**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA
U.S. Department of Justice, Antitrust Division
450 Fifth Street N.W., Suite 4000
Washington, DC 20530

STATE OF ARIZONA
2005 N. Central Avenue
Phoenix, AZ 85004

STATE OF ARKANSAS
323 Center Street, Suite 200
Little Rock, AR 72201

STATE OF CALIFORNIA
300 South Spring Street, Suite 1702
Los Angeles, CA 90013

STATE OF COLORADO
1300 Broadway, 7th Floor
Denver, CO 80203

STATE OF CONNECTICUT
165 Capitol Avenue
Hartford, CT 06106

DISTRICT OF COLUMBIA
400 Sixth Street, N.W.
Washington, DC 20001

STATE OF FLORIDA
PL-01 The Capitol
Tallahassee, FL 32399-1050

STATE OF ILLINOIS
115 S. LaSalle Street, Floor 23
Chicago, IL 60603

STATE OF MARYLAND
200 St. Paul Place, 19th Floor
Baltimore, MD 21202

**COMPLAINT**

1:24–cv–3973

JURY TRIAL DEMANDED

COMMONWEALTH OF
MASSACHUSETTS
One Ashburton Place, 18th Floor
Boston, MA 02108

STATE OF MICHIGAN
525 W Ottawa St.
Lansing, MI 48933

STATE OF MINNESOTA
445 Minnesota Street
Saint Paul, MN 55101

STATE OF NEVADA
8945 West Russell Road., Suite 204
Las Vegas, Nevada 89148

STATE OF NEW HAMPSHIRE
1 Granite Place South
Concord, NH 03301

STATE OF NEW JERSEY
124 Halsey Street, 5th Floor
Newark, NJ 07101

STATE OF NEW YORK
28 Liberty Street
New York, NY 10005

STATE OF NORTH CAROLINA
P.O. Box 629
Raleigh, NC 27602

STATE OF OHIO
30 E. Broad Street, 26th Floor
Columbus, OH 43215

STATE OF OKLAHOMA
15 West 6th Street
Suite 1000
Tulsa, OK 74119

STATE OF OREGON
1162 Court Street, N.E.
Salem, OR 97301

COMMONWEALTH OF PENNSYLVANIA
Strawberry Square, 14th Floor
Harrisburg, PA 17120

STATE OF RHODE ISLAND
150 South Main Street
Providence, RI 02903

STATE OF SOUTH CAROLINA
P.O. Box 11549
Columbia, South Carolina 29211

STATE OF TENNESSEE
P.O. Box 20207
Nashville, TN 37202

STATE OF TEXAS
P.O. Box 12548
Austin, TX 78711-2548

COMMONWEALTH OF VIRGINIA
202 N. 9th Street
Richmond, VA 23219

STATE OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188

STATE OF WEST VIRGINIA
1900 Kanawha Boulevard East
Capitol Complex
Building 6, Suite 401
Charleston, WV 25305

STATE OF WISCONSIN
P.O. Box 7857
Madison, Wisconsin 53707

and

STATE OF WYOMING
109 State Capitol
Cheyenne, WY 82002,

*Plaintiffs*,

v.

LIVE NATION ENTERTAINMENT, INC.
9348 Civic Center Drive
Beverly Hills, CA 90210

and

TICKETMASTER L.L.C.
9348 Civic Center Drive
Beverly Hills, CA 90210,

*Defendants.*

**Table of Contents**

I.    Introduction ................................................................................................ 2

II.   Defendants Live Nation and Ticketmaster ......................................... 8

III.  Industry Background.................................................................................. 9

   A.   How Live Concerts Work ....................................................................... 9

   B.   Money Flows Across the Live Entertainment Industry ................................. 16

   C.   Live Nation's "Flywheel" ...................................................................... 23

   D.   History of Live Nation and Ticketmaster................................................ 27

IV.   Live Nation Maintains Monopolies and Market Power Across the Live Concert
Ecosystem Through an Anticompetitive and Exclusionary Course of Conduct......................... 30

   A.   Oak View Group: Nascent competitor to a self-described "hammer" for Live Nation. 31

   B.   Live Nation threatens rivals to blunt expansion into U.S. concert promotions. ........... 34

   C.   Using "carrots" and "sticks," Live Nation locks venues into exclusive, long-term
   ticketing agreements with Ticketmaster that shut out competition. ......................................... 36

   D.   Ticketmaster's long-term exclusive agreements with venues are designed to lock up
   share and lock out competition, which forecloses a substantial share of primary ticketing
   markets.................................................................................................... 40

   E.   Live Nation restricts access to its venues unless Live Nation is paid
   to be the promoter. ..................................................................................... 45

   F.   Live Nation strategically acquires promoters, venues, and festivals to eliminate
   rivals, expand its network, and grow its "moat."....................................................... 46

V.    Anticompetitive Effects and Competitive Harm................................. 53

VI.   Relevant Markets and Monopoly Power......................................... 57

   A.   Primary Ticketing Services Markets ..................................................... 59

      i.    Primary Ticketing Services to Major Concert Venues........................... 60

      ii.   Primary Concert Ticketing Offerings to Fans at Major Concert Venues...................... 64

   B.   Concert Promotions Services Markets .................................................. 69

      i.    Concert Booking and Promotion Services to Major Concert Venues........................... 69

      ii.   Promotion Services to Artists......................................................... 72

   C.   Artist Use of Large Amphitheaters ...................................................... 74

VII.  Jurisdiction, Venue, and Commerce ...................................................... 76

VIII. Violations Alleged ................................................................................. 78

IX.   Request for Relief ................................................................................. 102

X.    Demand for a Jury Trial ........................................................................ 104

I.      **Introduction**

1.      One monopolist serves as the gatekeeper for the delivery of nearly all live music in America today: Live Nation, including its wholly owned subsidiary Ticketmaster. In Live Nation's words, it is the "largest live entertainment company in the world," the "largest producer of live music concerts in the world," and "the world's leading live entertainment ticketing sales and marketing company." Indeed, Live Nation is all these things, to the detriment of fans, artists, venues, and competition.

2.      Today, musical artists must rely on promoters, venues, and ticketers to organize the business of playing live music. These service providers should work to serve the interests of artists and fans. Genuine competition for and among these service providers would generate the best, most cost-effective, and fan-friendly experience. But the world live music fans live in today is far from that.

3.      Live Nation directly manages more than 400 musical artists and, in total, controls around 60% of concert promotions at major concert venues across the country. Live Nation also owns or controls more than 265 concert venues in North America, including more than 60 of the top 100 amphitheaters in the United States. For comparison, its closest rival owns no more than a handful of top amphitheaters. And, of course, through Ticketmaster, Live Nation controls roughly 80% or more of major concert venues' primary ticketing for concerts and a growing share of ticket resales in the secondary market.

4.      The live music industry, like other heavily concentrated industries, is largely controlled by a well-known group of insiders who lead multiple interconnected companies with numerous conflicts of interest. These insiders have spent decades amassing, fortifying, and exercising power, particularly against anyone who seeks to disrupt the now-standard industry business practices and conduct. These business practices can, and often do, work against the

interests of those with relatively little power and influence, especially working musicians and fans. These insiders often speak to each other, and work together, as allies and partners rather than as vigorous competitors.

5.      With this vast scope of power comes influence. Live Nation and its wholly owned subsidiary, Ticketmaster, have used that power and influence to insert themselves at the center and the edges of virtually every aspect of the live music ecosystem. This has given Live Nation and Ticketmaster the opportunity to freeze innovation and bend the industry to their own benefit. While this may be a boon to Live Nation's bottom line, there is a real cost to Americans. As described in detail below, today Live Nation possesses and routinely exercises control over which artists perform on what dates at which venues. Through Ticketmaster, Live Nation also possesses and exercises control over how fans are able to purchase tickets to see their favorite artists in concert and what fees those fans will pay to do so. Artists and fans as well as the countless people and other services that support them suffer from the loss of dynamism and growth that competition would inevitably usher in.

6.      As this Complaint describes in detail, through a self-reinforcing "flywheel" that Live Nation-Ticketmaster created to connect their multiple interconnected businesses and interests, Live Nation and Ticketmaster have engaged in numerous forms of anticompetitive conduct. That anticompetitive conduct includes the following:

a.      **Relationship with Oak View Group.** Live Nation-Ticketmaster exploits its longtime relationship with Oak View Group, a potential competitor-turned-partner that has described itself as a "hammer" and "protect[or]" for Live Nation. In recent years, Oak View Group has avoided bidding against Live Nation for artist talent and influenced venues to sign exclusive agreements with Ticketmaster. For example, Live Nation has

3

scolded Oak View Group multiple times for trying to compete. In one instance, Live Nation asked, "who would be so stupid to . . . play into [an artist agent's] arms," and on another occasion, Live Nation stated, "let's make sure we don't let [the artist agency] now start playing us off."

      b.    **Retaliating Against Potential Entrants.** Live Nation-Ticketmaster successfully threatened financial retaliation against a firm unless it stopped one of its subsidiaries from competing to gain a foothold in the U.S. concert promotions market.

      c.    **Acquiring Competitors and Competitive Threats.** Live Nation-Ticketmaster strategically acquired a number of smaller and regional promoters that it had internally identified as threats. This has undermined competition and impacted artist compensation.

      d.    **Threatening and Retaliating Against Venues that Work with Rivals.** Live Nation-Ticketmaster's power in concert promotions means that every live concert venue knows choosing another promoter or ticketer comes with a risk of drawing an adverse reaction from Live Nation-Ticketmaster that would result in losing concerts, revenue, and fans.

      e.    **Locking Out Competition with Exclusionary Contracts.** Live Nation-Ticketmaster locks concert venues into long-term exclusive contracts so that venues cannot consider or choose rival ticketers or switch to better, more, or cost-effective ticketing technology. These contracts allow Live Nation-Ticketmaster to reduce competitive pressure to improve its own ticketing technology and customer service.

      f.    **Blocking Venues from Using Multiple Ticketers.** Live Nation-Ticketmaster's conduct and exclusive contracts prevent new and different promotions and

ticketing competitors and business models from emerging. They block venues from being able to use multiple ticketers, who would compete by offering the best mix of prices, fees, quality, and innovation to fans.

g.    **Restricting Artists' Access to Venues.** Live Nation-Ticketmaster has increasingly gained control of key venues, including amphitheaters, through acquisitions, partnerships, and agreements. Live Nation-Ticketmaster restricts artists' use of those venues unless those artists also agree to use their promotion services.

h.    **Acquiring Competitors and Competitive Threats.** Live Nation-Ticketmaster strategically acquired a number of smaller and regional promoters that it had internally identified as threats. This has undermined competition and impacted artist compensation.

7.    Taken individually and considered together, Live Nation's and Ticketmaster's conduct allows them to exploit their conflicts of interest—as a promoter, ticketer, venue owner, and artist manager—across the live music industry and further entrench their dominant positions. Because Live Nation and Ticketmaster control so much of the concert-going experience, would-be rivals must compete at scale across different levels of the concert ecosystem, raising barriers to competition even further and requiring multi-level entry by existing and would-be competitors.

8.    The real world, practical costs of Live Nation's strategy are well-known. Public frustration with concert ticket pricing and sales is a constant drumbeat. The fees that must be paid to attend a live concert in America far exceed fees in comparable parts of the world. Any fan who has logged onto Ticketmaster's website to buy a concert ticket knows the feeling of

shock and frustration as the base cost of the ticket increases dramatically with the addition of fees to include:

> a.      "service" or "convenience" fees,
>
> b.      "Platinum" fees,
>
> c.      "VIP" fees,
>
> d.      "per order" or "handling" fees,
>
> e.      "payment processing" fees,
>
> f.      "facility" fees, and/or
>
> g.      any other fee or tax Ticketmaster collects from the fan, often with a cut of that fee going back to Ticketmaster.

9.      Whatever the name of the fee and however the fees are packaged and collected, they are essentially a "Ticketmaster Tax" that ultimately raise the price fans pay.

10.     Live Nation's anticompetitive conduct has not only harmed fans in the form of more and higher fees, but also undermines innovation. Competition increases the array and quality of services available and makes it easier for fans to find and see artists they love. Unburdened by competition on the merits, Ticketmaster does not need to invest as much to improve the fan experience.

11.     Live Nation and Ticketmaster understand the benefits a more open and competitive ticketing ecosystem would bring to fans and others. For example, in 2022, Ticketmaster evaluated and recognized that a more open, non-exclusive ticketing system—in essence, ending its preferred exclusive primary ticketing relationships—could lead to more competition and threats to its dominance. Instead, Ticketmaster has focused on adding new restrictions to its ticketing systems to force fans to interact with Ticketmaster and thereby

facilitate Ticketmaster's ability to increase the amount of data it collects from fans. This, of course, benefits not only Ticketmaster but also the vast array of related Live Nation businesses and feeds the Live Nation-Ticketmaster flywheel. According to Live Nation's CEO, Ticketmaster "now not only know[s] the person that bought the ticket, but [also] those three people that you are taking to the show, which we [Live Nation] have not known historically." Its data supremacy over rivals has only accelerated.

12.     The impact of the diminished incentive to innovate can manifest in real ways. Without competitive pressure to spur investment and innovation, customer service, website and app design, and product quality and stability suffer. These harms are the natural and predictable consequence of an industry suffocating under monopoly.

13.     The United States and certain States previously tried to protect what should be a dynamic, thriving industry through a Clayton Act Section 7 case and resulting consent decree in 2010, followed by an amended consent decree in 2020. Notwithstanding the prior case under Section 7 of the Clayton Act, Live Nation and Ticketmaster have violated other antitrust laws, namely the Sherman Act, through additional, different, and more expansive forms of anticompetitive conduct and exclusionary practices.

14.     Live Nation's monopoly, and the anticompetitive conduct that protects and maintains its monopoly, strikes a chord precisely because the industry at stake is one that has for generations inspired, entertained, and challenged Americans. Conduct that subverts competition here not only harms the structure of the live music industry and the countless people that work in that industry, but also damages the foundation of creative expression and art that lies at the heart of our personal, social, and political lives.

15.     It is often said that music requires little more than "three chords and the truth." In our modern economy, the live music industry requires that plus competition. Restoring competition protects the ability of working artists and fans to meaningfully access, afford, and engage with music and each other. Addressing and stopping anticompetitive conduct is also essential to ensure the vibrancy of live music. The United States and the Attorneys General of Arizona, Arkansas, California, Colorado, Connecticut, the District of Columbia, Florida, Illinois, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Hampshire, New Jersey, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Virginia, Washington, West Virginia, Wisconsin, and Wyoming hereby seek relief from this Court, including structural relief, to stop the anticompetitive conduct arising from Live Nation's monopoly power.

**II.     Defendants Live Nation and Ticketmaster**

16.     According to its 2023 securities filings, Defendant Live Nation Entertainment, Inc. is the "largest live entertainment company in the world," the "largest producer of live music concerts in the world," and "the world's leading live entertainment ticketing sales and marketing company," and it owns, operates, leases, has equity interest in, or has exclusive booking rights for or significant influence over 373 venues globally and more than 265 in North America. This includes more than 60 of the top 100 amphitheaters in the United States that Live Nation either owns or controls through long-term leases or for which it has the exclusive right to determine who performs at the venue. Control over a venue not only confers on Live Nation the ability to dictate whether fans can see a particular artist they love, but in many cases also provides Live Nation control over many aspects of the concert experience and a host of additional revenue streams ranging from sponsorships to food and beverage sales.

17.     Live Nation's business brings in over $22 billion dollars in revenue a year globally. Live Nation divides its business into three segments: Concerts (e.g., promotions, venue management, and music festival production), Ticketing (e.g., Ticketmaster business), and Sponsorship and Advertising. In 2023, Live Nation generated $18.8 billion in Concerts revenue, $2.9 billion for Ticketing, and $1.1 billion for Sponsorship & Advertising.

18.     Defendant Ticketmaster L.L.C. is a wholly owned subsidiary of Live Nation (collectively referred to as "Live Nation" herein). Ticketmaster provides primary and secondary ticketing services, which are responsible, respectively, for selling tickets to fans in the first instance for a show and allowing fans to resell those tickets at a later time. Ticketmaster is by far the largest concert ticketing company in the United States for major concert venues, at least eight times the size of its closest competitor.

## III.    Industry Background

### A.  How Live Concerts Work

19.     Today's live music concerts are complex productions involving thousands of choices to bring together artists and their fans on a particular date and time. Staging a single concert at a major concert venue—let alone an entire tour—involves months of preparation and requires the orchestrated support of many intermediaries in multiple roles. Among the decisions that will most impact the overall experience of fans include what venue will host a particular live music experience, who will promote the event, and who will ticket the event.



20.    The planning of a concert predictably begins with an **artist**[1] who decides to share her music and the artistic vision for the presentation of that music with the world and, specifically, with her fans. For artists, the decision to perform live and share music in this medium is an important opportunity to publicly display their art, but also to generate and continue to cultivate enduring relationships with their fans who appreciate and patronize that art. The overall experience associated with what music to present and, critically, how to present it, allows artists to express their artistic vision in a way that will resonate with fans. While artists strive to ensure fans at a single show appreciate their art, they also work to cultivate that fan base over the long run. This allows artists to maximize their ability to earn money over the arc of their career as compensation for their creative labor, whether it is through more concerts, the sale of more tickets at larger concerts, or the sale of merchandise and other related products and

---

[1] As used in this Complaint, "artist" refers to both musicians and comedians, who make similar choices in planning their performances and face similar competitive conditions.

services. As is often publicly reported, the income earned from concerts generally represents a substantial part of artists' compensation for their creative and performance labor.

21.     **Managers and/or agents** typically assist artists to achieve these goals. Managers and agents guide artists' professional lives, including touring, and are often compensated based on a share of the artist's revenues or profit streams. Live Nation manages more than 400 artists in the United States, and in that capacity works with artists, along with other industry intermediaries, to shape their tours and price tickets. One of the founders of Oak View Group, a leading venue development company that partners with Live Nation, also owns a company that is a major manager of artists in the United States music industry.

22.     In the modern era, once an artist decides to perform a concert or go on tour, the first major decision they must make, alongside their manager or agent, is to contract with one or more **promoters**. Promoters are primarily responsible for arranging the concert or tour and promoting the event to the public. Promoters provide a variety of services, including working with artists and their managers and/or agents to help choose the venue(s) to host the concert or tour and determine ticket prices, promoting the concert to the public, and shouldering the financial risk and potential upside if the show or tour underperforms/overperforms in terms of profitability. Promoters are also generally responsible for facilitating payments to the artist, venue, and other vendors associated with the concert or tour.

23.     Artists historically used different promoters for each show in a new city or region of the country. Today, while local promoters may book one or a handful of shows in a local market, touring artists typically use national promoters—principally Live Nation and AEG Presents (a subsidiary of Anschutz Entertainment Group Inc. ("AEG"))—as they can offer a single packaged tour deal. These deals often include a larger, upfront guaranteed payment to the

artist for a national tour with multiple shows across many markets as compared to one-off shows in a single city or region. Through tour deals, national promoters reduce their own risk of not generating enough revenue to cover the artist's guarantee by, in effect, using the profits of successful shows to mitigate the losses of unsuccessful shows within an artist's tour.

24.     Live Nation and its much smaller rival (less than half the size, although even that overstates its competitive significance), AEG, are the two largest concert promoters in the United States. Both Live Nation and AEG also separately provide and are compensated for providing primary ticketing services to venues. No other promoter in the United States can rival their venue networks, scale, reach, and connections to compete to promote national tours for major artists on a regular basis.

25.     The second major decision an artist—supported by their manager and/or agent— must make is which concert **venues** to use at various stops on a national tour. Concert venues are the physical spaces or facilities that host live music. Venues compete to attract artists to perform at their facility, and artists may choose where to perform based on a variety of characteristics, including the venue's ambiance, capacity, location, and acoustics. Sometimes a venue owner separately contracts with a promoter, like Live Nation, to provide that promoter with financial incentives for booking and promotions services over an extended period of time, which predictably can lead a promoter to steer artists it promotes to perform at the venue. Other times venues provide these incentives on a show-by-show basis.

26.     Venue owners can either operate the facility themselves or hire a management company to operate it. Venue operators provide and maintain the facilities where concerts are held and oversee the venue's services, such as concessions, parking, security, and artist merchandising. Venue operators usually charge the artist and their promoter rent to use the

facility to perform a concert, and the venue operator often works directly with the artist in providing related ancillary services, such as the staging and lighting of a show.

27.     Most artists start their careers performing at smaller venues like clubs or theaters, which offer limited capacities, but at generally lower costs. These venues allow newer artists to develop and grow a relationship with their fans in more intimate settings before moving on to larger venues as their "draw" of fans increases. As artists grow their fan base, they graduate to larger venues. Major concert venues include large amphitheaters and arenas that are particularly suited to hosting live concerts for popular artists due to their capacity, infrastructure, and amenities. Concerts are a vital source of revenue for these venues.

28.     Live Nation owns, operates, or otherwise controls more than 265 venues across North America. For many years, Live Nation has been the single largest—and growing—owner of American clubs and theaters, which gives it the unique ability to capture artists early in their careers. As artists grow their popularity, this early access enhances Live Nation's ability to funnel artists through the vast array of Live Nation products and services in the modern live music ecosystem. Live Nation's control over access to so many popular venues across the country gives it outsized power and control in this industry.

29.     Large **amphitheaters**, in particular, are attractive venues for certain popular artists. Amphitheaters are outdoor venues, which allow artists to take advantage of warm weather in the summer months when many artists prefer to tour. Many touring artists like amphitheaters because they generally offer a balance between more seating than clubs and theaters at a more lucrative compensation and more affordable prices for fans, and a more curated and intimate artistic experience than arenas or large festivals. Large amphitheaters are especially attractive to artists who have graduated from clubs and theaters, but are not yet able to fill higher-capacity

arenas on a consistent basis. They also may be attractive to artists who once played in arenas or stadiums but are no longer able to attract the same audience size.

30.     Live Nation controls more than 60% of large amphitheaters in the United States. Live Nation owns, operates, or exclusively books at least 40 of the top 50 and 60 of the top 100 amphitheaters in the United States. No other company in the United States owns more than a handful of amphitheaters, even those with an otherwise sizeable portfolio of arenas.

