O6QKUSAC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,
     et al.,
 4
                    Plaintiffs,
 5
                v.                        24 CV 3973 (AS)
 6
     LIVE NATION ENTERTAINMENT,
 7   INC., et al.,
                                          Conference
 8
                    Defendants.
 9
     ------------------------------x
10                                        New York, N.Y.
                                          June 27, 2024
11                                        11:00 a.m.

12   Before:

13                   HON. ARUN SUBRAMANIAN,

14                                        District Judge

15                         APPEARANCES

16   UNITED STATES DEPARTMENT OF JUSTICE
          Attorneys for Plaintiff United States of America
17   BY:  BONNY E. SWEENEY
          ARIANNA MARKEL
18        JOHN R. THORNBURGH, II
          LORRAINE VAN KIRK
19        SARAH LICHT

20   NEW YORK STATE ATTORNEY GENERAL
          Attorneys for Plaintiff State of New York
21   BY:  JEREMY R. KASHA
          ELINOR ROSE HOFFMANN
22        AMY ELIZABETH McFARLANE

23   FLORIDA ATTORNEY GENERAL'S OFFICE
          Attorneys for Plaintiff State of Florida
24   BY:  LIZABETH A. BRADY

25
```

O6QKUSAC

1                          APPEARANCES (Continued)

2   PENNSYLVANIA OFFICE OF ATTORNEY GENERAL
         Attorneys for Plaintiff Commonwealth of Pennsylvania
3   BY:   JOSEPH S. BETSKO

4   OFFICE OF THE ATTORNEY GENERAL – STATE OF MARYLAND
         Attorneys for Plaintiff State of Maryland
5   BY:   SCHONETTE WALKER

6   NEW JERSEY OFFICE OF ATTORNEY GENERAL
         Attorneys for Plaintiff State of New Jersey
7   BY:   YALE A. LEBER

8   CRAVATH SWAINE & MOORE LLP
         Attorneys for Defendants
9   BY:   DAVID R. MARRIOTT
         NICOLE MARIE PELES
10
         –AND–
11
    LATHAM & WATKINS LLP
12  BY:   ALFRED CARROLL PFEIFFER, JR.
         TIM O'MARA
13

14  Also Present:

15  Sonali Durham
    Joseph Ehrenkranz
16  Cordelia Bell

17

18

19

20

21

22

23

24

25

O6QKUSAC

1            (Case called; appearances noted)

2            THE COURT:  Good morning.  First of all, thanks to

3    everyone for coming in today.  We have a beautiful day in

4    New York, so if you're from out of town, welcome.  And thank

5    you, also, to the parties for cooperating and talking with each

6    other to submit the joint letter and proposed schedule.  It

7    really reflects a lot of hard work from the parties, and I do

8    really appreciate it.

9            So let's get started with some disclosures.  I

10   appreciate Live Nation noting that they were currently

11   represented by the law firm that I previously worked at,

12   Susman Godfrey.  I was not involved in that case, and have no

13   interest in any fees or anything else arising from that

14   representation.  I think Live Nation was just making sure that

15   everyone was aware that they were presently represented by

16   Susman Godfrey.

17            Anything else to address along those lines?

18            MR. MARRIOTT:  That's correct, your Honor, we were

19   just making sure that was disclosed.

20            THE COURT:  In terms of any prior representations I

21   may have had, you can probably plug my name into Law360 and see

22   if anything comes up.  If, while you're doing that, you come

23   across any of my opinions, you might want to read them.  You

24   may be the only ones, other than the parties in the cases, but

25   like any additional readers, you're always welcome.  I think

O6QKUSAC

1    the only representations to just note for the parties would be

2    my representation of Baltimore in some of the financial

3    products antitrust cases, the opioids litigation.  I don't

4    think that that has any relevance here, but I just want to put

5    that on your radar.

6              I also represented some public entities in California

7    in *State of California ex rel. OntheGo Wireless v. Cellco*

8    *Partnership*, 34-2012-00127517, in Sacramento County Superior

9    Court.  There's a related case in Nevada, as well, that had to

10   do with False Claims Act allegations relating to cell phone

11   billing.  So, I don't think that has any bearing on this case,

12   but just, again, in the interest of full disclosure, I wanted

13   to put it on your radar.

14             Any other issues to address along those lines before

15   we get to this case?

16             MR. MARRIOTT:  No, your Honor.

17             THE COURT:  Hearing nothing, let's move on.

18             Thank you, again, for the joint letter.  Let's talk

19   about the schedule and other issues raised therein.

20             First, Mr. Marriott, maybe we should start with the

21   consent decree and -- the amended final judgment, I should say.

22             What's the relevance of that judgment here in this

23   case, as you see it?  And then you can let me know, I think you

24   had raised some questions you might have as to the appropriate

25   forum to raise certain issues, so I'll hear you out there.

O6QKUSAC

1          MR. MARRIOTT:  Thank you, your Honor.  May I use the

2     podium?

3          THE COURT:  You can use the podium, you can stay

4     seated, whatever is more comfortable.

5          MR. MARRIOTT:  I'm sufficiently used to standing, that

6     I'd probably be better off --

7          THE COURT:  Let's do it.

8          MR. MARRIOTT:  Thank you.

9          So, as we note, your Honor, in our letter, we think

10     there is a threshold question here about whether this is the

11     appropriate forum for this case.  We believe, respectfully,

12     that it's not.

