# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.,* | |
| *Plaintiffs,* | |
| v. | Case No. 1:24-cv-03973 (AS)(SLC) |
| | [rel. 1:24-cv-03994 and 1:24-cv-04106] |
| LIVE NATION ENTERTAINMENT, INC. and TICKETMASTER L.L.C., | |
| *Defendants.* | **ORAL ARGUMENT REQUESTED** |

## MEMORANDUM OF LAW IN SUPPORT OF
## <u>DEFENDANTS' MOTION TO TRANSFER VENUE</u>

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND ................................................................................................................... 5

A.    The Merger & the First Government Investigation ................................................. 5

B.    The Proposed Consent Decree ................................................................................. 5

C.    DOJ's Response to Public Comments and the Final Order ...................................... 7

D.    The Amended Consent Decree ................................................................................. 8

E.    This Lawsuit.............................................................................................................. 9

LEGAL STANDARD........................................................................................................... 11

ARGUMENT ....................................................................................................................... 11

A.    Parties on Both Sides of this Action Agreed that the D.C. Court Is the Appropriate
       Forum for the Present Dispute. ................................................................................ 12

B.    Transfer Is in the Interest of Justice. ....................................................................... 16

C.    On Balance, the Private and Public Interest Factors Favor Transfer. ...................... 18

       i.     Private Interest Factors ................................................................................... 18

       ii.    Public Interest Factors .................................................................................... 19

CONCLUSION.................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Androb Jewelry Serv., Inc. v. Malca-Amit USA, LLC*,
  No. 16-cv-05171, 2017 WL 4712422 (S.D.N.Y. 2017)...........................................................15

*Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Tex.*,
  571 U.S. 49 (2013) ..................................................................................................... passim

*Butcher v. Lawyers Title Ins. Corp.*,
  No. 04-73968, 2005 WL 8154943 (E.D. Mich. 2005).......................................................16, 17

*Cont'l Grain Co. v. Barge FBL-585*,
  364 U.S. 19, 80 S. Ct. 1470 (1960) .........................................................................................17

*Davidson v. Dean*,
  104 F.3d. 350 (2d Cir. 1996)............................................................................................13, 20

*Flanagan v. Arnaiz*,
  143 F.3d 540 (9th Cir. 1998)....................................................................................................12

*Goulart v. United Airlines, Inc.*,
  No. C 94-1751 SC, 1994 WL 544476 (N.D. Cal. 1994)...................................................16, 20

*In re Residential Capital, LLC*,
  527 B.R. 865 (S.D.N.Y. 2014).................................................................................................17

*Koehler v. Green*,
  358 F. Supp. 2d 346 (S.D.N.Y. 2005)......................................................................................20

*Magnolia v. Conn. Gen. Life Ins. Co.*,
  157 F. Supp. 2d 583 (D. Md. 2001) .........................................................................................13

*Omnicell v. Medacist Sols. Grp., LLC*,
  272 F.R.D. 469 (N.D. Cal. 2011) ............................................................................................13

*Pence v. Gee Grp., Inc.*,
  236 F. Supp. 3d 843 (S.D.N.Y. 2017)......................................................................................18

*Republic Bldg. Co. v. Charter Twp. of Clinton*,
  81 F.4th 662 (6th Cir. 2023) ....................................................................................................12

*Schweitzer v. Nevels*,
  669 F. Supp. 3d 242 (S.D.N.Y. 2023).................................................................................18, 19

ii

*Seariver Mar. Fin. Holdings, Inc. v. Pena*,
    952 F. Supp. 9 (D.D.C. 1997) ........................................................................16, 20

*SEC v. Levine*,
    881 F.2d 1165, 1179 (2d Cir. 1989) ..................................................... 14

*United States v. ASCAP*,
    32 F.3d 727 (2d Cir. 1994)....................................................................12

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ...........................................................4, 16

*Whitehaus Collection v. Barclay Products, Ltd.*,
    No. 11-cv-217, 2011 WL 4036097 (S.D.N.Y. 2011).......................19, 20

*Willoughby v. Potomac Elec. Power Co.*,
    853 F. Supp. 174 (D. Md. 1994) .......................................................13

*Yonkers Racing Corp. v. City of Yonkers*,
    858 F.2d 855 (2d Cir. 1988)...............................................................16

**Statutes & Rules**

15 U.S.C. § 22 ..............................................................................................11

28 U.S.C. § 1404(a) .............................................................................. passim

15 U.S.C. § 16(b)-(h) ....................................................................................7

**Other Authorities**

U.S. District Courts Combined Civil and Criminal Federal Court Management
    Statistics (Dec. 31, 2023), *available at*
    https://www.uscourts.gov/sites/default/files/fcms_na_ distprofile1231.2023_0.pdf...............20

Defendants Live Nation Entertainment, Inc. ("Live Nation") and Ticketmaster L.L.C. ("Ticketmaster", and together with Live Nation, "Defendants") respectfully submit this memorandum in support of their motion to transfer venue to the U.S. District Court for the District of Columbia (the "D.C. Court") pursuant to 28 U.S.C. § 1404(a).[1]

## PRELIMINARY STATEMENT

At its core, this case concerns the combination of Live Nation and Ticketmaster—a merger approved by the U.S. Department of Justice ("DOJ") and more than a dozen state attorneys general nearly fifteen years ago. Before the merger closed, DOJ and the investigating states scrutinized its potential effects, ultimately finding that its vertical aspects—combining primary ticketing with concert promotion—provided no basis for a challenge. DOJ did allege a horizontal theory, however, as Live Nation had just entered the primary ticketing market in competition with Ticketmaster. Against that backdrop, the parties negotiated and agreed to a consent decree, which conditioned the merger on the combined company divesting certain ticketing assets and committing not to engage in certain forms of retaliation or conditioning that might foreclose rivals—a commitment DOJ concluded would "ensure that there will be enough air and sunlight in this space for strong competitors to take root, grow, and thrive". (Ex. 2 at 14.) The decree was entered as a final judgment by the D.C. Court, which—by agreement of the parties—expressly retained jurisdiction over its enforcement, modification and construction.

