# Exhibit 1

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>                                    *Plaintiffs,*<br><br>v.<br><br>TICKETMASTER ENTERTAINMENT,<br>INC., *et al.*,<br><br>                                    *Defendants.* | Case: 1:10-cv-00139<br>Assigned to: Collyer, Rosemary M.<br>Assign. Date: 1/25/2010<br>Description: Antitrust |

## PLAINTIFF UNITED STATES' RESPONSE TO PUBLIC COMMENTS

Pursuant to the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)-(h) ("APPA" or "Tunney Act"), the United States hereby files the public comments concerning the proposed Final Judgment in this case and the United States' response to those comments. After careful consideration of the comments, the United States continues to believe that the proposed Final Judgment will provide an effective and appropriate remedy for the antitrust violations alleged in the Amended Complaint. The United States will move the Court, pursuant to 15 U.S.C. § 16(b)-(h), for entry of the proposed Final Judgment after the public comments and this Response have been published.[1]

---

[1] As approved by the Court in a Minute Order dated June 15, 2010, the United States will publish the Response and the comments without attachments or exhibits in the Federal Register. The United States will post complete versions of the comments with attachments and exhibits on the Antitrust Division's website at http://www.justice.gov/atr/cases/ticket.htm.

# I.    PROCEDURAL HISTORY

On January 25, 2010, the United States and the States of Arizona, Arkansas, California, Florida, Illinois, Iowa, Louisiana, Nebraska, Nevada, Ohio, Oregon, Rhode Island, Tennessee, Texas, and Wisconsin, and the Commonwealths of Massachusetts and Pennsylvania (the "States") filed the Complaint in this matter, alleging that the merger of Ticketmaster Entertainment, Inc. ("Ticketmaster") and Live Nation, Inc. ("Live Nation"), if permitted to proceed, would substantially lessen competition in the market for primary ticketing services to major concert venues in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.[2] Simultaneously, the United States filed a Competitive Impact Statement ("CIS"), a proposed Final Judgment, and a Hold Separate Stipulation and Order signed by the United States, the States, and the defendants consenting to the entry of the proposed Final Judgment after compliance with the requirements of the APPA.

The proposed Final Judgment and CIS were published in the Federal Register on February 10, 2010.  *See* 75 Fed. Reg. 6,709 (2010).  A summary of the terms of the proposed Final Judgment and CIS, together with directions for the submission of written comments relating to the proposed Final Judgment, were published for seven days in *The Washington Post* from February 26, 2010, through March 4, 2010.  The Defendants filed the statement required by 15 U.S.C. § 16(g) on February 12, 2010.  The 60-day period for public comments ended on May 3, 2010, and twelve comments were received as described below and attached hereto.

---

[2]  An Amended Complaint was filed on January 28, 2010, solely to add the States of New Jersey and Washington as plaintiffs.

-2-

## II.     THE INVESTIGATION AND PROPOSED RESOLUTION

### A.     Investigation

On February 10, 2009, Ticketmaster and Live Nation entered into a definitive merger agreement.  Over the following eleven and a half months, the United States Department of Justice ("Department") conducted an extensive, detailed investigation into the potential competitive effects of the proposed merger.  As part of the investigation, the Department issued Second Requests and twelve Civil Investigative Demands ("CIDs") to the merging parties, as well as more than fifty CIDs to third parties.  The Department considered more than 2.5 million documents received in response to the Second Requests and CIDs.  More than 250 interviews were conducted with customers, competitors, and other individuals with knowledge of the industry, including two commenters here      Jam Productions, Ltd. and the group led by It's My Party, Inc.      which are competitors and complainants about the proposed transaction.  The investigative team analyzed their concerns, as well as the views and data presented by hundreds of others.  While the Department was reviewing this transaction, a group of state Attorneys General and the Canadian competition authorities conducted their own antitrust investigations.  Nineteen states joined the United States' Amended Complaint and the proposed Final Judgment resolving the Amended Complaint; no state has filed a separate lawsuit to block the merger or has opposed the proposed Final Judgment before this Court.  At the conclusion of its investigation, Canada imposed parallel relief that is substantively identical to that contained in the proposed Final Judgment.[3]

---

[3] Competition authorities in the United Kingdom also reviewed the transaction and ultimately cleared the merger without imposing any conditions; market conditions in the United Kingdom, however, differ substantially from those prevailing in the United States and Canada.

As part of its investigation, the Department considered the potential competitive effects of the merger on numerous products and services, customer groups, and geographic areas.  For the vast majority of these, including the provision of services to promote live entertainment events, the Department determined that the proposed merger was unlikely to reduce competition substantially.  Because Ticketmaster and Live Nation were the two largest providers of primary ticketing services, the Department appropriately devoted significant time and resources to analyzing whether the combination of the parties' primary ticketing services would likely reduce competition.  The United States concluded that the combination of Ticketmaster and Live Nation likely would lessen competition in the provision and sale of primary ticketing services for major concert venues in the United States.

Primary ticketing is the initial distribution of tickets to an event.  Ticketing companies are responsible for distributing primary ticket inventory through channels such as the Internet, call centers, and retail outlets and for enabling the venue to sell tickets at its box office.  The primary ticketing company provides the technology infrastructure for ticket distribution.  Primary ticketing firms also may provide technology and hardware that allow venues to manage fan entry at the event, including everything from handheld scanners that ushers use to check fans' tickets to the bar codes on the tickets themselves.  The overall price a consumer pays for a ticket generally includes the face value of the ticket and a variety of service fees above the face value of the ticket.  Such fees are most often charged by the provider of primary ticketing services.  The primary ticketing provider, however, does not set the face value of the ticket.  It is set by the promoter and artist.

The complexity and demands of selling tickets to major concert venues requires sophisticated primary ticketing services.  A major concert venue's primary ticketing provider

must be able to withstand the heavy transaction volume associated with the first hours when tickets to popular concerts become available to concert-goers, offer integrated marketing capabilities, and otherwise have a proven track record of high quality service.  As such, major concert venues have had few choices for primary ticketing providers.  Ticketmaster had a long-standing track record of filling these needs.  When Ticketmaster and Live Nation announced their merger, Live Nation had recently begun engaging in primary ticketing services, primarily selling tickets to concerts at its own venues as a way to demonstrate to other venues that its primary ticketing platform performed well.  No primary ticketing company other than Ticketmaster and Live Nation had amassed or likely could have amassed in the near term sufficient scale to develop a reputation for successfully delivering similarly sophisticated primary ticketing services.

Primary ticketing services are sold pursuant to contracts individually negotiated with venues.  Because primary ticketing companies can price discriminate among different venues, the Department determined that the proposed transaction could affect different classes of venues differently.  Specifically, the Department found that major concert venues, because of their need for the most sophisticated ticketing services, have few ticketing options.  These venues can be readily identified, and market power can be selectively exercised against them.  Furthermore, the Department determined that because the merged firm could price discriminate, any effects of the proposed transaction on foreign venues would be distinct from any effects on domestic venues, and thus it was appropriate to include only major concert venues located in the United States within the relevant market.

