# Exhibit 2



# DEPARTMENT OF JUSTICE

## THE TICKETMASTER/LIVE NATION MERGER REVIEW AND CONSENT DECREE IN PERSPECTIVE

Christine A. Varney
Assistant Attorney General
Antitrust Division
U.S. Department of Justice

Remarks as Prepared for
South by Southwest

Austin, Texas

March 18, 2010

Thank you so much for welcoming me here today, to the live music capitol of the world and a conference unlike any other I am likely to attend, in my official capacity at least, to discuss the intersection of antitrust and the music industry.

No doubt, the topic that is on everyone's mind is the merger between Live Nation and Ticketmaster, and the settlement agreement that the Department of Justice negotiated with the parties.  Today, I would like to explain how the Antitrust Division viewed the merger, the nature of our settlement, and why we took the approach that we did.  I want to assure you that our decision to accept the settlement agreement reflected our effort to secure the best outcome possible given the facts and circumstances of the case before us.  Live music is as old as humanity itself, and any Austin resident can attest to the incredible welfare it spreads when it is in affordable and plentiful supply.  We were prepared to go to court to protect concertgoers and the venues that serve them from undue concentration in primary ticketing, and we entered into a settlement only because we believe it is the best avenue to preserve and promote competition in the live music business.

*Merger Analysis and the Limits of Antitrust*

Before I begin discussing the approach we took to this merger, I would like to say just a word or two about the limits of antitrust enforcement.  In merger enforcement, our role is to investigate the industry environment and determine whether the specific transaction will substantially lessen competition in the market place.  Our concern is with competitive market structure, so our job is to prevent the anticompetitive harms that a merger presents.  That is a limited role: whatever we might want a particular market to

look like, a merger does not provide us an open invitation to remake an industry or a firm's business model to make it more consumer friendly. Congress can of course do more, but the antitrust laws limit our role in merger review to ensuring that any transaction does not "substantially [] lessen competition."[1]

In the course of investigating *this* merger, we heard many complaints about trends in the live music industry, and many complaints from consumers about Ticketmaster. I understand that people view Ticketmaster's charges, and perhaps all ticketing fees in general, as unfair, too high, inescapable, and confusing. We heard that it is impossible to understand the litany of fees and why those fees have proliferated. I also understand that consolidation has been going on in the industry for some time and the resultant economic pressures facing local management companies and promoters. Those are meaningful concerns, but many of them are not *antitrust* concerns. If they come from a lack of effective competition, then we hope to treat them as symptoms as we seek to cure the underlying disease. Where such issues concern consumer fairness, however, they are better addressed by other federal agencies.

This brings me to a second point. Though we at the Antitrust Division work very hard to understand and incorporate industry trends into our analysis, our merger enforcement powers are limited to the transaction before us. We work in the context of market realities; we cannot try to change or unmake them. In a particular case, the question for us is whether the merger *under consideration* poses competitive concerns. That review process does not allow us to prevent either of the merging parties from continuing to pursue their business models, even where there were complaints about that

---

[1] 15 U.S.C. § 18.

model before the merger, unless the merger itself results in increased market power that in turn substantially lessens competition. In short, we are not a regulator and cannot turn back the clock on broad industry trends. Our authority under the antitrust laws only enables us to examine particular transactions or industry practices to determine whether they harm competition.[2]

Of course, neither of these points should be overstated. In our merger enforcement, we look to industry trends and realities precisely because they can be worrisome and we need to know whether a merger will exacerbate them. Moreover, we try to understand existing consumer concerns and complaints because they can be important markers for market power, which a merger can often extend or reinforce. What I mean to communicate is that troubling trends and customer issues are a vital part of our analysis and we need very much to hear about them—from people like you—in order to fulfill our role as both investigators and enforcers in antitrust. Yet our *powers* do not extend to all such complaints, especially in merger enforcement. What we do is try to ensure that mergers do not create undue concentration and other problems in the market structure, and then we must leave it to the competitive force of the market (along with our powers to prevent attempts at or maintenance of monopolization) to create best outcomes for consumers. With that in mind, let me share our view of the competitive and market structure concerns that the Ticketmaster / Live Nation transaction raised, and what we did to address them.

---

[2] As Justice Breyer once explained, "[e]conomic regulators seek to achieve [consumer welfare] directly by controlling prices through rules and regulation; antitrust seeks to achieve [this goal] indirectly by promoting and preserving a [competitive] process." *Town of Concord v. Boston Edison Co.*, 915 F.2d 17, 22 (1st Cir. 1990).

