# Exhibit 5

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | |
| *Plaintiffs,* | |
| v. | |
| TICKETMASTER ENTERTAINMENT, INC. and LIVE NATION, INC., | |
| *Defendants.* | |

## COMPETITIVE IMPACT STATEMENT

Plaintiff United States of America ("United States"), pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), files this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in this civil antitrust proceeding.

## I. NATURE AND PURPOSE OF THE PROCEEDING

Defendant Ticketmaster Entertainment, Inc. ("Ticketmaster") and Defendant Live Nation, Inc. ("Live Nation") entered into an agreement, dated February 10, 2009, pursuant to which they would merge into a new entity to be known as Live Nation Entertainment. The United States, and the States of Arizona, Arkansas, California, Florida, Illinois, Iowa, Louisiana, Nebraska, Nevada, Ohio, Oregon, Rhode Island, Tennessee, Texas, and Wisconsin, and the Commonwealths of Massachusetts and Pennsylvania filed a civil antitrust Complaint on January 25, 2010, seeking to enjoin the proposed transaction because its likely effect would be to lessen

competition substantially for primary ticketing services to major concert venues located in the United States in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. This loss of competition likely would result in higher prices for and less innovation in primary ticketing services.

At the same time the Complaint was filed, the United States also filed a Hold Separate Stipulation and Order ("Hold Separate") and proposed Final Judgment, which are designed to eliminate the anticompetitive effects of the acquisition. Under the proposed Final Judgment, which is explained more fully below, Defendants are required to grant a perpetual license to their Host platform and to divest their entire Paciolan business in order to establish two independent ticketing companies capable of competing effectively with the merged entity. The Final Judgment also prohibits Defendants from engaging in certain conduct that would prevent equally efficient firms from competing effectively. Under the terms of the Hold Separate, Ticketmaster will take certain steps to ensure that the Paciolan business is operated as a competitively independent, economically viable and ongoing business concern that will remain independent and uninfluenced by the consummation of the transaction and to ensure that competition is maintained during the pendency of the ordered divestiture.

The United States and Defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish and remedy violations thereof.

## II. DESCRIPTION OF THE EVENTS GIVING RISE TO THE ALLEGED VIOLATION

### A.  *The Concert Industry*

Staging concerts traditionally has required the participation of several parties. *Artists* provide the entertainment that makes the concert possible. *Managers* and/or *agents* represent artists in negotiations to establish the commercial terms on which artists will perform. *Promoters* contract with artists to perform at particular concerts, assume the financial risk of staging the concerts, make the arrangements for the concerts to occur at certain times and places, and market the concerts. *Venues* are the physical locations where concerts occur, and venues' owners, operators, or managers usually arrange for the sale of tickets to concerts at their venues. *Primary ticketing companies* provide services – such as websites, call centers, and retail networks from which tickets may be purchased – that facilitate the initial sale of tickets to concertgoers.[1]

Contracts between venues and primary ticketing companies are individually negotiated. In a typical contract, a venue agrees to use one primary ticketing company as its exclusive service provider for several years. In exchange, the primary ticketing company often agrees to pay to the venue a portion of the fees that the primary ticketing company charges to concertgoers who purchase tickets to events at the venue. The primary ticketing company also may agree to pay an up-front bonus or advance upon execution of the contract. Primary ticketing contracts typically prohibit venues from reselling the primary ticketing services they receive.

---

[1] After their initial sale, concert tickets may be resold on the secondary ticketing market. *Ticket brokers* purchase tickets with the intention of reselling them to concertgoers. *Secondary ticketing companies* provide services that facilitate the resale of tickets to concertgoers by ticket brokers and others.

*B.*     *The Defendants and the Proposed Transaction*

Ticketmaster is the largest primary ticketing company in the United States. In 2008, Ticketmaster earned gross revenues of about $800 million from its U.S. primary ticketing business. Ticketmaster offers two principal primary ticketing products to venues: (1) Host, a Ticketmaster-managed platform for selling tickets through Ticketmaster's website and other sales channels; and (2) Paciolan, a venue-managed platform for selling tickets through the venue's own website and other sales channels. In 2008, Ticketmaster provided primary ticketing services to venues representing more than 80% of major concert venues.[2] In addition to its primary ticketing operations, Ticketmaster expanded into the artist management business in 2008 by acquiring a controlling interest in Front Line Management Group Inc. ("Front Line"), an important artist management firm with clients such as the Eagles, Neil Diamond, Jimmy Buffett, Christina Aguilera and John Mayer.

Live Nation is the largest concert promoter in the United States, earning more than $1.3 billion in revenue from its U.S. promotions business in 2008 and promoting shows representing 33% of the concert revenues at major concert venues in 2008. Live Nation has entered long-term

---

[2] While the conclusions reached in the antitrust analysis described below are not sensitive to the precise number of venues included within this class, for purposes of this Competitive Impact Statement, "major concert venues" are the 500 U.S. venues generating the greatest concert revenues in 2008, as reported in Pollstar, a leading source of concert industry information. Concert ticket revenues from events at these venues represent more than 90% of the concert ticket revenues at all venues reported in Pollstar. Major concert venues are a diverse group, which includes large stadiums and arenas with relatively few concerts (*e.g.*, the Verizon Center in Washington, DC), mid-sized amphitheaters that host concerts regularly during certain seasons (*e.g.*, Nissan Pavilion in Bristow, VA), and smaller clubs and theaters with frequent concerts throughout the year (*e.g.*, Warner Theatre in Washington, DC and Live Nation's House of Blues clubs). To account for this diversity, venues are weighted by their capacity in calculating shares of the market for primary ticketing services to major concert venues. Only public sources of information were used to calculate the market shares described in this Competitive Impact Statement.

4

partnerships with several popular artists – including Madonna and Jay-Z – to exclusively promote their concerts, sell recordings of their music, and market artist-branded merchandise such as T-shirts. Live Nation also owns or operates about 70 major concert venues throughout the United States. And as explained further below, Live Nation entered the market for primary ticketing services in late December 2008.

On February 10, 2009, less than two months after its entry into primary ticketing, Live Nation agreed to merge with Ticketmaster. That proposed transaction would substantially lessen competition and is the subject of the Complaint and proposed Final Judgment filed by the United States in this matter.

C.     *The Market for Primary Ticketing Services to Major Concert Venues in the United States*

Antitrust law, including Section 7 of the Clayton Act, protects consumers from anticompetitive conduct, such as firms' acquisition of the ability to raise prices above levels that would prevail in a competitive market. Market definition assists antitrust analysis by focusing attention on the relevant portions of the economy where competitive effects are likely to be felt. Well-defined markets encompass the economic actors – including both sellers and buyers – whose conduct most strongly influences the nature and magnitude of competitive effects. To ensure that antitrust analysis takes account of a broad enough set of products to evaluate whether a transaction is likely to lead to a substantial lessening of competition, defining relevant markets in horizontal merger cases frequently begins by identifying a collection of products or set of services over which a hypothetical monopolist profitably could impose a small but significant and non-transitory increase in price. Here, the United States's investigation revealed that major concert venues would have no alternatives to primary ticketing services if prices were to rise

5

significantly above the levels that would have prevailed but for the proposed transaction, so the hypothetical-monopolist test would exclude all other products or services from the relevant market. But that is not the end of the market-definition exercise.

When sellers are unable to set different terms of sale for different buyers, all buyers will face similar competitive effects, and a relevant product market properly (if implicitly) encompasses not only all sellers of the relevant product, but all buyers as well. But when different buyers may experience different competitive effects, a well-defined product market encompassing fewer than all buyers can focus antitrust analysis appropriately on those buyers most vulnerable to suffering probable and significant competitive harm. It also avoids conflating in that analysis those buyers whose prices are likely to be significantly affected with others who are unlikely to be harmed substantially.

One situation in which different buyers experience different effects involves price discrimination, such as when sellers are able to charge different prices to different buyers for equivalent products. Sellers can price discriminate when they are able to identify and target vulnerable buyers for price increases and when buyers facing low prices cannot resell to those facing higher prices. Both conditions are present here. Venues and primary ticketing companies individually negotiate their contracts, and the terms of those contracts typically make it impossible for venues to resell (arbitrage) primary ticketing services.

