# Exhibit 7

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, et al.

*Plaintiff,*

v.

TICKETMASTER ENTERTAINMENT, INC., and LIVE NATION ENTERTAINMENT, INC.,

*Defendants.*

Case: 1:10-cv-00139-RMC
Assigned to: Collyer, Rosemary M.
Assign. Date: 1/25/2010
Description: Antitrust

## PLAINTIFF UNITED STATES' MEMORANDUM IN SUPPORT OF MOTION TO MODIFY FINAL JUDGMENT AND ENTER AMENDED FINAL JUDGMENT

Defendants have repeatedly and over the course of several years violated this Court's July 30, 2010, Final Judgment. That Final Judgment permitted Live Nation Entertainment, Inc. ("Live Nation")[1] and Ticketmaster Entertainment, Inc. ("Ticketmaster") to merge, but prohibited the merged company from retaliating against concert venues for using another ticketing company, or conditioning or threatening to condition Live Nation's provision of concerts and other live events on a venue's purchase of Ticketmaster's ticketing services. While Defendants promptly consummated their merger, they have failed to live up to their end of the bargain. Specifically, Defendants have repeatedly conditioned and threatened to condition Live Nation's provision of live concerts on a venue's purchase of Ticketmaster ticketing services, and they have retaliated against venues that opted to use competing ticketing services – all in violation of the plain language of the decree. Indeed, Defendants' well-earned reputation for threatening behavior and retaliation

---

[1] Following the merger, Live Nation changed its name to Live Nation Entertainment, Inc.

in violation of the Final Judgment has so permeated the industry that venues are afraid to leave Ticketmaster lest they risk losing Live Nation concerts, hindering effective competition for primary ticketing services.  To protect venues that have provided evidence regarding Live Nation's conditioning and retaliatory conduct, the United States does not identify the affected customers below.[2]

Defendants deny the United States' allegations.  However, to address the United States' concerns and prevent violations of the Final Judgment in the future, Defendants have agreed to modify the Final Judgment as set forth in the concurrently filed Proposed Amended Final Judgment and do not oppose the United States' Motion.  For the Court's convenience, a redline comparison of the July 30, 2010, Final Judgment and the Amended Final Judgment is attached hereto as Exhibit 1.

In short, although the United States believes the Final Judgment is clear as written, to put a stop to Defendants' conduct and to remove any doubt about Defendants' obligations under the Final Judgment going forward, the United States and Defendants propose to modify the Final Judgment to add certain clarifying language.  In addition, to ensure that American consumers get the benefit of the bargain reached in 2010 and ordered by this Court, the parties propose to extend the term of the relevant provisions of the Final Judgment term by five- and one-half years, until December 31, 2025.  Most primary ticketing contracts last for three to five years.  Thus, a five- and one-half-year extension of the Final Judgment would ensure that at least one full cycle of most venue ticketing contracts would be free from Defendants' coercive tactics and give true competition a chance to take hold.

---

[2] The United States can provide additional information regarding the venues and evidence underlying Live Nation's alleged violations at the Court's request.

To ensure compliance with the Final Judgment going forward, Defendants have also agreed to submit to certain monitoring provisions, including appointment of an independent monitoring trustee, designating an antitrust compliance officer, reporting and investigating potential violations, and notifying employees and customers of Defendants' obligations under the Final Judgment and encouraging all parties to report potential violations to the Department of Justice. The United States believes these provisions are particularly important in this case in light of Defendants' disregard for the Final Judgment's prohibitions over the past seven years. Finally, to further encourage compliance, Defendants have also agreed to certain changes to make enforcement of the Final Judgment more efficient in the future, including lowering the standard of proof necessary to establish a violation and providing the United States with a four-year look back period to bring contempt actions against Defendants.

Together, these modifications will clarify and strengthen the Final Judgment while the extension gives it a chance to work as intended and promote competition in the primary ticketing industry. Notice and comment period is not required under the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)–(h) ("Tunney Act").[3] The proposed modifications serve the purpose of the original Final Judgment by clarifying its terms and enhancing the United States' ability to monitor and enforce compliance; they do not alter the essence of the remedy.

No Plaintiff State has indicated its opposition to the Motion at this time. The United States began meeting and conferring with Plaintiff States on December 5, 2019, regarding appropriate relief to seek in connection with the United States' allegations against Live Nation.[4] After subsequently meeting and conferring with Plaintiff States regarding the Proposed Amended Final

---

[3] *See* discussion *infra* Part V.
[4] Declaration of Meagan K. Bellshaw ¶ 2.

