# Exhibit 11

ORAL ARGUMENT SCHEDULED FOR DECEMBER 6, 2018

## No. 18-5214

IN THE

# United States Court of Appeals
# for the District of Columbia Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

v.

AT&T INC.; DIRECTV GROUP HOLDINGS, LLC;
and TIME WARNER INC.,

*Defendants-Appellees.*

On Appeal from the
United States District Court for the District of Columbia
No. 1:17-cv-2511 (Hon. Richard J. Leon)

## FINAL, CORRECTED BRIEF OF APPELLANT
## UNITED STATES OF AMERICA
## PUBLIC COPY—SEALED MATERIAL DELETED

MAKAN DELRAHIM
  *Assistant Attorney General*

ANDREW C. FINCH
  *Principal Deputy Assistant
  Attorney General*

CRAIG W. CONRATH          KRISTEN C. LIMARZI
ERIC D. WELSH             ROBERT B. NICHOLSON
DANIEL E. HAAR            ADAM D. CHANDLER
CAROLINE J. ANDERSON      PATRICK M. KUHLMANN
TAYLOR M. OWINGS          MARY HELEN WIMBERLY
WILLIAM J. RINNER           *Attorneys*
  *Attorneys*              U.S. DEPARTMENT OF JUSTICE
U.S. DEPARTMENT OF JUSTICE ANTITRUST DIVISION
ANTITRUST DIVISION        950 Pennsylvania Ave., N.W.
                          Room 3224
                          Washington, D.C. 20530-0001
                          (202) 514-2413
                          maryhelen.wimberly@usdoj.gov

*Counsel for the United States*

## UPDATED CERTIFICATE AS TO
## PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Plaintiff-Appellant United

States of America certifies as follows:

## A.    Parties And Amici

The parties that appeared before the district court and that are

before this Court are:

1.    Plaintiff-Appellant

- United States of America

2.    Defendants-Appellees

- AT&T Inc.

- DIRECTV Group Holdings, LLC

- Time Warner Inc., now known as Warner Media, LLC, doing business as WarnerMedia

3.    The district court did not grant any motion to intervene by

any third parties, nor did it accept any proposed amicus briefs.

Before this Court, the following have appeared as amici:

- American Antitrust Institute
- American Cable Association
- Arthur, Thomas C.
- Bailey, Elizabeth E.
- Baker, Jonathan B.
- Barnett, Jonathan

- Boudreaux, Donald J.
- Business Roundtable
- Butler, Henry N.
- Carrier, Michael A.
- Chamber of Commerce of the United States of America
- Church, Jeffrey R.
- Cinémoi North America
- Comanor, William S.
- Commonwealth of Kentucky
- Consumers Union
- Edlin, Aaron S.
- Elhauge, Einer R.
- Elzinga, Kenneth G.
- Epstein, Richard A.
- Faulhaber, Gerald R.
- Federal Communications Commission
- First, Harry
- Fox, Eleanor M.
- Furchtgott-Roth, Harold
- Galetovic, Alexander
- Gaynor, Martin
- Goetz, Charles J.
- Harrington, Joseph
- Harris, Barry C.
- Hausman, Jerry A.
- Hazlett, Thomas W.
- Hovenkamp, Herbert
- Hurwitz, Justin (Gus)
- Hylton, Keith
- Kalt, Joseph P.
- Kearl, James R.
- Klein, Benjamin
- Klick, Jonathan
- Lambert, Thomas A.
- Lande, Robert H.
- Landes, William M.

ii

- Lao, Marina
- Levenstein, Margaret C.
- Liebowitz, Stan
- Lipsky, Jr., Abbott B. (Tad)
- Lopatka, John E.
- Malone, Phillip R.
- Mayo, John W.
- Melamed, A. Douglas
- Miller, Nathan H.
- Nalebuff, Barry
- National Association of Manufacturers
- Noll, Roger G.
- Open Markets Institute
- Ordover, Janusz A.
- Padilla, Jorge
- Public Knowledge
- Reporters Committee for Freedom of the Press
- Rogerson, William P.
- Scott Morton, Fiona M.
- Sibley, David
- Sidak, J. Gregory
- Small Business & Entrepreneurship Council
- Spiller, Pablo T.
- Spitzer, Matthew L.
- State of Alabama
- State of Georgia
- State of Louisiana
- State of New Mexico
- State of Oklahoma
- State of Rhode Island
- State of South Carolina
- State of Utah
- State of Wisconsin
- Stiglitz, Joseph E.
- Suslow, Valerie Y.
- Sykes, Alan O.

- Teece, David J.
- The Latino Coalition
- Tschirhart, John T.
- U.S. Black Chambers, Inc.
- Whinston, Michael D.
- White, Lawrence J.
- Wickelgren, Abraham L.
- Willig, Robert D.
- Winter, Ralph A.
- Yoo, Christopher S.
- Yun, John M.

The government is not aware of any other intervenors or amici in this Court as of October 18, 2018.

## B.    Rulings Under Review

1.    The Order of the Honorable Richard J. Leon, U.S. District Court for the District of Columbia, entered on June 12, 2018, is reprinted in the Joint Appendix (JA) at JA220.  The Order is not published in the *Federal Supplement*.

2.    The Memorandum Opinion accompanying the Order, also entered on June 12, 2018, is reprinted at JA48-219.  The Memorandum Opinion is published in the *Federal Supplement* at 310 F. Supp. 3d 161.

## C.    Related Cases

The case now pending before this Court was not previously before

this Court or any court other than the district court below.  Counsel is

not aware of any related case pending before this Court or any court.


 /s/ Mary Helen Wimberly
Mary Helen Wimberly
*Counsel for the United States*

# TABLE OF CONTENTS

Page

UPDATED CERTIFICATE AS TO PARTIES,
RULINGS, AND RELATED CASES..................................................i

TABLE OF AUTHORITIES ....................................................viii

GLOSSARY .................................................................xi

JURISDICTIONAL STATEMENT ...........................................1

INTRODUCTION ...........................................................1

STATEMENT OF THE ISSUE ...............................................3

PERTINENT STATUTE ......................................................3

STATEMENT OF THE CASE ................................................3

    I.    LEGAL BACKGROUND ..................................................4

    II.   FACTUAL BACKGROUND AND TRIAL EVIDENCE ...............6

        A. Overview Of The Pay-Television Industry.............................6

        B. The Negotiation Of Affiliate Agreements ...............................8

        C. The Merger And The Parties ....................................10

        D. Industry Evolution ............................................13

        E. Effect Of The Merger On Time Warner's Bargaining
           Leverage .....................................................16

    III.  PROCEDURAL HISTORY ..........................................21

        A. District Court Proceedings ....................................21

        B. The District Court's Opinion ..................................24

STANDARD OF REVIEW....................................................28

SUMMARY OF ARGUMENT ..............................................29

ARGUMENT.................................................................33

    I.    THE GOVERNMENT PROVED THAT THE MERGER IS
        LIKELY TO LESSEN COMPETITION SUBSTANTIALLY ......33

# TABLE OF CONTENTS—Continued

Page

II.  THE DISTRICT COURT CLEARLY ERRED WHEN IT
     FOUND THE MERGER WAS UNLIKELY TO HAVE AN
     ANTICOMPETITIVE EFFECT .................................................. 37

    A. The District Court's Bargaining-Leverage Analysis Is
       Contrary To Fundamental Economic Logic And The
       Evidence .................................................................... 40

    B. The District Court Misunderstood, And Failed To
       Apply, The Established Principle Of Corporate-Wide
       Profit Maximization ................................................. 49

    C. The District Court's Analysis Of Industry Evidence Is
       Internally Inconsistent ............................................ 57

III. THE DISTRICT COURT CLEARLY ERRED IN
     DISMISSING THE QUANTIFICATION OF FEE
     INCREASES AND CONSUMER HARM .................................... 61

    A. The District Court Erred In Finding No Proof Of Any
       Price Increase ........................................................... 63

    B. The District Court Erred In Finding Insufficient
       Evidence To Support Professor Shapiro's Calculations ....... 64

       1. Subscriber Loss Rate ........................................ 66

       2. Diversion Rate .................................................. 68

       3. DirecTV's Margin .............................................. 70

CONCLUSION ........................................................................ 73

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

## TABLE OF AUTHORITIES

Page(s)

C ASES:

*Abrams v. McGuireWoods LLP,*
    518 B.R. 491 (N.D. Ind. 2014) ........................................................ 51

*Anderson v. Bessemer City,*
    470 U.S. 564 (1985) ................................................... 28, 39, 53, 56

*Bishopp v. District of Columbia,*
    788 F.2d 781 (D.C. Cir. 1986) ........................................................ 39

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,*
    509 U.S. 209 (1993) ........................................................................ 69

*Brown Shoe Co. v. United States,*
    370 U.S. 294 (1962) ........................................................ 4, 5, 58, 65

*Caribe BMW, Inc. v. Bayerische Motoren Werke*
    *Aktiengesellschaft,* 19 F.3d 745 (1st Cir. 1994) ............................ 52

*Chi. Bridge & Iron Co. v. FTC,*
    534 F.3d 410 (5th Cir. 2008) ................................................... 58, 60

*Continental T.V., Inc. v. GTE Sylvania Inc.,*
    433 U.S. 36 (1977) .......................................................................... 45

*Copperweld Corp. v. Indep. Tube Corp.,*
    467 U.S. 752 (1984) ........................................................... 51, 52, 72

*FTC v. Advocate Health Care Network,*
    841 F.3d 460 (7th Cir. 2016) ................................................. 6, 29, 39

*FTC v. H.J. Heinz Co.,*
    246 F.3d 708 (D.C. Cir. 2001) ................................. 28, 39, 40, 57, 65

*FTC v. Procter & Gamble Co.,*
    386 U.S. 568 (1967) .......................................................................... 5

*Hosp. Corp. of Am. v. FTC,*
    807 F.2d 1381 (7th Cir. 1986) ................................................... 4, 60

## TABLE OF AUTHORITIES—Continued

Page(s)

*Latif v. Obama*,
   677 F.3d 1175 (D.C. Cir. 2012) ..................................................... 40

*Polypore Int'l, Inc. v. FTC*,
   686 F.3d 1208 (11th Cir. 2012) ..................................................... 58

*ProMedica Health Sys., Inc. v. FTC*,
   749 F.3d 559 (6th Cir. 2014) ......................................................... 45

*Pyles v. Nwaobasi*,
   829 F.3d 860 (7th Cir. 2016) ......................................................... 39

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
   792 F.2d 210 (D.C. Cir. 1986) ......................................................... 4

*St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys.,*
   *Ltd.*, 778 F.3d 775 (9th Cir. 2015) ............................................... 45

*State Oil Co. v. Khan*,
   522 U.S. 3 (1997) ............................................................................ 45

*Trenwick Am. Litig. Trust v. Ernst & Young, LLP*,
   906 A.2d 168 (Del. Ch. 2006) ......................................................... 51

*United States v. Anthem, Inc.*,
   855 F.3d 345 (D.C. Cir. 2017) ....................................................... 28

*United States v. Baker Hughes Inc.*,
   908 F.2d 981 (D.C. Cir. 1990) .................................................. 5, 24

*United States v. Gen. Dynamics Corp.*,
   415 U.S. 486 (1974) ......................................................................... 6

*United States v. H&R Block, Inc.*,
   833 F. Supp. 2d 36 (D.D.C. 2011) ............................................... 65

*United States v. Thompson*,
   27 F.3d 671 (D.C. Cir. 1994) ......................................................... 39

# TABLE OF AUTHORITIES—Continued

Page(s)

**STATUTES:**

15 U.S.C.

§ 18 ..................................................................... 3, 4

§ 25 ....................................................................... 1

§ 29(a) .................................................................... 1

28 U.S.C.

§ 1291 ..................................................................... 1

Celler-Kefauver Act, Pub. L. No. 81-899, 64 Stat. 1125 (1950) ........... 5

**LEGISLATIVE HISTORY:**

H.R. Rep. No. 81-1191 (1949) ................................... 5

S. Rep. No. 81-1775 (1950) ..................................... 4

**RULES:**

Fed. R. App. P. 4(a)(1)(B)(i) .................................. 1

Fed. R. Civ. P. 52(a) ........................................... 40

**REGULATORY PROCEEDING:**

*In re Comcast Corp.*, 26 F.C.C. Rcd. 4238 (2011) ........................ 17, 35

**OTHER AUTHORITIES:**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ...... 6, 50, 52

Robert H. Bork, *The Antitrust Paradox* (1978)....................... 45, 50, 52

Richard Posner, *Antitrust Law: An Economic Perspective* (1976) ..... 45

Michael H. Riordan, Competitive Effects of Vertical Integration, in *The Handbook of Antitrust Economics* (Paolo Buccirossi, 2008 ed.)........................................................ 6

# GLOSSARY

MVPD      Multichannel Video Programming Distributor

NBCU      NBC Universal

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 15 U.S.C. § 25, and entered a final judgment disposing of all parties' claims on June 12, 2018. A notice of appeal was filed on July 12, 2018. Fed. R. App. P. 4(a)(1)(B)(i). This Court's jurisdiction rests on 15 U.S.C. § 29(a) and 28 U.S.C. § 1291.

