**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, et al., | Case No. 1:24-cv-03973-AS-SLC |
| Plaintiffs, | |
| | [Rel. 1:24-cv-04106-AS-SLC; 1:24-cv-03994-AS-SLC] |
| v. | |
| LIVE NATION ENTERTAINMENT, INC., and TICKETMASTER L.L.C., | **ORAL ARGUMENT REQUESTED** |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ..........................................................................................................3

    A.    Allegations Relevant To The Tying Claim ...................................................3

    B.    Allegations Relevant To The *Parens Patriae* Claims...............................5

ARGUMENT ................................................................................................................8

I.    Plaintiffs' Tying Claim Fails ................................................................................8

    A.    Plaintiffs Cannot Impose On Live Nation A Duty To Deal With Rival Promoters ....................................................................................................8

    B.    Plaintiffs' Efforts To Recast A Refusal To Deal As Tying Fail ............12

          1.    Refusal To Deal Doctrine Cannot Be Evaded By Artful Pleading Alone....................................................................................12

          2.    The Amended Complaint Nowhere Alleges Tying ...................14

          3.    It Is Immaterial That Rival Promoters Would Be Renting Amphitheaters "On Behalf Of" Artist Clients ............................15

II.    The State Plaintiffs Cannot Establish Antitrust Standing On Their Claims For Damages Under The Sherman Act ...................................................................17

    A.    The State Plaintiffs Fail To Allege That Consumers Suffered Antitrust Injury.........................................................................................................19

          1.    Consumers' Alleged Injury Does Not Occur In Any Market Where Competition Purportedly Is Restrained......................................19

          2.    Consumers' Alleged Injury Is Not "Inextricably Intertwined" With Alleged Injury To Other Market Participants ............................21

    B.    Consumers Are Not "Efficient Enforcers" Of The State Plaintiffs' Sherman Act Claims .............................................................................23

CONCLUSION...........................................................................................................25

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re Adderall XR Antitrust Litig.*,
   754 F.3d 128 (2d Cir. 2014)........................................................................9, 11, 17

*In re Aluminum Warehousing Antitrust Litig.*,
   2023 WL 7180648 (2d Cir. Nov. 1, 2023)........................................................23

*In re Aluminum Warehousing Antitrust Litig.*,
   833 F.3d 151 (2d Cir. 2016)........................................................3, 19, 20, 21

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*,
   190 F.3d 1051 (9th Cir. 1999) ...........................................................20, 21

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
   472 U.S. 585 (1985)....................................................................11, 15

*Assoc. Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters*,
   459 U.S. 519, 534 (1983).............................................................18, 24

*Atl. Richfield Co. v. USA Petroleum Co.*,
   495 U.S. 328 (1990).............................................................................18

*In re ATM Fee Antitrust Litig.*,
   554 F. Supp. 2d 1003 (N.D. Cal. 2008) ...............................................12

*Blue Shield of Virginia v. McCready*,
   457 U.S. 465 (1982).............................................................................22

*Daniel v. Am. Bd. of Emergency Med.*,
   428 F.3d 408 (2d Cir. 2005)............................................................3, 23, 24

*De Jesus v. Sears, Roebuck & Co.*,
   87 F.3d 65 (2d Cir. 1996) .................................................................14, 17

*Eastman Kodak Co. v. Image Tech. Services, Inc.*,
   504 U.S. 451 (1992)...........................................................................14, 17

*In re Elevator Antitrust Litig.*,
   502 F.3d 47 (2d Cir. 2007) (per curiam).......................................9, 11, 15

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*,
   711 F.3d 68 (2d Cir. 2013)...................................................18, 22, 23, 24

*Hawaii v. Standard Oil Co. of Cal.*,
    405 U.S. 251 (1972) ...................................................................................18

*Illinois Tool Works Inc. v. Indep. Ink, Inc.*,
    547 U.S. 28 (2006) ....................................................................................14

*Image Tech. Services, Inc. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) ..................................................................15

*It's My Party, Inc. v. Live Nation, Inc.*,
    811 F.3d 676 (4th Cir. 2016) ......................................................................9

*It's My Party, Inc. v. Live Nation, Inc.*,
    88 F. Supp. 3d 475 (D. Md. 2015), *aff'd*, 811 F.3d 676 (4th Cir. 2016) ................13

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ....................................................................................9

*New York v. Facebook, Inc.*,
    549 F. Supp. 3d 6 (D.D.C. 2021) .....................................................11, 12, 17

*New York v. Meta Platforms, Inc.*,
    66 F.4th 288 (D.C. Cir. 2023) ....................................................................11

*New York v. Microsoft Corp.*,
    209 F. Supp. 2d 132 (D.D.C. 2002) ..........................................................18

*Novell, Inc. v. Microsoft Corp.*,
    731 F.3d 1064 (10th Cir. 2013) .................................................................11

*Ocean View Cap., Inc. v. Sumitomo Corp. of Am.*,
    1999 WL 1201701 (S.D.N.Y. Dec. 15, 1999) ...........................................19

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
    555 U.S. 438 (2009) ....................................................................................8

*Pennsylvania v. Nat'l Collegiate Athletic Ass'n*,
    948 F. Supp. 2d 416 (M.D. Pa. 2013) ........................................................18

*Rebotix Repair LLC v. Intuitive Surgical, Inc.*,
    2021 WL 1227593 (M.D. Fla. Mar. 8, 2021) ............................................12

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*,
    373 F.3d 57 (1st Cir. 2004) ........................................................................12

*United States v. Colgate & Co.*,
    250 U.S. 300 (1919) ....................................................................................8

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP,*
  540 U.S. 398 (2004) ............................................................................... *passim*

**STATUTES**

15 U.S.C. § 15c ...................................................................................................17

**RULES**

Fed. R. Civ. P. 12(b)(6)..........................................................................................3

**TREATISES**

ABA Antitrust Section, *Antitrust Law Developments (Ninth)* (2022) ...........................................10

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (2024) ................................12, 14, 15, 18

iv

## PRELIMINARY STATEMENT

The Government's case against Live Nation will ultimately fail because its factual premises are false.  No, scores of venues do not choose Ticketmaster because Live Nation has threatened retaliation if they do not; they choose Ticketmaster because it offers a superior technology that empirically sells more tickets.  No, Ticketmaster does not force exclusivity on venues to hold off rivals; venues themselves frame their ticketing rights as an exclusive asset to be auctioned to the highest bidder because that commercial structure maximizes the venues' own revenue.  No, Live Nation did not strong-arm Oak View Group into refraining from becoming a competing concert promoter, as Oak View Group itself will confirm.  The claims rooted in these allegations are factually groundless, to say the least, and as this case goes forward, the litigation will properly concern what evidence the Government can marshal to support these theories.

