O9rWlivC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA, *et
al.*,

                    Plaintiffs,

              v.                          24 Civ. 3973 (AS)

LIVE NATION ENTERTAINMENT
INC., *et al.*,

                    Defendants.
                                          Conference
------------------------------x
                                          New York, N.Y.
                                          September 27, 2024
                                          11:00 a.m.

Before:

                    HON. ARUN SUBRAMANIAN,

                                          District Judge

                         APPEARANCES

MERRICK B. GARLAND
       Attorney General of the United States
       United States Department of Justice, Antitrust Division
       Attorney for Plaintiff United States of America
BY:    BONNY SWEENEY
       JOHN R. THORNBURGH II
       JENNIFER P. ROUALET
       LORRAINE VAN KIRK
       BRIAN A. WHITE
       ARIANNA MARKEL
       Assistants Attorney General

O9rWlivC

```
 1                      APPEARANCES CONTINUED

 2    LETITIA A. JAMES
           Attorney General of the State of New York
 3         Attorney for Plaintiff State of New York
      BY:  JEREMY R. KASHA
 4         AMY E. McFARLANE
           ELINOR R. HOFFMANN
 5         Assistants Attorney General

 6    BRIAN SCHWALB
           Attorney General of the District of Columbia
 7         Attorney for Plaintiff District of Columbia
      BY: ADAM GITLIN
 8         Assistant Attorney General

 9    MICHELLE HENRY
           Attorney General of the State of Pennsylvania
10         Attorney for Plaintiff State of Pennsylvania
      BY:  JOSEPH S. BETSKO
11         Assistant Attorney General

12    CRAVATH, SWAINE & MOORE
           Attorneys for Defendants
13         Live Nation and Ticketmaster
      BY:  DAVID R. MARRIOTT
14         JESSE M. WEISS
           NICOLE M. PELES
15         -and-
      LATHAM & WATKINS LLP
16    BY:  TIMOTHY L. O'MARA
           ROBIN L. GUSHMAN
17         ANDREW M. GASS

18    COHEN & GRESSER LLP
           Attorneys for Nonparty SeatGeek
19    BY:  RONALD F. WICK

20

21

22

23

24

25
```

O9rWlivC

| | |
|---|---|
| 1 | THE COURT:  All right.  We're here for a discovery |
| 2 | conference in United States of America v. Live Nation, *et al.* |
| 3 | Ms. Sweeney, are you going to be speaking on behalf of |
| 4 | the plaintiffs? |
| 5 | MS. SWEENEY:  Yes, your Honor, but I also have some |
| 6 | help today from my colleagues. |
| 7 | So, Mr. Thornburgh is going to address the motion to |
| 8 | compel the substantial completion date for discovery and some |
| 9 | of the other RFP issues, document request issues. |
| 10 | Ms. Roualet is going to discuss the secondary |
| 11 | ticketing issue raised by the defendants. |
| 12 | And then if your Honor has any questions about the |
| 13 | pending motion, which is fully briefed -- that is, the motion |
| 14 | to transfer -- Ms. Van Kirk is able to answer those questions. |
| 15 | I'll handle the other matters, and I'm sure that my |
| 16 | colleagues from the states will also want to speak on behalf of |
| 17 | the states. |
| 18 | THE COURT:  Ms. Sweeney, from your side, is anyone |
| 19 | planning to speak remotely on the line? |
| 20 | MS. SWEENEY:  No, your Honor. |
| 21 | THE COURT:  OK.  Because we have some technical |
| 22 | difficulties with the audio coming off the line, and so I just |
| 23 | wanted to figure that out. |
| 24 | All right.  For the defendants, Mr. Marriott, are you |
| 25 | going to be taking the lead? |

O9rWlivC

1          MR. MARRIOTT:  Good morning, your Honor.

2          I think it's fair to say we've divided the topics,

3     your Honor, and we can rise as appropriate when the issue comes

4     up.  Or I can recite them now if you prefer that.

5          THE COURT:  No.  That's fine.  We can handle it in

6     real time.

7          MR. MARRIOTT:  Thank you, your Honor.

8          THE COURT:  All right.

9          Thank you, everyone, for joining today.

10          First thing, as to the motion to transfer, it will be

11     denied, and the Court will issue its opinion and order on the

12     motion.  You should have that by Monday or Tuesday at the

13     latest.  So that will be on the docket.

14          Let's move to the motion to compel.

15          First of all, is there any live issue on the motion to

16     compel, based on the defendants' response?

17          MR. THORNBURGH:  Yes, there is, your Honor.

18          Good morning, your Honor.  John Thornburg, for the

19     United States.

20          Yes, we do think there is a live issue with regards to

21     the motion to compel, and it is plaintiffs' position that

22     defendants are continuing to improperly withhold these

23     communications in question.

24          Plaintiffs have a substantial need for these

25     communications, your Honor, and the communications, from our

O9rWlivC

```
1    perspective, are foundational to our discovery efforts, as they

2    likely contain factual information relevant to the parties'

3    claims and defenses.  We expect them to also lead to factual

4    information that is relevant to the claims, and they will

5    likely identify third parties the defendants may rely on, just

6    to quote their defenses.

7         THE COURT:  Do you have any reason -- well, let's make

8    sure that we're all on the same page here.  The defendants say

9    there are three documents, so you want those three documents.

10        MR. THORNBURGH:  Your Honor, I believe defendants'

11   letter indicated that there are at least three categories of

12   documents.  I could be wrong.  My understanding was that they

13   were describing categories, not necessarily particular

14   documents.

15        THE COURT:  Mr. Marriott, is that correct?  Or

16   whoever's going to handle it.

17        MR. O'MARA:  Tim O'Mara, Latham & Watkins, for

18   defendants.

19        So, your Honor, with respect to employees, it's three

20   categories, but two of those were oral.  So only one of the

21   sets of communication is in emails, and there's just two or

22   three of them.

23        THE COURT:  So there are three categories, but in

24   terms of documents that can be produced, to your knowledge, at

25   this point there are three documents.
```

O9rWlivC

| | |
|---|---|
| 1 | MR. O'MARA:  Yes, your Honor.  I will call it three |
| 2 | sets of communications between Live Nation employees and a |
| 3 | third party, two of which were oral, one of which is reduced to |
| 4 | a handful of emails; I would say three. |
| 5 | THE COURT:  And I understand the basis for your |
| 6 | refusal to produce those documents is work product privilege. |
| 7 | MR. O'MARA:  Correct, your Honor. |
| 8 | THE COURT:  And how is that work product privilege not |
| 9 | waived due to the disclosure of the documents in communications |
| 10 | to third parties with whom you have no common interest? |
| 11 | MR. O'MARA:  Your Honor, the way the waiver doctrine |
| 12 | works -- |
| 13 | THE COURT:  Hold on for one second. |
| 14 | Mr. Hernandez, we're going to have to cut off the |
| 15 | line.  We're going to cut off the remote line because we have a |
| 16 | technical difficulty that is leading to knocking.  And it's not |
| 17 | Halloween yet. |
| 18 | Does either side have someone critical on the line who |
| 19 | needs to be here remotely? |
| 20 | MR. MARRIOTT:  No, your Honor. |
| 21 | MS. SWEENEY:  No, your Honor. |
| 22 | THE COURT:  OK.  Let's cut off the line. |
| 23 | My apologies. |
| 24 | MR. O'MARA:  Thank you, your Honor. |
| 25 | The waiver doctrine your Honor's describing is |

O9rWlivC

1    applicable to the attorney-client communication, but that's not

2    the way the waiver works under the work product.

3          Work product has a broader protection of privilege,

4    and under the work product doctrine, if it reflects an

5    attorney's thinking, strategy, preparation for the case, it

6    still remains protected, and you see that in the case law, your

7    Honor, where one of the key issues here is that an attorney

8    interviewed a third party.  Analytical, investigative is

9    considered work product.  Potential witness list that counsel

10   would speak to is also considered work product.  And neither

11   one of those instances is ever considered a waiver.

12         The key issue in this instance is really the identity

13   of the person being talked to, is the work product.

14         THE COURT:  And you're not claiming that there's any

15   common interest with these third parties, correct?

16         MR. O'MARA:  Not the one we're talking about, no, your

17   Honor.

18         MR. THORNBURGH:  Your Honor, may I respond to that?

19         THE COURT:  Yes, you may.

20         MR. THORNBURGH:  So, courts in this circuit have found

21   that when a party communicates with an independent witness in a

22   litigation, that those communications are no longer entitled to

23   work product protections.  And I'd point the Court to *Aeroflex*,

24   219 F.R.D. 66, for that proposition.

25         THE COURT:  Can you give me that citation again.

O9rWlivC

1          MR. THORNBURGH:  Yeah, 219 F.R.D. 66.

2          I would also point out, your Honor, that counsel, in

3     their letter and counsel just now, referenced cases where

4     in-house counsel has interviewed an individual as part of a

5     precomplaint investigation.  That is not the types of

6     communications, one, that plaintiffs have requested here; and

7     two, defendants, as far as it was indicated in their letter,

8     did not indicate that their counsel interviewed these third

9     parties or anyone else regarding the precomplaint

10    investigation.  So we don't think that that case law is

11    applicable to the facts at hand.

12          MR. O'MARA:  May I respond, your Honor?

13          THE COURT:  OK.  Well, counsel, how do you respond to,

14    and I'm citing from *Patane v. Nestle Waters N. Am.*, a District

15    of Connecticut case, 2022 WL 6569823?  And this case says

16    district courts in this circuit have held that disclosure of

17    work product to a third-party witness in the action waives the

18    protection where the witness does not share a common interest

19    with the disclosing party, citing to *Subramanian v. Lupin Inc.*,

20    2019 WL 12038811 at *4 (S.D.N.Y. 2019).

21          MR. O'MARA:  Your Honor, I think the issue is that

22    that assumes that there is some work product communication

23    being disclosed here.  The issue that we're talking about is

24    the identity of either a potential witness or the identity of

25    someone interviewed.  So to be clear, this is, at the direction

O9rWlivC

1   of counsel, someone asking a venue, in one instance, and an

2   artist agent, in another instance, if they could attend a

3   precomplaint meeting with the DOJ's front office.  So what that

4   reflects, by having to disclose the identity of that potential

5   witness, that is the work -- if we had to disclose that in

6   response to this discovery, that would disclose the work

7   product, because it would reflect, and what the case law says

8   here -- and we've cited these cases, but these are Southern

9   District of New York cases, for example, *Steele*, 2016 WL

10  1659317, finding the identities of the individuals interviewed

11  by plaintiffs were protected work product.

12          There's also, not only is there case law about the

13  interviews, but there's also very clear --

14          THE COURT:  Excuse me.

15          Could you give me the citation there.

16          MR. O'MARA:  Yes.  I'm sorry.

17          It's 2016 WL 1659317.

18          Another case, your Honor, which we would point to is

19  *United States v. U.S. Airways*, 2013 WL 12341600, where it talks

20  about the fact that forcing counsel to disclose the list of

21  witnesses with whom the counsel spoke is protected because to

22  force them to disclose that would reveal, more or less, the

23  variability of the witnesses in the counsel's mind in preparing

24  for trial.

