**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA et al.,

*Plaintiffs*,

v.

LIVE NATION ENTERTAINMENT, INC.,
and TICKETMASTER L.L.C.,

*Defendants*.

Civil No. 1:24–cv–3973-AS

**ORAL ARGUMENT REQUESTED**

**PLAINTIFFS' JOINT MEMORANDUM OF LAW IN**
**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................2

LEGAL STANDARD ...........................................................................................................6

ARGUMENT .......................................................................................................................6

    A.    Live Nation Has Engaged in Unlawful Tying, as Alleged in the Complaint. ......................6

        1.    Plaintiffs Plead All the Elements Necessary to State a Tying Claim. .............................6

        2.    Live Nation Wrongly Seeks to Impose New Elements on Plaintiffs' Section 1 Tying Claim. ..............................................................................................................................8

        3.    Judicial Estoppel Bars Defendants' Improper Factual Argument that Promoters (Not Artists) Are the Consumers. .............................................................................................. 11

        4.    Regardless, the Complaint's Allegations that Artists Are the Consumers of the Tying Product Are Decisive at this Stage. ...................................................................................13

        5.    Plaintiffs' Complaint States a Tying Claim, Not a Refusal-to-Deal Claim. ..................14

    B.    State Plaintiffs Have Standing to Seek Damages in the Fan-Facing Primary-Ticketing Market. ...............................................................................................................................16

        1.    Plaintiffs' Direct Purchases from the Violator Establish Their Standing. ....................17

        2.    State Plaintiffs Have More than Adequately Pled Causation. .......................................18

        3.    Even If Consumers' Injuries Are Downstream from Defendants' Anticompetitive Conduct, They Are Inextricably Intertwined with It. ..............................................................20

        4.    Plaintiffs Are Not Just Efficient Enforcers, But Likely the Only Ones Positioned to Obtain Redress for Past Overcharge Injuries. ..........................................................................23

CONCLUSION....................................................................................................................25

## TABLE OF AUTHORITIES

**Cases**                                                                   Pages(s):

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
   190 F.3d 1051 (9th Cir 1999)................................................................. 18, 19, 23

*Anderson News, L.L.C. v. American Media,* Inc.
   680 F.3d 162 (2d Cir. 2012) ..............................................................................18

*Apple v. Pepper*,
   587 U.S. 273 (2019) ................................................................... 1, 17, 22, 24

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...........................................................................6, 14

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
   472 U.S. 585 (1985) ...........................................................................15

*Assoc. Gen Contractors of Calif., Inc. v. Calif. State Council of Carpenters*,
   459 U.S. 519 (1983) ...........................................................................20, 23

*Austin v. Town of Farmington*,
   826 F.3d 622 (2d Cir. 2016) ...........................................................................6, 13

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ...........................................................................6

*Blue Shield of Virginia v. McCready*.
   457 U.S. 465 (1982) ...........................................................................20, 21

*Chase Mfg., Inc. v. Johns Manville Corp.*,
   84 F.4th 1157 (10th Cir. 2023) ...........................................................................14

*Daniel v. Am. Bd. of Emergency Med.*,
   428 F.3d 408 (2d Cir. 2005) ...........................................................................20, 25

*Davitashvili v. Grubhub Inc.*,
   2022 WL 958051 (S.D.N.Y. Mar. 30, 2022) ................................................. 20, 21, 22

*De Jesus v. Sears, Roebuck & Co.*,
   87 F.3d 65 (2d Cir. 1996) ...........................................................................9, 10

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*,
   111 F.4th 337 (4th Cir. 2004) ...........................................................................14

*E & L Consulting, Ltd. v. Doman Indus. Ltd.*,
    472 F.3d 23 (2d Cir. 2006) ................................................................7, 8

*Eastman Kodak Co. v. Henry Bath LLC*,
    936 F.3d 86 (2d Cir. 2019) .................................................................18

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992) ............................................................. 6, 10, 15

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*,
    711 F.3d 68 (2d Cir. 2013) .................................................................20

*Gelboim v. Bank of Am. Corp.*,
    823 F.3d 759 (2d Cir. 2016) ...............................................................25

*Gonzalez v. St. Margaret's House Hous. Dev. Fund Corp.*,
    880 F.2d 1514 (2d Cir. 1989) ............................................................7, 8

*Harry v. Total Gas & Power N.A., Inc.*,
    889 F.3d 104 (2d Cir. 2018) ...............................................................21

*Heckman v. Live Nation Ent.*,
    686 F. Supp. 3d 939 (D.C. Cal. 2023) ...............................................24

*Ill. Brick Co. v. Illinois*,
    431 U.S. 720 (1977) ...........................................................................17

*Ill. Tool Works Inc. v. Indep. Ink, Inc.*,
    547 U.S. 28 (2006) ..........................................................................8, 10

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) ...........................................................11

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
    903 F.2d 612 (9th Cir. 1990) .............................................................10

*In re Aluminum Warehousing Antitrust Litigation*,
    833 F.3d 151 (2d Cir. 2016) .........................................................19, 21

*In re Amazon.com, Inc. eBook Antitrust Litig.*,
    2023 WL6006525 (S.D.N.Y. July 31, 2023) .....................................17

*In re DDAVP Direct Purchaser Antitrust Litig.*,
    585 F.3d 677 (2d Cir. 2009) .........................................................20, 24

*In re Elevator Antitrust Litig.*,
  502 F.3d 47 (2d Cir. 2007) ...................................................................15

*In re Google Digital Advert. Antitrust Litig.*,
  627 F. Supp. 3d 346 (S.D.N.Y. 2022) ...................................................14

*In re Google Play Store Antitrust Litig.*,
  2024 WL 4438249 (N.D. Cal. Oct. 7, 2024) ........................... 11, 14, 16

*In re Keurig Mountain Single-Serve Coffee Antitrust Litig.*,
  383 F. Supp. 3d 187 (S.D.N.Y. 2019) ...............................................18, 22

*In re Platinum and Palladium Antitrust Litig.*,
  61 F. 4th 242 (2d Cir. 2023) ...............................................................23

*Intellivision v. Microsoft Corp.*,
  484 F. App'x 616 (2d Cir. 2012) .........................................................12

*It's My Party, Inc. v. Live Nation, Inc.*,
  811 F.3d 676 (4th Cir. 2016) ..............................................................12

*It's My Party, Inc. v. Live Nation, Inc.*,
  88 F. Supp. 3d 475 (D. Md. 2015) ......................................................12

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
  466 U.S. 2 (1984) ............................................................................8, 9

*New Hampshire v. Maine*,
  532 U.S. 742 (2001) ..........................................................................13

*New York v. Facebook, Inc.*
  549 F. Supp. 3d 6 (D.D.C. 2021) .......................................................15

*New York v. Meta Platforms*,
  66 F.4th 288 (D.C. Cir. 2023) ...........................................................15

*Ocean View Cap., Inc. v. Sumitomo Corp of Am.*,
  1999 WL 1201701 (S.D.N.Y. Dec. 15, 1999) ....................................19

*Serpa Corp. v. McWane, Inc.*,
  199 F.3d 6 (1st Cir. 1999) ..................................................................23

*Verizon Commc'ns Inc. v. L. Offs. of Curtis v. Trinko, LLP*,
  540 U.S. 398 (2004) .......................................................................15, 16

*Viamedia, Inc. v. Comcast Corp.*,
  951 F.3d 429 (7th Cir. 2020) .......................................................................................... 9

**Statutes**

15 U.S.C. § 15c ............................................................................................................... 24

Sherman Act Section 1, 15 U.S.C. § 1 ................................................................... passim

Sherman Act Section 2, 15 U.S.C. § 2 ................................................................. 1, 6, 14

## INTRODUCTION

The Amended Complaint ("Complaint" or "Compl.") pleads five claims under federal antitrust law (Claims 1–5), as well as thirty-four claims arising under state law (Claims 6–39), and lays out in detail the pervasive and sprawling nature of Defendants' anticompetitive conduct in the live music industry. Defendants' motion to dismiss does not seek to dismiss the entirety, or even the majority, of the well-pleaded allegations and claims. Instead, Defendants' motion seeks two narrow forms of relief: first, dismissal of Plaintiffs' unlawful tying claim (Claim 3), and second, dismissal of the State Plaintiffs' federal damages claims brought on their residents' behalf. Defendants' narrow motion implicitly acknowledges that Plaintiffs' Complaint marshals sufficient facts to support numerous and significant claims of illegal conduct, and even the limited arguments Defendants advance in their partial motion to dismiss fail as a matter of law.

