# EXHIBIT B

**15-1278**

IN THE

# United States Court of Appeals

**FOR THE FOURTH CIRCUIT**

IT'S MY PARTY, INC.; IT'S MY AMPHITHEATRE, INC.,
d/b/a MERRIWEATHER POST PAVILION,

*Plaintiffs-Appellants,*

—v.—

LIVE NATION, INC.,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT BALTIMORE

## REDACTED BRIEF OF APPELLEE LIVE NATION

JONATHAN M. JACOBSON
*Counsel of Record*
CHUL PAK
LUCY YEN
KIMBERLEY PIRO
WILSON SONSINI GOODRICH
& ROSATI
1301 Avenue of the Americas
New York, New York 10019
(212) 497-7758

*Counsel for Defendant-Appellee*

July 31, 2015
Corrected August 19, 2015

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 15-1278 Caption: It's My Party, Inc., et al. v. Live Nation, Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Live Nation, Inc.
(name of party/amicus)

who is Appellee, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☒ NO

2. Does party/amicus have any parent corporations? ☐ YES ☒ NO
If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☒ YES ☐ NO
If yes, identify all such owners:

Liberty Media Corporation

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))? ☐ YES ☒ NO

If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐ YES ☒ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐ YES ☒ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Jonathan M. Jacobson Date: July 31, 2015

Counsel for: Appellee

## CERTIFICATE OF SERVICE

**************************

I certify that on July 31, 2015 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Robert W. Hayes
Abby L. Sacunas
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103

L. Barrett Boss
Cozen O'Connor
1627 I St., N.W.
Washington, DC 2006

/s/ Jonathan M. Jacobson
(signature)

July 31, 2015
(date)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ iii
TABLE OF ABBREVIATIONS & RECORD REFERENCES ........ xi
ISSUES PRESENTED ........ 2
COUNTERSTATEMENT OF THE CASE ........ 2
STATEMENT OF FACTS ........ 2
A. Concert Promotion Services ........ 3
1. Appellants IMA and IMP ........ 3
2. Defendant Live Nation ........ 4
3. Other National and Local Promoters ........ 4
4. Touring Options for Artists ........ 5
B. Venue Services ........ 7
C. The Artist Is the Consumer of Promotion and Venue Services ........ 8
D. Venue Options in Baltimore-Washington Region ........ 8
E. Appellant's Success ........ 10
F. Mr. Hurwitz's Opposition to Competition ........ 10
PROCEEDINGS BELOW ........ 11
A. Appellants' Claims ........ 12
B. Opinion Below ........ 14
SUMMARY OF ARGUMENT ........ 15
ARGUMENT ........ 17
I. Appellants Failed To Raise An Issue of Fact as to Anticompetitive Conduct ........ 19
A. Tying Claims ........ 19
1. Tying Nissan to promotional services. ........ 19
a. Coercion is required ........ 23
b. No local tying ........ 25
No national tour tying ........ 26
2. Venue-to-venue tying ........ 29
3. Sell-offs are not tying arrangements. ........ 30
B. Refusal to Deal Claim ........ 32

C. Exclusive Dealing ....................................................................................33
a. Insubstantial foreclosure ..........................................................34
b. Radius clauses ...........................................................................35
D. "Synergistic" Provision of Promotion with Venues ....................................36
E. Conduct as a Whole ....................................................................................38

II. Appellants Raised No Genuine Issue of Fact of Market or Monopoly Power ....................................................................................................39

A. Appellants' Venue Markets were Legally Insufficient ..............................40

1. Elhauge's Opinion Was Excluded Correctly ..................................40

2. Appellants' Evidence Was Legally Insufficient .............................49

B. No National Promotion Market ..................................................................50
C. Appellants Cannot Prove Market Power ....................................................55

III. No Injury-in-Fact ..............................................................................................57

IV. No Antitrust Injury ...........................................................................................59

V. No State Law Violation .....................................................................................60

VI. The "Project Hawaii" Report was Excluded Properly ......................................61

VII. Judge Motz Correctly Applied The Standard For Summary Judgment .............62

CONCLUSION ........................................................................................................63

REQUEST FOR ORAL ARGUMENT ....................................................................64

CERTIFICATE OF COMPLIANCE ........................................................................65

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.A. Poultry Farms v. Rose Acre Farms*,
881 F.2d 1396 (7th Cir. 1989) ....................62

*Abcor Corp. v. AM Int'l*,
916 F.2d 924 (4th Cir. 1990) ....................62

*AD/SAT v. Associated Press*,
181 F.3d 216 (2d Cir. 1999) ....................45

*Alaska Airlines, Inc. v. United Airlines, Inc.*,
948 F.2d 536 (9th Cir. 1991) ....................37

*Allegheny Pepsi-Cola Bottling Co. v. Mid-Atl. Coca-Cola Bottling Co.*, 690 F.2d 411 (4th Cir. 1982)....................57

*In re Aluminum Phosphide Antitrust Litig.*,
893 F. Supp. 1497 (D. Kan. 1995)....................44

*Am. Mfrs. Mut. Ins. Co. v. ABC-Paramount Theatres, Inc.*,
446 F.2d 1131 (2d Cir. 1971) ....................27, 28

*Amerinet, Inc. v. Xerox Corp.*,
972 F.2d 1483 (8th Cir. 1992) ....................18

*Amin v. Appalachian Reg'l Hosps.*,
No. 84-5708, 1985 WL 13730 (6th Cir. Sept. 13, 1985)....................24

*Anderson v. Liberty Lobby*,
477 U.S. 242 (1986)....................62

*Aquatherm Indus., Inc. v. Florida Power & Light Co.*,
145 F.3d 1258 (11th Cir. 1998) ....................24

*Atlantic Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990)....................18

*Baltimore Bedding Corp. v. Moses*,
34 A.2d 338 (Md. 1943) ....................60

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
603 F.2d 263 (2d Cir. 1979) ....................................................................37

*Berlyn, Inc. v. Gazette Newspapers, Inc.*,
223 F. Supp. 2d 718 (D. Md. 2002),
*aff'd*, 73 F. App'x 576 (4th Cir. 2003) ...................................................60

*Bob Maxfield, Inc. v. Am. Motors Corp.*,
637 F.2d 1033 (5th Cir. 1981) .........................................................24, 28

*Borschow Hosp. & Med. Supplies v. Cesar Castillo Inc.*,
96 F.3d 10 (1st Cir. 1996)..................................................................24, 25

*Brooke Grp. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993)...............................................................................49

*Brunswick Corp. v. Pueblo-O-Mat,*
429 U.S. 477 (1977).........................................................................57, 59

*Cajun Elec. Power Co-op. v. FERC*,
28 F.3d 173 (D.C. Cir. 1994).................................................................24

*Cellar Door Prods. v. Kay*,
897 F.2d 1375 (6th Cir. 1990) ...............................................................53

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)...............................................................................62

*Chapman v. NYS Div. for Youth*,
546 F.3d 230 (2d Cir. 2008) ..................................................................50

*Chuck's Feed & Seed Co. v. Ralston Purina Co.*,
810 F.2d 1289 (4th Cir. 1987) ...............................................................34

*Comcast Corp. v. Behrend*,
133 S. Ct. 1426 (2013)...........................................................................58

*Concord Boat Corp. v. Brunswick Corp.*,
207 F.3d 1039 (8th Cir. 2000) .........................................................17, 49

*Daisy Mountain Fire Dist. v. Microsoft Corp.*,
547 F. Supp. 2d 475 (D. Md. 2008)........................................................38

*Danny Kresky Enters. Corp. v. Magid*,
716 F.2d 206 (3d Cir. 1983) ....................................................................53

*Delta Turner, Ltd. v. Grand Rapids-Kent Cnty. Convention/Arena Auth.*, 600 F. Supp. 2d 920 (W.D. Mich. 2009) ...............................................53

*E.I. duPont de Nemours & Co. v. Kolon Indus.*,
637 F.3d 435 (4th Cir. 2011) ..............................................................50, 51

*Edmondson Vill. Theatre v. Einbinder*,
116 A.2d 377 (Md. 1955) .......................................................................60

*EEOC v. Freeman*,
778 F.3d 463 (4th Cir. 2015) ..................................................................48

*Faulkner Adver. Assocs. v. Nissan Motor Corp.*,
905 F.2d 769 (4th Cir. 1990) ..................................................................39

*Fishman v. Estate of Wirtz*,
807 F.2d 520 (7th Cir. 1986) ..................................................................53

*Flip Side Prods., Inc. v. Jam Prods., Ltd.*,
843 F.2d 1024 (7th Cir. 1988) ................................................................53

*Freeland v. AT&T*,
238 F.R.D. 130 (S.D.N.Y. 2006) ............................................................22

*Gabaldoni v. Washington Cnty. Hosp. Ass'n*,
250 F.3d 255 (4th Cir. 2001) ..................................................................60

*Gemini Concerts, Inc. v. Triple-A Baseball Club Assocs.*,
664 F. Supp. 24, 26-27 (D. Me 1987)......................................................52

*H.J., Inc. v. IT&T*,
867 F.2d 1531 (8th Cir. 1989) .........................................................24, 45

*Hammes v. AAMCO Transmissions, Inc.*,
33 F.3d 774 (7th Cir. 1994) ....................................................................59

*Hecht v. Pro-Football, Inc.*,
570 F.2d 982 (D.C. Cir. 1977)................................................................53

*Heerwagen v. Clear Channel*,
435 F.3d 219 (2d Cir. 2006) ....................18, 52, 53, 55

*Houser v. Fox Theatres*,
845 F.2d 1225 (3d Cir. 1988) ....................53

*Ill. Tool Works v. Indep. Ink, Inc.*,
547 U.S. 28 (2006)....................18, 37, 39

*Innovation Data Processing, Inc. v. IBM*,
585 F. Supp. 1470 (D.N.J. 1984)....................22, 29

*Jarrett v. Insight Commc'ns Co.*,
No. 3:09-CV-00093, 2014 WL 3735193 (W.D. Ky. July 29, 2014)....................24

*Ky. Speedway v. NASCAR*,
588 F.3d 908 (6th Cir. 2009) ....................44, 49

*Lantec, Inc. v. Novell, Inc.*,
306 F.3d 1003 (10th Cir. 2002) ....................49

*Liu v. Amerco*,
677 F.3d 489 (1st Cir. 2012)....................11

*In re Live Concert Antitrust Litig.*,
863 F. Supp. 2d 966 (C.D. Cal. 2012) ....................49, 53

*Lowry's Reports, Inc. v. Legg Mason, Inc.*,
271 F. Supp. 2d 737 (D. Md. 2003)....................60

*M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*,
981 F.2d 160 (4th Cir. 1992) ....................52

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)....................19

*Monarch Entm't Bureau v. New Jersey Highway Auth.*,
715 F. Supp. 1290 (D.N.J. 1989),
*aff'd*, 893 F.2d 1331 (3d Cir. 1989)....................53

*Nobel Scientific Indus. v. Beckman Instruments, Inc.*,
670 F. Supp. 1313 (D. Md. 1986),
*aff'd on opinion below*, 831 F.2d 537 (4th Cir. 1987)....................21

*Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns*,
311 F. Supp. 2d 1048 (D. Colo. 2004)....................................................................53

*Northern Pac. Ry. v. United States*,
356 U.S. 1 (1958).............................................................................................20

*Out Front Prods. Corp. v. Magid*,
748 F.2d 166 (3d Cir. 1984) ....................................................................32, 53

*Pac. Bell Tel. Co. v. linkLine Commc'ns*,
555 U.S. 438 (2009)..........................................................................................38

*Paladin Assocs. v. Montana Power Co.*,
328 F.3d 1145 (9th Cir. 2003) ............................................................................24

*Paschall v. Kansas City Star Co.*,
727 F.2d 692 (8th Cir. 1984) ..............................................................................36

*PepsiCo, Inc. v. Coca-Cola Co.*,
114 F. Supp. 2d 243 (S.D.N.Y. 2000),
*aff'd*, 315 F.3d 101 (2d Cir. 2002)........................................................................40

*PepsiCo, Inc. v. Coca-Cola Co.*,
315 F.3d 101 (2d Cir. 2002) ...........................................................................41, 50

*Purity Products, Inc. v. Kohlberg, Kravis, Roberts & Co.*,
No. 89-2322, 1989 WL 117937 (4th Cir. Sept. 11, 1989)..................................60

*R.J. Reynolds Tobacco Co. v. Philip Morris, Inc.*,
67 F. App'x 810 (4th Cir. 2003),
*aff'g* 199 F. Supp. 2d 362 (M.D.N.C. 2002).............................................33, 55

*Rebel Oil v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) ..............................................................................50

*Redmond v. Missouri Western State College*,
84-6139-CV-SJ-6, 1988 WL 142119 (W.D. Mo. Nov. 2, 1988) .......................41

