# EXHIBIT C

# United States District Court
## For the District of Maryland
### Northern Division

IT'S MY PARTY, INC. and
IT'S MY AMPHITHEATRE, INC.,

   Plaintiffs,

  v.

LIVE NATION, INC.,

   Defendant.

)
)
)
)
)
)
)
)
)
)
)

PUBLIC VERSION

Civil Action No.: 1:09-cv-00547-JFM

**HEARING REQUESTED**

## LIVE NATION, INC.'S MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

JONATHAN M. JACOBSON
CHUL PAK
LUCY YEN
Wilson Sonsini Goodrich & Rosati
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
(212) 497-7700 (Telephone)
(212) 999-5899 (Telecopier)

FRANKLIN M. RUBINSTEIN
*Wilson Sonsini Goodrich & Rosati*
Professional Corporation
1700 K Street, N.W.
Washington, D.C. 2006
(202) 973-8800 (Telephone)
(202) 973-8899 (Facsimile)

*Attorneys for Defendant Live Nation, Inc.*

October 14, 2011

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................... iv

INTRODUCTION .......................................................................................................... 1

PROCEDURAL BACKGROUND .................................................................................. 1

STATEMENT OF UNDISPUTED FACTS .................................................................... 2

    A.    The Parties and Their Competitors ....................................................... 2

        1.    Plaintiffs IMA and IMP ........................................................... 2

        2.    Defendant Live Nation ............................................................ 5

        3.    Competitors to Live Nation and Plaintiffs ............................. 6

    B.    Competition in Baltimore/Washington, D.C. Is Robust and Healthy ..... 8

        1.    Concert Output Has Grown ..................................................... 8

        2.    No Adverse Effect on Ticket Prices ........................................ 9

    C.    The Artist Is the Decision-Maker ........................................................ 9

        1.    Choosing Concert Promoter(s) .............................................. 10

        2.    Setting Concert Ticket Prices ................................................ 12

        3.    Selecting Concert Venues ...................................................... 13

ARGUMENT ................................................................................................................. 14

I.     LEGAL STANDARD ............................................................................................ 14

II.    THE SECTION 2 CLAIMS SHOULD BE DISMISSED BECAUSE
       PLAINTIFFS CANNOT PROVE MONOPOLY POWER OR EXCLUSIONARY
       CONDUCT ........................................................................................................... 15

    A.    Plaintiffs Admitted That Defendant Does Not Have Monopoly Power .............. 15

        1.    No Indicia of Monopoly Power .............................................. 16

    B.    Defendant Has Not Engaged in AntiCompetitive Conduct .................................. 20

        1.    Predatory Bidding ................................................................... 20

## TABLE OF CONTENTS
### *(Continued)*

|  |  |  | **Page** |
|---|---|---|---|
| | 2. | Exclusive Dealing | 22 |
| | | a. Live Nation's Touring Agreements Are Exclusive Only Where The Artist So Chooses | 22 |
| | | b. Live Nation's Touring Agreements Are Pro-Competitive | 23 |
| | 3. | Refusing Carve-Outs for Merriweather | 25 |
| C. | | Attempted Monopolization | 25 |
| III. | | PLAINTIFFS' SECTION 1 CLAIMS SHOULD BE DISMISSED BECAUSE THERE IS NO UNLAWFUL TYING | 26 |
| A. | | Per Se Tying Analysis Is Disfavored | 26 |
| B. | | Plaintiffs Cannot Prove Coercion | 27 |
| | 1. | Artists Voluntarily Choose to Retain Live Nation | 27 |
| | 2. | The Four Acts Who Plaintiffs Claim Unsuccessfully Sought to Play at Merriweather Were Not Coerced but Chose to Play at Nissan After Negotiations | 31 |
| IV. | | PLAINTIFFS CANNOT PROVE ANTICOMPETITIVE EFFECTS | 36 |
| V. | | PLAINTIFFS CANNOT PROVE THAT LIVE NATION CAUSED THEIR ALLEGED INJURIES | 37 |
| VI. | | PLAINTIFFS LACK STANDING BECAUSE THEY HAVE NOT SUFFERED ANTITRUST INJURY | 40 |
| VII. | | THE MARYLAND STATE LAW CLAIMS FAIL | 43 |
| CONCLUSION | | | 45 |
| REQUEST FOR HEARING | | | 45 |

## TABLE OF AUTHORITIES

### CASES

*Allegheny Pepsi-Cola Bottling Co. v. Mid-Atl. Coca-Cola Bottling Co.*,
690 F.2d 411 (4th Cir. 1982) .................................................................................38

*Allied Orthopedic Appliances, Inc. v. Tyco Health Care Group, LP*,
592 F.3d 991 (9th Cir. 2010) ........................................................22, 23, 24, 31

*Amerinet, Inc. v. Xerox Corp.*,
972 F.2d 1483 (8th Cir. 1992) ...............................................................................31

*Atl. Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990)...............................................................................................42

*Barry Wright Corp. v. ITT Grinnell Corp.*,
724 F.2d 227 (1st Cir. 1983)...................................................................................24

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977)........................................................................................41, 42

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
479 U.S. 104 (1986)...............................................................................................41

*Carter v. Aramark Sports and Entm't Servs., Inc.*,
835 A.2d 262 (Md. Ct. Spec. App. 2003).............................................................44

*Cavalier Tel., LLC v. Verizon Va., Inc.*,
330 F.3d 176 (4th Cir. 2003) ................................................................................25

*Classen Immunotherapies, Inc. v. King Pharms., Inc.*,
466 F. Supp. 2d 621 (D. Md. 2006)......................................................................44

*Concord Boat Corp. v. Brunswick Corp.*,
207 F.3d 1039 (8th Cir. 2000) ......................................................................23, 37

*Davidson v. Microsoft Corp.*,
792 A.2d 336 (Md. Ct. Spec. App. 2002).............................................................43

*E.I. duPont de Nemours & Co. v. Kolon Indus. Inc.*,
637 F.3d 435 (4th Cir. 2011) ........................................................................15, 19

*Eastside Vend Distribs., Inc. v. Coca-Cola Enters.*,
No. 24-C-04-003998, 2006 WL 1516012 (Md. Cir. Ct. May 8, 2006) ...........44

*Faulkner Adver. Assoc. v. Nissan Motor Corp in U.S.A.*,
905 F.2d 769 (4th Cir. 1990) ................................................................................37

## TABLE OF AUTHORITIES

*(Continued)*

**Page**

*Greenbelt Homes, Inc. v. Nyman Realty, Inc.,*
    426 A.2d 394 (Md. Ct. Spec. App. 1981) ........................................................43

*Ill. Tool Works Inc. v. Indep. Ink, Inc.,*
    547 U.S. 28 (2006) ..............................................................................................26

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde,*
    466 U.S. 2 (1984) ........................................................................................ passim

*Lowry's Reports, Inc. v. Legg Mason, Inc.,*
    271 F. Supp. 2d 737 (D. Md. 2003) ...................................................................44

*M&M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.,*
    981 F.2d 160 (4th Cir. 1992) (en banc) .............................................................25

*Martello v. Blue Cross and Blue Shield of Md., Inc.,*
    143 Md. App. 462 (2002) ...................................................................................44

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) .......................................................................14, 15, 29, 36

*Menasha Corp. v. News Am. Mktg. In-Store, Inc.,*
    354 F.3d 661 (7th Cir. 2004) .......................................................................18, 24

*Military Servs. Realty, Inc. v. Realty Consultants of Virginia,*
    823 F.2d 829 (4th Cir. 1987) .............................................................................37

*Monsanto Co. v. Spray-Rite Serv. Corp.,*
    465 U.S. 752 (1984) ...........................................................................................15

*Natural Design, Inc. v. Rouse Co.,*
    302 Md. 47 (Ct. App. 1984) ...............................................................................44

*NicSand, Inc. v. 3M Co.,*
    507 F.3d 442 (6th Cir. 2007) .......................................................................41, 42

*Nobel Scientific Indus., Inc. v. Beckman Instruments, Inc.,*
    670 F. Supp. 1313 (D. Md. 1986) .............................................18, 19, 25, 27

*Novell, Inc. v. Microsoft Corp.,*
    699 F. Supp. 2d 730 (D. Md. 2010) ...................................................................23

*Oksanen v. Page Mem'l Hosp.,*
    945 F.2d 696 (4th Cir. 1991) .............................................................................14

**TABLE OF AUTHORITIES**

*(Continued)*

<u>Page</u>

*Omega Envtl., Inc. v. Gilbarco, Inc.,*
  127 F.3d 1157 (9th Cir. 1997) ..................................................................................24

*Pacific Bell Tel. Co. v. linkLine Commc'ns, Inc.,*
  555 U.S. 438 (2009)......................................................................................15, 20

*Paddock Publ'ns, Inc. v. Chicago Tribune Co.,*
  103 F.3d 42 (7th Cir. 1996) .....................................................................................18

*Purity Prods., Inc. v. Tropicana Prods., Inc.,*
  702 F. Supp. 564 (D. Md. 1988), *aff'd,* 887 F.2d 1081 (4th Cir. 1989) ...........................44

*Quality Discount Tires, Inc. v. Firestone Tire & Rubber Co.,*
  382 A.2d 867 (Md. Ct. App. 1978)...........................................................................43

*R.J. Reynolds Tobacco Co. v. Phillip Morris, Inc.,*
  199 F. Supp. 2d 362 (D. M.D.N.C. 2002).................................................. *passim*

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.,*
  614 F.3d 57 (3d Cir. 2010)............................................................................23, 24

*Rome Ambulatory Surgical Ctr., L.L.C. v. Rome Mem'l Hosp.,*
  349 F. Supp. 2d 389 (N.D.N.Y. 2004)...........................................................31

*Serv. & Training, Inc. v. Data Gen. Corp.,*
  963 F.2d 680 (4th Cir. 1992) ...........................................................................26, 33

*Sewell Plastics, Inc. v. The Coca-Cola Co.,*
  720 F. Supp. 1196 (D. W.D.N.C. 1989),
  aff'd 912 F.2d 463 (4th Cir. 1990)......................................................19, 37, 42

*Spectrum Sports, Inc. v. McQuillan,*
  506 U.S. 447 (1993).........................................................................................25

*Stephen Jay Photography v. Olan Mills,*
  903 F.2d 988 (4th Cir. 1990) ...............................................................................27

*Sterling Merch., Inc. v. Nestle, S.A.,*
  No. 10-1925, 2011 WL 3849828 (1st Cir. Sept. 1, 2011)...........................................42, 43

*Story Parchment Co. v. Paterson Parchment Paper Co.,*
  282 U.S. 555 (1931)............................................................................................38

## TABLE OF AUTHORITIES
*(Continued)*

**Page**

*Thompson Everett, Inc. v. Nat'l Cable Adver., L.P.*
57 F.3d 1317 (4th Cir. 1995) .................................................................................. *passim*

*Tricom, Inc. v. Elec. Data Sys. Corp.*,
No. 92-76374, 1996 WL 224762 (E.D. Mich. Mar. 6, 1996)...........................................31

*United States v. E.I. duPont de Nemours & Co.*,
351 U.S. 377 (1956)..........................................................................................16

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko*,
540 U.S. 398 (2004)......................................................................................20, 25

*Waldrep Bros. Beauty Supply, Inc. v. Wynn Beauty Supply Co.*,
992 F.2d 59 (4th Cir. 1993) ..................................................................................44

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.*,
549 U.S. 312 (2007)...........................................................................................21

*White v. Rockingham Radiologists, Ltd.*,
820 F.2d 98 (4th Cir. 1987) .........................................................................16, 17, 28

## STATUTES

Md. Com. Law Code Ann. § 11-202(a)(2) ..................................................................44

Sherman Act, 15 U.S.C. § 1.....................................................................................1

## RULES

Federal Rule of Civil Procedure 56 ....................................................................1, 14, 45

## MISCELLANEOUS

Restatement (Second) of Torts (1979) § 768(1) .............................................................44

Defendant Live Nation, Inc. ("Live Nation") submits this Memorandum in support of its Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 on all claims asserted against it by Plaintiffs It's My Party, Inc. ("IMP") and It's My Amphitheatre, Inc. d/b/a/ Merriweather Post Pavilion ("IMA").

