**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, et al., <br><br> Plaintiffs, <br><br> v. <br><br> LIVE NATION ENTERTAINMENT, INC., and TICKETMASTER L.L.C., <br><br> Defendants. | Case No. 1:24-cv-03973-AS-SLC <br><br> [Rel. 1:24-cv-04106-AS-SLC; 1:24-cv-03994-AS-SLC] <br><br> **ORAL ARGUMENT REQUESTED** |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANTS' MOTION TO DISMISS</u>**

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| PRELIMINARY STATEMENT | | 1 |
| ARGUMENT | | 2 |
| I. | Plaintiffs' Tying Claim Fails As A Matter Of Law | 2 |
| | A. Tying Liability Requires A Tying Arrangement | 2 |
| | B. The Tying Claim Does Not Survive On An "Agency" Theory | 4 |
| | C. Live Nation's Lawful Refusal To Deal Cannot Be Used To Infer An Unlawful Tying Arrangement | 5 |
| | D. While *It's My Party* Is Indeed Highly Relevant Precedent That Forecloses Plaintiffs' Claim, Judicial Estoppel Plays No Role Here | 7 |
| II. | State Plaintiffs Lack Standing For Federal Damages Claims | 8 |
| CONCLUSION | | 10 |

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*Am. Mfrs. Mut. Ins. Co. v. Am. Broad. Paramount Theaters, Inc.*,
    446 F.2d 1131 (2d Cir. 1971)..................................................................................6

*Apple v. Pepper*,
    587 U.S. 273 (2019).................................................................................................8

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985).................................................................................................6

*Authenticom, Inc. v. CDK Glob., LLC*,
    874 F.3d 1019 (7th Cir. 2017).................................................................................7

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).................................................................................................9

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
    504 U.S. 451 (1992).................................................................................................3

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*,
    711 F.3d 68 (2d Cir. 2013)................................................................................9, 11

*Gonzalez v. St. Margaret's House Housing Development Fund Corp.*,
    880 F.2d 1514 (2d Cir. 1989).................................................................................3

*In re Google Digital Advertising Antitrust Litigation*,
    627 F. Supp. 3d 346 (S.D.N.Y. 2022)....................................................................3

*It's My Party, Inc. v. Live Nation, Inc.*,
    88 F. Supp. 3d 475 (D. Md. 2015), *aff'd,* 811 F.3d 676 (4th Cir. 2016) ..................6

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004).................................................................................................7

*Viamedia, Inc. v. Comcast Corp.*,
    951 F.3d 429 (7th Cir. 2020) ..........................................................................3, 5, 7

**OTHER AUTHORITIES**

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust
    Principles and Their Application ¶ 1700j1 (5th ed. 2023).......................................7

**PRELIMINARY STATEMENT**

Tying doctrine proscribes a form of conditional dealing. To be liable for unlawful tying, a seller must say to a buyer, in substance, "if you want X you have to take Y"—or in the alternative, "if you want X you have to promise you won't buy Y from my competitor." While there are other elements of the claim—market power, effects in the tied product market, and so on—the foundational *sine qua non* of tying under the Sherman Act is that there has to be a tying agreement.

Despite pages of obfuscation, what emerges from Plaintiffs' brief is that they do not allege that Live Nation has ever made a tying agreement with artists. There is not a single instance—much less a broader commercial practice—of Live Nation giving an artist an ultimatum of the type, "if you want to rent an amphitheater I own, you have to take my concert promotion services." That would be trivially easy to plead if Plaintiffs had any evidence that an artist attempted to rent a Live Nation venue but wanted to engage another promoter for their show. But Plaintiffs have no such evidence because artists do not rent venues. Promoters do. The Amended Complaint itself says so: "Typically, venues enter into individualized agreements with *promoters* (either on a show-by-show or long-term basis), which dictate the payments *between venues and promoters* in exchange for the performance(s)." Am. Compl. ¶ 192 (emphasis added).

