# EXHIBIT 3

No. 20-319

# In the Supreme Court of the United States

———————

COMCAST CORPORATION, ET AL., PETITIONERS

*v.*

VIAMEDIA, INC.

———————

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT*

———————

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE**

———————

ELIZABETH B. PRELOGAR
  *Acting Solicitor General*
  *Counsel of Record*
RICHARD A. POWERS
  *Acting Assistant Attorney*
  *General*
MALCOLM L. STEWART
  *Deputy Solicitor General*
SOPAN JOSHI
  *Assistant to the Solicitor*
  *General*
KATHLEEN S. O'NEILL
  *Senior Director of Litigation*
DANIEL E. HAAR
NICKOLAI G. LEVIN
MARY HELEN WIMBERLY
  *Attorneys*

  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *SupremeCtBriefs@usdoj.gov*
  *(202) 514-2217*

**QUESTIONS PRESENTED**

1. Whether respondent plausibly alleged that petitioners' unilateral refusal to deal violated Section 2 of the Sherman Act, 15 U.S.C. 2.

2. Whether petitioners were entitled to summary judgment on respondent's tying claim, notwithstanding any disputed issue of material fact as to the usual elements of an unlawful tying arrangement, on the ground that respondent's evidence of unlawful tying included proof that petitioners had refused to deal with respondent.

(I)

# TABLE OF CONTENTS

Page

Statement ........................................................................... 1
Discussion ......................................................................... 7
    A.  The court of appeals' reinstatement of respondent's
       refusal-to-deal claim does not warrant further
       review ........................................................................ 8
    B.  The court of appeals' reinstatement of respondent's
       tying claim does not warrant further review................ 20
Conclusion ....................................................................... 24

# TABLE OF AUTHORITIES

Cases:

*Aerotec International, Inc.* v. *Honeywell
   International, Inc.*, 836 F.3d 1171 (9th Cir. 2016) .......... 23
*Aspen Skiing Co.* v. *Aspen Highlands Skiing Corp.*,
   472 U.S. 585 (1985)............................................ 5, 8, 9, 10, 13
*Eastman Kodak Co.* v. *Image Technical Services,
   Inc.*, 504 U.S. 451 (1992)................................................ 21, 22
*Jefferson Parish Hospital District No. 2* v.
   *Hyde*, 466 U.S. 2 (1984) .................................................. 5, 20
*Novell, Inc.* v. *Microsoft Corp.*, 731 F.3d 1064
   (10th Cir. 2013), cert. denied, 572 U.S. 1096 (2014)......... 19
*Pacific Bell Telephone Co.* v. *linkLine
   Communications, Inc.*, 555 U.S. 438 (2009) ............... 9, 22
*Service & Training, Inc.* v. *Data General Corp.*,
   963 F.2d 680 (4th Cir. 1992).............................................. 23
*United States* v. *Grinnell Corp.*, 384 U.S. 563 (1966) .......... 4
*Verizon Communications Inc.* v. *Law Offices
   of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) ....... *passim*

Statutes:

Sherman Act, 15 U.S.C. 2 ............................................ 4, 8, 15

(III)

IV

Statute—Continued:                                    Page

   47 U.S.C. 522(13) ..................................................... 2

Miscellaneous:

Gregory J. Werden, *Identifying Exclusionary*
   *Conduct Under Section 2:  The "No Economic*
   *Sense" Test*, 73 Antitrust L.J. 413 (2006) ......................... 18

# In the Supreme Court of the United States

————

No. 20-319

COMCAST CORPORATION, ET AL., PETITIONERS

*v.*

VIAMEDIA, INC.

————

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT*

————

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE**

————

This brief is submitted in response to the Court's order inviting the Acting Solicitor General to express the views of the United States. In the view of the United States, the petition for a writ of certiorari should be denied.

**STATEMENT**

Respondent sued petitioners in the United States District Court for the Northern District of Illinois, alleging violations of federal antitrust laws and state laws. The district court granted petitioners' motion to dismiss certain claims, Pet. App. 145a-191a, 192a-206a, and granted summary judgment to petitioners on the remaining claims, *id.* at 207a-275a. The court of appeals reversed. *Id.* at 1a-144a.

1. Petitioners are Comcast Corp. and one of its wholly owned subsidiaries. For simplicity, this brief will treat them as a single petitioner. Petitioner is a

(1)

2

technology and entertainment company that offers a variety of goods and services, including cable television. Pet. App. 284a.  In providing cable-television services, it acts as a multichannel video programming distributor (MVPD), generally defined as an entity that "makes available for purchase, by subscribers or customers, multiple channels of video programming." 47 U.S.C. 522(13); see Pet. App. 9a.

