OatWlivC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,
   *et al.*,

4              Plaintiffs,

5       v.                              24 Civ. 3973 (AS)

6  LIVE NATION ENTERTAINMENT
7  INC., *et al.*,

8              Defendants.
                                Conference (via Teams)
9  ------------------------------x
                                New York, N.Y.
10                              October 29, 2024
                                4:00 p.m.
11

12 Before:

13

14              HON. ARUN SUBRAMANIAN,

15                              District Judge

16                     APPEARANCES

17 MERRICK B. GARLAND
        Attorney General of the United States
18      United States Department of Justice, Antitrust Division
        Attorney for Plaintiff United States of America
19 BY:  BONNY E. SWEENEY
        JOHN R. THORNBURGH II
20      JENNIFER P. ROUALET
        BRIAN A. WHITE
21      Assistants Attorney General

22

23

24

25

OatWlivC

```
 1                      APPEARANCES CONTINUED

 2    LETITIA A. JAMES
           Attorney General of the State of New York
 3         Attorney for Plaintiff State of New York
      BY:  JEREMY R. KASHA
 4         Assistant Attorney General

 5    BRIAN SCHWALB
           Attorney General of the District of Columbia
 6         Attorney for Plaintiff District of Columbia
      BY: ADAM GITLIN
 7         Assistant Attorney General

 8    JONATHAN SKRMETTI
           Attorney General of the State of Tennessee
 9         Attorney for Plaintiff State of Tennessee
      BY:  HAMILTON MILLWEE
10         Assistant Attorney General

11    LATHAM & WATKINS LLP
           Attorneys for Defendants
12         Live Nation and Ticketmaster
      BY:  TIMOTHY L. O'MARA
13         -and-
      CRAVATH, SWAINE & MOORE LLP
14    BY:  DAVID R. MARRIOTT
           JESSE M. WEISS
15
      COHEN & GRESSER LLP
16         Attorneys for Third Party SeatGeek
      BY:  RONALD F. WICK
17
      PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
18         Attorneys for Third Party Viagogo Entertainment Inc.
      BY:  EYITAYO ST. MATTHEW-DANIEL
19
20    HOGAN LOVELLS LLP
           Attorneys for Intervenor
21         Anschutz Entertainment Group, Inc.
      BY:  JUSTIN W. BERNICK
22

23

24

25
```

OatWlivC

| | |
|---|---|
| 1 | THE COURT:  Good afternoon.  We're here for a |
| 2 | conference in 24 Civ. 3973. |
| 3 | I'll remind the parties and anyone on the line to |
| 4 | please mute if you are not speaking.  We've been getting some |
| 5 | feedback. |
| 6 | Thank you. |
| 7 | All right.  Let's start with the plaintiffs' motion to |
| 8 | compel.  What I'm going to do is I'm going to give you the |
| 9 | Court's tentative ruling on the issues that have been raised, |
| 10 | and then I'll hear from the parties if they have any further |
| 11 | thoughts or would like to present argument on any specific |
| 12 | points. |
| 13 | On the motion to compel, this dispute is really about |
| 14 | the number of custodians, the time period during which |
| 15 | documents need to be reviewed, the time period of the |
| 16 | documents, and any cap on the number of documents that the |
| 17 | defendants have to review. |
| 18 | The Court is not going to micromanage the production |
| 19 | process or the search terms to be employed, but we will give |
| 20 | you this guidance: |
| 21 | First of all, the plaintiffs will be limited to 55 |
| 22 | custodians.  There is no 2017 limitation, which is what the |
| 23 | defendants had asked for.  There's also no hard cap of a review |
| 24 | of 1.5 million documents, and the review of documents does not |
| 25 | end at the end of the substantial completion deadline. |

OatWlivC

1          Now, the Court is not going to impose a specific

2    requirement of how many documents must be reviewed per week, as

3    the plaintiffs have suggested.  The defendants need to figure

4    out how to best review documents.  The defendants insist that

5    attorney review of each and every document produced is

6    necessary.  That is defendants' choice.  They are entitled to

7    make that choice.  The Court does not fully understand why

8    attorney review of every single document is necessary, but

9    again, that's the defendants' choice to make.  However, to

10   help, hopefully, streamline this review and hopefully break the

11   logjam, the plaintiffs need to tell the defendants which 25

12   custodians they want to prioritize.  The review and production

13   of documents related to those priority custodians must be done

14   by the substantial completion deadline.

15          Now, the number of documents at issue could be more or

16   could be less than 1.5 million documents.  The parties should

17   meet and confer and work out the parameters of that review.

18   This is a way for the plaintiffs to focus on the custodians who

19   they believe are the most important to their case and

20   prioritize the production of those documents.  And as to the

21   other remaining custodians and documents, there will still be

22   time after the substantial completion deadline for the review

23   and production of those documents.  So as to those

24   nonprioritized custodians documents, they will be reviewed and

25   produced over the next three-month period, which still leaves

OatWlivC

1    two months for depositions.

2            Now, the idea here is that with the priority

3    custodians out of the way, those documents can be reviewed, the

4    depositions can start as to those priority custodians, and if

5    there are remaining depositions to be taken, there will be

6    ample time for those depositions based on what is produced from

7    the files of the nonpriority custodians.

8            A status update letter to the Court will be submitted

9    every two weeks, starting Friday, November 8, 2024, to update

10    the Court on the status of the review and production of

11    documents.  That means the number of documents reviewed and the

12    number of documents produced.

13            Privilege logs for each rolling production will be

14    sent two weeks after production.

15            In terms of some of the specific items in the

16    plaintiffs' proposed interim deadlines, there's agreement as to

17    the vast majority of the items, but as to some specific line

18    items, the Court notes the following:

19            In terms of hit reports, the defendants have agreed to

20    provide revised hit reports within two business days of

21    receiving proposed revised search terms.  The Court thinks that

22    that is reasonable.

23            The defendants suggest rolling productions once a

24    month, in November, December and January.  The Court agrees

25    that that's a good minimum standard.  The defendants should

OatWlivC

1    endeavor to provide rolling productions on a more frequent

2    basis, but at a minimum, that's what they should do.

3           The defendants say that there's no need for validation

4    of search terms through a review of the null set.  The Court

5    agrees with that.

6           I'm just looking through the proposal.

7           I believe that that's it, and the parties should be

8    able to work out the remaining open items.

9           With that, let me turn first to Mr. Thornburgh.  If

10   you have any comments on that proposal and that proposed

11   ruling, I'll hear from you now.  And then I'll turn to

12   Mr. O'Mara.

13          MR. THORNBURGH:  Good afternoon, your Honor.  Want to

14   make sure you can hear me.

15          THE COURT:  I can hear you.

16          MR. THORNBURGH:  Great.  Thank you.

17          Yeah, so, obviously, thank you.  Thank you for

18   providing the information that you have.  I'm digesting it at

19   the moment, and I certainly understand the Court's desire not

20   to wade too far deeply or even more deeply into the, you know,

21   specific issues beyond those you've already ruled on.

