OB81LIVC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA, et
     al.,
 4
                    Plaintiffs,
 5
                v.                       24 Civ. 3973 (AS)
 6
     LIVE NATION ENTERTAINMENT,
 7   INC., et al.,

 8               Defendants.             Conference (Remote)
     ------------------------------x
 9                                       New York, N.Y.
                                         November 8, 2024
10                                       11:44 a.m.

11   Before:

12                      HON. ARUN SUBRAMANIAN,

13                                       District Judge

14                            APPEARANCES

15   UNITED STATES DEPARTMENT OF JUSTICE
     ANTITRUST DIVISION
16        Attorneys for Plaintiffs
     BY:  BRIAN A. WHITE, ESQ., Trial Attorney
17        JOHN A. THORNBURGH, II, ESQ., Trial Attorney
          BONNY E. SWEENEY, ESQ., Senior Trial Attorney
18
     NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
19        Attorneys for Plaintiff State of New York
     BY:  JEREMY R. KASHA, ESQ.
20        Assistant Attorney General

21   CRAVATH SWAINE & MOORE LLP
          Attorneys for Defendants Live Nation, Ticketmaster
22   BY:  DAVID R. MARRIOTT, ESQ.

23   LATHAM & WATKINS LLP
          Attorneys for Defendants Live Nation, Ticketmaster
24   BY:  ROBIN L. GUSHMAN, ESQ.
          TIM O'MARA, ESQ.
25        JESSE M. WEISS, ESQ.
```

OB81LIVC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

OB81LIVC

APPEARANCES<br>(Continued)

COHEN & GRESSER, LLP
     Attorneys for SeatGeek
BY:  RONALD F. WICK, ESQ.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
     Attorneys for Viagogo (StubHub)
BY:  EYITAYO ST. MATTHEW-DANIEL, ESQ.

HOGAN LOVELLS US LLP
     Attorneys for AEG
BY:  JUSTIN BERNICK, ESQ.

OB81LIVC

```
 1              (Case called)

 2              THE COURT:  Let's proceed on what I understand are the

 3    couple of issues that we are here to address.

