<u>Via ECF</u>

The Honorable Arun Subramanian  January 21, 2025
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl St., Courtroom 15A
New York, NY 10007

Re:   *United States, et al. v. Live Nation Entertainment, Inc., et al.*, No. 1:24-cv-3973-AS

Dear Judge Subramanian:

Plaintiffs hereby respectfully respond to the questions posed by the Court in its Order dated January 16, 2025, ECF No. 393.

**Question #1**: Is there a case or other authority directly addressing whether a tying or other Section 1 claim based on refusal-to-deal allegations is subject to the rule in *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004)?

**Response to Question #1**: Yes, the following cases directly address whether the Section 2 rule in *Trinko* applies to Section 1 claims:

***fuboTV Inc. v. Walt Disney Co.***, -- F. Supp. 3d --, 2024 WL 3842116, at *17 (S.D.N.Y. Aug. 16, 2024):

- "The JV Defendants argue that the Supreme Court's decisions in [*Trinko*] and *Pacific Bell Telephone Co. v. linkLine Communications, Inc.*, 555 U.S. 438, 442 (2009) control this case and compel the rejection of Fubo's claims. But the reliance on *Linkline* and *Trinko* is inapt for at least two independent reasons. First, those cases involved actions brought under Section 2 of the Sherman Act, not Section 7 of the Clayton Act, and primarily allege specific technical *per se* violations of the Sherman Act not applicable here. Second, *Linkline* and *Trinko* both involved unilateral conduct by existing and well-established companies, who operated as lawful monopolies (as a result of a combination of historical accident and regulatory action), not a new joint venture or concerted action by horizontal competitors. Specifically, courts have been clear that the 'no duty to deal' defense raised by the JV Defendants in reliance on *Linkline* and *Trinko* is not a defense to concerted actions."

***Spa Universaire v. Qwest Commc'ns Int'l, Inc.***, 2007 WL 2694918, at *1 (D. Colo. Sept. 10, 2007):

- "The defendants sought to extend the reasoning of *Trinko* to the Section 1 claim and, after briefing, this Court on March 18, 2005, ruled that the *Trinko* opinion did not foreclose claims for contracts in restraint of trade, illegal price discrimination, predatory pricing, illegal market allocation and conspiracy under Section 1."

***Z-Tel Commc'ns, Inc. v. SBC Commc'ns, Inc.*, 331 F. Supp. 2d 513, 547 (E.D. Tex. 2004):**

- "To briefly review, *Trinko*'s second sentence reads as follows: 'In this case we consider whether a complaint alleging breach of the incumbent's duty under the 1996 Act to share its network with competitors states a claim under § 2 of the Sherman Act, 26 Stat 209.' *Trinko*, at 875. In other words, *Trinko* was a § 2 case at heart. It is with that thought in mind that this Court notes that the words 'tying' or 'tie' do not readily appear in *Trinko*'s text. Tie-ins may be illegal under § 1 of the Sherman Act. The Court declines to read *Trinko* so as to lessen antitrust liability in contexts other than those addressed in that opinion. For this reason, Defendant's second argument to dismiss Plaintiff's Tying claim fails." (footnote omitted).

In addition, Plaintiffs identify the following cases as relevant to this issue:

***New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 31-32 (D.D.C. 2021):**

- "To the extent any scholarly commentary uses the term 'conditional dealing,' rather, the phrase generally refers to actions such as 'tying' or 'exclusive dealing.' The key fact distinguishing such conduct from a standard refusal to deal is that it is not 'unilateral,' but instead 'involves some assay by the monopolist into the marketplace' that interferes with the relationship between rivals and third parties. *Novell*, 731 F.3d at 1072. Tying, for instance, occurs when a firm 'requires third parties to purchase a bundle of goods rather than just the ones they really want,' *id*., thereby leveraging the monopolist's power in the 'tying' product market to harm its competitors (who lose access to customers) in the 'tied' product market. *See Microsoft*, 253 F.3d at 84. 'Exclusive dealing' is similar: it refers to a monopolist's conditioning the sale of a product on the buyer's agreement not to deal with its competitors. *Id*. at 69-70. Again, these 'conditional dealing' schemes are thus categorically different from unilateral conduct that involves only the monopolist's competitors, such as its refusal to deal with them. The distinction is critical, as antitrust law is far more tolerant of unilateral behavior. *See Novell*, 731 F.3d at 1072-73 (citing cases)." (citations omitted).

***Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1309 (10th Cir. 2017):**

- "[T]his general right to refuse to deal with competitors applies only to single, not multiple, actors—to unilateral, not concerted action. The *Trinko* Court acknowledged that distinction when it rejected the plaintiff's reliance on two early concerted-refusal-to-deal cases . . . because 'these cases involved *concerted* action, which presents greater anticompetitive concerns." *Trinko*, 540 U.S. at 410 n.3. So, contrary to Defendants' insistence, *Trinko* simply does not speak to claims, like those here, alleging concerted refusals to deal [under Sherman Act Section 1]." *Id*. at 1309 (citations omitted).

***Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1076 (10th Cir. 2013) (Gorsuch, J.):**

- "Refusal to deal doctrine targets only a discrete category of section 2 cases attacking a firm's unilateral decisions about with whom it will deal and on what terms." *Id*. at 1076.

***Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992):**

- "In 1987, the [independent service organizations, or ISO's] filed the present action in the District Court, alleging, *inter alia,* that Kodak had unlawfully tied the sale of service for

- Kodak machines to the sale of parts, in violation of § 1 of the Sherman Act, and had unlawfully monopolized and attempted to monopolize the sale of service for Kodak machines, in violation of § 2 of that Act." *Id.* at 459.

- "[R]espondents have presented sufficient evidence of a tie between service and parts. The record indicates that Kodak would sell parts to third parties only if they agreed not to buy service from ISO's. [Footnote 8:] In a footnote, Kodak contends that this practice is only a unilateral refusal to deal, which does not violate the antitrust laws. Assuming, *arguendo*, that Kodak's refusal to sell parts to any company providing service can be characterized as a unilateral refusal to deal, its alleged sale of parts to third parties on condition that they buy service from Kodak is not." *Id*. at 463 & n.8 (citation omitted).

**Question #2**: Is there a case or other authority directly addressing whether a seller must directly deal with the same buyer (or an intermediary with no independent financial interest) as to both the tying and tied product?

**Response to Question #2**: Yes, the following cases address this issue:

***Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020)** (Section 2 claim of tying interconnect services and ad rep services):

- "[A] tying claim does not fail as a matter of law simply because it was implemented by refusing to deal with an intermediary." *Id*. at 472.

- "The fact that the arrangements were structured so that ownership of the slot avails passed from the MVPDs to Viamedia does not affect this analysis. In applying the antitrust laws, we care more about economic substance than about form." *Id*. at 470.

- "Because self-providing ad rep services was not a viable option for RCN and WOW!, refusing to deal with their chosen intermediary had the effect of forcing them into much less desirable direct relationships with Comcast, their monopolist-competitor." *Id*. at 471.

- "Given these dynamics, Viamedia offered sufficient evidence that Comcast explicitly used its control over the Interconnects to deny access to its competitor MVPDs *or their agent* to force RCN and WOW! to use Comcast's ad rep services for *all* spot avails, including the two-thirds of spot avails sold outside of the Interconnects, many of which used to be sold locally in competition with Comcast." *Id.* at 471 (first emphasis added).

- "The partial dissent insists that that there was no conditioning and that 'RCN and WOW! maintained the ability to deal directly with Comcast and access the Interconnect without any ad representative should they choose not to employ Comcast.' This is wrong as a matter of fact. . . . The record contains evidence of the opposite: RCN and WOW! needed to employ an ad rep services provider, and once Comcast refused to deal through their chosen intermediary, they had no practical choice but to obtain ad rep services from Comcast." *Id*. at 471 n.17 (citation omitted).

- "As an ad rep services provider, Viamedia acted in the best interests of its MVPD customers and served as their agent or interface with the Comcast-controlled Interconnects . . . ." *Id*. at 472.

3

***Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992)** (Section 1 claim of tying photocopier replacement parts and photocopier repair services):

- "Some [independent service organization, or 'ISO'] customers purchase their own parts and hire ISO's only for service. Others choose ISO's to supply both service and parts. ISO's keep an inventory of parts, purchased from Kodak or other sources, primarily the OEM's." *Id*. at 458 (citations omitted).

- "In 1985 and 1986, Kodak implemented a policy of selling replacement parts for micrographic and copying machines only to buyers of Kodak equipment who use Kodak service or repair their own machines. As part of the same policy, Kodak sought to limit ISO access to other sources of Kodak parts. Kodak and the OEM's agreed that the OEM's would not sell parts that fit Kodak equipment to anyone other than Kodak. Kodak also pressured Kodak equipment owners and independent parts distributors not to sell Kodak parts to ISO's. In addition, Kodak took steps to restrict the availability of used machines. Kodak intended, through these policies, to make it more difficult for ISO's to sell service for Kodak machines. It succeeded. ISOs were unable to obtain parts from reliable sources, and many were forced out of business, while others lost substantial revenue. Customers were forced to switch to Kodak service even though they preferred ISO service." *Id.* at 458 (citations omitted).

- "Evidence in the record indicates that service and parts have been sold separately in the past and still are sold separately to self-service equipment owners." *Id*. at 462.

- "[R]espondents have presented sufficient evidence of a tie between service and parts. The record indicates that Kodak would *sell parts to third parties* only if they agreed not to buy service from ISO's." *Id*. at 463 (emphasis added).

***Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984)** (Section 1 claim of tying anesthesiological services and hospital services):

- "At issue in this case is the validity of an exclusive contract between a hospital and a firm of anesthesiologists. We must decide whether the contract gives rise to a per se violation of § 1 of the Sherman Act because every patient undergoing surgery at the hospital must use the services of one firm of anesthesiologists, and, if not, whether the contract is nevertheless illegal because it unreasonably restrains competition among anesthesiologists." *Id.* at 4-5 (footnote omitted).

