**VIA ECF**

The Honorable Arun Subramanian
United States District Court
Southern District of New York
500 Pearl Street, Courtroom 15A
New York, NY 10007-1312

Re:    *United States et al. v. Live Nation Entertainment, Inc. et al.*; 1:24-cv-03973-AS-SLC

Dear Judge Subramanian:

      Defendants submit this letter responding to the questions posed in the Court's January 16, 2025 Order regarding Defendants' motion to dismiss (ECF No. 393).

1. **Is there a case or other authority directly addressing whether a tying or other Section 1 claim based on refusal-to-deal allegations is subject to the rule in *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004)?**

   - *Sambreel Holdings LLC v. Facebook, Inc.*, 906 F. Supp. 2d 1070, 1075–78, 1080 (S.D. Cal. 2012) (emphases added):

     > As an overarching premise, the Court is persuaded that Facebook has a right to control its own product, and to establish the terms with which its users, application developers, and advertisers must comply in order to utilize this product. Indeed, it is well settled that, "as a general matter, **the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'"** *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 408, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004), *quoting U.S. v. Colgate and Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992 (1919). . . .
     >
     > **"[I]t is a longstanding antitrust principle that Section 1 of the Sherman Act does not preclude a party from unilaterally determining the parties with whom it will deal and the terms on which it will transact business."** *Kingray, Inc. v. NBA, Inc.*, 188 F.Supp.2d 1177, 1188 (S.D.Cal.2002) (citation omitted). . . .
     >
     > **Claim 2: Sherman Act § 1, Unlawful Negative Tying**
     > Sambreel alleges that Facebook's gating campaign constituted unlawful negative tying because Facebook agreed to offer its website only to users who would agree not to use Sambreel's services. The two markets at issue are 1) the market for social networking services in the United States, and 2) the market for applications and add-ons that enhance social networking services. (Compl. ¶¶ 50–58).
     >
     > **As a preliminary matter, the Court finds that just as Facebook has the right to determine the terms on which it will permit its Application Developers to use the Facebook Platform, it has a right to dictate the terms on which it will**

1

**permit its users to take advantage of the Facebook social network.** *Trinko*, **540 U.S. at 408, 124 S.Ct. 872;** *LiveUniverse*, **304 Fed.Appx. at 557.** There is no fundamental right to use Facebook; users may only obtain a Facebook account upon agreement that they will comply with Facebook's terms, which is unquestionably permissible under the antitrust laws. *Id.* **It follows, therefore, that Facebook is within its rights to require that its users disable certain products before using its website.**

"A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.'" *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 461–62, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) *quoting Northern Pacific R. Co. v. United States*, 356 U.S. 1, 5–6, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). **The Court finds that the allegations in the Complaint do not support such an arrangement here**. . . .

- *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 31–33 (D.D.C. 2021) (emphases added), *aff'd sub nom. New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023):

    **Plaintiffs get no further by maintaining that Facebook's policies also violated antitrust rules against what they call "conditional dealing."** *See* States Opp. at 35. As an initial matter, the States are wrong to argue that a monopolist violates that so-called doctrine "when it requires third parties seeking to obtain its products or services to refrain from taking some action that would tend to foster competition on the merits." *Id.* They cite only *Lorain Journal Co. v. United States*, 342 U.S. 143, 149, 72 S.Ct. 181, 96 L.Ed. 162 (1951), for that proposition, and yet *Lorain* says nothing of the sort. That is unsurprising, **as such a broadly formulated rule would cover refusals to deal with competitors,** thus contradicting the cases discussed above — after all, **such refusals can always be reframed as offers to deal only on the condition that the third party refrains from competing**. *See, e.g.*, Herbert Hovenkamp, *FRAND and Antitrust*, 105 Cornell L. Rev. 1683, 1697 (2020) (defining "simple refusal[s] to deal" covered by *Trinko* rule to include "refusal[s] conditioned on a firm's status that cannot readily be changed," such as where a firm "agree[s] to sell to [non]competitors but not [ ]competitors"). . . .

