**VIA ECF**

The Honorable Arun Subramanian
United States District Court, Southern District of New York
500 Pearl Street, Courtroom 15A
New York, NY 10007-1312

Re:    *United States et al. v. Live Nation Entertainment, Inc. et al.*; 1:24-cv-03973-AS-SLC

Dear Judge Subramanian:

Pursuant to the Court's order (ECF No. 402), Defendants submit this letter addressing topics discussed at the January 22, 2025, hearing on Defendants' motion to dismiss.

## **Tying**

The Court was clear at oral argument that there is no basis for Plaintiffs to challenge Live Nation's unilateral policy of not renting its amphitheaters to rivals. It was also clear that tying-like *consequences* of that unilateral policy are not actionable as tying. If the tying claim is to survive, there must be other conduct beyond the policy that satisfies the elements of a tying claim.

That brings us to the issues of (a) whether the existing, already-amended Complaint (ECF No. 234) in fact states a tying claim based on conduct other than the "policy" itself; and (b) if it does not, whether Plaintiffs should be given leave to amend to assert a tying claim. The answer is "no" on both counts.

Plaintiffs cannot seriously deny that both the original and Amended Complaint were about the policy. They were hoping to convince the Court that tying-like consequences and fictions about promoters working "on behalf of" artists sufficed to challenge the policy. It is therefore not surprising that Plaintiffs' efforts to identify conduct *beyond the policy itself* they had alleged or could allege with another amendment were strained. Mostly, Plaintiffs simply rephrased their allegations about the *effects* of Live Nation's policy not to rent its venues to rival promoters. This was evident in relation to the discussion of paragraph 113, which in part states: "In other words, if an artist wants to use a Live Nation venue as part of a tour, he or she almost always must contract with Live Nation as the tour's concert promoter." Am. Compl. ¶ 113. That is a statement about the consequences of the policy—which is referenced in the immediately preceding sentence: "Live Nation has a longstanding policy going back more than a decade of preventing artists who prefer and choose third-party promoters from using its venues." *Id.* The phrase "[i]n other words" in the next sentence plainly means to restate the prior sentence's description of the policy, along with its *effects*—not to assert wrongdoing in the form of different conduct.

The Court raised the question whether Plaintiffs might be contending that Live Nation tells artists that if they want to play at Live Nation venues, they must use Live Nation concert promotion services at non-Live Nation venues. *See* Jan. 22, 2025 Hr'g Tr. at 35:6–12. As Defendants' counsel mentioned, this lawsuit followed an 18-month investigation during which that theory was raised. *Id.* at 38:2–5. Yet that is not what Plaintiffs alleged in either the initial Complaint or the amended one. That is no accident. The Amended Complaint specifically alleges, quoting deposition testimony from the investigation, that the policy itself, without further conduct, will

1

typically lead artists who want to do extensive "amphitheater tours" to choose Live Nation as their promoter. Am. Compl. ¶ 114. Thus, Plaintiffs claim, the policy itself "has significantly foreclosed competition in promotion services to artists." *Id.* ¶¶ 245–46; *see also id.* ¶ 149 ("Live Nation's role as gatekeeper for the venues it owns or controls, especially large amphitheaters, means that touring artists who intend to play several concerts in large amphitheaters are effectively forced to hire Live Nation, or face reduced compensation and access to fans.").

These allegations leave very little room for Plaintiffs to argue that any additional conduct—e.g., an isolated instance in which a promoter genuinely tied venue access to a broader touring deal—meaningfully restrained competition. Even on a *per se* theory, Plaintiffs would have to allege that a "substantial volume of commerce is foreclosed" by the alleged tie. *See Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 16 (1984) ("If only a single purchaser were 'forced' with respect to the purchase of a tied item, the resultant impact on competition would not be sufficient to warrant the concern of antitrust law."). And to be actionable, such "foreclosure must result from the tie itself, not from any other anticompetitive conduct . . . , or from any external factors unrelated to the tie." *In re: Cox Enters., Inc.*, 871 F.3d 1093, 1106 (10th Cir. 2017); *cf. Comcast Corp. v. Behrend*, 569 U.S. 27, 38 (2013) (prices "caused by factors unrelated to an accepted theory of antitrust harm are not 'anticompetitive' in any sense relevant here"). Within these constraints, Plaintiffs chose to go after the policy. That is the issue before the Court, and it can be resolved as a matter of law and with prejudice.

