P1MCusaO

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA,
 3   et al.,
                  Plaintiffs,
 4
                  v.                         24 Civ. 3973 (AS)
 5
     LIVE NATION ENTERTAINMENT
 6   INC., et al.,
                  Defendants.
 7   ------------------------------x
                                             New York, N.Y.
 8                                           January 22, 2025
                                             11:00 a.m.
 9   Before:

10                    HON. ARUN SUBRAMANIAN,

11                                           District Judge

12                         APPEARANCES

13   UNITED STATES DEPARTMENT OF JUSTICE ANTITRUST DIVISION
          Attorneys for Plaintiffs
14   BY:  BONNY E. SWEENEY
          ARIANNA MARKEL
15
     NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
16        Attorneys for Plaintiff State of New York
     BY:  JEREMY R. KASHA
17
     OFFICE OF THE ATTORNEY GENERAL FOR THE DISTRICT OF COLUMBIA
18        Attorneys for Plaintiffs District of Columbia
     BY:  ADAM GITLIN
19        COLE NIGGEMAN

20   LATHAM & WATKINS LLP
          Attorneys for Defendant Live Nation Entertainment, Inc.
21   BY:  ANDREW GASS
          JENNIFER GIORDANO
22        TIM O'MARA
          -and-
23   CRAVATH SWAINE & MOORE LLP
     BY:  DAVID R. MARRIOTT
24        NICOLE PELES

25
```

P1MCusaO

```
 1              (Case called)
 2              MS. SWEENEY:  Good morning, your Honor.  Bonny Sweeney
 3   for the United States.
 4              THE COURT:  Good morning.
 5              MS. MARKEL:  Good morning, your Honor.  Arianna Markel
 6   for the United States.
 7              THE COURT:  Good morning to you.
 8              MR. KASHA:  Good morning, your Honor.  Jeremy Kasha
 9   for the State of New York.
10              THE COURT:  Good morning.
11              MR. NIGGEMAN:  Good morning, your Honor.  Cole
12   Niggeman for the District of Colombia.
13              THE COURT:  Good morning.
14              MR. GITLIN:  Good morning, your Honor.  Adam Gitlin
15   for the Office of the Attorney General for the District of
16   Columbia.
17              THE COURT:  Good morning to you.
18              And for defendants.  And I'm just going to do one good
19   morning.
20              MR. GASS:  Good morning all around.  Andy Gass for
21   Live Nation.
22              MR. MARRIOTT:  Dave Marriott for defendants, your
23   Honor.
24              MS. GIORDANO:  Good morning, your Honor.  Jennifer
25   Giordano from Latham Watkins for Live Nation.
```

P1MCusaO

1           MR. O'MARA:  Good morning, your Honor.  Tim O'Mara

2      from Latham Watkins for defendants.

3           MS. GUSHMAN:  Good morning.  Robin Gushman from Latham

4      Watkins for defendants.

5           MS. PELES:  Good morning.  Nicole Peles from Cravath

6      for defendants.

7           THE COURT:  Good morning to all of you.

8           Before we get to the motion to dismiss, why don't we

9      touch on discovery.  I didn't receive anything indicating that

10     there was a pending discovery dispute, but Ms. Sweeney or

11     whoever wants to handle this from the plaintiffs' side,

12     anything we need to address today?

13          MS. SWEENEY:  No, your Honor.  We addressed that with

14     defendants before today's conference and we don't have anything

15     on the agenda for today.  Thank you.

16          THE COURT:  Mr. Marriott or whoever wants to handle

17     this from your end.

18          MR. MARRIOTT:  Nothing here, your Honor.  Thank you.

19          THE COURT:  Perfect.  Good job, everyone.

20          Let's go to the motion to dismiss.

21          Let me take a step back.

22          My usual practice is to ask questions.  I don't know

23     if the parties have any separate presentation they would like

24     to make.  So what I usually do is I'll ask the questions that I

25     have and then, to the extent that either side wants to present

P1MCusaO

```
1    on any other issues, you're free to do so.

2              So the first questions I have are for the plaintiffs.

3    Who is going to be handling the tying claim?

4              MS. MARKEL:  I will, your Honor.

5              THE COURT:  You can do anything you'd like, you can

6    sit, you can stand, you can use the lecturn, it's up to you.

7              MS. MARKEL:  I will use the podium.  Thank you.

8              THE COURT:  All right.  So, the defendants say that

9    the anticompetitive conduct that's at issue on the tying claim

10   is their refusal to rent amphitheaters to rival promoters; is

11   that right?

12             MS. MARKEL:  That is what they are arguing, your

13   Honor.  But our tying claim is based on our allegations that

14   Live Nation coerces artists to buy Live Nation promotion

15   services through a long-standing policy that requires them to

16   do so as a precondition to renting out a live nation

17   amphitheater.

18             THE COURT:  What is the policy?  Again, the defendants

19   say, we heard that, but the policy that you're talking about is

20   simply a policy that they don't rent amphitheaters to rival

21   promoters.  Are they right about the policy?

22             MS. MARKEL:  No.  The policy is that third-party

23   artists may not rent amphitheaters from -- or Live Nation

24   owned-and-operated amphitheaters unless those artists purchased

25   Live Nation's promotion services, as well.
```

P1MCusaO

```
 1              THE COURT:  I understand that.  Maybe you can help me
 2    make sure that I understand how this all works.  The promoters
 3    go in and they rent these venues; am I right so far, that's how
 4    it works?
 5              MS. MARKEL:  We allege that artists rent --
 6              THE COURT:  I'll spot you all the "on the behalf of"
 7    and everything else.  I'm just saying that in terms of how it
 8    actually works, the promoters go in and they rent these venues;
 9    is that fair?
10              MS. MARKEL:  Your Honor, it is our position that it is
11    the artists who are the ones really renting the amphitheater --
12              THE COURT:  Again, I'm going to spot you all that.  I
13    understand your position is that the promoters are working on
14    behalf of the artists.  That's in paragraph 208 of your
15    complaint.  You've alleged that.  I understand that.
16              I'm just saying, help me with just the real deal what
17    happens on the ground.  You're a promoter, you want to run a
18    tour on behalf of an artist, you're working with that artist.
19    You go in and you try to rent the venues and that's what the
20    promoter does; right?
21              MS. MARKEL:  The promoter will facilitate access to
22    that venue.
23              THE COURT:  I'm not holding any of this -- the way I'm
24    phrasing it, you're not somehow conceding yourself into a box.
25    I really want to understand how this works.  So I will spot you
```

P1MCusaO

1    all of the language, facilitate, whatever label you want to put

2    on it.

3            But it's the promoter that goes and gets the theater;

4    right?

5            MS. MARKEL:  That's right.

6            THE COURT:  Now, that's step 1.

7            Now, what you're alleging on the tying claim is that

8    Live Nation will not rent its venues to any rival promoters;

9    right?  That's step 2.

10           MS. MARKEL:  No, your Honor.  We are alleging that

11   Live Nation will not rent the venues to artists.  They are the

12   ones who are deciding, making the ultimate decision as to which

13   venue to play in.

14           THE COURT:  So you're saying that they go directly to

15   artists and they say to the artist, if you want to work in this

16   town again, you better use us as a promoter, otherwise you're

17   never going to use these theaters.  They go to these artists

18   themselves.  So discovery is going to show that there are

19   direct lines of communication between Live Nation and artists

20   that are relevant to this tying claim and the anticompetitive

21   conduct that you're talking about?

22           MS. MARKEL:  It's possible that discovery may show

23   those direct lines of communication, but there doesn't need to

24   be explicit threats or demands made to artists.  An industry

25   understanding would be sufficient.  It's enough for there to

P1MCusaO

1    just be a policy.

2                THE COURT:  I suppose I'm not understanding whether

3    there's a dispute here about the facts.  I'm trying really to

4    just get to the facts.

5                Let me tell you what the defendants say.  They say you

6    can use all the language that you want, but what you're talking

7    about when you get down to the substance on the tying claim is

8    that it's about the fact that Live Nation does not rent these

9    theaters to rival promoters; right?  And so they say, okay,

10   well, that's just a refusal to deal with our competitors.

11   There's no other separate anticompetitive conduct that's at

12   issue on the tying claim.  And so if that's the case, then the

13   tying claim is just a refusal to deal claim in disguise.

14               And so what I'm trying to understand is if the

15   anticompetitive conduct that you are talking about — in

16   substance, maybe not the language in the way we phrase it, just

17   in substance — is something more than the refusal to rent these

18   theaters to rival promoters.

19               And so I'll let you respond to that.  Is there

20   something more than just the refusal to deal with rival

21   promoters?

22               MS. MARKEL:  Yes, your Honor.  This is conduct that

23   impinges or takes away the free choice of artists to use

24   whichever promoter they wish to use in a Live Nation

25   amphitheater.  So it's not a simple refusal to deal.

P1MCusaO

1          And I would point to both plaintiffs' and defendants'

2     cited the *New York v. Facebook* case in their response to your

3     first question.  There, there's language that says the key fact

4     distinguishing such tying conduct from a standard refusal to

5     deal is that it is not unilateral, but instead involves some

6     assay by the monopolist into the marketplace that interferes

7     with the relationship between rivals and third-parties.  So --

8          THE COURT:  That's exactly right.  And the next

9     paragraph, which the defendants cited, says an example of that

10    comes from Lorain Journal.  And the explaining what they mean

11    by the assay comment that you just pointed to, they say, look,

12    if you're a newspaper and you tell advertisers that if you want

13    space in the newspaper, they can't work with this other radio

14    station, then that would be kind of a separate conduct.  So not

15    just a refusal to deal with the radio station, but there's

16    separate conduct that's directed towards the advertisers,

17    right.  And so here they say that's missing because the only

18    conduct that you're talking about with respect to Live Nation

19    is the fact that they won't deal with these rival promoters.

20         Now, you point out that, functionally, that results in

21    the situation where artists, if they want to use these

22    theaters, have to work with Live Nation as a promoter because

23    the promoters aren't able to rent those theaters.  And so you

24    can't work with them and then also have space in the theaters,

25    right, you got to go to different places.  But they're saying

P1MCusaO

```
1   there's no separate conduct.  The only conduct you're talking

2   about that's challenged on the tying claim on their part is

3   that they won't rent their amphitheaters to rival promoters.

4           That's what I'm trying to figure out, are they right

5   that there's no other conduct that you are challenging or are

6   you right that there is separate conduct, meaning that they are

7   going to artists and doing other things to prevent them from

8   working with rival promoters or making them kind of join at the

9   hip, the selection of the promoter and the selection of these

10  amphitheaters?  That's what I'm trying to figure out.

