UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA et al.,

                Plaintiffs,

-against-

LIVE NATION ENTERTAINMENT, INC. and TICKETMASTER L.L.C.,

                Defendants.

24-cv-3973 (AS)

OPINION AND ORDER

---

ARUN SUBRAMANIAN, United States District Judge:

Live Nation and Ticketmaster (collectively "Live Nation") move to dismiss two parts of the amended complaint: plaintiffs' section 1 tying claim and the state-plaintiffs' Sherman Act damages claim. For the following reasons, the motion is DENIED.

### I. Plaintiffs Plausibly Allege a Tying Claim

"A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchase a different (or tied) product." *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 31 (2d Cir. 2006) (cleaned up). "To state a valid tying claim under the Sherman Act," the Second Circuit requires plaintiffs to plausibly allege that: "(i) the sale of one product (the tying product) is conditioned on the purchase of a separate product (the tied product); (ii) the seller uses actual coercion to force buyers to purchase the tied product; (iii) the seller has sufficient economic power in the tying product market to coerce purchasers into buying the tied product; (iv) the tie-in has anticompetitive effects in the tied market; and (v) a not insubstantial amount of interstate commerce is involved in the tied market." *Kaufman v. Time Warner*, 836 F.3d 137, 141 (2d Cir. 2016) (citing *E & L Consulting*, 472 F.3d at 31).

The complaint alleges these elements. It identifies a tying and tied product—large amphitheaters (the tying product) and Live Nation's concert-promotion services (the tied product). Dkt. 257 ¶¶ 242–43. On the element of coercion, it alleges that consumers—here artists—are forced to accept Live Nation's concert-promotion services if they want to play in Live Nation's large amphitheaters. *Id.* ¶ 113 ("Live Nation has a longstanding policy going back more than a decade of preventing artists who prefer and choose third-party promoters from using its venues. In other words, if an artist wants to use a Live Nation venue as part of a tour, he or she almost always must contract with Live Nation as the tour's concert promoter."); *id.* ¶ 201 ("Because of Live Nation's control over a vast network of large amphitheaters and its policy to only work with artists that it promotes, artists seeking to perform a tour in large amphitheaters are denied the ability to work with the promoter of their choice if they want to play a Live Nation-owned or controlled venue."); *id.* ¶ 244 ("Live Nation has unlawfully required artists seeking to use its large

amphitheaters for shows as part of a tour to also purchase promotion services from Live Nation."). It says Live Nation has monopoly power in the large-amphitheater market, *id*. ¶ 242, and that its conduct leads to anticompetitive effects in the concert-promotion market, *id*. ¶¶ 244–47. And no one disputes that the claim involves interstate commerce.

But Live Nation says that the devil's in the details. While the complaint *says* that artists rent amphitheaters, Live Nation argues that artists work through intermediaries—rival concert promoters who rent venues on behalf of artists. From this, Live Nation says that "[s]ettled law provides that Live Nation has no duty to aid its competitors," and so "[i]ts refusal to rent its venues to rival promoters is therefore legally protected behavior." Dkt. 273 at 8. Live Nation relies on the Supreme Court's decision in *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004). In that case, the Court foreclosed a section 2 monopolization claim based on Verizon's alleged refusal to deal with competing telephone-network carriers. *Id*. at 410 ("We conclude that Verizon's alleged insufficient assistance in the provision of service to rivals is not a recognized antitrust claim under the Court's existing refusal-to-deal precedents.").

