P3DVUNIC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,
     et al,
 4
                   Plaintiffs,
 5
                   v.                     24 Civ. 3973 (AS)
 6
     LIVE NATION ENTERTAINMENT,
 7   INC. and TICKETMASTER L.L.C.,

 8              Defendants.              Teleconference

 9   ------------------------------x
                                         New York, N.Y.
10                                       March 13, 2025
                                         2:05 p.m.
11
     Before:
12
                         HON. ARUN SUBRAMANIAN,
13
                                         District Judge
14
                            APPEARANCES
15
     UNITED STATES DEPARTMENT OF JUSTICE
16        Attorneys for Plaintiff United States
     BY:  JOHN R. THORNBURGH II
17        BONNY E. SWEENEY

18   OFFICE OF THE ATTORNEY GENERAL FOR THE DISTRICT OF COLUMBIA
          Attorneys for Plaintiff District of Columbia
19   BY:  ADAM GITLIN

20   CRAVATH SWAINE & MOORE LLP
          Attorneys for Defendants
21   BY:  JESSE M. WEISS
          -and-
22   LATHAM & WATKINS LLP
     BY:  TIM O'MARA
23        ALFRED C. PFEIFFER JR.
          ROBIN L. GUSHMAN

24

25
```

P3DVUNIC

```
 1              (Teleconference)

 2              THE COURT:  Good afternoon.  We're here for a

 3  discovery conference in 24 CV 3973.

 4              Let's have appearances of who's speaking.

 5              So do we have Mr. Thornburgh?

 6              MR. THORNBURGH:  Good afternoon, your Honor.

 7              Yes, this is John Thornburgh.

 8              THE COURT:  All right.  Mr. Weiss and Mr. O'Mara, are

 9  you here?

10              MR. O'MARA:  Yes, your Honor, Mr. O'Mara is here.

11              MR. WEISS:  This is Mr. Weiss, your Honor.

12              THE COURT:  All right.

13              Ms. Sweeney and Mr. Gitlin?

14              MS. SWEENEY:  Good afternoon, your Honor.

15              This is Bonny Sweeney

16              THE COURT:  Mr. Gitlin, are you with us?

17              All right.  We'll move on for the moment.

18              Mr. Pfeiffer?

19              MR. PFEIFFER:  Good afternoon, your Honor.

20              Al Pfeiffer here.

21              THE COURT:  All right.  Good.

22              So first thing, the pending motion to dismiss will be

23  denied.  An order will issue today or most likely with the

24  docketing down in our docketing department tomorrow morning.

