**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> LIVE NATION ENTERTAINMENT, INC., and TICKETMASTER L.L.C., <br><br> *Defendants.* | Case No. 1:24-cv-03973-(AS) <br><br> **ORAL ARGUMENT REQUESTED** <br><br> **REDACTED** |

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

FACTUAL BACKGROUND ..................................................................................4

    A.    Competition For Ticketing Rights ..........................................................4

    B.    Alleged Threats And Retaliation Regarding Live Nation Content .........8

    C.    Live Nation's Amphitheaters ................................................................8

    D.    Competition in Concert Promotion ........................................................9

    E.    Live Nation As A Vertically Integrated Company ...............................11

LEGAL STANDARD .............................................................................................12

ARGUMENT ..........................................................................................................13

I.    All Antitrust Claims Fail Because Plaintiffs Cannot Support Their Alleged
    Relevant Markets ..........................................................................................13

    A.    A Relevant Market Must Encompass The Effective Area Of Competition...........14

    B.    Plaintiffs' Market Centered On "Large Amphitheaters" Fails .............14

    C.    Plaintiffs' Markets Centered On "Major Concert Venues" Fail...........16

        1.    Plaintiffs' Venue-Facing Ticketing Markets Fail ......................17

        2.    Plaintiffs' Fan-Facing Primary Ticketing Market Fails.............19

        3.    Plaintiffs' Promotion Services And Concert Booking Markets Fail .........20

II.    Plaintiffs' Section 2 Monopolization Claims Fail Because They Do Not
    Demonstrate Anticompetitive Effects..........................................................22

    A.    Plaintiffs Must Demonstrate Anticompetitive Effects To Prevail On Their
        Monopolization Claims.........................................................................22

    B.    Plaintiffs Do Not Demonstrate Anticompetitive Effects In Their Venue-
        Facing Ticketing Markets .....................................................................23

        1.    Plaintiffs Fail To Demonstrate That Ticketmaster's Exclusive
            Contracts Foreclose Competition..............................................24

i

2.      Plaintiffs Fail To Demonstrate That Ticketmaster's Exclusive Contracts Prevent Rivals From Achieving Scale .......................................27

3.      Plaintiffs Fail To Demonstrate Anticompetitive Effects Resulting From Alleged "Threats" or "Retaliation" ...................................27

C.      Plaintiffs Do Not Demonstrate Anticompetitive Effects In Their Amphitheater Market ...............................................................30

D.      Plaintiffs Do Not Demonstrate Anticompetitive Effects In Their Promotion Markets ..................................................................31

III.    Plaintiffs' Section 1 Exclusive Dealing Claim Fails ....................................32

IV.     Plaintiffs' Claim That Defendants Unlawfully Tie Amphitheaters to Promotion Services Fails .........................................................................33

A.      Live Nation Has No Duty To Deal With Rivals ....................................33

B.      Plaintiffs Cannot Prove The Elements Of Tying ...................................36

V.      State Plaintiffs' Claims Fail .........................................................................36

A.      State Plaintiffs Lack Article III Standing To Assert Sovereign Capacity Claims ................................................................................37

B.      State Plaintiffs Fail To Demonstrate Antitrust Injury On Their *Parens Patriae* Claims ...................................................................37

CONCLUSION .................................................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*A.V.E.L.A. v. Est. of Marilyn Monroe,*
  241 F. Supp. 3d 461 (S.D.N.Y. 2017)........................................................................29

*Anderson v. Liberty Lobby,*
  477 U.S. 242 (1986).....................................................................................12, 13

*Anheuser-Busch, Inc. v. Abrams,*
  525 N.Y.S.2d 816 (1988)..................................................................................37

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
  472 U.S. 585 (1985)........................................................................................35

*Associated Gen. Contractors of California v. California State Council of Carpenters,*
  459 U.S. 519 (1983)........................................................................................39

*Balaklaw v. Lovell,*
  14 F.3d 793 (2d Cir. 1994)...............................................................................25

*Berkey Photo v. Eastman Kodak,*
  603 F.2d 263 (2d Cir. 1979).............................................................................13

*Blue Shield of Va. v. McCready,*
  457 U.S. 465, 102 S. Ct. 2540 (1982)...............................................................39

*Broadway Delivery v. United Parcel Service of America,*
  651 F2d 122 (2d Cir. 1981)...............................................................................2

*Brownsburg Cmty. Sch. v. Natare,*
  824 N.E.2d 336 (Ind. 2005) ............................................................................37

*Brunswick v. Pueblo Bowl-O-Mat,*
  429 U.S. 477 (1977).........................................................................................23

*C.K. & J.K. v. Fairview Shopping Ctr.,*
  63 Ohio St. 2d 201 (1980) ...............................................................................37

*Celotex v. Catrett,*
  477 U.S. 317 (1986).........................................................................................13

*City of New York v. Grp. Health,*
  649 F.3d 151 (2d Cir. 2011)........................................................................13, 14

*Concord Assocs., L.P. v. Entertainment Properties Trust*,
  817 F.3d 46 (2d Cir. 2016)..........................................................................20

*De Jesus v. Sears, Roebuck & Co.*,
  87 F.3d 65 (2d Cir. 1996) ...........................................................................36

*Dickson v. Microsoft Corporation*,
  309 F.3d 193 (4th Cir. 2002) ......................................................................32

*Disenos Artisticos E Industriales, S.A. v. Work*,
  714 F. Supp. 46 (E.D.N.Y. 1989) ...............................................................14

*E & L Consulting, Ltd. v. Doman Industries Ltd.*,
  472 F.3d 23 (2d Cir. 2006) .........................................................................32

*F.T.C. v. Whole Foods Mkt.*,
  548 F.3d 1028 (D.C. Cir. 2008)............................................................18, 21

*Fed. Trade Comm'n v. Sysco*,
  113 F. Supp. 3d 1 (D.D.C. 2015) ................................................................18

*Ferguson v. Greater Pocatello Chamber of Commerce*,
  848 F.2d 976 (9th Cir. 1988) ......................................................................25

*Ga. Pac. v. Cook Timber*,
  194 So. 3d 118 (Miss. 2016)........................................................................37

*Gatt Commc'ns v. PMC Assocs.*,
  711 F.3d 68 (2d Cir. 2013)..........................................................................38

*Geneva Pharm. Tech. v. Barr Labs.*,
  386 F.3d 485 (2d Cir. 2004)...................................................................14, 17

*Gibson v. Cendyn Group*,
  148 F.4th 1069 (9th Cir. 2025) ...................................................................32

*Goenaga v. March of Dimes Birth Defects Found.*,
  51 F.3d 14 (2d Cir. 1995) ...........................................................................13

*Harrison v. Jefferson Par. Sch. Bd*,
  78 F.4th 765 (5th Cir. 2023) .......................................................................37

*Heerwagen v. Clear Channel Comms.*,
  435 F.3d 219 (2d Cir. 2006)........................................................................20

*Howard Hess Dental Laboratories v. Dentsply International*,
  602 F.3d 239 (3d Cir. 2010).........................................................................32

iv

*In re Adderall XR Antitrust Litig.*,
754 F.3d 128 (2d Cir. 2014)..........................................................................35

*In re Aluminum Warehousing Antitrust Litig.*,
833 F.3d 151 (2d Cir. 2016)..........................................................................38

*In re Eyewear Antitrust Litig.*,
2025 WL 2773064 (S.D.N.Y. Sept. 26, 2025)..........................................14

*In re Google Digital Advert. Antitrust Litig.*,
627 F. Supp. 3d 346 (S.D.N.Y. 2022).......................................................23

*In re Mylan N.V. Sec. Litig.*,
666 F. Supp. 3d 266 (S.D.N.Y. 2023).......................................................24

*In re WorldCom Sec. Litig.*,
308 F. Supp. 2d 338 (S.D.N.Y. 2004).......................................................35

*Indeck Energy Servs. v. Consumers Energy*,
250 F.3d 972 (6th Cir. 2000) ......................................................................25

*It's My Party v. Live Nation*,
811 F.3d 676 (4th Cir. 2016) ...............................................................15, 21

*Kaufman v. Time Warner*,
836 F.3d 137 (2d Cir. 2016)..........................................................................36

*La. Power & Light v. United Gas Pipe Line*,
493 So.2d 1149 (La. 1986) ...........................................................................37

*MacDermid Printing Sols. v. Cortron*,
833 F.3d 172 (2d Cir. 2016)................................................23, 31, 32, 36

*Matsushita Elec. Indus. v. Zenith Radio*,
475 U.S. 574 (1986).........................................................................................13

*Mazda v. Carfax*,
2016 WL 7231941 (S.D.N.Y. Dec. 9, 2016), *aff'd*, 726 F. App'x 66 (2d Cir.
2018) .......................................................................................................................25

*Meijer, Inc. v. Ferring B.V. (In re DDAVP Direct Purchaser Antitrust Litig.)*,
585 F.3d 677 (2d Cir. 2009)..........................................................................39

*Minn. Twins P'ship v. State ex rel. Hatch*,
592 N.W.2d 847 (Minn. 1999).......................................................................37

*Natsource v. GFI Grp*,
332 F. Supp. 2d 626 (S.D.N.Y. 2004).......................................................29

*New York ex rel. Schneiderman v. Actavis PLC*,
   787 F.3d 638 (2d Cir. 2015)..................................................................................23

*New York v. Microsoft Corp.*,
   209 F. Supp. 2d 132 (D.D.C. 2002) ......................................................................37

*Novell v. Microsoft*,
   731 F.3d 1064 (10th Cir. 2013) ............................................................................35

*Ohio v. Am. Express Co.*,
   585 U.S. 529 (2018).......................................................................................1, 14

*Pac. Bell Tel. Co. v. linkLine Commc'ns*,
   555 U.S. 438 (2009) .............................................................................................35

*Paddock Publ'ns v. Chi. Tribune*,
   103 F.3d 42 (7th Cir. 1996) .................................................................................25

*Panini America v. Fanatics*,
   2025 WL 753954 (S.D.N.Y. Mar. 10, 2025) ........................................................32

*Pennsylvania v. Nat'l Collegiate Athletic Ass'n*,
   948 F. Supp. 2d 416 (M.D. Pa. 2013) ...................................................................38

*People ex rel. Woodard v. Colo. Springs Bd. of Realtors*,
   692 P.2d 1055 (Colo.1984) ...................................................................................37

*PepsiCo v. Coca-Cola*,
   114 F. Supp. 2d 243 (S.D.N.Y. 2000), *aff'd*, 315 F.3d 101 (2d Cir. 2002) ............19

*PepsiCo v. Coca-Cola*,
   315 F.3d 101 (2d Cir. 2002)..................................................................................14

*Ports Petroleum Co. of Ohio v. Tucker*,
   323 Ark. 680, 916 S.W.2d 749 (1996)...................................................................37

*Prentice v. Title Ins. Co. of Minn.*,
   176 Wis.2d 714, 500 N.W.2d 658 (1993) ..............................................................37

*Raskin v. Wyatt*,
   125 F.3d 55 (2d Cir. 1997).....................................................................................29

*Right Field Rooftops v. Chicago Baseball Holdings*,
   87 F. Supp. 3d 874 (N.D. Ill. 2015) ......................................................................21

