**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA, et al.,

                Plaintiffs,

   v.

LIVE NATION ENTERTAINMENT, INC.,
and TICKETMASTER L.L.C.,

                Defendants.

Case No. 1:24-cv-03973-AS-SLC

**ORAL ARGUMENT REQUESTED**

**REDACTED**

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION TO PARTIALLY
EXCLUDE THE EXPERT TESTIMONY OF PAUL K. MEYER**

November 13, 2025

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 2

LEGAL STANDARD .................................................................................................... 6

ARGUMENT ................................................................................................................. 8

I.   Mr. Meyer's Cross-Industry Comparisons Do Not Meet the Standards for
     Admissibility ........................................................................................................ 9

     A.   Comparisons Between Live Nation and Companies in Unrelated Industries Are
          Uninformative, Unreliable, and Would Mislead the Jury .............................. 9

     B.   Mr. Meyer Improperly Relies on Company-Wide Accounting Metrics ................... 12

II.  Mr. Meyer's Pseudo-Economic Opinions Do Not Meet the Standards for
     Admissibility. ..................................................................................................... 14

CONCLUSION ........................................................................................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bailey v. Allgas, Inc.*,
    148 F. Supp. 2d 1222 (N.D. Ala. 2000) ................................................................. 9

*Bailey v. Allgas, Inc.*,
    284 F.3d 1237 (11th Cir. 2002) ............................................................. 9, 10, 12, 13

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ......................................................................................... 6, 7, 8

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    No. 11 MDL 2262 (NRB), 2025 WL 2733020 (S.D.N.Y. Sept. 25, 2025) ............... 8

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
    341 F. Supp. 3d 213 (S.D.N.Y. 2018), *aff'd*, 982 F.3d 113 (2d Cir. 2020) ............... 7

*In Re: Acetaminophen – ASD-ADHD Prods. Liab. Litig.*,
    22-md-2043, 2024 WL 3357608 (S.D.N.Y. July 10, 2024) ..................................... 7

*Kumho Tire Co.*,
    526 U.S. 137 (1999) ................................................................................................ 8

*Mirkin v. XOOM Energy LLC*,
    No. 18-CV-2949, 2025 WL 16333 (E.D.N.Y. Jan. 2, 2025) ............................. 10, 12

*Nora Beverages, Inc. v. Perrier Grp. Of Am., Inc.*,
    164 F.3d 736 (2d Cir. 1998) .................................................................................. 14

*Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*,
    No. 05-MD-1720, 2022 WL 15053250 (E.D.N.Y. Oct. 26, 2022) .......................... 12

*R.F.M.A.S., Inc. v. So*,
    748 F. Supp. 2d 244 (S.D.N.Y. 2010) ............................................................ 7, 8, 14

*See In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016) .................................................................................... 6

*Tchatat v. City of New York*,
    315 F.R.D. 441 (S.D.N.Y. 2016) ............................................................................. 8

*United States v. Microsoft*,
    253 F.3d 34 (D.C. Cir. 2001) ................................................................................. 15

*United States v. Pollok*,
  139 F.4th 126 (2d Cir. 2025) ................................................................... 8

*United States v. Tin Yat Chin*,
  371 F.3d 31 (2d Cir. 2004) ...................................................................... 7

*United States v. Williams*,
  506 F.3d 151 (2d Cir. 2007) .................................................................... 6

*Vale v. United States of Am.*,
  673 F. App'x 114 (2d Cir. 2016)......................................................... 7, 14

**Rules**

Fed. R. Evid. 702 advisory committee's notes to the 2023 amendments ..................... 7

Federal Rule of Evidence 702............................................................ passim

Federal Rules of Evidence 403 ....................................................... 1, 2, 8, 17

Pursuant to Federal Rules of Evidence 702 and 403, Plaintiffs respectfully submit this motion and supporting memorandum to partially exclude the opinions of Live Nation's proffered expert Paul K. Meyer.

## INTRODUCTION

Mr. Meyer—who is not an economist and has no experience assessing relevant markets or monopoly power—seeks to testify to the jury that Live Nation's profits are "modest, and therefore inconsistent with what one would expect from a monopolist allegedly charging supercompetitive prices."[1]  Mr. Meyer appears to be referencing *supra*competitive pricing, a concept in the economic field of industrial organization, but Mr. Meyer has no expertise in this area.  When asked whether he is an expert in industrial organization, he answered, "[w]hatever that means, I wouldn't hold myself out to be that."  Ex. 3, Deposition of Paul K. Meyer (Nov. 5, 2024) at 33:10–13.

Rather than support his claim with economic analysis, Mr. Meyer offers a set of highly misleading comparisons between Live Nation's accounting profit margins and those of other companies.  Mr. Meyer first compares Live Nation's internal Concerts and Ticketing segments to what he describes as "industry participants in concert promotions, venue operations and ticketing" (the "Concerts Comparison" and the "Ticketing Comparison").  He then attempts to compare Live Nation's company-wide profit margins to firms across a broad range of unrelated industries, including (1) a disparate assortment of firms, such as SeaWorld and Six Flags, pulled from a document about stock valuation; (2) the 500 companies that make up the S&P 500; and (3) a group of five large technology firms selected by Mr. Meyer, which consists of Meta, Apple, Alphabet, NVIDIA, and Microsoft (collectively, the "Cross-Industry Comparisons").

---

[1] Ex. 2, Expert Surrebuttal Report of Paul K. Meyer, Oct. 29, 2025, ¶¶ 10, 28.

