**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>　　　　　　　*Plaintiffs,*<br><br>　　v.<br><br>LIVE NATION ENTERTAINMENT, INC.,<br>and TICKETMASTER L.L.C.,<br><br>　　　　　　　*Defendants.* | Case No. 1:24-cv-03973-(AS)<br><br>**ORAL ARGUMENT REQUESTED**<br><br>**REDACTED** |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO EXCLUDE THE REPORTS, OPINIONS, AND**
**TESTIMONY OF MONETARY RELIEF STATES' DAMAGES EXPERT**
<u>**DR. ROSA M. ABRANTES-METZ**</u>

**TABLE OF CONTENTS**

Page

INTRODUCTION ..................................................................................................1

BACKGROUND .................................................................................................3

LEGAL STANDARD....................................................................................10

ARGUMENT ..................................................................................................11

I.    DR. ABRANTES-METZ'S DAMAGES MODEL IS UNRELIABLE AND UNHELPFUL TO THE TRIER OF FACT BECAUSE IT CANNOT SEPARATE ACTIONABLE CONDUCT FROM NON-ACTIONABLE CONDUCT .......................11

II.   DR. ABRANTES-METZ'S DAMAGES MODEL IS UNRELIABLE AND UNHELPFUL TO THE TRIER OF FACT BECAUSE IT IGNORES UPFRONT PAYMENTS IN CALCULATING TICKETMASTER'S RETAINED AMOUNT.........18

III.  DR. ABRANTES-METZ'S DAMAGES MODEL IS UNRELIABLE AND UNHELPFUL TO THE TRIER OF FACT BECAUSE IT CANNOT DETERMINE TO WHICH STATES' CITIZENS DAMAGES ACCRUE..............................................21

IV.   DR. ABRANTES-METZ'S DAMAGES MODEL IS UNRELIABLE AND UNHELPFUL TO THE TRIER OF FACT BECAUSE HER ASSUMPTIONS ABOUT AXS COMPARABILITY ARE INTERNALLY INCONSISTENT AND INCONSISTENT WITH PLAINTIFFS' OTHER EXPERT'S FINDINGS ....................24

CONCLUSION....................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alto v. Sun Pharm. Indus., Inc.*,
No. 1:19-CV-09758-GHW, 2021 WL 4803582 (S.D.N.Y. Oct. 13, 2021),
*judgment entered*, 2021 WL 4805430 (S.D.N.Y. Oct. 14, 2021) ....................................10, 11

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002)...........................................................................10, 11, 21

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
603 F.2d 263 (2d Cir. 1979)............................................................................11

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)............................................................................................12

*Concord Boat Corp. v. Brunswick Corp.*,
207 F.3d 1039 (8th Cir. 2000) ........................................................................21

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)...........................................................................................10

*Dependable Sales and Service, Inc. v. TrueCar, Inc.*,
311 F. Supp. 3d 653 (S.D.N.Y. 2018)..............................................................18

*Deutsch v. Novartis Pharms. Corp.*,
768 F. Supp. 2d 420 (E.D.N.Y. 2011) ..............................................................25

*General Elec. Co. v. Joiner*,
522 U.S. 136 (1997)...........................................................................................11

*In re Elec. Books Antitrust Litig.*,
No. 11 MD 2293 DLC, 2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014)...................23

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
299 F. Supp. 3d 430 (S.D.N.Y. 2018)..............................................................25

*In re Namenda Direct Purchaser Antitrust Litig.*,
331 F. Supp. 3d 152 (S.D.N.Y. 2018)..............................................................18

*In re Wholesale Grocery Products Antitrust Litig.*,
946 F.3d 995 (8th Cir. 2019) ......................................................................18, 25

*Kansas v. UtiliCorp United, Inc.*,
497 U.S. 199 (1990)...........................................................................................22

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997)..................................................................................16

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999)..................................................................................10

*Litovich v. Bank of Am. Corp.*,
    No. 20-CV-3154 (VEC), 2025 WL 2521039 (S.D.N.Y. Sept. 2, 2025)................................16

*Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*,
    No. 11-CV-681 KBF, 2015 WL 5459662 (S.D.N.Y. Sept. 16, 2015)....................................21

*Meadows v. Anchor Longwall & Rebuild, Inc.*,
    306 F. App'x 781 (3d Cir. 2009) ...........................................................11

*New York v. Feldman*,
    210 F. Supp. 2d 294 (S.D.N.Y. 2002)..................................................22

*Price v. L'Oreal USA*,
    No. 17 CIV. 614 (LGS), 2020 WL 4937464 (S.D.N.Y. Aug. 24, 2020)................................22

*Ruggiero v. Warner-Lambert Co.*,
    424 F.3d 249 (2d Cir. 2005)...................................................................11

*U.S. Football League v. Nat'l Football League*,
    842 F.2d 1335 (2d Cir. 1988)................................................................18

*US Airways, Inc. v. Sabre Holdings Corp.*,
    938 F.3d 43 (2d Cir. 2019)..........................................................14, 15, 16

## STATUTES

15 U.S.C.
    § 15b...............................................................................................14
    § 15c...............................................................................................22
    § 15c(a)(1).......................................................................................21

Areeda & Hovenkamp, Antitrust Law ¶ 657b2 (2025) ................................................12

# INTRODUCTION

Dr. Abrantes-Metz claims to offer a model to calculate and apportion damages for State Plaintiffs who seek to recover such monetary relief on behalf of the citizens of their respective states.[1]  But in the end, all she offers is a simplistic comparison between two ticketing rivals—Ticketmaster and AXS—and a conclusory opinion that Ticketmaster should never be allowed to charge more than that one, cherry-picked competitor.  Indeed, for all her econometric window dressing about "retained amounts" and "elasticity of demand," Dr. Abrantes-Metz has just one opinion:  any amount that Ticketmaster charged above AXS is de facto anticompetitive and results in harm to fans.  This superficial analysis is not the kind of opinion that passes muster under *Daubert*.  Just as bad, Dr. Abrantes-Metz does nothing to connect her supposed "damages" to the effects of the alleged anticompetitive conduct, to conduct that is actually actionable in this case, or even to the residents of the individual states for whom she is supposed to be allocating damages.  Dr. Abrantes-Metz's damages analysis fails on multiple levels and should be excluded in its entirety.

*First*, Dr. Abrantes-Metz's model cannot disaggregate damages deriving from actionable versus non-actionable conduct.  Nothing in her model can identify damages flowing from lawful conduct (e.g., agreements with venues that are indisputably not anticompetitive) versus unlawful conduct (e.g., agreements with venues that Plaintiffs contend were influenced by exclusionary conduct), nor can the model differentiate damages that flow from Plaintiffs' two very different theories of liability (conditioning versus exclusive contracts).  Dr. Abrantes-Metz also did not conduct her analysis in a way that allows a trier of fact to determine what damages are the result

---

[1] State Plaintiffs seeking "monetary damages" do so in their *parens patriae* capacities.  Ex. 4 (Pls.' Supp. Initial Disclosures at 2).

of conduct that was within the applicable statute of limitations, and as a result is guaranteed to report impermissible "damages" for acts that are time-barred.

*Second*, Dr. Abrantes-Metz's assumptions about what Ticketmaster earns from a ticketing contract are baseless. In particular, Dr. Abrantes-Metz's model purports to show that Ticketmaster keeps more in fees, on a per-ticket-basis, than a single competitor, AXS. It is indisputable that any primary ticketing company's income from a ticketing contract is its fee income less upfront payments. These upfront payments also directly impact the share of ticketing fees ███████. And yet Dr. Abrantes-Metz ignores them, claiming without support that they are immaterial. Made worse, Dr. Abrantes-Metz includes in her calculation Ticketmaster's "inside fees," which are paid by promoters or artists and could never affect the fees that *venues* charge to fans (the sole mechanism of harm that Dr. Abrantes-Metz identifies). The result is an unreliable and superficially inflated Ticketmaster "overcharge" based on faulty assumptions belied by the record and the real world.

