# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *et al.,*<br><br>　　　　　　*Plaintiffs,*<br><br>　　　v.<br><br>LIVE NATION ENTERTAINMENT, INC. and TICKETMASTER L.L.C.,<br><br>　　　　　　*Defendants.* | Case No. 1:24-cv-03973 (AS)(SLC)<br><br>**ORAL ARGUMENT REQUESTED**<br><br>**FILED UNDER SEAL** |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO EXCLUDE THE REPORTS, OPINIONS, AND TESTIMONY OF <u>PLAINTIFFS' EXPERT DR. SHANNON ANDERSON</u>

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 4

LEGAL STANDARDS ...................................................................................................... 7

ARGUMENT .................................................................................................................... 8

I.      DR. ANDERSON LACKS THE REQUISITE EXPERTISE TO OFFER HER
        OPINIONS. ............................................................................................................. 8

II.     ALL OF DR. ANDERSON'S OPINIONS SHOULD BE EXCLUDED
        BECAUSE THEY ARE IRRELEVANT, UNHELPFUL TO THE JURY, AND
        RISK UNFAIR PREJUDICE AND CONFUSION. ....................................... 14

        A.      Dr. Anderson's Economic and Monopoly Profits Opinions Are
                Inadmissible. ........................................................................................... 14

        B.      Dr. Anderson's Financial Reporting Opinions Are Inadmissible. ........ 17

        C.      The Management View Opinion Is Inadmissible. ................................. 19

        D.      Dr. Anderson's Rebuttal Opinions Should Be Excluded. .................... 22

CONCLUSION ............................................................................................................... 25

Appendix A ............................................................................................................ Attached

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*523 IP LLC v. CureMD.Com*,
  48 F. Supp. 3d 600 (S.D.N.Y. 2014)........................................................................9

*Anderson News, L.L.C. v. Am. Media Inc.*,
  No. 09 Civ. 2227, 2015 WL 5003528 (S.D.N.Y. Aug. 20, 2015) ...........................20

*Boucher v. U.S. Suzuki Motor Corp.*,
  73 F.3d 18 (2d Cir. 1996)..........................................................................................7

*Chalmers v. City of New York*,
  No. 20 Civ. 3389, 2022 WL 4330119 (S.D.N.Y. Sep. 19, 2022) .....................13, 16

*City of New York v. FedEx Ground Package Sys., Inc.*
  No. 13 Civ. 9173, 2018 WL 4961455 (S.D.N.Y. Oct. 15, 2018) ....................14, 23

*Clarke v. Travco Ins. Co.*,
  No. 13-cv-5140, 2015 WL 4739978 (S.D.N.Y. Aug. 7, 2015)........................14, 16

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)............................................................................................7, 16

*Dreyer v. Ryder Auto. Carrier Grp., Inc.*,
  367 F. Supp. 2d 413 (W.D.N.Y. 2005) ...................................................................15

*Ellis v. YMCA Camp Mohawk, Inc.*,
  615 F. App'x 697 (2d Cir. 2015) ............................................................................12

*H. Daya Int'l Co., Ltd. v. Do Denim, LLC*,
  No. 16 CIV. 8668, 2023 WL 1340422 (S.D.N.Y. Jan. 31, 2023)...............10, 16, 20

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
  No. 14-MD-2542, 2025 WL 354671 (S.D.N.Y. Jan. 30, 2025) .............................24

*In re LIBOR-Based Fin. Instruments*,
  No. 11 MDL 2262, 2025 WL 2733020 (S.D.N.Y. Sep. 25, 2025)..........................23

*In re Rezulin Prods. Liab. Litig.*,
  309 F. Supp. 2d 531 (S.D.N.Y. 2004).......................................................................7

*In re Rezulin Prods. Liab. Litig.*,
  441 F. Supp. 2d 567 (S.D.N.Y. 2006).....................................................................14

*Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*,
 103 F. Supp. 2d 268 (S.D.N.Y. 2000) ...................................................................7, 21

*Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*,
 No. 16CV1318GBDBCM, 2021 WL 4810266 (S.D.N.Y. Sep. 30, 2021) ..............................24

*LinkCo, Inc. v. Fujitsu Ltd.*,
 No 00 Civ. 7242, 2002 WL 1585551 (S.D.N.Y. July 16, 2002) ......................................19, 21

*Pac. Life Ins. Co. v. Bank of New York Mellon*,
 571 F. Supp. 3d 106 (S.D.N.Y. 2021) .........................................................................8, 10, 20

*Scentsational Techs., LLC v. Pepsi, Inc.*,
 No. 13-cv-8645, 2018 WL 1889763 (S.D.N.Y. Apr. 18, 2018) ......................................8, 20

*United States v. Bankman-Fried*,
 No. S6 22-CR-0673, 2023 WL 6162865 (S.D.N.Y. Sep. 21, 2023)..................................19, 21

*United States v. Brooks*,
 No. 08 CR. 35, 2008 WL 2332371 (S.D.N.Y. June 4, 2008) ...........................................17, 21

*United States v. Gatto*,
 986 F.3d 104 (2d Cir. 2021)...............................................................................................8

*United States v. Williams*,
 506 F.3d 151 (2d Cir. 2007)...............................................................................................7

*Vogel v. TakeOne Network Corp.*,
 No. 22-cv-3991, 2025 WL 2732653 (S.D.N.Y. Sep. 25, 2025) ...........................................16

## Statutes & Rules

Fed. R. Evid. 402 ...........................................................................................................7

Fed. R. Evid. 403 ........................................................................................................4, 8

Fed. R. Evid. 702 .................................................................................................... passim

Defendants Live Nation Entertainment, Inc. and Ticketmaster L.L.C. (together, "Live Nation" or "Defendants") respectfully submit this memorandum of law in support of their motion to exclude the reports, opinions, and testimony of Plaintiffs' expert, Dr. Shannon Anderson.[1]

## INTRODUCTION

Dr. Anderson's presence in this case appears to have a single purpose: to try to undermine the inconvenient fact for Plaintiffs that Live Nation's profits do not even approach monopoly profits. But Dr. Anderson—like all of Plaintiffs' liability experts—does not confront this issue directly and does not actually opine that Live Nation earns supracompetitive or monopoly profits. Indeed, she does not even attempt to calculate economic or monopoly profits at all. Rather, Dr. Anderson is here to tell the jury that no measure of profits can be trusted for any purpose. That position is facially absurd and runs counter to well-established principles of both financial accounting and economics.

It is telling that Plaintiffs enlisted neither a CPA nor an economist to offer these opinions. Instead, they found Dr. Anderson, a former professor of management accounting with no expertise relevant to this action. Dr. Anderson purports to opine that accounting measures cannot be used to measure economic profits and monopoly profits. She also purports to opine on Defendants' financial accounting prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), including by lobbing inapposite criticisms at Defendants' accounting expert Paul Meyer. But by her own admission, she is neither an economist nor an expert in financial accounting, antitrust, or valuation, and she has conceded that she has no expertise in how to calculate or measure economic profits or monopoly profits. Ex. 3 (Anderson Deposition

---

[1] Citations and quotations are omitted unless otherwise stated.

