**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA, *et al.*,

                       *Plaintiffs*,

       v.

LIVE NATION ENTERTAINMENT, INC., and
TICKETMASTER L.L.C.

                       *Defendants*.

---

Case No.: 1:24-cv-03973-AS-SLC

**ORAL ARGUMENT REQUESTED**

**FILED UNDER SEAL**

**DEFENDANTS' MOTION TO EXCLUDE CERTAIN OPINIONS AND**
**TESTIMONY OF DR. NICHOLAS HILL**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ............................................................................................... 1

LEGAL STANDARD........................................................................................... 3

ARGUMENT ...................................................................................................... 4

I.    DR. HILL'S OPINIONS DEFINING CERTAIN MARKETS SHOULD BE
      EXCLUDED. ............................................................................................ 4

      A.    Dr. Hill's Opinion Defining a Market for Major Concert
            Amphitheaters Should Be Excluded. ........................................... 6

      B.    Dr. Hill's Opinions Defining Markets for Providing Promotion
            Services to Artists in Major Concert Venues Should Be Excluded. ..........12

II.   DR. HILL'S OPINION THAT DEFENDANTS ENGAGED IN
      ANTICOMPETITIVE CONDUCT IS AN IMPROPER LEGAL
      CONCLUSION AND SHOULD BE EXCLUDED. ............................................ 15

III.  DR. HILL'S OPINIONS PURPORTING TO SUMMARIZE AND WEIGH
      THE "QUALITATIVE EVIDENCE" SHOULD BE EXCLUDED. .................... 16

CONCLUSION................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002)......................................................................4, 5 11

*Anderson News, L.L.C. v. Am. Media Inc.*,
    2015 WL 5003528 (S.D.N.Y. Aug. 20, 2015)................................................4, 16, 19

*Bobcar Media, LLC v. Aardvark Event Logistics, Inc.*,
    554 F. Supp. 3d 606 (S.D.N.Y. Apr. 6, 2020) ...........................................18

*Cameron v. City of New York*,
    598 F.3d 50 (2d Cir. 2010)........................................................................15

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993).....................................................................................3, 4

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    299 F. Supp. 3d 430 (S.D.N.Y. Feb. 28, 2018).........................................3, 4

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    2025 WL 2733020 (S.D.N.Y. Sept. 25, 2025)...........................................16

*In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
    341 F. Supp. 3d 213 (S.D.N.Y. Oct. 24, 2018)...........................................12

*In re Rezulin Prods. Liab. Litig.*,
    309 F. Supp. 2d 531 (S.D.N.Y. Mar. 15, 2004) .........................................3

*Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*,
    588 F.3d 908 (6th Cir. 2009) ....................................................................5, 11

*LinkCo, Inc. v. Fujitsu Ltd.*,
    2002 WL 1585551 (S.D.N.Y. July 16, 2002) ...........................................17

*Nimely v. City of New York*,
    414 F.3d 381 (2d Cir. 2005).......................................................................3, 4, 19

*Rodriguez v. Vill. of Port Chester*,
    535 F. Supp. 3d 202 (S.D.N.Y. Apr. 26, 2021) .........................................11

*Scentsational Techs., LLC v. Pepsi, Inc.*,
    2018 WL 1889763 (S.D.N.Y. Apr. 18, 2018),...........................................2, 4, 16, 17, 19

*Scism v. Ferris*,
    2022 WL 2915745 (N.D.N.Y. July 25, 2022) ...........................................18

*U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Loc. Union No. 3, AFL-CIO*,
   313 F. Supp. 2d 213 (S.D.N.Y. Feb. 24, 2004)......................................................15, 16

*Union Carbide Corp. v. Montell N.V.*,
   28 F. Supp. 2d 833 (S.D.N.Y. Nov. 11, 1998)..............................................................16

*United States v. Aetna Inc.*,
   240 F. Supp. 3d 1 (D.D.C. Jan. 23, 2017).......................................................................6

*United States v. Bertelsmann SE & Co. KGaA*,
   No. 1:21-cv-02886-FYP (D.D.C. 2022) .........................................................................9

*United States v. H&R Block Inc.*,
   833 F. Supp. 2d 36 (D.D.C. Nov. 10, 2011) ...........................................................1, 11

*United States v. Williams*,
   506 F.3d 151 (2d Cir. 2007).............................................................................................3

## Statutes & Rules

Fed. R. Civ. P. 26.....................................................................................................................11

Fed. R. Evid. 403 ................................................................................................................3, 19

Fed. R. Evid. 702 ........................................................................................................... passim

## Other Authorities

U.S. Dep't of Justice & Federal Trade Comm'n, Merger Guidelines (2023)......................7

Michael L. Katz & Carl Shapiro, Critical Loss: Let's Tell the Whole Story, 17
   Antitrust 49 (2003).........................................................................................................7

## INTRODUCTION

Plaintiffs proffer Dr. Nicholas Hill as their chief economic expert in support of their antitrust claims.  Dr. Hill's opinions are flawed in many respects, but this motion focuses on three critical defects that warrant exclusion under Rule 702.  The first relates to market definition and, in short, is that Dr. Hill uses an illogical, unscientific, and unreliable Hypothetical Monopolist Test ("HMT") to support Plaintiffs' gerrymandered markets.  The second and third concern large portions of Dr. Hill's report in which he offers legal conclusions that Defendants have "engaged in anticompetitive conduct," or offers opinions about what is purportedly shown by certain "qualitative evidence."  These are not permissible subjects of expert testimony.

