# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA, *et al.*,

*Plaintiffs*,

v.

LIVE NATION ENTERTAINMENT, INC.,
and TICKETMASTER L.L.C.,

*Defendants*.

Case No.: 1:24-cv-03973-AS

**ORAL ARGUMENT REQUESTED**

**REDACTED**

### PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE REPORTS, OPINIONS, AND TESTIMONY OF MONETARY RELIEF STATES' DAMAGES EXPERT DR. ROSA M. ABRANTES-METZ

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................................1

LEGAL STANDARD......................................................................................................3

ARGUMENT ..................................................................................................................4

    I.    DR. ABRANTES-METZ APPROPRIATELY SELECTED AXS—TICKETMASTER'S CLOSEST COMPETITOR—AS A REASONABLE BENCHMARK ............................................................................................4

    II.    DR. ABRANTES-METZ'S DAMAGES MODEL IS RELIABLE AND HELPFUL TO THE TRIER OF FACT BECAUSE IT IS TIED TO DEFENDANTS' ILLEGAL CONDUCT...............................................................8

        A.    DEFENDANTS' IMPROPERLY BRING A SECOND SUMMARY JUDGMENT MOTION AS A *DAUBERT* MOTION ..........9

        B.    DR. ABRANTES-METZ'S MODEL IS APPROPRIATELY BASED ON THE ALLEGED ANTICOMPETITIVE CONDUCT ..........12

        C.    DR. ABRANTES-METZ'S METHODOLOGY ADEQUATELY ADJUSTS TO THE STATUTE OF LIMITATIONS AND CAN RELIABLY EXCLUDE SPECIFIC YEARS .............................................14

    III.    DR. ABRANTES-METZ'S DAMAGE MODEL PROPERLY RELIES ON EVENT-LEVEL TRANSACTIONAL DATA ...............................................17

    IV.    DR. ABRANTES-METZ'S TREATMENT OF UPFRONT PAYMENTS AND INSIDE FEES IS APPROPRIATE AND RELIABLE ...............................21

        A.    UPFRONT PAYMENTS ARE IRRELEVANT TO DR. ABRANTES-METZ'S CALCULATIONS ...............................................21

        B.    DEFENDANTS IDENTIFIED NO EVIDENCE THAT INCLUDING UPFRONT PAYMENTS WOULD CHANGE DR. ABRANTES-METZ'S ESTIMATE OF DAMAGES ..............................22

        C.    DEFENDANTS IGNORE THE VALUABLE SPONSORSHIP RIGHTS PURCHASED THROUGH UPFRONT PAYMENTS .............24

        D.    DEFENDANTS' "INSIDE FEES" CRITIQUE FAILS ...........................24

CONCLUSION................................................................................................................26

CERTIFICATE OF COMPLIANCE ..............................................................................30

## TABLE OF AUTHORITIES

Page

CASES

*Amorgianos v. Amtrak*
303 F.3d 256 (2d Cir. 2002)................................................................3

*Bigelow v. RKO Radio Pictures*
327 U.S. 251 (1946)................................................................5

*Blue Shield of Virginia v. McCready*
457 U.S. 465 (1982)................................................................18

*Bocoum v. Daimler Trucks N. Am. LLC*
2022 WL 902465 (S.D.N.Y. Mar. 28, 2022) .............................3

*Borawick v. Shay*
68 F.3d 597 (2d Cir. 1995)................................................................3

*Briseno v. ConAgra Foods, Inc*
844 F.3d 1121 (9th Cir. 2017) .............................................19

*Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*
239 F.3d 179 (2d Cir. 2001)................................................3, 16, 21

*Cason-Merenda v. Detroit Med. Ctr.*
2013 WL 1721651 (E.D. Mich. Apr. 22, 2013)...................4

*Celebrity Cruises Inc. v. Essef Corp.*
434 F. Supp. 2d 169 (S.D.N.Y. 2006)...................................5

*Chalmers v. NCAA*
2025 WL 1225168 (S.D.N.Y. Apr. 28, 2025).....................15

*Comcast Corp. v. Behrend,* 569 E.S. 27 (2013)................................13

*Dial Corp. v. News Corp.*
314 F.R.D. 108 (S.D.N.Y. 2015) .............................4, 5, 8

*DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*
2019 WL 1515231 (E.D.N.Y. Feb. 21, 2019).....................8

*Ehret v. Uber Tech.*
68 F. Supp. 3d 1121 (N.D. Cal. 2014) ...............................19

## TABLE OF AUTHORITIES
### (continued)

Page

*Epic Games, Inc. v. Apple Inc.*
  2022 WL1741813 at *112-13 (9th Cir. May 25, 2022) .........................................19

*In re Air Cargo Shipping Servs. Antitrust Litig*
  2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014) .........................................14

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*
  261 F. Supp. 2d 188 (E.D.N.Y. 2003) .........................................16

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*
  2025 WL 354671 (S.D.N.Y. Jan. 30, 2025) .........................................4, 5, 8

*In re Lipitor Antitrust Litig.*
  855 F.3d 126 (3d Cir. 2017).........................................12

*In re Prograf Antitrust Litig.*
  2014 WL 7641156 (D. Mass. Dec. 23, 2014) .........................................8

*In re TFT-LCD (Flat Panel) Antitrust Litig.*
  2011 WL 560593 (N.D. Cal. Feb. 15, 2011) .........................................18

*J. Truett Payne Co. v. Chrysler Motors Corp.*
  451 U.S. 557 (1981).........................................3, 5

*Kansas v. UtiliCorp United, Inc.*
  497 U.S. 199 (1990).........................................20

*Kelco Disposal, Inc. v. Browning-Ferris Indus. of Vermont, Inc.*
  845 F.2d 404 (2d Cir. 1988).........................................21

*McWane, Inc. v. FTC*
  783 F.3d 814 (11th Cir. 2015) .........................................11

*N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*
  766 F.3d 212 (2d Cir. 2014).........................................11

*Ne. Tel. Co. v. AT&T Co.*
  651 F.2d 76 (2d Cir. 1981).........................................22

*New York ex. rel. Spitzer v. Feldman*
  2003 WL 21576518 (S.D.N.Y. July 10, 2003) .........................................11, 18

## TABLE OF AUTHORITIES
### (continued)

Page

*New York v. Hendrickson Bros.*
840 F.2d 1065 (2d Cir. 1988)..............................................................................11

*Oracle Int'l v. Rimini St., Inc.*
2022 WL 16575007 (D. Nev. Nov. 1, 2022) .........................................................10

*Price v. L'Oreal USA*
Inc., 2020 WL 4937464 (S.D.N.Y. Aug. 24, 2020).........................................20, 21

*Sabal Trail Transmission, LLC v. 0589 Acres of Land, Fla.*
2018 WL 3655556 (M.D. Fla. Aug. 2, 2018) .........................................................10

*Story Parchment Co. v. Paterson Parchment Paper Co.*
282 U.S. 555 (1931)..............................................................................................3

*Syufy Enters. v. Am. Multicinema, Inc.*
793 F.2d 990 (9th Cir. 1986) .................................................................................8

*U.S. Football League v. Nat'l Football League*
842 F.2d 1335 (2d Cir. 1988)......................................................................3, 4, 16

*United States v. Google, LLC*
747 F. Supp. 3d 1 (D.D.C. 2024) ...................................................................11, 14

*US Airways, Inc. v. Sabre Holdings Corp.*
938 F.3d 43 (2d Cir. 2019)............................................................................14, 15

*Zenith Radio Corp. v. Hazeltine Research Inc.*
395 U.S. 100 (1969)..............................................................................................3

*Zenith Radio Corp. v. Hazeltine Research, Inc.*
401 U.S. 321 (1971)..............................................................................................15

*Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*
571 F.3d 206 (2d Cir. 2009)..................................................................................3

*ZF Meritor, LLC v. Eaton Corp.*
696 F.3d 254 (3d Cir. 2012)..................................................................................11

STATUTES

15 U.S.C.
§ 15c.................................................................................................17, 18, 20, 21

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

Court Rules

Fed. R. Civ. P.
    15(b)............................................................................................................................16
    23................................................................................................................................19

Fed. R. Evid.
    702..........................................................................................................................4, 5, 8

## INTRODUCTION

Dr. Abrantes-Metz is a highly-qualified expert whose opinions are based on (1) data that Ticketmaster and its most significant competitor in primary ticketing—AXS—produced in this litigation, (2) widely accepted statistical techniques such as multiple regression and instrumental variables regression analysis, and (3) documentary evidence from Defendants' own files.

There is no basis to exclude her testimony, which relies on facts and data in the record and reliable methodologies and will be helpful to the jury. Many courts have accepted and credited Dr. Abrantes-Metz's opinions and testimony as an economic expert, including regarding calculations of damages.[1] Defendants' disagreements with Dr. Abrantes-Metz's opinions and interpretation of the evidence are for cross-examination, not exclusion.

