## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES OF AMERICA, et al.,<br><div align="right">Plaintiffs,</div><br>v.<br><br>LIVE NATION ENTERTAINMENT,<br>INC., and TICKETMASTER L.L.C.,<br><div align="right">Defendants.</div> | Case No. 1:24-cv-03973-AS |

**PLAINTIFFS' CORRECTED MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**<u>FILED UNDER SEAL</u>**

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... i

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION .................................................................................................................... 1

FACTUAL BACKGROUND .................................................................................................... 2

    I.     Relevant Markets ....................................................................................................... 2

    II.    Conditioning, Threats, and Retaliation .................................................................... 5

    III.   Long-Term Exclusivity .............................................................................................. 9

    IV.   Acquisition and Co-Optation of Rival Promoters ................................................. 11

    V.    Amphitheater Acquisitions and Tying ................................................................... 13

LEGAL STANDARD ............................................................................................................ 14

ARGUMENT ......................................................................................................................... 14

    VI.   Genuine Issues of Material Fact Preclude Summary Judgment on Relevant Markets
          ................................................................................................................................. 14

         A.    MCV Targeted Customer Markets Are Properly Defined ................................. 16

         B.    The Market for Promotion Services to Artists at MCVs is Properly Defined.... 19

         C.    The Market for Use of MCAmps is Properly Defined ...................................... 21

         D.    The Fan-Facing Ticketing Market Is Properly Defined .................................... 24

    VII.  Genuine Issues of Material Fact Preclude Summary Judgment on Anticompetitive
          Effects ..................................................................................................................... 26

         A.    Defendants' Anticompetitive Conduct Causes Anticompetitive Harm in the
             Ticketing Markets ............................................................................................. 27

             1.    Ticketmaster's Exclusive Contracts Foreclose Competition, Harm
                  Consumers and Competition, and Prevent Rivals from Achieving Scale ... 27

             2.    Defendants Block Rivals from Achieving Scale ........................................ 30

             3.    Defendants' Conditioning, Threats, and Retaliation Cause Anticompetitive
                  Harm ........................................................................................................ 31

         B.    Defendants' Anticompetitive Conduct Causes Anticompetitive Harm in
             MCAmp Market ............................................................................................... 34

         C.    Defendants' Anticompetitive Conduct Causes Anticompetitive Harm in
             Promotions and Concert Booking Markets ...................................................... 35

    VIII. Genuine Issues of Material Fact Preclude Summary Judgment on Plaintiffs' Section
          1 Exclusive Dealing Claim ................................................................................... 36

    IX.   Genuine Issues of Material Fact Preclude Summary Judgment on Plaintiffs' Section
          1 Tying Claim ........................................................................................................ 37

          A.    Refusal-to-Deal Framework Is Inapplicable Because Artists Are the Consumers
             of Amphitheater Access .................................................................................. 37

B.    The Facts Show Coercion and Anticompetitive Effects......................................39

X.    Defendants' Vertical Integration Does Not Justify Anticompetitive Conduct..........41

XI.    The States Have Standing and Consumers Were Harmed........................................41

A.    Plaintiff States Have Standing...........................................................................41

B.    State Plaintiffs Have Established Injury in the Fan-Facing Market...................42

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Apple v. Pepper*,
    587 U.S. 273 (2019)..................................................................................... 42

*Blue Shield of Virginia v. McCready*,
    457 U.S. 465 (1983)..................................................................................... 44

*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*,
    441 U.S. 1 (1979)......................................................................................... 41

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962)............................................................................... passim

*Chase Mfg., Inc. v. Johns Manville Corp.*,
    84 F.4th 1157 (10th Cir. 2023) .............................................................. 19, 31

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992)..................................................................................... 14

*Emigra Group, LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*,
    612 F. Supp. 2d 330 (S.D.N.Y. 2009) ........................................................ 22

*Epic Games, Inc. v. Apple, Inc.*,
    67 F.4th 946 (9th Cir. 2023) ................................................................. 41, 42

*FTC v. IQVIA Holdings Inc.*,
    710 F. Supp. 3d 329 (S.D.N.Y. 2024) ........................................................ 15

*FTC v. Kroger Co.*,
    2024 WL 5053016 (D. Or. Dec. 10, 2024) ................................................. 24

*FTC v. Microsoft Corp.*,
    681 F. Supp. 3d 1069 (N.D. Cal. 2023) ...................................................... 23

*FTC v. Staples, Inc.*,
    190 F. Supp. 3d 100 (D.D.C. 2016) ............................................................ 17

*FTC v. Tapestry, Inc.*,
    755 F. Supp. 3d 386 (S.D.N.Y. 2024) .............................................. 16, 21, 23

*FTC v. Whole Foods Mkt., Inc.*,
    548 F.3d 1028 (D.C. Cir. 2008)............................................................. 17, 19

*FTC v. Wilh. Wilhelmsen Holding ASA*,
    341 F. Supp. 3d 27 (D.D.C. 2018) .............................................................. 17

*Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*,
  386 F.3d 485 (2d Cir. 2004) ............................................................ 15

*Harrison v. Jefferson Par. Sch. Bd,*,
  78 F.4th 765 (5th Cir. 2023) ............................................................ 41

*Hayden Pub. Co. v. Cox Broad. Corp.*,
  730 F.2d 64 (2d Cir. 1984) .............................................................. 15

*Heerwagen v. Clear Channel Commc'ns*,
  435 F.3d 219 (2d Cir. 2006) ............................................................ 26

*Hill v. A-T-O, Inc.*,
  535 F.2d 1349 (2d Cir. 1976) .......................................................... 40

*In re DDAVP Direct Purchaser Antitrust Litig.*,
  585 F.3d 677 (2d Cir. 2009) ............................................................ 43

*In re Elec. Books Antitrust Litig.*,
  14 F. Supp. 3d 525 (S.D.N.Y. 2014) ................................................ 42

*It's My Party v. Live Nation, Inc.*,
  811 F.3d 676 (4th Cir. 2016) ...................................................... 23, 24

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
  466 U.S. 2 (1984) ...................................................................... 40, 41

*Kaytor v. Elec. Boat Corp.*,
  609 F.3d 537 (2d Cir. 2010) ............................................................ 14

*Mack v. Bristol-Myers Squibb Co.*,
  673 So.2d 100 (Fla. Dist. Ct. App. 1996) ......................................... 41

*McWane, Inc. v. FTC*,
  783 F.3d 814 (11th Cir. 2015) ............................................. 25, 29, 32

*Meredith Corp. v. SESAC LLC*,
  1 F. Supp. 3d 180 (S.D.N.Y. 2014) .................................................. 24

*NCAA v. Bd. of Regents of Univ. of Oklahoma*,
  468 U.S. 85 (1984) ........................................................................ 18

*Park v. Thomson Corp.*,
  2007 WL 119461 (S.D.N.Y. Jan. 11, 2007) ...................................... 40

*Regeneron Pharms., Inc. v. Novartis Pharma AG*,
  96 F.4th 327 (2d Cir. 2024) ................................................. 15, 21, 25

*See Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*,
  784 F.2d 1325 (7th Cir. 1986) ......................................................... 25

*See New York v. Kraft Gen. Foods, Inc.*,
　926 F. Supp. 321 (S.D.N.Y. 1995) ...................................................................... 19

*Sentry Data Systems, Inc. v. CVS Health*,
　379 F. Supp. 3d 1320 (S.D. Fla. 2019) ............................................................... 26

*Spinelli v. NFL*,
　96 F. Supp. 3d 81 (S.D.N.Y. 2015) ..................................................................... 29

*State ex rel. Wilson v. Ortho-McNeil-Janssen Pharmaceuticals, Inc.*,
　777 S.E.2d 176 (S.C. 2015) ................................................................................. 41

*Ticketmaster Corp. v. Tickets.com, Inc.*,
　2003 WL 21397701 (C.D. Cal. Mar. 7, 2003), *aff'd*, 127 F. App'x 346 (9th Cir. Apr. 11,
　2005) ..................................................................................................................... 30

*United States v. Alexander*,
　No. 14-CR-0453 GTS, 2016 U.S. Dist. LEXIS 192710 (N.D.N.Y. Mar. 1, 2016) ................. 7

*United States v. Am. Express Co.*,
　838 F.3d 179 (2d Cir. 2016) ................................................................................ 16

*United States v. Anthem*,
　236 F. Supp. 3d 171 (D.D.C. 2017) ..................................................................... 26

*United States v. Apple, Inc.*,
　2025 WL 1829127 (D.N.J. 2025) ......................................................................... 42

*United States v. Bertelsmann SE & Co. KGaA*,
　646 F. Supp. 3d 1 (D.D.C. 2022) ........................................................ 16, 18, 19, 20

*United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005) .............................. 28

*United States v. E.I. du Pont de Nemours & Co.*,
　351 U.S. 377 (1956) ............................................................................................. 15

*United States v. Google LLC*,
　747 F. Supp. 3d 1 (D.D.C. 2024) ............................................................. 23, 28, 31

*United States v. Google, LLC*,
　687 F. Supp. 3d 48 (D.D.C 2023) ........................................................................ 28

*United States v. Grinnell Corp.*,
　384 U.S. 563 (1966) ............................................................................................. 35

*United States v. Microsoft Corp.*,
　253 F.3d 34 (D.D. Cir 2001) ....................................................... 26, 28, 33, 35

*United States v. United States Sugar Corp.*,
　73 F.4th 197 (3d Cir. 2023) ................................................................................. 16

*United States v. Visa, Inc.*,
    788 F. Supp. 3d 585 (S.D.N.Y. 2025) ............................................................... 21

*US Airways, Inc. v. Sabre Holdings Corp*,
    2022 WL 986232 (S.D.N.Y. 2022) ................................................................... 25

*Viamedia, Inc. v. Comcast Corp*,
    951 F.3d 429 (7th Cir. 2020) .................................................................... 37, 39

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012) ..................................................................... 27, 37

**Statutes**

Neb. Rev. Stat. ............................................................................................................ 41

**Other Authorities**

2023 Merger Guidelines §4.3 (2023) ........................................................... 15, 17

**Rules**

Fed. R. Civ. P. 56(a) .............................................................................................. 14

## INTRODUCTION

Unwilling to defend their anticompetitive conduct in front of a jury, Live Nation ("LN") and Ticketmaster ("Defendants") ask this Court to ignore numerous factual disputes and rule as a matter of law that their interlocking monopolies across the live entertainment industry are legal. This Court should reject Defendants' motion for summary judgment ("MSJ") because it ignores "mountains of evidence," MSJ1, demonstrating the genuine issues of material fact that preclude summary judgment.

Each of Defendants' arguments collapses in the face of evidence. Plaintiffs' proposed relevant markets are aligned with commercial realities, as demonstrated by Defendants' own documents and testimony by multiple industry participants. Defendants attempt to deflect this evidence by sleight-of-hand, asserting that Ticketmaster's market share in the primary ticketing market would be a "mere 49%" if stadiums were included. MSJ2. Besides improperly conflating data sources, Defendants' assertion is flatly contradicted by evidence showing that Defendants' market share *exceeds 80%* when using a methodologically sound calculation. *See infra* at 18. Defendants' assertion that their conduct did not cause anticompetitive effects similarly relies on highly disputed facts: industry witness testimony and economic analysis demonstrates that Defendants' conduct harmed competition in the ticketing, concert booking, promotion, and large amphitheater markets.

In the primary ticketing markets, Defendants' long-term exclusive contracts foreclose a substantial share of the market—at least ▮%—and deny rivals scale, harming competition and consumers. Defendants' principal argument—that venues "prefer" long-term exclusives—is highly disputed, as is their claim that two ticketing companies (which together control less than 10% share) have achieved "viable scale." MSJ25, 27. Equally disputed is Defendants' argument that their 15-year-long campaign of threats and retaliation against venues that consider switching

to competing ticketing companies has not raised rivals' costs. Defendants' documents, testimony by venues and ticketers, and quantitative analyses by Plaintiffs' economic experts show that Defendants' anticompetitive conduct has successfully deterred venues from choosing competing ticketers, harming competition by reducing quality and innovation and increasing price.

In the large amphitheater, promotions, and concert booking markets, disputed facts about the effects of Defendants' monopolizing conduct doom Defendants' motion. Documents and testimony from Defendants and others show that LN's strategic acquisitions and co-optation of competitors harms competition in these markets by reducing output, reducing quality, limiting choice, and reducing artist and venue earnings.

