UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES OF AMERICA, et al., | Case No. 1:24-cv-03973-AS-SLC |
| Plaintiffs, | **ORAL ARGUMENT REQUESTED** |
| v. | **REDACTED** |
| LIVE NATION ENTERTAINMENT, INC., and TICKETMASTER L.L.C., | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO EXCLUDE THE REPORTS, OPINIONS, AND TESTIMONY OF DR.
SHANNON ANDERSON**

December 8, 2025

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 3

LEGAL STANDARD ......................................................................................................... 5

ARGUMENT ...................................................................................................................... 6

I.  DR. ANDERSON WILL PROVIDE RELEVANT AND RELIABLE TESTIMONY ON
    LIVE NATION'S INTERNAL ACCOUNTING PRACTICES AND INFORMATION ..... 7

    A.  Dr. Anderson Appropriately Analyzed Live Nation's Internal Accounting Practices
        and Information ...................................................................................................... 7

    B.  Defendants Arguments to Exclude This Testimony Fail ............................................ 9

II.  DR. ANDERSON WILL PROVIDE RELEVANT AND RELIABLE TESTIMONY ON
    LIVE NATION'S PUBLICLY REPORTED ACCOUNTING INFORMATION .............. 11

    A.  Dr. Anderson Appropriately Analyzed Live Nation's Publicly Reported Accounting
        Information ............................................................................................................ 11

    B.  Defendants' Arguments to Exclude This Testimony Fail ......................................... 12

III. DR. ANDERSON'S TESTIMONY WILL PROVIDE CRITICAL CONTEXT FOR
     MR. MEYER'S MISLEADING ANALYSIS .................................................................... 16

IV. DR. ANDERSON WILL PROVIDE RELEVANT AND RELIABLE TESTIONY ON
    THE LIMITATIONS OF LIVE NATION'S ACCOUNTING DATA ................................ 20

CONCLUSION ................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adesina v. Aladan Corp.*,
   438 F. Supp. 2d 329 (S.D.N.Y. 2006)........................................................................................ 23

*Auto Konnect, LLC v. BMW of N. Am., LLC*,
   590 F. Supp. 3d 977 (E.D. Mich. 2022) ................................................................................... 14

*Blue Cross & Blue Shield v. Marshfield Clinic*,
   65 F. 3d 1406 (7th Cir. 1995) .................................................................................................. 22

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579, (1993) ........................................................................................................... 6, 23

*Deutsch v. Novartis Pharms. Corp.*,
   768 F. Supp. 2d 420 (E.D.N.Y. 2011)........................................................................................ 6

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
   MDL No. 1358, M21-88, 2008 WL 1971538 (S.D.N.Y. May 7, 2008) .................................. 14

*In re Mirena IUD Prods. Liab. Litig.*,
   169 F. Supp. 3d 396 (S.D.N.Y. 2016)...................................................................................... 22

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
   638 F. Supp. 3d 227 (E.D.N.Y. 2022) ..................................................................................... 19

*In re Zyprexa Products Liability Litigation*,
   489 F. Supp. 2d 230 (E.D.N.Y. 2007) ..................................................................................... 14

*Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*,
   No. 04 Civ. 7369, 2006 WL 2128785 (S.D.N.Y. July 28, 2006)........................................ 5, 19

*Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC* ,
   No. 16-CV-1318 (GBD) (BCM), 2021 WL 4810266 (S.D.N.Y. Sept. 30, 2021) .................... 19

*Kodak Graphic Commc'ns Canada Co. v. E.I. Du Pont De Nemours & Co.*,
   640 F. App'x 36 (2d Cir. 2016) .............................................................................................. 10

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) .................................................................................................................. 6

*McCullock v. H.B. Fuller Co.*,
   61 F.3d 1038 (2d Cir. 1995) ......................................................................................... 5, 14, 22

*Telerate Sys., Inc. v. Caro,*
    689 F. Supp. 221 (S.D.N.Y. 1988)............................................................................................ 22

*United States v. Brown,*
    776 F.2d 397 (2d Cir. 1985) ...................................................................................................... 5

*United States v. Diaz,*
    878 F.2d 608 (2d Cir. 1989) .................................................................................................... 10

*United States v. Joseph,*
    542 F.3d 13 (2d Cir. 2008) ........................................................................................................ 5

*United States v. Majors,*
    196 F.3d 1206 (11th Cir. 1999) ............................................................................................... 14

*United States v. Ulbricht,*
    No. 4-CR-68, 2015 WL 413318 (S.D.N.Y. Feb. 1, 2015)........................................................ 5

*Washington v. Kellwood Co.,*
    105 F. Supp.3d 293 (S.D.N.Y. 2015).............................................................................. 5, 6, 19

## Rules

Fed. R. Evid. 702 ................................................................................................................ 5, 6, 14

Plaintiffs respectfully submit this memorandum in opposition to Defendants' motion to exclude the reports, opinions, and testimony of Dr. Shannon Anderson. Dr. Anderson is well qualified to provide relevant and reliable testimony regarding her analysis of Live Nation's complex accounting practices and information. Her reports, opinions, and testimony are well within the bounds of Federal Rules of Evidence 702 and 403. Accordingly, the motion should be denied.

## **INTRODUCTION**

Live Nation's profits exceeded one billion dollars in the United States last year.[1] Each time a fan buys a ticket, Ticketmaster makes on average between five and eight dollars in contribution margin from the sale of that ticket.[2] Each time a fan attends a concert at a Live Nation amphitheater, Live Nation makes on average more than twenty-seven dollars in contribution margin from that fan's attendance.[3] Live Nation CEO Michael Rapino has publicly boasted about the "high margins" of Live Nation's ticketing business, its sponsorship business, its onsite sales business, and its amphitheater business.[4]

Yet apparently, Live Nation plans to build its defense on a claim that its profitability level somehow *disproves* that it is a monopolist. This defense rests primarily on a single accounting

---

[1] Ex. 1, Expert Report of Shannon Anderson, 1 August 2025, Exhibit 3 at 2 (reporting $▮ billion in adjusted operating income in 2024).

[2] *See* Ex. 7, LNE-LIT24-006449579, at -839 (reporting global CM per ticket of $▮ in 2022, $▮ in 2023, and $▮ in 2024); Ex. 8, LNE-LIT24-001688269, at -279 (reporting United States CM per ticket of $▮ in 2023 and $▮ in 2024); Ex. 1 ¶ 77 (describing Live Nation's use of CM to assess performance).

[3] *See* Ex. 7 at -744 (reporting United States CM per fan of $▮ at Live Nation owned-and-operated amphitheaters in 2024 and forecasting that this number will grow to $▮ in 2025); Ex. 1 ¶ 85 (describing Live Nation's use of per-fan metrics to assess performance); Ex. 2, Rebuttal Expert Report of Shannon Anderson, 9 October 2025, ¶ 118 (calculating per-fan profitability metrics for Live Nation owned-and-operated amphitheaters).

[4] Ex. 9, Transcript, Michael Rapino CNBC Interview with David Faber, 14 November 2018, at 10:2–9 ("We've always looked at that as our competitive advantage; scale our content, and it feeds our three high margin businesses. Sponsorship, 70 percent margin business; ticketing, a 20-plus margin business, and on-site, which is a 20-plus margin business."); Ex. 10, S&P Global, Live Nation Entertainment, Inc. Analyst/Investor Day, 5 November 2025, at 12 (describing Live Nation's amphitheaters as "high-margin venues").

metric—the company-wide operating margin (measured as a percentage of revenue) that Live Nation publicly reports in its SEC filings. But Live Nation's own leadership has repeatedly explained that this is not an appropriate metric for analyzing its promotions business, which accounts for a large part of the company. And in any event, it is well established that monopoly power does not turn on a narrow assessment of company-wide operating margins, which can vary based on accounting treatment and do not measure Live Nation's economic performance in any relevant market.

