# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, et al., | Case No. 1:24-cv-03973-AS-SLC |
| Plaintiffs, | **ORAL ARGUMENT REQUESTED** |
| v. | **REDACTED** |
| LIVE NATION ENTERTAINMENT, INC., and TICKETMASTER L.L.C., | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE CERTAIN OPINIONS AND TESTIMONY OF PLAINTIFFS' EXPERT DR. NICHOLAS HILL**

December 8, 2025

**TABLE OF CONTENTS**

                                                                                        **Page**

TABLE OF CONTENTS ........................................................................................... i

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 2

LEGAL STANDARD .............................................................................................. 7

ARGUMENT .......................................................................................................... 9

   I.    DR. HILL'S AMPHITHEATER AND PROMOTION SERVICES MARKETS ARE
   WELL DEFINED AND RELIABLE ................................................................... 9

      A.    Dr. Hill correctly uses aggregate diversion, a well-established methodology, to
      implement the HMT for the Promotion Services and Amphitheater markets ....................... 11

      B.    Dr. Hill uses the best data available—including Defendants' own data—that is
      informative of artist substitution to estimate aggregate diversion ......................................... 12

      C.    Defendants' remaining critiques of Dr. Hill's aggregate diversion analyses go to
      weight, not admissibility ............................................................................................. 16

   II.    DR. HILL'S TESTIMONY REGARDING ANTICOMPETITIVE CONDUCT IS
   ADMISSIBLE AND WELL WITHIN THE REALM OF ECONOMIC ANALYSIS ............. 21

   III.    DR. HILL'S ANALYSIS OF QUALITATIVE EVIDENCE TO SUPPORT HIS
   OPINIONS IS ADMISSIBLE AND APPROPRIATE FOR AN ANTITRUST ECONOMIST 24

CONCLUSION ...................................................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allegra v. Luxottica Retail N. Am.*,
　341 F.R.D. 373 (E.D.N.Y. 2021) ........................................................................ 8, 25

*Amorgianos v. Amtrak*,
　303 F.3d 256 (2d Cir. 2002) .......................................................................... 8, 9, 18

*Anderson News, L.L.C. v. Am. Media, Inc.*,
　2015 WL 5003528 (S.D.N.Y. Aug. 20, 2015), *aff'd,* 899 F.3d 87 (2d Cir. 2018).................... 27

*AngioDynamics, Inc. v. C.R. Bard, Inc.*,
　2022 WL 2643583 (N.D.N.Y. July 8, 2022) ........................................................ 25

*B & R Supermarket, Inc. v. Mastercard Int'l, Inc.*,
　2021 WL 234550 (E.D.N.Y. Jan. 19, 2021) ........................................................ 26

*Bobcar Media, LLC v. Aardvark Event Logistics, Inc.*,
　554 F.Supp.3d 606 (S.D.N.Y. 2020)................................................................... 28

*Brown Shoe Co. v. United States*,
　370 U.S. 294 (1962) ....................................................................................... 9, 10

*Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*,
　239 F.3d 179 (2d Cir. 2001) ............................................................................... 16

*Fed. Trade Comm'n v. Kroger Co.*,
　WL 5053016 (D. Or. 2024).............................................................................. 3, 18

*Fed. Trade Comm'n v. Sysco Corp.*,
　113 F.Supp.3d 1 (D.D.C. 2015).......................................................................... 12

*Fed. Trade Comm'n v. Tapestry, Inc.*,
　755 F.Supp.3d 386 (S.D.N.Y. 2024)..........................................................11, 12, 19

*Fed. Trade Comm'n v. Wilh. Wilhelmsen Holding ASA*,
　341 F.Supp.3d 27 (D.D.C. 2018)......................................................................... 12

*Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*,
　301 F.R.D. 116 (S.D.N.Y. 2014) ........................................................................ 24

*Hughes v. Ester C. Co.*,
　317 F.R.D. 333 (E.D.N.Y. Sept. 30, 2016) ........................................................... 8

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    2025 WL 2733020 (S.D.N.Y. Sept. 25, 2025) ........................................................................... 22

*In re Processed Egg Prods. Antitrust Litig.*,
    81 F.Supp.3d 412 (E.D. Pa. 2015) ........................................................................................... 26

*In re Se. Milk Antitrust Litig.*,
    739 F.3d 262 (6th Cir. 2014) ................................................................................................... 18

*Jakobovits v. PHL Variable Ins. Co.*,
    645 F.Supp.3d 95 (E.D.N.Y. 2022) .......................................................................................... 24

*K. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*,
    588 F.3d 908 (6th Cir. 2009) ...................................................................................................11

*LinkCo, Inc. v. Fujitsu Ltd.*,
    2002 WL 1585551 (S.D.N.Y. July 16, 2002) ......................................................................... 28

*McWane, Inc. v. Fed. Trade Comm'n*,
    783 F.3d 814 (11th Cir. 2015) ................................................................................................. 10

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
    691 F.Supp.2d 448 (S.D.N.Y. 2010) ................................................................................. 24, 25

*Pharmacychecker.Com v. Nat'l Ass'n of Bds. of Pharmacy*,
    2023 WL 2973038 (S.D.N.Y. Mar. 28, 2023) .......................................................................... 9

*Regeneron Pharms., Inc. v. Novartis Pharma AG*,
    96 F.4th 327 (2d Cir. 2024) ................................................................................................. 9, 10

*Scentsational Techs., LLC v. Pepsi, Inc.*,
    2018 WL 1889763 (S.D.N.Y. Apr. 18, 2018) ......................................................................... 27

*SEC v. Tourre*,
    950 F.Supp.2d 666 (S.D.N.Y. 2013) ........................................................................................ 24

*Teradata Corp. v. SAP SE*,
    124 F.4th 555 (9th Cir. 2024) ........................................................................................... passim

*Teradata Corp. v. SAP SE*,
    570 F.Supp.3d 810 (N.D. Cal. 2021), *rev'd and remanded*, 124 F.4th 555 (9th Cir. 2024) ..... 13

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ..................................................................................................... 9

*U.S. Airways, Inc. v. Sabre Holdings Corp.*,
    2022 WL 986232 (S.D.N.Y. Apr. 1, 2022) .............................................................. 10

*Union Carbide Corp. v. Montell N.V.*,
    28 F. Supp. 2d 833 (S.D.N.Y. 1998) ...................................................................... 22

*United States v. Bazaarvoice, Inc.*,
    2014 WL 203966 (N.D. Cal. Jan. 8, 2014) .......................................................... 14

*United States v. Bertelsmann SE & CO. KGaA*,
    646 F. Supp. 3d 1 (D.D.C. 2022)............................................................................ 3

*United States v. Bilzerian*,
    926 F.2d 1285 (2d Cir. 1991) ........................................................................... 8, 24

*United States v. Duncan*,
    42 F.3d 97 (2d Cir. 1994) .......................................................................... 7, 8, 21

*United States v. Google LLC*,
    778 F.Supp.3d 797 (E.D. Va. 2025).................................................................... 21

*United States v. H&R Block*,
    833 F.Supp.2d 36 (D.D.C. 2011).................................................................. 14, 15

*United States v. Jones*,
    965 F.3d 149 (2d Cir. 2020) ................................................................................. 7

*United States v. Lumpkin*,
    192 F.3d 280 (2d Cir. 1999) ........................................................................... 8, 23

*Wendell v. GlaxoSmithKline LLC*,
    858 F.3d 1227 (9th Cir. 2017) ............................................................................ 18

*Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*,
    571 F.3d 206 (2d Cir. 2009) ........................................................................... 8, 27

## Rules

Fed. R. Evid. 403 ............................................................................................... 1, 9

Fed. R. Evid. 702 ......................................................................................... 1, 7, 16

Fed. R. Evid. 704 Advisory Committee Note ...................................................... 22

**INTRODUCTION**

Defendants' motion is a transparent attempt to silence Dr. Nicholas Hill—Plaintiffs' highly experienced and well-qualified primary expert economist—in an effort to hide the full extent of Defendants' anticompetitive conduct from the jury in this case. Unable to identify any legitimate methodological flaws in Dr. Hill's work, Defendants' motion repackages (inaccurate) cross-examination points as (inappropriate) grounds for exclusion. But Dr. Hill employs well-established and accepted economic methodologies to reach his opinions, all well within the bounds of Federal Rules of Evidence 702 and 403.

Dr. Hill uses standard economic tools and analyses to define the relevant markets. He examines evidence in the record to identify practical indicia supportive of each of the markets, which alone is sufficient to support his market definition opinions. Dr. Hill also corroborates those findings by empirically utilizing the hypothetical monopolist test ("HMT")—a well-recognized and accepted market-definition tool—to define all six of his markets. Dr. Hill implements the HMT in five of the six markets using a well-accepted method called aggregate diversion analysis.

Defendants do not dispute Dr. Hill's use of the HMT or aggregate diversion (nor could they). Instead, Defendants limit their critique to Dr. Hill's *implementation* of that analysis in *only two* of his relevant markets: (1) the market for the provision of promotion services to artists at major concert venues (the "Promotion Services" market) and (2) the market for the use of major concert amphitheaters by artists (the "Amphitheaters" market). But those implementation-specific critiques are fodder for cross examination, not admissibility.

