**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | Case No. 1:24-cv-03973-AS |
| *Plaintiffs,* | **ORAL ARGUMENT REQUESTED** |
| v. | **REDACTED** |
| LIVE NATION ENTERTAINMENT, INC., and TICKETMASTER L.L.C., | |
| *Defendants.* | |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFFS' MOTION TO PARTIALLY EXCLUDE THE EXPERT TESTIMONY OF
<u>PAUL K. MEYER</u>**

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND .........................................................................................................................2

LEGAL STANDARD...................................................................................................................5

ARGUMENT ...............................................................................................................................5

I.      MR. MEYER'S BENCHMARKING COMPARISONS USE RELIABLE
        FINANCIAL INFORMATION FOR EVALUATING LIVE NATION'S
        PROFITS...........................................................................................................................6

        A.      Mr. Meyer's Benchmarking Comparisons Are Relevant .......................................7

        B.      Mr. Meyer's Benchmarking Comparisons Are Reliable .........................................9

                1.      Mr. Meyer's Benchmarking Analyses Are Based on Reliable
                        Financial Information................................................................................10

                2.      Mr. Meyer's Choice of Comparators Reflects Expert Judgment and
                        Is Reliable ................................................................................................11

        C.      Plaintiffs' Authorities Do Not Support Exclusion of Mr. Meyer's
                Comparisons .....................................................................................................14

        D.      Rule 403 Does Not Justify Exclusion ..................................................................16

II.     MR. MEYER'S OPINION THAT LIVE NATION'S MODEST PROFITS ARE
        INCONSISTENT WITH "WHAT ONE WOULD EXPECT FROM A
        MONOPOLIST ALLEGEDLY CHARGING SUPERCOMPETITIVE PRICES"
        IS ADMISSIBLE ...........................................................................................................17

CONCLUSION...........................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Adesina v. Aladan Corp.*,
    438 F. Supp 2d 329 (S.D.N.Y. 2006)......................................................................7

*Alfa Corp. v. OAO Alfa Bank*,
    475 F. Supp. 2d 357 (S.D.N.Y. 2007)..................................................................14

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002)..................................................................................5

*Bailey v. Allgas, Inc.*,
    148 F. Supp. 2d 1222 (N.D. Ala. 2000).........................................................14, 15

*Bailey v. Allgas, Inc.*,
    284 F.3d 1237 (11th Cir. 2002) ....................................................................6, 15, 16

*Bailey v. Allgas, Inc.*,
    No. 98–6278, slip op., 184 F.3d 824 (11th Cir. June 11, 1999) ...........................6

*Boucher v. U.S. Suzuki Motor Corp.*,
    73 F.3d 18 (2d Cir. 1996)......................................................................................9

*Campbell ex rel. Campbell v. Metro Prop. & Casualty Ins. Co.*,
    239 F.3d 179 (2d Cir. 2001)................................................................................20

*Celebrity Cruises, Inc. v. Essef Corp.*,
    434 F. Supp. 2d 169 (S.D.N.Y. 2006)..................................................................14

*CFTC v. Wilson*,
    No. 13 Civ. 7884 (AT), 2016 WL 7229056 (S.D.N.Y. Sept. 30, 2016)..................5

*City of Tuscaloosa v. Harcros Chemicals, Inc.*,
    158 F.3d 548 (11th Cir. 1998) ............................................................................18

*Clerveaux v. E. Ramapo Cent. Sch. Dist.*,
    984 F.3d 213 (2d Cir. 2021)...............................................................................7, 9

*Colon ex rel. Molina v. BIC USA, Inc.*,
    199 F. Supp. 2d 53 (S.D.N.Y. 2001)..............................................................17, 18

*Costantino v. David M. Herzog, M.D., P.C.*,
    203 F.3d 164 (2d Cir. 2000)................................................................................17

*Dartez v. Fibreboard Corp.*,
    765 F.2d 456 (5th Cir. 1985) ...............................................................................17

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993).................................................................................5, 7, 16, 20

*FTC v. Meta Platforms, Inc.*,
    No. CV 20-3590 (JEB), 2025 WL 3211725 (D.D.C. Nov. 18, 2025) ....................20

*George v. Celotex Corp.*,
    914 F.2d 26 (2d Cir. 1990)....................................................................................17

*In re Fosamax Prods. Liab. Litig.*,
    645 F. Supp. 2d 164 (S.D.N.Y. 2009)....................................................................5

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    638 F. Supp. 3d 227 (E.D.N.Y. 2022) .............................................................7, 19

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*,
    No. 05-MD-1720, 2022 WL 15053250 (E.D.N.Y. Oct. 26, 2022)........................16

*In re Perrigo Co. PLC Sec. Litig.*,
    19CV70, 2021 WL 3773461 (S.D.N.Y. Aug. 24, 2021) .........................................7

*In re Suboxone (Buprenorphine Hydrochloride and Nalaxone) Antitrust Litigation*,
    421 F. Supp. 3d 12 (E.D. Pa. 2019) .......................................................................8

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999)...................................................................................5, 9, 11

*Laureano v. City of New York*,
    No. 17-CV-181, 2021 WL 3272002 (S.D.N.Y. July 30, 2021) ...............................7

*Lickteig v. Cerberus Cap. Mgmt., L.P.*,
    589 F. Supp. 3d 302 (S.D.N.Y. 2022)............................................................11, 14

*Main Street Mortg., Inc. v. Main Street Bancorp., Inc.*,
    158 F. Supp. 2d 510 (E.D. Pa. 2001) ...................................................................19

*Manbro Energy Corp. v. Chatterjee Advisors, LLC*,
    No. 20 Civ. 3773 (LGS), 2022 WL 4225543 (S.D.N.Y. Sept. 13, 2022)..........14, 15

*Mirkin v. XOOM Energy LLC*,
    No. 18-CV-2949, 2025 WL 16333 (E.D.N.Y. Jan. 2, 2025) ............................15, 16

*PRCM Advisers LLC v. Two Harbors Inv. Corp.*,
    No. 20-CV-5649 (LAK), 2025 WL 1276513 (S.D.N.Y. May 2, 2025) ..................11

*Rock v. Arkansas*,
    483 U.S. 44 (1987)..................................................................................................5

