# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | Case No.: 1:24-cv-03973-AS |
| *Plaintiffs*, | |
| v. | |
| LIVE NATION ENTERTAINMENT, INC., and TICKETMASTER L.L.C., | |
| *Defendants*. | |

## PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY

Plaintiffs submit this notice of supplemental authority regarding *In re Google Digital Advertising Antitrust Litigation*, No. 21-md-3010, ECF No. 307 (S.D.N.Y. Dec. 12, 2025) (Castel, J.) ("*Google Digital Advertising*"). The *Google Digital Advertising* opinion and order is attached as Exhibit 1.

*Google Digital Advertising* supports Plaintiffs' Opposition ("Opposition")[1] to Defendants' Motion to Exclude Dr. Rosa M. Abrantes-Metz ("Motion").[2] Defendants argue that Dr. Abrantes-Metz's opinions should be excluded because AXS and Ticketmaster are purportedly not of "comparable quality," Motion at 10, 24, and that AXS is an inappropriate benchmark. *Id.* at 2, 4; *see also id.* 9-10, 24-26. *Google Digital Advertising* supports Plaintiffs' position that the court should reject Defendants' argument. Opposition at 1-2, 4-8.

---

[1] Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Exclude the Reports, Opinions, and Testimony of Monetary Relief States' Damages Expert Dr. Rosa M. Abrantes-Metz, ECF No. 743.

[2] Defendants' Motion to Exclude the Reports, Opinions, and Testimony of Monetary Relief States' Damages Expert Dr. Rosa M. Abrantes-Metz, ECF No. 703.

The *Google Digital Advertising* court considered and rejected an argument that plaintiffs' expert's opinions and testimony on damages in that case should be excluded based on the expert's selection of what the defendant argued was an "unsuitable benchmark," *Google Digital Advertising* at 15, because questions as to whether a benchmark is sufficiently comparable "go to the weight of the evidence, not his methodology" and therefore do not "warrant exclusion under *Daubert*." *Google Digital Advertising* at 16.

Dated: December 18, 2025        Respectfully Submitted,

**Rob Bonta**
Attorney General of California

By: */s/ Henry J. Hauser*
Henry J. Hauser (admitted *pro hac vice*)
*Deputy Attorney General*
Brent Nakamura (admitted *pro hac vice*)
*Supervising Deputy Attorney General*
Office of the Attorney General
California Department of Justice
455 Golden Gate Ave, Suite 11000
San Francisco, CA 94102-7020
Telephone: (415) 510-4400
Email: Henry.Hauser@doj.ca.gov
*Counsel for Plaintiffs*

# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

IN RE: GOOGLE DIGITAL ADVERTISING                    21-md-3010 (PKC)
ANTITRUST LITIGATION                                 21-cv-7001 (PKC)
                                                     21-cv-7034 (PKC)

                                                     OPINION AND
                                                     ORDER

-----------------------------------------------------------x

CASTEL, Senior District Judge:

        Publisher plaintiffs seek to certify two subclasses, one consisting of

publishers who sold ad space through Google's AdX ad exchange (the "AdX Class") and

the second consisting of publishers that sold ad space through Google's AdSense platform

(the "AdSense Class").  Each of the Publisher subclasses runs from December 15, 2016

through March 31, 2024.  Separately, Christopher Hanson, doing business as the Hanson

Law Firm, seeks to certify a class consisting of all advertisers who placed an ad on a third-

party website using the Google Ads ad-buying tool during the period of January 1, 2016

through the present (the "Advertiser Class").

        Fact and expert discovery are complete for all plaintiffs who filed actions

prior to December 2024.  For reasons that will be explained, the Publishers' motion to

certify the AdX Class will be granted with modification, and the motions to certify the

Publishers' AdSense Class and the Advertiser Class will be denied.

        1.      The Publishers' motion to certify the AdX Class will be granted with

        modification.  Google's opposition turns largely on challenges to the opinions of the

        Publishers' expert, Professor Einer Elhauge, and his choice of the benchmark

        comparator for assessing antitrust harm and damages for the unlawful tying of

        Google's DoubleClick for Publishers ("DFP") ad server to Google's AdX exchange.

Google has moved to exclude Elhauge's testimony under <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993). The Court concludes that Elhauge's choice of benchmark withstands <u>Daubert</u> scrutiny. The Court separately concludes that multi-customer management firms ("MCMs") are properly included in the AdX Class because any injuries that they suffered would be identical to the injuries of open-web publishers. The AdX Class will not include instream video ad sales because plaintiffs have not pointed to evidence common to class members that such ads were subject to supracompetitive take rates.

2.      The Publishers' motion to certify the AdSense Class will be denied. The Progressive, Inc. ("The Progressive"), which is the sole proposed representative of the AdSense Class, does not satisfy the typicality and adequacy requirements of Rules 23(a)(3) and 23(a)(4), Fed. R. Civ. P. Although The Progressive sold ad impressions through an AdSense interface, 99.99% of its sales were routed through the DFP ad server, a fact that not only sets The Progressive apart from the rest of the class, but one that conflicts with the putative AdSense Class's core contention that an AdSense customer could transact only through an AdSense ad server on an AdSense auction platform.

3.      Hanson's motion to certify the Advertiser Class will be denied. Hanson was a customer of Google Ads for approximately three months in 2016. His claims are not typical and he cannot adequately represent a class whose claims turn heavily on the implementation of Unified Pricing Rules that occurred in 2019, after Hanson exited the market. And while a version of Project Bernanke, another allegedly anticompetitive initiative of Google, was in place at the time that Hanson used Google Ads, Hanson has failed to show that antitrust impact and damages arising

from Project Bernanke can be proved through evidence that would be common to all proposed class members. Through an expert, Hanson has aggregated advertisers' damages into averages despite a wide disparity in advertisers' prices under Project Bernanke, and the proposed Advertiser Class would include advertisers who transacted on AdSense and third-party exchanges, even though Project Bernanke was implemented solely for AdX transactions. Further, approximately 59% of the proposed Advertiser Class did not use Google Ads while Project Bernanke was in effect, and individualized questions of whether a particular advertiser agreed to arbitrate its claims against Google would likely overwhelm issues common to the class.

BACKGROUND.

The Court assumes the reader's familiarity with the open-web display-advertising industry – sometimes referred to as the digital ad-tech stack.[1] Open-web publishers sell impressions for display ads using digital ad servers and advertisers purchase ads using ad-buying tools. Publishers and advertisers transact ad impressions in real-time auctions held through ad exchanges, such as Google's AdX.

Google offers different services, depending on the customer's size and sophistication, and these serves are often referred to as "products." A sophisticated, well-resourced publisher is likely to use Google's DFP ad server because of its detailed inventory-management options, whereas a small publisher is more likely to sell ad impressions using Google's easy-to-use AdSense interface. Large advertisers are likely to

---

[1] The Court has summarized the relevant technology, product markets and theories of liability in its opinions and orders on the motions to dismiss the claims brought in this multidistrict litigation. Texas v. Google, 627 F. Supp. 3d 346 (S.D.N.Y. 2022); In re Google Digital Advertising Antitrust Litig., 721 F. Supp. 3d 230 (S.D.N.Y. 2024).

buy ads using Google's DV360 product, whereas smaller advertisers are likely to use the simpler, self-service options of Google Ads. But these segments are not absolute, and many large advertisers purchase a high volume of ads through Google Ads.

Plaintiffs The Nation Company, LLC ("The Nation") and Genius Media Group, Inc. ("Genius") seek to represent the AdX Class and The Progressive seeks to represent the AdSense Class. The Court will refer to The Nation, Genius and The Progressive collectively as the "Publishers." The Publishers assert that Google has violated sections 1 and 2 of the Sherman Act by coercively imposing a two-way product tie between the DFP ad server and AdX, and AdX and the DFP ad server. (Pub. 2nd Am. Compl't ("Pub Compl't") ¶¶ 394-403 (ECF 1192).)[2] The Publishers also assert that Google has willfully maintained and/or enhanced its monopoly power in the markets for ad servers and ad exchanges, in violation of section 2 of the Sherman Act. (Pub. Compl't ¶¶ 404-09.)

The claims of the AdSense Class are directed to Google's AdSense products, including products that plaintiffs characterize as the AdSense ad server and AdSense ad-auction platform. The Publishers assert that for AdSense customers, Google has enforced a two-way tie between the AdSense basic ad server and an AdSense ad-auction platform, selling the products only as a single package and thereby preventing other ad servers from competing for the business of small publishers seeking to access basic auction platforms. Google has maintained that the AdSense ad server and auction platform are a single, unitary product.

Hanson, who seeks to represent the Advertiser Class, brings claims of monopolization and attempted monopolization under section 2 of the Sherman Act, directed

---

[2] Unless otherwise specified, all citations to an ECF docket entry are to In re: Google Digital Advertising Antitrust Litigation, 21-md-3010 (PKC).

to the product markets for ad exchanges and ad-buying tools for small advertisers. (Adv. First Am. Compl't ("Adv. Compl't") ¶¶ 340-54 (ECF 1198).) Hanson does not bring a tying claim, and his claims of monopolization and attempted monopolization are focused on three auction-specific practices wherein Google allegedly used its monopoly power and unique access to price information to manipulate AdX auction outcomes, increase consumer prices and strengthen its monopoly power. (See id.) Those practices are known as Unified Pricing Rules, Project Bernanke and Buy-Side Dynamic Allocation, which will be discussed in greater detail below.

While this MDL was pending, the U.S. Department of Justice ("DOJ") brought suit against Google in the Eastern District of Virginia, raising claims and factual assertions that were substantially identical to those raised by plaintiffs in these actions. United States v. Google LLC, 23-cv-108 (LMB/JFA) (E.D. Va.). Several states joined the DOJ action, which proceeded to trial before the Honorable Leonie M. Brinkema. Judge Brinkema found that ad servers and ad exchanges are different product markets, that Google has acquired monopoly power in the publisher ad server market through the DFP ad server and the market for ad exchanges through AdX, and that its monopoly power in those markets was willfully acquired and maintained, including through tying publisher access to AdX to their use of the DFP ad server. See United States v. Google LLC, 778 F. Supp. 3d 797 (E.D. Va. 2025). The Publishers and Hanson then moved for partial summary judgment on their claims in this MDL, urging that nonmutual offensive issue preclusion barred Google from relitigating matters actually and necessarily decided in the Eastern District of Virginia action. In re: Google Digital Advertising Antitrust Litig., 2025 WL 3012840 (S.D.N.Y. Oct. 27, 2025).

This Court granted the plaintiffs' summary judgment motions in substantial part. As to the Publishers, this Court granted issue preclusion as to Judge Brinkema's finding that publisher ad servers and ad exchanges for open-web display advertising are separate, relevant product markets. Id. at *8. This Court also found issue preclusion as to the finding that Google had monopoly power in the worldwide market for ad servers, via its DFP ad server, and the market for ad exchanges, via AdX, and that Google willfully acquired and maintained that monopoly power. Id. at *8-9. Issue preclusion was also granted to the Publishers on Judge Brinkema's finding that Google unlawfully tied publisher access to real-time bids over AdX (the tying product) to the publisher's use of the DFP ad server (the tied product). Id. at *8-9.[3]

I.    The Definitions of the AdX Class and the AdSense Class.

The Publishers define the two proposed subclasses as follows:

**AdX Publisher Class:** All persons or entities in the United States that directly paid Google, through payment of fees directly to Google or reductions in advertising revenue received directly from Google, for services associated with selling advertising impressions on websites via Google's AdX Ad Exchange ("AdX Sales") from December 15, 2016 through March 31, 2024 ("Class Period"). The AdX Publisher Class only seeks damages associated with its members' AdX Sales.

**AdSense Publisher Class:** All persons or entities in the United States that directly paid Google, through payment of fees directly to Google or reductions in advertising revenue received directly from Google, for services associated with selling advertising impressions on websites via Google's AdSense Package ("AdSense Sales") during the Class Period. The AdSense Publisher Class only seeks damages associated with its members' AdSense Sales.

---

[3] This Court also granted the narrower motion for partial summary judgment filed by Hanson on behalf of the putative Advertiser Class, and held that Google is precluded from relitigating the issue of whether publisher ad servers and ad exchanges are separate worldwide markets. Id. at *10-11, 18.

(ECF 955 at 1-2.)[4]

The Publishers estimate that the AdX Class has 4,986 members, of which 99.88% were injured, with aggregate damages before trebling of $1.717 billion. (Elhauge Rebuttal at 349 (ECF 959-3).) The Publishers also estimate that during the proposed class period, AdX had a 62.65% to 66.63% market share in the advanced auction-platform submarket. (Elhauge Rep. ¶ 206 (ECF 959-1).)

With respect to the AdSense Class, there are an estimated 712,807 members, of which 97% were injured, with aggregate damages of $530.8 million. (Elhauge Rebuttal at 349) During the relevant time period, AdSense had a nearly 100% market share in the basic auction-platform submarket. (Elhauge Rep. ¶ 207.)

II.    The Motion to Certify the AdX Class Will Be Granted with Modification.

A.  The AdX Class Satisfies Rule 23(a).

1.  The AdX Class Satisfies the Numerosity Requirement.

Rule 23(a)(1) requires the class representatives to demonstrate that "the class is so numerous that joinder of all members is impracticable . . . ." In this Circuit, "numerosity is presumed at a level of 40 members . . . ." Consolidated Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995). The AdX Class is estimated to have 4,986 members. The Court concludes that the numerosity requirement is satisfied.

2.  The AdX Class Satisfies the Commonality Requirement.

Rule 23(a)(2) requires the class representatives to demonstrate that "there are questions of law or fact common to the class . . . ." "[F]or purposes of Rule 23(a)(2), even a single common question will do . . . ." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 359

---

[4] Although the Publishers have amended their complaint to allege worldwide markets in for ad servers and ad exchanges, the Publishers seek to certify a class only of persons within the United States.

(2011) (quotation marks and brackets omitted); accord Elisa W. v. City of New York, 82 F.4th 115, 127 (2d Cir. 2023).  The AdX subclass has identified common questions of law and fact, including whether Google imposed unlawful product ties, implemented anticompetitive auction practices on AdX, and caused injury and damages to Publishers. The Court concludes that the commonality requirement is satisfied.

       3.   Genius and The Nation Satisfy the Typicality Requirement.

Rule 23(a)(3) requires the movant to demonstrate that "the claims or defenses of the representative parties are typical of the claims or defenses of the class . . . ." "Typicality . . . 'is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" Marisol A. v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997) (quoting In re Drexel Burnham Lambert Grp., Inc., 960 F.2d 285, 291 (2d Cir. 1992)).  Genius and The Nation, the named plaintiffs and proposed class representatives, have demonstrated that their claims are typical of the class because they are based on the same course of conduct by Google, assert violations of the same laws and seek relief for the same injuries allegedly caused by Google's supracompetitive take rate charged for AdX transactions.  The Court concludes that the typicality requirement is satisfied.

       4.   Genius and The Nation Satisfy the Adequacy Requirement.

Rule 23(a)(4) requires the class representatives to demonstrate that they "will fairly and adequately protect the interests of the class."  In considering the adequacy requirement, the Court must consider whether the class representatives have interests that are antagonistic to those of other class members, and whether the representatives have an interest in vigorously pursuing the claims of the class.  See, e.g., In re Patriot Nat'l, Inc. Sec.

Litig., 828 Fed. App'x 760, 764 (2d Cir. 2020).  To defeat class certification, the conflict

must be "fundamental."  Denney v. Deutsche Bank AG, 443 F.3d 253, 268 (2d Cir. 2006).

Some open-web publishers contract with a Multi-Customer Management

("MCM") firms to "consult, represent, and manage networks or inventory" on the

publisher's behalf.  (Elhauge Rebuttal ¶ 734.)  Google urges that Genius and The Nation

have interests that are antagonistic to MCM firms, who are proposed members of the AdX

Class, and that they therefore do not satisfy the adequacy requirement.

In industry parlance, the MCM firm is sometimes referred to as a "parent"

publisher and the publisher client is the "child" publisher.  (Elhauge Rebuttal ¶ 734.)

"Essentially, the parent publisher helps the child publisher increase ad revenue."  (Elhauge

Rebuttal ¶ 734.)  Both Genius and The Nation have utilized the services of an MCM firm

during portions of the proposed class period.  (Elhauge Rebuttal ¶ 752; Leonard Rep. ¶ 16

(ECF 959-10).)

