**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> LIVE NATION ENTERTAINMENT, INC., and TICKETMASTER L.L.C., <br><br> *Defendants.* | Case No. 1:24-cv-03973-AS <br><br> **ORAL ARGUMENT REQUESTED** <br><br> **REDACTED** |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF**
**<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...........................................................................................................1

ARGUMENT ................................................................................................................2

I.      Plaintiffs' Alleged Relevant Markets Fail ........................................................2

        A.      Targeted Customer Markets.................................................................2

        B.      The Fan-Facing Market.......................................................................6

        C.      Large Amphitheaters...........................................................................7

II.     Plaintiffs Do Not Demonstrate Anticompetitive Effects ...................................8

        A.      Ticketing Services Markets..................................................................8

                1.      Exclusivity .............................................................................9

                2.      Content Leveraging...............................................................12

        B.      Promotion and Booking Markets........................................................12

        C.      Large Amphitheater Market...............................................................13

III.    Plaintiffs' Tying Claim Fails ..........................................................................13

IV.     State Plaintiffs' Claims .................................................................................15

CONCLUSION.............................................................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962).................................................................................................4

*California v. Infineon Techs. AG*,
531 F. Supp. 2d 1124 (N.D. Cal. 2007) ................................................................16

*Connecticut v. Aurobindo Pharma USA*,
2025 WL 1207566 (D. Conn. Apr. 25, 2025)........................................................16

*FTC v. Meta Platforms*,
2025 WL 3458822 (D.D.C. Dec. 2, 2025).......................................................*passim*

*FTC v. Staples, Inc.*,
190 F. Supp. 3d 100 (D.D.C. 2016) .........................................................................4

*FTC v. Sysco*,
113 F. Supp. 3d 1 (D.D.C. 2015) .............................................................................5

*FTC v. Tapestry*,
755 F. Supp. 3d 386 (S.D.N.Y. 2024)......................................................................8

*Heerwagen v. Clear Channel Comms.*,
435 F.3d 219 (2d Cir. 2006).....................................................................................7

*In re Adderall XR Antitrust Litig.*,
754 F.3d 128 (2d Cir. 2014)...................................................................................15

*In re Pool Prods. Distribution Mkt. Antitrust Litig.*,
940 F. Supp. 2d 367 (E.D. La. 2013) .....................................................................12

*In re WorldCom Sec. Litig.*,
308 F. Supp. 2d 338 (S.D.N.Y. 2004).....................................................................15

*It's My Party v. Live Nation*,
811 F.3d 676 (4th Cir. 2016) ...............................................................................7, 8

*MacDermid Printing Solutions v. Cortron*,
833 F.3d 172 (2d Cir. 2016)......................................................................1, 8, 12, 13

*McWane v. FTC*,
783 F.3d 814, 832 (11th Cir. 2015) .......................................................................12

*NicSand v. 3M*,
  507 F.3d 442 (6th Cir. 2007) ................................................................9

*Omega Envtl. v. Gilbarco*,
  127 F.3d 1157 (9th Cir. 1997) ............................................................11

*Race Tires Am. v. Hoosier Racing Tire*,
  614 F.3d 57 (3d Cir. 2010)............................................................9, 11

*Snapp v. Puerto Rico*,
  458 U.S. 592, 607 (1982) ...................................................................15

*Stubhub v. Golden State Warriors*,
  2015 WL 6755594 (N.D. Cal. Nov. 5, 2015) ...................................6, 7

*Ticketmaster v. Tickets.com*,
  2003 WL 21397701 (C.D. Cal. Mar. 7, 2003) ...................................11

*United States v. Dentsply International*,
  399 F.3d 181 (3d. Cir. 1984)..............................................................10

*United States v. E. I. du Pont de Nemours & Co.*,
  351 U.S. 377 (1956).............................................................................1

*United States v. Google*,
  687 F. Supp. 3d 48 (D.D.C. 2023) .....................................................12

*United States v. Visa*,
  788 F. Supp. 3d 585 (S.D.N.Y. 2025).......................................9, 10, 11

*Verizon Commc'ns v. L. Offs. of Curtis V. Trinko*,
  540 U.S. 398 (2004).............................................................................15

*Viamedia v. Comcast*,
  951 F.3d 429 (7th Cir. 2020) .............................................................15

*ZF Meritor v. Eaton*,
  696 F.3d 254 (3d Cir. 2012).........................................................9, 10, 11

