UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA, *et al.*,

    *Plaintiffs,*

v.

LIVE NATION ENTERTAINMENT, INC.,
and TICKETMASTER L.L.C.,

    *Defendants.*

Case No. 1:24-cv-03973-(AS)

**ORAL ARGUMENT REQUESTED**

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION TO EXCLUDE THE REPORTS, OPINIONS, AND
TESTIMONY OF MONETARY RELIEF STATES' DAMAGES EXPERT
<u>DR. ROSA M. ABRANTES-METZ</u>**

## TABLE OF CONTENTS

**Page**

ARGUMENT ............................................................................................................................. 1

I.   DR. ABRANTES-METZ'S MODEL SHOULD BE EXCLUDED BECAUSE IT CANNOT ISOLATE HARM FROM UNLAWFUL CONDUCT ...................................... 1

II.  DR. ABRANTES-METZ'S MODEL SHOULD BE EXCLUDED BECAUSE IT CANNOT DETERMINE THE DAMAGES ACCRUING TO EACH INDIVIDUAL STATE ................................................................................................... 3

    A.  THE MODEL CANNOT DISAGGREGATE DAMAGES ACCRUING TO IN-STATE VERSUS OUT-OF-STATE RESIDENTS. .................................... 3

    B.  THE MODEL CANNOT SHOW HARM TO *ANY* CONSUMER IF HARM DOES NOT OCCUR UNTIL A FAN BOTH PURCHASES A TICKET AND ATTENDS THE EVENT. ................................................................ 5

    C.  THE MODEL CANNOT DISAGGREGATE DAMAGES ACCRUING TO NATURAL PERSONS VERSUS CORPORATE ENTITIES. .......................... 6

III. DR. ABRANTES-METZ'S MODEL SHOULD BE EXCLUDED BECAUSE IT CANNOT LINK ANY CONDUCT BY DEFENDANTS TO ANY HARM TO FANS ........................................................................................................................... 7

IV.  DR. ABRANTES-METZ'S TREATMENT OF UPFRONT PAYMENTS AND INSIDE FEES IS ECONOMICALLY UNSOUND ........................................................ 7

V.   DR. ABRANTES-METZ'S SINGLE-COMPETITOR BENCHMARK FAILS BECAUSE SHE DOES NOT CONTROL FOR QUALITY ............................................. 9

CONCLUSION ........................................................................................................................ 11

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*Alto v. Sun Pharm. Indus.*,
   2021 WL 4803582 (S.D.N.Y. Oct. 13, 2021)...........................................................................3

*Benn v. Allstate Ins.*,
   569 F. Supp. 3d 1029 (C.D. Cal. 2021) ...................................................................................4

*City of Long Beach v. Total Gas & Power N. Am.*,
   2021 WL 5754295 (2d Cir. Dec. 3, 2021) ................................................................................4

*Comcast v. Behrend*,
   569 U.S. 27 (2013).................................................................................................................2

*Dependable Sales and Service v. TrueCar*,
   311 F. Supp. 3d 653 (S.D.N.Y. 2018) .....................................................................................8

*Deutsch v. Novartis Pharms.*,
   768 F. Supp. 2d 420 (E.D.N.Y. 2011) ...................................................................................10

*In re Air Cargo Shipping Services Antitrust Litig.*,
   2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014).........................................................................2

*In re Google Digital Advertising Antitrust Litig.*,
   2025 WL 3562687 (S.D.N.Y. Dec. 12, 2025) .......................................................................11

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   299 F. Supp. 3d 430 (S.D.N.Y. 2018) ...................................................................................10

*New York v. Feldman*,
   210 F. Supp. 2d 294 (S.D.N.Y. 2002) .....................................................................................4

*United States v. Google*,
   747 F. Supp. 3d 1 (D.D.C. 2024) ............................................................................................2

*US Airways v. Sabre Holdings*,
   938 F.3d 43 (2d Cir. 2019) .....................................................................................................6

