UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA, *et al.*,

                         *Plaintiffs*,

             v.

LIVE NATION ENTERTAINMENT, INC., and TICKETMASTER L.L.C.

                         *Defendants*.

Case No.: 1:24-cv-03973-AS-SLC

**ORAL ARGUMENT REQUESTED**

---

**DEFENDANTS' REPLY MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO EXCLUDE CERTAIN OPINIONS AND
<u>TESTIMONY OF DR. NICHOLAS HILL</u>**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

ARGUMENT ...........................................................................................................................2

I.   DR. HILL'S OPINIONS DEFINING AMPHITHEATER AND
     PROMOTIONS MARKETS SHOULD BE EXCLUDED......................................2

     A.   Dr. Hill's "Show Order" Analyses Rely on Unreliable Data and an
          Unsupported Methodology ..........................................................................2

     B.   Dr. Hill Fails To Reliably Implement His Own Methodology ....................4

     C.   Dr. Hill Has Not Analyzed the *Brown Shoe* Practical Indicia ....................7

II.  DR. HILL'S OPINION THAT DEFENDANTS ENGAGED IN
     ANTICOMPETITIVE CONDUCT SHOULD BE EXCLUDED ...........................8

III. DR. HILL'S OPINIONS PURPORTING TO SUMMARIZE AND WEIGH
     "QUALITATIVE EVIDENCE" SHOULD BE EXCLUDED .............................10

CONCLUSION......................................................................................................................12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002) ................................................................................. 2, 4, 5, 6

*B & R Supermarket, Inc. v. Mastercard Int'l, Inc.*,
   No. 17-CV-02738, 2021 WL 234550 (E.D.N.Y. Jan. 19, 2021) ................................. 12

*B & R Supermarket Inc v. Visa Inc.*,
   No. 17-CV-2738, 2024 WL 4252031 (E.D.N.Y. Sept. 20, 2024) .................................. 9

*Bobcar Media, LLC v. Aardvark Event Logistics, Inc.*,
   554 F.Supp.3d 606 (S.D.N.Y. 2020) .......................................................................... 12

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) ..................................................................................................... 1

*Dial Corp. v. News Corp.*,
   165 F.Supp.3d 25 (S.D.N.Y. 2016) ........................................................................ 10, 12

*FTC v. IQVIA Holdings Inc.*,
   710 F.Supp.3d 329 (S.D.N.Y. 2024) ............................................................................ 5

*FTC v. Sysco Corp.*,
   113 F. Supp. 3d 1, 41 (D.D.C. 2015) ........................................................................... 4

*FTC v. Tapestry, Inc.*,
   710 F.Supp.3d 329 (S.D.N.Y. 2024) ........................................................................ 2, 4

*Fort Worth Employees' Retirement Fund v. J.P. Morgan*,
   301 F.R.D. 116 (S.D.N.Y. 2014) ................................................................................ 11

*Hughes v. The Ester C Co.*,
   317 F.R.D. 333 (E.D.N.Y. 2016) .................................................................................. 6

*In re Fresh Del Monte Pineapples Antitrust Litig.*,
   No. 04-md-1628, 2009 WL 3241401 (S.D.N.Y. Sept. 30, 2009) .............................. 7, 8

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   299 F. Supp. 3d 430 (S.D.N.Y. Feb. 28, 2018) ............................................................ 6

*In re Processed Egg Prods. Antitrust Litig.*,
   81 F.Supp.3d 412 (E.D. Pa. 2015) .............................................................................. 12

*Jakobovits v. PHL Variable Ins. Co.*,
   645 F.Supp.3d 95 (E.D.N.Y. 2022) ............................................................................ 11

*Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*,
  588 F.3d 908 (6th Cir. 2009) ...................................................................................2

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999).................................................................................................7

*LaSalle Bank Nat. Ass'n v. CIBC Inc.*,
  No. 08 Civ. 8426, 2012 WL 466785 (S.D.N.Y. Feb. 14, 2012) ..................................8

*LinkCo, Inc. v. Fujitsu Ltd.*,
  No. 00 Civ. 7242, 2002 WL 1585551 (S.D.N.Y. July 16, 2002) ...............................11

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
  691 F.Supp.2d 448 (S.D.N.Y. 2010).........................................................................11

*Scentsational Techs., LLC v. Pepsi, Inc.*,
  No. 13-cv-8645, 2018 WL 1889763 (S.D.N.Y. Apr. 18, 2018) ..................................10

