## CASE NO. 25-1954

In The

# US Court of Appeals for the Federal Circuit

## PLAINTIFF-APPELLANT'S APPENDIX

### *US District Court Central District of California*

*Gurvey v. Live Nation Entertainment, Inc., Ticketmaster, LLC, Live Nation, Inc., The Commissioner of Major League Baseball (MLB), MLB Advanced Media, Phish/Phish Live, Cowan Liebowitz and Latman, PC, Hinshaw & Culbertson, LLP, Sheppard Mullin Richter and Hampton, LLP, Baker Botts, LLP et al.*

*Case No. 23cv4381 (CACD) on Appeal*

Amy R. Weissbrod Gurvey
CEO and California Counsel
LIVE-Fi® Technology Holdings
7302 Woodstone Circle
Princeton, New Jersey 08540
amyg@live-fi.com

US Patentee/ Plaintiff/Appellant *Pro Se*

# APPENDIX[1]

₁ **NOTE:    This Appendix includes orders from continuing multidistrict litigation(s) concerning Appellant Amy Weissbrod Gurvey's US ticketing management patents and pending health care delivery and clinical trial patent applications. 14 that were unlawfully placed on "hold" by the Commissioner of Patents.  No infringement hearings have been allowed Appellant by any district court for 15 years since 2011.** Lawsuits remain pending before four district courts, one New York State court and before this appeals court. The courts include the US District Court NDNY, SDNY, DC District Court, Central District of California and the NY Court of Claims.

The Federal Circuit court held that orders entered on public dockets listed in *fn 2*, can be considered in the current appeal. [2] In addition, the court held that the claim Appellant filed before the NY Court of Claims in 2025 could be considered. That Claim was unlawfully returned to Appellant undocketed by the Clerk even though the State of New York has waived Eleventh Amendment immunity for damages based on acts of its officers for tortious interference in Appellant's lawsuits against *private infringers*, unjust enrichment and misappropriation of property. This proves an illegal taking of Appellant's patents.  There is no dispute that officers of NYS tortiously interfered with

---

[1] NOTE: above.

[2] 24cv211 (NDNY); 06cv1202(SDNY); 24cv2930 (SDNY); 24cv3973 (SDNY), 25cv3257 (DCD): 23cv3549 (DCD).

Appellant's infringement lawsuits against private companies before the SDNY, EDNY and NDNY and have themselves been unjustly enriched based on the delay caused by private entities' and the State's misappropriation(s) of property.

Currently pending before the NDNY in 24cv211 returnable January 23, 2026 is Appellant's order to show cause to vacate an unconstitutional *sua sponte* order entered January 25, 2025, properly seeking injunctive relief against the NYS Thruway, NYS Gaming Commission and Port Authority of NY and NJ to stop using Appellant's patents without permission and for the NYS Office of Court Administration (OCA) to produce its complete files. Withheld files include all *ex parte* documents submitted by OCA attorney Shawn Kerby to the Federal Circuit since 2018 that were never ordered served on Appellant. The Appellate Division First Dept. complied with the NDNY's hearing on injunction on August 26, 2025 but the First Dept. said it has none of the OCA documents that were circulated *ex parte* to the Federal Circuit. It is contended that NYS officers have no legal right or power to tortiously interfere with Appellant's lawsuits against *private infringers* Live Nation Entertainment, Live Nation, Ticketmaster, MLB, MLB Advanced Media, Phish, PhishLIVE and the parties attorneys at Cowan Liebowitz & Latman, Hinshaw & Culbertson and Baker Botts

The claims currently before this appeals court were filed before the SDNY and the CACD include RICO *ex parte* obstruction of justice by infringer defendants and their defense

3

attorneys, willful infringement, contributory infringement, unfair competition, wrongful state action in collusion with NYS officers of the courts, conflicts of interest/breach of fiduciary duty, unprivileged defamation warranting special damages, attorney in-court fraud and deceit, and monopolistic practices in violation of the Clayton and Sherman Antitrust Acts. 15 USC §1, et seq. A further issue is whether the State of NY has engaged in acts that constitute a total taking of Appellant's patents because in 2025 the Court of Claims also  denied Appellant access to recover damages for those claims for which the State has waived Eleventh Amendment immunity before the Court of Claims. *Florida Prepaid Postsecondary Education Expense Board v. College Savings Bank*, 527 US 627 (1999)

In addition, it is undisputed that willful infringers Live Nation and Ticketmaster breached the conditions of merger "so ordered" by the DC District Court in a judgment entered 2010 and in an amended judgment entered in 2020. *US v. Ticketmaster and Live Nation*, 2010 WL 975407, 975408 (RMC)(DCD)(Jan. 25, 2010) (Jan. 8, 2020). The conditions included that the merged entity defendant Live Nation Entertainment, Inc. could not withhold ticket data from companies seeking to conduct nonticketing businesses. Appellant and her company LIVE-Fi® Technology Holdings are the contended priority inventor and owners of US patents that conduct nonticketing businesses. The DCD court ordered that any company adversely affected by breach, must return to the DCD to enforce the judgments.

Appellant's US patents and patents pending include ticketing management platforms and apparatuses and utility claims for direct-to-patient health care delivery, disease diagnosis and clinical trials. The disclosures incorporate novel methods for authentication of ticketing data, hybrid encryption, maximum user security, transmission matrices for content transmissions, routing logic, ticket resale and exchange, sports betting, multifunctional bar codes, targeted advertising, royalty accounting and AI analytics. The patents are fully compliant with regulatory law including health care law. "Placed bets" is included within the definition of "tickets" such that most sports betting firms including those that are venture partners of NYS are using the patents without permission. One of Appellant's registered tradenames is "*Tekcite* Solutions" which is "Eticket" backwards.

Fourteen of Appellant's pending US patent applications were unlawfully placed on "hold" by the Commissioner of Patents in violation of the Administrative Procedures Act, 5 USC §551-596, 701 (APA). In further violation, the Commissioner has still not produced the results of its seven-year conflicts of interest investigation against SDNY practitioner defendants at Cowan Liebowitz & Latman. The Cowan defendants were at all times USPTO registered attorneys representing both Appellant and Cowan's other named clients, willful infringers, with known competing interests - Live Nation, Phish, MLB/MLBAM and Legend Films of San Diego. The Cowan lawyers are potentially strictly liable for contributory infringement based on conflict of interest violations and enabling disclosure of Appellant's public

5

formal applications and confidential trade secrets to its clients. 37 CFR §§2.10, 2.19, 10.66, 11.108, 11.116, 1.324. There is no dispute that the Cowan practitioners filed defective applications under Appellant's name that did not correspond with the formal applications given to the firm to protect, abandoned those applications without statutory notice and were never granted unilateral withdrawal by the USPTO. Then the USPTO granted unilateral withdrawal to Appellant's subsequent practitioners during the Commissioner's investigation when the Commissioner took 14 of Appellant's published applications out of the prosecution queue, and then sent office action notices to the withdrawn attorneys. Certain pending patent applications being used by defendants without permission did not get office actions for 9 years when the deadline is 14 months. Nor did Appellant get issued patents for 17 years when the deadline is 3 years. *Wyeth v. Kappos*, 591 F. 3d 1364 (Fed Cir. 2010). During this delay other USPTO officers improperly granted claims in Appellant's published disclosures to other inventors.

All documents submitted to the Commissioner of Patents by the Cowan defendants, its defense attorneys and the NYS officers during its seven-year investigation remain unlawfully withheld in violation of the APA. Upon belief, the withheld documents include the same forged and fraudulent documents uploaded to the Internet by OCA attorney Kerby that were circulated to the Federal Circuit since 2018 and never ordered served. Three arising under patent infringement appeals were transferred since 2018 to the 2d Circuit that had no jurisdiction

6

to hear the infringement appeals and never heard them on the merits. 18-2076, 20-1620, 23-134.

The SDNY granted Appellant pro hac vice status to appear for LIVE-Fi in the Government's antitrust action before the SDNY in which 40 US states have joined as plaintiffs. Docket #638 granting pro hac vice status was also unilaterally deleted from the case docket since entry. Appellant's first infringement complaint docketed and date stamped on April 22, 2010 was also unilaterally deleted form the 06cv1202 docket in 2012 and in 2023, a clerk was convicted of taking bribes for deleting docket entries. In 24cv2930 (SDNY) the SDNY found that Appellant was never granted pro hac vice status in the 24cv3973 lawsuit, a blatant falsehood, at which point, the plaintiff Alan Amron in voluntarily withdrew his infringement lawsuit against the same defendants. Amron was found to have omitted citation to Appellant's issue US patents when applying for a subset patent already disclosed by Appellant to the USPTO.

**Appx. Exh.1** - 2011 Cropped Patent List and Patent List – Appellant's published patent applications unilaterally removed from the prosecution queue by the Commissioner of Patents to conduct a conflicts of interest investigation against Cowan Liebowitz & Latman, PC a defendant in both the SDNY and CACD lawsuits.

**Appx. Exh. 2** - Non-Party *ex parte* 2018 letter written by NYS Office of Court Administration staff attorney Shawn Kerby to the Federal Circuit falsely claiming that Appellant was "disbarred". Appellant has never been disbarred by any court. The letter was not discovered nor could it be discovered by Appellant until July 2025 because it was never ordered served by the Federal Circuit or the SDNY after circulation to 4

judges. Kerby who had actual and apparent authority to bind NYS, sought that the Federal Circuit not hear Appellant's arising under patent appeals to orders of the SDNY based on fraudulent defamation. As a result the SDNY denied infringement hearings against private entities Live Nation, Phish/Phish Live, Cowan Liebowitz & Latman, PC and three arising under patent appeals through 2023 were transferred *sua sponte* by the Federal Circuit to the 2d Circuit that had no jurisdiction to hear the appeals. This is how Appellant was denied constitutional access to the SDNY and the Federal Circuit.

**Appx. Exh.3** - NDNY 24cv211 (Docket #85) - August 31, 2025 letter in response to NDNY 24cv211 hearing on order to show cause against the Appellate Division First Dept. to produce all NYS files. 12-14 Redwells including forged documents were produced on August 26, 2025.

**Appx. Exh.4** - Order to Show Cause with Exhibits pending before the NDNY 24cv211 returnable January 23, 2026 including returned Claim from the NY Court of Claims.

**Appx. Exh.5** – Orders on noticed motion papers seeking intervention as of right. SDNY 24cv2930 (PAE)(RFT)

**Appx. Exh. 6** – Orders 24cv3973 (SDNY) (Government Antitrust Divestiture Action to break up Live Nation and Ticketmaster joined by 40 US states. Order Granting *Pro Hac Vice* Status #638, Order Denying Intervention as Party Plaintiff as of Right on Reconsideration

**Appx. Exh.7** – Orders DCD 25cv3257 *Gurvey v. Live Nation Entertainment, Inc.*, 23cv3549 *Gurvey v. Commissioner of Patents*

Amy R. Weissbrod Gurvey, an attorney duly admitted in California on good standing declares to the truth of the statements contained in the documents listed above with service on all parties by ECF in CACD 23cv04381 (MEMF).

/amyweissbrodgurvey/

8

# EXHIBIT 1

 **PALM INTRANET**

Day : Monday
Date: 5/9/2011
Time: 14:50:51

**Inventor Name Search Result**

Your Search was:

Last Name = GURVEY
First Name = [Nothing Entered]

| Application# | Patent# | PG Pub# | Status | Date Filed | Title | Examiner Name | Inventor Name |
|---|---|---|---|---|---|---|---|
| 10442468 | Not Issued | 20030220813 | 161 | 05/20/2003 | Electronic system and method coupling live event ticketing with sale of event recordings | WORJLOH,JALATEE | GURVEY, AMY R. |
| 11253912 | 7603321 | 20060173701 | 150 | 10/18/2005 | ELECTRONIC SYSTEM AND METHOD COUPLING LIVE EVENT TICKETING AND INTERACTIVE ENTRIES WITH THE SALE, DISTRIBUTION AND TRANSMISSION OF EVENT RECORDINGS, MASTERING SYSTEM AND INTELLIGENT TERMINAL DESIGNS | WORJLOH,JALATEE | GURVEY, AMY R. |
| 11612854 | Not Issued | 20070156443 | 30 | 12/19/2006 | Electronic System and Apparatuses Coupling Ticketing on Mobile Devices with Event Sponsorship and Interaction | CHOU,ALAN | GURVEY, AMY R. |
| 12384707 | Not Issued | | 160 | 04/07/2009 | Electronic system & method coupling live event ticketing & interactive entries with the sale distribution & transmission of event recordings, mastering system & intellegent terminal designs | | GURVEY, AMY R. |
| 12384708 | Not Issued | | 160 | 04/07/2009 | Interactive electronic apparatuses for live events | | GURVEY, AMY R. |
| 12587759 | Not Issued | | 160 | 10/11/2009 | Electronic system and method coupling live event ticketing and interactive entries with the sale, distribution and transmission of event recordings, mastering system and intelligent terminal designs | | GURVEY, AMY R. |
| 29310547 | Not Issued | | 167 | 08/25/2008 | USER INTERFACE FOR A PORTION OF A DISPLAY SCREEN TARGETED FOR LIVE EVENTS OR TRAVEL | LEE,SUSAN | GURVEY, AMY R. |
| 29314569 | Not Issued | | 160 | 04/10/2009 | Intelligent seating table with chairs apparatus design enabling electronic menu ordering, event viewing and interaction, play, order and release of recordings and linking with off-site terminals | | GURVEY, AMY R. |
| 29314571 | Not Issued | | 161 | 04/10/2009 | Intelligent turnstiles and control terminals | CLARK,DORIS | GURVEY, AMY R. |
| 60382710 | Not Issued | | 159 | 05/22/2002 | Premium performance ticket | | GURVEY, AMY R. |
| 60382949 | Not Issued | | 159 | 05/24/2002 | Premium performance ticket | | GURVEY, AMY R. |
| 60619754 | Not Issued | | 159 | 10/18/2004 | Electronic system and method coupling live event ticketing with sale of event recordings with optional balancing system and encasement designs | | GURVEY, AMY R. |
| 11788314 | Not Issued | 0 | 161 | 04/19/2007 | Electronic system and method for the direct resale and exchange of mobile and premium tickets | WORJLOH,JALATEE | GURVEY, AMY REBECCA |
| 11788337 | Not Issued | | 160 | 04/19/2007 | Electronic system and method for the direct resale and exchange of mobile and premium tickets | | GURVEY, AMY REBECCA |
| 61134222 | Not Issued | | 159 | 07/08/2008 | Electronic system, method & designs providing advertising solution from value added ticketing | | GURVEY, AMY REBECCA |

**Inventor Search Completed:** No Records to Display.

**Search Another: Inventor** Last Name           **First Name**

| Date Filed | Title | Examiner Name | Inventor Name |
|---|---|---|---|
| 05/20/2003 | Electronic system and method coupling live event ticketing with sale of event recordings | WORJLOH,JALATEE | GURVEY, AMY R. |
| 10/18/2005 | ELECTRONIC SYSTEM AND METHOD COUPLING LIVE EVENT TICKETING AND INTERACTIVE ENTRIES WITH THE SALE, DISTRIBUTION AND TRANSMISSION OF EVENT RECORDINGS, MASTERING SYSTEM AND INTELLIGENT TERMINAL DESIGNS | WORJLOH,JALATEE | GURVEY, AMY R. |
| 12/19/2006 | Electronic System and Apparatuses Coupling Ticketing on Mobile Devices with Event Sponsorship and Interaction | CHOU,ALAN | GURVEY, AMY R. |
| 04/07/2009 | Electronic system & method coupling live event ticketing & interactive entries with the sale distribution & transmission of event recordings, mastering system & intellegent terminal designs | | GURVEY, AMY R. |
| 04/07/2009 | Interactive electronic apparatuses for live events | | GURVEY, AMY R. |
| 10/11/2009 | Electronic system and method coupling live event ticketing and interactive entries with the sale, distribution and transmission of event recordings, mastering system and intelligent terminal designs | | GURVEY, AMY R. |
| 08/25/2008 | USER INTERFACE FOR A PORTION OF A DISPLAY SCREEN TARGETED FOR LIVE EVENTS OR TRAVEL | LEE,SUSAN | GURVEY, AMY R. |
| 04/10/2009 | Intelligent seating table with chairs apparatus design enabling electronic menu ordering, event viewing and interaction, play, order and release of recordings and linking with off-site terminals | | GURVEY, AMY R. |
| 04/10/2009 | Intelligent turnstiles and control terminals | CLARK,DORIS | GURVEY, AMY R. |
| 05/22/2002 | Premium performance ticket | | GURVEY, AMY R. |
| 05/24/2002 | Premium performance ticket | | GURVEY, AMY R. |
| 10/18/2004 | Electronic system and method coupling live event ticketing with sale of event recordings with optional balancing system and encasement designs | | GURVEY, AMY R. |
| 04/19/2007 | Electronic system and method for the direct resale and exchange of mobile and premium tickets | WORJLOH,JALATEE | GURVEY, AMY REBECCA |
| 04/19/2007 | Electronic system and method for the direct resale and exchange of mobile and premium tickets | | GURVEY, AMY REBECCA |
| 07/08/2008 | Electronic system, method & designs providing advertising solution from value added ticketing | | GURVEY, AMY REBECCA |

Records to Display



| | PG Pub# | Status | Date Filed | Title | Examiner Name | Inventor Name |
|---|---|---|---|---|---|---|
| | | | 05/20/2003 | Electronic system and method coupling live event ticketing with sale of event recordings | WORJLOH,JALATEE | GURVEY, AMY R. |
| | | | 10/18/2005 | ELECTRONIC SYSTEM AND METHOD COUPLING LIVE EVENT TICKETING AND INTERACTIVE ENTRIES WITH THE SALE, DISTRIBUTION AND TRANSMISSION OF EVENT RECORDINGS, MASTERING SYSTEM AND INTELLIGENT TERMINAL DESIGNS | WORJLOH,JALATEE | GURVEY, AMY R. |
| | | | 12/19/2006 | Electronic System and Apparatuses Coupling Ticketing on Mobile Devices with Event Sponsorship and Interaction | CHOU,ALAN | GURVEY, AMY R. |
| | | | 04/07/2009 | Electronic system & method coupling live event ticketing & interactive entries with the sale distribution & transmission of event recordings, mastering system & intellegent terminal designs | | GURVEY, AMY R. |
| | | | 04/07/2009 | Interactive electronic apparatuses for live events | | GURVEY, AMY R. |
| | | | 10/11/2009 | Electronic system and method coupling live event ticketing and interactive entries with the sale, distribution and transmission of event recordings, mastering system and intelligent terminal designs | | GURVEY, AMY R. |
| | | | 08/25/2008 | USER INTERFACE FOR A PORTION OF A DISPLAY SCREEN TARGETED FOR LIVE EVENTS OR TRAVEL | LEE,SUSAN | GURVEY, AMY R. |
| | | | 04/10/2009 | Intelligent seating table with chairs apparatus design enabling electronic menu ordering, event viewing and interaction, play, order and release of recordings and linking with off-site terminals | | GURVEY, AMY R. |
| | | | 04/10/2009 | Intelligent turnstiles and control terminals | CLARK,DORIS | GURVEY, AMY R. |
| | | | 05/22/2002 | Premium performance ticket | | GURVEY, AMY R. |
| | | | 05/24/2002 | Premium performance ticket | | GURVEY, AMY R. |
| | | | 10/18/2004 | Electronic system and method coupling live event ticketing with sale of event recordings with optional balancing system and encasement designs | | GURVEY, AMY R. |
| | | | 04/19/2007 | Electronic system and method for the direct resale and exchange of mobile and premium tickets | WORJLOH,JALATEE | GURVEY, AMY REBECCA |
| | | | 04/19/2007 | Electronic system and method for the direct resale and exchange of mobile and premium tickets | | GURVEY, AMY REBECCA |
| | | | 07/08/2008 | Electronic system, method & designs providing advertising solution from value added ticketing | | GURVEY, AMY REBECCA |

Search Another: Inventor Last Name          First Name

# EXHIBIT 2



*Live-Fi™ Technology Holdings*

*7302 Woodstone Circle*
*Princeton, NJ 08540*
*amyg@live-fi.com*
*917-733-9981*

March 8, 2025

Hon. Kimberly Moore, Chief Judge
Mr. Jarrett Perlow, Chief Clerk
US Court of Appeals Federal Circuit
717 Madison Place, NW
Washington, DC 20439

cc: US Attorney SDNY
US Dept. of Justice
26 Federal Plaza 37ᵗʰ FL
New York, NY 10278

Motion to Vacate Dismissal of Appeals and Writs of Mandamus
Fed Cir. #18-2076 (18-2206)(SDNY); Fed Cir. #s20-1620, 23-134 (06-1202)(SDNY)

cc: Hon. Owen Kendler, Chair, US Dept. of Justice Antitrust Division
cc: Hon. Pam Bondi, Attorney General of the United States
cc: Lisa Monaco, Assistant US Attorney General
cc: Hon. Anne M. Nardacci (NDNY 24cv211)
cc: Hon. Jia M. Cobb (DDC 23cv3549)

Dear Judge Moore and Chief Clerk Perlow:

The undersigned Appellant-Patentee Amy R. Weissbrod Gurvey files this grievance because in 2025, it was recently discovered that in 2018, a court attorney serving on the New York State Office of Court Administration (OCA), Shawn Kerby, was engaging in *ex parte* communications with the previous clerk Peter R. Marksteiner seeking that Plaintiff's arising under patent appeal in SDNY Case no. 18-cv-2206 be transferred to the Second Circuit. In the relevant lawsuit, defendant New York City was directly sued for infringement damages under *Monell v. Dept. of Social Services*, 436 US 658 (1978). The complaint was dismissed sua sponte in 5 days. When those infringement claims were denied adjudication, the appeal was properly heard by the Federal Circuit because infringement claims are defined by patent statutes. 28 USC 1338, 1291. The 2d Circuit had no jurisdiction to hear the appeal. Moreover, Kerby never appeared for defendant NYC in the SDNY lawsuit. The Corporation Counsel for the City of NY filed no opposition papers admitting to infringement by NYC institutions and agencies. Since Plaintiff moved to vacate the sua sponte dismissal entered without motion on notice, it has been left hanging on the docket since 2019 for six years.

1

Kerby appears to have engaged in *ex parte* obstruction of justice by circulating forged state documents manufactured by NYS First Dept. attorney grievance committee (AGC) staff attorneys Jorge Dopico and Richard Supple since 2008. Plaintiff is not admitted to practice law in NYS and the AGC has no jurisdiction over Plaintiff. The forged documents were manufactured to threaten criminal prosecution and maliciously abuse process against Plaintiff to gain litigation advantages in patent cases. The forged documents ordered permanently concealed in an Appellate Division order entered April 21, 2016. However, since 2012, they were circulated *ex parte* to SDNY clerks, a circuit attorney, a magistrate and four judges none of whom ordered service on Plaintiff in violation of ABA Rule 2.9 on Ex parte Communications.

Please also be advised that currently being investigated is whether Supple or any NYS officers of the courts circulated the forged documents to federal officers serving at the US Patent and Trademark Office. Plaintiff's ticketing patent Gurvey US Patent No.11403566 was suspiciously delayed 13 years in prosecution, prejudicially 10 years beyond the 3-year deadline of *Wyeth v. Kappos*, 591 F. 3d 1364 (Fed. Cir. 2010). The prosecution delay in turn delayed Plaintiff's enforcement rights in that valuable patent.

Plaintiff's FOIA requests filed with the USPTO General Counsel James Payne and David Berdan since 2016 to produce all relevant documents have been ignored. An additional lawsuit had to be filed before the DC District Court, 23cv3549, to compel production of still withheld and essential USPTO files.

Please be further advised that Plaintiff's opposition to the vertical merger of Live Nation and Ticketmaster was selected for posting on the US Dept. of Justice Media and Entertainment Antitrust webpage in March 2010. The ex parte violations of NYS attorneys functioned to deny Plaintiff infringement hearings against these entities before the SDNY when both are willful infringers since 2009. A response to this letter is appreciated and whether Plaintiff is entitled to vacate any of the Federal Circuit orders entered since 2018 transferring Plaintiff's arising under patent appeals to a court that cannot hear these appeals based on lack of appellate jurisdiction. Sup. Cl. Art. VI. Cl. 2 US Constitution; *Haywood v. Drown*, 556 US 729 (2009) Thank you.

Dated: March 11, 2025

Yours etc.,

Princeton NJ 07043

/amyweissbrodgurvey/

Amy R. Weissbrod Gurvey
US Patentee

2

**NEW YORK STATE**
**Unified Court System**

OFFICE OF COURT ADMINISTRATION

**LAWRENCE K. MARKS**
CHIEF ADMINISTRATIVE JUDGE

**JOHN W. McCONNELL**
COUNSEL

November 30, 2018

Hon. Peter R. Marksteiner
Circuit Executive & Clerk of Court
U.S. Court of Appeals for the Federal Circuit
717 Madison Place, NW
Washington, DC 20439

         Re:    <u>Weissbrod Gurvey v. State of N.Y., et al.</u>
                No. 18-2076

Dear Mr. Marksteiner:

      We submit this letter on behalf of the defendant-appellees OCA and Hearing Panel
IV in response to plaintiff-appellant's November 25, 2018 letter seeking permission to
appeal from an Order of the Southern District of New York, dated October 2, 2018,
denying appellant's motion for reconsideration of that Court's June 5, 2018 Order
currently on appeal here. Pursuant to the Order of this Court, dated November 19, 2018,
the appeal has been fully submitted and has been assigned to a merits panel.

      As set forth in appellees' briefs, there is no federal patent law cause of action
presented by the June 5, 2018 Order, where the claims challenge State related attorney
disciplinary matters resulting in plaintiff's suspension that have been litigated repeatedly
in state and federal courts. Similarly, there is no federal patent law cause of action
underlying the related October 2, 2018 Order denying plaintiff's motion to reconsider that
June 5, 2018 Order.

1

In any event, the merits of the underlying June 5, 2018 Order are the subject of the appeal pending here, reviewing the district court's dismissal of the action as barred by the Eleventh Amendment, res judicata, Rooker-Feldman doctrine, collateral estoppel, and judicial and quasi-judicial immunity.

Based upon the foregoing, we respectfully request that leave to appeal from the October 2, 2018 Order of the district court be denied.

Very truly yours,

Shawn Kerby
Assistant Deputy Counsel

TO: David Lawrence, Esq.
David.lawrence@ag.ny.gov

Nicole Feder, Esq.
nfeder@lbcclaw.com

Kathy Chang Park, Esq.
kpark@law.nyc.gov

Susan Paulson, Esq.
spaulson@law.nyc.gov

Amy Weissbrod Gurvey
amygurvey@gmail.com
315 Highland Avenue
Upper Montclair, NJ 07043

2

FORM 9. Certificate of Interest

Form 9
Rev. 10/17

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Amy Weissbrod-Gurvey   v.  Stateof N.Y., et. al.

Case No. 18-2076

## CERTIFICATE OF INTEREST

Counsel for the:

☐ (petitioner) ☐ (appellant) ☐ (respondent) XX(appellee) ☐ (amicus) ☐ (name of party)

### Shawn Kerby

certifies the following (use "None" if applicable; use extra sheets if necessary):

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held companies that own 10% or more of stock in the party |
|---|---|---|
| Office of Court Administration | Office of Court Administration | None |
| Hearing Panel IV | Hearing Panel IV | None |
| | | |
| | | |
| | | |
| | | |
| | | |

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

FORM 9. Certificate of Interest

Form 9
Rev. 10/17

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. *See* Fed. Cir. R. 47. 4(a)(5) and 47.5(b). (The parties should attach continuation pages as necessary).

| 11/30/2018 | /s/ Shawn Kerby |
|---|---|
| Date | Signature of counsel |

Please Note: All questions must be answered

Shawn Kerby

Printed name of counsel

cc: Amy Weissbrod-Gurvey; David Lawrence; Nicole Feder; Susan Paulson; Kathy Chang Park

# EXHIBIT 3





U.S. DISTRICT COURT - N.D. OF N.Y.

F I L E D

SEP - 5 2025

AT_____ O'CLOCK_____
John M. Domurad, Clerk - Syracuse

*Live-Fi™ Technology Holdings*

*7302 Woodstone Circle*
*Princeton, NJ 08540*
*amyg@live-fi.com*
*917-733-9981*

August 31, 2025

Hon. Brenda Sannes        cc:   Hon. Anne Nardacci
Chief Judge                           NDNY 445 Broadway
Northern District of NY           Albany, NY 12207
PO Box 7367
100 S. Clinton Street
Syracuse, New York 13261-7367

***Gurvey v. Hon(s). Gov. Kathy Hochul, Letitia James, Joseph Zayes, Port Authority of NY and NJ, NYS Thruway, et al. (AMN)(CFH)(PJE) Docket # 24cv211 (NDNY)***

**Motion to sequester NYS files by Injunction, Vacate Orders under FRCP Rule 60(b) and order recusal**

Dear Judge Sannes:

      This past Tuesday, August 26, 2025, after <u>fourteen (14) years</u>, the undersigned US patentee of standard essential apparatus and method patents for direct-to-user live event ticketing management and health care delivery, also a California attorney in excellent standing, was finally given <u>first</u> access to New York State files ordered "concealed" by the Appellate Division First Dept. in an order entered April 21, 2016. That order was found nonfinal by the NY Court of Appeals and could not be applied by any subsequent court.

1

The files were stated as unlawfully opened in 2007 by NYS staff
counsels J. Richard Supple, an attorney O. Lee Squitieri under the
supervision and control of Jorge Dopico chief counsel at the First Dept.
attorney grievance committee (AGC) and presiding AGC administrative
justice Luis Gonzalez. The files were also opened in violation of the
Administrative Procedures Act, 5 USC §§551- 559, 701-706 (APA)
without jurisdiction over me in the capacity of an attorney because I am
not admitted to practice law in New York State.

The files demonstrate malicious abuse of process, unprivileged
defamation and retaliatory harassment to prevent me from enforcing
my US patents in NY. Supple and his former firm Hinshaw &
Culbertson, AGC staff counsels, were dually serving as defense
attorneys for Live Nation Entertainment and Cowan Liebowitz &
Latman of NY in a parallel SDNY patent infringement, unfair
competition and conflicts of interest lawsuit proving motive.

On August 26, 2025, eight First Dept. armed officers serving at 27
Madison Avenue including five marshals carrying guns finally gave me
access. Two marshals also carrying guns were protecting a room with
12-14 overstuffed Redwells in adjoining offices at 41 Madison Avenue.
After initial inspection, I only completed 1/3 of the review and must
return.

I now seek that the NDNY order sequestration of these files by
injunction and vacate all orders in this NDNY lawsuit. Judge Nardacci
must recuse herself because impartiality can seriously be questioned. 28
USC 455(a) in copying the fraudulent Internet notices that the
undersigned is "disbarred". It should now be obvious Plaintiff's
constitutional rights continue to be seriously violated by RICO
conspiracy violations by state officers. Declaratory determinations must
be entered by this Court.

2

In 15 years, I never got a single hearing on my US patents in violation of the Fourteenth Amendment from the SDNY or this Court. Moreover, other courts are copying documents posted on the Internet by Office of Court Administration attorney Shawn Kerby and clerk Sam Younger, *sua sponte* without motions on notice when the documents are fraudulent. In violation of due process five Appellant Division First Dept. justice ordered that the files would remain concealed in an order entered April 21, 2015.

Members of the Office of the Letitia James were also implicated in the elaborate RICO corruption scandal including Michael Berg with AGC staff counsels Thomas Cahill (deceased), staff attorneys James T. Shed, Orlando Reyes, Raymond Vallejo and Naomi Goldstein, Dopico, First Dept. staff attorney Ms. Holmes, several clerks and former justice Gonzalez.

It was in 2011 that I first filed a NYS mandamus lawsuit under Article 78 of the CPLR. That petition was dismissed *sua sponte* on January 3, 2014 by the First Dept. without motion on notice after *sua sponte* transfer from the Supreme Court of NY. (110774-2011) My 2017 follow-up petition was also not heard. It was transferred to the 2d Dept. and again *sua sponte* dismissed without motion on notice in 2018. [132-17 (1st Dept.)] became 01366-18 (2d Dept.)] These orders were also appealed as of right to the NY Court of Appeals that found them "*nonfinal, that they did not finally determine an action and that no constitutional issue was directly involved*". Parallel petitions filed before the SDNY seeking prospective injunctive relief and declaratory determinations against NYS presiding justices were also dismissed *sua sponte* without motions on notice. 13cv2565 (JMF), 18-cv-2206 (AT). *Ex parte Young*, 209 US 123 (1908); *Wells Fargo Bank v. St. Louis*, 2024 WL 2737961 (NYAD 2d Dept. 2024). I was then forced to move for a writ of mandamus petition before the US Supreme Court. This petition is pending. #24-7441.

3

In 2025, the smoking gun was discovered. Since 2018, OCA's Kerby had been writing *ex parte* letters to the US Court of Appeals for the Federal Circuit that I not be granted "arising under" patent appeals to orders of the SDNY denying me infringement hearings and inducing infringement hearings against Live Nation Entertainment (LNE) and Cowan Liebowitz & Latman since 2017. Mindy's Cosmetics v. Dakar, 611 F. 3d 590 (9th Cir. 2010). LNE is now the subject of an antitrust divestiture petition before the SDNY (24cv3973).

The court had no justification to dismiss defendant Port Authority of NY and NJ from infringement claims and an amended complaint. The Port Authority is a private entity using the patents without permission.

In response to Kerby's ex parte fraud and unprivileged defamation including because OCA was not a party to the SDNY lawsuit, the Federal Circuit in response transferred three patent appeals to the Second Circuit [18-2076, 20-1620, 23-134] proving monumental damages. The Second Circuit has no jurisdiction to hear an arising under patent appeal. Supremacy Clause, Art. VI, Cl. 2; *Haywood v. Drown*, 556 US 729 (2009); *Christianson v. Colt Industries Operating Corp.*, 486 US 800 (1988).

Multiple venture partners of NYC such as the new Yankee Stadium, MTA and MetroCard are also using the patents without permission and reaping millions of dollars a week in revenues. Although I can sue the City and its partners directly, I continue to be unlawfully denied access to all district court courts in NY. *Monell v. Dept. of Social Services*, 436 US 658 (1978). The reason is OCA clerk Younger's fraudulent postings on the Internet since 2013 that "I was disbarred in NY". Younger has not taken these postings down after

4

several requests. There is no other remedy at law but injunction from the district court.

OCA attorney Kerby sent the same fraudulent notices to the Federal Circuit *ex parte* since 2018. The Federal Circuit never served me with Kerby's unlawful *ex parte* proffers in violation of due process and ABA Rule 2.9 on *Ex parte* Communications. Kerby had no standing under the APA to write *ex parte* letters to an appeals court seeking to deny me infringement appeals to orders of the SNDY.

In this 24cv211 NDNY lawsuit, I continue to be the innocent victim of RICO conspiratorial fraud, malicious abuse of process and retaliatory harassment by NYS officers for ulterior motives.

The files I just got access to on August 26 proved an elaborate RICO concealment practice by state officers. Forged AGC documents were first mailed to me without CPLR service in 2007 affixing the signature of a former First Dept. chief counsel Paul Curran. **Curran left the state office in 2002 and died of cancer in 2007.** Curran never signed these documents. Curran's name was forged onto photocopies of old AGC letterhead. In addition, the names of more recent AGC counsels - Ralph Riordan and Charlotte Moses Fischman- were superimposed on the same photocopied letterhead and are much darker in type in comparison with the other roster names. The Redwells establish that many forged documents were manufactured by AGC court officers.

Supple harboring conflicts of interest. As staff counsel to the AGC where the USPTO Commissioner had filed ethics violations against Hinshaw's Cowan Liebowitz clients, Supple could never accept the Cowan firm's SDNY retainer. NY's Judiciary Law Part 1240.6d, 1240.18. No AGC officer could give Supple and Squitieri ex parte access to enter unserved and forged documents into the confidential Appellate

5

Division files. A *sua sponte* order of the First Dept. entered in 2012 and then the SDNY entered in 2013 (13-cv-2565)(JMF)) both say my license in NYS was suspended for six months on December 4, 2012. **There was no license to suspend in New York State existing in 2012**. My temporary commission granted by the Appellate Division Third Dept. was voluntarily resigned in 1998, 14 years earlier, when I was in medical school and changed careers. Resignation was approved by Third Dept. officer Dan Brennan and OCA's Denise Rajpal immediately. I never thereafter paid bar dues or requested reinstatement. There are notations from state officers in these files seeking to get me to move for reinstatement to confer faux jurisdiction in favor of the AGC but I never did.

The files proves there existed clear additional motives for NYS officers to attempt to falsely discredit me and ruin my career and patent company. In 2006, the Cowan firm had been placed under conflicts of interest investigation by the former USPTO Commissioner of Patents, Wynn Cogggins. Conflict of interest and unilateral abandonment violations were found during a seven-year investigation and under the APA I had the constitutional right to be served with the results. I was never served. Damages are proven. In the interim, fourteen of my US patent applications were taken out of the queue also in violation of the APA and never reinstated. The Cowan firm was also found to have breached of my attorney client privilege and the Defend Trade Secrets Act (18 USC §1836) to Legend Films of San Diego, Live Nation Entertainment, and the Commissioner of Major League Baseball (MLB). Based on undisclosed conflicts with the concealed AGC staff counsel posts, pursuant to NY's Judiciary Law Part 1240.6d Supple and Hinshaw &Culbertson could never accept the Cowan firm's SDNY retainer or continue in that retainer.

In addition, my first US patent infringement complaint date-stamped and filed by the SDNY on April 22, 2010 was also unilaterally

6

deleted *sua sponte* from the docket in Case No. 06cv1202. My 11403566 US continuation patent that issued on August 2, 2022 - twelve years later - is considered the standard essential patent for ticketing management. It did not issue for seventeen years from the 2005 filing date in violation of *Wyeth v. Kappos*, 591 F. 3d 1364 (Fed Cir. 2010). The deadline is three years. That patent still in term It is being infringed by private entity Port Authority of NY and NJ, and the NYS Thruway and NYS Gaming Commission defendants in this lawsuit.

OCA's Kerby got Supple's forged documents from Younger in 2013 who previously admitted he got them from Supple and SDNY magistrate Henry Pitman (no longer serving). None of the *ex parte* proffers were ever ordered served by SDNY judges Barbara Jones, Jesse M. Furman, Lorna Schofield, Laura Taylor Swain and Analisa Torres or by the circuit attorney Julie Allsman.

In 2025, Judge Nardacci in this lawsuit copied Younger's fraudulent postings. The Judge found that Plaintiff was disbarred *sua sponte* without motion on notice or due process. The order must be vacated and Judge Nardacci must recuse herself.

In 2024, OCA's Younger admitted that in 2013 he uploaded fraudulent disbarment notices to the Internet. I WAS NEVER DISBARRED IN ANY COURT AND NEVER SUSPENDED IN ANY FINAL ORDER IN NYS. A judge cannot copy data from the Internet without ordering a hearing. If an attorney cited did the same and cited in a brief to cases from Copilot, the attorney would be severely sanctioned or disbarred. No judge can do the same.

I am resigned from the practice of law since 1998, emphatically clear in the Redwells I reviewed. I was never admitted to the First Dept. and never appeared on behalf of a client in that court even before 1998.

7

US Supreme Court decisions are clear that no attorney jurisdiction exists over me. *Middlesex County Ethics Committee v. Garden State Bar Association*, 457 US 423 (1982). The NY Court of Appeals orders entered in 2018 and 2023 already determined nonfinality of *ex parte* orders entered by the First Dept. and could not be copied because OCA officers Kerby and Younger are engaging in unconstitutional fraud. **SINCE 1998, THERE WAS NO LICENSE IN NY IN EXISTENCE TO SUSPEND**. Moreover, I was also denied verbatim hearing transcripts. *Cleavinger v. Saxner*, 474 US 193 (1985).

In 2024, Younger finally admitted that he accepted *ex parte* documents in 2013 from SDNY circuit attorney Julie Allsman and from the chief 2d Circuit clerk Catherine O'Hagan Wolfe who coincidentally previous served as the chief clerk of the First Dept. AGC when justice Gonzalez was presiding. Allsman admitted that in 2013 she unilaterally removed my out-of-state California certifications from the SDNY roster in violation of due process.

There are references in the 12-14 Redwells to a former 1997 HUD housing proceeding concerning my HUD protected apartment at Gateway Plaza in Battery Park City. NYC L&T 60941-97. The lease was offered in 1995 when I was in medical school. The landlords Hudson Towers Housing and 1/3 owner Lefrak Organization (2/3 financed by the US Government) were sanctioned by the SDNY Judge Charles Brieant in 1985 for HUD violations and illegal evicting tenants in violation of HUD mandates. 24 CFR §966; 83CV0519 (CEB) The case files can be ordered from the National Archives. Sultzer v. Pierce, 85 CV 0519 (CES). Another Supreme Court file sanctioned Battery Park City Authority officers. Sultzer v. BPCA, 13906/86. Former NY Justice Sheila Abdus-Salaam issued an injunction to protect my HUD apartment and belongings when the landlords had taken illegal consideration from an outsider not on the building project's wait list, a

8

coterminous lease to my HUD protected apartment was issued, and I was never notified.

I was never an attorney in the HUD proceeding because I had an attorney retained, Jay Stuart Dankberg, a former NYC Civil Court Judge. This fact precluded any faux jurisdiction falsely claimed by the First Dept. AGC. In addition, in the file is a 2001 destruction order targeting certain HUD audiotapes entered by NYS OCA clerk Jane Chin and NYC Civil Court clerk Ernesto Belzaguy with notice that a civil court transcriber Linda Sears was also contacted by members of NYS Attorney General to destroy completed transcripts. NYC housing judges are not constitutional judges in NYS and cannot preside over jury trials, a constitutional right of a HUD tenant. 24 CFR §966.66. Mr. Dankberg, however, was unjustly sanctioned $5000 when he properly moved for a HUD jury trial after I was denied HUD mandated notice and to transfer this case to Civil Court Judge Peter Wendt. These document prove lack of jurisdiction per se, continuing harassment without jurisdiction and malicious abuse of process by AGC officers. There is an order from the NY of Claims entered in 2023 in Claim No. 135611, denying me access to recover damages against NYS.

In summary, the State of NY has denied me constitutional access to all district courts and state courts to prevent me from enforcing my valuable US patents, to continue in combined use HUD housing since 2007 and to be awarded damages. The US Supreme Court has held that if a state deprives a patentee of complete access to all courts in the state to file infringement lawsuits, may the patentee abrogate the state's sovereign immunity. *Florida Prepaid Post Secondary Expense Board v. College Savings Bank*, 527 US 627 (1999)

The acts of NYS court officers establish an elaborate RICO coverup involving forgery of state files, concealment of files, allowing *ex parte* access to unauthorized individuals with a warrant by Supple

9

and Hinshaw lawyers, APA violations, unprivileged defamation, retaliatory harassment and malicious abuse of process without jurisdiction, RICO fraud, and attorney in-court fraud and deceit by NYS staff counsels dually serving as defense lawyers for private willful infringers of my patents. The forgery of state documents warrants disbarment by all attorneys who participated in the fraud. *US v. Reich*, 479 F. 3d 179 (2d Cir. 2007)

WHEREFORE, for these reasons, the orders of the NDNY must be vacated and Judge Nardacci must recuse herself because impartiality can seriously be questioned. 28 USC §455(a). Injunctive relief must be ordered against the First Dept. AGC state officers and an evidentiary hearing immediately convened.

Respectfully submitted,
/amyweissbrod gurvey/

AMY R. WEISSBROD GURVEY
CEO LIVE-Fi® Technology Holdings

cc: Noah Engelhart, Esq.
Asst. NYS Attorney General

10

RS FIRMLY TO SEAL

POSTAGE REQUIRED

# UNITED STATES
POSTA

**PRIORITY**®

ted delivery date

stic shipments inc

Tracking® service

d international ins

used internationa

e does not cover certa
Mail Manual at *http://*
rnational Mail Manual

T RATE
ATE ■ ANY WEIC

ACKED ■


PS00001000014

---

## UNITED STATES
## POSTAL SERVICE.

**Retail**

**P**   **US POSTAGE PAID**
**$11.00**   Origin: 08540
09/03/25
3369300325-25

### PRIORITY MAIL®

0 Lb 3.10 Oz
**RDC 03**

EXPECTED DELIVERY DAY: 09/05/25

**B006**

SHIP
TO:

 PO BOX 7367
SYRACUSE NY 13261-7367

**USPS TRACKING® #**

9505 5141 8791 5246 6212 29



---

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® and Priority Mail International® shipments. Misuses may be a violation of federal law. This package is not for resale. EP14F © U.S. Postal Service; October 2023; All rights reserved.

FROM: 

U.S. DISTRICT COURT
JOHN M. DOMURAD, CLERK

SEP 0 5 2025

RECEIVED   TO:

Hon. Brenda Sannes
Chief Judge
US Dist Court
Northern Dist. of NY
PO Box 7367
100 S. Clinton Street
Syracuse New York
13261-7367

# EXHIBIT 4

Amy Weissbrod Gurvey
CEO LIVE-Fi® Technology Holdings
US Patentee/Inventor/Entrepreneur
7302 Woodstone Circle
Princeton, NJ 08540
917-733-9981
amy@live Fi.net

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

_____X

**AMY R. WEISSBROD GURVEY,**
**US Patentee, Petitioner**                    24cv211 (AMN)(PJE)(BS)

v.                                             **NOTICE OF ORDER TO**
                                               **SHOW CAUSE**

**Hon(s). Kathy Hochul, Letitia James**
**Joseph Zayas, Laura Taylor Swain,**
**Frank Hoare, Brian O'Dwyer,**
**Kevin O'Toole, et al, Respondents**

_____X

To Chief Judge Brenda Sannes:

This is a letter _seeking permission_ to file the instant order to show cause
returnable December 30, 2025 at 2:00 pm in the afternoon of that day
by zoom hearing in the chambers of Judge Brenda Sannes. Petitioner
requests notice by docket and email if the order to show cause is
granted or denied or if an alternative date for hearing will be set.

Petitioner will argue for vacatur of the NDNY's January 2025 order _sua
sponte_ dismissing Petitioner's otherwise proper _Ex parte Young_
complaint properly seeking prospective injunctive relief against NYS
decision makers of state agencies – NYS Thruway, NYS Gaming

Commission, and Port Authority of NY and NJ. Each continues to use Petitioner's ticketing patents without permission and is properly sued for prospective injunctive relief to stop using the patents. Petitioner's three issued US patents *inter alia* authenticate ticket and placed bet data to enable a slew of additional benefits with more than 14 platforms disclosures. They include hybrid encryption, transmission content matrices, ticket resale and exchange, multifunctional barcodes, targeted advertising and AI analytics.

Based on *Building and Realty Institute of Westchester and Putman Counties (BRI) v. State of New York*, 2021 WL 4198332 (SDNY); *Virginia Office of Protection and Advocacy v. Stewart*, 563 US 217 (Scalia, J.). Petitioner will also seek an order requiring a hearing on taking of her patents by respondent agencies and an order to add NY Court of Claims chief judge Richard E. Sise as a respondent. In addition, Petitioner will seek vacatur of the order requiring prior permission to file subsequent motions as both unconstitutional and wrongfully induced by ongoing violations of federal law, fraud and frivolous litigation by members of the respondent Attorney General in violation of *Building and Realty Institute of Westchester and Putman Counties (BRI) v. State of New York*, 2021 WL 4198332 (SDNY). Petitioner will also seek an order mandating production of all Office of Court Administration (OCA) documents withheld in violation of the Fourteenth Amendment.

Petitioner seeks sanctions against AG attorneys for ongoing unconstitutional acts of frivolous litigation, fraud, RICO conspiracy and instructing *ex parte* circulation of documents by OCA and First Dept. attorney grievance committee (AGC) officers to federal court officers. While the receiving courts in turn never served Petitioner with ex parte proffers, the acts of the state officers that tortiously interfered with private infringement lawsuits and forfeiture of appeals on the merits, require strict liability claims by the Court of Claims. Instead, that court has returned Petitioner's claims, warranting injunctive relief for continuing violations, an amended complaint and joinder of defendants.

## FACTS IN SUPPORT OF ORDER TO SHOW CAUSE

In July 2025, it was discovered that NYS officers at the NYS Office of Court Administration (OCA), *i.e.*, Shawn Kerby, Sam Younger and chief counsel John McConnell had been writing unlawful *ex parte* letters without standing or jurisdiction, attempting to tortiously interfere with Petitioner's arising under patent litigation and appeals before the Federal Circuit against *private* willful and contributory infringers Live Nation merged with Ticketmaster, Phish/PhishLIVE and Cowan Liebowitz & Latman. PC.[1] These acts are per se unlawful and unconstitutional.

The State of New York has waived immunity for claims of tortious interference with private infringement lawsuits and appeals, and also for claims for misappropriation of property and unjust enrichment. Since July 2025, there is now no dispute that tortious interference with private infringement lawsuits and appeals has been proven by discovery of OCA's *ex parte* circulated letters. These letters caused forfeiture and damages. They induced the Federal Circuit to transfer three arising under patent appeals [18-2076, 20-1620, 23-134] against private and contributory infringers Live Nation merged with Ticketmaster, Phish/PhishLIVE and Cowan Liebowitz & Latman to the Second Circuit that had no jurisdiction to hear the appeals and did not hear them. Ergo there was never any decision on the merits of infringement claims allowing other infringers to continue to penetrate the market and use Petitioner's patents without permission.

Because the Federal Circuit did not hear the infringement appeals on the merits, it follows that respondent NYS agency decision makers became enabled to misappropriate Petitioner's patents and be unjustly enriched through such uses that continue.

The August 31, 2025 production of theretofore withheld First Dept. documents since 2011 in violation of Petitioner's constitutional

---

[1] The US Attorney EDNY criminally prosecuted Ticketmaster for placing spiders on competitors' webpages to steal ticketing data. *US v. Ticketmaster*, 2021 CR 22, 24 (EDNY). The Dept. of Justice and 40 US states are now suing Live Nation Entertainment to divest that entity of Ticketmaster before the SDNY for antitrust violations ongoing since 2010. 24cv3973 (SDNY)

rights proved that OCA Kerby's acts and acts of First Dept. attorney grievance committee (AGC) attorneys included *ex parte* circulation of forged state documents including a fabricated blacklist to SDNY administrators since 2013. Ergo five SDNY judges were induced not to grant infringement discovery ordered by the 2d Circuit or infringement hearings for 13 years after Petitioner won binding arbitration against before the SDNY on August 4, 2009. 462 Fed. Appx. 26 (2d Cir. 2012)

The NDNY's 2025 unconstitutional orders were immediately and contumaciously defied by two additional SDNY judges since October 2025 in Case Nos. 24cv2930 (PAE)(RFT), 24cv3973 (AS). Petitioner continues to be denied taking and infringement hearings by the SDNY and this court. The 24cv2930 SDNY lawsuit was brought by an infringer of Petitioner's patents against MLB Advanced Media, another infringer. There is no dispute that the plaintiff, Alan Amron, failed to cite to Petitioner's issued patents when applying for a subset patent before the USPTO rendering his patent void and enforceable. In addition, in Petitioner's SDNY infringement lawsuit, Robyn Tarnofksy was the senior attorney for the NYLAG serving as pro se help unit for the SDNY without disclosing conflicts of interest. Tarnofsky required Petitioner to sign five retainer agreements with NYS, proving the State was Petitioner's attorney and never disclosed conflicts of interest.

The 24cv2930 sitting judge Hon. Paul A Engelmayer, improperly denied Petitioner's application to intervene as of right citing to this Court's January 2025 order. Then the judge allowed Amron to withdraw his lawsuit in entirety over Petitioner's objection, again denying Petitioner a hearing on her patents against two infringers to affirm the patents in the market. The court also fabricated that Petitioner was never granted pro hac vice status by the SDNY, a pure fiction disproved by #638 on the 24cv3973 docket.

Thereafter this court issued an order limiting application of its "prior permission" order to filings before this court after the order was already copied by the two SDNY judges, rendering the order moot.

However, the NY Court of Claims then also returned Petitioner's properly filed new claim for continuing tortious interference by Kerby and OCA respondent Joseph Zayas for continued violations of federal patent law and the Fourteenth Amendment by continuing to withhold the complete state files. NY's Judiciary Law Part 1240.7 required

4

production of the files and was enacted in 2017.

Respondents were never sued for damages in the instant NDNY lawsuit. Yet Petitioner's vacatur motion under Rule 60(b) has still not been adjudicated. State agency decision-makers Frank Hoare, Brian O'Dwyer and Kevin O'Tootle are properly sued for prospective injunctive relief to stop using Petitioner's patents under *Ex parte Young*, 209 US 123 (1908) and for taking declaratory determinations.

Petitioner seeks severe sanctions against Assistant AG's Michael Berg and Assistant AG Noah Engelhart for continuing frivolous litigation and instructing RICO crimes by state officers. Petitioner also seeks determinations that AG must be disqualified from appearing for respondents in this lawsuit *ab initio*. This is because assistant AG Berg defended First Dept. attorney grievance committee (AGC) officers sued in their individual capacities from *ex parte* forgery causes of action in "ordered concealed" state files. In the previous lawsuit before the Supreme Court of NY filed in 2015, Assistant AG Berg engaged in frivolous litigation by averring under oath that taking hearings can be heard before the Court of Claims. This is not the law. The Court of Claims is a court of limited jurisdiction that can only hear claims for damages against the state and its officers sued in their official capacities after taking hearing on patents must be heard by the district courts. *Kentucky v. Graham*, 472 US 159 (1985).

Tortious interference now been proven by OCA officers.

Forgery crimes by First Dept. officers were now proven by the First Dept. compelled production on August 31. 2025, that were circulated to the Federal Circuit ex parte by OCA officers without standing or jurisdiction.

Mr. Berg's previous representation of AGC individual officers from forgery crimes and frivolous arguing that the Court of Claims must hear these claims constitutes in-court fraud and deceit. *Amalfitano v. Rosenberg*, 12 NY 3d 8 (2009), 533 F. 3d 117 (2d Cir. 2007). However, because OCA and State's agencys' defense in this lawsuit could be in conflict with AG's previous representation of the individual AGC defendants from forgery claims, means that a conflict exists between the state agencies and the official OCA officers. NY's Executive Law subd. 63-1; *Kentucky v. Graham*, 473 US 159 (1985)

Case 1:24-cv-03973-AMN-PJE   Document 101   Filed 12/26/25   Page 6 of 10

# MEMORANDUM OF PATENT LAW

In *Building and Realty Institute of Westchester and Putman Counties (BRI) v. State of New York*, 2021 WL 1198332 (SDNY), it was held that actions for damages against NYS officials in their official capacities are essentially actions against the state and will be barred by the Eleventh Amendment **unless**: (1) Congress has abrogated the State's immunity; (2) the state has consented to suit; or (3) the *Ex parte Young* doctrine applies. *Ex parte Young*, 209 US 123 (1908) *see also Will v. Mich. Dept. of State Police*, 491 US 58, 71 (1989); *In re Deposit Ins. Agency*, 481 F. 3d 612, 617 (2d Cir. 2007). Berg is deemed to know the law specifically because he personally argued this lawsuit for the State in defense of the plaintiffs' claims.

Alternatives (2) and (3) apply unequivocally to this lawsuit warranting vacatur of orders by this Court by order to show cause, the addition of Court of Claims Chief Judge Richard E. Sise as a named respondent to accept injunctive relief for ongoing violations of Petitioner's constitutional rights guaranteed by the Fifth Amendment and Fourteenth Amendment.

As to (1), Congress did attempt to enact a sweeping statute abrogating immunity for a state's patent infringement, i.e., 35 USC §271(h) that was found to be overbroad. The US Supreme Court found that Congress had overstepped its bounds in abrogating the State's sovereign immunity under the Eleventh Amendment in the face of the powers of Congress to protect patents under Article II Section 8 of the US Constitution. The court found contrary to what AG argued to this Court, i.e., that Congress could not merely *assume* that the several states would deprive a patentee of access to its courts to get taking damages as an alternative to infringement.

However, the SDNY, EDNY and NDNY have in fact denied Petitioner constitutional access to get infringement damages against private entities and taking adjudications against the State and its agencies.

Ergo, Petitioner contends that this Court must grant prospective injunctive relief against the respondent state agency decision makers to stop using Petitioner's patents, and also enter a determination on taking. Based on the US Supreme Court's decision a two-step process is required, a taking determination by a district court and then a damages award before the Court of Claims.

However, the taking claim is independent of Petitioner's tortious interference and Ex parte Young claims. Ergo, the continuing return of Petitioner's new claim duly filed before the Court of Claims in November 2025 for OCA officers' continuing tortious interference with arising under patent appeals against private infringers and withholding of all state files in violation of federal and the Fourteenth Amendment must be heard. Chief Judge Richard Sise of the Court of Claims must be added as a defendant to the instant NDNY lawsuit and an amended complaint granted and all orders of the court vacated.

## MEMORANDUM OF LAW

Per *Building and Realty Institute of Westchester and Putnam Counties (BRI) v. State of New York*, 2021 WL 4198332 (SDNY), patent cases where a state's agencies continue to use an inventor's patents are covered by *Ex parte Young*, 208 US 123 (1908). See also *Virginia Office of Protection and Advocacy v. Stewart*, 563 US 247 (2011)(Scalia, J.)

Under the *Ex parte Young* doctrine, a suit may proceed against state officials, notwithstanding the Eleventh Amendment, when a plaintiff, "(a) alleges an ongoing violation of federal law, i.e., federal patent law and (b) seeks relief properly characterized as prospective. *See In re Deposit Ins. Agency*, 481 F. 3d at 618; *see also Santiago v. NYS Dept. of Corr. Serv.*, 945 F. 2d 25, 32 (2d Cir. 1991) (holding that prospective relief claims cannot be brought directly against the state, or a state agency, but only against state officials in their official capacities).

NDNY Judge Anne Nardacci clearly defied the prevailing law in *sua sponte* dismissing Petitioner's claims in abuse of discretion. The Eleventh Amendment does not bar suits for declaratory and injunctive

7

relief against state officials acting in their official capacities in alleged continuing violation of federal rights including patent statutes. *See Quern v. Jordan*, 440 US 332, 337 (1979); *Nassau & Suffolk County Taxi Owners Assn v. State*, 336 F. Supp. 3d 50, 67 (EDNY 2018) ("[T]he doctrine of *Ex parte Young* permits a suit to proceed in federal court against a state official in his or her official capacity, notwithstanding the Eleventh Amendment." (quoting *Kisembo v. NYS Off. of Child & Fam Services*, 285 F. Supp. 3d 509, 520 (NDNY 2018) The continuing withholding of OCA files is a separate Fourteenth Amendment violation against this Petitioner and a violation of Judge Sannes' order after the First Dept. noticed it does not have the OCA files.

In July 2025, well within the one year and "reasonable time" vacatur statutory provisions of FRCP Rule 60(b)(1)-(6), Petitioner discovered that since 2018 the Federal Circuit has been receiving, *sua sponte* considering and acting on *ex parte* letters from NYS Office of Court Administration (OCA) attorney Shawn Kerby. As a result of these *ex parte* tortious proffers that were never served on Petitioner by the Federal Circuit, the Federal Circuit transferred three arising under patent appeals against private willful and contributory infringers Live Nation, Instant Live Concerts, LLC, Phish/Phish Live and Cowan Liebowitz & Latman PC to the 2d Circuit that had no jurisdiction to hear the appeals. Supremacy Clause Art. VI. Cl. 2.

Kerby's actions were undertaken without standing or jurisdiction in favor of NYS because Petitioner is not admitted in NYS. They are unprotected by immunity. Specifically Kerby pleaded that the Federal Circuit not hear Petitioner's arising under patent appeals to orders of the SDNY denying infringement hearings against *private* willful and contributory infringers Live Nation Entertainment merged with Ticketmaster, Phish and Cowan Liebowitz & Latman because Petitioner is "disbarred" PETITIONER HAS NEVER BEEN SANCTIONED OR DISBARRED IN CALIFORNIA OR BY THE NY COURT OF APPEALS. However, even if she had been disbarred, most patentees are not out-of-state attorneys in good standing. Moreover, even if Kerby's allegations were true, which they are not, that fact would have nothing to do with Petitioner's constitutional right to get infringement hearings guaranteed by the Fourteenth Amendment in any district wherein her patents are being

used without permission. In other words, Kerby engaged in tortious interference and ex parte RICO corruption crimes and unprivileged defamation without standing or jurisdiction that had the legal effect of causing forfeiture of infringement claims and appeals on the merits against private infringers and taking damages against the state agencies. These acts prevented petitioner from affirming her patents in the market and allowing other infringers to penetrate the market including the respondent NYS agencies.

The State of New York has waived its immunity for tortious interference claims. This means that Petitioner had an unfettered constitutional right guaranteed by the Fourteenth Amendment to enter the NY Court of Claims to get hearings on strict liability tortious interference with her private infringement lawsuits against NYS and its officers. Ergo, the orders of the NDNY dismissing these claims are unconstitutional, clear abuse of discretion and must be vacated.

The ultimately legal effect of the tortious interference by OCA's Kerby ex parte tortious acts was also misappropriation of property and unjust enrichment by the respondent state agencies. Petitioner was denied constitutional access to get private infringement and taking hearings by the SDNY, the EDNY, and the NDNY. Petitioner was also denied access to the DC District Court in 25cv3257 that copied OCA's unserved proffers and blacklist. The DCD improperly found that Petitioner was disbarred, and then the judge recused herself and transferred the action when she realized the prejudicial error. The same documents were upon belief, circulated to the United States Patent and Trademark Office to delay petitioner's patent prosecutions well beyond the 3-year deadline. Wyeth v. Kappos, 591 F. 3d 1364 (Fed. Cir. 2010) To date, Petitioner's FOIA requests to the USPTO Law Dept. and Administration Procedures Act violations also are pending before the DC District Court.

In the NDNY lawsuit Petitioner did not seek damages against any respondent. Petitioner only sought prospective injunctive relief against state agency decision makers to stop using her patents, orders against the OCA to produce its complete files, orders for taking hearings and prospective injunctive relief against the Court of Claims.

The Court must grant Petitioner taking hearings on patents. While neither the Supreme Court nor the Second Circuit has conclusively addressed the issue, there is a dispute between circuits warranting a petition for writ of certiorari. In *Community Housing Improvement Program v. City of NY* ("CHIP"), 492 F. Supp. 3d 35, 39, 40 n. 3 (EDNY 2020), the court pointed to a recent decision in which the Second Circuit affirmed the district court's ruling that "the Eleventh Amendment ...bar[s] a takings claim." *Id.* However, as noted in *CHIP*, this decision was a non-precedential summary order "that did not analyze the question in detail." *Id.* Other district courts within the Second Circuit have held that the Eleventh Amendment applies to Takings Clause claims but only where damages were sought in the complaint.

*In Florida Prepaid Post Secondary Education Expense Board v. College Savings Bank*, 527 US 627 (1999), the US Supreme Court held that the Eleventh Amendment precluded Congress from enacting a broad-sweeping statute, i.e., 35 USC 271(h), that would make a state or state agency strictly liable for infringement of a patent without proof that the state had deprived the patentee of taking remedies. The court held that without proof that a state has denied taking hearings, that Congress had overstepped its bounds. In the instant case, Petitioner was deprived of taking remedies by three district courts in New York against three state agencies — the NYS Thruway, the NYS Gaming Commission, the Port Authority of NY and NJ, a joint state agency.

Petitioner's tortious interference claims against OCA officers attempting to prevent infringement hearings against private entities are independent of the taking claim and entitled to immediate injunctive relief against the Court of Claims by amended complaint.

Dated: December 21, 2025
Princeton, NJ

Amy Weissbrod Gurvey
US Patentee
CEO LIVE-Pix Technology Holdings

The Port Authority of NY and NJ, local area airport terminals, the MTA and MetroCard, sports betting companies and congestion pricing companies have still not been ordered to submit to infringement hearings before the SDNY.

Summary charts against these companies based on infringement of Petitioner's high level ticketing and authentication patents include:

- **US 11,403,566**: Methods/systems for authenticating ticketing data and enabling use by non-ticketing businesses.
- **US D647,910 S**: Design patent — ornamental aspects of a ticketing interface/device.
- **US 7,603,321**: Systems for secure ticketing and data verification across venues/transportation.

Potentially relevant accused Use(s) entitled Petitioner to exclusive operation of systems where ticketing data is authenticated and repurposed for:

- **Transportation**: MetroCard, MTA, NYS Thruway, Port Authority (airports, bridges, tunnels).
- **Sports/Entertainment**: Yankee Stadium, MLB Advanced Media, Live Nation, Ticketmaster, StubHub, Citifield
- **Regulated Gaming & Betting**: NYS Gaming Commission, sports betting operators, NY Lottery, OTB,
- **Congestion Pricing**: NYC tolling/traffic pricing systems.

Each infringement involves **ticket/token validation** and often **sharing data with non-ticketing businesses** (concessions, advertising, loyalty programs, parking, betting, etc.).

| Patent Claim Element | Accused Feature | Evidence Source | Notes |
|---|---|---|---|
| "Authenticating ticketing data…" | Ticketmaster QR/barcode validation | Ticketmaster technical docs, user guides | Maps directly to claim 1 of '566 |
| "Enabling non-ticketing businesses…" | StubHub resale integration with MLB Advanced Media | MLBAM licensing agreements | Shows data flow beyond ticketing |
| "Secure token for transportation access…" | MetroCard authentication at MTA turnstiles | MTA public procurement specs | Matches '321 system claims |

| Patent Claim Element | Accused Feature | Evidence Source | Notes |
|---|---|---|---|
| "Ornamental design of ticketing interface" | Live Nation mobile app ticket screen | Screenshots, app store images | Compare to D647,910 drawings |

## Claim Chart -- US Patent 11,403,566 vs. Ticketmaster / Live Nation

| Patent Claim Element | Accused Feature | Evidence Source | Notes |
|---|---|---|---|
| "A method for authenticating ticketing data…" | Ticketmaster mobile app QR/barcode scanning at venue gates | Ticketmaster support docs, app screenshots | Direct authentication of ticketing data |
| "…enabling non-ticketing businesses to access authenticated data" | Live Nation concessions, merchandise, loyalty programs tied to ticket scans | Live Nation marketing materials, venue partner agreements | Shows data use beyond ticketing |
| "…secure transmission of authenticated data to third-party systems" | Ticketmaster API integrations with StubHub and MLB Advanced Media | Developer/API documentation, MLBAM partnership announcements | Demonstrates external data flow |
| "…recording authenticated ticketing events for subsequent business use" | Ticketmaster/Live Nation analytics dashboards for sponsors | Investor presentations, venue case studies | Matches claim language on recording and reuse |

## Claim Chart – US Patent 7,603,321 vs. MTA MetroCard / Congestion Pricing

| Patent Claim Element | Accused Feature | Evidence Source | Notes |
|---|---|---|---|
| "System for secure ticket/token validation…" | MetroCard magnetic stripe authentication at turnstiles | MTA procurement specs, technical manuals | Core validation process |
| "…enabling access to non-ticketing services" | MetroCard linked discounts at retail partners, congestion pricing toll passes | NYC DOT congestion pricing proposals, MTA partner programs | Extends beyond transit |
| "…data verification across multiple venues/modes" | MetroCard accepted at subways, buses, PATH, AirTrain | Port Authority/MTA interoperability docs | Multi-venue verification |
| "…providing authenticated data to external systems" | Congestion pricing system sharing toll data with enforcement agencies | NYC DOT reports | Matches external data provision |

## Claim Chart – US Design Patent D647,910 S vs. MLB Advanced Media / StubHub

| Patent Claim Element | Accused Feature | Evidence Source | Notes |
| --- | --- | --- | --- |
| Ornamental design of ticketing interface (as shown in drawings) | MLB Ballpark app digital ticket screen | App screenshots, App Store images | Compare layout, ornamental features |
| Distinctive arrangement of authentication elements | StubHub resale ticket QR interface | StubHub app screenshots | Side-by-side comparison required |
| Overall visual impression | MLBAM ticket display vs. D647,910 figures | Expert design comparison | Establishes substantial similarity |

## EXPEDITED ORDERS ON INJUNCTIVE AND DECLARATORY RELIEF MUST BE GRANTED AGAINST STATE OFFICERS

Petitioner now seeks expedited adjudication of the order to show cause and an inquest on treble RICO fraud, willful infringement without permission and conspiracy damages as confirmed by the First Dept.'s document production. There is no dispute from the order of the First Dept. entered April 21, 2016 that for 14 years the essential documents were maliciously and unconstitutionally ordered withheld from Petitioner and four mandamus lawsuits were *sua sponte* dismissed without motion on notice in violation of Petitioner's constitutional rights. *Wells Fargo Bank v. St. Louis*, 2024 WL 2737961 (NYAD 2d Dept. 2024) There is no dispute that Live Nation, Phish and MLB are infringing Petitioner patents in the district and out of state and at all e3 national baseball stadiums. In the summer these venues double as outdoor concert halls.

24

2021 WL 4198322
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

BUILDING AND REALTY INSTITUTE
OF WESTCHESTER AND PUTNAM
COUNTIES, INC., et al., Plaintiffs,
v.
State of NEW YORK, et al., Defendants,
and
Community Voices Heard,
Defendant-Intervenor.
G-Max Management, Inc., et al.,
Plaintiffs,
v.
State of New York, et al., Defendants,
New York Tenants & Neighbors, and
Community Voices Heard,
Defendant-Intervenors.

No. 19-CV-11285 (KMK), No. 20-CV-634 (KMK)
|
Signed 09/14/2021

### Attorneys and Law Firms

Kenneth J. Finger, Esq., Finger & Finger, A Professional Corporation, White Plains, NY, Counsel for Plaintiffs Building and Realty Institute of Westchester and Putnam Counties, Inc.; Apartment Owners Advisory Council; Cooperative and Condominium Council; Stepping Stones Associates, L.P.; Lisa DeRosa as Principal of Stepping Stones, L.P.; Jefferson House Associates, L.P.; Shub Karman, Inc.; DiLaRe, Inc.; Property Management Associates; Nilsen Management Co., Inc.

Randy M. Mastro, Esq., William J. Moccia, Esq., Akiva Shapiro. Esq., Gibson, Dunn & Crutcher, LLP, New York, NY, Counsel for Plaintiffs G-Max Management, Inc.; 1139 Longfellow, LLC; Green Valley Realty, LLC; 4250 Van Cortlandt Park East Associates, LLC; 181 W. Tremont Associates, LLC; 2114 Haviland Associates, LLC; Siljay Holding LLC; 125 Holding LLC; Jane Ordway; Dexter Guerrieri; Brooklyn 637-240 LLC; 447-9 16th LLC.

Michael A. Berg, Esq., Shi-Shi Wang, Esq., New York State Office of the Attorney General, New York, NY, Counsel for Defendants State of New York; Ruthanne

Visnauskas in her official capacity as Commissioner of New York State Division of Housing and Community Renewal; Division of Homes and Community Renewal; Letitia James in her official capacity as Attorney General of the State of New York; Woody Pascal in his official capacity as Deputy Commissioner of the New York State Division of Housing and Community Renewal

Rachel K. Moston, Esq., Claudia Brodsky, Esq., New York City Law Department, New York, NY, Counsel for Defendant City of New York.

Caitlin J. Halligan, Esq., Sean Patrick Baldwin, Esq., Michael Duke, Esq., Thaddeus C. Eagles, Esq., Babak Ghafarzade, Esq., Selendy & Gay, PLLC, New York, NY, Counsel for Intervenors Community Voices Heard and N.Y. Tenants & Neighbors.

Ellen B. Davidson, Esq., The Legal Aid Society, New York, NY, Counsel for Intervenors Community Voices Heard and N.Y. Tenants & Neighbors.

### OPINION AND ORDER

KENNETH M. KARAS, UNITED STATES DISTRICT JUDGE

**\*1** On December 10, 2019, a group of ten Plaintiffs who are landlords and organizations in Westchester County, New York filed a Complaint against the State of New York ("New York" or the "State"), Ruthanne Visnauskas in her official capacity as Commissioner of the New York State Division of Housing and Community Renewal ("Visnauskas"), and the Division of Community Renewal ("DHCR") (collectively, "BRI Defendants"), alleging that recent amendments to the Emergency Tenant Protection Act of 1974 (the "ETPA") violate their constitutional rights (the "BRI Action"). (*See* BRI Compl. (Dkt. No. 1, Case No. 19-CV-11285).)[1] Specifically, BRI Plaintiffs allege violations of the Fifth and Fourteenth Amendments and the Contract Clause, U.S. Const. art. I, § X, cl. 1; *id.* amends. V, XIV. (*Id.* at 92–96.)[1] BRI Plaintiffs request that this Court declare the Housing and Stability Tenant Protection Act (the "HSTPA") as unconstitutional and seek an injunction against its enforcement. (BRI Compl. at 95–98.)[2] The BRI Defendants move this Court to dismiss the BRI Complaint

brought by BRI Plaintiffs for lack of jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). (BRI Defendants' Motion To Dismiss (Dkt. No. 60).) Community Voices Heard ("CVH") filed a parallel Motion To Dismiss the BRI Complaint against the BRI Defendants for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). (CVH Motion To Dismiss (together the "BRI Motions") Dkt. No. 62).)[4]

The BRI Action is one of five federal actions that real estate groups have filed in the United States District Courts for the Southern and Eastern Districts of New York, seeking to challenge the long-standing system of rent stabilization authorized under New York State law.[5] This opinion, however, concerns two cases: the BRI Action and *G-Max Management, Inc. et al. v. State Of New York et al.* (20-CV-634). *G-Max* is a related case filed on January 23, 2020, brought by a group of 13 Plaintiffs who are "small landlord owners" (the "G-Max Plaintiffs"). The G-Max Plaintiffs filed the G-Max Complaint against the State of New York, Visnauskas, Letitia James in her official capacity as Attorney General of New York ("James"), Woody Pascal in his official capacity as Deputy Commissioner of the New York State Division of Housing and Community Renewal ("Pascal"), and New York City (collectively, "G-Max Defendants"), alleging violations of the Fifth and Fourteenth Amendments; the Contract Clause, U.S. Const. art. I, § X, cl. 1; *id.* amends. V, XIV; the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601 *et seq.*; and various provisions of the New York State Constitution (the "G-Max Action"). (*See* G-Max Compl. (Dkt. No. 1, Case No. 20-CV-634).)[6] G-Max City Defendant moves this Court to dismiss the G-Max Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (G-Max City Defendants' Motion To Dismiss (Dkt. No. 67).) G-Max State Defendants move this Court to dismiss the G-Max Complaint against the G-Max Plaintiffs for lack of jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). (G-Max State Defendants' Motion To Dismiss (Dkt. No. 70).) CVH and New York Tenants & Neighbors ("T&N") filed a parallel Motion To Dismiss the G-Max Complaint against the G-Max Defendants for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). (CVH Motion To Dismiss (together the "G-Max Motions") Dkt. No. 72).)[7] Because of the overlapping claims and issues of law in the two cases, the Court addresses the motions filed in both cases in this Opinion and Order.[8]

**\*2** For the reasons stated herein, the BRI and G-Max Defendants and Intervenors CVH and T&N Motions To Dismiss are granted without prejudice.

## I. Background

### A. Factual Background

In 1969, the City of New York (the "City") enacted the first rent-stabilization laws with the Rent Stabilization Act of 1969 (collectively, "RSL.") RSL were "a means to control a perceived penchant toward unreasonably high rent increases on the part of landlords." *Gramercy Spire Tenants' Ass'n v. Harris,* 446 F. Supp. 814, 825 (**S.D.N.Y.** 1977). At the time, the New York City Council "found that many owners of non-rent-controlled buildings were demanding exorbitant and unconscionable rent increases" and these increases were "causing severe hardship to tenants of such accommodations and ... uprooting long-time city residents from their communities." *Id.* (citation and quotation marks omitted). RSL apply to privately owned buildings, built between February 1, 1947 and March 10, 1969 for buildings with six or more units. N.Y.C. Admin. Code § 26-504(a). Cited in the RSL legislative findings, the conditions of rent environment in New York City were described as "exactions of unjust, unreasonable and oppressive rents and rental agreements ... profiteering, speculation and other disruptive practices tending to produce threats to the public health, safety and general welfare ...." N.Y. Unconsol. Law § 26-501 (McKinney). Essentially, RSL place limits on the amount of rent that can be charged, limit the percentage and frequency of rent increases, and entitle tenants to certain protections such as lease renewal, eviction prevention under many circumstances, and the ability to file complaints against landlords. *Id.* §§ 26-501 *et seq.* RSL created a system of rent regulation that covers nearly one million apartments, which house over two million people, or about one in three residents in the City. Timothy L. Collins, *An Introduction to the New York City Rent Guidelines Board and the Rent Stabilization System* (rev. ed. Jan. 2020), https://rentguidelinesboard.cityofnewyork.us/wp-content/uploads/2020/01/intro2020.pdf.

In 1974, the ETPA was passed, which extended rent stabilization to any Westchester, Rockland, or Nassau County municipality with a rental vacancy rate of five percent or less that opted in. N.Y. Unconsol. Law §§ 8621 *et seq.*; *see also Massagli v. Bastys,* 532 N.Y.S.2d 638, 641 (Sup. Ct. 1988) (describing applicability of ETPA to Westchester, Rockland, and Nassau counties prior to its amendment in 2019); HSTPA, Part G, § 3. The ETPA has been described as "a form of local option legislation,

Case 1:24-cv-03973-AS PJ Document 830 101 Filed 01/13/26 Page 48 of 209

Building and Realty Institute of Westchester and Putnam..., Not Reported in Fed....

which authorized the City of New York (and other specified localities) to declare the existence of a public emergency requiring the regulation of residential rents." *Gramercy Spire*, 446 F. Supp. at 819. The ETPA covers roughly 25,000 rent-stabilized apartments in the 21 municipalities in Westchester County. (BRI Compl. ¶ 1, at 98.) Once the existence of a public emergency is declared, the ETPA places limits on the rents that property owners can charge tenants. The ETPA also created a Rent Guidelines Board ("RGB") to regulate how much the rents of ETPA units could be increased for one- and two-year periods. Under the ETPA, landlords are generally obligated to offer one- or two-year renewal leases to each tenant prior to expiration of the current lease. Further, landlords are required to make rent adjustments in their rent-regulated apartments in accordance with standards set forth in the ETPA, in addition to complying with local building and housing laws. N.Y. Unconsol. Law § 8624 (McKinney 2019). RSL and regulations have since been renewed and modified several times.

**\*3** In June 2019, the New York State Senate again amended the State's RSL and enacted the HSTPA. As amended, the HSTPA expands previous incarnations of the New York rent stabilization statutes in various ways – it places additional limits on rent increases, deregulation of units, and eviction of tenants in breach of lease agreements, among other changes. *See generally* HSTPA. Most significantly, the HSTPA limits a landlord to use one housing unit only if there is a showing of "immediate and compelling necessity" for his or her own personal use and occupancy as his or her primary residence or for the use by an immediate family member. HSTPA, Part 1. The HSTPA repealed the luxury decontrol provisions, which allowed landlords to decontrol units once the rent or the tenant's income reached a certain threshold. *Id.* at Part D, § 5; *see also* N.Y. Unconsol. Law §§ 26-504.1, 26-504.2, 26-504.3 (repealed 2019). In addition, the HSTPA eliminated the vacancy and longevity rental increases. *Id.* at Part B, §§ 1, 2; *see also* N.Y. Unconsol. Law § 26-511(c)(5-a) (repealed 2019); *id.* § 8630(a-1) (repealed 2019). The HSTPA changed it so that preferential rent operates as the legal rent for the life of the tenancy – i.e., the rent cannot be raised upon lease renewal. *Id.* at Part E. Further, the HSTPA reduced the value of capital improvements called "individual apartment improvements" ("IAI") and "major capital improvements" ("MCI") that landlords could cover through rent increases. *Id.* at Part K, §§ 1, 2, 4, 11. IAI spending is now capped at $15,000 over a 15-year period, and no more than three IAIs can be charged to tenants during that time. *Id.* § 1. The HSTPA provided that the maximum collectible rent increases will now be no more

than the average of the five most recent RGB annual rent increases for one-year renewal leases. *Id.* at Part H, § 1. The HSTPA increased the percentage of tenant consent needed to convert a building to cooperative or condominium use from at least 15% of tenants for approval to a threshold of 51%. *Id.* at Part N. The HSTPA also prohibited conversion plans under which tenants who decline to buy their units are evicted. *Id.* The HSTPA extended the period during which state housing courts may stay the eviction of breaching tenants from six months to one year. *Id.* at Part M, § 21.

The HSTPA removed the geographic limitation of the ETPA so that now all municipalities in the State, including Westchester County, can opt-in to rent stabilization. *Id.* at Part G, § 3. Specifically, under the HSTPA, any locality in the State can participate in rent stabilization if "a declaration of emergency" regarding available apartments is made in the subject locality pursuant to the ETPA. *Id.* § 5. In 2019, when New York reauthorized and amended RSL through the HSTPA, it declared that a "severe disruption of the rental housing market ha[d] occurred" that "threaten[ed] to be exacerbated" because previous incarnations of the law allowed for the removal of vacant units from rent stabilization in certain circumstances. HSTPA, Part D, § 1. As such, the HSTPA was adopted to limit "profiteering" and curtail "the loss of vital and irreplaceable affordable housing for working persons and families." *Id.*

The BRI Plaintiffs present four legal claims through ten causes of actions. (*See* BRI Compl. at 91–92.) Through these causes of action, BRI Plaintiffs assert claims pursuant to 42 U.S.C. § 1983 and the U.S. Constitution. (*Id.*) First, BRI Plaintiffs allege that the HSTPA deprives property owners of substantive due process in violation of the Fourteenth Amendment. (*Id.* at 92–94.) Next, BRI Plaintiffs' second and third claims allege that the HSTPA effects a physical and a regulatory **taking** of **property** in violation of the Fifth Amendment, and the Fourteenth Amendment as applied to the states. (*Id.* at 95–96.) Finally, though not identified explicitly as a claim in the BRI Complaint, BRI Plaintiffs allege that the HSTPA violates the Contract Clause, Article I, § 10 of the U.S. Constitution, because the HSTPA locks in existing preferential rents for the duration of the current tenancy and impairs the existing lease contract agreements. (*Id.* at 96.) As such, the Court will treat the Contract Clause as its own claim. (*Id.*) BRI Plaintiffs request that this Court declare the HSTPA as facially unconstitutional and seek an injunction against its enforcement. (*Id.* at 97–98.)ꞌ

G-Max Plaintiffs allege that the HSTPA "violate[s] the

Takings, Due Process, and Equal Protection Clauses of the U.S. and New York State Constitutions, and the Contract Clause of the U.S. Constitution, both facially and as applied." (G-Max Pls.' Mem. of Law in Opp'n to Mot. ("G-Max Pls.' Mem.") 2 (Dkt. No. 61, Case No. 20-CV-634); G-Max Compl. ¶¶ 213–72.) The G-Max Plaintiffs also allege that the HSTPA violates the FHA due to its disparate impacts. (G-Max Compl. ¶¶ 273–80.)[10]

**\*4** BRI and G-Max Plaintiffs assert that these actions are distinguishable from a series of similar cases because the other plaintiffs seek to strike down RSL as a whole, while G-Max and BRI Plaintiffs challenge only the constitutionality of the HSTPA, and not RSL broadly as they existed prior to the HSTPA. (*See generally* BRI Compl.; G-Max Compl.)

B. Procedural Background

BRI Plaintiffs filed the Complaint on December 10, 2019, and G-Max Plaintiffs commenced the G-Max Action on January 23, 2020. (BRI Compl.; G-Max Compl.) On May 8, 2020, CVH filed the BRI Motion To Intervene and accompanying Memorandum of Law in Support of the Motion To Intervene. (Not. of Mot.; CVH Mem. of Law in Supp. of BRI Mot. To Intervene (Dkt. Nos. 39–41, Case. No. 19-CV-11285).) On the same day, CVH and T&N filed the G-Max Motion To Intervene and accompanying Memorandum of Law in Support of the Motion To Intervene. (Not. of Mot.; CVH G-Max Mem. in Supp. of G-Max Mot. To Intervene (Dkt. Nos. 58–60, Case No. 20-CV-364).) On May 22, 2020, BRI and G-Max Plaintiffs filed their Opposition papers to the Motions To Intervene in the BRI and G-Max Actions. (Dkt. Nos. 42–44, Case No. 19-CV-11285; Dkt. No. 61, Case No. 20-CV-364.) The Court held Oral Argument on the Motions To Intervene in both Actions and an additional Motion To Add a Party, filed by 300 Apartment Associates, Inc. in the BRI Action on July 8, 2020. (*See* Dkt. (minute entries for July 8, 2020, Case No. 19-CV-11285, Case No. 20-CV-364).) The Court reserved its ruling on all of the Motions. (*Id.*) On September 23, 2020, the Court issued two Opinions and Orders regarding the pending Motions To Intervene. The Court granted CVH's Motion to Intervene and denied 300 Apartment Associates' Motion To Intervene in the BRI Action. (Dkt. Nos. 86–87, Case No. 19-CV-11285.) However, the Court granted 300 Apartment Associates the ability to file memoranda as amicus curiae in the case going forward. (Dkt. No. 87, Case No. 19-CV-11285.) The Court also granted CVH and T&N's Motions to Intervene in the G-Max Action. (Dkt. No. 92, Case No.

20-CV-634.)

Pursuant to the briefing schedule set by the Court, on June 19, 2020, BRI and G-Max Defendants filed Motions To Dismiss, CVH filed its own Motion To Dismiss in the BRI Action, and CVH and T&N filed their own Motion To Dismiss in the G-Max Action on June 19, 2020. (Dkt. Nos. 60, 62, Case No. 19-CV-11285; Dkt. Nos. 67, 70, 72, Case No. 20-CV-634). On the same day, BRI and CVH filed Memoranda of Law in Support of the Motions to Dismiss. (BRI State Defs.' Mem. in Support of Mot. To Dismiss ("BRI State Defs.' Mem.") (Dkt. No. 61, Case No. 19-CV-11285); CVH Mem. in Support of Mot. To Dismiss ("BRI CVH Mem.") (Dkt. No. 63, Case No. 19-CV-11285).) On August 13, 2020, BRI Plaintiffs filed their Opposition. (Pls.' Mem. of Law in Opp'n to Mot. To Defendants' and CVH's Mots. To Dismiss ("BRI Pls.' Mem.") (Dkt. No. 81, Case No. 19-CV-11285).) On September 4, 2020, BRI Defendants and CVH filed Replies. (Reply Mem. of Law in Support of Defs.' Mot. To Dismiss ("BRI State Defs.' Reply"); Reply In Further Support of CVH's Mot. To Dismiss ("BRI CVH Reply") (Dkt Nos. 84–85, Case No. 19-CV-11285).)

Also on June 19, 2020, G-Max Defendants and CVH and T&N filed Memoranda of Law in Support of the Motions to Dismiss. (G-Max State Defs.' Mem. in Support of Mot. To Dismiss ("G-Max State Defs.' Mem."); G-Max City Defs.' Mem. in Support of Mot. To Dismiss ("G-Max City Defs." Mem.") (Dkt. Nos. 68, 71, Case No. 20-CV-634); CVH and T&N Mem. in Support of Mot. To Dismiss ("G-Max CVH Mem.") (Dkt. No. 73, Case No. 20-CV-634).) On July 30, 2020, G-Max Plaintiffs filed their Opposition. (G-Max Plaintiffs' Omnibus Mem. of Law in Opp'n to Defendants' and CVH and T&N's Mots. To Dismiss ("G-Max Pls.' Mem.") (Dkt. No. 86, Case No. 20-CV-634).) On September 11, 2020, G-Max Defendants and CVH and T&N filed Replies. (City Defs.' Reply Mem. of Law In Further Support of Mot. To Dismiss ("G-Max City Defs.' Reply"); State Defs.' Reply Mem. of Law In Further Support of Mot. To Dismiss ("G-Max State Defs.' Reply"); CVH's Reply In Further Support of CVH and T&N's Mots. To Dismiss ("G-Max CVH Reply") (Dkt Nos. 89–91, Case No. 20-CV-634).)

**\*5** Since filing their Motions and supporting papers for the pending Motions To Dismiss, the Parties have submitted numerous letters alerting the Court to new authority addressing the legal questions in this case. (*See* Dkt. Nos. 88–100, Case No. 19-CV-11285; Dkt. Nos. 93–101, 104–06, Case No. 20-CV-634.)

II. Discussion

A. Standard of Review

"The standards of review under Rules 12(b)(1) and 12(b)(6) ... are substantively identical." *Neroni v. Coccoma*, No. 13-CV-1340, 2014 WL 2532482, at *4 (**N.D.N.Y.** June 5, 2014) (quotation marks omitted) (citing *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003)), *aff'd*, 591 F. App'x 28 (2d Cir. 2015). "In deciding both types of motions, the Court must accept all factual allegations in the complaint as true, and draw inferences from those allegations in the light most favorable to the plaintiff." *Gonzalez v. Option One Mortg. Corp.*, No. 12-CV-1470, 2014 WL 2475893, at *2 (D. Conn. June 3, 2014) (quotation marks omitted)). However, "[o]n a Rule 12(b)(1) motion, ... the party who invokes the Court's jurisdiction bears the burden of proof to demonstrate that subject matter jurisdiction exists, whereas the movant bears the burden of proof on a motion to dismiss under Rule 12(b)(6)." *Id.* (citing *Lerner*, 318 F.3d at 128); *see also Sobel v. Prudenti*, 25 F. Supp. 3d 340, 352 (E.D.N.Y. 2014) ("In contrast to the standard for a motion to dismiss for failure to state a claim under Rule 12(b)(6), a plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." (quotation marks omitted)). This allocation of the burden of proof is the "only substantive difference" between the standards of review under these two rules. *Fagan v. U.S. Dist. Ct. for S. Dist. of N.Y.*, 644 F. Supp. 2d 441, 447, n.7 (**S.D.N.Y.** 2009).

1. Rule 12(b)(1)

"A federal court has subject matter jurisdiction over a cause of action only when it has authority to adjudicate the cause pressed in the complaint." *Bryant v. Steele*, 25 F. Supp. 3d 233, 241 (E.D.N.Y. 2014) (quotation marks omitted) (quoting *Arar v. Ashcroft*, 532 F.3d 157, 168 (2d Cir. 2008), *vacated and superseded on reh'g on other grounds*, 585 F.3d 559 (2d Cir. 2009) (en banc)). "Determining the existence of subject matter jurisdiction is a threshold inquiry[,] and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (quotation marks omitted), *aff'd*, 561 U.S. 247 (2010); *see also United States v. Bond*, 762 F.3d 255, 263 (2d Cir. 2014) (describing subject matter jurisdiction as a "threshold

question"). "In adjudicating a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), the court may consider matters outside the pleadings." *JTE Enters., Inc. v. Cuomo*, 2 F. Supp. 3d 333, 338 (E.D.N.Y. 2014).

2. Rule 12(b)(6)

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation, quotation marks, and alterations omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (quotation marks and alteration omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff need allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[ ] across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

**\*6** In considering a motion to dismiss, the Court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (same). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court ... draw[s] all

Case 1:24-cv-03973-AS PJDocument 830-1 Filed 01/13/26 Page 51 of 209
Case 1:24-cv-00211-AMN-PJE Document 101-2 Filed 12/26/23 Page 6 of 38

Building and Realty Institute of Westchester and Putnam..., Not Reported in Fed....

reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (**S.D.N.Y**. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).

### B. Sovereign Immunity
Before evaluating Plaintiffs' constitutional claims, the Court must first address Defendants' assertions whether sovereign immunity as it implicates whether subject-matter jurisdiction exists. *See Dube v. State Univ. of N.Y.*, 900 F.2d 587, 594 (2d Cir. 1990); *see also* Fed. R. Civ. P. 12(h)(3). BRI Defendants argue that the Eleventh Amendment mandates dismissal of this action against the State and DHCR. (BRI State Defs.' Mem. of Law at 37–38.) The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States." U.S. Const. amend. XI. Claims against the State or its agencies and instrumentalities are barred regardless of the relief sought. *See Alabama v. Pugh*, 438 U.S. 781, 782 (1978) (per curiam) (barring a suit seeking injunctive relief from a state); *Clissuras v. City Univ. of N.Y.*, 359 F.3d 79, 81 (2d Cir. 2004) (noting that immunity extends to arms of the state). "The Eleventh Amendment effectively places suits by private parties against states outside the ambit of Article III of the Constitution." *In re Charter Oak Assocs.*, 361 F.3d 760, 765 (2d Cir. 2004) (citing *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996)). The two well-established exceptions to this are a valid Congressional abrogation of sovereign immunity or waiver by the state. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984); *see also Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009).

New York has not waived its Eleventh Amendment immunity to suit in federal court, and Congress did not abrogate the states' immunity in enacting 42 U.S.C. § 1983. *See Rodriguez v. New York*, No. 17-CV-4126, 2017 WL 8777374, at *2 (**S.D.N.Y**. Nov. 28, 2017) (citing *Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 40 (2d Cir. 1977); *Lane v. N.Y. State Office of Mental Health*, No. 11-CV-1941, 2012 WL 94619, at *2 (**S.D.N.Y**. Jan. 11, 2012) (holding that Congress, through § 1983, did not "abrogate[ ] the state's immunity"); *Bryant v. N.Y. State Dep't of Corr. Servs. Albany*, 146 F. Supp. 2d 422, 425 (**S.D.N.Y**. 2001) (noting it is "beyond dispute" that New York and its agencies have not consented to being sued in federal court).[11] As such, a claim that is barred by a state's sovereign immunity must be dismissed pursuant to the Eleventh Amendment for lack of subject matter jurisdiction. *See Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 253 (2011) (noting that "the Eleventh Amendment ... confirm[s] the structural understanding that States entered the Union with their sovereign immunity intact, unlimited by Article III's jurisdictional grant"); *Seminole Tribe*, 517 U.S. at 54 ("For over a century [the Supreme Court has] reaffirmed that federal jurisdiction over suits against unconsenting States 'was not contemplated by the Constitution when establishing the judicial power of the United States.' " (quoting *Hans v. Louisiana*, 134 U.S. 1, 15 (1890))).

**\*7** Eleventh Amendment immunity extends not only to a State when sued as a defendant in its own name, but also to "state agents and state instrumentalities" when "the state is the real, substantial party in interest." *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997); *see also Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006) ("The immunity recognized by the Eleventh Amendment extends beyond the states themselves to state agents and state instrumentalities that are, effectively, arms of a state." (quotation marks omitted)); *Roberts v. New York*, 911 F. Supp. 2d 149, 159–60 (**N.D.N.Y**. 2012) ("Regardless of the type of relief sought, the Eleventh Amendment bars this Court from assuming jurisdiction over plaintiffs' claims asserted against the State of New York and its agencies."). In both the BRI and G-Max Actions, there are a number of state agencies. In particular, DHCR, Visnauskas, James, and Pascal are instrumentalities or agents of New York. *See Cmty. Hous. Improvement Program v. City of New York* ("*CHIP*"), 492 F. Supp. 3d 33, 39 n.3 (E.D.N.Y. 2020) ("The DHCR is the New York State agency charged with overseeing and administering the RSL."). Courts have repeatedly applied sovereign immunity to dismiss actions against the State and DHCR. *See, e.g., Schiavone v. N.Y.S. Office of Rent Admin.*, No. 18-CV-130, 2018 WL 5777029, at *3–4 (**S.D.N.Y**. Nov. 2, 2018); *Morring v. Cuomo*, No. 13-CV-2279, 2013 WL 4004933, at *1 (**S.D.N.Y**. Aug. 5, 2013); *Manko v. Ruchelsman*, No. 12-CV-4100, 2012 WL 4034038, at *3 (E.D.N.Y. Sept. 10, 2012); *Helgason v. Certain **State of N.Y.** Emps. (Unknown and Known)*, No. 10-CV-5116, 2011 WL 4089913, at *7–8 (**S.D.N.Y**. June 24, 2011), *report and recommendation adopted sub nom. Helgason v. Doe*, 2011 WL 4089943 (**S.D.N.Y**. Sept. 13, 2011); *Morris v. Katz*, No. 11-CV-3556, 2011 WL 3918965, at *5 (E.D.N.Y. Sept. 4, 2011); *Sierotowicz v. **State of N.Y.** Div. of Hous. & Cmty. Renewal*, No. 04-CV-3886, 2005 WL 1397950, at *1–2 (E.D.N.Y. June 14, 2005).

Actions for damages against state officials in their official capacities are essentially actions against the state and will be barred by the Eleventh Amendment unless (1)

Case 1:24-cv-03973-AS    Document 830    Filed 01/13/26    Page 52 of 209
Case 1:24-cv-00211-AMN-PJE    Document 101-2    Filed 12/26/25    Page 7 of 38

Building and Realty Institute of Westchester and Putnam..., Not Reported in Fed....

Congress has abrogated immunity; (2) the state has consented to suit; or (3) the *Ex parte Young* doctrine applies. *See Ex parte Young,* 209 U.S. 123 (1908); *see also Will v. Mich. Dep't. of State Police,* 491 U.S. 58, 71 (1989); *In re Deposit Ins. Agency,* 482 F.3d 612, 617 (2d Cir. 2007). The Eleventh Amendment bars actions against state officials sued in their official capacities where, as here, the state is a real party in interest. *See Edelman v. Jordan,* 415 U.S. 651, 663, 669 (1974) (holding that suits against state employees in their official capacities are barred by the Eleventh Amendment); *Ward v. Thomas,* 207 F.3d 114, 119 (2d Cir. 2000) (rejecting federal suit against state officials under the Eleventh Amendment); *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir. 1988) ("The [E]leventh [A]mendment also bars suits against state officials and state agencies if the state is the real party in interest ...."); *Muhammad v. Rabinowitz,* 11-CV-2428, 2012 WL 1155098, at *6 (**S.D.N.Y.** Apr. 6, 2012) (dismissing claims for damages against state employees in their official capacity as being barred by the Eleventh Amendment); *Crockett v. Pataki,* 97-CV-3539, 1998 WL 614134, at *5 (**S.D.N.Y.** Sept. 14, 1998) (dismissing claims against governor and housing commissioner sued in their official capacities); *Sassower v. Mangano,* 927 F. Supp. 113, 121 (**S.D.N.Y.** 1996) (dismissing claims for damages against state officials sued in their official capacities). Where claims are brought against an official in their official capacity, the state is considered the real party in interest, and therefore the same sovereign immunity principles apply as if the claim was brought directly against the state. *See Spiteri v. Russo,* No. 12-CV-2780, 2013 WL 4806960, at *16 (E.D.N.Y. Sept. 7, 2013), *aff'd sub nom. Spiteri v. Camacho,* 622 F. App'x 9 (2d Cir. 2015); *see also KM Enterprises, Inc. v. McDonald,* 518 F. App'x 12, 13–14 (2d Cir. 2013) (finding that a suit against a state agent in her official capacity effectively rendered the suit against the State of New York and was thus covered under sovereign immunity); *Gollomp,* 568 F.3d at 369 ("Eleventh Amendment sovereign immunity 'is not a mercurial area of law, but has been definitively settled by the Supreme Court since 1890 with respect to actions against the state itself, and 1945 with respect to actions against state agencies or state officials named in their official capacity.' " (quotation marks omitted)); *Huminski v. Corsones,* 386 F.3d 116, 133 (2d Cir. 2004) ("[S]tate officials cannot be sued in their official capacities for retrospective relief under [§] 1983."); *Anghel v. N.Y. Dep't of Health,* No. 12-CV-3484, 2013 WL 2338153, at *9 (E.D.N.Y. May 29, 2013) ("A suit for damages against a state official in his or her official capacity 'is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state.' " (quoting *Ying Jing Gan v. City of New York,*

996 F.2d 522, 529 (2d Cir. 1993))), *aff'd,* 589 F. App'x 28 (2d Cir. 2015); *Pietri v. N.Y. Off. of Ct. Admin.,* 936 F. Supp. 2d 120, 128 (E.D.N.Y. 2013) ("The Eleventh Amendment also bars suits against state officials in their official capacities for money damages.").

**\*8** In both Actions, the issues presented before this Court involve the third exception. Under the *Ex parte Young* doctrine, a suit may proceed against state officials, notwithstanding the Eleventh Amendment, when a plaintiff, "(a) alleges an ongoing violation of federal law and (b) seeks relief properly characterized as prospective." *See In re Deposit Ins. Agency,* 482 F.3d at 618 (quotation marks and citations omitted); *see also Santiago v. N.Y. State Dep't of Corr. Serv.,* 945 F.2d 25, 32 (2d Cir. 1991) (holding that prospective relief claims cannot be brought directly against the state, or a state agency, but only against state officials in their official capacities). While Eleventh Amendment immunity precludes claims against State Defendants, the claims by BRI and G-Max Plaintiffs against Visnauskas, and by the G-Max Plaintiffs against Pascal and James – state officials – are permissible under the doctrine of *Ex parte Young*. Under this doctrine, the Eleventh Amendment does not bar suits for declaratory and injunctive relief against state officials acting in their official capacities in alleged violation of federal rights. *See Quern v. Jordan,* 440 U.S. 332, 337 (1979); *Edelman,* 415 U.S. at 677. Consequently, the claims against Visnauskas, James, and Pascal in their official capacities are analyzed below on their merits. *See Nassau & Suffolk Cnty. Taxi Owners Ass'n, Inc. v. State,* 336 F. Supp. 3d 50, 67 (E.D.N.Y. 2018) ("[T]he doctrine of *Ex parte Young* permits a suit to proceed in federal court [ ]against a state official in his or her official capacity, notwithstanding the Eleventh Amendment." (quoting *Kisembo v. NYS Off. of Child. & Fam. Servs.,* 285 F. Supp. 3d 509, 520 (**N.D.N.Y.** 2018))).

However, the Eleventh Amendment bars BRI Plaintiffs' substantive Due Process and Contract Clause claims against the State and DHCR. The Eleventh Amendment also bars G-Max Plaintiffs' Due Process, Equal Protection, and Contract Clause claims against New York State. In fact, G-Max Plaintiffs do not even discuss the Eleventh Amendment as applied to their substantive due process and equal protection claims. Instead, G-Max Plaintiffs spend only a page of their lengthy brief addressing sovereign immunity but only as it relates to their takings claims. (*See* G-Max Pls.' Mem. at 74.) BRI Plaintiffs similarly barely address the issue of sovereign immunity, citing cases from BRI Defendants' briefs but offering no analysis. (*See* BRI Pls.' Mem. at 66–67.) Simply put, federal courts lack jurisdiction over § 1983 claims that are barred by Eleventh Amendment immunity.

Case 1:24-cv-03973-AS   Document 830   Filed 01/13/26   Page 53 of 209
Case 1:24-cv-03973-AMN-PJE   Document 101   Filed 01/13/26   Page 53 of 209

Building and Realty Institute of Westchester and Putnam..., Not Reported in Fed....

*See Dube*, 900 F.2d at 594 (concluding that "federal causes of action ... brought under [§] 1983, in the absence of consent, ... against the State or one of its agencies or departments are proscribed by the Eleventh Amendment" (quotation marks and alterations omitted)); *Morales v. New York*, 22 F. Supp. 3d 256, 268 (**S.D.N.Y.** 2014) (holding that sovereign immunity mandates dismissal under Rule 12(b)(1)); *see also Morabito v. New York*, 803 F. App'x 463, 465 (2d Cir. 2020) (summary order) (affirming the district court's holding that the Eleventh Amendment barred a § 1983 suit against New York, a state agency, and a state official in his official capacity), *as amended* (Feb. 27, 2020), *cert. denied*, 141 S. Ct. 244 (2020), *reh'g denied*, 141 S. Ct. 886 (2020). Indeed, courts routinely dismiss, on sovereign immunity grounds, due process, equal protection, and Contract Clause claims against the state, state agencies, and agents sued in their official capacities. *See, e.g., Adeleke v. United States*, 355 F.3d 144, 151–53 (2d Cir. 2004) (affirming dismissal of due process damages claim on the basis of sovereign immunity); *JTE Enters.*, 2 F. Supp. 3d at 340–41 (dismissing due process claim as barred by sovereign immunity); *Taedger v. New York*, No. 12-CV-549, 2013 WL 5652488, at *7 (**N.D.N.Y.** Oct. 15, 2013) (dismissing equal protection claim on sovereign immunity grounds against New York state, state agency, and agency official); *accord Boda v. United States*, 698 F.2d 1174, 1176 (11th Cir. 1983) (ruling that a claim alleging a violation of constitutional due process rights was barred by the doctrine of sovereign immunity); *Smith v. Fla. Dep't of Corr.*, No. 08-CV-1213, 2009 WL 10670364, at *1 (M.D. Fla. Oct. 16, 2009) (dismissing substantive due process claims as barred by sovereign immunity); *see also Zynger v. Dep't of Homeland Sec.*, 370 F. App'x 253, 255 (2d Cir. 2010) (summary order) (finding that the plaintiff waived a possible challenge to the district court's dismissal of due process claims against the federal government, its agencies, and an agent in his official capacity); *335-7 LLC v. City of New York*, — F. Supp. 3d —, 2021 WL 860153, at *4 n.2 (**S.D.N.Y.** Mar. 8, 2021) (noting that plaintiffs agreed to dismissal of due process claim and conceded that their damages claim against the state defendant was barred by sovereign immunity); *CHIP*, 492 F. Supp. 3d at 40 (explaining that the parties agreed that sovereign immunity barred plaintiffs due process and Contract Clause claims).

**\*9** Next, the Court must determine whether sovereign immunity bars claims under the Takings Clause. G-Max Plaintiffs argue that "the Supreme Court has rejected the notion that sovereign immunity limits the compensation remedy." (G-Max Pls.' Mem. at 74.) But neither the Supreme Court nor the Second Circuit has conclusively addressed the issue. *See CHIP*, 492 F. Supp. 3d at 40

("Despite the fact that the Eleventh Amendment and Takings Clause date back so long, neither the Supreme Court nor the Second Circuit has decisively resolved the conflict.") In *CHIP*, the court noted that "[t]he overwhelming weight of authority among the circuits" is that "sovereign immunity trumps the Takings Clause – at least where ... the state provides a remedy of its own for an alleged violation." 492 F. Supp. 3d at 40.[12] The court pointed to a recent decision in which the Second Circuit affirmed the district court's ruling that "the Eleventh Amendment ...bar[s] a takings claim." *Id.* However, as noted in *CHIP*, this decision was a non-precedential summary order "that did not analyze the question in detail." *Id.* (citing *Morabito*, 803 F. App'x at 464–65 (affirming dismissal of Takings Clause claim against New York, a state agency, and state official in his official capacity because the Eleventh Amendment "generally bars suits in federal courts by private individuals against non-consenting states"), *aff'g* No. 17-CV-6853, 2018 WL 3023380 (W.D.N.Y. June 18, 2018)). Other district courts within the Second Circuit have held that the Eleventh Amendment applies to Takings Clause claims. *See, e.g., MPHJ Tech. Invs., LLC v. Sorrell*, 108 F. Supp. 3d 231, 242 n.8 (D. Vt. 2015) (ruling that "to the extent [Plaintiff] is seeking damages under the Takings Clause, its claim against the Attorney General in his official capacity is barred by the Eleventh Amendment"); *Gebman v. New York*, No. 07-CV-1226, 2008 WL 2433693, at *4 (**N.D.N.Y.** June 12, 2008) (holding that Eleventh Amendment barred the plaintiff's § 1983 due process and regulatory takings claims against the State). This Court agrees with this line of authority and therefore rejects BRI and G-Max Plaintiffs' position that their Takings Clause claims survive Eleventh Amendment state sovereign immunity. Therefore, for the reasons further articulated in *CHIP*, claims under the Takings Clause are dismissed on sovereign immunity grounds against the State, the DHCR by BRI Plaintiffs, Visnauskas as to both BRI and G-Max Plaintiffs, and James and Pascal as to G-Max Plaintiffs (to the extent BRI and G-Max Plaintiffs seek monetary relief from these Defendants in their official capacities). *See CHIP*, 492 F. Supp. 3d at 40–43.

### C. Standing

#### 1. Legal Requirements

The Court next addresses the issue of standing. Article III of the Constitution restricts federal judicial power to the resolution of cases and controversies. U.S. Const. art. III,

§ 2. "That case-or-controversy requirement is satisfied only where a plaintiff has standing." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273 (2008). The Supreme Court has explained that constitutional standing requires a plaintiff to establish at minimum three elements—that the plaintiff suffered an "injury in fact," which means an "invasion of a legally protected interest," the existence of "a causal connection between the injury and the conduct complained of," and "a likelihood that the 'injury will be redressed by a favorable decision.' " *Fulton v. Goord*, 591 F.3d 37, 41 (2d Cir. 2009) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). A "legally protected interest" is one that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (quotation marks omitted). As a threshold matter, standing is a jurisdictional predicate that cannot be waived. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006); *accord Leopard Marine & Trading, Ltd. v. Easy Street Ltd.*, 896 F.3d 174, 188 (2d Cir. 2018).

**\*10** Under current standing jurisprudence, an organization may assert two distinct types of standing: (1) organizational standing, and (2) associational standing. Under the organizational standing theory, "an association may have standing in its own right to seek judicial relief to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). In contrast, under the associational standing theory, "an association has standing to bring suit on behalf of its members." *Hunt v. Wash. St. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). "[The Supreme] Court has recognized that an association may have standing to assert the claims of its members even where it has suffered no injury from the challenged activity." *Id.* at 342. The Supreme Court, however, has held that "an organization seeking to recover damages on behalf of its members lacked standing because 'whatever injury may have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof.' " *Bano v. Union Carbide Corp.*, 361 F.3d 696, 714 (2d Cir. 2004) (quoting *Warth*, 422 U.S. at 515–16). To establish organizational standing, an organizational plaintiff "must meet the same standing test that applies to individuals." *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 649 (2d Cir. 1998) (citation, quotation marks, and alterations omitted). The Supreme Court has held that an organization establishes an injury-in-fact if it can show that it was "perceptibly impaired" by defendants' actions. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). Consequently, the Second Circuit has repeatedly held that "only a 'perceptible impairment' of an organization's activities is necessary for there to be an 'injury in fact.' " *Nnebe v.*

*Daus*, 644 F.3d 147, 157 (2d Cir. 2011) (quoting *Ragin v. Harry Macklowe Real Est. Co.*, 6 F.3d 898, 905 (2d Cir. 1993)); *N.Y. C.L. Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2011); *N.Y. State Citizens' Coal. for Children v. Velez*, 629 F. App'x. 92, 94 (2d Cir. 2015). However, the Second Circuit has restricted organizational standing under § 1983 by interpreting the rights it secures "to be personal to those purportedly injured." *Nnebe*, 644 F.3d at 156 (quoting *League of Women Voters of Nassau Cnty. v. Nassau Cnty. Bd. of Supervisors*, 737 F.2d 155, 160 (2d Cir. 1984)). Accordingly, BRI Plaintiffs bear the burden of showing that (1) a distinct and palpable injury-in-fact exists to themselves as organizations; (2) the injury-in-fact is fairly traceable to the challenged action; and (3) a favorable decision would redress its injuries. *Id.*

### 2. BRI Plaintiffs

BRI Defendants challenge the standing of several plaintiffs – Property Management Associates ("Property Management"), Nilsen Management Co., Inc. ("Nilsen Management"), Apartment Owners Advisory Council ("AOAC"), Cooperative and Condominium Council ("CCAC"), and Lisa DeRosa ("DeRosa"). (BRI State Defs.' Mem. at 37–40.) The Court will first discuss Property Management and Nilsen Management, both of which serve as "managing agents" for apartment buildings or multi-family homes in Westchester County that contain rent-regulated units. (BRI Compl. ¶¶ 8(g), 8(h), 24, 31.) The Court agrees with BRI Defendants that the BRI Complaint fails to allege that as managing agents Property Management and Nilsen Management sufficiently allege injuries as required for standing. (BRI State Defs.' Mem. at 38–39; BRI Compl. ¶¶ 8(g),(h).) Property Management alleges it is unable to recoup building and apartment renovations because of changes to IAIs and MCIs. (*Id.* ¶ 31.) Nilsen Management complains of rent disparities between actual rent and market rent for the eight building that the company manages. (*Id.* ¶ 24.) But Property Management and Nilsen Management have neither alleged facts that trace these purported injuries to the BRI Defendants nor established how their role as managing agents could confer standing upon them. And neither Property Management nor Nilsen Management represents that either owns any rent-regulated properties that would result in any possible cognizable injuries. Instead, the BRI Complaint refers to "another Owner-Landlord, with buildings operated by Property Management" and Nilsen Management "manag[ing] 8 buildings in Yonkers." (*Id.* ¶¶ 24, 31.) As the Supreme Court has explained, an organization, like Property

Management and Nilsen Management, may establish an injury-in-fact if it demonstrates that it was "perceptibly impaired" by BRI Defendants actions. *Havens Realty Corp.*, 455 U.S. at 379; *cf. W.R. Huff Asset Management Co. v. Deloitte*, 549 F.3d 100, 109 (2d Cir. 2008) ("There are, indeed, a few well-recognized, prudential exceptions to the 'injury-in-fact' requirement. These exceptions permit third-party standing where the plaintiff can demonstrate (1) a close relationship to the injured party and (2) a barrier to the injured party's ability to assert its own interests."). Property Management and Nilsen Management have not offered any such plausible demonstrations of perceptible impairment based on their roles as managing agents for rent regulated properties. Their vague assertions regarding alleged injuries without more are insufficient facts upon which the Court could find that standing. Thus, the claims by Property Management and Nilsen Management are dismissed for lack of standing.

**\*11** Next, the Court turns to whether AOAC and CCAC have standing. "[A]n organization[ ] is fully able to bring suit on its own behalf 'for injuries it has sustained,' " *Int'l Action Ctr. v. City of New York*, 522 F. Supp. 2d 679, 693 (**S.D.N.Y.** 2007) (quoting *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 174 (2d Cir. 2005)), "so long as those injuries—or threats of injury—are 'both "real and immediate," [and] not "conjectural or hypothetical,' " *id.* (alteration in original) (quoting *Bordell v. Gen. Electric Co.*, 922 F.2d 1057, 1060 (2d Cir. 1991)). The Supreme Court has held that a "concrete and demonstrable injury to [an] organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests" and may be sufficient to confer standing. *Havens Realty Corp.*, 455 U.S. at 379. Importantly, the Supreme Court has held that an organization establishes an injury-in-fact if it establishes that it "spent money to combat" activity that harms its organization's core activities. *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1303 (2017). In line with this Supreme Court precedent, the Second Circuit has repeatedly held that "where an organization diverts its resources away from its current activities, it has suffered an injury ... independently sufficient to confer organizational standing." *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 111 (2d Cir. 2017); *see also Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 158 (2d Cir. 2014) (finding standing for a not-for-profit corporation that expended resources investigating and advocating for plaintiffs because such activities diverted resources from its other advocacy and counseling activities); *Nnebe*, 644 F.3d at 157 (finding standing for

an organization that used resources to assist its members who faced adverse action by providing counseling, explaining the rules, and assisting members in obtaining attorneys); *Ragin*, 6 F.3d at 905 (finding standing where an organization devoted significant resources to identify and counteract the defendants' actions).

AOAC is described as an entity that "provides its members with a variety of services, including advice relating to regulatory compliance and assistance to members who are facing legal challenges." (*Id.* ¶ 6.) AOAC "advocates on behalf of its members at the local, City, County[,] and State levels and provides regular updates on issues of importance to property owners." (*Id.*) Similarly, CCAC "is a component entity of the BRI" that represents more than 150 cooperatives and condominiums in Westchester County. The BRI Complaint describes the CCAC as serving the same role as AOAC of advising its members on various matters and advocating on their behalf before the different levels of government. (*Id.* ¶ 7.) Plaintiffs AOAC and CCAC allege that they have standing because they "have been forced to devote substantial time and resources to counsel their members about how to administer their properties under the [HSTPA], [and] how to abide by the maze of new requirements governing the owners['] properties ...." (*Id.* ¶ 17.) Further, Plaintiffs AOAC and CCAC allege that they have participated in the RGB process, advised and advocated for their members related to the HSTPA, expended time, money, and resources in helping members to address the implementation of the HSTPA, and noted that their members are regulated by and have suffered injuries because of the HSTPA. (*Id.* ¶¶ 6–7, 17–21.) The injuries alleged by AOAC and CCAC are not "conjectural or hypothetical," and instead the Court finds that these injuries of expending time, money, and resources to help their clients address the passage of the HSTPA are both "real and immediate." *Bordell*, 922 F.2d at 1060. As such, AOAC and CCAC have alleged sufficient facts of an injury-in-fact with "a causal connection between the injury and the conduct complained of" – the enactment of the HSTPA. *Fulton*, 591 F.3d at 41. Finally, AOAC and CCAC satisfy the last requirement of standing – redressability. AOAC and CCAC's injuries would be redressed if the Court were to invalidate the HSTPA. Consequently, the Court finds that AOAC and CCAC satisfy the requirements of standing.

Lastly, the Court evaluates whether DeRosa has standing to sue. The general rule in New York is that individual partners cannot sue on a partnership claim in their individual capacity. *See Leonard P'ship v. Town of Chenango*, 779 F. Supp. 223, 233 (**N.D.N.Y.** 1991) (noting "under New York law, an individual partner may

Case 1:24-cv-03973-AS    Document 830    Filed 01/13/26    Page 56 of 209
Case 1:24-cv-00211-AMN-PJE    Document 101-2    Filed 12/26/25    Page 11 of 38

Building and Realty Institute of Westchester and Putnam..., Not Reported in Fed....

not assert the claim of the partnership"); *Shea v. Hambro America Inc.*, 606 N.Y.S.2d 198, 199 (App. Div. 1994) ("[I]t is settled that a partnership cause of action belongs only to the partnership itself or to the partners jointly, and ... an individual member of the partnership may only sue and recover on a partnership obligation on the partnership's behalf."); *Stevens v. St. Joseph's Hosp.*, 381 N.Y.S.2d 927, 928 (App. Div. 1976) (same).[13] The BRI Complaint alleges that DeRosa is a "principal" of Stepping Stones, L.P., a limited partnership that owns an apartment building in White Plains. (BRI Compl. ¶ 8(a).) As to her injuries, the BRI Complaint only asserts, without explanation or specific factual allegations, that DeRosa "has standing to sue in her own right as principal of Stepping Stones." (*Id.* ¶ 22.; BRI Pls.' Mem. at 67–68.) DeRosa has neither filed a derivative suit nor alleged that she has suffered a distinct injury that can be remedied by this Court. (BRI Compl. ¶¶ 8(a), 22.) To assert a claim derivatively on behalf of Stepping Stones, DeRosa would need to name Stepping Stones as a defendant in this matter, which she has not done. *See Lenz v. Associated Inns & Rests. Co. of Am.*, 833 F. Supp. 362, 378 (**S.D.N.Y.** 1993) ("[I]n a derivative action brought by a limited partner, the limited partnership is an indispensable party."). Further, DeRosa would be required to plead that she unsuccessfully demanded that Stepping Stones file suit in its own name, or that such a demand would be futile. *See Plymouth Cnty. Ret. Ass'n v. Schroeder*, 576 F. Supp. 2d 360, 368–69 (E.D.N.Y. 2008) ("[T]he plaintiff must state with particularity 'any effort ... to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and the reasons for not obtaining the action or not making the effort.' " (citing Fed. R. Civ. P. 23.1(b)(3))). Nor is standing saved by the vague claim that the "value of Stepping Stones Associates' property has been substantially diminished by the HSTPA," as this does not sufficiently allege any injury to DeRosa separate from the partnership to which she belongs. (BRI Compl. ¶ 22.) *See Russell Pub. Grp., Ltd. v. Brown Printing Co.*, No. 13-CV-5193, 2014 WL 1329144, at *4 (**S.D.N.Y.** Apr. 3, 2014) (holding that plaintiff cannot bring claims in her individual capacity because all alleged injuries are to the corporation or were indirectly caused by harm to the corporation and plaintiff suffered no "distinct" injury). "[I]t is the burden of the party who [is seeking standing to sue to] ... clearly ... allege facts demonstrating that [s]he is a proper party to invoke judicial resolution of the dispute." *Thompson v. County of Franklin*, 15 F.3d 245, 249 (2d Cir. 1994) (citation and quotation marks omitted). Because DeRosa has failed to "clearly allege facts" demonstrating that she, not Stepping Stones, is the proper party to sue and further does not allege that she personally sustained any injuries by BRI Defendants, her claims in

the BRI Action are dismissed due to lack of standing.

### 3. G-Max

**\*12** In the G-Max action, the City challenges G-Max Plaintiffs' standing to bring any claims against it. The City argues that G-Max Plaintiffs lack standing to sue because the City does not enforce the HSTPA and therefore has not caused G-Max Plaintiffs' any alleged injuries – a necessary predicate of standing. (G-Max City Defs.' Mem. at 9–12.) As the City explains, it has two roles in the enforcement of RSL. First, the ETPA "authorizes local legislative bodies to declare the existence of a housing emergency whenever the vacancy rate falls below five percent, after which housing becomes subject to the ETPA." (*Id.* at 10 (citing ETPA § 3).) Under the Local Emergency Housing Rent Control Act ("LEHRCA"), the City must make a new determination of emergency at least every three years following a survey of the supply of housing accommodations. N.Y. Unconsol. Law § 8603 (McKinney 2020). Second, the City's RGB annually establishes guidelines for rent adjustments. N.Y.C. Admin. Code § 26-510(a). Aside from these two actions, the enforcement of RSL is left to the State. *Rent Stabilization Ass'n v. Higgins*, 630 N.E.2d 626, 628 (N.Y. 1993) ("The legislature in 1983 designated DHCR 'the sole administrative agency to administer the regulation of residential rents' under the rent control and rent stabilization statutes ...." (quoting Omnibus Housing Act, L. 1983, ch. 403, § 3)). To achieve standing, G-Max Plaintiffs would need to challenge the City Council's declaration of a housing emergency or the RGB's rent adjustment. Instead, G-Max Plaintiffs allege that the HSTPA, a *state* statute, is unconstitutional and also violates the FHA. (G-Max Compl. ¶¶ 273–80.) But the City does not enforce the HSTPA and thus could not possibly cause any injuries alleged by G-Max Plaintiffs. G-Max Plaintiffs need to establish a "causal connection between the injury and the conduct complained of [and] the injury has to be fairly traceable to the challenged action of the defendant," which G-Max Plaintiffs have not established here. *Lujan*, 504 U.S. at 560 (quotation marks and alterations omitted). For example, G-Max Plaintiffs challenge the HSTPA recoupment rate and period for MCIs and IAIs. (G-Max Compl. ¶¶ 11–12.) But this injury is potentially attributable to the State, not the City. To obtain a rent adjustment based on MCI or IAI, a landlord must apply to the DHCR, a *state* agency, which determines whether to grant the adjustment. *See* N.Y.C. Admin. Code § 26-511.1 (the DHCR shall promulgate rules and regulations to establish a schedule of reasonable costs of MCIs and a notice and documentation procedure

Case 1:24-cv-03973-AS    Document 830    Filed 01/13/26    Page 57 of 209
Case 1:24-cv-00211-AMN-PJE    Document 101-2    Filed 12/26/25    Page 12 of 38

Building and Realty Institute of Westchester and Putnam..., Not Reported in Fed....

for IAIs). As noted above, the City plays no role in determining the recoupment rate of MCIs or IAIs.

G-Max Plaintiffs also challenge the repeal of the high-income regulatory provisions of the HSTPA. (G-Max Compl. ¶¶ 72–73, 198, 243.) But this repeal in the HSTPA is a result of a change in *state* law. *See* HSTPA, Part D, § 5. G-Max Plaintiffs describe the HSTPA as "irrational and arbitrary," *id.* ¶ 252, and that the law unfairly "singles out" G-Max Plaintiffs, *id.* ¶¶ 257, 262. G-Max Plaintiffs further argue that the City concedes it has "roles in enforcing" the underlying rent stabilization laws that the HSTPA amends. (G-Max Pls.' Mem. at 75.) Specifically, G-Max Plaintiffs note the fact that the City's role is to periodically renew the emergency declaration and to set rent-increase levels through the RGB. (*Id.*; *see also* G-Max Compl. ¶¶ 74(c), 229.) But fatal to G-Max Plaintiffs' claims is that the City has not caused any of their alleged injuries. G-Max Plaintiffs do not challenge the RGB's rent adjustments, nor the City Council's declaration of a housing emergency. Instead, G-Max Plaintiffs challenge the HSTPA itself. (G-Max Compl. ¶¶ 213–80.) Because G-Max Plaintiffs allegations against the City are in essence challenges to a state law and the resulting state actions, thus they have failed to allege any injuries that are fairly traceable to the City's conduct. *Lujan*, 504 U.S. at 560–61 ("[T]here must be a causal connection between the injury and the conduct complaint of—the injury has to be fairly traceable to the challenged action of the defendant ...." (quotation marks and alterations omitted)). Accordingly, all claims against the City are dismissed in their entirety for lack of standing.

G-Max Plaintiffs bring an FHA claim against all G-Max Defendants except the State. (G-Max Compl. ¶¶ 5, 21, 273–80.) This claim is wanting as G-Max Plaintiffs do not have standing to sue for violations of the FHA. The purpose of the FHA is to "eliminate all traces of discrimination within the housing field." *Cabrera v. Jakobovitz*, 24 F.3d 372, 390 (2d Cir. 1994) (quotation marks omitted). To effect this purpose, the FHA makes it unlawful to "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b). The FHA extends "only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." *Bank of Am.*, 137 S. Ct. at 1302 (quotation marks omitted). Thus, under the FHA, only an "aggrieved person" may bring a claim under the FHA. An "aggrieved person" is someone who "claims to have been injured by a discriminatory housing practice" or who believes that

they "will be injured by a discriminatory housing practice that is about to occur." 42 U.S.C. § 3602(i). To carry its burden of establishing standing, an FHA plaintiff "must allege specific, concrete facts demonstrating that the challenged practices harm [the plaintiff], and that [the plaintiff] personally would benefit in a tangible way from the court's intervention." *Palmieri v. Town of Babylon*, No. 01-CV-1399, 2006 WL 1155162, at *12 (E.D.N.Y. Jan. 6, 2006) (citing *Warth*, 422 U.S. at 508), *aff'd*, 277 F. App'x 72 (2d Cir. 2008).

**\*13** G-Max Plaintiffs have not alleged sufficient facts to plausibly establish that they are "aggrieved person[s]" under the FHA. G-Max Plaintiffs are comprised of limited liability companies, a corporation, and two individuals who want to take over a rental unit from the only rent stabilized tenant in their building. (G-Max Compl. ¶¶ 22–33.) G-Max Plaintiffs allege that the HSTPA disproportionately benefits white renters. (*Id.* ¶¶ 208–12.) First, this conclusory allegation is far from the type of "specific, concrete" allegation that plausibly states a cognizable harm or that G-Max Plaintiffs would benefit in a tangible way from a favorable result in this case. *See Palmeri*, 2006 WL 1155162, at *2. For example, there are no specific allegations that these entities have been "deprived benefits from interracial associations when discriminatory rental practices kept minorities out of their apartment complex" protected by the FHA. *Bank of Am.*, 137 S. Ct. at 1303. Second, individual Plaintiffs Ordway and Guerrieri do not have standing because they no longer wish to rent one of their rent stabilized unit to *anyone* – regardless of their race, color, religion, sex, familial status, or national origin, which as such does not implicate the FHA protections. (G-Max Compl. ¶¶ 168–76.)

But even more problematic to G-Max Plaintiffs' FHA claim is that they fail to allege the necessary causal link between the HSTPA and the alleged pattern of racially segregated housing in New York. Under the FHA, there is a "robust causality requirement," which "protects defendants from being held liable for racial disparities they did not create." *Winfield v. City of New York*, No. 15-CV-5236, 2018 WL 1631336, at *2 (**S.D.N.Y.** Mar. 29, 2018) (quoting *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 542 (2015)). G-Max Plaintiffs have offered no such causal link between the HSTPA and the purported racial segregation caused by G-Max Defendants. (G-Max Compl. ¶¶ 5, 208–12, 273–80.) Further, G-Max Plaintiffs complain of economic harm and argue that this is sufficient to confer standing. But G-Max Plaintiffs do not actually allege that the economic harm *to them* is a result of the purported violations of the FHA. (*Id.* ¶¶ 130–31, 135, 140, 143–44,

154; G-Max Pls.' Mem. 71.) Instead, the G-Max Complaint alleges that the HSTPA has a disparate, adverse impact on racial and ethnic minority renters, thereby perpetuating residential segregation in New York which violates the FHA. (*Id.* ¶¶ 5, 208–10, 273–80.) G-Max Plaintiffs can only establish standing from economic harm that is the result of any FHA violation for which G-Max Plaintiffs would otherwise have standing. Because G-Max Plaintiffs have not met the "injury in fact" prong which is one of the "irreducible constitutional minimum[s] of standing," the FHA claim against all G-Max Defendants is dismissed. *Lujan*, 504 U.S. at 560.

### D. Physical Takings Under the Fourteenth and Fifth Amendments

#### 1. Applicable Law

BRI and G-Max Plaintiffs bring facial and as-applied Takings Clause claims. The Takings Clause of the Fifth Amendment provides that no "private **property** [shall] be **taken** for public use, without just compensation." U.S. Const. amend. V. The Takings Clause applies to the states through the Fourteenth Amendment. *See Kelo v. City of New London*, 545 U.S. 469, 472 n.1 (2005). To state a takings claim under § 1983, BRI and G-Max Plaintiffs must show "(1) a property interest (2) that has been taken under color of state law (3) without just compensation." *Frooks v. Town of Cortlandt*, 997 F. Supp. 438, 452 (**S.D.N.Y.** 1998) (citing *HBP Assoc. v. Marsh*, 893 F. Supp. 271, 277 (**S.D.N.Y.** 1995)). A plaintiff's property interest must stem from some "legitimate claim of entitlement" and not just an "abstract need or desire" or "unilateral expectation." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). The law recognizes two types of takings: physical takings and regulatory takings. *See Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 374 (2d. Cir. 2006).

A physical taking only occurs when the government "requires the landowner to submit to the physical occupation of his land." *Yee v. City of Escondido*, 503 U.S. 519, 527 (1992) (emphasis omitted); *accord Southview Assocs., Ltd. v. Bongartz*, 980 F.2d 84, 94 (2d Cir. 1992); *Elmsford Apartment Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148, 162 (**S.D.N.Y.** 2020); *Greystone Hotel Co. v. City of New York*, 13 F. Supp. 2d 524, 527 (**S.D.N.Y.** 1998). The Second Circuit has explained that a physical taking happens when "government has committed or authorized a permanent *physical* occupation

of property." *Southview Assocs.*, 980 F.2d at 92–93 (emphasis added). The "*absolute* exclusivity of the occupation, and *absolute* deprivation of the owner's right to use and exclude others from the property ... [are] hallmarks of a physical taking." *Id.* at 93 (emphasis in original) (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 n.12 (1982)). Recently, in *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021) the Supreme Court reiterated that there are "heightened concerns associated with '[t]he permanence and absolute exclusivity of a physical occupation' in contrast to 'temporary limitations on the right to exclude.' and ... '[n]ot every physical invasion is a taking.' " 141 S. Ct. at 2074–75 (alterations in original) (quoting *Loretto*, 458 U.S. at 435 n.12). The Supreme Court has explained that there are different circumstances under which a physical taking may occur, such as "condemnations" of property, *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 322 (2002), seizure of property through eminent domain, *Kelo*, 545 U.S. at 489, or physical occupation of property, *Loretto*, 458 U.S. at 427. Physical appropriations are the "clearest sort of taking." *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001). Such *per se* takings are assessed by the rule: "[t]he government must pay for what it takes." *Cedar Point*, 141 S. Ct. at 2071 (quoting *Tahoe Sierra*, 535 U.S. at 322).

**\*14** "A facial challenge is an attack on a statute itself as opposed to a particular application." *City of Los Angeles v. Patel*, 576 U.S. 409, 415 (2015); *see also Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019) ("A facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications."). This is the "most difficult challenge to mount successfully," because the challengers "must establish that no set of circumstances exists under which the [HSTPA] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). The "uphill battle" of a facial claim is "made especially steep" when those seeking relief "have not claimed ... that [government action] makes it commercially impracticable" for the plaintiffs to continue business use of their property. *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 495–96 (1987).

#### 2. Analysis

#### a. Physical Taking – Facial Challenge

G-Max Plaintiffs bring a facial physical takings claim.[14] Specifically G-Max Plaintiffs argue that the condominium

Case 1:24-cv-03973-AS   Document 830   Filed 01/13/26   Page 59 of 209
Case 1:24-cv-00211-AMN-PJE   Document 101-2   Filed 12/26/25   Page 14 of 38

Building and Realty Institute of Westchester and Putnam..., Not Reported in Fed....

and cooperative conversion amendments grant tenants "a collective veto right over such conversions, thereby denying owners the right to dispose of their property and exit the rental business via a conversion." (G-Max Pls.' Mem. at 44; G-Max Compl. ¶ 218.) G-Max Plaintiffs also claim that this elevates possession rights of the tenant over those of a lawful property owner through "drastic restrictions on owners' ability to reclaim units for personal use and occupancy." (G-Max Compl. ¶¶ 82, 102–09, 218–19.) G-Max Plaintiffs take issue with the elimination of a "sunset provision" under which previous versions of the RSL would have expired without legislative action. (*Id.* ¶ 218.) G-Max Plaintiffs further contend that by "compelling owners to remain in the rental business absent tenant consent, the co-op/condo conversation go far beyond 'regulat[ing] an existing landlord-tenant relationship.' " (G-Max Pls.' Mem. at 45.) G-Max Plaintiffs explain that "[b]y blocking the eventual non-renewal of existing tenancies ... while simultaneously allowing current tenants to block conversion altogether ..., the HSTPA forces owners to remain in the rental business on a going-forward basis." (*Id.*; G-Max Compl. ¶¶ 104–11.) G-Max Plaintiffs claim that this "compel[s] owners to remain in the rental market against their will." (*Id.*) Finally, G-Max Plaintiffs dispute G-Max Defendants' argument that the various exit options available to property owners foreclose a physical takings claim. (*Id.* at 47; G-Max CVH Mem. at 11–12; G-Max State Defs.' Mem. at 18.)

**\*15** In *Yee*, the Supreme Court considered a Takings Clause challenge to a local rent control ordinance, in which mobile home park owners claimed that the law amounted to a physical taking because it had the effect of depriving them of all use and occupancy of their property. 503 U.S. at 524–25. Specifically, the plaintiffs complained that the ordinance granted tenants the right to permanently occupy and use such property. *Id.* at 525. The Supreme Court disagreed and ruled that the ordinance did not amount to a physical taking of the mobile home park owner's property because the property owners *voluntarily* rented their land. *Id.* at 527–28. "Put bluntly, no government has required any physical invasion of petitioners' property." *Id.* at 528. Instead, "[the] tenants were invited by [the property owners], not forced upon them by the government." *Id.* (citing *FCC v. Fla. Power Corp.*, 480 U.S. 245, 252–53 n.6 (1987)).

Consistent with *Yee*, courts have repeatedly recognized that when owners invite tenants to physically occupy their apartments, laws like the HSTPA (and RSL before it) simply govern the property owners' voluntary use of their property as rental housing. *See 335-7 LLC*, 2021 WL 860153 at \*8 ("In accordance with *Yee*, courts in this

Circuit have long upheld the RSL against facial physical taking challenges because landlords have voluntarily offered their property for rent and, by the express terms of the RSL, landlords can evict unsatisfactory tenants, reclaim or convert units, or exit the market."); *see also Fed. Home Loan Mortg. Corp. v. N.Y. State Div. of Hous. & Cmty. Renewal* ("*FHLMC*"), 83 F.3d 45, 47–48 (2d Cir. 1996) (noting that "where a property owner offers property for rental housing, the Supreme Court has held that government regulation of the rental relationship does not constitute a physical taking"); *Southview Assocs.*, 980 F.2d at 94–95 (finding no physical taking where the government limited the development of property because property owners had not lost the right to possess, use, and dispose of the property); *Greystone Hotel*, 13 F. Supp. 2d at 527 (holding that the challenged RSL provision regulates the terms on which property owners can rent rooms, the amounts it can charge, and the services it must provide, but does not amount to a physical occupation of the property); *Higgins*, 630 N.E. 2d at 632–33 (concluding that it is not a physical taking to require an owner who has voluntarily acquiesced in the use of its property for rental housing to rent to family members succeeding the tenant); *Seawall Assocs. v. City of New York*, 542 N.E.2d 1059, 1065 (N.Y. 1989) (holding that "[i]t is the forced occupation ..., not the identities of the new tenants or the terms of the leases, which deprives the owners of their possessory interests and results in physical takings").

Here, the Court finds no physical taking because the HSTPA does not compel physical occupation. The HSTPA merely changes the percentage required to convert buildings into condominiums or cooperatives from 15% of tenants to 51%. *See* HSTPA, Part N, § 1. Prior to the enactment of the HSTPA, RSL allowed tenants who did not purchase to remain in their homes. N.Y. Gen. Bus. Law § 352-eeee(2)(c)(ii) (McKinney 2021) (proving that "[n]o eviction proceedings will be commenced at any time against non-purchasing tenants for failure to purchase"). However, the HSTPA did not create forced occupancies or authorize "physical invasion" of G-Max Plaintiffs' properties, thus moving their allegations outside the zone of a taking because such amendments do not compel landlords to use their properties for new and unexpected use. *Yee*, 503 U.S. at 528. As G-Max Plaintiffs acknowledge, the State has previously adjusted the tenant-approval threshold for cooperative and condominium conversions under General Business Law § 352-eeee. In the 1970s, the threshold for conversion was 35%, and prior to the HSTPA it was 15%. (G-Max Compl. ¶¶ 107, 112.) In other words, while the HSTPA may have added certain hurdles to the conversion of rental properties, the HSTPA does not on its face

require G-Max Plaintiffs to rent their properties; that was a choice of their own making, thus defeating their Takings Claim. *See CHIP*, 492 F. Supp. 3d at 44 (concluding that the "[p]laintiffs' argument fails ... because ... no physical taking has occurred in the first place"); *see also 335-7 LLC*, 2021 WL 860153, at *8 ("[C]ourts in this Circuit have long upheld the RSL against facial physical taking challenges because landlords have voluntarily offered their property for rent and, by the express terms of the RSL, landlords can evict unsatisfactory tenants, reclaim or convert units, or exit the market."); *Higgins*, 630 N.E.2d at 633 ("Because the challenged regulations may require the owner-lessor to accept a new occupant but not a new use of its rent-regulated property, we conclude that appellants have failed to establish their claim that, facially, a permanent physical occupation of appellants' property has been effected.").

**\*16** It is true that in *Yee*, the Supreme Court acknowledged that the day would come in which a statute, on its face or as applied, would "compel a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy." *Yee*, 503 U.S. at 528. Indeed, G-Max Plaintiffs assert that property conversions are "no longer feasible" under the HSTPA, but offer no specific allegations to support that they have attempted such conversions. (G-Max Compl. ¶¶ 149, 163, 181, 186, 191, 196.) In any event, even if G-Max Plaintiffs were unable to obtain the required number of purchase agreements for conversion, they may still use the property as a rental, thus defeating their facial claim. *See Elmsford*, 469 F. Supp. 3d at 162–64 (noting that the "Supreme Court has ruled that a state does not commit a physical taking when it restricts the circumstances in which tenants may be evicted"); *335-7 LLC*, 2021 WL 860153, at *8–10 (rejecting a physical takings claim). In addition, whether this amendment renders conversion a "near-impossibility" as G-Max Plaintiffs allege is a question more aptly suited for a regulatory takings analysis as it is essentially asking whether the regulation goes "too far." *1256 Hertel Ave. Assocs. v. Calloway*, 761 F.3d 252, 263 (2d Cir. 2014).

Therefore, the Court finds that G-Max Plaintiffs' facial takings claim should be dismissed.

### b. Physical Taking – As-Applied Challenge

BRI and G-Max Plaintiffs also bring as-applied physical takings claims.[15] To be clear, BRI and G-Max Plaintiffs do not allege condemnation, seizure by eminent domain, or physical encroachment of any property. Instead, BRI Plaintiffs argue that the HSTPA constitutes a physical

taking because it "deprives property owners of their basic ownership rights to either choose, include or exclude those that it selects from their property and to possess, use, and dispose of their property or concomitantly, to use, rent and own their property without improper, illegal and unconstitutional government interference and restriction." (BRI Compl. ¶ 99.) As BRI Plaintiffs describe it: the HSTPA "dramatically limit[s] the ability of property owners to dispose of their own property ... [which] effects an unconstitutional physical taking ...." (*Id.* ¶ 124.) BRI Plaintiff do not object to the physical presence of tenants, instead they object to the financial terms of the tenants' occupation. (*See id.* ¶ 105 (alleging the HSTPA effects a physical taking because it "has eliminated almost every avenue that allowed a transition from regulation to free market"). G-Max Plaintiffs, with the exception of Plaintiffs Ordway and Guerrieri, lodge a similar complaint – that the HSTPA deprives owners of "their fundamental rights to possess, use, admit or exclude others, and dispose of their property, thereby effecting an unconstitutional physical taking ...." (G-Max Compl. ¶ 7; G-Max Pls.' Mem. at 44–51.) G-Max Plaintiffs focus on certain provisions of the HSTPA, specifically the (1) limitations on converting rental units into condominiums or cooperatives, (2) restrictions on recovery of a unit for personal use, and (3) changes to the eviction process. (G-Max Compl. ¶¶ 82, 103, 122.)

Takings are rooted in the disruption of an owner's "bundle of property rights" which include the rights to "possess, use[,] and dispose of" property. *Horne v. Dep't of Agric.*, 576 U.S. 350, 361–62 (2015) (quoting *Loretto*, 458 U.S. at 435) (quotation marks omitted). Previous examples of actionable takings include installation of physical items on buildings, *Loretto*, 458 U.S. at 438, the seizure of control over private property, *Horne*, 576 U.S. at 361–62, and takings through eminent domain, *Kelo*, 545 U.S. at 489. Like the plaintiffs in *CHIP*, BRI Plaintiffs maintain the first and third strands in *Horne's* bundle of property rights as they continue to possess the properties and can dispose of them through sale. 492 F. Supp. 3d at 43. BRI Plaintiffs principally argue that BRI Defendants limit their use of property through enactment of the HSTPA – and to some extent interfere with their ability to dispose of the property – which is sufficient to constitute a physical taking. (BRI Pls.' Mem. at 23–27.)

**\*17** BRI Plaintiffs' allegations fall short of plausibly alleging an as-applied physical taking. As the Supreme Court has explained to find a physical taking the state must "not simply take a single 'strand' from the 'bundle' of property rights" but instead "chop[ ] through the bundle, taking a slice of every strand." *Loretto*, 458 U.S. at 435. A regulation which involves no physical invasion,

such as the HSTPA, cannot form the basis of a *physical* takings claim. BRI Plaintiffs' claim fails, because under binding case law of *Loretto, Horne, Yee*, and others, no physical taking ever actually occurred. As articulated in *CHIP*, "[n]o precedent binding on this Court has ever found any provision of a rent-stabilization statute to violate the Constitution." 492 F. Supp. 3d at 38.[16] Importantly, the "fact of a taking is fairly obvious in physical takings cases." *Buffalo Teachers*, 464 F.3d at 374; *see also Loretto*, 458 U.S. at 421 (finding a physical taking where New York law provided that a landlord must permit a cable television company to install equipment on the owner's property); *Horne*, 576 U.S. at 361 (holding that the government's formal demand that plaintiffs turn over a percentage of their raisin crop is a "clear physical taking").[17] This is in contrast to a regulatory taking where the government "merely ... bans certain private uses" of property. *Tahoe-Sierra*, 535 U.S. at 322–23. BRI Plaintiffs do not allege that they have been deprived of title to their property, or that they are unable to sell the property if they choose. Instead, BRI Plaintiffs complain of several burdensome aspects of the HSTPA in Westchester County. (BRI Compl. ¶ 100; *see also* BRI Pls.' Mem. at 15.) For example, BRI Plaintiffs point to the fact that owners are generally required to tender renewal leases to tenants in rent stabilized apartments. (*Id.* ¶ 100(b).) BRI Plaintiffs also highlight that the HSTPA grants succession rights to certain family members who have lived with the tenant of record in a rent stabilized apartment for a certain period of time before the tenant dies or moves out. (*Id.* ¶ 100(d); BRI Pls.' Mem. at 25–26, 44.) *See* N.Y. Comp. Codes R. & Regs. ("N.Y.C.R.R.") tit. 9, § 2523.5 (2021). However, these renewal leases and familial succession rights are not creations of the HSTPA. As BRI Defendants note, these aspects have been "part of New York's rent stabilization regime for decades" and repeatedly upheld by courts. (BRI State Defs.' Mem. at 16.) *See, e.g., Golub v. Frank*, 483 N.E.2d 126 (N.Y. 1985) (explaining that RSL "provide[ ] that no tenant shall be denied a renewal lease except upon grounds specifically recognized by law"); *Lesser v. Park 65 Realty Corp.*, 527 N.Y.S.2d 787, 789 (App. Div. 1988) (noting that "[t]he family succession provisions ... were enacted in response to the harsh consequences resulting from displacement from one's home upon the death or departure of a named tenant with whom a family member, not named in the lease, resided"). These longstanding and pre-existing provisions of the rent stabilization laws in New York cannot form the basis of BRI Plaintiffs' as-applied physical takings challenge to the HSTPA when these provisions predated its enactment.

BRI Plaintiffs also allege that the HSTPA forces owners

to accept "the intrusion of strangers" or "prevents [them] from excluding strangers from the property" or mandates them to rent units "often to strangers who claim 'succession' rights." (BRI Compl. ¶¶ 33, 104, 107.) But this characterization is flawed, as an individual who lives in a rent stabilized apartment must prove he or she is a family member (or in an intimate relationship with the tenant of record) who has resided in the apartment for a period of two years or one year in the case of elderly or disabled persons. N.Y.C.R.R. tit. 9, § 2523.5. Such persons, either family or a person in an intimate relationship with the tenant, are a far cry from the "strangers" BRI Plaintiffs describe as foisted upon them infringing on their property rights. As noted above, the Supreme Court has held that once a property owner "decides to rent his land to tenants, the government may ... require the landowner to accept tenants he does not like." *Yee*, 503 U.S. at 529; *see also Higgins*, 630 N.E.2d at 633 (rejecting physical takings challenge to succession rights in rent-stabilized units because "the challenged regulations may require the owner-lessor to accept a new occupant but not a new use of its rent-regulated property"). As Judge Edgardo Ramos succinctly explained in *335-7 LLC*, even if the successor were indeed a "stranger[ ]," that feature of the law "is not a physical taking as long as it only forces new tenants, not a new use." 2021 WL 860153, at *9.[18][19]

**\*18** BRI Plaintiffs further claim that the ETPA grants tenants a "life estate." (BRI Compl. ¶¶ 43, 100(d).) G-Max Plaintiffs assert a similar claim – that the HSTPA's amendments to the eviction process essentially authorize a permanent physical occupation of their property. (G-Max Compl. ¶¶ 121–26.) But the Second Circuit has already rejected this argument because owners of rent-stabilized apartment offer their properties for rent and retain statutory rights to recover them. *Harmon*, 412 F. App'x at 422 (noting that landlords did not dispute retention of statutory rights such as recovery of property for personal use or demolition, or the ability to evict an unsatisfactory tenant, among others); *see also FHLMC*, 83 F.3d at 47–48 (finding no physical taking where the law regulated the terms under which the owner may use the property as previously planned); *Greystone Hotel*, 13 F. Supp. 2d at 527 (finding no physical taking in a forced conversion from renting to transients to leasing to permanent tenants). For example, owners of rent stabilized apartments can "recover possession of a housing accommodation because of immediate and compelling necessity ...." N.Y. Unconsol. Law § 26-408(b)(1) (McKinney 2021). The lone change to this part of the rent stabilization law through the HSTPA is that a landlord can only recover possession for use "as his or her primary residence" or use for the same purpose for

his or her immediate family. HSTPA, Part I, § 1. But this modification still does not *eliminate* the owner's property rights – instead, it lawfully limits them. *See CHIP*, 492 F. Supp. 3d at 44 (dismissing physical taking claim because "while significant to investment value, personal use, unit deregulation, and eviction rights, is not so qualitatively different from what came before as to permit a different outcome."); *335-7 LLC*, 2021 WL 860153, at *9–10 (concluding that the HSTPA did not constitute a physical taking even though it restricted conversion, eviction, and vacancy as the same was true in all of the cases where RSL have been upheld); *Greystone Hotel*, 13 F. Supp. 2d at 527 ("The challenged provisions regulate the terms on which [a property owner] can rent its rooms, the amounts it can charge, and the services it must provide. That is not a physical occupation ...."); *see also FHLMC*, 83 F.3d at 47–48 (holding that where property owners offer property for rental housing, governmental regulation of the rental relationship does not constitute a physical taking).

Contrary to BRI and G-Max Plaintiffs' assertions, owners retain many important statutory rights, even after passage of the HSTPA. (BRI Pls.' Mem. 16–17; G-Max Pls.' Mem. 9–10.) Aside from the ability to recover housing units for an "immediate and compelling necessity," landlords can evict tenants who fail to pay rent, who violate another substantial obligation of the lease agreement, commit a nuisance, or use the apartment for unlawful purposes. N.Y.C.R.R. tit. 9, § 2524.3. Landlords can recover property to demolish it, withdraw units for use as an owner-owned and operated business, or may withdraw the units from the rental market if the cost to repair dangerous living conditions "would substantially equal or exceed" the building's value. *Id.* § 2524.5. In *Yee,* the Supreme Court held that the ordinance at issue did not constitute a physical taking despite "limit[ing] the bases upon which a park owner may terminate a mobile home owner's tenancy." *Yee*, 503 U.S. at 524, 528. As explained in *335-7 LLC*, the Supreme Court in *Yee* reasoned that there was no physical taking because "[t]he mobile park owners had voluntarily made their property available to tenants and nothing in the law's terms required them to continue to do so." 2021 WL 860153, at *8. The Supreme Court held that the law "merely regulate[d] petitioners' use of their land by regulating the relationship between landlord and tenant," which was consistent with longstanding precedent "that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails." 503 U.S. at 528–29 (emphasis omitted) (collecting cases). The New York Court of Appeals has similarly held that RSL do not effect a facial physical taking because the "right to evict an

unsatisfactory tenant or convert rent-regulated property to other uses remains unaffected." *Higgins*, 630 N.E.2d at 632.

Furthermore, under the HSTPA, landlords can convert rent regulated apartments to condominiums or cooperatives with purchase agreements from 51% of tenants. N.Y. Gen. Bus. Law § 352-eee.[20] BRI and G-Max Plaintiffs concede that landlords can use these avenues to stop being landlords and end physical occupation of these properties as rent regulated units. (*See, e.g.*, BRI Compl. ¶¶ 100(b), 100(h) (noting that under the HSTPA property owners can refuse to renew leases in "narrow circumstances," but also alleging that condo conversions have been "virtually eliminated"); ¶ 109 (alleging that the HSTPA "significantly limits the owner's right not to renew" a lease and also "substantially eliminates" the ability to remove a tenant); ¶ 111 (asserting that "non-renewal of a lease is permitted in certain limited circumstances where an owner seeks to occupy a unit or demolish a building"); G-Max Compl. ¶ 126 ("making it harder for property owners to evict tenants"); ¶ 175 ("demanding renewal leases in perpetuity"); ¶ 227 ("effects of rent-regulation [ ]such as perpetual renewal and succession rights").) As BRI Defendants highlight, BRI Plaintiffs do not plausibly plead an individual owner would need to occupy more than one apartment, or why a corporate owner would need occupy a residential apartment – or more importantly how the lack of their ability to do so amounts to a physical taking. (BRI State Defs.' Mem. at 18.) Instead, the HSTPA prohibits an owner from refusing to renew rent-regulated leases in order to occupy more than one unit for him or herself or allowing a family member to do so, absent an immediate and compelling necessity. N.Y. Unconsol. Law § 26-408(b)(1). G-Max Plaintiffs challenge the same restrictions regarding a property owner's personal use of property. But like BRI Plaintiffs, G-Max Plaintiffs acknowledge that at least some landlords may recover units for their own use through different avenues in the HSTPA. (G-Max Compl. ¶¶ 8, 122.) These concessions are fatal to the physical taking claims because this type of regulation of the landlord-tenant relationship is permissible. *See Loretto*, 458 U.S. at 440 (affirming that states hold "broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails").[21]

**\*19** G-Max Plaintiffs, like BRI Plaintiffs, argue that the limited manner in which they may use their property under the HSTPA effectuates a taking. But the case law is clear: property owners who offer their properties for rent do not suffer from a taking based on laws that regulate the

Case 1:24-cv-03978-AS JE Document 80-1 Filed 04/13/26 /25 Page 63 of 209

Building and Realty Institute of Westchester and Putnam..., Not Reported in Fed....

rental of that property. *See Higgins*, 630 N.E.2d at 633 (finding no physical **taking** where the **property** owner decided to rent to tenants); *see also Harmon*, 412 F. App'x at 422 (noting that "where ... a property owner offers property for rental housing, the Supreme Court has held that governmental regulation of the rental relationship does not constitute a physical taking" (quoting *FHLMC*, 83 F.3d at 47–48)). Because "the government effects a physical taking only where it *requires* the landowner to submit to the *physical occupation* of his land'" the Court finds that BRI and G-Max Plaintiffs fail to allege a physical taking by the HSTPA. *See Yee*. 503 U.S. at 527 (second emphasis added) (finding no physical taking where petitioners voluntarily rented property and no physical invasion of the property had occurred); *335-7 LLC*, 2021 WL 860153, at *10 ("Although [the] [p]laintiffs complain that the RSL constitutes a physical taking by restricting their reversionary interests because conversion, eviction and vacancy are up to the tenant, not the owner, the same was true in all of the cases where the RSL has been upheld."); *CHIP*, 492 F. Supp. 3d at 43 ("The restrictions on [the landlords'] right to use the property as they see fit may be significant, but that is insufficient under the standards set forth by the Supreme Court and Second Circuit to make out a physical taking."); *Elmsford*, 469 F. Supp. 3d at 162–63 ("Government action that does not entail a physical occupation, but merely affects the use and value of private property, does not result in a physical **taking** of **property**.").

G-Max Plaintiffs Ordway and Guerrieri offer a more thorough as-applied analysis as to their physical taking claim. In particular, Ordway and Guerrieri assert that they cannot recover a third unit in their building for personal use to combine two floors into a single residence. (G-Max Compl. ¶¶ 168–76.) Prior to the enactment of the HSTPA, Ordway and Guerrieri initiated holdover proceedings in housing court to remove the current tenant in the unit they wished to occupy. (*Id.* ¶¶ 172–73.) These Plaintiffs argue that because of the HSTPA, they have lost their "fundamental right to occupy their own private property." (*Id.* ¶ 175.) Even assuming that there is an unwanted tenant in one of their rental units, Ordway and Guerrieri have failed to allege how HSTPA bars recovery of their unit. As discussed *supra*, under the HSTPA, a property owner may recover a unit because of "immediate and compelling necessity." HSTPA, Part I, § 1. While the HSTPA limits recovery to one unit for personal use, Ordway and Guerrieri's other units were recovered voluntarily. (G-Max Compl. ¶ 171.) The voluntary recovery of the other rental units means that under HSTPA there is no bar to recovering a unit based on "immediate and compelling necessity" – indeed to date,

they have not exercised their rights to do so under this provision. HSTPA, Part I, § 1. Thus, Plaintiffs Ordway and Guerrieri cannot claim that the HSTPA results in their inability to occupy their own private property when their property right of disposal, i.e. an exit option, is available to them. In particular, the return of Ordway and Guerrieri's adult son could serve as the immediate and compelling necessity as to why they need to recoup the unit for personal use, a remedy available to them under the HSTPA. (G-Max Compl. ¶ 174.) Aside from this option, Ordway and Guerrieri have other disposal options, as they could evict the tenant, upon request, if they provide a similar accommodation. N.Y. Admin. Code § 26-511(c)(9). In *Harmon*, the Second Circuit affirmed the dismissal of a physical takings challenge to RSL because landlords retained the right to recover possession of a unit for immediate and compelling necessity, as is the case here. 412 F. App'x at 422.[22] The right to recover a unit under the "immediate and compelling necessity" provision remains substantially unchanged by the HSTPA. *See* HSTPA, Part I, § 1 ("The landlord seeks in good faith to recover possession of a housing accommodation because of immediate and compelling necessity for his or her own personal use and occupancy as his or her primary residence or for the use and occupancy of his or her immediate family as their primary residence ....").

**\*20** A recent decision from the First Department is instructive here. *See Harris v. Israel*, 142 N.Y.S.3d 497 (App. Div. 2021). In *Harris*, the court was tasked with determining whether the HSTPA applied to a holdover proceeding which had been pending for one year before the HSTPA's enactment. *Id.* at 498. Specifically, the court considered the same amended provision challenged by Ordway and Guerrieri, which governs an owner's right to refuse to renew a rent-stabilized lease on the ground that the owner seeks to recover the unit for her or her own personal use and occupancy as a primary residence. *Id.* The Appellate Division concluded that the amended provision was applicable to this proceeding. *Id.* However, while *Harris* was pending before the First Department, the Court of Appeals in *Regina Metropolitan Co. v. New York State Division of Housing and Community Renewal*, 154 N.E.3d 972 (N.Y. 2020), held that the HSTPA's rent overcharges could not apply retroactively without violating due process. *Id.* at 976–77. Consequently in *Harris*, the court reversed and reinstated the judgment of possession, applying *Regina Metro's* reasoning "that an owner's increased liability and the disruption of relied-upon repose are impairments to his or her substantive rights" to preclude "any retroactive application of HSTPA" given that "petitioner had spent several years reclaiming all other units at the property and

was ultimately awarded a judgment of possession before [the] HSTPA's enactment." *Harris*, 142 N.Y.S.3d at 499. To put it more directly, *Harris* turned on "settled expectations" following a favorable *judgment. Id.* However, by their own admission, Ordway and Guerrieri have not obtained any judgment of possession. (G-Max Compl. ¶ 172 (noting that Ordway and Guerrieri "commenced owner-occupancy holdover proceedings ....").) Having only "commenced" an owner-occupancy holder proceeding by serving one "notice of non-renewal" which is not a judgment of possession, Ordway and Guerrieri have no "settled expectations" regarding their property. (*Id.*); *see Harris*, 142 N.Y.S.3d at 499.[24] The court in *Harris* ultimately determined that Part I of the HSTPA "impair[s] rights owners possessed in the past, increasing their liability for past conduct and imposing new duties with respect to transactions already completed." *Id.* (alteration in original). But Ordway and Guerrieri have merely just begun proceedings to repossess their unit.[25]

The Supreme Court has explained that a plaintiff alleging a taking must show that the state regulatory entity has rendered a final decision on the matter and that the plaintiff has sought just compensation by means of an available state procedure. *See Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186 (1985), *overruled in part by Knick v. Township of Scott*, 139 S. Ct. 2162 (2019). Prior to the Supreme Court's decision in *Knick*, the law in the Second Circuit had been that a taking is not without just compensation under § 1983 unless a plaintiff has exhausted all state remedies that may provide just compensation. 139 S. Ct. at 2169 (citing *Williamson Cnty.*, 473 U.S. at 195). However, the Supreme Court in *Knick* overruled the state-exhaustion requirement as an "unjustifiable burden on takings plaintiffs." *Id.* at 2167. This means that "a property owner has a claim for a violation of the Takings Clause as soon as a government **takes** his **property** for public use without paying for it." *Id.* at 2170. However, the Supreme Court reversed *Williamson County* only to the extent of finding that a property owner need not seek compensation from the State before raising a takings claim, but left undisturbed the "question [of] the validity of th[e] finality requirement." *Id.* at 2169; *see also Sagaponack Realty, LLC v. Village of Sagaponack*, 778 F. App'x 63, 64 (2d Cir. 2019) (explaining that "*Knick* leaves undisturbed *Williamson's* requirement that a state regulatory agency must render a final decision on a matter before a taking claim can proceed").

Applying this principle here, Ordway and Guerrieri have not plausibly pled that the HSTPA inflicts an "*absolute* deprivation" of the right to their property, because they can recover the unit under the HSTPA. *Southview Assocs.*, 980 F.2d at 95 (finding no physical taking because "no absolute, exclusive physical occupation exist[ed]"); HSTPA, Part I, § 1. Here, there has not been a final decision taking Ordway and Guerrieri's property. Instead, Ordway and Guerrieri's allegations merely establish personal use restrictions that govern the terms of an existing landlord-tenant relationship, which does not make plausible their takings claim. *See Dawson v. Higgins*, 610 N.Y.S.2d 200, 209 (App. Div. 1994) (upholding constitutionality of personal-use restrictions for rent-controlled apartments); *see also Higgins*, 630 N.E.2d at 632 ("That a rent-regulated tenancy might itself be of indefinite duration—as has long been the case under rent control and rent stabilization—does not, without more, render it a permanent physical occupation of property."). Thus, the as-applied physical takings challenge as to Plaintiffs Ordway and Guerrieri fails.

## E. Regulatory Takings Under the Fourteenth and Fifth Amendments

### 1. Applicable Law

**\*21** A regulatory taking occurs when the government acts in a regulatory capacity and such state regulation "goes too far" and "effects a taking." *Buffalo Teachers*, 464 F.3d at 374 (citation omitted). Courts view regulatory takings as either categorical or non-categorical. *See Sherman v. Town of Chester*, 752 F.3d 554, 564 (2d Cir. 2014). A categorical taking occurs in "the extraordinary circumstance when no productive or economically beneficial use of land is permitted." *Id.* (emphasis omitted) (quoting *Tahoe-Sierra*, 535 U.S. at 330); *see also Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005) (holding that government regulation of private property may be "so onerous that its effect is tantamount to a direct appropriation or ouster—and that such 'regulatory takings' may be compensable under the Fifth Amendment"); *Lucas*, 505 U.S. at 1019 (holding that the categorial rule applies when a regulation completely deprives an owner of "all economically beneficial use" of his or her property" (emphasis omitted)). Categorical takings occur only in a "narrow" set of circumstances. *Lingle*, 544 U.S. at 538. The regulatory takings framework applies in a myriad of circumstances, including use restrictions such as zoning ordinances, *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 387–88 (1926), orders barring the mining of gold, *United States v. Cent. Eureka Mining Co.*, 357 U.S. 155, 168

Case 1:24-cv-03973-AS-JE Document 830 01-Filed 01/13/26/25 Page 65 of 209

Building and Realty Institute of Westchester and Putnam..., Not Reported in Fed....

(1958), and regulations that prohibit certain conduct on private property, *Andrus v. Allard*, 444 U.S. 51, 65–66 (1979).

Anything short of a complete elimination of value or a total loss is a non-categorical taking, which is analyzed under the framework articulated in *Penn Central*, 438 U.S. at 124. The *Penn Central* analysis of a non-categorical taking "requires an intensive ad hoc inquiry into the circumstances of each particular case." *Buffalo Teachers*, 464 F.3d at 375. In applying *Penn Central*, courts must "weigh three factors to determine whether the interference with property rises to the level of a taking: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Id.* (quotation marks omitted). The inquiry turns on whether "justice and fairness require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." *Kaiser Aetna v. United States*, 444 U.S. 164, 175 (1979) (quotation marks omitted). Notably, the Supreme Court cautioned that "[g]overnment action that physically appropriates property is no less a physical taking because it arises from a regulation." *Cedar Point*, 141 S. Ct. at 2072. The key inquiry is "whether the government has physically **taken property** for itself or someone else—by whatever means—or has instead restricted a property owner's ability to use his own property." *Id.* (citing *Tahoe-Sierra*, 535 U.S. at 321–323).

## 2. Analysis

### a. Regulatory Taking – Facial Challenge

As noted, a *per se* regulatory taking exists when the government completely deprives an owner of all economically beneficial uses of one's property. *See Lingle*, 544 U.S. at 538. Such a categorical taking involves "the extraordinary circumstance when *no* productive or economically beneficial use of [property] is permitted." *Tahoe-Sierra*, 535 U.S. at 330 (quoting *Lucas*, 505 U.S. at 1017 (emphasis in original)). BRI and G-Max Plaintiffs do not allege facts to support that they have been deprived of *all* economical viable use of their property by the "mere enactment of the regulation[ ]" – here, the HSTPA. *Tahoe-Sierra*, 535 U.S. at 318. Instead, BRI and G-Max Plaintiffs only plead that the HSTPA decreases the value of their properties. (BRI Compl. ¶¶

22–23, 33, 54, 69, 79, 81–82, 126(a), 128, 135(a)) (claims that the HSTPA results in decreased, diminution, or reduction in BRI Plaintiffs' property values); (G-Max Compl. ¶¶ 4–5, 9, 11, 91, 119, 127, 148, 154, 161, 176, 180, 185, 190, 195, 198–99, 202, 205, 227) (claims that the HSTPA drastically devalues or impairs the values of G-Max Plaintiffs' properties).)

**\*22** As the court in *CHIP* noted, "[r]ent regulations have now been the subject of almost a hundred years of case law, going back to Justice Holmes. That case law supports a broad conception of government power to regulate rents, including in ways that may diminish — even significantly — the value of landlords' property." 492 F. Supp. 3d at 38. Importantly, "every regulatory-taking challenge to the RSL has been rejected by the Second Circuit." *Id.* at 44 (citing *W. 95 Hous. Corp.v. N.Y.C. Dep't of Hous. Pres. & Dev.*, 31 F. App'x 19, 21 (2d Cir. 2002) (summary order) (upholding that New York's rent stabilization laws are not subject to facial challenge as a regulatory taking)); *see Rent Stabilization Ass'n of the City of N.Y. v. Dinkins*, 5 F.3d 591, 595 (2d Cir. 1993) ("[T]he hardship provisions [of RSL], standing alone, obviously cannot effect a taking because they do not limit a landlord's rent in the first instance." (emphasis in original)); *see also Greystone Hotel*, 13 F. Supp. 2d at 528–29 (declining to find regulatory taking claim where plaintiffs conceded that the unregulated portion of the building retained value); *FHLMC*, 83 F.3d at 48 (finding no regulatory **taking** where **property** owners could still rent their apartments and collect the regulated rents). Judge Ramos succinctly applied this vast case law to the HSTPA:

> [e]ven following the [HSTPA], the RSL does not strip landlords of all economic enjoyment of their rent-stabilized properties because they still collect rent from their tenants and, to the extent their rental income does not exceed their operating costs, they may seek hardship exemptions. They may also convert or sell their buildings.

*335-7 LLC*, 2021 WL 860153, at \*11. The Court will follow the weight of authority that rejects facial regulatory takings claims such as those alleged in these cases. *See id.*; *see also Harmon v. Markus*, 2010 WL 11530596, at \*3 (**S.D.N.Y.** Mar. 1, 2021) (noting that it is "well-settled law that a facial taking challenge to rent stabilization laws will not lie as of right"). Further, the Supreme Court has noted that it is "particularly important in takings cases to adhere to [its] admonition that 'the constitutionality of statutes ought not be decided except in an actual factual setting that makes such a decision necessary.' " *Pennell v. City of San Jose*, 485 U.S. 1, 10 (1988) (quoting *Hodel v. Va. Surface Mining & Reclamation Ass'n., Inc.*, 452 U.S. 264, 294–95 (1981)).

The need for individualized analysis of such claims is why facial attacks face an uphill battle because "whether a taking has occurred depends ... on a variety of financial and other information unique to each landlord." *Dinkins*, 5 F.3d at 597.

Because the Court concludes that the HSTPA is not a *per se* regulatory taking, BRI and G-Max Plaintiffs' claims will be analyzed as a non-categorical taking under the framework articulated in *Penn Central. See Tahoe-Sierra*, 535 U.S. at 330 (explaining that a plaintiff must show no productive or economically beneficial use of his or her property to sustain a categorical regulatory takings claim); *cf. Greystone Hotel*, 13 F. Supp. 2d at 528 (concluding at summary judgment that failure to offer facts showing that plaintiff was denied economically viable use of its property forfeited a regulatory takings claim).[26] In applying the *Penn Central* factors, it is the Court's responsibility to "determin[e] when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than disproportionality concentrated on a few persons." *Penn Cent.*, 438 U.S. at 124.[27]

#### b. Regulatory Taking – As-Applied Challenge

**\*23** As discussed previously, a regulatory taking occurs when governmental regulation of private property "goes too far" and is "tantamount to a direct appropriation or ouster." *Lingle*, 544 U.S. at 537. In evaluating a regulatory takings claim, it is important to note that government regulation "involves the adjustment of rights for the public good, and that [g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Id.* at 538 (citation and quotation marks omitted). Indeed, the Supreme Court has consistently recognized that "[s]tates have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails." *Loretto*, 458 U.S. at 440; *see also Fla. Power*, 480 U.S. at 252 (noting that "statutes regulating the economic relations of landlords and tenants are not *per se* takings"). "When a landowner decides to rent his land to tenants, the government may place ceilings on the rents the landowner can charge ...." *Yee*, 503 U.S. at 529 (citing *Pennell*, 485 U.S. at 12 n.6). Such forms of regulation are analyzed by engaging in the "essentially ad hoc, factual inquiries" necessary to determine whether a regulatory taking has occurred. *Kaiser Aetna*, 444 U.S. at 175. There are limits, however, to the power of the government to regulate property. In the words of Justice Holmes, "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pa. Coal Co.*, 260 U.S. at 415. Mere profit loss, however, does not establish that a regulation has gone too far. *See Sadowsky v. City of New York*, 732 F.2d 312, 317 (2d Cir. 1984) ("[R]egarding economic impact, it is clear that prohibition of the most profitable or beneficial use of a property will not necessitate a finding that a taking has occurred."); *see also Penn Cent.*, 438 U.S. at 130 (noting that "the submission that [the plaintiffs] may establish a 'taking' simply by showing that they have been denied the ability to exploit a property interest that they heretofore had believed was available for development is quite simply untenable").

The Court must first evaluate the economic impact of the regulations on BRI and G-Max Plaintiffs. *Penn Cent.*, 438 U.S. at 124.[28] Put differently, the Court needs to determine whether the HSTPA "amounts to a physical invasion or instead merely affects property interests through some public program adjusting benefits and burdens of economic life to promote the common good." *Jado Assocs., LLC v. Suffolk Cnty. Sewer Dist. No. 4-Smithtown Galleria*, No. 12-CV-3011, 2014 WL 2944086, at \*6 (E.D.N.Y. June 30, 2014) (quoting *Lingle*, 544 U.S. at 539).[29] The changes by the HSTPA do not impose a physical occupation, but instead adjust the economic relationship between owners and tenants. *See FHLMC*, 83 F.3d at 48 (finding that the law "regulates the terms under which the owner may use the property" but does not "deprive [plaintiffs] of economically viable use of the property"); *Dinkins*, 805 F. Supp. at 163 ("A 'reasonable return' is not protected by law in this [C]ircuit."); *Harmon*, 412 Fed. App'x at 422 (affirming the dismissal of a taking claim because the "law does not subject the property to a use which its owner neither planned nor desired. Rather, it regulates the terms under which the owner may use the property ...." (quoting *FHLMC*, 83 F.3d at 48)); *Greystone Hotel*, 13 F. Supp. 2d at 528 (holding that there was no taking where the plaintiff failed to show deprivation of "economically viable use of its property" and further held that plaintiff is "not guaranteed a 'reasonable return' on its investment"); *Higgins*, 630 N.E.2d at 633–34 (holding that because the regulations "do not affect the owner's right to receive the regulated rents" the plaintiffs "have not met their burden of showing the requisite deprivation of economically beneficial use of their property"). BRI and G-Max Plaintiffs do not allege that the HSTPA deprives them of all of their properties' economic value; instead, both assert that the rents they are able to charge are insufficient. (BRI Compl. ¶¶ 22–23, 33, 46, 76, 79, 102, 107; G-Max Compl. ¶¶ 12, 59, 71, 85–93, 128–67.)[30] For

example, BRI Plaintiffs allege that the HSTPA "reduced the market value of regulated properties in some cases by over 50%." (BRI Compl. ¶ 128.) In a similar vein, G-Max Plaintiffs argue that "[a]ll [G-Max] Plaintiffs have been harmed ... [by] the HSTPA's provisions, which independently and cumulatively deprive [them] of their private property without compensation." (G-Max Compl. ¶ 127.) The G-Max Complaint purports to detail specific examples of the HSTPA's "direct harmful impacts on each individual [G-Max] Plaintiff." (*See id.* ¶¶ 128–96; G-Max Pls.' Mem. at 11–18.) But the Second Circuit has held that the owner of rent regulated property "is not guaranteed [a] 'reasonable return' on investment." *FHLMC*, 83 F. 3d at 48. Indeed, courts in the Second Circuit have concluded that a property owner has "no constitutional right to what it could have received in an unregulated market." *Greystone Hotel*, 13 F. Supp. 2d at 528 (citing *FHLMC*, 83 F. 3d at 48). Stated otherwise, a "mere diminution in the value of property, however serious, is insufficient to demonstrate a taking." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 645 (1993); *Andrus*, 444 U.S. at 66 ("When [the Supreme Court] review[s] [a] regulation, a reduction in the value of property is not necessarily equated with a taking."); *FHLMC*, 83 F.3d at 48 (denying regulatory taking claim because "[a]lthough [plaintiff] will not profit as much as it would under a market-based system, it may still rent apartments and collect the regulated rents"); *Dinkins*, 805 F. Supp. at 163 (explaining that "the Second Circuit does not consider the denial of a 'reasonable return' as necessarily preventing an owner's economically viable use of his land" that constitutes a per se regulatory taking); *see also Kabrovski v. City of Rochester*, 149 F. Supp. 3d 413, 425 (W.D.N.Y. 2015) (noting that a taking "does not occur merely because a property owner is prevented from making the most financially beneficial use of a property"); *Donovan Realty, LLC v. Davis*, No. 07-CV-905, 2009 WL 1473479, at *5 n.3 (**N.D.N.Y.** May 27, 2009) (describing that the "mere diminution in value or inability to exploit property to the fullest economic extent" is insufficient to support takings claim); *Sterngass v. Town of Woodbury*, 433 F. Supp. 2d 351, 356 (**S.D.N.Y.** 2006) (holding that there is no taking where a zoning change prevented a property owner from "develop[ing] the land to its highest and best use"), *aff'd*, 251 F. App'x 21 (2d Cir. 2007) (summary order). Other courts have declined to find regulatory **takings** where the **property** values were reduced well beyond what the HSTPA allegedly does here. *See, e.g., Village of Euclid*, 272 U.S. at 384 (approximately 75%); *Hadacheck v. Sebastian*, 239 U.S. 394, 405 (1915) (92.5%); *Pulte Home Corp. v. Montgomery County*, 909 F.3d 685, 696 (4th Cir. 2018) (83%); *MHC Fin. Ltd. P'ship v. City of San Rafael*, 714

F.3d 1118, 1127 (9th Cir. 2013) (81%); *Appolo Fuels, Inc. v. United States*, 381 F.3d 1338, 1348 (Fed. Cir. 2004) (92%); *William C. Haas & Co., Inc. v. City & County of San Francisco*, 605 F.2d 1117, 1120 (9th Cir. 1979) (roughly 95%).

**\*24** Second, the Court is to evaluate whether the HSTPA interferes with investment-backed expectations to the point of constituting a taking. BRI and G-Max Plaintiffs claim that the HSTPA interferes with the investment-backed expectations by changing the reimbursement rate and recoupment period for MCIs and IAIs. (BRI Compl. ¶¶ 12, 56, 126(b); G-Max Compl. ¶¶ 2, 11–12, 85, 86–88.) BRI Plaintiffs broadly suggest that in looking at the "varied factors impacted by the HSTPA, the *Lingle* criteria for a regulatory taking fits, i.e., there is a substantial, and in fact, monumental impact and interference with investment backed expectations" and in attacking the "permanency" of the ETPA, which they argue "essentially forever preclud[es] the right to exclude from one's property," that the HSTPA effects a regulatory taking. (BRI Pls.' Mem. at 33.)[11] G-Max Plaintiffs claim that the effect of the HSTPA's "drastic infringements on fundamental property rights is to strip rent-regulated properties of economic value and eliminate any chance that owners had of realizing a reasonable return or profit on their investments." (G-Max Compl. ¶ 91.) But both the BRI and G-Max Complaints fail to allege that these changes made their properties entirely unprofitable by decreasing the percentage of IAI costs that owners can compel tenants to pay, or by increasing the minimum amortization period for MCIs. The "mere diminution in the value of property," regardless of how serious, "is insufficient to demonstrate a taking." *Concrete Pipe & Prods.*, 508 U.S. at 645. BRI and G-Max Plaintiffs' allegations that their properties have materially lost value or are less profitable do not render the HSTPA a regulatory taking. *See Andrus*, 444 U.S. at 66 ("[L]oss of future profits—unaccompanied by any physical property restriction—provides a slender reed upon which to rest a takings claim."). Judge Ramos recently considered and rejected this very argument in *335-7 LLC* and explained that given the range of expectations among property owners, landlords cannot possibly allege that RSL frustrate the reasonable investment-backed expectations of every landlord it affects. *CHIP*, 492 F. Supp. 3d at 47. Further, the HSTPA only takes effect whenever the local legislative body of a city, town, or village determines the existence of a public emergency pursuant to the ETPA – demonstrating that the law is indeed not permanent. HSTPA, Part A. Thus, the Court is not persuaded by BRI Plaintiffs' arguments on this point. Prediction of profitability is essentially a matter of reasoned speculation that courts are not especially competent to perform.

Case 1:24-cv-03973-AS   Document 830   Filed 01/13/26   Page 68 of 309
Case 1:24-cv-00211-AMN-PJE   Document 101-2   Filed 12/26/25   Page 23 of 38

Building and Realty Institute of Westchester and Putnam..., Not Reported in Fed....

Furthermore, perhaps because of its very uncertainty, the interest in anticipated gains has traditionally been viewed as less compelling than other property-related interests. *Park Ave. Tower Assocs. v. City of New York*, 746 F.2d 135, 139–40 (2d Cir. 1984) (explaining that a takings claim based on loss profits is undermined further by the legion of cases that have upheld regulations which severely diminished the value of commercial property); *CHIP*, 492 F. Supp. 3d at 51 ("[B]y the time these [p]laintiffs invested, the RSL had been amended multiple times, and a reasonable investor would have understood it could change again. Under the Second Circuit's case law, it would not have been reasonable, at that point, to expect that the regulated rate would track a given figure, or that the criteria for decontrol and rate increases would remain static."); *335-7 LLC*, 2021 WL 860153, at *12 ("[The] [p]laintiffs also cannot argue that the [HSTPA] interfered with their reasonable investment-backed expectations. Rent regulation has existed in some form in the City for over seventy years, and rent stabilization in particular has existed for over fifty years. Plaintiffs knowingly entered a highly regulated industry."). The Constitution does not demand that property owners be able to pass on to their tenants every penny of every expense and certainly not that they will be able to do so within a certain time frame. As explained during the legislative debate for the HSTPA, the changes to MCIs and IAIs were intended to "help the tenants ... stay" in their units, as "some of the individual apartment improvements [were being] made not to improve the apartments as such, but simply to raise the rent." Assembly Bill A08281, Chamber Tr. at 35, 73 (New York 2019), https://www2.assembly.state.ny.us/write/upload/transcript s/2019/6-14-19.html. Further, the challenges to the HSTPA that adjust the recoupment rate for MCIs and IAIs follow two recent changes to these very processes. In both 2011 and 2015, the New York State Legislature ("the State Legislature") lengthened the recoupment rate and amortization period for IAIs and MCIs. The 2011 amendment changed the formula for IAIs so that a landlord could increase rent by 1/60 the cost of improvement in buildings with more than 35 units, changed from 1/40. 2011 N.Y. Sess. Laws ch. 97 (McKinney). In 2015, the amendment lengthened the amortization period for MCIs from 84 months to 96 months for buildings with 35 or fewer units, and to 108 months for buildings with more than 35 units. 2015 N.Y. Sess. Laws ch. 20 (McKinney). While BRI and G-Max Plaintiffs may be unhappy that full recovery of all reasonable MCIs and IAIs costs are now on a longer schedule, the Second Circuit has held that loss of a reasonable return does not amount to a regulatory taking. *Park Ave. Tower*, 746 F. 2d at 138 ("[T]he inability of [landlords] to receive a reasonable return on their

investment by itself does not, as a matter of law, amount to an unconstitutional taking ....")

Finally, under *Penn Central* the Court looks to the "character of the governmental action." *Penn Cent.*, 438 U.S. at 124. Like the rent-control law upheld by the Supreme Court in *Bowles v. Willingham*, 321 U.S. 503 (1944), the HSTPA does not "*require* any person to ... offer any accommodations for rent." *Id.* at 517 (emphasis added). Instead, the HSTPA imposes "negative restriction[s]" on permitted uses, which are "uncharacteristic of a regulatory taking." *Buffalo Teachers.* 464 F.3d at 375; *see also Elmsford*, 469 F. Supp. 3d at 168 (finding eviction moratorium did not have the character of a taking). As discussed above, the HSTPA does not result in the physical occupation of property, but instead simply adjusts the economic relationship between owners and tenants. *FHLMC*, 83 F.3d at 48 (affirming the denial of a regulatory taking claim because plaintiff failed to demonstrate deprivation of economically viable use of the property); *Dinkins*, 805 F. Supp. at 163 (noting that the Second Circuit does not consider the denial of a reasonable return, for rent regulation, as necessarily preventing an owner's economical viable use of his land); *Greystone Hotel*, 13 F. Supp. 2d at 528–29 (finding no regulatory taking where plaintiff failed to offer facts showing that it was denied economically viable use of its property even if such use was not the plaintiff's preferred one); *Higgins*, 630 N.E. 2d at 633–34 (rejecting regulatory taking claim where the regulations did not affect the owner's right to receive the regulated rents). The HSTPA builds upon a long-standing regime of rent-stabilization that has repeatedly been upheld by courts in previous regulatory takings challenges. *335-7 LLC*, 2021 WL 860153, at *12 (rejecting a regulatory taking by reasoning that the Second Circuit has rejected the notion that loss profits, much less loss of a reasonable return, alone could constitute a taking); *CHIP*, 492 F. Supp. 3d at 51 (finding that because plaintiffs made their investments in rent-stabilized property against a backdrop of New York law that suggested RSL could change, plaintiffs could thus not allege that the HSTPA violated their reasonable investment-backed expectations).

"Legislation designed to promote the general welfare commonly burdens some more than others." *Penn Cent.*, 438 U.S. at 133. To the extent BRI and G-Max Plaintiffs attack the efficacy and the wisdom of the HSTPA, (BRI Compl. ¶¶ 5, 75, 87. 94, 244; G-Max Compl. ¶¶ 65–101, 114, 246), the case law is clear that the relevant inquiry for the courts is whether a law "arbitrarily singles out a particular parcel for different, less favorable treatment than the neighboring ones" or reflects "land-use control as

part of some comprehensive plan," *Penn Cent.*, 438 U.S. at 132. The HSTPA applies to about one million rental units in New York City and 25,000 rental units in the 21 municipalities in Westchester County. (BRI Compl. ¶ 1, at 98; G-Max Comp. ¶ 60.) The alleged burdens of the HSTPA are thus shared among many more property owners than the law upheld in *Penn Central*. As G-Max Defendants point out, landlords receive corresponding benefits because the HSTPA facilitates housing for those who otherwise could not afford it, specifically in some instances to New Yorkers who provide vital but undercompensated services, and some who would experience homelessness without it. (G-Max CVH Mem. at 24.) This in turn creates a more diverse community, and owners of unregulated properties (or regulated ones with market values below regulated rents) can charge more because of the increased demand for real estate these community benefits allow. (*Id.*) The Supreme Court has noted that a " 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *See Loretto*, 458 U.S. at 426. The HSTPA is the State Legislature's response to an ongoing housing emergency in New York and, as such, is a "public program adjusting the benefits and burdens of economic life to promote the common good." *1256 Hertel Ave.*, 761 F.3d at 264 (citation omitted).

**\*25** Putting the merits aside however, BRI and G-Max Plaintiffs claims are not ripe for judicial review. "Ripeness is a doctrine rooted in both Article III's case or controversy requirement and prudential limitations on the exercise of judicial authority." *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 347 (2d Cir. 2005). The ripeness doctrine's "basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977); *see also Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) ("Ripeness is a justiciability doctrine designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." (citation and quotation marks omitted)); *Authors Guild, Inc. v. HathiTrust*, 902 F. Supp. 2d 445, 455 (**S.D.N.Y.** 2012) ("Article III of the Constitution limits the jurisdiction of the federal courts to cases or controversies of sufficient immediacy and reality

and not hypothetical or abstract disputes." (citation and quotation marks omitted)), *vacated in part on other grounds*, 755 F.3d 87 (2d Cir. 2014).

As discussed above, *Knick* leaves undisturbed" the requirement in *Williamson* that "a state regulatory agency must render a final decision on a matter before a taking claim can proceed." *Sagaponack Realty*, 778 F. App'x at 64. BRI and G-Max as-applied regulatory taking claims are not ripe because the property owners have not tried to take advantage of available hardship exemptions. N.Y.C. Admin. Code §§ 26-511(c)(6), (6-a), 26-405(g); N.Y. Unconsol. Law §§ 8626(d)(4), (5), 8584(4). Indeed, a taking claim "depends upon the landowner's first having followed reasonable and necessary steps to allow regulatory agencies to exercise their full discretion in considering ... waivers allowed by law." *Palazzolo*, 533 U.S. at 620–21; *see also Thomas v. Town of Mamakating*, 792 F. App'x 24, 27 (2d Cir. 2019) (summary order) (explaining that judicial review is "condition[ed] ... on a property owner submitting at least one meaningful application for a variance" (quoting *Murphy*, 402 F.3d at 348)). For example, several G-Max Plaintiffs complain of mounting taxes, water bills, electric bills, insurance premiums, and the cost of regular maintenance and repairs. (G-Max Compl. ¶¶ 129, 134, 147, 160, 165.) BRI and G-Max Plaintiffs may apply to the DHCR for a hardship exemption if their rental incomes do not exceed their expenses by at least a statutorily defined percentage. N.Y.C. Admin. Code § 26-511(c)(6). However, G-Max Plaintiffs do not allege that they sought and have been denied hardship exemptions to address any shortfalls in their ability to pay their debts, thus fatally undermining this claim. *See Hodel*, 452 U.S. at 296–97 (denying relief where plaintiffs could have sought variance or waiver from the challenged provisions for use of their property); *Greystone Hotel*, 13 F. Supp. 2d at 528–29 (denying regulatory takings challenge as premature because the plaintiff had not applied for a hardship exemption); *Harmon*, 2010 WL 11530596, \*3 (finding regulatory taking not ripe where the plaintiffs failed to apply for a hardship exception). BRI and G-Max Plaintiffs also complain of not being able to convert building to condominiums or cooperative buildings. But these allegations also suffer from the same ripeness defect, as none of the BRI and G-Max Plaintiffs has tried to obtain the requisite tenant agreements for conversions to condominiums or cooperative buildings. (BRI Compl. ¶¶ 100(h), 124, at 95; G-Max Compl. ¶¶ 149, 163, 181, 186, 191, 196.)

Accordingly, because BRI and G-Max Plaintiffs have not shown that the HSTPA inflicts "any deprivation significant enough to satisfy the heavy burden placed

upon one alleging a regulatory taking" these claims are dismissed. *Keystone*, 480 U.S. at 493.

F. Substantive Due Process Under the Fourteenth Amendment

1. Applicable Law

**\*26** BRI and G-Max Plaintiffs assert substantive due process claims. To assert a substantive due process claim, plaintiff must show that (1) "a constitutionally cognizable property interest is at stake;" and (2) "[D]efendants' "alleged acts against [the property] were arbitrary, conscience-shocking, or oppressive in the constitutional sense, not merely incorrect or ill-advised." *Ferran v. Town of Nassau*, 471 F.3d 363, 369–70 (2d Cir 2006) (citations and quotation marks omitted).

To uphold the legislative choice in the face of a substantive due process challenge, a court need only find some "reasonably conceivable state of facts that could provide a rational basis" for the legislative action. *Beatie v. City of New York*, 123 F.3d 707, 712 (2d Cir. 1997) (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)). To pass constitutional muster, the legislation under review merely must "find some footing" in the realities of the subject addressed by the law. *Heller*, 509 U.S. at 321. Thus, the Second Circuit has recognized that "it may be seen that today it is very difficult to overcome the strong presumption of rationality that attaches to a statute." *Beatie*, 123 F. 3d at 712. To succeed on such a claim, BRI and G-Max Plaintiffs must "convince the [C]ourt that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Vance v. Bradley*, 440 U.S. 93, 111 (1979). However, the Court "will not strike down a law as irrational simply because it may not succeed in bringing about the result it seeks to accomplish," because "the problem could have been better addressed some other way," or because "the statute's classifications lack razor-sharp precision." *Beatie*, 123 F. 3d at 712. Thus, if public "officials responsible for the enforcement guidelines reasonably might have conceived that the policies would serve legitimate interests, those guidelines must be sustained." *All Aire Conditioning. Inc. v. City of New York*, 979 F. Supp. 1010, 1018 (**S.D.N.Y**. 1997).

The Due Process Clause "protects individual liberty against certain government actions." *Collins v. City of*

*Harker Heights*, 503 U.S. 115, 125 (1992) (quotation mark omitted). The Due Process Clause offers heightened protection against government interference with certain fundamental rights and liberty interests. *Reno v. Flores*, 507 U.S. 292, 301–02 (1993). These fundamental rights are "specific freedoms protected by the Bill of Rights" and those liberties which have been designated by the Supreme Court in a long line of cases. *See Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (citing cases in which the Supreme Court recognized various fundamental rights such as the right to marry or to have an abortion). However, economic regulations, such a rent-stabilization, are not subject to the same heightened scrutiny as fundamental rights. *See F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993) ("In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines or infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."); *see also Immediato v. Rye Neck Sch. Dist.*, 73 F.3d 454, 461 (2d Cir. 1996) ("Where the claimed right is not fundamental, the government regulation need only be reasonably related to a legitimate state objective.").

2. Analysis

**\*27** BRI and G-Max Plaintiffs assert that the HSTPA violates rent regulated property owners' substantive due process rights in violation of both the U.S. and New York Constitutions. (BRI Compl. ¶¶ 40–70, 84–97, at 92–94; G-Max Compl. ¶¶ 239–54.)[123] Specifically, BRI Plaintiffs argue that the HSTPA violates due process because it is not "rationally related to achieve any of the ends that have been used to justify the extreme measures taken under this law" and that it "fails to[ ] achieve the ends that it is claimed to serve." (BRI Compl. ¶¶ 42–44, 50.) To support their claim, BRI Plaintiffs cite studies by economists that the HSTPA does not achieve the purposes for which it allegedly was passed. (*Id.* ¶¶ 59, 146.) G-Max Plaintiffs make similar allegations, such as that the HSTPA "does not substantially advance legitimate state interests" and "does not accomplish its stated objective." (G-Max Compl. ¶ 242.) G-Max Plaintiffs also argue that the HSTPA "contravenes its purported intent—supposedly, to preserve affordable housing in New York" but "in fact, [it] do[es] the opposite." (*Id.* ¶ 5.) While the specifics of their allegations somewhat differ, BRI and G-Max Plaintiffs both allege broadly that the HSTPA is "arbitrary and irrational" on its face. (BRI Compl. ¶¶ 2–3, 41, 69, 91, 95, 97, at 93–94; G-Max Compl. ¶¶ 1, 5, 20, 69,

Case 1:24-cv-03973-AS  Document 830  Filed 01/13/26  Page 71 of 209
Case 1:24-cv-00211-AMN-PJE  Document 101-2  Filed 12/26/25  Page 26 of 38

Building and Realty Institute of Westchester and Putnam..., Not Reported in Fed....

101–02, 243, 252, 278.)[54]

First, as a threshold matter, BRI and G-Max Plaintiffs cannot invoke the substantive due process doctrine to circumvent the requirements of takings claim. In *Stop the Beach Renourishment, Inc. v. Florida. Department of Environmental Protection*, 560 U.S. 702 (2010) (plurality opinion), the Supreme Court explained that plaintiffs cannot use substantive due process "to do the work of the Takings Clause" in circumstances in which "a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior." *Id.* at 721; *see also Albright v. Oliver*. 510 U.S. 266, 273 (1994) (plurality opinion) ("Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.' " (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989))); *Gounden v. City of New York*, No. 10-CV-3438, 2011 WL 13176048, at *4 (E.D.N.Y. Apr. 22, 2011) (finding that the Fifth Amendment, an explicit textual source, guides the analysis for plaintiff's taking claim rather than substantive due process). Undaunted by contrary authority, BRI Plaintiffs contend that "a reading of the case law reveals" that they may bring a substantive due process claim that "arise[s] out of the same facts as their takings claim." (BRI Pls.' Mem. at 47.) In support of this assertion, BRI Plaintiffs rely on Justice Kennedy's concurrence in *Lingle* and his concurrence in *Stop the Beach*, pointing to the notion that "a regulation might be so arbitrary or irrational as to violate due process." (*Id.* (citing *Lingle*, 544 U.S. at 548–49 (Kennedy, J., concurring); *Stop the Beach*, 560 U.S. at 737 (Kennedy, J., concurring)).) But a concurrence is not binding precedent. *See Maryland v. Wilson*, 519 U.S. 408, 412–13 (1997) (observing that statement in a concurrence does not "constitute[ ] binding precedent"). Given the lack of authority for the claim, the Court rejects it and dismisses the due process claims. *Stop the Beach*, 560 U.S. at 721.

**\*28** However, even when considered on the merits, the Court concludes that the due process claims fail under rational basis review.[55] BRI Plaintiffs argue that their due process rights are violated due to "the lack of surveys and findings of an emergency for decades." (BRI Pls.' Mem. at 49.) BRI Plaintiffs point to "the amount of housing construction in Westchester in the last decades," asserting that this is "more than adequate housing." (*Id.*) BRI Plaintiffs further contend that the HSTPA "impinges on substantive property rights, not merely economic regulation, but basic restriction on a person's ability to use his or her own property without arbitrary and unconscionable government restriction." (*Id.* at 51.) BRI Plaintiffs lodge conclusory allegations to challenge the lack of underlying data to support the State Legislature's concern about housing emergencies while offering no analysis as to why the HSTPA does not pass rational basis review to warrant discovery. (*Id.* at 51–52.)

G-Max offers similar arguments about the purported goals of the HSTPA and questions the law's efficacy at addressing such issues surrounding affordable housing. (G-Max Pls.' Mem. at 52–63.) Specifically, G-Max Plaintiffs highlight that instead the HSTPA

> authorizes tenants to remain entrenched in rent-regulated units no matter how high the rent or how high their incomes[,] ([G-Max] Compl. ¶ 245): how the repeal of the sunset provisions severs any purported link between the HSTPA and the "emergency" it is purportedly designed to address[,] (*id.* ¶ 246); how it amends the co-op/condo conversion rules for *unregulated* properties, even though the conversion of such buildings has no conceivable nexus to affordable housing[,] (*id.* ¶ 114); and how certain provisions are given impermissibly retroactive effect[,] (*id.* ¶¶ 82, 85, 88–89). Indeed, the [G-Max] Complaint explains that, through its far-reaching web of now-permanent restrictions on ownership rights, the HSTPA will *necessarily* exacerbate the emergency it is supposedly intended to address. *See id.* ¶¶ 64, 73, 75–76, 245.

**\*29** (*Id.* at 53.) But the Second Circuit has held that "[l]egislative acts that do not interfere with fundamental rights or single out suspect classifications carry with them a strong presumption of constitutionality and must be upheld if rationally related to a legitimate state interest." *Beatie*, 123 F.3d at 711 (quotation marks omitted). A regulation "may be based on rational speculation unsupported by evidence or empirical data." *Beach Commc'ns*, 508 U.S. at 315; *see also Lingle*, 544 U.S. at 544–45 (noting that the "reasons for deference to legislative judgments about the need for, and likely effectiveness of, regulatory actions are by now well established," and that such deference is preferable to "choos[ing] between the views of two opposing economists"); *Beatie*, 123 F.3d at 713 (holding that "a lack of direct empirical support for the [legislature's] assumption" could not "rebut the presumption that the statute has a rational basis"). 2019 N.Y. Sess. Laws ch. 36, N.Y. Comm (McKinney)

The State Legislature had a rational basis to pass the HSTPA to achieve its goals related to the State's housing crisis. Specifically, the State Legislature found that "tenants struggle[d] to secure safe, affordable housing, and landlords ha[d] little incentive to keep tenants in place long term by offering consistently low rent

Case 1:24-cv-03973-AS   Document 830   Filed 01/13/26   Page 72 of 209
Case 1:24-cv-00211-AMN-PJE   Document 101-2   Filed 12/26/25   Page 27 of 38

Building and Realty Institute of Westchester and Putnam..., Not Reported in Fed....

increases." N.Y. Comm. Report, S. 6458 ("Committee Report"), 242nd Sess. (2019). In direct response to such a concern, the State Legislature limited landlords' ability to deregulate units so that tenants would not be displaced and curtailed landlords' ability to increase rents. The HSTPA also addressed the issues of housing instability and tenant hardship, both of which are recognized as a legitimate state goal. *See Pennell*, 485 U.S. at 14 n.8 ("The consideration of tenant hardship also serves the additional purpose ... of reducing the costs of dislocation that might otherwise result if landlords were to charge rents to tenants that they could not afford."); *CHIP*, 492 F. Supp. 3d at 52 (upholding RSL where the housing shortage was only one of multiple justifications offered for the regulation, and concluding that a statute must be upheld so long as any one justification is valid). The State's interest in stabilizing rent, limiting a landlord's ability to charge more than the regulated rent, preventing deregulation of rent-stabilized apartments, and restricting the ability of landlords to remove tenants in certain circumstances are rationally related to the goal of maintaining stable rents and keeping tenants in their homes. *Pennell*, 485 U.S. at 13 (noting that the Supreme Court "ha[s] long recognized that a legitimate and rational goal of price or rate regulation is the protection of consumer welfare" and this includes "protecting tenants from burdensome rent increases"); *see also Nordlinger v. Hahn*, 505 U.S. 1, 12 (1992) ("[T]he State has a legitimate interest in local neighborhood preservation, continuity, and stability."). Rent stabilization laws, like the HSTPA, serve the aim of keeping tenants in their homes. *See Higgins*, 630 N.E.2d at 634 (finding a "close causal nexus" between the RSL and preventing homelessness); *CHIP*, 492 F. Supp. 3d at 52 (rejecting Due Process challenge to the HSTPA given the multiple justifications for the law, such as alleviating New York City's housing shortage).[36] As the Supreme Court long ago articulated in *Pennell*, the goal of "preventing excessive and unreasonable rent increases caused by the growing shortage of and increasing demand for housing ... is a legitimate exercise of ... police powers." 485 U.S. at 12 (quotation marks omitted).

**\*30** Importantly, one of the broadest aims of the HSTPA is to make housing more affordable. HSTPA, Part D, § 1 ("The situation has permitted speculative and profiteering practices and has brought about the loss of vital and irreplaceable affordable housing for working persons and families. The legislature therefore declares that in order to prevent uncertainty, potential hardship[,] and dislocation of tenants living in housing accommodations subject to government regulations as to rentals and continued occupancy as well as those not subject to such regulation, the provisions of this act are necessary to protect the

public health, safety[,] and general welfare."). Even dating back to 1969 when the first RSL were passed, the City Council at the time found that landlords were "demanding exorbitant and unconscionable rent increases," which caused "severe hardship to tenants." N.Y.C. Admin. Code § 26-501. Limiting landlords' ability to charge more than the regulated rent, placing caps on the amount chargeable for credit checks and late fees, preventing deregulation of units, and changing the percentage needed to covert buildings into condominiums and cooperatives are related to the overall goal of preventing excessive and unreasonable rent increases rampant throughout New York State and serve the aim of making housing more affordable. The New York State Senate sought to lock in preferential rents to close the loophole that permitted owners to increase rents by a greater percentage than that approved by the local RGBs, and to prevent sharp rent increases that could force tenants to be displaced from their apartments. *See* Committee Report. ("[The HSTPA was] enacted in response to an ongoing housing shortage crisis, as evidenced by an extremely low vacancy rate. Under tight rental markets, tenants struggle to secure safe, affordable housing, and landlords have little incentive to keep tenants in place long term by offering consistently low rent increases.").[37] The New York State Senate explained in its justification of the HSTPA that the City and the municipalities in Nassau, Westchester, and Rockland struggle to protect their regulated housing stock, which is critical in "maintain[ing] affordable housing for millions of low and middle income tenants." *Id.* The New York State Senate went on to describe that the rent regulations in the HSTPA make it so that "residents can afford to live there without the threat of eviction, the fear of rapid and unaffordable rent increases, or rent burden." *Id.* These aims are "rationally related to a legitimate government interest." *Beatie*, 123 F.3d at 711; *see also Pennell*, 485 U.S. at 13 (applying rational basis review to a rent regulation and highlighting that the Supreme Court has "long recognized that a legitimate and rational goal of price or rate regulation is the protection of consumer welfare").

While BRI and G-Max Plaintiffs wish to cast doubt on the wisdom of the HSTPA, "it is, by now, absolutely clear that the Due Process Clause does not empower the judiciary to sit as superlegislature to weigh the wisdom of legislation." *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 124 (1978) (quotation marks omitted). Given the clear connection between the State Legislature's purpose and the enactment of the HSTPA, Plaintiffs' allegations regarding the efficacy of the law do not diminish that it aims to serve the permissible goal, even if imperfectly, to address housing issues in the State. (*See* BRI Compl. ¶¶

Case 1:24-cv-03973-AS    Document 830    Filed 01/13/26    Page 73 of 209
Case 1:24-cv-00211-AMN-PJE    Document 101-2    Filed 12/26/25    Page 28 of 38

Building and Realty Institute of Westchester and Putnam..., Not Reported in Fed....

44–70; G-Max Compl. ¶¶ 75–78.) The Supreme Court has "emphatically refuse[d] to go back to the time when courts used the Due Process Clause to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought." *Ferguson v. Skrupa*, 372 U.S. 726, 731–32 (1963) (quotation marks omitted). It is long settled that "States have power to legislate against what are found to be injurious practices in their internal commercial and business affairs ...." *Id.* at 730. BRI and G-Max Plaintiffs' substantive due process claims therefore fail to state a claim and are consequently dismissed.

## G. Equal Protection

### 1. Applicable Law

G-Max Plaintiffs also bring equal protection claims. The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall make or enforce any law which ... den[ies] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This is "essentially a direction that all persons similarly situated be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *see also Sound Aircraft Servs., Inc. v. Town of East Hampton*, 192 F.3d 329, 335 (2d Cir. 1999) ("At its core, equal protection prohibits the government from treating similarly situated persons differently."). To state an equal protection claim, G-Max Plaintiffs must "plausibly allege that [they have] been intentionally treated differently from others similarly situated and no rational basis exists for that different treatment." *Progressive Credit Union v. City of New York*, 889 F.3d 40, 49 (2d Cir. 2018) (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). The Constitution guarantees the "right to be free from invidious discrimination in statutory classifications and other governmental activity." *Harris v. McRae*, 448 U.S. 297, 322 (1980). Where a challenged policy neither disadvantages a suspect class nor interferes with a fundamental right, the claim will survive constitutional scrutiny if the policy is rationally related to a legitimate state purpose or interest. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973).

### 2. Analysis

**\*31** G-Max Plaintiffs allege an equal protection violation. (G-Max Compl. ¶¶ 255–64.)³⁸ Specifically, G-Max Plaintiffs claim that the HSTPA "singles out building owners whose properties happen to include rent-regulated units ... for oppressive treatment that ... bears no rational relationship to the goal of providing affordable housing." (*Id.* ¶¶ 257, 262.) G-Max Plaintiffs do not contend that the HSTPA disadvantages a suspect class or interferes with a fundamental right; instead they argue that the law is not rationally related to a legitimate state interest. (G-Max Pls.' Mem. at 63–64.) Rational basis review is the proper standard to analyze equal protection challenges to rent stabilization laws. *See Black v. State of New York*, 13 F. Supp. 2d 538, 542 (**S.D.N.Y.** 1998) ("The rational relationship standard is the appropriate standard for testing the validity under the Equal Protection Clause of laws regulating housing rental rates."); *see also Lindsey v. Normet*, 405 U.S. 56, 74 (1972) (applying rational relationship standard to statute that mandated timely determination of eviction proceedings).³⁹ Under this standard, a challenged statute is given a strong presumption of validity and then tested to determine if the classification it creates is rationally related to a legitimate state interest. *City of Cleburne*, 473 U.S. at 440; *Beach Commc'ns*, 508 U.S. at 314–15. "[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Beach Commc'ns*, 508 U.S. at 313. Indeed, following this principle, courts have upheld prior iterations of RSL in New York against equal protection challenges. *See Black*, 13 F. Supp. 2d at 542 (dismissing equal protection challenge to RSL's succession provisions because "prevention of the loss of housing by apartment inhabitants" is "a legitimate goal of the state and city legislatures"); *see also Pennell*, 485 U.S. at 14 (rejecting equal protection claim to a provision of a San Jose rent control law because the ordinance was designed to serve the legitimate purpose of protecting tenants and could hardly be viewed as irrational).

There is no doubt that the HSTPA passes the rational basis test. As noted above, the goals of the HSTPA are rationally related to a legitimate state interest in the stability of the New York housing market and other aims as explained in the analysis of G-Max Plaintiffs' substantive due process claim. Accordingly, G-Max Plaintiffs equal protection claims also fail as a matter of law.

## H. Contract Clause Under Article I, § 10

### 1. Applicable Law

Article I, § 10 provides that "[n]o State shall ... pass any ... Law impairing the Obligation of Contracts." U.S. Const., art. I, § 10, cl. 1. To state a claim for violation of the Contract Clause, a complaint must allege sufficient facts to demonstrate that state law has "operated as a substantial impairment of a contractual relationship." *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992) (citations omitted). "This inquiry has three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial." *Id.* Even if a state law constitutes a substantial impairment, however, it will survive a Contract Clause challenge if it serves "a significant and legitimate public purpose" and "the adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.' " *Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411–12 (1983) (alterations in original) (quoting *U.S. Tr. Co. v. New Jersey*, 431 U.S. 1, 22 (1977)).

To determine whether a Contract Clause violation exists, the threshold question is " 'whether the state law has, in fact, operated as a substantial impairment of a contractual relationship.' " *Id.* at 411. As the severity of impairment increases, so too does the level of scrutiny to which the legislation is subjected. *Id.* As a measure of contractual expectations, one factor to be considered in determining the extent of the impairment is "whether the industry the complaining party has entered has been regulated in the past." *Kraebel v. N.Y.C. Dept. of Hous. Pres. & Dev.*, 959 F.2d 395, 403 (2d Cir. 1992) (citation omitted). The next question is whether the state has "a significant and legitimate public purpose behind the regulation." *Energy Rsrvs.*, 459 U.S. at 411. Lastly, the Court must consider "whether the adjustment of the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption." *Id.* at 412 (brackets in original) (citations and quotations omitted).

### 2. Analysis

**\*32** BRI and G-Max Plaintiffs challenge the HSTPA's change to preferential rents as a violation of the Contract Clause. U.S. Const., art. I, § 10, cl. 1. (*See* BRI Compl. ¶¶ 121–23; G-Max Compl. ¶¶ 265–72.) BRI Plaintiffs also argue that the HSTPA "diminishes the ability of a landlord to maintain the housing, perform capital repairs,

do individual apartment improvements, and eliminates the availability of housing for those in the most need due to the purported 'goal.' " (BRI Pls.' Mem. at 60.) Similarly, G-Max Plaintiffs allege that the HSTPA has impaired existing contractual relationships based on other provisions aside from preferential rents, which include limits on MCIs and IAIs that were already under contract, limiting the amount recoverable in a summary proceeding, "destroying the benefit of the bargain for owners who contracted with the City to offer affordable housing units under the Article XI program." and a change to the percentage required for cooperative and condominium conversions. (G-Max Compl. ¶ 268.)[20] G-Max Plaintiffs make facial and as-applied challenges under the Contract Clause. (*Id.* ¶ 267.) BRI Plaintiffs argue that the HSTPA violates the Contract Clause as it "impairs the existing lease (contract) agreements." (BRI Compl. at 96.) G-Max Plaintiffs lodge a similar complaint, alleging that the HSTPA causes the "substantial impairment of existing contracts," rendering the law "invalid." (G-Max Compl. ¶ 5.) Specifically, G-Max Plaintiffs allege that the HSTPA "has undermined the bargains embodied in these contracts, interfered with the contracting parties' reasonable expectations, and prevented landlord owners, including [G-Max] Plaintiffs, from safeguarding their rights." (*Id.* ¶ 269.)[21] BRI and G-Max Plaintiffs also challenge the provision which provides that the rent under a renewal lease "shall be no more than the rent charged to and paid by the tenant prior to that renewal, as adjusted by the most recent applicable [Rent Guidelines Board-approved] increases and any other increases authorized by law." *See* HSTPA, Part E § 1. The change is essentially that this provision applies to all rent regulated rents, including preferential rents.

BRI and G-Max Plaintiffs have not plausibly stated a Contract Clause violation because their claims are based on future, rather than existing, contracts. (BRI Pls.' Mem. at 62–64; G-Max Pls.' Mem. at 65–66.) The law has been well settled for almost 200 years that the Contract Clause does not "limit the ability of the government to regulate the terms of *future* contracts." *Traher v. Republic First Bancorp. Inc.*, 432 F. Supp. 3d 533, 539 (E.D. Pa. 2020) (emphasis in original) (citing *Ogden v. Saunders*, 25 U.S. 213 (1827)). Recently, in *CHIP*, the court evaluated similar claims by plaintiffs that the HSTPA revised the duration of their expiring leases as "unavailing." 492 F. Supp. 3d at 53. The court explained that as applied to future renewals "[a] contract ... cannot be impaired by a law in effect at the time the contract was made." *Id.* (alterations in original) (quoting *Harmon*, 412 F. App'x at 423). The court explained that future leases will be subject to the HSTPA from the onset. *Id.* (citing *2 Tudor City Place Assocs. v. 2 Tudor City Tenants Corp.*, 924

F.2d 1247, 1254 (2d Cir. 1991) ("Laws and statutes in existence at the time a contract is executed are considered a part of the contract, as though they were expressly incorporated therein."); *see also Bricklayers Union Loc. 21 v. Edgar*, 922 F. Supp. 100, 105 (N.D. Ill. 1996) (holding that "claims regarding future contracts do not state a claim since the Contract Clause does not apply to laws with prospective effect."). The court in *CHIP* ultimately rejected the plaintiffs' Contract Clause claim regarding their expiring, preferential leases on these grounds. 492 F. Supp. 3d at 53. BRI and G-Max Plaintiffs do not allege that Part E of the HSTPA has been applied retroactively to any lease renewals between Plaintiffs and their tenants. Still, even if BRI and G-Max Plaintiffs had made such allegations, precedent bars such challenges to the HSTPA under the Contract Clause to enjoin the law's enforcement against future contracts. *See Elmsford*, 469 F. Supp. 3d at 170 ("[T]he Contracts Clause also permits states to modify and abrogate existing contract terms long since agreed to and performed by the parties."); *see also Fraternal Ord. of Police v. District of Columbia*, 502 F. Supp. 3d 45, 59–60 (D.D.C. 2020) ("As to any future contracts, it is well established that that Contract Clause only concerns itself with laws that retroactively impair current contract rights."), *appeal docketed*, No. 21-7059 (2d Cir. June 7, 2021); *Powers v. New Orleans City*, No. 13-CV-5993, 2014 WL 1366023, at *4 (E.D. La. Apr. 7, 2014) ("[T]he Contract Clause applies only to substantial impairment of existing contracts and not prospective interference with a generalized right to enter into future contracts."), *aff'd sub nom. Powers v. United States*, 783 F.3d 570 (5th Cir. 2015); *Robertson v. Kulongoski*, 359 F. Supp. 2d 1094, 1100 (D. Or. 2004) ("The Contract Clause does not prohibit legislation that operates prospectively."), *aff'd*, 466 F.3d 1114 (9th Cir. 2006). The HSTPA allows owners to increase preferential rents annually by the same percentages as any other regulated rents, as well as to account for MCIs, IAIs, and otherwise as authorized by law. *See* HSTPA, Part E, § 1. BRI Plaintiffs assert that the HSTPA "forever extend[s]" the preferential rent in current leases. (BRI Pls.' Mem. at 63.)[c] However, this is not accurate. Tenants must sign new leases to continue their occupancy, and landlords can increase rents in those new leases by the amount set by the RGB or decline to renew the leases in certain circumstances such as to recover for personal use based on an immediate and compelling necessity, among other exit options. HSTPA, Part E; N.Y.C. Admin. Code § 26-511(c)(9)(b); N.Y.C.R.R. tit. 9 §§ 2524.5(a)(2), 520.11(e), 2522.4(b) and (c). For G-Max Plaintiffs in particular, while they have identified a contractual relationship, they have not alleged that it was impaired by the HSTPA. Plaintiff G-Max cites a preferential rent for a two-year lease that commenced February 1, 2018, and

expired on February 1, 2020 and Plaintiff Longfellow entered into a two-year lease also with preferential rent that started May 1, 2018 and ended July 1, 2020. (*See* G-Max Compl. ¶¶ 131, 135.) However, both these leases took effect *prior* to the enactment of the HSTPA (on June 14, 2019); thus, the law did not impair these contracts at all. These G-Max Plaintiffs would have collected the same rent for the duration of these contracts had the HSTPA not been enacted.

**\*33** Moreover, prior versions of RSL barred uncontrolled increases of preferential rents until 2003, so this change was not outside of the realm of reasonable expectations of the property owners. With the passage of the HSTPA, the terms of the amendments have been incorporated into all rent-stabilized lease renewals since its enactment on June 14, 2019, and thus BRI and G-Max Plaintiffs fail to state a Contract Clause claim with respect to such leases. *See Traher*, 432 F. Supp. 3d at 539 ("[T]he Supreme Court limited the reach of the Contracts Clause by holding that it did not limit the ability of the government to regulate the terms of *future* contracts." (citing *Ogden*, 25 U.S. 213)). BRI and G-Max Plaintiffs allege that these preferential rents will be charged in perpetuity or are locked into place going forward. (BRI Compl. ¶ 45; G-Max Compl. ¶¶ 131, 135, 138.) But such assertions are incorrect as rents may be revoked when the current tenant vacates a rent-regulated apartment. *See* HSTPA, Part E, § 1.

Further, any as-applied Contract Clause claims against BRI and G-Max Defendants fails because the HSTPA does not substantially impair new leases due to the fact that no reasonable expectations have been disrupted. It is "well established that [New York] City's rent control laws do not unconstitutionally impair contract rights." *Brontel, Ltd. v. City of New York*, 571 F. Supp. 1065, 1072 (**S.D.N.Y.** 1983) (citing *Marcus Brown Holding Co. v. Feldman*, 256 U.S. 170, 198 (1921)); *Tonwal Realties, Inc. v. Beame*, 406 F. Supp. 363, 365 (**S.D.N.Y.** 1976) (same); *Israel v. City Rent & Rehab. Admin. of N.Y.*, 285 F. Supp. 908, 910 (**S.D.N.Y.** 1968) (holding that the constitutionality of rent control statute is well settled and does not violate the impairment of contract rights); *see also Troy Ltd. v. Renna*, 727 F.2d 287, 298–99 (3d Cir. 1984) (holding that the rental housing law did not violate the Contract Clause because courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure and noting that it was doubtful that any impairment of a contractual relationship had occurred); *Kargman v. Sullivan*, 582 F.2d 131, 134–35 (1st Cir. 1978) (finding no Control Clause violation for Boston's rent control law).

A law only violates the Contract Clause when it "operate[s] as a substantial impairment of a contractual relationship" and is not "drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose." *Sveen v. Melin*, 138 S. Ct. 1815, 1821–22 (2018) (citation and quotation marks omitted). In the justification for the stand-alone bill regarding preferential rents that is incorporated into the HSTPA, the State Senate explained that the 2003 amendment permitting rent increases to the regulated maximum

> put hundreds of thousands of tenants at risk of sudden and unexpected substantial rent increases. All too many ... have been unable to pay the higher rents and been forced to leave their homes. Countless tenants have also been discouraged from raising concerns about conditions in their apartments and/or buildings because of fears this could lead to the termination of their preferential rents.

Committee Report; *see also* Assembly Bill A08281, Chamber Tr. at 74, 76 (stating that, because "the landlords have the right today to go back to the legal rent ... no tenant is going to want to ever make any demands of the landlord" and that landlords were "jacking up the rents to displace longtime residents"). In reviewing a Contract Clause claim challenging an economic or social regulation, like the HSTPA, "courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Energy Rsrvs.*, 459 U.S. at 413 (citation omitted). Courts should not "second-guess the [legislature's] determinations that these are the most appropriate ways of dealing with the problem." *Keystone*, 480 U.S. at 506 (rejecting Contract Clause claim); *cf. W. 95 Hous. Corp. v. N.Y.C. Dep't of Hous. Pres. & Dev.*, 01-CV-1345, 2001 WL 664628, at *10 (**S.D.N.Y.** June 12, 2001) (explaining in the context of an equal protection claim that the court need not-and should-not decide whether the legislature's decision to pass RSL was correct), *aff'd*, 31 F. App'x 19 (2d Cir. 2002). Under prior RSL, owners were able to increase preferential rents by a greater percentage than the amount approved by the Rent Stabilization Board, as long as it did not exceed the maximum legal rent. *See* HSTPA, Part E, § 1 (modifying N.Y.C. Admin. Code § 26-511(c)(14)). By limiting such increases to the approved percentage, the HSTPA merely restores the law as it existed prior to 2003. *See Rosenshein v. Heyman*, 854 N.Y.S.2d 835, 835–36 (App. Div. 2007) (noting that RSL were amended in 2003 to allow owners to revoke preferential rents upon renewal). The State Senate in its enactment of the HSTPA sought to remedy the issue of preferential rents, and this Court must defer to the legislative judgment regarding the necessity and reasonableness of taking this measure. *See U.S. Tr. Co.*, 431 U.S. at 22–23 ("As is customary in reviewing economic and social regulation, however,

courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure."). It is not for this Court to "weigh the wisdom of legislation nor to decide whether the policy which it expresses offends the public welfare." *Day-Brite Lighting, Inc. v. Missouri*, 342 U.S. 421, 423 (1952); *see also Pa. Coal*, 260 U.S. at 413 ("The greatest weight is given to the judgement of the legislature[.]").[12]

**\*34** The Court finds that BRI and G-Max Plaintiffs have not pled sufficient facts to demonstrate that the impairment by the HSTPA is substantial. BRI and G-Max Plaintiffs are "involved in a heavily-regulated industry—rental of residential property in New York City—and cannot claim surprise that [their contractual] relationships with certain tenants are affected by governmental action." *Kraebel*, 959 F.2d at 403; *see also Energy Rsrvs.*, 459 U.S. at 413–14 (holding that the regulation did not substantially impair a contract because "supervision of the industry was extensive and intrusive"); *All. of Auto. Mfrs., Inc. v. Currey*, 984 F. Supp. 2d 32, 54 (D. Conn. 2013) ("Where, as here, the industry has been heavily regulated, and regulation of contracts is therefore foreseeable, a party's ability to prevail on its Contracts Clause challenge is greatly diminished."). The HSTPA has not substantially impaired any contracts because no reasonable expectations regarding rent-stabilized housing have been disrupted.[14] When BRI and G-Max Plaintiffs "purchased into an enterprise already regulated in the particular [manner] to which [they] now object[ ], [they] purchased subject to further legislation upon the same topic." *Veix v. Sixth Ward Bldg. & Loan Ass'n of Newark*, 310 U.S. 32, 38 (1940). Accordingly, BRI and G-Max Plaintiffs' Contract Clause claims are dismissed.

### III. Conclusion

For the foregoing reasons, BRI Defendants, G-Max Defendants, CVH, and T&N Motions To Dismiss are granted in their entirety. The Clerk of Court is respectfully directed to terminate the pending Motions, (Dkt. Nos. 60, 62, Case No. 19-CV-11285; Dkt. Nos. 67, 70, 72, Case No. 20-CV-364.) Because this is the first adjudication of BRI and G-Max Plaintiffs claims on the merits, the dismissal is without prejudice and with leave to amend the BRI and G-Max Complaints within 30 days of the date of this Order.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 4198332

Footnotes

1    BRI Plaintiffs are: Building and Realty Institute of Westchester and Putnam Counties, Inc.; Apartment Owners Advisory Council;
     Cooperative and Condominium Council; Stepping Stones Associates, L.P.; Lisa DeRosa as Principal of Stepping Stones, L.P.;
     Jefferson House Associates, L.P.; Shub Karman, Inc.; DiLaRe, Inc.; Property Management Associates; and Nilsen Management Co.,
     Inc.

2    The BRI Plaintiffs do not continue the use of numerical paragraphs on pages 91 to 98 of the BRI Complaint. As such, facts from
     this portion will be cited by page number.

3    2019 N.Y. Sess. Laws Ch. 36 (McKinney), hereinafter "HSTPA." The HSTPA is also commonly referred to as the "2019
     amendments," but the Court will use "HSTPA" for clarity.

4    CVH filed a Motion To Intervene in the BRI Action, which the Court granted. (Dkt. No. 86.)

5    *See also 335-7 LLC v. City of New York*, No. 20-CV-1053 (**S.D.N.Y.**); *Community Housing Improvement Program v. City of New York*,
     No. 19-CV-4087 (E.D.N.Y.); and *74 Pinehurst LLC v. State of New York*, No. 19-CV-6447 (E.D.N.Y.).

6    G-Max Plaintiffs include the following: G-Max Management, Inc.; 1139 Longfellow, LLC; Green Valley Realty, LLC; 4250 Van
     Cortlandt Park East Associates, LLC; 181 W. Tremont Associates, LLC; 2114 Haviland Associates, LLC; Siljay Holding LLC; 125
     Holding LLC; Jane Ordway; Dexter Guerrieri; Brooklyn 637-240 LLC; and 447-9 16th LLC.

7    CVH and T&N filed a Motion To Intervene in the G-Max Action, which the Court granted. (Dkt. No. 92.)

8    The Court does not, however, consolidate the cases.

9    The New York State Office of the Attorney General (the "NYAG") represents all Defendants in the BRI Action. (*See generally* Dkt.,
     Case No. 19-CV-11285.)

10   In the G-Max Action, the NYAG represents the State of New York, Visnauskas, and Pascal. (*See generally* Dkt., Case No.
     20-CV-634.) The New York City Law Department represents the City of New York. (*See generally id.*) Similarly, the BRI Plaintiffs
     are "organizations and landlords in Westchester County."

11   Section 1983 actions may be brought against state actors to enforce rights created by federal statutes as well as by the
     Constitution. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 279 (2002). To state a § 1983 claim, Plaintiffs must allege that Defendants

"acted under color of state law" and that as a result Plaintiffs "suffered a denial of ... federal statutory rights, or ... constitutional rights or privileges." *Annis v. County of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998).

12   *See also Bay Point Props., Inc. v. Miss. Transp. Comm'n*, 937 F.3d 454, 456–57 (5th Cir. 2019) (holding that the takings claim against the state agency must be dismissed based on Eleventh Amendment immunity); *Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1213–14 (10th Cir. 2019) (same); *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 552 (4th Cir. 2014) (concluding that "the Eleventh Amendment bars Fifth Amendment taking claims against States in federal court when the State's courts remain open to adjudicate such claims" (italics omitted)); *Jachetta v. United States*, 653 F.3d 898, 909–10 (9th Cir. 2011) (same); *Seven Up Pete Venture v. Schweitzer*, 523 F.3d 948, 955 (9th Cir. 2008) (determining that the "Takings Clause, which is ... self-executing ... can comfortably co-exist with the Eleventh Amendment immunity of the States from similar actions in federal court"); *DLX, Inc. v. Kentucky*, 381 F.3d 511, 528 (6th Cir. 2004) (holding that "because [the state] enjoys sovereign immunity in the federal courts from [the plaintiff's] federal takings claim, the district court was correct to dismiss the ... complaint for want of jurisdiction"), *overruled on other grounds San Remo Hotel, L.P. v. City & County of San Francisco*, 545 U.S. 323 (2005); *Robinson v. Ga. Dep't of Transp.*, 966 F.2d 637, 638, 640–41 (11th Cir. 1992) (holding Eleventh Amendment barred plaintiffs' claim "for violation of the Fifth and Fourteenth Amendments for a taking of their property"); *Garrett v. State of Illinois*, 612 F.2d 1038, 1040 (7th Cir. 1980) (ruling that a takings claim filed in federal court against the state barred by Eleventh Amendment).

13   Moreover, the Second Circuit has held that corporate shareholders "generally lack standing to assert claims in their own name based on injury to the [entity] and must instead bring such claims derivatively." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 122 (2d Cir. 2013).

14   BRI Plaintiffs explain that "the essence of the [BRI] Complaint is a facial challenge" to the HSTPA. (BRI Pls.' Mem. at 68). But BRI Plaintiffs by their own admission state that they "do not allege a physical encroachment." (*Id.* at 15.) BRI Plaintiffs misstate the law regarding physical takings, describing these challenges as applicable "when the degree of the regulation is such that it removes an opportunity for a reasonable return on investment." *Id.* This describes the analysis for *regulatory* takings. For example, BRI Plaintiffs cite *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922), but that case is generally regarded as the first case to address the concept of regulatory takings – in which the Supreme Court held that government *regulation* will not be considered a taking unless the regulation "goes too far." *Id.* at 415. BRI Plaintiffs confuse the two types of takings in other portions of their Memorandum of Law. (*See* BRI Pls.' Mem. at 13–15, 22 (BRI Defendants cite *regulatory* takings cases such as *Tahoe-Sierra, Eastern Enterprises. v. Apfel*, 524 U.S. 498 (1998), *Dolan v. City of Tigard*, 512 U.S. 374 (1994), *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987); *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992), and *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104 (1978).) As such, these arguments will be addressed in the regulatory takings analysis *infra*.

15   The Court notes that not once in the 98-page BRI Complaint do BRI Plaintiffs mention an "as-applied" taking challenge to the HSTPA. (*See generally* BRI Compl.) The Court believes that given the extremely high burden to mount a successful facial challenge for a physical or regulatory taking that BRI Plaintiffs styled claims as "as-applied" given the less stringent standard. However, the BRI Complaint is devoid of analysis as to its application to the various landlords involved in the BRI Action. Instead, BRI Plaintiffs repeatedly assert that the HSTPA is unconstitutional in all circumstances – which is a facial, not as-applied, challenge. (BRI Compl. at 95–97.) As such, the Court construes BRI Plaintiffs takings challenge as a facial one and dismisses it for the same reasons as it dismisses the G-Max Plaintiffs' claim.

16   Indeed, the Second Circuit has rejected physical takings claims against rent stabilization laws, like the HSTPA. *See Harmon v. Markus*, 412 F. App'x 420 (2d Cir. 2011) (summary order); *FHLMC*, 83 F.3d at 47–48. Furthermore, even if the HSTPA goes beyond prior versions of the rent stabilization laws in New York, "it is not for a lower court to reverse this tide." *FHLMC*, 83 F.3d at 47; *see also 335-7 LLC*, 2021 WL 860153, at *10 (holding that plaintiffs had not sufficiently alleged an as-applied physical takings challenge because "these limitations [do not] lock[ ] [the] [p]laintiffs out of screening their tenants or leaving the rental market.").

17    BRI Plaintiffs cite *Loretto* and note that the Supreme Court found a taking where there was minimal intrusion by the use of the property for cable equipment. (BRI Pls.' Mem. at 23.) *Loretto* is distinguishable. In *Loretto*, the key part of the Supreme Court's analysis was that the cable equipment installed at appellant's building under a New York state law was a *physical intrusion* that resulted in a *permanent physical occupation* – very different from the rent regulations, like the HSTPA, that allegedly impact property owners' rights according to BRI and G-Max Plaintiffs. *Loretto*, 458 U.S. at 426.

18    The Court notes that these challenged succession rules pre-date the HSTPA, and have been previously upheld by courts; therefore, such challenges to these rules cannot form the basis of a physical taking claim here. *See Harmon v. Markus*, No. 08-CV-5511, 2010 WL 11530596, at *1 (**S.D.N.Y.** Mar. 1, 2010), *aff'd* 412 F. App'x 420 (2d Cir. 2011).

19    BRI Plaintiffs also describe the various changes in the HSTPA as "commandeer[ing] a[n] ... easement." (BRI Compl. ¶¶ 100–01.) This assertion is meritless. An easement is a "nonpossessory right to *enter* and use land in the possession of another and obligates the possessor not to interfere with the uses authorized by the easement." *Marvin M. Brandt Revocable Tr. v. United States*, 572 U.S. 93, 105 (2014) (emphasis added) (citing Restatement (Third) of Property: Servitudes § 1.2(1) (1998)). No allegation in the BRI Complaint plausibly demonstrates that the HSTPA effects a physical taking involving *entry* on to property and thus is not an easement. (BRI Compl. ¶¶ 100–01.)

20    The Court also notes that BRI and G-Max Plaintiffs' conversion challenges are speculative and not ripe as neither involve allegations that they have tried to actually obtain the 51% tenant agreements for conversion. (BRI Compl. ¶¶ 85(x)–(y), 120; G-Max Compl. ¶¶ 113, 149, 163, 181, 186, 191, 196.)

21    BRI Plaintiffs also allege that the HSTPA limits their right and ability to refuse to rent to prospective tenants. (BRI Compl. ¶¶ 110, 116.) But these allegations ignore the many protections afforded to landlords by the HSTPA and prior incarnations of the law to investigate potential tenants. For example, property owners may perform credit checks and background checks precisely so that landlords maintain some control over to whom to offer leases. N.Y. Real Prop. Law § 238-a (McKinney 2021).

22    While summary orders do not have precedential effect, the Court is not at liberty to disregard or contradict "a Second Circuit ruling squarely on point merely because it was rendered in a summary order" and rather should view such reasoning as "valuable appellate guidance." *United States v. Tejada*, 824 F. Supp. 2d 473, 475 (**S.D.N.Y.** 2010).

23    It is also notable that while the "immediate and compelling necessity" standard is new for rent stabilized units, it has long been the standard for recovery for rent controlled units. *See* N.Y.C. Admin. Code 26-408; N.Y.C.R.R. tit. 9, § 2104.5(a)(1) (2021).

24    The Complaint is silent as to the status of Plaintiffs Ordway and Guerrieri's holdover proceedings in Brooklyn housing court to remove the tenant, which may render this claim moot if ultimately successful. (G-Max Compl. ¶¶ 172–73.)

25    G-Max Plaintiffs further argue that *Regina Metro* and *Harris* should extend to the HSTPA's Part K regarding MCIs. (G-Max Pls.' Suppl. Letter, March 16, 2021; Dkt. No. 98.) But *Regina Metro* reaffirmed that "a statute that affects only 'the propriety of prospective relief' ... has no potentially problematic retroactive effect even when the liability arises from past conduct." 154 N.E.3d at 988 (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 273 (1994)). The MCI changes in the HSTPA make it so that "increases shall be collectible prospectively" and thus result in not impermissibly retroactive legislation. N.Y.C. Admin. Code §

26-511.1(8).

26     The Supreme Court's recent decision in *Cedar Point* is illustrative of what constitutes a *per se* regulatory taking and why BRI and
       G-Max Plaintiffs have failed to allege any. In *Cedar Point*, the Supreme Court held that a California regulation granting labor
       organizers a "right to take access" to private farms for three hours per day, 120 days per year, constituted a *per se* physical
       taking. 141 S. Ct. at 2069, 2080. The Supreme Court reasoned that because the "regulation grant[ed] a formal entitlement to
       physically invade the growers' land" and that did not arise from any "traditional background principle of property law" and was
       "not germane to any benefit provided to agricultural employers or any risk posed to the public," it "amount[ed] to simple
       appropriation of private property." *Id.* at 2080. Here, no such appropriation exists. Unlike the circumstances in *Cedar Point*, the
       HSTPA does not "grant[ ] a right to invade property closed to the public." *Id.* at 2077. Instead, BRI and G-Max Plaintiffs' "tenants
       were invited by [them], not forced upon them by the government." *Yee*, 503 U.S. at 528. This is in stark contrast to *Cedar Point*
       where the regulation at issue resulted in a *physical invasion* of property, which is entirely absent in both Actions here.

27     G-Max Plaintiffs argue that they have stated a facial regulatory takings claim. (*See* G-Max Pls.' Mem. at 33–36.) But the weight of
       the authority dictates otherwise as described above. Thus, the Court dismisses G-Max Plaintiffs facial regulatory takings claim.

28     As previously noted, BRI Plaintiffs assert that the BRI Complaint is at bottom a facial challenge, but that the BRI Complaint should
       be construed as raising an as-applied challenge because the two are "the same" given the "HSTPA's restrictive effect upon each
       of the [BRI] Plaintiffs and their members." (BRI Pls.' Mem. at 68.) To that end, BRI Plaintiffs offer sweeping assertions that "[t]he
       broad draconian measures of the HSTPA amount to a [t]aking without the necessary demonstration of an as-applied challenge as
       the cumulative effects satisfying the law in that regard." (*Id.* at 9.) BRI Plaintiffs offer no legal support that an as-applied
       regulatory takings challenge can be determined by evaluating the "cumulative effects" of the HSTPA. (*Id.*) Nevertheless, the Court
       will analyze BRI Plaintiffs' under-developed arguments as to their alleged as-applied challenge.

29     BRI Plaintiffs claim that there are "several tests" to evaluate a regulatory taking and argue that the appropriate test for a
       regulatory taking is the "diminution of value" that "focuses on the impact of the regulation on the landowner." (BRI Pls.' Mem. at
       28.) BRI Plaintiffs contend that "if the landowner's use is restricted such that the value of his property is drastically diminished, a
       taking exists no matter how great the benefit to the public." (*Id.* at 28–29; BRI Compl. ¶¶ 85(a)–(aa).) BRI Plaintiffs state that
       some courts "adhere to a lesser standard, finding takings where the existing use is substantially minimized." (*Id.*) The Court
       disagrees with this characterization of the case law. For example, BRI Plaintiffs cite to *Penn Central* for the notion that there is no
       set formula to trigger compensation for economic injury caused by public action. While that may be true, it does not support the
       assertion that courts find takings where existing use of property is substantially minimized by government regulation as they put
       forward.

       In *Penn Central*, the Supreme Court held that owners could not establish a taking by showing that they had been denied the right
       to use superadjacent airspace; in fact, the Supreme Court reached a conclusion that was the opposite of what BRI Plaintiffs urge
       – that minimized use of property did *not* constitute a taking. *Penn Cent.*, 438 U.S. at 130, 138 ("[T]he submission that appellants
       may establish a 'taking' simply by showing that they have been denied the ability to exploit a property interest that they
       heretofore had believed was available for development is quite simply untenable."). BRI Plaintiffs also cite to cases regarding
       physical takings, total regulatory takings, and land-use exactions, (*see* BRI Compl. ¶ 101), which have no bearing on the as-applied
       regulatory taking claim here since each involves a distinct legal theory, *Lingle*, 544 U.S. at 546–48 (citing *Nollan*, 483 U.S. 825;
       *Dolan*, 512 U.S. 374). Instead, those cases deal with instances in which the government demanded an easement or other cession
       of property rights as a condition of granting a development permit or allowing certain land use. *Id.* The HSTPA does not impose
       on BRI Plaintiffs any such land-use exaction and thus the Court finds reliance on such cases unavailing.

       Further, BRI Plaintiffs cite *Sherman v. Town of Chester*, 752 F.3d 566 (2d Cir. 2014) to support the contention that a regulatory
       taking occurs when government "effectively prevent[s] [plaintiff] from making any economic use of his property." (BRI Pls.' Mem.
       at 31.) But the BRI Complaint does not allege that BRI Plaintiffs have been deprived of all economic use of their property. Indeed,
       BRI Plaintiffs' allegations do not challenge any particular application of the HSTPA to any of the BRI Plaintiffs and instead make

Case 1:24-cv-93973-AS   Document 830   Filed 01/13/26   Page 81 of 209
Case 1:24-cv-00211-AMN-PJE   Document 101-2   Filed 12/26/25   Page 36 of 38

Building and Realty Institute of Westchester and Putnam..., Not Reported in Fed....

generalized assertions about the HSTPA's constitutionality, which is a facial, not as-applied challenge. (*See generally* BRI Compl.)

30    BRI Plaintiffs complain that the rent increases authorized each year for rent-stabilized units in Westchester County are insufficient. (*See* BRI Compl. ¶¶ 78, 80.) However, rent increases are not determined by any of the BRI Defendants and instead are determined by the Westchester RGB, which is not a party in the BRI Action. (*Id.* ¶¶ 34, 78, 80.) BRI Plaintiffs have thus not plausibly alleged that the HSTPA is unconstitutional on the grounds that property owners are unsatisfied with the rent increased approved by the RGB in Westchester County, and this falls short of establishing a regulatory taking. (*Id.* ¶ 80.)

31    It is worth noting again that BRI Plaintiffs have made clear throughout this case that HSTPA, not the ETPA, is the sole law being challenge in the instant BRI Action. Thus, the Court does not consider BRI Plaintiffs arguments against the ETPA. (BRI Compl. ¶ 1.)

32    Because "[d]ue process ... rights under the New York state and United States constitutions are coextensive with one another," these claims are analyzed together. *Johns v. Home Depot U.S.A., Inc.*, 221 F.R.D. 400, 408 n.3 (**S.D.N.Y**. 2004).

33    G-Max Plaintiffs point to a New York Court of Appeals case that struck down the provisions of Part F of the HSTPA that would have applied new overcharge calculations retroactively, extended the limitations period for past overcharge claims, and retroactively imposed treble damages. *Regina Metro.*, 154 N.E.3d at 1001–03. Because this issue has already be adjudicated, G-Max Plaintiffs' challenge to these provisions is denied as moot.

34    Both BRI and G-Max Plaintiffs challenge various aspects of the HSTPA as violating due process. BRI Plaintiffs challenge the changes in MCIs and IAIs recoupment, the high rent and high-income regulation, the vacancy and longevity "bonus," the 5% vacancy threshold, limitations on preferential rents, and eligibility for rent regulation. (BRI Pls.' Mem. at 53–57; BRI Compl. ¶¶ 5, 8–9, 41, 48–49, 59, 81, 91–93, 120.) G-Max Plaintiffs challenge the following aspects of the HSTPA under the due process clause:

    (1) its repeal of the income cap for rent-regulated apartments with rents above a certain threshold ... (2) its repeal of provisions that allowed units to be removed from rent stabilization or control once the rent crossed a statutory high-rent threshold and the unit became vacant; (3) its repeal of provisions permitting larger rent increases for a new tenant after a vacancy; (4) its modification of the preferential rent provisions such that owners who voluntarily agreed to a further-reduced rent in the past (even before the HSTPA took effect) cannot even charge the government-approved legal regulated rent upon renewal; (5) its lowering of the rent increase cap for MCIs from 6% to just 2% in rent-stabilized apartments in New York City, from 15% to 2% in rent-controlled apartments in New York City, and from 15% to 2% in other counties when landlords make MCIs (and its elimination of such increases after 30 years); (6) its retroactive application of these MCI rent increase caps to rent increases attributable to MCIs that were approved within the seven years *prior* to the amendment taking effect; (7) its outright elimination of MCIs for buildings with 35% or fewer rent-regulated units; (8) its cap of $15,000 over 15 years on recoverable IAI spending—spread across a maximum of just three IAIs ... (9) its restrictions on evicting tenants who do not pay their rent, potentially extending their tenancies for up to a year; (10) its curtailment of owners' rights to reclaim possession of their units for personal use and occupancy ... (11) its retroactive expansion of the limitations, record-retention, and lookback periods for rent overcharge claims; and (12) its imposition of substantial new restrictions on co-op/condo conversions ....

    (G-Max Compl. ¶ 243 (emphasis in original).)

35    BRI Plaintiffs dispute the standard of review for their due process claim. BRI Plaintiffs first argue that strict scrutiny should apply to their due process claim but only a page later in their brief state that such a claim "requires that [the] economic legislation be supported by a legitimate legislative purpose furthered by a *rational* means." (BRI Pls.' Mem. at 50–51 (emphasis added and citation omitted); BRI Compl. ¶ 5, at 92 (stating that the HSTPA "warrants strict scrutiny" and should be struck down because it is not "narrowly tailored" to serve a compelling government interest).) For the purposes of resolving the instant Motions, the Court

construes this to mean that BRI Plaintiffs contend that the HSTPA should be analyzed under a strict scrutiny standard. And in the event the Court disagrees with that standard, BRI Plaintiffs argue that the HSTPA does not even pass muster under rational basis review. However, the HSTPA does not involve suspect classifications, nor does it impinge on any fundamental rights. *See Pennell*, 485 U.S. at 13–14 (holding that the Supreme Court "will not overturn a statute that does not burden a suspect class or a fundamental interest unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational" (alteration omitted)). Further, BRI Plaintiffs offer no authority or basis to establish that there is a fundamental right to rent apartments without government regulation. (*See generally* BRI Pls.' Mem.) Given the lack of support offered by BRI Plaintiffs and the case law holding otherwise, the Court concludes that HSTPA is subject to a rational basis standard. *See Sidberry v. Koch*, 539 F. Supp. 413, 419 (S.D.N.Y. 1982) ("[H]ousing is not a fundamental right, and classifications affecting housing are subject only to the 'rational relationship' test."). G-Max Plaintiffs do not advocate for "heightened" or "strict" scrutiny of their due process claim. (G-Max Pls.' Mem. at 53 n.45.)

36    Plaintiffs in *335-7 LLC* also raised a due process claim but agreed to dismissal and conceded that their damages claim against the State was barred by sovereign immunity. As such, the district court dismissed both claims. 2021 WL 860153, at *4 n.2.

37    It is noteworthy that versions of Part E of the HSTPA, which prohibits an owner from adjusting the amount of preferential rent upon the renewal of a lease, have been introduced almost every year at other Legislative Sessions before the New York State Senate dating back to 2009. *See* Senate Bill S2845, 2019-2020 Legislative Session (showing previous versions of Part E introduced in Legislative Sessions in 2009-2010, 2011-2012, 2013-2014, 2015-2016, and 2017-2018), https://www.nysenate.gov/legislation/bills/2019/s2845/amendment/original. Thus, BRI and G-Max Plaintiffs cannot plausibly claim to be surprised that the HSTPA interfered with their reasonable expectations regarding regulation of rent stabilized units.

38    G-Max Plaintiffs bring an equal protection violation under both the federal and State constitutions, which are analyzed under the same standard. *See Hernandez v. Robles*, 855 N.E.2d 1, 9 (N.Y. 2006) ("[W]e have held that our Equal Protection Clause 'is no broader in coverage than the Federal provision.' ").

39    G-Max Plaintiffs do not dispute that rational basis review applies to their equal protection claim. (G-Max Compl. ¶¶ 257, 262.)

40    The G-Max Complaint alleges the HSTPA "destroy[s] the benefit of the bargain for owners who contracted with the City to offer affordable housing units under the Article XI program." (G-Max Compl. ¶ 268(d).) But none of the G-Max Plaintiffs claims that it opted into rent stabilization under Article XI. G-Max Plaintiffs also argue that the HSTPA renders cooperative and condominium conversions impossible for owners who had already entered into contracts to finance such conversions under the prior regime. (G-Max Compl. ¶ 268(e).) But G-Max Plaintiffs have not alleged that they entered into such conversion contracts that have been impacted by the HSTPA. Thus, G-Max Plaintiffs lack standing to assert these claims and such claims are consequently dismissed. *See* U.S. Const., art. III, § 2.

41    G-Max Plaintiffs describe the HSTPA as causing a substantial impairment of existing contracts. (G-Max Compl. ¶ 5.) G-Max Plaintiffs also state that "[t]he only real winners here will be wealthy white tenants who, according to U.S. Census Bureau data, already disproportionality benefit from rent regulation, and who are now poised to receive a massive windfall at the expense of minority renters who will be frozen out of historically majority-white neighborhoods." (*Id.*) But as G-Max State Defendants point out, according to the most recent 2014 New York City Housing and Vacancy Survey, renter occupied housing units by rent regulation status show that 64.4% of rent-stabilized tenants are racial minorities, and only 35.6% are white. *See Series IA: Renter Occupied Housing Units by Rent Regulation*, U.S. Census Bureau Table 4 (2014), https://www.census.gov/data/tables/time-series/demo/nychvs/series-1a.html. Thus, repeal of the HSTPA would harm the

existing minority tenants who live in rent regulated housing. (G-Max State Defs.' Mem. at 49 n.13.)

42    G-Max Plaintiffs do not dispute that the Contract Clause applies only to impairments of existing contracts at the time the HSTPA was enacted. (*See* G-Max Pls.' Mem. at 65 n.58.)

43    BRI Plaintiffs assert that "the [S]tate, through its legislation, does become the 'silent' party [to a contract] herein." (BRI Pls.' Mem. at 61.) While perhaps rhetorically pleasing, the assertion lacks factual and legal support.

44    BRI Plaintiffs argue that they are "not complaining about the rent regulations, *per se*, but about the fact that the HSTPA just "goes too far." (BRI Pls.' Mem. at 60.) But this terminology is used in a takings, not Contract Clause, analysis. Further, BRI Plaintiffs offer no legal support for this argument, and, as such, the Court does not address it.

---

End of Document        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Virginia Office for Protection and Advocacy v. Stewart, 563 U.S. 247 (2011)**

131 S.Ct. 1632, 179 L.Ed.2d 675, 79 USLW 4253, 11 Cal. Daily Op. Serv. 4586...

KeyCite Yellow Flag
Declined to Extend by King v. Youngkin. 4th Cir.(Va.), December 5, 2024

131 S.Ct. 1632
Supreme Court of the United States

# VIRGINIA OFFICE FOR PROTECTION AND ADVOCACY, Petitioner,
v.
James W. STEWART III, Commissioner, Virginia Department of Behavioral Health and Developmental Services, et al.

No. 09–529.
|
Argued Dec. 1, 2010.
|
Decided April 19, 2011.

**Synopsis**
**Background:** Independent state agency, created under federal statutes and dedicated to advocacy for persons with developmental disabilities or mental illnesses, brought action against certain state officials in their official capacities, alleging violations of federal law by refusing agency access to records to which it was entitled under federal enabling statutes, and seeking declaratory and injunctive relief. The United States District Court for the Eastern District of Virginia, Robert E. Payne, Senior District Judge, 2008 WL 2795940, denied officials' motion to dismiss. Officials appealed. The United States Court of Appeals for the Fourth Circuit, Wilkinson, Circuit Judge, 568 F.3d 110, reversed and remanded. Certiorari was granted.

**[Holding:]** The United States Supreme Court, Justice Scalia, held that the *Ex parte Young* exception to sovereign immunity permitted the suit.

Reversed and remanded.

Justice Kennedy filed concurring opinion, in which Justice Thomas joined.

Chief Justice Roberts filed dissenting opinion, in which Justice Alito joined.

Justice Kagan did not participate in the consideration or decision of the case.

West Headnotes (10)

**[1]    Federal Courts**◆─Suits Against States; Eleventh Amendment and Sovereign Immunity

Sovereign immunity under the Eleventh Amendment is the privilege of the sovereign not to be sued without its consent. U.S.C.A. Const.Amend. 11.

508 Cases that cite this headnote

**[2]    Federal Courts**◆─Abrogation by Congress
**Federal Courts**◆─Waiver by State; Consent

A State may waive its Eleventh Amendment sovereign immunity at its pleasure, and in some circumstances, Congress may abrogate it by appropriate legislation. U.S.C.A. Const.Amend. 11.

596 Cases that cite this headnote

**[3]    Federal Courts**◆─Abrogation by Congress
**Federal Courts**◆─Waiver by State; Consent

Absent waiver or valid abrogation of a State's Eleventh Amendment sovereign immunity, federal courts may not entertain a private person's suit against a State. U.S.C.A. Const.Amend. 11.

864 Cases that cite this headnote

**Virginia Office for Protection and Advocacy v. Stewart, 563 U.S. 247 (2011)**

131 S.Ct. 1632, 179 L.Ed.2d 675, 79 USLW 4253, 11 Cal. Daily Op. Serv. 4586...

**[4]** **Federal Courts**—Suits for injunctive or other prospective or equitable relief; Ex parte Young doctrine

**Federal Courts**—Agencies, officers, and public employees

The *Ex parte Young* exception to a State's sovereign immunity rests on the premise that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes. U.S.C.A. Const.Amend. 11.

399 Cases that cite this headnote

**[5]** **Federal Courts**—Suits for injunctive or other prospective or equitable relief; Ex parte Young doctrine

The *Ex parte Young* exception to a State's sovereign immunity does not apply when the state is the real, substantial party in interest, as when the judgment sought would expend itself on the public treasury or domain, or interfere with public administration. U.S.C.A. Const.Amend. 11.

102 Cases that cite this headnote

**[6]** **Federal Courts**—Suits for injunctive or other prospective or equitable relief; Ex parte Young doctrine

**Federal Courts**—Agencies, officers, and public employees

The *Ex parte Young* exception to State's Eleventh Amendment sovereign immunity permitted federal court to hear suit against State officials brought by independent state agency, created pursuant to federal statutes and dedicated to advocacy for persons with developmental disabilities or mental illnesses, alleging that officials violated federal enabling statutes by refusing agency's request to access mental health facility records, and seeking injunction requiring production of those records

and preventing future refusal of agency's request for access to such records; relief sought was prospective, State conceded that injunction requested could properly be awarded by federal court to privacy advocacy group created under same federal statutes, suit would not diminish State's dignity, and agency's power to sue officials was consequence of State's own decision to create public, rather than private, advocacy agency. U.S.C.A. Const.Amend. 11; Developmental Disabilities Assistance and Bill of Rights Act of 2000, § 143(a)(1, 2), 42 U.S.C.A. § 15043(a)(1, 2); Protection and Advocacy for Individuals with Mental Illness Act, § 101, 42 U.S.C.A. § 10801.

223 Cases that cite this headnote

**[7]** **Federal Courts**—Suits for injunctive or other prospective or equitable relief; Ex parte Young doctrine

In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective. U.S.C.A. Const.Amend. 11.

398 Cases that cite this headnote

**[8]** **Federal Courts**—What Are Suits Against States; Entities and Individuals Entitled to Immunity

The general criterion for determining when a suit is in fact against the sovereign, for purpose of invoking the Eleventh Amendment sovereign immunity bar, is the effect of the relief sought, not who is bringing the lawsuit. U.S.C.A. Const.Amend. 11.

68 Cases that cite this headnote

|9| **Federal Courts**⬤=Suits for injunctive or other prospective or equitable relief; Ex parte Young doctrine

The *Ex parte Young* exception to the Eleventh Amendment sovereign immunity bar cannot be used to obtain an injunction requiring the payment of funds from the State's treasury, or an order for specific performance of a State's contract. U.S.C.A. Const.Amend. 11.

117 Cases that cite this headnote

[10] **Federal Courts**⬤=Suits for injunctive or other prospective or equitable relief; Ex parte Young doctrine
**Federal Courts**⬤=Agencies, officers, and public employees

In order to invoke the *Ex parte Young* exception to sovereign immunity, a state agency needs two things: first, a federal right that it possesses against its parent State; and second, authority to sue other state officials to enforce that right, free from any internal veto wielded by the state government. U.S.C.A. Const.Amend. 11.

25 Cases that cite this headnote

**\*\*1633** *Syllabus*\*

Together, the Developmental Disabilities Assistance and Bill of Rights Act of 2000 (DD Act) and the Protection and Advocacy for Individuals with Mental Illness Act (PAIMI Act) offer States federal money to improve, *inter alia,* medical care for persons with developmental disabilities or mental illness. As a condition of funding, a State must establish a protection and advocacy (P & A) system "to protect and advocate [those individuals'] rights." 42 U.S.C. § 15043(a)(1). A participating State may appoint either a state agency or a private nonprofit entity as its P & A system, but if a state agency it must have authority to litigate and freedom from the control of other state agencies or officers. Virginia has appointed an independent **\*\*1634** state agency, petitioner Virginia Office for Protection and Advocacy (VOPA), authorizing

it to litigate to secure disabled individuals' rights, free of executive-branch oversight; to operate independently of Virginia's attorney general; and to employ its own lawyers to sue on its behalf.

While investigating patient deaths and injuries at state mental hospitals, VOPA asked respondents—state officials in charge of those hospitals—to produce relevant patient records. Respondents refused, asserting that a state-law privilege shielded the records from disclosure. VOPA then filed suit in Federal District Court, seeking a declaration that respondents' refusal to produce the records violated the DD and PAIMI Acts and an injunction requiring respondents to produce the records and refrain in the future from interfering with VOPA's right of access. Respondents moved to dismiss on the ground that they are immune from suit under the Eleventh Amendment, but the court held that the suit was permitted by the doctrine of *Ex parte Young.* 209 U.S. 123, 28 S.Ct. 441. 52 L.Ed. 714, which normally allows federal courts to award prospective relief against state officials for violations of federal law. The Fourth Circuit reversed, finding that *Ex parte Young* did not apply because the suit was brought by a state agency.

*Held: Ex parte Young* allows a federal court to hear a lawsuit for prospective relief against state officials brought by another agency of the same State. Pp. 1637 – 1642.

(a) Absent a waiver of sovereign immunity by a State itself or a valid abrogation by Congress, federal courts may not entertain a private person's suit against a State. Pp. 1637 – 1638.

(b) The doctrine of *Ex parte Young,* which establishes an important limitation on the sovereign-immunity principle, is accepted as necessary to "permit the federal courts to vindicate federal rights." *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89. 104 S.Ct. 900, 79 L.Ed.2d 67. It rests on the premise that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes. It does not apply "when 'the state is the ... party in interest.' " *Id.,* at 101, 104 S.Ct. 900. P. 1638.

(c) Entertaining VOPA's action is consistent with precedent and does not offend the distinctive interests protected by sovereign immunity. Pp. 1638 – 1642.

(1) *Verizon Md. Inc. v. Public Serv. Comm'n of Md.,* 535 U.S. 635, 122 S.Ct. 1753, 152 L.Ed.2d 871, held that, in determining the *Ex parte Young* doctrine's applicability,

"a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.' " *Id.,* at 645, 122 S.Ct. 1753. VOPA's suit satisfies that inquiry. Respondents concede that the action would be proper were VOPA a private organization rather than a state agency. The "general criterion for determining when a suit is in fact against the sovereign is the *effect* of the relief sought," *Pennhurst, supra,* at 107, 104 S.Ct. 900, not who is bringing the lawsuit. This Court applied that criterion in *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 117 S.Ct. 2028, 138 L.Ed.2d 438, which held that an Indian Tribe could not invoke *Ex parte Young* to bring what was essentially a quiet title suit that would "extinguish [Idaho's] control over ... lands and waters long deemed ... an integral part of its territory." *Id.,* at 282, 117 S.Ct. 2028. Respondents have advanced no argument that the relief sought here threatens a **\*\*1635** similar invasion of Virginia's sovereignty. Pp. 1639 – 1640.

(2) Respondents claim that a State's dignity is diminished when a federal court adjudicates a dispute between its components. But a State's stature is not diminished to any greater degree when its own agency sues to enforce its officers' compliance with federal law than when a private person does so. Moreover, VOPA's power to sue state officials is a consequence of Virginia's own decision to establish a public P & A system. Not every offense to a State's dignity constitutes a denial of sovereign immunity. The specific indignity against which sovereign immunity protects is the insult to a State of being haled into court without its consent; that does not occur just because a suit happens to be brought by another state agency. Pp. 1640 – 1641.

(3) The apparent novelty of this suit is not likely a consequence of past constitutional doubts. In order to invoke the *Ex parte Young* exception, a state agency needs both a federal right that it possesses against its parent State and authority to sue state officials to enforce that right, free from any internal state-government veto; such conditions rarely coincide. In any event, the principles undergirding the *Ex parte Young* doctrine support its extension to actions of this kind. Pp. 1641 – 1642.

568 F.3d 110, reversed and remanded.

SCALIA, J., delivered the opinion of the Court, in which KENNEDY, THOMAS, GINSBURG, BREYER, and SOTOMAYOR, JJ., joined. KENNEDY, J., filed a concurring opinion, in which THOMAS, J., joined. ROBERTS, C.J., filed a dissenting opinion, in which

ALITO, J., joined. KAGAN, J., took no part in the consideration or decision of the case.

**Attorneys and Law Firms**

Seth M. Galanter, Washington, DC, for petitioner.

Ginger D. Anders, for United States as amicus curiae, by special leave of the Court, supporting petitioner.

Solicitor General Earle Duncan Getchell, Jr., Richmond, VA, for respondents.

Justice Kagan recused.

Paul J. Buckley, Managing Attorney, Virginia Office for Protection and Advocacy, Richmond, VA, Deanne E. Maynard, Seth M. Galanter, Counsel of Record, Brian R. Matsui, Morrison & Foerster LLP, Washington, DC, for petitioner.

Kenneth T. Cuccinelli, II, Attorney General of Virginia, E. Duncan Getchell, Jr., Solicitor General, Counsel of Record, Wesley G. Russell, Jr., Deputy Attorney General, William E. Thro, Special Counsel, Charles E. James, Jr., Chief Deputy Attorney General, Stephen R. McCullough, Senior Appellate Counsel, Office of the Attorney General, Richmond, VA, for Respondents.

**Opinion**

Justice SCALIA delivered the opinion of the Court.

**\*250** We consider whether *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), allows a federal court to hear a lawsuit for prospective relief against state officials brought by another agency of the same State.

I

A

The Developmental Disabilities Assistance and Bill of Rights Act of 2000 (DD Act), 114 Stat. 1677, 42 U.S.C. § 15001 *et* **\*\*1636** *seq.,* offers States federal money to

**Virginia Office for Protection and Advocacy v. Stewart, 563 U.S. 247 (2011)**

131 S.Ct. 1632, 179 L.Ed.2d 675, 79 USLW 4253, 11 Cal. Daily Op. Serv. 4586...

improve community services, such as medical care and job training, for individuals with developmental disabilities. See §§ 15023(a), 15024. As a condition of that funding, a State must establish a protection and advocacy (P & A) system "to protect and advocate the rights of individuals with developmental disabilities." § 15043(a)(1). The P & A system receives separate federal funds, paid to it directly. § 15042(a) and (b). A second federal law, the Protection and Advocacy for Individuals with Mental Illness Act (PAIMI Act), 100 Stat. 478. 42 U.S.C. § 10801 *et seq.,* increases that separate funding and extends the mission of P & A systems to include the mentally ill. §§ 10802(2), 10803, 10827. At present, every State accepts funds under these statutes.

Under the DD and PAIMI Acts, a P & A system must have certain powers. The system "shall ... have the authority to investigate incidents of abuse and neglect ... if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred." § 15043(a)(2)(B); § 10805(a)(1)(A). Subject to certain statutory requirements, it must be given access to "all records" of individuals who **\*251** may have been abused, see § 15043(a)(2)(I)(iii)(II); § 10805(a)(4)(B)(iii), as well as "other records that are relevant to conducting an investigation," § 15043(a)(2)(J)(i). The Acts also require that a P & A system have authority to "pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of" its charges. § 15043(a)(2)(A)(i); see § 10805(a)(1)(B). And in addition to pressing its own rights, a P & A system may "pursue administrative, legal, and other remedies on behalf of" those it protects. § 10805(a)(1)(C); see § 15044(b).

A participating State is free to appoint either a state agency or a private nonprofit entity as its P & A system. § 15044(a); § 10805(c)(1)(B). But in either case, the designated entity must have certain structural features that ensure its independence from the State's government. The DD Act prohibits the Governor from appointing more than one-third of the members of the system's governing board, § 15044(a)(2), and restricts the State's ability to impose hiring freezes or other measures that would impair the system's ability to carry out its mission, § 15043(a)(2)(K). Once a State designates an entity as its P & A system, it may not change its selection without "good cause." § 15043(a)(4)(A).

Virginia is one of just eight States that have designated a government entity as their P & A system. The Virginia Office for Protection and Advocacy (VOPA) is an "independent state agency." Va.Code Ann. § 51.5–39.2(A) ( Lexis 2009). Its board consists of eleven "nonlegislative citizen members," of whom only three are

appointed by the Governor. § 51.5–39.2(B). The remaining eight are appointed by components of the legislature: five by the Speaker of the House of Delegates, and three by the Senate Committee on Rules. *Ibid.* VOPA itself nominates candidates for consideration, and the statute instructs the appointing officials that they "shall seriously consider the persons nominated and appoint such persons whenever feasible." *Ibid.* Board members serve for fixed terms and are removable only by a court and only for **\*252** specified reasons. See § 51.5–39.2(C) and (F); § 24.2–233 and 234 (Lexis 2006).

VOPA enjoys authority to litigate free of executive-branch oversight. It operates independently of the Attorney General of Virginia and employs its own lawyers, who are statutorily authorized to sue on VOPA's behalf. § 51.5–39.2(A); § 2.2– **\*\*1637** 510(5) (Lexis 2008). And Virginia law specifically empowers VOPA to "initiate any proceedings to secure the rights" of disabled individuals. § 51.5–39.2(A).

B

In 2006, VOPA opened an investigation into the deaths of two patients and injuries to a third at state-run mental hospitals. It asked respondents—state officials in charge of those institutions—to produce any records related to risk-management or mortality reviews conducted by the hospitals with respect to those patients. Respondents refused, asserting that the records were protected by a state-law privilege shielding medical peer-review materials from disclosure.

VOPA then brought this action in the United States District Court for the Eastern District of Virginia, alleging that the DD and PAIMI Acts entitled it to the peer-review records, notwithstanding any state-law privilege that might apply. It sought a declaration that respondents' refusal to produce the records violated the DD and PAIMI Acts, along with an injunction requiring respondents to provide access to the records and refrain in the future from interfering with VOPA's right of access to them. Respondents moved to dismiss the action on the grounds that they are immune from suit under the Eleventh Amendment. The District Court denied the motion. In its view, the suit was permitted by the doctrine of *Ex parte Young,* which normally allows federal courts to award prospective relief against state officials for violations of federal law. *Virginia v. Reinhard,* 2008 WL 2795940, \*6 (E.D.Va., July 18, 2008).

**Virginia Office for Protection and Advocacy v. Stewart, 563 U.S. 247 (2011)**

131 S.Ct. 1632, 179 L.Ed.2d 675, 79 USLW 4253, 11 Cal. Daily Op. Serv. 4586...

**\*253** The Court of Appeals reversed. *Virginia v. Reinhard,* 568 F.3d 110 (C.A.4 2009). Believing VOPA's lawsuit to be an "intramural contest" that "encroaches more severely on the dignity and sovereignty of the states than an *Ex parte Young* action brought by a private plaintiff," the Court of Appeals concluded it was not authorized by that case. *Id.,* at 119–120 (internal quotation marks omitted).

We granted certiorari. 561 U.S. 1005, 130 S.Ct. 3493, 177 L.Ed.2d 1054 (2010).

II

A

[1] [2] [3] Sovereign immunity is the privilege of the sovereign not to be sued without its consent. The language of the Eleventh Amendment[1] only eliminates the basis for our judgment in the famous case of *Chisholm v. Georgia,* 2 U.S. 419, 2 Dall. 419, 1 L.Ed. 440 (1793), which involved a suit against a State by a noncitizen of the State. Since *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), however, we have understood the Eleventh Amendment to confirm the structural understanding that States entered the Union with their sovereign immunity intact, unlimited by Article III's jurisdictional grant. *Blatchford v. Native Village of Noatak,* 501 U.S. 775, 779, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991); see *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 98, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Our cases hold that the States have retained their traditional immunity from suit, "except as altered by the plan of the Convention or certain constitutional amendments." **\*\*1638** *Alden v. Maine,* 527 U.S. 706, 713, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999). A State may waive its sovereign immunity at its pleasure, *College Savings Bank v. Florida Prepaid Postsecondary Ed. Expense Bd.,* 527 U.S. 666, 675–676, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999), and in some circumstances Congress **\*254** may abrogate it by appropriate legislation.[2] But absent waiver or valid abrogation, federal courts may not entertain a private person's suit against a State.

B

In *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714, we established an important limit on the sovereign-immunity principle. That case involved a challenge to a Minnesota law reducing the freight rates that railroads could charge. A railroad shareholder claimed that the new rates were un-constitutionally confiscatory, and obtained a federal injunction against Edward Young, the Attorney General of Minnesota, forbidding him in his official capacity to enforce the state law. *Perkins v. Northern Pacific R. Co.,* 155 F. 445 (C.C.D.Minn.1907). When Young violated the injunction by initiating an enforcement action in state court, the Circuit Court held him in contempt and committed him to federal custody. In his habeas corpus application in this Court, Young challenged his confinement by arguing that Minnesota's sovereign immunity deprived the federal court of jurisdiction to enjoin him from performing his official duties.

We disagreed. We explained that because an unconstitutional legislative enactment is "void," a state official who enforces that law "comes into conflict with the superior authority of [the] Constitution," and therefore is "stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States." 209 U.S., at 159–160, 28 S.Ct. 441.

[4] [5] This doctrine has existed alongside our sovereign-immunity jurisprudence for more than a century, accepted as **\*255** necessary to "permit the federal courts to vindicate federal rights." *Pennhurst,* 465 U.S., at 105. It rests on the premise—less delicately called a "fiction," *id.,* at 114, n. 25, 104 S.Ct. 900—that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes. The doctrine is limited to that precise situation, and does not apply "when 'the state is the real, substantial party in interest.' " *id.,* at 101, 104 S.Ct. 900 (quoting *Ford Motor Co. v. Department of Treasury of Ind.,* 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945)), as when the " 'judgment sought would expend itself on the public treasury or domain, or interfere with public administration,' " 465 U.S., at 101, n. 11, 104 S.Ct. 900 (quoting *Dugan v. Rank,* 372 U.S. 609, 620, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963)).

Virginia Office for Protection and Advocacy v. Stewart, 563 U.S. 247 (2011)

131 S.Ct. 1632, 179 L.Ed.2d 675, 79 USLW 4253, 11 Cal. Daily Op. Serv. 4586...

C

[6] This case requires us to decide how to apply the *Ex parte Young* doctrine to a suit brought by an independent state agency claiming to possess federal rights. Although we have never encountered such a suit before, we are satisfied that entertaining VOPA's action is consistent with our precedents and does not offend the distinctive interests protected by sovereign immunity.

**\*\*1639** 1

[7] In *Verizon Md. Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002), we held that "[i]n determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.' " *Id.*, at 645, 122 S.Ct. 1753 (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997) (O'Connor, J., concurring in part and concurring in judgment)). There is no doubt VOPA's suit satisfies that straightforward inquiry. It alleges that respondents' refusal to produce the requested medical records violates federal law; and it seeks an injunction requiring the production of the records, which would **\*256** prospectively abate the alleged violation. Respondents concede that were VOPA a private organization rather than a state agency, the doctrine would permit this action to proceed.³

[8] [9] We see no reason for a different result here. Although respondents argue that VOPA's status as a state agency changes the calculus, there is no warrant in our cases for making the validity of an *Ex parte Young* action turn on the identity of the plaintiff. To be sure, we have been willing to police abuses of the doctrine that threaten to evade sovereign immunity. To do otherwise "would be to adhere to an empty formalism." *Coeur d'Alene Tribe, supra*, at 270, 117 S.Ct. 2028. But (as the dissent concedes, *post*, at 8 (opinion of Roberts, C. J.)) the limits we have recognized reflect the principle that the "general criterion for determining when a suit is in fact against the sovereign is the *effect* of the relief sought," *Pennhurst, supra*, at 107, 104 S.Ct. 900, not who is bringing the lawsuit. Thus, *Ex parte Young* cannot be used to obtain an injunction requiring the payment of funds from the State's **\*257** treasury, see *Edelman v. Jordan*, 415 U.S. 651, 666, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); or an order for

specific performance of a State's contract, see *id.*, at 666–667, 94 S.Ct. 1347; *In re Ayers*, 123 U.S. 443, 8 S.Ct. 164, 31 L.Ed. 216 (1887).

*Coeur d'Alene Tribe*, on which respondents heavily rely, is an application of this principle. There we refused to allow an Indian Tribe to use *Ex parte Young* to obtain injunctive and declaratory relief establishing its exclusive right to the use and enjoyment of certain submerged lands in Idaho and the invalidity of all state statutes and regulations governing that land. 521 U.S., at 265, 117 S.Ct. 2028. We determined that the suit was "the functional **\*\*1640** equivalent of a quiet title suit against Idaho," would "extinguish ... the State's control over a vast reach of lands and waters long deemed by the State to be an integral part of its territory," and thus was barred by sovereign immunity. *Id.*, at 282, 117 S.Ct. 2028.

Respondents have advanced no argument that the relief sought in this case threatens any similar invasion of Virginia's sovereignty. Indeed, they concede that the very injunction VOPA requests could properly be awarded by a federal court at the instance of a private P & A system.

2

Respondents and the dissent argue that entertaining VOPA's lawsuit in a federal forum would nevertheless infringe Virginia's sovereign interests because it diminishes the dignity of a State for a federal court to adjudicate a dispute between its components. See Brief for Respondents 23–26; *post*, at 4–8 (arguing that " 'special sovereignty interests' " bar VOPA's lawsuit (quoting *Coeur d'Alene Tribe, supra*, at 281, 117 S.Ct. 2028)). We disagree. As an initial matter, we do not understand how a State's stature could be diminished to any greater degree when *its own agency* polices its officers' compliance with their federal obligations, than when *a private person* hales those officers into federal court for **\*258** that same purpose—something everyone agrees is proper.⁴ And in this case, of course, VOPA's power to sue state officials is a consequence of Virginia's own decision to establish a public, rather than a private, P & A system. We fail to perceive what Eleventh Amendment indignity is visited on the Commonwealth when, by operation of its own laws, VOPA is admitted to federal court as a plaintiff.⁵

But even if it were true that the State's dignity were offended in some way by the maintenance of this action in

**Virginia Office for Protection and Advocacy v. Stewart, 563 U.S. 247 (2011)**

131 S.Ct. 1632, 179 L.Ed.2d 675, 79 USLW 4253, 11 Cal. Daily Op. Serv. 4586...

federal court, that would not prove respondents' case. Denial of sovereign immunity, to be sure, offends the dignity of a State: but not every offense to the dignity of a State constitutes a denial of sovereign immunity. The specific indignity against which sovereign immunity protects is the insult to a State of being haled into court without its consent. That effectively occurs, our cases reasonably conclude, when (for example) the object of the suit against a state officer is to reach funds in the state treasury or acquire state lands; it **\*259** does not occur just because the suit happens to be brought by another state agency. Respondents' asserted dignitary harm is simply **\*\*1641** unconnected to the sovereign-immunity interest.

The dissent complains that applying *Ex parte Young* to this lawsuit divides Virginia against itself, since the opposing parties are both creatures of the Commonwealth. *Post,* at 7. Even if that were a distinctive consequence of letting this suit proceed in federal court, it would have nothing to do with the concern of sovereign-immunity—whether the suit is against an unconsenting State, rather than against its officers. But it is *not* a consequence of the federal nature of the forum. The same result will follow if the federal claim is sued upon in state court, as the dissent would require. There also, "[w]hatever the decision in the litigation, ... [t]he Commonwealth will win [, a]nd the Commonwealth will lose." *Post,* at 1648. Nor would sending the matter to state court even avoid the prospect that "a federal judge will resolve which part of the Commonwealth will prevail," *ibid.,* since the state-court loser could always ask *this* Court to review the matter by certiorari. (Or is that appeal also to be disallowed on grounds of sovereign immunity? But see *Cohens v. Virginia,* 19 U.S. 264, 6 Wheat. 264, 5 L.Ed. 257 (1821).)[ⁱ] And of course precisely the same thing would happen if respondents specifically waived their sovereign-immunity objections *in this very case.* Yet no one would contend that despite the waiver, sovereign immunity forbade the suit. So also here: If, by reason of *Ex parte Young,* there has been no violation of **\*260** sovereign immunity, the prospect of a federal judge's resolving VOPA's dispute with respondents does not make it so.

We do not doubt, of course, that there are limits on the Federal Government's power to affect the internal operations of a State. See, *e.g., Printz v. United States,* 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) (Congress may not commandeer state officers); *Coyle v. Smith,* 221 U.S. 559, 579, 31 S.Ct. 688, 55 L.Ed. 853 (1911) (Congress may not dictate a State's capital). But those limits must be found in some textual provision or structural premise of the Constitution. Additional limits cannot be smuggled in under the Eleventh Amendment by

barring a suit in federal court that does not violate the State's sovereign immunity.[⁷]

3

A weightier objection, perhaps, is the relative novelty of this lawsuit. Respondents rightly observe that federal courts have not often encountered lawsuits brought by state agencies against other state officials. That does give us pause. Lack of historical precedent can indicate a constitutional infirmity, see, *e.g., Free Enterprise Fund v. Public Company Accounting Oversight Bd.,* 561 U.S. 477, 504 – 507, 130 S.Ct. 3138, 3159 – 3160, 177 L.Ed.2d 706 (2010), and our sovereign-immunity decisions have traditionally **\*\*1642** warned against " 'anomalous and unheard-of proceedings or suits,' " *Alden,* 527 U.S., at 727, 119 S.Ct. 2240 (quoting *Hans,* 134 U.S., at 18, 10 S.Ct. 504).

[10] Novelty, however, is often the consequence of past constitutional doubts, but we have no reason to believe that is the case here. In order to invoke the *Ex parte Young* exception to sovereign immunity, a state agency needs two things: first, a federal right that it possesses against its parent State; and second, authority to sue other state officials to enforce that **\*261** right, free from any internal veto wielded by the state government. These conditions will rarely coincide—and at least the latter of them cannot exist without the consent of the State that created the agency and defined its powers. See *post,* at 3–4 (KENNEDY, J., concurring). We are unaware that the necessary conditions have ever presented themselves except in connection with the DD and PAIMI Acts, and the parties have referred us to no examples.[⁸] Thus, the apparent novelty of this sort of suit does not at all suggest its unconstitutionality. In any event, we are satisfied, for the reasons we have explained, that—novelty notwithstanding—the principles undergirding the *Ex parte Young* doctrine support its application to actions of this kind.

\* \* \*

Like the Court of Appeals, we are mindful of the central role autonomous States play in our federal system, and wary of approving new encroachments on their

Virginia Office for Protection and Advocacy v. Stewart, 563 U.S. 247 (2011)

131 S.Ct. 1632, 179 L.Ed.2d 675, 79 USLW 4253, 11 Cal. Daily Op. Serv. 4586...

sovereignty. But we conclude no such encroachment is occasioned by straightforwardly applying *Ex parte Young* to allow this suit. It was Virginia law that created VOPA and gave it the power to sue state officials. In that circumstance, the Eleventh Amendment presents no obstacle to VOPA's ability to invoke federal jurisdiction on the same terms as any other litigant.

We reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

Justice KAGAN took no part in the consideration or decision of this case.

## *262 Justice KENNEDY, with whom Justice THOMAS joins, concurring.

*Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), recognized a narrow limitation on state sovereign immunity, permitting railroad stockholders to enjoin enforcement of unconstitutional rate regulations. That negative injunction was nothing more than the pre-emptive assertion in equity of a defense that would otherwise have been available in the State's enforcement proceedings at law. *Id.,* at 165–166, 28 S.Ct. 441; see also Harrison, Ex Parte *Young,* 60 Stan. L.Rev. 989, 997–999 (2008).

The Court has expanded the *Young* exception far beyond its original office in order "to vindicate the federal interest in assuring the supremacy of [federal] law," *Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985), but not without careful attention in each case to the sovereign interests of the State. See *Verizon Md. Inc. v. Public Serv. Comm'n* **1643 *of Md.,* 535 U.S. 635, 649, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002) (KENNEDY, J., concurring). In *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), for example, the Court applied the exception to an affirmative prospective order but not to equitable restitution, for the latter was too similar to an award of damages against the State. *Id.,* at 668, 94 S.Ct. 1347; see *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 103, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) ("Under the theory of *Young,* such a suit [for restitution] would not be one against the State since the federal-law allegation would strip the state officer of his official authority. Nevertheless, retroactive relief was barred by the Eleventh Amendment"). And *Pennhurst* declined to

extend *Young* to suits alleging a state-law violation, for without the need to ensure the supremacy of federal law there was no justification for restricting state sovereignty. 465 U.S., at 105–106, 104 S.Ct. 900.

The "straightforward inquiry" of *Verizon Md.* derives from *Edelman* and *Pennhurst,* both of which defined important limits on *Young* in order to respect state sovereignty while still adhering to principles necessary to implement the Supremacy Clause. As a result, *Verizon Md.* incorporates **263 the very balancing it might at first seem to reject. *Verizon Md.* itself was an easy case, for it involved the same kind of preenforcement assertion of a defense that was at issue in *Young.* But when *Young*'s application is explored in novel contexts, as in *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997), and also in this case, the inquiry "proves more complex," *Verizon Md., supra, at* 648, 122 S.Ct. 1753 (KENNEDY, J., concurring).

In this case, in my view, the Virginia Office for Protection and Advocacy may rely on *Young,* despite the somewhat striking novelty of permitting a state agency to sue officials of the same State in federal court. In the posture of the case as it comes before the Court, it must be assumed that VOPA has a federal right to the records it seeks, and so the extension of *Young* would vindicate the Supremacy Clause. To be balanced against this important interest is the need to preserve "the dignity and respect afforded a State, which the immunity is designed to protect." *Coeur d'Alene, supra,* at 268, 117 S.Ct. 2028. Permitting a state agency like VOPA to sue officials of the same State does implicate the State's important sovereign interest in using its own courts to control the distribution of power among its own agents. But the affront to the State's dignity is diminished to some extent when it is noted that if the State had elected the alternate course of designating a private protection and advocacy system it then would have avoided any risk of internal conflict while still participating in the federal program. The availability of that alternate course does not, in my view, weigh much in favor of the validity of the underlying federal scheme, but the only question here is the reach of the *Young* exception.

Virginia's concern that the holding here upsets the federal balance is further mitigated by the various protections built into the structure of federal litigation to ensure that state officials do not too often call upon the federal courts to resolve their intramural disputes.

**264 First, and most important, state law must authorize an agency or official to sue another arm of the State. If States do not wish to see their internal conflicts aired in

Virginia Office for Protection and Advocacy v. Stewart, 563 U.S. 247 (2011)

131 S.Ct. 1632, 179 L.Ed.2d 675, 79 USLW 4253, 11 Cal. Daily Op. Serv. 4586...

federal court, they need not empower their officers or agencies to sue one another in a federal forum. And if state officers are not by state law empowered to sue, they may invoke federal jurisdiction only in their personal capacities.

**\*\*1644** Second, to the extent there is some doubt under state law as to an officer's or agency's power to sue, or any other state-law issue that may be dispositive, federal courts should abstain under *Railroad Comm'n of Tex. v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). *Pullman* recognizes the importance of state sovereignty by limiting federal judicial intervention in state affairs to cases where intervention is necessary. If an open question of state law would resolve a dispute, then federal courts may wait for the resolution of the state-law issue before adjudicating the merits. Likewise, certification of questions of state law to the state courts may pretermit an otherwise sensitive federal controversy. *Lehman Brothers v. Schein,* 416 U.S. 386, 391, 94 S.Ct. 1741, 40 L.Ed.2d 215 (1974) (Certification "helps build a cooperative judicial federalism").

Finally, federal law does not often create rights for state officials or agencies to assert against other arms of the State. True, officials may assert that their personal federal rights are violated by unlawful state action, for example where the State engages in discriminatory employment practices. But the statutory framework in the case now before the Court is unusual in that it vests a state agency itself with federal rights against the State. Statutes tend to protect the rights of individuals, not officers or agencies, and the Constitution's rights-creating Clauses protect persons rather than officers. Because the *Young* exception is available only to those who assert federal violations, the paucity of federal rights vested in government officials makes the scope of the holding here a narrow one.

**\*265** All this is simply to underscore that the program at issue may present constitutional questions but that the parties do not raise them in this litigation. Virginia does not argue, for example, that Congress exceeded its spending power under Article I, § 8 by forcing a state that wishes to designate a public agency as its advocacy system to allow intramural suits like the instant one or by requiring that the agency be structured as Congress directs. *E.g.,* 42 U.S.C. § 15043(a)(2)(G) (system must "be independent of any agency that provides treatment, services, or habilitation to individuals with developmental disabilities"); § 15044(a)(2) ("[N]ot more than 1/3 of the members of the governing board may be appointed by the chief executive officer of the State"). *Young*—a court-made doctrine based on convenience, fiction, or both—neither implicates nor subsumes these more

fundamental concerns regarding the excessive exercise of federal power. The Court should be most cautious before deciding cases that might later lead to a general principle that the National Government can condition receipt of funds on the State's agreement to make far-reaching changes with respect to its governmental structure or its basic policies of governance in matters within its special competence. Assuming, as the Court must, that the statutes here are constitutional, the narrow question is whether VOPA may rely on *Young* to avoid the sovereign immunity bar.

One might doubt whether the constitutional question may be so severed from the *Young* analysis. The Court wields *Young* in the name of the Supremacy Clause only to vindicate important federal rights. Perhaps this Court should not extend the fiction in the name of claims that may rest on unconstitutional foundations. This concern is misplaced. The canon of constitutional avoidance directs courts to prefer the interpretation of a statute that preserves its validity, but the specter of a statute's unconstitutionality cannot be permitted to distort the antecedent question of jurisdiction. Courts **\*266** interpret and **\*\*1645** evaluate a statute only after confirming their authority to adjudicate the case before them. To decline to adjudicate a federal right for fear of its potential unconstitutionality is in effect to invalidate the right in the quest to save it. The Court should not permit the commission of acts that violate a federal right on the mere suspicion that Congress acted beyond its authority. Because the suit must be assumed to vindicate the Supremacy Clause and poses no serious affront to state sovereignty in light of the options available to the State under the program, it may proceed.

With these observations, I join the Court's opinion.

Chief Justice ROBERTS, with whom Justice ALITO joins, dissenting.

Today the Court holds that a state agency may sue officials acting on behalf of the State in federal court. This has never happened before. In order to reach this unsettling result, the Court extends the fiction of *Ex parte Young*—what we have called an "empty formalism"—well beyond the circumstances of that case. Because I cannot subscribe to such a substantial and novel expansion of what we have also called "a narrow exception" to a State's sovereign immunity, I respectfully dissent.

I

A

"The federal system established by our Constitution preserves the sovereign status of the States." *Alden v. Maine,* 527 U.S. 706, 714, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999). As confirmed by the Eleventh Amendment, "[a]n integral component of that residuary and inviolable sovereignty" is the States' "immunity from private suits." *Federal Maritime Comm'n v. South Carolina Ports Authority,* 535 U.S. 743, 751–753, 122 S.Ct. 1864, 152 L.Ed.2d 962 (2002) (internal quotation marks omitted); *Hans v. Louisiana,* 134 U.S. 1, 13, 10 S.Ct. 504, 33 L.Ed. 842 (1890) (" 'It is inherent in the nature of sovereignty not to be amenable to the suit of an individual *without its consent* ' " (quoting The Federalist No. 81 (A. Hamilton))). "The preeminent **\*267** purpose of state sovereign immunity is to accord States the dignity that is consistent with their status as sovereign entities." *Federal Maritime Comm'n, supra,* at 760, 122 S.Ct. 1864. Accordingly, any time a State is haled into federal court against its will, "the dignity and respect afforded [that] State, which [sovereign] immunity is designed to protect, are placed in jeopardy." *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 268, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997). The immunity does not turn on whether relief will be awarded; "[t]he Eleventh Amendment is concerned not only with the States' ability to withstand suit, but with their privilege not to be sued." *Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 147, n. 5, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993). See *Federal Maritime Comm'n, supra,* at 769, 122 S.Ct. 1864 ("the primary function of sovereign immunity is not to protect state treasuries, but to afford the States the dignity and respect due sovereign entities" (citation omitted)).

Because of the key role state sovereign immunity plays in our federal system, the Court has recognized only a few exceptions to that immunity. The sole one relevant here is the "narrow exception," *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 76, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), established by our decision in *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). In *Ex parte*

*Young,* the Court held that private litigants could seek an injunction in federal court against a state official, prohibiting him from enforcing **\*\*1646** a state law claimed to violate the Federal Constitution. See *id.,* at 159–168, 28 S.Ct. 441. As we have often observed, *Ex parte Young* rests on the "obvious fiction," *Coeur d'Alene Tribe, supra,* at 270, 117 S.Ct. 2028, that such a suit is not really against the State, but rather against an individual who has been "stripped of his official or representative character" because of his unlawful conduct, *Ex parte Young, supra,* at 159–160.[1]

**\*268** While we have consistently acknowledged the important role *Ex parte Young* plays in "promot[ing] the vindication of federal rights," we have been cautious not to give that decision "an expansive interpretation." *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 105, 102, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Indeed, the history of our *Ex parte Young* jurisprudence has largely been focused on ensuring that this narrow exception is "narrowly construed," 465 U.S., at 114, n. 25, 104 S.Ct. 900. We have, for example, held that the fiction of *Ex parte Young* does not extend to suits where the plaintiff seeks retroactive relief, *Edelman v. Jordan,* 415 U.S. 651, 678, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); where the claimed violations are based on state law, *Pennhurst, supra,* at 106, 104 S.Ct. 900; where the federal law violation is no longer "ongoing," *Green v. Mansour,* 474 U.S. 64, 71, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985); "where Congress has prescribed a detailed remedial scheme for the enforcement against a State" of the claimed federal right, *Seminole Tribe, supra,* at 74, 116 S.Ct. 1114; and where "special sovereignty interests" are implicated, *Coeur d'Alene Tribe, supra,* at 281, 117 S.Ct. 2028.

We recently stated that when "determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md. Inc. v. Public Serv. Comm'n of Md.,* 535 U.S. 635, 645, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002) (internal quotation marks omitted). But not every plaintiff who complies with these prerequisites will be able to bring suit under *Ex parte Young.* Indeed, in *Verizon* itself the Court went beyond its so-called straightforward inquiry in considering whether *Ex parte Young* applied. After deciding the plaintiffs "clearly satisfie[d]" the "straightforward inquiry," the Court went on to examine whether Congress had created a detailed remedial scheme like the one in *Seminole Tribe.* 535 U.S., at 645, 647–648, 122 S.Ct. 1753 (internal quotation marks

**Virginia Office for Protection and Advocacy v. Stewart, 563 U.S. 247 (2011)**

131 S.Ct. 1632, 179 L.Ed.2d 675, 79 USLW 4253, 11 Cal. Daily Op. Serv. 4586...

omitted). Only after determining that Congress had not done so did the Court conclude that the suit could go forward under *Ex parte Young.*

**\*269** If *Verizon*'s formulation set forth the only requirements for bringing an action under *Ex parte Young,* two of our recent precedents were wrongly decided. In *Seminole Tribe,* the Court acknowledged that it had often "found federal jurisdiction over a suit against a state official when that suit seeks only prospective injunctive relief in order to end a continuing violation of federal law." 517 U.S., at 73, 116 S.Ct. 1114 (internal quotation marks omitted). The Court held, however, that the "situation presented" there was "sufficiently different from that giving rise to the traditional *Ex parte Young* action so as to **\*\*1647** preclude the availability of that doctrine." *Ibid.*

In *Coeur d'Alene Tribe,* the Court recognized that an "allegation of an ongoing violation of federal law where the requested relief is prospective is *ordinarily* sufficient to invoke the *Young* fiction." 521 U.S., at 281, 117 S.Ct. 2028 (emphasis added). The Court held, however, that the action could not proceed under *Ex parte Young* because it implicated "special sovereignty interests"—in that case, the State's property rights in certain submerged lands. 521 U.S., at 281–283, 117 S.Ct. 2028.

As we explained in *Papasan v. Allain,* 478 U.S. 265, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986), there are "certain types of cases that formally meet the *Young* requirements of a state official acting inconsistently with federal law but that stretch that case too far and would upset the balance of federal and state interests that it embodies." *Id.,* at 277, 106 S.Ct. 2932. This is one of those cases.

In refusing to extend *Ex parte Young* to claims that involve "special sovereignty interests," the Court in *Coeur* **\*270** *d'Alene Tribe* warned against a rote application of the *Ex parte Young* fiction:

"To interpret *Young* to permit a federal-court action to proceed in every case where prospective declaratory and injunctive relief is sought against an officer, named in his individual capacity, would be to adhere to an empty formalism and to undermine the principle ... that Eleventh Amendment immunity represents a real limitation on a federal court's federal-question jurisdiction. The real interests served by the Eleventh Amendment are not to be sacrificed to elementary mechanics of captions and pleading. Application of the *Young* exception must reflect a proper understanding of its role in our federal system and respect for state courts instead of a reflexive reliance on an obvious fiction." 521 U.S., at 270, 117 S.Ct. 2028.

**B**

It is undisputed that petitioner's complaint alleges an ongoing violation of federal law by a state official and seeks only prospective relief. If this were a "traditional *Ex parte Young* action," *Seminole Tribe, supra,* at 73, 116 S.Ct. 1114, petitioner might very well be able to pursue its claims under that case. This, however, is anything but a traditional case—and petitioner is anything but a typical *Ex parte Young* plaintiff.

Unlike the plaintiffs in *Ex parte Young*—and, for that matter, unlike any other plaintiff that has ever sought to invoke *Ex parte Young* before this Court—petitioner is a state agency seeking to sue officials of the same State in federal court. The Court is troubled by this novelty, *ante* at 12–13, but not enough. See *Free Enterprise Fund v. Public Company Accounting Oversight Bd.,* 561 U.S. 477, 505, 130 S.Ct. 3138, 3159 (2010) ("Perhaps the most telling indication of [a] severe constitutional problem ... is the lack of historical precedent" (internal quotation marks omitted)); cf. **\*271 \*\*1648** *Alden,* 527 U.S., at 743–745, 119 S.Ct. 2240; *Printz v. United States,* 521 U.S. 898, 905–910, 918, 925, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997). This is especially true in light of the "presumption" we articulated more than 120 years ago in *Hans v. Louisiana,* that States are immune from suits that would have been "anomalous and unheard of when the Constitution was adopted." *Hans,* 134 U.S., at 18, 10 S.Ct. 504; see also *Alden, supra,* at 727, 119 S.Ct. 2240 (invoking presumption).

Accordingly, when determining whether to lift the bar of sovereign immunity, we have "attribute[d] great significance" to the absence of analogous suits "at the time of the founding or for many years thereafter." *Federal Maritime Comm'n,* 535 U.S., at 755, 122 S.Ct. 1864. This sort of suit was not only anomalous and unheard of at the time of the founding; it was anomalous and unheard of yesterday. The *Hans* presumption applies here with full force.

The Court speculates that these suits have not previously arisen because the necessary conditions—state agencies pursuing a federal right free of internal state veto—are themselves novel. See *ante,* at 12; see also *ante,* at 3–4 (KENNEDY, J., concurring). Even if true, that simply highlights the fact that this case is not suitable for mere

rote application of *Ex parte Young.*

In addition to its novel character, petitioner's complaint "conflicts directly with the principles of federalism that underlie the Eleventh Amendment." *Pennhurst,* 465 U.S., at 106, 104 S.Ct. 900. In *Alden,* we held that state sovereign immunity prohibited Congress from authorizing "private suits against nonconsenting States in their own courts." 527 U.S., at 749, 119 S.Ct. 2240. We explained that such power would permit one branch of state government, the "State's own courts," "to coerce the other branches of the State" and "to turn the State against itself." *Ibid.*

Here the Court goes further: this suit features a state agency on one side, and state executive officials on the other. The objection in *Alden* was that the Federal Government could force the State to defend itself before itself. Here extending **\*272** *Young* forces the State to defend itself *against* itself in federal court.

Both sides in this case exercise the sovereign power of the Commonwealth of Virginia. Petitioner claims the title of "The Commonwealth of Virginia" in its complaint, App. 10; respondents are state officials acting in an official capacity. Whatever the decision in the litigation, one thing is clear: The Commonwealth will win. And the Commonwealth will lose. Because of today's holding, a federal judge will resolve which part of the Commonwealth will prevail.

Virginia has not consented to such a suit in federal court; rather, petitioner has unilaterally determined that this intramural dispute should be resolved in that forum. This is precisely what sovereign immunity is supposed to guard against. See *ante,* at 10 ("The specific indignity against which sovereign immunity protects is the insult to a State of being haled into court without its consent"). That indignity is compounded when the State is haled into federal court so that a federal judge can decide an internal state dispute.

The Court is wrong to suggest that Virginia has no sovereign interest in determining *where* such disputes will be resolved. See *ante,* at 10–11, and n. 6. It is one thing for a State to decide that its components may sue one another in its own courts (as Virginia did here); it is quite another thing for such a dispute to be resolved in federal court against the State's wishes. For this reason, the Court's examples of other suits pitting **\*\*1649** state entities against one another are inapposite. In each of those hypotheticals, the State consented to having a particular forum resolve its internal conflict. That is not true here.[3]

**\*273** In sum, the "special sovereignty interests" implicated here make this case "sufficiently different from that giving rise to the traditional *Ex parte Young* action so as to preclude the availability of that doctrine." *Seminole Tribe,* 517 U.S., at 73, 116 S.Ct. 1114. I would cling to reality and not extend the fiction of *Ex parte Young* to cover petitioner's suit.

II

The Court offers several justifications for its expansion of *Ex parte Young.* None is persuasive.

The Court first contends that whether the *Ex parte Young* fiction should be applied turns only on the "relief sought" in a case. *Ante,* at 8–9 (internal quotation marks omitted). The Court is correct that several of our prior cases have focused on the nature of the relief requested. See, *e.g., Edelman,* 415 U.S., at 664–671, 94 S.Ct. 1347. That may well be because "the difference between the type of relief barred by the Eleventh Amendment and that permitted under *Ex parte Young* will not in many instances be that between day and night." *Id.,* at 667, 94 S.Ct. 1347. But the Court is wrong to draw a negative implication from those cases and categorically conclude that there can be no other basis for determining whether to extend *Ex parte Young* 's fiction.

The thrust of the Court's argument appears to be that, because the relief sought here is no different from that which could be sought in a suit by a private protection and advocacy system, the doctrine of *Ex parte Young* should also apply to a suit brought by a state system. *Ante,* at 7–9. But private entities are different from public ones: They are private. When private litigants are involved, the State is not turned against itself.

**\*274** Contrary to the Court's suggestion, see *ante,* at 9, there is indeed a real difference between a suit against the State brought by a private party and one brought by a state agency. It is the difference between eating and cannibalism; between murder and patricide. While the ultimate results may be the same—a full stomach and a dead body—it is the means of getting there that attracts notice. I would think it more an affront to someone's dignity to be sued by a brother than to be sued by a stranger. While neither may be welcomed, that does not mean they would be equally received.

**Virginia Office for Protection and Advocacy v. Stewart, 563 U.S. 247 (2011)**

131 S.Ct. 1632, 179 L.Ed.2d 675, 79 USLW 4253, 11 Cal. Daily Op. Serv. 4586...

The Court also contends that petitioner's ability to sue state officials in federal court "is a consequence of Virginia's own decision to establish a public [protection and advocacy] system." *Ante*, at 1640. This cannot mean that Virginia has consented to an infringement on its sovereignty. That argument was rejected below, and petitioner did not seek certiorari on **\*\*1650** that issue. See *Virginia v. Reinhard,* 568 F.3d 110, 116–118 (4th Cir.2009); Pet. for Cert. i.

Instead the Court claims that "Virginia has only itself to blame"—if it wanted to avoid its current predicament, it could have chosen to establish a private entity instead. *Ante,* at 9–10, and n. 5; see also *ante,* at 3 (KENNEDY, J., concurring). But I am aware of no doctrine to the effect that an unconstitutional establishment is insulated from challenge simply because a constitutional alternative is available. And here the public and private systems are not interchangeable alternatives in any event.

The Court's analysis is also circular; it wrongly assumes Virginia knew in advance the answer to the question presented in this case. Only *after* concluding that *Ex parte Young* applies to this arrangement—that for the first time in history a state agency may sue an unwilling State in federal court—can the Court suggest that Virginia knowingly exposed its officers to suit in federal court.

In a similar vein, the Court asserts that because Virginia law authorizes petitioner to exercise independent litigating **\*275** authority, petitioner should be treated the same "as any other litigant." *Ante,* at 13. But petitioner is not like any other litigant. While it is true petitioner enjoys some independence from the Commonwealth's executive branch, that does not mean petitioner is independent *from the Commonwealth.* As noted, petitioner certainly views itself as "The Commonwealth of Virginia," App. 10, and would presumably invoke sovereign immunity itself if sued. As a matter of sovereign immunity law, it should make no difference how a State chooses to allocate its governmental powers among different state agencies or officials.

The Court is wrong to suggest that simply because petitioner possesses independent litigating authority, it may sue state officials in federal court. See *ante,* at 13 ("the Eleventh Amendment presents no obstacle" since it "was Virginia law that created [petitioner] and gave it the power to sue state officials"). There is more to this case than merely whether petitioner needs the approval of the Attorney General to sue, and the Virginia Code provisions cited by the Court say nothing about actions against the State in federal court.

If independent litigating authority is all that it takes, then scores of state entities now "suddenly possess the authority to pursue *Ex parte Young* actions against other state officials" in federal court. *Reinhard, supra,* at 124. There would be no Eleventh Amendment impediment to such suits. Given the number of state agencies across the country that enjoy independent litigating authority, see, *e.g.,* Brief for State of Indiana et al. as *Amici Curiae* 11–13, the Court's decision today could potentially lead to all sorts of litigation in federal courts addressing internal state government disputes.

And there is also no reason to think that the Court's holding is limited to state *agency* plaintiffs. According to the Court's basic rationale, state officials who enjoy some level of independence could as a matter of federal law bring suit against other state officials in federal court. Disputes that **\*276** were formerly resolved in state cabinet rooms may now appear on the dockets of federal courts.

\* \* \*

No one questions the continued vitality or importance of the doctrine announced in *Ex parte Young.* But *Ex parte Young* was about affording relief to a private party against unconstitutional state action. It was not about resolving a dispute between two different state actors. That is a matter **\*\*1651** for the State to sort out, not a federal judge.

Our decision in *Chisholm v. Georgia,* 2 U.S. 419, 2 Dall. 419, 1 L.Ed. 440 (1793)—permitting States to be sued by private parties in federal court—"created such a shock of surprise" throughout the country "that the Eleventh Amendment was at once proposed and adopted." *Principality of Monaco v. Mississippi,* 292 U.S. 313, 325, 54 S.Ct. 745, 78 L.Ed. 1282 (1934). It is fair to say that today's decision will probably not trigger a similar response. But however much their practical functions and prominence may have changed in the past 218 years, the States remain a vital element of our political structure. Sovereign immunity ensures that States retain a stature commensurate with their role under the Constitution. Allowing one part of the State to sue another in federal court, so that a federal judge decides an important dispute between state officials, undermines state sovereignty in an unprecedented and direct way. The fiction of *Ex parte Young* should not be extended to permit so real an intrusion.

**Virginia Office for Protection and Advocacy v. Stewart, 563 U.S. 247 (2011)**

131 S.Ct. 1632, 179 L.Ed.2d 675, 79 USLW 4253, 11 Cal. Daily Op. Serv. 4586...

Because I believe the Court's novel expansion of *Ex parte Young* is inconsistent with the federal system established by our Constitution, I respectfully dissent.

563 U.S. 247, 131 S.Ct. 1632, 179 L.Ed.2d 675, 79 USLW 4253, 11 Cal. Daily Op. Serv. 4586, 2011 Daily Journal D.A.R. 5504, 22 Fla. L. Weekly Fed. S 935

## All Citations

### Footnotes

\*  The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1  The Eleventh Amendment reads as follows:

   "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

2  We have recognized that Congress may abrogate a State's immunity when it acts under § 5 of the Fourteenth Amendment, *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 59, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), but not when it acts under its original Article I authority to regulate commerce, *id.*, at 65–66, 116 S.Ct. 1114.

3  The dissent is mistaken when it claims that applying the *Verizon Maryland* test would mean two of our cases were "wrongly decided." *Post*, at 4 (opinion of ROBERTS, C.J.). We discuss the first of those cases, *Coeur d'Alene Tribe*, below. *Infra*, at 8. As for the second, *Seminole Tribe,supra*, it is inapposite. The reason we refused to permit suit to proceed in that case was that the Indian Gaming Regulatory Act created an alternative remedial scheme that would be undermined by permitting *Ex parte Young* suits; *Congress*, we said, had foreclosed recourse to the doctrine. See *Seminole Tribe,supra*, at 73–76, 116 S.Ct. 1114.

   Respondents now argue—for the first time in this litigation—that the DD and PAIMI Acts have the same effect here. We reject that suggestion. The fact that the Federal Government can exercise oversight of a federal spending program and even withhold or withdraw funds—which are the chief statutory features respondents point to—does not demonstrate that Congress has "displayed an intent not to provide the 'more complete and more immediate relief' that would otherwise be available under *Ex parte Young*." *Verizon Maryland*, 535 U.S., at 647, 122 S.Ct. 1753 (quoting *Seminole Tribe*, 517 U.S., at 75, 116 S.Ct. 1114).

4  The dissent compares VOPA's lawsuit to such indignities as "cannibalism" and "patricide," since it is a greater "affront to someone's dignity to be sued by a brother than to be sued by a stranger." *Post*, at 9. We think the dissent's principle of familial affront less than universally applicable, even with respect to real families, never mind governmental siblings. Most of us would probably prefer contesting a testamentary disposition with a relative to contesting it with a stranger. And confining one's child to his room is called grounding, while confining a stranger's child is called kidnaping. Jurisdiction over this case does not depend on which is the most apt comparison.

5  The dissent accuses us of circular reasoning, because we "wrongly assum[e] [that] Virginia knew in advance the answer to the question presented in this case." *Post*, at 10. That would be true if we were relying on the Commonwealth's waiver of sovereign immunity. We are not. We rely upon *Ex parte Young*. We say that Virginia has only itself to blame for the position in which it finds itself, not because it consented to suit, but because it created a state entity to sue, instead of leaving the task to a private entity. It did not have to *know* that this would allow suit in federal court. Know or not know, *Ex parte Young* produces that result.

**Virginia Office for Protection and Advocacy v. Stewart, 563 U.S. 247 (2011)**

131 S.Ct. 1632, 179 L.Ed.2d 675, 79 USLW 4253, 11 Cal. Daily Op. Serv. 4586...

6    The dissent agrees that because of the " 'constitutional plan,' " *post,* at 8, n. 3 (quoting *McKesson Corp. v. Division of Alcoholic Beverages and Tobacco, Fla. Dept. of Business Regulation,* 496 U.S. 18, 30, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990)), this Court can adjudicate disputes between state agencies without offending sovereign immunity. But explaining away exceptions to its theory does not advance the ball. It has not demonstrated that sovereign immunity has anything *at all* to say about federal courts' adjudicating interagency disputes.

7    We have no occasion to pass on other questions of federalism lurking in this case, such as whether the DD or PAIMI Acts are a proper exercise of Congress's enumerated powers. As Justice KENNEDY observes, whether the Acts run afoul of some *other* constitutional provision (*i.e.,* besides the Eleventh Amendment) "cannot be permitted to distort the antecedent question of jurisdiction." *Post,* at 5 (concurring opinion).

8    We think greatly exaggerated the dissent's concern that, "[g]iven the number of state agencies across the country that enjoy independent litigating authority," today's decision "could potentially lead to all sorts of litigation in federal courts addressing internal state government disputes." *Post,* at 11. Such litigation cannot occur unless the state agency has been given a federal right of its own to vindicate (as VOPA alleges it has been given under the highly unusual statute at issue here).

1    *Ex parte Young* also rests on the "well-recognized irony that an official's unconstitutional conduct constitutes state action under the Fourteenth Amendment but not the Eleventh Amendment." *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 105, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (internal quotation marks omitted).

2    While I agree that in *Seminole Tribe* "we refused to permit suit to proceed" under *Ex parte Young* because Congress "had foreclosed recourse to the doctrine," *ante,* at 7, n. 3, that simply confirms my point that the availability of *Young* depends on more than just whether *Verizon* 's prescribed inquiry is satisfied. In short, *Seminole Tribe* makes clear that a plaintiff who files a "complaint alleg[ing] an ongoing violation of federal law and seeks relief properly characterized as prospective," *Verizon,* 535 U.S., at 645, 122 S.Ct. 1753 (internal quotation marks omitted), may nonetheless be barred from pursuing an action under *Young.*

3    Sovereign immunity principles would of course not prohibit this Court from reviewing the federal questions presented by this suit if it had been filed in state court. See *ante,* at 11. We have held that "it is inherent in the constitutional plan that when a state court takes cognizance of a case, the State assents to appellate review by this Court of the federal issues raised in the case whoever may be the parties to the original suit, whether private persons, or the state itself." *McKesson Corp. v. Division of Alcoholic Beverages and Tobacco, Fla. Dept. of Business Regulation,* 496 U.S. 18, 30, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990) (internal quotation marks and citation omitted). By contrast, there is nothing "inherent in the constitutional plan" that warrants lower federal courts handling intrastate disputes absent a State's consent.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

# U.S. District Court
# Northern District of New York - Main Office (Syracuse) [NextGen CM/ECF Release 1.8 (Revision 1.8.5)] (Albany)
# CIVIL DOCKET FOR CASE #: 1:24-cv-00211-AMN-PJE

Weissbrod Gurvey v. Hochul et al
Assigned to: U.S. District Judge Anne M. Nardacci
Referred to: Magistrate Judge Paul J. Evangelista
Cause: 35:271 Patent Infringement

Date Filed: 02/13/2024
Date Terminated: 01/24/2025
Jury Demand: Plaintiff
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

### Plaintiff

**Amy R. Weissbrod Gurvey**
*US Patentee*

represented by **Amy R. Weissbrod Gurvey**
Amy R. Gurvey
NJ
7302woodstone Circle
Ste 08540
Princeton, NJ 08540
917-733-9981
Email: amyg@live-fi.com
PRO SE

V.

### Defendant

**Hon. Kathy Hochul**
*Chief NYS Government Officer*

represented by **Noah C. Engelhart**
NYS Office of The Attorney General
The Capitol
Albany, NY 12224
518-776-2701
Email: noah.engelhart@ag.ny.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

### Defendant

**Hon. Letitia James**
*Chief NYS Government Officer*

represented by **Noah C. Engelhart**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

### Defendant

**Hon. Joseph A. Zayas**

represented by **Noah C. Engelhart**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

### Defendant

**Hon. Laura Taylor Swain**

reason enough to deny the motion.") (collecting cases). To the extent that Plaintiff's arguments can be considered, most were already made and previously addressed in the Reconsideration Order. *Wilson v. Hilton*, No. 20-cv-1489, 2024 WL 510286, at *3 (N.D.N.Y. Feb. 8, 2024) ("Reconsideration is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple.'") (citation omitted). To the extent that any of Plaintiff's arguments are properly raised, they lack merit. Plaintiff has not demonstrated "exceptional circumstances" or established any other basis to warrant such "extraordinary judicial relief." *Pelczar v. Pelczar*, 833 F. Appx 872, 876 (2d Cir. 2020) (citation omitted); *see also Commerzbank AG v. U.S. Bank, N.A.*, 100 F.4th 362, 377 (2d Cir. 2024). Plaintiff's requests for further reconsideration are thus DENIED. Plaintiff's request to file an amended complaint, Dkt. No. 89, is also DENIED, whether considered on its face, *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) ("A party seeking to file an amended complaint postjudgment must first have the judgment vacated or set aside pursuant to Fed. R. Civ. P. 59(e) or 60(b).") (citation omitted), or liberally construed as another request for reconsideration, *Smith v. Hogan*, 794 F.3d 249, 252 n.3 (2d Cir. 2015). Any other pending requests from any party are DENIED as moot. Plaintiff is advised that any future submissions directed to this Court in connection with this closed case will not be considered and will be stricken from the docket. Finally, while Plaintiff is not proceeding *in forma pauperis* in this action, the Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any *in forma pauperis* appeal from the Dismissal Order, the Reconsideration Order, or this Text Order would not be taken in good faith. SO ORDERED by U.S. District Judge Anne M. Nardacci on 11/20/2025. (Copy served upon pro se plaintiff by mail). (mab) (Entered: 11/20/2025)

| 11/26/2025 | 96 | AFFIDAVIT in Support of Motion re 92 First MOTION to Vacate 80 MOTION to Set Aside Judgment filed by Amy R. Weissbrod Gurvey. Motion returnable before Judge Paul J. Evangelista., 85 MOTION for Recusal filed by Amy R. Weissbrod Gurvey., 90 Affidavit in Support of Motion.. [89 filed by Amy R. Weissbrod Gurvey. (Attachments: # 1 Affirmation LTR MOTION NY COURT OF CLAIM re Tortious Interference by NYS Officers)(Weissbrod Gurvey, Amy) (Entered: 11/26/2025) |
| 12/01/2025 | 97 | Letter from Amy Weissbrod Gurvey. (dpk) (Additional attachment(s) added on 12/1/2025: # 1 Envelope) (dpk, ). (Entered: 12/01/2025) |
| 12/01/2025 | 98 | Letter from Amy Weissbrod Gurvey. (dpk) (Entered: 12/02/2025) |
| 12/08/2025 | 99 | AFFIDAVIT in Support re 92 First MOTION to Vacate 80 MOTION to Set Aside Judgment filed by Amy R. Weissbrod Gurvey. Motion returnable before Judge Paul J. Evangelista., 85 MOTION for Recusal filed by Amy R. Weissbrod Gurvey., 90 Affidavit in Support of Motion.. [89 *Letter Motion to NY Court of Claims to Docket Notice of Claim based on State's Tortious Interference with Private Appeals and Unjust Enrichment* filed by Amy R. Weissbrod Gurvey. (Weissbrod Gurvey, Amy) (Entered: 12/08/2025) |
| 12/13/2025 | 100 | AFFIDAVIT in Support re 92 First MOTION to Vacate 80 MOTION to Set Aside Judgment filed by Amy R. Weissbrod Gurvey. Motion returnable before Judge Paul J. Evangelista., 85 MOTION for Recusal filed by Amy R. Weissbrod Gurvey., 90 Affidavit in Support of Motion., [89 filed by Amy R. Weissbrod Gurvey. (Attachments: # 1 Appendix SCOTUS Petition 24-7441)(Weissbrod Gurvey, Amy) (Entered: 12/13/2025) |
| 12/26/2025 | 101 | First MOTION to Vacate 99 Affidavit in Support of Motion,, 100 Affidavit in Support of Motion, filed by Amy R. Weissbrod Gurvey. Motion returnable before Judge Hon. Brenda Sannes. Response to Motion due by 1/16/2026. Reply to Response to Motion due by 1/23/2026 (Attachments: # 1 Exhibit(s) Ex parte Tortious ltr by OCA to Fed Cir wt Standing or Jx, # 2 Exhibit(s) Case In Support, # 3 Exhibit(s) Case in Support) (Weissbrod Gurvey, Amy) (Entered: 12/26/2025) |



# Court of Claims
## State of New York

WEBSITE: www.nycourts.gov/courts/nyscourtofclaims

**Date:** 1 9 2026 10:27 AM

| | |
|---|---|
| **To:** | **NAME:** |
| | **FAX:** 16099172663 |
| | **FROM:** COC FilebyFax |
| | **SUBJECT:** Gurvey, Amy R. Weissbrod - Rejected Fax.pdf |

**NOTES:**

**NUMBER OF PAGES TRASMITTED INCLUDING COVER:** 5

THIS TRANSMISSION, INCLUDING ANY ATTACHMENTS, IS FOR THE SOLE USE OF THE INTENDED RECIPIENT(S) OR ENTITY NAMED ABOVE AND MAY CONTAIN CONFIDENTIAL AND PRIVILEGED INFORMATION. IF YOU RECEIVED THIS AND ARE NOT THE INTENDED RECIPIENT(S), YOU ARE HEREBY NOTIFIED THAT ANY DISCLOSURE, COPYING, UNAUTHORIZED DISTRIBUTION OR THE TAKING OF ANY ACTION IN RELIANCE ON THE CONTENTS OF THIS INFORMATION IS PROHIBITED. IF YOU HAVE RECEIVED THIS TRANSMISSION IN ERROR, PLEASE IMMEDIATELY CONTACT THE SENDER AS INDICATED ABOVE TO ARRANGE THE PROPER HANDLING OF THE INFORMATION.



# Court of Claims
## State of New York

ROBERT ABRAMS BUILDING
FOR LAW AND JUSTICE
BOX 7344, CAPITOL STATION ALBANY,
NEW YORK 12224

(518) 432-3411

RICHARD E. SISE
PRESIDING JUDGE

KRISTEN ANNE CONKLIN
CHIEF CLERK

# REJECTED FAX

Fax No. (866) 413-1069

To: Amy R. Weissbrod Gurvey
Date: January 9, 2026
Claimant's Name: Amy R. Weissbrod Gurvey
Number of pages received: 55

This will acknowledge **RECEIPT ONLY** (not actual filing) of the following documents. If said document(s) meet the necessary filing requirements, said document(s) will be filed as of the received date.

Document(s) received on: January 9, 2026

☐    CLAIM      Note: An acknowledgment letter containing claim number and place of accrual will be forwarded shortly after review of your submission.

☐    NOTICE OF MOTION

☐    PLEADING:

☑    OTHER: Fax rejected in accordance with Decision & Order by Hon. Frank P Milano filed on 6/23/2023

☐    DOCUMENT RECEIVED NOT LEGIBLE, PLEASE **FAX AGAIN**.

☐    DOCUMENT RECEIVED MISSING PAGES:
     PLEASE FAX MISSING PAGES IMMEDIATELY.

www.nyscourtofclaims.state.ny.us

## CASE NO. 25-1954

In The

# US Court of Appeals for the Federal Circuit

## PLAINTIFF-APPELLANT'S OPENING BRIEF CORRECTED

*US District Court Central District of California*

*Case No. 23cv4381 (CACD) on Appeal*

Amy R. Weissbrod Gurvey
CEO and California Counsel
LIVE-Fi® Technology Holdings
7302 Woodstone Circle
Princeton, New Jersey 08540
amyg@live-fi.com

US Patentee/ Plaintiff/Appellant *Pro Se*

RECEIVED

JAN 0 9 2026

COURT OF CLAIMS
STATE OF NEW YORK

## amyg@live-fi.com

| | |
|---|---|
| **From:** | amyg@live-fi.com |
| **Sent:** | Friday, January 9, 2026 9:45 AM |
| **To:** | 'amyweissbrod@gmail.com' |
| **Subject:** | LIVE-Fi Technology Holdings - Amy Weissbrod Gurvey CEO |
| **Attachments:** | FED CIR 25-1954 DOCKET 47 CORRECTED OPENDING BRIEF.pdf |

Fax 866-413-1069

January 8 2026

To Hon. Richard E. Sise
NY Court of Claims

The undersigned, CEO and US patentee, has filed an Amended Notice Claim against the State of NY seeking damages for tortious interference, unjust enrichment and misappropriation of property, claims for which the State has waived Eleventh Amendment immunity under the Court of Claim Act Section 8. NYS Office of Court Administration attorneys participated in a concealed RICO conspiratorial enterprise including ex parte acts perpetrated before the Federal Circuit since 2018. The undersigned could never discover the crimes that were concealed and documents never served by the Federal Circuit. There is contended no ground for this court to demand permission to file any Claim against the state. All statutes are tolled based on intent to delay discovery.

Enclosed is a copy of the principal Corrected Brief with docket stamp at the Fed Circuit (Docket #47). The filed version includes the undersigned's three issues US ticketing management patents in the Addendum comprising far more than 50 pages.
The Fed Cir never heard my appeals to the SDNY's denial of my infringement complaints since 2013 against private infringers Live Nation, Ticketmaster, Phish and Cowan Liebowitz & Latman because these entities' defense attorneys were dually serving as NYS court officers without disclosing conflicts of interest.

OCA attorney Shawn Kerby was caught in 2025 writing ex parte letters since 2018, never served by the Fed Cir, not to hear my appeals to orders of the SDNY denying infringement hearings against private entities. The letters induced transfer of three infringement appeals to the 2d Circuit that had no jurisdiction to hear the appeals and did not hear them. This proves acts of tortious interference, unjust enrichment and misappropriation of property by several NYS officers. Takers include NYS Thruway (toll booth and congestion pricing), the NYS Gaming Commission (NY Lottery and sports betting) and the Port Authority of NY and NJ (airport terminal concessions and kiosks). The Fed Cir brief should key you into the history of the case, issues and the relief I seek against the State to stop using my patents and injunctive relief ag the OCA officers. I have never heard such a story. In the meantime, the State has no viable to pay me damages for the filed claims for which NYS has waived Eleventh Immunity.

A copy of a formal motion delineated the crimes with documentation produced thus far by the First Dept. will be mailed to the court. I demand that your court vacate the "prior permission" order and set an inquest on damages.

Amy Weissbrod Gurvey CEO LIVE-Fi® Technology Holdings
7302 Woodstone Circle, Princeton, NJ 08540
FAX 6099172663
(M/Txt) 9177339981

RECEIVED

JAN 09 2026

COURT OF CLAIMS
STATE OF NEW YORK

1

RECEIVED  01/09/2026 10:27AM 16099172663          GURVEY

1/9/2026 10:27 AM Case 1:24-cv-03973-AS   25BOCA-GWFAX 309A09917266  Filed 01/13/26    Page 106 of 209  5 of 5
Fax Message Delivery

Date: 2026-01-09 10:07:49
Job ID: FTST18344780
DID/DTMF: 9311
Elapsed transmission time: 00:14:16
Line: 25
Pages: 55
Server: 25BOCA-GWFAX
Signal noise: -70
Signal quality: 1
Signal speed: 14400
Signal strength: -14
Receipt status: 0
File size: 1084

RECEIVED

JAN 0 9 2026

COURT OF CLAIMS
STATE OF NEW YORK

# EXHIBIT 5

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:24-cv-02930-PAE

eChanging Barcode, LLC v. MLB Advanced Media L.P. et al
Assigned to: Judge Paul A. Engelmayer
Similar Case: 1:23-cv-10576-PAE
Cause: 35:271 Patent Infringement

Date Filed: 04/16/2024
Date Terminated: 11/10/2025
Jury Demand: Both
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

### Plaintiff

**Alan Amron**
*TERMINATED: 08/08/2024*

represented by **Gerard Francis Dunne**
Law Office of Gerard F. Dunne, PC
56 Lakeview Drive
Riverhead, NY 11901
917-656-7753
Email: jerry.dunne@dunnelaw.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

### Plaintiff

**eChanging Barcode, LLC**

represented by **David Lawrence Hecht**
Hecht Partners LLP
125 Park Avenue
25th Floor
10017
New York, NY 10017
212-851-6821
Email: dhecht@hechtpartners.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Delphine W. Knight Brown**
Hecht Partners LLP
125 Park Avenue
New York, NY 10017
203-979-5492
Email: dkbrown@hechtpartners.com
*ATTORNEY TO BE NOTICED*

**Gerard Francis Dunne**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

### Defendant

**StubHub Holdings Inc.**
*TERMINATED: 08/08/2024*

represented by **Christopher Scott Ponder**
Sheppard, Mullin, Richter & Hampton LLP

1540 El Camino Real
Suite 120
Menlo Park, CA 94025
650-815-2676
Email: cponder@sheppardmullin.com
*ATTORNEY TO BE NOTICED*

**Paul Wendell Garrity**
Sheppard, Mullin, Richter & Hampton
30 Rockefeller Plaza
New York, NY 10112
(212) 653-8700
Fax: (212) 653-8701
Email: pgarrity@sheppardmullin.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**TicketMaster, LLC**
*TERMINATED: 08/08/2024*

represented by **Excylyn Janaize Hardin-Smith**
Fish & Richardson
7 Times Square
20th Floor
New York, NY 10036
212-765-5070
Email: hardin-smith@fr.com
*ATTORNEY TO BE NOTICED*

**Neil J. McNabnay**
Fish & Richardson P.C. (Dallas)
1717 Main Street, Suite 5000
Dallas, TX 75201
(214) 747-5070
Fax: (214) 747-2091
Email: mcnabnay@fr.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Live Nation Entertainment, Inc.**
*TERMINATED: 08/08/2024*

represented by **Excylyn Janaize Hardin-Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Neil J. McNabnay**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Major League Baseball (MLB)**
*TERMINATED: 08/08/2024*

**Defendant**

**MLB Advanced Media L.P.**

represented by **Alan E. Littmann**
Goldman Ismail Tomaselli Brennan &
Baum LLP
200 S. Wacker Drive

22nd Floor
Chicago, IL 60606
312-681-6000
Email: alittmann@goldmanismail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jennifer M. Hartjes**
Goldman Ismail Tomaselli Brennan &
Baum LLP
200 South Wacker Dr
Suite 2200
Chicago, IL 60606
312-881-5958
Email: jhartjes@goldmanismail.com
*TERMINATED: 03/04/2025*

**Madeline Refine Thompson**
Goldman Ismail Tomaselli Brennan &
Baum LLP
200 South Wacker Dr
Ste 22nd Floor
Chicago, IL 60048
312-681-6000
Email: mthompson@goldmanismail.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**AZPB Limited Partnership**
*TERMINATED: 08/08/2024*

**Defendant**

**Atlanta National League Baseball Club
LLC**
*TERMINATED: 08/08/2024*

**Defendant**

**Baltimore Orioles Limited Partnership**
*TERMINATED: 08/08/2024*

**Defendant**

**Boston Red Sox Baseball Club Limited
Partnership**
*TERMINATED: 08/08/2024*

**Defendant**

**Chicago Cubs Baseball Club LLC**
*TERMINATED: 08/08/2024*

**Defendant**

**Chicago White Sox, Ltd.**
*TERMINATED: 08/08/2024*

**Defendant**

**The Cincinnati Reds LLC**
*TERMINATED: 08/08/2024*

**Defendant**

**Cleveland Guardians Baseball Company LLC**
*TERMINATED: 08/08/2024*

**Defendant**

**Colorado Rockies Baseball Club Ltd.**
*TERMINATED: 08/08/2024*

**Defendant**

**Detroit Tigers Inc.**
*TERMINATED: 08/08/2024*

**Defendant**

**Houston Astros LLC**
*TERMINATED: 08/08/2024*

**Defendant**

**Kansas City Royals Baseball Club LLC**
*TERMINATED: 08/08/2024*

**Defendant**

**Angels Baseball LP**
*TERMINATED: 08/08/2024*

**Defendant**

**Los Angeles Dodgers LLC**
*TERMINATED: 08/08/2024*

**Defendant**

**Marlins Teamco, LLC**
*TERMINATED: 08/08/2024*

**Defendant**

**Milwaukee Brewers Baseball Club, Limited Partnership**
*TERMINATED: 08/08/2024*

**Defendant**

**Minnesota Twins, LLC**
*TERMINATED: 08/08/2024*

**Defendant**

**Sterling Mets, L.P.**
*TERMINATED: 08/08/2024*

**Defendant**

**New York Yankees Partnership**
*TERMINATED: 08/08/2024*

**Defendant**

**Athletics Investment Group LLC**
*TERMINATED: 08/08/2024*

**Defendant**

**The Phillies**
*TERMINATED: 08/08/2024*

**Defendant**

**Pittsburgh Associates**
*TERMINATED: 08/08/2024*

**Defendant**

**Padres L.P.**
*TERMINATED: 08/08/2024*

**Defendant**

**The Baseball Club of Seattle, LLLP**
*TERMINATED: 08/08/2024*

**Defendant**

**St. Louis Cardinals, LLC**
*TERMINATED: 08/08/2024*

**Defendant**

**Rays Baseball Club, LLC**
*TERMINATED: 08/08/2024*

**Defendant**

**Rangers Baseball LLC**
*TERMINATED: 08/08/2024*

**Defendant**

**Rogers Blue Jays Baseball Partnership**
*TERMINATED: 08/08/2024*

**Defendant**

**Washington Nationals and Baseball Club, LLC**
*TERMINATED: 08/08/2024*

**Intervenor**

**Amy R LIVE-Fi Technology Holdings**
*9177339981*
*TERMINATED: 10/21/2025*

represented by **Amy Rebecca Gurvey**
Amy R. Gurvey, ESQ.
7302 Woodstone Circle
Princeton, NJ 08540
917-733-9981
Email: amyg@live-fi.com
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**MLB Advanced Media L.P.**                    represented by **Alan E. Littmann**
                                               (See above for address)
                                               *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*

                                               **Jennifer M. Hartjes**
                                               (See above for address)
                                               *TERMINATED: 03/04/2025*

V.

**Counter Defendant**

**eChanging Barcode, LLC**                     represented by **David Lawrence Hecht**
                                               (See above for address)
                                               *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*

                                               **Gerard Francis Dunne**
                                               (See above for address)
                                               *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/16/2024 | 1 | COMPLAINT against AZPB Limited Partnership, Angels Baseball LP, Athletics Investment Group LLC, Atlanta National League Baseball Club LLC, Baltimore Orioles Limited Partnership, Boston Red Sox Baseball Club Limited Partnership, Chicago Cubs Baseball Club LLC, Chicago White Sox, Ltd., Cleveland Guardians Baseball Company LLC, Colorado Rockies Baseball Club Ltd., Detroit Tigers Inc., Houston Astros LLC, Kansas City Royals Baseball Club LLC, Live Nation Entertainment, Inc., Los Angeles Dodgers LLC, MLB Advanced Media L.P., Major League Baseball (MLB), Marlins Teamco, LLC, Milwaukee Brewers Baseball Club, Limited Partnership, Minnesota Twins, LLC, New York Yankees Partnership, Padres L.P., Pittsburgh Associates, Rangers Baseball LLC, Rays Baseball Club, LLC, Rogers Blue Jays Baseball Partnership, St. Louis Cardinals, LLC, Sterling Mets, L.P., StubHub Holdings Inc., The Baseball Club of Seattle, LLLP, The Cincinnati Reds LLC, The Phillies, TicketMaster, LLC, Washington Nationals and Baseball Club, LLC. Document filed by Alan Amron. (sac) (Entered: 04/18/2024) |
| 04/16/2024 | 2 | CIVIL COVER SHEET filed. (sac) (Entered: 04/18/2024) |
| 04/16/2024 | | Case Designated ECF. (sac) (Entered: 04/18/2024) |
| 04/16/2024 | 3 | PRO SE CONSENT TO RECEIVE ELECTRONIC SERVICE. The following party: Alan Amron consents to receive electronic service via the ECF system. Document filed by Alan Amron. (sac) (Entered: 04/18/2024) |
| 04/16/2024 | 4 | REQUEST FOR ISSUANCE OF SUMMONS as to AZPB Limited Partnership, Angels Baseball LP, Athletics Investment Group LLC, Atlanta National League Baseball Club LLC, Baltimore Orioles Limited Partnership, Boston Red Sox Baseball Club Limited Partnership, Chicago Cubs Baseball Club LLC, Chicago White Sox, Ltd., Cleveland Guardians Baseball Company LLC, Colorado Rockies Baseball Club Ltd., Detroit Tigers Inc., Houston Astros LLC, Kansas City Royals Baseball Club LLC, Live Nation Entertainment, Inc., Los Angeles Dodgers LLC, MLB Advanced Media L.P., Major League Baseball (MLB), Marlins Teamco, LLC, Milwaukee Brewers Baseball Club, |

| | | |
|---|---|---|
| | | Limited Partnership, Minnesota Twins, LLC, New York Yankees Partnership, Padres L.P., Pittsburgh Associates, Rangers Baseball LLC, Rays Baseball Club, LLC, Rogers Blue Jays Baseball Partnership, St. Louis Cardinals, LLC, Sterling Mets, L.P., StubHub Holdings Inc., The Baseball Club of Seattle, LLLP, The Cincinnati Reds LLC, The Phillies, TicketMaster, LLC, Washington Nationals and Baseball Club, LLC., re: 1 Complaint. Document filed by Alan Amron. (sac) (Entered: 04/18/2024) |
| 04/18/2024 | 5 | STANDING ORDER M10-468: To ensure that all cases heard in the Southern District of New York are handled promptly and efficiently, all parties must keep the court apprised of any new contact information. It is a party's obligation to provide an address for service; service of court orders cannot be accomplished if a party does not update the court when a change of address occurs. Accordingly, all self-represented litigants are hereby ORDERED to inform the court of each change in their address or electronic contact information. Parties may consent to electronic service to receive notifications of court filings by email, rather than relying on regular mail delivery. Parties may also ask the court for permission to file documents electronically. Forms, including instructions for consenting to electronic service and requesting permission to file documents electronically, may be found by clicking on the hyperlinks in this order, or by accessing the forms on the court's website, nysd.uscourts.gov/forms. The procedures that follow apply only to cases filed by pro se plaintiffs. If the court receives notice from the United States Postal Service that an order has been returned to the court, or otherwise receives information that the address of record for a self-represented plaintiff is no longer valid, the court may issue an Order to Show Cause why the case should not be dismissed without prejudice for failure to comply with this order. Such order will be sent to the plaintiffs last known address and will also be viewable on the courts electronic docket. A notice directing the partys attention to this order shall be docketed (and mailed to any self-represented party that has appeared and has not consented to electronic service) upon the opening of each case or miscellaneous matter that is classified as pro se in the court's records. SO ORDERED. (Signed by Chief Judge Laura Taylor Swain on 3/18/2024) (sac) (Entered: 04/18/2024) |
| 04/19/2024 | | Pro Se Payment of Fee Processed: $405.00 Money Order processed by the Finance Department on 4/19/24, Receipt Number 28617. (amf) (Entered: 04/19/2024) |
| 04/23/2024 | 6 | REQUEST FOR ISSUANCE OF SUMMONS as to Alan Amron, re: 1 Complaint. Document filed by Alan Amron. (rro) (Entered: 04/23/2024) |
| 05/03/2024 | | CASE ACCEPTED AS SIMILAR. Create association to 1:23-cv-10576-PAE. Notice of Assignment to follow. (vba) (Entered: 05/03/2024) |
| 05/03/2024 | | NOTICE OF CASE REASSIGNMENT to Judge Paul A. Engelmayer. Judge Unassigned is no longer assigned to the case. (vba) (Entered: 05/03/2024) |
| 05/03/2024 | | Magistrate Judge Robyn F. Tarnofsky is designated to handle matters that may be referred in this case. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf. (vba) (Entered: 05/03/2024) |
| 05/08/2024 | 7 | SUMMONS ISSUED as to Angels Baseball LP, Atlanta National League Baseball Club LLC, Baltimore Orioles Limited Partnership, Boston Red Sox Baseball Club Limited Partnership, Chicago Cubs Baseball Club LLC, Chicago White Sox, Ltd., Cleveland Guardians Baseball Company LLC, Colorado Rockies Baseball Club Ltd., Detroit Tigers Inc., Houston Astros LLC, Kansas City Royals Baseball Club LLC, Los Angeles Dodgers LLC, Major League Baseball (MLB), Marlins Teamco, LLC, Milwaukee Brewers Baseball Club, Limited Partnership, Minnesota Twins, LLC, New York Yankees Partnership, Padres L.P., Pittsburgh Associates, Rangers Baseball LLC, Rays Baseball Club, LLC, Rogers Blue Jays Baseball Partnership, St. Louis Cardinals, LLC, Sterling Mets, L.P., StubHub |

| | | |
|---|---|---|
| | | Holdings Inc., The Baseball Club of Seattle, LLLP, The Cincinnati Reds LLC, The Phillies, TicketMaster, LLC, Washington Nationals and Baseball Club, LLC. (sha) (Entered: 05/08/2024) |
| 05/08/2024 | 8 | AMENDED SUMMONS ISSUED as to Angels Baseball LP, Atlanta National League Baseball Club LLC, Baltimore Orioles Limited Partnership, Boston Red Sox Baseball Club Limited Partnership, Chicago Cubs Baseball Club LLC, Chicago White Sox, Ltd., Cleveland Guardians Baseball Company LLC, Colorado Rockies Baseball Club Ltd., Detroit Tigers Inc., Houston Astros LLC, Kansas City Royals Baseball Club LLC, Los Angeles Dodgers LLC, Major League Baseball (MLB), Marlins Teamco, LLC, Milwaukee Brewers Baseball Club, Limited Partnership, Minnesota Twins, LLC, New York Yankees Partnership, Padres L.P., Pittsburgh Associates, Rangers Baseball LLC, Rays Baseball Club, LLC, Rogers Blue Jays Baseball Partnership, St. Louis Cardinals, LLC, Sterling Mets, L.P., StubHub Holdings Inc., The Baseball Club of Seattle, LLLP, The Cincinnati Reds LLC, The Phillies, TicketMaster, LLC, Washington Nationals and Baseball Club, LLC, Ticketmaster, Stubhub, MLB. (sha) (Entered: 05/08/2024) |
| 05/31/2024 | 9 | **FILING ERROR - DEFICIENT DOCKET ENTRY - FILED AGAINST PARTY ERROR -** AMENDED COMPLAINT amending 1 Complaint,,,, against All Defendants with JURY DEMAND.Document filed by eChanging Barcode, LLC. Related document: 1 Complaint,,,,. (Attachments: # 1 Exhibit 715 Patent, # 2 Exhibit Admissions, # 3 Exhibit Infringement Analysis).(Dunne, Gerard) Modified on 6/3/2024 (pc). (Entered: 05/31/2024) |
| 06/03/2024 | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT PLEADING. Notice to Attorney Gerard Francis Dunne to RE-FILE Document No. 9 Amended Complaint,. The filing is deficient for the following reason(s): the All Defendant radio button was selected;. Re-file the pleading using the event type Amended Complaint found under the event list Complaints and Other Initiating Documents - attach the correct signed PDF - select the individually named filer/filers - select the individually named party/parties the pleading is against. (pc) (Entered: 06/03/2024) |
| 06/03/2024 | 10 | **FILING ERROR - DEFICIENT PLEADING - PDF ERROR -** AMENDED COMPLAINT amending 1 Complaint,,,, against AZPB Limited Partnership, Angels Baseball LP, Athletics Investment Group LLC, Atlanta National League Baseball Club LLC, Baltimore Orioles Limited Partnership, Boston Red Sox Baseball Club Limited Partnership, Chicago Cubs Baseball Club LLC, Chicago White Sox, Ltd., Cleveland Guardians Baseball Company LLC, Colorado Rockies Baseball Club Ltd., Detroit Tigers Inc., Houston Astros LLC, Kansas City Royals Baseball Club LLC, Live Nation Entertainment, Inc., Los Angeles Dodgers LLC, MLB Advanced Media L.P., Major League Baseball (MLB), Marlins Teamco, LLC, Milwaukee Brewers Baseball Club, Limited Partnership, Minnesota Twins, LLC, New York Yankees Partnership, Padres L.P., Pittsburgh Associates, Rangers Baseball LLC, Rays Baseball Club, LLC, Rogers Blue Jays Baseball Partnership, St. Louis Cardinals, LLC, Sterling Mets, L.P., StubHub Holdings Inc., The Baseball Club of Seattle, LLLP, The Cincinnati Reds LLC, The Phillies, TicketMaster, LLC, Washington Nationals and Baseball Club, LLC with JURY DEMAND.Document filed by eChanging Barcode, LLC. Related document: 1 Complaint,,,,. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit C).(Dunne, Gerard) Modified on 6/4/2024 (vf). (Entered: 06/03/2024) |
| 06/04/2024 | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT PLEADING. Notice to Attorney Gerard Francis Dunne to RE-FILE re: Document No. 10 Amended Complaint. The filing is deficient for the following reason(s): the PDF attached to the docket entry for the pleading is not correct; The pleading reflects title "Complaint"; Court's leave has not been granted. Re-file the pleading using the event type Amended Complaint found under the event list Complaints and Other Initiating Documents - attach the correct signed PDF - select the individually named filer/filers - |

| | | select the individually named party/parties the pleading is against. File the Exhibit to Pleading event found under the event list **Other Documents** and attach either opposing party's written consent or Court's leave. (vf) (Entered: 06/04/2024) |
|---|---|---|
| 06/04/2024 | 11 | LETTER MOTION for Leave to File Amended Complaint addressed to Judge Paul A. Engelmayer from Gerard F Dunne dated June 4, 2024. Document filed by eChanging Barcode, LLC. (Attachments: # 1 Exhibit Exhibit A Assignment recorded, # 2 Exhibit Exhibit B Proposed Amended Complaint, # 3 Exhibit Exhibit A to Amended Complaint, # 4 Exhibit Exhibit B to Amended Complaint, # 5 Exhibit Exhibit C to Amended Complaint).(Dunne, Gerard) (Entered: 06/04/2024) |
| 06/11/2024 | 12 | ORDER terminating 11 Letter Motion for Leave to File Document. Although counsel states that he represents both Amron and putative plaintiff eCharging Barcode, LLC, counsel has not filed an appearance on this docket on behalf of Amron. It is thus premature, and procedurally improper, to file the attached amended complaint at present. Rather, counsel should first file an appearance on behalf of Amron, and thereafter file a motion to substitute pursuant to Federal Rule of Civil Procedure 25(c). Counsel may resubmit this motion for leave to amend in conjunction with the motion to substitute, and the Court will address them in tandem. SO ORDERED. (Signed by Judge Paul A. Engelmayer on 6/11/2024) (tg) (Entered: 06/11/2024) |
| 06/12/2024 | 13 | NOTICE OF APPEARANCE by Gerard Francis Dunne on behalf of Alan Amron..(Dunne, Gerard) (Entered: 06/12/2024) |
| 06/15/2024 | 14 | MOTION to Substitute Party. Old Party: Alan Amron, New Party: eChanging LLC *and Leave to File Amended Complaing*. Document filed by Alan Amron. (Attachments: # 1 Exhibit Assignment, # 2 Exhibit Proposed Amended Complaint).(Dunne, Gerard) (Entered: 06/15/2024) |
| 06/29/2024 | 15 | AFFIDAVIT OF SERVICE of Summons and Complaint,,,,,. MLB Advanced Media L.P. served on 6/26/2024, answer due 7/17/2024. Service was accepted by Colleen Bahahan, Business Document Specialist, NY Dept of State. Document filed by Alan Amron..(Dunne, Gerard) (Entered: 06/29/2024) |
| 06/29/2024 | 16 | AFFIDAVIT OF SERVICE of Summons and Complaint,,,,,. TicketMaster, LLC served on 6/26/2024, answer due 7/17/2024. Service was accepted by Colleen Bahahan, Business Document Specialist, NY Dept. of State. Document filed by Alan Amron..(Dunne, Gerard) (Entered: 06/29/2024) |
| 06/29/2024 | 17 | AFFIDAVIT OF SERVICE of Summons and Complaint,,,,,. StubHub Holdings Inc. served on 6/26/2024, answer due 7/17/2024. Service was accepted by Colleen Banahan, Business Document Specialist, NY Dept. of State. Document filed by Alan Amron..(Dunne, Gerard) (Entered: 06/29/2024) |
| 07/15/2024 | 18 | NOTICE OF APPEARANCE by Excylyn Janaize Hardin-Smith on behalf of Live Nation Entertainment, Inc., TicketMaster, LLC..(Hardin-Smith, Excylyn) (Entered: 07/15/2024) |
| 07/15/2024 | 19 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Other Affiliate Liberty Media Corporation for Live Nation Entertainment, Inc., TicketMaster, LLC. Document filed by Live Nation Entertainment, Inc., TicketMaster, LLC..(Hardin-Smith, Excylyn) (Entered: 07/15/2024) |
| 07/15/2024 | 20 | LETTER MOTION for Extension of Time *to answer or otherwise respond to the Complaint* addressed to Judge Paul A. Engelmayer from Excylyn J. Hardin-Smith dated 7/15/2024. Document filed by Live Nation Entertainment, Inc., TicketMaster, LLC.. (Hardin-Smith, Excylyn) (Entered: 07/15/2024) |

| 07/16/2024 | 21 | NOTICE OF APPEARANCE by Paul Wendell Garrity on behalf of StubHub Holdings Inc...(Garrity, Paul) (Entered: 07/16/2024) |
| 07/16/2024 | 22 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by StubHub Holdings Inc...(Garrity, Paul) (Entered: 07/16/2024) |
| 07/16/2024 | 23 | LETTER MOTION for Extension of Time to File Answer re: 1 Complaint,,,, addressed to Judge Paul A. Engelmayer from Paul W. Garrity dated July 16, 2024. Document filed by StubHub Holdings Inc...(Garrity, Paul) (Entered: 07/16/2024) |
| 07/16/2024 | 24 | ORDER granting 20 Letter Motion for Extension of Time. GRANTED. SO ORDERED. (Signed by Judge Paul A. Engelmayer on 7/16/2024) (sgz) (Entered: 07/17/2024) |
| 07/16/2024 | | Set/Reset Deadlines: Live Nation Entertainment, Inc. answer due 8/16/2024; TicketMaster, LLC answer due 8/16/2024. (sgz) (Entered: 07/17/2024) |
| 07/17/2024 | 25 | MOTION for Alan E. Littmann to Appear Pro Hac Vice *on Behalf of MLB Advanced Media L.P.*. Filing fee $ 200.00, receipt number ANYSDC-29620222. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by MLB Advanced Media L.P.. (Attachments: # 1 Affidavit of Alan E. Littmann, # 2 Exhibit A - Certificate of Good Standing, # 3 Proposed Order for Admission).(Littmann, Alan) (Entered: 07/17/2024) |
| 07/17/2024 | 26 | **FILING ERROR - CORPORATE PARENT/OTHER AFFILIATE NOT ADDED -** RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by MLB Advanced Media L.P...(Littmann, Alan) Modified on 7/24/2024 (lb). (Entered: 07/17/2024) |
| 07/17/2024 | 27 | MOTION to Dismiss *Complaint.* Document filed by MLB Advanced Media L.P... (Littmann, Alan) (Entered: 07/17/2024) |
| 07/17/2024 | 28 | MEMORANDUM OF LAW in Support re: 27 MOTION to Dismiss *Complaint.* . Document filed by MLB Advanced Media L.P...(Littmann, Alan) (Entered: 07/17/2024) |
| 07/17/2024 | 29 | DECLARATION of Alan E. Littmann in Support re: 27 MOTION to Dismiss *Complaint.*. Document filed by MLB Advanced Media L.P.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H). (Littmann, Alan) (Entered: 07/17/2024) |
| 07/18/2024 | | >>>**NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 25 MOTION for Alan E. Littmann to Appear Pro Hac Vice *on Behalf of MLB Advanced Media L.P.*. Filing fee $ 200.00, receipt number ANYSDC-29620222. Motion and supporting papers to be reviewed by Clerk's Office staff.<. The document has been reviewed and there are no deficiencies. (rju)** (Entered: 07/18/2024) |
| 07/18/2024 | 30 | ORDER: Accordingly, it is hereby ORDERED that plaintiff shall file any amended complaint by August 7, 2024. No further opportunities to amend will ordinarily be granted. If plaintiff does amend, by August 28, 2024, each defendant shall: (1) file an answer; (2) file a new motion to dismiss; or (3) submit a letter to the Court, copying plaintiff, stating that it relies on the previously filed motion to dismiss. It is further ORDERED that if no amended complaint is filed, plaintiff shall serve any opposition to the motion to dismiss by August 7, 2024. Defendant's reply, if any, shall be served by August 14, 2024. At the time any reply is served, the moving party shall supply the Court with a courtesy copy of all motion papers by attaching them as PDF files to a single email addressed to EngelmayerNYSDChambers@nysd.uscourts.gov. SO ORDERED. ( Amended Pleadings due by 8/7/2024., Motions due by 8/28/2024.) (Signed by Judge Paul A. Engelmayer on 7/18/2024) (tg) (Entered: 07/18/2024) |

| 07/23/2024 | 31 | MOTION for Christopher Ponder to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-29643708. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by StubHub Holdings Inc.. (Attachments: # 1 Affidavit of Christopher Ponder, # 2 Exhibit A - Certificate of Good Standing for California, # 3 Exhibit B - Certificate of Good Standing for Texas, # 4 Proposed Order For Admission Pro Hac Vice of Christopher Ponder).(Ponder, Christopher) (Entered: 07/23/2024) |
|---|---|---|
| 07/23/2024 | 32 | MOTION for Jennifer M. Hartjes to Appear Pro Hac Vice *on Behalf of MLB Advanced Media L.P.*. Filing fee $ 200.00, receipt number ANYSDC-29643989. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by MLB Advanced Media L.P.. (Attachments: # 1 Affidavit of Jennifer M. Hartjes, # 2 Exhibit A - Certificate of Good Standing, # 3 Proposed Order for Admission).(Hartjes, Jennifer) (Entered: 07/23/2024) |
| 07/23/2024 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 31 MOTION for Christopher Ponder to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-29643708. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bc)** (Entered: 07/23/2024) |
| 07/23/2024 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 32 MOTION for Jennifer M. Hartjes to Appear Pro Hac Vice *on Behalf of MLB Advanced Media L.P.*. Filing fee $ 200.00, receipt number ANYSDC-29643989. Motion and supporting papers to be reviewed by Clerk's Office staf. The document has been reviewed and there are no deficiencies. (bc) (Entered: 07/23/2024)** |
| 07/24/2024 | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Notice to Attorney Alan E. Littmann to RE-FILE Document No. 26 Rule 7.1 Corporate Disclosure Statement. The filing is deficient for the following reason(s): the corporate parent/other affiliate was not added;. Re-file the document using the event type Rule 7.1 Corporate Disclosure Statement found under the event list Other Documents - select the correct filer/filers - attach the correct signed PDF - when prompted with the message "Are there any corporate parents or other affiliates?", select the Yes or No radio button - If Yes - enter the corporate parent/other affiliate, click the Search button - select the correct corporate parent/other affiliate name from the search results list or if no person found, create a new corporate parent/other affiliate - select the party to whom the corporate parent/other affiliate should be linked - add corporate parent/other affiliate names one at a time. (lb) (Entered: 07/24/2024)** |
| 07/25/2024 | 33 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Other Affiliate MLB Advanced Media, Inc., Other Affiliate MLB Media Holdings, L.P. for MLB Advanced Media L.P.. Document filed by MLB Advanced Media L.P...(Littmann, Alan) (Entered: 07/25/2024) |
| 07/25/2024 | 34 | MOTION for Neil J. McNabnay to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-29658775. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Live Nation Entertainment, Inc., TicketMaster, LLC. (Attachments: # 1 Affidavit Declaration of Neil J. McNabnay, # 2 Exhibit Certificate of Good Standing from the Supreme Court of Texas, # 3 Proposed Order Proposed Order). (McNabnay, Neil) (Entered: 07/25/2024) |
| 07/26/2024 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 34 MOTION for Neil J. McNabnay to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-29658775. Motion and supporting papers to be reviewed by** |

| | | Clerk's Office staff.. **The document has been reviewed and there are no deficiencies. (bc)** (Entered: 07/26/2024) |
|---|---|---|
| 07/30/2024 | 35 | ORDER FOR ADMISSION PRO HAC VICE granting 34 Motion for Neil J. McNabnay to Appear Pro Hac Vice. (Signed by Judge Paul A. Engelmayer on 7/30/2024) (ks) (Entered: 07/30/2024) |
| 07/30/2024 | 36 | ORDER FOR ADMISSION PRO HAC VICE granting 32 Motion for Jennifer M. Hartjes to Appear Pro Hac Vice. (Signed by Judge Paul A. Engelmayer on 7/30/2024) (ks) (Entered: 07/30/2024) |
| 07/30/2024 | 37 | ORDER FOR ADMISSION PRO HAC VICE granting 31 Motion for Christopher Ponder to Appear Pro Hac Vice. (Signed by Judge Paul A. Engelmayer on 7/30/2024) (ks) (Entered: 07/30/2024) |
| 07/30/2024 | 38 | ORDER FOR ADMISSION PRO HAC VICE granting 25 Motion for Alan E. Littmann to Appear Pro Hac Vice. (Signed by Judge Paul A. Engelmayer on 7/30/2024) (ks) (Entered: 07/30/2024) |
| 08/07/2024 | 39 | NOTICE OF APPEARANCE by David Lawrence Hecht on behalf of eChanging Barcode, LLC..(Hecht, David) (Entered: 08/07/2024) |
| 08/07/2024 | 40 | NOTICE OF VOLUNTARY DISMISSAL pursuant to Rule 41(a)(1)(A)(i) of the Federal Rules of Civil Procedure, the plaintiff(s) and or their counsel(s), hereby give notice that the above-captioned action is voluntarily dismissed, without prejudice against the defendant(s) AZPB Limited Partnership, Angels Baseball LP, Athletics Investment Group LLC, Atlanta National League Baseball Club LLC, Baltimore Orioles Limited Partnership, Boston Red Sox Baseball Club Limited Partnership, Chicago Cubs Baseball Club LLC, Chicago White Sox, Ltd., Cleveland Guardians Baseball Company LLC, Colorado Rockies Baseball Club Ltd., Detroit Tigers Inc., Houston Astros LLC, Kansas City Royals Baseball Club LLC, Live Nation Entertainment, Inc., Los Angeles Dodgers LLC, Major League Baseball (MLB), Marlins Teamco, LLC, Milwaukee Brewers Baseball Club, Limited Partnership, Minnesota Twins, LLC, New York Yankees Partnership, Padres L.P., Pittsburgh Associates, Rangers Baseball LLC, Rays Baseball Club, LLC, Rogers Blue Jays Baseball Partnership, St. Louis Cardinals, LLC, Sterling Mets, L.P., StubHub Holdings Inc., The Baseball Club of Seattle, LLLP, The Cincinnati Reds LLC, The Phillies, TicketMaster, LLC, Washington Nationals and Baseball Club, LLC. Document filed by eChanging Barcode, LLC. **Proposed document to be reviewed and processed by Clerk's Office staff (No action required by chambers)**...(Hecht, David) (Entered: 08/07/2024) |
| 08/07/2024 | 41 | AMENDED COMPLAINT amending 1 Complaint,,,, against MLB Advanced Media L.P. with JURY DEMAND.Document filed by eChanging Barcode, LLC. Related document: 1 Complaint,,,,. (Attachments: # 1 Exhibit A - U.S. Patent No. 9,047,715).(Hecht, David) (Entered: 08/07/2024) |
| 08/08/2024 | | ***NOTICE TO COURT REGARDING NOTICE OF VOLUNTARY DISMISSAL Document No. 40 Notice of Voluntary Dismissal was reviewed and referred to Judge Paul A. Engelmayer for approval for the following reason(s): the plaintiff(s) filed their voluntary dismissal and it did not dismiss all of the parties or the action in its entirety. (km) (Entered: 08/08/2024) |
| 08/20/2024 | 42 | MOTION to Strike Document No. 41 eChanging Barcode's Amended Complaint. Document filed by MLB Advanced Media L.P...(Littmann, Alan) (Entered: 08/20/2024) |
| 08/20/2024 | 43 | MEMORANDUM OF LAW in Support re: 42 MOTION to Strike Document No. 41 eChanging Barcode's Amended Complaint. . Document filed by MLB Advanced Media L.P...(Littmann, Alan) (Entered: 08/20/2024) |

| 08/20/2024 | 44 | DECLARATION of Alan E. Littmann in Support re: 42 MOTION to Strike Document No. 41 *eChanging Barcode's Amended Complaint*.. Document filed by MLB Advanced Media L.P.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G).(Littmann, Alan) (Entered: 08/20/2024) |
| 08/22/2024 | | ***DELETED DOCUMENT. Deleted document number 45 ORDER. The document was incorrectly filed in this case. (kgo)** (Entered: 08/22/2024) |
| 08/22/2024 | 45 | ORDER: On August 20, 2024, defendant MLB Advanced Media, L.P. ("MLBAM") filed a motion to strike the amended complaint ("AC") under Rule 12(f)(2) of the Federal Rules of Civil Procedure. Dkt. 42. In its motion, it also asked the Court to dismiss the AC for the reasons stated in MLBAM's July 17, 2024 motion to dismiss under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. 27. It is hereby ORDERED that eChanging Barcode, LLC ("eChanging") file a response to both motions by August 30, 2024. The response should address whether there is any substantive consequence to eChanging were the Court to dismiss the AC without prejudice to eChanging's right to bring a new action. Defendant's reply, if any, shall be filed by September 6, 2024. SO ORDERED. ( Responses due by 8/30/2024, Replies due by 9/6/2024.) (Signed by Judge Paul A. Engelmayer on 8/22/2024) (tg) (Entered: 08/22/2024) |
| 08/23/2024 | 46 | NOTICE OF APPEARANCE by Gerard Francis Dunne on behalf of eChanging Barcode, LLC..(Dunne, Gerard) (Entered: 08/23/2024) |
| 08/23/2024 | 47 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by eChanging Barcode, LLC..(Dunne, Gerard) (Entered: 08/23/2024) |
| 08/30/2024 | 48 | RESPONSE in Opposition to Motion re: 42 MOTION to Strike Document No. 41 *eChanging Barcode's Amended Complaint*., 27 MOTION to Dismiss *Complaint. pursuant to 45 Order*. Document filed by eChanging Barcode, LLC..(Hecht, David) (Entered: 08/30/2024) |
| 09/06/2024 | 49 | REPLY MEMORANDUM OF LAW in Support re: 42 MOTION to Strike Document No. 41 *eChanging Barcode's Amended Complaint*. . Document filed by MLB Advanced Media L.P...(Littmann, Alan) (Entered: 09/06/2024) |
| 10/21/2024 | 50 | MOTION for Sanctions . Document filed by MLB Advanced Media L.P...(Littmann, Alan) (Entered: 10/21/2024) |
| 10/21/2024 | 51 | MEMORANDUM OF LAW in Support re: 50 MOTION for Sanctions . . Document filed by MLB Advanced Media L.P...(Littmann, Alan) (Entered: 10/21/2024) |
| 10/21/2024 | 52 | DECLARATION of Jennifer M. Hartjes in Support re: 50 MOTION for Sanctions .. Document filed by MLB Advanced Media L.P.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R).(Littmann, Alan) (Entered: 10/21/2024) |
| 10/21/2024 | 53 | DECLARATION of Andrew M. Thaler in Support re: 50 MOTION for Sanctions .. Document filed by MLB Advanced Media L.P...(Littmann, Alan) (Entered: 10/21/2024) |
| 11/04/2024 | 54 | RESPONSE in Opposition to Motion re: 50 MOTION for Sanctions . . Document filed by eChanging Barcode, LLC. (Attachments: # 1 Affidavit Declaration of Alan Amron). (Dunne, Gerard) (Entered: 11/04/2024) |
| 11/12/2024 | 55 | REPLY MEMORANDUM OF LAW in Support re: 50 MOTION for Sanctions . . Document filed by MLB Advanced Media L.P...(Littmann, Alan) (Entered: 11/12/2024) |

| 12/06/2024 | 56 | OPINION AND ORDER re: 42 MOTION to Strike Document No. 41 *eChanging Barcode's Amended Complaint.* filed by MLB Advanced Media L.P., 50 MOTION for Sanctions . filed by MLB Advanced Media L.P.. For the foregoing reasons, the Court denies defendant's motion to strike and motion for sanctions. The Court permits the substitution of eChanging for Amron as plaintiff. MLBAM shall file an answer or a new motion to dismiss by January 6, 2025. If MLBAM files a new motion to dismiss, plaintiff shall serve any opposition by January 27, 2025. MLBAM's reply, if any, shall be served by February 10, 2025. The Clerk of Court is respectfully directed to terminate all pending motions. SO ORDERED. MLB Advanced Media L.P. answer due 1/6/2025.( Motions due by 1/6/2025.) (Signed by Judge Paul A. Engelmayer on 12/6/2024) (tg) (Entered: 12/06/2024) |
|---|---|---|
| 01/06/2025 | 57 | MOTION to Dismiss *eChanging Barcode's Amended Complaint.* Document filed by MLB Advanced Media L.P...(Littmann, Alan) (Entered: 01/06/2025) |
| 01/06/2025 | 58 | MEMORANDUM OF LAW in Support re: 57 MOTION to Dismiss *eChanging Barcode's Amended Complaint.* . Document filed by MLB Advanced Media L.P...(Littmann, Alan) (Entered: 01/06/2025) |
| 01/27/2025 | 59 | MEMORANDUM OF LAW in Opposition re: 57 MOTION to Dismiss *eChanging Barcode's Amended Complaint.* . Document filed by eChanging Barcode, LLC..(Hecht, David) (Entered: 01/27/2025) |
| 02/10/2025 | 60 | REPLY MEMORANDUM OF LAW in Support re: 57 MOTION to Dismiss *eChanging Barcode's Amended Complaint.* . Document filed by MLB Advanced Media L.P... (Littmann, Alan) (Entered: 02/10/2025) |
| 02/28/2025 | 61 | MOTION for Jennifer M. Hartjes to Withdraw as Attorney *on Behalf of MLB Advanced Media L.P..* Document filed by MLB Advanced Media L.P...(Littmann, Alan) (Entered: 02/28/2025) |
| 03/04/2025 | 62 | MEMO ENDORSEMENT granting 61 Motion to Withdraw as Attorney. ENDORSEMENT: GRANTED. SO ORDERED. Attorney Jennifer M. Hartjes terminated. (Signed by Judge Paul A. Engelmayer on 3/3/2025) (tg) (Entered: 03/04/2025) |
| 05/27/2025 | 63 | ORDER: On August 7, 2024, then-plaintiff Alan Amron voluntarily dismissed all defendants except MLB Advanced Media L.P. Dkt. 40. On December 6, 2024, the Court issued a decision permitting the substitution of eChanging Barcode, LLC ("eChanging") for Amron as plaintiff. See Dkt. 56. The Clerk of Court is respectfully directed to update the case caption to reflect these actions. SO ORDERED. (Signed by Judge Paul A. Engelmayer on 5/27/2025) (tg) (Entered: 05/27/2025) |
| 05/30/2025 | 64 | OPINION AND ORDER re: 57 MOTION to Dismiss *eChanging Barcode's Amended Complaint.* filed by MLB Advanced Media L.P.. For the foregoing reasons, the Court denies MLBAM's motion to dismiss the Amended Complaint. The Court will by separate order schedule an initial telephonic conference with the parties. The Clerk of Court is respectfully directed to terminate the motion pending atDocket 57. SO ORDERED. (Signed by Judge Paul A. Engelmayer on 5/30/2025) (tg) (Entered: 05/30/2025) |
| 06/02/2025 | 65 | ORDER: An initial pretrial conference is hereby scheduled in the above-captioned case for Monday, July 7, 2025, at 2:00 p.m. This conference will be held telephonically. The parties should call into the Court's dedicated conference line at (855) 244-8681, and enter Access Code 2318-315-0661, followed by the pound (#) key. Counsel are directed to review the Court's Individual Rules and Practices in Civil Cases, found at https://nysd.uscourts.gov/hon-paul-engelmayer, for the Court's procedures for telephonic conferences and for instructions for communicating with chambers. As further set forth by this Order. SO ORDERED. ( Initial Conference set for 7/7/2025 at 02:00 PM before Judge |

|            |        | Paul A. Engelmayer.) (Signed by Judge Paul A. Engelmayer on 6/2/2025) (tg) (Entered: 06/02/2025) |
|------------|--------|---|
| 06/13/2025 | 66     | ANSWER to 41 Amended Complaint, with JURY DEMAND., COUNTERCLAIM against eChanging Barcode, LLC. Document filed by MLB Advanced Media L.P...(Littmann, Alan) (Entered: 06/13/2025) |
| 06/27/2025 | 67     | MOTION for Madeline R. Thompson to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-31299497. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by MLB Advanced Media L.P.. (Attachments: # 1 Affidavit in Support of Madeline R. Thompson Appearance, # 2 Exhibit A - Certificate of Good Standing, # 3 Proposed Order Granting Admission Pro Hac Vice).(Thompson, Madeline) (Entered: 06/27/2025) |
| 06/27/2025 |        | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 67 MOTION for Madeline R. Thompson to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-31299497. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bc)** (Entered: 06/27/2025) |
| 06/30/2025 | 68     | ORDER FOR ADMISSION PRO HAC VICE granting 67 Motion to Appear Pro Hac Vice. The motion of Madeline R. Thompson for admission to practice Pro Hac Vice in the above-captioned action is granted. As further set forth by this Order. (Signed by Judge Paul A. Engelmayer on 6/30/2025) (tg) (Entered: 06/30/2025) |
| 06/30/2025 | 69     | JOINT LETTER addressed to Judge Paul A. Engelmayer from David L. Hecht and Alan Littmann dated June 30, 2025 re: Initial Conference. Document filed by eChanging Barcode, LLC..(Hecht, David) (Entered: 06/30/2025) |
| 06/30/2025 | 70     | PROPOSED CASE MANAGEMENT PLAN. Document filed by eChanging Barcode, LLC..(Hecht, David) (Entered: 06/30/2025) |
| 07/04/2025 | 71     | ANSWER to 66 Counterclaim. Document filed by eChanging Barcode, LLC..(Dunne, Gerard) (Entered: 07/04/2025) |
| 07/07/2025 | 72     | JOINT CIVIL CASE MANAGEMENT PLAN AND SCHEDULING ORDER: All parties do not consent to conducting all further proceedings before a Magistrate Judge, including motions and trial. 28 U.S.C. § 636(c). This case is to be tried to a jury. Any motion to amend or to join additional pa1iies shall be filed within 30 days from the date of this Order. Unless otherwise indicated, the Case Management Conference will be held telephonically. The parties should call into the Court's dedicated conference line at (888) 363-4749, and enter Access Code 468-4906, followed by the pound (#) key. Deposition due by 11/4/2025. Fact Discovery due by 11/15/2025. Expert Discovery due by 1/9/2026. Estimate length of trial 4 days. Telephone Conference set for 2/10/2026 at 02:00 PM before Judge Paul A. Engelmayer. (Signed by Judge Paul A. Engelmayer on 7/7/2025) (tg) (Entered: 07/07/2025) |
| 07/07/2025 |        | Minute Entry for proceedings held before Judge Paul A. Engelmayer: Telephonic Initial Pretrial Conference held on 7/7/2025. Associated Cases: 1:24-cv-02930-PAE, 1:23-cv-10576-PAE(ajs) (Entered: 07/10/2025) |
| 07/21/2025 | 73     | NOTICE of Service re MLB Advanced Media L.P.'s Rule 26(a) Initial Disclosures. Document filed by MLB Advanced Media L.P...(Littmann, Alan) (Entered: 07/21/2025) |
| 09/13/2025 | 74     | FIRST MOTION to Intervene . Document filed by Amy R LIVE-Fi Technology Holdings. Return Date set for 9/23/2025 at 02:00 PM. (Attachments: # 1 Exhibit US Patent 11403566, # 2 Exhibit CA Cert of Good Standing, # 3 Exhibit NDNY Order 9-5-25 Granting Injunction, # 4 Exhibit Letter to NDNY August 2025, # 5 Exhibit Ex parte Letter |

| | | |
|---|---|---|
| | | to Fed Cir 2018 from OCA Attorney, # 6 Exhibit SCOTUS Cover Sheet Docket 24-7441, # 7 Exhibit SCOTUS Petition and Brief).(Gurvey, Amy) (Entered: 09/13/2025) |
| 09/16/2025 | 75 | NOTICE OF APPEARANCE by Delphine W. Knight Brown on behalf of eChanging Barcode, LLC..(Knight Brown, Delphine) (Entered: 09/16/2025) |
| 09/18/2025 | 76 | MEMO ENDORSEMENT with respect to 74 Motion to Intervene. ENDORSEMENT: The Court is in receipt of this motion to intervene. Any opposition from the parties is due September 29, 2025. No reply is invited at this time. The request for oral argument is denied. The Court will resolve this motion on the papers. SO ORDERED. (Signed by Judge Paul A. Engelmayer on 9/18/2025) (tg) (Entered: 09/18/2025) |
| 09/18/2025 | | Set/Reset Deadlines: Responses due by 9/29/2025 (tg) (Entered: 09/18/2025) |
| 09/19/2025 | 77 | AFFIRMATION of Amy Weissbrod Gurvey in Support re: 74 FIRST MOTION to Intervene .. Document filed by Amy R LIVE-Fi Technology Holdings. (Attachments: # 1 Exhibit NDNY Order Granting Hearing on Injunction, # 2 Exhibit Ex parte 2018 Fraudulen Ltr from OCA).(Gurvey, Amy) (Entered: 09/19/2025) |
| 09/25/2025 | 78 | LETTER MOTION for Extension of Time addressed to Judge Paul A. Engelmayer from David L. Hecht and Alan Littmann dated September 25, 2025. Document filed by eChanging Barcode, LLC. (Attachments: # 1 Proposed Order Text).(Hecht, David) (Entered: 09/25/2025) |
| 09/26/2025 | 79 | REVISED SCHEDULING ORDER granting 78 Letter Motion for Extension of Time. Upon consideration of the parties' September 25, 2025 joint letter-motion regarding amendments and additions to the operative Scheduling Order, Dkt. 72, it is ORDERED that the motion is GRANTED. The Court therefore sets the following revised deadlines as agreed upon by the parties: Plaintiff to file opening claim construction brief (Local Patent Rule 12): May 15, 2026, Defendant to file responsive claim construction brief (Local Patent Rule 12): June 16, 2026, Plaintiff to file reply to responsive claim construction brief (Local Patent Rule 12: June 23, 2026. Depositions to be completed: 10/16/2026, Close of Fact Discovery: October 30, 2026, Close of Expert Discovery: December 18, 2026. As further set forth in this Order. The Markman Hearing will take place on July 23, 2026 at 2:00 p.m. in Courtroom 1305 of the Thurgood Marshall United States Courthouse. Except as modified above, the provisions of the Court's Civil Case Management Plan and Scheduling Order of July 7, 2025 (Dkt. 72) remain in effect. SO ORDERED. (ks) Modified on 9/26/2025 (ks). (Entered: 09/26/2025) |
| 09/26/2025 | | Set/Reset Deadlines: ( Brief due by 5/15/2026., Deposition due by 10/16/2026., Expert Discovery due by 12/18/2026., Fact Discovery due by 10/30/2026., Reply to Response to Brief due by 6/23/2026., Responses to Brief due by 6/16/2026), Set/Reset Hearings:( Markman Hearing set for 7/23/2026 at 02:00 PM in Courtroom 1305, 40 Centre Street, New York, NY 10007 before Judge Paul A. Engelmayer.) (ks) (Entered: 09/26/2025) |
| 09/29/2025 | 80 | RESPONSE in Opposition to Motion re: 74 FIRST MOTION to Intervene . . Document filed by eChanging Barcode, LLC..(Hecht, David) (Entered: 09/29/2025) |
| 09/29/2025 | 81 | DECLARATION of David L. Hecht in Opposition re: 74 FIRST MOTION to Intervene .. Document filed by eChanging Barcode, LLC. (Attachments: # 1 Exhibit 1 - State Bar of New York Attorney Profile, # 2 Exhibit 2 - Order, # 3 Exhibit 3 - State Bar of California Attorney Profile, # 4 Exhibit 4 - Assignment).(Hecht, David) (Entered: 09/29/2025) |
| 09/29/2025 | 82 | DECLARATION of Alan Amron in Opposition re: 74 FIRST MOTION to Intervene .. Document filed by eChanging Barcode, LLC..(Hecht, David) (Entered: 09/29/2025) |
| 09/29/2025 | 83 | RESPONSE in Opposition to Motion re: 74 FIRST MOTION to Intervene . . Document filed by MLB Advanced Media L.P...(Littmann, Alan) (Entered: 09/29/2025) |

| 10/07/2025 | 84 | REPLY AFFIRMATION of Amy Weissbrod Gurvey in Support re: 74 FIRST MOTION to Intervene .. Document filed by Amy R LIVE-Fi Technology Holdings. (Attachments: # 1 Exhibit CA Bar Certificate of Good StandingStand, # 2 Exhibit NDNY 24cv211 Doc 85 Order Setting Hearing on Injunction, # 3 Exhibit NDNY 24cv211 Docket Order Hearing on Injunction, # 4 Exhibit DCD 25cv3257 Complaint to Enforce Antitrust Judgment ag Live Nation Ticketmaster, # 5 Exhibit Fraudulent 2018 Ex parte Ltr to Fed Cir fr NYS OCA Atty wt Standing or Jx over Patentee NYS OCA Atty, # 6 Exhibit DCD 23cv3549 APA Amended Complaint re Plaintiff Amron, # 7 Exhibit SCOTUS Docket Notice 24-7441 June 2024, # 8 Exhibit SDNY Motion to Appear Pro Hac Vice.(Gurvey, Amy) (Entered: 10/07/2025) |
| --- | --- | --- |
| 10/21/2025 | 85 | ORDER denying 74 Motion to Intervene. For the foregoing reasons, LIVE-Fi's motion to intervene is denied. The Clerk of Court is respectfully directed to terminate the motion at Docket 74 and, to the extent LIVE-Fi's filings hold it out as a party to this action, to terminate LIVE-Fi as a party to this action. SO ORDERED. (Signed by Judge Paul A. Engelmayer on 10/21/2025) (tg) (Entered: 10/21/2025) |
| 10/24/2025 | 86 | FIRST MOTION for Reconsideration re; 77 Affirmation in Support of Motion, 84 Reply Affirmation in Support of Motion,,, . Document filed by Amy R LIVE-Fi Technology Holdings. Return Date set for 10/14/2025 at 02:00 PM. (Attachments: # 1 Exhibit DCD 25cv3257 (JMC), # 2 Exhibit NDNY Order Injunction 9-5-25, # 3 Exhibit SCOTUS 24-7441, # 4 Exhibit SCOTUS 24-7441 ADD DOCS TO APPEAL, # 5 Exhibit CA CERT OF GOOD STANDING, # 6 Exhibit NDNY 24CV211 ORDER GRANTING HEARING ON INJUNCTION, # 7 Exhibit DCD 23CV3549 Amended Complaint, # 8 Exhibit Ex Parte Letter to Fed Cir from OCA attorney Shawn Kerby 2018).(Gurvey, Amy) (Entered: 10/24/2025) |
| 10/24/2025 | 87 | REDACTION to 86 FIRST MOTION for Reconsideration re; 77 Affirmation in Support of Motion, 84 Reply Affirmation in Support of Motion,,, . *CROPPED PATENT & PATENT APPL LIST* by Amy R LIVE-Fi Technology Holdings (Attachments: # 1 Exhibit Cropped Patent & Pending Appl List, # 2 Exhibit US PATENT D647910S 11-1-11, # 3 Exhibit US PATENT 11403566 8-2-22, # 4 Exhibit US PATENT 7603321 10-13-09).(Gurvey, Amy) (Entered: 10/24/2025) |
| 11/03/2025 | 88 | AFFIRMATION of Amy Weissbrod Gurvey in Support re: 86 FIRST MOTION for Reconsideration re; 77 Affirmation in Support of Motion, 84 Reply Affirmation in Support of Motion,,, .. Document filed by Amy R LIVE-Fi Technology Holdings. (Attachments: # 1 Exhibit NDNY 24cv211 Injunction 9-5-25 & Orders, # 2 Exhibit Cropped USPTO Patent List, # 3 Exhibit CAL CERT OF GOOD STANDING 2025, # 4 Exhibit CAL BAR ACTIVE STATUS).(Gurvey, Amy) (Entered: 11/03/2025) |
| 11/03/2025 | 89 | MEMO ENDORSEMENT denying 86 Motion for Reconsideration. ENDORSEMENT: DENIED. The standard for granting a motion for reconsideration is "strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked." Analytical Survs., Inc. v. Tonga Partners, L.P., 684 F.3d 36, 52 (2d Cir. 2012) (citation omitted). Because Gurvey's citations to Supreme Court cases about intervention in the antitrust context do not alter the Court's analysis as to whether LIVE Fi's intervention in this patent dispute is appropriate, the motion for reconsideration is denied. The Court apologizes for its earlier misstatement as to Gurvey's admission to practice pro hac vice in another case in this District; however, the fact of her admission does not affect the Court's analysis in its October 21, 2025 Order as to the propriety of intervention under Federal Rule of Civil Procedure 24. Dkt. 85. The Court also notes that Gurvey has been admonished in that same case, after repeated filings, that further filings "may result in sanctions or a filing ban." 24cv3973, Dkt 648. Gurvey has been similarly admonished by other courts, such as the Northern District of New York, which wrote that her "repeated litigating of the very same issues constitutes a needless and |

| | | |
|---|---|---|
| | | burdensome imposition on the resources of the courts and defendants." 24cv211, Dkt. 79, at 16. Gurvey is directed to refrain from future filings on the docket of this case. SO ORDERED. (Signed by Judge Paul A. Engelmayer on 11/3/2025) (tg) (Entered: 11/03/2025) |
| 11/07/2025 | 90 | STIPULATION OF VOLUNTARY DISMISSAL It is hereby stipulated and agreed by and between the parties and/or their respective counsel(s) that the above-captioned action is voluntarily dismissed, with prejudice against the defendant(s) MLB Advanced Media L.P. and without costs pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure. Document filed by eChanging Barcode, LLC. **Proposed document to be reviewed and processed by Clerk's Office staff (No action required by chambers)**...(Hecht, David) (Entered: 11/07/2025) |
| 11/12/2025 | 91 | STIPULATION OF DISMISSAL WITH PREJUDICE:IT IS HEREBY STIPULATED, CONSENTED AND AGREED by and between the undersigned attorneys of record for all parties hereto, that the above-entitled action, including all claims and counterclaims, is hereby dismissed with prejudice, pursuant to Fed. R. Civ. P. Rule 41(a)(1)(A)(ii), and without costs or attorneys' fees to any party. This Stipulation may be filed with the Clerk of this Court without further notice. GRANTED. SO ORDERED. (Signed by Judge Paul A. Engelmayer on 11/12/2025) (tg) (Entered: 11/12/2025) |
| 11/17/2025 | 92 | FIRST MOTION to Stay re: 89 Order on Motion for Reconsideration,,,,,, . Document filed by Amy R LIVE-Fi Technology Holdings. Return Date set for 11/26/2025 at 02:00 PM. (Attachments: # 1 Exhibit Fed Cir Petition Granted in Part, # 2 Exhibit Cropped Patent List 2012, # 3 Exhibit CA Cert of Good Standing, # 4 Exhibit CA Active Status, # 5 Exhibit Fraudulent 2018 Ltr from NYS OCA to Fed Cir, # 6 Exhibit NDNY 24cv211 25PF01 Motion to Expedite OSC and Vacate Orders, # 7 Exhibit 24cv2930 Order Denying Intervention as of Right, # 8 Exhibit US Patent 11403566, # 9 Exhibit US Patent D647910S, # 10 Exhibit US Patent 7603321, # 11 Exhibit DCD Claim Charts Live Nation).(Gurvey, Amy) (Entered: 11/17/2025) |
| 11/18/2025 | 93 | MEMO ENDORSEMENT denying 92 Motion to Stay. ENDORSEMENT: DENIED. SO ORDERED. (Signed by Judge Paul A. Engelmayer on 11/18/2025) (tg) (Entered: 11/18/2025) |
| 12/24/2025 | 94 | AFFIRMATION of Amy R. Weissbrod Gurvey CEO and CA Counsel in Support re: 92 FIRST MOTION to Stay re: 89 Order on Motion for Reconsideration,,,,,, ., 86 FIRST MOTION for Reconsideration re; 77 Affirmation in Support of Motion, 84 Reply Affirmation in Support of Motion,,, .. Document filed by Amy R LIVE-Fi Technology Holdings..(Gurvey, Amy) (Entered: 12/24/2025) |
| 12/27/2025 | 95 | AFFIRMATION of Amy R. Weissbrod Gurvey CEO and CA Counsel in Support re: 86 FIRST MOTION for Reconsideration re; 77 Affirmation in Support of Motion, 84 Reply Affirmation in Support of Motion,,, ., 92 FIRST MOTION to Stay re: 89 Order on Motion for Reconsideration,,,,,, .. Document filed by Amy R LIVE-Fi Technology Holdings. (Attachments: # 1 Exhibit Tortious Interference OCA 2018 Ltr to Fed Cir, # 2 Exhibit BRI Reality SDNY 2021 Decision Ex parte Young, # 3 Exhibit Scalia SCOTUS Ex Parte Young Doc Production, # 4 Exhibit NDNY OCA Hearing Vacate Amend Jan 2026).(Gurvey, Amy) (Entered: 12/27/2025) |
| 01/02/2026 | 96 | AFFIRMATION of Amy R. Weissbrod Gurvey CEO and CA Counsel in Support re: 92 FIRST MOTION to Stay re: 89 Order on Motion for Reconsideration,,,,,, ., 86 FIRST MOTION for Reconsideration re; 77 Affirmation in Support of Motion, 84 Reply Affirmation in Support of Motion,,, .. Document filed by Amy R LIVE-Fi Technology Holdings..(Gurvey, Amy) (Entered: 01/02/2026) |

## PACER Service Center

### Transaction Receipt

| 01/12/2026 15:53:41 | | | |
|---|---|---|---|
| **PACER Login:** | amyweissbrodgurvey | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:24-cv-02930-PAE |
| **Billable Pages:** | 16 | **Cost:** | 1.60 |

and state forums in violation of 42 USC § 1983, 1985, 1988, the Fourteenth Amendment's guarantee of infringement hearings, and the First Amendment right to petition.

22.  NYS UCS defendants serving at the NYS office of Court Administration (OCA) were discovered in 2025 to have engaged in *ex parte* communications since 2018 before the Federal Circuit that in turn transferred three arising under patent appeals – 18-2076, 20-1620, 23-134 - to the Second Circuit that has no jurisdiction to hear these appeals, proving damages.

## OVERVIEW OF PATENT 11,403,566

23. **Summary**: Overlay System for Live Event Environments A system and method for deploying ticketholder authentication, privacy-first and transmission matrices across live entertainment venues, enabling secure data exchange, resale and exchange of tickets, real-time analytics, user-controlled interaction, content transmissions, merchandise orders and visibility.
**Inventor**: Amy R. Weissbrod Gurvey assigned to Plaintiff LIVE. Fi® **Issued**, August 2, 2022

## 24.  Claim Chart – Infringement by defendant LNE

| . Claim Language (Simplified) | Accused Instrumentality | Infringement Basis |
|---|---|---|
| A system comprising a venue-integrated overlay that preserves user privacy while enabling real-time data analytics | Ticketmaster's SafeTix, TM+ and Live Nation's venue apps | These systems collect and analyze user data during events, without user-controlled privacy toggles, violating the claim's privacy-preserving requirement |
| The overlay system includes a modular architecture enabling third-party integration without disclosing user identity | TM+ integrations with third party advertisers and sponsors | Live Nation's integrations expose user data to third parties without anonymization, breaching modular privacy abstraction |
| A method for deploying the overlay across multiple venues with centralized control and decentralized privacy enforcement | Live Nation's centralized ticketing and venue management system | Centralized control overrides venue-level privacy enforcement, contrary to the claim's decentralized model |

30

| Claim Language (Simplified) | Accused Instrumentality | Infringement Basis |
|---|---|---|
| The system includes a consent-based data sharing protocol with audit trails | Ticketmaster's data sharing with partners and affiliates | No user-facing consent logs or audit trails are provided, violating the claim's transparency and consent requirements |
| A venue-specific implementation that adapts to crowd density and user behavior in real time | Live Nation's crowd analytics and behavioral targeting | These features mirror the patented adaptive overlay but lack privacy safeguards, constituting unauthorized use |

## LIVE-Fi® ISSUED PATENTS AND PENDING PATENTS DELAYED BY DEFENDANTS' EX PARTE MISCONDUCT

| Claim Element | LIVE-Fi Patent Feature | Accused Instrumentality | Venture Partners (DoE Liability) | Infringement Basis |
|---|---|---|---|---|
| 1(a) Authentication of ticketing data for live event interaction and other benefits | Encrypted credentialing with dynamic access tokens | SafeFix, TM+, Verified Fan Presence | Salesforce (CRM), Oracle, recent data, Okta (auth) ROS, I | Replicates dynamic token issuance and credentialing logic |
| 1(b) Ads packaged with live events | Contextual ad delivery tied to ticket metadata | Ticketmaster Ads, Live Nation Sponsorships | Google Ads, Meta, Root, Spotify | Uses ticket-linked targeting and ad delivery pipelines |
| 2(a) Transmission of event content | Real-time streaming and venue-linked content | Veeps, Live Nation livestreams, TM+ content | Veeps, Hulu, YouTube, Meta | Mirrors transmission logic and venue-linked content routing |
| 2(b) Transmission of ordered merchandise services | m-event commerce tied to ticket ID | Ticketmaster Merch, FX VIP Packages | Shopify, Stripe, PayPal, Square | Implements ticket-linked ordering and fulfillment logic |
| 3(a) Hybrid encryption of ticketing and user data | asymmetric/symmetric asymmetric encryption | SafeFix QR, TM+ behavioral tracking | Cloudflare, AWS KMS, Akamai | Substantially similar encryption |

| Claim Element | LIVE-Fi Patent Feature | Accused Instrumentality | Venture Partners (DoE Liability) | Infringement Basis |
|---|---|---|---|---|
| 3(b) Routing logic for ticket-linked services | Modular routing based on user role and venue | TM-, TN Touring, TM One | Twilio Segment, Snowflake | layering and routing. Replicates modular routing and role-based access |
| 4(a) Transmission matrices for venue and artist data | Structured data flow across artist, venue, fan | TM-, TN Touring dashboards | Tableau, Salesforce, Oracle | Uses matrixed data routing and analytics dashboards |
| 4(b) AI analytics for ticketing behavior and fraud | ML-based anomaly detection and fan segmentation | TM-, SafeTIX, TN Analytics | Palantir, AWS SageMaker, Google Cloud AI | Implements equivalent AI models and segmentation logic |

**Doctrine of Equivalents:** Partners like Salesforce, Oracle, Google, StubHub, ROKT and Palantir contribute materially to infringing systems through equivalent functionality—especially in authentication, routing, encryption, resale and exchange, and analytics.

**Consent Decree Violations:** Overlaps also support your APA and antitrust assertions, especially where the consent decree and competitive impact statement are also violated.

# VENUE PARTNER CLAIM CHARTS

| Claim Element | Amy & LIVE-Fi Patent Feature | Accused NYC Partner Instrumentality | Infringement Basis / Equivalent Functionality |
|---|---|---|---|
| 1(a) Authentication of ticketing data for live event interaction | Dynamic encrypted ticket tokens | Yankee Stadium (Ticketmaster Verified Fan, SafeTix) | Uses TM credentialing for access control and fan segmentation |
| 1(b) Ads packaged with live events | Contextual ad delivery tied to ticket metadata | MTA digital kiosks, MetroCard-linked promotions | Ad delivery based on transit-linked event metadata and ticketing |
| 2(a) Transmission of event content | Real-time streaming and venue-linked content | Port Authority event feeds, Yankee Stadium live-streams | Venue-linked content routing via TM+ and partner APIs |
| 2(b) Transmission of ordered merchandise/services | Ticket-linked commerce and fulfillment | MetroCard-linked retail offers, stadium concessions | Uses ticket ID or transit ID to trigger merchandise delivery |
| 3(a) Hybrid encryption of ticketing and user data | Layered symmetric/asymmetric encryption | MetroCard backend, TM+ QR codes, MTA mobile apps | Implements equivalent encryption for ticketing and user profiles |
| 3(b) Routing logic for ticket-linked services | Modular routing based on user role and venue | TM+ integrations with MTA, Port Authority stadiums | Replicates routing logic across transit, venue, and ticketing layers |
| 4(a) Transmission matrices for venue and artist data | Structured data flow across artist, venue, fan | TM+ dashboards used by Yankee Stadium, MTA analytics | Matrixed data routing and performance dashboards |
| 4(b) AI analytics for ticketing behavior and fraud | ML-based anomaly detection and fan segmentation | TM+, MTA fan extension analytics, stadium access logs | Equivalent ML models for fraud detection and segmentation |

- **Yankee Stadium**: Uses Ticketmaster's Verified Fan and SafeTix systems which mirror your encrypted credentialing and routing logic.

-
- **MTA & MetroCard**: Integration with Ticketmaster for event-linked promotions and mobile ticketing may infringe routing and ad-packaging claims.

-
- **Port Authority**: If venue access or event-linked services are routed through TM- or partner APIs, they may be liable under equivalents.

-
- **Indirect Infringement**: These partners may be liable if they knowingly benefit from or enable infringing systems, especially where TM- or SafeTix are embedded.

## PRAYER FOR RELIEF

Plaintiff LIVE-Fi® respectfully requests that the Court:

- Declare LNE Defendants in breach of the competitive impact statement and consent decree;
- Enjoin further violations and compel data access;
- Award damages for violations;
- Awarded damages for patent infringement and willful infringement;
- Award damages for wrongful state action, unprivileged defamation and ex parte corruption with NYS UCS officers;
- Vacate improper SDNY orders and restore access;
- Refer judicial and attorney misconduct to appropriate authorities;
- Grant such other relief as the Court deems just and proper.

Dated: September 8, 2025
REVISED 9-27-25
Princeton NJ

/amywⱡⱤⱾhrodgurvey/
California Counsel LIVE-Fi® Technology Holdings, LLC



*Live-Fi™ Technology Holdings*

*7302 Woodstone Circle*
*Princeton, NJ 08540*
*amyg@live-fi.com*
*917-733-9981*

March 8, 2025

Hon. Kimberly Moore, Chief Judge
Mr. Jarrett Perlow, Chief Clerk
US Court of Appeals Federal Circuit
717 Madison Place, NW
Washington, DC 20439

cc: US Attorney SDNY
US Dept. of Justice
26 Federal Plaza 37th FL
New York, NY 10278

Motion to Vacate Dismissal of Appeals and Writs of Mandamus
Fed Cir. #18-2076 (18-2206)(SDNY); Fed Cir. #s20-1620, 23-134 (06-1202)(SDNY)

cc: Hon. Owen Kendler, Chair, US Dept. of Justice Antitrust Division
cc: Hon. Pam Bondi, Attorney General of the United States
cc: Lisa Monaco, Assistant US Attorney General
cc: Hon. Anne M. Nardacci (NDNY 24cv211)
cc: Hon. Jia M. Cobb (DDC 23cv3549)

Dear Judge Moore and Chief Clerk Perlow:

The undersigned Appellant-Patentee Amy R. Weissbrod Gurvey files this grievance because in 2025, it was recently discovered that in 2018, a court attorney serving on the New York State Office of Court Administration (OCA), Shawn Kerby, was engaging in *ex parte* communications with the previous clerk Peter R. Marksteiner seeking that Plaintiff's arising under patent appeal in SDNY Case no. 18-cv-2206 be transferred to the Second Circuit. In the relevant lawsuit, defendant New York City was directly sued for infringement damages under *Monell v. Dept. of Social Services*, 436 US 658 (1978). The complaint was dismissed sua sponte in 5 days. When those infringement claims were denied adjudication, the appeal was properly heard by the Federal Circuit because infringement claims are defined by patent statutes. 28 USC 1338, 1291. The 2d Circuit had no jurisdiction to hear the appeal. Moreover, Kerby never appeared for defendant NYC in the SDNY lawsuit. The Corporation Counsel for the City of NY filed no opposition papers admitting to infringement by NYC institutions and agencies. Since Plaintiff moved to vacate the sua sponte dismissal entered without motion on notice, it has been left hanging on the docket since 2019 for six years.

1

Kerby appears to have engaged in *ex parte* obstruction of justice by circulating forged state documents manufactured by NYS First Dept. attorney grievance committee (AGC) staff attorneys Jorge Dopico and Richard Supple since 2008. Plaintiff is not admitted to practice law in NYS and the AGC has no jurisdiction over Plaintiff. The forged documents were manufactured to threaten criminal prosecution and maliciously abuse process against Plaintiff to gain litigation advantages in patent cases. The forged documents ordered permanently concealed in an Appellate Division order entered April 21, 2016. However, since 2012, they were circulated *ex parte* to SDNY clerks, a circuit attorney, a magistrate and four judges none of whom ordered service on Plaintiff in violation of ABA Rule 2.9 on Ex parte Communications.

Please also be advised that currently being investigated is whether Supple or any NYS officers of the courts circulated the forged documents to federal officers serving at the US Patent and Trademark Office. Plaintiff's ticketing patent Gurvey US Patent No.11403566 was suspiciously delayed 13 years in prosecution, prejudicially 10 years beyond the 3-year deadline of *Wyeth v. Kappos*, 591 F. 3d 1364 (Fed. Cir. 2010). The prosecution delay in turn delayed Plaintiff's enforcement rights in that valuable patent.

Plaintiff's FOIA requests filed with the USPTO General Counsel James Payne and David Berdan since 2016 to produce all relevant documents have been ignored. An additional lawsuit had to be filed before the DC District Court, 23cv3549, to compel production of still withheld and essential USPTO files.

Please be further advised that Plaintiff's opposition to the vertical merger of Live Nation and Ticketmaster was selected for posting on the US Dept. of Justice Media and Entertainment Antitrust webpage in March 2010. The ex parte violations of NYS attorneys functioned to deny Plaintiff infringement hearings against these entities before the SDNY when both are willful infringers since 2009. A response to this letter is appreciated and whether Plaintiff is entitled to vacate any of the Federal Circuit orders entered since 2018 transferring Plaintiff's arising under patent appeals to a court that cannot hear these appeals based on lack of appellate jurisdiction. Sup. Cl. Art. VI. Cl. 2 US Constitution; *Haywood v. Drown*, 556 US 729 (2009) Thank you.

Dated: March 11, 2025

Princeton NJ 07043

Yours etc.,

/amyweissbrodgurvey/

Amy R. Weissbrod Gurvey
US Patentee

2

Case 1:24-cv-02930-PAE    Document 92-5    Filed 11/17/25    Page 5 of 6
FORM 9. Certificate of Interest    Case 1:24-cv-03973-AS    Document 830    Filed 01/13/26    Page 134 of 209    Form 9
Rev. 10/17

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

_____    Amy Weissbrod-Gurvey    v.  State of N.Y., et. al.    _____

Case No.  18-2076

## CERTIFICATE OF INTEREST

Counsel for the:

☐ (petitioner) ☐ (appellant) ☐ (respondent) XX(appellee) ☐ (amicus) ☐ (name of party)

**Shawn Kerby**

certifies the following (use "None" if applicable; use extra sheets if necessary):

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held companies that own 10% or more of stock in the party |
|---|---|---|
| Office of Court Administration | Office of Court Administration | None |
| Hearing Panel IV | Hearing Panel IV | None |
| | | |
| | | |
| | | |
| | | |
| | | |

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

---

FORM 9. Certificate of Interest

Form 9
Rev. 10/17

5.    The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. *See* Fed. Cir. R. 47. 4(a)(5) and 47.5(b). (The parties should attach continuation pages as necessary).

| 11/30/2018 | /s/ Shawn Kerby |
|---|---|
| Date | |
| | Signature of counsel |
| Please Note: All questions must be answered | Shawn Kerby |
| | Printed name of counsel |
| cc:   Amy Weissbrod-Gurvey; David Lawrence; Nicole Feder; Susan Paulson; Kathy Chang Park | |

Case 1:24-cv-02930-PAE   Document 89   Filed 11/03/25   Page 1 of 9
Case 1:24-cv-03973-AS   Document 830   Filed 01/13/26   Page 136 of 209
Case 1:24-cv-02930-PAE   Document 86   Filed 10/24/25   Page 1 of 18



Live-Fi™ Technology Holdings

*7302 Woodstone Circle*
*Princeton, NJ 08540*
*amyg@live-fi.com*
*917-733-9981*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____X

Alan Amron, echangingbarcode, LLC,
Plaintiffs,

Case No. 24-cv-2930 (PAE)

MOTION FOR
RECONSIDERATION
[FRCP Rule 59(e)]

MLB, MLB ADVANCED MEDIA (MLBAM),
[Live Nation Entertainment (LNE), Inc.
merged with Ticketmaster, LLC, StubHub, Inc.]
AND 30 NATIONAL BASEBALL TEAMS AND
STADIUMS, and DOES 1-X, Defendants[1].

_____X

October 24, 2025
Dear Judge Engelmayer:

Most respectfully, US Patentee/Proposed Intervenor Amy
Weissbrod Gurvey, CEO and General Counsel of patent loan out
company LIVE-Fi® Technology Holdings and a California attorney in
good standing <u>not</u> admitted in New York State, moves for
reconsideration of the order of the SDNY entered yesterday 10-23-25

---

[1] [Defendants LNE and StubHub noticed as voluntarily terminated by the Plaintiff]

1

Case 1:24-cv-02930-PAE    Document 89    Filed 11/03/25    Page 2 of 9
Case 1:24-cv-03973-AS    Document 830    Filed 01/13/26    Page 137 of 209
Case 1:24-cv-02930-PAE    Document 86    Filed 10/24/25    Page 2 of 18

denying intervention into plaintiff Amron's infringement lawsuit against defendants MLB and MLB Advanced Media (MLBAM).

It is alleged that the SDNY misapplied the prevailing law and failed to follow the extensive factual record, both proper grounds for reconsideration under Rule 59(e). Directly contrary to the court's order, Petitioner was in fact granted *pro hac vice* status by this court in SDNY lawsuit 24cv3973 (Doc. #638 entered August 22, 2025, Exhibit appended). The citations by the court are in bad faith.

Moreover, plaintiff Amron is infringing Petitioner's patent claims and committed fraud before the USPTO by failing to cite to Weissbrod Gurvey's issued US patent claims as prior art when applying for a subset patent and cannot be rewarded for his crimes. Weissbrod Gurvey's patents are more comprehensive ticket authentication and ticketing management platform. Amron's is but a subset technology that should not have been granted by the Government. Whether plaintiff Amron is infringing Petitioner's patent is a question of fact that cannot be decided *sua sponte* without motion on notice.

In addition, based on the unique facts, the Government cannot adequately represent Petitioner's patent interests as proven by Petitioner's litigation pending since 2023 against the Secretary of Commerce/US Commissioner of Patents before the DC District Court. 23cv3549 (JMC).

### FRCP RULE 59(e) RECONSIDERATION

(1)    Directly contrary to the court's order, Weissbrod Gurvey was in fact granted *pro hac vice* status by this court in SDNY lawsuit 24cv3973 (Doc. #638 entered August 22, 2025, Exhibit appended). The citations by the court are in bad faith.

(2)    Even if Gurvey had not been not granted *pro hac vice* status, she is entitled to refile her motions in both the 24cv3973 lawsuit

2

Case 1:24-cv-02930-PAE    Document 86    Filed 11/03/25    Page 3 of 9
Case 1:24-cv-03973-AS    Document 80-89    Filed 01/13/26    Page 138 of 209
Case 1:24-cv-02930-PAE    Document 86    Filed 10/24/25    Page 3 of 18

and in this lawsuit as a *pro se* patentee. This is because under the US Supreme Court's six-year relate back limitation pertaining to the filing of infringement claims, Petitioner was the sole patent inventor and holder of the issued patents and portfolio patents pending during the relevant six-year period (2018-2024) [*SCA Hygiene Products v. First Quality Baby Products*, 137 S. Ct. 954 (2017)]. Ergo, it is alleged that Amron is infringing Petitioner's patents as is MLB and MLB Advanced Media (MLBAM)

(3)    The Government cannot protect Petitioner's interests. Weissbrod Gurvey is also the plaintiff in two (2) DC District Court lawsuits . The 2025 lawsuit (25cv3257) is an antitrust enforcement/willful infringement lawsuit against Live Nation Entertainment, Inc., Live Nation, Inc. and Ticketmaster LLC. These defendants and their venture partners, defendants herein MLB and MLBAM are infringers of Petitioner's patented platforms by the doctrine of equivalents.

(4) Petitioner's other 2023 DCD lawsuit 23cv3549 (JMC) seeks injunctive relief against the Secretary of Commerce/US Commissioner of Patents for violations of the Administrative Procedures Act, 5 USC §§551, 701, et seq. (APA). The claims against the Government include delaying Petitioner's patents 13 years beyond the 3-year deadline set by the Federal Circuit [*Wyeth v. Kappos*, 591 F.3d 1364 (Fed Cir. 2010)] and unlawfully taking Weissbrod Gurvey's published patent applications out of the queue in due course *sua sponte without motion on notice* since 2007 to conduct a conflicts of interest investigation against MLB's and Weissbrod Gurveys' common intellectual property practitioners at Cowan Liebowitz & Latman of NYC. The published applications were able to be copied before they were unlawfully removed from the queue and it appears that is exactly what plaintiff Amron has done.

especially given the *ex parte* removal of her applications for an extended period of time.

(9)     *Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*, 386 U.S. 129 (1967) affirms that private parties may intervene in antitrust proceedings when they are directly harmed by exclusionary conduct. Petitioner's exclusion from the patent queue and downstream platforms warrant intervention. The Cowan lawyers were MLB's USPTO lawyers harboring a conflict even before they solicited Petitioner's patent prosecution retainer and abandoned that retainer without USPTO permission. This caused further publication of defective applications. In addition, defendants MLB and MLBAM sued by plaintiff herein are venture partners of Live Nation Entertainment and Ticketmaster, Petitioner's adversaries in the 25cv3257 DCD lawsuit.

(10)There is no dispute Petitioner's patent applications were removed from the USPTO queue without notice, hearing, or written justification, violating 5 USC §§ 555(b), 558(c), and 706(2)(A)–(D). The former Commissioner of Patents Wynn Coggins acted *ultra vires* in removing Petitioner's filings, which were timely, complete, and compliant with statutory requirements. The removals were performed *sua sponte* without motion on notice and obstructed Petitioner's ability to assert her rights and enforce her patents in a timely manner. The acts constitute final agency actions subject to judicial review.

(11)Petitioner has suffered concrete injury due to:

- o Loss of priority and enforceability of her inventions.
- o Exclusion from federally-regulated platforms and markets.
- o Procedural misconduct by USPTO and downstream monopolists who are being sued in a class action before this court and their venture partners who are defendants in this lawsuit.

These injuries are traceable to agency and private conduct and redressable through intervention and declaratory relief.

(12)  Petitioner's issued patents and *sua sponte* removed patent applications authenticate ticket data and prevent unauthorized

5

duplication of credentials including in the resale and exchange of
tickets, premium performance tickets and in sports betting. 17
applications were removed from the queue by the Commissioner.,

(13)   The 2d Circuit decisions cited by the court are of no
significance.

(14)   The Federal Circuit has exclusive jurisdiction over arising
under patent appeals where the claims are defined by patent statutes.
*Gunn v. Minton*, 133 S. Ct. 1059 (USSC Tex. 2013) Plaintiff Amron's
breach of the duty of candor and good faith to the USPTO rendered his
patent unenforceable. The Federal Circuit held in Monsanto, *supra,*
that the district court has jurisdiction to declare his patent
unenforceable.

(15)   The record is also undisputed that Apple, Inc., plagiarized
Petitioner's published applications in 2008 when filing for its own
ticketing management patent, #2008-82491. Apple was denied a patent
for eight years but on appeal to the Patent Trial and Appeals Board was
granted a single near field claim in or about 2017. This is now the same
claim in use at the checkpoint of entry by MLB/MLBAM at Yankee
Stadium and at all 30 national baseball stadiums. The recent US Open
at Arthur Ashe Stadium was also using Apple's single near field claim.
This explains why it took over two hours in line to enter the stadium
long after the matches began. Petitioner expressly challenges that grant
to Apple in the DCD lawsuit, 23cv3549, and she challenges the grant to
Amron in 2015.

(16)   Weissbrod Gurvey's patents, and the improperly removed
published applications include apparatuses, mobile interface designs
and utility claims for ticket data authentication, hybrid encryption,
transmission matrices for event interaction and content, ticket resale
and exchange, direct-to-user targeted advertising by multifunctional
bar codes, merchandise/hospitality fulfillment, royalty accounting, AI

analytics and sports betting. The include claims that prevent unauthorized duplication of data in various functions. For example, once a premium performance ticket is activated on a mobile display, it can be exchanged or resold without duplication of ticketing data. Multiple embodiments and permutations are claimed in Petitioner's patents and pending patents.

(17) Petitioner also owns mobile displays that activate electronic readers at venues with multifunctional bar codes. (D647910S) This is but one claim being infringed by the plaintiff Amron.

(18) Petitioner's claims also enable most non-ticketing businesses. Based on the ongoing  contumacious breach by defendants Live Nation and Ticketmaster of the competitive impact statement, final judgment and amended judgment in *US v. Ticketmaster and Live Nation,* 2010 W 975407, 975408 (pp. 8 line 10), Petitioner properly seeks injunctive relief from the DCD to get defendant MLB's data and plaintiff's data, if any, from Ticketmaster.

(19) Significant is that Magistrate Tarnofsky was a senior unified court system (UCS) attorney serving on the NY Legal Assistance Group when she refused to assist Petitioner disqualify Live Nation's infringement defense attorneys at Hinshaw & Culbertson from the previous SDNY infringement lawsuit in 2016. H&C counsels were dually serving as UCS attorneys without disclosing conflicts of interest and were found by the First Dept. to have inserted forged and unserved documents into concealed state files engaging in Petitioner's unprivileged defamation.

(20)  Moreover, Magistrate Tarnofsky's husband, Antony Ryan, Esq., is a partner at Cravath Swaine and Moore.  The Dept. of Justice's DC District Court competitive impact statement, the consent decree, final judgment and amended judgment entered in 2010 and 2020 were spearheaded by DOJ's former Christine Varney who is now a senior

**WHEREFORE**, Petitioner Amy Weissbrod Gurvey respectfully requests:

1. Leave to intervene in relevant federal proceedings under Fed. R. Civ. P. 24(a)(2) and (b)(1)(B).
2. A declaratory judgment that plaintiff's patents are unenforceable under *Monsanto*.
3. A stay pending determination by the DC District Court on Petitioner's motion to restore Petitioner's applications to the queue.
4. Injunctive relief to prevent further exclusionary conduct and retaliation.

Dated: October 24, 2025
Princeton, NJ

/amyweissbrodgurvey/

Petitioner/US patentee

---

DENIED. The standard for granting a motion for reconsideration is "strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked." *Analytical Survs., Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012) (citation omitted). Because Gurvey's citations to Supreme Court cases about intervention in the antitrust context do not alter the Court's analysis as to whether LIVE-Fi's intervention in this patent dispute is appropriate, the motion for reconsideration is denied.

The Court apologizes for its earlier misstatement as to Gurvey's admission to practice *pro hac vice* in another case in this District; however, the fact of her admission does not affect the Court's analysis in its October 21, 2025 Order as to the propriety of intervention under Federal Rule of Civil Procedure 24. Dkt. 85. The Court also notes that Gurvey has been admonished in that same case, after repeated filings, that further filings "may result in sanctions or a filing ban." 24cv3973, Dkt 648. Gurvey has been similarly admonished by other courts, such as the Northern District of New York, which wrote that her "repeated litigating of the very same issues constitutes a needless and burdensome imposition on the resources of the courts and defendants." 24cv211, Dkt. 79, at 16. Gurvey is directed to refrain from future filings on the docket of this case.

SO ORDERED.

PAUL A. ENGELMAYER
United States District Judge                    9

Date: November 3, 2025
New York, New York

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| eChanging Barcode, LLC, | |
| *Plaintiff*, | |
| v. | Civil Action No. 1:24-cv-02930-PAE |
| MLB Advanced Media, L.P., | |
| *Defendant*. | |

## <u>STIPULATION OF DISMISSAL WITH PREJUDICE</u>

IT IS HEREBY STIPULATED, CONSENTED AND AGREED by and between the undersigned attorneys of record for all parties hereto, that the above-entitled action, including all claims and counterclaims, is hereby dismissed with prejudice, pursuant to Fed. R. Civ. P. Rule 41(a)(1)(A)(ii), and without costs or attorneys' fees to any party.

This Stipulation may be filed with the Clerk of this Court without further notice.

Dated: New York, New York,
November 7, 2025

| | |
|---|---|
| */s/David L. Hecht* | */s/Alan Littmann* |
| David L. Hecht | Alan Littmann |
| Hecht Partners LLP | Goldman Ismail Tomaselli |
| 125 Park Avenue, 25th Floor, | Brennan & Baum LLP |
| New York, NY 10017 | 200 South Wacker Dr., 22nd Floor, |
| Email: dhecht@hechtpartners.com | Chicago, IL 60606 |
| Telephone: (212) 851-6821 | Email: alittmann@goldmanismail.com |
| | Telephone: 312-881-5969 |
| | |
| *Attorneys for eChanging Barcode, LLC* | *Attorneys for MLB Advanced Media L.P.* |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

eCHANGING BARCODE LLC,

                    Plaintiff,

        -v-

MLB ADVANCED MEDIA L.P.,

                    Defendants.

---

24 Civ. 2930 (PAE)

ORDER

---

PAUL A. ENGELMAYER, District Judge:

Before the Court is a motion to intervene in this patent infringement lawsuit by LIVE-Fi

Technology Holdings ("LIVE-Fi"). For the following reasons, that motion is denied.

The Court assumes familiarity with the background of this case. In brief, plaintiff

eChanging Barcode, LLC ("eChanging") is the sole patentholder of U.S. Patent No. 9,047,715

(the "715 Patent"), which embodies a technology that prevents the unauthorized duplication of

credentials, such as event tickets, through screenshots or static copies. Dkt. 41 ¶¶ 9–10, 17–18.

eChanging alleges that the barcoding technology used by defendant Major League Baseball

Advanced Media L.P. ("MLBAM") infringes on the '715 Patent. *Id.* ¶¶ 26–40. eChanging

seeks damages and injunctive relief under 35 U.S.C. § 271 for the alleged infringement. *Id.*

¶¶ 43, 47–48.

On September 13, 2025, LIVE-Fi moved, through counsel Amy Rebecca Gurvey, to

intervene under Federal Rule of Civil Procedure 24. Dkt. 74 ("Motion to Intervene"). It did so

on the grounds that Alan Amron, the owner of eChanging, "improperly failed to cite" Live-Fi's

patents and that MLBAM is using LIVE-Fi's patents "without permission." *Id.* The motion to

intervene also raised numerous other issues unrelated to intervention, including the "recusal of

magistrate Robyn Tarnofsky," *id.* at 3, and the alleged entry of "forged and unserved documents"

1

proprietary technology." Motion to Intervene at 20. But LIVE-Fi does not claim that it holds or

has ever held an interest in the '715 Patent. Nor does it describe how its "patent rights" or "trade

secrets" at all relate to this dispute. Because LIVE-Fi fails to demonstrate an "interest relating to

the property or transaction that is the subject of the action," it does not have a right to intervene.

*See N.Y. News, Inc. v. Kheel*, 972 F.2d 482, 486–87 (2d Cir. 1992) (affirming denial of motion to

intervene where proposed intervenor "does not have a protectable interest in the action"); *Cont'l*

*Indem. Co. v. Bulson Mgmt., LLC,* No. 20 Civ. 3479, 2020 WL 6586156, at *3 (S.D.N.Y.

Nov. 10, 2020) (same); *see also United States v. State of N.Y.*, 820 F.2d 554, 558 (2d Cir. 1987)

("[A] failure to meet *any* of Rule 24(a)(2)'s requirements provides sufficient grounds to deny a

motion to intervene as of right." (emphasis in original)).

LIVE-Fi's arguments for permissive intervention fare no better. Rule 24(b) states that the

court "[o]n timely motion, may permit anyone to intervene who . . . has a claim or defense that

shares with the main action a common question of law or fact." LIVE-Fi argues that its claims

share common questions with the main action, including: "(a) [the] use and dissemination of

ticketing data; (b) the scope and application of LIVE-Fi's patented technologies; and (c) the

contractual and regulatory obligations stemming from the Live Nation-Ticketmaster merger."

Motion to Intervene at 21. But none of these questions are implicated by the present case, which

concerns eChanging's claim that MLBAM infringed the '715 Patent, and will therefore focus on

the validity of the '715 Patent and whether it was in fact infringed by MLBAM's product.

Accordingly, the Court denies LIVE-Fi's motion for permissive intervention. *See,*

*e.g.*, *Eddystone Rail Co., LLC v. Jamex Transfer Servs., LLC*, 289 F. Supp. 3d 582, 595

(S.D.N.Y. 2018) (denying motion to intervene where proposed intervenors "fail to demonstrate

that their claim or defense shares a common question of law or fact with this . . . proceeding");

*Tymoshenko v. Firtash*, No. 11 Civ. 2794, 2011 WL 5059180, at *3 (S.D.N.Y. Oct. 19, 2011)

(same).

## CONCLUSION

For the foregoing reasons, LIVE-Fi's motion to intervene is denied. The Clerk of Court

is respectfully directed to terminate the motion at Docket 74 and, to the extent LIVE-Fi's filings

hold it out as a party to this action, to terminate LIVE-Fi as a party to this action.

SO ORDERED.

Paul A. Engelmayer
Paul A. Engelmayer
United States District Judge

Dated: October 21, 2025
       New York, New York

4



*Live-Fi™ Technology Holdings*

*7302 Woodstone Circle*
*Princeton, NJ 08540*
*amyg@live-fi.com*
*917-733-9981*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

UNITED STATES OF AMERICA, et al.,         Case No. : 1:24-CV-03973-AS
Plaintiffs,

v.                                        **MOTION TO INTERVENE**
                                          **AS OF RIGHT FRPC 24(a)(2)**

                                          ORAL ARGUMENT
                                          REQUESTED

LIVE NATION ENTERTAINMENT, INC.,
et al., Defendants.

---------------------------------------------------------------X

To Judge Arun Subramanian:

LIVE-Fi® TECHNOLOGY HOLDINGS respectfully submits this motion
to intervene as of right in this antitrust lawsuit pursuant to FRCP Rule 24(a)(2).
*Bridgeport v Delmonte*, 602 F. 3d 469 (473 (2d Cir. 2010). The fact that LIVE-
Fi®'s previous motion for joinder was denied does not affect LIVE-Fi®'s right to
independently move for intervention. *Brennan v. NYC Board of Education*, 260 F.
3d 123 (2d Cir. 2001).

California counsel Amy Weissbrod Gurvey admitted *pro hac vice* declares
to the truth of the following statements in support of LIVE-Fi®'S motion as a
rights holder, a market participant harmed by defendants Live Nation and
Ticketmaster's exclusionary misconduct precluding access to venue customers and
as an advocate for artists denied fair revenue sharing.

1

## I.    FACTS IN SUPPORT OF MOTION TO INTERVENE AS OF RIGHT

1.    Proposed Intervenor LIVE-Fi® is a US-based technology company that invented, owns and controls standard essential US patents, patents pending and US-registered copyrights for direct-to-user confidential data transmissions, hybrid encryption, routing logic and transmission matrices for live event content distribution, interaction and AI analysis. Most of the patent claims disclose non-ticketing operations. While they do disclose apparatuses and methods for electronic ticketing, the independent claims and operations are the priority systems for end-to-end management of live events, authenticated content distribution, resale and exchange of tickets, mobile ticket displays, and AI analysis.

2.    There are three issued US patents and 13 pending patents in the portfolio with confidential patent data applications pending before the United States Patent and Trademark Office (USPTO). [1] The inventions are the priority privacy-first alternative to defendant Ticketmaster's opaque data flows and adhesionary release of consumer data mandated when the consumer logs in the webpage to purchase tickets for an event. They are also and a revenue unlock for artists and venues via ethical advertising and ticket resale systems.  In a nutshell LIVE-Fi® methods restore transparency and revenue equity in live entertainment and sports. By enforcing our rights, we are not just protecting innovation but empowering artists and venues to reclaim value from data they generate.

3.    The relevant preferred embodiment discloses the apparatuses, systems and designs for direct-to-user event ticketing operations, venue readers, confidential royalty accounting, secured data transmission and analysis methods and designs for new venue architecture.  New continuation in part filings before the United States Patent and Trademark Office disclose secure direct to patient health care delivery methods with hybrid encryption protection of data transmissions.

---

[1] Gurvey US Patent Nos. 11403566, D647910S and 7603321

4.      The 11403566 US patent that issued on August 2, 2022 disclosing methods for event ticketing management is a continuation of the October 13, 2009 321 patent. It issued an unprecedented 17 years after the relevant application was filed in 2005 (11253912). Per the Federal Circuit, the deadline is three years from the date of filing, making the 566 late by fourteen years. *Wyeth v. Kappos*, 591 F. 3d 1364 (Fed Cir. 2010). The 566 patent is considered a standard essential patent for ticketing management and by law all claims should have issued in 2008.

5.      A *sua sponte* investigation was opened by the Commissioner of Patents to investigate the cause for prejudicial delay. It was determined that defendant Live Nation's intellectual property attorneys at Cowan Liebowitz & Latman of NYC, also representing LIVE-Fi® and its counsel Weissbrod Gurvey without disclosing conflicts of interest, and defendant Live Nation's defense attorneys at Hinshaw & Culbertson NY's office engaged in collusive conflict of interest violations and *ex parte* obstruction of justice with NYS officers of the courts. Forged documents were circulated to USPTO officers and the US Court of Appeals for the Federal Circuit, delaying LIVE-Fi® patents in USPTO prosecution and appeals to orders of this court denying infringement hearings. The Commissioner found that conflicts of interest violations admitted to by the Cowan firm were determined to be per se practitioner ethics violations in breach of federal mandates. 37 CFR 2.10, 2.19, 10.66, 11.108, 11.116. The violations also included abandonment of patent applications, forfeiture of valuable priority dates and withholding patent files ordered produced by the 2d Circuit in 2012 (462 Fed Appx. 26). The violations also induced the Commissioner of Patents to take fourteen (14) of LIVE-Fi®'s applications out of the queue *sua sponte* for seven years to complete the investigation, per se violations of the Administrative Procedures Act that does not allow these acts by federal officers. [2] 5 USC §§500-596

6.      However, the Act does expressly require the USPTO to serve LIVE-Fi® with the results of the investigation, but LIVE-Fi® was never served and all FOIA requests were ignored since 2017. In 2025, it was discovered that Hinshaw & Culbertson partners were dually serving as state court counsels to divisions of

---

[2] 37 CFR 2.10,. 2.19, 01.66, 11.108, 11.116.

3

the NYS office of Court Administration, an attorney Shawn Kerby, who began writing ex parte to the Federal Circuit in 2018 to prevent constitutional appeals by fraud. In total fourteen (14) applications were removed from the queue *sua sponte* by the former Commissioner, Wynn Coggins. The documents were never produced based on fraud and forged documents circulated by the Hinshaw defense attorneys to administrative clerks and circuit attorneys of this court including Magistrate Pitman, no longer serving. In 2016, the Hinshaw lawyer J. Richard Supple was identified as NYS staff counsel attorneys for the First Dept. attorney grievance committee (AGC) dually serving while representing defendant Live Nation and the Cowan lawyers before this Court without disclosing conflicts of interest. In 2017, the NY's Judiciary Law Part 1240 Amendments were enacted and the Hinshaw lawyers were required to be sanctioned and ordered withdraw from the Cowan firm's representation. They never withdrew and the acts remain on appeal to the US Supreme Court. Docket #24-7441.

7.    LIVE-Fi® is currently negotiating to be a partner in a new performance venue located within the Southern District of New York (SDNY). The venue will not use defendant Ticketmaster's ticketing platform. LIVE-Fi remains at significant risk for having its ticketing data stolen based on defendant Ticketmaster's past anticompetitive conduct including placing spiders on competitors' websites to steal ticketholder data for which it was criminally prosecuted by the EDNY in 2021. [3] [4] The conviction demonstrates continuing

---

[3] It should be noted that in 2007, to diffuse liability for infringement the LIVE-Fi® patents by the doctrine of equivalents, defendant Live Nation venture partnered with Apple, Inc.'s *iTunes* that copied Live-Fi® ticketing management system in applying for a competing patent in 2008 with 50 claims. 2008-082491. Apple was denied a patent for eight years based on LIVE-Fi®'s prior art. But in 2017, Apple was granted a single "near field" claim which is being challenged. However, it is currently the only claim used for entrance at checkpoints to the new Yankee Stadium, a venture partner of the City of New York.

[4] In 2008, defendant Live Nation's intellectual property attorneys at Cowan Liebowitz & Latman who were also Weissbrod Gurveys' originally retained patent prosecution attorneys, were found to have engaged in conflict of interest violations

4

anticompetitive conduct, the innate intrinsic value of ticketholder data and the ongoing risk of theft of LIVE-Fi®'s data and patent pending systems before the USPTO. *US v. Ticketmaster*, 21-cr-22, 24, (EDNY 2021). To exemplify, in 2008, defendant Live Nation partnered with Apple's iTunes to split the infringement of LIVE-Fi®'s patents by the doctrine of equivalents. The patents were infringed in NYC in this district. Apple applied for its own ticketing management patent in 2008 (2008-082491), was denied a patent for eight years based on LIVE-Fi®'s prior art, but in 2017, was granted a single near field claim, being investigation as improper. This claim is used at the checkpoint for the new Yankee Stadium, a venture partner of NYC, that can be sued directly in this court.

8.     In addition, defendant Ticketmaster's platforms are opaque and not compliant with law. Therefore, clear motive exists to attempt to exclude LIVE-Fi® confidential data protection systems from competing for nationwide venue businesses.

9.     Contrary to the court's previous order denying joinder, in the 2010 consent decree and competitive impact statement signed before the US District Court for the District of Columbia (DDC), defendant Live Nation *admitted* to ownership and control of several NYC venues including House of Blues, Irving Plaza and Roseland Ballroom. *US v. Ticketmaster and Live Nation*, 2010 WL 975408, pp. 8 line 10. In addition, in 2005 defendant Live Nation's logo was captured on the Irving Plaza marquis in Gramercy Park within the promotional stills distributed for the theatrical release "*August Rush*". Then during the merger in 2009, defendant Live Nation also *admitted* that since at least 2007, it was importing a ticketing system from CTS Eventim of Germany to service its NYC venues owned and operated venues in an attempt to compete with defendant Ticketmaster prior to the merger. These facts prove defendant Live Nation's and its

---

by the US Commissioner of Patents. The Cowan lawyers were placed under investigation for seven years. This resulted in LIVE-Fi® patents being taken out of the queue for eight years, making defendants liable for delayed patent enforcement rights by its counsel. *Mindy's Cosmetics v. Dakar*, 611 F. 3d 590 (9th Cir. 2010)

Hinshaw & Culbertson and Baker Botts lawyers jurisdictional fraud in 2009 when defendant denied all contacts with NYS in response to LIVE-Fi® lawsuit seeking damages for misappropriation of trade secrets and patent infringement. In addition, the Hinshaw lawyer J. Richard Supple conspired with defendant Live Nation second counsel Steven Schortgen secured an unlawful ex parte stay of patent discovery before Judge Barbara Jones in 2009 that was reversed by the 2d Circuit in 2012. In the interim, the infringement complaint and Rule 60(b) motion papers were both deleted *ex parte* from the SDNY docket by a clerk convicted of taking bribes in 2024. These mysterious discoveries happened at the same time defendant Live Nation was issuing false and misleading press releases that it "owned a monopoly" on distributing live concert recordings to lure artists away from their respective record labels. There was no monopoly ever owned by defendants proving Lanham Act violations and advertising fraud. 15 USC §1 et seq. [5] A recording patent acquired by defendant Live Nation was invalidated by the USPTO in 2007 and did not give defendant Live Nation a monopoly. In the meantime, ticketing data was used to authenticate live recording sales. [6]

    10.    Contrary to the court's previous order, past strict liability infringement damages and willful infringement damages owed to LIVE-Fi® will not being pursued in this lawsuit in spite of the SDNY officers being duped by defendants' fraud. These matters are currently before the US Supreme Court in a petition seeking a writ of mandamus, Docket #24-7441. However, what is being pursued is injunctive relief to prevent future theft of ticketing data from competitors in violation of patent pending systems, a preclusion order to prevent disclosure of confidential patent data currently before the USPTO, declaratory determinations of constitutional violations in violation of the Fourteenth Amendment by defendant Live Nation and its Hinshaw attorneys against defendant LIVE-Fi and its counsel.

---

[5] This means that LIVE-Fi® patents were being willfully infringed since before 2009 and in this district when the first US patent issued and that LIVE-Fi® had patent enforcement rights immediately in 2010 when the first infringement action could be filed. *SCA Hygiene Products Aktiebolag v. First Quality Baby Products*, 137 S. Ct. 954 (2017)

[6] Griner US patent 6614729.

6

Defendant's lawyers at Hinshaw & Culbertson at all times, were doubling as NY officers of the courts without disclosing conflicts of interest. Damages for defendant Live Nation and its law firms' anticompetitive acts including forgery crimes, fraud, *ex parte* obstruction of justice, malicious abuse of process and unprivileged defamation in NY courts are not protected by immunity. Weissbrod Gurvey as California counsel is not admitted in NY and there is no jurisdiction over counsel as a NY attorney. The acts perpetrated were abhorrent and heinous and calculated both to prevent enforcement of LIVE-Fi® patents before New York courts and keep LIVE-Fi® out of the relevant non-ticketing markets nationwide.

11.    In 2016, the Hinshaw NYC attorney J. Richard Supple and another attorney O. Lee Squitieri were found by the First Dept. to have inserted forged, fraudulent and unserved documents *ex parte* into the confidential state files located at 41 Madison Avenue NYC and then denied Weissbrod Gurvey access to those files. The exhibits appended hereto establish that state officers acting in coordination with defendant Live Nation Entertainment's attorneys also transmitted defamatory and fraudulent document to the US Court of Appeals for the Federal Circuit without service in an apparent effort to block arising under patent appeals from SDNY orders. These same documents were first discovered in 2025. They were upon belief also circulated to the USPTO officers resulting in unexplained prejudicial delays in prosecution of LIVE-Fi® patents. Counsel Weissbrod Gurvey was never notified of these *ex parte* communications nor given an opportunity to response in violation of due process of law also violations of the APA statutes.

12.    The 2010 final judgment was entered in *US v Tickenmatser and Live Nation* Case No. 1:10-cv-0139-RMC (DDC) after which the amended judgment was entered on January 8, 2020. It prohibited defendants from withholding ticketing data from third parties seeking to conduct non-ticketing businesses at venues where defendants hold dominate market share. The Government delayed in filing this action until prompted by a bipartisan petition of the Senate Judiciary Committee in 2023, making this motion more than timely. *Bridgeport v Delmonte,* 602 F. 3d 469 (473 (2d Cir. 2010). There can be no prejudice to defendants because discovery has hardly begun. Weissbrod Gurvey's discovery of the *ex parte* defamatory documents circulated since 2018 by NYS OCA officers who were

7

consorts with defendant Live Nation's defense lawyers did not occur until 2025.
*Detention Watch Network v. US ICE*, 2016 WL 11793613

13.    The stated preclusion entered in 2010 by the DDC against withholding
ticketing data from non-ticketing businesses *was ordered to prevent the merged
entity from leveraging ticketing dominance and to foreclose competitors from
adjacent markets such as analytics, market access, direct to fan marketing, and fan
engagement platforms.* The order was contumaciously defied immediately in 2010
by both defendants and continued to be defied after the amended judgment was
entered in 2020. The withholding of ticketing data from LIVE-FiR has caused
monumental exclusionary damages to LIVE-FiR's business. Because this is not the
only antitrust violation perpetrated against defendant LIVE-FiR, this court
maintains jurisdiction. See order of October 4, 2024 denying defendants' motion
to transfer this action.

14.    Because defendant Ticketmaster's systems are opaque and unsecured,
a confidential data transmission and hybrid encrypted system also performing AI
transmission matrices remains sorely coveted by competitors. It cannot be
excluded by defendant Live Nation and its attorneys' crimes in NYS files.

15.    The current SDNY lawsuit, 24cv3973-AS is a Sherman Antitrust Act
enforcement and divestiture action. As stated, this court previously denied
defendants' motion to transfer to the DC District Court in October 2024.
Defendants argued that the Government's complaint sought to enforce the original
terms and conditions of merger. However, the court disagreed. It held that
defendants' anticompetitive acts included a plethora of acts not covered by the
DDC orders. This is proven by the EDNY criminal proceedings against defendant
Ticketmaster filed in 2024 and the other anticompetitive acts of unserved forgery
and fraud by defendant Live Nation Entertainment's attorneys in NYS court files
*US v. Ticketmaster*, 24-cr-22, 2- (EDNY). Documents were found affixing the
signature of a 2002 former AGC chief counsel, Paul Curran, who died of cancer in
2007.

## II. MEMORANDUM OF LAW

16.    A third party may see intervention as of right under Rule 24(a)(2) if:

(i)    It has a legally protectable interest such as market access and relevant US patents which LIVE-FiR does own and control;

(ii)   The outcome of the lawsuit may impair those interest(s) such as LIVE-FiR's continuing right to get injunctive relief, preclusion orders and injunctive relief to protect confidential patent data before the USPTO, declaratory determinations against defendants and its attorney agents for continuing violations of constitutional rights, and to recover damages for LIVE-FiR and artists who continue to be excluded from targeting advertising and revenue participations.

(iii)  The outcome could further impair LIVE-FiR's already-delayed recovery of strict liability patent infringement damages, copyright infringement damages, and a patent term adjustment from the DC District Court, 23cv3549.

(iv)   In addition, the outcome could impede LIVE-FiR's recovery of damages and treble damages based on defendant Live Nation and its attorneys' fraud before the USPTO and collusion with NYS officers of the courts before the Federal Circuit [7]; and

(v)    The Government and the 35 US states do not adequately represent all of LIVE-FiR's interests. *Detention Watch Network v. US ICE*, 2016 WL 11793613 (SDNY); *Brotherhood of R.R. Trainmen v. Baltimore & O.R. Co.*, 331 US 519 (1947)

17.    LIVE-FiR's harm is ongoing and stems from:

(i)    The merged entity's exclusionary use of ticketing data it acquired both from its own ticketing customers and from data acquired from competitors by criminal acts. *US v. Ticketmaster*, 21-cr-22, 24 (EDNY). These acts are at risk to continue against LIVE-FiR including at its new venue partnership where tickets protected by confidential data transmission will be sold and resold with LIVE-FiR patented and patent pending systems.

---

[7] This claims supports a claim for unjust enrichment and potentially a constructive trust over divested revenues.

9

(ii)    Defendants' conduct not only impairs access to confidential ticketing data in violation of the 2010 final judgment and 2020 amended judgment but misappropriates the economic value of patented innovations – diverting revenues from artist and innovators to Ticketmaster-controlled channels.

(iii)   Defendants continue willful infringement of LIVE-Fi® patents that remain in term further demonstrating a direct substantial and legally protectable interest in the subject matter of this litigation; and

(iv)    Forgery crimes, *ex parte* obstruction of justice and collusion by defendant Live Nation's lawyers doubling as NY officers of the courts continue to be perpetrated before the United States Patent and Trademark Office, the US Commissioner of Patents, the Federal Circuit and the state and federal courts in New York demonstrating RICO corruption. [8]

18.     The disposition of this action will undoubtedly further delay and prejudice LIVE-Fi®'s continuing ability to protect its interests with respect to market access to venue clients, patent and copyright enforcement and to get injunctive relief against defendants for perpetrating crimes and unprivileged defamation to prevent infringement hearings.

19.     In addition, LIVE-Fi®'s unpublished patent applications are confidential properly interests. They are entitled to protective orders against discovery production from this court. *Radio Music License v. BMI*, 347 FRD 262 (SDNY 2024)

20.     Moreover, the documents generated from defendant Live Nation's participation in *ex parte* fraud, obstruction of justice and circulation of forged documents to tribunals, the USPTO officers and the Federal Circuit were required to be served on LIVE-Fi® pursuant to the Administrative Procedure Act (APA), 5

_____

[8] The Federal Circuit fraud crimes were perpetrated without NY attorney jurisdiction malicious abusing process against LIVE-Fi®'s counsel Amy Weissbrod Gurvey who is only admitted in California. As such the fraud crimes are not protected by immunity.

10

USC §§500-596, 701-706. That the anticompetitive conduct involved violations of federal statutes is a separate ground for granting intervention as a matter of right under mandates of the US Supreme Court. *Brotherhood of R.R. Trainmen v. Baltimore & O.R. Co.*, 331 US 519 (1947). NYS's Office of Court Administration attorney Shawn Kerby has been circulating ex parte fraudulent and defamatory documents to the Federal Circuit since 2018 concerning defendant LIVE-FiR's counsel. The documents were discovered in 2025 and were unlawfully intended to interfere with the patent appeals process without jurisdiction over Weissbrod Gurvey in the capacity of a NY attorney and must be assessed for sanctions.

21. Patent infringement claims are not enforceable against the 35 US state plaintiffs before the federal district courts because of the Eleventh Amendment. *Florida Prepaid Post Secondary Education Expense Board v. College Savings Bank*, 527 US 627 (1999). Therefore, LIVE-FiR interests cannot be adequately protected by the existing plaintiffs. The exception would be NYS that deprived LIVE-FiR of due process of law after the EDNY separately found criminal violations by defendant Ticketmaster.

22. In a summation, there can be no dispute: (i) that ticketing and advertising revenues derived from LIVE-FiR patented methods are retained by defendants Live Nation and Ticketmaster; (ii) performing artists and third party innovators like Live-FiR are excluded from revenue participation despite enabling the underlying value and profits; (iii) this supports a claim for unjust enrichment and potentially a constructive trust over diverted revenues against the merged entity defendants.

23. Because defendants are using ticket data to perform functions covered by LIVE-FiR delayed patents (e.g. resale, authentication, targeted advertising and AI analysis) and require ticket purchasers to release their right to use of data, defendant LIVE-FiR may also assert breach of confidentiality if ticket data is not adequately protected by defendant Ticketholder's opaque system. This violates both LIVE-FiR's intellectual property and privacy engineering principals.

24. In summation, LIVE-FiR's intervention is necessary to protect legally cognizable interests, including: (i) preservation of patent rights under 35

11

USC §271; (ii) the right to a patent term adjustment based on defendant Live Nation and its attorneys' acts that caused forfeiture of seven years of patent term in valuable disclosures and induced USPTO officers to violate the APA statutes, 5 USC §§ 500-596, 702–706; (iii) preservation of copyrights under Title 17; (iv) the right to protective orders to prevent production of confidential patent data and applications still pending; and (v) the right to preserve evidence relevant to *ex parte* crimes before court officers by defendant Live Nation and its attorneys.

25.    The US Supreme Court has also held that intervention is appropriate where the applicant's interests may be impaired but are not adequately represented. See *Trbovich v. United Mine Workers*, 404 U.S. 528 (1972); *Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*, 386 U.S. 129 (1967).

26.    Documents submitted *ex parte* by NYS officers of the courts to the Federal Circuit in collusion with defendant Live Nation's defense attorneys, prove acts of unlawful influence, constitutional indifference, improper *ex parte* communications, and retaliatory exclusion from federally regulated platforms and patent appeals — all of which intersect with the monopolistic conduct alleged in this case.

27.    This Court has already held that the Government's claims are independent of the orders contained in the prior DDC consent decree and amended judgment, because the ongoing and expanded violations are properly before this Court. Order entered Oct. 3, 2024.

28.    Evidence of defendant Live Nation's attorneys' in-court fraud, defamatory and malicious abuse of process in collusion with NYS officers of the courts are appended as exhibits. They are antitrust violations by a monopolist. Facts in LIVE-FIRE's Reply papers and exhibits docketed as #637 may be relevant to this motion.

29. Under U.S. antitrust law and the Sherman Act Section 2, an antitrust monopolist is:

- A single firm or company with significant and durable market power, meaning it can raise prices or exclude competitors over time.
- The company acquired or maintained monopoly power through exclusionary or predatory conduct, not just through superior products, innovation, or business acumen.
- The company is subject to legal scrutiny if its behavior unreasonably restrains competition or harms the competitive process against others.

Examples of unlawful conduct include:

- Predatory pricing
- Tying arrangements
- Exclusive dealing
- Refusal to deal

District courts are required to assess:

- Whether the firm has monopoly power (often >50% market share)
- Whether its conduct has anticompetitive effects against others.

In everyday colloquial language, an antitrust monopolist is described as:

- **"Too big to compete with"**—a company that dominates its market so thoroughly that others can't survive.
- **"A bully in the marketplace"**—using its size or control to squash rivals, manipulate prices, or limit consumer choice.
- **"A gatekeeper"**—controlling access to essential platforms, technologies, or services in ways that stifle innovation
- **A company thought of** as a firm that doesn't just win—it **rigs the game** to keep winning, even if it means hurting consumers or blocking better alternatives and violating constitutional rights including access to all courts.

**WHEREFORE**, Prospective Intervenor LIVE-FiR respectfully seeks that this Court grant its Motion to Intervene as of right in all respects.

Respectfully submitted,
AMY WEISSBROD GURVEY
California counsel

13



Live-Fi™ Technology Holdings

7302 Woodstone Circle
Princeton, NJ 08540
amyg@live-fi.com
917-733-9981

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

X

UNITED STATES OF AMERICA, et al.,
Plaintiffs,

Case No. : 1:24-CV-03973-AS

V.

NOTICE OF MOTION FOR
ADMISSION TO APPEAR
PRO HAC VICE FROM
CALIFORNIA ON BEHALF
OF LIVE-FI® TECHNOLOGY
HOLDINGS, LLC

LIVE NATION ENTERTAINMENT, INC.,
et al., Defendants.

_____X

Pursuant to Rule 1.3 of the Local Rules of the United States District Court

for the Southern District of New York (SDNY), Amy Weissbrod Gurvey, a

California attorney, hereby moves this Court for an Order granting admission to

appear *pro hac vice* as counsel for LIVE-FI® Technology Holdings, LLC. LIVE-

FI® is an interested party as it owns and controls the standard essential US patents

for ticketing, ticket resale and authenticated content management and interaction,

patents being willfully infringed by defendants Live Nation and Ticketmaster.

Defendants since 2010 have also continued to breach material provisions of the

competitive impact statement both signed as a condition of merger in 2010 before

1

the DC District Court. *U.S v. Ticketmaster and Live Nation*, 2010 WL 975407, 975408 (DCD January 25, 2010) That provision expressly stated that defendants Live Nation and Ticketmaster cannot withhold ticketing data from companies seeking to conduct non-ticketing businesses. 2010 WL 975408, pp 8, line 10. This makes LIVE-FI™ a proper interested party to this lawsuit.

Petitioner is in good standing before the Supreme Court of California since 1979.

A notarized certification of good standing is annexed hereto as Exhibit A. Petitioner has never been convicted of a felony and has never been censured, disbarred or denied admission or readmission to any court. Petitioner was suspended for six months on December 4, 2012 by the First Dept. *without jurisdiction over Petitioner* who was voluntarily resigned in NYS since 1998 and granted permission to resign by the Third Dept. and NYS Office of Court Administration. That six month order remains on appeal and was found nonfinal by the NY Court of Appeals such that it cannot be used collaterally in any other lawsuit.

A proposed order for admission *pro hac vice* is annexed hereto as Exhibit B. The declaration pursuant to Local Rule 1.3 is annexed hereto as Exhibit C.

Petitioner's contact information is as follows:

Amy R. Weissbrod Gurvey
CEO and Counsel
c/o LIVE-FI™ Technology Holdings LLC
7302 Woodstone Circle  Princeton, NJ  08540
amygg@livefit.com   Phone: (917) 733-9981

The motion is GRANTED, but by separate order, the Court notes the denial of the related motion for joinder.

SO ORDERED.

Arun Subramanian, U.S.D.J.
Date: August 22, 2025

Pursuant to 28 USC §1746, Petitioner declares that the foregoing is true and correct.

By. _____
AMY WEISSBROD GURVEY

# EXHIBIT 7



Live-Fi™ Technology Holdings

7302 Woodstone Circle
Princeton, NJ 08540
amyg@live-fi.com
917-733-9981

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **LIVE-Fi® TECHNOLOGY HOLDINGS, LLC,**<br><br>Plaintiff,<br><br>v.<br><br>**LIVE NATION ENTERTAINMENT, INC.; LIVE NATION, INC.; TICKETMASTER, LLC; DOES I-X, Inclusive,**<br><br>Defendants. | **Case: 1:25−cv−03257**<br>**Assigned To : AliKhan, Loren L.**<br>**Assign. Date : 9/12/2025**<br>**Description: Pro Se Gen. Civ. (F−DECK)**<br><br>**COMPLAINT TO ENFORCE ANTITRUST FINAL JUDGMENT, AND AMENDED JUDGMENT, ALSO SEEKING INJUNCTIVE RELIEF, DECLARATORY DETERMINATIONS AND DAMAGES** |

—————————————————————————————————X

## I. STATEMENT OF THE CASE

Plaintiff LIVE-Fi® Technology Holdings LLC (LIVE-Fi®) brings this action seeking injunctive relief, declaratory relief and damages to redress defendants Live Nation and Ticketmaster's ongoing violations of the final antitrust judgment entered January 25, 2010 and

**RECEIVED**

SEP 1 2 2025

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

the Amended Judgment entered January 8, 2020. *US v. Ticketmaster and Live Nation*, 2010 WL 975407, 975408.

Defendant Live Nation Entertainment, Inc. (LNE), the reorganized merged entity, is now also being sued by the US Dept. of Justice and 35+ US states for continuing monopolistic violations in violation of the Sherman Act, 15 USC §§1-38.[1] In that lawsuit, it is alleged *inter alia* that defendants as monopolists since 2010 continue to unlawfully tie venues' rights to hire top tier artists on defendant Live Nation's roster with a duty to continue defendant Ticketmaster's ticketing services. However, it is the authentication of defendant Ticketmaster's collected ticketing data to enable **non-ticketing revenues**, an essential priority claim owned by Plaintiff LIVE-Fi® in its patents. that continues to be willfully infringed. Because there is no such thing as laches [2], defendant LNE did everything in its power including instructing its agent-attorneys to perpetrate forgery and RICO crimes with state court officers to prevent any lawsuit by Plaintiff.

Defendant LNE's crimes have included calculated and abhorrent document forgery and fraud before district and state courts and before the US Commissioner of Patents at the United States Patent and Trademark Office (USPTO), Commissioner of Patents Wynn Coggins. Defendant LNE instructed three of its agent-law firms Hinshaw & Culbertson, Cowan Liebowitz & Latman and Baker Botts to perpetrate fraud and RICO violations before the USPTO when defendants' intellectual property attorneys at Cowan Liebowitz & Latman[3] were

---

[1] See, *US v. Live Nation Entertainment*, 24cv3973 (AS)(SDNY).

[2] *SCA Hygiene Products Aktiebolag v. First Quality Baby Products*, 137 S. Ct. 954 (2017)

[3] For over 20 years, defendant LNE's Cowan agent-IP lawyers had the offices at 1133 Avenue of the Americas, NYC 10036. In the same building defendant LNE had corporate offices for its *iHeart* radio station, 106.7 Lite FM. This is the principal NY tower for the nightly *Delilah* broadcasts. Yet in 2009, defendant Live Nation lied to

placed under conflicts of interest and abandonment investigation by the
former Commissioner during Plaintiff LIVE-Fi®'s patent prosecution
retainer. The Cowan defendants were found to have violated
practitioner mandates related to conflicts of interest that were never
disclosed and also unilateral abandonment violations. Plaintiff was
required to be served with the results of the investigation. The USPTO
never served. Ten FOIA requests filed and ignored. The USPTO
Commissioner was discovered to have violated the Administrative
Procedures Act, 5 USC §§500-596, Appeals, §§701-706 et seq., and took
fourteen (14) of Plaintiff's patent applications out of the queue to
conduct the investigation for seven years. There is no constitutional
right to take patent applications out of the queue. It is believed that
defendant LNE also got it agent Hinshaw & Culbertson to get Plaintiff's
replacement counsels to unilaterally withdraw from USPTO retainers
without notice. These bad faith acts functioned to delay issuance and
enforcement of LIVE-Fi patents, and tolls any prevailing state statutes
of limitation under the discovery rule.

   **The State of NY has no jurisdiction over Weissbrod Gurvey
in the capacity of an attorney because Weissbrod Gurvey is only
admitted in California.** Yet, defendant LNE also conspired to have its
agent-attorneys at Hinshaw & Culbertson, LLP, Cowan Liebowitz &
Latman and Baker Botts to get NYS officers of the courts to give
Hinshaw partners *ex parte* access to "ordered concealed" state files to
enter defamatory and forged documents. The acts constitute wrongful
state action without a warrant. 42 USC §1983; NY's Judiciary Law (JL)
Part 1240.6d, 1240.7, 1240.18. Forgery and RICO crimes were enabled
when Hinshaw & Culbertson counsel J. Richard Supple, a concealed
AGC staff attorney, was given *ex parte* access to the First Dept.
attorney grievance committee (AGC) files without a warrant. Access

---

the SDNY that it "*had no contacts*" with NY State and could not be sued before the
SDNY.

was given unlawfully by AGC chief counsel Jorge Dopico. JL Part 1240.18.

The corrupted NYS files were just sequestered by injunction by the NDNY Chief Judge Brenda Sannes **after 14 years.** NDNY 24cv211 Docket #85 They had been ordered permanently "concealed" from Plaintiff by a First Dept. order entered April 21, 2016. The NDNY had to be petitioned for injunctive relief and declaratory relief and to order First Dept. officers to stop violating Plaintiff's constitutional rights. All Firs Dept. order had been found nonfinal by the NY Court of Appeals and could not be applied *sua sponte* to deny LIVE-Fi® constitutional access to enforce its patents by any court.

In addition, since 2018, LNE defendants and their attorney-agents acting in consort got a NYS Office of Court Administration (OCA) attorney Shawn Kerby to write *ex parte* letters **without standing** in favor of NYS - to the US Court of Appeals for the Federal Circuit. The subject of these just discovered *ex parte* letters was to prevent Plaintiff's appeals to three SDNY orders denying infringement hearings. 18-2076; 20-1620; 23-134. The letter falsely discredited and defamed LIVE-Fi®'s California counsel Amy Weissbrod Gurvey. The letters falsely say that counsel was disbarred in NYS. That statement is a blatant fraud and falsehood. It could not be left hanging on any docket.

The right to get infringement hearings on issued patents is guaranteed by the Fourteenth Amendment of the United States Constitution. Defendant LNE having orchestrated an elaborate RICO NYS conspiratorial enterprise also got its attorneys to induce OCA clerk Sam Younger to post fraudulent and defamatory notices on the Internet. Defendants have refused to take down these defamatory notices since 2013 in response to several state petitions. Younger's fraudulent orders were then improperly copied *sua sponte* by other courts without motion on notice or independent due process hearings in

4

further violation of Plaintiff's constitutional rights, and when the NY Court of Appeals already found all First Dept. orders to be nonfinal.

The Federal Circuit thereby being induced by Kerby's wrongful state action and failing to serve Plaintiff with these documents, transferred three (3) arising under patent appeals to orders of the SDNY denying infringement hearings to the Second Circuit that had no jurisdiction to hear these appeals. 18-2076; 20-1620; 23-134; Supremacy Clause Art. VI, Cl. 2; *Haywood v. Drown*, 556 US 729 (2009). Ergo the appeals were never heard and the matter is now before the US Supreme Court. Docket #24-7441.

However, multi-district litigation against defendant LNE was required by the judgment(s) of this Court and through no fault of Plaintiff. This has allowed frivolous litigation to continue in different courts to get inconsistent orders and attempt to prejudice LIVE-Fi®'s recoveries. Any entity or individual injured by violations of the final judgment and amended judgment were required to seek redress, treble damages and injunctive relief before the court that entered the judgments.

The 2010 Competitive Impact Statement (CIS), pp. 8 line 10, provided that "***LNE defendants are precluded from withholding ticketing data from entities seeking to conduct <u>non-ticketing businesses</u> at the merged entity's dominant share of owned, operated and serviced event venues***". This provision was contumaciously defied by defendants against multiple entities – not just against LIVE-Fi® - as soon it was entered in January 2010. Plaintiff's infringement complaint docketed and date-stamped three months later on April 22, 2010 was unilaterally deleted *ex parte* from the SDNY docket by 2013 without motion on notice. *Wells Fargo v. St. Louis*, 2024 WL 2737961 (NYAD 2d Dept. 2024). Moreover, in violation of the

Second Circuit 2012 remand order[4], patent discovery improperly stayed improperly by former Judge Barbara Jones in 2009 as abuse of discretion, was never allowed. Nor was a single infringement hearing ever allowed in 13 years.

The DCD's mandate concerning ticket data continues to be breached by defendants against Plaintiff LIVE-Fi® and others.

Because touring replaced CDs as the main source of revenues for performing artists since the Napster crisis, in the evolving concert market defendant **LNE's principal sources of revenues come from non-ticketing businesses**. To conduct these non-ticketing businesses defendants are necessarily and willfully infringing LIVE-Fi® patents at all owned, operated and serviced venues.

Defendant Ticketmaster's ticketing services are "locked in". Defendant Ticketmaster and the merged entity have developed market penetration not only at event venues owned by defendant Live Nation but also at venues not owned by defendants.

LIVE-Fi®'s resale and exchange USPTO patent applications that were unlawfully delayed in prosecution and were improperly stayed by the Commissioner during the Cowan Liebowitz practitioner investigation. These applications have the earliest priority dates in the repertoire. They are being willful infringed by defendant LNE and its partner StubHub by the doctrine of equivalents.

## II. PATENTS

Plaintiff LIVE-Fi®'s apparatus and method patents disclose the standard essential platforms and algorithms for conducting **non-ticketing** businesses. Plaintiff LIVE-Fi® is the priority owner of algorithms, methods and apparatuses for ticket data authentication.

---

[4] 462 Fed. Appx. 26 (2d Cir.)

hybrid encryption, user interaction, content transmissions, royalty administration, resale and exchange of tickets, routing logic, transmission matrices, and AI analytics.

Defendant LNE did everything in its monopoly power including instructed six law firms to engage in forgery and RICO crimes that began in "ordered concealed" First Dept. files in 2011 to falsely defame LIVE-Fi's California counsel. The plan was to prevent or other deter in perpetuity lawsuits against itself and more than 20 of defendant LNE's venture partners.

LIVE-Fi® issued patents and pending patents include methods, apparatuses and designs. The patents have early priority dates that predate the America Invents Act.[5] The issued patents disclose the standard essential algorithms, platforms, apparatuses and designs for authentication of ticket data, secured event content interaction and transmissions, priority-first confidentiality of data, royalty administration, transmissions of user generated content (UGC), ticket resale and exchange systems, and hybrid encryption of user data. Pending patents disclose essential continuation in part systems for routing logic, transmission matrices and artificial intelligence (AI) analytics and other continuation in part disclose expanded systems for direct-to-patient health care delivery and diagnosis of disease.

To date named defendants have thwarted any attempts by Plaintiff to license patents or create a joint venture. There is no dispute that defendants have denied access to ticketing data in violation of the final judgment and CIS.

In addition, defendant Ticketmaster in retaliation has locked out LIVE-Fi® executives from purchasing event tickets on its webpages and

---

[5] Title 35 of the US Code. Stat. at Large, 284-341; Publ. Law 112-29 (Sept.16, 2011).

getting access to the deeper pages that advertise promotions using ticketing data to conduct nonticketing businesses.

In 2021, defendant Ticketmaster was already prosecuted by the EDNY for placing spiders on competitors' webpages to steal ticket data for its own marketing database. *US v. Ticketmaster*, 21-CR-22, 24 (EDNY 2021).

Most recently, another lawsuit was filed before the SDNY against defendant LNE by "one Alan Amron", alter ego stated as echangingbarcode LLC. No jurisdictional motion was filed by defendants LNE, Live Nation and Ticketmaster in that lawsuit that defendants had "no NY contacts" and could not be sued before the SDNY. However, the damage is that the plaintiffs Amron and echangingbarcode are alleged to be using Plaintiff LIVE-Fi's priority issued patents and did not cite to LIVE-Fi patents as prior art when they filed patent applications. That LIVE-Fi®'s continuation patent filed in 2009 did not issue with all owed patent claims until Auguust 2, 2022[6] is of no relevance to whether the Amron patent must be invalidated. It had be cited by Amron when he filed his SDNY lawsuit in 2023 and an amended lawsuit against 2024 against LNE defendants and MLB Advanced Media and the 30 MLB baseball teams. In that lawsuit patent infringement damages are stated as $782mil, an amount that Plaintiff LIVE-Fi® contends must be tripled based on willful infringement and RICO crimes.

### III. JURISDICTION AND VENUE

Jurisdiction is proper conferred under 28 U.S.C. §§1331, 1338, and 1367.

---

[6] US Patent 11403566

Venue lies in this District pursuant to 28 U.S.C. § 1391(b) because the Competitive Impact Statement, Consent Decree and Amended Judgment to which defendants LNE are bound were entered by this Court.

## IV. PARTIES

## FACTUAL  SUMMARY ALLEGATIONS

### A. Breach of Consent Decree and Competitive Impact Statement

1. The 2010 Final Judgment prohibited defendant LNE from retaliating against or withholding ticketing data from companies or individuals seeking to conduct non-ticketing businesses at its owned and serviced venues.
2. Plaintiff LIVE-Fi® sought access to defendants' ticketing data to deploy its proprietary patented overlay systems at defendant LNE's dominated venues.
3. Defendants withheld such data, obstructing Plaintiff's business model and violating the decree's core non-retaliation and data-sharing provisions, causing damages.
4. The US DOJ confirmed repeated violations of the decree, prompting the 2020 Amended Final Judgment to extend enforcement and impose penalties. The Amended Judgment is in full force and effect.
5. The US DOJ filed an antitrust action against defendants to divest defendant LNE of Ticketmaster in 2024. That action remains pending with 35+ US states joining as plaintiffs. 24cv3973 (AS)(SDNY)
6. Defendants' anticompetitive misconduct directly contravenes the Competitive Impact Statement and conditions so ordered by the DC District Court.
7. The 2010 Final Judgment prohibited Live Nation from retaliating against companies or withholding ticketing data from companies seeking to conduct non-ticketing businesses at venues under its control.
8. Plaintiff LIVE-Fi® is the sole owner of standard essential patents that enable nonticketing businesses.

9. LIVE-Fi® sought access to ticketing data to deploy a patented overlay system at defendant LNE dominated venues and consummate a fair overlay agreement that would benefit all parties including allow equitable allocation of nonbusiness revenues to artists.

10. Defendants withheld such data, obstructing Plaintiff's business model and violating the decree's core non-retaliation and data-sharing provisions.

11. The DOJ confirmed repeated violations of the decree, prompting the 2020 Amended Final Judgment to extend enforcement and impose penalties through 2026.

12. Defendants' conduct directly contravenes the Competitive Impact Statement filed with the original merger approval.


## B. Patent Infringement and Wrongful State Action

13. Plaintiff LIVE-Fi® holds issued U.S. Patent Nos. 11403566, D647910S, 7603321 and pending patents delayed in prosecution due to fraud by defendant LNE's agents, covering algorithms for authentication, hybrid encryption, privacy-preserving, routing logic and AI-enabled overlay systems for live event environments.

14. Defendants have deployed materially similar systems across their venues alone and with venture partners without license or authorization.

15. Defendants' agents and attorneys have engaged in wrongful state action with NYS officers of the Courts to deprive Plaintiff's California counsel of access to district courts.

16. Plaintiff has issued cease-and-desist notices and filed declarations documenting infringement including three infringement complaints that were suspiciously deleted *ex parte* from a SDNY docket and never given hearing.

17. Defendants engaged in wrongful state action by instructing NY officers of the courts to engage in fraud and *ex parte* obstruction of justice before the First Dept., SDNY and the Federal Circuit to prevent competition in the marketplace.

18. Defendants' continued use constitutes willful infringement under 35 USC §§ 271, 284.

19. To date, Plaintiff LIVE-Fi® never got a single hearing on issued patents in violation of the Fourteenth Amendment.

## C. *Ex Parte* **Fraud and Constitutional Denial of Access to SDNY**

20. Plaintiff's previous patent discovery and infringement filings before SDNY were *sua sponte* denied without motions on notice, violating procedural due process based on defendant LNE and its attorneys' *ex parte* obstruction of justice.

21. NYS officers of the courts that included attorney defendants at Hinshaw & Culbertson staff counsel on the First Dept. AGC who never disclosed conflicts of interest, engaged in *ex parte* fraud, defamation and malicious abuse of process and entered forged documents into confidential state files without a warrant, and got orders permanently concealing state files from Plaintiff.

22. These actions constitute fraud on the court and *ex parte* obstruction of access before state forums and federal forums in violation of 42 USC § 1983, 1985, 1988 and the First Amendment right to petition and the Fourteenth Amendment's guarantee of infringement hearings.

23. NYS defendants further engaged in *ex parte* communications since 2018 before the Federal Circuit that in turn transferred three arising under appeals – 18-2076, 20-1620, 23-134 - to the Second Circuit that has no jurisdiction to hear arising under patent appeals, proving damages.

## V. OVERVIEW OF PATENT 11,403,566

24. **Summary:** Overlay System for Live Event Environments
A system and method for deploying ticketholder authentication, privacy-first and transmission matrices across live entertainment venues, enabling secure data exchange, resale and exchange of tickets, real-time analytics, user-controlled interaction, content transmissions, merchandise orders and visibility.

**Inventor**: Amy R. Weissbrod Gurvey assigned to Plaintiff LIVE-Fi®
**Issued**: August 2, 2022

11

25.    Claim Chart – Infringement by defendant LNE

| . Claim Language (Simplified) | Accused Instrumentality | Infringement Basis |
|---|---|---|
| A system comprising a venue-integrated overlay that preserves user privacy while enabling real-time data analytics | Ticketmaster's SafeTix, TM+, and Live Nation's venue apps | These systems collect and analyze user data during events, without user-controlled privacy toggles, violating the claim's privacy-preserving requirement |
| The overlay system includes a modular architecture enabling third-party integration without disclosing user identity | TM+ integrations with third-party advertisers and sponsors | Live Nation's integrations expose user data to third parties without anonymization, breaching modular privacy constraints |
| A method for deploying the overlay across multiple venues with centralized control and decentralized privacy enforcement | Live Nation's centralized ticketing and venue management system | Centralized control overrides venue-level privacy enforcement, contrary to the claim's decentralized model |
| The system includes a consent-based data sharing protocol with audit trails | Ticketmaster's data sharing with partners and affiliates | No user-facing consent logs or audit trails are provided, violating the claim's transparency and consent requirements |
| A venue-specific implementation that adapts to crowd density and user behavior in real time | Live Nation's crowd analytics and behavioral targeting | These features mirror the patented adaptive overlay but lack privacy safeguards, constituting unauthorized use |

# VI. LIVE-Fi® ISSUED PATENTS AND PENDING PATENT APPLICATIONS DELAYED BY DEFENDANTS' EX PARTE FRAUD AND MISCONDUCT

| Claim Element | LIVE-Fi Patent Feature | Accused Instrumentality | Venture Partners (DoE Liability) | Infringement Basis |
|---|---|---|---|---|
| 1(a) Authentication of ticketing data for live event interaction and other benefits | Encrypted credentialing with dynamic access tokens | SafeTix, TM+, Verified Fan, Presence | Salesforce (CRM), Oracle (event data), Okta (auth). ROKT | Replicates dynamic token issuance and credentialing logic |

| Claim Element | LIVE-Fi Patent Feature | Accused Instrumentality | Venture Partners (DoE Liability) | Infringement Basis |
|---|---|---|---|---|
| 1(b) Ads packaged with live events | Contextual ad delivery tied to ticket metadata | Ticketmaster Ads, Live Nation Sponsorships | Google Ads, Meta, Roku, Spotify | Uses ticket-linked targeting and ad delivery pipelines |
| 2(a) Transmission of event content | Real-time streaming and venue-linked content | Veeps, Live Nation livestreams, TM+ content | Veeps, Hulu, YouTube, Meta | Mirrors transmission logic and venue-linked content routing |
| 2(b) Transmission of ordered merchandise/services | In-event commerce tied to ticket ID | Ticketmaster Merch, LN VIP Packages | Shopify, Stripe, PayPal, Square | Implements ticket-linked ordering and fulfillment logic |
| 3(a) Hybrid encryption of ticketing and user data | Layered symmetric/asymmetric encryption | SafeTix QR, TM+ behavioral tracking | Cloudflare, AWS KMS, Akamai | Substantially similar encryption layering and routing |
| 3(b) Routing logic for ticket-linked services | Modular routing based on user role and venue | TM+, LN Touring, TM One | Twilio, Segment, Snowflake | Replicates modular routing and role-based access |
| 4(a) Transmission matrices for venue and artist data | Structured data flow across artist, venue, fan | TM+, LN Touring dashboards | Tableau, Salesforce, Oracle | Uses matrixed data routing and analytics dashboards |
| 4(b) AI analytics for ticketing behavior and fraud | ML-based anomaly detection and fan segmentation | TM+, SafeTix, LN Analytics | Palantir, AWS SageMaker, Google Cloud AI | Implements equivalent ML models and segmentation logic |

**Doctrine of Equivalents**: Partners like Salesforce, Oracle, Google, StubHub, ROKT and Palantir contribute materially to infringing

13

systems through equivalent functionality—especially in authentication routing, encryption, resale and exchange, and analytics.

**Consent Decree Violations**: Overlaps also support your APA and antitrust assertions, especially where the consent decree and competitive impact statement are also violated.

## VII. VENUE PARTNER CLAIM CHARTS

| Claim Element | Amy & LIVE-Fi Patent Feature | Accused NYC Partner Instrumentality | Infringement Basis / Equivalent Functionality |
|---|---|---|---|
| 1(a) Authentication of ticketing data for live event interaction | Dynamic encrypted ticket tokens | Yankee Stadium (Ticketmaster Verified Fan, SafeTix) | Uses TM credentialing for access control and fan segmentation |
| 1(b) Ads packaged with live events | Contextual ad delivery tied to ticket metadata | MTA digital kiosks, MetroCard-linked promotions | Ad delivery based on transit-linked event metadata and ticketing |
| 2(a) Transmission of event content | Real-time streaming and venue-linked content | Port Authority event feeds, Yankee Stadium livestreams | Venue-linked content routing via TM+ and partner APIs |
| 2(b) Transmission of ordered merchandise/services | Ticket-linked commerce and fulfillment | MetroCard-linked retail offers, stadium concessions | Uses ticket ID or transit ID to trigger merchandise delivery |
| 3(a) Hybrid encryption of ticketing and user data | Layered symmetric/asymmetric encryption | MetroCard backend, TM+ QR codes, MTA mobile apps | Implements equivalent encryption for ticketing and user profiles |
| 3(b) Routing logic for ticket-linked services | Modular routing based on user role and venue | TM+ integrations with MTA, Port | Replicates routing logic across transit, |

14

| Claim Element | Amy & LIVE-Fi Patent Feature | Accused NYC Partner Instrumentality | Infringement Basis / Equivalent Functionality |
|---|---|---|---|
| | | Authority, stadiums | venue, and ticketing layers |
| 4(a) Transmission matrices for venue and artist data | Structured data flow across artist, venue, fan | TM+ dashboards used by Yankee Stadium, MTA analytics | Matrixed data routing and performance dashboards |
| 4(b) AI analytics for ticketing behavior and fraud | ML-based anomaly detection and fan segmentation | TM+, MTA fare evasion analytics, stadium access logs | Equivalent ML models for fraud detection and segmentation |

- **Yankee Stadium**: Uses Ticketmaster's Verified Fan and SafeTix systems, which mirror your encrypted credentialing and routing logic.
- 
- **MTA & MetroCard**: Integration with Ticketmaster for event-linked promotions and mobile ticketing may infringe routing and ad-packaging claims.
- 
- **Port Authority**: If venue access or event-linked services are routed through TM+ or partner APIs, they may be liable under equivalents.
- 
- **Indirect Infringement**: These partners may be liable if they knowingly benefit from or enable infringing systems, especially where TM+ or SafeTix are embedded.

## VIII. STATE FRAUD & RICO CRIMES

Defendant LNE's attorney-agents at Hinshaw & Culbertson, Cowan Liebowitz & Latman and Baker Botts induced NYS officers to engage in forgery crimes in concealed First Dept. files since 2011. The Northern District of NY, Hon. Brenda Sannes, 24cv211 (Docket #85) just ordered that the forged state files to which Plaintiff was given first access on August 26, 2025, are now being sequestered by injunction by September 25, 2025.

15

In addition, fraud was perpetrated before the US Patents and Trademark Office when the Cowan defendant lawyers were placed under conflicts of interest and abandonment investigation by the commission of patents, Wynn Coggins. The USPTO ethics violation noticed served on the First Dept. AGC were removed from NYS consideration by the Hinshaw lawyers serving as counsels to the AGC. In 2016. The First Dept. identified H&C counsel J. Richard Supple and another NYC attorney O. Lee Squitieri, as the perpetrator of crimes in the state files. Supple was given access to the files by AGC staff counsel Jorge Dopico and a sua sponte six month sanction without motion on notice or jurisdiction was entered on December 4, 2012 that was found nonfinal by the NY Court of Appeals and could not be copied by any subsequent court without a separate due process hearing.

By such egregious activities defendant LNE and its agents/attorneys were able to engage in fraud, malicious abuse of process, retaliatory harassment and unprivileged defamation of LIVE-Fi®'s California counsel, Amy Weissbrod Gurvey, **without jurisdiction** in consort with NYS officers of the courts and engaged in attorney fraud and deceit before the SDNY and the US Patent and Trademark Office. **NYS officers had no jurisdiction over Weissbrod Gurvey in the capacity of an attorney because Weissbrod Gurvey is only admitted in California**. The acts that constitute frivolous litigation without jurisdiction are not protected by immunity. They continue. *Forrester v. White*, 484 US 219 (1989); *Stump v. Sparkman*, 435 US 349 (1978); *Cleavinger v. Saxner*, 474 US 193 (1985)

In the DCD's signed competitive impact statement entered in 2010 defendant LNE *admitted* that defendant owned, operated and serviced live event venues in NYC since 2005 – House of Blues, Irving Plaza and Roseland Ballroom and were importing a ticketing service from CTS Eventim of Germany to service those venues. Defendant LNE's logo

16

embossed on the marquis at Irving Plaza was captured on a still for the 2005 theatrical release "August Rush".

Even before merger, defendants were already using LIVE-Fi® patented methods without permission at these and other nationwide venues and liable for strict liability infringement and inducing infringement. 35 USC §271, 284; *SCA Hygiene Products Aktiebolag v. First Quality Baby Products*, 137 S. Ct. 954 (2017). However, the patents were delayed based on defendants additional fraud before the USPTO while its attorneys at Cowan Liebowitz & Latman were placed under investigation by the commissioner of Patents Wynn Coggins for conflicts of interest and abandonment violations. In a previous SDNY patent infringement litigation, defendant LNE attorneys via defendants Hinshaw & Culbertson and Baker Botts also committed jurisdictional fraud. Defendants swore under oath that defendant LNE *"had no contacts with NYS"* and could not be compelled to answer Plaintiff LIVE-Fi®'s claims and therefore defendants got the infringement complaint date stamped and filed on April 22, 2010 deleted ex parte from the SDNY without motion on notice. Defendant LNE also owns iHeart Radio, 106.7 WLTW Lite FM at 1133 Avenue of the Americas, NYC in the same building where their defendant attorneys at Cowan Liebowitz & Latman had their offices.

A recording patent acquired by defendant LNE in 2005, Griner US Patent No. 6614729, was invalidated by the USPTO in 2007 for lack of utility and fraud. That patent did not give defendant LNE a monopoly on distributing live concert records as was falsely released to the press for ten years proving other monopolistic misconduct. Lanham Act, 15 USC §1.

A single *ex parte* sanction order entered without motion on notice by the First Dept. on December 4, 2012 was found nonfinal by the NY Court of Appeals. It said that Weissbrod Gurvey's New York license to practice law was suspended for six months. **THERE WAS NO**

17

**LICENSE IN NY IN EXISTENCE IN 2012 TO SUSPEND**. The forgery crimes by defendant LNE's agent-attorneys in NYS files warrant disbarment. *US v. Reich*, 479 F. 3d 179 (2d Cir. 2007). [7]

Most damaging was the Federal Circuit's transfer order to a 2023 order of the SDNY denying a hearing on LIVE-FI®'s delayed continuation patent, 11403566, that issued August 2, 2022 patent. 11403566. That patent was mysteriously delayed in USPTO prosecution an unprecedented 17 years for issuance, when the deadline is three years. *Wyeth v. Kappos*, 591 F. 3d 1364 (Fed Cir. 2010). Both the law of the Federal Circuit and liberal pleading rules of the 2d Circuit required a hearing by the SDNY on this patent and none was allowed. *Anza Technology v. Mushkin*, 934 F. 3d 1349 (Fed. Cir. 2019); *Metzler Investments Gmbh v. Chipotle Mexican Grill,* 970 F. 3d 133 (2d Cir. 2020)(citing *Grant Williams v. Citicorp*, 659 F. 3d 208 (2d Cir. 2011)

Defendants' joint venture partners continue to use LIVE-Fi® patents without permission nationwide. Many users are venture partners of the City of New York including the new Yankee Stadium and Citifield. The patents enable hundreds of millions of dollars a week in revenues. Partners include LNE's concert and sports venues that have exclusive ticketing contracts signed with defendant Ticketmaster in violation of the antitrust statutes prohibiting tying. MLB/MLB Advanced Media, Madison Square Garden, the MTA, Metrocard, the Port Authority of NY and NJ, ROKT, ROKU, Google, Meta and the local airport terminals are other local venue partners.

---

[7] Weissbrod Gurvey has not been admitted in NY since 1998 as proven by the sequestered state files. Weissbrod Gurvey was granted unilateral resignation in good standing by the Third Dept.'s Dan Brennan and Office of Court Administration clerk Denise Rajpal in 1998 when she was in medical school and changed careers. No dues were thereafter paid to NYS and no reinstatement was ever sought.

LIVE-Fi®'s California Counsel Weissbrod Gurvey confirmed in 2024 that her good name and vested commission were deleted *ex parte* from the SDNY roster admittedly in 2013 by SDNY circuit attorney Julie Allsman and clerk Catherine O'Hagan Wolfe. *Bradley v. Fisher*, 80 US 335 (1872); *Marbury v. Madison*, 5 US 137 (1803). Only one bar admission is required for roster listing that need not be NYS. *In re Gouiran*, 58 F. 3d 54 (2d Cir. 1995).

Defendants herein Cowan Liebowitz & Latman and Baker Botts are contended strictly and jointly liable for inducing defendant LNE's willful infringement and Cowan Liebowitz for violations of the Defend of Trade Secrets Act, 18 USC §836. Four SDNY judges accepted Supple's forged and unserved proffers since 2012 and never ordered service on Plaintiff LIVE-Fi® in violation of ABA Rule 2.9 *Ex parte Communications*.

In addition, defendant Baker Botts attorney Steven Schortgen conspired with defendant H&C's Supple to file fraudulent jurisdictional documents before the SDNY that defendant LNE *"had no NY contacts"* and could not be compelled to answer Plaintiff's claims. These motions were granted and denied reconsideration. LIVE-Fi®'s Rule 60(b) vacatur motion was thereafter also deleted from the SDNY docket with the first infringement complaint.

## IX. US DISTRICT COURT NDNY, 24cv211
### RESPONSE TO ORDER TO SHOW CAUSE

The following letter was written by LIVE-Fi®'s counsel to the Chief Judge Brenda Sannes of the US District Court for the Northern District of NY on August 31, 2025. It follows a response to an order to show cause in a NDNY lawsuit seeking injunctive relief, declaratory determinations and infringement damages filed after the fraudulent ex parte letters from OCA's Kerby were discovered in 2025. An order

returnable against defendants is scheduled September 26th, 2025 to compel the "ordered concealed" First Dept. files by injunction.



Live-Fi™ Technology Holdings

7302 Woodstone Circle
Princeton, NJ 08540
amyg@live-fi.com
917-733-9981

August 31, 2025

Hon. Brenda Sannes                    cc:   Hon. Anne Nardacci
Chief Judge                                 NDNY 445 Broadway
Northern District of NY                     Albany, NY 12207
PO Box 7367
100 S. Clinton Street
Syracuse, New York 13261-7367

*Gurvey v. Hon(s). Gov. Kathy Hochul, Letitia James, Joseph
Zayes, Port Authority of NY and NJ, NYS Thruway, et al.
(AMN)(CFH)(PJE) Docket # 24cv211 (NDNY)*

**Motion to sequester NYS files by Injunction, Vacate Orders
under FRCP Rule 60(b) and order recusal**

Dear Judge Sannes:

This past Tuesday, August 26, 2025, after fourteen (14) years, the undersigned US patentee of standard essential apparatus and method patents for direct-to-user live event ticketing management and health care delivery assigned to LIVE-Fi® Technology Holdings, LLC and in excellent standing in California, was finally given first access to New York State files. The files were "ordered concealed" by the Appellate Division First Dept. in an order entered April 21, 2016. That order was found nonfinal by the NY Court of Appeals and could not be copied or applied sua sponte by any subsequent court.

20

The files state they were unlawfully opened in 2007 by NYS staff counsel J. Richard Supple of Hinshaw & Culbertson, and another NYC attorney O. Lee Squitieri under the supervision and control of Jorge Dopico chief counsel at the First Dept. attorney grievance committee (AGC) and a former presiding AGC administrative justice Luis Gonzalez. The files were opened in violation of the Administrative Procedures Act, 5 USC §§551- 559, 701-706 (APA) without jurisdiction over the undersigned in the capacity of an attorney because I am not admitted to practice law in New York State.

The files demonstrate malicious abuse of process, unprivileged defamation and retaliatory harassment to prevent enforcement of LIVE-Fi® patents in NY. Supple and other lawyers at his former firm Hinshaw & Culbertson were at all times AGC staff counsels. They were dually serving as defense attorneys for defendants Live Nation Entertainment and Cowan Liebowitz & Latman of NY in a parallel SDNY patent infringement, unfair competition and conflicts of interest lawsuit proving motive. Because the US Commissioner of Patents violation notices were filed at the AGC, the Hinshaw firm or any of its lawyers could never accept the Cowan defendants' retainer. NY Judiciary Law Part 1240.6d, 1240.7, 1240.18.

On August 26, 2025, eight First Dept. armed officers serving at 27 Madison Avenue including five armed marshals finally gave me access. Two marshals also carrying guns were protecting a room with 12-14 overstuffed Redwells in adjoining offices at 41 Madison Avenue. After initial inspection, I only completed 1/3 of the review and must return

I now seek that the NDNY order sequestration of these files by injunction and vacate all orders in this 2024 NDNY lawsuit. Judge Nardacci must recuse herself because impartiality can seriously be questioned. 28 USC 455(a). The judge sua sponte copied without due

21

process a fraudulent Internet notice that the undersigned is
"disbarred". **The undersigned has never been disbarred.** The
posting is fraudulent and my constitutional rights continue to be
seriously violated by RICO conspiracy acts undertaken by state officers.
Declaratory determinations must be entered by this Court. This order
cannot stand or be left hanging.

In 15 years, LIVE-Fi® never got a single hearing on US ticketing
patents invented by me personally in violation of the Fourteenth
Amendment from the SDNY or this Court. Moreover, other courts are
copying the fraudulent documents posted since 2013 uploaded to the
Internet by Office of Court Administration (OCA) attorney Shawn
Kerby and clerk Sam Younger, *sua sponte* without motions on notice In
violation of due process five Appellant Division First Dept. justices
ordered that the files would remain concealed in an order entered April
21, 2016.

Members of the Office of the Letitia James were also implicated in
the elaborate RICO corruption scandal including Michael Berg with
AGC staff counsels Thomas Cahill (deceased), staff attorneys James T.
Shed, Orlando Reyes, Raymond Vallejo and Naomi Goldstein, Dopico.
First Dept. staff attorney Ms. Holmes, several clerks, former justice
Gonzalez and Hinshaw & Culbertson counsel J. Richard Supple, a
concealed AGC staff counsel.

It was in 2011 that I personally first filed a NYS mandamus
lawsuit under Article 78 of the CPLR when I received what appeared to
be forged documents in the hard mail in New Jersey. The petition was
dismissed *sua sponte* on January 3, 2014 by the First Dept. without
motion on notice after *sua sponte* transfer from the Supreme Court of
NY. (110774-2011) My 2017 follow-up petition was also not heard. It
was transferred to the 2d Dept. and again *sua sponte* dismissed without
motion on notice in 2018. [132-17 (1st Dept.)] became 01366-18 (2d

Dept.)] These orders were appealed as of right to the NY Court of Appeals that found them *"nonfinal, that they did not finally determine an action and that no constitutional issue was directly involved"*. Parallel petitions filed before the SDNY seeking prospective injunctive relief and declaratory determinations against NYS presiding justices were also dismissed *sua sponte* without motions on notice. 13cv2565 (JMF), 18-cv-2206 (AT). *Ex parte Young*, 209 US 123 (1908); *Wells Fargo Bank v. St. Louis*, 2024 WL 2737961 (NYAD 2d Dept. 2024). I was then forced to move for a writ of mandamus petition before the US Supreme Court. This petition is pending. #24-7441.

In 2025, the smoking gun was discovered. Since 2018, OCA's Shawn Kerby had been writing *ex parte* letters to the US Court of Appeals for the Federal Circuit that I not be granted "arising under" patent appeals to orders of the SDNY denying me infringement hearings and inducing infringement hearings against Live Nation Entertainment (LNE) and Cowan Liebowitz & Latman since 2017. *Mindy's Cosmetics v. Dakar*, 611 F. 3d 590 (9th Cir. 2010). LNE is now the subject of an antitrust divestiture petition before the SDNY (24cv3973).

The NDNY had no justification to dismiss defendant Port Authority of NY and NJ from infringement claims and deny an amended complaint. The Port Authority is a private entity using the patents without permission.

In response to Kerby's *ex parte* fraud and unprivileged defamation including without standing because OCA was not a party to the SDNY lawsuit, the Federal Circuit transferred three patent appeals to the Second Circuit [18-2076, 20-1620, 23-134]. This proves concrete monumental damages. The Second Circuit has no jurisdiction to hear an arising under patent appeal. Supremacy Clause, Art. VI, Cl. 2;

23

*Haywood v. Drown*, 556 US 729 (2009); *Christianson v. Colt Industries Operating Corp.*. 486 US 800 (1988).

Multiple venture partners of NYC such as the new Yankee Stadium. MTA and MetroCard are also using the patents without permission and reaping millions of dollars a week in revenues. Although LIVE-Fi® can sue the City and its partners directly, the underprivileged defamation that was perpetrated by defendant LNE and its lawyers continued to deny me constitutional access to the SDNY. *Monell v. Dept. of Social Services*. 436 US 658 (1978). Another reason was *ex parte* fraud by Hinshaw & Culbertson and OCA clerk Younger's fraudulent postings on the Internet since 2013 that "I was disbarred in NY". No court officer can enter a sua sponte order copied from the Internet. If an attorney copied briefs from Copilot of Chat GPT he would be sanctioned. Younger has not taken these postings down after several requests. There is no other remedy at law but injunction from the district court.

OCA attorney Kerby then sent these same fraudulent notices to the Federal Circuit *ex parte* since 2018. The Federal Circuit never served me with Kerby's unlawful *ex parte* proffers in violation of due process and ABA Rule 2.9 on *Ex parte* Communications. Kerby as a NYS officer had no standing under the APA to write *ex parte* letters to an appeals court seeking to deny me infringement appeals to orders of the SDNY. This proves unconstitutional practices by NYS court officers.

In the instant 2 1cv211 NDNY lawsuit, I continue to be the innocent victim of RICO conspiratorial fraud. malicious abuse of process and retaliatory harassment by NYS officers for ulterior motives.

The files I just got access to on August 26 proved an elaborate RICO concealment practice by state officers with defendant Live Nation's defense attorneys. Forged AGC documents were first mailed to

24

me without CPLR service in 2007 affixing the signature of a former First Dept. chief counsel Paul Curran. **Curran left the state office in 2002 and died of cancer in 2007**. Curran never signed these documents. Curran's name was forged onto photocopies of old AGC letterhead by a First Dept. attorney Jorge Dopico. In addition, the names of more recent AGC counsels - Ralph Riordan and Charlotte Moses Fischman - were superimposed on the same photocopied letterhead and are much darker in type in comparison with the other roster names. The Redwells establish that many forged documents were manufactured by AGC court officers.

Supple of Hinshaw & Culbertson harbored conflicts of interest. As staff counsel to the First Dept. attorney grievance committee (AGC) where the USPTO Commissioner had filed ethics violations against Hinshaw's Cowan Liebowitz clients, Supple could never accept the Cowan firm's SDNY defense retainer. NY's Judiciary Law Part 1240.6d, 1240.18. Moreover, no AGC officer could give Supple and Squitieri *ex parte* access to enter unserved and forged documents into the confidential Appellate Division files.

A *sua sponte* order of the First Dept. entered in 2012 and then the SDNY entered in 2013 (13-cv-2565)(JMF)) both say my license in NYS was suspended for six months on December 4, 2012. **There was no license to suspend in New York State existing in 2012**. My temporary commission granted by the Appellate Division Third Dept. was voluntarily resigned in 1998,14 years earlier, when I was in medical school and changed careers. Resignation was approved by Third Dept. officer Dan Brennan and OCA's Denise Rajpal immediately. I never thereafter paid bar dues or requested reinstatement. There are notations from state officers seeking to get me to move for reinstatement to confer faux jurisdiction in favor of the AGC but I never did.

The files prove there existed clear motives for NYS officers to attempt to falsely discredit me and ruin my career and patent company. In 2006, the Cowan firm had been placed under conflicts of interest investigation by the former USPTO Commissioner of Patents, Wynn Cogggins. Conflict of interest and unilateral abandonment violations were found during a seven-year investigation and the APA required that I had the constitutional right to be served with the results. I was never served. Damages are proven. Fourteen of my US patent applications were taken out of the queue also in violation of the APA and never reinstated. The Cowan firm was also found to have breached of my attorney client privilege and the Defend Trade Secrets Act (18 USC §1836) to Legend Films of San Diego, Live Nation Entertainment, and the Commissioner of Major League Baseball (MLB)/MLB Advanced Media. Based on undisclosed conflicts with concealed AGC staff counsel posts, pursuant to NY's Judiciary Law Part 1240.6d. Supple and Hinshaw &Culbertson could never accept the Cowan firm's SDNY retainer or continue in that retainer.

In addition, my first US patent infringement complaint date-stamped and filed by the SDNY on April 22, 2010 was also unilaterally deleted *sua sponte* from the docket in Case No. 06cv1202. My 11403566 US continuation patent that issued on August 2, 2022 - twelve years later - is considered the standard essential patent for ticketing management and ticketholder direct marketing. It did not issue for seventeen years from the 2005 filing date in violation of *Wyeth v. Kappos*, 591 F. 3d 1364 (Fed Cir. 2010). The deadline is three years. That patent is still in term. It is being infringed by private entity Port Authority of NY and NJ, and the NYS Thruway and NYS Gaming Commission, named defendants in this lawsuit.

OCA's Kerby got Supple's forged documents from Younger in 2013 who previously admitted he got them from Supple and SDNY magistrate Henry Pitman (no longer serving). None of the *ex parte*

26

proffers were ever ordered served by SDNY judges Barbara Jones, Jesse M. Furman, Lorna Schofield, Laura Taylor Swain and Analisa Torres or by the circuit attorney Julie Allsman.

In an order entered in 2025, Judge Nardacci copied Younger's fraudulent postings *sua sponte*. The Judge found that Plaintiff was disbarred without motion on notice or due process. This is not allowed. The undersigned was never disbarred. The order cannot stand, it must be vacated and Judge Nardacci must recuse herself.

In 2024, OCA's Younger also admitted that in 2013 he uploaded fraudulent disbarment notices to the Internet that were never entered by any court. I am resigned from the practice of law since 1998, emphatically clear in the Redwells I reviewed. I was never admitted to the First Dept. and never appeared on behalf of a client in that court even before 1998.

US Supreme Court decisions are clear that no attorney jurisdiction exists over me in favor of NYS. *Middlesex County Ethics Committee v. Garden State Bar Association*, 457 US 423 (1982). The NY Court of Appeals orders entered in 2018 and 2023 already determined nonfinality of *ex parte* orders entered by the First Dept. These orders could not be copied because they are not final orders. OCA officers Kerby and Younger continued to engage in unconstitutional fraud. **SINCE 1998, THERE WAS NO LICENSE IN NY IN EXISTENCE TO SUSPEND**. Moreover, I was also denied verbatim hearing transcripts. *Cleavinger v. Saxner*, 474 US 193 (1985).

In 2024, Younger finally admitted that he accepted *ex parte* documents in 2013 from SDNY circuit attorney Julie Allsman and from the chief 2d Circuit clerk Catherine O'Hagan Wolfe who coincidentally previous served as the chief clerk of the First Dept. AGC when justice Gonzalez was presiding. Allsman admitted that in 2013 she unilaterally

removed my out-of-state California certifications in good standing from the SDNY roster in violation of due process. Only one bar is required that need not be the NY bar. *In re Gouiran*, 58 F. 3d 54 (2d Cir. 1995)

There are references in the 12-14 Redwells to a former 1997 HUD housing proceeding concerning my HUD protected apartment at Gateway Plaza in Battery Park City. NYC L&T 60941-97. A HUD lease was offered in 1995 when I was in medical school. The landlords Hudson Towers Housing and 1/3 owner Lefrak Organization (2/3 financed by the US Government) were sanctioned by the SDNY Judge Charles Brieant in 1985 for HUD violations and illegal evicting tenants in violation of HUD mandates. 24 CFR §966; 85CV0519 (CEB) The case files can be ordered from the National Archives. *Sultzer v. Pierce*, 85 CV 0519 (CES). Another Supreme Court file sanctioned Battery Park City Authority officers. *Sultzer v. BPCA*, 13906/86. Former NY Justice Sheila Abdus-Salaam issued an injunction to protect my HUD apartment and belongings when the landlords had taken illegal consideration from an outsider not on the building project's wait list, and issued a coterminous lease to my HUD protected apartment and I was never notified.

I was never an attorney in the HUD proceeding because I had an attorney retained, Jay Stuart Dankberg, a former NYC Civil Court Judge. This fact precluded any faux jurisdiction falsely claimed by the First Dept. AGC.

In addition, in the file is a 2001 destruction order targeting certain HUD audiotapes entered by NYS OCA clerk Jane Chin and NYC Civil Court clerk Ernesto Belzaguy with notice that a civil court transcriber, Linda Sears, was also contacted by members of NYS Attorney General to destroy completed transcripts. NYC housing judges are not constitutional judges in NYS and cannot preside over jury trials, a constitutional right of a HUD tenant. 24 CFR §966.66.

28

Mr. Dankberg, however, was unjustly sanctioned $5000 when he properly moved for a HUD jury trial after I was denied HUD mandated notice. Mr. Dankberg sought to transfer this case to Civil Court Judge Peter Wendt. These documents prove lack of jurisdiction per se, continuing harassment without jurisdiction and malicious abuse of process by AGC officers. There is an order from the NY of Claims entered in 2023 in Claim No. 135611, denying me access to recover damages against NYS.

In summary, the State of NY has denied me constitutional access to all district courts and state courts to prevent me from enforcing my valuable US patents, to continue in combined use HUD housing since 2000 and to be awarded damages. The patents have been assigned to LIVE-Fi® Technology Holdings, LLC. The US Supreme Court has held that if a state deprives a patentee of complete access to all courts in the state to file infringement lawsuits, only then may the patentee abrogate the state's sovereign immunity. *Florida Prepaid Post Secondary Expense Board v. College Savings Bank*, 527 US 627 (1999)

The acts of NYS court officers establish an elaborate RICO coverup involving forgery of state files, concealment of material documents, allowing *ex parte* access to unauthorized individuals without a warrant by Supple, defendant Hinshaw lawyer and Squitieri. APA violations, unprivileged defamation, retaliatory harassment and malicious abuse of process without jurisdiction. They also prove RICO fraud, and attorney in-court fraud and deceit by NYS staff counsels dually serving as defense lawyers for private willful infringers of my patents. The forgery of state documents warrants disbarment by all attorneys who participated in the fraud. *US v. Reich*, 479 F. 3d 179 (2d Cir. 2007)

Dated: August 31, 2025  cc: Noah Englehart, NYS Asst. AG
/amyweissbrodgurvey/ CEO, LIVE-Fi® Technology Holdings

29

## XI. PRAYER FOR RELIEF

Plaintiff LIVE-Fi ® respectfully requests that the Court:

- Declare LNE defendants in breach of the DC District Court's final judgment, competitive impact statement and consent decree and the amended judgment.
- Enjoin further violations and compel data access;
- Find constitutional violations of Plaintiff's constitutional rights.
- Award damages for violations;
- Awarded damages for patent infringement;
- Award damages for wrongful state action;
- Award treble RICO damages;
- Vacate improper SDNY orders and restore access;
- Refer judicial misconduct to appropriate authorities;
- Grant such other relief as the Court deems just and proper.

Dated: September 9, 2025
Princeton NJ

/amyweissbrodgurvey/

CEO LIVE-Fi® Technology Holdings, LLC



*Live-Fi™ Technology Holdings*

*7302 Woodstone Circle*
*Princeton, NJ 08540*
*amyg@live-fi.com*
*917-733-9981*

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

_____X

**LIVE-Fi® TECHNOLOGY**          **CASE NO. 25CV3257 (LLA)**
**HOLDINGS, LLC,**               **CASE NO. 23CV3549 (JMC)**

**Plaintiff,**                   **MOTION FOR ENTRY OF**
                                 **DEFAULT JUDGMENT, TO**
                                 **AWARD SUMMARY**
                                 **JUDGMENT, CONSOLIDATE**
                                 **LAWSUITS AND VACATE**
                                 **JUDGE ALIKHAN'S ORDER**

**v. LIVE NATION ENTERTAINMENT, INC.;**
**LIVE NATION, INC.; TICKETMASTER, LLC,**
**ET AL.,  Defendants.**

_____X

This notice of motion is to be heard in January 2026 by a date selected by the Court. A date after January 8 2026 is preferred based on Plaintiff's packed multidistrict litigation schedule related to her US ticketing patents. Gurvey US Patent Nos. 11403566, D647910S, 7603321 and patents pending that were removed from the queue by the former Commissioner of Patents to conduct a conflict of interest investigation for fraud before the United States Patent and Trademark Office.  The Chief Judge of US District Court for the Northern District

RECEIVED
Mailroom

DEC 3 0 2025

Angela D. Caesar, Clerk of Clerk
U.S. District Court, District of Columbia

of NY (NDNY), Hon. Brenda Sannes, is hearing Plaintiff's counsel's order to show cause against the State of NY, the NYS Office of Court Administration (OCA) and the NYS attorney general (AG) seeking injunctive relief against NYS agencies. The NYS court officers were discovered to have engaged in *ex parte* obstruction of justice, conflicts of interest violations and tortious interference with Plaintiff's arising under *private* infringement appeals against defendants Live Nation Entertainment, Live Nation, Inc., and Ticketmaster, pending before the Federal Circuit since 2018. 18-2076, 20-1620, 23-134. The acts unjustly enriched the State of NTY and its agencies. NYS has waived damages for these acts before the NY Court of Claims but Plaintiff's damage claims were returned unadjudicated, proving a taking of patents.

Plaintiff LIVE-Fi® Technology Holdings' moves herein: (i) to enter default judgment and summary judgment on violations of the judgment and amended judgment in *US v. Ticketmaster and Live Nation*, 2010 WL 975407, 975408 (RMC)(DCD) after defendants were duly served with process and have ignored Plaintiff's complaint; (ii) to include an order granting summary judgment treble antitrust damages; (iii) to vacate the *sua sponte* unconstitutional order of the first DCD judge Lauren Alikhan who somehow found without motion on notice or any responsive pleading from defendants that LIVE-Fi®'s counsel inventor Amy Weissbrod Gurvey "*was disbarred and is not admitted to any bar*'" (a statement that contumaciously contradicts the record and is a pure fabrication; (iv) to consolidate lawsuit 25 cv3257 with the pending DCD lawsuit 23cv3549 based on common issues of law and fact including *ex parte* obstruction of justice by defendant Live Nation's attorneys with NYS officers of the courts; and (v) to expand Plaintiff's FOIA requests and APA violation claims stated against the USPTO Commissioner and Federal Circuit, both that never served Plaintiff's counsel with the *ex parte* documents accepted and considered from OCA officers since 2018.

The relief sought in (iv) is based on discovery of *ex parte* letters written to and considered by the US Court of Appeals for the Federal

2

Circuit by the NYS Office of Court Administration (OCA) since 2018 that were never ordered served on Plaintiff in violation of US Supreme Court mandates. *Twomey v. Ohio*, 273 US 510 (1927); ABA Rule 2.9 on Ex parte Communications. These letters were posted without service, copied by Judge Alikhan and entered in her *sua sponte* order that must be vacated.

In support of this motion, California Counsel Amy Weissbrod Gurvey, affirms to the truth of the following statements. Plaintiff incorporates by reference public docket entries pending before the SDNY, the NDNY and Federal Circuit that are undisputed.

1.    Judge Alikhan transferred the 25cv3257 lawsuit to Judge Cobb but did not formally recuse herself by motion on notice. This Court must vacate her unconstitutional *sua sponte* decision and order.

2.    Upon belief based on the language used, Judge Alikhan clearly copied unserved *ex parte* letters written since 2018 by a NYS Office of Court Administration (OCA) attorney, Shawn Kerby, to the Federal Circuit without standing or jurisdiction. The letters sought that the Federal Circuit not hear Plaintiff's arising under patent infringement appeals to orders of the SDNY denying infringement hearings against private defendants herein Live Nation, Ticketmaster and the parties common USPTO practitioners at Cowan Liebowitz & Latman, another served defendant herein.

3.    The OCA letters are the subject of a NDNY injunction (24cv211) and a criminal RICO forgery and takings investigation. Hearing by the NDNY on Plaintiff's order to show cause is scheduled for the end of January 2026 (Exhibits hereto).

4.    All three LNE defendants have defaulted in this lawsuit. Entry of judgment awarding treble damages for antitrust violations and breaches of the competitive impact statement entered in 2010 and

3

amended judgment must be entered. The competitive impact statement required Plaintiff to enter this court to enforce the judgment requiring multidistrict litigation. It should be noted that the Government's attorney spearheading the DCD litigation in 2010 in which 18 US states joined, was Christine Varney, Esq., who is now a partner at Cravath Swaine and Moore, that is the designated defense attorney for the Government's divestiture action before the SDNY. 24cv3973 (AS). Cravath and Varney never disclosed conflicts of interest and likely must be disqualified to ensure the integrity of the SDNY wherein Plaintiff has moved to intervene as of right.

5.    Plaintiff LIVE-Fi® brought the 3527 DCD lawsuit seeking declaratory determinations and antitrust treble damages to redress ongoing violations of the merger mandates. Plaintiff also sued LNE SDNY attorneys (Cowan Liebowitz & Latman and Hinshaw & Culbertson) who were found to be involved in *ex parte* RICO corruption with NYS officers of the courts to deny Plaintiff infringement hearings against LNE defendants and its venture partners.

6.    The collusive plan was for LNE to delay prosecution and issuance of Plaintiff's ticketing management patents before USPTO and then also to delay hearings on infringement claims before national district courts. The SDNY would have affirmed Plaintiff's patent claims in the marketplace in 2013 but for the fact that Plaintiff's infringement complaint was unilaterally deleted from the SDNY docket and never reinstated after Plaintiff won binding arbitration on contract claims. A SDNY clerk was convicted of taking bribes for deleting docket entries in 2023 proving how long it takes to uncover criminal corruption and taking of patents by a several state.

7.    Defendants' plan was successful because while Plaintiff's patents were delayed and denied infringement hearings on the merits unlawfully, LNE defendants and their venture partners including Ticketmaster's serviced venues, StubHub, MLB, MLB Advanced Media,

sports betting companies, conferencing centers, airport terminals and NYS agencies -- NYS Thruway, NYS Gaming Commission, and the Port Authority of NY and NJ, were enabled to continue to use the patents without permission. This caused a flood of infringers into the market.

8.    Before the NDNY in 24cv211, Plaintiff was sua sponte denied injunctive relief against the three state agencies to stop using her patents without permission in abuse of discretion. Plaintiff was denied taking hearings, injunctive relief against OCA officers to compel production of the complete state files and injunctive relief against the NY Court of Claims that returned Plaintiff's damage claims. The State of NY has waived 11th Amendment immunity for tortious interference, unjust enrichment and misappropriation of property and the Court of Claims could not return Plaintiff's notice of claims unadjudicated.

9.    Petitioner's 2005 patent application, 11253912, took 17 years to issue in two parts, the second part being a continuation application filed October 11, 2009, 12587759. The deadline for patent claims to issue is three years per application, not seventeen years (*Wyeth v. Kappos*, 591 F. 3d 1364 (Fed Cir. 2010). The first 10 claims that issued in 7603321 should have issued in 2008 and the next 25 claims in 2012. During this egregious unprecedented delay at the USPTO, it was discovered that the USPTO Commissioner had taken Plaintiff's patent applications out of the queue in violation of the Administrative Procedures Act, 5 USC §551-596, 701 et seq. (APA), delaying Plaintiff's patent enforcement rights against defendant LNE, its partners and NYS agencies and preventing Plaintiff from affirming her patents in the marketplace.

10.    Defendants and their attorneys are believed to have tortiously interfered with the seven-year conflict of interest investigation opened *sua sponte* by former Commissioner of Patents Wynn Coggins and the Office of Enrollment and Discipline. Commissioner Coggins took fourteen of Plaintiff's pending patent and

5

additional trademark applications out of the queue to conduct the investigation in violation of the Administrative Procedures Act, 5 USC §§551-592, 701, et seq. (APA). Then in further violation of the APA, the results finding conflict violations by the defendant Cowan lawyers were never served on LIVE-Fi®'s counsel, Gurvey. Now based on discovery of the Federal Circuit *ex parte* proffers since 2018 that were never served on Plaintiff, is believed and at least plausible that *ex parte* corruption before the USPTO on behalf of the Cowan lawyers was also undertaken by OCA and NYS Attorney General attorneys. Ergo, an expansion of the FOIA requests sought since 2015 is now sought from this Court.

11.    Plaintiff's 759 continuation patent filed on October 11, 2009 did not receive its first office action for 9 years until 2018, when the deadline is 14 months. In 2018, no full faith and credit was awarded by the examiner for the first ten claims that issued on October 13, 2009 in 7603321, pre-American Invents Act. The examiner clearly abused discretion. He misspoke that Plaintiff's continuation application was filed <u>after</u> the first 7603321 patent issued, when it was filed two days before. Further, he was deemed on notice that other USPTO examiners defied the APA by granting patent claims to other applicants who failed to cite to Plaintiff's issued patents and pending disclosures as prior art in their pending applications. This was proven by the citations on the face of the patents that were granted to Alan Amron and the single near field claim granted to Apple. Inc. on appeal as stated in Plaintiff's amended complaint.

12.    The Competitive Impact Statement (CIS) entered January 25, 2010, pp. 8 line 10, provided that "***LNE merged defendants Live Nation and Ticketmaster are precluded from withholding ticketing data from entities seeking to conduct <u>non-ticketing businesses</u> at the merged entity's dominant share of owned, operated and serviced event venues***".

13.   At all times relevant Plaintiff LIVE-Fi® and counsel Gurvey were the sole priority US patentees or assignees of methods, platforms, apparatuses and electronic screens that authenticate ticketing data to enable most non-ticketing businesses. Those businesses include targeted advertising, ticket resale and exchange, content and interactive content transmissions to ticketholders and users, multifunctional bar code technology, and AI analytics. These functionalities generate most of the revenues for live events and virtual events in the current market. There is no question of breach by LNE defendants sued and served in the 25cv3257 lawsuit.

14.   LNE defendants have therefore defaulted and their breaches of the antitrust judgment continue. There has been no defense filed to these claims.

15.   However, the additional crimes of forgery and *ex parte* RICO fraud were established as perpetrated by LNE defendants and their attorneys in collusion with NYS OCA officers before the Federal Circuit, and before First Dept. attorney grievance committee (AGC) attorneys and members of the NYS Attorney General since 2013 before state and district courts.

16.   The FOIA requests filed since 2015 before the USPTO Commissioner, Office of Enrollment and Discipline, USPTO General Counsel and Office of Petitions continue to be ignored. Plaintiff now moves for all USPTO ex parte submissions by defendant attorneys at Cowan Liebowitz & Latman, Hinshaw & Culbertson, OCA and the NYS Attorney General to be ordered produced by mandamus. *Virginia Office of Protection and Advocacy v. Stewart*, 563 US 247 (2011)(Scalia, J.).

17.   The LNE defendants sued herein are willful infringers of the 11403566, D647910S and 7603321 and antitrust violators. The SDNY having receiving an amended complaint on anticipated patent claims that issued in the 566 patent and were stated in the operative pleading

was required to grant infringement hearings in 2023 against
defendants LNE and Cowan Liebowitz. Instead the SDNY
administration engaged in sua sponte corruption to deny Plaintiff
access to the court. *Anza Technology v. Mushkin*, 934 F. 3d 1349 (Fed.
Cir. 2019); *Metzler Investments Gmbh v. Chipotle Mexican Grill,* 970 F.
3d 133 (2d Cir. 2020); *Grant Williams v. Citicorp.,* 659 F. 3d 208 (2d Cir.
2011)

18.    The two lawsuits pending before this Court - 25cv3257 and
23cv3549, should be consolidated based on common issues of law and
fact including of RICO *ex parte* corruption with NYS court officers.

19.    The unserved documents considered by the Federal Circuit
since 2018 submitted ex parte by OCA officers induced the appeals
court to transfer three of Plaintiff's arising under patent appeals to the
2d Circuit that had no jurisdiction to hear the appeals and did not hear
them on the merits. Supremacy Clause Art. VI, Cl. 2;  18-2076, 20-1620,
12-134.

20.    NYS OCA or AG officers **had no standing or jurisdicti**on
to interfere in Plaintiff's private infringer cases and the acts are *not*
protected by immunity. *Forrester v. White*, 484 US 219 (1989); *Stump v.
Sparkman,* 435 US 349 (1978); *Cleavinger v. Saxner,* 474 US 193 (1985)

21.    In the signed 2010 competitive impact statement defendant
LNE *admitted* that its owned, operated and serviced live event venues
with technology infringing Plaintiff's ticketing management patents in
NYC since 2005 – House of Blues, Irving Plaza and Roseland Ballroom
and were importing a ticketing service from CTS Eventim of Germany
to service those venues. The systems imported from CTS Eventim all
infringed Plaintiff's patents by the time the first delayed patent issued
in 2009. Claim charts were included in the amended complaint filed in
this lawsuit.

22.    The antitrust violations must be heard and the infringed patents are fully enforceable. Strict liability infringement damages can be recovered for the full term and six years beyond the term for acts of infringement within the term. 35 USC §271, 284; *SCA Hygiene Products Aktiebolag v. First Quality Baby Products*, 137 S. Ct. 954 (2017).

**WHEREFORE,** based on the undisputed allegations above, the default of defendants in this lawsuit and the Exhibits annexed hereto, Plaintiff prays that based on the amended complaint filed in this action and public dockets, that the order of Judge Alikhan be vacated, that default judgment on treble damage antitrust claims be entered against the LNE defendants, that treble willful infringement damages be entered against LNE defendants for unauthorized uses in this district, that the two 25cv3257 and 23cv3549 lawsuits be consolidated, and that the FOIA requests related to the Commissioner's investigations and APA violations be expanded to include all submissions to the USPTO related to Plaintiff's claims by the NYS Office of Court Administration, NYS Attorney General, and defendants Cowan Liebowitz & Latman. Plaintiff also seeks an award of ECF filing privileges in this lawsuit.

Dated December 26, 2025
Princeton, NJ

AMY WEISSBROD GURVEY
CEO LIVE-Fi® TECHNOLOGY HOLDINGS

Service:  12-27-2025
Attorney General DC District Court

EXHIBIT 8

# EXHIBIT 9

NOTE: This order is nonprecedential.

# United States Court of Appeals
# for the Federal Circuit

---

**AMY R. WEISSBROD GURVEY,**
*Plaintiff-Appellant*

v.

**LIVE NATION ENTERTAINMENT, INC.,
TICKETMASTER, INC., LIVE NATION, INC.,
INSTANT LIVE CONCERTS, LLC, MAJOR LEAGUE
BASEBALL, PHISH INC./LIVE PHISH, HINSHAW &
CULBERTSON, LLP, BAKER BOTTS, LLP, MLB
ADVANCED MEDIA, INC., SHEPPARD, MULLIN,
RICHTER, AND HAMPTON, STEVEN SCHORTGEN,**
*Defendants-Appellees*

**COWAN, LIEBOWITZ AND LATMAN, P.C., DOES, 1-
10,**
*Defendants*

---

2025-1954

---

Appeal from the United States District Court for the
Central District of California in No. 2:23-cv-04381-MEMF-
E, Judge Maame Ewusi-Mensah Frimpong.

---

**ON MOTION**

---

2                   GURVEY v. LIVE NATION ENTERTAINMENT, INC.

PER CURIAM.

## O R D E R

Upon consideration of Amy R. Weissbrod Gurvey's motion to "add NDNY injunction & SDNY orders to appeal record and for a thirty-day extension to file briefs," ECF No. 33-1 at 1 (capitalization omitted),

IT IS ORDERED THAT:

(1) The motion is granted only to the extent that Ms. Weissbrod Gurvey may include in the appendix public records, including court orders and publicly-available filings from other cases while otherwise complying with the rules of this court. The relevance of those materials, if any, is left to the merits panel assigned to this case.

(2) Ms. Weissbrod Gurvey's opening brief is due within 30 days of the date of entry of this order. No further extensions of time for the opening brief should be anticipated.

(3) The Clerk of Court shall transmit a copy of this order to the assigned merits panel.

FOR THE COURT

November 14, 2025
Date

Jarrett B. Perlow
Clerk of Court

# EXHIBIT 10



*Live-Fi™ Technology Holdings*

*7302 Woodstone Circle*
*Princeton, NJ 08540*
*amyg@live-fi.com*
*917-733-9981*

**January 9, 2026**

**US Court of Appeals for the Federal Circuit**
**717 Madison Place, NW**
**Washington, DC 20439**
**cafchelp@cafc.uscourts.gov**

NOTICE OF CORRECTED OPENING BRIEF WITH ADDENDUM AND
SEPARATE APPENDIX

AMY R. WEISSBROD GURVEY
/amyweissbrodgurvey/
AMY R. WEISSBROD GURVEY CEO
LIVE-Fi® Technology Holdings

ECF Service
ECF CACD Case No. 23cv04381 (MEMF)
All parties
Jennifer Ayers, Sheppard Mullin Richter and Hampton
Paul Elliott, Baker Botts, LLP
Michael Hawes, Attorney
Robert Adam Lauridsen, Keker VanNest Peters
Todd Lundell, Hinshaw & Culbertson
Heather Rosing, attorney
Franco E. Muzzio, attorney
Marian C. Rice, attorney
Steven Schortgen, attorney

1

**Service**
    12/31/2025, 9 of 9 persons served
    Ayers, Jennifer, aty - email
    Elliott, Paul, aty - email
    Gurvey, Amy Rebecca, pro se - email
    Hawes, Michael, aty - email
    Lauridsen, Robert Adam, aty - email
    Lundell, Todd E., aty - email
    Muzzio, Franco E., aty - email
    Rice, Marian C., aty - email
    Schortgen, Steven, aty - email


**Upload Documents**
    US PATENT 11403566.pdf (36 pages)
    Gurvey Patent D647910S.pdf (2 pages)
    US7603321.pdf (23 pages)
    FEDCIR 25-1954 DOC#35 CROPPED PATENT LIST 10-31-25.pdf (1 page)
    FEDCIR 18-2076 20-1620 23-134 LTR TO VACATE TRANSFER ORDERS RE KERBY 3-11-25.pdf (6 pages)
    NDNY 24cv211 Doc101 OSC Vacate Amend Complaint.pdf (10 pages)
    NDNY 24-cv-211 DOCKET 12 26 2025.pdf (2 pages)
    NDNY 24CV211 DOC101-2 BRI REALTY CASE.pdf (38 pages)
    NDNY 24CV211 DOC101-3 VA PROT ADVCY CASE.pdf (16 pages)
    24cv211 ORDER Doc 85 Setting Hearing to Sequester NY Files Recuse Judge 9-5-25.pdf (11 pages)
    NDNY 24-CV211 Order granting hearing for injunction 9-5-25.pdf (1 page)
    CA CERTIFICATE OF GOOD STANDING JUNE 24 2025.pdf (1 page)
    CAL BAR ACTIVE STATUS.pdf (1 page)
    DCD 25cv3257 DOC #1 COMPLAINT TO ENFORCE JUDGMENT LIVE NATION TICKETMASTER 9-12-25.pdf (30 pages)


**Docket Text**
    Exhibits to Opening Brief of Plaintiff Appellant for Appellant Amy Rebecca Gurvey. Service: 12/31/2025 by email. [25-1954]