

Connell Foley LLP
One Newark Center
1085 Raymond Blvd., 19th Floor
Newark, New Jersey 07102
P 973.436.5800   F 973.436.5801

**Bryan P. Couch**
Partner
Direct Dial 973-436-5703
BCouch@connellfoley.com

January 21, 2026

The Honorable Arun Subramanian
United States District Court
Southern District of New York
500 Pearl St., Room 15A
New York, New York

> Re:   United States, et al. v. Live Nation Entertainment, Inc., et al.
>         Civil Action No. 24-cv-3973 (AS)

Dear Judge Subramanian:

We represent non-party Tixr, Inc. ("Tixr") in connection with the above captioned matter. Pursuant to Rule 11(B) of this Court's Individual Practices in Civil Cases and pursuant to the Court's November 25, 2025 Order (Dkt. 685), we respectfully request that certain information originating from Tixr and designated "Highly Confidential" pursuant to the Amended Protective Order (hereinafter "PO") (Dkt. 347) remain under seal, as outlined in **Appendix A**. More specifically, the materials Non-Party Tixr requests remain under seal are limited to excerpts from the compelled deposition testimony of Tixr's founder and CEO, Robert Davari. *See* Robert Davari's Deposition Transcript, pages 24-25, 26, 29-30, and 33. Counsel for Tixr has met and conferred with the Parties and neither Party stated any opposition to Tixr's sealing requests.

Sealing of the requested materials, as set forth in detail in Appendix A, is warranted under the law of this Circuit. "The Second Circuit has set forth a three-part analysis for determining whether documents relating to a lawsuit must be made available to the public." *Stern v. Cosby*, 529 F. Supp. 2d 417, 420 (S.D.N.Y. 2007) (citations omitted). Courts first assess whether the documents at issue are "judicial documents" relevant to the performance of the judicial function and useful in the judicial process. *Lugosch*, 435 F.3d at 119. Second, "the court must determine 'the weight of the presumption'" of public access to the documents. *Stern*, 529 F. Supp. 2d at 420 (citing *Lugosch*, 435 F.3d at 119). Third, the "'court must balance competing considerations against'" the presumption of public access. *Id.* (citing *United States v. Amodeo*, 71 F.3d 1044, 1050 (2d Cir. 1995)). The "privacy interests of innocent third parties," such as Tixr, "are a venerable common law exception to the presumption of access." *Amodeo*, 71 F.3d at 1050-51 (citation modified).

In the deposition excerpts at issue, compelled and under oath, Mr. Davari discussed Tixr's strategic approach and dealings regarding several prospective clients. Although the materials related to a summary judgment motion are considered "judicial documents," the materials Tixr seeks to seal carry a weak presumption of public access that fails to outweigh the competitive harm to Tixr in the event of their disclosure.

Public disclosure of such information would result in current and potential clients, business partners, and competitors knowing precisely how Tixr could be expected to approach and evaluate related business relationships and would cause Tixr a dire and wide-ranging strategic disadvantage. Public disclosure of such information would result in clearly defined and very serious injury to Tixr. *See United States v. International Business Machines Corporation*, 67 F.R.D. 40, 46 (S.D.N.Y. 1975). The documents at issue include a confidential

Further, these materials reflect Tixr's evaluation of its competitive position in relation to its competitors and "evaluation of the strengths and vulnerabilities of product or service offerings." PO ¶ 2(e). Such competitive analysis includes Tixr's information that demonstrates Defendants' anticompetitive conduct, which presents a material risk of Defendants' retaliation against Tixr and its information sources. *See Heckman v. Live Nation Ent., Inc.*, 2025 WL 1720178, at *5-6 (C.D. Cal. May 13, 2025) (denying Defendants' employees access to certain third-party information, in part, based on the allegations of Defendants' "history of threatening and retaliating against companies that do business with Defendants' competitors"), *adopted as final*, Dkt. No. 370 (May 15, 2025). Courts routinely seal such material to prevent competitive injury to the producing party. *See Oliver Wyman, Inc. v. Eielson*, 282 F. Supp. 3d 684, 706 (S.D.N.Y. 2017) (sealing defendants' "internal analysis of the competitiveness of its practice groups"); *Playtex Prods. LLC v. Munchkin, Inc.*, 2016 WL 1276450, at *11-12 (S.D.N.Y. Mar. 29, 2016) (sealing the producing party's "competitive analyses").

