January 28, 2026

**VIA ECF**

The Honorable Arun Subramanian
United States District Judge
United States District Court, Southern District of New York
500 Pearl Street, Courtroom 15A
New York, NY 10007-1312

Re:   *United States et al. v. Live Nation Entertainment, Inc. et al.*; **1:24-cv-03973-AS**

Dear Judge Subramanian:

Defendants submit this letter in response to Your Honor's January 27, 2026 letter (ECF No. 969), and Your Honor's invitation at the January 23, 2026 hearing to submit additional evidence and argument. We first address the issues raised in the January 27 letter, and then include certain additional materials.

\*   \*   \*

## Defendants' Response to the Court's January 27 Letter

As this Court recognized at the January 23 hearing, defining the relevant market is the threshold step in analyzing any antitrust claim (other than *per se* offenses such as price fixing). *See* Jan. 23 Hr'g Tr. ("Hr'g Tr.") at 79:4-7. This is equally true in a case such as this one, where Plaintiffs seek to infer power from market share (i.e., "indirect") evidence, and in a case where the plaintiff relies on "direct" evidence. In *Ohio v. American Express Co.* ("*Amex*")—a case in which a judgment was reversed for improper market definition—the Supreme Court explained that, even where the plaintiffs "rel[ied] exclusively on direct evidence to prove that Amex's antisteering provisions have caused anticompetitive effects in the credit-card market," "**we must first define the relevant market**." 585 U.S. 529, 542 (2018) (emphasis added). Many other cases hold the same. *See, e.g.*, *United States v. Eastman Kodak Co.*, 63 F.3d 95, 104 (2d Cir. 1995) ("Without a definition of the relevant market, there is no way to measure a company's ability to act as a monopolist."); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 268 (2d Cir. 1979) ("It is, of course, a basic principle in the law of monopolization that the first step in a court's analysis must be a definition of the relevant markets."); *City of New York v. Grp. Health Inc.*, 649 F.3d 151 (2d Cir. 2011) ("To state a claim under … §§ 1 or 2 of the Sherman Act … a plaintiff must allege a plausible relevant market in which competition will be impaired.").

Plaintiffs cited a concerted action case, *FTC v. Indiana Federation of Dentists*, for the proposition that "elaborate market analysis" may not be required if a plaintiff has evidence of "actual, sustained adverse effects on competition" in "areas where [the defendant] predominated." 476 U.S. 447, 461 (1986). But that is just another way of saying that direct evidence can meet a plaintiff's burden to prove market or monopoly power. Under *Amex*, a legally proper market definition is still required. 585 U.S. at 542.

It was surprising to hear Plaintiffs suggest at the hearing that they may be seeking to demonstrate monopoly power through "direct evidence," rather than indirectly by reference to elevated shares (though in reality both approaches require a properly defined market). Doing so would have required them to show raised prices or reduced output, market-wide—not anecdotally but systematically. But that has never been the case they developed. To the contrary, Plaintiffs admitted they have no evidence that Defendants charge higher prices to venues inside Plaintiffs' alleged "major concert venues" ("MCVs") markets than to venues outside them. *See* Hr'g Tr. at 65:13-66:3.[1] There is certainly no evidence that artists are subjected to worse terms from promoters for shows at "MCVs" compared to other venues. And no one has even suggested that there has been an output reduction of ticketing or concert promotion services.

---

[1] Plaintiffs' invocation of the "Cellophane fallacy" here "puts the cart before the horse." *FTC v. Meta Platforms, Inc.*, 2025 WL 3458822, at *27 (D.D.C. Dec. 2, 2025). "The fallacy is a risk only if [Live Nation] is in fact a monopoly." *Id.* Because Plaintiffs have "not submitted any evidence to show that [Live Nation's] prices are supracompetitive"— and in fact have submitted essentially no evidence of market-wide pricing trends at all—there is no risk that a Cellophane fallacy might infect an otherwise sound study. *See PepsiCo, Inc. v. Coca-Cola Co.*, 114 F. Supp. 2d 243, 257-58 (S.D.N.Y. 2000). More broadly, the risk of systematic pricing analyses being tainted by longstanding supracompetitive prices is no reason not to do such analyses in the first place—it is just cause to be thoughtful about controlling for that possibility in the resulting analysis.

