<u>VIA ECF</u>
The Honorable Arun SubramanianJanuary 28, 2026
United States District Court for the Southern District of New York
500 Pearl Street, Courtroom 15A
New York, NY 10007-1312

**Re:***United States et al. v. Live Nation Entertainment, Inc. et al.*; 1:24-cv-03973-AS-SLC

Dear Judge Subramanian:

In *Regeneron Pharm. v. Novartis Pharma AG*, the Second Circuit confirmed that Plaintiffs may select their methodology to establish a relevant market using either (1) the *Brown Shoe* factors or (2) the Hypothetical Monopolist Test (HMT). 96 F.4th 327, 339-40 & n.8 (2d Cir. 2024); *see id.* at 338 (defining "relevant market as 'all products reasonably interchangeable by consumers for the same purposes'"). Defendants ignore this controlling precedent, relying on a single out-of-circuit district court case – *FTC v. Meta* – to assert that quantified price differentials inside and outside a relevant market are required to show a market involving targeted customers.

Defendants are wrong on the law and the facts. *Meta* does not stand for Defendants' proposition, nor does it overrule a decades-long body of precedent. And the evidence, detailed below, demonstrates under both *Brown Shoe* and the HMT that MCVs are meaningfully distinct from stadiums and large theaters and face competitive conditions different from these and other venue types, while being similarly situated as a group. Genuine issues of material fact around the appropriateness of MCV-focused relevant markets should be left to the jury at trial.

**A.Quantified Price Differentials Are Not Required**
1.<u>Defendants Misread *Meta* to Infer a Non-Existent Standard</u>
Defendants invent a standard unsupported by precedent. In *Meta* (and *Kodak*), plaintiffs sought to demonstrate relevant markets by establishing price differentials across different groups of customers, only for courts to find a failure of proof. The insufficiency of evidence where plaintiffs argued that they could demonstrate differential pricing to targeted customers does not transform differential pricing into the test itself. In this case, Plaintiffs' claims do not rely on demonstrating differential pricing to MCVs, and as a result any lack of proof (actual or imagined) is irrelevant.

Defendants' reliance on *Meta* fails. There, the government specifically alleged and sought to prove that the defendant charged different prices to different customers. 2025 WL 3458822, at *34-35 (D.D.C. Dec. 2, 2025) (addressing FTC argument that "Meta exploits this smaller group [of customers] by targeting them with a higher ad load" and finding based on executive testimony that "it is contradicted by the evidence"). Far from disregarding the various traditional methods for assessing relevant markets and market power, Judge Boasberg's opinion examined *both* the FTC's *Brown Shoe* practical indicia evidence and the HMT, rejecting them before turning to whether price differentials nonetheless sufficed to demonstrate the proposed relevant market. *Id.* at *1-2 (Table of Contents headings), *11-36. Only then did he identify that the FTC had argued a market should be inferred from Meta's differential ad loads before rejecting the FTC's proffered evidence that those differences existed. *Id.* at 34-35. Had Judge Boasberg applied what Defendants call the "*Meta* standard" (Transcript of Jan. 23, 2026 Hearing at 59-62), he could have dispensed with the first two subparts of his market definition analysis.

Any reliance on *United States v. Eastman Kodak Co.,* 63 F.3d 95 (2d Cir. 1995), would be

similarly misplaced. In *Kodak,* the government asserted a market to be demonstrated by direct evidence of monopoly power, but then failed to demonstrate the alleged differential pricing. *Id.* at 105-09. *FTC v. Hackensack Meridian Health Inc.* rightly pointed out that a plaintiff declining to establish one potentially sufficient condition for market definition was not foreclosed from pursuing other means to demonstrate a relevant market. 30 F.4th 160, 168 (3d Cir. 2022).

