Q1NFuni1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,
et al.,

                    Plaintiffs,

          v.                            24 CV 3973 (AS)

LIVE NATION ENTERTAINMENT,
INC., et al.,

                                        Conference

                    Defendants.

------------------------------x

                                        New York, N.Y.
                                        January 23, 2026
                                        10:00 a.m.

Before:

                    HON. ARUN SUBRAMANIAN,

                                        District Judge

                         APPEARANCES

UNITED STATES DEPARTMENT OF JUSTICE
     Attorneys for Plaintiff United States of America
BY:  BONNY E. SWEENEY
     JOHN R. THORNBURGH, II
     LORRAINE VAN KIRK
     DAVID E. DAHLQUIST

NEW YORK STATE ATTORNEY GENERAL
     Attorneys for Plaintiff State of New York
BY:  JONATHAN H. HATCH

                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

Q1NFuni1

APPEARANCES (Continued)

OFFICE OF THE ATTORNEY GENERAL - DISTRICT OF COLUMBIA
        Attorney for Plaintiff District of Columbia
BY:  ADAM GITLIN

CRAVATH SWAINE & MOORE LLP
        Attorneys for Defendants
BY:  DAVID R. MARRIOTT
        LAUREN A. MOSKOWITZ

        -AND-

LATHAM & WATKINS LLP
BY:  ALFRED C. PFEIFFER, JR.
        TIM O'MARA
        ANDREW GASS
        JENNIFER L. GIORDANO
        ROBIN L. GUSHMAN
        LEAH WISSER
        ESHON KASHFIPOUR

JONES DAY
        Attorneys for Intervenor Circuit of the Americas, Inc.
BY:  KATHERINE L. WALL


Also Present:

Nicholas Hill, Expert (for Plaintiffs)
Ali Yurukoglu, Expert (for Defendants)

Q1NFuni1

(Case called; appearances noted)

THE COURT:  In lieu of taking appearances, given the number of people here, who is going to be speaking on behalf of the plaintiffs?

MS. SWEENEY:  Good morning, your Honor.

Bonny Sweeny for the United States.  I'm going to be addressing part of the summary judgment motion.

THE COURT:  Okay.  And Mr. Hernandez, can we get the mics turned up?

THE DEPUTY CLERK:  Yes, your Honor.  Working on it.

THE COURT:  And for the defendants.

MR. MARRIOTT:  Good morning, your Honor.

David Marriott for defendants.  Every one of the lawyers at counsel table may have some role in speaking.

THE COURT:  May have something to say.

MR. MARRIOTT:  Yes, your Honor.

THE COURT:  And thank you for being here.

I apologize for the delay.  There were some technical issues here that we had to clear up.

Everyone, please speak into the microphones, because it may be it's just the acoustics, but it's hard to hear.  If you need to, remain seated if you want to, use the lectern, whatever is easier for you.

Let's start with the state law claims.  Neither side has briefed the 33 state and D.C. claims in this case, and

Q1NFuni1

plaintiffs say that several of those laws -- for example, *California v. UCL* -- don't rise and fall with the federal antitrust claims. Defendants, of course, disagree.

So, the Court's proposal is to stay those claims. If the federal claims proceed, a stay would allow the parties, the Court, and the jury to focus on the federal claims that are at the heart of this case, and then the parties and the Court can evaluate the remaining claims later with the outcome on the federal claims in mind.

Same thing if the federal antitrust claims are dismissed on summary judgment, then the Court and parties can proceed to address the other claims, with the Court's ruling on the federal claims in hand.

The only peculiar a situation, I suppose, would be if, on summary judgment, some or all the federal claims survive but the Court determines that the states lack antitrust standing to seek damages. That might raise some question as to whether a jury trial is it warranted on federal claims, but we can always cross that bridge when we get to it. And the Court would, of course, permit all parties to be heard on how to proceed if that happens.

So, with all that said, Ms. Sweeny, do you have a reaction to the Court's proposal? I don't expect that -- you don't need to give me an answer right now. If you want to think about it, you can do so. But they haven't been briefed,

and so there's nothing that I can do right now, because the parties really addressed the state law claims in footnotes.

MS. SWEENEY:  Your Honor, I'm only addressing parts of the summary judgment.  My colleague, Ms. Van Kirk, is going to address some of the federal claims, and Mr. Gitlin, from the District of Columbia, is going to address the state claims.

THE COURT:  Mr. Gitlin, while you're walking up to the lecturn or however you're going to do it, what do you say about the proposal, which I don't think would prejudice anybody here but would allow us and the jury to avoid having to deal with 39, potentially, claims, which would probably require a trial lasting five years, not five unique weeks.

MR. GITLIN:  Thank you, your Honor.  And I'll use the lecturn, because I don't think we have a mic on my end of the table.

First, let me just address the question of whether or not the issue has been properly briefed and whose shoulders that falls.  It's defendant's motion.

THE COURT:  I didn't ask you whether the motion was properly briefed.  I'm happy to let you address that, but I'm trying to cut through this, because as we have seen, there are a ton of issues raised on these various motions, and so it's like what any good lawyer does:  You've got to take the big problem and try to make it a smaller problem, which is what I'm trying to do.

Q1NFuni1

MR. GITLIN:  Right.

THE COURT:  I'm trying to punt the ball, punt to the future.

MR. GITLIN:  I appreciate your Honor's efforts.

I take what your Honor said with respect to whether or not there is a scenario in which certain federal claims and that the state damages claims may, indeed, proceed with respect to -- at least in certain respects.  And I want to think about whether or not those claims are entirely foreclosed, because I'm not sure they are in certain scenarios, and I'm happy to talk about that in further detail if your Honor would like.

Just to parse it out a bit, with respect to state law claims, that do not rise in fall with the Sherman Act, the states have been anticipating proving up what we need to all along, and so with the understanding that plaintiffs are already, for example, supplying draft jury instructions that include particular instructions and aspects of verdict forms that would deal with state law claims that do not rise and fall with the Sherman Act, as long as we are trying those issues as well, I don't think we'd object to otherwise deferring the issues until after trial.  And then defendants can question whether or not we've met our burden on the state law claims that don't match one-for-one with Sherman Act claims.

THE COURT:  And look, on the burden issue, I know what you're going to say, which is:  Look, it was defendant's

Q1NFuni1

summary judgment motion; it was on them to brief all these issues and psych dismissal for any claims that they wanted to.

They chose to address, in a footnote, the state law claims and just say that they fall for the same reasons as the federal claims.  And so if that's not true, or some subset of the state law claims, that's on them.  So, I understand your argument, and I'll certainly consider it.

The practical issue, though, is:  Sure, maybe you're right about that.  But it's not as if, by not moving for summary judgment in some more robust way, that the confidents would waive objections to the jury instructions and motions *in limine* and everything else and so, really, we would just be pushing those issues closer to trial.

And we're pretty close to trial, right?  So that's the reason why I proposed this idea of staying the claims, to make everything more manageable for the parties, the Court, but most importantly, the jury, who is going to have to go through a number of complicated issues even if, even just on the federal claims, if those survive.

MR. GITLIN:  Yes, your Honor.

And that is entirely consistent with what I would have said today, had we engaged on the merits of the summary judgment.  Defendants are going to have their opportunity to question whether or not we've met our burden, and we, in anticipation of -- as your Honor said -- the many issues that

Q1NFuni1

the jury's going to have to address if our proposed -- even already now, in our proposed jury instructions, have attempted to consolidate and condense particular state law requirements so that there are only certain very limited additional findings that go beyond antitrust that we'd ask the jury to make.

THE COURT:  How long are the proposed jury instructions?

MR. GITLIN:  The state-specific ones, I think it's a small handful of additional findings.  I believe it's less than half a dozen.

THE COURT:  What I would ask you to do is, understanding your front-line argument, which is that there's really nothing for the Court to do here, because the defendants didn't properly move for summary judgment on anything independent of the federal claims -- so, I get that argument -- can you talk, like, huddle with your folks and see if -- putting that aside, like, either I'll accept that argument or not.  But in the alternative, is there any problem with staying the claims, from your perspective, or would you -- if I wasn't going to foreclose the state law claims on that ground and defendants were going to get a chance to address all these things, which is what they've asked for, then would stay make sense, or is there a problem with that.

MR. GITLIN:  Your Honor, you'll have an answer today, if not before we leave the court.

Q1NFuni1

THE COURT:  All right.  Who wants to address this on behalf of the defendants?

MR. MARRIOTT:  The proposal is fine, your Honor.

THE COURT:  Okay.  All right.  With that said, we'll move on.  These are going to go in increasing order of difficulty.

Let's go to the standing of the state plaintiffs.  And question for defendants -- and it's really to understand like, what arguments I'm supposed to be addressing, because there was an initial issue concerning the capacity in which the states were asserting these claims, and then the plaintiffs responded and confirmed that they were asserting them in their quasi-sovereign capacity.  And I think that what that leaves us with in terms of an issue to address is whether the state plaintiffs have asserted a cognizable antitrust injury, based on *In Re: Aluminum* and the other cases that you cited, and I just want to confirm that that's correct.

MR. GASS:  Your Honor, that's mostly correct.  My understanding with respect to part of it is inverted from what you said.  I understood them to say:  We are not bringing claims in our quasi-sovereign capacity, just in our *parens patriae* capacity.

THE COURT:  Is that right?

MR. GITLIN:  No, your Honor.  I don't know how you want me to address it.

Q1NFuni1

THE COURT:  No, I just need you to say "no."

Okay.  So, let's assume that you got a "no," so -- and that's what I understood from the plaintiff's response, that they were asserting, that they said it wasn't in one of the other categories that the defendants had focused on in their opening brief.  They responded and said it's in their quasi-sovereign capacity.

And then I didn't see a response to that, and so that's why I assumed that the only issue for me to address was antitrust injury.

MR. GASS:  There is that, yes, your Honor.  And as we noted in our reply brief, there's also a handful of states that probably don't have the authority to bring claims in their *parens patriae* or quasi-sovereign capacity, so that's a second issue, and that's another issue where we've said --

THE COURT:  That's not one that I need to address on this motion; right?  I could rule on antitrust injury, and then we could decide, given that ruling, like, either no one has standing or there is an antitrust injury and I can, then, look at whether there are certain states that would not have that capacity to sue under their state statutes; is that --

MR. GASS:  We agree with that.

THE COURT:  All right.  Very good.

So now, you're not off the hook yet, if you're going to address the antitrust injury.

Q1NFuni1

MR. GASS:  I'm here.

THE COURT:  So, I understand what you say.  You say: Look, I know the Court, on the motion to dismiss, had relied on *DDAVP* and *McCready*.  But here's the thing, that when you -- me, when I characterize the thing that was the same between the two markets as being ticketing services, that wasn't right, because ticketing services are what the venues are purchasing, whereas fans, consumers, are purchasing tickets. And those are separate things, as you point out in your arguments concerning the fan-facing market.  Okay?

MR. GASS:  Agreed.

THE COURT:  All right.  So then how is that different? And I understand why you can analogize that.  You can say that that's a reason to distinguish DDAVP, because there, it's just a drug.  So there was a drug.  People were buying it, and then the drug was the thing that was in dispute between the generic and the brand manufacturer.  Okay.

But how can you distinguish *McCready*?  Because in *McCready*, the conspiracy concerned whether providers of psychological services were included in the plan and would be compensated by the plan, but the person who is the plaintiff was a plan beneficiary who obviously did not participate in that market.  And the thing was different because it's like, the beneficiary doesn't participate in the plan; it's like a different thing.  But because the beneficiary was a

Q1NFuni1

recipient of plan reimbursements and thus, the harm was intertwined with the violation, the Court said:  There's clearly antitrust injury.  This is the type of injury that the Clayton Act was designed to address.

And so why isn't that like almost a one-to-one correlation to the plaintiff's argument here?  Now, you say there's no injury.  You say there's no harm, there's no causation, there's no damage.  I get that, but on the plaintiff's case, why isn't it the same thing?

MR. GASS:  Yes.  With respect to the question whether the plaintiff is buying, literally, the same thing as the thing that's in the market where competition is retrained, I agree with you.  But on every other dimension, these cases are different.

In that case the patient was sort of the only logical stakeholder to be able to pursue that claim.  Here, the point is, the venues are the ones who are the logical actor.  If they're the ones who have been harmed in this way, they are a much better plaintiff.  That's why in the Second Circuit --

THE COURT:  I'm going to stop you there, because that sems like efficient enforcer, which we're not addressing.  But also, in *McCready*, the psychologists would have been the person that you would expect would have brought the claim, because they were being excluded.  They were the object of the conspiracy.  Like, literally, they were the ones who were being

Q1NFuni1

victimized by not being able to participate in these plans. They were getting boxed out by the psychiatrists and the other people in the market who wanted to erase them from the market.

MR. GASS:  I don't agree with that, your Honor, because there, the patient was the one who was going to get the money, not the psychiatrist.  The insurer was going to pay it to them, but the direct payment was going to go from the insurers to the patient.

THE COURT:  But what was the effect of the conspiracy. That was not the conspiracy.  The conspiracy was directed to psychologists to kind of box them out of the market, because psychiatrists were conspiring with these plans to do that.

So that seems just like this.  The violation is in the venue-facing market, like, assuming that that's the market we're talking about.  For purposes of this, by the way, I should say, this is assuming that what we're talking about is the venue-facing ticketing market, because it's a different inquiry if the fan-facing ticketing market is --

MR. GASS:  And that's the point in our brief.

And listen, the point is, if we're talking about harm to competition in the venue-facing ticketing market, then it makes no sense to say that the person with the concrete injury who is -- and I don't want to talk about efficient enforcer, but -- who has the requisite information, the direct interest at stake to complain, the requisite sort of proximity of

Q1NFuni1

causation to the harm is the consumer rather than the venue. The venues are the ones who will say, either I was a victim or I wasn't; right?

THE COURT:  But that seems opposite.  I mean, first of all that's not in McCready.  That's not the logic of *McCready.* *McCready* recognizes that the psychologists could have been plaintiffs.  There could have been other plaintiffs.  It could have been the plans.  There's other people who could have been plaintiffs.  All the Court looked at is whether the injury that was complained of was inextricably intertwined with the violation even if it was in a separate market directed to separate people.

MR. GASS:  I do agree with that.

And then you get to the *Aluminum Warehousing* issue; right?

THE COURT:  Okay.

MR. GASS:  It's an additional, in the Second Circuit, an additional requirement to show standing.

THE COURT:  All right.  Other than the *Aluminum* case, is there another kind of key or best case that I should make sure to look at before I rule on this?

MR. GASS:  That's the one, your Honor.

THE COURT:  That's the one?

MR. GASS:  Yeah.

THE COURT:  Got it.  Okay.  Who is going to address

Q1NFuni1

tying?

MR. GASS:  You're stuck with me, your Honor.

THE COURT:  Let me stop you for a second, because i didn't even allow the plaintiffs to respond.

Any response to the colloquy?

MR. GITLIN:  Just briefly, your Honor.

THE COURT:  Maybe you can just move it just so you don't have to keep going back and forth.

JUROR:  So, I think your Honor gets *McCready* just right.  I just want to highlight, with respect to *DDAVP*, that all the issues that Mr. Gass just identified: having the requisite information, the direct information, the most at stake, *DDAVP*, that purchaser-based lawsuit was already after there was a lawsuit between the manufacturers; right?  That is, the manufacturers who had all the same and had all the incentives you would need and all of the information and all, everything they would need at stake.

The mere fact that there is somebody else who is -- I think your Honor was right, that is goes to the efficient enforcer question, but -- the mere fact that there's somebody who has all the information that they need to sue, and may -- in the case of *DDAVP* -- already be suing doesn't mean that there isn't standing and injury for others who are hurt by the conduct that -- the underlying conduct that may have even happened in a different market.

Q1NFuni1

And I'm happy -- your Honor, I don't think you followed up with respect to whether or not certain states have standing to sue in a *parens patriae* capacity, but I'm happy to address those issues as well, if your Honor would like.

THE COURT:  I think counsel was saying -- and I think this was in a footnote -- that there are certain states where it is unclear that that authority has been vested in the sovereign under state -- and I think it's just state law.

MR. GITLIN:  Right.  And if I may briefly respond -- and I'll give him credit where it's due; it was in the main text of the reply for the first time -- and it highlighted two examples, but they're telling, so if I could take a moment of the Court's time.

