# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, et al.,<br><br>　　　　　　　　　　Plaintiffs,<br><br>　　　　v.<br><br>LIVE NATION ENTERTAINMENT, INC., and<br>TICKETMASTER L.L.C.,<br><br>　　　　　　　　　　Defendants. | Case No. 1:24-cv-03973-AS |

# PLAINTIFFS' OPPOSITIONS
## TO DEFENDANTS' MOTIONS *IN LIMINE*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... ii

OPPOSITIONS ......................................................................................................................... 1

    Opposition to Defendants' Motion 1  Evidence that Market Participants Fear Losing
        Concerts is Admissible ................................................................................................ 1

    Opposition to Defendants' Motion 2 Industry Executives Should Be Allowed to Testify on
        Venue Fears of Losing Content ................................................................................ 4

    Opposition to Defendants' Motion 3 Defendants' Motion is an  Untimely and Meritless
        *Daubert* Motion ...................................................................................................... 7

    Opposition to Defendants' Motion 4  Consent Decree Evidence Is Relevant and Admissible 9

    Opposition to Defendants' Motion 5  Evidence of Defendants' Years-Long Campaign of
        Anticompetitive Conduct is Admissible .................................................................. 11

    Opposition to Defendants' Motion 6  Evidence of Ticketmaster's Sales to Brokers and
        Broker Policies is  Highly Relevant and Admissible .............................................. 14

    Opposition to Defendants' Motion 7 The Jury Should be Instructed on the Role of Future
        Remedies Rather Than Excluding All Remedies Evidence ..................................... 16

    Opposition to Defendants' Motion 8  Defendants Own Experts Rely On Out-of-Market
        Comparisons,  and Defendants' Motion Should Be Denied ..................................... 17

    Opposition to Defendants' Motion 9  Evidence on Primary Ticketing Outside the United
        States  Is Relevant and Admissible ......................................................................... 20

    Opposition to Defendants' Motion 11  Executive Compensation is Relevant to Motive, Bias,
        and  Live Nation's Profits ........................................................................................ 21

    Opposition to Defendants' Motion 12 The Description of Ticketmaster's Retained Fees as a
        "Tax"  Is Supported By Expert Analysis ................................................................ 23

    Opposition to Defendants' Motion 13 Fact Witnesses Should Be Permitted to Use the Term
        "Monopoly" ............................................................................................................ 25

CONCLUSION ....................................................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*American Key Corp. v. Cole Nat. Corp.*,
762 F.2d 1569 (11th Cir. 1985) ........................................................................... 29

*American Soc. of Composers, Authors & Publishers v. Showtime/The Movie Channel*,
912 F.2d 563 (2d Cir. 1990) ................................................................................. 12

*Blue Cross & Blue Shield of Vermont v. Teva Pharm. Indus., Ltd.*,
712 F. Supp. 3d 499, 536 (D. Vt. 2024) ............................................................... 13

*Brady v. Wal-Mart Stores, Inc.*,
531 F.3d 127 (2d Cir. 2008) ................................................................................. 11

*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*,
441 U.S. 1 (1979)................................................................................................. 10

*Callahan v. A.E.V., Inc.*,
182 F.3d 237 (3d Cir.1999) .................................................................................... 3

*Capozzi v. United States*, 980 F.2d 872, 875 (2d Cir. 1992) ...................................... 13

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962)............................................................................................ 15

*Discover Fin. Servs. v. Visa U.S.A. Inc.*,
2008 WL 4560707 (S.D.N.Y. Oct. 9, 2008)............................................................. 3

*Emich Motors Corp. v. General Motors Corp.*,
181 F.2d 70 (7th Cir. 1950) .................................................................................... 4

*Fitzgerald v. Henderson*,
251 F.3d 345 (2d Cir. 2001) ........................................................................... 14, 15

*FTC v. Ind. Fed'n of Dentists*,
476 U.S. 447 ................................................................................................. 22, 24

*FTC v. Staples, Inc.*,
970 F. Supp. 1066  (D.D.C. 1997)........................................................................ 24

*GeigTech E. Bay v. Lutron Elecs. Co.*,
2024 WL 68418 (S.D.N.Y. Jan. 5, 2024) .............................................................. 20

*Hess v. Inland Asphalt Co.*,
1990 WL 51164 (E.D. Wash. Feb. 20, 1990) ........................................................ 29

*Hydrolevel Corp. v. American Soc. of Mech. Eng'rs, Inc.*,
635 F.2d 118 (2d Cir. 1980) .................................................................................... 3

*Kansas City Star Co. v. United States*,
240 F.2d 643 (8th Cir. 1957) ............................................................................... 15

*L-3 Commc'ns Corp. v. OSI Sys.*,
  2006 WL 988143 (S.D.N.Y. Apr. 13, 2006) ........................................ 26
*MF Glob. Holdings Ltd. v. PricewaterhouseCoopers*,
  232 F. Supp. 3d 558  (S.D.N.Y. 2017) ............................................... 28
*Midwestern Mach. Co. v. N.W. Airlines*,
  392 F.3d 265 (8th Cir. 2004) ........................................................... 15
*Moskowitz v. American Express Co.*,
  2025 WL 2240326\ (E.D.N.Y. Aug. 6, 2025) ...................................... 26
*Nat'l Collegiate Athletic Assoc. v. Alston*,
  594 U.S. 69 (2021) ........................................................................... 10
*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. L.E. Myers Co. Grp.*,
  937 F. Supp. 276 (S.D.N.Y. 1996) ......................................... 1, 5, 20
*New York ex rel. Spitzer v. St. Francis Hosp.*,
  94 F. Supp. 2d 423 (S.D.N.Y. 2000) ................................................... 5
*S.E.C. v. Singer*,
  786 F. Supp. 1158 (S.D.N.Y. 1992) .................................................... 7
*S.E.C. v. Treadway*,
  438 F. Supp. 2d 218 (S.D.N.Y. 2006) .................................................. 1
*Sidibe v. Sutter Health*,
  103, F.4th 675 (9th Cir. 2024) ......................................................... 15
*State Farm Mut. Auto. Ins. Co. v. Campbell*,
  538 U.S. 408 (2003) ......................................................................... 26
*U.S. Info. Sys. Inc. v. Int'l Bhd. Of Elec. Workers Loc. Union No. 3*,
  2006 WL 2136249 (S.D.N.Y. Aug. 1, 2006) ........................................ 6
*United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*,
  No. 95-1231, 2007 U.S. Dist. LEXIS 18678 (D.D.C. Mar. 16, 2007) ..... 30
*United States v. Aluminum Co. of America*,
  148 F.2d 416 (2d Cir. 1945) ............................................................ 11
*United States v. American Tel. & Tel. Co.*,
  552 F. Supp. 131 (D.D.C. 1982) ...................................................... 11
*United States v. E.I. du Pont de Nemours & Co.*,
  353 U.S. 586 (1957) ......................................................................... 16
*United States v. Ferguson*,
  2007 WL 4240782 (D. Conn. Nov. 30, 2007) ..................................... 24
*United States v. Garcia*,
  413 F.3d 201 (2d Cir. 2005) .............................................................. 7
*United States v. Gilbert*,
  668 F.2d 94 (2d Cir. 1981) .............................................................. 11
*United States v. Google LLC*,
  778 F. Supp. 3d 797 (E.D. Va. 2025) ............................................... 15

*United States v. Graham,*
 2019 WL 2366724 (S.D.N.Y. May 31, 2019). ........................................................ 18
*United States v. Grinnell Corp.,*
 384 U.S. 563 (1966) ......................................................................................... 15
*United States v. Microsoft Corp.,*
 253 F.3d 34o (D.C. Cir. 2001) ........................................................................ 10
*United States v. Ozsusamlar,*
 428 F. Supp. 2d 161 (S.D.N.Y. 2006) .............................................................. 1
*United States v. Patel,*
 2023 WL 2643815 (D. Conn. Mar. 27, 2023) .................................................. 18
*United States v. Peake,*
 143 F. Supp. 3d 1 (D.P.R. 2013) ...................................................................... 26
*United States v. Quattrone,*
 441 F.3d 153  (2d Cir. 2006) ............................................................................ 25
*United States v. Reed,*
 437 F.2d 57 (2d Cir. 1971) ............................................................................... 26
*United States v. Rowland,*
 826 F.3d 100 (2d Cir. 2016) .............................................................................. 4
*United States v. Shkreli,*
 2017 WL 3623626 (E.D.N.Y. June 24, 2017) .................................................. 19
*United States v. Siddiqui,*
 699 F.3d 690 (2d Cir. 2012) ............................................................................. 25
*United States v. Snype,*
 441 F.3d 119 (2d Cir. 2006) ............................................................................. 16
*United States v. Wirtz,*
 357 F. Supp. 2d 1164 (D. Minn. 2005) .............................................................. 7
*Walker v. Schult,*
 365 F. Supp. 3d 266 (N.D.N.Y. 2019) ......................................................... 12, 20
*WorldCom, Inc. Securities Litig.,*
 2005 WL 578109 (S.D.N.Y. Mar. 4, 2005) ...................................................... 12

