**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>   *Plaintiffs,*<br><br>   v.<br><br>LIVE NATION ENTERTAINMENT, INC.,<br>and TICKETMASTER L.L.C.,<br><br>   *Defendants.* | Case No. 1:24-cv-03973-AS<br><br>**ORAL ARGUMENT REQUESTED**<br><br>**FILED UNDER SEAL** |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS *IN LIMINE***

**TABLE OF CONTENTS**

**Page**

I.      OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* NO. 1 .........................................1

II.     OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* NO. 2 .........................................5

III.    OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* NO. 3 .........................................7

      A.      Evidence That Defendants' Older Acquisitions Were Not Challenged Is Admissible ......................................................................................................................7

      B.      Evidence of the Government's 1990s Investigation of Exclusive Contracting in Ticketing Is Admissible ...................................................................10

IV.     OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* NO. 4 .......................................11

V.      OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* NO. 5 .......................................14

VI.     OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* NO. 6 .......................................16

VII.    OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* NO. 7 .......................................17

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Amdocs (Isr.) Ltd. v. Openet Telecom, Inc.*,
  2012 WL 12832376 (E.D. Va. Mar. 30, 2012) .........................................................................17

*Broadcom Corp. v. Emulex Corp.*,
  2011 WL 13130705 (C.D. Cal. Aug. 10, 2011) .......................................................................18

*Broadway Delivery v. United Parcel Service of America*,
  651 F.2d 122 (2d Cir. 1981) ......................................................................................................2

*Evans v. Fenty*,
  714 F. Supp. 2d 116 (D.D.C. 2010) ...........................................................................................6

*Fraser v. Major League Soccer, L.L.C.*,
  284 F.3d 47 (1st Cir. 2002) .......................................................................................................9

*Heckler v. Chaney*,
  470 U.S. 821 (1985) .................................................................................................................10

*Henry v. Speckard*,
  22 F.3d 1209 (2d Cir.1994) .....................................................................................................12

*In re Carbon Black Antitrust Litigation*,
  2005 WL 2323184 (D. Mass. Sept. 8, 2005) ...........................................................................10

*In re High Fructose Corn Syrup Antitrust Litigation*,
  295 F.3d 651 (7th Cir. 2002) ...................................................................................................10

*In re NFL's "Sunday Ticket" Antitrust Litig.*,
  2024 WL 1751781 (C.D. Cal. Apr. 17, 2024) .........................................................................18

*Interstate Com. Comm'n v. Louisville & N.R. Co.*,
  227 U.S. 88 (1913) .....................................................................................................................5

*It's My Party v. Live Nation*,
  No. 09-cv-547 (D. Md.) ............................................................................................................16

*Kellner v. City of New York*,
  2025 WL 3507346 (E.D.N.Y. Dec. 8, 2025) ...........................................................................11

*Lagudi v. Long Island R.R. Co.*,
  775 F. Supp. 73 (E.D.N.Y. 1991) .............................................................................................17

*Ohio v. Am. Express*,
   585 U.S. 529 (2018)................................................................................................................3

*Outley v. City of New York*,
   837 F.2d 587 (2d Cir. 1988)..............................................................................................16, 17

*Shafii v. PLC Brit. Airways*,
   22 F.3d 59 (2d Cir. 1994) ....................................................................................................11

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
   988 F.3d 690 (4th Cir. 2021) .......................................................................................8, 13, 14

*Sullivan v. Nat'l Football League*,
   34 F.3d 1091 (1st Cir. 1994).................................................................................................2

*The Topps Co. v. Cadbury Stani S.A.I.C.*,
   No. 99 CIV. 9437 (CSH), 2005 WL 2464963 (S.D.N.Y. Oct. 6, 2005)..................................12

*U.S. ex rel. Feldman v. van Gorp*,
   No. 03 CIV. 8135 (WHP), 2010 WL 2911606 (S.D.N.Y. July 8, 2010)................................11

*U.S. Football League v. Nat'l Football League*,
   1986 WL 7012 (S.D.N.Y. June 17, 1986) ..............................................................................18

*United States v. Abel*,
   469 U.S. 45 (1984)...........................................................................................................11, 17

*United States v. Garcia*,
   413 F.3d 201 (2d Cir. 2005)..................................................................................................14

*United States v. Google*,
   Case No. 23-cv-103, ECF No. 1303 (E.D. Va. Sept. 4, 2024) ..................................................8

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001)...................................................................................................8

## STATUTES

Clayton Act § 7 ...........................................................................................................................9

Sherman Act § 2...........................................................................................................................7, 9

# RULES

Fed. R. Evid.

401.................................................................................................................6, 8

402......................................................................................................................6

403......................................................................................................................6

404(b)...............................................................................................................17

701..............................................................................................................14, 15

702....................................................................................................................14

801(d)(2) ............................................................................................................6

807....................................................................................................................11

Defendants Live Nation Entertainment, Inc. and Ticketmaster L.L.C. ("Defendants") respectfully submit this combined Opposition to Plaintiffs' motions *in limine*, ECF No. 1015 ("Pls.' Mot.").

