

**Office of the New York State Attorney General**

**Letitia James Attorney General**

February 23, 2026

**By ECF Filing (Redacted)**

Hon. Arun Subramanian
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street, Courtroom 15A
New York, New York 10007

Re:   *United States of America, et al. v. Live Nation Entertainment, Inc., et al.*,
       1:24-cv-03973 (AS)

       Submission Regarding Defendants' pending Motion to Exclude the Reports, Opinions, and Testimony of Monetary Relief States' Damages Expert Dr. Rosa Abrantes-Metz (ECF No. 704)

Dear Judge Subramanian,

I write on behalf of the Plaintiff States in the *United States v. Live Nation* action to further address the questions raised by the Court regarding Dr. Abrantes-Metz's expert opinions during the February 19, 2026 conference regarding the treatment of upfront payments and inside fees in her damages calculations. *See* ECF No. 704 (Defs. Br. in Supp. of Mot. to Exclude) at 18–21. The existence of upfront payments and inside fees has no impact on Dr. Abrantes-Metz's damage calculations, and indeed, it would be improper to adjust for them in calculating harm to consumers. There is no basis to preclude her testimony at trial.

**Upfront Payments**

As part of her analysis, Dr. Abrantes-Metz calculates that the per-ticket retained amount for Ticketmaster is ▮ higher than her benchmark firm, AXS. Abrantes-Metz Opening Report ¶ 110, *available at* ECF No. 722-1.[1] Defendants claim that Dr. Abrantes-Metz should reduce this difference in retained amounts to account for Ticketmaster's "upfront payments," arguing that those payments are "set in conjunction with Ticketmaster's per-ticket fees," such that "if a venue demands a larger upfront payment, Ticketmaster typically will seek a larger share of the fees in return." ECF No. 704 at 18. According to Defendants, this means that upfront payments impact

---

[1] To the extent possible, Plaintiff States have refrained from resubmitting documents already submitted to the Court under seal.

the retained amount, which is the per-ticket price charged by Ticketmaster to venues for its ticketing services. *Id.* at 19.

Defendants suggest that the "retained amount"—by which they appear to mean the amount Ticketmaster retains from the *venue*—should be reduced to account for the fact that Ticketmaster made a large upfront payment to the venue at the outset of the contract. But Dr. Abrantes-Metz's analysis isn't focused on the amount Ticketmaster retains from the venue, but the amount that Ticketmaster retains from *fans*, because that is what ultimately drives the fees fans pay and whether they have been injured.[2]

For example, if a fan pays $100 for a ticket, Dr. Abrantes-Metz calculates how Ticketmaster allocates that $100: it allocates some to the artist and promoter, some to the venue, and some to Ticketmaster. The amount that Ticketmaster allocates to itself (the retained amount) serves as the marginal *price* of its ticketing services to the venue on a per-ticket basis. That price is what affects the amount of fees ultimately paid by fans, something Dr. Abrantes-Metz carefully calculates (and Defendants do not challenge). Abrantes-Metz Opening Report ¶¶ 108–10.

Assume Ticketmaster charges $5—that is it retains $5 of the $100 ticket price—and then decides to increase that charge to $10. Whether that increase in the retained amount caused an increase in the *total* ticket price is what matters for determining fan impact. It is irrelevant to this question what portion of that $10 is needed to cover upfront payments. Fans aren't parties to these upfront payments. Their ticket prices are not reduced by some amount of "upfront payment." Unlike per-ticket fees, these lump-sum transfers are exchanged in a separate transaction between the venue and the ticketer before a single ticket is sold, before we even know how many tickets to a given event will be sold. In the same way, if a consumer is unlawfully compelled to buy a bottle of soda for $2.00 at one store when another store is selling it for $1.50, the stores' arrangements with their wholesalers don't affect whether that consumer has overpaid.

