February 24, 2026                                                                                                          REDACTED

**VIA ECF**

The Honorable Arun Subramanian
United States District Judge
United States District Court, Southern District of New York
500 Pearl Street, Courtroom 15A
New York, NY 10007-1312

    **Re:**    *United States et al. v. Live Nation Entertainment, Inc. et al.*; 1:24-cv-03973-AS

Dear Judge Subramanian:

    Plaintiffs' most recent submission regarding Dr. Abrantes-Metz, ECF No. 1064, confirms the fundamental problem with her analysis. Her analysis of "retained amounts" does not and cannot reliably do what it claims to set out to do—set out a measure of the price that either Ticketmaster or AXS charges to venues.

    Whatever a "retained amount" is, for that analysis to go to the jury, it must be a reasonable proxy for Ticketmaster's price to the venues. And price (or a proxy for it) is what Dr. Abrantes-Metz has repeatedly said she is measuring. *See, e.g.*, Abrantes-Metz Tr. 180:15-20, ECF No. 722-3 ("Q: And, basically, you intend this as a proxy for price, even though you call it 'retained amount,' right? A: Yes. This is the price that Ticketmaster charges for its services, to the venues."). She has further said that Ticketmaster is charging venues a price that is above the competitive level, and those venues pass some portion of it on to fans in fees. *Id*. at 153:5-11. But the only price that Ticketmaster ever sets is established upfront, at the point when it enters into ticketing services agreements with venues. There is no dispute that, from Ticketmaster's perspective there is one price-setting moment per customer per contract (whether that contract runs 2 or 5 or more years).

    It is also clear that, in that price-setting moment, Ticketmaster's price is a function of two things that flow in opposite directions: (1) the lump sum payments that Ticketmaster promises to make up front and annually to the venue, and (2) the share of the fees that Ticketmaster gets over the life of the contract. Those two price-setting factors are both negotiated together and in relation to each other, and are set forth in the contract. The price (or retained amount or whatever one calls it) reflects the expected value of those two things, netted against each other.

    But Dr. Abrantes-Metz simply does not count the guaranteed payments that, by contract, will flow to the venue. That is the fatal flaw in her analysis. Respectfully, it doesn't matter why she does it (it is no excuse that the data she chose didn't let her) nor does the argument that upfront guaranteed payments are fixed costs (they aren't). Her analysis fails because she acts as if only the money flowing in one direction determines the price, when indisputably that is not true.

    In *Daubert* terms, that is a classic fit issue: her concept of retained amount does not fit the facts. It is also a reliability issue: she has proffered an equation that cannot reliably predict that which she is trying to predict. Either way, it is wrong in the same way that Dr. Hill's diversions

were wrong. It does not actually represent what it purports to represent, in this case Ticketmaster's price.

*What Dr. Abrantes-Metz Did*

Dr. Abrantes-Metz claims to set out to assess the amount that Ticketmaster gets to keep from its ticketing contracts with venues, as a proxy for the price it charges (and then to compare that to the amount that AXS gets to keep from other contracts). What a party gets to keep should be a straightforward analysis: how much revenue did the party get via the contract, and if, as in this case, there are payments that must be made to bring in that revenue, how much were they? But Dr. Abrantes-Metz has simply chosen to ignore half the equation—the often multi-million-dollar upfront payments that Ticketmaster makes to venues, as part of and in order to get its ticketing contracts with them. And she has also, at the same time, inflated the amount of revenue Ticketmaster receives under those contracts, by including inside fees that promoters, not venues, pay to Ticketmaster to use a specialized pricing tool during certain concert sales.

None of that is in serious dispute. Dr. Abrantes-Metz concedes that she excluded from her analysis all upfront payments in assessing how much Ticketmaster gets to retain. Abrantes-Metz Reb. Rpt. ¶¶107, 111, ECF No. 722-2; Abrantes-Metz Tr. 232:18-233:5. And she concedes that she did include some inside fees, in assessing how much Ticketmaster gets to retain. Abrantes-Metz Tr. 273:10-14, 270:9-21. So let's turn to the excuses for why that supposedly does not matter.

