UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| United States of America et al., <br><br>         Plaintiffs, <br><br>    -against- <br><br>Live Nation Entertainment, Inc. and Ticketmaster L.L.C., <br><br>         Defendants. | 24-cv-3973 (AS) <br><br> OPINION AND ORDER |

ARUN SUBRAMANIAN, United States District Judge:

 This opinion resolves a series of outstanding motions filed by Live Nation in this antitrust action as it proceeds to trial. The first is what the Court construes to be a motion for reconsideration filed in the form of multiple letters on the docket. Dkts. 1048, 1049. The second is a motion asking the Court to use its discretion to certify an interlocutory appeal to the Second Circuit, stay the case in the meantime, and delay any trial indefinitely. Dkt. 1058. The third is a motion to bifurcate the trial such that the federal government won't try its case until after the state plaintiffs take their turn. Dkt. 1034. Fourth and finally is a lingering *Daubert* motion filed while summary judgment briefing was ongoing in late 2025. Dkt. 703.

 For the reasons set forth below, these motions are DENIED.

## I. Live Nation's requests for reconsideration are denied

 Eight hours after the Court's decision on Live Nation's summary judgment, Dkt. 1037, Live Nation filed a letter on the docket. Dkt. 1048. The gist of it is that Live Nation believes that the Court erred when it didn't grant summary judgment on the government's tying claim because the government hadn't successfully defined the tied market (notably, this argument wasn't briefed on summary judgment). Ten hours later, Live Nation filed another letter on the docket. Dkt. 1049. Like the first one, this letter also raises a legal issue for the Court's consideration that wasn't raised on summary judgment. This time, Live Nation maintains that the failure of the government to define an upstream market necessarily means that certain downstream arguments about so-called "conditioning" must fall out of the case. Four hours later, the Court heard from the parties on these issues in a telephonic hearing, and it heard again from them at the final pretrial conference the following week. The Court now construes Live Nation's letters as collectively posing a motion for reconsideration on multiple grounds.

The standard for a motion for reconsideration "is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).

As a threshold matter, neither of the arguments raised in Live Nation's letters was presented on summary judgment. While Live Nation certainly argued against recognition of the artist-facing concert promotions market for MCVs (relevant to both arguments), it did not contend that a failure to recognize this market would be fatal to the government's tying claim, but instead raised general arguments about how the failure to define markets would doom plaintiffs' claims because they would be unable to show market power. As to conditioning, Live Nation's argument wasn't raised either on summary judgment or in its motions in limine. For these reasons alone, the motions are denied. *Devi v. Silva*, 861 F. Supp. 2d 135, 143 (S.D.N.Y. 2012) ("[A] party is not permitted to raise a new argument in a motion for reconsideration that it failed to raise in the underlying motion."). But they would be denied on the merits as well.

### A. Reconsideration isn't warranted on the issue of tied markets

According to the government's tying theory, Live Nation uses its market power in the market for booking Major Concert Amphitheaters (MCAmps) to tie separate promotion services for artists at a broader category of major concert venues (MCVs). The Court concluded that there's a genuine dispute of material fact as to whether the MCAmp market is well-defined (the tying market), but not about whether the market for promotion services at MCVs (the tied market) is. Live Nation now claims that tying requires market definition for both the tying *and* tied markets—even on a per se theory of tying. These arguments fail, but some explanation of tying and market definition is needed to clarify the issues in this case.

To start, market definition is a tool that can be used to assess market power. *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 496 (2d Cir. 2004). To assess a company's share of the market, you need a denominator: the size of the market. Because antitrust law is preoccupied with market power and its abuse, defining a market is a key step along the way. Market power can be relevant to tying. On a tying theory, "a seller refuses to sell a product that a buyer desires unless the buyer also agrees to purchase a second product, which the buyer would not otherwise want from this seller on the offered terms." Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1700a. Naturally, market power in the tying market is a way to require the customer in the tied market to buy the product (they have no choice but to buy it if they want the tying product). So market definition, the tool to identify market power, is highly relevant to an analysis of the tying market. The next question is what relationship market definition might have to the tied market on a per se theory.

