## AMENDED AND RESTATED CO-PROMOTION & EVENT INCENTIVE AGREEMENT

This Amended and Restated Co-Promotion and Event Incentive Agreement ("Agreement") entered into as of December 15, 2016, by and between Live Nation Worldwide, Inc. ("Live Nation"), whose business address is 220 West 42nd Street, New York, NY 10036 and Brooklyn Events Center, LLC ("Operator"), whose business address is 15 MetroTech Center, 11th Floor, Brooklyn, New York 11201, amends, restates, and supersedes that certain Co-Promotion & Event Incentive Agreement between the Parties dated as of April 19, 2011, as amended by that certain First Amendment, dated as of January 24, 2012. Live Nation and Operator shall herein be referred to individually as a "Party", and together as the "Parties".

WHEREAS, Operator and Live Nation desire to enter into an agreement that provides incentives to Live Nation to book and promote live music concerts, comedy events and other *non-sports* and *non-family show* entertainment events agreed upon in writing by the Parties through an ELA (as defined below) in each instance ("Events") at Barclays Center, an indoor arena in Brooklyn, New York (the "Facility"). Except as otherwise specified with respect to Events promoted by third parties, further references to "Events" herein means Events promoted by Live Nation.

NOW THEREFORE, for and in consideration of the mutual covenants and promises contained herein, the sufficiency of which are hereby acknowledged, Operator and Live Nation agree as follows:

**Ex. No**
**PX0081**
1:24-cv-03973

CONFIDENTIAL TREATMENT REQUESTED



3.    **Event Incentives.**   Operator and Live Nation have mutually and reasonably agreed on those certain Event incentives as set forth in Section 3(a) – (f) (each, an "Event Incentive", and collectively, the "Event Incentives"). The achievement of any Event Incentive shall entitle Live Nation to receive a bonus in accordance with the below; provided, however, that should a particular Event meet more than one (1) of the Event Incentives, only one (1) Event Incentive shall apply and Live Nation shall have the right to determine which Event Incentive shall be applied to such Event. The fact that an Event counts toward the Minimum Event Threshold does not mean that it meets an Event Incentive for purposes of the immediately preceding sentence. For any bonus generated in accordance with this Section 3, Operator shall use commercially reasonable efforts to pay Live Nation within sixty (60) days of earning the applicable Event Incentive; provided, however, in no event shall a bonus payment be made later than within thirty (30) days after the end of each calendar quarter immediately following the calendar quarter in which the Event was staged.

(a)    Minimum Event Threshold.   Live Nation will use best efforts to book and actually stage at least twenty-five (25) Events at the Facility during each Contract Year during the Term (i.e., each consecutive twelve (12) month period beginning with the Effective Date) (the "Minimum Event Threshold"). Notwithstanding anything to the contrary contained in this Section 3(a), any lower bowl-only Events/Events in the Facility "theater" configuration above five (5) in any Contract Year shall not count towards the Minimum Event Threshold in such Contract Year.

(i)    Should Live Nation meet the Minimum Event Threshold at the Facility in a Contract Year, Operator shall remit          to Live Nation for such Contract Year.

(ii)    Operator agrees to remit          to Live Nation for each Event over the Minimum Event Threshold (i.e., commencing with the          Event) in a Contract Year provided that any such Event generates a Promoter Profit (i.e., Event gross less Event expenses (e.g., taxes, fees, artist guarantee, rider production needs, advertising, etc.)).

CONFIDENTIAL TREATMENT REQUESTED                    BSE-DOJ-00000067

(iii)   By way of example only, if Live Nation books and stages ▮ Events in a Contract Year and six (6) are staged in a lower bowl-only/"theater" configuration and each of the Events over the Minimum Event Threshold generates a Promoter Profit, then Live Nation shall receive a bonus in the amount of $▮

(b)   Event Multiples. For any multi-run Event engagement at the Facility (i.e., when an artist plays more than one Event at the Facility as part of a single engagement, generally performed in a period of two (2) weeks or less), Operator shall remit ▮ per paid Event ticket to Live Nation, provided that each Event in the multi-run engagement generates a Promoter Profit.

(c)   Event Market Exclusivity. For those Events that are exclusively staged at the Facility (i.e., Live Nation does not also book any such Event at a third party venue whether as part of a tour, non-tour one-off performance, or multi-run show engagement within the New York DMA), Operator shall remit ▮ per paid Event ticket to Live Nation, provided that such Event generates a Promoter Profit.