31.     Today, almost all major concert venues contract with a **primary ticketer** to handle the sale of tickets. Primary ticketers orchestrate the sale of tickets to fans. In the past, tickets for major concert venues were sold through call centers, retail outlets, and box offices, all of which could be operated or offered by different parties. Today, most tickets are sold through the internet and mobile applications and the most common delivery method is electronic delivery to fans' mobile phones. The vast majority of major concert venues have an exclusive arrangement with a primary ticketer, most often Ticketmaster, who is entitled to manage and sell tickets on behalf of the initial rights holder—for concerts, this is typically the artist—for all events at that venue. The primary ticketer manages ticketing inventory and provides the technology for online ticketing, accounting, payment processing, and other administrative capabilities.

32.     Live Nation's subsidiary, Ticketmaster, is the largest primary ticketer in the United States. AEG operates AXS, the second largest primary ticketer in the United States, although it is much smaller than—less than a fifth of the size of—Ticketmaster. Ticketmaster's dominance is especially apparent among major concert venues. In 2022, Ticketmaster's share of primary ticketing for NBA and NHL arenas exceeded 70%, with AXS and SeatGeek trailing. In the past ten years, AXS has not moved a single arena away from Ticketmaster. Live Nation's

conduct, including its financial and commercial relationship with venue manager Oak View Group and the conditioning of access to artists on a venue's selection of primary ticketer, vitiates many venues' ability to select a primary ticketer on the merits of its ticketing service, significantly disadvantaging Live Nation's rivals when they compete for primary ticketing contracts.

33.    In light of existing market dynamics and Live Nation's conduct, it has been and remains rare for venues in the United States to be "open," which would mean that the dynamism of competition would decide what primary ticketer wins the contract for a particular concert at a particular venue. Instead, primary ticketers, notably Ticketmaster, typically contract to be the exclusive ticketer for a major concert venue for a period of many years, offering venues up-front payments in the form of signing bonuses and sponsorships. Indeed, Ticketmaster's exclusive contracts cover more than 60% of ticket sales to major concert venues and more than 75% of concert ticket sales to major concert venues. These exclusive agreements contractually bar any option of having more than one ticketing company offering differentiated services to fans at such venues for a single show or even across shows, with very limited exceptions. This model that locks in the certainty of exclusivity over the dynamism of open competition is an intentional business strategy found in the Ticketmaster-dominated primary ticketing market in the United States, but does not burden competition for such services in many other parts of the world not dominated by Ticketmaster.

34.    In other countries, many venues are "open." For instance, in France, concert tickets are often held in a central inventory management system that is accessible by multiple ticketing companies. And in the United Kingdom, a promoter often allocates bundles of tickets to multiple ticketing providers. No matter the form it takes, an "open" system means that artists,

whose incentives for a lower-cost, higher-quality concert experience are more closely aligned with fans, are more likely to play a role in choosing the ticketing company of their choice.

35.     In addition to the primary ticketer, fans can buy tickets through a **secondary ticketing platform**, where individual ticket holders, season ticket holders, or businesses can re-sell tickets to other fans. Secondary ticketing platforms earn revenue through fees paid by the seller of the ticket and, usually, fees paid by the buyer of the ticket as well.

36.     Ticketmaster's ticketing agreements with a venue sometimes entitle Ticketmaster to control secondary ticketing services in addition to primary ticketing services. Ticketmaster's overall share of resale tickets in North America has grown rapidly since 2019, accounting for nearly one third of ticket resales in 2022. Ticketmaster's rapid increase in secondary market share coincided with its launch of SafeTix technology in or about 2019. SafeTix technology requires that all transfers occur within the Ticketmaster platform. This technology makes it harder for fans to use rivals' secondary ticketing platforms to resell tickets, pushing them instead to the Ticketmaster resale platform.

### B.  Money Flows Across the Live Entertainment Industry

37.     Today, artists who perform at a live concert must navigate a complex web of contracts, business relationships, and money flows across numerous intermediaries and participants. These arrangements often result in fees and charges being split among various industry participants in ways that are not always visible to artists, let alone to fans. Importantly, many of these contracts are interdependent, such that increases to one incentivize or directly influence increases in other areas. And at times, the convoluted web of agreements results in one entity paying on behalf of another, only to then recoup portions of those funds for its own benefit.

38.     Today, **fans** pay more in fees associated with live music concert tickets in America than other parts of the world.

39.     An intermediary, like Live Nation, makes money through a series of interconnected agreements it enters into with artists, venues, rival promoters, and fans by virtue of the many "hats" it wears across the industry. Through these agreements, Live Nation has constructed a live entertainment ecosystem in which Live Nation can not only extract revenues at every stage as an intermediary, but on many occasions, also double-dip across multiple business lines—for example, as both a ticketer and a promoter—creating a feedback loop that inflates its fees and revenue, all at the expense of fans.

40.     **Promoters** like Live Nation generate revenue primarily through a pre-agreed split of the gross ticket sales of a show or tour with the **artist** as well as through payments made by **venues** to incentivize the promoter to route its artists to perform at a particular venue.

41.     When trying to secure the right to promote an artist's tour, a promoter and artist often negotiate over the artist's guaranteed payment and the profit split of certain additional concert revenues. For example, Live Nation typically pays an artist the higher of either (1) a percentage of the gross ticket sales less expenses or (2) the artist's guaranteed payment. Guaranteed payments are typically based on the number of performances in the tour, length of the promotion contract, and projected ticket sales, while the percentage of the gross ticket sales less expenses is a set percentage. Live Nation will also enter into some multi-tour deals where the artist will earn even larger cash advances today in exchange for the right to promote the artist exclusively for a certain number of performances or a specific amount of time. While Live Nation sweetens the upfront incentives for certain artists by offering these larger cash advances, they extract recompense in other parts of the ecosystem by, for example, routing their promoted

artists through Live Nation's owned and controlled venues or venues exclusively ticketed by

Ticketmaster. For other artists, Live Nation typically conditions use of its owned or controlled

venues (especially large amphitheaters) on an artist signing with Live Nation as promoter.

42.     In addition to contracting with artists for promotion services, Live Nation, as a

**promoter**, also frequently and separately contracts with **venues** to provide booking and

promotions services, in exchange for a cut of the venue's revenues associated with the shows it

brings to the venue and, occasionally, even a cut from shows that rival promoters bring to the

venue. These agreements can come in a variety of forms and are known as "rebate deals," "co-

promotion deals," or "drawbacks." These revenues generally are not added to the pool of money

Live Nation splits with artists. In fact, some of these payments functionally remit money back to

Live Nation that Live Nation initially paid to venues on behalf of its artists (e.g., facility rental

fee rebates). These deals—through which Live Nation can essentially claw back a show's

expenditures—reflect Live Nation's power over venues, derived from its influence over artists'

decisions about what venues to play and when. Over the past few years, Live Nation has

continued to increase its concert promotions fees imposed on venues, which are passed through

to fans.

43.     Ticketmaster, as **primary ticketer**, collects both the face value of the ticket as

well as a host of fees tacked on top of the face value ("primary ticketing fees"). Ticketmaster,

owned by Live Nation, retains a portion of the fees. The remaining fees are remitted to other

intermediaries like the venue and promoter, which are often Live Nation-owned entities,

amounting to paying several of these fees (or portions thereof) to itself.

44.     **"Ticketing" Fees.** Americans are well-acquainted with the numerous and

different fees appended to the cost of a single ticket to attend a concert today. The numerous fees

that are added on top of each other—often with little visibility offered to the fan buying the ticket—contribute to Live Nation's nearly 40% adjusted operating margin in 2023 for its global ticketing business. In addition to charging those fees, Ticketmaster often offers consumers the ability to purchase ticket insurance and "upsells" (such as the option to add parking) at checkout, and it retains a "cut" of these revenues as well. The fees can include, for example:

- *"Service" or "Convenience" Fees*. Service fees, sometimes called convenience fees, are negotiated between the venue and the ticketer and can be set in a variety of ways. Sometimes the ticketer will receive an agreed-upon dollar amount and/or an agreed-upon percentage of the service fee. Alternatively, the venue and ticketer might agree in advance as to the actual fee that the fan will pay for any event and how to split that. Sometimes, the ticketer will receive a fee based on the face value of the ticket. Under any of those models, the ultimate fee that the consumer pays results from the negotiation between the ticketer and the venue. Generally, under these models, the higher the ticket price, the higher the ticketing fee. As a result, the fee has no meaningful relation to the actual cost of providing the ticketing service, which would not vary ticket by ticket or show by show.

- "*Platinum" and "Pricemaster" Fees*. Not all primary tickets, however, are subject to the typical "service" fees. Ticketmaster has two dynamic pricing tools, Platinum and Pricemaster. For tickets that are dynamically priced by Ticketmaster, consumers often pay higher ticketing fees. Ticketmaster additionally receives an "inside fee" from the promoter amounting to a double dip by Ticketmaster.

- *"Per Order" (or "Handling") Fees*, which are additional ticketing service fees charged on top of each order, separate and apart from the ticketing fees embedded in the service charge. These are often split between the ticketer and the venue.

- *"Payment Processing" Fees*, which are additional fees charged on certain transactions for processing the electronic payment inherently necessary to purchase any electronically delivered ticket.

- *"Facility" Fees*, which are fees charged by some venues and typically remitted in full to the venue.

Although venues retain some proportion of ticketing fees described above, a significant proportion of the venue's share is often passed onto promoters, like Live Nation, to incentivize them to steer content to their venue.

45.     The face values of tickets are typically set or approved by artists, although promoters' offers also influence face values. Artists, in consultation with their manager and the promoter (either or both of which might be Live Nation employees), can also decide to enable dynamic pricing through Ticketmaster's two dynamic pricing tools, Pricemaster and Platinum, which allow face values to increase based upon the level of demand for a given concert. Promoters and venues use Ticketmaster's Pricemaster tool for "bulk" dynamic pricing of groups of seats, while Platinum tickets, on the other hand, are used to dynamically price at the seat level. For tickets that are dynamically priced by Ticketmaster, whether as bulk or at the seat level, consumers often pay much higher face values. Ticketmaster has a pricing team that makes pricing recommendations—including recommendations as to average and minimum face value of tickets. And typically, it is Ticketmaster's own pricing team that adjusts the face value of tickets based on demand for a particular show.

46.     **Venues** earn revenue by renting their facilities to the artist and promoter, selling food, beverages, and merchandise to patrons, collecting ticketing and parking fees, and—sometimes—by sharing in the profit from concerts through co-promotion agreements with promoters such as Live Nation. When venues set aspects of ticket fees, they must not only account for their own operating costs, but also ensure the fees are sufficient to cover all the payments the venues must make to intermediaries like promoters and ticketers. For example, venues must ensure the additional ticket fees cover the fee charged by the primary ticketing service (generally Ticketmaster) and offset the various payments they must make to the promoter (often Live Nation). Because of the interrelated nature of contracts in the industry, money often flows in multiple directions to and from various intermediaries, sometimes in both directions for a single show.

47.     Live Nation tells the public that the service fees are decided by the venue. While it is nominally true that "[t]he venue decides on the service fees," in reality, these decisions are predicated upon the portion of those fees that Live Nation (via Ticketmaster) will retain in the first instance—an amount Live Nation negotiates with each venue in advance of the venue setting the amount of the fee. This arrangement is consistent with the many other fees extracted at various stages; those fees may superficially be set by a market participant other than Live Nation or Ticketmaster, but Live Nation and Ticketmaster nonetheless have a hand in setting nearly all these fees and often benefit financially from a significant portion of these fees.

48.     In other words, Live Nation's various contracts operate together to drive up the overall number and size of fees paid by fans. For example, under many Ticketmaster contracts, when venues increase their own fees to offset Live Nation's concert promotion charges, Ticketmaster is entitled to receive a "ticketing" fee. This double-dip by Live Nation (as

promoter) and Ticketmaster (as ticketer) means venues have to raise fan-paid fees just to offset Live Nation's promotions charges. For example, a venue forced to pay Live Nation a $5 promotions rebate and Ticketmaster a portion of any increased fees would need to raise fees on fans by significantly more than $5 to break even.

49.     **Secondary ticketing** providers earn revenue through fees paid by the seller of the ticket and, usually, the buyer of the ticket as well. Ticketmaster provides secondary ticketing services via "TM+" to venues when it provides primary ticketing services to the venue hosting the event. Ticketmaster also sells secondary tickets via its "3PE" tool when it does not provide primary ticketing services to the venue hosting the event.

50.     In addition to the fees Live Nation extracts under its ticketing and promotions contracts, Live Nation also generates significant revenues from its **sponsorship and advertising** business. Live Nation takes advantage of its vast network of venues and high volume of tickets to secure substantial sponsorship and advertising revenue—further deepening its pool of profits. It sells signage rights, online advertising, beverage pouring rights, venue-naming rights, and more. Live Nation considers its sponsorship and advertising business to be one of its high-margin businesses.

51.     Live Nation is able to extract significant revenues through its sponsorship and advertising business in part by controlling access to fans at performances where advertisers want to reach them. By controlling the vast majority of large amphitheaters in the United States—pushing concerts to venues it owns, operates, and/or exclusively tickets; locking in key artist talent; and growing the massive data trove it has accumulated as a ticketer—Live Nation is able to drive substantial advertising revenue that feeds the rest of its business.

### C.  Live Nation's "Flywheel"

52.     Founded in 1996, Live Nation began as a live events promoter. Over the following three decades, Live Nation expanded its reach across nearly the entire live entertainment industry—live events promotions, primary ticketing, secondary ticketing, venue ownership and operations, music festivals, artist management, sponsorships, and more. Live Nation controls wide swaths of live music in the United States because of its multidimensional power.

53.     Live Nation uses its concert promotion business—the core of its "flywheel"—to feed its other high margin businesses, including Ticketmaster's ticketing business, Live Nation's network of venues, as well as Live Nation's sponsorship and advertising business.

54.     As Live Nation's CEO put it, concert promotion is the business that gives the company control over content that feeds Live Nation's three high margin businesses:

> At the core is our flywheel. It's the concert business . . . It's the lower margin part of our business. But in order to get into these three high margin businesses and be competitive, we have to have that scale [in concerts] . . . [Our] leadership position [in concerts] drives the three high margin businesses that are driving our true cash flow and EBITDA.

55.     The modified graphic below, based upon Live Nation documents, demonstrates how the flywheel entrenches Live Nation's profits and power.



56.     The modified graphic below, based upon Live Nation's public filings, demonstrates how this flywheel generates substantial revenues and profits across Live Nation's businesses.



57.     Live Nation wields its power in concert promotions to fuel and drive its primary ticketing business. This presents a Hobson's choice for major concert venues that Live Nation does not already own or otherwise control: either choose Ticketmaster as their exclusive provider of primary ticketing services and benefit from access to Live Nation concerts, or choose a rival ticketing company and risk losing access to Live Nation concerts. Losing access to even a portion of Live Nation's tours can seriously harm venues that rely on highly profitable concerts.

58.     Live Nation does not have to threaten individual venues explicitly (although it does) to discourage them from signing ticketing contracts with competitors. The risks are well-known in the industry, and Live Nation's topmost executives remain outspoken that Live Nation likely will steer concerts away from independent venues that do not select Ticketmaster as their ticketer. Live Nation's CEO publicly acknowledged as much in not-so-subtle terms:

> We can't say to a Ticketmaster venue that says they want to use a different ticketing platform, "If you do that, we won't put shows in your building." … [But] **we have to put the show where we make the most economics, and maybe that venue [that wants to use a different ticketing platform] won't be the best economic place anymore because we don't hold the revenue**.

59.     The power and profits from Live Nation's high-margin businesses (including Ticketmaster and Sponsorship & Advertising) help keep the flywheel spinning by financially fueling (what may appear on paper to be) Live Nation's less profitable promotions business. Live Nation can do this in a number of ways. For example, for top artists, Live Nation can use profits from other business lines to fund break-even or even unprofitable exclusive promotion contracts on a standalone basis to keep feeding the flywheel. Rival promoters often find themselves unable to match Live Nation's offers to artists because Live Nation can subsidize artist offers with profits from ticketing and other higher margin businesses. (Of course, some of Live Nation's exclusionary conduct also is aimed at weakening or eliminating rivals, and reducing the amount Live Nation needs to bid to win artists' business). At the same time, artists who do not choose

Live Nation to promote their shows or tours can find themselves locked out of Live Nation-owned and controlled venues, including Live Nation's large stable of amphitheaters that are more accessible for fans.

60.     Live Nation also uses consumer data—acquired through primary and secondary ticketing sales—to augment its ability to feed its flywheel. As Live Nation's CEO put it: "No one has 80 million customers segmented in a database as rich as ours . . . that audience and that platform is really the key, unique part of our business."

61.     As described below, Live Nation's conduct and anticompetitive scheme further creates and enhances barriers for rivals and nascent threats while cementing Live Nation's grip on nearly every corner of this ecosystem. Industry participants recognize that rivals must participate at scale and at multiple points of the concert ecosystem to compete effectively with Live Nation. For example:

- Live Nation's self-reinforcing conduct and power in promotions, ticketing, and venue access disadvantages rivals that do not have a similar portfolio of intertwined assets, increasing barriers for those that do not enter and expand in multiple markets simultaneously.

- Ticketing rivals must invest in and develop ticketing systems robust enough to handle high-demand on-sale events for popular artists, fraud/protection and credit card access for fans, and back-office support. Rival ticketers must also accumulate sufficient data to target, market, and advertise shows to fans, as well as sufficient working capital to secure business, all at a time when there are limited opportunities to even compete to dislodge Ticketmaster's monopoly that is

maintained by long-term, exclusive ticketing contracts and the content threat and thereby recoup this investment.

- Promotions rivals face similar obstacles. They need significant capital to fund tour payments (often millions of dollars), enough scale to hedge against the risk of any single tour failing, extensive relationships with artists, artist managers, agents, and venue operators (and, on the flip side, willingness of those market participants to use a competitor without the fear of retaliation by Live Nation or its surrogates), and enough experience and data from previous tours to make effective routing and pricing recommendations to artists.

### D. History of Live Nation and Ticketmaster

62.     SFX Entertainment, which later became Live Nation, was founded in 1996 and rapidly began rolling up smaller entertainment companies to consolidate power in concert promotions. That strategy continues today. As Live Nation's current CEO has explained, this strategy of consolidation "from day one" is part of the company's DNA: "we want to continually be the largest promoter in the world, have as many boots on the ground in as many cities and countries in the world as possible . . . ."

63.     Ticketmaster, Inc. was founded in 1976 as an independent ticketing company. It has been the largest primary ticketer for major concert venues for decades. Like Live Nation, Ticketmaster initially rose to power in part through a series of acquisitions that consolidated the company's dominant position in primary ticketing. Ticketmaster also expanded and cemented its dominance by pushing through changes to the structure of ticketing contracts that reduced competitive pressures to lower ticketing fees that are ultimately borne by fans.

64.     Ticketmaster restructured how ticketing companies get paid for their services. Venues used to pay ticketing service companies to ticket events. But in the early 1980s, Ticketmaster started passing more ticketing costs onto consumers (who effectively have no choice in selecting the ticketer) in the form of fees, and then sharing some of the additional revenue with venues. Second, Ticketmaster began paying venues large upfront advances in exchange for the exclusive, multi-year right to sell and distribute their tickets.

65.     On February 10, 2009, Live Nation (then known as Live Nation, Inc.) and Ticketmaster (then known as Ticketmaster Entertainment, Inc.), agreed to merge. At the time, Live Nation was an emerging direct competitor to Ticketmaster in primary ticketing services: after spending nearly two years evaluating, licensing, and developing its own ticketing platform, Live Nation had rapidly become America's second-largest primary ticketer at major concert venues.[2] Alleging the merger would likely substantially lessen competition in the provision and sale of primary ticketing services for major concert venues, the United States and nineteen states[3] filed a case challenging the merger under Section 7 of the Clayton Act, 15 U.S.C. § 18.[4] The parties agreed to a consent decree, entered as a final judgment in the Section 7 case on July 30, 2010, allowing the merger to proceed subject to certain conditions.[5]

---

[2] Amended Complaint at 5 ¶ 3, 13–14 ¶¶ 34–37, *United States et al. v. Ticketmaster Ent., Inc., et al.*, No. 1:10-cv-00139, Dkt. No. (D.D.C. Jan. 29, 2010), ECF No. 5.

[3] Specifically, the States of Arizona, Arkansas, California, Florida, Illinois, Iowa, Louisiana, Nebraska, Nevada, Ohio, Oregon, Rhode Island, Tennessee, Texas, Wisconsin, New Jersey, and Washington and the Commonwealths of Massachusetts and Pennsylvania. *Id.* at 1.

[4] *Id.* at 17 ¶ 46.

[5] Final Judgment, *United States et al. v. Ticketmaster Ent., Inc., et al.*, No. 1:10-cv-00139 (D.D.C. July 30, 2010), ECF No. 15.

66.     In January 2020, the United States filed a motion to modify the consent decree in the Section 7 case.[6] Ticketmaster and Live Nation denied the allegations but ultimately agreed to the United States' and some state co-plaintiffs' proposed amendments to the consent decree.[7] The court entered the amended consent decree as an amended final judgment that, among other things, partially extended the decree's effective date through December 31, 2025.[8] The court then closed the Section 7 case on February 29, 2020.[9] Several of the plaintiff states here were not parties to the 2010 or 2020 decrees.

67.     In the years since, Live Nation and Ticketmaster have committed additional, different, and more expansive violations of the antitrust laws compared to the narrower scope of the Section 7 case. As detailed below, Live Nation and Ticketmaster have engaged in ongoing unlawful monopolization of markets across the concert industry in violation of Section 2 of the Sherman Act and state analogues. For example, since 2020, Live Nation and Ticketmaster have unlawfully coopted actual and potential rivals to remove competitive threats and cement Live Nation's and Ticketmaster's dominance of the concert industry. In addition, as also detailed below, Live Nation and Ticketmaster have violated Section 1 of the Sherman Act and state analogues. For example, since 2020, Ticketmaster has entered into long-term exclusive ticketing agreements with venues. The Section 7 consent decree—which addressed a claim different from those at issue here—has failed to restrain Live Nation and Ticketmaster from violating other antitrust laws in increasingly serious ways.