13          This case arises out of the merger between Live Nation

14     and Ticketmaster in 2010.  That merger was the product of a

15     consent decree and an amendment to that decree — your Honor has

16     made reference to those — and the court in the District of

17     Columbia retained jurisdiction to deal with issues related to

18     the consent.  And the stated objective, your Honor, at least as

19     we understand the present pleading in this case, the stated

20     objective of this case is to undo the merger between

21     Live Nation and Ticketmaster, notwithstanding the decree and

22     notwithstanding the history of enforcement in the D.C. District

23     Court.  So we are concerned, your Honor, that by filing here,

24     what plaintiffs have effectively done is sought to circumvent

25     the decree, to evade the underlying determination in that

O6QKUSAC

1   decree that the transaction was not anticompetitive, and to

2   frustrate, effectively, defendants' right under the decree to

3   apply to the D.C. District Court for relief that may be

4   appropriate there.  So, with that in mind, what we'd like to

5   do, at an appropriate time, your Honor — and we can be prepared

6   to do that promptly — is to file a motion with respect to that

7   issue.  I can say more about it now, if you like, but that's

8   the fundamental issue, your Honor, is that we believe the

9   decree is implicated by the allegations here because the relief

10  that counsel for plaintiffs seek is to undo the very thing that

11  the decree brought about, which was the integration of

12  Live Nation and Ticketmaster.

13          THE COURT:  Well, is it your position that the

14  judgment would have some type of preclusive effect in this

15  case?

16          MR. MARRIOTT:  The consent judgment, your Honor, or

17  judgment by this Court in this case?

18          THE COURT:  No.  Just to make sure we're talking about

19  the same thing, in 2020, there was the amended final judgment,

20  correct?

21          MR. MARRIOTT:  Correct.

22          THE COURT:  And that's what you're relying on, that's

23  the last order that we have from Judge Collyer in D.C.?

24          MR. MARRIOTT:  That's correct.

25          THE COURT:  So, are you saying that that judgment has

O6QKUSAC

1    preclusive effect in this lawsuit?

2              MR. MARRIOTT:  I wouldn't put it exactly that way,

3    your Honor.  I wouldn't say that it has preclusive effect.

4    What I would say is that that, and, of course, it depends

5    exactly what counsel here is seeking.  Our point is that that

6    consent decree is the thing that allowed the combination of

7    Live Nation and Ticketmaster.

8              THE COURT:  I understand that, but if there's no

9    preclusive effect — and maybe this is a question for

10   Ms. Sweeney — if in this lawsuit, there's no preclusive effect,

11   and in this lawsuit, my understanding is that the government is

12   not seeking to enforce or construe or undo the judgment with

13   respect to the Section 7 proceeding and the judgment that was

14   entered in that case — and, Ms. Sweeney, maybe you can just

15   clarify — in this case, are you seeking to either enforce that

16   judgment, undo that judgment, or construe the terms of the

17   judgment in that case?

18             MS. SWEENEY:  No, your Honor.  This case is much

19   broader than that consent judgment.  We have filed claims

20   against Live Nation, Ticketmaster.  We have --

21             THE COURT:  When you say it's broader than that, is

22   any part of your case -- are you seeking any judgment from this

23   Court that would either be an effort to enforce the judgment in

24   D.C., to undo that judgment in some way, or to construe the

25   judgment in that case?  That's my question.

O6QKUSAC

1        MS. SWEENEY:  No, your Honor.

2        THE COURT:  All right.

3        And the claims, as I understand it, that were asserted

4    in D.C. that relate to the judgment were under Section 7 of the

5    Clayton Act; is that correct?

6        MS. SWEENEY:  That's correct.

7        THE COURT:  In what way is that claim different than

8    the claims asserted in this case by the government?

9        MS. SWEENEY:  Well, there's very many differences, and

10   I would just like to start out by saying that I disagree with

11   Mr. Marriott's description of our case and also of the consent

12   judgment.

13        In this case before your Honor, the United States and

14   the plaintiff states have alleged five federal antitrust causes

15   of action, all under the Sherman Act.  We have three

16   monopolization claims and two Section 1 unlawful restraint of

17   trade claims.

18        The 2010 consent judgment, that complaint was directed

19   solely at forward-looking conduct, and it was solely a claim

20   under Section 7 of the Clayton Act.  Not only are the claims in

21   this case vastly different and vastly broader, but the case

22   alleges an array of anticompetitive conduct across five

23   different relevant antitrust markets.

24        So, there is no comparison between that earlier action

25   and this action.

O6QKUSAC

1          I'd also like to point out that in this case, the

2    United States is joined by 29 states and the District of

3    Columbia, many of which of those states were not signatories to

4    the consent judgment.  So there are different parties, there

5    are different causes of action, and there are very different

6    claims with respect to the allegations of anticompetitive

7    conduct.

8          THE COURT:  What about the provisions in, I believe

9    it's, Section 9 of the judgment that speak directly to

10   retaliation and that seem to resonate with some of the

11   allegations that are in the complaint filed in this case?  So,

12   if you read it fairly, there are allegations in this case that

13   Live Nation, Ticketmaster took actions that were directly in

14   contravention of their obligations under the judgment.