This lawsuit seeks a profound modification of the decree: unwinding the merger that it expressly allowed. Plaintiffs, most of whom are parties to the decree, ask the Court to do so based on allegations of misconduct that in some respects are squarely regulated by the decree,

---

[1] Citations to exhibits are to the exhibits appended to the Declaration of David R. Marriott. Plaintiffs' May 24, 2024 complaint [ECF No. 4] is referred to as the "Complaint" or "Compl.".

and more broadly on a theory about the merger's competitive impact that is directly at odds with the findings on which the decree is predicated.  Plaintiffs' requested relief would destroy the fundamental bargain effectuated by the decree:  that Live Nation and Ticketmaster could merge so long as they made certain divestures and constrained their behavior for the term of the decree. The requested relief would also contradict provisions of the decree that expressly *allow* various synergistic activities between concert promotion and ticketing employees.  (*See, e.g.*, Ex. 8 § IX.B (authorizing permissible data sharing across concerts and ticketing).)  Yet, Plaintiffs seek to do so outside the court that approved the merger, and retains jurisdiction over the decree and any attempt to "modify" it.  (Ex. 8 § XIV.)

This action should be transferred to the D.C. Court.  *First*, the decree includes a mandatory forum selection clause designating the D.C. Court as the forum for legal actions, like this one, that cover a broad collection of decree-related categories.  *Second*, the interest of justice favors transfer.  *Third*, private and public interest factors favor transfer.

At bottom, this case will require the presiding court to revisit the earlier findings upon which the decree is predicated; assess the adequacy of the decree in protecting competition; and if the alleged conduct were proven, decide whether to unwind the very merger the decree approved.  These determinations should be made by the D.C. Court—the court that determined the decree was in the public interest; gave it the force of a court order; modified and extended the decree through the end of 2025; retains jurisdiction over the decree to this day; and was designated by the parties as the forum in which decree-related issues are to be adjudicated.

Plaintiffs suggest the decree is of no moment, because the Complaint contains allegations of "additional, different, and more expansive violations of the antitrust laws compared to the narrower scope of the Section 7 case" the decree resolved (Compl. ¶ 67.)  That is wrong.

2

To begin, much of the "additional conduct" was known to DOJ when it decided to approve the merger pursuant to the decree.  For example, the use of exclusive ticketing contracts is a longstanding industry practice, which is addressed in the Competitive Impact Statement accompanying the decree's filing in 2010.  (Ex. 5 at 3.)  DOJ nonetheless determined that the decree offered "total protection" to the industry and that its terms would enable competition to thrive.  (Ex. 2 at 14-15.)  Thus, there is a clear interconnection between Plaintiffs' allegations that these practices harm competition and the question of whether the decree succeeded or failed to do what DOJ earlier said it would—*i.e.*, protect competition in the live events industry.  The D.C. Court should be the one to adjudicate the decree's efficacy.

Moreover, the Complaint is *rife* with allegations about the supposed harms of the vertical integration that the merger (and decree) enabled.  For example, Plaintiffs allege:  "Venues have seen that if they sign with a Ticketmaster competitor, they risk losing lucrative Live Nation concerts and may suffer other harmful retaliation"; and:  "Live Nation does not have to threaten individual venues explicitly (although it does) to discourage them from signing ticketing contracts with competitors" because "the risks are well-known".  (Compl. ¶¶ 58, 69.)  Those are the *exact* concerns DOJ investigated and found were (a) not the basis for a vertical challenge even under the prophylactic standards of Section 7, and (b) fully addressed by the conduct commitments in the decree.  What is more, they are the *exact* allegations DOJ made when moving to modify the decree in the D.C. Court just four years ago.  (*E.g.*, Ex. 7 at 18.)  But, four years ago, DOJ asserted these allegations in the D.C. Court pursuant to the procedures provided for in the decree and determined that modifying the decree would "give true competition a chance to take hold".  (*Id.* at 2, 11, 19.)  Now, by contrast, DOJ side-steps the decree while relying on the same alleged concerns DOJ earlier found were adequately addressed by it.

Plaintiffs will no doubt argue that this case is about more than the merger. But the raison d'être of this action is for this Court to "[o]rder the divestiture of, at minimum, Ticketmaster". (Compl. ¶ 371.f.) In announcing this action, DOJ declared: "It is time to break up Live Nation-Ticketmaster". (Ex. 10 at 2.) It is axiomatic that allegations of additional conduct *unrelated* to the vertical integration enabled by the merger could not possibly justify *unwinding the merger*. *Cf. United States v. Microsoft Corp.,* 253 F.3d 34, 102-07 (D.C. Cir. 2001) (en banc) ("radical" remedy of divestiture requires a "significant causal connection" between any unlawful conduct and the dominant market position). "Additional conduct" therefore cannot disguise the fact that Plaintiffs seek to ignore the decree, affirmatively reject its premise—that permitting the merger was in the public interest—and reverse the merger it allowed. Those arguments should be made to the court that originally considered them, not in a collateral attack in a different venue.