After its investigation, the United States determined that the proposed merger would likely substantially lessen competition for primary ticketing services to major concert venues in

the United States.  As explained more fully in the Amended Complaint and CIS, this loss of

competition would eliminate financial benefits that venues enjoyed during the period when Live

Nation exerted competitive pressure against Ticketmaster, and would reduce incentives to

innovate and improve primary ticketing services.[4]  As alleged in the Amended Complaint, the

proposed merger of Ticketmaster and Live Nation would remove Live Nation's competitive

presence from an already highly concentrated and difficult-to-enter market.[5]  The resulting

increase in concentration, loss of competition, and absence of any reasonable prospect of

significant new entry or expansion by market incumbents likely would result in higher prices for

major concert venues and reduce innovation in primary ticketing services.[6]

### B.    Proposed Final Judgment

The proposed Final Judgment is designed to preserve competition in the market for

primary ticketing services to major concert venues in the United States by requiring divestitures

of assets and mandating certain conduct remedies.  First, the proposed Final Judgment creates a

new, vertically integrated primary ticketing company and bolsters another company to compete

against Live Nation Entertainment.[7]  Second, the conduct restraints in the proposed Final

Judgment supplement these divestitures to ensure that competitive ticketing firms will not be

improperly foreclosed from the market by the merged firm's conduct.

The proposed Final Judgment establishes Anschutz Entertainment Group, Inc. ("AEG")

as an entrant into primary ticketing services.  AEG is the second largest promoter in the United

---

[4] Amended Complaint ¶ 40 *et seq*.; CIS § II(D).
[5] Amended Complaint ¶¶ 38, 40, 43, 44; CIS § II(D).
[6] Amended Complaint ¶ 40 *et seq*.; CIS § II(D).
[7] Live Nation Entertainment is the name of the newly merged entity.  Throughout this Response, the historical Ticketmaster ticketing operation is referred to as "Ticketmaster," the artist management business is referred to as "Front Line," and the promotions and venue management business is referred to as "Live Nation."

States (behind Live Nation).  AEG also owns, operates, or manages more than 30 major concert

venues in the United States, owns part of an artist management firm, and owns the Los Angeles

Kings hockey franchise.  Entry will occur via a two-stage process.  In the first part of the

process, the merged firm must provide AEG with an AEG-branded ticketing website based on

the Ticketmaster Host platform, Ticketmaster's primary platform for selling tickets.[8]  AEG has

the right to use the AEG-branded ticketing website to sell tickets at venues it owns, operates, or

manages as well as to events at any other venues from which AEG secures the right to provide

primary ticketing services.  AEG has the freedom to compete with Ticketmaster on the prices it

charges to venues for ticketing services and on the service fees that are added to a ticket's price.[9]

In the second part of the process, AEG may exercise an already negotiated right to acquire a

perpetual, fully paid-up license to the then-current version of the Ticketmaster Host platform,

including a copy of the source code, which the merged firm must install.[10]  The agreement

between AEG and the merged firm contains financial incentives for AEG to exercise the right.

Finally, the proposed Final Judgment prohibits the merged firm from providing primary ticketing

services to AEG's venues after AEG's right to use the AEG-branded ticketing website expires,

which will take place five years after execution of the license.[11]  This provision is critical to

preserving competition in the primary ticketing services market, because it guarantees that

within five years, AEG will have to either remain a full fledged primary ticketing services

competitor or bolster another primary ticketing competitor by using them to meet its ticketing

needs.

---

[8] Proposed Final Judgment § IV.A.2.
[9] *Id.*
[10] *Id.* § IV.A.1.
[11] *Id.* § XIII.B.

The proposed Final Judgment also requires the merged firm to divest Ticketmaster's entire Paciolan line of business[12] to an independent and economically viable competitor in the market for primary ticketing services to major concert venues.[13]  The merged firm has already divested this business to Comcast-Spectacor, L.P. ("Comcast-Spectacor"), a vertically-integrated company whose subsidiary New Era Tickets ("New Era") was one of many licensees of the Paciolan platform prior to the divestiture.  In addition to its interest in New Era, Comcast-Spectacor owns two major U.S. concert venues, a venue management firm that manages fifteen other major concert venues, the Philadelphia Flyers, the Philadelphia 76ers, a venue/sports marketing company, and a food services company whose clients include major concert venues.  Comcast-Spectacor's ticketing business model is different from Ticketmaster's in that venue clients, rather than Comcast-Spectacor, independently set service fees and venue clients maintain ownership of their ticketing data.

The proposed Final Judgment also prohibits the merged firm from engaging in certain conduct that could, in theory, prevent equally efficient firms from competing effectively.[14]  The proposed Final Judgment proscribes retaliation against venue owners who contract or consider contracting for primary ticketing services with the merged firm's competitors.[15]  The proposed Final Judgment also prohibits the merged firm from explicitly or practically requiring venues, or threatening to require venues, to take their primary ticketing services in order to be allowed to present concerts Live Nation promotes or concerts by artists Front Line manages.  It likewise

---

[12] In 2008, Paciolan directly handled the sale for more than 9 million concert and sporting tickets.  It also provided in-house ticketing solutions for more than 250 clients, including Tickets West, Comcast-Spectacor's ticketing solution New Era, and numerous colleges, universities and performing arts centers throughout the U.S.

[13] *Id.* §§ IV.E, IV.K.

[14] *Id.* § IX.

[15] *Id.* § IX.A.1.

prohibits the merged firm from explicitly or practically requiring venues, or threatening to

require venues, to take concerts the merged firm promotes or concerts by artists it manages in

order to be allowed to purchase the merged firm's primary ticketing services.[16]  Further, the

Final Judgment prohibits the merged firm from using certain ticketing data in its non-ticketing

business and from providing that data to internal promoters and artist managers.[17]  Finally, the

proposed Final Judgment mandates that the merged firm provide any current primary ticketing

client with that client's ticketing data promptly upon request, if the client chooses not to renew

its primary ticketing contract.[18]

In sum, the perpetual license of the Ticketmaster Host platform, the divestiture of

Paciolan, and the conduct remedies will ensure that major concert venues will continue to

receive the benefits of competition in the primary ticketing services market that otherwise would

be lost as a result of the merger.

## III.  STANDARD OF JUDICIAL REVIEW

The APPA requires that proposed consent judgments in antitrust cases brought by the

United States be subject to a sixty-day comment period, after which the court shall determine

whether entry of the proposed Final Judgment "is in the public interest."  15 U.S.C. § 16(e)(1).

In making that determination in accordance with the statute, the court is required to

consider:

> (A) the competitive impact of such judgment, including termination of alleged
> violations, provisions for enforcement and modification, duration of relief sought,
> anticipated effects of alternative remedies actually considered, whether its terms
> are ambiguous, and any other competitive considerations bearing upon the

---

[16] *Id.* §§ IX.A.2, IX.A.3.

[17] *Id.* § IX.B.