*Ticketmaster / Live Nation*: *Vertical Transactions and Horizontal Concerns*

The proposed merger between Live Nation and Ticketmaster presented a union between two leading players in the chain of live music production: promotion, venue operation, and nascent self-ticketing for Live Nation; and primary ticketing and artist management for Ticketmaster. In antitrust parlance, this transaction presented an instance of both "horizontal integration" – that is, two direct competitors coming together – and also "vertical integration" because key elements of the merging parties' businesses were situated above and below each other in the supply chain.

Horizontal mergers present the most straightforward kinds of antitrust concerns because when two competitors join forces that process can result in consumers having fewer choices in the marketplace and firms having fewer competitors to worry about. Of course, not every horizontal merger is problematic—some can be benign or can even generate efficiencies that benefit consumers—but antitrust lawyers and economists generally view them with skepticism and use a well-defined set of tools to sort the troubling mergers from those that pose less risk. Vertical mergers, by contrast, are generally viewed more favorably by legal and economics scholars because vertically related firms make goods that work *together* to produce a final product.[3] In particular, as scholars have explained, a firm with a substantial share at one level in the supply chain enjoys (or, in the language of economics, *internalizes*) the benefits of competition at the

---

[3] *See, e.g.*, Michael H. Riordan and Steven C. Salop, *Evaluating Vertical Mergers: A Post-Chicago Approach*, 63 ANTITRUST L.J. 513, 513 (1995) (describing the discrepancy between the settled approach to horizontal mergers and the remaining disagreements over vertical ones).

other levels.[4]  From a live music perspective, for example, a firm like Ticketmaster—with a very large share of primary ticketing—benefits from the fact that people want to buy tickets, and that depends on the existence of high quality bands, with high quality promoters, finding high quality venues, to produce high quality shows.  Under the explanation offered above, some would argue that Ticketmaster has an incentive to preserve robust competition at the other levels in the live music chain of production because that ensures that it has the best "inputs" into its business at the lowest cost.[5]  In short, under the conventional legal and economic understanding of vertical integration, it is not clear that a prototypical vertical merger will take choices away from consumers the same way a horizontal merger will.

On the other hand, the conventional account of vertical integration does not capture more nuanced economic thinking that demonstrates various ways in which vertical integration can in fact be dangerous for competition.[6]  Let me discuss one example in particular.  The way that markets typically protect consumers from monopoly

---

[4]  Joseph Farrell & Phillip J. Weiser, *Modularity, Vertical Integration, and Open Access Policies: Towards a Convergence of Antitrust and Regulation in the Internet Age*, 17 HARV. J.L & TECH. 85, 100-05 (2003) (describing the internalization of complimentary efficiencies by platform monopolists).

[5]  Alternatively, if a firm like Ticketmaster chose not to support competition in an adjacent market, but to vertically integrate into that market, many legal and economic scholars would suggest—at least as a starting point—that this decision is likely to reflect an efficient business justification.  See Farrell & Weiser, *supra* note 4, at 97-100 (2003).

[6]  *E.g.*, Richard A. Posner, *Vertical Restraints and Antitrust Policy*, 72 U. CHI. L. REV. 229, 234 (2005) (describing conditions under which tying retards entry); Dennis W. Carlton & Michael Waldman, *The Strategic Use of Tying to Preserve and Create Market Power in Evolving Industries*, 33 RAND J. ECON. 194 (2002) (same); Weiser & Ferrell, *supra* note 4, at n.101 (noting that vertical integration may be more problematic on a dynamic or evolving model of the market, rather than a static one); *see also Town of Concord v. Boston Edison Co.*, 915 F.2d 17, 23-24 (Breyer, J.).

is entry. When a firm raises its price, other firms will enter to provide the same product or service at a lower price than the incumbent firm and prices will return to competitive levels. This theory often breaks down in reality, however, because entry can be harder in practice than in principle. After all, successful entry requires not just risk taking, but also overcoming the rival's reputation, the entrant's own lack of expertise, and the cost of raising capital. Moreover, the firm that is frequently best poised to enter is someone else in the supply chain, either just above or just below the monopolist. Those types of firms know a lot about the industry, they already have a reputation in it, they have the capital to spend or the ability to borrow it, and they can use their own sales or purchases in the supply chain to sponsor and support the work of the new entrant until it is ready to compete for third party business. Thus, in looking at vertical integration, one thing that we are very mindful of is a situation where the firm that is being bought up is not just an upstream supplier or a downstream buyer but, really, a potential or actual *competitor*.