Because primary ticketing companies can price discriminate among different venues, the proposed transaction could affect different classes of venues differently, and antitrust analysis requires attention to those venues with few alternative primary ticketing providers to Ticketmaster and Live Nation because, if the proposed transaction were consummated, their real-world choices would be reduced differently than would be other venues' options.

6

Major concert venues require more sophisticated primary ticketing services than other venues, so each tends to select a primary ticketing company with an established reputation for providing good service to similar venues. Ticketmaster has shown that its primary ticketing platform is able to withstand the heavy transaction volume associated with the first hours when tickets to popular concerts become available to concertgoers ("high-volume on-sales"), offers integrated marketing capabilities, and otherwise provides proven, high-quality service to venues. When the proposed transaction was announced, Live Nation was building experience selling tickets to concerts at its own venues as a way to demonstrate to other venues that its primary ticketing platform also performed well. No primary ticketing company other than Ticketmaster and Live Nation has amassed or likely could have amassed in the near term sufficient scale to develop a reputation for successfully delivering similarly sophisticated primary ticketing services. Additionally, Live Nation planned to compete for primary ticketing contracts with major concert venues, but had less interest in serving non-concert venues outside its historically core concert expertise. Because they would have no equally attractive alternative primary ticketing provider to the merged firm, and because they would have benefited more from competition between Ticketmaster and Live Nation, major concert venues are more vulnerable than smaller venues to anticompetitive harms caused by the proposed transaction, and a well-defined relevant market should not encompass customers other than major concert venues. For example, a high school that hires a student to sell tickets to one of its musical productions could be said to be buying "primary ticketing services," but the relevant market can exclude such other venues because there is no significant risk that sales to them would affect Defendants' ability to exercise market power over major concert venues.

7

Antitrust analysis also must consider the geographic dimensions of competition. Section 7 protects against harm to competition "in any section of the country." 15 U.S.C. § 18. Here, domestic anticompetitive harms would be experienced by major concert venues located throughout the United States. Because the merged firm could price discriminate, any effects of the proposed transaction on foreign venues would be distinct from any effects on domestic venues. Thus, including only major concert venues located in the United States within the relevant market poses no risk of omitting buyers whose inclusion would significantly alter the antitrust analysis.[3]

In short, the sale of primary ticketing services to major concert venues in the United States is a well-defined relevant market for the purpose of analyzing the effects of the proposed transaction.

### D.    The Competitive Effects of the Proposed Transaction

Until 2009, Ticketmaster dominated the market for primary ticketing services to major concert venues in the United States with greater than 80% market share. The only other primary ticketing companies with greater than a 1% share in 2008 were Tickets.com (4%), Front Gate

---

[3] In this case, there are not significant transportation costs associated with the relevant services, so sellers' locations do little to inform the market-definition inquiry, though they are not irrelevant to antitrust analysis. To the contrary, only sellers capable of serving major concert venues located in the United States can compete with Defendants in the relevant market. Many of those sellers are located within the United States, but some are foreign firms, as suggested by Live Nation's adaptation of a European primary ticketing platform for use in the United States, which is discussed below. Foreign sellers historically have not competed effectively in the United States because of the significant investments required to enter the domestic market. Still, Live Nation's example suggests that, with a significant investment of time and money, foreign primary ticketing companies might be capable of adapting their products for U.S. customers.

Tickets (3%), New Era Tickets (2%), Live Nation (2%),[4] and Tessitura (1%). Ticketmaster's largest customer for primary ticketing services was Live Nation, the owner or operator of venues representing about 15% of capacity at all major concert venues in the United States in 2008. Ticketmaster renews its primary ticketing contracts at a very high rate. Even though Ticketmaster's distribution costs have declined dramatically as concertgoers have shifted their purchases toward the internet and away from traditional sales channels, the ticketing fees retained by Ticketmaster have not fallen, and Ticketmaster has continued to enjoy large profit margins on its primary ticketing business for many years.

These margins have persisted because they are protected by high barriers to other companies successfully, substantially, and profitably entering or attempting to expand in the market for primary ticketing services to major concert venues. First, the platforms required to provide primary ticketing services to major concert venues are technologically complicated and expensive to develop and deploy. Second, major concert venues are reluctant to enter long-term exclusive contracts with new primary ticketing companies because they lack Ticketmaster's established reputation for capably handling high-volume on-sales and providing high-quality service to venues. Third, the costs of installing and training employees to use new equipment make it expensive for venues to switch between primary ticketing companies. Fourth, because there are high fixed costs to develop and maintain a primary ticketing platform, entrants struggle to obtain sufficient scale to compete successfully with Ticketmaster on price. Fifth, Ticketmaster's scale provides another important incumbent advantage over other firms –

---

[4] Before 2009, by virtue as its position as a promoter, Live Nation received roughly 10% of the tickets to concerts it promoted, and it sold those tickets to concertgoers through its MusicToday subsidiary and a platform licensed from eTix. Live Nation also used the MusicToday platform to provide primary ticketing services to a few small venues.

extensive data about individual concertgoers collected over many years. Ticketmaster can use that data as a powerful marketing tool to secure venue contracts for primary ticketing services. Sixth, Ticketmaster's practice of signing long-term exclusive contracts with venues limits how quickly other firms can amass sufficient scale to compete effectively with Ticketmaster on any of these dimensions.

By 2008, Ticketmaster's longstanding dominance faced a major threat. Live Nation was better positioned to overcome the entry barriers discussed above than any other existing or potential competitor because it could achieve sufficient scale to compete effectively with Ticketmaster simply by ticketing its own venues. Live Nation also possessed a unique competitive advantage in that it could bundle access to important concerts with its ticketing service. Recognizing Live Nation's potential to disrupt its dominant position in the market for primary ticketing services, Ticketmaster attempted to renew Live Nation's primary ticketing contract before its December 31, 2008 expiration. But Live Nation instead chose to license technology from CTS Eventim AG ("CTS") that would enable it to sell concert tickets to its own venues beginning in 2009 and to compete with Ticketmaster for other venues' primary ticketing contracts in the future.

This competition began even before Live Nation's contract with Ticketmaster expired. On September 11, 2008, Live Nation announced that SMG – the largest venue management company in the United States, with the ability to control or influence the selection of primary ticketing companies at more than 40 major concert venues – had agreed to use Live Nation's primary ticketing services, if Live Nation could provide a primary ticketing platform comparable to other leading primary ticketing companies. SMG was Ticketmaster's third largest customer (behind only Live Nation and Anschutz Entertainment Group, Inc.), but it switched to Live Nation

10

because SMG expected that, if it used Live Nation's primary ticketing services, Live Nation would use its strength in promotions to bring more concerts to SMG-managed venues. On October 14, 2008, Live Nation announced that it would provide primary ticketing services to New York City's Roseland Ballroom, another former Ticketmaster client. By 2009, Live Nation provided primary ticketing services to more than 15% of the capacity at major concert venues in the United States.

Ticketmaster responded to competition from Live Nation in several ways. First, it offered more attractive renewal terms to customers with expiring contracts than it had customarily offered in order to lock customers into long-term deals before Live Nation could sign them. Second, Ticketmaster acquired a controlling interest in Front Line on October 23, 2008. Front Line's strength in artist management enabled Ticketmaster for the first time to offer venues a package of primary ticketing services and concert content that could rival Live Nation's ticketing-and-content package. Finally, Ticketmaster moved to eliminate Live Nation entirely as a competitor by agreeing to the proposed transaction less than two months after Live Nation began ticketing with the CTS platform.

The proposed transaction would extinguish competition between Ticketmaster and Live Nation and thereby eliminate the financial benefits that venues enjoyed during the brief period when Live Nation was poised to challenge Ticketmaster's dominance. The proposed transaction would also diminish innovation in primary ticketing services because the merged firm would have reduced incentives to develop new features. Further, the proposed transaction would result in even higher barriers to entry and expansion in the market for primary ticketing services. In addition to the long-standing entry barriers discussed above, the merged firm's ability to bundle primary ticketing services (implicitly or explicitly) with access to artists managed by Front Line

11

and/or promoted by Live Nation would require competitors to offer venues both primary ticketing services and access to content in order to compete most effectively.