Judgment on multiple occasions, the United States requested that any Plaintiff State that intended to oppose this Motion notify the United States no later than January 6, 2020.[5] In response, Plaintiff States Arizona, California, Iowa, Ohio, Tennessee, Wisconsin and Washington expressly declined to inform the United States whether or not they would oppose this Motion;[6] Texas and Nevada represented they do not oppose this Motion;[7] and, as of the time of this filing, no other State had indicated that it would oppose the Motion.[8]

The United States does not oppose the Moving States' motion to extend[9] the deadline by two weeks to allow the Moving States to pursue relief that does not undermine the modifications agreed to by the United States and Defendants as set forth in the Proposed Amended Final Judgment.

## I. DEFENDANTS' COMMITMENT TO THE 2010 FINAL JUDGMENT

In 2009, Live Nation and Ticketmaster were separate companies leading different segments of the live entertainment industry. Live Nation was then and remains today the largest concert promoter in the United States. As a promoter, Live Nation contracts with artists to arrange and market their concerts, assuming the associated financial risks or gains from the concerts' success or failure, and frequently selects the venue at which to stage concerts. Ticketmaster has been the largest primary ticketing service provider for major concert venues in the United States for at least three decades. As a primary ticketing provider, Ticketmaster enters into exclusive contracts with

---

[5] *Id.* ¶¶ 2-3.
[6] *Id.* ¶ 5-6.
[7] *Id.* ¶ 4.
[8] *Id.* ¶ 8.
[9] Unopposed Motion to Extend Deadline to File Proposed Amendments to Final Judgment, Dkt. 20 (Jan. 8, 2020).

venues to provide them with a range of services necessary for the initial sale of tickets to concertgoers, and earns significant profits from fees imposed on each ticket sold.

In February 2009, Live Nation and Ticketmaster entered into an agreement to merge the two companies into a combined Live Nation Entertainment. Throughout 2009, the Division conducted a pre-complaint civil investigation into the proposed merger. The Division ultimately concluded that, without modifications, the proposed merger would likely harm competition in the primary ticketing market, resulting in higher fees and less innovation and services for venues and consumers and making it difficult for smaller firms to compete against the merged company's combined offerings.

On January 25, 2010, the United States and seventeen Plaintiff States filed a civil antitrust Complaint in this Court seeking to enjoin the proposed merger of Live Nation and Ticketmaster.[10] At the same time, the parties agreed to a proposed Final Judgment designed to eliminate the acquisition's anticompetitive effects.[11] That proposed Final Judgment contained a variety of terms and commitments negotiated between the parties. Both Ticketmaster and Live Nation stipulated that the Court could enter the Final Judgment and committed to comply with its terms.

In the proposed Final Judgment, Ticketmaster and Live Nation committed to refrain from several practices in exchange for permission to merge. As relevant here, Defendants agreed in Section IX of the Final Judgment not to:

> 1. Retaliate against a Venue Owner because it is known to Defendants that the Venue Owner is or is contemplating contracting with a company other than Defendants for Primary Ticketing Services [hereinafter "Anti-Retaliation Provision"]; and

---

[10] Compl. (Dkt. 1). Seventeen states joined the initial complaint, which was later amended to add two additional Plaintiff States. *See* Am. Compl. (Dkt. 5).
[11] [Proposed] Final Judgment (Jan. 25, 2010) (Dkt. 1-1). A revised [Proposed] Final Judgment was filed June 29, 2010, to add two additional Plaintiff States. *See* Dkt. 14-1.

    2.   Condition or threaten to Condition the Provision of Live Entertainment Events to a Venue Owner based on that Venue Owner refraining from contracting with a company other than Defendants for Primary Ticketing Services [hereinafter "Anti-Conditioning Provision"].

On July 30, 2010, after conducting its independent review under the Tunney Act, this Court entered the Final Judgment, giving Defendants' commitments the force of law. In entering its order, the Court found "the essence of this Final Judgment is…the imposition of certain conduct restrictions on defendants, to assure that competition is not substantially lessened."[12] The Court also retained "jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate . . . to modify any of its provisions, to enforce compliance, and to punish violations of its provisions."[13]

## II. DEFENDANTS' VIOLATIONS OF THE FINAL JUDGMENT

The United States has found that, since 2012, Defendants' executives have retaliated against or threatened venues throughout the United States in violation of the Final Judgment's Anti-Retaliation and Anti-Conditioning Provisions. These violations began shortly after the decree was entered in 2010 and have recurred throughout its term, with the most recent known violation occurring as late as March 2019. As a result of this conduct, venues throughout the United States have come to expect that refusing to contract with Ticketmaster will result in the venue receiving fewer Live Nation concerts or none at all. Given the paramount importance of live event revenues to a venue's bottom line, this is a loss that most venues can ill-afford to risk. As a result, many venues are effectively required to contract with Ticketmaster to obtain Live Nation concerts on reasonable terms, limiting the ability of Ticketmaster's competitors to compete in the primary ticketing market and harming venues that would benefit from increased competition.