## INTRODUCTION

This appeal arises from the first vertical merger case the United States has needed to litigate to judgment in four decades, a fact that reflects the government's high standard for bringing such actions and the widespread harm this merger will cause. The outcome of this appeal will shape the future of the media and telecommunications industries for years to come by setting the standard for determining whether industry participants will be permitted to merge into vertically integrated firms that control valuable programming content as well as the means of distributing that content to consumers.

In a deal valued at $108 billion, AT&T, the largest pay-television distributor in the country, acquired Time Warner, a mass-media conglomerate that controls the popular Turner television networks. At

trial, the government demonstrated that the merger will empower AT&T to use Time Warner's valuable programming to raise its rival distributors' costs for obtaining programming, while also enabling AT&T to protect its high-margin satellite-television business from competition by upstart rivals—all to the detriment of American consumers. AT&T endorsed this theory of harm six years ago when it warned federal regulators that such a vertically integrated firm would use its ownership of programming to raise fees to rival distributors and limit competition in the distribution market. AT&T changed its tune once its own merger was under scrutiny, but the evidence established the harm AT&T predicted is likely to occur here.

Most vertical mergers (like most horizontal mergers) are indeed procompetitive or competitively neutral. This merger's combination of Turner's competitively significant programming content with the vast distribution footprint of DirecTV, among other circumstances, makes this the exceptional vertical merger whose effects are to lessen competition substantially, in violation of Section 7 of the Clayton Act.

The district court held otherwise, but only by erroneously ignoring fundamental principles of economics and common sense. These errors

distorted its view of the evidence and rendered its factual findings

clearly erroneous, and they are the subject of this appeal.

## STATEMENT OF THE ISSUE

Whether the district court's fundamental errors of economic logic

and reasoning rendered clearly erroneous its conclusion that the

government failed to show AT&T's acquisition of Time Warner was

reasonably likely to lessen competition substantially by increasing Time

Warner's bargaining leverage in negotiations with AT&T's rival

distributors, thereby raising their programming costs.

## PERTINENT STATUTE

Section 7 of the Clayton Act, 15 U.S.C. § 18, is reprinted in the

Addendum to this Brief.

## STATEMENT OF THE CASE

This case arises from the government's suit to block the merger of

AT&T and Time Warner on the ground that it violates Section 7's

prohibition against mergers that may lessen competition substantially.

Following a bench trial, the district court (Hon. Richard J. Leon) ruled

that the government failed to prove a Section 7 violation and denied its

request for a permanent injunction.  The government appeals that

decision and order.

## I.    LEGAL BACKGROUND

Section 7 of the Clayton Act prohibits any merger the effect of

which "may be" to lessen competition substantially.  15 U.S.C. § 18.

The legal standard under Section 7, therefore, is "reasonable

probability."  *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962);

S. Rep. No. 81-1775, at 3 (1950).  Congress intended Section 7 to sweep

more broadly than the Sherman Act's prohibition against transactions

that amount to unreasonable restraints of trade or attempts to

monopolize.  *See Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,

792 F.2d 210, 220 (D.C. Cir. 1986).

To establish a Section 7 violation, a plaintiff need not show that

the merger *will* have an anticompetitive effect, such as increased prices.

"All that is necessary is that the merger create an appreciable danger of

[higher prices] in the future.  A predictive judgment, necessarily

probabilistic and judgmental rather than demonstrable, is called for."

*Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1389 (7th Cir. 1986) (citation

omitted).  Section 7 decisions refer to anticompetitive effects as "likely"

when a "reasonable probability" of their occurrence has been established.  For example, while describing the ultimate issue as "whether a transaction is likely to lessen competition substantially," this Court stressed that "Section 7 involves *probabilities*, not certainties or possibilities." *United States v. Baker Hughes Inc.*, 908 F.2d 981, 984, 991 (D.C. Cir. 1990).

Congress amended Section 7 in 1950, Pub. L. No. 81-899, 64 Stat. 1125, so that the Act applies "not only to mergers between actual competitors, but also to vertical and conglomerate mergers." *Brown Shoe*, 370 U.S. at 317 (citing H.R. Rep. No. 81-1191, pt. 1, at 11 (1949)). A vertical merger, like the one at issue here, integrates successive production or distribution functions within a single firm (e.g., a merger of a manufacturer of steering wheels and a manufacturer of automobiles).  *See id.* at 323 ("Economic arrangements between companies standing in a supplier-customer relationship are characterized as 'vertical.'").  The same reasonable-probability standard applies to all mergers.  *See FTC v. Procter & Gamble Co.*, 386 U.S. 568, 577 (1967).

Courts apply Section 7 through the lens of economics when determining whether a merger may substantially lessen competition. *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 498-502 (1974); *see, e.g.*, *FTC v. Advocate Health Care Network*, 841 F.3d 460, 464, 473-76 (7th Cir. 2016) (correcting mistakes in economic reasoning). Mainstream economics recognizes that a vertical merger might lessen competition in various ways, including by raising rivals' costs. *See* Michael H. Riordan, Competitive Effects of Vertical Integration, in *The Handbook of Antitrust Economics* 145, 155-59 (Paolo Buccirossi, 2008 ed.). A merger combining a manufacturer with the leading supplier of a key input, for example, could allow the combined company to increase the price of the input to rival manufacturers, raising their costs. Once that company raised its rivals' costs, it could then "raise its own price or increase its market share at the rivals' expense." 3 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 651b5, at 109-11 (4th ed. 2015).

## II. FACTUAL BACKGROUND AND TRIAL EVIDENCE

### A. Overview Of The Pay-Television Industry

Companies in the pay-television industry create, bundle, and distribute video content to consumers. Generally, studios (e.g., Warner

Brothers Studios) and sports-content providers (e.g., Major League Baseball) create content; programmers (e.g., Turner Broadcasting Systems) package content into networks (e.g., TNT, TBS, NBC); and distributors (e.g., Comcast, DirecTV) assemble packages of these networks and deliver them to subscribers.

Distributors include multichannel video programming distributors (MVPDs) that deliver programming over their own transmission paths. MVPDs include cable television providers (e.g., Charter and Cox), the two direct broadcast satellite providers (DirecTV and DISH), services of telephone companies (e.g., Verizon's FIOS and AT&T's U-Verse), and so-called overbuilders (e.g., RCN).  JA58-59 (Op. 11-12).  MVPDs typically provide a broad portfolio of video content, JA320 (Tr. 82:2-3), and offer packages that include "linear programming" (programs shown in a scheduled sequence, as with traditional broadcast television), which allows consumers to view live content such as sporting events and scheduled programming such as the Discovery Channel, JA319, 402 (Tr. 81:14-19, 471:12-16).  MVPDs may also offer content that consumers can watch "on demand."  JA59 (Op. 12).

Virtual MVPDs do not own their own transmission paths, but deliver content over the internet. JA405 (Tr. 485:22-24). Like MVPDs, virtual MVPDs offer packages of linear programming and on-demand content. JA355-356 (Tr. 235:25-236:1). Unlike MVPDs, virtual MVPDs compete by offering the consumer innovative conveniences including fewer channels at lower prices ("skinny bundles"). JA425-426 (Tr. 583:25-584:13). For example, DISH's Sling launched in 2015 and, at the time of trial, offered a skinny bundle starting at $20 a month, a price to the consumer far below that of traditional MVPD service. JA195 (Op. 148); JA356, 358, 359 (Tr. 236:16-18, 238:1-2, 239:8-12). Virtual MVPDs, therefore, provide price competition to the traditional MVPDs.

## B.    The Negotiation Of Affiliate Agreements

To obtain the necessary copyright license to carry a network, an MVPD or a virtual MVPD (a "distributor"), such as DirecTV or Sling, enters into an affiliate agreement with a programmer, such as Turner or NBC Universal (NBCU). Affiliate agreements generally run between five and seven years, and contain hundreds of separate provisions, including price and non-price terms. JA323, 326, 328, 476, 497, 600,

8

606 (Tr. 87:9-11, 90:11-17, 92:12-24, 987:8-17, 1024:6-14, 1402:6-14, 1454:18-21).

Negotiations typically last months. JA323 (Tr. 87:14-19). They "can be very tough," and almost every point is "contentious," according to Turner's former top negotiator. JA495-496 (Tr. 1022:25-1023:5). If the parties fail to reach an agreement, then, in industry terminology, the distributor experiences a "blackout" of the programmer's content, or the programmer "goes dark" on the distributor, until an agreement is reached (if ever). JA63-64 (Op. 16-17).

The outcome of negotiations for video-programming content depends on each party's bargaining leverage. The better a party's alternative to reaching an agreement, i.e., its situation in the event of a blackout, the greater its leverage. JA707, 724-725 (Tr. 2193:2-20, 2213:1-2214:2). For a programmer such as Turner, a blackout would mean a loss of license fees for its programming and advertising revenue; for a distributor such as Comcast or Sling, a blackout would lead to a loss of subscribers (existing subscribers and potential subscribers who never sign up because the distributor lacks the programmer's desirable content). JA710-712 (Tr. 2196:3-2198:12).

In this industry, "even though [blackouts] don't happen very much, that's the key to leverage"; "your leverage is based on . . . saying . . . I don't like the deal" and therefore "I'm going to walk away."  JA709 (Tr. 2195:6-12).  So even when the alternative to reaching a deal (a blackout) would leave both parties worse off, and therefore is highly unlikely, it is their relative pain from a blackout that drives negotiations.  The government presented evidence from both distributors and programmers, who testified that they often prepare for negotiations by projecting anticipated costs of a blackout.  *See, e.g.*, JA502, 503, 504 (Tr. 1029:15-18, 1030:2-7, 1031:17-23) (Breland/Turner); JA453-455 (Tr. 862:7-864:23) (Rigdon/Comcast).

### C.    The Merger And The Parties

On October 22, 2016, AT&T agreed to acquire Time Warner in a transaction valued at $108 billion.  JA83 (Op. 36).  The merger would bring together two major players in the pay-television industry and create a second vertically integrated leading MVPD (after Comcast and NBCU, which merged in 2011 subject to conditions imposed by the FCC and negotiated with the Department of Justice, *see* Modified Final

Judgment, *United States v. Comcast*, No. 1:11-cv-106 (D.D.C. Aug. 21, 2013) (Dkt. No. 36)).

AT&T is the nation's largest video distributor, with approximately 25 million subscribers. JA1306 (PX0455-011). AT&T's primary distribution service is DirecTV, a satellite-based MVPD with a nationwide footprint that competes with all other distributors across the country. (The only other national MVPD is DISH. *See* JA59 (Op. 12).) AT&T also offers U-Verse, an MVPD service using AT&T's local fiber optic networks, and DirecTV Now, a virtual MVPD.

Time Warner is one of the country's marquee providers of television programming and movies. It owns Turner, which operates popular networks including TNT, TBS, CNN, Cartoon Network/Adult Swim, TruTV, Turner Classic Movies, Boomerang, and HLN. JA77 (Op. 30 n.7). In addition, Time Warner owns Home Box Office, Inc., which operates the HBO premium network—"the gold standard in premium video," JA1313 (PX0459-010), with almost 50 million subscribers—as well as Cinemax and other premium channels, JA1326 (PX0459-023). Time Warner also owns Warner Bros. Entertainment, Inc., a television and movie studio. JA77 (Op. 30).