In several respects, however, claims in the Amended Complaint are legally infirm on their face and therefore amenable to adjudication on a Rule 12 motion.  Through this motion, Live Nation seeks dismissal of two in particular: First, the claim that a refusal to rent Live Nation-owned amphitheaters to rival promoters is an unlawful tying arrangement; and second, the claim that the State Plaintiffs have *parens patriae* standing to assert Sherman Act claims arising from conduct in product markets in which the States' citizen-consumers do not participate and from which they suffer no discernible antitrust injury.

On the first issue, the logic of the Government's tying claim goes like this:  Live Nation has a dominant position in a product market allegedly limited to amphitheaters and nothing else.  And it uses that dominant position to distort competition in a separate market for the "provision of promotion services to artists performing in major concert venues."  Amended Complaint, ECF No. 257 ("Am. Compl."), ⁋ 243.  Essentially, the theory goes, Live Nation tells artists, "if you want to play the amphitheaters I own, you have to take my concert promotion services as well."

1

That claim is legally defective.  It implies that Live Nation must allow *rival concert promoters* to book its amphitheaters.  But Supreme Court precedent squarely forecloses that result.  There is no duty to deal with rivals under federal antitrust law, except in the rarest circumstances not alleged here.

Plaintiffs try to evade this bedrock principle of antitrust law by seeking to reframe as "tying" what their own allegations show to be a refusal to deal.  That gambit fails for three reasons.  First, the case law is clear that refusal to deal doctrine cannot be evaded by artful pleading.  The substance of the challenged conduct governs, not a plaintiff's characterization, and the Court determines the proper doctrinal framework for a claim as a matter of law.  Here, the well-pleaded facts describe an industry in which risk-bearing promoters rent venues so they can include those venues in touring offers.  The core substantive contention of Plaintiffs' claim is that Live Nation does not rent its amphitheaters to rival promoters, instead limiting access only to Live Nation's own promoters.  That presents a refusal to deal claim, not tying.  Second, the suite of commercial arrangements alleged in the Amended Complaint do not describe an antitrust "tie" at all.  Tying is the forced imposition of a second product *on a single buyer* who would prefer to buy the first standing alone.  Here, the buyers of the two supposedly tied products are different actors: Promoters are the ones who rent amphitheaters from Live Nation, and performing artists are the ones who hire promoters.  Third, Plaintiffs argue that because promoters rent venues "on behalf of" their artist customers, one should look past the promoter and essentially *pretend* that Live Nation is entering into tying agreements with artists.  Am. Compl. ¶ 208.  The law permits no such subterfuge.  The single buyer and conditional dealing elements that define tying are mandatory— it is never enough that a different business practice has tying-*like* effects.  This "on behalf of" theory is particularly baseless in the context of a refusal to deal, since substantially all refusal to

deal claims concern a rival attempting to buy something to use "on behalf of" its customers. There is nevertheless a clear-cut legal distinction between tying and refusals to deal, with each subject to markedly different legal rules. The refusal to deal case law applies here.

On the *parens patriae* issue, it is black-letter law that for states to assert federal antitrust claims on behalf of their citizens as consumers, the citizens-as-consumers must themselves have antitrust standing. Here they do not. Consumers do not participate at all in the bulk of the product markets at issue in the Amended Complaint, and thus lack the type of injury necessary to make them proper antitrust plaintiffs. *See In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 158 (2d Cir. 2016) ("Generally, only those that are participants in the defendants' market can be said to have suffered antitrust injury."). In any event, the State Plaintiffs acting in their *parens patriae* capacity are not "efficient enforcers" of any of the asserted Sherman Act claims, which is an independent basis for dismissal. *See Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 443 (2d Cir. 2005).

This case will be complicated enough. Live Nation respectfully asks the Court to grant this Motion and allow the parties to focus discovery on the asserted legal theories whose viability properly turns on the factual record as it will be developed, trimming from the litigation extraneous claims that fail as a matter of law as pleaded. *See* Fed. R. Civ. P. 12(b)(6).

## BACKGROUND

### A.    Allegations Relevant To The Tying Claim

Live Nation owns and operates a number of amphitheaters which host live music events. Am. Compl. ¶ 16. It also offers concert promotion services to artists. *Id.* ¶ 17. Live Nation allegedly has a policy of limiting use of its amphitheaters to artists who use Live Nation as a

concert promoter. *Id.* ¶ 201.[1]  This allegedly gives Live Nation a competitive advantage in the promotions market:  "[A]rtists seeking to perform a tour in large amphitheaters are denied the ability to work with the promoter of their choice if they want to play a Live Nation-owned or controlled venue."  *Id.*  That is the core harm alleged in the tying claim—that competition is distorted in the market for concert promotion services by virtue of Live Nation's dominance in amphitheater ownership. *Id.* ¶ 244-46.[2]

The Amended Complaint has some contradictory allegations about which actor—the promoter or artist—actually engages in commercial transactions with venues like amphitheaters. It contains a graphic at paragraph 19 which suggests that artists are the ones who do so.  But elsewhere it commits to the proposition that *promoters* are the ones who rent venues.  In fact, the alleged tied product market is called "[t]he provision of concert booking and promotion services to major concert venues," *see id.* ¶ 192, and the description of "booking and promotion services" asserts that "Promoters … help the artist choose the venue(s) where they will play [and] work with venues on behalf of the artist to arrange aspects of the show(s)." *Id.* ¶ 200.  Paragraph 208 of the Amended Complaint states clearly that "promoters reach out to venues to inquire about availability and pricing," and "promoters enter into contracts for access to amphitheaters on behalf of specific artist clients." *See also id.* ¶ 192  ("Typically, venues enter into individualized agreements with *promoters* (either on a show-by-show or long-term basis), which dictate the payments between venues and promoters in exchange for the performance(s)." (emphasis added)).

---

[1] We accept this as true for these purposes, but for the record Live Nation does sometimes rent its amphitheaters (and other venues) to rival promoters.

[2] There is no allegation, nor could there be, that Live Nation is the only vertically integrated promoter/venue operator with a similar policy.  We nonetheless assume, contrary to reality, that rival promoters do not have their own amphitheaters and similar policies.