25          MR. THORNBURGH:  Your Honor, may I respond to one

O9rWlivC

1  thing counsel said?

2          THE COURT:  You may.

3          MR. THORNBURGH:  So, I just want to comment on one

4  category of communications here regarding defendants reaching

5  out to third parties to attend a potential meeting with the

6  Department of Justice, and clearly when defendants reached out

7  to those third parties, they had in mind that those individuals

8  would attend the meeting, and the identity of those third

9  parties would become known to plaintiffs in this action.  And

10  so again, the question in the Second Circuit here is whether

11  the transmittal of the communications in question substantially

12  increased the likelihood that potential adversaries -- here,

13  either plaintiffs or potentially third parties -- would obtain

14  the communication and information within it.  So clearly, when

15  defendants reached out to the third parties about attending a

16  meeting with the Department of Justice, they intended for the

17  identity of those third parties to become known to the

18  Department of Justice.

19          THE COURT:  Yeah.  I think that that's compelling, and

20  I think that counsel is correct as to the relevant standard.

21          Additionally, in terms of the communications that are

22  memorialized in written documents, if the communications

23  themselves are not what is privileged and would otherwise be

24  subject to disclosure to the government, that would invariably

25  disclose the identity of the recipient.  And so based on the

O9rWlivC

standard that counsel has articulated, that is repeated in the

cases that I cited, it would seem that the disclosure of the

communications and the outreach would substantially increase

the risk of disclosure to third parties, including the

government.  Indeed, the purpose of the communications was to

potentially facilitate these third parties joining meetings.

So for those reasons, the motion to compel will be

granted as to the three documents.  And then as to the

interrogatory -- well, let's stop at the documents for a

second.

Then as to the interrogatory, counsel, is your

submission that they cover the same ground, meaning that you're

asking for the identities of those third parties, but is it

within that category where there would have been a substantial

increase in the likelihood of disclosure of those identities

because those people were being asked to come to meetings?  Or

is it more broad than that?  Because defendants' counsel has

pointed to cases like *Steele*, which involve attorneys having a

list of witnesses or people that they've identified and

interviewed prior to a case moving forward, and he indicates

that courts have held that work product privilege may attach to

the attorney's identification of those third parties.

MR. THORNBURGH:  So, your Honor, the interrogatory

covers any communications that defendants had with third

parties, and we would, you know, submit that the communications

O9rWlivC

1  in question beyond the category we've just discussed are

2  unlikely to contain attorney work product because as far as we

3  know, again, these are just communications with third parties.

4  The case law regarding interviews in regards to, you know,

5  internal investigation that predates a complaint is really not

6  applicable to the facts at hand.

7             THE COURT:  OK.

8             Counsel, do you want to speak specifically to the

9  interrogatory?  Because I think it might be on different

10  footing than the disclosure of the documents that we're talking

11  about here.

12            MR. O'MARA:  Your Honor, I think you're exactly right,

13  which is to say that the point is there that it's the identity

14  that is the work product.  It's the potential witness list, and

15  it goes beyond an interview.  It is literally, like, who

16  counsel thought might be a potential helpful witness list, and

17  that is itself what is protected.

18            THE COURT:  And I'm looking at how the interrogatory

19  is set forth, and it's more broad than a potential meeting with

20  the government or something like that.  Right?  It's literally

21  identify all the third parties that you communicated with about

22  the investigation or the litigation.  Is that correct?

23            MR. O'MARA:  That's correct, your Honor.  As drafted,

24  both the RFP and the log would initially call for potentially

25  any communications with over 10,000 employees and some unknown

O9rWlivC

| | |
|---|---|
| 1 | set of parties over huge swaths of our business.  What happened |
| 2 | there, your Honor, is through the meet-and-confer process -- |
| 3 | THE COURT:  You narrowed it down. |
| 4 | MR. O'MARA:  They've been narrowed down. |
| 5 | THE COURT:  And I thank the parties for their efforts |
| 6 | in doing that. |
| 7 | I'm going to deny the motion to compel as to the |
| 8 | interrogatory response.  It's granted as to the documents. |
| 9 | It's denied as to the interrogatory response. |
| 10 | MR. O'MARA:  Thank you, your Honor. |
| 11 | MR. THORNBURGH:  Your Honor, if I could just clarify? |
| 12 | I just want to make sure we're all understanding. |
| 13 | There was more than one category of documents that was |
| 14 | at issue.  My understanding, based on defendants' |
| 15 | representations in their letter, there was more than one |
| 16 | category of documents that was at issue with regard to the RFP |
| 17 | request.  I just want to make sure we understand that your |
| 18 | decision relates to the documents that are responsive to the |
| 19 | requests as a whole, not just the category regarding |
| 20 | communications with -- that led up to the Department of Justice |
| 21 | meeting. |
| 22 | THE COURT:  Yes, that's correct. |
| 23 | At this time that's only three documents, right? |
| 24 | MR. O'MARA:  Between the Live Nation employees and the |
| 25 | third parties, yes, your Honor. |

O9rWlivC

1      THE COURT:  OK.  So it applies to all three of those

2  documents at this time.  But I understand the nature of your

3  question, which is that let's assume for the moment that the

4  defendants go back and they find additional documents, the

5  Court's ruling would apply to those documents as well.  If

6  there is some additional basis for the refusal to produce those

7  documents, then, counsel, I expect you'll raise that with the

8  Court at the appropriate juncture.  But if these documents were

9  furnished to third parties who had no existing common-interest

10  arrangement with the defendants at that time, then, counsel,

11  given the standard that you articulated, which is that if it's

12  going to substantially increase the risk of disclosure, then

13  obviously that would be satisfied by providing documents,

14  written communications to third-party witnesses who are not

15  subject to any common-interest arrangement.  So it would apply

16  to all those documents.

17      MR. THORNBURGH:  OK.  Thank you, your Honor.

18      THE COURT:  OK.  That's the motion to compel.

19      What is next?

20      MR. THORNBURGH:  Next on the plaintiffs' agenda was

21  the interim and substantial completion deadlines for document

22  productions, your Honor.

23      THE COURT:  All right.  And this is a fair concern,

24  because we have fact depositions to be completed by June and

25  expert reports in July.  Is that correct?

O9rWlivC

1          MR. THORNBURGH:  That's correct, your Honor.

2          THE COURT:  OK.  So do you have a proposal as to a

3    substantial completion deadline?

4          MR. THORNBURGH:  Well, your Honor, when we spoke with

5    the Court in July and you spoke to my colleague, I think you

6    made some statements that, referencing six months prior to the

7    end of discovery would be an appropriate deadline for

8    substantial completion, document production.  And that would be

9    in December of this year.

10          As you may recall, plaintiffs sought a deadline that

11    was sooner than that, but we certainly think, at minimum, the

12    December deadline for substantial completion would be

13    appropriate.

14          I'll just add, your Honor, that given some of the

15    delays that we described in our letter, our joint statement,

16    joint letter to the Court, plaintiffs are concerned that based

17    on kind of the current pace of document production from

18    defendants, so we would be unlikely -- or they would be

19    unlikely to even meet that deadline, and so we would also

20    propose additional deadlines for interim productions, search

21    term proposals and privilege logs, which I'm happy to discuss

22    with the Court.

23          THE COURT:  OK.

24          Mr. O'Mara, are you going to be handling this?

25          MR. O'MARA:  Yes, your Honor.

O9rWlivC

1          THE COURT:  First, have the parties met and conferred

2     on this?  Because I think it's in everyone's interests to have

3     more clarity as to when documents would be produced.  I think

4     it makes sense to have a schedule.  I don't want to impose one

5     on the parties if you're in the middle of having these

6     discussions and you think you could come up with a reasonable

7     schedule.  I do think something around the December, January

8     time frame for substantial completion makes a lot of sense.

9     But in terms of all the nitty-gritty about what happens between

10    now and then, the parties have been working cooperatively and

11    so I prefer the parties to do that.  I know you don't want to

12    have weekly calls with the plaintiffs.  They seem like

13    delightful people, and so you think maybe you'd want to get on

14    the call, but if you don't, that's your business.  But maybe

15    you have a useful suggestion along these lines.

16         MR. O'MARA:  Thank you, your Honor, very much so.  And

17    I appreciate your Honor's position about not wanting to get

18    into the nitty-gritty between now and whatever date we end up

19    picking for substantial completion deadline.

20         The first thing that I'd like the Court to hear is the

21    defendants are happy to talk about any deadline, whether that's

22    December, January, even November.  That's not our issue, but I

23    think you can't talk about that date in the abstract.  Right?

24    So what we have to talk about when we start to have a

25    conversation with your Honor about a substantial completion

O9rWlivC

 1    deadline, we have to start with what we are being asked to do

 2    between now and then and what is humanly possible.  Right?

 3         And so if your Honor will indulge me for a second, I

 4    just want to sort of lay the context for that, and to do that I

 5    want to explain a little bit what happened with the CID and the

 6    numbers that came out of that and what would mean going forward

 7    based on the discovery we've seen.

 8         Let me start with the bottom line, your Honor.  If you

 9    take the discovery that's been served to date and you take the

10    number of custodians which have been identified by the

11    plaintiffs and you take the number, the search terms that have

12    been proposed, which were ones used during the CID, you end up

13    with something north of -- it would take over 600,000 attorney

14    hours to review those documents at a cost of about $15 million.

15         So if you'll indulge me for a minute, I just want to

16    explain how we actually get to that number.

17         We start, we're looking historically as to what

18    happened.  This isn't a case that's starting from scratch.

19    Obviously we had an 18-month civil investigative demand that

20    took place before the complaint was filed.  During that

21    investigation there was 48 custodians that were used over a

22    five-year period, and so we collected their documents and we

23    applied a set of agreed-to search terms.  That resulted in a

24    set of documents that was three million documents to be

25    reviewed.  We ended up reviewing 2.4 million of those

O9rWlivC

documents.  600,000 were deemed responsive and produced.  1.8

were deemed not responsive and not produced.  600,000 were

left.

      To get through the 2.4 million documents over that

18-month period, most of which was in the 12-month document

review period took -- this is a factual record -- 200,000

attorney hours.  I'm not talking about hours for anybody at

this table or anybody working on the CID.  I'm talking about

contract reviewers and a QC team.  That 200,000 hours translate

into a cost to defendants for the documents produced during the

CID of $16 million.  So that's historically what happened, and

it gives us some metrics that we can use to predict what it

would take to get through the current asks.

      So let me break down the current asks.

      We start, your Honor, with the 48 custodians that were

involved in the CID.  Now during the CID, that was a five-year

period.  NOW plaintiffs have come back and said they want an

additional three years here plus two custodians that were on

our initial disclosures which were not CID custodians.  We were

able to collect the emails for just that set, the CID refresh,

two new, and then because these custodians were used during the

CID, we can look at the ratio of their systems emails to their

other documents and figure out what that universe will be just

for this refresh, and that's -- after applying the search terms

in the CID, that's another 2.2 million documents being

O9rWlivC

1    reviewed.  So it's almost identical to what got reviewed during

2    the CID.