*First*, Plaintiffs have plausibly alleged a Sherman Act Section 1 tying claim. *See* Compl. Claim 3. The Complaint alleges that Live Nation uses its dominance over large amphitheaters to coerce artists into purchasing the tied product, Live Nation's promotion services. Instead of focusing on whether Plaintiffs have sufficiently alleged facts supporting that Section 1 claim, Defendants try to recast it as a flawed Section 2 refusal-to-deal claim. Their attempt ignores the actual elements of a Section 1 tying claim. And not only do Plaintiffs' well-pleaded allegations defeat Defendants' tortured construction of a Section 1 tying claim, but Defendants' factual position in prior litigation contradicts the one they seek to take in this case.

*Second*, twenty-seven plaintiffs (collectively, "State Plaintiffs," *see* Ex. A at n.3 for full list) have antitrust standing to seek federal damages in their *parens patriae* capacity on behalf of their residents. State Plaintiffs sufficiently allege that Defendants have unlawfully maintained a monopoly in the fan-facing primary ticketing market and that fans suffered injury from that unlawful monopoly. *Apple v. Pepper*, 587 U.S. 273 (2019)—the controlling case Defendants do

1

not address—requires no more. Even if *Pepper* does not resolve the standing inquiry, State Plaintiffs have properly pled direct causation, or at least have alleged injuries inextricably linked to Defendants' conduct, and they are efficient enforcers for federal damages claims.

Plaintiffs respectfully request that the Court deny Defendants' motion in its entirety.

## BACKGROUND

The Complaint alleges the following facts relevant to Defendants' motion, which are taken as true and viewed in the light most favorable to Plaintiffs for purposes of that motion:

### A.    Live Nation Conditions Artists' Use of Large Amphitheaters on Their Agreement to Use its Promotions Services.

Live Nation, which owns or controls over 60% of the large amphitheaters in the United States and more than 60 of the top 100 amphitheaters, has monopoly power over the use of large amphitheaters. Compl., ECF No. 257 ¶¶ 16, 30, 213–214. Live Nation has a longstanding policy that, if artists want access to a Live Nation venue (whether an amphitheater or otherwise), they almost always must also contract with Live Nation to serve as their artist's concert promoter. *Id.* ¶ 113. Live Nation wields its monopoly power over large amphitheaters, together with that policy, to coerce artists into choosing Live Nation as their promoter. *See, e.g.*, *id.* ¶¶ 6(g), 16, 41, 69, 113–116, 149, 201, 244.

Many artists give in to Live Nation's demand out of fear of losing revenue and the opportunity to reach more fans. *See id.* ¶¶ 6(g), 113–116, 201, 245. Large amphitheaters differ from other types of concert venues, since they are outdoor venues that generally offer more seating than clubs and theaters. *Id.* ¶ 29. These venues are attractive to artists who want to perform outdoors and are especially important for artists who have graduated from playing smaller clubs and theaters but are not yet (or no longer) able to fill larger venues. *Id.* ¶¶ 29, 207.

It is the *artist* (not the artist's promoter) who makes the ultimate decision whether to

2

perform in amphitheaters and, if so, in which ones and on what terms. *Id.* ¶¶ 25, 208. Artists pay

rent to the amphitheater and perform shows that enable it to collect additional revenue from fans,

including food, beverage, and parking revenue. *Id.* ¶ 207; *see also id.* ¶ 19. In exchange, the

amphitheater makes its venue available to artists and provides on-site services like staging and

lighting. *Id.* While some artists use their agents to communicate directly with venues, others use

their promoters to inquire about the availability and pricing of an amphitheater for a particular

day, *id.* ¶ 208, much like a real estate broker or other sales representative would do for a client.

To avoid being locked out of some of the most popular and largest amphitheaters, artists

must hire Live Nation as their promoter. *Id.* ¶¶ 30, 59, 113–114, 201. The alternative—skipping

Live Nation-controlled amphitheaters—would mean fewer shows, lower compensation, and

reduced access to fans. *Id.* ¶¶ 149, 210. As a result, artists who would prefer a promoter other

than Live Nation are effectively denied that choice. *See, e.g.*, *id.* ¶¶ 59, 113–114, 150, 201, 246.

Live Nation knowingly wields its market power, combined with its exclusionary

amphitheater policy, to force artists to sign with Live Nation for promotion services. *See, e.g.*, *id.*

¶¶ 210, 212. As one Live Nation executive admitted: "If [artists] want to do an extensive

amphitheater tour with a lot of shows, they would typically be coming to us for that, and they

do." *Id.* ¶ 114. Another Live Nation promotions executive directed his employees not to offer

increased payment guarantees to artists who are looking for "True Amp Tours," meaning all

amphitheaters, not just Live Nation-controlled venues. *Id.* ¶ 116; *see also id.* ¶¶ 129–130. Live

Nation's promotions team offers lower guarantees because they know artists need to play shows

at Live Nation amphitheaters and therefore must use Live Nation as their promoter. *Id.* ¶ 116.

Live Nation's conduct locks in artists and expands its dominance in promotions, even at

the cost of additional profits Live Nation could earn by opening its amphitheaters to artists who

choose another promoter. *Id.* ¶¶ 115–116. Live Nation's decision to sacrifice short-term profits and reduce output to keep artists who choose a third-party promotor out of its amphitheaters demonstrates the anticompetitive goals and effects of its business practices. *See id.*

### B. Defendants Harm Consumers Directly, Causing Fans to Pay Higher Prices and Receive Lower Quality Services Than They Would Absent Defendants' Conduct.

Fans—the residents on behalf of whom Plaintiff States seek *parens patriae* damages— purchase concert tickets directly from Ticketmaster. Defendants' anticompetitive conduct distorts the market, causing fans to pay more for concert tickets and have a worse quality ticketing experience than in a market free from Defendants' unlawful conduct. *Id.* ¶¶ 45, 139–158, 223.

Defendants start the causation chain by making upfront payments to venues for primary-ticketing exclusivity, which are in venues' interest to accept. *Id.* ¶ 64. Defendants can pay significantly more than rivals for exclusivity, because they know that they can recoup the up-front payments by passing costs onto fans through higher and higher fees and face values. *Id.* ¶¶ 42, 64, 139–154, 175–190. Ticketmaster has significant involvement in setting the numerous fees that consumers pay—including so-called service fees, dynamic pricing fees, per order fees, and payment processing fees, as well as upsells and insurance. *Id.* ¶ 44. Ticketmaster also recommends ticket prices and sometimes adjusts the face value of tickets based on demand. *Id.* at ¶ 45. Live Nation's promotions and sponsorship businesses and its venue ownership allow it to routinely double dip into the pockets of fans, venues, and artists. *Id.* ¶¶ 51, 142, 149. In the but-for world, competition in the sale of primary ticketing to fans would drive live-concert attendance costs down, and venues would pass lower costs through to consumers' benefit, because, among other reasons, venues compete for fans' business. *Id.* ¶¶ 25, 142–146.

Fans have no reasonable alternatives once Defendants elect to extract monopoly rents at the ticket-purchase stage. Compl. ¶¶ 142, 167, 175. Even if fans pushed venues to self-supply

(i.e., handle ticketing themselves), very few venues would be willing to take the risk given the significant investment and technology required to create and operate a ticketing platform. *Id*. The secondary ticketing market is also not a viable alternative for venues because it is a resale market that is functionally different from the primary market. *Id*. ¶ 167. Fans are thus left with a no-win situation: they can either pay Ticketmaster-imposed fees to see their favorite artists or forgo seeing their favorite artists live. *Id*. ¶¶ 145, 150. Unsurprisingly, fans pay more in fees associated with concert tickets in the United States than in other parts of the world. *Id*. ¶¶ 38, 105, 107.

Defendants complement their long-term exclusive contracts with threats and retaliation to prevent venues from working with competing ticketing companies, which could lower ticket prices and fees and create a better fan experience. *Id*. ¶¶ 88–98, 193–194. These are not empty threats. Live Nation has acted on its threats to venues that dared select another ticketer (including by rerouting Live Nation concerts, demanding the disabling of secondary ticketing for Live Nation content, and demanding the removal of fan-friendly features on other ticketing platforms for Live Nation content), and its reputation is well known in the industry. *Id*. ¶¶ 88–98. So great is venues' fear of losing content that they have sought "make good" or "lost event guarantee" clauses in their ticketing contracts to even consider moving away from Ticketmaster. *Id*. ¶¶ 96, 152. Major concert venues "rely on live entertainment for a significant portion of their revenues," and with Live Nation's record of rerouting shows away from venues that push back against its monopoly, the risks far outweigh the potential reward. *Id*. ¶¶ 88–98, 193–194.

Consumers will not discipline Defendants' fees and ticket prices by switching to other ticketers, not only because Defendants prevent venues from offering ticketing alternatives, but because fans value content. *See id*. ¶¶ 98–112. Without access to Ticketmaster-contracted venues' artist catalogue, consumers cannot reasonably support venues' efforts to use other ticketers, who

may offer a better fan experience but would be unable to offer the live acts fans want. *See id.* ¶ 144. Thus, Defendants' control of the primary ticketing market enables them to reduce competition and subject consumers to higher prices and lower quality. *Id.* ¶¶ 139–158.