*Rowe Entm't, Inc. v. William Morris Agency, Inc.*,
No. 05-0854-cv, 2005 WL 22833 (S.D.N.Y. Jan. 5, 2005),
*aff'd*, 167 F. App'x 227 (2d Cir. 2005)...............................................................52

*Satellite Television & Assoc. Res., Inc. v. Cont'l Cablevision of Va., Inc.*, 714 F.2d 351 (4th Cir. 1983) ........ 17

*Schachar v. Am. Acad. of Ophthalmology*, 870 F.2d 397 (7th Cir. 1989) ........ 38

*Schor v. Abbott Labs.*, 457 F.3d 608 (7th Cir. 2006) ........ 38

*Serv. & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680 (4th Cir. 1992) ........ 24, 25

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993) ........ 18

*Sports Racing Servs., Inc. v. Sports Car Club*, 131 F.3d 874 (10th Cir. 1997) ........ 24

*Stephen Jay Photo., Ltd. v. Olan Mills, Inc.*, 903 F.2d 988 (4th Cir. 1990) ........ 20, 24

*Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112 (1st Cir. 2011) ........ 34

*T. Harris Young & Assoc. v. Marquette Elecs.*, 931 F.2d 816 (11th Cir. 1991) ........ 41

*Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961) ........ 50

*Thompson Everett, Inc. v. Nat'l Cable Adver., L.P.*, 57 F.3d 1317 (4th Cir. 1995) ........ 19

*Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438 (11th Cir. 1991) ........ 59

*U.S. Philips Corp. v. ITC*, 424 F.3d 1179 (Fed. Cir. 2005) ........ 24

*Ungar v. Dunkin' Donuts*, 531 F.2d 1211 (3d Cir. 1976) ........ 24

*Unijax, Inc. v. Champion Int'l*,
683 F.2d 678 (2d Cir. 1982) ....................24

*United States v. Black & Decker Mfg. Co.*,
430 F. Supp. 729 (D. Md. 1976) ....................56

*United States v. Carilion Health Sys.*,
892 F.2d 1042 (4th Cir. 1989) ....................52

*United States v. Connecticut Nat'l Bank*,
418 U.S. 656 (1974) ....................55

*United States v. E.I. duPont de Nemours & Co.*,
351 U.S. 377 (1956) ....................45

*United States v. Eastman Kodak Co.*,
63 F.3d 95 (2d Cir. 1995) ....................51

*United States v. Griffith*,
334 U.S. 100 (1948) ....................36, 37

*United States v. Grinnell Corp.*,
384 U.S. 563 (1966) ....................54, 55

*United States v. Hughes Tool Co.*,
415 F. Supp. 637 (C.D. Cal. 1976) ....................56

*United States v. Loew's, Inc.*,
371 U.S. 38 (1962) ....................36, 37

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) ....................17, 34

*United States v. TicketMaster Ent., Inc.*,
No. 1:10-cv-00139-RMC (D.D.C. June 21, 2010) ....................37

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko*,
540 U.S. 398 (2004) ....................17, 33, 37, 39

*Virginia Vermiculite v. WR Grace & Co.-Conn.*,
98 F. Supp. 2d 729 (W.D. Va. 2000),
*aff'd*, 307 F.3d 277 (4th Cir. 2002) ....................49

*Ways & Means, Inc. v. Ivac Corp.*,
506 F. Supp. 697 (N.D. Cal. 1979),
*aff'd*, 638 F.2d 143 (9th Cir. 1981)....................21

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,
549 U.S. 312 (2007)....................8

*White v. Rockingham Radiologists, Ltd.*,
820 F.2d 98 (4th Cir. 1987)....................18

*Will v. Comprehensive Accounting Corp.*,
776 F.2d 665 (7th Cir. 1985)....................24

*Zellers v. NexTech Northeast, LLC*,
533 F. App'x 192 (4th Cir. 2013)....................48

**Statutes & Rules**

Clayton Act § 3, 15 U.S.C. § 14....................33

Sherman Act § 1, 15 U.S.C. § 1....................*passim*

Sherman Act § 2, 15 U.S.C. § 2....................*passim*

FED. R. CIV. P. 12(b)(6)....................50

FED. R. CIV. P. 56....................*passim*

FED. R. EVID. 702....................15, 48

FED. R. EVID. 801(d)(2)....................61

**Other Authorities**

AMERICAN BAR ASS'N, SECTION OF ANTITRUST LAW,
ANTITRUST LAW DEVELOPMENTS (7th ed. 2012)....................*passim*

PHILLIP AREEDA & HERBERT HOVENKAMP,
ANTITRUST LAW (4th ed. 2015)....................*passim*

U.S. DEP'T OF JUSTICE & FEDERAL TRADE COMMISSION, HORIZONTAL
MERGER GUIDELINES (2010)....................41, 42

## TABLE OF ABBREVIATIONS & RECORD REFERENCES

| | |
|---|---|
| JA | References to the Joint Appendix |
| SA | References to the Supplemental Appendix |
| AppBr. | Plaintiffs-Appellants' Opening Brief (Sealed) (filed June 10, 2015) (Dkt. No. 23) |
| Baltimore-Washington region | The area encompassing Baltimore, Maryland, Washington, D.C., and Northern Virginia |
| IMA | Plaintiff-Appellant It's My Amphitheatre, Inc. |
| IMP | Plaintiff-Appellant It's My Party, Inc. |
| Merriweather | Merriweather Post Pavilion |
| Nissan | Nissan Pavilion, now named Jiffy Lube Live |
| NIN | Nine Inch Nails |
| ECF– | References to the docket for this case below, Case Number 1:09-cv-00547-JFM, U.S. District Court for the District of Maryland |
| Video | Indicates a video clip, playable on the electronic version of this brief |

**BRIEF OF APPELLEE LIVE NATION, INC.**

Appellants' Merriweather Post Pavilion is a hugely successful operation, one that has grown to the point of achieving greater revenues and more concerts than Live Nation's Nissan Pavilion. Yet, Appellants allege that they are victims of tying, exclusive dealing, and monopolization. They charge that, because Live Nation has assembled a large and efficient network of concert resources across the country, it is able to offer artists national tours and opportunities to make more money. And they complain that, when these tours include Live Nation venues, Live Nation is able to offer more attractive financial terms for the artists – forcing Appellants to compete.

None of this comes close to an antitrust violation. On the contrary, Appellants' real complaint is that there is *too much* competition. Their principal, Seth Hurwitz, insists that the bidding for artists' performances has gotten [redacted] to the point that he tried, without success, [redacted] [redacted] JA1560-62; JA1604; SA1 (video). As the court below recognized, however, the antitrust laws were designed to protect competition, not prevent it. Its decision granting summary judgment should be affirmed in all respects.

## ISSUES PRESENTED

1. Did the District Court (Motz, J.) err in determining that Appellants had failed to raise a genuine issue of material fact on any of their claims under the Sherman or Clayton Acts, or applicable state law, and accordingly, in granting summary judgment dismissing the case in its entirety?

2. Did the District Court abuse its discretion in excluding the "venue market" opinion of Einer Elhauge?

3. Did Appellants fail to raise any genuine issue of material fact as to the existence of injury-in-fact or of *antitrust* injury, warranting summary judgment on these alternative grounds?

4. Did the District Court abuse its discretion in excluding a document prepared by a nonparty, labelled "Project Hawaii," as inadmissible hearsay?

## COUNTERSTATEMENT OF THE CASE

### STATEMENT OF FACTS

The evidence is of course viewed in the light most favorable to the Appellants; and they are given the benefit of all reasonable inferences. Here, however, many of Appellants' statements are directly contrary to the uncontroverted record. The following counterstatement, in contrast, is based entirely on facts that are not in genuine dispute.

A. CONCERT PROMOTION SERVICES

"It is the artist who is the impetus for and ultimately the organizer of every tour." JA2121 (Hurwitz Decl.). An artist (or his/her/their manager) commonly hires an agent to handle touring details, including assisting the artist with city and venue selection, procuring offers from and negotiating with promoters, and booking shows. JA5176-77; JA5156. Promoters, including IMP and Live Nation, compete to provide concert promotion services to the artist, which can consist of (i) financing concerts by guaranteeing the artist a payment for a concert, (ii) advising on the selection of venues and securing them, (iii) managing concert costs, and (iv) creating and executing marketing strategies for the performance. JA2123-25; JA4249.

**1. Appellants IMA and IMP.** IMP has successfully promoted live music concerts in Washington, D.C., and in or near Baltimore, Maryland, for over thirty years. JA2116-18. As its principal, Seth Hurwitz, says, IMP promotes concerts for artists with "the highest levels of popularity," at "virtually every large venue" in the Baltimore-Washington, D.C. area. JA2118. IMP does not, however, have the ability to promote a national tour. JA4870; JA4888.

IMA has managed and operated the Merriweather Post Pavilion, an outdoor amphitheater located in Columbia, Maryland, since 2004. JA2116. Mr. Hurwitz is

the principal of IMA. He also owns the 9:30 Club, a nationally-recognized indoor live music venue in Washington, D.C. JA2118.

**2. Defendant Live Nation.** Live Nation provides concert promotion services to artists on a global, North American, and local basis. The company maintains tour promotion offices in Los Angeles and Toronto, as well as local promotion offices throughout the United States. JA1524. It also owns, operates, leases, or has exclusive booking rights at venues across North America. JA49; JA52. One such venue is Nissan Pavilion (now called "Jiffy Lube Live"), an outdoor amphitheater located in Bristow, Virginia. JA62.

**3. Other National and Local Promoters.** Numerous other promoters compete against Live Nation and IMP in the Baltimore-Washington region and throughout the world. AEG Live, a global concert promoter and venue operator, promotes the tours of artists like Katy Perry, Justin Bieber, Cher, and Bon Jovi. JA4246-47; JA4286; *see also* JA4270 (competition for Jonas Brothers tour); JA4277 (competition for Nickelback tour). AEG Live increased its share of North American promotion from 12% to 19% from 2006 to 2010. JA5514. In 2015, AEG is promoting Taylor Swift and the U.S. tour of the Rolling Stones.

Trade organizations such as the Arena Network and Arena Coalition also coordinate efforts in order to attract artists to the groups' venues. JA4253. More local concert promoters include Beaver Productions, Upfront Promotions, and

Outback Concerts, all of whom have promoted artists at large venues in the Baltimore-Washington area, such as the Verizon Center, First Mariner Arena, and the Patriot Center. *See, e.g.,* JA1436; JA1445; JA1483.

**4. Touring Options for Artists.** An artist has multiple ways to structure the finances, schedule, and arrangements for concerts, and a wide selection of promoters that can provide these services. Appellants' expert has noted the most basic option: holding concerts in different cities using different local promoters. JA5143. When artists book a tour "locally" in this fashion, they contact directly the promoters (and, through them, the venues) with whom they want to work. Many artists do so. JA4252-53; JA262; JA266 (311 regularly books its tours locally); JA268; *see* JA4279; JA4286; JA4289-94, JA4322-29, JA4341. Less than half of Live Nation's "major concerts," as Appellants define the term, is made up of nationally-negotiated tours. JA235.

Artists can also work with a single promoter for most or all of the national or global tour dates in question, JA314, or split promotion services among two or more promoters, each responsible for a date or block of dates. JA1829.

Financing options for a tour vary. The artist typically receives the higher of a minimum guaranteed payment (a "guarantee") or an agreed-upon percentage of the gross ticket sales (often referred to as the "back-end"). JA4249. If the artist opts for multiple local promoters, then separate financial terms will be negotiated

with each local promoter. JA4247. If the artist selects one promoter for all the tour dates, then the promoter can provide an overall guarantee based on the total number of concerts. JA4248. For the artists at issue in this case, the agreed-on back-end percentages range from 85% to 100% of the "gross" ticket sales (i.e., the box office receipts less enumerated expenses). JA308; *see, e.g.*, JA4432 ([redacted]).

Some tours with multiple concerts under one agreement are "cross-collateralized." JA4250. Under cross-collateralization, "the back-end revenues from every individual concert are pooled, with the funds held in escrow until the tour ends (or some other agreed-upon time)." *Id.* Cross-collateralization "is essentially an insurance policy; if any cities on the tour route lose money, the money earned from more successful cities will cover any losses." *Id.* Because this practice reduces the promoter's overall financial risk, the promoter can offer the artist a higher guarantee. *See id.* Cross-collateralization is used by Live Nation, AEG Live, and others. JA314-15; JA5178.