## INTRODUCTION

This is a "monopolization" case without any monopoly; Plaintiffs have conceded, under oath, that Live Nation has no monopoly power. It is also a "tying" case with no tying, for the evidence irrefutably shows that the products at issue can always be obtained separately. And it is a case in which the incontrovertible facts show that competition in the markets at issue has not diminished in any way but, in fact, has increased on every relevant measure.

If not monopolization or tying, then what? The record indicates beyond dispute that this is a case brought by a highly successful concert promoter, Seth Hurwitz, against his primary rival, Live Nation, premised solely on the fact that Mr. Hurwitz has not won every battle – and that his overtures to merge with or otherwise eliminate competition from Live Nation have failed. Mr. Hurwitz admits that his business is successful, profitable, and growing. He promotes many of the most popular music acts in the world, and is nowhere near being excluded.

This is just not the stuff of which legitimate antitrust cases are made.

## PROCEDURAL BACKGROUND

Plaintiffs filed their Complaint on March 5, 2009. Dkt. No. 1. Counts I and II, brought under Section 1 of the Sherman Act, accuse Live Nation of unlawful "tying" by refusing to provide its promotion services to artists unless they also appear at Live Nation venues. Compl. ¶ 133. Counts III to VII are monopolization and attempted monopolization claims under Section 2 of the Sherman Act. In Counts III and V, Live Nation is alleged to have monopolized "the national market for the promotion of live popular music concerts." *Id.* ¶ 147. In Counts VI and VII, Live Nation is alleged to have monopolized or attempted to monopolize "major artists" who are an "essential input" to venue operations. *Id.* ¶¶ 178-79, 187. In Count IV, Live Nation is alleged to have attempted to monopolize the market for "leasing or licensing amphitheatres for

use in venue operations" in Baltimore, Maryland. *Id.* ¶¶ 156-58. The remaining counts are state law claims premised on the alleged federal antitrust violations.

On April 27, 2009, Defendant moved to dismiss the Complaint. Dkt. No. 13. On July 17, 2009, the Court denied Defendant's Motion to Dismiss. Fact discovery ended on August 1, 2011. Dkt. No. 71. The Court ordered that expert discovery be deferred until after the Court rules on Defendant's Motion for Summary Judgment. Dkt. No. 46.

## STATEMENT OF UNDISPUTED FACTS

The concert business starts and ends with the artist. Some artists tour globally or nationally, while others pick and choose among specific local regions. When he or she is ready to tour, the artist, among other decisions, hires promoter(s) to promote the concert(s) and venue(s) at which the artist will perform. Plaintiffs and Live Nation compete to promote concerts and to have artists play at their venues. This is a relatively straightforward business that makes the following facts undisputed.

### A.    The Parties and Their Competitors

#### 1.    Plaintiffs IMA and IMP

Seth Hurwitz is the principal of both Plaintiffs. Compl. ¶ 10. IMP is his concert promotion arm. *Id.* ¶ 9. IMP has promoted live music concerts at venues throughout the Baltimore/Washington, D.C. metropolitan area for nearly thirty years. *Id.* ¶¶ 9, 116. IMP does not (and cannot) promote an artist's entire national tour. *Id.* ¶ 9. IMP is a sister company to Sledge, Inc. ("Sledge"), which owns and operates the 9:30 Club, a world-renowned club in Washington, D.C., where IMP regularly promotes new and developing artists. *Id.* ¶ 117.

IMA is Mr. Hurwitz's venue management arm. *Id.* ¶ 8. Since 2004, IMA has managed Merriweather Post Pavilion ("Merriweather"), an outdoor amphitheatre located in Columbia, Maryland. *Id.* ¶ 8. Merriweather is approximately 20 miles from downtown Baltimore and 30 miles from downtown Washington, D.C., and has a seating capacity of 19,316, including approximately 5,000 fixed seats (the remainder are open seats on the lawn). *Id.* ¶ 8.

Merriweather was managed by Live Nation from 2001 to 2003, prior to IMA taking over the contract in 2004.  Mankin Decl. ¶ 5.

Plaintiffs are a major force in the Baltimore/Washington, D.C. concert business.  In 2009, Billboard reported that Merriweather was the fourth highest grossing amphitheatre in the U.S. and the *top* amphitheatre in Baltimore/Washington, D.C.  Yen Decl., Ex. 1 (Billboard 2009 amphitheatre rankings).  In 2010, Billboard reported that Merriweather retained its top rank locally and rose to third nationally.  Yen Decl., Ex. 2 (Billboard 2010 amphitheatre rankings).  Merriweather has hosted an impressive list of artists, including R.E.M., Nickelback, Kenny Chesney, John Mayer, Kanye West, Nine Inch Nails, Kings of Leon, and the Black Eyed Peas.  Compl. ¶ 119; Yen Decl., Ex. 3 (Pollstar – Chart 1) (identifying █ concerts in 2006, █ in 2007, █ in 2008, and █ in 2009 hosted by Merriweather).

According to Mr. Hurwitz, Plaintiffs' business could not be better, even as his rivals suffer through these difficult economic times.  *See* Yen Decl. Ex. 4 (Wall Street Journal 4/8/11) ("We're not doing anything different this year because last year worked for us."); Ex. 5 (Hurwitz Tr.) at 151:7-21 (███████████████████████████████████████████████████ ██████████████████████████████████████████████████████); *Id.* at 157:17-19 (███████████████████████████████████████) ; *Id.* at 204:21-205:4 (███████████████████████████████).  Mr. Hurwitz was particularly exuberant about his rivals' recent troubles because ████████████████████████████████ ██████████  *Id.* at 27:11-17.

Plaintiffs' good fortunes are attributable, at least in part, to Mr. Hurwitz's unique position in Baltimore/Washington, D.C.  Artists' agents have described him as ████████████████ Yen Decl., Ex. 56.  Through ownership of the 9:30 Club, Mr. Hurwitz successfully develops relationships with artists in the early stages of their careers.  Compl. ¶ 117.  He then leverages those relationships against managers and agents to secure talent for his promotion business and Merriweather.  *Id.*; Yen Decl., Ex. 5 (Hurwitz Tr.) at 75:17-76:4 (████████████████ ██████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████ Yen Decl., Ex. 6 (████████████████████████

████████████████). ████████████████████████████

████████████████████████████████████

████████████████████████████████. Yen Decl., Ex. 5 (Hurwitz Tr.) at

81:8-83:17.

Mr. Hurwitz does not like Live Nation spurring competition and upsetting his unique

position in Baltimore/Washington, D.C.  As early as ████████████████████████

████████████████████████████████████████████

████████████████████████. Yen Decl., Ex. 7; Ex. 5 (Hurwitz Tr.) at

20:14-22:20.  Mr. Hurwitz's rationale was that ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

Yen Decl., Ex. 5 (Hurwitz Tr.) at 20:17-24.  In multiple emails, Mr. Hurwitz ████████████

████████████████████████

- ████████████████████████████████████████

  ████████████████████████████

  ████████ *Id.* at 20:25-21:4, 22:2 (████████████████████████),

  22:14-18, 28:14-18.

- ████████████████████████████████████████

  ████████████████████████████████

  Yen Decl., Ex. 8; Yen Decl., Ex. 5 (Hurwitz Tr.) at 33:18-21 (████████████

  ████████████████████████████████

  ████████████████).

- ████████████████████████████████████████

  ████████. Yen Decl., Ex. 5 (Hurwitz Tr.) at 52:6-15.

This lawsuit is not Mr. Hurwitz's first legal salvo against Live Nation. In 2009, the Department of Justice ("DOJ") opened an "extensive, detailed" investigation to consider the competitive effects of the proposed merger between Live Nation and Ticketmaster. *See* Request for Judicial Notice; Yen Decl., Ex. 9 (Plaintiff United States' 6/21/10 Response to Public Comments) at 3. The DOJ approved the merger with conditions, and Plaintiffs submitted comments critical of the proposed Consent Decree, including assertions mirroring the allegations of this Complaint. *Compare* Yen Decl., Ex. 11 (5/3/10 Objections filed by Plaintiffs) *with* Compl. [Dkt. No. 1]. In response, the DOJ noted that IMP "overstates the strength of Live Nation's promotion position"; that "IMP's analysis of the market is too focused on IMP's own issues in competing with Live Nation"; and that the merger would *not* "result in any harm to any other relevant market, such as concert promotion, venue services, or venue management." Request for Judicial Notice; Yen Decl., Ex. 9 (Plaintiff United States' 6/21/10 Response to Public Comments) at 15, 21, 22. The Consent Decree was approved by the District Court for the District of Columbia, over Plaintiffs' objections, on July 30, 2010. Yen Decl., Ex. 10.

Mr. Hurwitz has also been litigious in state court. In 2008, Live Nation began development of a smaller concert venue in Silver Spring, Maryland that might attract smaller bands like Mr. Hurwitz's 9:30 Club. Mankin Decl. ¶ 6. Mr. Hurwitz ████████████████ ████. Yen Decl., Ex. 6 (Mr. Hurwitz ██████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████ ). In 2010, Mr. Hurwitz filed a lawsuit against the State of Maryland and Montgomery County seeking a restraining order against construction of the club. Request for Judicial Notice; Yen Decl., Ex. 12 (8/31/2010 Second Amended Verified Complaint). On March 31, 2011, the case was dismissed. Request for Judicial Notice; Yen Decl., Ex. 13 (3/31/11 Order on Motion to Dismiss).

### 2.    Defendant Live Nation

Defendant Live Nation is the world's largest concert promoter. Live Nation can promote concerts globally, nationally, and locally. It maintains a global tour office in Canada, a national

tour office in California, and local booking offices throughout the country, including one in Bristow, Virginia. Between 2006 and 2009 (the relevant timeframe of the Complaint), Live Nation promoted national tours of over 100 artists. Garner Decl. ¶ 6.

Live Nation also owns and operates Nissan Pavilion ("Nissan"), an outdoor amphitheatre located in Bristow, Virginia, approximately 35 miles southwest of Washington, D.C. Nissan, which today is called "Jiffy Lube Live," has a seating capacity of 25,000 (v. 19,000 for Merriweather), including 10,000 fixed seats (v. 5,000 for Merriweather). Compl. ¶¶ 11, 120. Prices for fixed seats are generally higher than tickets for lawn seating. Mankin Decl. ¶ 12. Nissan stages concerts for artists performing as part of a national Live Nation tour as well as concerts booked independently by the local Live Nation promoter. *Id.* at ¶ 4. Live Nation also owns/operates, leases, or has exclusive booking rights at venues across the United States (principally amphitheaters and small indoor venues). Compl. ¶¶ 64, 75, 80.

### 3. Competitors to Live Nation and Plaintiffs

Plaintiffs and Live Nation face significant competition to attract artists for concert promotion and fans to their venues. With so many options available,



Yen Decl., Ex. 5 (Hurwitz Tr.) at 48:5-49:3 (                                                  ). Notwithstanding the fact that his companies have filed a monopolization lawsuit, Mr. Hurwitz observed that

*Id.* at 28:20-25. Even                , as Mr. Hurwitz had proposed,                                        . Yen Decl., *Id.* at 59:11-60:18.