This defect is fatal to Plaintiffs' tying claim. Plaintiffs resort to three tactics to try to resurrect it. First, as if tying liability could be established by linguistic sleight-of-hand alone, they repeatedly rephrase Live Nation's policy of not renting its amphitheaters to rival promoters as a form of tying agreement with artists. That is not what the well-pleaded *facts* in the Amended Complaint say and it is not how the industry works, as the Government well knows.

Second, Plaintiffs argue that even if promoters (not artists) are the ones who rent venues, they do so as a mere "agent" of the artist, which is good enough. That is also, however, not what the Amended Complaint alleges. To the contrary, it makes clear that promoters have ongoing,

1

independent economic relationships with venues, often on a "long-term" basis, *id.,* paying rent the promoters themselves negotiate as part of a broader risk-bearing role in which they cover all show expenses and guarantee the artist's compensation, in exchange for a piece of the upside if the gig makes money. If there were an "agency" exception to tying doctrine's conditional dealing requirement, the allegations in the Amended Complaint wouldn't satisfy it.

Third, Plaintiffs appear to contend that it doesn't actually matter if Live Nation makes conditional dealing demands of artists (or their agents), because the *effect* of Live Nation's refusal to deal with rival promoters is to require that an artist who wants to play Live Nation amphitheaters also take Live Nation concert promotion services. That is simply not the law. There can be no tying liability under the Sherman Act without an actual tie. The *Viamedia* and *Kodak* cases Plaintiffs rely on neither hold nor even suggest otherwise. In both cases, the defendants *in fact made conditional dealing demands of the putative tying victims*. Neither case conjured a tying agreement from the effect of a parallel refusal to deal, without more. No case allows that.

The State Plaintiffs' federal claims for damages likewise fail because Plaintiffs lack standing to assert them. Plaintiffs' argument regarding *Apple v. Pepper* is a strawman because the "direct purchaser" doctrine from *Illinois Brick* is not implicated by this motion. The motion is based on Plaintiffs' failure to allege the requisite causal linkage between the asserted violations and the prices consumers paid for tickets in the purported fan-facing primary ticketing market. There is no logical connection between the alleged conduct and the asserted consumer injury.

## ARGUMENT

I. **PLAINTIFFS' TYING CLAIM FAILS AS A MATTER OF LAW**

    A. **Tying Liability Requires A Tying Arrangement**

Plaintiffs argue that Defendants "do not dispute that Plaintiffs have sufficiently alleged all five elements of a tying claim" and instead are asking the Court to dismiss Count Three based on

2

"additional elements" that Defendants have supposedly "conjure[d]" out of nowhere. ECF No. 308, Pls.' Opp'n Br. ("Opp.") at 8. Not so. Tying requires that there be *an agreement* with a buyer forcing it to buy Product B as a condition of buying Product A. The quotation from *Kodak* at page six of the Opposition explicitly says so. Yet, after stating the correct rule, Plaintiffs argue that the "five elements" for unlawful tying can be satisfied *in the absence of a tying arrangement*. That is wrong. Plaintiffs' cited case, *Gonzalez v. St. Margaret's House Housing Development Fund Corp.*, states: "A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product.'" 880 F.2d 1514, 1516 (2d Cir. 1989) (citation omitted) (cited Opp. at 6–7). The five elements the court goes on to describe determine when such an agreement may be unlawful. *Gonzalez*, 880 F.2d at 1516–17. But if there is no tying agreement in the first place, they simply never come into play analytically.