Contracts between MVPDs and television networks typically authorize the MVPD to sell a few minutes per hour of advertising time—called "spot advertising"—on each network that it carries. See Pet. App. 147a. Unlike advertisements that the networks themselves sell and air, which appear to everyone watching a given program on that network, an MVPD's spot advertisements ordinarily appear only to its own subscribers.  See *id.* at 147a-148a.  Among other benefits, spot advertising allows advertisements to be geographically targeted to a particular designated marketing area, so that "during a national broadcast like the World Series, for example, a Chicago-area car dealership can advertise only in the Chicago [area] while a Cleveland restaurant can simultaneously advertise exclusively in the Cleveland [area]." *Id.* at 148a.

Often several MVPDs operate in a given area.  Pet. App. 149a.  An advertiser wishing to reach everyone watching a certain program in (for example) the Chicago area therefore must separately negotiate with each Chicago-area MVPD to run a spot advertisement during that program.  *Ibid.*  To reduce transaction costs, MVPDs in each region have cooperated to develop an "Interconnect": a single clearinghouse for each region to sell advertising spots that all of the participating MVPDs will show to their respective subscribers.  *Ibid.*

3

The largest MVPD in the region often serves as Inter-connect manager and controls the regional Interconnect. *Id.* at 150a. Petitioner performs that function in many of the largest markets, including Chicago and Detroit. *Ibid.*

"Organizing, marketing, and selling [s]pot [c]able [a]dvertising on behalf of MVPDs * * * takes a substantial amount of specialized knowledge, infrastructure, resources, and technical ability." Pet. App. 300a. Accordingly, "[s]ome of the largest MVPDs—such as [petitioner]—devote entire subsidiary organizations" to the task. *Ibid.* Smaller MVPDs, however, "do not have the resources to invest in the highly-specialized infrastructure, equipment, staff, and expertise necessary to run their own in-house." *Ibid.* They instead obtain advertising-representation (ad-rep) services by contracting with larger MVPDs or independent providers. See *id.* at 300a, 302a.

Both petitioner and respondent provide ad-rep services, and they compete with each other for ad-rep contracts with various MVPDs. Pet. App. 152a-153a. Smaller MVPDs hire respondent to help them sell their available spot-advertising slots, both directly to potential advertisers and through the Interconnect clearinghouse. *Id.* at 152a, 286a, 300a-301a. One reason they prefer respondent is that (unlike petitioner) it is not a competitor MVPD. See *id.* at 32a, 302a. Respondent alleges that, starting in 2012, petitioner in its role as Interconnect manager denied respondent access to the Chicago- and Detroit-area Interconnects, thereby preventing respondent's clients from selling spot-advertising slots through those clearinghouses. *Id.* at 154a-155a,

4

308a, 311a-312a.  Respondent alleges that petitioner re-
fused to reinstate Interconnect access except under
commercially unreasonable terms.  *Id.* at 155a, 311a.

Petitioner then allegedly told respondent's clients
that they could regain access to the Interconnects if
they ended their respective relationships with respond-
ent and instead purchased ad-rep services from peti-
tioner.  Pet. App. 155a-156a, 311a-312a.  Respondent al-
leges that a "similar course of events unfolded" in other
markets where petitioner had market power.  *Id.* at
156a, 313a.  Upon the termination of their contracts to
obtain ad-rep services from respondent, respondent's
clients in Chicago and Detroit ended their respective re-
lationships with respondent and purchased ad-rep ser-
vices from petitioner.  *Id.* at 156a, 312a-313a.  Respond-
ent alleges that petitioner, in its role as Interconnect
manager, forwent millions of dollars in revenue by
denying respondent's clients access to the Intercon-
nects during the periods those clients remained under
contract with respondent.  *Id.* at 320a-322a.

2.  a.  Respondent filed suit, alleging that petitioner
had monopolized ad-rep services markets in several
metropolitan areas, in violation of Section 2 of the Sher-
man Act, 15 U.S.C. 2.  See Pet. App. 36a-37a; *id.* at 328a-
331a.  A monopolization claim under Section 2 "has two
elements:  (1) the possession of monopoly power in the
relevant market and (2) the willful acquisition or
maintenance of that power."  *United States* v. *Grinnell
Corp.*, 384 U.S. 563, 570-571 (1966).  Accordingly, "the
possession of monopoly power will not be found unlaw-
ful unless it is accompanied by an element of anticom-
petitive *conduct*."  *Verizon Communications Inc.* v.
*Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407
(2004) (*Trinko*).  Respondent alleged that the practices

5

described above constituted both an unlawful refusal to deal and an unlawful tying arrangement.

This Court's decision in *Aspen Skiing Co.* v. *Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), is "[t]he leading case for § 2 liability based on refusal to cooperate with a rival." *Trinko*, 540 U.S. at 408. There, the Court upheld a jury verdict against a ski resort that had refused to reinstate a joint ticket program with its smaller competitor, even when the competitor offered to pay the full retail price for the larger resort's tickets. *Aspen Skiing*, 472 U.S. at 610-611.