22          THE COURT:  I thought that was pretty deep.

23          MR. THORNBURGH:  I agree, your Honor.

24          I would just -- I think the one issue that would be

25   helpful to get the Court's guidance on, if you are willing to

OatWlivC

1    do so, is this issue of the right, appropriate search terms to

2    be utilized.  And I think the disagreement here is really that

3    defendants are insisting on utilizing the search terms that

4    were used in the precomplaint investigation.  And the problem

5    with that approach is that those search terms, first of all,

6    were never agreed to by, you know, the parties in the way that

7    defendants have suggested.  But beyond that, they were

8    developed at a time during the investigation before all of the

9    factual issues, substantive issues that are at play now in the

10   litigation were dealt with or explored in the investigation.

11          So, for example, issues related to defendants'

12   amphitheaters, issues related to defendants' relationship with

13   OVG, search terms related to how defendants utilized their

14   pricing strategy for dynamic or platinum pricing.  Those are

15   all issues that we have allegations and claims related to those

16   allegations in our complaint, but they were not the subject of

17   significant exploration during the precomplaint investigation.

18   And I think perhaps most importantly is state plaintiffs'

19   damages claims.

20          You know, that was not an issue in the search terms

21   that were discussed or that were utilized during the United

22   States's precomplaint investigation.  And so we proposed search

23   terms to defendants earlier this week, and we're trying to work

24   with them in good faith to narrow those where we can, but we've

25   proposed search terms that address all those issues, where the

OatWlivC

1   search terms that were utilized during the precomplaint

2   investigation do not do so.  So we would ask for the Court's

3   guidance on that issue in particular.

4          THE COURT:  OK.  Look, you're telling me that you

5   provided revised search terms to the defendants this week.  Is

6   that right?

7          MR. THORNBURGH:  We actually provided them last week,

8   and then actually yesterday we provided further revised search

9   terms in light of the initial hit report that defendants gave

10  us.

11         THE COURT:  Got it.  And the defendants have pledged

12  to give you hit reports within two business days.  Is there a

13  dispute here?

14         MR. THORNBURGH:  That's correct.  They've pledged to

15  give us hit reports, but their position -- and I'll let,

16  obviously, defense counsel speak for themselves, but our

17  understanding of their position is although they're providing

18  us hit reports for the search terms we had proposed, their

19  position is that we should go back to the search terms that

20  were utilized during the precomplaint investigation.  So that's

21  the issue from plaintiffs' perspective.

22         THE COURT:  OK.  So the guidance that you're looking

23  for is not for me to adjudicate the search terms, but you want

24  the guidance of no, you're not limited to these search terms

25  used in the precomplaint investigation.  Is that right?

OatWlivC

| | |
|---|---|
| 1 | MR. THORNBURGH:  That's correct, your Honor.  And we |
| 2 | think that it makes more sense as a starting point to start |
| 3 | from search terms that we've resolved in relation to the |
| 4 | litigation at hand. |
| 5 | THE COURT:  Yes.  You're saying, look, we're going to |
| 6 | work with defendants in the way that parties normally do to |
| 7 | come up with search terms that make sense; we just don't want |
| 8 | to be artificially limited to what was in the precomplaint |
| 9 | investigation because there are additional issues in the |
| 10 | allegations in the operative complaint. |
| 11 | MR. THORNBURGH:  That's exactly right, your Honor. |
| 12 | THE COURT:  OK.  Anything further, Mr. Thornburgh, |
| 13 | with respect to all of the things that I addressed, or should |
| 14 | we go to Mr. O'Mara? |
| 15 | MR. THORNBURGH:  I don't think so at this point in |
| 16 | time. |
| 17 | THE COURT:  OK. |
| 18 | Mr. O'Mara, why don't you address the search term |
| 19 | issue, and then you can speak freely about anything else that |
| 20 | you'd like. |
| 21 | MR. O'MARA:  Your Honor -- |
| 22 | THE COURT:  You're fading in and out, so you might |
| 23 | want to just say a few words to make sure that we're catching |
| 24 | it. |
| 25 | MR. O'MARA:  Yeah.  Can you hear me, your Honor? |

OatWlivC

1          THE COURT:  I can hear you.

2          MR. O'MARA:  OK.  Thank you.

3          Your Honor, on the search terms, we don't disagree

4   with anything that your Honor just said.  Our position has been

5   consistent with what I told you on September 27, what we have

6   repeatedly told the plaintiffs.  There's a number of levers you

7   pull to determine how many documents you end up reviewing, and

8   the search terms is just one of them.  The other one, as the

9   Court focused on, is the number of custodians, and the third

10  one, of course, is the time period you're pulling the documents

11  from.

12          A potential fourth one is the type of documents you're

13  pulling, and I don't have any objection to, obviously, working

14  with plaintiffs to tweak the CID search terms in such a way

15  that they think cover the actual amended complaint, but the

16  issue so far, to date, your Honor, has simply been going back,

17  given the search terms that the plaintiffs have proposed,

18  coupled with the time periods they were proposing, coupled with

19  the custodians they were proposing, it was pulling back and a

20  number of documents that there's no way we would ever get

21  through.  And I can go through the numbers if you'd like, but

22  the bottom line is that on the last proposal, it was likely

23  pulling back something like 20 million documents.

24          Now, that all changes with your Honor's guidance about

25  the custodians, but I would just flag that, again, the search

OatWlivC

1    terms are just one piece of that.  Those numbers will

2    drastically change with the Court's guidance from custodians

3    and time periods, but all I would say is that we're open to

4    negotiating search terms.  They just have to pull back some

5    sort of reasonable number of the documents that we can review

6    in the time period that we have.

7              THE COURT:  OK.  I think what I'm hearing is that

8    you're willing to work with the plaintiffs on the search terms;

9    you're not limiting them to what was used in the CID.  So I

10   think we have no disagreement there.

11             Your general point is about the volume of documents,

12   and on that point, I think in any case, in any litigation,

13   there is going to be a negotiation as to the appropriate volume

14   of documents yielded by search terms, and so the parties should

15   have that discussion, which I don't think that they've had.

16             In terms of the numbers, though, we have reduced the

17   number of custodians from what the government has requested,

18   and we've made clear that there's an ongoing process here.  The

19   Court imposed a substantial completion deadline to make sure

20   that documents weren't produced on the eve of depositions.  So

21   we have a substantial completion deadline in place, but that is

22   not the cutoff for the review and production of documents.  So

23   that should further provide some relief in terms of the number

24   of documents.

25             Aside from that, I understand that the defendants have

OatWlivC

1    elected to engage in attorney review and coding of every single

2    document.  As I said, I'm not sure why that is necessary, and

3    so maybe you can help me on that specific point.  Once you've

4    swept the documents for privilege -- and the vast majority of

5    these documents will raise no privilege concerns -- why can't

6    you just produce those documents over to the plaintiffs?  And

7    why doesn't that make even tactical sense for you?  Because you

8    are then putting the burden on the government to review those

9    documents and figure out which ones they are interested in or

10   not as opposed to you having to have attorneys sit at a

11   computer in a massive warehouse somewhere on multiple terminals

12   reviewing these documents yourself.  And so maybe you can help

13   me with just that understanding, because you can do that, and

14   that's your right, but that's a burden that you've elected to

15   undertake.