 4              First, on the amendment to the protective order, the

 5    Court has reviewed the parties' proposals and it will adopt the

 6    plaintiffs' proposal, which is Exhibit B to the parties' joint

 7    letter.  And just cutting to the chase, to the extent that the

 8    defendants want in-house counsel to be able to review the

 9    information at issue, as the Court sees it, there are two

10    options that the defendants have.  One is the option that's in

11    the protective order as it stands, which is that for

12    confidential information, they are permitted to designate

13    in-house counsel to review that information subject to some

14    limitations.  Now I understand that the defendants want

15    Mr. Wall and his colleague that was previously identified to be

16    the designated in-house counsel and the prohibitions that come

17    along with the designation would not fit for those two

18    individuals, but that doesn't explain for present purposes why

19    a competent and trusted in-house lawyer for the defendants——and

20    the Court is sure that there are many——can't fulfill the

21    function of making sure that defendants' in-house legal team is

22    apprised of the details of the documents that we're talking

23    about here today, and Mr. Wall is surely not the only person

24    who can handle that function.  There are likely many other

25    people in the in-house legal department who could handle that
```

OB81LIVC

1    particular function.  But even if the defendants really wanted

2    Mr. Wall and his colleague to be able to review this

3    information, then it seems that they should be able to talk

4    with the producing parties to de-designate the information

5    that's at issue.  At a basic level, the limited information

6    that defendants seek to disclose to their clients doesn't seem

7    to the Court to itself be confidential or highly confidential.

8    Indeed, it's about what the defendants themselves allegedly did

9    or said.  The problem is that the information appears in

10   documents that contain other things that should be maintained

11   confidential under this Court's protective order.  So just go

12   and have the information that you want to disclose

13   de-designated, and if you can't reach agreement, then the Court

14   will step in.  The producing parties should be reasonable in

15   their discussions with the defendants because if the Court

16   starts looking at documents—and I am fully ready to look at as

17   many documents as you want me to look at—and the Court gets

18   the sense that nonconfidential information was just bulk-tagged

19   as confidential or highly confidential, then the Court may

20   simply bulk de-designate documents presented so that they can

21   be furnished as nonconfidential documents.  So be reasonable in

22   your discussions with the defendants so that any truly

23   nonconfidential, nonhighly confidential information can be

24   freely disclosed.

25         Now the defendants complain that having to go document

OB81LIVC

1    by document to have documents de-designated would be unduly

2    burdensome.  There's been no actual showing of burden to date,

3    and of course defendants can simply bullet out in a memo or an

4    email the information that they believe is not either

5    confidential or highly confidential, and if there are disputes,

6    again, the Court will resolve them.

7            Now the Court on its own at the last conference raised

8    potential work product issues.  That wasn't something that the

9    parties or anyone raised, but the Court raised it.  As to that

10   concern, if the defendants are simply pointing to information

11   across numerous documents and telling the other side or the

12   producing third party that they don't think that information

13   fits the definition of confidential or highly confidential

14   information under the protective order, then that doesn't raise

15   any work product concerns, and in the normal course of

16   discovery, parties inevitably reveal to the other side the

17   documents and information they are most concerned with.  That's

18   just how discovery works.  So the defendants can simply flag

19   for the producing party those excerpts of documents that they

20   believe should be de-designated, and again, if the parties and

21   third parties can't resolve any issues on their own, just bring

22   those disputes to the Court.

23           But the Court expects that the parties and everyone on

24   the line can figure out a creative way to streamline this

25   process—for example, as I said, a memo simply extracting the

OB81LIVC

1    information that the defendants want de-designated, leaving out

2    all the sensitive, confidential information and identifiers

3    that the plaintiffs and third parties are concerned with, and

4    once de-designated, there would be no issue with furnishing

5    that information to Mr. Wall or anyone else working for the

6    defendants who need to see it.

7          So for those reasons, the defendants' motion to amend

8    the protective order is granted in part.  We'll put in the

9    amendment, and that will be reflected on the docket.

10          With that, I think I should at this point turn to

11    Mr. O'Mara to address any outstanding issues on search terms or

12    custodians.  So Mr. O'Mara, if you're on the line.

13          MR. O'MARA:  Your Honor, this is Tim O'Mara.  I

14    actually think that the plaintiff might want to start here

15    rather than I.

16          MR. THORNBURGH:  Good morning, your Honor.  This is

17    John Thornburgh for the United States.  I'm happy to start, if

18    that's all right with you.

19          THE COURT:  Of course.  Proceed.

20          MR. THORNBURGH:  All right.  Thank you.

21          So, you know, we've been working with defendants I

22    think, you know, quickly and in good faith on trying to resolve

23    the outstanding discovery issues.  I think we've made some

24    progress.  You know, from plaintiffs' perspective, there are

25    two issues, two important issues that remain outstanding for

OB81LIVC

1    which we can, you know——we appreciate the Court's guidance.

2              So the first one is on search terms and custodial

3    document negotiations.  So we have worked diligently over the

4    last few weeks to provide defendants with revised search term

5    proposals, you know, each one of which was narrower and less

6    burdensome than the one before it.  We've also incorporated

7    proposed changes from defendants to try to reduce the document

8    hit count and reduce their burden.  Our most recent proposal,

9    you know, decreased the number of documents that hit on

10   proposed search terms by nearly a million documents, and so we

11   think we've made good progress to try to address defendants'

12   burden concerns and also taking into account the guidance we

13   got from the Court last week.  Late last night, at around

14   11 p.m., we received a counterproposal from defendants, and,

15   you know, frankly we were just surprised by that proposal

16   because, after you kind of look under the hood, so to speak, it

17   seems likely that defendants' proposal would result in

18   defendants reviewing significantly less than the 1.5 million

19   document cap that the Court rejected just last week.  So, you

20   know, we think that our proposed search terms are reasonable as

21   they stand.  We're willing to make additional modifications to

22   address specific concerns that defendants have about, you know,

23   a few search terms hitting on too many documents, but given the

24   Court's guidance last week that the Court was not going to, you

25   know, cap the number of documents that defendants have to

OB81LIVC