- "The exclusive contract had an impact on two different segments of the economy: consumers of medical services, and providers of anesthesiological services. Any consumer of medical services who elects to have an operation performed at East Jefferson Hospital may not employ any anesthesiologist not associated with Roux." *Id.* at 7.

- "In sum, any inquiry into the validity of a tying arrangement must focus on the market or markets in which the two products are sold, for that is where the anticompetitive forcing has its impact. *Thus, in this case our analysis of the tying issue must focus on the hospital's sale of services to its patients, rather than its contractual arrangements with the providers of anesthesiological services*. In making that analysis, we must consider whether petitioners are selling two separate products that may be tied together, and, if so, whether they have used

4

their market power to force their patients to accept the tying arrangement." *Id.* at 18 (emphasis added).

- "[T]he anesthesiological component of the package offered by the hospital could be provided separately and could be selected either by the individual patient or by one of the patient's doctors," and "an anesthesiologist is normally selected by the surgeon, rather than the patient." *Id*. at 22-23.

- "Thus, the hospital's requirement that its patients obtain necessary anesthesiological services from Roux combined the purchase of two distinguishable services in a single transaction." *Id.* at 24.

- "[P]atients are required to purchase two separate items . . . ." *Id*. at 25.

**Question #3**: Do you have cases similar to this one holding that a consumer who directly purchased a product from the defendant, and who alleges an overcharge with respect to that product, either has or lacks antitrust standing?

**Response to Question #3**:

***In re Amazon.com, Inc. eBook Antitrust Litig.***, **2023 WL 6006525 (S.D.N.Y. July 31, 2023) (Report & Recommendation):**

- "In responding to Amazon's argument that Plaintiffs are complaining about inflated commissions for agency services charged to the Publishers, Plaintiffs rely heavily on *Apple Inc. v. Pepper*, 139 S. Ct. 1514 (2019), and for good reason, because the facts in *Pepper* are nearly indistinguishable from the factual allegations here. . . . To be sure, the lone issue in *Pepper* was whether the plaintiffs—iPhone owners who had bought apps directly from Apple through the Apple store—where 'direct purchasers' from Apple under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). *But ignoring* Pepper *simply because the case focused on a narrower component of the antitrust standing analysis would be misguided.* The . . . Complaint alleges that *it was Amazon's imposition of contractual provisions in its agreements with the Publishers that allowed it to charge supracompetitive commissions and those commissions, which were part of the retail price charged to consumers, caused consumers to pay higher-than-competitive prices for eBooks purchased on Amazon's platform. Accepting those allegations as true, as I must on a motion to dismiss, it was Amazon's conduct that resulted in the overpayment by consumers for eBooks purchased on Amazon's platform. Pepper* makes clear that 'if the retailer's unlawful monopolistic conduct caused a consumer to pay the retailer a higher-than-competitive price, the consumer is entitled to sue the retailer under the antitrust laws." *Amazon*, 2023 WL 6006525, at *12-13. (emphasis added) (citations omitted).

- "To support its arguments that Plaintiffs lack standing because they are complaining about monopolization of a market in which they do not participate—a market for agency services—Amazon relies primarily on two decisions: *In re Aluminum Warehousing Antitrust Litigation*, 95 F. Supp. 3d 419 (S.D.N.Y. 2015) ('*In re Aluminum*'), and *In re Zinc Antitrust Litigation*, 155 F. Supp. 3d 337 (S.D.N.Y. 2016) ('*In re Zinc*'). Neither decision supports Amazon's arguments here." *Amazon*, 2023 WL 6006525, at *13.

5

- "A practice that eliminates price competition and results in consumers paying higher prices, as Plaintiffs have alleged occurred here, is anticompetitive. . . . Plaintiffs have also identified an 'actual injury.' 'This requires us to look to the ways in which the plaintiff claims it is in a worse position as a consequence of the defendant's conduct.' Plaintiffs, who are consumers who purchased eBooks from Amazon, contend that they are worse off because they were 'overcharged' for eBooks they bought on Amazon's platform." *Id.* at *10-11 (citations omitted).

***In re Amazon.com, Inc. eBook Antitrust Litig.*, 2024 WL 918030 (S.D.N.Y. Mar. 2, 2024) (adopting in full report and recommendation in 2023 WL 6006525):**

- "Both sets of objections fail in light of the Supreme Court's decision in [*Pepper*], which held that iPhone owners had antitrust standing because they were direct purchasers of iPhone apps from Apple, who allegedly engaged in antitrust conduct in relation to iPhone apps. The Supreme Court rejected Apple's argument that the iPhone owners were not direct purchasers because the app developers were the ones to set the retail price of the apps and pay the allegedly inflated commission fees to Apple." *Id.* at *2. (footnote and citations omitted).

- "Amazon's argument that the commission the Publishers pay to Amazon is not directly linked to the prices paid by Amazon's retail eBook customers was squarely rejected by *Pepper*." *Id.* at *3 (footnote omitted).

- "*Amazon attempts to distinguish itself by arguing that is has no control over its eBook prices . . . . But this is not a material distinction from the 'who sets the price' argument that the Supreme Court rejected in* Pepper, 139 S. Ct. at 1522. And, in any case, Amazon cannot disclaim any control over eBook pricing, given the alleged MFNs and other contractual terms that purportedly give Amazon considerable leverage over eBook pricing and terms." *Amazon*, 2024 WL 918030, at *3. (emphasis added).