    For the *Lorain Journal* principle (or exclusive-dealing doctrine generally) to apply to this case, as Plaintiffs argue it does, they would thus have to allege that Facebook conditioned access to its Platform APIs on app developers agreeing not to deal with other social-networking services. And, indeed, the States' Opposition suggests that Facebook did just that. *See* States Opp. at 35 ("Facebook ... adopt[ed] policies prohibiting app developers from promoting competing social networks."); *id.* ("These policies deterred apps from ... working with other [social] networks ...."). **If Facebook had in fact interfered in that way with the ability of competing social-networking services to make agreements with app developers, it could plausibly have violated Section 2**; such conduct might well have had a "significant effect in preserving [Facebook's] monopoly" by keeping user engagement with

competing social-networking services "below the critical level necessary for any rival to pose a real threat to [its] market share." *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005) (finding Section 2 liability based on exclusive dealing); *see also Microsoft*, 253 F.3d at 69–70 (same).

**Plaintiffs, however, have not sufficiently *pleaded* the sort of conduct just described.** . . .

- *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 305 (D.C. Cir. 2023) (emphasis added):

    This brings us to the States' claim that Facebook published in its 2013 list of Platform Policies for app developers a policy that "forbid applications that 'replicat[e] [Facebook's] core functionality.'" Complaint ¶ 201 (alterations in original).

    Here too the States' quotation is accurate but incomplete and so is misleading. The full text of this Platform policy statement in 2013 was:

    > Reciprocity and Replicating core functionality: (a) Reciprocity: Facebook Platform enables developers to build personalized, social experiences via the Graph API and related APIs. If you use any Facebook APIs to build personalized or social experiences, you must also enable people to easily share their experiences back with people on Facebook. (b) Replicating core functionality: *You may not use Facebook Platform* to promote, or to export user data to, a product or service that replicates a core Facebook product or service without our permission.

    The words we have put in italics are critical. The full text shows that Facebook was prohibiting developers from using Facebook's Platform to duplicate Facebook's core products.

    **The States' basic allegation – that Facebook "cut off" competitors from "access to ... [Facebook's] immensely valuable network," Complaint ¶ 13 – thus amounts to a "claim based upon the defendant's refusal to cooperate with its competitor[s]."** *Covad Commc'ns Co. v. Bell Atlantic Corp.*, 398 F.3d 666, 673 (C.A.D.C. 2005).

- Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1700j1 (5th ed. Supp. 2024):

    If a defendant is ever forced by antitrust law to sell inputs to would-be rivals, that duty arises not from the easily triggered "per se" rule against tying but from the more narrowly circumscribed commands of Sherman Act § 2 to true monopolists, actual or potential. . . .

> A challenged arrangement is not a tie-in unless the alleged foreclosure can be eliminated by instructing the defendant to disaggregate what it sells to its customers[,] . . . rather than by an order to sell something . . . to would-be rivals.

- *Authenticom, Inc. v. CDK Glob., LLC*, 874 F.3d 1019, 1026 (7th Cir. 2017) (emphasis added):

  > The proper remedy for a section 1 violation based on an agreement to restrain trade is to set the offending agreement aside. From the standpoint of preliminary injunctive relief, that would mean ordering Reynolds and CDK not to implement their 2015 agreements or any alleged agreement collectively to bar Authenticom from their data management systems. Had the district court issued such an injunction, we would have a different case. But it did not. Instead, **it ordered the defendants to enter into an entirely new arrangement with Authenticom (granted, during the pendency of the litigation), essentially forcing them to do business with Authenticom on terms to which they did not agree. Such an order is inconsistent with *Trinko*, which cautioned that an order to continue to do business with a firm is proper only if the case fits "within the limited exception recognized in *Aspen Skiing*** [*Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985) ]." 540 U.S. at 409, 124 S.Ct. 872. *Aspen Skiing* was a section 2 case, which already distinguishes it from the present one. In a section 1 case, all that is needed is to break up the allegedly troublesome agreement and return the market, for the time being, to the *status quo ante*. See *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 533 (4th Cir. 2003) (reversing a mandatory injunction similar to the one in this case on the ground that "relief under the antitrust laws must flow from *that conduct* which is proscribed by the antitrust laws") (internal quotation marks omitted; emphasis in original).