Lastly, the procedural posture of this case makes it inappropriate to permit further amendment. Plaintiffs had 18 months of pre-complaint discovery and must be presumed to have made informed decisions about what to allege. Moreover, the Court already arranged for Defendants to preview their motion to dismiss on the tying claim before the amendment to the Complaint, specifically to move the case along and avoid a situation where "[P]laintiffs will say, well, now that we know what the arguments are, if you dismiss our complaint, it should be without prejudice so that we can refile." June 27, 2024 Hr'g Tr. at 31:19–21.[1] And when the Court asked

---

[1] The Court's complete comments were as follows:

> So here's my question for you: An amended complaint is going to come out in a month. Do you want to put in a letter to the Court identifying the issues as to which you would contemplate moving to dismiss and put that on the docket? The upside for you is that if you do that, let's say, within two weeks, the government plaintiffs will know what arguments you're going to make, they will then amend. If they cannot overcome your arguments on a motion to dismiss, you would have a good argument that those claims should be dismissed with prejudice, as opposed to advancing those arguments after the amended complaint is filed, in which case, the government plaintiffs will say, well, now that we know what the arguments are, if you dismiss our complaint, it should be without prejudice so that we can refile. So that's just a suggestion on your side. I just want to make sure you're aware that if you do that, you'll just have a different argument down the road. From the government's perspective, you'll obviously have a better sense of what the arguments are going to be—exactly what, Ms. Sweeney, you raised—in terms of knowing what the arguments are that are going to be raised so that you will have a chance to address those issues in your amended pleading. So, it would seem to

Plaintiffs at oral argument what "additional conduct" they would allege if given the opportunity to amend, Plaintiffs could not identify any conduct beyond Live Nation's unilateral policy of not renting its amphitheaters to rivals. *See* Jan. 22, 2025 Hr'g Tr. at 19:11–20:3. Accordingly, the appropriate resolution of the motion with respect to the tying claim is dismissal with prejudice.

**Standing**

In their January 21 letter to the Court, the State Plaintiffs seeking *parens patriae* damages described their theory of causation as follows:

> The Complaint alleges that Defendants maintain a feedback loop in which supracompetitive ticket prices fund exclusivity deals with coerced venues, leading to fewer concerts and less choice among touring artists, without regard to whether, in the but-for world, venues or artists would make different choices *or simply make the same ones on better terms*.[2]

Jan. 21, 2025 Ltr. from Pls., at 10 (ECF No. 398) (emphasis added).

That statement demonstrates the standing problem in this case. It acknowledges that in the unique circumstances of these industries, the benefits of more competition—which no one denies—could lead to a situation where venues and artists get "better terms," but from a monetary perspective, *fans* are unaffected. We appreciate this may seem counterintuitive, so let us explain.

---

> benefit both sides, and make sure that we can just keep the schedule that we're putting in place. So, I'll leave that to you. I don't need your answer as to whether that's something that you would want to do. You would need to do it within two weeks to make sure that Ms. Sweeney and her colleagues have an appropriate opportunity to consider those arguments and supplement their pleading, if they need to.

June 27, 2024 Hr'g Tr. at 31:8–32:11. *See also* July 17, 2025 Ltr. from Defs. (ECF No. 180).