11          MS. MARKEL:  The conduct here is that artists are

12  being forced to purchase Live Nation promotion services and not

13  just be able to rent space in --

14          THE COURT:  And that is because those other promoters

15  that you would want to work with, that the artist would want to

16  work with simply can't get the Live-Nation-owned amphitheater

17  space, right, because Live Nation won't work with them; is that

18  fair?

19          MS. MARKEL:  That's fair.

20          THE COURT:  Okay.  So then what's the difference

21  between this and a refusal to deal claim?  That's what I'm

22  trying to figure out.  You can dress it up in different

23  language, but they're saying it's exactly the same thing.

24          And maybe this is an easier way to get to this point.

25  So how do you eliminate the foreclosure here, meaning what's
```

P1MCusaO

```
 1    the remedy?  So, in a tying claim, usually the remedy will be
 2    to disaggregate the two products.  And so you say you can't tie
 3    these up, you have to untie them and do them separately.
 4    That's the typical remedy on a tying claim.  Here, what is the
 5    remedy?  What are you seeking?  How would I eliminate this
 6    tying violation if that's what is found at the end of the day?
 7              MS. MARKEL:  Your Honor, I would think it's premature
 8    to come up with a particular remedy at this stage, but there is
 9    a menu of options that would be available to remedy this type
10    of tying arrangement.  A simple one would be to eliminate the
11    policy at issue, to have an open venue --
12              THE COURT:  To force them to deal with their
13    competitors?
14              MS. MARKEL:  The venue would be open to artists --
15              THE COURT:  I got you.  I mean, you're telling me
16    that -- okay, I got that.  One option.  One option is to force
17    Live Nation to deal with its competitors.  Got it.  What are
18    the other options?
19              MS. MARKEL:  Another option might be divestiture.
20    There are other options that are available.
21              THE COURT:  Divestiture of what?
22              MS. MARKEL:  Of Live-Nation-owned amphitheaters.
23              THE COURT:  Is it possible, in the way that *Kodak* and
24    all these other cases have dealt with tying claims, to
25    disaggregate amphitheaters and promotion services in this
```

P1MCusaO

1  context, can you do that?

2      MS. MARKEL:  Yes.  And there are amphitheaters who do

3  this.  For instance, Greek Theater and Red Rocks are examples

4  of this.

5      THE COURT:  What I mean is, could you have a situation

6  where Live Nation owns these amphitheaters and, separately,

7  there's promotion services, and you could actually separate

8  them out without doing something like divestiture?

9      MS. MARKEL:  Yes, absolutely.

10      THE COURT:  How?

11      MS. MARKEL:  Live Nation can rent amphitheaters to

12  artists or to promoters, that they can rent amphitheaters to

13  whoever wants them, and it can separately sell its promotion

14  services to artists.

15      THE COURT:  So let's say that Live Nation, under

16  *Trinko* and these other cases, I say, look, I can't prevent them

17  from refusing to deal with their competitors, so I can't force

18  them to rent these amphitheaters to rival promoters.  Let's say

19  that's kind of what the basic premise of the thought is.  At

20  that point, is there any possible remedy short of divestiture?

21  The one I would think of would be if artists themselves were

22  able to kind of go in, rent amphitheaters, and then select the

23  promoter that they want.  Is that a potential option?

24      MS. MARKEL:  That would be a potential option.

25      THE COURT:  Is it an option available given what you

P1MCusaO

```
1    have pleaded in the complaint, which is artists can't do that,

2    like it's not a reality?

3         MS. MARKEL:  I think, your Honor, this is something

4    that would be subject to discovery, how practicable any of

5    these potential remedy options are.  I don't think that is

6    necessarily inconsistent with what we have alleged in our

7    complaint.

8         THE COURT:  Now, you rely a lot on Viamedia, and maybe

9    this underscores some of the things that we've been talking

10   about.  There were kind of two separate acts, right.  There was

11   the denial of Viamedia from the Comcast controlled

12   interconnects, and then separately Comcast used its control

13   over the interconnects to demand that smaller NVPD competitors

14   turn over to Comcast 100 percent of their spot avails.  So

15   there were kind of two separate markets and there were two

16   separate things that Comcast was doing, and so there was an

17   obvious remedy.  Can't do both.  You got to stop doing one or

18   the other.  You can't connect the two, you disconnect them.

19        Here, it's not clear to me what the second

20   anticompetitive act is.  I understand that there's one

21   anticompetitive act, which is that Live Nation doesn't rent

22   these venues to rival promoters, I understand that.  Putting

23   that to the side, is there just a separate thing that

24   Live Nation is doing in a separate market, meaning the market

25   for promotion services?
```

P1MCusaO

1          MS. MARKEL:  Yes.  In the market for promotion

2     services, it has this policy that requires artists who wish to

3     perform in a venue to use their promotion services.

4          THE COURT:  And what do you mean by that?  Is that

5     just part and parcel with the fact that they don't rent these

6     venues to rival promoters or is it something different?

7          MS. MARKEL:  No, it's something different.  We allege

8     two different product markets.

9          THE COURT:  I understand the markets.  I'm just saying

10    really, in terms of a human level, is it something different or

11    is it just the same thing, but it has effects in a second

12    market?

13         MS. MARKEL:  No, it's a different thing.  The services

14    that promoters provide to artists include facilitating, like

15    actually promoting and marketing a show, for instance, also

16    facilitating access to and making recommendations as to which

17    venues, but they also do a substantial amount of promotions and

18    marketing services for artists that are separate from the

19    actual renting of an amphitheater.

20         THE COURT:  And so is Live Nation saying to artists,

21    if you want to use our amphitheater, then you have to use us as

22    a promoter for your entire tour, meaning for every show that

23    you have, whether we own the venue or not, you've got to use

24    Live Nation at that point?  Or, again, is it not something

25    separate like that?  It's just the fact that to have promotion

P1MCusaO

1    for the amphitheater shows that you want to do, you end up

2    having to use Live Nation because they're not running to any

3    other promoters?  Which one of those two is right?

4          MS. MARKEL:  We allege that there is a market for

5    large amphitheater tours, and Live Nation has monopoly power in

6    large amphitheaters, they own about 60 percent.  And so an

7    artist who does wish to play in large amphitheaters — and there

8    are tours that consist of large amphitheaters — then that

9    artist is essentially forced to use Live Nation for its

10   promotion services to play those amphitheaters.

11         THE COURT:  Right.  But not because of anything

12   Live Nation separately does vis-à-vis artists.  This is all

13   based on the fact that, for its amphitheaters, it does not work

14   with any other promoters, it doesn't let them rent the spaces.

15   And so that's why you use the word "essentially," because it

16   just happens to be that they refuse to deal with these other

17   promoters.  And so any artist that wants to have that kind of

18   tour ends up essentially having to use Live Nation because,

19   otherwise, you wouldn't be able to include in your tour those

20   theaters that were owned by Live Nation; am I right about that?

21         MS. MARKEL:  That's essentially a tying arrangement.

22   The artists are being forced to purchase a separate product

23   than just the amphitheaters.

24         THE COURT:  And so let's assume that there's no

25   separate conduct, that the anticompetitive conduct that you're

P1MCusaO

1    talking about, although you've alleged it has different

2    implications in the context of a Section 1 tying claim, but the

3    conduct is in fact a refusal to deal with these rival

4    promoters.  Is it to your position, if that's true, then you

5    still have a viable claim because *Trinko* only applies strictly

6    in the Section 2 refusal to deal context?

7            MS. MARKEL:  As an initial matter, we don't agree with

8    the premise of that.

9            THE COURT:  I got it.  I know you don't agree with it.

10           MS. MARKEL:  But I don't think *Trinko* would apply to

11   Section 1 conduct anyway, a claim that we have alleged.  We

12   provided the Court with -- we identified other examples of

13   courts declining to apply *Trinko* to Section 1 claims in our

14   submission yesterday, and then there are also cases that don't

15   directly discuss the Section 1, Section 2 distinction.  But

16   courts apply refusal to deal to Section 2, but not to

17   Section 1.

18           So, for example, in our opposition brief, we cite to

19   the *Google Digital Advertising* case.  That's an example where

20   the Court applied refusal to deal principles to a Section 2

21   monopolization claim, but they did not -- the court did not

22   apply it to a Section 1 tying claim, and it didn't apply it to

23   a Section 2 tying claim either.  When courts do actually apply

24   *Trinko*, it is for a very narrow type of conduct under

25   Section 2.  It's for truly unilateral conduct by a monopolist.

P1MCusaO

```
 1              THE COURT:  Sure.  Look, I've read all the cases that
 2     both sides have submitted, and I my understanding, my takeaway
 3     from all these cases is that if there is other anticompetitive
 4     conduct at issue — this goes to the New York v. Facebook
 5     point — it's not just the unilateral refusal to deal with
 6     competitors, but there's something more in terms of the actual
 7     facts of what the defendant is doing, then you have a
 8     potentially viable claim.  But, no matter what label you put on
 9     it, if it's just a refusal to deal allegation, if that's the
10     anticompetitive conduct, then you have a potential Trinko
11     issue.
12              Neither of the parties really address this, but in
13     footnote 4 of Trinko, there's discussion of a separate theory
14     that had been brought by the respondent in that case, which was
15     a monopoly leveraging theory.  You may be familiar with this.
16     There was a separate theory, and the allegation there was that
17     Verizon was leveraging its power over the regulated market for
18     the local loop to maintain a full fledged monopoly in the
19     retail local service market, which sort of sounds similar here.
20     What the court said in footnote 4 is, look, there's some
21     pleading issues with that claim anyway, but if the
22     anticompetitive conduct underlying that claim was the refusal
23     to deal, then it would be deficient for the same reasons we're
24     saying in this case.
25              So it seems like the court in Trinko signaled that
```

P1MCusaO

```
1    it's not about the labels, okay, it's substance over form.  And

2    so if the anticompetitive conduct really at the heart of it is

3    just this refusal to deal with competitors and there's not

4    separate conduct, then you have the same problem then with

5    Trinko.  Trinko says that's subject to Aspen Skiing and other

6    exceptions that aren't invoked here.  You're not going to be

7    able to have a viable claim.

8              So I don't know if you're familiar with that footnote.

9    Nobody talked about it.  I'm not suggesting you have to be well

10   versed in footnote 4, but there's just five footnotes, that's

11   one of them.