But as the Seventh Circuit observed in *Viamedia, Inc. v. Comcast Corp.*, "a tying claim does not fail as a matter of law simply because it was implemented by refusing to deal with an intermediary." 951 F.3d 429, 472 (7th Cir. 2020). To the extent that plaintiffs can make out a claim that Live Nation engaged in illegal tying, and didn't *just* refuse to deal with its rivals, the claim is actionable. *See New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 31–32 (D.D.C. 2021) ("The key fact distinguishing [tying] from a standard refusal to deal is that it is not 'unilateral,' but instead 'involves some assay by the monopolist into the marketplace' that interferes with the relationship between rivals and third parties." (quoting *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013))); *see also, e.g.*, *Z-Tel Commc'ns, Inc. v. SBC Commc'ns, Inc.*, 331 F. Supp. 2d 513, 547 (E.D. Tex. 2004) ("The Court declines to read *Trinko* so as to lessen antitrust liability in contexts other than those addressed in that opinion."). Defendants' cited cases don't suggest otherwise. Dkt. 399 at 1–4 (citing cases like *New York v. Facebook, Inc.* and *Sambreel Holdings LLC v. Facebook, Inc.*, 906 F. Supp. 2d 1070 (S.D. Cal. 2012)). In those cases, there was no plausible allegation of a violation separate and apart from a unilateral refusal to deal. But here, plaintiffs say they have alleged more.

To that end, the complaint alleges that Live Nation targeted artists, not just rival promoters. It says that Live Nation has had "a longstanding policy going back more than a decade of preventing *artists* who prefer and choose third-party promoters from using its venues," and that "if an *artist* wants to use a Live Nation venue as part of a tour, he or she almost always must contract with Live Nation as the tour's concert promoter." Dkt. 257 ¶ 113 (emphasis added). The complaint explains that due to Live Nation's monopoly power in the large-amphitheater market, artists are effectively locked into using Live Nation as the promoter for a tour that stops at large amphitheaters. *Id*. ¶ 114 ("As one Live Nation executive explained, 'if [artists] want to do an extensive amphitheater tour with a lot of shows, they would typically be coming to us for that, and they do.'" (alteration in original)); *see also id*. ¶ 201 ("Artists who seek to perform all or parts of their tour in large amphitheaters are uniquely impacted by Live Nation's anticompetitive conduct.

2

Because of Live Nation's control over a vast network of large amphitheaters and its policy to only work with artists that it promotes, artists seeking to perform a tour in large amphitheaters are denied the ability to work with the promoter of their choice if they want to play a Live Nation-owned or controlled venue. These artists are forced either to work with Live Nation or forgo an amphitheater tour altogether."). The complaint further alleges that a senior Live Nation executive directed employees not to increase guaranteed payments to artists looking for "True Amp Tours" because to play at Live Nation's amphitheaters, "they will need to sign with Live Nation as their promoter." *Id*. ¶ 116 ("[W]e know [artists] are likely playing amphitheaters and we are going to get those in most cases." (second alteration in original)). These allegations aren't just about a refusal to deal with rival promoters. They are about the coercion of artists. And Live Nation agreed at oral argument that to the extent that the facts show, for example, that Live Nation tied the rental of amphitheaters to artists using Live Nation as the promoter for an entire tour, that "would certainly be a different scenario and look much more like tying." Dkt. 412 at 30:12–17. At this stage, the Court rejects Live Nation's refusal-to-deal argument.

Live Nation's second (and related) argument is that *promoters* rent amphitheaters in the tying market while *artists* hire promoters in the tied market. Live Nation says this is fatal because tying requires that the same consumer—here artists—purchase both products. *See De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 71 (2d Cir. 1996) (noting the "fundamental principle of antitrust law that an illegal tying arrangement requires that at least two products and/or services be purchased by the same individual; that is, there must be lineal movement between the products" (quoting *Waldo v. North Am. Van Lines, Inc.*, 669 F. Supp. 722, 731 (W.D. Pa. 1987))).

The problem for Live Nation is that, as noted above, the complaint *does* allege that artists are the real consumers in the large-amphitheater market. *See Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) ("[I]n determining whether a complaint states a claim that is plausible, the court is required to proceed 'on the *assumption that all the [factual] allegations in the complaint are true*.'" (emphasis and second alteration in original) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007))). Artists "are the customers" in the large-amphitheater market. Dkt. 257 ¶ 208 ("Artists either work directly with their agent, or through their chosen promoter, to communicate with venues about availability and ultimately choose the amphitheaters where they will perform. When promoters reach out to venues to inquire about availability and pricing, they do so on behalf of a particular artist. . . . Those artists are the customers.").