25  You'll have that order on that motion.
```

P3DVUNIC

1          Now, on the matters that have been raised for today's

2     conference, let's start with the motion to compel.  And I'll

3     give you my preliminary thoughts and then I'm happy to hear

4     from both sides as to what I got wrong.

5          So I'm looking at the letter that was submitted at

6     docket 472.  And there are four requests for relief here.

7          As to number one, my understanding is that the

8     defendants have -- are, in fact, going to produce the remaining

9     priority custodian responsive documents by March 14th, and will

10    produce at least 95 percent of all nonpriority custodial

11    documents by April 15th.  And they've said so in their letter,

12    so that should be resolved and is moot.

13         As to the second request for relief, I agree with the

14    defendants that they have to timely serve any subpoenas that

15    they want to serve, but I'm not understanding how that -- why

16    that should impede in any way the plaintiffs' efforts to take

17    discovery, to take depositions in light of everything that's

18    transpired in these cases.

19         If there's a request for a deposition, the third party

20    wants to wait, you can either move to compel compliance with

21    the subpoena or agree to wait.  That's your call to make.  And

22    if later the defendants, having not timely served a subpoena to

23    that third party, wants to do it later in time and the third

24    party wants to complain, they can complain.  Or the defendants

25    can move to compel compliance and we'll deal with it at that

P3DVUNIC

1    juncture.

2              As to the third request for relief prohibiting delay

3    to depositions, the defendants say they are not prohibiting

4    delay and so they say there's no issue here.  And that the

5    plaintiffs, if they want to take depositions, they should move

6    forward and take them.  But I'll hear the parties out if

7    there's something that I'm missing there.

8              As to the biweekly remote video -- or remote or video

9    discovery status conferences, that seems fair in light of the

10   advancing discovery and the fact that we're staring down on a

11   discovery deadline and upcoming depositions, it probably makes

12   sense to have biweekly conferences.  I guess the question is

13   whether the parties would want those conferences with the

14   Court.  I'm happy to do my best to accommodate, but we can

15   address it if the parties would like the Court's attendance at

16   those conferences.

17             So those are the four requests for relief.

18             Let me turn to Mr. Thornburgh to see if you have any

19   issues with what I've said or want to clarify or you can tell

20   me that I got everything wrong and should revisit everything

21   that I just said.

22             MR. THORNBURGH:  I won't be doing that, your Honor.

23             I do want to just clarify a few points in what you

24   said and perhaps ask the Court to reconsider a few things here.

25             On number one, with regards to producing all remaining

P3DVUNIC

| | |
|---|---|
| 1 | priority custodian documents, what defendants have said is that |
| 2 | they will produce nearly all of them by March 14th.  But |
| 3 | there's one significant tranche of documents that remains |
| 4 | outstanding, and that's an undefined volume of documents for a |
| 5 | priority custodian for which plaintiffs had noticed a |
| 6 | deposition in mid March.  And defendants acknowledged in their |
| 7 | letter there was a technical issue with that production, and |
| 8 | defendants first informed plaintiffs of that a few weeks ago |
| 9 | after plaintiffs' repeated prodding as to any remaining |
| 10 | document issues.  And defendants had indicated they would give |
| 11 | us an update on that custodial production last night and how |
| 12 | soon we could expect those documents and the volume of |
| 13 | documents, and we still haven't gotten that update.  And so, |
| 14 | you know, without -- |
| 15 | THE COURT:  Mr. Thornburgh, who is the custodian? |
| 16 | MR. THORNBURGH:  His name is Colin Lewis, your Honor. |
| 17 | THE COURT:  Tom Lewis? |
| 18 | MR. THORNBURGH:  Colin, C-O-L-I-N, Lewis. |
| 19 | THE COURT:  All right.  Thank you.  Colin Lewis. |
| 20 | So Mr. O'Mara, do you want to pick that up.  Where are |
| 21 | Mr. Lewis's documents? |
| 22 | MR. O'MARA:  Yes, your Honor. |
| 23 | So it's slightly more complicated and nuanced than |
| 24 | just a technical issue. |
| 25 | What has happened with Mr. Lewis's documents, his |

P3DVUNIC

1    laptop was timely collected, long before the January 15

2    substantial completion deadline.  And for unknown technical

3    reasons, the collection was corrupted.

4         And when the defendants went to set up the

5    re-collection, unfortunately, Mr. Lewis's house was one of the

6    houses that burnt down in the L.A. fires.  The laptop wasn't

7    lost, but it obviously caused substantial delay in being able

8    to get back in touch with him and then meet him and get his

9    laptop and get it collected.

10        So there are sort of extenuating circumstances here

11   which is led to why this one laptop is outstanding.  It is true

12   it's outstanding.  It just finished processing last night after

13   the collection.  And we can report now that it's about --

14   there's about 150,000 documents on that laptop.  That's

15   obviously the review set, not the responsive set.  And

16   obviously if you compare that to the 4.5 million documents we

17   reviewed in the last four months, we think this is a relatively

18   insignificant issue.  But we can assure the plaintiffs and the

19   Court that we are reviewing this expeditiously and will have it

20   done very quickly or as quickly as possible.

21        THE COURT:  As quickly as you'll turn over any

22   responsive documents from that set by next Friday?

23        MR. O'MARA:  I don't think that's quite possible, your

24   Honor.  I wouldn't want to commit to it, but I think we can

25   probably do it in the next two weeks.

P3DVUNIC

1          THE COURT:  All right.

2          Mr. Thornburgh, any objection or issue with two weeks,

3     given the extenuating circumstances that Mr. O'Mara has

4     indicated?

5          MR. THORNBURGH:  No, your Honor.

6          But I would note that just so the Court has the full

7     picture, plaintiffs two weeks ago, consistent with the Court's

8     guidance going back to July, getting them documents in the

9     door, having time for review, and then noticing depositions, we

10    noticed seven party depositions for March, again, in light of

11    the impending end-of-June fact discovery deadline.

12         And four of those seven depositions have been moved

13    already to April by defendants.  One is Mr. Lewis, another one

14    I should acknowledge is Mr. Carnes.  Plaintiffs moved that

15    because of all the documents that were produced late.  And then

16    for two other deponents, defendants only offered their

17    availability in May.

18         So the problem is one particular custodian, if that

19    deposition moves, is not the end of the world; but the problem

20    is these stack on top of each other and it is causing

21    difficulties with plaintiffs' ability to timely complete

22    depositions and discovery with the remaining time left before

23    June 27.

24         THE COURT:  Why don't you take the depositions, and

25    then if you get a dump of documents for that particular witness

P3DVUNIC

1    that you weren't anticipating, make an application to the Court

2    for a shorter follow-up deposition if you really needed it.

3    Meaning that if something came out of that subsequent

4    production that was really necessary, that broke the case open,

5    you could make an application and I'd allow it.  Nine times out

6    of ten, you probably wouldn't have a need for that subsequent

7    deposition because you probably covered most of the material

8    issues at the outset given all the discovery that's happened.

9    So you could just handle it that way.  That way, you're not

10    running into any timing issues and you'll have the facts that

11    you need to proceed with expert discovery and everything else.

12            But if there's some sort of follow-up, meaning there's

13    some, you know, super-hot, burning-your-fingers document that

14    you get out of the subsequent production, all you need to do is

15    make an application to take an out-of-time fact deposition and

16    I'll understand, if there was some late production of documents

17    and the documents are really important, that you can take that

18    deposition.  That's one way to handle it to alleviate the time

19    issue, right?

20            MR. THORNBURGH:  Yes, your Honor.

21            And again, that makes sense and plaintiffs will

22    certainly do that.

23            As I said, I think just as I was trying to emphasize,

24    part of the issue here is just the number of days left between

25    today and June 27th and fitting in all of these depositions.

P3DVUNIC