*Rose v. Vulcan Materials*,
   282 N.C. 643 (1973) ..............................................................................................37

*Saginaw Cnty. v. STAT Emergency Med. Servs.*,
    946 F.3d 951 (6th Cir. 2020) ................................................37

*Shak v. JPMorgan Chase & Co.*,
    156 F. Supp. 3d 462 (S.D.N.Y. 2016)..............................................22, 31

*Spahr v. Leegin Creative Leather Prods.*,
    No. 2:07-CV-187, 2008 WL 3914461 (E.D. Tenn. Aug. 20, 2008)........................37

*Spinelli v. Nat'l Football League*,
    96 F. Supp. 3d 81 (S.D.N.Y. 2015)................................................25

*Stubhub v. Golden State Warriors*,
    2015 WL 6755594 (N.D. Cal. Nov. 5, 2015) ........................................20

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961)..............................................................24

*Ticketmaster v. RMG Techs.*,
    536 F. Supp. 2d 1191 (C.D. Cal. 2008) ............................................20

*Ticketmaster v. Tickets.com*,
    2003 WL 21397701 (C.D. Cal. Mar. 7, 2003), *aff'd*, 127 F. App'x 346 (9th
    Cir. 2005) ...............................................................26, 27, 32

*United States v. Colgate & Co.*,
    250 U.S. 300 (1919)..............................................................34

*United States v. E.I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956)..............................................................14

*United States v. Google*,
    687 F. Supp. (D.D.C. 2023)........................................................23

*United States v. Google*,
    687 F. Supp. 3d 48 (D.D.C. 2023) ............................................2, 30, 31

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966)...........................................................1, 22

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001)...................................................2, 22

*Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004).........................................................34, 35

*Viamedia v. Comcast*,
    951 F.3d 429 (7th Cir. 2020) .....................................................35

## STATUTES

740 Ill. Comp. Stat. 10/11 ................................................................................................36

Ariz. Rev. Stat. § 44-1412 ...............................................................................................36

Conn. Gen. Stat. § 35-44b ...............................................................................................36

D.C. Code § 28-4515 .......................................................................................................36

Iowa Code § 553.2 ...........................................................................................................36

Kan. Stat. § 50-163 ..........................................................................................................36

Md. Code Ann., Com. Law § 11-202 ..............................................................................36

Mich. Comp. Laws § 445.784 .........................................................................................36

N.H. Rev. Stat. § 356:14 ..................................................................................................36

N.J. Stat. § 56:9-18 ..........................................................................................................36

N.M. Stat. § 57-1-15 ........................................................................................................36

Neb. Rev. Stat. § 59-829 ..................................................................................................36

Nev. Rev. Stat. § 598A.050 .............................................................................................36

Okla. Stat. Title 79, § 212 ...............................................................................................36

R.I. Gen. Laws § 6-36-2(b) .............................................................................................36

S.C. Code § 39-5-20 .........................................................................................................36

Tex. Bus. & Com. Code § 15.04 ......................................................................................36

Utah Code § 76-16-502 ....................................................................................................36

Va. Code Ann. § 59.1-9.17 ..............................................................................................36

Vt. Stat. Title 9, § 2453 ...................................................................................................36

W. Va. Code § 47-18-16 ..................................................................................................36

Wash. Rev. Code § 19.86.920 ..........................................................................................36

## RULES

Fed. R. Civ. P. 56(a) ........................................................................................................12

**OTHER AUTHORITIES**

Krattenmaker & Salop, *Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power Over Price*, Yale Law Journal 96 (1986).................................................28, 29

## INTRODUCTION

Plaintiffs opened this case alleging that Live Nation had multiple, self-reinforcing monopolies and had—for fifteen years—engaged in "systematic" and "intentional" corruption of competition across "virtually every aspect of the live music ecosystem." *See* Am. Compl. (ECF No. 257) ¶¶5, 141. Strong words. If there was a lick of truth to them, one would expect Plaintiffs to now have mountains of evidence demonstrating monopoly power and the anticompetitive effects of Live Nation's conduct. And yet, after an 18-month investigation and a year of discovery, Plaintiffs have barely a molehill. There is no triable issue that Live Nation has monopoly power or has caused the actual anticompetitive effects required in a Section 2 monopolization action.

Monopoly power is the foundational element of every monopoly maintenance case. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966). Plaintiffs allege Defendants have six monopolies. But instead of proving those monopolies (or any one of them) directly through evidence of high pricing or output restrictions, Plaintiffs seek inferences of monopoly power from market shares. That approach is conceptually permissible—but only if the relevant markets are properly defined. Here, the alleged relevant markets are all gerrymandered in obvious and legally indefensible ways. The most glaring error infects the primary ticketing and promotion services markets, which are arbitrarily limited to a subset of the larger concert venues that primary ticketing companies compete to serve, and where artists play. These made-for-litigation markets plainly do not encompass "the area of effective competition" that the law requires. *Ohio v. Am. Express Co.*, 585 U.S. 529, 543–44 (2018).

So why do Plaintiffs artificially limit their market definitions in this way? For the simple reason that if they included all major concert venues and the artists that seek to play in them, Live Nation and Ticketmaster's market shares are too low to infer monopoly power and Plaintiffs' claims fail. Plaintiffs' expert calculates that Ticketmaster's market share in primary ticketing

1

services drops from a monopoly-like 86% to a mere 49% when *stadiums* are included in the relevant market—as they were when the government challenged the Live Nation-Ticketmaster merger. That would mean that far from having the "power to exclude competition," Ticketmaster has lost over 30 points of market share since the merger, a sure sign that it does not have monopoly power. *See Broadway Delivery v. United Parcel Service of America*, 651 F2d 122, 129–31 (2d Cir. 1981) (explaining that "if the defendant's share is less than 50%," the plaintiff must offer additional evidence that that the defendant is able to exclude competition to avoid summary judgment).

There is also no direct evidence of any anticompetitive effects from the conduct challenged as unlawful—another threshold requirement for any monopolization case. *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001). This became apparent in Plaintiffs' expert report on liability, which reads as if the issue in this case is whether Defendants' market position and practices *potentially harm their rivals*. *See, e.g.*, Ex. 79 (Pls.' Expert Rebuttal Rpt. of Dr. Hill ("Hill Rebuttal")) ¶10 (contending that Live Nation takes "actions that create barriers to entry and expansion for Live Nation's rivals and hinder their ability to compete").[1] Arguments of that nature fail to prove anticompetitive effects as a matter of law. *See, e.g.*, *United States v. Google*, 687 F. Supp. 3d 48, 81 (D.D.C. 2023) (summary judgment warranted because evidence that a defendant's conduct "can reasonably be expected," "might," or "could potentially" lead to harm "is not evidence of anticompetitive effects"). There must be evidence of actual harm to *consumers*; "harm to one or more *competitors* will not suffice." *Microsoft*, 253 F.3d at 58. But for all their rhetoric

---

[1] All "Ex." citations refer to the exhibits attached to the concurrently filed Declaration of Robin L. Gushman.

about anticompetitive conduct, Plaintiffs never show that anything Defendants have done harmed artists or venues.

Consider, for example, the claim that Ticketmaster has somehow forced exclusive contracting on venues—effectively requiring them to commit to just one ticketing company when, absent coercion, they would prefer to use several ticketing platforms at a time. After hundreds of hours of deposition testimony and millions of pages of document discovery, that theory turns out not to be even arguably true. Not a single "major concert venue" claims to have been forced into exclusive contracts. To the contrary, every venue witness has testified that they seek and prefer exclusive ticketing contracts. And there is no competent evidence that exclusive contracting allows Ticketmaster to extract supracompetitive prices from venues, let alone by excluding competition from rivals. There has indisputably been successful entry and expansion by rivals under the exclusive contracting paradigm that pervades the industry.

It is the same story with regard to the claim that Ticketmaster wins business by threatening to divert Live Nation-promoted concerts away from venues if they choose a competing company for their ticketing business. Viewing the record generously for Plaintiffs, at most three venue witnesses support this claim—*one* in the last five years. To put that in context, Ticketmaster has negotiated thousands of ticketing contracts with major concert venues over the course of the relevant time period. Three out of thousands could not possibly prove the *market-wide* anticompetitive effects required for a monopolization claim. And therefore Plaintiffs resort to the testimony of other ticketing companies—*not* venues—asserting that someone told them that the reason they lost a ticketing contract negotiation to Ticketmaster was that someone else told their counterparty that choosing a different ticketing company would mean the venue would lose Live

3

Nation shows.  None of that evidence would be admissible at trial for the truth of the matter asserted, and therefore it cannot be used to survive summary judgment.

Discovery has also disproven Plaintiffs' claim that Live Nation uses the portfolio of amphitheaters it owns to coerce artists to use Live Nation concert promotion services for the non-amphitheater portions of their tours.  Remarkably, Plaintiffs chose to depose only a single artist in this entire litigation—one who, according to a competing concert promoter, ████████████ ██████████████████████████████████████████████████████ ████████████████████████████  But when asked ██████████████████████████ ██████████████████████████████  the artist answered, without ambiguity or qualification, ██████  That is no basis for a trial.

Claims of monopoly power cannot rest on gerrymandered market definitions.  Nor is it enough for an antitrust plaintiff to claim that conduct is inconvenient or costly to the alleged monopolist's rivals.  Conduct is exclusionary within the meaning of Section 2 only if it harms consumer welfare, most commonly by raising prices, lowering output, or reducing quality.  There is no evidence of that in the record.  The faithful application of law to the evidence adduced should yield summary judgment for Live Nation and Ticketmaster.

## FACTUAL BACKGROUND

Plaintiffs allege that Live Nation harmed competition across the live entertainment industry, spanning primary ticketing, amphitheater ownership and operation, and concert promotion.  We discuss each in turn.

### A.    Competition For Ticketing Rights

There are many types of venues that host concerts, including stadiums, arenas, amphitheaters, theaters, and clubs.  *See* Ex. 72 (Pls.' Expert Rpt. of Dr. Hill ("Hill")) ¶39.  These venues typically use primary ticketing companies (like Ticketmaster) to sell all or substantially all

4

of their ticketing inventory.  *See* Ex. 72 (Hill) ¶¶48, 57; Ex. ██ (█████ Tr.) 22:7–19.  Venues typically select their vendor by organizing competitive bidding among ticketing service providers through "requests for proposal" ("RFPs"), in which the venue solicits multiple bids for the right to be its ticketing provider.  SUF ¶13.  Ticketmaster, SeatGeek, AXS, Paciolan, and others compete to provide primary ticketing services to venues of various sizes—including arenas, amphitheaters, and stadiums.  SUF ¶1.

Venues seek to be paid for their ticketing rights through some combination of (a) a share of the per-ticket fees charged to consumers by the ticketing company over the course of the contract, and (b) an up-front lump sum payment from the winning bidder.  *See* Ex. 74 (Defs.' Expert Rpt. of Dr. Budish ("Budish")) ¶¶58–60.  The competing ticketing providers bid against each other based on the value of payments they offer—including both the magnitude of the lump sum and the "split" of fees the venue is to receive—as well as the quality of the services they provide.  *See* Ex. ██ (█████ Tr.) 25:10–16; Ex. ██ (█████ Tr.) 66:17–67:8.  Under the resulting contracts, the consumer-facing amount of the per-ticket fees are generally set by the venue, often on a show-by-show basis.  *See* Ex. 72 (Hill) ¶61; *see also* Ex. 73 (Pls.' Expert Rpt. of Dr. Abrantes-Metz ("Abrantes-Metz")) ¶¶99, 145 (acknowledging the venue sets the fees).  The bulk of those fees go to the venue and other entities involved in the production of the concert, not the ticketing company.  *See* Ex. 73 (Abrantes-Metz) ¶62; Ex. 74 (Budish) ¶¶59, 73; Ex. ██ (█████ Tr.) 154:22–155:6.