Through this motion, Plaintiffs do not seek to exclude Mr. Meyer's opinions as to the content of Live Nation's financial reports or Defendants' view as to what the metrics in those reports mean from a finance or accounting perspective.  Plaintiffs also do not seek to exclude Mr. Meyer's Concerts Comparison or his Ticketing Comparison.[2]  However, Mr. Meyer should not be permitted to present the jury with wholly irrelevant comparisons between Live Nation and companies in other industries that are completely unrelated to the relevant markets at issue in this case.  He also should not be permitted to provide pseudo-economic testimony about whether Live Nation's profits are "inconsistent with what one would expect from a monopolist," given that he lacks any economic expertise and has not performed any analysis that would support such testimony.

Accordingly, Plaintiffs move to exclude (1) Mr. Meyer's testimony regarding his Cross-Industry Comparisons and (2) his unqualified opinion as to whether Live Nation's profits constitute monopoly profits.[3]  Mr. Meyer's testimony on these topics would not meet the relevancy and reliability standards of Rule 702 and would be unduly prejudicial under Rule 403 if presented to a jury.

## BACKGROUND

Mr. Meyer is a Partner and the Global Head of Intellectual Property for HKA, a consulting firm that focuses on "risk mitigation, dispute resolution, expert witness and litigation support."[4]  His consulting experience focuses on "financial, accounting, valuation and damages

---

[2] These comparisons contain glaring errors—such as conflating firms across different lines of business, conflating in-market versus out-of-market activities, comparing domestic operations to foreign operations, and comparing inconsistent accounting metrics across firms—but Plaintiffs do not seek to exclude these misleading opinions at this time and fully intend to address them on cross examination at trial.

[3] See Ex. 1, Expert Report of Paul K. Meyer, Sept. 16, 2025, § VII.D.2-3 (including n. 356), Attachments 19, 20; Ex. 2 ¶¶ 10 (item (7)), 28 (item (7)), 93-97, 121, Attachment 25.

[4] HKA, https://www.hka.com/ (last visited Nov. 11, 2025).

matters."[5]  This is the third time he has been engaged by Live Nation or Ticketmaster.  Ex. 3 at 196:7–16, 373:17–23.  He is not an economist nor an attorney, does not have expertise in antitrust law, and does not have training in how to define relevant markets.  Ex. 3 at 33:17–34:4, 310:3–11.  A small minority of Mr. Meyer's prior expert engagements have related to antitrust proceedings, and none of these have involved assessing monopoly power.  Ex. 3 at 30:11–31:12.

*Initial Report*

On September 16, 2025, Mr. Meyer submitted his initial report, which included a range of opinions on Live Nation's finances and the damages claimed in this case.  Ex. 1.  This report included Mr. Meyer's Concerts Comparison, his Ticketing Comparison, and his Cross-Industry Comparisons.

In his Concerts Comparison, Mr. Meyer compared certain accounting profit margins for Live Nation's U.S. Concerts segment to those of three companies that he described as "competitors in concert promotions and venue operations."  Ex. 1 ¶¶ 221-225.  In his Ticketing Comparison, Mr. Meyer compared another set of accounting profit margins for Live Nation's U.S. Ticketing segment to those of six companies that he described as "competitors in primary and secondary market ticketing."  Ex. 1 ¶¶ 226-229.

Then, Mr. Meyer presented the three comparisons at issue in this motion—the Cross-Industry Comparisons.  *First*, Mr. Meyer compared Live Nation's company-wide operating margins to seven out-of-industry companies: WWE, SeaWorld, Six Flags, Formula 1, Wagner Music,[6] and Universal Music.  Ex. 1 ¶¶ 230-232. ███████████████

████████████████████████████████████

---

[5] HKA, Our Experts, Paul K. Meyer, Partner, Head of Global Intellectual Property, https://www.hka.com/expert-post/paul-k-meyer/ (last visited Nov. 11, 2025).

[6] Plaintiffs believe Mr. Meyer intended to refer to the "Warner Music Group" rather than "Wagner Music."



Second, Mr. Meyer compared Live Nation on a company-wide basis to the 500 member companies that make up the S&P 500.  Ex. 1 ¶¶ 233-236.  He compared Live Nation to these companies based on four metrics: company-wide operating income, company-wide operating margins, company-wide total cash from operations, and company-wide cash from operating margin.  Ex. 1 ¶ 234.  The S&P 500 includes firms classified in 11 sectors across the economy: (1) Communication Services; (2) Consumer Discretionary; (3) Consumer Staples; (4) Energy; (5) Financials; (6) Health Care; (7) Industrials; (8) Information Technology; (9) Materials; (10) Real Estate; and (11) Utilities.  Ex. 1 ¶ 233.

Third, Mr. Meyer presented a single footnote appended to the S&P 500 comparison that referenced Live Nation's profitability relative to "leading communication services and information technologies companies."  Ex. 1 ¶ 236 n.356.  This footnote contains a string citation to the annual reports of Meta, Apple, Alphabet, NVIDIA, and Microsoft.  Mr. Meyer did not specify or provide any support for why he believes Live Nation should be compared to these

_____

[7] ████████████████████████████████████ When Mr. Meyer presented this comparison, he also included a "see also" citation to ██████████ ████████████████████████████████████████████████ For the avoidance of doubt, Plaintiffs seek to exclude Mr. Meyer's testimony about both the 2021 set and the revised 2022 set of firms used for valuation benchmarking purposes.

technology firms, the metrics on which he believes they should be compared, or how he believes they compare on the basis of these metrics.

Relying on his Concerts Comparison, his Ticketing Comparisons, and his Cross-Industry Comparisons, Mr. Meyer reached the conclusion that Live Nation has "modest profitability." Ex. 3 at 19:14–24:20.

*Surrebuttal Report*

On October 29, 2025, Mr. Meyer submitted his surrebuttal report in response to Plaintiffs' financial expert Dr. Shannon Anderson. Ex. 2. Mr. Meyer did not correct many of the flaws in his analysis that Dr. Anderson had identified. Instead, Mr. Meyer reached an even stronger, unsupported conclusion based on his comparisons: for the first time, he opined that, because Live Nation's profits are in his view "modest," he believes they are "therefore inconsistent with what one would expect from a monopolist allegedly charging supercompetitive prices." Ex. 2 ¶¶ 10, 28.