*Third*, Dr. Abrantes-Metz's model cannot reliably determine to which states' citizens specific damages belong, her core task in this case. Despite having ready access to data that would have allowed her to run her analysis based on where the actual fans at issue reside, she instead chose to run a "venue-level" and "event-level" analysis that says nothing about where fans live.

*Fourth*, Dr. Abrantes-Metz's key assumptions regarding the comparability of Ticketmaster and AXS are internally inconsistent and undermined by another of Plaintiffs' experts, Dr. Hill. Indeed, the record evidence shows that Ticketmaster and AXS are not comparable and therefore— even if a single-competitor benchmark were appropriate in this case—AXS is certainly not the competitor to choose.

These flaws render Dr. Abrantes-Metz's model unreliable and unfit to aid the trier of fact, and her reports, opinions, and testimony should be excluded.

## BACKGROUND

Dr. Abrantes-Metz puts forward a model to calculate damages on behalf of twenty-five "Monetary Relief States"—District of Columbia, Arizona, Arkansas, California,[2] Colorado, Connecticut, Florida, Illinois, Indiana, Iowa, Michigan, Minnesota, Nevada, New Hampshire, New Jersey, New York, North Carolina, Oklahoma, Rhode Island, South Carolina, Utah, Washington, West Virginia, Wisconsin, and the Commonwealth of Pennsylvania. Ex. 1 (Abrantes-Metz Rpt. ¶ 20 n.7). Dr. Abrantes-Metz was instructed by the Monetary Relief States "to calculate monetary recoveries consistent with the relevant markets that [Plaintiffs' expert] Dr. Hill identified, and antitrust harms to consumers from Defendants' anticompetitive exclusive primary ticketing arrangements, including through the tying of venue access to the selection of Ticketmaster as the primary ticketer." *Id.* (Abrantes-Metz Rpt. ¶ 21). By their own concession, the Monetary Relief States' damages claims flow from only two forms of alleged conduct: Ticketmaster's exclusive ticketing contracts and Defendants' alleged conditioning of Live Nation content on venues entering ticketing agreements with Ticketmaster. Ex. 3 (Abrantes-Metz Tr. 26:7-19, 56:20-57:14). Dr. Abrantes-Metz assumes for purposes of her damages analysis (i) the existence of this alleged conduct, (ii) the purported impact of this alleged conduct, and (iii) antitrust liability. *Id.* (Abrantes-Metz Tr. 57:16-58:8).

Dr. Abrantes-Metz's damages model proceeds in three steps. *First*, she calculates Ticketmaster's per ticket "retained amount"—i.e., the fee amount kept by Ticketmaster per ticket

---

[2] While Dr. Abrantes-Metz groups California in with the other twenty-three states and the District of Columbia who seek damages on behalf of their citizens, Defendants note that California seeks restitution, not damages. *See* Amend. Compl. ¶¶ 277, 517, Dkt. 257.

sold—and then purports to "test whether Ticketmaster imposes higher charges on venues than competitors" by comparing Ticketmaster's "retained amount" to a single competing ticketer, AXS. Ex. 1 (Abrantes-Metz Rpt. ¶¶ 109–10). Using this single-competitor benchmark, Dr. Abrantes-Metz concludes that "Ticketmaster keeps, on average ███ more per ticket than AXS." *Id.* Dr. Abrantes-Metz confirmed that, in the end, her opinion is really that Ticketmaster should not be able to charge more than AXS, full stop. *See* Ex. 3 (Abrantes-Metz Tr. 268:2-269:12). But Dr. Abrantes-Metz's benchmark is cherry-picked and rises and falls with her flawed assumption that Ticketmaster is properly comparable to AXS. Dr. Abrantes-Metz did not utilize any other competitor benchmarks, did not incorporate any other market pricing data beyond AXS into her benchmark, and did not examine whether any non-competitor benchmarks (e.g., a before versus after benchmark) yield results consistent with her findings. *See id.* (Abrantes-Metz Tr. 276:3-278:17).

*Second*, Dr. Abrantes-Metz contends that this higher retained amount manifests as higher total fees at Ticketmaster-ticketed venues. Ex. 1 (Abrantes-Metz Rpt. ¶ 101).

*Third*, Dr. Abrantes-Metz's damages theory assumes *venues* will increase ticketing fees to fans to recover what venues allegedly lost due to the higher Ticketmaster retained amount. *Id.* (Abrantes-Metz Rpt. ¶ 97). Dr. Abrantes-Metz asserts that venues pass through to fans any increases (or decreases) in Ticketmaster's per-ticket retained amounts to fans via higher (or lower) total fees that venues set. *Id.* (Abrantes-Metz Rpt. ¶¶ 97, 132). Focusing only on a relatively uncommon type of Ticketmaster-venue contract—"███████████████████████████████

███████████████████████████████████████████████████████[3]—

---

[3] Dr. Abrantes-Metz acknowledges that ████████████████████████████████

████████████████ Ex. 1 (Abrantes-Metz Rpt. ¶ 146). Finding it "difficult to measure the causal

4

Dr. Abrantes-Metz concludes that "for every $1 per-ticket increase (decrease) in Ticketmaster's retained amount, total ticketing fees increase (decrease) by ██████ per ticket." Ex. 1 (Abrantes-Metz Rpt. ¶ 132, § V.B.2); Ex. 3 (Abrantes-Metz Tr. 150:10-151:2). She then applies that incidence range to her ████ per-ticket retained amount differential to compute alleged fan overcharges of ████████ per ticket. Ex. 3 (Abrantes-Metz Rpt., Fig. 33). Dr. Abrantes-Metz described this as a quantification of "how much of one extra dollar retained amount is going to be paid by consumers and how much is going to be paid by the venues." *Id.* (Abrantes-Metz Tr. 151:8-23).

In deposition, Dr. Abrantes-Metz confirmed that her analysis has significant limitations.

*First*, Dr. Abrantes-Metz's damages model cannot disaggregate damages between the two very different types of conduct she analyzed: Ticketmaster's exclusive ticketing contracts, on the one hand, and Defendants' alleged conditioning of Live Nation content on venues using Ticketmaster, on the other. Dr. Abrantes-Metz testified that she assumed these forms of conduct "existed and impacted competition," but "didn't quantify the impact on fans" separately for each. *Id.* (Abrantes-Metz Tr. 57:5-58:8). When asked whether she disclosed any estimation of monetary recoveries specific to just the alleged leveraging of content, Dr. Abrantes-Metz answered "No." *Id.* (Abrantes-Metz Tr. 58:10-22). When asked whether she disclosed any estimation of monetary recoveries specific to just Ticketmaster's exclusive contracts, Dr. Abrantes-Metz again answered "No." *Id.* (Abrantes-Metz Tr. 58:23-59:5). Dr. Abrantes-Metz further acknowledged that her damages model contains "no division of conduct between the two" because she assumes "they

---

relationship" between the retained amounts and total fees in those standard contracts, Dr. Abrantes-Metz instead relies on the less common "████████████," and then applies her findings to *all* tickets, even those sold pursuant to the standard, traditional contracts that she does not analyze. Ex. 1 (Abrantes-Metz Rpt. ¶¶ 146–47).