Transcript ("Anderson Tr.")) 82:25–87:1, 212:10–17.[2]  Dr. Anderson's sole area of expertise, managerial accounting, by her own admission, has nothing to do with this case.  Dr. Anderson simply brings no relevant expertise to this case and all of her opinions should be excluded for that reason.  *See infra* Section I.

Even if Dr. Anderson had the requisite expertise to offer her opinions (she does not), those opinions would not assist the jury.  Because these opinions have no probative value, allowing Dr. Anderson to introduce them would only confuse and inflame the jury.

*First*, Dr. Anderson's primary role as she sees it is to "caution[] the court about accepting accounting earnings as a surrogate for economic profits".  Ex. 3 (Anderson Tr.) 218:20–22.  To support that opinion, she opines that accounting profits are "often inconsistent" with economic profits, and that accounting profits are therefore "inadequate" as a basis for conclusions about monopoly profits.  Ex. 1 (Expert Report of Shannon Anderson ("Anderson Rpt.")) ¶ 13.  Even setting aside her admission that she has no expertise in how to define or calculate economic profits *or* in how to evaluate whether a firm is earning monopoly profits, she does not even attempt to calculate economic profits and concedes that she has no idea whether Live Nation's economic profits are higher than, lower than, or the same as its publicly reported financial accounting profits. She does not apply any science whatsoever to this opinion, which is simply lifted from two articles she or her support staff found.  Her opinion is inadmissible and should be excluded.  *See infra* Section II.A.

*Second*, Dr. Anderson opines that Live Nation's publicly reported financial results used by Mr. Meyer—which she expressly concedes were prepared in accordance with GAAP and which

---

[2] Unless otherwise noted, all exhibits refer to those attached to the Declaration of Nicole M. Peles in Support of Defendants' Motion to Exclude the Reports, Opinions, and Testimony of Plaintiffs' Expert Dr. Shannon Anderson.

she is not challenging as non-compliant or deficient in any way—"obscure" and "impair[] the assessment of" Live Nation's profitability.  Ex. 1 (Anderson Rpt.) ¶¶ 14(a), 91.  Dr. Anderson's opinions concerning Live Nation's public financial reporting should be excluded.  In addition to lacking expertise in financial accounting, which is a subject distinct from management accounting, Dr. Anderson fails to explain how the opinions are relevant to any issue in this case.  *See infra* Section II.B.

*Third*, Dr. Anderson's final proclaimed purpose here is to "explain how the firm . . . thinks about its business from a performance management standpoint".  Ex. 3 (Anderson Tr.) 93:23–94:2.  Dr. Anderson's opinions concerning how Live Nation management views the business constitute no more than a recitation of testimony and documents that the jury is capable of understanding and evaluating on its own—without specialized expertise.  These opinions are also irrelevant because Dr. Anderson's own opinion is that they are not relevant to understanding economic profits or monopoly profits.  *See, e.g.*, *id*. at 266:21–267:4.  *See infra* Section II.C.

*Fourth*, Dr. Anderson's criticisms of Mr. Meyer's opinions must also be excluded.  She identifies several purported "flaws" in his analysis, including his evaluation of Live Nation's profitability using accounting profits, his presentation of averages that include periods impacted by COVID-19, his comparator analysis, and his analysis of the profitability of Live Nation owned-and-operated ("LNOO") amphitheaters.  But these opinions are well beyond the scope of Dr. Anderson's expertise in management accounting—indeed, many of them implicate no expertise at all, and amount to no more than lay critiques of Mr. Meyer's analysis that the jury is capable of making itself.  *See infra* Section II.D.

At bottom, Dr. Anderson's opinions merely imply to the jury that Defendants' financial accounting numbers cannot be trusted, and that Defendants are hiding profits and otherwise

engaging in nefarious conduct.  Such an implication, which cannot be neutralized merely by disclaiming it, is baseless, unfairly prejudicial, and plainly improper.  Dr. Anderson's opinions should be excluded in their entirety under Federal Rules of Evidence 702 and 403.

## BACKGROUND

Dr. Anderson submitted an opening expert report on August 1, 2025 and a rebuttal expert report on October 9, 2025 (the "Anderson Reb. Rpt.").  Dr. Anderson was deposed on November 2, 2025.

According to her description of her assignment in her opening report, Dr. Anderson purports to (1) "[e]xplain[] the differences between public financial reporting and internal management accounting principles and practices"; and (2) "[e]xplain[] Live Nation's accounting practices for its reported business segments, internal business lines, and relevant portions of the business, and describe[] the resulting profitability measures".  Ex. 1 (Anderson Rpt.) ¶ 1.  The affirmative opinions in Dr. Anderson's opening report fall into three categories:  "Economic and Monopoly Profits Opinions", "Financial Reporting Opinions", and the "Management View Opinion".

Dr. Anderson's Economic and Monopoly Profits Opinions are as follows:

- "Accounting-based performance measures" are "inconsistent with economic performance (*e.g.*, economic profits) and thus are inadequate as the basis for reaching conclusions about the presence or source of monopoly profits".  *Id.* ¶ 13.

- "[I]t is economic profits that have been an important input to the evaluation of monopoly profits."  *Id.* ¶ 59.

- Economic profits are "unconstrained by GAAP" and "include full consideration of assets employed in generating revenues", using current market values of assets employed rather than historical cost" and "the opportunity costs of capital".  *Id.* ¶ 59. Economic and accounting profits "diverge" in their treatment of intangible assets. Customer data and venue "synergies" may generate "future income" but are "not recognized as an asset on the balance sheet even if they provide substantial economic value".  *Id.* ¶¶ 61–64.

Dr. Anderson's Financial Reporting Opinions are as follows:

- "Live Nation's publicly reported segment financial results obscure the performance and profitability of constituent business lines and relevant markets", *id.* ¶ 91, and "impair[] the assessment of accounting profits of certain business activities", *id.* ¶ 14(a).

- 
  *Id.* ¶ 14(b).

- Live Nation's Sponsorship and Advertising segment profits are driven by its other two segments, and because those segments are reported separately, "the requirement and/or discretion to separately report its performance does not provide a clear view of performance in relevant markets". *Id.* ¶ 93. Dr. Anderson presents alternative presentations of Live Nation's accounting profitability by changing the treatment of credit card and artist fees. These alternatives "show that accounting determinations for the treatment of certain costs can meaningfully impact calculated profit margins that are relevant for performance evaluation". *Id.* ¶¶ 109, 116, 121.