**Market Definition:**  Defendants' summary judgment motion explains why Plaintiffs' market definitions fail as a matter of law.  The Court could grant that motion without granting this one.  But in what would be the first-ever jury trial in a government monopolization case, Plaintiffs intend to support their artificially limited market definitions with a grossly flawed HMT that will be exceedingly difficult for any jury to follow.

The HMT was developed to aid the process of market definition in merger reviews.  It seeks to include in the relevant market not only substitute products at existing prices, but others that might become substitutes if there were a Small but Significant Nontransitory Increase in Price, or SSNIP.  "Diversion" is a central concept in HMT analysis.  A sound diversion analysis "measures to what extent consumers of a given product will switch (or be 'diverted') to other products in response to a price increase in the given product." *United States v. H&R Block Inc.*, 833 F. Supp. 2d 36, 62 (D.D.C. 2011).  The analyst is therefore required to estimate a "diversion ratio," which is a measure of how many sales would remain in or be lost from the candidate market in the event of a SSNIP.  In most cases, the

1

diversion ratio drives the outcome of the HMT. If one assumes for any candidate market that there would be low diversion in the event of a SSNIP, the market will probably pass the HMT.

In two cases, Dr. Hill's HMT analyses are driven by what he calls a diversion ratio but is not a diversion analysis at all—not by his own standards; not by accepted scientific standards in the field; not by any standard. Specifically, Dr. Hill looks at the stops on an artist's tour and compares one stop to the next. If stop B is at a different venue type than stop A, he says that is evidence of the artist switching; and if stop B is at a venue of the same type as stop A, he says it is evidence of the artist not switching. That has nothing to do with what consumers might do "in response to a price increase in the given product." *Id.* at 62. A diversion analysis would look to where an artist would turn if venue A *raised its price or worsened its terms*. That is entirely absent from this analysis.

To make matters worse, Dr. Hill implements his HMT in an internally inconsistent and deceptive manner. This is the epitome of "junk science" that may very well fool a jury but does not comport with the economics underlying the HMT. The opinions resting on these flawed HMT analyses should therefore be excluded.

**Legal Conclusions and Qualitative Evidence:** The Second Circuit does not permit experts to be used as partisan storytellers who, without applying any genuine scientific expertise, act as a "narrator of the facts" and apply the facts to the law. *Scentsational Techs., LLC v. Pepsi, Inc.*, No. 13-CV-8645, 2018 WL 1889763, at *4 (S.D.N.Y. Apr. 18, 2018), *aff'd sub nom. ScentSational Techs. LLC v. PepsiCo, Inc.*, 773 F. App'x 607 (Fed. Cir. 2019); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 469 (S.D.N.Y. 2018) (quoting *Nimely v. City of New York*, 414 F.3d 381,

397 (2d Cir. 2005)).  Yet that is much of Dr. Hill's proposed testimony.  He collects and presents Plaintiffs' favorite evidence and point of view in extensive, one-sided narratives. He opines that the "qualitative evidence is consistent with" over 80 factual statements, and that Live Nation has engaged in five categories of anticompetitive conduct.  All of that should be excluded as impermissible under Rules 702 or 403.[1]

## LEGAL STANDARD

Federal Rule of Evidence 702 "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).  "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied."  *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).  A "fundamental" requirement of Rule 702 is that the proffered testimony "assist the trier of fact".  *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 540 (S.D.N.Y. 2004) (internal quotations omitted).

Reliability of expert testimony hinges on (i) whether the expert's technique or theory is testable, (ii) whether the theory has been subject to peer review and publication, (iii) what the technique's known or potential rate of error is and the existence and maintenance of standards controlling the technique's operation, and (iv) whether the technique has been generally accepted.  *Daubert*, 509 U.S. at 593-94.  Expert testimony must be reliable at every step, and "any step that renders the analysis unreliable . . . renders

---

[1] In support of this motion, Defendants rely upon the Declaration of Nicole M. Peles in Support of Defendants' Motion To Exclude Certain Opinions and Testimony of Dr. Nicholas Hill, executed November 13, 2025, and the documents attached thereto, which are cited herein as "Ex. __".  Dr. Hill submitted an opening expert report on August 1, 2025 (the "Hill Report"), Ex. 1, and a rebuttal expert report on October 9, 2025 (the "Hill Rebuttal Report"), Ex. 2.  Dr. Hill was deposed on November 3, 2025 ("Hill Tr."), Ex. 5.

the expert's testimony inadmissible". *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Id.* at 266.