Dr. Abrantes-Metz uses the widely-accepted "yardstick" or "benchmark" method of calculating antitrust damages to estimate total consumer damages of ▮▮▮▮▮▮▮ per ticket.[2] Specifically, she compares the fees that Ticketmaster charges major concert venues ("MCVs") for primary ticketing services to those charged by AXS—its largest competitor and the only other vertically integrated primary ticketer in the market—to show that Ticketmaster's contracts with venues contain supra-competitive ticketer retained fees ("retained fees"), which are reflected in higher consumer ticket prices.[3]

Substantial evidence supports Dr. Abrantes-Metz's selection of AXS as an appropriate and reasonable benchmark.  She determined that AXS is a reasonable benchmark based on five criteria: (1) "AXS and Ticketmaster are both full-service primary ticketers, vertically integrated with their respective promotion services arms,"[4] (2) "AXS is the second-largest full-service ticketing provider" to MCVs,[5] (3) AXS's parent company is the second-largest promoter for

---

[1] *See* Ex. 1 Expert Report of Rosa Abrantes-Metz, Aug. 15, 2025 ("Abrantes-Metz Report"), ¶¶ 1–19.
[2] *Id.* ¶ 37.
[3] *Id.* §§ V–VI.
[4] *Id.* ¶ 111; Defendants' Mot. for Summ. J. ("MSJ") at 5, 7, 17.
[5] Ex. 1 Abrantes-Metz Report ¶ 111; Ex. 2 Expert Report of Nicholas Hill, August 1, 2025 ("Hill Report"), Appendix E.4, Fig. 122 (showing that AXS's market share for MCV primary ticketing
(continued…)

MCV concerts,[6] (4) "AXS and Ticketmaster provide ticketing services ████████████ ██████"[7] and (5) "evidence indicates that AXS is of comparable quality to Ticketmaster."[8] Defendants do not challenge four out of these five criteria.  Nor do they dispute that AXS is a meaningful competitor to Ticketmaster in the relevant market.  In their summary judgment briefing, Defendants concede that AXS competes to provide primary ticketing to MCVs, has been a "significant" entrant into primary ticketing, and is "vertically integrated into venue ownership" through "Live Nation's biggest competitor in concert promotion, AEG."  MSJ at 5, 7, 11, 17.  Tellingly, Defendants never identify a benchmark that they claim is superior to AXS.

Instead, Defendants argue that AXS is not a valid benchmark only because of purported differences with Ticketmaster on a single dimension of quality—████████████████. MSJ at 25.  Defendants are incorrect and ignore substantial evidence in the record confirming that industry participants—including Ticketmaster itself—view AXS as Ticketmaster's closest competitor.  And Defendants also ignore additional factors that make AXS a conservative and appropriate benchmark.[9]

Defendants then attempt to argue that statute of limitations and state citizenship issues bar some (unspecified) amount of the Monetary Relief States' claims, but their arguments rest on misinterpretations of binding law and premature resolutions of disputed factual issues in their favor. To the extent these arguments are valid—and they aren't—they can only be assessed at trial.

Finally, Defendants' arguments regarding upfront payments and inside fees similarly fail. Dr. Abrantes-Metz's treatment of upfront payments and inside fees was appropriate, and

---

is ████████████████████████████████████████ by tickets sold, face value, and all-in price). Defendants do not dispute that AXS's market share is ████████████ ███████.

[6] Ex. 1 Abrantes-Metz Report ¶ 111.
[7] *Id.* ¶ 111.
[8] *Id.* ¶ 111; Ex. 3 Rebuttal Report of Dr. Rosa Abrantes-Metz, Oct. 9, 2025 ("Abrantes-Metz Rebuttal"), ¶¶ 17–51.
[9] *See* Ex. 1 Abrantes-Metz Report ¶¶ 126–131.

Defendants fail to show, whether as a matter of economics, empirically, or through relevant evidence, that treating them differently would materially alter her damages calculations.

## LEGAL STANDARD

There is a presumption that expert testimony is admissible. *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995). Courts should exclude expert testimony only "if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009). Expert testimony therefore should be excluded only if it is "so fundamentally unsupported" that it offers "no assistance to the jury." *Bocoum v. Daimler Trucks N. Am. LLC*, 2022 WL 902465, at *6 (S.D.N.Y. Mar. 28, 2022).

The Supreme Court has long expressed its "willingness to accept a degree of uncertainty" in proving antitrust damages because "the vagaries of the marketplace usually deny us sure knowledge" of what would have occurred "in the absence of the defendant's antitrust violation." *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566–67 (1981); *see also Zenith Radio Corp. v. Hazeltine Research Inc.*, 395 U.S. 100, 123 (1969) ("[D]amage issues in these [antitrust] cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts"). A "just and reasonable estimate of damages" is sufficient, *U.S. Football League v. Nat'l Football League,* 842 F.2d 1335, 1378 (2d Cir. 1988), even where the "result be only approximate." *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 563 (1931).

"A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method" does not require exclusion, which is warranted only "if the flaw is large enough that the expert lacks 'good grounds' for [their] conclusions." *Amorgianos v. Amtrak*, 303 F.3d 256, 267 (2d Cir. 2002); *see also Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001) (asserted "gaps or inconsistencies in the reasoning" of an expert go to "the weight of the evidence, not to its admissibility").

**ARGUMENT**

I.    **DR. ABRANTES-METZ APPROPRIATELY SELECTED AXS—TICKETMASTER'S CLOSEST COMPETITOR—AS A REASONABLE BENCHMARK**

Defendants' argument to exclude Dr. Abrantes-Metz's opinions because AXS and Ticketmaster are not of "comparable quality" is without merit.[10]  At most, Defendants' argument goes the weight of her testimony, not its admissibility, as it relies on disputes of fact, not methodological deficiencies.

Dr. Abrantes-Metz uses a widely accepted method of calculating antitrust damages—the "yardstick" or "benchmark" method[11]—and substantial evidence supports her choice of AXS as a benchmark.  Dr. Abrantes-Metz determined that AXS is a reasonable benchmark based on five criteria—four of which defendants do not dispute.  Defendants' claim that AXS is not a valid benchmark relies solely on certain purported differences with Ticketmaster on a cherry-picked dimension of quality. Mot. at 24–26. Their argument fails for four reasons.[12]

*First*, Defendants inappropriately seek to impose a heightened standard for assessing Dr. Abrantes-Metz's damages model, claiming that a benchmark is only valid if it is "substantially equal" to the defendant at issue and that the "record shows a consensus that AXS is, in fact, of comparable quality to Ticketmaster."  Mot. at 24–25.  But the Second Circuit and district courts within this circuit "have allowed antitrust plaintiffs considerable latitude in proving the amount of damages." *Nat'l Football League*, 842 F.2d at 1378 (2d Cir. 1988); *see also In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 2025 WL 354671, at *12 (S.D.N.Y. Jan. 30, 2025).  Accordingly, under Federal Rule of Evidence 702, a benchmark "only needs to be sufficiently comparable to permit a degree of reliable comparison." *Keurig*, 2025 WL 354671, at *34.  Plaintiffs are not required to demonstrate "strict identity between the benchmark and the hypothetical free market that Plaintiffs and their expert seek to describe." *Cason-Merenda v.*

---

[10] *See* Mot. at 24-26.
[11] *See, e.g.*, *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 118–19 (S.D.N.Y. 2015).
[12] Defendants also fail to cite a single case to support their suggestion that Dr. Abrantes-Metz's selection of one competitor—Defendants' most significant and comparable rival—as a benchmark is inappropriate.  *See* Mot. at 2, 4, 9.

*Detroit Med. Ctr.*, 2013 WL 1721651, at *6 (E.D. Mich. Apr. 22, 2013) (citing *J. Truett Payne*, 451 U.S. at 566–67).

Courts in this district have therefore "declined to exclude expert damages opinions based on the calculation of damages using the yardstick method using firms or markets that may have been affected by alleged anticompetitive conduct." *Keurig*, 2025 WL 354671, at *11 (citing *Dial Corp.*, 165 F. Supp. 3d at 40–42). Because "selection of comparators will seldom approach the 'Utopian ideal' of identifying the perfect clone[,]" imposing too high a requirement for benchmark comparability "would create an unworkable and unfair standard." *Keurig*, 2025 WL 354671, at * 11; *see also Celebrity Cruises Inc. v. Essef Corp.*, 434 F. Supp. 2d 169, 189 (S.D.N.Y. 2006); *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946) (cautioning against a standard that "would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain"). Another Southern District court has found that a plaintiffs' expert's benchmark was appropriate and satisfied the requirements of Rule 702 in part because "the selection of perfectly comparable benchmark firms aside from [defendant] is impossible where [defendant's] alleged monopoly prevents comparable firms from operating within its market." *Dial Corp.*, 314 F.R.D. at 118–19.