And Defendants' recycled motion to dismiss ("MTD") Plaintiffs' tying claim fares no better this time around. Plaintiffs have adduced ample evidence that artists are the actual customers who access and use amphitheaters, and that LN's unremitting tying policy coerces artists who want to play in LN amphitheaters to also buy LN's promotions services. Defendants ignore extensive testimony by artist managers and agents confirming that artists who want to play in LN's amphitheaters must also use LN's promotions services. The same is true for Defendants' failed MTD challenging States' standing: fact discovery and expert testimony quantifying consumer harm from Defendants' ticketing monopolies has only strengthened the States' position.

This Court should deny Defendants' motion.

## FACTUAL BACKGROUND

### I.    Relevant Markets

Artists perform live music—an increasingly vital source of artists' livelihood—in intimate clubs, small theaters, large amphitheaters and arenas, and even stadiums.

Counterstatement of Material Fact ("COMF") ¶1. Defendants monopolize multiple interrelated markets in the live entertainment industry, which center on large amphitheaters and arenas that host concerts regularly (Major Concert Venues ("MCVs")) and large amphitheaters that host concerts regularly (Major Concert Amphitheaters ("MCAmps")). Specifically, Defendants monopolize markets for:

1. Primary ticketing to MCVs (for concerts),
2. Primary ticketing to MCVs (for all events),
3. Concert booking services to MCVs,
4. Promotion services to artists at MCVs,
5. Artist use of MCAmps, and
6. Primary ticketing to fans at MCVs (for concerts).

Qualitative evidence and expert opinion, including quantitative analyses such as the hypothetical monopolist test, supports each of these markets. COMF ¶¶4-6. Plaintiffs' economic expert Dr. Nicholas Hill determined that Defendants' shares in these markets range from 55% (promotion services to artists) to more than 85% (primary concert ticketing). COMF ¶2.

Consistent with industry usage, MCVs are large amphitheaters and arenas with a capacity of at least 8,000 that hosted ten or more concerts in at least one year during the period 2017–2024. COMF ¶3. MCVs account for 40% of all concert tickets sold and 43% of total all-in prices, even though they account for just 1% of all U.S. venues. COMF ¶7. They uniquely rely on revenue from concerts by popular artists, COMF ¶8, and thus are uniquely susceptible to Defendants' exercise of market power. COMF ¶9. Most venues with 8,000-plus capacity that host 10 or more concerts are MCVs. COMF ¶10.

Extensive evidence supports segmenting MCVs in this way, by venue type, capacity, and show count. Defendants consistently analyze their own business by these factors. They organize their promotions business into line-of-business segments like "large amps," COMF ¶11, and they further segment their amphitheater business into "boutique amphitheaters" and "large

amphitheaters." COMF ¶12. Defendants characterize and report on venues by type and capacity in their SEC filings and Board of Director meetings. COMF ¶13. They analyze ticketing by venue type because of venues' differing ticketing needs, COMF ¶14, and venue type influences artists' financial offers and earnings, COMF ¶15, and other industry participants' analyses. COMF ¶16.

Defendants themselves utilize capacity thresholds around 8,000, COMF ¶17, and proposed company-wide venue definitions for indoor arenas and large amphitheaters with capacities above 7,000 and 8,500 respectively. COMF ¶18. They review their business according to venues' yearly show count, COMF ¶19, analyze "avg. shows" by venue type, COMF ¶20, and focus on venues that surpass a certain show count, COMF ¶21, specifically venues with a show count of ten or more. COMF ¶22. As a LN executive explained, ███████████████ ████████████████████████████████████████████████████ ████████████████████████████ COMF ¶23.

MCAmps—a type of MCV—are large amphitheaters with a capacity of at least 8,000 that host ten or more concerts in a year. They are outdoor venues, typically with fixed seats and a lawn where thousands of fans can listen to music under the stars. COMF ¶24. They are made for music. Some artists prefer playing in MCAmps, which are a ████████████████ ██████████████████████ COMF ¶25.

MCAmps and MCV arenas share many characteristics that make them appealing to artists. They host similar numbers of shows annually, COMF ¶26, cater to artists of similar popularity, COMF ¶27, offer similar earning potential to artists, COMF ¶28, and are subject to similar competitive conditions, COMF ¶29. But an outdoor MCAmp performance is ███████ ████████████ from one performed inside an arena. COMF ¶25(a).

Other venues differ materially from MCVs. Stadiums, for example, differ in size (over three times as many tickets on average), design (they require elaborate temporary stages over fields), usage (primarily house football, soccer, or baseball teams), show counts (far fewer concerts), artist popularity (few artists are popular enough to fill them), and industry recognition (Defendants categorize them separately). COMF ¶¶30-36. Similarly, clubs and theaters differ from MCVs in numerous respects, namely size (much smaller than MCVs), artist popularity (less popular artists on average than those at MCVs), production (they are intimate settings with less elaborate productions), and industry recognition (Defendants categorize them separately). COMF ¶¶37.

## II.    Conditioning, Threats, and Retaliation

In 2010, antitrust enforcers reviewing the proposed LN-Ticketmaster merger identified the potentially problematic nature of Defendants' vertical combination, permitting it to proceed only after divestitures and entry of a consent decree. The decree specifically prohibited Defendants from retaliating against venues that chose not to use Ticketmaster, or conditioning or threatening to condition the provision of LN content on a venue's use of Ticketmaster. COMF ¶38. Those fears proved to be justified. By 2012, Defendants were already violating the decree. COMF ¶¶39-42. To address these violations, an amended consent decree was entered on January 28, 2020, COMF ¶43, extending prohibitions on content conditioning, threats, and retaliation and notifying venue clients about the amended decree. COMF ¶44.

The conditioning, threats, and retaliation continued, however. Defendants simply disguised their threats with less explicit language or used intermediaries like Oak View Group ("OVG")—a potential-competitor-turned-partner—to deliver the message that venues using a non-Ticketmaster ticketer would get fewer LN shows. RSUF ¶29. Shortly before the amended decree was entered  Defendants' CEO said this in an industry magazine interview:

The [consent] decree gets a lot of misconception...It says we can't threaten venues. We can't say to a Ticketmaster venue that says they want to use a different ticketing platform, "If you do that, we won't put shows in your building." It also says we can do what's right for our business, so we have to put the show where we make the most economics, and maybe that venue...won't be the best economic place anymore because we don't hold the revenue. COMF ¶45.

Internally, Defendants' executives and employees openly discussed how to use LN content to force venues to stick with Ticketmaster (including through intermediaries), and how to route around venues ticketed by competitors. A 2020 strategy deck, for example, advised employees to ████████████████████ COMF ¶46, and a Ticketmaster executive instructed a colleague in 2022 to explain to a venue considering competitors how ████████████████████ COMF ¶47.

In 2021, when the ████████████████ was choosing a ticketer, Defendants repeatedly warned ████████ CEO that it would lose LN content if it left Ticketmaster. COMF ¶¶48-51. After ████████ switched to SeatGeek, Defendants retaliated by significantly reducing the number of LN concerts—a practice it swiftly reversed after ████████████████ reinstated Ticketmaster. COMF ¶52. ████████████████

COMF ¶¶53-54. Defendants also retaliated by imposing additional financial, ████████████ costs on ████████. COMF ¶¶55-56.

News of Defendants' successful discipline of ████████ rippled throughout the industry. Major media outlets reported on the show decline and ████████████████, COMF ¶57, and it was discussed by industry participants. COMF ¶58. ████████████████

████████████████. COMF ¶59.

██████ experience is not unique. The few other venues that risked switching from Ticketmaster faced similar retaliation and incurred similar costs. COMF ¶¶60, 40-42. NBA/NHL arenas that switched away from Ticketmaster between 2017–2024 lost on average more than five LN shows per year relative to NBA/NHL arenas that did not switch. COMF ¶61. And NBA/NHL arenas that switched *to* Ticketmaster saw an increase of ten or more LN concerts on average per year relative to NBA/NHL arenas with unchanged ticketers. COMF ¶62. In contrast, NBA/NHL arenas that switched to or from Ticketmaster saw essentially no change in the number of shows *promoted by other promoters*. COMF ¶63. Defendants' withholding of LN content causes venues to lose significant concert profits. COMF ¶64.

Defendants' content conditioning deters venues from switching away from Ticketmaster. Despite venue complaints about Ticketmaster's "archaic" and inferior technology compared to its rivals, COMF ¶65, only three NBA/NHL arenas switched away from Ticketmaster between 2017 and 2024. COMF ¶66. As one former venue executive testified, there is "widespread fear in the industry that if you were to [switch from Ticketmaster to SeatGeek], that Live Nation might retaliate against you." COMF ¶67.

Other ticketers, ██████████████████, testified that venues fear they will lose LN content if they switch from Ticketmaster.[1] COMF ¶68. Venues' content concerns are reflected in ██████████████ win-loss data, where salespeople contemporaneously record interactions with venues they hope to retain as clients, including the reasons for any "losses." COMF ¶69. For

---

[1] To the extent that Defendants seek to exclude any threat evidence, MSJ29 n.6, their motion fails to adequately raise such a challenge. When a party has "not specified or identified what evidence they are seeking to admit or exclude," a court "cannot make a proper determination as to admissibility." *United States v. Alexander*, No. 14-CR-0453 GTS, 2016 U.S. Dist. LEXIS 192710 *22 (N.D.N.Y. Mar. 1, 2016). Defendants should be prohibited from raising this challenge on reply.

████ ticketers, over █████ of MCV opportunities lost to Ticketmaster are attributed to concerns over content withholding when a reason is cited. COMF ¶70.

Venues' internal documents reflect this fear, frequently predicting lost LN shows if they choose a competing ticketer, COMF ¶71, and modeling the financial impact of lost LN shows. COMF ¶72. To protect themselves, some venues shift the risk of content loss by requiring rival ticketers to include ████████████████████████████████████████████████████████████████ COMF ¶¶73-76. Tellingly, Ticketmaster has never had to offer—let alone pay—a ██████████████ ██████████ to any venue as no other industry participant has the critical content and ability to punish venues for choosing a ticketer on its merits.

All of this undermines rivals' ability to compete and harms competition. Even when rival ticketers adopt creative solutions to alleviate venues' concerns, these solutions—███████████ ████████████████████████████████████████████████████████████████ ████████████████████████ COMF ¶¶77-78. ████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████ COMF ¶¶79-80.

Defendants also use proxies to coerce venues into signing with Ticketmaster. Defendants paid OVG $20 million upfront and ~$7.5 million annually for 10 years to "advocate" for Ticketmaster to exclusively ticket venues OVG manages, among other things. COMF ¶81. OVG obliged. ████████████████████████████████████ COMF ¶82, and recommended Ticketmaster without disclosing that Ticketmaster paid for OVG's "advocacy." COMF ¶83. And ████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

████████████████████████████████████████████ COMF ¶84. In 2023, ███████ OVG-managed venue with an expiring ██████-ticketed contract switched to Ticketmaster. COMF ¶85.

### III.    Long-Term Exclusivity

Ticketmaster imposes exclusivity on its venue clients through template contracts that grant Ticketmaster ████████████████████████████████████████████████ ██████████████ COMF ¶86. As Ticketmaster executives admit, "exclusivity is a term in nearly every one of our agreements." COMF ¶87. In 2024, Ticketmaster required exclusivity from ██% of MCVs. COMF ¶88.

Ticketmaster aggressively interprets and enforces its exclusivity provisions. It has warned other ticketers that if Ticketmaster tickets a venue, they ███████████████████████ █████████████████████████" COMF ¶89. And it backs up its exclusivity provisions with legal threats. As its lawyer put it, ████████████████████████████ ██████████████████████████ COMF ¶89.

Ticketmaster locks up venues for many years at a time so that venues are █████████ ████████ or negotiate ████████████████ COMF ¶90. Ticketmaster's internal documents exhort: ████████████████████████████████████████████ ████████████████████████████████████ COMF ¶91. In 2024, Ticketmaster's exclusive agreements with MCVs averaged ██ years, and its exclusive agreements with NBA/NHL arenas averaged ██ years. COMF ¶92. In practice, Ticketmaster's lock-in lasts far longer, because venues renew Ticketmaster's exclusive agreements at near total rates, with ██% of its exclusive contracts renewing from 2017–2024, and ██% renewing during the last cycle. COMF ¶93.

Ticketmaster's auto-renewal and early renewal practices further lock in venues and lock out competition. COMF ¶94. Many Ticketmaster contracts renew automatically, potentially adding multiple additional years to the multi-year agreements. COMF ¶95. And Ticketmaster frequently pressures venues to renew their exclusive agreements early to ███████████ and "████" competitors. COMF ¶96. Ticketmaster's agreements are often renewed repeatedly, and in many cases renewed well before the expiration date and without considering other ticketers. COMF ¶199.