Against this backdrop, Plaintiffs intend to proffer the testimony of Dr. Shannon Anderson, a widely recognized accounting professor and researcher who taught courses at leading business schools for approximately thirty years and serves as the co-author of a leading accounting textbook. Dr. Anderson has analyzed Live Nation's publicly reported accounting information, its internal accounting information, and ordinary-course materials that provide further context for this information. Dr. Anderson found that, internally, Live Nation's executives rely on "more granular management accounting information to evaluate the performance of the company and its component parts, rather than relying solely on publicly reported financial information," Ex. 1 ¶ 76, and that they track "certain internal performance metrics that are not required to be reported publicly in [] financial statements." Ex. 1 ¶ 77. Dr. Anderson also found that, in the ordinary course of business, Live Nation's leadership does *not* focus on the company-wide operating margins that Defendants intend to highlight in this case. Ex. 1 ¶¶ 112–115.

Relying on her expertise, Dr. Anderson plans to testify on how Live Nation's management actually tracks and reports the performance of its relevant business lines in the ordinary course. She will explain her analysis of the information contained in Live Nation's

accounting reports and relied on by management, as well as the significance of this information in light of relevant accounting principles. This testimony will provide expert insight into Live Nation's operations that cannot be gleaned from its publicly reported financial statements alone. Thus, Dr. Anderson will offer the jury a more complete view of how Live Nation generates profits and makes decisions than Defendants wish to present.

To preserve their narrow defense, Defendants seek to exclude Dr. Anderson's testimony in its entirety. They argue that her analysis of Live Nation's internal accounting information is "irrelevant," ignoring the insight this testimony will provide into Live Nation's operations and incentives. They claim she is unqualified to provide much of her testimony despite her comprehensive training and decades of experience in the field. And they seek to prevent her from commenting on their own accounting expert's work, which would enable him to present misleading information without appropriate context or critique. Because the Federal Rules of Evidence do not support imposing such blinders on the jury, Defendants' motion should be denied.

## BACKGROUND

For more than three decades, Dr. Anderson taught accounting courses and performed accounting research at leading universities in the United States and across the world, including the University of Michigan's Ross School of Business (1992 to 2001); Rice University's Jesse H. Jones Graduate School of Business (2001 to 2010); the University of Melbourne (various visiting positions from 2004 to 2013); and the University of California, Davis, Graduate School of Management (2010 to 2022). Ex. 1 ¶ 3. Since taking emerita status, Dr. Anderson has taught a graduate course at the University of Canterbury (2024), led research workshops for faculty at the University of New South Wales (2024), published a new edition of her textbook (2025), been a

speaker at a national research conference on management accounting (2025), and continued to conduct research on cost management practices. Ex. 1 ¶ 3.

Dr. Anderson's research focuses on managerial accounting and typically includes statistical analysis of archival accounting and operational data, collecting and analyzing survey data, and conducting interviews with key employees. Ex. 1 ¶¶ 4–5. Her research has been published in influential journals, books, and monographs and has received numerous awards, including the highest honor from the American Accounting Association—the Notable Contribution to Accounting Literature Award. Ex. 1 ¶ 5. She is the co-author of a cost accounting textbook— *Fundamentals of Cost Accounting*—which is now in its eighth edition. Ex. 1 ¶ 5.

Plaintiffs retained Dr. Anderson to "review and analyze Live Nation's internal and public accounting information in order to understand and assess how Live Nation determines the revenues and profitability of its reported business segments, internal business lines, and relevant components of the business." Ex. 1 ¶ 1. This assignment included "[e]xplaining the differences between public financial reporting and internal management accounting principles and practices, including the different purposes for which such information typically is produced," as well as "[e]xplaining Live Nation's accounting practices for its reported business segments, internal business lines, and relevant portions of the business, and describing the resulting profitability measures." Ex. 1 ¶ 1.a–b. Her evaluation involved "[a]nalyzing examples of Live Nation's internal accounting practices in relation to public financial reporting and their effects on resulting profitability measures reported publicly by Live Nation," and "[a]nalyzing examples of how Live Nation determines the revenues and costs recognized in or allocated to specific reported business segments, business lines and relevant portions of the business, and their effects on resulting

4

publicly reported profitability measures for Live Nation and reported business segments." Ex. 1 ¶ 1.b.ii–iii.

Dr. Anderson performed this analysis, and Plaintiffs served her opening report on August 1, 2025. *See* Ex. 1. On October 9, 2025, Plaintiffs served Dr. Anderson's rebuttal report, which included responses to Defendants' accounting expert Paul K. Meyer. *See* Ex. 2.

## **LEGAL STANDARD**

To offer expert testimony, a witness must first be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Courts in the Second Circuit construe these qualification requirements in consideration of the "'liberal thrust' of the Federal Rules and their general relaxation of traditional barriers to opinion testimony." *United States v. Ulbricht*, No. 14-CR-68, 2015 WL 413318, at \*7 (S.D.N.Y. Feb. 1, 2015); *see also United States v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985) (the qualification requirements of Rule 702 "must be read in light of the liberalizing purpose of the Rule.").

Courts have noted that an expert "should not be required to satisfy an overly narrow test of his own qualifications." *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, No. 04 Civ. 7369, 2006 WL 2128785, at \*6 (S.D.N.Y. July 28, 2006) (internal citation omitted). "Quibble[s] with [an expert's] academic training" go to the "testimony's weight . . . not its admissibility," and are an appropriate subject for cross-examination. *United States v. Joseph*, 542 F.3d 13, 21–22 (2d Cir. 2008) (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995)). "[I]f the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 305, 324–25 (S.D.N.Y. 2015) (internal citation omitted). Instead, "the only matter the court should be concerned with is whether the expert's

knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth." *Id.* (internal citation omitted).

Once the expert qualification requirements have been satisfied, Rule 702 requires expert testimony that "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). When assessing the relevance of proffered testimony, courts evaluate whether the testimony "is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Id.* at 591 (internal citation omitted). For evidence to be "not only relevant, but reliable," courts consider whether the expert has "a reliable basis in the knowledge and experience of [the relevant] discipline" such that the testimony is supported by "good grounds, based on what is known." *Id.* at 589–90, 592 (internal citation omitted); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999). "[T]he law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Deutsch v. Novartis Pharms. Corp.*, 768 F. Supp. 2d 420, 426 (E.D.N.Y. 2011) (quoting *Kumho Tire Co.*, 526 U.S. at 142).

## ARGUMENT

Dr. Anderson is prepared to provide highly relevant testimony to the jury regarding Live Nation's complex accounting practices and information. Defendants seek to exclude this testimony in its entirety. In doing so, they attempt to draw a hard line between the company's internal accounting information and its publicly reported accounting information, arguing that Dr. Anderson should not be permitted to testify as to either one for different reasons. They further contend that Dr. Anderson should not be permitted to critique Mr. Meyer's analysis and

that she should not be permitted to explain the limitations of Live Nation's accounting data. For the reasons discussed below, the Court should reject each of these arguments.[5]

## I. DR. ANDERSON WILL PROVIDE RELEVANT AND RELIABLE TESTIMONY ON LIVE NATION'S INTERNAL ACCOUNTING PRACTICES AND INFORMATION

As Dr. Anderson has explained, managerial accounting and financial accounting are two complementary subfields within the accounting profession. Ex. 1 ¶ 4. Managerial accounting "provides internal accounting information to support managerial decision-making," and financial accounting "organizes publicly reported accounting data in accordance with professional accounting standards for presentation to external audiences." Ex. 1 ¶ 4. Accordingly, managerial accounting "supplements reported financial accounting, often presenting an enhanced view of company performance and its sources." Ex. 1 ¶ 4.

In their motion, Defendants attempt to prevent Dr. Anderson from providing such an "enhanced view" by seeking to exclude her testimony on Live Nation's internal accounting practices and information. The court should reject this effort.