Defendants' critiques are also meritless. Defendants' primary critique is that Dr. Hill was required—as a matter of law—to use data depicting price changes or worsening of terms to estimate aggregate diversion. Defendants invent this requirement out of whole cloth. Economists

1

frequently use, and courts have accepted, the use of non-price data to estimate aggregate diversion in defining relevant markets. Just last year, the Ninth Circuit reversed a district court's decision to exclude an expert's market definition opinions because the expert used non-price data to estimate aggregate diversion. The Ninth Circuit held—citing several other antitrust cases—that there is no requirement to use pricing data to estimate aggregate diversion, especially since such data are not always readily available. *Teradata Corp. v. SAP SE*, 124 F.4th 555, 569–570 (9th Cir. 2024), cert. denied, (U.S. Oct. 6, 2025). Omitting *Teradata* entirely, Defendants' opening brief misstates the law to manufacture an issue with Dr. Hill's work where none exists. Defendants' remaining narrow critiques of Dr. Hill's aggregate diversion analysis fare no better.

Defendants' other challenges to Dr. Hill's opinions—concerning his purported legal conclusions and use of qualitative evidence—are also without merit. Defendants criticize Dr. Hill for opining that Defendants' conduct is anticompetitive as a matter of economics; he has never sought nor claimed to provide a legal opinion. The shallowness of that critique is only reinforced by the fact that Defendants' own expert reports are replete with characterizations of conduct as anticompetitive or procompetitive. As for Dr. Hill's use of qualitative evidence, Defendants' arguments misconstrue the nature of Dr. Hill's opinions and anticipated testimony, as well as the role of an economist in an antitrust case.

Ultimately, Defendants' motion suffers the same fatal flaw as their Motion for Summary Judgment: both nitpick factual determinations and methodological decisions that must be left to the trier of fact. Like Defendants' Motion for Summary Judgment, this Motion should be denied.

## BACKGROUND

Dr. Hill is a renowned Ph.D. economist with nearly two decades of experience and extensive knowledge of antitrust economics and industrial organization. Dr. Hill is frequently called upon—by plaintiffs and defendants alike—to serve as an expert witness in complex

antitrust cases. Over the last decade, more than ten federal courts have accepted Dr. Hill's testimony, including on market definition and the proper application of the HMT. *See* Ex.1, Expert Report of Nicholas Hill, Aug. 1, 2025 ("Hill Rpt.") Appendix A.4; *see also Fed. Trade Comm'n v. Kroger Co.,* 2024 WL 5053016 (D. Or. Dec. 10, 2024); *United States v. Bertelsmann SE & CO. KGaA*, 646 F. Supp. 3d 1 (D.D.C. 2022). Dr. Hill has published research, including articles on market definition, in many reputable journals and publications. Ex.1 (Hill Rpt.) Appendix A.5. Despite Dr. Hill's prolific experience, none of his opinions have ever been excluded by a court.

Dr. Hill was retained by the DOJ on behalf of Plaintiffs to "economically analyze questions of market definition, market power, and competitive effects raised by the allegations in the Amended Complaint." *Id.* ¶9.

Dr. Hill takes a similar and well-established approach to define all six of his relevant markets, including the Promotion Services and Amphitheater markets—the only markets Defendants challenge. *See id.* §4.1; *see also* Defendants' Memorandum of Law in Support of Motion to Exclude Certain Opinions and Testimony of Dr. Nicholas Hill ("Defs. Br.") at 4–5. In doing so, Dr. Hill considers a range of evidence concerning "product differentiation, demand-side substitutability between products, and customer switching patterns" to identify the extent to which products are close substitutes for one another. Ex.1 (Hill Rpt.) §4.1.1.

Dr. Hill defines several of his markets around a specific set of venues referred to as "major concert venues" ("MCVs") based on three criteria: (i) venue type (amphitheater or arena), (ii) venue capacity (8,000 or larger), and (iii) the number of shows (hosted 10 or more shows in any one year of available data). *Id.* §5. Dr. Hill's use of all three criteria is supported by evidence in the record. *Id.* ¶¶141–144; *see also* Plaintiffs' Memorandum of Law in Opposition to

Defendants' Motion for Summary Judgment at §§I, VI.A. Beyond the definition of MCVs, Dr. Hill identifies practical indicia specifically supportive of his Promotion Services and Amphitheater markets. *See id.* ¶¶159, 164, 176 (Promotion Services market); ¶¶282, 284, 287, 296 (Amphitheater market). Dr. Hill also ensures the robustness of his markets using several different formulations of MCVs. *See, e.g.*, *id.* at Figs. 25, 59, 135.

Dr. Hill also utilizes the HMT, a standard tool used in market definition, "to ensure that important customer substitutes are not improperly excluded from the market—i.e., that the market is not too narrowly defined." *Id.* ¶91. The HMT asks whether a single firm that owned all the products in a candidate market could profitably impose a small but significant non-transitory increase in price or worsening of other non-price terms ("SSNIP") above the competitive level. *Id.* ¶¶91–92. This test informs whether a group of products could profitably be subject to an exercise of substantial market power. *Id.* ¶91.

To implement the HMT in five of his six markets, Dr. Hill uses a standard and commonly used tool known as aggregate diversion analysis. *See id.* §4.1.2.b; Ex.6, U.S. Department of Justice and Federal Trade Commission Merger Guidelines (Dec. 18, 2023), at §4.2.B.[1] Aggregate outside diversion refers to the proportion of lost sales for a hypothetical monopolist that would result from customers switching to products outside of the candidate market in response to a price increase or worsening of terms. If a sufficient portion of customers would switch to a product outside the candidate market to make a price increase unprofitable, it means those products are sufficiently constraining (*i.e.*, competing with) the product(s) in question and that the candidate market is too narrow. In monopolization cases such as this one, this methodology tends to be conservative (*i.e.*, generous to defendants) because "the alleged monopolist is likely

---

[1] Aggregate diversion is a way to implement critical loss analysis, which is used to determine whether undertaking a SSNIP or worsening of terms would increase a hypothetical monopolist's profits. *Id.* ¶97 n.186.

to have already exercised market power sufficient to increase the price of its products above the competitive level." Ex.1 (Hill Rpt.) ¶¶99, 102. Economists use various data sources and methods to estimate aggregate diversion depending on the industry and available data. Ex.2, Expert Rebuttal Report of Nicholas Hill, Oct. 9, 2025 ("Hill Reb.") ¶27; *see also* Ex.15 American Bar Association, "Market Definition in Antitrust: Theory and Case Studies," at §I.C.1.a (2012) (estimating actual loss—*i.e.*, aggregate diversion—can utilize a range of data from a "full econometric analysis" to "qualitative information or experience").

Consistent with standard aggregate diversion analysis, Dr. Hill calculates the corresponding critical diversion. Ex.1 (Hill Rpt.) §4.1.2.b. This reflects the maximum percentage of lost customers who could switch to an option outside the candidate market while still allowing the hypothetical monopolist to profitably impose a SSNIP. *Id*. ¶101. An input to the critical diversion is the profit margin that the hypothetical monopolist could expect to earn in the candidate market. *Id*. ¶101. To determine the profit margin for the critical diversion in both the Amphitheater and Promotion Services markets, Dr. Hill utilizes ordinary course documents and data produced by Defendants and other industry participants. Ex.2 (Hill Reb.) §§3.1.2 (Amphitheater market); 4.1.3 (Promotion Services market).

In the candidate relevant markets, Dr. Hill compares the actual aggregate diversion he calculated to the critical diversion. Ex.1 (Hill Rpt.) ¶101. If the critical diversion is *less than* the aggregate diversion, that indicates the candidate market is too narrowly defined. In contrast, if the critical diversion *exceeds* the aggregate diversion, the candidate market is not too narrow and therefore is a properly defined relevant market. *Id.* ¶101.

Dr. Hill uses ticketing data produced by Defendants and other industry participants to estimate diversion in both the Promotion Services and Amphitheater markets using three

different methodologies. Ex.2 (Hill Reb.) §§3.1.1.b, 4.1.2. For each methodology, Dr. Hill uses data on the location and type of venue in which artists performed their concerts over different time horizons—next show (next show in which they perform), corrected show-weighted (amphitheater season or year), and monthly persistence (prior month)—to inform where an artist would likely substitute if the price of promotion services or amphitheater availability for a given concert increased by a SSNIP. *Id.* Dr. Hill's aggregate diversion accounts for all potential forms of artist substitution to the extent the data allowed. *Id.*

The Promotion Services market consists of promotion services provided to artists performing in MCVs. Ex.1 (Hill Rpt.) §6.1. The market includes all kinds of promotion, including standalone promoters, promoters integrated with venues, and artists who self-promote—although the latter is very rare. Ex.2 (Hill Reb.) ¶139. Dr. Hill analyzes whether artists faced with a SSNIP in the Promotion Services market would tolerate the higher price, play a concert at another MCV that did not see a price increase, or instead play a concert at a venue outside the market (i.e., a non-major concert venue). *Id.* ¶¶139–42. Dr. Hill's analysis found that actual diversion outside the candidate market is significantly less than the critical diversion, which validates the basic intuition that artists interested in playing in MCV arenas and amphitheaters would not switch in sufficient numbers to venues outside the market, such as stadiums, theaters, or clubs. Ex.1 (Hill Rpt.) ¶¶173–74, Fig. 23; Ex.2 (Hill Reb.) ¶¶151–152, Fig. 23.