*Senra v. Cunnningham*,
    9 F.3d 168 (1st Cir. 1993)...................................................................................17

*Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*,
    223 F.3d 585 (7th Cir. 2000) ...............................................................................20

*U.S. Airways, Inc. v. Sabre Holdings Corp.*,
    No. 11 Civ. 2725 (LGS), 2016 WL 11796987 (S.D.N.Y. Aug. 3, 2016) ...................... *passim*

*U.S. Info. Sys. v. Int'l Bhd. of Elec. Workers Loc. Union No. 3*,
    313 F. Supp. 2d 213 (S.D.N.Y. 2004)....................................................................5

*United States v. Ewings*,
    936 F.2d 903 (7th Cir. 1991) ...............................................................................17

*United States v. Green*,
    No. 22-3217, 2024 WL 4488577 (2d Cir. Oct. 15, 2024)..........................................9

*United States v. Williams*,
    506 F.3d 151 (2d Cir. 2007)............................................................................7, 9

## RULES

Fed. R. Evid.
    401........................................................................................................................7
    403..................................................................................................2, 16, 17, 20
    702.................................................................................................... *passim*

## PRELIMINARY STATEMENT

A fundamental issue in this case is whether Live Nation has monopoly power, one indication of which is abnormally high profitability. The Government routinely relies on claims of high profitability to show market power, but not here. In the ticketing, promotion, and venue businesses that it allegedly monopolizes, Live Nation's profits are modest and anything but monopolistic. Likewise, at the enterprise level—which addresses Plaintiffs' narrative that a company-wide "flywheel" purportedly "entrenches Live Nation's profits and power," Am. Compl. ¶ 55—Live Nation does not have the profitability associated with monopoly.

Plaintiffs' response to this is two-fold. They proffer their own expert (Dr. Anderson) to say nothing more than that one should not trust the numbers from Live Nation's accounting systems (though she does not contest their accuracy). And then, in this motion, they seek to selectively exclude elements of a comprehensive accounting analysis presented by Mr. Paul Meyer, who uses his expertise in financial and managerial accounting to evaluate Live Nation's financial disclosures and general ledger data, and offers opinions that include his assessment of the modest profits realized by Live Nation and its various business segments.

Plaintiffs accept, however reluctantly, that evidence of Live Nation's financial performance from accounting records is relevant and that Mr. Meyer may testify about that. But the foundation of this motion is that, because Mr. Meyer is not an economist, he cannot be allowed to say anything about "supracompetitive" pricing or profits. Mot. at 1 (emphasis in original). Plaintiffs' motion targets three benchmarking comparisons and a single sentence describing Live Nation's recorded profits as inconsistent with a monopolist allegedly charging supracompetitive prices. Mot. at 2.

The motion should be denied. Mr. Meyer's comparisons provide logical and valuable context regarding Plaintiffs' claims about Live Nation's alleged monopoly power. Evidence of

accounting profits is often admitted in antitrust cases—often at the insistence of the government—and arguments about its probative value "go[ ] to the weight, not the admissibility of [the] opinion" under Rule 702 or 403. *U.S. Airways, Inc. v. Sabre Holdings Corp.*, No. 11 Civ. 2725 (LGS), 2016 WL 11796987, at *1 (S.D.N.Y. Aug. 3, 2016). Furthermore, Plaintiffs are in no position to complain about company-wide profitability evidence. Their "flywheel" arguments make that highly relevant. Live Nation is clearly entitled to prove that the allegedly synergistic effect of multiple monopolies does not result in abnormally high company-wide profits.

## BACKGROUND

There can be, and is, no genuine dispute about Mr. Meyer's qualifications as an expert in accounting and financial reporting. Mr. Meyer is a Certified Public Accountant, a Certified Fraud Examiner, and Accredited in Business Valuation, bringing over four decades of experience in analyzing complex financial statements, tracing revenue and expense transaction flows, and assessing profitability in both litigation and advisory contexts. Ex. 1 (Meyer Rpt. ¶¶ 1, 4). He has served as an adjunct professor at Stanford University's Graduate School of Engineering, where he taught courses on accounting, quantitative methods, valuation, and financial issues for nearly thirty years. Mr. Meyer has been recognized as an expert and testified in approximately 75 trials and major arbitrations in courts and tribunals in the United States and abroad. *Id.* (Meyer Rpt., Attach. 1). Defendants engaged Mr. Meyer to address accounting and financial reporting questions raised by Plaintiffs' claims and to counter the financial presentations and damages models proposed by Plaintiffs' experts. He submitted an initial report on September 16, 2025 (*see* Ex. 1 (Meyer Rpt.)), a sur-rebuttal report on October 29, 2025 (*see* Ex. 2 (Meyer Reb. Rpt.)), and was deposed on November 5, 2025 (*see* Ex. 3 (Meyer Tr.)).

In his reports, Mr. Meyer conducted a thorough analysis of revenue and expense transactions across Live Nation's concert promotion, venue operations, ticketing, and sponsorship

2

and advertising activities.  *See* Ex. 1 (Meyer Rpt. ¶¶ 79, 87-172).  He evaluated the relationship between segment reporting and enterprise profitability, *see id.* (Meyer Rpt. ¶¶ 15-19, 173, 181-206, 304-10), and presented Live Nation's historical operational results using audited financial statements and internal records.  *See id.* (Meyer Rpt. ¶¶ 176, 180-219).  Mr. Meyer examined multiple performance metrics, including operating income and operating margin, contribution margin, cash flow and liquidity measures, and Adjusted Operating Income (AOI), detailing the relevance and limitations of each.  *Id.* (Meyer Rpt. ¶¶ 123-124, 181-206, 221-229).