Google requires each MCM firm to enter into a form contract in order to

participate in Google's MCM program.  (Ad Manager Multiple Customer Management

Program Terms and Conditions, ECF 1033-39 (the "MCM Agreement").)  The MCM

Agreement includes a broad provision by which the Parent, i.e., an MCM, indemnifies

Google for claims brought by third parties relating to participation in Google's advertising

program:

> In addition to any indemnification obligations under the
> Agreements, Parent agrees to indemnify, defend and hold
> Google, its agents, affiliates, subsidiaries, directors, officers,
> employees, and applicable third parties (e.g. relevant
> advertisers, syndication partners, licensors, licensees,
> consultants and contractors) (collectively "Indemnified
> Person(s)") harmless from and against any and all third party
> claims, liability, loss, and expense (including damage awards,
> settlement amounts, and reasonable legal fees), brought against
> any Indemnified Person(s), arising out of or related to (a)

Parent's participation in the Program or (b) Parent's breach of
these Terms.

(Id. ¶ 7.)

Google argues that this indemnification provision creates antagonistic
interests between open-web publishers like Genius and The Nation, who have an incentive
to maximize their recovery in this action, and MCM parent firms, who, Google contends,
would be required to indemnify Google for any damages awarded in this action to MCM
children, i.e., certain publishers utilizing the MCM parent's services.  Google argues that
MCM firms therefore have an incentive to minimize the recovery of open-web publishers
and MCM children, such as Genius and The Nation.

But Google's interpretation of the indemnification provision would likely fail
under California law because it would require an MCM firm that was injured by Google's
anticompetitive acts to, in turn, indemnify Google for Google's own unlawful conduct.[5]
The California statute provides that "[a]ll contracts which have for their object, directly or
indirectly, to exempt any one from responsibility for his own fraud, or willful injury to the
person or property of another, or violation of law, whether willful or negligent, are against
the policy of the law."  Cal. Civ. Code § 1668.  The California Supreme Court has stated
"that section 1668 should be read broadly" and that "the Legislature did not intend to allow
parties to privately negotiate how much they are willing to pay to inflict willful injury."
New England Country Foods, LLC v. VanLaw Food Prods., Inc., 17 Cal. 5th 703, 712
(2025).  "[P]ermitting contracts that reduce accountability for willful harm would effectively
allow parties to put a price on violating our social policy against such harm."  Id. at 713.

---

[5] Google's contract governing the use of its advertising products contains a California choice-of-law provision.
(ECF 1063-3 (Google Platforms Services Terms and Conditions § 14.6).)  The MCM Agreement does not
itself contain a choice-of-law provision.  (See ECF 1033-39.)

Here, Google is asserting that it would demand payment from MCM firms who were themselves injured by Google's Sherman Act violations, including the intentional acquisition and maintenance of monopoly power in the markets for publisher ad servers and ad exchanges. Requiring an injured party to "indemnify" the party that willfully inflicted such a harm would likely conflict with section 1668.

The Court therefore concludes that the MCM Agreement's indemnification provision does not create a fundamental conflict between Genius and The Nation and any MCM firms in the proposed class. See Denney, 443 F.3d at 268.

The Court further concludes that Genius and The Nation can adequately represent the interests of the AdX Class. Genius is a website that publishers song lyrics and related musical content, and it sells open-web advertising impressions through DFP and AdX. (ECF 959-40.). The Nation runs a new and commentary website and also sells open-web advertising impressions through DFP and AdX. (ECF 957-47.) They have ably functioned as plaintiffs throughout this action.

The Court also concludes that the law firms of Boies Schiller Flexner LLP, Korein Tillery LLC and Berger Montague PC have ably and diligently advanced the Publishers' claims throughout this complex antitrust litigation. The three firms have acted as interim co-lead counsel on behalf of the Publishers since April 26, 2021. (21 Civ. 7034, ECF 76.) The Court concludes that they have demonstrated an ability to fairly and adequately represent the AdX Class, and they will be appointed co-lead counsel pursuant to Rule 23(g).

B.  The AdX Class Satisfies the Predominance and
Superiority Requirement of Rule 23(b)(3).

1.  Overview of Rule 23(b)(3).

"Not only must each of the requirements set forth in Rule 23(a) be met, but certification of the class must also be deemed appropriate under one of the three subdivisions of Rule 23(b)."  Brown v. Kelly, 609 F.3d 467, 476 (2d Cir. 2010).  The AdX Class moves for certification under Rule 23(b)(3), which provides that a class action may be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Rule 23(b)(3), Fed. R. Civ. P.

"Predominance is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."  Roach v. T.L. Cannon Corp., 778 F.3d 401, 405 (2d Cir. 2015) (quotation marks omitted).  "Rule 23(b)(3)'s predominance requirement is 'more demanding than Rule 23(a).'"  Johnson v. Nextel Commc'ns Inc., 780 F.3d 128, 138 (2d Cir. 2015) (quoting Comcast Corp. v. Behrend, 569 U.S. 27, 34 (2013)).  "While the inquiry may be more demanding, the Supreme Court has also instructed that Rule 23(b)(3) 'does not require a plaintiff seeking class certification to prove that each elemen[t] of [her] claim [is] susceptible to classwide proof.'  Rather, all that is required is that a class plaintiff show that 'common questions 'predominate.'"  Sykes v. Mel S. Harris & Assocs. LLC, 780 F.3d 70, 81 (2d Cir. 2015) (emphasis and alterations in original; quoting Amgen Inc. v. Connecticut Ret. Plans and Trust Funds, 568 U.S. 455, 469 (2013)).  "Rule 23(b)(3) requires a showing

that <u>questions</u> common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." <u>Amgen</u>, 568 U.S. at 459.

"Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." <u>Amchem Products, Inc. v. Windsor</u>, 521 U.S. 591, 625 (1997). But a court has a "duty to take a 'close look' at whether common questions predominate over individual ones." <u>Comcast</u>, 569 U.S. at 34. Predominance is not met where "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." <u>Id.</u>

> 2. The Existence of a Common Methodology to
>    <u>Demonstrate Antitrust Injury and Damages.</u>

Google argues that the AdX Class does not satisfy the predominance requirement because the Publishers have not come forward with a common methodology to demonstrate members' antitrust injury and damages

<u>Comcast</u> teaches that a plaintiff's damages analysis must be tailored to a viable theory of antitrust impact. Plaintiffs in <u>Comcast</u> proposed four theories of antitrust impact. 569 U.S. at 31. On the motion for class certification, the district court concluded that damages on only one of the four theories – the "overbuilder theory" – could be decided on a classwide basis. <u>Id.</u> at 31-32. Although the expert's damages model did not isolate for damages caused by the "overbuilder theory," the district court certified the class and the Third Circuit affirmed, concluding that the class-certification stage was not the proper juncture to adjudicate the expert's methodology. <u>Id.</u> at 32.

The Supreme Court reversed, explaining that if plaintiffs prevailed on liability, they would be entitled to damages only on one of the four theories, the "overbuilder theory," and "that a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory." <u>Id.</u> at 35.

Instead, the expert's damages model assumed the validity of all four of plaintiffs' theories of antitrust injury and did not isolate damages for any single theory.  Id. at 36.  Plaintiffs did not show predominance because the expert did not offer an analysis specific to the "overbuilder theory."  Id.  "'The first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact of that event.'"  Id. at 38 (emphasis in original; quoting Federal Judicial Center, Reference Manual on Scientific Evidence 432 (3d ed. 2011)); see also Waggoner v. Barclays PLC, 875 F.3d 79, 105-06 (2d Cir. 2017).

In a summary order, the Second Circuit affirmed a district court's finding of predominance premised in substantial part on an expert's regression analysis of the price premium that consumers were willing to pay for body wipes falsely marketed as "flushable."  Kurtz v. Costco Wholesale Corp., 818 Fed. App'x 57, 61-63 (2d Cir. 2020). The panel "acknowledge[d]" that the expert's model "fails to consider some arguably significant variables," but unless the regression analysis was "so incomplete as to be inadmissible as irrelevant," the "failure to include variables will affect the analysis's probativeness, not its admissibility."  Id. at 62 (quotation marks omitted).  It held that the expert's model satisfied Comcast, even if it did not account for every variable identified by defendants, because "it purports to measure the price premium attributable to the 'flushable' label.  The fact that [the expert's] model may fail to account for other possible sources of a price premium simply means that his model may not ultimately prove Plaintiff's claim.  But it still serves as common evidence of plaintiffs' theory of injury and does not run afoul of Comcast."  Id.

As will be shown, the Publishers have come forward with an expert analysis that plausibly satisfies Comcast because it connects the antitrust harm and damages to the

wrongful conduct, specifically the unlawful tying arrangement, for substantially all members of the AdX Class.

### 3. Google's Daubert Motion Will Be Denied.

#### a. Overview of Google's Daubert Motion.

Google moves to exclude the damages opinions of the Publishers' expert economist, Professor Einer Elhauge, because he did not reliably apply the well-accepted "benchmark" or "yardstick" method used to calculate antitrust damages. As will be discussed, Elhauge compares the 20% take rate that Google charged to publishers that transacted on the AdX platform with the 10% take rate that Google charged to mobile-app developers that transacted on Google's analogous auction platforms through non-Google products. Elhauge uses that segment of the mobile-app auction-platform market as a stand-in for the "but-for" world in which Google does not impose the DFP-AdX product ties, and concludes that class-wide damages should be awarded to the AdX Class based on the difference between the 10% take rate in the "but-for" world and the 20% take rate that Google charged publishers who sold ads on AdX.

Google does not challenge Elhauge's credentials or dispute that the use of a benchmark is a well-accepted method to prove antitrust damages.[6] However, it urges that Elhauge's choice of benchmark renders his analysis unreliable, asserting that differences between the open-web auction-platform market and the third-party mobile-app auction-platform market render the latter an unsuitable benchmark for this case.

---

[6] Elhauge is a law professor at Harvard University. (Elhauge Rep. ¶ 1.) He teaches and writes in the field of economic analysis of antitrust law and is president of Legal Economics, LLC, which provides expert witnesses and litigation support work. (Elhauge Rep. ¶¶ 1-2.) He has been qualified as an expert in economics in twenty-five cases. (Elhauge Rep. ¶ 2.)

The Court concludes that Elhauge's analysis acknowledged and controlled for the differences between the benchmark market and Google's open-web auction platforms.  Google's disagreement with Elhauge's conclusions go to the weight of the evidence, not his methodology, and do not identify the type of "apples and oranges" comparisons that warrant exclusion under <u>Daubert</u>.  Google's motion to exclude Elhauge's expert testimony on damages for failure to satisfy <u>Daubert</u> will therefore be denied.

      b.  <u>The Court's Gatekeeping Role Under Rule 702 and Daubert.</u>

Rule 702 establishes "a gatekeeping role for the judge" to ensure that the expert's testimony is useful for "the particularized resolution of legal disputes."  <u>Daubert</u>, 509 U.S. at 597.  A district court has "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  <u>Id.</u>

A court considers "(1) whether a theory or technique 'can be (and has been) tested'; (2) 'whether the theory or technique has been subjected to peer review and publication'; (3) a technique's 'known or potential rate of error,' and 'the existence and maintenance of standards controlling the technique's operation'; and (4) whether a particular technique or theory has gained 'general acceptance' in the relevant scientific community." <u>In re Mirena IUS Levonorgestrel-Related Products Liability Litig. (No. II)</u>, 982 F.3d 113, 123 (2d Cir. 2020) (quoting <u>Daubert</u>, 509 U.S. at 593-94).  These factors also guide a court's analysis of the opinions of a non-scientific expert.  <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 149-50 (1999).

But the factors are not a "definitive checklist or test."  <u>Daubert</u>, 509 U.S. at 593.  A district court undertakes a flexible inquiry and exercises "the discretion needed to ensure that the courtroom door remains closed to junk science while admitting reliable expert testimony that will assist the trier of fact.  To warrant admissibility, however, it is

critical that an expert's analysis be reliable at every step."  Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002).  "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand.  A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible.  The judge should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions."  Id. (quotation marks omitted).

"It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions."  United States v. Napout, 963 F.3d 163, 187 (2d Cir. 2020) (quotation marks and brackets omitted).  "[A] trial judge should exclude expert testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison.  By contrast, other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony."  Restivo v. Hessemann, 846 F.3d 547, 577 (2d Cir. 2017) (internal citations, quotation marks, brackets and ellipses omitted).

"Although neither the Supreme Court nor the Second Circuit has definitively held that a Daubert inquiry is necessary to evaluate expert opinions offered in support of class certification, the heavy weight of authority militates towards a Daubert inquiry at class certification."  In re Namenda Indirect Purchaser Antitrust Litig., 338 F.R.D. 527, 543 (S.D.N.Y. 2021) (McMahon, J.) (brackets and quotation marks omitted).  In a recent summary order, the Second Circuit noted with approval that "the district court properly proceeded in two stages, first determining that Plaintiffs-Appellees' expert testimony was

admissible under <u>Daubert</u>, and then examining both sets of expert reports to conclude that common issues of law and fact predominated at trial."  <u>City of Philadelphia v. Banc of America Securities LLC</u>, 2025 WL 2180607, at *3 (2d Cir. Aug. 1, 2025).

      c.   <u>The "Benchmark" Model for Calculating Antitrust Damages.</u>

      Elhauge employs a "benchmark" or "yardstick" model to calculate antitrust damages attributable to the DFP-AdX product ties.[7]  (<u>See</u> Elhauge Rep. ¶¶ 398-413.)  "The approach examines the actual prices and quantities that occurred in a similar market that was not affected by defendant's behavior."  <u>In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.</u>, 335 F.R.D. 1, 15 (E.D.N.Y. 2020) (Gershon, J.).

      The use of a benchmark model is a widely accepted method to calculate damages in an antitrust case.  <u>See</u>, <u>e.g.</u>, <u>Iowa Public Employees' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.</u>, 2024 WL 5004632, at *14 (S.D.N.Y. Dec. 6, 2024) ("Courts in this Circuit have repeatedly stated that a 'yardstick' methodology is an accepted method to measure antitrust impact and damages.") (Failla, J.) (collecting cases); <u>In re Restasis</u>, 335 F.R.D. at 18 ("a yardstick approach to measure the but-for world . . . is a generally accepted way to measure antitrust damages."); <u>Dial Corp. v. News Corp.</u>, 314 F.R.D. 108, 118 (S.D.N.Y. 2015) ("The 'yardstick' method for calculating damages is an accepted means of measuring damages in an antitrust action.") (Pauley, J.), <u>amended</u>, 2016 WL 690895 (S.D.N.Y. Feb. 9, 2016).

      For the analysis to be reliable, the expert must select a benchmark that reasonably represents a but-for world where the relevant market was untainted by the anticompetitive conduct at issue.  For example, where an antitrust plaintiff seeks to prove

---

[7] Courts use the terms "benchmark" and "yardstick" interchangeably.  Unless quoting from authority, this Court will refer to Elhauge's analysis as a "benchmark" analysis.

damages caused by a drug company's monopolistic scheme to delay FDA approval of a

generic equivalent, the expert may use as a benchmark the price of a comparable drug that

reached generic status unimpeded.  See In re Restasis, 335 F.R.D. at 15 (approving expert's

analysis of price, quantity and market penetration of a generic glaucoma drug as a

benchmark for defendant's dry-eye medication).  Courts also have accepted a benchmark

consisting of a defendant's own product after it was no longer subject to the claimed

anticompetitive practices.  In re Namenda Direct Purchaser Antitrust Litig., 331 F. Supp. 3d

152, 175-80 (S.D.N.Y. 2018) (effect of generic competition on defendant's own drug was an

adequate benchmark to measure damages in the but-for scenario where that same drug faced

generic competition three years earlier) (McMahon, J.).

 Courts generally allow some degree of flexibility in an expert's choice of

benchmark because "it would create an unworkable and unfair standard to require that any

benchmark be completely unaffected by a defendant's anticompetitive conduct or that the

yardstick selected perfectly reflect the affected company but for the anticompetitive

conduct.  The selection of comparators will seldom approach the 'Utopian ideal' of

identifying the perfect clone."  In re Keurig Green Mountain Single-Serve Coffee Antitrust

Litig., 2025 WL 354671, at *11 (S.D.N.Y. Jan. 30, 2025) (Broderick, J.) (quotation marks

omitted).  "[P]recluding reasonable damage calculations in such cases 'would be an

inducement to make wrongdoing so effective and complete in every case as to preclude any

recovery, by rendering the measure of damages uncertain.'"  Id. (quoting Bigelow v. RKO

Radio Pictures, 327 U.S. 251, 264 (1946)).