## STATUTES

15 U.S.C. § 18.............................................................................................5

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| Mot. | Memorandum of Law in Support of Defendants' Motion for Summary Judgment (ECF No. 689) |
| MSJ Ex. __ | Exhibits to the Declaration of Robin L. Gushman in Support of Defendants' Motion for Summary Judgment (ECF No. 691) |
| Opp. | Plaintiffs' Corrected Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (ECF No. 771) |
| Pls. Ex. __ | Exhibits to the Declaration of Michael G. McLellan in Opposition to Defendants' Motion for Summary Judgment (ECF No. 744) |
| RSUF ¶__ | Plaintiffs' Corrected Response to Defendants' Local Civil Rule 56.1 Statement in Support of Their Motion for Summary Judgment (ECF No. 775) |
| COMF ¶__ | Plaintiffs' Corrected Counterstatement of Material Facts in Support of Their Opposition to Defendants' Motion for Summary Judgment (ECF No. 774) |

**INTRODUCTION**

The essence of "monopolization" is that a firm with "the power to control prices or exclude competition," *United States v. E. I. du Pont de Nemours & Co.,* 351 U.S. 377, 391 (1956), has engaged in unjustified conduct that enhances that power to the detriment of its customers. Therefore, a plaintiff must prove, first, that the defendant has monopoly power, and second, that it engaged in behavior that (among other requirements) so weakened the competitive constraints on the firm that it led to higher prices, reduced output, or reduced quality. *See FTC v. Meta Platforms*, 2025 WL 3458822, at *10 (D.D.C. Dec. 2, 2025). Section 1 rule of reason claims likewise require proof of market power and actual anticompetitive effects. In *MacDermid Printing Solutions v. Cortron*—which Plaintiffs' Opposition ignores—the Second Circuit found that "in no precedential opinion in this Circuit has a plaintiff successfully proved an adverse effect on competition without offering evidence of changed prices, output, or quality." 833 F.3d 172, 183 (2d Cir. 2016).

Defendants moved for summary judgment because, despite the many complexities in this case, an essential nucleus of material facts is either conceded or not subject to reasonable dispute. Consider the primary ticketing services and promotion services markets at the heart of this case.

- There is agreement on which firms offer primary ticketing services to amphitheaters, arenas, stadiums, and other large venues, and which firms offer promotion services to artists that seek to play these venues.

- There is no evidence—nor an argument—that the prices or terms Ticketmaster charges to so-called "major concert venues" ("MCVs") are inferior to those charged to other large venues.

- There is no evidence—nor an argument—that the prices or terms Live Nation charges to artists who play MCVs are inferior to those charged to other artists.

1

- Without the MCV limitation to their market definitions, Defendants' market shares in both primary ticketing services and promotion services are too low to infer monopoly power.

- Plaintiffs do not purport to have "direct evidence" of monopoly power with respect to either their ticketing or promotion markets.

- There is no evidence that anything Defendants did led to higher prices, less output, or reduced quality to venues or artists.

Plaintiffs do not get the jury trial they seek on these undisputed facts. They have failed to raise triable issues on the most fundamental elements of their claims. Their theories about how Defendants *could* impose disadvantageous commercial terms on MCVs and artists who play them, and how there is a *possibility* of anticompetitive effects in those supposed markets, do not avert summary judgment. Evidence of actual monopoly power and actual anticompetitive effects is required as a matter of law.

Summary judgment is warranted on other grounds as well, for the reasons discussed below. Nothing survives in the end. This baseless case should be dismissed.

## ARGUMENT

## I. PLAINTIFFS' ALLEGED RELEVANT MARKETS FAIL

### A. Targeted Customer Markets

Most market definition disputes raise the question of what *products or services* compete with which others. That can become a line-drawing exercise ill-suited for summary judgment. But for Plaintiffs' alleged monopolies concerning primary ticketing services, promotion services, and booking services, that's not the case. There is no dispute whether, for example, SeatGeek's ticketing service is a substitute for Ticketmaster's, or AEG's concert-promotion service is a substitute for Live Nation's. There is agreement on which services matter and which service

providers count.  The disagreement is that Plaintiffs do not want—and cannot afford—to calculate market shares based on each agreed-provider's sales across the full range of opportunities for which these companies compete.  Instead, Plaintiffs seek to define the market as limited to the provision of the services in question *only to some buyers (MCVs) and not others*.  Opp.16-19.  The effect on market shares is stark.

Plaintiffs argue this is the classic fact-bound dispute over reasonable interchangeability, but it is not.  Plaintiffs' legal justification for what they are doing is explicit: they say these are "targeted customer markets" and expressly tailor their arguments to their own Merger Guidelines and cases applying them.  Opp.16-17.  But of course this is not a merger case, and Plaintiffs' burden is not to prove *potential* power, but *actual* power.  Summary judgment therefore turns on a legal question: in an actual monopolization case, what evidence is the plaintiff required to adduce to support the contention that the market should be defined to encompass only a subset of buyers of the relevant products or services?