**STATUTES**

15 U.S.C.
   § 15c.........................................................................................................................................4
   § 15c(a)(1).........................................................................................................................4, 5
   § 15d.........................................................................................................................................6

## ARGUMENT

I. **DR. ABRANTES-METZ'S MODEL SHOULD BE EXCLUDED BECAUSE IT CANNOT ISOLATE HARM FROM UNLAWFUL CONDUCT**

Monetary Relief States ("Plaintiffs" or "States") concede that their liability case hinges on "two forms of anticompetitive conduct": (1) Defendants' "conditioning the provision of concerts to venues based on their use of Ticketmaster"; and (2) Ticketmaster's "use of long term, exclusive contracts." Pls.' Opp'n to Defs.' Mot. to Exclude ("Opp'n" or "Opposition") at 8, Dkt. 743. Plaintiffs do not contest that "conditioning" can occur without an exclusive contract and vice versa, nor do they contest that a factfinder could find one, both, or neither of the alleged behaviors completely lawful. Furthermore, Plaintiffs concede that their damages expert, Dr. Abrantes-Metz, *cannot* identify nor separate harm caused by one theory of liability from the other. *Id.* at 13, 21. That concession dooms her model.

Plaintiffs double down in their Opposition, arguing that the model is valid irrespective of whether a factfinder determines either form of alleged misconduct is lawful in whole or in part. *Id.* at 12-13. Put differently, Plaintiffs' position is that *damages are the same* no matter what: if the conditioning conduct is found to be lawful, but Ticketmaster's exclusive contracts are not; if Ticketmaster's exclusive contracts are found to be lawful but the conditioning conduct is not; if some combination of contracts are found to be lawful while others are unlawful; or if all of the alleged conduct is found entirely unlawful—it does not matter to Dr. Abrantes-Metz because her model predicts the exact same number.[1] That is an absurd result. A model that produces the same

---

[1] Relatedly, because Dr. Abrantes-Metz estimates a single difference in retained amounts and applies that across the board, her model also predicts the same overcharge for venues that had exclusive versus non-exclusive ticketing (as defined by Dr. Hill), and the same overcharge for venues that had a high share of Live Nation-promoted events versus a low share.

1

output in the face of material and contradictory changes to the plaintiffs' core liability case is plainly unreliable, and unhelpful to the trier of fact.

This is the exact danger identified by the Supreme Court in *Comcast v. Behrend*, 569 U.S. 27 (2013). The Supreme Court explained that "any model supporting a 'plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation.'" *Id.* at 35. Like Dr. Abrantes-Metz, the expert in *Comcast* "expressly admitted that the model calculated damages resulting from 'the alleged anticompetitive conduct as a whole' and did not attribute damages to any one particular theory of anticompetitive impact." *Id.* at 36-37. The Supreme Court excluded the model as a result, because it improperly "identifie[d] damages that are not the result of the wrong." *Id.* at 37. Dr. Abrantes-Metz's model is built the same way.

Plaintiffs also handwave away *twenty-two* venues—a non-exhaustive list—who testified that they (i) use a competitive bidding process; (ii) sought out or benefited from exclusive contracts; (iii) chose Ticketmaster because it is the best; and (iv) were not threatened or did not fear losing content. Defs.' Mot. to Exclude ("Mot.") at 13-14, Dkt. 704. Plaintiffs do not dispute that there should not be damages in such circumstances, and tellingly fall back on the argument that the model should be accepted anyway because "it measures the average amount of damages across the market." Opp'n at 13-14. A model that does that is not identifying "damages" at all, much less damages stemming from Plaintiffs' theory of liability. The cases cited by Plaintiffs do not hold otherwise. Neither *United States v. Google,* 747 F. Supp. 3d 1 (D.D.C. 2024) nor *In re Air Cargo Shipping Services Antitrust Litigation,* 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014) involved an average-damages model that intermixed unlawful and lawful conduct.