*SourceOne Dental, Inc. v. Patterson Cos., Inc.*,
  No. 15-cv-5440, 2018 WL 2172667 (E.D.N.Y. May 10, 2018).............................8, 10

*State of New York v. Solvent Chem. Co.*,
  2006 WL 2640647 (W.D.N.Y. Sept. 14, 2006) ..............................................................1

*Teradata Corporation v. SAP SE*,
  124 F.4th 555 (9th Cir. 2024) ...................................................................................4

*Union Carbide Corp. v. Montell N.V.*,
  28 F.Supp.2d 833 (S.D.N.Y. 1998).........................................................................9

*United States v. Bazaarvoice, Inc.*,
  No. 13–cv–00133, 2014 WL 203966 (N.D. Cal. Jan. 8, 2014) ....................................4

*United States. v. Bilzerian*,
  926 F.2d 1285 (2d Cir. 1991)....................................................................................11

*United States v. Google LLC*,
  778 F.Supp.3d 797 (E.D. Va. 2025) ....................................................................9, 10

*United States v. H&R Block Inc.*,
  833 F.Supp.2d 36 (D.D.C. Nov. 10, 2011) ............................................................4, 5

*U.S. Airways, Inc. v. Sabre Holdings Corp.*,
  No. 11 Civ. 2725, 2022 WL 874945 (S.D.N.Y. Mar. 24, 2022) ..................................9

**Statutes & Rules**

Fed. R. Evid. 403 .................................................................................................9, 12

Fed. R. Evid. 702 ................................................................................................3, 12

**INTRODUCTION**

Far from seeking to "silence" Dr. Hill, Defendants' Motion[1] seeks to exclude specific opinions that rely on unreliable methods or exceed the proper scope of expert testimony. Defendants move to exclude two market-definition opinions because Dr. Hill employs an unscientific attempt of the Hypothetical Monopolist Test ("HMT") to underpin Plaintiffs' markets for promotion services at major concert venues ("MCVs") and for major concert amphitheaters ("MCAs"). Defendants also seek to strike portions of Dr. Hill's report that (i) offer legal conclusions—such as Defendants "engaged in anticompetitive conduct"—and (ii) present assertions about "qualitative evidence" untethered to economic analysis.

Plaintiffs argue that because this is an antitrust case and Dr. Hill is a purportedly "renowned" antitrust economist, he should be permitted to say whatever he wants to the jury. This is not the law. In what would be the first-ever jury trial in a government monopolization case, the Court's role as "gatekeeper" is critical to protect the jury "from being bamboozled by technical evidence of dubious merit." *State of New York v. Solvent Chem. Co.*, 2006 WL 2640647, at *1 (W.D.N.Y. Sept. 14, 2006); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993).

---

[1] Defendants' Motion and Plaintiffs' Opposition ("Opposition") refer to Dkts. 716 and 779, respectively. Documents cited as "Ex.__" refer to the documents attached to Dkt. 717.

1

**ARGUMENT**

I. **DR. HILL'S OPINIONS DEFINING AMPHITHEATER AND PROMOTIONS MARKETS SHOULD BE EXCLUDED**

   A. **Dr. Hill's "Show Order" Analyses Rely on Unreliable Data and an Unsupported Methodology**

Plaintiffs' Opposition boils down to a contention that the HMT and aggregate diversion ratios are "well-established and accepted economic methodologies." Opp. 1. It is well-established that diversion "measures to what extent consumers of a given product will switch (or be 'diverted') to other products in response to a price increase in the given product." *FTC v. Tapestry, Inc.*, 755 F.Supp.3d 386, 442 (S.D.N.Y. 2024). In his show order analyses,[2] however, Dr. Hill's calculations contradict accepted definitions of diversion and are arbitrary, unsupported in economics, and disconnected from switching behavior. That is grounds for exclusion. *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) (mandating exclusion when expert opinion is based on methodology that is "simply inadequate to support the conclusions reached"); *Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 916-19 (6th Cir. 2009) (excluding expert's "own version" of aggregate diversion analysis "that had not