Lastly, any presumption of public access is also outweighed by Tixr's and other third-parties' privacy interests. The materials related to Tixr's sealing requests contain information related to its research and development, business strategies, and dealings with prospective clients. Disclosure of this information could adversely impact Tixr's relationship with its current and prospective clients and give its competitors an unfair advantage. Courts routinely permit sealing in such circumstances. *Iacovacci v. Brevet Holdings*, LLC, 2022 WL 101907, at *2 (S.D.N.Y. Jan. 11, 2022) (collecting cases); *see also Kewazinga Corp.*, 2021 WL 1222122, at *3. The materials at issue also contain identifying information of venues, promoters and other professionals, and sealing such identifying information is necessary to protect those third-parties' vital privacy interests and minimize the risk of potential retaliation by Defendants. Dkt. No. 549; *Heckman*, 2025 WL 1720178, at *5-6.

For the foregoing reasons, AEG respectfully requests that this Court allow the materials identified in Appendix A to remain under seal.

Respectfully submitted,

Bryan P. Couch

BPC/vs

## APPENDIX A

| MATERIAL | RELEVANT FILING | USE OF MATERIAL IN FILING | EXCERPTS TO REMAIN UNDER SEAL (No objection absent designating otherwise) |
|---|---|---|---|
| Defs. Ex. 94, Davari (Tixr) Dep. | Plaintiffs' Response to Defendants' Local Civil Rule 56.1 Statement in Support of Their Motion for Summary Judgment ("RSUF") (ECF 759) | Davari (Tixr) Dep., pp. 32-38. **Relevant Statement**: As a part of fans' purchase of primary tickets to concerts, fans purchase the offerings or services that accompany or are bundled with a ticket purchase, e.g., mobile application features, friendly user interface and intuitive design, innovative technology, fraud detection prevention security, fan club benefits, information and content related to the event, functionality of mobile ticket and ticket scanning. Davari (Tixr), 32:11–38:2. RSUF ¶6. | Seal: P. 33 (13-14): "…much like what the Intuit Dome really wanted is,…" |
| Defs. Ex. 94, Davari (Tixr) Dep. | Plaintiffs' Counterstatement of Material Facts in Support of Their Opposition to Defendants' Motion for Summary Judgment ("COMF") (ECF 763) | Davari (Tixr) Dep., pp. 16-19, 23-26. **Relevant Statement:** Other ticketers understand that venues are afraid they will lose Live Nation content if they switch away from Ticketmaster. Davari (Tixr) Dep. at 16:18-19:22, 23:18-26:20. COMF ¶68. Davari (Tixr) Dep., pp. 13-16, 29-30, 32-39. **Relevant Statement:** Other ticketers have invested in new ticketing innovations that would benefit fans, venues, and promoters alike. Davari (Tixr) Dep., at 13:19–16:17, 29:15–30:20, 32:11–39:8. COMF ¶197. | Seal: P. 24-25 (24:16-25:10 ): "Probably the most sobering example of that was Insomniac which was an independent electronic dance music company. When we met them they had actually been recently acquired by Live Nation. They went through a six month plus RFP. We won that RFP. We signed a contract, which I believe we produced. We were ready to go live with their biggest festival, Electric Daisy Carnival. And then what I heard was that, you know, proverbial call came up from the top and |

| | | | |
|---|---|---|---|
| | | | it was a political thing and they were no longer able to use us. And we had to notify our investors, a lot of excitement about it. It was going to be the largest thing we'd ever done. It was going to catapult the company very, very early in our history. And Live Nation actually sent in their M&A team to try to acquire us and, you know, we weren't ready or willing to be acquired and after that they swiftly took that deal away from us. So that's one example and one kind of sector of -- of limitation."<br>**Seal: P. 26 (11-17):** "And again, a sobering example of that was there's a company called Danny Wimmer Presents and, you know, the CEO verbally told me on the phone that, you know, even though we have better product, we have the better economic offer; that he was unable to move to us because frankly, he was too afraid."<br>**Seal: P. 29-30 (29:15-30:20):** "Q: And what did the Clippers personnel say about Tixr's technology? A: I mean, they said then and they openly say now that they believe we are, you know, the best and especially for their needs. You know, it's what they |

| | | | |
|---|---|---|---|
| | | | really needed to accomplish what they needed to accomplish. And a good point here is -- and anybody that visits that venue, which is an incredible venue, will see what they have had to do to accomplish the goals, but they really wanted to do some things differently. They wanted to do facial identification and they wanted to do -- they wanted to have an app where every single person has the app and logs in that way. They wanted to do cashless food and beverage and merchandise and Hyatt hospitality. They really wanted to push the envelope and make it a state of the art venue. And it wasn't necessarily that we had every feature they needed, but they knew because of our --because of how modern our text app was and how we had conceptualized and built the product, we were going to be the one to get them there because we had the most flexibility and fastest to market when it came to product development, because of how engineering focused we are and how little, you know, the industry term is technical debt we have, right? They, to this day, even though we're not |

| | | | |
|---|---|---|---|
| | | | actually actively -- we don't have a commercial partnership, they remain friends, and huge advocates of the company." |