In the case Plaintiffs have in fact litigated, they claimed to demonstrate monopoly power via high shares in various product markets, which until the hearing they never suggested they didn't have to properly define. The litigation, in other words, has been about the viability of the "targeted customer markets" they have put forward.

As the Court appreciates, in most cases, a relevant product market is "determined by the reasonable interchangeability of use" between the product and substitutes. *Brown Shoe Co. v. United States*, 370 U.S. 294, 324–25 (1962). In this case, involving alleged service markets, however, everyone agrees on the list of service providers and that they offer reasonably interchangeable ticketing, promotion, and booking services. *See* Hr'g Tr. at 68:6–20; Pls.' RSUF (ECF No. 775) ¶¶ 1, 35, 56. But if market shares were calculated in the normal and relatively mechanical way, based on the universe of business opportunities for which these agreed-upon providers compete (the "area of effective competition"), Defendants' market shares would be much lower than Plaintiffs contend.

So, Plaintiffs take a different approach, which appears to increase Defendants' market shares. They limit their markets to a set of 257 venues that they dub "major concert venues." These supposed markets are defined by customers, not products. Plaintiffs admit that three of their six markets are "targeted customer markets"—the two venue-facing ticketing markets and the concert booking market. *See* Hr'g Tr. at 45:22–46:7; *see also* Pls.' Opp. Br. (ECF No. 771) at 16–17; Defs.' Ex. 72 (Hill Rpt.) (ECF No. 693-32) ¶¶ 226, 201 n.428, 104 ("Economists often refer to the targeting of groups of customers as price discrimination."), ¶ 104 n.192 ("[T]he suppliers engaging in targeting must be able to set different terms for targeted customers than other customers."). At the hearing, Plaintiffs contended that two of their other supposed markets (i.e., the alleged promotions market and fan-facing ticketing market) are not targeted customer markets. But that suggestion is irreconcilable with the fact that these alleged markets are similarly limited to a set of services in connection with just 257 venues, when the same suppliers compete for the patronage of customers over shows at a much broader set of venues. *See* Am. Compl. ¶ 161; *see also* Defs.' Ex. 72 (Hill Rpt.) (ECF No. 693-32) ¶¶ 156, 263 & Appx. C. The "targeted customer markets" concept is the only thing that could possibly justify limiting the markets in that way. As a result, if Plaintiffs truly are standing on their contention that some of the "MCV"-defined markets are *not* targeted customer markets, they lose then and there for obviously failing to define markets that cover the area of effective competition, and with no justification whatsoever for doing so.

That threshold issue aside, to whatever extent Plaintiffs are indeed pursuing "targeted customer" (or "price discrimination") markets, the law requires them to prove those markets with evidence of actual price discrimination. The Court's citation to *Kodak* is entirely correct, and we apologize for not raising the case earlier. The similarity of *Kodak* to this case and the *Meta* decision is very strong notwithstanding the unusual procedural posture of a consent decree termination action in *Kodak*. *Compare Meta Platforms*, 2025 WL 3458822, at *35. Fundamentally, in *Kodak*, the government sought an inference that Kodak retained market power due to its market share over American consumers (not consumers world-wide) because Kodak could price discriminate against them, and indeed had. *Kodak*, 63 F.3d at 103. Given that the government's market power argument depended on a price discrimination market, the Second Circuit required it to produce "probative evidence of systematic price discrimination." *Id.* at 107. "In the absence of such proof," the court declined to accept the government's market definition. *Id.* Notably, the government developed and offered such evidence in *Kodak*, much as the FTC

developed and offered such evidence in *Meta*. But the district court found the government's price discrimination evidence insufficient, so the price discrimination market failed. That is strong, in-Circuit authority for the proposition that such evidence is required when the question is whether a company has actual market power.