    2.   <u>Plaintiffs' Market Reflects Competition, Defendants' "*Meta* Test" Obscures It</u>

Requiring demonstrated price differentials flies in the face of over 60 years of case law derived from the *Brown Shoe* court's instruction to take "a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one." *Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962). Market definition inquiries must not be "used to obscure competition but to 'recognize competition where, in fact, competition exists.'" *United States v. Cont'l Can Co.*, 378 U.S. 441, 453 (1964) (quoting *Brown Shoe*, 370 U.S. at 326). Given that "[d]irect evidence of monopoly power is rare," courts must rely on "circumstantial evidence of monopoly power" through an indirect, structural approach. *United States v. Google LLC*, 747 F. Supp. 3d 1, 117 (D.D.C. 2024) ("*Google Search*").

Defendants' "rote application" of an invented "formula" (*Regeneron*, 96 F.4th at 340 n. 8), would foreclose meritorious market definitions accepted by courts in wide-ranging cases. As this Court pointed out, Defendants' test would foreclose markets where power exists but has yet to be exercised. Yet the Sixth Circuit held in *Conwood Co. v. U.S. Tobacco Co.* that "the material consideration in determining whether a monopoly exists is not that prices are raised and that competition is excluded, but that *power exists* to raise prices or to exclude competition when it is desired to do so." 290 F.3d 768, 783 n.2 (6th Cir. 2002) (emphasis added) (cleaned up). *See also Am. Tobacco Co. v. United States*, 328 U.S. 781, 811 (1946); *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 274 (2d Cir.1979) ("[T]he fact that the power has not been used to extract improper benefits provides no succor to the monopolist."); *Google Search*, 747 F. Supp. 3d at 117. Defendants' test would also foreclose meritorious markets in other situations: for example, where nuances in prices, terms, or quality render comparisons infeasible, *cf. Coal. for a Level Playing Field v. Autozone*, 813 F. Supp. 2d 557, 566-67 (S.D.N.Y. 2011), or where non-targeted customers outside the alleged relevant market were subject to market power resulting in similar prices and terms inside and outside of the market.

This is not merely a hypothetical concern—Defendants' flawed test would have rejected numerous market definitions that prior courts permitted. For instance, the Supreme Court in *Grinnell* accepted a market that accounted for the particularized needs and preferences of a subset of customers within a broader customer group although no price differences were identified or quantified for those customers versus others. *See United States v. Grinnell*, 384 U.S. 563, 574 (1966). The *Google Ad Tech* case addressed a relevant market of "publisher ad servers," which "are uniquely suited for managing ad inventory for large web publishers" even though "Google has not exercised its monopoly power to raise [its] prices." *United States v. Google,* 778 F. Supp.3d 797, 834, 851-52 (E.D. Va. 2025). And a court in this circuit recently explained that in a Sherman Act case "[a] product market can be limited to a particular category of buyers," with a relevant market of "sales of store-brand infant formula to [] retailers" rather than to all "end-user consumers." *P&L Develop., LLC v. Gerber Prods. Co.*, 715 F. Supp. 3d 435, 459 (E.D.N.Y. 2024) (denying motion to dismiss without requiring allegations of differential pricing to the targeted customers based on differences in the customers' uses of formula).

### B. Plaintiffs' Evidence Supports Relevant Markets

1. *Brown Shoe* Factors and HMT Are the Appropriate Frameworks

Although Defendants suggest that Sherman Act cases are somehow different, *Brown Shoe* factors are unquestionably applicable to monopolization, and routinely relied on for Section 2 market definition. *See Grinnell*, 384 U.S. at 573-75 (explaining that there is "no reason to differentiate between 'line' of commerce in the Clayton Act and 'part' of commerce for purposes of the Sherman Act," then applying *Brown Shoe*'s holding for Section 2 market definition); *Regeneron*, 96 F.4th at 339; *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 496 (2d Cir. 2004); *FTC v. Tapestry, Inc.*, 755 F. Supp. 3d 386, 411 n.2 (S.D.N.Y. 2024) ("Generally, the standards for determining a relevant market 'are the same under the various antitrust statutes, and courts routinely rely on cases decided under one statute when deciding cases under the other statutes.'"). *Brown Shoe's* practical indicia have long helped factfinders identify relevant markets based on the observed commercial realities of an industry, including in customer-based markets. *See, e.g., Spirit Airlines, Inc. v. Nw. Airlines, Inc.*, 431 F.3d 917, 929, 933-35 (6th Cir. 2005) (reversing summary judgment based on *Brown Shoe* evidence where jury "could find that leisure or price-sensitive passengers represent a separate and distinct market…for Section 2 purposes" even though targeted customers by definition paid *less* than customers outside the market); *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 47, 51-52 (D.D.C. 2018) (relevant market defined in part by *Brown Shoe* factor "Distinct Customer Group with Distinct Needs").