What they said was, there are some states that either don't have the power to proceed in a *parens* capacity or they only recently got it.  For the case that they cite, the *Infineon* case, for the proposition that Arizona does not have the power to proceed in a *parens* capacity, assuming -- to pursue state law -- presumably, this is to pursue sate law damages on behalf of its residents, that might have some residence if Arizona had actually pled a state law damages claim in this case.  If you go to the complaint, you can see that that it didn't.

The other example that they use comes from the *Connecticut v. Aurobindo* case and suggests, I believe, that

Q1NFuni1

Connecticut may have, in that case, only recently -- not for the entire damages period, had had the power to sue. But that was with respect to whether it could sue on behalf of indirect purchasers. And as your Honor knows, all these state antitrust laws, they ave been on the books, in some instances, longer than the Sherman Act.

There's no question that for the period, if you are a direct purchaser, the *parens* authority has existed, as defendants conceded at the motion to dismiss phase. We are not indirect purchasers. We are not proceeding on behalf of indirect purchasers.

So if the two examples, the best ones they could come up with, don't even apply here, I think that raises real questions as to whether those even are really live issues that present questions for summary judgment.

THE COURT: All right. Counsel, briefly, you want to respond?

MR. GASS: Just on the standing issue, I'll address quickly that you will see in the *Aluminum Warehousing* case is that the question is whether the conduct was a fulcrum for the injury. In other words, whether you had to do the conduct where you were going to it in order to injure the party who's asserting the claim. And that's just not true here; right?

There's innumerable ways where someone who is -- you know, a defendant who is engaging in commerce directly, as

Q1NFuni1

Mr. Gitlin just said, with the consumer could harm them without going through the venue and that, by itself, is enough to preclude standing under the *Aluminum Warehousing* case.

THE COURT:  Okay.  But didn't *Aluminum Warehousing* involve -- well, the plaintiff in *Aluminum Warehousing* did not have a transactional relationship with the defendant who was involved in the violation; correct?

MR. GASS:  That is correct.

THE COURT:  Why doesn't that make *Aluminum Warehousing* irrelevant?

MR. GASS:  Because it's about anticompetitive conduct that takes place.  It's the nexus to the anticompetitive conduct, not whether there's some relationship in commerce.  That's a distinction without a difference.

THE COURT:  All right.  I'll take a closer look at that.

MR. GASS:  Thank you, your Honor.

THE COURT:  Any response on the *parens patriae*?

MR. GASS:  No, your Honor.

THE COURT:  What did you say?

MR. GASS:  Let's just move on.

THE COURT:  Let's move on?

MR. GASS:  Yeah.

THE COURT:  Okay.  I'm going to take that as, there is no response to what you said, counsel.

Q1NFuni1

All right.  So, who is going to address tying?

You are also going to address tying?

THE DEFENDANT:  It's going to be me the whole time, your Honor, on summary judgment.

THE COURT:  Okay.  All right.

Let me make sure I understand some basics, and I apologize if this is too basic, but, for section one, just as with section two, there has to be a properly-defined market, and in this case, two different properly defined markets; is that correct?

MR. GASS:  That is correct.

THE COURT:  All right.  And who is addressing this from the plaintiff's side?  All right.  Can you grab the closest mic?

MS. VAN KIRK:  Certainly.

THE COURT:  And just quick question:  Do you agree with that or disagree.

THE DEPUTY CLERK:  Can you give your name for the record, please.

MS. VAN KIRK:  Absolutely.  Good morning, your Honor.

Lorraine Van Kirk for the United States.

And I'll be addressing -- Ms. Sweeny will be addressing the markets and the threats from our side, and you heard Mr. Gitlin.

THE COURT:  This is a pure, section one-specific

Q1NFuni1

question which is:  Do you agree with the defendants that for section one, just like with section two, you have to have properly-defined markets?  And we'll get into later whether these are properly-defined markets or not.

MS. VAN KIRK:  Yes, your Honor.

THE COURT:  Okay.

So, back to the defendants.  All right.  So the tying market is the provision of the use of large amphitheaters for amphitheater tours.  This is the market definition that you say resembles the one in *It's My Party*, and I have your arguments there.

MR. GASS:  Correct.

THE COURT:  As to the tied market, promotion services to artists in large amphitheaters, that's not addressed specifically, so is it -- I mean, I'm trying to understand how I'm supposed to work through this, because it's only in this tying claim, so it's not addressed in the briefing and I don't know that it's addressed in the reports.  I could be wrong about all of that.  But it's a more basic question.

If I don't find that the tying market is properly defined, then there's no tying claim.  If I determine that that is a properly-defined market, will the defendants concede that:  Yeah, if you did, then the tied market would also be properly defined, and then we would move on to our other arguments on top.

Q1NFuni1

MR. GASS:  We do not.

And your Honor, I had understood the tied product market to be something different.  I had understood the tied product market to be the market for promoting artists at MCVs, as the government defines that term, so if there is some other market for promoting markets at large amps, we certainly don't concede that that is properly defined.  There's no evidence on that market in this case.

MS. VAN KIRK:  Your Honor, I would just jump up to agree, that the tied market is the same as our promotion services market.

THE COURT:  Wait, so you're saying that the tying claim is not tied to large amphitheaters?

MS. VAN KIRK:  No.  The tying market, it involves the use of large amphitheaters by artists.

THE COURT:  The tied market, then, is the same market that's at issue in the section two claims.  It's not dealing with amphitheaters, specifically; it's dealing with major concert venues.

MS. VAN KIRK:  Exactly.

THE COURT:  Good.  That's helpful.

MR. GASS:  We're making progress.

THE COURT:  Back to the defendants.  That is addressed, because that's part of the whole market definition issue.  Okay.  That's very helpful.

Q1NFuni1

I think in the complaint -- it's just because in the complaint, the tied market was described as being tied to amphitheaters, which is the reason that was tripping me up.

Okay.  Now, is that an issue from the defendant's perspective, or no?

MR. GASS:  It's a huge issue.  I mean, among other things, because they have to show anticompetitive affects from the tie in that tied product market.  And, you know, we can talk about sort of what the facts are on that issue but sort of among --

THE COURT:  We're going to get there.  That's the same issue that would be presented on the section two claims.

MR. GASS:  Correct.  And there's all kinds of market definition issue, as you note, with respect to the promoting to MCVs in the first instance, which I gather we'll get to later.

THE COURT:  We are going to get to it.

Hard to ping-pong back and forth, so let me see if there's a way I can avoid this.

MR. GASS:  And your Honor, if it makes sense for the government to stand up here with me and we can just shift back and forth the mic, that's fine, too.

THE COURT:  No.  I want to make sure that everyone gets equal time at the lecturn, so I'm not going to let you just stand there.  We'll trade back and forth.

So, I apologize that right now, you're sitting at --

Q1NFuni1

MS. VAN KIRK:  No apology necessary, your Honor.

Thank you.

THE COURT:  We'll switch out periodically.

Let me ask plaintiffs a couple of questions here.

Help me with something that may not be an issue, but it's something that I notice, which is:  For the section two claims, you have a market where the promoters are sellers and the artists are the buyers.  And on this tying claim, though, you are saying, essentially, that the venues are sellers and the artists are buyers, right, because the artists are like the real customers.

And is there a problem with that, meaning, you seem to be saying on the section two claims that promoters and sellers are sort of independent contracting parties, but here on the tying claim, you're saying the promoters -- who are still there -- are really just the agents of the artists who are the principals.

And I think the defendants raised this briefly.  Is there an issue?  Is there a disconnect between those two theories, or no; there's no disconnect; they are consistent.

MS. VAN KIRK:  Your Honor is right, but there is no problem with that.  And that's because artists are very clearly the customers.  And I'll walk through why for a number of reasons.

THE COURT:  Just to stop you there, you're saying

Q1NFuni1

that, yeah, it is true that promoters are sellers and artists are buying services from the promoters, but that doesn't matter because you can contract with someone to be your agent. That's like anyone who you contract to be your agent, and so that shouldn't mean that there's some kind of problem, for tying purposes, in saying that the artists are the real customers here; is that fair?

MS. VAN KIRK: Exactly, your Honor.

THE COURT: Okay. So, then you're leading to the next question, which is: You were about to say that the artists are the real customers. What is your best evidence that the artists are the real customers? And I would ask you, if possible -- and I don't know if you can access to the AV equipment -- if you could show me something, fantastic. If you can cite me to docket numbers, that would be really great, because I'll go and look at the docket numbers, whatever you tell me.

MS. VAN KIRK: Certainly. To begin with, promoters don't perform concerts in arenas or amphitheaters, artists do. The Eras Tour, for example was the Taylor Swift tour, not the Louis Messina tour.

THE COURT: And I've got all this. I really do understand those basic points, and I've read the briefs about 15 times.

Let me back up, just so you understand why I'm asking

Q1NFuni1

it in this very focused way.  By necessity, given the number of issues in this case, the summary judgment briefing often does not contain the evidence, and so usually, it contains cites to the statement of facts or to the expert reports.  And then you have to go to those.  Those, then, have further citations to things in the record.

And so when you go through all these different, steps sometimes, it's easy for me to, perhaps, miss what you believe is your critical evidence.  So, I understand the arguments you're making and that artists are the real consumers.  You read the decision on the motion to dismiss, so I certainly understood the allegation.

Right now, the defendants are saying:  Even if, theoretically, this could be true, the record did not bear this out.  And what's the best evidence that they are just wrong, the artists are clearly the customers when it comes to the venues?

MS. VAN KIRK:  We disagree with defendant's characterization.

We would point the Court, first, to our COMF 246. It's clear there at artists are the ultimate decision-makers on which venues they play and why.  And the good news for the Court, that's undisputed.

The rental agreements -- and this is at COMF -- forgive me.  We're intimately familiar with the kinds of

Q1NFuni1

cross-reference problems that the Court just referred to, and I'll typically be referring your Honor to statements within these 56.1 statements, which I'll call --

THE COURT:  What I'll ask you -- and I'll give each side a chance to do this -- is by, with the snowstorm, let's say Wednesday, to give me just the docket cites for the evidence that you want me to look at.  Because for now, it's totally fine for you to cite to the statement or facts or things along these lines, but by Wednesday, just give me the: here are the ten best pieces of evidence that show that artists are the best customers.

MS. VAN KIRK:  Absolutely.

THE COURT:  Please continue.

MS. VAN KIRK:  The rental agreements are also for specific artists on specific dates, and that's at COMF 242. And again, that is also undisputed.

To rent an amp, you also need a specific artist and a specific date.  Any standing agreement between the promoter and the venue is insufficient.  That's our RSUF 53.

Artist representatives also negotiate directly with amps over things such as the event financials, and we have evidence to that effect in our COMF 243.

And as your Honor noted in the motion to dismiss briefing, in other litigation, defendants, themselves, have agreed that the artist is the consumer of promotion and venue

Q1NFuni1

services.  And that's a direct quote from their briefing in *It's My Party*.  That's what we consider to be our best evidence on the facts.

But, as your Honor mentioned, defendants raise a question on the law as well.  And there, too, we believe it's extremely clear that amps can be rented through buyer intermediaries and that tying can be effectuated in this way.  And there's simply no requirement that a world-famous artist sign on the dotted line in order to actually rent an amphitheater.  And defendants also don't cite to one.

Tying is effectuated by buyer intermediaries in this way in many cases.  Take *Jefferson Parish* or *It's My Party*, *Eastman Kodak*, or *Viamedia*, to just name a few.

For example, in *Viamedia*, which the parties briefed extensively, as your Honor quoted in the motion to dismiss order, the fact that the tying arrangement were structured to involve a buyer intermediary or *Viamedia* did not affect the analysis and the tying claim survived summary judgment.

Similarly --

THE COURT:  Yeah, and just on that -- because I know what the defendants are going to say -- it is true that in *Viamedia*, there was a separate refusal to deal claim that the Court acknowledged was cognizable, because it fit within the Aspen Skiing exception.

And so there's a sentence, literally, where the Court,

Q1NFuni1

when it's addressing the tying claim, says:

Well, first, obviously, the refusal to deal claim didn't fall under *Trinko*, but in any event -- and then it says that, what you just said which is that you couldn't -- just the fact that you have an intermediary doesn't somehow absolve you of liability for a tying claim where the actual customer is a non-competitor, as it was in *Viamedia*.

MS. VAN KIRK:  Certainly.  But it's also true that a buyer intermediary can help effectuate this in many a case that doesn't involve refusal to deal as well.

THE COURT:  And you're saying, it's just the a jury question, whether they believe the artists are the consumers.

MS. VAN KIRK:  Exactly.  It's hotly disputed.

And that's --

THE COURT:  It's a genuine issue of material fact based on the cites that you gave me and the docket numbers that you'll furnish on Wednesday.

MS. VAN KIRK:  Precisely.

(Continued on next page)

Q1N4UNI2

THE COURT:  Defendants, do you have a response to that?  And you can handle the factual issue and then also *the Trinko* question.

MR. GASS:  Thank you, your Honor.

Let me start with the logic of the claim, and then I'll get into the specific facts.

So the logic of the claim is that the marketing, which competition has been harmed, is the marketing which concert promoters vie against each other for the patronage of artists, right.  And the theory then is that something about the policy of not renting to the promoters impairs that competition.  All of the evidence in this case of a promoter being aced out, to use a quote, allegedly of the market, is a promoter saying, I'm trying to promote this show or this tour, and I can't rent this venue.  The promoters are factually the ones who do it.  We didn't hear anything to the contrary.  There is no evidence in the record to the contrary.

THE COURT:  It's largely undisputed.

MR. GASS:  Right.

There is no reason why they have a theory of anticompetitive harm, let alone effects, if it's that role of the promoter that's not the one that's being unduly tainted.  So the promoter can't, in their theory, be some ministerial agent.  In fact, in the industry there is a separate actor who is called the artist's agent.  The promoter is not the artist's

Q1N4UNI2

agent.  There is no jury question over whether in any kind of legally-relevant sense, the promoter is acting solely on behalf of the artist.  Their position is no different than if the plaintiff in *Trinko* had said I am a competing long-distance telephone service provider, and I seek access to your telephony infrastructure, but I'm doing it on behalf of my customers, right.  So effectively, like, treat them as the buyer, not me the competitor.  That is a rhetorical sleight of hand that can't pass muster.

THE COURT:  Well, I mean, you're analogizing a fact that backs *Trinko*.  Here, the distinction is that you have two separate markets.  So if you accept everything else about the plaintiffs' claim, if you accept that artists are the real customers in both the tying and tied market, nothing in *Trinko* suggests that you are immunized from tying these two markets together and then forcing the consumers to purchase the tied product if they want to utilize the tying market.  I mean, that's just not in *Trinko*.  So I get what you're saying that in *Trinko* in terms just the market at issue, like, obviously, all told, they were like the people who were not the competitors who were involved.  But I'm saying that I think what these other cases are saying is that when you are talking about two different markets that are tied together, that's just not something that *Trinko* addressed.

But to more central point, what do you do, like, let's

Q1N4UNI2

say that the records showed -- and I get that you say it doesn't show this -- but the records show that artists, like all of the artists using these amps basically said, "we would love to use someone other than Live Nation as a promoter but my agent told me I've got to use Live Nation because if I don't use Live Nation, I don't get access to all of these great Live Nation amphitheaters, so I'm stuck with using them."  Now if those were the facts and they went around the country, and they got every artist to say this, you wouldn't still be sitting here saying, well, they're not really the people buying the venues, and they're getting tied because then they would have an evidentiary record that would show that despite the existence of the intermediary, like, they are the real customers.

MR. GASS:  I would agree with you if what the artists were being coerced into buying was Live Nation promoting concerts for their full tour, even outside the amps.  I would disagree with you if the sole contention was Live Nation saying, if you want to play my own amp, I'm not going to rent it to your promoter.  I don't think that's a tie.  I still think that's a refusal to deal.

THE COURT:  All right.  So you're saying that the plaintiffs have not made the former contention?

MR. GASS:  Well, they made the former contention. They haven't proved it up.

Q1N4UNI2

Shall we talk about the facts here, or should we reserve that for a later portion?

THE COURT:  I've asked you to talk about the facts and the law.

MR. GASS:  Your Honor, if I may approach.  I have a few slides.  This is confidential information, so we are not going to put it on the screen.  But I just want -- it's not a deck in terms of a presentation.  It's just some evidence I want you to see.  May I approach?

THE COURT:  Have you given a copy to the plaintiff?