**Statutes**

15 U.S.C. § 15b ........................................................................................................ 14
15 U.S.C. § 26 .......................................................................................................... 14
15 U.S.C. § 4 ............................................................................................................ 14
15 U.S.C. §§ 1–38 .................................................................................................... 13

**Other Authorities**

## Rules

Fed. R. Civ. P. 801 ................................................................................................ 4

Fed. R. Civ. P. 801(c) .......................................................................................... 4

Fed. R. Evid. 401 ................................................................................................. 14

Fed. R. Evid. 402 ................................................................................................. 14

Fed. R. Evid. 403 ................................................................................................. 8

Fed. R. Evid. 408 ................................................................................................. 11

Fed. R. Evid. 408(b) ............................................................................................ 11

Fed. R. Evid. 602 ................................................................................................. 7

Fed. R. Evid. 701 ........................................................................................ 7, 29, 30

Fed. R. Evid. 703 ................................................................................................. 8

Fed. R. Evid. 801(c) ............................................................................................ 4

Fed. R. Evid. 803(3) ........................................................................................ 2, 3

Fed. R. Evid. 803(6) ............................................................................................ 2

## OPPOSITIONS

### Opposition to Defendants' Motion 1
### Evidence that Market Participants Fear Losing Concerts is Admissible

Market participants will testify—based on personal knowledge—that venues will lose Live Nation concerts if they do not select Ticketmaster. Defendants seek to cast this highly probative evidence of coercion and content-steering as hearsay, but it is not. Plaintiffs' fact witnesses—all participants in the markets—will testify from their personal and professional experiences. Further, where hearsay may arguably be present, such evidence will be admissible under a hearsay exception. *See United States v. Ozsusamlar*, 428 F. Supp. 2d 161, 164–65 (S.D.N.Y. 2006) (a district court "should exclude evidence on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds.").

### A.    Defendants' Hearsay Predictions are Incorrect and Premature

Defendants move for a pre-trial blanket ruling excluding a broad array of evidence. But each piece needs to be evaluated on an individualized basis during trial. Defendants' proposal would require predicting in advance what dozens of witnesses may or may not say. Such predictions are perilous. The Court should address any potential hearsay issues during the actual testimony of a witness "when admission of particular pieces of evidence is in an appropriate factual context" and foundation and personal knowledge can be immediately evaluated. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. L.E. Myers Co. Grp.*, 937 F. Supp. 276, 287 (S.D.N.Y. 1996); *see S.E.C. v. Treadway*, 438 F. Supp. 2d 218, 225 (S.D.N.Y. 2006) (denying motion *in limine* to exclude hearsay testimony as "premature").

**B.    Competitors' Win-Loss Reports are Admissible Business Records**

Although Defendants dominate the relevant markets, there are a few small competitors. Plaintiffs intend to call some of these competitors' executives at trial to testify about their firsthand experiences of trying to compete with Defendants.

One set of business records maintained by such competitors are "win-loss" reports which track the customers that have been won or lost, including contemporaneous comments on opportunities. Defendants seek to exclude these ordinary-course reports, even though both sides' experts rely on data from these reports. *See* ECF 1018, Defs. Mot. 2 n.3; ECF 695-3, Carlton Report, § III.D.1.a; ECF 695-6, Hill Rebuttal Report, ¶ 321. Defendants similarly include on their exhibit list Ticketmaster documents that purportedly memorialize win-loss information.[1] Win-loss reports are admissible business records of a market competitor (Fed. R. Evid. 803(6)) and they are admissible to show the state of mind of the competitors' *venue clients* in their selection of and negotiations with ticketers (Fed. R. Evid. 803(3)), and the effect on the ticketers' subsequent actions.

**C.    Customer Statements Are Admissible to Show Both Motive and Impact on Competitors' Actions**

Statements from prospective client venues are admissible, whether in win-loss reports or testimony, because they show the motive for those venues not to choose certain ticketers, and the impact on the competitors' business decisions. Such customer statements are often admitted for these purposes in antitrust cases. *See, e.g.*, *Discover Fin. Servs. v. Visa U.S.A. Inc.*, 2008 WL 4560707, at *1 (S.D.N.Y. Oct. 9, 2008) (denying motion *in limine* to exclude Discover executives' testimony about what Citibank's executives purportedly told them, offered to show

---

[1] *See, e.g.*, Ex. 1, DX-0243; Ex. 2, DX-0535; Ex. 3, DX-0661; Ex. 4, DX-0729.

"Citibank's motives for not entering into a deal with Discover" and the "impact on Discover's strategy going forward"); *Callahan v. A.E.V., Inc.*, 182 F.3d 237, 252 (3d Cir.1999) (hearsay statements admissible to show why customers had taken their business elsewhere); *Hydrolevel Corp. v. American Soc. of Mech. Eng'rs, Inc.*, 635 F.2d 118, 128 (2d Cir. 1980) (responses of potential customers admissible under Rule 803(3)).[2]

Here, venues' fear of losing concerts has forced some rivals to exit the relevant ticketing markets and focus their efforts on venue types that are less dependent on Live Nation-promoted concert revenue.[3] Competitors have also agreed to ███████████████████████████ ████████████████████████████████[4] ████████████████████████ ███████████████. *See, e.g.*, Defs. Mot. Ex. 3, Ianello Dep., 272:4–13. The actions taken by other market participants in response to Defendants' illegal conduct are relevant, firsthand evidence of how Defendants' monopoly has impacted the relevant markets that either falls within a hearsay exception or is non-hearsay.

---

[2] Defendants cite to *U.S. Info. Sys. Inc. v. Int'l Bhd. of Elec. Workers Loc. Union No. 3*, but that case confirms that "statements of a customer as to his reasons for not dealing with a supplier are admissible for…the purpose of proving customer motive." 2006 WL 2136249, at *8 (S.D.N.Y. Aug. 1, 2006).

[3] *E.g.*, Defs. Mot. Ex. 6, Groetzinger Dep., 187:18–193:7 (████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████); Defs. Mot. Ex. 4, Davari Dep., 23:18–26:20 (Tixr when approaching arenas has heard that the "implicit or explicit threat" of losing Live Nation content "make[s] it very difficult for them to even consider…any other ticket company [besides Ticketmaster]").

[4] Defs. Mot. Ex. 6, Groetzinger Dep., 165:10–167:15 (███████████████████████████ ██████████████████████████████████), 169:19–171:4 (████████████████████ █████████████████████); Defs. Mot. Ex. 2, Perez Dep., 242:2–243:6 (████████ ███████████████████████████████████████████████████████████ █████████████████████████████.

At trial, evidence from rival ticketers that prospective clients were threatened or retaliated against with loss of content will be offered to demonstrate the effects on the listeners—namely, rival ticketers—and the actions they took in response to such facts. Evidence provided by market participants and offered as such is not hearsay under Fed. R. Evid. 801(c). *See United States v. Rowland*, 826 F.3d 100, 115 (2d Cir. 2016) The committee note to Fed. R. Civ. P. 801(c) expressly cites a case in which "customer complaints" were accepted as being non-hearsay when offered for this purpose. Fed. R. Civ. P. 801, Note to Subdivision(c) (citing *Emich Motors Corp. v. General Motors Corp.*, 181 F.2d 70 (7th Cir. 1950), *rev'd on other grounds*, 340 U.S. 558). Prospective client feedback provides key context for rival ticketers' actions, and excluding these statements would shield from the jury a significant driver of these ticketers' strategic decision-making.

### Opposition to Defendants' Motion 2
### Industry Executives Should Be Allowed to Testify on
### Venue Fears of Losing Content

Defendants seek to restrict Plaintiffs' venue and competitor witnesses from testifying about competitive conditions in the ticketing industry. To maintain its monopoly, Live Nation has created an environment where customers perceive a significant risk of lost content if they were to switch ticketers. Defendants seek to broadly exclude industry witnesses' perception of industry-wide sentiment to hide this fact from the jury—even where such views were accrued through years of personal experience and observation. This Court should reject Defendants' request for a blanket ruling prohibiting a vague set of evidence and instead consider evidence as it comes in at trial. *See Nat'l Union Fire*, 937 F. Supp. at 287; *see supra* Opposition to MIL 1.

The statements at issue[5] are not hearsay—they are witness statements describing their own observations. *See New York ex rel. Spitzer v. St. Francis Hosp.*, 94 F. Supp. 2d 423, 425–426 (S.D.N.Y. 2000) (denying motion to strike statements claimed to be hearsay because they were based on declarant's personal observations over time). If Defendants seek to challenge the credibility of this testimony, that is for cross-examination. And even if testimony contains specific statements, those are admissible as non-hearsay to provide context for the listener's actions in their own negotiations over ticketing services. *See supra* Opposition to MIL 1. Indeed, Plaintiffs anticipate that Defendants will attempt to elicit testimony from their own witnesses about industry-wide sentiments, such as impressions of ticketers they have no experience using. Whether any of that testimony is admissible will depend on the specific testimony and the foundation that witness is able to provide.