## I.    OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* NO. 1

One of the central issues in this case is market definition, and one of the core problems with how Plaintiffs have defined the alleged markets in this case is that they are completely gerrymandered.  For all but one of the alleged relevant markets, Plaintiffs arbitrarily limit them to a subset of the larger concert venues that primary ticketing companies compete to serve, and where artists play.  These made-for-litigation markets plainly do not encompass "the area of effective competition" that the law requires.

But if Plaintiffs are going to be allowed to present these markets to the jury, then Defendants must be allowed to show how they are made up and made for litigation as opposed to bearing any semblance to how the real world works.  One way to show that is through proof that the Department of Justice ("DOJ") itself, when looking at the primary ticketing market in the context of the Live Nation-Ticketmaster merger, defined the relevant market completely differently.  When DOJ challenged the Live Nation-Ticketmaster merger in 2010, it alleged a relevant market for primary ticketing services to "major concert venues"—which it defined as "the top 500 revenue generating venues in the United States as reported by Pollstar" (the "Prior DOJ Market Definition").  2010 Am. Compl. ¶ 21, ECF No. 691-8.  In particular, that definition included stadiums.  Now, rather than defining the same made-up term "major concert venues" the same way, Plaintiffs define "major concert venues" as arenas and amphitheaters—excluding stadiums—and limit that set to those that have a capacity of 8,000 or more and that hosted 10 or more shows in at least one year between 2017-2024.

This is not a question of prosecutorial discretion; it is a matter of whether any plaintiff—the Government included—should be able to completely change allegations and theories, and not have to answer for inconsistencies that result. Plaintiffs identify no case, and Defendants are aware of none, suggesting that the market that a plaintiff alleged in prior litigation against the *same* defendants concerning the *same* industry and many of the same alleged issues—here, the purported effects of combining Live Nation and Ticketmaster on competition for primary ticketing services—is not probative of the market definition advanced in a subsequent litigation. *See Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1113 (1st Cir. 1994) (noting that "portions of some prior antitrust decisions [against the same defendant] are relevant to the issue of defining the relevant market").

The jury has the right to know that (1) the first time around, DOJ included stadiums in its definition of its "major concert venues" targeted-customer market, getting to an alleged market share of over 80%, and (2) including stadiums whose capacities and number of concerts fit plaintiffs' new definition of targeted major concert venues drops that market share substantially (over 30 percentage points) to less than 49%. That share is too low to infer monopoly power on its own, and the declining share also shows a period of successful entry and expansion of rivals and of the market as a whole. *See Broadway Delivery v. United Parcel Service of America*, 651 F.2d 122, 129–31 (2d Cir. 1981) (explaining that "if the defendant's share is less than 50%," the plaintiff must offer additional evidence that the defendant is able to exclude competition). Those are probative facts that Defendants should be free to present to the jury, and to argue that this result is game over for Plaintiffs.

Plaintiffs' arguments in support of their motion to keep out this highly relevant evidence all fail.

*First*, Plaintiffs argue that the Prior DOJ Market Definition is irrelevant because "the competitive conditions today are not analogous to those sixteen years ago" due to Defendants' alleged anticompetitive conduct. Pls.' Mot. at 2. This argument puts the cart before the horse. The whole point of the market definition exercise is to define the area of competition to analyze whether and to what extent competition in that area of competition has been harmed by any of the alleged conduct by Defendants. Plaintiffs cannot rely on the assumption that Defendants have engaged in anticompetitive conduct since the Merger that has altered and harmed competition in the relevant market without first proving a valid relevant ticketing market. *Ohio v. Am. Express*, 585 U.S. 529, 542-43 (2018). All of the ways that Plaintiffs' alleged ticketing market does not make sense should be on the table to address that question, including that DOJ itself viewed the area of effective competition for primary ticketing services differently when looking at the exact same market player and the exact same product.

Plaintiffs suggest that evidence of the Prior DOJ Market Definition would "require a series of mini-trials to answer a series of sideshow questions" about stadiums. *Id.* at 3. That is hardly a sideshow, and will happen regardless of the outcome of this motion. Plaintiffs' artificial exclusion of stadiums from their gerrymandered targeted-customer market definition is one of the main issues for the jury to consider in deciding whether the contours of Plaintiffs' set of newly and differently defined "major concert venues" make any sense. Plaintiffs' own market definition put that question at issue. That is no basis to exclude evidence that the DOJ, after an extensive investigation, claimed that the appropriate set of targeted customers in which to analyze the effects of Live Nation combining with Ticketmaster should include stadiums.