Upfront payments may affect the overall *profitability* of a ticketing agreement for Ticketmaster (and the venue), as do all of Ticketmaster's other expenses. But it wouldn't make sense to remove, for example, Ticketmaster's expenses related to ticket scanners deployed at a given venue when calculating the impact of Ticketmaster's retained amounts on fans, even though both influence Ticketmaster's overall profit from a given ticketing contract. *See* Abrantes-Metz Rebuttal Report ¶ 108, *available at* ECF No. 722-2. As explained above, every penny of that $100 is allocated to artists and promoters, venues, or ticketers. That some of the price retained by Ticketmaster helps compensate them for the upfront payment they made is true but not relevant to the question being addressed by Dr. Abrantes-Metz. Some of the price retained by the venue helps compensate the venue for its electricity expenses. None of this changes the fact that the fan has paid $100 for the ticket.

The amount of any upfront payment is set when the contract between the venue and ticketer is signed, before the number of tickets that will ultimately be sold by the venue is known. After the agreement concludes, it is possible to divide the original upfront payment by all tickets sold and determine that "upfront payments" might amount to, hypothetically, about $1 per ticket. But that doesn't reflect a change to the price and cannot be set or known at the time the contract is signed

---

[2] As a matter of economics, whether the funds kept by Ticketmaster from fees charged to fans are called "retained amounts" or something else, the substance is the same: Fans pay these charges and Ticketmaster keeps these portions of the fans' payments.

(unlike the per-ticket fees specified in the contract). Suppose that after-the-fact, fewer tickets had been sold for a given event than anticipated; that would change this calculation to, say, hypothetically, $1.10 per ticket. Yet that has no effect on prices paid by the fans. The fans do not pay more, or receive a rebate, because it turns out that upfront payments amount to $1.10 instead of $1.00 per ticket.

To the extent Defendants are suggesting that higher upfront payments must cause higher per-ticket fees, they don't explain why that matters or why that would require an adjustment. As a threshold matter, Defendants' premise is doubtful. Defendants point to the fact that upfront payments and ticketing fees are set in the same contract as evidence that the former determine the latter. But as a matter of economics, that doesn't follow. Upfront payments are lump-sum in nature. Abrantes-Metz Rebuttal Report ¶ 111.[3] By definition, lump-sum payments do not affect marginal pricing decisions, for the same reasons sunk costs should be ignored in making marginal decisions. For example, suppose an accounting firm had an unexpected tax liability from several years prior, which did not affect its current operations, and had to make a large lump-sum payment to the government as a result. Despite incurring a large one-time cost, that payment should have no effect on the prices the firm charges for its services to its clients.

The testimony cited by Defendants in their opening brief isn't to the contrary. There, the employees discuss upfront payments as related to the "net from the contract," trading variable revenues against higher fixed payments, and "the scope of the business." ECF No. 704 at 19. But the impact of upfront fees on the overall profitability of a contract or how Ticketmaster and a venue share revenue doesn't mean that the amount of fees charged to fans changes, just as a provision in the contract requiring the venue to purchase insurance doesn't change the fees. And even if that were true, as discussed below, the fact that Ticketmaster may structure contracts differently with different venues has no bearing on whether Ticketmaster retains more fees on average than AXS.

Ultimately, Ticketmaster's upfront payments therefore would only matter for purposes of Dr. Abrantes-Metz's analysis if they were to (1) systematically impact the difference in prices charged by Ticketmaster and AXS, and (2) do so in a way unrelated to Ticketmaster's anticompetitive conduct. Defendants have put forward no evidence that suggests there is any systematic difference between Ticketmaster and AXS in this regard. This requires at least three things to be true: (i) that upfront payments are a type of advance or loan against future per-ticket fees, (ii) that there is a material difference in the extent of upfront payments between Ticketmaster and AXS, and (iii) that this financing arrangement between Ticketmaster and the venue doesn't cause harm to fans. But none of the three are true.