*Plaintiffs' Excuses Cannot Save This Analysis*

*First*, Plaintiffs' assertion that the omitted upfront payments, and included inside fees, are immaterial is simply not correct. Upfront payments alone are typically in the many millions of dollars, per contract. And Dr. Abrantes-Metz knows this. *See, e.g.*, Ex. 1, LNE-LIT24-000115211 at -211 ($8 million dollar bonus payment from Ticketmaster to venue (cited in Abrantes-Metz Rpt., Ex. H.1)); Ex. 2, LNE-LIT24-000128312 at -313-14 ($5 million signing bonus from Ticketmaster to venue, as well as $2.5 million annual sponsorship payments (cited in Abrantes-Metz Rpt., Ex. H.1)); Ex. 3, LNE22-000587087 at -111-12 ($12 million bonus from Ticketmaster to venue, as well at $1.25 million annual sponsorship payments). Plaintiffs have further admitted that these upfront payments matter to venues—ticketers win and lose contracts due to the size of their upfront offer, venues negotiate hard to increase the volume of upfront payments, and venues rely on upfront payments as a guaranteed revenue steam. *See, e.g.*, Hill Rpt. ¶51, ECF No. 693-32 ("primary ticketing companies compete for venues based on the size of the upfront payment they offer to venues [and] the shares of ticketing fees venues and ticketers retain. ..."). That is also clear from the venues themselves. *See, e.g.*, Talukder Tr. 168:5-171:20 (Community Arena Management/Frost Bank Center), ECF No. 722-22 (███████████████████████████████████████████████████████); Marion Tr. 78:15-84:19 (Simmons Bank Arena), ECF No. 722-11 ███████████████████████████████████████████████████████).

*Second*, Plaintiffs' assertion that the upfront payments are not marginal costs is wrong as a matter of both fact and logic. As Dr. Hill admits above, upfront guarantees and revenue allocation agreements are how ticketers compete to win venues' business. Thus, each contract negotiation is

2

the point of competition, which is the point at which Ticketmaster's marginal cost must be assessed. *Cf. Irvin Industries, Inc. v. Goodyear Aerospace Corp.*, 974 F.2d 241, 244–45 (2d Cir. 1992) (evaluating variable costs at the time of the bid); *AD/SAT, a Div. of Skylight, Inc. v. Associated Press*, 920 F. Supp. 1287, 1302 (S.D.N.Y. 1996), *aff'd*, 181 F.3d 216 (2d Cir. 1999) (recognizing that "[b]ecause variable costs, by definition, are those avoidable costs incurred as a result of an increase in output, where a new business is being considered all costs are avoidable and therefore variable"). At that point of contracting, Ticketmaster and the venue agree to the formula setting the allocation of ticketing fees *and* to the magnitude of the upfront payment. And from Ticketmaster's perspective, the setting of those terms, upon execution of the contract, is the only time it sets its price—not even Plaintiffs contend they are variable after that. Wichser Tr. 157:6-158:22 (Ticketmaster COO), ECF No. 722-30 ("[D]epending on the rights holders needs or wishes, if they want more cash up front guaranteed, they have financing needs on their end, right, that would, by the way math works, leads to a lower royalty share with the venue. If they don't have a need for as much cash up front, they might push for a higher variable share. So you always end up in that protracted balance between those two"); Hurwitz Tr. 215:10-19 (It's My Party), ECF No. 694-6 (███████████████████████████████████████████████). Fee allocation terms and upfront payments are two sides of the same coin; together they establish the price that Ticketmaster charges for ticketing services. Dr. Abrantes-Metz's analysis cannot stand because she disregards one of two factors that sets the price.