To be clear, no Second Circuit or Supreme Court case says that a plaintiff must provide a formal market definition for the tied market. Though Live Nation insists that this proposition lies plainly within a series of Second Circuit cases, a read of those cases reveals that it plainly doesn't. *See, e.g., Gonzalez v. St. Margaret's House Housing Dev. Fund Corp.*, 880 F.2d 1514, 1516–19

(2d Cir. 1989); *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 31–32 (2d Cir. 2006). Instead, the question teed up by Live Nation is an inferential one, not one that any controlling case has directly addressed. It is whether this requirement can be bootstrapped from the other elements of tying. There are two candidate elements. First, the tying and tied products must each be "in a separate and distinct product market." *Kaufman v. Time Warner*, 836 F.3d 137, 141 (2d Cir. 2016). Second, there must be "anticompetitive effects" in the tied market. *Id.* The Court examines each of these to see if either one could plausibly embed the requirement that Live Nation identifies.

Start with the requirement that the tying and tied products are in separate markets. This is assessed through the "consumer demand test." *Id.* at 142. That test is "a rough proxy for whether a tying arrangement may, on balance, be welfare-enhancing, and unsuited to per se condemnation." *Id.* (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 87–88 (D.C. Cir. 2001)). The idea is that it's so efficient to bundle some products together that consumers don't even demand them separately from one another. *Id.* So "[i]f a court finds either that there is no noticeable separate demand for the tied product or, there being no convincing direct evidence of separate demand, that the entire 'competitive fringe' engages in the same behavior as the defendant then the tying and tied products should be declared one product and per se liability should be rejected." *Id.* For example, "an unusually efficient padlock manufacturer may have all of the market for padlocks in a particular geographic area and also require a would-be purchaser of a padlock to buy a set of compatible keys packaged with the lock." *Id.* at 143.

This analysis doesn't turn on market power (which is what market definition is used to gauge), nor does it appear to endorse anything related to market definition at all. It's instead a less formal inquiry directed at the narrower question of whether the tied product can really stand alone from the tying product in the first place. It's difficult to see how the elephant of market definition could manage to hide in so small a mousehole. That's especially so when—as here—the *tying* market (use of amphitheaters) has arguably been properly defined and there's no contention that the tied product (promotion services) is a part of it, despite extensive briefing from both sides on the market definition.

On to the next candidate, anticompetitive effects. A threshold question that the parties disagree on is whether plaintiffs must show anticompetitive effects *at all* if their tying claim is per se. As a matter of Supreme Court precedent, the leading opinion is *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2 (1984). There, the Court held that tying claims must clear certain preconditions that weren't previously required, one of which is the "substantial potential for impact on competition." *Id.* at 16; *see also id.* at 11–16. *Jefferson Parish* left many questions open. For example, though it required some potential impact on competition it also strongly suggested that a forced sale by virtue of a tie could *itself* constitute that harm with nothing more. *Id.* at 12–13. That was the last word from the Supreme Court on the question.

In the meantime, the circuit courts have taken up the mantle. The Second Circuit devised a test for tying that predated *Jefferson Parish*, and it continued to apply the test afterward. *See Yentsch v. Texaco, Inc.*, 630 F.2d 46, 56–57 (2d Cir. 1980) (before *Jefferson Parish*); *Gonzalez*, 880 F.2d

3

at 1516–17 (after *Jefferson Parish*). That test requires "anticompetitive effects." But "anticompetitive effects" means something different here from elsewhere in antitrust law. The Second Circuit has used the phrase "anticompetitive effects" in the context of tying to mean that some *nontrivial* impact on competition must be *possible*. *See, e.g.*, *Yentsch*, 630 F.2d at 58 (faulting plaintiff for "skirt[ing] perilously close to failing to demonstrate any foreclosure at all" because it conceded that it wouldn't have purchased the tied product from anybody else); *Coniglio v. Highwood Servs, Inc.*, 495 F.2d 1286, 1291–92 (2d Cir. 1974) (no anticompetitive effects when there were no other sellers in the tied market, so there was no competition to harm).[1] Perhaps attesting to the narrow set of cases that this might apply to, Areeda and Hovenkamp note that many other cases in this circuit "have listed 'anticompetitive effects' as a separate element without giving it any content or applying it." Areeda & Hovenkamp ¶ 1722c (collecting cases).

Now, what does all that have to do with market definition? If a showing of anticompetitive effects required a strict analysis of foreclosure—one that required a tabulation of market shares, for instance—then market definition might be highly relevant. But that isn't what's pondered by any of these cases. Instead, "anticompetitive effect" takes on its "ordinary meaning," and courts that follow this approach (of which the Second Circuit is an exemplar), "insist upon some minimal showing that an alleged tie is of the type that could cause the kind of foreclosure that anti-tying rules seek to prevent." Areeda & Hovenkamp ¶ 1722a; *see also id.* ¶ 1702 ("[C]ourts do not insist that 'anticompetitive effect' be assessed by the usual manner of measuring the share of the market for the tied product foreclosed by the tie and assessing the significance of that foreclosure share in the particular market context."). The Court is cognizant that some commentators have expressed their desire to see the law reformed to require a greater showing on behalf of plaintiffs. But there's some distance between a greater showing and the requirement to go through the exercise of fully defining a market. Even if Live Nation were correct that the law should be *changed* to require a greater showing of anticompetitive harm, it doesn't follow that the showing would require the kind of formal market definition used to measure market power.