(d)   Concerts Non Touring (Residencies). For purposes of this Agreement, a "Residency" shall be defined as ▮ Events or more (at the Facility) within a single Contract Year that is headlined by the same artist. Operator shall remit ▮ per paid Event ticket for each Residency Event plus a ▮ bonus for the Residency, provided that the Residency generates a Promoter Profit on an overall basis.

(e)   Festival Events. For purposes of this Agreement, a "Festival" means an Event that (i) is longer than a typical concert in duration (e.g. generally four hours or longer) (inclusive of other attractions such as food and merchandise vending, performance art, and social activities), (ii) has more than one stage, (iii) is oriented towards music that may be presented with a theme including, without limitation, musical genre, nationality or locality of musicians, or holiday, (iv) is mutually designated by the Parties as a "music festival", and (v) which is advertised as a "music festival" to the general public. In the event of a disagreement between the Parties as to whether a particular Event should be designated as a Festival, the Parties agree to negotiate in good faith to resolve such disagreement. For each Festival staged at the Facility that generates positive Net Revenue, Live Nation shall receive ▮ per paid Event ticket plus a ▮ bonus. For the avoidance of doubt, a "Festival" shall count toward the Minimum Event Threshold as one (1) Event.

(f)   Third Party Touring Shows. Prior to the first publicly ticketed event staged at the newly renovated venue currently known as Nassau Veterans Memorial Coliseum, Operator shall pay to Live Nation an amount equal to ▮ per paid Event ticket for all live music concerts, that are promoted by third party promoters (collectively, "Third Party Touring Shows") at the Facility. Following the first publicly ticketed event at Nassau Veterans Memorial Coliseum, Operator shall pay to Live Nation an amount equal to ▮ per paid Event ticket for all Third Party Touring Shows at the Facility. Any per paid Event ticket

CONFIDENTIAL TREATMENT REQUESTED            BSE-DOJ-00000068

revenue due to Live Nation for Third Party Touring Shows in accordance with this Section 3(f) shall be capped at ▉ per Contract Year.

## 4. Financial Terms.

(a) Operator and Live Nation agree to equally share Net Revenue (as herein defined) from Events at the Facility as follows: ▉ to Live Nation and ▉ to Operator. Should Net Revenue equal a negative amount (each, a "Loss") and unless otherwise agreed in writing by Operator and Live Nation, such Loss shall be borne ▉ by Live Nation and ▉ by Operator. Net Revenue means the following with respect to Events:

(i) Promoter Profit or Loss or production fees, if any, received by or attributable to Live Nation, as determined by the artist settlements (gross box office receipts after the deduction of taxes, chargebacks (if applicable and assessed by the ticketing company), applicable Facility fees, LEED building fee and other approved add-ons, approved Event expenses (including, without limitation, applicable, advertising, per-head insurance charges, ASCAP/BMI/SESAC/GMR, catering, transportation, barricade, Facility box office credit card charges, telephones, stagehands, dressing room furnishings, runners, towels, production rentals and services, police / fire / emergency personnel, tour specific overhead provided that, when possible, any such tour specific overhead is mutually agreed upon by the Parties in advance of the applicable Event and if not agreed upon by the Parties in advance, the tour specific overhead is reasonable, artist and support artist guarantees, percentages paid to the artists and bonuses outside of the specific Event (as mutually agreed upon by the Parties in advance of the applicable Event when possible and understanding that it is not uncommon for artists to renegotiate their deals, particularly when it is evident that a show or tour is going to be successful), if any).

(ii) Merchandise revenues received by or attributable to Operator, after the deduction of artists' percentage, credit card fees, applicable taxes and seller's fees (including cost of goods sold).

(iii) Facility rent received by Operator, net of Operator's actual expenses.

(iv) Food and beverage revenues received by Operator, after the deduction of (A) taxes, and credit card fees, (B) COGS, (C) labor, and (D) and any such revenues due by Operator to the Facility food/beverage concessionaire or any such revenues entitled to be retained by the Facility food/beverage concessionaire.

Page 4 of 11

(v) Ticketing service charge rebates received by Operator on tickets sold at outlets, phones and Internet (after taxes, credit card fees, and/or other deductions, if and as applicable).