---

[6] Motion to Modify Final Judgment and Enter Amended Final Judgment at 4, *United States et al. v. Ticketmaster Ent., Inc., et al.*, No. 1:10-cv-00139, Dkt. No. (D.D.C. January 8, 2020), ECF No. 22.

[7] *Id.* at 2.

[8] Amended Final Judgment, *United States et al. v. Ticketmaster Ent., Inc., et al.*, No. 1:10-cv-00139, Dkt. No. (D.D.C. Jan. 28, 2020), ECF No. 29.

[9] Minute Order, *United States et al. v. Ticketmaster Ent., Inc., et al.*, No. 1:10-cv-00139, Dkt. No. (D.D.C. Feb. 19, 2020).

IV.    **Live Nation Maintains Monopolies and Market Power Across the Live Concert Ecosystem Through an Anticompetitive and Exclusionary Course of Conduct**

68.    Live Nation maintains and exercises its power through a coordinated pattern of anticompetitive conduct that serves a variety of ends: expanding its scope and reach into every crevice of an increasingly more complex and interconnected ecosystem, eliminating rivals, continuing to increase barriers to entry, and inhibiting competition on the merits. Each act is exclusionary on its own. But the acts also work together across the ecosystem, enhanced by the flywheel and scale effects, to magnify the anticompetitive force of the scheme.

69.    Live Nation's strategy includes several forms of anticompetitive conduct across its various intermediary roles that work in harmony to protect Live Nation's power and keep rivals at bay. For example:

- Live Nation enters into agreements with rivals not only to remove them, but also to cement and expand its dominance.

- Live Nation engages in threats (directly or through intermediaries) and pressure campaigns to nullify rivals or nascent threats.

- Live Nation relies on "carrots and sticks" to induce venues to sign long-term exclusive ticketing contracts that offer durable protection for Ticketmaster's dominance. Venues have seen that if they sign with a Ticketmaster competitor, they risk losing lucrative Live Nation concerts and may suffer other harmful retaliation.

- Live Nation conditions artists' access to its vast and desirable network of amphitheaters and other venues on choosing Live Nation as the promoter, which enables the company to expand its control over artists and third-party venues alike.

30

- Live Nation removes and neutralizes potential competitors and nascent threats via acquisitions, joint ventures, and other contractual agreements.

   **A. Oak View Group: Nascent competitor to a self-described "hammer" for Live Nation.**

70.    Live Nation and Oak View Group have colluded and established a partnership to allocate business lines, avoid competing with each other, and chart a mutually beneficial plan to cement Live Nation's dominance. Oak View Group is a leading American venue development and management company uniquely positioned to compete against Live Nation. Oak View Group has a portfolio of over 200 venues in the United States, including more than 100 venues that it manages but does not own. It was founded in 2015 by two industry giants whose combined résumés include roles as the former CEO of AEG, the former CEO of Ticketmaster, the former chairman of Live Nation, and the owner of The Azoff Company, whose portfolio includes one of the world's leading artist management companies: Full Stop Management.

71.    Oak View Group's experience and relationships with venues and artists make it particularly well-suited to be a real competitor to Live Nation in the United States concert promotion business. Oak View Group's ownership structure also gives it a key asset any would-be promotions rival needs to compete against Live Nation: access to capital. In 2018, private equity firm Silver Lake invested $100 million in Oak View Group, in which it now holds a controlling stake.

72.    Unsurprisingly, then, Live Nation recognized Oak View Group's promotion capability by categorizing Oak View Group as one of its "Biggest Competitor Threats" shortly after Oak View Group was founded. Over time though, Oak View Group and Live Nation morphed from competitors into partners who found it easier and mutually beneficial to work together rather than compete. Oak View Group now operates as an agent and a self-described

"pimp" and "hammer" for Live Nation, often influencing venues and artists for the benefit of Live Nation. As Oak View Group's CEO recently emphasized to Live Nation's CEO, "[j]ust like I tell our folks we 100% always protect you and LN on your lanes," and "I always protect you on rebates, promotor position, ticketing." The cozy relationship between Live Nation and Oak View Group covers several areas that ultimately impact fans.

73.     First, Live Nation and Oak View Group have agreed to a competitive détente in concert promotions to avoid competition between the two companies over artists and tours. In 2016, for example, after learning that Oak View Group offered to promote an artist Live Nation had previously promoted, Live Nation's CEO immediately emailed Oak View Group, warning that such competition would only lead to artists demanding more compensation. He wrote: "whats up? We have done his [touring] and vegas[.] Let's make sure we don't let [the artist agency] now start playing us off." Oak View Group's CEO backed down: "Our guys got a bit ahead. All know we don't promote and we only do tours with Live Nation." Oak View Group's other co-founder followed up: "Growing pains," later noting that Oak View Group's executives "should never discuss comp [for artists]," and Oak View Group's talent buyers would work for Live Nation.

74.     This was not a one-off episode. In 2022, Live Nation's CEO again challenged the CEO of Oak View Group after learning that Oak View Group made another direct promotions offer: "who would be so stupid to do this and play into [the artist agent's] arms"? Oak View Group's CEO again backed down: "We have never promoted without you. Won't." Oak View Group's CEO later added that he was "[m]ore than happy to do these deals thru LN as I have always been aligned," and that "I never want to be competitors."

75.     As a Senior Vice President at Oak View Group explained to a colleague in 2019 when approached about potentially bidding on a tour: "It has been our policy to stay on the sidelines when it comes to buying and specifically promoting tour dates as we are cognizant not to compete with our partner Live Nation in this side of the business."

76.     Second, just as Oak View Group effectively ceded the concert promotions space to Live Nation, Live Nation effectively ceded its arena consulting business to Oak View Group.[10] Shortly after its founding, Oak View Group formed an alliance with venues to provide "insights and access to premier sports and live entertainment content," a venture that encroached on Live Nation's own consulting business, Live Nation Arenas. To relieve this competitive friction, Oak View Group's CEO proposed that Live Nation Arenas combine with Oak View Group and that the head of Live Nation Arenas join Oak View Group's alliance board of advisors, which he did. In his proposal, Oak View Group's CEO warned the head of Live Nation Arenas, "[w]e are experiencing Arena's that want to play us off one another."

77.     Live Nation identified three paths forward with regard to Oak View Group: "1) Lead 2) Follow 3) or get out of the way." Live Nation ultimately decided to "get out of the way" in deference to Oak View Group, just as Oak View Group agreed to get out of the way of Live Nation for promotions. In some instances, Live Nation Arenas and Oak View Group decided to partner with one another for agreements with venues, sharing the profits instead of competing for the contracts. The relationship between Live Nation and Oak View Group is so cozy that these venue partnerships were entered into on nothing more than verbal agreements. Through its venue development deals, venue management deals, and venue alliances, Oak View

---

[10] Arena consulting services are advisory services for venues that may include assistance with booking shows, selecting and working with promotors and ticketers, and getting sponsorship deals.

Group can help direct Live Nation content to venues across the country and demand or influence the use of Ticketmaster at these venues.

78.     Third, Live Nation exploits its long-term relationship with Oak View Group to flip venues to Ticketmaster, further cementing Ticketmaster's power. In 2022, Live Nation and Oak View Group entered into a long-term agreement. Since then, Oak View Group has recognized it has a significant financial interest in maintaining existing Ticketmaster contracts at its venues and converting other venues to Ticketmaster. Oak View Group has pushed through these new contracts, subverting the ticketer selection process Oak View Group runs on behalf of its clients. As Oak View Group's CEO explained to Live Nation's CEO, the deal "allows us to tie up all Owned and Operated facilities to 10 year deals, develop a standard A and B market deal for all future projects and to convert all OVG 360 deals to TM now or as they expire for 10 years… Appreciate the consideration and partnership and all of us will work diligently on this so we are always aligned with TM."

79.     Oak View Group projected it would flip at least 22 venues to Ticketmaster over the next four years. As venue manager, Oak View Group is able to control which non-incumbent ticketing services are invited to submit bids for ticketing service proposals and often only invites Ticketmaster. By advocating for Ticketmaster over rival ticketers, Oak View Group takes off the table several of the limited opportunities rival ticketers have to compete against Ticketmaster. So far, Oak View Group is on pace to hit its goal: in 2023 Oak View Group converted six venues to Ticketmaster.

**B. Live Nation threatens rivals to blunt expansion into U.S. concert promotions.**

80.     Live Nation also wields its power to keep other rivals from expanding in the concert promotions market in the United States. For example, in 2021, Live Nation threatened commercial retaliation against private equity firm Silver Lake, unless one of its portfolio

companies, TEG, stopped competing with Live Nation for artist promotion contracts in the United States. These threats ultimately succeeded, and Silver Lake has tried to sell TEG altogether.

81.     Prior to the TEG incident, Live Nation and Silver Lake had a relationship through Silver Lake's ownership of Oak View Group, which, as discussed above, became a functionary for aspects of Live Nation's anticompetitive scheme. But TEG's attempt to expand its role in the live music industry in the United States—a clear direct threat to Live Nation quickly threatened to sour that relationship.

82.     Live Nation's campaign to squash competition with TEG took place at the highest levels. In 2021, Live Nation's CEO complained to Oak View Group's co-founder that TEG was "[f]ull on competitors." Oak View Group, in turn, conveyed to Silver Lake that Live Nation was "not happy." Live Nation's CEO then escalated his complaints to Silver Lake directly, conveying: "I am all in on [Oak View Group] where the big play lies with venues – why insult me with this investment in ticketing/promotions etc."

83.     Later in 2021, Live Nation learned that TEG made offers to prominent artists in the United States and succeeded in securing a big-name artist for a concert at the Los Angeles Coliseum. In response, Live Nation used its exclusive ticketing deal with the venue to frustrate TEG's concert. For this concert, TEG reached an agreement with StubHub where TEG would sell a certain number of tickets on StubHub's platform. In response, Live Nation, through its subsidiary Ticketmaster, which purportedly was the exclusive ticketer for all shows at the venue, threatened to deny entry to any fan using a StubHub-issued ticket. Ultimately, StubHub stopped selling tickets and attempted to work with Ticketmaster to fulfill the tickets that it had already

sold. But Ticketmaster failed to fulfill many of those tickets to StubHub's customers, and hundreds of StubHub's customers were refused entry to the event.

84. After learning about the TEG concert, Live Nation's CEO again threatened Silver Lake, TEG, and Oak View Group. As Live Nation's CEO put it, he "fail[ed] to understand" why Silver Lake "continue[d] to invest in a business that competes with LN/OVG…." Live Nation threatened to pull its support from Oak View Group and instead back an Oak View Group competitor unless TEG stopped competing with Live Nation in the United States:

> I can assure you the OVG investment is a much bigger win then T[E]G …. LN declared to back OVG vs other developers or going solo and it's been a huge win for both sides– we have over 20 global arenas in development that neither could do without the other … do you really want LN backing [AEG's venue development and management company]…? Seems like a dumb trade off??

85. The co-founder of Oak View Group, who refused to allow TEG to promote any of his large roster of artist clients,[11] thereafter informed Live Nation that he was going to demand that Silver Lake sell TEG. Live Nation's CEO replied, "Love ya."

86. TEG soon stopped competing for concert promotions in the United States. Silver Lake now seems "intent on dumping teg" and has asked, through the founder of Oak View Group, whether Live Nation would be interested in purchasing TEG.

### C. Using "carrots" and "sticks," Live Nation locks venues into exclusive, long-term ticketing agreements with Ticketmaster that shut out competition.

87. Live Nation puts a "choice" to venues: use Ticketmaster and potentially receive a significant payment for long-term exclusivity or use another ticketer and risk losing access to the vast array of Live Nation assets, including lucrative concerts. Sometimes Live Nation is bold and communicates this threat directly. Other times, the expression of the threat may be implicit, but

---

[11] Oak View's co-founder also owns a large artist management company, Full Stop Management.

the meaning is self-evident. And in some circumstances, Live Nation deploys its extensive network of intermediaries to communicate this "choice." Sometimes, the "choice" does not have to be communicated at all. It is well understood across the live concert industry, as a result of Live Nation's historical conduct and exactly as Live Nation intended, that choosing ticketers other than Ticketmaster carries enormous risk and financial pain.

88.    Live Nation's reputation and history of retaliation are so well known in the industry that Live Nation does not have to (although it still does) explicitly threaten individual venues. Instead, its threats have become more public and generalized. As Live Nation's CEO told the industry in 2019, Live Nation's concert promotions business decides to host concerts "where we make the most economics," which usually means venues where Ticketmaster holds the primary ticketing contract. Venues considering primary ticketing options understand all too well the risks of switching to another ticketer, and some even model the loss they would suffer if they switched and lost access to some of Live Nation's concerts. The threat of steering shows away from venues allows Live Nation to exercise its monopoly power to get better promotions deals and impose Ticketmaster on venues.

89.    Live Nation has a number of punitive tools it can use to retaliate against venues, even without making good on the catastrophic threat of pulling or moving concerts completely. In addition to reducing the number of concerts it places at a venue, Live Nation has the power to move shows to less desirable and less lucrative dates, curtail promotional efforts, and force venues to disable secondary ticketing on non-Ticketmaster platforms (potentially making unsure fans less likely to commit to tickets in the first place and frustrating fans who do buy tickets but change plans).

90.     These kinds of threats and punishments are not just how Live Nation acquired its outsized power in every corner of this industry. In fact, Live Nation has continued to use this playbook in recent years. For example, in 2021, Live Nation threatened retaliation against a venue that had decided to switch from Ticketmaster to SeatGeek for primary ticketing. That venue had decided to switch, in part, because SeatGeek offered to share a greater percentage of the fees associated with secondary ticketing.

91.     Upon learning about the potential switch, a senior Live Nation executive texted a not-so-subtle warning to the venue's CEO: "Apparently seatgeek are telling [nearby venue] and others that they have a contract deal with you guys already?? Anyways should think about bigger relationship with LN not just who is writing a bigger sponsorship check 😊." A few days later, Live Nation's CEO emailed the venue's owner that Live Nation "will be very concerned that seatgeek a secondary provider will be selling our LN artist tickets when not authorized by the artist."

92.     Once the venue switched to SeatGeek, Live Nation followed through on its threats, re-routing concerts to other venues. Live Nation's promotions business also demanded that the venue disable secondary ticketing on SeatGeek's platform for all Live Nation-promoted concerts, depriving the venue and SeatGeek of secondary fee revenue.

93.     Live Nation eventually relented and allowed the venue to enable secondary ticket sales—but only after (a) the venue agreed to split its share of secondary fee revenue (sourced through SeatGeek) with Live Nation, and (b) SeatGeek agreed to change its ticket-buying interface to make it conform, in some respects, to Ticketmaster's without regard to whether that was what fans or the venue preferred. In particular, Live Nation demanded that SeatGeek change the way it distinguished primary and secondary tickets (to make it more like Ticketmaster) and

38

limit the use of its fan-friendly tool called "DealScore." Given all of Live Nation's complaints, which it directed to the venue, it is unsurprising that within about a year, that venue returned to Ticketmaster.

94.     The knowledge and awareness in the industry—that Live Nation will route shows away from venues that do not choose Ticketmaster—is so widespread that other intermediaries deliver threats and warnings to venues for Live Nation's benefit. For example, Oak View Group, Live Nation's self-described "hammer," has made such threats to at least one venue. And at least one other venue has been warned by a rival CEO that Live Nation would move shows away from the venue if it selected SeatGeek for primary ticketing services.

95.     Even Live Nation's biggest competitors fear losing concerts if they do not use Ticketmaster. Live Nation's principal competitor, AEG, has an approximately 30% ownership stake in Anschutz Spectacor Management ("ASM Global"), a venue management company that manages more than 30 arenas in the United States. ASM Global resulted from a 2019 merger between AEG Facilities and Spectacor Management Group ("SMG"). Before the merger, SMG's legacy venues had used Ticketmaster as their exclusive primary ticketer, and AEG Facilities' legacy venues had used AXS as their exclusive primary ticketer. Through its minority interest in ASM Global, AEG advocated for AXS to serve as the exclusive primary ticketer for the ASM Global venues AEG now partially owned. But ASM Global's majority shareholder Onex worried that Live Nation would retaliate by withholding shows from ASM Global venues if ASM Global entirely switched away from using Ticketmaster.

96.     To avoid losing access to concerts at ASM Global venues by "alienating" Live Nation, AEG was forced to accept that Ticketmaster would remain the dominant provider at ASM Global venues despite AEG's partial ownership of ASM Global and AEG's ability to

provide an alternative primary ticketer, AXS. AEG agreed Ticketmaster would remain the default primary ticketer for most ASM Global venues, with AEG reserving the right to use AXS for events promoted by AEG.

97.     These threats—whether direct or indirect, explicit or implicit— coupled with Live Nation's multi-pronged strategy of long-term exclusive agreements, a history of retaliation, and other exclusionary conduct—means neither venues nor artists are free to choose ticketers based on their own assessment of price, quality, or value. They are not free to choose a ticketer based on the best technology, or most favorable contract terms, or simply what works best for them or—importantly—what works best for the fans that fill venues to see their favorite artists. Instead, venues, artists, fans, rivals, and others throughout the live concert industry must navigate an ecosystem created by Live Nation, defined by its dominance in promotions *and* ticketing, together with its extensive network of venues (especially amphitheaters), and limited by Live Nation's restrictions and restraints.

> **D. Ticketmaster's long-term exclusive agreements with venues are designed to lock up share and lock out competition, which forecloses a substantial share of primary ticketing markets.**

98.     Ticketmaster's long-term, exclusive agreements with venues are a key tool to protect Live Nation's stranglehold on the live concert industry, and on primary ticketing in particular. These agreements make Ticketmaster the sole provider of primary ticketing services for all or nearly all events held at a venue for multiple years, sometimes as long as 14 years.

99.     Ticketmaster's exclusive agreements cover more than 75% of concert ticket sales at major concert venues, foreclosing a substantial share of the primary ticketing market from rival ticketers. In 2022 alone, for example, Ticketmaster signed several lengthy deals with major concert venues.

100.    Ticketmaster is quite clear about why it focuses on these deals: they are, in Ticketmaster's own words, a "[h]edge against significant improvements by the competition or even a new competitor" because the "client is under contract for longer and not able to leave [Ticketmaster] or price the competition's offer into our new deal for an extended time." In other words, even if a rival ticketer were to offer a better price, a better product, or simply a better ticketing experience, a Ticketmaster-exclusive venue would not be able to choose the rival for a long time, often a decade.

101.    Before its long-term exclusive agreements expire, Ticketmaster also works defensively to deny rivals the opportunity to compete at all. Ticketmaster often renews or extends these ticketing agreements before they expire, thus preventing rivals like SeatGeek and AXS from being able to bid at all. This not only eliminates the chance Ticketmaster will lose the contract but also mitigates competitive pressure on Ticketmaster to improve the terms of the contract.

102.    To ensure their existing locked-in venues agree to early renewals and thereby block competition from a rival for the contract, Ticketmaster used COVID-19 as an opportunity to extend the terms of its existing long-term venue ticketing agreements by one year. After one venue resisted, telling Ticketmaster that it disagreed and intended to sign with a rival, Ticketmaster's counsel wrote: "Any effort by [the venue] to switch ticketing service providers before [the extension date] would be a breach of contract, and any announced intention to do so would be an anticipatory breach." In a conversation between that venue's CEO and Live Nation executives, Live Nation's CFO indicated Live Nation would "drop" the contractual dispute if the venue agreed to enter into a new ticketing contract with Ticketmaster, but not if the venue went with a rival.

103.     Ticketmaster's renewal strategy not only blocks potential rivals but also creates friction—legal costs and otherwise—to ensure venues do not even try to pursue a competitive bidding process.

104.     These strategies are part of a deliberate and defensive series of actions and decisions designed to lock up venues, lock out competitors, and hold the industry hostage from innovation and evolution. It is well recognized that "opening" venues, that is, eliminating exclusivity to permit multiple primary ticketers to service a venue or a particular concert, could benefit fans. Open venues can make it easier for fans to find tickets via multiple platforms and those platforms would be incentivized (in terms of price and technology) to compete for fans' purchases. Venues, too, could benefit, because having multiple ticketers would enable venues to increase the number of tickets sold, exercise greater choice over how tickets are sold or resold, and reach new audiences.

105.     When venues have proposed non-exclusive ticketing contracts, Ticketmaster has almost invariably rejected the request, even outside the live concerts space. And even though Live Nation agreed to limited non-exclusivity for AEG-promoted shows at certain ASM Global venues as part of its recent contract negotiation—to dislodge its largest ticketing rival (AEG's AXS) from the very venues that its largest promotions rival (AEG) partially owns—Ticketmaster has refused to even consider it for other venues. If even AEG must acquiesce to Live Nation's demands that Ticketmaster exclusively ticket every show at AEG's own affiliated venues—save those shows promoted by AEG—no other major concert venue owner stands a chance.

106.     While the industry and fans would benefit from "opening," Ticketmaster—as the incumbent monopolist—and its parent company, Live Nation, knows it would not. For Ticketmaster, the success of exclusivity combined with Ticketmaster's already high market share

in the United States are fool-proof ways to maintain its empire, the benefits of which are reflected in Ticketmaster's bottom line. Primary ticketing fees are far higher in the United States than in other countries around the world.

107.    Ticketmaster's exclusive agreements also inhibit the growth of more specialized ticketing services and different business models. For example, Ticketmaster's exclusivity provisions deny most artists the ability to sell tickets directly to their most passionate fans and "fan clubs" through pre-sale windows. Since third parties often charge less than Ticketmaster, when selling to fan clubs through non-Ticketmaster ticketing systems, artists are better able to control ticketing fees. Through fan clubs or other alternative ticket distribution methods, artists can also offer tickets alongside other experiences and opportunities that can improve the concert experience or increase value for fans. Alternative distribution methods can also provide artists greater control over how, when, and to whom tickets are made available. Ticketmaster previously allowed tickets to be sold through third parties to fan clubs in accordance with its Fan Club Policy. But after acquiring one such third-party provider of tickets to fan clubs in 2018, Ticketmaster has used its exclusive ticketing contracts with venues to curtail artists' ability to use third-party providers for fan club sales—at the expense of artists' choice and their relationships with fans.