15          So, how do you respond to that?

16          MS. SWEENEY:  Sure.  We do allege in this complaint

17   that there have been acts of retaliation and conditioning,

18   which are prohibited by the consent judgment; however, it's

19   also true that conduct can violate other statutes and other

20   consent decrees.  And here, we allege that that conduct is

21   part — and it's only one small part, I should point out we have

22   many different kinds of anticompetitive conduct — but it's part

23   of the conduct that supports our claim that Live Nation and

24   Ticketmaster monopolized the market for the provision of

25   primary ticketing services to venues.

O6QKUSAC

1          THE COURT:  Okay.  Thank you.

2          Mr. Marriott?

3          MR. MARRIOTT:  Yes, your Honor.  Thank you.

4          So, we don't disagree that the party matchup is not

5   perfect.  There are some plaintiff states here who were not

6   involved in the prior decrees, but there is a substantial

7   overlap.  There are a lot of states that were there who are now

8   also here.

9          We do not disagree that the causes of action are not

10  identical.  That was a Clayton Act, Section 7, case, and the

11  present case here has Sherman Act claims, which is why I said

12  it isn't exactly preclusive effect, your Honor, that we're

13  arguing.  But I do think it's the case, and your Honor hit upon

14  the provision, which is Section 9 of the amended consent

15  decree, which expressly prohibits the very conduct that counsel

16  for plaintiffs is here putting at issue.

17         So, while counsel says that they aren't seeking a

18  declaration as it relates to the decree, I believe, your Honor,

19  at least as we read the complaint, that they are really saying

20  that we engaged in conduct that, if true, would violate the

21  decree.  And that, we think, squarely puts the allegations of

22  this case --

23         THE COURT:  Doesn't the judgment expire, especially

24  with respect to Section 9, next year, before discovery in this

25  case would even be over?

O6QKUSAC

1          MR. MARRIOTT:  It expires in December of 2025, so

2    discovery in this case technically would be over, but it would

3    be before this case has been issued.

4          THE COURT:  I like the assurance that discovery in

5    this case will be over.

6          MR. MARRIOTT:  Well, I'm just going off --

7          THE COURT:  I baited you in.

8          MR. MARRIOTT:  Well, I think we can do that,

9    your Honor.

10          THE COURT:  Okay.  Understood.

11          That's why I asked you whether there was preclusive

12    effect.

13          Is there any case law that you're aware of in which

14    this situation has arisen where there is a judgment relating to

15    the approval of a merger or a merger that's allowed to proceed

16    over a Section 7 challenge, then later there are efforts to

17    either modify or undo the merger in a Sherman Act case?  Are

18    there any prior cases that raise that fact situation?

19          MR. MARRIOTT:  We have not found a case in which — and

20    we are continuing to look, your Honor — but we have not found a

21    case in which the government has successfully done what we

22    believe they're trying to do here, which is to get a decree in

23    one court, live under that decree for approximately 15 years

24    with the supervising antitrust monitoring judge, and then later

25    go seek effectively to challenge at least some conduct which is

O6QKUSAC

1      included in a different place, and we believe, again, with

2      respect --

3            THE COURT:  And you'd agree that if the government

4      brought its case up December of 2025, you wouldn't have an

5      argument along these lines because the judgment would have

6      fully expired?  Parts of it have expired in 2020; the rest of

7      it is going to expire in 2025.  So, it's a timing issue.  If

8      the government had brought this case in 2026, you'd have no

9      argument that this is the wrong forum for this case, right?

10           MR. MARRIOTT:  Well, we certainly wouldn't have the

11     same argument, your Honor — I'm not so sure we wouldn't have

12     any argument — and that's because I think they're seeking

13     different relief here, but the fundamental relief, the kind of

14     legal relief that they seek, is to break up the company, and

15     that's the thing that we think is so fundamental to the consent

16     decree.  That's the thing that was inherently part of that.

17     It's what the consent decree allowed.  It is the thing now

18     they're seeking to undo, albeit in a court different from the

19     court that issued the consent decree.

20           So, the timing is different, but I don't think, given

21     the relief they seek, that that makes this an easily

22     distinguishable circumstance.

23           THE COURT:  Okay.  Understood.

24           I saw someone who might want to be heard.

25           MR. KASHA:  Thank you, your Honor.  I'm Jeremy Kasha,

O6QKUSAC

speaking for the State of New York, and on this particular

issue, also speaking for the 13 other plaintiff states that are

not signatories to the consent decree.

It probably goes without saying that we take umbrage

at the idea of being transferred to D.C. and probably ending up

in the back pews of proceedings that we were never involved in

in the first place.

But there's another important point. You asked about

the area of overlapping allegations with the conduct that is

covered by the consent decree. And Ms. Sweeney, for the

United States, correctly pointed out that although it's

important conduct, that's only a portion of the totality. But

I'd like to point out, also, that the conduct in the complaint

that is overlapping, which you can see in paragraphs 90 to 93

of the complaint, first of all, relates to a venue in New York

City, less than 20 minutes away by subway, and, second of all,

the facts relating to that postdate the consent decree and even

the amended final judgment.

Now, the United States Supreme Court in an antitrust

case, *Lawlor v. National Screen Service Corporation*, held that

a consent decree "cannot be given the effect of extinguishing

claims which did not even then exist and could not possibly

have been sued upon in the previous case."

So, I think it's kind of an open and shut question.