Finally, Plaintiffs are wrong to assert that the Section 7 case that the decree resolved is "narrower" than the monopoly claims asserted here. The problem Plaintiffs have created is not about which case is "narrower" or "broader"; it arises from the undeniable overlapping core of both cases. Furthermore—as DOJ has itself argued in other contexts—from a legal perspective Section 7 "sweep[s] more broadly than the Sherman Act's prohibition against transactions that amount to unreasonable restraints of trade or attempts to monopolize." (Ex. 11 at 4.) The former merely requires a showing that the merger *may* substantially lessen competition or *tend* to create a monopoly; the latter requires an actual showing of exclusionary conduct and monopoly power. That DOJ previously concluded that there was no vertical case against the merger under Section 7—despite its far more restrictive, prophylactic standard—cannot be swept aside.

In sum, DOJ and 16 of the state Plaintiffs here contractually agreed that Live Nation and Ticketmaster could merge on prescribed terms and that they would not seek to "modify" the

decree except in the D.C. Court.  Yet this lawsuit is a naked attempt to vitiate that bargain in a different venue.  Plaintiffs' decision to file in this Court should be seen for what it is:  an attempt to downplay the significance of the findings underlying the decree and Defendants' history of compliance, and circumvent the court that adjudged the decree to be in the public interest. Plaintiffs should not be allowed to do so.  The Court should transfer this action to the D.C. Court.

## **BACKGROUND**

A.    The Merger & the First Government Investigation

On February 10, 2009, Live Nation and Ticketmaster entered into a definitive merger agreement, bringing together Live Nation's concert promotions business with Ticketmaster's primary ticketing business.  (Compl. ¶ 65.)  Over the next year, DOJ "conducted an extensive, detailed investigation into the potential competitive effects of the proposed merger . . . issu[ing] Second Requests and twelve Civil Investigative Demands ("CIDs") to the merging parties, as well as more than fifty CIDs to third parties".  (Ex. 1 at 3.)  In total, DOJ "considered more than 2.5 million documents . . . [and conducted] [m]ore than 250 interviews . . . with customers, competitors, and other individuals with knowledge of the industry".  (*Id.*)  DOJ's investigation scrutinized potential horizontal effects in primary ticketing and potential vertical effects from the combination of concert promotions and primary ticketing.  (Ex. 2 at 7-8.)

B.    The Proposed Consent Decree

After investigating "the potential competitive effects of the merger on numerous products and services, customer groups, and geographic areas. . . . [f]or the vast majority of these, including the provision of services to promote live entertainment events, [DOJ] determined that the proposed merger was unlikely to reduce competition substantially".  (Ex. 1 at 4.)  However, DOJ found that the merger "would lessen competition in the provision and sale of primary ticketing services" due to the fact that Live Nation had launched a competing ticketing system.

5

(*Id.*)  Based on these conclusions, DOJ and attorneys general from 19 states[2] (the "Government Plaintiffs") sued to enjoin the merger in the D.C. Court (the "D.C. Complaint"), alleging that the combination of Ticketmaster's established primary ticketing business and Live Nation's nascent primary ticketing business could substantially lessen competition.  (Ex. 3 ¶¶ 37-41.)

The parties simultaneously entered into a previously negotiated proposed consent decree under which Defendants agreed to certain structural and behavioral commitments in exchange for the Government Plaintiffs' approving the merger.  (Ex. 1 at 6; Ex. 4 §§ IV, IX.)  DOJ explained at the time that the proposed decree was designed to address the concerns identified through its investigation.  (Ex. 1 at 6.)  First, the decree created "a new, vertically integrated primary ticketing company" by requiring the merged company to license Ticketmaster's primary ticketing software suite and related services to Anschutz Entertainment Group, Inc. ("AEG"), a fierce rival in concert promotions.  (Ex. 1 at 6-7; Ex. 4 § IV.)  Second, it "bolster[ed] another company to compete" in primary ticketing by requiring the merged company to divest Paciolan, a Ticketmaster ticketing subsidiary.  (Ex. 1 at 8; Ex. 4 § IV.)  Third, the proposed consent implemented "conduct restraints" that act to "supplement these divestitures to ensure that competitive ticketing firms will not be improperly foreclosed from the market by the merged firm's conduct".  (Ex. 1 at 6.)  Specifically, Live Nation is prohibited from:

> 1. Retaliat[ing] against a Venue Owner because it is known to Defendants that the Venue Owner is or is contemplating contracting with a company other than Defendants for Primary Ticketing Services;
>
> 2. Condition[ing] or threaten[ing] to Condition the Provision of Live Entertainment Events to a Venue Owner based on that Venue Owner refraining from contracting with a company other than Defendants for Primary Ticketing Services; or

---

[2] Arizona, Arkansas, California, Florida, Illinois, Iowa, Louisiana, Massachusetts, Nebraska, Nevada, New Jersey, Ohio, Oregon, Pennsylvania, Rhode Island, Tennessee, Texas, Washington, and Wisconsin.

3. Condition[ing] or threaten[ing] to Condition the provision of Primary Ticketing Services to a Venue Owner based on that Venue Owner refraining from contracting with a company other than Defendants for the Provision of Live Entertainment Events.

(Ex. 4 § IX; collectively, the "Anti-Retaliation Provisions".)

DOJ explained that, although it declined to include a vertical challenge in its complaint, it was aware "of the potential for foreclosure at other levels of the supply chain—that is, behavior that would prevent 'critical inputs,' such as artist content and promotion services, from reaching venue owners," and therefore, "in crafting the consent decree, . . . sought to prohibit certain potentially anticompetitive practices and forms of vertical integration by the merged company that would impact or prevent new entry and continued competition from rivals".  (Ex. 2 at 7.) According to DOJ, the Anti-Retaliation Provisions accomplished that goal and, together with the other provisions of the consent, ensured "that there will be enough air and sunlight in this space for strong competitors to take root, grow, and thrive."  (Ex. 2 at 14.)