[18] *Id.* § IX.C.

adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

(B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A)-(B). In considering these statutory factors, the court's inquiry is necessarily a limited one as the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *see generally United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1 (D.D.C. 2007) (assessing public interest standard under the Tunney Act); *United States v. InBev N.V./S.A.*, 2009-2 Trade Cas. (CCH) ¶76,736, No. 08-1965 (JR), 2009 U.S. Dist. LEXIS 84787, at *3 (D.D.C. Aug. 11, 2009) (noting that the court's review of a consent judgment is limited and only inquires "into whether the government's determination that the proposed remedies will cure the antitrust violations alleged in the complaint was reasonable, and whether the mechanisms to enforce the Final Judgment are clear and manageable").

As the United States Court of Appeals for the District of Columbia Circuit has held, under the APPA, a court considers, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may positively harm third parties. *See Microsoft*, 56 F.3d at 1458-62. With respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981));

*see also Microsoft*, 56 F.3d at 1460-62; *United States v. Alcoa, Inc.*, 152 F. Supp. 2d 37, 40

(D.D.C. 2001); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *3.  Courts have held that:

> [t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General.  The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree.  The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is "*within the reaches of the public interest*."  More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[19]  In determining whether a

proposed settlement is in the public interest, the court "must accord deference to the

government's predictions about the efficacy of its remedies, and may not require that the

remedies perfectly match the alleged violations."  *SBC Commc'ns*, 489 F. Supp. 2d at 17; *see

also Microsoft*, 56 F.3d at 1461 (noting the need for courts to be "deferential to the government's

predictions as to the effect of the proposed remedies"); *United States v. Archer-Daniels-Midland

Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant due respect to the

United States' prediction as to the effect of proposed remedies, its perception of the market

structure, and its views of the nature of the case).

Courts have greater flexibility in approving proposed consent decrees than in crafting

their own decrees following a finding of liability in a litigated matter.  "[A] proposed decree

must be approved even if it falls short of the remedy the court would impose on its own, as long

---

[19] *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass").  *See generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

as it falls within the range of acceptability or is 'within the reaches of public interest.'" *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983); *see also United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a greater remedy). As this Court has previously recognized, to meet this standard "[t]he government need not prove that the settlements will perfectly remedy the alleged antitrust harms, it need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." *United States v. Abitibi-Consolidated Inc.*, 584 F. Supp. 2d 162, 165 (D.D.C. 2008) (citing *SBC Commc'ns*, 489 F. Supp. 2d at 17). Therefore, the United States "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." *SBC Commc'ns*, 489 F. Supp. 2d at 17.

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its complaint, rather than to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Id*. at 1459-60. As this Court recently confirmed in *SBC Communications*, courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power." *SBC Commc'ns*, 489 F. Supp. 2d at 15.

-12-

In its 2004 amendments to the Tunney Act,[20] Congress made clear its intent to preserve

the practical benefits of utilizing consent decrees in antitrust enforcement, stating "[n]othing in

this section shall be construed to require the court to conduct an evidentiary hearing or to require

the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2).  The clause reflects what

Congress intended when it enacted the Tunney Act in 1974, as Senator Tunney explained:  "[t]he

court is nowhere compelled to go to trial or to engage in extended proceedings which might have

the effect of vitiating the benefits of prompt and less costly settlement through the consent

decree process."  119 Cong. Rec. 24,598 (1973) (statement of Senator Tunney).  Rather, the

procedure for the public-interest determination is left to the discretion of the court, with the

recognition that the court's "scope of review remains sharply proscribed by precedent and the

nature of Tunney Act proceedings."  *SBC Commc'ns*, 489 F. Supp. 2d at 11.

## IV.    SUMMARY AND RESPONSE TO PUBLIC COMMENTS

During the 60-day public comment period, the United States received comments from the

following firms or individuals:  It's My Party, Inc.,[21] Jam Productions, Ltd., Jack Orbin, Middle

East Restaurant, Inc., LIVE-FI Technologies, Inc., Kenneth de Anda, Chris Cantz, Joe Carlson,

Don Crepeau, Jason Keenan, Tom Kuhr, and Gary T. Johnson.  Upon review, the United States

believes that nothing in the comments demonstrates that the proposed Final Judgment is not in

---

[20] The 2004 amendments substituted the word "shall" for "may" when directing the courts to consider the enumerated factors and amended the list of factors to focus on competitive considerations and address potentially ambiguous judgment terms. *Compare* 15 U.S.C. § 16(e) (2004), *with* 15 U.S.C. § 16(e)(1) (2006); *see also SBC Commc'ns*, 489 F. Supp. 2d at 11 (concluding that the 2004 amendments "effected minimal changes" to Tunney Act review).

[21] It's My Party, Inc.'s (" IMP") comment is attached as Exhibit A.  The comment was filed on behalf of a number of firms, namely IMP, It's My Amphitheatre, Inc., Seth Hurwitz (both of which are affiliated with IMP), Frank Productions, Inc., Sue McLean and Associates, and Metropolitan Talent, Inc.  The National Consumers League joined IMP's comment.  *See* IMP Comment at 1 n.1.

the public interest.  What follows is a summary of the comments, and the United States'
responses to the concerns raised in those comments.

### A.      It's My Party ("IMP")

IMP, through its leader, Seth Hurwitz, and various affiliated companies, is the operator of
the 9:30 Club in Washington, D.C. and the promoter at Merriwether Post Pavilion, an
amphitheater in Columbia, Maryland.  IMP is a competitor of Live Nation Entertainment in both
the concert promotion and venue operation businesses.  IMP has also filed an antitrust lawsuit
against Live Nation, Inc. alleging that Live Nation's pre-merger conduct harmed IMP.

IMP contends that the proposed Final Judgment will not effectively protect competition
in the primary ticketing services market because the remedy does not address Live Nation
Entertainment's "domination of the promotion of popular music concerts by major artists and
control of venues capable of hosting concerts by major artists."[22]  IMP argues that Live Nation's
vertical integration, culminating in its merger with Ticketmaster, has resulted in a firm that
controls all aspects of the relationship between artists and their fans.[23]  IMP argues that to
cement its competitive position, Live Nation has improperly expanded its promotion business by
purchasing the rights to artists' entire tours (or even several tours) in one deal, shutting out
regional promoters such as IMP from the opportunity to bid on individual dates.[24]  IMP asserts
that Live Nation's share of the promotion market for "popular music concerts by major artists" is
actually 70% and that Live Nation Entertainment's dominance in promotions will therefore
enable it to prevent effective competition in the primary ticketing services market, because
ticketing competitors cannot promise to supply venues with the same breadth of concerts

---

[22] *Id.* at 2.
[23] *See id.* at 8-9.
[24] *See id.* at 9.

available to Live Nation Entertainment.[25]  IMP also argues that primary ticketing competitors

cannot succeed if they cannot provide ticketing services to venues owned by Live Nation

Entertainment itself.[26]  IMP argues that if the merger is to be allowed at all, additional remedies

must be imposed to ameliorate the effect of Live Nation Entertainment's dominance of the

concert business.[27]

 IMP's allegations are not new.  It articulated these concerns to the United States on

several occasions during the investigation of the defendants' merger.  The United States believes

that the proposed Final Judgment will remedy any loss of competition in primary ticketing

services that would result from the merger.  The United States did not find that, based on the

evidence uncovered in the Department's investigation, the merger would result in harm to any

other relevant market, such as concert promotion, venue services, or venue management, and

therefore does not believe that remedies in such markets are appropriate.