Now consider the Ticketmaster / Live Nation transaction. As I think you all know, Ticketmaster is dominant in primary ticketing for major concerts, and entry by new competitors appears to be difficult for reasons of both technology and reputation.[7] Notably, Ticketmaster has maintained a market share of over 80% in this market for the past 15 years. In 2009, this long-term dominance faced its most existential threat when Live Nation sought to use its standing as a major promoter and venue owner to sponsor entry by a new ticketing system. Indeed, Ticketmaster proposed to buy Live Nation just months after Live Nation launched such a platform. In so doing, Ticketmaster

---

7   Complaint at 9-11, United States v. Ticketmaster (D.D.C. 2010) (No. 10-cv-139) (filed Jan. 25, 2010), *available at* http://www.justice.gov/atr/cases/f254500/254552.pdf.

recognized that Live Nation sought not only to service its own venues and clients, but also to lure business away from Ticketmaster at third party sites.[8]

The Ticketmaster/Live Nation merger thus represented both a horizontal combination and an instance of vertical integration. It involved both a merger between two large players at different stages in the supply chain, and a merger between the largest primary ticketing service in the business and the first major entrant to challenge its dominant position—a firm with a unique ability to overcome the hurdles that made a challenge to Ticketmaster so difficult.[9] To be sure, Ticketmaster and Live Nation were strongest at different points in the live music chain, but Live Nation's foray into ticketing only made clearer that the merger would help to preserve Ticketmaster's power in the primary ticketing line of its business. Thus, the merger posed a threat to growing competition in primary ticketing. It was this substantial lessening of competition that we concluded violated the antitrust laws, and so it is the primary target at which our settlement agreement is aimed. At the same time, our review of the merger made us aware of the potential for foreclosure at other levels of the supply chain—that is, behavior that would prevent "critical inputs," such as artist content and promotion services, from reaching venue owners. Thus, in crafting the consent decree, we sought to prohibit certain potentially anticompetitive practices and forms of vertical integration by the merged company that would impact or prevent new entry and continued competition from rivals.

---

[8]   *Id.* at 11-12.

[9]   *Id.* at 14 ("No existing ticketing company or likely entrant possesses the combination of attributes to prevent the selective exercise of market power the major concert venues by the merged firm."); *see also* Competitive Impact Statement at 10, United States v. Ticketmaster (D.D.C. 2010) (No. 10-cv-139) (filed Jan. 25, 2010), *available at* http://www.justice.gov/atr/cases/f254500/254544.pdf.

The "behavioral remedies" in the decree that sought to limit anticompetitive forms of vertical integration reflect our awareness that the integration of all elements of the live music supply chain into a single company might lead that company to consider foreclosing access to talent (the critical input) by competing, independent venue owners and operators.  In addition to these independent venue owners, independent promoters and managers are concerned that, by bringing together Ticketmaster's Frontline artist management group and Live Nation's promotion business, the new, merged company will lock up much of the key talent in the industry, squeezing them out of the business.  On this view, vertical integration is the headliner, and consolidation or market power maintenance in primary ticketing is only a sideshow.

This vertical integration theory was investigated *thoroughly*, but ultimately we did not rely on it to block the transaction.  Let me explain two reasons why.  The first is that, from the standpoint of antitrust doctrine, the market for both artist management and promotion is too fragmented to sustain an allegation that either Frontline or Live Nation have "monopoly power"—i.e., that either is an entrenched, dominant firm in the antitrust sense.  There is already some controversy over vertical theories when there is clearly a monopolist involved in the alleged market; the absence of a plainly dominant firm makes a vertical theory that much harder to pursue.  To be sure, Frontline and Live Nation have larger shares than any of their competitors, but as a whole, their competitors have larger shares of artist management and promotion than Frontline and Live Nation do.  From the standpoint of antitrust doctrine, it would take more consolidation in artist management and promotion to make the case that either Frontline or Live Nation had market power in those industries as required by antitrust law.

A second reason we did not allege a vertical theory of foreclosure in the management or promotion aspects of the deal was the apparent "ease of entry" from an antitrust perspective. Unlike many industries, the live music business churns continuously. Every year brings the next big act and promoters typically sign-up artists for only one tour at a time. This means that new agents or new promoters—as well as existing agents and promoters—have lots of opportunities to bid for new business. Facing such facts made it much more difficult for us to make a case that uniting Frontline and Live Nation would truly bring a lock-up of the talent in the industry. A foreclosure case on such facts would not have been strong.