Defendants have asserted that the proposed transaction will generate efficiencies sufficient to counteract any anticompetitive effects. More specifically, they have contended that the vertical integration of Ticketmaster and Live Nation's complementary businesses will reduce the number of industry participants who currently must be compensated for a concert to be produced and, thus, will allow the merged entity to reduce the prices paid by venues for primary ticketing services and by concertgoers for tickets. While appreciating that vertical integration may benefit consumers in some situations, the United States does not fully credit Defendants' efficiency claims because they each could realize many of the asserted efficiencies without consummating the proposed transaction. Ticketmaster and Live Nation each already had expanded vertically before they agreed to the proposed transaction, and but for the proposed transaction, venues and concertgoers would have continued to enjoy the benefits of competition between two vertically integrated competitors. A vertically integrated monopoly is less likely to spur innovation and efficiency than competition between vertically integrated firms, and a vertically integrated monopoly is unlikely to pass the benefits of innovation and efficiency onto consumers.

Defendants also contended that Live Nation's impact on ticketing would be minimal because of shortcomings in Live Nation's ticketing platform, including the absence of a season ticketing component, which is important for a number of venues. Though the CTS platform was originally designed for use in Europe, Live Nation and CTS have invested heavily to adapt it for use in the United States. In the first six months of 2009, Live Nation used the CTS platform to sell more than 6 million tickets to concerts at its U.S. venues. Before entering the proposed transaction, Live Nation had planned to continue improving the CTS platform, including

12

developing a season ticketing component, to make it more attractive to potential third-party venue clients in the United States.

## III. EXPLANATION OF THE PROPOSED FINAL JUDGMENT

The proposed Final Judgment will eliminate the anticompetitive effects of the proposed transaction in the market for primary ticketing services to major concert venues in four principal ways.

*First*, the Final Judgment will enable Anschutz Entertainment Group, Inc. ("AEG") to become a new, independent, economically viable, and vertically integrated competitor in the market for primary ticketing services to major concert venues. AEG is the second largest promoter in the United States (behind Live Nation), promoting shows representing about 14% of concert revenues at major concert venues in 2008. No company other than AEG or Live Nation promotes concerts representing more than 4% of the concert revenues from major concert venues. AEG also owns, operates, or manages more than 30 major concert venues, representing about 8% of the capacity at major U.S. concert venues, and it can select (or influence the selection of) the primary ticketing company for those venues. In addition, AEG owns one-half of an important artist management firm with several popular clients, including Justin Timberlake and the Jonas Brothers. Due to its significant presence in promotions, venues, and artist management, AEG is the company best positioned to achieve the necessary scale, overcome the other entry barriers discussed above, and compete successfully with the merged firm in the market for primary ticketing services to major concert venues.

The Final Judgment facilitates AEG's entry through a two-stage process that gives it access to Ticketmaster's core primary ticketing platform, which AEG can then use to service its own venues and to sell primary ticketing services to third-party venues. In the first stage, which

13

must begin within six months of the proposed transaction's consummation and may continue for up to five years, the Final Judgment requires Defendants to provide AEG with its own branded website based on Ticketmaster's Host platform, including any upgrades and enhancements (the "AEG Site"). AEG has the right to use the AEG Site to sell tickets to events at specified venues it currently owns, operates, and manages as well as to events at any other venues from which AEG secures the right to provide primary ticketing services. Though AEG must pay Defendants royalties for each ticket sold through the AEG Site, those royalties are below the average rate Ticketmaster currently charges, and Defendants have no control over AEG's final prices. These provisions immediately provide AEG incentives to compete with Defendants and diminish the risk that AEG would be unable to compete successfully had it attempted to deploy a less established primary ticketing platform.

The Final Judgment also requires Defendants to provide AEG with an option to acquire a perpetual, fully paid-up license to the then-current version of Ticketmaster's Host platform, including a copy of the source code, which Defendants must install and then support during the first six months after its installation. AEG is permitted to exercise this option within four years of the proposed transaction's consummation, which will allow AEG to assume full responsibility for operating its own primary ticketing business, independently of Defendants.

The Final Judgment gives AEG incentives to exercise its option to acquire a copy of Host (or to develop or acquire a competing primary ticketing platform) by prohibiting Defendants from providing primary ticketing services to AEG's venues after AEG's right to use the AEG Site expires. That provision is critical to preserving competition in the primary ticketing services market because it guarantees that, within five years, AEG will have to either supply its own primary ticketing services or obtain them from some company other than the merged firm.

14

Because AEG cannot rely indefinitely on the AEG Site, it will have incentives to plan for the future. Even if AEG's plans do not involve exercising its option to acquire a copy of Host, the Final Judgment will preserve competition because AEG will have to contract for primary ticketing services with one of Defendants' rivals. AEG's ticket volume would give that primary ticketing company sufficient scale and credibility to compete effectively with the merged firm.

*Second*, the Final Judgment's requirement that Defendants divest Ticketmaster's entire Paciolan business will establish another independent and economically viable competitor in the market for primary ticketing services to major concert venues. Ticketmaster currently licenses its Paciolan platform both directly to venues representing 3% of major U.S. concert venue capacity and to other primary ticketing companies that sublicense the Paciolan platform to venues representing an additional 4% of the relevant market. Before consummating the proposed transaction, Defendants must enter a letter of intent to divest to Comcast-Spectacor, L.P. ("Comcast-Spectacor") the entire Paciolan business, including all intellectual property in the Paciolan platform and all contracts with venue and primary ticketing company licensees of that platform. Through its New Era Tickets ("New Era") subsidiary, which currently licenses the Paciolan platform from Ticketmaster, Comcast-Spectacor already provides primary ticketing services to venues representing 2% of major concert venue capacity. In addition to its interest in New Era, Comcast-Spectacor owns 2 major U.S. concert venues and manages 15 others. When combined with New Era's ticketing business and Comcast-Spectacor's venue presence, the Paciolan business that the Final Judgment requires Defendants to divest would provide Comcast-Spectacor sufficient scale to compete effectively and independently with the merged firm in the market for primary ticketing services to major concert venues. Comcast-Spectacor and others

15

have contended that the movement in primary ticketing services will be towards "self-enablement" models, such as Paciolan, which allow a venue to manage its own ticketing platform.

Within 60 days of signing the letter of intent, the Paciolan business must be divested in such a way as to satisfy the United States in its sole discretion, and in consultation with the Plaintiff states, that the operations can and will be operated by Comcast-Spectacor or an alternative purchaser as a viable, ongoing business that can compete effectively in the relevant market. Defendants must take all reasonable steps necessary to accomplish the divestiture quickly and shall cooperate with any prospective purchaser. In the event that Defendants do not accomplish the Paciolan divestiture in a timely fashion, the Final Judgment provides that the Court will appoint a trustee selected by the United States to effect the divestiture. If a trustee is appointed, the proposed Final Judgment provides that Defendants will pay all costs and expenses of the trustee. The trustee's commission will be structured so as to provide an incentive for the trustee based on the price obtained and the speed with which the divestiture is accomplished. After his or her appointment becomes effective, the trustee will file monthly reports with the Court and the United States setting forth his or her efforts to accomplish the divestiture. At the end of six months, if the divestiture has not been accomplished, the trustee and the United States will make recommendations to the Court, which shall enter such orders as appropriate, in order to carry out the purpose of the trust, including extending the trust or the term of the trustee's appointment.

*Third*, the Final Judgment prohibits Defendants from engaging in certain conduct that would impede effective competition from equally efficient rivals that may or may not be not vertically integrated. Thus, the Final Judgment proscribes retaliation against venue owners who

contract or consider contracting for primary ticketing services with Defendants' competitors. The Final Judgment also prohibits Defendants from explicitly or practically requiring venues to take their primary ticketing services if the venues only want to obtain concerts the Defendants promote or concerts by artists the Defendants manage, and it likewise prohibits Defendants from explicitly or practically requiring venues to take concerts they promote or concerts by artists they manage if those venues only want to obtain the Defendants' primary ticketing services. These provisions preserve the ability of primary ticketing companies that do not also have access to content (and promoters and artist managers that do not also provide primary ticketing services) to continue competing with Defendants. Elsewhere, the Final Judgment prevents Defendants from abusing their position in the primary ticketing market to impede competition among promoters and artist managers by requiring that Defendants either refrain from using certain ticketing data in their non-ticketing businesses or provide that data to other promoters and artist managers. Finally, the Final Judgment mandates that Defendants provide any current primary ticketing client with that client's ticketing data promptly upon request, if the client chooses not to renew its primary ticketing contract. That provision reduces venues' switching costs and lowers barriers to other companies competing for Defendants' primary ticketing clients because it ensures that those venue clients will not be forced to relinquish valuable data if they decide to switch primary ticketing service providers.