---

[12] Final Judgment at 2.
[13] Final Judgment § XIV.

*Venue A*

Defendants violated both the Anti-Conditioning and Anti-Retaliation Provisions during negotiations with Venue A by first threatening to withhold concerts from Venue A if Venue A did not contract with Ticketmaster, and then refusing to book concerts at Venue A for a year in retaliation for its selection of a competing ticketer.

In 2017, Venue A issued a request for proposals ("RFP") for a new, two-year exclusive primary ticketing contract. Ticketmaster submitted a proposal and met with Venue A's ticketing committee. Although Venue A's RFP included a request only for ticketing services and not for live content, the Live Nation promoter responsible for deciding where in the region to place Live Nation concerts attended the meeting with Venue A along with two Ticketmaster employees. At the meeting, the Live Nation promoter explicitly threatened to withhold concerts from Venue A if it did not select Ticketmaster. A few weeks later, when Venue A informed the Live Nation promoter that it planned to select a competing ticketer that had offered better financial terms, the promoter responded that the competitor's offer would not be better than Ticketmaster's if Venue A did not receive as many Live Nation shows. The Live Nation promoter went on to specify that Live Nation would not book shows at Venue A unless it had no other options in the market.

Before Venue A's decision not to contract with Ticketmaster, Live Nation estimated that for the next several years it would book three to four shows per year at Venue A. But in the year following Venue A's switch to Ticketmaster's competitor, Live Nation promoted zero shows at Venue A. Venue A understood that Live Nation's decision to book zero shows at Venue A was retaliation for not selecting Ticketmaster as its primary ticketer.

*Venue B*

Defendants violated both the Anti-Conditioning and Anti-Retaliation Provisions during negotiations to provide primary ticketing services to Venue B.  In 2017, Venue B evaluated offers for primary ticketing services from Ticketmaster and several competitors.  When Venue B informed Live Nation that it was planning to choose Ticketmaster's competitor, Ticketmaster's Vice President for Client Development threatened to withhold all Live Nation concerts from Venue B if it did not renew its contract with Ticketmaster.  The Ticketmaster VP told Venue B that "if you move in that direction, you won't see any Live Nation shows."  Ticketmaster's Executive Vice President and Co-Head of Sports for NBA and NHL Arenas made a similar threat to Venue B, telling it that Live Nation's CEO would never put one of his shows on sale through that particular Ticketmaster competitor.

Despite Defendants' threats, Venue B initially selected a Ticketmaster competitor as its primary ticketing provider.  Before Venue B's ticketing decision, Live Nation and Venue B discussed potential bookings approximately once per week.  But when Venue B opted to go with Ticketmaster's competitor, Live Nation stopped contacting the arena about any possible concerts or booking shows at Venue B.  For unrelated reasons, one month later Venue B agreed to contract with Ticketmaster.  Immediately thereafter, Live Nation began to get "geared back up" to bring concerts to Venue B, because Venue B was "back in the family."

*Venue C*

Defendants twice violated the Anti-Conditioning Provision by threatening to blacklist Venue C from all future Live Nation shows after Venue C decided to contract with Ticketmaster's competitor for primary ticketing services.  According to a Venue C executive, Ticketmaster's President warned the executive that if Venue C went with a competing ticketer, Ticketmaster's

response "would be 'nuclear'" and "though he would deny it if I repeated it, Live Nation would never do a show in our building, that they would find other places for their content . . . ." Following a conversation with Ticketmaster's President, a second Venue C executive reported that Ticketmaster and Live Nation "will not do any business whatsoever with our stadium" and that Ticketmaster was "drawing a line in the sand and picking this as their 'hill to die on.'" The Venue C executive went on to state his understanding that Venue C was "now on 'the black list.'"

### Venue D

Defendants violated the Final Judgment when a senior Ticketmaster executive in charge of Sports for NBA and NHL Arenas threatened to withhold concerts at Venue D if Ticketmaster was not selected as its primary ticketing provider.   In September 2018, Venue D began evaluating primary ticketing providers in advance of the expiration of its Ticketmaster contract.  When Venue D told Ticketmaster that it was considering other primary ticketers, Ticketmaster's executive told Venue D that if it chose another primary ticketer, its Live Nation concert volume would be put at risk because Live Nation concerts would either skip the market altogether or play at another venue. Later, the senior executive reiterated his threat if that Venue D went with another primary ticketing provider, Live Nation would pull concerts from Venue D and reduce the volume of shows held there.