Turner has "high quality cable network assets," JA1129

(Tr. 3408:25), ████████████████████████████████████████

████████████████████████████ JA1448 (sealed PX0008-035).  ████████████

████████████████████████████████████████████████████████

████████ JA1592 (sealed PX0127-002); JA425 (Tr. 583:6-19) (Turner

CEO).

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ JA1448 (sealed PX0008-035).  It has rights to

important NBA regular season and playoff games, and all NBA All Star

games, through 2024, JA407-408, 417 (Tr. 487:25-488:25, 548:23-24);

NCAA March Madness games (including Final Four and championship

games every other year) through 2032, JA409, 417 (Tr. 489:1-16,

548:20-22); and MLB regular season and playoff games through 2021,

JA414, 417-418 (Tr. 502:13-24, 548:25-549:2).

AT&T and Time Warner executives, along with executives of other

distributors, describe Turner content as "must have."  *See, e.g.*, JA418

(Tr. 549:21-24) (Turner CEO); JA1109-1110 (Tr. 3356:10-3357:9)

(AT&T's Entertainment Group CEO); JA1436 (sealed PX0006-001)

(same); JA332 (Tr. 104:6-7) (Cox negotiator); JA362 (Tr. 242:16-21)

(DISH CEO).  Because Turner content is so valuable, distributors

negotiate with the expectation that they will lose pay-television

subscribers to rivals if they do not reach a deal.  A Cox negotiator stated

that if it "didn't have the Turner Networks, it could significantly impact

the viability of our video model."  JA341 (Tr. 128:20-21).  A Charter

executive labeled Turner content "critically important," and remarked,

"I can't not have the Disney ESPN networks and the Turner networks."

JA586, 602 (Tr. 1350:14, 1404:14-15).

## D.    Industry Evolution

Although MVPDs are still the way most American consumers

watch television, consumer habits are evolving, and innovation

threatens AT&T's legacy pay-television model and the high margins it

provides.  MVPDs have been losing some of their subscribers to new

forms of media distribution.  JA65, 68-69 (Op. 18, 21-22).  Of the lost

subscribers, some subscribed to both a virtual MVPD, which can

provide a skinny bundle of linear programming, and a complementary

video on-demand service such as Netflix, which delivers previously

aired premium movies and other non-linear programming.  JA70

(Op. 23); JA355-356 (Tr. 235:23-236:13).  Turner programming provides

the live news and sports that are critical to a virtual MVPD employing

a skinny-bundle strategy.  JA425-427, 491-492 (Tr. 583:20-585:2,

1018:5-1019:6); JA1259 (PX0004).  AT&T operates virtual MVPD

DirectTV Now, but has been careful to protect the "golden goose" of

DirecTV's high-margin business, JA661-662 (Tr. 1802:1-1803:1), so that

its internet-based business does not "cannibalize" its traditional big-

bundle business, *see* JA660-661, 664-666 (Tr. 1801:15-1802:5, 1805:17-

1807:3); JA1264 (PX0046); JA1348-1349 (PX0544).

AT&T views emerging virtual MVPDs as a threat to its "cash cow"

MVPD business.  JA648 (Tr. 1733:13-18); *see* JA1460-1461 (sealed

PX0031-041 to -042).  When asked why programmers had licensed

networks to a virtual MVPD, one AT&T executive complained that

"[c]ontent providers are generally short-sighted" and sell to anyone

"willing to write them a new check for their content."  JA1263 (PX0042).

Another said that it "[s]ets me on fire" when programmers supply

valuable content to upstarts because it "deteriorates the value of the

bundle."  JA1267 (PX0228).

**Material Under Seal Deleted**

AT&T's CEO Randall Stephenson identified the threat of new methods of media distribution to the legacy pay-television model in August 2016, when he expressed alarm at Time Warner's vertical acquisition of a mere 10% stake in one of the new media-distribution companies, Hulu, which was going to launch a virtual MVPD service. *See* JA1265 (PX0047). Stephenson stated that he had criticized Time Warner for "going around us," and informed Time Warner's CEO that "it's hard to imagine how [the Hulu acquisition] won't impact all of our relationships." *Id.*

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████ JA1721 (sealed PX0184-005). As one virtual MVPD executive testified, a vertically integrated AT&T-Time Warner could use its control of content to disadvantage and slow the growth of their innovative offerings. *E.g.*, JA398-399 (Tr. 467:23-468:6) ("If they have the content that you need, then they can . . . coerce you to pay more."); JA371 (Tr. 266:4) (being forced to carry all Turner networks would "break[] our model").

15

### E.   Effect Of The Merger On Time Warner's Bargaining Leverage

Witnesses testified that, once in the hands of AT&T, Time Warner would gain additional bargaining leverage over AT&T's distributor rivals.  Time Warner would bargain knowing that, if negotiations fail, the ensuing Turner blackout will prompt some of the rivals' subscribers to switch to DirecTV, U-Verse, or DirecTV Now.  Because the merged firm would pick up those subscribers, it would lose less from a blackout than would an independent Time Warner, thus gaining bargaining leverage.  JA335, 369, 369-370, 710-712, 716-717 (Tr. 107:6-24, 263:1-18, 263:25-264:5, 2196:3-2198:12, 2202:17-2203:22).  That enhanced leverage would lead to higher fees.  JA726-727 (Tr. 2215:13-2216:23).  Higher costs would weaken the rival distributors as competitors, and they would pass on much of the price increase to their subscribers.  JA393, 446-447, 1035, 1176-1178 (Tr. 462:1-22, 707:23-708:19, 2912:1-13, 3824:19-3826:7).

1.   In multiple submissions to the Federal Communications Commission (FCC), AT&T and DirecTV (before AT&T acquired it) described the competitive harm that can flow from a merger between a large distributor and an owner of popular programming (a position

16

contrary to their argument in district court).  In filings concerning Comcast's proposed acquisition of NBCU, DirecTV asserted that the merger "would enable Comcast *to raise the prices paid by its [distributor] rivals* for NBCU programming."  JA1274 (PX0441-005) (emphasis added).  Likewise, in a regulatory proceeding before the FCC, AT&T stated that cable operators with affiliated programming "attempt *to use their control over such programming to try to artificially limit competition* in downstream video distribution markets."  JA1281 (PX0442-004) (emphasis added).  AT&T also asserted in comments filed with the FCC "that vertically integrated programmers" use control over programming as "a weapon to hinder competition" in distribution. JA1249 (PX0002-004).  The FCC relied specifically on DirecTV's analysis of this effect in issuing a remedial order to curb the harm of the Comcast-NBCU merger.  *In re Comcast Corp.*, 26 F.C.C. Rcd. 4238, App. B, ¶ 37 (2011).

MVPD executives who negotiate with programmers testified similarly that the AT&T-Time Warner merger would cause Time Warner to extract higher fees.  Cox's head of content acquisition was "very concerned" about the merger because, "instead of negotiating with

a company [whose] sole job is to distribute its content, it's now owned by a company who is also a distributor and they want to gain customers." JA335 (Tr. 107:6-24).  Charter's chief negotiator similarly testified that, following the merger, "either I pay excessive increases or I lose the product and [AT&T has] a more competitive distribution profile." JA588 (Tr. 1352:1-3).

2.  Defendants' internal documents also recognize that vertical integration increases a programmer's bargaining leverage because an integrated firm "can play hardball and threaten blackout if they do not get the terms from MVPDs they want."  JA1260 (PX0011-001).  DirecTV similarly concluded that the acquisition of a programmer would increase its "leverage in negotiations."  JA1269 (confidential marked PX0231-013) (introduced, JA620; later excluded, JA628).  In notes for a presentation to AT&T's board of directors concerning the proposed merger, Stephenson identified, as a "key issue[]," "[h]ow [AT&T] can . . . advantage [its] own distribution . . . without harming Time Warner's position as a wide distributor of content to other [subscription video on-demand services,] cable networks[,] and broadcast networks."  JA1142 (Tr. 3487:5-14); see JA1772 (sealed DX0609-0008).

3.  Professor Carl Shapiro of the University of California at
Berkeley—a distinguished antitrust economist who served on the
President's Council of Economic Advisers, JA696, 700 (Tr. 2168:13-20,
2172:11-17)—was the government's economic expert.  Professor Shapiro
applied the economics of bargaining, a standard toolkit pioneered by
Nobel Prize winner John Nash.  The economics of bargaining begins
with the fundamental insight that trade is voluntary, thus neither
party to a negotiation will accept terms that make it worse off than
walking away.  The terms negotiated depend on each party's alternative
position if there is no deal.  *See generally* JA707 (Tr. 2193:2-20).  This is
true even when permanently walking away from the deal is costly for
either party.  *See* JA709, 805 (Tr. 2195:6-13, 2395:10-21).  Even then,
each party's "leverage is based on what would happen if there were no
deal."  JA707 (Tr. 2193:17-18).

Mergers affect the outcome of bargaining by altering the costs and
benefits of failing to agree.  Anything making one party better off in the
event no deal is struck makes it easier for that party to walk away and
thus get better terms.  Anything making one party worse off in the
event no deal is struck makes it harder for that party to walk away and

therefore causes that party to get worse terms.  Here, the merger would make Time Warner's alternative to an agreement—a Turner blackout—less costly because its post-merger parent company, AT&T, would gain (or retain) subscribers that otherwise would be customers of the blacked-out rival distributor.  *See generally* JA707-712 (Tr. 2193:2-2198:12).

After explaining the basic economic insight that Time Warner's bargaining leverage would increase, Professor Shapiro quantified the impact of the change.  Using 2016 industry data, he estimated that AT&T's rivals would pay $587 million more per year indefinitely for Turner programming as the likely result of the merger.  JA754, 756-757 (Tr. 2253:1-17, 2255:23-2256:6).  He also estimated that these fee increases would lead to hundreds of millions of dollars of net harm passed through to consumers annually.  JA756-757 (Tr. 2255:7-2256:20).  The government's proof extended to all of DirecTV's MVPD and virtual MVPD rivals, JA109-110 (Op. 62-63), and Professor Shapiro's quantification of harm included individual virtual MVPDs.

## III.  PROCEDURAL HISTORY

### A.    District Court Proceedings

The government filed its complaint in November 2017.  JA25-47

(Compl.).[1]  The district court conducted a 23-day bench trial from March

19 to April 30, 2018.  The government called 19 fact witnesses—11

employees of defendants and eight employees of third parties—as well

as four expert witnesses.  Defendants presented testimony from five

additional fact witnesses and three expert witnesses.

The district court substantially constrained the government's

presentation of evidence showing that the merged entity would have

greater bargaining leverage.[2]

Important evidence that the government proffered—but the

district court refused to admit—included, among other things, AT&T's

---

[1] About a week later, Turner sent letters to video distributors offering to
negotiate affiliate agreements in good faith, to submit any disputes to
arbitration, and to guarantee continued access to programming during
arbitration.  JA537 (Tr. 1181:11-13); JA1342 (PX0490); JA1343-1347
(PX0491).  As of the trial, only 20 of approximately 1,000 distributors
had accepted the offer.  JA537-538 (Tr. 1181:6-1182:4).

[2] The court made the vast majority of its evidentiary rulings during
sealed bench conferences and declined to release the transcripts of these
conferences to anyone during the trial.  *See* U.S. Mot. to Unseal Bench
Conference Transcripts 2-3 (D.C. Cir., filed July 26, 2018) (collecting
record citations); JA1224 (Tr. 3953:17) (discussing "husher").

**Material Under Seal Deleted**

own analyses of the potential competitive effects of vertical integration, *see, e.g.*, JA651-657 (Tr. 1757:12-1763:10); JA1473 (confidential marked exhibit PX0034-099) (███████████████████

███████████████████████████

███████████████████████

██████), and defendants' analyses of blackouts, *see, e.g.*, JA630-637, JA1396-1397 (sealed in part Tr. 1590:20-1597:2); JA1480 (confidential marked exhibit PX0074-006) (DirecTV presentation showing ██████

██████ to DirecTV from a long-term blackout of Disney content).