Importantly, the Amended Complaint explains that when promoters rent venues for the shows they put on, they are not merely acting as some kind of administrative functionary for the artist. To the contrary, significant economic consequences flow from promoters being the parties who engage in that transaction with venues. "Promoters take on the financial risk associated with a show or tour, and in exchange they are compensated with a portion of the revenue generated by successful shows." *Id.* ¶ 200. A key element of this risk—and the promoters' business relationship with artists—is the promoter's guarantee to make a minimum payment to the artist for each performance. *Id.* ¶ 41. The Amended Complaint thus makes clear that promoters shoulder all the downside risk inherent in a show. *See id.* ¶ 22. If a concert loses money, the promoter is the one on the hook to the venue to pay the rent. The artist is not. There are also frequently financial payments, typically referred to as "rebates," that flow from the venue to the promoter, that are not passed on to the artist. *See id.* ¶ 42. So promoters are not simple agents renting venues for a principal. As the Amended Complaint acknowledges, the promoter has an independent—and material—economic stake in the commercial transaction with the venue.

### B.    Allegations Relevant To The *Parens Patriae* Claims

Twenty-seven of the State Plaintiffs seek treble damages in their *parens patriae* capacities on behalf of "natural persons" residing in their states for Defendants' alleged violation of the federal antitrust laws. *See id.* ¶¶ 217, 517(j). The supposed antitrust injury supporting the State Plaintiffs' *parens patriae* damages claims is that consumers "paid more and continue to pay more for fees relating to tickets to live events than they would have paid in a free and open competitive market." *Id.* ¶ 223. There are dozens of allegations in the Amended Complaint discussing ticketing fees, *see, e.g.*, *id.* ¶¶ 43-44, 48, 141-42, 145-46, but the actual violations that Plaintiffs allege have almost nothing to do with consumers or the ticketing fees they pay.

Plaintiffs assert five federal claims for violations of Sections 1 and 2 of the Sherman Act. *See id.* ¶¶ 224-64. The first two claims relate to Defendants' alleged actions in the ticketing space, and the remaining three claims relate to Defendants' alleged actions in the concert promotion space and venue space. *See id.* With respect to the ticketing-related claims, Plaintiffs allege that Defendants' purportedly unlawful activity took place in the following relevant product markets: (1) the "provision of primary ticketing services to major concert venues," including a sub-market for the "provision of primary ticketing services for concerts and comedy events . . . to major concert venues" (the "venue-facing ticketing markets"), *id.* ¶¶ 164, 172; and (2) the "provision of primary concert ticketing offerings to fans at major concert venues," and in the alternative, the provision of "both primary concert ticketing offerings and services that provide resale for concert tickets to fans at major concert venues" (the "fan-facing ticketing market"), *id.* ¶¶ 175, 185. As for the promotion-related claims, Plaintiffs assert the following relevant product markets: (1) the "provision of concert booking and promotion services to major concert venues," *id.* ¶ 192; (2) the "provision of promotion services to artists performing in major concert venues," *id.* ¶ 200; and (3) the "provision of the use of large amphitheaters and ancillary services to musicians and comedians . . . for large amphitheater tours," (also related to the venue claim) *id.* ¶ 207.

Consumers do not participate in any of promotion-related alleged product markets, in which artists, promoters, and venues are the relevant players. *See id.* ¶¶ 161, 192, 200, 207. Nor do consumers participate in the purported venue-facing ticketing markets, in which venues and ticketers are the relevant players. *See id.* ¶ 161, 164, 172. The ***only alleged market*** in which consumers participate is the alleged fan-facing ticketing market. *See id.* ¶ 161, 175, 185. And the only claim involving this fan-facing ticketing market is Plaintiffs' First Claim for Relief, which

asserts that Defendants monopolized "several relevant markets related to primary ticketing services." *See id.* ¶ 225.

Plaintiffs allege that Defendants monopolized the primary ticketing services markets (including the alleged fan-facing ticketing market) by (1) directly and indirectly threatening venues that Live Nation will divert shows to other venues if they do not sign with Ticketmaster, (2) retaliating against venues that contract with rival ticketers, and (3) foreclosing rival ticketing companies from the market, including through use of long-term exclusive contracts with venues. *See id.* ¶ 227. None of this alleged conduct occurred in the fan-facing ticketing market, in which ticketers sell tickets to fans. Instead, it involves Defendants' alleged interactions with *venues* and *rival ticketers*. *See id.*

Plaintiffs allege a grab-bag of "anticompetitive effects" that supposedly result from Defendants' conduct in the ticketing space. *See id.* ¶¶ 139-54. With respect to venues and rival ticketers, Plaintiffs assert that "venues have fewer real choices for obtaining concerts and ticketing services;" Defendants have prevented "rivals and nascent threats" from entering the market; and venues "reasonably fear the disruption, retaliation, and complications of partnering with anyone other than Live Nation," which has "raised rivals' costs" in their agreements with venues. *Id.* ¶¶ 139-54. With respect to fans, Plaintiffs allege consumers pay higher fees and get a "lower-quality ticketing experience." *See id.* ¶ 145. Plaintiffs claim that, "by locking venues into its business model, Live Nation has . . . dampened competition that otherwise would push fees down for fans." *Id.* ¶ 150. But Plaintiffs do not elaborate on how, exactly, increased competition for ticketing contracts or non-exclusive ticketing agreements between venues and Ticketmaster would "push fees down for fans." *See id.* Nor does the Amended Complaint contain any allegations

concerning why the attacks on the exact same conduct as it relates to non-fan-facing product markets in the ticketing space would somehow fail to address the identical competitive concerns.

## ARGUMENT

## I.    PLAINTIFFS' TYING CLAIM FAILS

Plaintiffs' tying claim must be dismissed because it seeks to impose on Live Nation a duty to deal with its rivals—an outcome forbidden by law.

### A.    Plaintiffs Cannot Impose On Live Nation A Duty To Deal With Rival Promoters

Settled law provides that Live Nation has no duty to aid its competitors. Its refusal to rent its venues to rival promoters is therefore legally protected behavior. And Plaintiffs allege no facts that implicate the narrow exception to this otherwise blanket rule.

Courts have "long recognized [the] right of a [firm] engaged in an entirely private business, freely to exercise [its] own independent discretion as to parties with whom [it] will deal." *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)); *see also Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 449 (2009) (firm has "no antitrust duty to deal with its rivals"). It is thus a bedrock principle of American law that the Sherman Act does not require "forced sharing." *Trinko*, 540 U.S. at 408. This is because requiring firms to help their competitors would undermine the very purpose of antitrust law by impeding competition and hurting consumers. If "firms [must] share the source of their advantage," they have no "incentive . . . to invest" in their businesses because whenever one firm invests in superior assets, rival firms will have a path to capturing the same economic gain without shouldering any of the capital expense. *Id.* at 407-08. Without forced dealing, consumer demand results in more investment, new, desirable products and a responsive marketplace as rivals compete for business.