3            So you can assume just the refresh on the CID

4    custodians will take another 200,000 attorney hours and another

5    $16 million.  But that's just the beginning, because on

6    Wednesday night, the plaintiffs sent us over the proposal for

7    new custodians in this case, and it's double.  It's another 48,

8    so -- to look over the same eight-year period.  So, basic math

9    will tell you the same thing.  You can make an assumption that

10   that new set of 48 custodians that we received on Wednesday

11   night will have roughly the same number of documents after our

12   search terms are applied over an eight-year period as the first

13   48 did, meaning that -- so the custodians identified on

14   Wednesday night will represent another 5.2 million documents to

15   be reviewed.  At the pace of the CID, that's another 400,000

16   attorney hours to get through it at a cost of $32 million.

17           So if you put those things together, your Honor,

18   that's where -- setting aside the 200,000 hours we already

19   spent on the CID and 16 million we already spent, just look at

20   the refresh plus the new custodians, approximately 600,000

21   attorney hours at a cost of $48 million.

22           What our takeaway from that is, your Honor -- first of

23   all, we have to ask ourselves what's going on here.  Obviously

24   that's extremely unusual.  You would expect in a case that the

25   government has spent 18 months investigating, that there would

O9rWlivC

| | |
|---|---|
| 1 | be some focus.  And instead, here, where we've produced 600,000 |
| 2 | documents and received another 500,000 from third parties |
| 3 | during the CID, they're essentially saying they need millions |
| 4 | more documents to bring this case to trial.  Set that aside, |
| 5 | what I think it most means here is that when you talk about any |
| 6 | sort of substantial completion deadline, whenever your Honor |
| 7 | wants it to be -- and we have very much a vested interest in |
| 8 | getting this case to trial as quickly as possible too; we would |
| 9 | like to see that -- we have to talk about, in connection with a |
| 10 | substantial completion deadline, we need to talk about what |
| 11 | that means, as the upper limit of the number of documents that |
| 12 | we need to review, and the metric for doing that, your Honor, I |
| 13 | think, is that what we would propose, the defendants, is we are |
| 14 | willing to, and we propose using a hundred contract attorneys |
| 15 | per business day plus a QC team of no less than ten additional |
| 16 | attorneys. |
| 17 | Now, a common metric that is used when we're talking |
| 18 | about document reviews -- |
| 19 | THE COURT:  Can I stop you for just a moment. |
| 20 | Have you had these discussions with Mr. Thornburgh? |
| 21 | MR. O'MARA:  Your Honor, for example, we just received |
| 22 | their custodian proposal for the new custodians Wednesday |
| 23 | night, very late.  So the answer is no. |
| 24 | MR. THORNBURGH:  Your Honor, may I respond to that, |
| 25 | please? |

O9rWlivC

1          THE COURT:  Well, I don't want to live in the past.

2    Let's just talk about where we are right now, because again,

3    the parties have been working cooperatively, and it's reflected

4    in these motion papers and everything else, that I think the

5    government is mindful of some of the logistical challenges that

6    Mr. O'Mara is referring to and has tried to work with the

7    defendants to make sure that what you're seeking is going to be

8    the truly relevant and important documents for this case.  I

9    think you understand you're not going to get every single piece

10   of paper that's potentially about the things that are at issue

11   in this case.  It's just not feasible in the time period that

12   we have, and I'm not telling you anything you don't know.

13         MR. THORNBURGH:  Of course, your Honor.

14         THE COURT:  And so what it seems like is that perhaps

15   there needs to be a little bit more discussion in terms of the

16   scope of discovery and that you're willing to work with the

17   defendants to address the issues that Mr. O'Mara has raised.

18   Is that fair?

19         MR. THORNBURGH:  We are, your Honor.

20         THE COURT:  OK.  What you'd like is just an outside

21   cutoff.  Now, if I give you an outside cutoff for substantial

22   completion, and what I'm thinking of is in the middle of

23   January, which would be -- I invariably place things on

24   weekends, but let's just say January 15.  OK?  So if it's

25   January 15, I'll give you that, but I am going to be sensitive

O9rWlivC

1   to some of the issues that Mr. O'Mara has raised.  And so if

2   they come back next week or in two weeks and say the government

3   is demanding these documents and it's just not feasible with

4   the January deadline for us to be able to produce those, you'll

5   know that I'll just hear that because of the things that Mr.

6   O'Mara has said.

7          Now, footnote that I'm sure there are ways to cut

8   through some of the attorney hours that Mr. O'Mara is referring

9   to, using either technological solutions or additional refined

10  search terms, perhaps.  I know we have a clawback provision

11  here, so if we're filtering out privileged documents, it may be

12  that they can foist a lot of the work on you, which you might

13  not want, by giving you documents, whether they might be

14  totally irrelevant to this case or not, and say:  Good luck.

15  Here are the documents you wanted.  Applying the search terms

16  you asked for, we filtered out the privileged documents; now

17  you review them -- which might be more of a burden for you than

18  on them.

19          That's a lot.  I'll allow you to respond.

20          MR. THORNBURGH:  Yes, your Honor, and I will just say

21  everything you just said makes sense.

22          We are more than willing to work with defendants on a

23  plan that makes sense, given the timeline for this case.  I

24  will just say, your Honor, we've been asking for the type of

25  information that counsel just provided to the Court.  We've

O9rWlivC

1    been asking for that information regarding the number of

2    documents reviewed during the investigation, remain

3    outstanding, etc.  We've been asking for that for weeks if not

4    more than a month, and defense counsel has declined to provide

5    us with that information.  And so we are willing to meet and

6    confer and to figure out search terms and talk about

7    methodology that would work to address defense counsel's

8    concerns.  But we would ask that defense counsel provide us

9    with the information that they just provided with the Court.

10             THE COURT:  Well, they just provided it to you too.

11             MR. THORNBURGH:  I meant on an ongoing basis, your

12    Honor.

13             THE COURT:  I understand.

14             MR. THORNBURGH:  Yeah.

15             THE COURT:  I understand.  And this is a good reminder

16    that the parties do not need to wait for these monthly meetings

17    to raise these issues.  If you feel like time is slipping away

18    and it is getting down to it, then Mr. Thornburgh, you can

19    follow the Court's practices, jump on a call with counsel for

20    the defendants and then bring that issue to the Court's

21    attention, and I'm happy to spend as much time as it takes over

22    the phone to try to resolve these issues in between these

23    meetings, because obviously, especially given the numbers that

24    Mr. O'Mara is talking about, these are not often things that we

25    can resolve in a single meeting month to month.  And hopefully

O9rWlivC

1    that will help resolve things.

2        Mr. O'Mara, I'm not drawing any inference based on

3    Mr. Thornburgh's submission as to the pace of communications in

4    this case.  The only thing I'll say is that if there is a

5    reasonable request for information and if you have that

6    information at your disposal, I know that a lot of times in

7    litigation we don't like to help our adversaries, but it might

8    be helpful to you to provide the information at a quicker pace

9    so that it can then be factored into what the government is

10   doing, because I do think that on both sides we have people

11   operating in good faith, honest brokers.  And so I don't think

12   that -- just by delaying things, all you're going to get is

13   that in the next, the October meeting you're going to hear from

14   plaintiffs' counsel that they asked for information and didn't

15   get a response, which is something you can avoid.

16        MR. O'MARA:  Absolutely, your Honor.  And we agree,

17   completely agree with that.  All I'll say is the obvious, and I

18   don't think it even needs to be said here, but obviously, from

19   our perspective, the numbers I'm giving you depend on a

20   meet-and-confer where we're talking about which custodians are

21   going to be at play, which search terms, all of that has played

22   out over the last month.  I don't quite agree on the timing.  I

23   agree with your Honor's point that more information is helpful,

24   we should get it out there, and we will do so.

25        THE COURT:  The parties should continue to meet and

O9rWlivC

1    confer.

2              Mr. Hernandez, is January 15 a weekday?

3              THE DEPUTY CLERK:  Yes, it is, your Honor.

4              THE COURT:  OK.

5              So I'm going to impose a substantial completion

6    deadline for the production of documents -- that's on both

7    sides -- of January 15.  I think that's reasonable in light of

8    the schedule that we have for depositions as well as expert

9    reports.  And given that deadline, I anticipate -- well, I'm

10   hoping that the parties will be able to work out a protocol for

11   the production of documents, privilege logs, etc.  However, I

12   am here.  So if there are disputes, bring them to the Court

13   sooner than later so that there's not a logjam during the

14   holidays and going into January.  And we'll figure all this

15   out.

16             MR. O'MARA:  Thank you, your Honor.

17             THE COURT:  All right.  What is next?

18             And the reason why I keep asking what is next is that

19   the Court received an agenda of issues, but the defendants have

20   suggested that by the time that we got here today, many of

21   these would be moot.  And so some of these might not be issues

22   that the parties need to raise with the Court, but I am here to

23   listen as to any outstanding issues from the plaintiffs'

24   perspective, and then we'll obviously shift to defendants.

25             MR. THORNBURGH:  Your Honor, I believe, although I

O9rWlivC

1    don't have the agenda in front of me, but the next issue is our

2    request for production No. 3, which concerns documents that

3    defendants have already reviewed in response to the

4    investigative subpoenas or CIDs issued by plaintiffs that have

5    not been produced.

6            THE COURT:  Defendants say they have produced them.

7            MR. O'MARA:  Your Honor, if I may?

8            I think this is just a misunderstanding or semantics.

9    I gave you the number that, the documents that were after the

10   search terms that were applied during the CID is 3 million.  Of

11   that 3 million, we got through, before the complaint was filed,

12   2.4 million.  Again, 1.8 not responsive; 600,000 produced.  I

13   think plaintiffs are under the misimpression that those 600,000

14   or some subset of them are ready to go out the door, that we

15   fully coded them responsive and that we're just deciding not to

16   give them to the government because the complaint was filed.

17   That's not true.

18           There are no documents in the 600,000 that were left

19   that were fully ready to be produced.  There's some that are in

20   process.  There's some that haven't been looked at, but there

21   was nothing that was deemed ready to go out the door and that

22   we're just withholding.

23           THE COURT:  OK.  So you're not refusing to produce

24   documents that were previously deemed to be responsive.

25           MR. O'MARA:  We're not refusing to produce anything

O9rWlivC

that was through the review process and ready to be produced, your Honor.

THE COURT:  OK.  So just as with all the other documents, you're --

MR. O'MARA:  Exactly.

THE COURT:  -- going to review them and then produce them as appropriate.

MR. O'MARA:  Your Honor, I think that goes to where we just left off, which is it goes to what the government wants us to spend our time on between now and the substantial completion.  We're happy to meet and confer on any of that, whether it's the custodians, whether it's the year involved, whether it's that set or whether it's something else.