## LEGAL STANDARD

To defeat a motion to dismiss, a complaint need only include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Courts must "accept all factual allegations as true, and draw all reasonable inferences in the plaintiff's favor." *Austin v. Town of Farmington*, 826 F.3d 622, 625 (2d Cir. 2016).

## ARGUMENT

**A.    Live Nation Has Engaged in Unlawful Tying, as Alleged in the Complaint.**

Plaintiffs allege that Live Nation is engaged in textbook unlawful tying, coercing artists to use its promotion services to access its amphitheaters. Defendants' motion to dismiss Plaintiffs' tying claim attempts to impose elements that the law does not require. Defendants also try to recast Plaintiffs' well-pleaded Section 1 tying claim into a Section 2 refusal-to-deal claim by distorting the allegations to argue that the real "buyer" of amphitheater services is the promoter, not the artist. Both arguments are contrary to the law and the facts as alleged.

*1.    Plaintiffs Plead All the Elements Necessary to State a Tying Claim.*

 The Complaint's allegations meet the standard for pleading a Section 1 tying claim. "A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461 (1992) (quotations omitted). In this Circuit, a plaintiff must allege five elements: "first, a tying and a tied product; second, evidence of actual coercion by the seller that forced the buyer

to accept the tied product; third, sufficient economic power in the tying product market to coerce purchaser acceptance of the tied product; fourth, anticompetitive effects in the tied market; and fifth, the involvement of a 'not insubstantial' amount of interstate commerce in the 'tied' market." *Gonzalez v. St. Margaret's House Hous. Dev. Fund Corp.*, 880 F.2d 1514, 1516–17 (2d Cir. 1989); *accord E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 31 (2d Cir. 2006).

The Complaint plausibly alleges all five necessary elements. First, the "tying" product is the provision of the use of large amphitheaters and ancillary services to artists for large amphitheater tours. Compl. ¶ 242; *see also id.* ¶ 207. The "tied" product is the "provision of promotion services to artists performing in major concert venues" and is separate from the tying product. *Id.* ¶¶ 243–244. And artists are the consumer for both. *Id.* ¶¶ 207, 242–43; *see also id.* 25–27, 29, 41, 59, 113–116, 149, 161, 200–201, 208–210, 244. Second, Live Nation coerces artists into using Live Nation's promotional services because Live Nation categorically prohibits artists who use a third-party promoter from playing in its amphitheaters despite artists' desire to purchase promotion services separately from amphitheater access. *See id.* ¶¶ 6(g), 16, 29–30, 41, 59, 69, 113–116, 138, 149–150, 201, 244–246. Third, Live Nation has sufficient market power over the tying product (large amphitheaters) to coerce artists into purchasing the tied product (promotion services) because Live Nation is a monopolist in the market for the provision of the use of large amphitheaters to artists. *See id.* ¶¶ 242–243; *see also id.* ¶¶ 6(g), 16, 25, 30, 41, 59, 69, 113–116, 129–130, 138, 149–150, 201, 210–214, 244–246. Indeed, artists who wish to play a large-amphitheater tour have no real choice but to perform at Live Nation-controlled amphitheaters. *See, e.g., id.* ¶¶ 6(g), 16, 30, 41, 59, 69, 113–116, 149–150, 201, 213–214, 246. Fourth, there are anticompetitive effects in the tied market, notably the lack of choice for artists to select their preferred promoter, reduced artist compensation, and less access to fans. *See id.*

¶¶ 113–114, 116, 144, 149–150, 201, 209, 212, 245–246. Fifth, Live Nation's conduct involves a not insubstantial amount of interstate commerce. *See id.* ¶¶ 221–222.

As in *Jefferson Parish Hospital District No. 2 v. Hyde*, "the essential characteristic of [the] invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." 466 U.S. 2, 12 (1984), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006). In short, Live Nation exploits its control over large amphitheaters to force artists to choose its promotion services—even though, as alleged in the Complaint, artists would often prefer a different promoter. *See, e.g.*, Compl. ¶¶ 59, 113–114, 150, 201, 246. The Complaint thus alleges a classic tying claim.

2. *Live Nation Wrongly Seeks to Impose New Elements on Plaintiffs' Section 1 Tying Claim.*

Defendants do not dispute that Plaintiffs have sufficiently alleged all five elements of a tying claim under *Gonzalez*, 880 F.2d at 1516-17, and *E & L*, 472 F.3d at 31. Rather, they conjure additional elements for a "genuine" tying claim based on a formalistic test no court has ever adopted. They argue that Plaintiffs must allege there are "consumers—artists—who (a) wish to acquire the tying product (amphitheater access) *directly* from one firm and the tied product (promotional services) from a second firm, (b) *seek to enter into contracts* with Live Nation for the amphitheater access *alone*, and (c) are *presented with terms* obligating the purchase of the tied product from the seller of the tying product, rather than from a third-party seller." MTD 14 (emphases added); *see also* MTD Ex. 2. But these are not the elements of a tying claim. *See E & L*, 472 F.3d at 31 (setting forth test); *Gonzalez*, 880 F.2d at 1516–17 (same).

Other courts have rejected arguments by defendants seeking to impose a requirement that

a consumer must "directly" acquire the tying product from the seller. As the Seventh Circuit explained in *Viamedia, Inc. v. Comcast Corp.*, "fundamentally, a tying claim does not fail as a matter of law simply because it was implemented by refusing to deal with an intermediary." 951 F.3d 429, 472 (7th Cir. 2020). There, Viamedia—which represented cable television providers (MVPDs), providing them various "ad rep services"—alleged that Comcast (its ad rep services rival) required MVPDs to hire Comcast as their ad rep if they wanted access to Comcast's "Interconnect" ad sales platform. *Id.* at 437, 466. MVPDs were the entities seeking Interconnect access, but Viamedia was "the MVPD's agent for Interconnect access." *Id*. at 472. The Seventh Circuit rejected Comcast's formalistic analysis, stating:

> The fact that the arrangements were structured so that ownership of the slot avails passed from the MVPDs to Viamedia does not affect this analysis. In applying the antitrust laws, we care more about economic substance than about form.

*Id.* at 470; *see also id.* at 472; *Jefferson Parish*, 466 U.S. at 22–23, 28 n.4 (patients are the consumers for use of hospital operating rooms and anesthesiology services even if they do not choose or directly pay the anesthesiologist). The same is true here: the fact that artists use promoters as their intermediaries to purchase the use of amphitheaters does not change the analysis of the "economic substance" of these transactions. *Viamedia*, 951 F.3d at 470.

Defendants incorrectly cite *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65 (2d Cir. 1996), for the proposition that the two products must "be purchased by the same individual." *See* MTD 14. But that decision had nothing to do with whether the "same individual" was purchasing the tied and tying products, and instead turned on whether a product was being sold at all. *See De Jesus*, 87 F.3d at 71 (holding plaintiffs' employment was not plausibly a "product" that they were purchasing from their employer, and the employer's internal employee database was not a "product"). Moreover, rather than adopt the novel legal standard Defendants advance today, *De*

*Jesus*, in fact, reaffirmed the same five elements of a tying claim described in *Gonzalez*. *See De Jesus*, 87 F.3d at 70. Defendants' citation to *Illinois Tool Works* is equally flawed. The identity of the buyer of the tied and tying products was not at issue. Rather, the Court examined whether a patent "necessarily confers market power," and if the defendant had that power. 547 U.S. at 45–46. Neither of these points is at issue here.

By contrast, the tying claim alleged here is near-identical in form to that upheld in *Eastman Kodak*. There, independent service organizations ("ISOs") who repaired Kodak machines alleged that Kodak tied the sale of repair services for its machines to the sale of replacement parts, and limited ISOs' access to replacement parts. *See* 504 U.S. at 458–59. Consumers included government agencies, banks, and others who needed their Kodak machines serviced, many of whom preferred to purchase those services and replacement parts from ISOs instead of Kodak. *Id.* at 457–58; *see also Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 903 F.2d 612, 614 (9th Cir. 1990) (policy at issue was "not selling replacement parts to ISOs or to customers who use ISOs"). In other words, the ISOs sought to obtain replacement parts from Kodak *on behalf of* their customers, just as promoters purchase access to amphitheaters on behalf of artists. The Supreme Court held that the ISOs had "presented sufficient evidence of a tie between service and parts" because the record indicated that Kodak would "sell parts to third parties only if they agreed not to buy service from [ISOs]." *Eastman Kodak*, 504 U.S. at 463. In other words, the use of an intermediary does not alter who is the actual customer.