If additional revenue streams from the concert venue are available to the promoter, then this, too, facilitates higher payments to the artist. JA4251. Promoting concerts at one's own venue(s) provides the promoter access to concession sales, parking fees, and ticket rebates. *Id.*; JA314-15. Concert promoters typically structure their offers to artists based on venues that they own

or operate and the anticipated ancillary revenues from those venues. JA4251; JA4367 (Aerosmith tour agreement). Appellants do so at Merriweather; IMP is the promoter or co-promoter for over 99% of concerts held there. *See* JA5008.

**B. Venue Services**

Artists have numerous venue types from which to choose, including clubs, theaters, casinos, arenas, amphitheaters, and stadiums. Venue sizes range from capacities of about 500 for clubs to over 60,000 in stadiums. JA2126. Factors such as seating capacity, the number of fixed (versus lawn) seats, earning potential, and the choice to play outdoors (or not) weigh on the artist's decision as to the venues to select. JA5155-57; JA913-17.

An artist's tour typically consists of multiple venue types. Even during the same summer season, many artists will perform at Nissan or Merriweather and then continue the tour at non-amphitheater venues. JA236; JA2627-28 (Nine Inch Nails); JA4370-71 (Depeche Mode); JA4387 (Coldplay). Often, an artist's tour may include more of one venue type than another in one year, only to change gears the following year. For example, Nickelback switched from an arena tour in 2006 to outdoor amphitheaters in 2007. JA5179.

Artists also choose *when* to perform. A choice to play in colder weather necessarily rules out amphitheaters. JA1767.

### C. The Artist Is the Consumer of Promotion and Venue Services

For purposes of this case, there is no dispute that "[t]he relevant competition . . . is competition either among venues or among promoters for the patronage of artists." JA1218-19, JA2123, JA4696. The "price" with which the artist is concerned is the artist's compensation, "the guarantee, plus a share of the ticket revenue." JA5123; JA260-61. The higher the artist's guarantee and share of revenues, the lower the effective "price" paid by the artist for concert promotion and venue services. JA5123; JA4911. Any exercise of market power here would thus be reflected in *lower* guarantees and a *lower* share of revenues to artists. JA4913; *see Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co*., 549 U.S. 312, 320-21 (2007).

### D. Venue Options in Baltimore-Washington Region

***Merriweather***. Appellants founded IMA in 2003 for the purpose of leasing Merriweather, and have held full booking control of the venue since 2004. JA181. Prior to Appellants' control, Merriweather was operated by others, including Live Nation's predecessor, SFX Entertainment. SFX and IMP operated Merriweather jointly from 1999 until IMA took over in 2004. *Id.*; JA826; JA4252.

***Nissan***. Artists have the ability to sell a greater number of tickets at Nissan than at Merriweather because Nissan is a larger venue, with a capacity of 25,000, including 10,000 fixed seats; Merriweather's capacity is 19,316, with just 5,000

fixed seats. Nissan's larger capacity enables the artist to earn more. JA4426-27. The higher income potential of Nissan is a significant competitive advantage over Merriweather. JA5162-63; *see also* JA270; JA263-64.[1]

***Others***. As Mr. Hurwitz readily confirmed, artists seeking to perform in the Baltimore-Washington region have "plenty" of venue options beyond Nissan and Merriweather. JA5170-71; JA4230 (video). These venues include: Filene Center at Wolf Trap (outdoor amphitheater located in Vienna, Virginia, with a capacity of 7000); Verizon Center (indoor arena located in Washington, D.C., capacity 19,000); First Mariner Arena (indoor arena in Baltimore, capacity 14,000); Patriot Center (indoor arena in Fairfax, Virginia, capacity 10,000); and Pier Six Pavilion (outdoor amphitheater in Baltimore, capacity 4200). JA1516. Each of these venues has hosted what Appellants call "major popular artists" during the relevant time period. JA1079; JA1424-25; JA1443; JA1497; JA1846-50.

---

[1] [redacted] The same holds for many other concert events. So Appellants' statement that "in none of the instances where artists sought to play Merriweather did LN offer more money to induce a Nissan performance," AppBr.47, is incorrect. In fact, Appellants themselves never presented a single instance in which *they* offered a better financial arrangement and the artist played Nissan instead.



### E. Appellants' Success

In four out of five concert seasons between 2008 and 2012, and overall, Merriweather has hosted as many or more concerts and had higher ticket revenues than Nissan notwithstanding its lower seating capacity. JA5001-03. [REDACTED] JA4908-09. By comparison, from 1995 to 1998 (before SFX/Live Nation came on the scene), Merriweather hosted *fewer* concerts than Nissan. JA185-89, JA825-26. Since 2006, Merriweather has hosted artists such as Nickelback, Santana, John Mayer, Jason Aldean, Rascal Flatts, Katy Perry, Kenny Chesney, Nine Inch Nails, and Taylor Swift. JA827-40 (listing concerts held at Merriweather from 2006 to 2012). [REDACTED] *See* JA4798.

### F. Mr. Hurwitz's Opposition to Competition

Notwithstanding Appellants' remarkable success, their principal, Seth Hurwitz, has consistently complained that artists are paid too much, and that concert output – the number of shows – is too high. He testified that [REDACTED] JA1566; SA1 (video) ([REDACTED]).

As early as 2005, Mr. Hurwitz began making proposals for Live Nation to [redacted] effectively ending competition between them. JA1560-62; JA1604. In the same vein, he proposed that Appellants and Live Nation should [redacted]. JA1560-62 ([redacted]). Mr. Hurwitz's rationale was that the [redacted] SA1 (video). *Cf. Liu v. Amerco*, 677 F.3d 489, 494-95 (1st Cir. 2012) (unsuccessful attempts to conspire may be unlawful).

Live Nation rejected Mr. Hurwitz's overtures. This lawsuit followed.

## PROCEEDINGS BELOW

Appellants filed their Complaint on March 5, 2009. JA37. The District Court denied a motion to dismiss on July 17, 2009. JA92. Live Nation moved for summary judgment on October 14, 2011. JA9. On August 23, 2012, the Court denied the initial motion for summary judgment, without prejudice to renewal following the close of expert discovery. JA229.

Live Nation's renewed motion for summary judgment was filed on March 21, 2014, together with motions to exclude the testimony of Mr. Elhauge and Appellants' other experts. JA22-23. Following extensive briefing, together with numerous motions to strike filed by Appellants, the Court heard argument on November 7, 2014, JA1253, and granted summary judgment in a detailed opinion dated February 19, 2015. JA1372.

### A. APPELLANTS' CLAIMS

Appellants brought claims under Sections 1 and 2 of the Sherman Act, and corresponding Maryland law, for monopolization, tying, and exclusive dealing, involving various relevant markets, as explained below. JA64-89.

Counts 1-7 of the Complaint, JA64-83, advanced a variety of federal antitrust claims. The claims were for restraint of trade under Sherman Act § 1 (Counts 1 and 2), monopolization under Sherman Act § 2 (Counts 3, 5, and 6), and attempted monopolization under Sherman Act § 2 (Counts 4 and 7). All these claims have since been modified (without amendment of the Complaint) since the Complaint was filed.[2] As the case evolved, the claims as presented below were as follows.

---

[2] For example, Count 4 alleged attempted monopolization of a Baltimore area venue market. Now, however, "[n]one of IMP/IMA's causes of action are grounded upon LN's exercise of market power in that market." AppBr.58.

***Tying.*** Appellants asserted tying claims under Section 1 of the Sherman Act and alleged tying as exclusionary conduct under Section 2. There are three forms of tying alleged. AppBr.4. *First*, Live Nation is alleged to require artists who take its promotion services to also agree to perform at Nissan – a tie between the claimed promotion market and the Baltimore-Washington venue market. JA4739. *Second*, Live Nation is alleged to require artists who want to perform at its amphitheaters outside Baltimore-Washington to also perform at Nissan – a tie of one venue market to another. *Id.* The *third* "tie" is better viewed as a refusal to deal claim. *See* JA1408-09. Live Nation is alleged to refuse to allow competing promoters to host shows in venues that it owns. JA4739.

***Exclusive Dealing.*** Although now reduced to a single paragraph at pages 67-68 of their brief, Appellants separately alleged exclusive dealing as exclusionary conduct under Section 2. JA4739-40. The theory was that Live Nation had signed certain artists to exclusive arrangements.

***Predatory Pricing.*** Appellants asserted originally but are no longer pursuing a predatory pricing claim. Their expert admitted that the evidence does not support such a claim. JA5125.

***State law claims***. Appellants also advanced a Maryland state law antitrust claim, a tortious interference claim, and an unfair competition claim. All were premised on the same factual assertions contained in the antitrust claims. JA86-89.

### B. Opinion Below

Judge Motz granted summary judgment dismissing the case in its entirety.

***Tying.*** (a) With regard to the claim that Live Nation required artists using its promotion services to perform at Nissan for their Baltimore-Washington appearance, the Court held that Appellants had failed to prove that promotion was a *national* market (as they claimed) and that, absent a cognizable market, Appellants could not prove the essential element of market power over a tying product. In addition, the Court held, as an alternative ground, that Appellants had failed to offer legally sufficient evidence of the "forcing" or "coercion" a tying claim requires. JA1390-1400.

(b) With regard to the claim that Live Nation required artists performing in one of its amphitheaters outside Baltimore-Washington to play Nissan as well, the court held Appellants' venue market definition to be legally insufficient. The Court also held, alternatively, that the claim failed for lack of evidence of coercion. JA1401-03.

(c) With regard to the claim that Live Nation refused to allow other promoters to produce shows in Live Nation venues, the Court again found a lack of power, and that the conduct in issue was not exclusionary. JA1408-10.

***Exclusive dealing.*** The court rejected exclusive dealing as an aspect of exclusionary conduct under Section 2 because Appellants failed to offer evidence of substantial foreclosure, an essential element of any such claim. JA1410-11.

***State law claims.*** Judge Motz concluded that the failure of Appellants' antitrust claims required rejection of their state law claims as well. JA1412-13.

***Exclusion of expert testimony.*** The court denied all of Live Nation's and Appellants' *Daubert* motions, with one exception. Specifically, Judge Motz excluded the venue market definition opinion provided by Professor Elhauge. JA1380-86. He explained that Elhauge had "defined [a] market that suits the needs of plaintiffs" but that "excludes potentially reasonable substitute venues." JA1385. Elhauge's analysis was not based on sufficient facts or data, and his methodology was "not based on sound logic or reasoning." It was therefore excluded under FED. R. EVID. 702.

## SUMMARY OF ARGUMENT

1. The court below concluded correctly that Appellants raised no genuine issue of material fact as to anticompetitive or exclusionary conduct, an essential element of all their claims.

- Appellants' claims of tying Nissan to promotional services and tying Nissan to performances in other venues were legally defective. It was undisputed that artists can book all their shows locally, and so can always obtain the tied and tying products separately. The claims also fail for the additional reason

that Appellants presented no evidence of the requisite conditioning – no evidence that promotional services or venues were ever refused unless the artist agreed to perform at Nissan.

- The claim that Live Nation refused to allow rival promoters to share its venues failed in light of the lack of evidence of an actual request by anyone – including Appellants – to use a Live Nation venue.

2. The Court's determination that Appellants failed to prove their relevant markets (or the requisite power within those markets) was correct.

- Professor Elhauge's conclusion that the relevant venue market is confined to large amphitheaters was properly excluded. Among many other defects, Elhauge failed to analyze the most critical question, cross-elasticity of demand. Even if Elhauge had not been excluded, Appellants still failed to raise a triable issue of fact.
- Appellants' *national* promotion market was properly rejected. Uncontradicted record facts established, beyond dispute, that the area of effective competition is local.
- Even if Appellants' markets were not defective, the record established conclusively that Live Nation lacks market power within those markets. Far from the power to depress artist compensation and concert output below competitive levels, Appellants' persistent complaint is that there are *too many* shows and that Live Nation pays *too much*.

3. Given Appellants' great success – including surpassing Nissan – they failed to raise a triable issue of injury-in-fact.

4. Appellants failed to offer damages reflecting any *anticompetitive* effect of the claimed violations. Their damages model presupposes an 84% market share for Merriweather and reduced compensation for artists.
5. Appellants' state law claims all fall with their antitrust claims.
6. There was no abuse of discretion in excluding the report of a nonparty consultant as hearsay.
7. Judge Motz applied the correct standard under Rule 56.

## ARGUMENT

Although Appellants assert a variety of antitrust claims, there are several essential elements common to all their claims.