The                          referenced by Mr. Hurwitz would include the many other concert promoters that do business in Baltimore/Washington, D.C. AEG Live, for example, is a

global concert promoter and venue operator, with 20 of the top 66 Pollstar ranked-venues in 2009. Yen Decl., Ex. 14. In recent years, AEG Live has promoted some of the biggest and highest grossing acts, including Taylor Swift (2009), Justin Bieber (2010), and Kenny Chesney (2006-2009). *Id.*, Ex. 57. In addition to AEG Live, there are many other local and national promoters. They range from local promoters like The Birchmere Presents, Walther Productions, and CD Enterprises to national promoters like Blue Deuce/Red Mountain Entertainment. Mankin Decl. ¶ 8.

For venues, ████████████████████ explained Mr. Hurwitz, including ██████████ ████████████████████████████. Yen Decl., Ex. 5 (Hurwitz Tr.) at 15:17-25, 28:14-29:9, 48:5-49:3.

- *Pier Six Pavilion*: Rams Head operates this outdoor amphitheater located in the Baltimore Inner Harbor. This 4,200-capacity venue has hosted live musical performances in a variety of genres, such as rock, jazz, and rhythm & blues.

- *Filene Center at Wolf Trap*: This Vienna, Virginia outdoor amphitheater is owned and operated by the Wolf Trap Foundation of the Arts. Wolf Trap has a capacity of 7,000 and a variety of prominent music artists have appeared there.

- *1st Mariner Arena*: This 14,000-capacity venue in Baltimore is owned by the City and operated by SMG. 1st Mariner Arena has hosted performances by many popular artists such as Lil' Wayne, Jonas Brothers, and Brad Paisley.

- *Patriot Center*: This indoor arena with a capacity of 10,000 is in Fairfax, Virginia and is operated by Monumental Sports & Entertainment. Artists such as Enrique Iglesias and Bruce Springsteen have played there.

- *Verizon Center*: Monumental Sports & Entertainment also owns and operates this 19,000-capacity indoor venue in Washington, D.C. Verizon has hosted performances by artists such as Coldplay.

Mankin Decl. ¶ 7.

### B.    COMPETITION IN BALTIMORE/WASHINGTON, D.C. IS ROBUST AND HEALTHY

Consistent with the multitude of significant promoter and venue options available to artists and fans in the Baltimore/Washington, D.C. region, competition for concert output and ticket prices – the key measures in antitrust analysis – remains vibrant.

### 1.    *Concert Output Has Grown*

During the relevant time period, rather than seeing a reduction in output as one might expect where there has been unlawful monopolization or tying, the Baltimore/Washington, D.C. region has experienced an *expansion* in output:  the ██████████████████████████ ██████████████████████.  *See* Yen Decl., Ex. 3 (Pollstar – Chart 1).  ████████████ has ████ in the growth, hosting ██ concerts in 2006, ██ in 2007, ██ in 2008, and ██ in 2009, an ██████████████.  *Id.*  In ████, Plaintiffs hosted even ████ concerts than in 2009.  *Id.*, Ex. 5 (Hurwitz Tr.) at 26:7-9.  Other venues have ████ in the growth too.  *Id.*, Ex. 3 (Pollstar – Chart 1) (████████, ██ shows in 2006 to ██ shows in 2009; ████████, ██ shows in 2006 to ██ shows in 2009; ████████, ██ shows in 2006 to ██ shows in 2009; ████████, ██ shows in 2006 to ██ shows in 2009).  On the other hand, ████ hosted ██ shows in 2006, ██ in 2007, ██ in 2008, and ██ in 2009, a ██████████████  *Id.*

Inconsistent with any evidence that it benefitted from anticompetitive conduct, Nissan's share ████ vis-à-vis other venues, from ████ percent to ████ percent when measured by ██████████████, and from ████ percent to ████ percent when measured by ████████ ████.  *Id.*  Meanwhile, Merriweather's share ████ from ██ percent to ████ percent by ██████████ and from ████ percent to ████ percent by ████████.  *Id.*

On the promotion side of the business, the number of shows IMP promoted during the relevant time also ████████.  IMP promoted ██ shows in 2006, ██ shows in 2007, ██ shows in 2008, and ██ shows in 2009, an ██████████████.  Yen Decl., Ex. 15 (Pollstar – Chart 2).  Live Nation promoted ██ shows in 2006, ██ shows in 2007, ██ shows in 2008, and ██ shows in 2009, a ██████████████.  *Id.*

### 2.    *No Adverse Effect on Ticket Prices*

There is no evidence of any adverse effect on concert ticket prices.  Although every concert is different, and looking at average prices across varied artists is misleading, the ███ ticket price data provide no support for an argument that prices have increased during the 2006 to 2009 period.  ██████'s average ticket price was ███ in 2006, ███ in 2007, ███ in 2008, and ███ in 2009.  Yen Decl., Ex. 3 (Pollstar – Chart 1).  At ███, average ticket prices were ███ in 2006, ███ in 2007, ███ in 2008, and ███ in 2009.  *Id.*  The trends are similar at the other major local and outdoor venues.  *Id.* (██████ in 2006, ███ in 2007, ███ in 2008, and ███ in 2009; ████████ in 2006, ███ in 2007, ███ in 2008, and ███ in 2009; ██████ in 2006, ███ in 2007, ███ in 2008, and ███ in 2009; ██████ in 2006, ███ in 2007, ███ in 2008, and ███ in 2009; ██████ in 2006, ███ in 2007, ███ in 2008, and ███ in 2009).

The most meaningful analysis is not of average prices, but a comparison of Live Nation's ticket prices versus other promoters *for the same artists*.  And, the evidence is that prices are typically ███ when the artist appears at ███: ██████ (2007 ██████; 2009 ██████), ██████ (2006 ██████; 2008 ██████), ██████ (2009 ██████; 2009 ██████), ██████ (2009 ██████; 2007 ██████), ██████ (2006 ██████; 2009 ██████), ██████ (2006 ██████; 2008 ██████), ██████ (2006 ██████; 2006 ██████; 2007 ██████; 2008 ██████; 2009 ██████).  Yen Decl., Ex. 16 (Pollstar – Chart 3).

### C.    The Artist Is the Decision-Maker

An artist is an entertainer and a business person.  He makes touring decisions based on what makes ██████ Yen Decl., Ex. 17 (Reznor Tr.) at 17:9-16, 40:6-18.  Trent Reznor, the lead singer for the band Nine Inch Nails ("NIN"), described the process.  The band first decides on the big-picture points:  when they want to tour, what type of venues feel appropriate for the type of tour they are doing, the length of the tour, and perhaps most

importantly, how much money they hope to earn. Yen Decl., Ex. 17 (Reznor Tr.) at 13:15-

14:14. The band then turns to savvy professional managers and agents ██████████

██████████ *Id.* at 14:8-14. The manager and agent draw upon their considerable resources and

experience to draw up the ████████ that will best achieve the artist's financial and artistic

objectives, and present them for the artist's ████████████████████ *Id.* at 13:15-24,

44:3-14.

In this commercial transaction, the artist is the "seller" and the promoter is the "buyer"

and financier of the tour. Yen Decl., Ex. 18 (Geiger Tr.) at 17:1-7. The artist, acting through the

manager and/or the agent, will solicit multiple bids from different promoters in the hope of

stimulating demand and securing the best deal. *Id.* at 16:11-25, 18:11-24; Ex. 19 (Kaul Tr.) at

89:8-14; Ex. 17 (Reznor Tr.) at 18:1-4 ████████████████████████

████████████████████). Among other items, decision points include (i) who

will be the promoter(s), (ii) how much the artist will be paid, which then impacts ticket prices,

and (iii) how the tour will be routed (dates, cities, and venues). Yen Decl., Ex. 19 (Kaul Tr.) at

15:17-23; Ex. 18 (Geiger Tr.) at 19:22-20:2.

Mr. Hurwitz has fully acknowledged the artist team's control in these decisions. ██

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████ Yen Decl., Ex.53.

1.   *Choosing Concert Promoter(s)*

One of the first decisions for the artist is whether to (a) hire one promoter for all the

concerts, (b) hire individual promoters and venues for each concert, or (c) some mix of (a) and

(b). Each artist has a different perspective. Yen Decl., Ex. 5 (Hurwitz Tr.) at 176:2-6; Ex. 20

(Fermaglich Tr.) at 17:21-24 (████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████ ); Ex. 18 (Geiger Tr.) 91:16-20 (███████████████████████████

█████████████████████████████████████████████████████

███████████████████████████ ).

Numerous artists seek out the financial benefits and efficiencies of a national deal with

one promoter.  Mr. Hurwitz, as a self-described ████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

█████████████ Yen Decl., Ex. 5 (Hurwitz Tr.) at 218:21-219:13; Ex. 21; Ex. 22 (Armor Tr.) at

80:6-81:5 (artist "can make more money" and make touring process "simpler" with national tour

deal); Compl. ¶ 78 (national tours can lead to larger corporate sponsorship revenues).  It is also

simpler and more convenient to deal with one promoter for all concert logistics than transacting

among multiple promoters across cities throughout the country.  Yen Decl., Ex. 18 (Geiger Tr.)

27:1-7; Garner Decl. ¶ 9.  A national tour also offers better risk management because it allows

artists to balance risks from a city/date that may be forecasted to sell poorly (or skipped entirely)

with another date that is projected to be a sellout.  Garner Decl. ¶ 11; Yen Decl., Ex. 18 (Geiger

Tr.) 55:18-19 (██████████████████████████████████████████

██████████████ ).

Live Nation, AEG Live, and other national concert promoters pursue national deals

because they help strengthen relationships with artists, promote name-branding and association

with an artist in the eyes of consumers, and enhance marketing and promotional opportunities.

Garner Decl. ¶ 11.  National touring agreements also enable AEG Live, Live Nation and others

to fill their many owned/operated venues and earn revenue from ancillary revenue streams like

food and beverage, concessions, and parking.  Id.  Because these concert promoters invest

heavily to build, operate, and maintain their venues, these ancillary streams are critical to

allowing promoters to recoup their investments in the artist's tour and their venues.  Id.

Even when a promoter secures a national tour deal, it does not necessarily promote every

single date on that tour.  Garner Decl. ¶ 28.  Because touring is so heavily controlled by the

artists, they can dictate that individual date(s) be sold to a local promoter or another national

promoter. *Id.* ███████████████████████████████████████████████, *e.g.*,

██████████████████████████████████████████. *See* Yen

Decl., Ex. 23 (Plaintiffs' 11/17/09 Response to Defendants' Interrogatory No. 4).

    A variety of factors weigh on the artist's selection of promoters: personal predilections,

the amount offered by the promoter, the venues available for the performances (*e.g.*, domestic v.

international, amphitheatre v. arena, *etc.*), and many others. Yen Decl., Ex. 22 (Armor Tr.)



79:11-16 (███████████████████████████████████████████

████████████████████); Garner Decl. ¶ 12; Mankin Decl. ¶ 9. As Mr. Hurwitz explained, he

██████████████████████████████████████████████████

████████████████████ Yen Decl., Ex. 5 (Hurwitz Tr.) at 75:17-76:4.

    **2.**   ***Setting Concert Ticket Prices***

    Critical to choosing a promoter is how much the promoter will pay the artist for each

concert or tour. Generally, payments can come in the form of a guaranteed amount, a percentage

of an individual concert's or entire tour's revenues (commonly referred to as "back-end"

payments), or some mixture of both. Garner Decl. ¶ 17. A guarantee assures the artist a fixed

amount regardless of how many fans actually attend, thereby putting the financial risk of loss on

the promoter. *Id.* On a national tour deal, the guarantee amount is typically predicated on the

number of concerts the artist will perform. Yen Decl., Ex. 17 (Reznor Tr.) at 50:15-51:4. Back-

end payments permit the artist and promoter to share in the financial risk, but may result in less

revenue for the promoter. Garner Decl. ¶ 20. Competitive bidding among promoters tends to

raise the guarantees and back-end offers that artists receive. *Id.*

    Consistent with their ability to dictate the financial terms on which promoters will pay

them, artists have substantial control over ticket pricing. Yen Decl., Ex. 5 (Hurwitz Tr.) at

90:20-96:15 (██████████████████████████████). ██████████

██████████████████████████████████ Yen Decl., Ex.