Plaintiffs' own cases make clear that a conditional dealing demand is required for a tying claim. For example, in *In re Google Digital Advertising Antitrust Litigation*, the plaintiffs alleged that Google "require[d] publishers to sign a combined contract" to buy both the tying and tied product. 627 F. Supp. 3d 346, 369 (S.D.N.Y. 2022) (cited Opp. at 14). In *Viamedia, Inc. v. Comcast Corp.*, Comcast allegedly expressly told the customer that it could only buy the tying product (interconnect access) on the condition that the customer also buy the tied product (ad rep services) from Comcast. 951 F.3d 429, 446 (7th Cir. 2020) (cited Opp. at 9). And in *Eastman Kodak Co. v. Image Technical Services, Inc.*, Kodak sold replacement parts to copier customers on the condition that they used them only to service their own equipment and not buy service from Kodak's competitors. 504 U.S. 451, 458, 463–64 (1992) (cited Opp. at 10).

Plaintiffs allege nothing like that here—no venue contracts with artists (unlike *Google*), no communications with artists conditioning their access to venues on using Live Nation promotional

3

services (unlike *Viamedia*), no restrictive agreements with the putative victim of the tie (unlike *Kodak*). Nothing. There is thus no "tie" to speak of, much less one that might be unlawful.

### B. The Tying Claim Does Not Survive On An "Agency" Theory

Plaintiffs seek to salvage their claim on the theory that concert promoters should be viewed as the artist's "agent/delegate." Opp. at 13. The Opposition brief goes so far as to assert that promoters function as a "real estate broker or other sales representative." *Id*. at 3. But that is not what the Amended Complaint actually alleges—nor could it, in good faith.

The Amended Complaint (accurately) describes concert promotion as a business fundamentally premised on risk-shifting. Promoters "shoulder[] the financial risk and potential upside if the show or tour underperforms/overperforms." Am. Compl. ¶ 22. They guarantee the artists a certain amount of money per show or tour, and effectively place a bet that revenues will exceed expenses, which is the only way promoters make a profit. *Id*. ¶ 23. And to these ends, promoters negotiate their own deals with venues: "Typically, venues enter into individualized agreements with *promoters* (either on a show-by-show or long-term basis), which dictate the payments *between venues and promoters* in exchange for the performance(s)." Am. Compl. ¶ 192.

That does not describe a simple agency relationship between artists and promoters with respect to the procurement of venue access. And the Amended Complaint is conspicuously silent with respect to features of the marketplace that would actually support the suggestion that promoters' contracts with venues are functionally equivalent to those a "real estate broker or other sales representative" cuts for a principal. There are no allegations (a) that promoters only approach particular venues at the artist's direction, (b) that promoters don't have preexisting deals with venues that they use to serve a broad roster of artists, (c) that promoters even tell artists what deals they have with venues as opposed to keeping those commercial terms a closely guarded secret, (d) that promoters pass through the terms they have negotiated at cost, or (e), more broadly,

4

anything indicating that promoters have no separate economic interest in the venue deals they negotiate, as a simple agent intermediary might (*e.g.*, nothing more than a commission).

Assuming there could be circumstances where a principal and an agent were rightly treated as one for purposes of the conditional dealing requirement of a tying claim, this case would not be among them, on the facts pleaded in the Amended Complaint.

### C. Live Nation's Lawful Refusal To Deal Cannot Be Used To Infer An Unlawful Tying Arrangement

There is no legal basis for treating the alleged *effects* of Live Nation's refusal to deal with rival promoters as *conduct* constituting a tying arrangement with artists, much less a tying agreement prohibited by antitrust law. The logic of Plaintiffs' argument would undermine the distinction between a *unilateral* refusal to deal and an unlawful tying *agreement*. Numerous courts have considered and rejected this stratagem. Plaintiffs' answer is the Seventh Circuit's decision in *Viamedia*, (Opp. at 9), but that case does not support their theory.