"[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish Hospital District No. 2* v. *Hyde*, 466 U.S. 2, 12 (1984). Here, respondent alleged that petitioner had improperly exploited its control over Interconnects to force respondent's clients to purchase a separate product—ad-rep services—that those customers would have preferred to purchase from respondent. Pet. App. 328a-331a.

b. The district court dismissed the refusal-to-deal claim, first with leave to amend, Pet. App. 145a-191a, and later with prejudice, *id.* at 192a-206a. The court subsequently granted summary judgment to petitioner on the tying claim. *Id.* at 207a-275a.

The district court dismissed the refusal-to-deal claim on the ground that respondent had not "adequately alleged" that petitioner's refusal to deal "was irrational but for its anticompetitive effect." Pet. App. 205a. The court stated that petitioner's "refusing to deal with [respondent] offers potentially improved efficiency." *Id.* at

6

189a.  The court explained that, "[b]efore [petitioner's] refusal to deal, MVPDs gave [respondent] control of their [spot-advertising slots] and then [respondent] gave control over a portion of those [slots] to the Interconnect.   After [petitioner's] refusal to deal,  * * * MVPDs simply deal with [petitioner] directly."  *Id.* at 188a-189a.  The court concluded that "[t]his type of vertical integration or elimination of a middleman  * * * represent[s] a prototypical valid business purpose."  *Id.* at 203a.

In granting summary judgment to petitioner on the tying claim, the district court found "[n]o evidence show[ing] that [petitioner] told MVPDs, expressly or impliedly, that they could only purchase Interconnect Services on the condition that they also purchase Ad Rep Services."  Pet. App. 240a; see *id.* at 242a.  The court also found that respondent's customers could "have received an interconnect-only deal if they had requested one—that is, that they could have received the tying product without the tied product—but the record indisputably shows they did not want that service alone."  *Id.* at 248a.

3.  The court of appeals reversed.  Pet. App. 1a-144a.

a.  The court of appeals reversed the dismissal of the refusal-to-deal claim, see Pet. App. 45a-69a, concluding that respondent's claim "closely tracks *Aspen Skiing*" by alleging "a prior course of voluntary conduct, sacrifice of short-term profits, and refusal to sell to rivals on the same terms as other potential buyers," *id.* at 62a-63a.  The court further held that respondent had plausibly pleaded that petitioner's "conduct was irrational but for its anticompetitive effect."  *Id.* at 63a.  The court rejected petitioner's argument that its vertical integration foreclosed liability for a refusal to deal, explaining that

7

"[n]o one objects to a vertically integrated [petitioner] offering both Interconnect services and ad rep services," *id.* at 68a, but that "[t]aking control of and exploiting control of a previously cooperative mechanism [*i.e.*, an Interconnect] is *not* vertical integration," *id.* at 69a.

The court of appeals also reversed the grant of summary judgment to petitioner on the tying claim. Pet. App. 69a-86a. Citing emails and testimony from respondent's clients and petitioner's own employees, the court found "[a]mple evidence show[ing] that [petitioner] conditioned MVPDs' access to the Interconnects on hiring [petitioner] as their ad rep." *Id.* at 77a. The court further explained that, to the extent the evidence was contested, "[respondent] is entitled to the benefit of reasonable inferences and interpretations in its favor." *Ibid.* The court also rejected petitioner's argument that respondent's tying claim "fail[ed] as a matter of law simply because it was implemented by refusing to deal with an intermediary." *Id.* at 81a.

b. Judge Brennan concurred in part and dissented in part. Pet. App. 109a-144a. He agreed with the majority's disposition of the refusal-to-deal claim, on the ground that respondent had plausibly alleged that petitioner's refusal to deal was "irrational but for its anticompetitive effect." *Id.* at 112a; see *id.* at 111a-116a. Judge Brennan dissented from the majority's ruling on the tying claim. *Id.* at 128a-144a. In his view, evidence that petitioner had conditioned Interconnect access on purchase of its ad-rep services "is simply absent from the undisputed facts." *Id.* at 133a.

### DISCUSSION

Petitioner challenges the court of appeals' rulings on respondent's refusal-to-deal and tying claims. Neither

8

question presented warrants further review. The court correctly held that respondent had plausibly alleged an unlawful refusal to deal under this Court's decisions in *Verizon Communications Inc.* v. *Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) (*Trinko*), and *Aspen Skiing Co.* v. *Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985). The court of appeals' factbound determination that there remained a genuine dispute of material fact on respondent's tying claim is likewise correct and does not warrant this Court's review.

### A. The Court Of Appeals' Reinstatement Of Respondent's Refusal-To-Deal Claim Does Not Warrant Further Review

The court of appeals correctly held that respondent had plausibly pleaded a refusal-to-deal claim. In *Trinko*, *supra*, this Court recognized the continuing vitality of *Aspen Skiing*, where the Court held that a refusal to deal with a rival may in some circumstances violate Section 2. The court of appeals correctly held that, taking respondent's allegations as true, the circumstances on which the *Aspen Skiing* Court based its decision are equally present here. Petitioner challenges the court of appeals' refusal to adopt the "no economic sense" test applied by the Tenth Circuit as the exclusive basis for Section 2 liability in refusal-to-deal cases. But the court applied the no-economic-sense test and held that respondent's allegations satisfy it. That factbound ruling does not warrant this Court's review, and it would provide an adequate ground for the court of appeals' judgment even if this Court adopted that test as the exclusive basis for refusal-to-deal liability. Further review is not warranted.