16           So help me understand just why attorneys have to be

17   coding these documents given the TAR review that's in place and

18   the other tools that are at your disposal that you will know

19   about much more than I do.

20           MR. O'MARA:  Thank you, your Honor.

21           I think the starting point to your answer is that to

22   be very clear, we heard the Court suggest that we should be

23   using technology-assisted review, and we are 100 percent

24   embracing that.  The debate there, I think what your Honor's

25   describing is the difference between the type of technology

OatWlivC

1    review that's employed.

2            What's often referred to as TAR 1.0 is what your Honor

3    is describing, where basically you train a computer on a set of

4    seed documents and then whatever the computer says is likely

5    responsive just gets turned over wholesale.  The other way that

6    it's typically done is what's called TAR 2.0, which is also

7    referred to as human in the loop, and that is where you

8    continuously, on an ongoing basis, train the computer to

9    elevate and then cue the most likely responsive documents from

10   the review set, and then humans look at them and decide the

11   final call for privilege but also for responsive and

12   nonresponsive.

13           As I did mention, your Honor, we are not aware of a

14   single case, to your point, that suggests that TAR 1.0 is

15   preferable to TAR 2.0.

16           THE COURT:  Mr. O'Mara, I understand that, because it

17   was in your letter.

18           MR. O'MARA:  Yeah.

19           THE COURT:  But I'm saying something a little bit more

20   basic, which is once you've conducted an appropriate privilege

21   review -- and I'll just footnote that by noting that the

22   protective order in this case has a rock solid clawback

23   provision.  There is no circumstance under which you would

24   produce a privileged document and not be able to claw that back

25   based on any kind of notion of an exception or waiver of

OatWlivC

```
1    privilege or anything along those lines.  The protective order

2    is clear about that.  So then we're talking just about

3    responsiveness review.

4            Why don't you just say:  Look, we've swept these for

5    privilege.  We've gotten these documents returned back on the

6    search terms.  Here you go, Mr. Thornburgh.  Here's all the

7    documents.  Have at it.

8            Why isn't that an option?  Again, that's not saying

9    that you have to do that.  I'm not saying that that would be

10   appropriate.  You know way more about this than I do, because

11   you are on the front lines, in the trenches; you understand

12   what's in these documents and not.  I'm just asking the

13   question to see if there's any help you can provide on that

14   point.

15           MR. O'MARA:  I guess what I would say is there is just

16   sort of a historical belief from the lawyers for the

17   defendants, myself included, that the TAR 1.0 model is not

18   necessarily that accurate and that there's a, sort of a basic

19   way in which you prepare your case, either the plaintiff or the

20   defendant, which requires a human being to look at the

21   documents to identify the potential exhibits for both sides.

22   And it's not simply a matter of producing stuff that's

23   responsive.  The document review is also about identifying

24   potential trial exhibits, and that works both ways.

25           So if you produce X millions of documents, you're
```

OatWlivC

1  still going to have to have some way of figuring out what the

2  trial exhibits are in that set.  And it certainly impacts how

3  you prepare for trial if you go through depositions without

4  knowing what you think are the hot documents, without knowing

5  what you think that the plaintiffs might use, and you're on the

6  eve of trial and you have to confront plaintiffs' trial exhibit

7  list and there's stuff on there you've never seen.

8          THE COURT:  OK.  Understood.

9          Mr. O'Mara, just walk me through the next couple of

10  weeks in terms of the search term negotiations.  You've now

11  received an initial set of search terms, some revised search

12  terms.  You are going to provide hit reports to the plaintiffs.

13          What do you anticipate being the time frame for the

14  parties to come to an agreement on search terms, or not?

15          MR. O'MARA:  So, your Honor, we just got the -- so as

16  Mr. Thornburgh said, they gave us revised terms yesterday.  We

17  pulled that hit report.  It's 9.6 million, but again, that's

18  meaningless at this point because of the Court's guidance on

19  custodians.  So the first thing we would have to do is to get

20  from plaintiffs, I think, two things, which is who are their 55

21  custodians and who are their 25 priority custodians and whether

22  plaintiffs are going to make any further revisions to their

23  search terms.  If they do not, we would run a search term hit

24  report on the 25 and the 55 and figure out what those numbers

25  are and then negotiate with the plaintiffs from there.

OatWlivC

1          THE COURT:  OK.

2          Mr. Thornburgh, understanding that you just heard the

3    Court's rulings on these things, when could you provide the

4    information that Mr. O'Mara just identified?

5          MR. THORNBURGH:  Your Honor, we've been moving

6    (unintelligible), and I think we could provide that by close of

7    business tomorrow, subject to me talking with my colleagues and

8    making sure they agree with that.

9          THE COURT:  OK.

10         Mr. O'Mara, you're going to hopefully receive the

11   information you just requested by tomorrow.  How much time do

12   you need to get back to the plaintiffs with the hit report and

13   any proposed modification to the terms?

14         MR. O'MARA:  Your Honor, it usually takes about a day

15   and a half to pull that hit report, so if we get it by close of

16   business tomorrow, we would have it certainly by Friday and

17   can, obviously, start negotiating with Mr. Thornburgh from

18   there.

19         Well, actually, let me revise that slightly, your

20   Honor, which is to say that if we were going to -- we could

21   provide the hit report by Friday.  If we're going to propose

22   counter-terms, and unfortunately, we need the computer time to

23   run those through, so our counter would have to follow by

24   Monday.

25         THE COURT:  All right.  I'm going to suggest to both

OatWlivC

1    sides that we have a follow-up conference which does not need

2    everyone involved in any way in this case; it could be a

3    smaller group.  But does Friday, November 8, in the morning --

4    so any time between 10 a.m. and 12 p.m. -- make sense for a

5    follow-up conference?  We may not need it because the parties

6    may have worked it out, but if there are any disputes, I'd

7    rather just get them resolved sooner than later given the time

8    issues here.

9             Mr. Thornburgh, does that work for you?

10            MR. THORNBURGH:  Yes, it does, your Honor.

11            THE COURT:  And Mr. O'Mara, does that work on your

12    end?

13            MR. O'MARA:  Yes, your Honor.  I would request later

14    in your window, if possible, since I'm in San Francisco.

15            THE COURT:  Oh, yes.  Of course we can.

16            Is 11:30 OK on your end?

17            MR. O'MARA:  Absolutely.  Thank you.

18            THE COURT:  OK.  So we'll have a conference set up for

19    November 8 at 11:30.  Hopefully I'll be able to cancel it, but

20    if not, we'll resolve any outstanding issues with these search

21    terms at that time.

22            All right.  Mr. O'Mara, anything else on the motion to

23    compel?

24            MR. O'MARA:  No, your Honor, other than I would

25    obviously like to reserve the possibility that when we reach

OatWlivC

1    January 15, or at some point in the future, that we revisit the

2    ongoing cost of what's been spent relative to what's been

3    produced.  In other words, as this develops further, we would

4    of course like to reserve the possibility of revisiting the

5    proportionality and reasonableness of the ongoing review.