```
1    review, we don't think that defendants' proposal that they
2    provided last night——which, again, after you look under the
3    hood would likely result in defendants reviewing less than
4    1.5 million documents——is a reasonable path forward here.
5              THE COURT:  Okay.  Well, look, I said there was no
6    cap, but to the extent that the proper application of search
7    terms would yield fewer than 1.5 million documents, that is
8    what it is too.  I mean, the point was that it would be
9    improper to judge relevance and proportionality based purely on
10   a document count.  You're supposed to judge these issues based
11   on the actual substance; so how reasonable are the search
12   terms, you know, which custodians should they go to, all of
13   those concerns, that's how you're supposed to figure it out.
14   I'm less concerned with the number of documents as being the
15   touchstone of Rule 26 proportionality.  I don't think there's
16   anything in the rules or any case that suggests that it's a
17   numbers game.  So, I mean, look, I'll hear from Mr. O'Mara, but
18   we can just do this sort of baseball arbitration; you can just
19   send me your search terms and I'll just pick one of them.  Or
20   if there's another proposal, I'm happy to do it.  But it seems
21   like you're working on it.  And do you think that there's
22   daylight, do you think you can try to resolve this with
23   defendants, or do you think, nah, it's not going to work
24   because we're so far off in those proposals and
25   counterproposals that no one's going to be able to figure this
```

OB81LIVC

1      out?

2              MR. THORNBURGH:  You know, your Honor, we thought as

3      of yesterday, before we got defendants' proposal, that we were

4      nearing an agreement.  As I've said, we've made significant

5      revisions to the search terms incorporating, you know, proposed

6      edits from defendants.  You know, one of the issues here I just

7      want to raise for the Court to understand is, defendants

8      continue to raise burden concerns about how many documents will

9      be captured by the custodial collections in the search terms.

10             THE COURT:  Yes.  What's the hit count on your search

11     terms?

12             MR. THORNBURGH:  Plaintiffs' search terms, your Honor?

13             THE COURT:  Yes.  The last hit count we got was

14     yesterday, 7.1 million.

15             MS. GUSHMAN:  Your Honor, this is Robin Gushman for

16     defendants.  I just want to clarify something with respect to

17     that count.

18             So the 7.1 million document count takes into account

19     the documents that have been collected thus far, which includes

20     primarily system emails.  We've explained this to defendants.

21     We are still in the process of collecting additional emails

22     from custodians, so that count is likely to increase

23     significantly, potentially by millions of documents.

24             THE COURT:  Okay.  And I'm sorry.  What was your name

25     again?

OB81LIVC

1           MS. GUSHMAN:  Robin Gushman.

2           THE COURT:  Ms. Gushman, can you just walk me through

3      that.  Okay.  I know that you disagree that it's actually

4      7 million, you think it's more, but let's say it's 7 million.

5      So then just, if you can, in like a couple sentences, so you

6      get those 7 million documents, you load them on Relativity or

7      whatever platform you're using, and then what happens next?

8      What are you doing to then review those documents for

9      production?

10          MS. GUSHMAN:  Your Honor, our proposal is to use

11      Technology Assisted Review, so what that would entail would be

12      reviewing an initial set of documents, reviewed by outside

13      counsel to determine responsiveness of those documents.  That

14      review will start to train a TAR model to understand what

15      documents are likely responsive and what documents are likely

16      not responsive.  That TAR model will filter the most likely

17      responsive documents to the top of the review, and we will

18      continue to review, using contract reviewers to do the initial

19      pass, those likely responsive documents, until we hit a certain

20      recall rate.  And the recall rate is essentially the estimated

21      percentage of responsive documents out of all responsive

22      documents in the set that have been identified through this TAR

23      process.  So for example, if you choose a 70 percent recall,

24      that means that when you hit 70 percent recalls, you've

25      identified 70 percent of the responsive documents in that

OB81LIVC

1    population, and at that point you cease the review and you

2    produce the responsive documents that you've identified through

3    that set.  So the number of documents that you review to get to

4    that point obviously depends on what the recall rate is, what

5    the richness of the population is, how responsive the documents

6    are, and of course how many total documents there are in the

7    overall population.

8        THE COURT:  Understood.  So the number may be higher,

9    but based on what you just told me, you're not actually going

10   to be reviewing that total set of hits because the way the

11   model works is, it tells you when you're getting to the point

12   where everything left is garbage, and at that point, you're