- "Amazon attempts to break the causation chain by arguing that the actual alleged injury at issue was Amazon charging the Publishers high commission fees, which the Publishers then reacted to by raising the prices of eBooks. *But this ignores that the commission fees come out of the pocket of the purchasers of eBooks (and go into Amazon's pocket), who are therefore the most directly injured, and that the retail trade eBooks market is ultimately the target and reason for Amazon's purported antitrust conduct.*" *Id.* at *4. (emphasis added) (citation omitted).

***Apple, Inc. v. Pepper*, 587 U.S. 273 (2019):**

- "Applying § 4, we have consistently stated that 'immediate buyers from the alleged antitrust violators' may maintain a suit against the antitrust violators." *Id*. at 279.

- "To the extent that *Illinois Brick* leaves any ambiguity about whether a direct purchaser may sue an antitrust violator, we should resolve that ambiguity in the direction of the statutory text. And under the text, direct purchasers from monopolistic retailers are proper plaintiffs to sue those retailers." *Id.* at 282.

- "[W]e fail to see why the form of the upstream arrangement between the manufacturer or supplier and the retailer should determine whether a monopolistic retailer can be sued by a downstream consumer who has purchased a good or service directly from the retailer and has

6

- paid a higher-than-competitive price because of the retailer's unlawful monopolistic conduct." *Id.* at 283.

- "The plaintiffs seek to hold retailers to account if the retailers engage in unlawful anticompetitive conduct that harms consumers who purchase from those retailers. That is why we have antitrust law." *Id.* at 288.

***Davitashvili v. Grubhub Inc.*, 2022 WL 958051 (S.D.N.Y. Mar. 30, 2022):**

- "[T]he Second Circuit agreed that the thrust of *McCready* is that the plaintiff was a participant in the very market directly distorted by the antitrust violation. The upshot is that sometimes the defendant will corrupt a separate market in order to achieve its illegal ends, in which case the injury suffered can be said to be inextricably intertwined with the injury of the ultimate target." *Id.* at *11 (cleaned up) (footnote omitted).

- "The amended complaint alleges plausibly that the direct classes' injuries in the direct markets similarly are 'inextricably intertwined' with Defendants' allegedly unlawful anticompetitive conduct in the Restaurant Platform Market. Plaintiffs plead that Defendants' NPCCs were designed to restrict competition that could result from restaurants offering lower prices in the direct markets. Defendants allegedly force consumers to pay supracompetitive prices in the direct markets as a 'means to eliminate competition' that would threaten their business." *Id.* at *12.

***In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677(2d Cir. 2009):**

- "In this case, the plaintiffs are purchasers of the defendants' product who allege being forced to pay supra-competitive prices as a result of the defendants' anticompetitive conduct. Such an injury plainly is of the type the antitrust laws were intended to prevent." *Id*. at 688.

- "Although the defendants' conduct at issue targeted their competitors, such as Barr, the plaintiffs' claimed injury of higher prices was 'inextricably intertwined' with the conduct's anti-competitive effects and thus 'flow[ed] from that which makes defendants' acts unlawful.'" *Id*.

- "As for the 'efficient enforcer factors'. . . [w]ith respect to the first factor, directness of injury, even though the plaintiffs' injuries were derivative of the direct harm experienced by the defendants' competitors, harming competitors was simply a means for the defendants to charge the plaintiffs higher prices." *Id*.

***In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F.Supp.3d 187 (S.D.N.Y. 2019):**

- "Here, the DPPs are direct purchasers of the defendant's product, the K-Cups, and allege that Keurig's anticompetitive conduct caused them to pay supra-competitive prices. . . . Although the conduct of which the DPPs complain largely targeted Keurig's direct competitors, such as TreeHouse and Rogers, the DPPs' alleged injury of overcharge was inextricably intertwined with the conduct's anti-competitive effects and thus flowed from that which makes defendants' acts unlawful." *Id*. at 221-22 (cleaned up) (citations omitted) .

- "The defendants in *DDAVP*—like Keurig here—argued that anticompetitive conduct targeted defendants' competitors and therefore the harm to the direct purchaser plaintiffs was too far

7

removed. The Second Circuit rejected this argument. As was the case with the direct purchaser plaintiffs in *DDAVP*, even though the injuries to the DPPs were derivative of the direct harm experienced by the defendants' competitors, harming competitors was simply a means for the defendants to charge the plaintiffs higher prices." *Id.* at 222.

***Crimpers Promotions Inc. v. Home Box Off., Inc.*, 724 F.2d 290 (2d Cir. 1983):**

- "We consider that Crimpers' case, rather than being distinguishable from *McCready's* in a sense favorable to the defendants, is stronger for the plaintiff, and that *Associated General* indicates no departure from *McCready* in any fashion pertinent to this case. *Id.* at 293.

- "Injury to Crimpers was the precisely intended consequence of defendants' boycott; with respect to that act the injury to Crimpers was even more 'direct' than to the producers or stations who defendants concede would have standing." *Id.* at 294.