2. **Is there a case or other authority directly addressing whether a seller must directly deal with the same buyer (or an intermediary with no independent financial interest) as to both the tying and tied product?**

- *hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137, 1152–54 (N.D. Cal. 2020) (emphases added):

  > **Lock-In** . . . In the instant case, hiQ has not explained how LinkedIn has exploited its locked-in *customers* (*i.e.*, users). Indeed, hiQ does not appear to claim any exploitation of locked-in *customers*; instead, it suggests that LinkedIn has used the lock-in to harm *people analytics providers*. See Opp'n at 22. **Similar to the problem with hiQ's tying argument, see *infra*, this is not a case whether the same party lured to do business with the defendant is then evoked in to purchase additional products and serving [sic] from that defendant**. The Court therefore finds the lock-in theory implausible and without precedent and dismisses it. . . .

  > **Tying** . . . In the FAC, hiQ alleges that the tying product is LinkedIn's "professional social networking platform" and the tied product is people analytics services.

4

FAC ¶ 125. hiQ further alleges that there is illegal tying because "LinkedIn has conditioned the provision of its dominant professional social networking platform on the use of its people analytics services (or the non-use of its competitors' people analytics services)." FAC ¶ 126.

**The tying claim, however, makes no sense**. hiQ has not explained how LinkedIn has essentially forced employers to purchase LinkedIn's people analytics product (or forced employers not to purchase other companies' comparable products) in order for the employers to use LinkedIn's professional social networking platform. **Again, there are two different consumer groups: (1) those individuals who use LinkedIn's professional social network, and (2) employers want to purchase people analytics products. As noted above, there is no tying of products directed at the same consumer group**.

- *In re Dealer Mgmt. Sys. Antitrust Litig.*, 360 F. Supp. 3d 788, 802–03 (N.D. Ill. 2019) (emphases added):

    **Defendant argues that Plaintiffs' Section 1 tying claim fails because such a claim requires that the buyer of the tying product and the tied product be the same**. "A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.'" *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461-62, 112 S. Ct. 2072, 119 L. Ed. 2d 265 (1992) (quoting *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5-6, 78 S. Ct. 514, 2 L. Ed. 2d 545 (1958)). "Such an arrangement violates § 1 of the Sherman Act if the seller has appreciable economic power in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market." *Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 832 (7th Cir. 2014) (quoting *Eastman Kodak*, 504 U.S. at 462) (internal quotation marks omitted). "[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12, 104 S. Ct. 1551, 80 L. Ed. 2d 2 (1984), abrogated on other grounds by *Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 126 S. Ct. 1281, 164 L. Ed. 2d 26 (2006).

    Here, **Defendant argues that Plaintiffs' tying claim fails because the dealers buy the tying product (*i.e.*, the DMS) but not the tied product (*i.e.*, integration services). Plaintiffs argue that because dealers pay a portion of the integration fees (which are passed on by the vendors) and make the purchasing decision for both the DMS and the integration service, dealers functionally are the purchasers of both the tied and tying products**. In support of that argument, Plaintiffs cite to *Dos Santos v. Columbus-Cuneo-Cabrini Med. Ctr.*, 684 F.2d 1346, 1354 (7th Cir. 1982). In that case, the Seventh Circuit noted that a patient might not be the real purchaser of anesthesiology services "[b]ecause the patient generally takes no part in the selection of a particular anesthesiologist" and "because the expense of anesthesia services to the patient is ordinarily at least partially insured

5

or otherwise payable by a third party[.]" *Id*. at 1354. However, the court in *Dos Santos* also noted that the patient does not make "*any* significant economic decision" in that regard. *Id.* (emphasis added).

**Although Plaintiffs allege that a vendor must receive authorization from the dealer before a data integrator can access the dealer's data, this does not establish that vendors such as Plaintiffs do not make any significant economic decision in selecting data integration services. Nor does the fact that some costs are passed on to dealers establish that the dealers are the actual purchasers of the data integration services**. *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 961. Plaintiffs reliance on *Dos Santos*, which was not even a tying case, therefore is misplaced. The Court recognizes that "formalistic distinctions rather than actual market realities are generally disfavored in antitrust law." *Eastman Kodak*, 504 U.S. at 466-67. **Still, Plaintiffs' allegations do "not plausibly suggest that dealers, not vendors, make the economic choice about which integrator to use and suffer the consequences of those decisions."** *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 961 (dismissing tying claim) (citations omitted). Accordingly, the Court grants Defendant's motion to dismiss Plaintiffs' tying claim.

- *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 71 (2d Cir. 1996) (emphasis added):

    This pattern accords with the "fundamental principle of antitrust law that an illegal tying arrangement requires that at least two products and/or services be purchased **by the same individual**; that is, there must be lineal movement between the products." *Waldo v. North Am. Van Lines, Inc.*, 669 F.Supp. 722, 731 (W.D.Pa.1987) (collecting cases).