[2] If the States are claiming that fans' injuries are "inextricably intertwined" because Ticketmaster needs fans to pay higher fees to be able to "fund" large upfront payments to venues to secure exclusive contracts, that would make the State Plaintiffs' antitrust injury problem worse, not better. Offering better financial terms than a competitor to win an exclusive contract is the very essence of competition and thus cannot cause antitrust injury to anyone. *See, e.g.*, *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 79, 83 (3d Cir. 2010) (offering financial incentives to win exclusive contract is competition and does not cause antitrust injury). Moreover, a theory that venues chose Ticketmaster because it paid more money conflicts with the Amended Complaint's other allegations that Ticketmaster supposedly coerced venues into exclusive contracts. Which is it? If Ticketmaster supposedly coerced venues into long-term agreements, then fans' supposed injuries in another market are at best a collateral consequence of that conduct, not the "fulcrum" of it. *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 161 (2d Cir. 2016). On the other hand, if venues chose Ticketmaster because it paid more than its rivals, any alleged injury to the fans would have flowed from competition itself, not from a reduction in competition, and thus cannot be antitrust injury. *Id.*

3

As an initial matter, Defendants agree completely that there are many cases, most perhaps, in which more competition in an input market will result in lower prices for that input, which (all else being equal) will result in lower downstream prices. The basis for this reasoning is that prices tend to reflect costs, so if input costs go down so should the price of finished goods.

What distinguishes this case is that both upstream markets (promotion and ticketing services) are in the nature of rights markets. Artists sell the rights to promote their tours to promoters; venues sell the rights to ticket their events to ticketing companies. *See* Am. Compl. ¶¶ 31, 41. More competition in rights markets implies that sellers will be paid more for their rights. That has the immediate effect of increasing consumer welfare for artists and venues. However, it also increases costs for, and puts upward pricing pressure on, everyone downstream, including fans. We are not saying that more competition necessarily *increases* ticket prices; it does not, as we will explain. But the dynamics at play are distinctly different than the standard case in which more competition in an input market will result in lower prices for that input and lower prices downstream.

The first implication of this is that the causal chain in any consumer overcharge theory is necessarily longer and more convoluted than what a venue suing for damages would offer. The venue would have no reason to adopt a damages theory implying downstream harm to fans. It would simply say, as Plaintiffs' January 21 letter to the Court suggested, that in a more competitive market it would have gotten "better terms." And importantly, the venue would be free to take the position that service charges—the part of the all-in price that venues determine—would *not have changed*. The venue could simply say that it would have captured a higher share of the available surplus. That comports with the prevailing view of how competition in this space works, which is that an artist's pricing—determined, of course, with full knowledge that fees will be applied to the face value—reflects his or her judgment of the right amount of consumer surplus to seek from fans, and the interactions among those in the chain of production (artists, promoters, venues, ticketers, etc.) determine who gets what share of the available surplus.[3]

The State Plaintiffs cannot say that, for it implies no downstream damages. So, they will necessarily take a different position. Presumably they will argue that venues would have contented themselves to split the gains from more competition with fans. But that is not what the Amended Complaint says. To the contrary, the suggestion in the Amended Complaint is that venues would have used any gains from competition to pay artists more so they could get more shows, *see* Am. Compl. ¶ 149, which is another way of saying that there would be a redistribution of the pool of consumer surplus, not additional extraction harming fans and giving rise to damages claims.

Respectfully, it was clear at oral argument that State Plaintiffs haven't thought through any of this. They are thinking of this as the standard case where more upstream competition lowers costs and, in turn, downstream prices. Nevertheless, in colloquy, they suggested that the consumer damages they seek are allegedly caused by one of two mechanisms: first, that but for Defendants' anticompetitive conduct, venues would choose to use more than one primary ticketing company for a given event, and as a result consumers would pay less for tickets; and second, that but for

---

[3] The primary ticketing company (like Ticketmaster) does not set prices or fees, so whatever theory the State Plaintiffs adopt has to make sense from an artist and venue perspective.

4

Defendants' anticompetitive conduct, there would be more ticketing companies vying for the patronage of venues, and the effect of that augmented competition for venues' favor would be that the price of tickets would go down.