12             Do you have a reaction to that?

13             MS. MARKEL:  Your Honor, the separate conduct here is

14   the forced purchase of promotion services for artists.  It's

15   not just simply not renting to promoters, it's artists to

16   perform in an amphitheater are being forced to actually

17   purchase a separate product by defendants.

18             And also, in --

19             THE COURT:  I guess what I'm really getting at is

20   isn't that just an implication of the anticompetitive conduct

21   which is just the refusal to rent these theaters to rival

22   promoters?  And that's different than the usual tying situation

23   where there's like two separate lines of transactions, like

24   Kodak.  There's replacement parts and then replacement

25   services, and you can totally disentangle those and have
```

P1MCusaO

```
 1   different people doing either one.

 2           Here, as far as I can tell, the only thing really at

 3   issue is the fact that Live Nation doesn't rent to rival

 4   promoters.  And so as you pointed out, there's two types of

 5   remedies here.  One is to force them to do that, which comes

 6   into some tension under *Trinko*; or second, divestiture, which

 7   is obviously a remedy that is not typically employed in the

 8   tying context.  And I'm not hearing a third option.  There's no

 9   third option that you can think of; right?

10           MS. MARKEL:  There are probably other options, but I

11   don't have them today.

12           THE COURT:  Now, in terms of repleading, if I were to

13   dismiss this claim without prejudice, the defendants said --

14   well, let me set it up.  The defendants said that if I dismiss

15   this claim, it should be with prejudice.  In response, I think

16   there was a footnote that said, please don't dismiss this claim

17   with prejudice.  But there was no explanation of what you would

18   plead to augment this claim.

19           Can you help me with some material that you would put

20   in an amended complaint that would avoid some of the arguments

21   that the defendants have raised?

22           MS. MARKEL:  Sure.  Well, I think some of the

23   questions, for instance, in response to question 4, are things

24   that we could add to an amended complaint, but these are also

25   things that would typically come out in discovery.
```

P1MCusaO

1          Essentially, our argument is that artists are making

2     the economic choice to rent an amphitheater, even if promoters

3     might be the ones who are kind of signing the contract on

4     behalf of them.  We have sufficient allegations in the

5     complaint to show that artists are the ones who are making that

6     type of economic choice, they're the economic actors.

7     Antitrust law puts economic substance over forum.

8          THE COURT:  I'm with you on -- whoever is speaking on

9     behalf of the defendants, I'm going to grill them on the

10    intermediary point.  So I understand that.

11         But again, what's the additional fact that shows that

12    this isn't just a -- whether it's the artist or the promoter,

13    right, let's say it is the artist, but they're working through

14    the promoter, what is the additional conduct that you would

15    allege that would show it's not just a refusal to deal with the

16    promoter who's working on behalf of the artist?  That's my

17    point.

18         MS. MARKEL:  Yes, your Honor.  I think some of the

19    other questions we had in our response might go to that, like

20    the role that artists and their managers play in

21    selecting amphitheaters, which amphitheaters are favored, more

22    facts about the financial arrangements, which are very

23    complicated, and how artists are the economic actors.  Do

24    amphitheaters compete with each other for artists or promoters?

25    And we have allegations that address a lot of this already in

P1MCusaO

1    the complaint, which is why we think what we have is

2    sufficient, but there is more that we could allege if given the

3    opportunity.

4                  THE COURT:  Okay.  Understood.

5                  And then you cited, just last point, you cited to

6    Buccaneer Energy and cases that involve concerted refusals to

7    deal, and I didn't understand how that would apply in this

8    context.  And you can just say, well, we were just pointing out

9    that the whole refusal to deal jurisprudence should be

10   understood narrowly.  If there's variations, if there's

11   distinctions of any kind, then courts have typically said we're

12   not going to just apply these refusal-to-deal kind of cases.

13   We weren't saying that there is a concerted refusal to deal

14   here because my understanding is it's framed as a unilateral

15   refusal to deal, there's not concerted conduct on the

16   defendants' side that's alleged in this context; is that fair?

17                  MS. MARKEL:  That's fair, your Honor.

18                  THE COURT:  Anything else that you wanted to raise?

19   And then I'll give the defendants a chance to respond on the

20   tying piece of this.

21                  MS. MARKEL:  There's just one other point, your Honor,

22   which is that in defendants' reply brief, they raised for the

23   first time the argument that there was no agreement here and

24   they say that we had not alleged instances of specific threats

25   or demands, and they brought that up again in their response to

P1MCusaO

1    question 4.

2            But I just want to note that *Eastman Kodak* is clear

3    that a condition of sale is enough.  The Second Circuit has

4    also held that a policy is enough to satisfy that agreement

5    requirement.  That's what allege here, a policy that we don't

6    actually have to show specific instances of threats made to

7    artists or specific demands made to a particular artist.

8            That case is *Hill v. A-T-O, Inc.*, 535 F.2d 1349, 1355

9    (2d Cir. 1976).  Defendants did not cite that in their reply

10   brief and we didn't have a chance to brief that issue, so I

11   wanted to raise that for the Court.

12           THE COURT:  Thank you very much.

13           Mr. Gass, are you going to be handling this from the

14   defendants' end?

15           MR. GASS:  Good morning, your Honor.

16           THE COURT:  Good morning.

17           MR. GASS:  Andy Gass for the defendants.

18           How can I help?

19           THE COURT:  Well, let's take the refusal to deal piece

20   of this out.  We're just talking about whether you have to have

21   a direct relationship with the buyer, both as to the tying and

22   the tied product.  You can't have intermediaries.  That's your

23   position.

24           MR. GASS:  If, conceivably, you could in some

25   circumstance, if it sufficed for your secretary or something to

P1MCusaO

1    make the call and be subject to the tie, that -- that wouldn't

2    be the case here.

3        THE COURT:  That's a question of fact; right?

4        MR. GASS:  It is a question of law, what type of

5    intermediary would suffice.

6        THE COURT:  Sure.  But to apply that in any reasonable

7    way, we need to understand what the facts are.  The complaint

8    alleges in paragraph 2 that the promoters are working on behalf

9    of artists in every single situation.  Now, you may disagree

10   with that, and you point to paragraph 2 under 9 where it's

11   alleged that the promoters take on financial risk, right.

12       Look, all I'm saying is that if we're looking at

13   substance over form, which the defendants, if I did a word

14   check in your brief, it's probably there like 20 times.  So

15   we're all on the same page about that.

16       Then if the facts showed that promoters were the

17   intermediaries but the artists were the ultimate parties who

18   were subject to coercion under "it's my party" and who were the

19   actual buyers, both with respect to the tying product and the

20   tied product, then you'd agree the mere fact that there was

21   somebody else who was transacting with respect to the

22   amphitheaters would not foreclose a tying claim; right?

23       MR. GASS:  I would agree that there is a conceivable

24   class of intermediary whose role were so ministerial that it

25   wouldn't make a difference for purposes of answering the

P1MCusaO

1    question whether there was an agreement in the first place or

2    whether there was unlawful coercion, that it wasn't the actual

3    victim of the tie who was factually engaging with the putative

4    tyer.  I would agree with that.

5         But, I think, as a matter of law, there is no basis to

6    conclude that the moment someone invokes the phrase

7    "intermediary" you have a fact question that gets you past a

8    motion to dismiss.  If you could, then all of the

9    refusal-to-deal cases would come out the other way because

10   everyone who's a competitor, who seeks access to one of their

11   own competitors' sources of infrastructure is doing so on

12   behalf of one of their own end consumers.

13        The one -- I disagreed with you when you said you're

14   invoking 209 and so on.  What we're really invoking is the

15   whole rest of the complaint, your Honor, where, to go back to

16   the question that you posed to the other side at the outset,

17   how does this all work?  Paragraph 22 alleges that in the

18   modern era, when an artist decides they want to go on a tour,

19   the first thing they do is they select a promoter.

20   Paragraph 192 alleges that the promoters have deals with

21   venues, not just on a one-off basis at the behest of particular

22   artists, but sometimes, quote, on a long-term basis.

23        What you can infer from that, combined with the core

24   complaint --

25        THE COURT:  Sorry to interrupt you, but what was that

P1MCusaO

1    last paragraph?

2              MR. GASS:  192, your Honor.

3              THE COURT:  Okay.  Continue, if I didn't totally

4    derail you.

5              MR. GASS:  Not at all.

6              The point is just that the plaintiffs have alleged

7    that the role of the concert promoter in all of this is not

8    some pure agent acting on someone's behalf.  They say the word

9    "agent" in their brief.  They don't allege any facts to suggest

10   that that's the case.  To the contrary, all of the facts that

11   they allege contradict the suggestion that that is the role of

12   the concert promoter here.  That's why all of this matters.  We

13   have a dynamic where this is how competition works in this

14   industry.  A promoter goes out and competes to sign artists

15   partly on the basis of what venue he's going to book you in,

16   right.  Access to venues is sort of a core piece of that

17   competition that happens.

18             THE COURT:  Look, I'm looking at paragraph 208.  It

19   says that when promoters contract with amphitheaters owned and

20   are operated by a third party, they typically do so for a

21   specific artist on a particular day.  Put another way, when

22   promoters communicate and contract directly with venues, they

23   are acting on behalf of their artist clients.  It goes on and

24   on.

25             So my point is that I agree that there's an inquiry

P1MCusaO

1   here because, as a factual matter, it has to be the case that

2   the buyer was coerced into the tying arrangement.  That's a

3   necessary finding at the end of the day.  And so if the facts

4   showed that there wasn't a single effective buyer as to both

5   the tying and the tied product, then that's a defense you would

6   raise.

7           What I'm suggesting here is that at least in terms of

8   the complaint, there are allegations that are not just "it's on

9   behalf of" and that's all we say, there are actual allegations

10  that suggest that the promoters are out there working on behalf

11  of artists for particular shows and tours.

12          And so given that we're trying to elevate substance

13  over forum and not get hung up on forum, wouldn't be this be a

14  proper inquiry to engage in at the summary judgment stage after

15  discovery?

16          MR. GASS:  Absolutely not, your Honor, because we run

17  right back headlong into the problem that, at bottom, this is

18  just a refusal to deal with those promoters.

19          THE COURT:  Aha.  See, that's what I detected, which

20  is the intermediary argument that you're raising is really -- I

21  wouldn't say a red herring because it is something we need to

22  consider, but it's really just trying to put focus on your

23  stronger argument, which is this refusal to deal claim in

24  disguise argument.

25          So let's turn there, because I'm unlikely, separate

P1MCusaO

1    and apart from that, to dismiss this claim based on the

2    intermediary theory.  You've read the cases, *Viamedia*, which

3    says, look, it doesn't matter that you're working through an

4    intermediary, there was the NVPDs.  There are some

5    distinctions.  But what I'm saying for these purposes is that

6    it's the kind of argument that you would entertain on a full

7    factual record.  I think it's more appropriate.  I'm just

8    spotting you on that.  You can fight me on it, but before we do

9    that, let's go back to the main event.

10          MR. GASS:  I do want to go back and fight you on it,

11    but let's go back to the main event.

12          THE COURT:  I will let you do that, but I want to go

13    back to the main event.

14          So you heard Ms. Markel say this is not just about a

15    refusal to rent amphitheaters to rival promoters.  Is she

16    right?

17          MR. GASS:  She is certainly not right.  I think that

18    your Honor hit the nail on the head by asking -- you in fact

19    took the wind out of my sails for what I was going to say,

20    which is to say focus on the actual conduct that is supposedly

21    unlawful here.  The conduct is a policy, it is a policy of not

22    renting venues to the people who come and ask to rent the

23    venues.  Who are the people --

24          THE COURT:  Let me stop you right there.  That's not

25    the way the complaint frames the policy.  What the complaint

P1MCusaO

```
1    says in paragraphs 244 and 245 is that Live Nation has

2    unlawfully required artists seeking to use its large

3    amphitheaters for shows as part of a tour to also purchase

4    promotion services from Live Nation.