The complaint alleges that when promoters contract with amphitheater owners, "they typically do so for a specific artist on a particular day," and "are acting on behalf of their artist clients." *Id*. And the artists, not the promoters, decide "where, when, and under what terms they will perform." *Id*. For this reason, plaintiffs say that when thinking about who the coerced consumer is, it's the artist and not the promoter. Reflecting this practical reality, plaintiffs note that in a different case, Live Nation itself agreed that "The Artist Is the Consumer of Promotion and Venue Services." Brief for Live Nation, *It's My Party v. Live Nation*, No. 15-1278 (4th Cir. Aug. 19, 2015), at *8.

Live Nation points out that the complaint alleges that "[p]romoters take on the financial risk associated with a show or tour," Dkt. 257 ¶ 200, and it argues that this shows promoters are the real consumers when it comes to large amphitheaters. But the nature of the financial arrangement between promoters and artists is a factual question that can't be resolved on the pleadings, and the complaint at least suggests that it's artist specific. *See id.* ¶ 41 ("When trying to secure the right to promote an artist's tour, a promoter and artist often negotiate over the artist's guaranteed payment and the profit split of certain additional concert revenues."). And whatever that arrangement is, it's not necessarily dispositive. If the evidence shows that promoters book venues on behalf of specific artists, that artists are the driving force behind which venues to book and when, and that artists are coerced into using Live Nation as their promoter if they want access to Live Nation's amphitheaters, plaintiffs may have a viable tying claim. Thinking about "financial risk" in isolation would put form over substance. Notably, in *Comcast*, the Seventh Circuit found it irrelevant that the consumers affected by Comcast's tying behavior didn't themselves operate in the relevant market, but rather operated through an intermediary who, like the promoters here, bore some degree of financial risk. *See* 951 F.3d at 470 ("The fact that the arrangements were structured so that ownership of the slot avails passed from the MVPDs to Viamedia does not affect this analysis. In applying the antitrust laws, we care more about economic substance than about form.").

The facts may ultimately show that the tying claim here is nothing more than a refusal-to-deal claim foreclosed by *Trinko*, or that artists aren't consumers in the large-amphitheater market. But at this stage, the Court's role is to determine whether the complaint states a plausible tying claim, and it does.

## II.   The State Plaintiffs Plausibly Allege Antitrust Standing

Live Nation also argues that the states lack antitrust standing to sue for damages on their Sherman Act claims. The states, suing in their *parens patriae* capacity, say that consumers have paid supracompetitive prices to Ticketmaster in the primary-ticketing market, and they are seeking damages for the overcharge. Dkt. 257 ¶ 223 (alleging that consumers in the plaintiff states "have paid more and continue to pay more for fees relating to tickets to live events than they would have paid in a free and open competitive market"); *id.* ¶ 142 (alleging that "[d]ue to Live Nation's unlawful conduct, fans across the United States, including fans in every Plaintiff State, have paid more in fees that are not negotiable and cannot be comparison shopped because there are no other options," calling this the "Ticketmaster Tax").[1]

---

[1] The amended complaint includes a general prayer for damages under section 4 of the Clayton Act, 15 U.S.C. § 15, which authorizes damages on Sherman Act claims. Dkt. 257 ¶ 517(j). The complaint doesn't say which of the five Sherman Act claims the states are seeking damages on. In their opposition brief, plaintiffs clarified that "[d]efendants have unlawfully maintained a monopoly in the fan-facing primary ticketing market and that fans suffered injury from that unlawful monopoly." Dkt. 308 at 1. As Live Nation pointed out in reply, this is part of the first claim asserted in the complaint. Dkt. 330 at 8. This claim alleges that Live Nation engaged in exclusionary conduct related to venues, promoters, and rival ticketers to maintain Ticketmaster's control of the primary-ticketing market, which has resulted in supracompetitive ticket prices in that market. *See, e.g.*, Dkt. 257 ¶¶ 224–32. The states haven't objected to this

Live Nation agrees that the states can sue on behalf of consumers. But it says that the consumers are too far removed from the alleged anticompetitive conduct to have antitrust standing. Courts "analyze antitrust standing under a two-part test: a plaintiff must show (1) antitrust injury, which is 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful,' and (2) that he is a proper plaintiff in light of four 'efficient enforcer' factors." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).