```
 1    But I certainly understand the point your Honor is making and
 2    we will do so as necessary.
 3            THE COURT:  All right.
 4            So anything else, Mr. Thornburgh, that you wanted to
 5    revisit or that you had questions about?
 6            MR. THORNBURGH:  Yes, if you don't mind, your Honor.
 7            On the nonpriority custodial documents by April 15th,
 8    there was an important caveat in defendants' letter, and I want
 9    to make sure we discuss it.
10            They said 95 percent of all documents except those in
11    their privilege workflow.  And based on defendants' prior
12    productions, including the productions they made on
13    January 29th, you know, two weeks after the substantial
14    completion deadline, that was nearly 200,000 documents.
15            And so the concern is that defendants are going to
16    have a quite voluminous number of documents in their "privilege
17    workflow" that would not come until two weeks or many weeks
18    after April 15.  And again, that would likely, you know, delay
19    depositions.
20            THE COURT:  All right.  Mr. O'Mara?
21            MR. O'MARA:  So, your Honor, there's two things we're
22    getting confused here, which is the production and review.  And
23    as to the January 15th deadline, without revisiting the whole
24    back and forth with the plaintiffs that's set out in the
25    briefs, obviously the target protocol called for review up
```

P3DVUNIC

1    through January 15th, by definition that means you're going to

2    produce some of those documents after January 15th that fell

3    within the next production date, which was January 29th.

4         So the January 29th, that 200,000, included two

5    things:  One, it included the documents that were reviewed and

6    marked responsive on January 15th and in the short period

7    before that that had not previously been produced.  And it also

8    included documents that were in the privilege workflow that had

9    tentatively been marked privileged and then in the 2C process

10   taken off that log.  So that explains that number.

11        Looking forward to the April 15th deadline, what we

12   have actually said in our letter is at this point in time we

13   anticipate being 95 percent done with the production — not the

14   review, but the production — by April 15.  And what we expect

15   to have outstanding at that point would largely be just the

16   last little bit of stuff that was reviewed up to April 15th, as

17   well as anything that would come off of the privilege log,

18   which would be due on April 29th.

19        So, you know, those numbers will be what they'll be,

20   but that's just still into the process.  But, again, what our

21   letter is saying is we expect by April 15th to be 95 percent

22   done with production.

23        THE COURT:  So just to make sure I understand, there's

24   no carve-out from that 95 percent number.

25        MR. O'MARA:  There's no carve-out, no.  There's not.

P3DVUNIC

1    We expect to be 95 percent done with the production, depending

2    on obviously what's tentatively marked privilege.  And as we're

3    doing the privilege log, stuff will come off of it; but we do

4    not expect that to be a substantial number to change the 95

5    percent production.

6              THE COURT:  And whatever comes off of it, as you say,

7    would be in the April 29th production, in any event.

8              MR. O'MARA:  Correct.  Correct.

9              THE COURT:  Okay.

10             All right.  Mr. Thornburgh, I think that addresses

11   your issue, but let me know if you have any further question.

12             MR. THORNBURGH:  I think so, your Honor.

13             I just want to make sure we're clear that what

14   constitutes the denominator of the entire universe would

15   include the "privilege workflow" that defendants' counsel was

16   just referring to.

17             So in other words, my concern is -- our concern is

18   that if the denominator is just made up of everything but the

19   privilege workflow, then that really allows -- that could mean

20   a quite voluminous number of documents are still outstanding as

21   of April --

22             THE COURT:  No.  Mr. O'Mara, I understood that what

23   you were saying is that on an ongoing basis, there are these

24   documents that have been marked privileged that then are

25   reviewed to make sure that they are, in fact, privileged.

P3DVUNIC

1    That's happening on an ongoing basis.

2            So what you're trying to communicate in your letter is

3    that once you kind of finish with the production as of

4    April 15, there is necessarily going to be that same kind of

5    those loose ends that need to be tied up.  But you're not

6    saying that everything that has gone into the privilege

7    workflow has basically been just kind of left there, and that

8    starting April 15th, you are going to just go into this big

9    tranche of documents that have never been touched and that

10   you've been just kind of building up, and then start kind of

11   reviewing.  That's not what you're saying, right?

12           MR. O'MARA:  That's correct, your Honor.

13           THE COURT:  Okay.

14           Mr. Thornburgh, does that address your issue?

15           MR. THORNBURGH:  I think so, your Honor.  So long as

16   we're all in agreement that the 95 percent means 95 percent

17   inclusive of all documents that will ultimately be produced.

18           THE COURT:  I think we're on the same page there.

19           But look --

20           MR. O'MARA:  Actually, your Honor, I'm sorry.  I'm

21   being told by my team that I have that wrong.  I'm sorry, your

22   Honor.  That's my mistake.

23           The 95 percent would be all nonprivileged documents.

24   And so until the privilege review is done, that number might

25   shift.  But by April 15th we will be through the review, have

P3DVUNIC

1    produced 95 percent of all nonprivileged documents, subject to