The prevailing  "competition for the contract" model has been a fixture of the industry for decades.  The Department of Justice ("DOJ") investigated exclusive contracting in the U.S. ticketing industry during the Clinton Administration without taking any action.  *See* Ex. 1 (*U.S. Drops Ticketmaster Antitrust Probe*, L.A. Times).  The truth is simply that venues in this market

tend to prefer exclusive ticketing contracts. SUF ¶21. Many venues believe that selling their exclusive ticketing rights to one provider yields more advantageous financial terms, on balance, than selling non-exclusive ticketing rights to multiple providers. *See* Ex. ██ (███████ Tr.) 120:13–23; Ex. ██ (██████ Tr.) 53:20–54:21; Ex. 123 (Marcus Tr.) 43:5–44:3; Ex. ██ ████ Tr.) 177:20–178:12. There are also logistical and efficiency benefits to exclusive contracting. It can, for example, be burdensome for a venue to train its staff on multiple ticket-distribution and sales-reporting systems, and exclusivity can reduce consumer confusion as to where to find tickets to shows hosted by the venue. *See* Ex. ██ (██████ Tr.) 52:5–53:2; Ex. ██ ████ Tr.) 122:12–123:12; Ex. ██ (████ Tr.) 93:12–94:13; Ex. ██ (██████ Tr.) 177:20–178:12.

There is no evidence that ticketing service providers force exclusivity on venues. SUF ¶22. Nor is there any evidence that ticketing service providers force venues to agree to exclusive agreements of any particular duration (i.e., for a longer period than the venue prefers) or scope (i.e., requiring more exclusive rights than the venue wants to grant). SUF ¶23.

In fact, in most instances an "exclusive" ticketing contract does not cover 100% of the primary ticketing inventory. SUF ¶24. To the contrary, the scope of the so-called "exclusivity" is defined by the venue-client—frequently resulting in carveouts whereby another ticketer distributes primary tickets to certain events in certain circumstances. SUF ¶25. But there is no meaningful practice in the U.S. of venues asking for a non-exclusive agreement in the sense that two or more primary ticketing companies would both sell tickets for the same event at the same time. *See* Ex. ██ (██████ Tr.) at 377:17–378:21; Ex. ██ (██████ Tr.) at 50:4–51:3; Ex. ██ (████ Tr.) at 59:24–60:18.

According to Plaintiffs' expert, at least 18% of Ticketmaster's primary ticketing contracts are up for bid each year. SUF ¶27. Since Live Nation's acquisition of Ticketmaster in 2010, there has been significant new entry into primary ticketing—including by AXS, CTS Eventim, Jump Platforms, SeatGeek, SI Tickets, and Tixr. SUF ¶12. Not all of those competitors bid for each contract each time it is up for renewal—but venues are generally aware of the possibility of playing one ticketing company off another, and typically do so. SUF ¶14.

The parties to this litigation disagree about the scope of the relevant primary ticketing market. Plaintiffs' alleged primary ticketing market is described as one for "major concert venues"—but in practice they have defined that category to *exclude* stadiums, smaller amphitheaters, and large theaters, and *include* only amphitheaters and arenas with "a capacity of 8,000 or more and that hosted 10 or more concerts in at least one year" from 2017 to 2024. Ex. 72 (Hill) ¶139. On that basis, Plaintiffs assert that Ticketmaster's share of the alleged primary ticketing market is about 86%. SUF ¶7. As Plaintiffs' own expert admits, however, when these limitations are lifted, Defendants' share is vastly lower:

- If Plaintiffs' "market" were expanded to include stadiums, Ticketmaster's share would be no more than 49%.

- If it included venues with 8,000 capacity that hosted at least one concert in 2017–2024, Ticketmaster's share would be no more than 58%.

- If it included venues with a top-500 concert by tickets sold in 2023, Ticketmaster's share would be no more than 49%.

SUF ¶¶8–10. When the government challenged the Live Nation-Ticketmaster merger in 2010, it alleged that the relevant market for primary ticketing services included stadiums, and Ticketmaster's share in that market was more than 80%. SUF ¶11. Consequently, if the relevant

market for primary ticketing services includes stadiums, Ticketmaster's market share has declined by over 30 points in the past 15 years.

### B.    Alleged Threats And Retaliation Regarding Live Nation Content

Plaintiffs allege that Ticketmaster "locks" venues into exclusive ticketing contracts by threatening loss of Live Nation-promoted concerts, or retaliating against venues that choose non-Ticketmaster ticketers by decreasing the number of Live Nation-promoted shows that get routed to the venue.  Am. Compl. ¶¶88–98.  Plaintiffs deposed dozens of venues, almost all of whom confirmed they were not concerned with losing Live Nation content when choosing a ticketer, were not aware of any threats by Ticketmaster, or chose Ticketmaster on the merits because it is the best option in the market.  SUF ¶28.  Just *one venue*—███████████—testified about alleged threats within the last five years.  SUF ¶29.[2]  The bulk of the "evidence" of threats or retaliation on which Plaintiffs now rely consists of hearsay testimony from competitor ticketing companies, who claim they "heard" a venue was concerned about loss of shows or someone told them of a generalized "fear" of retaliation from Live Nation.  *See e.g.* Ex. 72 (Hill) ¶¶362–67.

### C.    Live Nation's Amphitheaters

Live Nation owns, operates, and/or leases a number of amphitheaters, which are normally booked by Live Nation promoters who have touring deals with artists interested in playing the amphitheaters (among other venues).  *See* Ex. 133 (Roux Tr.) 198:10–199:6; Ex. 143 (Zachary 30(b)(6) Tr.) 9:8–15.  Historically, Live Nation has treated these amphitheaters as part of its

---

[2] ████████████████████████████████████████████, and it does not evidence any threats, *see* Ex. 2—though whether it does or does not is immaterial to this motion.  Desperate for more, Plaintiffs are also recycling two of the supposed threats that happened *over five years ago* and that were already investigated and resolved in connection with the amended consent decree, discussed below.  *See* SUF ¶¶30-31.  They have nothing else.

concert promotions business and part of the value it sells as a promoter.  SUF ¶42.  For that reason, Live Nation has a long-standing practice of generally not renting its amphitheaters to other promoters—because doing so would mean dealing with rival promoters.  SUF ¶44.  This is consistent with industry practice.  SUF ¶45.  For example, ███████████████████████████████ ████████████████████████████████████████████████████████████████ █████████████████████████.  *See* Ex. ███ (███████ Tr.) 280:9–11.

Live Nation is occasionally asked to rent its amphitheaters to rival promoters, and occasionally it has done so.  Ex. ███ (███████ Tr.) 29:9-30:3.  Promoters—not artists—book the venues and execute the contracts relating to rental of the venues.  SUF ¶51.  Promoters do not act as ministerial intermediaries in this role.  Promoters compete against each other in part based on the venues they can offer to place artists in, and it is common for promoters to have standing deals with venues that apply to any artist they may book there.  SUF ¶¶43, 53.

There is no evidence that any artist was coerced to accept Live Nation's promotion services as a condition of renting Live Nation amphitheaters.  SUF ¶48.  Plaintiffs deposed *just one artist* during discovery, ████████████████████████████████████████████████ ███████.  SUF ¶49; *see* Ex. 72 (Hill) ¶410.  He did not.  To the contrary, the artist testified that ██████████████████████████████████████████████████████████████ SUF ¶50.

### D.    Competition in Concert Promotion

Promoters (like Live Nation) submit bids to buy the right to promote artists' concerts or tours, with artists choosing to sell their tour to the promoter with the most attractive bid.[3]  *See*

---

[3] Artists derive much of their income—which has grown exponentially over the last 25 years—from live performances and touring.  *See* Ex. 72 (Hill) fig. 3.  Artists are the ultimate decision-makers for their shows and tours—they have ultimate say over face value ticket pricing, tour

Ex. 78 (Defs.' Expert Rpt. of Yurukoglu ("Yurukoglu")) ¶30; *see, e.g.*, Ex. ███ (██████ Tr.) 179:23–180:19; Ex. 3 (LNE-LIT24-000139211); Ex. █ (██████████████) at 2; Ex. █ (██████████████) at 1.  Promoters typically compete for artists by offering large, guaranteed payments.  *See* Ex. 72 (Hill) ¶32; Ex. ███ (██████ Tr.) 31:7–24.  These guarantees are large enough that the promoter sometimes loses money on the concert (or tour).  *See* Ex. 72 (Hill) ¶196, fig. 33.  Promoters, therefore, generally take on the financial risk associated with a show or tour.  SUF ¶38.

It is undisputed that Live Nation, AEG, and other promoters compete to provide promotion services to artists who play in all types of venues—including arenas, amphitheaters, theaters, clubs, and stadiums.  SUF ¶35.  But in the promotion space as in the ticketing space, Plaintiffs limit their alleged market to the provision of services to artists who play at what Plaintiffs refer to as "major concert venues"—which they define again as venues with "a capacity of 8,000 or more and that hosted 10 or more concerts in at least one year." Ex. 72 (Hill) ¶¶139, 156.  In this supposed market, Plaintiffs contend that Live Nation's share is 55%.  *Id.* fig. 24.  When excluded venues are added, Live Nation's share is well below 50%.  *See* Ex. 78 (Yurukoglu) fig. 23.

Live Nation has acquired and/or entered joint ventures with some smaller promotion companies over the last ten years.  SUF ¶40.  With a few exceptions, these regional promotion companies did not compete for national tours of artists that play in "major" venues.  SUF ¶41. They would promote shows instead on a local basis.  *See id.*

---

routing, and all other creative and business aspects of their performances.  *See* Ex. ███ (███ Tr.) 98:2–8, 98:15–23; Ex. ███ (██████ Tr.) 29:23–31:5; Ex. 72 (Hill) ¶27; Ex. 79 (Hill Rebuttal) ¶108.

### E.    Live Nation As A Vertically Integrated Company

Live Nation is a vertically integrated company comprised primarily of its promotion business (Live Nation), its venue ownership and operation business (Venue Nation), its sponsorship business (Sponsorship & Advertising), and its ticketing business (Ticketmaster).  *See* Am Compl. ¶3; Ex. 6 (Live Nation FY 2024 10-K) at 5–6.  Other companies in the live entertainment industry are vertically integrated too.  For example, Live Nation's biggest competitor in concert promotion, AEG, is also vertically integrated into venue ownership and ticketing (through AXS).  *See* Ex. ███ (██████ Tr.) 11:2–3, 12:1–13:9; Ex. ███ (██████ Tr.) 12:3–10, 291:1–12; Ex. ███ (██████ Tr.) 13:23–14:6.  Many other promoters also own venues.  *See, e.g.*, Ex. ███ (██████ Tr.) 15:14–19, 230:15–19.