When asked in deposition what he understands the term "*super*competitive" to mean, Mr. Meyer explained, "I'm not saying that as an economist. I'm just saying that you don't see profits that you would see or anticipate seeing from someone that's alleged to or could be alleged to be a monopolist." Ex. 3 at 75:23–76:9. Mr. Meyer agreed that he is not holding himself out as "an expert on what a competitive price would be in any of the relevant markets" or "what a monopoly price would be in any of the relevant markets." Ex. 3 at 79:7–16. He also agreed that he has not performed "an economic analysis of whether Live Nation is charging a competitive price or a monopoly price in any of the relevant markets." Ex. 3 at 79:17–25. When asked what source he relied on for his definition of "supercompetitive," Mr. Meyer pointed to his footnote identifying large technology firms and said, "[j]ust basically, I set up the baseline to compare

against, so it's really my definition. I'm not using a definition from an economist." Ex. 3 at 78:6–78:14. He also provided additional, inconsistent definitions of "supercompetitive" in response to other questions. *See* Arg. Sec. II.

## LEGAL STANDARD

To be admissible, expert opinions must satisfy Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

In deciding a motion to exclude expert testimony, courts perform a "gatekeeping" role of "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597–98 (1993). The party offering the expert testimony bears the burden of demonstrating that these relevancy and reliability criteria are satisfied. *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 253 (2d Cir. 2016) (citing *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007)).

The court's gatekeeping role is critical in a jury trial. As the Advisory Committee for the Federal Rules of Evidence emphasized, "[j]udicial gatekeeping is essential because just as jurors may be unable, due to lack of specialized knowledge, to evaluate meaningfully the reliability of scientific and other methods underlying expert opinion, jurors may also lack the specialized

knowledge to determine whether the conclusions of an expert go beyond what the expert's basis and methodology may reliably support." Fed. R. Evid. 702 advisory committee's notes to the 2023 amendments; *see also In Re: Acetaminophen – ASD-ADHD Prods. Liab. Litig.*, 22-md-2043, 2024 WL 3357608, at *13–15, *28 (S.D.N.Y. July 10, 2024).

Courts generally resolve any challenges to the expert's qualifications as a threshold matter before analyzing the substance of the proffered testimony. *Vale v. United States*, 673 F. App'x 114, 116 (2d Cir. 2016). "To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004).

When assessing the relevance of proffered testimony, courts evaluate whether the testimony "is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591 (internal quotations and citations omitted). In other words, the party offering the testimony must demonstrate that "the testimony is relevant and will assist the jury." *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 239–40 (S.D.N.Y. 2018), *aff'd*, 982 F.3d 113 (2d Cir. 2020).

When assessing reliability, courts determine "whether [the expert's] reasoning or methodology is appropriately applied to the case at hand, and whether the expert is applying it in a manner that ensures a reliable linkage between the facts that he is examining and the conclusions that he is announcing." *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 253 (S.D.N.Y. 2010). The party offering the testimony "must show not only that its experts' methodologies are reliable for some purposes, [but] also . . . that those methodologies are reliable ways 'to draw a

conclusion regarding the particular matter to which the expert testimony was directly relevant.'" *Id.* at 250 (quoting *Kumho Tire Co.*, 526 U.S. 137, 154 (1999)).

In addition to Rule 702, "'a judge assessing a proffer of expert scientific testimony . . . should also be mindful of other applicable [Federal Rules of Evidence],' including Rule 403, which permits exclusion of relevant evidence 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" *United States v. Pollok*, 139 F.4th 126, 140 (2d Cir. 2025) (quoting *Daubert*, 509 U.S. at 595); *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 (NRB), 2025 WL 2733020, at *9 (S.D.N.Y. Sept. 25, 2025).  The court may exclude an expert's opinion under Rule 403 if it may mislead the jury or cause the jury to confuse the issues.  *See, e.g., Tchatat v. City of New York*, 315 F.R.D. 441, 446-47 (S.D.N.Y. 2016).  The Court in *Daubert* emphasized that expert evidence "can be both powerful and quite misleading because of the difficulty of evaluating it." 509 U.S. at 595 (quotation omitted).  Accordingly, when applying Rule 403, courts "exercise[] more control over experts than over lay witnesses."  *Id*.

## ARGUMENT

Mr. Meyer's Cross-Industry Comparisons—in which he compares Live Nation on a company-wide basis to an assortment of disparate firms from a document about stock valuation, the S&P 500, and five handpicked technology companies—do not meet the relevancy and reliability standards of Rule 702.  Mr. Meyer is not qualified to opine as to "what one would expect from a monopolist allegedly charging supercompetitive prices," and any attempt to do so would likewise fail to satisfy Rule 702's requirements.  Mr. Meyer's testimony on either of these topics would be misleading to the jury.

I.    **MR. MEYER'S CROSS-INDUSTRY COMPARISONS DO NOT MEET THE STANDARDS FOR ADMISSIBILITY**

Mr. Meyer's Cross-Industry Comparisons warrant exclusion for at least two reasons: (1) they inappropriately compare Live Nation to companies across a broad range of unrelated industries, and (2) they are based on company-wide accounting metrics that are ill-suited for analyzing the service offerings at issue.

**A.    Comparisons Between Live Nation and Companies in Unrelated Industries Are Uninformative, Unreliable, and Would Mislead the Jury**

As Mr. Meyer admits, a company's profitability can differ depending on the products and services it sells.  Ex. 3 at 67:18–25.  Accordingly, courts have recognized that profitability comparisons lack relevance and reliability when they compare firms across unrelated industries.