happen simultaneously and reinforce each other." Ex. 3 (Abrantes-Metz Tr. 59:6-20). Her testimony is that this makes it "not possible" to apportion her total damages between the separate categories of conduct, or between the specific ticketing contracts signed by Ticketmaster and the venues. *Id.* (Abrantes-Metz Tr. 58:23-59:20). Thus, if certain ticketing contracts are found to be lawful and not anticompetitive, or if one of Monetary Relief States' theories is rejected, Dr. Abrantes-Metz has no way of calculating damages limited only to whatever conduct remains in the case. And extensive record evidence shows that Dr. Abrantes-Metz's model does, in fact, include effects from a number of ticketing contracts that are lawful. In particular, the record shows that venues (i) selected their ticketer through a competitive bidding process;[4] (ii) sought out exclusive ticketing partnerships, benefit from working with a single ticketer, or believed that working with multiple ticketers would present specific operational challenges;[5] (iii) chose Ticketmaster because they consider Ticketmaster to be the best-in-class;[6] and (iv) were not

---

[4] *See, e.g.*, Ex. ███████ Tr. 139:8-141:1, 143:9-144:6); Ex. ███ ██████████████ Tr. 24:7-10); Ex. ████████████ Tr. 29:15-31:4); Ex. ██████████ Tr. 25:7-26:25, 27:13-29:10); Ex. █████████████████████ Tr. 31:5-19); Ex. █████ Tr. 65:21-67:15); Ex. ██████████, Tr. 22:10-24:3); Ex. ████ Tr. 12:11-14:7); Ex. ████████████ Tr. 43:6-12).

[5] *See, e.g.*, Ex. ████████████████ Tr. 122:3-123:12); Ex. ███ Tr. 29:13-30:3, 163:12-164:20); Ex. █████████ Tr. 98:10-22); Ex. ████ Tr. 50:17-53:2); Ex. ██████ Tr. 50:13-53:2); Ex. ████ Tr. 55:8-57:9); Ex. ████ Tr. 69:24-72:5); Ex. ████████ Tr. 33:14-34:6); Ex. ████ Tr. 246:23-247:16); Ex. ██████ Tr. 263:3-7); Ex. ████████ Tr. 56:19-58:20); Ex. ███ Tr. 49:13-52:18); Ex. █████ Tr. 29:2-30:1); Ex. ████ Tr. 72:10-74:11); Ex. ██████████ Tr. 177:20-178:23); Ex. ███ Tr. 49:6-50:11); Ex. █████ Tr. 36:21-37:24).

[6] *See, e.g.*, Ex. ████ Tr. 27:25-30:6, 34:8-16); Ex. ████ Tr. 24:4-28:8); Ex. ████ Tr. 14:4-17, 32:6-16); Ex. ████ Tr. 55:22-56:22, 72:10-73:6); Ex. ████ Tr. 43:16-45:21, 47:13-48:8); Ex. ██████ Tr. 32:5-37:6, 91:18-93:14); Ex. ████ Tr. 67:20-69:5); Ex. █████ Tr. 23:2-24:2, 55:22-56:8); Ex. ████ Tr. 27:13-29:5, 45:19-

threatened by Defendants or were not concerned about the possibility of losing Live Nation content if the venue chose a primary ticketer other than Ticketmaster.[7]

Dr. Abrantes-Metz's damages model also does not account for when the alleged anticompetitive conduct began. Ex. 3 (Abrantes-Metz Tr. 366:18-367:8). Instead, Dr. Abrantes-Metz was instructed to "calculate damages for the period 2017 to 2024" on the assumption that the "anticompetitive conduct would have been in place then." *Id.* Further, Dr. Abrantes-Metz bases her yearly damages amounts on when a concert took place, not on when an individual consumer purchased their tickets and allegedly paid the supracompetitive price. *Id.* (Abrantes-Metz Tr. 226:19-229:19).

*Second*, Dr. Abrantes-Metz's damages analysis ignores entirely one of the key determinants of Ticketmaster's "retained amount": the ███████████ upfront payments that venues demand and receive from ticketing providers during ticketing negotiations. It is undisputed that Ticketmaster paid many millions of dollars to venues up front (i.e., in advance of any ticketing activity) to secure their business. Ex. 2 (Abrantes-Metz Reb. Rpt. §V.A. Heading & ¶¶ 107–08); Ex. 3 (Abrantes-Metz Tr. 237:10-239:9). And it is undisputed that the upfront payments are a key

---

46:20); Ex. ███ Tr. 39:19-40:18); Ex. ███ Tr. 46:14-47:18, 174:16-175:5); Ex. ███ Tr. 94:21-96:24); Ex. ███ Tr. 21:4-24:6, 25:6-26:9, 29:16-30:13). *See also* Ex. ███ 0000003 at -0003); Ex. ███ Tr. 18:8-20:6); Ex. ███ Tr. 126:12-129:15).

[7] *See, e.g.*, Ex. ███ Tr. 279:16-24); Ex. ███ Tr. 160:19-163:18); Ex. ███ Tr. 150:10-15); Ex. ███ Tr. 31:6-32:11); Ex. ███ Tr. 47:7-12); Ex. ███ Tr. 23:11-25); Ex. ███ Tr. 46:1-48:6); Ex. ███ Tr. 131:23-133:10); Ex. ███ Tr. 197:2-19); Ex. ███ Tr. 16:3-17:3, 34:4-8); Ex. ███ Tr. 60:2-7); Ex. ███ Tr. 32:8-33:6); Ex. ███ Tr. 29:19-30:3); Ex. ███ Tr. 157:8-158:4); Ex. ███ Tr. 33:20-34:7, 109:4-11); Ex. ███ Tr. 114:15-25); Ex. ███ Tr. 102:23-103:9); Ex. ███ Tr. 65:17-66:11). *See also* Ex. ███-USVLN-00518838 at -8838) (November 2022 texts between ███

7

financial component of securing ticketing contracts and are often set in conjunction with Ticketmaster's per-ticket fees. *See, e.g.*, Ex. 30 (Wichser (Ticketmaster) Tr. 157:11-14, 157:20-158:3); Ex. ██████████████████████████ Tr. 60:9-22).  Venues highly value the lump sum, upfront payments because they shift financial risk to Ticketmaster and immediately enable things like large capital improvements to the venue. *See, e.g.*, Ex. ████████████████████ ████ Tr. 83:14-22).  But they are unambiguously a cost to the ticketing company that it needs to recover over the life of the contract from its fee income.  The upfront payments always affect what Ticketmaster or any other vendor would accept as its share of fees, and therefore must be accounted for in any sensible estimate of a ticketing company's "retained amount."  *E.g.*, Ex. 30 (Wichser Tr. 155:13-18, 157:10-14).

Yet Dr. Abrantes-Metz simply ignores them, theorizing without testing that they have no impact on retained amounts.  That is like theorizing that five minus two might still be five.  When asked what actual evidence supports her position that these ██████████████ payments do not materially impact the allocation of ticketing fees between Ticketmaster and the venue, Dr. Abrantes-Metz identified none, called it "a principle of economics," and admitted she is the only witness who is saying that.  Ex. 3 (Abrantes-Metz Tr. 240:22-242:14).  Venues further testified that if upfront payments were to go away, ██████████████████████████ ████████████████████████████████.  *E.g.*, Ex. ████████████████████ Tr. 61:5-23); Ex. ████████████████ Tr. 57:12-58:15).  Dr. Abrantes-Metz acknowledged during her deposition that this was an economically rational response from the venues.  *See* Ex. 3 (Abrantes-Metz Tr. 247:11-248:16).