Dr. Anderson's Management View Opinion is as follows:

- 
  . *Id.* ¶ 14(c); *see also id.* ¶¶ 110–115.

Dr. Anderson also was asked by Plaintiffs to rebut Live Nation's expert, Paul Meyer.

Those rebuttal opinions (the "Rebuttal Opinions"), set forth in her Rebuttal Report, are as follows:

- Mr. Meyer's reliance on "data from financial disclosures and internal accounting metrics" to evaluate Live Nation's profitability is inadequate for assessing monopoly profits, and he fails to evaluate economic profits or fully account for intangible assets. Ex. 2 (Anderson Reb. Rpt.) ¶¶ 11, 17–59.

- Mr. Meyer inappropriately includes periods affected by COVID-19 in his Live Nation historical profitability analyses. *Id.* ¶¶ 60–64, 115.

- Mr. Meyer's comparison of Live Nation's financial results is "flawed" and "unreliable" because he failed to assess the appropriateness of comparators, improperly changed metrics from one comparison to another, and failed to perform a sensitivity analysis. *Id.* ¶¶ 65–108. His profitability analysis for Live Nation owned-

and-operated amphitheaters should have included different accounting data and different measures of profitability. *Id.* ¶¶ 109–21.

At her deposition, however, Dr. Anderson significantly narrowed the scope of her assignment and opinions and disclaimed any intention to, or expertise that would permit her to, testify on several topics covered in her reports. Although she reasserted her opinion that accounting profits are not equal to economic profits, she described her affirmative assignment as solely to "explain how the firm, in its ordinary course of business, is measuring performance" and "how it thinks about its business from a performance management standpoint". Ex. 3 (Anderson Tr.) 93:23–94:2; *see also id.* at 54:5–7. Indeed, Dr. Anderson testified that she is *not* offering any opinions on any of the following topics:

- Whether GAAP has fallen short of achieving a consistent, verifiable representation of Live Nation's financial results, *id*. at 110:5–8, 116:1–20;

- Whether Live Nation's public financial reporting is compliant with GAAP or SEC guidelines, stating that she does not take issue with Live Nation's financial reporting or accounting data and disclaiming any opinion that Live Nation's reporting is improper or deceptive, *id*. at 27:4–5, 85:18–24, 86:11–87:1, 121:12–122:19, 124:5–7, 126:24–127:3;

- How to define, calculate or assess economic profits, including how to calculate opportunity cost or quantify intangible assets or whether accounting-based measures are useful for calculating economic profits, *id*. at 147:17–22, 148:11–13, 151:16–20, 153:1–10, 176:13–20, 217:1–3, 219:2–14;

- How to perform a financial valuation analysis of Live Nation or its alleged intangible assets; "my assignment had no bearing on the valuation of the firm [or] economic returns", *id.* at 212:10–17, 222:3–10, 276:13–16;

- The presence or source of monopoly profits, how economists would evaluate such profits, or whether economic profits or accounting data can or should be used as the basis for monopoly profits, *id*. at 64:3–6, 93:19–23, 96:13–16, 138:15–17, 159:6–13, 169:10–15, 174:2–11, 181:10–16, 181:22–182:8;

- Whether the calculations of Live Nation's profitability for which she presents alternatives are inappropriate, or whether her alternatives better reflect profitability, *id*. at 81:15–24;

- How Live Nation "competes in its business or in the relevant markets", *id*. at 98:8–17;

- How to define the relevant markets in this case, including whether there is overlap or compatibility between Dr. Hill's defined markets and the managerial accounting view of the world, *id*. at 53:19–54:1, 63:12–21, 65:9–17, 119:7–14.

Neither of Plaintiffs' other experts, Dr. Hill and Dr. Abrantes-Metz, relies on Dr. Anderson's opinions in any way.  Ex. 5 (Hill Tr.) 48:2–5; Ex. 4 (Abrantes-Metz Tr.) 76:3–7.

## LEGAL STANDARDS

Federal Rule of Evidence 702 "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand".  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).  A witness "who is qualified as an expert by knowledge, skill, experience, training, or education" may testify as an expert if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).  Expert testimony must be reliable, *see id.*, and courts should exclude "speculative or conjectural" opinions, *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996).

A "fundamental" requirement of Rule 702 is that the proffered testimony "assist the trier of fact".  *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 540 (S.D.N.Y. 2004).  To assist the trier of fact in understanding or determining a fact at issue, the expert's testimony must "be relevant in that it 'fits' the facts of the case".  *Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d 268, 279–80 (S.D.N.Y. 2000) (quoting *Daubert*, 509 U.S. at 591–92). Expert testimony or evidence that is not relevant is not admissible.  *Daubert*, 509 U.S. at 587–89, 597; *see* Fed. R. Evid. 402.  Courts do "not admit expert testimony that is 'directed solely to lay

matters which a jury is capable of understanding and deciding without the expert's help'". *Pac. Life Ins. Co. v. Bank of New York Mellon*, 571 F. Supp. 3d 106, 114 (S.D.N.Y. 2021). And even where expert testimony is relevant, "the district court can nevertheless exclude [the expert's] testimony if it finds the testimony would be unfairly prejudicial" or would risk confusing the issues or misleading the jury. *United States v. Gatto*, 986 F.3d 104, 117 (2d Cir. 2021); *see* Fed. R. Evid. 403.

Moreover, a proposed expert cannot proffer expert testimony that simply recites the content of documents to help construct Plaintiffs' narrative. *See Scentsational Techs., LLC v. Pepsi, Inc.*, No. 13-cv-8645, 2018 WL 1889763, at *4 (S.D.N.Y. Apr. 18, 2018) ("Acting simply as a narrator of the facts does not convey opinions that are based on an expert's knowledge and expertise; nor is such a narration traceable to a reliable methodology.").

## ARGUMENT

All of Dr. Anderson's opinions should be excluded. She is unqualified to offer the vast majority of her opinions, and those opinions are all irrelevant and/or would be unhelpful or misleading to the jury. Appendix A submitted herewith sets forth each of Dr. Anderson's opinions and why each is inadmissible as discussed herein.

## I.    DR. ANDERSON LACKS THE REQUISITE EXPERTISE TO OFFER HER OPINIONS.

Dr. Anderson opines that "[a]ccounting-based performance measures (*e.g.*, accounting profits)" for Live Nation "are often inconsistent with economic performance (*e.g.*, economic profits) and thus are inadequate as the basis for reaching conclusions about the presence or source of monopoly profits". Ex. 1 (Anderson Rpt.) ¶ 13. She reiterates this opinion in her rebuttal to Mr. Meyer. *See* Ex. 2 (Anderson Reb. Rpt.) ¶¶ 11(a)–(b), (d). But by her own admission, Dr. Anderson is not qualified to provide expert opinions on a single element of that syllogism: she

is not an expert in financial accounting profits, in economic profits, or in monopoly profits. Thus, the entirety of those opinions, as well as all of her opinions on Live Nation's public financial reporting, the accounting decisions underlying such reporting, and her challenges to Mr. Meyer's analysis of Live Nation's profitability that was based on publicly reported financial results, *see* Ex 1 (Anderson Rpt.) ¶ 14; Ex. 2 (Anderson Reb. Rpt.) ¶¶ 11(d)–(e), should be excluded. *See* App. A.