Moreover, the Second Circuit has "consistently held . . . that expert testimony that usurps . . . the role of the [jury] in applying that law to the facts before it is inadmissible because it by definition does not aid the [jury] in making a decision". *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 469 (S.D.N.Y. 2018) (quoting *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005)). "Acting simply as a narrator of the facts does not convey opinions that are based on an expert's knowledge and expertise; nor is such a narration traceable to a reliable methodology." *Scentsational Techs., LLC v. Pepsi, Inc.*, No. 13-CV-8645, 2018 WL 1889763, at *4 (S.D.N.Y. Apr. 18, 2018), *aff'd sub nom. ScentSational Techs. LLC v. PepsiCo, Inc.*, 773 F. App'x 607 (Fed. Cir. 2019); *see also Anderson News, L.L.C. v. Am. Media Inc.*, No. 09 Civ. 2227, 2015 WL 5003528, at *2 (S.D.N.Y. Aug. 20, 2015), *aff'd*, 899 F.3d 87 (2d Cir. 2018) ("[A]n expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence.").

## **ARGUMENT**

### I. **DR. HILL'S OPINIONS DEFINING CERTAIN MARKETS SHOULD BE EXCLUDED.**

Dr. Hill's markets are arbitrarily defined and contrived to exclude thousands of venues in the United States to create the appearance of high shares for Defendants. The only way Dr. Hill supports his engineered markets is by using diversion ratios—the key measure of likely substitution out of Dr. Hill's proposed markets—that are biased and

unscientific, find no support in any academic literature and contradict Dr. Hill's own definition of diversion. As explained in further detail below, Dr. Hill's unreliable diversion calculations are a virus that infects Dr. Hill's proposed markets for (1) major concert amphitheaters and (2) promotion services to artists at major concert venues.

Dr. Hill's opinions that these two markets are properly defined antitrust markets should be excluded under Rule 702 for two principal reasons. *First*, Dr. Hill "fail[ed] to apply his own methodology reliably," *Amorgianos*, 303 F.3d, at 268, by calculating a diversion ratio that does not reflect anything about switching in response to a price increase or worsening of terms and by failing to apply his stated formula correctly. *Second*, his outside diversion ratio estimates are untethered from any established or peer-reviewed methodology for estimating diversion. *See Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 916–19 (6th Cir. 2009) (upholding district court's decision to exclude where expert "used his own version" of the SSNIP test "that had not been tested, had not been subjected to peer review, had no controlling standards, had no demonstrable showing of support within the scientific community, and was produced solely for purposes of the instant litigation.").

As explained in further detail below, Dr. Hill's opinions regarding these purported markets should be excluded on the basis on his unscientific and unreliable diversion calculations. However, if the Court is not inclined to exclude Dr. Hill's market definitions altogether, Dr. Hill should be precluded from offering opinions and testimony based on his diversion analyses.

A.    **Dr. Hill's Opinion Defining a Market for Major Concert Amphitheaters Should Be Excluded.**

Dr. Hill opines that there is a relevant market for "major concert amphitheaters" ("MCAs").  In the first instance, the parameters of this supposed market reveal the arbitrary line-drawing exercise Dr. Hill deployed.    Specifically, Dr. Hill's "major concert amphitheaters" market not only excludes other similarly sized venues (*e.g.*, arenas), it is limited to a narrow slice of actual amphitheaters—*i.e.*, those with a capacity of 8,000 that have hosted 10 or more concerts in at least one year.  Ex. 1 (Hill Rpt.) ¶¶ 139–40, 272.  As a result, Dr. Hill's MCA market includes only 87 amphitheaters, and excludes 291 amphitheaters (along with 19,000 other venues in the United States).  *See* Ex. 4 (Yurukoglu Reb. Rpt.) at 132.    For example, the Greek Theater in Los Angeles, a renowned amphitheater in Los Angeles that hosted an average of over 80 concerts per year in 2022-2024, is not included a major concert amphitheater according to Dr. Hill.

This gerrymandered market then becomes the "candidate market" that is supposedly tested with HMT analysis.  Dr. Hill says this is standard, but what he does is anything but.

As Dr. Hall admits, market definition for antitrust purposes is fundamentally based on the idea of substitution.  Ex. 1 (Hill Rpt.) ¶ 93 ("Market definition relies on customer substitution patterns.");  s*ee also United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 20 (D.D.C. 2017) (explaining the key question in defining an antitrust relevant product market is "whether particular products are sufficiently close substitutes such that substitution to one could constrain any anticompetitive pricing in the other" (internal quotation marks omitted)).  The HMT likewise examines "whether a group of products in a geographic area includes an appropriately broad group of substitutes."  *Id.* ¶ 91.  It does so by testing the

profitability of a SSNIP of a single product within a candidate set. The profitability calculation in turn depends on to what extent and to where customers of the product would switch. *Id.* ¶¶ 91–93.

Diversion ratios matter to the HMT and, by extension, market definition expressly *because* they measure substitution. As Dr. Hill explains, "[a] diversion ratio…measures customer substitution between two products," *id.* ¶ 98, and specifically the aggregate outside diversion ratio for the focal product reflects "the percentage of lost customers that would actually switch to an option outside rather than inside the candidate market in the event of a price increase or worsening of terms of the focal product," *id.* ¶ 101; *see also* U.S. Dep't of Justice & Federal Trade Comm'n, Merger Guidelines (2023) [hereinafter 2023 Merger Guidelines], at 37 ("A measure of customer substitution between firms in this setting is the diversion ratio."); Ex. 1 (Hill Rpt.) ¶ 97; Michael L. Katz & Carl Shapiro, Critical Loss: Let's Tell the Whole Story, 17 Antitrust 49, 49–50 (2003); 2023 Merger Guidelines § 4.3.C & n.85 (explaining the use of aggregate diversion ratio analysis to implement the hypothetical monopolist test).