Here, Defendants' conduct reduced the ability and incentive of other primary ticketers to enter, expand, scale, and effectively compete against Ticketmaster.[13]  *See Dial Corp.*, 314 F.R.D. at 118–19.  Requiring strict identity between Ticketmaster and AXS "would create an unworkable and unfair standard[,]" *In re Keurig*, 2025 WL 354671, at *11. Choosing AXS—Ticketmaster's most significant competitor in primary ticketing—is the most appropriate option and is "sufficiently comparable to permit a degree of reliable comparison." *Keurig*, 2025 WL 354671, at *34.

*Second*, substantial evidence supports Dr. Abrantes-Metz's determination that AXS matches or outperforms Ticketmaster across many dimensions of quality[14] and that Ticketmaster

---

[13] Ex. 2 Hill Report, § 10.1–10.2.
[14] *See* Ex. 3 Abrantes-Metz Rebuttal ¶¶ 22–36; *see also* Ex. ████████████████

(continued…)

struggles with key dimensions of quality.[15]  Notably, multiple Ticketmaster internal

presentations from recent years ████████████████████████████████████████████:

- In May 2023, Ticketmaster acknowledged that ███████
  ████████████████████████████████████████████████████
  ████████████████████████████████████████████████████
  ████████████[16]

- In July 2021, Ticketmaster identified ███████████████████████
  ███████████████████████████████████████[17]

- In November 2018, Live Nation likewise indicated that ███████████
  █████████████████████████████████[18]

- Two months earlier, Ticketmaster acknowledged that ████████████████
  █████████████████████████[19]

Similarly, an internal Ticketmaster interview summary for ████████████████ stated

that Ticketmaster's ██████████████████ with AXS.[20]  Third parties have recently and

similarly indicated that Ticketmaster and AXS are of comparable quality.[21]

Defendants also ignore substantial evidence that Ticketmaster struggles with key quality

dimensions, including innovation, customization, flexibility, technology, reliability, and

customer service.  In internal presentations, Ticketmaster has emphasized ████████████

███████████████████████████████████████████████████.  For instance, a ████████████

presentation identified a plethora of Ticketmaster weaknesses including the █████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

---

████████████████████ 133:12-134:15; Ex. █████████████, at -982; Ex. ████████
████████, at -779–780.
Ex. 3 Abrantes-Metz Rebuttal ¶¶ 37–48, 52–57; *see also* Ex. ████████████████ at -
857; Ex. ██████████████ at -983.
[16] Ex. ████████████████ at -982.
[17] Ex. ████████████████, at -150.
[18] Ex. ████████████████ at-716.
[19] Ex. ████████████████ at -862.
[20] Ex. ████████████████ at -857.
[21] *See* Ex. ████████████████████████████ 128:8–129:8; Ex. ████████████
███████████████████ 128:8–129:8; Ex. ████████████████
████████████████████████████████████████

6



[23] ████████████████████████████████████████ Ticketmaster struggles to implement technology improvements, ███████████████████████████ ███████████████.[24] Ticketmaster's shortcomings were on display during Taylor Swift's Eras Tour, where Mark Yovich (President of Ticketmaster) admitted ████████████ ████████████████"[25]

All these facts point in the same direction: AXS is of comparable quality to Ticketmaster and is therefore an appropriate and reasonable benchmark.

*Third*, Ticketmaster's argument that Dr. Carlton's, Dr. Budish's, or Dr. Hill's analysis shows that Ticketmaster is of higher quality than AXS is a red herring. Dr. Hill did not endorse Dr. Carlton's or Dr. Budish's analysis (and Defendants cite to no evidence or testimony to the contrary); he specifically opined that they were "flawed" and internally inconsistent.[26] Even if Dr. Carlton's analysis could be credited, it suggests only that Ticketmaster may do marginally better than AXS in terms of the ███████████████, which is just *one* dimension that bears on quality. As one of Defendants' own economic experts recognizes, "there are multiple dimensions of quality of ticketing services."[27] Purported higher quality on a single dimension is not enough, especially in the context of a *Daubert* challenge.

*Finally*, AXS is a conservative benchmark that may understate consumer damages.[28] Dr. Abrantes-Metz concluded that AXS is a conservative benchmark based several factors, including

---

[22] Ex. ███████████████████████, at -983.
[23] Ex. ███████████████████, at -851.
[24] Ex. ███████████████████, at -284.
[25] Ex. ███████████████████, at -495.
[26] Ex. 16 Rebuttal Report of Nicholas Hill, October 9, 2025 ("Hill Rebuttal"), § 8.2.3.
[27] Ex. 17 Expert Report of Eric Budish, Sept. 16, 2025 ("Budish Report"), ¶ 66; *see also* Ex. 3 Abrantes-Metz Rebuttal ¶¶ 49–51.
[28] *See* Ex. 1 Abrantes-Metz Report ¶¶ 126–131.

that: (1) Ticketmaster's "dominance may have affected AXS's pricing behavior" by causing AXS to follow – instead of undercutting – Ticketmaster's pricing; (2) Live Nation's alleged conduct "reduces the ability of rival primary concert ticketers to achieve the benefits of scale, thereby increasing their costs and reducing their ability to compete with Ticketmaster[;]" and (3) lower-cost self-service ticketing options may have become more prevalent in the but-for world.[29] As another Southern District court recently explained, a benchmark is "more likely to be approved where it makes the resulting estimates more conservative." *In re Keurig*, 2025 WL 354671, at *12. This confirms the propriety of the AXS benchmark.

In sum, Dr. Abrantes-Metz's selection of AXS as a benchmark easily satisfies Rule 702's requirement of sufficient comparability. *See Dial Corp.*, 314 F.R.D. at 118–19; *Keurig*, 2025 WL 354671, at *34. At most, Defendants' criticism goes to the weight of Dr. Abrantes-Metz's opinions, not their admissibility. *See In re Keurig*, 2025 WL 354671, at *34; *see also DPWN Holdings (USA), Inc. v. United Air Lines, Inc.,* 2019 WL 1515231, at *10 n.6 (E.D.N.Y. Feb. 21, 2019) (An objection to a choice of benchmark "goes to the weight, not the admissibility" of an expert's opinion."). The appropriate benchmark is "a question of fact" for "the jury to consider." *Syufy Enters. v. Am. Multicinema, Inc.*, 793 F.2d 990, 1003 (9th Cir. 1986); *see also In re Prograf Antitrust Litig.*, 2014 WL 7641156, at *3 (D. Mass. Dec. 23, 2014) (benchmark comparability involves "questions about which reasonable economists may disagree").

## II.    DR. ABRANTES-METZ'S DAMAGES MODEL IS RELIABLE AND HELPFUL TO THE TRIER OF FACT BECAUSE IT IS TIED TO DEFENDANTS' ILLEGAL CONDUCT

Dr. Abrantes-Metz quantifies the damages resulting from liability on two forms of anticompetitive conduct alleged by Plaintiffs: Defendants' conditioning the provision of concerts to venues based on their use of Ticketmaster ("Conditioning Conduct") and use of long term, exclusive contracts ("Exclusivity Conduct"). Plaintiffs will present significant lay and expert evidence of both at trial. Contrary to Defendants' assertions (Mot. at 16–17): (1) Dr. Abrantes-

---

*See Id.* ¶¶ 126–131.

Metz's model is appropriately based on Dr. Hill's opinions regarding the conduct; (2) the model appropriately includes a range of years for which recovery is proper and is flexible enough to permit a reliable determination of the ultimate amount based on findings by the trier of fact; (3) the determination of statute of limitations issues and the state-specific accrual of damages is appropriately reserved for the factfinder; and (4) the event-level data utilized by Dr. Abrantes-Metz (the very same data used, endorsed, and left uncritiqued by Defendants' experts)[30] appropriately allows for the calculation of damages based upon whichever statute of limitations period the factfinder determines is applicable.[31]

Defendants argue that Dr. Abrantes-Metz's damages model fails to "determine the amount of damages that flow from allegedly unlawful versus lawful conduct," and (2) "cannot parse between proper recovery within the applicable limitations period and improper recovery falling outside the applicable limitations period." Mot. at 11, 14. As a threshold matter, neither argument is appropriate now, before the trier of fact has an opportunity to consider Defendants' anticompetitive conduct or the statute of limitations. More fundamentally, Defendants are wrong: Dr. Abrantes-Metz's model is reliable *because* it is based on Defendants' illegal conduct and can reliably estimate damages based on whatever time period the factfinder determines is actionable.

### A.    Defendants' Improperly Bring a Second Summary Judgment Motion As a *Daubert* Motion

To establish the predicates for their arguments, Defendants both assume the role of factfinder and assume their favored resolution of key legal questions. Their attempts to bring a summary judgment motion in disguise should be rejected.