Venues cannot easily terminate their Ticketmaster agreements. Indeed, termination is generally authorized only for breach, bankruptcy, or receivership. COMF ¶97. Ticketmaster has threatened to sue venues that sought to terminate instead of auto-renewing. COMF ¶98. And many venues seeking to end their agreements face termination fees and punitive claw back provisions requiring repayment of many upfront payments—making termination even more expensive and unlikely. COMF ¶99.

While most MCVs are bound by exclusive ticketing contracts with Ticketmaster, COMF ¶88, most venues do not "prefer" exclusivity. Response to Statement of Undisputed Facts ("RSUF") ¶21. Rather, Ticketmaster imposes exclusivity on its venue clients because Ticketmaster views open ticketing as a threat to its core business. COMF ¶100. Occasional attempts by venues to negotiate more flexible ticketing agreements with Ticketmaster are quickly ████████████ COMF ¶¶101-102.

Even though venues with non-exclusive primary ticketing contracts say that switching between ticketers is ███████ and presents no operational challenges (beyond informing staff and securing the right equipment), Ticketmaster's iron grip on the market deprives most venues and fans of ticket distribution competition through other channels. COMF ¶103.

Venues' preference for greater flexibility in ticketing is demonstrated by several MCVs' non-exclusive primary ticketing contracts, COMF ¶104, and negotiations regarding non-exclusive contracts with ███████████. COMF ¶105. Promoters—LN included—prefer flexibility too. Indeed, when Ticketmaster is not the exclusive ticketer for a venue, LN sometimes secures exclusivity carveouts to use Ticketmaster for LN's shows—the very non-exclusivity that Ticketmaster itself withholds. COMF ¶106.

## IV.    Acquisition and Co-Optation of Rival Promoters

LN maintains its promotions monopoly by buying potential rivals, partnering with competitors, policing competing offers to artists, and restricting rivals' access to revenue. Since 2016, LN has acquired a controlling interest in 14 rival promoters, including promoters that promoted arena and amphitheater concerts that it had categorized as among its "Biggest Competitor Threats." COMF ¶¶107-108. By 2019, LN had acquired most large U.S. promoters, determining ███████████████████████ COMF ¶109. Its acquisitions continued, however. As its Concerts President explained, "Can't get complacent and let small guys encroach from the edges." COMF ¶110.

LN bought promoters even when it believed a promoter ████████████████ ████████████████████████████████ ████████████████████████ or when the purchase was "more of a defensive move…to assist in growing our moat." COMF ¶111-114.

LN used promoter acquisitions to expand Ticketmaster's dominance and convert venues to Ticketmaster. COMF ¶115. As one example, Defendants bought the promoter United Concert—without buying its ticketing company, SmithsTix, which ticketed an MCAmp and "more than 40 venues throughout Utah"—to ██████████████████ ██████████████ COMF ¶116. LN then converted the United Concert venues to

11

Ticketmaster. COMF ¶117. It has run this playbook—acquiring promoters and venues to convert their ticketing contracts to Ticketmaster—many times over. COMF ¶118.

LN has also co-opted potential competitors without acquiring them. LN demanded, for example, that OVG—previously ranked among LN's "Biggest Competitor Threats"—COMF ¶119, ████████████████████████████████████████████████ ████████████████ COMF ¶¶120-123.

LN did a "deal" with the promoter ████████████████—with whom its relationship was previously ████████████████████████████████████ COMF ¶124. Under the deal, ████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ COMF ¶125. As LN Concerts' President admitted, the ████ deal is not ████████████: ████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████ COMF ¶126.

Similarly, LN and Detroit-based promoter 313 Presents agreed that LN would exclusively promote 313's three amphitheaters and LN would not pursue a competing amphitheater in greater Detroit. COMF ¶127. For its part, 313 would ████████████████████████████ ████████████████████ to avoid ████████████████████████ COMF ¶128. Unsurprisingly, ████████████████████████████████████ ████████████████████████ due to the deal. COMF ¶129.

LN also cut off rival promoters from much-needed revenue. Soon after the LN-Ticketmaster merger, Ticketmaster stopped permitting promoters to negotiate deals directly with Ticketmaster, instead requiring promoters to accept deals that were negotiated between the venue and Ticketmaster. COMF ¶130. This cut promoters off from ticket service fee revenue, disadvantaging them in competing for artists.

## V.    Amphitheater Acquisitions and Tying

Through outright ownership and varying contractual arrangements, LN controls a substantial majority of MCAmps. Altogether, its portfolio accounts for 79% of tickets sold at MCAmps and 69% by venue count. COMF ¶131. Its share of the top 50 and top 25 MCAmps is even higher—88% and 92%, respectively. COMF ¶132. LN's share has grown since 2015 with its acquisitions, leases, and exclusive booking agreements. But for that conduct, LN's share of MCAmps would be 20 percentage points lower. COMF ¶133.

LN has repeatedly bought, leased, or exclusively booked MCAmps that it previously viewed as competitive threats. COMF ¶134. It has renewed MCAmps leases even when its executives acknowledged that various amphitheaters were █████████████████████ ████████████████████████████████████████████ because LN wanted to ████████████████████████████████████████████████████████████████ or ██████████████████████████████████████████. COMF ¶135. It has bought amphitheaters defensively to ██████████████████████████████████ ████████████████████████ COMF ¶136. For amphitheaters it does not yet control, LN's executives are clear: █████████████████████████████████████████████ and ██████████████████████████████. COMF ¶137.

LN uses its control over the MCAmp market to force artists who want to perform in MCAmps not only to play in LN amphitheaters but also to use LN promoters for those shows.

COMF ¶138. This policy deters rival promoters from submitting tour bids for artists performing ten or more shows at amphitheaters. COMF ¶139.

Not all amphitheaters coerce artists in this way. Many non-LN amphitheaters operate as open venues, allowing artists to rent the amphitheater for their show while using the promoter of their choice. COMF ¶140. At open amphitheaters, artists and their agents can solicit offers from multiple promoters, resulting in more concerts and more competition and compensation for artists. COMF ¶140. Because of LN's restrictive policies, fewer amphitheater shows are played, and artists earn less at amphitheaters shows. COMF ¶¶258–59.

## LEGAL STANDARD

A successful summary judgment motion requires the movant to show there is "no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he court must draw all reasonable inferences in favor of the nonmoving party, even though contrary inferences might reasonably be drawn." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (cleaned up).

## ARGUMENT

### VI. Genuine Issues of Material Fact Preclude Summary Judgment on Relevant Markets

Market definition can help ascertain the "locus of competition" in which anticompetitive conduct and effects are assessed. *Brown Shoe Co. v. United States*, 370 U.S. 294, 320–21 (1962). Market definition is not an end in itself, but rather facilitates an assessment of market power— "the power to force a purchaser to do something that he would not do in a competitive market," *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 464 (1992) (cleaned up), or to "exclude competition*," United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391

(1956). Defendants fail to meet their burden of showing no genuine issues of material fact remain regarding Plaintiffs' proposed relevant markets.

A "relevant market is defined as all products reasonably interchangeable by consumers for the same purposes." *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 496 (2d Cir. 2004) (cleaned up). "Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one." *Brown Shoe*, 370 U.S. at 336. "[A]n antitrust plaintiff need not specify a market by precise 'metes and bounds.'" *Teradata Corp. v. SAP SE*, 124 F.4th 555, 567 (9th Cir. 2024) (quoting *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 611 (1953)). Thus, "the scope of a relevant market requires resolving empirical questions that can be determined only after a factual inquiry into the commercial realities faced by consumers." *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 339 (2d Cir. 2024) (cleaned up). So "[t]he conclusion that genuine issues of material fact preclude a finding as to relevant market as a matter of law is not unexpected." *Hayden Pub. Co. v. Cox Broad. Corp.*, 730 F.2d 64, 70 n.8 (2d Cir. 1984) (cleaned up).

In determining a relevant market, "there is no requirement to use any specific methodology" as "long as an antitrust plaintiff adequately references one or more of the legal frameworks [the court has] recognized," such as the *Brown Shoe* factors or hypothetical monopolist test ("HMT"). *Regeneron*, 96 F.4th at 340 n.8 (cleaned up); *see FTC v. IQVIA Holdings Inc.*, 710 F.Supp.3d 329, 353–54 (S.D.N.Y. 2024); U.S. Dep't of Justice & FTC, Merger Guidelines §4.3 (2023). *Brown Shoe* factors ensure a relevant market "correspond[s] to the commercial realities of the industry" by considering "practical indicia," including industry recognition of a particular market, a product's peculiar characteristics and uses, unique facilities, distinct customers and prices, sensitivity to price changes, and specialized vendors. 370 U.S. at

15

325, 336. "All the factors need not be satisfied for the Court to conclude that [Plaintiffs] ha[ve] identified a relevant market." *IQVIA*, 710 F.Supp.3d at 355; *see also FTC v. Tapestry, Inc.*, 755 F.Supp.3d 386, 438–39 (S.D.N.Y. 2024) (collecting cases relying on only three factors). Although Defendants conspicuously ignore *Brown Shoe* factors, a court will "not err by considering facts on the ground rather than relying upon HMT analysis." *United States v. United States Sugar Corp.*, 73 F.4th 197, 206 (3d Cir. 2023). The HMT "ask[s] whether a hypothetical monopolist acting within the proposed relevant market would be substantially constrained from increasing prices by the ability of customers to switch to other producers." *United States v. Am. Express Co.*, 838 F.3d 179, 198 (2d Cir. 2016) (cleaned up).

In brief, Defendants are not entitled to judgment as a matter-of-law on any of Plaintiffs' markets, which are supported by both *Brown Shoe* factors and HMTs.

### A. MCV Targeted Customer Markets Are Properly Defined

Defendants' argument that the definition of MCVs is "unrecognizable…outside this specific litigation," MSJ16, incorrectly focuses on terminology rather than substance.[2] MCVs are targeted customers in the markets for primary ticketing (for concerts and all events) and for concert booking based on record facts, not "mere speculative belief or unsupported speculation." *Teradata*, 124 F.4th at 567 (cleaned up).

As Defendants concede, "'targeted' customers 'can be a proper subject of antitrust concern,'" MSJ18 (quoting *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1038 (D.C. Cir.

---

[2] *See Tapestry*, 755 F.Supp.3d at 430 ("Defendants insist that the terms 'accessible' or 'affordable' luxury…are not well recognized in the industry. Even if this were true…it would not be dispositive.") (cleaned up); *United States v. Bertelsmann SE & Co. KGaA*, 646 F.Supp.3d 1, 32 (D.D.C. 2022) (rejecting argument that proposed antitrust market was invalid because "no one in the industry uses the term 'anticipated top seller'"); *United States v. Apple, Inc.*, No. 24-CV-4055, 2025 WL 1829127, at *7 (D.N.J. June 30, 2025) (finding plausibly pleaded "performance smartphones" market over defendant's objection that the term was "an invented definition").

2008)), where "sellers c[an] profitably target a subset of customers for price increases," *FTC v. Staples, Inc.*, 190 F.Supp.3d 100, 117–18 (D.D.C. 2016) (cleaned up). Courts have upheld targeted customer markets based on evidence that targeted customers (1) may face different terms; and (2) are unlikely to defeat a worsening of terms by arbitrage. *See FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F.Supp.3d 27, 51–57 (D.D.C. 2018); Merger Guidelines §4.3.D.1.[3] Courts have also upheld targeted customer markets by reference to *Brown Shoe* factors and HMT. *See FTC v. Sysco*, 113 F.Supp.3d 1, 40–44 (D.D.C. 2015); *Wilhelmsen*, 341 F.Supp.3d at 57–58.

Three factors—drawn from Defendants' and industry participants' business practices—define MCVs: 1—venue type (amphitheater or arena), 2—venue capacity (8,000 or larger), and 3—number of annual shows (ten or more). COMF ¶3. Defendants do not dispute that MCVs are readily identifiable by Defendants and can be offered different terms. Indeed, terms for primary ticketing and concert booking—including pricing terms—are generally individually negotiated with each MCV. COMF ¶141. Defendants neither claim MCVs can engage in arbitrage nor explain how such arbitrage would even be possible. Merger Guidelines §4.3.D.1 ("Arbitrage…is inherently impossible for many services."). On this basis alone, summary judgment is inappropriate.

Defendants claim—incorrectly—that their market share would be "too low to infer monopoly power" if stadiums were counted as MCVs. MSJ1. Defendants conflate data sources and misstate facts. Even using a calculation similar to the 2010 merger calculation, in 2023

---

[3] Courts routinely reference the Merger Guidelines, recognizing that they have provided the "clearest articulation of this approach" across years. *See FTC v. Sysco*, 113 F.Supp.3d 1, 38 (D.D.C. 2015) (citing Merger Guidelines §4.1.4); *Wilhelmsen*, 341 F.Supp.3d at 46 (quoting *Sysco*, 113 F.Supp.3d at 38); *see also Staples*, 190 F.Supp.3d at 117 (quoting Merger Guidelines §3); *Whole Foods*, 548 F.3d at 1037 (quoting Merger Guidelines §1.12)).