### A. Dr. Anderson Appropriately Analyzed Live Nation's Internal Accounting Practices and Information

Dr. Anderson found that "Live Nation's internal management accounting looks at lower levels of [c]ompany and segment operations to provide managers with more granular financial information" than what the company reports in its public filings. Ex. 1 ¶ 75. She also found that Live Nation "tracks certain internal performance metrics that are not required to be reported publicly in its financial statements," such as contribution margin, a "key metric that Live Nation

---

[5] Defendants group Dr. Anderson's opinions into four incomplete and misleadingly titled categories that Defendants designed themselves. *See* Def. Br. at 4–7 & App. A. Dr. Anderson does not use these categories, and Plaintiffs do not endorse them.

uses to assess performance" and relies on for internal decision-making purposes. Ex. 1 ¶ 77; Ex. 2 ¶ 142. Dr. Anderson identified the metrics that Live Nation tracks internally for each of its business lines, analyzed these metrics, and assessed the purposes for which management uses them. Ex. 1 ¶¶ 75–89.

Dr. Anderson also relied on her expertise to interpret the significance of how Live Nation chooses to track and evaluate its performance in the ordinary course. Based on her analysis of Live Nation's internal reports and executive compensation plans, she found that the company often focuses on profit levels (measured in *dollars*) rather than on profit margins (measured as a *percentage* of revenue), particularly for purposes of its promotions business. Ex. 1 ¶¶ 112–115. As Dr. Anderson explains, this is significant because, "[i]n managerial accounting, firms commonly focus on profit levels when the business strategy turns on achieving scale, high volume and market share, while profit margins are more commonly emphasized when competitive advantage turns on operational efficiency in relation to pricing." Ex. 1 ¶ 14.c.

In addition, Dr. Anderson analyzed how Live Nation's "accounting determinations for the treatment of certain costs can meaningfully impact calculated profit margins that are relevant for performance evaluation." Ex. 1 ¶ 14.d.[6] For example, she analyzed the impact of Live Nation's accounting treatment of credit card fees, which account for the majority of the variable expenses that Live Nation attributes to its ticketing business. Ex. 1 ¶¶ 116–120. She found that Live Nation recognizes internally that these fees are ▮▮▮▮▮▮▮▮▮▮▮" (as they are collected from fans and forwarded to the credit card processing vendor) and that Live Nation thus computes ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. 1

---

[6] Defendants characterize this as a "Financial Reporting Opinion" in their motion (Def. Br. at 5), but for purposes of this analysis, Dr. Anderson relied largely on internal evidence that cannot be found in Live Nation's public financial reports.

¶¶ 118–120; Ex. 2 ¶¶ 128–131.  Accordingly, she assessed and presented how treating credit card fees in this alternative way would impact the calculation of profit margins for Live Nation's ticketing business.  Ex. 1 ¶¶ 116–120.

Similarly, Dr. Anderson assessed Live Nation's accounting treatment of artists' share of event revenue at Live Nation-promoted shows.  Ex. 1 ¶¶ 121–126.  She found that "Live Nation records artists' share of ticketing event revenue as segment revenue, despite artists ultimately controlling ticket prices and driving 'nearly all commercial value and . . . receiv[ing] the majority of all ticketing revenue.'"  Ex. 1 ¶ 14.d.  Live Nation then "deducts the portion of event [] revenues that are paid out — or passed through — to artists" as expenses to Live Nation.  Ex. 1 ¶ 122.  As Dr. Anderson explains, Live Nation CEO Michael Rapino has acknowledged that the company considers this portion of its revenues to be "flow-through" and that its profit margins can appear lower due to the accounting treatment of these revenues.  *See* Ex. 11, Transcript, Michael Rapino CNBC Interview with Michael Eisner, 23 December 2008, at 4:19–5:6; Ex. 2 ¶ 133.  Dr. Anderson assessed how this accounting treatment impacts the calculation of profit margins for Live Nation's promotions business relative to an alternative treatment.  Ex. 1 ¶¶ 121–126.

### B. Defendants Arguments to Exclude This Testimony Fail

Defendants appear to agree that Dr. Anderson possesses expertise in managerial accounting.  Def. Br. at 9, 13.  Nevertheless, they seek to exclude her testimony on Live Nation's internal accounting practices and information for three reasons: (1) they believe Dr. Anderson acts "solely as a mouthpiece for documents and testimony," (2) they believe that Live Nation's internal accounting practices and information are "irrelevant," and (3) they believe Dr. Anderson's testimony on these points would "create[] a risk of prejudice and confusing the jury." Def. Br. § II.C.  None of these arguments provides a basis for exclusion.

*First*, in analyzing and explaining this evidence, Dr. Anderson does not act "solely as a mouthpiece." Live Nation's internal accounting reports often total hundreds of pages and are filled with complex and interrelated metrics that reflect the impact of discretionary accounting decisions. *See, e.g.*, Ex. 7. There is no reason to believe that jurors will possess an accounting background, and they should not be left to navigate this information on their own. Dr. Anderson's expertise is perfectly suited to analyzing this information, as she has done, and helping the jury understand its significance. *See Kodak Graphic Commc'ns Canada Co. v. E.I. Du Pont De Nemours & Co.*, 640 F. App'x 36, 40 (2d Cir. 2016) (upholding the district court's determination that "expert testimony could help the jury understand the provenance and significance of [net present value] numbers in DuPont's internal documents") (citing *United States v. Diaz*, 878 F.2d 608, 617–18 (2d Cir. 1989) (upholding admission of expert testimony that "provided interpretation of the financial records")).

*Second*, Live Nation's internal accounting practices and information are highly relevant. As Dr. Anderson has explained, "[m]anagement accounting and the questions that managers ask reveal a lot about the strategy of the firm, about how the different components work together to deliver the firm performance, and so it's very revealing about the business model of the firm and how well it's working." Ex. 3, Deposition of Shannon Anderson, 2 November 2025, at 96:18–97:13; *see also* Ex. 3 at 97:15–98:2 ("[F]rom my perspective, understanding how managers run the business is an important foundation for understanding Live Nation and its business model."). In light of this testimony, Defendants' claim that "Dr. Anderson concedes that the entire field of management accounting is irrelevant here" is wrong. *See* Def. Br. at 21. Defendants may wish to limit the jury to a few select accounting metrics from their public financial statements, but internally, Live Nation uses a much wider base of information to evaluate and manage its

business. Dr. Anderson's analysis of this information provides insight into Live Nation's goals, priorities, and incentives.

*Third*, Defendants contend that "[s]uggesting that Live Nation management is focused on various metrics beyond those reported in Live Nation's GAAP-compliant financial reporting would mislead the jury into thinking those financial reports or the metrics reported therein are unreliable or that management is doing something to hide what really matters or what is really going on in those financial reports." Def. Br. at 21. Not so. Dr. Anderson has clearly explained that she is not suggesting that Live Nation's management is intentionally "hiding" something. Ex. 3 at 125:24–126:9. Rather, much of the information in Live Nation's internal accounting reports cannot be found in its publicly reported financial statements because it is not required by GAAP. *See* Ex. 3 at 126:14–127:6. Dr. Anderson's testimony regarding her analysis of this additional information will not prejudice the jury, as Defendants suggest, but will provide them insight into how Live Nation makes decisions relevant to this case.

## II.    DR. ANDERSON WILL PROVIDE RELEVANT AND RELIABLE TESTIMONY ON LIVE NATION'S PUBLICLY REPORTED ACCOUNTING INFORMATION

Defendants also seek to prevent Dr. Anderson from providing testimony on Live Nation's publicly reported financial information, which they suggest is an entirely distinct category (even though many metrics in Live Nation's public financial statements also appear in its internal managerial reports). While Defendants offer different arguments with respect to this information, these arguments fare no better.

### A.    Dr. Anderson Appropriately Analyzed Live Nation's Publicly Reported Accounting Information

Dr. Anderson explains that, for purposes of its public reporting, Live Nation divides its business into three segments—Ticketing, Concerts, and Sponsorship & Advertising. Ex. 1 ¶¶

20–28. She analyzed the information that Live Nation reports on each of these segments and evaluated the similarities and differences between this information and Live Nation's internal accounting information. Ex. 1 ¶¶ 66–89. Live Nation's publicly reported information includes a profitability measure called adjusted operating income ("AOI"), which Live Nation also tracks internally. Ex. 1 ¶ 66, ¶ 81 n.155, ¶ 84 n.161, ¶ 88. As Dr. Anderson explains, while Live Nation includes AOI in its public financial statements, this metric was designed by the company and is not defined by GAAP. Ex. 1 ¶¶ 110–111.