In the Amphitheater market, artists facing a SSNIP or worsening of terms from a major concert amphitheater—for example, in the form of an increased rent expense—could respond by performing at another major concert amphitheater (still controlled by the hypothetical monopolist) or playing at a venue outside the market (such as an arena). Here too, Dr. Hill finds

that actual diversion outside the candidate market is less than the critical diversion, indicating that the candidate market is valid. Ex.2 (Hill Reb.) ¶¶40–41, Figure 2.

After defining each of the relevant markets, Dr. Hill turns to assessing Defendants' conduct. Economic theory and empirical analysis underpin each of Dr. Hill's opinions of Defendants' conduct and resulting competitive effects. *See* Ex.1 (Hill Rpt.) §4.3. Dr. Hill's opening report identifies and analyzes five categories of conduct that Defendants engage in, including content withholding, tying access to major concert amphitheaters, and deterring entry and expansion by rival promoters. *See generally id*. §10.

When analyzing Defendants' exclusionary conduct and resulting harm in each of the relevant markets, Dr. Hill also conducts quantitative analyses to support his opinions. For example, Dr. Hill conducts numerous empirical analyses, including regressions, to support his opinions regarding Defendants' conduct. *See, e.g.*, Ex.1 (Hill Rpt.) Figs. 68, 71, 76, 88–92, 99, 101; Ex.2 (Hill Reb.) Figs. 61–62.

Dr. Hill also supports each of his opinions regarding Defendants' exclusionary conduct and harm with an analysis of related qualitative evidence. *See, e.g.*, Ex.1 (Hill Rpt.) §10.1.2; §10.2.2; ¶¶387–389, 399–400, 410, 416. But Dr. Hill's analysis of qualitative evidence is not the sole basis for any of his opinions regarding the effects of Defendants' conduct. *See* Ex.5, Deposition of Nicholas Hill, Nov. 3, 2025 ("Hill Dep.") 23:2–19.

## LEGAL STANDARD

"Generally, expert testimony may be admissible if it is helpful to the trier of fact." *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) (citing Fed. R. Evid. 702). "The fundamental requirements are thus that such evidence be relevant and reliable." *United States v. Jones*, 965 F.3d 149, 161 (2d Cir. 2020). "In carrying out its 'gatekeeping function' the district court 'has

broad discretion' and '[i]ts inquiry is necessarily a flexible one' in which the factors considered 'depend upon the particular circumstances of the particular case at issue.'" *Allegra v. Luxottica Retail N. Am.*, 341 F.R.D. 373, 392–93 (E.D.N.Y. 2021) (quoting *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d. Cir. 2016)). The Court "should exclude expert testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison" but "other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009) (cleaned up).

"In undertaking this flexible inquiry, the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Amorgianos v. Amtrak*, 303 F.3d 256, 266 (2d Cir. 2002). "A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible"; only "if the flaw is large enough that the expert lacks good grounds for his or her conclusions" is exclusion warranted. *Id.* at 267 (cleaned up). "Deference to experts is particularly appropriate when expert testimony concerns soft sciences like economics." *Hughes v. Ester C. Co.*, 317 F.R.D. 333, 341 (E.D.N.Y., 2016). While expert testimony may not "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it," *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999), experts "may opine on an issue of fact within the jury's province." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991); *see also Duncan*, 42 F.3d at 103 ("factual conclusions . . . are not prohibited even if 'they embrace an ultimate issue to be decided by the jury.'").

Overall, "the standards for inclusion of expert testimony are quite permissive for qualified experts—and rightfully so." *Pharmacychecker.com v. Nat'l Ass'n of Bds. of Pharmacy*, 2023 WL 2973038, at *18 (S.D.N.Y. Mar. 28, 2023). This is because "our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony." *Amorgianos*, 303 F.3d at 267. Federal Rule of Evidence 403 requires exclusion of expert testimony only where "its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusion of the issues, or misleading the jury."

<u>**ARGUMENT**</u>

## I.  DR. HILL'S AMPHITHEATER AND PROMOTION SERVICES MARKETS ARE WELL DEFINED AND RELIABLE

Dr. Hill followed a standard and reliable methodology in defining each of his relevant markets. Relevant markets are defined based on the products that consumers treat as reasonable substitutes, not those that "appear to be functionally similar." *Regeneron Pharms., Inc. v. Novartis Pharma AG,* 96 F.4th 327, 339–41 (2d Cir. 2024). They need not have precise "metes and bounds." *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 611 (1953); *see also Teradata Corp.*, 124 F.4th at 567 ("The issue of product definition [is] always an inexact science often requiring distinctions in degree rather than kind.") (cleaned up). Rather, market definition is a "pragmatic, factual" analysis, not a "formal, legalistic one." *Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962). For that reason, "[m]arket definition is a 'highly factual [determination] best allocated to the trier of fact.'" *Dial Corp. v. News Corp.*, 165 F. Supp. 3d 25, 34 (S.D.N.Y. 2016) (cleaned up); *see also Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001) (observing that market definition is a "deeply fact-intensive inquiry").

To determine the boundaries of a product market, courts often "look to 'the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and

substitutes for it.'" *Regeneron*, 96 F.4th at 339 (quoting *Brown Shoe*, 370 U.S. at 325). One way courts and economists evaluate interchangeability is the HMT. *Id.* at 339; *see also* Ex.1 (Hill Rpt.) ¶¶91–92. If a hypothetical monopolist can profitably implement a SSNIP, then the proposed market is a relevant market. *Regeneron*, 96 F.4th at 339.

Alternatively, courts and economists can define markets using practical indicia. *See, e.g.*, *Id.* (quoting *Brown Shoe*, 370 U.S. at 325). Either approach suffices: "there is no requirement to use any specific methodology" for market definition. *Id.* at 340 n.8; *see also U.S. Airways, Inc. v. Sabre Holdings Corp.*, 2022 WL 986232, at *1 (S.D.N.Y. Apr. 1, 2022) (rejecting motion to exclude expert's market definition opinions since defendant "does not cite any binding or persuasive authority to support the proposition that a reliable market definition must rest on empirical studies and cannot rely on so-called 'qualitative' data or analysis of real-world market conditions"); *Teradata Corp.*, 124 F.4th at 570 (district court abused its discretion by narrowly focusing on the expert's implementation of the HMT instead of the qualitative analysis of deposition testimony and documentary record that was the "primary foundation" for market definition); *McWane, Inc. v. Fed. Trade Comm'n*, 783 F.3d 814, 829 (11th Cir. 2015) (rejecting contention that "expert's analysis [of the product market] was insufficient because it did not involve an econometric analysis" as "there appears to be no support in the caselaw for [the] claim that such a technical analysis is always required").

Here, Dr. Hill defined the Promotion Services and Amphitheater markets using both the HMT and practical indicia. *See* Ex.1 (Hill Rpt.) §§6.1.4, 9.1.3 (HMT); §§6.1.1–3 (Promotion Services market); ¶154, §§9.1.1–2 (Amphitheater market). Defendants—including their economic experts—do not dispute that the HMT is a well-accepted tool for defining antitrust markets or that aggregate diversion is an appropriate way to implement it. *See* Defs. Br. at 1;

10

Ex.3, Expert Report of Ali Yurukoglu, September 16, 2025 ("Yurukoglu Rpt") ¶73. They quibble only with Dr. Hill's implementation of the HMT. Regardless, Dr. Hill's evaluation of practical indicia is independently sufficient to support both relevant markets.

### A. Dr. Hill correctly uses aggregate diversion, a well-established methodology, to implement the HMT for the Promotion Services and Amphitheater markets

One well-accepted implementation of the HMT is aggregate diversion analysis. *See, e.g.*, *Fed. Trade Comm'n v. Tapestry, Inc.*, 755 F.Supp.3d 386, 442 (S.D.N.Y. 2024). Defendants do not dispute this, only contending that Dr. Hill's implementation was incorrect. Defs. Br. at 1. But the weight to give to Dr. Hill's aggregate diversion analysis is for the jury to decide after cross-examination at trial. *See, e.g.*, *Dial Corp.*, 165 F.Supp.3d at 42 (denying defendants' motion to exclude the testimony of an expert based on purported flaws in his aggregate diversion analysis because the "parties' many disagreements over [the expert's] methodologies go to the weight not admissibility of [his] testimony").

Defendants identify a single case where a court excluded an expert due to their implementation of the HMT, but examination of the expert's work in that case demonstrates it is inapposite. *K. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 918–19 (6th Cir. 2009). There, the excluded expert admitted to "not perform[ing] the standard SSNIP test," nor did that expert consider data that would be informative as to customer substitution in the face of an increase in price or worsening of terms. *Id.* Instead, the expert merely looked at aggregated data over several years, found that price and demand increased during the time period, and concluded that this was sufficient to define the relevant market. *Id.* Those shortcomings, coupled with the expert's failure to perform the required "reasonable-interchangeability analysis," warranted exclusion. *Id.*

Here, Dr. Hill uses aggregate diversion analysis to implement the HMT. To do so, Dr. Hill uses data about how artists would likely substitute if faced with a SSNIP or worsening of terms for a particular show or venue in the Promotion Services or Amphitheater markets. Ex.2 (Hill Reb.) §3.1.1 (Amphitheater market), §4.1.2 (Promotion Services market). And Dr. Hill did so using *three different methodologies*, each of which yielded a comparable estimate of actual diversion. *Id.* Dr. Hill's use of a reliable and well-established methodology stands in stark contrast to that of the excluded expert in *Kentucky Speedway*.