In his analysis of Live Nation's Ticketing segment, Mr. Meyer compared Live Nation's U.S. Ticketing segment contribution margin for 2019-2023 to companies "among Live Nation's most significant competitors in ticketing."  *Id.* (Meyer Rpt. ¶¶ 226-29).  Upon comparing Live Nation's U.S. Ticketing segment results to that of AXS, Eventim's ticketing segment, SeatGeek, Vivid Seats, StubHub, Etix, and Eventbrite, Mr. Meyer "observed no evidence that Live Nation's U.S. Ticketing segment [achieved] significantly [greater] contribution margin [than these other] industry participants."  *Id.*

Mr. Meyer evaluated Live Nation's financial results separately for its U.S. Concerts segment and found that Live Nation's contribution margin remained below ▮▮▮▮▮▮ from 2018-2023.  *Id.* (Meyer Rpt. ¶¶ 221-25).  For context, he compared Live Nation's U.S. Concerts contribution margin and operating profit margin to three top competitors—AEG Presents, MSGE, and Eventim's Live Entertainment Section—and found that Live Nation's U.S. Concert segment contribution margins were consistent with AEG Presents' and significantly less than MSGE's similar profitability measures.  *Id*.

Mr. Meyer also assessed the financial results of 58 Live Nation-owned or operated amphitheaters, 42 of which are identified by Dr. Hill as "major concert venues."  Ex. 1 (Meyer

Rpt. ¶¶ 67, 202-04).  He found that the weighted average operating margin at these 42 "major concert venues" from 2015-2024 was approximately ██████, with ██ of the 42 venues realizing zero or negative operating margins.  *Id.*

Given Plaintiffs' allegations that Live Nation's "flywheel generates substantial revenues and profits across Live Nation's businesses," Am. Compl. ¶ 56, Mr. Meyer also assessed Live Nation's consolidated results on both a worldwide and U.S.-only basis.  He found that Live Nation's weighted average operating margin for the 2015–2024 period from its worldwide operations was approximately ██████, Ex. 1 (Meyer Rpt. ¶¶ 180-83), while its average operating margin from U.S. operations was approximately ██████ over the same period.  *Id.* (Meyer Rpt. ¶¶ 198-99).  Mr. Meyer compared these results to Live Nation's Standard and Poor's 500 ("S&P 500") peers, a cohort of live entertainment, ticketing, theme park, and recorded music companies previously used by Live Nation's Board of Directors for benchmarking, and a set of five profitable technology companies to provide context for Live Nation's margins and cash generation.  *Id.* (Meyer Rpt. ¶¶ 230-36); Ex. 2 (Meyer Reb. Rpt. ¶¶ 93-97).  In each comparison, he found that Live Nation earned only "modest profits."  *See, e.g.*, Ex. 1 (Meyer Rpt. ¶¶ 232, 236).

In his sur-rebuttal report, Mr. Meyer concluded that Live Nation's recorded profits are "inconsistent with what one would expect from a monopolist allegedly charging supercompetitive prices."  Ex. 2 (Meyer Reb. Rpt. ¶¶ 10, 28); *see also* Ex. 3 (Meyer Tr. 75:25-76:9) ("[W]hen you look at all that data and then you look at the entities on the extremes, that's not -- by any means where Live Nation is.  And so it's just a reference there.  I'm not saying that as an economist. I'm just saying that you don't see profits that you would see or anticipate seeing from someone that's alleged to or could be alleged to be a monopolist.").

## LEGAL STANDARD

"[T]o be admissible, expert testimony must be both relevant and reliable." *U.S. Info. Sys. v. Int'l Bhd. of Elec. Workers Loc. Union No. 3*, 313 F. Supp. 2d 213, 225 (S.D.N.Y. 2004) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)).  In response to a motion challenging its expert's opinion, the party proffering the expert must show that it is more likely than not that the expert and their opinion meet the qualification, reliability, and relevance standards of Rule 702.  *See Daubert*, 509 U.S. at 592.  "[I]n accordance with the liberal admissibility standards of the Federal Rules of Evidence, only serious flaws in reasoning or methodology will warrant exclusion." *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009) (citing *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002)).  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987)). "If an expert's testimony lies within 'the range where experts might reasonably differ,' the jury, and not the trial court, should 'decide among the conflicting views of different experts.'" *CFTC v. Wilson*, No. 13 Civ. 7884 (AT), 2016 WL 7229056, at *7 (S.D.N.Y. Sept. 30, 2016) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999)).

## ARGUMENT

Plaintiffs seek to exclude Mr. Meyer's conclusion that Live Nation's profits are "inconsistent with what one would expect from a monopolist allegedly charging supercompetitive prices," and three distinct comparisons Plaintiffs label as his "Cross-Industry Comparisons." Mot. at 1.  These comparisons evaluate Live Nation's operating margins and cash-flow metrics against (1) a set of firms that Live Nation's Board of Directors benchmarks against, (2) the S&P 500, of which Live Nation is a member, and (3) five leading communication services and information

5

technology companies.[1]    Plaintiffs cast vague aspersions that these comparisons are "uninformative, unreliable, and would mislead the jury," *Id.* at 9, because they involve comparators from "unrelated industries" and rely on "company-wide accounting metrics." *Id.* at 9.

Plaintiffs' motion leans heavily on *Bailey v. Allgas, Inc.*, 284 F.3d 1237 (11th Cir. 2002), Mot. at 9-14, which ironically demonstrates that Plaintiffs' arguments more rightly go to the sufficiency of Mr. Meyer's work not the admissibility.  The Eleventh Circuit in *Bailey* did not hold that company-wide or cross-industry accounting benchmarks are *inadmissible*; it affirmed summary judgment where "[r]egardless of whether the testimony of the [plaintiff's] expert is admissible," the "testimony is insufficient to prove the existence of an oligopoly." *Id.* at 1255, 1257.  Here, Plaintiffs make the same mistake the district court did when the Eleventh Circuit reversed the exclusion of the *Bailey* expert's testimony on the first appeal. *Id.* at 1241 ("'[T]he district court erred by conflating the *admissibility* of [the expert's] evidence with the *sufficiency* of that evidence to overcome [defendant's] motion for summary judgment.'") (quoting *Bailey v. Allgas, Inc.*, No. 98–6278, slip op. at 9, 184 F.3d 824 (11th Cir. June 11, 1999).

For the reasons discussed below, Plaintiffs are wrong on the law and facts, and their motion should be denied.