 However, "there comes a point where the proposed benchmark is so different

from the plaintiff that it cannot serve as the 'corresponding data for a firm or in a market

unaffected by the violation' necessary to support the yardstick analysis."  Id. (quoting In re

NASDAQ Market-Makers Antitrust Litig., 169 F.R.D. 493, 521 (S.D.N.Y. 1996) (Sweet, J.)).  Judge Cote excluded a benchmark analysis contained in a "bare-bones report" that did "not identify the products to which [defendant] should be compared" and did "not explain how [the] approach would isolate the impact" of the claimed misconduct.  Weiner v. Snapple Beverage Corp., 2010 WL 3119452, at *7 (S.D.N.Y. Aug. 5, 2010).  In a price-fixing conspiracy case related to a "specially distributed drug," selecting "the pharmaceutical industry as a whole" as a benchmark was "fundamentally unreasoned" because it did not account for the drug's unique traits.  City of Rockford v. Mallinckrodt ARD, Inc., 2024 WL 1363544, at *6-9 (N.D. Ill. Mar. 29, 2024); see also In re Wholesale Grocery Products Antitrust Litigation, 946 F.3d 995, 999, 1001-03 (8th Cir. 2019).

        d.    Elhauge's Use of Mobile-App Advertisement Auction Platforms as a Benchmark for Open-Web Display Advertising Auction Platforms.

As a comparative benchmark, Elhauge examines Google's auction platforms for a segment of the market for mobile-app ads in which Google charged a 5% to 10% take rate.  (Elhauge Rep. ¶¶ 398-413.)  Elhauge concludes that this segment of the mobile-app ad-auction market is a reliable stand-in for the but-for world where Google did not impose the DFP-AdX product ties.  He concludes that as a result of those ties, Google charged AdX customers a supracompetitive take rate of roughly 20%,[8] and that class-wide damages should be measured against the 10% take rate that Google charged in the benchmark product market.

Further explanation is necessary as to the tech components in mobile-app ad auctions and how they differ from the components in open-web ad auctions.  Google offers

---

[8] The parties use the 20% figure as a type of shorthand for Google's AdX take rate.  With greater precision, Elhauge has concluded that Google charged publishers a 19.67% take rate for AdX transactions.  (Elhauge Rep. ¶ 412.)

two auction platforms for the sale of mobile-app ads: AdMob and AdX.  (Elhauge Rep. ¶ 401.)  AdMob facilitates a relatively simple auction process, similar to AdSense, while AdX provides more advanced auction options.  (Elhauge Rep. ¶ 401.)  Elhauge opines that mobile-app ads are bought by advertisers who are similar to open-web advertisers, that the ads are viewed by similar consumers, and that the AdX platform used in mobile apps is analogous to the AdX platform used in open-web display ads.  (Elhauge Rep. ¶ 401.)

However, mobile-app advertising differs from open-web advertising in one critical respect.  Instead of using ad servers like open-web publishers, app developers use software development kits ("SDKs").  (Elhauge Rep. ¶ 402.)  SDKs request advertiser bids, serve ads and facilitate billing.  (Elhauge Rep. ¶ 402.)  Because some advertisers require the use of a specific SDK, app developers use multiple SDKs to maximize advertiser exposure.  (Elhauge Rep. ¶ 402.)  In 2023, Apple iOS apps used an average of 72 SDKs and Android apps used an average of 65 SDKs.  (Elhauge Rep. ¶ 402.)  Google's AdMob SDK remains a dominant SDK product and is installed in 94% of Android apps and 81% of Apple iOS apps.  (Elhauge Dec. ¶ 403.)  The second-largest SDK, Facebook Ads, is installed in 24% of Android apps and 18% of Apple iOS apps.  (Elhauge Dec. ¶ 403.)

Elhauge states that developers' use of multiple SDKs, including those independent of Google, distinguishes the mobile-app ad market from the open-web display ad market, in which publishers have a strong incentive to use a single ad server.  (Elhauge Rep. ¶ 402.)  In all other relevant respects, SDKs perform the same functions for mobile-app ads as ad servers perform for open-web ads.  (Elhauge Rep. ¶ 402.)

Google has two different take-rate regimes for developers that transact sales on its mobile-app ad-auction platforms.  The first broadly parallels the structure of the open-web auction-platform market:  For "most of the mobile app ad market," Google ties

advertisers' access to ad-auction platforms to the advertiser's use of the Google GDN ad-buying tool.  (Elhauge Rep. ¶ 403.)  And in order for app developers to access that extensive and exclusive GDN ad inventory, they in turn must use the Google SDK.  (Elhauge Rep. ¶ 403.)  AdX and AdMob have each touted themselves as the only auction platforms that provide GDN ad inventory.  (Elhauge Rep. ¶ 403 n. 1020.)  For the segment of the market where sales are transacted through the Google SDK for GDN ad inventory via the AdX and AdMob auction platforms, Google charges developers a 20% take rate – the same rate that it charges publishers on its open-web auction platforms.  (Elhauge Rep. ¶ 403.)  Elhauge concludes that for this portion of the mobile-app auction market, Google enforces a tying requirement that is analogous to the product ties on the open-web advertising market. (Elhauge Rep. ¶ 403.)

For his benchmark analysis, Elhauge uses a separate segment of the mobile-app ad-auction market where Google makes its auction platforms available to both non-Google SDKs and to ad buyers that do not use the GDN product, for which Google charges a significantly lower take rate.  (Elhauge Rep. ¶ 404.)  In November 2021, Google first set separate rates on the AdX and AdMob auction platforms for this subset of ad sales by app developers using non-Google SDKs to advertisers that used non-Google ad sources (called "authorized buyers" by Google).  (Elhauge Rep. ¶ 404.)

In other words, Google began to permit apps with non-Google SDKs to transact with non-Google advertisers over its AdMob and AdX auction platforms without any additional product tie.  (Elhauge Rep. ¶ 404.)  For such transactions, Google initially charged a take rate of 10% for sales made on its auction platforms.  (Elhauge Rep. ¶ 404.) In the second quarter of 2022, Google lowered that take rate to 5%.  (Elhauge Rep. ¶ 404.)

Elhauge opines that this segment of the mobile-app ad market, in which Google charges lower auction-platform take rates for sales transacted via non-Google products, "provides a good competitive yardstick" for the take rate that Google would charge in a but-for world where it did not impose the two-way DFP-AdX product ties. (Elhauge Rep. ¶ 405.)  He states that the "authorized buyers" that Google allows to transact in its mobile-app auction platforms are analogous to hypothetical open-web advertisers that would transact on AdX without being required to use Google's ad-buying tools.  (Elhauge Rep. ¶ 405.)  Similarly, he states that app developers transacting on Google's auction platforms with third-party SDKs are analogous to hypothetical open-web publishers that would transact on AdX without being required to use a Google ad server.  (Elhauge Rep. ¶ 405.)  Thus, Elhauge opines that the 5% to 10% rate that Google charges for this segment of the auction-platform market for mobile-app ads is benchmark evidence of the rate that Google would charge in the market for open-web display ads if it did not impose anticompetitive ties.  (Elhauge Rep. ¶ 405.)

Elhauge states that Google's decision to lower its take rate to 5% "suggests that the competitive equilibrium price was the 5% rate on which Google ultimately settled" and thus the likely most accurate "but-for" rate.  (Elhauge Rep. ¶ 442.)  "Nonetheless, to be conservative, I will estimate the but-for rates for AdX and AdSense during the Class Period to be 10% for purposes of common impact analysis."  (Elhauge Rep. ¶ 442.)

Elhauge asserts that the reliability of applying a 10% rate is underscored by internal Google documents indicating that competitive pressure pushed it to lower its take rate to 10%, including statements like "Rev Share change needed to remain competitive" and "Rationale for rev share change" was to "[a]lign with Industry Rates . . . ."  (Elhauge Rep. ¶¶ 406-10.)  He also observes that Google's take rate for mobile-app transactions that

tied auction platforms to other Google products (i.e., the Google SDK for developers and GDN for advertisers) mirrors the take rate that Google charges for its open-web display ads, which "indicates that the difference between that rate and the 5-10% rate Google charged for mobile app ads unprotected by tying is a good measure of the anticompetitive effect on prices of such tying restraints." (Elhauge Rep. ¶ 410.) Lastly, he observes that Google did not offset its reduction in rates for auction-platform services by increasing the price for other ad-tech products: for example, it did not charge app developers for its Google SDK. (Elhauge Rep. ¶ 411.) Elhauge thus concludes that in a but-for world where Google does not tie products used for open-web display ads, Google would not offset a decline in take rates for auction platforms by increasing the rates that it charges publishers for ad servers. (Elhauge Rep. ¶ 411.)

### e. The Publishers Have Demonstrated that Elhauge's Choice of Benchmark Is Sufficiently Reliable Under Rule 702.

Elhauge has explained why AdMob and AdX transactions involving third-party SDKs and third-party ad-buying tools is a reliable and useful benchmark that reflects a "but-for" scenario where Google's open-web ad servers and ad-buying tools are not tied to the AdX auction platform. He has identified similarities between the markets, specifically as to how app developers are analogous to open-web publishers, how SDKs are analogous to ad servers, and how the AdX auction platform in the mobile-app market is similar to the AdX platform in the open-web display-ad market. Although Google eventually lowered its auction-platform to take rate of 5% for transactions involving non-Google SDKs and non-Google ad-buying tools, Elhauge adopts the higher 10% rate as a more conservative figure. Google also does not dispute that the purchasers of mobile-app ads are similar to the purchasers of open-web display ads and that the ads are viewed by similar consumers.

The Court will address each of Google's arguments why Elhauge's choice of benchmark does not adequately account for the differences in the mobile-app and open-web advertising technology.  It is fair for Google to raise on this motion its arguments about how certain product features and differences in demand could affect the 20% take rate on open-web ad sales and the 10% take rate on mobile-app ad sales.  But many of its other arguments focus on its view that the 20% take rate was justified and not the result of anticompetitive behavior, which is principally a merits issue of marginal significance to the reliability and suitability of Elhauge's proposed benchmark.

i.    Aggregated Advertiser Demand.

Google argues that the 20% take rate for open-web auction transactions is explained because "Google aggregates demand from many buyers" on AdX, whereas in the mobile-app market, developers establish separate relationships through each third-party SDK.  (ECF 1031 at 17.)  Google characterizes its open-web auction platforms as "valuable 'one-stop shops' for reaching web ad buyers," which "could explain why Google can charge a 20% rate on web ad sales, and why it charges less to developers that undertake the work of integrating directly with app ad buyers using third-party SDKs."  (Id. at 18.)

But Google's argument goes directly to the merits of plaintiffs' claims in this litigation: that Google aggregated so much ad inventory on AdX because it tied exclusive access to AdX on a publisher's use of DFP and advertisers' use of Google's ad-buying tools. As Elhauge notes in his rebuttal report, this argument about advertiser demand "amounts to a claim that no tie should ever be deemed to have anticompetitive effects because any coercive denial of the tying products to those who refuse to use the defendant's tied products should be treated as conferring the 'benefit' of access to the tying products to those who take the defendant's tied product."  (Elhauge Rebuttal ¶ 604.)

The value and reason for the aggregated advertiser demand available on the AdX open-web auction platform may have bearing on the ultimate merits, but it does not undermine the essential suitability of the benchmark.[9]

ii.  Added Value of the Google SDK and Ad Server.

Google asserts that Elhauge erred in distinguishing the segment of the mobile-app auction market where Google charges a 20% take rate on transactions involving the Google SDK and GDN, and the segment where it charges a 10% take rate.  Google claims that the higher take rate reflects unique benefits conferred by the Google SDK.

But as Elhauge notes, Google does not charge developers for access to its SDK and charges open-web publishers only a 1% rate for the DFP ad server.  (Elhauge Rep. ¶ 411.)  He explains: "Google charged nothing for its SDK services and nothing for its AdSense ad server and practically nothing (1%) for its DFP ad server.  The evidence thus does not support the defense experts' inference that those ad server/SDK services were sufficiently valuable that they explain the roughly 10% difference between the tied and un-tied rates."  (Elhauge Rebuttal ¶ 608.)

The claimed value provided by Google's SDK and its open-web ad servers, viewed alongside Google's decision to respectively charge nothing and 1% for their use, does not undermine the reliability of Elhauge's choice of benchmark for Daubert purposes and is appropriately weighed by a trier of fact.

---

[9] The Court expresses no view at this juncture on which merits issues are foreclosed from relitigation by reason of the Court's grant of partial summary judgment to the Publishers.

iii.    Analytics and Security Features.

Google also asserts that the 20% take rate that it charges on open-web transactions reflects analytics and security features that Google does not provide to app developers that use third-party SDKs, i.e., software-development kits.  (ECF 1031 at 19-22.)

Google states that for AdX transactions, it "supplies publishers with a variety of reports covering all buyers," including "trends," "metrics" and "visualizations."  (ECF 1031 at 19.)  In support, Google cites to a presentation that was prepared for a publisher customer as part of an "AdX Bid Landscapes Overview."  (ECF 1032-32 at 3.)  The presentation states that publishers can see advertisers' bid-related data, such as impressions won and win rates, and that "[b]id data can be visualized as time-series charts, bar charts, pie charts or as a specialized 'bid landscape' histograms."  (Id.)  Publishers can also view data by country or for a specific advertiser.  (Id.)  The document includes exemplar slides and charts.  (ECF 1032-32.)

Google also claims that AdX provides "greater protection from malware, invalid traffic (IVT), and ad fraud" while third-party SDKs provide their own security measures.  (ECF 1031 at 20.)  It contends that "some or all of the price difference could be explained by the fact that publishers valued the stronger protections that Google provided for web transactions . . . ."  (ECF 1031 at 21.)

But the Publishers point to observations from one of Google's experts, Judith Chevalier, Ph.D., that "in the app context, many of Google's exchange competitors offer their own SDKs that provide security protections and integration functionalities similar to those provided by Google's SDK, further demonstrating the value of such features in the marketplace."  (Chevalier Rep. ¶ 78 (ECF 1070-1).)  Given that the security features cited by Google are comparable to those offered by competitors in their own SDKs, they do not

explain the difference in the 10% and 20% take rates.  Elhauge also addresses this factor, and points to evidence that non-Google mobile-app auction platforms charge rates of 5% to 10%.  (Elhauge Rebuttal ¶ 609.)

The Court concludes that the value attributable to the analytics and security services offered by Google are most appropriately weighed by a trier of fact and do not go toward the underlying reliability of Elhauge's choice of benchmark.  Google does not point to evidence to suggest that a reasonable publisher or app developer would value these features to the extent that they explain the gap between the 10% and 20% take rates, and Elhauge has cited some evidence suggesting that these features are incorporated into third-party app-auction platforms that charge rates of 5 to 10%.  The value and demand for Google's analytics and security features "go to the weight, not the admissibility, of the testimony."  Restivo, 846 F.3d at 577; see also Kurtz, 818 Fed. App'x at 62 (unless expert's analysis is "so incomplete as to be inadmissible as irrelevant," the "failure to include variables will affect the analysis's probativeness, not its admissibility.").

### iv.  Competitive Conditions.

Google asserts that the gap between auction-platform take rates is attributable to different competitive conditions between the open-web and mobile-app platforms.  It points to Elhauge's quotations from internal Google communications that advocated for dropping the take rate on third-party mobile-app transactions "in response to competitive pressure" and his assertion that "Google felt competitive pressure . . . and had to compete with rival mobile app ad auction platforms who were charging 5-10%."  (Elhauge Rep. ¶ 406; Elhauge Rebuttal ¶ 610.)  Google urges that Elhauge did not adequately control for how much of the 10% rate differential "could be explained by different competitive conditions for web and app transactions" and instead attributed the entire rate gap to the

alleged product ties. It cites <u>Berkey Photo, Inc. v. Eastman Kodak Co.</u>, 603 F.2d 263, 297-98 (2d Cir. 1979), for the principle that "a purchaser may recover only for the price increment that 'flows from' the distortion of the market caused by the monopolist's anticompetitive conduct."

But Elhauge's analysis acknowledged differences in the mobile-app and open-web auction platform markets, including developers' reliance on multiple SDKs instead of a single ad server. (Elhauge Rep. ¶ 402 ("This frequent use of multiple SDKs, including many third-party SDKs not provided by Google, is different from the market for ad servers for open-web display ads, for which publishers have strong economic incentives to single home. . . . Nothing in the difference between SDKs and ad servers suggests that costs or competitive rates for the ad auction platforms that interact with them would be expected to differ.").)

Elhauge's analysis also purports to control for the differences between the open-web and mobile-app markets by pointing to the portion of the app market where Google continued to tie access to GDN ad inventory to the use of the Google SDK, AdMob and AdX, in which Google's take rate continued to mirror the take rate that it charged on the open web. (Elhauge Rep. ¶ 403.) Thus, Elhauge opines that the lower take rate can be attributed exclusively to competition that ensued when Google dropped its tying requirement:

> [I]t was only starting in November 2021 that Google set a separate rate for these un-tied transactions, and when it did so, Google lowered the rate because of increased competition from third party SDKs and the need to compete for the business of non-Google Ads advertisers buying via those third party SDKs (the parallel to ad servers in the mobile app market) who could use rival app ad auction platforms that charged 5-10%. The rates charged on un-tied mobile app ad transactions after November 2021 are thus a good yardstick for what but-for

> AdX/AdSense prices would be without the challenged tying restraints.