Defendants' position is that the law is what Judge Boasberg held it to be in the *Meta* case: if a plaintiff alleging actual monopoly seeks to define a market by reference to a subset of buyers of a given product, "then that market's borders must be shown by significant differences in price" paid by those buyers compared with others outside the target set.  *See Meta*, 2025 WL 3458822, at *35.

If Defendants are right about the legal standard, then the case is over as to ticketing and concert promotion.  Plaintiffs have no evidence that Ticketmaster has ever actually extracted different—and worse—terms from MCVs than from other venues.  They have no evidence that Live Nation has ever actually extracted different—and worse—terms from artists whom they promote at MCVs compared to artists they promote at other venues.  Plaintiffs' expert

acknowledged that he did not conduct any such analysis—not even in response to Defendants' experts, who did.  *See* RSUF ¶¶3-4.[1]

Plaintiffs' position is that it suffices to show that Defendants *could potentially* raise prices to the targeted customers.  Opp.19-20.  And they point to the *Brown Shoe* factors, arguing that enough of them point toward recognition of target-customer markets to render this a jury issue. Opp.18-21.  Not so.

The *Brown Shoe* factors go to the question of "reasonable interchangeability," which the Supreme Court famously said establishes the "outer boundaries of a product market."  *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962); *see Meta*, 2025 WL 3458822 at *28 (observing that *Brown Shoe* factors use "qualitative evidence as 'evidentiary proxies' for whether consumers would in fact substitute between products").  But when someone alleges a targeted customer market, reasonable interchangeability in a *Brown Shoe* sense is not contested.  The market definition dispute in ticketing and promotion does not change the list of service providers in competition with one another.  Those are agreed.  The issue is that in calculating market shares, Plaintiffs want to telescope in on just some of the buyers, to the exclusion of others.  That is not what the *Brown Shoe* factors address.

The concept of targeted customer markets was developed to address a recurring issue in mergers, which is that even within an otherwise competitive market, there may be pockets of customers that can be targeted for price increases.  *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 117-18 (D.D.C. 2016).  There is a bespoke test for such a market, asking whether "captured or dedicated

---

[1] The only market for which Plaintiffs purport to offer evidence of price discrimination is concert booking services.  Opp.18.  But even there, the evidence they cite refers not to MCVs but to a differently defined set of venues comprising just arenas, irrespective of size and show count, and excluding amphitheaters.  COMF ¶151.

customers could be targeted for monopolist pricing even if a price increase for all customers would not be profitable." *FTC v. Sysco,* 113 F. Supp. 3d 1, 39 (D.D.C. 2015). But importantly, that test is geared to the Clayton Act, which bans mergers that "*may … substantially … lessen competition, or … tend to create a monopoly.*" 15 U.S.C. § 18. Merger analysis is prospective, permitting courts to find a targeted customer market upon proof that price discrimination is *likely*.

There is neither logic nor precedent for inferring *actual monopoly power* from market shares that are inflated by the *possibility* of price discrimination. If this doctrine is to be ported into Sherman Act litigation, then the proof that Judge Boasberg required in *Meta* is properly required: there must be evidence of "significant differences in price" for venues and artists within and outside the MCV universe. *Meta*, 2025 WL 3458822, at *35. After all, the logic of this market concept, when confronted before a merger, is that "a hypothetical monopolist would profitably and separately impose" substantial price increases on vulnerable customers. *See* Horizontal Merger Guidelines (2010) §4.1.4. If an accused actual monopolist has not done that, the market must not be so narrow.

Plaintiffs' invocation of their expert's handful of hypothetical monopolist tests ("HMTs") thus cannot thwart summary judgment. Opps.19-20. With respect to ticketing and booking, the particular HMTs they invoke do not even purport to measure distinctions between MCVs and non-MCVs.[2] With respect to concert promotion, the study at least attempts to address the right issue. Opps.19-20. But it begs the question: if an economic analysis says that Live Nation should be discriminating against artists when they choose to play MCVs, why is there no evidence that Live

---

[2] Their ticketing HMT purports to measure at what price venues would substitute away to *self-ticketing*. MSJ Ex. 72 ¶240. And on the booking side, the analysis purports to show "how likely it is that a major concert venue would substitute away from concerts to other event types." *Id.* ¶205. Again, not the question.

Nation has in fact done so? Most if not all artists who play stadiums (left out of the MCV market) also play arenas (in the alleged market). That presents an ideal opportunity to compare terms, artist-by-artist. And yet there is no evidence whatsoever Live Nation charges more—or even thinks it can charge more—to artists based on this made-for-litigation categorization of venues.