As a last ditch effort, Plaintiffs throw in the bald assertion that Dr. Abrantes-Metz's model is "'sufficiently robust' to account for (including by dropping) any individual venue contracts that should be excluded." Opp'n at 14. But this unsupported claim cannot be reconciled with Plaintiffs' concession that the model cannot distinguish harm caused by the two forms of alleged misconduct. Dr. Abrantes-Metz also has not disclosed any method for "dropping" the lawful contracts from the model, and cannot do so now (or still later).

An antitrust damages model must allow the trier of fact to disaggregate harm from unlawful and lawful conduct. Dr. Abrantes-Metz's model does not allow that, as it will produce *exactly the same output* irrespective of contra liability findings.

## II. DR. ABRANTES-METZ'S MODEL SHOULD BE EXCLUDED BECAUSE IT CANNOT DETERMINE THE DAMAGES ACCRUING TO EACH INDIVIDUAL STATE

Each State must prove its own damages claim. Dr. Abrantes-Metz's model must therefore be capable of showing what each State needs to show under its specific state statute. If it does not, it fails the *Daubert* "fit" requirement, and should be excluded. *See Alto v. Sun Pharm. Indus.*, 2021 WL 4803582, at *3 (S.D.N.Y. Oct. 13, 2021) (expert testimony must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute"). Dr. Abrantes-Metz's model does not provide a reliable method for calculating the damages that accrue to each specific State.

### A. The model cannot disaggregate damages accruing to in-state versus out-of-state residents.

Plaintiffs assert that "Dr. Abrantes-Metz's model is appropriate because Defendants face dozens of state law claims with a number of those statutes permitting recovery for non-state residents." Opp'n at 19. Notably, Plaintiffs do not even attempt a state-by-state analysis of what their own individual laws require. Indeed, Plaintiffs cite only one example of a state statute

3

permitting recovery for non-state residents: California. But in this action, California seeks restitution, not damages. Am. Compl. ¶277. Indeed, California *cannot* seek damages under its Unfair Competition Law, and restitution is only available where there is no "adequate remedy at law." *Benn v. Allstate Ins.*, 569 F. Supp. 3d 1029, 1033, 1036-37 (C.D. Cal. 2021); *City of Long Beach v. Total Gas & Power N. Am.*, 2021 WL 5754295, at *2 (2d Cir. Dec. 3, 2021).[2]

In addition, ten States seek damages only under 15 U.S.C. §15c, and therefore may not recover on behalf of out-of-state residents. *Id.* §15c(a)(1); *New York v. Feldman*, 210 F. Supp. 2d 294, 304 (S.D.N.Y. 2002).[3] For the fourteen States who also seek damages under state law, at least nine are not entitled to recover for out-of-state residents under their state laws either.[4] So at least nineteen out of the twenty-five[5] States cannot recover for out-of-state residents.

Dr. Abrantes-Metz's model calculates the average overcharge per event. The data she used does not include *any* information about individual ticket transactions or individual ticket-purchasers. Ex. 3, Dkt. 722-3 (Abrantes-Metz Tr. 228:23-229:19). Her model therefore has no

---

[2] The object of restitution is to restore the status quo—a "fundamental distinction" to the object of damages, which is to compensate a party for injuries suffered. *Benn*, 569 F. Supp. 3d at 1036.

[3] Plaintiffs misread *Feldman*. Opp'n at 18. *Feldman* expressly finds that 15 U.S.C. §15c only authorizes States to recover on behalf of their own residents. 210 F. Supp. 2d at 304. *Feldman* then acknowledges that some state laws *may* allow recovery beyond what the federal statute provides. *Id. Feldman* thus demonstrates the need for a *state-by-state analysis* to determine what each statute allows. Plaintiffs do no such analysis here.

[4] *See* Am. Compl. ¶¶274 (Arkansas), 290 (Colorado), 302 (District of Columbia), 305, 315 (Florida), 329 (Illinois), 338 (Indiana), 343 (Iowa), 368 (Michigan), 393 (Nevada), 398 (New Hampshire), 456 (Rhode Island), 467 (South Carolina), 487 (Utah), 508 (West Virginia).