---

[2] Plaintiffs state that Dr. Hill "use[d] three different methodologies" to estimate actual diversion. Opp. 12 (emphasis omitted). Each is derived from artists' pre-planned tour schedules rather than observed substitution in response to a SSNIP. Further, the first two—the "next show" and "monthly persistence" methodologies—rely on the order in which artists play shows. For clarity, Defendants refer to these two analyses as Dr. Hill's "show order" analyses. Plaintiffs and Dr. Hill do not even purport to cite an authority for either of these two methods. Plaintiffs' Opposition identifies an article Plaintiffs claim supports Dr. Hill's third ("show-weighted") methodology. *Id.* at 18. Of course, Dr. Hill cannot rely on authorities never mentioned in the 500+ pages of his reports despite Defendants' expert pointing out this very deficiency. Ex.3 (Yurukoglu Rpt.) ¶96; Ex.4 (Yurukoglu Reb. Rpt.) ¶32. Regardless, Dr. Hill's implementation departs from the paper's methodology, and his show-weighted methodology also suffers from the same defects described in Section II.B.

2

been tested, had not been subjected to peer review, had no controlling standards, [and] had no demonstrable showing of support within the scientific community").[3]

There is no debate that the data Dr. Hill uses in his show order analyses consist only of artists' pre-planned tour schedules: the routing decisions and the mix and timing of venue types on those tours. He just follows the trucks, as it were, and opines that routing reveals where an artist would switch if the cost of playing at an MCA or MCV increased. Dr. Hill's method is as arbitrary as assuming that a grocery shopper considers popsicles to be a better substitute for red apples than green apples, because the shopper visits the freezer section after putting red apples in their basket. Here, if an MCA in Philadelphia raised its prices, presumably other nearby venues would likely be good substitutes. But Dr. Hill's show order analysis does not allow this by assumption. There isn't any logic in it related to diversion and Dr. Hill does not cite any literature or precedent to support his approach. Even Dr. Hill testified that the sequence of venues "does not necessarily tell you what choices [an artist] will make" in response to an increase in price. Ex.5 (Hill Tr.) 105:22-106:9.

Artists and promoters plan tours many months in advance, and all at once. *Id.* 242:22-243:11. The sequence of stops on a tour is mostly a matter of logistics and efficiency. It's about minimizing travel time between stops, avoiding backtracking, arriving on high-demand days like weekends, and working around days when a preferred venue is booked, among other factors. *See* Ex.3 (Yurukoglu Rpt.) ¶¶44-48, 98-99. None of that has anything to do with diversion.

---

[3] Plaintiffs claim that the expert in *Kentucky Speedway* did not perform the standard SSNIP test or "consider data that would be informative as to customer substitution in the face of an increase in price or worsening of terms." Opp. 11. Dr. Hill's show-order analyses suffer the same defect.

3

Defendants do not contend an economist must *always* use data generated following an increase in price or worsening of terms. That does not mean an economist can use *any* data. Plaintiffs' cited cases are illustrative. Unlike Dr. Hill's show order analyses, each involves data—like win-loss records—reflecting the alternatives customers chose among at the moment of competition. *See, e.g.*, *United States v. Bazaarvoice, Inc.*, 2014 WL 203966, at *55 (N.D. Cal. Jan. 8, 2014) (win-loss data and ordinary course documents referencing competitors); *United States v. H&R Block Inc.*, 833 F. Supp. 2d 36, 60 (D.D.C. Nov. 10, 2011) ("the number of consumers who switch between different products."); *Tapestry*, 755 F.Supp.3d at 442-47 (survey data eliciting consumers' next-best options)*; FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F.Supp.3d 27, 57-58 (D.D.C. 2018) (win-loss data); *FTC v. Sysco Corp.*, 113 F.Supp.3d 1, 34-37 (D.D.C. 2015) (RFP and bidding data)*.* Indeed, in *Teradata Corporation v. SAP SE*, the court explained that although the expert's data "may not have captured actual transactions, it showed that other companies viewed SAP as a primary competitor, suggesting that customers would substitute SAP's products for rival products in response to price increases." 124 F.4th 555, 569 (9th Cir. 2024). Tour-sequence data says nothing about competitive alternatives an artist would divert to in response to a price increase.

### B.     Dr. Hill Fails To Reliably Implement His Own Methodology

Two additional fundamental flaws also render Dr. Hill's analysis inadmissible: he (1) includes non-switchers in his total switchers, and (2) overstates Defendants' margins. Both errors independently bias his HMT toward finding a narrower relevant product market, and each is a paradigmatic failure to "appl[y] the principles and methods reliably to the facts." *Amorgianos*, 303 F.3d at 265.