Plaintiffs admit they have no evidence of price discrimination in their "MCV"-defined markets. *See* Hr'g Tr. at 65:13–66:3. Defendants have contrary evidence. Defendants' expert, Dr. Dennis Carlton, found Ticketmaster's margins and take rates are *lower*, not higher, inside Plaintiffs' preferred 257-venue market than outside the alleged market. Defs.' Ex. 76 (Carlton Rpt.) (ECF No. 695-3) ¶¶ 97–100. Plaintiffs' expert, Dr. Nicholas Hill, admitted he had "never shown that Ticketmaster has a statistically significant higher margin or take-rate inside [Plaintiffs'] alleged ticketing market than outside." Defs.' Ex. 145 (Hill Dep. Tr.) (ECF No. 696-24) at 405:7–18. While Dr. Hill disputes (weakly) Dr. Carlton's finding that "MCVs" fare *better* than others, he finds no differences that are statistically significant. *See id.* That is game, set, and match for Plaintiffs' alleged "MCV" markets.

*Hackensack* does not change this analysis. That case involved a prospective challenge to a merger in the unique context of the "complex healthcare market," in which "'hospitals compete to attract patients[] based primarily on non-price factors.'" *FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 168 (3d Cir. 2022); *see also FTC v. Advocate Health Care Network*, 841 F.3d 460, 470–73 (7th Cir. 2016) (detailing unique history of geographic market definition in the context of hospital mergers). The Third Circuit declined "to adopt a rigid requirement that price discrimination must be feasible in every customer-based geographic market." *Hackensack*, 30 F.4th at 169. But it did not suggest that the absence of such evidence would not be meaningful or even dispositive in other cases. And it certainly did not purport to disagree with either *Kodak* or the not-yet-decided *Meta* case, both of which establish that an inference of market or monopoly power from a company's share of a customer-limited market in a retrospective case, as opposed to a prospective merger challenge, is permissible only upon proof of price discrimination.[2]

The Court's January 27 letter cites authority stating that "identifying a monopoly under Section 2 does not require proof of the *exercise* of monopoly power." ECF No. 969 at 2. Defendants agree with that, and note that conflation of exclusionary conduct, on one hand, with the need to properly define a market, on the other, was among the principal legal errors the *Amex* court committed. Regardless, though, the observation that establishing monopoly power *vel non* isn't the same as establishing the exercise of monopoly power cannot save Plaintiffs' faulty targeted customer markets for at least two reasons. First, it does not address the question of what Plaintiffs must show to meet their burden of proving the parameters of the relevant market in the first instance. Whether monopoly power is exercised or not, it can only exist in the context of a properly defined market. Second, the notion that monopoly power exists here but somehow was not exercised is the opposite of Plaintiffs' theory; they claim Defendants have been victimizing venues, artists, and fans through the alleged exercise of monopoly power. Bottom line: where, as

---

[2] The issue in *Hackensack* is also whether customers will substitute away to a different hospital or not. As noted above, substitutability is not contested in Plaintiffs' "MCV" markets at all, so there is no reason to resort to legal tests like the *Brown Shoe* factors or economic tests like the HMT, which address that specific question, not others.

4

here, a plaintiff seeks to rely on alleged market shares in targeted customer markets, it must justify ignoring the larger market in which the defendant and its rivals compete. Plaintiffs have failed to do so.

Plaintiffs seem to think that it does not matter that they have no evidence that Defendants' theoretical power has manifested in any kind of price or output effect in any of their markets over 15 years. That is wrong. But they pivot to speculation about what could happen, rather than what did happen, as an argument of last resort. More precisely, at the hearing, Plaintiffs tried to distract from their failure of proof on the issue that matters—actual price discrimination—by pointing to other evidence that supposedly shows "economic differences" between "MCVs" and other venues like stadiums. In particular, Plaintiffs contended that (1) "rival ticketers [] talk about how it is easier to make inroads into the stadium market because those venues are insulated from the threat that Live Nation is going to withhold concerts if they switch ticketers," and (2) "[m]ajor concert venues are much more reliant on concert revenue than stadiums are." *See* Hr'g Tr. at 69:2–70:19.