The same is true of the Merger Guidelines' HMT. *See, e.g., Teradata Corp. v. SAP SE*, 124 F.4th 555, 565-66, 569-70 (9th Cir. 2024); *Meta*, 2025 WL 3458822, at *18-19; *Tevra Brands LLC v. Bayer HealthCare LLC*, 2024 WL 2261946 (N.D. Cal. May 16, 2024). *See also Pit Row, Inc. v. Costco Wholesale Corp.*, 101 F.4th, 493 (7th Cir. 2024) (Wood, J.) (in unfair pricing case, "[f]or guidance on how to approximate the relevant market, we consult the federal Merger Guidelines")).

Plaintiffs' chosen frameworks also routinely define markets where plaintiffs have alleged that a firm can profitably target a subset for customers for changes in prices (or other terms). *See, e.g., FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 40 (D.D.C. 2015) (recognizing "'the *Brown Shoe* practical indicia and the Merger Guidelines' SSNIP test [] support a finding that broadline distribution to national customers is a relevant product market").

2. Plaintiffs' Evidence Distinguishes MCVs from Other Venues
    a. Ticketing

MCVs purchasing *primary concert ticketing services* are a distinct customer group with different competitive conditions from venue types outside the market such as stadiums and large theaters. As set forth in the accompanying Supplemental Appendix and demonstrated by some examples below, MCVs are uniquely dependent on revenue from concerts by popular artists, which means they are more vulnerable to conditioning, threats, and content-withholding than stadiums and large theaters:

- MCVs are much more dependent on concerts than stadiums. *See* Supplemental Appendix ("Supp. Appx") at Section I, *e.g.*, Pls. Ex. 97, ECF No. 749-17, Live Nation Form 10-K (Dec. 31, 2024) at 6 ("Stadiums typically have 30,000 or more seats. Although they are the largest venues available for live music, they are not specifically designed for live music," whereas amphitheaters and arenas have capacities between 5,000-30,000 and 5,000-20,000, respectively); Defs. Ex. 139, ECF No. 696-18, Thornton (ASM) Dep., at 45:3-8 ("Q. [F]or amphitheaters, do you know what percentage -- roughly, what percentage of events are concerts? . . . . A. Again, it

3

depends on the market, but it's predominantly concerts.").

- Stadiums host fewer concerts, are more dependent on sports income than concerts, and are therefore less concerned that their choice of a ticketer may cause Live Nation to steer popular artists to other venues. *See* Supp. Appx Section I, *e.g.*, Pls. Ex. 107, ECF No. 751-7, Clay Luter (Ticketmaster) Dep., at 78:16-81:3 (Stadiums tend to host fewer concerts annually than arenas because of seasonality and capacity, and there are more artists who can fill an arena than can fill a stadium); Defs. Ex. 80, ECF No. 695-7, Abbamondi (BSE Global) Dep., at 182:1-184:1 (NFL team's experience of switching the stadium's ticketer not a "relevant comp" because the stadium does not "host as many concerts as [the arena], so it is "not as big a part of the business."); Defs. Ex. 72, ECF No. 693-32, Hill (Pls.' Expert) Opening Report, p. 60 fig. 10 (Stadiums on average host fewer than 5 concerts a year—approximately one-third of the average number of concerts hosted by arenas and amphitheaters).
- Large theaters have different ticketing needs than MCVs because they host fewer concerts by artists that play in the MCVs and do not require a sophisticated ticketer to manage large onsales or implement dynamic pricing. *See* Supp. Appx Section I, *e.g.*, Defs. Ex. 139, Thornton (ASM), ECF No. 696-18, Dep., at 36:17-37:18, 267:8-269:6, 271:8-277:18 (testifying that theaters are easier to ticket than arenas and distinguishing functionality of ticketing at different venue types, including stadiums, arenas, and theaters.); Defs. Ex. 84, ECF No. 695-11, Beckerman (AEG) Dep., at 148:13-149:8 ("[W]hen we're looking at clubs and theaters where there isn't the threat of losing content, that making a ticketing switch, the consequences aren't as dire as they would be in an arena, for example.").