MR. GASS:  Before the hearing, yes.

THE COURT:  Please proceed.

MR. GASS:  We are going to be referring to Slide 20, here.

MR. PFIEFFER:  Your Honor, we have more copies if that's useful to your court staff.

THE COURT:  That's okay.  Save the trees.

MR. GASS:  You will recall that a year ago when we were here debating the legal merits of the tie-in claim, you asked Ms. Markel, what is your theory?  Is your theory that Live Nation is out there tying the use of amps to Live Nation Promotion Service just at Live Nation venues?  Or is your theory Live Nation is out there tying the use of amps to require artists to use Live Nation for promotion for the tours more broadly?  And she said the second.  It just so happens

Q1N4UNI2

that there is no evidence of that happening in the entire record of this case.

THE COURT:  Of coercion?

MR. GASS:  Correct.  If you look at the separate statement and you see us saying there's no evidence of this coercion you will see that the plaintiffs cite to three instances in which an artist was allegedly coerced.

THE COURT:  Before you get to this, let me ask you, I suppose it's a legal question, but it's really a conceptual question, given the facts of this case.

MR. GASS:  Yeah.

THE COURT:  Which is why does coercion matter if Live Nation agrees it's not disputed that it has a policy that it does not rent its venues to other promoters?  Like, that's the coercion.  You don't have to show they went outside and started banging on people's doors or calling them in the middle of the night asking them if their refrigerator is running.  I mean, they don't need that kind of stuff.

MR. GASS:  If the artist is the buyer, then it's their burden to come forward with artists who were coerced to use Live Nation as an element of the claim.

THE COURT:  What's the difference?  Whether you coerced artists to use other promoters or whether you just had a policy and you called it a policy and you said, you can't use other promoters, what is the difference?

Q1N4UNI2

MR. GASS:  Well, because many artists can choose to use Live Nation.  So the claim turns on, were you coerced to use Live Nation when you didn't want to?

THE COURT:  Like it's some intent test?  Meaning, I thought that what tying is, I want to use your venue.  You have a policy that I can't use your venue unless I use Live Nation as a promoter.  And thus I use Live Nation as a promoter.  Were you coerced?  Well, no, but, I mean, that's the policy.

Now, if you are saying that there is no evidence that any artist was influenced by the policy to choose Live Nation over any other promoter, then that is something.  But strictly speaking, the question of coercion seems like it might not necessarily need to be shown in the usual way, given that there is an express policy of tying these products together.

MR. GASS:  I disagree with that, as a matter of law, your Honor.  If a seller is tying two products together but the buyer wants to buy the two products together, and there was no evidence that anyone was coerced to when they didn't want to, then you haven't satisfied one of the elements of the claim.

THE COURT:  The element being?

MR. GASS:  Coercion, it's an element of the claim.

THE COURT:  You are saying the coercion is not satisfied by the explicit policy?

MR. GASS:  Well, it's not satisfied by the explicit policy if there is no evidence of anyone in particular who said

Q1N4UNI2

I didn't want those two things together. All right. And that's why --

THE COURT: I think we're talking past each other. That's what I said.

So you're saying there is no record evidence of any artist who wanted to use a different promoter but was in any way constrained from doing so, whether it was due to coercion, if that's what you call it, a policy, whatever. There is no single artist that is shown that they might have even chosen a different promoter had it not been for this policy; is that fair?

MR. GASS: I would say there is no evidence of an artist saying I really want my tour promoted by someone other than Live Nation. But I just I can't do that because I need to play these amps and Live Nation won't let me use these amps. It didn't happen, right. The plaintiffs deposed one single artist in this case, right. That was their choice. They've only talked to one artist in 18 months of discovery. And I asked him directly, "were you coerced in any way to use Live Nation for the arena portion of your tour?" And this is Slide 21. He said "no." That was the one example of this phenomenon There are two other examples that they point to in their separate statement of artists who the competition for which in the promotions market was impeded by this policy. And it's the next two slides, right. And you know, what a competing

Q1N4UNI2

promoter won both of those tours.  So the point is they have nothing else on this.

THE COURT:  Okay.

MR. VANKIRK:  May I speak to that briefly, your Honor?

THE COURT:  Of course.

MR. VANKIRK:  Thank you.

A couple of quick points.  First, your Honor is completely correct that when there is an un-limiting policy of a tie in, there is no need to establish coercion on an individual basis.  And that's the *Hill v. ATO* case that we cite, as well as the *Thompson* case.

What's more, factually, the example that was just referenced of the single artist that's referenced in our papers, he testified as well that he wasn't the one who negotiated directly with promoters, rather his representatives did.  And his representatives testified that it was a given, sort of as your Honor says, that they would have to use Live Nation.  That's at RSUF 50 the response to the statement of undisputed facts, 50.

What's more, defense counsel has pointed the Court now to some examples.  If you turn to page 23, which we've just received on it.  This is an example that they present of no coercion.  Well, you'll see on top that this artist who was otherwise entirely represented by a rival had to play Live Nation as it's promoter in order to go to the Hollywood Bowl.

Q1N4UNI2

There is an example right there.

And I would also just return to the basics of our theory for a moment. Plaintiffs' allege coercion in multiple ways. We allege that artists are coerced to use promoters for a single show and also for amp tours. And we allege and submit evidence that Live Nation uses its leverage over amphitheaters to force artists to use artists for arena shows.

There's three separate ways, focusing on the question that was referenced, regarding the artist whose name I won't mention, about coercion in the briefing, that question involves extremely narrow testimony. And it only concerns that third form of coercion, the leveraging of Live Nation's power within the amphitheater market for arena tours. And the answer that was provided there in that deposition is of limited weight, given the other testimony that that artist didn't negotiate with promoters directly, rather his agents did.

THE COURT: All right.

MR. GASS: Let me just briefly respond. Three quick points, one on this idea that the artist doesn't know whether he was coerced, I don't think that's a basis for a trial. To say, you know, "were you coerced?"

"No, I wasn't."

"Well, someone else said you were."

"Well, I wasn't."

Two, and this is perhaps just with a way to cut

through all of this, let's go back to the tied product market. It is an element of this claim to show anticompetitive effects in the tied product market. What is the evidence that a buyer of this service, artists, by their account, was made worse off by this? That they were paid less? That anything that sounds in the doctrine of anticompetitive effects wasn't satisfied here? They've made no effort to study the question whether these three artist or anyone else was actually treated worse in a way that the law requires for you to make out that element of these claims.

And then finally, your Honor, if we're going with the theory that the coercion is the policy itself, then the policy itself is just the refusal to deal with rivals. It brings us back to where we started.

MR. VANKIRK: May I respond, your Honor?

THE COURT: One second.

MR. VANKIRK: Of course.

THE COURT: I understood two of those points, but on the point of anticompetitive effects, what do you say about *Jefferson Parish*, where the Court indicated that illegal tie-ins inherently linked to anticompetitive effects. And so the way that the Court implied that in tied context was to say that -- this is a quote from the case, "By conditioning his sale of one commodity on the purchase of another, a seller coerces the abdication of buyers' independent judgment as to

the tied product's merits and insulates it from the competitive stresses of the open market."  And the Court there said that that was sufficient.  That's the reason why you can bring a tie-in claim, and that's what the anticompetitive effects means in the tie-in context.

MR. GASS:  On that narrow point, your Honor, that's a *per se* tie-in claim.  Right, there are two flavors of tying.  There's *per se* and rule of reason tying.  There is no basis on the record of this case to treat this, I think by your own account, highly unusual commercial arrangement as one that doesn't require a full inquiry into the effects on competition.

THE COURT:  What's your case that says that when you are evaluating a tie-in claim nowadays that's subject to the rule of reason that you apply the same anticompetitive effects inquiry, the higher price, lower quality, reduced output?

MR. GASS:  We have a quote for the proposition, your Honor, in our brief that tying requires proof of anticompetitive effects in the Second Circuit, and I'm flipping through it.  The quote is on page 36 of our opening brief.  "To prove tie, plaintiffs must show evidence of actual coercion by the seller that forced the buyer to accept the tied product, the *DeJesus* case.  And that "the tie in has anticompetitive effects in the tied market."  *Kaufman v. Time Warner*, 836 F.3d 137, 141 (2d Cir. 2016).

And finally, your Honor, on this point if there is --

Q1N4UNI2

THE COURT:  So is it the *Kaufman* case?  Because just saying "anticompetitive effects" is not the issue.  Like, what does that mean in this context?

MR. GASS:  Yes, anticompetitive effects mean anticompetitive effects, as the Second Circuit --

THE COURT:  And I'm look to the *Kaufman* case, and that's what it says?

MR. GASS:  Yes.

THE COURT:  Okay.

MR. GASS:  And finally, your Honor, on this sort of unremitting policy idea, that's an old case that opposing counsel was citing to you.  There is more recent Second Circuit case which affirms summary judgment for absence of coercion where the sole conduct at issue was a so-called underwritten policy.  And that's *Trans Sport, Inc. v. Starter Sportswear*, 964 F.2d 186 in the Second Circuit.

THE COURT:  Some of the cases that counsel is referring to, *Clark v. Thompson* says, When a policy of conditioned sales is demonstrated, proof of coercion on an individual basis is unnecessary.  That's from a 2007 case.

And in *Trans Sport* all the Court said was, Actual coercion is where the manufacturer goes beyond persuasion and conditions its retailer purchase of one product on the purchase of another.

And so that's I think why counsel was saying that.

It's what they are talking about when they say coercion is like a policy. Like, if you are just not trying to persuade people to buy the other product, but you are saying you have to, you can do that two ways. You can do it through what we typically think of as coercion. You can also do through a policy.

MR. GASS: I believe it'd be legal error, your Honor, to conclude that where the policy is, I sell these two things together, you don't need evidence that someone wanted to buy them separately.

THE COURT: You're saying you still need evidence that someone wanted to buy them separately from a different person?

MR. GASS: A particular person, yeah.

THE COURT: What's the case for that?

And I'm going to give you until Wednesday to put in something so you can find the case.

MR. GASS: I mean, my colleague just helpfully passed me a note on that. That actually comes from *Jefferson Parish* where there is the idea of a particular person having been forced themself beyond a policy. But we will put in additional briefing on that as well.

THE COURT: I've already read *Jefferson Parish*, but I will take another look at it. But if there is another authority that just makes this very clear in this context, I'd appreciate it.

MR. GASS: Thank you.

Q1N4UNI2

MR. VANKIRK:  Your Honor, respectfully we disagree on the law and the facts of both of these claims.

As your Honor put it, *Jefferson Parish*, *Hill v. ATO*, and *Eastman Kodak* all establish that coerced purchases are themselves the anticompetitive effects.  But even if that weren't the case, the Court need not reach that.  And that's because we do submit direct anticompetitive effects evidence.  We put your Honor to our Comp 224 where there is evidence that artists earn less, as shown by plaintiffs' economic expert.

We'd also again quote to the evidence in Comp 177 where defendants themselves instructed employees not to increase guarantee offers to artists for true competitors.  Since, "we know they are likely playing amphitheaters, so we are going to get those artists in most cases."

We also point to Paragraph 227 of the comp where Live Nation amps charge higher venue and service fees than non-Live Nation amps, which in turn can lead some artists to lower the face value of their ticket price and earn less so that their fans don't have to pay as astronomical fees.

THE COURT:  At a bottom-line level, do you have evidence that will indicate to the jury that artists may have liked to use other promoters, but they didn't because of this policy?  Is there that kind of evidence?  Like, I understand what you're saying is that you don't need to have that evidence, but do you have that evidence?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Q1N4UNI2

MR. VANKIRK:  Yes, your Honor.  And we point you back to our Supp. 50 for this point.

THE COURT:  Okay.  All right.  Very good.  Anything else?

MR. VANKIRK:  Only because it bears repeating, we would emphasize that these are generally and hotly disputed factual questions that are appropriate for the jury.

THE COURT:  Well, that is definitely in the briefs. But it's my job to figure out if they are genuine issues of material fact.  And the defendants disagree with you on that, but I will take a look at those also.

MR. VANKIRK:  Thank you.

MR. GASS:  One last point, your Honor.  Just on the question of whether there is a need to actually look at whether there are anticompetitive effects and what counsel just pointed to is not market-wide anticompetitive effects.  It's sort of anecdotal evidence of worse treatment, which is not the same thing.

I would just point out, your Honor, that what we have here is a vertically integrated company saying basically I want to compete in one of those verticals by using as an advantage the investments that I've made in other.  And we submit to you, and we're happy to elaborate on this with references to cases, that in that circumstance in particular there's no basis to say we don't even need to look at whether this conduct was, on

Q1N4UNI2

balance, anticompetitive or not.  The normal rule of reason

anticompetitive effects analyses is warranted.

THE COURT:  All right.  Very good.

Exclusive dealing, Section One.  On market

foreclosure, I understand you've got a few different arguments

for why the way that plaintiffs are looking at foreclosure is

wrong.  And this is just the pure factual record question.  Did

you, through your expert or anywhere in your briefing, do an

alternative analysis that accounts for the way it properly

should be done?  You know, assuming that the plaintiffs, that

the other defects that you've identified go into the

plaintiffs' favor?  Did you put in a number?  The plaintiffs

say that the market foreclosure as a result of the exclusive

dealing was at least 65 percent.  I get you have some arguments

for why that number was wrong and based on the wrong premises.

But did you put in an alternative number and say, no, it was

actually 5 percent?  Because if you consider the full scope of

opportunities then that goes down.  If you consider the

contracts that actually had a bidding process and were open to

competition, then it go down further.  Did you actually do that

and put in a number?

MR. GASS:  I don't believe we did, your Honor.

Because the point is to say that 65 percent number assumes that

every time we won the contract there was foreclosure which is

the opposite of what the cases say.  Because the cases say if

Q1N4UNI2

there was bidding and an opportunity to compete it doesn't matter who won, that is not foreclosure.

THE COURT:  Got it.

Same thing as with the tie-in claim for the Section One exclusive dealing claim.  The Court has to find a viable market, a properly defined market just as with the Section Two monopolization claim; correct?

MR. GASS:  Of course, your Honor.

THE COURT:  Quick question for the plaintiffs, agree?

MR. VANKIRK:  Yes, your Honor.

THE COURT:  Okay.  So now we get to the Section Two claim and market definition.  So for this, Ms. Sweeney, you want to take the lectern to get equal time?

MR. SWEENEY:  Certainly.

THE COURT:  First question is for the defendants.  Just so I make sure that I'm understanding things correctly, there are six markets.  Is it your contention that all six markets are targeted customer markets?

MR. GASS:  Yes.

THE COURT:  Ms. Sweeney, is that correct?

MR. SWEENEY:  No, that's not correct, your Honor.

THE COURT:  Which ones are not targeted customer markets?

MR. SWEENEY:  The artist-facing markets are not targeted customer markets.

Q1N4UNI2

THE COURT:  Understood.

So the only markets that are targeted customer markets are the venue facing markets?

MR. SWEENEY:  That's correct, your Honor.

THE COURT:  And the fan-facing market also would not be a targeted customer market?

MR. SWEENEY:  Correct.

THE COURT:  Is that really the case, given that in the artist-facing market the services are limited to MCVs?  Why are those not properly understood as targeted customer markets, given that they are constrained to artists that are using MCVs, for instance?

MR. SWEENEY:  We point out in our brief, your Honor, that we satisfied both of the legally established frameworks for proving up the relevant market.  One of them is the Brown Shoe practical --

THE COURT:  Let me stop you there.  We are about to get right to what you are getting to.  I'm really trying to understand conceptually, from start to finish, how to go through the analysis.  The defendants essentially say that all the markets are targeted customer markets.  And then plaintiffs don't really say no, they're not.  But then there is a battle over what characterizing them as targeted customer markets means.  And so I hear what you're saying.  You're saying the artists and fan-facing markets are not targeted customer

markets because they are directed to all artists and all fans that are utilizing services with respect to MCVs.  And what I'm asking you is why is that not a targeted customer market, given that you are only talking being MCVs, as opposed to stadiums, large theaters, et cetera?  And maybe you say it doesn't matter.  Like, Judge, you are getting lost in the weeds.  It doesn't matter.  Regardless of what you call it, you apply *Brown Shoe*.  You do the HMT.  You apply *Regeneron* and move on. I hear you on that.  That's what we're going to get into next. But I'm trying to understand if I'm missing something.