For example, Defendants point to deposition testimony by John Abbamondi that there is "widespread fear in the industry that if you were to [switch from Ticketmaster to SeatGeek], that Live Nation might retaliate against you." Defs. Mot. 5. Mr. Abbamondi's testimony continued that this "widespread fear" played a role in his ticketing negotiations with SeatGeek. Specifically: "That [industry fear] was both a real concern as well as a negotiating point. And so in my conversations with SeatGeek and my team's conversation more importantly, we were positioning ourselves as being at great risk and would need significant economic concessions from SeatGeek in order for it to make it smart for us to make that switch to SeatGeek." ECF 695-7, Abbamondi Dep., 182:1–25.

---

[5] The statements contained with Defendants' two citations of challenged testimony are ECF 695-7, Abbamondi Dep., 182:1–25; Defs. Mot. Ex. 2, Perez Dep., 217:7–19; Defs. Mot. Ex. 3, Ianello Dep., 37:20–38:3; Defs. Mot. Ex. 4, Davari Dep., 16:18–19:22, 23:18–26:20.

This kind of testimony is also based on personal knowledge. For example, Mr. Abbamondi is the former CEO of the Barclays Center, a former ticketing executive at Madison Square Garden, a former executive at the NBA (where he liaised with Ticketmaster and NBA arenas on ticketing issues), and a former employee of Major League Baseball and two baseball clubs. ECF 748-7, Abbamondi CID Dep., 8:22–12:3. He clearly has personal knowledge of competitive conditions, and such testimony is both "rationally based" on his own perception and helpful to the trier of fact. *See U.S. Info. Sys. Inc.*, 2006 WL 2136249, at *11 (personal knowledge includes "evidence given by witnesses who obtained their knowledge of events through interactions with other people").

This motion (like the first) again tries to exclude testimony of ticketing executives. Defs. Mot. 2, 6 (both citing to Pls. COMF ¶ 68). As discussed above, these witnesses have personal knowledge, their testimony is not hearsay, and admissibility should be determined at trial. *See S.E.C. v. Singer*, 786 F. Supp. 1158, 1167 (S.D.N.Y. 1992) ("a witness' *conclusion based on personal observations over time* may constitute personal knowledge despite the witness' inability to recall the specific incidents upon which he based his conclusions"); *United States v. Wirtz*, 357 F. Supp. 2d 1164, 1169 (D. Minn. 2005) (personal knowledge can include inferences and opinions, as long as they are grounded in personal observations and experience) (internal citations omitted).

Defendants' arguments under Rule 701 fail for the same reasons because Rule 701 represents "no departure" from Rule 602. *United States v. Garcia*, 413 F.3d 201, 211 (2d Cir. 2005).

**Opposition to Defendants' Motion 3**
**Defendants' Motion is an**
**Untimely and Meritless *Daubert* Motion**

This Court should reject Defendants' belated motion to exclude expert testimony. *See* Individual Rule 8.J (motions under Rules 702–705 and *Daubert* must be made by dispositive motion deadline). Defendants argue that Dr. Hill's "content-shifting analyses" are more prejudicial than probative, because he should have done more analysis. Defs. Mot. 7–10. Any such criticism is a subject for cross examination. Moreover, Defendants' arguments appear to be based on Rule 703, not Rule 403.[6] For that reason alone, Defendants' motion should be denied as untimely.

Dr. Hill analyzed the number and percentage of concerts promoted by Live Nation at independent major concert venues in 2024, and the average number of Live Nation promoted concerts at NBA and NHL arenas that switched away from or to Ticketmaster. *See* ECF 693-32, Hill Report, Figs. 70, 71, 73; ECF 695-6, Hill Rebuttal Report, Figs. 215–18. These analyses were based on data in the combined primary ticketing dataset, which includes data produced by Live Nation and numerous ticketers and promoters during this litigation. Dr. Hill concluded that the impact of switching *away* from Ticketmaster for NBA and NHL arenas is an average decline of 1.3 Live Nation shows per quarter, whereas venues that switched *to* Ticketmaster saw an average of 2.7 more Live Nation concerts per quarter following their switch. *See* ECF 695-6, Hill Rebuttal Report, Figs. 216–17, 245; ECF 693-32, Hill Report, ¶¶ 353, 355. Dr. Hill buttressed his opinion with qualitative evidence of concerns about lost content. *See* ECF 693-32, Hill Report, Appx. I; *id.* § 10.1.2.

---

[6] Tellingly, every case that Defendants cite in this motion are decisions based on Rules 702, 703, or *Daubert*.

Defendants' motion does not challenge Dr. Hill's methodology or data. Rather, Defendants complain that Dr. Hill needed to do a "show-level analysis" because Live Nation content may have declined for other reasons after venues switched away from Ticketmaster. Defs. Mot. 8. Defendants are free to explore those alternative reasons during cross-examination, but the possibility of alternative explanations is not a reason for exclusion.[7]

Defendants also contend that Dr. Hill's analysis should be excluded because there is "no basis to contend that venues themselves are aware of, or agree with" Dr. Hill's analysis. Defs. Mot. 9. As discussed above, Dr. Hill supported his opinions with qualitative evidence that venues have experienced content loss after switching away from Ticketmaster. *See, e.g.*, ECF 748-7, Abbamondi CID Dep., 274:11–19 (Barclays Center); Defs. Mot. Ex. 6, Groetzinger Dep., 167:16–168:11 (███████████); *see also* ECF 695-7, Abbamondi Dep., 139:10–140:21; ECF 695-8, Brad Alberts (H-E-B Center) Dep., 44:9–45:6, 195:5–12.

If Defendants' arguments were to be accepted, similar content-shifting analyses performed by two of their experts should also be excluded. For example, Defendants' expert Dr. Eric Budish uses the same data as Dr. Hill to compare the number of tickets sold per show at the Barclays Center before and after its switch to SeatGeek. *See* ECF 697-1, Budish Report, Ex. 18–20. Defendants' expert Dr. Ali Yurukoglu uses the same data as Dr. Hill to perform his own analyses to support his opinion that content-shifting is "consistent with the procompetitive incentives of a vertically integrated firm." ECF 695-5, Yurukoglu Report, § V.

Plaintiffs propose that all the expert analyses related to content shifting be presented to the jury to evaluate as the triers of fact.

---

[7] Dr. Hill considered alternative explanations for lost content in some circumstances (such as the opening of the ███████████████ in connection with ███████████), but did not find them persuasive. *See, e.g.*, ECF 695-6, Hill Rebuttal Report, ¶¶ 344-349 & Figs. 58-59.

**Opposition to Defendants' Motion 4**
**Consent Decree Evidence Is Relevant and Admissible**

Defendants' effort to exclude *all* references to the 2010 Consent Decree and 2020

Amended Consent Decree (collectively "Decrees") would bar crucial evidence relevant to

Defendants' conduct and notice of legal obligations. Plaintiffs do not intend to re-litigate the

merger investigation, resulting consent decree, and subsequent consent-decree litigation. But, as

noted in Plaintiffs' motion *in limine*, "[e]vidence of the procedural history, such as the fact that

there existed a 2010 Decree and an Amended Decree through 2025, as well as Defendants'

obligations under those decrees are important and relevant to current litigation." ECF 1015, Pls.

MIL 6. Key for an antitrust analysis, the Decrees were one of the "market" or "commercial

realities" that governed Defendants' conduct and affected customers' and competitors'

perceptions of the "commercial realities" of interacting with Defendants. *See, e.g.*, *Nat'l*

*Collegiate Athletic Assoc. v. Alston*, 594 U.S. 69, 93 (2021) ("whether an antitrust violation

exists necessarily depends on a careful analysis of market realities," and "if those market realities

change, so may the legal analysis").

Unfortunately, consent decrees are sometimes a waystation rather than an endpoint. *See,*

*e.g.*, *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 10–11, 13 (1979)

(noting 50-year history of litigation and consent decree amendments, and "[o]f course, a consent

judgment, even one entered at the behest of the Antitrust Division, does not immunize the

defendant from [antitrust] liability for actions, including those contemplated by the decree");

*United States v. Microsoft Corp.*, 253 F.3d 34, 47 (D.C. Cir. 2001) (en banc) (per curiam);

*United States v. American Tel. & Tel. Co.*, 552 F. Supp. 131, 135–39 & n.18 (D.D.C. 1982);

*United States v. Aluminum Co. of America*, 148 F.2d 416, 422 (2d Cir. 1945).

The existence of the Decrees are necessary context to understand Defendants' conduct, motivation, and knowledge of their legal obligations, as well as customers' and competitors' understanding of events—well-recognized bases for admission. For example, the Decrees contain anti-retaliation provisions, and Ticketmaster sent the consent decree to venues. Indeed, the existence of the Decrees affected the willingness of some venues to leave Ticketmaster (*see, e.g.*, ECF 695-7, Abbamondi Dep., 127:23–132:7), and it also shows motive and bias if Defendants' executives deny they engage in content-steering.