*Second*, Plaintiffs argue that "plaintiffs in antitrust cases can allege alternative markets or submarkets." Pls.' Mot. at 3. That is a non-sequitur. Where plaintiffs allege alternative markets,

defendants are of course free to introduce evidence regarding them.  None of Plaintiffs' cases is deciding a motion *in limine* to exclude evidence of alternative markets or inconsistencies between them.

*Third*, Plaintiffs contend that the DOJ's Prior Market Definition should be excluded because Plaintiffs have prosecutorial discretion.  That is a complete red herring.  Prosecutorial discretion has nothing to do with how Plaintiffs previously analyzed the area of effective competition in which to understand the effects of Live Nation's merger with Ticketmaster.  DOJ came to a view of the economic realities of how primary ticketing works and applied that view.  Nothing about those decisions is about resource allocation.  Resources were being allocated and used to thoroughly analyze and investigate the merger and those resources came to a view.  Plaintiffs have to contend with that view and how it differs from the view that they are now trying to convince the jury is how this industry works.  None of Plaintiffs' cases is to the contrary.

Plaintiffs' conclusory claims of prejudice are meritless.  Plaintiffs contend that "Defendants have argued that defining major concert venues today the same way that the DOJ defined them in 2010 would decrease Ticketmaster's primary ticketing share 'from a monopoly-like 86% to a mere 49% when stadiums are included' but omit any mention that the DOJ's 2010 market definition … only included stadiums that were among the 500 venues that generated the highest concert revenues in 2008."  Pls.' Mot. at 4-5.  Plaintiffs are making Defendants' point.  DOJ's Prior Market Definition defined "major concert venues" as the top 500 revenue generating venues in the United States as reported by Pollstar regardless of labels or seats or roofs.  So if a stadium was on that list, it was in the market.  Now, Plaintiffs have defined "major concert venues" to artificially exclude stadiums completely, even if they meet the (also artificial) capacity and number of concerts thresholds.  Defendants pointing out this inconsistency is no more prejudicial

4

than any other problem Defendants intend to point out about Plaintiffs' flawed market definition. If Plaintiffs believe this comparison is apples and oranges, they are free to argue it. But that does not make this evidence unduly prejudicial.

Plaintiffs' motion should be denied.

## II.    OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* NO. 2

Plaintiffs insist that the 2010 Consent Decree and 2020 Amended Consent Decree (together, the "Decrees"), including Defendants' obligations under the Decrees, are "important and relevant to the current litigation," Pls.' Mot. at 6, yet at the same time seek to selectively prevent Defendants from presenting evidence and argument concerning the neutral third party authorized to monitor Defendants' compliance with those Decrees (the "Monitoring Trustee"). Put simply, Plaintiffs want to have their cake and eat it too. To be very clear: if the Court grants Defendants' Motion *in Limine* No. 4 and excludes the Decrees, *see* ECF No. 1019 at 10-12, then Defendants would agree not to offer evidence concerning the Monitoring Trustee. Conversely, if the Court admits Plaintiffs' evidence concerning the Decrees, then Defendants should be permitted to respond, in part, by presenting evidence regarding the Monitoring Trustee—and in that case, Plaintiffs' Motion *in Limine* No. 2 should be denied.

Arguments or evidence about the Decrees are inherently prejudicial: the fact that the Amended Decree arose from alleged Decree violations and extended anti-retaliation obligations is likely to mislead jurors to conclude—incorrectly—that Plaintiffs have already established such violations. Defendants must have the opportunity to dispel these inferences by providing evidence of Defendants' compliance with the Amended Decree. *See Interstate Com. Comm'n v. Louisville & N.R. Co.*, 227 U.S. 88, 93 (1913) (emphasizing that all parties "must be given opportunity to … offer evidence in explanation or rebuttal"). Moreover, contrary to Plaintiffs' assertion, the Decrees are neither "important" nor "relevant" in this litigation. Pls.' Mot. at 6. Indeed, as discussed in

Defendants' Motion *in Limine* No. 4, Plaintiffs have explicitly argued in this case that their "current claims are separate and distinct from the Decree and the Clayton Act claim underlying it." *See* ECF No. 225; *see also* Defs.' MIL Ex. 20,[1] Pls.' Resp. to Interrog. No. 15 ("Plaintiffs are not seeking to enforce, construe, or modify the consent decree.").

But if Plaintiffs are allowed to put Defendants' obligations under the Decrees at issue, then Defendants must have the opportunity to counter with Plaintiffs' own admission that the Monitoring Trustee has never reported any violations under the Amended Decree, Pls.' Resp. & Obj. to Defs.' First Set of Reqs. for Admis., ECF No. 691-14, which is "reliable evidence of [] [D]efendants' overall performance with respect to their obligations under [the Amended Decree]," *Evans v. Fenty*, 714 F. Supp. 2d 116, 121-22, 125 (D.D.C. 2010) (finding that monitor's reports were "reliable evidence" as to defendants' compliance with court orders where monitor was tasked with submitting quarterly reports on defendants' compliance). Therefore, evidence concerning the Monitoring Trustee should not be excluded under Rules 401, 402 or 403.