*First*, Defendants' treatment of all upfront payments as per-ticket loans runs contrary to economic principles and contradicts the record evidence and the deposition testimony of Defendants' own experts. In Defendants' telling, Ticketmaster might give one venue $10 million today and require the venue to pay Ticketmaster $1.00 for every ticket sold over the life of the

---

[3] *See also* Abrantes-Metz Opening Report ¶¶ 77, 83 & n.193 (citing N. Gregory Mankiw, Principles of Economics, Eighth Edition, Cengage Learning, Boston, 2016, pp. 235 ("A lump-sum tax is the most efficient tax possible. Because a person's decisions do not alter the amount owed, the tax does not distort incentives and, therefore, does not cause deadweight losses."); *see also id.* at 255 ("Some costs, called fixed costs, do not vary with the quantity of output produced. They are incurred even if the firm produces nothing at all.").

contract. For a different venue, Ticketmaster might pay $20 million and require the venue to pay $2.00 per ticket sold. In this hypothetical, the upfront payment is a loan, repaid over time through elevated per-ticket fees.

As noted above, the mere fact that a lump-sum payment is made up front and fees are paid back over the life of a contract doesn't establish that the specific fees charged depend solely or directly on the amount of the lump-sum payment. Further, the record evidence indicates that upfront payments often relate to the purchase of distinct, highly valuable assets, such as exclusivity, sponsorship, or advertising rights. This is consistent with the record evidence as cited by Dr. Abrantes-Metz.[4] Upfront payments made to secure arena advertising rights have nothing to do with the ticket prices that fans pay.

Defendants draw no distinctions between upfront payments relating to purchases of bona fide services and those that are purportedly an advance on future fees. Nor have Defendants' experts systematically analyzed these payments or attempted to determine the value of the rights being purchased.[5] But Defendants' experts have acknowledged that sponsorship upfront payments can be large. In three examples of sponsorship upfront payments, Dr. Budish cites ▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ is added together.[6] *See* Budish Opening Report ¶ 60 & n.81. There is also evidence in the record indicating sponsorship payments can be negotiated outside ticketing agreements, indicating they are for genuine consideration.[7] Defendants may argue that most of these payments are effectively loans, not payment for services, but it is the jury's province to determine whether that is credible.

*Second*, even if upfront payments were to affect per-ticket retained amounts, this would only alter Dr. Abrantes-Metz's analysis if Ticketmaster and AXS differed materially in their upfront payment practices. Otherwise, while each ticketer's respective retained amounts would appear lower after the adjustment, the difference between them would not be expected to change, leaving the damages calculation unaffected.

Only Dr. Abrantes-Metz has investigated this question. Defendants have not refuted her analysis; they have simply ignored it. The record evidence indicates that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Abrantes-Metz Rebuttal Report ¶¶ 116–19. Further, Dr. Abrantes-Metz *conducted the only review* of upfront payments available in AXS agreements and found that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Abrantes-Metz Rebuttal Report ¶¶ 116, 118–19. By contrast, Dr. Budish, the only other expert to recalculate Ticketmaster's retained amount based on upfront payments, admitted he had no opinions on ▓▓▓▓▓▓▓▓



[4] *See, e.g.*, Abrantes-Metz Opening Report ¶ 76 & n. 182; Abrantes-Metz Rebuttal Report ¶¶ 117(a), 118(b), 119(d), & n. 215 (quoting Budish Report n. 81).

[5] *See* Ex. 1 (Budish Dep.) at 345:9–348:6 (discussing ▓▓▓▓▓▓▓▓▓▓▓▓▓▓), 347:4–9 (discussing ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓); Ex. 2 (Carlton Dep.) at 245:25–246:24, 249:6–15 (discussing ▓▓▓▓▓▓▓▓ ▓▓▓▓▓); Ex. 8 (Meyer Dep.) at 339:1–5 (same).

[6] These three examples are of Ticketmaster paying upfront for ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

[7] *See* Hill Expert Rebuttal Report ¶ 535, *available at* ECF No. 717-2.

███████████████████████████████████████████████ *See* Ex. 1 (Budish Dep.) at 349:6–15, 352:23–353:7, 353:18–355:15.