*Third*, Plaintiffs' assertion that Dr. Abrantes-Metz did the best she could with the data available would be no excuse but, yet again, it is not correct. She admits this. She knew about these multi-million dollar guaranteed payments but chose not to make them part of her analysis. Abrantes-Metz Tr. 231:22-232:11 ("Q: … In Paragraph 107 of your rebuttal report, you also state that your analyses do not account for upfront payments from ticketers to venues, right? THE WITNESS: Well, it accounts with having considered and ***decided that they should not be deducted***." (objection omitted) (emphasis added)). The data was there to be used. At Plaintiffs' insistence, Defendants produced more than ten thousand ticketing contracts and amendments, along with tens of thousands of related deal analysis and negotiation documents. Third parties did the same. *See, e.g.*, DX-1394 (2,000+ page compendium of AXS ticketing contracts).[1] The problem here is not limited data, or a math error. Dr. Abrantes-Metz made analytical choices, contrary to the facts and market realities, that render her work incapable of reliably estimating the price of ticketing services charged to venues.

Similar errors infect Plaintiffs' arguments about inside fees. For example, Plaintiffs now argue that Dr. Abrantes-Metz's retained amount is what Ticketmaster retains ***from fans***. Pls.' Ltr. at 2 (emphasis added). But that's not how Dr. Abrantes-Metz defines it. Dr. Abrantes-Metz's analysis proceeds in several steps. *See* Defs.' Mot. to Exclude at 3-5, ECF No. 704. Her foundational step is to calculate the "retained amount," which she testified is a proxy for "the price that Ticketmaster charges for its services, ***to the venues***." Abrantes-Metz Tr. 180:15-181:6 (emphasis added); *id.* at 147:11-148:3 ("A: … the negotiation of what Ticketmaster gets to keep happens between the venues and Ticketmaster"). That is the $2.30 overcharge Plaintiffs reference in their brief—an alleged overcharge to venues. Pls.' Ltr. at 1. Dr. Abrantes-Metz's theory of

---

[1] This document was included in Defendants' February 18, 2026 submission of trial exhibits. Given the size of this exhibit, Defendants did not append another copy to this filing.

harm is then that Ticketmaster's "too high" prices ***to venues*** result in a passed-on overcharge ***from the venues*** to fans downstream.  Abrantes-Metz Rpt. ¶147.  Given her methodology, there is no basis to calculate an overcharge to the venue using a cost the venue does not incur.[2]

       Dr. Abrantes-Metz's model, which excludes upfront payments and includes inside fees, should be excluded as a result.

---

[2] While Plaintiffs take a different position now, Dr. Abrantes-Metz did not dispute that inside fees are charged directly to the artist or promoter for use of Ticketmaster's Platinum pricing tool and that such fees are not paid by venues.  Abrantes-Metz Tr. 272:4-274:13.

4

Dated: February 24, 2026

Respectfully submitted,

| LATHAM & WATKINS LLP | CRAVATH, SWAINE & MOORE LLP |
|---|---|

*(signature)*

*(signature)*

Alfred C. Pfeiffer (admitted *pro hac vice*)
   *Co-Lead Trial Counsel*
David R. Marriott
   *Co-Lead Trial Counsel*
Andrew M. Gass (admitted *pro hac vice*)
Timothy L. O'Mara (admitted *pro hac vice*)
Jennifer L. Giordano
Kelly S. Fayne (admitted *pro hac vice*)
Lindsey S. Champlin (admitted *pro hac vice*)
Robin L. Gushman (admitted *pro hac vice*)

505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600

1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

555 11th Street, NW, Suite 1000
Washington, D.C. 20004
(202) 637-2200

Al.Pfeiffer@lw.com
David.Marriott@lw.com
Tim.O'Mara@lw.com
Andrew.Gass@lw.com
Jennifer.Giordano@lw.com
Kelly.Fayne@lw.com
Lindsey.Champlin@lw.com
Robin.Gushman@lw.com

*Attorneys for Defendants Live Nation Entertainment, Inc. and Ticketmaster L.L.C.*

Lauren A. Moskowitz
Jesse M. Weiss
Nicole M. Peles

Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 474-1000

lmoskowitz@cravath.com
jweiss@cravath.com
npeles@cravath.com

*Attorneys for Defendants Live Nation Entertainment, Inc. and Ticketmaster L.L.C.*

cc: All Counsel of Record (via ECF)