Perhaps for these reasons, Live Nation relies mostly on nonbinding out-of-circuit cases that addressed this question in passing. The Court gives each of these the weight that they're entitled

---

[1] *Coniglio* might appear later to endorse a version of a market definition requirement, but the case doesn't bear such an extreme reading. After rejecting the plaintiff's argument that there was any anticompetitive harm as to the tied product (exhibition football games), the plaintiff suggested at oral argument that the court should consider a broader category of "general entertainment." *Coniglio*, 495 F.2d at 1292. This, the Court held, was no better. It not only "f[e]ll far short" of the requirement that an affidavit set forth specific facts, *id.*, but also was such a broad notion that it was "all but meaningless as an analytic tool." *Id.* To make that point, the court considered *Brown Shoe*, but it appeared to do so as an illustrative tool to explain how plaintiff's proposed market was so vague as to withstand any analysis at all, frustrating any finding of anticompetitive effects. Since *Coniglio* was decided in 1974, the Supreme Court gave more guidance on tying in *Jefferson Parish*, and it doesn't appear that any court in the Second Circuit over the last sixty years has interpreted *Coniglio* to create a market definition requirement to show anticompetitive effects in a tied market, suggesting that—to the degree that *Coniglio* can even be read to endorse it—it has been superseded by the test for tying that was later adopted in cases like *Yentsch*, 430 F.2d at 56–57, and *Gonzalez*, 880 F.2d at 1516–17.

to: "respect to the extent they have the power to persuade." *Quituizaca v. Garland*, 52 F.4th 103, 119 (2d Cir. 2022) (Sullivan, J. concurring) (internal quotations omitted). But their power to persuade is limited. These cases provide little-to-no reasoning for any requirement to define the tied market. They typically address the question in a single sentence, some don't cite any authority at all, others rely only on nonbinding authority, and others yet misread the cases that they rely on. *See, e.g.*, *Cavalleri v. Hermes Int'l*, 2025 WL 2662897, at *3 (N.D. Cal. Sept. 17, 2025) (no citation); *Sidibe v. Sutter Health*, 4 F. Supp. 3d 1160, 1178–79 (N.D. Cal. 2013) (no citation); *Packaging Sys., Inc. v. PRC-Desoto Int'l, Inc.*, 268 F. Supp. 3d 1071, 1083–84 (C.D. Cal. 2017) (citing only nonbinding authority for the tied market); *Truck-Rail Handling, Inc. v. Burlington N. & Santa Fe Ry. Co.*, 244 F. App'x 130, 131–32 (9th Cir. 2007) (relying on a case that addressed only the tying market); *Fifth & Fifty-Fifth Residence Club Ass'n, Inc. v. Vistana Signature Experiences, Inc.*, 2018 WL 11466157, at *13 (S.D.N.Y. Sept. 28, 2018) (no citation except to *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 443 (3d Cir. 1997), which instead held that the claim failed because "the proposed tying market … is not a relevant market" but that if that hurdle had been overcome, "plaintiffs might possess a valid tying claim," despite previously concluding that the tied product market was *not* properly defined for Section 2 purposes); *Allen-Myland, Inc. v. Int'l Bus. Machines Corp.*, 33 F.3d 194, 200–210 (3d Cir. 1994) (not analyzing the tied market). Not one of these cases provides any reasoning at all for its purported holding, and so this litany of nonbinding caselaw is unpersuasive.

What, then, is plaintiff describing as the tied market? Plaintiffs may point to a market as understood in a natural way, composed of promotion services for concerts, at MCAmps, MCVs, or another broader category. The clear legal requirement is that plaintiffs must identify some separate product from the tying market and then establish that there are anticompetitive effects in the market for that tied product. Against that, Live Nation may introduce evidence to rebut any evidence that plaintiffs produce of harms to competition in that market.