(vi) Net revenues (after taxes, credit card fees, and other deductions) from the sale of single Event suite tickets sold for suites that are not under contract, including standing room only tickets (if any) for these suites. Net revenues shall not include any deduction for sales commissions.

(vii) Net revenues (after taxes, credit card fees, and other deductions) from the sale of standing room only tickets for Facility suites that are under annual or multi-year contracts after the first four (4) tickets. Net Revenues from the sales of the first four tickets referenced in the immediately prior sentence will be payable [ ] to Live Nation. Other revenues or license fees from Facility suites under annual or multi-year contracts shall be excluded other than as set forth herein. Net revenues shall not include any deduction for sales commissions.

(viii) Net revenues (after taxes, credit card fees, and other deductions) received by a Party in connection with VIP events that result in incremental revenues to a Party.

(ix) Net revenues (gross revenues after taxes, credit card fees, and deduction of hard costs of fulfillment but with no deductions for sales commissions other than as identified below in this Section 4(a)(ix)) from the sale of mutually approved Event-specific sponsorship but not including Facility-specific sponsorship sold by Operator, name-in-title sponsorship revenues and/or tour sponsorship revenues; provided, however, that any Party that solicits an Event-specific sponsor shall first be entitled to a [ ] commission of the cash consideration paid by such sponsor for such sponsorship; provided further, however, that each Party shall have the right to reasonably approve any such Event-specific sponsorship (e.g., a reasonable basis for disapproval would include the category conflict with a sponsorship agreement to which a Party is subject).

(x) Membership or other fees and net revenues received by a Party from a Facility-specific "concert club" (if any, with any such "concert club" to be subject to the mutual approval of the Parties). For the avoidance of any doubt, the All Access Pass program, the Ice Pass program, and any similarly structured programs shall not be considered "concert clubs".

(xi) Other revenue streams identified directly attributable to an Event not otherwise excluded herein and as agreed-upon by the Parties prior to each Event.

(b) Events requiring settlement pursuant to this Agreement shall be settled on the night of such Event with best estimates for all approved Event expenses and Net Revenue (as defined herein). The Parties shall be entitled to an accurate and complete

CONFIDENTIAL TREATMENT REQUESTED

BSE-DOJ-00000070

settlement as soon as reasonably possible thereafter but in no event later than five (5) days following the completion of such Event. Each Party shall make available to the other copies of financial information reasonably necessary for financial settlements for Events as set forth herein. Any additional monies due to a party as a result of final settlement shall be sent by certified funds or business check via delivery service or by wire transfer once the final settlement has been approved by both Parties.



CONFIDENTIAL TREATMENT REQUESTED

BSE-DOJ-00000071



CONFIDENTIAL TREATMENT REQUESTED

8.    **Term; Other.**  This Agreement shall be effective upon full execution (the "Effective Date") and continue through December 14, 2023 ("Term").

If either Party fails to promptly and fully perform any material term or condition of this Agreement and such failure continues for thirty (30) calendar days after written notice from the non-defaulting party, then the non-defaulting party shall have the right to terminate this Agreement in addition to any other rights or remedies available in law or in equity to such party. This Agreement may also be terminated by either Party if the other Party makes a general assignment for the benefit of creditors, or provides for an arrangement, composition, extension or adjustment with its creditors, files a voluntary petition for relief or if a petition against the other Party in a proceeding under the federal bankruptcy laws or other insolvency laws is filed and not withdrawn or dismissed within forty-five (45) calendar days thereafter, or if under the provisions of any law providing for reorganization or winding up of corporations, any court of competent jurisdiction assumes jurisdiction, custody or control of the other party or any substantial part of its property and such jurisdiction, custody or control remains in full force unrelinquished, unstayed or unterminated for a period of forty-five (45) calendar days.  In the event of a termination pursuant to this Section, unless otherwise prohibited by law, any sums earned prior to and up to the date of termination shall be paid to the respective party no later than fifteen (15) days following the date of termination.



CONFIDENTIAL TREATMENT REQUESTED

BSE-DOJ-00000073



Page 9 of 11

CONFIDENTIAL TREATMENT REQUESTED



Page 10 of 11

CONFIDENTIAL TREATMENT REQUESTED

BSE-DOJ-00000075



Page 11 of 11

CONFIDENTIAL TREATMENT REQUESTED