108.    Ticketmaster further uses its extensive network of long-term exclusive ticketing contracts to raise the costs of rival ticketers and further heighten barriers to entry. For example, in the areas where despite Ticketmaster's best efforts, competitors still persist, Ticketmaster deploys its vast power and network to protect its monopoly. One example of this is Ticketmaster's encrypted mobile ticket program, SafeTix, Ticketmaster has added SafeTix to its suite of products and services in a manner that protects its position in primary ticketing, expands

its position in secondary ticketing, and undercuts the ability of rival ticketers to compete in either aspect of ticketing.

109.    Pursuant to this program, Ticketmaster replaced the static barcodes on PDF—or other types of electronic tickets—with a constantly refreshing and encrypted barcode. Ticketmaster's SafeTix marketed this change as reducing the risk of ticket fraud from stolen or illegal counterfeit tickets. But the transfer restrictions implemented as part of this change also make it more difficult for a fan who wishes to buy or sell a SafeTix-encrypted ticket through a secondary platform to use a rival platform like StubHub or SeatGeek. Further, SafeTix introduces uncertainty as to when, or even whether, that ticket can even be transferred. If a ticketholder wants to sell or otherwise transfer a SafeTix-encrypted ticket, both the ticketholder and the purchaser must create Ticketmaster accounts (thereby providing Ticketmaster with their data), download the Ticketmaster app, and wait for Ticketmaster to determine when or whether the transfer can be completed. By reducing the incentives to enter secondary ticketing altogether, SafeTix not only reduces competition from existing rivals but also disincentivizes prospective innovators from considering secondary ticketing as a viable foothold for entering primary ticketing.

110.    In addition to inserting Ticketmaster as an intermediary into secondary ticket transfers and transactions, SafeTix has also fortified Live Nation's data advantages over its rivals. According to internal documents, SafeTix was expected to grow the "size/value of the TM database," already by far the largest of any ticketer, by as much as 30 to 40%. As Live Nation's CEO put it, "[o]ne of the advantages we've launched under the transfer strategy is we now not only know the person that bought the ticket, but we're going to know those three people that you are taking to the show, which we have not known historically." Live Nation can monetize this

unique trove of data in its various businesses to both increase its bottom line and further entrench its positions across the live entertainment industry.

**E.   Live Nation restricts access to its venues unless Live Nation is paid to be the promoter.**

111.   Live Nation's control over a significant number of concert venues not only facilitates maintenance of Ticketmaster's monopoly in ticketing but also serves to limit artists' options and exclude rival promoters. Live Nation has a longstanding policy going back more than a decade of preventing artists who prefer and choose third-party promoters from using its venues. In other words, if an artist wants to use a Live Nation venue as part of a tour, he or she almost always must contract with Live Nation as the tour's concert promoter.

112.   Live Nation's policy of restricting the use of its venues is particularly problematic for artists seeking to tour in large amphitheaters where Live Nation enjoys monopoly power. These artists—many of whom have well-established, dedicated fan bases but have not yet matured their fan base to play larger stadiums—are effectively forced to hire Live Nation as their promoter or risk being locked out of dozens of desirable Live Nation-controlled large amphitheaters in the United States. Live Nation's amphitheater portfolio includes at least 40 of the top 50, and more than 60 of the top 100 amphitheaters in the United States. No other entity owns more than a handful of amphitheaters in either set. This network of large amphitheaters has allowed Live Nation to attain a greater than 70% market share in large amphitheater promotions and become by far the largest promoter of national amphitheater tours. Put differently, it is nearly impossible for an artist to create a tour that includes stops at amphitheaters without Live Nation.

113.   Live Nation senior executives know the company has restricted the use of its amphitheaters and other venues for years and often make the choice to sacrifice additional profits

the company could be earning as a venue owner by opening its venues to non-Live Nation promoted shows that are available to play at those venues. A 2018 internal Live Nation analysis found that its top 10 amphitheaters are "dark," or without shows, "on nearly 50% of their Saturdays in the summer," the highest performing day of the week during the primary performance season. Relatedly, a 2022 analysis found that Live Nation's top 15 amphitheaters are, on average, dark on eight Saturdays between June and September.

114.    Live Nation also recognizes its amphitheater portfolio gives it control over artists pursuing an amphitheater tour. For example, a senior Live Nation executive directed his employees not to increase guaranteed payments offered to artists they know are looking for "True Amp Tours." This is because Live Nation recognizes these artists almost certainly will need to play several shows at Live Nation's stable of top amphitheaters, and to do so, they will need to sign with Live Nation as their promoter: "we know [artists] are likely playing amphitheaters and we are going to get those in most cases." Because many artists sign with Live Nation to promote their entire tour—both amphitheater and non-amphitheater shows alike—Live Nation's restrictive amphitheater policies help the company extend its reach to promoting artists in other venues as well. Further, because relationships are so important in the promotions business, once Live Nation uses its exclusionary amphitheater policy to lock in emerging artists early in their careers, they are able to keep some of those artists as they graduate to higher capacity venues, such as arenas and stadiums.

**F.  Live Nation strategically acquires promoters, venues, and festivals to eliminate rivals, expand its network, and grow its "moat."**

115.    To protect and expand its positions across the live entertainment industry, Live Nation has pursued a strategy of acquiring nascent threats and neutralizing rivals. This strategy has included acquiring promoters, amphitheaters, festivals, other venues, and even small

ticketers, as well as entering into long-term exclusive booking contracts with many venues. Although many of these rivals were relatively small at the time of their acquisitions, Live Nation's internal documents show that the company viewed them as some of its "biggest" threats. This is unsurprising given the lack of sizeable, scaled, national competitors in the markets in which Live Nation operates. Live Nation's conduct has thwarted growth of its rivals and disincentivized investment that might have led to entry. Nonetheless, Live Nation viewed many of these acquisitions of competitors on the "edge" as necessary to protect its "moat" around the live concert ecosystem.

116.    In its own words: "Live Nation is a company founded on acquisition. At its inception, Live Nation began rolling up the regional world of promoters and venues and has not stopped since." Over the past decade, Live Nation has acquired dozens of companies across the industry to expand its reach and entrench its positions.

117.    Live Nation has recognized that one of its "Biggest Competitor Threats" is smaller and regional independent promoters that have the ability to "com[e] in from the edges creating events, opening venues, and purchasing artist inventory." To address this disruptive potential, Live Nation pursued an aggressive plan to acquire or co-opt key independent promoters, even when the economics of a particular deal did not make sense for its promotions business. Live Nation personnel justified the counterintuitive economics for these transactions by looking at the long-term benefits: reducing competition for artists, including by "keeping the [artist] guarantees down" and stopping competitors from "driving the price up" for artists.

118.    Live Nation's acquisitions have, over time, constrained artists' choice of promoters. This is especially true for nationwide tours and has the effect of further increasing venues' dependence on Live Nation for content. As a major venue in New York City recognized,

Live Nation has made significant acquisitions of top independent promoters over the past decade, eliminating most mid-tier promoters and leaving primarily small, concert promotion companies with little market share.

119.    Below are some specific examples of Live Nation's acquisition strategy in practice.

120.    **United Concerts**. In 2017, Live Nation acquired United Concerts, a promoter and venue owner in Utah, whose venues included the most popular large amphitheater in the state. Live Nation acquired United Concerts in part to eliminate a potential competitive promotions threat and to starve a competing primary ticketer of customers.

121.    Before Live Nation bought United Concerts, many venues in Utah, including United Concerts' venues, used a regional ticketing company called SmithsTix.[12] Internally, Live Nation noted that SmithsTix had taken Ticketmaster's "last client in Utah" and left a "barren landscape[]" for Ticketmaster there. Live Nation chose not to acquire SmithsTix directly because doing so would "require us to go to the DOJ [to notify them as required under the 2010 consent decree that it planned to acquire a primary ticketing company] and that's something we wouldn't necessarily want to do." Instead, Live Nation went bigger while sidestepping the notification requirements of the consent decree: it acquired United Concerts and its venues, and *then* converted those venues to Ticketmaster. Left "with only a few small clients," SmithsTix ultimately went out of business.

122.    **AC Entertainment**. In 2016, Live Nation acquired a controlling stake in AC Entertainment—a regional independent promoter in the Southeast and one of Live Nation's

---

[12] The prior owner of United Concerts also owned DATATIXS, a regional ticketing company that operated under the SmithsTix brand. SmithsTix provided ticketing services to more than 40 venues throughout Utah, including the arena that the home of the Utah Jazz.

internally designated "Biggest Competitor Threats." AC Entertainment promoted over 1,000 shows a year, including arena and amphitheater shows. AC Entertainment also controlled the venue booking decisions at 14 historic theaters and clubs throughout Tennessee and the Carolinas and promoted major music festivals, including Bonnaroo.

123.    Live Nation pursued the acquisition even though it had doubts about the standalone economics of the deal. Live Nation's Chief Strategy Officer explained to Live Nation executives: "The numbers are not super exciting and this feels like more of a defensive move to (I) Keep [rival] AEG out of the region especially creating situation where [a well-known artist manager] can play both sides in Nashville." Live Nation's Chief Strategy Officer also recognized that the acquisition helped "grow[] our moat in the [Nashville] market," while another internal document touted the benefit of "lower competition in the Region and specifically in Nashville."

124.    **Frank Productions and National Shows 2**. In 2018, Live Nation acquired yet another "Biggest Competitor Threat" in rival promoter, Frank Productions. Frank Productions owned four theaters and clubs in Wisconsin—one of which competed with a Live Nation-operated venue. When its owners looked to transition the business to new ownership as they stepped back, Live Nation jumped at the opportunity to take another edge competitor off the board, and out of the hands of any other potential buyer.

125.    Live Nation used this acquisition, in part, to convert Frank Productions' venues to Ticketmaster. Frank Productions previously selected other primary ticketing service providers over Ticketmaster because it had "a difficult time wrapping their head around why they would do business with a company [Live Nation/Ticketmaster] who will be in direct competition with them in their home market." Recognizing that Frank Productions venues' ticketing contracts

were set to expire not long after the acquisition, Live Nation acquired the company and then flipped the venues to exclusive Ticketmaster contracts.

126.     Live Nation also acquired Frank Productions' subsidiary, National Shows 2—yet another firm listed as a "Competitor Threat." National Shows 2, which promoted over 350 shows per year in the United States, was one of a small number of competitors to Live Nation in the Nashville region after Live Nation bought AC Entertainment, the acquisition described *infra* ¶ 122, in 2016.

127.     **Red Mountain Entertainment**. In 2018, Live Nation acquired Red Mountain Entertainment, a regional promoter that promoted shows in Alabama and Mississippi, including several music festivals throughout the Southeast. At the time of the acquisition, Red Mountain also operated and/or exclusively booked concerts at Wharf Amphitheater in Orange Beach Alabama, Brandon Amphitheater in Brandon, Mississippi, and Tuscaloosa Amphitheater in Tuscaloosa, Alabama. Red Mountain had been on Live Nation's radar since at least 2016 when a Live Nation executive indicated it had an "active plan to mitigate further expansion" by Red Mountain because Live Nation "[c]an't get complacent and let small guys encroach from the edges." Live Nation recognized that Red Mountain's control of the Tuscaloosa Amphitheater was driving up compensation to artists, and so it wanted control of the Tuscaloosa Amphitheater to "keep[] the guarantees down" to artists.

128.     As Red Mountain grew, Live Nation unleashed what it called a "velvet hammer" by warning that it would cut off "the content flow on artist[s]" to Red Mountain venues if Red Mountain continued to compete as a promoter. A Live Nation executive described the message he communicated to Red Mountain: "Either we are together or we are competitors. Seemed to work, as they had 3 venues, 2 festivals and another venue coming online in [20]18, and wanted

the content flow on artists where we had touring rights to in the U.S. Velvet Hammer." Red Mountain ultimately agreed to sell its business to Live Nation.

129.     **313 Presents ("313")**. In 2018, Live Nation co-opted a Detroit-based competitor, 313, by entering into a multi-faceted agreement. Prior to the agreement, Live Nation recognized 313 predecessor organizations, Palace Sports and Olympia Entertainment, as "competitors" since they "make direct offers to artists." As such, Live Nation and the co-founder of Oak View Group concocted a "scheme" to "put [Olympia] out of the promoting side." After the agreement, Live Nation stopped competing with 313 over venues in the Detroit market while 313 stopped competing against Live Nation for artist talent. 313 recognized that without the agreement, 313 and Live Nation would be forced to compete to the benefit of artists.

130.     The agreement worked to suppress competition to the benefit of both parties. 313 Presents saw reduced talent costs and avoided competition from an expanding venue operator. Live Nation, meanwhile, disarmed another promotions competitor, secured exclusive deals at three amphitheaters, and locked-up several venues with Ticketmaster for years to come. Today, 313 controls several of the most popular concert venues in the Detroit live music hub.

131.     **ScoreMore Shows**. ScoreMore Shows was a regional promoter in Texas that Live Nation identified as a "Competitor Threat." Around 2017, Live Nation agreed with ScoreMore not to compete to sign artists in Dallas and to pool their collective revenues to co-promote artists. After that agreement was in place, in 2018, Live Nation acquired a majority stake in ScoreMore Shows. Internal Live Nation documents celebrated that ScoreMore and Live Nation were "no longer competing" or "driving the price up" for booking artists. Live Nation replaced rivalrous competition with cooperation. As the CEO of ScoreMore Shows stated to Live Nation:

> [Y]ou are forgetting that **in pooling these revenues it also meant that we were no longer competing. We weren't driving the price up, either**. We haven't

been sending offers or telling agents anything but "yes, that's good, we work with LN, we will copro[mote] there." [S]o if we were on our own (without the pool), sending our own offers, putting in indie rooms, driving the price up … do you think the [contribution margin] would be the same? [W]ould you still think we don't provide the value?

132.    For Live Nation, the value of no longer competing with ScoreMore meant that it could book more shows while paying less to artists. Live Nation's CEO wrote to ScoreMore's CEO, "I agree that measurement is what you book and what you stand down for overall win. . . ."

133.    **Logjam Presents**. In 2023, Live Nation acquired a majority stake in Logjam Presents, the leading promoter and venue operator in Montana. Prior to the acquisition, the Logjam Presents venues used a competing primary ticketing service provider. As with previous acquisitions, Live Nation switched Logjam venues from the competing primary ticketing service provider to Ticketmaster once its ticketing agreement expired.

134.    At the same time Live Nation was acquiring the businesses identified above, Live Nation was also building a "top tier festival portfolio through acquisitions." Live Nation recognized that the "Proliferation of Festivals" was one of its "Biggest Competitor Threats" because these outdoor shows threatened to "cannibaliz[e] high margin amp shows." In executing this strategy, and to help protect its power and position in amphitheaters, Live Nation acquired several popular and widely attended festivals, including, Austin City Limits, Lollapalooza, Electric Daisy Carnival, Bottlerock, Mountain Jam, Shaky Knees, Houston Free Press Summer, Governor's Ball, and others.

135.    Beyond its outright acquisition of venues, some of which are described above, Live Nation has entered into long-term exclusive booking contracts to augment its control of venues, particularly large amphitheaters. In recent years, Live Nation has entered into long-term exclusive booking agreements with more than a dozen large amphitheaters and long-term leases

with several additional amphitheaters as well. While the specific terms vary from agreement to agreement, these exclusive booking agreements generally provide Live Nation the exclusive right to control which artists may use the venue, cementing Live Nation's ability to reward artists it promotes while locking out artists promoted by third-party competitors. Some agreements also provide Live Nation with some degree of control over other aspects of the venue's operations such as concessions and ticketing.

## V.    Anticompetitive Effects and Competitive Harm

136.    Live Nation has engaged in individual anticompetitive acts that have themselves harmed competition. But those individual acts have also had the desired effect of working together in a mutually reinforcing manner to enhance Live Nation's flywheel, suffocate competition, and inhibit the evolution of the live music industry that competition could and should usher in. Live Nation (and its subsidiaries like Ticketmaster) has inserted itself into nearly every corner of the live music industry, which inures to the benefit of Live Nation, but comes at a real cost to fans, artists, venues, and to the competitive process more broadly. Live Nation's conduct, taken individually and collectively, has complicated and exploited the relationship between artists and fans for the delivery of live entertainment and increased its bottom line.

137.    The anticompetitive effects of Live Nation's distortion of the competitive process cascade through a number of interrelated relevant antitrust markets and fall upon the various entities within those markets. Live Nation's anticompetitive actions allow Live Nation to impose costs and take more for itself, obstruct innovation, impede competitors and nascent threats, and maintain its monopolies and power.

138.    Because the competitive process has systematically and intentionally been corrupted, there has been less competition than there otherwise would have been in the live

music industry over a variety of dimensions, including, ticketing fees, contractual terms, output, quality, and innovation. For example, due to Live Nation's anticompetitive conduct:

- Fans have paid more in fees that are not transparent, not negotiable, and cannot be comparison-shopped because there are no other options;

- Fans have been denied access to the benefits a competitive process would deliver, such as more choices in concerts and innovative fan-friendly ticketing options;

- Artists have had fewer opportunities to play concerts, and fewer real choices for promoting their concerts, selling tickets to their own shows, and performing at certain venues; and

- Venues have fewer real choices for obtaining concerts and ticketing services, and many are reluctant to disrupt the status quo due to the financial risk.

139.    Live Nation has used its unlawfully maintained power in promotions, large amphitheaters, and ticketing to siphon an inflated portion of the money flows from the concert ecosystems and impose additional costs through a web of overlapping agreements with other industry participants. For example, Live Nation's "take rate"—the sum of the various cuts of fees and payments it takes through contracts across the concert industry—as the dominant intermediary is higher than it would be in a marketplace without Live Nation's anticompetitive scheme. Through interconnected agreements associated with Live Nation's various roles as ticketer, promoter, artist manager, and venue owner, Live Nation has created a feedback loop that pushes ticketing and ancillary fees higher while allowing Live Nation to be on all sides of numerous transactions and thereby double-dip from the pockets of fans, artists, and venues.

140.    Likewise, Live Nation's role as gatekeeper for the venues it owns or controls, especially large amphitheaters, means that touring artists who intend to play several concerts in

large amphitheaters are effectively forced to hire Live Nation, or face reduced compensation and access to fans. Rival promoters are unable to promote artists at many in-demand venues, hampering their ability to compete against Live Nation. And fans attending concerts at Live Nation-controlled amphitheaters get access to fewer shows and see fewer artists than they otherwise would because only Live Nation-promoted artists are allowed to perform there. In many instances, these same fans also face higher prices for ticketing and ancillary services, because Live Nation, acting as the primary ticketer, promoter, and venue owner, faces little competition in each of these interconnected markets. On the other hand, fans who live near the few remaining amphitheaters owned and booked by third parties may not have access to Live Nation's stable of artists, who are instead routed disproportionately through Live Nation's venues.

141.    Live Nation has created and now protects a system that inhibits artists, fans, and venues from making choices that should exist in a free market, whether that is choosing a concert promoter or a primary ticketer. And by locking venues into its business model, Live Nation has also dampened competition that otherwise would push fees down for fans. As a result, market forces that ordinarily would constrain the fees borne by fans are absent.

142.    Each aspect of Live Nation's scheme erects barriers for rivals and nascent threats to compete on the merits in the alleged markets with better, lower-priced, or different services. This scheme also cements an industry structure that requires would-be competitors to enter multiple markets simultaneously and at scale to compete effectively, further increasing entry barriers. Without Live Nation's exclusionary conduct, rivals and nascent threats could bring more innovations to the marketplace, develop important scale to improve offerings, further enhance their competitive reputation, increase investments, create disruptive business models, or

expand. If those rivals and nascent threats were able to compete on a level playing field, the entire ecosystem, including artists, venues, fans, and others, would realize the many benefits of competition.

143.    Based on Live Nation's conduct, venues reasonably fear the disruption, retaliation, and complications of partnering with anyone other than Live Nation lest they lose access to culturally significant and lucrative concerts. That has predictably raised rivals' costs. For example, it has forced at least one ticketing rival to agree to venues "make good" or "lost event guarantee" clauses in some of its ticketing contracts if those venues choose that rival and Live Nation, as predicted, retaliates. These clauses obligate the rival ticketer to compensate its venue customer if Live Nation diverts or pulls concerts in response to a venue choosing a rival ticketer over Ticketmaster. In other words, Live Nation's conduct not only constrains which ticketer venues may choose, but also inhibits and raises costs for rival ticketers who try to compete with Ticketmaster.

144.    Competition on the merits would enable more innovation and better products. For example, rivals might bring fan-focused innovations to the marketplace, such as a more streamlined user interface and purchase flow, insightful presentation of ticket inventory, enhanced buying options, or more flexible refund policies. Instead, those would-be rivals face artificial barriers obstructing their ability to gain traction in the marketplace, which in turn dampens incentives to innovate.

145.    Live Nation's conduct and power also lessens the competitive pressure to innovate to improve its own products, platforms, and services. Concerns about Ticketmaster's ticketing technology are widespread and have made national news. Facing limited competitive pressure, Ticketmaster has less incentive to invest more into proactively improving its ticketing

products.. Live Nation instead uses the capital it might otherwise spend on technological improvements to sweeten ticketing contracts for venues to keep them locked into long-term exclusive agreements and out of the hands of rivals.

## VI.   Relevant Markets and Monopoly Power

146.   Courts define a relevant product and geographic market to help identify the lines of commerce and areas of competition impacted by alleged anticompetitive conduct. There can be multiple relevant markets covering the same or similar products and services, and markets need not have precise metes and bounds. A relevant market also may include distinct groups or clusters of customers or sellers, where those customers or sellers are identifiable and particularly susceptible to anticompetitive conduct by a monopolist or others.

147.   Additionally, there may exist within a relevant product market a nested sub-market that itself constitutes a relevant antitrust market. Such a market may be defined based on differences in products or services within the broader market or differences in the competitive conditions faced by various customer groups within the broader market. Where such a submarket exists, it may be helpful to also examine the effects of anticompetitive conduct within these relevant markets, as the effects may be particularly acute or significant. Additionally, there may be related markets adjacent to each other within an industry that offer distinct products and services, potentially to distinct customers, where competitive dynamics within one market impact competition within the other.