We understand perhaps defendants feel they need to go through

O6QKUSAC

```
 1   the motions to preserve the record, but the states do take
 2   umbrage about this, and we believe it would be inappropriate
 3   for the case to be transferred.
 4             THE COURT:  Okay.  Thank you.
 5             Mr. Marriott, when do you want to make your
 6   application?
 7             I'll say this:  For the reasons that have been raised
 8   here, I don't see a basis to transfer this case or dismiss it
 9   on the basis of the final judgment in the D.C. proceeding.
10   However, I will certainly permit the defendants to make an
11   application here.
12             When would you like to make that application?  Because
13   I don't know that it really turns on what the amended complaint
14   says.  Maybe it does.  I believe it might.
15             Ms. Sweeney, if I'm right, the amended complaint may
16   add some additional plaintiffs?
17             MS. SWEENEY:  That's correct, your Honor, additional
18   state plaintiffs, yes.
19             THE COURT:  But there are already plaintiffs in the
20   case that were not parties to the D.C. case, right?
21             MS. SWEENEY:  Yes, your Honor.
22             THE COURT:  Okay.
23             So, Mr. Marriott, do you have --
24             MR. MARRIOTT:  Your Honor, I, likewise, don't think it
25   probably turns — I haven't seen the amended complaint,
```

O6QKUSAC

1    obviously — but I don't think it turns much on that.  Would

2    three weeks be acceptable to the Court for putting in a motion?

3              THE COURT:  That's fine.

4              And, Ms. Sweeney, how much time would you need for a

5    response?

6              MS. SWEENEY:  Your Honor, I think the local rules

7    allow two weeks.  We'd like more than two weeks.  Either three

8    or four weeks would be appropriate, in our view.

9              I'm looking at -- the states are also partners in

10   this, but I assume that would be okay.

11             THE COURT:  Okay, three weeks.

12             MS. SWEENEY:  Okay.  Thank you, your Honor.

13             THE COURT:  And we'll do one week for a reply.

14             MR. MARRIOTT:  Thank you, your Honor.

15             THE COURT:  You're not going to get any extensions on

16   page limits.  You should be able --

17             MR. MARRIOTT:  I think we're good with what we have.

18             THE COURT:  Okay, good.

19             So that takes care of the judgment in the D.C. case.

20             Ms. Sweeney, you've indicated that you anticipate up

21   to 80 fact depositions.  Is there an issue to raise here along

22   these lines, or are you just giving the court a heads-up that

23   there are going to be a lot of depositions?

24             MS. SWEENEY:  Yes, your Honor.  Over the past week and

25   a half or so, we've been negotiating with the defendants a

O6QKUSAC

1    couple of different documents, a proposed protective order, an

2    ESI protocol, and also a deposition protocol.  So we have a

3    disagreement with the defendants as to the number of

4    depositions.

5              So we want to bring it to your Honor's attention so

6    that we could resolve that issue and get that order in place so

7    we can begin discovery.  And, if you like, I can go through the

8    reasons why we think we need up to 80 depositions.

9              THE COURT:  What's the counterproposal?

10             MS. SWEENEY:  Defendants have proposed 40.

11             THE COURT:  All right.  Why do you need 80?

12             MS. SWEENEY:  Well --

13             THE COURT:  It's a lot of depositions.  Even 40.

14             MS. SWEENEY:  Absolutely.  We agree that's a lot of

15    depositions, your Honor, and we intend to be as efficient as

16    possible, and, hopefully, we wouldn't need to take that many,

17    but we still will need to take a fair number of party

18    depositions.  There's very distinct business segments within

19    Live Nation and Ticketmaster.  So we anticipate something in

20    the range of 25 depositions of Live Nation and Ticketmaster

21    personnel.

22             And then we have a whole host of nonparties who play

23    an integral role in this industry, and we have to get testimony

24    from them.

25             As we mentioned in the letter, we expect serving a

O6QKUSAC

1    great many subpoenas, mostly for data on nonparties.  So we

2    won't take that many depositions, but we will need to take

3    depositions, for example, from venues, from rival ticketers,

4    from artists, from artist agents, from venue management

5    companies, from ticket brokers.  There's a whole different --

6    the industry is organized in such a way, that there are many

7    different entities that have testimony that we will want to

8    bring to light in this case.

9          So, our initial recommendation is for 80 depositions,

10   and, hopefully, we wouldn't actually need that many, but that's

11   what we're thinking now.

12         THE COURT:  Okay.

13         Mr. Marriott?

14         MR. PFEIFFER:  Your Honor, this is actually mine, if

15   that's okay.

16         THE COURT:  All right.  Mr. Pfeiffer.

17         MR. PFEIFFER:  We clearly disagree that 80 is

18   appropriate.  80 is an extraordinary number of depositions.  We

19   proposed 40, which we think is larger than your normal

20   antitrust case.

21         I'm in front of one of your colleagues right now in

22   the tapestry litigation where the parties agreed on 25.  That

23   included the Part III proceedings as well, not just the

24   proceedings before Judge Rochon.

25         We think to impose discipline on both sides, to try to

O6QKUSAC

1    ease the burden on parties, that we should start with a much

2    smaller number.  There's always the ability to come to the

3    Court when good-faith dictates a need for an increase, but to

4    start high and hope to end up lower almost never works out.

5    It's one of those work expands to fill the time situations.

6            So, we would urge your Honor to set a much lower cap.

7    We believe 40 is an appropriate number for both sides, and if

8    people need more, we can come back to you.