C.    DOJ's Response to Public Comments and the Final Order

Following submission of the proposed consent, DOJ was statutorily required to solicit public comment under the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)–(h) (the "Tunney Act").  (Ex. 5.)  DOJ received comments from more than a dozen firms and individuals, including several of Defendants' competitors.  (Ex. 1 at 13.)  At least two such competitors, It's My Party, Inc. and Jam Productions, Ltd., objected to the merger on vertical grounds.  (Id. at 14-15, 25-26.)  In response, DOJ acknowledged the potential risk for market foreclosure in some vertical mergers, but dismissed such concerns here.  (Ex. 1 at 14-22.) DOJ not only concluded that it "could not prove that the vertical integration resulting from the merger would significantly harm competition in the concert promotion market or any market other than primary ticketing services" (Ex. 1 at 26-27; Ex. 2 at 8-9), but it also recognized the

pro-competitive benefits of vertical integration. (Ex. 1. at 15 & n.28 ("vertical integration can

produce procompetitive benefits" and "[m]ost instances of vertical integration, including those

that result from mergers, are economically beneficial").) DOJ further noted that the "vertical

integration of complementary businesses in the live entertainment industry reduces the number

of firms that must be compensated for a concert. . . . creat[ing] incentives for the vertically

integrated entity to reduce primary ticketing services prices and service fees." (*Id.* at 15-16.)

On July 30, 2010, the D.C. Court entered the proposed decree as a Final Judgment

(the "Decree"). (Ex. 4.) In so doing, the court expressly retained jurisdiction over the Decree:

> This Court retains jurisdiction to enable any party to this Final Judgment to apply
> to this Court at any time for further orders and directions as may be necessary or
> appropriate to carry out or construe this Final Judgment, to modify any of its
> provisions, to enforce compliance, and to punish violations of its provisions.

(Ex. 4 § XIV.)

D.    The Amended Consent Decree

Nearly a decade later, on January 8, 2020, DOJ filed an unopposed motion in the

D.C. Court to amend the Decree. (Ex. 6.) Leading up to the amendment, DOJ conducted a

sweeping investigation into Live Nation and its compliance with the Anti-Retaliation Provisions

in its dealings with large venues. (Ex. 7 at 6-10.) Ultimately, DOJ alleged six specific violations

of the Decree (Ex. 7 at 7-10), out of the many hundreds of large venue negotiations that Live

Nation had been involved with since the Decree was entered. Several of those turned on whether

the Decree banned *threats* of (as opposed to actual) retaliation.[3] Live Nation denied the

allegations, but agreed to the amendments DOJ sought. (Ex. 8 §§ IX, XV, XVII-XIX.)

In amending the Decree, DOJ relied on its reservation of jurisdiction over modifications,

---

[3] The Decree explicitly banned threats of conditioning, but it did not contain similar
language with respect to retaliation. (Ex. 5 § IX.A.1.)

construction and enforcement. (Ex. 7 at 6.) Shortly thereafter, the D.C. Court entered an

amended consent decree (the "Amended Decree", and together with the Decree, the "Decrees").

(Ex. 8.) The Amended Decree modified the Decree in three principal ways. *First*, it extended its

application until December 31, 2025, including a four-year lookback provision allowing

the Government Plaintiffs to bring an enforcement action in the D.C. Court for any undiscovered

violations committed during the Amended Decree's pendency that are identified on or before

December 31, 2029. (Ex. 8 §§ XV, XVIII.D.) *Second*, it modified the scope of the Anti-

Retaliation Provisions to cover threats of retaliation and delineated specific enforcement

provisions requiring Defendants to pay a penalty of $1,000,000 for *each* violation of the

Amended Decree. (Ex. 8 §§ IX, XVIII.C.) *Third*, it provided for the appointment of an

"Independent Monitoring Trustee", who was granted "full and complete access to all personnel,

books, records, and facilities relating to compliance with [the Amended Decree]" and is required

to "promptly report" any violations of the Amended Decree to DOJ. (Ex. 8 §§ XVII.A.2.,

XVII.A.8.) The D.C. Court yet again retained jurisdiction over the Amended Decree:

> This Court retains jurisdiction to enable any party to this Amended Final Judgment
> to apply to this Court at any time for further orders and directions as may be
> necessary or appropriate to carry out or construe this Amended Final Judgment, to
> modify any of its provisions, to enforce compliance, and to punish violations of its
> provisions.

(Ex. 8 § XIV (section entitled "Retention of Jurisdiction").)

DOJ described the Amended Decree as the "most significant enforcement action of an

existing antitrust decree by the Department in 20 years". (Ex. 9 at 1.) DOJ emphasized that the

modification would "ensure that American consumers get the benefit of the bargain that the

United States and Live Nation agreed to in 2010". (*Id.* at 2.)

E.    This Lawsuit

On May 23, 2024, DOJ, 29 states and the District of Columbia filed the instant action in

the Southern District of New York, seeking to undo the very merger the Decrees allowed, circumventing their jurisdictional provisions and ignoring the delineated remedies set forth in the Decrees to which most of them are party.  (Compl.; Ex. 10.)

The Complaint and the Decrees inescapably overlap.  To be sure, when it comes to alleging any specific violations of the Decrees, the Complaint has little to say.  Indeed, although Defendants have been under the watch of a DOJ-appointed monitor for the last four years and Ticketmaster has engaged in *thousands* of negotiations with venues during that period, the Complaint alleges *only one* specific violation of the Amended Decree.  (Compl. ¶¶ 90-93.) But the overlap is more substantial in at least two fundamental ways.  First, the Complaint is rooted in allegations that reflect precisely the same vertical concerns that DOJ carefully investigated and determined were addressed by the Decrees.  For example, Plaintiffs allege:

- ¶ 32.  "Live Nation's . . . conditioning of access to artists on a venue's selection of primary ticketer, vitiates many venues' ability to select a primary ticketer on the merits of its ticketing service, significantly disadvantaging Live Nation's rivals when they compete for primary ticketing contracts."