 1. *Effect of Vertical Integration on Primary Ticketing Services Market*

 Contrary to IMP's assertion, the United States is well aware of the potential competitive

impact of vertical integration on the primary ticketing services market and designed its remedy

with that potential effect in mind.  It is well recognized that vertical integration can produce

procompetitive benefits.[28]  In the present case, vertical integration of complementary businesses

---

[25] *See, e.g., id.* at 14, 19-20.
[26] *See id.* at 24.
[27] *See id.* at 26-27.
[28] *See Fruehauf Corp. v. FTC*, 603 F.2d 345, 351-52 (2d Cir. 1979) ("A vertical merger
. . . does not . . . automatically have an anticompetitive effect . . . or reduce competition . . ." and
"may even operate to increase competition"); *see also*, Phillip E. Areeda & Herbert Hovenkamp,
ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 1020 (3d
ed. 2009) ("ANTITRUST LAW") ("Most instances of vertical integration, including those that
result from mergers, are economically beneficial."); Michael Riordan & Steven C. Salop,
*Evaluating Vertical Mergers: A Post-Chicago Approach*, 63 ANTITRUST L.J. 513, 522-27 (1995)
(discussing a variety efficiency benefits from vertical mergers, and summarizing that "[a] variety

in the live entertainment industry reduces the number of firms that must be compensated for a concert.  This creates incentives for the vertically integrated entity to reduce primary ticketing services prices and service fees.  The United States, however, was well aware of the concern that it may become more important for ticketing service companies to also provide live entertainment content in order to compete in primary ticketing for major concert venues.  Accordingly, the proposed Final Judgment establishes AEG — Live Nation's largest competitor in the concert promotion business — as a credible, vertically integrated competitor in the primary ticketing services market.[29]  Therefore, to the extent it becomes important over the next several years for ticketing companies to provide access to content in order to compete in primary ticketing, AEG's established concert promotion business will make it well-positioned to provide a viable competitive alternative to the merged firm. AEG will also benefit from its long-standing relationships with venues developed through its concert promotion business and through its venue management operations.  Its venues and its concert promotion business will also provide scale to AEG's own ticketing business or to another ticketing rival to Live Nation Entertainment.  The availability of AEG's concerts to its own primary ticketing business or to another primary ticketer undermines IMP's argument[30] that the merged firm will control so much content that venues will be forced to use Ticketmaster's ticketing services.

The United States was also well aware that there are other avenues venues may pursue for ticketing services.  Venues may increasingly look to venue management companies to provide a range of services, including primary ticketing.  The sale of the Paciolan ticketing

---

of efficiency benefits that can reduce costs, improve product quality, and reduce prices may ensue from vertical mergers").

[29]  IMP itself acknowledges that AEG is Live Nation's most significant competitor in the concert promotion business.  *Id.* at 21.

[30]  *See id.* at 14-15, 17-26.

business to Comcast-Spectacor creates significant additional competitive stimulus to the
ticketing market that will, in combination with the AEG licensing agreement, ensure that the
proposed Final Judgment restores the competition that may otherwise have been lost as a result
of the merger. Comcast-Spectacor is well-placed to capitalize on the venue relationships it
developed as an existing provider of venue management, concessions, and fan marketing
services. Paciolan and New Era have historically pursued a differentiated ticketing strategy
under which their venue customers control all ticketing fees. New Era plans to continue
competing using this business model. With its vertically integrated operation and venue-friendly
business model, Comcast-Spectacor is well-placed to compete against Live Nation
Entertainment following the merger. Comcast-Spectacor already participates in many aspects of
the live entertainment business. Its willingness to invest in the ticketing business by purchasing
Paciolan, and its commitment to providing a competitive alternative to Ticketmaster, again
suggests that IMP's analysis of the ticketing services market is flawed. If IMP were correct,
Comcast-Spectacor as a venue owner and manager of venues for third parties, would have no
choice but to acquire primary ticketing services from the merged entity, as it would risk the loss
of all acts promoted by Live Nation by not selecting Live Nation Entertainment as its ticketer.[31]
Like AEG, Comcast-Spectacor has fundamentally pursued a competitive strategy at odds with
IMP's predictions of the future of the primary ticketing business.

As described above in Part II.B, the conduct provisions in the decree will bolster the
structural relief that establishes Comcast-Spectacor and AEG as primary ticketing services
competitors. In particular, Section IX.A of the proposed Final Judgment ensures that the merged
firm cannot retaliate against or refuse to provide concerts to venues that choose an alternative to

---

[31] *See id.* at 24-25.

Ticketmaster for primary ticketing services. This and other provisions underscore the carefully

constructed nature of the remedy contained in the proposed Final Judgment and further belie the

argument presented by IMP[32] that the United States failed to account for the importance of

content or vertical integration to the primary ticketing services market.

> 2. *Effect of Vertical Integration on Concert Promotion*

Much of IMP's concerns with Live Nation have nothing to do with the merger.

Ticketmaster was not in the concert promotion business. As the United States discusses in more

detail below in its response to Jam's comment,[33] the United States thoroughly investigated the

effect of the vertical merger of Live Nation's promotion business with Ticketmaster's ticketing

and artist management businesses. Based on the evidence uncovered in the Department's

investigation, the United States did not find that the merger would significantly harm

competition in the concert promotion business.

> 3. *The Effect of Live Nation's Concert Promotion Business on Primary*
> *Ticketing*

IMP contends that Live Nation dominates concert promotion (and thus can leverage that

dominance into primary ticketing), based on the allegation that Live Nation has a 70% market

share in the market for the promotion of "popular music concerts" by "major artists."[34] In the

United States' investigation of this merger, the government looked into Live Nation's share of

concert promotion. The United States used data from Pollstar, an aggregator of live

entertainment data widely used by those in the industry. This data showed Live Nation with a

33% market share of concert revenue at major concert venues. The United States finds that

---

[32] *See id.* at 14-15.
[33] *See infra* § IV.B.1.
[34] *Id.* at 17-21.

IMP's market share calculation is not helpful because it is based on a market definition that is not well-suited to analyzing how the merger of Ticketmaster and Live Nation would affect the ticketing business.[35]

First, IMP argues that the market should be restricted to "popular music" as distinct from gospel, jazz, blues, and other musical and entertainment genres that are reported to Pollstar as "concert revenues."[36]  To support this distinction, IMP refers to the cross-elasticity of demand for consumers of different types of concerts.[37]  However, this is entirely the wrong approach for analyzing a merger in the market for the provision of primary tickets services to major concert venues.  While *consumers* may have strong preferences for particular types of concerts     and for specific artists within a particular genre     *venues* purchase primary ticketing services for the distribution of tickets to concerts.  From the perspective of a venue, the relevant consideration is how much revenue and profit it can earn from an event, not the genre of music the artist performs.  A gospel show and rock show that earn the same revenues for a venue are in fact potential substitutes.  For example, Merriweather Post Pavilion, IMP's own venue, hosted a jazz festival the weekend of June 4 and is hosting a rock festival on June 19.  Therefore, it is entirely appropriate to look at the entire set of entertainment options for venues in assessing whether Live Nation so dominates concert promotion that it will restrain competition in the market for primary ticketing services.