Yet let me say that the Antitrust Division took such claims very seriously, and it was only after extensive investigation that we satisfied ourselves that there was no vertical theory that we could successfully pursue under the doctrine as it stands. Even slightly different facts about the level of concentration or amount of long-term contracting in the industry could substantially alter our analysis in subsequent cases. Here, however, we were not convinced that we could establish the existence of truly dominant firms in well-defined antitrust markets foreclosing competition in the supply chain, all of which are necessary for a sustainable challenge to a vertical transaction. We did conclude, however, that Ticketmaster was dominant in primary ticketing, and the remedies that we secured will ensure that competition is preserved in that important realm and that Ticketmaster's power in ticketing will not wend its way into other levels of the live music supply chain.

9

*The Settlement: Structural, Behavioral, and Monitoring Safeguards*

The settlement agreement that the Department secured employs multiple techniques to safeguard competition in primary ticketing. Some of these relate to the structure of the industry and some relate to the behavior of the merging parties. We will need the help of you and your colleagues in the industry to make all of them work.

*Structural Safeguards*

First and foremost, the settlement agreement endeavors to recreate the exact dynamic that Live Nation had itself produced by integrating into ticketing. It does so by requiring Ticketmaster to license its ticketing platform to AEG, another major promoter and owner of some of the country's most significant venues. Moreover, the agreement essentially forbids Ticketmaster from servicing AEG venues in the future, which requires AEG to have its own ticketing platform ready for use within five years, or to direct its business to one of Ticketmaster's remaining competitors. This ensures that there will be at least one firm with the scale and credibility necessary to go head to head with Ticketmaster in primary ticketing.[10] Given the demonstrated difficulty of creating a system with the technology and reputation necessary to compete in that space, this is a major step towards ensuring healthy competition in ticketing and in live music production generally.

Second, the settlement agreement requires Ticketmaster to divest to Comcast-Spectacor its Paciolan line of business. Paciolan allows venues to host their own primary ticketing service on their own websites, and thus creates a form of venue-ticketing integration rather than the promoter-ticketing integration entailed by the AEG licensing

---

[10] Competitive Impact Statement, *supra* note 9, at 13-15.

agreement. These venues will have more flexibility to reduce ticketing fees, and thereby to compete with Live Nation/Ticketmaster shows over the price of live music entertainment.[11] This means that the settlement agreement helps to preserve not only competition within a business model—namely, integrated live music production firms—but also among different models.[12] This dynamic places greater competitive pressure on the post-merger Ticketmaster business model, creates a variety of opportunities and entry points for those seeking to play a continuing role in the industry, and can allow for competition of different kinds—i.e., between entirely different business models. Existing firms and new entrants can thus choose to specialize in dealing with one model or the other, or both, and can thereby demonstrate their own comparative advantage as well as the advantages of the respective models.

Let me make this point a bit more concrete. We believe that the creation of two new competitors to Ticketmaster, employing two very different business models, will give existing independent players and people thinking of getting into the business a more varied package of choices as to how they will try to best serve consumers in the live music business. They can choose to find their place within the Ticketmaster / Live Nation model, the AEG model, the Paciolan model, or another model of their own design, and seek strategies and partners to make that model work. Yet what we protect is competition, not competitors, and so the task of making those models work for them has

---

[11]   *See* U.S. Dep't of Justice, *Justice Department Requires Ticketmaster Entertainment Inc. to Make Significant Changes to Its Merger with Live Nation Inc.*, at 2 (Jan. 25, 2010), *available at* http://www.justice.gov/atr/public/press_releases/2010/254540.pdf.

[12]   *See* Competitive Impact Statement, *supra* note 9, at 15-16 (describing view of Comcast-Spectacor that industry is moving towards "self-enablement" model).

11

to be theirs, not ours. We believe that we have provided a fair playing field on which they can compete, and we hope that they can take this opportunity to show that consumers prefer the product that they can provide. In other words, the Antitrust Division is only the referee in this game, while the judges are concertgoers and the venues that serve them. We sincerely hope that a vigorous battle for their business from ticketing companies and promoters will make everyone better off.