*Fourth*, the Final Judgment requires Defendants to notify the United States at least thirty days before acquiring any assets of or any interest in any firm engaged in providing primary ticketing services in the United States, regardless of whether the acquisition would otherwise be subject to reporting pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as

17

amended, 15 U.S.C. § 18a. If the United States requests additional information within thirty days of the Defendants notifying it of an acquisition, the Final Judgment prohibits Defendants from consummating the acquisition until twenty days after providing the requested information. These provisions facilitate the vigilant and effective oversight that will be necessary to guard against the potential for Defendants to frustrate the purposes of the Final Judgment.

In short, the Final Judgment will eliminate the anticompetitive effects of the proposed transaction in the provision of primary ticketing services to major concert venues in the United States while preserving the possibility of efficiency-enhancing vertical integration in the concert industry and also preserving competition from Defendants' non-vertically integrated rivals.

## IV. REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no prima facie effect in any subsequent private lawsuit that may be brought against Defendants.

# V. PROCEDURES AVAILABLE FOR MODIFICATION
## OF THE PROPOSED FINAL JUDGMENT

The United States and Defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty (60) days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within sixty (60) days of the date of publication of this Competitive Impact Statement in the Federal Register, or the last date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later. All comments received during this period will be considered by the United States Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time prior to the Court's entry of judgment. The comments and the response of the United States will be filed with the Court and published in the Federal Register.

Written comments should be submitted to:

> John R. Read
> Chief, Litigation III Section
> Antitrust Division
> United States Department of Justice
> 450 Fifth Street, NW, Suite 4000
> Washington, DC 20530

19

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## VI. ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

The United States considered, as an alternative to the proposed Final Judgment, a settlement that would have required Defendants to divest the current set of divestiture assets to Comcast-Spectacor. The United States rejected that settlement because it would not have been as effective as the remedy embodied in the proposed Final Judgment at replicating the competitive dynamics that would have prevailed in the market for primary ticketing services had the proposed transaction not occurred.

As another alternative to the proposed Final Judgment, the United States considered a full trial on the merits against Defendants. The United States could have continued the litigation and sought preliminary and permanent injunctions against Defendants' merger. The United States is satisfied, however, that the divestiture of assets and prohibitions of anticompetitive practices described in the proposed Final Judgment will preserve competition for the provision of primary ticketing services to major concert venues in the United States. Thus, the proposed Final Judgment would protect competition as effectively as would any remedy available through litigation, but avoids the time, expense, and uncertainty of a full trial on the merits of the Complaint.

## VII. STANDARD OF REVIEW UNDER THE APPA
## FOR THE PROPOSED FINAL JUDGMENT

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty-day comment period, after which the court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the court, in accordance with the statute as amended in 2004, is required to consider:

> (A)    the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

> (B)    the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). In considering these statutory factors, the court's inquiry is necessarily a limited one as the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *see generally United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1 (D.D.C. 2007) (assessing public interest standard under the Tunney Act); *United States v. InBev N.V./S.A.*, No. 08-1965 (JR), 2009-2 Trade Cas. (CCH) ¶76,736, 2009 U.S. Dist. LEXIS 84787, at *3 (D.D.C. Aug. 11, 2009) (noting that the court's review of a consent judgment is limited and only inquires "into whether the government's determination that the proposed remedies will cure

21

the antitrust violations alleged in the complaint was reasonable, and whether the mechanism to enforce the final judgment are clear and manageable.").[5]

As the United States Court of Appeals for the District of Columbia Circuit has held, under the APPA a court considers, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may positively harm third parties. *See Microsoft*, 56 F.3d at 1458-62. With respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460-62; *United States v. Alcoa, Inc.*, 152 F. Supp. 2d 37, 40 (D.D.C. 2001); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *3. Courts have held that:

> [t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is *"within the reaches of the public interest."* More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[6] In determining whether a

---

[5] The 2004 amendments substituted "shall" for "may" in directing relevant factors for court to consider and amended the list of factors to focus on competitive considerations and to address potentially ambiguous judgment terms. *Compare* 15 U.S.C. § 16(e) (2004), *with* 15 U.S.C. § 16(e)(1) (2006); *see also SBC Commc'ns*, 489 F. Supp. 2d at 11 (concluding that the 2004 amendments "effected minimal changes" to Tunney Act review).

[6] *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the

proposed settlement is in the public interest, a district court "must accord deference to the government's predictions about the efficacy of its remedies, and may not require that the remedies perfectly match the alleged violations." *SBC Commc'ns*, 489 F. Supp. 2d at 17; *see also Microsoft*, 56 F.3d at 1461 (noting the need for courts to be "deferential to the government's predictions as to the effect of the proposed remedies"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant due respect to the United States' prediction as to the effect of proposed remedies, its perception of the market structure, and its views of the nature of the case).

Courts have greater flexibility in approving proposed consent decrees than in crafting their own decrees following a finding of liability in a litigated matter. "[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.'" *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983); *see also United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a greater remedy). To meet this standard, the United States "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." *SBC Commc'ns*, 489 F. Supp. 2d at 17.

overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"). *See generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

Moreover, the court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459; *see also InBev*, 2009 U.S. Dist. LEXIS 84787, at *20 ("[T]he 'public interest' is not to be measured by comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged."). Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Microsoft*, 56 F.3d at 1459-60. As this Court recently confirmed in *SBC Communications*, courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power." *SBC Commc'ns*, 489 F. Supp. 2d at 15.

In its 2004 amendments, Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2). The language wrote into the statute what Congress intended when it enacted the Tunney Act in 1974, as Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Senator Tunney). Rather, the procedure for the public interest determination is left to the

24

discretion of the court, with the recognition that the court's "scope of review remains sharply proscribed by precedent and the nature of Tunney Act proceedings." *SBC Commc'ns*, 489 F. Supp. 2d at 11.[7]

## VIII. DETERMINATIVE DOCUMENTS

In formulating the proposed Final Judgment, the United States considered the AEG/TM Technology Agreement, dated January 11, 2010 and attached hereto as Exhibit A,[8] to be a determinative document within the meaning of the APPA.

Dated: January 25, 2010

Respectfully submitted,

Aaron D. Hoag
Attorney
U.S. Department of Justice
Antitrust Division
450 Fifth Street, N.W., Suite 4000
Washington, D.C. 20530
Telephone: (202) 514-5038
Fax: (202) 514-7308
Email: aaron.hoag@usdoj.gov

---

[7] *See United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone"); *United States v. Mid-Am. Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo. 1977) ("Absent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should . . . carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances."); S. Rep. No. 93-298, 93d Cong., 1st Sess., at 6 (1973) ("Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized.").

[8] The United States redacted competitively sensitive information and information unrelated to U.S. markets from the version of the AEG/TM Technology Agreement attached as Exhibit A.

## CERTIFICATE OF SERVICE

I, Aaron Hoag, hereby certify that on January 25, 2010, I caused a copy of the Competitive Impact Statement and attached Exhibit to be served on defendants Ticketmaster Entertainment, Inc., and Live Nation, Inc., and the plaintiff States of Arizona, Arkansas, California, Connecticut, Florida, Illinois, Iowa, Nebraska, Nevada, Ohio, Oregon, Rhode Island, Tennessee, Texas, and Wisconsin, and Commonwealths of Massachusetts, and Pennsylvania by mailing the documents via email to the duly authorized legal representatives of the parties, as follows:

FOR TICKETMASTER ENTERTAINMENT, INC.
M. Sean Royall, Esq.
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
Tel: (202) 955-8546
Fax: (202) 467-0539
Email: SRoyall@gibsondunn.com

FOR LIVE NATION, INC.
Michael Egge, Esq.
Latham & Watkins LLP
555 Eleventh Street, NW
Washington, D.C. 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
Email: michael.egge@LW.com

FOR PLAINTIFF STATE OF ARIZONA
Nancy M. Bonnell
Antitrust Unit Chief
Consumer Protection & Advocacy Section
1275 West Washington
Phoenix, AZ 85007
Tel: (602) 542-7728
Fax: (602) 542-9088
Email: Nancy.Bonnell@azag.gov

FOR PLAINTIFF STATE OF ARKANSAS
David A. Curran
Assistant Attorney General
323 Center St., Suite 200
Little Rock, AR 72201
Tel: (501) 682-3561
Fax: (501) 682-8118
Email: david.curran@arkansasag.gov