Despite receiving a competitive bid from a Ticketmaster competitor, Venue B determined that the risk of contracting with a ticketer other than Ticketmaster was too great.  Venue D renewed its contract with Ticketmaster for primary ticketing services.

### Venue E

Defendants violated the Final Judgment by threatening to condition Venue E's access to Live Nation concerts on the selection of Ticketmaster as the arena's ticketing provider and then

retaliating by withholding Live Nation content after Ticketmaster was not selected. Beginning in early 2012, the President of Live Nation Arenas threatened on multiple occasions to divert Live Nation concerts away from Venue E if it did not select Ticketmaster as its primary ticketer. After Venue E did not select Ticketmaster, two Live Nation executives – the President of Live Nation Arenas and the local Live Nation President in charge of placing concerts in the region – repeatedly threatened that Venue E would not get Live Nation shows unless it switched to Ticketmaster.

When Venue E refused to switch to Ticketmaster despite these threats, Live Nation followed through on its threats and retaliated against Venue E by reducing the number of concerts played there. Indeed, between 2011 and 2015, Live Nation shows playing at Venue E dropped by an average of almost fifty percent.

### *Venue F*

Defendants violated the Final Judgment by retaliating against Venue F after the arena switched from Ticketmaster to a competing ticketer. Immediately after learning that Venue F had switched ticketers, Ticketmaster's President contacted the local Live Nation President responsible for placing concerts in the region to suggest that Live Nation book more shows at Venue F's nearby rival venue. In the two years following Venue F's move to a Ticketmaster competitor for primary ticketing, Live Nation significantly reduced the number of shows promoted at Venue F in retaliation.

## III. THE UNITED STATES AND DEFENDANTS HAVE AGREED TO CLARIFY, MODIFY, AND EXTEND THE FINAL JUDGMENT TO ADDRESS THE UNITED STATES' CONCERNS

As set forth in the proposed Amended Final Judgment, Defendants have agreed to undertake certain steps to address the United States' concerns and help prevent future violations of the Final Judgment.

*First*, Live Nation has agreed to extend by five- and one-half years, until December 31, 2025, Section IX of the Final Judgment, as modified, as well as certain interrelated provisions: Section I (jurisdiction); Section II (definitions); Section III (applicability of the Final Judgment); Section XI (compliance inspection); Section XII (notification of related acquisitions), Section XIII.A.(no reacquisition of divested assets), Section XIV (retention of jurisdiction); Section XV (expiration as modified), and Section XVI (public interest determination).  As explained above, because most primary ticketing contracts last for three to five years, a five- and one-half-year extension of the Final Judgment would ensure that at least one full cycle of most venue ticketing contracts would be free from Defendants' coercive tactics and give true competition a chance to take hold.

*Second*, Live Nation has agreed to modify the decree to add language clarifying the specific conduct prohibited by the Anti-Retaliation and Anti-Conditioning Provisions.  While the United States believes these provisions were always clear and unambiguous, for the avoidance of doubt, these revisions make even clearer that Live Nation is not merely prohibited from withholding or threatening to withhold *all* concerts as a condition of Section IX; rather, conditioning, threatening to condition, or retaliating with respect to one or more concerts is sufficient to violate the Final Judgment.  The definition of "Provision of Live Entertainment Events" has been similarly modified to make clear that the definition encompasses not only the services necessary to put on a concert at a venue, but also the concerts themselves – an interpretation supported by the plain language of the original decree but that Defendants nevertheless have disputed.  The Anti-Conditioning Provision has been modified so that in the future there can be no doubt that Defendants are prohibited from threatening to withhold one or more concerts from a venue if the venue does not use Ticketmaster for primary ticketing services.  Finally, the proposed modification

11

to the last paragraph of Section IX.A. makes clear that Plaintiffs do not need to identify particular shows that have been withheld to establish retaliation.  None of these proposed modifications changes the conduct prohibited by the Final Judgment; they simply serve to clarify pre-existing parameters of the prohibited conduct for avoidance of doubt in the future.

*Third*, Live Nation has agreed to appointment of an independent Monitoring Trustee charged with "the power and authority to monitor Defendants' compliance with the terms of" the Proposed Amended Final Judgment, as well as "other powers as the Court deems appropriate."  To that end, the Monitoring Trustee's responsibilities include investigating and reporting on Defendants' compliance with the Proposed Final Judgment, including providing periodic reports to Plaintiffs, and recommending appropriate remedies should violations occur.  The Monitoring Trustee shall be selected by the United States, after consultation with Defendants and Plaintiff States, and approved by the Court upon application by the United States.