When the government offered public FCC filings made by AT&T and DirecTV explaining the potential competitive harm from vertical integration, the district court refused to treat these documents as party admissions and questioned their relevance.  JA1135-1136, 1228 (Tr. 3499:18-3500:1, 3967:12-20); *see also* JA294-295, 298 (Mar. 19, 2018 Hr'g Tr. 77:19-78:24, 83:6-22).  The court also refused to take judicial notice of these documents, asserting that the government "has not established that any of the content from these exhibits is relevant to this case."  JA1227-1228 (Tr. 3966:3-3967:1).  Instead, on the last day of trial, upon motion by the government, the court took judicial notice of

ten brief excerpts from the documents "only for the fact that the statements were made," JA1227-1228 (Tr. 3966:13-3967:20), after having directed the government not to use any of them in closing argument, JA1221 (Tr. 3947:2-4).

The district court also strictly limited expert economic testimony. Despite noting the "complexity" of the economic evidence presented by Professor Shapiro, JA196 (Op. 149), the court set narrow time limits on the presentation of Professor Shapiro's testimony—for example, allowing the government only 2.5 hours to present his direct testimony, JA693 (Tr. 2153:23-25) ("If you don't finish, well, it's too bad."). The court also refused to allow the government to question either side's economic expert about an economic analysis sponsored by DirecTV in connection with the proposed Comcast-NBCU merger that used the economics of bargaining, just as did Professor Shapiro. JA797-799, 881-882 (Tr. 2377:10-2379:16, 2611:5-2612:12).

On several occasions, the district court declined to close the courtroom so that the government could elicit testimony concerning confidential business information. For example, it refused to close the courtroom for ten minutes ███████████████████████

**Material Under Seal Deleted**

████████████████████████████████████

████████████████████████████████████

██████████████████████████████

███████████████████████████████████████

████████████████████.  JA1420-1429, 1433 (sealed Tr. 2842:25-2851:3,

2900:5-6).  The court subsequently relied on the expert's criticisms in

concluding that the Altman analysis was "significantly flawed."  JA169,

172-173 (Op. 122, 125-26).

## B.    The District Court's Opinion

1.  The district court ruled for defendants, concluding that the

government "failed to meet its burden to establish that the proposed

'transaction is likely to lessen competition substantially.'"  JA51 (Op. 4)

(quoting *Baker Hughes*, 908 F.2d at 985).  The court accepted the

government's product market—the market for Multichannel Video

Distribution, consisting of MVPDs and virtual MVPDs, JA109-112

(Op. 62-65)—but concluded that the government had failed to show

likely harm, JA108 (Op. 61).

Relevant to this appeal, the court concluded that "the

Government's proof at trial falls *far* short of establishing the validity of

its increased-leverage theory." JA118 (Op. 71). The court concluded

that the government's case "rests on assumptions that are implausible

and inconsistent with record evidence." JA160 (Op. 113) (quotation

marks omitted).

First, and importantly, the government's proof of increased

leverage "was severely undermined," according to the court, by evidence

that, even after the merger, "a blackout would be *infeasible*" because it

would be costly for Turner, JA162 (Op. 115) (emphasis added); thus, the

argument that "a post-merger Turner would gain increased leverage by

wielding a blackout threat . . . does not make sense as a matter of logic,"

JA164 (Op. 117). Second, the court explained, witnesses "consistently

testified that they had *never* considered the identity of the

programmer's owner in the course of affiliate fee negotiations." JA160

(Op. 113). Additionally, the district court concluded that the inputs

used in Professor Shapiro's model were not "sufficiently grounded in the

evidence." JA167 (Op. 120).[3]

---

[3] The district court also concluded that the merger (1) would not
empower AT&T to harm emerging online distributors, unilaterally or
though coordination with Comcast-NBCU, and (2) would not enable
AT&T to use its control of HBO to harm competition. Those findings

2.  The district court discounted much of the government's evidence from the industry as colored by self-interest.  It voiced "fundamental concerns" that the testimony of third-party distributors concerning the effects of the merger "reflects self-interest rather than genuine concerns about harm to competition."  JA139, 141 (Op. 92, 94).  Similarly, it was "mindful" that AT&T and DirecTV "acted as competitors" in making FCC filings endorsing the economics of bargaining.  JA128 (Op. 81).  By comparison, the district court credited the trial testimony of defendants' executives, and it dismissed as "Poppycock !" the idea that their self-interest potentially influenced their testimony.  JA155 (Op. 108).

The district court "largely agreed" with defendants' criticisms of Professor Shapiro.  JA157 (Op. 110).  It found that the inputs used in his calculations lacked evidentiary support.  JA165-196 (Op. 118-49).  It also criticized his analysis for not accounting for Turner's existing affiliate agreements with distributors, which, the government acknowledged, would delay the onset of competitive harm.  JA167

---

are at issue now only in that the former conclusion encompasses the application of the increased-leverage theory to virtual MVPDs.

(Op. 120).  The model's "sensitivity" and the lack of "statistical tests" supplied "additional cause to reject the model's conclusions."  JA167 (Op. 120 n.38).

By contrast, the district court decided that defense expert Professor Dennis Carlton's econometric analysis of three prior instances of vertical integration (or disintegration) "definitively shows" that they "have had no statistically significant effect on content prices."  JA152 (Op. 105).  The court rejected all arguments to the contrary.

3.  Finally, the district court preemptively announced that it would deny any government request for a stay pending appeal.  JA218 (Op. 171).  Even seeking a stay, the court warned, "would undermine faith in our system of justice of not only the defendants, but their millions of shareholders and the business community at large."  JA219 (Op. 172).  Indeed, the court stated, were any court to grant "a stay pending appeal," that "would be a manifestly unjust outcome in this case."  JA217 (Op. 170).

On June 14, 2018, the district court granted a joint motion to modify the Case Management Order to allow defendants to close their transaction.  JA18 (June 14, 2018 Minute Order).  The government

joined this motion because AT&T represented that it would manage

Turner as a separate business unit and erect a firewall to prevent the

exchange of competitively sensitive information until the earlier of

February 28, 2019, or the conclusion of this appeal.  JA1375 (Ex. A to

Joint Mot. to Modify Case Management Order, at 1).

## STANDARD OF REVIEW

This Court reviews a district court's order denying injunctive

relief for abuse of discretion, applying de novo review to the district

court's conclusions of law, and setting aside any factual findings that

are clearly erroneous.  *United States v. Anthem, Inc.*, 855 F.3d 345, 352-

53 (D.C. Cir.), *cert. dismissed*, 137 S. Ct. 2250 (2017); *FTC v. H.J. Heinz

Co.*, 246 F.3d 708, 713 (D.C. Cir. 2001).  Findings of fact are clearly

erroneous if they are "illogical" or rest on a "story . . . so internally

inconsistent or implausible on its face that a reasonable factfinder

would not credit it."  *Anderson v. Bessemer City*, 470 U.S. 564, 575, 577

(1985).

Errors of economic logic or reasoning constitute clear error.

*Heinz*, 246 F.3d at 718-19 (district court rejection of Section 7 merger

challenge was "clearly erroneous" when factual findings regarding

degree of competition created an "inherent inconsistency in its logic");

*FTC v. Advocate Health Care Network*, 841 F.3d 460, 464 (7th Cir. 2016)

(geographic market finding in Section 7 case was "clearly erroneous"

because it incorrectly treated the FTC's economic expert analysis "as if

its logic were circular").

## SUMMARY OF ARGUMENT

The government established a reasonable probability that the

AT&T-Time Warner merger would increase Time Warner's bargaining

leverage and, thus, substantially lessen competition, in violation of

Section 7 of the Clayton Act.  The district court's contrary conclusion

rests on two fundamental analytical errors: it discarded the economics

of bargaining, and it failed to apply the foundational principle of

corporate-wide profit maximization.  These errors colored the court's

view of the facts, leading to a decision that is clearly erroneous in light

of the evidence presented at trial.

1.  The government proved that a merged AT&T-Time Warner

would have the incentive and ability to lessen competition by raising

the costs of AT&T's rival distributors—both traditional MVPDs and the

newer, more innovative, virtual MVPDs.  Just six years ago, AT&T and

DirecTV warned federal regulators that vertical integration in the pay-television industry would result in precisely this type of harm. Time Warner's distributor customers—straight from the trenches of negotiations—agreed. The merger will give Time Warner increased bargaining leverage in distributor negotiations that will result in the distributors' paying higher fees for the same programming. The government's economic expert, Professor Shapiro, quantified the cost increase, as well as the harm inflicted on consumers. American consumers will pay hundreds of millions of dollars a year more for pay-television service, as distributors pass on their higher costs.

2. The district court erroneously concluded that the merger will not give Time Warner *any* increased bargaining leverage. The reasons the district court gave for finding zero increase in leverage are implausible and internally inconsistent.

First, the court erred by discarding the economics of bargaining that it purported to accept—and that defendants themselves had endorsed. It is fundamental to the economics of bargaining that a party derives leverage in a negotiation from the ability to walk away. The court agreed that Time Warner enjoyed bargaining leverage before the

merger, but it illogically and erroneously concluded that Time Warner will have *no* increased leverage post-merger because blackouts are "infeasible" so Time Warner cannot credibly threaten them. The court's reasoning makes no sense, rendering clearly erroneous its analysis of the evidence on increased bargaining leverage.

Second, the court erred in concluding that Time Warner would not maximize the profits of the combined entity as a whole by extracting higher fees from rival distributors when negotiating with them for Turner content. Corporate-wide profit maximization is an established principle of corporate and antitrust law, but the court rejected it on the basis of self-serving testimony from defendants' executives. At the same time, however, the court embraced this same principle in accepting that the merger would result in cost savings through coordination between Time Warner and DirecTV. Again, the court's reasoning is internally inconsistent. Again, it is clear error.

The court's logical errors were only compounded by its assessment of the evidence, which was also internally inconsistent and thus erroneous. The court discounted the testimony of customers—critical evidence, especially in vertical merger cases—on the ground that the

distributor-customers were also self-interested competitors.  At the same time, the court accepted without reservation the self-serving testimony of defendants' executives in the face of contrary corporate statements made in the ordinary course of business prior to the merger. The court did not attempt to reconcile this inconsistency, and its illogical treatment of industry evidence fails to justify its rejection of the government's case.

3.  The district court's rejection of Professor Shapiro's quantification of the increased costs and consumer harm is not an alternative basis for affirmance because it is clearly erroneous.  Having decided, illogically, that the merger would not lead to *any* increased bargaining leverage, the court nitpicked the values used in Professor Shapiro's modeling and articulated erroneous rationales for rejecting each value.  Even defense experts offered values greater than zero; yet the court determined that Time Warner would not raise rivals' costs one cent.

For these reasons, this Court should vacate the district court's judgment and remand the matter for further proceedings.

# ARGUMENT

## I. THE GOVERNMENT PROVED THAT THE MERGER IS LIKELY TO LESSEN COMPETITION SUBSTANTIALLY

A.  Using the economics of bargaining, the government demonstrated at trial that, by combining Time Warner's programming and DirecTV's distribution, the merger would give Time Warner increased bargaining leverage in negotiations with rival distributors, leading to higher, supracompetitive prices for millions of consumers.

Pre-merger, a blackout of Turner programming on Charter (for example) cost Time Warner license fees from Charter and advertising revenue from reduced viewership, and it cost Charter current and potential customers because its service is less attractive without the desirable Turner programming.  Crucially, post-merger, that same blackout is less costly to AT&T than it had been to Time Warner alone because some Charter subscribers will switch to AT&T's DirecTV or U-Verse.  JA710-712 (Tr. 2196:7-2198:12) ("the inevitable consequence of [a] blackout will be that DirecTV subscribership base will grow").

It is precisely because of this diversion to DirecTV (which would have the competitively valuable Turner content) that the costs of blackouts to the merged entity would be lower than absent the merger.

33

Because—solely as a result of the merger—the costs of not reaching a

deal are reduced, Time Warner will have increased leverage to

negotiate better terms with rival distributors.  Exercising that leverage

will result in increased programming fees for those rival distributors—

lessening competition among DirecTV and its rivals—and ultimately

increasing prices for millions of American consumers.

   B.  The economics of bargaining on which the government relied is

"mainstream"—as AT&T's expert Professor Michael Katz

acknowledged.  JA992 (Tr. 2750:16-19).  Moreover, AT&T and DirecTV

asserted its relevance in arguing that their 2015 merger was in the

public interest.  Their expert, Professor Katz, explained to the FCC on

their behalf the economics of bargaining and its application:

> The economic theory of bargaining indicates that the license fee
> agreed to by the video service provider and the content owner is
> determined both by the total amount of value, or surplus, created
> by the transmittal of the content and by the video service
> provider's and content owner's "disagreement points," which are
> determined by what would happen to each party's profits in the
> absence of an agreement.