Courts are also wary of taking on the practical consequences of forced dealing, such as setting the prices and terms of dealing. Doing so would require judges to become "central planners, identifying the . . . terms of dealing" in complex and changing industries, "a role for which they are ill suited." *Id.* at 408. Judicial intervention can also have unintended consequences. *See It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 691 (4th Cir. 2016) ("anticompetitive effects and consequences . . . can ironically arise from antitrust lawsuits"). As the Supreme Court has warned, "compelling negotiation between competitors" can actually exacerbate antitrust concerns by requiring or "facilitat[ing] the supreme evil of antitrust: collusion." *Trinko,* 540 U.S. at 408; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 594 (1986) (improper application of antitrust doctrine can be "costly, because [it can] chill the very conduct the antitrust laws are designed to protect"). Thus, mindful of the grave antitrust dangers inherent in judicially imposed duties to deal, courts are steadfast in protecting "the broad right of a firm to refuse to deal with its competitors." *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 134 (2d Cir. 2014) (quoting *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) (per curiam)).

Applied to the reality of what Plaintiffs are complaining about, this rule forecloses Plaintiffs' tying claim. As Plaintiffs allege, live concerts generally require three parties: an artist, a promoter, and a venue. "For artists seeking to perform in major concert venues, promoters are an essential component to ensuring the show or tour is successful." Am. Compl. ¶ 200; *see id.* ¶ 194 ("the support of a promoter" is required for successful shows). One of the promoter's core responsibilities is lining up and contracting with venues, including amphitheaters if they are part of the tour schedule. *See supra at* Background Section A; Am. Compl. ¶ 208 ("promoters contract with amphitheaters"). Importantly, when Plaintiffs amended the Complaint knowing this motion was coming and that Defendants had advised the Court that promoters rent venues, not artists, they

did not add any new allegations about artists seeking to rent venues themselves. Rather, they confirmed that "promoters reach out to venues to inquire about availability and pricing" and "promoters enter into contracts for access to amphitheaters." *Id.* ¶ 208. They added, in each case, "on behalf of" artists, *id.,* but that simply confirms that among the services promoters provide to artists is procuring venues. As such, the Amended Complaint alleges that rival promoters wanting to include Live Nation amphitheaters in their tour offers are seeking to rent venues from Live Nation for their prospective artist-clients, and Live Nation is declining. That is a refusal to deal claim.

This provides the answer to the Court's question at the Initial CMC about how these facts "map" to the refusal to deal case law: in a word, *squarely*. Plaintiffs' theory is the same in substance as the one rejected in *Trinko*. There, customers alleged that Verizon, the dominant local exchange carrier (LEC), "denied" rival LECs access to certain of its network "elements" "in order to limit [rivals'] entry" into local exchange markets and "to discourage customers from becoming or remaining customers" of Verizon's competitors. *Id.* at 404, 407. Verizon's rivals needed access to these network elements to provide the same level of service to customers. *See id.* at 401-11. The rivals' own assets were insufficient. Like here, the plaintiffs in *Trinko* alleged that antitrust liability attached because Verizon's refusal to let its rivals use its network elements made for a less competitive market and narrowed customers' range of choice. *See id.* at 404. The Supreme Court soundly rejected that reasoning. The theory was "not a recognized antitrust claim," the Court held, because such "forced sharing" would contravene settled "refusal-to-deal precedents." *Id.* at 408, 410. This is the pattern in dozens of refusal to deal cases—and in this one. *See* ABA Antitrust Section, *Antitrust Law Developments (Ninth)* § 2(C)(3)(a) (2022) (collecting cases).

Notably, Plaintiffs do not even try to allege any facts that implicate the "sole exception to the broad right of a firm to refuse to deal with its competitors," which addresses the *termination* of *already-existing* relationships. *Adderall*, 754 F.3d at 134 (citation omitted).  The Supreme Court outlined this exception in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985).  There, the Court acknowledged that antitrust liability can attach when a firm "unilateral[y] terminat[es] [] a voluntary (and thus presumably profitable) course of dealing" with a rival.  *Trinko*, 540 U.S. at 409 (emphasis omitted).[3]  As the Second Circuit has reiterated, the "limited nature of [*Aspen Skiing's*] exception to the right of refusal to deal" restricts that exception's application to "when a monopolist seeks to terminate a prior (voluntary) course of dealing with a competitor." *Elevator Antitrust*, 502 F.3d at 53; *see also Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1074 (10th Cir. 2013) (*Aspen* exception is a "narrow-eyed needle").  Plaintiffs fail to allege that here.  They never once allege that Live Nation had, and then sought to terminate, an amphitheater arrangement with a competitor.  To the contrary, they allege that "Live Nation has a longstanding policy going back more than a decade of preventing artists who prefer and choose third-party promoters from using its venues."  Am. Compl. ¶ 113; *id.* ¶ 115 ("the company has restricted the use of its amphitheaters and other venues for years").  *Aspen Skiing's* exception thus cannot apply and the foundational duty-to-deal prohibition controls, foreclosing Plaintiffs' claim.  *See Adderall*, 754 F.3d at 134; *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 305 (D.C. Cir. 2023) (because firm "had no prior course of dealing" with rivals, exception did not apply).

---

[3] Of course, the relationship must also be critical to the functioning of the market.  Indeed, courts have evolved the *Aspen Skiing* exception into a three-part test.  *See New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 27 (D.D.C. 2021).  The foundation of it, however, is a "monopolist's discontinuation of [a] preexisting course of dealing."  *Id.*

**B.     Plaintiffs' Efforts To Recast A Refusal To Deal As Tying Fail**

Against all this, Plaintiffs resort to semantics.  Fundamentally, they seek to impose a duty to deal with rivals through legal characterization, *i.e.*, *saying* that there is tying when their own allegations show a refusal to deal.  Central to that strategy, Plaintiffs argue that because rival promoters purchase venues "on behalf of" their artist clients, the legal rules and doctrinal concerns about imposing an antitrust duty to deal with *rivals* are not implicated.