THE COURT:  OK.

Mr. Thornburgh, I think as to the issue that the plaintiffs brought to the Court's attention, which is the refusal to produce documents, I don't believe that there is a refusal, and so you'll let me know if, in fact, there is a refusal.

MR. THORNBURGH:  No, your Honor.  I will just say, and I know you don't want to deal with the past, and I understand that.  We did request -- we spoke to the defense about this request several times over more than a month period, and defendants indicated to us that they were refusing to produce documents responsive to this request.  It was, in fact, in

O9rWlivC

1    defendants' statement to the Court just this past Monday that

2    we learned for the first time that defendants say there are no

3    such documents.  If there are no such documents, there are no

4    such documents, and we agree we can move on.  But that has not

5    been what defendants have told us throughout this process until

6    Monday.

7         THE COURT:  I understand, and now you've got it on

8    record, so you can order a copy.  Everyone should order a copy

9    of the transcript.  I always forget to tell people that, so

10   I'll tell you that right now.  And you've got them on record.

11        And again, this is why I am here, to resolve these

12   things quickly.  And so if you feel in the future, next week,

13   the following week, that you're running into the same issues,

14   then all you need to do is follow those practices, get on a

15   call, we'll have a court reporter and we'll set things

16   straight.

17        MR. THORNBURGH:  Thank you, your Honor.

18        THE COURT:  OK.  So request No. 3 is done.

19        Is there still an issue on request No. 5?

20        MR. THORNBURGH:  From plaintiffs' perspective, there

21   is, and I think it falls into two buckets primarily.

22        One is we do believe, based on defendants'

23   representations on a call we had with them a week ago, that we

24   are closer.  We can hopefully meet in the middle, so to speak,

25   at an agreeable place, but defendants have yet to provide that

O9rWlivC

```
1    proposal in writing.  And based on some of our, you know, prior

2    experiences, we are cautiously optimistic but we would ask that

3    defendants actually put that proposal in writing so we can have

4    a record of it.

5           The second issue pertains to what is in our letter,

6    which is that there is a disagreement here about how to handle

7    artist promotional contracts, which from plaintiffs'

8    perspective, are significantly important to several claims in

9    our case.  And I understand that defendants have some concerns

10   about the competitive sensitivity of those contracts, but from

11   our perspective, that should not be a burden to producing what

12   are otherwise responsive documents to our requests, and

13   certainly relevant.

14           THE COURT:  OK.

15           Mr. O'Mara, are you going to be handling this one?

16           MR. O'MARA:  Yes, your Honor.

17           THE COURT:  OK.  So as to the written proposal, can

18   you get that to the plaintiffs by Monday?

19           MR. O'MARA:  Yes.  Absolutely, your Honor.

20           THE COURT:  OK.

21           You'll get the written proposal by Monday.

22           Now let's turn to the confidentiality issue.

23           MR. O'MARA:  Your Honor, to back up again, I think

24   like a lot of these discovery issues, and I know we're not

25   dealing in the past, but you have to put this in the context of
```

O9rWlivC

1    what happened during the CID, which is this isn't a situation

2    where we're starting fresh and no contracts have been produced.

3    This is a situation where, in fact, a lot of material's already

4    been produced, both data and documents.

5         So what does that mean in respect to these tour

6    contracts?

7         Well, these tour contracts, your Honor, when I say

8    that they're highly sensitive, your Honor can appreciate that

9    these are some of the most famous people in the world.  Right?

10   Like, these are unbelievably famous bands.  This is a

11   relationship business.  The contract with these people matter,

12   are very sensitive.  It impacts the dynamics in the industry,

13   and certainly it's very important to our client from a business

14   client relationship standpoint.  So in that spirit, what we

15   have said in the meet-and-confer with the plaintiffs is during

16   the CID you identified 70 artists that you wanted tour

17   contracts for, and we pulled the tour contracts for those 70

18   artists and produced 80 tour contracts.

19        So they have these 80 contracts that they believe are

20   necessary for their case.  And what I asked for was, I said

21   could you please take a look at those 80 contracts and tell me

22   what information in those contracts you think you need for your

23   case so we can see if, maybe, there's another way to provide

24   that information without having to actually produce these very

25   sensitive contracts with these very famous people.  And the

O9rWlivC

answer was, yes, we will get back to you on that.  And that
was, that was only two weeks ago, and so we have -- actually, a
week ago.  I'm sorry.  So we haven't finished that
conversation.  But during that meet-and-confer, plaintiffs said
I can tell you on the fly that these are very important
contracts for our case because we want to see how artist
compensation has changed, potentially changed over time,
whether artist compensation varies by genre, whether the artist
compensation by routing and in particular routing through Live
Nation owned and operated venues.  And your Honor, the answer
to that is that is a data question.

There is an unbelievable amount of data being
requested in this case and being produced in this case, and
every one of those items that I just ticked through, it can be
answered without the contract by looking at the data.  And in
fact, if that is your concern and that is what you're looking
for, the only way to answer those questions -- comprehensively,
accurately, across the industry -- is to look at the data and
not to try and do a bespoke analysis contract by contract.

So it's not that we're refusing to produce contracts,
your Honor.  We've produced an enormous number of them already,
and we've asked for this one particular set of very sensitive
documents.  If there's something else that the government can't
get through the data or the sample they have to let us know and
we can have a conversation about it.

O9rWlivC

1          THE COURT:  Mr. Thornburgh.

2          MR. THORNBURGH:  Yes, your Honor.

3          So, a couple of responses.

4          First of all, we did just have this call a week ago.

5     There are additional reasons that the contracts are relevant

6     beyond the reasons that I was able to articulate on the fly to

7     counsel back a week ago.  But beyond that I do want to respond

8     specifically to the compensation point, because I think it's

9     important.

10          Our understanding of the way that, at least based on

11    what we've seen so far from defense counsels' data, that that

12    data is stored.  And we actually heard this from defendants'

13    executives themselves, is that it's actually not possible, as

14    far as we understand it, to go into Live Nation's systems and

15    look up a particular artist and understand how much they were

16    paid for that contract, to actually get all of the compensation

17    that's associated with it.  It's done at lower levels of

18    granularity, and not all of the sources of compensation are

19    always accounted for.  And so that's one reason why getting the

20    actual financial terms that are in the contract is important,

21    because we necessarily can't get that information from the data

22    that we've seen thus far from defendants.

23          THE COURT:  Mr. O'Mara raised the idea of having a

24    certain set of those documents that you would get, meaning that

25    you could track compensation but not for every single artist

O9rWlivC

1    since the beginning of time but, rather, for a finite category;

2    you name the artist and then the defendants will turn over

3    those documents.  That appears to be how it was done during the

4    CID process.

5            Is that something you're considering now, or are you

6    saying now we've got to get all of them?

7            MR. THORNBURGH:  Our concern, your Honor, is that we

8    don't know what we don't know.  For example, we don't know if

9    request certain artists whether we are requesting a meaningful

10   sample of artists and not requesting a sample of artists that

11   are not representative of the entire --

12           THE COURT:  OK.

13           MR. THORNBURGH:  -- artists that Live Nation promotes.

14           So the concern here is, we went with the sampling

15   approach during the investigation, because we had tried for

16   several months to get artist contracts and we were unable to

17   come to an agreement, and so we agreed to that sampling

18   approach to kind of jump-start the issue.  But now our concern

19   is that we do need all these artist contracts to see the

20   relevant terms.

21           THE COURT:  Mr. O'Mara, how many contracts are we

22   talking about?

23           MR. THORNBURGH:  Probably thousands.

24           THE COURT:  OK.

25           All right.  Well, what I have before me is an issue

O9rWlivC

about confidentiality.  I'm not seeing that.  What is the

confidentiality issue, given that we have a highly confidential

category, and that's pretty limited?

MR. O'MARA:  Your Honor, I think it's just -- again,

we respect and appreciate the protective order in this case.

We respect and appreciate the Court helping the parties protect

the confidentiality of the players in this industry.  We

understand that these documents will be produced pursuant to a

protective order which has a highly confidential designation.

All of that we totally understand.

My point is simply with these documents, which are the

most sensitive in the industry, if it could at all be answered

through data, which is a completely different animal,

obviously, when it comes to confidentiality, for some of the

most famous people in the industry when, again, it is a client

relationship business, we are asking that the plaintiffs work

with us on this.  And I don't think, for example -- to my

knowledge, I'm not sure what plaintiffs' counsel just said in

terms of what information can be gleaned from the contract if

the data is even accurate.  And so once again, I'm going to say

they have 80 of these.  If they think there is a delta between

the contract and the data, then if they could identify it for

us, we could figure out if that's even true and then have a

reasonable conversation about that.

I mean to put this in context, your Honor, to begin

O9rWlivC

1   there's a whole set of broader contracts.  For example, the

2   primary ticketing contracts in this case, thousands and

3   thousands of those.  We have produced all of those over a

4   seven-year period and agreed to do it over a ten-year period.

5   I don't think we're being difficult here.  We're asking for

6   particular consideration over a particularly sensitive type of

7   document.

8              THE COURT:  OK.

9              So the objection raised on the sensitivity of the

10  documents is overruled given the terms of the protective order.

11  If there are certain adjustments to the treatment of those

12  documents under the protective order, then the Court is happy

13  to entertain those.  For instance, if it would be helpful for,

14  at least in the first instance, those documents to be

15  maintained on an attorney's eyes only basis or with allowances

16  for financial experts to crunch their numbers, then I'm happy

17  to hear that, because I understand that there may be certain

18  categories of documents that are so sensitive that if there's

19  any risk of leakage on the other side and you would want to

20  protect against that and it may not matter to the plaintiffs at

21  this juncture to have that initial treatment, and then we can

22  address later whether some other treatment is warranted.

23  However, the objection to just disclosure in general is

24  overruled, so those documents should be produced.

25              Now, Mr. Thornburgh, you should think about whether

O9rWlivC

1    you need thousands upon thousands of these contracts.  It may

2    be that the sampling approach that you employed in the CID

3    phase may be insufficient and that you may need an additional

4    number of those contracts, but in light of the concerns that

5    Mr. O'Mara raised, you should consider whether you need all of

6    them, everything under the sun, or whether there's some subset

7    that would meet your purposes.  For instance, you might say

8    turn over what you have by next week in this category.  You can

9    quickly take a look at those, and if it's not answering your

10   concerns or it leaves unanswered questions, then you can go

11   back to the defendants and seek an additional set of those

12   documents.

13           We're talking about contracts here that can be easily

14   produced.  I don't think that this falls into the same category

15   as emails and other communications that need to be reviewed for

16   responsiveness, etc., and require hundreds of thousands of

17   attorney hours.

18           MR. THORNBURGH:  Of course, your Honor.  We're

19   certainly willing to do that.