Defendants claim that this "same reasoning did not apply to Kodak's policy of not selling parts *to the rival service organizations*, which was analyzed as a refusal to deal." MTD 14. But the Ninth Circuit decision that Defendants cite for that proposition is a later appeal in which Section 1 tying claims were no longer at issue. *Id.* at 15 (citing *Image Tech. Servs., Inc. v.*

*Eastman Kodak Co.*, 125 F.3d 1195, 1201 (9th Cir. 1997)). Another court recently rejected a similar argument, explaining: "[t]he circuit's reasoning in *Kodak* had nothing to do with Kodak's freedom not to deal with its rivals." *In re Google Play Store Antitrust Litig.*, 2024 WL 4438249, at *9 (N.D. Cal. Oct. 7, 2024). Defendants' arguments here should be similarly rejected.

### 3. Judicial Estoppel Bars Defendants' Improper Factual Argument that Promoters (Not Artists) Are the Consumers.

The crux of Defendants' motion is not a legal question so much as a factual argument (which is improper for a motion to dismiss) that *promoters*, rather than *artists*, are the consumers of amphitheater access. *See* MTD 16. Judicial estoppel bars Live Nation's argument because it is directly contrary to Live Nation's factual position that a court adopted in a prior case.

In *It's My Party v. Live Nation* ("*IMP*"), Live Nation embraced the position—even making it a section heading in its appellate brief—that "The Artist Is the Consumer of . . . Venue Services." Br. of Live Nation, *IMP*, No. 15-1278 (4th Cir. Aug. 19, 2015), ECF 66, at 8, attached as Ex. B. Summarizing the record in *IMP*, Live Nation told the Fourth Circuit, "For purposes of this case, there is no dispute that '[t]he relevant competition . . . is competition either among venues or among promoters for the patronage of artists.'" *Id.* (citations omitted). Indeed, Live Nation argued in the district court that "everyone in the industry . . . agree[s] that the artist and/or their management and agent teams always retain control over which venues to play." Live Nation's Mot. for Summary Judgment, 1:09-cv-00547 (D. Md. Oct. 15, 2011), ECF 85, at 28, attached as Ex. C. Live Nation acknowledged that the "artist is the decision-maker" because artists decide "when they want to tour, what type of venues feel appropriate for the type of tour they are doing, the length of the tour, and . . . how much money they hope to earn." *Id.* at 9–10; *see also id.* 13–14, 31, 35, 40 (stating that artists "seek" venue services, that "tour routing cannot be set without the artist's approval," that "some artists explicitly tell the promoter what venues

11

are on and off the table," that "artists routinely place conditions on the cities and venues where they will play (or will refuse to play)," and that artists and Live Nation engage in "arms-length negotiations" for venue services and thus there was no coercion). And Live Nation succeeded, through a final judgment affirmed on appeal, in its position that artists, rather than promoters, were the consumers of its venues: "This case involves two separate but related markets: the market for concert promotion and the market for concert venues. *In both, the relevant consumers are performing artists*, who contract with promoters and venues to put on concerts." *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 681 (4th Cir. 2016) (emphasis added).

The doctrine of judicial estoppel thus precludes Live Nation from taking a different, clearly inconsistent factual position in this litigation. *See, e.g.*, *Intellivision v. Microsoft Corp.*, 484 F. App'x 616, 620–21 (2d Cir. 2012) (summary order) ("Judicial estoppel prevents a party from asserting a factual position clearly inconsistent with a position previously advanced by that party and adopted by the court in some manner." (quotations and citation omitted)).

Defendants omit any discussion of their factual positions to the court in *IMP*. Rather, they argue that the *IMP* district court concluded that "near carbon-copy allegations that Live Nation's venue and promotion services are tied" should be considered as a refusal-to-deal claim. MTD 13. That is also incorrect for many reasons, including that the alleged tie in *IMP* was different from the one alleged here, and the Complaint's allegations go well beyond those in *IMP*. Moreover, the district court in *IMP* denied Live Nation's motion to dismiss the plaintiffs' Section 1 tying claims. 88 F. Supp. 3d 475, 482 (D. Md. 2015). Although the court ultimately found in Live Nation's favor on the Section 1 tying claim on summary judgment after expert discovery, its ruling on that claim was based on its appraisal of distinguishable evidence at odds with the Complaint's allegations here, rather than refusal-to-deal caselaw. *See id.* at 489–98.

Defendants should not be allowed to change factual positions in this case. "Having convinced th[e]" *IMP* "Court to accept one interpretation of" the consumer for amphitheaters (artists), "and having benefited from that interpretation," Defendants "now urge[] an inconsistent interpretation." *New Hampshire v. Maine*, 532 U.S. 742, 755 (2001). But "judicial estoppel prevents parties from playing fast and loose with the courts." *Id.* at 750 (cleaned up).

      4.  *Regardless, the Complaint's Allegations that Artists Are the Consumers of the Tying Product Are Decisive at this Stage.*

In any event, the Complaint squarely alleges that artists (not promoters) are consumers of the tying product. *See, e.g.*, Compl. ¶ 208. When a promoter signs a rental contract with a venue, it does so as the agent/delegate of a specific artist who pays rent to the amphitheater and performs a show that enables the venue to collect additional revenue from fans. *Id.* ¶¶ 207–208. Amphitheaters provide artists the use of their venue in addition to services, like staging and lighting. *Id.* ¶¶ 26, 207. "Put another way, when promoters communicate and contract directly with venues, they are acting on behalf of their artist clients. Those artists are the customers for the provision of use of large amphitheaters who ultimately decide where, when, and under what terms they will perform." *Id.* ¶ 208; *see also id.* ¶¶ 25–26, 29, 59, 113–116, 149, 161, 201, 207–210, 242–244. Not only does proof of these allegations ultimately defeat Defendants' claims on the merits, but at a minimum, Defendants cannot meet the high standard for dismissal now because Plaintiffs' factual allegations must be accepted as true. *See Austin*, 826 F.3d at 625.

Defendants attempt to muddy Plaintiffs' factual allegations by conflating the distinct services that promoters provide to artists versus those that they provide to venues. Defendants claim incorrectly that the "tied" product market at issue is the "provision of concert booking and promotion services *to major concert venues.*" MTD 4 (emphasis added). But Plaintiffs allege that concert promoters offer distinct services to two distinct sets of customers: (1) artists, and (2)

major concert venues. Compl. ¶ 161, 191. These services constitute two separate and distinct relevant markets. *Compare id.* ¶¶ 41, 200 (promotions services to artists), *with id.* ¶¶ 42, 192 (promotions services to major concert venues; promoters' revenue for these services generally not split with artist); *see also id.* ¶ 40, 161, 191. Here, the "tied" product in Plaintiffs' tying claim is the bundle of services that promoters provide to artists, not to venues. *Id.* ¶¶ 243–244; *see also id.* ¶ 161. Defendants' factual disputes about the relationships between promoters, artists, and amphitheaters are not properly the subject of a motion to dismiss. *See Iqbal*, 556 U.S. at 678.

     5.  *Plaintiffs' Complaint States a Tying Claim, Not a Refusal-to-Deal Claim.*

As discussed above, Claim 3 alleges a Section 1 tying claim. "[T]his is not a case in which a refusal to deal with a rival [is] the basis of Section 2 liability." *Google Play*, 2024 WL 4438249, at *8; *see also In re Google Digital Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 367 (S.D.N.Y. 2022) (analyzing Section 1 tying claim under that framework, not refusal-to-deal). Nevertheless, Defendants attempt to turn Plaintiffs' well-pleaded Section 1 tying claim into a Section 2 refusal-to-deal claim based primarily on the fact that a promoter (i.e., a rival) may be the contract signatory setting the terms for a particular artist to perform at an amphitheater. *See* MTD 8–11. In making that argument, Defendants ignore Plaintiffs' actual allegations to try to shoehorn the Complaint into the narrow subcategory of refusal-to-deal conduct.

Those efforts are contrary to the law. Section 2 of the Sherman Act prohibits monopolization, attempts to monopolize, and conspiracy to monopolize. 15 U.S.C. § 2. Refusals to deal are a narrow, "court-made subcategor[y] of [anticompetitive] conduct" under Section 2. *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 354 (4th Cir. 2024). Courts limit the doctrine to cases where a defendant refuses to deal with *rivals*—as Defendants' cited cases recognize. *See* MTD 8–12 (citing cases); *cf., e.g.*, *Chase Mfg., Inc. v. Johns Manville Corp.*, 84 F.4th 1157, 1173 (10th Cir. 2023) (Often, "a refusal-to-deal framework applies to

narrow situations often remedied by monopolists sharing their technology with rivals.").