- *Exclusionary conduct.* Even if Live Nation had market power or monopoly power, Appellants also had to prove that the practices challenged as tying or exclusive dealing unreasonably harmed competition. **Exclusionary or anticompetitive conduct** is thus an essential element of each claim under Sherman Act §§ 1 and 2. The mere possession of monopoly power cannot be found unlawful unless "accompanied by an element of anticompetitive conduct." *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 407 (2004) (Section 2 claim); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1058 (8th Cir. 2000) (Section 1 and 2 claims); *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001). Appellants' failure to prove anticompetitive conduct is addressed in Point I below.
- *Relevant market.* On each claim, Appellants also had to prove a **relevant product and geographic market**. *Satellite Television & Assoc. Res., Inc. v.*

*Cont'l Cablevision of Va., Inc.*, 714 F.2d 351, 355 (4th Cir. 1983) ("we must first define the relevant market because the concept of competition has no meaning outside its own arena"); *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 229 (2d Cir. 2006). For Appellants' tying claims, separate "tying" and "tied" product markets must be proven. *White v. Rockingham Radiologists, Ltd.*, 820 F.2d 98, 103 (4th Cir. 1987). *See* Point II.A below.

- *Market power.* On Appellants' Section 1 claims, **market power** in the relevant market must be shown. On the Section 2 monopolization claims, Appellants had to prove Live Nation has **monopoly power**. *White*, 820 F.2d at 103-04 (tying and monopolization claims); *Ill. Tool Works v. Indep. Ink, Inc.*, 547 U.S. 28, 35 (2006). For Appellants' claim of attempted monopolization, there must be a "dangerous probability" that Live Nation will obtain monopoly power. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). Live Nation's lack of market power, lack of monopoly power, and lack of any dangerous probability of such power – even in the markets as Appellants define them – is demonstrated in Point II.B.
- *Fact of injury*. For each claim, Appellants had to prove "**injury-in-fact**." That is, Appellants must show that they (i) incurred financial loss that was (ii) caused by Live Nation's unlawful conduct and not some other cause. *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1493-94 (8th Cir. 1992). *See* Point III below.
- *Antitrust injury.* For each claim, Appellants also had to prove "**antitrust injury**." Even if an injury is caused by an antitrust violation, the injury does not qualify as "antitrust injury" unless the injury arises from "an *anticompetitive* aspect of the practice under scrutiny." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (emphasis added). *See* Point IV below.

Summary judgment is "particularly well-suited" for antitrust cases because of their complexity. *Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*, 57 F.3d 1317, 1322 (4th Cir. 1995). Appellants must come forward with specific facts of adequate "quality and quantity" to merit continuing this case to trial. *Id.* at 1323. If the facts render Appellants' claims "implausible – if the claim is one that simply makes no economic sense" – then summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The District Court carefully followed these precepts. Its judgment should be affirmed.

## I. APPELLANTS FAILED TO RAISE AN ISSUE OF FACT AS TO ANTICOMPETITIVE CONDUCT

Judge Motz properly concluded that Appellants failed to raise a genuine issue of fact supporting their allegations of anticompetitive conduct. We demonstrate here the correctness of his analysis of tying, exclusive dealing, and monopolization.

### A. TYING CLAIMS

**1. Tying Nissan to promotional services.** Appellants' principal claim in this case is the purported tie of Nissan to promotional services. The claim is legally insufficient for three related but independently sufficient reasons.

***First***, there can be no tie because artists can always (and regularly do) obtain promotional services on an individual concert-by-concert basis – an option that

allows any artist to choose Merriweather at any time. *See, e.g.*, *Northern Pac. Ry. v. United States*, 356 U.S. 1, 6 n.4 (1958) ("no tying problem" where "the buyer is free to take either product by itself"); *Stephen Jay., Ltd. v. Olan Mills, Inc.*, 903 F.2d 988, 991 (4th Cir. 1990); 10 PHILLIP AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 1753b (4th ed. 2015); AMERICAN BAR ASS'N, SECTION OF ANTITRUST LAW, ANTITRUST LAW DEVELOPMENTS 184 & n.1164 (7th ed. 2012).

There is no issue of fact in this respect. The record is uncontroverted that artists are free to obtain promotional services on this kind of "local," i.e., *à la carte*, basis. Professor Elhauge conceded the point in his deposition, JA5142-43 ("I can't think of an instance where [an artist] tried to book locally and w[as] told you have to do a nationally-negotiated tour"), and in his (corrected) expert report, JA5533 ("I have found no evidence indicating that Live Nation negotiates multiple localities simultaneously when artists are not having their tours negotiated through a centralized booker, such as the national touring group."); *see* JA1373; JA1391.

This option to bypass nationally-negotiated tours is used frequently. *E.g.,* JA4247, JA4252; JA262, JA268. Live Nation books roughly half its shows, and generates roughly half its profit, from local bookings. *E.g.,* JA4341; JA235. Appellants' own data show that 92 of the 213 Nissan-Merriweather "major artist" concerts at issue, or 43%, were not part of Live Nation national tours. JA4631.

Where this kind of *à la carte* option is so readily available, a tying claim fails as a matter of law. As the court said in *Nobel Scientific Industries v. Beckman Instruments, Inc.*, 670 F. Supp. 1313 (D. Md. 1986), *aff'd on opinion below*, 831 F.2d 537 (4th Cir. 1987), "when 25 percent of all purchases were made outside the tying program, then as a matter of law, separate purchase of the products was a viable alternative and no tying existed." *Id*. at 1325 (citing *Ways & Means, Inc. v. Ivac Corp.*, 506 F. Supp. 697 (N.D. Cal. 1979), *aff'd*, 638 F.2d 143 (9th Cir. 1981)). Here, the numbers are much higher than 25%.

This admittedly unrestrained option to obtain promotional services locally eliminates Appellants' promotional tying claim as a matter of law.

***Second***, Appellants' own statistical data – reflected in Professor Elhauge's artist choice calculations – demonstrate the *absence* of tying.[3]

---

[3] These "Artist Choice Regressions," on which Appellants rely so heavily, AppBr.8, 11, 21, 34-40, address an issue not in the case. They are based on the premise that "nationally-negotiated tours" are the "tying product." JA4630-36. No such market was ever alleged, let alone proven. Instead, the tying product Appellants alleged was "major promotional services" in what they claimed was a national market. JA5884-86. "Nationally-negotiated tours" are an unquantified subset of that market – and necessarily skew the data, as artists signing with Live Nation for a national tour will be of course be predisposed to play Live Nation venues. Moreover, using "nationally-negotiated tours" as the tying product omits, among other things, local bookings, and reduces the percentage of relevant shows at Merriweather substantially. For sake of argument, however, we address Elhauge's calculations as presented.

Preliminarily, it is useful to note that statistical evidence such as Elhauge's can rarely, if ever, *prove* a tying arrangement. *See, e.g.*, *Freeland v. AT&T*, 238 F.R.D. 130, 155-56 (S.D.N.Y. 2006) ("'A high percentage, even 100 percent, of bundled sales does not itself indicate that two products have been tied together.'") (quoting 10 AREEDA & HOVENKAMP ¶ 1756b2). Conversely, however, an appreciable number of non-tied sales can prove the *absence* of a tie. Thus, in *Innovation Data Processing, Inc. v. IBM*, 585 F. Supp. 1470, 1474-75 (D.N.J. 1984), the court held that, as a matter of law, where only 85% of the sales included both products (while 15% did not), there was no tie. The leading treatise pegs the relevant number at "more than 10 percent." 10 AREEDA & HOVENKAMP ¶ 1756b2.

Here, the numbers are higher. If the "tying service" is limited to "nationally-negotiated tours," Elhauge's data show that 14% of these artists played Merriweather, not Nissan, for their Baltimore-Washington date. JA4631. If the tying service includes all Live Nation major promotion, including local – as Appellants allege (AppBr.24, 59-61) – the ratio of Merriweather concerts to Nissan is much higher. In fact, of the artists who performed for Live Nation at least five times during the year, and who played Nissan or Merriweather, some 46% played Merriweather. JA4996. Either way, the undisputed data show a substantial number of artists who have accepted the "tying service" but elected to play Merriweather anyway. That is not tying.

Importantly, moreover, Professor Elhauge's formula affirmatively disregards conditioning. It only compares artists' choices after signing a Live Nation nationally-negotiated tour agreement with the choices when they do not sign a tour agreement. Mr. Elhauge specifically conceded that his formula counts as "tied" concerts where the artist affirmatively wanted to play Nissan rather than Merriweather. JA5136-37 (a concert is deemed foreclosed in the regressions even if the artist "hated Merriweather and really wanted to play at Nissan"). The regressions have nothing to do with conditioning, and are therefore irrelevant.

***Third***, as Judge Motz concluded correctly, even if summary judgment were not required due to *á la carte* availability or the high percentage of non-tied concerts, Appellants offer no evidence at all of the coercion to accept the tied product that the law requires. There is no evidence that any artist was ever required to perform at Nissan to get Live Nation's promotional services elsewhere. Appellants cannot identify even a single instance where Live Nation refused a national tour – or any promotional service – unless the artist agreed to play Nissan.

a. *Coercion is required*. Appellants argue that proof of "coercion" (or "forcing") is unnecessary. They say only "conditioning" is required. AppBr.35-

39. However, they make no effort to address the fact that *every* circuit, including this Court, requires proof of coercion.[4]

Nor is it remotely correct to say, as Appellants do, that "LN has not identified one case where proof of conditioning by a competitor with market power was held insufficient to demonstrate tying in a claim by another competitor (as opposed to a customer)." AppBr.20. Among many others, this Court's decisions in *Stephen Jay*, 908 F.2d at 991, and *Serv. & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680, 688 (4th Cir. 1992), rejected tying claims on that precise basis. *See* JA1394.

Appellants' focus on the word "conditioning" is unavailing. *Every* offer is "conditioned" on the terms proposed. Where, as here, two products are offered

---

4 *E.g., Stephen Jay*, 903 F.2d at 991 ("seller must coerce"); *Borschow Hosp. & Med. Supplies v. Cesar Castillo Inc.*, 96 F.3d 10, 18 (1st Cir. 1996) ("essential element"); *Unijax, Inc. v. Champion Int'l*, 683 F.2d 678, 684-85 (2d Cir. 1982) ("indispensable element"); *Ungar v. Dunkin' Donuts*, 531 F.2d 1211, 1218-19 (3d Cir. 1976) (proof is a "necessity"); *Bob Maxfield, Inc. v. Am. Motors Corp.*, 637 F.2d 1033, 1037 (5th Cir. 1981) ("indispensable element"); *Amin v. Appalachian Reg'l Hosps.*, 774 F.2d 1161, at *1 (6th Cir. 1985) (unreported); *Jarrett v. Insight Commc'ns Co.*, No. 3:09-CV-00093, 2014 WL 3735193, at *4 (W.D. Ky. July 29, 2014); *Will v. Comprehensive Accounting Corp.,* 776 F.2d 665, 669 (7th Cir. 1985) (tying "depends on coercion"); *H.J., Inc. v. IT&T*, 867 F.2d 1531, 1542 (8th Cir. 1989) ("essential element"); *Paladin Assocs. v. Montana Power Co.*, 328 F.3d 1145, 1159-60 (9th Cir. 2003) ("essential"); *Sports Racing Servs., Inc. v. Sports Car Club,* 131 F.3d 874, 887-89 (10th Cir. 1997) (forcing is "critical"); *Aquatherm Indus., Inc. v. Florida Power & Light Co.*, 145 F.3d 1258, 1263 (11th Cir. 1998) ("essential element"); *Cajun Elec. Power Co-op. v. FERC*, 28 F.3d 173, 177-78 (D.C. Cir. 1994) (forcing); *U.S. Philips Corp. v. ITC*, 424 F.3d 1179, 1194-95 (Fed. Cir. 2005) (forcing).

together, the offer is "conditioned" – in the sense Appellants use the term – whether the customer is free to get just one product or not. That is not tying. As Judge Motz held, a plaintiff must show undue "pressure" by the defendant to force the purchase of the unwanted tied product. JA1394. Whether described as "conditioning," as Appellants do, or coercion or forcing, what is absolutely clear is that there must be evidence that Live Nation *refused* to promote unless the artist agreed to play Nissan. *E.g.*, *Borschow*, 96 F.3d at 18; *Serv. & Training*, 963 F.2d at 688. There is no such evidence here.

b. *No local tying*. Appellants' brief jumbles together the various "ties" they claim, without disclosing what they assert to be the tying product. Piercing the confusion, however, one (and just one) of their vignettes involves a claim of "tying" outside of a Live Nation tour: Nickelback in 2006. AppBr.33.

Nickelback was on an *AEG* tour, not with Live Nation, in 2006. JA6454. The owners of The Woodlands (near Houston) – a venue for which Live Nation has exclusive booking rights – wanted Live Nation to book Nickelback at their location. JA6352. That never happened because *the band rejected* Live Nation's offers and instead played for AEG in Houston's Toyota Center arena. JA6454; JA1050. How any of this could conceivably be called a tie is unclear. But the kicker is that Nickelback's 2006 Baltimore-Washington performance was at Merriweather, promoted by Appellants. JA1051. And the very next year,

Nickelback did play The Woodlands – as well as Merriweather *again*. JA1046-47. To characterize these events as a tie that injured Appellants is untenable.

c. *No national tour tying*. There is an equal absence of evidence suggesting that Live Nation has ever tied Nissan (or any other venue) to a national tour. To be sure, there are cases in which Live Nation fights for Nissan, just as Appellants fight for Merriweather. What is missing, though, is any evidence of *tying*. Appellants cannot cite a single instance in which Live Nation ever refused a national tour except on the condition that the artist perform at Nissan.