17 (Reznor Tr.) at 49:8-21 (████████████████████████████████

██████████████████████████████). Artists have different philosophies regarding ticket pricing. Garner Decl. ¶ 26; Yen Decl., Ex. 17 (Reznor Tr.) at 50:2-14 (██ ████████████████████████████). Some want to charge as much as possible, and others want to set price caps. Garner Decl. ¶ 26. For other artists, ticket prices are a direct function of the amount they want to earn from guarantees or back-end payments. *Id.*; Yen Decl., Ex. 5 (Hurwitz Tr.) at 92:8-25. Other factors which may influence ticket pricing include popularity of the artist, past touring history, recording history, and concert production costs. Garner Decl. ¶ 26; Yen Decl., Ex. 17 (Reznor Tr.) at 50:2-5 (███████████████ ████████████████████████████████████████████ ██████████████████████).

### 3.    *Selecting Concert Venues*

Tour routing cannot be set without the artist's approval. Yen Decl., Ex. 18 (Geiger Tr.) at 22:10-16 (████████████████████████████████████████); *see, e.g.*, Yen Decl., Ex. 24 (██████████████████████████████ ████████████████████████). A primary factor is whether the venue package will generate sufficient revenues to meet the artist's financial expectations. Yen Decl., Ex. 17 (Reznor Tr.) at 17:17-23; 18:1-3; 19:22-24 (██████████████████████ ████████████████████████████████████████████ ██████████████████████).

Some artists explicitly tell the promoter what venues are on and off the table. Yen Decl., Ex. 5 (Hurwitz Tr.) at 225:9-20 (███████████████████████████ ████████████████████); Garner Decl., Ex. A (██████████████████ ████████████████████████████████████████████ ██████████████) (emphasis added); Mankin Decl., Ex. A (████████████████ ████████████████████).

Artists also routinely place conditions on the cities and venues where they will play (or will refuse to play). Yen Decl., Ex. 5 (Hurwitz Tr.) at 36:19-21 (████████████████

-13-



); Ex. 18 (Geiger Tr.) at 22:10-25 (

); Ex. 19 (Kaul Tr.) at 12:16-13:5

).

Venue changes occur within a tour and from year to year as artists switch to give their fans different experiences.  Garner Decl. ¶ 30; *see* Yen Decl., Ex. 17 (Reznor Tr.) at 53:1-6

).  For example,            performed at           in 2006, indoors at           in 2007, at            in 2008, and did not tour in 2009.  Rogers Decl., Exs. B-D; Yen Decl., Ex. 54.

## ARGUMENT

Live Nation respectfully requests that the Court grant summary judgment on all claims asserted by Plaintiffs as there are no genuine disputes of material fact.  Fed. R. Civ. P. 56.

## I.    LEGAL STANDARD

The standard for summary judgment in antitrust cases is well settled.  Plaintiffs must do more than simply show that there is some "metaphysical doubt" as to the facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Plaintiffs must come forward with specific facts showing there is a genuine issue for trial.  *Id.* at 587.  And not just any facts.  The disputed facts must be material, "and the *quality and quantity* of the evidence offered to create a question of fact must be adequate to support a jury verdict."  *Thompson Everett, Inc. v. Nat'l Cable Adver., L.P.*, 57 F.3d 1317, 1323 (4th Cir. 1995) (emphasis added) (granting summary judgment against Section 1 and Section 2 claims).  Evidence that is "'merely colorable' or 'not significantly probative'" will not suffice to defeat summary judgment.  *Id.*

Summary judgment is an "an important tool for dealing with antitrust cases."  *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 708 (4th Cir. 1991) (granting summary judgment against

Section 1 and Section 2 claims). The unusual entanglement of legal and factual issues in antitrust cases makes summary judgment "favored as a mechanism to secure the 'just, speedy and inexpensive determination' of a case" when its proper use can avoid the cost of trial. *Thompson Everett*, 57 F.3d at 1323-1324. Live Nation should win "if the factual context renders respondents' claim implausible – if the claim is one that simply makes no economic sense." *Matsushita*, 475 U.S. at 587. Additionally, "antitrust law limits the range of permissible inferences from ambiguous evidence." *Id.* at 588. Conduct as consistent with permissible competition as with illegal conduct does not, standing alone, support an inference of illegality. *Id.*; *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 763-64 (1984).

## II.    THE SECTION 2 CLAIMS SHOULD BE DISMISSED BECAUSE PLAINTIFFS CANNOT PROVE MONOPOLY POWER OR EXCLUSIONARY CONDUCT

Plaintiffs assert four monopolization claims and one attempted monopolization claim. Compl. (Counts III-VII); *see supra* at 1-2. While there are differences among the claims, all are premised on (a) Live Nation having monopoly power (or a dangerous probability thereof) over (i) a national market for concert promotion and (ii) a Baltimore/Washington, D.C. market for venues; and (b) using that power to coerce artists to perform at Nissan instead of Merriweather and to have Live Nation promote their concerts instead of IMP. *E.g.*, Compl., ¶¶ 3, 72-77, 83-84, 147, 150-51, 158, 178-79.

Plaintiffs' monopolization claims fail because Live Nation does not have monopoly power and has not engaged in anticompetitive conduct. These two points are the focus of this section. As discussed later in the brief, the claims also fail because Live Nation's conduct is not the proximate cause of any injury to Plaintiffs (*infra* at 38-41), there are no anticompetitive effects (*infra* at 36-38), and Plaintiffs have not incurred "antitrust injury" (*infra* at 41-43).

### A.    PLAINTIFFS ADMITTED THAT DEFENDANT DOES NOT HAVE MONOPOLY POWER

Foremost among Plaintiffs' burden is proving that Live Nation actually has monopoly power – it is undisputed that Live Nation does not. *Pacific Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438 (2009); *E.I. duPont de Nemours & Co. v. Kolon Indus. Inc.*, 637 F.3d 435,

450 (4th Cir. 2011) ("'when monopolization has been found the defendant controlled seventy to one hundred per cent of the relevant market'"). Monopoly power is the "the power to control prices or exclude competition." *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 391 (1956). Summary judgment is warranted if Live Nation cannot control prices or exclude competition. *White v. Rockingham Radiologists, Ltd.*, 820 F.2d 98, 105 (4th Cir. 1987).



Yen Decl., Ex. 5 (Hurwitz Tr.) at 48:5-49:3.

*Id.* at 28:14-29:9. Similarly, there are always the other promoters whom artists have chosen for their Baltimore/Washington, D.C. shows. Yen Decl., Ex. 18 (Geiger Tr.) at 31:7-16; Yen Decl., Ex. 15 (Pollstar – Chart 2) (█ other promoters).

### 1. *No Indicia of Monopoly Power*

Mr. Hurwitz's admission comports with the realities of the marketplace. Judged by the traditional indicia of monopoly power, Live Nation (i) does not have the *ability* to control prices or exclude competition; (ii) has not, in fact, caused supra-competitive pricing or lower output; and (iii) must compete with too many other firms to have monopoly power.

There is widespread agreement that it is the artist – and not Live Nation or any promoter or venue – that has the ability to control ticket pricing and concert output. *White*, 820 F.2d at 105 (summary judgment where defendant radiologists lacked monopoly power in that hospital could unilaterally relieve them of their privileges). With respect to ticket prices, although the promoter or venue sells the ticket to the fan, setting the price falls squarely on the artist, either exclusively or sometimes through negotiation with the promoter. Yen Decl., Ex. 5 (Hurwitz Tr.) at 96:8-15. Some artists outright tell the promoter what the price of each seat will be. Yen Decl., Ex. 17 (Reznor Tr.) at 49:9-24 (



). Other artists focus on how much they want to be paid for a concert or tour; the higher the payments, the higher ticket prices will be. Yen Decl., Ex. 29 (

); Ex. 5 (Hurwitz Tr.) 140:20-141:4 (

).

With respect to concert output, here again it is the artist that controls who wins and loses. Artists have their pick among venues, and readily change. *See, e.g.,* Rogers Decl., Exs. A, B, and D (

); Yen Decl., Ex. 19 (Kaul Tr.) at 40:13-41:17 (

); Yen Decl., Ex. 22 (Armor Tr.) at 81:9-19 (venue and routing "decisions are made on various levels from the agency to the agent to the manager to the artist").

Artists also dictate who will be their promoter(s). AEG Live is a growing powerhouse. Yen Decl., Ex. 25 (███████████████████████████████████████ ███████████████████████████████). In ███, the band ████ gave some concert dates to ██████████ and many others to ██████████████████. Yen Decl., Ex. 20 (Fermaglich Tr.) at 27:10-16 (████ dates promoted by ████████████████████). ██████████████ jumped ship to Live Nation in ████ after years of exclusive touring agreements with AEG Live. Yen Decl., Ex. 19 (Kaul Tr.) at 25:6-14. When asked what they would do if Live Nation refuses to give in to artist demands during negotiations, Marc Geiger, booking agent for NIN and John Mayer, bluntly stated █████████████████████████████ Yen Decl., Ex. 18 (Geiger Tr.) at 31:7-16.

As these examples show, bidding for a concert is no different than bidding for athletes in free agency. Each time an artist is ready to tour, promotion and venue rights are up for grabs. A promoter and venue may win one year and lose the next. Fortunes change with each season. But there is no durable market power in this industry because control resides with the artist. *Nobel Scientific Indus., Inc. v. Beckman Instruments, Inc.*, 670 F. Supp. 1313, 1322 (D. Md. 1986) (no monopoly power where customers switch among suppliers for price and other reasons). "Competition-for-the-contract is a form of competition that antitrust laws protect rather than proscribe, and it is common." *Paddock Publ'ns, Inc. v. Chicago Tribune Co.*, 103 F.3d 42, 45 (7th Cir. 1996); *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 663 (7th Cir. 2004) (competition for contract is "a viral form of rivalry").

It comes as no surprise then that actual ticket prices and the number of concerts in Baltimore/Washington, D.C. from 2006 to 2009 reflect the absence of monopoly power. *See infra* at 36-38 (discussing Plaintiffs' inability to prove anticompetitive effects). Prices are stable (and often ████ for the same artists at ████ than ██████████), output has expanded, and Plaintiffs are thriving while Live Nation has not come anywhere close to domination. These are hardly the outcomes a monopolist would hope to achieve. *R.J. Reynolds Tobacco Co. v. Phillip Morris, Inc.*, 199 F. Supp. 2d 362, 381-82 (D. M.D.N.C. 2002) (granting summary judgment for

defendant because rivals were successful in signing retailers to merchandising contracts and plaintiffs failed to prove the existence of supra-competitive prices); *Sewell Plastics, Inc. v. The Coca-Cola Co.*, 720 F. Supp. 1196, 1218-19 (D. W.D.N.C. 1989), aff'd 912 F.2d 463 (4th Cir. 1990) (defendant lacked market power where overall prices decreased, output increased, and number of competitors remained the same); *Nobel Scientific*, 670 F. Supp. at 1318-22 (granting summary judgment because defendant lacked monopoly power since there was intense price competition and customers frequently switched suppliers).