Plaintiffs make much of *Viamedia*'s observation that "a tying claim does not fail as a matter of law simply because it was implemented by refusing to deal with an intermediary." Opp. at 9 (quoting *Viamedia*, 951 F.3d at 472). That may be true but is of no moment here. The Seventh Circuit did not use that principle to create from whole cloth a tying arrangement that didn't otherwise exist. It found there was a triable issue that Comcast had made "demands (or threats)" to *Viamedia's ad-buying customers* "that they either use it for their advertising services [the tied product] or face exclusion from the Interconnects [the tying product] if they stayed with Viamedia." *Id.* at 446.[1] In that context—*i.e.,* after identifying conduct potentially constituting

---

[1] The Solicitor General, in a brief on Comcast's petition for certiorari, took the position that "the record supports a reasonable inference that [Comcast] required [Viamedia's] clients to purchase ad-rep services as a condition of regaining Interconnect access." Critically, the basis for that view

tying—the court recognized an unlawful refusal to deal as potential evidence of coercion. Here, by contrast, there are no allegations of conditional dealing "demands" or "threats" by Live Nation directed to artists. *Viamedia* is inapposite.

That said, Plaintiffs' invocation of *Viamedia* is an important reminder that "there can be no illegal tie unless *unlawful* coercion by the seller influences the buyer's choice." *Am. Mfrs. Mut. Ins. Co. v. Am. Broad. Paramount Theaters, Inc.*, 446 F.2d 1131, 1137 (2d Cir. 1971) (emphasis added); *see also It's My Party, Inc. v. Live Nation, Inc.*, 88 F. Supp. 3d 475, 493 (D. Md. 2015), *aff'd,* 811 F.3d 676 (4th Cir. 2016) (to prove tie, "plaintiffs must introduce evidence demonstrating unlawful pressure"). *Viamedia* held that an *unlawful* refusal to deal could contribute to a finding of coercion. However, as *It's My Party* squarely holds, a *lawful* refusal to deal cannot. 88 F. Supp. 3d 475. There, the district court dismissed plaintiffs' tying claims in part for lack of evidence of wrongful coercion, despite allegations that Live Nation "will not allow an artist it does not promote to perform at one of its venues." *Id.* at 497, 501. The court recognized these as "refusal to deal" allegations, found that the conduct was not unlawful because it did not meet the narrow exception of *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), and therefore would not credit it as the basis for a tying claim. *It's My Party*, 88 F. Supp. 3d at 501–03. So too here.

The distinction between the behaviors known as refusals-to-deal and tying is fundamental. Each is subject to distinct liability standards and remedies. "A challenged arrangement is not a tie-in unless the alleged foreclosure can be eliminated by instructing the defendant to disaggregate what it sells to its customers[,] . . . rather than by an order to sell something . . . to would-be rivals." Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and

---

was evidence that Comcast rolled out its strategy by *telling* each customer "that it 'would have to hire [Comcast] for ad rep services if it wanted to regain [Interconnect] access.'" Br. for United States as Amicus Curiae, *Comcast Corp., et al. v. Viamedia, Inc.*, at 20–21, attached as Ex. 3.

6

Their Application ¶ 1700j1 (5th ed. 2023); *Authenticom, Inc. v. CDK Glob., LLC,* 874 F.3d 1019, 1026 (7th Cir. 2017) (the "proper remedy" for tying is to "enjoin the tie, not to create a duty to deal"). Here, there is no tying arrangement this Court could enjoin. The only remedy this Court could order would be a mandatory injunction establishing the terms and conditions on which Live Nation must deal with rival promoters—precisely the kind of remedy that indicates a refusal to deal and which the Supreme Court has warned courts "are ill suited" to implement properly. *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407–08 (2004).

> **D.  While *It's My Party* Is Indeed Highly Relevant Precedent That Forecloses Plaintiffs' Claim, Judicial Estoppel Plays No Role Here**

Plaintiffs assert that the Court should deny this motion on judicial estoppel grounds based on arguments Live Nation made in its *It's My Party* briefing nine years ago. That assertion is in significant tension with Plaintiffs' simultaneous suggestion that *It's My Party*—a principal case in support of this motion—is distinguishable on the facts or the law. But regardless, Live Nation has not changed positions such that it is judicially estopped.