1. "As a general rule, businesses are free to choose the parties with whom they will deal, as well as the

9

prices, terms, and conditions of that dealing." *Pacific Bell Telephone Co.* v. *linkLine Communications, Inc.*, 555 U.S. 438, 448 (2009). That freedom generally extends to businesses with monopoly power. *Trinko*, 540 U.S. at 408. Imposing a broad duty on monopolists to deal with their rivals would be "in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in * * * economically beneficial facilities." *Id.* at 407-408. It also could "facilitate the supreme evil of antitrust: collusion." *Id.* at 408.

This Court has explained, however, that "the high value that [it has] placed on the right to refuse to deal with other firms does not mean that the right is unqualified." *Trinko*, 540 U.S. at 408 (brackets and citation omitted). Refusing to cooperate with rivals "as a purposeful means of monopolizing interstate commerce is prohibited by the Sherman Act." *Aspen Skiing*, 472 U.S. at 602 (citation omitted). While the Court "ha[s] been very cautious in recognizing such exceptions" to the general right to refuse to deal, it has held that "[u]nder certain circumstances, a refusal to cooperate with rivals can constitute anticompetitive conduct and violate § 2." *Trinko*, 540 U.S. at 408.

In *Aspen Skiing*, the defendant (which owned three of the four mountain areas in the Aspen ski area) and the plaintiff (which owned the fourth mountain area) had cooperated for years in the issuance of a joint ski ticket. 472 U.S. at 587-591. After repeatedly demanding an increased share of the profits, the defendant terminated its participation in the joint ticket, even refusing to sell its own ski tickets to the plaintiff at retail prices. *Id.* at 592-594. This Court upheld a jury verdict against the defendant, explaining that a reasonable

10

factfinder could have inferred from the evidence at trial that the defendant "was not motivated by efficiency concerns," *id.* at 610, but instead was "more interested in reducing competition in the Aspen market over the long run by harming its smaller competitor," *id.* at 608.

In *Trinko*, this Court described *Aspen Skiing* as "at or near the outer boundary of § 2 liability," but affirmed the continuing vitality of that decision. 540 U.S. at 409. The plaintiff in *Trinko* alleged that a local telephone company had violated the antitrust laws by refusing to share its network with its rivals, in violation of its obligations under a telecommunications statute. *Id.* at 405. The *Trinko* Court did not adopt a universal standard governing all refusal-to-deal claims. Instead, it framed the "question before [it]" as "whether the allegations of [the plaintiff's] complaint fit within existing exceptions" to the general right to refuse to deal "or provide[d] a basis, under traditional antitrust principles, for recognizing a new one." *Id.* at 408.

In explaining why "[t]he refusal to deal [in *Trinko*] d[id] not fit within the limited exception recognized in *Aspen Skiing*," 540 U.S. at 409, the *Trinko* Court emphasized three distinctions between the circumstances before it and those involved in the prior case. First, the Court observed that "[t]he complaint does not allege that [the phone-company defendant] voluntarily engaged in a course of dealing with its rivals, or would ever have done so absent statutory compulsion." *Ibid.* For that reason, the Court explained, the *Trinko* "defendant's prior conduct shed[] no light upon" whether the defendant's "refusal to deal" was motivated "by competitive zeal" or "by anticompetitive malice." *Ibid.* In *Aspen Skiing*, by contrast, "[t]he unilateral termination of a voluntary (*and thus presumably profitable*)

11

course of dealing suggested a willingness to forsake short-term profits to achieve an anticompetitive end." *Ibid.*

Second, the *Trinko* Court noted the "difference in pricing behavior" between the two cases. 540 U.S. at 409. The *Aspen Skiing* defendant had "turned down a proposal to sell at its own retail price, suggesting a calculation that its future monopoly retail price would be higher." *Ibid.* The Court observed that "the [*Aspen Skiing*] defendant's unwillingness to renew the ticket *even if compensated at retail price* revealed a distinctly anticompetitive bent." *Ibid.* By contrast, the Court explained that the phone company's "reluctance" to share its network with rivals at statutorily mandated rates "tells us nothing about dreams of monopoly." *Ibid.*

Third, the Court observed that the regulatory context in which the refusal to deal had occurred made *Trinko* "different from *Aspen Skiing* in a more fundamental way." 540 U.S. at 409-410. In *Aspen Skiing*, "what the defendant refused to provide to its competitor was a product [lift tickets] that it already sold at retail." *Id.* at 410. In *Trinko*, by contrast, the "services allegedly withheld are not otherwise marketed or available to the public," but instead were "created" by and "brought out on compulsion of" the telecommunications statute, to be "offered not to consumers but to rivals." *Ibid.*

The Court in *Trinko* also concluded that "traditional antitrust principles" did not "justify adding the present case to the few existing exceptions from the proposition that there is no duty to aid competitors." 540 U.S. at 411. The Court explained that "[o]ne factor of particular importance is the existence of a regulatory structure designed to deter and remedy anticompetitive harm."