6          THE COURT:  All right.  Understood.

7          Mr. Thornburgh, anything further on your end?

8          MR. THORNBURGH:  Yeah, just one question, or

9    clarification, your Honor.

10          On the nonpriority custodians and the related document

11   productions for those nonpriority custodians, two related

12   questions:

13          One, is the Court envisioning setting a substantial

14   completion deadline for the production of documents for those

15   nonpriority custodians?  I think, you know, plaintiffs think

16   that that would make sense to do so.  I think you gave some

17   general time parameters, but we think it makes sense to set a

18   specific date.

19          And then second, just wanted to get clarification that

20   for those, for document productions related to those

21   nonpriority custodians, that the expectation would be that

22   defendants continue to make those productions on at least a

23   once-a-month basis after January 15.

24          THE COURT:  Right.  I think the Court's expectation is

25   that the same pace that we will hopefully be maintaining

OatWlivC

1   through January 15 will be kept up.  So I think with your

2   second observation, you answered your first question, which is

3   that the idea would be that over that three-month period there

4   would be the same pace of production so that you are getting

5   rolling productions of documents for the nonpriority

6   custodians, not a dump of documents at the end of the

7   three-month period.

8         MR. THORNBURGH:  All right.  Thank you, your Honor.

9         THE COURT:  All right.  Let's move to the motion to

10  amend the protective order, and that is going to be handled by

11  Mr. Weiss on the defendants' side.

12        Mr. Weiss, my inclination is to use the plaintiffs'

13  counterproposal as the frame for the amendment.  Well, let me

14  take a step back.

15        I agree with defendants that they need to be able to

16  discuss with the people involved in these allegations of

17  anticompetitive conduct the who, when, what, where and why,

18  which is what I understood from the last conference -- and I

19  don't think anybody really disagreed with it -- is necessary

20  for you to just figure out whether these things happened or not

21  or what your clients' story is going to be.  So as a general

22  matter, I do believe that you need to be able to do this, but

23  the devil is in the details, because the defendants' proposal

24  is just too vague for the Court to adopt.

25        The plaintiffs' counterproposal seems appropriate to

OatWlivC

1    meet your purposes, and the plaintiffs indicated in their

2    footnote that to the extent that the definition of what it is

3    you are concerned about needs to be further fleshed out, they

4    are willing to meet and confer with you about it.  And I'll

5    tell you that the Court's view is that limiting disclosure only

6    to anticompetitive conduct seems unduly limiting, because there

7    may be certain other types of conduct that you need to just be

8    able to relay to your clients to help them understand what it

9    is they're being accused of and the circumstances without

10    revealing any competitively sensitive information.  So the

11    Court's inclination is to adopt the plaintiffs' counterproposal

12    as a frame, but I understand the plaintiffs as saying they're

13    willing to meet and confer with you as to any modifications

14    that you'd like to discuss.

15         The other modification that seems appropriate is in

16    who you're able to convey the information to.  The plaintiffs'

17    counterproposal says that you can only make a disclosure to

18    those named with specificity in a document, who received or

19    sent such a document or who is an employee alleged to have

20    engaged in the conduct referenced in such document.

21         That seems also to be unduly limiting.  There may be

22    certain situations where you might think the person who was

23    actually engaged in the conduct is a subordinate to another

24    individual who was in charge of whatever the issue is and you

25    may need to talk to both people -- that's just an example -- to

OatWlivC

1     understand the context of what occurred.  And so I think that

2     that can also be modified to make it broader in a way that will

3     not be too constraining on the defendants.

4          The only other issue is whether there needs to be

5     preclearance with the information to be conveyed, which is what

6     is suggested by the third parties who have submitted letters,

7     SeatGeek, StubHub and AEG.  The Court does not think that, with

8     the limitations that are in the plaintiffs' counterproposal,

9     that kind of preclearance is necessary.  It's not how the

10    protective order generally works.  There's no preclearance.

11    The expectation is that counsel will follow the protective

12    order, and if they don't and if it turns out that they have

13    been violating it, then there are penalties for that.

14         Further, given the limitations in the counterproposal,

15    the information that is being conveyed should not fall under

16    the definition of confidential or highly confidential

17    information, because those have specific definitions in the

18    protective order, and this type of information that's covered

19    by the plaintiffs' counterproposal does not fall into those

20    categories, as far as the Court can see.

21         So now with all that background, Mr. Weiss, does that

22    seem something that's workable and you can talk to the

23    plaintiffs about this, or do you have anything further to add?

24         MR. WEISS:  Thank you, your Honor.

25         I think that the Court's suggestion or direction is to

OatWlivC

1    take plaintiffs' language, go back to them, meet and confer and

2    make adjustments where we think they're required.  We can

3    certainly do that and bring it back to the Court if we need to.

4            I think there are a couple of issues with their

5    language -- we can try and work it out in the meet-and-confer

6    process -- that may be worth noting here.

7            One is the, I think your Honor focused on at the

8    conference, anticompetitive retaliation, which is an undefined

9    term, not capturing all of the type of conduct that may be

10    alleged.  What we're really trying to get at here, your Honor,

11    is a pretty narrow concept, which is the particulars of alleged

12    misconduct engaged in by individuals at Live Nation.  That's

13    what we want to be able to discuss.  So I think their, in some

14    respects, their language is too narrow, because anticompetitive

15    retaliation, I'm not sure exactly what that, how it is defined,

16    but it is conveyed as a narrow concept.

17            In some respects, it's vague or broad in that it's

18    focused on subject matter, which is a broad concept, and we

19    have a document related -- today, the subject matter of a

20    confidential document we can discuss, you know, in order to

21    investigate the issues in this case, at least some of the

22    nonparties made this point, and we agree with it.  If a

23    document relates to a negotiation with Live Nation, the subject

24    matter of a document is the negotiation with Live Nation, we

25    can obviously talk to our client about the negotiations that

OatWlivC

they had with third parties.  What we're talking about here is
something narrow, I think, and more targeted, which is the
particulars of conduct that is alleged, that individuals at
Live Nation are alleged to have engaged in.

So to the extent that the specifics of that conduct
derived from a confidential, a document designated confidential
or highly confidential, so I think --

THE COURT:  What I'm hearing from you is that the word
to be changed, perhaps, is "retaliation," because if you're
focused on misconduct, I take it that the only misconduct that
is really at issue and that you care about for purposes of
defense of this case is conduct that is anticompetitive in
nature.  Right?

MR. WEISS:  Well, I think we take issue with the
characterization of some of this conduct that they're alleging.

THE COURT:  No, you don't think you did anything
anticompetitive.  I'm saying that the allegation is that it is
anticompetitive in nature.  And so you see it.  You know what's
reported in the document, and the example, I think, that maybe
you gave at the last conference was it is alleged that Live
Nation spoke to this venue and said X, Y and Z, we need to be
able to convey the X, Y or Z to our client to see if it really
happened or not.  Right?  I think that's just a simple example.