13   like, okay, what's left is probably not going to be responsive,

14   and so you're proceeding on that basis.  So the number will be

15   lower, but I just wanted the context.  Is what I said more or

16   less right?

17       MS. GUSHMAN:  Your Honor, that is more or less right.

18   I will clarify, of course, that if the, you know, the initial

19   document population is, for example, 14 million documents,

20   you'll be reviewing a significant number of documents in order

21   to reach that recall rate, but it's correct that you would not

22   be reviewing every single document in that population.

23       THE COURT:  Okay.  And Ms. Gushman, are you prepared

24   to address the proposal/counterproposal issue, or is there

25   someone else on your team that is handling that?

OB81LIVC

 1            MS. GUSHMAN:  Yes, I'm prepared to address that.

 2            Just one comment on Mr. Thornburgh's note that they

 3    had significantly decreased the population through revisions to

 4    search terms.  We respectfully disagree with that.  Their

 5    initial search terms population returned 7.8 million documents.

 6    We took the search term hits on that, organized them by

 7    highest-hitting terms, and then we proposed edits to reasonably

 8    streamline and eliminate and narrow terms that were inherently

 9    overbroad.  So for example, there was one term, "'revenue'

10    within 15 of 'ticket,'" that hit on over 730,000 documents in

11    itself, so we proposed edits to narrow terms like that.  We

12    also asked plaintiffs to include qualifiers to narrow certain

13    of those search strings to clarify why certain of these terms

14    are actually relevant.

15            On the next term, plaintiffs rejected most of these

16    proposed revisions, and the next set of search strings yielded

17    about 7.1 million documents.  So that's the latest hit count

18    that we've been discussing.  We again proposed revisions to

19    narrow this set.  This still included overbroad terms.  For

20    example, one string that contains the term "'fee' within 10 of

21    'ticket'" that hits on over 2.1 million documents.  And again,

22    as I noted previously, this number will significantly increase

23    after we finish collections.  The counterproposal that

24    Mr. Thornburgh referenced takes into account the search term

25    edits that we proposed.  It also proposes to narrow the

OB81LIVC

1    document population based on the type of document that is

2    searched.  So to clarify that, plaintiffs have agreed that it

3    is appropriate to search only emails and attachments and what

4    are called modern attachments, which are essentially documents

5    that are linked in emails.  They've agreed that it's

6    appropriate to search that limited set of document sources for

7    certain custodians and for certain time periods.  What we have

8    proposed is to search all custodians for that type of document,

9    so emails, attachments, and modern attachments, as well as

10    texts and chats for certain time periods and certain

11    custodians.  So that is what has reduced the document count.

12    We believe that limiting to that set of document types is

13    reasonable.  The most relevant material will be found in those

14    document types.  That is evidenced by the fact that the

15    deposition exhibits that were used during the investigation, as

16    well as documents referenced in the complaint, were, for the

17    vast majority, pulled from emails, attachments, texts and

18    chats, and the modern attachments, which are the links in the

19    emails, will give plaintiffs access to certain shared sources

20    as well.

21        THE COURT:  Got it.  That's very helpful, although I

22    will say that that entire discussion gives me some PTSD from my

23    days in private practice, so I commend you for having to work

24    through all of these issues with the plaintiffs here.  This

25    process, at this point, have the duplicates and near duplicates

OB81LIVC

1    already been taken out, or is it that you can't really do that

2    because at this point we're taking the full volume of documents

3    and applying the search terms to it and so the number could be

4    lower or higher, just we haven't done that process, you can't

5    feasibly do it at this point?

6        MS. GUSHMAN:  Your Honor, we have de-duplicated across

7    custodians and across the documents that have been collected

8    thus far.  It's possible that documents that are forthcoming in

9    the collection we're working on will, you know, be duplicates

10   of what's already in the collection, but the search term hits

11   account for de-duplication.

12       THE COURT:  Okay.

13       MR. THORNBURGH:  Your Honor—sorry—just one comment

14   on that, which is, you know, plaintiffs have agreed—despite

15   our ESI order contemplating something different, we've agreed

16   to allow defendants, in their review of documents, to utilize

17   email threading, which defendants have acknowledged will reduce

18   the document universe by 10 to 15 percent, and that

19   implementation has not yet occurred, so I just want to point

20   out that, you know, that implementation will significantly

21   reduce the number.  And as your Honor pointed out earlier, you

22   know, we can estimate the number of documents that defendants'