- "Here, as in *McCready*, plaintiff's injury could hardly have been more 'direct.' . . . [D]espite their standing, the producers and stations would be hard put to establish just what damage they had suffered from inability to participate in Crimpers' show. . . .Crimpers *is* the most logical plaintiff to sue for the injury here alleged in the boycott of its trade show—as distinguished from the more general conspiracy to prevent direct dealings between producers and television stations." *Id.* at 296-97.

- "In sum, despite the able presentation by defendants' counsel, we are unconvinced that the victim of a successful boycott designed to support a broad policy of market limitation lacks standing under § 4 simply because the boycottee was not a buyer or a seller but was endeavoring to provide a method whereby buyers and sellers could deal effectively with each other without paying tribute to the defendants. The contrary view would run counter not only to the two most recent decisions of the Supreme Court but to elementary common sense." *Id.* at 297.

***In re Elec. Books Antitrust Litig.*, 859 F.Supp.2d 671, 676, 688, 690 (S.D.N.Y. 2012):**

- "Under the agency model, however, retailers do not set prices or make sales. Instead, the publisher sets the price and sells eBooks to consumers directly. The retailer acts as the publisher's agent by making the publisher's titles available in the retailer's store. In exchange for this service, the retailer receives as commission a percentage of the sale price for each eBook sold through its store." *Id.* at 676.

- "Besides ignoring many of the allegations in the Complaint, these arguments misconstrue the standard for pleading an antitrust conspiracy in this district. *The examination of a complaint for its purported failure to state a claim under the law is not the occasion for a court to judge the merits of the parties' competing claims*, including claims about the motivations of critical actors in an alleged price-fixing conspiracy. So long as a plaintiff states a plausible claim, a complaint may not be dismissed on a Rule 12(b)(6) motion even if a court believes it is more likely than not that the defendants reacted independently to 'common stimuli.' A court ruling on a Rule 12(b)(6) motion 'may not properly dismiss a complaint that states a plausible version of events merely because the court finds a different version more plausible.' In short, there is no 'probability requirement at the pleading stage,' and a plaintiff need not 'rule out the possibility of independent action.'" *Id.* at 688 (emphasis added) (citations omitted).

8

- "Finally, the fact that Apple might have had different motivations for joining the conspiracy, and was involved in only a portion of it, does not undermine the existence of the conspiracy itself or Apple's role as a participant." *Id.* at 690.

**Question #4**: Are there factual issues relevant to the arguments raised on the motion to dismiss? If not, why not? If so, explain what they are.

(Response on following page)

**Response to Question #4**: Yes, there are factual issues relevant to the arguments raised by Defendants' partial motion to dismiss, notably (but not exhaustively):

Plaintiffs allege that the artist is the customer for the provision of use of large amphitheaters, and, accordingly, claim a Section 1 tie. Defendants argue that the promoter is the customer, which directly contradicts the factual allegations in the Amended Complaint that the artist is the customer. *See, e.g.*, Am. Compl. ¶¶ 25-26 (artists make the "major decision" as to "which concert venues to use"; "[v]enues compete to attract artists to perform at their facility"; "artists . . . choose" a venue based on factors like "venue's ambiance, capacity, location, and acoustics"; "venue operator often works directly with the artist" with respect to staging and lighting of a show; venues charge "the artist and their promoter rent"); *id.* ¶¶ 207-208 (contracts at issue are "on behalf of" artists and typically for a "specific artist on a particular day"); *see also id.* ¶¶ 19, 29, 59, 201, 244. Factual issues relevant to deciding this issue include:

Who is the ultimate decisionmaker on amphitheater selection? What role do artists and their managers play in selecting amphitheaters for a tour? Which amphitheaters are favored or disfavored by artists, and how do artists' varied preferences affect their amphitheater selections? What are the contours of the relationship between an artist and an amphitheater, including who has financial responsibility for the use of the amphitheater and what additional amenities and services are amphitheaters contractually required to provide to artists? What are the contours of the relationship between an artist and a promoter with respect to an amphitheater, including financial responsibility, rights of refusal by the artist, and contractual terms requiring the promoter to ensure the artist's access to particular amphitheaters? Do amphitheaters compete with each other for artists or promoters, and if so, how do they compete? What are the economic and contractual terms for access to amphitheaters? For example, when are amphitheaters paid, who pays amphitheaters, and how much are amphitheaters paid?

**Would venues use increased leverage from more competition to reduce the cost of ticketing or reduce fees assessed by ticketers to consumers?** The Complaint alleges that venues may want to reduce overall costs of attendance so they can compete against other venues and may use rival ticketers in hopes of getting better overall offerings and increasing output and revenues, all of which would improve their bottom line (¶¶ 25, 98, 143, 105, 150-51). Defendants' causation argument depends on their competing factual inference that if marginal costs went down, venues would instead "pocket[] the incremental profit," MTD 22, and/or increase fees because they otherwise could not cover their costs, *id.* at 23; MTD Reply 9.