3. **Do you have cases similar to this one holding that a consumer who directly purchased a product from the defendant, and who alleges an overcharge with respect to that product, either has or lacks antitrust standing?**

- *Bakay v. Apple Inc.*, No. 24-cv-00476-RS, 2024 WL 3381034, at *7 (N.D. Cal. July 11, 2024) (emphases added):

    Apple argues that antitrust standing is independently unsatisfied because Plaintiffs' alleged injury occurs in the smartphone and SOS market and manifest as **supracompetitive iPhones prices**, and Plaintiffs have failed to allege injury "in the market where competition is allegedly being restrained," that is, in the U.S. mobile browser market. *F.T.C. v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020). **Plaintiffs insist that they are market participants because they directly purchased their iPhones from Apple**, and, in turn, directly bought iOS from Apple. **Yet, the issue is not whether Plaintiffs are direct or indirect purchasers of the iPhone. What matters is whether Plaintiffs' alleged injury in the smartphone market amounts to a claim of antitrust injury in the U.S. mobile browser market. Here, Apple's restraint is characterized as the WebKit requirement, which prohibits a non-WebKit browser engine from deploying**

6

on iOS (thereby restraining PWA developers). **The injury as alleged is the iPhone's supracompetitive price. The distinct markets here weigh against a determination of antitrust standing because whether Plaintiffs' injuries flow from "that which makes Defendant's conduct unlawful" is unclear.** *See Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1028 (N.D. Cal. 2015) (citing *Am. Ad Mgmt.*, 190 F.3d at 1055).

Plaintiffs argue that they are the appropriate class of individuals to bring the instant action because only iPhone purchasers can recover for an iPhone overcharge. In support, Plaintiffs invoke *Apple v. Pepper*, where the Supreme Court held that an antitrust defendant "may be liable to different classes of plaintiffs—both to downstream consumers and upstream markets." 139 S. Ct. 1514, 1525 (2019). Plaintiffs further maintain that the fact that the WebKit agreements may also injure browser or PWA developers does not mean that Plaintiffs are deprived of antitrust standing. **Here, however, the site of Plaintiffs' injury is the smartphone market, while Apple's alleged anticompetitive conduct occurs in the U.S. mobile browser market**, as it relates to the development and distribution of PWAs. **The iPhone users in *Pepper* sustained injuries in the same market as the upstream app developers, that is, in the app market. Those circumstances are absent here.**

- *Nypl v. JPMorgan Chase & Co.*, No. 15-cv-09300-LGS, 2017 WL 1133446, at *1, *5 (S.D.N.Y. Mar. 24, 2017) (emphases added and footnotes omitted):

    Plaintiffs, a group of individuals and businesses that **purchased foreign currency** in the end-user market, bring this putative class action against eighteen banks and their affiliates under the Sherman Antitrust Act, 15 U.S.C. § 1 et seq. **Plaintiffs allege that they paid inflated foreign currency exchange rates** caused by Defendants' alleged conspiracy to fix prices in the foreign exchange ("FX") or foreign currency market. . . .

    The Complaint here does not plausibly allege that the end-user (i.e., consumer) retail foreign currency market in which Plaintiffs participated was directly restrained by Defendants' alleged anticompetitive acts. All of the Complaint's allegations of wrongdoing are based on the DOJ press release and relate to Defendants' manipulation of the FX spot market and the benchmark exchange rates derived from trades in the FX spot market. Plaintiffs admitted in their opposition to Defendants' earlier motion to stay this action that the FX spot market is "completely different" from the end-user market. *Nypl*, 2016 WL 3211440, at *3. Consequently, any injury Plaintiffs suffered was in a market separate from the one that Defendants allegedly manipulated, and therefore does not qualify as an antitrust injury.