As an initial matter, consider how different each of those theories of antitrust injury is from (a) each other and (b) from the injuries courts have found to be "inextricably intertwined" with conduct in adjacent markets. These are not in-restaurant diners complaining about an alleged policy by which restaurants have conspired with meal-delivery services not to offer lower prices for in-restaurant dining. *Cf. Davitashvili v. Grubhub Inc.*, 2022 WL 958051, at *11–12 (S.D.N.Y. Mar. 30, 2022. These are not online book purchasers complaining that provisions in the contracts between Amazon and book publishers have a one-to-one effect of raising consumer prices. *Cf. In re Amazon.com, Inc. eBook Antitrust Litig.*, 2023 WL 6006525, at *12–13 (S.D.N.Y. July 31, 2023) (report & recommendation). The contention here is that but for the anticompetitive conduct alleged in the upstream market, *the structure of that market might look completely different*, so that maybe (in one version) there would be multiple ticketing companies selling tickets to the same events and competing on fees, or maybe (in another version) venues are able to leverage more competition to get better terms at least for themselves.

There is no case finding that a plaintiff has met its burden to plead antitrust injury and the other elements of standing in a comparable circumstance. There are numerous cases declining to find it. *See, e.g.*, *Bakay v. Apple Inc.*, 2024 WL 3381034, at *7 (N.D. Cal. July 11, 2024) ("[T]he issue is not whether Plaintiffs are direct or indirect purchasers of the iPhone. What matters is whether Plaintiffs' alleged injury in the smartphone market amounts to a claim of antitrust injury in the U.S. mobile browser market. . . . The iPhone users in *Pepper* sustained injuries in the same market as the upstream app developers, that is, in the app market. Those circumstances are absent here."); *Nypl v. JPMorgan Chase & Co.*, 2017 WL 1133446, at *5 (S.D.N.Y. Mar. 24, 2017) ("Plaintiffs' allegation that they purchased foreign currency directly from Defendants in the end-user market is no substitute for factual allegations showing that Defendants' alleged anticompetitive conduct directly restrained the end-user market."); *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1027–28 (N.D. Cal. 2015) ("Plaintiffs allege that they suffered antitrust injury in the form of supracompetitive pricing in Android phones, which is not the market in which the alleged anticompetitive conduct occurred. . . . Plaintiffs have failed to allege that they have suffered 'antitrust injury' in the same market as and sufficiently close to the alleged anticompetitive conduct to allow them to pursue private antitrust remedies against Defendant.").

Our position is that in these circumstances where (a) venues are plainly more efficient enforcers, (b) 100% of the allegedly anticompetitive conduct takes place in the venue-facing ticketing market, and (c) any consumer-level damages theory will be more complex and probably in conflict with what venues would argue, consumers lack antitrust standing. And even if that might be incorrect, it is incumbent upon the State Plaintiffs to plead the basis for consumer standing now in tangible terms that allow Defendants to focus on something real, rather than every possibility that might support standing.

5

Dated: January 27, 2025

Respectfully submitted,

| LATHAM & WATKINS LLP | CRAVATH, SWAINE & MOORE LLP |
|---|---|

/s/ Andrew M. Gass

Andrew M. Gass (admitted *pro hac vice*)
Alfred C. Pfeiffer (admitted *pro hac vice*)
   *Co-Lead Trial Counsel*
Timothy L. O'Mara (admitted *pro hac vice*)
Jennifer L. Giordano
Kelly S. Fayne (admitted *pro hac vice*)
Lindsey S. Champlin (admitted *pro hac vice*)
Robin L. Gushman (admitted *pro hac vice*)

505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600

555 11th Street, NW, Suite 1000
Washington, D.C. 20004
(202) 637-2200

Andrew.Gass@lw.com
Al.Pfeiffer@lw.com
Tim.O'Mara@lw.com
Jennifer.Giordano@lw.com
Kelly.Fayne@lw.com
Lindsey.Champlin@lw.com
Robin.Gushman@lw.com

*Attorneys for Defendants Live Nation Entertainment, Inc. and Ticketmaster L.L.C.*

/s/ David R. Marriott

David R. Marriott
   *Co-Lead Trial Counsel*
Lauren A. Moskowitz
Jesse M. Weiss
Nicole M. Peles

Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 474-1000

dmarriott@cravath.com
lmoskowitz@cravath.com
jweiss@cravath.com
npeles@cravath.com

*Attorneys for Defendants Live Nation Entertainment, Inc. and Ticketmaster L.L.C.*

cc:    All Counsel of Record (via ECF)