5            So the characterization of the policy that you just

6    offered is in the defendants' briefing, but isn't there a

7    dispute about that?

8            MR. GASS:  There is not, your Honor, because when they

9    say that's the policy, you have to understand that allegation

10   in the context of their description of factually what is

11   happening in this industry.

12           THE COURT:  Show me in the complaint where the policy

13   is set forth in the way that the defendants describe it in

14   their briefing.

15           MR. GASS:  Okay.  Let me start first with the question

16   of what does the complaint have to say about who the actor is

17   who rents the venues factually, setting aside the on behalf --

18           THE COURT:  I already know it's the promoters.

19           MR. GASS:  It's the promoters, 192.

20           THE COURT:  I've already got that.

21           MR. GASS:  So there are four different places where

22   the policy is referenced.  I'm going to walk you through each

23   of them.  It starts with paragraph 113 and 114 where we have

24   the suggestion that Live Nation has a longstanding policy going

25   back more than a decade of preventing artists who prefer and
```

P1MCusaO

1    choose third-party promoters from using its venues.

2           Now, what that means, in light of the allegation in

3    paragraph 192, is that when the promoters are the ones who go

4    out and seek to rent the venues, they are told no.

5    Paragraph 114 continues on, the artists, quote, are effectively

6    forced to hire Live Nation as their promoter.  This is an

7    effect of the policy of not renting to rival promoters.

8    Paragraph 115 complains that what should be happening here is

9    that Live Nation should, quote, be opening its venues to

10   non-Live-Nation promoted shows.

11          We have a couple more references, just so we can sort

12   of get a comprehensive vision of what language they're using to

13   describe this policy, which I agree is very artfully pleaded

14   specifically to avoid saying that what the policy is, is

15   renting to rival promoters, but again, we go through that.

16          Paragraph 201, we have this reference to a policy to

17   only work with artists that it promotes in its large

18   amphitheaters.  And then paragraph 205, this may be the "tell,"

19   the policy is blocking third-party-promoted artists from using

20   its amphitheaters, right.

21          So all of these characterizations of what the policy

22   is are studiously worded to avoid tying what the policy is to

23   the description of how the industry works when everyone knows

24   that how the industry works is that the promoters are the ones

25   who rent the venues and all these characterizations of the

P1MCusaO

1    policy are about its effects, not the conduct.

2              THE COURT:  So your position is, look, this is just a

3    refusal-to-deal claim, full stop, because there's nothing else

4    that's at issue.  The argument is just that, as a natural

5    effect of the fact that Live Nation does not rent amphitheaters

6    to its rivals, it happens to be that artists have to use

7    Live Nation as its promoter if it wants to have shows there.

8    But that's not a tying claim.  It's not really even a *Trinko*

9    argument that you're making.  It's just a basic argument that,

10   unlike every other tying case in the universe where there are

11   two separate things that can be disaggregated, there just isn't

12   two separate things.  It's one thing.  The ultimate relief

13   that, if they win on the tying claim, they would be entitled

14   to, would absolutely be an order to the defendants to force

15   them to work with their rivals, right?

16             MR. GASS:  You hit the nail on the head.

17             THE COURT:  Okay.  So then we have to think about

18   whether -- okay.  I think I understand your argument there.

19             The question really comes down to whether there's some

20   other conduct that they're talking about.  You would agree that

21   if there was -- let's say there's a hypothetical alternative

22   situation that you disagree with as pled, but they said that

23   Live Nation actually went to artists and did something

24   separate.  They said, look, I know that you want to play at

25   MetLife.  I don't even know if that's one of the things that's

P1MCusaO

| | |
|---|---|
| 1 | at issue, I'm just using that as an example because we're in |
| 2 | football season.  You want to play at MetLife, I'm telling you, |
| 3 | you can't use any other promoter for your entire tour, okay, |
| 4 | I'm telling you that.  You would agree that, in that situation, |
| 5 | it's more like Lorain Journal and there's a potential tying |
| 6 | claim here? |
| 7 | MR. GASS:  Funny story about that, your Honor. |
| 8 | THE COURT:  Well, first, yes or no? |
| 9 | MR. GASS:  That was a theory that the government |
| 10 | investigated.  We had -- |
| 11 | THE COURT:  The answer is yes? |
| 12 | MR. GASS:  The answer is there would certainly be a |
| 13 | different scenario and look much more like tying.  I absolutely |
| 14 | agree with you that if the problem is Live Nation is saying you |
| 15 | can only access my venues if you agree to use me as the |
| 16 | promoter for shows that are not my venues, then that's a |
| 17 | completely different commercial arrangement.  It's not one that |
| 18 | counsel said she was going to plead facts to cure to suggest |
| 19 | that was what was happening when you offered her the chance to |
| 20 | show how she was going to cure these defects on amendment.  To |
| 21 | the contrary, everything that counsel said had nothing to do |
| 22 | with Live Nation's conduct. |
| 23 | THE COURT:  So we have one option. |
| 24 | Second option, you would agree that, is there anything |
| 25 | preventing artists from renting amphitheaters themselves? |

P1MCusaO

1          MR. GASS:  Well, in paragraph --

2          THE COURT:  And I'm talking promoters.

3          MR. GASS:  In paragraph 209, we have the suggestion

4    that just, as a practical reality, that's not how the industry

5    works.  But listen, like, if what we're talking about here is

6    just they want to be able to say that artists have to be able

7    to come to Live Nation themselves, and there's nothing about

8    their case that's going to entail an order that Live Nation

9    rent its venues to rival promoters, it's like we can be done

10   here.  You can't force us to rent our venues to rival promoters

11   here.  That was the whole basis for the motion.

12         THE COURT:  I understand that.  That's why I'm trying

13   to understand whether there are other versions of this claim

14   that would be viable.

15         And then there's a subsequent question whether that

16   would fit within what's alleged in paragraphs 244 and 245 or

17   whether the plaintiffs should be given leave to amend to allege

18   those theories.  And so I think we've got two alternatives that

19   we've discussed.

20         The question is whether those alternatives are ones

21   that the plaintiffs think that they can move forward on.

22         MR. GASS:  I agree that's a question.  I will just

23   again highlight, they've already alleged that this isn't how

24   the industry works, right.

25         THE COURT:  I agree that is what the complaint says,

P1MCusaO

1  that it's not a reality that artists do this directly.  But

2  okay.  I understand.

3       MR. GASS:  Can I just, just because I don't mean to

4  quibble, but I think it's a really important feature of the

5  *Viacom* decision that the Court finds precisely, it's not

6  just -- though, you're right.  It's absolutely the case that

7  *Comcast* was saying you can only access by interconnects if you

8  also use me for the non-interconnect portions of your ads

9  services.  That's key.

10       But another key distinction is the one at 470 of the

11  opinion where they're citing testimony from a Comcast employee

12  who's saying, I told the buyers you have to do this.  It wasn't

13  just a unilateral refusal to deal, it was also communicated to

14  the parties.  That's another core distinction of that case.

15  But listen, you understand the issues, I've got nothing more.

16       THE COURT:  Well, help me with one thing.  You cite to

17  this *Areeda* and *Hovenkamp cite*, which says that a challenged

18  arrangement is not a tie-in unless the alleged foreclosure can

19  be eliminated by instructing the defendant to disaggregate what

20  it sells to customers rather than by an order to sell something

21  to would-be rivals.  Is that a *Trinko* point or is that just

22  more kind of basic and foundational in terms of tying

23  jurisprudence?

24       MR. GASS:  I think it gets more at the idea that

25  conduct that is actually just an inevitable consequence of

P1MCusaO

```
1    vertical integration is sometimes called tying, and you have to
2    be careful not to fall into that trap.  One of the ways that
3    you should be careful is to think like what is the conceivable
4    remedy that would cure the ill here, and we just went through
5    that with opposing counsel.
6         THE COURT:  And the reason why you brought this motion
7    directed to only one of these claims is that because this is
8    the only claim that the plaintiffs have alleged that's subject
9    to per se liability?  Or is that one of the reasons at least?
10   Or am I right that it's subject to per se liability?
11        MR. GASS:  I don't know that this is really a per se
12   claim as opposed to rule of reason tying claim.  This is just a
13   pure legal issue, it's just a separate distinguishable thing,
14   and it's just fatally infirm as a matter of law.
15        THE COURT:  Last question is in paragraph 113.  The
16   complaint alleges if an artist wants to use a Live Nation venue
17   as part of a tour, he or she almost always must contract with
18   Live Nation as the tour's concert promoter.  That's what the
19   allegation is.  If the facts showed that there's one venue you
20   want to use and Live Nation owns it, and so Live Nation comes
21   to the artist and says, well, you want to use that theater, you
22   got to use us for your entire tour.  Again, that would be a
23   different situation that would be closer to a conventional
24   tying claim.  You're just saying that's not what they mean by
25   this in the complaint; is that fair?
```

P1MCusaO

1          MR. GASS:  That's not what they pleaded here.

2          THE COURT:  I quoted you --

3          MR. GASS:  That would be a different tying claim than

4   the one the parties have spent hundreds of pages briefing.

5          THE COURT:  Okay.  But I'm saying this is what the

6   complaint actually alleges.  I guess the question is really for

7   the plaintiffs, whether that is what they're saying or that has

8   to be taken in context with everything else in the complaint

9   that indicates, no, we're just saying that we can't use anyone

10  else effectively because we want to play at these venues and we

11  have to use the promoters for those venues.

12         MR. GASS:  Listen, fundamentally, if that were the

13  contention at issue, then setting aside whether there are other

14  problems with that claim, which I think there probably would be

15  for a variety of reasons, you could issue an order remedying

16  that.  You could say, listen, you can't go and say you could

17  only have my venues if you agree to use me for other parts of

18  your tour.  That doesn't require forced sharing of

19  Live Nation's venues.

20         THE COURT:  Well, I agree.  So didn't you just provide

21  the remedy that would --

22         MR. GASS:  No, because that's not the tying claim

23  we're arguing about.

24         THE COURT:  Anything else from your end?

25         MR. GASS:  No.

P1MCusaO

```
1          THE COURT:  Let me hear from Ms. Markel or anyone else

2    who wants to speak on behalf of the plaintiffs.  You've gotten

3    some things to respond to.