Consumers who directly purchased a product at allegedly supracompetitive prices from a defendant—here Ticketmaster—usually have antitrust standing. *See DDAVP*, 585 F.3d at 688 ("In this case, the plaintiffs are purchasers of the defendants' product who allege being forced to pay supra-competitive prices as a result of the defendants' anticompetitive conduct. Such an injury plainly is 'of the type the antitrust laws were intended to prevent.'" (quoting *Brunswick*, 429 F.3d at 489)); *see also Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 530 (1983) ("Congress was primarily interested in creating an effective remedy for consumers who were forced to pay excessive prices by the giant trusts and combinations that dominated certain interstate markets.").

But Live Nation says that this case is different given the nature of the complaint's allegations, where consumers' injuries are "downstream" of anticompetitive conduct perpetrated against other market actors, like venues, promoters, and rival ticketers. The Court rejects this argument. In *DDAVP*, the defendants—Ferring and Aventis—were alleged to have engaged in anticompetitive conduct relating to an antidiuretic drug, DDAVP. This included conduct directed to keeping competitors out of the market, like engaging in sham infringement litigation against generic rivals. *DDAVP*, 585 F.3d at 694. The plaintiffs in the case weren't the competitors targeted by the defendants' scheme, but rather DDAVP consumers. They alleged that "the lack of competing, generic versions of DDAVP injured them by forcing them to pay monopolistic prices for the drug." *Id.* at 683. Even though the defendants' conduct wasn't directed at consumers, the Second Circuit had no trouble holding that the consumers had standing. *Id.* at 688 ("Although the defendants' conduct at issue targeted their competitors, . . . the plaintiffs' claimed injury of higher prices was 'inextricably intertwined' with the conduct's anti-competitive effects and thus 'flow[ed] from that which makes defendants' acts unlawful.'" (alteration in original) (quoting *Blue Shield of Va. v. McCready*, 457 U.S. 465, 484 (1982))). Here, the complaint alleges that Live Nation engaged in anticompetitive conduct in the primary-ticketing market to box out rivals so that Ticketmaster would be the only game in town. *See, e.g.*, Dkt. 257 ¶ 227 (alleging that Live Nation maintained a monopoly by "[d]irectly threatening venues that Live Nation will divert live music shows to other venues if they do not sign with Ticketmaster," "[i]ndirectly threatening venues that Live Nation will divert live music shows to other venues if they do not sign with Ticketmaster by, for example, co-opting business partner Oak View Group into warning venues that they will lose Live Nation

---

characterization, so the Court proceeds on the understanding that they only seek damages for injuries in the primary-ticketing market caused by conduct outlined in Count 1.

5

content if they contract with a ticketer other than Ticketmaster," "[r]etaliating against venues that contract with rival ticketers," and "[f]oreclosing rival ticketing companies from the market"). These allegations mirror those at issue in *DDAVP*, a case that Live Nation declined to address.

True, the complaint in this case carves the primary-ticketing market into several different markets, and as Live Nation points out, the consumers didn't participate in those markets where the alleged anticompetitive acts took place. But looking to substance, and putting antitrust legalese to the side, the thrust of the complaint is that Live Nation engaged in a variety of exclusionary conduct to maintain its monopoly over primary-ticketing services, and consumers suffered injury by using those services and getting overcharged. Whatever market definitions one employs, where a defendant unlawfully maintains its monopoly over a product through a course of exclusionary conduct focusing on that product, consumers of that product alleging that they were overcharged suffer a cognizable injury. In this situation, as *DDAVP* and *McCready* confirm, the consumers' injury is "clearly foreseeable," "inextricably intertwined" with the anticompetitive conduct, and "flows from that which makes [the] defendants' acts unlawful." *McCready*, 457 U.S. at 479, 484 (citation omitted); *see also DDAVP*, 585 F.3d at 688. Rejecting a claim of antitrust injury under these circumstances—on the pleadings no less—would "engraft artificial limitations on the § 4 remedy," precisely what the Supreme Court has forbidden. *McCready*, 457 U.S. at 472.