2    minor cleanup; and the two weeks following whatever has been at

3    that point tentatively marked privileged will go through that

4    process.  If stuff is de-designated from it, it then gets

5    produced on April 29th.  That could shift the ultimate number,

6    but it shouldn't shift it dramatically.  As in shift the

7    ultimate number of the total number of responsive nonprivileged

8    documents that are ultimately produced by April 15th.

9            THE COURT:  All right.

10           Mr. Thornburgh, so I think that you may have been

11   right about what you were saying, but you're going to get the

12   documents by April 29th is what Mr. O'Mara is saying.

13           MR. THORNBURGH:  I hear that, your Honor.

14           I guess I'm just -- I'm still not clear whether

15   defendants are obligated by April 15th to produce 95 percent of

16   all the documents that will ultimately be produced for

17   nonpriority custodians.  I think that is the relief plaintiffs

18   requested; and that is, you know, the relief we think makes

19   sense.  And again, the concern is that if you just exclude

20   those privilege workflow documents, that could be any

21   undetermined amount of documents that defendants have withheld

22   in the first instance; and we just don't have any idea how many

23   tens of thousands of documents or hundreds of thousands of

24   documents that could be.

25           THE COURT:  Mr. O'Mara, can you -- look, we're talking

P3DVUNIC

1  about two weeks here, and so I don't think that's going to be

2  an issue.  However, you should have a running total of what's

3  in the privilege workflow, and that's something that you can

4  provide to the plaintiffs so that you'll get a sense of what

5  you think the volume of documents produced after April 15th

6  will be.  And, you know, let's provide that to the plaintiffs

7  by, let's say, the first week of April.

8          And so if at that point it becomes clear that you're

9  just kind of storing up all of the documents to be produced

10  after the April 15 deadline, in an attempt to jam the

11  plaintiffs up, which I don't think is what you're trying to do,

12  then we can address it.  And you can maybe put some more people

13  on that review so that you can kind of quicken the pace.  But

14  if it's just a smattering of documents or that the volume is

15  just immaterial in comparison to what's been produced from the

16  nonpriority custodians, then this should not be an issue.

17          Does that make sense?

18          MR. O'MARA:  It does, your Honor.  We'll do that.

19  Thank you.

20          THE COURT:  All right.

21          Mr. Thornburgh, what's next?

22          MR. THORNBURGH:  Yes.  So I want to, if we could, your

23  Honor, talk about the nonparty subpoenas issue in the Court's

24  ruling on the relief requested related to that.

25          I certainly understand the Court's perspective and

P3DVUNIC

1    what you're saying about our ability to, you know, go forward

2    with the deposition or seek relief from the Court.  I do want

3    to emphasize, your Honor, though that the defendants' belated

4    issuance of subpoenas and, in many cases — even today — kind of

5    delay negotiations with nonparties over those subpoenas are

6    impacting not only those nonparty productions to plaintiff,

7    right — so, for example, a nonparty, as we said in our letter,

8    understandably does not want to go and collect documents and

9    data more than once because it's burdensome and costly.  And so

10   defendants issued these subpoenas five or six months later.

11   And so now the nonparty is having to wait to have those

12   negotiations with defendants.  That is pushing back any

13   potential deposition of those nonparties to May or even June.

14   And we obviously are anticipating taking additional

15   deposition -- party depositions in May and June of nonpriority

16   custodians and other nonparties.

17          And so the consequence of these belated -- not only

18   the belated subpoenas, but, for example, your Honor, we

19   understand that one of the ticketers the defendants reference

20   in their letter, defendants issued them a subpoena in January.

21   That ticketer provided responses and objections to the subpoena

22   on February 23rd.  And defendants, since February 23rd, have

23   not engaged with the nonparty on the subpoena.

24          And so the concern is that those negotiations will

25   continue to drag on and continue to make it difficult for

P3DVUNIC

1  plaintiffs to move forward with the depositions they need to

2  take.

3        THE COURT:  Yeah, but I'm not understanding why the

4  defendants' delay in terms of pursuing their own discovery

5  should matter to you.

6        Let me just put it this way:  So if you've timely

7  issued subpoenas to a third party, and the third party tells

8  you, Well, I want to wait until I get whatever I get from the

9  defendants, and the defendants aren't playing fair, then

10  wouldn't you just first tell the third party, No, you produce

11  it to us; and if you want to try to oppose the defendants'

12  untimely efforts to subpoena you, you can do it, but we need

13  these documents.  And then we're going to seek a deposition.

14  And the defendants will just be at a disadvantage because they

15  won't have the documents that they are looking for.

16        I mean, isn't that how you would proceed?  That's the

17  reason why I didn't understand the issue.

18        Look, I understand that you're trying to work things

19  out with all of these third parties.  But from the defendants'

20  perspective, unless there's some chicanery here, their point is

21  that, Look, discovery is ongoing.  And so it may be that they

22  have requests that are valid that they want to serve.  And

23  their request, as long as they are timely, should not be

24  dictated by when the plaintiffs subpoenaed those third parties.

25        And I get that, as long as it's not jamming you up.

P3DVUNIC