Live Nation merged with Ticketmaster in January 2010.  *See* Ex. 7 (Press Release).  The merger was challenged by DOJ and 19 states, who contended that Ticketmaster had greater than 80% market share in a "market for primary ticketing services to major concert venues in the United States," which was comprised of the top 500 venues in the U.S. by revenue (including stadiums).  *See* SUF ¶11; Ex. 8 (2010 Am. Compl.) ¶21; Ex. 9 (2010 Competitive Impact Statement) at 4.  The theory of the challenge was a *horizontal* one: Live Nation had recently announced that it was planning its own organic entry into the ticketing business, so the government saw the merger with Ticketmaster as reducing that potential competition.  *See* Ex. 8 (2010 Am. Compl.) ¶¶3–6.  The parties ultimately agreed to a consent decree that required a number of steps to ensure robust future competition in the ticketing space.  *See* Ex. 10 (Proposed Final Judgment).

Following submission of the proposed consent decree, DOJ received public comments from a dozen firms and individuals—including several of Live Nation's competitors—pursuant to the Tunney Act.  *See* Ex. 11 (2010 DOJ Response to Comments) at 13.  At least two competitors objected to the merger on vertical grounds, and in response, DOJ acknowledged the theoretical

risk of market foreclosures in some vertical mergers but dismissed such concerns in this industry. *See id.* at 14–22, 25–29. Indeed, DOJ recognized the pro-competitive benefits of vertical integration. *See id.* at 15 n.28, 27–29 ("vertical integration can produce procompetitive benefits" and "[m]ost instances of vertical integration, including those that result from mergers, are economically beneficial"). In July 2010, the District of Columbia federal court entered the proposed decree. *See* Ex. 12 (Final Judgment).

Five years later, DOJ opened an investigation into Live Nation's compliance with a term of the decree that concerned threats or retaliation by Live Nation over venues using a ticketing company other than Ticketmaster. *See* Ex. 13 (Motion to Modify) at 9–13. After looking into dozens of contract negotiations between Ticketmaster and venues, out of the many hundreds that had taken place during the relevant period, the government alleged that Defendants violated the decree on six occasions. *See id.* at 9–13. Without admitting liability, Defendants agreed to settle the claim, and an amended decree went into effect on January 28, 2020. *See id.* at 5–6. Since then, the outside antitrust monitor appointed under the decree has not reported a single violation. Ex. 14 (Pls.' RFA Responses) No. 18.

## LEGAL STANDARD

A federal court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a "dispute about a material fact is 'genuine' … if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). While the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, *Celotex v. Catrett*, 477 U.S. 317, 325 (1986), when "moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's

burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). By contrast, to defeat a motion for summary judgment, the non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and must demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. v. Zenith Radio*, 475 U.S. 574, 586 (1986).

## ARGUMENT

## I.   ALL ANTITRUST CLAIMS FAIL BECAUSE PLAINTIFFS CANNOT SUPPORT THEIR ALLEGED RELEVANT MARKETS

In an antitrust case, "the first step in a court's analysis must be a definition of the relevant markets." *Berkey Photo v. Eastman Kodak*, 603 F.2d 263, 268–69 (2d Cir. 1979); *see also City of New York v. Grp. Health*, 649 F.3d 151, 155 (2d Cir. 2011) (to pursue a claim under the Sherman Act, "a plaintiff must allege a plausible relevant market in which competition will be impaired"). Plaintiffs' case fails at this threshold step. Plaintiffs theorize supposed "markets" for "large amphitheaters" and "major concert venues" that unjustifiably exclude (a) competing products or (b) substantial portions of the business opportunities for which rivals compete. Plaintiffs prefer these made-for-litigation markets because they generate the market share required for monopolization claims. But market definition is not some rhetorical device that Plaintiffs can manipulate in ways convenient to their claims. The law requires that market definition be rooted in commercial realities. Plaintiffs' markets clearly are not.

With respect to amphitheater market definition, the legal defect is a familiar one in antitrust law: the market as defined excludes obvious substitutes—most notably, arenas. With respect to Plaintiffs' proposed markets structured by reference to "major concert venues," the legal defect is that these are markets defined, explicitly, around only a subset of the opportunities for which

sellers compete.  There is no basis in the law to exclude the balance of those opportunities from the market for the purpose of calculating shares.

Because Plaintiffs fail to properly define relevant markets, all of their antitrust claims fail. *See Grp. Health*, 649 F.3d at 156 (summary judgment on Sherman Act Section 1 and 2 claims appropriate because the "market alleged in the [plaintiff's] complaint is legally insufficient"); *Disenos Artisticos E Industriales, S.A. v. Work*, 714 F. Supp. 46, 49 (E.D.N.Y. 1989) (same); *In re Eyewear Antitrust Litig.*, 2025 WL 2773064, at *12 (S.D.N.Y. Sept. 26, 2025) (dismissing Section 1 and 2 claims "for failure to allege a plausible market definition").

### A.    A Relevant Market Must Encompass The Effective Area Of Competition

Starting with "an accurate definition of the relevant market" that rests on "actual market realities" rather than "formalistic distinctions" is crucial in antitrust analysis, because "[w]ithout a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition." *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018).  The relevant market is "the area of effective competition."  *Id.*  It must include all products that are "reasonably interchangeable by consumers for the same purposes." *Geneva Pharm. Tech. v. Barr Labs.*, 386 F.3d 485, 496 (2d Cir. 2004) (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)).  That is because "the ability of consumers to switch to a substitute restrains a firm's ability to raise prices above the competitive level."  *Id.*  Products are "reasonably interchangeable if consumers treat them as 'acceptable substitutes.'" *PepsiCo v. Coca-Cola*, 315 F.3d 101, 105 (2d Cir. 2002) (citation omitted).  They need not be perfect substitutes.

### B.    Plaintiffs' Market Centered On "Large Amphitheaters" Fails

Plaintiffs allege a relevant antitrust market for the use of "large amphitheaters"—those with a capacity of 8,000 or more—in which Plaintiffs contend artists are the consumers and venues are the suppliers.  Am. Compl. ¶¶242, 250; Ex. 72 (Hill) ¶¶39, 275. Notably, this is a twist on a market

definition argument that another federal court rejected on summary judgment. *See It's My Party v. Live Nation*, 811 F.3d 676, 682–83 (4th Cir. 2016). It fails because "large amphitheaters" indisputably compete with other types of venues.

The record evidence shows that the customers at issue—whether framed as artists, as Plaintiffs suggest for purposes of this claim, or promoters—routinely substitute arenas and other venues for large amphitheaters. There is no evidence that any appreciable number of those customers view large amphitheaters as a performance location for which there is no commercially acceptable alternative—and substantial evidence that most view other venue types as perfectly suitable substitutes. SUF ¶¶46–47. Indeed, when Plaintiffs define the "major concert venues" for their other claims, they include arenas and large amphitheaters in the same market. Ex. 72 (Hill) ¶13 n.3.

In *It's My Party*, the Fourth Circuit rejected a "major amphitheaters" market on summary judgment, concluding that there was no evidence "demonstrating that artists are so likely to stick to amphitheaters in the event of a price increase that amphitheaters comprise their own market." 811 F.3d at 682–83. The court acknowledged that some artists prefer amphitheaters, but reasoned that because "[a]rtists who prefer amphitheaters may nonetheless turn to a lower-priced substitute" to "allow[] the show to go on," there was no basis to exclude "venues such as similarly sized arenas or stadiums from the market definition." *It's My Party*, 811 F.3d 676 at 683. So too here.

It is Plaintiffs' burden to show why "similarly sized arenas or stadiums" must be excluded from the market definition. The only meaningful evidence they have offered on the issue is a "Hypothetical Monopolist Test" offered by their expert, Dr. Hill, supposedly showing that Live Nation could profitably increase the price it charges for its large amphitheaters. Ex. 72 (Hill) §9.1.3. The exercise is contrived and will be the subject of a *Daubert* challenge. But the very

15

approach begs the question of why an alleged monopolist left so much money on the table. Plaintiffs do not claim that Live Nation has ever *actually* charged artists monopoly prices at its large amphitheaters.  What the undisputed facts show, instead, is that buyers routinely substitute away from large amphitheaters to other similarly sized venues—even *without* being forced to switch by any kind of small-but-significant-nontransitory-increase-in-price.  *See, e.g.*, SUF ¶47. The "large amphitheaters" market therefore fails as a matter of law.

     **C.**    **Plaintiffs' Markets Centered On "Major Concert Venues" Fail**

Plaintiffs' remaining five alleged relevant markets are all defined based on customers that are limited in various ways to "major concert venues," as shown below:

| Alleged Market | Alleged Provider | Alleged Customer |
| --- | --- | --- |
| Provision of primary ticketing services to major concert venues | Primary ticketers | Major concert venues |
| Provision of primary concert ticketing services to major concert venues | Primary ticketers | Major concert venues |
| Provision of primary concert ticketing offerings to fans at major concert venues | Primary ticketers | Fans at major concert venues |
| Provision of concert booking and promotion services to major concert venues | Promoters | Major concert venues |
| Provision of promotion services to artists performing in major concert venues | Promoters | Artists performing in major concert venues |

Am. Compl. ¶225.

Plaintiffs define the phrase "major concert venues" in a way that is unrecognizable as a matter of plain English, industry practice, or any other source outside this specific litigation.  The definition they seek to give it is one no one would guess the term to mean, and it is not what the same term meant when the government challenged the Live Nation-Ticketmaster merger 15 years ago.  To boost Defendants' market shares, Plaintiffs limit the venue set to *exclude* stadiums, smaller amphitheaters, and large theaters, and *include* only amphitheaters and arenas  with "a

16

capacity of 8,000 or more and that hosted 10 or more concerts in at least one year" from 2017 to 2024. Ex. 72 (Hill) ¶139. All of the ticketing competition to serve other venues and all of the promoter competition to serve artists that play other venues is written out of the script. That does not even arguably track commercial reality. It is gerrymandering born of necessity, because all these monopoly claims fail otherwise.

### 1. Plaintiffs' Venue-Facing Ticketing Markets Fail

We begin with ticketing. Plaintiffs are trying to prevail on claims predicated on the counterintuitive proposition that competition for a ticketing contract matters to this case when it happens at an arena like Madison Square Garden, but not when it happens at a stadium like MetLife. That gambit fails as a matter of law.

Market definition generally aims to do two things: identify relevant competitors and provide the best estimate of relative strengths via the proxy of market share. *See Geneva Pharms.*, 386 F.3d at 496, 501. Here, there is no dispute about the identity of the relevant competitors. The parties agree that Ticketmaster, SeatGeek, AXS, Paciolan, and others compete to provide primary ticketing services to "major concert venues," however defined. SUF ¶1.

It is also undisputed that these companies do not provide ticketing services just to the set of venues Plaintiffs have now sought to define as "major concert venues." These companies provide primary ticketing services to all types of venues—from amphitheaters to arenas to stadiums, which all typically require the same basic ticketing functions (e.g., a website, a payment processor, a seating map, customer support, and physical ticketer readers). SUF ¶1–2 .

The question, then, comes down to whether Ticketmaster's supposedly higher share in "major concert venues" (as defined by Plaintiffs) signifies some level of control of that segment of the business that can translate into a greater ability to extract surplus from those specific venues,

but not others.  If not, then there is no inferential value to calculating Ticketmaster's share of that narrower market.