In *Bailey v. Allgas, Inc.*, 284 F.3d 1237 (11th Cir. 2002), the Eleventh Circuit held that comparing a company's accounting profitability to that of the firms in the Fortune 500 did not provide evidence of market power.  In *Bailey*, an expert witness analyzed the defendant's return on assets ("ROA") in comparison to that of the companies that make up this group.  *Id.* at 1251. The Eleventh Circuit rejected this approach because "[i]n order for the comparison to have any significance, the [company's] ROA must be measured against the ROA of *similar firms in the same or similar industries*."  *Id.* at 1253 (emphasis added).  Given the differences among the financial characteristics of firms in different industries, "[s]imply comparing a [company's] ROA with the average ROA of the Fortune 500, which contains a broad cross-section of industries and types of companies, will not provide a true measure of excessive returns."  *Id.*[8]

---

[8] The district court had excluded the expert's testimony and granted summary judgment for the opposing party. *Bailey v. Allgas, Inc.*, 148 F. Supp. 2d 1222 (N.D. Ala. 2000).  On appeal, the Eleventh Circuit did not reach the question of whether the expert's testimony had been properly excluded because it held that summary judgment would have been warranted even if the testimony had been admitted.  *See Bailey*, 284 F.3d at 1242, 1257-58.

In *Mirkin v. XOOM Energy LLC*, No. 18-CV-2949, 2025 WL 16333 (E.D.N.Y. Jan. 2, 2025), the U.S. District Court for the Eastern District of New York granted a motion to exclude an expert's proffered testimony comparing the profit margins of the defendant (an energy company) to those of the companies listed in the Dow Jones Industrial Average ("DJIA") in a breach of contract case. The expert had "provide[d] no explanation for how the margins realized by companies in the DJIA have any comparative value in determining the reasonableness of XOOM's margins." *Id.* at *6. The court explained that the member companies of the DJIA have a wide variety of business models, and that the expert had provided "no basis for his opinion that the margins realized from the production and sale of products like soda, clothing, software, pharmaceuticals, and entertainment have any relationship to XOOM's margins selling (but not producing) energy." *Id.* Given these issues, the court held that the expert's opinion was inadmissible.

Like the comparisons at issue in *Bailey* and *Mirkin*, Mr. Meyer's Cross-Industry Comparisons do not compare Live Nation to companies in "the same or similar industries." *Bailey*, 284 F.3d at 1253. Like the Fortune 500 and the DJIA, the companies in the S&P 500 "sell a wide variety of products and services" that cover "pretty much the U.S. economy." Ex. 3 at 236:16–237:3. When asked whether he believes that every company in the S&P 500 is a relevant comparator for Live Nation, Mr. Meyer responded, "[n]o, that wouldn't be my opinion and I didn't intend to communicate that to you if that's how you read my report." Ex. 3 at 237:22–238:2. Likewise, Mr. Meyer makes no attempt to claim that Meta, Apple, Alphabet, NVIDIA, and Microsoft offer products or services similar to those offered by Live Nation.

██████████████████████████████████████

██████████████████████████████████████

███████████████████████ He then attempted to claim that "there are commonalities" between theme parks such as SeaWorld and Live Nation because "[y]ou have to fill an arena, you have to promote, you have to manage, you've got to figure out your costs.  All those things that go into it."  Ex. 3 at 227:10–228:1.  But such remote "commonalities" are not sufficient to assign relevance to comparisons across firms operating in different industries and offering entirely different products.[9]

Elsewhere in his analysis, Mr. Meyer recognized the importance of ensuring that companies have similar business models when comparing their profit margins.  Specifically, for purposes of his Ticketing Comparison, he evaluated whether to include Paciolan (a primary ticketing company that integrates its white-label technology into its clients' mobile applications) as a comparator for Ticketmaster.  Ex. 2 ¶ 90.  He concluded that "[g]iven [] *significant differences in business models and services provided* by Paciolan as compared to full-service ticketers such as Ticketmaster, Paciolan is not a relevant comparator to Ticketmaster for purposes of evaluating the profitability of Ticketmaster's U.S. Ticketing segment[.]"  Ex. 2 ¶ 91 (emphasis added).  In his deposition, Mr. Meyer stated that he excluded Paciolan to "get a cohort group that was more representative."  Ex. 3 at 224:11–225:9.  But he provided no convincing explanation as to why it was appropriate to exclude Paciolan—a company that operates within the same industry—from his Ticketing Comparison but to include companies in other industries—like

---

[9] ████████████████████████████████████████████████████████
████████████████████████████████████████ But Mr. Meyer has not substantiated his claim that this is "probably" true. ████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████████████

SeaWorld and Six Flags—with much greater "differences in business models and services provided" for purposes of his Cross-Industry Comparisons.

The ruling in *Payment Card Interchange Fee and Merchant Discount Antitrust Litigation* provides a useful point of contrast. No. 05-MD-1720, 2022 WL 15053250 (E.D.N.Y. Oct. 26, 2022). There, the U.S. District Court for the Eastern District of New York denied a motion to exclude the opinion of an expert witness who had compared the profit margins of Visa and Mastercard to those of other firms "in the payments space." *Id.* at *29. The movant attempted to analogize to *Bailey* in support of the motion, but the court rejected this analogy, explaining that "[w]hile [the expert's] selection of comparator companies may not be perfect, he [did] not simply compare Visa's and Mastercard's profit to a massive cross-section of industries, like the expert in *Bailey,* but rather target[ed] companies in the payment space." *Id.* at *30.

While Mr. Meyer's Concerts and Ticketing Comparisons arguably focus on companies "in the [concerts and ticketing] space," his Cross-Industry Comparisons plainly do not. His flawed attempts to draw comparisons to out-of-industry firms more closely resemble those at issue in *Bailey* and *Mirkin* and should be excluded.