And while Dr. Abrantes-Metz excludes upfront payments that directly affect the fee splits between ticketers and venues, she inexplicably includes "inside fees" in her calculations that

venues do not pay at all. Ex. 3 (Abrantes-Metz Tr. 273:15-274:13). Dr. Abrantes-Metz agreed during her deposition that inside fees are not paid by venues and are instead charged directly to the artist or promoter for use of Ticketmaster's Platinum pricing tool. *See id.* (Abrantes-Metz Tr. 272:4-274:13); *see also* Ex. 31 (McInnes 30(b)(6) (Live Nation Entertainment) Tr. 62:17-23); Ex. 32 (Marcus 30(b)(6) (Ticketmaster) Tr. 233:15-18). Yet Dr. Abrantes-Metz's model counts them anyway, as a cost that venues incur, when calculating the amount Ticketmaster allegedly overcharges venues. *See* Ex. 3 (Abrantes-Metz Tr. 272:4-274:14).

*Third*, Dr. Abrantes-Metz performed no individualized analysis of who purchased tickets and where such fans reside. Her damages are aggregated, computed, and reported at the event level, attributing damages to events held in particular venues within particular states, not to individual purchasers or their location. *Id.* (Abrantes-Metz Tr. 228:8-20). Dr. Abrantes-Metz agreed that her analysis provides "no way to determine," for any event, how much of the alleged damages are attributable to residents of the state in which the venue sits as opposed to ticket purchasers from other states. *Id.* (Abrantes-Metz Tr. 229:21-231:7). Dr. Abrantes-Metz admitted that she "did not undertake an individual analysis," and her analysis was conducted "without the information on who exactly the consumer is or which state the consumer lives in." *Id.*

*Fourth*, Dr. Abrantes-Metz's model rests on a key assumption: that, in a but-for world without the alleged conduct, Defendants would have been able to charge only the retained amount actually charged by AXS in the real world, and no more. AXS is the ticketing subsidiary of AEG and entered the U.S. primary ticketing market for major concert venues in 2013. Dr. Hill contends that AXS has ███████ market share in primary ticketing services to major concert venues. *See* Ex. 33 (Hill Reb. Rpt., App'x H, Fig. 194). Dr. Abrantes-Metz uses AXS as a single-competitor benchmark for a competitive price on the assertion that AXS offers "comparable levels

of capabilities and quality" as Ticketmaster.  Ex. 1 (Abrantes-Metz Rpt. ¶¶ 110–11).  However, she admits that she is not offering any opinion on whether the record shows a consensus that AXS is, in fact, of comparable quality to Ticketmaster.  Ex. 3 (Abrantes-Metz Tr. 286:22-287:6).  The analyses of Plaintiffs' primary liability expert, Dr. Hill, show that Ticketmaster outperforms AXS on key quality metrics—i.e., ███████████████████████████████████████████████████ ███████████████████████████.  *See* Ex. 33 (Hill Reb. Rpt. ¶ 460, Figs. 75, 76, 77).[8]

## LEGAL STANDARD

Federal Rule of Evidence 702 assigns a gatekeeping role to the district court to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).  This gatekeeping role applies to all expert testimony.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).  In particular, the court considers whether: 1) the testimony is grounded on sufficient data, 2) the testimony is the product of reliable principles and methods, and 3) the expert reliably applied the principles and methods to the facts of the case.  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002).  Courts must undertake a "rigorous examination" of the facts and the expert's methodology to ensure the opinion offered is reliable at every step.  *Id.* at 267.  The expert's testimony also must 'fit' under the facts of the case.  *See Daubert*, 509 U.S. at 591; *Alto v. Sun Pharm. Indus., Inc.*, No. 1:19-CV-09758-GHW, 2021 WL 4803582, at *3 (S.D.N.Y. Oct. 13, 2021), *judgment entered*, 2021 WL 4805430 (S.D.N.Y. Oct. 14, 2021).

---

[8] ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████.

Courts may exclude the opinion of an expert where there is too great of an analytical gap between the facts and the opinion proffered. *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 255 (2d Cir. 2005). Rule 702 "mandate[s]" the exclusion expert testimony if the data the expert relies on or the expert's methodology is inadequate to support the conclusions offered. *Amorgianos*, 303 F.3d at 266; *see also Meadows v. Anchor Longwall & Rebuild, Inc.*, 306 F. App'x 781, 790 (3d Cir. 2009) ("[E]xpert testimony based on assumptions lacking factual foundation in the record is properly excluded.").

## ARGUMENT

### I.  DR. ABRANTES-METZ'S DAMAGES MODEL IS UNRELIABLE AND UNHELPFUL TO THE TRIER OF FACT BECAUSE IT CANNOT SEPARATE ACTIONABLE CONDUCT FROM NON-ACTIONABLE CONDUCT

Dr. Abrantes-Metz's damages model fails because it cannot distinguish damages attributable to conduct that is actionable and conduct that is not. This failure occurs at multiple independent levels, any one of which is sufficient grounds to reject the model.

### A.  Dr. Abrantes-Metz's Model Cannot Distinguish Damages Flowing From Allegedly Unlawful Conduct Versus Lawful Conduct.

Dr. Abrantes-Metz's model fails at the outset because it cannot determine the amount of damages that flow from allegedly unlawful versus lawful conduct. Antitrust plaintiffs may only recover damages for harms that "'flow[] from' the distortion of the market caused by the monopolist's anticompetitive conduct." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 297 (2d Cir. 1979). The alleged harm to Monetary Relief States' citizens flows from two forms of purported misconduct: Ticketmaster's exclusive contracts, and Defendants' alleged conditioning of Live Nation content on venues contracting with Ticketmaster.

11

Dr. Abrantes-Metz testified that she did not provide an estimation of monetary recoveries specific to Ticketmaster's exclusive contracts, nor any estimation of monetary recoveries specific to the conditioning allegations, nor any method by which to calculate and apportion damages as between the two forms of conduct. Ex. 3 (Abrantes-Metz Tr. 58:10-59:20). Dr. Abrantes-Metz instead testified that her model assumes the two forms of conduct are collapsed into one. *Id*. In particular, given her assignment and the assumptions underlying her model, Dr. Abrantes-Metz testified that there was "no division of conduct" and it was "not possible to" disaggregate damages as to one form of conduct versus the other because she assumed they happen simultaneously. *Id.* (Abrantes-Metz Tr. 26:7-19, 56:20:-59:20). As a result, if *either* of the two types of alleged anticompetitive conduct are found to be lawful, or even lawful in part (e.g., shorter term exclusivity agreements), Dr. Abrantes-Metz's model becomes instantly useless because it cannot disaggregate the impacts of that lawful conduct versus the unlawful conduct. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 35–37 (2013) (refusing to accept a model for damages that assumed four market distortions when only one remained at issue in the case); *see also* Areeda & Hovenkamp, Antitrust Law ¶ 657b2 (2025) ("When the disaggregation question is left to a jury, the jury must be provided with an evidentiary basis for performing the disaggregation function. That requires a damages study that links a particular quantum of damages to allegedly unlawful acts.").

This is not a hypothetical problem, or something that can be sorted out later at trial. Indeed, the very nature of Plaintiffs' claims—and in particular their claim focused on exclusive contracts— renders the model fatally flawed now. It is undisputed that exclusive contracts may have procompetitive benefits and are not generally unlawful. *See* Defs.' Mot. for Summ. J., §§ II.B., III, Dkt. 689. And while Plaintiffs allege that certain of Ticketmaster's exclusive contracts were unlawful, Plaintiffs have made no attempt to prove that *each* of Ticketmaster's exclusive contracts

were, in fact, anticompetitive—a legal requirement to establish their Sherman Act Section 1 claim. *Id.* at § III. To the contrary, extensive record evidence shows that venues (i) select their ticketer through a competitive bidding process;[9] (ii) sought out exclusive ticketing partnerships, benefit from working with a single ticketer, or believed that working with multiple ticketers would present specific operational challenges;[10] (iii) chose Ticketmaster because they consider Ticketmaster to be the best-in-class;[11] and (iv) were not threatened by Defendants or were not concerned about the possibility of losing Live Nation content if their venue chose a primary ticketer other than Ticketmaster.[12] All of this evidence means that, even if Plaintiffs could create a dispute of fact

---

[9] *See, e.g.,* ███ Tr. 139:8-141:1, 143:9-144:6); Ex. ███ Tr. 24:7-10); Ex. ███ Tr. 29:15-31:4); Ex. ███ Tr. 25:7-26:25, 27:13-29:10); Ex. ███ Tr. 31:5-19); Ex. ███ Tr. 65:21-67:15); Ex. ███, Tr. 22:10-24:3); Ex. ███ Tr. 12:11-14:7); Ex. ███ Tr. 43:6-12).