*First*, with respect to accounting profits, Dr. Anderson admits that she has "not put [her]self forward as an expert in financial accounting". Ex. 3 (Anderson Tr.) 82:14–15. In fact, in preparing her reports, Dr. Anderson purports to have "ma[d]e certain that [she] was not inadvertently offering an opinion about financial accounting". *Id.* at 27:3–7. Dr. Anderson admitted that with respect to "compliance with GAAP" or an "interpretation of GAAP", she "would not put [her]self forward to render those opinions". *Id*. at 76:16–77:11; *see also id.* at 86:7–14 ("I would say I have no reason to say [Live Nation's financial reporting is in compliance with GAAP] because I have not formed an independent assessment, but nor am I qualified as an expert to do so.").

While Dr. Anderson may be qualified to opine on management accounting topics, that expertise cannot be extrapolated to financial accounting. As Dr. Anderson explains in her report, "management accounting" is "a sub-field of accounting that provides internal accounting information to support managerial decision-making". Ex. 1 (Anderson Rpt.) ¶ 4. Management accounting is "distinct from" the field of "financial accounting", which refers to the organization of publicly reported accounting data for presentation to external audiences in accordance with accepted accounting principles (*e.g.*, public financial statements). *Id*. "[A]n expert qualified in one subject matter does not thereby become an expert for all purposes." *523 IP LLC v.*

*CureMD.Com*, 48 F. Supp. 3d 600, 642 (S.D.N.Y. 2014); *see also* Fed. R. Evid. 702 (requiring "specialized knowledge" or "experience").

Dr. Anderson is not a CPA, which she herself describes as a common prerequisite credential for financial accounting experts. *See* Ex. 3 (Anderson Tr.) 12:18–23, 76:16–18. Moreover, she has "[n]ever been retained as an expert in a litigation on financial accounting matters", *id.* at 82:8–10, which is further disqualifying, *see H. Daya Int'l Co., Ltd. v. Do Denim, LLC*, No. 16 CIV. 8668, 2023 WL 1340422, at *3 (S.D.N.Y. Jan. 31, 2023) (finding expert unqualified in part because of expert's lack of "previous activities as an expert witness" in area at issue). Indeed, in formulating her opinions on Live Nation's financial reporting that she is not qualified to render, she confessed that she relied on a member of her support staff named Henry Mirsberger, who has a CPA. Ex. 3 (Anderson Tr.) 26:25–27:7, 28:15–29:16. When asked, she was unable to provide Mr. Mirsberger's CV or any specific information on his accounting credentials other than that she believes he previously worked for "one of the big public accounting firms". *Id.* at 79:16–25. In reality, Mr. Mirsberger received his CPA *in 2023* and has never worked full-time at an accounting firm. Ex. 6 (Mirsberger LinkedIn Profile). Dr. Anderson's reliance on Mr. Mirsberger for her opinions on Live Nation's public reporting highlights her utter lack of expertise in this area.[3]

*Second*, Dr. Anderson conceded that opinions about economic profits and monopoly profits are properly within the domain of economists. *See* Ex. 3 (Anderson Tr.) 304:14–16 (declining to offer "opinions about economic profits" because those "should be offered by an

---

[3] An expert is not permitted to "present the work of others" who assisted her unless the "expert is qualified in the field and could perform the work themselves". *Pac. Life Ins. Co.*, 571 F. Supp. 3d at 115. Dr. Anderson by her own admission is not so qualified.

economist"). Dr. Anderson is not an economist and is not an expert in calculating economic profits:

- "I'm not an economist", *id.* at 304:13–15;

- "I'm not holding myself out as an economics expert", *id.* at 159:2–3;

- "I'm not offering opinions about economic profits, about monopoly profits. That should be offered by an economist", *id.* at 304:13–16;

- "I don't know what an antitrust economist would choose or find relevant in their own analysis [concerning profit margins or profit levels]", *id.* at 270:1–5;

- As to what would be a "useful input to calculating economic profits or used by an economist, I really can't offer an opinion. It's possible", *id.* at 176:13–20;

- "I really don't -- I don't know how an economist would take scale into effect as part of economic profits", *id.* at 267:10–12.

Dr. Anderson similarly acknowledges that she is not an expert on evaluating the presence or source of monopoly profits. *See id.* at 85:3–5, 158:21–159:12. Dr. Anderson does not know how to calculate monopoly profits, and she has no understanding of what information might even be relevant to evaluating monopoly profits, including whether or to what extent evaluating the presence of monopoly profits relies on calculating economic profits:

- "It wasn't my assignment to even contribute to that assessment [of monopoly profits]", *id.* at 93:21–23;

- "[I]f I'm confined to my expertise as a management accounting expert, I shouldn't be speaking about monopoly profits", *id.* at 172:4–6;

- "I have no independent assessment of [whether monopoly profits are based on economic profits], having not ever been asked to evaluate monopoly profits", *id.* at 161:11–19;

- "I do not [have any independent opinion as to how an economist would measure monopoly profits for purposes of this case]", *id.* at 162:12–15;

- "I have no opinions about the calculation by an economist of monopoly profits", *id.* at 182:7–8;

11

- "I think . . . that tying of economic profits to the evaluation of monopoly profits is outside of my expertise. I'm not willing to leave you with the impression that a monopoly profit calculation requires economic profits, because that would require me to opine on how economists do that and I have no such opinion", *id.* at 167:15–21.

Dr. Anderson could not be more unqualified to offer expert opinions on economic profits or monopoly profits, including how they are calculated or how they relate to each other and to accounting profits. Instead of coming from a qualified expert in this case, the source of Dr. Anderson's Economic and Monopoly Profits Opinions is two academic articles. *See* Ex. 1 (Anderson Rpt.) ¶ 57. Dr. Anderson concedes that those articles are her only sources on what economic profits and monopoly profits may or may not be and how they may or may not relate to accounting profits; she conceded that she relies on those articles because "that's not my independent opinion or my expertise". Ex. 3 (Anderson Tr.) 169:8–170:11; *see also id.* at 161:23–162:10 (admitting that these two articles are the "full extent of [her] understanding of how one thinks about monopoly profits"), 173:4–16 ("I am repeating what is in that article. I don't have opinions about monopoly profits and how one should go about demonstrating them."), 184:1–8 ("I've not calculated economic profits. I -- from the articles that I've already cited to you, there seems to be quite a bit of suspicion on how perfection [of economic profit calculation] can be achieved, but I have no opinion having not done so myself."). She never even vetted those articles or their authors to understand whether they are generally accepted in the field or have been criticized. *Id.* at 177:19–23. In other words, Dr. Anderson is simply acting as an unqualified and uncritical mouthpiece for two articles, which is not the proper subject of expert testimony. "Federal Rule of Evidence 702 requires expertise based on specialized knowledge and experience, not a mere understanding derived from others' publications." *Ellis v. YMCA Camp Mohawk, Inc.*, 615 F. App'x 697, 699 (2d Cir. 2015).