The problem with Dr. Hill's approach, however, is that he does not analyze or measure *economic substitution* when calculating his diversion ratios, and thus what he purports to call "diversion" is not diversion at all. *See* Ex. 3 (Yurukoglu Rpt.) ¶ 89; Ex. 4 (Yurukoglu Reb. Rpt.) ¶ 23.

*First*, Dr. Hill's diversion estimates are not based on whether an artist would substitute away from an MCA in response to an increase in price or worsening of terms. The data Dr. Hill analyzes does not provide *any* information about changes in price or

worsening of terms.[2]  Instead, Dr. Hill looks at tour routing, *i.e.*, the pattern of venues an artist plays on a given tour.  Specifically, he looks at artists who perform one show at any MCA and then calculates what percent of those artists play *their next show* also at any MCA.  *See* Ex. 1 (Hill Rpt.) ¶ 286.

For example, assume an artist agreed in 2023 to play a five-stop tour in 2024 that started at an amphitheater in Dallas, moved to an amphitheater in Louisville, then played a club in Tallahassee, followed by an arena in Atlanta, and ended with an amphitheater in Hartford.  Dr. Hill's diversion analysis would treat that artist as having "switched" between each MCA stop on the tour, despite having selected all five stops at the same time a year prior.  His procedure would also ignore the arena stop in Atlanta, because it followed a stop at a club, and did not follow an amphitheater stop.  Alternatively, assume an artist meticulously considered whether to play all arenas or all amphitheaters, thought it was a close call, but decided to play ten amphitheaters only.  In Dr. Hill's view, the ensuing tour routing shows no switching, so he would say there was no diversion.  This is completely arbitrary and at odds with the commercial reality of how artists choose from venue alternatives.

Using this "where the artist plays next approach," Dr. Hill calculates that in 2023, artists who performed at an MCA followed that performance with one at another MCA 55% of the time.  *Id*. fig. 55.  Dr. Hill then simply assumes that artists would switch in response to a worsening of terms or increase in price in precisely equal proportions to the percentage of artists who did / did not play their next show at an MCV.  Accordingly, he

---

[2] The data that Dr. Hill analyzes for his purported diversion analysis only show which artists played which venues on which dates and the promoter for each show.  Ex. 3 (Yurukoglu Rpt.) ¶ 90.

calculates his outside diversion ratio at 45% (*i.e.*, 100%-55%). *Id.* fig. 57. He pairs that outside diversion ratio with his estimate of an MCA profit margin[3] on each MCA performance to test the profitability of a SSNIP as called for in the HMT and concludes this is a relevant market. Stated simply, Dr. Hill's HMT analysis is grounded in an arbitrary ratio that has absolutely nothing to do "diversion"—it has nothing to do with switching, let alone switching in response to a price increase or worsening of terms.

*Second*, Dr. Hill fails to implement the calculation according to his own stated definition. This is even more in the weeds, and exceedingly unlikely to be appreciated by a jury, but it is a fundamental error.

Specifically, Dr. Hill uses the wrong denominator. Dr. Hill defines his "actual outside diversion ratio" as:

$$\frac{\# \text{ of artists who switch } \textbf{\textit{from }} MCA_n \textbf{\textit{ to }} a \text{ non } MCA}{\# \text{ of artists who switch from } MCA_n overall}$$

*Id.* ¶ 101. Based on his own definition, the correct denominator is the total number of artists who would switch away from a specific MCA (denoted $MCA_n$ in the formula) due

---

[3] Dr. Hill uses a profit margin of ▇▇, but this profit margin is also inconsistent with the facts and Dr. Hill's own logic in a way that systematically biases the profit margin upward, again towards Dr. Hill's desired result. Specifically, Dr. Hill attempts to count the co-promotion function of the venues in his profit margin calculation, but cavalierly deletes the promoter's primary expense—the fees paid to the artist— from the profit calculation. Dr. Hill performs this deletion even when the artist's fees are guarantees that are paid no matter how the concert performs. Dr. Hill claims that these payments to the artist are "pass through" payments that do not factor into promoter decisions. However, this treatment of artist guarantees is at odds with how Dr. Hill has treated payments to talent in his previous work. In a recent merger analysis, Dr. Hill treated advances paid by publishers to authors as the price paid by publishers to authors. Guarantees to artists and advances to authors serve similar roles to incentivize the content creator (artist or author) to sign with the distributor (promoter or publisher) and insure them against the risk associated with the outcome (ticket sales or book sales). Dr. Yurukoglu's report proposes a formula for treating artist payments analogously to how Dr. Hill treated author payments in his prior testimony in *United States v. Bertelsmann SE & Co. KGaA, see* Demonstrative Exhibits for the Direct Testimony of Dr. Nicholas Hill at 18, *U.S. v. Bertelsmann SE & CO. KGaA*, No. 1:21-cv-02886-FYP (D.D.C. 2022), https://www.justice.gov/atr/media/1254431/dl, and finds the profit margin for MCAs, properly calculated, to be between ▇▇▇▇▇▇▇ instead of Dr. Hill's overstated ▇▇, *see* Ex. 3 (Yurukoglu Rpt.) ¶¶ 107– 114, 117.