---

[30] *E.g.*, Ex. 18 Expert Report of Dennis Carlton, Sept. 16, 2025, ¶ 42 n.73 & Tables 1–4 ("I use Dr. Hill's combined event-level primary ticketing data (which Dr. Abrantes-Metz also uses) for my analysis"); Ex. 17 Budish Report ¶¶ 26, 95 n.161 & Ex. 1.
[31] *See infra* Section III.

With respect to "unlawful versus lawful conduct," Defendants attempt to fashion a safe harbor by first citing to the general proposition that "[i]t is undisputed that exclusive contracts *may* have procompetitive benefits and are not *generally* unlawful." Mot. at 12 (emphasis added). Defendants then devote more than half a page in support of their arguments to footnotes to record evidence for several high-level propositions—including for the general proposition that ███████████████████████████████████████████████████. *Id.* at 13. But the fact that Defendants may be able to argue that some (unidentified) proportion of their contracts are procompetitive *at trial* is not a basis to exclude any expert testimony *now*; deciding what evidence to credit is the role of the jury.

Defendants then reference whether "Plaintiffs could create a dispute of fact . . . sufficient to survive summary judgment," Mot. at 13–14, betraying the true nature of this motion: a second summary judgment motion based on disputed facts. This is flatly improper for a *Daubert* motion, and Defendants' lack of support to the contrary is unsurprising as courts routinely reject attempts to "masquerade a request for summary judgment under the guise of a *Daubert* motion[.]" *Sabal Trail Transmission, LLC v. 0589 Acres of Land, Fla.*, 2018 WL 3655556, at *7 (M.D. Fla. Aug. 2, 2018); *Oracle Int'l v. Rimini St., Inc.*, 2022 WL 16575007, at *6 (D. Nev. Nov. 1, 2022) (denying *Daubert* motion as improper where it "does not attack" the expert's "qualifications or expertise" but rather "raises . . . legal arguments that should have been raised at summary judgment.").[32]

And even if it were appropriate to resolve disputed factual issues, Defendants' legal premise regarding exclusive contracts doesn't apply here. Notwithstanding Defendants' assertions to the contrary, exclusivity agreements "run afoul of the antitrust laws when used by a

---

[32] The Court granted Defendants' request to enlarge their summary judgment brief, ECF 660, 662, yet Defendants did not raise any of these issues.

dominant firm to maintain its monopoly." *United States v. Google, LLC*, 747 F. Supp. 3d 1, 152 (D.D.C. 2024) (citing *McWane, Inc. v. FTC*, 783 F.3d 814, 832 (11th Cir. 2015); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012)).  Indeed, Defendants' arguments about the procompetitive nature of Ticketmaster's long-term and exclusive contracts rest in part on disputed questions about the quality of Defendants' services as compared to their competitors. *See* Mot. at 13, 24-25; *supra* Section I.  And the second form of anticompetitive conduct at issue—Live Nation leveraging its control over content to coerce entry into these anticompetitive contracts—likewise depends on resolving outstanding factual issues.  The factual record regarding both forms of conduct is—appropriately—addressed in Plaintiffs' summary judgment opposition.  *See* MSJ Opposition at Sections II-IV.

Defendants' arguments about the relevant statutes of limitations aren't subject to resolution here either.  Indeed, Defendants failed to move for summary judgment on any issue related to the statute of limitations and whether certain claims or time periods were time-barred. It is well-settled that Defendants, not Plaintiffs, bear the burden of proof on statute of limitations issues.[33] They likewise may only be addressed at trial.

In sum, Defendants' arguments that Dr. Abrantes-Metz's damage analysis should be excluded because it measures the effects of "ticketing contracts that are perfectly lawful" or includes conduct outside the damages period depend on presupposing the resolution of factual

---

[33] "Because a statute of limitations is an affirmative defense, [a defendant] bears the burden of proof to show ... the claims [are barred]." *N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 230 (2d Cir. 2014). Defendants cannot meet their burden of proof on an issue on which they failed to move in their motion for summary judgment, especially where they admit that different rules apply to certain state and federal statutes of limitations. Mot. 15, n. 14; *See, e.g.*, *New York ex. rel. Spitzer v. Feldman*, 2003 WL 21576518, at *4–5 (S.D.N.Y. July 10, 2003) (discussing applicability of fraudulent concealment to New York, California, and federal antitrust statutes, before noting that "statute of limitations issue cannot be decided until a jury determines whether defendants engaged in the fraudulent concealment of their scheme" (citing *New York v. Hendrickson Bros.*, 840 F.2d 1065, 1085 (2d Cir. 1988)).

issues that are instead committed to the jury.  *See* Mot. at 13–14, nn. 9–13.  The jury can and will resolve these at trial.

### B.    Dr. Abrantes-Metz's Model Is Appropriately Based on the Alleged Anticompetitive Conduct

Defendants' argument about lawful conduct fails for a second, independent reason: they mischaracterize Dr. Abrantes-Metz's model.  This model relies upon Dr. Hill's opinions regarding the Exclusivity and Conditioning Conduct and provides a conservative estimate of the anticompetitive effects from two forms of unlawful conduct.[34]  Dr. Abrantes-Metz's model focuses on measuring the distortion that occurs in the competitive process as a result of these two forms of conduct.[35]  Dr. Abrantes-Metz's deposition confirms that the model does not require both to be found unlawful—to Dr. Abrantes-Metz, both forms of conduct are intertwined and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ because the result is ultimately captured in the contracts between Ticketmaster and the venues.[36]  In other words, ▮▮▮▮▮▮▮▮▮ ▮▮▮▮ because it is part of the same transaction and scheme—either the transaction or scheme is lawful because neither form of conduct is anticompetitive or the competitive process has been corrupted because at least one of the forms of conduct is unlawful.[37]  *See In re Lipitor Antitrust Litig.*, 855 F.3d 126, 147 (3d Cir. 2017) ("The relevant inquiry, we have held, is the anticompetitive effect of a defendant's exclusionary practices considered together." ((brackets and citation omitted))).  To the extent Ticketmaster has engaged in anticompetitive conduct and charged supracompetitive fees to fans, those supracompetitive amounts constitute damages.

---

[34] *See Supra* Introduction.

[35] *See* Ex. 1 Abrantes-Metz Report Fig. 1.

[36] Ex. 19 Deposition of Rosa Abrantes-Metz, October 31, 2025 ("Abrantes-Metz Dep.") 59:18-20; *see also id*. at 59:3-5, 121:18-22, 122:12-123:6.

[37] *Id.; see also id*. at 141:9-18.

Defendants did not inquire during Dr. Abrantes-Metz's deposition as to whether both the Exclusivity and Conditioning Conducts must be found to be unlawful for her model to validly and reliably measure the competitive distortion and resulting damages, or whether only one must be found unlawful. In any event, to the extent Defendants now assume whether, as a fact matter, these conducts are distinguishable, that too is a question for the jury.

Defendants' reliance of *Comcast Corp. v. Behrend* is wrong. In *Comcast*, only one independent competitive distortion remained, and the others were otherwise "unrelated." 569 U.S. 27, 36 (2013) ("the model assumed the validity of all four theories of antitrust impact initially advanced by respondents: decreased penetration by satellite providers, overbuilder deterrence, lack of benchmark competition, and increased bargaining power"); *see also id*. at 38 (noting that distortions could be caused by "factors unrelated" to the remaining anticompetitive conduct at issue). In any event, if the fact finder determines that the Exclusivity and Conditioning Conducts are both unlawful, Defendants do not challenge that the validity of her model does not depend on a finding as to any other allegedly unlawful types of conduct at issue in this case.

And even if certain individual agreements are found to be lawful, e.g., a small number of venue contracts reflect competitive conditions, Dr. Abrantes-Metz's conservative economic model is still valid and provides a reliable and helpful estimate of the distortion. As discussed above, Defendants cite excerpts from transcripts from less than a handful of venues to argue that their conduct *may* not be anticompetitive. But even assuming that certain specific venue agreements were found not to be affected by anticompetitive conduct, if the fact finder concludes that either course of conduct is unlawful, Dr. Abrantes-Metz's regression model is valid because

it measures the average amount of damages across the market—242 venues[38] in total—not at any

*one* venue specifically. This is sufficient to capture the average market-wide harm[39] and results

in an estimate that remains valid even if the jury concludes that a few particular venue contracts

aren't anticompetitive. *See, e.g.*, *Google*, 747 F. Supp. 3d at 143-152 (analyzing and discussing

the effects of the exclusivity agreements on the market as a whole, not on any particular third

party); *see also In re Air Cargo Shipping Servs. Antitrust Litig*, 2014 WL 7882100, at *61

(E.D.N.Y. Oct. 15, 2014) ("Courts have commonly accepted the calculation of average damages

in antitrust cases"). Further, Dr. Abrantes-Metz's model is sufficiently robust to account for

(including by dropping) any individual venue contracts that should be excluded. Defendants'

arguments that the model fails to differentiate between unlawful and lawful conduct should be

rejected.