Ticketmaster's concert ticketing share in the 500 venues generating the greatest concert revenue *exceeded 80%*, a far cry from Defendants' "made-for-litigation" 49%. RSUF ¶11.

Plaintiffs' proposed targeted customer markets are supported by *Brown Shoe* factors and the HMT. MCVs are *distinct customers* with *peculiar characteristics*, relying heavily on concert revenue, which non-concert events rarely match. COMF ¶9. They represent a "uniquely attractive," remunerative opportunity for artists, promoters, and ticketers. COMF ¶142. *See NCAA v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 111 (1984). Just as "authors of anticipated top-selling books" constituted a distinct set of sellers in *Bertelsmann*, MCVs are a distinct set of customers requiring stronger marketing, publicity, and sales support compared to smaller venues. *United States v. Bertelsmann SE & Co. KGaA*, 646 F.Supp.3d 1, 29–33 (D.D.C. 2022). COMF ¶143.

Additional *Brown Shoe* indicia support Plaintiffs' markets for primary ticketing services to MCVs, including *industry recognition* (Ticketmaster segments its business by venue type, COMF ¶14, and recognizes MCVs have similar needs from ticketers, COMF ¶144, *specialized vendors* (certain ticketers succeed in stadiums, COMF ¶145, or clubs, while others succeed at MCVs given "materially different" ticketing needs, COMF ¶146), *distinct prices* (prices for ticketing services are differentiated across different venue types), COMF ¶147, and *sensitivity to price* (MCVs are unlikely to defeat a worsening of terms by self-ticketing). COMF ¶148.

*Brown Shoe* indicia likewise support Plaintiffs' market for concert booking to MCVs, including *industry recognition* (Defendants tout their share of the MCV booking market, COMF ¶149, and analyze booking deals specifically at MCVs, COMF ¶150), *distinct prices* (Defendants earn more at MCVs, COMF ¶151), *sensitivity to price changes* (MCVs rarely self-book and do not switch away from booking services when rebate prices increase, COMF ¶152), and

*specialized vendors* (Defendants' promoters boast unique access to MCV artists). COMF ¶153.

Moreover, Hill concluded a hypothetical monopolist would be able to profitably implement a

price increase for ticketing and concert booking services to MCVs. COMF ¶154. Plaintiffs

adduce considerable admissible evidence raising genuine issues of material fact as to the

existence of the MCV targeted customer markets. Nothing more is required at this stage.

### B. The Market for Promotion Services to Artists at MCVs is Properly Defined

Defendants do not dispute that the provision of promotion services to artists constitutes a

market. MSJ20. Instead, Defendants dispute the market's precise boundaries. That is not a basis

for summary judgment. *See New York v. Kraft Gen. Foods, Inc.*, 926 F.Supp. 321, 360 (S.D.N.Y.

1995) ("The market need not—indeed cannot—be defined with scientific precision.") (cleaned

up). Here too, Plaintiffs offer evidence in support of their market for promotion services to artists

at MCVs.

*Brown Shoe* factors support the promotion services market for artists at MCVs. The

*industry recognizes* that promotion services at MCVs are distinct. COMF ¶155. Only a subset of

*specialized vendor* promoters have the requisite experience, capital, ability, and relationships to

secure artists' access to MCVs. COMF ¶156. And the artists who perform at MCVs are *distinct*

*customers* with *peculiar characteristics*—with similar levels of popularity, strong preferences for

performing in MCVs, and need for stronger marketing, publicity, and sales support. COMF

¶157. *See Bertelsmann,* 646 F.Supp.3d at 29–33. They also pay *distinct prices* for promotion

services, with different deal structures.[4] COMF ¶158.

---

[4] Defendants contend that Plaintiffs "adduced no evidence at all that artists pay discriminatory prices when touring in this particular subset of venues." MSJ21 (citing *Whole Foods*, 548 F.3d at 1038). Defendants move the goal posts. *Whole Foods* does not require that Plaintiffs show payment of "discriminatory prices." 548 F.3d at 1039 (observing "a core group of particularly

Defendants complain promoters do not "limit themselves and their competitive efforts only to artists that play in [MCVs]." MSJ20.[5] But Plaintiffs' market consists of the sale of promotion services *at MCVs*, so the fact that the same suppliers of this product also sell different products outside the market is immaterial. *Bertelsmann*, 646 F.Supp.3d at 28 ("[E]ven if alternative []markets exist..., or if there are broader markets that might be analyzed, the viability of such additional markets does not render the one identified by [plaintiffs] unusable."). What's more, the *Brown Shoe* inquiry considers whether there are "specialized vendors," not distinct vendors. 370 U.S. at 325.

Defendants argue artists' preferences for performing in MCVs are irrelevant because "antitrust markets are not defined by customer preferences alone." MSJ21. But preferences *do matter* if sufficient artists are unlikely to substitute outside the market when faced with a small but significant non-transitory increase in price ("SSNIP"). Hill's HMT, using three different underlying methodologies, finds it would be profitable for a hypothetical monopolist to impose a SSNIP in the promotions services market. COMF ¶159. It demonstrates the strong preferences certain artists have for performing in MCVs, supporting Hill's conclusion that the market for promotion services to artists at MCVs is well-drawn. COMF ¶159.

 Finally, Defendants emphasize that a few promoters have put together a few tour offers for artists that include, under the same terms, MCVs and a few other venue types. MSJ21 (citing

---

dedicated, 'distinct customers,' paying 'distinct prices,' *may* constitute a recognizable submarket") (quoting *Brown Shoe*, 370 U.S. at 325) (emphasis added). Distinct prices are but one way of showing that a supplier can set different terms, and one among many *Brown Shoe* factors that may be considered. *Cf. id.* (observing "prices that segregate core from marginal consumers…simply indicate[] the existence of a submarket of core customers").

[5] Hill notes that a hypothetical monopolist in the market would be able to target artists wishing to perform in the United States, but Defendants do not take issue with the geographic bounds of the market. Hill Report, ¶175.

SUF ¶39). Of course, "[w]hatever the market urged by the plaintiff or the defendant, the other party can usually contend plausibly that something relevant was left out, that too much was included, or that dividing lines between inclusion and exclusion were arbitrary." *Tapestry*, 755 F.Supp.3d at 415 (quoting Areeda & Hovenkamp ¶530d). Such exceptions notwithstanding, most shows at MCVs are put on by artists performing primarily at MCVs. COMF ¶161. It is for the jury to weigh all the evidence and decide whether the exception swallows the rule. At this stage, the evidence, viewed in the light most favorable to Plaintiffs—and mindful that "'fuzziness' is inherent in bounding any market," *id*. (cleaned up)—raises genuine issues of material fact as to the market for promotions services for artists at MCVs.

### C.  The Market for Use of MCAmps is Properly Defined

Defendants criticize Plaintiffs' MCAmp market for excluding other venues like arenas—which they characterize as "obvious substitutes." MSJ13, 15. Defendants err, however, by focusing too heavily on functional similarities and ignoring whether amphitheaters and arenas are "*economic* substitutes under established legal frameworks." *Regeneron*, 96 F.4th at 340.

Second Circuit law is clear: where "two products should be considered part of distinct antitrust markets," as here, "those proposed markets are not to be rejected simply because a court believes the plaintiff is unintuitively separating products that might have real-world functional similarities into different markets." *Id*. 339–41 (upholding relevant market for medication delivered in prefilled syringes, to the exclusion of medication delivered in vials, based on evidence including physicians' "strong preference" for syringes); *see United States v. Visa, Inc.*, 788 F.Supp.3d 585, 605–08 (S.D.N.Y. 2025) (finding defendant placed "improper weight on the functional, rather than economic, similarities" and upholding relevant market); *Tapestry*, 755 F.Supp.3d at 416 (same).

Defendants have failed to meet their burden because ample evidence—under both the *Brown Shoe* and HMT frameworks—distinguishes MCAmps from other venue types. First, Plaintiffs' *Brown Shoe* evidence is sufficient to create a genuine factual dispute even if Hill's HMT is excluded, which it should not be. *See Emigra Group, LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLC*, 612 F.Supp.2d 330, 355 (S.D.N.Y. 2009) ("Hard data concerning cross-elasticity is not the only means of proving a relevant market."). Second, Hill concluded that the market for the use of MCAmps was a properly defined relevant market after performing several analyses, including an HMT using three different underlying methodologies. COMF ¶160.

*Brown Shoe* indicia support the market. The *industry recognizes* and analyzes that MCAmps are a distinct line of business. COMF ¶162. Defendants even tout their ownership and control over MCAmps internally and externally. COMF ¶163. LN is *the* dominant and *specialized vendor* with 60 of the 87 MCAmps, advertising itself as having "43 of the top 50 amphitheaters" and "accounting for 70% of all amphitheater shows." COMF ¶164. Many testified that only LN can offer amphitheater tours, which Hill confirmed empirically. COMF ¶¶165-167.

MCAmps also have *peculiar characteristics*, being smaller than stadiums, but larger than clubs and theaters. COMF ¶168. And unlike arenas, they are outdoor venues, typically with a lawn, COMF ¶24, open only during the warmer months, designed for concerts with superior acoustics and sight lines, lacking an anchoring tenant, and depending almost entirely on concert revenues. COMF ¶¶169-170. For a variety of reasons, certain artists prefer amphitheaters. COMF ¶25. Amphitheater concerts are a ███████████████████████████ ██████████████████████ COMF ¶25. Because of these peculiar characteristics, MCAmps require *unique production facilities* and "production[s] built for amps," not arenas. COMF ¶171.

*Distinct artist customers* want to perform in amphitheaters. COMF ¶¶25, 172-175. Given this preference, Defendants assume MCAmp artists are *insensitive to price increases*. When they

███████████████████████████████████████████████████████████████

█████████████████████████████████ without discussing the possibility of artists switching to different venues. COMF ¶176. Furthermore, Defendants felt they could extract favorable deals from artists that ██████████████████████ COMF ¶177. As one artist wrote, ██████████████

████████████████████████████████████████████████████████████████

████████████████████████████████ COMF ¶174.

Defendants' suggestion that consumer cross-shopping (here, an artist performing at an amphitheater and arena) disproves the existence of a distinct market has routinely been rejected by courts. *See Tapestry*, 755 F.Supp.3d at 455 (collecting cases). In *Tapestry*, the court rejected defendants' challenge to plaintiffs' accessible-luxury handbags market, even though consumers often "have several different types of handbags in their closet." *Id.* As here, "[d]espite some functional equivalence, as a matter of economic reality, the products may be recognized as distinct and, more importantly for antitrust purposes, the prices set by one may not meaningfully constrain the prices set by the others." *Id.*; *see United States v. Google, LLC*, 747 F.Supp.3d 1, 129–30 (D.D.C. 2024) ("The fact that advertisers may move money between search and social ads to achieve varying goals does not make them substitutes."); *FTC v. Microsoft Corp.*, 681 F.Supp.3d 1069, 1087 (N.D. Cal. 2023) ("That customers may cross-shop between consoles and PCs does not demonstrate reasonable interchangeability of use[.]") (cleaned up).

Defendants' reliance on *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676 (4th Cir. 2016), is misplaced. There, the plaintiff did not present evidence sufficient to rule out "potentially reasonable substitute venues within the vicinity" that an artist could turn to in

response to an increase in price. *Id*. 486–88. Here, Plaintiffs offer exactly this type of evidence through their expert economist and *Brown Shoe* evidence. This includes empirical analyses demonstrating that most MCAmps shows are performed by artists predominantly touring MCAmps, MCAmps passed the HMT, and rival promoters rarely bid on tours for artists performing at a significant number of MCAmps. COMF ¶178. *It's My Party* cannot carry the day.

### D.  The Fan-Facing Ticketing Market Is Properly Defined

*Brown Shoe* indicia and the HMT both demonstrate that a national market for primary concert tickets sold to fans at MCVs ("fan-facing market") is a properly defined antitrust market. "No single *Brown Shoe* factor is dispositive, as the determination of the relevant market in the end is a matter of business reality." *FTC v. Kroger Co.*, 2024 WL 5053016, at *610 (D. Or. Dec. 10, 2024) (cleaned up).