Dr. Anderson also explains that Live Nation's publicly reported accounting information is shaped by managerial discretion. This includes discretion that Live Nation's managers exercise in defining the company's reported segments, as well as the manner in which they choose to attribute profits to these segments. Ex. 1 ¶ 14.a–b. Dr. Anderson provides examples of how these discretionary choices can lead to aggregations of data that do not allow for observation of a particular set of business activities, Ex. 1 ¶¶ 91–108, strengthening the rationale for supplementing the record with more granular internal accounting information. Dr. Anderson clearly explains that she is not questioning Live Nation's compliance with GAAP. *See* Ex. 1 ¶ 120 n.258, ¶ 124 n.272, ¶ 126; Ex. 2 ¶ 11.f.i, ¶ 132 n.290, ¶ 133.

### B. Defendants' Arguments to Exclude This Testimony Fail

Defendants argue that Dr. Anderson should not be permitted to testify on Live Nation's publicly reported accounting information for two reasons: (1) they believe she is unqualified because she has specialized in managerial accounting rather than financial accounting, and (2) they believe this testimony would "imply impropriety" in Live Nation's accounting practices and would therefore be prejudicial. Def. Br. § II.B. The Court should reject both arguments.

*First*, Dr. Anderson is well qualified to provide this testimony. As she explained in her deposition, "[t]o be able to teach in any part of accounting, there's a base level of knowledge that

12

financial account[ant]s [have] of managerial accounting and that managerial account[ants] have of financial accounting." Ex. 3 at 76:16–77:1. Although she has specialized in managerial accounting, Dr. Anderson's training includes coursework in both areas, Ex. 3 at 76:16–77:1, including graduate-level courses in financial statement analysis. In any event, managerial accounting and financial accounting "are not completely divorced" but rather "meet in the middle." Ex. 3 at 95:12–25. The same data from the general ledger is used for both managerial and financial accounting purposes, and cost accounting—the topic of Dr. Anderson's textbook— has the "closest interaction with financial accounting," as it addresses how companies determine product costs for both managerial and GAAP-compliant reports. Ex. 3 at 74:6–76:13, 77:13– 78:4, 163:10–24; Ex. 1 ¶ 47.a.

Moreover, interpreting profitability metrics involves a common skillset regardless of whether those metrics appear in an internal management report or in a publicly reported financial statement. For example, Dr. Anderson analyzed Live Nation's data regarding AOI, a non-GAAP measure of profitability that Live Nation tracks in both its internal management reports and its publicly reported financial statements. *See, e.g.*, Ex. 1 ¶¶ 66–89, 110–115; Ex. 2 ¶¶ 139–143. The fact that Live Nation includes this figure in its financial statements does not somehow remove it from the scope of Dr. Anderson's expertise.

To be sure, Dr. Anderson transparently explained that she is not an auditor or an expert on technical GAAP compliance issues, Ex. 3 at 77:2–78:19, but such expertise is not required for the opinions she is offering. Dr. Anderson is "not questioning [Live Nation's] GAAP compliant disclosures or financial statements in any manner" and has "made no independent assessment of [their] compliance." Ex. 3 at 85:17–86:6. Defendants acknowledge this. Def. Br. at 2–3. Yet they suggest that because Live Nation's publicly reported accounting information is prepared *in*

*accordance with* GAAP, Dr. Anderson should not be permitted to testify on its *contents*. Def. Br. at 3. Given Dr. Anderson's comprehensive accounting education and decades of experience in the field, that conclusion simply does not follow.

Under Rule 702, experts may testify "as to matters within their general expertise" even in cases where they "lack qualifications as to certain technical matters within that field." *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, MDL No. 1358, M21-88, 2008 WL 1971538, at *6 (S.D.N.Y. May 7, 2008). Here, Dr. Anderson possesses training, experience, and expertise that is more than sufficient to support each of the opinions she offers. If Defendants wish to call her qualifications into question because she has specialized in managerial accounting, they may do so on cross examination. *See In re Zyprexa Products Liability Litigation*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) ("Assertions that the witness lacks particular educational or other experiential background, 'go to the weight, not the admissibility, of [the] testimony.'") (quoting *McCullock*, 61 F.3d at 1044).[7]

*Second*, Defendants claim that Dr. Anderson accuses Live Nation of "engaging in nefarious conduct" and suggests its financial reports "cannot be trusted." Def. Br. at 3–4, 18–19.

---

[7] Likewise, the Court should reject Defendants' claim that Dr. Anderson's testimony should be excluded because she (like many accounting professors) does not hold a CPA license. Def. Br. at 10. Courts routinely admit testimony on accounting topics from experts who do not hold this license, so long as they possess other sufficient qualifications. *See, e.g., United States v. Majors*, 196 F.3d 1206, 1215 (11th Cir. 1999) (affirming district court determination that expert could testify on his analysis of financial records despite lack of CPA license because "[b]y virtue of training and experience, he possessed special knowledge and skill not available to the ordinary witness"); *Auto Konnect, LLC v. BMW of N. Am., LLC*, 590 F. Supp. 3d 977, 986 (E.D. Mich. 2022) (rejecting claim that expert was unqualified "because he is not a CPA, a certified business valuation analyst or member of a nationally accredited professional valuation guild," as the expert had "the education and experience to assist the jury"). Nor should Dr. Anderson's testimony be excluded because she worked with a support team, as virtually all experts do (including each of Defendants' experts in this case). Def. Br. at 10. When Defendants asked Dr. Anderson about her communications with this team in her deposition, she explained that an individual on the team had assisted her with research on topics such as recent adjustments to the accounting code. Ex. 3 at 78:21–79:14. When Defendants pursued further questioning about this team member's qualifications, Dr. Anderson explained that "[n]one of my opinions required that level of sophistication and knowledge that would have gone beyond my remit"; that she "would not have pushed into that domain"; and that she "had no concerns that [the team member] was unable to help me for the level of questioning I had." *Id.* at 80:5–14.

14

She does not. Instead, Dr. Anderson explains that Live Nation "exercises significant discretion in defining reported business segments," which impacts the usefulness of these financial statements for evaluating a particular activity. Ex. 1 ¶ 14.a. For example, Dr. Anderson explains that Live Nation publicly reports profitability data for all of its concerts (at all venue types) within a single, aggregated Concerts segment. Ex. 1 ¶ 98. Therefore, relying on Live Nation's publicly reported financial statements alone would not permit one to assess the profitability of Live Nation's shows at its owned-and-operated amphitheaters. Ex. 1 ¶¶ 98–101. As Dr. Anderson explains, this is not because Live Nation is doing something "nefarious"; it is because publicly reported data is not available at this level of granularity. Ex. 1 ¶¶ 98–101; Ex. 3 at 124:17–126:9.[8]

Similarly, Dr. Anderson explains that Live Nation "employs substantial discretion in its attribution of profits to specific segments and business lines" and makes discretionary choices that impact the reported profitability of each category. Ex. 1 ¶ 14.b. For example, she describes a 2022 change to Live Nation's internal accounting policies that ███████████████████████████

████████████████████████████████████████████

█████████████████████████████████████. Ex. 1 ¶ 104.c (citing Ex. 12, LNE22-000630996, at -996–997). While Dr. Anderson does not claim this change violated GAAP, she explains that this is "a clear example of how Live Nation can, at its discretion, change where profits are reported amongst its segments and business lines." Ex. 1 ¶

---

[8] Likewise, Dr. Anderson explains that, while "GAAP principles are established with an aim of achieving objective, consistent and verifiable representation," users of GAAP-compliant information recognize this information "can fall short of that aim in many ways." Ex. 2 ¶ 134. Defendants view this as "a baseless backdoor attack on the integrity of audited financial reports." Def. Br. at 18–19. But as Dr. Anderson explained in her deposition, this is a "widely held view" that is "well covered" in both accounting coursework and in the accounting profession. Ex. 3 at 109:17–110:4. Dr. Anderson is not "attack[ing]" GAAP as Defendants claim but rather explaining why one may wish to supplement public financial reports with more granular internal accounting information.