### B. Dr. Hill uses the best data available—including Defendants' own data—that is informative of artist substitution to estimate aggregate diversion

Defendants' primary critique of Dr. Hill's aggregate diversion analysis is that he does not utilize data depicting prices or worsening of terms when estimating aggregate diversion. Defs. Br. at 7. But as courts have recognized, "[e]conomists regularly estimate diversion ratios using non-price response data." *Tapestry, Inc.*, 755 F.Supp.3d at 447 (rejecting argument that the expert's data analysis was unreliable because the survey data was not premised on switching purchases in response to a price increase); *see also Fed. Trade Comm'n v. Wilh. Wilhelmsen Holding ASA*, 341 F.Supp.3d 27, 57–58 (D.D.C. 2018) (endorsing expert's reliance on various data, including non-price customer relationship management data, to calculate aggregate diversion); *Fed. Trade Comm'n v. Sysco Corp.*, 113 F.Supp.3d 1, 35–37 (D.D.C. 2015) (accepting expert's relevant market definition despite use of customer relationship management and other data for calculating aggregate diversion that did not capture customer responses to price changes or worsening of terms).

The Ninth Circuit's *Teradata* decision is particularly instructive on how economists can calculate diversion beyond examining price and term changes. There, a software vendor sued its competitor, alleging, in part, anticompetitive tying. 124 F.4th at 562–63. The trial court excluded

the testimony of plaintiff's expert Dr. John Asker—whom Defendants previously retained in this matter and whom Defendants' current expert, Dr. Ali Yurukoglu, consulted about his opinions in this case—finding his market definition methodology unreliable. *Id.* at 563; Ex.7, Deposition of Ali Yurukoglu, Oct. 7, 2025 ("Yurukoglu Dep.") 15:22–17:20. To estimate aggregate diversion in one relevant market, Dr. Asker conducted an analysis of non-price customer relationship management data based on "the number of times competitors are mentioned in sales representatives' sales report." *Teradata Corp. v. SAP SE*, 570 F.Supp.3d 810, 839 (N.D. Cal. 2021), *rev'd and remanded*, 124 F.4th 555 (9th Cir. 2024). Although Dr. Asker opined that the results of his aggregate diversion analysis were consistent with the deposition testimony and documents supporting his market definition, the trial court nevertheless excluded his opinions, finding Dr. Asker's aggregate diversion analysis did not "measure[] a customer's response to changes in price," and therefore his methodology was unreliable. *Id.* at 839–41.

The Ninth Circuit reversed, holding that the trial court had abused its discretion in excluding Dr. Asker's market definition opinions. The court found that the "few courts [that] have considered the issue **have endorsed the use of customer relationship management and other non-price data to calculate [] aggregate diversion.**" *Teradata*, 124 F.4th at 569 (emphasis added). The court also observed that "[d]ata recording actual customer responses to price changes is frequently unavailable, so a categorical rule requiring such data would be unrealistic." *Id.* Moreover, the Ninth Circuit held that the HMT "does not require showing actual diversion in response to price changes, only *likely* diversion," and that while Dr. Asker's data "may not have captured actual transactions" it was informative as to how customers would substitute in response to price increases. *Id.*

Defendants cite a paper by Dr. Carl Shapiro to explain the use of aggregate diversion, but Dr. Shapiro *himself* estimated aggregate diversion without using pricing data in defining a relevant market accepted by a trial court. Defs. Br. at 7; *see United States v. Bazaarvoice, Inc.*, 2014 WL 203966, at *30–32 (N.D. Cal. Jan. 8, 2014) (accepting Dr. Shapiro's relevant market even though his aggregate diversion purportedly "makes no attempt to model how customers would behave in response to a price increase").

Indeed, Defendants' own economic expert, Dr. Yurukoglu acknowledged it can be appropriate to estimate aggregate diversion using non-price data when data depicting prices or worsening of terms are not available. *See* Ex.7 (Yurukoglu Dep.) 77:21–78:15. When Dr. Yurukoglu was asked whether he looked for data in this case depicting a small but significant increase in price or worsening of terms for estimating aggregate diversion in Dr. Hill's markets, he did not identify any such data. Ex.7 (Yurukoglu Dep.) 218:3–20:6. In light of that gap, Dr. Yurukoglu acknowledged that similar non-price data such as tour offers—where an artist *might* play—and artists' performance history, both provide relevant information about the types of venues artists view as likely substitutes. Ex.4 Expert Sur-Rebuttal Report of Ali Yurukoglu, Oct. 29, 2025 ("Yurukoglu Reb.") ¶65; Ex.7 (Yurukoglu Dep.) 191:16–192:3.

Surprisingly, Defendants turn to *H&R Block* to argue that Dr. Hill is "required to estimate diversion in response to a price increase or worsening of terms," Defs. Br. at 11. But *H&R Block* actually supports Dr. Hill's approach. 833 F.Supp.2d 36, 62–63 (D.D.C. 2011). There, the plaintiff's expert relied on historical consumer "IRS switching data" in his aggregate diversion analysis to estimate how consumers would likely respond to a price increase in a market for tax preparation software products. *Id.* The defense expert's "fundamental critique" was that the data used was "not necessarily indicative of what products consumers would switch to in response to

14

a price increase," because consumers could switch for "a lot of reasons." *Id.* at 64–65. However, the court nevertheless accepted plaintiff's expert's market definition and diversion analysis, concluding that it was "reasonable to use switching data as a proxy for diversion, especially since no more refined historical data apparently exists." *Id.* at 65–66.

Here, Dr. Hill's use of the best data available to inform likely artist diversion in both the Promotion Services and Amphitheater markets is sound. Specifically, when an artist performs at a venue in the relevant market, Dr. Hill analyzes the other types of venues the artist performed at around the same time, which is informative of the artist's preferences and likely substitution. Dr. Hill's decision to use the best data available to estimate likely diversion is consistent with standard economic practice. *See* Ex.6, 2023 Merger Guidelines, at §4.1 (explaining that it is necessary when doing antitrust econometric analysis to "take into account . . . the availability or quality of data or reliable modeling techniques," recognizing "that the goal of economic modeling is not to create a perfect representation of reality, but rather to inform an assessment of the likely change in [] incentives").

Defendants argue that this is not a reasonable way to infer likely substitution, but Defendants' experts do not offer any alternative aggregate diversion estimates of their own, nor did they identify any alternative datasets that Dr. Hill could have used to conduct such an analysis. *See* Ex.7 (Yurukoglu Dep.) 196:14–24; Ex.4 (Yurukoglu Reb.) ¶¶38, 52. Dr. Yurukoglu puts forward one analysis of purported diversion for a single amphitheater in Irvine, California, in connection with the Amphitheater market. However, that analysis relies on the closing of the amphitheater—equivalent to a price increase to infinity—not a SSNIP or worsening of terms (as Defendants now claim is necessary). *See* Ex.4 (Yurukoglu Reb.) ¶71. That analysis is also premised on the idea that artists who performed at an amphitheater previously would have

returned to that same amphitheater the following year had it been open, but Dr. Hill demonstrates that assumption is incorrect. *See* Ex.2 (Hill Reb.) Fig. 6 (showing that only 4% of artists who performed at the amphitheater in 2022 returned the following year). Moreover, Dr. Yurukoglu acknowledges the single amphitheater in Irvine, California is not representative of the other 85+ amphitheaters in the Amphitheater market. Ex.7 (Yurukoglu Dep.) 216:21–218:1. Whether Dr. Hill's diversion methodology is sufficiently reliable is a question for the jury to decide.

　Defendants' related critique of Dr. Hill's "next show" diversion methodology is a red herring. Defs. Br. at 8. Dr. Hill explains in his rebuttal report why considering an artist's next concert is informative as to artist substitution, as it takes into account an artist's popularity and preferences at a particular point in time. Ex.2 (Hill Reb.) §3.1.1a. Moreover, Dr. Hill puts forward two additional methodologies—corrected show-weighted and monthly persistence—that are not subject to this critique. Ex.2 (Hill Reb.) ¶¶42–52. In short, lacking data showing systematically how artists pick a substitute venue if their first preference is unavailable, Dr. Hill used the best data available to answer the question of reasonable interchangeability; Rule 702 requires no more for his analysis to reach the jury.

### C. Defendants' remaining critiques of Dr. Hill's aggregate diversion analyses go to weight, not admissibility

　Defendants' additional (and inaccurate) critiques of Dr. Hill's aggregate diversion opinion are even weaker grounds for exclusion. *See Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001) (assertions of "gaps or inconsistencies" in the reasoning of an expert "go to the weight of the evidence, not to its admissibility").

　*First*, Defendants incorrectly claim that Dr. Hill uses the "wrong denominator" for his aggregate diversion analysis. Defs. Br. at 9–10. As Dr. Hill explained in his rebuttal report, however, he included all shows in the denominator because it better captures artists' preferences

16

and likely substitution, which is the goal of aggregate diversion. Ex.2 (Hill Reb.) ¶¶72–73. If an artist played several shows in a row at the same amphitheater, for example, that indicates the artist more strongly prefers that venue type than if they had only played one concert there. In any event, the impact of this critique is limited to rare instances where artists repeat concerts at the same venue, and Dr. Hill calculates a sensitivity of his aggregate diversion analysis in his second report that demonstrates Defendants' critique is immaterial. *See* Ex.2 (Hill Reb.) Fig. 9 (indicating Defendants' "wrong denominator" critique only increases outside diversion in the Amphitheater market by three percentage points); Ex.3 (Yurukoglu Rpt.) ¶¶100 n. 127, 119 n.154.