## I.    MR. MEYER'S BENCHMARKING COMPARISONS USE RELIABLE FINANCIAL INFORMATION FOR EVALUATING LIVE NATION'S PROFITS

---

[1] Plaintiffs also suggest concerns about Mr. Meyer's segment-level comparisons, citing "glaring errors," "such as conflating firms across different lines of business, conflating in-market versus out-of-market activities, comparing domestic operations to foreign operations, and comparing inconsistent accounting metrics across firms."  Mot. at 2 n.2.  However, Plaintiffs concede that these alleged "errors" in Mr. Meyer's segment-level comparisons do not warrant exclusion of these opinions at this time. *Id.*  The same applies to Plaintiffs' objections to Mr. Meyer's "Cross-Industry Comparisons."

In deciding whether to exclude an expert's opinion, the court must determine whether the opinion is "not only relevant, but reliable." *Daubert*, 509 U.S. at 589. "[A]n expert's testimony is relevant if it will 'help the trier of fact to understand the evidence or to determine a fact in issue,'" *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 638 F. Supp. 3d 227, 253 (E.D.N.Y. 2022) (quoting *In re Perrigo Co. PLC Sec. Litig.*, 19CV70 (DLC), 2021 WL 3773461, at *3 (S.D.N.Y. Aug. 24, 2021)), and is reliable where it (1) "is grounded on sufficient facts or data; (2) . . . is the product of reliable principles and methods; and (3) [where] the witness has applied the principles and methods reliably to the facts of the case." *Clerveaux v. E. Ramapo Cent. Sch. Dist.*, 984 F.3d 213, 233 (2d Cir. 2021) (quoting *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007)). Mr. Meyer's benchmarking comparisons are both relevant and reliable, and therefore admissible.

### A.    Mr. Meyer's Benchmarking Comparisons Are Relevant

"[A]n expert's testimony is relevant if it will help the trier of fact to understand the evidence or to determine a fact in issue." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 638 F. Supp. 3d at 253 (citing *In re Perrigo Co. PLC Sec. Litig.*, 2021 WL 3773461, at *3). In determining relevance, the court should consider whether the evidence has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Daubert*, 509 U.S. at 587 (citing Fed. R. Evid. 401); *see also Adesina v. Aladan Corp.*, 438 F. Supp 2d. 329, 342 (S.D.N.Y. 2006) (explaining that "the judge looks to Rule 401"). Rule 401's "hurdle is a very low one." *Laureano v. City of New York*, No. 17-CV-181, 2021 WL 3272002, at *2 (S.D.N.Y. July 30, 2021) (internal quotations omitted). Indeed, "evidence need not be conclusive in order to be relevant; an incremental effect is sufficient." *Id.* (cleaned up).

Plaintiffs allege that Live Nation operates a coordinated "flywheel" encompassing concert promotion, venue ownership and operation, ticketing services, and sponsorships, purportedly "entrench[ing] Live Nation's profits and power." Am. Compl. ¶ 55; *see also id.* ¶ 112 (alleging that Live Nation can monetize data "in its various businesses to both increase its bottom line and further entrench its positions across the live entertainment industry."). Plaintiffs' expert Dr. Anderson also claims that Live Nation's discretion in segment-level reporting "obscure[es]" its segment-level profitability. Ex. 4 (Anderson Rpt. ¶ 91). It is obviously relevant and informative for a financial accounting expert to assess Plaintiffs' narrative by analyzing Live Nation's financial results and profitability at the consolidated level. If Plaintiffs contend that Live Nation "takes advantage" of its complementary business to "further deepen[ ] its pool of profits," Am. Compl. ¶ 50, surely it is helpful to the trier of fact whether Live Nation's financial results reflect the fruits of that alleged conduct. Live Nation's consolidated results capture *all* its realized profits, from whatever source, and Mr. Meyer's comparisons will help the jury understand the financial evidence in context. *See, e.g.*, Ex. 3 (Meyer Tr. 180:15-23) ("I think the best thing to look at is the consolidated business because that does show you" Live Nation's performance "across the whole operation.").

Moreover, using comparators to evaluate the magnitude of profits is a common, widely accepted practice. *See, e.g.*, *U.S. Airways*, 2016 WL 11796987, at *1 (accounting expert "using a well-established methodology for measuring economic profits" in order to opine that "the profitability of [Defendant] . . . was vastly greater than comparable companies"). Courts recognize that comparisons are helpful to the factfinder, *see, e.g.*, *In re Suboxone (Buprenorphine Hydrochloride and Nalaxone) Antitrust Litigation*, 421 F. Supp. 3d 12, 43 (E.D. Pa. 2019), and should not be excluded so long as they are not "based on assumptions that are so unrealistic and

contradictory as to suggest bad faith or to be in essence an apples and oranges comparison," *U.S. Airways*, 2016 WL 11796987, at *1 (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)).  Here, Mr. Meyer's choice of comparators are far from the type of "apples to oranges" comparison that would warrant exclusion.  Mr. Meyer compares Live Nation's results against S&P 500 companies (a collection of companies Live Nation is a part of), Ex. 1 (Meyer Rpt. ¶ 233), select firms Live Nation benchmarks itself against in the ordinary course of business, Ex. 3 (Meyer Tr. 225:15-226:2), and certain technology firms with relevant operational structures, *id.* (Meyer Tr. 80:5-9).  All these comparisons provide useful context to evaluate whether Live Nation's "flywheel" truly leads to extraordinary profits for the firm.  *See id.* (Meyer Tr. 90:10-13).

### B.    Mr. Meyer's Benchmarking Comparisons Are Reliable

"In assessing reliability, the district court should consider the indicia of reliability identified in [Federal Rule of Evidence] 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case." *Clerveaux*, 984 F.3d at 233 (quoting *Williams*, 506 F.3d at 160).  Although *Daubert* sets forth several examples of factors a court may consider in assessing the reliability of expert testimony, *Kumho Tire*, 526 U.S. at 141, *i.e.*, the Second Circuit affords District Courts "substantial leeway . . . to decide how and whether certain evidence is reliable."  *United States v. Green*, No. 22-3217, 2024 WL 4488577, at *2 (2d Cir. Oct. 15, 2024) (citing *Kumho Tire Co.*, 526 U.S. at 142). "Proponents do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable . . . The evidentiary requirement of reliability is lower than the merits standard of correctness."  Fed. R. Evid. 702, advisory committee's note to the 2023 amendment (cleaned up).