(Elhauge Rebuttal ¶ 598.)  Citing Google's internal documents, he also states:

> Google lowered the rate to 5-10% because on these untied transactions Google felt competitive pressure it did not feel on tied transactions and had to compete with rival mobile app ad auction platforms who were charging 5-10%.  Indeed, the fact that Google expected to lose sales to rivals "unless it charged the same 5-10% rate that rival ad auction platforms charged . . . indicates that Google did not believe its ad auction platforms offered any higher value than rival ad auction platforms that would enable Google to charge higher prices than rivals without any anticompetitive restraints."

(Elhauge Rebuttal ¶ 610 (quoting Elhauge Report ¶ 408).)

The Court concludes that Elhauge sufficiently accounted for the different competitive conditions between the mobile-app and open-web markets.  He articulated a rationale not based on ipse dixit for his opinion that the mobile-app take rate was a valid surrogate for the take rate that would have resulted in a competitive open-web market free of an unlawful tying arrangement.  Elhauge then adjusted the comparator take rate of a range of 5% to 10% to the single figure of 10%, an adjustment in Google's favor.  (Elhauge Rep. ¶ 442.)  Here, any "analytical gap between the data and the opinion proffered" is not so wide that it favors excluding Elhauge's analysis, and instead would "go to the weight of the evidence, not its admissibility."  Restivo, 846 F.3d at 577.  Indeed, the competitive conditions cited by Google are the same ones identified by Elhauge himself in his initial report.  In carrying out the Court's gatekeeper role, it is sufficient that Elhauge responded to the differences in the benchmark and "explain[ed] how he accounted for those differences in his model.  . . .  The benchmarks [the expert] selected are sufficiently comparable to permit a degree of reliable comparison, and therefore do not render his damages calculation

inadmissible." <u>SourceOne Dental, Inc. v. Patterson Companies, Inc.</u>, 2018 WL 2172667, at *4-5 (E.D.N.Y. May 10, 2018) (Cogan, J.).

f.  <u>Google's Daubert Motion Will Be Denied.</u>

For the reasons explained, the Court concludes that the publisher plaintiffs have demonstrated that Elhauge's choice of benchmark is sufficiently reliable application of a well-accepted methodology to the facts of this case.  Google's motion to exclude his opinion on damages pursuant to Rule 702 and <u>Daubert</u> will therefore be denied.

4.  Separate from the <u>Daubert</u> Challenge, Certain Purported Flaws in Elhauge's Benchmark Analysis Cited by <u>Google Go to the Merits and Not Predominance</u>

In addition to asserting that Elhauge did not reliably apply a benchmark analysis, Google also asserts that the benchmark analysis does not satisfy predominance because individual inquiries are needed to decide whether class members actually paid supracompetitive take rates.  (ECF 1028 at 21-23.)  Google incorporates the same arguments raised in its <u>Daubert</u> motion to explain the difference between the benchmark take rate charged in third-party mobile-app transactions and the open web transactions on DFP and AdX: access to aggregated advertiser demand on AdX as well as reporting, analytics and security services.  (<u>Id.</u>)

For the reasons already explained, these arguments go to a disagreement with the merits of Elhauge's analysis.  Google does not explain why the open-web AdX product features that are not available in the mobile-app counterparts for third-party transactions would cause individual issues to predominate.  There is no assertion that open-web publishers had an à la carte option to choose among these features.  The issue of whether these features explain the difference between Google's mobile-app and open-web take rates applies equally to all class members, and the claims of the AdX Class "will prevail or fail in

31

unison.  In no event will the individual circumstances of particular class members bear on the inquiry."  Amgen, 568 U.S. at 460.

Google also argues that the publishers cannot show predominance because Elhauge's model "detects antitrust injury where none can exist."  (ECF 1028 at 23.)  In the benchmark mobile-app third-party auction market, Google removed the purported sell-side product ties in November 2021 and decreased the AdX take rate to 10%.  (Elhauge Rep. ¶ 404.)  The relevant time period for the class's claims is defined as December 15, 2016 through March 31, 2024.  (ECF 955.)  Google urges that Elhauge has not identified an overcharge in the mobile-app third-party auction market for the period of December 15, 2016 through November 2021 – the time period before Google decreased its take rate.  But, according to Elhauge, during the 2016 to 2021 time period, Google's mobile-app ad-auction products were subject to ties analogous to the DFP-AdX ties in the open web, during which time Google charged a 20% take rate in both mobile-app and open-web auction platforms. (Elhauge Rep. ¶¶ 403-04.)  Elhauge's benchmark analysis is premised on a comparison of the take rate charged to members of the AdX Class in the absence of the claimed product ties – not the rate used by Google when analogous product ties were also in effect on the mobile-app market.  And to the extent that Google challenges the soundness of Elhauge's reasoning, the success or failure of Elhauge's analysis of the 2016 to 2021 period would commonly affect all class members.  Google is not suggesting that some portion of the AdX Class would require individualized determination for the 2016 to 2021 period based on Elhauge's analysis – it is disagreeing with Elhauge's conclusions. [10]

---

[10] Google's opposition relies on In re Freight Fuel Surcharge Antitrust Litigation, 292 F. Supp. 3d 14, 126-31 (D.D.C. 2017), aff'd, 934 F.3d 619 (D.C. Cir. 2019), which concluded that the expert's economic theory could not establish classwide injury.  In that case, however, the expert's model and the documents in evidence failed to show that a large portion of the class was even subject to certain surcharges that formed the basis of the classwide damages.  See 292 F. Supp. 3d at 105, 122-26.  There was thus no "class-wide answer" to how different portions of the class were injured.  Id.

5.  Elhauge's Damages Analysis Is Consistent with <u>Comcast</u>'s Requirement
to Tailor the Damages Model to the Theory of Antitrust Impact.

Google urges that Elhauge's analysis does not satisfy <u>Comcast</u> because it does not adequately account for each individual theory of antitrust impact.  Elhauge acknowledges that his benchmark model solely measures the antitrust impact of the alleged DFP-AdX product ties and does not separately calculate damages for Google's alleged auction-manipulation practices or advertiser-side product ties.  The Publishers describe the DFP-AdX ties as the "lynchpin" of their claims and assert that these additional practices had a synergistic effect of intentionally consolidating Google's monopoly power.

There is no dispute that Elhauge did not isolate damages for each of Google's alleged anticompetitive practices and that he based his benchmark analysis solely on sell-side product ties.  (<u>See</u>, <u>e.g.</u>, ECF 958 at 28 ("Because the yardstick only measures the anticompetitive effects of the ad server-ad auction platform tying restraints, and not the effects of the additional exclusionary conduct, Prof. Elhauge's overcharge estimate is conservative.").)  The Publishers describe the sell-side ties as "the lynchpin of Google's exclusionary scheme" and assert that "[a]bsent those ties, publishers would have been free to choose rival ad servers."  (<u>Id.</u>)

Elhauge explains that "in my opinion, although each of the Challenged Restraints was exclusionary and contributed to the suppression of rival market share and inflation of Google rates, it is not economically appropriate to separate out the incremental injury created by each of the Challenged Restraints because they were mutually reinforcing, such that they synergistically worked to enhance the Scheme's anticompetitive effects." (Elhauge Rebuttal ¶ 710 (quotation marks omitted).)  For example, in discussing Dynamic Revenue Sharing ("DRS"), Elhauge states that the anticompetitive harm to members of the AdX Class does not depend on whether a given publisher was subject to DRS, but rather,

the classwide harm caused by excluding rival auction platforms from competing for real-time auctions, thereby reinforcing the tying restraints.  (Elhauge Rebuttal ¶ 505.)  He states that "in terms of measuring that anticompetitive harm for both common impact and damages, my analysis does so with a yardstick that includes only the effects of the tying restraints and conservatively omits the additional anticompetitive harm created by the DRS restraints and other non-tying restraints."  (Elhauge Rebuttal ¶ 505.)

Referencing the auction-manipulation practices in his deposition, Elhauge testified that his "analysis conservatively puts them aside so that, to the extent there's additional anticompetitive effects from them, they would have increased damages, but that simply underscores the conservative nature of my estimate."  (Elhauge Dep. 174 (ECF 959-4).)  He confirmed that his damages calculations "only directly take into account the effect of the tying restraints" and "don't quantify the harm from the nontying restraints."  (Elhauge Dep. 175.)  Elhauge testified that if Google were found not to have engaged in any unlawful tying restraints, his analysis would not provide a basis to award damages.[11]  (Elhauge Dep. 176.)

The Court concludes that Elhauge's damages analysis does not run afoul of Comcast.  In Comcast, the expert's overbroad damages analysis did not isolate for the sole theory of antitrust impact susceptible to common evidence, leading the Supreme Court to hold "that a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory."  569 U.S. at 35.  Comcast stands

---

[11] Q. So if Google were found not to have engaged in any illegal tying restraints, would your reports offer any basis to award damages?
. . .
A. I'm not exactly sure whether you're saying -- I think you're saying if they were not found to have engaged in all six of them, liability was rejected?
Q. Right.
A. No, I don't think in that case my reports offer a basis to award damages. They would still offer a basis to find anticompetitive effects but not to award damages.

for the proposition that a plaintiff cannot demonstrate predominance when the expert's damages analysis does not model the sole theory of antitrust impact eligible for classwide relief.

But here, Elhauge's antitrust injury and damages analyses assess the consequence of the DFP-AdX product ties alone, recognizing that other anticompetitive behavior had an aggregative but not additive effect. The Publishers do not seek additional damages for other claimed anticompetitive conduct or buy-side product ties. Elhauge expressly acknowledged in his deposition that his model only analyzes damages arising out of the DFP-AdX ties, and that if the Publishers fail to demonstrate liability on those ties, they would not be entitled to damages on any other theory. The additional anticompetitive practices are relied upon as supporting evidence of Google's intentional monopolization of the markets for open-web ad servers and ad-auction platforms – a matter in which this Court has already applied issue preclusion in light of Judge Brinkema's decision in United States v. Google. See 2025 WL 3012840, at *8-9.

Because Elhauge's damages analysis exclusively models for damages arising from the claimed DFP-AdX ties and the Publishers do not seek damages for the additional anticompetitive practices claimed by the Publishers, it satisfies the requirements of Comcast.

### 6. Elhauge Addressed How Tying Affected the Price of DFP.

Google asserts that the Publishers have not shown predominance because Elhauge's analysis measures an overcharge for AdX without evaluating discounts that Google gave to customers of its DFP ad server. According to Google, the fees that it charges to DFP customers "are competitive, and even free for many publishers." (ECF 1028 at 26.) It urges that Elhauge should have evaluated damages based on the combined

"package" price charged to publishers for both DFP and AdX, rather than focusing on the take rate charged for AdX alone.

The Second Circuit has not taken a position on the "package" method for calculating damages on a tying claim.  "[T]here are two basic methods that courts use to measure damages in tying cases.  One method is the 'tied product' approach . . . .  Under this measure, the damages awarded reflect the difference between the price actually paid for the tied product and the price for which the item could have been purchased on the open market.  The second approach is the so-called 'package' measure, which would award damages only to the extent that the plaintiff overpaid for the combination of the tied and tying products."  In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 142-43 (2d Cir. 2001) (emphasis in original; internal citations omitted), abrogated on other grounds by In re Initial Pub. Offerings Sec. Litig., 471 F.3d 24 (2d Cir. 2006).  "This Court has not taken a position on the issue."  Id. at 143; see also Freeland v. AT & T Corp., 238 F.R.D. 130, 149-52 (S.D.N.Y. 2006) (applying the "package" method after reviewing the "tied product" and "package" methods) (Cote, J.).

Contrary to Google's argument, Elhauge detailed his views on how the DFP-AdX ties affected the price that publishers pay for the DFP ad server.  Google charges publishers $0.02 per thousand impressions sold through DFP, which is approximately 1-2% of gross ad revenue.  (Elhauge Rep. ¶ 67.)  Elhauge opines that when a two-way product tie is in place, "how a firm nominally allocates prices among the tied products can be arbitrary."  (Elhauge Rep. ¶ 73.)  For "the tied bundle of advanced ad servers and auction platforms [i.e., DFP and AdX], Google was able to profitably charge a rate that was far more than 5% over competitive levels."  (Elhauge Rep. ¶ 73.)  For the combined AdX-DFP products, Google charged "prices that were 355% to 614% higher than the top of the normal

range for a reasonably competitive market.  These Lerner Index estimates provide further evidence that Google was able to charge rates for the combination of its ad server and auction platform products that were far more than 5% over competitive levels . . . ." (Elhauge Rep. ¶ 78.)

Elhauge acknowledged that "there is some variation in DFP ad serving fees," but that they are "uniformly low" relative to AdX, and that "the injury to publishers does not depend on whether they were subject to different DFP ad serving fees, but rather on the aggregate effect of Google's tying restraints in suppressing rival shares and inflating the market rates for AdX . . . ."  (Elhauge Rebuttal ¶ 388.)  "Furthermore, DFP was generally priced above competitor ad servers.  DFP was also priced well above DFP's marginal operating cost and profitable."  (Elhauge Rebuttal ¶ 402.)

Elhauge also responded to Google's expert, Gregory Leonard, Ph.D., who opined that DFP's low price reflects its compatibility with AdX and that the incremental costs of making DFP interoperable with other ad exchanges would raise publishers' overall prices.  (Elhauge Rebuttal ¶¶ 399-402.)  In response, Elhauge opines that Google spent substantial resources to obstruct interoperability and asserts that "[i]n the but-for world, Google would need to compete on quality and price, which would likely result in lower, not higher, prices for publishers."  (Elhauge Rebuttal ¶ 400.)  He concludes that "the tying restraints increased DFP's market power relative to the but-for world.  Without these restraints, DFP would have less market power and would charge lower prices, not higher." (Elhauge Rebuttal ¶ 401.)

On this motion for class certification, the Court need not decide whether damages are best determined using a "tied product" or "package" method or adopt the conclusions of either Professor Elhauge or Dr. Leonard.  Contrary to Google's assertion,

Elhauge expressly opined on how the two-way product tie affected the price of DFP, concluded that the tie resulted in an overcharge for DFP use both in isolation and in combination with AdX, and concluded that in a competitive market without tying, the price of DFP would be lower.  It is not necessary to finally determine the proper model for antitrust injury and damages.  A model that isolates the impact of the charges of DFP and a model that assesses the combined impact on the DFP-AdX package could each produces a reliable assessment of injury and damages.  Neither model would result in the predominance of individualized issues over common issues.

7.  Plaintiffs Have Not Pointed to Common Evidence Showing that the Take Rate for Instream Video Sales Made over AdX Was Supracompetitive.

Google argues that Elhauge's benchmark analysis does not adequately identify classwide impact or damages arising from instream video sales that took place over AdX because Google charged a 20% take rate both for instream video sales transacted over AdX and instream video sales by mobile-app publishers using third-party SDKs, i.e., software-development kits.  "Instream video ads" are commonly understood as video advertisements that run within a video – for example, a short news piece – that the viewer has selected to watch.  See, e.g., Inform Inc. v. Google LLC, 2024 WL 988966, at *2 n.1 (S.D.N.Y. Mar. 7, 2024).

Google's argument is based on a footnote in Elhauge's expert report that quotes an internal Google email of November 13, 2021 describing Google's decision to decrease it take rates on third-party mobile-app transactions to 10% but excluded instream video transactions from that rate drop.[12]  (Elhauge Rep. ¶ 404 n. 1027.)  In his rebuttal

---

[12] As quoted in the Elhauge Report, the email stated: "We are changing the mobile app display (i.e., excluding instream) sellside rev[enue] share on 3P [third-party] SDK rendered impressions to be 90% on GAM and AdMob, for OA [Open Auction] and PA [Private Auction] transaction types of the Authorized Buyer's buying segment."  (Elhauge Rep. ¶ 404 n. 1027; brackets in original.)

report, Elhauge opined that for open-web transactions, "the lion's share of instream video ads are not auctioned on open websites, so few of them are in the relevant market. But that does not reflect any categorical exclusion of instream video ads. It simply reflects the fact that normally it is more efficient to sell instream video ads through other markets, like the market for direct sales." (Elhauge Rebuttal ¶ 79.)

Google urges that Elhauge has not shown classwide damages for instream video transactions because Google did not decrease the take rate for instream-video sales made through third-party mobile-app auctions, meaning that they are not incorporated into Elhauge's benchmark analysis. Thus, there is no point of comparison in the benchmark for the 20% take rate that Google charged for open-web instream video sales.