Plaintiffs respond that MCVs "can be offered different terms" since deals "are generally individually negotiated with each MCV." Opp.17. That is an excellent foundation for *studying* whether systematic price discrimination occurred. But Plaintiffs did not do that, either to meet their burden of proof or respond to Defendants' experts, who found no discrimination. *See* MSJ Ex. 76, fig.2; RSUF ¶¶3-4.

This is all gerrymandering, pure and simple. It's the only way to create market shares consistent with the claims of monopoly. Plaintiffs try to muddy the waters on that too, for example arguing that Defendants "conflate data sources" in stating that Ticketmaster's share of the ticketing market is 49% when stadiums are included. Opp.17-18. But the salient point—drawn from their own expert—is that Ticketmaster's purported share swings from below 50% to above 80% depending on which venues Plaintiffs choose to count. *See* MSJ Ex. 79 ¶269, fig.45. And regardless, Plaintiffs' markets *must be* well-defined as a matter of law. As the *Meta* decision shows, when the market definitions fail, the case fails, period. *Meta*, 2025 WL 3458822 at *40.

B.    **The Fan-Facing Market**

Plaintiffs' Opposition deepens the mystery of why we are having to deal with this "fan-facing" ticketing market. Ticketing *services* are not sold to fans. And if—as the Opposition indicates—this is about selling *tickets* to fans, then there is no basis for limiting the market to *primary* ticketing because, indisputably, primary and secondary ticketing companies compete to do that. *Stubhub v. Golden State Warriors*, 2015 WL 6755594, at *3 (N.D. Cal. Nov. 5, 2015)

(dismissing antitrust case based on primary-secondary competition). Plaintiffs' only response is that "[s]econdary tickets cannot constrain primary ticketers … because re-sold tickets cannot increase total output of concert tickets." Opp.25. That is a diversion. This is supposedly about competition in ticket *distribution*, not about whether *artists* have reduced their output. The question is which ticket marketplaces fans view as reasonable substitutes when they want to go to a show, which is every marketplace that has the tickets. *Stubhub*, 2015 WL 6755594, at *3.

Markets for tickets to particular shows are also local. *Heerwagen v. Clear Channel Comms.*, 435 F.3d 219, 228 (2d Cir. 2006); Mot.20. Plaintiffs respond that "Ticketmaster operates on a national level." Opp.25. So does Safeway, but supermarket markets are still local. Plaintiffs have offered no coherent defense of their incoherent national fan-facing market.

### C.    Large Amphitheaters

Plaintiffs do not seriously contest that, at prevailing prices, artists routinely substitute arenas and other venues for "large amphitheaters." Mot.14-16. That means as a matter of law that they belong in the same market. *It's My Party v. Live Nation*, 811 F.3d 676, 682-83 (4th Cir. 2016); Mot.15.

Plaintiffs instead misrepresent Defendants' arguments as focused on "functional similarities" and not "whether amphitheaters and arenas are 'economic substitutes.'" Opp.21. But it is Plaintiffs, not Defendants, who do that. Opp.22 ("MCAmps [are] smaller than stadiums, but larger than clubs and theaters."). Summary judgment is warranted based on observed *artist choices*, which prove that, notwithstanding the "functional" differences, they treat large amphitheaters and other venues as "reasonably interchangeable." *See Meta*, 2025 WL 3458822, at *19 ("The best evidence of what consumers consider as substitutes often comes from consumers themselves.").

Plaintiffs try to dismiss this evidence as artists "cross-shopping," similar to having "several different types of handbags in the[] closet."  Opp.23 (quoting *FTC v. Tapestry*, 755 F. Supp. 3d 386, 455 (S.D.N.Y. 2024)).  But artists do not patronize non-substitutable venues the way one might collect non-substitutable kinds of handbags.  With their managers, agents, and promoters, they are making economically consequential decisions about how to maximize their touring potential at a particular stage of their careers.  The substitution evidence Defendants rely on reflects that hardly anyone chooses *only* large amphitheaters.

Plaintiffs cite evidence that Defendants' amphitheater customers are insensitive to price increases.  Opp.23.  But there is no dispute that there is *differentiation* between large amphitheaters and competing venues, and we may presume for present purposes that it allows for some pricing freedom.  That doesn't show "that artists are so likely to stick to amphitheaters in the event of a price increase that amphitheaters comprise their own market."  *It's My Party*, 811 at 682-83.[3]

## II.    PLAINTIFFS DO NOT DEMONSTRATE ANTICOMPETITIVE EFFECTS

To prove anticompetitive effects under the Sherman Act, Plaintiffs must prove that wrongful acts caused *actual consumer harm*, i.e., "changed prices, output, or quality." *MacDermid*, 833 F.3d at 183.  Plaintiffs do not cite evidence of any of that, much less evidence that might create a genuine dispute of material fact.