[5] Defendants include California in the total count given Plaintiffs' inclusion of the State in their damages model. But as per above, California does not seek damages under its state laws nor under the federal statute.

conception of where any ticket-purchaser resides and cannot identify to which States' residents damages accrue, rendering it fundamentally unfit and inadmissible.[6]

### B. The model cannot show harm to *any* consumer if harm does not occur until a fan both purchases a ticket and attends the event.

Plaintiffs stake out an entirely new position in their Opposition: that each individual consumer is not harmed until they both (1) purchase tickets, *and* (2) "subsequently access[] those events." Opp'n at 16. That doesn't make sense; why would an injury occur only upon attending an already-paid-for event?[7] But taking Plaintiffs' new theory at face value, it again means that Dr. Abrantes-Metz's model *cannot show harm to any consumers*. Dr. Abrantes-Metz conceded she used *only* event-level ticket data—without any inkling about who purchased a ticket, when, or where. Ex. 3, Dkt. 722-3 (Abrantes-Metz Tr. 228:8-20, 229:21-231:7). And if the model has no conception of the consumer, it cannot know whether they attended the event.

There are myriad reasons why a ticket-purchaser might not be the person that attends the show. In fact, that's normally how it works: a person buys, say, four tickets and attends with three others who may or may not pay for their ticket. Another pervasive example is when a ticket is resold in the secondary market. Plaintiffs concede this matters when determining to which State those damages accrue. The damages model ignores it.

---

[6] Plaintiffs argue that "Defendants also fail to recognize that several states have also not asserted *parens patriae* authority under Section 15c, and, at the very least, this argument would be entirely inapplicable to those states." Opp'n at 18, n.46. That argument is misleading. Plaintiffs expressly stated in their supplemental disclosures that any state seeking damages, which is all Dr. Abrantes-Metz calculates, does so in their *parens patriae* capacity. Ex. 4, Dkt. 722-4.

[7] Plaintiffs say "[a] ticket, by itself, *is worthless without its extrinsic and subsequent event*." Opp'n at 16 n.44. That is hard to square with today's resale markets, in which thousands of sellers who have no interest in the events trade in tickets.

5

### C. The model cannot disaggregate damages accruing to natural persons versus corporate entities.

Dr. Abrantes-Metz's model also cannot isolate damages to individuals, rather than businesses. Monetary relief under 15 U.S.C. §15c(a)(1) must "exclude any amounts … allocable to any business entity." As noted, ten States seek damages under the federal statute only, and of the fourteen States who seek damages under their state laws too, at least seven have similar "natural persons" requirements. That means that at least seventeen of the twenty-five[8] States cannot recover any damages deriving from tickets purchased by business entities, like corporate resellers. Because Dr. Abrantes-Metz did not use any purchaser data, her model cannot distinguish between human fans and corporate buyers and therefore fails.

Plaintiffs argue that they can defer proof of damages to individual States to some future post-trial claims administration proceedings. No, they cannot. As Plaintiffs note, this is not a class action case. Having chosen not to undertake the burdens of class certification, Plaintiffs are not entitled to its benefits. Each State is a separate entity, suing on behalf of a distinct group of consumers, and must show, now, that it is seeking damages actually recoverable under the specific statutes under which it sues. Plaintiffs cite no case holding otherwise.[9] More fundamentally, however, the pervasive issues in Dr. Abrantes-Metz's model cannot be ignored on the hope that they might later be resolved. Plaintiffs solve nothing by kicking the can down the road.

---

[8] Inclusive of California.

[9] The cases Plaintiffs do cite are inapplicable, including because they relate to interpretations of 15 U.S.C. §15d, which *expressly allows* aggregation of damages *only where* there has been a determination that the defendant agreed to fix prices. Congress could have broadened that provision to cover additional case types. It did not.