4

          i.          <u>Dr. Hill's Calculation of the Proportion of Switches Outside the Purported Relevant Market Is Unreliable.</u>

As this court has recognized, "[t]he aggregate diversion ratio for any given product represents the proportion of lost sales" (i.e., switches), not the proportion of all sales. *FTC v. IQVIA Holdings Inc.*, 710 F.Supp.3d 329, 370 (S.D.N.Y. 2024). Dr. Hill purports to follow this approach, but doesn't. For MCAs, Dr. Hill explains that the aggregate outside diversion ratio is the number of artists who, after a small price increase at an MCA, leave that MCA and divert to a non-MCA, divided by the number of artists who divert to any new venue (MCA or non-MCA)—i.e., "outside switchers" divided by "all switchers." Ex.1 (Hill Rpt.) ¶292. That definition requires the denominator to be lost customers, not all prior customers. *But the fractions Dr. Hill computes use the wrong denominator*: he divides by all artists who previously played MCAs, including those who stay and pay the assumed higher price (non-switchers). *See* Ex.3 (Yurukoglu Rpt.) ¶¶91-96. As a result, his analysis does not measure "to what extent consumers of a given product will switch (or be 'diverted') to other products" at all. *H&R Block*, 833 F.Supp.2d at 62. Dr. Hill's diversion analysis for promotion services at MCVs suffers from the same flaw. Mot. 14.[4] This is a textbook failure to apply one's own method reliably and warrants exclusion. *Amorgianos*, 303 F.3d at 266-67.

---

[4] Plaintiffs assert that Dr. Hill intentionally used the wrong denominator because including non-switchers "better captures artists' preferences and likely substitution." Opp. 16-17. This is mere lip service. Neither Plaintiffs nor Dr. Hill cites any authority—in the law or economics—to justify departing from the definition of an aggregate diversion ratio and still purport to be applying it.

5

    ii.  <u>Dr. Hill's Calculation of the Critical Outside Aggregate Diversion Ratio Is Unreliable.</u>

Dr. Hill recognizes that "[t]he first step" in implementing the aggregate HMT is to "calculate a critical outside aggregate diversion ratio [which] reflects the maximum percentage of lost customers who could switch" outside the market before the SSNIP becomes unprofitable for the hypothetical monopolist. Ex.1 (Hill Rpt.) ¶101. Under his formula for critical outside aggregate diversion, which can be rewritten as $\left(1 - \frac{2*SSNIP}{Margin}\right)$, an increase in margin causes the critical ratio to be higher, making it more likely that the actual outside diversion ratio falls below this threshold and the candidate market "passes" the HMT. Ex.3 (Yurukoglu Rpt.) ¶¶105, 105 n.133. Thus, Dr. Hill's exclusion of artist payments and other major costs when computing margins, which inflates those margins, is yet another unreliable step that skews his HMT in Plaintiffs' favor. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F.Supp.3d 430, 504 (S.D.N.Y. 2018) ("three unreliable steps does not an admissible methodology make").

    iii.  <u>Plaintiffs' Justifications of Dr. Hill's Errors Are Unavailing.</u>

Plaintiffs concede that Dr. Hill committed methodological errors by citing cases permitting "minor flaw[s]" and "slight modification[s]." Opp. 8. But "deference to experts," *Hughes v. The Ester C Co.*, 317 F.R.D. 333, 341 (E.D.N.Y. 2016), has its limits. *See Amorgianos*, 303 F.3d at 268 (upholding exclusion of expert opinion that "failed to apply his own methodology reliably"). The denominator error replaces the required measure—a proportion of lost sales—with an unconditional ratio, and the margin error moves the very threshold that determines pass/fail. Those are not "minor" flaws; they change the outcome. Plaintiffs ask the Court to overlook those failures because the method

6

Dr. Hill tried, but failed, to use is commonly accepted. *Daubert* requires more. *Amorgianos*, 303 F.3d at 265-66 ("[T]he district court must 'make certain that an expert ... employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'") (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

### C. Dr. Hill Has Not Analyzed the *Brown Shoe* Practical Indicia

Revealing the limitations of Dr. Hill's HMT opinions, Plaintiffs decamp to *Brown Shoe.* Opp. 10-11. To be clear, Dr. Hill never analyzed the *Brown Shoe* practical indica. His entire treatment is footnote 171 of his Report and footnote 14 of his Rebuttal Report, which merely cite the 2023 Merger Guidelines and an Antitrust Law Journal article introducing the concept of practical indicia. Ex.1 (Hill Rpt.) ¶88 n.171; Ex.2 (Hill Reb. Rpt.) ¶14 n.14. Dr. Hill provides no "evaluation" whatsoever.