There are two core problems with this approach. First, Plaintiffs' purported evidence does not go to the relevant issue—which is not whether rivals can compete more easily, or whether certain venues depend on concert revenue more than others, but whether anything about the composition or characteristics of the market *actually results in price discrimination for customers within it compared to customers outside it*. Even if there were reams of evidence that Plaintiffs' 257 venues were more reliant on concert revenue than other venues, that would not show what needs to be shown to establish a price discrimination market—*i.e.*, that price discrimination has happened. Even if some customers are especially dependent on one supplier and cannot switch easily, if the supplier's market share counting all sales is low, there is no basis to find that it monopolizes the dependent few. Even if it's harder for rivals to compete for "MCVs" than other venues, that doesn't matter to the market definition question unless those obstacles result in worse terms for patrons in the "MCV" markets—which Plaintiffs haven't even tried to show.[3]

Second, even if this type of evidence were relevant, Plaintiffs do not have it. To show a propensity or capability of price discrimination to a targeted customer market, Plaintiffs would have to show *differences* in treatment of buyers inside and outside the proffered customer set. Plaintiffs failed to tender any such evidence. What they have are a handful of anecdotes that they say tend to show that their 257 venues are vulnerable to exploitation. But they never analyze whether the vulnerability they allege is *limited* to those 257 venues as opposed to also being true for other venues. To the contrary, nearly all of Plaintiffs' anecdotes feature the identical behavior happening outside the markets as they define them, as well as within them.

---

[3] The Court recognized this problem at the hearing—i.e., Plaintiffs could have "sliced and diced" their market however they want, and made "a monopolization claim by modifying the customer base." Hr'g Tr. at 51:15-52:2. That is exactly what Plaintiffs are doing here—they are looking for the pocket of concentrated affinity for Defendants' services that gets them to high market shares. Indeed, Plaintiffs' alleged market of primary concert ticketing to their 257 venues accounts for only about 20% of tickets in the broader marketplace (all tickets at venues of 8,000+ capacity). Plaintiffs cut out the vast majority of the ticketing business through their customer-defined market in an obvious effort to inflate Defendants' market shares.

With respect to alleged threats to withhold Live Nation content, for example, of the four venues that were supposedly threatened in the last five years, only three of those venues are among Plaintiffs' 257 venues. Pls.' COMF (ECF No. 774) ¶¶ 39–60; Pls.' RSUF (ECF No. 775) ¶ 29; Defs.' Ex. 79 (Hill Reb. Rpt.) (ECF No. 695-6), fig. 163. In other words, Plaintiffs' own evidence shows that, whatever the relevance of this conduct in the first place, it apparently happens both inside and outside the limited markets they define. The same dynamic plays out with respect to Plaintiffs' statement that "rival ticketers … talk about how it is easier to make inroads into the stadium market." *See* Hr'g Tr. at 70:15–19. They cite five examples of instances where "Defendants' [alleged] threats and retaliation have hindered [rival ticketers'] expansion" by requiring them to enter terms in their ticketing contracts with venues that promises to make them whole if the venue loses certain content. *See* Pls.' Opp. Brief (ECF No. 771) at 32; Pls.' COMF (ECF No. 774) ¶ 74. But *three* of these five examples involve *stadiums*, not Plaintiffs' 257 venues. In other words, Plaintiffs' own evidence contradicts their theory that there is differential treatment as between their 257 venues and stadiums. *See also* Pls.' COMF (ECF No. 774) ¶ 58 (citing email correspondence from ▬▬▬▬▬▬▬▬▬▬▬▬ (a stadium) to support the contention that, after Barclays' switch away from and subsequent return to Ticketmaster, potential venue clients became less willing to switch away from Ticketmaster); *id.* ¶ 68 (citing inadmissible hearsay from rival ticketers as to potential venue-clients that allegedly had concerns about losing Live Nation concerts, at least 10 of which are stadiums ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬)); *id.* ¶ 85 (contending that six OVG-managed venues switched to Ticketmaster, but four of those venues are not "MCVs" ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬).[4]