Moreover, the *Brown Shoe* Specialized Vendors indicia provide an additional evidentiary basis showing meaningful distinctions for MCVs in ticketing:

- Other ticketers, including SeatGeek and Tickets.com have achieved greater success in stadiums and large theaters than in MCVs. *See* Supp. Appx Section I, *e.g.*, Pls. Ex. 21, ECF No. 746-1, Groetzinger (SeatGeek) Dep., at 189:10-193:7 ███████████████████████████████████████████████████████████████████████
- Meanwhile, there are primary ticketers who service clubs and other small venues (but very few, if any, arenas or large amphitheaters) in the United States including DICE, See Tickets, owned by CTS Eventim, AXS, Eventbrite, and Tixr. *See* Supp. Appx Section I, *e.g.*, Defs. Ex. 127, ECF No. 696-6, Mueller (Live Nation) Dep., at 70:23-71:11 ("Q.   So from the ticketing perspective, though, do you understand that there's a different set of ticketers that service large-scale shows versus club and theater shows?   A. Yes . . . ███████████████████████████████████████████████████████████████████████████████████████████").

b. Concert Booking

MCVs purchasing *concert booking services* are a distinct customer group well-suited for performances by artists of a popularity level that are distinct from the types of artists that routinely play in stadiums or large theaters. As a result, their concert booking options are limited to only those promoters that can help book these specific types of artists. Live Nation's control of major concert amphitheaters combined with their scale gives them a significant competitive advantage in promoting the tier of artists who perform in MCVs, making these venues particularly vulnerable to Live Nation's exercise of market power relative to other venue types, as shown below:

4

- MCVs purchasing concert booking services seek artists at a popularity level distinct from artists that routinely play in stadiums or large theaters, and are consequently limited to those promoters who can help book these specific types of artists. *See* Supp. Appx Section III, *e.g.*, Pls. Ex. 98, ECF No. 749-18, Kearns (SeatGeek) Dep., at 198:11-21 ("[A] performer needs to be at a certain caliber to begin with, to perform at a stadium, whereas arenas have a broader spectrum of caliber that are performing."); Defs. Ex. 79, ECF 695-6, Hill (Pls.' Expert) Rebuttal Report, p. H-66 fig. 167 (Analysis showing differences in popularity among artists at major concert venues versus other venue types including stadiums).
- Live Nation's competitive advantage in promotion bookings is derived from their control of major concert amphitheaters, which in turn allows Live Nation to exercise greater market power over MCVs relative to other venue types. *See* Supp. Appx Section III, *e.g.*, Pls. Ex. 224, ECF No. 761-5, Live Nation presentation (March 2024), LNE22-002133950, at -951, -963 ("Historically, only Live Nation promoters are permitted to book shows at Venue Nation amphitheaters" and "[Live Nation] Talent is effectively the exclusive promoter for Venue Nation Amps"); Defs. Ex. 128, ECF No. 696-7, Nagle (Village of Rosemont), Dep., at 64:8-65:6 ("a big part of" why Allstate Arena had to give in to Live Nation's demands regarding rebates was due to Live Nation's control of content, "if you look at the tickets sold year to year, they're 80 percent of the business. So they… kind of have you.").
- Live Nation's anticompetitive acquisitions of rival promoters were most impactful in reducing promoter competition in MCVs, especially as compared to smaller venues. *See* Defs. Ex. 103, ECF No. 695-30, Geiger (Gate 52, formerly SaveLive) Dep., at 42:18-43:10 (Live Nation's acquisition of promoters has "drastically reduced" the options artists have for promoters.)