MR. SWEENEY:  I think you are right, your Honor, it doesn't matter.  And I would just point it a couple cases which have held in monopolization cases that is, where courts have accepted a relevant market that defined it as some portion of the market that was based on criteria very similar to the criteria we have in our briefing.  For example, there is a very old case, the *International Boxing Club of New York* v. *United States*.  The Supreme Court upheld a separate market of championship boxing which is the cream of the boxing business. And here we're talking about certain venues in the U.S. that are disproportionately impacted by the level of concerts that they perform.  And there is a lot of this evidence in our brief, certainly in Dr. Hill's reports, that shows that stadiums, for example, are much less reliant on concert venue. Amps and arena are particularly reliant on concert venue.  They

attract a certain level of artist in terms of popularity and very similar for amps and arena.  And then, of course, I don't know how much your Honor wants me to go into this right now, but the proposed amp market which is --

THE COURT:  Well, let's stop right now.  Because I want to make sure we get the conceptual framework correct, and then I know you're going to have a lot of evidence that you want to share.

On the conceptual framework, you're saying this isn't something new.  This is something that is age old.  So there is no reason to use anything other than the traditional *Brown Shoe* and HMT analysis; correct?

MR. SWEENEY:  Correct.

THE COURT:  Do you have a case other than the one that you mentioned?

MR. SWEENEY:  Yes.  I would look, your Honor, at *United States v. Grinnell*, which is a very well-known monopolization case.  The Supreme Court also in this case approved a market that accounted for the particularized needs and preferences of a subset of customers within a broader customer group.  The Court said what Defendants overlook is that the high degree of differentiation between central station protection and the other forms means that for many customers only central station protection will do.  There is an Eighth Circuit case, *Superturf Inc. v. Monsanto Company*, which we also

Q1N4UNI2

cite in our brief, which recognized, again, a monopolization case that there was a group of customers for artificial and natural grass for whom the artificial turf is the only realistic choice.

THE COURT:  Those are cases where the market was defined to only include those customers; right?

MR. SWEENEY:  That's true, your Honor -- not precisely.  But what I'm getting at is in all of these cases the Court recognized that distinct needs and preferences of customers is a very important criterion to look at when defining a relevant market.

THE COURT:  All right.  I'll give you a chance to give your response to the *Meta* case because it's cited like ten times in the defendants' reply.  So I know that you have a response.  What's your response to that?

MR. SWEENEY:  Absolutely.  Yeah, the defendants rely on *Meta* to argue that a plaintiff alleging a monopoly can define a market by reference to a subset of buyers.  And I'm quoting here, "only where the plaintiff has direct proof that the subset of buyers pays a significantly higher price than buyers outside the targeted market."

So first of all, as a matter of law, if we accept what defendants say as true, that would eviscerate an entire body of antitrust monopolization law that has built up over decades. And that is that a plaintiff can prove monopoly power by

indirect evidence or by direct evidence.  And defendants are saying, you have to prove it by direct evidence.  You no longer can rely on the indirect method, which even the *Meta* court said, it's very rare to have the kind of evidence that a plaintiff in a monopolization case could use to demonstrate these direct effects that defendants want to see.

THE COURT:  So in a normal monopolization case, you need not have direct evidence.  You can make out your claim through indirect evidence; correct?

MR. SWEENEY:  Correct.

THE COURT:  Instead of saying "direct" and "indirect" because that's not very helpful, what do you mean by indirect evidence?

MR. SWEENEY:  Sure.  Direct evidence is what defendants describe as significantly higher price --

THE COURT:  Which --

MR. SWEENEY:  But that's only part of it.  Let me back up.

So direct evidence of monopoly power, the way the Supreme Court has described it is the power to increase price or reduce quality or exclude competitors from the market.  And we will introduce that kind of evidence at trial in all of our markets.  There is certainly a ton of evidence that the defendants have the power to exclude competitors from the market.  And there is also evidence that they have provided

Q1N4UNI2

products and services to their customers that are of reduced quality because of their power in the market.  In addition, in particular in the examples that Ms. Van Kirk raised, we have shown direct price distinctions.  But we are not required to under the law.  Under the law we can prove that defendants have monopoly power in these various markets by showing that they possess a significant share of the relevant market and that there are barriers to entry.  And we have done that. Defendants have not disputed that in the markets as we define them, they have very high shares.  The concert ticketing market for example is 87 percent.  And the promotions market is 65 percent.

THE COURT:  So you could have --

MR. SWEENEY:  That market is 79 percent.

THE COURT:  You could have sliced and diced your market however you want today on that theory, right?  Because it doesn't matter.  You could have made the market MCBs operating in the tristate area, you know, with 9,000 people up to 11,000 people.  Why not?  Because you might be able to show indirect evidence of the kind you are talking about.  And you probably would be able to show a sufficient share to show monopoly power, and we move on to the other factors.  Isn't that a problem?  Because wouldn't that mean that any plaintiff in any case can always make a monopolization claim by modifying the customer base such that it can establish, through the

Q1N4UNI2

indirect method, market share and barriers to entry and move on to the rest of the case?

MR. SWEENEY:  That is exactly why the Second Circuit in *Regeneron* says you have to rely on one of these two established frameworks for proving up the relevant market.  And we rely on both.  We have the *Brown Shoe* indicia.  And I'm going to take your Honor up on your suggestion that we submit, next week, our best evidence on the *Brown Shoe* practical indicia evidence.

And then in addition, Dr. Hill has performed the hypothetical monopolist test for all of these markets, and they all pass.  Do defendants challenge the HMT for the major concert venue markets?  They do not.

So we have introduced that kind of evidence.  And I understand your Honor's concern.  Of course a plaintiff could make up such a narrowly-defined case that it makes no sense.  But as the Second Circuit has said over and over again, first of all, you have to look at the commercial realities of the market.  What are the facts on the ground?  And the whole purpose of market definition, it's not an end in itself, as many courts have said.  What it is, it's a tool to assess, in this case, the competitive impact of defendants' conduct.  And so it wouldn't make sense, as defendants argue, to have a market defined so broadly to include every venue in the United States, from the largest stadium seating 45,000 or more people,

to the local community college, small, little amphitheater or club that hosts 100 people.

THE COURT:  I'm going to stop you there because I don't want to lose the thread.  You disagree.  You think *Meta* is wrong?

MR. SWEENEY:  Back to *Meta*, your Honor, I also --

THE COURT:  Was *Meta* right or wrong?  Is it right but a different set of facts, or no.  You disagree with Judge Boasberg?  He is wrong?

MR. SWEENEY:  I think, your Honor, that the *Meta* case arose in a different circumstance.  Here is how it differs from our situation.  In that case the FTC put forward both -- and by the way, the decision came after a full trial on the merits. The plaintiffs' case survived motion to dismiss, summary judgment, and then went to a six-week trial.

THE COURT:  Let me make it easier.  Judge Boasberg says you have to have price discrimination.  If you don't have proof of actual price discrimination, then you can't use these markets.  And there is support for that in the *Areeda* treatise and even in the merger guidelines.  Because they basically say that the reason we can sometimes have a targeted customer market is because there is the possibility in the merger context which is prospective of price discrimination.  So in a monopolization you have to show actual price discrimination. If you can show that, then of course you can have a targeted

Q1N4UNI2

market.  If you can't show that, then we do what we have been doing for many decades, which is we use all the customers.  The theory being that if you are treating all of the customers same, then you should be considering all of those customers when you are running all of these analyses to make sure that you are properly capturing whether a price increase or worsening of terms would be profitable for the monopolist.  So that's why you have to treat everybody.  If changing the general price of an undifferentiated service would cause everyone else to start using your competitor, then a monopolist is not going to do it.  And a monopolist can only do it if they have a sufficient market share so that no one has anyone where else to go.  That's why you have to consider the whole market.

This is the defendants' theory.  That's why I'm asking you to react to it.  Your position is you do not have to show price discrimination in order to have a targeted customer market; correct?

MR. SWEENEY:  Correct.  And let me just go a little bit further in my discussion of *FTC v. Meta*.  In that case the FTC tried to make its case of monopoly power both with direct evidence and indirect evidence.  And the precise evidence that it put in front of the judge for direct evidence of monopoly power was precisely the price discrimination that it also used to try to defend its indirect case.  So there the Court, after a full trial, had evaluated all the evidence.  There was a lot

Q1N4UNI2

of conflicting evidence.  He weighed the evidence.  There was a lot more evidence, according to the Judge, from Meta that said, no, there is no discrimination.  In that case, of course, there was no price, but there was a quality-adjusted price.  Because there was, according to the FTC, there was a reduced quality because certain customers received more ads.  Well, so the Court evaluated that evidence and said no.  Meta has introduced more evidence and more persuasive evidence.  And once more, the Court explicitly in the opinion evaluated the credibility of the witnesses and found that Meta witnesses more credible.

So that is a very unique circumstance that doesn't apply here.  To take that case with that unique circumstance and use it to bootstrap a brand new requirement into monopolization law is wrong.

THE COURT:  All right.  Who is going to be handling this for defendants?

MR. GASS:  You're still stuck with me, Mr. Gass, your Honor.

THE COURT:  All right.  Mr. Gass, let's start with *Meta*.  Do you have any other case or authority that indicates that where you have a targeted customer market, which I understand there is a dispute over whether all of these markets are or some of them.  Put that to the side.  Do you have another authority I should look at, other than *Meta*?

MR. GASS:  I want to get back to that first question.

The direct answer to your second question is no because this is the second time ever that the government has ever tried to do it.  Historically we always define cases by reference to products, not customers, as your Honor mentioned.  We always looked to the area of effective competition, which the concession then that these are not targeted customer markets is fatal to these claims.  Because everyone agrees that the area of effective competition is broader than we just, when we promote Artist X at arenas and amps, the same companies compete for the same artist when they play at arenas, right.  Normally that's how we do it.  But starting in the sort of 2000s and then initially embodied in the 2010 merger guidelines, you have this recognition that when we are thinking about mergers, as your Honor well mentioned, it may be the case some customers have some particularized needs which make it so that while others would be able to substitute away in the event of this accommodation, they won't be able to.  So they will be uniquely susceptible to a price increase.

The example from the 2019 merger guidelines which I'm sure your Honor is familiar with is, imagine a merger of two glass bottle manufacturers, right.  And most customers can substitute to aluminum.  If you are a baby food manufacturer, you can't do that, you may be uniquely vulnerable to a price increase.  Okay.

So then there is series of cases, *Cisco*, *FTC v. Whole*

Q1N4UNI2

*Foods* and so on which say in the merger context, we've got to think about whether that's going to happen here. And there is all kinds of evidence about prospectively how is this going to look going forward? What do we think is going to happen when this merger happens? And the key question is always do we think that prices are going to go up for this person, for this unique vulnerable set of buyers? That's what we are trying to figure out.

The first time that the government attempted this in a retrospective monopolization case was *FTC v. Meta*, right. And what happens there, your Honor, is, as you know, one of the government's theories in the case is that that there are certain consumers of Facebook who just use it for the personal social networking feature, and they don't care about the short-form video stuff. So the idea is, as a result, because they're not going to substitute away to YouTube and TikTok --

THE COURT: No, I've got it. I've read it. I understand that Ms. Sweeney correctly points out that Judge Boasberg goes on after addressing the legal contours of the issue to then say that the evidentiary record did not support the FTC's argument.

MR. GASS: Yeah.

THE COURT: There was a predicate which is what the defendants have been focusing on, where he explains what you have to show in order to do this.

Q1N4UNI2

MR. GASS:  Right.  And the reason there's not other cases doing this is because no one has attempted to do it before --

THE COURT:  I was hoping you were going to give me a bunch of other cases.

MR. GASS:  Well, the government has been --

THE COURT:  Hold on.  You say the government, but plaintiffs have been bringing monopolization claims forever. And every plaintiff tries to make a smaller market -- to make more market share, the defendant has more market share, and every defendant wants to make that market larger.  So this must have been tried.  And Ms. Sweeney points to some cases that she says I should go look at.

MR. GASS:  But those are different cases, right. Those are cases where what's going on is that there is product differentiation, right, because of specialization.  And so A isn't really a substitute for B.  It's not defining the market by reference to the customer themself.  It's defining it by reference to the suite of available substitutes.

THE COURT:  All right.  So what you have to show, just to make sure I understand your argument, is higher price, worse terms, or something that makes the customer group uniquely susceptible to a price increase.

MR. GASS:  I don't agree with that last part, your Honor.  That might suffice in a prospective merger challenge.

Q1N4UNI2

In a case like this where you are looking backwards at 15 years of alleged anticompetitive conduct, there was a two-year investigation that proceed the lawsuit and 18 months of discovery in it, it doesn't suffice to show that you might be harmed.

THE COURT:  I got you.  So you said you have to show --

MR. GASS:  Actual.

THE COURT:  -- actual price increase, not a price increase just in the abstract but a differential between people inside the subset and outside the subset?

MR. GASS:  Correct.

THE COURT:  Okay.  And *Meta* is the source for that? It's just a new thing.

MR. GASS:  It's also like logic and reason, right. Like, why we do these targeted customer markets, also called "price discrimination markets" in the merger context is we are worried that they might potentially be subject to a price increase.  The logic of that is if you are doing it backwards looking, it doesn't suffice to say, listen, this monopolist might subject these customers to a price increase.  If they were a monopolist they would do that.  So in a retrospective case, from first principles you would have to show actual evidence, not predictions of what might happen.

THE COURT:  Is that necessarily true, given the

Q1N4UNI2

allowance for indirect evidence?  Maybe it comes out of the Cellophane Fallacy that because you have a monopolist that was already active in the market, there is not always going to be a way to show that.  So why is it necessarily true the test would be different?

MR. GASS:  You would still need to say, listen, I need to account for Cellophane.  I need to account for all of that.  But I need some actual evidence that these customers were made worse off, not that there was an incentive for them to be made worse off, irrespective of whether the monopolist actually acted on that incentive.

Very briefly, your Honor, on this HMT point.  I just want your Honor to appreciate how inapposite the ticketing HMT is that they report.  I also want to talk about one other factual point.

But just on this HMT thing in particular, the suggestion is Dr. Hill did an HMT that shows that MCVs in particular could be price discriminated against, right.  What the HMT is that he did is he said, I want to know the price at which MCVs would substitute way to self-ticket.  And when I asked that question, like 97 percent of people doesn't substitute away self-ticketing, therefore MCV is our market.  What that, in fact, shows is that self-ticketing is not a substitute for third-party ticketing.  It does not show that MCVs are uniquely vulnerable in any respect in a way that's

Q1N4UNI2

different from what venues outside the MCV market are.

THE COURT:  Right.  But isn't that just a function that HMT is not directed to gauging this issue about price discrimination.  The HMT is talking about interchangeability of products.  It's the only other product that could be interchangeable with third-party ticketing is self-ticketing.  So it was a properly done HMT in that respect.

MR. GASS:  But doesn't answer the question, right.  And, your Honor, it goes to what makes this case much easier than that.  In *Meta*, depending on what the preferences of these customers were, you had a different set of suppliers out there that might fundamentally alter the suite of substitutes to whom the buyer might turn.

In this case, bizarrely enough, in both the ticketing and the promotions space, there is agreement on who the sellers are.

THE COURT:  Yeah, so because of that, I take it that you're saying that for that reason the *Meta* standard, I'll call it that, is really all we need to do here.  And we should not proceed to the *Brown Shoe* and HMT test because it's a red herring.  It's not measuring anything that talks about the efforts to exploit the people and the customer subset.

MR. GASS:  We are not debating substitutability here from the sale side.

THE COURT:  Is that a yes?

Q1N4UNI2

MR. GASS:  Yes.

THE COURT:  The *Brown Shoe* and HMT, they just don't apply here.

MR. GASS:  Correct, they are the wrong tools.

THE COURT:  They are the wrong tools.

So why how are you not asking me to defy the Second Circuit and *Regeneron* and other cases that say in every monopoly case the way you do this is apply *Brown Shoe* or the HMT, and that's what you do?

MR. GASS:  Because that case is not about a targeted customer market.  Again, I want to circle back to why these really are best thought of as targeted customer markets.  But when the HMT and *Brown Shoe* are tools for assessing the issue at stake in most market definition issues in monopolization cases, which is, does Coke compete with Pepsi?, as your Honor knows.  Here, again, in this circumstance we're not trying to answer that question, right.  The suite of promoters who compete for artists at MCVs, Live Nation, AEG, a few regional strong players, is the same.  Irrespective of whether it's arenas or amphitheaters over 8,000 people who have hosted ten or more concerts in a year, which is the government's definition of MCVs, or whether you drop any of those restrictions, or whether you include stadiums, as you obviously should.  Because that reflects the area of effective competition.  The number of players in the market doesn't

Q1N4UNI2

change.  All that changes is the number of transaction you are studying.