Rule 408(b) explicitly permits "admit[ting] this evidence for another purpose" besides proving liability. *See, e.g.*, *United States v. Gilbert*, 668 F.2d 94, 97 (2d Cir. 1981) (deeming argument "meritless" that admission of consent decree evidence was improper, given that FRE 408 "specifically permits use of such evidence for other purposes" than proving liability); *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 136 (2d Cir. 2008) (no abuse of discretion to admit consent decree evidence with limiting instruction for purpose of demonstrating defendant was aware of its legal obligations). Prohibiting all references to the Decrees' existence would hide from the jury that Defendants were on notice that certain conduct was potentially illegal and that their internal and external communications and business decisions were subject to monitoring— and thus may have been modified or muted.

Defendants' cited cases are largely inapposite and, to the extent they are relevant, support admission here. *See, e.g.*, *In re WorldCom, Inc. Securities Litig.*, 2005 WL 578109 at *1–2 (S.D.N.Y. Mar. 4, 2005) (declining to categorically exclude evidence of defendant's related prior criminal prosecution, while only excluding evidence of unrelated litigation and state investigation); *American Soc. of Composers, Authors & Publishers v. Showtime/The Movie Channel*, 912 F.2d 563, 580–81 (2d Cir. 1990) (Defendants cite to the opinion's Appendix,

which contains magistrate judge's discussion regarding admission of settlement negotiation evidence against a non-participant to the settlement and concluding evidence *was* admissible).

The Court should not preemptively bar all references to the Decrees. If necessary, the parties can propose an appropriate limiting instruction. *Walker v. Schult*, 365 F. Supp. 3d 266, 275 (N.D.N.Y. 2019); *United States v. Walker*, 142 F.3d 103, 110 (2d Cir. 1998).

### <u>Opposition to Defendants' Motion 5</u>
### Evidence of Defendants' Years-Long Campaign of
### Anticompetitive Conduct is Admissible

Defendants seek to exclude evidence of Defendants' anticompetitive conduct over the past decade because such facts are claimed to be "old evidence." Defendants' motion begins from a false premise because there is no statute of limitations for any of Plaintiffs' equitable claims under federal law.[8]  Instead, Defendants seek the complete exclusion of their illegal conduct because Plaintiff States' damages claims—which are only on behalf of *some* of the States, and relate only to *some* of the relevant markets—are subject to a statute of limitations.[9] Defendants take this narrow limitation and argue that it must apply indiscriminately to *all* claims and *all* plaintiffs in this action. Defendants' request comes on the eve of trial and after more than a year of discovery during which Defendants never sought to preclude discovery, claims, or arguments from the very same time periods they now seek to bar. Defendants' gambit to make

---

[8] "[N]o statute of limitations will block federal government actions unless Congress clearly and specifically says so." *Capozzi v. United States*, 980 F.2d 872, 875 (2d Cir. 1992). The United States brought this action pursuant to Section 4 of the Sherman Act, 15 U.S.C. § 4, which authorize it to institute proceedings in equity to prevent and restrain violations of the Act. Congress has not established a statute of limitations for civil actions seeking equitable relief pursuant to Section 4. *See* 15 U.S.C. §§ 1–38. *See also Blue Cross & Blue Shield of Vermont v. Teva Pharm. Indus., Ltd.*, 712 F. Supp. 3d 499, 536 (D. Vt. 2024)

[9] California's Unfair Competition Law claim for monetary relief is also subject to a four-year statute of limitations.

this evidence of their illegal conduct vanish from trial has no legitimate basis and should be denied.

Defendants recognize that the statute of limitations only applies to Plaintiff States' damages claims. Defs. Mot. 12. They have not identified any statute of limitations that would apply to the federal claims brought under 15 U.S.C. § 4, or 15 U.S.C. § 26, and have conceded that they do not intend to raise any statute of limitations defense with respect to claims brought by the United States.

Nevertheless, Defendants argue that this evidence should be excluded because it is outside the limitations period for Plaintiff States' damages claims. As an initial matter, they do not dispute the relevance of this evidence to any of Plaintiffs' other claims. Evidence relevant to even one claim is admissible. Fed. R. Evid. 401, 402Defendants provide no authority to support the importation of a statute of limitations for some claims to all claims.

But their argument fails as to Plaintiff States' damages claims too. A statute of limitations is a bar on bringing substantive claims before a certain period; it is not an evidentiary rule. Therefore, "[a] statute of limitations does not operate to bar the introduction of evidence that predates the commencement of the limitations period but that is relevant to events during the period." *Fitzgerald v. Henderson*, 251 F.3d 345, 365 (2d Cir. 2001). Although Plaintiff States agree that they cannot recover monetary relief or damages suffered more than four years prior to filing suit, *see* 15 U.S.C. § 15b, evidence of Defendants' exclusionary conduct prior to 2020 is still relevant to explain why the prices paid during the limitations period were higher than they should have been. In fact, "federal courts in anti-trust cases have long admitted evidence of conduct prior to the statutory period." *Kansas City Star Co. v. United States*, 240 F.2d 643, 651 (8th Cir. 1957). Even Defendants' own cited cases support this conclusion. *See Midwestern*

*Mach. Co. v. N.W. Airlines*, 392 F.3d 265, 271, 276 (8th Cir. 2004) (injuries caused by a merger might not materialize for years and that the statute of limitations does not begin to run until the plaintiff suffers injury). [10]

     As the evidence is relevant, all that remains is Rule 403. Here, each category of evidence covering a decade-plus of anticompetitive conduct is highly probative to the issues in this case, not mere "background." Antitrust cases routinely rely on conduct that predates the complaint by many years. *See United States v. Grinnell Corp.*, 384 U.S. 563, 576 (1966) (finding Section 2 violation due in part to acquisition that predated the Complaint by eight years and other agreements that predated the Complaint by 54 years); *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 709 (1962); *United States v. Google LLC*, 778 F. Supp. 3d 797, 824–825, 827–828 (E.D. Va. 2025) (considering evidence of acquisitions predating complaint by 12 and 15 years). This logic applies fully to cases involving acquisitions, because it can take many years for an acquisition "to ripen into a prohibited effect." *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 597 (1957). Here, Plaintiff States' damages expert, Dr. Abrantes-Metz, will testify to damages calculations for the limitations period. There is no basis for concern that jurors will somehow be confused that historical evidence relevant to liability will impact consideration of damages, especially considering the "strong presumption that juries follow limiting instructions." *United States v. Snype*, 441 F.3d 119, 129–30 (2d Cir. 2006). [11]

---

[10] Defendants' alternative proposal of a May 2018 cutoff is similarly arbitrary; it is up to the jury how to weigh older evidence and whether it is persuasive. *Fitzgerald*, 251 F.3d at 365; *see also Sidibe v. Sutter Health*, 103, F.4th 675 (9th Cir. 2024)

[11] *See* Plaintiffs' Proposed Jury Instructions: Post-Instruction No. 38.

**Opposition to Defendants' Motion 6**
**Evidence of Ticketmaster's Sales to Brokers and Broker Policies is**
**Highly Relevant and Admissible**

At trial, Defendants will argue that other market participants—including ticket brokers—
are responsible for the problems in the live entertainment industry. "Blame the Broker" is
expected to be a common theme of Defendant's arguments. Defendants seek to exclude firsthand
testimony of other market participants to ensure that Defendants alone are the purveyors of their
message, fearing others might describe their "relationship" with their broker partners.
Defendants' request to exclude all evidence contrary to their own claims should be rejected.

Defendants seek to exclude testimony and evidence from their competitors asserting that
Ticketmaster "sells primary tickets to brokers" on the basis that these statements constitute
impermissible lay opinion testimony and have minimal probative value.[12] But Defendants' own
expert claims that combatting brokers is a "key dimension of ticketing quality." *See* ECF 697-1,
Budish Report, § 4.1.[13] Preventing Plaintiffs from discussing issues that Defendants have placed
at the center of this case would unfairly prejudice Plaintiffs. Further, whether statements that
Defendants seek to exclude are admissible is highly dependent on the context and foundation laid
at trial, and thus is not ripe.

Defendants claim that statements regarding Ticketmaster's sale of tickets to brokers has
"minimal probative value far outweighed by the risk of juror confusion." Defs. Mot. 15. But

---

[12] Notably, Defendants' Motion does not similarly seek the exclusion of evidence that
████████████████████████████████████████████████ *See* Defs. Mot. Ex. 27, Plawsky Dep., 13:10-13; 41:15-
41:25; 43:1-44:9.

[13] Dr. Budish uses the terms "scalper" and "broker" interchangeably. Ex. 5, Budish Dep., 177:7-
19; *see also* Ex. 6, PX-1178 (in an email entitled "████████████████," Ticketmaster chairman
Jared Smith writes, ████████████████████████████████████████████████
████████████████████████████████ .