Plaintiffs also contend that the Monitoring Trustee's written reports are inadmissible hearsay. This objection is wrong, but inapposite, as Defendants do not intend to offer the Monitoring Trustee's reports into evidence.[2] Defendants seek only to introduce Plaintiffs' Request for Admission response admitting that the Monitoring Trustee found no violations of the Amended Decree. This is a quintessential party admission and is admissible. Fed. R. Evid. 801(d)(2).

Plaintiffs' motion should be denied.

---

[1] Citations to "Defs.' MIL Ex." refer to the exhibits attached to the Declaration of Robin L. Gushman in Support of Defendants' Motions *in Limine*, submitted to the Court on February 10, 2026. Citations to "Defs.' Opp. Ex." refer to the exhibits attached to the Declaration of Robin L. Gushman in Support of Defendants' Opposition to Plaintiffs' Motions *in Limine*, submitted to the Court on February 18, 2026.

[2] For the avoidance of doubt, Defendants intend to remove the Monitor Trustee's written reports from Defendants' Exhibit List.

6

### III.    OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* NO. 3

Plaintiffs challenge conduct that occurred many years ago—such as acquisitions by Live Nation of, or joint ventures with, promoters, ticketers or venues from before 2018.  Defendants have moved to exclude evidence of these acquisitions.[3]  If Plaintiffs are allowed to introduce such evidence, and argue that those acquisitions harmed competition, then Defendants must be allowed to introduce evidence as to the Government's contemporaneous treatment of those acquisitions: in particular, the failure of any government enforcement agency to investigate or challenge any of those acquisitions.

Likewise, Plaintiffs challenge exclusive contracting that has been prevalent in the United States ticketing industry for decades.  Defendants should also be allowed to offer evidence relating to the fact that the Government did investigate but did not challenge the widespread practice of exclusive ticketing until this case.

This evidence is probative and relevant to the jury's consideration of the alleged effects of the conduct Plaintiffs are challenging.  Plaintiffs cannot place Defendants' acquisitions and exclusive contracting at the center of their case, and then prevent Defendants from presenting evidence that the Government was aware of but never challenged them for many years, until now.

#### A.    Evidence That Defendants' Older Acquisitions Were Not Challenged Is Admissible

Plaintiffs have placed Defendants' acquisitions directly at issue, alleging that Live Nation engaged in "a strategy of acquiring nascent threats and neutralizing rivals" that harmed competition under Section 2.  Am. Compl. ¶¶ 6, 68, 117, ECF No. 257.  "[T]o be condemned as

---

[3] In light of the Court's summary judgment ruling issued today, ECF No. 1037, Plaintiffs' claims relating to Live Nation's acquisitions of promoters are no longer relevant to this case and should be excluded for that additional reason.

exclusionary, a monopolist's act must have an 'anticompetitive effect.'" *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001).  Evidence that these acquisitions went unchallenged for years is highly relevant to jurors' assessment of Plaintiffs' claim that these acquisitions supposedly harmed competition in the alleged markets.  Fed. R. Evid. 401.

To be clear, Defendants do not seek to admit enforcers' reports or deliberations; Defendants seek only to introduce evidence of the fact that the Government did not challenge these acquisitions—and only to the extent Plaintiffs are allowed to introduce evidence concerning such acquisitions.  That is similar to what the court permitted in *United States v. Google*, Case No. 23-cv-103, ECF No. 1303 (E.D. Va. Sept. 4, 2024), on which Plaintiffs heavily rely.  Plaintiffs assert that the *Google* court excluded evidence about "antitrust enforcers' review, comments, and decisions not to challenge Google's acquisitions," but fail to note that the court took "judicial notice of the fact—because it's a fact—that those two acquisitions were approved by regulators at that time" because "[t]hat's an appropriate fact in this record."  *Id.*  So too here:  that the Government never challenged Defendants' other acquisitions is an admissible fact if Plaintiffs are allowed to introduce evidence as to those acquisitions.  *Id.*

Plaintiffs' reliance on *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690 (4th Cir. 2021), is misplaced.  Pls.' Mot. at 9.  There, the court precluded evidence of one DOJ investigation that happened before the alleged harmful effects of the challenged merger materialized, and of another investigation—into that same merger—that had concluded two months before the lawsuit was filed.  988 F.3d at 700, 702.  The concern in *Steves*—that non-enforcement of the merger on these facts could have been due to "limited resources" or similar factors—does not apply here.  *Id.*  Since its investigation and conditional clearance of the Merger in 2010, the DOJ has directed significant resources to assessing the potential antitrust implications of Defendants' subsequent acquisitions

8

in the live entertainment industry.  Now, Plaintiffs seek to introduce evidence of "dozens" of acquisitions throughout that 15-year period, while seeking to bar any evidence that no Government enforcement agency challenged *any* of those acquisitions.  Am. Compl. ¶ 118.  As Plaintiffs point out, they intend to have the jury "consider Defendants' past conduct 'as a whole,' with the benefit of a retrospective record."  Pls.' Mot. at 10.  The Government's pattern of non-enforcement over the past decade is part of and relevant to that "retrospective record."