*Third*, even assuming that Ticketmaster has larger upfront payments, and that these payments lead to higher per-ticket retained amounts, Defendants ignore that fans bear the majority of any such increase. For fans to be unaffected, the increase in Ticketmaster's retained amounts must be offset by either (i) a reduction in the venue's fees or (ii) a reduction in the face value of the ticket. For example, Defendants implicitly assume that if Ticketmaster pays a venue a $10 million upfront payment, the venue charges $10 in fees per ticket, and Ticketmaster charges $1 in per-ticket fees. They also assume an increase in the upfront payment to $20 million would lead the venue to charge only $9 in fees per ticket while Ticketmaster would charge $2 in fees, leaving the fan indifferent. Defendants never showed that happens; the closest their several experts come is to identify one solitary, anecdotal example where, at a contract renewal, ticketing fees increased and Ticketmaster's retained amount decreased, and it did not even do so by the same percentage or amount. *See* Carlton Surrebuttal Expert Report ¶ 62 & n.107, *available at* ECF No. 685-77.

Dr. Abrantes-Metz's economic analyses, however, provide statistical evidence that this *isn't* what happens. Her instrumental variable regressions show that increases in ticketing fees fall primarily on fans, with the venue absorbing only a smaller share. *See* Abrantes-Metz Opening Report ¶ 145; *see also generally* § V.B. Separate regressions confirm that ████████████████████████ ████████████████████████████████████ *See id.* § VI.B. Defendants have not challenged the implementation of either of these regressions. Thus, to the extent that upfront payments lead Ticketmaster to charge higher per-ticket fees, Dr. Abrantes-Metz has empirically demonstrated that fans ultimately pay for it.

Finally, Dr. Abrantes-Metz's separate analysis of the total ticket fees charged to fans corroborates her core findings. *See* Abrantes-Metz Opening Report Figure 29. Because this analysis focuses solely on the final fees paid by fans, it does not rely on the calculation of retained amounts—rendering Defendants' arguments about upfront payments inapplicable. This analysis likewise finds higher total fees per ticket for Ticketmaster events. If Defendants were right that the retained amount differential calculated by Dr. Abrantes-Metz was due primarily to the treatment of upfront payments, then that differential between Ticketmaster and AXS should not be present in an analysis of total fees to fans, who aren't a party to any such payments. Instead, the persistence of the Ticketmaster-AXS fee gap in Figure 29 of her opening report confirms that the result is not an artifact of the upfront payments and independently corroborates Dr. Abrantes-Metz's core finding. Defendants have offered no challenge to this regression analysis; they (again) simply ignore it.

In sum, Dr. Abrantes-Metz has presented economic theory, analysis, and empirical evidence supporting her treatment of upfront payments. At the very most, this is a battle between opposing experts that should be resolved by the jury.

**Inside Fees**

Defendants also argue that Dr. Abrantes-Metz improperly includes certain "inside fees" in Ticketmaster's retained amounts when calculating the overcharge to fans. *See* ECF No. 704 at 20; ECF No. 709 at 9. Inside fees can include a variety of charges that are not separately

disclosed to fans.[8] Defendants don't dispute that Ticketmaster retains these fees, or that these fees are included in the ticket's total cost. Instead, Defendants argue that these fees are paid by artists or promoters instead of venues and thus can't cause an overcharge to fans. *See id.*

Based on their briefing and statements at the February 19, 2026 conference, it appears Defendants' critique is solely focused on inside fees related to Ticketmaster's "Platinum pricing tool." *See* ECF No. 704 at 20.[9] But Defendants' representation to the Court that none of the venue contracts address inside Platinum pricing fees, or that venues receive fees related to Platinum pricing, is incorrect. Plaintiffs have identified numerous venue contracts that ▇▇▇ ▇▇▇▇▇▇ For example, a contract between Ticketmaster and ▇▇▇▇▇▇▇▇▇▇ cited in Dr. Abrantes-Metz's opening report provides:



Ex. 3 ▇▇▇▇▇▇ Licensed User Agreement) at Ex. E § 1.a (LNE-LIT24-002794752, at -785) (emphasis added). The same contract further provides:



---

[8] *See* Hill Opening Expert Report ¶ 62, *available at* ECF No. 685-72.

[9] Plaintiffs promptly requested a copy of the hearing transcript, but none was yet available at the time of this filing.