### B. Reconsideration isn't warranted based on failure to define the market between artists and promoters for MCVs

Live Nation's second letter argues that any claims predicated on "conditioning" are now "irrelevant as a matter of law" because the Court held that one of the upstream markets in which the conditioning might occur isn't well-defined. Dkt. 1049 at 1. This argument confuses two markets. The Court held that there's a genuine dispute of material fact about whether the market for concert-booking and promotion services to MCVs is properly defined. Dkt. 1037 at 21–24. Ticketmaster is alleged to have threatened venues by withholding concerts from them—activity that, if true, would happen in a market that the Court held is arguably well-defined. Live Nation now argues that the failure to define a *separate* market is fatal: a market between artists and promoters to get into MCVs. It justifies this by pointing to the centrality of the artists to the entire theory of harm. But to use evidence of conduct involving (indirectly) a participant in another market, you don't have to properly define the contours of that other market. Again, Live Nation tries to add a market-definition requirement where there otherwise isn't one; and again, Live Nation points to no case supporting that bootstrapping.

This is also why Live Nation's characterization of this claim as a theory of "monopoly leveraging" is wrong. In a monopoly leveraging theory, a company uses a monopoly in one market to "strengthen a monopoly share in another market." *Virgin Atl. Airways Ltd. v. Brit. Airways PLC*, 257 F.3d 256, 272 (2d Cir. 2001). Here, the theory is that Live Nation entrenches its monopoly power in a *single* market using threats and coercion. Those threats and coercion may be based on a product in another market, but Live Nation points to no authority (much less binding precedent) which states that if a threat occurs concerning a product in a different market from the one in which a defendant is a monopolist, then the plaintiff must define that market too. Here, coercion and threats are relevant to the theory of exclusive dealing in the market between venues and primary ticketers—and the Court explained exactly how that might work as part of an exclusive dealing analysis. Dkt. 1037 at 34–40.

Live Nation's motion for reconsideration is denied.

## II. Live Nation's motion to certify an interlocutory appeal is denied

Before waiting even two full business days to hear back on whether the Court would grant its motion for reconsideration, Live Nation filed a motion asking for interlocutory appeal to the Second Circuit. In that motion, it argues that the Court should certify an appeal on what's required to define a targeted customer market and on whether defining a tied market is required here. Interlocutory appeal of an order is permitted if the Court "shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). "[E]ven when all three prongs of the § 1292(b) test are met, it is still within the discretion of the Court to deny a request to certify a question for interlocutory appeal." *Tantaros v. Fox News Network, LLC*, 465 F. Supp. 3d 385, 389 n.3 (S.D.N.Y. 2020).

In this case, neither question presents the sort of "substantial ground for difference of opinion" that would justify an interlocutory appeal. "The mere presence of a disputed issue that is a question of first impression, standing alone, is insufficient to satisfy this prerequisite." *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 399 F. Supp. 2d 320, 322 (S.D.N.Y. 2005). Instead, "[t]he district court must analyze the strength of the arguments in opposition to the challenged ruling, and determine whether there is 'substantial doubt' that the district court's order was correct." *Id.* at 322–33 (citation omitted).

Start with the targeted customer markets. The arguments raised now are the same ones that the Court rejected earlier—namely, that *FTC v. Meta Platforms, Inc.*, -- F. Supp. 3d --, 2025 WL 3458822 (D.D.C. Dec. 2, 2025), went the other way and that *United States v. Eastman Kodak Co.*, 63 F.3d 95, 107 (2d Cir. 1995) might be read to as well. The Court wasn't convinced by those arguments earlier and it similarly isn't convinced now that they create substantial ground for difference of opinion. This part of *Meta*'s holding wasn't nearly as reasoned as the rest of the opinion, and the Court doesn't think that it should be read so broadly as to entail a universal principle of law. And *Eastman Kodak* is clearly distinguishable for the reasons stated in the summary judgment opinion.

Next, Live Nation's arguments about a tied market are no more persuasive. The Court already addressed these above and concluded that they amount to an attempt to bootstrap an additional requirement onto the elements of tying.

On top of that, answers to these questions wouldn't "materially advance the ultimate termination of the litigation." If certified, these questions would go to the Second Circuit, which (if it elected to take the appeal), would have to decide *both* of them in favor of Live Nation to substantially trim down what's going to trial. If only one is answered in its favor, then even under the most optimistic view for Live Nation, the case will have to advance anyway, likely with much of the same evidence presented. And it will do so only after a lengthy delay. But that optimistic view isn't even warranted. While on summary judgment the Court addressed Live Nation's argument that targeted customer markets require proof of differing prices, it may well be the case that at trial, evidence emerges that supports a finding of differing prices *anyway*. That is to say that even if Live Nation gets everything it wants on appeal, there might be the same trial to be had. And as a result, "appellate review would neither dispose of the litigation nor advance the time for trial, but would instead delay the upcoming trial without significantly limiting its scope." *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 2008 WL 2511038, at *2 (S.D.N.Y. June 18, 2008).