148.   Live Nation has its tentacles in virtually every aspect of the live entertainment industry. As a result, Live Nation's conduct has harmed artists, venues, and fans through the loss of competition in several relevant antitrust markets related to ticketing and promotions. Practical indicia in the industry, the structure of the industry and behavior of market participants, along

with substantial evidence that includes ordinary course documents, economic analysis, and other evidence support the relevant markets identified below:

- *Primary Ticketing Services Markets* – Primary ticketing providers offer a variety of services to two distinct sets of customers: major concert venues and fans. The particular products and services offered to and the competitive conditions faced by these two customer groups are distinct but related.

    o First, with respect to venues, there is a relevant market for the provision of primary ticketing services to major concert venues in the United States ("primary ticketing services market"). This market includes within it a relevant submarket, which is in and of itself a relevant market, for the provision of primary *concert* ticketing services to major concert venues in the United States ("primary concert ticketing services market").

    o Second, with respect to fans, there is a relevant market for primary concert ticketing offerings to fans at major concert venues in the United States ("fan-facing primary ticketing market"), and there is a relevant market that includes both primary concert ticketing offerings and services that offer resale of concert tickets ("fan-facing ticketing market").

- *Concert Promotions Services Markets* – Concert promoters similarly offer a variety of services to two distinct sets of customers: major concert venues and artists. The particular products and services offered to and the competitive conditions faced by these two customer groups are distinct but related.

o   First, with respect to venues, there is a relevant market for the provision of
concert booking and promotional services to major concert venues in the
United States ("venue booking and promotion services").

o   Second, with respect to artists, there is a relevant market for the provision of
promotional services to artists performing in major concert venues in the
United States ("artists promotions market").

- *Artist Use of Large Amphitheaters* – Owners, operators, and exclusive bookers of
large amphitheaters offer artists use of large amphitheaters for their shows. The
provision of the use of large amphitheaters and ancillary services to artists for large
amphitheater tours is a relevant market ("use of amphitheaters market").

149.   Even where Live Nation's anticompetitive conduct appears to affect a single
relevant market, its effects on fans, artists, venues, and others directly reverberate across the live
entertainment industry. Likewise, due to the anticompetitive scheme's overall effect of
maintaining Live Nation's market power and monopolies and the self-reinforcing aspects of Live
Nation's flywheel, effects are felt across the ecosystem regardless of the market in which any
particular anticompetitive act has the most direct impact.

### A.   Primary Ticketing Services Markets

136.   Primary ticketing providers offer venues and fans a variety of related but distinct
services. Primary ticketing services allow a venue to sell, track, and distribute some or all of the
tickets for a show. From the fan perspective, primary ticketing services allow fans to purchase
tickets for a show when it first goes on sale to the public and provide a bundle of services that
handle payment processing and customer service. Often in today's market, contracts between
primary ticketing services and venues dictate the terms and conditions on which primary

ticketers are able to offer tickets to fans, directly impacting (and often limiting) competition for these services from the fan perspective.

### i. Primary Ticketing Services to Major Concert Venues

150.    The provision of primary ticketing services to major concert venues is a relevant product market. Primary ticketing services are sold to venues, the customers for these services. Primary ticketers contract with venues to provide an array of services. This array of services includes the initial (or primary) sale and distribution of tickets for events at the operative venue, underlying technology, and various business support functions. Primary ticketers for major concert venues require, among other things, sophisticated software capable of handling complex ticketing arrangements and high-demand on-sales, back-office support functions, and consumer data for marketing. In addition, primary ticketers for major concert venues that also host sporting events often must provide support for distributing a team's season tickets. The choice of primary ticketer is a key decision for major concert venues because ticketing operations can materially impact the fan experience at, and reputation of, the venue.

151.    The venues most directly impacted by Live Nation's scheme are major concert venues. These are venues big enough to host major concerts and able to provide a suitable environment and infrastructure for widely attended concerts, like large arenas and amphitheaters. As a result, major concert venues are popular locations for concerts and generate a substantial portion of their revenue from them. Because primary ticketers individually negotiate with venues over pricing and other terms, primary ticketers take into account venue size and how important concert ticketing is to a given venue when submitting a bid. Because major concert venues are particularly susceptible to the effects of Live Nation's conduct, and can be targeted, they are appropriately considered together in evaluating that conduct. Internal documents indicate that

60

Ticketmaster monitors different categories of venues to inform its business decisions and individual negotiations, including size of venue and importance of concert revenues to the venue.

152.    The United States is a relevant geographic market for the provision of primary ticketing services to major concert venues. Major concert venues in the United States require providers of primary ticketing services capable of fulfilling contractual requirements within the United States. Internal Ticketmaster documents support the United States as a relevant geographic market. For example, Live Nation evaluates the business and competitive conditions in segments within the United States separately from Canada.

153.    There are no reasonable substitutes for primary ticketing services to major concert venues, nor is arbitrage reasonably possible. Given the significant investment and technology required to build and maintain a primary ticketing service, self-supply is a not a reasonable substitute for most major concert venues. Additionally, secondary ticketing services are not reasonable substitutes. *First*, the intended purpose of secondary ticketing services is different than for primary ticketing services. Whereas primary ticketing services are meant to facilitate and run ticket sales on a venue's behalf, secondary ticketing services are meant to facilitate ticket purchasers' resale of their ticket(s). *Second*, ticketholders and fans—not venues—are ticketers' typical customers on the secondary ticketing platform. *Third*, the platforms for primary and secondary ticketing services are functionally very different. Internal Ticketmaster documents recognize these kinds of differences by, for example, analyzing the performance and competitive conditions of primary ticketing separately from secondary ticketing.

154.    For these and other reasons, a monopolist in primary ticketing services to major concert venues in the United States would be able to maintain prices above competitive levels and/or maintain quality below the level that would prevail in a competitive market.

155.    Live Nation—through Ticketmaster—has a durable monopoly in primary ticketing services for major concert venues in the United States. For example, in 2022, Ticketmaster accounted for at least 70% of the total face value associated with all tickets sold at large arenas and amphitheaters. No other rival ticketed more than 14%.

156.    Live Nation's monopoly power in primary ticketing for major concert venues in the United States also is demonstrated by its ability to control prices and/or exclude competition. For example, in the United States, where Ticketmaster has a higher market share relative to other markets, Ticketmaster is able to charge higher prices and impose higher fees not tied to higher costs. In addition, Live Nation has the ability to exclude competition. Some examples of its power and scheme are described above, such as successfully threatening and retaliating against venues that consider a rival primary ticketer and imposing various other restrictive contractual terms.

157.    Live Nation's primary ticketing services monopoly for major concert venues in the United States is also protected by significant barriers to entry and expansion. Successfully building primary ticketing capabilities requires substantial investment and access to scale. Live Nation touts its enormous scale as an advantage. Live Nation's scale and its flywheel exacerbate the barriers to entry and expansion in primary ticketing. Live Nation uses its monopoly power in concert promotions to foreclose competition in primary ticketing and erects additional barriers to entry, which prevent ticketers who are not vertically integrated from competing on a level playing field. Live Nation's agreements and exclusionary conduct act as further barriers to entry because they impede rivals' ability and incentives to compete.

158.    Within this market exists a narrower relevant product market for the provision of primary ticketing services for concerts and comedy events ("concerts")[13] to major concert venues. There are some unique attributes to providing primary ticketing services for *concerts* to major concert venues such that there are no reasonable substitutes, nor is arbitrage possible. For example, some primary ticketing features are particularly important for concerts, including the ability to handle complex on-sale processes, surge traffic, and specific types of marketing initiatives. In addition, financial arrangements contracting, and fees charged to fans for primary ticketing services can differ for concerts as compared to other event types like sports. This is due, at least in part, to how lucrative hosting concerts can be for major concert venues. Thus, viable competitive alternatives for primary ticketing services for concerts at major concert venues can be, and are, different than for other live events. Internal Live Nation documents analyze concert ticketing separately from ticketing for other events and identify venues for which concert revenues are particularly important.

159.    Live Nation—through Ticketmaster—has a durable monopoly in primary concert ticketing services for major concert venues in the United States. For example, Ticketmaster accounts for at least 80% of the total face value associated with all concert tickets sold at major concert venues.

160.    For the same reasons as stated above, there are substantial barriers to entry and expansion within this narrower market. A monopolist in primary concert ticketing services at

---

[13] Live music concerts and comedy shows (as well as musical artists and comedians) have competitive similarities in terms of tour planning, on-sale events, and venue suitability. Ordinary course evidence suggests that concerts and comedy events are assessed and treated similarly as a matter of industry practice.

major concert venues in the United States would be able to maintain prices above competitive levels and/or maintain quality below the level that would prevail in a competitive market.

### ii. Primary Concert Ticketing Offerings to Fans at Major Concert Venues

161.    The provision of primary concert ticketing offerings to fans at major concert venues is a relevant product market. Fans rely upon primary concert ticketing offerings to purchase tickets to concerts. Primary ticketers typically provide an online interface to purchase tickets to a concert during an initial on-sale and continue to offer tickets for sale until the show is sold out. In addition to facilitating the purchase of tickets, primary concert ticketing offerings typically also provide customer service to fans, employ mechanisms to detect and prevent fraudulent purchases, store credit card information, keep track of fan purchases, and provide fans other related services. Primary concert ticketing offerings to fans at major concert venues require, among other things, sophisticated software capable of handling complex ticketing arrangements and high-demand on-sales and databases. Currently in the United States, except in rare cases, only a single primary ticketing service is offered to fans to purchase tickets to a given concert, and typically, only one primary ticketing service is offered to fans to purchase tickets during all on-sales for a given venue.

162.    Resale services offer a different service: the resale of previously purchased tickets. Thus, in order for a ticket to be available for resale on a secondary ticketing marketplace, the ticket must have already been purchased from a primary ticketing offering, with the purchaser having already paid the fees associated with the primary ticketing offering. Accordingly, the fees (and often ticket prices) associated with resale marketplaces are not closely related to the fees associated with primary ticketing offerings, because primary ticketing fees are baked into the price of tickets being resold on these marketplaces.

64

163.    Likewise, other means of obtaining tickets during an initial on-sale are limited and not available to all fans. Ticketmaster makes available a limited number of tickets to ticket brokers but charges fees for the initial transfer of tickets to these brokers before those tickets can be resold to fans. Ticketmaster also allows for the limited ticket sales to artist fan clubs in some circumstances, but such ticket sales are limited in number and not all fans are eligible to purchase tickets through these channels. As a result, they do not represent reasonably close substitutes for most fans today, although they could in the future but for Ticketmaster's anticompetitive conduct.

164.    In addition, fans may not view primary and resale tickets as close substitutes due to a perception that a primary ticket purchase is more "secure" or "guaranteed" as compared to a resale purchase.

165.    Internal documents indicate that Live Nation tracks its share of primary concert ticketing separately from its share of resale ticketing and identifies a distinct set of competitors in each segment. Live Nation also monitors its share of concert ticketing separate from its share of ticketing for other types of shows.

166.    The United States is a relevant geographic market for primary concert ticketing offerings for fans. Fans seeking to attend shows in the United States must use primary concert ticketing services that offer tickets for those shows. Internal Live Nation documents support the United States as a relevant geographic market. For example, Live Nation evaluates the business and competitive conditions in segments within the United States separately from Canada.

167.    For these and other reasons, and consistent with industry information, a monopolist in primary concert ticketing offerings to fans at major concert venues in the United

States would be able to maintain prices above competitive levels and/or maintain quality below the level that would prevail in a competitive market.

168.    Live Nation—through Ticketmaster—has a durable monopoly in primary concert ticketing offerings to fans at major concert venues in the United States. For example, in 2022 Ticketmaster accounted for at least 80% of the total face value associated with all concert tickets sold at major concert venues.

169.    Ticketmaster's monopoly power in primary concert ticketing offerings to fans at major concert venues in the United States is further demonstrated by its ability to control prices and/or exclude competition. In the United States, where Live Nation maintains a high market share in arenas and amphitheaters through its exclusive contracts and owned and operated venues, Ticketmaster has much higher fees relative to other countries notwithstanding comparable costs. In addition, Live Nation has the ability to exclude competition by insisting that venues utilize only Ticketmaster for all shows and for all tickets sold for a given show.

170.    Live Nation's monopoly in primary concert ticketing offering to fans is also protected by significant barriers to entry and expansion. To successfully build primary concert ticketing capabilities requires substantial investment and access to scale. Live Nation touts its enormous scale as an advantage. Live Nation's scale and its flywheel exacerbate the barriers to entry and expansion in primary ticketing. Live Nation uses its market power in concert promotions to foreclose competition for primary ticketing service for fans, while also erecting additional barriers to entry that prevent, by preventing ticketers who are not vertically integrated from competing on a level playing field. Live Nation's agreements and exclusionary conduct act as further barriers to entry because they impede rivals' ability and incentives to compete.

171.    Although the provision of primary concert ticketing services to fans is a relevant product market, in the alternative, there is also a broader relevant product market that includes both primary concert ticketing offerings and services that provide resale for concert tickets to fans at major concert venues. For the reasons above, primary concert ticketing offerings to fans offer distinct services from resale service providers, and resale marketplaces necessarily rely upon an initial sale of a ticket via a primary concert ticketing service (inclusive of the primary ticketing fees) in order for the resale marketplace to exist. Nonetheless, a fan looking to purchase a concert ticket may be able to purchase such a ticket from a primary ticketing offering or resale service provider. To the extent the two markets are combined into a larger market, internal documents show that Live Nation has substantial market power or monopoly power in this broader market as well.

172.    The United States is a relevant geographic market for concert ticketing offerings and resale services for fans. Fans seeking to attend concerts in the United States must use ticketing services that offer tickets for those shows. Internal Live Nation documents support the United States as a relevant geographic market. For example, Live Nation evaluates the business and competitive conditions in segments within the United States separately from Canada.

173.    For these and other reasons, and consistent with industry information, a monopolist in a combined market of primary concert ticketing offerings and services that provide resale of concert tickets to fans for shows in the United States would be able to maintain prices above competitive levels and/or maintain quality below the level that would prevail in a competitive market.

174.    Live Nation—through Ticketmaster—has a monopoly in this market. For example, in 2022, Ticketmaster accounted for more than 70% of the total transactions associated

with all tickets sold or resold for concerts at major concert venues in the United States. Transaction volume is an economically relevant measure of power in this market. Importantly, these numbers capture only transactions handled principally by Ticketmaster. But, as discussed above, because of Ticketmaster's use of technology like SafeTix, Ticketmaster necessitates its involvement in the resale of tickets that take place entirely on rivals' secondary ticketing platforms. In doing so, Ticketmaster is able to exert some degree of control over these transactions as well as obtain valuable fan data related to ticket transfers. As a result, Ticketmaster's share understates its competitive significance in this market.

175.    Ticketmaster's monopoly power in this market also is demonstrated by its ability to control prices and/or exclude competition. For example, Ticketmaster is able to charge higher prices in areas where its power is greatest (notwithstanding comparable costs), as evidenced by the much higher fees charged in the United States, where Ticketmaster has a high market share, relative to elsewhere where its shares are much lower. In addition, Live Nation has the ability to exclude competition. Some examples of its power and scheme are described above, such as successfully threatening and retaliating against venues that consider a rival primary ticketers and imposing various other restrictive contractual terms.

176.    Live Nation's monopoly over primary concert ticketing offerings and services that provide resale of concert tickets is also protected by significant barriers to entry and expansion. To successfully build primary ticketing capabilities requires substantial investment and access to scale. Live Nation touts its enormous scale as an advantage. Live Nation's scale and its flywheel exacerbate the barriers to entry and expansion in primary ticketing. Live Nation uses its market power in concert promotions to foreclose competition to become a primary ticketing offering for fans and erects additional barriers to entry, by preventing ticketers who are not vertically

integrated from competing on a level playing field. Additionally, Live Nation has taken steps to impede resale providers from efficiently facilitating the resale of tickets, including by hindering the transfer of tickets originally sold by Ticketmaster. Live Nation's agreements and exclusionary conduct act as a further barrier to entry because they impede rivals' ability and incentives to compete.

### B. Concert Promotions Services Markets

177.    Concert promoters offer a variety of related products and services to two distinct sets of customers: major concert venues and artists. For major concert venues, promoters arrange for, book, and market shows with artists to fill available dates at the venues. These services can take the form of booking one-off performances of an artist or long-term booking agreements where the promoter promises to bring multiple artists to a venue over a period of time. For artists, concert promoters work to plan, finance, and market an artist's show or—as is more often the case—a tour of multiple shows. In this way, although concert promoters are responsible for bringing together an artist and venue to perform a show, the particular form and nature of services they offer venues and artists differ considerably.

### i. Concert Booking and Promotion Services to Major Concert Venues

178.    The provision of concert booking and promotion services to major concert venues is a relevant antitrust product market. In general, promoters arrange and coordinate artist performances at venues and help to promote those shows to the public once they are booked. Promoters have significant influence over which venues an artist chooses to play. Typically, venues enter into individualized agreements with promoters (either on a show-by-show or long-term basis), which dictate the payments between venues and promoters in exchange for the performance(s). Concert booking and promotion services are essential to major concert venues because they help ensure the venues receive a steady stream of concert content.

179.    The venues most directly impacted by Live Nation's scheme are major concert venues. As discussed above, major concert venues have unique characteristics that make it appropriate to include them in this product market. In particular, major concert venues rely on live entertainment for a significant portion of their revenues and thus are unlikely to forego promotion services. Revenue from live entertainment is important to offset substantial fixed costs at these venues, and more events allow venues to allocate those costs across a greater number of shows.

180.    There are no reasonable substitutes for the purchase of concert booking and promotion services for major concert venues. Booking and promotional services for non-concert events at major concert venues are not adequate substitutes because the venues' average revenue per show from concerts is often higher than from non-concert events. Neither self-promotion nor self-supply is a significant constraint because most venues will be unable to incentivize a sufficient number of artists to choose to perform at their venue without the support of a promoter. Most venues cannot successfully promote concerts at scale because they lack the necessary expertise and relationships and are unwilling to assume the financial risk of a show selling poorly. Industry participants, including Live Nation and venues, recognize that providing concert promotions is a unique business and separately analyze the business and competitive conditions.

181.    The relevant geographic market for the provision of concert booking and promotion services to major concert venues is no broader than the United States, and there may also be smaller, regional relevant geographic markets. When procuring booking and promotion services, major concert venues in the United States require providers that can service their requirements in the United States. Further, many artists who perform at major concert venues do

so as a part of regional or national tours that include venues across the United States. Internal Live Nation documents also support the United States as a relevant geographic market. For example, Live Nation considers the United States to be a distinct reporting segment and separately evaluates the business and competitive conditions in the United States.

182.    For these and other reasons, a monopolist in the provision of concert booking and promotion services to major concert venues in the United States would be able to maintain prices above competitive levels and/or maintain quality below the level that would prevail in a competitive market.

183.    Live Nation has monopoly power in the provision of concert booking and promotion services to major concert venues in the United States. For example, Live Nation as a promoter accounts for around 60% of the total face value associated with all primary tickets sold at major concert venues and more than 70% of the total face value associated with large amphitheater shows in the United States. Total face value is an economically relevant measure of power in this market. As another point of reference, Live Nation is reported to have promoted 22 of the top 30 Billboard "boxscores" in 2023.

184.    Live Nation's monopoly power in concert booking and promotion services for major concert venues in the United States is also demonstrated by its ability to control prices and exclude competition. For example, as described above, Live Nation extracts supracompetitive payments from venues, including large promoter rebates, and otherwise imposes onerous, restrictive contractual terms on venues in exchange for supplying them with content. In addition, Live Nation has the ability to exclude competition in concert promotions through, for example, exclusivity agreements with venues. Some examples of its power and scheme are described

above, including using its power to stop rivals or nascent threats from competition in concert promotions.

185.    Live Nation's power over concert booking and promotion services is protected by barriers to entry and expansion. Promotion contracts with artists, the key input in this market, requires capital, expertise, connections, data, and a demonstrated level of success in the industry. There are also indirect network effects that sustain high barriers to entry in concert promotions. Venues naturally prefer to work with a promoter who is successful in promoting many popular artists, and artists naturally prefer to work with a promoter who is successful in promoting many high-demand shows at popular venues. As described above, in addition to Live Nation's scheme, Live Nation's self-described flywheel and scale-related factors enhance substantial barriers for entry and expansion in this market as well.

### ii.  Promotion Services to Artists

186.    The provision of promotion services to artists performing in major concert venues is also a relevant product market. Artists seek to contract with promoters for their help in arranging individual concerts and tours. Typically, artists enter into contracts with a promoter for a single show, multiple shows, including a tour. Promoters work with artists, and their managers and/or agents, to help the artist choose the venue(s) where they will play, work with venues on behalf of the artist to arrange aspects of the show(s), and then ultimately promote each show in local areas where the artist will perform. Promoters take on the financial risk associated with a show or tour, and in exchange they are compensated with a portion of the revenue generated by successful shows. For artists seeking to perform in major concert venues, promoters are an essential component to ensuring the show or tour is successful.

187.    Artists who seek to perform all or parts of their tour in large amphitheaters are uniquely impacted by Live Nation's anticompetitive conduct. Because of Live Nation's control

over a vast network of large amphitheaters and its policy to only work with artists that it promotes, artists seeking to perform a tour in large amphitheaters are denied the ability to work with the promoter of their choice if they want to play a Live Nation-owned or controlled venue. These artists are forced either to work with Live Nation or forgo an amphitheater tour altogether.

188.    There are no reasonable substitutes for promotion services for artists seeking to perform in major concert venues. Artist performances in major concert venues are complicated events whose success requires significant industry experience and relationships with different vendors. Self-promotion is not a reasonable substitute for artists because they generally lack the expertise, relationships, and financial resources to promote a show or tour on their own at major concert venues.