9            THE COURT:  Was that your opening offer, 40

10   depositions?  In your earlier discussions, would you have cut

11   it in the middle at 60?

12           MR. PFEIFFER:  I confess, I don't remember the exact

13   chess moves, whether we started with 40 or not.

14           THE COURT:  Okay.

15           What if we, instead of having a 40-deposition limit,

16   were to have a 300-hour requirement?  And so the government can

17   use that however they're going to use it, but it would provide

18   you, roughly, the same number of hours — I added another 20 —

19   but would fit with your 40-deposition limit, it would answer

20   your concern about efficiency and not having 80 seven full-day

21   depositions.  At the same time, the government may only need a

22   couple of hours with certain witnesses, and it will give them

23   an incentive to be efficient in their questioning.

24           MR. PFEIFFER:  Quick reaction, your Honor:  We would

25   hope that the seven hours for any individual deposition cap

O6QKUSAC

1    would still apply.

2                THE COURT:  That still remains, of course.

3                MR. PFEIFFER:  I think that would be very acceptable

4    to us, your Honor.

5                THE COURT:  Okay.

6          Ms. Sweeney, does that sound reasonable?  That way, if

7    you need to take more depositions, you can.  And some of these

8    depositions, I am sure, may be in the way of authenticating

9    documents, doing things that are ministerial, where you don't

10   need seven hours, and so you would still have the flexibility

11   to spend more time on the witnesses that you need more time

12   with, and preserving the testimony of witnesses where you may

13   only need a couple of hours for them.

14               MS. SWEENEY:  Yeah, I appreciate that, your Honor.

15         And the United States has, in other cases,

16   successfully used the hour limit instead of a number of

17   depositions, and that's probably an appropriate method here.

18         I'm just looking at the math.  So, 300 hours would

19   still be within the 40-deposition range, and perhaps if we

20   break it up into hours, that would be sufficient, but we would

21   request maybe going up to 420 hours, which would be 60.  I note

22   that in the *Google Search* case, for example, in the District of

23   Columbia, I think the Court permitted 85 depositions per side,

24   which is also a monopolization case, but, in many ways, much

25   simpler than this case.

O6QKUSAC

1        THE COURT:  Okay.  I'm going to put in a 300-hour

2   limit on depositions from each side.

3        And, Ms. Sweeney — and this goes for both sides — if

4   along the way, there is some extenuating circumstance, and you

5   believe there is good cause for an expansion of that limit, you

6   can certainly come to the Court.  And just to let you know, I

7   will probably say no, but I will hear you out, and I will

8   absolutely hear your arguments, and if you make a good case, I

9   will provide you with relief if you can make a showing of good

10  cause.

11       MS. SWEENEY:  Thank you, your Honor.

12       And, your Honor, an important question here:  I assume

13  that that only applies to fact depositions and does not apply

14  to expert depositions since, of course, we have no idea how

15  many experts that each side will proffer?

16       THE COURT:  That's correct.

17       And Mr. Pfeiffer?

18       MR. PFEIFFER:  We agree with that, your Honor.

19       THE COURT:  All right.

20       Next, Live Nation suggests that there is a jury trial

21  issue here.  I don't think that there is any reason for us to

22  address whether a jury trial right extends to the federal

23  claims or not, but I'm happy to hear you out.

24       Mr. Marriott?

25       MR. MARRIOTT:  Your Honor, I don't think we need to

O6QKUSAC

1    take this issue up now.  We just didn't want -- in the forum

2    which contemplated effectively checking the box that there was

3    a jury trial, we didn't want to be waiving our argument that

4    this is not a case where there is a jury trial.  We don't think

5    there clearly is a right to a jury trial as to the federal

6    claims, and I don't think plaintiffs are even arguing there's a

7    right as to the federal claims.  They seem to have an argument

8    tied to their state claims.  We respectfully disagree with

9    that, but we don't think there's anything the Court needs to do

10   with that at this stage.  When we know more about these claims

11   and what exactly is pled and contended, the parties will be in

12   a better position, I think, to present an issue to the Court,

13   if there is an issue to then be presented.

14            THE COURT:  Okay.

15            Now, just to make sure that we're on the same page in

16   terms of what the law requires, if there are common issues of

17   fact between claims seeking legal relief and seeking equitable

18   relief, you would agree as to those common issues, that courts

19   have held that those would be subject to the jury trial right?

20            MR. MARRIOTT:  I would agree courts have held that,

21   your Honor.

22            THE COURT:  Okay.

23            So the question is:  Are there separate issues of fact

24   that would not be tied to the claims as to which legal relief

25   is sought, and as to those issues of fact, should they be heard

O6QKUSAC

1    by the jury or heard by the Court?

2                MR. MARRIOTT:  That, your Honor, and then the kind of

3    gating question of whether or not there will actually be state

4    law claims that seek legal relief that survive to get to a jury

5    trial.  And so we don't think that will actually be the case,

6    we think, in the end, those claims won't survive, and so we

7    don't think -- and that's the hook to get a jury trial, if

8    there is a hook.  And so we just wanted to flag it so that we

9    aren't said to have waived the contention that this is not a

10   jury case.  We think these are issues that are tried to the

11   courts.  We aren't aware of a case where plaintiffs' counsel

12   and the government actually have been allowed to take basically

13   state law claims and use them to bootstrap a jury trial on all

14   issues in the case, and that's the issue we wish to preserve.