- ¶ 87.  "Live Nation puts a 'choice' to venues: use Ticketmaster and potentially receive a significant payment for long-term exclusivity or use another ticketer and risk losing access to the vast array of Live Nation assets, including lucrative concerts."

- ¶ 90.  "These kinds of threats and punishments are not just how Live Nation acquired its outsized power in every corner of this industry. In fact, Live Nation has continued to use this playbook in recent years. For example, in 2021, Live Nation threatened retaliation against a venue that had decided to switch from Ticketmaster to SeatGeek for primary ticketing."

- ¶ 156.  "Live Nation's monopoly power in primary ticketing for major concert venues in the United States also is demonstrated by its ability to . . . successfully threaten[] and retaliat[e] against venues that consider a rival primary ticketer . . . ."

Second, Plaintiffs seek remedies for alleged violations of the Decrees in ways dramatically different from the penalties prescribed in the Decrees—penalties that DOJ told the D.C. Court were sufficient to ensure that the merger is and remains in the public interest.  (Ex. 7 at 18-19.)

## LEGAL STANDARD

Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought". 28 U.S.C. § 1404(a). "In the typical case not involving a forum-selection clause, a district court considering a § 1404(a) motion . . . must evaluate both the convenience of the parties and various public-interest considerations." *See Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Tex.*, 571 U.S. 49, 62 & n.6 (2013) (listing private and public interests factors to be evaluated). In contrast, "a valid forum-selection clause [should be] given controlling weight in all but the most exceptional cases". *Id.* at 63.

## ARGUMENT

This case should be transferred to the D.C. Court, which entered both the Decrees and has retained jurisdiction over them to this day. In addition to the fact that venue is proper in the D.C. Court—as Defendants are "found or transact[] business" there (*see* 15 U.S.C. § 22)—Plaintiffs *should* have brought this action there for three primary reasons. *First*, the Decrees include a mandatory forum selection clause, which makes the D.C. Court the proper forum. *Second*, the interests of justice recommend transfer. *Third*, private and public interest factors favor transfer.

Even if these traditional analyses did not apply (they do), transfer is warranted under the unique circumstances of this case. Never before has DOJ (a) approved a merger pursuant to a consent decree; (b) imposed conduct constraints that it expressly determined would ensure competition thrived post-merger; (c) operated under that decree for more than a decade; and then (d) sought to unwind the very merger the decree approved, based in large part on the conduct the decree regulated. Stranger still, DOJ here seeks to unwind the merger in a court *other than the one that effectuated that merger and found the decree allowing it to be in the public interest*. Plaintiffs' novel attack on the decree should be heard by the court that entered it.

11

A.    Parties on Both Sides of this Action Agreed that the D.C. Court Is the Appropriate Forum for the Present Dispute.

The Supreme Court has made clear that "a valid forum-selection clause, which represents the parties' agreement as to the most proper forum," should be "given controlling weight in all but the most exceptional cases". *See Atl. Marine*, 571 U.S. at 63 (cleaned up). Here, most of the parties to this case agreed that the D.C. Court is the proper forum for the questions about the Decrees raised by Plaintiffs' claims here. There is no question that the jurisdiction-retention provision in the Amended Decree is valid, and there is no reason not to enforce it.

The Amended Decree instructs that the D.C. Court "retains jurisdiction to enable any party to apply to [it] for further orders as may be necessary or appropriate to carry out or construe this Amended Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions." (Ex. 8 § XIV.) This provision is a mandatory forum selection clause. Courts, including the Second Circuit, have found virtually identical language to confer *exclusive* jurisdiction on the decree-issuing court to avoid conflicting judgments that could frustrate the decree's purpose. *See, e.g.*, *United States v. ASCAP (In re Karmen)*, 32 F.3d 727, 731-32 (2d Cir. 1994) (finding issuing court retained exclusive jurisdiction where decree said: "Jurisdiction of this cause is retained for the purpose of enabling any of the parties to this Amended Final Judgment to make application to the Court for such further orders and directions as may be necessary or appropriate in relation to the construction of or carrying out of this Judgment, for the modification thereof, for the enforcement of compliance therewith and for the punishment of violations thereof."); *see also Flanagan v. Arnaiz*, 143 F.3d 540, 544 (9th Cir. 1998); *Republic Bldg. Co. v. Charter Twp. of Clinton*, 81 F.4th 662, 668 (6th Cir. 2023).

Courts have found that such jurisdiction retention provisions not only are exclusive as between federal and state courts but also provide for exclusive jurisdiction as between different

12

federal district courts. *See, e.g.*, *Davidson v. Dean*, 104 F.3d. 350 (2d Cir. 1996) (unpublished) (finding N.D.N.Y. "had no jurisdiction over Davidson's claim under the Consent Decree" because jurisdiction was retained in S.D.N.Y.); *Omnicell v. Medacist Sols. Grp., LLC*, 272 F.R.D. 469, 476-77 (N.D. Cal. 2011) (extending *Flanagan* to apply among federal forums and finding venue improper).[4]  For example, the court in *Omnicell* likened the jurisdiction retention provision in the stipulated settlement to a mandatory forum selection clause providing for exclusive jurisdiction in the issuing court. *See Omnicell*, 272 F.R.D. at 473-477.[5]  These cases make clear that the jurisdiction-retention language found in a judicially ordered consent decree, rather than a private contract, should be considered a mandatory rather than permissive forum selection clause. *Id.* at 474 (agreeing that "when a court expressly retains jurisdiction to enforce a settlement agreement, the retention of jurisdiction operates as an exclusive forum selection clause requiring disputes under the settlement agreement to be brought in that court").  Thus, not only did the D.C. Court retain jurisdiction to hear claims that require construing the Amended Decree (like those in this case), it also retains *exclusive* jurisdiction to do so.