Second, while Live Nation is clearly the largest promoter in the country, Pollstar figures include Live Nation promotions within its own venues.  Live Nation is essentially the exclusive

---

[35] The United States expresses no view on whether the provision of promotional services to "major artists" for "popular music concerts" could be considered a proper antitrust market in other contexts.

[36] IMP Comment at 19.

[37] *Id.* at 18-21.

promoter within its own amphitheaters and clubs, which account for a substantial portion of the overall concert sales reported by Live Nation in Pollstar. The concerts Live Nation promotes internally have never been available to third party venues. Thus, the more relevant figures are likely to be Live Nation's share of concert promotion outside of its own venues, as that share is a better measure of Live Nation's significance as provider of content to independent venues, and thus of Live Nation's ability to "force" venues to use Ticketmaster after the merger. According to 2008 Pollstar data, Live Nation in fact only accounts for 23% of the concerts promoted at major concert venues it does not own, measured by revenue.[38] Live Nation's leading position in the promotion market is driven to a large degree by its ownership of a number of key venues. While the relationship between Live Nation's venues and its promotion business is relevant to a Live Nation competitor such as IMP, independent venues are not beholden to Live Nation for content to nearly the degree that IMP would suggest.[39]

Third, IMP contends that only tickets to "concerts by major artists (with an average attendance of between 8,000 to 30,000 fans)" should be counted in calculations of Live Nation's share of the promotions market.[40] According to IMP, it is appropriate to focus exclusively on these "major artists" because they are the ones most likely to appear in amphitheaters. This market share calculation, however, exacerbates the flaw identified in the previous paragraph by focusing in on a set of concerts where Live Nation's market share is exceptionally high due to its ownership of venues, rather than due to its significance as a promoter for independent venues. This calculation does not shed any light on the importance of Live Nation's promotion business

---

[38] Measured by number of tickets sold, which IMP claims is the superior measure, Live Nation accounts for just 18% of the concerts promoted at major concert venues not owned or operated by Live Nation.

[39] *See* IMP Comment at 24-25.

[40] *Id.* at 20.

to the market for providing ticketing services to non-Live Nation amphitheaters or to the many other types of concert venues such as clubs, theatres, arenas, and stadiums that also employ primary ticketing companies to sell concert tickets. Though IMP excludes tickets sold at those venues from its calculation of Live Nation's market share, that choice obscures the relationship between Live Nation's position as a leading concert promoter and the likely effects of its merger with Ticketmaster on buyers of primary ticketing services.

In the United States' view, IMP not only overstates the strength of Live Nation's promotion position, but may also overstate the significance of concert promotion to the overall market for primary ticketing services. IMP provides no evidence that decisions by venues in choosing a primary ticketing company will be driven solely or primarily or even significantly by the number of concerts promoted by the merged entity.

Before the merger, Live Nation based its entry strategy into the ticketing business on its ability to promise content to venues. The United States' Amended Complaint does not argue, however, that this was or is the only possible strategy for competing in the ticketing business. For example, the ticketing needs of a venue that hosts sporting events will be likely driven as much by the needs of the teams they host as they are by their interest in filling dates between sporting events with major concerts. A major arena with a professional basketball and/or hockey team will need its ticketer to handle season ticket sales of sports tickets and provide marketing support for sports ticketing sales. Indeed, this is a significant segment of the market, as sixty-six major concert venues host major league professional sports teams and many of the remaining major concert venues house other sports teams (such as minor league hockey franchises or college sports teams) which demand robust season ticketing abilities.

AEG and Comcast-Spectacor own, operate, and manage professional sports teams and

venues in which professional sports teams play.  Given that, as noted above, many of the major

concert venues also host sports teams, both AEG and Comcast-Spectacor will be well-positioned

to capitalize on their expertise in sports and venue management to compete for ticketing

contracts in these venues.  Paciolan's historical strength is also in providing ticketing for sports

franchises; when combined with Comcast-Spectacor's strength in providing venue management,

concession, and marketing services to arenas and other buildings, the United States believes the

result is a viable competitor that, in combination with the entry of AEG into primary ticketing,

will restore any competition in primary ticketing that may be lost as a result of the merger.

The United States respectfully suggests that IMP's analysis of the market is too focused

on IMP's own issues in competing with Live Nation in the amphitheater business to inform

analysis of the merger's likely effects.  IMP exaggerates Live Nation's position in the concert

promotion market by ignoring many venues that purchase primary ticketing services and many

artists that play at those venues.  A view of Live Nation's market position more tailored to

assessing the competitive effects of the proposed merger reveals that AEG and Comcast-

Spectacor can fully compete with Live Nation in the primary ticketing services market.  IMP's

comment therefore casts little light on competition in the actual product market alleged in the

United States' complaint     the provision of primary ticketing services to major concert venues.

### 4.    *Ability to Provide Ticketing Services to Live Nation Venues*

IMP contends that Ticketmaster's competitors, including AEG and Comcast-Spectacor,

will be unable to compete in the primary ticketing market if they are unable to provide primary

ticketing services to venues that are owned or operated by the merged firm.[41]  IMP provides no

support for this statement other than a general assertion that without access to Live Nation's

---

[41] IMP Comment at 14, 24.

venues, competitors will be unable to penetrate the market and will not be able to prevent Live
Nation from charging "supra competitive ticket service fees."[42]  The United States concluded
that ticketing companies do not need access to Live Nation's own ticketing volume in order to
accumulate sufficient scale in the ticketing business to provide competitive pricing to venues.
AEG's and Comcast-Spectacor's purchases of the divestiture assets supports this conclusion.
Venues not owned or operated by Live Nation     including over 400 of the 500 major concert
venues     account for a substantial majority of major concert venues and revenues and provide a
substantial base of business for competing ticketing companies to target.

     5.    *IMP's Own Choice of Primary Ticketing Service Provider*

     IMP's own choice of ticketing provider     and its ability to choose     underscores the
degree to which IMP's concerns are overstated.  Shortly after the Amended Complaint and
proposed Final Judgment in this matter were filed, Seth Hurwitz, the main proprietor of IMP and
its affiliates, announced that he was terminating Merriweather Post Pavilion's ticketing contract
with the local Ticketmaster affiliate and entering a contract with TicketFly, a recent entrant into
the primary ticketing services market.[43]  At the same time that Mr. Hurwitz alleges that the
merger eliminated competition for primary ticketing services, IMP left Ticketmaster for a
competing ticket company: "'Hopefully this move will demonstrate to people it's possible to
have a choice,' he said. 'We wanted to make that choice'"[44]  It is precisely this choice that the
Final Judgment seeks to facilitate, whether that choice is exercised to select AEG, Comcast-
Spectacor, another ticketing company such as TicketFly, or even Ticketmaster.