As the competition plays out, however, we are going to want very much to know what kind of condition the field is in, for two reasons. First, as I will explain in a minute, the settlement agreement contains various behavioral proscriptions about what the merged firm cannot do in an attempt to extend or abuse its consolidated position in the market. We will be vigorously monitoring for compliance, and we will actively solicit input from you and others in the music business to make sure the merged entity does not violate its agreement. Second, the Antitrust Division retains its power under Section 1 of the Sherman Act to address unreasonable restraints of trade and under Section 2 of the Sherman Act to attack any behavior that constitutes an illegal monopolization of a segment of the live music industry. As I just said, it is up to independent actors and firms to figure out their business models. If those players believe they have a profitable model that a competitor is preventing them from getting off the ground, we need to know that, and we need to know why. Some of these complaints will turn out to be only hard but clean competition, but some of them could be either violations of the settlement agreement or of Section 2. We want to have an ongoing conversation with the industry about the post-merger landscape and the ability of industry players to fairly compete in order to find the truly troubling cases, if they exist. So let me explain what the settlement

agreement provides in this regard, and the steps we've taken to ensure that that conversation will take place.

*Behavioral Remedies*

The behavioral aspects of the settlement agreement forbid the post-merger company from engaging in various forms of anticompetitive conduct. Ticketmaster and Live Nation will be expressly prohibited from retaliating against any venue that considers or works with another primary ticketing service, which should encourage experimentation and innovation in the industry. Moreover, the two firms will be prohibited from creating mandatory bundles of their services—the merged firm will not be allowed to require that a client accept Live Nation as a promoter in order to access Ticketmaster's primary ticketing services, or vice versa. This will prevent "leveraging" power in either direction, so that the new firm cannot use its strength in either stage of the supply chain to exclude its competitors at the other. Finally, the settlement agreement has twin provisions designed to prevent anticompetitive abuse of Ticketmaster's unique store of ticketing data. Under these provisions, Ticketmaster must either refrain from using its ticketing data in its promotion and management business, or it must give that information to other managers and promoters. Ticketmaster must also provide its existing venue clients with their ticketing data on request, which will reduce the costs of switching from one ticketing service to another.[13] These provisions should work together to prevent the post-merger entity from using its new, unique position to exclude any of its existing or new competitors from the business. To ensure that these requirements are met, Live Nation and Ticketmaster will be under the watchful eye of the Justice

---

[13] Competitive Impact Statement, *supra* note 9, at 17.

Department for a decade, and the settlement agreement includes special provisions to facilitate that ongoing oversight, including an expanded responsibility to report future mergers.[14]

      I hope that the music industry and the public at large will help us in that monitoring effort. To ensure that we have the means to fully police adherence to the order, I have formed an Order Compliance Committee. My hope is that you and your industry colleagues will zealously report any worrisome behavior to that group. This is a direct line into the Division, and we very much hope that consumers and independent industry players will use it early and often. We understand that you are not antitrust lawyers, but we want to hear what you and your colleagues have to say about how things are going in the industry, and we will do the hard work of sorting the actionable allegations from the issues beyond our jurisdiction. I can tell you that we have already been following up on a number of issues that have been raised. We do not necessarily foresee a problem, but we will not tolerate one either.

      It should be clear that this a broad set of remedies for the merger's potential anticompetitive effects, and you can be sure that the parties agreed to them only because of the Department's steadfast commitment to enforce the antitrust laws. Yet let me say also that this is no haphazard assemblage of one-off provisions to which Ticketmaster and Live Nation were willing to accede. Quite to the contrary, the components of the settlement agreement work together, as a whole, to ensure that there will be enough air and sunlight in this space for strong competitors to take root, grow, and thrive. This is a

---

[14] *Id.* at 17-18.

settlement in the legal sense, but trust me, we did not settle for anything less than total protection for this important industry and its fans.

Indeed, settlement of this kind *is* vigorous antitrust enforcement—only with a scalpel rather than a sledgehammer. We settled with Ticketmaster and Live Nation because, as in many cases, the flexibility available at the settlement stage allowed us to secure a package of remedies that mitigated consumer harm while still allowing the parties to prove that together they could discount, innovate, or otherwise benefit the live music industry and its fans.[15] We sought both structural and behavioral remedies to, in Shakespeare's words, "make assurance double sure," both recreating a market dynamic in primary ticketing at least as competitive as the one that existed before the merger, and providing backstops against anticompetitive behavior that the industry itself could help us to enforce. The result, we think, is sure to benefit concertgoers, artists, and the industry as a whole. Like our promise of vigorous enforcement, we look forward to seeing that promise through.

---

[15] *Id.* at 20.