FOR PLAINTIFF STATE OF CALIFORNIA
Paula Lauren Gibson
Deputy Attorney General
California Office of the Attorney General
300 So. Spring Street, Suite 1702
Los Angeles, CA 90013
Tel: (213) 897-0014
Fax: (213) 897-2801
Email: Paula.Gibson@doj.ca.gov


FOR PLAINTIFF STATE OF FLORIDA
Patricia A. Conners
Antitrust Division
PL-01; The Capitol
Tallahassee, FL 32399-1050
Tel: (850) 414-3300
Fax: (850) 488-9134
Email: Lisa.McGlynn@myfloridalegal.com


FOR PLAINTIFF STATE OF ILLINOIS
Robert W. Pratt
Chief, Antitrust Bureau
Office of the Attorney General
State of Illinois
100 West Randolph Street
Chicago, Illinois 60601
Tel: (312) 814-3722
Fax: (312) 814-4209
Email: RPratt@atg.state.il.us

FOR PLAINTIFF STATE OF IOWA
Layne M. Lindebak
Assistant Attorney General
Special Litigation Division
Iowa Department of Justice
Hoover Office Building-Second Floor
1305 East Walnut Street
Des Moines, Iowa 50319
Tel: (515) 281-7054
Fax: (515) 281-4902
Email: Layne.Lindebak@iowa.gov


FOR PLAINTIFF STATE OF LOUISIANA
Stacie L. de Blieux
Assistant Attorney General
Public Protection Division
1885 North Third St.
Baton Roughe, LA 70802
Tel: (225) 326-6400
Fax: (225) 326-6499
Email: deblieuxs@ag.state.la.us


FOR PLAINTIFF COMMONWEALTH OF MASSACHUSETTS
William T. Matlack,
Chief, Antitrust Division
Assistant Attorney General
Office of Attorney General Martha Coakley
One Ashburton Place
Boston, MA 02108
Tel: (617) 727-2200
Fax: (617) 727-5765
Email: William.Matlack@state.ma.us

FOR PLAINTIFF STATE OF NEBRASKA
Leslie Campbell-Levy
Assistant Attorney General
Chief, Consumer Protection & Antitrust
Nebraska Department of Justice
2115 State Capitol
Lincoln, NE 68509
Tel: (402) 471-2811
Fax: (402) 471-2957
Email: leslie.levy@nebraska.gov

FOR PLAINTIFF STATE OF NEVADA
Brian Armstrong
Senior Deputy Attorney General
State of Nevada, Office of the Attorney General
Bureau of Consumer Protection
555 E. Washington Ave., Suite 3900
Las Vegas, Nevada 89101
Tel: (702) 486-3420
Fax: (702) 486-3283
Email: BArmstrong@ag.nv.gov

FOR PLAINTIFF STATE OF OHIO
Jennifer L. Pratt
Chief, Antitrust Department
150 E. Gay St., 23rd Floor
Columbus, OH 43215
Tel: (614) 466-4328
Fax: (614) 995-0266
jennifer.pratt@ohioattorneygeneral.gov

FOR PLAINTIFF STATE OF OREGON
Caren Rovics
Senior Assistant Attorney General
Financial Fraud/Consumer Protection Section
Civil Enforcement Division
1162 Court Street NE
Salem, OR 97301-4096
Tel: (503) 934-4400
Fax: (503) 378-5017
Email: caren.rovics@doj.state.or.us


FOR PLAINTIFF COMMONWEALTH OF PENNSYLVANIA
James A. Donahue, III
Chief Deputy Attorney General
Office of Attorney General
Antitrust Section
14th Floor Strawberry Square
Harrisburg, PA 17120
Tel: (717) 787-4530
Fax: (717) 705-7110
E-mail: jdonahue@attorneygeneral.gov


FOR PLAINTIFF STATE OF RHODE ISLAND
Patrick Lynch
Attorney General
State of Rhode Island
150 South Main Street
Providence, Rhode Island 02903
Tel: (401) 274-4400
Fax: (401) 222-2295
Email: plynch@riag.ri.gov

FOR PLAINTIFF STATE OF TENNESSEE
Robert E. Cooper, Jr.
Attorney General and Reporter
State of Tennessee
425 Fifth Avenue North
Nashville, TN 37243
Tel: (615) 532-5732
Fax: (615) 532-2910
Email: Bob.Cooper@Ag.Tn.Gov


FOR PLAINTIFF STATE OF TEXAS
David M. Ashton
Assistant Attorney General
Office of the Attorney General
300 W. 15th Street
Austin, Texas 78701
Tel: (512) 936-1781
Fax: (512) 320-0975
Email: david.ashton@oag.state.tx.us


FOR PLAINTIFF STATE OF WISCONSIN
Gwendolyn J. Cooley
Assistant Attorney General
Wisconsin Department of Justice
17 West Main Street
Madison, WI 53703
Tel: (608) 261-5810
Fax: (608) 267-2778
Email: cooleygj@doj.state.wi.us

Aaron D. Hoag, Esq.
Attorney
U.S. Department of Justice
Antitrust Division
450 Fifth Street, N.W., Suite 4000
Washington, D.C. 20530
Telephone: (202) 514-5038
Fax: (202) 514-7308
Email: aaron.hoag@usdoj.gov

# EXHIBIT A

01/11/10

## LETTER OF AGREEMENT

## AEG/TM TECHNOLOGY AGREEMENT

This Letter of Agreement sets forth the basic terms of the proposed transaction (the "Transaction") pursuant to which Anschutz Entertainment Group, Inc. ("AEG") will license the TM Host technology of Ticketmaster Entertainment, Inc. ("TM") and TM will provide AEG with transitional access to a branded white-label site on the Ticketmaster.com site. The parties will negotiate in good faith to enter into definitive agreements regarding the Transaction promptly following the execution hereof; provided that if the parties fail to enter into such definitive agreements, the terms of this Letter of Agreement shall be binding and effective in lieu of such definitive agreements so long as the Department of Justice ("DOJ") approves these terms as part of a remedy package acceptable to allow the merger between TM and Live Nation, Inc. (the "Merger") to close, and subject to and upon completion as of, that closing.

### A. GENERAL TERMS.

1. The effectiveness of this Letter of Agreement and the closing of the Transaction (the "Closing") will be subject to, and under no circumstances can the Closing occur, until (a) confirmation from the DOJ that the terms of this Letter of Agreement form a part of a remedy that is acceptable to the DOJ to approve the Merger and (b) the closing of the Merger. In the event that the DOJ brings legal action to enjoin the closing of the Merger prior to the Closing, either party may terminate this agreement at any time by delivering written notice to the other. If DOJ allows the parties to proceed with the Merger subject to a proposed final Consent Judgment, this Transaction shall be a part of the remedy package provided that TM and Live Nation are not required to make material modifications to the Transaction in order to secure DOJ's agreement to allow the parties to proceed with the Merger.

2. The parties agree to take such further actions and execute such additional documents as reasonably necessary to effectuate the intent of the parties hereunder. In particular, the parties acknowledge that they are entering into this letter agreement without addressing in sufficient detail all of the matters that will be entailed in accomplishing the effective transition of AEG's ticketing to the branded white label arrangement contemplated hereunder. Accordingly, the parties agree that, in the absence of definitive agreements, they will cooperate in good faith to address such matters in a fashion which is fair and appropriate consistent with the intent of the parties and, where appropriate, past practice, to facilitate an effective transition by AEG of its ticketing to the new arrangement.