*Fourth*, Live Nation has agreed to take certain steps to help ensure future compliance with the Final Judgment, including:

(i)  Appoint an Antitrust Compliance Officer;

(ii)  Provide a copy of the Amended Final Judgment to relevant employees along with a cover letter explaining the prohibited conduct and requiring each employee to certify that he or she has read, understands and will abide by the terms of the Amended Final Judgment and that he or she is unaware of any violations;

(iii)  For the first year, conduct semi-annual compliance training programs, followed by annual training thereafter, with all training programs to be approved by the Department of Justice in its sole discretion;

(iv)  Annually communicate to relevant employees that they may disclose information regarding actual or potential violations to the Antitrust Compliance Officer or the Monitoring Trustee without reprisal or adverse consequences;

(v)  Provide notice and a copy of the Amended Final Judgment to every actual or potential venue customer within thirty days of entry along with a cover letter encouraging customers to contact the Department of Justice if they are or become

aware of any potential violations and waiving any contractual obligation the venue may have to provide notice to Live Nation or Ticketmaster about any such contacts;

(vi)    Provide notice and a copy of the Amended Final Judgment to every actual or potential venue customer at the beginning of any negotiation related in whole or in part to primary ticketing services along with a cover letter encouraging the venue to contact the Department of Justice if they are or become aware of any potential violations and waiving any contractual obligation the venue may have to provide notice to Live Nation or Ticketmaster about any such contacts;

(vii)   Notify Plaintiffs and the Monitoring Trustee within seven days of learning of any violations or potential violations of the Amended Final Judgment;

(viii)  If the Antitrust Compliance Officer or Defendants' management learn of a potential violation, promptly notify the Monitoring Trustee, investigate and, if necessary, terminate or appropriately modify any violative conduct;

(ix)    Within thirty days of Defendants' management or the Antitrust Compliance Officer's learning of any violation or potential violation, provide Plaintiffs a statement describing the violation or potential violation;

(x)     Maintain all documents related to violation or potential violation for a period of five years;

(xi)    Establish a whistleblower protection policy;

(xii)   Annually certify in writing to Plaintiffs Defendants' compliance with the Final Judgment; and

(xiii)  Maintain and produce to Plaintiffs upon request a list of all employees who received the annual compliance training and a copy of all materials distributed as part of that training.

Together, these steps are intended to promote compliance with the Proposed Amended Final Judgment's provisions and to make the enforcement of this Court's Order as effective as possible. Similar provisions are now generally included as a matter of course in Antitrust Division consent decrees aimed at preventing anticompetitive conduct.[14]

---

[14] *See, e.g.* Final Judgment, *United States v. Sinclair Broadcast Group, Inc., et al.*, 1:18-cv-02609-TSC, Dkt. 34 (D.D.C. May 22, 2019); Final Judgment, *United States v. Knorr-Bremse AG, et al.*, 1:18-cv-00747-CKK, Dkt. 19 (D.D.C. July 11, 2018); Final Judgment, *United States v. DirecTV Group Holdings, LLC, et al.*, 2:16-cv-08150-MWF-E, Dkt. 41 (C.D. Cal. Oct. 2, 2017); Final Judgment, *United States v. Apple, Inc. et al.*, 1:12-cv-02826-DLC, Dkt. 119 (S.D.N.Y. Sept. 6, 2012).

*Fifth*, Live Nation has agreed to incorporate four new procedural provisions designed to promote compliance and make the enforcement of the Amended Final Judgment as effective as possible. With the exception of the penalty provision, the United States is seeking to include these provisions in all newly proposed final judgments in antitrust matters, and it has already included them by agreement with parties in 7 of its recent proposed consent decrees in civil merger and civil non-merger cases.[15] As part of these modifications, Defendants have agreed that in any future civil contempt action, any motion to show cause, or any similar action brought by the United States regarding an alleged violation of the Amended Final Judgment, the United States may establish the violation and the appropriateness of any remedy by a preponderance of the evidence.

The parties also affirm that the Proposed Amended Final Judgment was drafted to restore competition that would otherwise have been harmed by the underlying merger between Ticketmaster and Live Nation. Defendants agree that they may be held in contempt if they fail to comply with any provision of the proposed Amended Final Judgment that is stated specifically and in reasonable detail, as interpreted in light of this procompetitive purpose.