JA1338-1339 (marked exhibit PX0467-312 to -313).

   Real-world evidence confirmed that bargaining between

programmers and distributors worked just as the economic principles

outlined by Professor Katz predicted.  Executives with both programmers and distributors testified that they use the prospect of a blackout as leverage in negotiations.  Indeed, distributors documented their preparations for negotiations with programmers and especially the quantitative studies they use to project the cost of a blackout.  *See infra* at 46-47.

C.  Applying the economics of bargaining to the facts established at trial showed that the reasonably probable effect of the merger was to increase fees paid by distributors other than AT&T's DirecTV for Turner programming, just as the FCC found that an unremedied merger of Comcast with NBCU would have done.  *In re Comcast Corp.*, 26 F.C.C. Rcd. 4238, App. B, ¶ 37 (2011) ("vertical integration of NBCU's programming and Comcast distribution assets would improve the bargaining position of the integrated firm when negotiating the sale of programming to one of Comcast's video distribution rivals because failure to reach an agreement means that some of the rival's subscribers will shift to Comcast" and, as a result, the integrated firm will "extract higher prices from rival MVPDs[,] . . . ultimately result[ing] in higher consumer prices for MVPD service").

Professor Shapiro quantified the harm by modeling the bargaining between Time Warner and AT&T's distributor rivals—both traditional and virtual MVPDs.  JA770 (Tr. 2317:6-11).  He estimated that the fees rivals will pay for Turner content likely would increase by hundreds of millions of dollars, and that consumers would end up paying hundreds of millions of dollars more in subscription fees, as a result of the merger.  JA754, 756-757, 809-810 (Tr. 2253:6-7, 2255:7-2256:20, 2406:23-2407:8).

The government also demonstrated that the merged AT&T-Time Warner would wield Turner content as a weapon against AT&T's virtual MVPD rivals.  DirecTV's traditional model of pay-television distribution is under competitive threat from these innovative new distribution models.  JA197-198 (Op. 150-51).  The merger would give AT&T—through its control of Turner—the ability to slow the trend toward lower-margin virtual MVPDs and protect the "golden goose" of DirecTV's high margins.  JA661-662 (Tr. 1802:1-1803:1).  The "skinny bundle" business model of many virtual MVPDs—less content and lower prices—depends on licensing high-value content, such as live news and sports, without having to pay for other, less valuable content.  *See* JA356, 360, 365, 387, 425-427, 491-492, 586, 588 (Tr. 236:2-13,

240:2-7, 245:7-23, 449:6-13, 583:20-585:2, 1018:5-1019:6, 1350:12-18, 1352:4-13); JA1259 (PX0004).  AT&T-Time Warner could require virtual MVPDs to accept additional, low-value channels for a higher total cost, thus making the "skinny" bundle resemble a more traditional pay-television package.  JA374, 375-376, 386-387 (Tr. 277:10-13, 278:16-279:24, 448:1-449:5).  The predictable result of the merger, therefore, is to impede the growth of innovative forms of distribution and slow the subscriber loss being experienced by DirecTV.

As the government argued at trial, this evidence established a reasonable probability that this merger—unlike most vertical mergers—will lessen competition substantially, in violation of Section 7 of the Clayton Act.  JA1231-1233 (Tr. 3970:23-3972:21).

## II.  THE DISTRICT COURT CLEARLY ERRED WHEN IT FOUND THE MERGER WAS UNLIKELY TO HAVE AN ANTICOMPETITIVE EFFECT

The district court's determination that the government had not proved its case rested on two fundamental errors: the court discarded the economics of bargaining that defendants themselves had endorsed in prior regulatory proceedings, and it disregarded the foundational

principle that a corporation with multiple divisions operates them to maximize the corporation's overall profits.

Because of these analytical flaws, the district court erroneously concluded that the government had shown neither that the merger is likely "to increase Turner's bargaining leverage in affiliate negotiations," JA117 (Op. 70), nor "that the challenged merger will lead to *any* raised costs on the part of distributors *or* consumers," JA196 (Op. 149); *accord* JA118 (Op. 71 n.23).

The court thus gave no weight to the undisputed fact that the merger gives Turner's parent company something it did not have before the merger: ownership in a nationwide distribution service.  It also rejected the common-sense proposition that the merger mitigates Time Warner's losses from the failure to reach a Turner distribution deal with a rival distributor because AT&T's DirecTV profits by picking up new subscribers when the distributor loses Turner programming.  If AT&T-Time Warner acts rationally, the merger necessarily will make a difference in the negotiations, but the district court inexplicably found it made *none*.  *See* JA117 (Op. 70).

The district court's findings should receive no deference because "the court arrived at" them "on the basis of faulty logic." *United States v. Thompson*, 27 F.3d 671, 677 (D.C. Cir. 1994); *see Anderson v. City of Bessemer*, 470 U.S. 564, 577 (1985) (an "interpretation of the facts [that] is illogical or implausible" is clearly erroneous); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 718 (D.C. Cir. 2001) (reversing decision as "clearly erroneous" that contained an "inherent inconsistency in its logic"); *Pyles v. Nwaobasi*, 829 F.3d 860, 868 (7th Cir. 2016) ("[A] finding of fact is clearly erroneous if it is 'based on errors of fact or logic.'"); *FTC v. Advocate Health Care Network*, 841 F.3d 460, 464 (7th Cir. 2016) (finding was "clearly erroneous" in Section 7 case because it incorrectly treated economic expert analysis "as if its logic were circular").

The testimony cited by the court in finding that the merger would have no effect on the negotiations contradicted basic economic logic, making it so "implausible on its face that a reasonable factfinder could not credit it." *Bishopp v. District of Columbia*, 788 F.2d 781, 786 (D.C. Cir. 1986); *see Anderson*, 470 U.S. at 575 (an appeals court can "find clear error" when testimony is "implausible on its face"). A "district court has wide latitude to resolve factual disputes—but only within

certain bounds." *Latif v. Obama*, 677 F.3d 1175, 1200 (D.C. Cir. 2012) (Henderson, J., concurring in the judgment).  The district court exceeded those bounds here, giving ample reason for this Court to "set aside the court's factual findings" because "they are 'clearly erroneous.'" *Heinz*, 246 F.3d at 713 (quoting Fed. R. Civ. P. 52(a)).

### A.     The District Court's Bargaining-Leverage Analysis Is Contrary To Fundamental Economic Logic And The Evidence

1.  The district court's determination that Time Warner would not have increased bargaining leverage post-merger erroneously disregarded the economics that governs negotiations in this industry and that defendants themselves embraced.  Defendants' FCC filings acknowledged that the vertical integration of a high-value programmer with a large distributor in the MVPD industry leads to higher fees for rival distributors.  In 2012, AT&T asserted to the FCC that a programmer commonly owned with a cable company considers the impact of its programming deals "on revenues from the sale of cable services to subscribers."  JA1288 (PX0442-024).  AT&T also asserted that "vertically integrated programmers . . . have the incentive and

40

ability to use . . . that control as a weapon to hinder competition to their downstream cable affiliates."  JA1249 (PX0002-004).

In the FCC's review of the merger of Comcast and NBCU in 2010, defendant DirecTV declared that "a standard economic model predicts that the proposed transaction would significantly increase the prices other MVPDs pay for NBCU programming."  JA1275 (PX0441-006). DirecTV explained that, "by combining Comcast's dominant cable and broadband distribution assets with NBCU's broadcast stations, the transaction would change the bargaining dynamic, giving Comcast-owned NBCU the incentive and ability to demand greater compensation."  JA1242 (PX0001-017).  In a subsequent 2012 FCC proceeding, DirecTV adopted the opinion of an economic expert who declared that "vertically integrated MVPDs have an incentive to charge higher license fees for programming that is particularly effective in gaining MVPD subscribers than do non-vertically integrated MVPDs." JA1293 (PX0443-079).

The district court questioned the relevance of these statements, JA1227-1228 (Tr. 3966:3-3967:1), and ruled they were not admissible as party admissions, JA1228 (Tr. 3967:12-20).  Then, the court appeared to

change course after trial, expressing the view that the statements had

"limited probative value" because they showed "that defendants have

previously recognized the validity of applying [the government's]

increased-leverage theory to affiliate fee negotiations."  JA128 (Op. 81).

Still, the court asked "so what?"  *Id.*  The court missed the point:

defendants in their previous regulatory filings were correct that the

economics of bargaining applies to affiliate fee negotiations and predicts

that a vertical merger like AT&T-Time Warner results in higher fees.

The district court's focus on whether blackouts would actually

occur post-merger reveals its failure to apply properly the economics of

bargaining—which defendants themselves had previously endorsed.

The district court concluded that, even post-merger, Time Warner could

not *"credibly threaten a distributor with a long-term blackout in order to

extract greater affiliate fees"* because *"such a blackout would be

infeasible,"* and thus Time Warner would never actually follow through

on its threat.  JA162 (Op. 115) (emphasis added).  The court discarded

as a mere "assumption" that "a post-merger Turner would gain

increased leverage by wielding a blackout threat," concluding that this

"*assumption* . . . does not make sense as a matter of logic." JA164 (Op. 117).

This "assumption," however, is basic economics, and the court's discarding of it "does not make sense as a matter of logic." Underlying the district court's conclusion are three independent findings that cannot all be true. First, the district court purported to accept the economics of bargaining. JA118-119, 131 (Op. 71-72, 84). Second, the court found that, pre-merger, Time Warner "enjoys bargaining leverage with distributors." JA125 (Op. 78); *see also, e.g.*, JA532-534 (Tr. 1156:24-1158:5) (Time Warner has "massive power" because a blackout sends a distributor into a "downward spiral"). Third, the court found that "a blackout would be infeasible" for Time Warner. JA162 (Op. 115). That third finding, however, is incorrect and irreconcilable with the first two; indeed, it completely negated the acceptance of the economics of bargaining.

It is fundamental to the economics of bargaining that a party derives leverage from having the ability to walk away, even if it never actually does so. If Time Warner truly could not walk away and the MVPDs knew that, it would have no leverage at all. Each MVPD would

43

make a low, take-it-or-leave-it offer, and Time Warner would have to accept it. That was not the case before the merger, and it certainly will not be the case after the merger. In reality, Time Warner earns $6 billion per year from licensing fees for Turner programming. JA1332 (PX0459-053). As Turner's Coleman Breland explained, Time Warner "fights for every last penny," JA480 (Tr. 991:5-14), and almost "went dark" on one MVPD over a single penny, JA483 (Tr. 994:4-18). Indeed, Breland testified, in recent years, Turner has come close to going dark with "virtually every major distributor." JA506-507 (Tr. 1033:8-1034:3). The district court's conclusion is illogical in the face of this evidence.

In this way, the bargaining between programmers and distributors has much in common with labor-management relations. Lengthy strikes and lockouts are rare because they are so costly to both sides, but both sides threaten a work stoppage to secure better contract terms, and an incremental shift in bargaining leverage can allow one party to hold out longer, thereby gaining a more favorable outcome. Thus, a threat can be credible—and respected—even if its use would be enormously costly.

Economics has long been the principal source of wisdom and logic in antitrust law; indeed, modern antitrust doctrine has evolved as courts have rejected precedents that stood at odds with well-accepted economics.[4]  Applying the economics of bargaining to a merger assessment has been uncontroversial.  *See, e.g.*, *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 786-87 (9th Cir. 2015); *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 562, 570 (6th Cir. 2014).  "To abandon economic theory is to abandon the possibility of a rational antitrust law."  Robert H. Bork, *The Antitrust Paradox* 117 (1978).  That is what the district court has done, and why its ruling constitutes error.

2.  The district court's discarding of the economics of bargaining resulted in a deeply flawed assessment of the government's evidence.  Because a party's leverage does not depend upon the actual breakdown of negotiations and ensuing blackouts, the court's reliance on evidence that "there has never been" a long-term blackout, JA162-163 (Op. 115-

---

[4] *E.g.*, *State Oil Co. v. Khan*, 522 U.S. 3, 18 (1997).  Milestones in the ascendency of economics are Richard Posner's *Antitrust Law: An Economic Perspective* (1976), Robert Bork's *The Antitrust Paradox* (1978), and *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 54-59 (1977).