In assessing these arguments, the starting point is that what mode of analysis to apply—the choice of the applicable doctrinal framework—is a legal question appropriate for resolution on a motion to dismiss.  *See, e.g.*, *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 61 (1st Cir. 2004) ("Whether a plaintiff's alleged facts comprise a per se claim is normally a question of legal characterization that can often be resolved by the judge on a motion to dismiss or for summary judgment."); *In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d 1003, 1010 (N.D. Cal. 2008) ("the decision of what mode of analysis to apply—per se, rule of reason, or otherwise—is entirely a question of law for the Court"); *see also* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, § 1909b (2024); ("the selection of a mode [of antitrust analysis] is entirely a question of law" to be decided by the court).  The Court determines what rules to apply in relation to what the well-pleaded facts reveal, not by the label the plaintiff attaches to them.

**1.     Refusal To Deal Doctrine Cannot Be Evaded By Artful Pleading Alone**

Plaintiffs' attempt to plead around the bedrock legal rule forbidding duties to deal by styling their claim as one alleging a tie is not novel.  Other parties have tried to recast a refusal to deal claim as tying, but courts have wisely declined to entertain such end-runs, analyzing what are in substance refusal to deal claims as refusal to deal claims regardless of how plaintiffs artfully fashion their theory.  *See, e.g.*, *New York*, 549 F. Supp. 3d at 24-34 (refusal to provide API access to competitors could not be attacked as tying), *aff'd*, 66 F.4th 288 (D.C. Cir. 2023); *Rebotix Repair*

*LLC v. Intuitive Surgical, Inc.*, 2021 WL 1227593, *8 (M.D. Fla. Mar. 8, 2021) (plaintiffs tying allegations were "in essence a refusal to deal claim"). Indeed, another district court has *already* concluded that near carbon-copy allegations that Live Nation's venue and promotion services are tied should be "consider[ed] [] as a refusal to deal claim." *It's My Party, Inc. v. Live Nation, Inc*., 88 F. Supp. 3d 475, 501 (D. Md. 2015), *aff'd*, 811 F.3d 676 (4th Cir. 2016).[4] Again, substance is what matters, not characterization.

Here, the substance is revealed by the logic of the claim, which is that *rival promoters are harmed*—in a *promotions market*—because *they* cannot procure bookings at Live Nation amphitheaters. The "practical" problem that this claim seeks to redress is clearly stated in Paragraph 209 of the Amended Complaint: "artists . . . typically do not contract directly with individual venues, as artists work with promoters who take on the financial risk of shows or entire tours, arrange shows on their behalf, and promote their shows to their fans." In that context, the remedy in this case could not be a prohibition on conditional dealing *with artists*, as would be the norm in a tying case asserting a claim that *artists* had been the victim of a forced tie, because "artists … typically do not contract directly with individual venues." *Id*. The only way to sever Plaintiffs' alleged "tie" and allow other promoters to compete more effectively would be to require

---

[4] *It's My Party* concerned, among other things, allegations that "Live Nation tied its promotion services to performing in venues it owns." *Id.* at 490. The tying claims under Section 1 of the Sherman Act were dismissed at summary judgment for improper market definitions and the absence of evidence of coercion. *Id.* Plaintiffs also claimed that Live Nation engaged in monopolization through tying: "plaintiffs argue that Live Nation's 'forcing artists to use it promotion services at its venues ... [is actionable] as part of a scheme to enhance, maintain and abuse monopoly power.'" *Id*. at 501. In this context, the district court refused to accept plaintiffs' characterization of the conduct as tying, applied refusal to deal law, and held "plaintiffs obviously cannot succeed" because "[t]hey have not shown that Live Nation previously engaged in a cooperative scheme with other promoters and allowed them to book concerts at its venues and later withdrew this support." *Id*. at 502.

Live Nation to rent its venues to its rivals.  That is a clear indication that this is not genuinely a tying claim, but a unilateral refusal to deal claim foreclosed by *Trinko* and its progeny.

### 2.    The Amended Complaint Nowhere Alleges Tying

"A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product." *Eastman Kodak Co. v. Image Tech. Services, Inc*., 504 U.S. 451, 461 (1992) (quotation omitted).  It is thus a "fundamental principle of antitrust law that an illegal tying arrangement requires that at least two products and/or services be purchased by the same individual; that is, there must be lineal movement between the products."  *De Jesus v. Sears, Roebuck & Co*., 87 F.3d 65, 71 (2d Cir. 1996) (quotation omitted); *see also Illinois Tool Works Inc. v. Indep. Ink, Inc*., 547 U.S. 28, 34-35 (2006) (the "essential characteristic of an invalid tying arrangement" requires a single "buyer" of two products (quotation omitted)); Areeda & Hovenkamp, *Antitrust Law*, § 1700(a) ("[t]ying occurs when a seller refuses to sell a product that a buyer desires unless the buyer also agrees to purchase a second product").

Here, Plaintiffs fail to allege the most fundamental element of tying:  that a single buyer wanted to buy only one product from a seller, but was forced to buy two.  A genuine tying claim in the context of this case would mean that there are consumers—artists—who (a) wish to acquire the tying product (amphitheater access) directly from one firm and the tied product (promotional services) from a second firm, (b) seek to enter into contracts with Live Nation for the amphitheater access alone, and (c) are presented with terms obligating the purchase of the tied product from the seller of the tying product, rather than from a third-party seller.  It would be similar to *Kodak,* where the Supreme Court held that where some copier owners bought replacement parts *directly from Kodak*, selling those parts "on condition that [the customers themselves also] buy service from Kodak" could be tying.  504 U.S. at 462-63 & n.8.  Notably, that same reasoning did not apply to Kodak's policy of not selling parts *to the rival service organizations*, which was analyzed

as a unilateral refusal to deal. *See Image Tech. Services, Inc. v. Eastman Kodak Co.,* 125 F.3d 1195, 1209-12 (9th Cir. 1997).

Plaintiffs do not allege that artists engage in analogous, *Kodak*-like purchasing behavior, or that Defendants place similar conditions on rental agreements with artists. They plead "artists seeking to perform a tour of large amphitheaters typically do not contract directly with individual venues." Am. Compl. ¶ 209. Plaintiffs' claim is thus strictly about a vertically integrated promoter/venue operator with a unilateral policy not to rent amphitheaters alone to other promoters. As Areeda and Hovenkamp note, that sort of "[v]ertical integration also resembles tying, but . . . the law does not and should not treat vertical integration with the hostility it has applied to tying agreements." Areeda & Hovenkamp, *Antitrust Law*, § 760a.