20           THE COURT:  OK.

21           All right.  What's next?

22           MS. SWEENEY:  Your Honor, we had raised an issue in

23   our letter regarding defendants' responses to interrogatories,

24   and defendants will say that it's now moot because last night

25   at 6:30 they served supplemental interrogatory answers upon the

O9rWlivC

1    plaintiffs, but I just wanted to bring it up to the Court's

2    attention for a couple reasons.

3            First of all, we served those interrogatories in early

4    August.  They responded primarily with objections which, in our

5    mind, were not meritorious objections.  And then they said,

6    well, we don't keep this information; in the ordinary course of

7    business, we don't track it.  So our concern is that in

8    addition to being slow to respond, defendants used objections

9    to delay, and they also, at least initially, took the position

10   that they did not have a duty to make an inquiry before

11   responding to interrogatories.

12           So we're concerned with the pace, especially in light

13   of the Court's schedule, and so one issue we wanted to raise

14   today, and I think your Honor has already alluded to this, is

15   that this conference has been enormously helpful in moving

16   things along.  Since Monday, we've received two additional

17   productions of documents in addition to these interrogatory

18   answers, so we're fully in favor of having regular conferences

19   like this one at a four-week interval if that works for your

20   Honor's schedule.

21           THE COURT:  Yeah, that's fine.  And the parties can

22   discuss.  I like to have people here, but I understand it's an

23   enormous cost to have people come to court as opposed to doing

24   things remotely.  It's often easier to do things remotely, so

25   if that is what the parties would like to do, then I'll

O9rWlivC

1    consider it.  I'll think about it, but I'm on board with the

2    approach of having one of these meetings every month.  That's

3    fine.

4               MS. SWEENEY:  Thank you, your Honor.

5               THE COURT:  OK.

6               Anything else for the plaintiffs?

7               MS. SWEENEY:  There are some issues.  There's one

8    issue that both sides raised, so I can address that as long as

9    I'm standing up.

10              THE COURT:  OK.

11              MS. SWEENEY:  That is the number of hours for 30(b)(6)

12   depositions.  We're nearly prepared to present to your Honor a

13   deposition protocol, but the only item --

14              THE COURT:  Yeah, there's one bracket left.

15              MS. SWEENEY:  Right, the number of 30(b)(6) deposition

16   hours.

17              THE COURT:  Now, remind me.  The 35 or 20 hours,

18   that's in addition to the 300 hours, or is that within the

19   category?

20              MS. SWEENEY:  That's within the category, your Honor.

21              THE COURT:  OK.  So then you can have 35 hours.

22              MS. SWEENEY:  Thank you, your Honor.

23              THE COURT:  All right.

24              Let me turn to you, Mr. Marriott.

25              MR. MARRIOTT:  Your Honor, I was going to respond to

O9rWlivC

1    that, but it sounds like the decision has been made.

2            THE COURT:  Fine.  And just, please, as we get closer

3    to depositions -- you've read my practices -- just make

4    objections to form.  No speaking objections.  You don't need to

5    object to scope.  Just make your objections to form, and if

6    there are objections to categories that are in a 30(b)(6)

7    notice, those should be raised with the Court in advance so

8    that these depositions can move forward without a lot of

9    disruption.  If there are disruptions, then I think my

10   practices also say whoever is the aggrieved party can just call

11   the Court and you'll have an additional participant in your

12   deposition.  So that's just for both sides as you're taking

13   depositions.

14           Mr. Marriott.

15           MR. MARRIOTT:  Your Honor, we have three remaining

16   issues.  Mr. O'Mara has the first.  Then I have one and Mr.

17   Weiss has one.

18           THE COURT:  OK.  Great.

19           MR. MARRIOTT:  Thank you, your Honor.

20           MR. O'MARA:  Your Honor, back to the basic issues that

21   you and I and plaintiffs have been talking about basically all

22   morning is that we think when you look at the discovery that's

23   been served to date, your Honor, it reflects a complete lack of

24   focus.  It is overbroad and is going to raise some real issues

25   between how we can complete that discovery on the current case

O9rWlivC

1    schedule, and while there's a number of meet-and-confer and

2    open issues that have yet to be resolved, for a lot of those

3    issues, we think one is worth teeing up with your Honor this

4    morning, which is the discovery in the secondary, which is a

5    particular category.

6          And your Honor's probably well aware, so when you

7    first sell a ticket, when the content owner sells it, that's

8    called a primary ticket.  If that ticket is then resold for any

9    reason -- the fan can't go to the concert, or whatever -- then

10   it is called a resell ticket, which is called secondary, and

11   there's a very clear distinction between the primary ticketing

12   market and the secondary ticketing market.  And when you look

13   at the claims in this case, your Honor, they all involve the

14   primary ticketing market, whether there was alleged

15   anticompetitive conduct or anticompetitive effects in the

16   primary ticketing market.

17         Now, it's important context -- again, back to the

18   CID --

19         THE COURT:  Is it your position that whatever happens

20   in the primary ticketing market has no effect whatsoever in the

21   secondary ticketing market?

22         MR. O'MARA:  Your Honor, I think for purposes of this

23   case, the question is whether it's the other way around, which

24   is whether stuff that happens in the secondary affects the

25   primary ticketing market.  And our position here is that the

O9rWlivC

1    point of what we're talking to the Court about today is not

2    that that could never happen or there should be absolutely no

3    discovery.  But it is a clear enough distinction that when you

4    look at the scope of these 30 requests that have been served on

5    secondary -- for things like fan complaints as to secondary

6    ticketing; product comparison for secondary ticketing; detailed

7    transaction and event-level data over eight countries,

8    including things, taxes collected on the secondary ticket where

9    Ticketmaster's not the primary ticketer; number of seats

10    available at a show where Ticketmaster sold a secondary ticket

11    where Ticketmaster is not the primary -- we're talking about an

12    incredibly broad amount of discovery which clearly has no

13    possible relationship to primary.

14            And so the request, your Honor, to help the

15    meet-and-confer and help focus this case, would be for the

16    Court to issue an order prohibiting discovery into secondary

17    absent a clear showing that the facts, data or evidence sought

18    has a direct relationship to an anticompetitive, alleged

19    anticompetitive effect in the primary.

20            THE COURT:  OK.  I think you're going to hear an

21    attempt to make that clear showing.

22            Ms. Sweeney, who's going to handle that from your

23    side?

24            MS. ROUALET:  Jennie Roualet, for the plaintiffs.  I'm

25    handling this issue.

O9rWlivC

1          THE COURT:  Ms. Roualet.

2          MR. KASHA:  Your Honor, I'd like to speak after Ms.

3     Roualet, if possible, regarding the states that seek damages.

4     We have a slightly different position.

5          THE COURT:  OK.

6          MR. KASHA:  Thank you.

7          THE COURT:  Ms. Roualet.

8          MS. ROUALET:  So, at the outset, I'd like to make the

9     point plaintiffs did in our joint letter, that this request is

10    premature.  As I think you've seen, the parties have been

11    meeting and conferring on a number of discovery issues, and

12    we've had one meet-and-confer about this issue and there's been

13    no meaningful back-and-forth, and plaintiffs have indicated a

14    willingness to narrow the requests as applicable, so I think,

15    making that point, first of all.

16         And second of all, I think plaintiffs are a little

17    surprised that defendants raised this issue because they

18    themselves have issued subpoenas to ticketing providers that

19    only provide secondary ticketing.

20         THE COURT:  Can you help me with just the general

21    question, because I think Mr. O'Mara is saying we just have no

22    idea why these categories of documents would be relevant to the

23    claims that you're advancing.  So 30,000-foot view, can you

24    give us the relevance of these inquiries into the secondary

25    ticketing market.

O9rWlivC

1          MS. ROUALET:  Sure.  I'm happy to, your Honor.

2          I think there's four buckets in the complaint that I'm

3     happy to talk about.  I think the first, contrary to

4     defendants' assertion, there is a fan-facing market that

5     potentially includes both primary and secondary ticketing in

6     the complaint, and I'm happy to direct your Honor to the

7     specific paragraph.

8          THE COURT:  OK.  This is a paragraph in your

9     complaint.

10         MS. ROUALET:  Yes.  It's paragraph 161, but it

11    actually is on -- the paragraph I'd like to direct you to is on

12    page 64, and it's a bullet that starts with "second."

13         THE COURT:  OK.

14         MS. ROUALET:  And I'll just read from there:  And

15    there's a relevant market that includes both primary concert

16    ticketing offerings and services that offer resale of concert

17    tickets.  And this our fan-facing ticketing market.

18         THE COURT:  OK.

19         MS. ROUALET:  Second, there's a number of assertions

20    in the complaint that defendants have used their monopoly power

21    in primary ticketing to prevent entry and expansion into the

22    secondary market.  And this is where state tix comes into play.

23         Third, the defendants have -- there are allegations in

24    the amended complaint that defendants have used the fees

25    obtained through secondary to reinforce its monopolies in other

O9rWlivC

1    relevant markets.

2            And fourth, there are allegations in the amended

3    complaint that defendants have used restrictions on secondary

4    ticketing to retaliate against venues that switch away from

5    Ticketmaster.

6            THE COURT:  OK.  I understand you've only had one

7    meet-and-confer on this issue, but -- and this gets to a

8    different issue that the defendants have raised concerning

9    contention interrogatories -- that description, you now have

10   heard from Mr. O'Mara the categories of documents that you are

11   seeking that the defendants believe have no relevance to this

12   case.  So let's say by Monday or Tuesday of next week, can you

13   provide in writing the summary of just why are these documents

14   potentially relevant?  And you've given that to me here, but I

15   think in the spirit of moving things quickly along, as

16   Ms. Sweeney had sought, I think it will be helpful if you can

17   provide that to the defendants, because if the defendants are

18   going to make an application to preclude discovery into those

19   issues, then they need to hear from the plaintiffs why you

20   think it's relevant, and then they can make their application

21   under Rule 26(b) if they have grounds to do so.

22           MS. ROUALET:  Yeah, your Honor.  We're happy to do

23   that.

24           I would just point out that we have given them some of

25   this information, and we haven't heard back from them, but

O9rWlivC

1    we're more than happy to put it in writing.

2             THE COURT:  OK.

3             Mr. O'Mara, have you gotten all the information you

4    need?  What else do you need to make the determination as to

5    whether there's enough in terms of relevance and

6    proportionality to support looking into these documents?

7             MR. O'MARA:  Your Honor, I think the issue is that the

8    categories you just heard are incredibly narrow in relation to

9    the sweeping discovery that's been served on secondary, which

10   is our point.  Like, we're not conceding that those points are

11   actually relevant, but we're talking in a narrow slice of the

12   discovery that's out there, and I think it actually would be

13   helpful if the plaintiffs provided that in writing, because if

14   that is the alleged relevance, it certainly will frame the

15   meet-and-confer going forward on what we should or shouldn't

16   have to do as secondary.

17            THE COURT:  OK.  Perfect.

18            So, Ms. Roualet, I'll tell you that to the extent that

19   you were able to tie to the specific requests for production,

20   here's why it's relevant, here's why we think we really need

21   it.  That's just going to help your cause, because then Mr.