Conduct that "interferes with the relationship between rivals and third parties," as Defendants' conduct does here, is not "a standard refusal to deal." *New York v. Facebook, Inc.* 549 F. Supp. 3d 6, 31–32 (D.D.C. 2021); *see also Kodak*, 504 U.S. at 463 n.8 (Kodak's "alleged sale of parts to third parties on condition that they buy service from Kodak is not" a "unilateral refusal to deal"); *New York v. Meta Platforms*, 66 F.4th 288, 303–04 (D.C. Cir. 2023) (analyzing policy that apps "may not integrate, link to . . . or redirect to any app on any other competing social platform" as exclusive dealing—not as a refusal-to-deal—because alleged harm restricted third parties in dealings with others). Here, Plaintiffs' tying claim is based on allegations that Live Nation's anticompetitive conduct interferes with the choices of Live Nation's artist customers—not with Live Nation's promoter rivals. *See, e.g.*, Compl. ¶¶ 6, 113–116, 149, 201, 208. Further, as discussed above at 13–14, Plaintiffs allege that when a promoter signs a rental contract with a venue, it does so as a delegate of a *particular* artist. None of Live Nation's cases involves factual allegations that a rival was simply serving as an intermediary on behalf of a *particular*, individual customer. *See* MTD 15–16 (citing, *inter alia, e.g., Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 404–05 (2004); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 595 (1985); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007)).

Finally, Defendants rely on *Trinko*[1] to argue that a parade of horribles would follow if Plaintiffs' tying claim were to survive, suggesting that it could facilitate collusion amongst

---

[1] The facts in *Trinko* are also completely different than here. In *Trinko*, Verizon was required under a separate statute to offer its rivals access to unbundled elements of its network that existed "only deep within the bowels of Verizon" and not offered to consumers. 540 U.S. at 410. This separate requirement to share with rivals did not create a duty to deal under the antitrust laws. *Id.*

competitors, and that if "firms [must] share the source of their advantage," they have no "incentive . . . to invest." MTD at 8–9. But allowing artists to hire the promoter of their choice to negotiate amphitheater access for them would not raise these concerns. Artists and amphitheaters have competing financial interests when negotiating the terms of access and use of an amphitheater. If Defendants' large amphitheaters were open to any artist regardless of promoter, there would be more competition, not less, among promoters for artists' business.

Nor does the Complaint suggest that the Court must take on a future "central plann[ing]" role by "setting the prices and terms of dealing." MTD 9 (quoting *Trinko*, 540 U.S. at 408). These hyperbolic claims are both premature and incorrect. *Cf. Google Play*, 2024 WL 4438249, at *8 (rejecting argument that refusal-to-deal framework applies based on "'vibe' in *Trinko*" and noting that defendants' "frequent mention of the case is simply a red herring"). Invoking remedies that are not sought in the Complaint deflects from the issue at hand: whether the Complaint sufficiently states a tying claim—which it does.

### B. State Plaintiffs Have Standing to Seek Damages in the Fan-Facing Primary-Ticketing Market.

State Plaintiffs' injuries result from their residents purchasing directly from Defendants, which under Supreme Court precedent gives them standing on the facts as alleged. State Plaintiffs have also amply alleged the causal links between the challenged conduct and fans' injuries in the fan-facing, primary-ticketing market. And even if fans are characterized as "downstream" from Defendants' anticompetitive conduct, their injuries are inextricably intertwined with that conduct. The nature of that conduct makes State Plaintiffs the efficient enforcers of damages claims; indeed, they are likely the only potential plaintiffs with the incentives and abilities to vindicate the public interest in seeking redress for past antitrust harms.

1.    *Plaintiffs' Direct Purchases from the Violator Establish Their Standing.*

State Plaintiffs have standing in a *parens patriae* capacity (i.e., on their residents' behalf),

because, as Defendants concede, consumers are active participants in the fan-facing primary

ticketing market, as they transact directly with Defendants. *See* MTD 20; Compl. ¶¶ 139–154.

This effectively ends the standing inquiry under *Apple v. Pepper*—one of the most important

cases on antitrust standing decided in the last decade, yet conspicuously absent from Defendants'

brief—because, as "the immediate buyers from the alleged antitrust violators," consumers "may

maintain a suit against the antitrust violators." 587 U.S. 273, 279 (2019) (consumers who bought

apps from Apple had standing to claim that Apple monopolized "the iPhone apps aftermarket"

and overcharged them for the apps, even though app developers set prices).

Here, fans are "immediate buyers" who are forced to buy tickets only and directly from

Defendants. *See, e.g.*, Compl. ¶¶ 143, 175–190. And the rationale animating *Pepper* applies: (1)

by transacting directly with Defendants, fans are direct purchasers, *Ill. Brick Co. v. Illinois*, 431

U.S. 720 (1977); (2) standing for immediate buyers is essential to avoid allowing Defendants to

"gerrymander out of this and similar lawsuits" by coercing others into "setting the price" at a

manner and level that allows Defendants to reap monopoly profits at fans' expense; and (3) a

contrary rule would provide a roadmap for Defendants to strategically structure transactions to

avoid antitrust enforcement—indeed, Defendants have already pointed the finger at everyone

else in the industry (e.g., MTD 1). *Pepper*, 587 U.S. at 281–88.

Since *Pepper*, courts have held that consumers may sue sellers for anticompetitive

conduct that results in higher prices. For example, consumers could sue Amazon, alleging

supracompetitive pricing of eBooks, even though publishers indisputably play a large role in

setting eBook prices. *In re Amazon.com, Inc. eBook Antitrust Litig.*, 2023 WL6006525, at *13–

14 (S.D.N.Y. July 31, 2023). Likewise, ticket purchasers have standing even if Defendants do not

alone set ticket prices or fees. *Pepper*'s rationale is even stronger here because Defendants are significantly more involved in setting fees and prices than Apple was. Compl. ¶¶ 44–45, 142.

### 2. *State Plaintiffs Have More than Adequately Pled Causation.*

After *Pepper*, plaintiffs who transact directly with the violator demonstrate antitrust injury without needing to articulate a path of direct causation, or that, in the alternative, their harms are "inextricably intertwined" with the reduction of competition. But even assuming they still must, the Complaint makes clear how fans' injuries (i.e., the supracompetitive amounts they are forced to pay) are directly linked to Defendants' anticompetitive conduct in the promotions and venue-facing markets. *See* Compl. ¶¶ 38, 44, 139–158, 175–190, 227.

Plaintiffs establish antitrust injury if theirs is a "direct result of the defendants' anticompetitive conduct." *Eastman Kodak Co. v. Henry Bath LLC*, 936 F.3d 86, 96 (2d Cir. 2019). "[I]t is not the status as a consumer or competitor that confers antitrust standing, but the relationship between the defendant's alleged unlawful conduct and the resulting harm to the plaintiff." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1058 (9th Cir 1999) (reversing summary judgment grant). Causation is fundamentally a fact question, so Defendants' disagreement with how State Plaintiffs assess the causal links is reserved for summary judgment or trial. *See Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012).

*American Ad Management*, cited by Defendants, is rare in its detailed analysis of how a plaintiff identifies antitrust injury, and illustrates exactly why State Plaintiffs are so injured, consistent with the general approach in this Circuit, *see, e.g.*, *In re Keurig Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 220 (S.D.N.Y. 2019). First, Defendants have not challenged whether, if true, the conduct underlying State Plaintiffs' damages claims would violate the antitrust laws. *See Am. Ad Mgmt.*, 190 F.3d at 1055–56. Second, fans "don't stand[] to gain" from Defendants' conduct. *Id.* at 1056. Third, consumers do not just happen to pay more

money for tickets than they should. Rather, they essentially fund Defendants' exclusive contracts, restarting ad infinitum the anticompetitive cycle, Compl. ¶¶ 56, 98, 139–154, 175–190, and their injury thus "flows from that which makes unlawful [Defendants'] conduct." *Am. Ad Mgmt.*, 190 F.3d at 1055. Fourth, the injury is not from "increased competition or lower (but non-predatory) prices." *Id* at 1057. Instead, it flows directly from increased fees and ticket prices resulting from Defendants' exclusive ticketing contracts with large upfront payments, backed by threats and potential retaliation, leaving fans nowhere to turn. Compl. ¶¶ 142–158, 223. Defendants have deprived fans of "open venues" where "it would be 'easy to find & purchase tickets anywhere . . .' and fans could find 'competitively priced tickets across various touch points.'" *Id.* ¶¶ 105, 107. Finally, Defendants have restrained non-price competition with their restrictive refund and insurance policies. *Id.* ¶ 143. Thus, contrary to Defendants' contention, MTD 20, Defendants *have* restrained price competition in the fan-facing market.