Appellants offer six instances in which they assert coercion. Their arguments are belied by the very evidence on which they themselves rely.

- *Sublime*. Appellants cite a Live Nation document bragging that Sublime's agent "is in no position to tell us no [on DC]. I will get it done or no tour offer." AppBr.33 (citing JA6340-41). Live Nation did in fact make a tour offer, but the agent indeed said "no," and booked locally. JA6460. Sublime did not play Nissan that year (2010) or any other time during the relevant time period. In 2010, they played Pier 6, a rival amphitheater (excluded from Appellants' market definition), instead. JA1079.
- *Jonas Brothers*. AppBr.41. The Jonas Brothers signed a global tour agreement with Live Nation in December 2007, [REDACTED] [REDACTED], JA6464, giving Live Nation an exclusive right to promote specific performances and a right of first refusal on any additional performances. JA6462. While that agreement was in effect, Appellants sought to get the Jonas Brothers to play Merriweather, [REDACTED]



[redacted] JA6477. Live Nation proposed the alternative of performing at First Mariner (another venue excluded from Appellants' market definition), with an earnings potential that [redacted] JA1103; JA6503. Far from coercion, this was an exercise of prior contractual rights that yielded a tangible benefit to the artist.

- *John Mayer*. AppBr.40. The John Mayer solo tour in 2006 never happened. Instead, he co-headlined with Sheryl Crow. They rejected Merriweather only after Live Nation agreed to pay them [redacted] of the gross ticket sales, less expenses. JA2716. That unusually hefty payout was based on inclusion of Nissan and White River (another Live Nation amphitheater) in the deal. Nothing in the documents remotely suggests any kind of coercion. And Mayer's agent, Marc Geiger, [redacted]. JA6556-57. There is no contrary evidence.
- *Nine Inch Nails* (*2006*). AppBr.32-33, 40-41. [redacted], and there is no contrary evidence. Appellants rely on a single document, JA6430, which in no way suggests otherwise. In the document, Live Nation conditions a specific *offer* on inclusion of Nissan. But conditioning an *offer* is not coercion; *every* offer is conditional on its specific terms. *See* 10 AREEDA & HOVENKAMP ¶ 1756e. That is especially true where, as here, the offer was *rejected*. [redacted]. JA6446-47. That is negotiation, not tying, as the court below held. JA1396-97. *See, e.g., Am. Mfrs. Mut. Ins. Co. v. ABC-Paramount*

*Theatres, Inc.*, 446 F.2d 1131, 1137 (2d Cir. 1971) (negotiation is not coercion).

- *Nine Inch Nails* (*2009*) and *The Fray* (*2009*). Appellants assert "coercion" in the context of these two bands in 2009, AppBr.43, but both performed at Merriweather rather than Nissan. JA834. Obviously neither artist was coerced into playing Nissan. Appellants' complaint therefore cannot be tying. It is, instead, that Appellants had to pay Live Nation for the sell-off or "co-promote." That is a different issue entirely, and is addressed below.

These episodes are all that Appellants have, and they are plainly insufficient as a matter of law. What Appellants call conditioning is, in every case, nothing more than the normal give-and-take of negotiation or an exercise of previously-agreed contractual rights. This kind of normal business behavior is not the coercion or conditioning that tying doctrine requires. For example, in the *Bob Maxfield* case, summary judgment was granted because there was no "evidence that [defendant] ever required [customers] to take [the tied product] or face a cutoff of [the tying product]." 637 F.2d at 1037; *accord, e.g., ABC-Paramount Theatres*, 446 F.2d at 1137 (bargaining position was not tying even though it "undoubtedly exercised at least a marginal influence" on the buyer's decision); 10 AREEDA & HOVENKAMP ¶¶ 1756b, 1756d2. Negotiating multiple dates at the same time, however aggressively, is not illegal absent proof that a tying product would in fact be refused if the tied product were not accepted. *Id.* ¶ 1754a. There is no evidence here whatsoever to that effect.

**2. Venue-to-venue tying.** There is an equal lack of evidence that Live Nation ever refused an artist's request to perform in one of its venues unless the artist played Nissan (rather than Merriweather) for its Baltimore-Washington date.

Appellants rely on just two items to support this claim. The first is Table 13 of Professor Elhauge's report. JA5530. That table shows that artists who played in a Live Nation amphitheater in a town where it has the only amphitheater (which he calls a "100% Live Nation locality") performed at Merriweather 26% of the time; in contrast, those who bypassed these so-called 100% Live Nation localities played Merriweather 84% of the time (if they performed at either Nissan or Merriweather that year). *Id*. For the reasons given above, these statistics are incapable of proving tying. In fact, the 26% number proves the absence of a tie. *E.g.*, *Innovation Data*, 585 F. Supp. at 1475-76 (15%); *see* JA5530.

The second relates to a concert by the band 311 in 2006. Appellants' evidence, AppBr.9, 33-34, establishes nothing more than (i) an effort by Mr. Hurwitz to get 311 to renege on a prior contract to perform at Nissan, coupled with (ii) a statement from the band's agent that, if he did renege, the band's Virginia Beach date [REDACTED] JA2147. None of this involved any *conduct by Live Nation* at all, and the agent in question, John Harrington, confirmed when Appellants deposed him that [REDACTED]

[redacted] JA6576-77. [redacted] JA6581-82.

Neither Appellants' statistical data nor the 311 episode raised a genuine issue of material fact.

**3. Sell-offs are not tying arrangements.** When a promoter signs an artist to a multi-appearance tour, it may not be the sole promoter on every date, and there may be cases where the artist wants to play a venue other than the ones set forth in the contract. In these instances, the original promoter may sell off dates to another promoter, with the artist's consent. These sell-offs or co-promotions are a common business practice in the industry. *E.g.,* JA4248-49. For example, in 2009, Kenny Chesney signed an extensive exclusive touring agreement with AEG. AEG then sold off eleven dates to Live Nation – at a significant markup. *See* JA6479.

All the sell-offs Appellants complain about here are in the same vein. Thus, in the case of Nine Inch Nails in 2009, the band signed a tour agreement with Live Nation covering performances through June 12, 2009. JA6484. [redacted]

[redacted] JA2652. The purpose, as the booking agent testified, was to [redacted] Live Nation was paying the band overall. JA2646. Similarly, for The Fray, the band signed a multi-appearance tour agreement. JA3360. At the band's request, however, the proposed routing was revised to include a Merriweather date and to alter various other dates. *See* JA6497. Again consistent with industry practice, the date was sold off to Appellants [redacted]. JA3360. The net effect of the changes was to make the band better off financially. JA4984-87.

Appellants cannot credibly contend that sell-offs such as these are illegal. They cannot possibly be ties since the tied product, Nissan, was in each instance rejected. Nor do Appellants offer any alternative theory that these sell-offs are anticompetitive. There is no contention that Appellants' voluntary payment of a sell-off amount rendered any concert unprofitable; if that were even an issue, Appellants could simply have declined the opportunity – as they did with Green Day in 2010. JA2008, JA2148.

As Judge Motz recognized, these arrangements are procompetitive. JA1398-1400. Allowing a sell-off permits the artist freedom to alter its choice of venue and promoter notwithstanding a prior agreement to participate in a tour. It affords greater opportunities for rivals such as Merriweather. And the payments provide a

real incentive for the original promoter to continue to authorize these arrangements going forward rather than demand strict contractual exclusivity. The effect on competition is unambiguously positive.

### B. Refusal to Deal Claim

Appellants insist that their claim that Live Nation declines to offer its venues to rival promoters is a tying claim. AppBr.66-67. The argument is incorrect because there is no evidence that the affected parties, competing promoters, were told they could use Live Nation venues only on condition they use Live Nation promotional services as well. If this were a tie, there would be two products in issue, not one.

But the point is academic. It is undisputed that Appellants were never denied the ability to promote at a Live Nation venue *because they never asked* – and never even desired to do so. JA1288-89; *see also* ECF-280-1, at 42. In fact, Appellants offered no instance of *any* promoter that sought to use one of Live Nation's amphitheaters and was denied. The testimony they cite from Live Nation's CEO says only that Live Nation "[u]sually [does] not" want other promoters to share its assets. AppBr.31. That is proof of nothing. Absent a request to deal, there cannot be any tying or refusal to deal. *Cf. Out Front Prods. Corp. v. Magid*, 748 F.2d 166, 169 (3d Cir. 1984) (rival promoter's claim for denied access to concert venue rejected in absence of any serious effort for access).

Even if Appellants could allege a refused request, which they cannot, their suggestion that Live Nation has a legal obligation to share its property with rivals is contrary to basic antitrust policy. As the Supreme Court has said:

> Firms may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers. Compelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities. . . . Thus, as a general matter, the Sherman Act "does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919).

*Trinko*, 540 U.S. at 407-08. Of course, in the Baltimore-Washington region, the only area in which Appellants operate, there is another large amphitheater – the Merriweather Post Pavilion – in addition to numerous other venues. There is no antitrust law that would require Live Nation to make Nissan available to the operators of Merriweather.

Appellants' refusal to rent claim – whether characterized as tying or a refusal to deal – should be rejected on any and all of these grounds.

### C. Exclusive Dealing

An exclusive dealing claim, whether asserted independently under Sherman Act § 1 or Clayton Act § 3, or as an aspect of exclusionary conduct under Sherman Act § 2, requires proof of substantial foreclosure of a relevant market. *E.g.*, *R.J. Reynolds Tobacco Co. v. Philip Morris, Inc.*, 67 F. App'x 810 (4th Cir. 2003),

*aff'g* 199 F. Supp. 2d 362, 390 (M.D.N.C. 2002) (Sherman Act §§ 1, 2); *Microsoft*, 253 F.3d at 69-70 ("in all cases the plaintiff must both define the relevant market and prove the degree of foreclosure"); *Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112, 123-24 (1st Cir. 2011) (Sherman Act §§ 1, 2).

a. *Insubstantial foreclosure.* Here, Appellants admittedly have failed to demonstrate any degree of foreclosure from exclusive dealing apart from their tying allegations. JA5144-45 ("I do not separately calculate the share foreclosed only by the exclusive dealing contracts"). They do not even attempt to dispute Dr. Klein's calculation that the foreclosure from exclusive arrangements, apart from any tying, is tiny – from just zero to 6%. JA5010. Dismissal of the tying claims, therefore, necessarily means dismissal of Appellants' exclusive dealing allegations as well for failure to prove substantial foreclosure. JA1411.

Appellants try to avoid this outcome on appeal by asserting that Live Nation "foreclosed over $1.5 billion in ticket sales over a five year period," and that an aggregate dollar amount qualifies as relevant foreclosure. AppBr.67-68. Even if their number were not imaginary, it would make no difference. Foreclosure relates to the *percentage of the market* affected, not the raw dollars. *E.g.*, ANTITRUST LAW DEVELOPMENTS 211-16; *Chuck's Feed & Seed Co. v. Ralston Purina Co.*, 810 F.2d 1289, 1295 (4th Cir. 1987). Appellants have not come close to showing the substantial foreclosure the law requires.

b. *Radius clauses.* Appellants also cite what they call "overly broad exclusivity and radius clauses." AppBr.2, 17.

A radius clause is a provision under which the artist agrees not to perform within a specific "radius" from a venue within a specified time before (and in some cases after) an agreed event. These clauses are an obvious necessity. No promoter would agree to pay a minimum guarantee for a performance if the economics could be defeated by another performance in the same area around the same time. Mr. Hurwitz describes these clauses as [redacted] JA6592-93. And Mr. Elhauge explains that "[s]imilar clauses appear fairly standard throughout the industry." JA5479; *see* JA6500.

Appellants' characterization of Live Nation's clauses as "overbroad" is supported by no document, testimony, or expert analysis, and their own evidence disproves their argument. [redacted] JA6251, 6256; *see also* JA6272, JA6295 (Huey Lewis, Doobie Brothers). Most of the other agreements are limited to the industry standard 150 miles, and expire either at the end of the tour or 30 days after. *See generally* JA6020-296.

The radius clause argument raises no genuine issue of material fact. All the clauses are short in duration, and reasonably necessary to induce payment of the

guarantee. *See* ANTITRUST LAW DEVELOPMENTS 217-18, 220. But even if that were not plainly so, Appellants have still failed to demonstrate any degree of foreclosure. That failure, again, is fatal to any claim.