Finally, even a conservative estimate of market share that assumes the validity of aspects of Plaintiffs' market definitions corroborates Mr. Hurwitz's ████████████████████

████████████[1] For example, even assuming that Baltimore and Washington, D.C. are part of the same geographic market, as Plaintiffs claim for their venue-related monopolization claims, ████ share ████ from ████ to ████ by tickets sold and from ████ to ████ by gross revenue during the relevant timeframe. Yen Decl., Ex. 3 (Pollstar – Chart 1). During the same time period, ████████ share ████ from ██ to ████ by tickets sold and from ████ to ████ by gross revenue. *Id.*

Live Nation's share of the promotion market is also below what would constitute a monopoly. In particular, Live Nation's promotion of music concerts in Baltimore/Washington, D.C. has never exceeded ████. *See* Yen Decl., Ex. 15 (Pollstar – Chart 2); *see also E.I. duPont de Nemours*, 637 F.3d at 450 (70% to 100% necessary for monopolization); *R.J. Reynolds Tobacco*, 199 F. Supp. 2d at 394 (defendant's 51.3% share "far below" minimum required for market power).[2]

---

[1] There are countless problems with Plaintiffs' market definitions. Live Nation does not concede their validity or admissibility for any purpose.

[2] From 2006 to 2009, ████ promotion market share was ████████ less than ██ percentage points from ████ to ████ by tickets sold and from ████ to ████ by gross revenue. Yen Decl., Ex. 15 (Pollstar – Chart 2). During the same period, ████ share ████ from ████ to ████ by tickets sold and from ████ to ████ when measured by gross revenue. *Id.*

## B.    DEFENDANT HAS NOT ENGAGED IN ANTICOMPETITIVE CONDUCT

Because simply possessing monopoly power does not violate Section 2, Plaintiffs also must prove that any power held by Live Nation was "accompanied by an element of anti-competitive *conduct*." *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko*, ("*Trinko*"), 540 U.S. 398, 407 (2004) (emphasis in original).  Plaintiffs accuse Live Nation of engaging in a variety of anticompetitive conduct, including (a) paying artists "super-competitive" performance guarantees in order to secure exclusive touring deals, and (b) signing artists to exclusive touring deals that route concerts through Live Nation venues while refusing carve-outs or threatening to reduce disproportionately artists' guarantees for performing at Merriweather or using IMP. Compl. ¶¶ 72-77, 83-84, 90,150, 163, 188.

The antitrust laws "safeguard the incentive to innovate," including "acquir[ing] monopoly power by establishing an infrastructure that renders [a company like Live Nation] uniquely suited to serve [its] customers." *Trinko*, 540 U.S. at 407.  Companies do not run afoul of Section 2 for "charging monopoly prices," choosing the parties with whom they will deal or not deal, refusing to "share the source of their advantage" with rivals, or refusing to deal on "terms and conditions that the rivals find commercially advantageous." *Id.* at 407-08; *linkLine*, 555 U.S. at 1119.

### 1.    *Predatory Bidding*

Plaintiffs allege that Live Nation pays artists supra-competitive guarantees in order to lock out rival promoters and venues.  As a preliminary matter, paying what some bemoan as "high" guarantees is prevalent in the industry – Plaintiffs admit to doing the same thing – and natural in any competitive bidding process.  Yen Decl., Ex. 5 (Hurwitz Tr.) at 211:5-7 (



); Ex. 26 (

); Ex. 22 (Armor Tr.) at 46:4-15

).  For example, when Live Nation offered the band ███████████ to promote ██ shows in ███, rival promoter ██

███████████████████ countered with ██████████. Yen Decl., Exs. 27, 28. Mr. Hurwitz and

his rivals are simply engaging in "the very essence of competition" – bidding what is necessary

to secure artists to fill their venues. *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.,*

*Inc.,* 549 U.S. 312, 323 (2007).

Plaintiffs are unable to satisfy the two-part test set by the Supreme Court in

*Weyerhaeuser* for a predatory buying claim. Under the first prong, "the predator's bidding on

the buy side must have caused the cost of the relevant output to rise above the revenues

generated in the sale of those outputs." *Id.* at 325. There is no evidence that Live Nation's

guarantees to artists exceeded the revenues that Live Nation projected for the concerts. For

concerts held at Nissan from 2006 through 2009, Live Nation's internal projections for each

concert anticipate ██████████████████████████████ Mankin Decl. ¶ 10.

The second prong requires Plaintiffs to prove that Live Nation has a "dangerous

probability of recouping the losses incurred in bidding up input prices through the exercise of

monopsony power." *Weyerhaeuser Co.*, 549 U.S. at 325. Without proof of likely recoupment,

Plaintiffs' predatory bidding claim "makes no economic sense" because it would involve "short-

term losses with no likelihood of offsetting long-term gains." *Id.* Recoupment occurs when

"with competition vanquished, the predator raises output prices to a supra-competitive level." *Id.*

at 318.

Here, there is no likelihood of recoupment. Plaintiffs allege that Live Nation's predatory

bidding has been in place since at least 2006. Five years later, ██████████████████

██████████████████████████████████████ Yen Decl., Ex. 5

(Hurwitz Tr.) at 151:17, 204:21-24; Ex. 4 (Wall Street Journal 4/8/2011). ████████████

███████████████████████████ *Id.*, Ex. 5 (Hurwitz Tr.) at 157:17-19. Nor is there

any danger of Plaintiffs being driven out of business and Live Nation raising prices. *See supra* at

36-38. Plaintiffs fail both prongs of *Weyerhaeuser*.

2.    ***Exclusive Dealing***

     a.    **Live Nation's Touring Agreements Are Exclusive Only Where The Artist So Chooses**

One of the central themes of Plaintiffs' monopolization claims is that Live Nation enters into national touring deals that call for Live Nation to be the exclusive promoter and venue provider across the country, with the result that local rivals are allegedly denied access to those artists for venues like Merriweather. Compl. ¶¶ 72-77, 83-84. Plaintiffs are correct that Live Nation has pursued a unique strategy popular with artists: developing a new product that is national in scope, offering the financial benefits of scale, and affording artists the efficiencies and convenience of one firm able to handle all their touring needs. *See supra* at 11. This is innovation and business acumen, not an antitrust violation. *Allied Orthopedic Appliances, Inc. v. Tyco Health Care Group, LP*, 592 F.3d 991, 1000 (9th Cir. 2010).

In the first place, the national touring deals are not necessarily "exclusive." Artists are able to solicit offers from local promoters, use those offers to negotiate changes with Live Nation, and ultimately determine that someone else will promote their concert and perform at venues other than Nissan. Examples in Baltimore/Washington, D.C. include ███████████

████████████████████████████████████████████████████

█████████████████████████████ *See* Rogers Decl., Exs. A-D (Pollstar data).

The same is true throughout the country. ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████ *See, e.g.*, Yen Decl., Ex. 27 ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ *See infra* at 30-31. In effect, Live Nation's offers are not "exclusive," but rather the equivalent of volume discounts.

Under similar circumstances, courts have denied claims that these types of agreements violate antitrust laws. *See Novell, Inc. v. Microsoft Corp.*, 699 F. Supp. 2d 730, 754 (D. Md. 2010) (Microsoft's Project Avalanche agreements with distributors and resellers were not unlawful exclusive deals because like any discount, "the more the distributor purchased the discounted products, the greater it benefits from the discount"); *R.J. Reynolds Tobacco*, 199 F. Supp. 2d at 388 (granting summary judgment where defendant's marketing program did not preclude retailers from displaying rival cigarettes); *see also Allied Orthopedic*, 592 F.3d at 996-97 (non-exclusivity of discount program undercuts claim of substantial foreclosure); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1062-63 (8th Cir. 2000) (defendant's non-exclusive marketing programs did not violate Section 2).

**b.      Live Nation's Touring Agreements Are Pro-Competitive**

Even assuming that Live Nation's agreements can be characterized as quasi-exclusive, there is nothing anticompetitive about them.  Courts recognize that exclusive dealing agreements can offer mutual benefits to buyer and seller and promote competition. *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 76 (3d Cir. 2010) ("it is widely recognized that in many circumstances exclusive dealing arrangements may be highly efficient – to assure supply, price stability, outlets, invest, best efforts or the like – and pose no competitive threat at all"); *Thompson Everett*, 57 F.3d at 1325-26 (temporary preemption of competition was "minor" compared to benefits of exclusive deals).

Here, as explained in Section C.2, there are many benefits to the artist and promoter, and pro-competitive reasons for embarking on national tours exclusively or quasi-exclusively promoted by Live Nation:  among other things, (i) larger guarantees and income for artists, (ii) greater fan exposure, (iii) reduced transaction costs, (iv) inducement to invest in venues and artists and recoupment of those investments, and (v) building loyalty among seller and buyer. *See supra* at 11-12.  That is why artists seek out national tour deals with Live Nation. *See, e.g.,* Yen Decl., Ex. 17 (Reznor Tr.) at 17:22-18:1 (██████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████).

The Court should not "overlook the crucial and undisputed fact" that it is the artist who "ultimately decides whether or not to enter into [an exclusive deal] in their own best interest." *Race Tires*, 614 F.3d at 78. As astutely noted by Judge Easterbrook of the Seventh Circuit, artists would not "shoot themselves in the feet" by signing exclusive deals if doing so would only put Live Nation in a more powerful position to "apply the squeeze" on them. *Menasha*, 354 F.3d at 663. "When the consumers favor a product or practice, and only rivals squawk, the most natural inference is that the complained-of practice promotes rather than undermines competition, for what helps consumers often harms other producers such as [Plaintiffs]." *Id.* (affirming summary judgment for entity with exclusive deals).

Finally, although they complain about them now, Plaintiffs recognize the competitive advantages that exclusivity provisions may offer. ████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████ *See e.g.,* Yen Decl., Ex. 30 ████████████████████████████████ (emphasis in original). These ████████████ are widely employed in the concert business. Yen Decl., Ex. 22 (Armor Tr.) at 107:12-108:11 (exclusivity provision included in contracts by Philadelphia promoter).

In any event, Live Nation's touring deals are of short duration, typically lasting just the ████████████████████████████, after which the artist opens bidding to everyone for the next season. *See* Garner Decl. ¶ 13. Short-term exclusive deals like Live Nation's do not harm competition, even assuming *arguendo* that Live Nation is a "dominant" firm. *Allied Orthopedic*, 592 F.3d at 997 (customers could forego discounts and choose alternative supplier relatively quickly); *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163 (9th Cir. 1997) (one-year deals reasonable); *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 237 (1st Cir. 1983) (two-year deals reasonable); *R.J. Reynolds Tobacco*, 199 F. Supp. 2d at 391 (less than one-year deals reasonable).

### 3.     *Refusing Carve-Outs for Merriweather*

Plaintiffs also allege that Live Nation does not allow artists to negotiate or carve out

appearances at Merriweather on national tours. Plaintiffs are wrong. Live Nation's agreements

allow for negotiation on tour routing. Yen Decl., Ex. 31 ██████████████████████

███████████████████████████████████████████████████████

██████ Moreover, many artists have successfully negotiated to play at Merriweather when

they appeared in the Baltimore/Washington, D.C. area. *See supra* at 22-23.

But even if Live Nation refused a carve-out, such refusal would not violate the antitrust

laws. By creating and investing in a national network of booking agents and venues, Live Nation

has created an infrastructure popular with artists. Live Nation has no obligation to share the

fruits of its innovation with rivals. *See Trinko*, 540 U.S. at 407-08 ("[c]ompelling such firms to

share the source of their advantage is in some tension with the underlying purpose of antitrust

law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those

economically beneficial facilities"); *Cavalier Tel., LLC v. Verizon Va., Inc.*, 330 F.3d 176, 190

(4th Cir. 2003) ("Verizon would not have been obligated to rent its facilities and provide access

to its elements to competitors to enable them to enter the market, and a complaint that alleges

that it had a duty to do so under the antitrust laws would fail to state a claim upon which relief

could be granted").