Neither side in the *It's My Party* litigation argued what Plaintiffs argue now, *i.e.*, that promoters function as mere agents of artists. As one might expect where both the plaintiff and defendant were vertically-integrated concert promoters and venue operators, there was no meaningful disagreement that "[p]romoters book artists at venues, and accordingly arrange concerts with venue owners." *It's My Party*, 88 F. Supp. at 481. In its appellate brief, Live Nation repeatedly said the same thing—that the *promoter* transacts with venues *and bears the financial risk of that transaction*. *See* ECF No. 309-2 at 3 ("Promoters . . . advis[e] on the selection of venues and secur[e] them"), 5 (artists "contact directly the promoters (and through them the venues) with whom they want to work"), 6 (discussing the "promoter's overall financial risk"). Statements that the "artist is the decision-maker" about "what type of venues feel appropriate" and

7

other artistic issues, Opp. at 11, are not inconsistent with the reality (as alleged in the Amended Complaint) that the *promoter* is the one to transact with venues and assume the financial risk for the shows. Plaintiffs' judicial estoppel argument fails.

## II.   STATE PLAINTIFFS LACK STANDING FOR FEDERAL DAMAGES CLAIMS

State Plaintiffs do not dispute that they lack standing to seek damages in connection with nearly every federal claim in this case. The *only* claim for which State Plaintiffs assert they have standing to seek damages is their first claim—specifically, the claim that Defendants monopolized an alleged "fan-facing, primary-ticketing market." *See* Opp. at 1, 16; Am. Compl. ¶ 225. But the case for antitrust standing on that claim fails as well.

Relying on *Apple v. Pepper*, 587 U.S. 273 (2019), State Plaintiffs' lead argument is that they have standing simply because consumers "transact directly with Defendants" in the purported fan-facing market. *See* Opp. at 17. That is wrong. In *Pepper*, the Court "merely h[e]ld" that the "*Illinois Brick* direct-purchaser rule"—which denies antitrust standing to indirect purchasers—did not bar "direct purchasers from Apple" "from suing Apple under the antitrust laws." 587 U.S. at 276, 281. Defendants' motion did not cite *Pepper* because Defendants do not contend that the *Illinois Brick* doctrine bars State Plaintiffs' damages claims. The decision is irrelevant here.

The point is instead that State Plaintiffs lack antitrust standing for other, independent reasons—reasons that apply irrespective of whether consumers are direct or indirect purchasers. Specifically, the State Plaintiffs must plausibly allege that their consumers' purported injury is "causally linked" to the asserted violation, and also that it is "of the type the antitrust laws were intended to prevent and that flows from that which makes [or might make] defendants' acts unlawful." *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013).

We appreciate that State Plaintiffs contend that *something* about Ticketmaster's interactions with venues raises prices down the line for consumers. But there is no discernible

8

mechanism by which the conduct complained of plausibly yields that result. A principal reason for this motion is that Defendants are not required to guess what State Plaintiffs' theory of causation actually is, particularly when their apparent intention is to reveal their thinking only in expert discovery. *Cf. Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, (2007) ("[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]"

Consider the argument that Ticketmaster makes "upfront payments to venues for primary-ticketing exclusivity," and that Ticketmaster "can pay significantly more than rivals for exclusivity." Opp. at 4. The contention seems to be that this leads to higher consumer fees because Defendants need to "recoup" the upfront payments. *Id.* That might make sense in a world where primary ticketing companies unilaterally set fees. However, as Plaintiffs admit, "venues set aspects of ticket fees," and in doing so, they "account for their own operating costs" and "ensure the fees are sufficient to cover all the payments the venues must make to intermediaries." Am. Compl. ¶ 46. But that means that the more Ticketmaster pays for exclusivity, the *less* pressure there is on the venues to raise fees to cover costs. Indeed, if Ticketmaster stopped entering exclusive contracts or decreased their upfront payments, venues would have to recover their costs in other ways, potentially resulting in *higher* consumer fees. State Plaintiffs have no answer.[2]

Confusing things further, State Plaintiffs insist that the theory of injury they are asserting is not a "pass-through" one, derivative of overcharges or other harms inflicted upstream. But if that is not their theory, then how can State Plaintiffs claim that alleged anticompetitive conduct involving Defendants' interactions with venues resulted in direct harm to consumers?