12

*Id.* at 412.  The *Trinko* Court concluded that the comprehensive telecommunications regulatory regime "was an effective steward of the antitrust function," *id.* at 413, and that "[a]n antitrust court is unlikely to be an effective day-to-day enforcer of the[] detailed sharing obligations" imposed by that regime, *id.* at 415.  The Court accordingly held that the plaintiff's complaint "fail[ed] to state a claim under the Sherman Act." *Id.* at 416.

2. The court of appeals correctly applied *Aspen Skiing* and *Trinko* to hold that respondent had plausibly alleged an unlawful refusal to deal.

a. Respondent's allegations "fit within the limited exception recognized in *Aspen Skiing*," *Trinko*, 540 U.S. at 409, even under the narrowest understanding of that exception, because respondent has plausibly alleged all three of the circumstances in *Aspen Skiing* that the *Trinko* Court later identified as significant. First, respondent has alleged that the parties previously engaged in a voluntary and profitable course of dealing.  *E.g.*, Pet. App. 285a, 307a-308a.  Second, respondent has alleged that it is willing to pay the market prices that petitioner otherwise would charge for Interconnect access.  *E.g.*, *id.* at 320a.  Respondent has further alleged (*id.* at 320a-322a) that petitioner deliberately forwent substantial short-term profits, thus "suggesting a calculation that [petitioner's] future monopoly retail price would be higher" once it forced respondent to leave the ad-rep services market.  *Trinko*, 540 U.S. at 409.  Third, respondent has alleged that, in markets where petitioner is dominant, petitioner generally offers Interconnect access to all MVPDs *except* respondent's clients.  *E.g.*, Pet. App. 322a.  And petitioner does

13

not contend that Interconnect access and ad-rep services were recently created or compelled by a comprehensive regulatory regime. Respondent's factual allegations, taken as true, unambiguously bring this case within the contours of *Aspen Skiing*.

b. Petitioner identifies four purported distinctions between this case and *Aspen Skiing*. None is availing.

i. Petitioner suggests that "the monopolist ski mountain owner [in *Aspen Skiing*] 'failed to offer *any* efficiency justification *whatever*,'" Pet. 11 (brackets and citation omitted), whereas respondent's operative complaint acknowledges a potential "'efficiency justification'" from "disintermediation," Pet. 13 (citation omitted). But the *Aspen Skiing* defendant *did* offer several justifications for abandoning the joint ticket: "usage could not be properly monitored," the tickets "were administratively cumbersome," the surveys used to allocate revenue "had been disruptive" and "inaccurate," and the defendant did not want to be associated with its rival's "inferior skiing services." 472 U.S. at 609-610. The defendant simply "did not persuade the jury that its conduct was justified by any normal business purpose." *Id.* at 608; see *ibid.* ("The jury may well have concluded that [the defendant] elected to forgo * * * short-run benefits because it was more interested in reducing competition in the Aspen market over the long run by harming its smaller competitor.").

ii. Petitioner suggests that its desire to vertically integrate, and to obviate the need for reliance on intermediaries by dealing directly with respondent's clients, reflects a "prototypical valid business purpose" that should, as a matter of law, preclude refusal-to-deal liability. Pet. 13 (citation omitted); see Pet. 13-14. But

14

petitioner, which functions as an MVPD, an Interconnect manager, and an ad-rep services provider, already "*is* vertically integrated and has been at all relevant times. No one objects to a vertically integrated [petitioner] offering both Interconnect services and ad rep services." Pet. App. 68a. Respondent has plausibly alleged that petitioner's decision to exclude respondent's clients from Interconnects was not a step towards further vertical integration, but rather an exclusionary act based on "exploiting its control over the cooperative Interconnects." *Id.* at 66a.

iii. Petitioner contends that the *Aspen Skiing* defendant "stopped offering multi-mountain passes altogether" and "behaved differently in other markets." Pet. 14-15. But respondent similarly alleges that petitioner stopped offering Interconnect-only access to respondent's clients in certain markets. And the court of appeals explained that respondent has alleged that petitioner behaved differently in other regions "where it did face competition." Pet. App. 63a; see *id.* at 322a-323a.

iv. Petitioner attaches significance to the difference between "'ski mountain passes'" and the "highly complex, evolving industry" here. Pet. 15 (brackets and citation omitted). But *Trinko* likewise involved the complex and evolving telecommunications industry, yet this Court did not treat those particular characteristics as relevant to determining whether the allegations fell within the *Aspen Skiing* exception. See *Trinko*, 540 U.S. at 409-410.