What I'm saying is that that X, Y and Z that was
reported to a venue, it would only be relevant to you if you

OatWlivC

```
 1    understood that the claim was that that was in furtherance of

 2    anticompetitive behavior by your client.  That's at least the

 3    claim.  You disagree with it, but that's the claim.

 4             MR. WEISS:  That's right, your Honor.  And I think

 5    also the language that this is about the subject matter of a

 6    confidential document, and that may be a tweak that can be

 7    worked out in a meet-and-confer, but what we're talking about

 8    here is, you know, again, the specific details about what

 9    someone at Live Nation is alleged to have said or done

10    (unintelligible) subject matter conveyed something broader.

11    Subject matter could be negotiation or meeting, which I think

12    there's no question that we can discuss with my client today

13    without any clarification to the protective order.

14             And I think the third point I raise here is your Honor

15    talked about who can, who this information can be disclosed to,

16    and we agree that what's enumerated in their proposal is unduly

17    restrictive.  We are certainly not proposing that any of this

18    information can be disclosed for purposes unrelated to the

19    litigation, to anyone and everyone.  The protective order

20    already says that any information here has to be, is

21    disclosable only in connection with the litigation, and you

22    know, we're not opposed to language that reiterates that.

23             In the amendment, we do think that in-house counsel

24    needs to be someone who is able to see this information.  We're

25    not relitigating the point of what in-house counsel can or
```

OatWlivC

1    can't see, but the purpose of this amendment is to focus on a

2    discrete category of information that we think is not sensitive

3    and is for the purpose of aiding our investigative or

4    preparatory work in the defense.  And so we think it's

5    important that in-house counsel be allowed to, you know, help

6    us facilitate that investigatory work by seeing this limited

7    category of information that's the subject of this amendment.

8                THE COURT:  All right.  Understood, Mr. Weiss.

9                I think as to the in-house counsel point, I am not

10   inclined to amend the protective order to include that kind of

11   extension of the people who are permitted to see this

12   information, and the reason is the problem that we're facing is

13   that these documents have been tagged as confidential, highly

14   confidential writ large.  They were not produced with kind of a

15   more narrow framework of tagging, meaning that with boxes in

16   the documents identifying confidential and highly confidential

17   information, which sometimes happens.  Unfortunately, as I

18   suspected at the outset, the documents that are likely to be

19   produced by both sides are going to be just bulk tagged as

20   either confidential or highly confidential.

21               OK.  So we're making an exception to help you

22   investigate certain allegations made against Live Nation, and

23   you need to talk to the people who were involved in those

24   incidents so that you can understand in representing your

25   client what occurred and what didn't occur.  I do agree that

OatWlivC

1    this designation in plaintiffs' counterproposal is too narrow

2    and can be modified and extended to people who may not have

3    been identified in the document but may have been part of the

4    outreach, to give the example of the venue, to the venue and so

5    would need to be talked to to defend your client.  I don't

6    think at this time that you would need to involve in-house

7    counsel, but you always have the option as to confidential

8    documents to identify certain in-house counsel to receive any

9    and all confidential documents.  And so you can certainly make

10   that election at any time, but I don't think it would be

11   appropriate to extend this amendment that far.

12       MR. WEISS:  Yeah, if I could just comment on that,

13   your Honor?

14       I appreciate all that.  So because this proposal, you

15   know, we tried to really narrowly focus it on something that,

16   on information that is, we submit, not sensitive.  We're not

17   talking about the documents themselves.  We're not talking

18   about any information in the documents that is not specifically

19   the details of what someone at Live Nation is alleged to have

20   said or done.

21       I think there are some third parties that raised

22   concerns about disclosing, like, the impressions of a third

23   party about comments made by Live Nation.  None of that is in

24   anything that we're proposing to be able to disclose.  I don't

25   think our language allows that.  I don't think plaintiffs'

OatWlivC

1    language allows it.  So it's very narrow.  So I think the

2    confidentiality concerns that were raised with respect to

3    individuals at Live Nation, including certain in-house counsel,

4    I don't think apply to this discrete sort of category of

5    information.

6         The other is just the practical issues that we have

7    excluding in-house counsel from this narrow category, which is,

8    one, in-house counsel's really important to be able to help us

9    navigate and figure out -- we're talking about our

10   investigatory work, so in-house counsel, be able to disclose

11   this information to in-house counsel is critical to be able to

12   facilitate what it is we're including to talk to, what it is we

13   need to look at.  And two, it creates a scenario where, you

14   know, we're talking to our mutual client, individuals at Live

15   Nation, about, again, this discrete, nonsensitive category of

16   information and in-house counsel have to leave the room.

17        So we don't think that's necessary.  We think it's

18   untenable.  We think it kind of impedes the purpose of this, we

19   submit, pretty narrow amendment, which is to enable us to, you

20   know, investigate allegations -- and specifically and solely

21   allegations of misconduct about things that Live Nation,

22   individuals at Live Nation are alleged to have said or done.

23        THE COURT:  And you're not talking about, in this

24   context, the two individuals who you had wanted to be able to

25   view confidential documents in this case.  And I don't want to

OatWlivC

1    get their names wrong, but you know the two individuals that

2    I'm referring to.  You're not saying it would include them;

3    you're just saying that there may be an in-house counsel that

4    you would need to review this information.

5        MR. WEISS:  Well, your Honor, there should be no

6    reason why we couldn't include them, Mr. Wall and Ms. Tobias,

7    because again, the information that we're talking about here is

8    narrow and discrete.  We're not, again, you know, relitigating

9    the question of whether they can see documents, whether they

10   can see competitively sensitive information from nonparties.

11   We're talking only about what their, you know, their client,

12   our client, Live Nation, is alleged to have said or done.

13       THE COURT:  OK.

14       MR. WEISS:  So to get the details about conduct that

15   Live Nation is alleged to have engaged in, we don't see any

16   reason why they shouldn't be able to see that and there's a lot

17   of value in them participating in the investigatory and

18   preparatory work that, that information would be useful.

19       THE COURT:  OK.  And, here, if you want to show

20   something to in-house counsel, meaning you're not showing the

21   documents but you want to convey information to in-house

22   counsel, then at that point, why shouldn't you be required to

23   disclose to the nonparties that furnish the information what

24   you're planning to disclose to in-house counsel so that they

25   can raise an objection with the Court if they need to?  Because

OatWlivC

1    if you remember, part of the initial guidance that I provided

2    is that I didn't think it was appropriate for you to have to

3    preclear information with the plaintiffs or nonparties if

4    you're trying to investigate these matters that don't fall

5    within the confidential or highly confidential categories but

6    are featured in those documents that have been designated as

7    such.  But at the point that you want to show Mr. Wall or his

8    colleague certain information -- you're not showing them.  I

9    keep saying showing; that's inappropriate.  You're just

10   conveying information to them, so why shouldn't there be a

11   disclosure in advance to nonparties?  Then you can show --

12   again, apologies -- convey the information to those individuals

13   but the nonparties would have had a chance in advance to know

14   what it is you're telling them.