23   reviewers would have to review, based on, you know, the

24   responsiveness rate of documents the defendants have already

25   reviewed, and the defendants told us, you know, on Monday that

OB81LIVC

1    the review thus far for documents that were left over from the

2    investigation indicate, you know, a 37 percent responsiveness

3    rate.  So if TAR is automatically prioritizing the most likely

4    responsive documents and you also use email threading, what

5    you're really looking at for defendants' review is probably

6    about half of whatever the document hit count is, and, you

7    know, we acknowledge that we don't have a full picture of what

8    the total document universe is, but we don't think it's, you

9    know, two times what the current hit count is, and, you know,

10   it's difficult for us to understand what that number would be

11   because defendants have not finished those collections.  So

12   even though defendants have not finished those collections,

13   we're trying our best to estimate what those would be, given

14   all these other variables that are in play.

15        THE COURT:  Understood.  Okay.  So just to help me

16   out, in terms of the hit report, it goes term by term and

17   explains the number of hits, right?  It's just like a kind of

18   Excel document; is that right?

19        MS. GUSHMAN:  Your Honor, the hit reports are term by

20   term, but the way that plaintiffs have proposed their search

21   terms, they're in search strings, so it's kind of individual

22   terms combined together in each row.  It is possible to

23   deconstruct those, but it takes significant machine time.

24        THE COURT:  No, no, no.  I understand.  Yeah, no.  I

25   meant just literally.

OB81LIVC

 1            Here's what I'm going to propose.  You should keep

 2   working on it.  It seems like there's probably still some

 3   wiggle room on both sides.  Take until this coming Wednesday,

 4   and if you haven't reached an agreement, then each side can

 5   just email to the Court where they are in terms of their

 6   proposal or counterproposal and the Court will figure out which

 7   search terms will be applied.  And as you might expect, neither

 8   side may be happy with whatever the Court does, but I think the

 9   show needs to get on the road, so let's do it that way, unless

10   the parties have a different suggestion.

11            So Mr. Thornburgh, does that seem acceptable on your

12   side?  Because you need to start getting documents in and start

13   reviewing them.  So while in a perfect world, with infinite

14   governmental resources, you may want to sit there and go

15   through like millions and millions of documents, it might be

16   worth your time to just see if you can tighten up these search

17   terms to really focus on what's going to be most centrally

18   relevant here.  And then Ms. Gushman, on your end, if you're

19   being a little bit too, you know, stingy on some of these

20   terms, you might want to expand them just a little bit,

21   understanding what Mr. Thornburgh said, which is that given the

22   TAR protocol, the number of documents you're actually reviewing

23   might be lower.  But the parties are free to take the positions

24   that they're going to take, and by Wednesday, just submit them

25   in, and then if there are disputes, we'll resolve them, and

OB81LIVC

1    we'll send you back the search terms.

2              Ms. Gushman, or either side, whoever wants to chime in

3    on that, if there's any other suggestion, happy to hear it.

4              MS. GUSHMAN:  Thank you, your Honor.  That all makes

5    sense.  Just one logistical question for the filing next

6    Wednesday.  Is that an actual filing or would you prefer that

7    by email?

8              THE COURT:  You just do it by email.  I don't know

9    that the media is going to be terribly interested in the search

10   terms that either side is proposing to be reviewed here.

11             MS. GUSHMAN:  Thank you, your Honor.

12             THE COURT:  Okay.  Mr. Thornburgh, any further issues

13   to address or does that pretty much cover it in terms of what

14   we needed to handle today?

15             MR. THORNBURGH:  Your Honor, at the risk of asking you

16   to get too much more into the nitty gritty of document review,

17   I will say, you know, the parties have been working on a TAR

18   protocol, which obviously relates to all these issues we were

19   just discussing.  I think, you know, the key question that is

20   outstanding there is, it relates to the recall rate, which

21   defendants' counsel, you know, described to you earlier.  And,

22   you know, typically, in a TAR protocol process, the recall rate

23   is calculated—again, the recall rate is estimating how many

24   documents, how many responsive documents the TAR protocol has

25   correctly identified as a percentage of all responsive

OB81LIVC

1   documents in the total document universe; so essentially trying

2   to make sure the TAR protocol is accurately or sufficiently

3   capturing responsive documents.  And typically in a TAR

4   protocol, you know, that recall rate is calculated by looking

5   at the entire document universe, so all the documents

6   collected.  Here, defendants have indicated they want to use

7   search terms, which obviously we've been discussing and

8   negotiating and we are amenable to that, but what we think is