**Would any cost savings from venues be passed on to consumers?** The Complaint alleges that "open venues" would lead to more competition and lower fees (¶¶ 34, 107, 148). Defendants' argument that in Plaintiffs' but-for world, ticketers would charge "higher fees" depends on their competing factual inference that all ticketers could and would "recoup" in the same way Defendants do. MTD Reply 9 n.2.

**Would consumers patronize non-Ticketmaster venues more as a result of greater primary ticketing competition?** The Complaint alleges that Defendants maintain a feedback loop in which supracompetitive ticket prices fund exclusivity deals with coerced venues, leading to fewer concerts and less choice among touring artists, without regard to whether, in the but-for world, venues or artists would make different choices or simply make the same ones on better terms (¶¶ 52–61, 69, 88–98, 139–154, 181–185, 222). Defendants' "chains of causation" argument depends on their competing factual inferences that venues may be "accomplices," and that if venues are "victims," but-for world consumers "would go to more concerts at non-Ticketmaster venues because more artists would play there." MTD Reply 10.

10

Respectfully submitted,

/s/ *Bonny Sweeney*
BONNY SWEENEY
*Lead Trial Counsel*

Matthew R. Huppert
Arianna Markel
John Thornburgh
Lorraine Van Kirk
United States Department of Justice
Antitrust Division
450 Fifth Street N.W., Suite 4000
Washington, DC 20530
Telephone: (202) 725-0165
Facsimile: (202) 514-7308
Email:Bonny.Sweeney@usdoj.gov

*Attorneys for Plaintiff*
*United States of America*


/s/ *Adam Gitlin*
ADAM GITLIN (admitted *pro hac vice*)
Chief, Antitrust and Nonprofit Enforcement Section
COLE NIGGEMAN (admitted *pro hac vice*)

Office of the Attorney General for the District of Columbia
400 6th Street NW, 10th Floor
Washington, DC 20001
Adam.Gitlin@dc.gov
Cole.Niggeman@dc.gov

*Attorneys for Plaintiff District of Columbia*

/s/ Robert A. Bernheim
Robert A. Bernheim (admitted *pro hac vice*)
Office of the Arizona Attorney General
Consumer Protection & Advocacy Section
2005 N. Central Avenue
Phoenix, AZ 85004
Telephone: (602) 542-3725
Fax: (602) 542-4377
Email: Robert.Bernheim@azag.gov
*Attorney for Plaintiff State of Arizona*

/s/ Amanda J. Wentz
Amanda J. Wentz (admitted *pro hac vice*)
Assistant Attorney General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
Telephone: (501) 682-1178
Fax: (501) 682-8118
Email:  amanda.wentz@arkansasag.gov
*Attorney for Plaintiff State of Arkansas*

/s/ Paula Lauren Gibson
Paula Lauren Gibson (admitted *pro hac vice)*
Deputy Attorney General
(CA Bar No. 100780)
Office of the Attorney General
California Department of Justice
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
Telephone: (213) 269-6040
Email: paula.gibson@doj.ca.gov
*Attorney for Plaintiff State of California*

/s/ Conor J. May
Conor J. May (admitted *pro hac vice*)
Assistant Attorney General
Antitrust Unit
Colorado Department of Law
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email: Conor.May@coag.gov
*Attorney for Plaintiff State of Colorado*

/s/ Kim Carlson McGee
Kim Carlson McGee (admitted *pro hac vice*)
Assistant Attorney General
Office of the Attorney General of Connecticut
165 Capitol Avenue
Hartford, CT 06106
Telephone: 860-808-5030
Email: kim.mcgee@ct.gov
*Attorney for Plaintiff State of Connecticut*

 /s/ Lizabeth A. Brady
Lizabeth A. Brady
Director, Antitrust Division
Florida Office of the Attorney General
PL-01 The Capitol
Tallahassee, FL 32399-1050
Telephone: 850-414-3300
Email: Liz.Brady@myfloridalegal.com
*Attorney for Plaintiff State of Florida*

/s/ Richard S. Schultz
Richard S. Schultz (Admitted *pro hac vice*)
Assistant Attorney General
Office of the Illinois Attorney General
Antitrust Bureau
115 S. LaSalle Street, Floor 23
Chicago, Illinois 60603
Telephone: (872) 272-0996
Email: Richard.Schultz@ilag.gov
*Attorney for Plaintiff State of Illinois*

/s/ Jesse Moore
Jesse Moore (admitted *pro hac vice*)
Deputy Attorney General
Office of the Indiana Attorney General
302 W. Washington St., Fifth Floor
Indianapolis, IN 46204
Telephone: 317-232-4956
Email: Jesse.Moore@atg.in.gov
*Attorney for Plaintiff State of Indiana*

/s/ Noah Goerlitz
Noah Goerlitz (admitted *pro hac vice*)
Assistant Attorney General
Office of the Iowa Attorney General
1305 E. Walnut St.
Des Moines, IA 50319
Telephone: (515) 281-5164
Email: noah.goerlitz@ag.iowa.gov
*Attorney for Plaintiff State of Iowa*

/s/ Lynette R. Bakker
Lynette R. Bakker (admitted *pro hac vice*)
First Assistant Attorney General
Public Protection Division
Kansas Office of Attorney General
120 S.W. 10th Avenue, 2nd Floor
Topeka, KS 66612-1597
Telephone: (785) 296-3751
Email: lynette.bakker@ag.ks.gov
*Attorney for Plaintiff State of Kansas*