    **Plaintiffs' contrary arguments fail. First, Plaintiffs attempt to distinguish *Aluminum III* on the ground that they purchased foreign currency directly from Defendants, whereas *Aluminum III* involved indirect purchasers. The relevant inquiry is not whether Defendants directly transacted with Plaintiffs,**

7

**but whether Defendants directly restrained the market in which Plaintiffs participated.** *See Aluminum III*, 833 F.3d at 161 ("The upshot is that to suffer antitrust injury, the putative plaintiff must be a participant in the very market that is directly restrained."). Accordingly, after the Second Circuit's decision in *Aluminum III*, the defendants in that case moved to dismiss the antitrust claims brought by another class of plaintiffs who were direct purchasers of aluminum. *In re Aluminum Warehousing Antitrust Litig. ("Aluminum IV")*, No. 13-MD-2481, 2016 WL 5818585, at *1 (S.D.N.Y. Oct. 5, 2016). Despite allegations that both the direct purchasers and the defendants participated in the physical aluminum market, the district court held that the direct purchasers had not suffered antitrust injury because they did not participate in the directly restrained market. *Id.* As the district court explained, "the fact that the parties may compete in a market into which competitive effects trickle down is not equivalent to competing in the market in which the anticompetitive conduct occurred (warehouse services) or the market(s) intended to be most directly affected (also warehouse services)." *Id.* **Similarly here, Plaintiffs' allegation that they purchased foreign currency directly from Defendants in the end-user market is no substitute for factual allegations showing that Defendants' alleged anticompetitive conduct directly restrained the end-user market**.

- *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1022, 1027–28 (N.D. Cal. 2015) (emphases added and footnote omitted):

    Plaintiffs are consumers who purchased mobile phones connected to Defendant's alleged anticompetitive conduct. . . .

    Plaintiffs allege two types of injury from Defendant's anticompetitive use of the MADAs: (1) likely loss of innovation and concomitant restriction of consumer choice, FAC ¶ 70, and (2) **supracompetitive prices for Android phones**, FAC ¶¶ 71–73. Neither of these injuries suffices to maintain the claims asserted here. . . .

    **Plaintiffs allege that they suffered antitrust injury in the form of supracompetitive pricing in Android phones, which is not the market in which the alleged anticompetitive conduct occurred**. See Def.'s Mot. 19–21. Moreover, Plaintiffs elide allegations concerning the number of supply chain levels between OEMs who sign the allegedly anticompetitive MADAs and end consumers like Plaintiffs. Without such allegations, the Court cannot determine whether Plaintiffs' alleged price injury "flows from that which makes [Defendant's] conduct unlawful." *Am. Ad Mgmt.*, 190 F.3d at 1055. As such, **Plaintiffs have failed to allege that they have suffered "antitrust injury" in the same market as and sufficiently close to the alleged anticompetitive conduct to allow them to pursue private antitrust remedies against Defendant**. *See Lorenzo*, 603 F.Supp.2d at 1301.

- *Hogan v. Amazon.com, Inc.*, No. 21-cv-00996-RSM, 2023 WL 3018866, at *2, *4–5 (W.D. Wash. Apr. 20, 2023) (emphases added):

    [Plaintiffs are] a putative class of consumers who purchased goods on Amazon.com through the "Buy Box" that were packaged and shipped using FBA [Fulfillment by Amazon]. . . .

    Plaintiffs claim that Amazon has "injured Plaintiffs and Class Members by **directly leading to higher prices for items that Plaintiffs and Class Members purchased** through Amazon's Buy Box." . . .

    **Amazon argues that Plaintiffs' Sherman Act claims both fail because they are not purchasers in the market in which competition was allegedly restrained.** For Plaintiffs' tying claim, Amazon argues that Plaintiffs assert anticompetitive harm in the market for fulfillment or logistics services pointing out that the Amended Complaint describes the tying product as "placement in the Buy Box" (Featured Offer), the tied product as "Fulfillment by Amazon," and the alleged market in which the tied product competes as the "market for logistics for retail goods in the United States—namely, the warehousing, packing, and shipping of retail goods." Dkt. #26 at 15 (citing Compl. ¶ 175). As pled, Amazon argues that Plaintiffs do not purchase the tied product as they "are not retailers who purchase logistics services for the warehousing, packing, and shipping of their goods. Rather, Plaintiffs allege they purchased 'items' ([Compl.] ¶ 182) such as 'skin care products, shampoo, consumer electronics, clothing, children's toys, child-proof cabinet locks, stroller accessories, bedding, kitchen supplies, eating utensils, drinkware, skateboarding equipment, and jewelry' ([Compl.] ¶ 42)." Amazon argues this is fatal because "[t]he key question in an illegal tying claim is whether the plaintiff purchased the tied product from the antitrust defendant." Dkt. #26 at 16 (emphasis removed) (quoting *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 88 (3d Cir. 2011); *accord Lakeland Reg'l Med. Ctr., Inc. v. Astellas US, LLC*, 763 F.3d 1280, 1289 (11th Cir. 2014)). Amazon argues that because Plaintiffs do not allege that they purchased the allegedly tied product—FBA—they cannot possibly have suffered antitrust injury. **Amazon asserts Plaintiffs' monopolization claim fails for the same reason, because their monopolization claim is also based on harm in the allegedly tied product market: "logistical services for retail goods."** Dkt. #26 at 16 (quoting Compl. ¶ 188). **And, as with the tying claim, the harm alleged in a monopolization claim must occur in the allegedly monopolized market.** *Id.* **(citing *Qualcomm*, 969 F.3d at 992). But, again, the Amended Complaint does not allege that end consumers such as Plaintiffs purchase fulfillment/logistics services—instead, they purchase retail goods— thereby failing to allege antitrust injury.** *Id.* (citing Compl. ¶¶ 20, 22, 24–25). . . .