4          And what's your response?

5          MS. MARKEL:  Sure.

6          THE COURT:  And I suppose, let's work backwards from

7    where we just ended, which is defendants say, look, if you were

8    really saying that there was conduct here that was Live Nation

9    saying that if you want to use our venue for part of your tour,

10   you've got to use us as a promoter for your entire tour.  That

11   is something that could be remedied and might be a viable tying

12   claim.  Is that in fact what you're alleging in this case?

13         MS. MARKEL:  Your Honor, we do allege that in the

14   complaint.  Here, Live Nation owns about 60 percent or more of

15   large amphitheaters.  And so to do a tour, an artist

16   essentially needs to use Live Nation to do that tour.

17         THE COURT:  You're saying the "essentially" thing, and

18   that's why Mr. Gass is saying that when you say this in

19   paragraph 113, it's not actually what you mean.  What you mean

20   is that --

21         MS. MARKEL:  That is what we mean, your Honor.

22         THE COURT:  Meaning that you think the allegation is

23   that you've done your investigation pursuant to Rule 11, you've

24   done a pre-complaint investigation, and you believe that at the

25   end of discovery, the facts will show that Live Nation goes to
```

P1MCusaO

1    artists and says, look, you want to use our venues for part of

2    your show, then you got to use us as a promoter for your entire

3    tour, like you can't use a promoter for those particular acts

4    that -- you can't use us for these venues only, you've got to

5    use us for the entire tour that you have, even for the venues

6    that are non-Live Nation owned.  Is that what you're suggesting

7    or is it something different?

8            MS. MARKEL:  I think that's part of it, your Honor,

9    but also the policy that an artist can only play at a Live

10   Nation amphitheater if it purchases Live Nation's promotion

11   services as part of that, as well.

12           THE COURT:  I understand that, but that's where

13   Mr. Gass says that's a refusal to deal, it's nothing more.

14   He's saying that is just a consequence of the fact of the

15   natural fact that if they don't rent to other promoters, given

16   that artists don't directly buy theater space, they go to

17   promoters, that that essentially, as you put it, would kind of

18   foreclose them from using other promoters for those venues.

19   And so he's saying you can dress it up however you like, but

20   that's a refusal-to-deal claim, and that's one that's

21   foreclosed by *Trinko* and suggested in *Areeda* and the treatises

22   that is not a viable tying claim.  And so that's why I'm really

23   trying to tease out whether that's all you're alleging or

24   whether there's this other stuff.

25           And so I think Mr. Gass pointed to three different

P1MCusaO

1    things that could be different, right.  There's potentially

2    artists going in and contracting for these venues, Mr. Gass

3    says the complaint says that that's not a viable alternative.

4    There's the option that Live Nation is doing something separate

5    with respect to artists and saying, if you want to use our

6    venues, you've got to use us as a promoter for the entire tour.

7    And then there's Live Nation doing other stuff that would

8    direct it towards artists, that condition, their use of

9    amphitheaters on using them as the promoter, that's separate

10    and apart from their policy of not renting to promoters.

11         So, whether you think of it as two or three different

12    things, there's got to be something else, and he's just saying

13    there is nothing else.  He's saying that when you get down to

14    it, if we take out all the rhetoric and the characterizations,

15    the actual conduct that's at issue on the tying claim is this

16    policy and what that policy is.  And he gave you the complaint

17    cites.  The policy is just the refusal to deal with promoters.

18    He's saying if that's all there is, then you just have no claim

19    for tying.

20         So, what I'm going to do, because that's a lot, I'm

21    going to give the plaintiffs a chance to respond to that and

22    I'll say give me a letter, no more than three pages, and the

23    function of this letter is twofold.  I want you to respond

24    directly to the argument made that, as a factual matter,

25    meaning not like the characterizations, but the actual facts,

P1MCusaO

```
1    the tying claim is not just about the policy not to rent to

2    rival promoters, it's about something else.  And Mr. Gass says

3    you have this investigation, you did all this stuff, you

4    thought about these theories and you didn't come up with

5    anything else.  And so it is absolutely just about that.  You

6    can call it whatever you want, but that is what is at issue.

7    I'm trying to get to that fundamental factual point.

8            If you've got something else, then there's going to be

9    a subsequent question, which is, if it's not alleged in the

10   complaint, then I think the proper course would be to dismiss

11   this claim and I'll consider whether it should be with

12   prejudice or without prejudice based on the parties'

13   submissions.

14           So let's deal with that in that way.

15           Ms. Markel, are you also dealing with the antitrust

16   standing issue?

17           MS. MARKEL:  No, I am not.  I'll leave that to my

18   colleagues from D.C.

19           THE COURT:  And who's going to be speaking on behalf

20   of the plaintiffs with respect -- actually, for this one, I'm

21   going to start with defendants.

22           Mr. Gass, are you also --

23           MR. GASS:  I'm afraid you're stuck with me, your

24   Honor.

25           THE COURT:  No, this is great.  Thank you.
```

P1MCusaO

1              So what is your response to any of the plaintiffs'

2      cases?  You've had your reply brief and you didn't respond to

3      any of them.  So you have *Davitashvili*, *Amazon*, *McCready*,

4      *DDAVP*.

5              MR. GASS:  Let me go through those one at a time.

6              So the *Grubhub* case -- well, this is necessarily going

7      to entail comparison to the facts of our case, as well.  So

8      I'll start by saying what the *Grubhub* case said, and then I'm

9      going to necessarily have to go into a little bit of the facts

10     of our case before I get to the other cases, as well.

11             So what the *Grubhub* case is about is you have a class

12     of restaurant goers who are saying there's a policy that the

13     meal delivery services have where they say if you want to do a

14     deal with me as a delivery service, you can't give

15     in-restaurant patrons a better price than you'd give delivery

16     customers.  The standing argument in that case was, listen,

17     guys, you in-restaurant meal eaters are not even participating

18     in the market for delivery services, so you don't have

19     standing.  What Judge Kaplan I think very sensibly says is this

20     is a very straightforward application of *McCready* where the

21     in-restaurant diners are like the intended subject of this

22     policy that's being imposed with the -- on the restaurants that

23     are dealing with the meal delivery services.

24             So the fact that the diners aren't getting meal

25     delivery is not going to get you out of standing.  They are to

P1MCusaO

1    use the framework that the Second Circuit prescribes.  Their

2    injuries are inextricably intertwined with those of the harms

3    to competition in the market where competition is being

4    restrained.

5         There's -- that is not at all the case in this

6    situation.  What we have here -- and again, I'll get to the

7    other cases in a moment.  What we have here is B-to-B markets

8    and B-to-C markets.  Here, the B-to-B market is the only way

9    that you can actually get your hands on tickets to sell to

10   consumers is by going through venues.  We have the allegation

11   in the complaint at paragraph 175, that, currently in the

12   United States, except in rare cases, only a single primary

13   ticketing service is offered to fans to purchase tickets,

14   right.  So that means that, for better or worse, the way that

15   you get your hands on tickets to sell to customers in the first

16   instance is by going to venues and purchasing the rights.  You

17   can think of it as venues selling off their ticketing rights.

18        The way that competition works in that market,

19   ideally, is you have ticketing service provider A who is

20   competing against ticketing service provider B for the venue's

21   patronage, and the result of that competition is that the venue

22   winds up getting a richer and richer deal by virtue of A and B

23   saying I'm going to give you more, I'm going to give you more,

24   I'm going to give you more.

25        Now, the core problem here is that that is

P1MCusaO

```
 1    effective -- that competition has the effect of raising the

 2    cost of providing the service of ultimately getting the ticket

 3    in the hands of the customer.  So all things equal, the

 4    competition is also -- all things equal, the competition is

 5    also going to have the effect of raising the price for the

 6    consumer.

 7            So, far from this being a circumstance where the

 8    conduct in this market is sort of obviously causing the injury

 9    in this other market, what we have here is a circumstance where

10    the conduct in this market is, at best, kind of obliquely

11    related to the injury asserted and, sort of more concretely,

12    it's very hard to understand how the higher prices down here

13    actually result from the anticompetitive conduct up here.  And

14    that's the same problem that condemns their other cases, as

15    well.