Live Nation points to *In re Aluminum Warehousing Antitrust Litigation*, but in that case, plaintiffs "disavow[ed] participation in any of the markets in which the defendants operate[d]." 833 F.3d 151, 161 (2d Cir. 2016). Their only connection with the defendants' allegedly anticompetitive behavior was participation in a market "allegedly affected" by the defendants' conduct. *Id.* at 162. Here, the consumers directly purchased from defendants the thing that the monopolistic conduct was focused on—primary-ticketing services. Live Nation fails to cite *any* appellate decision foreclosing a claim of antitrust injury under the circumstances presented here.

Live Nation does cite a few district court cases, but those cases involved different factual circumstances. And facts matter where, as here, the inquiry focuses on the question of foreseeability. *See McCready*, 457 U.S. at 477–79. To give an example, take *Bakay v. Apple, Inc.*, 2024 WL 3381034 (N.D. Cal. July 11, 2024). In *Bakay*, the court discerned as many as eight steps between the alleged misconduct in the mobile-browser market and the plaintiffs' claimed injury in the distinct smartphone market. *Id.* at *5–7 ("Between that cause and purported effect lies a gulf of uncertainty."). Similarly, in *Nypl v. JPMorgan Chase & Co.*, 2017 WL 1133446 (S.D.N.Y. Mar. 24, 2017), the alleged anticompetitive conduct took place in a market that the plaintiffs admitted was "completely different" than the market where the plaintiffs made their purchases. *Id.* at *5.

Live Nation nevertheless argues that the plaintiffs' theory of injury doesn't make sense in this case considering the "unique circumstances of these industries." Dkt. 409 at 3. They say that the "dynamics at play are distinctly different than the standard case in which more competition in an input market will result in lower prices for that input and lower prices downstream." *Id.* at 4. While Live Nation's arguments may have force at summary judgment or trial, they are ill-suited to the pleadings stage. As the Second Circuit has reminded us, "[e]ven if their truth seems doubtful, 'Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual

allegations.'" *Anderson News*, 680 F.3d at 185 (quoting *Twombly*, 550 U.S. at 556). At the pleadings stage, the states have plausibly alleged a viable antitrust injury.

The states have also plausibly alleged that they satisfy the efficient-enforcer factors. "The efficient enforcer inquiry turns on: (1) whether the violation was a direct or remote cause of the injury; (2) whether there is an identifiable class of other persons whose self-interest would normally lead them to sue for the violation; (3) whether the injury was speculative; and (4) whether there is a risk that other plaintiffs would be entitled to recover duplicative damages or that damages would be difficult to apportion among possible victims of the antitrust injury." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 772 (2d Cir. 2016). "[T]he weight to be given the various factors will necessarily vary with the circumstances" of each case. *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 443 (2d Cir. 2004).

These factors favor the states. As the Court has explained, there is a direct link between Live Nation's alleged anticompetitive conduct in the primary-ticketing market and consumers' claimed injury. As to the second factor, consumers are "significantly motivated due to their 'natural economic self-interest' in paying the lowest price possible," *DDAVP*, 585 F.3d at 689 (quoting *Daniel*, 428 F.3d at 444), and other market actors—like venues or rival ticketers—would seek remedies for different kinds of injuries, *id.*, and may face barriers to filing suit due to their ongoing relationships with Live Nation. As to the third factor, which asks whether there is a "high degree of speculation in a damages calculation," *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 66–67 (2d Cir. 2019), that finding can't be made at the pleadings stage. But generally speaking, overcharges suffered by direct-purchasing antitrust plaintiffs can be measured and aren't the kind of speculative damages that foreclose standing. And on the fourth factor, Live Nation concedes that this case does not pose issues of duplicative damages or difficulty in apportioning damages.

## CONCLUSION

For the reasons above, Live Nation's motion to dismiss is DENIED. The Clerk of Court is respectfully directed to terminate Dkt. 272.

SO ORDERED.

Dated: March 14, 2025
New York, New York

ARUN SUBRAMANIAN
United States District Judge