1  And I'm telling you that I wouldn't let them jam you up in that

2  way.

3         MR. THORNBURGH:  Your Honor, I think, to be frank, it

4  is jamming us up.  And the reason is because, you know, if it's

5  one nonparty, your Honor, what you're suggesting makes sense,

6  in that we push the nonparty to produce documents and say, you

7  know, If you want to produce documents later in response to

8  defendants' subpoena, you can do that.

9         But, again, it's costly and burdensome for a nonparty

10 to collect documents and data more than once.  It's not just

11 one party, we're talking half a dozen — if not a dozen —

12 nonparties saying in response to defendants' subpoenas issued

13 in January and February, we're only going to go do our

14 collections once.  And so you gave us -- sure, plaintiffs, you

15 gave us search terms and the data you requested back in

16 October, November, maybe December.  But now that we've gotten

17 defendants' January or February subpoena, you know, we feel

18 like we have to negotiate with them, and then we'll go do the

19 document pull once.

20        And so as a consequence, all of those nonparties, it

21 has a cumulative effect of slowing down all of the discovery.

22 I get it, if it was just one nonparty, what your Honor is

23 saying would make sense.  But because there are so many

24 subpoenas the defendants waited to issue until January and

25 February, it's making it difficult — exceedingly difficult —

P3DVUNIC

1    for plaintiffs to schedule and move forward with nonparty

2    depositions, you know, with the time remaining in discovery.

3             THE COURT:  All right.

4             Mr. O'Mara, I mean, can you just get these

5    cross-subpoenas out by March 21st -- or, let's see.  Hold on.

6    March 14th.  It could be tomorrow, but let's say next week,

7    okay?  By next Friday, could you get these cross-document

8    subpoenas out or the subpoenas that were served by

9    February 28th.  What's the problem there?

10            MR. WEISS:  Your Honor, this is Jesse Weiss.  I can

11   address this issue.

12            So first, just to supplement what Mr. Thornburgh said,

13   none of the subpoenas that we have issued are dilatory or late.

14   We've issued some subpoenas --

15            THE COURT:  Why don't you start by answering the

16   question.  Is there any reason why you can't get these out by

17   next Friday?  We're talking about subpoenas here.  We're

18   talking about cross-subpoenas relating to third parties that

19   were subpoenaed prior to February 28th.

20            MR. WEISS:  The issue there, your Honor, is that a

21   number of nonparties that plaintiffs subpoenaed are still

22   producing documents.  The approach that we've take -- and we

23   understand for some of them we're still negotiating search

24   parameters and collection parameters with plaintiffs.

25            The approach that we've taken has been not to issue

P3DVUNIC

1    150 nonparty subpoenas, but to approach nonparty discovery in a

2    more targeted way.

3           The prejudice that we are trying to avoid with putting

4    in an arbitrary date is if a nonparty produces documents, and

5    we determine upon review of that that some targeted

6    supplementation is warranted, we don't believe that we should

7    be cut off from seeking that targeted supplementation.  So

8    that's the reason why a deadline of next week would be

9    problematic.  There are still documents coming in from

10   nonparties, and plaintiffs have subpoenaed prior to

11   February 28th.

12          MR. THORNBURGH:  Your Honor, may I speak to that

13   briefly?

14          THE COURT:  Sure.

15          MR. THORNBURGH:  If defendants were issuing narrowly

16   tailored document subpoenas to entities to follow up on

17   individual things they needed, that would be one thing.  But

18   that's not what the defendants are doing or have done.

19          Defendants have issued overly broad subpoenas going

20   back to January — we're talking 70 sets in some instances, that

21   failed to take into account any of the documents that the

22   nonparties had produced in response to plaintiffs' subpoenas.

23          And so it's not just asking, you know, a nonparty to

24   go grab, you know, some additional one data field or, you know,

25   some -- go get particular presentations or something like that.

P3DVUNIC

 1    The subpoenas are so broad that, you know, when nonparties get

 2    them, they say, Okay.  Well, now we have to have this full long

 3    negotiation with defendants.  And so, therefore, plaintiffs,

 4    we're not going to produce any of our documents -- any

 5    additional documents in response to your subpoena until we

 6    finish those negotiations; and therefore, any depositions

 7    cannot occur until well after that.

 8             And so again, it's slowing down the entire process.

 9             THE COURT:  And, Mr. Thornburgh, I take it that what

10    you're saying is, Defendants, just get your subpoenas out by

11    March 21st, because once you get them out, to the extent that

12    Mr. -- to address Mr. Weiss's concern, there is some follow-up

13    or something that wasn't produced, you will have already served

14    your subpoena.  And then you can go get that targeted follow

15    up.  There are these spreadsheets from this time period that

16    you're missing in your production; could you go provide those.

17    Right?  That's what you're saying.  Meaning that your proposal

18    is not exclusive of that kind of targeted follow-up later; in

19    fact, having served the subpoenas, the defendants could then

20    try to go get that follow-up in accordance with the subpoenas

21    they already served.

22             MR. THORNBURGH:  That's exactly right, your Honor.

23             MR. WEISS:  Your Honor, can I just address it?

24             THE COURT:  You can briefly address it, but I don't

25    see why that doesn't make sense, but do your best.

P3DVUNIC