Plaintiffs contend these are "targeted customer markets" "defined around groups of vulnerable customers," and that such markets exist when "one group of customers may be subject to the targeted exercise of market power while other customers are not likely to be targeted." Ex. 72 (Hill) ¶¶103, 226.  Courts have recognized that "defining a product market based on a type of customer seems incongruous.  After all, one ordinarily thinks of a customer as purchasing a product in the market, and not as the product market itself." *Fed. Trade Comm'n v. Sysco*, 113 F. Supp. 3d 1, 37–39 (D.D.C. 2015) ("Defining a market around a targeted customer … is not free from controversy.").  But some courts have held that "[i]n appropriate circumstances," certain "targeted" customers "can be a proper subject of antitrust concern"—specifically, where there is a "core group of particularly dedicated, 'distinct customers,' paying 'distinct prices.'" *F.T.C. v. Whole Foods Mkt.*, 548 F.3d 1028, 1038 (D.C. Cir. 2008) (citations omitted).  "Markets to serve targeted customers are also known as 'price discrimination markets.'" *Sysco*, 113 F. Supp. 3d at 39.

On the undisputed facts of this case, Plaintiffs haven't come close to showing that "major concert venues" as they define the set constitute a "core group of particularly dedicated, 'distinct customers,' paying 'distinct prices,'" as they must to assert a "targeted customer" or "price discrimination" market.  *Whole Foods*, 548 F.3d at 1038–39.  In fact, they have no evidence whatsoever demonstrating that this limited subset of venues are victims of price discrimination.  Again, 15 years into the alleged monopolization campaign, that should be easy to prove if true.  But it is not true:  Plaintiffs' own expert acknowledges that the relevant data show no statistically

significant difference in Ticketmaster's margins or take rates comparing (a) Plaintiffs' "major concert venues" grouping and (b) venues outside it.  SUF ¶¶3–4.

Plaintiffs have "chosen to define the elements of the relevant market to suit [their] desire for high [Ticketmaster] market share, rather than letting the market define itself" and they have "not proffered sufficient evidence from which a factfinder could conclude that the customer base should be viewed so narrowly."  *PepsiCo v. Coca-Cola*, 114 F. Supp. 2d 243, 249 (S.D.N.Y. 2000) (rejecting plaintiff's targeted-customer market "insofar as it creates a 'strange red-haired, bearded, one-eyed man-with-a-limp classification'"), *aff'd*, 315 F.3d 101 (2d Cir. 2002).  There needs to be a basis consistent with the law for the jury to conclude that Ticketmaster's market share is 86% (as Plaintiffs contend), not 49% (as their expert calculates when stadiums are included).  *See* Ex. 72 (Hill) fig. 46; Ex. 79 (Hill Rebuttal) fig. 45.  There's none.  Plaintiffs' venue-facing primary ticketing market is thus impermissible as a matter of law and the claims that rely on it fail.

### 2.    Plaintiffs' Fan-Facing Primary Ticketing Market Fails

Plaintiffs' fan-facing market for "the provision of primary concert ticketing offerings to fans at major concert venues" also contravenes the law in numerous respects.

*First*, Plaintiffs' focus on "major concert venues" remains nonsensical.  There is no evidence that primary ticketing services *to fans*, whatever that might entail, involves something different at an arena as compared to a stadium, or at a 7,000 capacity amphitheater as compared to an 8,000 capacity amphitheater.  SUF ¶5.

*Second*, the product this market claims to be based on does not exist.  Fans do not buy "primary concert ticketing offerings"—they buy tickets.  SUF ¶6.  Primary ticketing companies compete against one another for venue-clients, not directly for the patronage of fans as secondary ticketing companies do.

*Third*, no fan-facing ticketing market can be limited to *primary* ticketing because from the perspective of a fan, a *primary* ticket to a Beyoncé concert is no different than a *secondary* ticket to the same concert. *See Stubhub v. Golden State Warriors*, 2015 WL 6755594, at *3 (N.D. Cal. Nov. 5, 2015) (holding that a "Primary Ticket Market" and a "Secondary Ticket Services Market" were "not cognizable as a matter of law," because "a 'primary' ticket to a Warriors game and a 'secondary' ticket to a Warriors game are 'commodities reasonably interchangeable by consumers for the same purposes'") (citation omitted).

*Fourth*, the geography of this "market" is all wrong. The geographic dimension of a market must include substitutable options to which "consumers can turn, as a practical matter, for supply of the relevant product." *Concord Assocs., L.P. v. Entertainment Properties Trust*, 817 F.3d 46, 53 (2d Cir. 2016). Here, Plaintiffs contend the geographic area of effective competition in this market is "the United States." Am. Compl. ¶225. But no fan-facing market could be national. To the contrary, "[a] purchaser of a concert ticket is hardly likely to look outside of her own area." *Heerwagen v. Clear Channel Comms.*, 435 F.3d 219, 228 (2d Cir. 2006). Tours might be promoted nationally, "but a higher price in Boston will not lead Boston purchasers to buy tickets for the same concert held in New York." *Id.*; *see also Ticketmaster v. RMG Techs.*, 536 F. Supp. 2d 1191, 1197 (C.D. Cal. 2008) (recognizing the same issue).

### 3.    Plaintiffs' Promotion Services And Concert Booking Markets Fail

We now turn to the promotion side of the case. Plaintiffs' alleged markets for the "provision of promotion services to artists performing in major concert venues" and the "provision of concert booking and promotion services to major concert venues" are likewise arbitrarily limited to "major concert venues" as they define the set. But that limitation is even less well-founded in these contexts than in ticketing. There is no evidence whatsoever that any major concert promoters limit themselves and their competitive efforts only to artists that play in this set of venues. Live

Nation's principal competitors such as AEG plainly compete for artists that want to play stadiums and other venue types left out of Plaintiffs' promotion market.  There is no basis in the record (much less common sense) to say that Beyoncé is in the relevant market for her arena tours but not for her stadium tours.

One might think Plaintiffs have in mind another price discrimination market.  Plaintiffs, however, have adduced no evidence at all that artists pay discriminatory prices when touring in this particular subset of venues or that these major concert venues pay "distinct prices" for booking services.  *Whole Foods*, 548 F.3d at 1038.  Instead, Plaintiffs attempt to justify this market with evidence that certain artists "prefer[] to perform at major concert venues."  Ex. 72 (Hill) ¶157.  But antitrust markets are not defined by customer preferences alone.  *See It's My Party*, 811 F.3d at 683 ("IMP's reliance on this evidence [that some artists prefer either amphitheaters or arenas] is akin to claiming that Pepsi and Coke are in different markets because consumers generally prefer one or the other"); *cf. Right Field Rooftops v. Chicago Baseball Holdings*, 87 F. Supp. 3d 874, 887 (N.D. Ill. 2015) ("While the Court accepts that there are some die-hard Cubs fans that would never attend a White Sox game, that does not mean that Cubs games constitute their own market."). There must be evidence that the preference is so pronounced that the customer is required to pay higher prices to satisfy it.  Here, there is no evidence that artists performing in these venues pay "distinct prices" for promotion services.  In fact, the undisputed evidence shows that promoters put together tour offers that include, under the same terms, *both* (a) "major concert venues" as Plaintiffs define the set and (b) numerous other venues.  SUF ¶39.  The undisputed evidence also shows that the same promoters provide booking services to both sets of venues.  SUF ¶56.  The distinction between the two is entirely artificial.

## II.    PLAINTIFFS' SECTION 2 MONOPOLIZATION CLAIMS FAIL BECAUSE THEY DO NOT DEMONSTRATE ANTICOMPETITIVE EFFECTS

Plaintiffs' monopolization claims require proof that Live Nation's conduct "indeed has the requisite anticompetitive effect." *Microsoft*, 253 F.3d at 58–59 (citations omitted). After extensive discovery, Plaintiffs have no direct or circumstantial evidence that the actions they say were illegal actually raised prices, lowered output, or otherwise caused tangible anticompetitive effects to consumers in any of the alleged ticketing, amphitheater, or promotion markets. Instead of real evidence of harm, Plaintiffs rely on presumptions and assumptions. That approach—coopted from the merger review context, where courts must look ahead and assess the *potential* for harm that *could* result—has no application in a case like this, where Plaintiffs allege that Live Nation has engaged in anticompetitive conduct for over a decade across six relevant markets. The challenged conduct must have resulted in observable or readily inferable *actual* anticompetitive effects or the plaintiff loses, period.

### A.    Plaintiffs Must Demonstrate Anticompetitive Effects To Prevail On Their Monopolization Claims

"[H]aving a monopoly does not by itself violate § 2 [of the Sherman Act]." *Microsoft*, 253 F.3d at 58. A firm violates Section 2 only when it "acquires or maintains … a monopoly by engaging in exclusionary conduct 'as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Id.* (quoting *Grinnell*, 384 U.S. at 570–71). "[T]o be condemned as exclusionary, a monopolist's act must have an 'anticompetitive effect.'" *Id.*

To make that showing, Plaintiffs must prove that the alleged conduct "harm[s] the competitive *process* and thereby harm[s] *consumers*." *Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 486 (S.D.N.Y. 2016) (citation and quotation marks omitted). "Harm to competition is different than harm to a single competitor or group of competitors, which does not necessarily

constitute harm to competition." *In re Google Digital Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 380 (S.D.N.Y. 2022) (citing *Brunswick v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 488 (1977) (quotation marks omitted)).

The United States will argue that it enjoys a relaxed standard for proving anticompetitive effects. We will address the merits of any such argument after it is made, not preemptively. But there is no version of such a standard that would allow the United States to prove anticompetitive effects with nothing but theory and speculation. "Speculation" that a defendant's conduct "can reasonably be expected," "might," or "could potentially" lead to harm "is not evidence of anticompetitive effects in the relevant markets"; "Plaintiffs are required to show with proof that the [defendant's] conduct indeed has the requisite anticompetitive effect." *United States v. Google*, 687 F. Supp. at 81; *see also MacDermid Printing Sols. v. Cortron*, 833 F.3d 172, 183 (2d Cir. 2016) (finding under the rule of reason that "in no precedential opinion in this Circuit has a plaintiff successfully proved an adverse effect on competition without offering evidence of changed prices, output, or quality").[4]

### B.    Plaintiffs Do Not Demonstrate Anticompetitive Effects In Their Venue-Facing Ticketing Markets

In the venue-facing ticketing markets where major concert venues are the customers, Plaintiffs contend that Live Nation engages in two forms of anticompetitive conduct: (1) "Ticketmaster signs long-term, exclusive primary ticketing contracts with major concert venues" and (2) "Live Nation conditions the provision of Live Nation concerts to major concert venues on those venues' use of Ticketmaster's primary concert ticketing services." Ex. 72 (Hill)

---

[4] *MacDermid* was a Section 1 case, but courts in the Second Circuit apply the rule-of-reason framework to Section 2 monopolization claims. *See, e.g.*, *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 652 (2d Cir. 2015).