### B. Mr. Meyer Improperly Relies on Company-Wide Accounting Metrics

Mr. Meyer's Cross-Industry Comparisons rely on company-wide accounting metrics that are ill-suited for analyzing the service offerings at issue. This provides an independent basis for their exclusion.

In *Bailey*, the Eleventh Circuit criticized the expert's reliance on company-wide accounting data rather than data tailored to the market at issue. *Bailey*, 284 F.3d at 1255. The allegations in that case focused on a single geographic area, but the expert based his margin comparison on accounting data that encompassed the defendant's entire footprint. *Id.* Given this

mismatch, the court held that the expert's "measurement of ROA for the entire company, without more, is virtually meaningless." *Id.*

So too here. Although Mr. Meyer's data combines lines of business rather than geographic areas (as was the case in *Bailey*), the principle is the same. By relying on company-wide data, Mr. Meyer makes no attempt to identify which of Live Nation's business activities drive which of the costs and revenues encompassed by the numbers he compares to other firms. He relies on a single company-wide metric—operating margin—to compare the profitability of Live Nation to that of the Valuation Benchmarking Firms. Ex. 1 ¶ 231. When comparing Live Nation to the S&P 500, he likewise relies on company-wide operating margin in addition to other company-wide metrics. Ex. 1 ¶ 234. For purposes of his comparison of Live Nation to Meta, Apple, Alphabet, NVIDIA, and Microsoft, Mr. Meyer cites each company's 10-K filing without specifying any metrics on which he believes they should be compared at all, let alone any metrics below the company-wide level. Ex. 1 ¶ 236 n.356.

Furthermore, the issues arising from Mr. Meyer's reliance on company-wide data are compounded by his decision to rely specifically on operating margin (measured as a percentage of revenue). Live Nation's leadership has repeatedly described this metric as inappropriate for assessing its Concerts segment, which accounts for a significant portion of the company. Live Nation's President and Chief Financial Officer Joe Berchtold gets ███████████ ███████████████████████████████████████████ ████████████████████████████████████████ Live Nation's Head of Investor Relations Amy Yong told Mr. Berchtold that ███████████████████ ██████████████████████████████████████████

13

██████████████████████████ Live Nation's leadership has also discussed the shortcomings of margin-based assessments on the company's quarterly earnings calls.[10]

By relying on company-wide operating margins for his Cross-Industry Comparisons, Mr. Meyer fails to distinguish among the levels of profitability for Live Nation's lines of business and fails to account for the shortcomings of this metric that Live Nation's leadership has recognized. Accordingly, his analysis lacks "a reliable linkage between the facts that he is examining and the conclusions that he is announcing." *R.F.M.A.S.,* 748 F. Supp. 2d 244 at 250.

## II. MR. MEYER'S PSEUDO-ECONOMIC OPINIONS DO NOT MEET THE STANDARDS FOR ADMISSIBILITY.

Because Mr. Meyer is neither an economist nor an attorney, does not have expertise in antitrust law, and has never been retained for purposes of assessing monopoly power, Ex. 3 at 30:21–31:12, 33:17–22, 310:3–11, he does not possess the qualifications to testify as to whether Live Nation's profits are "inconsistent with what one would expect from a monopolist allegedly charging supercompetitive prices." Ex. 2 ¶¶ 10, 28. This alone is sufficient to exclude his opinion on this topic. *See, e.g., Nora Beverages, Inc. v. Perrier Grp. Of Am., Inc.*, 164 F.3d 736,

---

[10] For example, on Live Nation's Q1 2023 earnings call, an analyst asked Mr. Berchtold about margins for the Concerts segment while acknowledging, "I know you hate the word margins, Joe, but we'll go with it anyway." Ex. 7, SH-CID_00016824, at -831. In response to the analyst's question, Mr. Berchtold stated: "[A]s you know, first of all, we look more at the cash profitability of the business, where that is, how that's operating on a per fan basis, which, as I said, we expect to continue to grow this year. I also noted I think in the concert side, the last year was a bottom tick in terms of our margins. We expect it to be coming back this year. We don't obsess over margins because, for instance, this year we expect to be having a great stadium and arena year, as you can tell by the numbers we already gave for Q1. That's inherently going to be a lower margin business than one of our amphitheater customers. We're still going to pursue that business, still great business, but it impacts technically the margin while generating cash profitability." Ex. 7 at -832. Likewise, talking points for the company's Q3 2023 earnings call sent from Mr. Berchtold to Live Nation CEO Michael Rapino state, ████████████████████████████████████ ███████████████████ The talking points further explain that ████████████████████ ██████████████████████████████████████████████████████████████████ ███████████████████████████

746 (2d Cir. 1998) (upholding a district court determination that a purported expert's experience as a marketer in the beverage industry did not qualify him to testify on contract negotiations).

But even if Mr. Meyer were qualified to offer this opinion, it would still be irrelevant, unreliable, and unduly prejudicial. Monopoly power may be proven through direct evidence, indirect evidence, or both. *United States v. Microsoft*, 253 F.3d 34, 51 (D.C. Cir. 2001). "Because such direct proof is only rarely available, courts more typically examine market structure in search of circumstantial evidence of monopoly power." *Id.* Under this approach, "monopoly power may be inferred from a firm's possession of a dominant share of a relevant market that is protected by entry barriers." *Id.*

It is true that one type of direct evidence that can support a finding of monopoly power is evidence that a firm is pricing above the level of its marginal cost (*i.e.*, that its prices are "supracompetitive"). But Mr. Meyer has performed no analysis to determine whether Live Nation is doing so in any of the relevant markets. When asked whether he has analyzed Live Nation's marginal costs, Mr. Meyer testified that "for what I've been doing, that's not relevant at all." Ex. 3 at 162:18–163:15. When asked whether the profit margins he reports are based on marginal cost, Mr. Meyer responded, "I don't see why that question would make any sense being asked to me" and that "[t]here'd be no reason to do it based on marginal cost." Ex. 3 at 163:16–164:6. And when asked to confirm whether he has compared Live Nation's marginal cost to its price in any line of business, he explained that, "[o]nce again, there's no situation why I'd be looking at marginal cost in the analysis that I'm doing." Ex. 3 at 164:7–19.