[10] *See, e.g.,* Ex. ███ Tr. 122:3-123:12); Ex. ███ Tr. 29:13-30:3, 163:12-164:20); Ex. ███ Tr. 98:10-22); Ex. ███ Tr. 50:17-53:2); Ex. ███ Tr. 50:13-53:2); Ex. ███ Tr. 55:8-57:9); Ex. ███ Tr. 69:24-72:5); Ex. ███ Tr. 33:14-34:6); Ex. ███ Tr. 246:23-247:16); Ex. ███ Tr. 263:3-7); Ex. ███ Tr. 56:19-58:20); Ex. ███ Tr. 49:13-52:18); Ex. ███ Tr. 29:2-30:1); Ex. ███ Tr. 72:10-74:11); Ex. ███ Tr. 177:20-178:23); Ex. ███ Tr. 57:7-59:5); Ex. ███ Tr. 49:6-50:11); Ex. ███ Tr. 36:21-37:24).

[11] *See, e.g.,* Ex. ███ Tr. 27:25-30:6, 34:8-16); Ex. ███ Tr. 24:4-28:8); Ex. ███ Tr. 14:4-17, 32:6-16); Ex. ███ Tr. 55:22-56:22, 72:10-73:6); Ex. ███ Tr. 43:16-45:21, 47:13-48:8); Ex. ███ Tr. 32:5-37:6, 91:18-93:14); Ex. ███ Tr. 67:20-69:5); Ex. ███ Tr. 23:2-24:2, 55:22-56:8); Ex. ███ Tr. 27:13-29:5, 45:19-46:20); Ex. ███ Tr. 39:19-40:18); Ex. ███ Tr. 46:14-47:18, 174:16-175:5); Ex. ███ Tr. 94:21-96:24); Ex. ███ Tr. 21:4-24:6, 25:6-26:9, 29:16-30:13). *See also* Ex. ███ 0000003 at -0003); Ex. ███ Tr. 18:8-20:6); Ex. ███ Tr. 126:12-129:15).

[12] *See, e.g.,* Ex. ███ Tr. 279:16-24); Ex. ███ Tr. 160:19-163:18); Ex. ███ Tr. 150:10-15); Ex. ███ Tr. 31:6-32:11); Ex. ███ Tr. 47:7-12); Ex. ███ Tr. 23:11-25); Ex. ███ Tr. 46:1-48:6); Ex. ███ Tr. 131:23-133:10); Ex. ███ Tr. 197:2-19); Ex. ███

about whether *some* Ticketmaster contracts excluded competition sufficient to survive summary judgment, the Court would still need to exclude Dr. Abrantes-Metz's damages analysis because, at a bare minimum, it measures effects from *other* ticketing contracts that are perfectly lawful, as the venues themselves confirmed.[13]   And because Plaintiffs have not presented any model or method for finding every exclusive Ticketmaster agreement unlawful, Dr. Abrantes-Metz's model necessarily attributes damages to contracts that will not, and cannot, form the basis of any award for Monetary Relief States.

> **B.    Dr. Abrantes-Metz Does Not Limit Her Damages Model to Conduct Within the Statute of Limitations.**

Dr. Abrantes-Metz's model cannot parse between proper recovery within the applicable limitations period and improper recovery falling outside the applicable limitations period.   The Monetary Relief States' damages claims are subject to statutes of limitations—including four years for the Sherman Act claims, *see* 15 U.S.C. § 15b.   Focusing on the Monetary Relief States' Sherman Act claims for ease of illustration, the limitations period runs from the time each allegedly anticompetitive contract was executed.   *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 69 (2d Cir. 2019).   This means the Monetary Relief States cannot recover damages arising out of any of Ticketmaster's contracts that were entered into prior to August 19, 2020 (four years from the date of the Amended Complaint where the Monetary Relief States first claimed damages), *even*

---

Tr. 16:3-17:3, 34:4-8); Ex. ▮▮▮▮ Tr. 60:2-7); Ex. ▮▮▮ Tr. 32:8-33:6); Ex. ▮▮▮ Tr. 29:19-30:3); Ex. ▮▮▮ Tr. 157:8-158:4); Ex. ▮▮▮ Tr. 33:20-34:7, 109:4-11); Ex. ▮▮▮ Tr. 114:15-25); Ex. ▮▮▮ Tr. 102:23-103:9); Ex. ▮▮ Tr. 65:17-66:11). *See also* Ex. ▮▮-USVLN-00518838 at -8838) (November 2022 texts between ▮▮▮

[13] *See supra* nn.9–12.

*if* the allegedly supracompetitive prices charged under the contract continued into the limitations period.  As the court explained in *Sabre*:

> A contract is a vehicle for determining at the time of contracting what should happen at some time thereafter.  So, like the Sixth, Eighth, and Ninth Circuits, [the Second Circuit] think[s] of the performance of a contract as a manifestation of the "overt act," the decision to enter the contract, rather than an independent overt act of its own.

938 F.3d at 69.  Dr. Abrantes-Metz's model therefore fails because she cannot separate out damages deriving from contracts that were entered into in the pre-limitations period.[14]  In fact, Dr. Abrantes-Metz confirmed that she has "no opinion" as to, and her model does not account for, when the allegedly anticompetitive conduct began.  Ex. 3 (Abrantes-Metz Tr. 366:18-367:18).  Instead, Dr. Abrantes-Metz calculates damages for all states across an eight-year period and assumes the alleged anticompetitive conduct was "in place" for that entire period.  *See id.* (Abrantes-Metz Tr. 363:20-24).  That concession alone proves the failure of her model.

Moreover, to calculate the pass-through percentages that serve as a cornerstone of her damages analysis, Dr. Abrantes-Metz relies on contract terms and fee-splits from Ticketmaster contracts with fifty-four Major Concert Venues.[15]  Ex. 1 (Abrantes-Metz Rpt. ¶ 151, n.290, Ex. H).  Fully *forty-two of those contracts (78%) have start dates pre-dating August 19, 2020.  Id.*

---

[14] While Monetary Relief States' statutes of limitations may differ for their state-specific claims, the problem still stands—Dr. Abrantes-Metz cannot parse between alleged anticompetitive conduct inside versus outside the applicable limitations periods, and therefore cannot identify the amounts of damages that are appropriately recoverable on a state-by-state and limitations-period-by-limitations-period basis.  Indeed, Dr. Abrantes-Metz acknowledged that limitations periods vary as between Monetary Relief States but testified that her assignment was to ignore such differentiation and "calculate damages for all of the states for all of the years."  *See* Ex. 3 (Abrantes-Metz Tr. 365:14-366:16); Ex. 1 (Abrantes-Metz Rpt. ¶ 22).

[15] Dr. Abrantes-Metz's analysis relies on and uses Plaintiffs' expert Dr. Nicholas's Hill's definition of "Major Concert Venues."  Ex. 1 (Abrantes-Metz Rpt. ¶ 30).