Dr. Anderson argues that she does have the requisite expertise to opine that accounting profits do not equal economic profits based on her "training". Ex. 3 (Anderson Tr.) 172:16. But she conceded that she does not know how to define or calculate economic profits. If Dr. Anderson is not qualified to say what economic profits *are*, then it is also beyond her expertise to say what they *are not*. Indeed, Dr. Anderson concedes that she cannot rule out the relevance of accounting profits to a determination of economic profits and/or monopoly profits:

- "Not knowing how an economist would calculate monopoly profits, I can't infer how useful elements of accounting are", *id.* at 171:17–19; *see also id.* at 174:2–11 (similar);

- "[Opining on whether economists would find accounting information useful] would require me to speculate on how economists prove monopoly and I really have no opinion or understanding of that", *id.* at 96:11–16;

- "As I said before, an economist is going to need to determine what is necessary to make a demonstration of monopoly profits, and I don't rule out the possibility that they could take, as input, GAAP accounting numbers", *id.* at 209:7–11.

Put simply, Dr. Anderson lacks the expertise necessary to opine that Live Nation's accounting profits are inadequate as a basis to assess economic or monopoly profits. She also lacks the expertise necessary to make any critiques of Live Nation's financial reporting or Mr. Meyer's use thereof. As such, the Economic and Monopoly Profits Opinions, the Financial Reporting Opinions, and the Rebuttal Opinions should be excluded. *See, e.g.*, *Chalmers v. City of New York*, No. 20 Civ. 3389, 2022 WL 4330119, at *10 (S.D.N.Y. Sep. 19, 2022) (excluding expert who, "by his own admission, [] is not qualified to proffer [his] opinion"). Only the Management View Opinion relates to management accounting and arguably fits within the scope of Dr. Anderson's expertise (which, as discussed below, is inadmissible for other reasons).

## II. ALL OF DR. ANDERSON'S OPINIONS SHOULD BE EXCLUDED BECAUSE THEY ARE IRRELEVANT, UNHELPFUL TO THE JURY, AND RISK UNFAIR PREJUDICE AND CONFUSION.

Beyond being woefully unqualified, Dr. Anderson has admitted that her opinions do not bear on any of the ultimate antitrust issues the jury must decide. She casts vague aspersions on the use of Live Nation's financial reporting to evaluate profits, opining that the accounting profits in Live Nation's financial disclosures cannot be used to evaluate economic or monopoly profits; that the way Live Nation reports its results "obscure[s]" and "impair[s]" assessment of its profitability; and that Live Nation's management views certain metrics as more important than others in evaluating performance. These issues are not just irrelevant; they suggest impropriety in Live Nation's reporting, even though Dr. Anderson disavows any opinion that Live Nation's reporting is improper or not compliant with GAAP. This risks giving the jury the impression that it should distrust Live Nation's audited disclosures, which would result in unfair prejudice and jury confusion. Dr. Anderson's opinions should be excluded for these independent reasons. *See* App. A.

### A. Dr. Anderson's Economic and Monopoly Profits Opinions Are Inadmissible.

At bottom, Dr. Anderson opines that in theory, accounting profits do not equal economic profits and thus are inadequate for evaluating monopoly profits. The rest of her Economic and Monopoly Profits Opinions are in service of that opinion. But Dr. Anderson has failed to "sufficiently tie[]" her generalized statements to the specific facts and issues of this case. *In re Rezulin Prods. Liab. Litig.*, 441 F. Supp. 2d 567, 576 (S.D.N.Y. 2006). As such, they do not "help answer the factual issues of this case", *City of New York v. FedEx Ground Package Sys., Inc.* No. 13 Civ. 9173, 2018 WL 4961455, at *6 (S.D.N.Y. Oct. 15, 2018), and are not grounded in reliable facts, *Clarke v. Travco Ins. Co.*, No. 13-cv-5140, 2015 WL 4739978, at *5 (S.D.N.Y. Aug. 7, 2015). All of those opinions should be excluded. *See* App. A.

Whether accounting profits, as a theoretical matter, may "often" be inconsistent with economic profits has no bearing on whether Live Nation's accounting profits are higher than, lower than, or equal to its economic profits in this specific case. Indeed, Dr. Anderson concedes that she has "no idea or opinion about what the level of Live Nation's economic profits are, much less their relation to Live Nation's accounting profits". Ex. 3 (Anderson Tr.) 148:7–13. She admits that she did not attempt calculate Live Nation's economic profits, *see id.* at 182:21–22, and that she does not even know *how* to calculate economic profits, *see id.* at 184:17–19. She did no work to determine whether Live Nation's economic profits are higher than, lower than, or the same as Live Nation's accounting profits. *Id.* at 148:6–13. And she lacks any "opinion as to whether it is possible to calculate Live Nation's economic profits in the relevant markets as defined by Dr. Hill". *Id.* at 185:5–8.

Dr. Anderson's opinion appears to rest in part on the notion that, unlike accounting profits, economic profits account for the value of intangible assets. Ex. 1 (Anderson Rpt.) ¶¶ 59–64; Ex. 3 (Anderson Tr.) 131:6–13. Dr. Anderson posits two intangible assets that may increase Live Nation's future profitability and thus "create a wedge [between] or separate accounting profits from economic profits", Ex. 3 (Anderson Tr.) 145:2–4: customer data and venue portfolio synergies, Ex. 1 (Anderson Rpt.) ¶¶ 61, 62–64; *see also* Ex. 3 (Anderson Tr.) at 158:9–11, 114:1-2. But any purported "wedge" is based entirely on an unsubstantiated assumption. *See Dreyer v. Ryder Auto. Carrier Grp., Inc.*, 367 F. Supp. 2d 413, 416–17 (W.D.N.Y. 2005) (excluding expert opinion where expert "failed to articulate the technical or scientific basis for his conclusions"). Dr. Anderson makes no effort to calculate the value of such intangible assets and admits that she lacks the expertise necessary to perform such a calculation. Ex. 3 (Anderson Tr.) at 144:1–2, 144:14–145:4, 150:5–7. She has not attempted to show that the value of these intangible assets

15

has not been borne out in Live Nation's historical performance. *Id.* at 213:6–11, 216:19–218:1, 221:9–15, 226:7–228:5. To the contrary, she acknowledges that much of the potential benefits of customer data—such as selling more tickets—are already reflected in Live Nation's historical revenues. *See id.* at 231:4–235:18. She admits that she cannot opine on whether Live Nation's profitability will increase in the future because of its intangible assets. *Id.* at 237:4–8; *see also id.* 219:12–14 ("I will not speculate on how an economist would go about incorporating th[e] effect [of intangible assets].").[4] In short, Dr. Anderson has failed to "ground[] [her] opinion in reliable facts" by identifying what value Live Nation's intangible assets actually have and how they might impact the calculation of economic profits, if at all. *Clarke*, 2015 WL 4739978, at *5.