to a price increase or worsening of terms at that MCA, $MCA_n$. However, Dr. Hill does not use that denominator. Ex. 5 (Hill Tr.) 241:3-8 ("Q. Okay. So you agree that the HMT originally presented in your opening report is not limited to artists who switched because of the worsening of terms, correct? A. Correct.").) When he implements the math, he effectively uses the following ratio:

$$\frac{\text{\# of artists who switch } \textbf{from} \text{ any MCA } \textbf{to} \text{ a non MCA}}{\text{all artists who played at any MCA}}$$

In other words, Dr. Hill uses the total number of artists who initially played at any MCA as the denominator, not the number of "switchers" from a single venue, as would be called for in the HMT. *See* Ex. 4 (Yurukoglu Reb. Rpt.) ¶¶ 28–29. Put differently, Dr. Hill's analysis assumes—without any explanation—that 100% of artists who initially played at any MCA would switch in response to a price increase or worsening of terms at a single MCA. Because it includes all artists, including non-switchers, Dr. Hill's denominator is systematically too large. This faulty calculation underestimates actual outside diversion and understates the substitutability between MCAs and other venues, biasing his HMT toward concluding that MCAs are a relevant market. *See, e.g.*, Ex. 3 (Yurukoglu Rpt.) ¶ 95.

Importantly, Dr. Hill does not provide a single citation to peer reviewed (or any other) literature to justify his method. He chooses this approach despite a surfeit of commonly accepted methods for estimating diversion all of which have a basis in peer-reviewed literature. Ex. 4 (Yurukoglu Reb. Rpt.) ¶¶ 32–34. When confronted with the internal inconsistency and lack of citation in his primary diversion estimate, Dr. Hill did not dispute the internal inconsistency nor did he provide any citation to support his methodology. Instead, Dr. Hill invented two additional procedures (again without citation

10

or a basis in commonly accepted methods) that correct none of the fundamental errors of his initial unreliable and biased approach.[4]

Dr. Hill's opinion that there is a properly defined antitrust market for the use of MCAs by artists should be excluded under Rule 702, for several reasons. *First*, Dr. Hill "failed to apply his own methodology reliably". *Amorgianos*, 303 F.3d at 268. If he is going to call this an HMT diversion ratio, he is required to estimate diversion in response to a price increase or worsening of terms. *See H&R Block Inc*., 833 F. Supp. 2d at 62. He clearly does not. Whatever value his study of tour routing patterns may have, it has nothing to do with diversion in an HMT. And then he uses the wrong denominator in calculating the diversion ratio.

*Second*, his outside diversion ratio estimates are untethered from any established or peer-reviewed methodology for estimating diversion. *See Kentucky Speedway*, 588 F.3d at 916–19 (upholding district court's decision to exclude where expert "used his own version" of the SSNIP test "that had not been tested, had not been subjected to peer review, had no controlling standards, had no demonstrable showing of support within the scientific community, and was produced solely for purposes of the instant litigation"). There is no

---

[4] With regards to his new inventions, at deposition, Dr. Hill raised "a paper by Steve Tenn" that "might be with Dan Hosken" purportedly "explaining the methodology" as well as a "series of other papers that mention the methodology as well" which Dr. Hill could not identify during his deposition. Ex. 5 (Hill Tr.) 90:8–91:9. Dr. Hill should not be permitted to support his flawed methodology with these vague allusions to papers that could have been—but were not—cited in his reports. *See Rodriguez v. Vill. of Port Chester*, 535 F. Supp. 3d 202, 211 (S.D.N.Y. 2021) (expert may not use deposition testimony to supply "the basis and reasoning" omitted from his expert report, because "an expert's deposition testimony cannot cure a party's failure to include opinions in their expert report under Rule 26"). By waiting until his deposition to raise this purported "support" for his methodology, Dr. Hill deprived Defendants' experts of the ability to evaluate whether Dr. Hill applied the same methodology as the paper, whether the assumptions underlying the methodology make sense in the context of this industry, and whether there have been other papers criticizing the methodology.

11

literature suggesting that substitution sequences comparable to Dr. Hill's analysis provide any useful information about diversion.

Dr. Hill's attempts to overcome these problems are a smokescreen. The "alternative methods" introduced in his rebuttal report—which Dr. Hill uses to conclude that his initial methodology was reliable, Ex. 2 (Hill Reb. Rpt.) ¶ 41—are also untethered from any coherent framework, and merely amount to Dr. Hill applying different weighting schemes to the individual artist data that underpins his initial methodology. Like his initial method, these new methods do not look at any data involving an increase in price or worsening of terms, and they do not look at any switching behavior. They are also biased in favor of reaching his desired result: His "corrected show-weighted" and "monthly persistence" measures both give less weight to the very artists most likely to switch to an outside option. *See* Ex. 4 (Yurukoglu Reb. Rpt.) ¶¶ 54, 59. Dr. Hill provides no citation to any academic literature to support these "alternative methods". Dr. Hill should not be permitted to validate an unsound initial method by demonstrating that another equally unsound method yields the same result. *See, e.g.*, *In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 296 (S.D.N.Y. 2018), *aff'd sub nom. In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 982 F.3d 113 (2d Cir. 2020) (rejecting expert's "secondary, indirect theory of causation" as "flawed by the same sorts of data holes and analytical gaps" as the primary theory).