### C.    Dr. Abrantes-Metz's Methodology Adequately Adjusts to The Statute of Limitations and Can Reliably Exclude Specific Years

As discussed above, arguments about the statute of limitations cannot be resolved here.

And depending on how these questions are resolved at trial, Dr. Abrantes-Metz's model *can*

reliably be adjusted to any period of time for which the statute of limitations is found to apply.[40]

There is no basis for exclusion of Dr. Abrantes-Metz's model.

Defendants' remaining arguments are equally unavailing. Defendants' reliance on *US*

*Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43 (2d Cir. 2019), is misplaced. Defendants

argue that *US Airways* means that "the limitations period runs from the time each allegedly

anticompetitive contract was executed," and that the States thus "cannot recover damages arising

---

[38] Ex. ██████████████████ .
[39] Ex. 1 Abrantes-Metz Report ¶¶ 132, 177, 182.
[40] *See* Ex. 1 Abrantes-Metz Report ¶ 22 ("The methodologies described in this report allow for the calculation of damages for any period between 2017 and 2024."); *see also id.* ¶ 212, n. 326, Figs 34–37 and Ex. C. *See also* Ex. 3 Abrantes-Metz Rebuttal ¶ 123 & Att. 1.

out of any of Ticketmaster's contracts that were entered into prior to August 19, 2020." Mot. at

14. But Defendants contort *US Airways* in such a way as to immunize antitrust defendants from

liability regardless of the duration, nature, or impact of their schemes merely because of the

effective date of a contract. This is not what *US Airways* held.  In *US Airways*, the plaintiff (US

Airways) had itself entered into two separate contracts with the defendant over several years.

*U.S. Airways* at 51.  The Second Circuit held that subsequent payments from the plaintiff to the

defendant pursuant to those contracts did not *alone* restart the statute of limitations under the

"continuing violation" doctrine in that specific situation.  *Id.* at 67-69.  Indeed, district courts

recognize that *US Airways* is applicable only in "the context of alleged antitrust conspiracies that

result in aggrieved parties entering into contracts with conspirator(s)." *Chalmers v. NCAA* 2025

WL 1225168, at *9 (S.D.N.Y. Apr. 28, 2025) (citing *US Airways*, 938 F.3d at 68-69).  No court

has held that it stands for the sweeping immunity Defendants claim.

It is undisputed that the States stand in for the consumer fans who are not parties to the

agreements between Defendants and MCVs but who were nevertheless harmed by paying

supracompetitive prices.  Consumer fans are third parties to these contracts and bear the effects

of the pricing resulting from those contracts.[41]  Thus, *US Airways* does not bar recovery under

those contracts.  Instead, "[t]he basic rule is that damages are recoverable under the federal

antitrust acts only if suit therefor is commenced 'within four years after the cause of action

accrued.'" *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971). An

antitrust cause of action accrues, and the limitations period begins to run, "when a defendant

commits an act that causes injury to the plaintiff."  *In re Ciprofloxacin Hydrochloride Antitrust*

---

[41] Defendants, for example, would certainly argue consumer fans lack standing to sue the date
the venue contracts were signed based on hypothetical future ticket sales, because consumer fans
could not have been monetarily harmed until they bought a ticket.

*Litig.*, 261 F. Supp. 2d 188, 218 (E.D.N.Y. 2003).[42]  The Monetary Relief Stats' citizens' injuries stem from the consumer fan transactions made with Defendants: purchases of tickets facilitating access to events at a later date.  Thus, consumer fans were not injured *until* they paid for tickets to events made possible by Defendants' services and subsequently accessed those events. Plaintiffs' claims that stem from agreements that predate August 2020 or earlier are not time-barred.

Finally, Defendants' arguments that the model includes tickets sold to consumers outside the limitations period also fail.[43]  Consumer fans are injured when they purchase a ticket *and* then use it to access the event.  The antitrust injury is complete only when the event occurs—in other words, purchasing a ticket is *linked* to the later event.  This is especially so where part of the servicer ticketers provided to fans includes ongoing services after the ticket purchase.  Thus, whether a consumer fan purchased a ticket in December 2019 or January 2020 for an event in January 2020 would have no material difference—the date of accrual is properly the January 2020 event date.[44]  Dr. Abrantes-Metz's model should therefore not be excluded.  *See UFL*, 842 F.2d at 1378 (A "just and reasonable estimate of damages" is sufficient.); *Campbell*, 239 F.3d at

---

[42] Moreover, different states have different rules for when state actions accrue under different doctrines involving the discovery rule, injury rule, or fraudulent concealment.  *See supra* n.33 (discussing statute of limitations and fraudulent concealment).  And, to the extent not sufficiently pled, were Plaintiffs to prove it up at trial, the pleadings can conform to the evidence under Rule 15(b).

[43] Defendants also argue that Dr. Abrantes-Metz's model, utilizing event-level transactional data, also includes tickets sold to consumers who are not residents of the Monetary Relief States.  As discussed later, States under their own laws have the ability to regulate conduct occurring within their borders, including transactions with venues located within their borders.  *See infra* Section III.

[44] A ticket, by itself, is worthless without its extrinsic and subsequent event, *e.g.*, Defendants refund consumers when events are cancelled, because tickets hold no value without access to the experience provided.  Conceptualizing the injury as including the ticket purchase and the date of the event is especially appropriate where, as here, Defendants are also intimately involved in the events themselves, acting as promoters of the events and sometimes as venues and venue-related service providers.

186 (asserted "gaps or inconsistencies in the reasoning" of an expert go to "the weight of the evidence, not to its admissibility").

### III.    DR. ABRANTES-METZ'S DAMAGE MODEL PROPERLY RELIES ON EVENT-LEVEL TRANSACTIONAL DATA

Defendants argue that Dr. Abrantes-Metz's damages model "fails because it cannot reliably calculate and apportion damages for the specific citizens of each of the Monetary Relief States."  Mot. at 21.  But Defendants are again attempting to invent a standard far beyond what the law requires.

First, Defendants claim that 15 U.S.C. § 15c prohibits reliance on event-level transaction data—instead of individual-level transaction data—because fans may sometimes cross state lines for concerts.  According to Defendants, this "renders Dr. Abrantes-Metz's model unreliable to support any finding on behalf of each Monetary Relief State as to the specific amount of damages attributable to their citizens."  *Id.* at 23.  But no Court has *ever* used 15 U.S.C. § 15c as a basis to exclude an expert witness, because it isn't a rule of evidence.  Section 15c by its plain text permits "[a]ny attorney general of a State [to] bring a civil action in the name of such State, as parens patriae on behalf of natural persons residing in such State, in any district court of the United States[.]"  *Id.*  Section 15c imposes no requirement that a state attorney general plaintiff must establish with *exact precision* individual state resident damages in multistate litigation, and Defendants cite no authority for this erroneous reading of Section 15c.  For the reasons discussed above, Dr. Abrantes-Metz's use of event-level data to calculate harm to consumer purchasers is a sufficient and reliable measure of harm suffered by affected residents who attended these events.  That is sufficient at this stage.  As Courts have long recognized, through Section 15c, Congress "permits State attorneys general the right to institute *parens patriae* suits [under the Sherman Act] on behalf of State residents" and "allows damages in these suits to be computed through

aggregation techniques , …" *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2011 WL 560593, at

*4, n.2 (N.D. Cal. Feb. 15, 2011) (quoting *Illinois v. Abbot & Assoc.,* 460 U.S. 557, 573 n.29

(1983)); *see also Blue Shield of Virginia v. McCready*, 457 U.S. 465, 475 n.11 (1982) ("we have

sought to avoid burdening [antitrust] actions with damages issues giving rise to the need for

massive evidence and complicated theories").  Dr. Abrantes-Metz's use of event-level data to

calculate harm to consumers fits comfortably within the "aggregation techniques" permitted for

Section 15c claims.[45]

Second, Defendants ignore that State Plaintiffs, under their own state laws and claims and

independent of the framework permitted by federal statutes, may obtain relief for non-State

residents for conduct occurring within their State.[46]  *New York v. Feldman*, relied upon by the

Defendants, is illustrative.  Mot. at 22 (citing 210 F. Supp. 2d, 294 (S.D.N.Y. 2002)).  In

*Feldman*, three states sued for violations of the Sherman Act (under Section 15c) and of their

state unfair competition laws.  *Id.* at 298-99.  Notably, two states (New York and Maryland),

sought to recover for harm to state and non-state residents arising from actions that occurred

within their borders.  *Id.*  Defendants there, as here, argued that Section 15c did not permit the

States to obtain relief for injured non-residents, and that the States were limited under Section

15c solely to recovery for their *own* injured state residents.  The Court rejected these arguments

in *Feldman,* concluding that Section 15c did not displace or preempt state law where state law

permitted states to seek redress harm for non-residents for conduct occurring within their

borders.  *Id.* at *305 (discussing Maryland's statute: "If the Attorney General were not permitted

---

[45] To the extent Defendants are challenging an individual State Plaintiff's standing, a Motion to Exclude an expert witness' reports, opinions, and testimony is an improper vehicle for such challenge.  *See supra* Section IIa.  For the reasons discussed in Plaintiffs' summary judgment opposition, all State Plaintiffs have standing here. *See* MSJ Opposition at Section V.