*Brown Shoe* factors show fans attend concerts, and primary concert ticketers compete to sell tickets and ancillary services directly to fans. COMF ¶¶179-184. Defendants concede that fans are direct purchasers, and fan demand and perception drive primary-ticketing competition, including incentivizing the development of features that cater to fans and improve user experience. COMF ¶¶179, 260. Fans' inability to choose among primary ticketers is not a natural feature of the market but rather *results from* Defendants' anticompetitive conduct. *See, e.g.*, *Meredith Corp. v. SESAC LLC*, 1 F.Supp.3d 180, 219–20 (S.D.N.Y. 2014) (finding defendants' market definition "problematic" because "[i]t takes as a given a quirky feature of current market structure…that itself may well be traceable to the [defendants'] longstanding practice"). COMF ¶¶180, 265.

Hill corroborates that conclusion, evaluating the HMT through qualitative evidence of market conditions and finding the fan-facing market exists because fans' demand for primary

concert ticketing at MCVs is not highly sensitive to the all-in price or included ticketing fees.

COMF ¶¶184-185. Evaluating the HMT through qualitative evidence is reliable and standard

practice. *McWane, Inc. v. FTC*, 783 F.3d 814, 829 (11th Cir. 2015) ("[C]ourts routinely rely on

qualitative economic evidence to define relevant markets.") (cleaned up); *US Airways, Inc. v.*

*Sabre Holdings Corp*, 2022 WL 986232, at *1 (S.D.N.Y. Apr. 1, 2022) (HMT using qualitative

evidence).

 Secondary tickets cannot constrain primary ticketers, even if they "appear to be

functionally similar," *Regeneron*, 96 F.4th at 339–40, because re-sold tickets cannot increase

total output of concert tickets. *See Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325,

1331 (7th Cir. 1986); COMF ¶186; *supra* §VI.C (distinguishing functional from economic

substitution).

 Further, Defendants' own expert highlights that secondary tickets have distinct pricing.

COMF ¶183. This uncontested fact, and the distinct customers implied, confirms Plaintiffs' fan-

facing market. *Brown Shoe*, 370 U.S. at 325.

 Finally, ticketing markets are not exclusively local. Many fans travel far—sometimes

hundreds of miles—for concerts at MCVs. COMF ¶¶ 188, 191. Ticketmaster operates on a

national level; its planning is national, and it offers the same mobile app to fans nationwide for

online purchasing. COMF ¶¶ 189–91. Defendants also use "nationwide contracts," track multiple

pricing metrics on a national basis, and market national tours to fans, and their alleged restraints

affect activities across multiple states. COMF ¶¶190-193. Defendants offer no reason to reject a

national market, and the jury must resolve the factual question of whether a national market

reflects commercial reality. *United States v. Grinnell Corp.*, 384 U.S. 563, 575–576 (1966) ("the

geographic market for the accredited central station service is national," even though "[t]he activities of an individual station are in a sense local").

Because primary ticketers now operate nationally, the 20-year-old *Heerwagen v. Clear Channel Communications* class-certification decision is inapt. 435 F.3d 219 (2d Cir. 2006); *see also* Def. Ex. 72, Hill Report, App'x E.4. The Rule 23(b)(3) predominance inquiry in *Heerwagen* focused on rock-concert attendance habits, not competitive constraints facing national ticketing companies selling digital tickets, or Ticketmaster's supracompetitive fees. *Heerwagen* itself recognized that national markets can be valid even for "services that tend to be provided locally." 435. F.3d at 230; *see also United States v. Anthem*, 236 F.Supp.3d 171, 203, 254–56 (D.D.C. 2017) (finding relevant local and national markets); *Sentry Data Systems, Inc. v. CVS Health*, 379 F.Supp.3d 1320, 1328–29 (S.D. Fla. 2019) (national presence "knit[s] the alleged local markets together into a relevant national market.").

## VII.    Genuine Issues of Material Fact Preclude Summary Judgment on Anticompetitive Effects

Defendants fall far short of their summary judgment burden because Plaintiffs have developed reams of evidence that, viewed in the light most favorable to Plaintiffs, shows that Defendants' anticompetitive conduct in all markets has harmed the competitive process. *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001). Defendants' conduct has foreclosed competition, denied rivals scale, reduced quality, diminished innovation, reduced choice for artists, venues and fans, raised rivals' costs, forced rivals to exit or limit their participation in the market, and deterred rival entry.

### A. Defendants' Anticompetitive Conduct Causes Anticompetitive Harm in the Ticketing Markets

Despite Defendants' attempt to narrow the scope of Plaintiffs' challenges to their anticompetitive conduct, anticompetitive harms in ticketing arise not just from Defendants' long-term exclusive contracts and content conditioning, but also from Defendants' anticompetitive acquisitions and agreements intended to switch venues' ticketing to Ticketmaster. COMF ¶¶194, 116–118, 191.

### 1. Ticketmaster's Exclusive Contracts Foreclose Competition, Harm Consumers and Competition, and Prevent Rivals from Achieving Scale

Defendants' contention that some competition for some Ticketmaster contracts defeats Plaintiffs' exclusive dealing claim, MSJ24–27, depends on inapplicable dicta and sidesteps the required exclusive dealing analysis.

To establish unlawful exclusive dealing, "there is no set formula," and courts instead "look at the practical effect of the exclusive dealing arrangements in any given case." *Visa*, 788 F.Supp.3d at 609 (cleaned up). Recognizing this flexible and fact-specific assessment, *Visa* applied what has become the prevailing analysis based on *ZF Meritor*, which assesses some or all of the "following factors: (1) significant market power by the defendant; (2) substantial foreclosure; (3) contracts of sufficient duration to prevent meaningful competition by rivals; (4) likely or actual anticompetitive effects considered in light of any procompetitive effects; (5) whether there is evidence that the dominant firm engaged in coercive behavior; (6) the ability of customers to terminate the agreements; and (7) the use of exclusive dealing by the defendant's competitors." *Id.* 608 (setting forth this analysis based on *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 271–72 (3d Cir. 2012)).

Every one of these factors is genuinely disputed and most affirmatively demonstrate anticompetitive foreclosure, precluding summary judgment.

*First—market power*: Defendants exercise substantial market power—commanding 75% and 86% of the markets for primary ticketing and primary concert ticketing services for MCVs. COMF ¶198.

*Second—substantial foreclosure*: Defendants' exclusive contracts substantially foreclose ██% of ticketing contracts at MCVs. COMF ¶88. Lower foreclosure percentages are routinely condemned. *E.g.*, *Visa*, 788 F.Supp.3d at 608 (45% and 55% foreclosure constitutes "an amount of foreclosure sufficient to violate the Sherman Act"); *Google LLC*, 747 F.Supp.3d at 157 ("50% foreclosure is significant foreclosure"); *see Microsoft*, 253 F.3d at 70 (recognizing "the roughly 40% or 50% [foreclosure] share usually required in order to establish a § 1 violation").

*Third—contract duration*: Ticketmaster's foreclosure of the market is durable. In 2024, its exclusive agreements averaged ██ years with MCVs and ██ years with NBA/NHL arenas COMF ¶92. That is plenty long to deny rivals the opportunity to compete—even without considering the cumulative anticompetitive conduct that further lengthens Ticketmaster's already long-term agreements. COMF ¶¶92-96. *See, e.g.*, *United States v. Google, LLC*, 687 F.Supp.3d 48, 158 (D.D.C 2023) ("Mozilla RSA and the Android agreements…of either two or three years…raise [antitrust] concerns" precluding summary judgment); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 185, 196 & n.2 (3d Cir. 2005) (exclusive purchase orders violate Section 2 "despite the lack of long term contracts"); *Motion Picture Adver. Serv. Co.*, 344 U.S. at 393–96 (condemning contracts ranging from two to five years under related antitrust law).

*Fourth—anticompetitive and procompetitive effects*: The parties vigorously dispute the anticompetitive effects of Ticketmaster's long-term exclusive agreements, including whether any benefits from long-term exclusivity could be achieved without denying competitors the opportunity to meaningfully compete. COMF ¶104, 105.

*Fifth—coercion*: Coercion takes many forms, and Defendants utilize many of them. Coercion occurs when companies are "threatened" with loss of access to other products, *Dentsply*, 399 F.3d at 194; when companies are "unable to satisfy customer demand" without accepting an exclusivity agreement, *ZF Meritor*, 696 F.3d at 285; or when companies "might lose their rebates" and "be cut off" for violating non-exclusivity, *McWane*, 783 F.3d at 821. Defendants use all these means of coercion, forcing all-or-nothing coercive choices on their venue customers. *See* §II–V, *supra*.

*Sixth—terminability*: Ticketmaster's long-term exclusive agreements cannot be exited easily. The agreements often lack a unilateral right to terminate without cause and can be terminated only upon breach, COMF ¶97—which courts find "reinforces [a] foreclosure effect." *Google LLC*, 747 F.Supp.3d at 158. Venues that terminate risk lawsuits from Ticketmaster. COMF ¶¶97-98. If venues do seek to terminate, often they must repay advanced funds under Ticketmaster's punitive claw back terms, COMF ¶99—provisions that, through their penalties, take "away the ability of customers to terminate the agreements." *Visa*, 788 F.Supp.3d at 611.

*Seventh—use by competitors*: While other ticketers sometimes seek exclusivity, Ticketmaster secures exclusivity most often and most thoroughly. Ticketmaster tickets over 90% of the independent MCVs that have exclusive ticketing arrangements. COMF ¶200. Venues seek and secure less exclusivity from rival ticketers. COMF ¶¶104-105.

Defendants ignore this multi-factor, holistic analysis, instead asserting the mechanistic rule that *any* competition for the contract defeats an exclusive dealing claim. MSJ24. Defendants rely upon *Spinelli v. NFL*, 96 F.Supp.3d 81, 107–114 (S.D.N.Y. 2015), a wholly inapposite case where private plaintiffs lacked antitrust standing and brought a Section 1 conspiracy claim that failed to "plausibly allege collective action." And Defendants omit *Spinelli*'s caution that

29

contracts *do* cause concern if there is "evidence of predatory practices or a 'unique' opportunity to leverage two distinct monopolies"—i.e., the facts alleged here. *Id*. 118. Regardless, the parties vigorously dispute whether, when, and to what extent rivals can compete for Ticketmaster's long-term exclusive MCV agreements—including because fear of retaliation permeates ticketing contract negotiations. COMF ¶201.

Defendants also urge the Court to "do the same here" as was done in *Tickets.com*—an uncitable, out-of-circuit, memorandum disposition from twenty years ago and the even older district court decision underlying it. MSJ26–27 (citing *Ticketmaster Corp. v. Tickets.com, Inc.*, 2003 WL 21397701 (C.D. Cal. Mar. 7, 2003)). But in *Tickets.com*, there was "no evidence that [Tickets.com] was excluded from contesting [bids] for the business or that any anti-competitive conduct prevented it from prevailing," and "[v]irtually all" Ticketmaster's exclusive agreements were competitively bid. *Id.* *6, 4. Tickets.com advanced "outlandish" arguments about Ticketmaster's anticompetitive conduct that were "not supported by any evidence," and it failed to "create a material issue of fact." *Id.* *6. And the district court "deduced" that "the use of a bidding system is an indication of lack of power to exclude competitors from the market" based on government-procurement cases with guaranteed competition from fixed-term contracts rebid every one-to-three years to numerous firms capable of bidding with no power to exclude bidders. *Id*. *4–5. This case is entirely different.

### 2. *Defendants Block Rivals from Achieving Scale*

Defendants baldly assert that their scale does not matter because AXS and SeatGeek, counted together, have acquired ticketing contracts for a handful of venues over the last decade. *See* MSJ27; RSUF ¶¶15-17 (AXS and SeatGeek acquired contracts for ▮ amphitheaters, ▮ NFL stadiums, and ▮ NBA/NHL arenas over past 13 years). Leaving aside Defendants' failure to explain how this handful constitutes "viable scale," Ticketmaster's documents directly

refute its litigation claim:  COMF ¶202, and ████████████████, COMF ¶203, and note ███████████████████████████████ COMF ¶204.

Ticketmaster's massive scale—and the data on fans, venues, artists, and pricing it acquires as a result—paired with the anticompetitive conduct that maintains it "inoculat[es] [Ticketmaster] against any genuine competitive threat." *Google*, 747 F.Supp.3d at 163. The benefits of Ticketmaster's scale are undeniable: Ticketmaster uses the data acquired from scale to market its ticketed events to the hundreds of millions of fans in its database, COMF ¶205, and otherwise uses the data to increase sell-through, COMF ¶206, make pricing predictions, COMF ¶207, and entrench itself in innumerable ways. COMF ¶¶208-210. A Ticketmaster executive candidly wrote that, as a result of its scale, Ticketmaster is ██████████████████ ████████████████████████████████████████████████████ ███████████████████ COMF ¶211. As Ticketmaster's President recently touted to investors, "Models are accessible to everybody. Proprietary data is not." COMF ¶212.