104.c.  If one were to rely solely on Live Nation's publicly reported financial statements, one's view would be impacted by discretionary choices like these.

Dr. Anderson's testimony on these points will contextualize Live Nation's publicly reported accounting information and highlight the importance of supplementing it with more granular internal information.  Providing this context would not "inflame" the jury.

## III.  DR. ANDERSON'S TESTIMONY WILL PROVIDE CRITICAL CONTEXT FOR MR. MEYER'S MISLEADING ANALYSIS

Defendants also seek to prevent Dr. Anderson from critiquing the work of their own proffered accounting expert, Mr. Meyer.  In her rebuttal report, Dr. Anderson identified numerous errors in Mr. Meyer's analysis and found that, in many cases, it departs from Live Nation's own ordinary-course accounting practices.  Defendants focus their attacks on Dr. Anderson's critiques of three parts of Mr. Meyer's analysis: (1) his treatment of the years that Live Nation's business was impacted by COVID-19, (2) his incongruent comparisons between Live Nation's profit margins and those of other firms, and (3) his evaluation of the profitability of Live Nation's amphitheaters.  Def. Br. § II.D.[9]  Contrary to Defendants' claim that "none of [this] is based on management accounting," Def. Br. at 22, Dr. Anderson's critiques illustrate the importance of looking beyond the surface level and understanding how a company operates in the ordinary course.

*First*, Mr. Meyer plans to show the jury average profitability figures for Live Nation that *include* the years that the concert business was severely disrupted by COVID-19.  For example, he plans to present tables displaying the company's average operating margin, for the period

---

[9] Defendants also take issue with Dr. Anderson's explanation that Mr. Meyer's accounting metrics do not measure Live Nation's economic profits, which is addressed by Section IV below.

from 2014 through 2025, *without* adjusting for the fact that music venues completely shut down for much of 2020 and 2021.[10] He also plans to present tables displaying average results for Live Nation's amphitheaters over this period without making such adjustments.[11] Mr. Meyer believes it is appropriate to present average figures that include these years because "[e]xtraordinary events that impact large, public gatherings and discretionary consumer and corporate spending are inherent risks in the live entertainment industry," though in his deposition, he could not identify a single other event that has come close to rivaling the impact of COVID-19 on the concert business. Ex. 4 ¶ 183; Ex. 6, Deposition of Paul K. Meyer, 5 November 2025, at 127:4–128:22. Contrary to Defendants' suggestion (Def. Br. at 23), the fact that Mr. Meyer *also* includes calculations excluding 2020 and 2021 does not eliminate the fact that he offers this opinion and that he chose to include these tables in his reports (and therefore in his potential testimony).

Dr. Anderson reviewed the record and found that Mr. Meyer's approach conflicts with how Live Nation analyzes its own profitability in the ordinary course. Specifically, she found that "Mr. Meyer's conclusion conflicts with Live Nation's practice of assessing and presenting profits and profitability excluding years impacted by COVID-19 in both its internal management accounting analyses and its external investor communications." Ex. 2 ¶ 61. This suggests Live Nation believes that excluding these years provides more insight into the company's operations and its potential future performance. Ex. 2 ¶ 61. Accordingly, Dr. Anderson's presentation of Live Nation's average profitability excludes these years, consistent with Live Nation's practice.

---

[10] *See* Ex. 4, Expert Report of Paul K. Meyer, 16 September 2025, Table 5 & ¶ 183 (reporting a weighted average company-wide operating margin of 1.7% for the 2015 to 2024 period), Table 10 & ¶ 199 (reporting a weighted average U.S. operating margin of ▮% for the 2015 to 2024 period).

[11] *See* Ex. 4, Tables 12–14 (reporting average results for Live Nation amphitheaters for the 2015 to 2024 period).

Ex. 1, Tables 3, 6, 8. The jury is entitled to hear from Dr. Anderson so it can properly assess this issue.

Live Nation claims that Dr. Anderson should not be permitted to offer this opinion because it "does not implicate management accounting expertise." Def. Br. at 23. To the contrary, Mr. Meyer's plan to present average figures heavily weighed down by COVID-19 confirms the importance of carefully analyzing the company's ordinary-course accounting practices to understand what is truly informative. *See* Ex. 3 at 205:19–206:14 (explaining that "empiricists know that they need to be very, very careful of outliers in data" and that Mr. Meyer's "inclusion of outliers in a piece of analysis, potentially giving the reader the expectation that that's normal" is "highly suspect").

*Second*, Mr. Meyer purports to compare Live Nation's profit margins to those of what he describes as "industry participants in concert promotions, venue operations and ticketing." Ex. 4 ¶¶ 220–229. Dr. Anderson performed an in-depth analysis of these comparisons and found they are riddled with errors. Ex. 2 ¶¶ 75–99. For example, Dr. Anderson found that Mr. Meyer repeatedly compared one accounting metric for Live Nation with a *different* accounting metric for other companies. Ex. 2 ¶¶ 81–82, 94–95. In another instance, she found that Mr. Meyer's calculations exclude a particular line of business for Live Nation while including the very same line of business for one of his comparator firms. Ex. 2 ¶ 78. And throughout this analysis, Dr. Anderson found that Mr. Meyer uncritically compared companies across different lines of business, and across entirely different countries, without adjusting at all for these differences. Ex. 2 ¶¶ 78–79, 90–91.

Given that Mr. Meyer failed to meaningfully correct these errors after Dr. Anderson identified them, it is unsurprising that Live Nation seeks to exclude them from the jury's

consideration.  Defendants argue that Dr. Anderson should not be permitted to critique this work because they believe it falls within "financial accounting," Def. Br. at 9, 24, but Dr. Anderson is well qualified to analyze and compare profitability data regardless of whether Mr. Meyer obtained it from internal accounting information or publicly reported accounting information. Defendants also suggest that Dr. Anderson's analysis of these comparisons is no more than a "lay critique" (Def. Br. at 3, 24), but this argument is baseless.  Jurors should not be left to fend for themselves in the face of misleading comparator sets, incongruent accounting metrics, and flawed calculations.

There is no basis in the caselaw for Defendants' proposed formalism.  *See Johnson & Johnson*, 2006 WL 2128785, at *5–6 (rejecting "overly narrow test[s]" of an expert's qualifications). Even in cases where an expert "lacks expertise in the specialized areas that are directly pertinent" (which Dr. Anderson does not), courts nevertheless admit testimony when "the expert has educational and experiential qualifications in a general field closely related to the subject matter in question." *Washington*, 105 F. Supp. 3d at 305, 324–325.

Nor is Dr. Anderson's critique of this analysis an improper assessment of Mr. Meyer's "credibility" as Defendants claim.  In support of this argument, Defendants cite *Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, a case about an expert who "vouch[ed] for" the credibility of affidavits submitted by personnel from the law firm that had hired him. No. 16-CV-1318 (GBD) (BCM), 2021 WL 4810266, at *21 (S.D.N.Y. Sept. 30, 2021).  This is far afield from the common practice of an expert analyzing the opposing expert's work, as Dr. Anderson has done.  *See, e.g., In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 638 F. Supp. 3d 227, 269–270 (E.D.N.Y. 2022) (admitting an expert's testimony to critique an opposing expert's analysis).