Defendants similarly argue Dr. Hill's approach to aggregate diversion in his Amphitheater market *understates* substitutability between amphitheaters and other out-of-market venues because artists who frequently play amphitheaters are less likely to switch to any other venue in response to a SSNIP. Defs. Br. at 10. But it is Defendants who are confused. Whether an artist plays more frequently at amphitheaters does not, in itself, inform whether an artist is more likely to substitute away from *that particular amphitheater* in response to a SSNIP or worsening of terms. Ex.2 (Hill Reb.) ¶¶34–38 (providing an example of an artist who may not have a strong preference for playing in amphitheaters generally but would be less likely to switch away from a particular amphitheater in response to a SSNIP). Dr. Yurukoglu acknowledged this reality at his deposition. Ex.7 (Yurukoglu Dep.) 185:14–86:13. That is why Dr. Hill's corrected show-weighted diversion methodology properly treats each show in the market as equally likely to be the marginal show. Ex.2 (Hill Reb.) ¶50.

*Second*, Defendants claim that Dr. Hill's aggregate diversion *formula* is insufficiently grounded in the academic literature. Defs. Br. at 10–11. As a starting point, there is no

requirement that Dr. Hill's specific aggregate diversion *formula* be found in published literature. *See, e.g.*, *Amorgianos*, 303 F.3d at 266–267 (observing there is no requirement "that an expert must back his [] opinion with published studies" and arguments regarding "lack of textual support may go to the weight, not the admissibility") (cleaned up); *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1235–36 (9th Cir. 2017) (reversing the exclusion of an expert and holding that the district court "wrongly conflated the standards for publication in a peer-reviewed journal with the standards for admitting expert testimony in a courtroom"); *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 282–83 (6th Cir. 2014) (district court erred in excluding testimony from expert who admitted his geographic relevant market was defined "unconventionally").

As discussed above, Dr. Hill's HMT methodology is well supported in economic literature and case law. *See infra* I.B. Regardless, Dr. Hill identified both a published paper and a recent case addressing the specific formula underlying his corrected show-weighted aggregate diversion at his deposition. Ex.5 (Hill Dep.) 89:4–90:19; *Kroger Co.*, 2024 WL 5053016, at *13 (describing Dr. Hill's aggregate diversion analysis that he performed on 2,537 proposed markets that were ultimately accepted by the court); Ex.11, Hosken, Daniel S. and Tenn, Steven, Horizontal Merger Analysis in Retail Markets (Jan. 19, 2015). The methods of Hosken and Tenn and Dr. Hill both examine the purchase decisions of customers—retail store customers in the same geographic area for Hosken and Tenn, artists for Dr. Hill—and infer what those customers' likely next best alternatives are based on the other purchases those customers made. *Id.*; Ex.2 (Hill Reb.) §3.1.1. The approach Dr. Hill took here is consistent with his analysis in *Kroger* and the paper by Drs. Hosken and Tenn.

*Third*, Defendants claim that Dr. Hill's Promotion Services market aggregate diversion fails to consider the relevance of artist tours. Defs. Br. at 13. However, Dr. Hill does consider

18

tours in defining the Promotion Services market, but he also finds there are many one-off shows for which artists purchase promotion services. Ex.1 (Hill Rpt.) §6.1.3. And even on a tour, artists can, and do, substitute at the show level—that is, if the price of promotion services at a given arena increased the artist could substitute to a show at a different venue—which any purported "tour market" advanced by Defendants would fail to capture.

Ultimately, Dr. Hill defines his Promotion Services market to include all shows at MCVs irrespective of whether the promotion services were purchased for a single show or for a bundle of shows as part of a (or the whole) tour. Ex.1 (Hill Rpt.) §6.1.3; Ex.2 (Hill Reb.) ¶133. There is nothing inappropriate about his decision, as there is always some "fuzziness [] inherent in bounding any market.'" *Tapestry, Inc.*, 755 F.Supp.3d at 415 (cleaned up). Moreover, Defendants' critique implicitly assumes that there can be only one relevant market that must include all concerts where an artist performed on a tour. But as Dr. Hill observes—and other courts have found—multiple, potentially overlapping, relevant markets can exist for evaluating Defendants' conduct. Ex.1 (Hill Rpt.) ¶87; s*ee also Tapestry, Inc.*, 755 F.Supp.3d at 413; Ex.6, 2023 Merger Guidelines, at §4.3.

*Fourth*, Defendants take issue with the well-founded margin estimates Dr. Hill uses as an input for determining the critical diversion in both the Amphitheater and Promotion Services markets. Defs. Br. at 9, 11.

In the Amphitheater market, Dr. Hill uses data from six amphitheaters and Live Nation to estimate amphitheater margins. Ex.1 (Hill Rpt.) §G.4; Ex.2 (Hill Reb.) §3.1.2. This includes estimating a co-promotion margin at four amphitheaters—in which the venue and promoter share in the profit and losses of the show—as well as two "standalone" margin estimates based on the amphitheater acting solely as a venue operator, including one based on what Live Nation *itself*

earned (████) in the rare instances in which it has allowed third-party promoted artists to perform in one of its amphitheaters. Ex.2 (Hill Reb.) §3.1.2.a.ii.

Defendants quibble with Dr. Hill's calculation of co-promotion margins, Defs. Motion at 9, but neither Defendants nor their experts put forward any critique of how Dr. Hill calculated the standalone amphitheater margin estimates. Ex.7 (Yurukoglu Dep.) 242:11–243:5. And when these standalone amphitheater estimates are used as an input for critical diversion, the Amphitheater market passes the HMT. Ex.2 (Hill Reb.) Fig. 16.

Defendants dispute Dr. Hill's treatment of artist payments with respect to his margin estimates, but once again, even if Defendants were right (they are not), this is an issue that goes to weight, not admissibility. Dr. Hill explains in both of his reports why—based on the commercial realities of the live entertainment industry and economic principles—it makes sense to exclude payments to artists from his margin estimates. Ex.1 (Hill Rpt.) §D.2; Ex.2 (Hill Reb.) §3.1.2.a; *see also* Ex.6, 2023 Merger Guidelines, at §4.3.B. One reason is that in both the Amphitheaters and Promotion Services markets, artists are customers, as opposed to mere inputs into the production of that service. Ex.2 (Hill Reb.) ¶82. Dr. Hill's treatment of artist payments is also consistent with the views of Live Nation's own CEO, Michael Rapino, who has previously observed that artist payments are a "flow through" for Live Nation's promotions business.[2] Ex.8, Transcript of *Conversations with Michael Eisner: Interview with Live Nation CEO Michael Rapino* (CNBC television broadcast Dec. 23, 2008), Tr. at 3:8–5:6.

---

[2] Defendants suggest that Dr. Hill's treatment of artist payments with respect to calculating margins here is somehow inconsistent with his opinions in a prior case concerning the publishing industry. Defs. Br. at 9, n.3. Defendants fail to point out that in the publishing industry authors *sell* their manuscripts to publishers, rarely earn more than their advance, and that it is publishers who then control when the book is marketed and sold. *Bertelsmann SE & Co. KGaA*, 646 F.Supp.3d at 14, 19-20. In contrast, here, artists purchase promotion services, often earn more than their guarantee, and play an active role in determining where and when they will perform. Ex.1 (Hill Rpt.) §§3.1.1; 3.1.2; Ex.2 (Hill Reb.) §3.1.5.

Nevertheless, in his rebuttal report Dr. Hill accounts for Defendants' critique and includes a margin estimate that accounts for the risk associated with a promoter's payments to artists. Specifically, Dr. Hill "treat[s] any payments to artists making up for a loss as insurance payments, and therefore akin to an expense to the promoter." Ex.2 (Hill Reb.) ¶167. After accounting for these artist payments, Dr. Hill's Promotion Services market still passes the HMT, and is therefore correctly defined. Ex.2 (Hill Reb.) Fig. 31.

## II.    DR. HILL'S TESTIMONY REGARDING ANTICOMPETITIVE CONDUCT IS ADMISSIBLE AND WELL WITHIN THE REALM OF ECONOMIC ANALYSIS

Defendants' attempt to exclude Dr. Hill's opinions regarding Defendants' own "anticompetitive conduct" is inappropriate because those opinions are based on well-founded economic principles and are consistent with expert testimony in other antitrust cases that courts have allowed and accepted.