1. <u>Mr. Meyer's Benchmarking Analyses Are Based on Reliable Financial Information</u>

Plaintiffs' attack on the data on which Mr. Meyer relies is without basis.  As a threshold matter, Mr. Meyer benchmarks Live Nation's audited and GAAP-conforming results against comparable, and similarly reliable information from his comparators.  *See* Ex. 3 (Meyer Tr. 41:23-42:5) ("[W]hen I compare Live Nation's financial [ ] reported profits and I make comparisons against the [S&P] 500 or competitors or other companies they benchmark against, I'm using the consistent data all those companies are reporting which is based on generally accepted accounting principles or what they call in Europe, IFRS."); *id.* (Meyer Tr. 68:4-67:1) ("[T]hey have to be consistent because they have to sign the financials and they have to make certain that they're representing to the public that these are based on a system. . . . the same system allows them to approach it in a way that's consistent.").

Indeed, Plaintiffs' own quantitative work relies on similar financial data.  For example, Dr. Hill's "event-level combined primary ticketing data" build, used throughout his and Dr. Abrantes-Metz's analyses, is based on Live Nation's accounting records drawn from its general ledger.  *See* Ex. 2 (Meyer Reb. Rpt. ¶ 153).  Similarly, Dr. Anderson relies on Live Nation's accounting records and publicly reported financials throughout her report, *see, e.g.*, Ex. 4 (Anderson Rpt., Exs. 1–3), and concedes that Mr. Meyer's calculations, and the data on which he relied, are accurate.  Ex. 6 (Anderson Tr. 194:21-197:6, 217:23-218:1).

Plaintiffs contend that "the issues arising from Mr. Meyer's reliance on company-wide data are compounded by his decision to rely specifically on operating margin (measured as a percentage of revenue)," when "Live Nation's leadership has repeatedly described this metric as inappropriate for assessing its Concerts segment, which accounts for a significant portion of the company."  Mot. at 13.  It is unclear what Plaintiffs mean by the assertion that the Concerts segment "accounts for

a significant portion of the company," but Plaintiffs never contend, much less show, there is any inaccuracy or unreliability in that audited data. *Id.* Their reliance on an isolated statement by a Live Nation officer in the context of investors' assessment of a single segment of its business (i.e., not company-wide) does not render Mr. Meyer's use of operating margin for his cross-company comparisons unreliable.[2] Courts have recognized that "if an expert's testimony falls within 'the range where experts might reasonably differ,' the duty of determining the weight and sufficiency of the evidence on which the expert relied lies with the jury, rather than the trial court." *PRCM Advisers LLC v. Two Harbors Inv. Corp.*, No. 20-CV-5649 (LAK), 2025 WL 1276513, at *4, *8 (S.D.N.Y. May 2, 2025) (citing *Lickteig v. Cerberus Cap. Mgmt., L.P.*, 589 F. Supp. 3d 302, 330 (S.D.N.Y. 2022). Additionally, courts defer to an "expert['s] judgment" where the expert applies "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field[.]" *Lickteig*, 589 F. Supp. 3d at 334 (quoting *Kumho Tire Co.*, 526 U.S. at 152).

2.  Mr. Meyer's Choice of Comparators Reflects Expert Judgment and Is Reliable

Plaintiffs mainly focus on critiques of the suitability of Mr. Meyer's three comparison groups. Plaintiffs first seek to exclude Mr. Meyer's comparison of Live Nation's profitability to that of a set of live entertainment and media firms that Live Nation's board itself uses for ordinary-course benchmarking exercises. *See* Mot. at 3-4. In his initial report, Mr. Meyer compared Live Nation's operating profitability to WWE, SeaWorld, Six Flags, Formula 1, Warner Music Group,

---

[2] Mr. Meyer's comparisons also do not rely solely on operating margin. Plaintiffs recognize that Mr. Meyer compared Live Nation to its S&P 500 peers "based on four metrics: company-wide income, company-wide operating margins, company-wide total cash from operations, and company-wide cash from operating margin.," Mot. at 4 (citing Ex. 1 (Meyer Rpt. ¶ 234), and Mr. Meyer explained the relevance and limitations of these different metrics. *See, e.g.*, Ex. 1 (Meyer Rpt. ¶¶ 308-310).

and Universal Music.[3]  Mr. Meyer then included an additional set of six comparators—Airbnb, Booking.com, Cedar Fair, Endeavor, Etsy, and Expedia—from a 2022 Live Nation Board of Directors document *in response to Dr. Anderson's critique of Mr. Meyer for not considering them in his initial analysis.  See* Ex. 2 (Meyer Reb. Rpt. ¶¶ 95-97).  Mr. Meyer explained some of the reasons why it would be logical for Live Nation to view these companies as suitable comparators, including that WWE, SeaWorld, Six Flags, and Formula One all "have to fill an arena, you have to promote, you have to manage, you've got to figure out your costs."  Mot. at 11; *see also* Ex. 3 (Meyer Tr. 225:15-226:2) ("So to me, that's one great way to say to the Court, how is Live Nation/Ticketmaster doing against the companies they identify they want to be better to get like that? So I took that right from the board documents.").  Plaintiffs' only argument for seeking exclusion of this comparison appears to be that in this specific Board of Directors document, Live Nation compared stock valuation metrics, but not explicitly profit margins.  Mot. at 4.  But, as Mr. Meyer has explained, profitability is an input into a company's valuation.  Ex. 3 (Meyer Tr. 235:11-16) ("What goes into a valuation? A lot of things. But one of them is profitability and, to me, that's a proper basis for making a comparison . . . .").

Next, Plaintiffs seek to exclude Mr. Meyer's comparison of Live Nation's profitability to that of S&P 500 constituents.  *See* Mot. at 4 (citing Ex. 1 (Meyer Rpt. ¶¶ 233-236)).  As Mr. Meyer explained in his opening report, "[t]he S&P 500 is a stock market index tracking the stock performance of 500 leading companies listed on stock exchanges in the United States."  Ex. 1 (Meyer Rpt. ¶ 233).  Notably, "Live Nation is a member company included in the S&P 500."  *Id.*

---

[3] In their motion, Plaintiffs state that "Mr. Meyer compared Live Nation's company-wide operating margins to seven out-of-industry companies," but list only these six firms.  Mot. at 3.  These are also the only six firms that Mr. Meyer included in Figure 9 of his initial report, to which Plaintiffs cite.