Google's own experts did not opine on the take rate for instream video sales. In response to this motion, Elhauge submitted a declaration setting forth a more expansive opinion on Google's take rate for instream video transactions. (ECF 1062-1.) He points to internal Google correspondence stating that the number of instream videos sold to third-party ad buyers in mobile-app auctions was so "tiny" that it made sense for Google to maintain a 20% take rate, consistent with its open-web auction platforms. (Elhauge Dec. ¶ 2.) Elhauge opines that, given the small number of instream video-ad transactions in third-party mobile-app auctions, Google faced no competitive pressure to decrease the 20% take rate. (Elhauge Dec. ¶¶ 3-4.) An internal Google analysis also observed that, in regard to the third-party mobile-app auction market, "we should evaluate whether the 10% fee on instream video is competitive to market, though this is not urgent." (Elhauge Dec. ¶ 4.)

Elhauge notes that in mid-2022, Google correspondence stated that a 5% take rate was implemented for "all publishers" using third-party SDKs selling to third-party buyers, which suggests that the rate applied to instream video sales, but that "Google did not

produce data allowing one to calculate, for instream video ads to mobile app yardstick buyers, how the rates and amounts of sales changed over time."  (Elhauge Dec. ¶ 4.)

Elhauge also states that for the AdX Class, instream video ads account for approximately 8.3% of damages, and that 0.13% to 1.08% of class members suffered damages exclusively on instream video ads.  (Elhauge Dec. ¶ 7.)  "Thus, excluding any overcharge on instream video ads has only a minimal effect on the percentage of the class injured."  (Elhauge Dec. ¶ 7.)  The Publishers state that, "[i]f necessary, the instream video transactions (constituting a small portion of AdX transactions and none of the AdSense transactions) could be readily identified and excluded."  (ECF 1058 at 8 n.18.)

The Publishers have not demonstrated that evidence common to would-be class members can show whether they were charged a supracompetitive take rate for instream video sales made over AdX.  They rely mainly on inferences drawn from stray phrases in a handful of internal Google documents.  For instream video sales, the evidence demonstrates that Google charged a 20% take rate in both the benchmark product market and AdX.  Elhauge acknowledges that he did not have access to data that permitted him to determine whether the take rate actually changed in the benchmark mobile-app market. (Elhauge Dec. ¶ 4.)

Because the Publishers have not pointed to common evidence demonstrating that AdX's take rate for instream video sales was supracompetitive, they have not demonstrated that common questions predominate over individual ones as to the antitrust impact and damages pertaining to instream video sales.

### 8.    Publishers Have Adequately Identified a Method to Identify Direct Purchasers in MCM Arrangements.

Google urges that common issues do not predominate because individual analysis is required to identify a subset of the putative AdX Class members who acted as

direct purchasers when they sold ads through MCM arrangements. As discussed, a Multi-Customer Management firm, or MCM, manages ad inventory on behalf of a publisher, and is known as the "parent" publisher, while the publisher client is known as a "child" publisher. (Elhauge Rebuttal ¶ 734.)

There are two types of MCM relationships. In a "Manage Inventory" relationship, Google directly pays the parent MCM firm for inventory sold by the child publisher, and the parent is then responsible for making payment to the child. (Leonard Rep. ¶ 44.) For "Manage Account" arrangements, the child publisher maintains the AdX account but directs Google to pay some portion of sales revenue to the MCM parent as a commission. (Elhauge Rebuttal ¶ 734 & n. 1856.) In a Manage Account relationship, Google sometimes pays the parent MCM firm, sometimes pays the child publisher, and sometimes pays both. (Leonard Rep. ¶ 44.) Google's expert estimates that MCM parent publishers make up approximately 3% of the AdX Class. (Leonard Rep. ¶ 47.)

The Clayton Act provides antitrust standing only for direct purchasers from antitrust violators. Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977); see also Apple Inc. v. Pepper, 587 U.S. 273, 279 (2019) ("Our decision in Illinois Brick established a bright-line rule that authorizes suits by direct purchasers but bars suits by indirect purchasers.") (emphasis in original). The Publishers assert that direct purchasers in the AdX Class include (1) child publishers in a Manage Account Relationship and (2) the MCM parent publishers in a Manage Inventory relationship. For the purposes of this class certification motion, Google does not challenge that both of these types of purchasers are direct purchasers consistent with Illinois Brick, but it urges that individual analyses of the contracts between the MCM parent and the publisher child is needed in order to identify class members, and that such an individualized inquiry defeats predominance.

41

But Elhauge opines that for members of the AdX Class, the Publishers can match "crosswalk files" to a data field called "gfp_network_id" and ascertain all publishers involved in an MCM relationship, including whether the publisher was an MCM parent or child and the "Child Revenue Share" that identifies which entity received bank deposits directly from Google.  (Elhauge Rebuttal ¶ 737.)  Google's does not mention this method identified by Elhauge.

Judge Furman rejected an argument that predominance could not be met because the identification of direct purchasers required individualized inquiry, calling it "an administrative feasibility argument dressed up in predominance clothing."  City of Philadelphia v. Bank of Am. Corp., 2023 WL 6160534, at *12 (S.D.N.Y. Sept. 21, 2023), aff'd sub nom. City of Philadelphia v. Banc of Am. Sec. LLC, 2025 WL 2180607 (2d Cir. Aug. 1, 2025).  The Second Circuit has rejected an argument that the complexity of identifying direct purchasers weighed against class certification, stating that "[t]he only relevant inquiry is whether determinations as to class membership are objectively possible. Appellants do not contend that identifying the direct payor for each transaction is impossible."  Fikes Wholesale, Inc. v. HSBC Bank USA, N.A., 62 F.4th 704, 717 (2d Cir. 2023) (emphasis in original; quotation marks and internal citation omitted).  Even if "[a]scertaining the direct payor . . . may not be as easy as Plaintiffs make it out to be," there is no suggestion that doing so is not feasible.  City of Philadelphia, 2023 WL 6160534, at *12.

Elhauge has described a method that appears to permit the Publishers to identify direct purchasers in a MCM arrangement in a manner that would not cause individualized inquiries to predominate.  Even if the method proves cumbersome, Google does not urge that it would be impossible to identify direct purchasers.  This Court

concludes that the necessity of identifying which entity in an MCM relationship received a direct payment from Google does not defeat predominance.

C.  <u>MCM Firms Will Be Included in the Class.</u>

Google asserts that the Publishers belatedly expanded the definition of the AdX Class to include MCM firms, despite not referencing such firms in their pleadings.  It argues that MCM firms should be excluded from the class.  Google does not urge that a publisher child should be excluded from the class definition because it sold ads using an MCM parent firm, provided that the publisher itself received a direct payment from Google.

The Publishers originally alleged that the AdX Class consists of "[a]ll persons or entities in the United States that paid take rates directly to one or more Defendants and/or received revenue directly from one or more Defendants for displaying advertisements on _their_ websites using Google's Ad Exchange services . . . ."  (Pub. First Am. Compl't ¶ 368 (emphasis added) (21-cv-7034, ECF 131); see also Pub. Second Am. Compl't ¶ 370 (ECF 1192).)  On the class certification motion, the definition of the AdX Class omits the word "their," and seeks to certify a class of "[a]ll persons or entities in the United States that directly paid Google, through payment of fees directly to Google or reductions in advertising revenue received directly from Google, for services associated with selling advertising impressions on websites . . . ."  (ECF 955.)

The Publishers' complaints made no mention of MCM firms.  They described the case as being about "online publishers" that "rang[e] from news organizations, to niche informational sites, to eclectic work-at-home bloggers . . . ." and asserted that "[p]laintiffs and the proposed Classes are publishers who _operate websites_ and seek to sell space _on their own websites_ . . . ."  (Pub. Second Am. Compl't ¶¶ 1, 6 (emphasis added).)

During expert discovery, Google's expert, Dr. Leonard, opined that individualized inquiry was needed as to publishers' relationships with MCM firms, and that Professor Elhauge should not have calculated damages owed to MCM parents. (Leonard Rep. ¶¶ 15, 43-48.) Elhauge's initial report did not expressly reference MCMs. In his rebuttal report, Elhauge responded to Leonard and set forth different damages analyses based upon the status of parent MCM firms in the class. (Elhauge Rebuttal ¶¶ 734-50.) Elhauge stated that class counsel intended to propose an "alternative" class definition that would omit the word "their" ("on their websites" versus "on websites") in order to remove ambiguity about whether MCMs are included in the class definition. (Elhauge Rebuttal ¶ 735.)

"A court is not bound by the class definition proposed in the complaint," Robidoux v. Celani, 987 F.2d 931, 937 (2d Cir. 1993), and "a court also 'has broad discretion to modify the class definition as appropriate.'" In re LIBOR-Based Fin. Instruments Antitrust Litig., 299 F. Supp. 3d 430, 463-64 (S.D.N.Y. 2018) (Buchwald, J.) (quoting 5 Moore's Federal Practice § 23.21[6] (3d ed. 2017)). See also Namenda, 331 F. Supp. 3d at 210-12.

The Court concludes that it is appropriate to include in the AdX Class MCM firms who are direct sellers of ads. First, any injury to MCM firms is no different than any injury to open-web publishers operating their own websites. MCM firms would receive damages to the extent that they were injured "through payment of fees directly to Google or reductions in advertising revenue received directly from Google . . . ." In the Publishers' view, that injury arose through the DFP-AdX product tie that foreclosed competition in the ad-exchange market, causing MCM firms to pay Google the same supracompetitive take rate as open-web publishers. This is identical to the injury claimed by open-web publishers

and would continue to limit class members only to firms that directly paid a supracompetitive take rate to Google.

Second, Google would not be prejudiced and was not surprised by the inclusion of MCM firms in the class, as shown by Dr. Leonard's discussion of MCM firms in his expert report.  Leonard understood that "Elhauge's damages calculations include revenues from transactions occurring via MCM . . . ." and that Elhauge's "identification of publishers" in the AdX Class included "revenues of parent entities in his damage calculations."  (Leonard Rep. ¶¶ 15, 47.)  Google's opposition memo references a need for "substantial new fact and expert discovery" pertaining to MCM firms but does not describe what that discovery would be or why it is needed.

Third, Google itself produced the underlying data related to MCM transactions, which identified open-web publishers conducting sales with through MCM firms.  (ECF 1058 at 27 n.51; Elhauge Rebuttal ¶¶ 737, 744.)  MCM firms' participation on AdX is also governed by Google policies.  (Elhauge Rep. ¶ 734 n. 1852; ECF 1033-39 (MCM Agreement).)

Fourth, the inclusion of MCM firms does not expand the relevant time period or bring claims directed to different underlying conduct.  There is no suggestion that the inclusion of MCM firms implicates <u>American Pipe</u> tolling.  <u>Cf.</u> <u>Vincent v. Money Store</u>, 304 F.R.D. 446, 453 (S.D.N.Y. 2015) (Koeltl, J.).

The claims of the MCM firms are based on conduct and a theory of injury that are identical to the claims of open-web publishers, and the role of MCM firms has been well known to Google.  Google does not identify additional discovery that would be required if MCM firms are included in the class definition, and its expert has already opined

on the calculation of damages in ad sales involving MCM firms.  The Court concludes that MCM firms are appropriately included within the class definition.

III.    The Motion to Certify the AdSense Class Will Be Denied Because The Progressive Does Not Satisfy the Typicality and Adequacy Requirements of Rule 23(a).

A.  Although The Progressive Managed Ad Sales through an AdSense Interface, Its Sales Were Transacted Almost Exclusively through the DFP Ad Server.

The claims of the AdSense Class, whose sole class representative is The Progressive, are premised on the assertion that class members were charged supracompetitive rates for sales made through an "AdSense Package" and that "Google has tied its AdSense auction platform with its AdSense basic ad server, only selling a package that included both."  (ECF 958 at 14.)  The Progressive has asserted that it "sells open-web display advertising through AdSense."  (ECF 958 at 24.)[13]

But the evidence on this motion shows that The Progressive sold ad impressions almost exclusively through the advanced DFP ad server and not through the AdSense basic ad server.  It also appears that the extent of The Progressive's use of the DFP ad server was not well-understood by The Progressive until the parties engaged in follow-up communications after the class-certification motion was fully briefed.  The Progressive now does not dispute that approximately 99.9% of its ad sales were made through the DFP ad server, as opposed to the AdSense ad server.

Throughout this litigation, including through the briefing on the class-certification motion, The Progressive maintained that it transacted sales through the AdSense ad server.  In response to an interrogatory that asked The Progressive to identify each ad tech product that it used, Norman Stockwell, publisher of The Progressive, stated:

---

[13] Google has maintained that "AdSense is and always has been a single, integrated product," meaning that, as one product, there could be no product tie between Google's AdSense ad server and an AdSense auction platform.  (ECF 949 at 3.)  Thus, Google itself has described the components of AdSense as a unitary product.

"Plaintiff has used Google Ad Sense exclusively since 2016.  To the best of Plaintiff's current knowledge, Plaintiff has not used any other Ad Tech Products prior to that date." (ECF 1032-12 at 10-11.)  In his deposition, Stockwell similarly testified: "Again, as a small publisher with little to no staff to handle the details of multiple advertising relationships, we see – we perceive the Google AdSense/Google Ad Network union to be the only game in town for a small publisher like ourselves to be able to access the demand of the Google Ad Network."  (ECF 957-48 at 120.)  Stockwell explained his understanding that DFP is "for larger publishers and so it's not something that works with the environment that we are in as a small publisher with AdSense and the Google Ad Network, which is, you know, what we use."  (Id. at 161-62.)

In opposition to the class certification motion, Google cited two emails produced by The Progressive that referenced DFP.  In an email of January 30, 2016, Stockwell wrote, "BTW - just checked the stats in DFP - this ad has delivered over 12,000 times since Dec 28th and had 15 click-throughs."  (ECF 1033-47.)  On that same date, he also wrote: "It is a DFP placement, and it seems to appear sometimes and not others."  (ECF 1033-47.)  In an email of January 4, 2018, Stockwell wrote, "I put it into 'doubleclick for publishers' - it tells me it is delivering - but I don't see it either."  (ECF 1033-46.)

In their reply memorandum, the Publishers acknowledged that The Progressive "sometimes" or "occasionally" used the DFP ad server to sell ads on the AdSense auction platform via DFP's "backfill functionality."  (See ECF 1033-44 (email to Stockwell from "The Google Ad Manager Team" stating: "We've analyzed your account and noticed that you are using Google Ad Manager primarily for its AdSense backfill functionality.").)

After the class certification motion was fully briefed, it became apparent that The Progressive transacted sales almost exclusively through the DFP ad server in order to access the inventory described as "AdSense Backfill."[14]  In a supplemental letter-brief of August 22, 2025 that identified errata in their reply memorandum, the Publishers set forth a thorough explanation of The Progressive's use of the DFP ad server and advised that they inaccurately characterized The Progressive as only "sometimes" or "occasionally" using DFP.  (ECF 1117.)

The Publishers explained that on July 23, 2025, counsel to Google emailed Publishers' counsel stating that "data produced in this case show that from December 2016 to March 2024, The Progressive sold approximately 99.99% of its AdSense impressions using DFP via AdSense Backfill."  (ECF 1117-2 at 15.)  In a declaration dated July 30, 2025, Stockwell explained that, as publisher of The Progressive, he managed online ad sales exclusively through the AdSense interface and therefore considered AdSense to be its exclusive ad server, and that he never encountered settings or information that caused him to believe that The Progressive was using the DFP ad server.  (Stockwell Dec. ¶¶ 3-5 (ECF 1117-3).)  He states that The Progressive exclusively managed programmatic advertising through the AdSense interface, though acknowledges that he may have logged into The Progressive's Google Ad Manager account at various points.  (Stockwell Dec. ¶¶ 6-7.)  The Publishers also note that The Progressive received payment for its ad sales exclusively via AdSense.  (ECF 1117-6 to 1117-9.)

Stuart May, who has the title of Product Management Lead at AdSense, states in a declaration that AdSense has a backfill feature through which publishers can

---

[14] The term "backfill" typically refers to ad inventory sold to a publisher who first unsuccessfully offered the sale to multiple sources, such as through direct sales.  (See ECF 1002-1 at 19.)

connect to the AdSense network via the DFP ad server.  (May Dec. ¶ 3 (ECF 1117-4).)

Publishers enable the backfill feature through Google Ad Manager, and May states that The

Progressive's account settings reflect that it enabled the backfill feature.  (May Dec. ¶¶ 4-5.)