### A.    Ticketing Services Markets

In ticketing, the issue is harm to venues—in particular, MCVs.  Plaintiffs have no evidence of changed prices, output, or quality for ticketing services, so they try to change the subject.

---

[3] A *Daubert* motion addresses Dr. Hill's attempt to show this through an HMT, which is inadmissible for the reasons discussed therein.

1.    <u>Exclusivity</u>

Plaintiffs say the right legal framework for addressing exclusive dealing is the "multi-factor, holistic analysis" in *United States v. Visa*, 788 F. Supp. 3d 585, 609 (S.D.N.Y. 2025). Opp.29.   But they suggest that balancing multiple factors can excuse zero proof of anticompetitive effects.  That is wrong.  *See ZF Meritor v. Eaton*, 696 F.3d 254, 271-72 (3d Cir. 2012) (plaintiffs have burden of proving *all* necessary elements).  In *Visa* itself, Judge Koeltl held that to avoid dismissal the government needed to allege "that Visa's contracts excluded rivals from the relevant market," 788 F. Supp. 3d at 611, and he quoted *MacDermid* as "generally requiring 'evidence of changed prices, output, or quality,'" *id.* at 609.  The other factors courts apply to exclusive dealing are *conjunctive* with the foundational requirement to prove anticompetitive effects.

Plaintiffs do not even try to meet the *MacDermid* standard.  Their one-paragraph discussion of effects states only that effects are disputed—and then changes the subject by suggesting that *benefits* from exclusivity could be achieved in other ways.  Opp.28.  The citations are to evidence that "[s]everal major concert venues" either have or have sought non-exclusive contracts.  *See* COMF ¶¶104-105.  That in no way infers changed prices, output, or quality.  Game over.

There is no need for the Court to consider the complete multi-factor analysis.  However, it bears noting that the cases Plaintiffs cite make clear that when, as here, (i) buyers request exclusivity, (ii) sellers compete to be selected as the exclusive supplier, and (iii) buyers are not coerced, exclusive contracts do not harm competition or cause anticompetitive effects.  *See ZF Meritor,* 696 F.3d at 284; *Visa*, 788 F. Supp. 3d at 613-614.  In *Visa,* Judge Koeltl contrasted the plaintiff's allegations with those in *NicSand v. 3M*, 507 F.3d 442 (6th Cir. 2007), where long-term exclusive agreements with all the major customers were found lawful because the customers "demanded" exclusivity and the defendant simply offered better financial terms than its competitor to win their business.  *Id.* at 452-454; *see also Race Tires Am. v. Hoosier Racing Tire*, 614 F.3d

57, 83-84 (3d Cir. 2010) ("the lengthy duration" of the exclusive agreements didn't harm competition because the purchaser was "free to pick the supplier that it believes will provide the best deal").

The gaping hole in Plaintiffs' supposed multi-factor analysis is the lack of any meaningful evidence that exclusive contracts were *imposed* on unwilling MCVs. The cases they cite emphasize the key distinction: coerced exclusivity is different and more problematic than exclusivity at the customer's request. *See ZF Meritor*, 696 F.3d at 284 ("Exclusive dealing will generally only be unlawful where … there is some element of coercion present."); *Visa*, 788 F. Supp. 3d at 611-615 (repeatedly referencing alleged coercion). Yet Plaintiffs do not even advance an argument that MCVs generally do not want exclusivity and accept it only because they have no other choice. They argue semantics: that because exclusive terms are in Ticketmaster's exclusive contracts, they are "impose[d]." Opp.9. They try to conflate the meager evidence of (a) alleged content threats to win the bidding for an exclusive contract with (b) coerced exclusivity in the first instance. Opp.30-31. And they once again suggest that because "several" MCVs asked for or obtained non-exclusive deals (which without more *refutes* coercion), a jury should be entitled to find that Ticketmaster's exclusive deals are generally imposed on the venues. Opp.11.

This is not coercion. Contrast this paltry evidence with the government's evidence against Dentsply, which refused to fill any orders from dealers that added rival tooth lines to their offerings. *United States v. Dentsply International,* 399 F.3d 181, 194 (3d. Cir. 1984). Or with *ZF Meritor,* where OEM customers *testified* "that many of the terms of the [exclusive agreements] were unfavorable …, but that the OEMs agreed to such terms because without Eaton's transmissions, the OEMs would be unable to satisfy customer demand." 696 F.3d at 285. Not a single MCV has testified to anything like that.