6

### III. DR. ABRANTES-METZ'S MODEL SHOULD BE EXCLUDED BECAUSE IT CANNOT LINK ANY CONDUCT BY DEFENDANTS TO ANY HARM TO FANS

Plaintiffs do not dispute that if the alleged harm to fans derives directly from Ticketmaster's contracts with venues, then *Sabre* applies and they cannot recover damages arising out of any contracts entered into outside the limitations period. *US Airways v. Sabre Holdings*, 938 F.3d 43, 69 (2d Cir. 2019); *see* Mot. at 14-15. Plaintiffs also do not dispute that such pre-limitations period contracts pervade Dr. Abrantes-Metz's model.

Instead, Plaintiffs now take the position that the limitations period does not begin until a fan *attends the event* for which they have purchased a ticket. If that is really the mechanism of damage Plaintiffs claim, there is a complete disconnect between (a) fans attending events and (b) Dr. Abrantes-Metz's model. That model calculates a purported overcharge to *venues*, aggregated at the event level. Dr. Abrantes-Metz says that *venues*—not Ticketmaster—then increase fees to fans. Ex. 1, Dkt. 722-1 (Abrantes-Metz Rpt. ¶¶99, 145). It has nothing to do with any particular fan scanning into any particular event. So if generally, or for statute of limitations purposes, this is Plaintiffs' theory, Dr. Abrantes-Metz's model does not "fit" it at all.

### IV. DR. ABRANTES-METZ'S TREATMENT OF UPFRONT PAYMENTS AND INSIDE FEES IS ECONOMICALLY UNSOUND

Plaintiffs' opposition further highlights the absurdity of Dr. Abrantes-Metz's exclusion of upfront payments (a key component of ticketers' contracts with venues), but inclusion of inside fees (which are not part of the venue contracts and which venues do not pay).

The core of Dr. Abrantes-Metz's model is her calculation of "retained amounts," which she defines as "the dollar amount that Ticketmaster and AXS *kept pursuant to their contractual arrangements with venues*...." Ex. 1, Dkt. 722-1 (Abrantes-Metz Rpt. ¶115 (emphasis added)).

7

This construct is essential to her theory, because the alleged harm results from *venues* passing on overcharges to fans. *Id.* ¶¶99, 145.

Upfront payments are indisputably part of the contractual arrangements between ticketers and venues, and Dr. Abrantes-Metz does not dispute that the level of upfront payment could impact the level of a ticketer's "retained amount." In fact, that is indisputable. Inside fees, on the other hand, are *not* part of venue contracts and are separately paid by *promoters and artists* for use of a pricing tool. Therefore, by Dr. Abrantes-Metz's stated logic, her model should include upfront payments and exclude inside fees. Yet Dr. Abrantes-Metz does the exact opposite.

Plaintiffs' sole argument regarding upfront payments is that they are a "fixed cost" and thus "cannot impact marginal costs." Opp'n at 21-22. That is not even true conceptually: upfront payments are a cost of acquiring a new contract (or renewal). They are clearly tied to changes in output. Furthermore, Plaintiffs do not dispute that a primary ticketing company's income from a ticketing contract is its fee income less upfront payments, nor do they dispute that both elements are negotiated *at the same time*. The level of upfront payments offered by a ticketer directly impacts the share of ticketing fees that venues are willing to give Ticketmaster in that contract, which in turn directly impacts the venue's (and Ticketmaster's) marginal revenue for each show and ticket.

Indeed, Plaintiffs have previously asserted that their injury flows "directly from increased fees and ticket prices resulting from Defendants' exclusive ticketing contracts with large upfront payments." Pls.' Opp'n to Mot. to Dismiss at 19, Dkt. 308. Plaintiffs' convenient assertion that such payments are now "irrelevant" to their damages ignores the economic realities of the contracts at issue. Dr. Abrantes-Metz's opinions should be excluded on that basis. *See, e.g.*, *Dependable Sales and Service v. TrueCar*, 311 F. Supp. 3d 653, 659 (S.D.N.Y. 2018) (excluding expert report

8

where expert's conclusion regarding the motivations behind consumers' purchases lacked adequate support and "did not account for other market factors.").