While an expert need not analyze all seven *Brown Shoe* practical indicia in detail, actual analysis of at least some is required. *See In re Fresh Del Monte Pineapples Antitrust Litigation*, 2009 WL 3241401, at *7-10 (S.D.N.Y. Sept. 30, 2009) [hereinafter *Pineapples*] (excluding expert testimony because it "quickly dismissed" products as "reasonable substitutes"). For promotion services in MCVs, Dr. Hill merely opines that the qualitative evidence he chose to examine is "consistent with there being a group of artists that prefers to perform at [MCVs]." Ex.1 (Hill Rpt.) ¶157, §§6.1.1-6.1.3. For MCAs, Dr. Hill says qualitative evidence is "consistent" with MCAs being "outdoor, warm weather" venues, artists in particular genres being more likely to prefer MCAs, and there being a group of artists that prefers to perform at MCAs. Ex.1 (Hill Rpt.) §§9.1.1-9.1.3. This is like defining a market for Honda Civics by citing documents on how much some Civic drivers like their

7

vehicles without assessing substitution and competition from other cars—that is not analysis. *See Pineapples*, 2009 WL 3241401, at *8 (excluding expert opinion dismissing reasonable substitutes "based upon . . . consumer taste test reflecting a preference for" one product over the other).

This Court made clear that "experts are going to be strictly limited to what is in their reports". Dkt. 174 at 26:25-27:6. *See also LaSalle Bank Nat. Ass'n v. CIBC Inc.*, 2012 WL 466785, at *9 (S.D.N.Y. Feb. 14, 2012) ("Opinions that are not disclosed in the expert's report cannot be offered."). Plaintiffs should not be permitted to recast Dr. Hill's work as satisfying *Brown Shoe*'s practical indicia when those elements were neither analyzed nor supported in his report.

\* \* \*

Dr. Hill's opinions that there are relevant markets for MCAs and for promotion services at MCVs should be excluded because they are supported only by unreliable analyses that Dr. Hill mislabels aggregate diversion ratio calculations. If the Court is not inclined to exclude Dr. Hill's market definitions altogether, Dr. Hill should at minimum be precluded from offering opinions and testimony based on his aggregate diversion analyses and from claiming to have performed a *Brown Shoe* analysis.

## II. DR. HILL'S OPINION THAT DEFENDANTS ENGAGED IN ANTICOMPETITIVE CONDUCT SHOULD BE EXCLUDED

Experts in antitrust cases can "testify about factors that would tend to show anticompetitive conduct in a market and describe why, in the expert's opinion, those factors are present in the case at hand." *SourceOne Dental, Inc. v. Patterson Cos., Inc.*, 2018 WL 2172667, at *1 (E.D.N.Y. May 10, 2018). However, they "cannot testify to whether a party's conduct was 'anticompetitive' or 'unlawful' under the Sherman Act." *Id.* Contrary

to Plaintiffs' assertions, Defendants do not seek to preclude Dr. Hill from testifying "about the relevant markets he has defined, the extent of Defendants' market power in these markets, the economic elements of Defendants' conduct, [or] his economic expert conclusions regarding the impact of the conduct on competition and customers in the relevant markets." Opp. 23. Defendants seek to bar testimony that they "engaged in anticompetitive conduct"—a legal conclusion that courts regularly exclude. *E.g.*, *B & R Supermarket Inc v. Visa Inc.*, 2024 WL 4252031, at *13-14 (E.D.N.Y. Sept. 20, 2024) (expert "may not directly testify as to whether [any defendant] did or did not engage in anticompetitive conduct").

Plaintiffs attempt to salvage Dr. Hill's legal conclusion by asserting that he is not opining on whether Defendants' conduct is "unlawfully anticompetitive." Opp. 22-23. This only exacerbates the danger Rule 403 seeks to avoid—jurors cannot be expected to parse "anticompetitive" as economic jargon versus a legal conclusion. Regardless, Dr. Hill should not be permitted to testify that Defendants' "conduct was *either* 'anticompetitive' or 'unlawful.'" *Union Carbide Corp. v. Montell N.V.*, 28 F.Supp.2d 833, 843 (S.D.N.Y. 1998).