Finally, Plaintiffs' broader contention that their 257-venue markets properly exclude stadiums because they are less dependent on concert revenue does not save them. First, the claim makes no sense: arenas typically fill up forty, fifty, sixty, seventy, or more nights a year hosting hockey and/or basketball games, and so have *fewer* "dark" nights to fill with concerts and other events, while NFL stadiums might host only ten football games a year. *See* Pls.' Ex. 207 (ECF No. 762-27) (Billboard website showing stadiums (Allegiant Stadium, SoFi Stadium, Gillette Stadium, Soldier Field, MetLife Stadium) rely heavily on concert revenue, each grossing over $60 million in concert ticket sales in 2024). Second, Plaintiffs failed to offer any systematic analysis or evidence to support the point, despite their burden to do so.

The reality is that Plaintiffs have not litigated this case as being about any kind of different treatment of "MCVs," and artists who play "MCVs," compared with other venues. Not on price, which is what they actually have to show. And not on any other dimension either.

---

[4] Plaintiffs may invoke some analyses from Dr. Hill that purport to measure "the impact of switching away from Ticketmaster for NBA and NHL arenas." *See* Defs. Ex. 72 (Hill Rpt.) (ECF No. 693-32) ¶¶ 347-57. But yet again, these studies say nothing about how this "impact" differs from any impact for *non*-"MCVs"—nor does it say anything about "MCVs" as Plaintiffs specifically define them, since the studies are limited to just six arenas. *See id.* Additionally, Dr. Hill disavowed any connection between the alleged threats and the show-count changes he analyzed. *See* Defs.' Ex. 145 (Hill Tr.) (ECF No. 626-24) at 310:8-16.

**Additional Evidence and Case Law Relating to Plaintiffs' Tying Claim**

Pursuant to the Court's invitation at the January 23, 2026 hearing, Defendants submit the following additional evidentiary and case citations relating to Plaintiffs' tying claim.

**It is undisputed that promoters, not artists, are the customers for venues.**

- Plaintiffs admit that it is "[u]ndisputed that promoters execute contracts relating to the rental of venues." Pls.' RSUF (ECF No. 775) ¶ 51.

- Promoters, not artists, pay the rent to use a venue for a show. Defs.' SUF (ECF No. 690) ¶ 51; Defs.' Ex. 139 (         Tr.) (ECF No. 696-18) at 19:16–18; Pls.' Ex. 292 (         Tr.) (ECF No. 757-32) at 34:16–20; *see also* Defs.' Ex. 89 (         Tr.) (ECF No. 695-16) at 72:14–16.

- According to Toby Blumenthal, VP and Artistic Planning & Chief Innovation Officer at the Mann Center for the Performing Arts, ███████████████████████████████████████ Defs.' SUF (ECF No. 690) ¶ 51; Defs.' Ex. 86 (Blumenthal Tr.) (ECF No. 695-13) at 185:15–185:17.

- According to John Abbamondi, former CEO of BSE Global, ███████████████████████████████████████ Defs.' SUF (ECF No. 690) ¶ 51; Defs.' Ex. 80 (Abbamondi Tr.) (ECF No. 695-7) at 340:6–12.

- According to ███████████████████████████████████████. Defs.' Ex. 101 (         Tr.) (ECF No. 695-28) at 135:10–20.

- According to Matthew Hansen, Chief Strategy Officer at Live Nation, no artist has ever approached Live Nation asking to perform at one of its venues. Pls.' Ex. 48 (Hansen Tr.) (ECF No. 752-8) at 232:16–233:7.

- According to Mike Shull, former General Manager of the Los Angeles City Department of Recreation and Parks, promoters are ███████████████████████████████████████ Defs.' SUF (ECF No. 690) ¶ 52; Defs.' Ex. 135 (Shull Tr.) (ECF No. 696-14) at 121:6–10.

**Plaintiffs have no evidence that artists would have chosen to use promoters other than Live Nation for their tours but for Live Nation's "policy" regarding the use of Live Nation-owned amphitheaters by third-party promoters.**

- "Our cases have concluded that the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have

preferred to purchase elsewhere on different terms. When such "forcing" is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984).