### c. HMT Analysis

The HMTs performed by Plaintiffs' expert further confirms the validity of Plaintiffs' primary ticketing and concert booking services markets.

In each market, Dr. Hill performed an HMT—which Defendants have not challenged—confirming that Plaintiffs' relevant markets are not too narrowly defined. Defs. Ex. 72, ECF No. 693-32, Hill (Pls.' Expert) Opening Report at 114, 132. Indeed, Defendants do not dispute that Plaintiffs have identified the correct sellers of services in each market (*i.e.*, ticketers in primary ticketing and promoters in booking services). *See* Transcript of Jan. 23, 2026 Hearing at 61-62 ("[I]n both the ticketing and the promotions space, there is agreement on who the sellers are."). Moreover, Defendants do not dispute that providers of these services can identify and target specific major concert venues on price and non-price terms. *See, e.g.*, Pls. Ex. 97, ECF No. 749-17, Live Nation Form 10-K (Dec. 31, 2024) at 6 ("We generally enter into written agreements with individual clients to provide primary ticketing services…").

Defendants' sole critique is that *some* additional customers should be in the market. But at most, Defendants' concerns about the competitive significance of non-MCV venues go to the analysis of competitive effects, not the validity of the proposed markets. A market can be validly defined yet too narrow to sustain a particular theory of harm. For example, Defendants will remain free to argue at trial that artist and promoter relationships with stadiums defeat Plaintiffs' *effects showing*—but they cannot defeat the underlying market definition.

Finally, Plaintiffs clarify two answers from the hearing: the venue-facing primary ticketing markets are separate and do not necessarily rise and fall together. The tying market is the provision of the use of large amphitheaters (for either individual shows or tours) by artists.

5

Respectfully submitted,

        */s/ Bonny Sweeney*
        BONNY SWEENEY
        *Co-Lead Trial Counsel*
        DAVID DAHLQUIST
        *Co-Lead Trial Counsel*
        United States Department of Justice
        Antitrust Division
        450 Fifth Street N.W., Suite 4000
        Washington, DC 20530
        Telephone: (202) 725-0165
        Facsimile: (202) 514-7308
        Email:Bonny.Sweeney@usdoj.gov

        *Attorneys for Plaintiff*
        *United States of America*

/s/ Robert A. Bernheim
Robert A. Bernheim (admitted *pro hac vice*)
Office of the Arizona Attorney General
Consumer Protection & Advocacy Section
2005 N. Central Avenue
Phoenix, AZ 85004
Telephone: (602) 542-3725
Fax: (602) 542-4377
Email: Robert.Bernheim@azag.gov
*Attorney for Plaintiff State of Arizona*

/s/ Amanda J. Wentz
Amanda J. Wentz (admitted *pro hac vice*)
Assistant Attorney General
Office of the Arkansas Attorney General
101 West Capitol Avenue
Little Rock, AR 72201
Telephone: (501) 682-1178
Fax: (501) 682-8118
Email:  amanda.wentz@arkansasag.gov
*Attorney for Plaintiff State of Arkansas*

/s/ Brent K. Nakamura
Brent K. Nakamura (admitted *pro hac vice)*
Supervising Deputy Attorney General
Office of the Attorney General
California Department of Justice
300 South Spring Street, Suite 9200-6
Los Angeles, CA 90013
Telephone: (213) 269-6000
Email: Brent.Nakamura@doj.ca.gov
*Attorney for Plaintiff State of California*

/s/ Conor J. May
Conor J. May (admitted *pro hac vice*)
Assistant Attorney General
Antitrust Unit
Colorado Department of Law
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email: Conor.May@coag.gov
*Attorney for Plaintiff State of Colorado*

/s/ Victoria Maria Orton Field
Victoria Maria Orton Field (admitted *pro hac vice*)
Assistant Attorney General
Office of the Attorney General of Connecticut
165 Capitol Avenue
Hartford, CT 06106
Telephone: 860-808-5030
Email: victoria.field@ct.gov
*Attorney for Plaintiff State of Connecticut*