So in that circumstance there is no utility whatsoever in using the HMT or *Brown Shoe*, as Judge Boasberg explained is fundamentally a tool for addressing substitutability.  We are not debating substitutability.

THE COURT:  One of the factors is distinct customers, right.  So you could evaluate some of this under the rubric of *Brown Shoe*.

MR. GASS:  Right.  But if that sufficed, then you could just create a targeted customer market by saying "I identify these as the target customers."  And they are going to be distinct from the others by a hypothesis.

THE COURT:  The supreme Court gave us *Brown Shoe*.

MR. GASS:  Your Honor --

THE COURT:  I'm saying that, you know, sort of a moment of levity.

But let me ask you a question.  I understand from your reply brief you say that there no evidence, nor an argument that the prices or terms Ticketmaster charges to major concert venues are inferior to those charged to other large venues. What does that mean, "large venues"?

MR. GASS:  This is a great back and forth in the record, your Honor.  I want to shine a spotlight on it.

Large venues mean, like, stadiums.  That's principally

Q1N4UNI2

what we had in mind.  So defendants' expert, Professor Carlton does a study.  And he says I've looked at pricing to venues -- this is Paragraph 3.

THE COURT:  My question is just what you're talking about, about stadiums.

MR. GASS:  Stadiums, yeah.

THE COURT:  And if plaintiffs had included stadiums and instead of talking about MCVs, they just said "large venues," would you concede at that point that market definition wouldn't pose an issue?  We have other arguments, but market definition wouldn't pose an issue?

MR. GASS:  If you're looking at all of the tickets sold at stadiums, we would certainly have a different set of issues.  And that's the fact pattern where you we don't apply an artificial constraint on concert tickets as opposed to sports tickets, and you don't lop off stadiums.  That's what it takes to get you to 87 percent.

THE COURT:  Why wouldn't the *Meta* argument still apply?  Even if we said "large venues," then we would have to satisfy the Meta standard.  And you couldn't just go to *Brown Shoe* and HMT because you not considering the mom and pop little theaters and all of the small players.  You have to include everybody in there.

MR. GASS:  Well, we would first have to say is, in fact, the competitor set the same or not?  And if it's going to

Q1N4UNI2

be different once you get down to the theater, then you don't need to go to the target customer, then you're just doing the standard analysis. My adversary suggested that we are contending that the market is all of the venues in the U.S. We are not saying that at all. We never said that. We are just saying you can't slice it this way.

THE COURT: So it's fair to say, if the plaintiffs could win their case including stadiums, then it would just be a different case. Maybe they win. Maybe they wouldn't, but not this case?

MR. GASS: Correct.

THE COURT: All right.

Ms. Sweeney, first of all, was that a clarification to the question about what "large venues" means? They are saying there is no evidence, nor an argument that the prices or terms Ticketmaster charges to major concert venues are inferior to those charged to other large venues, they mean stadiums, disagree or disagree?

MR. SWEENEY: I want to refer back to the comment that your Honor made which is exactly right --

THE COURT: Well, first it's agree or disagree. And then we can go back.

MR. SWEENEY: Our expert did not conduct that analysis.

THE COURT: But you are the master of the record. So

Q1N4UNI2

do you disagree or disagree?

MR. SWEENEY:  For purposes of the ticketing market only, there is not that kind of evidence.

But let me refer your Honor back to your point which is the Cellophane issue.  Because as Mr. Gass said, their expert did try to look at the differences in price between stadiums and major concert venues.  He made a number of errors which Dr. Hill corrected.  But as Dr. Hill pointed out in his report, and this is his rebuttal report, at pages 70-71 and notes 394, there is no reason to think that stadiums are good proxies for that kind of analysis, for all the reasons that we have in our briefing and in our statements of fact.  And we when we get to that point, I'll go through some of them.  But there are big differences between stadiums and major concert venues, as we've defined them.

But in addition, there is also no reason to believe that they're competitive.  And this Note 394 in Dr. Hill's report.

(Continued on next page)

Q1N4UNI2

THE COURT:  It's competitive.

MS. SWEENEY:  There's no reason to believe that the stadium market is not controlled, also, by Live Nation.  As he points out, they have a very high share of the market there, too.

THE COURT:  Then why didn't you include them in your relevant market?

MS. SWEENEY:  We did not include them in our relevant market because, for all the reasons that Dr. Hill identified as well as in our analysis in the *Brown Shoe* factors.  Stadiums have different ticketing needs.  They host many fewer concerts than arenas and amphitheaters.

Remember the purpose of market definition is to look at where the anticompetitive conduct is having an impact.  And it's the defendant's, Ticketmaster's and Live Nation's control over concerts that gives them the power to impose anticompetitive impacts on all of the customers, on venues, on artists, and on fans.

And so the stadiums attract artists of a very different caliber.  If you look at the Spotify listings -- and this is in Dr. Hill's report -- you'll see that they have more than three times as many Spotify listeners than the average artist who performs at amps and arenas, so it's catering to a different artist, and the ticketing needs are different as a result.

Q1N4UNI2

You have different -- you have fewer on-sales for concerts at stadiums, but much bigger ones. You don't have, in amphitheaters, in particular -- and even less so in arenas, you don't have the same kinds of season ticketholder issues that you have in stadiums.

THE COURT: But are you saying that the product, that is going to the customer is different in some way between the MCVs and the stadiums, or is it the same product?

MS. SWEENEY: We agree that there is a certain basic set of services that a primary ticketing provider provides. However, the needs for those ticketings services vary greatly between major concert venues and amphitheaters and stadiums.

And just to cite a few examples from our brief --

THE COURT: So the product is the same. Are the competitors different in the stadiums? Like, are there differences in terms of the suppliers or -- the suppliers?

MS. SWEENEY: Many of the same ticketers that ticket amps and arenas also ticket stadiums but not all of them. It's not completely coextensive.

THE COURT: We can assume the suppliers are the same.

MS. SWEENEY: And I want to go back to --

THE COURT: Let me make sure I understand. So, the real difference is the customer, meaning the venues are different. In which way are they economically different in a way that would matter for the market definition, meaning that I

Q1N4UNI2

understand that there's differences between MSG and Met Life Stadium; that's obvious. But in a way that would matter for purposes of an antitrust analysis, what are the key economic differences between MCVs and stadiums?

MS. SWEENEY: Major concert venues are much more reliant on concert revenue than stadiums are. Stadiums receive most of their revenue, by a large proportion, from their sporting events. And amphitheaters, obviously, don't host sporting events; they host concerts. Arenas host multiple times more concerts than stadiums, so there is a big financial difference in terms of exercising market power, which is what the defendants have been doing, on these venues. That is an economic difference that is important in assessing the competitive impacts of defendants' conduct.

THE COURT: So, you're saying that economically, the MCVs are more reliant on concerts, which are the focus of this case. And give me, in the same way that I asked your colleague, that's the best evidence of the impact of that economic difference to MCVs in a way that would distinguish them from stadiums?

MS. SWEENEY: Well, for example, all of the evidence that we have assembled and presented to your Honor with regard to Live Nation and Ticketmaster's threats and retaliation against venues who have considered switching from Ticketmaster to another ticketer or considered or actually do it and then

Q1N4UNI2

are retaliated against --

THE COURT:  But are they doing that in some way that is relevant to the MCV group?  Because, you hear what I'm saying.  Like, if you had a bunch of evidence of threats but it had no connection to MCVs as a category, then it's unclear to me how it would be relevant for this market question.

But, if you had threats that were obviously revealed in distinction between MCVs and stadiums, then that, I think, would be probative, because it would suggest that Live Nation is using or that Live Nation and Ticketmaster are using their power in this particular segment of the market to do things that they're not doing to other people.

Do you have evidence of that kind of thing?

MS. SWEENEY:  We do have evidence.  We have received -- in this is in our papers, your Honor.  We have the evidence of the rival ticketers who talk about how it is easier to make inroads into the stadium market because those venues are insulated from the threat that Live Nation is going to withhold concerts if they switch ticketers.

THE COURT:  Okay.  And in your Wednesday submission, could you point me to the best evidence along those lines?

MS. SWEENEY:  Certainly, your Honor.

THE COURT:  Again, you're saying that the jury's going to hear evidence that rival ticketers think that stadiums are

different.  We could maybe get access there, because they're not doing as many concerts, and that's the content that Live Nation principally brings, and so we could make inroads there because they're not beholden to all the various antitrust violations that are plaguing the MCVs.

MS. SWEENEY:  Exactly, your Honor.

THE COURT:  Okay.  Understood.

Defendant's response.

MR. GASS:  A few points, your Honor.

One, if the contention is that MCVs, as the government has defined the market, are uniquely susceptible somehow to concert threats because they depend more on that revenue, they've just defined the market tautologically by limiting the set under consideration to those who host ten or more venues. If you wanted to do it organically, you would just say:  Let's just look apples to apples; let's take the ones that are most dependent on concert revenue.

Two, in all of that --

THE COURT:  The record does have evidence of relative concert revenue as between what's inside the market and what's outside the market.  Those are the charts that are in Dr. Hill's report and elsewhere.

MR. GASS:  We have -- the government has all of the revenue evidence for the venues, for the artists, everything. They could absolutely study -- they wouldn't have to rely on

speculation, these are the kinds of venues who might be more vulnerable to thinks because they depend on concert revenue. Okay.  If they are, what is the evidence that they were? Again, 15 years worth of data; right?  It doesn't suffice to say, one might imagine that in this circumstance, they would be preyed upon.  Were they preyed upon or were they not preyed upon?

THE COURT:  All right.  Let me stop you there.

Ms. Sweeny --

MS. SWEENEY:  I think your Honor --

THE COURT:  Defense says that you don't have evidence that they were preyed upon in a way that would should that this has been happening, so what's your evidence of that?

MS. SWEENEY:  We don't have evidence that the major concert venues have been preyed upon?

THE COURT:  That's what --

MS. SWEENEY:  Well, I certainly disagree with that, your Honor.

THE COURT:  Okay.  What is the best evidence?

MS. SWEENEY:  We have cited a lot of evidence in our papers that -- just, even shortly after the consent decree was entered after the merger in 2010 and defendants were expressly prohibited from conditioning content on the venue accepting Ticketmaster, that Ticketmaster, nonetheless, threatened venues that they would lose content if they didn't use Ticketmaster as

Q1N4UNI2

their primary ticketer.

THE COURT:  And that's not linked to the MCV category.  But based on what you said before, your understanding is that that's principally directed to this subset, because they are the ones that are reliant on Live Nation content; is that fair?

MS. SWEENEY:  That's correct, your Honor.

And then, as we show in our papers, your Honor, that conduct as continued.  It may have become more subtle as a result of the enforcement action in 2019, 2020, but the conduct has continued.  And we have evidence not only of threats, but also of retaliation with respect to a very large venue in New York.

THE COURT:  Right.

Mr. Gass, so I think what Ms. Sweeny is saying -- just so I understand conceptually what's happening here is that you are saying you have to show actual price discrimination.  I understand that.

And Ms. Sweeny is saying that we disagree.  To the extent that we have to show unique effects within this market, we have shown that by the nature of these threats, the retaliation, and the evidence that rivals believe that they can make inroads in stadiums but not venues that are primarily reliant on Live Nation content.  Those are the MCVs.

So what's the response to that?

MR. GASS:  I want to walk through those facts in a

moment, and I'll direct your Honor to slide 8 of the deck that I passed up to do that.

But first, none of that is a substitute for showing that the venues were actually made worse off; right? So, imagine that it's the case, right, that there are threats uniquely against these venues -- which, it isn't -- but, like, so what? The answer we're trying to -- the question we're trying to answer is: Were these venues the victims of price discrimination? Presumably, if we could thwart competition by threatening venues with some bad thing if they don't choose us, that would give us the ability to extract better terms for ourselves and less favorable terms to the venues.

They're should be evidence of that, for 15 years; there's literally nothing. And it doesn't suffice to say: Well, I have a theory by which these threats should make the venues worse off in a way that matters here. But if that were true, they would have evidence of it.

But let me just point to -- let me just undermine the factual contentions that Ms. Sweeny just made. If your Honor turns to slide 8 here, there are -- and I'm going to are very mindful of the confidentiality concerns. We are in open court. I appreciate --

THE COURT: Well, we're going to be in open court during trial, and we're not going to be doing things with decks so, you're going to have to, you know --

Q1N4UNI2

MR. GASS:  I agree completely, your Honor.

THE COURT:  When we're in open Court, the presumption, the strong prescription is that everything can be said openly in court.  Now, I understand for today's hearing, we haven't worked out all the details, but -- I'm on slide 8.

MR. GASS:  Apologies to both of you, your Honor.

And to be clear, it's third-party confidentiality that I'm trying to be mindful of.

THE COURT:  That's fine.

MR. GASS:  But, noted.

So, the contention that you heard is that there is actually something about these threats and about rivals' ability to make inroads that is uniquely different in the space that the government defines as MCVs versus the space that the government defines as outside the market.

The sum total of the threats that the government has invoked in the combination of their separate statements in response to our moving papers is eight, eight over 15 years.  And that's -- you sort of cobble that together from paragraphs 39 to 60 of their counterstatement and then paragraph 29 of their response to our statement.  There are eight instances over 15 years.

And as you'll see, there's only five in the last five years; right?  And just looking at those five -- again, this is supposed to yield some, like, market-wide difference in venue

Q1N4UNI2

treatment to suffice -- to show a target market -- of those five, lo and behold, one of them is not in the market. This is one of them. They're saying this arena here on slide 9, below 8,000 capacity, so it doesn't count, according to them.

So, evidentiary, we actually are out three doing whatever it is that they say we're doing across the board, not uniquely to MCVs.

Again, there's a bunch of evidence on 10 and 11 that -- other venues that they list there specifically denied the threat. I think that the slide on 10 is extraordinarily telling. If your Honor takes a moment to look at it, this is another one of those venues.

But more to the point, we see from this that, just based on their own response, they had all of the evidence that they could marshal in response to our summary judgment motion. They gave you an example of a venue outside the market that was subject to the identical conduct, as they say.

With respect to the rivals entering this market differently, one of the things that they point to is that one of the rivals is ostensibly going around to its customers saying: Listen, it's so hard for me to make inroads here. I need to give you a term of the contract or you're going to be made whole if you lose certain content. And they mischaracterize that as being Live Nation content, but they say that is significant evidence of it being differentially

Q1N4UNI2

difficult for rivals to enter the MCV space as they define it compared to other venues. Well, lo and behold, let's turn to slide 17.

Here are the five examples of that, that they invoke in their opposition to our papers. It turns out, three of them are outside the market. So, whatever merit there may be as a matter of theory to this contention that there's some differential treatment, the government's own evidence that they submitted contradicts it.

THE COURT: All right. Ms. Sweeny, so I think you said -- and I just wanted to make sure that I didn't forget about this -- that even if you included stadiums, you would still be able to make out a showing of monopoly of market power; right?

MS. SWEENEY: Yeah. Dr Hill's analysis --

THE COURT: The answer is "yes"?

MS. SWEENEY: Yes.

THE COURT: But to be very clear, given that you have not asserted that market as an alternative market, as plaintiffs sometimes do, you would agree that you are not relying on a market that includes stadiums; correct?

MS. SWEENEY: We are not relying on a market that includes stadiums; that is correct.

THE COURT: Okay. So if the MCV market is not properly defined, then the markets that would rely on that

definition would be out, meaning those claims would be out.

MS. SWEENEY:  Well, we would not agree that those claims would be out, because there's more than one way to prove a monopolization claim -- that would be the direct evidence route -- but they are not part of our market.

THE COURT:  Sorry.  You have to have a properly defined market; right?  If you don't have a properly-defined market, then you cannot have a claim, or am I wrong about that?  I'm missing something?

MS. SWEENEY:  If you can prove the exercise of market power, that is, control over price or quality and exclusion of competitors, there isn't a requirement in the law that you also define a relevant market.

THE COURT:  Mr. Gass, is that correct, and the submission is just that the plaintiffs haven't done that?