Defendants' own expert claims that getting tickets into the hands of fans and not brokers is a "critical dimension" of primary ticketing quality. *See* ECF 697-1, Budish Report, ¶ 114. As Dr. Budish recognizes, "[u]nderstanding the pressure that this rent-seeking behavior [by scalpers] places on primary ticketing is *key to understanding and evaluating the quality of primary ticketers*." *Id.* at ¶ 34 (emphasis added). Thus, Defendants have affirmed the inherent probative value of the evidence they now try to exclude.

Tellingly, Defendants also rely on evidence regarding rival ticketers' dealings with brokers. *See* ECF 697-1, Budish Report, ¶ 140 (citing Marion Dep., 133:14–134:17 (noting that

████████████████████████████████████████████████████████████████

███████████████████████████████████████ )); *see also* Ex. 7, DX-0768 (listing among ████████████████████████████████████████████████████████████ ). Defendants should not be permitted to use this evidence as both a sword and a shield.

Defendants' Motion highlights the testimony of AXS CEO Bryan Perez, who observed tickets sold on a third-party platform that only accepts tickets from brokers. *See* Defs. Mot. Ex. 2, Perez Dep., 266:1–17. While Plaintiffs do not intend to elicit trial testimony that lacks a foundation or asks witnesses to speculate, Plaintiffs may solicit questions from Mr. Perez or any other fact witness at trial, so long as this testimony is "grounded in observation or other first-hand knowledge." *United States v. Graham*, 2019 WL 2366724, at *8 (S.D.N.Y. May 31, 2019).

Similarly, the documents Defendants seek to exclude highlight the need for the Court to make individual, not categorical, admissibility determinations as this evidence arises in trial. For example, one document relays an ████████████████████████████████████████ ██████████████████████████████ (Ex. 8, PX-0018). Another document is an email from Laurie Jacoby at Barclays Center—one of Defendants' customers, not a competitor.

(Ex. 9, PX-0097). While each of the documents that Defendants cite goes beyond mere speculation, their context is fact-specific.

Without the benefit of context provided in trial, Defendants' motion is premature. *See United States v. Patel*, 2023 WL 2643815, at *44 (D. Conn. Mar. 27, 2023) (denying motion *in limine* involving alleged hypothetical lay opinion testimony, noting that the court "cannot dispositively rule on this issue without the context provided in trial"); *United States v. Shkreli*, 2017 WL 3623626, at *5 (E.D.N.Y. June 24, 2017). And allowing Plaintiffs to elicit testimony and introduce evidence regarding Ticketmaster's partnerships with brokers would not "mischaracterize this relationship" (Defs. Mot. 16)—indeed, it would bring important facets of Ticketmaster's relationships with brokers to light regarding an issue that Defendants' own expert has acknowledged is "key." The jury should be presented with both sides of the story to reach its verdict.

### Opposition to Defendants' Motion 7
### The Jury Should be Instructed on the Role of Future
### Remedies Rather Than Excluding All Remedies Evidence

The Parties agree that the jury's task is to "determine liability and damages." Defs. Mot. 16–17. But the parties disagree on what information can be shared with the jury about the consequences of their verdict. Plaintiffs have proposed a short instruction to address this disagreement:

> **Plaintiffs Proposed Jury Instruction No. 10**: In addition to damages, Plaintiffs are seeking other remedies that will be decided by the Court at a later date, if you find Defendants liable on one or more claims. Plaintiffs may, for example, ask the Court to order Live Nation to sell Ticketmaster, open its amphitheaters to artists promoted by non-Live Nation promoters, stop using exclusive ticketing contracts with venues, or sell some of its amphitheaters. However, you are not responsible for determining whether any of those remedies is needed or appropriate at this time.

Plaintiffs believe the jury should be informed by witnesses and other evidence about a world without Defendants' monopoly.

First, it is relevant and important to the liability case that the combination of Live Nation and Ticketmaster gives the combined company the ability and incentive to restrict competition. Witnesses may testify that the combination is inherently problematic, and competitors may testify about whether they have considered or pursued similar combinations. Defendants are expected to argue and present testimony that vertical integration increases efficiencies, and they have proposed an inapplicable jury instruction that vertical integration is a defense to liability. *See* Post-Instruction No. 17D, ECF 1031 at Ex. 10. Since Defendants will argue that the combination of Live Nation and Ticketmaster is beneficial to fans and customers, it would be nonsensical to bar testimony intended to demonstrate that a separation of the two companies would benefit competition, market participants, and fans.

Defendants' request to exclude all evidence of remedies is premature—especially given that Defendants are expected to advance evidence related to the benefits of their combination. *Nat'l Union Fire*, 937 F. Supp. at 287 (denying motion *in limine*, "reserv[ing] judgment on the motion until trial when admission of particular pieces of evidence are in an appropriate factual context."); *Walker*, 365 F. Supp. 3d at 275. Defendants' reliance on *GeigTech E. Bay v. Lutron Elecs. Co.*, 2024 WL 68418, at *5–6 (S.D.N.Y. Jan. 5, 2024), is misplaced given that the court *denied* a similar motion because the parties had not precisely identified the evidence that was disputed.

<u>**Opposition to Defendants' Motion 8**</u>
**Defendants Own Experts Rely On Out-of-Market Comparisons,**
**and Defendants' Motion Should Be Denied**

Defendants seek to exclude evidence of their monopoly power outside the relevant markets, even though their own experts have opined that Defendants do not have in-market

monopoly power based on comparisons of the competitive conditions within the relevant markets to those outside of them. *See, e.g.*, ECF 695-3, Carlton Report, ¶ 96 ("█████████████ █████████████████████████████████████████████████████████ █████"). Defendants also appear to be seeking to bar evidence of Defendants' conduct outside the relevant markets. Defs. Mot. 19–20. Barring Plaintiffs from putting forward evidence and argument to rebut defenses, or that is otherwise relevant, would unfairly restrict Plaintiffs at trial. As Defendants tacitly concede through their experts, evidence regarding monopoly power outside relevant markets can be relevant. For example, Defendants' expert Dr. Carlton compares Ticketmaster's take rate and margins in the primary concert ticketing market for major concert venues to other venues and opines that this analysis shows that there is a "███████████ ████████████████████████████████████████████████ ██████" ECF 695-3, Carlton Report, ¶¶ 13, 96. Defendants cannot be allowed to create an uneven playing field where they can make comparisons to competitive conditions outside relevant markets but Plaintiffs cannot explain why such comparisons are fraught.

Critical to Dr. Carlton's conclusion is his assumption that the ████████████████ ████████████ *Id.* ¶ 96. But Dr. Carlton did nothing to establish that the competitive conditions outside Plaintiffs' relevant markets are any more competitive than the competitive conditions within Plaintiffs' markets, and Plaintiffs should not be muzzled in their ability to make these points on cross examination. *See* Defs. Mot. Ex. 28, Abrantes-Metz Dep., 217:10–218:4 ("Dr. Carlton is the one who has to explain why this is a valid comparison. I am pointing out that he didn't, because the prior is that, potentially, the same type of conduct has happened.").

If Defendants intend to elicit testimony that "outside" markets are non-monopolized such that comparisons of margins and take-rates are at all probative, then Plaintiffs need to be able to

elicit both fact and expert testimony demonstrating that Dr. Carlton's assumptions are entirely wrong. Defendants' internal documents suggest that Ticketmaster's market share for all primary concert ticketing, regardless of venue type, could be as high as 80%. *See* Ex. 10, PX-0508, LNE22-000164868 at -79; ECF 693-32, Hill Report, Fig. 48 (showing Ticketmaster's share of primary concert tickets was 84% at all venue types with 8K+ capacity and at least 10 concerts, or 81% at the top 500 concert venues as measured by total concert revenue).

Defendants also indicated that they intend to seek to admit several exhibits under FRE 1006 that purport to compare Major Concert Venues to non-MCVs along various metrics. *See, e.g.*, Ex. 11, DX-3382 (claiming to compare artist take-rates in MCVs and non-MCVs); Ex. 12, DX-3387 (claiming to compare Live Nation promotion profit share between MCVs and non-MCVs). While it is Plaintiffs' position that these exhibits are improper, if they are admitted, Plaintiffs should not be hamstrung in arguing why such comparisons are inapt.

Finally, to the extent Defendants' motion seeks to bar evidence of Defendants' conduct or market conditions outside the relevant markets, the motion should be denied. Defendants have not identified with particularity which evidence is disputed. Additionally, evidence of market conditions or conduct outside the relevant markets can shed light on issues in the case, such as the defendant's business strategy and how firms operate when there is more competition. *See, e.g.*, *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 456 (1986) (finding harm to competition based in part on "evidence that outside of Indiana, in States where dentists had not collectively refused to submit x-rays, insurance companies found little difficulty in obtaining compliance by dentists with their requests"). It is up to the jury to weigh the probative value of any such evidence.