Plaintiffs further argue that because the Government would have investigated Defendants' acquisitions under Section 7 of the Clayton Act, and the jury here is charged with evaluating Defendants' conduct under Section 2 of the Sherman Act, the Government's decisions are somehow irrelevant.  *Id*. at 10.  Plaintiffs do not cite a single case for this proposition, and for good reason:  whether Defendants' past acquisitions and Plaintiffs' current claims are evaluated under different standards is irrelevant where the jury is not tasked with addressing the legality of any acquisition.  Rather, the jury will consider the Government's pattern of non-enforcement as one of several factors in its assessment of Defendants' overall conduct.  And again, only if Plaintiffs are permitted to introduce evidence as to these prior acquisitions.  Moreover, the standard for proving a violation of Section 7 is *lower* than the standard under Section 2—"[w]hereas Section 2 requires monopoly power … something less than monopoly power is required to condemn mergers under [S]ection 7's 'substantially lessen competition' test."  *Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47, 60, n.9 (1st Cir. 2002).  An acquisition that the Government decided did not violate Section 7 certainly would not violate Section 2.

Finally, Plaintiffs' warning of a "sideshow" requiring evidence on what enforcers "knew and did not know" falls flat.  Pls.' Mot. at 10.  Plaintiffs are the ones seeking to make these acquisitions part of the "show"; if they get to do so, the jury should hear the full context, which

includes that no Government enforcer ever challenged any of the now-challenged acquisitions. Defendants seek only to establish that the Government did not challenge these acquisitions—not to introduce internal agency deliberations—which poses no risk of waste or delay.

**B.      Evidence of the Government's 1990s Investigation of Exclusive Contracting in Ticketing Is Admissible**

In the 1990s, the DOJ closed a yearlong investigation into exclusive contracting in the United States ticketing industry without taking any action. Evidence of the Government's 1990s investigation is directly relevant to Plaintiffs' claims that Live Nation entered "long-term, exclusive ticketing contracts" that harmed competition. Am. Compl. ¶¶ 61, 68. The fact that the Government has declined to challenge this longstanding, widespread industry practice for decades is highly probative of whether such practices actually cause the competitive harm Plaintiffs claim they do.

Plaintiffs' authorities do not say otherwise. *Heckler v. Chaney*, 470 U.S. 821 (1985), addressed judicial review of agency non-enforcement under the APA—not admissibility at trial. *In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651 (7th Cir. 2002), and *In re Carbon Black Antitrust Litigation*, 2005 WL 2323184 (D. Mass. Sept. 8, 2005), involved allegations of *per se* price-fixing conspiracies. Both courts adopted the narrow holding that the defendants could not argue that "the closing of [the Government's prior] investigations is somehow evidence that no conspiracy exists." *In re Carbon Black*, 2005 WL 2323184, at *1; *see In re High Fructose Corn Syrup*, 295 F.3d at 664 (rejecting argument that "because the Justice Department has not moved against the alleged HFCS price-fixing conspiracy, there must not have been one"). Here, by contrast, Defendants seek to introduce the 1990s investigation to provide historical context for the industry's longstanding use of exclusive contracts.

10

Finally, Plaintiffs' hearsay objection to the LA Times article on the 1990s investigation does not warrant exclusion. Defendants intend to offer statements in the article for the fact that such statements were made, not for the truth of the matter asserted. *See Shafii v. PLC Brit. Airway*s, 22 F.3d 59, 65 (2d Cir. 1994) (admitting statements in affidavit where "[t]he statements are not offered for the truth of the matter asserted but for the fact that they had occurred"); *see also Kellner v. City of New York*, 2025 WL 3507346, at *27 (E.D.N.Y. Dec. 8, 2025) (admitting *New Yorker* article under Rule 807 in light of the journal's "sterling reputation for accuracy and the existence of its fabled fact-checking department"). The fact of the public statements in the article, including statements on the investigation's closure, is relevant to how industry participants perceived the regulatory status of exclusive ticketing and why they continued to rely on such arrangements. To the extent the article may be relevant for a non-hearsay purpose, Defendants reserve their rights to offer it at trial. Moreover, Plaintiffs' objection to this article does not prohibit Defendants from establishing, through witnesses with personal knowledge, the fact that the Government investigated exclusive contracting in the 1990s and took no action.

## IV.    OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* NO. 4

In a scant two paragraphs, Plaintiffs argue that the Court should preclude evidence of their extensive collaboration with several of their intended trial witnesses, both during investigations by the DOJ and/or other regulators into Live Nation or Ticketmaster's alleged anticompetitive conduct, and during this litigation. That motion should be denied.