*Id.* at Ex. E § 1(b)(iv) (LNE-LIT24-002794752, at -785).[10] Two additional contracts, also cited in Dr. Abrantes-Metz's opening report, contain similar provisions. Ex. 4 (LNE-LIT24-000110142 at -169–70); Ex. 5 (LNE22-000031427 at -466–67).[11] Indeed, Plaintiffs have identified 110 such examples in the contracts used to support Dr. Abrantes-Metz's analyses, which are listed in Exhibit 6.[12] All of the examples use similar language governing platinum tickets, either setting the platinum fee to be charged to fans, rebates to be paid to venues, or both. These provisions are consistent with the deposition testimony cited in Dr. Abrantes-Metz's opening report, describing the fees from Platinum pricing that are paid by fans and are "split" with the venues. *See* Abrantes-Metz Opening Report ¶ 69 & nn. 164–65.

Plaintiffs have also identified some venue contracts in which the agreement allows Ticketmaster to enter into an independent agreement with the artist/promoter that would govern settlement of platinum tickets. One example provides:



Ex. 7 (███████████████ Licensed User Agreement) at Ex. A § 1(e) (LNE-LIT24-000653085, at -113).

Many of these contracts also contain provisions similar to those discussed above ███████ ███████████████, although at least 3 do not.[13] But even if a few venue contracts reference separate agreements with artists or promoter without the ███████ that does not provide a basis for excluding inside fees. Defendants provided no evidence of the prevalence of these contracts, made no reference to any contracts directly in their briefing, and none of their experts calculated the impact of removing Platinum pricing fees subject to these agreements from Dr. Abrantes-Metz's retained amounts. Indeed, none of the Defendants' experts referenced any issue with Dr. Abrantes-Metz's treatment of inside fees in their opening reports. In his surrebuttal report, Dr. Carlton purports to subtract inside fees from Dr. Abrantes-Metz's retained amounts, but does not appear to reference any contracts in doing so. *See* Carlton Surrebuttal Expert Report ¶ 75 & n. 124, *available at* ECF No. 685-77. Even then, Dr. Carlton still calculated a significantly positive overcharge. *See id.* Given the expert discovery schedule, Plaintiffs and Dr. Abrantes-Metz did not have the opportunity to respond to this new analysis,

---

[10] *See* Abrantes-Metz Opening Report nn. 168 & 197 and Exhibits H.1 & H.2.

[11] *Id.*

[12] Plaintiffs are ready to provide any of these additional contracts to the Court on request.

[13] *See* Ex. 7; *see also* LNE-LIT24-004150752, LNE2019-CID-0838928 (Plaintiffs will provide these contracts on request).

raised for the first time in sur-rebuttal, and Dr. Carlton's failure to cite any contracts in support of his new analysis is squarely a matter for which Plaintiffs should be permitted cross-examination.

Even if Defendants were right that inside fees for Platinum pricing were never charged directly to venues—and the available evidence shows that they typically are—this does not impact the underlying analysis in terms of how the parties exercise their bargaining power. When a venue signs an exclusive ticketing agreement with Ticketmaster, they agree that they must use Platinum for dynamic pricing rather than another dynamic pricing platform, locking in whatever inside fees Ticketmaster might charge. All amounts related to a given ticket are part of the same transaction, where Ticketmaster collects ticketing-related amounts from fans and then allocates them to the venue, artist, promoter, and Ticketmaster. "Inside fees" are one component of the allocation that Ticketmaster retains (and are included in the retained amounts), so they are part of the ticket price the fan pays, and as discussed above, Dr. Abrantes-Metz's regressions show that increases in retained amounts are associated with increases in consumer fees.

Finally, as with respect to upfront payments, an error in calculating retained amounts would not impact an analysis of the overall *difference* in total fees charged to fans. Dr. Abrantes-Metz's analysis of total fees paid by fans further confirms the existence of significant differences between fees assessed by Ticketmaster and by AXS. *See supra* at 5.

As with upfront payments, the treatment of inside fees is at most a highly disputed factual issue between the parties and the experts. Resolving who is credible and correct should be left to the factfinder.

Respectfully submitted,

/s/ *Jonathan H. Hatch*
Assistant Attorney General
Office of the New York State Attorney General

*Lead Trial Counsel for Plaintiff State of New York*


cc:   All Counsel of Record (by ECF filing)