### III. Live Nation's motion to bifurcate is denied

Since mid-2024, this suit has involved both state and federal claims. On the eve of trial, Live Nation filed a motion asking for the trial to be bifurcated so that the states' claims could be tried separately from and before the federal government's claims. Under Rule 42, the Court "may order a separate trial of one or more separate issues" "[f]or convenience, to avoid prejudice, or to expedite and economize." Fed. R. Civ P. 42(b). "The decision to bifurcate is within the discretion of the trial judge." *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1289 (2d Cir. 1990).

The motion is denied. Live Nation has known that numerous federal and state claims, including for damages, have been at issue in this case since its inception. Dkt. 4. And when the *plaintiffs* made a motion to bifurcate the case a year ago (asking to cleave liability from damages and equitable remedies) it was Live Nation who opposed that relief. Live Nation explains that it brought this motion when it did because it only "bec[a]me apparent in the context of determining jury instructions that the DOJ and the States may not be entitled to the same instructions with respect to the fundamental element of harm to competition." Dkt. 1035 at 2. But mistaken assumptions about differences in the legal standards to be applied isn't grounds for a last-minute bid for bifurcation in a case that has been on the books for two years.

Live Nation first argues that the federal government will present evidence at trial that it would be time-barred for the states to present on their claims for damages. Dkt. 1035 at 6. But it confuses whether *claims* are time-barred with whether *evidence* is time-barred. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 118–19 (1969). Some of the evidence admissible on a claim might be relevant to the defendant's liability, even if the evidence might not itself fit within the relevant limitations period. Just as in every case involving claims with different elements or

limitations periods, the jury will properly be informed about what evidence it may consider for each of the claims in the case, and what the relevant limitations periods are.

Live Nation then argues that there's simply too much here for a jury to understand. In particular, "depending on how the Court resolves the parties' jury instruction disputes, DOJ's claims and the States' claims may be subject to different legal causation standards." Dkt. 1035 at 6. If the burden of proof on causation for the DOJ is lower than it is for the states, it says, that "would hopelessly confuse the jury." Dkt. 1035 at 7. Plaintiffs point out that Live Nation has it wrong. Both the federal and state plaintiffs' claims require the same standard of causation for liability purposes; there is a different standard to show an entitlement to damages. So a jury will be prompted with those two standards at trial, bifurcation or no bifurcation. Bifurcation would not address any of the problems that Live Nation purports to identify. While the case may be complex, it is complex with or without the claims asserted by the states. What's more, the federal and state claims in this case involve a near-identity of factual disputes, evidence, and witnesses. Along these lines, plaintiffs have proffered that the state claims, even those that don't arise under the antitrust laws, largely parallel the federal claims, and that they will turn on much of the same evidence. *See* Dkts. 1052 at 5–6; 1081 at 2; *see also In re Google Play Store Antitrust Litig.*, 147 F.4th 917, 941 (9th Cir. 2025) (holding that "[t]he district court was well within its discretion to deny bifurcation because of the overlap in factual disputes").

For this reason, bifurcation of the states' and federal government's cases would undermine, rather than further, the interests in convenience, avoiding prejudice, and fostering judicial economy. On Live Nation's proposal, the states would try their claims first, and then the federal government would try the case *again*? There's no ground for bifurcation here.

## IV.    The motion to exclude the testimony of Dr. Abrantes-Metz is denied

Live Nation has moved to exclude the testimony of Dr. Abrantes-Metz. Abrantes-Metz's testimony consists of her calculation of the damages caused to fans by Live Nation's conduct in the venue-facing primary ticketing market that was discussed at length in the summary judgment opinion.

Under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the proponent of expert testimony must show that the "witness … is qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The proponent must also demonstrate that it is more likely than not that the expert's testimony "will help the trier of fact to understand the evidence or to determine a fact in issue," "is based on sufficient facts or data," "is the product of reliable principles and methods," and "reflects a reliable application of the principles and methods to the facts of the case." *Id.*

Each of Live Nation's arguments for exclusion is unavailing.