189.    The relevant geographic market for the artist promotions market is no broader than the United States, and there may also be smaller, regional relevant geographic markets as well. When procuring promotion services for performances in major concert venues in the United States, artists require promoters who can service their requirements in the United States. Internal Live Nation documents also support the United States as a relevant geographic market. For example, Live Nation considers the United States to be a distinct reporting segment and evaluates the business and competitive conditions in the United States separately.

190.    For these and other reasons, and consistent with industry information, a monopolist in the artist promotions market in the United States would be able to maintain prices above competitive levels and/or maintain quality below the level that would prevail in a competitive market.

191.    Live Nation currently has monopoly power in the market for the provision of promotion services to artists performing in major concert venues in the United States. Live

Nation's policy of blocking third-party promoted artists from using its amphitheaters has enabled the company to grow its share in the artists promotions market, above and beyond what it would have been able to achieve through fair competition. Industry participants, including venue owners, recognize Live Nation's dominance in this market. As one prior venue manager explained, "If you don't do a deal with these guys, you're going to lose shows." Live Nation as a promoter accounts for around 60% of the total face value associated with all primary tickets sold at major concert venues and more than 70% of the total face value associated with large amphitheater shows in the United States.

192.    Live Nation's power over the artist promotion services market is protected by barriers to entry and expansion.

### C.  Artist Use of Large Amphitheaters

193.    The provision of the use of large amphitheaters and ancillary services to musicians and comedians ("artists") for large amphitheater tours is also a relevant product market. "Large" amphitheaters (also known as "non-boutique amphitheaters") are recognized as a distinct type of venue in Live Nation's ordinary course documents and regular reporting and by industry participants. Large amphitheaters have unique characteristics—including capacity, sight lines, acoustics, seating, and staging—that differentiate them both from smaller amphitheaters and other venues. These unique characteristics make large amphitheaters attractive to both artists and fans in the summer months when most touring takes place, and as a result, there are artists who seek to perform several shows or even entire tours at large amphitheaters in given year. They also are attractive to artists who are not yet able to—or no longer able to—fill a larger venue, like an arena, but have outgrown smaller clubs and theaters. In a similar vein, industry participants, including Live Nation and venues, recognize that large amphitheater concerts constitute a unique business and separately analyze the business and competitive conditions.

Large amphitheaters provide artists the use of their venue plus related services, such as staging and lighting, and in exchange, the artist pays rent and performs a show that enables the venue to collect additional revenue from fans, including from food, beverage and parking. Artists either work directly with their agent, or through their chosen promoter, to communicate with venues about availability and ultimately choose the amphitheaters where they will perform.

194.    The artists most impacted by Live Nation's anticompetitive conduct are those interested in performing a tour of large amphitheaters in a particular year. This includes artists seeking to perform exclusively at large amphitheaters as well as artists seeking to construct a tour that includes both a significant number of shows at large amphitheaters as well as shows at other venues.

195.    Artists seeking to perform a tour of large amphitheaters will not view a tour that excludes large amphitheaters as a reasonable substitute. As described above, large amphitheaters have unique characteristics that distinguish them from other venues, and artists seeking a tour of large amphitheaters will generally not consider a tour wholly excluding large amphitheaters as a reasonable alternative. Industry participants, including Live Nation, recognize that there are artists with a specific interest in touring large amphitheaters.

196.    The relevant geographic market for the use of large amphitheaters market is no broader than the United States, and there may also be smaller, regional relevant geographic markets. Artists seeking to do a large amphitheater tour often do so as part of regional or national tours across the United States. Internal Live Nation documents also support the United States as a relevant geographic market. For example, Live Nation considers the United States to be a distinct reporting segment and evaluates the business and competitive conditions in the United States separately.

197.    For these and other reasons, a monopolist who controls the use of large amphitheaters in the United States would be able to maintain prices above competitive levels and/or maintain quality below the level that would prevail in a competitive market.

198.    Live Nation has monopoly power in the use of large amphitheaters market. Live Nation owns, operates, or exclusively books concerts in more than 55 large amphitheaters in the United States. Live Nation's controlled venues account for at least 65% of the total number of primary tickets and face value associated with all concert tickets sold at large amphitheaters. These measures are economically relevant measures of power in this market.

199.    Live Nation's monopoly power in the use of large amphitheaters market is protected by barriers to entry and expansion. Entering this market requires significant time, capital and expertise to either build a new amphitheater or sign a contract with an existing amphitheater to operate it. Building a new large amphitheater is particularly burdensome and uncertain, as it requires a potential new entrant to identify a specific location for the facility, acquire the land, secure the necessary permitting, and contract with the many vendors necessary to put on successful shows. Large amphitheaters also require access to artists to ensure financial viability. Because Live Nation routes the artists it promotes to its own existing network of amphitheaters, that makes it more difficult for a new amphitheater to attract the talent necessary to be financially viable.

## VII.    Jurisdiction, Venue, and Commerce

200.    The United States brings this action against Live Nation and Ticketmaster pursuant to Section 4 of the Sherman Act, 15 U.S.C. § 4, to prevent and restrain Defendants' violations of Section 1 and Section 2 of the Sherman Act, 15 U.S.C. §§ 1-2.

201.    The Attorneys General of the Plaintiff States, as the chief legal officers of their respective states, bring this action under their respective and independent statutory, common law,

and equitable powers, and in their quasi-sovereign capacities, to prevent anticompetitive conduct that harms competition and the economies of the Plaintiff States and the economic welfare of consumers in and from the Plaintiff States. Plaintiff States have quasi-sovereign interests in protecting consumers—from economic harm resulting from illegal anticompetitive conduct and in ensuring their economies are not suppressed by unjustified restraints of trade.

202.    The Attorneys General assert these claims based on their independent authority to bring this action pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and common law, to prevent and restrain Live Nation's violations of Section 1 and Section 2 of the Sherman Act, 15 U.S.C. §§ 1-2. State attorneys general are specifically authorized to bring suits to secure injunctive relief for violations of the Sherman Act. 15 U.S.C. §26.

203.    This Court has subject matter jurisdiction over this action under Section 4 of the Sherman Act, 15 U.S.C. § 4, Sections 4c and 16 of the Clayton Act, 15 U.S.C. §§ 15c and 26, and 28 U.S.C. §§ 1331, 1337(a), and 1345(d), and has supplemental jurisdiction under 28 U.S.C. § 1367(a).

204.    The Court has personal jurisdiction over the Defendants, and venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391, because all Defendants transact business and are found within this District.

205.    Defendant Live Nation is a Delaware corporation with its principal place of business at 9348 Civic Center Drive, Beverly Hills, CA 90210, and an office at 430 W. 15th Street, New York, NY 10011. Defendant Ticketmaster is a Virginia limited liability company with its principal place of business at 9348 Civic Center Drive, Beverly Hills, CA 90210. Ticketmaster operates from offices in various locations, including at 430 W. 15th Street, New York, NY 10011.

206.    Each Defendant engages in, and its activities substantially affect, interstate trade and commerce. Each Defendant provides a range of products and services that are marketed, distributed, and offered to consumers throughout the United States, in the plaintiff States, across state lines, and internationally. Defendants' actions and course of conduct are ongoing and are likely to continue or recur, including through other practices with the same purpose or effect.

## VIII.   Violations Alleged

### First Claim for Relief: Monopolization of Primary Ticketing Services Markets in Violation of Sherman Act § 2

207.    Plaintiffs incorporate the allegations of Paragraphs 1 through 206 above.

208.    Live Nation has monopolized several relevant markets related to primary ticketing services in the United States. These include the provision of primary ticketing services to major concert venues, the provision of primary concert ticketing services to major concert venues, and the provision of primary concert ticketing offerings to fans at major concert venues (even if combined with services that offer resale of concert tickets).

209.    Each constitutes a relevant antitrust market, and Live Nation has monopoly power in each market.

210.    Live Nation has unlawfully maintained its monopoly in each market through a course of exclusionary conduct, including:

- Directly threatening venues that Live Nation will divert live music shows to other venues if they do not sign with Ticketmaster;

- Indirectly threatening venues that Live Nation will divert live music shows to other venues if they do not sign with Ticketmaster by, for example, co-opting business partner Oak View Group into warning venues that they will lose Live Nation content if they contract with a ticketer other than Ticketmaster;

78

- Retaliating against venues that contract with rival ticketers by:

  o Diverting concerts on Live Nation-promoted tours to other venues;

  o Disabling or delaying the sale of secondary tickets through the rival ticketer's platform;

  o Refusing to publicize shows hosted by a venue that uses a competing ticketer;

  o Diverting content away from venues ticketed by companies other than Ticketmaster, making it risky for any venue to contract with a rival ticketer; and

  o Lodging complaints against rival ticketers when Live Nation promotes a show at a venue where Ticketmaster is not the primary ticketer;

- Foreclosing rival ticketing companies from the market by:

  o Imposing long-term exclusive contracts covering a significant proportion of tickets sold;

  o Engaging in strategic purchases of rival promoters and venues to enhance its market power in content and to convert ticketing to Ticketmaster, further foreclosing the primary ticketing market; and

  o Deterring entry and expansion by rivals into primary ticketing by using its monopoly to expand its control over secondary ticketing, which previously had been an entry point for primary ticketing.

211.    Although each of these acts is anticompetitive when considered alongside Live Nation's associated conduct, each act occurs in concert with and against the backdrop of allegations and facts outlined throughout this Complaint. These acts have synergistic anticompetitive effects that have harmed competition and the competitive process.

212.    Live Nation's exclusionary conduct has foreclosed a substantial share of each of these markets.

213.    Live Nation's anticompetitive acts have had harmful effects on competition and consumers.

214.    Live Nation's exclusionary conduct lacks a non-pretextual procompetitive justification that offsets the harm caused by Live Nation's anticompetitive and unlawful conduct.

215.    Live Nation's anticompetitive and exclusionary practices violate Section 2 of the Sherman Act, 15 U.S.C. § 2.

### *Second Claim for Relief: Unlawful Exclusive Dealing in Violation of Sherman Act § 1*

216.    Plaintiffs incorporate the allegations of Paragraphs 1 through 206 above.

217.    The provision of primary ticketing services to major concert venues in the United States is a relevant antitrust market, and the provision of primary concert ticketing services to major concert venues in the United States is a relevant antitrust market.

218.    Ticketmaster's long-term exclusive agreements to provide primary ticketing services to major concert venues in the United States unreasonably restrain competition, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

219.    These contracts exclude all competitors, are terminable only for cause, and have terms ranging from three to 14 years.

220.    Ticketmaster's long-term exclusive primary ticketing contracts restrict the access of Ticketmaster's competitors to the only significant channel of distribution for primary ticketing services to major concert venues.

221.    Through its long-term exclusive primary ticketing contracts, Ticketmaster has foreclosed a substantial share of the market for the provision of primary ticketing services to major concert venues in the United States.

222.    Live Nation's anticompetitive acts have had harmful effects on fans of major concerts, the venues that host them, and competition for primary ticketing.

223.    Live Nation's exclusionary conduct lacks a non-pretextual procompetitive justification that offsets the harm caused by Live Nation's anticompetitive and unlawful conduct.

### Third Claim for Relief: Unlawful Tying Arrangement Concerning the Use of Large Amphitheaters and Artist Promotions Markets in Violation of Sherman Act § 1

224.    Plaintiffs incorporate the allegations of Paragraphs 1 through 206 above.

225.    The provision of the use of large amphitheaters and ancillary services to artists for large amphitheater tours in the United States is a relevant antitrust market, and Live Nation has monopoly power in that market.

226.    The provision of promotion services to artists performing in major concert venues in the United States is a relevant market, and Live Nation has market power in that market.

227.    The provision of the use of large amphitheaters to artists and the provision of promotion services to artists are separate services sold to artists. The services are provided in different markets, with distinct demand for each, and they are treated by industry participants as separate products. There are some industry participants, such as third-party operated amphitheaters, that only offer access to amphitheaters, and there are promoters who only offer artists promotion services.

228.    Live Nation has unlawfully required artists seeking to use its large amphitheaters for shows as part of a tour to also purchase promotion services from Live Nation.

81

229.     The purpose and effect of this tying policy is to prevent artists from choosing a promoter on the merits and instead force artists who wish to play in Live Nation amphitheaters to contract with the company for promotions services.

230.     This anticompetitive conduct has significantly foreclosed competition in promotion services to artists. Artists who would otherwise choose rival promoters on the merits of those promoters must refrain from doing so to maintain use of Live Nation's amphitheaters on their tours.

231.     This conduct lacks a non-pretextual procompetitive justification that offsets the harm caused by Live Nation's anticompetitive and unlawful conduct.

232.     Live Nation's anticompetitive and exclusionary practices violate Section 1 of the Sherman Act, 15 U.S.C. § 1.

### Fourth Claim for Relief: Monopolization of the Market for the Use of Large Amphitheaters in Violation of Sherman Act § 2

233.     Plaintiffs incorporate the allegations of Paragraphs 1 through 206 above.

234.     The provision of the use of large amphitheaters and ancillary services to artists for large amphitheater tours in the United States is a relevant antitrust market, and Live Nation has monopoly power in that market.

235.     Live Nation has unlawfully maintained its monopoly in this market through a course of anticompetitive exclusionary conduct, including:

- Entering into exclusive booking arrangements with venues, enabling Live Nation to extend its control of this market beyond the significant share it controls through its owned, operated, and leased amphitheaters;

- Acquiring control over several amphitheaters, enabling Live Nation to extend its control of this market through its portfolio of owned and operated amphitheaters;

- Acquiring several competing promotion companies that either owned amphitheaters or had exclusive booking contracts with amphitheaters; and

- Acquiring numerous large festivals, further reducing the ability of artists on large amphitheater tours to seek alternatives to Live Nation. These exclusionary acts have harmed artists, rival promoters, and fans.

236.    Although each of these acts is anticompetitive when considered alongside Live Nation's associated conduct, each act occurs in concert with and against the backdrop of allegations and facts outlined throughout this Complaint. These acts have synergistic anticompetitive effects that have harmed competition and the competitive process.

237.    Live Nation's exclusionary conduct has foreclosed a substantial share of the market.

238.    Live Nation's anticompetitive acts have had harmful effects on competition and consumers.

239.    Live Nation's conduct lacks any procompetitive benefits or justification that offsets the significant anticompetitive harm that flows from the exclusionary conduct.

240.    Live Nation's anticompetitive and exclusionary practices violate Section 2 of the Sherman Act, 15 U.S.C. § 2.

### *Fifth Claim for Relief: Monopolization of the Markets for Concert Promotion Services in Violation of Sherman Act § 2*

241.    Plaintiffs incorporate the allegations of Paragraphs 1 through 206 above.

242.    The provision of concert booking and promotion services to major concert venues and the provision of promotion services to artists performing in major concert venues in the United States are related, relevant antitrust markets, and Live Nation has monopoly power in each market.

243.    Live Nation has unlawfully maintained its monopoly in each market through a course of exclusionary conduct described herein, including:

- Engaging in strategic purchases of rival promoters (actual or potential) and venues to enhance and entrench its monopoly power;

- Tying artists' use of Live Nation owned, controlled and exclusively-booked large amphitheaters to their purchase of promotional services from Live Nation;

- Deterring entry and expansion by rivals by threatening potential rivals and their investors; and

- Imposing restrictive terms in contracts with major concert venues that undermine and foreclose competition from actual and potential rival promoters.

244.    Although each of these acts is anticompetitive when considered alongside Live Nation's associated conduct, each act occurs in concert with and against the backdrop of allegations and facts outlined throughout this Complaint. These acts have synergistic anticompetitive effects that have harmed competition and the competitive process.

245.    Live Nation's exclusionary conduct has foreclosed a substantial share of each market.

246.    Live Nation's anticompetitive acts have had harmful effects on competition and consumers.

247.    Live Nation's exclusionary conduct lacks a non-pretextual procompetitive justification that offsets the harm caused by Live Nation's anticompetitive and unlawful conduct.

248.    Live Nation's anticompetitive and exclusionary practices violate Section 2 of the Sherman Act, 15 U.S.C. § 2.

### Sixth Claim for Relief: Violation of Arkansas Law

249.    Plaintiff State of Arkansas incorporates the allegations of Paragraphs 1 through 248 above.

250.    Plaintiff State of Arkansas brings this action in its sovereign capacity pursuant to Ark. Code Ann. § 4-75-212(a) and its *parens patriae* capacity pursuant to Ark. Code Ann. § 4-75-212(b) and Ark. Code Ann. § 4-75-315(b).

251.    Defendants' acts as alleged herein violate Arkansas's prohibition on monopolies under Ark. Code Ann. §§ 4-75-301 *et seq.*, and Unfair Practices Act, Ark. Code Ann. §§ 4-75-201 *et seq*.

252.    Plaintiff State of Arkansas is entitled to and seeks all remedies available at law or in equity, including, without limitation, the following:

a.    A declaratory judgment, pursuant to Ark. Code Ann. § 4-75-212(a)(1) and Ark. Code Ann. § 4-75-315(a)(1), that Defendants' acts and practices as described in this Complaint violate Arkansas's Unfair Practices Act and its prohibition on monopolies;

b.    Permanent injunctions against Defendants, pursuant to Ark. Code Ann. § 4-75-212(a)(2) and Ark. Code Ann. § 4-75-315(a)(2), enjoining Defendants from engaging in any act that violates Arkansas's Unfair Practices Act and its prohibition on monopolies, including but not limited to the unfair methods of competition alleged herein;

c.    Damages for injuries sustained or restitution for loss as a result of violations of Arkansas antitrust statutes pursuant to Ark. Code Ann. § 4-75-212(b)(1)(A) and Ark. Code Ann. § 4-75-315(b)(1);

d.    Civil penalties pursuant to Ark. Code Ann. § 4-75-212(a)(4) and Ark. Code Ann. § 4-75-315(a)(4);

e.      Costs and attorneys' fees pursuant to Ark. Code Ann. § 4-75-212(a)(4) and Ark. Code Ann. § 4-75-315(a)(4); and

f.      All other just and equitable relief that this Court may deem appropriate.

### Seventh Claim for Relief: Violation of California Law

253.    The State of California incorporates the allegations of Paragraphs 1 through 248 above.

254.    Defendants' acts and practices detailed above also violate California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq., which prohibits any unlawful, unfair, or fraudulent business act or practice.

255.    In bringing its state claims, Plaintiff State of California is entitled to, without limitation, the following relief:

a.      Injunctive, restitution and other equitable relief under the UCL (Cal. Bus. & Prof. Code § 17203); and

b.      Civil penalties assessed at up to $2,500 for each violation of the UCL (Cal. Bus. & Prof. Code § 17206).

### Eighth Claim for Relief: Violation of District of Columbia Law

256.    The District of Columbia incorporates the allegations of Paragraphs 1 through 248 above.

257.    The Attorney General for the District of Columbia brings this action pursuant to D.C. Code § 28-4501, *et seq.* and 15 U.S.C. § 12, *et seq.*

258.    Defendants' conduct alleged herein constitutes unlawful monopolization within the District of Columbia under D.C. Code § 28-4503.

259.    Defendants' conduct alleged herein constitutes unlawful combination in restraint of trade within the District of Columbia under D.C. Code § 28-4502.

260.     The District of Columbia seeks all remedies available under federal law and the District of Columbia Antitrust Act, D.C. Code § 28-4507.

261.     The District of Columbia is also entitled to recover its costs and attorney's fees under D.C. Code § 28-4507(a)(2)(B).

### *Ninth Claim for Relief: Violation of Florida Law*

262.     Plaintiff State of Florida incorporates the allegations of Paragraphs 1 through 248 above.

Florida Antitrust Act

263.     This is an action against Defendants for their violation of the Florida Antitrust Act, Sections 542.18 and 542.19, Florida Statutes.

264.     Defendants engaged in a wide-ranging anticompetitive and exclusionary course of conduct within Florida.

265.     The acts and practices within Defendants' wide-ranging anticompetitive and exclusionary course of conduct alleged herein constitute violations of the Florida Antitrust Act;

266.     The State of Florida seeks all legal and equitable remedies available for violations of the Florida Antitrust Act, Sections 542.18 and 542.19, Florida Statutes.

267.     Defendants' anticompetitive acts alleged herein, or the effects thereof, are continuing and will continue and are likely to recur unless permanently restrained and enjoined.

Florida Deceptive and Unfair Trade Practices Act

268.      This is an action against Defendants for their violation of the Florida Deceptive and Unfair Trade Practices Act, Section 501.204, Florida Statutes.

269.     Defendants engaged in a wide-ranging anticompetitive and exclusionary course of conduct within Florida.

270.     Defendants' unfair methods of competition alleged herein involve trade or commerce within the meaning of the Florida Deceptive and Unfair Trade Practices Act.

271.     The acts and practices within Defendants' wide-ranging anticompetitive and exclusionary course of conduct alleged herein constitute unfair methods of competition in violation of the Florida Deceptive and Unfair Trade Practices Act, Section 501.204, Florida Statutes.

272.     The State of Florida seeks all legal and equitable remedies available for violations of the Florida Deceptive and Unfair Trade Practices Act, Section 501.204, Florida Statutes.

273.     Defendants' unfair methods of competition alleged herein, or the effects thereof, are continuing and will continue and are likely to recur unless permanently restrained and enjoined.

Florida's Prayer for Relief

274.     Award to the State of Florida all legal and equitable remedies available for violations of the Florida Deceptive and Unfair Trade Practices Act, Section 501.204, Florida Statutes;

275.     Award to the State of Florida all legal and equitable remedies available for violations of the Florida Antitrust Act, Sections 542.18 and 542.19, Florida Statutes;

276.     Adjudge and decree that Defendants violated Sections 542.18, and 542.19, Florida Statutes;

277.     Adjudge and decree that Defendants violated Section 501.204, Florida Statutes;

278.     Enjoin and restrain, pursuant to Florida law, Defendants, their affiliates, assignees, subsidiaries, successors, and transferees, and their officers, directors, partners, agents and employees, and all other persons acting or claiming to act on their behalf or in concert with

them, from continuing to engage in any anticompetitive conduct, and from adopting in the future

any practice, plan, program, or device having a similar purpose or effect to the anticompetitive

actions set forth above.

### *Tenth Claim for Relief: Violation of Illinois Law*

279.   Plaintiff State of Illinois incorporates the allegations of Paragraphs 1 through 248

above.