15               THE COURT:  Understood.  Thank you.

16               MR. MARRIOTT:  Thank you, your Honor.

17               THE COURT:  Next, Live Nation points to the

18   investigative files and asks that they be turned over by

19   July 22nd of this year.

20               Ms. Sweeney, you've probably talked to defendants

21   about this?

22               MS. SWEENEY:  We have not, your Honor.  They raised

23   that in their letter.  But we're prepared to respond today.

24   And, of course, that's something we understand we have to turn

25   over to defendants.

O6QKUSAC

1          I would say that there's an important first step,

2   which is, we have to have a protective order entered by the

3   Court.  We've received confidential documents from a number of

4   nonparties, and we have to be able to (a) provide them notice

5   that they're going to be turned over in this litigation and (b)

6   provide them with a copy of the protective order.

7          So, the parties have been negotiating that protective

8   order, and I'm hopeful that we can get that to you by next

9   week, by July 2nd.

10          And then I would also say that, assuming the

11   protective order is in place, and we can notify the nonparties,

12   substantial compliance with July 22nd shouldn't be a problem,

13   but I don't want to speak to the entirety of the documents,

14   because the 22nd of July is just our 30 days' response period,

15   and I hope we can meet it, but just to be sure.  And, also, I

16   cannot speak for the states on this issue.

17          THE COURT:  Okay.

18          Is there any different position from the states?

19          MR. KASHA:  No.  We have the same position, that

20   there, of course, needs to be a protective order and that

21   substantial compliance by that date shouldn't be a problem, but

22   there might be a lot of materials, and there may be things

23   trickling in after that.

24          THE COURT:  Okay.

25          Does that suffice for the defendants?  It looks like

O6QKUSAC

1   everyone's on the same page, they're going to try to get the

2   documents to you by July 22nd.  Any issue there?

3          MR. PFEIFFER:  I don't think so, your Honor.  I think,

4   as has been said, with the guidance of some past examples from

5   your Court, we are working on a protective order together and

6   expect to have that to you by early next week, and we really

7   hope to get things promptly.

8          THE COURT:  Great.

9          The only thing I really require in the protective

10  order is the clawback provision.  That's really for the young

11  lawyers out there who are worried about inadvertently turning

12  over some document, and then they're, like, sweating at night

13  thinking they're going to get in trouble.  It's to prevent all

14  of that on both sides.

15         So, if you turn over something, and it turns out it's

16  privileged, you just claw it back, and we will -- if there's a

17  question of whether it's privileged or not, that's a separate

18  issue — we'll talk a little bit about that — but I don't want

19  to cause any undue hardship for the parties.

20         MR. PFEIFFER:  We understand and appreciate that,

21  your Honor.  Thank you.

22         THE COURT:  All right.

23         Next, on rebuttal and surrebuttal expert reports:  I

24  guess the question I'm always wondering about is, Ms. Sweeney,

25  from where you stand, expert reports are a discovery tool for

O6QKUSAC

1    the other side, so why do you want to do rebuttal report?

2              MS. SWEENEY:  Well, your Honor, first of all, we have

3    the burden of proof, but, also, in this kind of case, there

4    will be a lot of data analysis, presumably, included within the

5    expert reports.  Our experts are going to want an opportunity

6    to test the data and the assumptions in the other side's

7    experts and respond to it.  For that reason, having a rebuttal

8    opportunity is, in some ways, more efficient than not having

9    one.

10             THE COURT:  That's fair.

11             You don't have an issue with the defendants having

12   surrebuttal reports, right?

13             MS. SWEENEY:  We do have an issue with that, for the

14   reason I mentioned at the outset, which is that plaintiffs have

15   the burden of proof.  And so, just like in motion practice, we

16   wouldn't expect the defendants to have a surreply in all

17   instances or vice versa, whoever is the moving party -- who is

18   not the moving party.  So --

19             THE COURT:  Don't you want to know what their experts

20   are going to say so you can grill them, whether in deposition

21   or at trial?  You're going to have more material to undermine

22   your adversary's position.  So, that's why I asked you why you

23   wanted to do a rebuttal report, because Mr. Marriott is going

24   to have more ammunition to depose your expert based on what's

25   in the rebuttal report or there are changes between the opening

O6QKUSAC

1    report and the rebuttal report, all of those things.  You've

2    all done this a million times.  So, once you've said, well, no,

3    I actually do want to do the rebuttal report, it seems like you

4    would also want a surrebuttal report on the understanding that

5    both the rebuttal and the surrebuttal reports are going to be

6    strictly limited to new or different material in the report

7    that they are responding to.

8            Mr. Marriott, any issues with that?

9            MR. MARRIOTT:  None, your Honor.

10           THE COURT:  Okay.

11           So, on those grounds, if you want to put in a rebuttal

12   report, you probably want to see what the response to that

13   rebuttal report is going to be before your expert is going to

14   take the stand or before there's a summary judgment motion

15   based on arguments made about the rebuttal report that you're

16   just not familiar with because you didn't have a chance to

17   review them in advance.

18           MS. SWEENEY:  One final suggestion, your Honor, and

19   that would be, if we are going to have those dueling reports,

20   then we could have simultaneous exchange.  That's one option

21   that the United States has used in other antitrust cases.