This action falls within the ambit of the forum selection clause agreed to by the parties. As explained, Section XIV of the Amended Decree is a mandatory forum selection clause with respect to any action falling in five different Decree-related categories: those that would (1) carry

_____

[4] *See also Magnolia v. Conn. Gen. Life Ins. Co.*, 157 F. Supp. 2d 583, 587 (D. Md. 2001) (dismissing case because "[i]t would make no sense for the California Court to retain jurisdiction to interpret and apply its own judgment but permit another court to construe what it meant in that judgment"); *Willoughby v. Potomac Elec. Power Co.*, 853 F. Supp. 174, 176 (D. Md. 1994) (transferring dispute because "a district court that enters a consent decree and retains enforcement jurisdiction in all probability has exclusive jurisdiction over claims relating to it").

[5] While the Supreme Court's opinion in *Atlantic Marine*, 571 U.S. at 59, supersedes *Omnicell*'s holding that dismissal under Federal Rule 12(b)(3) was appropriate, it does not undermine the *Omnicell* court's interpretation that the relevant jurisdiction retention provision provided for exclusive jurisdiction in the consent decree-issuing court.

it out, (2) construe it, (3) modify it, (4) enforce compliance with it, and (5) punish violations of it. It defies credulity to suggest that seeking to unwind a merger permitted by a consent decree would implicate *none* of these five categories. This is an expansive list. It contains no carve-outs or limiting language. As such, it plainly evinces an intention for all decree-related actions to be brought in the D.C. Court. At a minimum, nothing about the text permits the bizarre interpretation that *almost* everything decree-related would have to be brought in the D.C. Court, but an action vitiating the very premise of the decree could be filed elsewhere.[6]

Both sides to this agreement—in its original and modified form alike—received benefits from the bargain. DOJ and nineteen states obtained two sets of divestitures of ticketing assets and material restrictions on the combined company's operations. Live Nation and Ticketmaster were allowed to merge. Each side obtained judicial ratification that their bargain was in the public interest notwithstanding arguments to the contrary and the assurance that the same court that made that public interest finding would address all related controversies. No reasonable person would have understood that bargain to include detailed prescriptions with respect to where to file actions enforcing the decree, carrying out its purpose, punishing transgressions of it, and interpreting its terms—while being blithely agnostic with respect to where a case should be filed seeking to unwind the merger that was the entire subject of the agreement.

At the very least, a subsequent effort to unwind the merger altogether constitutes an effort to "modify" that core bargain within the plain text of the forum selection clause. Though the connection may be less direct, this action also implicates each of the other enumerated categories of actions subject to exclusive jurisdiction in the D.C. Court. For example, Plaintiffs:

- assert claims that will require the <u>construction</u> of the Amended Decree by this Court; for

---

[6] *See SEC v. Levine*, 881 F.2d 1165, 1179 (2d Cir. 1989) ("Construction of the consent judgment as a contract is constrained by traditional contract principles.").

example, determining whether alleged acts constitute prohibited retaliation or threatening and why the remedies prescribed in the Decree are not enough to protect competition, contrary to DOJ's findings set forth in its D.C. Court filings;

- repudiate the <u>benefit</u> to Defendants of entering the Decrees by asking this Court to order the divestiture of Ticketmaster (Compl. ¶ 371.f);

- effectively ask this Court to <u>enforce compliance</u> by enjoining Defendants from engaging in conduct prohibited by the Amended Decree (Compl. ¶ 371.h); and

- demand that Defendants be <u>punished</u> for conduct they allege violates the Amended Decree.

Although Plaintiffs have sought to downplay the role of the Decrees here, there is no question that the Complaint alleges conduct that, if proven, would violate the Decrees. Counsel for Plaintiffs admitted as much during the June 27, 2024 case management conference.[7] This case will require the determination of whether retaliation and conditioning conduct occurred and the monitor's findings as to whether violations of the decrees have, in fact, occurred will be highly probative evidence. And, Plaintiffs' demand for relief seeks to negate the Decrees entirely by eliminating the merger that the Decrees enabled. The forum selection clause applies.

That certain states or certain claims in this action may arguably not be subject to the Amended Decree does not bar transfer. Where "a mandatory forum selection clause governs some, but not all, of the claims in a given case, that does not render the clause irrelevant as to the remaining claims under the transfer analysis. That some claims are clearly subject to the clause can weigh strongly in favor of transfer of the entire action, including the other claims . . . ." *Androb Jewelry Serv., Inc. v. Malca-Amit USA, LLC*, No. 16-cv-05171, 2017 WL 4712422, at *3 (S.D.N.Y. Sept. 25, 2017). This action is permeated with allegations of conduct regulated by the Decrees—all in service of a demand to unwind the very merger the Decrees approved.

---

[7] *See* CMC Tr. 9:16-25 ("We do allege in this complaint that there have been acts of retaliation and conditioning, which are prohibited by the consent judgment; however, it's also true that conduct can violate other statutes and other consent decrees.").

15

B.    <u>Transfer Is in the Interest of Justice.</u>

Even if the D.C. Court was not selected as the forum, transfer will promote the interest of justice, "the overarching consideration under § 1404(a)". *Atl. Marine*, 571 U.S. at 63.