---

    [42] *Id.* at 24.
    [43] *See Merriweather drops Ticketmaster, signs with Ticketfly*, Feb. 18, 2010, available at
http://www.ticketfly.com/merriweather-post-pavilion-comes-to-ticketfly.
    [44] *Id.*

6. *Need for Additional Remedial Measures*

IMP asserts that additional remedial measures are required to protect competition in the primary ticketing market if the merger of Live Nation and Ticketmaster is permitted.  IMP proposes that:  (1) the merged firm be prevented from either offering any inducement to artists it manages or promotes to appear at venues it controls or punishing an artist who works with a competing promoter or venue; (2) the merged firm be prevented from insisting that rival promoters and venue owners share profits with Live Nation; and (3) the merged firm be prohibited from promoting or hosting more than 75% of any artist's tour.[45]  None of these proposals relate to the primary ticketing services market.  Rather, all of them are designed to dramatically alter competition in the concert promotion and venue operation businesses, markets where the proposed merger was not challenged by the Department in its Amended Complaint in this case.  Moreover, some of these proposals, such as the limitations on exclusive promotion contracts, would likely inhibit efficient competition in the concert promotion and venue operation markets more than enhance competition.  The proposals would prohibit Live Nation from engaging in potentially efficient vertical integration or bundling without analysis of whether such conduct has an adverse effect on competition either in general or in particular circumstances.

IMP also argues that the merged firm should be required "to return at the request of any promoter all data relating to concerts for which Ticketmaster provided the ticketing and to delete any such information from its electronically stored data and files."[46]  The United States recognizes the value of information about the price and volume of past ticket sales for making

---

[45] IMP Comment at 26-27.
[46] *Id.* at 27.

decisions about future concerts, and took this into consideration in fashioning remedies in this matter. Section IX.C of the proposed Final Judgment requires that Ticketmaster provide a copy of ticketing data to ticketing clients if they choose to leave Ticketmaster, but does not require Ticketmaster to take the additional step suggested by IMP[47] and to purge the data from its files.[48] Aside from the affirmative obligation imposed by Section IX.C, each party's rights and obligations regarding the ticketing data will be governed by the contract between Ticketmaster and the venue. The United States does not believe that IMP's proposal[49] is necessary to ensure that venues are able to leave Ticketmaster for alternative ticketing providers. So long as venues have access to their data, they will be free to switch ticketing providers.

### B. Jam Productions

Jam Productions ("Jam") is a concert promoter based in Chicago, Illinois, and a competitor of Live Nation. Jam's comment contends that the merger is "vertical integration on steroids" and will "suppress or eliminate competition in many segments of the music industry including rival concert promoters; primary and secondary ticketing companies; artist management firms; talent agencies; venue management companies; record companies; artist merchandise, apparel and licensing companies; artist fan clubs and sponsorship/marketing companies."

---

[47] *Id.* at 27.
[48] Instead, Section IX.B of the proposed Final Judgment protects venue owners who are also independent promoters by prohibiting the sharing of competitively sensitive client ticketing data with Live Nation promoters and Front Line artist managers.
[49] IMP Comment at 27.

1.      *The Vertical Integration Concern*

While Jam's comment provides more in the way of a list of alleged past Live Nation

misconduct than a cogent analysis of the merger in light of the antitrust theory and precedent

applicable to vertical mergers, the core argument advanced by Jam is nonetheless clear:  instead

of alleging a competitive problem from the combination of two competing ticketing companies

(that is, challenging the deal as an unlawful *horizontal* merger), the Department should have

brought a case alleging that competition in non-ticketing markets would be reduced by the

combination of lines of business that do not compete, but where one line supplies an input for

the other (that is, challenging the deal as an unlawful *vertical* merger).

This argument, however, is not a valid basis for rejecting a proposed remedy during

Tunney Act review.  As explained above, in a Tunney Act proceeding the Court must evaluate

the adequacy of the remedy only for the antitrust violations alleged in the complaint.  *See United

States v. Microsoft Corp.*, 56 F.3d 1448, 1459 (D.C. Cir. 1995).  The Tunney Act does not usurp

the Department's prosecutorial discretion to choose what type of case to bring; courts "cannot

look beyond the complaint . . . unless the complaint is drafted so narrowly as to make a mockery

of judicial power."  *SBC Commc'ns*, 489 F. Supp. 2d at 15.  Jam, however, seeks to "construct

[its] own hypothetical case and then evaluate the decree against that case"     precisely the

approach specifically forbidden in Tunney Act proceedings by the D.C. Circuit.  *Microsoft*, 56

F.3d at 1459.

During its investigation, however, the United States did carefully consider Jam's

allegations[50] and determined that it could not prove that the vertical integration resulting from

---

[50] *See id.* at 6 (acknowledging that during the investigation JAM raised the same issues
with the United States that it provides in its comments).

the merger would significantly harm competition in the concert promotion market or any market other than primary ticketing services. To be sure, vertical mergers can reduce competition under certain circumstances, for example by foreclosing rivals from access to an input critical to the ability to compete, raising the costs of rivals by preventing them from achieving efficient scale, or raising entry barriers. Vertical mergers can, however, also be procompetitive by bringing together complementary businesses and making the merged firm a more efficient competitor.[51]

The United States analyzed whether the addition of Ticketmaster's ticketing business and Front Line artist management business to Live Nation's concert promotion business would adversely effect competition in the concert promotion market. The United States concluded this was unlikely for two primary reasons.

*First*, although the merged firm will remain an important player in the artist management business, it will not have the ability to exclude promotion competitors from the market. Even if, in theory, all artists managed by Front Line refused to work with promoters other than Live Nation, a substantial majority of the artists are not affiliated with the merged firm and will be fully available for competing concert promoters to present.[52] Moreover, Front Line is unlikely to withhold all of the artists it manages from competing promoters. Front Line has no legal right to dictate to its artists which promoters they can use. In fact, Front Line has a fiduciary obligation to obtain the best deals for its artists, regardless of the interests of other Front Line-affiliated

---

[51] Jam may have been concerned that the merger would make LiveNation a more efficient competitor to it when it says: "The critical mass created by the complete vertical integration of the live music industry by Live Nation and Ticketmaster puts all its competitors at a distinct competitive disadvantage." *Id*. at 19. Of course, having companies become more efficient at providing their goods or services is generally procompetitive, not anticompetitive.

[52] According to Pollstar data, Front Line artists accounted for just under 25% of gross sales for the top 50 tours in 2008 in North America. Including artists subject to long-term "360-degree" promotional agreements with Live Nation raises the merged firms' share to approximately 30%.

companies.  In addition, artist management services are typically provided pursuant to agreements that can be terminated by the artist at will.  If the merged firm acted or threatened to act contrary to the interests of its managed artists, the artists could simply sign with another artist manager.  There are countless managers capable of handling acts of all sizes; indeed, some of the largest artist management firms represent only one artist.  In light of these factors, the United States concluded it was unlikely that the combination of Front Line with Live Nation restrict competition in the concert promotion business.