3. Upon the closing of the Transaction (the "Closing"), that certain Term Sheet between Ticketmaster L.L.C. ("TM LLC") and AEG, dated as of April 29, 2004,

as amended (the "Term Sheet"), will be amended to (a) provide that it will be terminated and of no further force and effect on the six-month anniversary of the Closing or such earlier date as the transition to the AEG Site (as defined below) is substantially complete (the "Transition Date") except with respect to those properties (venues, events or teams) which (i) are outside of the United States, Canada, Sweden or the U.K. or (ii) AEG expressly elects to continue operating under the Term Sheet as specified in writing by AEG not less than three months prior to the Transition Date (the "Excluded Properties"), (b) delete in their entirety (i) the second paragraph of Paragraph 2 of the Term Sheet, which provides that, subject to certain conditions, ███████████████████████████

███████ and (ii) the second paragraph of Paragraph 3 of the Term Sheet, which provides, among other things, that ██████████████████████████████████████

██████████████████████ and (c) provide that the fee structure for all ticketing provided under the Term Sheet in the U.S. and Canada will be pursuant to the fee structure set forth below in Section C.4 for those categories of properties described therein. ██████████████████████████████████████ All AEG-controlled ticketing ticketed pursuant to the Term Sheet in the U.S. and Canada (other than with respect to the Excluded Properties and the Non-Released Venues (as defined below)) will be governed by this agreement (rather than the Term Sheet) and will be transitioned to the AEG Site on the Transition Date.   Further, AEG retains the right, upon 90 days prior written notice, to transition any or all of the Excluded Properties to the AEG Site.  Upon the Transition Date, the Term Sheet will remain in effect with respect to the Excluded Properties (with the term thereof being extended to be co-terminus with the white label arrangement set forth below) and properties outside of the U.S., Canada, Sweden and the U.K., but will be of no further force and effect beyond such properties..  The parties acknowledge and agree that as of the Closing the Term Sheet will be amended to provide that Section 36 (Termination Right) will be deleted from the Term Sheet and be of no further force or effect; provided that with respect to any Excluded Properties and other properties that continue to be governed by the Term Sheet AEG shall have the same early termination rights that it has below under the white label arrangement. ██████████████████████████

4. Each of the venues ticketed pursuant to the Term Sheet immediately prior to the Closing that has a ticketing agreement directly with TM or its affiliates will have

the right to terminate such TM ticketing agreement effective at the Transition Date or any time thereafter prior to the first anniversary of the Transition Date upon the provision of 90 days prior written notice, subject to (a) the venue releasing TM from any further obligations under its agreement with TM (including any suite, club seat, advertising allowance or sponsorship arrangement) and (b) AEG (or the applicable venue owner) agreeing to pay to TM a pro rata portion of any signing bonus or any unrecouped advances or any other amounts owing to TM, any royalty payments. Each venue that makes such an election shall be referred to herein as a "Released Venue". Any such venue that does not make such an election to become a Released Venue (a "Non-Released Venue") will remain subject to the ticketing agreement with TM or its affiliates, and will no longer be ticketed pursuant to the Term Sheet and may not be transferred to the AEG Site.

5.

6.

7.



3



8. 

9. TM acknowledges that following the Closing it has no ownership rights in AEG ticketing data and agrees that it will implement appropriate procedures, reasonably satisfactory to AEG, to ensure that such data will not be used by TM from and after the Closing (except to fulfill its obligations under the Term Sheet and this agreement).

10. AEG agrees that if AEG commences managing or providing venue support services to a venue with an existing ticketing agreement with TM or any of its affiliates, AEG will not interfere with such TM ticketing agreement, and such TM ticketing agreement will control and such venue may not be ticketed pursuant to the AEG Site until such time as such ticketing agreement with TM expires or is terminated. AEG agrees that if a venue or festival becomes an AEG Owned Property (as defined below), and such property is subject to an existing ticketing agreement with TM or any or its affiliates, TM consents to allow this agreement to supersede such existing TM ticketing agreement and apply to the ticketing of such property provided that (a) the venue releases TM from any further obligations under its agreement with TM (including any suite, club seat, advertising allowance or sponsorship arrangement) and (b) AEG pays to TM a pro rata portion of any signing bonus or any unrecouped advances or any other amounts owing to TM. AEG further agrees that if AEG holds an event at a third party venue that has an existing exclusive ticketing contract with TM, such TM ticketing agreement, and not the Term Sheet or this agreement, will apply to tickets covered by such TM ticketing agreement, except that AEG may ticket such events through this agreement, rather than the venue's TM ticketing agreement, in

4

the case of any venue where Live Nation or its affiliates following the Transition Date have presented shows which have not been ticketed through the venue's agreement with TM.

11. Effective upon the Closing, each party, on its own behalf and on behalf of all of its officers, directors, servants, stockholders, employees, agents, representatives, successors, assigns, parents, subsidiaries and affiliates (collectively, the "Releasing Party"), knowingly, voluntarily, unconditionally and forever releases, discharges, acquits, hold harmless and covenants not to sue the other party and each of its officers, directors, servants, stockholders, employees, agents, representatives, successors, assigns, parents, subsidiaries and affiliates (collectively, the "Released Party") of, from and for any and all amounts claimed to be owed, damages, as well as any and all incidental, special, consequential or punitive damages of every kind or nature whatsoever, and any and all actions, claims, demands, costs, liabilities, losses and expenses, known or unknown, accrued or unaccrued, actual or potential, suspected or unsuspected, fixed or contingent, that the Releasing Party has or may have, arising out of or in connection with the Term Sheet prior to the execution hereof. This release shall not apply to any claims either party may have in the future relating to the enforcement of this agreement or the Term Sheet relating to either (a) rights and obligations arising under such documents from and after the execution of this agreement or (b) payment obligations either party may have in connection with ticketing transactions that have occurred prior to the execution of this agreement but which have not yet been fully settled by the parties in accordance with the Term Sheet.

The parties acknowledge that they are familiar with the provisions of Section 1542 of the California Civil Code, which provides as follows:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.**

The parties expressly, knowingly, and intentionally waive and relinquish any and all rights which they have under the provisions of Section 1542, and waive the provisions of Section 1542, as well as any other similar statute or common law principle under the laws of any other jurisdiction that may be deemed applicable. The parties further acknowledge that they may hereafter discover facts different from, or in addition to, those which they now know or believe to be true, and agree that, in such event, this Release shall nevertheless be and remain effective in all respects, notwithstanding such different or additional facts, or the discovery thereof. The parties acknowledge that they separately bargained for the foregoing waivers.

5

## B. CORE HOST TECHNOLOGY

1. At the option of AEG, exercisable by AEG by providing TM with written notice not later than the fourth anniversary of the date of the Closing, TM will grant to AEG a perpetual license of certain technology that TM or its affiliates currently use for its ticketing operations in the United States and Canada. The territory covered by the license is worldwide (subject to the rights that TM has granted to Ticketmaster Group Limited Partnership ███████████████████████████ ███████████████ and subject to the rights that TM has granted to Credit Union Center in Saskatoon ███████████ and subject to the rights that TM has granted third parties in China, Mexico, Central America and South America), except that in the case of any territory outside of the United States and Canada, AEG may not utilize the technology unless it has been installed in the U.S. as described in Section B.3. and TM has ticketing operations in such territory. In addition, for any use outside of the United States and Canada, AEG shall install such technology at its own cost and utilizing its own resources. Prior to the earlier of (i) five years from the Closing and (ii) full completion of the installation of the licensed software, neither this agreement nor the license may be assigned by AEG and the technology may not be sold by AEG; provided that, notwithstanding the foregoing, AEG may at any time transfer, directly or indirectly, this Agreement to an entity in which AEG continues to own a controlling interest, and this Agreement may be transferred as a part of the sale of AEG or all or substantially all of AEG's assets. Any transferee must assume, in writing, all of AEG's obligations and liabilities under this Agreement. For avoidance of doubt, after any transfer of this Agreement, AEG (or any successor thereof) shall retain no rights whatsoever hereunder, and any transfer of this Agreement shall include a transfer of all of AEG's (or its successor's) copies of any software, documentation or other materials provided hereunder. Neither AEG nor any direct or indirect transferee thereof has the right to grant any sublicenses under this Agreement. Neither AEG nor any direct or indirect transferee thereof has the right to permit any third party to use or operate the software licensed hereunder (except in the manner and to the extent currently permitted by TM to its ticketing clients, including AEG). AEG may terminate the license in its discretion at any time, and may elect, at its option, to use other ticketing technologies for its ticketing needs.

2. The software covered by the license described in Section B.1 above are the current versions (including any upgrades and enhancements thereto in effect as of the commencement of installation of the ticketing system and website) of:
   - Ticketmaster Classic Ticketing system (Host);
   - Ticketmaster.com full website package;
   - Access Management;
   - Payment processing and settlements;
   - PCI point of sale system (for phone and outlets).

TM represents that the above software constitutes all of the software currently utilized by TM in performing its services as a primary ticket seller for AEG.