Moreover, Defendants have agreed to pay a penalty of one million dollars per violation of each of the Anti-Retaliation and Anti-Conditioning Provisions in relation to negotiations with a venue during a single contracting cycle. This penalty is intended to incentivize Live Nation's

---

[15] *See, e.g.,* [Proposed] Final Judgment, *U.S. et al. v. Deutsche Telekom AG, et al.,* 1:19-cv-2232, Dkt. 2-2 (D.D.C. July 26, 2019); Proposed Final Judgment, *U.S. et al., v. Nexstar Media Group, Inc., et al.*, 1:19-cv-2295, Dkt. 2-2 (D.D.C. July 31, 2019); Final Judgment, *U.S. v. Amcor Ltd., et al.*, 1:19-cv-1592, Dkt. 21 (D.D.C. Sept. 11, 2019); Final Judgment, *U.S. v. Canon Inc., et al.*, 1:19-cv-1680, Dkt. 12 (D.D.C. Oct. 8, 2019); Final Judgment, *U.S. v. Harris Corp., et al.*, 1:19-cv-1809, Dkt. 10 (D.D.C. Oct. 10, 2019); [Proposed] Final Judgment, *U.S. v. Symrise AG, et al.*, 1:19-cv-3263, Dkt. 2-2 (D.D.C. Oct. 30, 2019); Proposed Final Judgment, *U.S. v. NACAC*, 1:19:cv-3706, Dkt. 2-2 (D.D.C. Dec. 12, 2019).

compliance with the Amended Final Judgment while lowering the United States' burden to prove specific damages resulting from any specific violation.

Finally, the parties have agreed that the United States may file an action against Defendants for violating the Amended Final Judgment for up to four years after the Amended Final Judgment has expired or been terminated. This provision is meant to address, *inter alia*, instances where evidence that a violation of the Amended Final Judgment occurred during the term of the Amended Final Judgment is not discovered until after the Amended Final Judgment has expired or been terminated or when there is not sufficient time for the United States to complete an investigation of an alleged violation until after the Amended Final Judgment has expired or been terminated. This provision, therefore, makes clear that the United States may still challenge a violation that occurred during the term of the Amended Final Judgment for four years after the Amended Final Judgment has expired or been terminated.

*Sixth*, Live Nation has agreed to reimburse the United States $3 million for its costs and attorney fees incurred in investigating and prosecuting this action.

## IV.   MODIFICATION OF THE FINAL JUDGMENT IS IN THE PUBLIC INTEREST

### A.   Legal Standard

On July 30, 2010, the Court held that entry of the Final Judgment was in the public interest and entered its Order.[16]  This Court has jurisdiction to modify the Final Judgment pursuant to Section XIV of the Final Judgment,[17] Federal Rule of Civil Procedure 60(b)(5), and its inherent

---

[16] Final Judgment § XVI ("Entry of this Final Judgment is in the public interest.")

[17] Section XIV of the Final Judgment states that the Court "retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary and appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions."

authority to enforce its lawful orders, including "the power to construe and interpret the language of the judgment"[18] and to modify a decree of injunctive relief.[19]  Moreover, the Final Judgment expressly contemplates the Court's authority to grant an extension, providing that the decree would expire ten years from the date of entry "[u]nless this Court grants an extension."[20]

Where, as here, the parties have consented to a proposed modification of an antitrust judgment, the issue before the Court is whether modification is in the public interest.[21]  The Court should "approve an uncontested modification so long as the resulting array of rights and obligations is within the zone of settlements consonant with the public interest today."[22]  The "district court may reject an uncontested modification only if it has exceptional confidence that adverse antitrust consequences will result – perhaps akin to the confidence that would justify a court in overturning the predictive judgments of an administrative agency."[23]

---

[18] *Heartland Hosp. v. Thompson*, 328 F. Supp. 2d 8, 12 (D.D.C. 2004).

[19] *New York v. Microsoft*, 531 F. Supp. 2d 141, 167 (2008) (quoting *United States v. Western Elec. Co.*, 46 F.3d 1198, 1202 (D.C.Cir.1995) (finding that in addition to authority under a final judgment, "[t]he Court may also modify the Final Judgments under its power in 'equity to modify a decree of injunctive relief," which the D.C. Circuit has described as "long-established, broad, and flexible.").

[20] Final Judgment § XV.

[21] As discussed below in Section VI, the requirements of the Tunney Act, 15 U.S.C. §§ 16(b)-(h), do not apply to actions such as this one.  Courts nevertheless should apply in this context a "public interest" standard of review akin to the review standard embodied in the Tunney Act because that standard pre-dates the Tunney Act and therefore applies even where the Act does not.  *See United States v. Microsoft Corp.*, 56 F.3d 1448, 1458 (D.C. Cir. 1995) (In passing the Tunney Act, "Congress did not purport to alter antitrust precedent applying the public interest in reviewing consent decrees."); *cf. also United States v. Am. Cyanamid Co.*, 719 F.2d 558, 565 & n. 7 (2d Cir. 1983) (the "court must, of course, consider protection of the 'public interest'"; the "Tunney Act… provides useful guidance to the courts in deciding how modification procedures should be addressed"); *United States v. Swift & Co.*, No. 58 C 613, 1975 WL 864, at *3 (N.D. Ill. Jan. 17, 1975) (applying "public interest" review – but not the Tunney Act – to a jointly proposed modification to antitrust consent decree).