Case 1:24-cv-03973-AS    Document 188-11    Filed 07/19/24    Page 59 of 90
USCA Case #18-5214    Document #1755905    Filed: 10/18/2018    Page 58 of 89

**Material Under Seal Deleted**

16), was misplaced.  That evidence shows only that there are gains to both sides from reaching a deal, not that leverage does not exist or is insensitive to changes in those gains.  JA805-806 (Tr. 2395:14-2396:7).

Turner always treats blackouts as a possibility.  JA421-422 (Tr. 559:19-560:1) (Martin/Turner); JA504 (Tr. 1031:10-16) (Breland/Turner).  It prepares a "Go Dark Analysis" to know "what the impact is if we go dark."  JA502, 503, 504 (Tr. 1029:15-18, 1030:2-7, 1031:17-23) (Breland/Turner); *see* JA1709 (sealed PX0144-117).  Turner executive Coleman Breland testified that both sides threaten blackouts.  JA498-500 (Tr. 1025:11-1027:1).  HBO President Simon Sutton testified that it threatened a blackout to get an agreement with MVPD Charter Communications.  JA609 (Tr. 1476:5-11).

Distributor witnesses likewise explained that their companies carefully project the likely subscriber loss they would expect to suffer from a blackout.  Greg Rigdon, Executive Vice President of Content Acquisition for Comcast Cable, testified that Comcast conducts "drop analyses" to project subscriber loss from programming blackouts, JA453-455 (Tr. 862:7-864:23), and that ████████████████

███████████████████████████████████████████,

46

JA1382, 1384-1385, 1388-1389 (sealed Tr. 922:11-24, 924:2-925:5, 962:1-963:19).  Tom Montemagno, Charter's negotiator, JA576 (Tr. 1340:16-18), testified that Charter predicts "the number of customers we might lose if we didn't renew this agreement and no longer carried this programming portfolio," JA583-584 (Tr. 1347:25-1348:5).  Such predictions help Charter understand "the overall leverage position."  JA578-579 (Tr. 1342:25-1343:5).

Third-party distributors also confirmed that changes in the cost of a blackout change their leverage position.  The district court erroneously thought certain witnesses testified that Time Warner's increased leverage was based on Time Warner profiting from long-term blackouts of Turner programming and thus "contradicted" the government's proof, JA143 (Op. 96); *see* JA143-144 (Op. 96-97), but their testimony was entirely consistent with the government's case.

Warren Schlichting, who oversees virtual MVPD Sling, owned by satellite MVPD DISH, did not say that "Turner would profit from, or at the very least would be willing to accept, a long-term blackout of DISH." JA143 (Op. 96).  Instead, he explained that DISH and Time Warner "know we got to get to a deal," but the merger gives Time Warner the

47

incentive to "raise prices" or "present onerous terms" because DISH's loss of subscribers would "accrue to [AT&T-Time Warner's] benefit." JA368 (Tr. 262:8-22). Schlichting also explained that DISH would be less competitive if it either paid more for Turner programming or lost that programming. JA369 (Tr. 263:13-18). In other words, Time Warner will bargain with the knowledge that, in the event of a blackout, some DISH subscribers would switch to AT&T's DirecTV. When asked to elaborate on the change in Time Warner's incentives, he explained, consistent with the government's evidence, that taking a subscriber is "more lucrative" than supplying programming to another distributor that serves that subscriber. JA369 (Tr. 263:10-12). Contrary to the court's analysis, JA143-144 (Op. 96-97), he did not say that Time Warner would withhold Turner programming and profit from doing so.

In addition, Charter's Tom Montemagno testified that his concern with the merger was "mainly . . . pricing increases" but included other costs Time Warner could impose: Charter could lose some exclusive access to Turner programming, or Time Warner might engage in "bundling" (i.e., making licenses for desirable networks conditional on

the acceptance of less desirable networks). JA586 (Tr. 1350:6-18). That testimony supports the government's argument that, post-merger, Time Warner would increase costs to AT&T's distributor rivals. The court, again, wrongly interpreted Montemagno's testimony that AT&T might "take exclusive[s] away" to mean that the programming would be withheld entirely. JA144 (Op. 97) (citing JA586 (Tr. 1350:14-15)). Losing an exclusive means only that the programming will be licensed to a rival. The court missed the point entirely.

## B. The District Court Misunderstood, And Failed To Apply, The Established Principle Of Corporate-Wide Profit Maximization

The district court's determination that Time Warner would not exercise increased bargaining leverage post-merger also erroneously rejected evidence that a merged AT&T-Time Warner would maximize profits of the firm *as a whole* by imposing higher programming costs on rival distributors. The court's analysis rested on a fundamental misunderstanding of the principle of corporate-wide profit maximization: it treated the principle as a question of fact that must be proved "'reasonable' in light of the record evidence." JA159 (Op. 112); *see* JA160-161 (Op. 113-14). The court then faulted Professor Shapiro

for not offering an "independent basis of evidence" for this principle, JA161 (Op. 114), and found "implausible and inconsistent with record evidence" the government's proof "that the identity of a programmer's owner influences negotiations," JA160, 162 (Op. 113, 115). These findings are clearly erroneous and internally inconsistent with the court's findings on the merger's cost savings.

1.   The district court effectively, and erroneously, treated as a factual dispute something that law and economics have long recognized: "business firms are (or must be assumed to be) profit maximizers." 1 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 113, at 144 (4th ed. 2013). "Profit motivation is patently ubiquitous and overwhelming"; it is the "driving force" of the economy. Bork, *supra*, at 119. The assumption of profit maximization is "crucial" in predicting business behavior. *Id.* at 119-21. Thus, parent corporations and their wholly owned subsidiaries act to maximize corporate-wide profits, not just the profits of individual divisions. Indeed, even defense expert Professor Carlton agreed that "if a firm has multiple divisions, a firm will maximize its profits across all of them." JA865 (Tr. 2525:19-25); *see also* JA713-714 (Tr. 2199:23-2200:2) (Professor Shapiro stating that he

and Professor Carlton agree on this point).  To conclude otherwise would be illogical.

In the antitrust context, the Supreme Court has explained that "[a] division within a corporate structure pursues the common interests of the whole rather than interests separate from those of the corporation itself."  *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 770 (1984).  Corporate law similarly obliges the "manager of the wholly-owned subsidiary . . . to act for the good of the parent company." *Abrams v. McGuireWoods LLP*, 518 B.R. 491, 501 (N.D. Ind. 2014); *see Trenwick Am. Litig. Trust v. Ernst & Young, LLP*, 906 A.2d 168, 173 (Del. Ch. 2006) ("Wholly-owned subsidiary corporations are expected to operate for the benefit of their parent corporations; that is why they are created."), *aff'd*, 931 A.2d 438 (Del. 2007).

The Supreme Court has adopted corporate-wide profit maximization as a principle of antitrust law, grounded in economic theory and corporate law, rather than treating the issue as one of fact. As the Court explained, a parent and a wholly owned subsidiary *always* have a "unity of purpose or a common design" whether or not the subsidiary formally acknowledges it.  *Copperweld*, 467 U.S. at 771;

51

*Caribe BMW, Inc. v. Bayerische Motoren Werke Aktiengesellschaft*, 19
F.3d 745, 750 (1st Cir. 1994) (Breyer, C.J.) (after *Copperweld*, as to
wholly owned subsidiaries, "we do not see how a case-specific judicial
examination of 'actual' parental control would help achieve any
significant antitrust objective"); 7 Areeda & Hovenkamp, *supra*,
¶ 1467f, at 248 ("in the case of complete ownership the inquiry is purely
structural, and control is irrebuttably presumed as a matter of law").
Thus, business executives' denials that they act to maximize profits
should not be credited, because "the basic tenet of price theory . . . states
that businessmen generally behave *as if* they were engaged in
maximization," and "[t]he fact that businessmen talk in terms not
always equatable with profit maximization is of no particular
importance, though it does mislead those who look no further." Bork,
*supra*, at 120-21.

Rather than accepting corporate-wide profit maximization as an
established principle, the district court ignored *Copperweld* entirely.
The court instead highlighted a passage from Professor Shapiro's trial
testimony wherein the court pressed him to concede the principle was
an "economist assumption" for which Professor Shapiro did not have "an

52

independent basis of evidence." JA161 (Op. 114). Here, however, the court misunderstood the status of profit maximization in antitrust analysis. Evidence not consistent with corporate-wide profit maximization must be disregarded as so "implausible on its face that a reasonable factfinder would not credit it," *Anderson*, 470 U.S. at 575— not the other way around. The district court did the reverse, rendering its assessment of the effect of the identity of a programmer's owner on negotiations clearly erroneous.

2. To be sure, the court purported to accept that, "generally, a firm with multiple divisions will act to maximize profits across them." JA161 (Op. 114) (quotation marks omitted). The court then asserted, however, that AT&T's ownership of Time Warner would not affect affiliate negotiations because "vertically integrated corporations have previously determined that the best way to increase company wide profits is for the programming and distribution components to separately maximize their respective revenues." JA162 (Op. 115). The evidence does not support the district court's assertion.

Importantly, not a single witness testified to the point that the district court relied on to reconcile its factual findings with corporate-

wide profit maximization—i.e., that the relevant corporations actually determined that they best maximize corporate-wide profits by paying no attention to the impact of one subsidiary on another.  Instead, AT&T CEO Stephenson acknowledged that despite his stated intention to operate Time Warner and AT&T independently, both units will report to him; he will be responsible for both units' strategic planning; and as CEO he is obligated to maximize shareholder value for the company as a whole.  JA1138-1139 (Tr. 3471:23-3472:15).

Although Madison Bond of NBCU testified that NBC "maximize[d] the revenue of NBC as a programmer," JA162 (Op. 115) (quoting JA677 (Tr. 2015:16-19)), and Coleman Breland of Turner likewise testified that Turner sought to be "on all the platforms," JA162 (Op. 115) (citing JA527 (Tr. 1129:17-22)), neither witness testified that *separately* maximizing subsidiary profits maximizes corporate-wide profits.  Likewise, although Time Warner CEO Jeff Bewkes testified that a blackout "creates a whole series of risks we don't want to have," JA162 (Op. 115) (citing JA1073 (Tr. 3120:22)), his point was only that blackouts were extremely costly, JA1072-1073 (Tr. 3119:10-3121:10)—not that a programmer would decline to weigh those costs against gains

Material Under Seal Deleted

to its parent company.  To the contrary, Bewkes instructed Turner to maximize company-wide profits by aligning its affiliate renewal negotiations with HBO to "maximize leverage," JA486-487 (Tr. 1013:11-1014:10) (Breland/Turner); JA1266 (PX0090); *see also* JA1445 (sealed PX0008-007) (Time Warner report to its board of directors that,

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████ ).

The court's failed effort to reconcile its determination that a programmer's owner does not matter in negotiations, with its purported acceptance of corporate-wide profit maximization, renders its rejection of the government's case clearly erroneous.

3.  The district court's analysis of Time Warner's post-merger incentives is also fundamentally inconsistent with its uncritical *acceptance* of defendants' claimed cost savings, *see* JA113 (Op. 66). Those savings depended on subsidiaries of the merged firm acting on the same unified interest in maximizing corporate-wide profits that defendants had disclaimed in the context of distributor negotiations. *See* JA753 (Tr. 2252:1-12) (Shapiro).  The court's simultaneous rejection

and acceptance of Time Warner's incentives to maximize AT&T-Time Warner's profits corporation-wide results in a "story . . . so internally inconsistent . . . that a reasonable factfinder would not credit it." *Anderson*, 470 U.S. at 575.

Defendants argued and the court accepted that the merger would result in substantial cost savings arising from what the economic experts and the court referred to as "the elimination of double marginalization." JA107, 113 (Op. 60, 66). Before the merger, DirecTV and Time Warner both earned margins over cost for the products sold in their respective markets. Post-merger, however, the combined entity would maximize corporate-wide profits by eliminating the cost associated with Time Warner's charging the upstream margin with DirecTV. The combined entity could then pass along some of that cost savings to consumers, as market conditions dictate, to attract additional subscribers. The district court found that, post-merger, DirecTV's prices to consumers would fall because AT&T, exerting control over each of its subsidiaries, would not maximize Time Warner's own revenue, but rather require Time Warner to license its programming to DirecTV for much less. *See* JA114 (Op. 67).