### 3.    It Is Immaterial That Rival Promoters Would Be Renting Amphitheaters "On Behalf Of" Artist Clients

Plaintiffs' ultimate answer to all of this is to contend that the legal rule forbidding duties to deal does not apply here because promoters rent venues "on behalf of" their artist customers, and therefore one should look past the promoter and essentially *pretend* that Live Nation is entering into tying agreements with artists. Am. Compl. ¶ 208. That argument is meritless. There is no exception to the bar on using antitrust law to impose a duty to deal with rivals on this basis. Virtually every refusal to deal case concerns the effects the refusal to deal has on some rival's ability to do something "on behalf of" its current or potential customers. In *Trinko,* the competing phone service provider sought access to the defendant's telephony infrastructure *on behalf of* the rival's own customers. *See* 540 U.S. at 404-05. In *Aspen Skiing*, the plaintiff sought access to the defendant's mountains *on behalf of* skiers that would benefit from an all-mountain pass. *See* 472 U.S. at 589-99. In *Elevator Antitrust,* the plaintiffs sought elevator parts *on behalf of* their service customers. 502 F.3d at 52. None of the cases dealing with antitrust duties to deal would make

sense unless access to the defendant's assets allowed a rival to accomplish something "on behalf of" customers that it could not accomplish alone.  Yet under Plaintiffs' logic, every refusal to deal case that could be linked to the purchase of some other product could be challenged as tying.  That is simply not the law.

Plaintiffs' "on behalf of" argument is not only contrary to the entire body of law establishing that there is no duty to deal with rivals, it is also fatally undercut by the factual allegations in the Amended Complaint.  Specifically, Plaintiffs do not allege that promoters rent venues like a real estate broker might, as nothing but the delegate of a principal.  To the contrary, as Plaintiffs allege, promoters take on significant "financial risk" when agreeing to work with an artist.  Am. Compl. ¶ 194; *see also, id.* ¶ 209 ("promoters … take on the financial risk of shows or entire tours, arrange shows on [artists'] behalf, and promote their shows to their fans").  If a show "underperforms," a promoter suffers financial harm, in part because the promoter has "shoulder[ed]" the cost of the show—including the cost of the venue.  *Id.* ¶ 22.  But if a show is successful, a promoter captures "upside" "profit[]."  *Id.*  Plaintiffs go to great lengths to plead that when Live Nation is a promoter, it "extracts supracompetitive payments from venues, including large promoter rebates, and otherwise imposes onerous, restrictive contractual terms on venues." *Id.* ¶ 198.  The Amended Complaint is therefore describing an industry in which the promoter not only hires the venue, but also has an independent financial interest in the commercial terms.  And in that setting, the core competitive injury asserted in the "tying" claim is one in the market for concert promotion services.  *Id.* ¶ 241-46.  The idea is that *promoters* are allegedly being harmed as promoters because they cannot offer their clients performances at Live Nation amphitheaters. That is the quintessential refusal to deal injury—*the rival* is allegedly unable to compete effectively because the dominant firm allegedly restricts *the rival's* ability to provide the entirety of the

16

product or services that end-users desire.  There is no genuine tying arrangement anywhere in sight.

* * *

In short, Plaintiffs' tying claim must be dismissed because it seeks to impose a forbidden duty-to-deal without plausibly alleging the narrow conditions for a viable duty-to-deal claim. *Trinko*, 540 U.S. at 408; *Adderall*, 754 F.3d at 134.  Plaintiffs' efforts to recast what is unequivocally a refusal to deal as tying are unavailing:  (1) the case law is clear that the substance of the challenged conduct trumps semantic pleading labels, *see*, *e.g.*, *New York*, 549 F. Supp. 3d at 24-34; (2) the definitional elements of a tying arrangement are not optional—*i.e.*, the law *requires* that one buyer "purchase" two products for tying liability to attach, *see*, *e.g.*, *Kodak*, 504 U.S. at 461; *De Jesus*, 87 F.3d at 71; and (3) there is no "on behalf of" exception to the no duty to deal rule, and if there were, it would not apply to risk-bearing concert promoters as alleged.[5]

## II.    THE STATE PLAINTIFFS CANNOT ESTABLISH ANTITRUST STANDING ON THEIR CLAIMS FOR DAMAGES UNDER THE SHERMAN ACT

Twenty-seven State Plaintiffs seek treble damages in their *parens patriae* capacities—on behalf of consumers—for Defendants' alleged violation of Sections 1 and 2 of the federal Sherman Act.  Am. Compl. ¶ 517(j); *see also* 15 U.S.C. § 15c.  These State Plaintiffs' damages claims fail because they have not alleged—and could never allege—antitrust standing.

The doctrine of antitrust standing "prevents private plaintiffs from 'recover[ing] damages under [Section 4 of the Clayton Act, 15 U.S.C. § 15] merely by showing injury causally linked to

---

[5] Live Nation respectfully seeks dismissal of this claim with prejudice.  Plaintiffs have already amended their complaint in an attempt to address the infirmity in their tying claim, to no avail. And Plaintiffs have in fact affirmed in discovery responses that they have no evidence of *artists* booking amphitheaters or other venues, so there is no point in allowing them to amend to change their alleged facts around the core obstacle that the tying claim would impose a duty to deal with rival *promoters*.

an illegal presence in the market.'" *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013) (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)). "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Assoc. Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters*, 459 U.S. 519 ("AGC"), 534 (1983) (quotation omitted). Antitrust standing therefore requires a plaintiff to plausibly allege both that it (1) has suffered an "antitrust injury"—*i.e.*, an injury "of the type the antitrust laws were intended to prevent and that flows from that which makes [or might make] defendants' acts unlawful"—and (2) "that it is a suitable plaintiff to pursue the alleged antitrust violations and thus is an 'efficient enforcer' of the antitrust laws." *Gatt*, 711 F.3d at 76 (citations omitted). This is a "threshold question," and the absence of antitrust standing warrants dismissal. *See id.* at 75.