22   O'Mara is going to have a harder time if we get on a call to

23   justify not producing those documents.

24            At the same time, and this is just a general matter,

25   you're going to have to be a little bit rifleshot in terms of

O9rWlivC

1    what you're looking for just given the timing.  The plaintiffs

2    obviously have a big incentive to move this case as quick as

3    they can.  Defendants too.  This is a disruption to their

4    business, and they're fighting the case vigorously.  Everyone

5    wants to get to the finish line as soon as possible.  So

6    everyone's going to have to compromise a little bit in terms of

7    you can't get every document that's under the sun, and you get

8    that.

9         MS. ROUALET:  Yes.

10        THE COURT:  So just think about it, and I think if you

11   give it to them in writing -- and again, do it by Monday or

12   Tuesday -- it's going to really be able to frame quickly the

13   meet-and-confer process so that you can get the documents that

14   are truly relevant more quickly.  And if there's a

15   pound-the-table refusal to produce documents, then either side

16   will bring that to the Court's attention within a week or two.

17        Mr. O'Mara.

18        MR. O'MARA:  Thank you, your Honor.

19        MS. ROUALET:  Thank you, your Honor.

20        THE COURT:  All right.

21        MR. KASHA:  Your Honor, if I may just ask?

22        THE COURT:  Yes.

23        MR. KASHA:  You know, some of the states, 28 of us,

24   are also seeking damages and we may have some points to make,

25   so we'll work with the Department of Justice and the other

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O9rWlivC

1    plaintiffs to participate in that letter too.

2            I just wanted to point out that the reasons why

3    secondary ticketing are subject to discovery also include the

4    damages and monetary relief.  And when one takes that into

5    consideration, I think the dynamic is a little bit different.

6    And although I think the letter approach is good, and we'll

7    frame it well, I think we want our particular issue to be left

8    off the table at this stage.

9            THE COURT:  Can you just give me two sentences on the

10   theory of damages that relates to this area?

11           MR. KASHA:  I can give you some examples of why we

12   might need information from the secondary market.  For example,

13   we might need to do a fee-margin comparison, how big are fees

14   in primary ticketing where defendant Ticketmaster is very

15   dominant, as we know, compared to fees in secondary ticketing,

16   where they're not as dominant.  That's one reason, for example.

17           Also, understanding the role of agents and

18   intermediaries can be important in understanding exactly who

19   ends up paying fees.  And the issue that was already touched

20   upon, that there, of course, could be other secondary ticketers

21   who would have entered into primary ticketing and didn't, and

22   that can cause damages possibly to defendants in terms of

23   quality of product, such as the application that they use and

24   other such things.

25           So we'll put it in writing, and I think this will tee

O9rWlivC

1  things up.  But I think particularly when we add that in, this

2  is almost a bit of a nonquestion.  Certainly the discovery has

3  to be reasonable, as it always does, and we'll continue to work

4  cooperatively with the other side, but their attempt to kind of

5  put a plug in all secondary ticketing discovery, I think,

6  should be looked at with some heavy skepticism.

7         THE COURT:  Well, I'm not looking at it with heavy

8  skepticism at this point.  I think the submission that's been

9  made by defendants is that it's an entirely other market with

10  tons of discovery there.  And there's proportionality too.  So

11  I think that they're saying you've got to be a little bit

12  narrower and focused in terms of what you're looking for to

13  satisfy the standard under Rule 26(b), but I think everyone

14  understands that.  And so you'll add your material to the

15  submission to be made to the defendants and then they'll take a

16  look at it.

17         And again, I think this is just -- in general, my

18  takeaway from this is that the parties are meeting and

19  conferring and narrowing issues on both ends.  It's just that

20  the case is a little bit slower than might be optimal for the

21  schedule that's been imposed by the Court.  And so we just need

22  to quicken that up a little bit, because we're going to very

23  quickly be in a situation where it's December or January and

24  people are wanting to celebrate the holidays and take vacations

25  and they're going to be unable to.  So right now, this is your

O9rWlivC

1    time.  So everyone's got to work really fast.

2            Mr. Marriott or Mr. O'Mara.

3            MR. MARRIOTT:  Thank you, your Honor.

4            I rise about contention interrogatories, which you

5    gave me a segue into.  As a general matter, we understand the

6    Court has an inclination against contention interrogatories but

7    that they may be allowed with permission.  And we think, your

8    Honor, that there is great cause and need for them in this

9    case.

10           You've heard from counsel for plaintiffs about their

11   need for 30(b)(6) testimony.  They believe that to be important

12   to their case.  We effectively don't really have that option,

13   your Honor, in this case because I'm confident we will hear

14   from the plaintiffs that they have no one to present who would

15   give us 30(b)(6) testimony.  What we really need to know is

16   what are the allegations and the contentions that we have to

17   deal with.  We need to know what the target is.  And you've

18   heard a little bit this morning, your Honor, about the breadth

19   of the claims, but just to kind of put a finer point on some of

20   the issues, there are 39 counts in this complaint.  There are

21   at least seven supposed markets that are alleged.  The conduct

22   concerns decades of alleged misconduct.  There are hundreds of

23   venues which plaintiffs have sought to put in play.  They've

24   served subpoenas, by my count, on 132 different third parties.

25   Their initial disclosures identify 246 individuals, 180

O9rWlivC

entities, and really, from our perspective at least, give only

a generic description of what it is supposedly that these

people have to contribute to the case.

We do have, we acknowledge, some responses to our

interrogatories.  We find those far less satisfying than I

think the plaintiffs think they are, and what we really want is

some specificity around what it is exactly they contend.  Your

Honor, what we'd like, if we can get the Court to agree with

this, we'd like it in time to be able to do something with it.

So having it, you know, the day before fact discovery closes

doesn't help.  Having it in a time when we can understand the

allegation and then serve our own subpoenas, take our own

depositions, and figure out whether there's really any "there"

there with respect to some of these allegations.  We, of

course, have our view about that, but we really just want to

know exactly what it is.  And we think that gives us something

a little bit more comparable to what they're going to have by

the way of 30(b)(6) testimony of us, because again, we don't

really have that with respect to them, your Honor.

THE COURT:  Just help me with understanding Rule

30(b)(6).  Technically speaking, you could take 30(b)(6)

depositions, right?

MR. MARRIOTT:  We technically can, your Honor, but I'm

not, frankly, entirely sure who we would take them of, because

the Department of Justice attorneys aren't going to sit for

O9rWlivC

 1    depositions.  Jonathan Kanter is not going to sit, so I'm not

 2    sure who we're going to take them of.

 3         THE COURT:  Well, that's up to plaintiffs, but you

 4    could notice a deposition.

 5         MR. MARRIOTT:  I'm happy to take Mr. Kanter's

 6    deposition.

 7         THE COURT:  Well, I don't know if you can demand a

 8    particular person as part of a 30(b)(6) --

 9         MR. MARRIOTT:  I think that's right.  We couldn't do

10    that, your Honor.

11         THE COURT:  The only obligation is for the plaintiffs

12    to make sure that whoever it is --

13         MR. MARRIOTT:  I agree with that.  Fair enough.

14    Nonetheless -- we can explore that with them and find out

15    whether there's someone they would put up.

16         Nonetheless, probably a more useful exercise would be

17    for us to be able to have a way of understanding from them in a

18    way where we can do something about it, exactly what their

19    contentions are.  So what we're proposing, your Honor, is

20    simply the opportunity to do this several months down the road.

21    We don't need it tomorrow.  We need it in time to be able to do

22    something with it.

23         THE COURT:  Ms. Sweeney, do you have an objection to

24    this?  I mean, here's the thing, if Mr. Marriott calls you and

25    says I don't understand this part of the discovery case that

O9rWlivC

1    you're proceeding with, teach me how it's relevant, I'm sure

2    that you would not be telling Mr. Marriott I'm not going to

3    explain to you the relevance of this discovery to our case.

4    That's not a contention interrogatory and response, but it's

5    just what normally happens in discovery to make sure that

6    everyone's on the same page in terms of relevance.  Because if

7    I understand what the issue is, it's that the defendants don't

8    know exactly where you're going with the discovery, and that's

9    preventing them from taking potentially discovery that they

10   would want on their end.  And so maybe you could help me

11   understand what the government is doing and what it's willing

12   to do here.

13       MS. SWEENEY:  Sure.  Absolutely, your Honor, and we

14   have been proceeding on that basis; that is, we've been doing

15   our best to explain to defendants during these meet-and-confer

16   sessions why particular requests are relevant to our claims,

17   and we'll continue to do that.  And certainly there has been

18   and there will continue to be a narrowing of our requests, but

19   with respect to -- I have to respond to Mr. Marriott's claims

20   about how they can't possibly figure out what our claims are.

21       I think there is ample evidence in the record so far

22   as to what we're seeking and what our claims are.  We filed a

23   very detailed original and an amended complaint.  We served

24   very extensive initial disclosures.  We identified 180

25   individuals and specific entities, and this is in sharp

O9rWlivC

contrast to the defendants' own initial disclosures, where they
only identified categories such as ticketers, venues, see *e.g.*
We didn't do that.  We gave them a lot of information, and as
soon as your Honor entered the protective order and we got
notice out to the nonparties, we also immediately turned over
our investigative file consisting of documents produced by over
a hundred nonparties to the plaintiffs in the course of the
prefiling investigation.  That included their documents as well
as communications between the United States and these
nonparties.

        In addition, as Mr. Marriott admitted, we have
answered identification interrogatories, and what's more, we
answered them on an expedited basis and have even supplemented
at least one of those answers.  So it just is not correct that
the plaintiffs have not provided a basis for defendants to
understand what the claims are.

        And I will say that especially in this case -- in most
cases contention interrogatories, particularly when they are
served prematurely are not very helpful.  They're especially
burdensome to the side that has to answer them, but they're not
often very helpful, and that would be really true here, where,
as you now have heard, we have served over 125 subpoenas to
nonparties.  We don't have that information in hand yet.  We
have served discovery on defendants.  Even though we have some
information from the precomplaint investigation, it is not all

O9rWlivC

1  the information we need to prove our claims.  So we're still

2  gathering information.

3          And with respect to the definition of markets and the

4  like, we have alleged seven different relevant antitrust

5  markets, and that's going to be the subject of expert

6  testimony.  So if we were required to answer contention

7  interrogatories prematurely, it would not do defendants that

8  much good.  And what I hear Mr. Marriott asking for, at least

9  what they say in their papers, is they want to serve these

10  interrogatories well before the close of discovery.  It's our

11  position, your Honor, that that would be not a fruitful

12  exercise, extremely burdensome and not justified by the state

13  of the record today.

14          THE COURT:  OK.

15          Mr. Marriott, we've all done contention

16  interrogatories and received them, and we think what we're

17  going to get is going to be earth-shattering, and sometimes we

18  get them and it doesn't really move the ball that much.  And

19  then what we really wait for usually is for the expert reports

20  to come out because that usually tells the more fulsome story.