Defendants' other cited cases are likewise inapposite. Plaintiffs in *In re Aluminum Warehousing Antitrust Litigation* did not transact with the defendants, agreed they were not participants in any market where defendants operated, and were irrelevant to defendants' scheme because the alleged anticompetitive acts "did not need or use injury to the consumers." 833 F.3d 151, 162 (2d Cir. 2016). Consumers here directly purchased, and thus actively participate, in the fan-facing market, Compl. ¶¶ 18, 44, 108, 142–143, 163, 175–190, and Defendants need consumers to buy tickets and bankroll their monopoly maintenance. *Id.* ¶¶ 139–154, 175–190. Fans' injuries are not a "purely incidental byproduct" of Defendants' exclusionary conduct, *Aluminum Warehousing*, 833 F.3d at 162, or indirect results of general price increases, *Ocean View Cap., Inc. v. Sumitomo Corp. of Am.*, 1999 WL 1201701 (S.D.N.Y. Dec. 15, 1999), but rather the crux of Defendants' anticompetitive scheme.

19

The causation that State Plaintiffs detail distinguishes their allegations from cases like *Gatt*, brought by a distributor cut out of a bid-rigging arrangement against remaining participants. *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68 (2d Cir. 2013). When, as in *Gatt*, a competitor is "injured" because of an antitrust violation, but customers ultimately bear the supracompetitive prices, that competitor has not suffered "antitrust injury." *See also Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408 (2d Cir. 2005). Competition is not what these competitors want; they want a greater share of the market, and may even want it at supracompetitive prices. *Accord Assoc. Gen Contractors of Calif., Inc. v. Calif. State Council of Carpenters*, 459 U.S. 519, 539 (1983) ("*AGC*"). It is consumers who pay more due to the alleged reduction in competition who are injured in a way the antitrust laws were meant to prevent.

### 3. Even If Consumers' Injuries Are Downstream from Defendants' Anticompetitive Conduct, They Are Inextricably Intertwined with It.

In the alternative, State Plaintiffs have adequately pled that consumers' injuries are inextricably intertwined with Defendants' unlawful anticompetitive conduct under *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 479 (1982) (plaintiff had standing because she "bore Blue Shield's sanction in the form of an increase in the net cost of her psychologist's services"). *See also In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009) (injury to direct purchasers "inextricably intertwined" with alleged monopolist's "exclusionary scheme" to prevent generic drug competition, leading to purchasers paying overcharges).

Critical to *McCready*'s holding was that the plaintiff's injury was "clearly foreseeable" to the violators and "a necessary step in effecting the [conspiracy's] ends." 457 U.S. at 479; *see also Davitashvili v. Grubhub Inc.*, 2022 WL 958051, at *11 (S.D.N.Y. Mar. 30, 2022). More recently, consumers challenged Grubhub and other food delivery platforms' policies that contractually prohibited restaurants from charging less in "direct markets" (e.g., to dine-in patrons). *Grubhub*,

20

2022 WL 958051, at *1. Judge Kaplan rejected defendants' argument that plaintiffs could not trace their overpayment in direct markets to the contracts. Even though the platforms negotiated the provisions with restaurants (not consumers), and reduced competition in the upstream market, the clauses were "designed to restrict competition that could result from restaurants offering lower prices in the direct markets," and the diners paid the overcharges. *Id.* at *12.

The dynamic here is the same. Defendants' exclusive agreements, backed by threats and retaliation, have the purpose and effect of restricting competition. Compl. ¶¶ 91, 98, 152–154. The restriction on fan choice is not just "clearly foreseeable," *McCready*, 457 U.S. at 479; excluding competing ticketers from supplying in the fan-facing market is the entire point. And Defendants induce entry into exclusive agreements by making large upfront payments to venues and guarantees to artists, a "necessary step in" maintaining their ticketing monopoly. *Id.*; *see, e.g.*, Compl. ¶¶ 37, 41, 64, 69. Without them, fans could discipline supracompetitive ticket costs by switching to cheaper ticketing options. Compl. ¶ 143.

Defendants erroneously claim that State Plaintiffs lack standing because there are no allegations that Defendants "used consumers as a means to injure competitors or other participants in the various alleged markets." MTD 21. First, under *McCready*, it is not only when a monopolist "uses" the plaintiff to injure a competitor that an injury is "inextricably intertwined," but also when the monopolist "corrupt[s] a separate market [in which a plaintiff is a participant] in order to achieve its illegal ends." *Aluminum Warehousing*, 833 F.3d at 161; *see also Harry v. Total Gas & Power N.A., Inc.*, 889 F.3d 104, 116 (2d Cir. 2018) (distinguishing "use" from "corruption" scenarios). Here, consumers are the real-world users of concert tickets who are forced to pay inflated prices because of Defendants' "corruption" of the "separate market." *See Aluminum Warehousing*, 833 F.3d at 161; Compl. ¶¶ 139–158. Second, consumer

overcharges procured by competition reduction *is* considered "use" of consumers; the Supreme Court let consumers proceed on just such a theory in *Pepper*. 587 U.S. at 276 (Apple "used its monopoly to overcharge consumers" for apps). Either way, when a monopolist harms a competitor to extract monopoly rents from consumers, the latter suffer antitrust injury. *See, e.g.*, *Keurig*, 383 F. Supp. 3d at 221–22.

Regardless, the Amended Complaint does allege Defendants used market power over consumers' purchases to injure competitors, just as Grubhub allegedly did by ensuring consumers, via their patronage of restaurants, could not sponsor competition from its rivals. *Compare Grubhub*, 2022 WL 958051 at *12 ("defendants allegedly force consumers to pay supracompetitive prices in the direct markets as a 'means to eliminate competition' that would threaten their business"), *with* Compl. ¶¶ 56, 146 (Live Nation uses flywheel to reinvest ticketing revenue to fund its concert promotions business, which has "allowed [it] to limit venues' and artists' options and impose supra-competitive fees on fans because there are no meaningful alternatives"). At the end of the day, whether it is delivered pizza or concert tickets, who gets the consumer's purchase is what determines which competitors will survive, and which will not.

Undoubtedly aware that all roads lead to standing for State Plaintiffs on their residents' behalf, Defendants try to break the causal chain by offering alternate facts, which they cannot do at the pleading stage. They contend that "Plaintiffs allege that . . . rival ticketers would pay less money to venues in connection with their ticketing agreements" in a but-for world. MTD 22 (citing Compl. ¶¶ 146, 152). Neither cited paragraph of the Complaint says, assumes, or lends an inference of anything like that. Moreover, to survive the pleadings, the Complaint need not allege that rival ticketers would pay less money to venues; and to prevail at trial, Plaintiffs need not prove it. A but-for world could see *more* money going to venues, MTD 23; but Defendants'

profits on the back end would decrease as competition increased and ticketing fees moved closer to the "cost of providing ticketing services." Compl. ¶¶ 44, 146, 154.

As for Defendants' contention that Plaintiffs must be assuming that "in a world in which their marginal costs went down, venues would respond by gratuitously reducing prices for consumers rather than pocketing the incremental profit," MTD 22, this construction is not only directly at odds with the pleadings; it is also simply wrong. The Complaint and economic intuition support the axiom that competition is best: venues may want to reduce overall costs of attendance so they can compete against other venues, and venues may sponsor rival ticketers in hopes of getting better overall offerings. *See, e.g.*, Compl. ¶¶ 25, 150–51.

### 4. *Plaintiffs Are Not Just Efficient Enforcers, But Likely the Only Ones Positioned to Obtain Redress for Past Overcharge Injuries.*

Finally, State Plaintiffs are "efficient enforcers" in raising federal damages claims. In this Circuit, courts consider four factors: (1) the directness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) avoiding duplicative recoveries. *In re Platinum and Palladium Antitrust Litig.*, 61 F.4th 242, 259 (2d Cir. 2023); s*ee also AGC*, 459 U.S. 519. Although "a court need not find in favor of the plaintiff[s] on each factor," *Am. Ad Mgt.*, 190 F.3d at 1055, the State Plaintiffs, acting in their *parens patriae* capacities, easily satisfy all three factors at issue (Defendants do not contest the fourth). That is true even without the presumption that, representing consumers, State Plaintiffs are the efficient enforcers. *See Serpa Corp. v. McWane, Inc*., 199 F.3d 6, 10 (1st Cir. 1999).

The Second Circuit analyzes the first efficient-enforcer factor, the "directness of the asserted injury," under the principles of proximate causation, with the inquiry centering around how close the harm is in the chain of causation. *See In re Platinum*, 61 F.4th at 259; *DDAVP*, 585

23

F.3d at 688 (injury sufficiently direct where "harming competitors was simply a means for the defendants to charge the plaintiffs higher prices"). As discussed above, Plaintiffs have alleged that Defendants have monopolized the market for the provision of primary concert ticketing offerings to fans at major concert venues through several types of illegal conduct, resulting in supracompetitive fees and ticket prices. *See, e.g.*, Compl. ¶¶ 142–144, 146, 151, 156, 158, 224–232. The injury flows directly to fans. *See Pepper*, 587 U.S. at 288.