### D. "SYNERGISTIC" PROVISION OF PROMOTION WITH VENUES

Faced with the failure of their exclusionary conduct claims, Appellants say: "Even if not independently actionable, LN's synergistic tying of promotion and venue services are anti-competitive actions." AppBr.65-66. They cite *United States v. Griffith*, 334 U.S. 100 (1948) and *United States v. Loew's, Inc.*, 371 U.S. 38 (1962) for the proposition "that simultaneously negotiating promotion or amphitheater services for markets LN monopolizes and where it faces competition is an abuse of [market] power." AppBr.65-66.

Appellants' argument attacks efficient competition. In competing for a single concert or a tour, there are obvious benefits to the artist (as well as the promoter) when a promoter can offer or utilize venues whose costs they control. Appellants themselves benefit from the same efficiencies when they promote artists at Merriweather or their 9:30 Club. Antitrust law does not outlaw this kind of efficient organization; it encourages it. *E.g., Paschall v. Kansas City Star Co.*, 727 F.2d 692, 701 (8th Cir. 1984) ("vertical integration may have substantial procompetitive effects in the form of lower prices and more efficient use of resources."). As the Department of Justice said in rejecting Appellants' arguments

in opposition to the Live Nation/TicketMaster consent decree, "vertical integration of complementary businesses in the live entertainment industry reduces the number of firms that must be compensated for a concert," resulting in lower costs overall. DOJ Response to Public Comments at 15-16, *United States v. TicketMaster Ent., Inc*., No. 1:10-cv-00139-RMC, Dkt. 13 (D.D.C. June 21, 2010).

*Loew's* and *Griffith* – decisions from a decidedly different era of antitrust law – do not change the outcome. *Loew's* was overruled in *Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28 (2006), and there is no authority today condemning "block booking" as necessarily illegal or anticompetitive.

*Griffith* involved agreements with the major movie distributors for exclusive first-run rights to all their films – substantial market foreclosure – in contrast to the artist-by-artist negotiations in this case. Appellants here cite the case for its supposed "monopoly leveraging" principle, i.e., that any use of power in one market to gain a competitive advantage in another is illegal. AppBr.65-66; *cf.* 334 U.S. at 107. *Compare Berkey Photo, Inc. v. Eastman Kodak Co*., 603 F.2d 263, 275-76 (2d Cir. 1979) (adopting similar reading of *Griffith*) *with, e.g., Alaska Airlines, Inc. v. United Airlines, Inc.,* 948 F.2d 536, 547 & n.16 (9th Cir. 1991) (rejecting *Berkey* and distinguishing *Griffith* as "involving concerted action"). But any vestiges of this "leveraging" aspect of *Griffith* (and *Berkey*) were expunged, in 2004, in the *Trinko* case, 540 U.S. at 415 n.4; and it is now clear that *exclusionary*

conduct – of which there is no evidence here – must be established in every case. *See* ANTITRUST LAW DEVELOPMENTS 304-08; *Daisy Mountain Fire Dist. v. Microsoft Corp.*, 547 F. Supp. 2d 475, 487-88 n.26 (D. Md. 2008) (rejecting leveraging doctrine); *Schor v. Abbott Labs.*, 457 F.3d 608, 612-14 (7th Cir. 2006) (rejecting "free-standing leveraging" theory).

**E. CONDUCT AS A WHOLE**

All of Appellants' specific claims are thus legally insufficient. Does aggregating Live Nation's conduct make a difference? The answer is no for two reasons. First, a plaintiff may not "join a . . . claim that cannot succeed with [another] claim that cannot succeed, and alchemize them into a new form of antitrust liability never before recognized." *Pac. Bell Tel. Co. v. linkLine Commc'ns*, 555 U.S. 438, 457 (2009).

Second, however the conduct might be aggregated, there is still no evidence of harm to competition. Competitive harm is the essence of any antitrust claim, and typically requires proof of an adverse effect on market price or output. *E.g., Schachar v. Am. Acad. of Ophthalmology*, 870 F.2d 397, 399 (7th Cir. 1989) ("[A]ntitrust law is about consumers' welfare and the efficient organization of production. It condemns reductions in output that drive up prices as consumers bid for the remaining supply."). Here, Appellants advance no such argument. Nor can they. Their principal, Mr. Hurwitz, has made it clear that Appellants' goal is to

end price competition and to lower output. *See* pp. 10-11 above. So they argue instead that Live Nation has restricted "artist choice." AppBr.4, 21 & *passim*. As the preceding discussion demonstrates, however, there is no such evidence. Artists are entirely free to book locally or on a tour basis, and are free to break out of a tour as many dates as they want.

* * * *

Considered singly or in the aggregate, Appellants' assertions of anticompetitive conduct raise no issue of fact. As proof of such conduct is an essential element of all of Appellants' claims, this failure of proof alone warrants summary judgment.[5]

## II. APPELLANTS RAISED NO GENUINE ISSUE OF FACT OF MARKET OR MONOPOLY POWER

Appellants' claims all require proof of both a relevant market and Live Nation's market power or monopoly power within the market as properly defined.

---

5 Live Nation argued below, and preserves the point here, that the per se rule for tying did not survive the Supreme Court's decisions in *Illinois Tool Works*, 547 U.S. at 36 (Court has "reject[ed] the application of a per se rule that all tying arrangements constitute antitrust violations") and *Trinko*, 540 U.S. at 415 n.4; *see generally* 9 AREEDA & HOVENKAMP ¶ 1701d. But, in this Circuit, even if tying is per se illegal, Appellants were still required to prove consumer harm in their tied product market – specifically the "large amphitheater only" market in Baltimore-Washington. *Faulkner Adver. Assocs. v. Nissan Motor Corp.*, 905 F.2d 769, 772 (4th Cir. 1990) ("a plaintiff must show . . . that the tying arrangement unreasonably foreclosed or restrained market competition in the tied product"). There is no such evidence in the record. As Appellants fail the other requirements of a per se tying claim in any event, this Court need not address the issue.

- *Venue markets.* For the claims of (i) tying Nissan to other venues and (ii) refusing to rent venues to rivals, Appellants alleged, and were required to prove, that the tying product market was amphitheaters seating over 8000.
- *Promotion market*. For the claims of (i) tying Nissan to promotional services, (ii) exclusive dealing, and (iii) monopolization and attempted monopolization, Appellants alleged, and were required to prove, a *national* promotion market.[6]

### A. Appellants' Venue Markets were Legally Insufficient

#### 1. Elhauge's Opinion Was Excluded Correctly

Based on the testimony of Professor Elhauge, Appellants sought to define the venue markets as the provision of "major amphitheaters to major amphitheater performers." An explanation requires many mouthfuls. The markets are limited to (i) outdoor amphitheaters, excluding all non-amphitheaters like clubs, stadiums, and arenas; (ii) amphitheaters seating 8000 or more; (iii) concerts selling 8000 tickets or more; (iv) concerts by "artists who prefer amphitheaters"; and (v) performances between May and September. JA4565-75. Appellants' own data demonstrate that the combined effect of these criteria is to exclude some 75% of concerts in the Baltimore-Washington area. JA842. *Cf. PepsiCo, Inc. v. Coca-Cola Co.*, 114 F. Supp. 2d 243, 249 (S.D.N.Y. 2000) (rejecting comparable "strange red-haired, bearded, one-eyed man-with-a-limp classification") (citation

---

[6] For purposes of this appeal, there is no dispute that the geographic scope of the venue markets is local and that the promotion market is limited to "major promotion" as Appellants define it.

omitted), *aff'd*, 315 F.3d 101 (2d Cir. 2002). Exclusion of this plainly outcome-oriented analysis was emphatically proper.

***Amphitheater limitation***. Judge Motz focused specifically on the most significant criterion, Elhauge's amphitheater-only limitation, and "exercise[d] his discretion to exclude" it. JA1385-86. Professor Elhauge relied principally on a "histogram," subjective evidence, and "functional differences," each of which Judge Motz addressed specifically, JA1382-86, and also on ticket and concession pricing data. These criteria, he claimed, supported a conclusion that there was an *identifiable* set of artists who so prefer amphitheaters that they could be *segregated and paid less* to perform. *See* U.S. DEPARTMENT OF JUSTICE & FEDERAL TRADE COMMISSION, HORIZONTAL MERGER GUIDELINES § 4.1.4 (2010).[7]

Notwithstanding this reliance on the "targeted customer" approach, Elhauge could not identify a single artist who could be "targeted" for a compensation decrease. On the contrary, his own data demonstrated that the artists he considered

[7] Some courts have rejected this targeted customer approach. *See, e.g., T. Harris Young & Assoc. v. Marquette Elecs.*, 931 F.2d 816, 824 (11th Cir. 1991) ("While a relevant product market can be limited to a portion of customers, such a limitation must be based on a distinction in the product sold to those customers."); *Redmond v. Missouri Western State College*, 84-6139-CV-SJ-6, 1988 WL 142119 (W.D. Mo. Nov. 2, 1988). Where it has been allowed, the courts require that the plaintiff identify a "discrete class of customers that has such a strong preference . . . that [they] would not consider substitutes if other factors (especially price) changed." *PepsiCo*, 315 F.3d at 106-07.

"foreclosed" played non-amphitheaters over half the time. Not one only played amphitheaters. JA853.

Most importantly, Elhauge never addressed the central issue: cross-elasticity of demand. In the context of this case, the question is whether a hypothetical firm that had all the "major" amphitheaters in a given area could reduce the compensation paid to artists by a small but significant amount (typically 5% - 10%) for a significant period of time without losing so much business to non-amphitheaters that the price change would be unprofitable. MERGER GUIDELINES §§ 4.1.1; *see also* 2B AREEDA & HOVENKAMP ¶ 536. Elhauge never addressed this issue. JA1382-83 (explaining that Elhauge did "nothing to indicate whether a change in the price to artists for amphitheaters (i.e., offering a lower guarantee) would induce greater demand for arenas or other venues").

Although Elhauge never addressed cross-elasticity of demand in defining the venue markets, Appellants' principal, Mr. Hurwitz, did – effectively conceding that Elhauge's large-amphitheater-only market was too narrow. He was asked what would have happened if his overture to Live Nation to eliminate competitive bidding between Nissan and Merriweather had been accepted:



JA4230 (video).

*Histogram*. Rather than examining whether artists would switch to non-amphitheaters in response to a price change, Elhauge based his venue market definition primarily on a static histogram purporting to show where artists had performed. Because of its "U-shape," Elhauge asserted that "the majority of artists are situated at one extreme or the other – either they strongly prefer playing at amphitheaters or they strongly prefer playing at non-amphitheaters." JA1382. The methodology is unrecognized. Appellants cite no case or literature in which this sort of histogram has been used in this way to define a market.

Even if the methodology were recognized, its implementation here was unsound. Elhauge's histogram ignored his "major" concert restriction. His selection criteria allowed him to include numerous events – such as the plays Hairspray and Mamma Mia, as well as "Barbie Live" – performed in only one year

in only one venue. JA854 (referring to 81 such instances); JA1383 & n.9. By including so many events that were *incapable of switching* (in response to a price change or otherwise), Elhauge skewed his data to enhance the U-shape of his histogram – as each event was necessarily 100% amphitheaters or 100% non-amphitheaters. To compound the problem, Elhauge also included artists who performed as few as two events if the two were in different years. (If the two events happened to be in amphitheaters, the artist was characterized as an "amphitheater artist.") Every artist is counted as one observation in his histogram, whether the artist performed two times or two hundred. None of this makes economic sense.

As Judge Motz recognized, Elhauge's U-shape *disappears* if these invalid data are avoided by just a slight adjustment to the selection criteria – to capture artists with as few as three or more performances in at least two different years. JA4955-61; JA1383. That Elhauge's result holds only under improper selection criteria demonstrates its unreliable nature. *See Ky. Speedway v. NASCAR*, 588 F.3d 908, 916-99 (6th Cir. 2009) (excluding expert who failed properly to apply the *Guidelines* test he claimed to be using); *In re Aluminum Phosphide Antitrust Litig.*, 893 F. Supp. 1497, 1506-07 (D. Kan. 1995) (excluding expert who selected an "arbitrary" time period "to plug evidentiary holes in plaintiffs' case").

*Functional differences/subjective preferences.* Elhauge also relied on the fact that amphitheaters have physical differences and that one artist, Trent Reznor of NIN, expressed a preference for playing in amphitheaters.