### C.     ATTEMPTED MONOPOLIZATION

Because of the same failure of proof as their monopolization claims, Plaintiffs' attempted

monopolization claim fails as well. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456

(1993) (requiring proof of (1) anticompetitive conduct, (2) specific intent to monopolize, and (3)

dangerous probability of success). Plaintiffs cannot prove a dangerous probability that Live

Nation will achieve monopoly power. *See supra* at 16-20; *M&M Med. Supplies & Serv., Inc. v.

Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 168 (4th Cir. 1992) (en banc) ("claims of less than

30% market shares should presumptively be rejected; . . . claims involving between 30% and

50% shares should usually be rejected"); *Nobel Scientific*, 670 F. Supp. at 1318 (summary

judgment against attempted monopolization claim because evidence insufficient as to dangerous probability of achieving monopoly power). Nor can Plaintiffs prove that Live Nation engages in anticompetitive conduct. *See supra* at 20-25.

## III.    PLAINTIFFS' SECTION 1 CLAIMS SHOULD BE DISMISSED BECAUSE THERE IS NO UNLAWFUL TYING

Plaintiff IMA alleges separate "per se" (Count I) and "rule of reason" (Count II) tying claims under Section 1 of the Sherman Act. Compl. ¶¶ 130-38 (Count I), ¶¶ 139-45 (Count II). The alleged tying product is "promotional services to artists," and the alleged tied product is "venues and venue services." *Id.* ¶ 131. IMA claims that Live Nation has monopoly or market power in concert promotion, and uses that power to tie venue services by refusing to provide promotion services unless artists appear at Nissan or other Live Nation-controlled venues. *Id.* ¶¶ 132-33. IMA asserts the tying prevents artists from performing at Merriweather. *Id.* ¶ 134.

### A.    PER SE TYING ANALYSIS IS DISFAVORED

Notwithstanding IMA's pleading a *per se* tying claim, the Supreme Court has shifted away from viewing tying arrangements as *per se* unlawful. "This Court's strong disapproval of tying arrangements has substantially diminished." *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 45 (2006) (rejecting *per se* treatment because many tying arrangements "are fully consistent with a free, competitive market"). In our economy, tying is prevalent: buyers want them, and "a seller's decision to offer such packages can merely be an attempt to compete effectively – conduct that is entirely consistent with the Sherman Act." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984).

A tying arrangement is condemned only when (1) "the seller has some special ability – usually called 'market power'" (2) to "force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms," and that (3) results in "substantial" anticompetitive harm and foreclosure in the tied market. *Ill. Tool Works*, 547 U.S. at 34-36; *Jefferson Parish*, 466 U.S. at 12-16; *Serv. & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680, 683 (4th Cir. 1992) (affirming Court's grant of

summary judgment against tying claim); *Nobel Scientific*, 670 F. Supp. at 1328 (requiring proof of market power).

Live Nation's lack of market power and the absence of anticompetitive harm are discussed in other sections of this brief (*see* Sections II and IV). In this section, we focus on the total absence of evidence that Live Nation exploited its promotion service to "coerce" or "force" any artist to perform at Nissan instead of Merriweather.

### B.    PLAINTIFFS CANNOT PROVE COERCION

Coercion is a required element of Plaintiff's burden, whether labeled as *per se* tying or rule of reason tying. IMA bears the burden of proving that Live Nation either (i) forced artists to purchase venue services that artists did not want, or (ii) prevented artists from purchasing venue services from another seller. *Jefferson Parish*, 466 U.S. at 12; *Stephen Jay Photography v. Olan Mills*, 903 F.2d 988, 991 (4th Cir. 1990). If artists voluntarily purchase Live Nation's concert promotion and Nissan venue services as a package, or are free to purchase Merriweather's venue services separately, there is no coercion. *Jefferson Parish,* 466 U.S. at 11-12; *Stephen Jay Photography*, 903 F.2d at 991.

#### 1.    *Artists Voluntarily Choose to Retain Live Nation*

Of the ▮ concerts held at Nissan during the relevant time period, not one single artist was "forced" or "coerced" by Live Nation to perform there against his or her wishes. Among the thousands of emails and other documents produced by Live Nation, there is not one that indicates an artist performed at Nissan involuntarily, or that Live Nation withdrew a tour offer because an artist wanted to play Merriweather, or Live Nation conditioned a tour offer on the artist appearing at Nissan instead of Merriweather. Garner Decl. ¶ 32.





Plaintiffs deposed Dori Armor, who has extensive experience booking music artists of all genres for the Hippodrome Performing Arts Center, the Meyerhoff Symphony Hall, and the Mann Center in Philadelphia. Ms. Armor explained that "larger" artists are sufficiently savvy at cutting deals to avoid being forced to do anything: "Well, because the agents and the managers, you know, the bottom line is it usually comes down to money. Very rarely did it come down to 'I really just like the Mann, we're just going to go there.' It just doesn't happen that way." *Id.*, Ex. 22 (Armor Tr.) at 46:4-15, 56:1-5.

Live Nation cannot coerce an artist because each touring agreement explicitly provides that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See, e.g.*, Yen Decl., Ex. 31 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ (emphasis supplied). This provision is not surprising because everyone in the industry, including Plaintiffs, agree that the artist and/or their management and agent teams always retain control over which venues to play. *See supra* at 9-14; *see White*, 820 F.2d at 103-04 (no coercion where patient's physician, not defendant hospital, determined whether patient required tied product (CT scan)).

-28-

The band ████ exemplifies the freedom an artist has in choosing promoters and venues.
In ██, ████ selected Live Nation, along with ████████████████████████ to
promote its tour.  Yen Decl., Ex. 32.  ████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████ Yen Decl.,
Exs. 33-34.  There is no evidence that ████ thereafter continued to press for ████████, or
that Live Nation stated that it would withdraw its tour offer or otherwise punish ████ if they did
not choose Nissan.  ████ always maintained the option to remove Nissan from the tour package
(but did not).

In fact, two months later ████ did just that when it removed Live Nation's ████████
████ venue because of disagreement about terms for that venue.  *Id.*, Ex. 35.  ████ opted to give
the ████████ show to Live Nation rivals ████████████████ at their ████████.
*Id.*, Exs. 35, 32.  And further contrary to the notion of any coercion, the band chose Live Nation
and returned to Nissan for its ████ tour.  *Id.*, Ex. 20 (Fermaglich Tr.) at 20:7-16, 70:10-14.  It
defies common sense that ████ would do business with Live Nation again in ████ after
supposedly having been forced to endure Live Nation's wrath a year earlier.  *Matsushita*, 475
U.S. at 588 (antitrust law "limits the range of permissible inferences").

Although Plaintiffs claim that Live Nation coerced ██ acts over the course of 2006-2009
(*see* Yen Decl. 36 (Plaintiffs' Amended Response to Interrogatory No. 1)), with rare exception,
the allegedly "coerced" artists never even suggested they wanted to play at Merriweather.
Garner Decl. ¶ 32.  In most of these instances, Plaintiffs ████████████████████████
████████████████████████████████████████████████████████████
████████████████████; Ex. 37 (████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████).  Mr. Hurwitz
admitted that there has been no instance where he was told ████████████████████████
████  *Id.*, Ex. 5 (Hurwitz Tr.) at 174:15-18.

If artists never displayed a preference for Merriweather (or objected to playing Nissan), or Plaintiffs failed to submit an offer for the agent to consider, there can be no coercion. *See, e.g.*, *Jefferson Parish*, 466 U.S. at 12 (invalid tying arrangement only exists where the buyer was forced into a purchase of a good that it "did not want at all, or might have preferred elsewhere on different terms").

In the instances where an artist actually insists on playing at Merriweather, Mr. Hurwitz has ███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
████████████████ Yen Decl., Ex. 38.  In another discussion, this time with the agent for ███████████████████████████████████████████████████████████
████████████████████████████ *Id.*, Ex. 21.

There are multiple examples of artists on Live Nation tours who have played at Merriweather or other non-Live Nation venues in Baltimore/Washington, D.C.: ██████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
████████████████ *See* Yen Decl., Ex. 3 (Pollstar data – Chart 1).

In these situations, Live Nation ██████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████ Garner Decl. ¶ 32; Yen Decl., Ex. 5 (Hurwitz Tr.) at 171:9-13 (████████████████████████████████████████████
██████████████████████████████████████

*compare* Yen Decl., Ex. 39 (████████████████████████████████████)

*with* Ex. 40 (████████████████████████████████);

*compare* Ex. 41 (████████████████████████████) *with* Ex. 42  (████

████████████████████████████████████████████

████████████).

  This is not coercion. *Allied Orthopedic*, 592 F.3d at 996-97; *Amerinet, Inc. v. Xerox*

*Corp.*, 972 F.2d 1483, 1500 (8th Cir. 1992); *Tricom, Inc. v. Elec. Data Sys. Corp.*, No. 92-76374,

1996 WL 224762, at *5 (E.D. Mich. Mar. 6, 1996) ("To prove an illegal tie, a plaintiff must

show that the purchase of the tying product together with the tied product was the purchaser's

only economically viable option.").

    **2.** ***The Four Acts Who Plaintiffs Claim Unsuccessfully Sought to Play***
      ***at Merriweather Were Not Coerced but Chose to Play at Nissan***
      ***After Negotiations***

  Plaintiffs focus on ████ artists who allegedly tried but were unable to negotiate carve-outs

to play at Merriweather, allegedly because of Live Nation's threats to "disproportionately"

reduce tour proceeds. Yen Decl., Ex. 36 (Plaintiffs' Amended Interrogatory Response No. 5).

However, the facts of the negotiation history demonstrate that none of the artists were coerced.

In each instance, the artist voluntarily agreed to play at Nissan after arms-length negotiations,

including extracting higher compensation from Live Nation. Where venue decisions are subject

to negotiations and the artist ultimately can choose the option that is in their best interests, there

can be no claim of coercion. *See Rome Ambulatory Surgical Ctr., L.L.C. v. Rome Mem'l Hosp.*,

349 F. Supp. 2d 389, 408 (N.D.N.Y. 2004) (no coercion where customers' choice of defendant's

services was a product of negotiations).



*Id.*, Ex. 44

████████████████ When ██████████ inquired about playing Merriweather instead of

Nissan, ████████████████████████████████████████████

████████████████████. Garner Decl. ¶ 35. ██████████████████████████

████████████████████████████████████████████████████

████████████████████ Garner Decl. ¶ 21; Yen Decl., Ex. 45 (Garner Tr.) at 42:16-25.

████████████████████████████████████████████ Garner

Decl. ¶ 35. █████████████████████████████████████

████████████████████████████████████████ Garner Decl. ¶

35; Yen Decl., Ex. 18 (Geiger Tr.) at 72:13-22.  Live Nation did not threaten to reduce payments,

and ███ was not coerced – it got exactly what it wanted.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

██████████ Yen Decl., Ex. 46.  Either way, Live Nation does not force artists to play where they

do not want to play.  *Id.*, Ex. 17 (Reznor Tr.) 42:16-43:2 (████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████)

(emphasis added).

██████████████

██████████████ toured during the Summer of ████. Garner Decl. ¶ 36. The band

played at ████████████████ on ████████████ and ████████████ on ████████

████ both dates were promoted by Live Nation. *Id.*  Although ████████████████████

████████████████████████████████████████████████████ There

could have been many reasons that the band chose to play at ████████████  For example, ████

████████████████████████████████████████ *Compare* Yen

Decl., Ex. 47 (████████████████████████████████████████), *with* Ex. 48

(█████████████████████████████████). IMP had never previously
promoted ██████████ Mankin Decl. ¶ 14. ████████████████████

██████████████████████████████████████████████████████

████████████████████ Garner Decl. ¶ 39; Yen Decl., Ex. 49 (Wavra Tr.) at 102:9-
103:5; Ex. 5 (Hurwitz Tr.) at 81:4-7 (█████████████████████████████

██████████████████████████████████████).