---

[2] To make matters worse, Plaintiffs now assert that a "but-for world could see *more* money going to venues" from ticketing companies. Opp. at 22. But under their own logic, that would also result in higher fees, because the ticketer would need to "recoup" those payments. *See id.* at 4.

9

One of the obstacles to understanding State Plaintiffs' theory here is that it is entirely unclear whether they are claiming that venues are victims or accomplices in the allegedly higher fees. The alleged anticompetitive conduct implies they are victims, *e.g.*, State Plaintiffs assert that Defendants engage in "threats and retaliation to prevent venues from working with competing ticketing companies, which could lower ticket prices and fees." Opp. at 5. But elsewhere Plaintiffs give the impression that venues are willing participants in a scheme to "fund Defendants' exclusive contracts, restarting ad infinitum the anticompetitive cycle." *Id.* at 19. These allegations imply very different—in fact, wholly contradictory—chains of causation leading to downstream consumer harm. The "victim" scenario is particularly mysterious, with a causal chain that seems to wind through a but-for world in which consumers would go to more concerts at non-Ticketmaster venues because more artists would play there. But why would bands play more shows at non-Ticketmaster venues? Is the suggestion really that a reduction in Defendants' take of fees charged to consumers by venues would change tour-routing—and not just on a one-off basis, but with a material effect on the industry? That doesn't make sense, and there are certainly no facts alleged in the Amended Complaint to support such a fantastical suggestion.

That State Plaintiffs' opposition raises more questions than it answers only underscores their failure to establish any logical link between the alleged conduct and higher ticketing fees. That fundamental failure dooms their attempt to demonstrate antitrust standing—or even basic proximate causation. *See Gatt*, 711 F.3d at 76. Their federal damages claims must be dismissed.

## **CONCLUSION**

The motion should be granted and these claims should be dismissed.

Dated: October 30, 2024

| | |
|---|---|
| LATHAM & WATKINS LLP | CRAVATH, SWAINE & MOORE LLP |
| *[signature]* | *[signature]* |
| Andrew M. Gass (admitted *pro hac vice*) | David R. Marriott |
| Alfred C. Pfeiffer (admitted *pro hac vice*) | *Co-Lead Trial Counsel* |
| *Co-Lead Trial Counsel* | Lauren A. Moskowitz |
| Timothy L. O'Mara (admitted *pro hac vice*) | Jesse M. Weiss |
| Jennifer L. Giordano | Nicole M. Peles |
| Kelly S. Fayne (admitted *pro hac vice*) | |
| Lindsey S. Champlin (admitted *pro hac vice*) | Two Manhattan West |
| Robin L. Gushman (admitted *pro hac vice*) | 375 Ninth Avenue |
| | New York, NY 10001 |
| 505 Montgomery Street, Suite 2000 | (212) 474-1000 |
| San Francisco, CA 94111 | |
| (415) 391-0600 | dmarriott@cravath.com |
| | lmoskowitz@cravath.com |
| 555 Eleventh Street, NW, Suite 1000 | jweiss@cravath.com |
| Washington, D.C. 20004 | npeles@cravath.com |
| (202) 637-2200 | |
| | *Attorneys for Defendants Live Nation* |
| Andrew.Gass@lw.com | *Entertainment, Inc. and Ticketmaster L.L.C.* |
| Al.Pfeiffer@lw.com | |
| Tim.O'Mara@lw.com | |
| Jennifer.Giordano@lw.com | |
| Kelly.Fayne@lw.com | |
| Lindsey.Champlin@lw.com | |
| Robin.Gushman@lw.com | |

*Attorneys for Defendants Live Nation Entertainment, Inc. and Ticketmaster L.L.C.*