3. Petitioner further suggests (Pet. 24-26) that the court of appeals erred in refusing to adopt the "no economic sense" test. But the court did apply that test, and correctly found that respondent had plausibly alleged

15

that petitioner's conduct made no economic sense but for its harmful effects on competition. Pet. App. 63a.

a. The United States' amicus brief in *Trinko* argued that "only 'exclusionary' or 'predatory' conduct is proscribed by Section 2," and that "in cases asserting a duty to assist rivals, conduct is exclusionary only if it would not make economic sense but for the tendency to impair competition." Gov't Amicus Br. at 14-15, *Trinko*, *supra* (No. 02-682) (capitalization, citation, and emphasis omitted). The government's brief in *Trinko* characterized *Aspen Skiing* as a case in which the defendant's refusal to deal with its rival was "condemned [under Section 2] because it made no economic sense but for its anticompetitive consequences." *Id.* at 20. In the present case, the government's amicus brief in the court of appeals endorsed (at 11-16) the no-economic-sense test as the proper standard for analyzing refusal-to-deal claims brought under Section 2, while taking no position on the proper application of that test to the allegations in respondent's complaint.*

As all three members of the panel below agreed, respondent's allegations satisfy the no-economic-sense test. The panel majority explained that, in a section of respondent's operative complaint "entitled '[Petitioner's] Refusal to Deal with [Respondent] is Irrational But for its Anticompetitive Effects,'" Pet. App. 63a (citation omitted),

> [respondent] walked through the long-term course of dealing prior to [petitioner's] conduct; the subsequent

---

* We are unaware of any appellate brief for the government filed between 2005 (the year after *Trinko* was decided) and 2018 (when the government filed its amicus brief in the court of appeals in this case) that has addressed the no-economic-sense test for a refusal-to-deal claim under Section 2.

16

degradation of the value of the cooperative Intercon-
nects; the financial losses suffered by [petitioner] it-
self, as well as by [respondent] and [petitioner's]
competitor MVPDs; [petitioner's] willingness to of-
fer Interconnect-only access in other markets where
it did face competition; and the fact that "there are
no procompetitive justifications" to be achieved by
the conduct given that there were "no material ad-
ministrability problems in allowing [respondent] to
participate in Interconnects" on behalf of its MVPD
customers.

*Ibid.* (brackets and citation omitted); see *id.* at 319a-
324a.  Those factual allegations, taken as true, suggest
that petitioner's decision to incur substantial short-
term "financial losses" by excluding respondent's cli-
ents from the Interconnects, *id.* at 63a, and the result-
ing "degradation of the value of the cooperative Inter-
connects" themselves, *ibid.*, would make no economic
sense except insofar as respondent's exclusion from the
ad-rep services markets could enable petitioner to ob-
tain increased ad-rep services revenues, both by acquir-
ing additional ad-rep clients and by charging monopoly
prices for those services.

To be sure, a monopolist might have legitimate pro-
competitive reasons for sacrificing short-term profits,
such as to prevent harm to its customers or to develop
an innovative replacement product.  See Gov't C.A.
Amicus Br. 14-15 & n.4.  A monopolist might legiti-
mately pursue those benefits by withdrawing from a
prior course of dealing with a rival, or by declining to
enter into such an arrangement in the first instance.
But respondent has plausibly alleged that no such pro-
competitive aims explain petitioner's conduct here.
Among other things, "[petitioner's] willingness to offer

17

Interconnect-only access in other markets where it did face competition," Pet. App. 63a, supports an inference that petitioner's refusal to do so here was driven by anticompetitive aims, and that petitioner hoped to recoup its short-term losses in Interconnect revenue by obtaining increased revenues for ad-rep services once respondent was driven out of that market.

b. Petitioner principally takes issue (Pet. 10, 12-14, 21-25) with the court of appeals' statements that, in evaluating potential procompetitive justifications under the no-economic-sense test, a court should "balanc[e] anticompetitive effects against hypothesized justifications," Pet. App. 57a, or "balance gains to the monopolist against losses to consumers," *id.* at 60a n.13. The precise import of those statements, read in isolation, is unclear. Taken as a whole, however, the opinion below unambiguously holds that the allegations in respondent's complaint are sufficient to withstand a motion to dismiss even on the narrowest understanding of the criteria for refusal-to-deal liability articulated in *Aspen Skiing* and *Trinko*.