15            MR. WEISS:  Your Honor, I think that the practical

16   issues with doing that on a document-by-document or

17   disclosure-by-disclosure basis that your Honor identified

18   earlier would apply.  And, again, what we're talking about here

19   is not information that is insensitive.  What this amendment is

20   allowing is us to show this information to individuals who

21   can't see competitively sensitive or confidential or highly

22   confidential information.  This is not reopening that question

23   of who can see highly confidential or confidential information.

24   This is for an avoidance of doubt, clarifying the details of

25   what an individual at Live Nation is alleged to have said or

OatWlivC

1    done is not something that we're -- is subject to the

2    paragraphs that define what is highly confidential and

3    confidential information.

4         So it's not trying to reopen that.  It's not, it

5    doesn't raise the concerns that were addressed and discussed

6    with respect to what category of in-house counsel could see

7    confidential or highly confidential information, because we are

8    talking about a very discrete, nonsensitive category type of

9    information, which is just allegations about what individuals

10   at Live Nation, you know, misconduct by individuals at Live

11   Nation.

12        THE COURT:  Understood.

13        (Indiscernible overlap)

14        THE COURT:  Well, understood.  I think if I asked

15   SeatGeek, StubHub or AEG whether this was sensitive

16   information, what they would tell me is that, yes, because it's

17   hard to draw these lines, and what you're talking about at a

18   basic level are documents that are designated as confidential

19   or highly confidential and may include information that would

20   be sensitive and would potentially expose those parties to

21   prejudice in some way if there was any misuse of the

22   information.  I'm not suggesting that you would misuse it, but

23   they're saying that's the concern.

24        But I'll tell you that I'm just unlikely to approve

25   that kind of extension here.  However, if there was a carve-out

OatWlivC

1  in the amendment that said that you would provide a disclosure

2  to the relevant nonparty if there's information that you want

3  to provide to in-house counsel, I would certainly consider

4  that.  That would provide the nonparties with the chance to

5  object to any such disclosure.  It would be clearer what it is

6  you're trying to produce to them so that it would be clear that

7  the information that you're conveying, as you've just said,

8  would not raise any of these concerns.

9          I don't think there's been a showing at this point

10 that a document-by-document review is an undue burden on your

11 part.  There just hasn't been a showing of that.  And in terms

12 of having these discussions, there's just no way at this

13 juncture to know whether what you're trying to do is say here

14 are these hundred documents, we've turned them into a memo from

15 counsel just isolating this type of information, here's the

16 memo with just the factual information that we'd like to talk

17 to you about, and then stripping it of any kind of work product

18 or any kind of other information that you would not want to

19 propose.  If you're just producing that to the nonparty, I'm

20 not sure what the burden is to do that.  If it's a much larger

21 volume, then I might hear you on burden, but we just don't know

22 at this juncture, largely because we're at the beginnings of

23 the discovery process.  But with the guidance I've provided,

24 I'll ask the parties to meet and confer and see if they can

25 come up with a proposal.

OatWlivC

1          In terms of timing, Mr. Weiss, I would love to address
2     this next Friday when we're reconvening anyway, but that might
3     not be enough time.  Mr. Weiss, do you think you need more time
4     than that, or do you think you can talk over the next week with
5     plaintiffs to come up with either an agreed proposal or a --
6          (Indiscernible overlap)
7          MR. WEISS:  Thank you, your Honor.  I expect that we
8     should be able to meet and confer in time to address this next
9     Friday.  That may be a little optimistic, but I expect we
10    should be able to do that.
11         THE COURT:  OK.  So we'll plan on discussing this next
12    Friday.
13         Mr. White, I haven't heard from you.  Is there
14    anything you wanted to add, or are you good to meet and confer
15    with Mr. Weiss on this issue.
16         MR. WHITE:  I think we're good to meet and confer with
17    Mr. Weiss, and we can do it between now and the next time we
18    convene with you.
19         I just wanted to flag a very few issues to make sure
20    that we've kind of got this out there.
21         The first one is some of the language that was in the
22    plaintiffs' proposal was designed to protect the sources of
23    information.  So, for example, if the allegation from a third
24    party is that somebody else told us that certain conduct
25    occurred, then the amendment to the protective order would

OatWlivC

1    permit defendants' lawyers to talk with individuals or the

2    group of people that you've described about the conduct that's

3    alleged to have taken place on the part of the defendant but

4    not about who told, who provided that information to the

5    government.  So I hope we've got a common understanding on

6    that, but that's the one we viewed as important.

7         The second item is when we're talking about what

8    allegations, what conduct is being alleged, our expectation

9    is -- and I want to make sure I'm understanding correctly.  The

10    defendants want to talk about conduct or actions that are the

11    subject of the complaint, the allegations in the complaint.

12    And the ones they've identified so far are the ones that appear

13    in paragraphs 225 to 227.  That's the alleged retaliation, the

14    actual retaliation that was identified.  In other parts of the

15    complaint where conduct is alleged that they want to talk about

16    with the people who are shown in the documents to have engaged

17    in that conduct, that was the subject of our footnote that we

18    said we'd meet and confer on.

19         And the last thing I wanted to flag is the burden

20    argument, which we didn't ask for a meet-and-confer with the

21    third parties, but obviously, third parties kind of asked for

22    that, I believe.  So just talking about the burden point, with

23    respect, it doesn't seem like it would be much burden because,

24    or that it would be disproportionate to the needs of the case.

25    We've served subpoenas on 140 nonparties, and we've reached out

OatWlivC

1    to meet and confer with all of them, other things like search

2    terms and narrowing the scope and otherwise meeting our

3    obligation to minimize the burden on the third parties.

4         What defendants would be required to do here if you

5    did impose that requirement on them would be significantly

6    less, we believe, than what the plaintiffs have been doing.  So

7    to the extent that burden is a reason to hesitate about the

8    third parties' request for a meet-and-confer requirement, as

9    your Honor said, that hasn't been substantiated and we don't

10   think it could be.

11        THE COURT:  Yeah, I don't see it.  Burden is not the

12   issue in the Court's view right now.  The difficulty really is

13   in work product concerns, because if the defendants have to

14   preclear disclosure of particular information, they are going

15   to be calling out to the plaintiffs and to the nonparties

16   certain documents that they believe are relevant, that they

17   want to look into.  And that's the concern, is that it's hard

18   to imagine how that meet-and-confer process would happen in a

19   way that would not require the defendants to reveal some of

20   their thought processes about the ongoing case, and I don't

21   think that that is reasonable given the narrow parameters of

22   what it is they are permitted to disclose, as you've

23   articulated in your counterproposal.  And you'll work it out

24   and tweak it a little bit, but given the narrow nature of the

25   proposal, I don't think it's appropriate to have preclearance.