9   important is that the recall rate be calculated based on

10  looking at all documents that were collected.  Because if you

11  only look at the documents that hit on search terms, it doesn't

12  tell you anything about how many responsive documents may still

13  be out there that were not captured by the search terms.  So,

14  you know, defendants do not agree to that.  We've offered a

15  compromise to defendants.  Defendants want to do a 70 percent

16  recall rate if you just focus on the search term universe.

17  We've said we think it's appropriate to look at the total

18  universe.  We would agree to, you know, a recall rate of

19  70 percent for the total universe, or we think the recall rate

20  should be 80 percent if you just focus on the search term

21  universe.  So we think we've offered, you know, two amenable

22  compromises that would work, and we would hope, you know, to

23  get the Court's guidance on that issue.

24          THE COURT:  Well, I don't have anything in front of

25  me.  I understand the description, and that makes sense.  Are

OB81LIVC

1    you at the point where you could present that issue to the

2    Court?  And what I would suggest would be a single joint letter

3    where, Mr. Thornburgh, you can take first crack at it, explain

4    your position and what you want, and then you can hand it over

5    to Ms. Gushman and she can provide the defendants' response and

6    what they propose.  And once again, I'll just pick one of them,

7    or something in between.  So are you at a point where you want

8    to put in that joint letter?  It can be short and sweet, you

9    know, three pages.  And I would handle it the same way that I

10   would handle any dispute on the search terms, meaning you

11   submit it by Wednesday and you'll get an answer next week.

12            MR. THORNBURGH:  That's amenable to plaintiffs, your

13   Honor.

14            THE COURT:  Okay.  Ms. Gushman, does that sound good

15   on your end?

16            MS. GUSHMAN:  Yes, that sounds good.  Thank you, your

17   Honor.

18            THE COURT:  Okay.  All right.  So we have two

19   submissions coming in next Wednesday.  That should hopefully

20   resolve the search term issues and issues on the recall rate.

21   And any other issues?  I'll start with Ms. Gushman.  Any issues

22   that you wanted to raise other than those two?

23            MS. GUSHMAN:  Nothing further for defendants.  Thank

24   you, your Honor.

25            THE COURT:  Okay.  All right.  Well, I appreciate

OB81LIVC

1    everyone——

2              MR. WHITE:  Your Honor?

3              THE COURT:  Yes.  Someone else?

4              MR. WHITE:  This is Brian White for the plaintiffs.  I

5    just have two items to flag, if I may.

6              THE COURT:  You may.

7              MR. WHITE:  Thank you, your Honor.

8              The first one is just the mechanics of implementing

9    your order on the amendment to the protective order.  What we

10   would like on the plaintiffs' side is, the existing protective

11   order is 23 paragraphs long.  We set up the amendment as

12   paragraph 24, with the idea that it could be cut and pasted

13   into the existing protective order and then issued as an

14   amended protective order.  I wanted to ask if that's agreeable

15   to the Court and, if so, would you like for us to do the cut

16   and paste and send it to chambers or handle that some other

17   way?

18             THE COURT:  No, you do it.  But I have no issues with

19   that approach.  I imagine that the reason is that if you need

20   to convey the terms of the protective order to someone, it's

21   easier to just send them one document as opposed to a document

22   and then an amendment to the protective order.  So I think that

23   makes sense.  I would appreciate it if you could provide that

24   to the Court.  But it would be easier if you do it.

25             MR. WHITE:  Okay.  Thank you, your Honor.

OB81LIVC

1            The second issue is one that we talked about at the

2     last discovery conference, because you asked about what

3     submissions might be coming up.  We've been meeting and

4     conferring over the privilege log that was on the agenda for

5     the last hearing.  We had indicated to defendants that we were

6     at an impasse yesterday, but defendants have offered to provide

7     some additional information, so we haven't filed a motion to

8     compel on that.  We may not, but we may.  If we do, it will be

9     relatively soon.

10            THE COURT:  Okay.  And how many documents are we

11     talking about?

12            MR. WHITE:  18.

13            THE COURT:  Okay.  All right.  Well, finish up those

14     discussions, and if you reach an impasse, you can certainly

15     file a letter consistent with our individual practices, and at

16     that point, given those 18 documents, the next thing that will

17     happen is that I'll ask the defendants to provide those

18     documents for *in camera* review.

19            MR. WHITE:  Thank you, your Honor.

20            THE COURT:  I think that that clears everything up.  I

21     thank everyone for joining today.  And thank you, Mr. O'Mara.

22     I know that you're on the West Coast so it's pretty early for

23     you, but thank you for making the time.  I appreciate it.  And

24     have a good weekend, everyone.  We are adjourned.

25                              o0o