/s/ Mario Guadamud
Mario Guadamud *(admitted pro hac vice)*
Louisiana Office of Attorney General
1885 North Third Street
Baton Rouge, LA 70802
Telephone: (225) 326-6400
Fax: (225) 326-6498
Email: GuadamudM@ag.louisiana.gov
*Attorney for Plaintiff State of Louisiana*

/s/ Schonette J. Walker
Schonette J. Walker (Admitted *pro hac vice*)
Assistant Attorney General
Chief, Antitrust Division
200 St. Paul Place, 19th floor
Baltimore, Maryland 21202
Telephone: (410) 576-6470
Email: swalker@oag.state.md.us
*Attorney for Plaintiff State of Maryland*

/s/ Katherine W. Krems
Katherine W. Krems (admitted *pro hac vice*)
Assistant Attorney General, Antitrust Division
Office of the Massachusetts Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (617) 963-2189
Email: Katherine.Krems@mass.gov
*Attorney for Plaintiff Commonwealth of Massachusetts*

/s/ LeAnn D. Scott
LeAnn D. Scott (admitted *pro hac vice*)
Assistant Attorney General
Corporate Oversight Division
Michigan Department of Attorney General
P.O. Box 30736
Lansing, MI 48909
Telephone: (517) 335-7632
Email: ScottL21@michigan.gov
*Attorney for Plaintiff State of Michigan*

/s/ Zach Biesanz
Zach Biesanz
Senior Enforcement Counsel
Antitrust Division
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 1400
Saint Paul, MN 55101
Telephone: (651) 757-1257
Email: zach.biesanz@ag.state.mn.us
*Attorney for Plaintiff State of Minnesota*

/s/ Gerald L. Kucia
Gerald L. Kucia (admitted *pro hac vice*)
Special Assistant Attorney General
Mississippi Office of Attorney General
Post Office Box 220
Jackson, Mississippi 39205
Telephone: (601) 359-4223
Email: Gerald.Kucia@ago.ms.gov.
*Attorney for Plaintiff State of Mississippi*

<u>/s/ Justin C. McCully</u>
Justin C. McCully (Admitted *pro hac vice*)
Assistant Attorney General
Consumer Protection Bureau
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68509
Telephone: (402) 471-9305
Email: justin.mccully@nebraska.gov
*Attorney for Plaintiff State of Nebraska*

<u>/s/ Lucas J. Tucker</u>
Lucas J. Tucker (admitted *pro hac vice*)
Senior Deputy Attorney General
Office of the Nevada Attorney General
Bureau of Consumer Protection
100 N. Carson St.
Carson City, NV 89701
Email: ltucker@ag.nv.gov
*Attorney for Plaintiff State of Nevada*

<u>/s/ Zachary Frish</u>
Zachary A. Frish (admitted *pro hac vice*)
Assistant Attorney General
Consumer Protection & Antitrust Bureau
New Hampshire Attorney General's Office
Department of Justice
1 Granite Place South
Concord, NH 03301
Telephone: (603) 271-2150
Email: zachary.a.frish@doj.nh.gov
*Attorney for Plaintiff State of New Hampshire*

<u>/s/ Yale A. Leber</u>
Yale A. Leber (admitted *pro hac vice*)
Deputy Attorney General
Division of Law
Antitrust Litigation and Competition Enforcement
124 Halsey Street, 5th Floor
Newark, NJ 07101
Telephone: (973) 648-3070
Email: Yale.Leber@law.njoag.gov
*Attorney for Plaintiff State of New Jersey*

<u>/s/ Jeremy R. Kasha</u>
Jeremy R. Kasha
Assistant Attorney General
New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8262
Email: Jeremy.Kasha@ag.ny.gov
*Attorney for Plaintiff State of New York*

<u>/s/ Jeff Dan Herrera</u>
Jeff Dan Herrera (*pro hac vice* pending)
Assistant Attorney General
Consumer Protection Division
New Mexico Department of Justice
408 Galisteo St.
Santa Fe, NM 87501
Telephone: (505) 490-4878
Email: JHerrera@nmdoj.gov
*Attorney for Plaintiff State of New Mexico*

<u>/s/ Jessica V. Sutton</u>
Jessica V. Sutton (admitted *pro hac vice*)
Special Deputy Attorney General
North Carolina Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
Telephone: (919) 716-6000
Facsimile: (919) 716-6050
Email: jsutton2@ncdoj.gov
*Attorney for Plaintiff State of North Carolina*

<u>/s/ Sarah Mader</u>
Sarah Mader (admitted *pro hac vice*)
Assistant Attorney General
Antitrust Section
Office of the Ohio Attorney General
30 E. Broad St., 26th Floor
Columbus, OH 43215
Telephone: (614) 466-4328
Email: Sarah.Mader@OhioAGO.gov
*Attorney for Plaintiff State of Ohio*