    The Court does not find that *Pepper* saves Plaintiffs' claims—they still have not established antitrust standing. **Unlike in *Pepper*, where plaintiffs purchased the allegedly monopolized product (iPhone apps), here Plaintiffs did not pay for the allegedly monopolized product** (logistic services, specifically FBA).

9

- *Palladino v. JPMorgan Chase & Co.*, No. 23-CV-1215 (MKB) (JAM), 2024 WL 5248824, at *13–14 (E.D.N.Y. Dec. 30, 2024) (emphases added and footnote omitted):

    **Plaintiffs fail to establish antitrust injury as either direct or indirect purchasers because they do not allege cardholder participation in the market where the anticompetitive conduct occurs.** Plaintiffs assert that the "relevant product market includes *General Purpose Card Network Services*, and takes in markets for merchant acceptance of *general* purpose credit cards and merchant acceptance of debit cards." (Am. Compl. ¶ 71.) Plaintiffs contend that Visa and Mastercard set rules and fee schedules (the "Rules") that establish the interchange amounts that card-issuing member banks must charge. (*Id.* ¶ 74.) In addition, Plaintiffs allege that these Rules are "at the center of the conspiracy" and "provide the essential mechanism for the operation and enforcement of the price-fixing conspiracy." (*Id.* ¶ 6.) Plaintiffs note, however, that the Rules are set in a separate General Purpose Card Network Services Market. (*Id.* ¶ 102 ("Visa and Mastercard operate separate *General Purpose Card Network Services*."); ¶ 134 ("Networks also set operating rules that apply to issuers and acquirers, and merchants are required to comply or risk losing access to that network.").) Thus, Plaintiffs contend that the alleged "horizontal agreements that eradicate competition among the Visa and Mastercard member banks for merchant-acceptance of their cards" occur in the General Purpose Card Network Services market, (*id.* ¶ 84), which Plaintiffs describe as a separate market from the market where cardholders engage in transactions.

    **Plaintiffs do not allege that cardholders participate in this market.** Instead, Plaintiffs indicate that cardholders participate in a related market for "*Merchant Acceptance of General Purpose Credit Cards*" and "*Merchant Acceptance of Debit Cards.*" (*Id.* ¶ 100.) "Most purchases made with payment-cards are made" in these markets, (*id.* ¶ 101), and these markets are where the networks and issuing banks compete to have more cardholders using their cards. (*Id.* ¶ 102. ("Member banks issue the networks' trademarked debit- and credit- *General Purpose Cards* to cardholders, and acquire and process merchant-sales transactions on the cards. These activities — carried out and managed by member banks — are controlled by the Visa and Mastercard networks, which set the terms of merchant acceptance on behalf of their member banks.")) **The General Purpose Card Network Services market, where the alleged conspiracy and price-fixing occur, is thus a separate market from this merchant-acceptance market where cardholders engage in transactions.** Because Plaintiffs are neither consumers nor competitors in the General Purpose Card Network Services, they cannot satisfy California's "market participant rule," *Kolling*, 187 Cal. Rptr. at 807–08, and fail to establish antitrust injury as either direct or indirect purchasers.