16            Certainly the Amazon ebooks case is not on point.  In

17    that case, what was happening is that the publishers were

18    basically the ones setting the price of the books that

19    consumers were buying via Amazon.  And the core complaint by

20    the end-user customers was, listen, Amazon has all of these

21    provisions in its contracts with the publishers, MFNs, and

22    price notification provisions that have the effect of raising

23    the cost of doing business with Amazon, and as a result, the

24    publishers are just one for one kind of ratcheting up the price

25    to solve that anticompetitive conduct that Amazon is engaging
```

P1MCusaO

 1    in.  Totally different than this scenario where the mechanism

 2    of causation, the links in the chain are just far more -- there

 3    are many more of them that you have to get to and not even

 4    clear how you do that.

 5         THE COURT:  Let's say that the plaintiffs were able to

 6    show that consumers paid supercompetitive prices in the

 7    fan-facing primary ticket mark market, which is what I think

 8    we're talking about.  They showed that as a matter of fact,

 9    meaning they deal with the issue that you've raised, which is

10    that all things being equal, increased competition in the

11    B-to-B market, which you reference, would end up raising ticket

12    prices, but they say that is just put to the side by the fact

13    that by foreclosing other competition in the primary ticketing

14    market, there's just no other options.  And so nevertheless,

15    despite what you just raised, the facts show that consumers

16    paid supercompetitive prices.  You would agree they would have

17    standing?

18         MR. GASS:  If the supercompetitive prices are a

19    function of the anticompetitive conduct, then I agree they have

20    standing.

21         The problem here --

22         THE COURT:  Why wouldn't they have a plausible

23    allegation of standing here?  What they say is they foreclose

24    competition in the B-to-B market, for that reason, when you get

25    down to the B-to-C market, there's no other options.

P1MCusaO

1          And so in paragraph 142, they say due to Live Nation's

2     unlawful conduct, fans across the United States, including fans

3     in every plaintiff state have paid more in fees that are not

4     negotiable and cannot be comparison shopped because there are

5     no other options, why wouldn't that be a plausible allegation

6     that you are going to -- not you personally, but someone on

7     your team is going to work to undermine in the course of

8     discovery and when we get to the summary judgment stage?  I

9     mean, that's a quintessential factual argument.

10          But in terms of a theory, that is a theory that, at

11     the pleading stage, would seem to check all of the boxes in

12     terms of antitrust injury and the efficient enforcer of

13     factors.

14          MR. GASS:  The problem, your Honor, is there is no

15     articulation of any mechanism by which the anticompetitive

16     conduct complained of leads to that result.

17          Let me directly take that example.  So for a given

18     concert, there's only one choice of primary ticketing company,

19     so there's no competition.  That's a result of exclusivity.

20     That's a result of the fact that, as they allege in paragraph

21     175, the way that this works is that venues choose a single

22     ticketing company with whom to contract, and that ticketing

23     company is the only one who provides primary ticketing

24     services.  To get from there's something anticompetitive about

25     that policy, that commercial structure, to consumers are having

P1MCusaO

1    to pay more down at the end of the line, you need a theory of,

2    like, well, what would -- what would happen if venues actually

3    used two primary ticketing companies to sell their tickets?

4    And not just that, but to sell sort of the same tickets for a

5    given show.  Which, by the way, is a commercial structure that

6    is found nowhere on earth that we're aware of.

7            So, the point is the actual harm to competition that's

8    being alleged really has no discernible connection to, let

9    alone sort of causal relationship with the alleged

10   supercompetitive prices.

11           And our core point here is they're saying there's

12   anticompetitive stuff up here, they're saying there's

13   supercompetitive conduct down here.  At least give us a bit of

14   a roadmap for how you're going to get from A to B so we're not

15   left not knowing the answer until we get to expert discovery.

16   That's fundamentally what this is about.

17           THE COURT:  I think I got you.  So you're saying,

18   look, the problem here is really that no matter what you think

19   of the inextricably intertwined standard, right, you got to

20   show the linkage, and you're just saying that there's no

21   linkage here.  And the basic reason why is because every venue

22   is always going to have one ticketer.  And so there's always

23   going to just be one ticketer, and so there's always just going

24   to be no other option.  And so at that point, what's the

25   linkage?

P1MCusaO

1          MR. GASS:  That's exactly for that one and you can

2    tell a similar story on each of the things that they're

3    complaining about.  The Live Nation overpays for these

4    exclusive deals.  Okay.  So the venue is being made better off

5    by virtue of this conduct.

6          Paragraph 22 of the opposition brief, we have the

7    fairly astonishing suggestion that they don't have to tell us

8    whether their theory is that their venues are made better off

9    or worse off.  I don't know how you could answer any of these

10   questions about whether the alleged supercompetitive prices are

11   a function of the anticompetitive conduct without knowing up

12   front, listen, this whole collection of anticompetitive stuff

13   that Ticketmaster is supposedly doing or Live Nation is

14   supposedly doing doesn't mean that venues are getting more

15   money than they would in a competitive market or less.  I would

16   love to know the answer to that question.

17         THE COURT:  Okay.  Let's get the answer.

18         MR. GASS:  Thank you.

19         MR. GITLIN:  Good morning, your Honor.  Adam Gitlin

20   with the Office of the Attorney General for the District of

21   Columbia on behalf of the state plaintiffs.

22         As a matter of housekeeping, if it's all right with

23   your Honor, I'll address any questions about antitrust injury

24   which I believe covers everything you covered with Mr. Gass up

25   to now.

P1MCusaO

| | |
|---|---|
| 1 | THE COURT:  I don't want to leave anyone out, so I'm |
| 2 | happy to hear about the efficient enforcer factors, but I think |
| 3 | that the majority of the parties' briefing focused on the |
| 4 | threshold issue of antitrust injury.  So I will hear you on |
| 5 | that and I'd love it if you could directly address Mr. Gass' |
| 6 | point that, look, if there was a linkage to the B-to-B conduct, |
| 7 | as he puts it, and the B-to-C overcharge that you're alleging, |
| 8 | that would be something, because I think they're basically |
| 9 | giving you or they're spotting you that if you could make that |
| 10 | linkage, then, at least for pleading purposes, you would |
| 11 | potentially satisfy the antitrust injury requirement.  They're |
| 12 | saying there's just no linkage given the allegations in the |
| 13 | complaint as to what's happening.  What's your response? |
| 14 | MR. GITLIN:  So, the response is a couple responses, |
| 15 | your Honor.  I'm not sure they're spotting us that they |
| 16 | wouldn't have essentially some complaint about the level of |
| 17 | linkage, and it's partly because, if anything, the linkage in |
| 18 | our case is stronger than it is in just about any case either |
| 19 | side cites because we're not talking about some vague B-to-B |
| 20 | interaction that's happening at a higher level of distribution |
| 21 | that somehow has some effect of giving consumers one exclusive |
| 22 | option.  It's much more aligned with what your Honor suggests, |
| 23 | which is they are specifically contracting to be the only |
| 24 | option for consumers so that then they can charge what they |
| 25 | would like.  There's no specific intent requirement here, they |

P1MCusaO

```
 1    don't have to say and we don't have to plead that they are

 2    specifically asking for exclusivity so that they can charge

 3    people more.

 4            THE COURT:  What about Mr. Gass' argument that the

 5    venues are always just going to have one primary ticketer?  And

 6    so you will never have a situation for a given show or event

 7    where you have multiple ticketers.  And so if that's never an

 8    option, then for the market that you're claiming damages,

 9    meaning the consumers who bought Ticketmaster tickets, they're

10    always just going to be the only one.

11            MR. GITLIN:  This is one of the many instances where

12    defendants are simply introducing facts that contravene not

13    only pleadings, but at some instances even their own words.

14            So if you look at paragraph 105 of the complaint, for

15    example, we say that fans could benefit from open venues

16    because it would be — and this is quoting defendants — easy to

17    find and purchase tickets anywhere, right.  That is multiple

18    touch points.  Fans could find, quote, competitively priced

19    tickets across various touch points.  At least internally, they

20    acknowledged -- I'll give your Honor a moment to get to the

21    page.

22            THE COURT:  I'm right there.

23            MR. GITLIN:  At least internally, before this

24    litigation, they acknowledged that just as it is in other

25    countries, you can have multiple ticketers.  It's simply by
```

P1MCusaO

 1    virtue of the fact that they've designed an ecosystem, right,

 2    which they've pioneered, we talked about in paragraph 64, they

 3    started this whole thing of paying venues up front for

 4    exclusivity that there would simply be no other way that people

 5    would do business in this space.  The particularities of it we

 6    don't have to address at the pleading stage, but certainly

 7    there are allegations that support their alternative worlds

 8    here.

 9            And to get to this, I want to, unless your Honor had

10    something further on that, I realized there's another

11    outstanding question issue Mr. Gass raised, which is whether or

12    not venues benefit from the status quo and whether that matters

13    for purposes of whether or not we've adequately pled the

14    allegations we need to.

15            THE COURT:  You can go there.

16            MR. GITLIN:  So, first of all, when we're talking

17    about businesses that are alleged to be coerced, and we

18    certainly do allege the coercion of businesses, whether they

19    are actually benefiting or not doesn't stop liability from the

20    defendants.  And that's true.  I mean, VF Meritor talks about

21    this even through trial.  That is, you can have essentially an

22    unwilling participant in a different portion of the supply

23    chain who has to go along to get along, essentially, and

24    everyone, what we explain is, is working with Live Nation

25    because they've got to make money.

P1MCusaO

1          But I also think it's important to note that we

2     don't -- we have pled sufficiently that venues could also

3     potentially benefit from a but for world in which you didn't

4     have the exclusive agreements here.

5          And again, with multiple ticketers — this is also in

6     paragraph 105 — they'd be able to, as defendants say, quote,

7     limit the risk of unsold inventory, pack the house.  These are

8     colloquial versions of essentially saying what we would say in

9     antitrust is increasing output, right.  And with increased

10    output, there are other possible but for worlds.  It's not just

11    that venues all of a sudden now can't, as they say in I think

12    paragraph -- cited in paragraph 46 of the complaint, cover

13    their costs.  There are other ways venues may cover their costs

14    and, ultimately, they may benefit from a but for world in which

15    they have more options, more ticketing innovation, and a

16    greater ability to reach fans.  I think the language they use

17    is reach new audiences and better know their fans.  And all of

18    that is available to them in a but for world without this

19    conduct.

20         THE COURT:  So I've got paragraph 105.  So you say

21    paragraph 105 says there might be open venues and multiple

22    ticketers, and so that has a direct impact on consumers because

23    that would eliminate this kind of situation where there are no

24    other options.  I've got that.

25         Separate and apart from that argument, is there any

P1MCusaO

1    other way in which the injury to consumers is directly linked

2    to the alleged anticompetitive conduct?

3        MR. GITLIN:  Your Honor, we do make, obviously,

4    quality based arguments -- sorry.  In our briefing based on --

5    based on allegations in the complaint that talk about how

6    fan-focused innovations would also be increasing.  That's

7    essentially -- that goes to what the quality adjusted price

8    would have been in the but for world, right, you've got more

9    innovation, more competition.

10        THE COURT:  What paragraphs are those?

11        MR. GITLIN:  So paragraph 153 talks about fan-focused

12    innovations.  Paragraph 143, as well.  Paragraphs 151 and 108

13    talk about how rivals and threats can bring more innovations to

14    the marketplace and that these -- and that this would help us

15    get around, essentially, the status quo where consumers simply

16    are left with no meaningful alternatives.

17        There's -- I'll add just that --

18        THE COURT:  Well, look, your antitrust injury

19    allegation is in paragraph 223.  What you allege there is that

20    consumers have paid more and continue to pay more for fees

21    relating to tickets to live events than they would have paid in

22    a free and open competitive market.  I mean, that's your

23    antitrust injury argument.

24        MR. GITLIN:  Yes.

25        THE COURT:  And so I'm not understanding how that is

P1MCusaO

```
1    related to the alleged anticompetitive conduct, except for what

2    you've said about 105.