1          MR. WEISS:  Plaintiffs have served subpoenas on over

2   150 nonparties.  A sizable number of those will not have

3   particular relevance to nonparty discovery between now and the

4   end of June.

5          So if we have a deadline of March 21st, and just issue

6   as many subpoenas as we can between now and then without taking

7   any targeted approach, we're going to be subpoenaing nonparties

8   who may not need to receive subpoenas from defendants.  So it

9   creates a burden on everyone, including a nonparty, to require

10  us to proceed in that more sweeping nontargeted way.

11         I have to correct the record.  The subpoenas that we

12  issued to date have been targeted.  Some of them have had more

13  requests than others; but in our meet-and-confers with the

14  nonparties, we have been narrowing our requests to the targeted

15  supplementation that we think we need.  And that's what we

16  would like to continue to be able to do.

17         THE COURT:  All right.  I understand.

18         So I will modify what I said previously and require

19  the defendants by March 21st to issue all of their

20  cross-document subpoenas to entities plaintiffs subpoenaed

21  prior to February 28th.

22         Mr. Weiss, I hear you on the concern that you've

23  raised.  But the plaintiffs are asking for this relief, even if

24  it might result in more subpoenas going out.

25         But I think their point is that having served these

P3DVUNIC

1   subpoenas before February 28th, it would be apparent to the

2   defendants where those subpoenas do not address those targeted

3   documents that you're talking about.  And so you would be able

4   to issue targeted subpoenas, which is what you want to do — you

5   don't want to just flood the zone with subpoenas that are

6   indiscriminate.

7           But what they are saying is you can look at the

8   plaintiffs' subpoenas; and to the extent that there's something

9   missing that you think you need, then you'd be able to issue

10  your cross-subpoena to address those targeted areas.  And we're

11  at the current time only talking about those subpoenas that

12  went out prior to February 28.

13          All right.  So I'll modify what I said previously on

14  that basis and that will be reflected in the Court's order.

15          Mr. Thornburgh, anything further?

16          MR. THORNBURGH:  The only last thing is just to go

17  back to the privilege workflow issue, your Honor.  We would ask

18  that the Court make defendants in their biweekly document

19  production updates to the Court include those document figures

20  in that letter.

21          To be frank, sometimes much of defendants' letter is

22  kind of pro forma based on prior productions; and so it would

23  be helpful to get a better sense of those production -- those

24  privilege workflow figures as defendants produce them.

25          THE COURT:  All right.  That's fine.  That will be

P3DVUNIC

1    done.

2              Mr. Thornburgh, anything else?

3              MR. THORNBURGH:  Not at this time, your Honor.

4         Thank you.

5              THE COURT:  Okay.  Mr. O'Mara or Mr. Weiss, anything

6    further in terms of the motion to compel?

7              MR. O'MARA:  No, your Honor, not for Tim O'Mara.

8              MR. WEISS:  No, your Honor.  Thank you.

9              THE COURT:  Okay.  So let's go to the issue of

10   bifurcation.  And Ms. Sweeney, do you want to address this?

11             MS. SWEENEY:  Sure.  Thank you, your Honor.

12             Yes.  So plaintiffs proposed to defendants that we

13   have separate trials on liability and the remedies phase.  And

14   defendants are correct that we are still discussing this issue.

15   And plaintiffs, of course, have no objection to full briefing

16   on the topic.

17             But we wanted to bring it to your Honor's attention

18   now because even though it's a trial issue, it has a big impact

19   on expert reports which are due at the end of July.  We believe

20   that it would be far more efficient if the equitable remedies,

21   for example, are decided at a subsequent and later proceeding,

22   because that would enable the reports and the testimony to be

23   tailored to whatever findings of fact and conclusions are made

24   in the first trial on liability.

25             So we're still discussing it with the defendants, we

P3DVUNIC

1    are happy to brief this motion, and we just wanted to alert

2    your Honor that that is coming.  And so we would hope to file a

3    motion in the near term so that it can be decided in time that

4    if your Honor bifurcates remedies, for example, we can take

5    advantage of that in the expert work that we do.

6            THE COURT:  All right.  And Ms. Sweeney, if you could,

7    could you just give me a lay of the land in terms of how the

8    plaintiffs see it at this point?  I'm not holding you to

9    anything, but just give me the plaintiffs' perspective on how

10   we would proceed in terms of the trial of this case.

11           MS. SWEENEY:  Sure.  And I defer to my colleague from

12   the state Mr. Gitlin to address any damages issues, because the

13   United States, of course, does not have any damages claims.

14           But so what we have -- what we propose and we have

15   proposed to the defendants is that there be an initial trial on

16   liability, and that would presumably be a jury trial, assuming

17   that all of the damages claims brought by the states remain

18   intact.  And then there would be a period of time -- in other

19   cases that the United States has brought, other antitrust

20   cases, there has been a period of time following the liability

21   rulings so that the experts can then prepare their reports.

22   There would then be additional experts discovery.  Hopefully,

23   no additional fact discovery, but I suppose that there could be

24   a special application made to conduct a little more fact

25   discovery.  But there would be new reports by the experts on

P3DVUNIC