¶20.  With respect to the contracts, it is unclear whether Plaintiffs' problem is with the exclusivity, the length, or the combination of the two.  But regardless, Plaintiffs assert that this alleged conduct causes three types of anticompetitive effects: (1) the contracts "foreclose competition from rivals by locking up most major concert venues"; (2) the contracts reduce the ability of rival ticketers to achieve the benefits of scale; and (3) Live Nation's alleged "conditioning" raises rival ticketers' costs in their dealings with venues because they have to compensate for the venues' loss of Live Nation content—all of which supposedly reduce rivals' ability to compete with Ticketmaster. Ex. 72 (Hill) §§2.2, 10.2.1; Am. Compl. ¶¶225–227.

Note that none of those arguments is about effects on consumers—that they paid more, or got less, because of these practices.  On the undisputed facts, these theories are solely about effects on rivals, without more.  They are thus incomplete and all fail.

1.    Plaintiffs Fail To Demonstrate That Ticketmaster's Exclusive Contracts Foreclose Competition

"[T]he Supreme Court has long held that [exclusive dealing] agreements, whether challenged under Section 1 or Section 2, are presumptively procompetitive and lawful."  *In re Mylan N.V. Sec. Litig.*, 666 F. Supp. 3d 266, 291 (S.D.N.Y. 2023).  Courts may hold an exclusive dealing agreement unlawful only if it "will foreclose competition in a substantial share of the market."  *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961).[5]

In analyzing foreclosure, it is "well established that exclusive agreements do not harm competition when there is competition to obtain the exclusive contract."  *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 117 (S.D.N.Y. 2015); *see also Indeck Energy Servs. v. Consumers*

---

[5] Where the exclusive dealing agreements at issue lack the requisite substantial "foreclosure," one could conclude either that there is no exclusionary conduct or that there are no anticompetitive effects.  We address the lack of foreclosure question under the rubric of effects, but the analysis (and conclusion) is the same either way.

*Energy*, 250 F.3d 972, 977–78 (6th Cir. 2000) (affirming summary judgment on Section 1 and 2 claims "in light of the fact that the exclusive contracts were of limited duration, and in light of the fact that the customers were free to seek other [suppliers] at the conclusion of the contracts"); *Mazda v. Carfax*, 2016 WL 7231941, at *16 (S.D.N.Y. Dec. 9, 2016), *aff'd*, 726 F. App'x 66 (2d Cir. 2018) (similar).  Indeed, "[c]ompetition-for-the-contract is a form of competition that antitrust laws protect rather than proscribe."  *Paddock Publ'ns v. Chi. Tribune*, 103 F.3d 42, 45 (7th Cir. 1996).

The Second Circuit has reasoned that when a buyer is free to enter into a new agreement with other sellers at the end of its current exclusive agreement, "[s]uch a situation may actually encourage, rather than discourage, competition, because the incumbent and other, competing [sellers] have a strong incentive continually to improve the [quality] and prices they offer in order to secure the exclusive position."  *Balaklaw v. Lovell*, 14 F.3d 793, 799 (2d Cir. 1994).  *Spinelli*, for instance, held that agreements with three-year exclusivity periods that went up for bidding at the conclusion of each agreement's term did not "foreclose competition and [we]re not anticompetitive as a matter of law."  96 F. Supp. 3d at 117.  The court noted that because "there was competition to obtain the exclusive contract," the plaintiffs could not "plausibly allege market foreclosure and harm to competition stemming from the challenged agreements."  *Id.* at 118; *see also Ferguson v. Greater Pocatello Chamber of Commerce*, 848 F.2d 976, 982 (9th Cir. 1988) (six-year exclusive contracts obtained through competitive bidding were lawful).

In the ticketing industry, it is undisputed that venues prefer and seek out exclusive contracts—using competitive RFP processes that pit ticketing companies against each other and generate escalating offers to win their business.  SUF ¶¶13–14, 21.  Venues are frequently made better off by virtue of that competition, which drives the price of up-front payments and the venues'

split of ticketing fees.  SUF ¶¶13–14, 20.  There are many examples of competitors bidding against Ticketmaster and winning their own exclusive deals.  SUF ¶¶15–19, 26.  And many other examples of competitive bidding resulting in the venue choosing Ticketmaster—but with relatively better financial terms for the venue.  SUF ¶20.

This competitive landscape has existed in the ticketing industry for decades—and in fact one court already held specifically that Ticketmaster's exclusive contracts do not violate the Sherman Act *because they are won competitively*.  *See Ticketmaster v. Tickets.com*, 2003 WL 21397701 (C.D. Cal. Mar. 7, 2003), *aff'd*, 127 F. App'x 346 (9th Cir. 2005).  In *Tickets.com*, the court observed that "virtually all long term contracts [we]re awarded after some form of bidding competition," and "every time a contract [wa]s up for renewal (about 20% or more of the total per year)," Ticketmaster and other ticketing companies "ha[d] the opportunity to compete for the contract."  *Id.* at 4.  The fact that Ticketmaster "won the majority of these competitions show[ed] only that the contracting venue believe[d] that [Ticketmaster] offer[ed] the better deal."  *Id.* Because of "the bidding nature of the competition" in which competitors "[were] fully able to join," the court determined that Ticketmaster could not "control prices or exclude competitors." *Id.*  The court also noted that Ticketmaster's exclusive contracts were "commercially reasonable" because "[t]he evidence point[ed] very strongly to the conclusion that the venues themselves prefer[red] long term exclusive contracts for their own reasons"; "that they ha[d] the economic power to resist long term contracts if it were in their interests to do so"; and that "[v]irtually no venues ha[d] complained about long term contracts or felt forced into them against their desires." *Id.* at 5.  The court called venues' preference for long-term contracts "overwhelming[]" and noted that the preference makes sense—long-term contracts ensure continuity and predictability, which leads to customer usage and satisfaction; they allow venues to fix costs for a longer period of time

and to avoid frequent renegotiation costs; and they enable venues to demand larger up-front payments. *Id.* Ticketing companies beyond just Ticketmaster enter into long-term exclusive contracts with venues, "not for the purpose of excluding competition, but for the mutual economic benefit of both" the companies and the venues. *Id.*; *see also* SUF ¶26. The court granted summary judgment on these bases, and the Court should do the same here.

2.    Plaintiffs Fail To Demonstrate That Ticketmaster's Exclusive Contracts
Prevent Rivals From Achieving Scale

Plaintiffs attempt to circumvent *Tickets.com* by asserting that Ticketmaster's exclusive ticketing contracts deprive rivals of scale. Ex. 72 (Hill) ¶20. The undisputed evidence refutes Plaintiffs' theory. Two competing ticketing companies—AEG, through AXS, and SeatGeek—have entered and reached viable scale in Plaintiffs' alleged "major concert venues" market during the period of allegedly anticompetitive conduct. *See* SUF ¶¶12, 15, 17. And Ticketmaster's competitors consistently demonstrate that they can compete for and win lucrative ticketing contracts with large venues that fall outside the allegedly restrained markets. For example, SeatGeek has won ticketing contracts with multiple stadiums in recent years. SUF ¶16. This opportunity to attain the benefits of scale from other venue customers, outside the market as Plaintiffs define it, for whom the same set of ticketing competitors routinely compete also dooms the no-ability-to-obtain-scale theory.

3.    Plaintiffs Fail To Demonstrate Anticompetitive Effects Resulting From
Alleged "Threats" or "Retaliation"

With respect to Plaintiffs' allegation that Ticketmaster coerces venues into contracting with Ticketmaster by withholding (or threatening to withhold) Live Nation content, Plaintiffs advance a "raising rivals' costs" theory that this supposed conduct "creates an additional implicit cost for rival primary concert ticketers—i.e., a venue that replaces Ticketmaster must factor in the cost of a likely reduction in access to Live Nation shows—and reduces rivals' ability to compete with

27

Ticketmaster." Ex. 72 (Hill) ¶20. To support that theory, Plaintiffs have an analysis purporting to show that venues that don't use Ticketmaster get fewer Live Nation concerts, with an associated theoretical cost to the ticketing company to make up the difference. *See* Ex. 72 (Hill) ¶¶323, 331–357; Ex. 79 (Hill Rebuttal) ¶¶308–311. This theory fails.

First, Plaintiffs have no evidence supporting their theory that rival ticketers' costs "unavoidably and significantly increase[d]" as a result of Live Nation's conduct. *See* Krattenmaker & Salop, *Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power Over Price*, Yale Law Journal 96, no. 2 (1986) ("Krattenmaker"), at 230. Plaintiffs point out that ███████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████. Ex. 72 (Hill) ¶361. The thing is, ████████████████████████████████████████ ███████████████. SUF ¶¶32–34. That one ticketer ██████████████████████████ ████████████████████ does not demonstrate that rival ticketers' costs "unavoidably and significantly increase[d]." The analysis can—and should—end here.

Second, even if Plaintiffs had evidence that rival ticketers' costs did increase, a legally viable raising-rivals'-costs theory would ask whether the rivals have an effective counter-strategy—for example, ████████████████████ promising to compensate the customer for its potential loss. *See* Krattenmaker at 252 ("rivals must lack effective counterstrategies"). Only if none were available would the effect of raising the rivals' costs amount to harm to competition, as opposed to harm to competitors. Here, Plaintiffs' theory treats the bare fact of (ostensibly) raised costs as sufficient to constitute harm to competition proven, in part, by ████████████████████ ███████████████. That approach has no basis in the law or the underlying economics literature, which emphasizes that a raising-rivals-costs theory can plausibly harm consumer welfare only

where rivals are so crippled that the defendant effectively winds up with "power over price." *Id.* at 230. There is nothing close to that evidence in this case.

If that were not enough, Plaintiffs have not even attempted to show causation between (a) the supposedly lower Live Nation show counts for venues that don't use Ticketmaster and (b) any effects on rivals' costs. They just presume that if non-Ticketmaster venues get fewer Live Nation shows, that must be the result of a deliberate cost-raising strategy. But that doesn't follow—particularly given that the venues deposed in this case almost uniformly confirmed that Live Nation *never* threatened or retaliated against them.[6] SUF ¶28; *see Natsource v. GFI Grp*, 332 F. Supp. 2d 626, 637 (S.D.N.Y. 2004) ("There can be no violation of the antitrust laws unless *the challenged conduct* has harmed consumers….") (emphasis added); *see also A.V.E.L.A. v. Est. of Marilyn Monroe*, 241 F. Supp. 3d 461, 481 (S.D.N.Y. 2017) ("A Section Two plaintiff must also allege causation—i.e., that anticompetitive conduct occurring in connection with obtaining or retaining a monopoly position is proximately related to [the] injuries.") (citation omitted). In fact, Plaintiffs' own expert disavowed any connection between the alleged threats and the show-count changes, admitting that his analysis of content-switching was "not necessarily related to the threat"—rather, he simply looked at "whether the content switched." Ex. 145 (Hill Tr.) 310:8–16.

---

[6] Only three venues (and one within the last five years) testified about alleged threats or retaliation. SUF ¶¶29-31. Plaintiffs also rely on deposition testimony from rival ticketers who said they lost ticketing contracts with venues because the venues were afraid of potential Live Nation content loss. Ex. 72 (Hill) ¶¶363-366. These statements—which are not supported by testimony from the venues themselves—constitute inadmissible hearsay and cannot be considered in ruling on Live Nation's summary judgment motion. *See Raskin v. Wyatt*, 125 F.3d 55, 66-67 (2d Cir. 1997) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.").