Moreover, setting aside his lack of analysis, even Mr. Meyer's own personal definition of "supercompetitive" is inconsistent. In one instance, he testified that he defines this term relative to his Concerts Comparison, his Ticketing Comparison, and his Cross-Industry Comparisons

collectively.  Ex. 3 at 77:2–17.[11]  In another instance, he testified that he defines the term based

on his comparison to Meta, Apple, Alphabet, NVIDIA, and Microsoft alone.  Ex. 3 at 78:6–14.

In yet another, he defined a numerical cutoff, testifying that he understands "supercompetitive"

to mean "profits on companies that are to the other extreme, where they are making, at the

operating line, 25, 30, 40 percent."  Ex. 3 at 77:18–78:4.  Mr. Meyer did not address the fact that,

under this last definition, Ticketmaster's profits *would qualify* as "supercompetitive."  Based on

the measures in his report, the operating margin for the Ticketing segment was ▮▮▮ in 2024.

Ex. 2, Attachment 5.1.U, at 20.  If one were to exclude the segment's fixed costs and focus on

variable expenses (*i.e.*, if one were to measure a contribution margin rather than an operating

margin), this number would increase to ▮▮▮ based on his data.  *Id.*, Attachment 5.1.U, at 19.

Nevertheless, Mr. Meyer plans to testify to the jury that Ticketmaster's profits are "modest," Ex.

3 at 107:7–19, illustrating the incongruity of his approach.

---

[11] In this response and others, Mr. Meyer referred to a comparison with the Fortune 500.  Because Mr. Meyer did not conduct a comparison with the Fortune 500, Plaintiffs understand these responses to refer to his comparison with the S&P 500.

## **CONCLUSION**

For the foregoing reasons, the Court should grant Plaintiffs' motion to partially exclude the opinions of Live Nation's proffered expert Paul K. Meyer pursuant to Federal Rules of Evidence 702 and 403.

Respectfully submitted,

*/s/ Bonny Sweeney*
BONNY SWEENEY
*Co-Lead Trial Counsel*
David Dahlquist
*Co-Lead Trial Counsel*
Matthew Jones
Jonathan S. Goldsmith
Zeynep Elif Aksoy
United States Department of Justice
Antitrust Division
450 Fifth Street N.W., Suite 4000
Washington, DC 20530
Telephone: (202) 725-0165
Facsimile: (202) 514-7308
Bonny.Sweeney@usdoj.gov
David.Dahlquist@usdoj.gov

*Attorneys for Plaintiff United States of America*

/s/ Robert A. Bernheim
Robert A. Bernheim (admitted *pro hac vice*)
Office of the Arizona Attorney General
Consumer Protection & Advocacy Section
2005 N. Central Avenue
Phoenix, AZ 85004
Telephone: (602) 542-3725
Fax: (602) 542-4377
Email: Robert.Bernheim@azag.gov
*Attorney for Plaintiff State of Arizona*

/s/ Amanda J. Wentz
Amanda J. Wentz (admitted *pro hac vice*)
Assistant Attorney General
Office of the Arkansas Attorney General
101 West Capitol Avenue
Little Rock, AR 72201
Telephone: (501) 682-1178
Fax: (501) 682-8118
Email: amanda.wentz@arkansasag.gov
*Attorney for Plaintiff State of Arkansas*

/s/ Brent K. Nakamura
Brent K. Nakamura (admitted *pro hac vice*)
Supervising Deputy Attorney General
Office of the Attorney General
California Department of Justice
300 South Spring Street, Suite 9200-6
Los Angeles, CA 90013
Telephone: (213) 269-6000
Email: Brent.Nakamura@doj.ca.gov
*Attorney for Plaintiff State of California*

/s/ Conor J. May
Conor J. May (admitted *pro hac vice*)
Assistant Attorney General
Antitrust Unit
Colorado Department of Law
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email: Conor.May@coag.gov
*Attorney for Plaintiff State of Colorado*

/s/ Victoria Maria Orton Field
Victoria Maria Orton Field (admitted *pro hac vice*)
Assistant Attorney General
Office of the Attorney General of Connecticut
165 Capitol Avenue
Hartford, CT 06106
Telephone: 860-808-5030
Email: victoria.field@ct.gov
*Attorney for Plaintiff State of Connecticut*

/s/ Elizabeth G. Arthur
Elizabeth G. Arthur (admitted *pro hac vice*)
Senior Assistant Attorney General
Office of the Attorney General for the District of Columbia
400 6th Street NW, 10th Floor
Washington, DC 20001
Email: Elizabeth.arthur@dc.gov
*Attorney for Plaintiff District of Columbia*

/s/ Lizabeth A. Brady
Lizabeth A. Brady
Director, Antitrust Division
Florida Office of the Attorney General
PL-01 The Capitol
Tallahassee, FL 32399-1050
Telephone: 850-414-3300
Email: Liz.Brady@myfloridalegal.com
*Attorney for Plaintiff State of Florida*

/s/ Richard S. Schultz
Richard S. Schultz (admitted *pro hac vice*)
Assistant Attorney General
Office of the Illinois Attorney General
Antitrust Bureau
115 S. LaSalle Street, Floor 23
Chicago, Illinois 60603
Telephone: (872) 272-0996
Email: Richard.Schultz@ilag.gov
*Attorney for Plaintiff State of Illinois*