(Abrantes-Metz Rpt., Ex. H.2).   Dr. Abrantes-Metz's model improperly calculates damages flowing from conduct outside of the limitations period and fails as a result.

Even if it Monetary Relief States were allowed to proceed under a theory whereby the limitations period runs from when each consumer purchased a ticket (which they should not be allowed to do, *see Sabre*, 938 F.3d at 69),[16] Dr. Abrantes-Metz's model cannot calculate those damages either.   Indeed, Dr. Abrantes-Metz testified that her model calculates damages based on when a given event *occurred*, not when the ticket was purchased and the consumer paid the alleged overcharge.   Ex. 3 (Abrantes-Metz Tr. 228:23-229:19) ("Q. Since you're basing it on when the event took place, let's imagine a scenario where the concert's in January of a given year, so the tickets were, at least mostly, sold in the prior year. Where do the tickets that were sold in that prior year show up? THE WITNESS: They should show up related to the event as when the event happened, because I'm calculating an average overcharge per event, and the data is not at the [] individual ticket transaction. And my recollection is that it is, as to the event level, when the event happened." (objection omitted) (cleaned up)).   As just one example, Dr. Abrantes-Metz's model includes tickets sold to consumers outside the limitations period *and* to consumers residing outside of the Monetary Relief States for a show that played in the District of Columbia within the limitations period.[17]   Dr. Abrantes-Metz's model improperly characterizes damages for these

---

[16] Even assuming that the Monetary Relief States could show that claims accruing before their limitations periods were actionable due to "continuing violations" during the limitations period, they "cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period."  *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 190 (1997); *see also Litovich v. Bank of Am. Corp.*, No. 20-CV-3154 (VEC), 2025 WL 2521039, at *16 (S.D.N.Y. Sept. 2, 2025) ("If the defendant engages in a continuing violation, each new overt act that is part of the violation restarts the period of limitations but does not permit the plaintiff to recover for injuries caused by acts that occurred before that limitations period.").

[17] *See* LNE-LIT24-DAT-000079 (contains event dates and locations); LNE-LIT24-DAT-000093 (contains information on ticket counts and transaction dates); LNE-LIT24-DAT-000095 (contains

tickets as recoverable (which is wrong, since the alleged harm occurred outside the limitations period) and as accruing to the citizens of the District of Columbia (which is wrong, since the purchasers resided outside the District of Columbia and outside the Monetary Relief States altogether). Dr. Abrantes-Metz conceded such flaws pervade her model during deposition.[18]

As a result, Dr. Abrantes-Metz's model does not reliably calculate recoverable damages for each of the Monetary Relief States.

These are non-exhaustive illustrative examples of the flaws in Dr. Abrantes-Metz's model, and the various ways in which such flaws will manifest in improper recovery. And the reality is, Dr. Abrantes-Metz cannot determine one way or another how many such errors persist throughout her model. Dr. Abrantes-Metz's model is unfit to calculate appropriate recovery because it does not account for, nor can it identify: (1) if the damages are linked to unlawful instead of lawful conduct, (2) when the alleged anticompetitive conduct that caused the damages began, (3) when the damage actually accrued to the consumer, and/or (4) to which states' citizens the damages belong such that a trier of fact would even know which limitations period is applicable (*see infra* Section III). Especially where only some of a defendant's conduct is actionable, the plaintiff must "provide the jury with a reasonable basis upon which to estimate the amount of [plaintiff's] losses" for which the plaintiff can recover, as well as the amount caused by "other factors" for which the

---

customer and transaction IDs); LNE-LIT24-DAT-000102 (contains state information for ticket buyers). Because Defendants do not think the contents of these files are in dispute, Defendants have not attached the large native documents to this filing. To the extent the Court would find it useful review these files, Defendants can provide them via a hard drive.

[18] *See* Ex. 3 (Abrantes-Metz Tr. 228:23-229:19) (testifying that damages are calculated based on when the event occurred, not when the ticket was purchased); *id.* (Abrantes-Metz Tr. 230:15-231:7) ("Q. So, for example, for an event at a venue at the Mann Center in Philadelphia, there's no way to determine, in your analysis of damages, how much of that damage is attributable to people who live in Pennsylvania as opposed to live in New Jersey or Delaware or elsewhere, right? A. That's correct. I did not undertake an individual analysis. I calculated an overcharge per event. That was not part of what was necessary for my assignment." (objection omitted))

plaintiff cannot recover. *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1378–79 (2d Cir. 1988). Dr. Abrantes-Metz's model is not a reliable method for doing so and should be excluded on that basis.

## II. DR. ABRANTES-METZ'S DAMAGES MODEL IS UNRELIABLE AND UNHELPFUL TO THE TRIER OF FACT BECAUSE IT IGNORES UPFRONT PAYMENTS IN CALCULATING TICKETMASTER'S RETAINED AMOUNT

Separately, Dr. Abrantes-Metz's opinions are unreliable because key assumptions are wholly unsupported—and indeed contradicted—by the record. *See Dependable Sales and Service, Inc. v. TrueCar, Inc.*, 311 F. Supp. 3d 653, 659 (S.D.N.Y. 2018) (excluding expert report where expert's conclusion regarding the motivations behind consumers' purchases lacked adequate support and "did not account for other market factors"); *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 171–72 (S.D.N.Y. 2018) (excluding expert conclusion drawn "without any analysis of the market and corporate conditions"); *see also In re Wholesale Grocery Products Antitrust Litig.*, 946 F.3d 995, 1002-3 (8th Cir. 2019) (upholding exclusion of expert's opinions for "[falling] short of incorporating all aspects of the relevant markets to demonstrate the veracity of the [competitive] benchmark chosen").

*First*, Dr. Abrantes-Metz does not account for the upfront payments that Ticketmaster makes to venues to secure ticketing contracts. Ex. 2 (Abrantes-Metz Reb. Rpt. ¶ 107). Dr. Abrantes-Metz takes the position that these payments are "irrelevant" and that they "should have no impact on marginal costs and thus pricing." *Id.* (Abrantes-Metz Reb. Rpt. ¶¶ 107, 111); *see* Ex. 3 (Abrantes-Metz Tr. 232:18-233:5). But the record evidence—and basic mathematics—does not support her theory. It is undisputed that, when Ticketmaster negotiates ticketing contracts with venues, the upfront payments are a key financial component of the deal, and are often set in conjunction with Ticketmaster's per-ticket fees—e.g., if a venue demands a larger upfront payment, Ticketmaster typically will seek a larger share of the fees in return. *See, e.g.*, Ex. 30

18

(Wichser Tr. 157:11-14, 157:20-158:3) ("███████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████"); Ex. ██████ Tr. 60:9-22) (████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████). Accordingly, there is no question that upfront payments are relevant to and impact the "price" Ticketmaster "charges" the venue.

Dr. Abrantes-Metz ignores this fact. Indeed, she acknowledges that she does not have any actual evidence to support her position that upfront payments do not materially impact the allocation of ticketing fees between Ticketmaster and the venue, and instead called it "a principle of economics." Ex. 3 (Abrantes-Metz Tr. 240:22-242:14). But it is not a "principle of economics" that if a bargain results from a two-way flow of money—some to the service provider and some to the buyer—the service provider's price is only what it receives without regard to what it has to pay for the opportunity to receive it. That is nonsense.