Ultimately, because Dr. Anderson provides no opinion as to whether Live Nation's economic profits would be higher than, lower than, or the same as its accounting profits, Dr. Anderson's theories are not "relevant to and being applied . . . to the facts" of this matter. *H. Daya Int'l Co., Ltd.*, 2023 WL 1340422, at *5. Because they are not "tied to the facts" of this specific case, the Economic and Monopoly Profits Opinions are irrelevant and unhelpful to the jury and should be excluded. *Chalmers*, 2022 WL 4330119, at *11 (quoting *Daubert*, 509 U.S. at 591); *see also Vogel v. TakeOne Network Corp.*, No. 22-cv-3991, 2025 WL 2732653, at *9 (S.D.N.Y. Sep. 25, 2025) (Subramanian, J.) (excluding expert opinion under Rule 702 because it failed to "connect the dots").

---

[4] Although Dr. Anderson gestures towards Live Nation's price-to-book ratio to suggest that these two intangible assets have unrecognized value, *see* Ex. 2 (Anderson Reb. Rpt.) ¶¶ 49–50, she admits that she has no expertise in valuation, *see* Ex. 3 (Anderson Tr.) 271:17–18, 276:13–17, and that she is offering no opinion on how intangible assets should be factored into the valuation of Live Nation, *id.* 212:10–17. She also concedes that "one cannot isolate any single factor as explaining the price to book knowing that many factors play into that", and that she "cannot demonstrate that [the delta between the price and the book is attributable to the future earnings potential of intangible assets] conclusively". *Id.* at 273:21–274:2, 275:2–5.

Dr. Anderson's opinion that accounting profits do not equal economic profits serves only to tarnish Live Nation's publicly reported financials and to cause the jury to question—without basis—whether it can trust Live Nation's financials. Thus, Dr. Anderson's opinions carry significant risk of misleading and prejudicing the jury by inviting them to infer wrongdoing that she and Plaintiffs do not allege. *See United States v. Brooks*, No. 08 CR. 35, 2008 WL 2332371, at *2 (S.D.N.Y. June 4, 2008).

### B.    Dr. Anderson's Financial Reporting Opinions Are Inadmissible.

Dr. Anderson contends that Live Nation's financial reporting "obscure[s]" and "impair[s]" its profitability. Ex. 1 (Anderson Rpt.) ¶¶ 14(a), 91. But because she does not opine that such reporting was improper, or that her alternative approaches would fare any better, the Financial Reporting Opinions boil down to mere speculation that Live Nation could have, in theory, made different financial accounting decisions that would have made its financial results look different. Thus, Dr. Anderson's Financial Reporting Opinions should all be excluded. *See* App. A.

Dr. Anderson has repeatedly disclaimed any opinion that Live Nation's public financial reporting is non-compliant or misleading. While she opines that Live Nation's decisions to report financial results in three segments (Concerts, Ticketing and Sponsorship) "obscure the performance and profitability of constituent business lines and relevant markets" and "impair[] the assessment of accounting profits of certain business activities", Ex. 1 (Anderson Rpt.) ¶¶ 14(a), 91, she does *not* dispute that Live Nation's segment reporting decisions are proper, consistent with GAAP and SEC guidelines, and "sufficiently transparent", Ex. 3 (Anderson Tr.) 127:17–21, 127:9–18. While Dr. Anderson contends that Live Nation's attribution of revenues and expenses between segments is ███████████████████████████████████████████████, she does *not* opine that such attribution was non-compliant with GAAP or SEC guidelines or that Live Nation was "nefarious in their execution of GAAP". *Id.* at 125:24–126:9.

17

Similarly, while Dr. Anderson purports to show "alternative presentations of profitability" based on treating credit card fees and artist payments as pass-through rather than as expenses, she does *not* opine that Live Nation's treatment of credit card or artist fees is improper. *See* Ex. 1 (Anderson Rpt.) ¶ 126; Ex. 3 (Anderson Tr.) 332:20–25.[5] Dr. Anderson does not suggest that her "alternatives" more accurately reflect Live Nation's profits, or that her alternatives would comply with GAAP.

At bottom, Dr. Anderson's opinions are that, if Live Nation did its financial reporting differently, it might (or might not) show different levels of profit. But simply pointing out that doing the math differently would yield a different result does not assist the jury. Dr. Anderson's opinion that Live Nation could have reported its financial results differently—but that its actual results are not improper, incorrect, unreliable, or a result of intentionally hiding profits—has no bearing on the issues in this case.

Moreover, Dr. Anderson's Financial Reporting Opinions are highly prejudicial because they imply impropriety even where she concedes there is none. Dr. Anderson criticizes GAAP because, in her non-expert view, it "can, in many ways, fall short" of its "aim of achieving objective, consistent and verifiable representation". Ex. 2 (Anderson Reb. Rpt.) ¶ 11(f)(ii). She also contends that "Live Nation's publicly reported segment financial results obscure the performance and profitability of constituent business lines and relevant markets", Ex. 1 (Anderson Rpt.) ¶ 91, and "impair[] the assessment of accounting profits of certain business activities using reported segment or entity profits", *id*. ¶ 14(a), and she asserts that the attribution of profits to specific segments and business lines is ███████ *id*. ¶ 14(b). Jurors will naturally infer from

---

[5] Nor does she opine that her alternative presentations could be used as comparators with other concert or ticketing companies. *See* Ex. 3 (Anderson Tr.) at 319:20–322:22.

these assertions that Live Nation's public reporting is unreliable, or suspect, and understand such inflammatory language to imply impropriety, *i.e.*, that Live Nation intentionally concealed its profitability.  Dr. Anderson concedes that Live Nation's reporting is GAAP-compliant and disavows any opinion that Live Nation is intentionally hiding profits or deceiving the public.  Ex. 3 (Anderson Tr.) 124:8–15, 127:10–18.  But her insinuation that GAAP and Live Nation's GAAP-compliant reporting cannot be trusted constitutes a baseless backdoor attack on the integrity of audited financial reports and on the integrity of Defendants, which is outside the purview of expert testimony.  *See LinkCo, Inc. v. Fujitsu Ltd.*, No 00 Civ. 7242, 2002 WL 1585551, at *2 (S.D.N.Y. July 16, 2002) ("It is also inappropriate for [an expert] to opine on the credibility of evidence.").