### B.    Dr. Hill's Opinions Defining Markets for Providing Promotion Services to Artists in Major Concert Venues Should Be Excluded.

Employing the same flawed methodology of his MCA analysis, Dr. Hill opines that there is a relevant market for providing promotion services to artists at major concert venues ("MCVs"). Dr. Hill defines an MCV to be "an amphitheater or arena that has a

capacity of 8,000 or more and that hosted 10 or more concerts in at least one year," without explaining the logic or intuition behind why MCAs and MCVs should be susceptible to the same arbitrary cut offs of 8,000 and 10 or more concerts. Ex. 1 (Hill Rpt.) ¶¶ 139–40, 272.

As with MCAs, many venues are excluded. *See* Ex. 5 (Hill Tr.) 61:19–64:7. His market does not include stadiums, arenas or amphitheaters with less than 8,000 seats, theaters, or clubs; it does not include venues like parks, convention centers, or fairgrounds (unless they otherwise contain an MCV); and it does not include festivals (unless the festival is held in an MCV). *Id.* 61:1-64:7. Dr. Hill's market would not include an arena or amphitheater that hosted nine concerts every year from 2017 through 2024, but would include an arena or amphitheater that hosted ten concerts in 2017 and zero concerts in 2018-2024. Dr. Hill's market excludes thousands of venues. *See* Ex. 4 (Yurukoglu Reb. Rpt.) fig. 13 (illustrating that Dr. Hill's definition of MCV includes 256 venues and excludes over 19,000 other venues in the United States).

Dr. Hill's approach to relevant market also, bizarrely, ignores the fact that artists typically consume promotion services for tours, not single shows. By way of illustration, Dr. Hill's markets would *include* promotion services provided to artists like Counting Crows, Foreigner, Keith Urban, Luke Bryan, and The Killers, when those artists play at Dr. Hill's MCVs, but exclude promotion services provided to those very same artists travelling on the very same tours when they travel to non-MCVs (*e.g.*, festivals, stadiums, theaters, or even amphitheaters and arenas with fewer than 8000 seats or 10 shows in a year). Query when, along the bus route, a given artist's tour switches from being within Dr. Hill's promotions market to outside it.

As with the MCA market definition, Dr. Hill bases his relevant market opinion on the HMT, which in turn is based on his unscientific diversion ratio estimates and inconsistent profit margin calculation.[5]  His diversion calculations suffer the same two fatal flaws detailed above.

*First*, they are not based on actual diversion but rather follow the same "where the artist plays next method", calculating the percentage of artists who perform at MCVs following a performance at an MCV.  Ex. 1 (Hill Rpt.) fig. 55.  Nothing more needs to be said about that.

*Second*, Dr. Hill makes the same math error when he attempts to apply the formula he defines for estimating actual outside diversion.  In this case, Dr. Hill estimates the outside diversion ratio based on the proportion of artists who performed at an MCV and then performed at a non-MCV.  *Id.* ¶¶ 172-173.  Dr. Hill concludes that the actual outside diversion ratio is 28% because after performing a show at an MCV, 28% of the time the artists performed at a non-MCV for their next show.  *Id.* fig. 23.  In doing so, Dr. Hill improperly uses all the artists who performed at any MCV in the first period as the denominator—rather than just switchers—and thus biases his result in favor of concluding that MCVs are a relevant market.

This is all a pseudo-scientific defense of a baseless market definition argument.  No jury should be allowed to hear a word of it.

---

[5] Dr. Hill repeats the error he made by deleting talent fees from the profit margin calculation.  In the case of promotion services, this error leads Dr. Hill to again overstate the profit margin at ██, whereas the calculation consistent with his treatment of content creator fees (artists or authors) from distributors (promoter or book publishers) would result in a profit margin of ██.  *See* Ex. 3 (Yurukoglu Rpt.) ¶¶ 200-202.

## II.    DR. HILL'S OPINION THAT DEFENDANTS ENGAGED IN ANTICOMPETITIVE CONDUCT IS AN IMPROPER LEGAL CONCLUSION AND SHOULD BE EXCLUDED.

Expert witnesses "may not present testimony in the form of legal conclusions". *Cameron v. City of New York*, 598 F.3d 50, 62 (2d Cir. 2010) (internal quotations omitted). In *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Loc. Union No. 3, AFL-CIO*, the court recognized that there is a "distinction between a legal conclusion and appropriate expert testimony". 313 F. Supp. 2d 213, 240 (S.D.N.Y. 2004). In that case, the expert opined that the defendant "engaged in anticompetitive conduct." *Id.* at 221. Here, Dr. Hill seeks to offer "the opinion that Ticketmaster and Live Nation engaged in anticompetitive conduct". Ex. 5 (Hill Tr.) 303:12–304:3. Dr. Hill's reports are also rife with improper legal conclusions regarding Live Nation and/or Ticketmaster, including:

- "Live Nation and Ticketmaster engage in anticompetitive conduct across all the relevant markets, causing harm to artists, venues, and fans." Ex. 1 (Hill Rpt.) § 10.