[46] Defendants also fail to recognize that several states have also *not* asserted *parens patriae* authority under Section 15c, and, at the very least, this argument would be entirely inapplicable to those states.

to recover for injuries to non-residents resulting from illegal activity conducted in [state] . . ., [it would] severely hamper the . . . ability to police and deter illegal conduct . . . and seriously undermine the State's interest in 'protect[ing] the public' by ensuring 'healthy competition'"). *See also id.* at 307 ("[T]he legislative history of section [15c] indicates that Congress intended to vest the States with *additional* powers to combat antitrust violations, not to limit the powers of the Attorneys General under state law." (emphasis in original)).  Dr. Abrantes-Metz's model is appropriate because Defendants face dozens of state law claims with a number of those statutes permitting recovery for non-state residents.[47]

*Third*, this is not a class action, and even in a class action, courts do not require proof of each absent individual proposed class member's damages for purposes of certification—instead, such matters are appropriately deferred until the post-trial claims administration proceedings. *See, e.g.*, *Briseno v. ConAgra Foods, Inc*, 844 F.3d 1121, 1131-32 (9th Cir. 2017) ("Rule 23 specifically contemplates" that post-trial claims administration proceedings will require "individualized claim determinations after a finding of liability" and that defendants can "individually challenge the claims of absent class members if and when they file claims for damages" during "the claims administration stage").  So too are the issues raised here by Defendants appropriately deferred and easily addressed in post-trial claims administration

---

[47] One example is California's Unfair Competition Law ("UCL") which covers misconduct that emanates from California. As one of Defendants' counsel's law firms recently argued in *Epic Games v. Apple*: "the UCL may prohibit misconduct that 'emanated from California,' . . . and Apple, which relies heavily on the fact that it has chosen to impose a single set of restrictions worldwide . . . and enforce them in California courts – does not contest that its conduct . . . which specifies that California law applies, emanates from California."  *Epic Games, Inc. v. Apple Inc.*, Nos. 21-16506 and 21-16695, Reply/Response Brief on Appeal/Cross-Appeal of Appellant, Cross-Appellee Epic Games, Inc., 2022 WL 1741813 at *112–13 (9th Cir. May 25, 2022).  The conduct here likewise emanates from California: Defendants are headquartered in California; their contractual terms of service as to fans require enforcement in California Courts; the conduct occurs nationwide from actions stemming in California.  *See also Ehret v. Uber Tech.*, 68 F. Supp. 3d 1121, 1131–32 (N.D. Cal. 2014) (California nexus established where misrepresentations developed in California, contained on websites and applications maintained in California, and billing and payment of services went through servers located in California).

proceedings, where state residents can make claims—not at the *Daubert* stage. Indeed, as Defendants admit, Mot. at 16 n.17, they have produced data containing state location information for ticket purchasers, and the post-trial claims process can readily remove any transactions made by citizens of non-Monetary Relief States, if necessary.[48]

Defendants' cited no authority to the contrary. *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199 (1990), for example, addressed standing and whether the states, through their citizens as indirect purchasers, had standing to sue under Section 15c in light of *Illinois Brick* and *Hannover Shoe*. The Supreme Court concluded that the states could not. *Id.* at 218–19. Here, however, the ticket-purchasing state residents are "the injured party under the antitrust laws, and [the] predicate for *parens patriae* action [is therefore] established." *Id.* at 219. *Price v. L'Oreal USA, Inc.*, 2020 WL 4937464 (S.D.N.Y. Aug. 24, 2020), is also inapposite. *Price* excluded expert analysis based on a national consumer survey of 105 individuals, which then focused on 18 people who resided in New York or California to extrapolate to the total number of purchases of the product at issue. *Id.* at *7 (noting that the expert's "assumptions lack support"). By contrast, Dr. Abrantes-Metz's analysis made no such extrapolations or imputations: it relied exclusively on data kept and produced by Ticketmaster and its closest competitor, AXS, including data on over 20,000 concerts and comedy shows that took place at MCVs in Monetary Relief States between 2017 and 2024.[49] In sum, neither authority is applicable here.

Accordingly, the Court should reject Defendants' arguments that Dr. Abrantes-Metz's model is unreliable to calculate damages to state residents—her model sufficiently shows the

---

[48] For example, the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ data file contains ▮▮▮▮▮▮▮▮ which may be used to remove non-citizens' transactions. Ex. ▮▮▮ is an example extract.
[49] Ex. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

damages that have occurred, and this is sufficient for this stage of the litigation where the claims at issue permit this recovery.  No more is required under Section 15c or any other standard.

## IV.   DR. ABRANTES-METZ'S TREATMENT OF UPFRONT PAYMENTS AND INSIDE FEES IS APPROPRIATE AND RELIABLE

Defendants argue that Dr. Abrantes-Metz's reports, opinions, and testimony should be excluded based on her treatment of the upfront payments and certain inside fees.[50]  Defendants' criticism is incorrect and, in any event, goes to the weight of her opinions.  *See Campbell*, 239 F.3d at 186.

### A.   Upfront Payments Are Irrelevant to Dr. Abrantes-Metz's Calculations

Dr. Abrantes-Metz's treatment of upfront payments is appropriate because they are not relevant to her calculations of primary ticketing fees or economic damages in this case.  Her calculations of damages are based on primary ticketing *prices* charged, not profits earned by ticketers or MCVs.  Dr. Abrantes-Metz therefore analyzes the extent to which Ticketmaster's *price* charged to MCVs (retained fees) impacts the marginal ticket *price* charged to consumers (total ticketing fees).[51]  Defendants acknowledge that upfront payments are "lump sum" transfers from primary ticketers to venues.[52]  These transfers are fixed costs and are not ████████ ████████████████████████████████████████████[53] and therefore do not affect marginal decisions, such as the pricing of concert tickets. To the extent that Defendants dispute whether lump sum upfront payments are fixed costs, the Second Circuit has confirmed that the "characterization of legitimately disputed costs is a question of fact for the jury." *Kelco Disposal, Inc. v. Browning-Ferris Indus. of Vermont, Inc.*, 845 F.2d 404, 408 (2d Cir. 1988), *aff'd*, 492 U.S. 257 (1989).  Put differently, a factfinder could readily and reasonably conclude that any upfront payments made by Ticketmaster to MCVs were not related to Ticketmaster's pricing and retained fees.

---

[50] Mot. at 18-19.
[51] Ex. 3 Abrantes-Metz Rebuttal ¶¶ 111-12.
[52] Mot. at 8.
[53] *See, e.g.*, Ex. ████████████ at -112 ¶ 13.4(A)-(B); Ex. ████████████ at 204; Ex. ████████████ at -310; Ex. ████████████, at -498.

Further reinforcing the lack of connection between upfront payments and the focus of Dr. Abrantes-Metz's calculations, lump-sum payments are independent of the firm's output level and the resulting market price.[54]  A firm's optimal production and pricing decisions set *marginal* revenue equal to *marginal* cost.[55]  Since a lump-sum payment is a fixed cost, it affects total and average costs, but because it does not change with output, it cannot impact marginal costs.[56]  Consequently, the firm's marginal cost curve remains invariant, and the profit-maximizing condition dictates no change in the firm's optimal quantity or the corresponding market price, regardless of the market structure.  In accord, the Second Circuit has approved the use of marginal costs for assessing antitrust liability.[57]  Defendants' argument that upfront payments ██████████████████████████████████████████████, and different upfront payments could ████████████████████, Mot. at 8, would only matter if ████████████████████████ ███████████████████████████████████████████████████████████ ████████ Defendants present no evidence to show this, and at most, it presents a disputed issue of fact.