### 3. *Defendants' Conditioning, Threats, and Retaliation Cause Anticompetitive Harm*

Defendants' assertion that threats and retaliation against venues that consider or choose rival ticketers do not cause anticompetitive effects (MSJ27–30) relies on genuinely disputed facts, ignores relevant facts, and is based solely on a 40-year-old article which rejects established precedent. Defendants' conditioning conduct *does* raise rivals' costs, and Defendants "ha[ve] not rebutted the sensible inference that its threats were anticompetitive." *Chase Mfg., Inc. v. Johns Manville Corp.*, 84 F.4th 1157, 1172 (10th Cir. 2023). Furthermore, not only has Defendants' conduct raised rivals' costs, it has foreclosed a substantial share of the market, caused some

rivals to exit the market and discouraged others from entering, deprived rivals of the ability to obtain scale, and decreased innovation, quality and choice.

Without citing a single case, Defendants argue that conduct that raises rivals' costs causes anticompetitive harm only if those costs "unavoidably and significantly" increase rivals' costs and no "effective counterstrategy" is available. MSJ28. Defendants rely on a 1986 article that "seeks to provide the unified analysis for which both the [Supreme] Court and its critics search," "reject[s]…the Court's…rules," and admits that "few exclusion claims probably would survive" their test. *Id.* (citing Thomas G. Krattenmaker & Steven C. Salop, *Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power Over Price*, 96 YALE L.J. 209, 213–14 (1986)). Actual caselaw, by contrast, offers the sensible test that anticompetitive conduct "can be harmful when it allows a monopolist to maintain its monopoly power by raising its rivals' costs sufficiently to prevent them from growing into effective competitors." *McWane*, 783 F.3d at 832.

Here, there is abundant evidence that Defendants' threats and retaliation raised rivals' costs "sufficiently to prevent them from growing into effective competitors." *McWane, Inc.,* 783 F.3d at 832. Rivals testified that Defendants' threats and retaliation have hindered their expansion by requiring them to pay venues more or offer ████████████ and other contractual concession to convince venues to risk losing LN content. COMF ¶¶73-75, 213. Other rivals have exited the market, or dropped plans to enter the market, because of the difficulty of winning over venues that are unwilling to risk losing LN content. COMF ¶214.

Defendants portray ████████████ as an "effective" and "cost-free counterstrategy." MSJ28. They are neither. Venues model anticipated LN content loss when weighing ticketers' offers and what they are willing to accept. COMF ¶72. ████████

████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████—all flatly contradicts Defendants' assertion. COMF ¶215.

Moreover, Defendants' threats and retaliation have foreclosed rivals from a substantial

portion of the market. Explanatory notes in ████████████████ business records explaining

why they did not win over a Ticketmaster client attribute more than ████ of lost opportunities to

concerns over content withholding. COMF ¶70. These lost opportunities have deprived rivals of

the ability to obtain scale, and venues, artists and consumers of greater quality, innovation and

price competition. *See Microsoft*, 253 F.3d at 60–65, 71–72 (anticompetitive conduct kept rivals

"from gaining the critical mass of users necessary" "to pose a real threat" and degraded customer

quality and choice).

Defendants' assertion that Plaintiffs have "not even attempted to show causation"

between lower show counts at non-Ticketmaster venues and rivals' costs because Hill did not so

opine is incorrect and irrelevant. Defendants' threats and retaliation caused venues to fear losing

LN content, thereby raising costs for rivals trying to win venues away from Ticketmaster. That

some of Defendants' hand-picked, current venue customers denied these concerns at deposition

simply illustrates that this is a genuine issue of material fact precluding summary judgment.

Evidence of Defendants' years-long campaign of threats and retaliation, venue modeling of lost

content, demands for ████████████████, and the public facts about ████████ show-count

decline paint an altogether different picture than the one portrayed by Defendants, MSJ29. On

top of this, Hill opines, based on his analysis, that LN retaliated against MCVs that used non-

Ticketmaster ticketers, causing anticompetitive harm to venues and the competitive process.

COMF ¶216.

### B. Defendants' Anticompetitive Conduct Causes Anticompetitive Harm in MCAmp Market

Defendants challenge Plaintiffs' showing of anticompetitive harm in the MCAmp market by manufacturing undisputed facts and ignoring Plaintiffs' evidence cataloguing the many harms resulting from Defendants' conduct. MSJ30-31.

Output is reduced. As LN executives admit, ███████████████████ ███████████████████████████████ COMF ¶217. Yet, in 2022, LN amphitheaters were "dark"—empty and concert-less—on ██% of Fridays and ██% of Saturdays during peak season between Memorial Day and Labor Day. COMF ¶218.

Choice is restricted. Artists who want to perform in amphitheaters cannot book an optimal route if they choose a non-LN promoter, and instead are forced to play in ██████ ██████████████████████ COMF ¶219. And LN's closed amphitheater model decreases ████████████████ COMF ¶220. Fans at LN amphitheaters █████████████████████████ COMF ¶221.

Quality suffers. Complaints about LN's amphitheaters abound: ███████████ ██████████████████████████████████████ █████████████████████████████████ COMF ¶222. LN's internal amphitheater business assessments tell a similar story about ██████████ ██████████████████████████████████████████ ██████████████████████████████ COMF ¶223; *see also* COMF ¶¶196–97.

Everybody hurts—except LN. Artists earn less because they cannot tour MCAmps without LN, and so they cannot benefit from competition between promoters. COMF ¶224. As a LN executive  explained, ██████████████████████████████████

██████████████ COMF ¶177. Artists get told ███████████████████████

██████████████████████████████████████████████ COMF ¶225.

All the while, LN brags that it is ████████████████████ with amphitheater parking fees

COMF ¶226, and charging higher venue and service fees to fans than non-LN amphitheaters.

COMF ¶227.

### C. Defendants' Anticompetitive Conduct Causes Anticompetitive Harm in Promotions and Concert Booking Markets

Despite Defendants' claim that Plaintiffs "have no evidence" of anticompetitive harms

caused by strategically acquiring potential rivals, co-opting competitors, policing competing

offers to artists, and restricting rivals' access to revenue, Plaintiffs have more than sufficient

evidence of harm to overcome Defendants' motion.

At MCVs, which include MCAmps, competition suffers. Since 2016, LN has acquired

promoters controlling at least 20% of MCV tickets sold in eleven separate metropolitan areas.

COMF ¶228. While Defendants question whether these promoters "ever competed or might have

competed" in Plaintiffs' nationwide market, MSJ31, they have at most identified a disputed fact.

*See Grinnell Corp.*, 384 U.S. at 576; *cf. Microsoft Corp.*, 253 F.3d at 79 ("it would be inimical to

the purpose of the Sherman Act to allow monopolists free reign to squash nascent, albeit

unproven, competitors").

Venues, fans, and artists all pay. LN's Ancillary Per Fan arena fee—which venues pay to

LN, often via per ticket rebates—more than doubled from $██ in 2017 to $████ in 2024.

COMF ¶229. LN hiked these fees because it could, "pulling shows" from venues that did not

agree to increased rebates. COMF ¶230. It even extracted payments on competitors' arena shows

for which it did none of the work. COMF ¶231. Fans now pay more due to LN's increased ticket

fees and other expenses. COMF ¶232.

LN's executives acknowledge promoter acquisitions harm artists and competition. In their words, the various acquisitions would "[l]ower competition," COMF ¶233(a) "keep[] guarantees down" so that artists earn less, COMF ¶233(b), and ███████████████ ███████████████████████ COMF ¶233(c). Thus, LN agreed to █████████ ████████████████████████ to avoid "driving the price up" for artist offers. COMF ¶234. LN's serial promoter acquisitions also "drastically reduced" artists' choice of promoters, especially for artists playing at "major amphitheaters, arenas," COMF ¶235, and harmed venues by increasing the rebates venues must pay to LN. COMF ¶236. Because venues often pay higher rebates to LN when LN or its affiliates deliver more shows, COMF ¶237. The more promoter-affiliates LN acquires, the more venues pay LN.

Artists and venues have limited promoter options. COMF ¶238. LN has ████████████  COMF ¶239. Even Legends/ASM—one of the world's largest venue management companies—recognizes it has ██████████████████████████████ COMF ¶240. LN's policy requiring artists that want to perform in LN amphitheaters to also purchase LN's promotion services also limits artist choice and harms competition. *See* Section IV, *infra*.

## VIII.    Genuine Issues of Material Fact Preclude Summary Judgment on Plaintiffs' Section 1 Exclusive Dealing Claim

Plaintiffs' Section 1 and Section 2 exclusive dealing claims withstand summary judgment for the same reasons. MSJ23 n.4 (acknowledging the closely overlapping inquiries under Section 1 and 2). Curiously, however, Defendants contend that exclusive dealing claims "under Section 1 cannot aggregate contracts as is allowed under Section 2." MSJ32. But if aggregation were prohibited, substantial foreclosure could occur only in markets where a single customer

controlled a monopolistic share of the market. That is not the law. *E.g.*, *ZF Meritor*, 696 F.3d at 286 (aggregating "long-term agreements with every direct purchaser" under Sections 1 and 2). Nor do Defendants' cases support the rule Defendants propound. Defendants cite to "hub-and-spoke" conspiracy cases in which courts declined to aggregate vertical agreements (some of which were not even exclusive) to create a horizontal "rim" connecting various defendants. These cases bear neither resemblance nor relevance to this matter.

### IX. Genuine Issues of Material Fact Preclude Summary Judgment on Plaintiffs' Section 1 Tying Claim

#### A. Refusal-to-Deal Framework Is Inapplicable Because Artists Are the Consumers of Amphitheater Access

Defendants recycle their failed refusal-to-deal argument to attack Plaintiffs' tying claim, arguing that promoters (not artists) are the customers in the MCAmp market because they sign the rental agreements and sometimes bear financial risk. Besides relying on disputed facts, RSUF ¶38, this Court has already rejected those arguments. MTD-Order 4 ("[A] tying claim does not fail as a matter of law simply because it was implemented by refusing to deal with an intermediary.") (quoting *Viamedia, Inc. v. Comcast Corp*, 951 F.3d 429, 472 (7th Cir. 2020)); *id.* ("Thinking about 'financial risk' in isolation would put form over substance.") (citing *Viamedia*, 951 F.3d at 470).[6]

Here, and just as alleged in the Amended Complaint, "the evidence shows that [1] promoters book venues on behalf of specific artists, [2] artists are the driving force behind which venues to book and when, and [3] artists are coerced into using Live Nation as their promoter if they want access to Live Nation's amphitheaters." MTD-Order 4.

---

[6] Even with respect to the financial arrangement, the record shows that it is artist-specific. *See* MTD-Order 4; COMF ¶241.

*First*, promoters book venues on behalf of specific artists. Event license agreements are for specific artists and specific show dates (COMF ¶242; RSUF ¶¶44, 53), and artist representatives sometimes contact a venue directly for hold dates and to negotiate expenses. COMF ¶243. Amphitheaters also provide services to artists that are distinct from promotions services, such as providing stagehands, catering, and runners. COMF ¶244. LN has separate booking agreements with venues (not specific to artists) that govern other terms, like per ticket rebate amounts. COMF ¶245.

*Second*, artists—in consultation with others—are the ultimate decisionmakers as to which venues to book and perform. COMF ¶246. When deciding which venues to play, artists often consider expenses like rent and merchandise rates that venues charge because those expenses affect an artist's income. COMF ¶247. Venues compete against each other for artists by lowering expenses and making venue improvements. COMF ¶248.

*Third*, LN's long-standing policy coerces artists into using LN as their promoter if they want access to LN's amphitheaters. COMF ¶249; RSUF ¶48. This policy is well-known by artist agencies and management companies. COMF ¶250. It leaves artists no choice if they want to perform in a LN amphitheater. COMF ¶251;[7] RSUF ¶48. LN targets artists, not just rival promoters, with this policy. *See* MTD-Order 2–3; COMF ¶252; RSUF ¶¶44, 52–53. And the combination of LN's market power in the MCAmp market, COMF ¶¶164–65, with its tying policy for individual amphitheater shows means that artists cannot perform MCAmp *tours* without using LN—which LN recognizes. COMF ¶166. As a result of this well-known policy, LN promoted more than 90%

---

[7] Though there are rare exceptions to the policy on an artist-by-artist basis, COMF ¶252, that does not mean that the policy is not unremitting or that there is no coercion. *See N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 11–12 (1958) (analysis unchanged by contracts with exceptions or lenient enforcement); *Int'l Salt Co. v. United States*, 332 U.S. 392, 397 (1947) (same); Areeda & Hovenkamp ¶1753d.

of concerts performed in its MCAmps between 2017–2024. COMF ¶167(b). LN also uses its leverage in amphitheater tours to get artists to use LN for arena shows. COMF ¶253.