*Third*, Mr. Meyer attempts to calculate profit margins for Live Nation's amphitheaters, but when Dr. Anderson evaluated these calculations, she found that they are skewed by both his choice of a data source and his selective presentation of that data. Ex. 2 ¶¶ 109–121. For example, Dr. Anderson determined that Mr. Meyer's chosen dataset does not include Live Nation's profits for sponsorships that Live Nation sells at these amphitheaters, *including the naming rights for the amphitheaters themselves*. Ex. 2 ¶ 113. Mr. Meyer testified that, because Live Nation allocates these profits to its separate Sponsorship & Advertising segment in its public financial reports, he believes it would be improper to consider these profits when assessing the performance of the amphitheaters. Ex. 6 at 171:23–172:4. This is form over substance. Dr. Anderson intends to explain that, based on her review of the evidence, Live Nation unsurprisingly recognizes that its profits from the sale of sponsorships at its amphitheaters are driven by its operation of those amphitheaters, Ex. 1 ¶¶ 95–96, and that Mr. Meyer's exclusion of these profits leads him to understate the profitability of these venues. Ex. 2 ¶ 113.

Curiously, while Defendants seek to exclude Dr. Anderson's critique of Mr. Meyer's amphitheater calculations, they do not provide any independent reasons why they believe this critique should be excluded. *See* Def. Br. at 24–25 & App. A at 5 (lumping Mr. Meyer's amphitheater analysis in with his margin comparisons without additional explanation). Whatever Defendants' reason may be, Dr. Anderson's critique of this analysis lies squarely within her realm of expertise and will provide critical context for the jury.

## IV. DR. ANDERSON WILL PROVIDE RELEVANT AND RELIABLE TESTIMONY ON THE LIMITATIONS OF LIVE NATION'S ACCOUNTING DATA

Dr. Anderson also plans to testify as to the limitations of accounting data, which are well understood in the field. Defendants have indicated that they plan to rely on their accounting

profit margins as proof that they lack monopoly power. Def. Br. at 1; Ans. at 2. However, they have not explained how they believe these metrics reflect the company's economic performance in any relevant market.

In her reports, Dr. Anderson explains what is well known to accounting professionals— that "publicly reported accounting profits may not equal and are often inconsistent with economic profits." Ex. 1 § III.B. She notes that academic literature has long recognized this distinction and provided citations to that literature. Ex. 1 ¶ 57. She describes several differences between accounting profits and economic profits, including the manner in which assets are valued and opportunity costs are addressed. Ex. 1 ¶ 59. And she explains that these measures also diverge in the treatment of intangible assets, analyzing a substantial collection of evidence regarding the role of intangible assets within Live Nation. Ex. 1 ¶¶ 61–63; Ex. 2 ¶¶ 30–50.

Defendants seek to exclude Dr. Anderson's testimony on this topic for three reasons: (1) they believe Dr. Anderson is not qualified to provide this testimony, (2) they believe this testimony is "irrelevant" and not "tied to the facts," and (3) they believe this testimony would "tarnish Live Nation's publicly reported financials" and would therefore be prejudicial. Def. Br. § II.A. Each of these arguments fails.

*First*, Dr. Anderson is well qualified to testify on this topic. As she explained in her deposition, the fact that accounting profits do not measure economic profits is "foundation[al]" in accounting and part of the "base knowledge" that "both financial and managerial accountants would have." Ex. 3 at 129:2–16. Dr. Anderson views this principle as "very much part of [her] training and [her] expertise in management accounting." Ex. 3 at 157:25–158:11; *see also id.* ("accountants know that . . . conventions of GAAP drive a wedge between accounting profits and economic profits").

In addition to her training, Dr. Anderson properly relied on relevant academic literature on this topic. For example, she discusses a frequently cited article by Fisher and McGowan, which explains that "it is impossible to infer either the magnitude or direction of differences in economic rates of return from differences in accounting rates of return" and that "it is the economic rate of return which is the magnitude of interest for economic propositions," such as monopoly profits. Ex. 1 ¶ 57 & n.106. Dr. Anderson's explanation of these points is also consistent with caselaw. *See Telerate Sys., Inc. v. Caro*, 689 F. Supp. 221, 238 (S.D.N.Y. 1988) (explaining that "economic returns on capital are difficult to measure" and should not be confused with accounting profits, which are "affected by accounting conventions regarding depreciation, valuation of assets, and categorization of expenses as current or capital expenses"); *Blue Cross & Blue Shield v. Marshfield Clinic*, 65 F. 3d 1406, 1412 (7th Cir. 1995) (noting that "measured rates of return reflect accounting conventions more than they do real profits (or losses), as an economist would understand these terms").

Defendants do not seriously contest these points. Instead, they suggest that Dr. Anderson should not be permitted to rely on academic literature to supplement her own education and experience, ignoring substantial precedent to the contrary. *See, e.g.*, *McCullock*, 61 F.3d at 1043 (finding that expert testimony "easily qualifie[d] for admission under Daubert" where it was based in part on "examination of various materials and educational sources"); *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 412 (S.D.N.Y. 2016) ("Experts need not conduct studies of their own in order to opine on a topic; a review of other studies and scientific literature can be enough to qualify experts to testify and to make that proposed testimony reliable.").

*Second*, Defendants' own stated intention to rely on accounting metrics defeats their argument that Dr. Anderson's testimony is "irrelevant" and not "tied to the facts" of this case.

Def. Br. at 16. Defendants have been clear that they intend to argue that their accounting profit margins disprove that they possess monopoly power. Def. Br. at 1; Ans. at 2. Yet through this motion, they seek to shield the jury from testimony explaining that those margins do not accurately reflect Live Nation's economic performance. Defendants should not be permitted to have it both ways.

Defendants also make much of the fact that Dr. Anderson did not calculate Live Nation's economic profits, claiming that this means her opinion on the topic has "no bearing" specific to Live Nation. Def. Br. at 15. This criticism is misplaced. One does not need to perform such a calculation to explain that accounting profits and economic profits differ, which Dr. Anderson knows well based on her training and experience. Ex. 3 at 157:25–158:11. Contrary to Defendants' suggestion (and in light of their planned defense), Dr. Anderson's testimony on this point has a strong "connection to the pertinent inquiry" and will "aid the jury" in interpreting the significance of accounting metrics that Defendants intend to highlight. *See Adesina v. Aladan Corp.*, 438 F. Supp. 2d 329, 342 (S.D.N.Y. 2006) (quoting *Daubert*, 509 U.S. at 591–592).

Moreover, in explaining that "economic and accounting profits diverge [] in the treatment of intangible assets," Dr. Anderson rooted her opinion in substantial evidence regarding Live Nation's own intangible assets. Ex. 1 ¶¶ 61–63; Ex. 2 ¶¶ 30–50. For example, she explains that Live Nation's customer data "constitutes a significant intangible asset that is not reflected in historical financial reporting," discussing ordinary-course materials that indicate Live Nation ascribes significant value to its data and expects this value to grow in the future. Ex. 2 ¶¶ 32–40.[12] In addition, she explains that Live Nation "recognizes that acquiring or entering into a

---

[12] Dr. Anderson discusses materials including Ex. 13, LNE-00720421, at -421–426 (Ticketmaster "Data Priorities" presentation explaining that "[o]ur fan data is our greatest marketing asset" and that planned projects to monetize fan data would benefit Live Nation's North American Concerts, Ticketmaster, and Sponsorship business lines); Ex. 14, LNE-LIT24-003351142, at -142 (investor call prep materials stating that "AI is [] wildly important to us in that it

business relationship with a new venue can allow it to achieve synergies that provide additional value to Live Nation beyond the recorded value of the new venue," discussing ordinary-course materials that illustrate this point as well. Ex. 2 ¶¶ 41–45.[13] While Defendants believe "[t]here is no reason that Mr. Meyer should have considered intangible assets," Def. Br. at 22, Dr. Anderson will appropriately explain that these assets play an increasingly significant role in Live Nation's business and that their value is not fully captured by the company's historical accounting data.

*Third*, explaining to the jury that accounting profits are not equivalent to economic profits would not be prejudicial. Defendants recycle their criticism that Dr. Anderson's testimony would "tarnish Live Nation's publicly reported financials," Def. Br. at 17, but Dr. Anderson has repeatedly made clear that she is not offering the opinion that Live Nation has violated GAAP. Ex. 3 at 85:17–86:14. She simply explains that the accounting metrics found in the company's financial statements do not measure its economic profits. *See* Ex. 3 at 114:4–9, 115:19–25. The jury should not be forced to take Defendants' handpicked metrics on faith without an explanation of what those metrics do and do not mean.