In complex litigation, "[e]xpert witnesses are often uniquely qualified in guiding the trier of fact through a complicated morass of obscure terms and concepts." *Duncan*, 42 F.3d at 101. Thus, courts routinely rely on experts' assessments of whether conduct was anticompetitive in antitrust cases. *See, e.g.*, *United States v. Google LLC*, 778 F.Supp.3d 797, 865 (E.D. Va. 2025) (acknowledging that "three experts testified that [defendant's conduct] was anticompetitive" and concluding that defendant's conduct "constituted anticompetitive conduct."); *U.S. Airways, Inc.*, 2022 WL 874945, at *7 ("The jury can credit any of the potential pathways to market change hypothesized by [plaintiff's expert] to find that a more competitive market could emerge in the absence of Sabre's purportedly anticompetitive conduct"). Indeed, courts in recent monopolization cases have allowed economic expert witnesses to testify regarding conduct that is "anticompetitive." Ex.12, Tr. at 54–55, *United States v. Google LLC*, 1:23-cv-108 (E.D. Va. Sept. 18, 2024) (testimony of Dr. Abrantes Metz); Ex.13, Tr. at 127-128, *United States v. Google*

*LLC*, 1:23-cv-108 (E.D. Va. Sept. 19, 2024) (testimony of Dr. Lee); Ex.14, Tr. at 5712:22–

5713:5, *United States v. Google LLC*, 1:20-cv-3010 (D.D.C. October 16, 2023) (testimony of Dr.

Whinston). This Court has also found expert opinions regarding "anticompetitive intent"

admissible in a monopolization case where supported by economic analysis. *See Dial Corp.*, 165

F.Supp.3d 25 at 41.

The Dr. Hill's opinions are no different. His opening report outlines the generally accepted

economic principles for analyzing anticompetitive conduct and harm to competition, which he

dutifully applies when forming his opinions. *See* Ex.1 (Hill Rpt.) §4.3. Nowhere in his reports

does Dr. Hill offer a legal opinion, assert that Defendants' conduct violates the antitrust laws, or

"tell the jury what result to reach." Fed. R. Evid. 704 Advisory Committee Note (distinguishing

between acceptable expert opinions and those that "merely tell the jury what result to reach" or

are "phrased in terms of *inadequately explored* legal criteria") (emphasis added).

The case law Defendants cite, by contrast, invariably dealt with experts opining on

whether conspiracies happened—actual facts the trier should determine, not economic

analyses—that allegedly caused market harm. *See In re LIBOR-Based Fin. Instruments Antitrust

Litig.,* 2025 WL 2733020, at *22 (S.D.N.Y. Sept. 25, 2025) (expert could testify on whether

market was conducive to conspiracy, not whether defendants colluded); *Union Carbide Corp. v.

Montell N.V.*, 28 F. Supp. 2d 833, 843 (S.D.N.Y. 1998) (expert prevented from opining on "legal

conclusions" regarding "market allocation, revenue sharing, and price coordination activities").

Regardless, throughout his reports Dr. Hill assesses—after presenting significant

quantitative and qualitative analyses—whether Defendants' conduct is anticompetitive as a

matter of economic principles.[3] Because Dr. Hill is not offering a legal opinion on whether

---

[3] Though they disagree with Dr. Hill's conclusions regarding "anticompetitive conduct," Defendants do not
challenge his underlying analyses of conduct on this basis. Moreover, Defendants' experts do not challenge the

Defendant's conduct is unlawfully anticompetitive, he should be permitted to testify about the relevant markets he has defined, the extent of Defendants' market power in these markets, the economic elements of Defendants' conduct, and his economic expert conclusions regarding the impact of the conduct on competition and customers in the relevant markets. *See, e.g.*, *U.S. Info. Sys., Inc., v. Int'l Bhd. Of Elect. Wrkrs*, 313 F.Supp.2d 213, 240 (S.D.N.Y 2004). Dr. Hill's opinions on Defendants' conduct will help the trier of fact to evaluate competitive effects in dynamic markets that are outside of a layperson's body of knowledge and expertise without "usurp[ing] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *Lumpkin*, 192 F.3d 280, 289 (citation omitted).

To deem expert testimony inadmissible for using the term "anticompetitive" would be equally fatal to Defendants' experts, who pepper their reports with similar opinions and conclusions. *See, e.g.*, Ex.9 (Carlton Rpt.) ¶37 (opining that venues expecting Ticketmaster to "be able to provide high-quality service in the future" is an example of "procompetitive conduct"), ¶50 (claiming that "[m]ultiyear, exclusive contracts have procompetitive justifications"); Ex.3 (Yurukoglu Rpt.) ¶¶20–22 (critiquing plaintiff's expert for purportedly failing to "distinguish between procompetitive and anticompetitive conduct"), ¶218 (identifying potential "procompetitive benefits"), ¶219 (describing the results of an economic model as "consistent with [Defendants'] procompetitive behavior"), ¶246 (identifying "procompetitive benefits" that Defendants purportedly achieved from acquiring smaller competitors"). The jury is entitled to hear Dr. Hill's testimony regarding Defendants' conduct and to weigh it against that of Defendants' experts.

---

premises of Dr. Hill's economic framework nor suggest an alternative framework for evaluating the economic effects of the conduct. Ex.2 (Hill Reb.) ¶296.

III.  **DR. HILL'S ANALYSIS OF QUALITATIVE EVIDENCE TO SUPPORT HIS OPINIONS IS ADMISSIBLE AND APPROPRIATE FOR AN ANTITRUST ECONOMIST**

Defendants improperly seek to exclude every reference by Dr. Hill to qualitative evidence he determined to be "consistent with" his opinions. Defs. Br. 19. But Defendants misstate the law, the typical role of an economist in an antitrust case, and the nature of Dr. Hill's report and anticipated testimony.

In complex cases, experts are often properly tasked with helping a jury "understand unfamiliar terms and concepts." *Bilzerian*, 926 F.2d at 1294. While "[m]ere narration" of the factual record by an expert is not permitted, *SEC v. Tourre*, 950 F.Supp.2d 666, 675 (S.D.N.Y. 2013), expert witnesses may discuss the relevant factual record if they intertwine such testimony with their analyses and ultimate opinions. *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F.Supp.2d 448, 466–67 (S.D.N.Y. 2010); *Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116 (S.D.N.Y. 2014) (admitting testimony that was based on "general knowledge of economic principles . . . and his application of that understanding to the specific facts of the . . . case"). Exclusion is only warranted where expert testimony would provide "nothing more than a repetition of the factual allegations in plaintiffs' complaint'" or where the proponent "effectively concede[d] [the expert] was not giving expert testimony at all." *Jakobovits v. PHL Variable Ins. Co.*, 645 F.Supp.3d 95, 115–16 (E.D.N.Y. 2022) (allowing expert "testimony [that] will assist the jury in understanding the evidence" given their lack of "background on relevant aspects of the life insurance industry"); *see also Dial Corp.*, 165 F.Supp.3d at 41 (allowing economic expert to rely on party's "statements regarding its strategies" and distinguishing other cases in which "expert testimony [was] plainly untethered to any economic analysis"). Defendants' motion appears to advance a bright-line rule that an

24

economic expert can *never* testify about factual, "qualitative evidence." *See* Defs. Br. at 16–19. No such rule exists.

First, economic experts regularly rely upon qualitative evidence—in addition to quantitative analyses—to reach opinions regarding market definition and the competitive effects of conduct. *See, e.g., AngioDynamics, Inc. v. C.R. Bard, Inc.*, 2022 WL 2643583, at *6 (N.D.N.Y. July 8, 2022) ("Courts have allowed expert economists to testify based on qualitative analyses and do not always require quantitative analysis.") (collecting cases); *Allegra*, 341 F.R.D. at 433 (accepting expert testimony based on "evaluation of various documents, including . . . training documents, as well as manuals and guides detailing the specific operations of each relevant machine."). Quantitative evidence is not inherently superior to qualitative evidence. Second, experts are permitted to define a standard of analysis based on their relevant expertise and then apply that standard to the factual record, as Dr. Hill did here. *Pension Comm.*, 691 F.Supp.2d at 466–67.

Dr. Hill's framework and opinions are consistent with these standards. In his report, Dr. Hill sets forth the "[e]conomic principles for the analysis of market definition" and "market power," as well as a "commonly-used framework for evaluating whether a monopolist's conduct has harmed competition and customers." Ex.1 (Hill Rpt.) §§4.1–4.3. Dr. Hill presents many quantitative and qualitative analyses applying these frameworks to support his opinions on the relevant markets and Defendants' conduct. In doing so, Dr. Hill intertwines references to the voluminous evidentiary record, analyzed through the lens of his economic framework, to show how that record supports his ultimate opinions.

None of Defendants' cases found such intertwined factual testimony by a concededly qualified expert to be inadmissible, especially in the context of a complex monopolization case.

And courts that have considered similar arguments have rejected them. *See, e.g.*, *B & R Supermarket, Inc. v. Mastercard Int'l, Inc.*, 2021 WL 234550, at \*13 (E.D.N.Y. Jan. 19, 2021) (admitting testimony where antitrust expert "did not rehash the factual record for the purpose of drafting a facts section and speculating about Defendants' agents' state of mind and motivations") (cleaned up). In antitrust cases, in particular, courts have allowed experts to testify to their examination and analysis of the factual record. *Id.* at \*13–14; *see also In re Processed Egg Prods. Antitrust Litig.*, 81 F.Supp.3d 412, 423–24 (E.D. Pa. 2015) (accepting expert testimony in which the economist "examin[ed] the factual record with the tools of an economist so as to formulate a theory that he then tests with econometric and statistical evidence").