His analysis revealed that "Live Nation consistently ranks in the bottom quartile among S&P 500 member companies in terms of operating income and cash from operations margin financial results – both on a total dollar value basis and profitability basis." *Id.* (Meyer Rpt. ¶ 236, Tbl. 16). Plaintiffs seek to exclude this comparison because "[l]ike the Fortune 500 and the DJIA, the companies in the S&P 500 'sell a wide variety of products and services' that cover 'pretty much the U.S. economy.'" Mot. at 10 (quoting Ex. 3 (Meyer Tr. 236:16-237:3)). However, the fact that "[t]he S&P 500 includes firms classified in 11 sectors across the economy," Mot. at 4, does not justify excluding this comparison. *See U.S. Airways, Inc.*, 2016 WL 11796987, at *1 (denying defendants' motion to exclude the testimony of accounting expert who compared company's profitability to "other big companies" in the S&P 500); Trial Tr. at 4081:10-4082:11, *U.S. Airways, Inc. v. Sabre Holdings Corp.*, No. 11-cv-2725 (LGS) (S.D.N.Y. Jan. 9, 2017), ECF No. 779. The companies listed on the S&P 500 are an unbiased, representative sample of prominent, established, and stable businesses in the U.S. equity market—all sharing a host of common characteristics that stem directly from the index's eligibility rules, including large market capitalization, U.S. domicile, certain profitability and financial viability criteria, and high public float and liquidity.

Finally, Plaintiffs seek to exclude Mr. Meyer's comparison of Live Nation's profitability to Meta, Apple, Alphabet, NVIDIA, and Microsoft, which was included in a "footnote appended to the S&P 500 comparison that referenced Live Nation's profitability relative to 'leading communication services and information technologies companies.'" *See* Mot. at 4 (citing Ex. 1 (Meyer Rpt. ¶ 236 n.356)). Plaintiffs claim that "Mr. Meyer did not specify or provide any support for why he believes Live Nation should be compared to these technology firms, the metrics on which he believes they should be compared, or how he believes they compare on the basis of these metrics." Mot. at 4-5. Not so. Mr. Meyer did provide a rationale for this comparison. He

explained that this comparison—which is just one component of his comprehensive profitability analysis—serves to highlight companies with "significant free cash flow, really high operating profits, really high gross margins," to illustrate that "[t]hat's not this business." Ex. 3 (Meyer Tr. 80:5-9).

Plaintiffs' "second-guessing of [Mr. Meyer's] judgment and arguments that [ ]he 'should have considered additional information or applied a different method' goes 'to the weight of such testimony,' not admissibility." *Manbro Energy Corp. v. Chatterjee Advisors, LLC*, No. 20 Civ. 3773 (LGS), 2022 WL 4225543, at *9 (S.D.N.Y. Sept. 13, 2022) (citing *Lickteig*, 589 F. Supp 3d at 334). This Court has recognized that "any selection of comparable companies is inherently the product of 'expert judgment.'" *Manbro Energy Corp.*, 2022 WL 4225543, at *9 (quoting *Lickteig*, 589 F. Supp. 3d at 334). "[T]he selection of comparators will seldom approach the 'Utopian ideal' of identifying the perfect clone" and "thus such criticisms 'go more to the weight afforded to [the expert's] analysis than to its admissibility.'" *Alfa Corp. v. OAO Alfa Bank*, 475 F. Supp. 2d 357, 367 (S.D.N.Y. 2007) (quoting *Celebrity Cruises, Inc. v. Essef Corp.*, 434 F. Supp. 2d 169, 189 (S.D.N.Y. 2006)).

If Plaintiffs truly believed that the problem lay in the makeup of these comparator sets, they had the opportunity to propose an alternative set of comparators through their experts. Similarly, their experts could have offered testimony to conduct the analyses with what they consider to be the proper controls. They chose not to do so.

### C.    Plaintiffs' Authorities Do Not Support Exclusion of Mr. Meyer's Comparisons

Plaintiffs primarily rely on two cases to support their request to exclude Mr. Meyer's comparisons: an out-of-circuit district court case, *Bailey v. Allgas, Inc.*, 148 F. Supp. 2d 1222 (N.D.

Ala. 2000), and an unpublished case, *Mirkin v. XOOM Energy LLC*, No. 18-CV-2949, 2025 WL 16333 (E.D.N.Y. Jan. 2, 2025). Neither case is helpful here.

In *Bailey*, the Northern District of Alabama rejected an economics expert's comparison of "one year of" a local propane distributor in Alabama's return on assets to "the median of Fortune 500 companies" to demonstrate *market power* in a Robinson-Patman Act case. 148 F. Supp. 2d 1222, 1241 (N.D. Ala. 2000). The circumstances in *Bailey* are markedly different from those here. Mr. Meyer is an expert in finance and accounting, not an economist, and he has expressly disclaimed providing any opinion on market power. *See* Ex. 3 (Meyer Tr. 32:2-13); *Bailey v. Allgas, Inc.*, 284 F.3d. 1237, 1252 (11th Cir. 2002) ("A company's ROA is based upon data collected and analyzed by accountants, not economists."). Mr. Meyer also does not evaluate return on assets for Live Nation or any comparator, and his comparisons span a ten-year horizon, not merely one year. *Bailey*, 148 F. Supp. 2d at 1241. In any event, Mr. Meyer's selection of comparators is a matter of "expert judgment," *Manbro Energy*, 2022 WL 4225543, at *9, and goes to the weight of the evidence, not its admissibility. Moreover, *Bailey*'s exclusion of an expert's comparison of a small, local Alabama business to the Fortune 500 to demonstrate market power does not make all comparisons to an S&P 500 cohort inapt; here, Mr. Meyer compares the profitability of one member of the S&P 500 (Live Nation) to the S&P 500 cohort. And he does so to provide context to Live Nation's financial results, not to establish or refute market power. Ex. 1 (Meyer Rpt. ¶ 233). *Bailey* also did not involve, and therefore did not analyze, an enterprise-wide effects or "flywheel" theory. Even if the Court credited Plaintiffs' reading of *Bailey*, it would not support exclusion here where Plaintiffs' emphasis on Live Nation's company-wide conduct and synergies makes Mr. Meyer's benchmarks probative and admissible. Finally, as discussed above, "the Eleventh Circuit did not reach the question of whether the expert's testimony had been

properly excluded," Mot. at 9 n.8, and when it had previously, it reversed the district court's exclusion of the expert's testimony for "conflating" its admissibility under *Daubert* with sufficiency to overcome the defendant's motion for summary judgment. *Bailey*, 284 F.3d at 1241.