May states that he has reviewed the source code for The Progressive's website, which

includes tags for Google Ad Manager but no AdSense tags.  (May Dec. ¶ 7.)  "This means

that all advertising inventory on the website that is enabled to be sold by AdSense is first

routed to DFP, which calls AdSense as appropriate and serves the ad to the user."  (May

Dec. ¶ 7.)

      One of Google's experts, Dr. Leonard, reviewed data from The Progressive

and concluded that 99.9% of its sales were made through the DFP ad server.  (Leonard Dec.

¶ 2 (ECF 1117-5).)  Dr. Leonard states that The Progressive transacted a total of 19,508,326

impressions via AdSense, of which 19,508,185 were made using DFP with AdSense

backfill.[15]  (Leonard Dec. ¶ 4.)  The Publishers do not dispute Leonard's analysis.

      The Court credits Stockwell's explanation that he has no formal training in

computer science, coding, or website design, and that because he managed ad inventory,

revenue and reporting metrics through the AdSense interface, he sincerely believed AdSense

to be The Progressive's ad server.  (Stockwell Dec. ¶¶ 2, 4-5.)  Stockwell's understanding of

the AdSense interface is also consistent with Google's previously-advanced position that

AdSense is a single, integrated product.  (ECF 949 at 3.)

      It is nevertheless the case that nearly all of The Progressive's sales were

made through the DFP ad server for backfill AdSense ad inventory.  Of the 19,508,326

---

[15] In his expert report, Leonard states that at least 14,417 AdSense publishers used the DFP ad server. (Leonard Rep. ¶ 180.)

impressions transacted on AdSense by The Progressive, only 141 were not made through the DFP ad server. [16]

B. **The Progressive Does Not Satisfy the Typicality Requirement of Rule 23(a)(3).**

Because The Progressive transacted on the AdSense exchange almost exclusively through the DFP ad server, it does not satisfy the typicality requirement of Rule 23(a)(3).

"[A] party seeking to maintain a class action 'must affirmatively demonstrate his compliance' with Rule 23." Comcast, 569 U.S. at 33 (quoting Dukes, 131 S. Ct. at 2551-2552). "Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate by effectively limiting the class claims to those fairly encompassed by the named plaintiff's claims." Mazzei v. Money Store, 829 F.3d 260, 271-72 (2d Cir. 2016) (quotation marks, internal citation and brackets omitted). "To establish typicality under Rule 23(a)(3), the party seeking certification must show that 'each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability.'" In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29, 35 (2d Cir. 2009) (quoting Robidoux v. Celani, 987 F.2d 931, 936 (2d Cir. 1993)); see also Mazzei, 829 F.3d at 272 ("Typicality requires that the disputed issues of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class.") (quotation marks and brackets omitted). A court must conclude that "the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected

---

[16] It is not apparent whether those 141 impressions were made through an AdSense server or through some other means.

in their absence." <u>General Telephone Co. of Southwest v. Falcon</u>, 457 U.S. 147, 158 n. 13 (1982).

The Publishers have asserted that the AdSense tag, which is placed on publishers' websites to facilitate programmatic ad sales, functions as a basic ad server, which calls out exclusively to the dedicated AdSense auction platform.  (Elhauge Rep. ¶¶ 22-23.)  "The AdSense ad server sends its publishers' ads to a dedicated AdSense ad auctioneer that employs basic algorithms to incorporate content targeting and other factors, along with bids received primarily from Google's Google Ads advertisers, to effect the sale of AdSense ad inventory to advertisers.  Unlike DFP publishers, AdSense publishers are largely restricted to one source of advertiser demand."  (Elhauge Rep. ¶ 190.)  Elhauge has opined that the "substantial differences between advanced ad servers like DFP and basic ad servers like AdSense present significant impediments to publishers substituting between them."  (Elhauge Rep. ¶ 192.)

But The Progressive does not now challenge May's assertion that its website does not include an AdSense tag, the use of which is fundamental to the tying claim and the definition of an AdSense Class consisting of publishers who transacted through the "AdSense Package."  Because The Progressive was not a consumer of the AdSense ad server except to a negligible degree, its claims are not typical of a class premised on a tie between that ad server and the AdSense auction platform.

Indeed, both Google and the Publishers have distinguished the arrangement used by The Progressive from the would-be class's "AdSense Package" publishers.  In his report, Dr. Leonard opined that there could be no tie between the AdSense ad server and auction platform because 14,417 AdSense publishers used DFP.  (Leonard Rep. ¶ 180.)  In his rebuttal report, Elhauge responds by stating that "the existence of a tie is not disproven

by showing that customers could exit the market to avoid it." (Elhauge Rebuttal ¶ 448.) The Progressive is one of those customers that "exit[ed] the market," even if it seems to have done so unwittingly.

The Publishers urge that The Progressive nevertheless satisfies Rule 23 because it claims the same injury suffered by the rest of the putative class: the payment of an artificially inflated take rate for sales transacted on the AdSense auction platform based on the allegedly anticompetitive ad-tech product ties. They note that the class's claims are directed to a scheme to foreclose competition in the market for ad-auction platforms, and that even if it transacted through the DFP ad server, The Progressive was injured by the same conduct that forms the basis of the class's claims: the payment of an artificially inflated take rate. This argument fails because The Progressive has no basis to prove that it was coerced to use the basic AdSense ad server as either the tied or tying product. Unijax, Inc. v. Champion Int'l, Inc., 683 F.2d 678, 685 (2d Cir. 1982) (an "indispensable element of a tying violation" is "[a]ctual coercion by the seller that in fact forces the buyer to purchase the tied product . . . ."). The Progressive cannot satisfy typicality when it did not use one of the two products in the claimed tying arrangement.

The Publishers also assert that "The Progressive was subject at least to the alleged tie between the AdSense auction platform and Google's DFP ad server." (ECF 1117 at 4.) But the Publishers' experts did not analyze the existence of such a tie, the Publishers have not moved to certify a subclass based on such a tie, and the definition of the AdSense Class cannot fairly be read to encompass persons harmed by such a tie.

The Court therefore concludes that The Progressive does not satisfy the typicality required by Rule 23(a)(3).

C.  The Progressive's Near-Exclusive Use of the DFP Ad
    Server Also Makes It an Inadequate Class Representative.

For the reasons largely explained, The Progressive's use of the DFP ad server

and the fact that its website did not embed the AdSense tag also renders it inadequate to

represent the interests of the class.

Rule 23(a)(4) requires the class representatives to demonstrate that they "will

fairly and adequately protect the interests of the class."  "In considering Rule 23(a)(4)'s

adequacy requirement, the primary factors are whether the class representatives have any

'interests antagonistic to the interests of other class members' and whether the

representatives 'have an interest in vigorously pursuing the claims of the class.'"  In re

Patriot Nat'l, Inc., 828 Fed. App'x at 764 (quoting Denney, 443 F.3d at 268); see also

Sykes, 780 F.3d at 90 ("Under Rule 23(a)(4) . . . adequacy is satisfied unless plaintiff's

interests are antagonistic to the interest of other members of the class.") (quotation marks

omitted).  "A conflict or potential conflict alone will not, however, necessarily defeat class

certification – the conflict must be fundamental."  Denney, 443 F.3d at 268 (quotation

marks omitted).

A class plaintiff does not satisfy the Rule 23(a)(4) adequacy requirement

when "a host of legal and factual issues unique to [it] . . . are likely to distract from [its]

representation of the class . . . ."  Brown, 609 F.3d at 479.  "[T]he mere existence of

individualized factual questions with respect to the class representative's claim will not bar

class certification," but certification is "inappropriate" if the plaintiff is "subject to unique

defenses which threaten to become the focus of the litigation."  Id. at 480; see also Pagan v.

Abbott Laboratories, Inc., 287 F.R.D. 139, 150 (E.D.N.Y. 2012) (plaintiff could not

adequately represent a class of contaminated infant-formula consumers because product

consumed by plaintiff's infant was later found not to be contaminated).

53

The appointment of a class representative that transacted on the AdSense auction platform almost exclusively via DFP would undermine the would-be class's core claim that, during the relevant time period, "Google has tied its AdSense ad auction platform with its AdSense basic ad server, only selling a package that included both." (ECF 958 at 14.)  The Publishers have described the sell-side ties as "the lynchpin of Google's exclusionary scheme" and asserted that "[a]bsent those ties, publishers would have been free to choose rival ad servers."  (Id. at 28.)  At trial, evidence about The Progressive's use of the DFP ad server and the differences between accessing the AdSense auction platform via the DFP and AdSense ad servers would subsume the claims of absent class members who used AdSense-only products.  It would be unfairly prejudicial to the absent class members to have as their class representative an outlier publisher that transacted 99.99% of its AdSense impressions through DFP – especially given that only roughly 2% of the proposed class, or 14,417 of the 712,807 potential class members, ever transacted through DFP.[17]

The Court therefore concludes that The Progressive is not an adequate class representative under Rule 23(a)(4).

D.  Because The Progressive Does Not Satisfy Rule 23(a), the Motion to Certify the AdSense Subclass Will Be Denied.

"[C]ertification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied."  Dukes, 564 U.S. at 350-51 (quotation marks omitted).  Because The Progressive does not satisfy Rule 23(a), the motion to certify the AdSense Class will be denied.

---

[17] The Publishers estimate that the AdSense Class would have 712,807 members.  (Elhauge Rebuttal Table 8 at 349.)  Accepting Google's assertion that 14,417 AdSense publishers used DFP (Leonard Rep. ¶ 180), 698,390 class members, or approximately 98% of the would-be class, used only AdSense products.

IV.    Hanson's Motion for Class Certification Will Be Denied.

    A.    Overview of Hanson's Motion.

Plaintiff Christopher Hanson, doing business as the Hanson Law Office, moves to certify the following class pursuant to Rule 23(b)(3): "All persons and entities that placed a display advertisement on a third-party website using Google Ads for the period January 1, 2016, through the present (the 'Class')."[18]  (ECF 962 at 9.)  The Court will refer to this proposed class as the "Advertiser Class."

Google Ads, formerly known as AdWords, is an ad-buying tool typically used by small advertisers.  (Chandler Rep. ¶ 242 (ECF 1071-1).)  One of plaintiffs' experts, John Chandler, Ph.D., describes Google Ads as "a straightforward platform with basic targeting options and analytics" and states that the simple interface of Google Ads makes its services "accessible to users with limited time and resources."  (Chandler Rep. ¶¶ 181, 242.)  Facebook, Amazon and "several small players" offer ad-buying products similar to Google Ads.  (Chandler Rep. ¶ 181.)  Large advertisers, by contrast, use ad-buying tools like Google's DV360, which have advanced options for targeting, real-time bidding, and analytics, although approximately half of DV360 customers also use Google Ads because it provides easy access to YouTube and search-based ad inventory.  (Chandler Dec. ¶¶ 180, 186.)  Dr. Chandler calls Google Ads "the pre-eminent example of a self-service ad-buying tool in display."  (Chandler Dec. ¶ 145.)

Hanson's theory of liability and antitrust impact centers on Google's auction-manipulation practices, specifically Buy-Side Dynamic Revenue Share ("BSDRS"), Project Bernanke and Unified Pricing Rules.  Project Bernanke grew out of BSDRS and was first

---

[18] Hanson's presently proposed class is narrower than the class proposed in the Consolidated Advertiser Complaint, which would have included any advertiser that bought a display ad using any Google product.

put in place by Google in 2013 before undergoing multiple iterations, including "Global Bernanke" (August 2015); an adaptation tailored to advertisers that used automatic-bidding tools (April 2016); an adaptation known as "Alchemist" (September 2019); and an adaptation known as "Bell v.2" (September 2024). Broadly summarized, all versions of Project Bernanke increased the volume of AdX transactions by Google Ads customers while maintaining Google's take rate of 14% on ad purchases.

Separately, Unified Pricing Rules, which were implemented in 2019, barred publishers who used the DFP ad server from setting higher price floors on AdX than on other exchanges, which allegedly caused Google Ads customers to pay higher prices and entrenched Google's monopoly power in the ad-exchange market.

Hanson asserts that Google implemented BSDRS, Project Bernanke and Unified Pricing Rules to acquire and maintain monopoly power in the ad-exchange market and the market for self-service ad-buying tools for open-web display ads. According to Hanson, Project Bernanke had the anticompetitive effect of coercively channeling ad purchases to AdX and causing Google Ads customers to pay higher prices than if they had bought impressions through a competing ad-buying tool. Hanson asserts that Project Bernanke and Unified Pricing Rules had the same effect on all Google Ads customers, and that common questions of fact and law predominate.

Hanson is the sole plaintiff seeking to represent the Advertiser Class. Six named plaintiffs originally brought claims on behalf of the proposed class, but three voluntarily dismissed all claims and two others have been compelled to arbitrate their claims.[19] The Advertisers' Complaint described Hanson as a customer of Google's ad-

---

[19] The Court concluded that Cliffy Care Landscaping LLC and Michael Stellman entered into valid and enforceable agreements to arbitrate with Google, and granted Google's motion to compel arbitration. Stellman

buying tools for the three-month period from June 1, 2016 through September 6, 2016, during which he paid $487.78 to Google for "intermediation services" that "broker[ed] the placement" of open-web display ads for his Napa, California law firm.  (Adv. Compl't ¶¶ 14-19.)

In its prior ruling on a motion to dismiss, this Court concluded that Hanson had neither antitrust standing nor Article III standing to pursue claims directed to certain practices, including Unified Pricing Rules, principally because he exited the market in 2016, before Google implemented the challenged practices:

> [T]he Advertiser Complaint describes certain ad-auction practices that post-date Hanson's use of Google's ad-buying products, including line item caps, auction data redaction and [Unified Pricing Rules].  It does not include any allegations that describe how Hanson could have been injured by these practices, and therefore does not plausibly allege his antitrust standing to pursue any claim directed to these practices.  It also does not plausibly allege an injury in fact sufficient to confer Article III standing for any claim directed to these practices.  Because Hanson does not allege that he has used any Google ad-buying product since 2016, he also does not have standing to pursue injunctive relief.
>
> Google's motion to dismiss Hanson's claims directed to conduct that post-dates September 6, 2016 will be granted.

In re Google Digital Advertising Antitrust Litigation, 721 F. Supp. 3d at 251 (internal citations and quotations omitted).

There is no dispute, however that Project Bernanke was in effect during the time that Hanson was a customer of Google Ads in 2016.

---

v. Google LLC, 763 F. Supp. 3d 563, 580 (S.D.N.Y. 2025).  The claims of Cliffy Care and Stellman are stayed.  (21 Civ. 7001, ECF 220.)

B. **Hanson Does Not Satisfy the Typicality or Adequacy**
   **Requirements of Rule 23(a)(3) and Rule 23(a)(4).**

1. **Hanson Could Not Have Been Affected by Unified Pricing Rules and**
   **Therefore Does Not Satisfy the Typicality and Adequacy Requirements.**

Google began to implement Unified Pricing Rules in September 2019, an initiative that limited publishers' ability to increase price floors on AdX transactions. (See Korula Dec. ¶ 57 (ECF 1033-6).) Unified Pricing Rules required publishers to set the same price floor for a given impression, regardless of the ad exchange, ad buyer, or ad-buying tool. (Zona Rep. ¶¶ 19, 85.) Publishers previously had the ability to set different price floors across different buyers and exchanges. (Zona Rep. ¶ 85.) Google described Unified Pricing Rules as a measure that allowed publishers to configure and manage prices through a single interface, but publishers objected that they could no longer freely price their own inventory, even on third-party exchanges. (Zona Rep. ¶ 86.) Because publishers could no longer set a higher price floor for AdX than for a third-party exchange, more transactions began to clear over AdX, with its overall win rate increasing by 39%. (Zona Rep. ¶ 87.)

Hanson asserts that class members were injured by Unified Pricing Rules because Google's monopoly power in the ad-exchange market caused advertisers to pay supracompetitive prices. But Hanson could not have been injured by the implementation of Unified Pricing Rules because he stopped using Google's ad-buying tools three years before Unified Pricing Rules went into effect in 2019.

Hanson characterizes his limited use of Google Ads as "irrelevant" to class certification and urges that the injury he suffered from Project Bernanke is sufficiently similar to the injury that Unified Pricing Rules caused to absent class members. (ECF 962 at 24.) This Court has already concluded that Hanson does not have antitrust standing or Article III standing to pursue claims directed to Unified Pricing Rules. See 721 F. Supp. 3d

at 251.  Further, it denied summary judgment to Hanson on Judge Brinkema's finding on Unified Pricing Rules because of his lack of standing.  2025 WL 3012840, at *11. [20]

While "non-identical injuries of the same general character can support standing," and it is an "obvious truth that class actions necessarily involve plaintiffs litigating injuries that they themselves would not have standing to litigate," "[a]t some point . . . a named plaintiff's claims can be so different from the claims of his putative class members that they present an issue not of the prudence of certifying a class under Rule 23 but of constitutional standing."  Langan v. Johnson & Johnson Consumer Companies, Inc., 897 F.3d 88, 94, 95 (2d Cir. 2018).