10

Plaintiffs' foreclosure argument fails for similar reasons. It improperly counts as "foreclosed" business from voluntary exclusive contracts that Ticketmaster's rivals had the opportunity to compete for. Plaintiffs contend that "Defendants' exclusive contracts substantially foreclose 72% of ticketing contracts at MCVs." Opp.28. Of course, that assumes that foreclosure should be measured in the MCV market, which is itself wrong.[4] But beyond that, Plaintiffs do not identify what portion of the Ticketmaster contracts that add up to 72% were either coerced or not subject to competition. Foreclosure means that rivals were deprived of the *opportunity* to compete for this business. *See Visa*, 788 F. Supp. 3d at 609 (foreclosure can "deprive rivals of the *opportunity* to achieve the minimum economies of scale necessary to compete") (emphasis added);[5] *Race Tires*, 614 F.3d at 83-84 (no harm to competition where rivals had opportunity to compete). Winning customer-driven bidding for exclusive rights does not foreclose competition, particularly here, where Plaintiffs admit that at least 18% (really 24%) of Ticketmaster's contracts expire each year. RSUF ¶27; MSJ Ex. 76 ¶69; *see Ticketmaster v. Tickets.com*, 2003 WL 21397701 (C.D. Cal. Mar. 7, 2003) (finding similar annual turnover sufficient to defeat foreclosure argument on summary judgment).[6]

---

[4] Foreclosure is measured against "the full range of selling opportunities reasonably open to rivals, namely, all the product and geographic sales they may readily compete for." *Omega Envtl. v. Gilbarco*, 127 F.3d 1157, 1162 (9th Cir. 1997). Even if MCVs were their own market on a "targeted customer" theory, it would still be true that Ticketmaster's rivals compete for stadiums and other venues as well—so those opportunities should also be counted in the relevant calculation.

[5] Plaintiffs' arguments about the ability of rival ticketing companies to achieve scale again fail to address the relevant standard. Opp.31. They suggest only that Ticketmaster is bigger and has more data than rivals. But the legal test is whether rivals have been able to "achieve the minimum economies of scale necessary to compete." *See ZF Meritor*, 696 F.3d at 271. SeatGeek, AXS, Paciolan, and others indisputably have achieved that. *See* RSUF ¶¶15-17.

[6] As explained in Defendants' motion, numerous cases hold that challenges to exclusive dealing under Section 1 of the Sherman Act cannot aggregate contracts as is allowed under Section 2. Mot.32-33. Plaintiffs take issue with these cases because they are "conspiracy cases." Opp.36-37. But Plaintiffs don't say why that matters, and it does not.

2.     Content Leveraging

Plaintiffs contend that Defendants' "threats and retaliation against venues" have raised rivals' costs.  Opp.32.  They then disparage the seminal article establishing this way of proving an anticompetitive effect—which the *McWane* court embraced, 783 F.3d 814, 832 (11th Cir. 2015)—because they cannot prove that by raising rivals' costs, Ticketmaster gained power over price. Opp.31.  The courts that have accepted this theory require proof that higher costs prevented rivals from "providing a competitive constraint on the allegedly supracompetitive prices charged by [Defendants], which in turn harmed … customers."  *See In re Pool Prods. Distribution Mkt. Antitrust Litig.*, 940 F. Supp. 2d 367, 391 (E.D. La. 2013).  When *McWane* speaks of raising rivals' costs "sufficiently to prevent them from growing into effective competitors," it means the same thing.  *See McWane*, 783 F.3d at 832.  There is no evidence in the record to support any such suggestion, and reams of evidence to contradict it.

**B.     Promotion and Booking Markets**

In the alleged promotion market, Plaintiffs again fail to identify any tangible harm to the *buyer*—artists—in the form of increased prices, reduced quality, or reduced output, as they must to avoid summary judgment.  *See MacDermid*, 833 F.3d at 183.  Plaintiffs had access to thousands of touring deals, inside and outside of the MCV-limited market.  Apparently they couldn't find *anything* in them worth citing as evidence of anticompetitive effects.  And not a single artist (or manager or agent) testified that they have been forced to pay monopoly prices.

Plaintiffs cite a few years-old documents referencing artist compensation and how it *might* be impacted by certain acquisitions.  Opp.36.  That is insufficient without more, since evidence that conduct "can reasonably be expected" to, "might," or "could potentially" lead to harm "is not evidence of anticompetitive effects."  *United States v. Google*, 687 F. Supp. 3d 48, 81 (D.D.C. 2023).  And on the booking side, Plaintiffs observe that a fee paid by venues to promoters has

12

increased, Opp.35—but they don't even attempt to draw any kind of causal connection back to conduct they say is anticompetitive.