Plaintiffs argue that upfront payments should not be considered because they sometimes purchase sponsorship rights. That is form over substance. As Plaintiffs' other expert Dr. Hill explains—"upfront" and similar payments come in many forms: "A signing bonus to induce the venue to enter into an agreement...[;] [a] sponsorship fee in return for sponsorship rights, such as the right to market the primary ticketing company on signage inside the venue[;] [and] [a]dvanced payments of some portion of the ticketing fee revenue that the venue expects to earn during the duration of the agreement." Ex. 35 (Hill Rpt. ¶55). Regardless of the form, Dr. Abrantes-Metz should have considered them. They are indisputably relevant to any conception of "retained amounts."

Plaintiffs then do a full one-eighty, arguing that "inside fees"—which have nothing to do with Ticketmaster's venue-contract pricing because they are *not paid by venues*—are properly included in the model. Why? Simply because Ticketmaster "retains" them. None of this is coherent. Plaintiffs' positions are inconsistent, baseless, and should not make their way to a jury trial.

## V. DR. ABRANTES-METZ'S SINGLE-COMPETITOR BENCHMARK FAILS BECAUSE SHE DOES NOT CONTROL FOR QUALITY

Dr. Abrantes-Metz's damages model is unreliable and unhelpful to the trier of fact because her *single* benchmark reference point—the average "retained amount" for one competitor, AXS—does not control for quality differences with Ticketmaster.

To be clear, a benchmark approach can, as a conceptual matter, be useful—so long as the benchmark is appropriate and the expert controls for factors (other than the anticompetitive conduct) that cause "competitive" prices to differ from the benchmark. Economists typically do

9

this using a rich dataset that allows them to study, capture, and control for variation in the market, resulting in an output that isolates damages deriving only from the alleged misconduct.

That is not what Dr. Abrantes-Metz did. Instead, she chose a single reference point—AXS—and assumed that any difference between AXS's and Ticketmaster's "retained amounts" is due to the allegedly anticompetitive behavior. That implies that, other than the alleged anticompetitive conduct, no other factor or difference between Ticketmaster and AXS contributes to differences in their respective "retained amounts." This assumption is not only unsupported, it is flatly contradicted by the record. Mot. at 24-25; Ex. 36 (Budish Rpt. ¶¶21-25, Sections 4.3.3, 4.4.3, 5.2); Ex. 37 (Carlton Rpt. ¶¶40-44). Indeed, buried in Dr. Abrantes-Metz's own Appendix at Exhibit G-2, she has a model showing that SeatGeek's retained amount is higher than AXS, and both SeatGeek and AXS's retained amounts are higher than that of Paciolan. Ex. 1, Dkt. 722-1 (Abrantes-Metz Rpt., Ex. G-2). Given that neither SeatGeek nor AXS are alleged to have acted anticompetitively, this Exhibit makes clear that factors other than the alleged misconduct drive differences in ticketers' retained amounts.

The model's assumptions are also inconsistent with Plaintiffs' monopoly power case, and Dr. Hill's testimony in particular, which relies extensively on brand, reputation, scale, data, and other advantages that Ticketmaster (lawfully) has over its rivals. Those inconsistencies render Dr. Abrantes-Metz's model unreliable. *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 481-83 (S.D.N.Y. 2018) (finding expert's opinions unreliable where they were inconsistent with the plaintiffs' other expert's opinions); *Deutsch v. Novartis Pharms.*, 768 F. Supp. 2d 420, 469 (E.D.N.Y. 2011) (similar).