Plaintiffs contend that "courts routinely rely on experts' assessments of whether conduct was anticompetitive." Opp. 21. Assessments and assertions are different. Plaintiffs' cases do not support putting an expert's bare assertion that Defendants engaged in "anticompetitive" conduct to the jury. In *Google*, a bench trial, the risk of juror confusion was absent. *United States v. Google LLC*, 778 F.Supp.3d 797 (E.D. Va. 2025). In *Sabre*, the motion concerned an expert's damages model. *U.S. Airways, Inc. v. Sabre Holdings Corp.*, 2022 WL 874945, at *1 (S.D.N.Y. Mar. 24, 2022) (explaining jury could

9

credit expert's theory of competitive pathways, not that expert could state conduct was "anticompetitive"). And *Dial Corp v. News Corp.* addressed the relevance of "anticompetitive intent;" it did not authorize experts to pronounce conduct "anticompetitive." 165 F.Supp.3d 25, 40-41 (S.D.N.Y. 2016). Plaintiffs' authorities in fact confirm that whether conduct was "anticompetitive" is an issue for the trier of fact. *See, e.g.*, *Google*, 778 F.Supp.3d at 857 (listing considerations "courts consider" to determine whether conduct is anticompetitive).

Plaintiffs' claim that excluding Dr. Hill's testimony for using "anticompetitive" would be "equally fatal to Defendants' experts," Opp. 23, misstates the governing standards and Defendants' motion. Defendants' experts do not offer legal conclusions dressed as economic opinions. Their opinions on the procompetitive benefits of Defendants' conduct are squarely in the zone of permissible expert economic testimony. *SourceOne Dental*, 2018 WL 2172667, at *1 (expert may testify "that if certain conduct did occur, economists would expect the market to react in a particular way").

Plaintiffs' opposition suggests that Dr. Hill intends to stop short of a legal conclusion. *See generally* Opp. 22. If true, they should have no objection to an order enforcing that limit.

### III. DR. HILL'S OPINIONS PURPORTING TO SUMMARIZE AND WEIGH "QUALITATIVE EVIDENCE" SHOULD BE EXCLUDED

Plaintiffs do not dispute that it is "inappropriate for experts to act as a vehicle to present a factual narrative of interesting or useful documents for a case." *Scentsational Techs., LLC v. Pepsi, Inc.*, 2018 WL 1889763, at *4 (S.D.N.Y. Apr. 18, 2018). Instead, they claim Defendants urge a bright-line ban on any reference to qualitative evidence. Opp. 24-25. Not so.

While economists may synthesize qualitative materials when applying a disclosed and reliable framework, they may not repeat hearsay, highlight cherry-picked documents, or suggest which disputed accounts the jury should believe. *See LinkCo, Inc. v. Fujitsu Ltd.*, 2002 WL 1585551, at *2 (S.D.N.Y. July 16, 2002). Dr. Hill does precisely this more than 80 times, labeling contested materials as "consistent with" certain statements of fact, without articulating criteria for selecting those materials, testing his selections against alternative explanations, or acknowledging contrary evidence. Mot. 17. Dr. Hill admitted he did not "list all the evidence that cuts in either direction," Ex.5 (Hill Tr.) 317:21-318:2, omitted testimony that undermined his narrative, *id.* 382:10-18, made "credibility determinations", *id.* 300:1-4, and "weigh[ed]" the evidence, *id.* 300:5-9. Those concessions confirm his "qualitative" sections are evidentiary selection exercises and credibility assessments, not expert analyses.

Plaintiffs discount Defendants' cases because they did not "involve[] antitrust claims." Opp. 27. Plaintiffs cite no authority for greater leniency in antitrust cases, and the authorities Plaintiffs cite do not justify Dr. Hill's story-telling. *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) and *Jakobovits v. PHL Variable Ins. Co.*, 645 F.Supp.3d 95, 115-116 (E.D.N.Y. 2022) involved challenges to an expert providing "background" information, not relaying or weighing contested facts. In *Pension Committee*, the expert "articulated a set of guidelines" for analyzing the adequacy of investor due diligence and then applied those standards to specific conduct. *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F.Supp.2d 448, 465-67 (S.D.N.Y. 2010). *Fort Worth Employees' Retirement Fund v. J.P. Morgan* addressed class certification and a different question entirely; it did not endorse narration