- *See also Virgin Atl. Airways Ltd. v. Brit. Airways PLC*, 257 F.3d 256, 270 (2d Cir. 2001) ("An invalid tying arrangement conditions the purchase of one product to the purchase of a second product that the buyer either does not want or would have preferred to purchase elsewhere."); *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996) ("To prove a tying claim, a plaintiff must have "evidence of actual coercion by the seller that forced the buyer to accept the tied product.").

- *See also Unijax, Inc. v. Champion Int'l, Inc.*, 683 F.2d 678, 686 (2d Cir. 1982):

    - "Unijax, like the plaintiff in Davis, failed to introduce any evidence that Champion had ever required, or even threatened to require, the company to purchase various grades of Champion's other fine paper or face a cutoff of the Kromekote grade. Moreover, Unijax did not present any evidence that it sought to purchase only the Kromekote grade and that Champion would not permit it to do so. Indeed, the testimony demonstrates that Unijax willingly purchased the purportedly tied products. We have previously held that unless the buyer can prove that it was the unwilling purchaser of the allegedly tied products, actual coercion has not been established and a tying agreement cannot be found to exist."

- In *Hill v. A-T-O, Inc.*, on which Plaintiffs rely, there was evidence of actual coercion—i.e., "affidavits stating that [consumers] … were forced to purchase" two products. 535 F.2d 1349, 1355 (2d Cir. 1976).

- Plaintiffs identified three artists who allegedly were coerced to use Live Nation promotion services even though they may not have wanted to: Mumford & Sons (Pls.' RSUF (ECF No. 775) ¶ 50); ▓▓▓▓ (*id.* ¶ 48); and ▓▓▓▓ (*id.*).

- "When asked whether 'Mumford & Sons [was] coerced in any way to use Live Nation for [the non-amphitheater leg of their tour] in 2025,' Ben Lovett, a member of Mumford & Sons, answered 'No.'" Defs.' SUF (ECF No. 690) ¶ 50 (quoting Defs.' Ex. 120 (Lovett Tr.) (ECF No. 694-15) at 110:25–111:4).

- Plaintiffs cite no evidence supporting the proposition that the other two artists, ▓▓ ▓▓▓▓▓▓▓▓▓, even used Live Nation as promoter for their full tours. And they did not.

    - Plaintiffs did not depose any member of ▓▓▓▓▓▓ nor ▓▓▓▓.

    - Louis Messina, founder of the Messina Touring Group (majority owned by AEG), continued to promote ▓▓▓▓▓▓▓▓▓▓▓, during which they ▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Defs.' RCOMF (ECF No. 799) ¶ 224; Defs.' Ex. 126 (Messina Tr.) (ECF No. 696-5) at 210:15–211:21.

8

- AEG promoted ▮▮▮▮▮▮▮▮▮▮ in 2022-2023.  AEG also promoted ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮.

**Live Nation's "policy" regarding the use of Live Nation-owned amphitheaters by third-party promoters is not sufficient to overcome summary judgment on Plaintiffs' tying claim, which should be evaluated under the rule-of-reason framework, not as a *per se* claim.  Plaintiffs must demonstrate anticompetitive effects in the tied product market.**

- Plaintiffs did not plead a *per se* tying claim; they pled their tying claim as a rule-of-reason claim, and they acknowledge that anticompetitive effects is an element of that claim. *See* Am. Compl. ¶¶ 246–47 (alleging anticompetitive effects from the alleged tie, and asserting that this "conduct lacks a non-pretextual procompetitive justification that offsets the harm caused by Live Nation's anticompetitive and unlawful conduct"); Pls.' Opp. Br. (ECF No. 771) at 39 (discussing the "coercion and anticompetitive effects elements of Plaintiffs' Section 1 tying claim").  It is far too late in this case for Plaintiffs to assert new unpled claims.  But even if they could, their failure to adduce any evidence of any artists who wanted to use a promoter other than Live Nation but could not as a result of the alleged tying policy, would be fatal to any attempted *per se* theory.

- A *per se* tying claim requires evidence that "the existence of forcing is probable" due to a "substantial potential for impact on competition."  *See In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d 403, 414–15 (S.D.N.Y. 2005) (discussing elements of rule-of-reason and *per se* tying claims).