/s/ Elizabeth G. Arthur
Elizabeth G. Arthur (admitted *pro hac vice*)
Senior Assistant Attorney General
Office of the Attorney General for the District of Columbia
400 6th Street NW, 10th Floor
Washington, DC 20001
Email: Elizabeth.arthur@dc.gov
*Attorney for Plaintiff District of Columbia*

 /s/ Lizabeth A. Brady
Lizabeth A. Brady
Director, Antitrust Division
Florida Office of the Attorney General
PL-01 The Capitol
Tallahassee, FL 32399-1050
Telephone: 850-414-3300
Email: Liz.Brady@myfloridalegal.com
*Attorney for Plaintiff State of Florida*

/s/ Richard S. Schultz
Richard S. Schultz (admitted *pro hac vice*)
Assistant Attorney General
Office of the Illinois Attorney General
Antitrust Bureau
115 S. LaSalle Street, Floor 23
Chicago, Illinois 60603
Telephone: (872) 272-0996
Email: Richard.Schultz@ilag.gov
*Attorney for Plaintiff State of Illinois*

/s/ Jesse Moore
Jesse Moore (admitted *pro hac vice*)
Deputy Attorney General
Office of the Indiana Attorney General
302 W. Washington St., Fifth Floor
Indianapolis, IN 46204
Telephone: 317-232-4956
Email: Jesse.Moore@atg.in.gov
*Attorney for Plaintiff State of Indiana*

/s/ Noah Goerlitz
Noah Goerlitz (admitted *pro hac vice*)
Assistant Attorney General
Office of the Iowa Attorney General
1305 E. Walnut St.
Des Moines, IA 50319
Telephone: (515) 281-5164
Email: noah.goerlitz@ag.iowa.gov
*Attorney for Plaintiff State of Iowa*

/s/ Christopher Teters
Christopher Teters (admitted *pro hac vice*)
Assistant Attorney General
Public Protection Division
Office of Kansas Attorney General
120 S.W. 10th Avenue, 2nd Floor
Topeka, KS 66612-1597
Telephone: (785) 296-3751
Email: chris.teters@ag.ks.gov
*Attorney for Plaintiff State of Kansas*

/s/ Mario Guadamud
Mario Guadamud (admitted *pro hac vice*)
Louisiana Office of Attorney General
1885 North Third Street
Baton Rouge, LA 70802
Telephone: (225) 326-6400
Fax: (225) 326-6498
Email: GuadamudM@ag.louisiana.gov
*Attorney for Plaintiff State of Louisiana*

/s/ Schonette J. Walker
Schonette J. Walker (admitted *pro hac vice*)
Assistant Attorney General
Chief, Antitrust Division
200 St. Paul Place, 19th floor
Baltimore, Maryland 21202
Telephone: (410) 576-6470
Email: swalker@oag.state.md.us
*Attorney for Plaintiff State of Maryland*

/s/ Katherine W. Krems
Katherine W. Krems (admitted *pro hac vice*)
Assistant Attorney General, Antitrust Division
Office of the Massachusetts Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (617) 963-2189
Email: Katherine.Krems@mass.gov
*Attorney for Plaintiff Commonwealth of Massachusetts*

/s/ LeAnn D. Scott
LeAnn D. Scott (admitted *pro hac vice*)
Assistant Attorney General
Corporate Oversight Division
Michigan Department of Attorney General
P.O. Box 30736
Lansing, MI 48909
Telephone: (517) 335-7632
Email: ScottL21@michigan.gov
*Attorney for Plaintiff State of Michigan*

/s/ Zach Biesanz
Zach Biesanz
Senior Enforcement Counsel
Antitrust Division
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
Saint Paul, MN 55101
Telephone: (651) 757-1257
Email: zach.biesanz@ag.state.mn.us
*Attorney for Plaintiff State of Minnesota*