MR. GASS:  You have to define a relevant market, and they haven't done it.  They failed.  It's over.

THE COURT:  Okay.

MS. SWEENEY:  Can I respond to a couple of --

THE COURT:  Ms. Sweeny, do you have a case for me that says you don't have to have a relevant market?

MS. SWEENEY:  We'll, I'm relying on all the cases that say there are two ways to prove monopoly power.  One is through showing that you have a relevant market in which -- as demonstrated by high market share and substantial barriers --

Q1N4UNI2

and some barriers to entry, or you show that the defendant has exercised market power through prices, quality, or exclusion of competitors.

THE COURT:  All right.  In all of the cases that I've read, the very first thing is:  To make out a claim, you have to have a properly-defined market, and then they describe market definition.

MS. SWEENEY:  I --

THE COURT:  But just to be very clear -- and maybe I can cut through this -- you're not relying on stadiums, so those are out.  So, the whole dispute over what the share would be if stadiums are included is irrelevant; fair?

MS. SWEENEY:  Fair, your Honor.

THE COURT:  And by the way, if anyone needs a break, let me know, because we've got a little bit more to go through, but we'll try to get through this as quickly as possible.

MS. SWEENEY:  And can I respond to Mr. Gass's last points, your Honor?

THE COURT:  Yes.

MS. SWEENEY:  He asserts that we have not shown any anticompetitive affects in the market with respect to ticketing, and I would just refer your Honor to some of our statements in our COMF, as we call it, counterstatement of material facts.

Q1N4UNI2

First of all, there is a ton of evidence that --

THE COURT:  Do you have the cites?

MS. SWEENEY:  I do.  So, first of all, lower quality services -- and this would be COMF 65 -- several venues have testified that they find Ticketmaster's services to be inferior in quality to that of the competitors.

Plus there's monetary harm.  Mr. Gass said there's no evidence of harm to venues, and Dr. Hill's analysis showed what happened to venues who switched away from Ticketmaster, looking only at NBA/NHL arenas, and those, of course, are within the major concert venue market.

And so he showed that venues that switched lost, on average, five concerts a year, that is, five Live Nation-promoted concerts; and those who switched to Ticketmaster gained, on average, ten Live Nation concerts a year.  He also conducted an analysis that determined an average or estimated an average of how much revenue was lost every time a venue loses a concert, and that was around $303,000 per concert.  And then we had the testimony from Barclays, that they lost concerts as a result of switching away from Ticketmaster to a rival ticketer.

And Mr. Gitlin, when he's talking about the fan-facing market, will also describe the monetary harm there that consumers, the fans who buy the tickets, have been injured.  So to say that there's no evidence of the kind of anticompetitive

Q1N4UNI2

conduct that we're talking about, we have adduced a lot of that evidence, your Honor, even though it is not our burden at this stage.

THE COURT:  Okay.  So switching gears to the promotion to artists market where the artists are the customers and Live Nation as promoter is the seller --

MS. SWEENEY:  Yes.

THE COURT:  -- the defendants say that there is no evidence or argument that the prices or terms Live Nation charges to artists who play major concert venues are inferior to those charged to other artists.

Would you agree with that?

MS. SWEENEY:  Well, I would disagree, but I'm also going to refer to my colleague, Ms. Van Kirk who is -- even though I'm in charge of market issues, she's handling those two particular issues with respect to anticompetitive effects.

THE COURT:  Just one question.  It's the same question I asked versus -- in the ticketing market, which is:  The defendants say two things.  They say there's no evidence of higher prices or worse terms in the ticketing market, and they say in the artist-facing promotion market, there's also no evidence of higher prices or worse terms.

Do you agree.

MS. VAN KIRK:  No, your Honor.

THE COURT:  So the question is:  What is the best

Q1N4UNI2

evidence that the prices or terms Live Nation charges to artists who play major concert venues are inferior to those charged to other artists.

MS. VAN KIRK:  We point the Court to what we call COMF 233A.  We have a number of examples in 233 and 234, but I'll offer just two.

There, we submit defendants' own email listing that "lower competition in the region is among the benefits of a promoter acquisition."  That's a direct quote from the document, even though defendants curiously state that it's not.

In two-thirty- --

THE COURT:  How does that relate to other artists who play in major concert venues receiving inferior terms or being charged more?

MS. VAN KIRK:  It relates because there's lower competition in the region for those artists to then select promoters.

THE COURT:  Is that linked in some way to major concert venues?

MS. VAN KIRK:  Forgive, me the artists are not the customers for the major concert venue.

THE COURT:  No, no.  That's not what I'm asking.  The artist-facing promotion market is still defined in terms of major concert venues.  That's why the defendants say the prices or terms Live Nation charges to artists who play major concert

Q1N4UNI2

venue are inferior.

Do you have some evidence of that?  Meaning, they're saying:  In order to have this market, you have to show that the prices or terms given to artists -- first of all, you have to show that there's a category of artists who play major concert venues.  And then you have to show that the prices or terms charged to these people are, like, worse.

Do you have any evidence of that, or, we don't have evidence of that specific thing, but we don't have to have it.  Those are two options.

MS. VAN KIRK:  We have evidence of reduced choice, and evidence that --

THE COURT:  Reduced choice among promoters.

MS. VAN KIRK:  Correct.

THE COURT:  Okay.  But you do not have evidence of higher prices or worse terms; fair?

MS. VAN KIRK:  The artists are forced to pay higher prices.

THE COURT:  They are.

And is that linked to artists specifically who play major concert venues, or is that all artists?

MS. VAN KIRK:  It's especially for artists that play major concert venues.  So, in --

THE COURT:  Focusing on the especially for major concert venue artists, what's the evidence for that?

MS. VAN KIRK:  In 233B, there's an email from defendants concerning a promoter with whom defendants compete, a large-scale promoter.  And there, the defendants in their email explain that the real advantage to us, monetarily, from this acquisition, is keeping guarantees down.

And those are the guarantees to artists.

THE COURT:  And why is that targeted on artists who play major concert venues?  What's the nexus?  How do you get from that to -- your basic argument is:  Yeah, we've got this evidence that shows price discrimination in this market considering artists who play manager concert venues.

But connect the dots for me, from the email that you're mentioning to that conclusion.

MS. VAN KIRK:  That promoter and the others whom defendants have acquired controls at least 20 percent of the MCV market and 11 areas, and you'll find that at COMF 228.

THE COURT:  All right.  So, if you just look at it in context with all the details that you've just told me about, you can see that it's targeted on the MCV market.

MS. VAN KIRK:  Yes, your Honor.

THE COURT:  Okay.  Very good.

MR. GASS:  May I respond, your Honor, or do you want to move on?

THE COURT:  You can respond, briefly.

MR. GASS:  That would be the set up.  What you just

Q1N4UNI2

heard would be the set up for a study of whether, in fact, the resulting acquisition resulted in treating artists' work in this court of subcomponent of the market, 11 venues.

They didn't do that. They didn't complete the sentence. They just say, there's some evidence that one of the reasons why the company did the deal is because they thought it might have the effect of reducing competition. Okay. I don't think that's true, but let's assume it is for purposes of this motion.

The point here is, that is not evidence of actual different treatment. Again, I'm a broken record on this, but 15 years' worth of evidence and so on.

THE COURT: Same argument. I got it. Okay.

Ms. Sweeny, on concert-booking services, is your answer the same as primary ticketing, that there is no evidence of different prices or worse terms for concert-booking services?

MS. SWEENEY: There is evidence of worse terms.

THE COURT: Worse terms?

MS. SWEENEY: And there is evidence that the rebates are different. Again -- and I apologize; this is how we've divided up the argument, but Ms. Van Kirk is in a better position to identify the evidence for that point.

THE COURT: Same question that I've asked about primary ticketing and the promotion space, but in concert

Q1N4UNI2

booking, is there evidence of worse terms to venues or higher prices to venues for concert-booking services?

MS. VAN KIRK:  Absolutely, your Honor.

THE COURT:  All right.  What is that evidence?

MS. VAN KIRK:  COMF 229, the ancillary per fan, or APF fees that are paid by venues have recently doubled in arenas.

COMF 230, Live Nation pulled shows from venues that wouldn't agree to pay it higher rebates.

COMF 231, Live Nation even extracted payments from arenas for venue shows that had had nothing to do with promoting.

COMF 236, the intensive agreement rebates that venues must pay increased as well.

THE COURT:  And again, connect the dots to the MCV as well.

MS. VAN KIRK:  This evidence is from arenas, major concert arenas, largely.

THE COURT:  Okay.

MS. VAN KIRK:  I would also back up, if I may for a moment, your Honor, especially regarding the promotions market, because defendants have pressed on this point about whether we've shown price increases or otherwise, and that's not a targeted customer market.

And just as a practical matter, that kind of proof that defendants are asking for is rare.  And such red-handed

Q1N4UNI2

proof is rare.  That's a direct quote from the *Meta* case, which defendants place so much reliance on, at page 10.  It's, of course, notoriously difficult to prove increases in prices when a defendant like Live Nation has been a monopolist for a long time.  What do you benchmark against?

And of course, it's also not required.  Really canonical cases like *Microsoft* don't involve increases in price or reductions in output, yet, of course, they find monopoly power.

THE COURT:  Yeah.  Right.  Sure, but the targeted customer aspect of at least some of these markets creates a wrinkle that has not been addressed in many cases.

So, what I'll ask is that in your Wednesday submission -- I understand the cases that, Ms. Sweeny, you cited.  If there is a specific case that addresses and says that you do not have to show price discrimination in the way that the defendants are suggesting, it would be great to see that.  Because I think that's what you're saying.

And I understand why you're saying it.  You're saying: Look, based on these things that have been tried and true principals.  When you have a monopolist in a market, the reason why we don't always require direct evidence is because the impacts might be baked into the market already; it might be ladder to chose these things.

And so if that's true, I'm hoping that you have a case

Q1N4UNI2

that says that, because I think it would meet the defendants' citation of *Meta*.  But I understand what you're saying.

All right.  Okay.

So, now, will you also going to be addressing -- would you be the one to be addressing -- and Ms. Sweeny, you can sit down.  I don't want you to have to stand up forever.

MS. SWEENEY:  Thank you, your Honor.

THE COURT:  Would you been the one addressing Dr. Hill's HMT analysis that's the subject of the *Daubert* motion?

MS. VAN KIRK:  My colleague, John Thornburgh.

THE COURT:  Okay.  You want to take the lecturn, or --

MR. THORNBURGH:  Sure, your Honor.  I'm happy to do so.

THE COURT:  Is Dr. Hill here?

Hello.

MR. THORNBURGH:  He is, your Honor.

THE COURT:  Well, I'm happy for you to do this.  I'm happy for Dr. Hill to do this.  But, as if I were, you know, an eight-year old, I need someone to explain to me what the monthly persistence and corrected show weighted metrics are, because a lot of it is done in footnotes in the briefing.

And I understand the order of shows, and I'm going to ask some questions about that, but I don't know that I fully understand these two other measures and what they are, exactly.

Q1N4UNI2

MR. THORNBURGH:  Of course, your Honor.

And I'm happy to explain it to you at the level that I understand it as an attorney and as a former high school economics teacher, but if you want it in more detail, I'll ask Dr. Hill, who can give you a more fulsome explanation of this.

THE COURT:  You might as well give me the high school version.  It seems appropriate for this.

MR. THORNBURGH:  As your Honor pointed out, the corrected show weight, the name is a bit misleading, so let me just try to simplify it as much as possible.

What Dr. Hill did was, for any concert that was performed at a major concert amphitheater or a large amp, he looked at where that artist who did that performance, the other shows or concerts that that artist performed in that same amphitheater season.  So, if we were to look at 2025, this past summer, Dr. Hill took into account for every artist that performed, just even one major concert amphitheater concert, he looked at the other concerts that that artist performed during amphitheater season, which is when amphitheaters are available.  And when you're trying to do aggregate diversion analysis, it makes to look at that.

He also, as a sensitivity, in the appendix of his report, looked at the entire year.  The monthly persistence analysis is looking at the --

THE COURT:  Let me just stop you there.  So on the

Q1N4UNI2

show-weighted approach, is that simply a modification of the general order of shows metric that Dr. Hill used to determine who switched for the HMT?  It based on the order, or --

MR. THORNBURGH:  It's not based on the order.  The order does not matter.  And I think this is an important point, your Honor, because defendants obviously, in their briefing, focused a lot on Dr. Hill's next-show methodology.  But he did it these three different ways, and he found consistent results across all three methodologies.

THE COURT:  Okay.  So then just one more time, for the show-weighted metric, you look at the prime amphitheater season.  You look at people who had tours during that season.

And how does he determine switching?

MR. THORNBURGH:  So again, I think this is an important point.  There is no, like, switching data available in this case in the sense of --

THE COURT:  I get that.  Just, what is he --

MR. THORNBURGH:  He's looking at the other choices, the other venue-type choices that the artist made and is saying:  If an artist -- the artists the defendants have discussed today who have testified in this case -- that artist played this past summer, played 20 concerts and 19 of them were in amphitheaters, he's saying that that is informative of how an artist, that artist would likely substitute if faced with a snip or worsening of terms, because it's indicating that that

Q1N4UNI2

artist -- as that artist testified to -- had a stong preference to play in amphitheater.  If you played 19 of your 20 shows in major concert amphitheaters, you are much more likely, if the price of amphitheater access or promotion services increases by a snip, to turn to another amphitheater in response though that.

Now, defendants want to make a big point.  I think defendants kind of miss the mark.  They're saying that aggregate diversion is about Dr. Hill or any expert trying to predict the exact venue that an artist would substitute to in the face of a snip, and that's not what aggregate diversion is about.  In this context, it's about determining the type of venue that an artist would turn to or most likely turn to if faced with a snip or worsening of terms.

THE COURT:  All right.  What about monthly persistence?

MR. THORNBURGH:  I'm going to tell you the general -- the reason it's a little bit more complicated is because the weighting is -- it gets into ratios.  But the bottom line is, Dr. Hill, for every show in which an artist performed at a major concert amphitheater -- again, as long as an artist did at least one show, they are in that data analysis -- he then looked at the shows that that artist played in the month following that initial show in the amphitheater to determine how likely it was -- what their venue-type preferences were.

So it's just looking at different time horizon.  So, you have a next show, which we think is informative for a lot of reasons.  We have Dr. Hill's corrected show weighted, which is looking at the entire amphitheaters season.  And we have the monthly persistence, which is looking at the next month following the show.

And again all three of Dr. Hill's methodologies found very consistent results.

THE COURT:  And you can have Dr. Hill address this or you can.  Can you just go through each of these three methods and explain why you believe they are a reasonable proxy for an outside diversion ratio in the HMT, given the arguments that the defendants are making?

MR. THORNBURGH:  Of course your Honor.

And so --

THE COURT:  And specifically, about the point of competition; right?

MR. THORNBURGH:  Yeah.

THE COURT:  I mean, one of their major points is that, where someone went to next or what else they did somewhere else is not really -- it doesn't tell you anything about what they would do with respect to any particular competitive decision they make, and that's different from a lot of the other cases that you cite to, like *Teradata* and *H&R Block*, where at least somehow, the data is relevant to the point of competition and

Q1N4UNI2

what consumers would do.

With that backdrop, fire away.

MR. THORNBURGH:  Of course, your Honor.

And I think that *Teradata* and the other cases that we cite to are certainly on point, and here's why.  The Artist -- when the artist goes on tour, the rationale for doing so is to perform and make money; okay?  That does not change.

I think it's helpful to juxtapose what an artist is trying to do there with defendants' grocery store example in their reply brief.  If I go to the grocery store, I might be buying Popsicles for one reason.  I might be buying hot dogs for another reason, and I might be buying soda for somebody else in my household.  I'm making those purchases for different reasons, potentially, for different people.

When an artist goes on tour, they are performing to their fans in order to make money.  As an example, defendants in their summary judgment briefing cite Beyonce.  Beyonce has performed in stadiums, has not performed in an arena in the last eight or nine years, in the United States.

And so if there was a snip or worsening of terms at a stadium where Beyonce was performing, she's much more likely to turn to another stadium and perform there, because she is so popular that she can make that money in a stadium.  And so the other venue choices, the other venue-type choices that an artist makes is informative of where they would likely turn if

Q1N4UNI2

there was a snip or worsening of terms in a single venue, and that's the core of what aggregate diversion is trying to answer.