**<u>Opposition to Defendants' Motion 9</u>**
**Evidence on Primary Ticketing Outside the United States**
**Is Relevant and Admissible**

At trial, Plaintiffs intend to call witnesses who have personal knowledge and direct experience with the live entertainment industry outside of the United States. These fact witnesses can testify about how competition, business practices, and contracts operate when they are not influenced by Defendants' monopoly or long-term exclusives in the United States. This evidence directly rebuts some of Defendants' likely trial argument.

For example, Defendants are expected to repeat an argument advanced at summary judgment that venues in the United States prefer exclusivity in ticketing. *See* ECF 689, Defs. MSJ 6. Defendants have also signaled that they are likely to argue that there are operational and technological issues when switching between different ticketers. *See id.*; ECF 695-3, Carlton Report, ¶¶ 54–57. In response, Plaintiffs anticipate presenting evidence from fact and expert witnesses regarding the preferences of venues in the United States and overseas. ECF 694-10, Klippert Dep., 86:6–18, 89:24–91:3; ECF 695-6, Hill Rebuttal Report, ¶¶ 530, 536. Plaintiffs also expect Dr. Hill to explain that it is difficult to discern venues' preferences because ticketing exclusivity in the United States is shaped by Defendants' monopoly power and conduct. ECF 693-32, Hill Report, ¶ 57, n.97 (quoting Rapino CID Dep., 136:9–19; PX-0219, LiveCo_00002573, at -573); ECF 695-6, Hill Rebuttal Report, ¶ 529. However, evidence from non-U.S. primary ticketing markets reflect that some venues prefer open distribution, for reasons which the jury may reasonably infer would also apply to U.S. venues. ECF 693-32, Hill Report, ¶ 244 (relying on testimony indicating that ticketing contracts are different in Europe, "where there aren't the same concepts of exclusivity and tying concerts into that same exclusive agreement").

Courts routinely consider competitive conditions outside the relevant markets when the evidence is informative as to anticompetitive effects in the markets at issue. *See, e.g.*, *Ind. Fed'n of Dentists,* 476 U.S. at 456; *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1075–76 (D.D.C. 1997) (comparing variations in anticompetitive effects in relevant geographic market and other geographic markets). Defendants' motion to exclude non-U.S. testimony that bears on questions before the jury in this case. Evidence on competitive conditions outside the United States is critical to Plaintiffs' case in showing that the current functioning of the U.S. market, with its operational and technological issues, are not an inevitable result of competition but rather the result of unlawful monopolization.

### Opposition to Defendants' Motion 11
### Executive Compensation is Relevant to Motive, Bias, and
### Live Nation's Profits

Live Nation's executive compensation packages represent inconvenient facts that undermine Defendants' plan to tell the jury that the company makes only "modest profits." *See, e.g.*, ECF 800, Defs. Anderson Daubert Reply, at 1 ("The incontrovertible evidence is that Live Nation earned only modest profits over the period Plaintiffs allege it was a monopolist."); ECF 498, Ans., at 2. The fact that Live Nation compensates its senior executives exceedingly well, based directly on their performance in generating profits, is at odds with this defense.

Such evidence is also relevant to motive and bias in this antitrust case where executives' compensation is directly tied to the performance of the company and much of their compensation is in the company's stock. *See United States v. Ferguson*, 2007 WL 4240782, at *1 (D. Conn. Nov. 30, 2007) (permitting evidence of executive's compensation tied to "[employer's] performance"); Ex. 13, Rapino Dep., 214:25–224:21 (Live Nation's CEO explaining that █████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ); Ex. 14, PX-0870

(████████████████████); ECF 762-5, Berchtold 30(b)(6) Dep., 28:21–29:23 (Live Nation's CFO receives company stock "if the company achieved certain stock performance and maintained those stock performance levels"); ECF 748-20, J. Smith Dep., 22:22–23:15.

The jury is entitled to assess Live Nation executives' motive to maintain their substantial compensation by creating value quickly for their employer—even if that means engaging in anticompetitive conduct. *See United States v. Quattrone*, 441 F.3d 153, 187 (2d Cir. 2006) (compensation evidence "relevant and consistent with Rule 403" where defendant earned a "substantial salary" that was relevant to his motive); *United States v. Logan*, 250 F.3d 350, 369 (6th Cir. 2001) ("substantial income" admissible as evidence of motive because "it demonstrated what [defendants] stood to lose"). Defendants argue that such evidence is inadmissible because "[t]here is no claim in which intent or motive is an element," but that is not the law. *United States v. Siddiqui*, 699 F.3d 690, 702 (2d Cir. 2012) ("Although it does not bear directly on the charged elements of a crime, evidence offered to prove motive is commonly admitted.") (citation omitted).

The jury is also entitled to assess the full degree of the executives' biases that may taint their testimony in defense of their employer that compensates them so substantially and in light of the potential for an adverse ruling to affect their own finances. *See United States v. Reed*, 437 F.2d 57, 59 (2d Cir. 1971) ("[I]t is settled that a witness's possible financial stake in the outcome of a case is highly relevant"); *Moskowitz v. American Express Co.*, 2025 WL 2240326, at *3 (E.D.N.Y. Aug. 6, 2025) (Compensation evidence is "probative of bias" because "the jury might reasonably infer that such compensation provides an even greater incentive for [executive] to slant his testimony in favor of [employer].").

Defendants rely on cases where courts excluded evidence of an executive's "wealth and lifestyle" or "net worth." *L-3 Commc'ns Corp. v. OSI Sys.*, 2006 WL 988143, at *6 (S.D.N.Y. Apr. 13, 2006); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003). Plaintiffs are not seeking to introduce this type of evidence—only compensation that witnesses have earned from Defendants and compensation that they stand to gain if Defendants prevail at trial. *See United States v. Peake*, 143 F. Supp. 3d 1, 18 (D.P.R. 2013) (distinguishing between evidence of "compensation," which the court permitted, versus "overall net worth, assets, or lifestyle").

### Opposition to Defendants' Motion 12
### The Description of Ticketmaster's Retained Fees as a "Tax"
### Is Supported By Expert Analysis

Defendants seek to exclude any use by Plaintiffs of the term "Ticketmaster Tax" at trial, arguing it is an "epithet" designed to "inflame" the jury. Defs. Mot. 23. But referring to the excess fees charged by Defendants as a "tax" is an acceptable and neutral shorthand supported by expert economic analysis and is designed to explain to the jury the nature of the overcharge at issue. Here, too, Defendants' motion is an untimely, disguised attempt to preclude economic analysis that will be helpful to the jury.[14]

The focus of Defendants' motion appears to be the expert testimony of Dr. Abrantes-Metz, who will provide expert economic opinion and analysis relevant to Plaintiff States' claims for monetary relief. Dr. Abrantes-Metz describes how economic theory and the record evidence support analyzing any overcharge imposed by Defendants on ticket sales to consumers as a tax, *i.e.*, "through the lens of tax incidence theory." *See* ECF 695-1, Abrantes-Metz Report, ¶ 77. Through use of tax incidence theory, Dr. Abrantes-Metz is able to determine how the total

---

[14] Defendants' motion is untimely for the same reasons discussed *supra* Opposition to MIL 3.

amount of additional fees Ticketmaster retains due to Defendants' anticompetitive conduct are imposed on the various parties, especially consumers. *See id.* §§ 4–5. Defendants do not challenge the admissibility of these expert opinions that evaluate Defendants' fees as a tax.

This economic analysis is important to ensure the jury has a reasonable basis for concluding Defendants' conduct results in harm to fans. A discussion limited to "overcharges" or "fees" would not be sufficient to prove that fans were the ones to bear the brunt of Ticketmaster's overcharges, or at least wouldn't be able to do so as clearly or efficiently. Dr. Abrantes-Metz is clear that the "tax" she refers to is limited to the fees retained by Ticketmaster, not all fees associated with a ticket, and she will be equally clear in her testimony at trial. *See id.* ¶ 100 ("[A]s I show below, Ticketmaster's tax, the retained amount, is supra-competitive and would be lower in the But-for World (*i.e.*, absent Live Nation's alleged conduct)"); Ex. 15, Abrantes-Metz Rebuttal Report, ¶ 10 ("As I explain throughout my report, I refer to 'Ticketmaster's tax' as the retained amount or 'the "tax" that Ticketmaster adds to the venue's transaction with fans,' not 'total ticket fees,' as Dr. Budish incorrectly indicates.").[15]

Finally, Defendants' suggestion that Plaintiffs use a "more neutral" term like "fees" only works where that language is appropriate and available. Defs. Mot. 23–24. Unlike in *MF Glob. Holdings Ltd. v. PricewaterhouseCoopers*, where the plaintiffs wished to use terms like "vulture funds" and "treasure hunters" when more neutral terms for the plaintiff creditors were available, here, "tax" is a reasonable way of describing an overcharge, especially when the testimony will come from a qualified expert witness who is testifying in her capacity as an expert economist.