Those interactions go directly to the credibility and potential bias of those witnesses, which is a "permissible and established basis of impeachment." *United States v. Abel*, 469 U.S. 45, 49 (1984). Indeed, "[t]he motivation of a witness in testifying, including [his] possible self-interest and any bias or prejudice against the defendant, is one of the principal subjects for cross-examination." *U.S. ex rel. Feldman v. van Gorp*, No. 03 CIV. 8135 (WHP), 2010 WL 2911606,

at *5 (S.D.N.Y. July 8, 2010) (quoting *Henry v. Speckard*, 22 F.3d 1209, 1214 (2d Cir.1994); *see also The Topps Co. v. Cadbury Stani S.A.I.C.*, No. 99 CIV. 9437 (CSH), 2005 WL 2464963, at *2 (S.D.N.Y. Oct. 6, 2005) (allowing examination of a non-party witness's relationship with a party because the topic was relevant to the witness's credibility and "possible bias or personal interest in giving testimony favorable to [the party]," and noting that "parties are given much more latitude in cross-examining an adverse witness for the purpose of exploring his possible bias or interest in the case").

Here, the record is replete with evidence that several of Plaintiffs' intended witnesses have urged and participated in Plaintiffs' investigations of Live Nation and Ticketmaster both before and during this litigation. *See, e.g.*, Defs.' MIL Ex. 6, ████████████████ Tr. 74:3-10 ████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████ ); *id.* 74:24-75:12 (████████████████████████████

████████ ); Defs.' MIL Ex. 3, ████████████ Tr. 18:12-19:22 (████████████████

████████████████████████████ ); *see also* Defs.' Opp. Ex.

1 (████████████████████████████████████████████

████████████████████████████ ); Defs.' Opp. Ex. 2 ████

████████████████████████ t); Defs.' Opp. Ex. 3 ████████████

██████ ████████ ███ ████████████ ██████ ██████ █ █

██████ ); Defs.' Opp. Ex. 4 (███ █ ███ ████████ ██████ ██████ ██████ ██████

████████████████████████████████████████████████

████████████████████████ ).

Far from being disinterested non-parties, these witnesses—who claim to be Defendants' direct competitors—have already admitted that they urged DOJ to file this lawsuit and that they hope to benefit from a result in Plaintiffs' favor. *See, e.g.*, Defs.' MIL Ex. 7, ███████████ Tr. 21:16-24 ████████████████████████████████ ████████████████████████████████████████████████; *id.* 22:13-18 ████████████████████████████████ ████████████████; *id.* 27:3-13 ██████████████████████ ████████████████████████████████████████ ████████████████████████████████); *id.* 27:23-28:9 (██████████████████████████); *id.* 31:6-21 ████████████ ████████████████████████████████ ████████████████; *id.* at 37:8-13 ████████████ ████████████████████████); Defs.' MIL Ex. 13, ██████████ ████ Tr. 129:15-21 ██████████████████████████ ████████████████████████████████ ██████████████████ This clear self-interest goes to the heart of their credibility and the jury should be allowed to consider this evidence of bias when evaluating the relevant witnesses' testimony.

Plaintiffs' sole cited authority—the out-of-Circuit decision in *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690 (4th Cir. 2021)—does not compel a different result. The potential bias or credibility of the witness was not even at issue in that case. The Fourth Circuit found that the jury did not need to hear that a witness had made statements to government regulators where the regulator had declined to bring an enforcement action against a party, because hearing about

13

the non-enforcement decision could have misled the jury into thinking that the regulator deemed the challenged conduct to be legal. *Id*. at 714. The situation here is quite different: the Government *has* chosen to pursue an action against Defendants, and as part of that action has relied upon an eager cohort of non-party witnesses who stand to directly benefit from the litigation.

Plaintiffs' cursory assertion that they will be forced to reveal privileged information to counter the resulting perception of bias makes no sense. First, Plaintiffs' communications with the relevant non-party witnesses are not privileged in the first place, so both parties can present evidence related to those communications without implicating privilege or waiver concerns. And, in any event, Plaintiffs remain free to demonstrate that this enforcement action is supported by the merits of the evidence. Accordingly, the Court should reject Plaintiffs' motion and allow Defendants to present evidence of Plaintiffs' witnesses' dealings with government regulators.

## V.    OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* NO. 5

Plaintiffs' Motion *in Limine* No. 5 demonstrates that Plaintiffs want a one-sided evidentiary rule, under which only their witnesses can testify about whether Defendants' conduct and margins are indicative of monopoly power. To be clear, as reflected in Defendants' Motion *in Limine* No. 13, we believe neither side's lay witnesses should be able to toss around characterizations of Defendants as "monopolies" or wielding "monopoly power." But Plaintiffs have made clear that they intend to offer such evidence; should the Court allow them to do so (and it should not), it should deny Plaintiffs' Motion *in Limine* No. 5.