*First*, Live Nation argues that Abrantes-Metz's use of AXS as a benchmark to measure the supracompetitive charges paid by consumers is unreliable, focusing on issues such as Ticketmaster's higher quality and functionality, as well as other potential comparators that Abrantes-Metz

8

didn't utilize, such as SeatGeek. Having reviewed Abrantes-Metz's opening and rebuttal reports in detail, this presents an issue that plainly goes to the weight of Abrantes-Metz's testimony, rather than its threshold admissibility. Live Nation says that Ticketmaster is higher quality and has more functionality, while the state plaintiffs say that AXS provides at least the same quality and services, is the next largest competitor in the market, is vertically integrated with its concert-promotions arm, services venues of similar size, and has similar terms in its contracts. Dkts. 791-2 ¶ 16; 706-1 ¶¶ 111–12; 706-2 ¶ 116. So using AXS as a benchmark for what pricing might look like in the but-for world of full competition is warranted. Further, Abrantes-Metz opines as to why AXS, as opposed to other ticketers such as SeatGeek, would be the appropriate comparator here. Dkt. 706-2 ¶¶ 124–29. There is no ground for exclusion on this basis. Abrantes Metz provides a comparator that is "sufficiently comparable to permit a degree of reliable comparison." *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 2025 WL 354671, at *34 (S.D.N.Y. Jan. 30, 2025) (quotation omitted).

Live Nation next argues that Abrantes-Metz's model is unreliable and unhelpful to the jury because it purportedly can't separate actionable conduct from non-actionable conduct. The issue is that Abrantes-Metz's model, according to Live Nation, doesn't separately estimate recoveries based on two lines of conduct in this case: (1) Ticketmaster's exclusive contracts, and (2) alleged conditioning of Live Nation's content on Ticketmaster's contracts. Plaintiffs' response is that these aren't two separate things that need to be disaggregated. As Abrantes-Metz explained at her deposition, "[t]here is no division of conduct between the two because they happen simultaneously and reinforce each other." Dkt. 722-3 at 59:16–20; s*ee also* Dkt. 743 at 12 (noting "either the transaction or scheme is lawful because neither form of conduct is anticompetitive or the competitive process has been corrupted because at least one of the forms of conduct is unlawful"). The conditioning and exclusive deals are both dynamics that would contribute to foreclosure in the market, which is ultimately the basis for the damages calculated by Abrantes-Metz. It's also how the Court analyzed the exclusive dealing theory in its decision on the summary judgment motion. For this reason, Abrantes-Metz's damages "'flow[] from' the distortion of the market caused by the monopolist's anticompetitive conduct." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 297 (2d Cir. 1979).

Live Nation's argument to the contrary relies on *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). In *Comcast*, four *different* types of anticompetitive conduct were alleged, resulting in different impacts to the market. *Id.* at 36. Importantly, three of those theories of harm were not found to be properly asserted on a classwide basis. *Id.* at 36–37. That meant that some of the theories were out, one of them was in, but the plaintiffs' damages model didn't distinguish among them or otherwise suggest that the damages from one violation would be the same as those from all of them. *Id.* This is consistent with the section of Areeda & Hovenkamp's treatise that Live Nation relies on, which describes how damages stemming from different theories of harm like tying or predatory pricing must be disaggregated for a jury. Areeda & Hovenkamp ¶ 657b2. This case is perfectly in line with that requirement and differs substantially from *Comcast*. Here, two lines of conduct are relevant to the same theory of harm—foreclosure, that theory is still in the case, and

the expert testimony at issue estimates damages based on that theory of harm. Note that even the *Comcast* court recognized that the plaintiffs' "methodology might have been sound, and might have produced commonality of damages, if all four of those alleged distortions remained in the case." *Comcast*, 569 U.S. at 37. Here, unlike there, the damages come from a single theory of harm, but with multiple overlapping reasons that explain why it occurred.

Live Nation next argues that on a Section 1 claim, the jury will need to go contract by contract to figure out whether each one is anticompetitive to determine damages. But the Court has rejected this argument on summary judgment. Rather, Abrantes-Metz concludes that if the violations are shown, then pricing in the market as a general matter would have been affected, and she uses the fees charged by AXS as the benchmark for what pricing might look like in a hypothetical world with more competition.