280.   Defendants' acts alleged herein violate Section 3 of the Illinois Antitrust Act, 740

ILCS 10/3(1)-(4).

281.   These violations substantially affect the people who reside in Illinois and

companies that conduct business in Illinois and have impacts within the State of Illinois.

282.   Plaintiff State of Illinois, through its Attorney General, requests that the Court

remedy these illegal acts, seeks all available relief as well as civil penalties under 740 ILCS 10/7.

283.   Plaintiff State of Illinois, through its Attorney General, also seeks to recover its

costs and attorneys' fees under 740 ILCS 10/7(2).

### *Eleventh Claim for Relief: Violation of Maryland Law*

284.   Plaintiff State of Maryland incorporates the allegations of Paragraphs 1 through

248 above.

285.   The Defendants' acts violate the Maryland Antitrust Act, MD Commercial Law

Code Ann. § 11-201 *et seq.* These acts have substantially lessened competition and have

anticompetitive effects within the State of Maryland.

286.   Plaintiff State of Maryland is entitled to all remedies available at law or in equity

(including, but not limited to, damages, injunctive relief, restitution, and divestiture) under

Maryland Commercial Law Code Ann. § 11-209. In addition, the Court may assess civil

penalties, costs, and reasonable attorneys' fees.

### *Twelfth Claim for Relief: Violation of Michigan Law*

287.     Plaintiff State of Michigan incorporates the allegations of Paragraphs 1 through 248 above.

288.     The acts alleged in the Complaint violate the Michigan Antitrust Reform Act, MCL 445.771, *et seq.*

289.     The Attorney General brings this suit in the name of the State of Michigan and on behalf of the people of the State of Michigan in her *parens patriae* capacity.

290.     The acts alleged in the Complaint constitute the establishment, maintenance, or use of a monopoly, or any attempt to establish a monopoly, of trade or commerce in a relevant market by any person, for the purpose of excluding or limiting competition or controlling, fixing, or maintaining prices, pursuant to MCL 445.773.

291.     Michigan seeks all legal and equitable relief authorized by MCL 445.777 and MCL 445.778.

### *Thirteenth Claim for Relief: Violation of Minnesota Law*

292.     Plaintiff State of Minnesota incorporates the allegations of Paragraphs 1 through 248 above.

293.     Defendants' acts as alleged herein violate the Minnesota Antitrust Law of 1971, Minnesota Statutes sections 325D.49 to 325D.66. These violations substantially affect the people of Minnesota and have impacts within the State of Minnesota, including anticompetitive harms, such as increased prices, increased costs, and reduced quality.

294.     Plaintiff State of Minnesota seeks relief, including but not limited to the following:

          a.     Enjoining Defendants and their employees, officers, directors, agents, successors, assignees, affiliates, merged or acquired predecessors, parents, or controlling

entities, subsidiaries, and all other persons acting in concert or participation with them

from engaging in conduct in violation of Minnesota Statutes sections 325D.49-66;

b.     Awarding judgment against Defendants for civil penalties pursuant to

Minnesota Statutes sections 8.31, subd. 3, and 325D.56; and

c.     Costs and reasonable attorneys' fees under Minnesota Statutes sections

325D.57 and 8.31, subd. 3a.

### Fourteenth Claim for Relief: Violation of Nevada Law

Violations of Nevada Unfair Trade Practices Act

295.    The State of Nevada incorporates the allegations of Paragraphs 1 through 248

above.

296.    The Defendants' conduct in the course of selling tickets, booking and promoting

live entertainment shows, and operating concert venues in the State of Nevada has been

unlawful, exclusionary and anticompetitive, as described in detail above, and has harmed fans,

venues, promoters and artists throughout the State of Nevada.

297.    Live Nation's unlawful maintenance of its monopoly power in each of the various

antitrust markets identified in Section VI through anticompetitive and exclusionary conduct, also

constitute violations of Nevada law pursuant to the Nevada Unfair Trade Practices Act, Nev.

Rev. Stat. § 598A.010, *et seq*. See specifically Nev. Rev. Stat. § 598A.060 – Prohibited Acts.

298.    The State of Nevada seeks all remedies available under federal law and the

Nevada Unfair Trade Practices Act including, without limitation, the following:

a.     Civil penalties pursuant to Nev. Rev. Stat. § 598A.170, which provides for

"an amount not to exceed 5 percent of the gross income realized by the sale of

commodities or services sold by such persons in this state in each year in which the

prohibited activities occurred";

b.      Damages for natural persons residing in Nevada that were damaged directly or indirectly by the defendants' conduct, pursuant to Nev. Rev. Stat. § 598A.160;

c.      Injunctive relief pursuant to Nev. Rev. Stat. § 598A.070(c)(1);

d.      Disgorgement, restitution and other equitable relief as provided by Nev. Rev. Stat. § 598A.070(c)(4);

e.      Costs and attorney's fees pursuant to Nev. Rev. Stat. § 598A.200; and

f.      Any other remedies the court may deem appropriate under the facts and circumstances of the case.

### *Fifteenth Claim for Relief: Violation of New Hampshire Law*

299.    Plaintiff State of New Hampshire incorporates the allegations of Paragraphs 1 through 248 above.

300.    The Defendants' acts violate the New Hampshire Combinations and Monopolies Act, NH RSA 356 *et seq*. These acts have substantially lessened competition and have anticompetitive effects within the State of New Hampshire.

301.    Plaintiff State of New Hampshire is entitled to all remedies available at law or in equity (including damages, injunctive relief, restitution, and divestiture) under NH RSA 356 *et seq*. In addition, the Court may assess civil penalties, costs, and reasonable attorneys' fees.

### *Sixteenth Claim for Relief: Violation of New Jersey Law*

302.    Plaintiff State of New Jersey repeats and realleges and incorporates by reference Paragraphs 1 through 248 of this Complaint as if fully set forth herein.

303.    The New Jersey Antitrust Act, N.J.S.A. 56:9-3, states: "It shall be unlawful for any person to monopolize, or attempt to monopolize, or to combine or conspire with any person or persons, to monopolize trade or commerce in any relevant market within this State."

304.    N.J.S.A. 56:9-4(a) of the New Jersey Antitrust Act, states: "Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce, in this State, shall be unlawful."

305.    In the operation of its businesses, Defendant engaged in numerous commercial practices that violate the New Jersey Antitrust Act, N.J.S.A. 56:9-1 to -19, including monopolizing trade or commerce in relevant markets within the State of New Jersey, in violation of N.J.S.A. 56:9-3; and have engaged in conduct constituting restraint of trade or commerce in relevant markets within the State of New Jersey, in violation of N.J.S.A. 56:9-4(a).

306.    Each violation of the New Jersey Antitrust Act by Defendant constitutes a separate unlawful practice and violation, under N.J.S.A. 56:9-16.

307.    To restore competition to the affected markets, New Jersey seeks all remedies available under the New Jersey Antitrust Act, N.J.S.A. 56:9-1 to -19, and/or Section 16 of the Clayton Act including, without limitation, the following:

308.    Divestiture of Ticketmaster and/or venues owned or operated by Live Nation Entertainment, pursuant to N.J.S.A. 56:9-7 and/or Section 16 of the Clayton Act;

309.    Injunctive and other equitable relief prohibiting Defendant's wrongful conduct, pursuant to N.J.S.A. 56:9-10(a);

310.    Equitable monetary relief to remedy Defendant's unlawful conduct, pursuant to N.J.S.A. 56:9-10(b);

311.    Civil penalties of not more than the greater of $100,000 or $500 per day for each and every day of said violation against Defendant, pursuant to N.J.S.A. 56:9-10(c);

312.    Costs and attorney's fees, pursuant to N.J.S.A. 56:9-12; and

313.   Other remedies as the Court may deem appropriate and the interests of justice may require.

### Seventeenth Claim for Relief: Violation of New York Law

314.   Plaintiff State of New York incorporates the allegations of Paragraphs 1 through 248 above.

315.   Defendants' acts as alleged in this Complaint violate New York's Donnelly Act, New York General Business Law §§ 340 *et seq.*, by contracts, agreements, arrangements or combinations that result in the establishment or maintenance of a monopoly and/or by restraining competition.

316.   Defendants' acts alleged in this Complaint also violate Section 63(12) of New York's Executive Law, in that Defendants have engaged in repeated and/or persistent illegal acts, including violations of Sections 1 and 2 of the Sherman Act, as well as violations of the Donnelly Act.

317.   To restore competition to the affected markets, New York seeks equitable relief, including an injunction prohibiting Defendants' wrongful conduct, as well divestitures of Ticketmaster and venues owned or operated by Live Nation Entertainment, pursuant to Section 16 of the Clayton Act, New York General Business Law § 342 and/or Section 63(12) of the New York Executive Law.

318.   New York also seeks equitable monetary relief to deter and remedy Defendants' unlawful conduct pursuant to Section 63(12) of the New York Executive Law.

319.   New York seeks also civil penalties of $1,000,000 per violation against each defendant, pursuant to New York Business Law § 342-a, as well as fees and costs pursuant to federal and state law.

### Eighteenth Claim for Relief: Violation of Ohio Law

<u>Violations of Ohio's Valentine Act Against All Defendants</u>

320.     Plaintiff State of Ohio incorporates the allegations of Paragraphs 1 through 248 above.

321.     Defendants Live Nation Entertainment, Inc. and Ticketmaster L.L.C. contract with and provide live entertainment services and commodities to Ohio businesses and consumers.

322.     Plaintiff brings this action pursuant to Ohio Rev. Code § 109.81 and Ohio Rev. Code Chapter 1331.

323.     Plaintiff, having reasonable cause to believe that violations of Ohio's antitrust laws have occurred, brings this action in his sovereign capacity pursuant to Ohio Rev. Code §109.81 to enforce Ohio law.

324.     Defendants, by and through their officers, directors, employees, agents, or other representatives, have engaged in a combination of capital, skill, or acts to create or carry out restrictions in trade or commerce in violation of Ohio's Valentine Act, codified in Ohio Rev. Code Chapter 1331.

325.     Defendants' collective and individual activities detailed above, including the vertical arrangements, constitute Trusts under Ohio Rev. Code § 1331.01(C)(1)(a), (b), and (e) and are thus illegal under Ohio's Valentine Act.

326.     The purposes or effects of Defendants' Trusts are to decrease competition, raise prices, and/or stifle innovation in all of the alleged relevant markets. Ohio Rev. Code § 1331.09.

327.     This complaint constitutes due notice of these violations under Ohio Rev. Code § 1331.03.

328.    Plaintiff seeks the following remedies pursuant to Ohio Rev. Code § 109.81 and

Chapter 1331:

        a.    Civil forfeiture pursuant to Ohio Rev. Code § 1331.03;

        b.    Relief permanently enjoining Defendants Live Nation Entertainment, Inc.

and Ticketmaster L.L.C. from engaging in any acts that violate Ohio's Valentine Act;

        c.    Costs, attorneys' fees, and interest; and

        d.    Other remedies the court may deem appropriate according to the facts and

circumstances of the case.

### *Nineteenth Claim for Relief: Violation of Oregon Law*

329.    Plaintiff State of Oregon incorporates the allegations of Paragraphs 1 through 248

above.

330.    Defendants' acts as alleged herein violate the Oregon Antitrust Act, Oregon

Revised Statutes 606.705 *et seq*. These violations substantially affect the people of Oregon and

have impacts within the State of Oregon.

331.    Plaintiff State of Oregon seeks relief, including but not limited to the following:

        a.    Enjoining Defendants and their employees, officers, directors, agents,

successors, assignees, affiliates, merged or acquired predecessors, parents, or controlling

entities, subsidiaries, and all other persons acting in concert or participation with them

from engaging in conduct in violation of Oregon Revised Statutes 646.705 *et seq*.;

        b.    Awarding judgment against Defendants for civil penalties for each of the

first through fifth claims above pursuant to Oregon Revised Statues 646.760;

        c.    Costs and reasonable attorneys' fees under Oregon Revised Statutes

646.760; and

        d.    All legal and equitable remedies available under federal law and Oregon's

Antitrust Act, ORS 646.705 *et seq.*, and any additional relief as the court finds just and proper.

### Twentieth Claim for Relief: Violation of Rhode Island Law

332.   The state of Rhode Island incorporates the allegations of Paragraphs 1 through 248 above.

333.   The acts alleged in causes of action 1–5 also constitute antitrust violations pursuant to the Rhode Island Antitrust Act, R.I. Gen. L. §§ 6-36-1, *et seq*.

334.   Rhode Island seeks all remedies available under federal law or the Rhode Island Antitrust Act including, without limitation, the following:

a.   Civil penalties pursuant to R.I. Gen. L. 6-36-10(c), which provides that "any person who violates this chapter may be liable for a civil penalty of not more than fifty thousand dollars ($50,000) for each violation;"

b.   Injunctive and other equitable relief pursuant to R.I. Gen. L. § 6-36;

c.   Costs and attorney's fees pursuant to § 6-36-11(a); and

d.   Other remedies as the court may deem appropriate under the facts and circumstances of the case.

### Twenty-first Claim for Relief: Violation of South Carolina Law

335.   Plaintiff State of South Carolina incorporates the allegations of Paragraphs 1 through 248 above. Each allegation is brought separately against each Defendant.

336.   The Attorney General of South Carolina is bringing this action in the name of the State pursuant to S.C. Code § 39-5-50.

337.   At all times described herein, the Defendants were engaged in conduct which constitutes "trade" and "commerce" as defined in S.C. Code § 39-5-10(b).

338.    Defendants' acts or practices regarding South Carolina consumers as alleged herein are capable of repetition and affect the public interest.

339.    Defendants' acts or practices alleged herein constitute "unfair methods of competition" under S.C. Code § 39-5-20. Every unfair act or practice by each Defendant constitutes a separate and distinct violation of S.C. Code § 39-5-20.

340.    Defendants' acts or practices alleged herein are offensive to established public policy, immoral, unethical, or oppressive.

341.    At all times Defendants knew or should have known their conduct violated S.C. Code § 39-5-20 and, therefore, the conduct is willful for purposes of S.C. Code § 39-5-110, justifying civil penalties.

342.    Plaintiff State of South Carolina seeks all remedies available under the South Carolina Unfair Trade Practices Act (SCUTPA) including, without limitation, the following:

a.      Permanently enjoin Defendants pursuant to S.C. Code § 39-5-50(a) from engaging in any acts that violate SCUTPA, including, but not limited to, the unfair methods of competition and unfair or deceptive acts or practices alleged herein;

b.      Civil penalties in the amount of $5,000, pursuant to S.C. Code § 39-5-110(a), for every willful violation of SCUTPA;

c.      Ascertainable loss damages as determined by the Court under S.C. Code § 39-5-50(b);

d.      Costs and attorneys' fees pursuant to S.C. Code § 39-5-50(a) and S.C. Code § 1-7-85; and

e.      All other legal and equitable relief as the court may deem appropriate under the facts and circumstances of the case.

### Twenty-second Claim for Relief: Violation of Tennessee Law

343.    Plaintiff State of Tennessee incorporates the allegations of Paragraphs 1 through 248 above.

344.    Defendants engaged in the conduct described above while selling tickets, promoting shows, and operating venues in Tennessee. This anticompetitive conduct in Tennessee harmed thousands of fans, venues, promoters, and artists across the state.

345.    As a result of this conduct, and the concomitant reduction in competition in the relevant markets, Tennesseans and Tennessee businesses have suffered anticompetitive harms, including increased prices, increased costs, and reduced quality.

346.    This conduct has affected Tennessee commerce to a substantial degree.

347.    Accordingly, Defendants' actions violate the Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101 *et seq.*, as amended.

348.    To remedy this anticompetitive conduct, the Tennessee Attorney General and Reporter seeks all legal and equitable relief to which it is entitled at law and equity.

### Twenty-third Claim for Relief: Violation of Texas Law

349.    Plaintiff State of Texas repeats and realleges the allegations of Paragraphs 1 through 248 above. Each allegation is brought separately against each Defendant.

350.    The aforementioned practices by Defendants Live Nation Entertainment, Inc. and Ticketmaster L.L.C. were and are in violation of Texas Business and Commerce Code § 15.01 et seq.

351.    Plaintiff State of Texas has reason to believe that Defendants have engaged in, and will continue to engage in, the anticompetitive and exclusionary course of conduct set forth herein, has caused and will cause adverse effects to consumers and harm to economic competition in trade and commerce in this State, and will cause damage to the State of Texas and

to persons in the State of Texas. Therefore, the Antitrust Division of the Office of the Attorney General of the State of Texas believes and is of the opinion that this matter is in the public interest.

352.    The State of Texas requests a judgment that the Defendants engaged in conduct in violation of Texas Business and Commerce Code § 15.01 et seq.

353.    The State of Texas requests a civil fine up to the maximum amount allowed pursuant to Texas Business and Commerce Code § 15.20(a).

354.    The State of Texas requests the issuance of a permanent injunction to enjoin any activity or contemplated activity that violates or threatens to violate any of the prohibitions in § 15.05 pursuant to the Texas Business and Commerce Code § 15.20(b).

355.    The State of Texas requests its costs of this suit, including attorneys' fees, pursuant to Section 15.20(b) of the Texas Business and Commerce Code and Section 402.006 of the Texas Government Code.

### *Twenty-fourth Claim for Relief: Violation of Virginia Law*

356.    Plaintiff Commonwealth of Virginia incorporates the allegations of Paragraphs 1 through 248 above.

357.    In addition to violating federal law, Defendants' acts described above violate the Virginia Antitrust Act, Va. Code § 59.1-9.1 *et seq.*

358.    Defendants engaged in the conduct described above while selling tickets, promoting concerts, and operating venues in Virginia. This anticompetitive conduct harmed fans, venues, promoters, and artists across the Commonwealth and affected commerce therein.

359.    Plaintiff Commonwealth of Virginia is entitled to legal and equitable remedies for the claims alleged above, including but not limited to civil penalties under Va. Code § 59.1-9.11

and other remedies (including recovery of costs and attorney's fees) under Va. Code § 59.1-9.15, in addition to the remedies available to it under federal law as alleged above.

### *Twenty-fifth Claim for Relief: Violation of Washington Law*

360.     The state of Washington incorporates the allegations of Paragraphs 1 through 248 above.

361.     The acts alleged in the claims for relief also constitute antitrust violations pursuant to the Washington Consumer Protection Act under Wash. Rev. Code § 19.86.030 (2024) and § 19.86.040 (2024).

362.     Washington seeks all injunctive remedies available under federal law.

363.     Washington seeks the following remedies available under the Washington Consumer Protection Act including, without limitation, the following:

   a.     That the Court adjudge and decree the conduct alleged in the complaint to be unlawful and in violation of the Washington Consumer Protection Act, Wash. Rev. Code § 19.86.030 (2024) and § 19.86.040 (2024).

   b.     Injunctive and other equitable relief pursuant to Wash. Rev. Code § 19.86.080 (2024);

   c.     Disgorgement and restitution pursuant to Wash. Rev. Code § 19.86.080 (2024);

   d.     Civil penalties pursuant to Wash. Rev. Code § 19.86.140 (2024);

   e.     Costs and attorney's fees pursuant to Wash. Rev. Code § 19.86.080 (2024); and

   f.     Other remedies, including pre-judgment interest, as the court may deem appropriate under the facts and circumstances of the case.

### Twenty-sixth Claim for Relief: Violation of West Virginia Law

364.   Plaintiff State of West Virginia incorporates the allegations of Paragraphs 1 through 248 above.

365.   Defendants' acts described above violate the West Virginia Antitrust Act, *see* W. Va. Code § 47– 18–1 *et seq*. These violations substantially affected the State of West Virginia and had impacts within the State of West Virginia.

366.   Plaintiff State of West Virginia is entitled to all remedies available at law or in equity (including damages, injunctive relief, disgorgement, restitution, and reimbursement), as well as civil penalties under West Virginia Code § 47–18–1 *et seq*.

367.   Plaintiff State of West Virginia also is entitled to recover its costs and attorneys' fees under West Virginia Code §§ 47–18–8, -9, and -17.

### Twenty-seventh Claim for Relief: Violation of Wisconsin Law

368.   Plaintiff State of Wisconsin repeats and re-alleges and incorporates by reference the allegations of Paragraphs 1 through 248 above as if fully set forth herein.

369.   The aforementioned practices by Defendants violate Wisconsin's Antitrust Act, Wis. Stat. Ch. § 133.03 *et seq*. These violations substantially affect the people of Wisconsin and have impacts within the State of Wisconsin.

370.   Plaintiff State of Wisconsin, through its Attorney General and under its antitrust enforcement authority in Wis. Stat. Ch. 133, is entitled to all remedies available under Wis. Stat. §§ 133.03, 133.16, 133.17, and 133.18.

## IX.   Request for Relief

371.   To remedy these illegal acts, Plaintiffs request that the Court:

a.      Adjudge and decree that Live Nation has acted unlawfully to maintain its monopoly in the markets for the provision of primary ticketing services to major concert

venues, the provision of primary concert ticketing services to major concert venues, and the provision of primary concert ticketing offerings to fans at major concert venues (even if combined with services that offer resale of concert tickets), in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 and the state laws cited in paragraphs 249 through 370 above;

b.      Adjudge and decree that Live Nation has acted unlawfully by entering into long-term exclusive primary ticketing contracts with major concert venues that unreasonably restrain trade in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and the state laws cited in paragraphs 249 through 370 above;

c.      Adjudge and decree that Live Nation has acted unlawfully by tying artists' use of Live Nation owned, controlled and exclusively-booked large amphitheaters to their purchase of promotional services from Live Nation in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and the state laws cited in paragraphs 249 through 370 above;

d.      Adjudge and decree that Live Nation has acted unlawfully to maintain its monopoly in the market for the provision of the use of large amphitheaters and ancillary services to artists on large amphitheater tours, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 and the state laws cited in paragraphs 249 through 370 above;

e.      Adjudge and decree that Live Nation has acted unlawfully to maintain its monopoly in the markets for the provision of concert booking and promotion services to major concert venues and the provision of promotion services to artists performing in major concert venues, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 and the state laws cited in paragraphs 249 through 370 above;

f.      Order the divestiture of, at minimum, Ticketmaster, along with any additional relief as needed to cure any anticompetitive harm;

g.      Order the termination of Live Nation's ticketing agreement with Oak View Group;

h.      Enjoin Live Nation from continuing to engage in anticompetitive practices described herein and from engaging in other practices with the same purpose and effect as the challenged practices;

i.      Enter any other preliminary or permanent relief necessary and appropriate to restore competitive conditions in the markets affected by Live Nation's unlawful conduct;

j.      Award any additional relief in law or equity the Court finds just and proper; and

k.      Award each Plaintiff, as applicable, an amount equal to its costs, including reasonable attorneys' fees, incurred in bringing this action.