22           THE COURT:  Okay.

23           Let's have rebuttal reports by September 26, 2025, and

24   surrebuttals by October 16, 2025.

25           One thing for both sides is:  The parties should

O6QKUSAC

1    understand, especially because we're doing rebuttal and

2    surrebuttal reports, that, at trial, the experts are going to

3    be strictly limited to what is in their reports.  So,

4    objection; scope, I'm going to ask for the page and line number

5    from the expert report, and no one is going to be able to

6    deviate from the opinions expressed in the reports.  Okay?

7         Fact discovery and depositions by June 27, 2025.

8         Ms. Sweeney, I take it that you want to make sure that

9    before you get into experts, that you just have fact discovery

10   completed without anything outstanding?

11        MS. SWEENEY:  Yes, that's it, your Honor.  We want to

12   make sure that the experts have access to all the discovery

13   material.  And, also, we think it's more efficient because then

14   the experts won't have to be supplementing and amending their

15   reports.

16        THE COURT:  I think that makes a lot of sense.  So

17   let's have fact discovery and depositions by June 27, 2025.

18   Although the parties can, by mutual agreement, agree to

19   reasonable extensions of those if there are a few straggling

20   witnesses who need to have their depositions taken after that

21   deadline, that's certainly fine.

22        And we covered the protective order.

23        The only guidance I'll give the parties is, especially

24   as to 30(b)(6) topics and objections, please don't spend months

25   and months meeting and conferring over those.  Have the

O6QKUSAC

 1    meet-and-confer, talk about it with each other.  If you can't

 2    reach a resolution in short order, we are here, we are always

 3    here.  We're here, we're here to be of service, so you can come

 4    find us, and we will make sure that you can get a quick answer.

 5    Because one of the things I most appreciate in what the parties

 6    have proposed is that they have this case with discovery being

 7    completed next year.  I was worried that there was going to be

 8    a schedule proposed that would have discovery going on until

 9    2035, and so I am pleased that you have this case in line to be

10    tried either in late -- well, it looks like early 2026, which I

11    think is appropriate, given the scope of this case.

12            So, the bottom line is on discovery disputes, follow

13    the individual practices, but just come to the Court quickly so

14    that we can get a resolution of it promptly.

15            Mr. Marriott, any other issues from the joint letter

16    or that you have at this juncture that you need any resolution

17    of?

18            MR. MARRIOTT:  Your Honor, the only other issue on

19    which we were interested in a little bit of guidance from the

20    Court was the lead trial counsel issue.

21            So, we want to just understand a little bit better how

22    we can meet the Court's needs in that respect.  At the present

23    time, we have two firms, we have two defendants.  We have

24    someone from Cravath who's lead trial counsel for purposes of

25    your Honor's rules for Ticketmaster and someone for

O6QKUSAC

1   Live Nation.  And we're just wondering if there may be any
2   flexibility in that approach so that we can make sure we're
3   both meeting your Honor's needs and also dealing with the
4   challenges that arise in trying to manage these and other
5   cases.
6            THE COURT:  No, that's fine.  So that would be you and
7   Mr. Pfeiffer?
8            MR. PFEIFFER:  That's correct, your Honor.
9            THE COURT:  That's fine.
10           And, Ms. Sweeney, obviously, the same on your end.  If
11   there happens to be a colead counsel on your end, then that's
12   perfectly appropriate, as long as we know who that person is.
13           MS. SWEENEY:  Thank you, your Honor.
14           MR. MARRIOTT:  Thank you, your Honor.
15           THE COURT:  Okay, great.
16           One thing I'll say, especially given that we have
17   maybe 600 hours of depositions in this case, and I'm sure there
18   will be lots of disputed issues and hearings and other
19   proceedings in this case, is that try to let the young lawyers
20   have some standup time or time taking depositions and defending
21   depositions.  If there are discovery disputes, I'd love to hear
22   from the young lawyers on those issues.  It's great experience
23   for them.  And just in case your respective clients are
24   concerned that their interests will not be served by having a
25   young lawyer present those issues, I can guarantee you that the

O6QKUSAC

1    Court, because I'm telling you this, will be especially

2    attentive to your arguments on both sides if I know that you

3    are providing an opportunity to a younger lawyer to advance

4    those arguments.  So I'll just leave you with that.

5            Otherwise, Ms. Sweeney, any issues that we need to

6    tackle today?

7            MS. SWEENEY:  Your Honor, we talked about the motion

8    that Mr. Marriott said that he is going to have ready shortly

9    regarding the consent decree, but we don't have a lot of

10   information about additional motions that the defendants might

11   raise, and so we would request that we have four weeks to

12   respond to any such motions to dismiss.  They alluded to them

13   in a vague way, so we'd like a little more time.

14           THE COURT:  No, thank you for reminding me.

15           So, Mr. Marriott, let me ask you this:  You mentioned

16   a motion to dismiss.  The one issue that you mentioned was

17   whether the *Trinko* case might foreclose the tie-in claim; is

18   that right?