*First*, permitting Plaintiffs to circumvent the jurisdictional provision by proceeding in this Court would enable what is in essence a collateral attack on the D.C. Court's orders. Plaintiffs seek to undo the merger that the Decrees allowed, (Compl. ¶ 371.f), based on conduct prohibited by the Decrees and a theory that is fundamentally at odds with the facts upon which the Decrees are premised (*supra* at 6). An order requiring the divestiture of Ticketmaster would squarely conflict with the judgment embodied in the Decrees. *See Butcher v. Lawyers Title Ins. Corp.*, No. 04-73968, 2005 WL 8154943, at *3 (E.D. Mich. Feb. 4, 2005) ("[T]ransferring this case . . . will promote the interests of justice because the transferee district has supervised related cases involving the same facts, transactions and parties. Indeed, the instant action is a collateral attack on a judgment of the Western District.").[8]

*Second*, transferring the case to D.C. will preserve the heavily-negotiated, and court-approved, bargain embodied in the Decrees, which reflects the recognition that the court that entered the Decree and found it in the public interest should adjudicate disputes relating to it, attempts to modify it, and attempts to enforce it. As explained (*supra* at 10-11, 14-16), the Complaint implicates the Decrees in numerous respects. Transfer would therefore allow the

---

[8] *See also Yonkers Racing Corp. v. City of Yonkers*, 858 F.2d 855, 865 (2d Cir. 1988) (removal was proper where "necessary to protect the integrity of the Consent Decree and [where] the issues raised [in the later action] . . . cannot be separated from the relief provided by the Consent Decree."); *Goulart v. United Airlines, Inc.*, No. C 94-1751, 1994 WL 544476, at *3 (N.D. Cal. Sept. 28, 1994) ("[T]he *relief* requested by plaintiffs is inextricably intermingled with the provisions of the Consent Decree and thus venue is not proper in this court."). In other contexts, government agencies have recognized that transfer to the decree-issuing court is warranted. *See Seariver Mar. Fin. Holdings, Inc. v. Pena*, 952 F. Supp. 9, 11 (D.D.C. 1997) (granting government's motion to transfer to the consent-issuing court).

court that has long held and continues to hold jurisdiction over the Decrees to decide disputes

that go to the core of the Decrees, as the parties to the Decrees intended.  *See Atl. Marine*, 571

U.S. at 66 (finding a motion to transfer in "the interest of justice" as "courts should not

unnecessarily disrupt the parties' settled expectations"); *In re Residential Capital, LLC*, 527 B.R.

865, 872–73 (S.D.N.Y. 2014) (granting transfer to give defendant "the benefit of its bargain").

That the Amended Decree expires at the end of 2025 does not change the conclusion.

Plaintiffs chose to file this case before expiry of the Amended Decree, and the conduct alleged in

the Complaint occurred while the Amended Decree was in effect.  More importantly, the Decrees

are a contract, representing the agreed-to resolution of competitive concerns raised about the

merger.  Defendants performed their obligations by divesting assets—including source code for

the Ticketmaster system and the entire Paciolan ticketing system—living under a monitor and

subjecting themselves to penalties for breach.  That the Amended Decree expires—as all merger

decrees do—changes nothing.  Whether Plaintiffs should be permitted to undo the bargain set

forth in the Amended Decree is a question the D.C. Court should address.

*Third*, allowing Plaintiffs to proceed here would run the risk of multiple and potentially

conflicting proceedings.  Even if this Court were to keep the case, the D.C. Court retains

jurisdiction to deal with applications by the parties.  Any party could seek a declaration that

Defendants did or did not violate the Decrees.  It makes little sense to embark on a path that

could require two different courts to deal with effectively the same issues.  *See Butcher*, 2005

WL 8154943, at *3 ("One element that courts have considered as relating to the 'interest of

justice' is the desire to avoid multiplicity of litigation from a single transaction."); *see also*

*Cont'l Grain Co. v. Barge FBL-585*, 364 U.S. 19, 26 (1960) ("To permit a situation in which two

cases involving precisely the same issues are simultaneously pending in different District Courts

leads to the wastefulness of time, energy and money that § 1404(a) was designed to prevent.").[9]

C.    On Balance, the Private and Public Interest Factors Favor Transfer.

In addition to the interest of justice, the private and public interest factors weigh in favor of transfer. These factors include: "the convenience of witnesses and the parties, the locus of operative facts, the location of relevant documents and relative ease of access to sources of proof, the availability of process to compel the attendance of unwilling witnesses, the court's familiarity with governing law, the relative financial means of the parties, the weight afforded to plaintiff's choice of forum, and judicial economy and the interests of justice". *Schweitzer v. Nevels*, 669 F. Supp. 3d 242, 247 (S.D.N.Y. 2023).

i.    Private Interest Factors

As the Supreme Court explained in *Atlantic Marine*, "a court evaluating a defendant's section 1404(a) motion to transfer based on a forum-selection clause should not consider arguments about the parties' private interests. When parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation. A court accordingly must deem the private-interest factors to weigh entirely in favor of the preselected forum." 571 U.S. at 64. But even if the retention of jurisdiction provision here did not constitute a mandatory forum selection clause, the private interest factors weigh in favor of transfer.