*Second*, artists would have the ability and incentive to prevent the merged firm from exercising market power in concert promotion.  There are two primary ways that the merged firm could attempt to exercise such market power: (1) reducing compensation paid to artists (or otherwise adversely altering the terms on which promotional services are provided to artists); or (2) restricting output     i.e., the number of concerts     in an effort to raise prices to consumers. In both cases, artists would have the incentive to prevent the merged firm from harming their own economic interests.  Artists would also have the ability to turn to a large number of competing concert promoters, including AEG and many regional promoters, who would gladly seize on the opportunity to expand their promotion business at the expense of the merged firm.

In addition to considering the impact of the merger on the concert promotion market, the United States also analyzed the possibility that the merger would reduce competition in the market for operating venues.  The United States did not rule out the possibility that Live Nation's ownership of many key venues throughout the country could give the merged firm some market power.  However, Ticketmaster owned no venues and therefore the merger does not result in any increase in the number of venues owned or operated by Live Nation.  In other words, whatever market power Live Nation had in concert promotion or venues before the

merger would not be enhanced by its merger with Ticketmaster.  Therefore, the addition of Front
Line and the Ticketmaster ticketing business to Live Nation seems unlikely to alter the
competitive dynamics in the venue market.  As noted above, Front Line artists account for a
fairly modest share of the concert business, and the merged firm does not "control" the Front
Line artists to the degree that it can prevent them from performing at competing venues.

Contrary to Jam's contention, the Supreme Court's 1948 *Paramount* decision does not
compel the United States to challenge this merger under *stare decisis*.[53]  In *Paramount*, the
Supreme Court was not determining the effects of a vertical merger.  Rather it was fashioning a
remedy for a long-running price fixing agreement among competing movie studios that had a
vertical aspect in that the movie studies used their ownership of movie theaters to facilitate their
price fix.  In that context, the Supreme Court instructed that the court-ordered remedy should be
tailored to the anticompetitive conduct at issue and, under the facts in that case, determined that
the defendant studios had to divest themselves of their movie theaters in order to "uproot" the
long-running price fixing agreement.  In this case, consistent with *Paramount*, the United States
fashioned a remedy that was tailored to the anticompetitive conduct alleged in the Amended
Complaint.[54]

---

[53]   Jam Comment at 22 ("So the lawyers who work for the US government are
consciously choosing the [sic] forget about the Stare Decisis doctrine they are all taught in law
school.") (citing *United States v. Paramount Pictures, Inc.*, 334 U.S. 131 (1948)).

[54]   Jam's citations to *Eastman Kodak v. Image Technical Servs.*, 504 U.S. 451 (1992) and
Complaint, *United States v. MCA*, Civ. No. 62-942-WM (filed July 13, 1962) are similarly not
instructive.  *Eastman Kodak* is not a merger case and MCA was a consent decree designed to
address a long-running anticompetitive conspiracy, only one part of which involved a vertical
merger.

-29-

2.      *Adequacy of Consent Decree Provisions*

Jam contends that the anti-retaliation provision of the proposed Final Judgment, Section

IX.A, will be difficult to enforce.[55]  The United States does not agree.  Section XI of the

proposed Final Judgment contains robust mechanisms enabling the United States to investigate

any potential violations of the proposed Final Judgment's terms.  The United States also has

significant experience in enforcing a similar anti-retaliation provision in the Final Judgment in

*United States v. Microsoft*.[56]

Jam contends that AEG and Comcast-Spectacor may not succeed due to Ticketmaster's

"superior technology" and the vertical integration of Ticketmaster and Live Nation.[57]  However,

Ticketmaster's software will power the AEG-branded website in the first stage of the

divestiture,[58] and AEG has the right to obtain a perpetual license to Ticketmaster's software in

the second stage.[59]  Consequently, AEG will be well-positioned to provide a technologically

competitive alternative to Ticketmaster.  AEG is also a competitor in the concert promotion

business with access to content, as the United States explains above in response to IMP's

comments.  Comcast-Spectacor, which owns and operates a number of major concert venues,

will also be a vertically integrated primary ticketing competitor.  For these reasons, that the

proposed Final Judgment will ensure that AEG and Comcast-Spectacor will be robust

---

[55] Jam Comment at 20.

[56] Final Judgment, *United States v. Microsoft*, Civ. No. 1:98-cv-01232 (D.D.C.) (entered Nov. 12, 2002).  The *Microsoft* Final Judgment prohibits the company from retaliating against any computer software or hardware company that works with a competitor to Microsoft's Windows operating system or its related platforms.  *Id.* §§ III.A, III.F.1.  The United States has effectively enforced these provisions of the *Microsoft* Final Judgment with minimal difficulty and controversy.

[57] Jam Comment at 21.

[58] Proposed Final Judgment § IV.A.2.

[59] *Id.* § IV.A.1.

-30-

competitors in the ticketing business.

    **C.**    **Jack Orbin**

Jack Orbin is the founder and President of Stone City Attractions, a regional concert promoter in the Southwestern United States that competes with Live Nation.  Orbin contends that the proposed Final Judgment will "drive independent concert promoters out of business" and will reduce competition in the "live entertainment industry."[60]  Orbin argues the proposed Final Judgment suffers from three faults: (1) "It fails to secure relief for the consumer by eliminating competition of independent concert promoters"; (2) "The relief fails to ensure adequate competition for primary ticket sales and for concert promotion, and is insufficient to allow entry into these markets"; and (3) "It fails to adequately prevent [the merged firm] from acquiring customer data from independent concert promoters."[61]  As noted above, these arguments are not a proper subject for Tunney Act review because they assert that the United States should have challenged the merger on different grounds than those alleged in the Amended Complaint.[62]

To the extent the comment relates to the market for primary ticketing services, it does not raise issues that suggest that entry of the proposed Final Judgment would not be in the public interest.[63]  Orbin assumes, without support, that Comcast-Spectacor will be unable to expand the use by venues of the Paciolan platform beyond the venues in which it is currently used.[64]  However, Paciolan is an existing successful ticketing platform that will now be independent of Ticketmaster and able to compete with Ticketmaster for primary ticketing services contracts.  Paciolan has a large client base that includes major concert venues (and numerous other venues)

---

[60] Orbin Comment at 3 (attached as Exhibit C).

[61] *Id.* at 4.

[62] *See United States v. Microsoft Corp.*, 56 F.3d 1448, 1459 (D.C. Cir. 1995).

[63] Orbin Comment at 5-6.

[64] *Id.*

and offers a completely different pricing model from Ticketmaster, enabling the venue to control all service fees, which will put it in a strong position to provide a competitive alternative to Ticketmaster.

Orbin is also "very skeptical" that AEG will be able to succeed as a primary ticketer.[65] Orbin contends that because the proposed Final Judgment requires Ticketmaster to license its Host platform to AEG, that AEG will be "fully beholden and dependent on Ticketmaster."[66] This is not accurate.  AEG has the right to obtain a copy of the Ticketmaster Host Platform and run it on its own systems.[67]  During the transition period when Ticketmaster operates a private label ticketing service on behalf of AEG, the proposed Final Judgment prohibits Ticketmaster from impeding AEG's ability to compete.  Specifically, Section IV.A.2 requires Ticketmaster to provide an operational system within six months with a website that has an AEG-determined branding, look, and feel; compels Ticketmaster at the request of AEG to post links on its website to events sold on the private label ticketing service; and explicitly prohibits Ticketmaster from having any right or ability to set the ticketing fees charged by AEG.  If Ticketmaster does not comply, the United States can and will move the Court to enforce the provisions of Section IX.A through civil and criminal contempt proceedings, as appropriate.