6

3.  TM will install a fully functional ticketing system and website in AEG's facilities limited to the following:

    - TM will provide recommendations for the infrastructure to host and manage the licensed technology.  This includes specific networking, hardware requirements, database requirements, bandwidth, OS, software/middleware needs and detailed security specifications.  TM will also provide information regarding practices for managing code, development and deployment of new features.
    - TM will configure and test the system (end to end testing, including UAT).
    - TM will deliver a complete set of software code and documentation.
    - AEG will at its own cost provide all space, networking equipment, hardware and system software.
    - AEG will provide all staffing required for systems operations, field, call center and outlet support
    - TM will train the AEG employees to operate and support the system.
    - TM will provide additional onsite and remote support as requested by AEG up to 1,000 hours a month for the first 6 months of the installation. Additional support above this level will be charged at $█ per hour.
    - TM will train AEG staff on the code necessary to do independent changes and release.
    - TM  man-month resources provided will be 102 for installation and 153 for training and documentation.
    - AEG will pay TM a one time fee of $██████ for the above upon completion.

4.  Following installation AEG may make such changes to the licensed software as it chooses.

5.  TM shall not be responsible for delays or failures in performance under the license set forth in this Section B to the extent that it shall be hindered in its performance by any act of God, civil commotion, application of any law or regulation or other act of any governmental officer or personnel, labor dispute, or any other occurrence beyond its reasonable control. TM disclaims all implied warranties, including the implied warranties of merchantability, fitness for a particular purpose and non-infringement.  AEG shall indemnify TM and hold it harmless from and with respect to any loss, damage, cost or expense (including reasonable attorneys' fees) arising out of or in connection with any claim by any third party relating to any use or other exploitation by or for AEG, any successor thereto or any affiliate of any of the software licensed under this Section B.  AEG shall not disclose the confidential information consisting of or relating to the software licensed under this Section B

7

except to its employees who require access thereto for AEG to exercise its rights granted hereunder. AEG shall not use such confidential information except as necessary to exercise its rights granted hereunder. AEG's confidentiality obligations under this Section B.6 shall survive any termination or expiration of the license granted pursuant to this Section B and shall remain fully enforceable thereafter.

## C. BRANDED WHITE LABEL SITE

1. For a period of five years (subject to Section C.8 below) commencing upon the Transition Date, AEG will have its own branded site (the "AEG Site") on the primary TM technology platform (including any upgrades and enhancements thereto in effect during the term), for events in the U.S. and Canada and, if applicable under Section A.8 above, select international markets, operated by TM and/or its affiliate on behalf of AEG with the following basic services:

   - The AEG Site will have a look and feel as determined by AEG with the branding of AEG; provided that AEG may request multiple pages within the AEG Site with the branding of venues, events or teams ticketed by AEG pursuant to the AEG Site.
   - AEG events will be posted on the TM.com site.
   - Access to the AEG Site by consumers will be direct from the AEG.com site or directed via the TM.com site.
   - All transactions will be made through the AEG Site and all payment processing will be done by TM through AEG credit card vendor accounts with funds being deposited direct into the AEG bank accounts designated by AEG for each of its properties ticketed under this arrangement. The proceeds processed through the AEG credit card vendor accounts will include all amounts charged to consumers, including tickets, convenience fees, processing fees and similar fees. TM shall provide an accounting for deposits for each merchant account in a reasonable amount of detail and shall work with AEG to reconcile any differences or discrepencies promptly; such accounting shall be provided in a manner that corresponds in frequency to the credit card settlements.
   - TM will provide Access Management software to the AEG venues under customary and appropriate licensing terms.
   - TM will give AEG staff access to its box office tools for building events, selling events and reporting under customary and appropriate licensing terms.
   - TM will continue to provide the service of building events for AEG as it has done under the current agreement.

8

- TM will provide full end to end testing of AEG Site (including software, UAT, load testing and security testing).
- TM will provide Tier 2 tech support to AEG.
- TM will agree to host the AEG Site in a manner consistent with TM's hosting of the TM.com site and in accordance with customary and usual service level commitments to be negotiated in good faith by the parties.
- TM will provide venue hardware for new installations and replacements in a manner customarily provided by TM to AEG and other ticketing clients; provided that if the venue for which such hardware is provided is no longer ticketed on the AEG Site for any reason within five years of the date of such installation or replacement, AEG at its election will either (a) reimburse TM ███ ██████████████████████████████████████████████ or (b) sell the hardware to TM ██████████████████████████████ ███████████████████

2. AEG will have the right, but not the obligation, to use the AEG Site for ticketing for all venues, teams and events covered under the terms of the Term Sheet other than the Excluded Properties and the Non-Released Venues, including without limitation:

- All AEG Owned Properties as defined below.
- All AEG Managed Buildings as defined below.
- All AEG Hybrid Buildings as defined below.

3. This arrangement shall be non-exclusive (with respect to both primary and secondary ticketing) and AEG shall reserve the right at any time during the term to transition individual properties, or groups of properties, to an alternative ticketing system; provided that AEG shall provide no less than ██ days prior written notice to TM prior to any such transition; provided further that once AEG transitions any property or group of properties away from the AEG Site, such property or group of properties can only be returned to the AEG Site if AEG determines, in good faith, that such other system did not perform reasonably satisfactory and AEG agrees to bear all costs associated with the transition of such property or properties back to the AEG Site and AEG elects to transition such property or properties back to the AEG Site within ██ days of the date that AEG transitioned such property from the AEG Site and transitions such property or properties back to the AEG Site within ███ days of the date that AEG transitioned such property from the AEG Site. In addition AEG may terminate this ticketing arrangement at any time during the Term by providing no less than ██ months prior written notice to TM.

4. The fees payable by AEG to TM for the services in Section C.1 above will be the fees set forth below for each for each ticket sold, printed, provided, or produced

9

or distributed by or through the AEG Site or by TM via the means set forth below
in the U.S. or Canada. For the sake of clarification, no fees shall be payable for
tickets sold (a) through the box office or (b) sold as season or subscription sales
through Archtics. AEG will account for and pay such fees to TM monthly within
30 days following the end of each month.

| | Yrs ▮(S) | Yrs ▮(S) | Yr▮(S) |
|---|---|---|---|
| **FEES FOR SALES VIA INTERNET** | | | |
| AEG Owned Properties* | ▮ | ▮ | ▮ |
| AEG Managed Buildings | ▮ | ▮ | ▮ |
| Current AEG Hybrid Buildings | ▮ | ▮ | ▮ |
| Future AEG Managed Buildings | ▮ | ▮ | ▮ |
| All other AEG ticketing clients | ▮ | ▮ | ▮ |
| **FEES FOR SALES VIA PHONE OR OUTLET** | | | |
| Phone Sales | ▮ | ▮ | ▮ |
| Outlet Sales | ▮ | ▮ | ▮ |

"AEG Owned Properties" shall mean each venue or festival in the United States,
Canada, Sweden or the U.K. in which AEG has an Ownership Interest (as defined
below) and exclusive ticketing rights. AEG shall be deemed to have an
"Ownership Interest" in a venue or festival where AEG or its affiliates:

10



A list of all AEG Owned Properties as of the date hereof is attached as Exhibit A hereto and AEG represents and warrants that each property listed on Exhibit A, except for ▆▆▆▆▆▆▆▆ meets the definition of "AEG Owned Property"; provided that such list is not intended to be limiting and any future AEG Owned Properties shall be subject to the same terms and conditions as those on the list; provided that the fees for any tickets sold at such additional properties in excess of the "Future Owned Properties Cap" (as defined below) shall be those set forth above for "Current AEG Managed Buildings". The "Future Owned Properties Cap" shall be equal to ▆▆▆▆▆▆ for year one, ▆▆▆▆▆▆ for year two, ▆▆▆ for year three, ▆▆▆▆▆▆ for year four and ▆▆ tickets for year five.