[22] *United States v. Western Elec. Co.*, 900 F. 2d 283, 307 (D.C. Cir. 1990) ("*Western Elec. I*").

[23] *United States v. Western Elec. Co.*, 993 F.2d 1572, 1577 (D.C. Cir. 1993) ("*Western Elec. II*").

The public interest standard to be applied by the district court is the same one used in reviewing an initial proposed consent judgment in a government antitrust case.[24]  It has long been recognized that the United States has broad discretion in settling antitrust litigation on terms that will best serve the public interest in competition.[25]

Respectfully, the Court's role in determining whether the initial entry of a consent decree is in the public interest is not to determine what decree would best serve society, but only to determine whether entering the proposed decree would be in the public interest.  It should so determine and enter the proposed decree unless it cannot find that the government's explanation of why the proposed decree would be in the public interest is reasonable, or finds that the government has abused its discretion or failed to discharge its duty to the public.[26]  The Court's role is to "insur[e] that the government has not breached its duty to the public in consenting to the decree."[27]  As the public interest standard for reviewing a modification to a consent decree is the same as for deciding whether initially to enter the decree, the Court should conclude that modifying the Final Judgment is in the public interest if the United States has offered a reasonable explanation

---

[24] *See Western Elec. I*, 900 F.2d at 295; *United States v. American Telephone & Telegraph Co.*, 552 F. Supp. 131,147 n.67 (D.D.C. 1982), *aff'd sub nom. Maryland v. United States*, 406 U.S. 1001 (1983).

[25] *See United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995) (stating that government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest").

[26] *See Microsoft*, 56 F.3d at 146062; *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981).

[27] *Bechtel*, 648 F.2d at 666; *see also Microsoft*, 56 F.3d at 1461 (examining whether "the remedies [obtained in the Final Judgment] were not so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 1, 6 (D.D.C. 2003) (noting that the court should grant due respect to the United States' prediction as to the effect of proposed remedies, its perception of the market structure, and its views of the nature of the case).

of why the modification vindicates the public interest in competitive markets, and there is no showing of abuse of discretion affecting the United States' recommendation.

**B.      The Proposed Modification Will Advance the Public Interest**

To date, Live Nation's repeated violations of the Final Judgment's prohibitions against retaliatory and threatening behavior have undermined Section IX's purpose – namely, to promote competition in the primary ticketing industry.[28]  Many venues depend on revenue generated by live events, including concerts, and a single concert can generate hundreds of thousands of dollars in revenue for a venue, including dollars earned from concessions, parking, merchandise, and ticketing fees.  As the largest concert promoter in the country, Live Nation is thus a critical source of live concerts that many venues can ill afford to alienate.  Even when Ticketmaster's competitors make competitive offers for a venue's primary ticketing contract, they are often unsuccessful, in part because venues know that by selecting a Ticketmaster competitor for primary ticketing services they risk having their show counts reduced or eliminated in retaliation.

Indeed, Defendants' violations have so permeated the industry that venues now fear retaliation and expect conditioning from Live Nation as a matter of course if they do not contract with Ticketmaster.  As a result, Defendants' actions have deterred entry into primary ticketing and foreclosed current competitors from winning venues' primary ticketing contracts.  At the same time, the presence of competitors in the primary ticketing market, even hamstrung as they are by Defendants' actions, has already resulted in better pricing and terms for venues by forcing Ticketmaster to improve its offer in response to competition.

The proposed modifications to the Final Judgment are in the public interest.  Extending Section IX and other relevant provisions by five- and one-half years will finally give the Final

---

[28] Final Judgment § IX, entitled "Promote Competition."

Judgment a chance to work as intended. Most primary ticketing contracts last for three to five years. A five- and one-half-year extension of the Final Judgment would therefore ensure that at least one full cycle of most venue ticketing contracts would be free from Defendants' coercive tactics and give true competition a chance to take hold.

The remaining modifications are also in the public interest because they clarify the prohibited conduct, strengthen the penalties associated with non-compliance while simultaneously lowering the United States' burden to seek relief in the future, and improve all parties' ability to monitor and enforce compliance by instituting notice and investigation obligations and appointing both internal (Antitrust Compliance Officer) and external (Monitoring Trustee) monitors to oversee Defendants' conduct. Moreover, requiring Defendants to provide notice of the Amended Final Judgment's prohibitions to venues should help educate venues and reduce fear of retaliation, allowing venues to feel increased freedom to choose a non-Ticketmaster primary ticketer. By forcing Defendants to actually adhere to the Final Judgment, it is likely that Ticketmaster's actual and potential competitors will be more likely and able to compete successfully for venue clients, engendering better deals for venues as a result of increased competition.