Defendants' claim that the merger will result in lower prices for DirecTV customers due to the elimination of double marginalization—and the court's acceptance of that claim—rests entirely on the assumption that the merged entity *will* act to maximize corporate-wide profits.  Yet, the court called the same assumption "implausible," JA160 (Op. 113), when Professor Shapiro used it to support his conclusion that the merged firm would exercise its bargaining leverage in order to raise rivals' costs.  The court never even attempted to reconcile these two findings, and the "inherent inconsistency" in the court's logic renders it clearly erroneous.  *Heinz*, 246 F.3d at 718.  In short, while defendants were entitled to argue mutually inconsistent facts, the court was not entitled to find mutually inconsistent facts.

## C.    The District Court's Analysis Of Industry Evidence Is Internally Inconsistent

The district court attempted to justify its disregard for the economics of bargaining and the principle of corporate-wide profit maximization by asserting that the industry evidence contradicted the government's theory, but that assertion, among other errors, rests on the court's internally inconsistent treatment of the evidence.

57

The district court rejected the government's customer testimony because "'customers' that purchase Turner content . . . are also competitors of AT&T's video distribution services," and competitor testimony "reflects self interest."  JA138-139 (Op. 91-92).  The court, in essence, thought Turner's customers could not be believed because they compete with AT&T and therefore must want to block the merger by any means possible.  It gave no consideration to the fact that these distributors had a direct and immediate stake as customers in the negotiations with Time Warner.

In vertical merger cases, "upstream customers are downstream competitors."  JA139 (Op. 92).  Customer testimony, though, is a widely accepted and critical source of evidence in merger cases.  *See, e.g.*, *Brown Shoe Co. v. United States*, 370 U.S. 294, 344 (1962) (relying on "[t]estimony in the record from numerous independent retailers, based on their actual experience in the market"); *Polypore Int'l, Inc. v. FTC*, 686 F.3d 1208, 1212, 1216, 1218 (11th Cir. 2012) (relying on testimony of customers); *Chi. Bridge & Iron Co. v. FTC*, 534 F.3d 410, 421-22, 433, 438 (5th Cir. 2008) (same).  Dismissing customer testimony is particularly problematic in a case like this one because those customers

are the principal source of evidence of the subjective importance *to them* of Time Warner's content.

More importantly, while the court purported to exercise "[c]aution . . . in evaluating the probative value of the proffered third-party competitor testimony" because it "reflects self-interest," JA139 (Op. 92), it wholly abandoned that caution when it came to testimony by defendants' executives, even when that testimony was inconsistent with prior statements by defendants and with basic economics.  For example, the court endorsed the testimony of Time Warner executives that the pre-2009 vertical integration of Time Warner (including Turner) and Time Warner Cable did not affect their affiliate negotiations.  JA154-155 (Op. 107-08).  Further, it credited testimony from AT&T's CEO offering implausibly benign explanations for statements about how to "advantage your own distribution" and "trying to preserve the old revenue streams."  JA135-136 (Op. 88-89).  The testimony of merging company executives, who stand to benefit financially from approval of a

merger, deserves at least as much skepticism (if not more so) as the

testimony of competitors.[5]

The court gave more credence to transparently self-serving

testimony offered during litigation than to statements made before the

merger was announced.  *But cf. Hosp. Corp. of Am. v. FTC*, 807 F.2d

1381, 1384 (7th Cir. 1986) (explaining that post-acquisition evidence is

"subject to manipulation by the party seeking to use it" and therefore "is

entitled to little or no weight"); *Chi. Bridge & Iron*, 534 F.3d at 435

(same).  It then described as "Poppycock !" the government's argument

that the self-serving explanations and predictions offered by defendants'

own executives should be discounted.  JA155 (Op. 108) (citation

omitted); *see also, e.g.*, JA163 (Op. 116 n.34) (harm to Turner caused by

---

[5] Despite having repeatedly pledged during the trial to deliver "[m]ore
choice, lower cost" to American consumers, JA1132-1133 (Tr. 3422:13-
3423:5) (Stephenson/AT&T), AT&T promptly increased the price of its
DirecTV Now product shortly after the trial concluded.  *Compare*
JA1149-1150 (Tr. 3506:20-3507:2) (Stephenson/AT&T) ("content pricing
to the consumer can do nothing but continue to go down in the
foreseeable future"), *and* JA1236 (Tr. 4028:1-14) (defendants' closing)
("pay-TV bills can be expected to go down for all pay-TV consumers"),
*with* Brian Fung, *AT&T Is Hiking the Price of DirecTV Now, Despite
Promising Lower Consumer Prices in the Time Warner Trial*, Wash.
Post (July 3, 2018), https://www.washingtonpost.com/technology/
2018/07/03/att-is-hiking-price-directv-now-despite-promising-lower-
consumer-prices-time-warner-trial.

blackouts); JA164 (Op. 117 n.36) (Time Warner CEO's assessment of increased-leverage analysis); JA199-201, 203-204, 207-209 (Op. 152-54, 156-57, 160-62) (testimony on AT&T's incentives related to virtual MVPDs).

The district court's inconsistent treatment of the evidence provides an independent reason why its findings that Time Warner would experience no change in bargaining leverage, and that DirecTV's rivals would not pay higher affiliate fees, are clearly erroneous.

## III. THE DISTRICT COURT CLEARLY ERRED IN DISMISSING THE QUANTIFICATION OF FEE INCREASES AND CONSUMER HARM

The court's rejection of the government's expert quantitative analysis does not provide an independent basis for affirmance. That rejection rests on the same errors of logic and economics described above, and in some instances resulted from the court demanding a degree of certainty that is inconsistent with Section 7's reasonable-probability standard.

Professor Shapiro presented a quantitative analysis of the merger's likely effect. First, he predicted the increase in fees paid by AT&T's distributor rivals for Turner programming by modeling the

bargaining through which those fees are determined.  Here, Professor

Shapiro focused on the expected benefits to AT&T of a Turner blackout

post-merger, i.e., the value to AT&T of the subscribers that DirecTV

and U-Verse would gain or retain.  These expected benefits are the

product of three quantities: (1) the "subscriber loss rate," which is the

proportionate reduction in subscribership for distributors if they

permanently lose Turner programming; (2) the "diversion rate," which

is the proportion of lost subscribers that would become (or remain)

DirecTV or U-Verse subscribers; and (3) AT&T's "margin," which is

AT&T's profit on diverted subscribers.  Using conservative estimates of

these quantities to ensure that he did not overstate the expected

benefits, JA734, 739-740, 744-747 (Tr. 2233:14-16, 2238:15-2239:5,

2243:1-2246:19), Professor Shapiro calculated that AT&T's rivals would

experience an annual cost increase of about $587 million, JA754

(Tr. 2253:6-7).

Second, Professor Shapiro took account of the merged firm's

incentive to maximize corporate-wide profits by eliminating double

marginalization.  He estimated that this would reduce AT&T's own

costs for Turner programming by $352 million annually.  JA751-754 (Tr. 2250:22-2253:15).

Lastly, Professor Shapiro determined, given the competitive conditions, the extent to which the rivals and AT&T would likely pass on to consumers their respective cost increases and decreases. Accounting for savings from the elimination of double marginalization that could be passed on to consumers, he predicted an annual net harm to consumers of $286 million, based on the 2016 market configuration, JA754, 756-757 (Tr. 2253:4-12, 2255:7-2256:20), increasing to $571 million by 2021, JA756-757 (Tr. 2255:23-2256:20).

## A.  The District Court Erred In Finding No Proof Of Any Price Increase

The district court erroneously concluded that Professor Shapiro's modeling failed at the first step because it did not provide "an adequate basis to conclude that the challenged merger will lead to *any* raised costs on the part of distributors."  JA196 (Op. 149).  Under the correct economic framework, *see supra* at 33-37, Time Warner gains leverage so long as (1) a rival distributor would experience any subscriber loss from a blackout, (2) some of those lost subscribers would sign up for DirecTV, and (3) DirectTV would earn any margin on those subscribers.

Although AT&T and the district court disputed the exact values of these three quantities, no one at trial claimed that any of these values were as low as zero.

This error is significant and could not have been harmless. While the court asserted that any consumer price increases proven by Professor Shapiro would have to "outweigh the conceded $350 million in annual cost savings to AT&T's customers," JA196 (Op. 149); *see also* JA114, 118 (Op. 67, 71 n.23), Professor Shapiro conceded no such thing. Instead, Professor Shapiro testified that the merger would result in $352 million of annual savings in licensing fees for Turner content *to AT&T.* JA754 (Tr. 2253:8-9). His estimate of how those cost savings would impact *consumers* was far lower and was an output of the very raising-rivals'-costs and pass-through analysis that the district court rejected. JA1176-1177 (Tr. 3824:19-3825:25). The court made no findings on the savings to consumers against which proven harm would have to be balanced.

## B.    The District Court Erred In Finding Insufficient Evidence To Support Professor Shapiro's Calculations

In evaluating Professor Shapiro's quantifications, the court demanded a level of precision at odds with Section 7's reasonable-

probability standard, not to mention economics.[6]  Economic models are

inherent simplifications of the real world and thus "imprecise tool[s],"

*United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 88 (D.D.C. 2011),

as Professor Carlton acknowledged, JA828 (Tr. 2450:22) (economic

models are "often imprecise").  Accordingly, courts have recognized that

an economist's quantitative analysis is probative if it is a "reliable,

reasonable, close approximation" of the real world.  *H&R Block*, 833 F.

Supp. 2d at 72.  By requiring much more, and finding no probative

value in Professor Shapiro's predictions, JA196 (Op. 149), the district

court demanded precision, ignoring that Section 7 does not require

"certainties," *Brown Shoe*, 370 U.S. at 323; *Heinz*, 246 F.3d at 719

("Section 7 is, after all, concerned with *probabilities*, not certainties.").

This was error.

     Moreover, as discussed next, the district court's specific critiques

of the values used by Professor Shapiro are unfounded.

---

[6] For example, the court faulted Professor Shapiro's estimates for
lacking "statistical tests."  *See* JA167 (Op. 120 n.38).  That is an
erroneously exacting standard for Section 7 and also misplaced because
Professor Shapiro used a standard, non-statistical methodology.

## 1.    Subscriber Loss Rate

The subscriber loss rate determines the distributor's cost of a long-term Turner blackout (in terms of subscribers who are lost or never acquired).  Professor Shapiro estimated the rate using multiple sources, including an in-depth analysis prepared by Altman Vilandrie & Company, a strategic consulting firm, at the request of Charter Communications for use in preparing for its negotiations with programmers.  *See* JA578-581, 583-585 (Tr. 1342:20-1345:14, 1347:22-1349:6) (Montemagno/Charter).  Professor Shapiro concluded that the rate was between 9% and 14%.  JA739-740 (Tr. 2238:25-2239:9).

In finding "Professor Shapiro's sources" for the subscriber loss rate "significantly flawed," JA168 (Op. 121), the court misapprehended its inquiry.  Professor Shapiro's task was to determine what Time Warner and the distributors would project their losses to be in the event of a Turner blackout.  JA504 (Tr. 1031:10-13).  Such a projection "helps" a distributor "understand [its] leverage, the programmers' leverage, . . . and just the overall leverage position."  JA579 (Tr. 1343:2-5) (Montemagno/Charter); *see also* JA455, 458-459 (Tr. 864:9-23, 867:5-868:17) (Rigdon/Comcast).  Companies then negotiate on the basis of

their subjective understanding.  *See* JA578-579 (Tr. 1342:20-1343:5)

(Montemagno/Charter).  One such Comcast projection ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮, *see* JA1747 (sealed PX0385-010); JA1383 (sealed

Tr. 923:18-23), was admitted to show Comcast's state of mind, JA460,

462 (Tr. 871:5-7, 873:10-12), but ignored by the court.  After the

merger—just as before—the outcome of bargaining will be determined

by what participants reasonably believe based on what they know.