The antitrust standing requirement applies to states bringing federal antitrust claims in their *parens patriae* capacities. A state "plainly qualifies as a person" authorized to bring claims under Section 4 of the Clayton Act, "whether it sues in its proprietary capacity or as *parens patriae*." *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 261 (1972). Accordingly, the state "must still show that the residents on whose behalf it sues have a cause of action and could satisfy the usual rules of proximate causation and antitrust injury." Areeda & Hovenkamp, *Antitrust Law*, § 355; *see also Pennsylvania v. Nat'l Collegiate Athletic Ass'n*, 948 F. Supp. 2d 416, 432 (M.D. Pa. 2013) ("Plaintiff [Commonwealth of Pennsylvania] 'must still show that residents on whose behalf it sues have a cause of action' under the antitrust laws, and Plaintiff must adequately allege both an antitrust injury and demonstrate that it has antitrust standing." (citation omitted)); *New York v. Microsoft Corp.*, 209 F. Supp. 2d 132, 139 n.9 (D.D.C. 2002) ("[T]he case law which establishes the doctrine of *parens patriae* standing proceeds along a separate channel from the body of law

18

that defines standing and antitrust injury.").  The State Plaintiffs cannot establish antitrust standing, and therefore their federal damages claims must be dismissed.

### A.    The State Plaintiffs Fail To Allege That Consumers Suffered Antitrust Injury

Plaintiffs allege that Defendants engaged in anticompetitive conduct in at least six "relevant antitrust markets related to ticketing and promotions."  Am. Compl. ¶ 161.  The State Plaintiffs claim that, as a "direct and proximate result" of this alleged unlawful conduct, consumers in their states suffered injury in that "they have paid more and continue to pay more for fees relating to tickets to live events than they would have paid in a free and open competitive market."  *Id.* ¶ 223.  The State Plaintiffs fail to demonstrate that this purported harm constitutes cognizable antitrust injury.

### 1.    Consumers' Alleged Injury Does Not Occur In Any Market Where Competition Purportedly Is Restrained

"Generally, only those that are participants in the defendants' market can be said to have suffered antitrust injury."  *Aluminum Warehousing*, 833 F.3d at 158 (2d Cir. 2016).  Consumers ***do not participate*** in most of the markets alleged in the Amended Complaint.  They do not participate in any of the promotions-related alleged markets, where artists, promoters, and venues are the relevant players.  *See* Am. Complaint ¶¶ 192, 200, 207.  Nor do consumers participate in the "venue-facing" alleged ticketing markets, in which ticketing companies provide primary ticketing services to venues.  *See id.* ¶¶ 164 (alleging that "venues [are] the customers for these services"), 172.  Accordingly, the State Plaintiffs fail to allege that consumers suffered cognizable antitrust injury as a result of the alleged restraints in these purported markets.  *See Aluminum Warehousing*, 833 F.3d at 158; *Ocean View Cap., Inc. v. Sumitomo Corp. of Am.*, 1999 WL 1201701, at *3 (S.D.N.Y. Dec. 15, 1999) ("[I]n this case, plaintiff alleges that the defendants violated the antitrust laws through their actions on the LME futures market.  Plaintiff did not

participate in the LME futures market.  Hence, plaintiff is not a participant in the 'relevant market,' and the Sherman Act was not designed to protect plaintiff's interests with respect to defendants' activity on the LME.").

The *only* alleged market in which consumers participate is the purported "fan-facing" market for the "provision of primary concert ticketing offerings to fans at major concert venues" (and the alternative purported market for the provision of "primary concert ticketing offerings and services that provide resale for concert tickets to fans at major concert venues").  Am. Compl. ¶¶ 175, 185.  Plaintiffs allege that Defendants monopolized this purported market by engaging in the same conduct in which they supposedly engaged to monopolize the venue-facing ticketing markets, including threatening and retaliating against venues that contract with rival ticketers and entering long-term exclusive ticketing agreements with venues.  *Id.* ¶ 227.  But none of this alleged conduct occurs in the fan-facing market for the "provision of primary concert ticketing offerings to fans at major concert venues" (or the alternative market that includes resale offerings).  All of this conduct relates to Defendants' interactions with *venues* and *rival ticketers* in the "distinct" venue-facing ticketing markets.  *See id.* ¶¶ 161, 227.  Because consumers suffered their alleged injury in a different market (the fan-facing market) than the markets where competition was allegedly restrained (the venue-facing markets), the State Plaintiffs fail to establish antitrust injury. *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*, 190 F.3d 1051, 1057 (9th Cir. 1999) ("Antitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained."); *Aluminum Warehousing*, 833 F.3d at 161 ("[T]o suffer antitrust injury, the putative plaintiff must be a participant in the very market that is directly restrained.").

**2.**    Consumers' Alleged Injury Is Not "Inextricably Intertwined" With
Alleged Injury To Other Market Participants

There is a "narrow exception to the market participant requirement for parties whose injuries are 'inextricably intertwined' with the injuries of market participants," but this exception does not apply here. *See Aluminum Warehousing*, 833 F.3d at 158 (quoting *Am. Ad Mgmt., Inc.*, 190 F.3d at 1057 n.5). "[T]o assess the plausibility of a putative plaintiff's claim to antitrust injury as being 'inextricably intertwined' with the injury the defendants ultimately sought to inflict, courts ask whether the plaintiff was 'manipulated or utilized by [defendant] as a fulcrum, conduit or market force to injure competitors or participants in the relevant product and geographical markets." *Aluminum Warehousing*, 833 F.3d at 161 (citations omitted).

The Amended Complaint does not allege that Defendants used *consumers* as a means to injure competitors or other participants in the various alleged markets. With respect to the promotions-related markets, Plaintiffs allege that Defendants engaged in various anticompetitive acts involving artists, promoters, and venues. *See* Am. Compl. ¶¶ 244, 250-51, 258-59. Plaintiffs allege that certain of these practices "have had harmful effects on competition and consumers," *id.* ¶¶ 253-54, 261-62, but there are no allegations whatsoever that consumers or their alleged injuries (*i.e.*, high ticketing fees) were used as a "conduit" to injure artists, promoters, or venues in these promotions-related markets.

With respect to the ticketing markets, as discussed above, Plaintiffs allege that Defendants engaged in various anticompetitive actions involving venues and rival ticketers. *Id.* ¶¶ 225, 227, 234-35. Plaintiffs allege that this conduct resulted in harm to venues and rival ticketers, including that "venues have fewer real choices for obtaining concerts and ticketing services"; Defendants have "lock[ed] venues into [their] business model" and "dampened competition"; Defendants have prevented "rivals and nascent threats" from entering the market; and venues "reasonably fear the

disruption, retaliation, and complications of partnering with anyone other than Live Nation," which has "raised rivals' costs" in their agreements with venues. *Id.* ¶¶ 139-54. Plaintiffs do not claim that Defendants used consumers (or the fees they pay) as a means to cause these purported harms. *Cf. Blue Shield of Virginia v. McCready*, 457 U.S. 465, 479 (1982) (finding plaintiff plausibly alleged antitrust injury where her injury was "a necessary step in effecting the ends of the alleged illegal conspiracy"). Rather, these alleged injuries are the result of entirely separate transactions among Defendants, venues, and rivals.