21          MR. MARRIOTT:  The problem, your Honor, is that we're

22  not going to get -- if we get this information in an expert

23  report, we're not going to get it in a time when we can do much

24  with it.  The point isn't sitting down and having them

25  generally tell us what it is we think they're interested in.

O9rWlivC

1    We can read the complaint.  We've read the complaint.  The

2    problem is the complaint speaks in sweeping generalities, as do

3    the subpoenas which seek documents from 130-some people.  We

4    want to know precisely what it is that they contend so with

5    those contentions in mind, your Honor, we can actually move

6    forward and take meaningful discovery.  We're not talking

7    about --

8            THE COURT:  When do you want to do this?  When would

9    you like to --

10           MR. MARRIOTT:  The deadline, your Honor, for

11   interrogatories under the Court's present order is in February,

12   and February 27 is fine by us.  That's several months away, and

13   we recognize they may not have the absolute complete set of the

14   responses at that time.  Fine.  They can still supplement those

15   in a way that gives us a chance to take discovery.  The

16   deposition period ends in June, your Honor.

17           THE COURT:  OK.

18           MR. MARRIOTT:  And we'd like the ability to do

19   something with it.

20           THE COURT:  And you're willing to do it too, meaning

21   that plaintiffs are going to hit you with contention --

22           MR. MARRIOTT:  Yeah, I'm sure.  Frankly, they're

23   effectively getting two bites at this, your Honor, because

24   again, they've got the 30(b)(6).  They want to talk about how

25   contention interrogatories are burdensome.  30(b)(6)

O9rWlivC

```
 1    depositions are far more burdensome because we have to load the

 2    information in a human being who's going to sit there in a

 3    deposition chair.  They've got to just get their group together

 4    and figure out what it is they want to tell us they actually

 5    contend.  Right?

 6            In the complaint, for example, there are allegations

 7    of direct threats.  There are allegations of indirect threats,

 8    of retaliation.  I mean when?  Who?  What did they say?  Having

 9    that information so that we're not blindsided by that when we

10    read about it in an expert report, when we hear about it in a

11    final pretrial disclosure and can't take any discovery about it

12    is what's important to us.  We want to know what they contend

13    so we've got the target and so that we can take meaningful

14    discovery with that target in mind.  And I would submit, your

15    Honor, that it is far less burdensome to do that than it is to

16    prepare a witness for a 30(b)(6) deposition.

17            THE COURT:  OK.  Well, we're talking about February

18    2025.  I appreciate you raising the issue, and I do want to

19    think about this, because I am sensitive to the concern that

20    you're raising about making sure that everyone is just being

21    out in the open about what's being alleged on both sides,

22    because it can only help move things forward in a more

23    expeditious fashion.

24            My experience with contention interrogatories is that

25    they sometimes do not serve that goal, and what is usually more
```

O9rWlivC

1   helpful is for you to ask direct questions to Ms. Sweeney and

2   then Ms. Sweeney to provide direct answers, kind of like what

3   we've been doing here today, where you can pose a series of

4   direct questions and then provide Ms. Sweeney with enough time

5   to provide you with direct answers.

6       You're not trying to create evidence for trial.

7   That's not my understanding of what you're trying to achieve

8   with these contention interrogatories. Right? What you're

9   trying to understand is just in some written form or some form

10  where you can actually look at it, you want some specific

11  answers to give some meat to what is alleged in the complaint,

12  and you want it to happen before depositions and before expert

13  reports. I get all that. But I want to think about whether

14  there's an easier way to do that than you serve a contention

15  interrogatory, then 30 days later you get a bunch of objections

16  and then a response that isn't more than what's in the

17  complaint and then everyone runs to the Court and says everyone

18  is not really faithfully answering these contention

19  interrogatories.

20      To try to get both sides what they want without having

21  to go through all that, that's my concern.

22      MR. MARRIOTT: OK. Your Honor, to be candid, I don't

23  think the kind of casual, informal, here's what we're

24  thinking --

25      THE COURT: Very formal. It would not be casual at

O9rWlivC

1    all.

2            MR. MARRIOTT:  Well, that helps.  Right?  Formality

3    would help.  But we want it targeted, and we want to be able to

4    say that this was the question that was asked and they said we

5    supposedly indirectly threatened people by doing the following

6    three things on the following dates.  And when we've got that

7    target set, we can then go about demonstrating that those

8    allegations are entirely unfounded as opposed to have that be

9    kind of a vague, moving thing.  And if you were to look at some

10   of the answers -- I know you haven't seen them, but if you were

11   to look at some of the answers to the interrogatories we've

12   got, it's well, everybody just kind of understands that you

13   can't do a certain thing in the marketplace or Live Nation will

14   get you.

15           So there's very vague notion to, you know, we're out

16   there and somehow our presence is so ominous that people feel

17   like they can't compete.  That's the kind of thing we need to

18   get behind, and we think contention interrogatories will help.

19   But this is an issue we can revisit, your Honor, as we get

20   closer.

21           THE COURT:  Let's revisit it in October.  I think that

22   it's a fair suggestion, and I'd like to help both sides get the

23   information that they need to understand the allegations in

24   this case rather than just waiting for the expert reports.  I

25   just want to make sure that we're doing things efficiently.

O9rWlivC

1          MR. MARRIOTT:  Thank you, your Honor.  We'll raise it

2     in October.

3          THE COURT:  All right.  Thank you very much.

4          Mr. Marriott, anything else from the defendants?

5          MR. MARRIOTT:  We have one other issue, your Honor.

6          THE COURT:  OK.

7          MR. WEISS:  Good afternoon, your Honor.  Jesse Weiss

8     for defendants.

9          I think I have the last issue of the day, which is the

10    scope of the protective order.  And let me just address what's

11    at issue, which is a discrete category of information, why we

12    submit there's a strong need for defendants to be able to

13    disclose this category of information to counsel and

14    individuals at defendants, why we believe this is the type of

15    information that's appropriate to be addressed as a category

16    rather than on a document-by-document basis and why the relief

17    we're seeking is timely and appropriate to implement now.

18         So what we're talking about here, your Honor, is

19    specifically assertions in third-party materials that have been

20    designated confidential or highly confidential about actions or

21    statements that defendants or employees of defendants are

22    alleged to have said or asserted to have said or done or

23    implied to third parties.

24         This is information that we submit is not sensitive as

25    to third parties.  It's not trade secrets.  It's not

O9rWlivC

contractual terms.  It's not pricing.  But more fundamentally,

it's information that's critical that we be able to share with

the lawyers and individuals at Live Nation who have information

about the relevant events so that we can investigate the

relevant facts, develop the full story of the events in

question, find the relevant documents, the details, the

witnesses and, ultimately, prepare our witnesses and our

defenses with respect to these events.

          And to give an example -- and I'll speak in general

terms because I can't, again, specifics, because of the

protective order.  We have advocacy submissions to the

plaintiffs and third parties who assert that Live Nation

supposedly said or did something with respect to a particular

venue on a particular date.  We need to be able to go to the

individuals at defendants or work through with in-house counsel

to find the relevant individuals and ask them, and say, you

know, it's been asserted that this particular statement was

made or this particular action was taken by you or by your

colleagues in this particular time frame to these particular

parties so we can fulsomely investigate and develop the facts

relating to these particular events.  And if we're not able to

do that, you know, we'd be hamstrung in doing this basic, you

know, fundamental investigative and preparatory work that we

need to really undertake now given the schedule in the case and

sweeping nature of the allegations.

O9rWlivC

1      So what we're asking, your Honor, is simply to be able

2  to disclose those kinds of details although they come from

3  documents that are designated confidential or highly

4  confidential to in-house counsel at Live Nation and

5  Ticketmaster and ideally to the individuals who are involved in

6  those events.

7      THE COURT:  All right.  Ms. Sweeney, or whoever is

8  going to handle this from the plaintiffs' side.  I don't

9  have -- this issue was raised in the agenda.  I just don't have

10  the plaintiffs' response.  Is there an issue here?

11      MS. SWEENEY:  Absolutely, your Honor.  We didn't have

12  an opportunity, this is an issue we learned about later on, so

13  we have a very brief response in our letter, but essentially

14  they're seeking categorical removal of a designation put on

15  there by nonparties that submitted information to the

16  plaintiffs.  And as defendants describe it, they're looking for

17  details in third-party materials relating to them purportedly

18  impacted by defendants' alleged conduct.

19      And we heard that what they're looking for is where

20  competitors of Live Nation and Ticketmaster -- for example,

21  competing ticketers and their customers; that is, venues --

22  have engaged in these negotiations -- for example, a

23  venue-ticketer negotiation -- where that venue might tell the

24  ticketer, well, look, we're concerned about losing Live Nation

25  content if we sign a contract with you.  These are the kinds of

O9rWlivC

1    threats that we talk about in our complaint.  There are threats

2    discussed in the materials produced to the plaintiffs, and this

3    is what defendants seek through this categorical

4    de-designation.

5         THE COURT:  But what's confidential about that?  I

6    mean I understand that it's potentially incendiary, but what's

7    confidential about that?  What counsel is saying, just to kind

8    of frame things, as I understand it, is that you're not

9    saying -- I don't see how it would fall into the highly

10   confidential category, but even as to the more general

11   confidentiality, if there's no pricing information, terms of

12   contract, things that a competitor would not want to be exposed

13   to Live Nation because of the competitive nature of their

14   relationship, then the question is just whether there's

15   confidentiality properly applied to those documents.  And so

16   I'm not understanding what the confidentiality issue is.

17        Why are these sensitive documents?  Not sensitive

18   because the stuff that's described is bad, but why is it

19   sensitive such that internal people at Live Nation should not

20   be privy to these documents?

21        MS. SWEENEY:  Sure, for a couple of reasons.

22        For one, these communications are contained within the

23   very same documents where the parties are disclosing their

24   negotiation strategy, both from the point of view of the venue

25   and the point of view of the ticketer.  That is very highly

O9rWlivC

1    sensitive financial going-forward strategic information that

2    would be very beneficial for Live Nation and Ticketmaster to

3    have and very harmful for those nonparties.

4            Moreover, as you heard today, and as you know from the

5    motion to seal that we filed in connection with the amended

6    complaint, the defendants are very concerned about the

7    confidentiality of their own documents and the confidentiality

8    of their artist client documents, but let's be clear that these

9    documents that we're talking about here are documents produced

10   by nonparties to this litigation, and they're asking this Court

11   to wholesale de-designate those documents without going through

12   the procedures ordered by the Court that plaintiffs have

13   adhered to and without the opportunity for these third parties

14   to object.

15           And so these are not designations that the Department

16   of Justice or the plaintiff-states put on these documents.

17   These are the designations from the third parties who produced

18   those documents, and they should have an opportunity to be

19   heard.  And there's no reason why defendants can't go through

20   the same meet-and-confer exercise that is required by the

21   protective order and by your Honor's individual practices and

22   what we did when we sought to de-designate certain materials

23   that we wanted to quote in the amended complaint.