No other identifiable classes of persons are similarly incentivized or able to seek damages, because Live Nation has intentionally created a system that disincentivizes other parties from acting as antitrust enforcers; thus State Plaintiffs also satisfy the second factor.[2] Venues are disincentivized from suing because they have to deal with Live Nation, promoters need to work with Live Nation to co-promote and fear venues not working with them, and artists lack the incentive because they need touring locations. Compl. ¶¶ 19–36, 69, 88–98, 144–154, 193–194. Moreover, they would be seeking lost profits, not overcharges, and "[d]enying the plaintiffs a remedy in favor of a suit by competitors would thus be likely to leave a significant antitrust violation undetected or unremedied." *DDAVP*, 585 F.3d at 689. And the United States lacks authority comparable to that in 15 U.S.C. § 15c to seek damages on natural persons' behalf.

On this factor, Defendants cite *Daniel*, but its analysis supports standing here. In *Daniel*, emergency room physicians lacked standing to challenge a conspiracy between a specialty certification board and hospitals operating residency training programs to limit the output of

---

[2] For example, Defendants' requirement of "mass arbitration" disincentivizes challenges by consumers themselves. *Cf. Heckman v. Live Nation Ent.*, 686 F. Supp. 3d 939, 952–53, 956–57, 962–66, 967–68 (D.C. Cal. 2023) (in putative class action raising some issues similar to those raised in the Complaint, denying on procedural and substantive unconscionability grounds Defendants' motion to compel arbitration). *Heckman* is on appeal, and even if the Ninth Circuit affirms, Defendants may ultimately be allowed to require some form of arbitration.

emergency room physicians. 428 F.3d at 444. Unlike fans here (who are more like the patients), the doctor plaintiffs were competitors with "no natural economic self-interest in reducing the cost of emergency medical care to customers." *Id.* Hospitals were a tougher call: they could be victims paying higher prices, or beneficiaries, supplying residency programs, for the scheme. *Id.* Likewise here, venues, artists, and rival promoters are victims Defendants have disincentivized from suing in various ways, including by trying to coopt them. State Plaintiffs stand in the shoes of the only customers in this industry who have overpaid, have an "undivided economic interest," and whose incentives for recovery are not impeded by lack of "sophistication" or "resources necessary to pursue an antitrust challenge" that render others poor bets to vindicate the public interest in antitrust enforcement. *Daniel*, 428 F.3d at 444.

Speculativeness, the third factor, goes to the calculation of damages, and Plaintiffs' damages theory is intuitive and straightforward. *See Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 779 (2d Cir. 2016). Plaintiffs are not asking the Court to consider multiple layers of complicit bad actors or speculate as to the amount of harm each defendant caused. Defendants do not seriously engage on this factor, other than to recycle the same unavailing arguments that consumers' alleged injuries are "speculative" and "wholly unconnected to the competitive harms that Plaintiffs' allege." MTD 24. That argument not only conflates the first and third factors of the efficient enforcer analysis, but more important, ignores Plaintiffs' role as direct purchasers and the interconnectedness of the harm across the industry. *See* Compl. ¶¶ 139–158, 175–190.

## CONCLUSION

The Court should deny Defendants' motion in its entirety.[3]

---

[3] Plaintiffs are mindful that the Court invited Defendants to submit a letter previewing their bases for dismissal. *See* ECF 180. Defendants' letter did not identify some of the specific arguments that they now advance in their motion (e.g., seeking to add new elements to a cognizable tying claim). *See id.* Thus, to the extent the Court is inclined to grant the motion to dismiss in whole or in part, Plaintiffs respectfully request the opportunity to amend.

Dated: October 16, 2024


*/s/ Bonny Sweeney*
BONNY SWEENEY
*Lead Trial Counsel*
ARIANNA MARKEL

United States Department of Justice
Antitrust Division
450 Fifth Street N.W., Suite 4000
Washington, DC 20530
Telephone: (202) 725-0165
Facsimile: (202) 514-7308
Bonny.Sweeney@usdoj.gov
Arianna.Markel@usdoj.gov

*Attorneys for Plaintiff United States of America*

*/s/ Adam Gitlin*
ADAM GITLIN (admitted *pro hac vice*)
 Chief, Antitrust and Nonprofit Enforcement Section
COLE NIGGEMAN (admitted *pro hac vice*)

Office of the Attorney General for the District of Columbia
400 6th Street NW, 10th Floor
Washington, DC 20001
Adam.Gitlin@dc.gov
Cole.Niggeman@dc.gov

*Attorneys for Plaintiff District of Columbia*

/s/ Robert A. Bernheim
Robert A. Bernheim (admitted *pro hac vice*)
Office of the Arizona Attorney General
Consumer Protection & Advocacy Section
2005 N. Central Avenue
Phoenix, AZ 85004
Telephone: (602) 542-3725
Fax: (602) 542-4377
Robert.Bernheim@azag.gov
*Attorney for Plaintiff State of Arizona*

/s/ Amanda J. Wentz
Amanda J. Wentz (admitted *pro hac vice*)
Assistant Attorney General
Arkansas Attorney General's Office
323 Center Street, Suite 200
Little Rock, AR 72201
Phone: (501) 682-1178
Fax: (501) 682-8118
Email:  amanda.wentz@arkansasag.gov
*Attorney for Plaintiff State of Arkansas*

/s/ Paula Lauren Gibson
Paula Lauren Gibson (admitted *Pro Hac Vice*)
Deputy Attorney General
(CA Bar No. 100780)
Office of the Attorney General
California Department of Justice
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
Tel: (213) 269-6040
Email: paula.gibson@doj.ca.gov
*Attorney for Plaintiff State of California*

/s/ Conor J. May
Conor J. May (admitted *pro hac vice*)
Assistant Attorney General
Antitrust Unit
Colorado Department of Law
Conor.May@coag.gov
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
*Attorney for Plaintiff State of Colorado*

/s/ Kim Carlson McGee
Kim Carlson McGee (admitted *pro hac vice*)
Assistant Attorney General
Office of the Attorney General of
Connecticut
165 Capitol Avenue
Hartford, CT 06106
Telephone: 860-808-5030
Email: kim.mcgee@ct.gov
*Attorney for Plaintiff State of Connecticut*

/s/ Lizabeth A. Brady
Lizabeth A. Brady
Director, Antitrust Division
Liz.Brady@myfloridalegal.com
Florida Office of the Attorney General
PL-01 The Capitol
Tallahassee, FL 32399-1050
850-414-3300
*Attorney for Plaintiff State of Florida*

/s/ Richard S. Schultz
Richard S. Schultz (admitted *pro hac vice*)
Assistant Attorney General
Office of the Illinois Attorney General
Antitrust Bureau
115 S. LaSalle Street, Floor 23
Chicago, Illinois 60603
(872) 272-0996 cell phone
Richard.Schultz@ilag.gov
*Attorney for Plaintiff State of Illinois*

/s/ Jesse Moore
Jesse Moore (*pro hac vice* forthcoming)
Deputy Attorney General
Jesse.Moore@atg.in.gov
Office of the Indiana Attorney General
302 W. Washington St., Fifth Floor
Indianapolis, IN 46204
Phone: 317-232-4956
*Attorney for the Plaintiff State of Indiana*

/s/ Noah Goerlitz
Noah Goerlitz (admitted *pro hac vice*)
Assistant Attorney General
Office of the Iowa Attorney General
1305 E. Walnut St.
Des Moines, IA 50319
Tel: (515) 281-5164
noah.goerlitz@ag.iowa.gov
*Attorney for Plaintiff State of Iowa*

/s/ Lynette R. Bakker
Lynette R. Bakker (admitted *pro hac vice*)
First Assistant Attorney General
Antitrust & Business Organizations
lynette.bakker@ag.ks.gov
Kansas Office of Attorney General
120 S.W. 10th Avenue, 2nd Floor
Topeka, KS 66612-1597
Phone: (785) 296-3751
*Attorney for Plaintiff State of Kansas*

/s/ Mario Guadamud
Mario Guadamud
Assistant Attorney General
Complex Litigation Section
Louisiana Office of Attorney General
1885 North Third Street
Baton Rouge, LA 70802
Phone: (225) 326-6400
Fax: (225) 326-6498
GuadamudM@ag.louisiana.gov
*Attorney for Plaintiff State of Louisiana*

/s/ Schonette J. Walker
Schonette J. Walker (admitted *pro hac vice*)
Assistant Attorney General
Chief, Antitrust Division
swalker@oag.state.md.us
200 St. Paul Place, 19th floor
Baltimore, Maryland 21202
(410) 576-6470
*Attorney for Plaintiff State of Maryland*