Physical differences cannot define a market absent proof that cross-elasticity of demand is low. *E.g., United States v. E.I. duPont de Nemours & Co*., 351 U.S. 377, 394 (1956) (market cannot be limited to cellophane but must include aluminum foil and other flexible wrapping materials in light of cross-elasticity of demand); *AD/SAT v. Associated Press*, 181 F.3d 216, 228-30 (2d Cir. 1999) (electronic and physical delivery in same market given cross-elasticity of demand); *H.J., Inc.*, 867 F.2d at 1538-40. Elhauge never addressed the issue.

As Judge Motz recognized, JA1383-84, the one artist (Reznor) cited by Elhauge as expressing even a preference for amphitheaters, JA4567, made clear that personal preference is a "small factor, but not a huge one." JA5846. Common sense says that the main factor is where the artist can make more money. Over the relevant period, only 35% of NIN's shows at "major venues" were in amphitheaters. JA1384. Their 2008 Baltimore-Washington area performance, in fact, was at the Verizon Center *arena* – promoted by *Appellants*. JA907; *see also* JA914-15, 921.

*Prices for tickets and concessions*. Appellants criticize the court below for not addressing specifically Professor Elhauge's analysis of ticket and concession

prices. Yet Appellants themselves provide no explanation of either analysis in the single paragraph in their brief in which the two are mentioned. AppBr.56.

Elhauge's ticket and concession price analyses were misdirected. The competition in issue in this case is competition by promoters and venues for the business of artists, and the price relevant to that competition is the guarantee and the artist's percentage of the gross ticket revenue. JA5122-23. The price *concertgoers* pay for tickets or concessions is irrelevant; it addresses the wrong question.

Even so, the analyses themselves provided zero support for Elhauge's conclusions. Elhauge's ticket prices regression purported to show that Live Nation's ticket prices are 5% higher in towns where it has the only amphitheater. But artists typically receive 85% - 100% of gross ticket sales. The higher the ticket price, therefore, the more money the artist makes. Observing higher ticket prices when Live Nation has the only amphitheater in town therefore means that artists are better off, not worse. It is emphatically not proof that amphitheaters are in a venue market separate from arenas and other venues.[8]

---

[8] Moreover, as Nobel laureate Daniel McFadden explained, Elhauge's regression is truly "junk science" and capable of proving nothing. The regression depends *entirely* on his improper use of cost-of-living on the left-hand side as a divisor, rather than on the right-hand side as an explanatory variable. If cost-of-living is on the right-hand side, Elhauge's result vanishes. JA275-78.

The concession data are equally irrelevant. Elhauge shows only that, looking at Nissan and Merriweather concession pricing – on different items with no effort to make an apples-to-apples comparison – Nissan's prices on these selected items from 2006 to 2010 increased 16% more than Merriweather's prices for items of different brands and sizes. JA4592-95, JA4695. Even if this analysis were in any way valid, it is not possibly relevant to whether the market can be limited to Nissan and Merriweather as Appellants claim. Making more money on concessions does not suggest reducing compensation to artists. If anything, it suggests the opposite.[9]

*Elhauge's errors were crucial.* Appellants assert that Elhauge's methodological errors do not matter because Live Nation would have a large market share anyway. AppBr.8, 20, 30-31. First, they say, "market shares would remain essentially unchanged if non-amphitheater artists were included." AppBr.8. That statement is misleading. Shares would remain similar *in a "major amphitheater" market only*. The core problem is that the "amphitheater-artist"

---

[9] The analysis, in any event, is invalid. As Appellants' concession price expert observed, every venue owner has "market power" over the price of concessions in its venues. JA5075. Customers *at any venue* desiring beer or popcorn have no choice but to pay the venue's price or forego the item. That is not "market power" relevant to whether the venue owner has the power to reduce compensation to performers, the issue here. Moreover, Appellants' own data confirm that the price increases at Nissan were no different from those in sports venues over the same period. JA350.

criterion is the main basis for excluding arenas, casinos, clubs, stadiums, and other venues from the market.

Appellants also claim that the shares are similar if the market is defined as "major" amphitheaters plus "major" arenas. AppBr.30-31. That too is irrelevant. Appellants *never attempted to define such a market*, and provided no basis for excluding casinos, clubs, stadiums, and venues with seating capacities under 8000 from such a market.

***Exclusion was proper***. Live Nation argued below, and continues to submit, that Professor Elhauge's testimony was so outcome-oriented – in so many respects – that it should have been excluded in its entirety. Judge Motz, however, excluded only his venue market opinion. That limited ruling was well within the court's discretion. *See, e.g., EEOC v. Freeman*, 778 F.3d 463, 466 (4th Cir. 2015) ("A district court abuses its discretion if it relies on an error of law or a clearly erroneous factual finding."); *Zellers v. NexTech Ne., LLC*, 533 F. App'x 192, 196 (4th Cir. 2013).

As the court below found after extended analysis, Elhauge's opinion was not based on sufficient facts and data but on data selectively and inconsistently applied to get a desired result. His opinions were not based on reliable principles or methods, but instead on novel tests made up just for this case. FED. R. EVID. 702. And they were not helpful. *Id.* Many cases have excluded relevant market

opinions on just these grounds. *E.g., Ky. Speedway*, 588 F.3d at 917-20; *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1025-26 (10th Cir. 2002); *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 993-94 (C.D. Cal. 2012); *Va. Vermiculite v. WR Grace & Co.-Conn.*, 98 F. Supp. 2d 729, 737-38 (W.D. Va. 2000), *aff'd on other issues*, 307 F.3d 277 (4th Cir. 2002); *see also Concord Boat*, 207 F.3d at 1055-57 (excluding Stanford professor Robert Hall). The court below acted well within its discretion in reaching the same result here.

**2. Appellants' Evidence Was Legally Insufficient**

Given their complete reliance on Elhauge's opinion, exclusion necessarily meant rejection of Appellants' venue market. *E.g.*, *Ky. Speedway,* 588 F.3d at 919. Yet even if Professor Elhauge's opinion had not been excluded, Appellants' evidence was insufficient as a matter of law. As the Supreme Court made clear in *Brooke Group v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 242 (1993), "[w]hen an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable," the opinion cannot create a genuine issue of material fact. Here, the only factual evidence tendered by Appellants in support of their major-amphitheater-only market was the evidence on which Elhauge relied. That evidence was insufficient for all of the reasons given for excluding the underlying opinion.

Appellants say: "As a fact issue, market definition is for the jury." AppBr.24. That statement is incorrect. Market definition is for the jury when a genuine issue of material fact has been raised, but not otherwise. Numerous cases have upheld summary judgment – and some have even upheld Rule 12(b)(6) dismissals – when the evidence creates no triable issue of fact. *E.g., PepsiCo,* 315 F.3d at 105-07; *Rebel Oil v. Atl. Richfield Co*., 51 F.3d 1421, 1435 (9th Cir. 1995) (if plaintiff's "evidence cannot sustain a jury verdict on the issue of market definition, summary judgment is appropriate"); *Chapman v. N.Y.S. Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (Rule 12(b)(6) dismissal). That is the only appropriate result here.

### B. No National Promotion Market

With regard to the *promotion* market, the issue is whether, as Judge Motz determined, the market is necessarily local or whether, as Appellants argue, there is an issue of fact supporting their contention of a *national* market. Appellants' arguments fail because they ignore the "area of effective competition . . . in which [the] seller operates and to which purchasers can practicably turn for supplies." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961); *see E.I. duPont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 441-42 (4th Cir. 2011).

To determine the area in which purchasers of concert promotion – artists in this case – "can practicably turn for supplies," the accepted test is whether a price

change by sellers (concert promoters) in one area would be made unprofitable by a loss of customers to another area. If so, the two areas are in a single market. If not, the two areas are in separate geographic markets. *Kolon,* 637 F.3d at 441-42; MERGER GUIDELINES § 4.2; *United States v. Eastman Kodak Co.*, 63 F.3d 95, 104-05 (2d Cir. 1995); 2A AREEDA & HOVENKAMP ¶¶ 530a, 550, 554.

A local-only price change would clearly be profitable. Appellants provided nothing to suggest that an artist seeking to play Baltimore, as an example, would retain the services of a promoter based in Florida, even in response to a small but significant price change. The services that promoters provide are local in nature. Paid advertising, such as radio, TV, newspaper, and digital advertising, is an important part of a promoter's activity. That activity is almost entirely local. *See* JA2156 (Hurwitz: "Fans will not typically travel beyond their metropolitan area or their region for a concert so most advertising and marketing of concerts is local."); JA1203-11, JA1231. Live Nation engages in television advertising on a strictly local basis. *See* JA1205-06. Even where advertising is available nationally, such as with certain newspapers, Live Nation spends [REDACTED] on national versus local newspaper advertising. JA1204-05. And, of course, selecting a venue is local to the site where the venue alternatives are located and the concert is to be held. An out-of-state promoter is simply not going to be able to provide the promotional services artists require.

The area in which suppliers – concert promoters in this case – "effectively compete" is local too. *M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 170 (4th Cir. 1992) (citations omitted); *see also Kolon*, 637 F.3d at 442-43; *United States v. Carilion Health Sys.*, 892 F.2d 1042 (4th Cir. 1989). Appellants concede that "promoters only compete locally," AppBr.26, and they readily admit that IMP promotes only "major concerts" in Baltimore-Washington, not in Houston, Florida, or New York. *See* JA6529; ECF-110, at 12 ("Neither IMP nor IMA can compete with Live Nation's national tour offers.").

Many other promoters similarly book only in local markets. That is one of the reasons booking "locally" is so prevalent. As discussed above, the record in this case is replete with evidence of locally-promoted major concerts. *See* p. 20 above. JA6578-80; JA268; JA1227-29; JA6561-62.

There have been a number of antitrust cases in the concert industry. *None* has found a national market for concert promotion. In three of the cases, the court found or acknowledged that the concert promotion market was local. *See Heerwagen,* 435 F.3d at 224-25; *Rowe Entm't, Inc. v. William Morris Agency, Inc.*, No. 05-0854-cv, 2005 WL 22833, at *5 (S.D.N.Y. Jan. 5, 2005), *aff'd*, 167 F. App'x 227 (2d Cir. 2005); *Gemini Concerts,* 664 F. Supp. at 26-27. In the eight others we have found, the local nature of the market was obvious and simply

assumed. To our knowledge, no case has ever found (or even hinted at) a national market for concert promotion.[10]

Appellants point out that *Live Nation* has the ability to offer a *national* tour. But Live Nation does so in the context of competing for, and (if successful) aggregating, a series of *local* dates. Appellants do not and cannot dispute that Live Nation also offers promotion services locally and, indeed, tries to have a local promoter in every significant local region. *See* JA2427 ("Live Nation still runs its business through a decentralized local structure"). As the Second Circuit held in an analogous context in *Heerwagen*, "[l]ocal markets for tickets sales are not transformed into a national market simply because concert tours are coordinated nationally." 435 F.3d at 230.

Appellants assert that, contrary to *Heerwagen,* "artists can turn to promoters throughout the country." AppBr.29. That is true in the literal sense that an artist

---

[10] *See Flip Side Prods., Inc. v. Jam Prods., Ltd.*, 843 F.2d 1024, 1026 (7th Cir. 1988); *Out Front*, 748 F.2d at 168; *Danny Kresky Enters. Corp. v. Magid*, 716 F.2d 206, 208 (3d Cir. 1983); *Cellar Door Prods. v. Kay*, 897 F.2d 1375 (6th Cir. 1990); *Live Concert Antitrust Litig*., 863 F. Supp. 2d at 969; *Delta Turner, Ltd. v. Grand Rapids-Kent Cnty. Convention/Arena Auth.*, 600 F. Supp. 2d 920, 937 (W.D. Mich. 2009); *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns*, 311 F. Supp. 2d 1048, 1063 (D. Colo. 2004); *Monarch Entm't Bureau v. New Jersey Highway Auth.*, 715 F. Supp. 1290, 1300 (D.N.J. 1989), *aff'd*, 893 F.2d 1331 (3d Cir. 1989); *see also Fishman v. Estate of Wirtz*, 807 F.2d 520, 531-32 & n.9 (7th Cir. 1986) (basketball); *Hecht v. Pro-Football, Inc.*, 570 F.2d 982, 988-89 (D.C. Cir. 1977) (football); *Houser v. Fox Theatres Mgmt. Corp.*, 845 F.2d 1225, 1230 & n.10 (3d Cir. 1988) (film exhibition).

seeking to perform in Boston can call a promoter in Phoenix. But the Phoenix promoter will not know the essential Boston contacts, the Boston venues, the best radio stations for ads, the best way to market to Boston concertgoers, or how well the artist performs in Boston versus other parts of the country. *See* JA173 ("artists' popularity often varies throughout the country."). Tellingly, Appellants offer no instance in their brief where an artist called a local promoter to book a date in another region.