     But there is no evidence that ████████████ did not want to perform at ████████,
wanted to perform at ██████████ instead, or any coercion by Live Nation.  Where Plaintiffs'
evidence is ambiguous or speculative, and the evidence is as consistent with inferences that Live
Nation "lawfully extolled the superiority" of its services and that █████████████
"independently concluded that they preferred" Live Nation's package offerings, summary
judgment is appropriate.  *Serv. & Training, Inc.*, 963 F.2d at 687.

████████

     ████████ played ██ dates on a Live Nation tour in ████.  Garner Decl. ¶ 40.  ███
played █████ that year but not ████████████.  *Id.*  That decision was not forced by Live Nation.
Yen Decl., Ex. 18 (Geiger Tr.) at 40:10-41:7 (██████████████████████████████

██████████████████████████████████████████████████).  ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ Yen Decl., Ex. 18 (Geiger Tr.) at 41:18-21.  ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████

████████████

     Up through ██████████████ rejected touring offers from Live Nation, opting instead to
work exclusively with ██████ Yen Decl., Ex. 19 (Kaul Tr.) at 25:15-27:13.  As the band became

more successful, it ████████ that success to secure more lucrative offers from promoters, including Live Nation. *Id.* at 29:24-30:9, 32:21-33:8. The band █████████ an offer from Live Nation because █████████████████████████ *Id.* at 32:7-32:16. Unfortunately for Live Nation, █████████ chose to perform at █████████ for its Baltimore/Washington, D.C. play. *Id.* at 119:18-120:2.

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████ *Id.* at 36:14-38:8, 62:9-63:22, 65:5-15. ███

██████████████████████████████████████████████

████████████████████████ *Id.* at 63:14-22. █████████████████

██████████████████████████████████████████████

████████████████████ *Id.* at 40:23-41:17.

        In █████████████ switched promoters and allowed Live Nation to promote their upcoming tours. ██████████████████████████████████████

████████████████████████████████████████████████

████ *Id.* at 72:20-73:3. ████████████████████████

████████████████████████████████████

████████████████ *Id.* at 76:13-19. ████████████████

██████████████████████████████████████

██████████████████ *Id.* at 103:22-105:5.

████████████████████████████████████████████

████████████████████████████████████████████████

█████████ *Id.* at 77:6-9, 80:7-14. ██████████████

████████████████████████████████████████████████

██████████████████████████████████████

████ *Id.* at 89:15-90:5. ████████████████████████

████████████████████████████████████████████



███████████████████████████████████████

████████████████████████ Yen. Decl., Ex. 50 (emphasis added).

████████ was never coerced to switch promoters, to enter into exclusive deals, or to

play ████████████ They unilaterally made the final decisions, and freely chose Live

Nation and Nissan ██████████ That is not coercion. ██████████████████

██████████████████████████████████

*Id.*, Ex. 19 (Kaul Tr.) at 79:14-80:2.

All of these examples underscore the economic fallacy of Plaintiffs' coercion theory. A

national tour deal is the subject of intense negotiations between a sophisticated seller and buyer.

Because it owns multiple venues throughout the U.S., Live Nation can offer the artist, among

other benefits, a greater financial package predicated on pooling the revenue potential from each

one of those venues at which the artist performs. *Id.*, Ex. 5 (Hurwitz Tr.) at 16:12-17:14

(██████████████████████████████████████

██████████████████████). On the other hand, those same

venues become a huge liability if they remain empty. It would be irrational for Live Nation to

jeopardize an entire national tour over one performance at Nissan when Live Nation can earn so

much more in ancillary revenues from the other venue stops on the tour. Garner Decl. ¶ 15.

For the artist, the options may include the financial package offered by Live Nation or

some other entity's national touring offer, or perhaps a combination of offers from multiple

promoters and venues across the country. The artist is seeking the best deal possible. Yen Decl.,

Ex. 18 (Geiger Tr.) at 58:9-23; Ex. 19 (Kaul Tr.) at 16:10-20. It would be irrational for an artist

to choose Nissan if Merriweather presented a clearly better financial opportunity overall. While

Plaintiffs believe Live Nation must have put a gun to the artist's head, the more reasonable

inference is that the artist chose the profit-maximizing option. Live Nation cannot be condemned for providing the financial reward the artist wants. Plaintiffs' tying claim "simply makes no economic sense." *Matsushita*, 475 U.S. at 587 (affirming summary judgment where plaintiffs cannot "exclude the possibility" of rational economic behavior).

## IV.    PLAINTIFFS CANNOT PROVE ANTICOMPETITIVE EFFECTS

For Plaintiffs' Section 1 tying claim and their Section 2 monopolization claims, "[w]ithout a showing of actual adverse effect on competition, [Plaintiffs] cannot make out a case under the antitrust laws." *Jefferson Parish*, 466 U.S. at 31 requiring evidence that "the price, the quality, or the supply or demand for either the 'tying product' or the 'tied product' involved in this case has been adversely affected by the exclusive contract"). The undisputed evidence shows absolutely no adverse impact on competition in the Baltimore/Washington, D.C. area during the relevant timeframe. This comes as no surprise given Mr. Hurwitz's concession that Live Nation nor anyone else has monopoly power. Instead, the market is brimming with the hallmarks of healthy and vigorous competition that has inured to the benefit of consumers, and defeats all of Plaintiffs' claims.

- The number of music concerts in the Baltimore/Washington, D.C. area has ███████ , and so has the number of concerts at Merriweather. ██████████ hosted ██ shows in 2006, ██ in 2007, ██ in 2008, and ██ in 2009, an ██████████ Yen Decl., Ex. 3 (Pollstar – Chart 1).

- No competitor has been pushed out of the market, and the likelihood of Plaintiffs or any other promoter or venue in Baltimore/Washington, D.C. being foreclosed from competition is zero. Plaintiffs today are making more money than ever, hosting more concerts, and selling out concerts like country singer Miranda Lambert. *Id.*, Ex. 4; *see also supra* at 2-3.

- Many different promoters promoted concerts in the Baltimore/Washington, D.C. area, and new promoters continue to enter the market, including ████████████ ██████████████████████████████████ Rogers Decl., Exs. B-D.

- Ticket prices at Nissan have remained competitive.  In fact, ticket prices for artists who
  have played at ███████████████ are, with few exceptions, ███ at ████.
  *See supra* at 9.

Given the growth of competition in Baltimore/Washington, D.C., Live Nation is entitled to

summary judgment. *Abcor Corp. v. AM Int'l.*, Inc., 916 F.2d 924, 931 (4th Cir. 1990) (affirming

summary judgment where no evidence of market share loss or other diminishment in

competition); *Military Servs. Realty, Inc. v. Realty Consultants of Virginia*, 823 F.2d 829, 832

(4th Cir. 1987) (affirming summary judgment because there was no evidence of anticompetitive

effects and plaintiff could not identify any rival other than itself that had been restrained by

defendant's conduct); *R.J. Reynolds Tobacco Co.*, 199 F. Supp. 2d at 382 (granting summary

judgment because plaintiffs failed to prove existence of "supra-competitive prices" or restriction

in output); *Sewell Plastics, Inc. v. The Coca-Cola Co.*, 720 F. Supp. 1196, 1218 (W.D.N.C.

1989) (granting summary judgment because evidence showed decline in prices, increase in

output, and number of competitors remaining stable), *aff'd*, 912 F.2d 463 (4th Cir. 1990).[3]

## V.    PLAINTIFFS CANNOT PROVE THAT LIVE NATION CAUSED THEIR ALLEGED INJURIES

There is an independent basis for dismissing all of Plaintiffs' tying and monopolization

claims.  To the extent they have been injured at all, Plaintiffs have not been injured "by reason

of" any antitrust violation by Live Nation.  As with every Section 1 and 2 antitrust claim,

Plaintiffs must separately establish that Live Nation's purportedly unlawful conduct was the

"material cause" of their injuries. *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1060

(8th Cir. 2000) (plaintiffs failed to take into account "intervening economic and market factors"

that may have been the actual cause of their injuries); *Thompson Everett*, 57 F.3d at 1325

---

[3] The same facts also doom Plaintiffs' tying claim because competition in the "tied" market of
venue services has not been substantially foreclosed. *See Jefferson Parish*, 466 U.S. at 16
(requiring substantial foreclosure in tied product); *Faulkner Adver. Assoc. v. Nissan Motor Corp
in U.S.A.*, 905 F.2d 769, 772 (4th Cir. 1990) (tying must have "unreasonably foreclosed or
restrained competition in the tied product").

(affirming summary judgment because "only injury caused by damage to the competitive process may form the basis of an antitrust claim").

It is not enough for Plaintiffs to estimate an amount of damages.  Plaintiffs must also show, with reasonable certainty, the *fact of* damages attributable to unlawful conduct.  *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 566 (1931) (whether defendant's unlawful acts "or conditions apart from them constituted the proximate cause of" plaintiff's damages); *Allegheny Pepsi-Cola Bottling Co. v. Mid-Atl. Coca-Cola Bottling Co.*, 690 F.2d 411, 415 (4th Cir. 1982) (lost profit damages claim failed to show any injury "which resulted from the defendants' alleged anticompetitive conduct").

Here, the reality of the concert business demonstrate that Plaintiffs' inability to secure shows that they believe they should have won has nothing to do with Live Nation, but rather is a direct result of independent business decisions made by artists and their representatives.



The band ███████, which is managed by ███████████, is an example.  For the ███ season, ████████ hired Live Nation as its national promoter, but weighed whether to play ████████ instead of ██████ for its Baltimore/Washington, D.C. stop.  In ████████████, the agent was leaning towards ██████ as the best option for the band.  On ████████, Mr. Hurwitz wrote the agent: ████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████ Yen Decl., Ex. 53 (emphasis added).

████████ manager did select ██████  On █████████████████ wrote to Mr. Hurwitz to explain that the decision was solely his.  ████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████ *Id.*, Ex. 51; Ex. 5

(Hurwitz Tr.) at 194:3-17 ( ███████████████████████████████
███████████████████████████ ).

    The ████████ experience is consistent with what others in the industry have said about the powerful role of the artist in selecting promoters and venues. *See supra* at 9-14. It certainly has been true with Live Nation's experience. *See, e.g.*, Garner Decl. ¶ 28.



- ██████████████████████████████████████████
  █████████████████ Yen Decl., Ex. 45 (Garner Tr.) at 19:15-16.

- █████████████████████████████████████████████
  █████████████████████████████████████████
  █████████████████████████████████████ *Id.* at 27:10-15.

- █████████████████████████████████████████████
  ██████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████ *Id.* at 30:16-22.

- █████████████████████████████████████████████
  █████████████████████████████████████████
  █████████ *Id.*, at 67:24-68-2.

- █████████████████████████████████████████████
  ███████████████████████████████████████
  ████████████████████████████████ *Id.* at 127:15-19.

- █████████████████████████████████████████████
  █████████████████████████ *Id.* at 196:9-12.

    To the extent they suffered any harm, Plaintiffs' allegations stem from their dissatisfaction with the ***artists' decision*** to sign touring agreements with Live Nation and play at its venues. But the Fourth Circuit does not recognize this as antitrust causation. In *Thompson*

*Everett*, plaintiff was an independent sales representative that had difficulty representing cable companies because it also represented advertisers and advertising agencies. Plaintiff alleged that its competitor defendants violated Sections 1 and 2 by using their exclusive contracts with cable companies to prevent plaintiff from garnering sales representations with those cable companies. *Thompson Everett*, 57 F.3d at 1319.