As the government explained at oral argument below, the term "balancing" can be used in this context to refer to the offsetting of any profits to the defendant both by the short-term losses it incurs, and by the portion of those profits that are attributable to anticompetitive (rather than efficiency) gains. See C.A. Oral Argument at 26:14-27:26 (Feb. 7, 2019). In other words, the no-economic-sense test evaluates whether the conduct is "profitable apart from any reduction in competition." *Id.* at 26:16-26:22. If particular conduct is "profitable" in *that* sense, it cannot be declared unlawful under the no-economic-sense test. See Pet. 24-25. Consistent with that understanding, the court of appeals explained

18

that conduct can be condemned under the no-economic-sense test only "if it is expected to yield a negative pay-off, net of the costs of undertaking the conduct, and not including any payoff from eliminating competition." Pet. App. 59a (quoting Gregory J. Werden, *Identifying Exclusionary Conduct Under Section 2: The "No Economic Sense" Test*, 73 Antitrust L.J. 413, 416 (2006)) (emphasis omitted). That language reflects the understanding that if anticipated gains from eliminating competition are ignored, conduct that is expected to produce less in revenue than the costs it entails would not be economically rational.

The court of appeals also suggested (without deciding) that, even when a particular refusal to deal is profitable in the sense described above, it may still be appropriate for an antitrust court to "balance gains to the monopolist against losses to consumers, rivals, or others." Pet. App. 60a n.13. Under that approach, particular conduct may be unlawful if it "benefit[s] the defendant very slightly while doing considerable harm to the rest of the economy." *Ibid*. The court made clear, however, that the proper disposition of respondent's appeal did not turn on the propriety of that form of balancing. See *id*. at 63a ("Even if an allegation that a defendant's conduct was irrational but for its anticompetitive effect were necessary, [respondent] has plausibly alleged just that."); *ibid*. ("[T]his case is easier and does not require precise delineation of the requirements of a refusal-to-deal pleading."). The court's discussion of "balancing" therefore provides no basis for this Court's review, especially because that discussion has no bearing on the court of appeals' conclusion that respondent's refusal-to-deal allegations are sufficient because they

19

closely track the relevant circumstances of *Aspen Skiing*.

4. Petitioner seeks review on the question "whether the Seventh Circuit erred in holding that a refusal-to-deal claim under § 2 of the Sherman Act may proceed *despite the presence of valid business justifications for the refusal*." Pet. i (first question presented) (emphasis added). But this Court would have no occasion to decide that question unless it first reviewed and reversed the court of appeals' determination that respondent has adequately alleged the absence of any such valid business justification here. Petitioner offers no reason to conclude that review of that factbound antecedent issue would be a sound use of this Court's resources, particularly given the close correspondence between the challenged practices here and those that were condemned in *Aspen Skiing*.

5. Petitioner does not identify (cf. Pet. 16-21) any case in which another circuit has refused to find a cognizable refusal-to-deal claim when the plaintiff had alleged the three features from *Aspen Skiing* that this Court identified as missing from the complaint in *Trinko*. Nor does petitioner identify any case in which another circuit has found that the no-economic-sense test was satisfied yet held that a refusal-to-deal claim could not go forward. Petitioner relies heavily (*e.g.*, Pet. 17) on the Tenth Circuit's decision in *Novell, Inc.* v. *Microsoft Corp.*, 731 F.3d 1064 (2013) (Gorsuch, J.), cert. denied, 572 U.S. 1096 (2014), and particularly on the court's statement that a monopolist's refusal to deal with its rival can violate Section 2 only if it is "irrational but for its anticompetitive effect," *id.* at 1075. But while the court below declined to adopt the no-economic-sense test as the exclusive standard for evaluating a

20

refusal-to-deal claim, see Pet. App. 60a n.13, it correctly applied that test and found that respondent's allegations satisfy it, see *id.* at 63a. There is consequently no reason to believe that any other circuit would have reached a different outcome here.

### B. The Court Of Appeals' Reinstatement Of Respondent's Tying Claim Does Not Warrant Further Review

The court of appeals correctly applied settled legal principles to hold that respondent had created a triable issue of fact about whether petitioner had unlawfully conditioned Interconnect access on MVPDs' purchases of petitioner's ad-rep services. That factbound holding does not warrant further review.

1. The court of appeals analyzed respondent's tying claim under the correct legal standard, evaluating whether (1) cooperative Interconnects and ad-rep services are separate products or services; (2) petitioner has market power over Interconnect access; and (3) petitioner exploited its control over Interconnect access to induce respondent's clients to purchase ad-rep services from petitioner. Pet. App. 71a-72a; see *Jefferson Parish Hospital District No. 2* v. *Hyde*, 466 U.S. 2, 12 (1984). Petitioner does not dispute that respondent's tying claim satisfies the first two elements of that standard.

On the third element, petitioner asserts that "[a]t most, 'the relevant evidence shows [petitioner's] desire to solicit [respondent's clients'] business directly,' 'consistent with' its lawful goal of 'increasing efficiency by internalizing services.'" Pet. 26-27 (brackets and citation omitted). Other record evidence, however, supports a contrary conclusion. Internal emails from one of respondent's clients expressed the client's understanding that it "would have to hire [petitioner] for ad

21

rep services if it wanted to regain [Interconnect] access." Pet. App. 77a. Another client testified to the FCC that "[petitioner] will only allow [it] to join the interconnects if [it] employs [petitioner]" as its advertising representative. *Ibid.* One of petitioner's employees admitted that any MVPD in the Chicago or Detroit region "has to" purchase ad-rep services from petitioner in order to gain Interconnect access. *Ibid.* The court of appeals correctly held that, viewed in the light most favorable to respondent, the record supports a reasonable inference that petitioner required respondent's clients to purchase ad-rep services as a condition of regaining Interconnect access.