OatWlivC

```
1         Now, if the defendants want in-house counsel to be
2    also able to receive this information, under those
3    circumstances, given that they're a little bit farther removed
4    from counsel investigating the underlying factual
5    circumstances, under that situation, it may be appropriate to
6    have a meet-and-confer requirement.  And that's why I've asked
7    Mr. Weiss to think about that, and the parties can discuss.
8         And since you raised it, to the extent -- well, I'm
9    going to just say you should do this, is that when the parties
10   meet and confer and come up either with an agreed proposal or a
11   redline, they should share those with counsel for SeatGeek,
12   StubHub and AEG so that the Court can hear from them as to any
13   further issues they have with the proposals.
14        I'll hear from anyone from SeatGeek, StubHub or AEG if
15   they'd like to be heard at this time, but you can also be heard
16   on November 8 when we have our follow-up discussion.  I won't
17   put anything in place until I've heard from you.  So with that,
18   if there's counsel from -- let me start with SeatGeek, just to
19   do this in an orderly way.
20        Counsel for SeatGeek, Mr. Wick, is there anything
21   further you'd like to add at this juncture?
22        MR. WICK:  Yes, your Honor.  Can you hear me?
23        THE COURT:  I can hear you.
24        MR. WICK:  Thank you.
25        I would just like to emphasize again Mr. White's first
```

OatWlivC

1    point, which is one that I made at the previous hearing, which

2    there's a provision in defendants' counterproposal regarding

3    the source of allegations and would just like to echo

4    Mr. White's point -- I hope that we're all on the same page --

5    that the distinction is between, you know, reporting to an

6    employee, you know, you're alleged to have threatened venue X,

7    vis-à-vis venue X told SeatGeek that you threatened them.

8    That's really the distinction.

9              THE COURT:  I think that's reflected in the

10   plaintiffs' counterproposal under line item No. 2, outside

11   counsel for defendants may not, and then there's the line about

12   identifiers, including source, date or subject.

13             MR. WICK:  Right.  Your Honor, the concern that I have

14   is that sort of the source of documents, I think, as opposed to

15   the other, you know, identifying the other party to a

16   conversation.  I think we'll be advocating some slightly

17   tighter language there.  That's the only point that I wanted to

18   make.

19             THE COURT:  OK.  Thank you.

20             Let me turn to counsel for StubHub if you're on the

21   line.  Anything further to add?

22             MS. ST. MATTHEW-DANIEL:  Thank you, your Honor.  Can

23   you hear me OK?

24             THE COURT:  I can hear you.

25             MS. ST. MATTHEW-DANIEL:  All right.  Thank you.

OatWlivC

1          I think that for StubHub we just want to underscore

2     the concern that we have about the information about sort of

3     nonpublic commercial strategy being disclosed to defendants'

4     employees, because there is really no way to put the genie back

5     in the bottle.  So we're encouraged by your Honor's direction

6     to the parties to meet and confer, and we'll be looking to see

7     what the revised proposal is.  There's a possibility that we

8     may be coming back and asking your Honor to reconsider sort of

9     the need for some sort of notice because of that concern about

10    information going out, StubHub not being aware that it has been

11    disclosed and then really only coming to that understanding if

12    and when, like, the harm materializes.

13         And sort of one other thing we wanted to just put on

14    the Court's radar is that the sort of notice proposal that we

15    had envisioned is something that we think is already working,

16    at least between the defendants and StubHub right now, and

17    we've been engaging with them in that spirit and it seems to be

18    working, and we would be prepared to keep doing that in the

19    interest of allowing defendants to sort of defend their case

20    but also protecting StubHub's confidentiality concerns.

21         Thank you for giving us the opportunity to weigh in.

22         THE COURT:  Of course.  And the defendants have said

23    that they are not interested in any competitively sensitive

24    information.  They've given some examples, so hopefully that

25    allays some of your concern.

OatWlivC

1          In terms of the meet-and-confer process as it's been

2     working to date, is that a meet-and-confer as to de-designating

3     certain documents that were designated confidential or highly

4     confidential, or on a separate issue?

5          MS. ST. MATTHEW-DANIEL:  It's essentially about that.

6     It's about saying, OK, you've designated this document highly

7     confidential or confidential; we would like to at least be able

8     to use these portions to engage with our client, and then

9     having a back-and-forth and then proposing sort of specific

10    reactions and then sort of engaging with them in that spirit,

11    and it has been working from StubHub's perspective.

12         I can't speak for defendants, but that is the sort of

13    process that we would hope to engage in here and do it

14    efficiently to allow them to defend their case but not result

15    in a situation where material that defendants may not fully

16    understand is nonpublic, is really sensitive, from StubHub's

17    perspective, gets disclosed inadvertently to an employee of the

18    defendant without StubHub being aware of it happening in real

19    time.

20         THE COURT:  OK.  Understood.  Thank you.

21         MS. ST. MATTHEW-DANIEL:  Thank you.

22         THE COURT:  Let me hear, if I need to hear, from

23    counsel for AEG.

24         Mr. Bernick.

25         MR. BERNICK:  Yes, your Honor.

OatWlivC

1          I wanted to emphasize that same point about notice.

2    AEG is Live Nation's largest competitor in various markets,

3    including the promotions markets and ticketing markets that are

4    at issue here.  And my guess is if the shoe were on the other

5    foot and Live Nation was facing a situation where its documents

6    might potentially be disclosed or the substance of

7    communications and those documents might be disclosed to AEG,

8    they would be throwing a fit right now without having some

9    notice of that disclosure.  And that's the situation that we're

10   in.

11         And I fully appreciate the Court's focus on this and

12   the notion that everyone has to abide by the protective order

13   and its provisions, but it creates an odd asymmetry when the

14   defendant in the case has access to literally hundreds of

15   thousands of our most competitive sensitive documents and we

16   have no idea which ones of those documents they deem contain

17   communications that could be disclosed to individuals of their

18   client who are responsible for competitive decision-making

19   adverse to AEG.  And so we would underscore the request that

20   there be some provision of notice so that both sides know what

21   their obligations are with respect to documents, which is

22   normally the case with protective orders.  A protective order

23   designates material one way or the other, and everybody knows

24   the obligations.

25         Here, it would create an asymmetry where only Live

OatWlivC

```
1    Nation's counsel would know what standard they're applying to
2    communications that AEG has produced in this case and we'd have
3    no knowledge of that.  And we also believe, consistent with
4    counsel for StubHub, that the process can easily work.  We had
5    a similar request from Live Nation to de-designate a document,
6    and we got back to them in 48 hours and affirmed that we were
7    comfortable with it.  So we do believe there's a workable
8    process that would allow both sides, the disclosing side and
9    the receiving side, to understand what confidentiality
10   protections  applied.
11           So that's the position we take on any subsequent
12   meet-and-confer.  We just wanted to alert the Court to that
13   effect, and I appreciate the time today.
14           THE COURT:  OK.
15           Mr. Wick, has SeatGeek also had discussions with Live
16   Nation on de-designating certain information so that the
17   clients can see it?
18           MR. WICK:  We have had a discussion with Live Nation.
19   We reached what I thought was an accommodation, and Live Nation
20   decided not to pursue it further at that time.  But we're
21   certainly open to having those conversations.
22           THE COURT:  OK.
23           (Indiscernible overlap)
24           THE COURT:  OK.  I understand the point about the
25   asymmetry, but there's asymmetries in multiple respects.  Live
```