<u>/s/ Robert J. Carlson</u>
Robert J. Carlson (admitted *pro hac vice*)
Senior Assistant Attorney General
Consumer Protection Unit
Office of the Oklahoma Attorney General
15 West 6th Street
Suite 1000
Tulsa, OK 74119
Telephone: 918-581-2230
Email: robert.carlson@oag.ok.gov
*Attorney for Plaintiff State of Oklahoma*

<u>/s/ Gina Ko</u>
Gina Ko (admitted *pro hac vice*)
Assistant Attorney General
Antitrust, False Claims, and Privacy Section
Oregon Department of Justice
100 SW Market St.,
Portland, Oregon 97201
Telephone: (971) 673-1880
Fax: (503) 378-5017
Email: Gina.Ko@doj.oregon.gov
*Attorney for Plaintiff State of Oregon*

<u>/s/ Joseph S. Betsko</u>
Joseph S. Betsko (admitted *pro hac vice*)
Assistant Chief Deputy Attorney General
Antitrust Section
Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
Telephone: (717) 787-4530
Email: jbetsko@attorneygeneral.gov
*Attorney for Plaintiff Commonwealth of Pennsylvania*

<u>/s/ Paul T.J. Meosky</u>
Paul T.J. Meosky (admitted *pro hac vice*)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400, ext. 2064
Fax: (401) 222-2995
Email: pmeosky@riag.ri.gov
*Attorney for Plaintiff State of Rhode Island*

<u>/s/ Danielle A. Robertson</u>
Danielle A. Robertson (admitted *pro hac vice*)
Assistant Attorney General
Office of the Attorney General of South Carolina
P.O. Box 11549
Columbia, South Carolina 29211
Telephone: (803) 734-0274
Email: DaniRobertson@scag.gov
*Attorney for Plaintiff State of South Carolina*

<u>/s/ Aaron Salberg</u>
Aaron Salberg (admitted *pro hac vice*)
Assistant Attorney General
1302 E. Hwy 14, Suite 1
Pierre SD 57501
Email: aaron.salberg@state.sd.us
*Attorney for Plaintiff State of South Dakota*

<u>/s/ Hamilton Millwee</u>
Hamilton Millwee (admitted *pro hac vice*)
Assistant Attorney General
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 38202
Telephone: (615) 291-5922
Email: Hamilton.Millwee@ag.tn.gov
*Attorney for Plaintiff State of Tennessee*

<u>/s/ Diamante Smith</u>
Diamante Smith (admitted *pro hac vice*)
Assistant Attorney General, Antitrust Division
Office of the Attorney General of Texas
P.O. Box 12548
Austin, TX 78711-2548
Telephone: (512) 936-1674
*Attorney for Plaintiff State of Texas*

<u>/s/ Marie W.L. Martin</u>
Marie W.L. Martin (admitted *pro hac vice*)
Deputy Division Director,
Antitrust & Data Privacy Division
Utah Office of Attorney General
160 East 300 South, 5th Floor
P.O. Box 140830
Salt Lake City, UT 84114-0830
Telephone: 801-366-0375
Email: mwmartin@agutah.gov
*Attorney for Plaintiff State of Utah*

<u>/s/ Sarah L. J. Aceves</u>
Sarah L. J. Aceves (*pro hac vice* forthcoming)
Assistant Attorney General
Consumer Protection and Antitrust Unit
Vermont Attorney General's Office
109 State Street
Montpelier, VT 05609
Telephone: (802) 828-3170
Email: sarah.aceves@vermont.gov
*Attorney for Plaintiff State of Vermont*

<u>/s/ David C. Smith</u>
David C. Smith (admitted *pro hac vice*)
Assistant Attorney General
Office of the Attorney General of Virginia
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 692-0588
Facsimile: (804) 786-0122
Email: dsmith@oag.state.va.us
*Attorney for Plaintiff Commonwealth of Virginia*

<u>/s/ Rachel A. Lumen</u>
Rachel A. Lumen (admitted *pro hac vice*)
Assistant Attorney General
Travis Kennedy (admitted *pro hac vice*)
Managing Assistant Attorney General
Antitrust Division
Washington Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
Telephone: (206) 464-5343
Email: Rachel.Lumen@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

<u>/s/ Douglas L. Davis</u>
Douglas L. Davis (admitted *pro hac vice*)
Senior Assistant Attorney General
Consumer Protection and Antitrust Section
West Virginia Office of Attorney General
P.O. Box 1789
Charleston, WV 25326
Telephone: (304) 558-8986
Fax: (304) 558-0184
Email: douglas.l.davis@wvago.gov
*Attorney for Plaintiff State of West Virginia*

<u>/s/ Laura E. McFarlane</u>
Laura E. McFarlane (admitted *pro hac vice*)
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
Telephone: (608) 266-8911
Email: mcfarlanele@doj.state.wi.us
*Attorney for Plaintiff State of Wisconsin*

*/s/ William T. Young*
William T. Young
Assistant Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
Telephone: (307) 777-7841
Email: william.young@wyo,gov
*Attorney for the Plaintiff State of Wyoming*

*/s/ William T. Young*
William T. Young
Assistant Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
(307) 777-7841
william.young@wyo,gov
*Attorney for the Plaintiff State of Wyoming*