4. **Are there factual issues relevant to the arguments raised on the motion to dismiss? If not, why not? If so, explain what they are.**

With respect to tying, Plaintiffs contend there is a factual question on whether artists are the actual consumers of venue access or whether concert promoters seek access to Live Nation amphitheaters to better compete in the concert promotion market. This is not an issue that requires further factual development, for four reasons.

First, after a lengthy investigation and advance notice of the grounds for this motion, there are no well-pleaded facts in the Amended Complaint that artists themselves (including, for these purposes, the artist's business manager or a talent agent) have sought to procure Live Nation amphitheaters. To the contrary, the Amended Complaint alleges that promoters, not artists, rent venues. Am. Compl. ¶¶ 192, 208 (ECF No. 234). Plaintiffs' argument that whatever is procured "on behalf of" artists is procured *by* the artist would be unnecessary if, in fact, artists procure venues themselves.

Second, and relatedly, there are no well-pleaded facts that when artists—or for that matter their agents—have sought to procure Live Nation amphitheaters, Live Nation responded with conditional demands in the nature of tying, e.g., by saying to them, "If you want to play my venues, you have to take my concert promotion services." It is implausible that Plaintiffs have reason to believe that has happened yet cannot allege it with even minimal detail.

Third, the foundation of the "tying" claim—Live Nation's longstanding policy of not renting its venues to rival promoters, *id.* ¶ 113—implicates the *Trinko* doctrine irrespective of what label Plaintiffs attach to their claim. The competitive effects theory is that Live Nation's policy hampers rival promoters' ability to compete against Live Nation *in concert promotion*, because they cannot offer artists Live Nation venues. *Id.* ¶ 149. The policy of not renting amphitheaters *to rivals* is therefore an inextricable part of the purported tying claim, rendering it incompatible with *Trinko*.

Fourth, the only remedy that would arguably restore competition in the concert promotions market would be a mandatory injunction compelling Live Nation to rent its amphitheaters to rival promoters. A prohibitory injunction against conditional dealing, the normal remedy for illegal tying, would be meaningless because no conditional dealing *with artists* is plausibly alleged in the Amended Complaint. A mandatory injunction compelling access would be the forced sharing that the *Trinko* line of cases prohibits.

With respect to antitrust standing, no further factual development will change the fact that the citizen consumers who allegedly give the States standing to seek damages (fans) are not participants in the alleged ticketing or promotions market. Nor are they, on the facts that are both pleaded and plainly true, the kinds of non-participants whose interests are "inextricably intertwined" in the relevant sense with those of participants. To be sure, if the States had standing to seek damages, there would be factual issues concerning causation, effects, and perhaps more. But as non-participants in the market in which the allegedly anticompetitive conduct occurred, and with damages claims that necessarily would be far more convoluted and speculative than venues or rival ticketing companies might advance, the citizen consumers would not meet Second Circuit standing requirements.

Dated: January 21, 2025

Respectfully submitted,

| LATHAM & WATKINS LLP | CRAVATH, SWAINE & MOORE LLP |
|---|---|

/s/ Andrew M. Gass

Andrew M. Gass (admitted *pro hac vice*)
Alfred C. Pfeiffer (admitted *pro hac vice*)
   *Co-Lead Trial Counsel*
Timothy L. O'Mara (admitted *pro hac vice*)
Jennifer L. Giordano
Kelly S. Fayne (admitted *pro hac vice*)
Lindsey S. Champlin (admitted *pro hac vice*)
Robin L. Gushman (admitted *pro hac vice*)

505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600

555 11th Street, NW, Suite 1000
Washington, D.C. 20004
(202) 637-2200

Al.Pfeiffer@lw.com
Tim.O'Mara@lw.com
Jennifer.Giordano@lw.com
Andrew.Gass@lw.com
Kelly.Fayne@lw.com
Lindsey.Champlin@lw.com
Robin.Gushman@lw.com

*Attorneys for Defendants Live Nation Entertainment, Inc. and Ticketmaster L.L.C.*

/s/ David R. Marriott

David R. Marriott
   *Co-Lead Trial Counsel*
Lauren A. Moskowitz
Jesse M. Weiss
Nicole M. Peles

Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 474-1000

dmarriott@cravath.com
lmoskowitz@cravath.com
jweiss@cravath.com
npeles@cravath.com

*Attorneys for Defendants Live Nation Entertainment, Inc. and Ticketmaster L.L.C.*

cc:   All Counsel of Record (via ECF)