3            So, I'm sorry if you're repeating yourself, but is

4    that injury that is alleged in paragraph 223 related to 105,

5    which is, if absent this anticompetitive conduct, you could

6    have a situation where there were multiple primary ticketers

7    and thus not this supercompetitive pricing based on

8    Ticketmaster's kind of stranglehold on that part of the market

9    or is there something else that I'm missing?

10           MR. GITLIN:  No, your Honor.  At a high level, I don't

11   think there's anything else that you're missing.  I do think

12   there are obviously, subject to discovery, exactly how this

13   plays out in a but for -- what is the most plausible but for

14   world obviously would change.  There are ones that and, you

15   know, could include significant number of alternative

16   ticketers, but anything that eliminates the exclusive dealing

17   that was sort of the anchor for these claims --

18           THE COURT:  I suppose in addition to having open

19   venues and multiple ticketers, you could just simply have other

20   primary ticketers who would operate differently under different

21   market conditions.  Maybe they would be forced to be more

22   competitive in terms of their pricing, even if they were the

23   only primary ticketer for a particular show.

24           MR. GITLIN:  I think that's correct.  And that goes to

25   sort of another one of the fact dispute issues that defendants
```

P1MCusaO

 1    have raised where they simply assume that every ticketer has to

 2    have the same business model essentially as Live Nation.  There

 3    are others that might simply compete in different ways.

 4         THE COURT:  So at a basic level, your argument is

 5    twofold.  We're saying we're charged too much — that's the

 6    antitrust injury — and there are two ways you get there.  One,

 7    you could have a situation where there are multiple ticketers

 8    and that would drive down prices; and then two, you could have

 9    different ticketers, and they would operate differently.  And

10    all of this is subject to fact discovery and figuring this out.

11    But in either of those two instances, the injury to consumers

12    would be inextricably intertwined with the alleged

13    anticompetitive conduct because it's just a straight line.  The

14    ultimate goal here is to be able to restrain the market for

15    sales to consumers, jack up prices.  That's what the complaint

16    alleges; is that fair?

17         MR. GITLIN:  I think that is true, your Honor.

18         The only qualification I would say is that while we --

19    while we think we've more than cleared the hurdle for

20    inextricable intertwining, as your Honor knows, we think that

21    actually the harm here is significantly more direct than I

22    guess you would see in some of the *McCready* line of cases.  Of

23    course we think *Apple v. Pepper* has a lot more decisional force

24    here than defendants do.

25         THE COURT:  Understood.

P1MCusaO

1          Mr. Gass, I'll give you a chance to respond.  You

2   heard at least an articulation, it may have been from me, but

3   two versions of the plaintiffs' case, that they think — maybe

4   I'm putting words in their mouth — would support this kind of

5   linkage between the B-to-B conduct and the B-to-C conduct.

6          And then I suppose separate from that, which you can

7   address, they come back to *Apple v. Pepper*.  They understand

8   it's an *Illinois Brick* case.  They say look, the upshot of that

9   is if you have consumers who are directly overcharged, they get

10  to bring the case, they're not going to lose on the standing

11  grounds, we'll figure out where the chips may fall later.

12          MR. GASS:  Well, let me take that one first, because

13  the Vakai decision from Judge Seeborg directly disagrees with

14  that.  It confronts that argument head-on.  It says, listen,

15  the mere fact that customers bought their phones from Apple

16  doesn't mean that they have antitrust standing to complain

17  about harms in some application related market where the

18  alleged competitive injury was that Apple was preventing OS

19  developers from allowing essentially side-loaded apps onto the

20  phone.  So that is a case where this argument was squarely

21  presented and the judge says that's not how this works.

22          And of course that's consistent with *Apple v. Pepper*

23  itself where the only argument was an *Illinois Brick* argument.

24  I mean, Apple wasn't even saying there's not antitrust standing

25  for other reasons.  It was just this thing.  And that's of

P1MCusaO

```
1   course different from here because there was not just, like,
2   privity of contract between Apple and the purchasers, there was
3   privity of conduct.  Apple was the one who was saying I'm just
4   imposing this tax on you.  We can distinguish the scenario that
5   counsel just articulated because just consider how vastly much
6   more complicated that is than the Pepper scenario, the Grubhub
7   scenario.
8           Let's talk about McCready for a second, as well.  The
9   theory that we just heard is, okay, in -- first, we still don't
10  know the answer to the question whether, but for the
11  anticompetitive conduct, venues will be better or worse off, no
12  clear answer.  But in a but for world, maybe what would happen
13  is that if Ticketmaster weren't doing the anticompetitive stuff
14  it was doing, venues would choose to have more than one primary
15  ticketing company selling their tickets.  Something about that
16  would mean that, notwithstanding any increase in competition
17  between those companies that were down to the benefit of the
18  venue, which plays a role in setting the prices, the customers
19  would be better off in that world.
20          That is a theory, I agree that's a theory, but it's a
21  theory that illustrates the point about why we don't let
22  everyone have antitrust standing in all cases.  No one is here
23  saying they don't get to pursue the theory.  The question is
24  just as a matter of antitrust standing doctrine, which is all
25  about the question from among the universe of people who can
```

P1MCusaO

 1    complain about anticompetitive stuff, is this one of the people

 2    that, as a matter of judicial economy and other considerations,

 3    should be here in court.  Do the end user customers fall in

 4    that bucket?  And the answer is clearly no because the injury,

 5    it requires such an attenuated chain of causation to get from

 6    the thing that they're complaining about to the effect that

 7    they're actually asserting is susceptible to damages that it

 8    doesn't work.

 9            The suggestion that this is a more direct theory of

10    injury than in *McCready* is astonishing.  Recall the facts of

11    *McCready*.  *McCready*, you have a person who wanted to use a

12    psychologist and be reimbursed by her healthcare coverage plan.

13    And the problem was that the healthcare insurance provider had

14    allegedly conspired with psychiatrists to exclude psychologists

15    from the coverage of the plan.  And the antitrust standing

16    argument that was made by the defendants in that case was,

17    well, this person who wanted to see a psychologist doesn't have

18    antitrust standing to challenge this policy between the health

19    insurance provider and the psychiatrists because she didn't

20    even want to see a psychiatrist anyway.  And the court says

21    that's not how this works, right.  Even though you weren't a

22    participant in this market where competition was allegedly

23    restrained, you were the direct point of it, right, you were

24    the fulcrum of the injury as the doctrine would subsequently

25    evolve to frame the point.

P1MCusaO

1          Nothing like that is true here.  In every version in a
2     theory of competitive harm, what you see is you have to squint
3     real hard to get from, okay, if you stopped the anticompetitive
4     conduct up here, how would the consumer wind of paying less?
5     And that's exactly why we're -- we're raising this issue.
6          By the way, the matter gets worse, not better, when
7     you start talking about the promotions role in all of this.
8     When you read their response to question 4, what you see is
9     they also invoke this sort of flywheel concept.  There, again,
10    same dynamic as in the ticketing space.  The way the
11    competition works, when it's working, is that rival promoter A
12    and rival promoter B are vying for the patronage of the artist.
13    And rival promoter A says I'll give you a guarantee of
14    X dollars to promote your tour, and rival promoter B says I'll
15    do you one better, I'll give you X plus one percent, and A
16    comes back and says, no, I'll give you two points on top of
17    that.  And the effect of that competition working, when it's
18    working the way that it's supposed to work, is that the cost of
19    supplying the whole event goes up, and again, all things equal,
20    which it may or may not be, the price is going to be higher.
21    This is no different than labor markets or anything like that.
22          The reason why we're here is to make clear that your
23    Honor appreciates that most of the harms to competition that
24    they're talking about in these upstream B-to-B markets have no
25    discernible connection to the suggestion that competitive

P1MCusaO

1    market consumers would be paying less, not more.

2           THE COURT:  Well, that might be true, but if they

3    have -- they've given you two versions of the theory that you

4    don't have to squint too hard to see the connection, which is

5    in one situation you have multiple ticketers for venues and

6    specific events, in another situation you might have a

7    different ticketer who would operate in a different manner from

8    Ticketmaster.  In either of those situations, they're positing

9    that the prices would be lower.  It's a factual question as to

10   whether they're right or whether you're right, but they've

11   alleged that linkage.  They say that they've been foreclosed

12   from any other option, other than Ticketmaster, and for that

13   reason they're paying more.  And so that seems like a pretty

14   straightforward theory of standing.

15          MR. GASS:  Let me take the other ticketer scenario.

16   So the theory is if Ticketmaster wasn't out there doing the

17   awful things that it does, there would be more ticketing

18   companies.  The way that this actually works, and I think that

19   you can infer this from the complaint, as well --

20          THE COURT:  When you keep talking about the way it

21   actually works and the labor markets and all these other

22   things, these are all the types of arguments that we entertain

23   on motions for summary judgment where you'll have a

24   distinguished economist come in and put in a report about how

25   there is no connection between what's happening in the consumer

P1MCusaO

1    market and these other markets, and the plaintiffs would have

2    their distinguished economist come in and say the opposite, and

3    then the court, for my sins, I have to figure out who's got the

4    right of it or maybe the jury has to figure that out at the end

5    of the day.  So that's usually how this works.

6          The question here is whether there's a plausible

7    allegation.  I think that's why the court asked the question on

8    the supplemental letter in the way that it did because,

9    normally, when you have consumers coming in and saying they've

10   been overcharged, antitrust standing is usually not even an

11   issue.  It happens to be that there are several recent cases

12   saying, yeah, if that's the case, you're typically going to

13   have interest standing, typically.  Typically.  That's why I

14   put pressure on the plaintiffs to point me to the particular

15   connections that they were alleging, and they point to at least

16   two.

17         And so I think for pleading purposes, that may be

18   enough.  However, I'll give you the same affordance that I gave

19   the plaintiffs on the tying issue which is that -- I think I

20   said Monday.  So each side can put in a letter, let's say no

21   more than five pages.  You can talk about whatever you'd like,

22   but as you can probably tell from this argument, my heated

23   questions were mainly on the defendants' side for the antitrust

24   standing issue, and they were on plaintiffs' side for the

25   antitrust tying issue.  And so I would just give you that

P1MCusaO