```
1   proposed relief that was tailored to fit with the liability

2   rulings.  And then a subsequent trial before your Honor on

3   equitable remedies with that expert testimony.

4          THE COURT:  And that's all assuming that you prevail

5   at the first trial, right?

6          MS. SWEENEY:  Correct.  And it certainly seems like —

7   especially from defendants' point of view — the attractive

8   nature of this proposal; that is, if we don't prevail on all of

9   our claims, then there's no need to have expert testimony on

10  remedies for certain claims.  And if we don't prevail on any of

11  our claims, of course there needn't be a second phase at all.

12         THE COURT:  All right.

13         Mr. Pfeiffer, if you want to address it, the issue,

14  you can; but it seems like there's nothing for the Court to

15  rule on at this point.

16         MR. PFEIFFER:  I think that's right, your Honor.  This

17  is Al Pfeiffer for the defendants.  I think that's right.

18  There's nothing to really address right now.

19         What I would say is we -- as we've told the

20  plaintiffs, we're certainly more than happy to continue to

21  discuss this with them as their proposal coalesces.  The

22  initial disclosures were pretty unformed, to the point where

23  the federal defendants said they took no position on what the

24  state plaintiffs said they were interested in having this look

25  like.  So we hope things will evolve further from there and
```

P3DVUNIC

1    we'll be happy to address that.

2            We do think that to the extent the parties are not

3    able to reach an agreement on this, this is obviously a

4    significant procedural matter that affects the defendants'

5    rights both from a deficiency and a fairness perspective under

6    Rule 42.  And we would expect this to be briefed and ideally

7    argued before we're decided, assuming we can't come to an

8    agreement.

9            MR. GITLIN:  Your Honor, this is Adam Gitlin, for the

10   state plaintiffs, just to respond to what Mr. Pfeiffer said.

11           With respect to the state damages claims, obviously we

12   were not entirely sure how the Court was going to dispose of

13   the motion to dismiss and know whether or not the damages

14   claims were proceeding.  But we're continuing to meet with --

15   meet and confer with defendants about how we could reach

16   agreement on a structure.  And, you know, as soon as we know

17   exactly what the Court's order says, I think we'll be able to

18   either come to an agreement or brief it, as I think all parties

19   are ready to.

20           THE COURT:  All right.

21           So, Mr. Pfeiffer, would you propose that the parties

22   meet and confer over the next few weeks and, within 30 days, if

23   there remains a dispute, a motion to be filed at that juncture?

24   Would that make sense?

25           MR. PFEIFFER:  Your Honor, this is Al Pfeiffer.

P3DVUNIC

1            That makes sense to me.

2            THE COURT:  All right.

3            Ms. Sweeney, Mr. Gitlin, does that make sense on your

4     end?

5            MS. SWEENEY:  Yes, your Honor, that makes sense.

6            THE COURT:  All right.  So that resolves that issue.

7            And then the last issue for this conference was an

8     amendment to the case management order that both sides agree

9     on; so we'll include that in our order as an amendment to the

10    case management order.

11           Now, that leaves the outstanding issue relating to the

12    preserved or not preserved text and chat messages.  And the

13    relief that's sought by the plaintiffs here, the response by

14    March 18th to certain questions in the plaintiffs' letter.

15           So what is the defendants' response at this time to

16    that request?  And whoever's going to -- whoever can address

17    that from the defendants' side, please just give your name

18    first for the court reporter's benefit.

19           MR. O'MARA:  Your Honor, this is Tim O'Mara, for the

20    defendants.

21           Your Honor, that motion just got filed.  And under the

22    Court's orders, we have till today to respond to that.  And we

23    think it's important for us to be able to respond and file our

24    response publicly on the docket and for your Honor to consider

25    our written response before we proceed.

P3DVUNIC

1          THE COURT:  Okay.  But it's 2:45 in the afternoon.  So

2     can you give me a sneak preview?

3          MR. O'MARA:  The sneak preview, your Honor, is is that

4     the plaintiffs' position, I think, is misleading and wrong

5     across a number of respects.  I think our preservation of texts

6     and chats has been robust, and that there's reasonable

7     explanations for the issues that are being flagged, including

8     in most instances that the texts that are being flagged were,

9     in fact, either not responsive or not subject to a hold.