But that concession gives away the game: it leaves a gaping hole where Plaintiffs' proof of causation of anticompetitive effects needs to be.

*      *      *

Ultimately, Plaintiffs want to hold Live Nation liable for a "perception" or "fear" that, at most, *rival ticketing companies* say exists simply because Live Nation owns Ticketmaster. But Plaintiffs did not bring a challenge to the merger; in fact, they have disclaimed it. Ex. 145 (Hill Tr). 525:24–526:6. Simply *being* a vertically integrated concert-promoter and ticketing company is not actionable—and Plaintiffs cannot frame as "anticompetitive effects" alleged harms resulting simply from the fact of vertical integration, as opposed to conduct that might actually be illegal. *See Google*, 687 F. Supp. 3d at 81.

### C.    Plaintiffs Do Not Demonstrate Anticompetitive Effects In Their Amphitheater Market

Plaintiffs' theory of harm in their alleged "large amphitheater" market—where venues are the seller and artists are allegedly the customers—is that Live Nation's "serial acquisitions, long-term leases, and long-term exclusive booking arrangements" have "reduced competition among major concert amphitheaters to attract artists," thereby harming artists. Ex. 72 (Hill) ¶20. But Plaintiffs have no evidence that artists were paid less as a result of Live Nation's alleged "control" of amphitheaters, or that output of performances decreased. Plaintiffs rely instead on an analysis of market concentration (as measured by the Herfindahl-Hirschman Index ("HHI")), which purports to show the change in HHI due to Live Nation's "control" of amphitheaters since 2015 is sufficient to "presume" a "substantial reduction in competition under the Merger Guidelines." Ex. 72 (Hill) ¶386, fig. 85. But this "presumption" is insufficient. This is not a merger case; it's a monopolization case—and Plaintiffs "are required to show with proof 'that the monopolist's

conduct *indeed* has the requisite anticompetitive effect.'" *Google*, 687 F. Supp. 3d at 81 (citation omitted). Plaintiffs have not done so.

### D. Plaintiffs Do Not Demonstrate Anticompetitive Effects In Their Promotion Markets

In their artist-facing promotion market (where artists are the customers), Plaintiffs' theory is that Live Nation "deters entry and expansion by rival promoters through serial acquisitions of promoters and coopting potential promotions rivals," which "reduces the ability of rival promoters to compete with Live Nation." Ex. 72 (Hill) ¶20. But there is no evidence that the promoters Live Nation acquired ever meaningfully competed for national tours of artists in Plaintiffs' alleged market—i.e., artists who play "major concert venues"—or that these regional players would have entered the national promotion space absent Live Nation's acquisition or partnership. *See* SUF ¶¶40–41. Plaintiffs assert that these promoters had "a strong presence in targeted regions across the country," Ex. 79 (Hill Rebuttal) ¶¶393–394, but even if true, this does not prove that these players ever competed or might have competed in the actual promotions market Plaintiffs define, which is *nationwide*, *see* Ex. 72 (Hill) ¶175. Plaintiffs also have no evidence whatsoever that the customers in their market—some of the most popular and powerful artists in the world—were harmed as a result of Live Nation's acquisitions. Plaintiffs do not (and cannot) show that artists market-wide made less money, performed fewer shows, or otherwise experienced anticompetitive effects from these regional promoter acquisitions. *See Shak*, 156 F. Supp. 3d at 486; *MacDermid*, 833 F.3d at 183; *cf.* Ex. █ (███████████████) at -444.

Finally, Plaintiffs barely even attempt to show anticompetitive effects in their alleged venue-facing "concert booking" market (where venues are the customers). None of the supposed anticompetitive conduct that their expert discusses takes place in this market, *see* Ex. 72 (Hill)

§10, and he does not say "how Live Nation's conduct harms the competitive process" in this market, *id.* ¶321. *See also id.* ¶20.

## III.  PLAINTIFFS' SECTION 1 EXCLUSIVE DEALING CLAIM FAILS

Plaintiffs' second claim challenging Ticketmaster's long-term exclusive agreements with venues as unlawful under Section 1 of the Sherman Act fails as a matter of law.

*First*, as discussed above, the undisputed evidence shows that Ticketmaster's exclusive ticketing contracts do not harm competition.  Plaintiffs' Section 1 claim fails for the same reason. *See E & L Consulting, Ltd. v. Doman Industries Ltd.*, 472 F.3d 23, 31 (2d Cir. 2006) (affirming dismissal of Section 1 and Section 2 claims because "the complaint fails to allege facts that would show that the exclusive distribution agreement … harms competition"); *Tickets.com*, 2003 WL 21397701, at *7 ("The result [under Section 1] is the same as under the monopoly analysis.").

*Second*, challenges to exclusive dealing under Section 1 cannot aggregate contracts as is allowed under Section 2.  *See, e.g.*, *Dickson v. Microsoft Corporation*, 309 F.3d 193, 203–05 (4th Cir. 2002) (declining to consider licensing agreements between Microsoft and various OEMs in the aggregate and analyzing each agreement "individually" instead); *Howard Hess Dental Laboratories v. Dentsply International*, 602 F.3d 239, 255–56 (3d Cir. 2010) (requiring plaintiffs to show that "every single agreement" between a manufacturer and its dealers had anticompetitive effect); *Gibson v. Cendyn Group*, 148 F.4th 1069, 1087 (9th Cir. 2025) (finding that "a grouping of individual agreements could not be 'aggregated' for the purposes of determining whether together they acted as an unreasonable restraint of trade," and requiring that the agreements "have a 'discrete effect' on competition"); *Panini America v. Fanatics*, 2025 WL 753954, at *9 (S.D.N.Y. Mar. 10, 2025) (refusing to "consider the effects of [] six exclusive deals together" and considering the effect of each separately instead).

Plaintiffs have not even attempted to show that particular Ticketmaster exclusive contracts have anticompetitive effect.  *See* Ex. 72 (Hill) §10.2 (discussing alleged anticompetitive effects of exclusive contracts in totality, not individually).  Summary judgment on this claim is thus warranted.

## IV.    PLAINTIFFS' CLAIM THAT DEFENDANTS UNLAWFULLY TIE AMPHITHEATERS TO PROMOTION SERVICES FAILS

This Court previously declined to dismiss Plaintiffs' tying claim because the evidence might show that artists are the consumers in the large amphitheater market or that there was something more to Plaintiffs' alleged tie than a unilateral refusal to deal.  ECF No. 483 ("MTD Order") at 4.  Following extensive discovery, there is evidence of neither.  The evidence shows that promoters (not artists) rent venues and confirms that Live Nation's practice of refusing to rent its venues to rival promoters is a classic refusal to deal and nothing more.  *See* SUF ¶¶44–45, 51.  Plaintiffs' claim also fails because they have adduced no evidence that Live Nation coerces artists into purchasing a product they do not want or that the alleged tie has anticompetitive effects.

### A.    Live Nation Has No Duty To Deal With Rivals

Plaintiffs allege that Live Nation has tied access to its amphitheaters (the tying product) with its promotion services (the tied product), forcing artists who want to rent its amphitheaters to also purchase its promotion services.  As this Court acknowledged, Plaintiffs' tying claim is premised on the theory that artists are the "consumers in the large-amphitheater market."  MTD Order at 3.  This is what allegedly transforms Live Nation's policy from a lawful refusal to deal to an unlawful tie.

After hundreds of hours of deposition testimony and millions of produced documents, Plaintiffs found no example of an artist entering into a direct contractual relationship to rent a venue—much less being refused such an agreement.  Undisputed evidence shows that only

promoters take the risk of signing such contractual agreements.  SUF ¶¶38, 51–52.  And the evidence shows these agreements are not made on behalf of artists in a principal-agent capacity; promoters enter the agreements on their own behalf to further their own, independent commercial objectives.  *See* SUF ¶¶51–55.

Promoters compete to "purchase[]" artists' services and buy their performances for financial gain.  SUF ¶36.  As in any competitive marketplace, promoters work hard to make their offers attractive to artists, competing to satisfy artists' wishes for how many shows to perform, which venues to play, and how much the artists desire to earn.  SUF ¶37.  Some promoters enter into standing contractual relationships with venues that apply to any artist the promoter may book.  SUF ¶53.  These standing relationships make these promoters more competitive in the bidding process.  SUF ¶54–55.  That artists desire to play certain venues, and that promoters aim to fulfill that desire, does not mean that promoters are the agents of artists or that artists are the consumers of venues.  It simply means that artists have purchasing power in the promotions market and use it to secure the most favorable terms from promoters, not all of whom can place artists in the same venues.

Because the undisputed evidence shows that promoters—not artists—rent venues, Live Nation's policy of refusing to share its property with rival promoters is an ordinary refusal to deal.  Courts have "long recognized [the] right of a [firm] engaged in an entirely private business, freely to exercise [its] own independent discretion as to parties with whom [it] will deal."  *Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)); *see also Pac. Bell Tel. Co. v. linkLine Commc'ns*, 555 U.S. 438, 449 (2009) (firm has "no antitrust duty to deal with its rivals"); *Novell v. Microsoft*, 731 F.3d 1064, 1074 (10th Cir. 2013).

The "broad right of a firm to refuse to deal with its competitors" is the principle that applies in all cases unless the law provides an exception. *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 134 (2d Cir. 2014); *see also Viamedia v. Comcast*, 951 F.3d 429, 454 (7th Cir. 2020) (protection of refusals to deal is the "general rule"). The Supreme Court has identified only one, "narrow-eyed" exception in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985). *Novell*, 731 F.3d at 1074. This exception requires a plaintiff to allege and prove that the defendant terminated a presumably profitable prior course of dealing. *See Adderall*, 754 F.3d at 135. Plaintiffs did not allege such a claim and have adduced no evidence to support it, and therefore the standard rule from *Trinko* is dispositive. *See Trinko*, 540 U.S. at 408; *see also In re WorldCom Sec. Litig.*, 308 F. Supp. 2d 338, 345 (S.D.N.Y. 2004) ("A party must plead the theories of liability it wishes to pursue.").

In denying Defendants' motion to dismiss, the Court relied heavily on *Viamedia* to say that *if* Plaintiffs could show some "plausible allegation of a violation separate and apart from a unilateral refusal to deal," the claim might survive. MTD Order at 2. They have not. If anything, *Viamedia*'s reasoning underscores why Plaintiffs' claims fail. There, plaintiffs alleged that Comcast refused to deal with rivals in violation of *Aspen Skiing*. *See Viamedia*, 951 F.3d at 453. The district court dismissed the *Aspen Skiing* claim on the pleadings. *Id.* The Seventh Circuit reversed that dismissal, finding that under *Aspen Skiing*, Comcast's refusal-to-deal was actionable. This holding directed the outcome of the related tying claim. *See id.* ("Viamedia alleged a prima facie refusal-to-deal claim. Such potentially illegal conduct cannot justify Comcast's related tying of Interconnect services to ad rep services…."). Because plaintiffs had alleged and carried their burden to show that *Aspen Skiing*'s narrow, limited exception applied, Comcast could not avail

itself of *Trinko*'s generally applicable protection of refusals to deal.  And because Comcast's actions were not legally protected, the tying claim was actionable.  The opposite is true here.