*/s/ Jesse Moore*
Jesse Moore (admitted *pro hac vice*)
Deputy Attorney General
Office of the Indiana Attorney General
302 W. Washington St., Fifth Floor
Indianapolis, IN 46204
Telephone: 317-232-4956
Email: Jesse.Moore@atg.in.gov
*Attorney for Plaintiff State of Indiana*

*/s/ Noah Goerlitz*
Noah Goerlitz (admitted *pro hac vice*)
Assistant Attorney General
Office of the Iowa Attorney General
1305 E. Walnut St.
Des Moines, IA 50319
Telephone: (515) 281-5164
Email: noah.goerlitz@ag.iowa.gov
*Attorney for Plaintiff State of Iowa*

*/s/ Christopher Teters*
Christopher Teters (admitted *pro hac vice*)
Assistant Attorney General
Public Protection Division
Office of Kansas Attorney General
120 S.W. 10th Avenue, 2nd Floor
Topeka, KS 66612-1597
Telephone: (785) 296-3751
Email: chris.teters@ag.ks.gov
*Attorney for Plaintiff State of Kansas*

*/s/ Mario Guadamud*
Mario Guadamud (admitted *pro hac vice*)
Louisiana Office of Attorney General
1885 North Third Street
Baton Rouge, LA 70802
Telephone: (225) 326-6400
Fax: (225) 326-6498
Email: GuadamudM@ag.louisiana.gov
*Attorney for Plaintiff State of Louisiana*

*/s/ Schonette J. Walker*
Schonette J. Walker (admitted *pro hac vice*)
Assistant Attorney General
Chief, Antitrust Division
200 St. Paul Place, 19th floor
Baltimore, Maryland 21202
Telephone: (410) 576-6470
Email: swalker@oag.state.md.us
*Attorney for Plaintiff State of Maryland*

*/s/ Katherine W. Krems*
Katherine W. Krems (admitted *pro hac vice*)
Assistant Attorney General, Antitrust Division
Office of the Massachusetts Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (617) 963-2189
Email: Katherine.Krems@mass.gov
*Attorney for Plaintiff Commonwealth of Massachusetts*

*/s/ LeAnn D. Scott*
LeAnn D. Scott (admitted *pro hac vice*)
Assistant Attorney General
Corporate Oversight Division
Michigan Department of Attorney General
P.O. Box 30736
Lansing, MI 48909
Telephone: (517) 335-7632
Email: ScottL21@michigan.gov
*Attorney for Plaintiff State of Michigan*

*/s/ Zach Biesanz*
Zach Biesanz
Senior Enforcement Counsel
Antitrust Division
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
Saint Paul, MN 55101
Telephone: (651) 757-1257
Email: zach.biesanz@ag.state.mn.us
*Attorney for Plaintiff State of Minnesota*

/s/ Lee Morris
Lee Morris (admitted pro hac vice)
Special Assistant Attorney General
Mississippi Office of Attorney General
Post Office Box 220
Jackson, Mississippi 39205
Telephone: (601) 359-9011
Email: Lee.Morris@ago.ms.gov
Attorney for Plaintiff State of Mississippi


/s/ Justin C. McCully
Justin C. McCully (admitted *pro hac vice*)
Assistant Attorney General
Consumer Protection Bureau
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68509
Telephone: (402) 471-9305
Email: justin.mccully@nebraska.gov
*Attorney for Plaintiff State of Nebraska*

/s/ Lucas J. Tucker
Lucas J. Tucker (admitted *pro hac vice*)
Senior Deputy Attorney General
Office of the Nevada Attorney General
Bureau of Consumer Protection
100 N. Carson St.
Carson City, NV 89701
Email: ltucker@ag.nv.gov
*Attorney for Plaintiff State of Nevada*

/s/ Zachary Frish
Zachary A. Frish (admitted *pro hac vice*)
Assistant Attorney General
Consumer Protection & Antitrust Bureau
New Hampshire Attorney General's Office
Department of Justice
1 Granite Place South
Concord, NH 03301
Telephone: (603) 271-2150
Email: zachary.a.frish@doj.nh.gov
*Attorney for Plaintiff State of New Hampshire*

/s/ Andrew F. Esoldi
Andrew F. Esoldi
Deputy Attorney General
Division of Law
Antitrust Litigation and Competition
Enforcement
124 Halsey Street, 5th Floor
Newark, NJ 07101
Telephone: (609) 696-5465
Email: Andrew.Esoldi@law.njoag.gov
Attorney for Plaintiff State of New Jersey

/s/ Jonathan Hatch
Jonathan Hatch
Assistant Attorney General
New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8598
Email: jonathan.hatch@ag.ny.gov
*Attorney for Plaintiff State of New York*

/s/ Evan Crocker
Evan Crocker (admitted *pro hac vice*)
Assistant Attorney General, Division Director
Consumer Affairs Division
New Mexico Department of Justice
201 3rd St NW, Suite 300
Albuquerque, NM 87102
Telephone: (505) 494-8973
Email: ecrocker@nmdoj.gov
*Attorney for Plaintiff State of New Mexico*

/s/ Francisco Benzoni
Francisco Benzoni (admitted *pro hac vice*)
Special Deputy Attorney General
Brian Rabinovitz (admitted *pro hac vice*)
Special Deputy Attorney General
North Carolina Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
Telephone: (919) 716-6000
Facsimile: (919) 716-6050
Email: fbenzoni@ncdoj.gov
Email: brabinovitz@ncdoj.gov
*Attorneys for Plaintiff State of North Carolina*