Dr. Abrantes-Metz further opines that it is "possible that in the But-for World, [major concert venues] would sell tickets through multiple ticketers" instead of entering exclusive contracts, and that this "would have resulted in consumer prices at least as low as those modeled in [her] AXS benchmark." Ex. 1 (Abrantes-Metz Rpt. ¶¶ 107–08). But multiple venues testified that, ████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

19

*E.g.*, Ex. ▮▮▮ Tr. 61:5-23); Ex. ▮▮▮ Tr. 57:12-58:15).  Dr. Abrantes-Metz acknowledged during her deposition that this was an economically rational response from the venues.  *See* Ex. 3 (Abrantes-Metz Tr. 247:11-248:16).  This confirms that upfront payments and fee income are part of one equation.  There is no basis for calculating Ticketmaster's retained amount without regard to upfront payments.

*Second*, Dr. Abrantes-Metz's model improperly includes "inside fees" when determining Ticketmaster's allegedly supracompetitive retained amount.  This results in her model calculating an inflated overcharge based on a fee venues never incur and therefore cannot pass on to fans.  In particular, Ticketmaster charges an "inside fee" for use of its Platinum pricing tool.  Ex. 31 (McInnes 30(b)(6) Tr. 62:17-23); Ex. 32 (Marcus 30(b)(6) Tr. 233:15-18).  Inside fees are charged directly to the artist or promoter for use of the tool.  Ex. 31 (McInnes 30(b)(6) Tr. 62:17-23); Ex. 32 (Marcus 30(b)(6) Tr. 233:15-18).   It is up to the artist and promoter whether or not to use the tool, and the fee is only charged if they decide to use it.  Ex. 3 (Abrantes-Metz Tr. 273:3-9).

Dr. Abrantes-Metz's model relies on *venues* passing on what they are allegedly overcharged by Ticketmaster to fans via higher ticketing fees.  Ex. 3 (Abrantes-Metz Tr. 151:8-23); Ex. 1 (Abrantes-Metz Rpt. ¶ 97).  But venues are *not* charged the inside fee for the Platinum pricing tool.  Ex. 3 (Abrantes-Metz Tr. 273:10-14).  By including inside fees in her calculations, Dr. Abrantes-Metz's model erroneously predicts that venues pass on a charge to consumers that the venues never incur.  Such a result is nonsensical and economically unsound.  And Dr. Abrantes-Metz provided no justification for including fees venues do not pay in her calculated overcharge.  To the contrary, though she acknowledged that venues do not pay inside fees, *id.* (Abrantes-Metz Tr. 273:10-14), she maintained that "whether it is an inside fee or not is irrelevant for [her] calculation," *id.* (Abrantes-Metz Tr. 270:9-21).

In sum, Dr. Abrantes-Metz's model excludes upfront payments that directly affect the fee splits in contracts between venues and ticketers, yet includes inside fees that venues do not pay. Dr. Abrantes-Metz's opinions are therefore counter to market realities and otherwise unsupported by record evidence, and should be excluded on that basis. *See Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, No. 11-CV-681 KBF, 2015 WL 5459662, at *8 (S.D.N.Y. Sept. 16, 2015) ("While it is certainly true … that [the expert] is testifying based on experience and not on scientific data, that does not mean that the Court's concerns with ipse dixit disappear. All experts testify to some extent based on experience. There must be some verifiable way of demonstrating the validity of each of [the expert's conclusions]."); *Amorgianos*, 303 F.3d at 266 ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert."); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000) (excluding expert opinion because, among other reasons, "it did not incorporate all aspects of the economic reality").

## III.    DR. ABRANTES-METZ'S DAMAGES MODEL IS UNRELIABLE AND UNHELPFUL TO THE TRIER OF FACT BECAUSE IT CANNOT DETERMINE TO WHICH STATES' CITIZENS DAMAGES ACCRUE

Dr. Abrantes-Metz's damages model also fails because it cannot reliably calculate and apportion damages for the specific citizens of each of the Monetary Relief States.[19]   To demonstrate antitrust injury for their federal claims, the Monetary Relief States must show that citizens *residing in their states* were injured.  *See* 15 U.S.C. § 15c(a)(1) ("Any attorney general of a State may bring a civil action in the name of such State, as *parens patriae* on behalf of *natural*

---

[19] As described in Defendants' Motion for Summary Judgment, Plaintiffs fail at the antecedent step of demonstrating antitrust injury.  Defs.' Mot. for Summ. J., § V.B., Dkt. 689.  But to the extent the Court allows the Monetary Relief States' *parens patriae* claims to proceed (it should not), Dr. Abrantes-Metz's model fails to provide a reliable method for determining damages for each Monetary Relief State's residents.

*persons residing in such State* … to secure monetary relief … for *injury sustained by such natural persons* … by reason of any violation of sections 1 to 7 of this title." (emphasis added)); *New York v. Feldman*, 210 F. Supp. 2d 294, 304 (S.D.N.Y. 2002) ("[15 U.S.C. § 15c] only authorizes a state attorney general to bring a federal antitrust suit on behalf of its own state's residents"); *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 216 (1990) ("[E]ven when state attorneys general decide to bring *parens patriae* actions, they may sue only on behalf of resident natural persons.").[20] Conversely, the Monetary Relief States *cannot* recover damages incurred by residents of other states for damages accruing under the Sherman Act. *See UtiliCorp*, 497 U.S. at 216 (distinguishing residents, whom state attorneys general may sue on behalf of, from nonresidents). Courts regularly reject models that use flawed proxies to estimate state-specific damages, especially when a more reliable approach can be taken. *See Price v. L'Oreal USA*, No. 17 CIV. 614 (LGS), 2020 WL 4937464, at *8 (S.D.N.Y. Aug. 24, 2020) (excluding expert opinion because his damages estimates relied on unsupported assumptions about how many purchases occurred in California and New York and did not collect direct data on purchase location or frequency).

Dr. Abrantes-Metz's damages model fails because—by her own admission—it does not, and cannot, identify who was injured or where they live. Dr. Abrantes-Metz admits that she did not analyze where fans were located and did not incorporate any information on "who exactly the consumer is or which state the consumer lives in." *See* Ex. 3 (Abrantes-Metz Tr. 230:1-10) ("Q. Did you analyze the extent to which tickets to a given event were sold to residents of a state other than the state where the venue was located? A. I do not believe so. The analysis was conducted at

---

[20] All Monetary Relief States who seek damages do so under 15 U.S.C. § 15c. The following ten Monetary Relief States seek damages under 15 USC § 15c *only*, and not under any state law: Arizona, Connecticut, Minnesota, New Jersey, New York, North Carolina, Oklahoma, Pennsylvania, Washington, and Wisconsin.

the event level, *without the information on who exactly the consumer is or which state the consumer lives in*." (emphasis added)).  And while Dr. Abrantes-Metz categorizes her alleged damages by state, she admits that her calculations are based on *where venues are located*, not on where the allegedly harmed fans who purchased tickets for events at those venues reside.  *See id*.

To be sure, this was a deliberate choice.  Several of the same State Plaintiffs, suing on behalf of their consumers in their *parens patriae* capacities, know how to accurately measure damages to their state residents and have done so before using consumer-specific purchase data. *See In re Elec. Books Antitrust Litig.*, No. 11 MD 2293 DLC, 2014 WL 1282293, at *10 (S.D.N.Y. Mar. 28, 2014) (describing Plaintiffs' expert's model which used "individual sales transaction data" for more than 149 million sales across seven book-sellers to "calculate[] the total damages to consumers, both putative class members and in the States").  Moreover, Dr. Abrantes-Metz had access to transaction-level and order-level data from Ticketmaster and her benchmark AXS that would have provided her with information on individual purchaser-consumers' state of residence and ZIP code.  *See, e.g.*, Ex. 34 (June 27, 2025 Fayne Ltr. at 8–9); Ex. 1 (Abrantes-Metz Rpt. ¶ 114, n.226).  Yet she chose to rely on Dr. Hill's event-level data, without conducting any analysis of where the supposedly impacted fans are located.  That choice renders Dr. Abrantes-Metz's model unreliable to support any finding on behalf of each Monetary Relief State as to the specific amount of damages attributable to their citizens.[21]

---

[21] Additionally, in calculating the amount of the overcharge that venues supposedly pass through to fans, Dr. Abrantes-Metz relied on data from Ticketmaster's contracts with just fifty-four venues. Ex. 1 (Abrantes-Metz Rpt., Fig. 27 & Ex. H.2).  Of the twenty-four State Plaintiffs seeking damages, *almost half* of them do not even have in-state venues represented in this dataset. *See id.* (Abrantes-Metz Rpt., Ex. H.2).  So even if Dr. Abrantes-Metz's methodology were reliable (it is not), her model would still be unhelpful to the trier of fact because it fails to demonstrate harm to citizens in every Monetary Relief State.