Likewise, Dr. Anderson's "alternatives" serve no purpose but to suggest that Live Nation's GAAP-compliant presentations of profitability are misleading, unreliable and fail to tell the whole story.  That is improper.  Permitting Dr. Anderson to showcase non-GAAP "illustrative examples"—which she does not contend are superior, compliant, or comparable—would mislead the jury, invite an unnecessary mini-trial on accounting hypotheticals, and unfairly prejudice Live Nation.  *See United States v. Bankman-Fried*, No. S6 22-CR-0673, 2023 WL 6162865, at *2 (S.D.N.Y. Sep. 21, 2023) (excluding expert testimony on topics not at issue because any probative value would be outweighed substantially by the risk of confusing the jury and wasting time).

### C.    The Management View Opinion Is Inadmissible.

In asserting her Management View Opinion, Dr. Anderson acts solely as a mouthpiece for documents and testimony that the jury is capable of evaluating for themselves.  She also concedes that her opinion is irrelevant to the antitrust issues in this case.  The Management View Opinion should be excluded.  *See* App. A.

Dr. Anderson bases her Management View Opinion entirely on a recitation of testimony and documents from Live Nation: ████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████ and █████████████████████████████████████

██████████████████████████. Ex. 1 (Anderson Rpt.) ¶¶ 112–13.  The Management

View Opinion is not based on any skill, experience or training.  Rather, Dr. Anderson "act[s]

simply as a narrator of facts" and thus "does not convey opinions that are based on an expert's

knowledge and expertise".  *Scentsational Techs.*, 2018 WL 1889763, at *4.  Indeed, she

acknowledges that her expertise is unnecessary, testifying that she "do[es]n't need to offer an

opinion" on how Live Nation competes because "the managers have spoken on that themselves"

and the managerial reports indicate "what they are asking to see and how are they enacting that

strategy".  Ex. 3 (Anderson Tr.) 98:8–17.  Whether Live Nation documents and testimony indicate

a focus on profit margin is a "matter[] which a jury is capable of understanding and deciding

without the expert's help".  *Pac. Life Ins. Co.*, 571 F. Supp. 3d at 114; *see also Anderson News,*

*L.L.C. v. Am. Media Inc.*, No. 09 Civ. 2227, 2015 WL 5003528, at *2 (S.D.N.Y. Aug. 20, 2015),

*aff'd*, 899 F.3d 87 (2d Cir. 2018) (excluding expert testimony introduced "solely for the purpose

of constructing a factual narrative based upon record evidence").  Nothing about Dr. Anderson's

expertise in managerial accounting is necessary to understand Mr. Berchtold's testimony or to

count how frequently profit levels and profit margins are referenced in Live Nation's documents.

Furthermore, "nothing about [Dr. Anderson's] skill, experience, training, or education

gives her specialized knowledge about the operations of these particular defendants"—or about

the live entertainment industry generally.  *H. Daya Int'l Co.*, 2023 WL 1340422, at *3; Ex. 3

(Anderson Tr.) 14:3–5 (admitting she has never been engaged as an expert in a case involving the

live event industry).  Dr. Anderson's recitation of evidence concerning how Live Nation managers

approach the business "more appropriately would be introduced by fact witnesses capable of

testifying on that subject matter"—the Live Nation managers themselves. *Bankman-Fried*, 2023 WL 6162865, at *2; *see also LinkCo.*, 2002 WL 1585551, at *2.

The Management View Opinion should also be excluded because it has no bearing on the issues here. *See Johnson Elec. N. Am. Inc*, 103 F. Supp. 2d at 279–80. Dr. Anderson concedes that this opinion does not relate to market definition, market power, or monopoly profits. *See, e.g.*, Ex. 3 (Anderson Tr.) 266:21–267:4 (testifying that she cannot answer whether "a company's focus on scale as a goal, as a thing that they're focused on growing the business . . . say[s] anything [] about the presence or source of monopoly profits"). She also concedes that she does not know whether an antitrust economist would find "profit margins as more [relevant] than profit levels . . . in their own analysis". *Id*. at 269:23–270:5. In fact, Dr. Anderson concedes that the entire field of management accounting is irrelevant here, because she "do[es]n't believe that *any* accounting measure is suitable for evaluating monopoly behavior". *Id.* at 102:18–21. Dr. Anderson's inability to identify how the Management View Opinion—or, indeed, management accounting in general—relates to any issue in the case demonstrates that such opinion is not relevant and thus is not helpful to the jury.

Dr. Anderson's Management View Opinion also creates a risk of prejudice and confusing the jury. *See Brooks*, 2008 WL 2332371, at *2. Suggesting that Live Nation management is focused on various metrics beyond those reported in Live Nation's GAAP-compliant financial reporting would mislead the jury into thinking those financial reports or the metrics reported therein are unreliable or that management is doing something to hide what really matters or what is really going on in those financial reports. Dr. Anderson's opinion that management is focusing on scale instead of profit margin is also misleading because it implies that the jury should infer

from that something about Live Nation's monopoly power, even though Dr. Anderson concedes it does no such thing.

### D.    Dr. Anderson's Rebuttal Opinions Should Be Excluded.

As an initial matter, Dr. Anderson does not dispute the accuracy of Mr. Meyer's analysis; she concedes that his calculations, and the data on which he relied, are accurate.   Ex. 3 (Anderson Tr.) 195:11–197:6.  In her Rebuttal Opinions, Dr. Anderson contends that Mr. Meyer's analysis of Live Nation's profitability is flawed for several reasons—none of which is based on management accounting, her sole professed area of expertise.  They should all be excluded.  *See* App. A.

*First*, Dr. Anderson takes issue with Mr. Meyer's decision to evaluate Live Nation's accounting profits.  She argues that Mr. Meyer's "conclusion that Live Nation has only 'modest profitability' . . . is irrelevant to the matter at hand" because "Mr. Meyer does not analyze Live Nation's economic profitability in the relevant markets".  Ex. 2 (Anderson Reb. Rpt.) ¶ 11(a).  But that opinion is based on her opinion that "accounting profits are inadequate as the basis for reaching conclusions about the premise or source of monopoly profits"—which she is not qualified to provide and has since admitted she lacks any basis to make, *see supra* Section I, and which should be excluded as irrelevant and prejudicial, *see supra* Section II.A.