- "Live Nation and Ticketmaster's anticompetitive conduct maintains its interlocking monopolies and materially harms the competitive process and customers." *Id.* § 10.6.

- "I confirm that Live Nation's anticompetitive conduct across all relevant markets causes harm to artists, venues, and fans." Ex. 2 (Hill Reb. Rpt.) ¶ 12.

- "I reaffirm my opinion that Live Nation has engaged in anticompetitive conduct that maintains its interlocking monopolies and materially harms the competitive process and customers in each relevant market related to the production of live concert performances at major concert venues in the United States." *Id.* ¶ 13.

The *U.S. Info Sys.* court held that the expert "would not be permitted to state that the defendants did or did not engage in anticompetitive conduct". 313 F. Supp. 2d at 240; *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 (NRB),

2025 WL 2733020, at *22 (S.D.N.Y. Sept. 25, 2025) (holding that an expert cannot state

that the defendants did or did not engage in anticompetitive conduct); *Union Carbide*

*Corp. v. Montell N.V.*, 28 F. Supp. 2d 833, 843 (S.D.N.Y. 1998) (same).  Dr. Hill's

opinion that Defendants engaged in any anticompetitive conduct or that such conduct

"maintained" Defendants' alleged "monopolies" is an inappropriate legal conclusion that

could confuse and inflame the jury and should be excluded.

### III.    DR. HILL'S OPINIONS PURPORTING TO SUMMARIZE AND WEIGH THE "QUALITATIVE EVIDENCE" SHOULD BE EXCLUDED.

Dr. Hill bases many of his opinions on a purported lay summary of the evidence

that fails to apply any relevant expertise.  "[A]n expert cannot be presented to the jury

solely for the purpose of constructing a factual narrative based upon record evidence" and

cannot "merely recit[e]" the contents of documents or testimony produced during

discovery; such an expert does "no more than that which the finder of fact could him or

herself do" and "such experts' reports 'may be precluded on this basis alone'".  *Anderson*

*News*, 2015 WL 5003528, at *2 (internal citations omitted); *see also Scentsational Techs*,

2018 WL 1889763, at *4 ("Acting simply as a narrator of the facts does not convey

opinions that are based on an expert's knowledge and expertise; nor is such a narration

traceable to a reliable methodology.").  Instead, "testimony by fact witnesses familiar

with those documents would be far more appropriate" because Dr. Hill's reports "do[] no

more than counsel for [Plaintiffs] will do in argument, i.e ., propound a particular

interpretation of [Defendants'] conduct".  *LinkCo, Inc. v. Fujitsu Ltd.*, No. 00 CIV. 7242,

2002 WL 1585551, at *2 (S.D.N.Y. July 16, 2002) (internal quotations omitted).  It is

also "inappropriate for [Dr. Hill] to opine on the credibility of evidence".  *Id*.

Here, Dr. Hill's reports are replete with sections in which he does nothing more than narrate and summarize "qualitative evidence" that, in his view, are "consistent with" his opinions. *See e.g.*, Ex. 1 (Hill Rpt.) § 10.1.2 ("Qualitative evidence is consistent with Live Nation conditioning or threatening to condition the provision of content on venues' use of Ticketmaster.").  Indeed, Dr. Hill's reports contain over 80 statements in which Dr. Hill opines that the "qualitative evidence" is "consistent with" or otherwise supports his purported opinion as to a statement of fact.[6]  Narrating and summarizing is not what an expert does.  It does not involve any specialized expertise to recount what is in a document or deposition testimony produced during discovery.  *Scentsational Techs.*, 2018 WL 1889763, at *4 ("Acting simply as a narrator of the facts does not convey opinions that are based on an expert's knowledge and expertise . . . .").

Not only is Dr. Hill acting impermissibly as a narrator of the record, he is also an unreliable narrator of that record:  When summarizing the qualitative evidence, Dr. Hill for the most part does not acknowledge, let alone discuss, contradictory qualitative evidence.  For example, although Dr. Hill opines that "qualitative evidence is consistent with Live Nation conditioning or threatening to condition the provision of content on venues' use of Ticketmaster":

- Dr. Hill does not acknowledge or discuss qualitative evidence of venues denying that Live Nation conditioned or threatened to condition the provision of content on their use of Ticketmaster.  *See, e.g.*, Ex. 5 (Hill Tr.) 321:6–323:24.

---

[6] *See* Ex. 1 (Hill Rpt.) ¶¶ 141, 142, 143, 144, 152, 153, 154, 159, 164, 176, 184 n.376, 187, 192, 194, 204, 210, 216, 219, 220 n.469, 223, 224, 229, 244, 251, 255, 256, 258, 260, 267, 276, 277, 282, 284, 287, 296, 305, 314, 320, 338, 359, 360, 361, 362-366, 367, 368, 372 n.797, 376, 377, 387, 388, 389, 393, 399, 400, 410, 416, 444, 453, 462, 463, 480 n.1037, 481 n.1038; *see also* Ex. 2 (Hill Reb. Rpt.) ¶¶ 104, 108, 122, 207 n.256, 261, 288, 294, 312, 323, 356 n.549, 358, 362, 382, 390, 393, 397, 426, 437 n.734, 442, 443-45, 446, 453, 464, 464 n.804, 465, 466, 467, 536, 550.