**B.  Defendants Identified No Evidence That Including Upfront Payments Would Change Dr. Abrantes-Metz's Estimate of Damages**

In any event, including upfront payments would only materially affect Dr. Abrantes-Metz's calculations of damages if it meaningfully changes the *difference* between Ticketmaster's and AXS's retained fees.[58]

As a matter of basic math, deducting Ticketmaster's and AXS's upfront payments from their retained fees would only materially affect the *difference* in retained fees if Ticketmaster's and AXS's upfront payments to MCVs are in fact *different*.  But Defendants don't dispute that

---

[54] *Ex.* 27 N. Gregory Mankiw, <u>Principles of Economics</u> 235, 255–56 (2016); Ex. 28 Harvey S. Rosen & Ted Gayer, <u>Public Finance</u> 332–33 (2010).
[55] Ex. 29 Robert Pindyck & Daniel Rubinfeld, <u>Microeconomics</u> § 8.3, 295 (2018); Ex. 30 Hal Varian, <u>Intermediate Microeconomics: A Modern Approach</u> 398–99 (2010).
[56] Ex. 27 Mankiw, <u>Principles of Economics</u> at 256.
[57] *Ne. Tel. Co. v. AT&T Co.*, 651 F.2d 76, 88 (2d Cir. 1981) (discussing "the relationship between a firm's prices and its marginal costs").
[58] Ex. 3 Abrantes-Metz Rebuttal ¶¶ 114, 117–120.

both Ticketmaster and AXS make upfront payments to MCVs.[59]  Further, Defendants' experts admittedly failed to: (1) calculate the value of Ticketmaster or AXS upfront payments specifically for MCVs;[60] (2) quantify any systematic difference between their upfront payments;[61] (3) estimate their retained fees if one deducted upfront payments;[62] or (4) offer any opinion on whether upfront payments affect the ticketing fees that fans pay.[63]

Finally, the second stage of Dr. Abrantes-Metz's instrumental variables regression is precisely an investigation of Defendants' claim—by how much the fees charged to fans depend on the fees charged by Ticketmaster.[64]  Defendants assert that because of upfront payments there is little or no relationship between them.[65]  She found instead that between ███████████ ████ of additional fee charged by Ticketmaster is borne by fans (her economic incidence analysis). This would necessarily account for the existence of upfront payments. In any event, calculating economic incidence is an empirical exercise, and Dr. Abrantes-Metz is the only economist to empirically measure the relationship between Ticketmaster's retained amounts and total ticketing fees.  Defendants cannot (and do not) provide any reliable or cognizable analysis to the contrary.[66]

---

[59] *See* Ex. 3 Abrantes-Metz Rebuttal ¶¶ 116–120.

[60] *See* Ex. 31 Deposition of Paul Meyer, November 5, 2025 ("Meyer Dep."), 318:9–-320:6 (stating that his calculations for Ticketmaster are "across all venues[,]" not just MCVs, and "I don't know what the amount would be [for MCVs], but it would be lower"); 321:17-322:5 (no analysis of upfront payments that AXS makes to venues).

[61] *See* Ex. 31 Meyer Dep. 319:1–-321:22, 340:24–-342:10 (offering "no opinion" on how frequently AXS makes upfront payments to venues, and "no opinion" on whether Ticketmaster's upfront payments to venues are greater than those of AXS); *see also* Ex. 32 Deposition of Eric Budish, November 4, 2025 ("Budish Dep."), 345:8–-346:8.

[62] *See, e.g.,* Ex. 32 Budish Dep. 338:2-340:14, 354:13-355:8; Ex. 31 Meyer Dep. 335:10-336:15, 339:22-340:7.

[63] Ex. 31 Meyer Dep. 336:11–24.

[64] Ex. 1 Abrantes-Metz Report ¶¶ 165, 171-76, 182, 211 & Fig. 27.

[65] Defendants posit that ████████████████ ████████████ but provide no empirical analysis to substantiate their conjectures.

[66] Ex. 1 *Id.* Abrantes-Metz Report § V.B.2.

### C. Defendants Ignore the Valuable Sponsorship Rights Purchased Through Upfront Payments

Treating upfront payments as a mere cost that should be deducted from a primary ticketer's retained fees overlooks valuable sponsorship rights that ticketers frequently receive in exchange for upfront payments.[67] At his deposition, Mr. Meyer agreed that there is a fair market value associated with sponsorship rights and "you'd have to account for what" primary tickers "are getting back[.]"[68] However, none of Defendants' experts considered sponsorship value in their analyses.[69]

Record evidence reflects that primary ticketers receive millions of dollars in economic value from sponsorship rights. Ticketmaster conducts "███████████████" analyses of the quantitative and qualitative value associated with sponsorship rights, including ███████████ ███████████████████████████████████████████████████████ ██████████[70] For Ticketmaster's sponsorship agreement with ███████████████, it "███████████████████████████████████████████████████ ████████████████████████████████████████████████████████"[71] Sponsorship payments are made in exchange for assets that are outside of retained fees and ticketing fee pricing decisions; they constitute a wholly different type of economic consideration than ticketing service pricing. Therefore, many upfront sponsorship payments may be appropriately viewed as fixed transfer payments in exchange for valuable sponsorship assets and services, rather than as a marginal cost to deduct from retained fees.

### D. Defendants' "Inside Fees" Critique Fails

Defendants' argument that Dr. Abrantes-Metz ████████████████████████ ████████████████████████ is also misplaced.[72] As detailed above, Dr. Abrantes-

---

[67] *See, e.g.*, Ex. 16 Hill Rebuttal ¶ 535; Ex. ██████████ ███████, July 21, 2025, 53:20–54:5; Ex. 34 Expert Report of Paul Meyer, September 16, 2025, Attachment 21; Ex. ██████████████████, at -310--311.

[68] *See* Ex. 31 Meyer Dep. 338:7-339:5; Ex. 35 Deposition of Dennis Carlton, November 6, 2025, 245:25–249:15.

[69] *See* Ex. 31 Meyer Dep. 338:7--339:5; *see also* Ex. 32 Budish Dep. 345:8-346:8.

[70] *See, e.g.*, Ex. ██████████; Ex. ██████████.

[71] Ex. ██████████; *see also* Ex. ██████████.

[72] *See* Mot. at 20.

Metz analyzes the primary ticketing service fees that Ticketmaster retains (not the *profit* Ticketmaster or venues earn from those fees), and the extent to which increases in those fees are paid by fans.[73]  Defendants do not dispute that Ticketmaster retains the inside fees.  Indeed, Dr. Abrantes-Metz was interpreting the data according to Defendants' own directions. In written correspondence, Defendants outlined the fields that record "revenue earned by Ticketmaster" and the "███████████████████████████████████████████████," which included ██████████ such as "██████," which is the category for inside convenience charges for Ticketmaster's ████████████ tool.[74]  While Defendants claim ██████████████████████ ████████████████████ their argument relies on a formalistic distinction without an economic difference.

Dr. Abrantes-Metz's Instrumental Variable Regression includes all ticketing fees remitted to Ticketmaster; it is irrelevant whether Ticketmaster's retained fees are nominally "paid" by the venue, promoter, or artist, or whether it is an inside fee or an outside charge.[75]  Indeed, ████ █████████████████████████████████ term,[76] nor should they as all retained fees are marginal costs on the transaction of purchasing a concert ticket, and Dr. Abrantes-Metz's Instrumental Variable Regression empirically demonstrates that a majority of the cost of Ticketmaster's supra-competitive retained fees ultimately falls on fans regardless of who nominally pays those fees.[77]  Dr. Abrantes-Metz performed an analysis specifically testing whether there was any offset made on face value in response to a higher retained amount (inclusive of inside fees).[78]  To the extent that artists or promoters were paying these ██████████ and not passing them on to consumers as Defendants claim, that would have been reflected in a negative and statistically

---

[73] *See* Ex. 1 Abrantes-Metz Report §§ 5 & 6.

[74] Ex. 40 K.S. Fayne Letter, "Re: Plaintiffs' Requests for Production for Data in *United States, et al. v. Live Nation, et al.* (1:24-cv-3973)," June 27, 2025, at 4–6 (citing Ex. ████████████ and worksheet ██████ ███████████████████.

        *See* Ex. 1 Abrantes-Metz Report § IV.

[76] *Ex.* 19 Abrantes-Metz Dep. 271:11–272:3.

[77] *Ex.* 1 Abrantes-Metz Report § V.B.2.d.

[78] *Id.* Figs. 32-33 & § V.C.2.

significant coefficient.  Instead, Dr. Abrantes-Metz found no offset, and no Defendant expert has disputed this finding or even studied this issue.

Whether Ticketmaster ████████████████████████████████████████████████ makes no economic difference; both are supra-competitive prices that fans ultimately pay pursuant to the contracts between Ticketmaster and venues.  These contracts determine both the ███████████████████████ that Ticketmaster retains and also ████████████████████ ██████████████████████████ In any event, this criticism goes to weight, not admissibility.

## CONCLUSION

For the reasons discussed above, Defendants' motion should be denied.