The refusal-to-deal doctrine is no defense to this straightforward tying claim. Defendants' argument to the contrary defies logic, seeks to impose new elements onto a Section 1 tying claim, and mischaracterizes *Viamedia*. In *Viamedia*, the plaintiffs alleged both an illegal refusal-to-deal (with its rival in the ad rep market, Viamedia) and a tying arrangement (tying sales to MVPDs of Comcast's Interconnects with its ad rep services) under Section 2. *Viamedia*, 951 F.3d at 462, 474. The court did *not* apply the refusal-to-deal framework to the tying claim. *Id.* 466–74. There is no support in *Viamedia* or elsewhere for melding these doctrines in the way Defendants have here. *See United States v. Google LLC*, 778 F.Supp.3d 797, 859–68 (E.D. Va. 2025) (rejecting argument that the "refusal to deal" doctrine applies to tying claims).

The facts show that artists—not promoters—are the customers who access and use amphitheaters. That should end Defendants' refusal-to-deal sideshow. Even if Plaintiffs were required to show that Defendants "terminated a presumably profitable prior course of dealing" under *Aspen Skiing*, MSJ35—which Plaintiffs are not—that is precisely what has happened here. LN's amphitheaters were previously open to certain artists who used ███████████ as their promoter; that is no longer the case. COMF ¶254. As the record reflects, Defendants are willing to sacrifice profits by not opening their amphitheaters to all artists (regardless of promoter). COMF ¶255.

### B.  The Facts Show Coercion and Anticompetitive Effects

Defendants challenge just the coercion and anticompetitive effects elements of Plaintiffs' Section 1 tying claim. MSJ36. Both challenges are easily rejected.

*Coercion*: In this Circuit, there is no requirement that a plaintiff demonstrate coercion on an individual basis. *Park v. Thomson Corp.*, 2007 WL 119461, at *4 (S.D.N.Y. Jan. 11, 2007) ("When a policy of conditioned sales is demonstrated, proof of coercion on an individual basis is unnecessary"). "An unremitting policy of tie-in, if accompanied by sufficient market power in the tying product to appreciably restrain competition in the market for the tied product constitutes the requisite coercion." *Hill v. A-T-O, Inc.*, 535 F.2d 1349, 1355 (2d Cir. 1976). Defendants' unremitting policy of conditioning LN amphitheater access on artists also purchasing their promotion services satisfies the coercion element. *Supra* §IX.A; COMF ¶¶249,251; RSUF ¶¶44,48. Regardless, there is record evidence of individual coercion. COMF ¶256; RSUF ¶¶48, 50

*Anticompetitive effects*:  Defendants tying has harmed competition because artists are forced into buying promotion services that they may "not want at all" or "might have preferred to purchase elsewhere on different terms." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984) ("When such 'forcing' is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated."); *Hill*, 535 F.2d at 1353 (same); *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 463 (1992) (denying summary judgment on tying claim where the "record indicates that Kodak would sell parts to third parties only if they agreed not to buy service from ISO's").  LN also denies artists the benefits of increased promoter competition for amphitheater dates and tours. COMF ¶257.

Other anticompetitive effects include reduced artist guarantees and compensation, COMF ¶¶241, 258, reduced content diversity, increased "dark days" (which inherently means reduced output in the promotions market), and reduced artist access to fans due to fewer amphitheater shows. COMF ¶259. In contrast to LN, many third-party MCAmps operate as open

40

venues where multiple promoters are allowed to promote shows, leading to increased concerts, and competition between multiple promoters. COMF ¶140; RSUF ¶45.

## X.    Defendants' Vertical Integration Does Not Justify Anticompetitive Conduct

Defendants imply that their anticompetitive conduct is somehow immunized or procompetitive because the merger of LN and Ticketmaster was permitted under a consent decree. They cite no legal support for that proposition—nor could they. *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 13 (1979) ("[o]f course, a consent judgment, even one entered at the behest of the Antitrust Division, does not immunize the defendant from [antitrust] liability for actions, including those contemplated by the decree"). Far from using vertical integration to benefit consumers, Defendants have used their market power to delay and diminish innovation, harming consumers in myriad ways.

## XI.    The States Have Standing and Consumers Were Harmed

### A.  Plaintiff States Have Standing

Defendants question States' standing on "sovereign capacity" grounds, but that argument is irrelevant. Sovereign capacity is just one of four permissible capacities[8] in which States can sue, and here, States have always relied on their "quasi-sovereign interests"[9] (Am. Compl. ¶216)

---

[8] "[S]tates have at least four types of interests that, if injured, satisfy standing's first requirement: sovereign, quasi-sovereign, proprietary, or private." *Harrison v. Jefferson Par. Sch. Bd,*, 78 F.4th 765, 769 (5th Cir. 2023).

[9] Only three states referred to their sovereign capacities (Am. Compl. ¶¶271, 414, 439), but that is pleading shorthand for their role as sovereigns entitled to vindicate public rights under state law. Defendants underrate and misconstrue the reach and bases for liability of the consumer protection and unfair competition laws at issue. MSJ36 n.7. Exhibit 1 describes the relevant statutes. Defendants' conduct can be found to violate these laws even in the absence of a Sherman Act violation. *E.g.*, *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 681 & 682 (2024); *see also Mack v. Bristol-Myers Squibb Co.*, 673 So.2d 100 (Fla. Dist. Ct. App. 1996); Neb. Rev. Stat. §§56-1602 *et seq.* For several, no market definition or showing of antitrust injury is required. *See Epic*, 67 F.4th at 1001–02; *State ex rel. Wilson v. Ortho-McNeil-Janssen Pharms., Inc.*, 777 S.E.2d 176, 189 (S.C. 2015). Defendants do not challenge these consumer protection and unfair competition claims, and Defendants' conclusory statement that all state law claims fail cannot satisfy the summary judgment standard. For

in preventing and remedying "harm to States' economies caused by restraints of trade in violation of the antitrust laws," which "[c]ourts have long found [to]…constitute injuries that are cognizable in federal court." *In re Elec. Books Antitrust Litig.*, 14 F. Supp. 3d 525, 532 (S.D.N.Y. 2014).

The record evidence above shows harm to States' economies in Plaintiffs' defined markets because the States have a quasi-sovereign interest in maintaining free and competitive economies. COMF ¶¶190, 261–66. None of Defendants' sovereign capacity cases are *antitrust* standing cases; the canonical interest States invoke in antitrust is quasi-sovereign. *See Apple*, 2025 WL 1829127, at *16–17. Moreover, the record shows harms to consumers. *See* Abrantes-Metz Report, §§V–VI.

## B. State Plaintiffs Have Established Injury in the Fan-Facing Market

Defendants concede that consumers directly purchase primary concert tickets. COMF ¶260. Under *Apple v. Pepper*, 587 U.S. 273 (2019), establishing standing requires nothing more, and Defendants' attempted distinction between "ticketing services" and "tickets" is unavailing. Concert tickets are overpriced due to Defendants' conduct, and it contravenes antitrust policy to allow a monopolist to structure its industry to avoid liability and leave no recourse to those who buy the end-product (tickets) from that monopolist. *See id.* 283–84.

Even if fans were not direct purchasers, State Plaintiffs have established antitrust injury because Ticketmaster injured them in a restrained market. Defendants suggest this Court's MTD-

---

example, Defendants violate the unfair prong of California's Unfair Competition Law ("UCL") through their coercion of MCVs into signing long-term exclusive contracts, RSUF ¶¶22, 23, 28, 30, which unfairly weakens rival ticketers' ability to compete by denying them scale and raising their costs, and harms consumers by enabling Ticketmaster to collect higher fees than would be possible without this unfair conduct, resulting in higher consumer prices. COMF ¶263. Summary judgment cannot defeat this violation of the unfair prong's balancing test, *see Epic*, 67 F.4th at 1000, nor numerous other State claims.

Order requires fans to consume the exact service that is subject to anticompetitive conduct, and assert that "tickets" and "ticketing services" are not exactly the same.[10] They are not; Plaintiffs have alleged that primary ticketing services are a relevant product market but that does not mean fans must negotiate exclusive contracts or receive threats from LN to recover overcharges. The MTD-Order accordingly emphasized "looking to substance, and putting antitrust legalese to the side," even if "consumers didn't participate in those markets where the alleged anticompetitive acts took place…consumers of that product alleging that they were overcharged suffer a cognizable injury." MTD-Order 6.

The caselaw eschews Defendants' formalism. *DDAVP* reflects the MTD-Order's message: substance trumps form when assessing antitrust injury. While the challenged conduct there was between a patentholder and would-be generic manufacturers, *consumers* suffered impact. Ticket-buyers can no more negotiate venues' ticketing-contract terms than drug-buyers can file antitrust counterclaims in patent-infringement cases between drugmakers. *See In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 690–91 (2d Cir. 2009).

The services here are "the same" in the way that matters, because the anticompetitive conduct occurs in the market where MCVs procure primary-ticketing services, locking in fans who suffer the anticompetitive effects—increased ticket prices, less choice, and reduced quality. COMF ¶¶261, 263–66. This case is why *McCready* and its progeny exist: to effectuate Congress's intention to provide recovery where consumers paid supracompetitive prices for one service because of interactions between different actors regarding a different service. *See Blue*

---

[10] Defendants' claim that fans purchase a distinct service contradicts the opinions of their own expert, Dr. Carlton, who opines there is no distinct market for a "ticket" and thinks the proper mode of damages analysis would be one of "pass-through," as one would analyze a product sold through the distribution chain with no modification, just a markup. Defs.' Ex. 76, Carlton Rep. ¶¶132, 111.

*Shield of Virginia v. McCready*, 457 U.S. 465, 483–84 (1982); *see also id.* 475 ("[W]hatever the adverse effect of Blue Shield's actions on McCready's employer, who purchased the plan, it is not the employer as purchaser, but its employees as subscribers, who are out of pocket as a consequence of the plan's failure to pay benefits.").

Record evidence raises genuine fact questions about how Defendants' conduct reduced primary-ticketing competition, harming fans. COMF ¶¶261, 263, 264, 266, 265. Defendants' challenge to State Plaintiffs' damages claims should be denied.

Respectfully submitted,

 */s/ Bonny Sweeney*
BONNY SWEENEY
*Co-Lead Trial Counsel*
David Dahlquist
*Co-Lead Trial Counsel*
Michael McLellan
Lorraine Van Kirk
Zeynep Aksoy
Serajul Ali
Seana Buzbee
Alex Cohen
Miniard Culpepper
Danielle Drory
Jonathan Goldsmith
Elena Goldstein
Rachel Hicks
Matthew Huppert
Matthew Jones
Collier Kelley
Owen Kendler
Andrew Kline
Alexis Lazda
Sarah Licht
Arianna Markel
Janelle Robins
Jennie Roualet
Chinita Sinkler
Curtis Strong

Andy Tan
David Teslicko
John R. Thornburgh II
Shana Wallace
Jennifer Wamsley
Brian White
United States Department of Justice
Antitrust Division
450 Fifth Street N.W., Suite 4000
Washington, DC 20530
Telephone: (202) 725-0165
Facsimile: (202) 514-7308
Bonny.Sweeney@usdoj.gov
David.Dahlquist@usdoj.gov

*Attorneys for Plaintiff United States of America*

*/s/ Robert A. Bernheim*
Robert A. Bernheim (admitted *pro hac vice*)
Office of the Arizona Attorney General
Consumer Protection & Advocacy Section
2005 N. Central Avenue
Phoenix, AZ 85004
Telephone: (602) 542-3725
Fax: (602) 542-4377
Email: Robert.Bernheim@azag.gov
*Attorney for Plaintiff State of Arizona*
*/s/ Amanda J. Wentz*
Amanda J. Wentz (admitted *pro hac vice*)
Assistant Attorney General
Office of the Arkansas Attorney General
101 West Capitol Avenue
Little Rock, AR 72201
Telephone: (501) 682-1178
Fax: (501) 682-8118
Email: amanda.wentz@arkansasag.gov
*Attorney for Plaintiff State of Arkansas*
*/s/ Paula Lauren Gibson*
PAULA LAUREN GIBSON (admitted *pro hac vice)*
Office of the Attorney General
California Department of Justice
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
Telephone: (213) 269-6000
Email: Paula.Gibson@doj.ca.gov
*Attorney for Plaintiff State of California*
*/s/ Conor J. May*
Conor J. May (admitted *pro hac vice*)
Assistant Attorney General
Antitrust Unit
Colorado Department of Law
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email: Conor.May@coag.gov
*Attorney for Plaintiff State of Colorado*