---

increases the value of the data that passes through our systems"); and Ex. 15, LNE22-000655312 at -313 (email from Ticketmaster CFO Michael Wischer to Ticketmaster President Mark Yovich stating that "these fan insights are another opportunity we have to use our global scale to help build moat . . . no one can replicate our reach and scale").

[13] On this point, Dr. Anderson discusses materials including Ex. 16, LNE22-000680203, at -204–206 (Live Nation presentation describing the company's "[p]roactive approach to portfolio expansion" and explaining that the "[p]rimary focus is to complete the venue ladder" and "fill the gap" by owning venues of different sizes across top markets) and Ex. 17, LNE-LIT24-001467759, at -759 (Live Nation presentation outlining the "strategic rationale" for a potential venue joint venture and stating that it would "[a]ddress[] large amp market gap and [s]trengthen[] Midwest amphitheater tour routing across St. Louis Hollywood Casino, Indianapolis Ruoff and Chicago Hollywood Casino Tinley Park").

## CONCLUSION

For the foregoing reasons, Defendants' motion to exclude the reports, opinions, and testimony of Dr. Shannon Anderson should be denied.

Respectfully submitted,

*/s/ Bonny Sweeney*
**BONNY SWEENEY**
*Co-Lead Trial Counsel*
**David Dahlquist**
*Co-Lead Trial Counsel*
**Matthew Jones**
Jonathan S. Goldsmith
Zeynep Elif Aksoy
United States Department of Justice
Antitrust Division
450 Fifth Street N.W., Suite 4000
Washington, DC 20530
Telephone: (202) 725-0165
Facsimile: (202) 514-7308
Bonny.Sweeney@usdoj.gov
David.Dahlquist@usdoj.gov

*Attorneys for Plaintiff United States of America*

/s/ Robert A. Bernheim
Robert A. Bernheim (admitted *pro hac vice*)
Office of the Arizona Attorney General
Consumer Protection & Advocacy Section
2005 N. Central Avenue
Phoenix, AZ 85004
Telephone: (602) 542-3725
Fax: (602) 542-4377
Email: Robert.Bernheim@azag.gov
*Attorney for Plaintiff State of Arizona*

/s/ Amanda J. Wentz
Amanda J. Wentz (admitted *pro hac vice*)
Assistant Attorney General
Office of the Arkansas Attorney General
101 West Capitol Avenue
Little Rock, AR 72201
Telephone: (501) 682-1178
Fax: (501) 682-8118
Email: amanda.wentz@arkansasag.gov
*Attorney for Plaintiff State of Arkansas*

/s/ Brent K. Nakamura
Brent K. Nakamura (admitted *pro hac vice)*
Supervising Deputy Attorney General
Office of the Attorney General
California Department of Justice
300 South Spring Street, Suite 9200-6
Los Angeles, CA 90013
Telephone: (213) 269-6000
Email: Brent.Nakamura@doj.ca.gov
*Attorney for Plaintiff State of California*

/s/ Conor J. May
Conor J. May (admitted *pro hac vice*)
Assistant Attorney General
Antitrust Unit
Colorado Department of Law
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email: Conor.May@coag.gov
*Attorney for Plaintiff State of Colorado*

/s/ Victoria Maria Orton Field
Victoria Maria Orton Field (admitted *pro hac vice*)
Assistant Attorney General
Office of the Attorney General of Connecticut
165 Capitol Avenue
Hartford, CT 06106
Telephone: 860-808-5030
Email: victoria.field@ct.gov
*Attorney for Plaintiff State of Connecticut*

/s/ Elizabeth G. Arthur
Elizabeth G. Arthur (admitted *pro hac vice*)
Senior Assistant Attorney General
Office of the Attorney General for the District of Columbia
400 6th Street NW, 10th Floor
Washington, DC 20001
Email: Elizabeth.arthur@dc.gov
*Attorney for Plaintiff District of Columbia*

/s/ Lizabeth A. Brady
Lizabeth A. Brady
Director, Antitrust Division
Florida Office of the Attorney General
PL-01 The Capitol
Tallahassee, FL 32399-1050
Telephone: 850-414-3300
Email: Liz.Brady@myfloridalegal.com
*Attorney for Plaintiff State of Florida*

/s/ Richard S. Schultz
Richard S. Schultz (admitted *pro hac vice*)
Assistant Attorney General
Office of the Illinois Attorney General
Antitrust Bureau
115 S. LaSalle Street, Floor 23
Chicago, Illinois 60603
Telephone: (872) 272-0996
Email: Richard.Schultz@ilag.gov
*Attorney for Plaintiff State of Illinois*

/s/ Jesse Moore
Jesse Moore (admitted *pro hac vice*)
Deputy Attorney General
Office of the Indiana Attorney General
302 W. Washington St., Fifth Floor
Indianapolis, IN 46204
Telephone: 317-232-4956
Email: Jesse.Moore@atg.in.gov
*Attorney for Plaintiff State of Indiana*

/s/ Noah Goerlitz
Noah Goerlitz (admitted *pro hac vice*)
Assistant Attorney General
Office of the Iowa Attorney General
1305 E. Walnut St.
Des Moines, IA 50319
Telephone: (515) 281-5164
Email: noah.goerlitz@ag.iowa.gov
*Attorney for Plaintiff State of Iowa*

/s/ Christopher Teters
Christopher Teters (admitted *pro hac vice*)
Assistant Attorney General
Public Protection Division
Office of Kansas Attorney General
120 S.W. 10th Avenue, 2nd Floor
Topeka, KS 66612-1597
Telephone: (785) 296-3751
Email: chris.teters@ag.ks.gov
*Attorney for Plaintiff State of Kansas*

/s/ Mario Guadamud
Mario Guadamud (admitted *pro hac vice*)
Louisiana Office of Attorney General
1885 North Third Street
Baton Rouge, LA 70802
Telephone: (225) 326-6400
Fax: (225) 326-6498
Email: GuadamudM@ag.louisiana.gov
*Attorney for Plaintiff State of Louisiana*

/s/ Schonette J. Walker
Schonette J. Walker (admitted *pro hac vice*)
Assistant Attorney General
Chief, Antitrust Division
200 St. Paul Place, 19th floor
Baltimore, Maryland 21202
Telephone: (410) 576-6470
Email: swalker@oag.state.md.us
*Attorney for Plaintiff State of Maryland*

/s/ Katherine W. Krems
Katherine W. Krems (admitted *pro hac vice*)
Assistant Attorney General, Antitrust
Division
Office of the Massachusetts Attorney
General
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (617) 963-2189
Email: Katherine.Krems@mass.gov
*Attorney for Plaintiff Commonwealth of Massachusetts*

/s/ LeAnn D. Scott
LeAnn D. Scott (admitted *pro hac vice*)
Assistant Attorney General
Corporate Oversight Division
Michigan Department of Attorney General
P.O. Box 30736
Lansing, MI 48909
Telephone: (517) 335-7632
Email: ScottL21@michigan.gov
*Attorney for Plaintiff State of Michigan*

/s/ Zach Biesanz
Zach Biesanz
Senior Enforcement Counsel
Antitrust Division
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
Saint Paul, MN 55101
Telephone: (651) 757-1257
Email: zach.biesanz@ag.state.mn.us
*Attorney for Plaintiff State of Minnesota*

/s/ Lee Morris
Lee Morris (admitted pro hac vice)
Special Assistant Attorney General
Mississippi Office of Attorney General
Post Office Box 220
Jackson, Mississippi 39205
Telephone: (601) 359-9011
Email: Lee.Morris@ago.ms.gov
Attorney for Plaintiff State of Mississippi

/s/ Justin C. McCully
Justin C. McCully (admitted pro hac vice)
Assistant Attorney General
Consumer Protection Bureau
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68509
Telephone: (402) 471-9305
Email: justin.mccully@nebraska.gov
Attorney for Plaintiff State of Nebraska