That Dr. Hill cites qualitative evidence throughout his reports is a feature, not a bug, of Dr. Hill's well-supported economic analysis. Defendants have not pointed to any instance in which Dr. Hill made an improper credibility determination concerning witness testimony.[4] As Dr. Hill explained in his opening report:

> To the extent that I have referenced or relied on discovery documents and testimony in this report, I have done so to ensure that my economic analyses are predicated on an understanding of the facts and to utilize the relevant factual information in my economic analyses. I do not offer expert opinions as to the meaning of individual documents.

Ex.1 (Hill Rpt.) ¶11.[5]

Defendants also take issue with the substance of Dr. Hill's citations, putting forward what they claim is "contradictory qualitative evidence." (Defs. Br. at 17.) But such critiques of Dr.

---

[4] Defendants claim that Dr. Hill admitted at deposition to making credibility determinations related to witness testimony, but nowhere in that convoluted line of questioning did Dr. Hill do so. Ex.5 (Hill Dep.) 300:1–301:15 (A: "I don't know what you mean by a credibility evaluation."). To the extent Dr. Hill "weigh[ed]" the evidence to determine his opinions were in fact supported by the factual record, Dr. Hill made clear "if you're asking did I determine what facts the jury or the court will look at? That's their decision, not mine." Ex.5 (Hill Dep.) 301:24–302:11.

[5] This is similar to the way Defendants' expert, Dr. Carlton, described his use of record evidence in his reports. Ex.9 (Carlton Rpt.) at 12, n.23.

Hill's conclusions are appropriate for cross-examination, not exclusion. *See Zerega*, 571 F.3d at 214. And Dr. Hill's reasonable concession that he did not "list all the evidence that cuts *in either direction*" given the voluminous evidentiary record here, is not the same as "cherry-picking" portions of the record. Ex.5 (Hill Dep.) 317:21–319:11 (emphasis added). Defendants' arguments also belie their own experts' reliance on qualitative evidence to support their opinions. *See, e.g.*, Ex.10 (Budish Rpt.) §§4.1, 4.3.1, 4.3.2, 4.4.1, 4.4.2, 5.1, 5.3; Ex.9 (Carlton Rpt.) III.A.1–2, III.C. To exclude expert testimony on this erroneous basis would be equally detrimental to Defendants' experts.

Defendants' remaining cases—none of which involved antitrust claims—are inapposite. They involved experts opining on the "knowledge, motivations, and intent" of the parties—none of which Dr. Hill does—which was not necessary for a lay jury to "comprehend[] the primary facts," *Anderson News, L.L.C. v. Am. Media, Inc.*, 2015 WL 5003528, at *2 (S.D.N.Y. Aug. 20, 2015), *aff'd*, 899 F.3d 87 (2d Cir. 2018), or involved "mere narration" of the factual record that "assign[ed] motives and draw conclusions wholly outside [the expert's] expertise." *Scentsational Techs., LLC v. Pepsi, Inc.*, 2018 WL 1889763, at *4, *8 (S.D.N.Y. Apr. 18, 2018). But even the *Scentsational* court recognized that "[i]t is certainly the case that an expert may and often must rely on facts—and that the expert will state them in a report" and provide a "recitation of how a document is supportive of an opinion," as Dr. Hill did here. *Id.* at *4.

Likewise, in *LinkCo, Inc.*, the court excluded expert testimony where "it d[id] not address technical questions that may be difficult for a juror to comprehend" because the expert did not actually "explain complex technical issues" and instead opined on "the credibility of evidence." *LinkCo, Inc. v. Fujitsu Ltd.*, 2002 WL 1585551, at *2 (S.D.N.Y. July 16, 2002). Here, Dr. Hill did not opine on the credibility of evidence but has explained economic principles underlying market

definition and competitive effects and how the complex record at issue here can be analyzed within that framework. Finally, in *Bobcar Media*, the court excluded expert testimony that "offers no analysis beyond highlighting aspects of the record that he finds important and demonstrating how it satisfies the legal standards he sets out." *Bobcar Media, LLC v. Aardvark Event Logistics, Inc.*, 554 F.Supp.3d 606, 613 (S.D.N.Y. 2020). Dr. Hill has plainly done more here.

## CONCLUSION

For the reasons set forth above, Defendants' motion to exclude the opinions of Dr. Hill should be denied.

Respectfully submitted,

*/s/ Bonny Sweeney*
BONNY SWEENEY
*Co-Lead Trial Counsel*
David Dahlquist
*Co-Lead Trial Counsel*
John R. Thornburgh II
Danielle Drory
David Teslicko
Seana Buzbee
United States Department of Justice
Antitrust Division
450 Fifth Street N.W., Suite 4000
Washington, DC 20530
Telephone: (202) 725-0165
Facsimile: (202) 514-7308
Bonny.Sweeney@usdoj.gov
David.Dahlquist@usdoj.gov
*Attorneys for Plaintiff United States of America*

/s/ Robert A. Bernheim
Robert A. Bernheim (admitted *pro hac vice*)
Office of the Arizona Attorney General
Consumer Protection & Advocacy Section
2005 N. Central Avenue
Phoenix, AZ 85004
Telephone: (602) 542-3725
Fax: (602) 542-4377
Email: Robert.Bernheim@azag.gov
*Attorney for Plaintiff State of Arizona*

/s/ Amanda J. Wentz
Amanda J. Wentz (admitted *pro hac vice*)
Assistant Attorney General
Office of the Arkansas Attorney General
101 West Capitol Avenue
Little Rock, AR 72201
Telephone: (501) 682-1178
Fax: (501) 682-8118
Email:  amanda.wentz@arkansasag.gov
*Attorney for Plaintiff State of Arkansas*

/s/ Brent K. Nakamura
Brent K. Nakamura (admitted *pro hac vice*)
Supervising Deputy Attorney General
Office of the Attorney General
California Department of Justice
300 South Spring Street, Suite 9200-6
Los Angeles, CA 90013
Telephone: (213) 269-6000
Email: Brent.Nakamura@doj.ca.gov
*Attorney for Plaintiff State of California*

/s/ Conor J. May
Conor J. May (admitted *pro hac vice*)
Assistant Attorney General
Antitrust Unit
Colorado Department of Law
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email: Conor.May@coag.gov
*Attorney for Plaintiff State of Colorado*

/s/ Victoria Maria Orton Field
Victoria Maria Orton Field (admitted *pro hac vice*)
Assistant Attorney General
Office of the Attorney General of Connecticut
165 Capitol Avenue
Hartford, CT 06106
Telephone: 860-808-5030
Email: victoria.field@ct.gov
*Attorney for Plaintiff State of Connecticut*

/s/ Elizabeth G. Arthur
Elizabeth G. Arthur (admitted *pro hac vice*)
Senior Assistant Attorney General
Office of the Attorney General for the District of Columbia
400 6th Street NW, 10th Floor
Washington, DC 20001
Email: Elizabeth.arthur@dc.gov
*Attorney for Plaintiff District of Columbia*

/s/ Lizabeth A. Brady
Lizabeth A. Brady
Director, Antitrust Division
Florida Office of the Attorney General
PL-01 The Capitol
Tallahassee, FL 32399-1050
Telephone: 850-414-3300
Email: Liz.Brady@myfloridalegal.com
*Attorney for Plaintiff State of Florida*

/s/ Richard S. Schultz
Richard S. Schultz (admitted *pro hac vice*)
Assistant Attorney General
Office of the Illinois Attorney General
Antitrust Bureau
115 S. LaSalle Street, Floor 23
Chicago, Illinois 60603
Telephone: (872) 272-0996
Email: Richard.Schultz@ilag.gov
*Attorney for Plaintiff State of Illinois*

/s/ Jesse Moore
Jesse Moore (admitted *pro hac vice*)
Deputy Attorney General
Office of the Indiana Attorney General
302 W. Washington St., Fifth Floor
Indianapolis, IN 46204
Telephone: 317-232-4956
Email: Jesse.Moore@atg.in.gov
*Attorney for Plaintiff State of Indiana*

/s/ Noah Goerlitz
Noah Goerlitz (admitted *pro hac vice*)
Assistant Attorney General
Office of the Iowa Attorney General
1305 E. Walnut St.
Des Moines, IA 50319
Telephone: (515) 281-5164
Email: noah.goerlitz@ag.iowa.gov
*Attorney for Plaintiff State of Iowa*

/s/ Christopher Teters
Christopher Teters (admitted *pro hac vice*)
Assistant Attorney General
Public Protection Division
Office of Kansas Attorney General
120 S.W. 10th Avenue, 2nd Floor
Topeka, KS 66612-1597
Telephone: (785) 296-3751
Email: chris.teters@ag.ks.gov
*Attorney for Plaintiff State of Kansas*

/s/ Mario Guadamud
Mario Guadamud (admitted *pro hac vice*)
Louisiana Office of Attorney General
1885 North Third Street
Baton Rouge, LA 70802
Telephone: (225) 326-6400
Fax: (225) 326-6498
Email: GuadamudM@ag.louisiana.gov
*Attorney for Plaintiff State of Louisiana*

/s/ Schonette J. Walker
Schonette J. Walker (admitted *pro hac vice*)
Assistant Attorney General
Chief, Antitrust Division
200 St. Paul Place, 19th floor
Baltimore, Maryland 21202
Telephone: (410) 576-6470
Email: swalker@oag.state.md.us
*Attorney for Plaintiff State of Maryland*