Plaintiffs' reliance on *Mirkin*, a breach of contract case, is similarly misplaced. In that case, the expert compared defendant's margins on specific products—"its fixed-rate and variable-rate products"— with the "company-wide 'gross margins' earned by 26 of the 30 companies listed in the Dow Jones Industrial Average ('DJIA')". *Mirkin*, 2025 WL 16333, at *6 (internal citation omitted). The *Mirkin* Court found this comparison inappropriate because "the DJIA companies are household names that rank among the largest businesses in the United States. As much as XOOM might like to imagine otherwise, the DJIA companies are dissimilar from XOOM on that basis alone." *Id.* Moreover, whereas Mr. Meyer clearly explained his basis for each of his comparisons, *see, e.g.*, Ex. 1 (Meyer Rpt. ¶¶ 230–233), the expert in *Mirkin* failed to provide any basis for comparing XOOM's margins to those of the DJIA; indeed, the defendant in Mirkin argued that its expert "need not justify the reliability of his comparison to the DJIA companies." *Mirkin*, 2025 WL 16333, at *6 (internal citation omitted).

Plaintiffs' attempt to distinguish *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, No. 05-MD-1720, 2022 WL 15053250 (E.D.N.Y. Oct. 26, 2022), only reinforces the misapplication of their authorities. That court made clear that comparator selection "need not be perfect" to be admissible, *id.* at *30. And, as discussed above, Mr. Meyer did not attempt to "establish the existence of an oligopoly," nor did he "simply compare [Live Nation's] profit to a massive cross-section of industries, like the expert in *Bailey*." *Id.*

### D.    Rule 403 Does Not Justify Exclusion

Exclusion of expert testimony under Federal Rule of Evidence 403 applies only if the court decides that the evidence's probative value is *substantially* outweighed by the danger of unfair

prejudice.  Fed. R. Evid. 403.  "'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."  Fed. R. Evid. 403, Adv. Comm. Notes to 1972 Proposed Rules.  Because Rule 403 excludes relevant evidence, "it is an extraordinary remedy that must be used sparingly."  *George v. Celotex Corp.*, 914 F.2d 26, 31 (2d Cir. 1990) (citing *Dartez v. Fibreboard Corp.*, 765 F.2d 456, 461 (5th Cir. 1985)).

Mr. Meyer's benchmarking comparisons are relevant and have probative value for all the reasons described above.  While "virtually all evidence is prejudicial to one party or another," *Costantino v. David M. Herzog, M.D., P.C.*, 203 F.3d 164, 174 (2d Cir. 2000), Plaintiffs have not made any argument as to why any alleged prejudice from Mr. Meyer's benchmarking comparisons would suggest decision on an improper basis.  Moreover, an important factor to consider in weighing the prejudice is the opposing party's ability to respond to the evidence or the extent to which the impact of the evidence is mitigated by other evidence.  *See, e.g.*, *United States v. Ewings*, 936 F.2d 903, 907 (7th Cir. 1991) (holding that any potential prejudice was mitigated where the defendant could respond and the government's evidence was "defused" by offsetting evidence); *Senra v. Cunnningham*, 9 F.3d 168, 171-172 (1st Cir. 1993) (finding any prejudicial effect was limited where other trial evidence explained the events and neutralized impact of the challenged evidence).  Plaintiffs had ample opportunity to respond to Mr. Meyer's comparisons in their experts' rebuttal reports and are free to test his analyses upon cross-examination.

## II.    MR. MEYER'S OPINION THAT LIVE NATION'S MODEST PROFITS ARE INCONSISTENT WITH "WHAT ONE WOULD EXPECT FROM A MONOPOLIST ALLEGEDLY CHARGING SUPERCOMPETITIVE PRICES" IS ADMISSIBLE

The Second Circuit has endorsed a "particularly broad standard for the admissibility of expert testimony," *Colon ex rel. Molina v. BIC USA, Inc*., 199 F. Supp. 2d 53, 75 (S.D.N.Y. 2001)

(citation omitted), and "the rejection of expert testimony is the exception rather than the rule." *Id.*; Fed. R. Evid. 702, advisory committee's note to the 2000 amendment. To be admissible under Rule 702, expert testimony need only assist the trier of fact in understanding the evidence or determining a fact in issue. *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 563-64 (11th Cir. 1998).

Plaintiffs seek to exclude Mr. Meyer's statement in his sur-rebuttal that Live Nation's modest profits are "inconsistent with what one would expect from a monopolist allegedly charging supercompetitive prices," Mot. at 1, 5, arguing that this constitutes "pseudo-economic" testimony beyond his expertise. *Id.* at 2, 14. Plaintiffs assert that Mr. Meyer "appears to be referencing supracompetitive pricing, a concept in the economic field of industrial organization," *Id.* at 1. "Nowhere in his extensive testimony, however, did [Mr. Meyer] offer any such opinion," as Plaintiffs characterize it. *City of Tuscaloosa*, 158 F.3d at 563 (reversing exclusion of a Certified Public Accountant who "analyzed the costs, revenues, and profits of the defendants"). Mr. Meyer is not an industrial organization economist and disclaimed offering opinions on market definition or market power. Ex. 3 (Meyer Tr. 32:2-13); *id.* at 78:6-14 (explaining that he used "supercompetitive" in a colloquial sense to describe outsized profitability relative to baselines, and that he "set up the baseline to compare against.").