But even where a plaintiff does not have Article III standing to pursue a specific claim, he may still bring claims on behalf of absent class members if he satisfies the requirements of Rules 23(a) and 23(b).  See id. at 93-96.  Hanson urges that he satisfies the Rule 23(a)(3) typicality requirement because he and the class members "share the same overarching goal" and that Unified Pricing Rules are "part of the same overarching course of conduct to further the same anticompetitive goal."  (ECF 962 at 20.)  He points out that "typicality does not require identical facts" and "does not require that damages be identical among class members."  Madden v. Midland Funding, LLC, 237 F. Supp. 3d 130, 157 (S.D.N.Y. 2017) (Seibel, J.) (quotation marks omitted); see also In re MF Global Holdings Ltd. Inv. Litig., 310 F.R.D. 230, 236 (S.D.N.Y. 2015) (typicality "does not require factual identity between the named plaintiffs and the class members . . . .") (Marrero, J.) (quotation marks omitted).

---

[20] This Court granted summary judgment to the Publishers on the issue that Unified Pricing Rules were anticompetitive conduct not offset by any procompetitive feature based on Judge Brinkema's findings.  2025 WL 3012840, at *9.

The typicality requirement is indeed flexible and permits some variance between the claims of the named plaintiff and the class. But "[t]ypicality requires that the disputed issues of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class." Mazzei, 829 F.3d at 272 (quotation marks and brackets omitted). The party seeking certification must show that each class members' claim arises from the same events and relies on similar legal arguments to prove liability. In re Flag Telecom, 574 F.3d at 35. "And of course, if Plaintiff is unable to establish that she suffered any injury at all . . . that would necessarily doom the claims of other class members. The premise of the commonality and typicality requirements is 'where the lead plaintiff's claim fails, so too will those of the class.'" Garcia De Leon v. New York University, 2022 WL 2237452, at *13 (S.D.N.Y. June 22, 2022) (McMahon, J.) (quoting Rapcinsky v. Skinnygirl Cocktails, L.L.C., 2013 WL 93636, at *6 (S.D.N.Y. Jan. 9, 2013) (Oetken, J.)).

Hanson does not suggest that he was impacted by Unified Pricing Rules and, as noted, his own claims directed toward them have been dismissed on standing grounds. There is no factual overlap between his use of Google Ads and the impact of Unified Pricing Rules. Unified Pricing Rules prevented publishers from setting the price floor of their choice on AdX, whereas in Project Bernanke, Google secretly manipulated advertisers' bids in order to clear more publisher inventory on AdX. (See, e.g., Zona Rep. ¶¶ 105, 107, 114.) While they allegedly had the common effect of consolidating Google's monopoly power in the ad-exchange market, they were enforced on different ad tech products and in discrete and discernable periods of time. Therefore, even if Unified Pricing Rules and Project Bernanke are viewed as two components of an overarching scheme, Hanson's claims cannot be typical of the class when he felt no impact from conduct that long post-dated his limited

use of Google's ad-buying tools.  That Hanson seeks to challenge a broad course of conduct does not make his claims typical of the class.  Cf. Dukes, 564 U.S. at 350 ("Quite obviously, the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once.").

For these same reasons, Hanson cannot adequately represent the Advertiser Class.  "To satisfy Rule 23(a)(4), the named plaintiffs must 'possess the same interest[s] and suffer the same injur[ies] as the class members.'"  In re Literary Works in Electronic Databases Copyright Litig., 654 F.3d 242, 249 (2d Cir. 2011) (brackets in original; quoting Amchem, 521 U.S. at 625-26).  A plaintiff has little or no incentive to pursue claims on behalf of a class based on conduct that did not affect him.  Maroney v. Woodstream Corp., 2025 WL 945874, at *6-7 (S.D.N.Y. Mar. 28, 2025) (plaintiff whose claims required no proof of scienter could not adequately represent class members whose claims had scienter as an element) (Karas, J.); In re LIBOR, 299 F. Supp. 3d at 539 ("a named plaintiff has no incentive to establish trader-based manipulation on a day on which it had no exposure to EDFs . . . .").

Hanson was not affected by Google's adoption of Unified Pricing Rules and he has no incentive to pursue the claims of absent class members who claim injury arising from them.  He does not satisfy the typicality and adequacy requirements of Rules 23(a)(3) and 23(a)(4).

### 2.  Hanson Is an Inadequate Class Representative Because He Cannot Pursue Injunctive Relief.

Hanson separately does not satisfy Rule 23(a)(4) because he does not have standing to pursue injunctive relief, as the Court previously has held.  In re: Google Digital Advertising Antitrust Litigation, 721 F. Supp. 3d at 251 (citing Nicosia v. Amazon.com,

Inc., 834 F.3d 220, 239 (2d Cir. 2016) ("Although past injuries may provide a basis for standing to seek money damages, they do not confer standing to seek injunctive relief unless the plaintiff can demonstrate that she is likely to be harmed again in the future in a similar way.")).

Hanson's opening brief makes no mention of injunctive relief nor does his reply address Google's argument directed to his ability to seek injunctive relief. But the pursuit of injunctive relief was central to the Advertisers' opposition to Google's motion to compel arbitration of Stellman and Cliffy Care, where the Advertisers urged that a claim for public injunctive relief was non-arbitrable under California law. See Stellman, 763 F. Supp. 3d at 575-79. In his complaint in this action, Hanson seeks injunctive relief under section 2 of the Sherman Act "to halt Google's monopoly conduct and restore competition in the relevant markets" and under California law "to benefit the public from the lower prices and greater innovation that will prevail in competitive digital advertising markets in the absence of Google's monopoly." (Adv. First Am. Compl't ¶¶ 346, 395 (ECF 1198).)

Hanson, who exited the Google ad-tech markets in 2016, would be foreclosed from seeking injunctive relief on behalf of absent class members because he is not at risk of future harm arising from Google's anticompetitive conduct. See Nicosia, 834 F.3d at 239. His inability to pursue injunctive relief also renders him inadequate to represent the class.

C.  Hanson Does Not Satisfy Rule 23(b)(3) Because He Has Not
Demonstrated that Antitrust Injury and Damages Attributable to
Project Bernanke Can Be Established Through Common Proof.

1.  Overview of Project Bernanke.

As noted, along with Unified Pricing Rules, Hanson asserts that class members were injured by a long-running Google initiative known as Project Bernanke.[21] Google adopted Project Bernanke in December 2013, but the details of its implementation evolved over time.  (See Zona Rep. ¶¶ 72-78.)

Project Bernanke was preceded by a Google initiative called Buy-Side Dynamic Revenue Share ("BSDRS"), which was implemented in January 2013.  (Zona Rep. ¶¶ 70-71.)  Google typically takes a 14% share of the price advertisers pay to buy ad impressions.  (Zona Rep. ¶ 70.)  With BSDRS, Google dynamically modified its take rate (i.e., adjusted it in real time) in order for an advertiser to win an auction for ad space that would otherwise have gone unfilled on AdX, or would otherwise have cleared on a rival exchange where the publisher had set a lower price floor than on AdX.  (Zona Rep. ¶ 70.)  Google was able to modify its take rate and clear the sale over AdX because it already knew the publisher's price floor.  (Zona Rep. ¶ 71.)  According to Hanson's expert, BSDRS acted as a subsidy of publishers' price floors on AdX, causing publishers to artificially inflate their prices and advertisers to pay more.  (Zona Rep. ¶ 71.)

Project Bernanke was implemented in December 2013 and is described by one of Hanson's experts as "an elaboration" of BSDRS.  (Zona Rep. ¶ 72.)  Google observed that approximately half of all available publisher impressions on AdX were going unsold, so it implemented Project Bernanke, which reduced advertiser bids for some

---

[21] "The program was named for former Federal Reserve Chairman Benjamin Bernanke, and an internal Google document described the project as 'Quantitative Easing on the AdExchange.'"  Texas v. Google, 627 F. Supp. 3d at 388 n. 23.

impressions and used those savings to bid on additional impressions, thus winning more impressions for advertisers and selling more inventory over AdX instead of third-party exchanges.  (Milgram Rep. ¶ 158 (ECF 963-6).)  Project Bernanke caused advertisers to pay higher bids on certain impressions and lower bids on others.  (Milgram Rep. ¶ 159.)  Google averaged a 14% take rate on ad sales for each publisher, although its exact share varied with individual impressions.  (Milgram Rep. ¶ 158.)  Google observed that under Project Bernanke, the win rate for Google Ads increased from 34% to 41%.  (Zona Rep. ¶ 73.)

In August 2015, Google implemented "Global Bernanke."  (Milgram Rep. ¶ 160; Zona Rep. ¶ 74.)  Global Bernanke increased the total number and value of advertiser impressions sold by permitting some variation in Google's take rate across individual publishers and relaxing the practice of maintaining Google Ads's average 14% take rate on a per-publisher basis.  (Milgram Rep. ¶ 160; Zona Rep. ¶ 74.)

In April 2016, Google Ads altered the Bernanke pricing regime for advertisers using its automated bidding tools.  (Milgram Rep. ¶ 163.)  With this change, Google Ads charged a winning advertiser only the amount equal to the lowest value that it could have paid while still winning the impression.  (Milgram Rep. ¶ 163.)  One of Google's experts opines that "[t]his resulted in a bidder-truthful process for Google Ads advertisers, making it simpler for them to configure their campaigns optimally."  (Milgram Rep. ¶ 163.)

In September 2019, when AdX adopted Unified Pricing Rules, Google updated Bernanke with a program called "Alchemist."  (Milgram Rep. ¶ 164.)  Alchemist optimized Bernanke to maximize the total value of impressions won by Google Ads advertisers using a first-price auction format, rather than the second-price auction format

previously in place.[22]  (Milgram Rep. ¶ 164; Zona Rep. ¶ 76.)  Describing Alchemist, J. Douglas Zona, Ph.D., states that "the Bernanke optimizations no longer applied, in part because the second-bid pricing structure was eliminated and in part because Google began to communicate the first-price auction floor to all bidders simultaneously, eliminating Google Ads' advantage in knowing the reserve prices in order to calculate the Bernanke bid modifiers."  (Zona Rep. ¶ 76.)  Dr. Zona states: "I found no evidence of a material effect on Google's win rate on AdX attributable to Alchemist that would have affected the results of my analysis."  (Zona Rep. ¶ 78.)

In September 2024, Google updated Global Bernanke with a feature called "Bell v.2."  (Zona Rep. ¶ 75.)  It altered bids made through Google Ads for publishers that were repeatedly using AdX for the same impression.  (Zona Rep. ¶ 75.)  Dr. Zona found no effect on win rate that could be attributed solely to Bell v.2.  (Zona Rep. ¶ 75.)

## 2. Dr. Zona's Analysis of Project Bernanke's and Global Bernanke's Antitrust Impact and Class Members' Damages.

Dr. Zona opines that Project Bernanke and Global Bernanke harmed competition in the ad-exchange market and the market for self-service open-web display advertising.  (Zona Rep. ¶¶ 104-08.)  He states that Bernanke's bid modifications were known by few outside the Google Ads engineering staff and that the bid modifications required access to information only available through the DFP ad server.  (Zona Rep. ¶¶ 105-06.)  Dr. Zona opines that Project Bernanke had "a significant impact" on the win rates of Google Ads customers using AdX and provided "substantial revenue gains" at the expense of rivals to Google Ads.  (Zona Rep. ¶¶ 107-08.)

---

[22] For background on the difference between a first-price and second-price auction, see Texas v. Google, 627 F. Supp. 3d at 387.

In his analysis of anticompetitive effect, Dr. Zona first evaluates how Bernanke and Unified Pricing Rules affected the win rate on AdX – i.e., the proportion of publisher queries that were matched to an advertiser at auction. (Zona Rep. ¶ 117.) To do so, Dr. Zona calculated the volume of business affected by Google's Project Bernanke and Unified Pricing Rules. (Zona Rep. ¶ 122.) He includes a chart reflecting his opinion that from 2016 through the adoption of Unified Pricing Rules in 2019, Project Bernanke inflated AdX's win rate to approximately 60%, which was above the win rate of 45% in a but-for world without Project Bernanke. (Zona Rep. ¶ 119.) When Unified Pricing Rules went into effect in September 2019, AdX's win rate dropped to approximately 55%, compared to a but-for world where it had a win rate of approximately 43%. (Zona Rep. ¶ 119.)

Second, Dr. Zona performed a regression analysis that purports to determine overcharge by measuring how advertisers' prices changed based on Google's market power and changes in concentration in the ad-exchange market. (Zona Rep. ¶ 122.) Dr. Zona estimated two regression models: one for ad purchases subject to cost-per-click billing and one for ad purchases billed on expected cost per 1,000 impressions. (Zona Rep. ¶¶ 127-28.) These models rely on aggregated measures of average monthly prices paid by all advertisers. (Zona Rebuttal ¶ 83.) For both regression models, Zona found a statistically significant relationship between Google's share of the ad exchange market and the prices paid by advertisers. (Zona Rep. ¶ 133.) Dr. Zona concludes that for advertisers who paid on a cost-per-click ("CPC") basis (i.e., based upon the number of consumers who clicked through the ad) the implementation of Project Bernanke resulted in an overcharge of 4.5%. (Zona Rep. ¶ 135.) After Unified Pricing Rules were implemented, the overcharge increased to 4.75%. (Zona Rep. ¶ 135.) For advertisers who paid per 1,000 impressions ("eCPM"), the overcharge was one-fourth to one-half a percent lower. (Zona Rep. ¶ 135.)

Using the results of his two analyses described above, Dr. Zona has calculated separate aggregate damages per year for Google Ads users who bought ads on a CPC and the eCPM (i.e., cost-per-1,000-impressions) basis. (Zona Rep. ¶ 137.) He also includes a table that sets forth aggregate damages based on whether purchases were affected by Project Bernanke, Unified Pricing Rules or the 2019 period when the two initiatives were "Mixed." (Zona Rep. ¶ 138.) That same table lists the ad buyers' inventory source by three categories: AdX, AdSense and third-party exchanges. (Zona Rep. ¶ 138.)

In his rebuttal report and in response to critiques from Google's experts, Dr. Zona revises his regression models and adjusts his damages calculations accordingly. (Zona Rebuttal ¶¶ 103-04 (ECF 963-2).) Dr. Zona testified at deposition that in preparing his rebuttal report, he calculated damages based on "a version of my model. I mean, it has some similarities and some major differences." (Zona Dep. at 112 (ECF 1033-4).) Specifically, instead of using monthly average price data aggregated among all advertisers (as he did in his initial model), Dr. Zona incorporates into his regression a measure of the monthly cost per click for each unique advertiser for each advertising type.[23] (Zona Rebuttal ¶ 86.) Dr. Zona also controls for unique effects associated with each individual advertiser as well as unique effects associated with each type of transaction. (Zona Rebuttal ¶ 85.)

Furthermore, unlike the modeling described in his initial report, Dr. Zona's rebuttal estimates just one model that uses data from both ad purchases subject to cost-per-click billing and those billed based on expected cost per 1,000 impressions. (See Zona Sur-

---

[23] Dr. Zona's rebuttal model only uses records where the number of clicks for a type of transaction for an advertiser exceeds 20 in a given month. (Zona Rebuttal ¶ 86.) As a result, Dr. Zona's rebuttal model relies on data from approximately 1.3 million advertisers out of a total of 2.6 million advertisers who purchased ad space from Google during the period at issue. (Id.; Zona Rep. ¶ 33.)

Reply ¶ 4 (ECF 1070-3).)  Again, Dr. Zona finds a statistically significant relationship between Google's share of the ad-exchange market and prices paid by Google Ads's customers.  (Zona Rebuttal ¶ 89.)  Using this new model, he revises downward his initial damages calculation for Project Bernanke, from $304,563,632 to $232,748,279.  (Zona Rep. ¶ 138; Zona Rebuttal ¶ 104.)[24]  Notably, Dr. Zona has neither disavowed his initial regression model and damages calculation nor adopted the rebuttal model over his initial model.  (Zona Dep. at 113 (ECF 1033-4).)  Instead, he maintains that both damages estimates are accurate.[25]

### 3. Hanson Has Not Pointed to Common Evidence of Antitrust Injury and Resulting Damages Caused by Project Bernanke.

#### a. Hanson Has Not Demonstrated that Project Bernanke's Alleged Auction Manipulations on AdX Affected Class Members Who Transacted Through AdSense or Third-Party Exchanges.