### C.    Large Amphitheater Market

Plaintiffs at least say something to argue tangible consumer harms in the alleged amphitheater market.  Opp.34-35.  But it still falls short of the mark.

Plaintiffs must show *changes* in prices, output, or quality attributable to the alleged anticompetitive conduct.  *See MacDermid*, 833 F.3d at 183.  They do not.  For example, Plaintiffs discuss the number of "dark" days in Live Nation amphitheaters in 2022, but they don't say how many "dark" days there were *before* Live Nation supposedly monopolized the market, nor propose a benchmark for how many "dark days" is indicative of an output restriction.  And they reference "broken seats" and "stage climate" as quality issues, but they don't say when or why the alleged quality problems began.  *See* Opp.34.

Again, Plaintiffs had full access to the documents, data, and witnesses that could evidence higher amphitheater prices, less output, or reduced quality compared to a competitive market.  But they haven't done the work.

## III.    PLAINTIFFS' TYING CLAIM FAILS

In its order denying Defendants' motion to dismiss, the Court explained that "[t]he facts may ultimately show that the tying claim here is nothing more than a refusal-to-deal claim foreclosed by *Trinko*, or that artists aren't consumers in the large-amphitheater market."  ECF No. 483 ("MTD Order") at 4.  That is exactly what has happened.

First, no evidence supports the suggestion "that Live Nation tied the rental of amphitheaters to artists using Live Nation as the promoter for an entire tour."  *Id.* at 3.  That did indeed appear to be Plaintiffs' theory at the hearing on the motion.  *See, e.g.*, ECF No. 412 at 13:20-14:23.  But

now—after their sole artist witness ███████████████████████████████████████ —

there is virtually no trace of that "whole tour" argument in the Opposition.[7]

Second, the evidence has confirmed that artists are not the consumers in the large amphitheater market; promoters are. Plaintiffs hardly put up a fight over this. Indeed, they act as if it has been their position all along. Opp.37 ("just as alleged in the Amended Complaint, 'the evidence shows that [1] promoters book venues…'"). They continue to say this is "on behalf of" artists (as everything in live entertainment is), but they do not offer any evidence that even one artist attempted to rent a Live Nation amphitheater and Live Nation insisted on promoting the event. In fact, Plaintiffs' artist-specific evidence of coercion (three artists over a 15-year period) is *third-party promoters* saying *they* wanted to promote these artists at Live Nation amphitheaters and couldn't. COMF ¶256; RSUF ¶48.

Third, Plaintiffs' arguments about "generally applicable policies," advanced to prove coercion, give away the game by showing that indeed this is "nothing more than a refusal-to-deal claim foreclosed by *Trinko*." *See* MTD Order at 4. The supposed mechanism of coercion that Plaintiffs invoke is simply *Live Nation's policy of not renting to other promoters*. Opp.38-40; COMF ¶256. Look closely at the *"Third"* paragraph on page 38 of the Opposition. There is no contract with tying terms. There is no conversation or email exchange with tying terms. It's strictly about "LN's long-standing policy." Opp.38.

It is no longer possible to pretend that this is about something other than Live Nation's policy of not renting its amphitheaters *to rivals*. That is a unilateral refusal to deal claim that maps

---

[7] In one sentence, Plaintiffs claim that Defendants use "leverage in amphitheater tours to get artists to use [Live Nation] for arena shows." Opp.39. But the only evidence Plaintiffs cite for this proposition—one email from 2018—at most indicates that someone at the company once contemplated such an approach, not that anyone actually implemented it. *See* COMF ¶253.

directly onto *Trinko*, with *amphitheaters* substituted for *telephony infrastructure* and *rival promoters* substituted for *rival phone service providers*. *See Verizon Commc'ns v. L. Offs. of Curtis V. Trinko*, 540 U.S. 398, 410 (2004).

The only remaining issue is whether *Viamedia* saves the day, on the theory that it allows a refusal to deal with a rival, acting as an intermediary on behalf of a third-party, to be challenged as tying. But among other essential distinctions between that case and this one, the refusal to deal there *was itself unlawful*. Plaintiffs offer no answer why that difference is not dispositive; indeed, they ignore it altogether. But the "broad right of a firm to refuse to deal with its competitors" applies in *all cases* absent an exception. *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 134 (2d Cir. 2014). The refusal to deal in *Viamedia* fell within the *Aspen Skiing* exception, and therefore, the court held, could serve as the coercion required for a tying claim. *Viamedia v. Comcast*, 951 F.3d 429, 459-60, 470 (7th Cir. 2020). That is not this case. It is telling that Plaintiffs suggest, for the first time, that the *Aspen Skiing* exception applies to Live Nation's conduct. Opp.39. But they did not allege a unilateral refusal to deal in their complaint and cannot back-fill with one now. *See In re WorldCom Sec. Litig.*, 308 F. Supp. 2d 338, 345 (S.D.N.Y. 2004). And even if they had, it would not remotely survive *Aspen Skiing*'s stringent requirements. *See Adderall*, 754 F.3d at 135.