Plaintiffs mischaracterize Defendants' argument as resting solely on the fact that Ticketmaster sells more tickets than AXS.[10] While, clearly, that is an important dimension of quality, Plaintiffs miss the point. The issue is that Dr. Abrantes-Metz assumed, with no rigorous economic or empirical analysis, that the price difference between the two competitors is *entirely attributable* to the challenged conduct, disregarding every other possible explanation including quality differences.[11] Dr. Abrantes-Metz agreed that differences in quality "can be a reason for differences in price." Ex. 3, Dkt. 722-3 (Abrantes-Metz Tr. 300:16-301:3). She could have recognized and controlled for quality differences in her analysis. Indeed, Plaintiffs' "supplemental authority," *In re Google Digital Advertising Antitrust Litigation*, 2025 WL 3562687, at *8 (S.D.N.Y. Dec. 12, 2025), found that the expert survived *Daubert* because he "controlled for the differences" between the benchmark and the defendant's platform—something Dr. Abrantes-Metz indisputably has not done. Her model is unreliable as a result.

## CONCLUSION

For the reasons stated above, the Court should exclude Dr. Abrantes-Metz's reports, opinions, and any related testimony.

---

[10] Defendants' experts identified myriad reasons beyond the undisputed fact that Ticketmaster is better at selling more tickets than AXS as to why Dr. Abrantes-Metz's *failure to control for quality differences* was a fundamental flaw in her analysis. *E.g.*, Ex. 36 (Budish Rpt. ¶¶ 23-24, 41-44, Sections 4-6); Ex. 38 (Budish Sur-rebuttal Rpt. ¶¶168-69).

[11] *See, e.g.*, Ex. 36 (Budish Rpt. ¶¶21-25, Sections 4.3.3, 4.4.3, 5.2); Ex. 38 (Budish Sur-rebuttal Rpt. ¶¶151-55, Sections 3-4, 6).

11

Dated: December 22, 2025

| LATHAM & WATKINS LLP | CRAVATH, SWAINE & MOORE LLP |
|---|---|

<table>
<tr><td>

*[signature]*

Alfred C. Pfeiffer (admitted *pro hac vice*)
   *Co-Lead Trial Counsel*
David R. Marriott
   *Co-Lead Trial Counsel*
Andrew M. Gass (admitted *pro hac vice*)
Timothy L. O'Mara (admitted *pro hac vice*)
Jennifer L. Giordano
Kelly S. Fayne (admitted *pro hac vice*)
Lindsey S. Champlin (admitted *pro hac vice*)
Robin L. Gushman (admitted *pro hac vice*)

505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600

1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

555 11th Street, NW, Suite 1000
Washington, D.C. 20004
(202) 637-2200

Al.Pfeiffer@lw.com
David.Marriott@lw.com
Tim.O'Mara@lw.com
Jennifer.Giordano@lw.com
Andrew.Gass@lw.com
Kelly.Fayne@lw.com
Lindsey.Champlin@lw.com
Robin.Gushman@lw.com

*Attorneys for Defendants Live Nation*
*Entertainment, Inc. and Ticketmaster L.L.C.*

</td><td valign="top">

*[signature]*

Lauren A. Moskowitz
Jesse M. Weiss
Nicole M. Peles

Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 474-1000

lmoskowitz@cravath.com
jweiss@cravath.com
npeles@cravath.com

*Attorneys for Defendants Live Nation*
*Entertainment, Inc. and Ticketmaster L.L.C.*

</td></tr>
</table>

12

**CERTIFICATE OF COMPLIANCE**

    I, Alfred C. Pfeiffer, an attorney duly admitted to practice *pro hac vice* before this Court, hereby certify pursuant to Local Rule 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rules"), Rule 8(C) of Judge Arun Subramanian's Individual Practices in Civil Cases ("Individual Rules"), that the foregoing Memorandum of Law was prepared using Microsoft Word, and contains 3,372 words. In making this calculation, I have relied on the word and page counts of the word-processing program used to prepare the document.

Dated:    December 22, 2025
            San Francisco, California

                                                    Alfred C. Pfeiffer