11

of contested evidence. 301 F.R.D. 116 (S.D.N.Y. 2014). Nor did *Dial Corp.*; in that case, the court permitted an expert to rely on internal documents in assessing the defendants' intent, which "may be relevant 'to the question of whether the challenged conduct is fairly characterized as 'exclusionary' or 'anticompetitive.''" 165 F.Supp.3d at 37-41. Dr. Hill also did not "formulate a hypothesis that can then be tested using economic theory", like the expert in *In re Processed Egg Prods. Antitrust Litig.*, 81 F.Supp.3d 412, 424 (E.D. Pa. 2015), when he handpicked portions of the factual record to include in his reports. In fact, Dr. Hill's reports do exactly what *B & R Supermarket v. Mastercard International Inc.*, cautioned against: they "rehash" the factual record for the purpose of constructing a narrative based on Dr. Hill's interpretations and credibility determinations, without testable discipline. 2021 WL 234550 at *13 (E.D.N.Y. Jan. 19, 2021). Plaintiffs' effort to distinguish *Bobcar Media, LLC v. Aardvark Event Logistics, Inc.*, 554 F.Supp.3d 606, 613 (S.D.N.Y. 2020), also falls flat. *Bobcar* holds that highlighting select portions of the record is inadmissible. That Dr. Hill elsewhere offers analyses does not license narration.[5]

## CONCLUSION

For these reasons, Dr. Hill's opinions that (1) there is a properly defined antitrust market for MCAs and (2) there is a properly defined antitrust market for promotion services at MCVs, (3) Live Nation has engaged in anticompetitive conduct and (4) the "qualitative evidence is consistent with" over 80 factual statements, as well as any opinions that rely on the above opinions, should be excluded under Rules 702 or 403. To the extent the Court is not inclined to exclude Dr. Hill's market definitions altogether, Dr. Hill should

---

[5] Plaintiffs argue exclusion of Dr. Hill would jeopardize Defendants' experts, Opp. 27, but Drs. Budish and Carlton apply models and use documents as inputs—not to narrate facts or weigh credibility.

12

be precluded from offering opinions based on his aggregate outside diversion analysis of MCAs and promotion services or from proffering brand-new analysis of the *Brown Shoe* indicia.

Dated: December 22, 2025

| LATHAM & WATKINS LLP | CRAVATH, SWAINE & MOORE LLP |
|---|---|

_____

Alfred C. Pfeiffer (admitted *pro hac vice*)
    *Co-Lead Trial Counsel*
David R. Marriott
    *Co-Lead Trial Counsel*
Timothy L. O'Mara (admitted *pro hac vice*)
Jennifer L. Giordano
Andrew M. Gass (admitted *pro hac vice*)
Kelly S. Fayne (admitted *pro hac vice*)
Lindsey S. Champlin (admitted *pro hac vice*)
Robin L. Gushman (admitted *pro hac vice*)

505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600

1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

555 11th Street, NW, Suite 1000
Washington, D.C. 20004
(202) 637-2200

Al.Pfeiffer@lw.com
David.Marriott@lw.com
Tim.O'Mara@lw.com
Jennifer.Giordano@lw.com
Andrew.Gass@lw.com
Kelly.Fayne@lw.com
Lindsey.Champlin@lw.com
Robin.Gushman@lw.com

*Attorneys for Defendants Live Nation Entertainment, Inc. and Ticketmaster L.L.C.*

_____

Lauren A. Moskowitz
Nicole M. Peles

Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 474-1000

lmoskowitz@cravath.com
npeles@cravath.com

*Attorneys for Defendants Live Nation Entertainment, Inc. and Ticketmaster L.L.C.*

14

**CERTIFICATE OF COMPLIANCE**

I, Nicole M. Peles, an attorney duly admitted to practice before this Court, hereby certify pursuant to Local Rule 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rules"), and Rule 8(C) of Judge Arun Subramanian's Individual Practices in Civil Cases ("Individual Rules"), that the foregoing Memorandum of Law was prepared using Microsoft Word, and contains 3,499 words.  In making this calculation, I have relied on the word and page counts of the word-processing program used to prepare the document.

Dated:   December 22, 2025
         New York, NY

_____
Nicole M. Peles