    - *See also Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 15–16 (1984):

        - "Per se condemnation—condemnation without inquiry into actual market conditions—is only appropriate if the existence of forcing is probable.  Thus, application of the per se rule focuses on the probability of anticompetitive consequences.  Of course, as a threshold matter there must be a substantial potential for impact on competition in order to justify per se condemnation.  If only a single purchaser were 'forced' with respect to the purchase of a tied item, the resultant impact on competition would not be sufficient to warrant the concern of antitrust law.  It is for this reason that we have refused to condemn tying arrangements unless a substantial volume of commerce is foreclosed thereby.…  Similarly, when a purchaser is 'forced' to buy a product he would not have otherwise bought even from another seller in the tied product market, there can be no adverse impact on competition because no portion of the market which would otherwise have been available to other sellers has been foreclosed."

    - The absence of evidence that any artists actually wanted to use a different promoter but could not means Plaintiffs could never have shown the required "substantial potential for impact on competition," *see id.*, even if they had pled a *per se* claim (which they did not).

9

- *Hill v. A-T-O, Inc.*, on which Plaintiffs rely, is a *per se* tying case. *See* 535 F.2d 1349, 1352 (2d Cir. 1976).

- To prevail on a rule-of-reason tying claim, Plaintiffs must show "anticompetitive effects in the tied market." *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996); *Kaufman v. Time Warner*, 836 F.3d 137, 141 (2d Cir. 2016) (plaintiff must show that "the tie-in has anticompetitive effects in the tied market"); *see also In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d at 414–15; *cf. Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984) (requiring inquiry into the "probability of anticompetitive consequences" even for *per se* tying claims).

- Under the rule of reason, "the plaintiffs 'bear an initial burden to demonstrate the defendants' challenged behavior had an *actual* adverse effect on competition as a whole in the [tied product] market.'" *In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d at 414–15 (quoting *Geneva Pharms. Tech. Corp. v. Barr Labs.*, 386 F.3d 485, 506–07 (2d Cir. 2004)).

- "[W]hether an actual adverse effect has occurred is determined by examining factors like reduced output, increased prices and decreased quality." *Virgin Atl. Airways Ltd. v. Brit. Airways PLC*, 257 F.3d 256, 264 (2d Cir. 2001).

- Plaintiffs have no evidence of reduced output, increased prices, or decreased quality in the tied product market (i.e., the market for promotion services to artists performing in "MCVs") resulting from the alleged tie.

*[signatures on following page]*

Respectfully submitted,

| LATHAM & WATKINS LLP | CRAVATH, SWAINE & MOORE LLP |
|---|---|

/s/ Andrew M. Gass                              /s/ Lauren A. Moskowitz

Andrew M. Gass (admitted *pro hac vice*)
Alfred C. Pfeiffer (admitted *pro hac vice*)
   *Co-Lead Trial Counsel*
David R. Marriott
   *Co-Lead Trial Counsel*
Timothy L. O'Mara (admitted *pro hac vice*)
Jennifer L. Giordano
Kelly S. Fayne (admitted *pro hac vice*)
Lindsey S. Champlin (admitted *pro hac vice*)
Robin L. Gushman (admitted *pro hac vice*)

505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600

1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

555 11th Street, NW, Suite 1000
Washington, D.C. 20004
(202) 637-2200

Al.Pfeiffer@lw.com
David.Marriott@lw.com
Tim.O'Mara@lw.com
Jennifer.Giordano@lw.com
Andrew.Gass@lw.com
Kelly.Fayne@lw.com
Lindsey.Champlin@lw.com
Robin.Gushman@lw.com

*Attorneys for Defendants Live Nation Entertainment, Inc. and Ticketmaster L.L.C.*

Lauren A. Moskowitz
Jesse M. Weiss
Nicole M. Peles

Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 474-1000

lmoskowitz@cravath.com
jweiss@cravath.com
npeles@cravath.com

*Attorneys for Defendants Live Nation Entertainment, Inc. and Ticketmaster L.L.C.*

cc: All counsel of record (via ECF)

11