/s/ *Lee Morris*
Lee Morris (admitted pro hac vice)
Special Assistant Attorney General
Mississippi Office of Attorney General
Post Office Box 220
Jackson, Mississippi 39205
Telephone: (601) 359-9011
Email: Lee.Morris@ago.ms.gov
*Attorney for Plaintiff State of Mississippi*

/s/ *Justin C. McCully*
Justin C. McCully (admitted *pro hac vice*)
Assistant Attorney General
Consumer Protection Bureau
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68509
Telephone: (402) 471-9305
Email: justin.mccully@nebraska.gov
*Attorney for Plaintiff State of Nebraska*

/s/ *Lucas J. Tucker*
Lucas J. Tucker (admitted *pro hac vice*)
Senior Deputy Attorney General
Office of the Nevada Attorney General
Bureau of Consumer Protection
100 N. Carson St.
Carson City, NV 89701
Email: ltucker@ag.nv.gov
*Attorney for Plaintiff State of Nevada*

/s/ *Zachary Frish*
Zachary A. Frish (admitted *pro hac vice*)
Assistant Attorney General
Consumer Protection & Antitrust Bureau
New Hampshire Attorney General's Office
Department of Justice
1 Granite Place South
Concord, NH 03301
Telephone: (603) 271-2150
Email: zachary.a.frish@doj.nh.gov
*Attorney for Plaintiff State of New Hampshire*

/s/ *Andrew F. Esoldi*
Andrew F. Esoldi
Deputy Attorney General
Division of Law
Antitrust Litigation and Competition Enforcement
124 Halsey Street, 5th Floor
Newark, NJ 07101
Telephone: (609) 696-5465
Email: Andrew.Esoldi@law.njoag.gov
*Attorney for Plaintiff State of New Jersey*

/s/ *Jonathan Hatch*
Jonathan Hatch
Assistant Attorney General
New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8598
Email: jonathan.hatch@ag.ny.gov
*Attorney for Plaintiff State of New York*

/s/ *Evan Crocker*
Evan Crocker (admitted *pro hac vice*)
Assistant Attorney General, Division Director
Consumer Affairs Division
New Mexico Department of Justice
201 3rd St NW, Suite 300
Albuquerque, NM 87102
Telephone: (505) 494-8973
Email: ecrocker@nmdoj.gov
*Attorney for Plaintiff State of New Mexico*

*/s/ Francisco Benzoni*
Francisco Benzoni (admitted *pro hac vice*)
Special Deputy Attorney General
Brian Rabinovitz (admitted *pro hac vice*)
Special Deputy Attorney General
North Carolina Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
Telephone: (919) 716-6000
Facsimile: (919) 716-6050
Email: fbenzoni@ncdoj.gov
Email: brabinovitz@ncdoj.gov
*Attorneys for Plaintiff State of North Carolina*

*/s/ Sarah Mader*
Sarah Mader (admitted *pro hac vice)*
Assistant Attorney General
Antitrust Section
Office of the Ohio Attorney General
30 E. Broad St., 26th Floor
Columbus, OH 43215
Telephone: (614) 466-4328
Email: Sarah.Mader@OhioAGO.gov
*Attorney for Plaintiff State of Ohio*

*/s/ Cameron R. Capps*
Cameron R. Capps (admitted *pro hac vice*)
Deputy Attorney General
Consumer Protection
Office of the Oklahoma Attorney General
313 N.E. 21st Street
Oklahoma City, Oklahoma  73105
Telephone:  (405) 522-0858
Fax:  (405) 522-0085
Email: Cameron.Capps@oag.ok.gov
*Attorney for Plaintiff State of Oklahoma*

*/s/ Gina Ko*
Gina Ko (admitted *pro hac vice*)
Assistant Attorney General
Antitrust, False Claims, and Privacy Section
Oregon Department of Justice
100 SW Market St.,
Portland, Oregon 97201
Telephone: (971) 673-1880
Fax: (503) 378-5017
Email: Gina.Ko@doj.oregon.gov
*Attorney for Plaintiff State of Oregon*