THE COURT:  And you'd say that all the arguments that the defendants are making don't undermine that basic point for admissibility purposes, and it ends up being a fact battle between Dr. Hill and Dr. Yurukoglu.

MR. THORNBURGH:  Absolutely, your Honor.

And again, I think the *Teradata* is very on point here, that the aggregate diversion methodology that the expert there used -- an expert that defendants, themselves, have previously retained in this matter -- the aggregate diversion was based on the number of times a competitor's name appeared in certain sales reports.

I think that is certainly, you know, no more, at best, indicative of customer choices than what Dr. Hill has done here when he's run three different sensitivities over three different time frames for determining artist's choices, venue-type choices.

THE COURT:  In a footnote, I think, there's a reference to some belated citing of literature that might support these approaches, but I'll give you a chance to say: Is there any literature cited in the record that supports the methods that Dr. Hill utilized?

MR. THORNBURGH:  Well, this is --

Q1N4UNI2

THE COURT:  We'll, either "yes" or "no" and then I'll let you --

MR. THORNBURGH:  Yes.  The short answer is yes, your Honor.

Dr. Hill, in his reports, cites to the horizontal merger guidelines, which discuss aggregate diversion analysis or critical loss, which is what he did.

Critical loss is -- at this level, there are different ways to implement critical loss.  In Dr. Hill's report he talks about the typical -- when you've all the right data available, aggregate diversion ratio formula.  This goes to defendants' critique of the formula.

Well, as we've already discussed and as defendants acknowledge, there is no specific switching data available in this case.

So, what Dr. Hill did, as many other economists do --

THE COURT:  Let me stop you.

MR. THORNBURGH:  Okay.

THE COURT:  Sorry.  Is there any literature cited in the record that supports either an order of shows approach or something like it, the monthly persistence approach, or the show weighted average approach?

MR. THORNBURGH:  I think in our opposition brief, your Honor, we cited to, one, Dr. Hill's testimony in *Kroger v. Albertson's*, which is the same methodology that he used here,

as well as Hoskin and Ten paper, which is consistent with Dr. Hill's methodology here.

I have to at least point out, your Honor, that the case law is pretty clear. There's no requirement that Dr. Hill cite to a specific academic paper for the specific formula that he utilized. And frankly -- and I think you're welcome to hear from Dr. Hill -- that's why he didn't do it, because he didn't think that that was necessary, because this is standard economic stuff in antitrust cases.

THE COURT: That's fair, but Dr. Yurukoglu cites to a number of materials, and he says that these types of analyses have been done, and there are people who have talked about them in the literature. And his suggestion -- which, I take your point's going the other way -- is that Dr. Hill's approaches just don't mesh with anything in the literature.

And so it's not just -- I'm not suggesting that you have to have support in the literature; it's just I think the suggestion from the other side is that there's a lot of literature saying there are other ways to do it, and it just wasn't done here.

MR. THORNBURGH: That's fair enough.

And I think that's just one reason to go back to how we got to this point, your Honor. Defendants started from the position of, Dr. Hill had to use certain types of data, pricing or worsening of terms data, in order to implement the HMT.

Now, they have since backed off of that position in their reply brief because it's been demonstrated that it's clearly wrong, but I would submit to you that part of the reason that defendants' expert is saying that this is so wrong is because he's not familiar, most likely, with the case law that exists demonstrating that that type of data is not necessary.

THE COURT:  Understood.  And in terms of -- I asked you about literature but also in terms of cases, in terms of order of shows or something like that.  And I'm not talking about switching data or win-loss data for particular transactions, but in terms of order of shows, is there any case that uses -- like, what's the case that use something the most like that?

MR. THORNBURGH:  Well, I think, your Honor, I would point the Court, probably, to *H&R Block*.  And I think that is looking at a form of switching data, but I think the reason it's most relevant, as I'll explain, is it's looking at how customers prepared their tax returns in one year and then how they prepared their tax returns in the following year, so it is a sequential element there.

And as the Court, there, acknowledged there was -- it was not clear why a customer switched from one methodology in one year to a different methodology in the next.  And so I think that's, in many ways, consistent with what Dr. Hill has

Q1N4UNI2

done here.

THE COURT:  Okay.  Mr. Gass, or --

MR. MARRIOTT:  Your Honor, we have a new voice.

THE COURT:  Okay.  I'm happy for you or Dr. Yurukoglu to respond.

MR. MARRIOTT:  Yeah, your Honor.

I think it would be helpful to have Dr. Yurukoglu do this.  He is the expert.  I did not teach economics, your Honor; I taught nothing.

But we would be glad to have Mr. Yurukoglu come.  And I'm happy to answer, as he comes up, some of the Court's questions -- if you wish -- that were directed to counsel.  But we'll invite Mr. Yurukoglu up.

THE COURT:  No.  You can switch at the lecturn.

Do it any way you want.  And you heard my questions to plaintiff's counsel, and my question for you is:  You just heard all of that; what's the response?

DR. YURUKOGLU:  Thank you, your Honor.

Ali Yurukoglu.  So, there's a bunch of responses.  I think there's a bunch of different issues were raised, so let me just take a step back.  The three methodologies: the show order, the -- what he calls the corrected show weighted, and the monthly persistence.

I want to first say that the monthly persistence is just a hybrid of the two.  It's something intermediate, so it's

Q1N4UNI2

kind of like, not a different methodology; it's just a mixture of the two.  So I think, we can, just for simplicity's sake, just focus on the show order and the corrected show weighted.

The show order was the one that came in the opening report.  That was his main.  And there is nothing in the literature like it.  That, I agree, on its own, is not fatal.

Forgetting about law, I'm just thinking about it as an economist.  If someone proposes something new, I go into it with an open mind and I evaluate, does it make sense.

And how do we evaluate whether a methodology makes sense is we try to think about applying it in a setting where we know the answer, and we try to ask:  Does this methodology deliver the answer that we know if it's faced with data when you apply it to those data?  And that's how econometrics textbook evaluates the validity of methodologies, you hypothesize, sort of idealize conditions and you ask:  Does the methodology work on those idealized conditions?

If it doesn't, it's a non-starter, because the real data is not idealized.  But if it doesn't even work when you have the idealized conditions, that is -- it's non-scientific.  You're just in make-believe world at that point.  You can justify any choice of number.

So, what I showed in my rebut -- first reply report was, his next show order, when you apply it to a setting where we know the answer -- so a setting where we imagine we have

Q1N4UNI2

perfect data.  The real data is not perfect.  We don't require perfect data in reality, but for the sake of evaluating the validity of the methodology, we imagine perfect data.  So, that's what I did.

If you think about what he's trying to do, we all agree, diversion is what happens when the price increases.  So, he's coming and saying:  I'm going to tell you what happens when the pricing increases without ever seeing a price increase.  So, we know there's going to be assumptions built into that.  We know there's going to be a little bit of magic going on.

If you're going to try to do that type of magic, you've got to state your assumptions and they've got to be valid, and then the way that you aggregate them up have to give you the right answer when those assumptions hold.

So, I imagined a world where we had data where there actually was a price increase.  If you were a scientist and you were trying to figure out what's the diversion rate, the best case scenario is:  I have two cities that are very similar, with the same types of venues.  I raise the price in one of the venues in one city.  I compared where the artists play, where the promoters book the shows in the two different cities.  That's the idealized version.  So, I imagine I have a data set that has that type of data, like, generated from that experiment.

Q1N4UNI2

You apply Dr. Hill's next show analysis, and you get something completely different that is, in fact, rigged to be too low in terms of how much outside diversion you get.

So, that's why I use, in my report, fairly strong language that it's internally inconsistent, nonscientific, because it doesn't meet that step zero of being valid, even with good data.

THE COURT:  Fundamentally, you could, perhaps, have an order of show method that would be appropriate, but you'd have to control for a lot of different things so that the analysis would be trained to who is going to actually switch out of the market or stay in the market as to any particular decision versus to a venue.

Your point is just, like, this particular version just doesn't have anything to do with that, because it's just looking at pure order of shows with no other considerations; is that fair?

DR. YURUKOGLU:  That's part of it, but the problem is, the math doesn't add up.  The formulas doesn't actually give you diversion, even if you have a perfect data set.  It's a much more fundamental problem than just, you're using the order of the shows.

THE COURT:  Okay.  And what about the -- and I understand monthly persistence is a hybrid --

DR. YURUKOGLU:  Yeah.

Q1N4UNI2

THE COURT:  But there's the show weighted average, which the plaintiffs say doesn't depend on this order of show approach; it looks at a season.  It looks at how often they're within the market during that season.  They weight that, and that seems more like a traditional measure of how we would look at things here.

DR. YURUKOGLU:  Yeah.  I was open to that, too.

So, in his reply report, he didn't sort of address the issues with the next order.  He said, well, here's another method.  He calls it corrected show weight.  It's his nomenclature.

So, I was curious about that because, again, there was no citation in the reply report.  I came up with, in my surreply, examples where that would fail as well.

Later on, he provided a citation to this paper that they brought up, and there's actually two big problems with him trying to claim that -- with Dr. Hill's usage of that paper. The first is a conceptual problem.  That paper, it's about retail markets.  It is you're seeing the same customer face the same choice set over and over.  It's like, every week, I go shopping with my family.  Do we go to Costco?  Do we go to Safeway?  Do we go to Whole Foods?  And you see that over and over.  It's sort of a consistent, stable choice set.

And under assumptions, okay, which are actually debatable and quite strong, there is a framework in which you

can map that to diversion.  Those assumptions and that repeated

choice of a stable choice set don't apply here, because the

choice I make in New York is different than the choice in

Philadelphia.  What it rules out, importantly, which is just

economically very salient, is that if the price of a venue --

say the price of an amphitheater in Philadelphia goes up, by

assumption, he's essentially ruling out, with this method, that

you would be more likely to switch to another venue in

Philadelphia.

He's saying, well, it's about everywhere else you

played in the country.  But Philadelphia is big market. LA is a

big market.  If the price goes up, you have to at least allow

for the possibility that you'd be more likely to switch to

another venue in market.  And that's where having the

non-stable choice set ruins, conceptually, the application

here.

And there's actually one other big problem, is that

the actual math formula that that paper provides are not what

he calculated in his backup.  We only figured this out because

the citation came -- it was like, he mentioned some authors in

the deposition.  We went and found the papers.  He's not even

applying the formulas in that paper correctly.  He's doing it

in a way that actually understates diversion, so it's not

surprising they all give you the same answer, because they are

all constructed to understate outside diversion.

Q1N4UNI2

THE COURT:  All right.  Mr. Marriott, do you have anything further?

MR. MARRIOTT:  I do not, your Honor.

Thank you.

Plaintiffs, if they have anything else -- and thank you, Dr. Yurukoglu.

DR. YURUKOGLU:  You're welcome.  Thank you.

THE COURT:  If there's anything else in response to Dr. Yurukoglu or if Dr. Hill wants to say anything, briefly -- briefly, because I know we've been here for a while.

MR. DAHLQUIST:  Yes, your Honor.

Another new voice.  David Dahlquist, on behalf of the United States.  And it's my first time before your Honor, so just a pleasure to meet you and thank you for the time today.

THE COURT:  Of course.

MR. DAHLQUIST:  In light of that testimony, we would appreciate the opportunity to have Dr. Hill address the Court. And we have a deck that will assist in some of those, so I'd like to hand that up, have Dr. Hill approach, and have him answer those questions as well as any questions you have.

THE COURT:  I'm happy to receive the deck, but in the interest of time, you know, let's -- in five -- I want to make sure that I hear from Dr. Hill.

MR. DAHLQUIST:  I appreciate that.

THE COURT:  And have you given defense counsel a copy

Q1N4UNI2

of the slides?

MR. DAHLQUIST:  I will give it to them right now.  It is directly from his report, your Honor.

MR. MARRIOTT:  And our only concern about that, your Honor, is that at the outset of the hearing, we also have a deck -- which we gave counsel in advance -- specifically asking if they had a deck, and we were told they did not have a deck.

They have ours.

Would you like our deck as well, your Honor?

THE COURT:  Yes, of course.

MR. MARRIOTT:  May I approach?

THE COURT:  You may.

MR. DAHLQUIST:  And your Honor, if I may -- and apologies.  We did not know how today was going to go, so apologies for not providing it in advance, but they have it.

Everything in the deck is directly out of Dr. Hill's either initial report or his rebuttal report.  And if we could focus just a couple pieces -- we don't have to go through the whole thing, but -- we can start at slide two.  And I think that's where Dr. Hill is prepared to at least address what he did.  And then we can probably jump all the way to slide 8, which goes directly to your Honor's question.

THE COURT:  Well, I mean, to be really honest -- and Dr. Hill, I'll address you directly.

DR. HILL:  Sure.

Q1N4UNI2

THE COURT:  You just heard Dr. Yurukoglu, and he says that counsel gave us an explanation of the three methods.  You heard what Dr. Yurukoglu said, so what is your response.

DR. HILL:  I can just talk.

THE COURT:  He says, basically, that your methods don't measure the things you're trying to measure, and even if they could measure that, they don't match up when he applied it to certain data sets, which shows that they're totally wrong.

DR. HILL:  Sure.  I'm happy to talk about the -- I'm fine setting the monthly persistence aside.  I disagree that it's a hybrid of the two.  I think it's valuable independently, but let's just focus on the other two.

So, I think we can start with the corrected show weighted.  So, here, again, just to go back to the basics, I'm asking:  If I take all the artists who perform -- let's take a major amphitheater, a major concert amphitheater.  I say, who played at the amphitheater in that year and where else did they play?

So I'm trying to understand -- in market definition, we're thinking about customer substitution, what the customers view as being close substitutes.  If I follow you around for a year and every time you go to a deli you order a roast beef sandwich, I'll say: likes roast beef.  If it's smoked turkey, I'll sat it's smoked turkey.

So, the most common method used to estimate diversion

Q1N4UNI2

in antitrust is substitution according to share.  You look at the choices people have made in the market, and then you estimate diversion by doing that.

So the question, again, is thinking about what choices have consumers made in the past, and that's what we're doing with artists.  In the corrected show weighted methodology, I take each performance at a major concert amphitheater -- in this case, in 2023 -- and I say:  Where else did those artists play?  And I find that roughly 55 percent of the time, those other shows were at major concert amphitheaters.  Two percent of the time, they were at stadiums.  11 percent of the time, they were at major arenas.  So it varies, but I'm using that information to try to understand what choices they make.

And this is the same methodology I used on Kroger Albertson's, which is a grocery store context.  I asked:  What choice did people in a particular area make when they went to the grocery store, and then I added up all those grocery stores.

So there, I added up all those ZIP codes to understand what demand looked like for that grocery store.  Here I'm doing it for artists.

THE COURT:  Wait.  Could you go back just bit?

In Kroger, what was the --

DR. HILL:  In Kroger, I would take a grocery store, and I was trying to understand who goes to that grocery store

Q1N4UNI2

and if there was a change in prices or worse quality, where else might they go to.

So, I had data at the Census tract level. At this Census tract, 20 percent went to Walmart; 20 percent went to Costco; 60 percent went to Kroger or Albertson's.

And so I used that information. I had each Census tract, and I took each Census tract where that grocery store was making sales, and I added them up to get a sense of where might consumers go if there was a worsening of terms.

And I weighted them. So if there was one census tract that accounted for a lot of the sales at the store I was interested in, it got a lot of weight. If there was a Census tract 100 miles away but one time, a customer had come in and shopped at that Kroger and Albertson's, it got a little bit of weight.

So, using those weights, I added up the choices made by customers in each of those Census tracts to get a picture of what the customers for that grocery store think of their substitutes. And so I'm doing the same thing here. I'm taking all the artists who played at major concert venues and I'm saying: Where else did they play? And I give more weight to artists who played a lot of concert venues and less weight to artists who played less.

THE COURT: And what is the response to argument that this different than Kroger because this ordered -- or it's kind

Q1N4UNI2

of a switching approach, for a particular artist, when they go somewhere else, it is somewhere else, and so the choice that they make in that other place does not say anything about what they would do in the last place they were in if the price changed.

DR. HILL:  In the case of the corrected show weighted methodology, in those, I'm looking at all of the choices they've made, both before and after.  And I'm asking about venue type, not a particular venue.

So, I'm learning about -- so, for example, Mr. Thornburgh, the artist in the other slide deck you saw from defendants, that particular artist played 19 out of 20 days at major concert amphitheaters in a particular amphitheater season.  My contention is, that's a reasonable way to learn about the choices that those customers made.