---

[15] The precise phrase "Ticketmaster Tax" does not appear anywhere in Dr. Abrantes-Metz's report. While that phrase is used twice in Plaintiffs' Amended Complaint, there, too, it is made explicit that "Ticketmaster Tax" refers to the "overcharges stemming from these fees," not the entirety of the fees themselves. *See* ECF 267, Am. Compl., ¶ 142.

*See* 232 F. Supp. 3d 558, 570 (S.D.N.Y. 2017). Plaintiffs' experts need to be able to explain to the jury how Ticketmaster's retention of excess fees impacts the end prices of tickets to consumers. Restricting the ability of Plaintiffs to refer to the impact of excess retained fees by limiting them to use of "fees" will likely confuse the jury without avoiding any significant prejudice.

<u>**Opposition to Defendants' Motion 13**</u>
**Fact Witnesses Should Be Permitted to Use the Term "Monopoly"**

The Court should deny Defendants' motion to exclude any non-expert testimony or related evidence "stating that Defendants have monopoly power, are monopolists, or using any other version of the word 'monopoly.'"

Courts have denied nearly identical motions. In *Hess v. Inland Asphalt Co.*, defendants in a monopolization case moved to exclude "any testimony by plaintiffs' witnesses using the term monopoly relative to the defendants." 1990 WL 51164, at *18 (E.D. Wash. Feb. 20, 1990). They made both of the arguments that Defendants make here: (1) that use of this term would constitute improper lay opinion testimony, and (2) that such testimony would be unduly prejudicial. *Id.* The court rejected both arguments. It found that such testimony was "based upon those persons' observations and perceptions and is admissible under FRE 701." *Id.* at *18.

So too here. Fact witnesses in this case have deep experience in the live entertainment industry. They understand the realities of operating in that industry and the position that Live Nation and Ticketmaster hold. The Federal Rules of Evidence permit them to testify about the views they have formed based on their first-hand experience. *See* Fed. R. Evid. 701.

Defendants rely on *American Key Corp. v. Cole Nat. Corp.*, a case in which a lay witness had improperly "attempted to construct a relevant economic market." 762 F.2d 1569, 1579 (11th Cir. 1985) But Plaintiffs do not intend to elicit any such testimony from fact witnesses. Rather, the uses of the term "monopoly" that Defendants seek to exclude would be "rationally based on

the witness's perception" derived from industry experience and based on common usage rather than any purported economic analysis. *See* Fed. R. Evid. 701. Attempting to police this word choice would be both unworkable and inappropriate in a case about monopolization. *Cf. United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, No. 95-1231, 2007 U.S. Dist. LEXIS 18678, at *8 (D.D.C. Mar. 16, 2007) (denying motion "to exclude use of the term 'bid rigger' as somehow constituting a pejorative, 'erroneous and inflammatory label'" because "[t]his is a case about bid rigging").

Finally, the Court should reject any attempt to equate Defendants' broad motion with Plaintiffs' targeted MIL 5. In that motion, Plaintiffs seek to prevent Defendants' executives from testifying that the company's accounting metrics prove that it is not a monopoly, as they have argued in the press. Unlike the first-hand testimony at issue here, testimony about the relationship between accounting metrics and monopoly power implicates specialized knowledge that Defendants' executives do not possess.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motions *in limine*.

26

Respectfully submitted,


 */s/ Bonny Sweeney*
BONNY SWEENEY
*Co-Lead Trial Counsel*
David Dahlquist
*Co-Lead Trial Counsel*
Arianna Markel
Alex Cohen
Danielle Drory
Jonathan S. Goldsmith
Elena Goldstein
Matthew Jones
Andrew Kline
Andy Tan
Shana Wallace

United States Department of Justice
Antitrust Division
450 Fifth Street N.W., Suite 4000
Washington, DC 20530
Telephone: (202) 725-0165
Facsimile: (202) 514-7308
Bonny.Sweeney@usdoj.gov
David.Dahlquist@usdoj.gov

*Attorneys for Plaintiff United States of America*

/s/ Robert A. Bernheim
Robert A. Bernheim (admitted *pro hac vice*)
Office of the Arizona Attorney General
Consumer Protection & Advocacy Section
2005 N. Central Avenue
Phoenix, AZ 85004
Telephone: (602) 542-3725
Fax: (602) 542-4377
Email: Robert.Bernheim@azag.gov
*Attorney for Plaintiff State of Arizona*

/s/ Amanda J. Wentz
Amanda J. Wentz (admitted *pro hac vice*)
Assistant Attorney General
Office of the Arkansas Attorney General
101 West Capitol Avenue
Little Rock, AR 72201
Telephone: (501) 682-1178
Fax: (501) 682-8118
Email: amanda.wentz@arkansasag.gov
*Attorney for Plaintiff State of Arkansas*

/s/ Brent Nakamura
Brent Nakamura (admitted *pro hac vice)*
Supervising Deputy Attorney General
Office of the Attorney General
California Department of Justice
300 South Spring Street
Los Angeles, CA 90013
Telephone: (213) 269-6000
Email: Brent.Nakamura@doj.ca.gov
*Attorney for Plaintiff State of California*

/s/ Conor J. May
Conor J. May (admitted *pro hac vice*)
Assistant Attorney General
Antitrust Unit
Colorado Department of Law
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email: Conor.May@coag.gov
*Attorney for Plaintiff State of Colorado*

/s/ Victoria Maria Orton Field
Victoria Maria Orton Field (admitted *pro hac vice)*
Assistant Attorney General
Office of the Attorney General of Connecticut
165 Capitol Avenue
Hartford, CT 06106
Telephone: 860-808-5030
Email: victoria.field@ct.gov
*Attorney for Plaintiff State of Connecticut*

/s/ Elizabeth G. Arthur
Elizabeth G. Arthur (admitted *pro hac vice*)
Senior Assistant Attorney General
Office of the Attorney General for the District of Columbia
400 6th Street NW, 10th Floor
Washington, DC 20001
Email: Elizabeth.arthur@dc.gov
*Attorney for Plaintiff District of Columbia*

/s/ Lizabeth A. Brady
Lizabeth A. Brady
Director, Antitrust Division
Florida Office of the Attorney General
PL-01 The Capitol
Tallahassee, FL 32399-1050
Telephone: 850-414-3300
Email: Liz.Brady@myfloridalegal.com
*Attorney for Plaintiff State of Florida*

/s/ Richard S. Schultz
Richard S. Schultz (admitted *pro hac vice*)
Assistant Attorney General
Office of the Illinois Attorney General
Antitrust Bureau
115 S. LaSalle Street, Floor 23
Chicago, Illinois 60603
Telephone: (872) 272-0996
Email: Richard.Schultz@ilag.gov
*Attorney for Plaintiff State of Illinois*

*/s/ Jesse Moore*
Jesse Moore (admitted *pro hac vice*)
Deputy Attorney General
Office of the Indiana Attorney General
302 W. Washington St., Fifth Floor
Indianapolis, IN 46204
Telephone: 317-232-4956
Email: Jesse.Moore@atg.in.gov
*Attorney for Plaintiff State of Indiana*


*/s/ Noah Goerlitz*
Noah Goerlitz (admitted *pro hac vice*)
Assistant Attorney General
Office of the Iowa Attorney General
1305 E. Walnut St.
Des Moines, IA 50319
Telephone: (515) 281-5164
Email: noah.goerlitz@ag.iowa.gov
*Attorney for Plaintiff State of Iowa*


*/s/ Christopher Teters*
Christopher Teters (admitted *pro hac vice*)
Assistant Attorney General
Public Protection Division
Office of Kansas Attorney General
120 S.W. 10th Avenue, 2nd Floor
Topeka, KS 66612-1597
Telephone: (785) 296-3751
Email: chris.teters@ag.ks.gov
*Attorney for Plaintiff State of Kansas*


*/s/ Mario Guadamud*
Mario Guadamud (admitted *pro hac vice*)
Louisiana Office of Attorney General
1885 North Third Street
Baton Rouge, LA 70802
Telephone: (225) 326-6400
Fax: (225) 326-6498
Email: GuadamudM@ag.louisiana.gov
*Attorney for Plaintiff State of Louisiana*


*/s/ Schonette J. Walker*
Schonette J. Walker (admitted *pro hac vice*)
Assistant Attorney General
Chief, Antitrust Division
200 St. Paul Place, 19th floor
Baltimore, Maryland 21202
Telephone: (410) 576-6470
Email: swalker@oag.state.md.us
*Attorney for Plaintiff State of Maryland*


*/s/ Katherine W. Krems*
Katherine W. Krems (admitted *pro hac vice*)
Assistant Attorney General, Antitrust Division
Office of the Massachusetts Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (617) 963-2189
Email: Katherine.Krems@mass.gov
*Attorney for Plaintiff Commonwealth of Massachusetts*