Federal Rule of Evidence 701 prohibits lay witnesses from venturing opinions grounded in "scientific, technical, or other specialized knowledge" because such testimony falls "within the scope of Rule 702." Fed. R. Evid. 701. Whether a particular act or profit margin signals monopoly power is precisely the kind of specialized economic and antitrust opinion that "must be determined by reference to Rule 702, not Rule 701." *United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005)

14

(internal quotation marks omitted). For that reason, Defendants have already told Plaintiffs that Defendants would agree not to ask any lay witness to offer any opinion that uses the terms "monopolist," "monopoly power," "monopoly rents," or any similar legal or economic terms, so long as they agreed to play by the same rules. If Defendants' employees cannot use those terms, no other lay witness should be allowed to do so either. But Plaintiffs declined that proposed solution, because they want to have it both ways. They want to restrict Defendants' employees from using these terms, but want non-party lay witnesses to be allowed to throw these terms around at whim. *See, e.g.,* Defs.' Opp. Ex. 5, ███████ Tr. 18:22-19:8 ██████████████

████████████████████████████████████████████████

███████████████████.[4] That is both unfair and also violates Rule 701, as Defendants explained in their Motion *in Limine* No. 13. Plaintiffs should be precluded from eliciting testimony from, or introducing other evidence through, any lay witness—including non-party witnesses—stating that Defendants have "monopoly power," are "monopolists," charge "monopoly rents," have "monopoly money" or using any other version of the word "monopoly." *See* ECF No. 1018 at 24-25.

To be clear, Defendants do not seek to muzzle fact testimony. Lay witnesses may testify to factual matters within their personal knowledge, including for example the existence and amounts of profit margins. What Rule 701 forbids, and what Plaintiffs' own motion recognizes as problematic, is the leap from facts to economic—or worse here, *legal*—opinion. A lay witness may state facts about margins and profitability; that witness may not pronounce whether those

---

[4] Evidence such as this should be excluded for the separate reason that, in light of the Court's summary judgment ruling, ECF No. 1037, evidence of Live Nation's supposed power in concert promotion is irrelevant.

margins and profitability constitute monopoly power or "monopoly profits" or any variation thereof.

For the foregoing reasons, Defendants propose that the proper resolution of Plaintiffs' Motion *in Limine* No. 5 and Defendants' Motion *in Limine* No. 13 is to treat both sides equally. The same evidentiary guardrails Plaintiffs seek for their benefit should apply with equal rigor to all witnesses, which will still allow both sides' witnesses to testify to facts relating to Defendants' conduct, margins and profitability without crossing the line into expert territory.

## VI.   OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* NO. 6

Plaintiffs' Motion *in Limine* No. 6 is premature.  Defendants have no present intention to introduce any evidence about the existence and outcome of a lawsuit the promotion and venue management company It's My Party, Inc. ("IMP") previously filed against Live Nation and subsequently lost on summary judgment.  *See It's My Party v. Live Nation*, No. 09-cv-547 (D. Md.).   However, because Plaintiffs intend to call the founder of IMP as a witness at trial, Defendants simply need to preserve the right to introduce such evidence *if* it becomes relevant and necessary, depending on the testimony that Plaintiffs elicit.  There could be circumstances where the existence and outcome of the lawsuit becomes both relevant and admissible, such as for potential impeachment or if Plaintiffs themselves elicit testimony about the case.  There is no reason for the Court to rule the evidence categorically inadmissible now, without the benefit of the relevant context.

In support of their motion, Plaintiffs primarily rely on *Outley v. City of New York*, 837 F.2d 587 (2d Cir. 1988), and several of its progeny, wherein courts held that a witness's prior litigation history or generalized "grudge" against a particular group was not admissible to show that the witness was "litigious" or otherwise acting consistently with that character trait in the instant lawsuit. *Id.* at 594. *Outley* nonetheless recognized that evidence of prior litigation involvement

16

could be relevant and admissible under Rule 404(b) for proving, *inter alia*, motive or intent. *Id.* at 592-595 (conducting 404(b) inquiry on evidence of prior litigation involvement); *see also Abel*, 469 U.S. at 49 (holding the use of evidence of bias to impeach a witness is generally permissible under the Federal Rules of Evidence). So too here; the evidence would not go to propensity but to bias. The Court should deny Plaintiffs' motion.

## VII.    OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* NO. 7

Plaintiffs once again seek to establish an uneven playing field, this time with regard to what the jury can hear about remedies that everyone agrees the jury will have no role in deciding. Plaintiffs seek to exclude "any evidence of or reference to the existence of treble damages, attorneys' fees, or civil penalties" because those remedies are "outside the jury's purview" and "informing the jury of such provisions would infringe on the role of the Court." Pls.' Mot. at 16.