*Second,* Live Nation argues that because Abrantes-Metz's model is based on event-level data, it doesn't properly account for two things: (1) the residency of the fans who bought the tickets, and (2) potentially differing statutes of limitations between states. Both arguments fail. Begin with state residency, which Live Nation asserts applies to damages on the federal claims, plus 19 of the 25 state claims. If there is objective and undisputed data that could be used to determine state residency, then there would appear to be no real issue. Live Nation could assert that damages should be reduced to account for that issue, and the state plaintiffs presumably would agree. This could be hashed out in a simple back-and-forth before Abrantes-Metz takes the stand or in a post-trial proceeding. If it isn't so easy, for instance if it isn't clear where ticket purchasers reside from the available data, then using the event level data and attributing damages to the states where the venues lie would be a "just and reasonable" way of measuring damages incurred by the states' residents. *See U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1378 (2d Cir. 1988).[2]

Next, the statute-of-limitations issue. The statute of limitations presents a defense and is not an element of the state plaintiffs' case-in-chief. Indeed, the first time that the statute of limitations has surfaced in this case is on this *Daubert* motion. To the extent that Abrantes-Metz's model must be adjusted to account for an applicable statute of limitations, defendants have in their expert analysis explained what modifications must be made on their view of the law. Dkt. 712-1 ¶¶ 34, 346–48. Again, the fact that the model may not have accounted for a defense that has never surfaced in this case isn't grounds for exclusion. And once again, the suggestion from Live Nation is that accounting for any limitations period is a mechanical task, not a fundamental problem with the methodology. So the same issue is presented as was raised as to residency. Either there's data where time-barred purchasers could be excluded from the model, which would be a mechanical exercise given that the model is based on a per-ticket average based on a defined number of tickets,

---

[2] There's a footnote argument concerning the fact that the contracts that Abrantes-Metz utilized would not cover almost half of the states represented. Dkt. 704 at 23 n.21. This argument is waived, but in any event, Abrantes-Metz opines that her theory of harm should hold true across *all* the contracts and defendants don't provide any reason to think that it would differ by state. Defendants are free to argue that other contracts that she didn't consider would yield different numbers, but that goes to weight, not admissibility.

or there's no such data, in which case Abrantes-Metz's event level approach would be a reasonable estimate. And because it is assembled event-by-event, to the extent there are events that are outside of the limitations period, then that too can be adjusted for in a mechanical fashion. And the state plaintiffs say this can easily be done. Dkt. 743 at 14. None of this requires exclusion of Abrantes-Metz's entire damages model.

However, the Court makes one observation here: The issues that have arisen concerning the counting or exclusion of tickets, whether because of residency, an applicable limitations period, or some other reason, may counsel for a more limited presentation of damages to the jury. The jury could be presented with the per-ticket damages that are the heart of Abrantes-Metz's model, with the number of tickets, and thus the ultimate amount of any monetary relief, to be addressed post-trial. If either side has an application along these lines, the Court will consider it.

One more issue lurks beneath the surface here concerning the statute of limitations. While the issue hasn't been briefed in detail by the parties, it is almost certainly the case that a claim accrued to any ticket purchaser when they were charged by Ticketmaster for their tickets. (While the state plaintiffs took a different view in their briefing, they have since conceded that this is their understanding of how the statute of limitations works.) Live Nation argues that, at least on the federal claims, the four-year limitations period runs from the time each allegedly anticompetitive contract was executed, *see US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 69 (2d Cir. 2019), and so plaintiffs can't recover damages arising from any contract executed before a specified date in 2020 (four years from the first complaint where damages were sought). The government responds that *US Airways* was specific to the context of a contracting party claiming an antitrust violation and damages that were reflected in the amounts paid under the contract. For those purposes, the Court held that because each payment was simply a manifestation of what was agreed to in the contract, the limitations period began on the effective date of the contract and didn't restart for each payment made. *Id.* at 68–69.

This case presents a different situation because the consumers who were allegedly overcharged for their tickets were not parties to the contracts. So it's unclear why the limitations period would be tethered to the effective date of the contracts, as opposed to when they paid the overcharge that was allegedly the result of foreclosure in the market. *See Chalmers v. NCAA*, 2025 WL 1225168, at *9 (S.D.N.Y. Apr. 28, 2025) (noting that *US Airways* arose in "the context of alleged antitrust conspiracies that result in aggrieved parties entering into contracts with conspirator(s)"). In response, Live Nation has pointed to no case applying *US Airways* outside of the context of contracting parties. While the Court will hear from Live Nation if they believe that there are cases in this context applying *US Airways* in the way it suggests, for present purposes the government has the better of the argument. (And again, shifting the tabulation of affected tickets to a post-trial proceeding might alleviate the need to resolve these issues now.)