## X.      Demand for a Jury Trial

372.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all issues properly triable to a jury in this case.

Dated this 23d day of May, 2024.

Respectfully submitted,


**FOR PLAINTIFF UNITED STATES OF AMERICA**:


JONATHAN S. KANTER                           _/s/ Bonny Sweeney_
Assistant Attorney General for Antitrust      BONNY SWEENEY
                                              SEANA BUZBEE
DOHA G. MEKKI                                 ALEX COHEN
Principal Deputy Assistant Attorney General   BRITTNEY DIMOND
for Antitrust                                 JONATHAN GOLDSMITH
                                              MATTHEW HUPPERT
ANDREW J. FORMAN                              COLLIER KELLEY
Deputy Assistant Attorney General             SARAH LICHT
                                              ARIANNA MARKEL
HETAL J. DOSHI                                JENNIFER ROUALET
Deputy Assistant Attorney General             CHINITA SINKLER
                                              JOHN R. THORNBURGH II
RYAN DANKS                                    ROBERT VANCE
Director of Civil Enforcement                 *Attorneys*

CATHERINE K. DICK                             United States Department of Justice
Acting Director of Litigation                 Antitrust Division
                                              450 Fifth Street N.W., Suite 4000
MIRIAM R. VISHIO                              Washington, DC 20530
Deputy Director of Civil Enforcement          Telephone: (202) 725-0165
                                              Facsimile: (202) 514-7308
OWEN M. KENDLER                               Email: Bonny.Sweeney@usdoj.gov
Chief, Financial Services, Fintech, & Banking
Section                                       *Attorneys for the United States*

MEAGAN K. BELLSHAW
Assistant Chief, Financial Services, Fintech, &
Banking Section

**FOR PLAINTIFF STATE OF ARIZONA:**

KRISTIN K. MAYES
ATTORNEY GENERAL

/s/ Robert A. Bernheim
ROBERT A. BERNHEIM
(*pro hac vice* forthcoming)

CONNOR NOLAN
(*pro hac vice* forthcoming)

Office of the Arizona Attorney General
Consumer Protection & Advocacy Section
2005 N. Central Avenue
Phoenix, AZ 85004
Telephone: (602) 542-3725
Fax: (602) 542-4377
Robert.Bernheim@azag.gov
Connor.Nolan@azag.gov

*Attorneys for Plaintiff State of Arizona*


**FOR PLAINTIFF STATE OF ARKANSAS:**

TIM GRIFFIN
ATTORNEY GENERAL

By: _____
Amanda J. Wentz, Ark. Bar No. 2021066
Assistant Attorney General

Arkansas Attorney General's Office
323 Center Street, Suite 200
Little Rock, AR 72201
Phone: (501) 682-1178
Fax: (501) 682-8118
Email: amanda.wentz@arkansasag.gov
(*pro hac vice* forthcoming)

*Attorneys for Plaintiff State of Arkansas*

**FOR PLAINTIFF STATE OF CALIFORNIA:**

ROB BONTA
Attorney General

/s/ Paula Lauren Gibson
PAULA L. BLIZZARD, Senior Assistant Attorney General
NATALIE S. MANZO, Supervising Deputy Attorney General
PAULA LAUREN GIBSON, Deputy Attorney General
(CA Bar No. 100780)
Office of the Attorney General
California Department of Justice
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
Tel: (213) 269-6040
Email: paula.gibson@doj.ca.gov

*Attorneys for Plaintiff State of California*
*Pro hac vice* application forthcoming

**FOR PLAINTIFF STATE OF COLORADO**:

PHILIP J. WEISER
Attorney General

CONOR J. MAY
Assistant Attorney General
*(Pro Hac Vice Forthcoming)*
BRYN A. WILLIAMS
First Assistant Attorney General
JONATHAN B. SALLET
Special Assistant Attorney General
ARIC SMITH
Assistant Attorney General
*(Pro Hac Vice Forthcoming)*
Colorado Department of Law
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email: Conor.May@coag.gov
Bryn.Williams@coag.gov

Jon.Sallet@coag.gov
Aric.Smith@coag.gov

*Attorneys for the Plaintiff State of Colorado*


**FOR PLAINTIFF STATE OF CONNECTICUT:**

WILLIAM TONG
ATTORNEY GENERAL OF CONNECTICUT

Jeremy Pearlman
Associate Attorney General
Email: Jeremy.pearlman@ct.gov

/s/ Nicole Demers
Nicole Demers
Deputy Associate Attorney General
Email: nicole.demers@ct.gov
(*pro hac vice* forthcoming)

/s/ Kim Carlson McGee
Kim Carlson McGee
Assistant Attorney General
Email: kim.mcgee@ct.gov
(*pro hac vice* forthcoming)

/s/ Rahul A. Darwar
Rahul A. Darwar
Assistant Attorney General
Email: rahul.darwar@ct.gov
(*pro hac vice* forthcoming)

Office of the Attorney General of Connecticut
165 Capitol Avenue
Hartford, CT 06106
Telephone: 860-808-5030

*Attorneys for Plaintiff State of Connecticut*


**FOR PLAINTIFF DISTRICT OF COLUMBIA:**

BRIAN L. SCHWALB
Attorney General

JENNIFER C. JONES
Deputy Attorney General
Public Advocacy Division

BETH MELLEN
WILLIAM F. STEPHENS
Assistant Deputy Attorneys General
Public Advocacy Division

*/s/ Amanda Hamilton*
Amanda Hamilton
Assistant Attorney General
Amanda.Hamilton@dc.gov
(*pro hac vice* forthcoming)

Adam Gitlin
Chief, Antitrust and Nonprofit Enforcement Section
Adam.Gitlin@dc.gov
(*pro hac vice* forthcoming)

Cole Niggeman
Assistant Attorney General
Cole.Niggeman@dc.gov
(*pro hac vice* forthcoming)

Office of the Attorney General for the District of Columbia
400 6th Street NW
Washington, D.C. 20001

*Attorneys for Plaintiff District of Columbia*


**FOR PLAINTIFF STATE OF FLORIDA:**

ASHLEY MOODY
ATTORNEY GENERAL OF FLORIDA

*/s/ Lizabeth A. Brady*
Lizabeth A. Brady
Director, Antitrust Division
Liz.Brady@myfloridalegal.com

Lee Istrail
Assistant Attorney General
Lee.Istrail@myfloridalegal.com

(pro hac vice forthcoming)

Nicole A. Sarrine
Assistant Attorney General
Nicole.Sarrine@myfloridalegal.com
(pro hac vice forthcoming)

Tyler A. Kovacs
Assistant Attorney General
Tyler.Kovacs@myfloridalegal.com
(pro hac vice forthcoming)

Florida Office of the Attorney General
PL-01 The Capitol
Tallahassee, FL 32399-1050
850-414-3300

*Attorneys for Plaintiff State of Florida*

**FOR PLAINTIFF STATE OF ILLINOIS:**

KWAME RAOUL
Attorney General

Richard S. Schultz
Assistant Attorney General
Richard.Schultz@ilag.gov

Daniel Betancourt
Assistant Attorney General
Daniel.Betancourt@ilag.gov

Office of the Illinois Attorney General
115 S. LaSalle Street, Floor 23
Chicago, IL 60603
Tel: (872) 272-0996
Fax: (312) 814-4902

*Attorneys for Plaintiff State of Illinois*
*Pro hac vice* applications forthcoming

110

**FOR PLAINTIFF STATE OF MARYLAND:**

ANTHONY G. BROWN
Attorney General

/s/ Schonette J. Walker

Schonette J. Walker
Assistant Attorney General
Chief, Antitrust Division
swalker@oag.state.md.us

Gary Honick
Assistant Attorney General
Deputy Chief, Antitrust Division
ghonick@oag.state.md.us

Byron Warren
Assistant Attorney General
bwarren@oag.state.md.us
200 St. Paul Place, 19th floor
Baltimore, Maryland 21202
(410) 576-6470

(*Pro hac vice* applications forthcoming)

*Attorneys for Plaintiff State of Maryland*


**FOR PLAINTIFF COMMONWEALTH OF MASSACHUSETTS:**

ANDREA JOY CAMPBELL
ATTORNEY GENERAL

/s/ Katherine W. Krems
KATHERINE W. KREMS (MA Bar # 710455)
Assistant Attorney General, Antitrust Division
(*pro hac vice* forthcoming)
MICHAEL B. MACKENZIE (MA Bar # 683305)
Deputy Chief, Antitrust Division
WILLIAM T. MATLACK (MA Bar # 552109)
Chief, Antitrust Division
Office of the Massachusetts Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108

Tel: (617) 963-2180
Email: Katherine.Krems@mass.gov

*Attorneys for Plaintiff Commonwealth of Massachusetts*

**FOR PLAINTIFF STATE OF MICHIGAN:**

DANA NESSEL
Attorney General of Michigan

_____
JASON R. EVANS
Division Chief
Corporate Oversight Division
EvansJ@michigan.gov

_____
JONATHAN S. COMISH
Assistant Attorney General
Corporate Oversight Division
ComishJ@michigan.gov

_____
LEANN D. SCOTT
Assistant Attorney General
Corporate Oversight Division
ScottL21@michigan.gov

Michigan Department of Attorney General
525 W Ottawa St.
Lansing, MI 48933
Telephone: 517-335-7622

*Attorneys for Plaintiff State of Michigan*
*Pro hac vice* application forthcoming


**FOR PLAINTIFF STATE OF MINNESOTA:**

KEITH ELLISON
ATTORNEY GENERAL

JAMES CANADAY
Deputy Attorney General

/s/ Katherine A. Moerke
KATHERINE A. MOERKE
(*pro hac vice* motion forthcoming)
ELIZABETH ODETTE
(*pro hac vice* motion forthcoming)
ZACH BIESANZ
Assistant Attorneys General
Office of the Minnesota Attorney General
Suite 1400
445 Minnesota Street
St. Paul, MN 55101
Telephone: (651) 757-1433
Fax: (651) 296-9663
katherine.moerke@ag.state.mn.us
elizabeth.odette@ag.state.mn.us
zach.biesanz@ag.state.mn.us

*Attorneys for Plaintiff State of Minnesota*


**FOR PLAINTIFF STATE OF NEVADA:**

AARON D. FORD
Nevada Attorney General

ERNEST D. FIGUEROA
Consumer Advocate

/s/ Lucas J. Tucker

Lucas J. Tucker
Senior Deputy Attorney General (NV Bar No. 10252)

LTucker@ag.nv.gov

Michelle C. Badorine
Senior Deputy Attorney General (NV Bar No. 13206)
MBadorine@ag.nv.gov
Office of the Nevada Attorney General
Bureau of Consumer Protection
8945 West Russell Road., Suite 204
Las Vegas, Nevada 89148
Tel: 702-486-3256

*Attorneys for Plaintiff State of Nevada*


**FOR PLAINTIFF STATE OF NEW HAMPSHIRE:**

JOHN M. FORMELLA
ATTORNEY GENERAL

*/s/ Zachary Frish*
Zachary Frish
(pro hac vice forthcoming)
Assistant Attorney General
Consumer Protection and Antitrust Bureau
New Hampshire Department of Justice
One Granite Place South
Concord, NH 03301
603-271-3658
Zachary.A.Frish@doj.nh.gov

*Attorney for Plaintiff State of New Hampshire*


**FOR PLAINTIFF STATE OF NEW JERSEY:**

MATTHEW J. PLATKIN
Attorney General of New Jersey

Isabella Pitt
(*pro hac vice* forthcoming)
Assistant Section Chief – Antitrust
Isabella.Pitt@law.njoag.gov

/s/ Yale Leber
Yale Leber
(*pro hac vice* forthcoming)
Deputy Attorney General
Yale.Leber@law.njoag.gov

Andrew Esoldi
(*pro hac vice* forthcoming)
Deputy Attorney General
Andrew.Esoldi@law.njoag.gov

New Jersey Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
(973) 648-3070

*Attorneys for Plaintiff State of New Jersey*


**FOR PLAINTIFF STATE OF NEW YORK:**

LETITIA JAMES
ATTORNEY GENERAL OF NEW YORK

 */s/* Jeremy R. Kasha

Jeremy R. Kasha
Assistant Attorney General
Jeremy.Kasha@ag.ny.gov

Amy E. McFarlane
Deputy Chief, Antitrust Bureau
Amy.McFarlane@ag.ny.gov

Elinor R. Hoffmann
Chief, Antitrust Bureau
Elinor.Hoffmann@ag.ny.gov

Christopher D'Angelo
Chief Deputy Attorney General
Economic Justice Division
Christopher.D'Angelo@ag.ny.gov
(pro hac vice forthcoming)

New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
212-416-8262

*Attorneys for Plaintiff State of New York*


**FOR PLAINTIFF STATE OF NORTH CAROLINA:**

JOSHUA H. STEIN
ATTORNEY GENERAL

 */s/* Jasmine S. McGhee
Jasmine S. McGhee
Senior Deputy Attorney General
Director, Consumer Protection Division
JMcghee@ncdoj.gov
(pro hac vice forthcoming)

Sarah G. Boyce
Deputy Attorney General & General Counsel
SBoyce@ncdoj.gov
(pro hac vice forthcoming)

North Carolina Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
Phone: (919) 716-6000
Facsimile: (919) 716-6050

*Attorneys for Plaintiff State of North Carolina*

**FOR PLAINTIFF STATE OF OHIO:**

DAVE YOST
OHIO ATTORNEY GENERAL

*/s/ Sarah Mader*
Sarah Mader (*pro hac vice forthcoming*)
Assistant Attorney General, Antitrust Section
Sarah.Mader@OhioAGO.gov

Edward W. Mehrer III (*pro hac vice forthcoming*)
Assistant Attorney General, Antitrust Section
Trey.Mehrer@OhioAGO.gov

Erik Clark
Deputy Attorney General for Major Litigation

Beth A. Finnerty
Section Chief, Antitrust Section

Office of the Ohio Attorney General
30 E. Broad St., 26th Floor
Columbus, OH 43215
Telephone: (614) 466-4328

*Attorneys for Plaintiff State of Ohio*


**FOR PLAINTIFF STATE OF OKLAHOMA:**

GENTNER DRUMMOND
Attorney General of Oklahoma


CALEB J. SMITH
Assistant Attorney General
Consumer Protection Unit
Office of the Oklahoma Attorney General
15 West 6th Street
Suite 1000
Tulsa, OK 74119
Telephone: 918-581-2230
Email: caleb.smith@oag.ok.gov

*Attorneys for Plaintiff State of Oklahoma*
*Pro hac vice* application forthcoming

**FOR PLAINTIFF STATE OF OREGON:**

Ellen F. Rosenblum
Oregon Attorney General

*/s/ Tim Nord*
_____
TIM NORD
Special Counsel
Tim.D.Nord@doj.oregon.gov
(pro hac vice forthcoming)
Civil Enforcement Division
Oregon Department of Justice
1162 Court Street NE
Salem, Oregon 97301
Tel: (503) 934-4400
Fax: (503) 378-5017

*Attorneys for Plaintiff State of Oregon*


**FOR PLAINTIFF COMMONWEALTH OF PENNSYLVANIA:**

MICHELLE A. HENRY
Attorney General

James A. Donahue, III
First Deputy Attorney General
jdonahue@attorneygeneral.gov

Mark A. Pacella
Executive Deputy Attorney General
Public Protection Division
mpacella@attorneygeneral.gov

/s/ Tracy W. Wertz
Tracy W. Wertz
Chief Deputy Attorney General
Antitrust Section
twertz@attorneygeneral.gov
(pro hac vice forthcoming)

Joseph S. Betsko
Assistant Chief Deputy Attorney General

Antitrust Section
jbetsko@attorneygeneral.gov
(pro hac vice forthcoming)

Jennifer A. Thomson
Senior Deputy Attorney General
Antitrust Section
jthomson@attorneygeneral.gov
(pro hac vice forthcoming)

Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
Phone: (717) 787-4530

*Attorneys for Plaintiff Commonwealth of Pennsylvania*


**FOR PLAINTIFF STATE OF RHODE ISLAND:**

PETER F. NERONHA
Attorney General

/s/ *Stephen N. Provazza*
Stephen N. Provazza
*Assistant Attorney General*
Chief, Consumer and Economic Justice Unit
(pro hac vice forthcoming)

Paul T.J. Meosky
*Special Assistant Attorney General*
Office of the Attorney General – State of Rhode Island
(pro hac vice forthcoming)

150 South Main Street
Providence, RI 02903
(401) 274-4400 (telephone)
(401) 222-2995 (fax)
sprovazza@riag.ri.gov
pmeosky@riag.ri.gov

*Attorneys for Plaintiff State of Rhode Island*

**FOR PLAINTIFF STATE OF SOUTH CAROLINA:**

ALAN M. WILSON
ATTORNEY GENERAL OF SOUTH CAROLINA

/s/ Alan M. Wilson
ALAN M. WILSON, Fed. ID # 10457
Attorney General of South Carolina

W. JEFFREY YOUNG, Fed. ID # 6122
Chief Deputy Attorney General

C. HAVIRD JONES, JR., Fed. ID # 2227
Senior Assistant Deputy Attorney General
SJones@scag.gov

JARED Q. LIBET, Fed. ID # 9882
Assistant Deputy Attorney General
JLibet@scag.gov

DANIELLE A. ROBERTSON, Fed. ID # 14007
Assistant Attorney General
DaniRobertson@scag.gov
 (pro hac vice forthcoming)

OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA
P.O. Box 11549
Columbia, South Carolina 29211
 (803) 734-0274

*Attorneys for Plaintiff State of South Carolina*


**FOR PLAINTIFF STATE OF TENNESSEE:**

JONATHAN SKRMETTI
Attorney General and Reporter

/s/ J. David McDowell
J. DAVID MCDOWELL
Deputy, Consumer Protection Division

HAMILTON MILLWEE

MARILYN GUIRGUIS
TYLER CORCORAN
Assistant Attorneys General

Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 38202
Telephone: 615-741-8722
Email:David.McDowell@ag.tn.gov
Hamilton.Millwee@ag.tn.gov
Marilyn.Guirguis@ag.tn.gov
Tyler.Corcoran@ag.tn.gov

*Attorneys for Plaintiff State of Tennessee*
*Pro Hac Vice Motions Forthcoming*


**FOR PLAINTIFF STATE OF TEXAS:**

KEN PAXTON
Attorney General

*/s/ Trevor E. D. Young*
BRENT WEBSTER
First Assistant Attorney General
JAMES LLOYD
Deputy Attorney General for Civil Litigation
TREVOR YOUNG (*pro hac vice* forthcoming)
Deputy Chief, Antitrust Division
DIAMANTE SMITH (*pro hac vice* forthcoming)
Assistant Attorney General, Antitrust Division

Office of the Attorney General of Texas
P.O. Box 12548
Austin, TX 78711-2548
(512) 936-1674

*Attorneys for Plaintiff State of Texas*

**FOR PLAINTIFF COMMONWEALTH OF VIRGINIA:**

JASON S. MIYARES
Attorney General of Virginia

STEVEN G. POPPS
Deputy Attorney General
Civil Division

/s/ David C. Smith
TYLER T. HENRY (*pro hac vice* forthcoming)
Senior Assistant Attorney General
DAVID C. SMITH (*pro hac vice* forthcoming)
Assistant Attorney General
CHANDLER P. CRENSHAW (*pro hac vice* forthcoming)
Assistant Attorney General

Office of the Attorney General of Virginia
202 North 9th Street
Richmond, Virginia 23219
Telephone:     (804) 786-2071
Facsimile:      (804) 786-0122
Email: THenry@oag.state.va.us
DSmith@oag.state.va.us
CCrenshaw@oag.state.va.us

*Attorneys for Plaintiff Commonwealth of Virginia*


**FOR PLAINTIFF STATE OF WASHINGTON:**

ROBERT W. FERGUSON
Attorney General

s/ Rachel A. Lumen
RACHEL LUMEN, WSBA No. 47918

Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206.464.5343
Rachel.Lumen@atg.wa.gov
(*pro hac vice* forthcoming)

*Attorney for the Plaintiff State of Washington*

**FOR PLAINTIFF STATE OF WEST VIRGINIA:**

PATRICK MORRISEY
ATTORNEY GENERAL OF WEST VIRGINIA

  */s/* Douglas L. Davis
Douglas L. Davis
Senior Assistant Attorney General
douglas.l.davis@wvago.gov
(*pro hac vice* forthcoming)

Ann L. Haight
Director and Deputy Attorney General
Consumer Protection and Antitrust Division
ann.l.haight@wvago.gov

West Virginia Office of the Attorney General
1900 Kanawha Boulevard East
Capitol Complex
Building 6, Suite 401
Charleston, WV 25305
(tel) 304-558-8986
(fax) 304-559-0184

*Attorneys for Plaintiff State of West Virginia*

**FOR PLAINTIFF STATE OF WISCONSIN:**

JOSHUA L. KAUL
ATTORNEY GENERAL OF WISCONSIN

/s/ Laura E. McFarlane

Laura E. McFarlane
Assistant Attorney General
mcfarlanele@doj.state.wi.us
(*pro hac vice* forthcoming)

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707
(608) 266-8911

*Attorneys for Plaintiff State of Wisconsin*

**FOR PLAINTIFF STATE OF WYOMING:**

BRIDGET HILL
ATTORNEY GENERAL OF WYOMING

/s/ William T. Young
William T. Young
Assistant Attorney General
William.Young@wyo.gov
(*pro hac vice* forthcoming)

Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
(307) 777-7841

*Attorneys for the Plaintiff State of Wyoming*