19           MR. PFEIFFER:  That's correct, your Honor.

20           THE COURT:  Mr. Pfeiffer?

21           MR. PFEIFFER:  Sorry, I know we're crossing you up.

22           Yes, that's one we have identified at this point that

23   we think is likely.  We're not expecting, from what we've

24   heard, that the amended complaint will change the nature of

25   that claim, and, to us, that strays over into the territory of

O6QKUSAC

1    the type of foresharing that *Trinko* forecloses.  So we expect

2    that.  We also think that there may be at least some of the

3    state claims that do not state a claim under the state laws

4    under which they're brought.  That's as much as we've

5    identified.  We're not anticipating, at this point, a motion to

6    dismiss that would resolve the entirety of the case.

7            THE COURT:  Okay.

8            So here's my question for you:  An amended complaint

9    is going to come out in a month.  Do you want to put in a

10   letter to the Court identifying the issues as to which you

11   would contemplate moving to dismiss and put that on the docket?

12   The upside for you is that if you do that, let's say, within

13   two weeks, the government plaintiffs will know what arguments

14   you're going to make, they will then amend.  If they cannot

15   overcome your arguments on a motion to dismiss, you would have

16   a good argument that those claims should be dismissed with

17   prejudice, as opposed to advancing those arguments after the

18   amended complaint is filed, in which case, the government

19   plaintiffs will say, well, now that we know what the arguments

20   are, if you dismiss our complaint, it should be without

21   prejudice so that we can refile.

22           So that's just a suggestion on your side.  I just want

23   to make sure you're aware that if you do that, you'll just have

24   a different argument down the road.  From the government's

25   perspective, you'll obviously have a better sense of what the

O6QKUSAC

1    arguments are going to be — exactly what, Ms. Sweeney, you

2    raised — in terms of knowing what the arguments are that are

3    going to be raised so that you will have a chance to address

4    those issues in your amended pleading.

5           So, it would seem to benefit both sides, and make sure

6    that we can just keep the schedule that we're putting in place.

7    So, I'll leave that to you.  I don't need your answer as to

8    whether that's something that you would want to do.  You would

9    need to do it within two weeks to make sure that Ms. Sweeney

10   and her colleagues have an appropriate opportunity to consider

11   those arguments and supplement their pleading, if they need to.

12          MR. PFEIFFER:  Thank you, your Honor.  We very much

13   appreciate the idea.

14          I won't commit to it right now, but I'm certainly

15   going to talk to my client about it.

16          THE COURT:  Okay, good.

17          And just the last point, since you raised it in the

18   joint letter, can you explain to me how *Trinko* would apply to

19   the tie-in claim that's alleged in the complaint, just so I

20   understand that?  Because, as I understood *Trinko*, it involved

21   a situation where there was a refusal to deal with competitors,

22   there was a requirement to deal with competitors that was

23   imposed by a different law, and the court was addressing

24   whether that was also a violation of the antitrust laws.  They

25   held that under the antitrust laws, there's no duty to deal

O6QKUSAC

```
 1   with the competitor — that's the language that you rely on.
 2   The tie-in claim here, as I understand it, has to do with the
 3   requirement for those who wanted to use amphitheaters that were
 4   within Live Nation's control, having to also use the concert
 5   promotion services.  So it had to do with third parties.
 6   That's the stage-setting.  So now, begin scene, you can tell me
 7   what the argument would be.
 8         MR. PFEIFFER:  Let me go back briefly to *Trinko*,
 9   because I actually was on the opposite side of things in those
10   days, but was very involved in related cases.
11         *Trinko* went broader, I think, than people expected.
12   We thought it was going to be about the communications act of
13   1996.  It turned out to be about the duty to make life easier
14   for your rivals.  I think that's where the claim, as it's
15   framed in the complaint, runs afoul of *Trinko*, that even though
16   there are some third parties involved, the duty that's actually
17   trying to be imposed here is for us to deal with companies that
18   are rivals of ours.  And that's what we think *Trinko* does not
19   allow them to do, and calling it a tie-in claim doesn't change
20   our freedom to refuse to deal with those rivals.
21         THE COURT:  Can you just map that onto the allegations
22   of the tie-in claims?  I've got you there.  The thing I needed
23   some help with was just how that principle maps onto the tie-in
24   claim that is actually alleged in the complaint.
25         MR. PFEIFFER:  I apologize, your Honor, I'm not sure
```

O6QKUSAC

1    that I'm sufficiently prepared to do that today.

2              THE COURT:  Okay, understood.

3              That's not an issue, and it will be reflected,

4    perhaps, in the letter that comes out in a couple of weeks,

5    but, in any event, if there's a motion to dismiss, then you'll

6    raise that argument, and we'll consider it.

7              MR. PFEIFFER:  Thank you, your Honor.

8              THE COURT:  Thank you.

9              Mr. Marriott or Mr. Pfeiffer, any further issues on

10   your end?

11             MR. MARRIOTT:  Nothing today, your Honor.  Thank you.

12             MR. PFEIFFER:  No, your Honor.  Thank you.

13             THE COURT:  And, Ms. Sweeney, anything else on your

14   end?

15             MS. SWEENEY:  Nothing, your Honor.  Thank you.

16             THE COURT:  Okay.

17             Well, again, I really appreciate everyone coming in.

18             Anything further from the states?

19             MR. KASHA:  No, your Honor.  Thank you.

20             THE COURT:  Okay.  I apologize for that.  Thank you.

21             And thank you, everyone, for coming in.  Again, I

22   really appreciate the materials in advance of the conference.

23   It's very helpful and shows a lot of hard work from the

24   parties.  I really appreciate it.  Thank you.

25             COUNSEL:  Thank you, your Honor.  (Adjourned)