The private interest factors include the "practical problems that make trial of a case easy, expeditious and inexpensive". *Id.* at 62 n.6. Courts in the Second Circuit typically analyze the convenience of the witness and parties, the locus of operative facts, the location of relevant

---

[9] *See also Pence v. Gee Grp., Inc.*, 236 F. Supp. 3d 843, 854 (S.D.N.Y. 2017) ("It would be wasteful in the extreme if discovery and trial of these matters were to be duplicated in two different districts.").

documents and ease of access to sources of proof, the availability of process to compel the attendance of unwilling witnesses and the relative financial means of the parties. *Schweitzer v. Nevels*, 669 F. Supp. 3d 242, 247 (S.D.N.Y. 2023). Ignoring the Amended Decree, many of these factors are best viewed as neutral. Defendants expect the District of Columbia and New York would be roughly equivalent in terms of their convenience for the parties and witnesses, the availability of compulsory process, and access to sources of proof.[10] The DOJ, of course, is headquartered in the District of Columbia and files cases there regularly.

But the Amended Decree and its relationship to Plaintiffs' allegations cannot be ignored. Even if the Decrees did not make the D.C. Court the exclusive jurisdiction for Plaintiffs' allegations, the D.C. Court's retention of jurisdiction matters. Because the D.C. Court entered the order permitting the combination of Live Nation and Ticketmaster, it is necessarily a locus of key operative facts. And Plaintiffs' Complaint alleges nationwide markets and contains no countervailing facts that put the locus of the case in New York. Moreover, allowing Plaintiffs to proceed in this Court would not foreclose any party's ability to apply to the D.C. Court for relief, such that the parties and witnesses could end up having to appear in two different proceedings. Setting out on a course that would allow two different federal district courts to address the same issues could call into question the enforceability of a judgment by any one.

       ii.   <u>Public Interest Factors</u>

The public interest factors[11] also support transfer. This Court and the judges on the D.C.

___

[10] While Plaintiffs' choice of forum would ordinarily cut in favor of New York, "[a] Plaintiff's choice of forum receives less deference when that forum is not the plaintiff's home district," *see Whitehaus Collection*, 2011 WL 4036097, at *3. Here, New York is only one of 29 current Plaintiff-states and the District of Columbia is also a Plaintiff.

[11] "The public interest factors . . . include the administrative difficulties flowing from court congestion, local interest in having localized controversies decided at home, and the interest in having the trial of a diversity case in a forum that is at home with the law." *Schweitzer*, 669 F.

Court are likely all familiar with the federal and state antitrust laws on which Plaintiffs' claims are based.  But the D.C. Court must be said to be more familiar with its own consent decrees.[12] And, as stated, Plaintiffs' claims fall squarely within the ambit of the Decrees, which have been pending in the D.C. Court since 2010.  Plaintiffs' claims will require at least some construction of the Decrees, which strongly favors transfer.  There is nothing to suggest dockets are more congested in the D.C. district courts than in the Southern District of New York, and some data suggests the D.C. district courts are *less* congested than the Southern District of New York.[13] *See Whitehaus Collection*, 2011 WL 4036097, at *5 (factor has "no more than marginal relevance", but where statistics suggested N.D. Ill. was less congested than S.D.N.Y., factor "favors transfer").

## CONCLUSION

For the foregoing reasons, Defendants respectfully submit that this Court should transfer this action to the United States District Court for the District of Columbia.

---

Supp. 3d at 249 (citing *Atl. Marine*, 571 U.S. at 62 n.6).

[12] *See Seariver*, 952 F. Supp. at 11 ("District of Alaska [which] retained jurisdiction to interpret the consent decree [that it entered] is . . . in the best position to determine the applicability of the decree to the facts of this case."); *Koehler v. Green*, 358 F. Supp. 2d 346, 347 (S.D.N.Y. 2005) (transferring case with court-ordered settlement "[g]iven that court's familiarity with and continuing jurisdiction over the matters that form the basis of the instant complaint"). That Judge Collyer, who entered the Decrees, is inactive does not bar transfer.  *See Davidson*, 104 F.3d 350 (transferring case to different judge within consent-issuing district); *Goulart*, 1994 WL 544476 (same).

[13] *See* U.S. District Courts Combined Civil and Criminal Federal Court Management Statistics (Dec. 31, 2023), *available at* https://www.uscourts.gov/sites/default/files/fcms_na_distprofile1231.2023_0.pdf (while, as of December 31, 2023, time from filing to trial (civil) is slightly higher in D.D.C. than S.D.N.Y., time from filing to disposition (civil), filings per judgeship and pending cases per judgeship are all lower).

Dated: July 19, 2024

LATHAM & WATKINS LLP

Alfred C. Pfeiffer (admitted *pro hac vice*)
 *Co- Lead Trial Counsel*
Timothy L. O'Mara (admitted *pro hac vice*)
Jennifer L. Giordano
Andrew M. Gass (admitted *pro hac vice*)
Lindsey S. Champlin (admitted *pro hac vice*)
Kelly S. Fayne (admitted *pro hac vice*)
Robin L. Gushman (admitted *pro hac vice*)

505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
(415) 391-0600

555 11th Street NW, Suite 1000
Washington, D.C. 20004
(202) 637-2200

Al.Pfeiffer@lw.com
Tim.O'Mara@lw.com
Jennifer.Giordano@lw.com
Andrew.Gass@lw.com
Lindsey.Champlin@lw.com
Kelly.Fayne@lw.com
Robin.Gushman@lw.com

*Attorneys for Defendants Live Nation*
*Entertainment, Inc. and Ticketmaster L.L.C.*

CRAVATH, SWAINE & MOORE LLP

David R. Marriott
 *Co-Lead Trial Counsel*
Lauren A. Moskowitz
Jesse M. Weiss
Nicole M. Peles

Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 474-1000

dmarriott@cravath.com
lmoskowitz@cravath.com
jweiss@cravath.com
npeles@cravath.com

*Attorneys for Defendants Live Nation*
*Entertainment, Inc. and*
*Ticketmaster L.L.C.*

21