Orbin argues that the proposed Final Judgment itself facilitates additional vertical integration and will make it more difficult for non-vertically integrated firms to compete.[68] Vertical integration, however, is merely one strategy for successful competition in the primary ticketing business.  The proposed Final Judgment ensures there will be two significant

---

[65] *Id.* at 6.
[66] *Id.* at 6.
[67] Proposed Final Judgment § IV.A.1.
[68] Orbin Comment at 6.

-32-

competitors to Ticketmaster that offer different value propositions through their respective areas of expertise.  So long as competition is restored to the primary ticketing market, ticketing companies will be able to compete along a wide range of attributes.  For example, some competitors may focus on the additional products they can offer in conjunction with primary ticketing, while others may specialize in innovative ticketing software that, standing alone, provides significant value to venues.

Finally, Orbin contends that the firewall established by Section IX.B is too limited to protect the data of independent concert promoters, especially in comparison to a firewall adopted in a recent FTC decree involving PepsiCo, Inc., and that it lacks "any mechanism [for] policing the firewall."[69]  As an initial matter, the firewall set forth in Section IX.B prohibits the sharing of information between Live Nation Entertainment's ticketing business and its promotions and artist management businesses.  Live Nation has technical safeguards in place to prevent the disclosure of sensitive information to those not appropriately authorized to access it.  Live Nation also has created a corporate policy governing access to this information, disseminated that policy to all employees, and instituted a training program to ensure that those with access to sensitive data understand and uphold their obligations.  Since the entry of the temporary order requiring the merged entity to comply with the proposed Final Judgment, the Department has been closely monitoring the merged entity and its ongoing efforts to develop methods to audit compliance and to submit to the Department detailed annual reports about such compliance.

Orbin wrongly contends that the proposed Final Judgment lacks "any mechanism of policing the firewall."  Section XI of the proposed Final Judgment provides the United States

---

[69] *Id.* at 7 (citing *In the Matter of PepsiCo, Inc.*, FTC File No. 091 0133 (Feb. 26, 2010) (attached to Orbin Comment)).

with a full panoply of tools to ensure compliance with the firewall, including the ability to demand documents and interview or depose any employee.  The United States may also require the merged firm to provide written reports, including an independent audit or analysis, on any matters relating to the proposed Final Judgment.  As discussed above, the United States has already engaged with the parties on the exact mechanisms in place to ensure compliance with the firewall, and the United States is confident that the proposed Final Judgment provides it with all the tools it needs to enforce the firewall provision.

A comparison of the firewall in this settlement to that in the FTC *PepsiCo* case is not particularly instructive.  Unlike in *PepsiCo*, the firewall in this case is not the central relief contained in the proposed Final Judgment.  The two divestitures are the core relief and the behavioral remedies are designed to supplement that relief in the proposed Final Judgment.  This is a result of the fact that, unlike in *PepsiCo*, the United States did not allege as a theory of harm in its Amended Complaint that a vertical merger would result in an anti-competitive information exchange.  The Department instead alleged that the merger would eliminate direct, horizontal competition between Ticketmaster and Live Nation in the provision of primary ticketing services to major concert venues.

### D.    Middle East Restaurant, Inc.

Middle East Restaurant, Inc. ("Middle East Restaurant") operates a restaurant and night club in Cambridge, Massachusetts, and competes against Live Nation in the Boston area.[70] Ticketmaster provides primary ticketing services to the company.[71]  Middle East Restaurant requests that the proposed Final Judgment be modified to allow Ticketmaster's existing ticketing

---

[70] Middle East Restaurant Comment at 1 (attached as Exhibit D).
[71] *Id.*

-34-

clients to terminate their contract and sign with a competing ticketing company.[72]  Middle East Restaurant is concerned that it will be at a competitive disadvantage with its promotions/venue competitor in the concert business providing its ticketing services and therefore profiting from its concerts and potentially having access to its data.[73]

Middle East Restaurant does not allege that its proposal is related to competition in the ticketing market.  Moreover, it is not necessary to allow existing Ticketmaster clients to terminate their contracts in order to restore competition in the primary ticketing market.  Since the average ticketing contract is three to five years in length, every year there is a substantial volume of contracts up for bid and available to be pursued by AEG, Comcast-Spectacor, and other ticketing competitors.  Finally, while Middle East Restaurant contends there are "no systems or penalties in place to protect The Middle East's customer's data,"[74] the firewall provision set forth in Section IX.B will prevent its ticketing data from being shared with promotions personnel within the merged entity.

### E.    Additional Comments

Finally, the United States received comments from LIVE-FI Technologies, Inc. and the following individuals:  Kenneth de Anda, Chris Cantz, Joe Carlson, Don Crepeau, Jason Keenan, Tom Kuhr, and Gary T. Johnson (collectively "citizen complainants").[75]  LIVE-FI's comment argues that the proposed Final Judgment: (1) "omit[s] all discussion of the negative anticompetitive impact the merger will have upon live event and recording distribution particularly electronic broadcasts and transmissions;"[76] (2) hurts small companies because the

---

[72] *Id.*
[73] *Id.*
[74] *Id.*
[75] These comments are attached Exhibits E through L.
[76] LIVE-FI Comment at 1.

divestiture assets were divested to large companies;[77] and (3) that through it this Court has "failed to adopt explicit protocols and safeguards to ensure that private litigants and smaller entities maintain equal and fair access to the Courts to protect their rights and remedies against the individual defendants and the merged entity."[78]  The citizen complainants generally argue that they paid high service fees, paid hidden service fees, that the merged entity does not make all seats at concerts available for purchase, that the merged entity is a monopoly, and/or that the Department of Justice generally failed to protect consumers.  None of these comments raise any substantive issues regarding the efficacy of the relief contained in the proposed Final Judgment to remedy the competitive harm to the primary ticketing services market alleged in the Amended Complaint.

## V.    CONCLUSION

After careful consideration of the public comments, the United States concludes that entry of the proposed Final Judgment will provide an effective and appropriate remedy for the antitrust violations alleged in the Amended Complaint and is therefore in the public interest. Accordingly, after the comments and this Response are published, the United States will move this Court to enter the proposed Final Judgment.

---

[77] *Id.* at 2.
[78] *Id.*

Dated: June 21, 2010

Respectfully submitted,

FOR PLAINTIFF UNITED STATES:

_____/s/_____

AARON D. HOAG
ANN MARIE BLAYLOCK (DC 967825)
Attorney
U.S. Department of Justice
Antitrust Division
450 Fifth Street, N.W., Suite 4000
Washington, D.C.  20530
Telephone: (202) 514-5038
Fax:  (202) 514-7308
Email: aaron.hoag@usdoj.gov