"AEG Managed Building" shall mean each venue in the United States, Canada, Sweden or the U.K. for which AEG or its wholly-owned subsidiaries have a management contract pursuant to which AEG or its wholly-owned subsidiaries control and exercise all or substantially all aspects of the management of the venue, including without limitation exclusive rights to ticket events at such venue. A list of all AEG Managed Buildings as of the date hereof is attached as Exhibit B hereto ("Current AEG Managed Buildings") and AEG represents and warrants that, except for ▆▆▆▆▆▆▆▆▆▆▆ each venue listed on Exhibit B meets the definition of "AEG Managed Building". Any future AEG Managed Buildings not on Exhibit C ("Future AEG Managed Buildings") may be ticketed on the AEG Site and will, except as set forth below, be subject to the fees set forth above for Future AEG Managed Buildings; provided that no venue (other than an AEG Owned Property) shall be ticketed on the AEG Site at any time during which such venue has in effect a ticketing agreement with TM or any of its affiliates. During the first ▆▆ years of the term, AEG may designate up to three buildings of the six buildings listed on Exhibit D hereto as Future AEG Managed Buildings which would, notwithstanding the foregoing, be ticketed on the AEG Site at the fees set forth above for Current AEG Managed Buildings (the "Grandfathered Management Deals"). The

11

Grandfathered Management Deals must meet the criteria above for AEG Managed Buildings.

"Current AEG Hybrid Buildings" means those buildings listed on Exhibit C hereto .

5. TM shall be responsible for initial site design and set up of the AEG Site at no charge to AEG. In addition, TM shall pay a $[redacted] allowance to AEG as compensation for marketing, development and other transitional expenses to be incurred by AEG in transitioning to the AEG Site. Other than the fees expressly set forth in this Section C, there shall be no additional charges or incremental costs applied by or otherwise receivable to TM directly or indirectly for the installation, maintenance or support of the AEG Site during the term of its operation.

6. During the term of the AEG Site, TM will license to AEG its proprietary Archtics software for use by AEG with the sports teams that are owned by AEG or that play in AEG Owned Properties, AEG Managed Buildings or AEG Hybrid Buildings under customary and appropriate licensing terms. The license fee will be waived for sports teams that are owned by AEG or its affiliates. The license fee and other terms for teams not owned by AEG will be negotiated separately by TM and the applicable team.

7. TM will cooperate with AEG in transitioning its ticketing operations for the applicable venues to the AEG Site, including without limitation in connection with linking customers from the ticketmaster.com site to the AEG Site. TM will make available any AEG venue and event information page listing and properly redirect venue clicks to AEG Site.

8. Notwithstanding Section C.1 above, the term of the AEG Site will end promptly following completion of the software installation as described in Section B above.

9. TM shall continue to provide all services and support currently being provided to AEG venues, events and teams under the Term Sheet. TM shall not be obligated to provide the following:

- Services relating to the settlement of ticketing proceeds among venues, promoters and other rights holders;
- Venue Hardware beyond that customarily provided by TM to AEG and other ticketing clients;

**D. MISCELLANEOUS.**

1. The terms and conditions described in this Letter of Agreement including its existence shall be confidential information and shall not be disclosed to any third party. Notwithstanding the foregoing, the parties acknowledge that the proposed Transaction is of interest to the United Stated Department of Justice (the "DOJ")

12

and certain other regulatory agencies (including without limitation the United Kingdom Competition Commission, the Canadian Competition Bureau, and certain state attorneys general) (the "Other Regulatory Agencies"), in the context of their respective on-going antitrust investigations of the proposed merger between Ticketmaster and Live Nation, Inc. (the "Merger") and, therefore, agree that either party shall be permitted, without the consent of the other, to disclose to the DOJ or, upon the request of any Other Regulatory Agency, to such Other Regulatory Agency, the terms and conditions of this agreement.

2. The parties each shall be solely responsible for and will bear all of their own respective expenses, including, without limitation, expenses of legal counsel, accountants and other advisors, incurred at any time in connection with pursuing or consummating the definitive agreement(s) and the transactions contemplated thereby.

3. This Letter of Agreement shall be governed by the laws of the State of California.

4. This Letter of Agreement, together with the letter agreement entered into concurrently herewith between AEG and Live Nation Worldwide, Inc., constitutes the entire agreement between TM and AEG with respect to the transactions contemplated herein. This Agreement shall not be amended except by a writing executed by both parties. TM reserves all rights not expressly granted hereunder.

Confirmed and agreed to as of the 11th day of January, 2010.

**TICKETMASTER ENTERTAINMENT, INC.**

By:

Name: _Irving Azoff_

Title: _CEO_

**ANSCHUTZ ENTERTAINMENT GROUP, INC.**

By: _____

Name: _____

Title: _____

13

and certain other regulatory agencies (including without limitation the United Kingdom Competition Commission, the Canadian Competition Bureau, and certain state attorneys general) (the "Other Regulatory Agencies"), in the context of their respective on-going antitrust investigations of the proposed merger between Ticketmaster and Live Nation, Inc. (the "Merger") and, therefore, agree that either party shall be permitted, without the consent of the other, to disclose to the DOJ or, upon the request of any Other Regulatory Agency, to such Other Regulatory Agency, the terms and conditions of this agreement.

2. The parties each shall be solely responsible for and will bear all of their own respective expenses, including, without limitation, expenses of legal counsel, accountants and other advisors, incurred at any time in connection with pursuing or consummating the definitive agreement(s) and the transactions contemplated thereby.

3. This Letter of Agreement shall be governed by the laws of the State of California.

4. This Letter of Agreement, together with the letter agreement entered into concurrently herewith between AEG and Live Nation Worldwide, Inc., constitutes the entire agreement between TM and AEG with respect to the transactions contemplated herein. This Agreement shall not be amended except by a writing executed by both parties. TM reserves all rights not expressly granted hereunder.

Confirmed and agreed to as of the 11th day of January, 2010.

**TICKETMASTER ENTERTAINMENT, INC.**

By: _____
Name: _____
Title: _____

**ANSCHUTZ ENTERTAINMENT GROUP, INC.**

By: _Timothy J. Leiweke_
Name: _Timothy J. Leiweke_
Title: _CEO & President_

13

**EXHIBIT A**

**AEG OWNED PROPERTIES**

- ████████
- ████████
- ██████
- █████████
- ██████████
- ██████████
- ██
- ████████████
- ███████
- ███████
- █████
- █████
- █████
- █████████
- ███████
- ███████
- ██████
- ██████

14

**EXHIBIT B**

**AEG MANAGED BUILDINGS**



**EXHIBIT C**

**CURRENT AEG HYBRID BUILDINGS**



**EXHIBIT D**

**POTENTIAL FUTURE AEG MANAGED BUILDINGS**



FIRST AMENDMENT TO LETTER OF AGREEMENT

AEG/TM TECHNOLOGY AGREEMENT

THIS FIRST AMENDMENT TO LETTER OF AGREEMENT - AEG/TM TECHNOLOGY AGREEMENT ("Amendment") is entered into as of January 22, 2010, by and between Ticketmaster Entertainment, Inc. ("TM") and Anschutz Entertainment Group, Inc. ("AEG"), with reference to the following facts:

A.    TM and AEG entered into that certain LETTER OF AGREEMENT - AEG/TM TECHNOLOGY AGREEMENT dated as of January 11, 2010 (the "LOA") pursuant to which pursuant to which AEG will license the TM Host technology of TM and TM will provide AEG with transitional access to a branded white-label site on the Ticketmaster.com site.

B.    TM and AEG hereby desire to revise Section C.2. of the LOA to provide additional clarity regarding such Section as set forth herein.

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein, the parties hereby agree as follows:

1.    Defined Term(s). All capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the LOA.

2.    Section C.2. Section C.2. of the LOA is hereby modified to read in its entirety as follows:

2.    AEG will have the right, but not the obligation, to use the AEG Site for ticketing for all venues, teams and events covered under the terms of the Term Sheet other than the Excluded Properties and the Non-Released Venues, including without limitation:

- All AEG Owned Properties as defined below.
- All AEG Managed Buildings as defined below.
- All AEG Hybrid Buildings as defined below.

The categorization of venues in this agreement as AEG Owned Properties, AEG Managed Buildings, AEG Hybrid Buildings, and "other AEG ticketing clients" is solely for the purpose of determining fees payable by AEG to TM for the services in Section C.1 above and does not imply any limitation on (a) the venues to which AEG may offer contracts for ticketing services, or (b) the prices or terms that AEG may offer such venues.

1

Amend 1 (TM Draft 01-22-10).doc

3.    Conflicting Terms.  In the event a conflict arises between this Amendment and the terms and conditions of the LOA, the terms and conditions of this Amendment shall control.

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date first written above.

**Ticketmaster Entertainment, Inc.**        **Anschutz Entertainment Group, Inc.**

By: _____     By: _____

Name: _Chris Riley_____     Name: _Ted Fikre_____

Date: _January 23, 2010_     Date: _January 23, 2010_

2