## V.    A PUBLIC COMMENT PERIOD IS UNNECESSARY

Consistent with the recent practice of courts in this district,[29] the United States does not propose to publish the proposed Amended Final Judgment for notice and public comment. The

---

[29] In certain past cases, the United States has voluntarily applied – with agreement from the parties – procedures consistent with the Tunney Act to major modifications of consent decrees because those procedures can help facilitate thorough exposition and review. *See, e.g., United States v. Western Elec. Co.*, 900 F. 2d 283, 305 (D.C. Cir. 1990) ("Western Elec. I") (in which the parties voluntarily agreed to apply Tunney Act procedures to the modification at issue). Courts in this district, however, have modified final judgments without requiring a period for public notice and comment. *See, e.g., United States et al. v. Verizon Communications, Inc., et al.*, Civil Action No. 1:08-cv-01878 (D.D.C. April 8, 2011, Judge Emmet Sullivan) (extending

Tunney Act requires, among other things, that "any proposal for a consent judgment submitted by the United States" be filed with the court and published in the Federal Register, as well as in newspapers of general circulation, at least 60 days prior to the effective date of such judgment.[30] The Tunney Act further requires that any written comments relating to the proposed consent judgment, and any responses by the United States to those comments, be filed with the court and published in the Federal Register prior to entry of the proposed consent judgment.[31]  These procedures are designed to facilitate a public interest determination "[b]efore entering any consent judgment proposed by the United States."[32]  The language of the Tunney Act does not require that modifications to a consent judgment be subject to these same procedures.

In this case, prior to the entry of the original Final Judgment, the United States complied with the procedures of the Tunney Act and certified its compliance with the Court.[33]

Here, the proposed modifications are intended only to clarify the prohibitions on Defendants' conduct that are already contained in the Final Judgment entered by this Court. Similarly, the new enforcement and monitoring provisions simply strengthen the United States'

---

the term of transition services agreements); *United States v. Cemex, S.A.B. de C.V. and Rinker Group Ltd*, Civil Action No. 1:07-cv-00640 (D.D.C. November 28, 2007, Judge Royce Lamberth) (substituting a 40-year lease of real property for a sale of that property); *United States v. Halliburton and Dresser Industries*, Civil Action No. 98-2340 (D.D.C. March 13, 2000, Judge Thomas Penfield Jackson) (substituting access to one test well for access to a different test well). Two courts outside of this district have further held that the Tunney Act is not applicable to judgment termination proceedings, suggesting that those courts would not view the Tunney Act as applicable to minor judgment modifications. *United States v. American Cyanamid Co.*, 719 F.2d, 558, 565 n.7 (2d Cir. 1983); *United States v. General Motors Corp.*, 1983-2 Trade Cas. ¶ 65,614 at 69,093 (N.D. Ill. 1983). *But see United States v. Motor Vehicle Mfrs. Ass'n*, 1981-2 Trade Cas. ¶ 64,370 (C.D. Cal. 1981).

[30] 15 U.S.C. § 16(b)-(c).
[31] 15 U.S.C. § 16(d).
[32] 15 U.S.C. § 16(e).
[33] Certificate of Compliance with Provisions of the Antitrust Procedures and Penalties Act, Dkt. 14-2 (June 29, 2010).

ability to monitor Defendants' conduct and to challenge that conduct in the future, discouraging future violations. Moreover, extending the Final Judgment by five- and one-half-years is intended to effectuate the parties' original bargain by making up for time lost to Defendants' violative conduct. Finally, the Court previously found the underlying Final Judgment to be in the public interest. Thus, no notice or public comment period is necessary for a determination that the proposed modification is in the public interest.

## VI.     CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court enter the proposed Amended Final Judgment submitted with this motion.

Dated:  January 8, 2020                    Respectfully submitted,

       /s/ Meagan K. Bellshaw
MEAGAN K. BELLSHAW (CA Bar #257875)
MONA S. K. HAAR (DC Bar # 986789)
LEE F. BERGER (DC Bar # 482435)
SARAH LICHT (DC Bar #1021541)
CRAIG D. MINERVA (DC Bar # 991020)
U.S. Department of Justice
Antitrust Division
Media, Entertainment and Professional Services Section
450 Fifth St., N.W., Suite 4000
Washington, D.C. 20530