The court found that the Altman Vilandrie study, *see* JA1492

(sealed PX0079), was "significantly flawed," JA169 (Op. 122).  The

study, nevertheless, was probative of what Charter "think[s] the impact

would be on their distribution business if there were a long-term

blackout of Turner."  JA709 (Tr. 2195:18-23).  Even the defendants'

expert who criticized the study admitted that the fees Charter was

paying for Turner programming made sense only if the subscriber loss

rate exceeded 9%, JA1026 (Tr. 2863:20-24), which is the low end of

Altman Vilandrie's estimate, JA736-738 (Tr. 2235:11-2237:8).  It was,

therefore, clear error for the court to find that "Professor Shapiro's

reliance on the projected long-term subscriber loss rates contained in

the Altman Vilandrie slide deck was misplaced."  JA176 (Op. 129).

Charter reasonably used it to prepare for programmer negotiations, *see, e.g.*, JA584-585 (Tr. 1348:11-1349:6), so Professor Shapiro was right to rely on it.

### 2. Diversion Rate

The diversion rate is the fraction of the subscribers that would switch to DirecTV or U-Verse from another distributor in the event of a Turner blackout. Professor Shapiro estimated the diversion rate based on AT&T's market shares in various local markets across the country, assuming that diversion from one distributor to another would be proportionate to the share of households currently selecting that option. JA742 (Tr. 2241:1-3). Professor Shapiro recognized that some subscribers lost to a distributor because of a Turner blackout would forgo MVPD or virtual MVPD service altogether, i.e., would "cut the cord." JA743 (Tr. 2242:2-10). He estimated the share of departing subscribers who would cut the cord at 10%, relying on the Altman Vilandrie report, and he reduced the diversion to AT&T by that proportion. JA743 (Tr. 2242:11-15).

In finding that the government "failed to provide adequate support for Professor Shapiro's diversion rate estimate," JA188

(Op. 141), the district court relied on materials not produced in court, much less admitted into evidence: specifically, the court relied on a proprietary data set from SNL Kagan and AT&T surveys of departing customers, both referenced by Professor Carlton, *see* JA187-188 (Op. 140-41). While Federal Rule of Evidence 703 permitted Professor Carlton to rely on data outside the record, his reference to such data did not elevate the extra-record material to direct evidence of the truth asserted therein. *See Boone v. Moore*, 980 F.2d 539, 542 (8th Cir. 1992). "Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993).

Further, the district court clearly erred in finding that Professor Carlton's opinion undermined the diversion rate estimate on which Professor Shapiro relied. Professor Carlton offered no opinion on the relevant issue: the fraction of households that would cut the cord because of a Turner blackout rather than switch to another distributor. JA877 (Tr. 2607:2-10). Instead, he opined on the fraction of households that did not currently subscribe to any MVPD or virtual MVPD. JA875, 876, 1167-1170 (Tr. 2605:1-6, 2606:1-6, 3806:22-3809:5). The court

correctly stated that the relevant fraction was of households "discontinuing [their] MVPD subscription." JA185 (Op. 138). It erred, however, by rejecting Professor Shapiro's estimate of this fraction on the basis of Professor Carlton's opinion about an entirely different fraction.

### 3.    DirecTV's Margin

The final variable is AT&T's profit on the subscribers that it would win or retain due to a Turner blackout of a rival distributor. AT&T measures the lifetime value of new and retained customers differently, and Professor Shapiro conservatively used the average value for new customers, not retained customers (who are 50% more valuable than new customers). JA745-746 (Tr. 2244:4-2245:2). He was also conservative in not seeking to include the profits that AT&T would earn on wireless service or the fact that subscribers who switch distributors because of a blackout have a higher lifetime value. JA747-748 (Tr. 2246:20-2247:25).

The district court criticized Professor Shapiro for using 2016 data instead of 2017 data. JA190-192 (Op. 143-45). Professor Shapiro relied on the only margin data available to him in preparing his report,

**Material Under Seal Deleted**

however.  ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉, JA1409-1410, 1413 (sealed Tr. 1904:6-1905:5,

1908:3-12), AT&T provided the government with DirecTV margin data

only on the day both sides' expert rebuttal reports were due, JA782-783,

784-785 (Tr. 2348:17-2349:6, 2350:22-2351:1).  *Contra* JA189 (Op. 142)

(data was provided "before Professor Shapiro's rebuttal report").  ▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉.  JA1399-

1403, 1406 (sealed Tr. 1878:25-1882:9, 1893:3-7).  When Professor

Shapiro submitted a supplemental report containing a small chart

presenting various harm estimates using 2017 margin data, however,

AT&T objected and the court precluded use of the chart.  JA1155-1158,

1160-1162 (Tr. 3689:3-3692:22, 3700:10-3702:3).  By failing to exclude

DirecTV's 2017 margins, and restricting Professor Shapiro's rebuttal

testimony addressing the new data, the district court abused its

discretion in a manner that affected the government's substantial

rights.

In any event, as the court acknowledged, even using 2017 data Professor Shapiro's analysis predicts a net increase in distributor costs and significant annual net harm to consumers.  JA191 (Op. 144).

*    *    *

The district court identified precisely the basis for its decision—a finding that the merger would not increase Time Warner's leverage. JA117-118, 196 (Op. 70-71, 149).  The court reached this ultimate finding only by rejecting fundamental logic and the economics of bargaining it purported to accept, and by casting aside *Copperweld*'s principle of corporate-wide profit maximization.  A remand is necessary, therefore, to determine under the correct analysis whether the merger violates Section 7.

## CONCLUSION

The judgment below should be vacated, and the case remanded.

Respectfully submitted.

 /s/ Mary Helen Wimberly

MAKAN DELRAHIM
  *Assistant Attorney General*

ANDREW C. FINCH
  *Principal Deputy Assistant
  Attorney General*

| | |
|---|---|
| CRAIG W. CONRATH | KRISTEN C. LIMARZI |
| ERIC D. WELSH | ROBERT B. NICHOLSON |
| DANIEL E. HAAR | ADAM D. CHANDLER |
| CAROLINE J. ANDERSON | PATRICK M. KUHLMANN |
| TAYLOR M. OWINGS | MARY HELEN WIMBERLY |
| WILLIAM J. RINNER |   *Attorneys* |
|   *Attorneys* | U.S. DEPARTMENT OF JUSTICE |
| U.S. DEPARTMENT OF JUSTICE | ANTITRUST DIVISION |
| ANTITRUST DIVISION | 950 Pennsylvania Ave., N.W. |
| | Room 3224 |
| | Washington, D.C. 20530-0001 |
| | (202) 514-2413 |
| | maryhelen.wimberly@usdoj.gov |

*Counsel for the United States*

October 18, 2018

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limit of Fed. R.

App. P. 32(a)(7)(B) because, excluding the parts exempted by Fed. R.

App. P. 32(f), the brief contains 12,996 words.

2.    This brief complies with the typeface requirements of Fed. R.

App. P. 32(a)(5) and the type-style requirements of Fed. R. App.

P. 32(a)(b) because the brief has been prepared in Microsoft Word 2010,

using 14-point New Century Schoolbook font, a proportionally spaced

typeface.


       /s/ Mary Helen Wimberly
      Mary Helen Wimberly
      *Counsel for the United States*

## CERTIFICATE OF SERVICE

I certify that on October 18, 2018, I caused the public, redacted version of the foregoing brief to be filed through this Court's CM/ECF system, which will serve a notice of electronic filing on all registered users, including counsel for Defendants-Appellees.  In addition, I caused two paper copies of the public, redacted version of the brief and two paper copies of the sealed, unredacted version of the brief to be hand delivered, as instructed by counsel for Defendants-Appellees, on:

> Benjamin M. Mundel
> Sidley Austin LLP
> 1501 K Street, N.W.
> Washington, D.C. 20005
> (202) 736-8000
> bmundel@sidley.com

>  /s/ Mary Helen Wimberly 
> Mary Helen Wimberly
> *Counsel for the United States*

# Addendum

## § 18. Acquisition by one corporation of stock of another

No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

No person shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of one or more persons engaged in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition, of such stocks or assets, or of the use of such stock by the voting or granting of proxies or otherwise, may be substantially to lessen competition, or to tend to create a monopoly.

This section shall not apply to persons purchasing such stock solely for investment and not using the same by voting or otherwise to bring about, or in attempting to bring about, the substantial lessening of competition. Nor shall anything contained in this section prevent a corporation engaged in commerce or in any activity affecting commerce from causing the formation of subsidiary corporations for the actual carrying on of their immediate lawful business, or the natural and legitimate branches or extensions thereof, or from owning and holding all or a part of the stock of such subsidiary corporations, when the effect of such formation is not to substantially lessen competition.

Nor shall anything herein contained be construed to prohibit any common carrier subject to the laws to regulate commerce from aiding in the construction of branches or short lines so located as to become feeders to the main line of the company so aiding in such construction or from acquiring or owning all or any part of the stock of such branch lines, nor to prevent any such common carrier from acquiring and owning all or any part of the stock of a branch or short line constructed by an independent company where there is no substantial competition between the company owning the branch line so constructed and the company owning the main line acquiring the property or an interest therein, nor to prevent such common carrier from extending any of its lines through the medium of the acquisition of stock or otherwise of any other common carrier where there is no substantial competition between the company extending its lines and the company whose stock, property, or an interest therein is so acquired.

Nothing contained in this section shall be held to affect or impair any right heretofore legally acquired: *Provided*, That nothing in this section shall be held or construed to authorize or make lawful anything heretofore prohibited or made illegal by the antitrust laws, nor to exempt any person from the penal provisions thereof or the civil remedies therein provided.

Nothing contained in this section shall apply to transactions duly consummated pursuant to authority given by the Secretary of Transportation, Federal Power Commission, Surface Transportation Board, the Securities and Exchange Commission in the exercise of its jurisdiction under section 79j of this title,[1] the United States Maritime Commission, or the Secretary of Agriculture under any statutory provision vesting such power in such Commission, Board, or Secretary.

(Oct. 15, 1914, ch. 323, §7, 38 Stat. 731; Dec. 29, 1950, ch. 1184, 64 Stat. 1125; Pub. L. 96–349, §6(a), Sept. 12, 1980, 94 Stat. 1157; Pub. L. 98–443, §9(*l*), Oct. 4, 1984, 98 Stat. 1708; Pub. L. 104–88, title III, §318(1), Dec. 29, 1995, 109 Stat. 949; Pub. L. 104–104, title VI, §601(b)(3), Feb. 8, 1996, 110 Stat. 143.)

REFERENCES IN TEXT

Section 79j of this title, referred to in text, was repealed by Pub. L. 109–58, title XII, §1263, Aug. 8, 2005, 119 Stat. 974.

AMENDMENTS

1996—Pub. L. 104–104, in sixth par., struck out "Federal Communications Commission," after "Secretary of Transportation,".

1995—Pub. L. 104–88, in sixth par., substituted "Surface Transportation Board" for "Interstate Commerce Commission" and inserted ", Board," after "vesting such power in such Commission".

1984—Pub. L. 98–443 substituted "Secretary of Transportation" for "Civil Aeronautics Board" and "Commission or Secretary" for "Commission, Secretary, or Board" in sixth par.

1980—Pub. L. 96–349, substituted "person" for "corporation" wherever appearing in first and second pars.; substituted "persons" for "corporations" in second par. and first sentence of third par.; and inserted "or in any activity affecting commerce" after "commerce" wherever appearing in first, second, and third pars.

1950—Act Dec. 29, 1950, amended section generally so as to prohibit the acquisition of the whole or any part of the assets of another corporation when the effect of the acquisition may substantially lessen competition or tend to create a monopoly.

EFFECTIVE DATE OF 1995 AMENDMENT

Amendment by Pub. L. 104–88 effective Jan. 1, 1996, see section 2 of Pub. L. 104–88, set out as an Effective Date note under section 1301 of Title 49, Transportation.

EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–443 effective Jan. 1, 1985, see section 9(v) of Pub. L. 98–443, set out as a note under section 5314 of Title 5, Government Organization and Employees.

EFFECTIVE DATE OF 1980 AMENDMENT

Pub. L. 96–349, §6(b), Sept. 12, 1980, 94 Stat. 1158, provided that: "The amendments made by this section [amending this section] shall apply only with respect to acquisitions made after the date of the enactment of this Act [Sept. 12, 1980]."

TRANSFER OF FUNCTIONS

Federal Power Commission terminated and functions, personnel, property, funds, etc., transferred to Sec-

[1] See References in Text note below.