Indeed, the purported injury to consumers (*i.e.*, that they "have paid more and continue to pay more for fees relating to tickets to live events than they would have paid in a free and open competitive market," *id.* ¶ 223) is not even "causally linked" to the anticompetitive conduct alleged in the purported ticketing markets—let alone injury "of the type the antitrust laws were intended to prevent and that flows from that which makes [or might make] defendants' acts unlawful.'" *See Gatt*, 711 F.3d at 76 (citation omitted). For example, Plaintiffs allege that, but for Defendants' allegedly unlawful exclusive ticketing agreements and purported threats of retaliation, venues would have more choices in ticketing providers, and rival ticketers would pay less money to venues in connection with their ticketing agreements. *See* Am. Comp. ¶¶ 146, 152. But Plaintiffs fail to explain why ticketing fees would be lower in this but-for world.

As a general matter, commercial actors—like venues—seek to maximize their profits. Plaintiffs acknowledge that "[w]hen venues set aspects of ticket fees, they must not only account for their own operating costs, but also ensure the fees are sufficient to cover all the payments the venues must make to intermediaries like promoters and ticketers." *Id.* ¶ 46. But the premise of their claim appears to be that in a world in which their marginal costs went down, venues would respond by gratuitously reducing prices for consumers rather than pocketing the incremental profit.

That would certainly be a surprising result from an economic perspective. Regardless, though, if Ticketmaster stopped entering exclusive contracts, venues would still have to "ensure the fees are sufficient to cover all the payments the venues must make" to other ticketers and promoters. *See id.* And according to Plaintiffs, Ticketmaster actually *overpays* venues by "sweeten[ing] ticketing contracts" to keep venues "locked into long-term exclusive agreements." *Id.* ¶ 154. In the absence of these exclusive agreements with Ticketmaster, the logical prediction is that venues would seek out similar or better financial deals for themselves, resulting in the same or even *higher* consumer fees.

The State Plaintiffs fail to establish antitrust injury for the consumers on whose behalf they seek damages. Their damages claims under the Sherman Act must be dismissed.

### B.    Consumers Are Not "Efficient Enforcers" Of The State Plaintiffs' Sherman Act Claims

Even if the State Plaintiffs had pled antitrust injury on the Sherman Act claims, these claims would still fail because consumers are not "efficient enforcers" of the antitrust claims alleged. *Gatt*, 711 F.3d at 78. Courts consider four factors to determine whether a particular plaintiff is an efficient enforcer, but the relative importance of each factor "will necessarily vary with the circumstances of particular cases," and not all factors are necessary to find that a plaintiff is not an efficient enforcer. *In re Aluminum Warehousing Antitrust Litig.*, 2023 WL 7180648, at *2–3 (2d Cir. Nov. 1, 2023) (quoting *Daniel*, 428 F.3d at 443) (finding just two efficient enforcer factors dispositive). The four factors are: (1) "the directness or indirectness of the asserted injury"; (2) "the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement"; (3) "the speculativeness of the alleged injury"; and (4) "the difficulty of identifying damages and apportioning them among direct and

indirect victims so as to avoid duplicative recoveries." *Daniel*, 428 F.3d at 443 (citation omitted) (affirming dismissal where plaintiff was not efficient enforcer).

As explained above, consumers' alleged injury (*i.e.*, paying high ticketing fees) is wholly unconnected to the competitive harms that Plaintiffs allege in the Amended Complaint. Consumers are not even participants in most of the alleged markets, and the purported anticompetitive conduct took place in "markets" distinct from the fan-facing market in which consumers purchased tickets. Moreover, as discussed above, the causal connection between the alleged anticompetitive conduct and consumers' injury is entirely speculative. *See Gatt*, 711 F.3d at 78–79 (finding that plaintiff was not an efficient enforcer where, *inter alia*, its "purported injuries are at best an indirect result of the primary asserted antitrust violation" and "the bulk of [plaintiff's] alleged damages are highly speculative"). And there are identifiable groups of other potential plaintiffs—namely, the venues, artists, and rival promoters and ticketers that actually participated in the markets alleged in the Amended Complaint—"whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement." *See AGC*, 459 U.S. at 542. According to the Amended Complaint, these market participants suffered more direct injuries as a result of Defendants' conduct. *See* Am. Compl. ¶¶ 144, 146, 149, 151–52. And of course the United States government itself is already asserting claims over precisely the same conduct—the states asserting federal antitrust claims are just piggybacking on that effort. At the end of the day, the consumers in whose shoes the States seek to stand are not "efficient enforcers" of the Sherman Act claims alleged in the Amended Complaint, and as a result, the State Plaintiffs lack antitrust standing to pursue damages on their behalf. *See Gatt*, 711 F.3d at 80. The Court should dismiss the State Plaintiffs' claims for damages under the Sherman Act for this independent reason.

## **CONCLUSION**

The motion should be granted and these claims should be dismissed with prejudice.

Dated: September 18, 2024

LATHAM & WATKINS LLP

_____

Andrew M. Gass (admitted *pro hac vice*)
Alfred C. Pfeiffer (admitted *pro hac vice*)
    *Co-Lead Trial Counsel*
Timothy L. O'Mara (admitted *pro hac vice*)
Jennifer L. Giordano
Kelly S. Fayne (admitted *pro hac vice*)
Lindsey S. Champlin (admitted *pro hac vice*)
Robin L. Gushman (admitted *pro hac vice*)

505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600

555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
(202) 637-2200

Andrew.Gass@lw.com
Al.Pfeiffer@lw.com
Tim.O'Mara@lw.com
Jennifer.Giordano@lw.com
Kelly.Fayne@lw.com
Lindsey.Champlin@lw.com
Robin.Gushman@lw.com

*Attorneys for Defendants Live Nation*
*Entertainment, Inc. and Ticketmaster L.L.C.*

CRAVATH, SWAINE & MOORE LLP

_____

David R. Marriott
    *Co-Lead Trial Counsel*
Lauren A. Moskowitz
Jesse M. Weiss
Nicole M. Peles

Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 474-1000

dmarriott@cravath.com
lmoskowitz@cravath.com
jweiss@cravath.com
npeles@cravath.com

*Attorneys for Defendants Live Nation*
*Entertainment, Inc. and Ticketmaster L.L.C.*