24           THE COURT:  OK.

25           Mr. Weiss, one issue is just that, let's put aside the

O9rWlivC

1    third party versus government nature of the document.

2    Ms. Sweeney is saying that the documents contain sensitive

3    financial information in addition to this other information

4    that perhaps your clients should have the opportunity to

5    review.  So a couple of ideas come to mind.

6            First of all, it seems like you might need to do some

7    kind of review of these to see if you can reduce the number of

8    documents that you think are just not even arguably subject to

9    any kind of confidentiality issue, and at that point you may

10   not have an issue, because with the other documents out of the

11   way, it might be that no third party would object to that.

12           MR. WEISS:  We can.

13           THE COURT:  I think you do need to give some notice to

14   the third parties who are at issue to allow them a chance to

15   raise their objections.  That doesn't mean the mere fact of

16   them objecting is going to require confidential treatment, but

17   at least a submission made that some of these documents have

18   financial information that would fall into the confidential

19   category.  So maybe that's helpful, but I'm happy to hear from

20   you in response.

21           MR. WEISS:  Thank you, your Honor.

22           Just to clarify, we're not seeking to disclose or have

23   categories de-designated, the documents themselves.

24           So as a hypothetical example, there's an email that

25   says, you know, this person from Live Nation told me X, Y and Z

O9rWlivC

1    on this particular date with respect to this particular venue,

2    and then there's other information in that email.  We're not

3    seeking to de-designate that email or to de-designate it with

4    redactions but only to be able to, without violating the

5    protective order be able to disclose to the relevant

6    individuals at Live Nation or Ticketmaster the specific

7    allegations or assertions about what they purportedly said or

8    did or whom they interacted with and the particulars around

9    that.

10        So we're not looking to, you know, have all these

11   documents de-designated on a wide-scale basis but, rather, have

12   it clarified or expressly stated in the protective order that

13   we're not inhibited from disclosing details about what Live

14   Nation or Ticketmaster supposedly did or their employees

15   supposedly did or who they interacted with just because that

16   information comes from a document that was designated

17   confidential and highly confidential.

18        THE COURT:  OK.  I see someone in my periphery

19   standing up in the back.

20        Hold on for just a moment.

21        Mr. Weiss, as it's raised in the three-page letter, I

22   can understand why Ms. Sweeney was under the impression that

23   you were seeking categorical de-designation over a vast swath

24   of the record here, because you just didn't have that much

25   space and so that's the way it kind of appears here.

O9rWlivC

1           MR. WEISS:  Right.

2           THE COURT:  And so I think you need to refine this

3    because it might be that you're able to make a proposal that

4    the government and the affected third parties would be

5    comfortable with.  Because I understand what you're saying

6    here, is really not that you're going to even, you might not

7    even have to convey the documents to anybody.  You just want to

8    be able to say that if there was a threat of retaliation or

9    some comment made, you want to be able to talk about that to

10   potentially the people who made those comments without

11   inadvertently violating the protective order.

12           I mean that's an example.  And so there's probably a

13   way to work through this issue.  And I don't hear Ms. Sweeney

14   as saying we are not going to talk about anything along these

15   lines.

16           Right, Ms. Sweeney?  You're just saying that, as

17   presented, as a categorical de-designation of these documents,

18   the government has an objection, because there's confidential

19   information there.

20           MS. SWEENEY:  Yes, your Honor.  We have an objection,

21   and also, I believe the third parties have an objection.

22           THE COURT:  Yeah.  OK.

23           So, Mr. Weiss, keep working on it, and if there's an

24   application you want to make to the Court, you don't need to

25   wait for the next of these meetings.  You can just bring it to

O9rWlivC

1    the Court's attention and we'll field it.

2         MR. WEISS:  Understood, your Honor.  Thank you.

3         THE COURT:  All right.  Thank you, Mr. Weiss.

4         Now, whoever stood up in the back, I'm happy to hear

5    you, but as you see, I'm not ordering the categorical

6    de-designation of these documents at this time, so it may be

7    that there's nothing further to be said at this time, but I'm

8    happy to hear you.  You need to come to the lectern so that

9    you're in front of the microphone.

10         MR. WICK:  Thank you, your Honor.  Ron Wick, on behalf

11    of nonparty SeatGeek.

12         I'd like to clarify the significance of some of these

13    documents that I think are at issue here.  It's beyond the fact

14    that there are documents that may contain financial information

15    as well as some of the information that Mr. Weiss described.

16         SeatGeek communications with venues, the customers

17    which it competes head-to-head with Live Nation, those deserve

18    the highest possible level of protection.  We regard those as

19    part and parcel of the negotiation documents, and they're

20    highly confidential.  If venue X discloses to SeatGeek, in

21    confidence as part of the competitive process, that it received

22    a threat or some other improper conduct made by Live Nation,

23    disclosing the contents of that discussion between SeatGeek and

24    its customers would be highly damaging to both parties.  It

25    would show competition.  It provides Live Nation with some very

O9rWlivC

1    valuable competitive information.

2            They'll learn about the depth of our relationship with

3    a client.  They learn if the threat worked, that they don't

4    need to be particularly competitive going forward with a

5    client.  They will learn that SeatGeek knows about the threat

6    and knows that it worked SeatGeek, and they can gauge how

7    likely it is that SeatGeek's going to continue to bid.  From

8    the venue's perspective, they subject themselves to further

9    retaliation based on something that was told to us in

10    confidence.  This is the height of competitively sensitive

11    information, and it's not clear to us why it's necessary to go

12    back to the business person who allegedly said X and say, you

13    know, SeatGeek says that venue X told it that you said this.

14    They can take venue X's deposition.  They can talk to their

15    business person about what was allegedly said.

16            Competitors -- it happens all the time in competitor

17    cases.  DOJ has the same constraints in investigating

18    documents.  They can't show Live Nation communications with

19    venues to relevant third parties.  So this should be treated as

20    highly confidential information, your Honor.

21            THE COURT:  Well, let me ask you this.  How are the

22    defendants supposed to figure out if those threats were made if

23    they can't talk to the people who allegedly made the threats?

24            MR. WICK:  They can certainly talk to the people who

25    allegedly made the threats.  They can talk to the CEO, the

O9rWlivC

1    marketing person, whoever it is, and say tell us about your

2    discussions with venue X.  They can.  At some point, I submit,

3    they're going to --

4         THE COURT:  You don't have a problem with, let's say

5    you've got all these documents and there's some allegations of

6    threats, for instance.  OK?  You don't have a problem with Mr.

7    Weiss going to his client and saying, OK, look, there's been a

8    suggestion that you made threats to this venue and tell us

9    about that.  You don't have any issue with that.  That's not

10    violating the confidentiality order despite the fact that

11    information is coming out of one of these documents.

12         MR. WICK:  Right.  That's not a disclosure of a

13    communication with SeatGeek.  That's correct.

14         THE COURT:  OK.  So it's really that you just don't

15    want the communication with SeatGeek to be sitting there on the

16    desk of someone from Live Nation, where they kind of see that

17    communication and have a visibility into what SeatGeek is doing

18    with respect to its potential vendors and customers.

19         MR. WICK:  They shouldn't have access to our

20    competitive intelligence.

21         THE COURT:  OK.

22         Mr. Weiss, I ask those questions, sort of leading

23    questions, because I think that should frame a little bit in

24    terms of what's being objected to.  I think there's some valid

25    grounds that are being raised, but at the same time, I think

O9rWlivC

1    that there's a reasonable understanding that you need to be

2    able to prepare your witnesses and have them provide you with

3    information as to what happened from your perspective.  And it

4    seems to me like there's a way to reconcile all those

5    interests.

6            MR. WEISS:  I think that's right, your Honor.  I would

7    just say that there may be circumstances where Live Nation and

8    SeatGeek were competing for a particular venue, they may not

9    know that, us going to Live Nation and saying, you know, it's

10   been asserted that you said X,Y and Z to this venue, we need to

11   be able to say that regardless of the context of what it might

12   reveal.

13           THE COURT:  I don't know that there's an objection.

14   You know what you might do in this regard is that you might,

15   because I understand the real concern is there's too many of

16   these documents, and so it's like going through each of them

17   one by one is going to bog things down, and Mr. O'Mara needs

18   every attorney on deck to review all these billions of

19   documents that are being prepared for production.  So I get

20   that, but it might be that you can come up with just like a

21   one-page proposal, might be just three lines, here's the

22   information that I would like to convey to people within Live

23   Nation that is coming out of these documents, and it's just

24   this.  And it might be that you share that with the plaintiffs

25   and they have no objection and the third parties don't care

O9rWlivC

1    either.  It might be, but at least it narrows what's in

2    dispute, because I think there's a lot here that you're not

3    trying to get in front of the eyes of Live Nation employees and

4    that the plaintiffs and the third parties are really concerned

5    about.

6        MR. WEISS:  Understood, your Honor.  I think that's a

7    sensible approach.

8        THE COURT:  OK.

9        All right.  Anything else -- Ms. Sweeney or Mr.

10   Marriott -- from either side?

11       MS. SWEENEY:  I have one new issue to raise, your

12   Honor, briefly, and that is we have, as you know, now served a

13   significant number of subpoenas on nonparties residing all over

14   the United States, and it is possible that we may run into a

15   few enforcement issues.  And so what I'd like to suggest if we

16   do is we may well seek to have those motions transferred to

17   your Honor to resolve.  Sometimes the nonparties will consent.

18   Sometimes we would maybe have to seek the compliance court's

19   agreement.  But before we did that, we kind of wanted to take

20   your Honor's temperature on that process.  And we believe there

21   would be a lot of efficiency in having them resolved all in one

22   court, because there are many similarities both with the

23   discovery to defendants as well as similarities across the

24   subpoenas.

25       THE COURT:  I'm happy to do it.  My law clerk took

O9rWlivC

1    this job because she was really interested in subpoena

2    compliance issues.  So actually, you just made her day.

3              I think it makes a lot of sense.  This is how I've

4    handled it in litigation when I was on your side.  That was the

5    best way to handle it because then another judge doesn't have

6    to get up to speed on all the issues in the case.

7              MS. SWEENEY:  Thank you, your Honor.

8              THE COURT:  OK.

9              Mr. Marriott, anything further from your side?

10             MR. MARRIOTT:  Nothing, your Honor.  Thank you.

11             THE COURT:  All right.

12             Do you want to talk with Ms. Sweeney and then propose

13   a date for the next one of these meetings?

14             MR. MARRIOTT:  Sure.  We'll do that, your Honor.

15             THE COURT:  OK.  Do that.  Sometime in late October

16   should work for the Court.  Give a couple of dates and times,

17   and then we'll get something on the calendar.

18             MR. MARRIOTT:  Thank you, your Honor.

19             THE COURT:  All right.

20             Really appreciate, and I apologize to everyone, all of

21   your colleagues who were on the remote line.  We'll get that

22   problem fixed for the next time so that we don't have to deal

23   with the knocking phenomenon.

24             All right.  Thank you very much.

25             We are adjourned.
                (Adjourned)