/s/ Katherine W. Krems
Katherine W. Krems (admitted *pro hac vice*)
Assistant Attorney General, Antitrust
Division
Office of the Massachusetts Attorney
General
One Ashburton Place, 18th Floor
Boston, MA 02108
Katherine.Krems@mass.gov
(617) 963-2189
*Attorney for Plaintiff Commonwealth of
Massachusetts*

/s/ LeAnn D. Scott
LeAnn D. Scott (admitted *pro hac vice*)
Assistant Attorney General
Corporate Oversight Division
Michigan Department of Attorney General
P.O. Box 30736
Lansing, MI 48909
Tel: (517) 335-7632
Scottl21@michigan.gov
*Attorney for Plaintiff State of Michigan*

/s/ Zach Biesanz
Zach Biesanz
Senior Enforcement Counsel
Antitrust Division
zach.biesanz@ag.state.mn.us
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 1400
Saint Paul, MN 55101
Phone: (651) 757-1257
*Attorney for Plaintiff State of Minnesota*

/s/ Gerald L. Kucia
Gerald L. Kucia (admitted *pro hac vice*)
Special Assistant Attorney General
Gerald.Kucia@ago.ms.gov.
Mississippi Office of Attorney General
Post Office Box 220
Jackson, Mississippi 39205
Phone: (601) 359-4223
*Attorney for Plaintiff State of Mississippi*

28

*/s/ Justin C. McCully*
Justin C. McCully (admitted *pro hac vice*)
Colin P. Snider (admitted *pro hac vice*)
Assistant Attorney General
Consumer Protection Bureau
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68509
Tel: (402) 471-9305
Email: justin.mccully@nebraska.gov
*Attorneys for Plaintiff State of Nebraska*

*/s/ Lucas J. Tucker*
Lucas J. Tucker (admitted *pro hac vice*)
Senior Deputy Attorney General
Office of the Nevada Attorney General
Bureau of Consumer Protection
100 N. Carson St.
Carson City, NV 89701
Email: ltucker@ag.nv.gov
*Attorney for Plaintiff State of Nevada*

*/s/ Zachary Frish*
Zachary A. Frish (admitted *pro hac vice*)
Assistant Attorney General
Consumer Protection & Antitrust Bureau
New Hampshire Attorney General's Office
Department of Justice
1 Granite Place South
Concord, NH 03301
(603) 271-2150
zachary.a.frish@doj.nh.gov
*Attorney for Plaintiff State of New Hampshire*

*/s/ Yale A. Leber*
Yale A. Leber (admitted *pro hac vice*)
Deputy Attorney General
New Jersey Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
Phone: (973) 648-3070
Yale.Leber@law.njoag.gov
*Attorney for Plaintiff State of New Jersey*

*/s/ Jeremy R. Kasha*
Jeremy R. Kasha
Assistant Attorney General
Jeremy.Kasha@ag.ny.gov
New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
(212) 416-8262
*Attorney for Plaintiff State of New York*

*/s/ Jeff Dan Herrera*
Jeff Dan Herrera (*pro hac vice* forthcoming)
Assistant Attorney General
Consumer Protection Division
JHerrera@nmdoj.gov
New Mexico Department of Justice
408 Galisteo St.
Santa Fe, NM 87501
Phone: (505) 490-4878
*Attorney for Plaintiff State of New Mexico*

*/s/ Sarah G. Boyce*
Sarah G. Boyce (admitted *pro hac vice*)
Deputy Attorney General & General Counsel
SBoyce@ncdoj.gov
North Carolina Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
Phone: (919) 716-6000
Facsimile: (919) 716-6050
*Attorney for Plaintiff State of North Carolina*

*/s/ Sarah Mader*
Sarah Mader (Admitted *pro hac vice)*
Assistant Attorney General, Antitrust Section
Sarah.Mader@OhioAGO.gov
Office of the Ohio Attorney General
30 E. Broad St., 26th Floor
Columbus, OH 43215
Telephone: (614) 466-4328
*Attorney for Plaintiff State of Ohio*

*/s/ Caleb J. Smith*
Caleb J. Smith (admitted *pro hac vice*)
Assistant Attorney General
Consumer Protection Unit
Office of the Oklahoma Attorney General
15 West 6th Street
Suite 1000
Tulsa, OK 74119
Telephone: 918-581-2230
Email: caleb.smith@oag.ok.gov
*Attorney for Plaintiff State of Oklahoma*

*/s/ Tim Nord*
Tim Nord (admitted *pro hac vice*)
Special Counsel
Tim.D.Nord@doj.oregon.gov
Civil Enforcement Division
Oregon Department of Justice
1162 Court Street NE
Salem, Oregon 97301
Tel: (503) 934-4400
Fax: (503) 378-5017
*Attorney for Plaintiff State of Oregon*

*/s/ Joseph S. Betsko*
Joseph S. Betsko (admitted *pro hac vice*)
Assistant Chief Deputy Attorney General
Antitrust Section
jbetsko@attorneygeneral.gov
Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
Phone: (717) 787-4530
*Attorney for Plaintiff Commonwealth of Pennsylvania*

*/s/ Paul T.J. Meosky*
Paul T.J. Meosky (admitted *pro hac vice*)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, ext. 2064
(401) 222-2995 (Fax)
pmeosky@riag.ri.gov
*Attorney for Plaintiff State of Rhode Island*

*/s/ Danielle A. Robertson*
Danielle A. Robertson (admitted *pro hac vice*)
Assistant Attorney General
Office of the Attorney General of South Carolina
P.O. Box 11549
Columbia, South Carolina 29211
DaniRobertson@scag.gov
(803) 734-0274
*Attorney for Plaintiff State of South Carolina*

*/s/ Aaron Salberg*
Aaron Salberg (admitted *pro hac vice*)
Assistant Attorney General
aaron.salberg@state.sd.us
1302 E. Hwy 14, Suite 1
Pierre SD 57501
*Attorney for Plaintiff State of South Dakota*

*/s/ Hamilton Millwee*
Hamilton Millwee (admitted *pro hac vice*)
Assistant Attorney General
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 38202
Telephone: 615.291.5922
Email: Hamilton.Millwee@ag.tn.gov
*Attorney for Plaintiff State of Tennessee*

*/s/ Diamante Smith*
Diamante Smith (admitted *pro hac vice*)
Assistant Attorney General, Antitrust Division
Trevor Young (admitted *pro hac vice*)
Deputy Chief, Antitrust Division
Office of the Attorney General of Texas
P.O. Box 12548
Austin, TX 78711-2548
(512) 936-1674
*Attorney for Plaintiff State of Texas*

/s/ Marie W.L. Martin
Marie W.L. Martin (admitted *pro hac vice*)
Deputy Division Director,
Antitrust & Data Privacy Division
mwmartin@agutah.gov
Utah Office of Attorney General
160 East 300 South, 5th Floor
P.O. Box 140830
Salt Lake City, UT 84114-0830
Tel: 801-366-0375
*Attorney for Plaintiff State of Utah*

/s/ Sarah L. J. Aceves
Sarah L. J. Aceves (*pro hac vice* forthcoming)
Assistant Attorney General
Consumer Protection and Antitrust Unit
sarah.aceves@vermont.gov
Vermont Attorney General's Office
109 State Street
Montpelier, VT 05609
Phone: (802) 828-3170
*Attorney for Plaintiff State of Vermont*

/s/ Tyler T. Henry
Tyler T. Henry (admitted *pro hac vice*)
Senior Assistant Attorney General
Office of the Attorney General of Virginia
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 786-2071
Facsimile: (804) 786-0122
thenry@oag.state.va.us
*Attorney for Plaintiff Commonwealth of*
*Virginia*

/s/ Rachel A. Lumen
Rachel A. Lumen (admitted *pro hac vice*)
Assistant Attorney General, Antitrust
Division
Washington Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-5343
Rachel.Lumen@atg.wa.gov
*Attorney for Plaintiff State of Washington*

/s/ Douglas L. Davis
Douglas L. Davis (admitted *pro hac vice*)
Senior Assistant Attorney General
Consumer Protection and Antitrust Section
West Virginia Office of Attorney General
P.O. Box 1789
Charleston, WV 25326
Phone: (304) 558-8986
Fax: (304) 558-0184
douglas.l.davis@wvago.gov
*Attorney for Plaintiff State of West Virginia*

/s/ Laura E. McFarlane
Laura E. McFarlane (admitted *pro hac vice*)
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
(608) 266-8911
mcfarlanele@doj.state.wi.us
*Attorney for Plaintiff State of Wisconsin*

/s/ William T. Young
William T. Young (admitted *pro hac vice*)
Assistant Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
(307) 777-7841
william.young@wyo,gov
*Attorney for the Plaintiff State of Wyoming*

31