Appellants now argue "price correlation," i.e., that if prices are the same across regions, a single market is indicated. AppBr.26. But the only evidence they cite, JA4602-03, relates only to Live Nation and only to percentages of the gross in preliminary national tour offers – not what artists are actually paid. Appellants ignore that the guarantees are different in each local area. *E.g.,* JA6447-48; JA2831-32; JA3106; JA3372; JA4370-71. And they offer nothing about other promoters, or the revisions to Live Nation tour offers made in response to local competition (*e.g.,* JA6447), or, significantly, that the revenues from the gate cannot be determined until the local concert is actually performed.

Appellants also rely on *United States v. Grinnell Corp.*, 384 U.S. 563 (1966), but that reliance too is misplaced. AppBr.28-29. *Grinnell* upheld a national market for burglar alarm central station service. The decision, however, precedes more recent Supreme Court authority. *See, e.g.*, *United States v.*

*Connecticut Nat'l Bank*, 418 U.S. 656, 668 (1974) ("the geographic market must be delineated in a way that takes into account the local nature of the demand"). And its holding has been criticized. *See, e.g.*, 2B AREEDA & HOVENKAMP ¶ 530f. But, even so, *Grinnell* is distinguishable on its facts. *Grinnell* involved "multistate competitors," *Heerwagen*, 435 F.3d at 230, who, unlike Appellant IMP, were *not* limited to one local geographic region in their ability to provide services. *Id.*

### C. APPELLANTS CANNOT PROVE MARKET POWER

Appellants fare no better with their market power arguments. They rely principally on what they concede are borderline market share data. AppBr.62. Those data cannot survive rejection of their market definitions. But even if Appellants' markets were accepted, their market share numbers cannot carry the day given the other, undisputed, facts demonstrating the absence of market power in either promotion or venues. *R.J. Reynolds,* 199 F. Supp. 2d at 383 ("[a] mere showing of substantial or even dominant market share alone cannot establish market power sufficient to carry out [an anticompetitive pricing] scheme"). Nothing in Appellants' cases suggests otherwise.

Appellants place heavy reliance instead on "direct evidence," AppBr.59-60, and Live Nation agrees that the direct evidence here is dispositive. It demonstrates conclusively a complete lack of ability to control price or exclude competition.

*Price/Output.* Appellants offered no evidence whatsoever that Live Nation could reduce artist compensation below competitive levels: nothing from any artist or manager; in fact, no document or testimony from any of the many fact witnesses in the case. On the contrary, Appellants themselves have argued at great length that Live Nation *pays too much*, and thus lacks the ability to control prices. *See* JA6585-87; JA313; JA315; JA379; JA1408; JA2097-98; JA2148. Nor is there any issue of fact as to output. Mr. Hurwitz's complaint is that there are too many shows. JA1566; JA1607.

Appellants focus instead on exclusion of competition. AppBr.60. They note that the total number of promoters "of major popular artists" decreased from 96 in 2006 to 70 in 2010. *Id.* What they ignore, however, is that, of the 70 promoters from 2010, 38 were not on the list in 2006 and thus entered within that period. JA1168-69. Regular entry and exit are of course hallmarks of a competitive market. *E.g., United States v. Black & Decker Mfg. Co.,* 430 F. Supp. 729, 751 (D. Md. 1976); *United States v. Hughes Tool Co*., 415 F. Supp. 637, 644 (C.D. Cal. 1976) ("substantial entry and exit rates . . . indicat[e] that . . . healthy competition is present").

Appellants also assert that Live Nation "eliminated" three promotion rivals. AppBr.60. The two promoters they cite, however, said the opposite. Both JAM and Stone City confirmed that they are still in business. JA166, JA171-72; *cf.*

JA209-10 (excluding much of this testimony). The other instance cited was not even a promoter, but a booking agent for the Mann Center in Philadelphia – also still in business – who complained that Live Nation "built a competing facility on the other side of the river" and was booking 90% of its shows there. JA2853. Even if it were not so clear that it is competition, not competitors, that the law protects, *Brunswick Corp. v. Pueblo-O-Mat,* 429 U.S. 477, 488 (1977), Appellants' evidence would not come close to suggesting exclusion of competition.

The direct evidence demonstrates conclusively that, even if Appellants' markets were not deficient, Live Nation has no market power, no monopoly power, and no dangerous probability of achieving monopoly power. JA1405-08. As proof of such power is essential to all of their claims, this failure of proof alone justified summary judgment.

## III. NO INJURY-IN-FACT

Injury-in-fact is an essential element of every antitrust claim. *Allegheny Pepsi-Cola Bottling Co. v. Mid-Atl. Coca-Cola Bottling Co.*, 690 F.2d 411, 415 (4th Cir. 1982). It must be proven with reasonable certainty. *See* ANTITRUST LAW DEVELOPMENTS 756-57 & cases cited. Here, the great success Appellants have achieved negates any suggestion of injury from unlawful conduct. As noted at p. 10 above:

- [redacted]
- Merriweather has hosted more concerts and generated greater revenues than Nissan despite Merriweather's 20% smaller seating capacity.
- Merriweather's performance over the relevant period is significantly better than during the period before Live Nation and its predecessor came on the scene.

Appellants' brief does not identify any concert in which they offered a better financial arrangement and the artist played Nissan instead. They cite only two offers of higher guarantees. [redacted] JA2991; JA3476; JA4439; JA4442. Nickelback drew far more fans at Nissan in 2009 than it had at Merriweather in 2006. JA828, 833.

In fact, although Appellants' asserted damages depend on their lists of lost concerts, Appellants do not tie any of the lost concerts to any specific unlawful conduct as the law requires. JA4769-82, 4790-96; *see, e.g., Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433-35 (2013); 2A AREEDA &HOVENKAMP ¶ 392g. The judgment may be affirmed on this alternative ground as well.

## IV. NO ANTITRUST INJURY

Even if Appellants had suffered some injury, they failed to demonstrate the *antitrust* injury the law requires – injury reflecting the *anticompetitive* effects of the challenged conduct. *Brunswick*, 429 U.S. at 489. Under that principle, damages based on an inability to share in the profits made possible by the purportedly illegal conduct are barred. *Id.*; *Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774, 782 (7th Cir. 1994) (when the harm is "depriv[ation] of [supracompetitive] profits . . . those lost profits [cannot be recovered] as antitrust damages); *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1453-54 (11th Cir. 1991). But that is precisely what Appellants sought to do here. Appellants' damages analysis presupposed that, but for Live Nation's challenged conduct, Appellants would have sold 84% of the tickets in their Baltimore-Washington venue market, a share much larger than anything Live Nation has been claimed to have. JA5043-44. Their expert's model also assumes that the profit margins that Appellants would have achieved on those concerts "lost" to Live Nation are higher than what Live Nation actually realized. *Id.*

Appellants' approach may be designed to achieve a huge damages award, but it is not an antitrust injury. As the Eleventh Circuit squarely held in *Todorov*, 921 F.2d at 1453-54, "Todorov's alleged damages equal the profits he would have garnered had he been able to share a part of [the defendants'] supercompetitive, or

monopoly, profits. This is not antitrust injury." Appellants' own damages theory, therefore, precludes any recovery.

## V. NO STATE LAW VIOLATION

To sustain their claim of tortious interference with prospective business advantage, Maryland law requires Appellants to show *wrongful* conduct by Live Nation. *See Gabaldoni v. Wash. Cnty. Hosp. Ass'n*, 250 F.3d 255, 263 (4th Cir. 2001) (quoting *K & K Mgmt., Inc. v. Lee*, 557 A.2d 965, 979 (Md. 1989)). The only allegations of conduct approaching that description in this case are the claimed antitrust violations; and the failure of the antitrust claims means that the tortious interference claim necessarily fails as well. *Purity Prods., Inc. v. Kohlberg, Kravis, Roberts & Co.*, No. 89-2322, 1989 WL 117937 (4th Cir. Sept. 11, 1989); *Berlyn, Inc. v. Gazette Newspapers, Inc.*, 223 F. Supp. 2d 718, 741 (D. Md. 2002), *aff'd*, 73 F. App'x 576 (4th Cir. 2003) (same).

As for Appellants' state law claim of unfair competition, "[t]he essential element of unfair competition is deception." *Edmondson Vill. Theatre v. Einbinder*, 116 A.2d 377, 380 (Md. 1955); *see also Balt. Bedding Corp. v. Moses*, 34 A.2d 338, 342 (Md. 1943). Because there is no suggestion that Live Nation has engaged in any dishonesty or deception, Appellants' unfair competition claim fails as well. *See Lowry's Reports, Inc. v. Legg Mason, Inc.*, 271 F. Supp. 2d 737, 754-55 (D. Md. 2003).

Finally, Appellants' state law antitrust claims of course fall with their federal claims. JA1412-13. Appellants do not argue otherwise.

## VI. THE "PROJECT HAWAII" REPORT WAS EXCLUDED PROPERLY

Appellants seek reversal of the Court's exclusion of a report by a nonparty private equity firm, Elevation Partners. They seek to admit it for its inflammatory language about [redacted] AppBr.6, 16, 68-69. Judge Motz ruled that, "[b]ecause the document was prepared by an entity other than Live Nation, it is not admissible to show that Live Nation adopted its contents as its own intent or plan." JA211. The ruling was correct and certainly no abuse of discretion.

The record is uncontroverted that Live Nation had no role in preparing the report. JA2313. Appellants argue, however, that Live Nation "adopted" it because portions of the content were copied months later in another Live Nation document. AppBr.69. But the portions later used do not include the language Appellants want, and everything that was copied is independently admissible against Live Nation. FED. R. EVID. 801(d)(2). The "adoption" argument fails because the only possible inference is that Live Nation *rejected* or at least did *not adopt* the language Appellants want to use. The portions that *were* used talk about paying artists higher compensation, something Mr. Hurwitz abhors but which is unambiguously procompetitive. JA2493.

In any event, admission of the report would make no difference. An intent to drive rivals from the market through more aggressive (but nonpredatory) price competition is entirely lawful. *E.g., Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 927 (4th Cir. 1990) ("desire to increase market share or even to drive a competitor out of business through vigorous competition" not actionable); *A.A. Poultry Farms v. Rose Acre Farms*, 881 F.2d 1396, 1402 (7th Cir. 1989).

## VII. JUDGE MOTZ CORRECTLY APPLIED THE STANDARD FOR SUMMARY JUDGMENT

Appellants complain repeatedly that Judge Motz "usurped the jury's role" and "resolv[ed] disputed issues of fact" against them. AppBr.1 & *passim*. The argument is based on a fundamental misunderstanding of the relevant standard under Rule 56.

When a motion for summary judgment is made, the parties having the burden of proof – Appellants here – are obliged to present evidence sufficient to create a *genuine* issue of fact on all essential elements of their claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-33 (1986). An issue of fact is not genuine unless "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). Rule 56 thus *requires* a judge to "resolve disputed issues of fact" to determine whether the dispute is genuine.

Judge Motz – no Rule 56 novice – followed these precepts rigorously. He gave Appellants the benefit of every *reasonable* inference, but properly declined to find a fact issue simply because Appellants said there was one. Instead, he exhaustively looked at the evidence, notwithstanding the massiveness of record, before reaching his conclusions. When encountering nominal "disputes," such as the contention that Sublime was "coerced," he properly looked at the objective and uncontroverted evidence conclusively demonstrating otherwise. *E.g.,* JA1397-98.

The court below applied the standards of Rule 56 meticulously.

## CONCLUSION

The judgment appealed from should, in all respects, be AFFIRMED.

Dated: July 31, 2015

Respectfully submitted,

/s/ Jonathan M. Jacobson

JONATHAN M. JACOBSON
CHUL PAK
LUCY YEN
KIMBERLEY PIRO
WILSON SONSINI GOODRICH & ROSATI
1301 Avenue of the Americas
New York, NY 10019
(212) 497-7758
(212) 999-5899 (facsimile)

*Counsel for Defendant-Appellee*

**REQUEST FOR ORAL ARGUMENT**

Live Nation believes that oral argument would be useful for the Court. Appellants have raised a number of factual challenges to the ruling below, and clarification through oral argument is likely to assist the Court in assessing these challenges.

Respectfully submitted,

JONATHAN M. JACOBSON
CHUL PAK
LUCY YEN
KIMBERLEY PIRO
WILSON SONSINI GOODRICH & ROSATI
1301 Avenue of the Americas
New York, NY 10019
(212) 497-7758
(212) 999-5899 (facsimile)

*Counsel for Defendant-Appellee*

**CERTIFICATE OF COMPLIANCE**

I certify that:

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 14,792 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), as permitted by this Court's Order of March 29, 2015 (Dkt. 20).

2. This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it was prepared in Microsoft Office Word in 14-point, proportionally-spaced, Times New Roman.

s/Jonathan M. Jacobson
Jonathan M. Jacobson