The Fourth Circuit affirmed summary judgment for defendants. The Court of Appeals observed that plaintiff can attempt to persuade the cable companies to alter the way they do business and cease exclusive deals with defendants. *Id.* at 1324. "The barrier to this result is that imposed by the *independent decision* of the cable company and the cable rep to enter into an exclusive contract." *Id.* at 1325 (emphasis added). Because the cable company decided to do business with defendants on an exclusive basis, unless the exclusive contract itself is illegal, the Court of Appeals concluded that plaintiff "has no basis for asserting an antitrust claim." *Id.*

Like the cable companies in *Thompson Everett*, artists make the independent decision to tour nationally and find one or more promoters who can provide such services. Plaintiffs admit they cannot offer national touring services. And while Plaintiffs "may surely attempt to persuade [artists] to alter the method they have selected for doing business," Plaintiffs cannot complain that they "do not have access" to artists if they are "unwilling to compete for these exclusive [national] contracts." *Id.* at 1324. Nor can Live Nation be said to have caused any injury when artists "could readily refuse to renew their exclusive, relatively short-term contracts" with Live Nation or demand a carve out for Merriweather. *Id.* Plaintiffs have not made the requisite showing of causation to assert antitrust claims against Live Nation. *Id.*

## VI.    PLAINTIFFS LACK STANDING BECAUSE THEY HAVE NOT SUFFERED ANTITRUST INJURY

Plaintiffs complain of harm because of competition from Live Nation. Compl., *e.g.*, ¶¶ 138, 154. They do not like, among other things, Live Nation's package of national promotion and venue services that artists seek, the very existence of Nissan as a rival venue, having to bid against Live Nation for artists, and Live Nation's economies of scale that permit it to offer

greater financial incentives to an artist if they perform at Live Nation venues. Because of the stiffer competition, Plaintiffs apparently have not made as much money as they believe they are entitled, and so seek lost profit damages. In addition, Mr. Hurwitz wants an injunction that prohibits Live Nation from signing an artist to an entire tour deal, but because AEG does not have a venue in Baltimore/Washington, D.C., AEG would not have to be subject to the same prohibition. Yen Decl., Ex. 5 (Hurwitz Tr.) at 7:19-8:17.

In essence, Plaintiffs have sued Live Nation because *they* want to be exclusive promoters in the Baltimore/Washington, D.C. area. However, "[t]his is just the kind of all-for-one-and-all-for-one competitor claim that the antitrust laws do not protect." *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 454 (6th Cir. 2007) (replacement of one exclusive dealer for another exclusive dealer does not state an antitrust injury).



But there are strict limits to what the antitrust laws will permit through litigation, even if Plaintiffs have suffered lost profits at the hands of Live Nation. *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 116 (1986) ("the antitrust laws do not require the courts to protect small businesses from the loss of profits" resulting from vigorous competition). To be afforded antitrust relief, Plaintiffs must show that they suffered "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488-89

(1977) (prohibiting competitor claim where claimant sought in damages "the profits they would have realized had competition been reduced").

 In this case, Plaintiffs have not suffered "antitrust injury." Just the opposite – they have lost some artists because of the superior services, economies of scale, and efficiencies that Live Nation can provide and Plaintiffs cannot. As a competitor to Live Nation, Plaintiffs "may not use the antitrust laws to sue a rival merely for vigorous or intensified competition." *NicSand*, 507 F.3d at 450. The antitrust injury requirement properly prevents Plaintiffs from gaining a "windfall" in the form of treble damages for sales they lost to the more efficient firm. *Sewell Plastics*, 720 F. Supp. at 1222.

 The competition provided by Live Nation (and others) about which Plaintiffs complain and seek to enjoin, has benefitted artists and consumers. What is good for consumers is bad for Plaintiffs, and so they sue. But Plaintiffs fail to meet the requirement that their injury is "attributable to an anti-competitive aspect of the practice under scrutiny, since it is inimical to the antitrust laws to award damages for losses stemming from continued competition." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (no antitrust injury where plaintiff's lost profits stemmed from defendant's vertical agreement with rival retailers to lower prices). Any injury suffered by Plaintiffs flows from *heightened* competition rather than a reduction in competition. *Brunswick*, 429 U.S. at 489. It is Plaintiffs' lawsuit that threatens to reduce competition in Baltimore/Washington, D.C. – Plaintiffs want to be able to pay artists less and reduce the number of shows available to fans. This is not "*antitrust*" injury. *Atl. Richfield*, 495 U.S. at 338 (emphasis in original).

 This case is strikingly similar to the recent First Circuit decision *Sterling Merch., Inc. v. Nestle, S.A.*, No. 10-1925, 2011 WL 3849828 (1st Cir. Sept. 1, 2011). After merger discussions between plaintiff (a local ice cream distributor) and defendant (the world's largest ice cream manufacturer) failed, defendant acquired a rival ice cream distributor. In subsequent years, plaintiff's ice cream distribution business thrived, defendant's business suffered (losing money and market share from 85% to 70%), and overall competition increased as consumers paid the

same or less for ice cream and output increased.  Despite these shortcomings, plaintiff brought

monopolization claims because it "would have done even better for itself" had it not been for

defendant's acquisition of a rival distributor, exclusive dealings with supermarkets, and price

squeeze via reduction in discounts to plaintiff.  *Id.* at *6.

The First Circuit affirmed the trial court's grant of summary judgment because plaintiff

had failed to carry its burden of proving antitrust injury.  *Id.* at *7.  Although it observed that

defendant had a large (but declining) market share, the First Circuit properly recognized that

plaintiff had failed to show that the market had suffered a reduction in output or an increase in

consumer prices – no "impairment of competition or antitrust injury from the sum of its

theories."  *Id.* at *8.  Moreover, plaintiff's sales, profits, and market share increases during the

relevant period provided further indication that no antitrust injury existed.  *Id.* at *9.

Mr. Hurwitz is no different than the disgruntled ice cream distributor hoping to use the

antitrust laws to do even better for itself.  The "antitrust injury" requirement exists to prevent

precisely this type of abuse of the antitrust laws.

## VII.    THE MARYLAND STATE LAW CLAIMS FAIL

Live Nation moves for summary judgment on all three of Plaintiffs' state law claims:  (1)

the Maryland Antitrust Act claim (Count VIII), (2) the tortious interference claim (Count X), and

(3) the unfair competition claim (Count XI).  The operative facts underlying the state law claims

are the same as the federal antitrust claims.

*Maryland Antitrust Act Claim.*  The Maryland Antitrust Act explicitly provides that

application of the Maryland Antitrust Act is to "be guided by the interpretation given by the

federal courts to the various federal statutes dealing with the same or similar matters."  Md.

Com. Law Code Ann. § 11-202(a)(2).  State and federal courts addressing claims under the Act

have not departed from this guidance absent an express indication to the contrary.  *Davidson v.*

*Microsoft Corp.*, 792 A.2d 336, 341 (Md. Ct. Spec. App. 2002); *see also Greenbelt Homes, Inc.*

*v. Nyman Realty, Inc.*, 426 A.2d 394, 398 (Md. Ct. Spec. App. 1981); *Quality Discount Tires,*

*Inc. v. Firestone Tire & Rubber Co.*, 382 A.2d 867, 869 (Md. Ct. App. 1978).  Thus, if the Court

finds in favor of Live Nation on the Sherman Act claims, the Maryland Antitrust Act claim should be similarly resolved.

*Tortious Interference Claim.* In order to succeed on a claim for tortious interference, Plaintiff must prove that, among other things, Live Nation's actions were "done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice)." *Carter v. Aramark Sports and Entm't Servs., Inc.*, 835 A.2d 262, 279-280 (Md. Ct. Spec. App. 2003). Absent an antitrust violation, and there are none here, competition among competitors constitutes a "justifiable cause" that immunizes Live Nation against a tortuous interference claim. *Eastside Vend Distribs., Inc. v. Coca-Cola Enters.*, No. 24-C-04-003998, 2006 WL 1516012, at *19 (Md. Cir. Ct. May 8, 2006); *Natural Design, Inc. v. Rouse Co.*, 302 Md. 47, 71 (Ct. App. 1984); *Martello v. Blue Cross and Blue Shield of Md., Inc.*, 143 Md. App. 462, 478 (2002); *Purity Prods., Inc. v. Tropicana Prods., Inc.*, 702 F. Supp. 564, 575 (D. Md. 1988), *aff'd*, 887 F.2d 1081 (4th Cir. 1989). Similarly, Section 768(1) of the Restatement (Second) of Torts (1979) provides that there is no tortious interference if the defendant's "action does not create or continue an unlawful restraint of trade." *See also Natural Design*, 302 Md. at 73. Live Nation has engaged in legitimate competition, and therefore cannot be held "liable in tort whenever [it does] so successfully." *Waldrep Bros. Beauty Supply, Inc. v. Wynn Beauty Supply Co.*, 992 F.2d 59, 63 (4th Cir. 1993).

*Unfair Competition.* Plaintiffs' unfair competition claim also fails because they are unable to prove that Live Nation has engaged in "fraud, deceit, or trickery" against Plaintiffs, the core substance of an unfair competition claim under Maryland law. *Classen Immunotherapies, Inc. v. King Pharms., Inc.*, 466 F. Supp. 2d 621, 626 (D. Md. 2006) ("Unfair competition is generally defined as 'damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods.'"). While courts have stated that "[w]hat constitutes unfair competition in a given case is governed by its own particular facts and circumstances," courts have still required some element of dishonesty in order to show unfair competition. *Lowry's Reports, Inc. v. Legg Mason, Inc.*, 271 F. Supp. 2d 737, 754-55 (D. Md. 2003) (unfair competition claims subject "to

the general principle that all dealings must be done on the basis of common honesty and fairness, without taint of fraud or deception," and that "controlling legal principles 'are simply the principles of old-fashioned honesty'"). There is no evidence that Live Nation has engaged in any acts of fraud, deceit, trickery, or dishonesty.

## CONCLUSION

The Complaint should be DISMISSED under Fed. R. Civ. P. 56.

## REQUEST FOR HEARING

Live Nation respectfully requests a hearing on its motion.

Dated:  October 14, 2011                  Respectfully submitted,

*Jonathan M. Jacobson*

_____

JONATHAN M. JACOBSON (JJ-0605)
CHUL PAK
LUCY YEN
*Wilson Sonsini Goodrich & Rosati*
Professional Corporation
1301 Avenue of the Americas
New York, NY  10019
(212) 497-7700 (Telephone)
(212) 999-5899 (Facsimile)

FRANKLIN M. RUBINSTEIN
*Wilson Sonsini Goodrich & Rosati*
Professional Corporation
1700 K Street, N.W.
Washington, D.C.  2006
(202) 973-8800 (Telephone)
(202) 973-8899 (Facsimile)

*Attorneys for Defendant Live Nation, Inc.*

## **CERTIFICATE OF SERVICE**

I herby certify that I caused a true and correct copy of the foregoing documents:

1) Memorandum in Support of Motion for Summary Judgment (Redacted)
2) Declaration of Lucy Yen in Support of Motion for Summary Judgment with exhibits (Redacted)
3) Declaration of Ted Mankin in Support of Motion for Summary Judgment with exhibits (Redacted)
4) Declaration of Jason Garner in Support of Motion for Summary Judgment with exhibits (Redacted)
5) Declaration of Brad Rogers in Support of Motion for Summary Judgment with exhibits (Redacted)

to be filed with the Clerk of the Court via CM/ECF and served to the counsel of record.

Dated: October 25, 2011

/s/ Lucy Yen
Lucy Yen