Petitioner contends that respondent's tying claim is not triable *regardless* of any material factual dispute over the usual elements of such a claim, because the tying claim here is "based on the same conduct" as the refusal-to-deal claim. Pet. 29. Petitioner argues that allowing such a "'derivative'" claim to proceed would amount to an "end-run around *Trinko*." Pet. 26 (citation omitted). That argument is unsound.

This Court rejected a similar argument in *Eastman Kodak Co.* v. *Image Technical Services, Inc.*, 504 U.S. 451 (1992), where the plaintiffs alleged "that Kodak had unlawfully tied the sale of service for Kodak machines to the sale of parts." *Id.* at 459. The Court concluded that the plaintiffs "ha[d] presented sufficient evidence of a tie between service and parts" because the "record indicate[d] that Kodak would sell parts to third parties only if they agreed not to buy service from" other suppliers. *Id.* at 463. Kodak argued that the plaintiffs' tying claim was foreclosed because Kodak's "practice [was] only a unilateral refusal to deal." *Id.* at 463 n.8. In rejecting that contention, the Court explained that,

22

even "[a]ssuming, *arguendo*, that Kodak's" practice could be "characterized as a unilateral refusal to deal, its alleged sale of parts to third parties on condition that they buy service from Kodak is not." *Ibid.* Likewise here, petitioner's provision of Interconnect access to respondent's former clients on the condition that they purchase ad-rep services from petitioner may constitute an unlawful tying practice, even if petitioner's actions with respect to respondent could be characterized as a refusal to deal with a rival.

2. Petitioner's reliance (Pet. 28) on this Court's decision in *linkLine*, *supra*, is misplaced. The gravamen of the *linkLine* plaintiff's antitrust claim was that a vertically integrated "firm with market power in the [wholesale] market can squeeze its downstream competitors by raising the wholesale price of inputs while cutting its own retail prices." 555 U.S. at 449. The plaintiff alleged that this "price squeeze" had effected an antitrust violation, even though the defendant had "no obligation under the antitrust laws to deal with the plaintiff at wholesale" and the defendant's retail prices were "'above predatory levels.'" *Id.* at 449, 451 (citation omitted). In rejecting that theory of antitrust liability, the Court described the price-squeeze claim as "nothing more than an amalgamation of a meritless claim at the retail level and a meritless claim at the wholesale level." *Id.* at 452.

Here, by contrast, respondent's tying claim is not an "amalgamation" of other claims. Rather, where specified criteria are satisfied, the use of a tying arrangement is an established basis for antitrust liability. See p. 20, *supra*. Nothing in *linkLine* suggests that an otherwise meritorious antitrust claim can be rejected

23

simply because it involves a course of conduct that includes a refusal to deal.

The court of appeals' decision also does not conflict with *Aerotec International, Inc.* v. *Honeywell International, Inc.*, 836 F.3d 1171 (9th Cir. 2016), or *Service & Training, Inc.* v. *Data General Corp.*, 963 F.2d 680 (4th Cir. 1992). In each of those cases, the court rejected a tying claim for lack of evidence of an actual tie, not because of any overlap with a refusal-to-deal claim. See *Aerotec*, 836 F.3d at 1179 ("The problem with Aerotec's claim is that there is no tie, *i.e.*, no evidence that Honeywell explicitly or implicitly ties or conditions the *sale* of APU parts *to APU owners* on a requirement that the owners 'buy and repair Honeywell' and/or for[]go services from independent service providers."); *Data General*, 963 F.2d at 686 ("Appellants introduced no evidence from which it could reasonably be inferred that Data General agreed to license MV/ADEX to CMOs only on the condition that the CMOs also purchase Data General's repair services."). Here, by contrast, the court of appeals correctly determined that the record evidence, viewed in the light most favorable to respondent, supports a reasonable inference that petitioner conditioned Interconnect access on purchase of its ad-rep services. That factbound determination does not warrant further review, and it distinguishes respondent's tying claim from the claims rejected in *Aerotec* and *Data General*.

24

**CONCLUSION**

The petition for a writ of certiorari should be denied.

Respectfully submitted.

ELIZABETH B. PRELOGAR
  *Acting Solicitor General*
RICHARD A. POWERS
  *Acting Assistant Attorney
  General*
MALCOLM L. STEWART
  *Deputy Solicitor General*
SOPAN JOSHI
  *Assistant to the Solicitor
  General*
KATHLEEN S. O'NEILL
  *Senior Director of Litigation*
DANIEL E. HAAR
NICKOLAI G. LEVIN
MARY HELEN WIMBERLY
  *Attorneys*

MAY 2021