OatWlivC

```
1    Nation and Ticketmaster are being sued in this case, and so
2    there's an asymmetry there.  They have to be able to defend
3    themselves, and where there are allegations made in these
4    documents, they have to be able to investigate those, and that
5    will involve communications with their client.  And so that is
6    just something that it would be unfair to prevent them from
7    doing.  But we can work out the details and do it in a way that
8    will protect everyone's interests, and so I do appreciate
9    everyone giving their thoughts here.  And hopefully, over the
10   next week and a half, the parties will be able to further meet
11   and confer on a more focused proposal.  I don't think there's
12   great time urgency in getting this amendment in place because,
13   again, we're at the beginning of the discovery period, but I do
14   think it's something that we need to move swiftly on so that we
15   can have this in place and the defendants can do what they need
16   to do in terms of conveying information to the people who need
17   to hear it.
18           There was someone who wanted to speak, and I just
19   wanted to make sure that I've given them the opportunity.
20           MR. WEISS:  Thank you, your Honor.
21           We'll certainly move swiftly to meet and confer and
22   aim to conclude that process in time to have any issues
23   addressed at the hearing, the next hearing.
24           I do want to just make one point -- I think your
25   Honor's question got at this -- which is we have had
```

OatWlivC

1    discussions with Mr. Wick and Mr. Bernick and Ms. St.

2    Matthew-Daniel, and I appreciate those, and they have been

3    responsive about certain documents.  It is a, notwithstanding

4    the responsiveness and cordiality, cumbersome process and to

5    multiply that across multiple documents and third parties, I

6    think, is one of the issues.  But the other one is we're not

7    talking about de-designation with this amendment.  We're not

8    seeking to de-designate anything.  This is for a much more

9    narrow category of information.

10          The only reason why we did that was to, you know, to

11   make, to balance the interests of the third parties and not --

12   in the confidential documents and materials that they've

13   designated, and we're not seeking to de-designate those, while

14   allowing us to, you know, have the ability to investigate

15   allegations of misconduct that may be derived from a vast array

16   of third-party documents and not just the third parties who are

17   on the phone today.  But I understand your Honor's direction

18   and will certainly proceed to meet and confer around the topics

19   that the Court has, with the guidance that the Court has

20   provided.

21          THE COURT:  All right.  Thank you.

22          Let's move on to the last two items, which are not

23   items that any ruling at this time is requested, and those are

24   the plaintiffs raising some potential challenges to the

25   privilege determinations made by the defendants.  And so my

OatWlivC

1    answer there is that the plaintiffs can challenge whatever they

2    want to challenge on the defendants' logs, using the procedures

3    spelled out in the individual practices.  And the only guidance

4    that I'll give to both sides when they're furnishing their

5    privilege logs is pay close attention to the Court's individual

6    practices, including 5G, which has certain parameters on

7    privilege logs, and be mindful that the Court will review

8    documents *in camera*.  And so if the Court reviews a significant

9    number of documents *in camera* and determines that privilege

10   determinations have not been made in good faith -- this goes

11   for all sides -- then there could be consequences, including an

12   order compelling production of documents from the privilege

13   logs subject to a clawback at a later time, which no one wants

14   to happen.  And so just be mindful when you're producing these

15   logs that you've actually had people really look and make those

16   privilege calls and that they're made in good faith.

17           That's on the privilege issue.

18           On the contention interrogatories issue and the issue

19   of a 30(b)(6) deposition -- again, I don't think there's

20   anything that the parties are asking for from the Court;

21   they're just giving the Court a preview of what may come in the

22   future -- the only guidance I have here, it looks like the

23   parties are discussing these issues in good faith, which is

24   great.  In terms of a deposition being premature, there's no

25   start date for depositions, so if you want to take an early

OatWlivC

1   deposition, you can.  On contentions they're probably less

2   useful to take earlier because the contentions will change as

3   discovery is produced and as the parties' allegations are

4   clarified through the discovery process.

5         So the Court is not going to, in the way that it would

6   normally do on a 30(b)(6) deposition, require the parties to

7   adhere to whatever was said in the 30(b)(6) deposition if it's

8   on contentions and the understanding from everyone is that

9   contentions might change based on what is produced with

10  discovery.  So that is some potentially, hopefully, useful

11  guidance in terms of the timing, but my general reaction to the

12  parties' letter was that they're working together in good faith

13  to try to determine what an appropriate schedule would be and

14  at the appropriate time that there's an issue to bring to the

15  Court, either as to contention interrogatories or the 30(b)(6)

16  deposition, they will, in fact, do so.

17        I'll hear from the plaintiffs first if there's any

18  issues on those two issues that they wanted to raise, but I

19  didn't get the sense from the letters that there was anything

20  more than an update being provided to the Court.

21        MR. WHITE:  Your Honor, you're right.  We did not file

22  a letter motion on the privilege log challenges.  The reason we

23  didn't do that is this is a follow-on from the order that the

24  Court issued after the September conference compelling

25  production of documents responsive to our RFP No. 2 that were

OatWlivC

1  said to be privileged but shared with third parties and there

2  was a common interest claim.

3          This is more documents that all fall into that

4  category.  It's the same RFP.  It's the same privilege claim.

5  The only difference is these aren't

6  businessperson-to-businessperson communications, like the ones

7  you previously compelled.  These are lawyer-to-lawyer

8  communications.

9          Now, I will say this, Judge, that we sent some

10 questions to defendants last week when we saw the logs.  They

11 haven't responded to those questions yet.  So maybe the best

12 way to proceed, given the guidance you gave us on briefing, is

13 we get the answers to the questions and we file our motion if

14 it still looks like we need to do that.  So that was the only

15 suggested path forward, but hopefully defendants will get us

16 the answers to the questions in time for us to tee it up for

17 next Friday's conference.

18         THE COURT:  OK.

19         From defendants, any response?  Again, I don't have an

20 application before me, so I'm not ruling on anything, but if

21 defendants have anything to add other than you might just say

22 we'll talk to the plaintiffs, and we'll see if we can resolve

23 this.

24         VOICE:  Talk to plaintiffs.

25         THE COURT:  Sorry.  Who was that?

OatWlivC

```
1              (Indiscernible overlap)

2              MR. O'MARA:  Your Honor, we will talk to the

3     plaintiffs and see if we can resolve this.  Thank you.

4              THE COURT:  Perfect.  All right.

5              Anything further?

6              And I think that was Mr. O'Mara, but anything further,

7     Mr. O'Mara from defendants' side?

8              MR. O'MARA:  No, your Honor.

9              THE COURT:  OK.

10             All right.  Well, I thank both sides for their good

11    argument here, and we will put out an order with some of the

12    details that we discussed.  And we'll see everybody, or at

13    least those people that need to be there, next Friday, November

14    8.

15             Thank you very much.

16             We are adjourned.

17             (Adjourned)

18

19

20

21

22

23

24

25
```