```
1   guidance as you determine how you want to use your pages, then
2   the Court will promptly rule on the motion so that you can make
3   sure to tailor discovery in light of the Court's ruling.
4               Mr. Gass, anything in addition?
5               MR. GASS:  No, your Honor.
6               THE COURT:  Ms. Sweeney or whoever wants to address
7   this from the plaintiffs' side, anything else you would like to
8   raise before we adjourn for today?
9               MS. SWEENEY:  Your Honor, just for some clarity with
10  respect to our letter.  I understand your Honor is saying that
11  both sides have an opportunity to file a letter addressing both
12  parts of today's motion, maximum of five pages?
13              THE COURT:  Yes.
14              MS. SWEENEY:  Thank you.
15              THE COURT:  Yes.  But I would just again, especially
16  on the tying issue, I think you understand, because I've said
17  it now like 50 times, but what I'm really looking for, in
18  addition to anything else you wanted to address, is on this
19  point about whether, as a just pure matter of your factual
20  allegation, there is anticompetitive conduct separate and apart
21  from the policy that Live Nation does not rent to rival
22  promoters.  Is there something else at issue in the tying claim
23  and, if so, what is it?  That's at least one question that I'd
24  likes you to address in terms of your letter.
25              MS. SWEENEY:  Thank you, your Honor.
```

P1MCusaO

1          And just, again, this is due end of day on Monday

2     or -- is that what your Honor said?

3          THE COURT:  Yes, end of day.  Let's make it 5:00 p.m.

4     so no one has to work until midnight.

5          MS. SWEENEY:  Thank you.

6          THE COURT:  And then just one last question, and

7     Ms. Markel, you can address this if you'd like, but on the

8     tying claims, is it your contention that this is subject to

9     per se liability or is this a rule of reason claim, or you

10    haven't really thought about it?

11         MS. MARKEL:  Our position is that -- I think we

12    haven't asserted that in our briefing or in the complaint, but

13    it would be a tying -- a per se claim.

14         THE COURT:  It would be a per se claim.

15         MR. GITLIN:  Your Honor, if I may, because I imagine

16    that the exchanges from plaintiffs are largely entirely going

17    to focus on the tying issue, so this may be our last

18    opportunity to address the Court on anything relating to

19    standing with respect to damages, I did want to give

20    Mr. Niggeman, or Mr. Gass might have something to say, but to

21    address any questions you might have or anything you might want

22    to say with respect to the efficient enforcer issue, that would

23    be --

24         THE COURT:  Thank you for reminding me.

25         First, Mr. Marriott or Mr. Gass, anything to address

P1MCusaO

1    on your end?

2            MR. GASS:  No, your Honor.

3            THE COURT:  I didn't have any specific separate

4    questions on the efficient enforcer factors, but I'm happy to

5    give you a couple minutes if you'd like to just address -- so

6    assuming that we get past antitrust injury, why are the

7    consumers here the efficient enforcers, given what Mr. Gass has

8    said?  It's kind of far removed from the conduct that's alleged

9    to be anticompetitive.  And so if you just kind of applied

10    those factors, you wouldn't have an efficient enforcer finding

11    as to these concerns.  Why is he wrong?

12            MR. NIGGEMAN:  Thank you, your Honor.  Cole Niggeman

13    on behalf of the Attorney General of the District of Colombia

14    on behalf of the plaintiffs.

15            The efficient enforcer factors reflect a concern about

16    whether the putative plaintiff is the proper party to perform

17    the Office of Private Attorney General.  And the plaintiffs

18    here satisfy each of the three factors outlined in associated

19    general contractors the defendants raised in their brief, but

20    they also satisfy the fourth factor that defendants did not

21    address, the risk of duplicative recovery.

22            THE COURT:  I think you've got that one.  You've got

23    that one in the bag, so you can address the other three.

24            MR. NIGGEMAN:  Thank you, your Honor.

25            And so with respect to the first factor, the

P1MCusaO

directness of the asserted injury, plaintiffs have sufficiently

pled the defendants have unlawfully maintained a monopoly in

the fan-facing primary ticketing market, and that fans pay more

for their concert tickets result as a result.  Paragraphs

through 139 through 154 of the complaint and elsewhere outline

this conduct.

            As my colleague Adam Gitlin mentioned, this is akin to

the *Amazon Ebooks* case where the court held that plaintiffs

have adequately pled a direct relationship between paying

higher retail prices for ebooks and the contractual provisions

Amazon used to prevent competition on price, which ultimately

led to supercompetitive prices.  This was further supported by

the fact that plaintiffs were direct purchasers from Amazon,

and thus paid the overcharge directly to Amazon.

            And as my colleague Mr. Gitlin also mentioned, injury

can also be sufficiently direct where the alleged harm is based

on where the alleged harm is derivative of defendants'

anticompetitive conduct, and like in *DDAVP*, defendants'

anticompetitive conduct here allows them to charge higher

prices.

            Moving on to the second factor, which is the existence

of an identifiable class of persons whose self-interest would

normally motivate them to vindicate the public interest and

antitrust enforcement.

            Consumers are likely the only potential plaintiffs

P1MCusaO

with the incentives and natural economic self-interest to
vindicate their rights.  This factor does not ask whether
plaintiffs are the most motivated.  Rather, this factor asks
whether a plaintiff is motivated by self-interest.  And
defendants' assertion that venues, artists, and rival promoters
and ticketers are better suited to sue, misconstrues the facts
on the ground.  Venues and promoters rely on defendants for
access to content, artists rely on defendants for access to
fans, and the rival ticketers would be seeking lost profits,
not overcharges.  And so defendants have essentially -- have
intentionally created a system where consumers are the only
potential plaintiffs with the incentive to seek damages.

        Paragraph 152 of the complaint outlines an example of
this fear of disruption, retaliation, and complications with
partnering with anyone other than Live Nation.  And I think
this quote from *DDAVP* on page 689 is particularly telling.
Even if the competitors might be the most motivated, the
plaintiffs are also significantly motivated due to their
natural economic self-interest in paying the lowest price
possible.

        Moving on to the third factor the speculativeness of
the asserted injury, this factor goes to calculation of damages
and whether plaintiffs can produce a just and reasonable
estimate of those damages.  And our theory is intuitive and
straightforward.  Consumers are direct purchasers and damages

P1MCusaO

1    would be determined based on transactions with defendants.

2    This is not a situation with multiple layers of complicit bad

3    actors, this is isn't a situation with complicated foreign

4    exchange markets or futures markets.  Our damages claim to be

5    based off of transactions between consumers and defendants.

6              It's also worth noting that there is some degree of

7    uncertainty that stems from the nature of antitrust laws.  And

8    that's not a -- the complexity of damages, your Honor, is

9    not -- alone is not a reason to deny plaintiffs relief here.

10   Defendants do not seriously contend this factor, and they just

11   recycle the same directness of the harm arguments, which

12   conflates the first and third AGC factors.  And plaintiffs have

13   adequately pled that in a but for competitive market, ticket

14   prices would be cheaper.

15             THE COURT:  Well, to be fair, it may not be a simple

16   analysis, but it is a conventional overcharge analysis.  As

17   you've probably seen, as well, some of those are pretty

18   complicated; however, they're well recognized as a form of

19   relief, and there's standards that are employed, there are a

20   lot of cases on what's allowed and what's not allowed.  And so

21   in that respect, it would satisfy the sufficient enforcer

22   factor; right?

23             MR. NIGGEMAN:  That's correct, your Honor.

24             THE COURT:  Mr. Gass, anything in response to

25   counsel's arguments on the efficient enforcer factors that you

P1MCusaO

 1    haven't already made, because I think a lot of the arguments

 2    you made go to those factors.

 3         MR. GASS:  There is some overlap to be sure.  I think

 4    it's worth noting that the doctrine really does frame this as

 5    an additional hurdle to get over.  So even if you satisfied the

 6    interest injury prong, you would still have to go get over this

 7    one.

 8         And I don't want to repeat myself, but I think we can

 9    agree that the two theories we heard here are but for the

10    anticompetitive conduct, two things might be different in the

11    world.  Venues might use more than one ticketing company to

12    sell primary tickets to their show or there might be more

13    ticketing companies vying for the patronage of venues to sell

14    tickets to shows on an exclusive basis.  Those are the two

15    theories that we heard.

16         On the second theory, I don't know why the existence

17    of more competitors who, by the very nature of competition,

18    would be offering venues more and more money for the rights to

19    be their exclusive ticketing provider would have the end result

20    of consumers paying less and not more by virtue of the

21    increased costs of input.

22         And I'm not saying no one could ever come up with such

23    a theory.  The point is when you're looking at who's the

24    efficient enforcer of that claim, it's not going to be someone

25    whose damages theory depends on this unbelievably complex chain

P1MCusaO

1    of effects where you have to sort of get through the fact that

2    actually it's not really -- it's the venue who's setting the

3    ticketing price and you need to understand where they're going

4    to be better off or worse off or -- excuse me.  They vaguely at

5    least a significant role.  I don't want to assert facts outside

6    the complaint and say the ticketing price.  And it just -- it

7    illustrates the sort of -- the complexity of the chain of

8    causation illustrates why these are the opposite of efficient

9    enforcers.  The --

10         THE COURT:  Again, it doesn't seem that hard to

11   imagine.  I think they would say, well, someone like -- I'll

12   just use Seagate.  Let's say that they were coming in, they

13   were the primary ticketer, sure.  For the reasons you've said,

14   maybe they would have to charge a little bit more than they

15   otherwise would because of all of the increased prices, the

16   costs in the B-to-B market, but they wouldn't charge as much as

17   Ticketmaster does in the real world that we're experiencing and

18   they would show that through economic analysis showing that

19   there would still be a supercompetitive overcharge in

20   comparison to what Seagate would charge.  You may be right,

21   they may be right, but in those situations.  It's precisely why

22   courts are not analyzing those factual issues at the pleading

23   stage, you allow discovery.

24         MR. GASS:  Right.  And yet, there are cases, including

25   the four or five that we cited in response to question 3, in

P1MCusaO

1   which courts say, listen, the fact that you were the one who

2   engaged in commerce with the seller doesn't mean that you have

3   antitrust standing.  *Apple v. Pepper* certainly didn't purport

4   to aggregate the antitrust standing inquiry -- the injury

5   inquiry.

6            THE COURT:  I agree.  And I'll take a closer look at

7   those cases.

8            MR. GASS:  Thank you.

9            THE COURT:  Thank you for the great argument on both

10  sides.  I really appreciate it.  We are adjourned.  Thank you

11  very much.

12                              * * *

13

14

15

16

17

18

19

20

21

22

23

24

25