10          That's separate than one of the issues that just

11    recently came up, which is that one custodian misunderstood the

12    way that the technology works for how you keep a text, which is

13    a very different issue.  But, in any event, your Honor, we can

14    go through it.  And we're putting that brief together right

15    now; we'll have it into the Court.  We're happy to have a

16    hearing on it.

17          We are happy to address most of the questions that the

18    plaintiffs ask.  We think they prematurely filed their motion;

19    we told them we would get them responses.  But, in any event,

20    we would like the opportunity, your Honor, again, to respond

21    fully; and then we're happy to have a hearing as soon as your

22    Honor wants it once our brief is in.

23          THE COURT:  Well, at this time -- so thank you,

24    Mr. O'Mara.  I know that you haven't put in your written

25    submission yet.

P3DVUNIC

1          But what I'll say is that the plaintiffs' sole request

2     at this juncture is a response to certain questions in Appendix

3     A.  And there are some of these questions that perhaps you

4     would have a valid objection to, but there are other of these

5     questions that one could imagine the plaintiffs asking at a

6     30(b)(6) deposition focused on document collection and

7     preservation.

8          And so to the extent that those questions would be

9     ones that the plaintiffs could ask in a deposition of that

10    kind, and that you would have to provide the answer to, you

11    might in your response that you file today simply indicate that

12    you're willing to provide responses to those questions.

13    Because --

14          MR. O'MARA:  100 percent, your Honor, we are going to

15    do that.

16          THE COURT:  Okay.  Good.

17          Because I think that would likely moot the request and

18    obviate the need for a hearing.

19          At this time I don't understand the plaintiffs making

20    an application for any remedy related to spoliation.  And so at

21    this time there might not be a need for a hearing if you're

22    able to work out which of these questions you're willing to

23    respond to.  And while March 18th was the date given here, if

24    it's going to take a couple more days for you to speak to the

25    appropriate people and provide a response, then the Court would

P3DVUNIC

1    have no issue with that.  So I'll leave you with that guidance

2    and we can hopefully avoid a hearing at this juncture.  And

3    we'll see what turns up in terms of the responses and any

4    further inquiry from the plaintiffs.

5              MR. O'MARA:  Thank you, your Honor.

6              THE COURT:  Okay.  Any further issues to be raised at

7    this time, and then we'll talk about when it's appropriate to

8    have a follow-up conference here.

9              First from the plaintiffs.  And again, just please

10   identify yourself if you're the one speaking.  Maybe,

11   Ms. Sweeney, I'll hand you the mic if there's any further

12   issue.

13             MS. SWEENEY:  Yes.  Thank you, your Honor.

14             Just housekeeping issue.  For purposes of amending the

15   case management plan, we would be happy to work with the

16   defendants to submit a proposed amendment for your Honor's

17   signature.

18             THE COURT:  All right.  That makes sense.

19             Anything else?

20             MS. SWEENEY:  Not at this time, your Honor.

21             THE COURT:  All right.  Anything else from the

22   defendants?  Maybe Mr. O'Mara, if you want to pick up the mic

23   from Ms. Sweeney.

24             MR. O'MARA:  This is Mr. O'Mara, your Honor.

25             No, not for defendants.

P3DVUNIC

 1            THE COURT:  All right.  So when is it appropriate for

 2     us to have a follow-up conference or do the parties want to

 3     meet and confer and make a proposal to the Court?

 4            Ms. Sweeney?

 5            MS. SWEENEY:  Plaintiffs are happy to make themselves

 6     available at your Honor's convenience, particularly if it's a

 7     video or telephonic conference.  But probably two weeks.

 8            THE COURT:  All right.  Mr. O'Mara, why don't you

 9     speak with Ms. Sweeney or someone on your side, whoever the

10     right person is, and make a proposal.

11            And again, I'll make myself available if it's helpful

12     to the parties to resolve any issues that have come up.  If the

13     parties talk and it would not be fruitful and would only gobble

14     up attorney billable hours, then you can let me know that a

15     hearing is not warranted or needed at the time.  Okay?

16            MR. O'MARA:  Thank you, your Honor.

17            MS. SWEENEY:  Thank you, your Honor.

18            THE COURT:  Thank you, everyone, for joining.

19            We are adjourned.

20                              *    *    *

21

22

23

24

25