### B.      Plaintiffs Cannot Prove The Elements Of Tying

Even if artists had sought to rent Live Nation's amphitheaters, Plaintiffs' claim would still fail on the prima facie tying elements.  To prove a tie, Plaintiffs must show "evidence of actual coercion by the seller that forced the buyer to accept the tied product," *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996), and that "the tie-in has anticompetitive effects in the tied market," *Kaufman v. Time Warner*, 836 F.3d 137, 141 (2d Cir. 2016).  Plaintiffs have not adduced a single example of a coerced purchase, nor have they shown harm to *artists* (the consumers in the tied-product market).  Indeed, the only *actual artist* they deposed— ████████████████ ████—testified that ████████████████████████████████████.  SUF ¶¶48– 50.  And Plaintiffs have adduced no evidence that artists had to pay higher prices for promotion services; that the quality of promotion services suffered by virtue of the tie; or that the tie reduced output of promotion services.  *See MacDermid*, 833 F.3d at 183.

## V.    STATE PLAINTIFFS' CLAIMS FAIL

State Plaintiffs' state law claims fail for the same reasons their Sherman Act claims fail. *See supra* Sections I–IV.[7]  They also fail because State Plaintiffs lack Article III standing to assert

---

[7] Numerous states have enacted provisions harmonizing their antitrust statutes with the Sherman Act.  *See* Ariz. Rev. Stat. §44-1412; Conn. Gen. Stat. §35-44b; D.C. Code §28-4515; Fla. Stat. § 542.32; 740 Ill. Comp. Stat. 10/11; Iowa Code § 553.2; Kan. Stat. §50-163; Md. Code Ann., Com. Law §11-202; Mich. Comp. Laws §445.784; Neb. Rev. Stat. §59-829; Nev. Rev. Stat. §598A.050; N.H. Rev. Stat. §356:14; N.J. Stat. §56:9-18; N.M. Stat. §57-1-15; Okla. Stat. tit. 79, §212; R.I. Gen. Laws §6-36-2(b); S.C. Code §39-5-20; Tex. Bus. & Com. Code §15.04; Utah Code § 76-16-502; Vt. Stat. tit. 9, §2453; Va. Code Ann. § 59.1-9.17; Wash. Rev. Code §19.86.920; W. Va. Code §47-18-16.  In other states, case law indicates that courts interpret their state antitrust statutes in line with the Sherman Act.  *See Ports Petroleum Co. of Ohio v. Tucker*, 323 Ark. 680, 916 S.W.2d 749, 754 (1996) (Arkansas); *People ex rel. Woodard v. Colo. Springs Bd. of Realtors*, 692 P.2d 1055, 1061 (Colo.1984) (Colorado); *Brownsburg Cmty. Sch. v. Natare*, 824 N.E.2d 336, 339 (Ind.

"sovereign capacity" claims and because they fail to demonstrate antitrust injury on their *parens patriae* claims.

### A.      State Plaintiffs Lack Article III Standing To Assert Sovereign Capacity Claims

To the extent the State Plaintiffs assert claims in their sovereign capacities, those claims fail for lack of Article III standing.  To satisfy Article III standing requirements, each State Plaintiff must show a "tangible interference with its authority to regulate or enforce [its] laws."  *Harrison v. Jefferson Par. Sch. Bd*, 78 F.4th 765, 769–74 (5th Cir. 2023) (quoting *Saginaw Cnty. v. STAT Emergency Med. Servs.*, 946 F.3d 951, 957 (6th Cir. 2020)).  State Plaintiffs do not even *allege* this, let alone adduce evidence to prove it.  Live Nation is entitled to summary judgment on all claims State Plaintiffs assert in their sovereign capacity.

### B.      State Plaintiffs Fail To Demonstrate Antitrust Injury On Their *Parens Patriae* Claims

State Plaintiffs' *parens patriae* claims fail too.  State Plaintiffs must demonstrate antitrust injury to prevail on their Sherman Act claims and the state law antitrust claims they bring in their *parens patriae* capacities.  *See New York v. Microsoft Corp.*, 209 F. Supp. 2d 132, 140 (D.D.C. 2002) (in a suit brought by state attorneys general, discussing the need to prove "antitrust injury" in both Clayton Act Section 4 claims for damages and Clayton Act Section 16 claims for injunctive

---

2005) (Indiana); *La. Power & Light v. United Gas Pipe Line*, 493 So.2d 1149, 1154 (La. 1986) (Louisiana); *Minn. Twins P'ship v. State ex rel. Hatch*, 592 N.W.2d 847, 851–52 (Minn. 1999) (Minnesota); *Ga. Pac. v. Cook Timber*, 194 So. 3d 118, 124 (Miss. 2016) (Mississippi); *Anheuser-Busch, Inc. v. Abrams*, 525 N.Y.S.2d 816, 820 (1988) (New York); *Rose v. Vulcan Materials*, 282 N.C. 643, 655 (1973) (North Carolina); *C.K. & J.K. v. Fairview Shopping Ctr.*, 63 Ohio St. 2d 201, 204 (1980) (Ohio); *Prentice v. Title Ins. Co. of Minn.*, 176 Wis.2d 714, 724, 500 N.W.2d 658 (1993) (Wisconsin); *Spahr v. Leegin Creative Leather Prods.*, No. 2:07-CV-187, 2008 WL 3914461, at *12 (E.D. Tenn. Aug. 20, 2008) (Tennessee).  Additionally, certain State Plaintiffs—Arkansas, California, Florida, Iowa, Louisiana, Nebraska, South Carolina, and Vermont—assert claims under their consumer protection laws, but they have no evidence supporting these claims beyond what they have adduced for their Sherman Act claims.  All state law claims fail on these bases.

relief); *Pennsylvania v. Nat'l Collegiate Athletic Ass'n*, 948 F. Supp. 2d 416, 432 (M.D. Pa. 2013) (plaintiff state suing in its *parens patriae* capacity "must adequately allege both an antitrust injury and demonstrate that it has antitrust standing"); *supra* note 7 (state antitrust laws harmonize with the Sherman Act). To demonstrate antitrust injury, a plaintiff must prove that it has suffered an injury "of the type the antitrust laws were intended to prevent and that flows from that which makes [or might make] defendants' acts unlawful." *Gatt Commc'ns v. PMC Assocs.*, 711 F.3d 68, 76 (2d Cir. 2013) (citations omitted). State Plaintiffs have not done so.

As this Court has recognized, "the complaint in this case carves the primary-ticketing market into several different markets, and … the consumers didn't participate in those markets where the alleged anticompetitive acts took place." MTD Order at 6. Live Nation's alleged anticompetitive conduct (long-term exclusive ticketing contracts and "conditioning") occurred in the venue-facing market where *venues* are the customers, while the alleged injury (harm to fans in the form of supracompetitive fees) occurred in the fan-facing market where *fans* are the customers. *See id.* at 4 n.1. State Plaintiffs fail to demonstrate antitrust injury because "to suffer antitrust injury, the putative plaintiff must be a participant in the very market that is directly restrained." *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 161 (2d Cir. 2016).

In its order on Live Nation's motion to dismiss, this Court distinguished *Aluminum Warehousing* on the basis that "[h]ere, the consumers directly purchased from defendants the thing that the monopolistic conduct was focused on—primary-ticketing services." MTD Order at 6; *see also id.* at 6 ("Whatever market definitions one employs, where a defendant unlawfully maintains its monopoly over a product through a course of exclusionary conduct focusing on *that product*, consumers of *that product* alleging they were overcharged suffer a cognizable injury.") (emphasis added). The evidence does not support this. There is a critical distinction between *ticketing*

*services* (the focus of the alleged monopolistic conduct) and *tickets* (what fans actually purchase). *See supra* Section I.C.2. Indeed, State Plaintiffs do not measure their supposed injuries based on the purchase of *ticketing services* (nor could they, because this is not something fans buy); they measure them based on the purchase of *tickets*. Ex. 73 (Abrantes-Metz) figs. 34–37 .

*In re DDAVP Direct Purchaser Antitrust Litigation* and *Blue Shield of Virginia v. McCready*—on which the Court relied in the motion to dismiss order—are distinguishable on this basis. In *DDAVP*, the defendants' exclusionary conduct focused directly on the *same product* (a drug) that the plaintiffs purchased. 585 F.3d 677, 683, 688 (2d Cir. 2009). And in *McCready*, the plaintiff alleged that she was a "consumer of *psychotherapeutic services* and that she had been injured by the defendants' conspiracy to restrain competition in the market *for such services*." *Associated Gen. Contractors of California v. California State Council of Carpenters*, 459 U.S. 519, 538 (1983) (describing *McCready*, 457 U.S. 465, 484 (1982)) (emphasis added). In such circumstances, "the consumers' injury is 'clearly foreseeable,' 'inextricably intertwined' with the anticompetitive conduct, and 'flows from that which makes [the] defendants' acts unlawful.'" MTD Order at 6 (citations omitted). But that is not this case: fans purchase a different product, in a different market, than the product in the venue-facing market where the alleged conduct occurs and, as a result, the alleged conduct and injury are not "inextricably intertwined."

## CONCLUSION

For the reasons stated above, Live Nation is entitled to summary judgment on all of Plaintiffs' claims.

Dated: November 11, 2025

LATHAM & WATKINS LLP

_____
Andrew M. Gass (admitted *pro hac vice*)
Alfred C. Pfeiffer (admitted *pro hac vice*)
    *Co-Lead Trial Counsel*
David R. Marriott
    *Co-Lead Trial Counsel*
Timothy L. O'Mara (admitted *pro hac vice*)
Jennifer L. Giordano
Kelly S. Fayne (admitted *pro hac vice*)
Lindsey S. Champlin (admitted *pro hac vice*)
Robin L. Gushman (admitted *pro hac vice*)

505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600

1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

555 11th Street, NW, Suite 1000
Washington, D.C. 20004
(202) 637-2200

Al.Pfeiffer@lw.com
David.Marriott@lw.com
Tim.O'Mara@lw.com
Jennifer.Giordano@lw.com
Andrew.Gass@lw.com
Kelly.Fayne@lw.com
Lindsey.Champlin@lw.com
Robin.Gushman@lw.com

*Attorneys for Defendants Live Nation*
*Entertainment, Inc. and Ticketmaster L.L.C.*

CRAVATH, SWAINE & MOORE LLP

_____
Lauren A. Moskowitz
Jesse M. Weiss
Nicole M. Peles

Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 474-1000

lmoskowitz@cravath.com
jweiss@cravath.com
npeles@cravath.com

*Attorneys for Defendants Live Nation*
*Entertainment, Inc. and Ticketmaster L.L.C.*

## **CERTIFICATE OF COMPLIANCE**

I, Andrew M. Gass, an attorney duly admitted to practice before this Court, hereby certify pursuant to Local Rule 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rules"), Rule 8(C) of Judge Arun Subramanian's Individual Practices in Civil Cases ("Individual Rules"), and the Court's Order granting Defendants an expansion of the word limit for the briefing on their summary judgment motion (ECF No. 660), that the foregoing Memorandum of Law was prepared using Microsoft Word, and contains 12,517 words. In making this calculation, I have relied on the word and page counts of the word-processing program used to prepare the document.

Dated:  November 11, 2025
        San Francisco, California

_____
Andrew M. Gass