*/s/ Sarah Mader*
Sarah Mader (admitted *pro hac vice)*
Assistant Attorney General
Antitrust Section
Office of the Ohio Attorney General
30 E. Broad St., 26th Floor
Columbus, OH 43215
Telephone: (614) 466-4328
Email: Sarah.Mader@OhioAGO.gov
*Attorney for Plaintiff State of Ohio*

*/s/ Cameron R. Capps*
Cameron R. Capps (admitted *pro hac vice)*
Deputy Attorney General
Consumer Protection
Office of the Oklahoma Attorney General
313 N.E. 21st Street
Oklahoma City, Oklahoma  73105
Telephone:  (405) 522-0858
Fax:  (405) 522-0085
Email: Cameron.Capps@oag.ok.gov
Attorney for Plaintiff State of Oklahoma

*/s/ Gina Ko*
Gina Ko (admitted *pro hac vice)*
Assistant Attorney General
Antitrust, False Claims, and Privacy Section
Oregon Department of Justice
100 SW Market St.,
Portland, Oregon 97201
Telephone: (971) 673-1880
Fax: (503) 378-5017
Email: Gina.Ko@doj.oregon.gov
*Attorney for Plaintiff State of Oregon*

*/s/ Joseph S. Betsko*
Joseph S. Betsko (admitted *pro hac vice)*
Assistant Chief Deputy Attorney General
Antitrust Section
Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
Telephone: (717) 787-4530
Email: jbetsko@attorneygeneral.gov
*Attorney for Plaintiff Commonwealth of
Pennsylvania*

*/s/ Paul T.J. Meosky*
Paul T.J. Meosky (admitted *pro hac vice)*
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400, ext. 2064
Fax: (401) 222-2995
Email: pmeosky@riag.ri.gov
*Attorney for Plaintiff State of Rhode Island*

*/s/ Jared Q. Libet*
Jared Q. Libet (admitted *pro hac vice)*
Assistant Deputy Attorney General
Office of the Attorney General of South
Carolina
P.O. Box 11549
Columbia, South Carolina 29211
Telephone: (803) 734-5251
Email: jlibet@scag.gov
*Attorney for Plaintiff State of South Carolina*

*/s/ Bret Leigh Nance*
Bret Leigh Nance (admitted *pro hac vice)*
Assistant Attorney General
1302 E. Hwy 14, Suite 1
Pierre SD 57501-8501
Email: bretleigh.nance@state.sd.us
Telephone: (605) 773-3215
Bar # 5613
*Attorney for Plaintiff State of South Dakota*

*/s/ Hamilton Millwee*
Hamilton Millwee (admitted *pro hac vice)*
Assistant Attorney General
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 38202
Telephone: (615) 291-5922
Email: Hamilton.Millwee@ag.tn.gov
*Attorney for Plaintiff State of Tennessee*

*/s/ Diamante Smith*
Diamante Smith (admitted *pro hac vice)*
Assistant Attorney General, Antitrust Division
Office of the Attorney General of Texas
P.O. Box 12548
Austin, TX 78711-2548
Telephone: (512) 936-1162
*Attorney for Plaintiff State of Texas*

_/s/ Marie W.L. Martin_
Marie W.L. Martin (admitted _pro hac vice_)
Deputy Division Director,
Antitrust & Data Privacy Division
Utah Office of Attorney General
160 East 300 South, 5th Floor
P.O. Box 140830
Salt Lake City, UT 84114-0830
Telephone: 801-366-0375
Email: mwmartin@agutah.gov
_Attorney for Plaintiff State of Utah_

_/s/ Sarah L. J. Aceves_
Sarah L. J. Aceves (admitted _pro hac vice_)
Assistant Attorney General
Consumer Protection and Antitrust Unit
Vermont Attorney General's Office
109 State Street
Montpelier, VT 05609
Telephone: (802) 828-3170
Email: sarah.aceves@vermont.gov
_Attorney for Plaintiff State of Vermont_

_/s/ David C. Smith_
David C. Smith (admitted _pro hac vice_)
Assistant Attorney General
Office of the Attorney General of Virginia
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 692-0588
Facsimile: (804) 786-0122
Email: dsmith@oag.state.va.us
_Attorney for Plaintiff Commonwealth of Virginia_

_/s/ Ashley A. Locke_
Ashley A. Locke (admitted _pro hac vice_)
Assistant Attorney General
Antitrust Division
Washington Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
Telephone: (206) 389-2420
Email: Ashley.Locke@atg.wa.gov
_Attorney for Plaintiff State of Washington_

_/s/ Douglas L. Davis_
Douglas L. Davis (admitted _pro hac vice_)
Senior Assistant Attorney General
Consumer Protection and Antitrust Section
West Virginia Office of Attorney General
P.O. Box 1789
Charleston, WV 25326
Telephone: (304) 558-8986
Fax: (304) 558-0184
Email: douglas.l.davis@wvago.gov
_Attorney for Plaintiff State of West Virginia_

_/s/ Caitlin M. Madden_
Caitlin M. Madden (admitted _pro hac vice_)
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
Telephone: (608) 267-1311
Email: caitlin.madden@wisdoj.gov
_Attorney for Plaintiff State of Wisconsin_

_/s/ William T. Young_
William T. Young
Assistant Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
Telephone: (307) 777-7847
Email: william.young@wyo,gov
_Attorney for the Plaintiff State of Wyoming_

## <u>Certificate of Compliance</u>

In accordance with Local Civil Rule 7.1(c), and Rule 8(c) of this Court's Individual Practices in Civil Cases, I certify that the word count of this memorandum of law is 5,306 words, which includes footnotes but excludes the caption, any index, table of contents, table of authorities, signature blocks, or any certificates. This certificate is made in reliance on the word count of the word-processing program used to prepare the document.

<u>*/s/ Bonny Sweeney*</u>
BONNY SWEENEY
*Co-Lead Trial Counsel*

*Attorney for Plaintiff United States of America*