IV.    **DR. ABRANTES-METZ'S DAMAGES MODEL IS UNRELIABLE AND UNHELPFUL TO THE TRIER OF FACT BECAUSE HER ASSUMPTIONS ABOUT AXS COMPARABILITY ARE INTERNALLY INCONSISTENT AND INCONSISTENT WITH PLAINTIFFS' OTHER EXPERT'S FINDINGS**

Dr. Abrantes-Metz's damages model is also internally inconsistent and inconsistent with findings of Dr. Hill. Dr. Abrantes-Metz's model is based on the assumption that AXS's "price" is the competitive price Ticketmaster would have charged venues absent the alleged conduct. *See* Ex. 3 (Abrantes-Metz Tr. 268:2-269:12). Dr. Abrantes-Metz testified that the difference in Ticketmaster's price as compared to AXS's price is due entirely to Defendants' alleged anticompetitive conduct. *Id.* (Abrantes-Metz Tr. 267:12-269:2). In other words, Dr. Abrantes-Metz's model rests on the assumption that, in the absence of specific anticompetitive conduct, Ticketmaster could not charge *any amount* above AXS.

Dr. Abrantes-Metz concedes that in order for AXS to be a reasonable benchmark, Ticketmaster and AXS must be of comparable quality, *see id.* (Abrantes-Metz Tr. 281:12-283:6), yet she admits that she is not offering any opinion on whether the record shows a consensus that AXS is, in fact, of comparable quality to Ticketmaster, *id*. (Abrantes-Metz Tr. 286:22-287:6).[22] Indeed, Dr. Abrantes-Metz concedes that there may have been quality differences between Ticketmaster and AXS that could partially explain any price differential between them. *See* Ex. 2 (Abrantes-Metz Reb. Rpt. ¶ 57). Dr. Abrantes-Metz states that "[t]o the extent there were any differences in dimensions of quality between AXS and Ticketmaster, testimony … and publicly

---

[22] Dr. Abrantes-Metz is also inconsistent as to what level of comparability between Ticketmaster and AXS is required for her benchmark analysis. During her deposition, Dr. Abrantes-Metz began her explanation of her model comparing Ticketmaster and AXS by using an analogy of clones, one of whom went to space and the other who did not, such that any difference between them is plainly related to one's time in space. Ex. 3 (Abrantes-Metz Tr. 81:24-84:12). She landed somewhere much different—ultimately taking the position that unless Ticketmaster was "systematically" of higher quality than AXS, they were sufficiently comparable for her analysis. *Id.* (Abrantes-Metz Tr. 289:20-295:5).

available information suggest these would have been at their greatest in the early years of the analysis period." *Id*. The logic of that concession is notable, since this is a comparison between a relatively new entrant and the most established and successful ticketing company in the world.

Dr. Hill (upon whom Dr. Abrantes-Metz relies) purports to have conducted extensive analysis of the relative quality of primary ticketing companies. Ex. 33 (Hill Reb. Rpt. ¶¶ 439–76). He never claims that AXS and Ticketmaster are of substantially equal quality. Indeed, in a telling maneuver, Dr. Hill responded to an analysis by a defense expert that Ticketmaster achieves greater ticket sales than AXS—a sure sign of higher quality—by "expand[ing] Dr. Carlton's analyses to include additional ticketers." Ex. 33 (Hill Reb. Rpt. ¶ 470); *see also id.* (Hill Reb. Rpt. ¶ 459, Figs. 75, 76, 77). He did not contest the Ticketmaster versus AXS comparison, which is what matters for these purposes.

And despite these quality differences that belie a fundamental assumption of her model, Dr. Abrantes-Metz does not analyze how much of the "overcharge" was the result of lawful quality differences as opposed to allegedly unlawful anticompetitive conduct. *See* Ex. 2 (Abrantes-Metz Reb. Rpt. ¶ 57 & Fig. 1).

These failings render Dr. Abrantes-Metz's benchmark unsupportable and her model unreliable, and her opinions should be excluded on that basis. *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 478, 481–83 (S.D.N.Y. 2018) (finding expert's opinions unreliable they were "internally inconsistent" and inconsistent with the plaintiffs' other expert's opinions); *Deutsch v. Novartis Pharms. Corp.*, 768 F. Supp. 2d 420, 469 (E.D.N.Y. 2011) (identifying inconsistencies between two of the same party's experts as a basis for exclusion); *see also In re Wholesale Grocery Prods*., 946 F.3d at 1002 (excluding expert opinion where "[t]here was too great an analytical gap between the facts of the case and the benchmark chosen … to

support [the expert's] opinion that the prices paid by [Defendants] and [the chosen benchmark] would move in tandem but for the [alleged anticompetitive conduct], and likewise that divergence in those prices demonstrates antitrust injury or impact").

## CONCLUSION

For the reasons stated above, the Court should exclude Dr. Abrantes-Metz's reports, opinions, and any related testimony.

Dated: November 13, 2025

LATHAM & WATKINS LLP

_____
Alfred C. Pfeiffer (admitted *pro hac vice*)
    *Co-Lead Trial Counsel*
David R. Marriott
    *Co-Lead Trial Counsel*
Andrew M. Gass (admitted *pro hac vice*)
Timothy L. O'Mara (admitted *pro hac vice*)
Jennifer L. Giordano
Kelly S. Fayne (admitted *pro hac vice*)
Lindsey S. Champlin (admitted *pro hac vice*)
Robin L. Gushman (admitted *pro hac vice*)

505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600

1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

555 11th Street, NW, Suite 1000
Washington, D.C. 20004
(202) 637-2200

Al.Pfeiffer@lw.com
David.Marriott@lw.com
Tim.O'Mara@lw.com
Jennifer.Giordano@lw.com
Andrew.Gass@lw.com
Kelly.Fayne@lw.com
Lindsey.Champlin@lw.com
Robin.Gushman@lw.com

*Attorneys for Defendants Live Nation*
*Entertainment, Inc. and Ticketmaster L.L.C.*

CRAVATH, SWAINE & MOORE LLP

_____
Lauren A. Moskowitz
Jesse M. Weiss
Nicole M. Peles

Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 474-1000

lmoskowitz@cravath.com
jweiss@cravath.com
npeles@cravath.com

*Attorneys for Defendants Live Nation*
*Entertainment, Inc. and Ticketmaster L.L.C.*

## CERTIFICATE OF COMPLIANCE

I, Alfred C. Pfeiffer, an attorney duly admitted to practice *pro hac vice* before this Court, hereby certify pursuant to Local Rule 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rules"), Rule 8(C) of Judge Arun Subramanian's Individual Practices in Civil Cases ("Individual Rules"), that the foregoing Memorandum of Law was prepared using Microsoft Word, and contains 8,615 words. In making this calculation, I have relied on the word and page counts of the word-processing program used to prepare the document.

Dated:    November 13, 2025
          Orford, New Hampshire

_____
Alfred C. Pfeiffer