Dr. Anderson also asserts that Mr. Meyer's analysis is flawed because he "does not consider intangible assets".  Ex. 2 (Anderson Reb. Rpt.) ¶ 11(b).  That is a non sequitur.  As Dr. Anderson acknowledges, intangible assets, "in accordance with [GAAP], are not fully reflected in public financial statements".  *Id.*  There is no reason that Mr. Meyer should have considered intangible assets in evaluating Live Nation's financial accounting data.  At bottom, Dr. Anderson is simply attempting to "repackage" her affirmative opinion about intangible assets as a rebuttal opinion, which cannot rescue it from exclusion.  *See In re LIBOR-Based Fin.*

*Instruments*, No. 11 MDL 2262, 2025 WL 2733020, at *27 n.48 (S.D.N.Y. Sep. 25, 2025) ("[An expert] may not simply repackage his excluded affirmative opinions as rebuttal opinions." (emphasis omitted)).

Dr. Anderson also critiques Mr. Meyer's decision to calculate Live Nation's profitability on a consolidated basis as "reduc[ing] transparency" into individual segments, though she admits that Live Nation's segment reporting is GAAP-compliant and "not unique". Ex. 2 (Anderson Reb. Rpt.) ¶ 23. That, too, is simply a repackaging of Dr. Anderson's inadmissible Financial Reporting Opinions. *See supra* Sections I, II.B.

*Second*, Dr. Anderson asserts that "Mr. Meyer inappropriately presents average figures that include financial results in periods impacted by COVID-19". Ex. 2 (Anderson Reb. Rpt.) ¶ 11(c). Setting aside the fact that Mr. Meyer presented figures that both included *and excluded* periods impacted by COVID-19, Dr. Anderson provides no reason to exclude those periods when looking at Live Nation's historic profitability. In fact, she admits that it would have been impermissible for Live Nation to have excluded financial results from those periods from its SEC filings. Ex. 3 (Anderson Tr.) 200:23–201:9 ("In the disclosures, of course, they must include [the period impacted by COVID]."). Dr. Anderson suggests that Mr. Meyer's average figures are inappropriate based only on the fact that Live Nation management has excluded financial results for those years when using data to understand trends and project for future periods. Ex. 2 (Anderson Reb. Rpt.) ¶¶ 62, 64. This opinion does not implicate management accounting expertise, or *any* specialized expertise, and should be excluded. *See FedEx Ground Package Sys.*, 2018 WL 4961455, at *4 (excluding expert opinion where expert failed to deploy any "specialized expertise . . . 'beyond the ken of the layperson'").

*Third*, Dr. Anderson purports to identify "several flaws" in Mr. Meyer's comparator analysis and issues with his analysis of the profitability LNOO amphitheaters. Ex. 2 (Anderson Reb. Rpt.) ¶¶ 11(d)–(e). She contends that he failed to assess the appropriateness of his comparators, used incomparable metrics, improperly changed metrics across comparisons, and failed to perform a sensitivity analysis. *Id.* ¶¶ 65–108. But Dr. Anderson's expertise is not in comparing companies. As she explains, management accounting focuses on how companies evaluate their performance *internally*. Ex. 1 (Anderson Rpt.) ¶¶ 43–44. Typically, a company's internal metrics are not comparable between firms; that is the case, for example, for Live Nation's AOI metric, which Dr. Anderson herself notes should not be used as the basis for comparing Live Nation with other firms. *Id.* ¶ 110. In contrast, financial accounting metrics are intended to be used to make comparisons across firms. Ex. 3 (Anderson Tr.) 103:15–104:1. But as discussed above, Dr. Anderson admits that she is not a financial accounting expert. *See supra* Section I. That is, Mr. Meyer's comparisons are outside Dr. Anderson's area of expertise and her opinions that Mr. Meyer should have included and presented different accounting data in his profitability analysis for LNOO amphitheaters, Ex. 2 (Anderson Reb. Rpt.) ¶¶ 111–15, are inadmissible, *see In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, No. 14-MD-2542, 2025 WL 354671, at *3 (S.D.N.Y. Jan. 30, 2025) ("Expert testimony that strays outside the expert's area of qualified expertise must be excluded.").

With respect to Dr. Anderson's contention that Mr. Meyer arbitrarily excluded certain firms from his comparator analysis (he did not), that does not implicate *any* expertise at all. Plaintiffs can explore Mr. Meyer's reasons for excluding those firms on cross-examination; and Dr. Anderson's expertise would not aid the jury in determining whether Mr. Meyer's reasons for excluding those firms (data limitations for private firms) is credible. *See Joint Stock Co. Channel*

*One Russia Worldwide v. Infomir LLC*, No. 16CV1318GBDBCM, 2021 WL 4810266, at *15 (S.D.N.Y. Sep. 30, 2021) ("[A]n expert witness may not testify as to the credibility of another witness's testimony. The credibility of witnesses is exclusively for the determination by the jury.").

## CONCLUSION

For the foregoing reasons, this Court should exclude Dr. Anderson's opinions in their entirety.

Dated: November 13, 2025

LATHAM & WATKINS LLP

_____
Alfred C. Pfeiffer (admitted *pro hac vice*)
    *Co-Lead Trial Counsel*
David R. Marriott
    *Co-Lead Trial Counsel*
Andrew M. Gass (admitted *pro hac vice*)
Timothy L. O'Mara (admitted *pro hac vice*)
Jennifer L. Giordano
Kelly S. Fayne (admitted *pro hac vice*)
Lindsey S. Champlin (admitted *pro hac vice*)
Robin L. Gushman (admitted *pro hac vice*)

505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600

1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

555 11th Street, NW, Suite 1000
Washington, D.C. 20004
(202) 637-2200

Al.Pfeiffer@lw.com
David.Marriott@lw.com
Tim.O'Mara@lw.com
Jennifer.Giordano@lw.com
Andrew.Gass@lw.com
Kelly.Fayne@lw.com
Lindsey.Champlin@lw.com
Robin.Gushman@lw.com

*Attorneys for Defendants Live Nation*
*Entertainment, Inc. and Ticketmaster L.L.C.*

CRAVATH, SWAINE & MOORE LLP

_____
Lauren A. Moskowitz
Jesse M. Weiss
Nicole M. Peles

Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 474-1000

lmoskowitz@cravath.com
jweiss@cravath.com
npeles@cravath.com

*Attorneys for Defendants Live Nation*
*Entertainment, Inc. and Ticketmaster L.L.C.*

## **CERTIFICATE OF COMPLIANCE**

I, Lauren A. Moskowitz, an attorney duly admitted to practice before this Court, hereby certify pursuant to Local Rule 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rules"), Rule 8(C) of Judge Arun Subramanian's Individual Practices in Civil Cases ("Individual Rules"), that the foregoing Memorandum of Law and accompanying Appendix were prepared using Microsoft Word, and contain 8,741 words.  In making this calculation, I have relied on the word and page counts of the word-processing program used to prepare the document.

Dated:    November 13, 2025
          New York, New York

_____
          Lauren A. Moskowitz