- Dr. Hill does not cite testimony from a witness who, in deposition, retracted the statement in a document that Dr. Hill relies on in his report. *See, e.g.*, *id.* 376:21–327:12.

- 

Ex. 5 (Hill Tr.) 382:10–18.

Dr. Hill admitted that he does not "list all the evidence that cuts in either direction". *Id.* 317:21–318:2. Expert testimony that "cherry-picks" portions of the record that the expert "finds important" without any analysis connecting those selections to a reliable methodology is not permitted and impinges on the role of the factfinder. *See, e.g.*, *Bobcar Media, LLC v. Aardvark Event Logistics, Inc.*, 554 F. Supp. 3d 606, 613 (S.D.N.Y. 2020), *aff'd*, 839 F. App'x 545 (Fed. Cir. 2021) (excluding expert testimony that "offers no analysis beyond highlighting aspects of the record that [the expert] finds important and demonstrating how it satisfies the legal standards he sets out" because "the jury would be engaging in the same process"); *Scism v. Ferris*, No. 1:18-CV-672 (TWD), 2022 WL 2915745, at *5 (N.D.N.Y. July 25, 2022) (excluding expert testimony where "the 'facts' relied on by the experts are not really facts—they are conclusions reached by each experts' credibility determinations and selective reading of the evidence"). Dr. Hill's biased summaries of the evidence should thus be excluded for the additional reason that they risk confusing the jury and obscuring the issues.

Similarly, expert opinions and testimony that "evaluat[e] witness credibility, even when such evaluations are rooted in scientific or technical expertise" are also inadmissible. *See Nimely*, 414 F.3d at 397–98. Here, Dr. Hill admits that he impermissibly made

18

"credibility determinations" and "weigh[ed]" the qualitative and quantitative evidence. Ex. 5 (Hill Tr.) 300:1–9.

Dr. Hill deploys the same narration and cherry-picked summaries of the record evidence throughout his reports. In fact, over 80 times, Dr. Hill refers to qualitative evidence in his reports, the vast majority of which do not include any references to industry studies, academic literature or even his own experience in presenting this purported summary of the record evidence. *See supra* note 6. All this demonstrates that Dr. Hill is seeking to act as a human highlighter rather than to present any permissible expert testimony. *See Scentsational Techs.*, 2018 WL 1889763, at *4; *see also Anderson News*, 2015 WL 5003528, at *2. All of these opinions and testimony should be excluded. *Anderson* News, 2015 WL 5003528, at *2 ("[E]xperts who 'merely recit[e] what is on the face of a document produced during discovery' . . . and such expert reports 'may be precluded on this basis alone.'").

## CONCLUSION

For these reasons, Dr. Hill's opinions that (1) there is a properly defined antitrust market for the use of major concert amphitheaters by artists and (2) there is a properly defined antitrust market for the provision of promotion services to artists at major concert venues, (3) Live Nation has engaged in five categories of anticompetitive conduct and (4) the "qualitative evidence is consistent with" over 80 factual statements, as well as any opinions that rely on the above opinions, should be excluded under Rules 702 or 403. To the extent the Court is not inclined to exclude Dr. Hill's market definitions all together, any opinions and testimony that rely on Dr. Hill's deeply flawed and unscientific aggregate diversion ratios should alternatively be excluded.

19

Dated: November 13, 2025

LATHAM & WATKINS LLP

CRAVATH, SWAINE & MOORE LLP

_____

_____

Alfred C. Pfeiffer (admitted *pro hac vice*)
    *Co-Lead Trial Counsel*
David R. Marriott
    *Co-Lead Trial Counsel*
Timothy L. O'Mara (admitted *pro hac vice*)
Jennifer L. Giordano
Andrew M. Gass (admitted *pro hac vice*)
Kelly S. Fayne (admitted *pro hac vice*)
Lindsey S. Champlin (admitted *pro hac vice*)
Robin L. Gushman (admitted *pro hac vice*)

505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600

1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

555 11th Street, NW, Suite 1000
Washington, D.C. 20004
(202) 637-2200

Al.Pfeiffer@lw.com
David.Marriott@lw.com
Tim.O'Mara@lw.com
Jennifer.Giordano@lw.com
Andrew.Gass@lw.com
Kelly.Fayne@lw.com
Lindsey.Champlin@lw.com
Robin.Gushman@lw.com

*Attorneys for Defendants Live Nation
Entertainment, Inc. and Ticketmaster L.L.C.*

Lauren A. Moskowitz
Nicole M. Peles

Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 474-1000

lmoskowitz@cravath.com
npeles@cravath.com

*Attorneys for Defendants Live Nation
Entertainment, Inc. and Ticketmaster
L.L.C.*

20

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Nicole M. Peles, an attorney duly admitted to practice before this Court, hereby certify pursuant to Local Rule 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rules"), and Rule 8(C) of Judge Arun Subramanian's Individual Practices in Civil Cases ("Individual Rules"), that the foregoing Memorandum of Law was prepared using Microsoft Word, and contains 6,225 words.  In making this calculation, I have relied on the word and page counts of the word-processing program used to prepare the document.

Dated:     November 13, 2025
         New York, NY

                                            _____
                                               Nicole M. Peles