Dated:  December 8, 2025

Respectfully Submitted,

**Rob Bonta**
Attorney General of California

By: */s/ Brent Nakamura*
Brent Nakamura (Admitted *pro hac vice*)
*Supervising Deputy Attorney General*
Matthew Erik Delgado (Admitted *pro hac vice*)
Henry J. Hauser (Admitted *pro hac vice*)
Deputy Attorneys General
Office of the Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013-1230
Telephone:
Email: Brent.Nakamura@doj.ca.gov

*Attorneys for Plaintiff State of California*

/s/ Elizabeth G. Arthur
Elizabeth G. Arthur (admitted *pro hac vice*)
Senior Assistant Attorney General
Office of the Attorney General for the
District of Columbia
400 6th Street NW, 10th Floor
Washington, DC 20001
Email: Elizabeth.arthur@dc.gov
*Attorney for Plaintiff District of Columbia*

/s/ Robert A. Bernheim
Robert A. Bernheim (admitted *pro hac vice*)
Office of the Arizona Attorney General
Consumer Protection & Advocacy Section
2005 N. Central Avenue
Phoenix, AZ 85004
Telephone: (602) 542-3725
Fax: (602) 542-4377
Email: Robert.Bernheim@azag.gov
*Attorney for Plaintiff State of Arizona*

/s/ Amanda J. Wentz
Amanda J. Wentz (admitted *pro hac vice*)
Assistant Attorney General
Office of the Arkansas Attorney General
101 West Capitol Avenue
Little Rock, AR 72201
Telephone: (501) 682-1178
Fax: (501) 682-8118
Email:  amanda.wentz@arkansasag.gov
*Attorney for Plaintiff State of Arkansas*

/s/ Conor J. May
Conor J. May (admitted *pro hac vice*)
Assistant Attorney General
Antitrust Unit
Colorado Department of Law
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email: Conor.May@coag.gov
*Attorney for Plaintiff State of Colorado*

/s/ Victoria Maria Orton Field
Victoria Maria Orton Field (admitted *pro hac vice*)
Assistant Attorney General
Office of the Attorney General of
Connecticut
165 Capitol Avenue
Hartford, CT 06106
Telephone: 860-808-5030
Email: victoria.field@ct.gov
*Attorney for Plaintiff State of Connecticut*

/s/ Lizabeth A. Brady
Lizabeth A. Brady
Director, Antitrust Division
Florida Office of the Attorney General
PL-01 The Capitol
Tallahassee, FL 32399-1050
Telephone: 850-414-3300
Email: Liz.Brady@myfloridalegal.com
*Attorney for Plaintiff State of Florida*

/s/ Richard S. Schultz
Richard S. Schultz (admitted *pro hac vice*)
Assistant Attorney General
Office of the Illinois Attorney General
Antitrust Bureau
115 S. LaSalle Street, Floor 23
Chicago, Illinois 60603
Telephone: (872) 272-0996
Email: Richard.Schultz@ilag.gov
*Attorney for Plaintiff State of Illinois*

/s/ Jesse Moore
Jesse Moore (admitted *pro hac vice*)
Deputy Attorney General
Office of the Indiana Attorney General
302 W. Washington St., Fifth Floor
Indianapolis, IN 46204
Telephone: 317-232-4956
Email: Jesse.Moore@atg.in.gov
*Attorney for Plaintiff State of Indiana*

*/s/ Noah Goerlitz*
Noah Goerlitz (admitted *pro hac vice*)
Assistant Attorney General
Office of the Iowa Attorney General
1305 E. Walnut St.
Des Moines, IA 50319
Telephone: (515) 281-5164
Email: noah.goerlitz@ag.iowa.gov
*Attorney for Plaintiff State of Iowa*

*/s/ LeAnn D. Scott*
LeAnn D. Scott (admitted *pro hac vice*)
Assistant Attorney General
Corporate Oversight Division
Michigan Department of Attorney General
P.O. Box 30736
Lansing, MI 48909
Telephone: (517) 335-7632
Email: ScottL21@michigan.gov
*Attorney for Plaintiff State of Michigan*

*s/ Zach Biesanz*
Zach Biesanz
Senior Enforcement Counsel
Antitrust Division
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
Saint Paul, MN 55101
Telephone: (651) 757-1257
Email: zach.biesanz@ag.state.mn.us
*Attorney for Plaintiff State of Minnesota*

*/s/ Lucas J. Tucker*
Lucas J. Tucker (admitted *pro hac vice*)
Senior Deputy Attorney General
 Office of the Nevada Attorney General
Bureau of Consumer Protection
100 N. Carson St.
Carson City, NV 89701
Email: ltucker@ag.nv.gov
*Attorney for Plaintiff State of Nevada*

*/s/ Zachary Frish*
Zachary A. Frish (admitted *pro hac vice*)
Assistant Attorney General
Consumer Protection & Antitrust Bureau
New Hampshire Attorney General's Office
Department of Justice
1 Granite Place South
Concord, NH 03301
Telephone: (603) 271-2150
Email: zachary.a.frish@doj.nh.gov
*Attorney for Plaintiff State of New Hampshire*

*/s/ Andrew F. Esoldi*
Andrew F. Esoldi
Deputy Attorney General
Division of Law
Antitrust Litigation and Competition Enforcement
124 Halsey Street, 5th Floor
Newark, NJ 07101
Telephone: (609) 696-5465
Email: Andrew.Esoldi@law.njoag.gov
Attorney for Plaintiff State of New Jersey

*/s/ Jonathan Hatch*
Jonathan Hatch
Assistant Attorney General
New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8598
Email: jonathan.hatch@ag.ny.gov
*Attorney for Plaintiff State of New York*

*/s/ Francisco Benzoni*
Francisco Benzoni (admitted *pro hac vice*)
Special Deputy Attorney General
Brian Rabinovitz (admitted *pro hac vice*)
Special Deputy Attorney General
North Carolina Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
Telephone: (919) 716-6000
Facsimile: (919) 716-6050
Email: fbenzoni@ncdoj.gov
Email: brabinovitz@ncdoj.gov
*Attorneys for Plaintiff State of North Carolina*

/s/ Cameron R. Capps
Cameron R. Capps (admitted *pro hac vice*)
Deputy Attorney General
Consumer Protection
Office of the Oklahoma Attorney General
313 N.E. 21st Street
Oklahoma City, Oklahoma  73105
Telephone:  (405) 522-0858
Fax:  (405) 522-0085
Email: Cameron.Capps@oag.ok.gov
Attorney for Plaintiff State of Oklahoma

/s/ Paul T.J. Meosky
Paul T.J. Meosky (admitted *pro hac vice*)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400, ext. 2064
Fax: (401) 222-2995
Email: pmeosky@riag.ri.gov
Attorney for Plaintiff State of Rhode Island

/s/ Jared Q. Libet
Jared Q. Libet (admitted *pro hac vice*)
Assistant Deputy Attorney General
Office of the Attorney General of South Carolina
P.O. Box 11549
Columbia, South Carolina 29211
Telephone: (803) 734-5251
Email: jlibet@scag.gov
Attorney for Plaintiff State of South Carolina

/s/ Marie W.L. Martin
Marie W.L. Martin (admitted *pro hac vice*)
Deputy Division Director,
Antitrust & Data Privacy Division
Utah Office of Attorney General
160 East 300 South, 5th Floor
P.O. Box 140830
Salt Lake City, UT 84114-0830
Telephone: 801-366-0375
Email: mwmartin@agutah.gov
Attorney for Plaintiff State of Utah

/s/ Ashley A. Locke
Ashley A. Locke (admitted *pro hac vice*)
Assistant Attorney General
Antitrust Division
Washington Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
Telephone: (206) 389-2420
Email: Ashley.Locke@atg.wa.gov
Attorney for Plaintiff State of Washington

/s/ Douglas L. Davis
Douglas L. Davis (admitted *pro hac vice*)
Senior Assistant Attorney General
Consumer Protection and Antitrust Section
West Virginia Office of Attorney General
P.O. Box 1789
Charleston, WV 25326
Telephone: (304) 558-8986
Fax: (304) 558-0184
Email: douglas.l.davis@wvago.gov
Attorney for Plaintiff State of West Virginia

/s/ Caitlin M. Madden
Caitlin M. Madden (admitted *pro hac vice*)
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
Telephone: (608) 267-1311
Email: caitlin.madden@wisdoj.gov
Attorney for Plaintiff State of Wisconsin

/s/ Joseph S. Betsko
Joseph S. Betsko (admitted *pro hac vice*)
Assistant Chief Deputy Attorney General
Antitrust Section
Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
Telephone: (717) 787-4530
Email: jbetsko@attorneygeneral.gov
Attorney for Plaintiff Commonwealth of Pennsylvania

**CERTIFICATE OF COMPLIANCE**

I, Brent Nakamura, an attorney duly admitted to practice pro hac vice before this Court, hereby certify pursuant to Local Rule 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rules"), Rule 8(C) of Judge Arun Subramanian's Individual Practices in Civil Cases ("Individual Rules"), that the foregoing Memorandum of Law was prepared using Microsoft Word, and contains 8,745 words. In making this calculation, I have relied on the word and page counts of the word-processing program used to prepare the document.

Dated:  December 8, 2025
        Santa Monica, CA


                                                        /s/ *Brent Nakamura*
                                                        Brent Nakamura