*/s/ Victoria Maria Orton Field*
Victoria Maria Orton Field (admitted *pro hac vice*)
Assistant Attorney General
Office of the Attorney General of Connecticut
165 Capitol Avenue
Hartford, CT 06106
Telephone: 860-808-5030
Email: victoria.field@ct.gov
*Attorney for Plaintiff State of Connecticut*
*/s/ Elizabeth G. Arthur*
Elizabeth G. Arthur (admitted *pro hac vice*)
Senior Assistant Attorney General
Office of the Attorney General for the District of Columbia
400 6th Street NW, 10th Floor
Washington, DC 20001
Email: Elizabeth.arthur@dc.gov
*Attorney for Plaintiff District of Columbia*
*/s/ Lizabeth A. Brady*
Lizabeth A. Brady
Director, Antitrust Division
Florida Office of the Attorney General
PL-01 The Capitol
Tallahassee, FL 32399-1050
Telephone: 850-414-3300
Email: Liz.Brady@myfloridalegal.com
*Attorney for Plaintiff State of Florida*
*/s/ Richard S. Schultz*
Richard S. Schultz (admitted *pro hac vice*)
Assistant Attorney General
Office of the Illinois Attorney General
Antitrust Bureau
115 S. LaSalle Street, Floor 23
Chicago, Illinois 60603
Telephone: (872) 272-0996
Email: Richard.Schultz@ilag.gov
*Attorney for Plaintiff State of Illinois*
*/s/ Jesse Moore*
Jesse Moore (admitted *pro hac vice*)
Deputy Attorney General
Office of the Indiana Attorney General
302 W. Washington St., Fifth Floor
Indianapolis, IN 46204
Telephone: 317-232-4956
Email: Jesse.Moore@atg.in.gov
*Attorney for Plaintiff State of Indiana*

/s/ Noah Goerlitz
Noah Goerlitz (admitted *pro hac vice*)
Assistant Attorney General
Office of the Iowa Attorney General
1305 E. Walnut St.
Des Moines, IA 50319
Telephone: (515) 281-5164
Email: noah.goerlitz@ag.iowa.gov
*Attorney for Plaintiff State of Iowa*
/s/ Christopher Teters
Christopher Teters (admitted *pro hac vice*)
Assistant Attorney General
Public Protection Division
Office of Kansas Attorney General
120 S.W. 10th Avenue, 2nd Floor
Topeka, KS 66612-1597
Telephone: (785) 296-3751
Email: chris.teters@ag.ks.gov
*Attorney for Plaintiff State of Kansas*
/s/ Mario Guadamud
Mario Guadamud (admitted *pro hac vice*)
Louisiana Office of Attorney General
1885 North Third Street
Baton Rouge, LA 70802
Telephone: (225) 326-6400
Fax: (225) 326-6498
Email: GuadamudM@ag.louisiana.gov
*Attorney for Plaintiff State of Louisiana*
/s/ Schonette J. Walker
Schonette J. Walker (admitted *pro hac vice*)
Assistant Attorney General
Chief, Antitrust Division
200 St. Paul Place, 19th floor
Baltimore, Maryland 21202
Telephone: (410) 576-6470
Email: swalker@oag.state.md.us
*Attorney for Plaintiff State of Maryland*
/s/ Katherine W. Krems
Katherine W. Krems (admitted *pro hac vice*)
Assistant Attorney General, Antitrust Division
Office of the Massachusetts Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (617) 963-2189
Email: Katherine.Krems@mass.gov
*Attorney for Plaintiff Commonwealth of
Massachusetts*

/s/ LeAnn D. Scott
LeAnn D. Scott (admitted *pro hac vice*)
Assistant Attorney General
Corporate Oversight Division
Michigan Department of Attorney General
P.O. Box 30736
Lansing, MI 48909
Telephone: (517) 335-7632
Email: ScottL21@michigan.gov
*Attorney for Plaintiff State of Michigan*
/s/ Zach Biesanz
Zach Biesanz
Senior Enforcement Counsel
Antitrust Division
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
Saint Paul, MN 55101
Telephone: (651) 757-1257
Email: zach.biesanz@ag.state.mn.us
*Attorney for Plaintiff State of Minnesota*
/s/ Lee Morris
Lee Morris (admitted pro hac vice)
Special Assistant Attorney General
Mississippi Office of Attorney General
Post Office Box 220
Jackson, Mississippi 39205
Telephone: (601) 359-9011
Email: Lee.Morris@ago.ms.gov
Attorney for Plaintiff State of Mississippi


/s/ Justin C. McCully
Justin C. McCully (admitted *pro hac vice*)
Assistant Attorney General
Consumer Protection Bureau
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68509
Telephone: (402) 471-9305
Email: justin.mccully@nebraska.gov
*Attorney for Plaintiff State of Nebraska*
/s/ Lucas J. Tucker
Lucas J. Tucker (admitted *pro hac vice*)
Senior Deputy Attorney General
Office of the Nevada Attorney General
Bureau of Consumer Protection
100 N. Carson St.
Carson City, NV 89701
Email: ltucker@ag.nv.gov
*Attorney for Plaintiff State of Nevada*

/s/ Zachary Frish
Zachary A. Frish (admitted *pro hac vice*)
Assistant Attorney General
Consumer Protection & Antitrust Bureau
New Hampshire Attorney General's Office
Department of Justice
1 Granite Place South
Concord, NH 03301
Telephone: (603) 271-2150
Email: zachary.a.frish@doj.nh.gov
*Attorney for Plaintiff State of New Hampshire*

/s/ Andrew F. Esoldi
Andrew F. Esoldi
Deputy Attorney General
Division of Law
Antitrust Litigation and Competition
Enforcement
124 Halsey Street, 5th Floor
Newark, NJ 07101
Telephone: (609) 696-5465
Email: Andrew.Esoldi@law.njoag.gov
Attorney for Plaintiff State of New Jersey

/s/ Jonathan Hatch
Jonathan Hatch
Assistant Attorney General
New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8598
Email: jonathan.hatch@ag.ny.gov
*Attorney for Plaintiff State of New York*

/s/ Evan Crocker
Evan Crocker (admitted *pro hac vice*)
Assistant Attorney General, Division Director
Consumer Affairs Division
New Mexico Department of Justice
201 3rd St NW, Suite 300
Albuquerque, NM 87102
Telephone: (505) 494-8973
Email: ecrocker@nmdoj.gov
*Attorney for Plaintiff State of New Mexico*

/s/ Francisco Benzoni
Francisco Benzoni (admitted *pro hac vice*)
Special Deputy Attorney General
Brian Rabinovitz (admitted *pro hac vice*)
Special Deputy Attorney General
North Carolina Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
Telephone: (919) 716-6000
Facsimile: (919) 716-6050
Email: fbenzoni@ncdoj.gov
Email: brabinovitz@ncdoj.gov
*Attorneys for Plaintiff State of North Carolina*

/s/ Sarah Mader
Sarah Mader (admitted *pro hac vice*)
Assistant Attorney General
Antitrust Section
Office of the Ohio Attorney General
30 E. Broad St., 26th Floor
Columbus, OH 43215
Telephone: (614) 466-4328
Email: Sarah.Mader@OhioAGO.gov
*Attorney for Plaintiff State of Ohio*

/s/ Cameron R. Capps
Cameron R. Capps (admitted *pro hac vice*)
Deputy Attorney General
Consumer Protection
Office of the Oklahoma Attorney General
313 N.E. 21st Street
Oklahoma City, Oklahoma  73105
Telephone:  (405) 522-0858
Fax:  (405) 522-0085
Email: Cameron.Capps@oag.ok.gov
Attorney for Plaintiff State of Oklahoma

/s/ Gina Ko
Gina Ko (admitted *pro hac vice*)
Assistant Attorney General
Antitrust, False Claims, and Privacy Section
Oregon Department of Justice
100 SW Market St.,
Portland, Oregon 97201
Telephone: (971) 673-1880
Fax: (503) 378-5017
Email: Gina.Ko@doj.oregon.gov
*Attorney for Plaintiff State of Oregon*

*/s/ Joseph S. Betsko*
Joseph S. Betsko (admitted *pro hac vice*)
Assistant Chief Deputy Attorney General
Antitrust Section
Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
Telephone: (717) 787-4530
Email: jbetsko@attorneygeneral.gov
*Attorney for Plaintiff Commonwealth of*
*Pennsylvania*
*/s/ Paul T.J. Meosky*
Paul T.J. Meosky (admitted *pro hac vice*)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400, ext. 2064
Fax: (401) 222-2995
Email: pmeosky@riag.ri.gov
*Attorney for Plaintiff State of Rhode Island*
*/s/ Jared Q. Libet*
Jared Q. Libet (admitted *pro hac vice*)
Assistant Deputy Attorney General
Office of the Attorney General of South
Carolina
P.O. Box 11549
Columbia, South Carolina 29211
Telephone: (803) 734-5251
Email: jlibet@scag.gov
*Attorney for Plaintiff State of South Carolina*
*/s/ Bret Leigh Nance*
Bret Leigh Nance (admitted *pro hac vice*)
Assistant Attorney General
1302 E. Hwy 14, Suite 1
Pierre SD 57501-8501
Email: bretleigh.nance@state.sd.us
Telephone: (605) 773-3215
Bar # 5613
*Attorney for Plaintiff State of South Dakota*
*/s/ Hamilton Millwee*
Hamilton Millwee (admitted *pro hac vice*)
Assistant Attorney General
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 38202
Telephone: (615) 291-5922
Email: Hamilton.Millwee@ag.tn.gov
*Attorney for Plaintiff State of Tennessee*

*/s/ Diamante Smith*
Diamante Smith (admitted *pro hac vice*)
Assistant Attorney General, Antitrust Division
Office of the Attorney General of Texas
P.O. Box 12548
Austin, TX 78711-2548
Telephone: (512) 936-1162
*Attorney for Plaintiff State of Texas*
*/s/ Marie W.L. Martin*
Marie W.L. Martin (admitted *pro hac vice*)
Deputy Division Director,
Antitrust & Data Privacy Division
Utah Office of Attorney General
160 East 300 South, 5th Floor
P.O. Box 140830
Salt Lake City, UT 84114-0830
Telephone: 801-366-0375
Email: mwmartin@agutah.gov
*Attorney for Plaintiff State of Utah*

*/s/ Sarah L. J. Aceves*
Sarah L. J. Aceves (admitted *pro hac vice*)
Assistant Attorney General
Consumer Protection and Antitrust Unit
Vermont Attorney General's Office
109 State Street
Montpelier, VT 05609
Telephone: (802) 828-3170
Email: sarah.aceves@vermont.gov
*Attorney for Plaintiff State of Vermont*
*/s/ David C. Smith*
David C. Smith (admitted *pro hac vice*)
Assistant Attorney General
Office of the Attorney General of Virginia
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 692-0588
Facsimile: (804) 786-0122
Email: dsmith@oag.state.va.us
*Attorney for Plaintiff Commonwealth of Virginia*
*/s/ Ashley A. Locke*
Ashley A. Locke (admitted *pro hac vice*)
Assistant Attorney General
Antitrust Division
Washington Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
Telephone: (206) 389-2420
Email: Ashley.Locke@atg.wa.gov
*Attorney for Plaintiff State of Washington*

*/s/ Douglas L. Davis*
Douglas L. Davis (admitted *pro hac vice*)
Senior Assistant Attorney General
Consumer Protection and Antitrust Section
West Virginia Office of Attorney General
P.O. Box 1789
Charleston, WV 25326
Telephone: (304) 558-8986
Fax: (304) 558-0184
Email: douglas.l.davis@wvago.gov
*Attorney for Plaintiff State of West Virginia*
*/s/ Caitlin M. Madden*
Caitlin M. Madden (admitted *pro hac vice*)
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
Telephone: (608) 267-1311
Email: caitlin.madden@wisdoj.gov
*Attorney for Plaintiff State of Wisconsin*
*/s/ William T. Young*
William T. Young
Assistant Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
Telephone: (307) 777-7847
Email: william.young@wyo,gov
*Attorney for the Plaintiff State of Wyoming*

## Certificate of Compliance

In accordance with Local Civil Rule 7.1(c), and Rule 8(c) of this Court's Individual Practices in Civil Cases, I certify that the word count of this memorandum of law is 12,956 words, which includes footnotes but excludes the caption, any index, table of contents, table of authorities, signature blocks, or any certificates. This certificate is made in reliance on the word count of the word-processing program used to prepare the document.

*/s/ Lorraine Van Kirk*
LORRAINE VAN KIRK

*Attorney for Plaintiff United States of America*