/s/ Lucas J. Tucker
Lucas J. Tucker (admitted pro hac vice)
Senior Deputy Attorney General
Office of the Nevada Attorney General
Bureau of Consumer Protection
100 N. Carson St.
Carson City, NV 89701
Email: ltucker@ag.nv.gov
Attorney for Plaintiff State of Nevada

/s/ Zachary Frish
Zachary A. Frish (admitted pro hac vice)
Assistant Attorney General
Consumer Protection & Antitrust Bureau
New Hampshire Attorney General's Office
Department of Justice
1 Granite Place South
Concord, NH 03301
Telephone: (603) 271-2150
Email: zachary.a.frish@doj.nh.gov
Attorney for Plaintiff State of New
Hampshire

/s/ Andrew F. Esoldi
Andrew F. Esoldi
Deputy Attorney General
Division of Law
Antitrust Litigation and Competition
Enforcement
124 Halsey Street, 5th Floor
Newark, NJ 07101
Telephone: (609) 696-5465
Email: Andrew.Esoldi@law.njoag.gov
Attorney for Plaintiff State of New Jersey

/s/ Jonathan Hatch
Jonathan Hatch
Assistant Attorney General
New York State Office of the Attorney
General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8598
Email: jonathan.hatch@ag.ny.gov
Attorney for Plaintiff State of New York

/s/ Evan Crocker
Evan Crocker (admitted pro hac vice)
Assistant Attorney General, Division
Director
Consumer Affairs Division
New Mexico Department of Justice
201 3rd St NW, Suite 300
Albuquerque, NM 87102
Telephone: (505) 494-8973
Email: ecrocker@nmdoj.gov
Attorney for Plaintiff State of New Mexico

/s/ Francisco Benzoni
Francisco Benzoni (admitted pro hac vice)
Special Deputy Attorney General
Brian Rabinovitz (admitted pro hac vice)
Special Deputy Attorney General
North Carolina Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
Telephone: (919) 716-6000
Facsimile: (919) 716-6050
Email: fbenzoni@ncdoj.gov
Email: brabinovitz@ncdoj.gov

*Attorneys for Plaintiff State of North Carolina*

/s/ Sarah Mader
Sarah Mader (admitted *pro hac vice)*
Assistant Attorney General
Antitrust Section
Office of the Ohio Attorney General
30 E. Broad St., 26th Floor
Columbus, OH 43215
Telephone: (614) 466-4328
Email: Sarah.Mader@OhioAGO.gov
*Attorney for Plaintiff State of Ohio*

/s/ Cameron R. Capps
Cameron R. Capps (admitted *pro hac vice*)
Deputy Attorney General
Consumer Protection
Office of the Oklahoma Attorney General
313 N.E. 21st Street
Oklahoma City, Oklahoma  73105
Telephone:  (405) 522-0858
Fax:  (405) 522-0085
Email: Cameron.Capps@oag.ok.gov
Attorney for Plaintiff State of Oklahoma

/s/ Gina Ko
Gina Ko (admitted *pro hac vice*)
Assistant Attorney General
Antitrust, False Claims, and Privacy
Section
Oregon Department of Justice
100 SW Market St.,
Portland, Oregon 97201
Telephone: (971) 673-1880
Fax: (503) 378-5017
Email: Gina.Ko@doj.oregon.gov
*Attorney for Plaintiff State of Oregon*

/s/ Joseph S. Betsko
Joseph S. Betsko (admitted *pro hac vice*)
Assistant Chief Deputy Attorney General
Antitrust Section
Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
Telephone: (717) 787-4530
Email: jbetsko@attorneygeneral.gov
*Attorney for Plaintiff Commonwealth of Pennsylvania*

/s/ Paul T.J. Meosky
Paul T.J. Meosky (admitted *pro hac vice*)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400, ext. 2064
Fax: (401) 222-2995
Email: pmeosky@riag.ri.gov
*Attorney for Plaintiff State of Rhode Island*

/s/ Jared Q. Libet
Jared Q. Libet (admitted *pro hac vice*)
Assistant Deputy Attorney General
Office of the Attorney General of South
Carolina
P.O. Box 11549
Columbia, South Carolina 29211
Telephone: (803) 734-5251
Email: jlibet@scag.gov
*Attorney for Plaintiff State of South
Carolina*

/s/ Bret Leigh Nance
Bret Leigh Nance (admitted *pro hac vice*)
Assistant Attorney General
1302 E. Hwy 14, Suite 1
Pierre SD 57501-8501
Email: bretleigh.nance@state.sd.us
Telephone: (605) 773-3215
Bar # 5613
*Attorney for Plaintiff State of South Dakota*

/s/ Hamilton Millwee
Hamilton Millwee (admitted *pro hac vice*)
Assistant Attorney General
Office of the Attorney General and
Reporter
P.O. Box 20207
Nashville, TN 38202
Telephone: (615) 291-5922
Email: Hamilton.Millwee@ag.tn.gov
*Attorney for Plaintiff State of Tennessee*

/s/ Diamante Smith
Diamante Smith (admitted *pro hac vice*)
Assistant Attorney General, Antitrust
Division
Office of the Attorney General of Texas
P.O. Box 12548
Austin, TX 78711-2548
Telephone: (512) 936-1162
*Attorney for Plaintiff State of Texas*

/s/ Marie W.L. Martin
Marie W.L. Martin (admitted *pro hac vice*)
Deputy Division Director,
Antitrust & Data Privacy Division
Utah Office of Attorney General
160 East 300 South, 5th Floor
P.O. Box 140830
Salt Lake City, UT 84114-0830
Telephone: 801-366-0375
Email: mwmartin@agutah.gov
*Attorney for Plaintiff State of Utah*

/s/ Sarah L. J. Aceves
Sarah L. J. Aceves (admitted *pro hac vice*)
Assistant Attorney General
Consumer Protection and Antitrust Unit
Vermont Attorney General's Office
109 State Street
Montpelier, VT 05609
Telephone: (802) 828-3170
Email: sarah.aceves@vermont.gov
*Attorney for Plaintiff State of Vermont*

/s/ David C. Smith
David C. Smith (admitted *pro hac vice*)
Assistant Attorney General
Office of the Attorney General of Virginia
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 692-0588
Facsimile: (804) 786-0122
Email: dsmith@oag.state.va.us
*Attorney for Plaintiff Commonwealth of
Virginia*

/s/ Ashley A. Locke
Ashley A. Locke (admitted *pro hac vice*)
Assistant Attorney General
Antitrust Division
Washington Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
Telephone: (206) 389-2420
Email: Ashley.Locke@atg.wa.gov
*Attorney for Plaintiff State of Washington*

/s/ Douglas L. Davis
Douglas L. Davis (admitted *pro hac vice*)
Senior Assistant Attorney General
Consumer Protection and Antitrust Section
West Virginia Office of Attorney General
P.O. Box 1789
Charleston, WV 25326
Telephone: (304) 558-8986
Fax: (304) 558-0184
Email: douglas.l.davis@wvago.gov
*Attorney for Plaintiff State of West Virginia*

/s/ Caitlin M. Madden
Caitlin M. Madden (admitted *pro hac vice*)
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
Telephone: (608) 267-1311
Email: caitlin.madden@wisdoj.gov
*Attorney for Plaintiff State of Wisconsin*

*/s/ William T. Young*
William T. Young
Assistant Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
Telephone: (307) 777-7847
Email: william.young@wyo.gov
*Attorney for the Plaintiff State of Wyoming*

## Certificate of Compliance

In accordance with Local Civil Rule 7.1(c), and Rule 8(c) of this Court's Individual Practices in Civil Cases, I certify that the word count of this memorandum of law is 7,967 words, which includes footnotes but excludes the caption, any index, table of contents, table of authorities, signature blocks, or any certificates. This certificate is made in reliance on the word count of the word-processing program used to prepare the document.

/s/ Bonny Sweeney
BONNY SWEENEY
Co-Lead Trial Counsel

Attorney for Plaintiff United States of America