/s/ Katherine W. Krems
Katherine W. Krems (admitted *pro hac vice*)
Assistant Attorney General, Antitrust Division
Office of the Massachusetts Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (617) 963-2189
Email: Katherine.Krems@mass.gov
*Attorney for Plaintiff Commonwealth of Massachusetts*

/s/ LeAnn D. Scott
LeAnn D. Scott (admitted *pro hac vice*)
Assistant Attorney General
Corporate Oversight Division
Michigan Department of Attorney General
P.O. Box 30736
Lansing, MI 48909
Telephone: (517) 335-7632
Email: ScottL21@michigan.gov
*Attorney for Plaintiff State of Michigan*

/s/ Zach Biesanz
Zach Biesanz
Senior Enforcement Counsel
Antitrust Division
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
Saint Paul, MN 55101
Telephone: (651) 757-1257
Email: zach.biesanz@ag.state.mn.us
*Attorney for Plaintiff State of Minnesota*

/s/ Lee Morris
Lee Morris (admitted pro hac vice)
Special Assistant Attorney General
Mississippi Office of Attorney General
Post Office Box 220
Jackson, Mississippi 39205
Telephone: (601) 359-9011
Email: Lee.Morris@ago.ms.gov
Attorney for Plaintiff State of Mississippi

/s/ Justin C. McCully
Justin C. McCully (admitted *pro hac vice*)
Assistant Attorney General
Consumer Protection Bureau
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68509
Telephone: (402) 471-9305
Email: justin.mccully@nebraska.gov
*Attorney for Plaintiff State of Nebraska*

/s/ Lucas J. Tucker
Lucas J. Tucker (admitted *pro hac vice*)
Senior Deputy Attorney General
Office of the Nevada Attorney General
Bureau of Consumer Protection
100 N. Carson St.
Carson City, NV 89701
Email: ltucker@ag.nv.gov
*Attorney for Plaintiff State of Nevada*

/s/ Zachary Frish
Zachary A. Frish (admitted *pro hac vice*)
Assistant Attorney General
Consumer Protection & Antitrust Bureau
New Hampshire Attorney General's Office
Department of Justice
1 Granite Place South
Concord, NH 03301
Telephone: (603) 271-2150
Email: zachary.a.frish@doj.nh.gov
*Attorney for Plaintiff State of New Hampshire*

/s/ Andrew F. Esoldi
Andrew F. Esoldi
Deputy Attorney General
Division of Law
Antitrust Litigation and Competition
Enforcement
124 Halsey Street, 5th Floor
Newark, NJ 07101
Telephone: (609) 696-5465
Email: Andrew.Esoldi@law.njoag.gov
Attorney for Plaintiff State of New Jersey

/s/ Jonathan Hatch
Jonathan Hatch
Assistant Attorney General
New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8598
Email: jonathan.hatch@ag.ny.gov
*Attorney for Plaintiff State of New York*

/s/ Evan Crocker
Evan Crocker (admitted *pro hac vice*)
Assistant Attorney General, Division Director
Consumer Affairs Division
New Mexico Department of Justice
201 3rd St NW, Suite 300
Albuquerque, NM 87102
Telephone: (505) 494-8973
Email: ecrocker@nmdoj.gov
*Attorney for Plaintiff State of New Mexico*

/s/ Francisco Benzoni
Francisco Benzoni (admitted *pro hac vice*)
Special Deputy Attorney General
Brian Rabinovitz (admitted *pro hac vice*)
Special Deputy Attorney General
North Carolina Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
Telephone: (919) 716-6000
Facsimile: (919) 716-6050
Email: fbenzoni@ncdoj.gov
Email: brabinovitz@ncdoj.gov
*Attorneys for Plaintiff State of North Carolina*

/s/ Sarah Mader
Sarah Mader (admitted *pro hac vice)*
Assistant Attorney General
Antitrust Section
Office of the Ohio Attorney General
30 E. Broad St., 26th Floor
Columbus, OH 43215
Telephone: (614) 466-4328
Email: Sarah.Mader@OhioAGO.gov
*Attorney for Plaintiff State of Ohio*

/s/ Cameron R. Capps
Cameron R. Capps (admitted *pro hac vice)*
Deputy Attorney General
Consumer Protection
Office of the Oklahoma Attorney General
313 N.E. 21st Street
Oklahoma City, Oklahoma  73105
Telephone:  (405) 522-0858
Fax:  (405) 522-0085
Email: Cameron.Capps@oag.ok.gov
Attorney for Plaintiff State of Oklahoma

/s/ Gina Ko
Gina Ko (admitted *pro hac vice)*
Assistant Attorney General
Antitrust, False Claims, and Privacy Section
Oregon Department of Justice
100 SW Market St.,
Portland, Oregon 97201
Telephone: (971) 673-1880
Fax: (503) 378-5017
Email: Gina.Ko@doj.oregon.gov
*Attorney for Plaintiff State of Oregon*

/s/ Joseph S. Betsko
Joseph S. Betsko (admitted *pro hac vice)*
Assistant Chief Deputy Attorney General
Antitrust Section
Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
Telephone: (717) 787-4530
Email: jbetsko@attorneygeneral.gov
*Attorney for Plaintiff Commonwealth of
Pennsylvania*

/s/ Paul T.J. Meosky
Paul T.J. Meosky (admitted *pro hac vice)*
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400, ext. 2064
Fax: (401) 222-2995
Email: pmeosky@riag.ri.gov
*Attorney for Plaintiff State of Rhode Island*

/s/ Jared Q. Libet
Jared Q. Libet (admitted *pro hac vice)*
Assistant Deputy Attorney General
Office of the Attorney General of South
Carolina
P.O. Box 11549
Columbia, South Carolina 29211
Telephone: (803) 734-5251
Email: jlibet@scag.gov
*Attorney for Plaintiff State of South Carolina*

/s/ Bret Leigh Nance
Bret Leigh Nance (admitted *pro hac vice)*
Assistant Attorney General
1302 E. Hwy 14, Suite 1
Pierre SD 57501-8501
Email: bretleigh.nance@state.sd.us
Telephone: (605) 773-3215
Bar # 5613
*Attorney for Plaintiff State of South Dakota*

/s/ Hamilton Millwee
Hamilton Millwee (admitted *pro hac vice)*
Assistant Attorney General
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 38202
Telephone: (615) 291-5922
Email: Hamilton.Millwee@ag.tn.gov
*Attorney for Plaintiff State of Tennessee*

/s/ Diamante Smith
Diamante Smith (admitted *pro hac vice)*
Assistant Attorney General, Antitrust Division
Office of the Attorney General of Texas
P.O. Box 12548
Austin, TX 78711-2548
Telephone: (512) 936-1162
*Attorney for Plaintiff State of Texas*

/s/ Marie W.L. Martin
Marie W.L. Martin (admitted *pro hac vice*)
Deputy Division Director,
Antitrust & Data Privacy Division
Utah Office of Attorney General
160 East 300 South, 5th Floor
P.O. Box 140830
Salt Lake City, UT 84114-0830
Telephone: 801-366-0375
Email: mwmartin@agutah.gov
*Attorney for Plaintiff State of Utah*

/s/ Sarah L. J. Aceves
Sarah L. J. Aceves (admitted *pro hac vice*)
Assistant Attorney General
Consumer Protection and Antitrust Unit
Vermont Attorney General's Office
109 State Street
Montpelier, VT 05609
Telephone: (802) 828-3170
Email: sarah.aceves@vermont.gov
*Attorney for Plaintiff State of Vermont*

/s/ David C. Smith
David C. Smith (admitted *pro hac vice*)
Assistant Attorney General
Office of the Attorney General of Virginia
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 692-0588
Facsimile: (804) 786-0122
Email: dsmith@oag.state.va.us
*Attorney for Plaintiff Commonwealth of Virginia*

/s/ Ashley A. Locke
Ashley A. Locke (admitted *pro hac vice*)
Assistant Attorney General
Antitrust Division
Washington Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
Telephone: (206) 389-2420
Email: Ashley.Locke@atg.wa.gov
*Attorney for Plaintiff State of Washington*

/s/ Douglas L. Davis
Douglas L. Davis (admitted *pro hac vice*)
Senior Assistant Attorney General
Consumer Protection and Antitrust Section
West Virginia Office of Attorney General
P.O. Box 1789
Charleston, WV 25326
Telephone: (304) 558-8986
Fax: (304) 558-0184
Email: douglas.l.davis@wvago.gov
*Attorney for Plaintiff State of West Virginia*

/s/ Caitlin M. Madden
Caitlin M. Madden (admitted *pro hac vice*)
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
Telephone: (608) 267-1311
Email: caitlin.madden@wisdoj.gov
*Attorney for Plaintiff State of Wisconsin*

/s/ William T. Young
William T. Young
Assistant Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
Telephone: (307) 777-7847
Email: william.young@wyo.gov
*Attorney for the Plaintiff State of Wyoming*

### Certificate of Compliance

In accordance with Local Civil Rule 7.1(c), and Rule 8(c) of this Court's Individual Practices in Civil Cases, I certify that the word count of this memorandum of law is 8,735 words, which includes footnotes but excludes the caption, any index, table of contents, table of authorities, signature blocks, or any certificates. This certificate is made in reliance on the word count of the word-processing program used to prepare the document.

*/s/ John R. Thornburgh II*
John R. Thornburgh II

*Attorney for Plaintiff United States of America*