While Mr. Meyer is not offering economic opinions, including the opinions Plaintiffs incorrectly ascribe to him, he *is* qualified to offer the opinions he does offer. Plaintiffs do not challenge Mr. Meyer's qualifications to offer opinions regarding profits generally, profits as expressed in Live Nation's financial disclosures, or profits as calculated from Live Nation financial and accounting data. They also do not challenge his qualifications to measure levels of profitability. Their challenge derives from Mr. Meyer's observation that the profits he calculates

(which he observes are "modest") are not at the high level one would logically expect from a company allegedly dominating the marketplace. Mr. Meyer may render opinions with implications for broader case issues, "so long as his opinions are based on his area of expertise and not on economic theory in which he is not qualified." *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 638 F. Supp. 3d 227, 246-47 (E.D.N.Y. 2022).

To the extent that Plaintiffs are concerned Mr. Meyer will offer an opinion about the quantum or degree of profits one would expect from a monopolist, Defendants will simplify matters and represent that he will not. It would reach too far, however, to prevent Mr. Meyer from testifying that, in his opinion as an expert in accounting, Live Nation earns modest profits. *See, e.g.*, *Main Street Mortg., Inc. v. Main Street Bancorp., Inc.*, 158 F. Supp. 2d 510, 513, 516-17 (E.D. Pa. 2001) (expert's "background as a CPA and experience in analyzing financial data" were sufficient to qualify him to testify on lost profits and "the amount of profit realized by the Defendant.").

Plaintiffs further argue that "even if Mr. Meyer were qualified to offer this opinion, it would still be irrelevant, unreliable, and unduly prejudicial." Mot. at 15. In support of their argument, Plaintiffs argue that Mr. Meyer "has performed no analysis" to determine whether Live Nation "is pricing above the level of its marginal cost" to "support a finding of monopoly power." *Id.* These are red herrings. First, Mr. Meyer already testified that he is not "planning to tell the jury whether Live Nation is pricing at a competitive level or a monopoly level." Ex. 3 (Meyer Tr. 80:16-20) ("I won't use those words"). Mr. Meyer's testimony is that he has "examined those [Live Nation] profits and when those profits are really compared against who they compete with and who they benchmark against and the [S&P] 500 and the high-tech companies, those profits are modest. That's exactly how I would say it at court if you were the jury right now." *Id.* (Meyer Tr. 78:20-

79:5).  *See also Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000) (rejecting an argument that an accounting expert should not be permitted to testify as to damages because "he does not have a degree in economics or statistics or mathematics or some other 'academic' field that might bear on the calculation of damages" where the expert accountant "did not purport to be doing science. He was doing accounting.").  And second, to be clear, merely pricing above marginal cost would not suffice to establish "monopoly power" in any event.  By that definition, virtually every company would be a "monopolist."  *See, e.g., FTC v. Meta Platforms, Inc.*, No. CV 20-3590 (JEB), 2025 WL 3211725, at *16 (D.D.C. Nov. 18, 2025) (explaining that "the power to price a good above marginal cost" demonstrates only market power, not monopoly power, and that "[i]n the real world, almost every business enjoys some degree of market power.").[4]

## CONCLUSION

Mr. Meyer's challenged opinions meet each of the criteria Rules 702 and 403 require.  As an experienced accounting expert, he utilized reliable and undisputed financial data, which Plaintiffs and their experts also rely upon.  He employed accepted methodologies to analyze operational results at various levels and to benchmark profitability against relevant comparators.  Mr. Meyer clearly explained his metrics and comparator cohorts; as he explained, "each [comparison] tells you something about modest.  And so to me, they're all important[.]" Ex. 3 (Meyer Tr. 90:10-13).  He consistently confined his opinions to accounting and financial reporting,

---

[4] Plaintiffs also claim that "Mr. Meyer's own personal definition of 'supercompetitive' is inconsistent," Mot. at 15, but even if that were true (which it is not), "such arguments go to the weight of the evidence, not to its admissibility."  *Campbell ex rel. Campbell v. Metro Prop. & Casualty Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001) (citing *Daubert*, 509 U.S. at 595); *see also U.S. Airways*, 2016 WL 11796987, at *1 (rejecting motion to exclude accounting expert's calculation of economic profits because "whether or not [ ] exclusion is proper is a question for the jury and goes to the weight, not the admissibility of his opinion.").

and explicitly disclaimed offering any industrial-organization analysis.  Plaintiffs' objections at most go to the weight of the evidence, not its admissibility.  Therefore, the motion to partially exclude Mr. Meyer's testimony should be denied.

Dated: December 8, 2025

LATHAM & WATKINS LLP

_____
Alfred C. Pfeiffer (admitted *pro hac vice*)
    *Co-Lead Trial Counsel*
David R. Marriott
    *Co-Lead Trial Counsel*
Andrew M. Gass (admitted *pro hac vice*)
Timothy L. O'Mara (admitted *pro hac vice*)
Jennifer L. Giordano
Kelly S. Fayne (admitted *pro hac vice*)
Lindsey S. Champlin (admitted *pro hac vice*)
Robin L. Gushman (admitted *pro hac vice*)

505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600

1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

555 11th Street, NW, Suite 1000
Washington, D.C. 20004
(202) 637-2200

Al.Pfeiffer@lw.com
David.Marriott@lw.com
Tim.O'Mara@lw.com
Jennifer.Giordano@lw.com
Andrew.Gass@lw.com
Kelly.Fayne@lw.com
Lindsey.Champlin@lw.com
Robin.Gushman@lw.com

*Attorneys for Defendants Live Nation
Entertainment, Inc. and Ticketmaster L.L.C.*

CRAVATH, SWAINE & MOORE LLP

_____
Lauren A. Moskowitz
Jesse M. Weiss
Nicole M. Peles

Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 474-1000

lmoskowitz@cravath.com
jweiss@cravath.com
npeles@cravath.com

*Attorneys for Defendants Live Nation
Entertainment, Inc. and Ticketmaster L.L.C.*

## **CERTIFICATE OF COMPLIANCE**

I, Alfred C. Pfeiffer, an attorney duly admitted to practice before this Court, hereby certify pursuant to Local Rule 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York and Rule 8(C) of Judge Arun Subramanian's Individual Practices in Civil Cases, that the foregoing Memorandum of Law in Opposition was prepared using Microsoft Word, and contains 6,591 words. In making this calculation, I have relied on the word and page counts of the word-processing program used to prepare the document.

Dated:   December 8, 2025
         San Francisco, California


                                          _____
                                          Alfred C. Pfeiffer