Hanson has failed to demonstrate that there is common evidence showing that class members who made ad buys on AdSense and third-party exchanges were impacted by Project Bernanke, including BSDRS.  In an effort to meet his burden, Hanson relies on Dr. Zona's analysis, including his estimate that 52.2% of all Google Ads impressions were transacted through AdSense, whereas 44.4% were transacted through AdX.  (Zona Rep. ¶ 130.)  Dr. Zona, in his initial report, also estimates that Project Bernanke caused the class to suffer $162,644,688 in aggregate damages based on inflated

---

[24] He also revised downward the damages calculation for Unified Pricing Rules by approximately $111 million and the "Mixed" category by more than $5 million.  (Zona Rep. ¶ 138; Zona Rebuttal ¶ 104.)

[25] Q.  Okay. And I believe that you just testified that your -- you believe that both damages estimates are accurate, the one in your opening report and in your reply report?
   A.  Yes.
   Q.  Okay. And you stand by the methodology that you used in both your opening report and your reply report?
   A.  Correct.

prices paid in AdSense transactions and another $20,312,556 in aggregate damages based on inflated prices paid on third-party exchanges.[26]  (Zona Rep. ¶ 138.)

One of Google's experts, Judith Chevalier, Ph.D., has opined persuasively that Dr. Zona's analysis fails to explain how the claimed auction manipulations directed to AdX impacted the prices that advertisers paid on AdSense transactions.  (Chevalier Rep. ¶ 260 ("AdSense transactions are not cleared through the AdX exchange and as such, Dr. Zona has not explained how these challenged features could impact prices for AdSense.") (ECF 1070-1).)  More specifically, Dr. Chevalier opines that rather than design his damages model around the take rate that Google charged to advertisers – a factor that Google controls – Dr. Zona models damages based on the dubious assumption that Google controls the cost-per-click charged to advertisers, a factor, in fact, set by auction participants and not controlled by Google.  (Chevalier Rep. ¶ 257.)  Dr. Chevalier asserts that even if Google were capable of setting cost-per-click prices on AdSense, Dr. Zona does not explain how auction-manipulation prices on AdX resulted in higher prices on AdSense transactions. (Chevalier Rep. ¶ 259.)  Similarly, she criticizes Dr. Zona's failure to identify how Google's prices for AdX transactions resulted in higher ad prices on third-party exchanges. (Chevalier Rep. ¶ 261.)

Another Google expert, Laila Haider, Ph.D., notes that Dr. Zona's analysis of Bernanke's anticompetitive effects made no mention of AdSense despite purporting to quantify damages for AdSense transactions.  (Haider Rep. ¶ 53 n. 50 (ECF 1033-1); see also Zona Rep. ¶¶ 70-74, 104-08.)  Like Dr. Chevalier, Dr. Haider observes that Dr. Zona's

---

[26] Inclusive of Unified Pricing Rules, Dr. Zona calculates that the class suffered a total of $468,270,121 in damages based on transactions that cleared over AdSense and on third-party exchanges, versus $322,698,786 in aggregate damages for AdX transactions.  (Zona Rep. ¶ 138.)

analysis fails to explain how an increase in Google Ads win rates on AdX could have caused an anticompetitive price increase on AdSense transactions.  (Haider Rep. ¶¶ 104-05.)

Dr. Zona's rebuttal report says little about these critiques of Drs. Chevalier and Haider.  He opines that the strong market position of Google Ads resulted in supracompetitive pricing of its impressions across all platforms, including AdSense.  (Zona Rebuttal ¶¶ 58-59.)  He similarly states that Dr. Haider "ignores the market-wide nature of the effect of Google's conduct," asserting that as a result of Project Bernanke, Google Ads increased prices across all supply channels, and that "individual inquiries into the source of the impressions purchased by class members are not necessary to determine whether the class member suffered anticompetitive conduct."  (Zona Rebuttal ¶ 98.)

Dr. Zona's responses are generalized <u>ipse</u> <u>dixit</u> that do not engage the detailed critiques of Drs. Chevalier and Haider.  Dr. Zona's initial expert report contains only a handful of references to AdSense – in contrast to its detailed discussion of how Project Bernanke affected AdX transactions.  Neither the Zona initial nor rebuttal report describe, other than in a broad and conclusory manner, the purported anticompetitive effect of Project Bernanke on AdSense transactions.

These deficiencies flow into Dr. Zona's revised regression model.  As noted above, the model that Dr. Zona presents in his rebuttal report pools together data from CPC transactions, which are all AdSense transactions, and eCPM transactions, which are primarily AdX transactions.  This stands in contrast to his initial modeling, in which he estimated two separate regression equations, one for CPC transactions and one for eCPM transactions.  Dr. Haider reran Dr. Zona's rebuttal model separately for these two types of transactions.  (Haider Decl. ¶ 2 (ECF 1033-5).)  She found that these models produced results that were substantially different from the revised (combined) model presented by Dr.

Zona in his revised report.  (Id.)  While Dr. Zona opines that prices on AdX and AdSense should track each other (Zona Sur-Reply ¶ 3), Dr. Zona's inconsistent modeling methodology between his initial and rebuttal reports—along with his failure to engage with the critiques presented by Drs. Haider and Chevalier—undermine his analysis.[27]

Hanson has not demonstrated, through evidence common to the class, antitrust impact and damages for Google Ads customers who purchased ads during the relevant period, and specifically for those customers who transacted over AdSense and third-party exchanges.  Hanson therefore has failed to satisfy the predominance and superiority requirement of Rule 23(b)(3).

> b.  Dr. Zona's Aggregation of Damages Obscures Project Bernanke's Individualized Impact on the Members of the Proposed Class.

Dr. Zona damages analysis in his initial regression model relies upon aggregated figures that purport to reflect damages broadly suffered by the proposed class members at a broad level, without controlling for the different ways that the alleged auction-manipulation practices affected individual advertisers.  (Zona Rep. ¶¶ 121-42.)

Dr. Haider observes, quoting a reliable third-party source, that calculating average prices based on aggregate data risks obscuring "substantial differences" in the prices paid by consumers:

> "When averages are used, there is a risk that the averages may hide substantial differences among customers or products, which may be critical for determining whether there is individual impact. The reliance on averages may be a critical flaw in the work of a plaintiffs' economics expert who concludes that price data reflect individual impact, since the underlying customer-specific pricing data may show a wide range in prices and/or changes in prices."

---

[27] In his sur-reply, Dr. Zona explains that in lieu of estimating two separate regressions for the AdSense and AdX channels, he introduced a control variable in his rebuttal model that addressed the effect of whether ad space purchases were AdX or AdSense transactions.  (Zona Rebuttal ¶ 85; Zona Sur-Reply ¶ 7.)

(Haider Rep. ¶ 112 (quoting ABA Section of Antitrust Law, Econometrics: Legal, Practical, and Technical Issues, ABA Book Publishing (2d ed. 2014) p. 360).)

        Judge Engelmayer has observed that "at the class certification stage, a model proffered as common proof of classwide antitrust injury may be defective – thus necessitating individualized injury inquiries – where it relies on average impact and thereby masks the existence of uninjured class members." In re Aluminum Warehousing Antitrust Litig., 336 F.R.D. 5, 62 (S.D.N.Y. 2020) (citing In re Lamictal Direct Purchaser Antitrust Litig., 957 F.3d 184, 192 (3d Cir. 2020)); see also Bell Atlantic Corp. v. AT&T Corp., 339 F.3d 294, 307 (5th Cir. 2003) (plaintiffs failed to demonstrate Rule 23(b)(3) predominance because "the plaintiffs' damages formula – a formula based on nationwide averages that makes no effort to adjust for the variegated nature of the businesses included in the classes – cannot reasonably approximate the actual damages suffered by the class members . . . .").

        In response to Dr. Zona's initial report, Dr. Haider tracks the monthly average cost-per-click costs for the top 100 advertisers on AdX and AdSense and compared them to the monthly averages calculated by Dr. Zona. (Haider Rep. ¶ 108.) When indexed to a baseline of 100, some advertisers transacting on AdX paid more than six times the average overcharge calculated by Dr. Zona while many paid far less than Dr. Zona's average. (Haider Rep. ¶ 108.) Dr. Haider's analysis shows a wide variation in advertisers' cost-per-click expenses and minimal clustering around the aggregated monthly average calculated by Dr. Zona. (Haider Rep. ¶ 108.)

        In response, Dr. Zona observes that "to the extent the mix of any idiosyncratic effects stays constant over time, there would be no change in the average price from month-to-month from these idiosyncrasies, and therefore, no effect on my results using aggregate monthly data." (Zona Rebuttal ¶ 83.) But this seems to suggest a lack of

connection between an advertiser's prices and the implementation of Project Bernanke. For example, in scrutinizing the 1st and 99th percentile values of advertisers transacting on AdX, Dr. Haider determined that in September 2019, advertisers' average cost-per-click price ranged from $.03 to $4.49. (Haider Rep. ¶ 108 n. 164.) For such advertisers transacting on a cost-per-thousand-impressions basis, average monthly rates ranged from $0 to $36.33. [28] (Haider Rep. ¶ 108 n. 164.) Dr. Haider opines that "even for a given advertiser, ad prices paid fluctuate dramatically from month to month, reflecting the idiosyncratic factors affecting prices for impressions that vary on an auction-by-auction basis." (Haider Rep. ¶ 108.)

Dr. Haider also concludes that by relying on aggregate prices, Dr. Zona's methodology in his initial report greatly overweighs the experiences of the top 0.1% of Google Ads customers and masks large variations within the class. (Haider Rep. ¶¶ 122-26.) Dr. Haider states that she found no statistically significant relationship between AdX share and ad prices paid by the bottom 99.9% of advertisers combined, and "that Dr. Zona's findings are driven by the pricing experience of advertisers within the top 0.1% as measured by clicks received." (Haider Rep. ¶ 123.) Dr. Haider also reviewed the monthly average ad prices paid by advertisers in the bottom 25% and the top 25% of numbers of clicks during the relevant time period, and found that, between the two groups, monthly average ad prices increased and decreased in different directions from 2016 through 2022, except for discrete periods in 2017 and 2020-21, when prices temporarily converged. (Haider Rep. ¶ 121.) These stark differences demonstrate that the aggregation offered by Hanson's expert masks

---

[28] Some advertisers do not pay for impressions that do not result in consumer clicks. (Haider Rep. ¶ 108 n. 164.)

differences between the individual class members rather than proving impact through common evidence.

Because Hanson has not disclaimed continued reliance on a damages model that aggregates damages across all class members and does not adequately account for advertisers' widely varying payments to Google, he does not satisfy the predominance and superiority required by Rule 23(b)(3).

      c.  <u>The Majority of the Class Was Not Impacted by Project Bernanke.</u>

Haider also notes that the majority of the would-be class did not buy ads through Google Ads while Project Bernanke was in place. (Haider Rep. ¶¶ 59-64.)

BSDRS was only in effect from January 2013 through November 2013, and thus was not active during the proposed class period. (Haider Rep. ¶ 60.) Even so, 94% of the proposed class did not buy ad inventory during the time that BSDRS was in effect. (Haider Rep. ¶ 60.) The initial version of Project Bernanke also predated the proposed class period and was in effect between November 2013 and August 2015, when it was superseded by Global Bernanke. (Haider Rep. ¶ 61.) Dr. Haider states that 90% of the proposed class did not buy ads while the initial version of Project Bernanke was in place. (Haider Rep. ¶ 61.) Global Bernanke was in effect from August 2015 through September 2019. (Haider Rep. ¶ 62.) Dr. Haider states that 60% of the proposed class did not buy ads while Global Bernanke was in place. (Haider Rep. ¶ 62.) Overall, Dr. Haider concludes that 1,504,812 advertisers, comprising 59% of the proposed class, did not buy ad inventory during any iteration of Project Bernanke. (Haider Rep. ¶ 63.)

Hanson does not dispute these figures.

Even if Hanson could show the existence of common evidence tending to prove antitrust impact and damages to class members who bought ads while Project

Bernanke was in effect, approximately 59% of the class still would not have been impacted

by Project Bernanke. This weighs against a finding of predominance and superiority under

Rule 23(b)(3).

        d.   Individualized Inquiry Would Be Required to Determine
            Whether Absent Class Members Agreed to Arbitrate.

As noted, the Court previously concluded that two named plaintiffs, Michael

Stellman and Cliffy Care Landscaping LLC, entered into a valid agreement to arbitrate their

claims pursuant to Google's Advertising Terms of Service, which Google first put into place

in September 2017. Stellman, 763 F. Supp. 3d at 568-73. In its Opinion and Order, the

Court reviewed evidence that Stellman and Cliffy Care did not affirmatively opt out of the

arbitration agreement after receiving conspicuous and unambiguous notice of their right to

do so. Id. at 571-73.

The definition of the Advertiser Class contains no carveout for advertisers

who are bound by an agreement to arbitrate. "[I]f a class were certified, the parties and the

Court would then have to determine which class members were properly a part of this case.

This would require an individualized inquiry into which class members agreed to these

provisions." National Convention Services, LLC v. Applied Underwriters Captive Risk

Assurance Co., Inc., 2019 WL 3409882, at *4 (S.D.N.Y. July 27, 2019) (Koeltl, J.). Hanson

points to authority for the proposition that a court ought not compel absent class members to

arbitration before a class has even been certified, see, e.g., B & R Supermarket, Inc. v. Visa

Inc., 2021 WL 4408167, at *4-5 (E.D.N.Y. Sept. 27, 2021) (collecting cases), but this Rule

23 motion does not invite the Court to decide whether any class member's claims must be

arbitrated. Hanson has stated that "the proposed class numbers in the millions, and at least

hundreds of thousands," and that more than "377,000 individuals [are] not subject to any

arbitration provision . . . ." (ECF 962 at 18, 42.) In recognizing that out of "millions" of

potential class members, 377,000 are not subject to arbitration, Hanson implicitly recognizes that the vast majority of the putative class would be required to arbitrate their claims and would require the Court to determine which putative class members are obligated to arbitrate and which are not.

Because individualized questions of arbitrability would likely dominate the putative Advertiser Class, Hanson has not met his burden of proving predominance and superiority under Rule 23(b)(3).

D.  The Court Need Not Reach Google's Daubert
Motion Directed to Drs. Zona and Singer.

In connection with Hanson's motion, Google has filed a motion to exclude the expert testimony of Dr. Zona and Dr. Hal Singer on Daubert grounds.  Dr. Singer has opined on the issue of antitrust impact and damages arising from Unified Pricing Rules. Because the Court concludes that Hanson does not satisfy the typicality and adequacy requirement to bring claims related to Unified Pricing Rules on behalf of the class, it need not decide whether Dr. Singer's methods satisfy Daubert.  As to Dr. Zona, the Court need not reach the Daubert motion because, assuming that he reliably applied accepted methodologies on the issue of antitrust impact and damages, his opinions would still fail to demonstrate that common questions of law and fact predominate over individualized ones and that a class action is superior to individualized adjudication.

CONCLUSION.

A.  The Publishers' motion for class certification is GRANTED as to the AdX Class as follows:

1.  The Court certifies a class consisting of all persons or entities in the United States that directly paid Google, through payment of fees directly to Google or reductions in advertising revenue received directly from Google, for

services associated with selling advertising impressions on websites via Google's AdX Ad Exchange from December 15, 2016 through March 31, 2024, with the exception of any claim arising from instream video transactions;

2. Genius and The Nation are approved as class representatives;

3. The law firms of Boies Schiller Flexner LLP, Korein Tillery LLC and Berger Montague PC are appointed Co-Lead Counsel for the AdX Class; and

4. Co-Lead Counsel for the AdX Class shall submit a proposed notice to the members of the AdX Class, compliant with Rule 23(c)(2), Fed. R. Civ. P., by January 23, 2026.

B. The Publishers' motion for class certification as to the AdSense Class is DENIED.

C. Christopher Hanson's motion for class certification as to the Advertiser Class is DENIED.

D. Google's motion to exclude the expert testimony of Professor Einer Elhauge is DENIED.

E. The Court does not reach Google's Daubert motion to exclude the expert testimony of Drs. Zona and Singer, and the Clerk is respectfully directed to terminate the motion.

F. The motions to seal certain portions of the submissions in support or opposition to class certification are provisionally GRANTED.

G. The Clerk is respectfully directed to terminate the following motions: 21-md-3010, ECF 955, 960, 965, 1017, 1024, 1029 and 1064; 21-cv-7001, ECF 225, 230, 241, 248, 255 and 256; 21-cv-7034, ECF 185, 208, 215, 222 and 226.

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated:  New York, New York
        December 12, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on December 18, 2025, a true copy of the foregoing document filed through the ECF system will be electronically sent to all persons identified on the Notice of Electronic Filing.

/s/ *Henry J. Hauser*
Henry J. Hauser