## IV.    STATE PLAINTIFFS' CLAIMS

The State Plaintiff issues are a bit of a mess. Though there are some points the Court could properly address now, it may make sense to defer resolution until after the dust has settled on the balance of this motion.

State Plaintiffs have now said, for the first time, that they bring *all* of their claims in a quasi-sovereign (*parens patriae*) capacity, as opposed to a sovereign capacity. Opp.41-42. Accordingly, they must show "injury to a sufficiently substantial segment of [their] population" to prevail on *any* of their claims, *Snapp v. Puerto Rico*, 458 U.S. 592, 607 (1982), and

they must demonstrate antitrust injury on their antitrust claims, *see* Mot.37.  There is significant interplay between the antitrust-injury issue and the market-definition points discussed above.  To be clear, State Plaintiffs cannot properly demonstrate antitrust injury irrespective of whether there is a properly defined "fan-facing" market.  But the operative analysis is different depending on whether the Court agrees with Defendants that there isn't one.

Beyond that, several states do not even allow state attorneys general to bring *parens patriae* actions under their state laws, or only recently allowed it.  *See, e.g.*, *California v. Infineon Techs.*, 531 F. Supp. 2d 1124, 1165-66 (N.D. Cal. 2007) (Arizona law); *Connecticut v. Aurobindo Pharma*, 2025 WL 1207566, at *5 (D. Conn. Apr. 25, 2025) (Connecticut law).

Another problem arises from Plaintiffs' argument that certain unfair competition and other state law claims do not rise and fall with the Sherman Act.  Opp.41 n.9.  Sorting out which (if any) those are will take some work, but that analysis turns in part on which (if any) portion of the Sherman Act claims survive.

Defendants welcome the Court's guidance regarding whether it makes sense to reserve these issues until after the hearing on this motion; to further brief these issues before the hearing; or to address these issues at the hearing.

## CONCLUSION

Defendants are entitled to summary judgment.

Dated: December 22, 2025

LATHAM & WATKINS LLP

_____
Andrew M. Gass (admitted *pro hac vice*)
Alfred C. Pfeiffer (admitted *pro hac vice*)
   *Co-Lead Trial Counsel*
David R. Marriott
   *Co-Lead Trial Counsel*
Timothy L. O'Mara (admitted *pro hac vice*)
Jennifer L. Giordano
Kelly S. Fayne (admitted *pro hac vice*)
Lindsey S. Champlin (admitted *pro hac vice*)
Robin L. Gushman (admitted *pro hac vice*)

505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600

1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

555 11th Street, NW, Suite 1000
Washington, D.C. 20004
(202) 637-2200

Al.Pfeiffer@lw.com
David.Marriott@lw.com
Tim.O'Mara@lw.com
Jennifer.Giordano@lw.com
Andrew.Gass@lw.com
Kelly.Fayne@lw.com
Lindsey.Champlin@lw.com
Robin.Gushman@lw.com

*Attorneys for Defendants Live Nation*
*Entertainment, Inc. and Ticketmaster L.L.C.*

CRAVATH, SWAINE & MOORE LLP

_____
Lauren A. Moskowitz
Jesse M. Weiss
Nicole M. Peles

Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 474-1000

lmoskowitz@cravath.com
jweiss@cravath.com
npeles@cravath.com

*Attorneys for Defendants Live Nation*
*Entertainment, Inc. and Ticketmaster L.L.C.*

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Andrew M. Gass, an attorney duly admitted to practice before this Court, hereby certify pursuant to Local Rule 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rules"), Rule 8(C) of Judge Arun Subramanian's Individual Practices in Civil Cases ("Individual Rules"), and the Court's Order granting Defendants an expansion of the word limit for the briefing on their summary judgment motion (ECF No. 660), that the foregoing Reply Memorandum of Law was prepared using Microsoft Word, and contains 5,000 words.  In making this calculation, I have relied on the word and page counts of the word-processing program used to prepare the document.

Dated:    December 22, 2025
           San Francisco, California

                                                 _____
                                             Andrew M. Gass