*/s/ Joseph S. Betsko*
Joseph S. Betsko (admitted *pro hac vice*)
Assistant Chief Deputy Attorney General
Antitrust Section
Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
Telephone: (717) 787-4530
Email: jbetsko@attorneygeneral.gov
*Attorney for Plaintiff Commonwealth of Pennsylvania*

*/s/ Paul T.J. Meosky*
Paul T.J. Meosky (admitted *pro hac vice*)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400, ext. 2064
Fax: (401) 222-2995
Email: pmeosky@riag.ri.gov
*Attorney for Plaintiff State of Rhode Island*

/s/ Jared Q. Libet
Jared Q. Libet (admitted *pro hac vice*)
Assistant Deputy Attorney General
Office of the Attorney General of South Carolina
P.O. Box 11549
Columbia, South Carolina 29211
Telephone: (803) 734-5251
Email: jlibet@scag.gov
*Attorney for Plaintiff State of South Carolina*

/s/ Jacob R. Dempsey
By: Jacob R. Dempsey (admitted *pro hac vice*) Assistant Attorney General
1302 East Highway 1889, Suite 1
Pierre SD 57501-8501
Email: jacob.dempsey@state.sd.us
Telephone: (605) 773-3215
(SD Bar No. 5025)
*Attorney for Plaintiff State of South Dakota*

/s/ Hamilton Millwee
Hamilton Millwee (admitted *pro hac vice*)
Assistant Attorney General
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 38202
Telephone: (615) 291-5922
Email: Hamilton.Millwee@ag.tn.gov
*Attorney for Plaintiff State of Tennessee*

/s/ Diamante Smith
Diamante Smith (admitted *pro hac vice*)
Assistant Attorney General, Antitrust Division
Office of the Attorney General of Texas
P.O. Box 12548
Austin, TX 78711-2548
Telephone: (512) 936-1162
*Attorney for Plaintiff State of Texas*

/s/ Marie W.L. Martin
Marie W.L. Martin (admitted *pro hac vice*)
Deputy Division Director,
Antitrust & Data Privacy Division
Utah Office of Attorney General
160 East 300 South, 5th Floor
P.O. Box 140830
Salt Lake City, UT 84114-0830
Telephone: 801-366-0375
Email: mwmartin@agutah.gov
*Attorney for Plaintiff State of Utah*

/s/ Sarah L. J. Aceves
Sarah L. J. Aceves (admitted *pro hac vice*)
Assistant Attorney General
Consumer Protection and Antitrust Unit
Vermont Attorney General's Office
109 State Street
Montpelier, VT 05609
Telephone: (802) 828-3170
Email: sarah.aceves@vermont.gov
*Attorney for Plaintiff State of Vermont*

/s/ David C. Smith
David C. Smith (admitted *pro hac vice*)
Assistant Attorney General
Office of the Attorney General of Virginia
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 692-0588
Facsimile: (804) 786-0122
Email: dsmith@oag.state.va.us
*Attorney for Plaintiff Commonwealth of Virginia*

/s/ Ashley A. Locke
Ashley A. Locke (admitted *pro hac vice*)
Assistant Attorney General
Antitrust Division
Washington Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
Telephone: (206) 389-2420
Email: Ashley.Locke@atg.wa.gov
*Attorney for Plaintiff State of Washington*

*/s/ Douglas L. Davis*
Douglas L. Davis (admitted *pro hac vice*)
Senior Assistant Attorney General
Consumer Protection and Antitrust Section
West Virginia Office of Attorney General
P.O. Box 1789
Charleston, WV 25326
Telephone: (304) 558-8986
Fax: (304) 558-0184
Email: douglas.l.davis@wvago.gov
*Attorney for Plaintiff State of West Virginia*

*/s/ Caitlin M. Madden*
Caitlin M. Madden (admitted *pro hac vice*)
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
Telephone: (608) 267-1311
Email: caitlin.madden@wisdoj.gov
*Attorney for Plaintiff State of Wisconsin*

*/s/ William T. Young*
William T. Young
Assistant Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
Telephone: (307) 777-7847
Email: william.young@wyo,gov
*Attorney for the Plaintiff State of Wyoming*