THE COURT:  All right.  So it's not trained on any particular venue.  Nevertheless, it is a reasonable way to think about what someone would do if prices within the market increased.

DR. HILL:  Correct.  And your Honor, if you look at my report, I did it at this aggregate level, putting together all of those performances.  And I also said there's also an analysis in there where I look venue by venue, so I took each major concert amphitheater and said:  Just for that major concert amphitheater, what other types of venues did those

Q1N4UNI2

artists play at?  And you'll see, there's a scatter plot in there where I look at all of them, and then I also look at the average of them.  And the average, not surprisingly, looks like the bigger picture, and there's variation within each of those venues.

THE COURT:  All right.  Thank you very much.

DR. HILL:  I just want to say one last thing.

And on the first methodology, the next show methodology, I think the key thing in all of this and the reason I originally used that methodology is, we want to make sure that we're looking at choices made when major concert amphitheaters are available.

If I look at the choices an artist makes in January, when no major concert amphitheaters are available, that's not going to give me a lot of information about what they might do when major concert amphitheaters are available. So, if I go a deli and I follow your preferences and smoked turkey is not available that day, I don't learn much about whether you like smoked turkey.

So, in all of this, I was trying to focus on amphitheaters.  And in the corrected show weighted methodology, I explicitly limited it to amphitheater season.

In the next show methodology, that does it implicitly just by looking at the choices made by the artist, and that's why it's helpful.  So, if you play a date in June, say, at a

Q1N4UNI2

major concert amphitheater, I say:  Great.  That means major concert amphitheaters are likely on the menu.  What did you do next?

And if I see you played a date in a different time of year, if you play a major concert arena in December, I say:  It doesn't look like major concert amphitheaters are available, so I'm not going to look at your next choice.

It's just another way of trying to restrict my attention choices made when major concert amphitheaters were actually available.

THE COURT:  Isn't the output -- let's say that you had two artists.  They play five shows at a major concert venue and five shows in a theater.  Okay?  Two artists to that.

They do it -- you know the first one only switches once.  There's like five shows in a major concert venue and then the rest of them are in theaters.  They switched once.  And the other one goes back and forth.  The numbers are going to be different in terms of the outputs for those two artist, but they're doing the same thing.

And why is that reasonable?

DR. HILL:  That's right.  I'm looking across all of the artists.  Let's take your example.  Let's say, at random, I choose between a stadium, a major concert arena and a major concert amphitheater.  And I turn loose hundreds of artists and I see what they do.

Q1N4UNI2

Some artists may have that first pattern you mentioned. They do all amps; they do all arenas. Some may mix them back and forth. Some may do some other pattern. But when I look across all of them, I'll get a sense in the aggregate.

And when I look across them all, I don't see 33 percent stadium, 33 percent major concert amphitheater, instead I'm seeing those artists play disproportionately at major concert amphitheaters.

THE COURT: Got it. All right. Thank you very much.

DR. HILL: Thank you, your Honor.

(Continued on next page)

Q1N4UNI4

MR. MARRIOTT:  May we briefly respond, and then I have three quick points, your Honor, if I may, after that on that issue.

THE COURT:  On that issue, okay.  Well, very, very briefly, literally like a minute.

DR. YURUKOGLU:  Let me just focus on the most important points.  When he says it is reasonable, or it is indicative -- there is an actual number going into the HMT.  Just to have something that's roughly correlated with it is not scientific.  I'm not actually even disputing that where they play if other cities might have some correlation with what they might choose.  But he is ruling out -- he is ruling out that what the city you play in that you are not going to substitute to the venue in that city, if the venue you were playing at in that city raise its pricing.  It's a nonstarter both conceptually and economically.

And layering on top of that the formulas don't add up, so that's relevant.

THE COURT:  Thank you very much.

Mr. Marriott?

MR. MARRIOTT:  Thank you, your Honor.

On that last point, what we didn't see in Dr. Hill's deck is any explanation of what we call "the denominator problem."  They have, as Dr. Yurukoglu mentioned, the major problem that they use the wrong denominator in their formula.

Q1N4UNI4

They are not looking at switches.  They are looking at all participants.  That's why the formula is doomed from the beginning.

More fundamentally, all of these methodologies, nonetheless, from their side rely effectively on core data. They may be looking at the core data in different ways.  It may not be a first stop in every one, but it is fundamental core data.  And contrary to what has been suggested, there is data in this case.  They had the opportunity for the government to get data from every one of the subpoenas that they say are in these marketplaces.  They got very little.  They got some. They didn't use it.  And that doesn't mean we simply ignore altogether that this is fundamentally about what happens in the event of the worsening of terms.

And Dr. Hill, in his deposition, admitted that the diversion estimates that he does do not depend on the study of switching in response to the worsening of terms, and that fundamentally is what it's about.  Thank you.

MR. THORNBURGH:  Your Honor, if I could just respond very quickly, I promise.

THE COURT:  Okay.  I'll hold you to that promise.

MR. THORNBURGH:  In the deck that my co-counsel handed up on Slide Nine it provides the results when Dr. Hill accounts for -- we don't agree with the purported critique of the wrong denominator.  But when you account for that, it demonstrates

Q1N4UNI4

that the critique is immaterial, and the results are essentially the same.

And just so the Court understands what that wrong-denominator critique actually means, all that it's talking about is because, as we discussed, we don't have switching data or switching data from one product to the next, Dr. Hill included in the denominator every concert. And so the question is if an artist, which sometimes on rare occasion an artist does, plays more than one show consecutively at the same venue, do you count that as one show? Or do you count that for multiple shows? So Bruce Springsteen plays MSG on Friday and Saturday night, do you count that as one show or you count that as two?

Dr. Hill counted it in his initial methodology as two. As he indicated in his report, it's indicating that that artist has a particularly stronger preference for that venue type, right. If an artist plays five consecutive shows in the same amphitheater, that's indicating a stronger preference for amphitheaters than if that artist played one show in a row at that amphitheater.

Again, we don't agree with the critique but, Dr. Hill, when he accounts for it, he provided results that shows there is no meaningful difference. And defendants' expert also did the same calculation and found there was no meaningful difference.

Q1N4UNI4

THE COURT:  Am I correct that what you're saying is even if this were an issue, Dr. Hill addressed it, did a new analysis with the correct denominator, and it doesn't change anything?  Is that what you're saying?

MR. THORNBURGH:  I would say did it with the denominator the defendants claim he should have used, not the correct one.  He feels like he used correct one.  But otherwise yes, your Honor.

THE COURT:  Do at trial, you are going to do it the right way; right?

MR. THORNBURGH:  I think we would show the way he did and, yes, of course, to show the way that the defense claims he "should have done it."

THE COURT:  Okay.  All right.

MR. THORNBURGH:  Thank you.

THE COURT:  So very quick cleanup questions, and let me ask Ms. Sweeney and Mr. Marriott, are you planning to say anything else?  I really have some very specific questions left.  But I want to ask you whether you had in mind to do anything else because I'll certainly allow each side a chance to speak.  However, if we are going to do that, then I'm going to take a short break.  That's the question, Ms. Sweeney, if you don't have anything further we can probably get through this in the next ten to 15 minutes.

MR. SWEENEY:  Your Honor, we would like a short break.

Q1N4UNI4

And we may have further remarks.

THE COURT:  Okay.  Let's take a break.  And let's come back at 1:20.

(Recess)

THE COURT:  Please be seated.  All right.

Ms. Sweeney?

MS. SWEENEY:  We just have one small thing, your Honor.

THE COURT:  Okay.

MS. SWEENEY:  Your Honor asked me for case citations when I said that where you have direct evidence of anticompetitive effects, you don't have to define a relative market.  I do have one case cite for, your Honor.  *FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 460-61.  The Court says, the finding of actual sustained adverse effects on competition in those areas where IFD Dentists predominated viewed in light of the reality that markets for dental services tend to be relatively localized is legally sufficient, and support a finding that the challenge to restraint was unreasonable, even in the absence of a relevant market definition.

That's all we have, your Honor.  Thank you for your time.

THE COURT:  Okay.  So I just have one question.

Ms. Sweeney, maybe this is for you or one of your

Q1N4UNI4

colleagues.  You are arguing for both a venue-facing primary ticketing market at MCVs and a narrower one only for concerts; is that right?

MS. SWEENEY:  That is correct, your Honor.

THE COURT:  Okay.  So the briefing does not address those separately.  Do they rise and fall together?  That was what I thought, but I want to make sure I'm not missing something?

MS. SWEENEY:  They do, your Honor.

THE COURT:  Dr. Hill, I believe addresses the concert ticketing market.  Is there any analysis on the broader ticketing market that I'm not seeing?

MS. SWEENEY:  Yes, your Honor.  That's in his Appendix F in his initial report.

THE COURT:  All right.  I'll take a look at that.  Thank you very much.

And Mr. Marriott, anything from your end?

MR. MARRIOTT:  We have nothing affirmative here, your Honor.

THE COURT:  Is there anything else I need to deal with at this time?  Obviously, we have a lot of work to do on our end.  Anything else that we need to deal with in terms of the flurry of motions to seal or anything else?

MR. MARRIOTT:  There is one issue that would be helpful to have some clarification on to make sure we are on

Q1N4UNI4

the same page as to what the ground rules are.  On Wednesday next we are to submit the piece of paper that your Honor has described.  I want to make sure it's clear what it is, so we give you what you want.  As I understand it that would be simply citations to record evidence and/or the identification of cases, no elaboration, no argument, topic, here is my three document references, and very importantly it's limited to the 56.1.  So it is limited to a record that is otherwise closed.  Neither side may be going out looking for evidence that is not part of the summary judgment record.

THE COURT:  When you say "the piece of paper".

MR. MARRIOTT:  The letter.

THE COURT:  The letter.  I gave each side the opportunity to put in by Wednesday a further submission.  And you're wanting to confirm that there not going to be additional argument in that submission; is that correct?

MR. MARRIOTT:  Correct.  I want to confirm it's a list evidence or a list of cases, not arguments so we know we are each submitting comparable things.  And any evidence is limited to that that is already in the record that is cited in 56.1?

THE COURT:  I think that's right.  But with that understanding, if there is some need to give a sentence or two of explanation as to something, then I will allow that because I think it's just going to help understand what it is that's being submitted and the significance of what's being submitted.

Q1N4UNI4

MR. MARRIOTT:  Fair enough, but limited to the 56.1 in the record?

THE COURT:  Of course.

MR. GITLIN:  Your Honor, just to clarify, first of all, I think your Honor had asked for at least the day to get back to you with respect to staying the state law claims.  If it's all right with the Court, we will draw into the Wednesday deadline, given that I report to something between three and four dozen sovereigns, that would help.

And I take it that, just going to Mr. Marriott's point there, particularly because we have to consider the Court's suggestion seriously in terms of whether or not to stay the claims, I take it we would be permitted to provide, obviously, some explanation as to particularly why not if we say that we believe that the state law claims should not be stayed?

THE COURT:  Of course.

MR. GITLIN:  Thank you, your Honor.

MR. THORNBURGH:  Your Honor, we have one more brief witness availability issue with respect to trial.  I can cover it here briefly for you to get the Court's guidance, or if the Court would prefer, we are happy to put in a letter on Monday if that's your preference.

THE COURT:  Well, what it is it?

MR. THORNBURGH:  Fair enough.

There is an individual, your Honor, who was on

Q1N4UNI4

plaintiffs' initial disclosures, and who plaintiffs deposed during our investigation.  And we had all along anticipated that would be an individual who would be a witness for us at trial.  When we reached out recently to ask about that individual's availability for trial, we learned that, unfortunately, that individual is going to be starting medical treatment early next month and so would be unavailable for trial.  We have proposed to defendants, as a result of that unavailability, we would take a trial testimony deposition at the end of this month when the witness has indicated he was available.  I understand defendants are opposing that deposition.  Given just the tight time constraints we are under and the fact that we would like to move forward with that deposition.  We think, given the Second Circuit case law, it's pretty clear to make sense for that person to sit, given their unavailability for medical reasons.  We wanted to get the Court's guidance on that?

THE COURT:  Mr. Marriot or whoever would like to address this?

MS. GUSHMAN:  Your Honor, Robin Gushman for defendants.

Plaintiffs have known about this witness for a very long time.  He was disclosed in their initial disclosures.  He was also deposed during the pre-complaint investigation in this matter.  And they decided not to depose him during discovery.

Q1N4UNI4

The real issue here is that we don't have his documents. And there is no time to get his documents. I also understand from his counsel that he will not be producing documents for the deposition. So we will be going into this deposition without documents from this individual.

There were two other individuals from this particular entity that were deposed during the litigation in the discovery period. And in negotiations with this party's counsel, we were able to obtain documents from those individuals. But they resisted producing documents from the individual at issue who will be deposed as proposed by plaintiffs next week. And we were not able to obtain documents. So we are going into this deposition without any documents from this individual which prejudices defendants.

THE COURT: Why isn't that issue independent of the deposition versus live testimony issue? Meaning, we are way past the end of discovery and no issue about this was raised. And so if it is true that the plaintiffs identified this individual as someone who would testify at trial, your argument about documents would equally apply to having to cross-examine this person without having access to documents; right?

MS. GUSHMAN: There is a provision in the protocol that allows us to potentially obtain documents from this individual on the witness list who were not deposed. So we would be able to subpoena this individual for documents. But

Q1N4UNI4

given the timing and given that plaintiffs are proposing a deposition next week and that he cannot testify beyond that point, there is no opportunity to obtain documents from him.

MR. THORNBURGH:  Your Honor, as I said earlier, this individual was deposed by the United States during our investigation.  And at that time his former employer produced documents to the United States which were part of the investigative file that plaintiffs produced at the beginning of this litigation to defendant.  So there are certainly some documents with this person's name on them, emails, et cetera, that defendants have and that's consistent with the investigative deposition record in which there were exhibits introduced on emails for which his name is on them.

THE COURT:  So help me with the protocol.  If this person were going to testify at trial, then you would agree that the defendants could subpoena this witness and obtain documents directly; right?

MR. THORNBURGH:  Yes, your Honor, that's correct.  I'd say they have option to depose this individual no matter what because that's on the deposition protocol.  Whether there would be additional document discovery of a third party who was identified by plaintiffs outside of this litigation is I think a little bit less clear.  Certainly, we would agree they would have opportunity to depose the person.

THE COURT:  So you do not agree that they have a right

Q1N4UNI4

under the parties' protocol to subpoena that person for documents now?

MR. THORNBURGH:  I believe I agree with what you just said, your Honor, because it there was a separate agreement, if you recall, based on defendants adding many people to their supplemental disclosures that apply to some of those people with respect to documents.  But the original agreement was for depositions, specifically even for people who were on the witness list, regardless as to whether they were included on one side's initial disclosures.

THE COURT:  All right.  Are you able to see if you can get this individual's documents?  Is that feasible?

MR. THORNBURGH:  Again, your Honor, this individual is a former employee.  His former employer has produced documents with his name on them.  So I'm not quite sure to the extent defendants suggest they wanted additional documents.  We are not opposed to them asking the nonparty for those additional documents.  We wouldn't oppose that discovery request.

THE COURT:  You don't have any control over this witness.

MR. THORNBURGH:  That's correct.  As I said, as soon as we put this individual on our preliminary witness list, we reached out to see if he would be available.  And we learned, unfortunately, about the medical issues.

THE COURT:  You need to do this deposition by the end

Q1N4UNI4

of this month.

MR. THORNBURGH:  Correct, your Honor, because this person is starting treatment next month.

THE COURT:  Proceed to schedule this deposition.

I'll say to the defense that I will hold the parties to the agreements that they have made.  So if there was an agreement made that would apply to this witness, and for reasons of this late-breaking need to take a deposition now, the terms of that agreement cannot be honored, then I will consider that in determining whether the witness's deposition testimony will be admissible at trial.  You can make that submission in advance of the deposition so that I can consider it.  If I look at what you're saying, and I see a violation or a failure to comply with the parties' agreement, then I will certainly take that into consideration.  Okay?

MS. GUSHMAN:  Thank you, your Honor.

THE COURT:  Anything further?

MR. MARRIOTT:  Nothing here, your Honor.  Thank you.

THE COURT:  I want to thank everybody for the great arguments on both sides and for coming out here.  Everyone stay safe over the weekend with the snowstorm.  We are adjourned.

(Adjourned)