*/s/ LeAnn D. Scott*
LeAnn D. Scott (admitted *pro hac vice*)
Assistant Attorney General
Corporate Oversight Division
Michigan Department of Attorney General
P.O. Box 30736
Lansing, MI 48909
Telephone: (517) 335-7632
Email: ScottL21@michigan.gov
*Attorney for Plaintiff State of Michigan*


*/s/ Zach Biesanz*
Zach Biesanz
Senior Enforcement Counsel
Antitrust Division
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
Saint Paul, MN 55101
Telephone: (651) 757-1257
Email: zach.biesanz@ag.state.mn.us
*Attorney for Plaintiff State of Minnesota*

/s/ Lee Morris
Lee Morris (admitted pro hac vice)
Special Assistant Attorney General
Mississippi Office of Attorney General
Post Office Box 220
Jackson, Mississippi 39205
Telephone: (601) 359-9011
Email: Lee.Morris@ago.ms.gov
Attorney for Plaintiff State of Mississippi

/s/ Justin C. McCully
Justin C. McCully (admitted pro hac vice)
Assistant Attorney General
Consumer Protection Bureau
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68509
Telephone: (402) 471-9305
Email: justin.mccully@nebraska.gov
Attorney for Plaintiff State of Nebraska

/s/ Lucas J. Tucker
Lucas J. Tucker (admitted pro hac vice)
Senior Deputy Attorney General
Office of the Nevada Attorney General
Bureau of Consumer Protection
100 N. Carson St.
Carson City, NV 89701
Email: ltucker@ag.nv.gov
Attorney for Plaintiff State of Nevada

/s/ Zachary Frish
Zachary A. Frish (admitted pro hac vice)
Assistant Attorney General
Consumer Protection & Antitrust Bureau
New Hampshire Attorney General's Office
Department of Justice
1 Granite Place South
Concord, NH 03301
Telephone: (603) 271-2150
Email: zachary.a.frish@doj.nh.gov
Attorney for Plaintiff State of New Hampshire

/s/ Andrew F. Esoldi
Andrew F. Esoldi
Deputy Attorney General
Division of Law
Antitrust Litigation and Competition
Enforcement
124 Halsey Street, 5th Floor
Newark, NJ 07101
Telephone: (609) 696-5465
Email: Andrew.Esoldi@law.njoag.gov
Attorney for Plaintiff State of New Jersey

/s/ Evan Crocker
Evan Crocker (admitted pro hac vice)
Assistant Attorney General, Division Director
Consumer Affairs Division
New Mexico Department of Justice
201 3rd St NW, Suite 300
Albuquerque, NM 87102
Telephone: (505) 494-8973
Email: ecrocker@nmdoj.gov
Attorney for Plaintiff State of New Mexico

/s/ Jonathan H. Hatch
Jonathan H. Hatch
Assistant Attorney General
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8598
Email: jonathan.hatch@ag.ny.gov
Attorney for Plaintiff State of New York

/s/ Francisco Benzoni
Francisco Benzoni (admitted pro hac vice)
Special Deputy Attorney General
Brian Rabinovitz (admitted pro hac vice)
Special Deputy Attorney General
North Carolina Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
Telephone: (919) 716-6000
Facsimile: (919) 716-6050
Email: fbenzoni@ncdoj.gov
Email: brabinovitz@ncdoj.gov
Attorneys for Plaintiff State of North Carolina

*/s/ Sarah Mader*
Sarah Mader (admitted *pro hac vice)*
Assistant Attorney General
Antitrust Section
Office of the Ohio Attorney General
30 E. Broad St., 26th Floor
Columbus, OH 43215
Telephone: (614) 466-4328
Email: Sarah.Mader@OhioAGO.gov
*Attorney for Plaintiff State of Ohio*

*/s/ Cameron R. Capps*
Cameron R. Capps (admitted *pro hac vice)*
Deputy Attorney General
Consumer Protection
Office of the Oklahoma Attorney General
313 N.E. 21st Street
Oklahoma City, Oklahoma 73105
Telephone: (405) 522-0858
Fax: (405) 522-0085
Email: Cameron.Capps@oag.ok.gov
*Attorney for Plaintiff State of Oklahoma*

*/s/ Gina Ko*
Gina Ko (admitted *pro hac vice)*
Assistant Attorney General
Antitrust, False Claims, and Privacy Section
Oregon Department of Justice
100 SW Market St.,
Portland, Oregon 97201
Telephone: (971) 673-1880
Fax: (503) 378-5017
Email: Gina.Ko@doj.oregon.gov
*Attorney for Plaintiff State of Oregon*

*/s/ Joseph S. Betsko*
Joseph S. Betsko (admitted *pro hac vice)*
Assistant Chief Deputy Attorney General
Antitrust Section
Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
Telephone: (717) 787-4530
Email: jbetsko@attorneygeneral.gov
*Attorney for Plaintiff Commonwealth of Pennsylvania*

*/s/ Paul T.J. Meosky*
Paul T.J. Meosky (admitted *pro hac vice)*
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400, ext. 2064
Fax: (401) 222-2995
Email: pmeosky@riag.ri.gov
*Attorney for Plaintiff State of Rhode Island*

*/s/ Jared Q. Libet*
Jared Q. Libet (admitted *pro hac vice)*
Assistant Deputy Attorney General
Office of the Attorney General of South Carolina
P.O. Box 11549
Columbia, South Carolina 29211
Telephone: (803) 734-5251
Email: jlibet@scag.gov
*Attorney for Plaintiff State of South Carolina*

*/s/ Bret Leigh Nance*
Bret Leigh Nance (admitted *pro hac vice)*
Assistant Attorney General
1302 E. Hwy 14, Suite 1
Pierre SD 57501-8501
Email: bretleigh.nance@state.sd.us
Telephone: (605) 773-3215
Bar # 5613
*Attorney for Plaintiff State of South Dakota*

*/s/ Hamilton Millwee*
Hamilton Millwee (admitted *pro hac vice)*
Assistant Attorney General
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 38202
Telephone: (615) 291-5922
Email: Hamilton.Millwee@ag.tn.gov
*Attorney for Plaintiff State of Tennessee*

*/s/ Diamante Smith*
Diamante Smith (admitted *pro hac vice)*
Assistant Attorney General, Antitrust Division
Office of the Attorney General of Texas
P.O. Box 12548
Austin, TX 78711-2548
Telephone: (512) 936-1162
*Attorney for Plaintiff State of Texas*

/s/ Marie W.L. Martin
Marie W.L. Martin (admitted *pro hac vice*)
Deputy Division Director,
Antitrust & Data Privacy Division
Utah Office of Attorney General
160 East 300 South, 5th Floor
P.O. Box 140830
Salt Lake City, UT 84114-0830
Telephone: 801-366-0375
Email: mwmartin@agutah.gov
*Attorney for Plaintiff State of Utah*

/s/ Sarah L. J. Aceves
Sarah L. J. Aceves (admitted *pro hac vice*)
Assistant Attorney General
Consumer Protection and Antitrust Unit
Vermont Attorney General's Office
109 State Street
Montpelier, VT 05609
Telephone: (802) 828-3170
Email: sarah.aceves@vermont.gov
*Attorney for Plaintiff State of Vermont*

/s/ David C. Smith
David C. Smith (admitted *pro hac vice*)
Assistant Attorney General
Office of the Attorney General of Virginia
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 692-0588
Facsimile: (804) 786-0122
Email: dsmith@oag.state.va.us
*Attorney for Plaintiff Commonwealth of Virginia*

/s/ Ashley A. Locke
Ashley A. Locke (admitted *pro hac vice*)
Assistant Attorney General
Antitrust Division
Washington Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
Telephone: (206) 389-2420
Email: Ashley.Locke@atg.wa.gov
*Attorney for Plaintiff State of Washington*

/s/ Douglas L. Davis
Douglas L. Davis (admitted *pro hac vice*)
Senior Assistant Attorney General
Consumer Protection and Antitrust Section
West Virginia Office of Attorney General
P.O. Box 1789
Charleston, WV 25326
Telephone: (304) 558-8986
Fax: (304) 558-0184
Email: douglas.l.davis@wvago.gov
*Attorney for Plaintiff State of West Virginia*

/s/ Caitlin M. Madden
Caitlin M. Madden (admitted *pro hac vice*)
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
Telephone: (608) 267-1311
Email: caitlin.madden@wisdoj.gov
*Attorney for Plaintiff State of Wisconsin*

/s/ William T. Young
William T. Young
Assistant Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
Telephone: (307) 777-7847
Email: william.young@wyo,gov
*Attorney for Plaintiff State of Wyoming*

<u>**Certificate of Compliance**</u>

 In accordance with Local Civil Rule 7.1(c), and Rule 8(c) of this Court's Individual Practices in Civil Cases, I certify that the word count of this memorandum of law is 7,969 words, which includes footnotes but excludes the caption, any index, table of contents, table of authorities, signature blocks, or any certificates. This certificate is made in reliance on the word count of the word-processing program used to prepare the document.


       */s/ Arianna Markel*
       ARIANNA MARKEL
       *Attorney for Plaintiff United States of America*