But at the same time, Plaintiffs' proposed jury instructions demonstrate that they intend to reference remedies "outside the jury's purview" in the upcoming trial. For example, their proposed Post-Instruction No. 10 states: "In addition to damages, Plaintiffs are seeking other remedies that will be decided by the Court at a later date, if you find Defendants liable on one or more claims. Plaintiffs may, for example, ask the Court to order Live Nation to sell Ticketmaster, open its amphitheaters to artists promoted by non-Live Nation promoters, stop using exclusive ticketing contracts with venues, or sell some of its amphitheaters. However, you are not responsible for determining whether any of those remedies is needed or appropriate at this time." ECF No. 1031-9 at 30-31. This instruction is inappropriate and prejudicial, and any such instructions, references, arguments, or evidence should be excluded. *See Lagudi v. Long Island R.R. Co.*, 775 F. Supp. 73, 74 (E.D.N.Y. 1991) ("[E]vidence relevant to the [remedies] issue could have a prejudicial impact upon the jury's liability determination."); *Amdocs (Isr.) Ltd. v. Openet Telecom, Inc.*, 2012 WL 12832376, at *1 (E.D. Va. Mar. 30, 2012) ("*[N]either* party will be allowed to inject any irrelevant

17

evidence or raise any improper arguments before the jury" regarding "[w]hether injunctive relief is appropriate should plaintiff prevail.") (emphasis added); *In re NFL's "Sunday Ticket" Antitrust Litig.*, 2024 WL 1751781, at *2 (C.D. Cal. Apr. 17, 2024) (in an antitrust case, "*neither* party can bring evidence or argument about injunctive relief and forward-looking changes") (emphasis added); *U.S. Football League v. Nat'l Football League*, 1986 WL 7012, at *3 (S.D.N.Y. June 17, 1986) ("[A]n antitrust jury forced to consider the 'impact' of uncertain injunctive relief … could become hopelessly confused."); *Broadcom Corp. v. Emulex Corp.*, 2011 WL 13130705, at *1 (C.D. Cal. Aug. 10, 2011) ("[R]eference to the possibility of injunctive relief could distract the jury from its job of determining whether and in what amount damages should be awarded."); *see also* ECF No. 1031-9 at 34 (Defs.' Arg. re: Post-Instr. No. 10).

As Defendants explained in their Motion *in Limine* No. 7, Defendants propose that the Court should exclude *any* evidence of or reference to "remedies not at issue in the upcoming trial." *See* ECF No. 1018 at 16-17. Accordingly, the issue with Plaintiffs' motion is not its goal but its scope—for the reasons explained in Defendants' motion and in this opposition, the scope of the exclusion should be broader and extend to any reference to equitable or other remedies that may be determined by the Court instead of the jury.[5]

---

[5] Defendants also do not intend to introduce evidence or argument "as to any impact a damages award would have on Defendants' business operations."  *See* Pls.' Mot. at 17.

Dated: February 18, 2026

Respectfully submitted,

LATHAM & WATKINS LLP

_____

Alfred C. Pfeiffer (admitted *pro hac vice*)
   *Co-Lead Trial Counsel*
David R. Marriott
   *Co-Lead Trial Counsel*
Andrew M. Gass (admitted *pro hac vice*)
Timothy L. O'Mara (admitted *pro hac vice*)
Jennifer L. Giordano
Kelly S. Fayne (admitted *pro hac vice*)
Lindsey S. Champlin (admitted *pro hac vice*)
Robin L. Gushman (admitted *pro hac vice*)

505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600

1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

555 11th Street, NW, Suite 1000
Washington, D.C. 20004
(202) 637-2200

Al.Pfeiffer@lw.com
David.Marriott@lw.com
Andrew.Gass@lw.com
Tim.O'Mara@lw.com
Jennifer.Giordano@lw.com
Kelly.Fayne@lw.com
Lindsey.Champlin@lw.com
Robin.Gushman@lw.com

*Attorneys for Defendants Live Nation
Entertainment, Inc. and Ticketmaster L.L.C.*

CRAVATH, SWAINE & MOORE LLP

_____

Lauren A. Moskowitz
Jesse M. Weiss
Nicole M. Peles

Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 474-1000

lmoskowitz@cravath.com
jweiss@cravath.com
npeles@cravath.com

*Attorneys for Defendants Live Nation
Entertainment, Inc. and Ticketmaster L.L.C.*

19

**CERTIFICATE OF COMPLIANCE**

I, Robin L. Gushman, an attorney duly admitted to practice before this Court, hereby certify pursuant to Local Rule 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rules") and Rule 8(C) of Judge Arun Subramanian's Individual Practices in Civil Cases ("Individual Rules"), that the foregoing Opposition was prepared using Microsoft Word, and contains 5,783 words. In making this calculation, I have relied on the word count of the word-processing program used to prepare the document.

Dated:    February 18, 2026
          San Francisco, California

Robin L. Gushman
Robin L. Gushman