*Third*, Live Nation argues that Abrantes-Metz's opinions are unreliable because her calculations ignore key features of how tickets are priced. There are two components at the center of this argument: (1) the inside fee and (2) the upfront payment. Abrantes-Metz's analysis begins by calculating how much *more* Ticketmaster charges to venues than its competitor AXS. That, she says,

is the "supracompetitive charge" that it can extract. Then she uses a tax-incidence model to predict whether that charge will fall more on the venues or whether the venues will proceed to charge fans more on tickets, predicting that for every dollar that Ticketmaster charges to the venue the fans will end up paying some portion of that dollar. Live Nation argues that the measure that Abrantes-Metz used to calculate how much venues are charged is flawed. That's for two reasons. First, because it allegedly includes payments that are made from artists and promoters rather than the venue to Ticketmaster (the inside fees); second, because it allegedly erroneously ignores payments made to the venues from Ticketmaster at the outset of the contract (the upfront payments).

These arguments don't pass muster on the record before the Court. Though Live Nation insists that the inside fees aren't borne by venues, plaintiffs claim that they are part of the charge to consumers, Dkt 1064 at 7, and they're explicitly described in some contracts between venues and Ticketmaster that describe how "Ticketmaster shall charge" the venue a fee. Dkt. 1064-3 at 35; *accord* 1064-4, 1064-5. As far as upfront payments go, the Court notes that there's a fundamental disagreement between Abrantes-Metz and the opposing experts as to whether they should be considered at all. Abrantes-Metz maintains that they shouldn't affect the amount that's paid otherwise in the contract, Dkt. 706-2 ¶¶ 110–11, while Live Nation's experts disagree. That comes down to a question of how the payment is properly characterized—is it a separate payment in exchange for exclusivity and some other services, or is an intrinsic part of the split of fees that Ticketmaster gets in its deals with the venues?

Whether that dispute goes to weight, rather than admissibility, matters little in the end. First, Abrantes-Metz observes in her report that both Ticketmaster and AXS made upfront payments in their deals with venues, and so, from her perspective, there's nothing to suggest that the amount of upfront payments should impact the relative difference in retained amounts (the supracompetitive overcharge) between Ticketmaster and AXS. Live Nation, for its part, doesn't point to empirical evidence suggesting that Abrantes-Metz was wrong in making that assumption, although both sides point to snippets of fact-witness testimony going their way.

Of course, it's the state plaintiffs' burden to establish, by a preponderance of the evidence, the reliability of their damages model for admissibility purposes. But here, the state plaintiffs point out that on top of the fact that nothing in Live Nation's submissions show that the upfront payments would disrupt her analysis, Abrantes-Metz included a cross-check to confirm her findings. Dkt. 1064 at 5. After calculating her per-ticket damages based on retained amounts (which Live Nation suggests might have been impacted by the upfront payments), she also estimates that the total fees charged to fans by Ticketmaster are higher than those charged by AXS. Dkt. 706-1 ¶ 182 (noting also that her estimate based on supracompetitive charges and the differences calculated in fees "are within a reasonable confidence interval" of one another).

Put another way, even putting the retained amounts to the side, and just focusing on the overall fees charged to consumers, those fees are higher in the actual world (where, according to plaintiffs, Ticketmaster is a monopolist) than in the but-for world of competition (as measured by the total fees on AXS contracts). Indeed, Abrantes-Metz calculates that the difference is *higher* than considering the retained amounts. This is evidence that any improper treatment didn't meaningfully

12

affect the outcome of the analysis. And for its part, Live Nation didn't respond to this argument. Nor did it have its own experts run the analysis while incorporating the variables it alleges are important, or excluding those it believes are irrelevant, so there's no contradiction of Abrantes-Metz's cross-check.[3] Under these circumstances, the issues raised here do not undermine the admissibility of Abrantes-Metz's model, although they may go to the weight assigned to it by the jury.

For these reasons the motion to exclude Abrantes-Metz's damages model is denied. However, the Court observes that given the disputes between the parties on the nature of the contracts at issue and mechanics of ticket sales, it may become clear during trial that certain of the positions taken by the state plaintiffs on this motion aren't borne out by the facts presented at trial. If so, then Live Nation may of course renew its motion to exclude her testimony based on the record that is presented.

## CONCLUSION

For these reasons, Live Nation's *Daubert* motion as to Dr. Abrantes-Metz, and its motions for reconsideration, to bifurcate, and to certify an interlocutory appeal, are denied.

The Clerk of Court is directed to terminate Dkts. 703, 707, 709, 715, 770, 1034, and 1058.

SO ORDERED.

Dated: February 27, 2026
New York, New York

                                    ARUN SUBRAMANIAN
                                    United States District Judge

---

[3] And these same issues apply to the inside fees—AXS also retained them, Live Nation didn't quantify the impact of their inclusion, and the cross-check measured ticketing fees without considering their retention. This also ameliorates any concerns as to the inclusion of those fees.