| | |
|---|---|
| **From:** | Master, John [John.Master@msg.com] |
| **Sent:** | 2/22/2019 6:18:00 PM |
| **To:** | Jared Smith [jared.smith@ticketmaster.com]; Kyle Hannaford [kyle.hannaford@ticketmaster.com] |
| **CC:** | Abbamondi, John G [John.Abbamondi@msg.com] |
| **Subject:** | RE: Ticketmaster-MSG Agreement -- Executed |
| **Attachments:** | Ticketmaster-MSG Global Agreement 2017-2022 EXECUTED 2.21.19.pdf |

Jared, Kyle – please find attached the signed, fully-compiled agreement!  (Finally!)  Great working with you both to get this done.
Have a great weekend!
John and John

**From:** Kyle Hannaford <kyle.hannaford@ticketmaster.com>
**Sent:** Friday, February 15, 2019 9:57 PM
**To:** Master, John <John.Master@msg.com>
**Cc:** Abbamondi, John G <John.Abbamondi@msg.com>; Jared Smith <jared.smith@ticketmaster.com>
**Subject:** RE: Ticketmaster-MSG Agreement -- Final (?) Draft

John,
I'm attaching a partially executed copy of the contract with Jared's signature.  Please arrange for countersignature on behalf of MSG at your earliest convenience.

Thank you for your time on this one.  Have a great weekend.

--Kyle

**From:** Jared Smith
**Sent:** Friday, February 15, 2019 2:57 PM
**To:** Master, John <John.Master@msg.com>
**Cc:** Kyle Hannaford <kyle.hannaford@ticketmaster.com>; John Abbamondi <John.Abbamondi@msg.com>
**Subject:** Re: Ticketmaster-MSG Agreement -- Final (?) Draft

Kyle why don't you print copies and Ill executed and we can send to John/John.

Once they get green light they can counter sign.

On Feb 15, 2019, at 1:29 PM, Master, John <John.Master@msg.com> wrote:

Here you go, guys – as soon as we get the ok, let's get this signed up.
John

**From:** Kyle Hannaford <kyle.hannaford@ticketmaster.com>
**Sent:** Thursday, February 14, 2019 6:35 PM
**To:** Master, John <John.Master@msg.com>
**Cc:** Jared Smith <jared.smith@ticketmaster.com>; Abbamondi, John G <John.Abbamondi@msg.com>
**Subject:** Re: Ticketmaster-MSG Agreement -- Final (?) Draft

Yes, that's fine.

On Feb 14, 2019, at 3:21 PM, Master, John <John.Master@msg.com> wrote:

**Ex. No**
**PX0750**
1:24-cv-03973

Ok – so you're saying that, if you're providing authentication for one team and not the other (b/c one has a soft landing and one a hard), then MSG has to eliminate PDFs for one team (authenticated) and not the other (not authenticated).   That's the point?  We agree with that.

Let me know if you're open to this wording of that sentence, which I think will make it a bit clearer on its face:

For any Contract Year during the Term in which Ticketmaster provides Authentication for Knicks and/or Rangers Events, the parties will not make the printing of Tickets in PDF form available to Consumers (including Subscribers) of the Team for whom Authentication is being provided (or for either Team, if Authentication is provided for both).

**From:** Kyle Hannaford <kyle.hannaford@ticketmaster.com>
**Sent:** Thursday, February 14, 2019 5:04 PM
**To:** Master, John <John.Master@msg.com>
**Cc:** Jared Smith <jared.smith@ticketmaster.com>
**Subject:** RE: Ticketmaster-MSG Agreement -- Final (?) Draft

Thanks John,
We're good with all of your changes, with the exception of one revision in Section 3.6.3.8 to clarify that the PDF elimination requirement would apply to either team that has Authentication (i.e., PDFs will be eliminated for the applicable team's events).  The language suggested that PDFs would only be eliminated if we're providing Authentication for both Knicks <u>and</u> Rangers.

Attached is a redraft with this change included.  If this is acceptable, we can proceed with execution.

**From:** Master, John [mailto:John.Master@msg.com]
**Sent:** Thursday, February 14, 2019 7:57 AM
**To:** Kyle Hannaford <kyle.hannaford@ticketmaster.com>
**Subject:** Ticketmaster-MSG Agreement -- Final (?) Draft

Kyle --

Please see the attached, which reflects the "split the baby" compromise John and Jared came to on Tuesday on the final two open issues, and also reflects that clean-up of section 10.1.4 that you and I discussed the other day (most substantively, how that flows into the Net Resale Revenue definition).  I don't think any of this will be controversial and, if you agree and are good with this, then I'll prepare an execution copy, which will be ready to be signed once Jared and John work out any last (non-contractual) issues that they are discussing.  But call me if any questions or concerns.
John

This message may contain confidential, privileged or proprietary information of the Madison Square Garden Company or its affiliates. If you have received this message in error, please inform the sender by email and kindly delete the message.

This message may contain confidential, privileged or proprietary information of the Madison Square Garden Company or its affiliates. If you have received this message in error, please inform the sender by email and kindly delete the message.

This message may contain confidential, privileged or proprietary information of the Madison Square Garden Company or its affiliates. If you have received this message in error, please inform the sender by email and kindly delete the message. <Ticketmaster-MSG Global Agreement 2017-2022 EXECUTION COPY 2.15.19.pdf>

This message may contain confidential, privileged or proprietary information of the Madison Square Garden Company or its affiliates. If you have received this message in error, please inform the sender by email and kindly delete the message.

HIGHLY CONFIDENTIAL

**EXECUTION COPY**

### TICKETMASTER-MSG TICKETING AND SPONSORSHIP AGREEMENT

This agreement (the "Agreement") is made and entered into as of the last date signed, and shall be deemed to have been effective as of the 1st day of July, 2017, by and between MSG Sports & Entertainment, LLC (hereinafter referred to as "MSG") and Ticketmaster L.L.C. ("Ticketmaster").

WHEREAS, MSG is engaged in the sports and entertainment businesses, including ownership and/or operation of the arena at the Madison Square Garden Sports and Entertainment Complex (the "Arena"), the Hulu Theater at Madison Square Garden (the "Theater"), the Beacon Theatre (the "Beacon"), Radio City Music Hall ("RCMH"), the Chicago Theatre ("Chicago") and the L.A. Forum in Inglewood, CA (the "Forum") (the Arena, the Theater, the Beacon, RCMH, Chicago and the Forum, and any New TM Venues added pursuant to Section 3.9, are collectively hereinafter referred to as the "MSG Venues"), the New York Knickerbockers basketball team (the "Knicks"), the New York Liberty basketball team (the "Liberty"), the Westchester Knicks and the New York Rangers hockey club (the "Rangers") (the Knicks, the Liberty, the Westchester Knicks and the Rangers are each, for so long as MSG owns such team, a "Team" and, collectively, the "Teams") (the MSG Venues and the Teams are each an "MSG Property" and, collectively, the "MSG Properties");

WHEREAS, MSG and Ticketmaster are parties to a separate agreement (the "Prior Primary Market Agreement"), pursuant to which Ticketmaster has provided to MSG certain computer hardware and software and communications equipment, and certain ticketing services in connection with certain entertainment events presented at the Arena, the Theater, the Beacon, RCMH, the Forum and Chicago;

WHEREAS, MSG and Ticketmaster were also parties, along with Ticketmaster's subsidiary TNOW Entertainment Group, Inc. ("TNOW"), to another separate agreement (the "Prior Secondary Market Agreement"), pursuant to which MSG provided Ticketmaster and TNOW certain advertising and promotional rights for use in connection with TNOW's and Ticketmaster's event ticket resale marketplaces, which operate in the "secondary market" as platforms for the resale of tickets to sporting events, concerts and other events, such that individuals who have initially purchased tickets for such events from the primary sellers of such events can then re-sell those tickets to individual buyers via Ticketmaster's resale platforms; and

WHEREAS, MSG and Ticketmaster desire to enter into a global contract that will reflect all aspects of their relationship going forward.

NOW, THEREFORE, in consideration of the promises and mutual representations, covenants and agreements hereinafter contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Ticketmaster and MSG hereby agree as follows:

### ARTICLE I
### DEFINITIONS

All capitalized terms used in this Agreement shall have the respective meanings indicated below or otherwise set forth herein; provided that, where a term is referenced as being defined in another section of the Agreement and a paraphrase thereof is contained parenthetically in this Article I,

1

                                        LNE-LIT24-001185583

such paraphrase is contained solely for convenience, and any conflict between the paraphrase and the separately-placed definition shall be resolved in favor of the latter.

**Access Control System.** Ticketmaster's software used by MSG to validate Tickets and authenticate Tickets' unique identifiers (e.g., a bar code or token) and, through that, authorize entry into the MSG Venues; Access Control Systems include, or shall include in the future, AccessManager, TM Presence and any successor such software to either.

**AccessManager.** Ticketmaster's Access Control System which is based on bar coding.

**AccountManager.** Ticketmaster software and hosting service module (and any successor thereto) in ARCHTICS that allows Subscribers to access their Subscription account information and conduct transactions and otherwise manage their Subscriptions in real time.

**Acquired Resale Platform.** This term shall be defined as set forth in the definition of "Ticketmaster Resale Platform" below.

**Act.** This term shall be defined as set forth in Section 11.7.2.1 below.

**Added Facility.** This term shall be defined as set forth in Section 3.9 below (i.e., a venue which MSG or one of MSG's controlled Affiliates builds, purchases or otherwise acquires a controlling ownership interest in (i.e., greater than 50% ownership of), directly or through a wholly-owned subsidiary, the primary purpose of which is the hosting of concerts or sporting events (e.g., stadiums, arenas, theaters, amphitheaters) at which tickets are sold for entry).

**Affiliate.** With respect to any Entity, any other Entity that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Entity.

**Alerts.** This term shall be defined as set forth in Section 8.8 below (i.e., notifications by Ticketmaster to certain Consumers of upcoming events in the region in which such Consumers reside, of upcoming Events at the MSG Venues, of the schedules of teams based at the MSG Venues, and of events of a particular performer).

**Annual Report.** This term shall be defined as set forth in Section 7.4 below (i.e., the Report On Controls Placed In Operation and Tests of Operating Effectiveness).

**ARCHTICS.** The Ticketmaster software that is the ticketing database used by MSG for event ticket sales, audit and management at the MSG Venues, which software (i) is inclusive of the module AccountManager and all upgrades, updates and new releases to the foregoing made available by Ticketmaster to any of its clients, (ii) provides multi-platform access (e.g., Windows 7 and later versions, Telephony, Ticketmaster Website, mobile applications and other mobile access, and future versions of AccountManager to its core relational database, and (iii) is open database connectivity compliant.

**Arena Concert Series.** This term shall be defined as set forth in Exhibit F.

**Authentication.** Verification by Ticketmaster, via interface with the TM System, of the status and validity of Tickets being transacted or otherwise forwarded, such that buyers purchasing or otherwise receiving such Tickets are assured that they are purchasing or receiving Tickets that are valid for entry to the applicable MSG Venue for the applicable Event and for use of the seats

2

indicated on such Tickets, and that such buyer's qualification for entry to such Event is confirmed to MSG.

**Authentication Delay Payment.** This term shall be defined as set forth in Section 9.4.7 below.

**Authentication Delay Period.** This term shall be defined as set forth in Section 9.4.7 below.

**Authorized Retailer.** A Secondary Marketplace Provider with whom Ticketmaster or MSG has entered into an agreement whereby Ticketmaster will provide Authentication for Tickets transacted on such Secondary Marketplace Provider's Resale Platform in exchange for consideration payable to Ticketmaster, subject to the conditions set forth in Section 3.6.3; provided, that each such Secondary Marketplace Provider (i) agrees to be bound by Ticketmaster's standard and reasonable API terms of use, (ii) meets Ticketmaster's minimum technology requirements for integration with Ticketmaster's Authentication tools such that Ticketmaster is not required to incur excessive additional development costs in respect of such Secondary Marketplace Provider, and (iii) provides Ticketmaster and MSG with data as to the ticket price and fees from each transaction (if available, on a disaggregated basis) relating to such Tickets.

**Authorized Retailer Agreement.** This term shall be defined as set forth in Section 3.6.3.3 below.

**Authorized Retailer Fee.** This term shall be defined as set forth in Section 3.6.3.2 below.

**Automatic Month-to-Month Renewal.** The automatic renewal of this Agreement on a month-to-month basis following the expiration of its Initial Term, subject to the terms and conditions set forth in Section 2.1.

**AutoProcessor.** A technology software that aggregates, ingests, publishes and delivers tickets in real time across multiple primary and secondary platforms (including, where applicable, 3P Resale Platforms), which software is and shall be throughout the Term provided by Ticketmaster to MSG at no charge; provided that MSG shall be solely responsible for any seller fees incurred on Tickets sold by MSG through 3P Resale Platforms using AutoProcessor.

**Average Per-Ticket Fee.** Whether with respect to Tickets hereunder, or with respect to the tickets of a third party with whom Ticketmaster is party to a ticket service agreement, the average net amount that Ticketmaster receives in any Contract Year, on a per-ticket basis, when all financial terms of the applicable ticket services agreement relating to Primary Sales and Ticket Resale are factored in (i.e., under this Agreement: (i) TM Fees, Signing Bonuses, Volume Bonuses, and Ticket Royalties for Primary Sales, and (ii) Sponsorship Fees and MSG Resale Participation Amounts for Ticket Resale).

**Box Office.** Each of the Ticket selling locations at the MSG Venues and any moveable, non-permanent ticket selling units that are operated by MSG, and the ticket selling locations at other venues operated by third parties to the extent that MSG obtains the authority to sell Tickets for an Event at such venue; provided, in all cases, such locations and units sell Tickets solely to consumers physically present at such locations or units.

**Business Day.** Any day other than a Saturday, Sunday or day which the banks are closed in the state in which an MSG Venue is being operated.

**Card Sponsor.** This term shall be defined as set forth in Section 3.16 below.

HIGHLY CONFIDENTIAL                                                                                    LNE-LIT24-001185585

**Central Computer.** This term shall be defined as set forth in Section 4.7 below (i.e., the current database system (the TM System and no more than six (6) ARCHTICS databases and/or their successors, unless otherwise mutually agreed) maintained by Ticketmaster that combines several of the MSG Venues).

**Chargeback.** An amount that a credit card company deducts from payments to or otherwise recovers from Ticketmaster due to a customer dispute or fraud regarding a Ticket sale.

**Chicago Metropolitan Area.** The region included within the fifty-mile radius extending from the corporate limits of the City of Chicago, Illinois in all geographic directions.

**Christmas Spectacular.** The Christmas Spectacular Starring the Radio City Rockettes.

**Comparable Venue.** A venue that is owned or operated by a third party Ticketmaster client which venue is capable of hosting an attraction similar to the attractions that MSG has hosted or is capable of hosting at the MSG Venues.

**Competitive Product.** This term shall be defined as set forth in Section 11.7.1 below.

**Confirmation Page.** A webpage on the Ticketmaster Website that is shown once a Consumer has completed a Ticket purchase via such website and that contains a confirmation number for the Ticket purchase.

**Contract Year.** Each year during the Term of the Agreement, commencing July 1st and ending on the subsequent June 30th.

**Consumer.** An Entity who purchases a Ticket or is seeking to purchase a Ticket by commencing a Ticket purchase via the Venue Pages.

**Convenience Charge.** The amount charged to a Consumer by Ticketmaster for use of the TM System.

**CopyNode.** A virtual replicated data warehouse from which data can be extracted in bulk in near real-time, with minimal impact to any primary database.

**Credit Card Fee Allocation.** This term shall be defined as set forth in Section 9.3.3 below.

**Customer Acquisition Costs.** Actual out-of-pocket costs incurred by Ticketmaster to unaffiliated third parties on search engine marketing (SEM), paid social media, retargeting or display costs related directly and solely to MSG Event Resale Transactions, or on commissions required to be paid by Ticketmaster to third parties (i.e., not corporate affiliates of Ticketmaster) for completed MSG Event Resale Transactions consummated by customers that linked to a Ticketmaster Resale Platform directly from the applicable third party.

**Daily Transaction Data.** Near real-time Ticket sales data from Tickets sold via the Distribution Channels and from the Box Offices, to be provided by Ticketmaster on a daily basis through the TM System to MSG in the format used by the Parties as of the time of execution hereof or such other format as the parties may mutually agree.

**Data Loss Event.** This term shall be defined as set forth in Section 14.2.3 below (i.e., the loss, theft or unauthorized disclosure of the MSG Consumer Data and the MSG Information from the TM System).

**Data Security Addendum.** This term shall be defined as set forth in Section 4.1.5.5 below

4

**EXECUTION COPY**

**Designated AccountManager Page.** MSG Property-branded (e.g., Knicks, Rangers) web pages that provides Subscribers access to AccountManager, hosted on Ticketmaster's web servers, each with the look and feel of the respective MSG Property website.

**Designated Venue.** This term shall be defined as set forth in Section 12.2 below.

**Designated Venue TM Fee.** This term shall be defined as set forth in Section 12.2 below.

**Distribution Channels.** Methods of selling tickets to events through the TM System that include IVR, Telephone Sales, the Ticketmaster Website, tablets, smart phones and other wireless devices and such other methods and locations for applicable Events as may be mutually determined by Ticketmaster and MSG, but excluding the Box Offices; provided that in no event shall Ticketmaster fail to provide methods of distribution that are being provided to any other Ticketmaster client in North America.

**DR Requirements.** This term shall be defined as set forth in Section 6.3 below (i.e., the disaster recovery requirements set forth in Exhibit C).

**DR Site.** This term shall be defined as set forth in Section 6.3 below.

**Entity.** An individual, partnership, association, corporate body, trustee, executor, administrator or legal representative.

**Event.** A specific presentation at a specific date and time of a sports, cultural, artistic, musical, variety or other showing, tour or performance at either (i) one of the MSG Venues or (ii) a third-party's venue if MSG or one of its Affiliates presents an event at such venue, obtains the authority, in a form reasonably satisfactory to Ticketmaster, to control the sale of tickets through Ticketmaster's ticketing service, and informs Ticketmaster that it elects to have such event at such third party's venue be deemed an "Event" under this Agreement.

**Event Detail Page.** A webpage on the Ticketmaster Website that contains detailed information about a specific Event, including such information as the time and date of the Event, artist information and pricing details.

**Event Taxes.** This term shall be defined as set forth in Section 19.2 below.

**Fan Club Requirements.** This term shall be defined as set forth in Section 3.3.2 below.

**Forecasted Monthly CAC Spend.** This term shall be defined as set forth in Section 10.1.4 below.

**Fulfillment Costs.** An amount to cover the estimated costs of credit card processing fees and Chargebacks, irrespective of actual costs, which amount shall be (i) 2.65% of Gross Resale Transaction Value with respect to MSG Major League Teams and MSG-Owned Non-Major League Content and (ii) 3.5% with respect to Non-MSG-Owned Events and MSG-Promoted Non-Owned Events, in each case, solely in connection with MSG Event Resale Transactions and for which revenue from such transactions is included in Gross Resale Revenue.

**Gross Resale Revenue.** With respect to any time period, the aggregate of the Gross Resale Transaction Values of all MSG Event Resale Transactions, less the aggregate amount of all ticket sales proceeds paid to resellers (net of any seller fees collected from such resellers) in connection with such transactions.

5

HIGHLY CONFIDENTIAL

**Gross Resale Transaction Value.**  The aggregate of all transaction values actually collected on all Ticket sales, whether paid by the buyer or seller, however characterized, by way of any Ticketmaster Resale Platform or Ticketmaster Non-Promoted Resale Platform in connection with any MSG Event Resale Transaction, including, but not limited to ticket price, markups, service or other charges or fees, validation (TicketFast re-issue) fees (provided that any such fees charged shall be consistent with those charged to purchasers of tickets via Ticketmaster Resale Platforms for events other than the Events), and gross shipping charges paid by customers.  Gross Resale Transaction Value shall exclude any sales tax (if applicable) and Refunds, but Chargebacks shall not be deducted.

**Group Sales.**  Sales of Tickets to one Entity to allow a group of at least nine (9) people (or such higher threshold as MSG might determine) to attend an Event as a group.

**Hardware.**  The computer hardware, processors, micro-chips and circuitry, communications and connectivity equipment, terminals/servers, monitors, modems, printers, routers and hook-ups currently supplied, and to be supplied, hereunder pursuant to the express terms hereof, by Ticketmaster to MSG (at the TM Data Center (as defined below), DR Site (as defined in Section 6.3 below) or at the MSG Venues) on which all of the Software will operate (except if and as subsequently removed or replaced pursuant to the terms hereof), or otherwise supplied by Ticketmaster under this Agreement at any time during the Term of this Agreement, which will, at a minimum, include those items listed in Exhibit A hereto, but excluding any such equipment, circuitry, connectivity and hook-ups that MSG is responsible for providing pursuant to the terms hereof.

**Historical Daily Transaction Data.**  Daily Transaction Data for the prior seven years.

**House Seats.**  Tickets (i) provided by MSG to an Event's promoter, performing act or event, or their managers or agents (i.e., band holds) or (ii) held by MSG for legitimate promotional or business purposes; provided that House Seats Tickets shall not be sold or otherwise distributed by MSG to the general public.

**Hosting Services.**  The operation of the Platform to provide access to the TM System and the Software applications executing the sale, auditing and controlling of Primary Sales of Tickets through the Distribution Channels, MSG's Ticket Network and the Box Offices in accordance with the terms of this Agreement.

**Incremental MSG CAC Spend.**  This term shall be defined as set forth in Section 10.1.4 below.

**Initial Term.**  This term shall be defined as set forth in Section 2.1 below (i.e., the period deemed to have commenced on July 1, 2017 and continuing through June 30, 2022).

**Interactive Voice Response ("IVR").**  A method for the purchase of advance Tickets for Events processed through the use of the combined ticketing and call center platforms; IVRs are used to facilitate sales through automated responses.

**Interactive Seat Maps ("ISM").**  Software functionality on the Ticketmaster Website which permits Consumers to navigate and choose from available seats at an MSG Venue for a particular Event prior to purchasing a Ticket.

**Internal Ticket Forwarding.**  The forwarding by MSG of a reasonable number of House Seats, subject to any restrictions thereon contained herein.

HIGHLY CONFIDENTIAL

**League Regulations.** This term shall be defined as set forth in Section 21.12 below.

**Legitimate Fan Club.**  An official organization maintained for the promotion of the applicable artist created and operated primarily for purposes other than distributing tickets (i.e., nurturing of online commerce and interaction with fans), and which (i) charges a membership fee or requires member fans to provide personal data about themselves to become a member of the club, such as name, address, phone number and confirmed e-mail address, (ii) limits the number of tickets that can be purchased by each registered member to four or less per performance of an Event, and (iii) provides for meaningful interaction between the artist, on the one hand, and fans, on the other hand, that goes beyond merely making tickets available (e.g., online chats with the artist, artist's journal, online message boards, contests, exclusive photos, downloads, sales of artist-related merchandise, publication and distribution of newsletters and information unrelated to ticketing and attempts to create a community among fans to spur interaction among the fans as well as between the fans and the artist); provided that the foregoing definition shall be enforced uniformly by Ticketmaster across its client base.

**Los Angeles Metropolitan Area.**   The region included within the fifty-mile radius extending from the corporate limits of the City of Los Angeles, California in all geographic directions.

**MFC Credit.** This term shall be defined as set forth in Section 12.2 below.

**MFC Credit Benefits.** This term shall be defined as set forth in Section 12.2 below.

**Minimum Annual CAC Spend.** This term shall be defined as set forth in Section 10.1.4 below.

**MSG AccountManager Websites.** This term shall be defined as set forth in Section 4 of Exhibit B, attached hereto (i.e., links created by MSG to the Designated AccountManager Page on certain of MSG's websites).

**MSG Consumer Data.**  The personally identifiable data and information collected by Ticketmaster in connection with Consumers' purchases of Tickets for Primary Sales, including, but not limited to, Consumers' contact information (e.g., name, address, telephone number, email address), Social Security numbers and other identifiers, bank or other Consumer account numbers, financial or personal details, transaction histories with MSG, types and bank issuers of credit cards used for MSG-related transactions, and user names and passwords.

**MSG Event Resale Transaction.** Any resale-purchase transaction made via any Ticketmaster Resale Platform with respect to any Ticket or group of Tickets.

**MSG Indemnitees.** MSG, SportsCo (if any) and their respective Affiliates and members and their respective officers, directors, employees and agents, and their respective successors and assigns.

**MSG Information.** The information provided by MSG or obtained by Ticketmaster in connection with providing services hereunder, including information about Consumers (including MSG Consumer Data) or Events or otherwise relating to any of the MSG Venues, MSG or any of its Affiliates and/or any of their respective businesses or operations contained on the TM System or otherwise provided by MSG to, and/or obtained by, Ticketmaster, the ownership of which information shall remain with MSG, subject to Ticketmaster's rights with respect to any Ticketmaster Consumer Data which may be included in such MSG Information.

HIGHLY CONFIDENTIAL                                                                 LNE-LIT24-001185589

EXECUTION COPY

**MSG Major League Teams.** The New York Knicks, the New York Rangers, and any other team that is a member of any of the National Basketball Association, the National Hockey League, the National Football League or Major League Soccer which team is playing substantially all of its home games for any season at any MSG Venue.

**MSG Marks.** This term shall be defined as set forth in Section 11.3.1 below.

**MSG-Owned Non-Major League Content.** Teams or productions that are wholly or fully owned, or solely managed, by MSG, which shall include at least, but not be limited to, the Christmas Spectacular, the Westchester Knicks, and any events that include Counter Logic Gaming and/or Knicks Gaming; provided, however, that the New York Liberty shall be deemed MSG-Owned Non-Major League Content whether or not fully owned by MSG.

**MSG Processor Agreement.** This term shall be defined as set forth in Section 9.3.2.5 below.

**MSG-Promoted Non-Owned Events.** Events that are solely and exclusively promoted by MSG, and for which MSG retains one hundred percent (100%) of the risk with respect to the production of such Events, other than the MSG Major League Teams and MSG-Owned Non-Major League Content (e.g., MSG-promoted concerts such as the "Billy Joel at the Garden" concert franchise).

**MSG Quarterly Resale Participation Payment.** This term shall be defined as set forth in Section 10.1.5 below.

**MSG Resale Participation Amount.** This term shall be defined as set forth in Section 10.1 below (i.e., the share of Net Resale Revenue to which MSG is entitled).

**MSG Venue.** This term shall be defined as set forth in the first recital to this Agreement (i.e., the Arena, the Theater, the Beacon, RCMH, Chicago and the Forum, and any New TM Venues added pursuant to Section 3.9).

**MSG Venue Tours.** Tours of the various MSG Venues for which Tickets are sold to the public.

**MSG's Ticket Network.** MSG's internal network infrastructure containing multiple interfaces, data feeds and integrations from the ticketing systems at the MSG Venues, Acxiom, Oracle A/R and MSG's customer master database that each connect to ARCHTICS and/or the TM System.

**MSG's Websites.** This term shall be defined as set forth in Section 8.4 below (i.e., websites operated by, or on behalf of MSG (or one of its Affiliates)).

**Net Average TM Fee.** This term shall be defined as set forth in Section 12.2 below.

**Net Resale Revenue.** With respect to any time period, the Gross Resale Revenue for such period, less each of Fulfillment Costs and, in the case of Gross Resale Revenue from MSG Major League Teams and MSG-Owned Non-Major League Content only, less (i) Customer Acquisition Costs actually expended by Ticketmaster during such period (but not including, for avoidance of doubt, such expended amounts that have been reimbursed to Ticketmaster by MSG or that are to be reimbursed pursuant to Section 10.1.4), and (ii) any Promoter Resale Fees paid to MSG pursuant to Section 10.3.2 with respect to such period.

**New Offering.** This term shall be defined as set forth in Section 3.7 below.

**New TM Venue.** This term shall be defined as set forth in Section 3.9 below (i.e., an Added Facility that becomes an MSG Venue under this Agreement).

8

**New York City Metropolitan Area.**  The region included within the fifty-mile radius extending from the corporate limits of the City of New York, New York in all geographic directions.

**Non-Arena MSG Venues.**  This term shall be defined as set forth in Section 17.3 below.

**Non-MSG-Owned Events.**  All Events other than MSG Major League Teams, MSG-Owned Non-Major League Content, and MSG-Promoted Non-Owned Events that are promoted or co-promoted (including in co-promotion with MSG) by third party promoters, including, but not limited to, third-party promoted concerts, family shows and sporting events.

**Open Distribution.**  This term shall be defined as set forth in Section 3.14 below.

**Open Seats.**  Seats in the MSG Venues that can be sold for an Event other than Subscription Tickets.

**Optional Third-Party Software.**  This term shall be defined as set forth in Section 14.2.3 below.

**PCI-DSS.**  This term shall be defined as set forth in Section 4.1.7.3 below.

**Platform.**  The Hardware, operating system and networking environment used by Ticketmaster to host the TM System and ARCHTICS at the TM Data Center.

**Pricemaster Tool.**  The dynamic pricing software solution that generates algorithm-based pricing recommendations, and provides direct connectivity for automated pricing updates, with respect to live events while such events are on sale.

**Primary Sale.**  Initial or original sale of tickets by the venue operator, team owner or, if permitted, such other promoter of an event as is making the original sale of tickets for such event.

**Prior Primary Ticketmaster-MSG Agreement.**  This term shall be defined as set forth in the second recital to this Agreement.

**Prior Secondary Market Agreement.**  This term shall be defined as set forth in the third recital to this Agreement.

**Processor.**  This term shall be defined as set forth in Section 9.3.2.2 below (i.e., Ticketmaster's credit card processor).

**Products.**  The ticket sales software and Internet-based premium Ticketmaster products indicated in Section 1 of Exhibit B hereof.

**Promoter Resale Fee.**  This term shall be defined as set forth in Section 10.3.2 below (i.e., a fee paid by Ticketmaster to MSG for MSG-Owned Non-Major League Content and MSG-Promoted Non-Owned Events with respect to which MSG elects to activate the Ticketmaster Integrated Marketplace).

**Quarter.**  Any full calendar quarter ending March 31, June 30, September 30 or December 31.

**Quarterly Resale Reports.**  This term shall be defined as set forth in Section 10.1.5 below.

**Raw Month-End Transaction Data.**  End-of-month Ticket sales data from Tickets sold via the Ticketmaster Website, Telephone Sales and the Box Offices, as stored on the Central Computer at the end of each month.

9

**Recordation.** This term shall be defined as set forth in Section 11.7.2.2 below (i.e., a photo shoot or the filming, recording, streaming, broadcasting and/or other media recordation of movies, commercials and other audio and/or visual programs in or around any MSG Venue).

**Refund.** An amount that Ticketmaster refunds to a customer in connection with a dispute regarding a ticket sale by way of a Ticketmaster Resale Platform in connection with an MSG Event Resale Transaction, when such dispute or request for a refund was not initiated or pursued by the customer at any time through a credit card company; for avoidance of doubt, Chargebacks shall not constitute Refunds.

**Related Third-Party Marketer.** A Third-Party Marketer who has a business relationship or agreement with Ticketmaster pursuant to which Ticketmaster is compensated by such Third-Party Marketer (currently includes Broadway.com, Broadway Inbound, EBG, Experience, FEVO, GameTime, Goldstar, Groupon, LaneOne, Vet Tix).

**Remedial Time.** This term shall be defined as set forth in Section 6.2 below (i.e., the respective times within which Ticketmaster has to resolve various types of Service Disruptions).

**Renewal Term.** This term shall be defined as set forth in Section 2.1 below.

**Resale Consumer Data.** The personally identifiable data and information collected by Ticketmaster in connection with Consumers' purchases of Tickets on Ticketmaster Resale Platforms, including, but not limited to, Consumers' contact information (e.g., name, address, telephone number, email address) and other identifiers, bank or other Consumer account numbers, and financial or personal details.

**Resale Platform.** Any platform, typically a website, for the resale of tickets to sporting events, concerts and other events such that individuals who have initially purchased tickets for such events from the primary sellers of such events, or others, may then re-sell those tickets to individual buyers at or via such platform.

**Sales Deck.** Software provided by Ticketmaster to function as an extension of certain Box Office functions, with a user-friendly graphical interface through which certain Consumers and MSG personnel can access the TM System in order to purchase Tickets, pick up Tickets which were pre-paid for through a Distribution Channel, and/or obtain information provided by MSG to Ticketmaster for programming into the TM System regarding Events and related information through Telephone Sales or the Ticketmaster Website.

**Sales Reports.** This term shall be defined as set forth in Section 7.3 below.

**Secondary Marketplace Provider.** An Entity that provides a Resale Platform.

**Service Disruption.** This term shall be defined as set forth in Section 6.2 below (i.e., an interruption in the full and proper functioning of the TM System or ARCHTICS and all other components thereof relating to the Events).

**Service Level Agreement.** This term shall be defined as set forth in Section 6.1 below.

**Signing Bonus.** This term shall be defined as set forth in Section 9.4.1 below.

10

**Similar Venue.** A theater or arena with no less than one thousand eight hundred (1,800) fixed seats that presents events that are similar to the types of Events presented at one or more of the MSG Venues.

**Software.** All of the computer software, including all upgrades, new releases, new versions and modifications thereto, used and/or developed by Ticketmaster during and prior to the Term, as subsequently modified, upgraded or replaced (subject to the Upgrade Notice provisions in Section 4.1.3 below and other applicable terms hereof), and to which MSG shall have access pursuant to this Agreement during the Term in connection with the sale of Tickets through the TM System, including, without limitation, the Ticketmaster "Host", AccessManager, ARCHTICS, AutoProcessor, TicketFast, AccountManager, IOMedia, TMOne, EventBase, Sales Desk, TM Ticker, TM Presence, the Products and any other new software developed, co-developed, acquired and/or licensed (except to the extent any such software is offered to MSG for license pursuant to a separate written agreement with the software developer) by Ticketmaster in connection with the sale of Tickets, subject to MSG's right to reasonably approve its own use of any such new software (as same may adversely impact MSG's business and/or the sale of Tickets) for the purposes of this Agreement.

**Special Event.** This term shall be defined as set forth in Section 11.7.2.1 below.

**Spin-Off.** This term shall be defined as set forth in Section 20.1.1 below.

**Sponsored Property.** This term shall be defined as set forth in Section 11.1 below.

**Sponsorship Benefit.** This term shall be defined as set forth in Section 11.2 below.

**Sponsorship Category.** This term shall be defined as set forth in Section 11.6 below

**Sponsorship Fee.** This term shall be defined as set forth in Section 11.5 below.

**SportsCo.** This term shall be defined as set forth in Section 20.1.1 below.

**Subscriber.** The purchaser of a Subscription.

**Subscription.** A package or subscription of Tickets for at least three (3) Events (e.g., a "season ticket" for a sports team); provided that such Tickets are not provided by MSG to third parties specifically with the intent, on the part of MSG, that such third parties will sell such Tickets on behalf of MSG.

**Subscription Ticket.** A ticket issued by MSG for a sports team Event or other Event that is part of a Subscription.

**Telephone Sales.** Sales of Tickets through use of telephone.

**Term.** This term shall be defined as set forth in Section 2.1 below.

**Third-Party Marketer.** An Entity that markets and sells tickets, generally at discounted prices (also commonly referred to as a "flash sales site"); provided that, for avoidance of doubt, Entities (including Secondary Market Providers) that are primarily in the business of operating Resale Platforms shall not be deemed Third-Party Marketers.

**Third Party/Predecessor Agreement.** This term shall be defined as set forth in Section 3.9.2 below (i.e., an agreement with a ticket services provider with respect to an Added Facility that is in place when such Added Facility becomes a New TM Venue).

HIGHLY CONFIDENTIAL

LNE-LIT24-001185593

**Ticket.** Evidence of license for admission of one individual to an Event.

**Ticket Back Text.** This term shall be defined as set forth in Section 4.11.2 below.

**Ticket Class.** This term shall be defined as set forth in Section 9.2.1 below (i.e., the breakdown of Tickets by type of Event upon which the parties have established the level of per-Ticket fee to be paid to Ticketmaster).

**Ticket Face Value.** The Ticket price established by MSG and/or its licensees, including any taxes applicable thereto and, where applicable, the Venue Surcharge.

**TicketFast.** Ticketmaster's technology which allows Consumers to have Tickets delivered via email and printed as PDFs.

**Ticket Forwarding.** The forwarding by a Subscriber of Subscription Tickets via the Designated AccountManager Page to a recipient with a valid email address, pursuant to terms of the user agreement posted from time to time on the Designated AccountManager Page.

**Ticket Receipt.** The amount paid by a Consumer for a Ticket attributable to the Ticket Face Value.

**Ticket Resale.** Any sale of a Ticket after the first transaction in which it was purchased.

**Ticket Royalties.** This term shall be defined as set forth in Section 9.4.2 below (i.e., the amount, paid by Ticketmaster to MSG, by which the Convenience Charge assessed on a Ticket exceeds the TM Fee (if applicable) and any applicable Credit Card Fee Allocation).

**Ticket Services Technology.** This term shall be defined as set forth in Section 4.15 below.

**Ticketmaster Consumer Data.** The personally identifiable data collected by Ticketmaster with respect to ticket purchasers that Ticketmaster independently collects (i.e., through transactions other than purchases of Tickets), regardless of whether such data is redundant to MSG Consumer Data.

**Ticketmaster Indemnitees.** Ticketmaster and its Affiliates and members and their respective officers, directors, employees and agents, and their respective successors and assigns.

**Ticketmaster Integrated Marketplace.** Ticketmaster's online platform for the sale of tickets to events (currently branded as "TM+"), through which Ticketmaster is able to show consumers seeking to purchase tickets with availability options for, and conduct transactions of, both tickets available for Primary Sale and tickets being offered by third parties for Ticket Resale on one or more of the Ticketmaster Resale Platforms.

**Ticketmaster Marks.** This term shall be defined as set forth in Section 11.3.2 below.

**Ticketmaster Non-Promoted Resale Platforms.** Any Acquired Resale Platform that Ticketmaster at no point uses the Sponsorship Benefits to promote or direct internet traffic to. For avoidance of doubt, a Ticketmaster Non-Promoted Resale Platform will become and thereafter remain a Ticketmaster Resale Platform upon the first usage of any Sponsorship Benefit to promote or drive traffic to such Acquired Resale Platform.

**Ticketmaster/Predecessor Agreement.** This term shall be defined as set forth in Section 3.9.2 below (i.e., an agreement in place with Ticketmaster with respect to the sale of tickets for events at an Added Facility at the time of its acquisition by MSG).

12

**Ticketmaster Resale Platform.**  (1) The Ticketmaster Integrated Marketplace and any currently existing Resale Platform created, owned or operated by Ticketmaster, TNOW Entertainment Group, Inc. or any of their respective Affiliates, or in which any such entity participates in any way, (2) any replacement or alternative Resale Platform or other vehicle for Ticket Resale that may be at any time created by any such entity and (3) any Resale Platform not covered by clauses (1) or (2) above that might be acquired, owned, operated by, or participated in financially, by any such entity (each, an "Acquired Resale Platform"), which Acquired Resale Platform Ticketmaster at any point uses the Sponsorship Benefits to promote or direct internet traffic to such Acquired Resale Platform.

**Ticketmaster Resale Platform Minimum.**  This term shall be defined as set forth in Section 10.1.3 below.

**Ticketmaster Website.**  The website operated by Ticketmaster and located on the ticketmaster.com domain.

**TM Charge.**  The credit card processing system within the TM System that utilizes the global banking association networks to authorize credit card purchases of Tickets sold by MSG from the Box Offices or the processing of Product transactions by MSG as permitted under this Agreement.

**TM.COM/Stage.**  A non-transactional (i.e., non-live) basic version (i.e., without full functionality) of the ticketmaster.com website where an Entity with access to such site can test Event builds before such Events go on sale.

**TM Data Center.**  The physical location in the Ticketmaster facilities where the Platform will be located on terminal servers.

**TM Fee.**  This term shall be defined as set forth in Section 9.2.1 below.

**TM-Owned Vendor.**  A provider of products or services which are ancillary to the core ticketing-related services that are provided under the Ticketmaster brand, and which is greater than fifty percent (50%) owned by Ticketmaster, current examples of which include, but are not limited to, Blue Digital and Live Analytics.

**TM Presence.**  Ticketmaster's Access Control System which can validate tickets and authenticate Ticket's unique identifier, and authorize entry into the venues, through bar codes, radio frequency identification (RFID) and/or near-field communication (NFC) chips.

**TM System.**  The Hardware (including, without limitation, the telephone/internet system), Software, related procedures and policies and personnel, hosting, support, repair and maintenance services established and maintained by Ticketmaster for the purpose of selling, auditing and controlling the sale of Tickets through the Distribution Channels and 3P Resale Platforms; also sometimes referred to as "The Host."

**Transaction Data.**  Ticket sales data from Tickets sold via Distribution Channels and from the Box Offices or otherwise by Ticketmaster, to the extent an account was created for the Consumer in connection with the purchase of such Tickets.

**Transaction Fees.**  This term shall be defined as set forth in Section 9.2.7 below (i.e., the transaction fees associated with the use of the transaction capabilities of the Products set forth in Exhibit B).

13

**Transaction Fee Royalties.** This term shall be defined as set forth in Section 9.4.4 below (i.e., royalties MSG is entitled to receive from Ticketmaster with respect to transactions using the Products set forth in Exhibit B).

**Transition Costs.** This term shall be defined as set forth in Section 13.7.1 below (i.e., reasonable costs incurred by Ticketmaster in excess of the costs customarily incurred by Ticketmaster in providing services hereunder during any Transition Period).

**Transition Period.** This term shall be defined as set forth in Section 13.7 below (i.e., a period of up to one year following expiration or termination of this Agreement wherein Ticketmaster will provide certain transition services to MSG).

**Unrelated Third-Party Marketer.** A Third-Party Marketer with whom Ticketmaster has no business relationship or agreement.

**Upgrade Notice.** This term shall be defined as set forth in Section 4.1.3 below.

**Upsells.** This term shall be defined as set forth in Section 8.5 below (i.e., products and/or services other than Tickets which MSG may sell at certain Ticketmaster points of sale).

**Venue Pages.** This term shall be defined as set forth in Section 8.4 below (i.e., the Event Detail Page, the Confirmation Page and any other page relating to Events accessed on the Ticketmaster Website directly through any of the foregoing).

**Venue Surcharge.** A facility surcharge assessed by MSG, in its sole discretion and for its sole benefit, which may be changed by MSG from time to time.

**Volume Bonus.** This term shall be defined as set forth in Section 9.4.3 below.

**Volume Bonus Generating Tickets.** This term shall be defined as set forth in Section 9.4.3 below.

**Weekly Wire.** This term shall be defined as set forth in Section 9.5.1 below (i.e., Ticketmaster's weekly wire transfer to MSG of all applicable Ticket Receipts, Ticket Royalties, Convenience Charges, Transaction Fee Royalties and any other amounts then due from Ticketmaster to MSG for such week).

**Yield Management Tool.** A web-based tool which enables simplified scaling of an MSG Venue's seating inventory, real-time price changes and advanced sales reporting, frequently in a map-based format.

**3P Resale Platform.** This term shall be defined as set forth in Section 3.14 below (i.e., a participating resale marketplace selected by MSG to engage in Open Distribution of Primary Sales of Tickets to Events; provided that each such marketplace (i) agrees to be bound by Ticketmaster's standard and reasonable API terms of use, (ii) meets Ticketmaster's minimum technology requirements for integration with Ticketmaster's Open Distribution tools such that Ticketmaster is not required to incur excessive additional development costs in respect of such marketplace, and (iii) provides Ticketmaster and MSG with data as to the ticket price and fees from each transaction (if available, on a disaggregated basis) relating to such Primary Sales).

14

 LNE-LIT24-001185596

EXECUTION COPY

## ARTICLE II

### TERM OF AGREEMENT

2.1  Term/Effective Date.    Subject to Section 2.3 below, the term of this Agreement shall be deemed to have commenced on July 1, 2017 and shall continue through and including June 30, 2022 (the "Initial Term"), provided that neither Ticketmaster's nor MSG's failure to comply with any obligations hereunder during the Term but prior to the execution of this Agreement shall be considered an event of default under Article XIII hereof if such party complied with its obligations under the Prior Primary Ticketmaster-MSG Agreement and the Prior Secondary Market Agreement during such period.  If this Agreement expires prior to the parties' negotiation of a renewal agreement, this Agreement shall automatically renew on a month-to-month basis (an "Automatic Month-to-Month Renewal") for a period of up to twenty-four (24) months, and the period during which the parties operate under the Automatic Month-to-Month Renewal shall be deemed the "Renewal Term."  The Initial Term and the Renewal Term, if any, are collectively referred to herein as the "Term."  MSG may nullify any such automatic renewal, or terminate any Renewal Term, by providing written notice to Ticketmaster not less than three (3) months prior to, as applicable, the expiration of the Initial Term or the date on which MSG seeks to terminate the Renewal Term (e.g., to terminate this Agreement on July 31, 2022, MSG would be required to provide written notice by April 30, 2022).  Ticketmaster may terminate any Renewal Term by providing written notice to MSG not less than one (1) year prior to the date on which it seeks to terminate such Renewal Term (e.g., to terminate this Agreement on July 31, 2022, Ticketmaster would be required to provide written notice no later than July 31, 2021).

2.2  Contract Years.  Each one-year period of the Term starting on July 1 and ending on June 30 shall be deemed a "Contract Year."

## ARTICLE III

### TICKETING SERVICES

3.1  Control.  Ticketmaster owns, operates and controls all proprietary aspects of the TM System.  MSG, in consultation with Ticketmaster, shall determine the appropriate means for distribution of Primary Sales of Tickets for Open Seats with respect to each Event (i.e., which Distribution Channels shall be used) reasonably in advance of such Event, and consistent with past practices of the parties.

3.2  Exclusivity.  MSG hereby grants to Ticketmaster, and Ticketmaster hereby accepts from MSG, the exclusive right to conduct the initial sale, on MSG's behalf as its agent, of all Tickets for Open Seats to all Events occurring during the Term, provided that such exclusivity is subject to the limitations and exceptions set forth in Sections 3.3 through 3.6 and Section 3.14 below.

3.3    MSG's Selling Rights.  Subject to Section 3.3.3 below, and notwithstanding anything contained in Section 3.2 above, MSG retains the rights to (1) sell single Tickets from its Box Offices to persons physically present at such Box Offices, (2) sell Subscription Tickets, (3) conduct Group Sales of Tickets other than via AccountManager, (4) distribute a reasonable number of House Seats, (5) sell Tickets to those Events with respect to which MSG has customarily not utilized the services of an independent ticket selling agency (including, without limitation, the Big East Tournament, the NCAA Tournament, track meets, educational seminars, series and box seats for tennis tournaments and Events oriented toward specific religious or ethnic groups), (6) sell

15

Tickets for charitable or benefit Events (in which case such Ticket sales will be made available exclusively by MSG at the Box Offices or by telephone or at those locations described in Section 3.4 below without utilizing the services of any other third party computerized ticket selling entity or system), (7) sell tickets sold through Third-Party Marketers, subject to Section 3.3.1 below, and (8) provide Tickets spread among various seating categories equaling up to eight percent (8%) of the Open Seats for each Event (and up to fifty percent (50%) of Open Seats for Events featuring Dave Matthews (including the Dave Matthews Band) or Phish) for distribution through Legitimate Fan Clubs exclusively via traditional mail order channels or Legitimate Fan Club branded websites (i.e., no branding provided to third party ticketing services), provided that the limitations on such sales contained herein shall be subject to Section 3.3.2 below.  Ticketmaster acknowledges that it shall not be entitled to any charges or fees related to such transactions conducted by MSG unless otherwise mutually agreed upon (e.g., to the extent MSG requests assistance from Ticketmaster in conducting or fulfilling such sales, then the parties shall mutually agree upon the charges or fees that Ticketmaster shall be entitled to receive for such assistance).

3.3.1  Tickets sold through Related Third-Party Marketers shall be processed through the Distribution Channels or directly on the platform of such Related Third-Party Marketer through integration with the TM System via Ticketmaster APIs.  With respect to Tickets sold through Unrelated Third-Party Marketers, if Ticketmaster is offered the opportunity by MSG in writing (email being sufficient) to process and deliver such Tickets through the Distribution Channels in accordance with the terms of this Agreement, Ticketmaster shall inform MSG in writing (email being sufficient) within forty-eight (48) hours of receipt of such offer whether such offer is accepted.  If Ticketmaster is not offered such opportunity, MSG shall pay to Ticketmaster the TM Fees that Ticketmaster would have received on the sale of such Tickets if they had been sold through the Distribution Channels.

3.3.2  If, with respect to a Comparable Venue, Ticketmaster does not impose the limitations set forth in Section 3.3(8) above (the "Fan Club Requirements"), including failure to strictly enforce the requirements to qualify as a Legitimate Fan Club, for a particular event (i.e., a particular performance of a concert series by a specific act) and if, in MSG's judgment, enforcement of Section 3.3(8) with respect to MSG would hinder MSG's ability to attract or host another performance of the same event series at an MSG Venue (i.e., another performance of the same concert series by the same Act), then, upon MSG's request, Ticketmaster shall waive the Fan Club Requirements with respect to such other performance of the same event series at such MSG Venue to the same extent as such Fan Club Requirements have not been imposed by Ticketmaster for the particular event at the Comparable Venue.

3.3.3  Notwithstanding anything contained in this Section 3.3, if Ticketmaster provides a Comparable Venue with the right to distribute tickets with respect to a particular type of event through means other than those set forth in Sections 3.3(1) through 3.3(7) above, it shall notify MSG thereof within a reasonable period of time (provided, any failure by Ticketmaster to provide such notification shall not constitute a breach of this Agreement unless done intentionally) and, upon MSG's request, MSG shall have the right to distribute Tickets through such means for the same or substantially similar type of Event to be held at a MSG Venue.

3.3.4  Will-Call. MSG shall maintain a "will-call window" at each of the MSG Venues for the pick-up of Tickets that are purchased through the Distribution Channels but not delivered by

16

Ticketmaster to the Consumer. Each will-call window shall be open during the normal hours of operation of its respective Box Office, as required for each Event, and shall be operated in a diligent and professional manner. MSG shall notify Ticketmaster of MSG's will-call capabilities and its general will-call Box Office hours for each MSG Venue. MSG shall verify the identity of each person picking up Tickets at will-call via the credit card used in the Ticket sales transaction and shall also make reasonable efforts to verify the identity of each person picking up Tickets at will-call via photo identification. MSG shall not release Tickets to any consumer whose identity has not been satisfactorily verified. All staffing and maintenance costs relating to the set-up and continued operation of the Ticket pick-up window shall be the sole responsibility of MSG.

3.4  Sales Deck.  Ticketmaster shall provide, at no cost to MSG, the Sales Deck software. In connection therewith, Ticketmaster shall provide a total of twenty-five (25) tablets for use across the MSG Venues.

3.5  Licensee Agreements.  Ticketmaster acknowledges that, in some cases consistent with past practice, licensees of the MSG Venues (which licensees are not owned, operated or controlled by MSG) may have separate agreements that do not provide MSG with the authority to sell tickets to such licensee's events (e.g., political conventions), in which cases up to two (2) events per MSG Venue per Contract Year may be specifically excluded from the definition of Events at MSG's sole election. In connection with any negotiations regarding agreements with licensees which do not have such pre-existing agreements with third parties, MSG shall use commercially reasonable efforts to obtain the authority for Ticketmaster to sell tickets to their events and/or to introduce such licensees to Ticketmaster so that Ticketmaster may offer to provide ticketing services.

3.6  Authentication.    Subject to the terms of this Section 3.6, Ticketmaster shall provide Authentication of all Tickets issued through the TM System and all Tickets sold or re-sold via Ticketmaster Resale Platforms. By no later than March 1, 2019, Ticketmaster shall also provide Authentication for Tickets that are not issued through the TM System, as follows:

3.6.1  Reserved.

3.6.2  Primary Sales via Third Party Resale Platforms (Open Distribution).  Ticketmaster shall provide Authentication for all Tickets sold by MSG via 3P Resale Platforms, as defined in Section 3.14 below (upon request by MSG as to specific 3P Resale Platforms). Unless otherwise agreed by the parties, this shall be accomplished by Ticketmaster's provision, with respect to each Ticket transacted or otherwise transferred on the platform of a 3P Resale Platform, of unique identifiers (e.g., bar codes, tokens and/or equivalent successor technology) that enable such 3P Resale Platform to validate, cancel, re-issue and void Tickets in "real time" as Ticket transactions are being conducted. MSG may provide such 3P Resale Platforms with a designation and a license to use MSG's trademarks (including Team trademarks), denoting them as "authorized retailers" or as sellers of "[MSG property (e.g., MSG, Knicks)] Authenticated Tickets" or as otherwise mutually agreed, including the rights to use MSG trademarks solely on their owned websites or in email marketing to customers in their owned databases. For avoidance of doubt, until such time as Authentication is available for the purposes of this Section 3.6.2 and Section 3.14, Ticketmaster will continue to facilitate MSG's sale of Tickets via Ticketmaster's "Trade Desk" platform, consistent with past practice.

17

HIGHLY CONFIDENTIAL

3.6.3  <u>Secondary Sales on Resale Platforms of Authorized Retailers</u>.  Upon request by MSG, subject to the provisions that follow, Ticketmaster shall provide Authentication for Tickets resold or otherwise transferred on the Resale Platforms of Authorized Retailers.

3.6.3.1    Unless otherwise agreed by the parties, this shall be accomplished by Ticketmaster's provision, with respect to each Ticket transacted or otherwise transferred on such Resale Platforms, of unique identifiers (e.g., bar codes, tokens and/or equivalent successor technology) that enable such Authorized Retailer to validate, cancel, re-issue and void Tickets in "real time" as Ticket resale transactions are being conducted.

3.6.3.2  The parties understand and agree that any agreement by Ticketmaster with an Authorized Retailer pursuant to which Ticketmaster provides Authentication in exchange for per-transaction fees paid by such Authorized Retailer ("<u>Authorized Retailer Fees</u>") will, unless otherwise approved in writing by MSG, provide that such Authorized Retailer Fee, on a per-Ticket basis, is at least five percent (5%) of Gross Resale Transaction Value of each Ticket (not including any fees charged by the Authorized Retailer).  Ticketmaster shall be entitled to retain 1.5% of the Gross Resale Transaction Value of such Ticket, and MSG shall receive the remainder of such fee for any Events (excluding, for the avoidance of doubt, Events promoted by Live Nation).  For avoidance of doubt, the parties agree that, should any agreement be entered into with an Authorized Retailer in which the Authorized Retailer Fees are calculated on a basis other than a percentage of Gross Resale Transaction Value (e.g., percentage of ticket price or percentage of revenue), the thresholds set forth above will be adjusted accordingly by the parties to achieve the same results under such basis.

3.6.3.3  Until February 1, 2019, Ticketmaster may contract with potential Authorized Retailers (each an "<u>Authorized Retailer Agreement</u>"), upon such payment terms as are agreeable to Ticketmaster, the Authorized Retailer, and MSG; after such date, MSG can enter into Authorized Retailer Agreements directly with Authorized Retailers, with Authorized Retailer Fees acceptable to MSG (i.e., without Ticketmaster approval), provided that Ticketmaster receives 1.5% of the Gross Resale Transaction Value of each Ticket transacted (or such adjusted threshold amount as may be set pursuant to the last sentence of Section 3.6.3.2), and Ticketmaster will honor such agreements.

3.6.3.4  Ticketmaster shall have the technological capability and a process in place which enables Authentication for actual transactions of Tickets resold or otherwise transferred through Authorized Retailers (i.e., an API) by no later than March 1, 2019.

3.6.3.5  MSG may provide Authorized Retailers with a designation and a license to use MSG's trademarks, denoting them as "authorized retailers" or as otherwise mutually agreed, including the rights to use MSG trademarks solely on their owned websites or in email marketing to customers in their owned databases.

3.6.3.6  Notwithstanding anything else contained in this Section 3.6.3, Ticketmaster shall have no obligation to provide Authentication for any Events promoted by Live Nation Worldwide, Inc. or any of its affiliates ("<u>Live Nation</u>") at any MSG Venues, and Ticketmaster shall not provide such Authentication for any Events promoted by Live Nation or any other promoter without MSG's written consent.

18

3.6.3.7  Notwithstanding anything else contained in this Section 3.6.3 or any other provision of this Agreement, in the event that MSG elects, pursuant to Section 10.3.1 below, that a "soft landing" presentation be made with respect to any MSG Major League Team with respect to any Contract Year, then Ticketmaster shall have no obligation to provide Authentication for the Events of such MSG Major League Team during such Contract Year (unless otherwise mutually agreed upon by the parties).

3.6.3.8  For any Contract Year during the Term in which Ticketmaster provides Authentication for Knicks and/or Rangers Events, the parties will not make the printing of Tickets in PDF form available to Consumers (including Subscribers) of the Team for whom Authentication is being provided (or for either Team, if Authentication is provided for both). For avoidance of doubt, MSG may continue to issue Tickets in printable PDF format until such time as Authentication of third party transactions is available and bar coded Tickets can be eliminated.

3.7  Competitor Products/Services. To the extent that any Ticketmaster competitor providing substantially similar services to the services provided by Ticketmaster to MSG under this Agreement offers any new software functionality or product in North America reasonably related to the services and Software provided by Ticketmaster hereunder for which Ticketmaster does not offer an alternative solution providing materially similar functionality, and MSG requests in writing that such new software functionality or product be provided by Ticketmaster to MSG pursuant to this Section, Ticketmaster shall use commercially reasonable efforts (subject to the following sentence) to promptly develop and offer MSG a solution that is materially similar to the competitor's functionality or product (a "New Offering") at no development cost to MSG, unless it will be offered to MSG on an exclusive basis, in which case MSG and Ticketmaster will mutually agree upon those development costs and transaction fees, if any, that will be borne by MSG. If such New Offering is not provided by Ticketmaster to MSG within one year of MSG's written request therefor, then (i) provided that MSG can demonstrate that it sustains any actual financial loss caused by such failure, the restrictions on Open Distribution set forth in Section 3.14.2.3 hereof shall apply at a limit of fifty percent (50%) of total available inventory (rather than 30%) thereafter until such time as the New Offering is provided to MSG, and (ii) subject to Section 17.4, Ticketmaster shall be liable for any actual financial loss sustained by MSG to the extent caused by a failure to provide such New Offering within such timeframe. If the New Offering is commercialized for use by Ticketmaster clients other than MSG (such that MSG has not contributed to development costs), then MSG shall be entitled to preferred pricing on transaction fees consistent with rates charged by Ticketmaster to Similar Venues utilizing such New Offering.

3.8  No Minimum Sale. Except as otherwise provided herein, it is agreed and understood that neither Ticketmaster nor MSG shall guarantee that any minimum number or fixed number of Tickets will be sold through the TM System.

3.9  New TM Venues. MSG or one of MSG's controlled Affiliates may, during the Term, build, purchase or otherwise acquire a controlling ownership interest in (i.e., greater than 50% ownership of) a new facility, directly or through a wholly-owned subsidiary, the primary purpose of which is the hosting of concerts or sporting events (e.g., stadiums, arenas, theaters, amphitheaters) at which tickets are sold for entry (an "Added Facility"). For avoidance of doubt, venues acquired by an MSG joint venture entity (i.e., 50% or less ownership by MSG or an MSG Affiliate) or an MSG

19

EXECUTION COPY

investment property not primarily in the business of presenting live events (e.g., Tao Group, the Tribeca Film Festival) shall not be deemed "Added Facilities." Any Added Facility that becomes an MSG Venue hereunder, pursuant to this Section 3.9, shall be deemed a "New TM Venue" hereunder. In the case of each Added Facility, the following shall apply:

3.9.1   With respect to (i) any Added Facility outside the United States or (ii) any venue in which MSG or its Affiliate operates and/or holds an ownership interest that is less than a controlling interest, MSG shall have the right, but not the obligation, by notice to Ticketmaster, to treat the venue as an MSG Venue.

3.9.2   If, at the time of MSG's or an MSG Affiliate's acquisition of controlling ownership of a previously-existing Added Facility, there was an agreement or arrangement in place with Ticketmaster with respect to the sale of tickets for events at such Added Facility (a "Ticketmaster/Predecessor Agreement"), then MSG shall have the right to either (i) continue to operate such Added Facility under the terms and conditions of the Ticketmaster/Predecessor Agreement (and the further option to renew such Ticketmaster/Predecessor Agreement under the same terms and conditions for a term not less than the Term of this Agreement), or (ii) subject to Section 3.9.3 below, treat the Added Facility as an MSG Venue under this Agreement. For avoidance of doubt, if, at the time of MSG's or MSG's Affiliate's acquisition of a previously-existing Added Facility, there was an agreement or arrangement in place with a third party ticketing services provider with respect to the sale of tickets for events at such Added Facility (a "Third Party/Predecessor Agreement"), neither MSG nor such Added Facility shall be required to terminate the Third Party/Predecessor Agreement; provided that, unless the Added Facility is subject to Section 3.9.1 above, the addition of the Added Facility as an MSG Venue under this agreement shall automatically occur after the expiration of the existing term, without renewal, of such Third Party/Predecessor Agreement.

3.9.3   With respect to any Added Facility in the United States added during the Term in which MSG or its Affiliate holds a controlling interest, if MSG is seeking an equity investment from its venue ticketing partner for such venue, then MSG shall first offer the terms of such investment to Ticketmaster. If Ticketmaster accepts such terms, then such Added Facility shall become an MSG Venue. If Ticketmaster rejects such investment terms, then MSG may offer such terms (or terms more favorable to MSG) to other ticketing companies and, if any such third-party ticketing company accepts the investment terms, then MSG may contract with such third party to provide ticketing services for such Added Facility (which contract may be renewed as long as such third-party ticketing company continues to be an investor in the MSG Venue). If no such equity agreement is reached with any such third party ticketing companies, or if MSG is not seeking a ticketing partner equity investment with respect to any Added Facility, then, unless the Added Facility is subject to Section 3.9.1 above, such Added Facility will automatically be deemed an MSG Venue hereunder.

3.10   Festivals.  With respect to any music festival in which MSG has invested or may invest, and similar type of event content outside of its venues, MSG shall, in each instance, make good faith efforts to have such festival or similar event engage in discussions to enter into a direct relationship with Front Gate Ticketing Solutions, LLC, Ticketmaster's affiliate which provides ticketing services to such events.

HIGHLY CONFIDENTIAL                                                                LNE-LIT24-001185602

3.11  Dynamic Pricing.  Ticketmaster shall at all times provide MSG with a customized model of the Pricemaster Tool with a dynamic pricing module and the Yield Management Tool for use in connection with all series Events (i.e., long-running multi-date Events, excluding concerts) consistent with past practice, for which TM may charge MSG an annual fee of $150,000 per Contract Year; provided, however, that (i) the Pricemaster Tool shall be updated (or replaced with successor technology) on at least a bi-annual basis, and (ii) MSG may discontinue such services and its obligation to such fee effective upon the conclusion of any applicable Contract Year upon notice to Ticketmaster.

3.12  Hosting Services.  Ticketmaster shall continue to provide Hosting Services (at its cost) to MSG for the use of ARCHTICS and the TM System in connection with the operation of the Platform at the TM Data Center (and if applicable, a DR Site) for the sale, audit and control of Tickets at the MSG Venues.  The TM Data Center is currently in Ashburn, VA.  The TM Data Center shall not be moved (i) without prior notice to MSG, (ii) outside the continental United States and (iii) unless the new location provides a service level at or above the level of service then being provided at the Ashburn location.

3.13  Agreements with Promoters/Artists.  Consistent with past practices of the parties, Ticketmaster shall not, without MSG's written consent, enter into any agreement with any artist, athlete, producer, promoter or other participant in or presenter of (or prospective participant or presenter of) an Event or Events relating to the manner in which Tickets for an Event may be sold or the imposition of any cost to the Consumer or any MSG Venue in connection with the purchase of a Ticket; except, however, that Ticketmaster may enter into deals with promoters pursuant to Section 10.3.3 hereof without MSG's consent, instead providing MSG written notice of such agreements.  In this regard, Ticketmaster may seek MSG's consent to enter into any such agreement with respect to a single manner of sale or imposition of cost (e.g., VIP ticket packages, fan club presales, etc.) with respect to a single Event or series of Events or for all Events on a going-forward basis; provided that, in response to a request for consent for all Events on a going-forward basis, MSG may grant, in its sole discretion, either (i) a "limited approval," i.e., consent to the request for a single Event or series of Events, (ii) a "blanket approval," i.e., consent to the request for all Events on a going-forward basis or (iii) deny the request.  If MSG provides consent but does not specify the type of consent being provided, it shall be deemed a limited approval.  If MSG provides a blanket approval with respect to the Ticketmaster agreements described above, then Ticketmaster shall not be obligated to obtain MSG's written consent to enter into any future agreement with respect to the same manner of sale or imposition of cost on substantially similar terms, subject to Ticketmaster's compliance with its other obligations in this Agreement.

3.14  Open Distribution of Primary Sales.  Notwithstanding anything contained in Section 3.2 above, Ticketmaster shall provide to MSG, at no additional cost to MSG (except as set forth in Section 3.14.2.5 below), all tools and technology required to enable a multi-channel distribution system ("Open Distribution") for Primary Sales for Events through participating resale marketplaces selected by MSG in its sole discretion, such as StubHub.com, SeatGeek.com, etc. (each, a "3P Resale Platform"); provided that each such 3P Resale Platform (i) agrees to be bound by Ticketmaster's standard and reasonable API terms of use, (ii) meets Ticketmaster's minimum technology requirements for integration with Ticketmaster's Open Distribution tools such that Ticketmaster is not required to incur additional development costs in respect of such marketplace, and (iii) provides Ticketmaster and MSG the Consumer and transaction data (on a disaggregated

21

basis) relating to such Primary Sales. For avoidance of doubt, such Ticketmaster-provided tools and technology for this purpose shall include, but not be limited to, AutoProcessor or its successor technology. Ticketmaster's enablement of Open Distribution shall include a Ticketmaster-provided centralized inventory management system that will enable MSG to allocate and manage primary Ticket inventory for the MSG Properties across multiple 3P Resale Platforms.

3.14.1   Notwithstanding anything to the contrary above, MSG shall be solely responsible for any seller fees charged by the applicable 3P Resale Platform in connection with MSG's Primary Sale of Tickets through such 3P Resale Platform.

3.14.2 MSG may sell Tickets via 3P Resale Platforms using Open Distribution solely for MSG Major League Teams, MSG-Promoted Non-Owned Events and MSG-Owned Non-Major League Content, subject to the following limitations:

3.14.2.1   No Ticket inventory for an Event may be made available by MSG through a 3P Resale Platform during the first forty-eight (48) hours of the public on-sale for such Event.

3.14.2.2   Any Ticket inventory made available to Consumers by MSG through a 3P Resale Platform must also be made available simultaneously via Ticketmaster channels, and such Ticket inventory may only be made available on a 3P Resale Platform at prices that are no less than the pricing of such Ticket inventory on Ticketmaster channels.

3.14.2.3   With respect to each of the MSG Major League Teams and the MSG-Owned Non-Major League Content, MSG may distribute for sale up to thirty percent (30%) of total available inventory (i.e., available inventory less Subscriptions, group ticket sales and customary holds consistent with past practice) per single Event, in the aggregate, through and among any combination of 3P Resale Platforms. (For example, for an Event with a capacity of 19,000, for which there were 13,000 Subscriptions, and for which 1,000 Group Tickets were sold and 1,000 Tickets were held as customary holdbacks, the available inventory would be 4,000 Tickets (19,000-13,000-1,000-1,000), and MSG could distribute a total of 1,200 (30% of 4,000) Tickets for sale among any combination of 3P Resale Platforms). Such limit will be determined and agreed upon, as to different types of Events, prior to the start of each season as a maximum number of tickets eligible to be distributed, and such limit will be pre-programmed into the above-referenced centralized inventory management system.

3.14.2.4   In the event that new Subscription sales or Group Sales are knowingly made by MSG to professional ticket brokers for the purpose of distribution on MSG's behalf, or with MSG's financial participation in any such broker's distribution, through third party marketplaces, that inventory will be deducted from the 30% eligible for direct posting by MSG to 3P Resale Platforms, and MSG shall use commercially reasonable efforts to ensure that such tickets are simultaneously listed on Ticketmaster channels, provided that such simultaneous listing has been made technologically available by Ticketmaster to MSG. Without limiting the foregoing, while MSG may sell Tickets to or through ticket brokers, it may not do so with the intention of circumventing the 30% limit set forth above.

3.14.2.5   The parties acknowledge and agree that Ticketmaster shall be entitled to retain a fee on each Primary Sale of Tickets sold through a 3P Resale Platform via Open Distribution in an amount equal to the applicable TM Fee set forth in Section 9.2.1.

22

3.15 <u>Automated Hold Management Feature</u>. Ticketmaster shall provide to MSG, at no additional cost to MSG, all tools and technology required to enable MSG to easily, with respect to any particular Event, have the relevant Venue Page show only a certain percentage (to be determined on a case-by-case basis by MSG) of available remaining inventory; provided that any Tickets which are not shown as available inventory using such feature shall not constitute Tickets which are part of a "customary hold" for purposes of determining available inventory under Section 3.14.2.3 above.

3.16 <u>Credit Card Control and Purchase Information</u>. Unless otherwise instructed by MSG, Ticketmaster shall provide the following services with respect to MSG's then-current credit card sponsor (the "<u>Card Sponsor</u>"), at no additional cost to MSG or the Card Sponsor:

3.16.1 Ticketmaster shall "gate" purchases of Tickets reserved for any preferred seating program of a Card Sponsor, as identified to Ticketmaster by MSG, such that such Tickets can only be purchased by Consumers using the Card Sponsor's payment cards or technologies;

3.16.2 Ticketmaster shall at all times make any such preferred seating program an available Ticket type at all purchase points, including via mobile application;

3.16.3 Ticketmaster shall provide to MSG daily reports, covering the prior day, showing detailed data, including, but not limited to, on a per-transaction basis, the following: Event, Ticket type (e.g., plan, individual, group, etc.), number of tickets, total price paid, whether or not preferred seating program Tickets, and traffic source (including any available pixel information). In addition, Ticketmaster shall provide to MSG an annual report, covering the preceding Contract Year, which identifies MSG's Card Sponsor's Ticket purchasers for any MSG Major League Teams, Non-MSG-Owned Events and MSG-Owned Non-Major League Content; and

3.16.4 Ticketmaster shall work in good faith with MSG and its Card Sponsor, upon MSG's request, to timely enable Customers to utilize such Card Sponsor's specialty payment methods in purchasing Tickets through the TM System, as well as to implement and enable such other Card Sponsor technologies as may be requested by MSG on a mutually agreed time frame.

3.17 <u>"Tickets Available" Feature</u>. Ticketmaster shall provide a feature that functions such that, whenever an Event is sold out of a particular ticket type (e.g., preferred seating program Tickets, Tickets attached to a discount code), the Event Detail Page informs the Consumer that other Ticket types may still be available and instructs the Consumer to "select all Ticket types" or similar language.

## ARTICLE IV

## HARDWARE AND SOFTWARE; HOSTING SERVICES

4.1 <u>Ticketmaster Obligations with Respect to Hardware and the Platform</u>. Ticketmaster, at its sole cost and expense, shall provide MSG with the Hardware, including at least those items described in Exhibit A hereto, throughout the Term.

23

 LNE-LIT24-001185605

4.1.1 <u>Installation and Repair</u>.  In installing any new Hardware, Ticketmaster agrees to install it using qualified personnel so as not to affect negatively the existing union jurisdictional requirements for labor relations at the MSG Venues, nor interfere with the ordinary business of the Box Offices (or other operating departments of the MSG Venues) and Ticket sales.  The number of terminals to be installed at the Box Offices at each MSG Venue shall be determined by MSG in its sole discretion.  Upon request by MSG, Ticketmaster shall replace Hardware that MSG, in its reasonable judgment, determines to be unsatisfactory.

4.1.2 <u>Ownership of Hardware</u>.  The Hardware shall remain at all times the sole and exclusive property of Ticketmaster and may be used by MSG only according to the terms and conditions of this Agreement.  Ticketmaster will place or request that MSG place on the Hardware a notice to the effect that Ticketmaster is the sole owner of the Hardware.  Nothing contained herein may be used to claim or infer that title to the Hardware has in any manner or at any time passed to MSG.  If requested by Ticketmaster, MSG will obtain a certificate satisfactory to Ticketmaster from all parties with a real property interest in the premises wherein the Hardware may be located waiving any claim with respect to the Hardware.  Except as may be necessary to prevent damage to or destruction of the Hardware, MSG will not move the Hardware nor permit such Hardware to be moved from any of the MSG Venues without Ticketmaster's consent, which consent shall not be unreasonably withheld, and shall give Ticketmaster prompt written notice of any attachment or other judicial process affecting any item of Hardware.

4.1.3 <u>Upgrades</u>.  Ticketmaster shall replace, at its cost, all Hardware that is obsolete or that MSG and Ticketmaster otherwise mutually and reasonably determine requires replacement, and shall make all changes and updates on a timely basis.  All proposed or planned Software upgrades, new releases and/or additional modules, including without limitation, any planned modification or upgrade to ARCHTICS or the Platform (but excluding, for the avoidance of doubt, minor updates such as patches and bug fixes), must be communicated to MSG in writing at least one month prior to the proposed date of installation, modification and/or upgrade (an "<u>Upgrade Notice</u>").  The Upgrade Notice shall include the complete release notes and/or a roadmap/chart or outline of proposed functionality and features, and set forth all proposed data format or interface protocol changes, if any.  No change, modification or upgrade by Ticketmaster to ARCHTICS or the Platform that would require or result in (A) any change to the structure or organization of any of the MSG Consumer Data or the MSG Information (and/or either of their storage allocations on MSG's Ticket Network), (B) any rewrites or changes to interfaces or data feeds between the Platform and MSG's Ticket Network or (C) an upgrade or change to the AccessManager application, shall commence unless and until each of the following has occurred: (i) MSG receives the above-described Upgrade Notice; (ii) MSG approves any such change, modification or upgrade testing prior to its release or implementation, such approval not to be unreasonably withheld; and (iii) Ticketmaster works with MSG's staff to conduct the upgrade testing plan, to MSG's reasonable satisfaction, to ensure that the services provided by Ticketmaster hereunder will be uninterrupted by the modification and/or upgrade and error-free.  Notice of bug fixes and patches will be provided to MSG as soon as practicable and worked on a case-by-case basis in accordance with applicable response times as determined by the severity of the issue as set forth in Article VI below.  Ticketmaster shall not undertake a major upgrade during the last quarter of MSG's

24

fiscal year (i.e., currently, during the period from April 1 through June 30) without the prior written consent of MSG.

4.1.4  Return of Hardware.  Subject to Section 13.7 below, upon termination of this Agreement for any cause whatsoever, MSG shall return to Ticketmaster all Hardware and other materials that are the property of Ticketmaster.  Ticketmaster shall be entitled to reasonable access to the MSG Venues in order to reclaim the Hardware; provided, however, that such access does not interfere with the operation of the Box Office or other areas of the MSG Venues or any other activities of MSG within or outside of the MSG Venues.

4.1.5  Hosting Services.  Ticketmaster shall operate ARCHTICS and the TM System (and/or any successor technologies to either) on the Platform to provide the Hosting Services and comply with the following:

4.1.5.1  Ticketmaster shall provide MSG with full use of ARCHTICS and regular access to all MSG Information contained thereon as MSG deems useful and/or necessary for all Ticket sales/purchasing and management for the MSG Venues.

4.1.5.2  Ticketmaster shall ensure that the Platform will interface with and integrate the multiple data feeds of the following systems on MSG's Ticket Network: the Box Offices' ticketing systems, Acxiom (or any other data provider that MSG may elect to use, subject to a commercially reasonable time frame for integration with the Platform), Oracle, MSG's current data platform, MSG's current Customer Resource Management (CRM) system and any other MSG systems as mutually agreed to by the Parties; provided that, in each case, the applicable third parties meet Ticketmaster's reasonable technology requirements for integration, and the completion of such integration is subject to a commercially reasonable time frame.  Ticketmaster shall maintain connectivity among the foregoing systems.

4.1.5.3  Ticketmaster shall continue to provide MSG with (i) a daily feed of cleansed Daily Transaction Data and (ii) an automated script that will allow MSG to obtain Daily Transaction Data from the Platform.  Ticketmaster shall also promptly put in place, and communicate to MSG, a process whereby problems with the daily feed of Daily Transaction Data, as well as data feeds of any other data that MSG receives pursuant to this Agreement (e.g., MSG Consumer Data) can be escalated for prompt resolution.

4.1.5.4  Ticketmaster shall provide MSG with data derived from TM System transactions with the same level of detail as that of data from ARCHTICS, including, but not limited to, data as to Ticket sales (primary and secondary), Consumer details, pricing components, Event metadata, manifest details and inventory availability.  Ticketmaster shall provide MSG with such data derived from Open Distribution transactions via 3P Platforms to the extent such data is provided to Ticketmaster by the applicable 3P Platforms.

4.1.5.5  All MSG Information shall be housed on Hardware under the complete dominion and control of Ticketmaster (or a third party approved by MSG, such approval not to be unreasonably withheld) in Ticketmaster's TM Data Center (including all DR Sites, as applicable), securely maintained in accordance with MSG's Data Security Addendum (the "Data Security Addendum"), attached hereto as Exhibit D.

4.1.5.6  With respect to Ticketmaster's obligations herein to provide Consumer and transaction data to MSG, Ticketmaster shall reasonably promptly transition from file-based

25

communication of such data to (i) real-time data feeds via secure APIs and/or CopyNode or any successor technology (provided that, if such transaction data is not delivered in any particular instance via CopyNode, then, in addition to delivery by APIs, it will also be delivered in a file-based form) and (ii) provision to MSG of access to a reporting data virtual warehouse from which data can be extracted in bulk by MSG in near real-time (i.e., CopyNode or any successor technology used by Ticketmaster).

4.1.6. The Platform shall include, without limitation:

4.1.6.1 Support for all locally-run Software of the most-current Microsoft Windows operating system and, at appropriate times, the prompt transition to either web-based or thin client delivery with respect to all Software.

4.1.6.2 Provision and support of necessary communications utilizing secure internet channels.

4.1.6.3 Security to prevent hacking/third-party access to the TM Data Center and all DR Sites, the TM System, the Platform, MSG Consumer Data, MSG Information and MSG's Ticket Network, and to secure the communications links between MSG's Ticket Network and the Platform, all of which shall enable Ticketmaster to strictly comply with and enforce the data protection requirements and policy specifically set forth in Section 4.1.7 below, and the Data Security Addendum.

4.1.6.4 Change control processes (including an audit trail) that will enable Ticketmaster to ensure that any upgrades or changes to the Software, including but not limited to ARCHTICS, or the TM System will not have any material (e.g., subject to reasonable throttling) impact on the Platform or the operation of MSG's Ticket Network or its components (i.e., require or result in any rewrites or changes to interfaces or data feeds (absent compliance with the Upgrade Notice provision set forth in Section 4.1.3 above)).

4.1.6.5 Periodic backup of MSG Information no less frequently than daily, with a weekly cumulative backup; and

4.1.6.6 Full compliance with the server redundancy and DR Requirements as set forth and/or referenced in Section 6.3 below.

4.1.7 Legal Compliance. In delivering the Platform (and otherwise in its performance under this Agreement), Ticketmaster shall:

4.1.7.1 Strictly comply with and enforce MSG's data protection requirements and policy as specifically set forth in the Data Security Addendum, and provide to MSG regular (timing to be mutually determined) information security reports (e.g., vulnerability scans, penetration testing results, remediation efforts);

4.1.7.2 Strictly comply with the Sarbanes-Oxley Act of 2002, providing such evidence thereof as may be reasonably requested by MSG in accordance with past practice; and

4.1.7.3 Strictly comply with the Payment Card Industry Data Security Standard ("PCI-DSS"), providing such evidence thereof as may be reasonably requested by MSG in accordance with past practice, and (i) provide a mechanism for all Consumers (and MSG, during any Ticket sales) to input credit card data and transact directly with Ticketmaster

26

(including mobile purchases), and (ii) provide point-to-point encryption (P2PE), conforming with the standards and requirements of the PCI Security Standards Council.

4.1.8  MSG's Designees. All services to be provided by Ticketmaster pursuant to this Article IV shall be coordinated with MSG's Chief Information Officer and MSG's Vice President, Ticketing Operations, and/or their respective designees.

4.1.9  Bandwidth. All bandwidth costs, electrical costs, equipment leasing costs, capital costs or other costs associated with the Hosting Services provided hereunder shall be borne solely by Ticketmaster, except that the costs for any internet circuits for any MSG Venue shall be borne by MSG. MSG shall be further responsible for providing, at each MSG Venue, remote desktop connectivity to the Platform, as well as any necessary security patches and maintenance of the foregoing, in each case that are compatible with and supported by the Platform and ARCHTICS and as otherwise set forth in Exhibit D.

4.2  Telephone Sales

4.2.1  Phone Centers and Online Response. Ticketmaster agrees to maintain and operate a phone center for taking orders for purchases of Tickets and related products through MSG's telephone number or the general Ticketmaster phone number.

4.2.2  Response Time. The Ticketmaster phone center shall at all times have sufficient staff and phone lines such that on a normal Ticket sales day (e.g., days on which there are no major on-sales), prospective Consumers shall not have to wait more than three and one-half minutes (3:30) on hold, on the average, after requesting to speak with a Telephone Sales representative, or five minutes (5:00) on hold, on the average, after requesting to speak with a customer service representative, provided that a breach of this Section 4.2.2 shall not constitute a material breach of this Agreement unless it occurs on a regular basis.

4.2.3  Telephone Lines. Ticketmaster shall at all times maintain as many telephone lines as are necessary to meet its obligations under Section 4.2.2 above. While Consumers are on hold after reaching Ticketmaster through one of the dedicated numbers described in Section 4.2.4 below, there shall be no promotion or advertisements.

4.2.4  MSG Dedicated Numbers. Ticketmaster and MSG may each include separate telephone numbers in any advertisements for Ticketmaster and any MSG Venue at which an Event is taking place. For the avoidance of doubt, neither party shall have any obligation to include telephone numbers in any advertising for Tickets to Events. Ticketmaster will dedicate one or more phone numbers exclusively to the Events.

4.2.5  Telephone Room Personnel. Ticketmaster shall have, in the Ticketmaster phone center, (i) personnel available to receive telephone Ticket orders between the hours of 9:00 a.m. and 6:00 p.m. (in the time zone of the relevant MSG Venue), Mondays through Saturdays, and between the hours of 12:00 p.m. and 6:00 p.m. (in the time zone of the relevant MSG Venue) on Sundays, and such telephone service will be adequately staffed to satisfy Ticketmaster's obligations pursuant to Section 4.2.2 above, and (ii) personnel available for customer service support between the hours of 9:00 a.m. and 8:00 p.m. (in the time zone of the relevant MSG Venue), Mondays through Saturdays, and between the hours of 9:00 a.m. and 6:00 p.m. (in the time zone of the relevant MSG Venue) on Sundays.

27

4.3  MSG Use of ARCHTICS and the Products.  Ticketmaster shall provide MSG the full use of ARCHTICS at Ticketmaster's cost as MSG deems useful for all Tickets.  Ticketmaster shall also provide MSG with the other Products pursuant to the provisions of Section 3 of Exhibit B attached hereto.

4.4  Accessible/Handicap Seating Requests.  Ticketmaster shall service telephone requests for handicap seating at the MSG Venues (utilizing a script and/or procedures provided by MSG), as requested by MSG, provided that Ticketmaster shall refer any such request to the Box Offices if the caller prefers to deal directly with MSG, it being understood and agreed that MSG's policies and procedures with respect to accessible/handicap seating comply with (and are subject to) all applicable federal and local laws.

4.5  Reserved.

4.6  Websites.

4.6.1  Seamless Deep Hyperlink Connection.  MSG's Websites (as defined in Section 8.4 below) shall seamlessly connect to the Ticketmaster Website through either I-frames or a commercially available API (or any successor technology agreed upon by the parties).

4.6.2  Bandwidth.  The bandwidth of the Ticketmaster Website shall be sufficient to provide the highest level of customer service, including accommodating the demands presented in connection with "first-day" sales and/or presales of concerts and other Events.

4.6.3  Privacy Policy.  The Ticketmaster Website will include an industry standard privacy policy.

4.7  Database System.  Ticketmaster shall maintain a current database system (i.e., the TM System and no more than six (6) ARCHTICS databases and/or their successors, unless otherwise mutually agreed) which combines several of the MSG Venues (the "Central Computer").  Ticketmaster shall ensure that the Central Computer includes the other existing MSG Venues and/or any New TM Venues upon request by MSG.  The Central Computer shall perform at a level of performance that is no less than either (i) that provided as of the execution of this Agreement or (ii) industry standard.  The Central Computer shall be in operation twenty-four hours per day every day of the Term (other than mutually agreed upon downtime for maintenance), and will be adequately staffed to perform all ongoing assistance, maintenance and repair services required to be provided by Ticketmaster under this Agreement.  Ticketmaster shall, at its sole cost and expense, maintain a central computer facility for all Distribution Channels, as required, for the operation of the TM System.  The Central Computer shall be used exclusively for Events.

4.7.1  Raw Data Access.  MSG shall have near real-time access via secure APIs and/or CopyNode or any successor technology (provided that, if such transaction data is not delivered in any particular instance via CopyNode, then, in addition to delivery by APIs, it will also be delivered in a file-based form) to current raw data collected from each Ticket sale, as well as other available Event data, and stored on the Central Computer and access to Raw Month-End Transaction Data for the prior seven calendar years, as soon as possible upon request.  MSG shall have the ability to generate configurable standard reports from the Ticket sales and Event data that are stored on the Central Computer.

28

4.7.2  Web and Purchaser Data; Other Ticketmaster-provided Information.  Ticketmaster shall provide MSG with the following web and purchaser data and other information:

4.7.2.1  Source external URLs for conversions of Ticket purchases;

4.7.2.2  Browsing/purchasing behavior (for Events) utilizable for MSG's segmentation targeting and analysis, to be provided programmatically and in near real time;

4.7.2.3  Information on purchase path abandonment by potential Consumers (where and how many at each point) for the Events;

4.7.2.4  Utilization of MSG's tags on the Ticketmaster Website in order to track and report on Consumer behavior, and access to purchasing information (including first and last name, email address, order confirmation number, and ARCHTICS identification number) for the purpose of segmentation and targeting;

4.7.2.5  Standard data reports as provided to other Ticketmaster clients solely relating to MSG Consumer Data, which reports, whether sourced from the TM System or ARCHTICS or any other Ticketmaster data repository (including CopyNode), shall have the same level of detail as MSG has received in past practice on ARCHTICS reports;

4.7.2.6  Benchmarking data to establish market trends, utilizing data obtained through ticket sales transactions at Similar Venues;

4.7.2.7  Payment type and device used, including bank issuers of credit cards used, and encrypted token identifiers;

4.7.2.8  Information on all Consumer and internal MSG holds of seats for Events;

4.7.2.9  Up-to-date pricing information for actual Ticket sales using promotional codes via secured APIs and via CopyNode (or any successor technology);

4.7.2.10  IP addresses of Consumers; and

4.7.2.11  Other data reasonably requested by MSG relating to the Events, provided that the provision of such data shall not require Ticketmaster to incur any incremental cost, or as otherwise mutually agreed to by the parties.

4.7.3  Appends.  For all Tickets purchased, Ticketmaster shall provide to MSG, via direct data feed through secure commercially available APIs (or any successor technology used by Ticketmaster), to the extent available the followings basic "appends" with respect to the purchasing Consumer: name, address, phone number, e-mail address, age, gender, income, occupation, education, marital status, and any other appends available to Ticketmaster without its incurrence of an incremental cost as of the request for such appends by MSG (i.e., if such appends are already in TM's possession as of the request).  With respect to any appends requested by MSG for which Ticketmaster incurs an incremental cost, Ticketmaster shall provide such appends to MSG at a rate no higher than the rate Ticketmaster charges its other clients for such appends; provided that such appends may be provided by Ticketmaster using its LiveAnalytics service.

4.7.4  TM.com/Stage.  Ticketmaster shall provide MSG with access to TM.com/Stage, which shall enable MSG to (i) walk through the entire ticket purchasing process from the main page

29

up through the transaction page, without completing a transaction, for all Events (ISM and non-ISM) and (ii) preview and check for accuracy on the Venue Pages (as defined in Section 8.4 below) artist/Event image, primary and secondary act listing, pull-down menus, notes, on-sale times, maps associated with the Event, presale/post-sale, offer and package descriptors, prices, seat locations and promotional codes for all shows of an engagement.

4.7.5  Unified Database.  Ticketmaster shall provide support for any endeavor undertaken by MSG to unify multiple ARCHTICS databases into a single ARCHTICS database.

4.8  Consumer Data.  Ticketmaster shall promptly provide to MSG all MSG Consumer Data that Ticketmaster collects via Ticket purchases or otherwise obtains, and MSG shall solely retain rights in all MSG Consumer Data regardless of whether such data is redundant to any Ticketmaster Consumer Data, subject to the terms hereof.  Ticketmaster shall have the right to use MSG Consumer Data for customer service related to Ticket purchases, Ticket fulfillment and notification and Consumer preferences, including any Alerts to the extent that the Consumer has opted in to receive the Alerts, but no other use.  Ticketmaster shall solely retain rights in the Ticketmaster Consumer Data, subject to the terms hereof.  MSG and Ticketmaster shall share with each other all, and shall jointly retain rights to, Resale Consumer Data.

4.8.1  Compliance with Law.  Both parties agree to use their respective consumer data only in compliance with all applicable laws and administrative rulings (U.S. and foreign) and in accordance with their own posted privacy policies.

4.8.2  Ticketmaster Privacy Policy.  Ticketmaster's privacy policy shall expressly state that consumer data may be shared with MSG.

4.8.3  Restrictions on Ticketmaster Use.  Ticketmaster will not share any MSG Information or MSG Consumer Data with any third party, absent express prior written consent from MSG in each instance, and Ticketmaster may not provide any MSG Consumer Data to any third parties, nor use such MSG Consumer Data to market or promote events at venues other than the MSG Venues in the New York Metropolitan Area, the Chicago Metropolitan Area, the Los Angeles Metropolitan Area, or the metropolitan area of any New TM Venue, where such venues are Similar Venues to any MSG Venue located in the same metropolitan area, without MSG's consent.

4.8.4  Consumer Data Indemnification by MSG.  MSG agrees to indemnify Ticketmaster and its Affiliates, and their respective officers, directors, employees and agents and their respective successors and assigns (collectively, the "Ticketmaster Indemnitees") against, and hold the Ticketmaster Indemnitees harmless from, all claims, actions, damages, expenses (including court costs and reasonable attorneys' fees), obligations, losses, liabilities and liens, imposed on, incurred by, or asserted against, the Ticketmaster Indemnitees occurring as a result of (i) a claim that Ticketmaster's release of the MSG Information, MSG Consumer Data or Resale Consumer Data to MSG violates any applicable (United States or foreign) law, rule or regulation, including without limitation Canada's Personal Information Protection and Electronic Documents Act, as long as such information and/or data was collected by Ticketmaster in compliance with applicable law, or (ii) MSG's use of MSG Consumer Data or Resale Consumer Data, except to the extent that any such claim relates to Ticketmaster's negligence or willful misconduct with respect thereto.

30

4.8.5  Consumer Data Indemnification by Ticketmaster.  Ticketmaster agrees to indemnify MSG and its Affiliates and members and their respective officers, directors, employees and agents, and their respective successors and assigns (collectively, the "MSG Indemnitees") against, and hold the MSG Indemnitees harmless from, all claims, actions, damages, expenses (including court costs and reasonable attorneys' fees), obligations, losses, liabilities and liens, imposed on, incurred by, or asserted against, the MSG Indemnitees occurring as a result of (i) a claim that Ticketmaster's collection or use of the Ticketmaster Consumer Data or Resale Consumer Data, or collection of the MSG Information, MSG Consumer Data or Resale Consumer Data, violates any applicable (United States or foreign) law, rule or regulation, including without limitation Canada's Personal Information Protection and Electronic Documents Act or (ii) Ticketmaster's use of the Ticketmaster Consumer Data or Resale Consumer Data, except to the extent that any such claim shall relate to MSG's negligence or willful misconduct with respect thereto.

4.9  Training and Other Services.  Ticketmaster shall also provide to MSG, at no additional cost or expense, the following:

4.9.1  All training services (together with written operating manuals as available) for employees of MSG whom MSG determines, in its reasonable discretion, would benefit from such training;

4.9.2  Reasonable maintenance of the Hardware;

4.9.3  A team of experienced, well-rounded client representatives who will be available on a non-exclusive full-time, year-round (uninterrupted) basis to MSG, provided that (i) MSG shall be consulted on the selection of the client representative assigned to MSG and (ii) MSG shall have the right, in its reasonable discretion, to reject any proposed client representative or to demand a replacement of the client representative then providing services (whether or not previously approved by MSG), and, under such circumstances, Ticketmaster shall promptly replace such client representative; and

4.9.5  Monitoring of the TM System on a 24-hour-per-day, 7-day-per-week basis.

4.10  Access Control Systems.  Ticketmaster agrees to provide MSG with AccessManager, TM Presence and any other successor Access Control System used by Ticketmaster, and all hand-held scanners and other related standard Hardware for exterior venue entry (but excluding automated kiosks or other unmanned equipment), at no cost to MSG.

4.11  Ticket Stock.

4.11.1  Advertisement.  Subject to the terms of this paragraph, MSG shall have the option of (i) obtaining sufficient quantities of Ticketmaster ticket stock to issue Tickets, at Ticketmaster's cost, in which case Ticketmaster shall be entitled to retain all advertising revenue with respect to such Tickets (provided that Ticketmaster shall not sell advertising on such Tickets to competitors of MSG's sponsors, as directed by MSG in advance of MSG's request for Ticket stock at Ticketmaster's cost), or (ii) printing its own Ticket stock to its specifications, at MSG's cost, in which case MSG shall be entitled to sell and retain all revenue from advertising with respect to such Tickets.  Ticketmaster shall ensure that the Ticket Back Text (as defined in Section 4.11.2 below) contains no Ticketmaster branding except for a graphic Ticketmaster or Ticketmaster Resale Platforms logo depiction, unless the relevant

31

Event is promoted by Ticketmaster or any of its affiliates. Notwithstanding anything else contained in this Section 4.11, to the extent that MSG incurs incremental out-of-pocket costs for new Ticket stock (e.g., RFID) due to adopting TM Presence and/or eliminating delivery of Tickets via PDF (Portable Document Format), Ticketmaster shall reimburse MSG with respect to such incremental out-of-pocket costs, including for purchase or production of additional hard stock Tickets or for the addition of any technological component (e.g., RFID) to Ticket stock, subject to a cap on such reimbursed costs of $100,000 per Contract Year; provided that, should MSG be required to incur such incremental out-of-pocket costs in excess of $100,000 per Contract Year, MSG shall be under no obligation to adopt TM Presence at any such MSG Venue.

4.11.2 <u>Ticket Back Text</u>. The parties agree that any printed Ticket sold or forwarded by Ticketmaster, including those printed by the Consumer via TicketFast, shall have certain language printed on its back (or in the case of TicketFast Tickets, on the bottom of the page on which the Ticket is printed), which shall include, without limitation, a disclaimer respecting refunds, the purchaser's assumption of risk of injury, and other relevant information necessary under New York law or otherwise deemed appropriate by MSG (the "<u>Ticket Back Text</u>"), subject to space limitations, provided that Tickets to be picked up at the Box Office pick-up window may, subject to Section 4.11.1, be printed on MSG's own Ticket stock, utilizing its own ticket back text, in which case Ticketmaster shall have no obligations as set forth above in this Section 4.11.2 with respect to such ticket back text. Ticketmaster shall print all such legally required notices and other appropriate information, as mutually agreed upon, on all Tickets sold or forwarded by it (in substantially the same size type face as has been used by Ticketmaster on its stock for Tickets sold by Telephone Sales or through Ticketmaster's Internet Website on behalf of MSG in the past), other than Tickets to be picked up at the Box Office pick-up window, which shall be printed by, and be the sole responsibility of, MSG. Ticketmaster shall indemnify MSG against any fines arising directly from Ticketmaster's failure to conform to the Ticket Back Text requirements provided herein with respect to Tickets sold or forwarded by Ticketmaster.

4.11.3 <u>Ticket Stock Risk of Loss</u>. MSG shall be responsible for the security of ticket stock in its possession, and risk of loss of such ticket stock shall shift to MSG upon the receipt thereof by MSG or MSG's authorized representatives, agents or employees. MSG shall assume the expense of design and production for all special stock used for such Subscription Tickets and Box Office Tickets.

4.12 <u>Permits</u>. MSG is responsible for obtaining all licenses, permits, registrations and authorizations as may be required for the presentation of each Event.

4.13 <u>Event Agreements</u>. MSG is responsible for securing the rights to present each and every Event by binding agreement, contract or other legal means and shall, upon the reasonable request of Ticketmaster, immediately provide Ticketmaster evidence of such right.

4.14 <u>Use of Hardware and Software</u>. Subject to Section 3.6 above and Section 13.7 below, the Hardware and Software and all materials provided by Ticketmaster related to such Hardware and Software may only be used by MSG in connection with systems used, operated and owned by Ticketmaster, and only for the purposes stated in this Agreement, and may not be utilized with any third party provider except as expressly permitted in this Agreement or otherwise by Ticketmaster

in writing. MSG shall use the Hardware in a careful and proper manner and shall comply with and conform to all federal, state, county, municipal and other laws, ordinances and regulations in any way relating to the possession, use or maintenance of the Hardware. MSG may make copies of ARCHTICS only to be used for archival or backup purposes. Except as otherwise provided in the immediately preceding sentence, MSG shall not (i) permit copying or reproduction of the Hardware or Software in any manner, including without limitation, use in a sharing arrangement or transmission over the internet or over e-mail and similar electronic transmission, (ii) disassemble, re-manufacture, repair, re-configure, enhance, upgrade, modify, translate, adapt, create derivative works from, decompile or reverse engineer the Hardware or Software in any way, nor merge them into any other program for any purpose, (iii) transfer, license or sub-license, assign, rent, sell, grant, publish, disclose, display, dispose of or otherwise make available the Hardware or Software, or any rights therein or copies or derivatives thereof, including other templates or working systems, to a third party, (iv) delete, remove, change or otherwise alter any trademarks, copyright notices or other proprietary marks in or on the Hardware or Software, or any copies, modifications or partial copies thereof, (v) hack, or attempt to hack, any of the Software, the servers on which the Software is hosted or any other portion of the TM System, or otherwise attempt to circumvent, or navigate outside of the borders of the Software servers in any manner whatsoever without the assistance (and at the express direction or approval) of Ticketmaster or (vi) use the Hardware or Software in conjunction with any other ticket distribution company and/or software other than Ticketmaster's software or products, except as expressly permitted in the Agreement. Neither MSG, nor its employees, agents, servants or representatives, shall alter, modify, copy or add to the Software without the prior written consent of Ticketmaster. Nothing herein shall be construed to limit MSG's use of its own hardware and software.

4.15 <u>Ticketmaster Technological Investment</u>. During the Initial Term, Ticketmaster shall, in its reasonable business judgment, invest substantially in the Hardware, the Software and other technologies and the various services it is obligated to provide to MSG under this Agreement (each example thereof, a "<u>Ticket Services Technology</u>").

4.15.1 <u>Technology and Development Goals</u>.

4.15.1.1 Ticketmaster will meet the "MSG-TM Technology Development Plan," attached hereto as Exhibit G, and the items included therein shall be completed upon the timelines set forth therein or otherwise agreed upon by the parties.

4.15.1.2 MSG may designate a representative who may participate in the Ticketmaster "product advisory board," as established and operated by Ticketmaster in its discretion.

4.15.1.3 Ticketmaster shall hold an annual (or more frequently, as may be mutually agreed upon) meeting with MSG at which Ticketmaster shall present its plans for future product development, agree on any key technological and other development goals for Ticketmaster's partnership with MSG, discuss trends in the ticketing business, recap any prior Service Disruptions, and discuss Ticketmaster's progress on the technology and development goals referenced in Exhibit G.

4.15.1.4 Ticketmaster shall offer MSG the opportunity to utilize any new product or service developed by Ticketmaster (or its Affiliates to the extent that such product or service is provided in connection with the sale or distribution of tickets) no later than such time Ticketmaster (or its Affiliate) offers such product or service to any other party.

33

LNE-LIT24-001185615

4.15.2 <u>MSG Discretion</u>.  Except as set forth in Section 3.6.3.8 above, MSG shall determine, in its sole and absolute discretion, whether and when it will adopt any new Ticket Services Technology, and Ticketmaster shall provide and support all currently provided (or later provided and MSG-adopted) Ticket Services Technology until such time as MSG adopts any successor or replacement Ticket Services Technology.

4.16  <u>Use of Hardware</u>.  MSG shall use the Hardware in a careful and proper manner and shall comply with and conform to all federal, state, municipal and other laws, ordinances and regulations in any way relating to the possession or use of the Hardware.  Neither MSG, nor its employees, agents, servants or representatives, shall alter, modify, copy or add to the Hardware or Software without the prior written consent of Ticketmaster.

## ARTICLE V

### SOFTWARE LICENSE

5.1   <u>Nonexclusive License</u>.   Ticketmaster  hereby  grants  to  MSG  a  nonexclusive  and nontransferable, royalty-free right to use all the Software at MSG's place of business, at the TM Data Center and at the locations at which Ticketmaster installs such Software for MSG according to the terms and conditions contained herein during the Term and any Transition Period as applicable.

5.2 <u>Software Upgrades</u>.  Ticketmaster shall provide MSG with modified versions of the Software and updates on a timely basis.  Any replaced Software version shall be returned to Ticketmaster or destroyed as per instructions issued by Ticketmaster to MSG.  All Software upgrades, new releases and additional modules must be communicated to MSG in accordance with the Upgrade Notice requirements set forth in section 4.1.3 above.

5.3 <u>Software Ownership</u>.  It is an express condition of this license that Ticketmaster remains the sole owner of the Software and proprietary documentation and manuals as well as any amendment, enhancement, variation, improvement or any other change thereto, whether made by Ticketmaster or any other person.  For enhancements or improvements that MSG develops for the TM System, Ticketmaster shall be the owner thereof; provided, however, that Ticketmaster agrees to extend MSG a license to use such enhanced and improved TM System during the Term hereof subject to the terms and conditions of this Agreement.

## ARTICLE VI

### MAINTENANCE AND SUPPORT

6.1 <u>General Maintenance</u>.  Ticketmaster shall provide, at no additional charge, maintenance and support of the Hardware and the Software on the terms and conditions set forth in this Article VI and in the service level agreement attached as Exhibit E hereto (the "<u>Service Level Agreement</u>").  Such maintenance shall include maintenance of any enhancements, modifications and/or upgrades to the Software and/or Hardware added by Ticketmaster during the Term.  It shall also include clarification or updates of documentation pertaining to the Software, guidance in the use of the Software and error analysis and correction of Software malfunctions and bugs.  Ticketmaster will

34

maintain the TM System as high quality, "state of the art" technology, as compared with other industry standard technologies for the sale and distribution of tickets. Ticketmaster shall maintain the Platform (including monitoring, upgrades, patches and replacement, each as required) as highest quality, "state of the art" technology, as may be available and in general use in the industry at any time, and at least at the service availability levels set forth in Exhibit E.

6.1.1 Except where the provisions of Section 6.2 apply, Ticketmaster shall respond no later than twenty-four (24) hours after having received any oral or written request by MSG for Hardware or Software maintenance assistance at the Box Offices.

6.1.2 Ticketmaster shall provide MSG with additional "back-up" Hardware and Software for use in the event of any malfunctions of the original Hardware or Software.

6.1.3 If, with respect to a specific Event, there is a critical malfunction of the TM System or a significant failure by Ticketmaster to provide its services in the time and manner proscribed herein, unless the malfunction or the service failure results from events or causes beyond Ticketmaster's reasonable control, in addition to its other obligations under this Article VI, Ticketmaster shall endeavor to provide MSG, or at MSG's direction, MSG's licensee, with reasonable marketing efforts and the like, in consultation with MSG, to promote Ticket sales, provided that nothing herein should be construed to limit MSG's remedies as the result of an event of default as set forth in Article XIII below.

6.2 Service Disruptions. Any interruption in the full and proper functioning of the TM System or ARCHTICS and all other components thereof relating to the Events (a "Service Disruption"), and the time within which Ticketmaster shall have each such Services Disruption resolved (a "Remedial Time") shall be dealt with by Ticketmaster in accordance with this Section 6.2 and with the Service Level Agreement.

6.2.1 If Ticketmaster becomes aware of any malfunction of ARCHTICS or the Platform or any other element of the TM System that is likely to result in a Service Disruption, Ticketmaster shall (i) immediately commence best efforts to cure and (ii) promptly notify MSG of such malfunction and of the potential Service Disruption.

6.2.2 If any element of ARCHTICS, the Platform or the TM System fails during normal business hours at the TM Data Center, all data shall be recovered by Ticketmaster at a second Ticketmaster data center or a DR Site.

6.2.3 Ticketmaster shall provide an initial communication with MSG, by phone (or by email, receipt of which is confirmed), within thirty (30) minutes after Ticketmaster's becoming aware (including, but not limited to, via notification by MSG) of the occurrence of any critical or reasonably material Service Disruption.

6.2.4 If a Service Disruption occurs due to the failure of ARCHTICS, the TM System or any component thereof, either during normal business hours, or outside of such hours but where MSG reasonably determines the situation to be an emergency (e.g., Event day, on-sale, payment due date), Ticketmaster shall have the applicable platform or components fully operational within two (2) hours following receipt of notice to Ticketmaster from MSG or Ticketmaster's discovery of the Service Disruption, whichever is earlier. For purposes of this Section 6.2, normal business hours shall mean the hours from 9 a.m. until 11 p.m. on any day on which an Event is being held and 9 a.m. until 7 p.m. on any other day. In each case, the

35

times set forth in the preceding sentence shall be those in the time zone for the MSG Venue at issue or, if affecting MSG Venues in multiple time zones, Eastern Time.

6.2.5  If a Service Disruption occurs due to the failure of ARCHTICS or the Platform or the TM System after normal business hours and MSG reasonably determines that it is not an emergency, Ticketmaster shall have the TM System or ARCHTICS (as the case may be) fully operational by the earlier of (i) the start of the next set of normal business hours and (ii) twenty-four (24) hours following receipt of notice by MSG or Ticketmaster's discovery of the Service Disruption, whichever is earlier.

6.2.6  If a Service Disruption occurs due to what is determined by Ticketmaster to be a cause out of its immediate control (e.g., an internet outage), Ticketmaster shall immediately work with all necessary third parties and use best efforts to have ARCHTICS and the TM System fully operational as soon as practicable.

6.2.7  Ticketmaster shall make commercially reasonable efforts to promptly develop a feature of the TM System that would enable it to save historical data during any Service Disruption, such that such historical data is not irretrievably lost due to the Service Disruption and can be re-processed when such Service Disruption is resolved.

6.2.8  Ticketmaster shall reasonably promptly develop an automated method for detecting Service Disruptions such that Ticketmaster receives notifications of Service Disruptions, the goal of which being that Ticketmaster will detect Service Disruptions before or simultaneously with discovery by MSG.

6.2.9  For avoidance of doubt, Ticketmaster shall not be liable for Service Disruptions of a reasonable length to allow Ticketmaster to perform routine maintenance on the TM System, including nightly maintenance of the TM System between 2 a.m. and 4 a.m. in the time zone for each MSG Venue; provided, however, that any such other routine maintenance Service Disruptions shall not be performed during business hours, and that Ticketmaster shall, in each instance thereof, provide MSG at least twenty-four hours' notice.

6.3  Disaster Recovery Plan.  Ticketmaster shall have in effect and shall fully comply with, throughout the Term, a disaster recovery plan that shall include, without limitation, provisions for fully operational, alternative data center sites at geographically separate hosting facilities (each facility referred to herein as a "DR Site") that include an uninterruptible power supply, full system redundancy (including all Hosting Services, Software and MSG Information), full network connectivity to the internet with failover capability to ensure reasonably continuous business operations, and appropriate protocols for staffing, escalation and periodic testing, and which protocols shall otherwise comply with the disaster recovery requirements set forth in Exhibit C attached hereto (the "DR Requirements"). Ticketmaster's DR Sites shall be located in either the United States or Canada, and no two shall be located within one thousand (1,000) miles of each other.  On an annual basis, (i) a reputable independent auditor shall certify that, with respect to Ticketmaster's obligations under this Agreement, Ticketmaster's disaster recovery plan complies with SSAE18 (Statement of Standards for Attestation Engagements No. 16) Type II, or subsequent standards replacing it, and (ii) Ticketmaster's Chief Financial Officer shall certify that Ticketmaster has otherwise complied with the DR Requirements and its obligations set forth in this Section 6.3.  If required pursuant to the terms hereof, Ticketmaster shall pay all power, bandwidth and any other costs associated with the operation and maintenance of the DR Sites

36

and/or costs of transferring data to or from such DR Sites and the TM Data Center. When a failure in the TM Data Center has been repaired, Ticketmaster shall re-propagate all MSG Information and MSG Consumer Data from the DR Sites to the TM Data Center.

6.4  Access to MSG's Equipment and Data. In order to perform its obligations under this Article VI and the Service Level Agreement, MSG will provide Ticketmaster 24-hour per day remote access to MSG's installation, pertinent sites, equipment (including any existing LAN or other network user monitor device) and user data. Failure to provide such access may prohibit timely and effective action by Ticketmaster and render Ticketmaster unable to resolve any Service Disruption. To the extent caused by such circumstances, Ticketmaster shall be under no liability for failure to prevent or remedy such Service Disruptions.

6.5  Maintenance and Support of the Products. In addition to the maintenance and support obligations set forth in this Article VI, Ticketmaster shall also be subject to the obligations set forth in Section 6 of Exhibit B attached hereto.

## ARTICLE VII

## AUDIT OF SALES AND PROCEDURES/ANNUAL REPORT

7.1  Books and Records. Ticketmaster agrees to keep accurate books of account and records covering all transactions entered into pursuant to this Agreement and to establish and maintain a reliable and accurate accounting system in connection therewith. All such books of account and records shall be kept available for at least three years after the expiration or earlier termination of this Agreement.

7.2  Audit. During regular business hours, on reasonable advance notice and for a reasonable time without materially interfering with the operations of Ticketmaster, to the extent that the Annual Report (as defined in Section 7.4 below) does not satisfy MSG's needs, MSG shall have the right to audit Ticket sales and returns for Events sold by Ticketmaster, and the books and records maintained by Ticketmaster regarding its obligations under Article X, to ensure Ticketmaster's compliance with the terms of this Agreement; provided, however, that MSG shall not be permitted to exercise such audit right more than once per calendar year during the Term of this Agreement and for a period of three (3) years thereafter. Such audit shall be conducted at MSG's expense; provided, however, that if any such audit results in a finding of a discrepancy of more than seven and one-half percent (7.5%) (which, if not for such audit, would have favored Ticketmaster) of the net amounts calculated as due to MSG under this Agreement in any three-month period, Ticketmaster shall reimburse MSG for the reasonable, out-of-pocket and documented costs of such audit. In connection with any audit, upon MSG's request, Ticketmaster shall provide MSG with (i) materials in Ticketmaster's possession or under Ticketmaster's control relating to the Ticket sales and returns for Events for the calendar year in which such request is made as well as the three calendar years prior, (ii) electronic and hard copies of such materials, (iii) access to its current employees who have or could have knowledge relevant to the audit and (iv) adequate work space and access to photocopy machines at Ticketmaster's offices, provided that MSG shall pay Ticketmaster a reasonable fee for any copies. In addition, each party shall provide to the other all information reasonably necessary for the other party to verify the accuracy of each payment and performance of all obligations

HIGHLY CONFIDENTIAL                                    LNE-LIT24-001185619

hereunder, and such other information for such purpose as the other party may from time to time reasonably request. If requested, the accuracy and completeness of such information will be certified by a senior executive officer of the party providing such information to the best of such executive's knowledge after appropriate investigation. All such information shall be kept available for at least three (3) years after the expiration or termination of this Agreement.

7.3     Sales Data and Reports. Ticketmaster shall provide to MSG either a weekly sales report or, at least weekly, a set of data feeds (either, a "TM Sales Report"), each being specific to both Ticket Class and MSG Venue, which TM Sales Reports, when aggregated, will provide detailed information on sales of Tickets and comport with and provide support for each Weekly Wire (as defined in Section 9.5.1 below). Data feeds shall be made available to MSG via TM One. The detail provided as to each Event through the TM Sales Reports shall include at a minimum the following explicit data points or such information necessary to calculate any of the following: (i) Ticketmaster code; (ii) Event date and start time; (iii) MSG Venue capacity for the Event; (iv) number of comped Tickets; (v) number of "killed" seats; (vi) total Tickets sold (broken down as between sold through Ticketmaster, through the relevant Box Office, and sold through other channels); (vii) Tickets held; (viii) Tickets available but unsold; (ix) scan count; (x) aggregate Face Values of all Tickets sold via Ticketmaster; (xi) Venue Surcharges collected; (xii) Convenience Charges; (xiii) TM Fees charged; (xiv) credit card fees paid; (xv) Ticket Royalties; (xvi) other fees charged to Consumers (e.g., delivery fees); and (xvii) all-in amounts collected from Consumers. With respect to any week in which a TM Sales Report has not been provided to MSG, MSG may, but shall have no obligation to, analyze and aggregate the sales data provided in the data feeds and itself create a data report (with the TM Sales Reports, "Sales Reports") and provide such report to Ticketmaster. In the event that, with respect to any Weekly Wire, a Sales Report does not reconcile with such Weekly Wire, individuals from each of the parties' respective finance departments shall speak by phone reasonably promptly following request by one party to the other in an effort to resolve the discrepancy; if the parties, on such call or thereafter, determine, with respect to any Weekly Wire, that such wire was greater or less than what it should have been, then Ticketmaster shall, in the next Weekly Wire after such determination, in addition to whatever is owed for the then-current week, pay to MSG the amount of such shortfall or deduct from the amount owed for the then-current week the amount of such overpayment, as applicable.

7.4     Annual Controls Report. Ticketmaster shall cause MSG to receive annually a "Report On Controls Placed In Operation and Tests of Operating Effectiveness" (the "Annual Report"). The Annual Report shall be in compliance with SSAE18 (Statement of Standards for Attestation Engagements No. 16) Type II, or subsequent standards replacing it, and shall be issued by a reputable independent auditor. The Annual Report shall also cover at least the first three quarters of MSG's fiscal year (such fiscal year currently being July 1st to June 30th) and be issued no later than sixty (60) days prior to the close of MSG's fiscal year (i.e., currently by May 1). Ticketmaster shall also provide, no later than one month after the end of MSG's fiscal year, a "bridge" report covering the final quarter of MSG's fiscal year, provided that MSG shall reimburse Ticketmaster in an amount equal to fifty percent (50%), not to exceed a total payment of $75,000 per contract year, of the incremental professional expenses incurred by Ticketmaster, if any, to provide such report. Payment shall be made within thirty days after Ticketmaster's provision of an invoice, with appropriate back-up, reflecting the cost of such incremental professional expenses.

7.4.1  No later than one month after the last day of MSG's fiscal year (currently June 30), Ticketmaster shall provide MSG with a letter confirming that, as of the last day of that preceding fiscal year, there have been no material changes to the systems of controls as covered by the most recently provided Annual Report.

7.4.2  If, during an audit being conducted in connection with the preparation of any Annual Report, the accounting firm conducting the audit identifies a significant control weakness, Ticketmaster shall immediately advise MSG of such control weakness.

7.4.3  The Annual Report shall cover Ticketmaster's operations in support of all ticketing, ticket sales and ticket sales reporting systems, as well as integration applications to ARCHTICS software provided to MSG by Ticketmaster.

7.4.4  The Annual Report shall include representations with respect to both ticket transaction processing and reporting controls and general computer controls.

7.4.4.1  With respect to Ticketmaster's ticket transaction processing and reporting controls, the Annual Report shall address, without limitation, the key processes (including but not limited to ticket printing, ticket sales, credit card, cash (i.e., retail ticket centers' cash receivables) and accounts receivable and payable processing, and ticket sales reporting), controls and results of testing.

7.4.4.2  With respect to general computer controls, the Annual Report shall address, without limitation, key controls over operations, security and maintenance and the results of testing of these controls.

7.4.4.3  The Annual Report shall include the standard reports provided by Ticketmaster to report ticket sales activity, both with respect to Primary Sales and Ticket Resales on Ticketmaster platforms. In addition, to the extent that Ticketmaster develops customized reports for MSG, the Annual Report shall include discussion of the controls over the development and maintenance of such reports to ensure that the key financial information in such reports "agree" with the standard reports. The Annual Report shall also specifically address the following five elements of internal control: (i) control environment; (ii) control activities; (iii) risk assessment; (iv) monitoring and communication; and (v) "information" as defined by SAS78 which recognizes the definition and description of internal control in the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

## ARTICLE VIII

## ADVERTISING; MARKETING

8.1  MSG Advertising.  MSG is responsible for marketing Events, creating public awareness thereof and generating demand for Tickets and Ticket sales through any legally permissible means, such as advertising and promotion through media. Ticketmaster cannot, and does not, make any representation or guarantee as to the sale of any or all Tickets for any Event. MSG may, during the Term, provide and place advertisements in any form of media that MSG shall desire to promote the availability of Tickets, except on the platforms of any ticketing companies or systems.

39

8.2 Ticketmaster's Advertising. Ticketmaster may advertise Events and the availability of Tickets through Distribution Channels in such manners or forms as may be pre-approved in writing by MSG (but such pre-approval shall not be required for promotions or notices on the Ticketmaster Website or any other in-house or Affiliate promotion).

8.2.1 All expenses incurred in connection with Ticketmaster advertising shall be borne exclusively by Ticketmaster.

8.2.2 No Ticketmaster advertising shall reflect negatively upon, or disparage, MSG or its employees, agents, representatives, trademarks, tradenames, logos or Affiliates.

8.2.3 To the extent that a Venue Surcharge is included in the price of a Ticket, any advertisement or presentation of the Ticket's price by Ticketmaster, including on the Ticketmaster Website, shall present the price inclusive of such Venue Surcharge and shall not state the price of the Ticket excluding such Venue Surcharge.

8.3 Advertising Income. Ticketmaster and MSG shall separately receive and retain all income derived from advertising that each is entitled to sell under Section 4.11. MSG shall be entitled to all income derived from (i) the advertising provided to MSG on the Venue Pages (as defined in Section 8.4 below) under Section 8.5, (ii) all advertising space available on "TicketFast" Tickets (if any) and (iii) static ads or promotions (but not banner or served ads) on Designated AccountManager Pages, which MSG retains all rights to sell and place, provided that such ads or promotions comply with any restrictions set forth herein, and shall be subject to space limitations.

8.4 Branding. To the extent that any prospective Consumer of a Ticket accesses the Ticketmaster Website from a website operated by or on behalf of MSG (or one of its Affiliates) ("MSG's Websites") or, after accessing the Ticketmaster Website through some other means, (i) initiates a Ticket purchase or (ii) requests information regarding an Event, then the Event Detail Page, the Confirmation Page and any other page relating to the Events accessed on the Ticketmaster Website directly through any of the foregoing (hereinafter, the "Venue Pages") will be branded as directed by MSG. The operational flow among the Venue Pages will have a "look and feel" at all times consistent with MSG's Websites, subject to the inclusion of (x) Ticketmaster's logo, (y) a link to buy Tickets on Venue Pages accessed from MSG's Websites and (z) Ticketmaster's standard co-existing and prominent top bar "Ticketmaster" branding on each Venue Page otherwise accessed. The final look and feel of the Venue Pages will be determined by MSG with Ticketmaster's approval, which approval shall not be unreasonably withheld. Ticketmaster will make changes to the Venue Pages' look and feel at MSG's request not more than once every six (6) months. The term "look and feel" as used above means the coloring of the webpages, the font size and typeface of printed words and MSG's branding. It does not mean the functionality or the placement of the functionality on the Venue Pages.

8.5 Upsells. At the various Ticketmaster points of sale, MSG shall have the opportunity to advertise and offer for sale other products and/or services than the Tickets ("Upsells"). Upsells may be purchased by consumers with or without completion of a Ticket purchase. For avoidance of doubt, the sale of "loaded tickets" (i.e., inclusive of added value exchangeable for items such as food and beverage and merchandise which is sold as part of the ticket in the same transaction, and not as a separate transaction) shall not be deemed an "Upsell." MSG shall determine, subject to Ticketmaster's approval, not to be unreasonably withheld, (i) subject to Section 8.5.3 below, the products and/or services to be offered as Upsells, including the number of products and/or services

40

to be offered (except that it cannot include content Ticketmaster prohibits from offering through its Distribution Channels, including pornography or gambling, or advertising for or reference to any Ticketmaster competitor), (ii) the order in which such products or services will be offered and (iii) the text of the sales offering.

8.5.1  Internet Upsells.  Ticketmaster shall provide MSG with the exclusive right to all advertising spaces and all selling locations provided by Ticketmaster on the Venue Pages.  For each Upsell transacted through the Ticketmaster Website, MSG shall pay Ticketmaster a per-transaction fee equal to the greater of (i) $2.00 and (ii) either (x) fifteen percent (15%) of the purchase price, where the product and/or service is fulfilled by a party other than Ticketmaster (including MSG), or (y) thirty percent (30%) of the purchase price, where the product and/or service is fulfilled by Ticketmaster.

8.5.2  Telephone.  MSG shall have the exclusive right to offer up to two Upsells to Consumers and prospective Consumers per Event via the telephone.  MSG agrees that, to the extent that the text of sales offerings for the Upsells via the telephone with respect to a particular Event is more than fifty (50) words per call, MSG will reimburse Ticketmaster for all of Ticketmaster's costs for such offerings in excess of 50 words whether or not a sale is consummated.  Such costs include, without limitation, line charges and operator costs.  For each Upsell transacted by Ticketmaster through the telephone, MSG shall pay Ticketmaster a per transaction fee equal to the greater of (i) $2.00 and (ii) either (x) fifteen percent (15%) of the purchase price, where the product and/or service is fulfilled by a party other than Ticketmaster (including MSG), or (y) thirty percent (30%) of the purchase price, where the product and/or service is fulfilled by Ticketmaster.

8.5.3  Upsell Changes.  Subject to Ticketmaster's approval rights set forth above, MSG shall have the opportunity to determine the products and/or services on an Event-by-Event basis (that is, different products and/or services may be sold in connection with different Events for which Tickets are on sale concurrently).  Upon seven (7) Business Days' notice, MSG may change one or more of the products and/or services being offered in any one of the permitted potential Upsells, provided that the potential Upsells for a particular Event may not be changed more than one time each month.

8.5.4  Fulfillment and Processing of Upsells.  MSG shall be responsible for processing and fulfilling all Upsells that are consummated separately from a Ticket purchase.  If Ticketmaster fulfills an Upsell for premium parking, MSG will pay Ticketmaster a fee equal to $2.00, which shall be deducted from the face price of the premium parking.  In all cases Ticketmaster will be entitled to charge additional fees equal to any taxes due in connection with the applicable transaction, plus credit card authorization fees in an amount equal to 2.40% of the face price of the goods or services sold in Upsells.  For avoidance of doubt, MSG shall not be charged any fee on transactions made by Consumers through ParkWhiz or any other Ticketmaster parking partner.

8.6  Marketing.  Ticketmaster and MSG shall, in good faith, assist each other and work with each other's marketing personnel in order to maximize sales of Tickets to all Events.  Ticketmaster shall, without limitation:

8.6.1  Upon MSG's request, and at no additional charge to MSG (except as set forth in the next sentence), include inserts that promote Events (including, for example, discount coupons,

spitter ticket cards or vouchers) with Tickets mailed to Consumers and Ticketmaster's periodic mailings to consumers in the metropolitan areas proximate to each MSG Venue (if any). Such inserts shall be provided by MSG at MSG's cost, but subject to size and weight specifications determined by Ticketmaster.

8.6.2   Use commercially reasonable efforts to provide the following marketing benefits:

8.6.2.1  Prominent featuring of Events on Ticketmaster category pages;

8.6.2.2  Regular inclusion of Events in client email notifications (CENs) and Alerts;

8.6.2.3 Regular appearance of Events (e.g., Christmas Spectacular, Knicks/Rangers games) in the spotlight position on Ticketmaster's home page and the category home pages; and

8.6.2.4  Run-of-site rotation for Events on the Ticketmaster Website.

8.7   Qualifiers.  MSG shall be entitled to place unlimited "qualifiers" (i.e., codes used to differentiate ticket types and promotions) for any Event, provided that MSG shall provide Ticketmaster as much notice as reasonably possible with respect to any new qualifier it seeks to add, which notice shall be no less than three (3) Business Days in advance of the date by which MSG would like the new qualifier programmed.  Ticketmaster shall use reasonable efforts to program new qualifiers as quickly as possible during business hours and shall accommodate reasonable special requests by MSG to program new qualifiers on a shorter timeframe to the extent Ticketmaster is able to do so.

8.8   Alerts.  MSG acknowledges that, subject to the limitations set forth in Section 4.8, Ticketmaster periodically uses the MSG Consumer Data and the Ticketmaster Consumer Data to notify Consumers of upcoming events in the region in which such Consumers reside, of upcoming Events at the MSG Venues, of the schedules of teams based at the MSG Venues, and of events of a particular performer (each of the above, an "Alert").

## ARTICLE IX

## FINANCIAL CONSIDERATIONS: PRIMARY TICKET SALES

9.1  Consumer Receipts and Charges.  Ticketmaster shall collect from Consumers all proceeds payable to MSG, including, without limitation, Ticket Receipts, Ticket Royalties, Transaction Fee Royalties and any Venue Surcharge, and shall deposit such amounts in an account maintained by Ticketmaster at a bank or financial institution as may be selected by Ticketmaster and approved by MSG, which approval shall not be unreasonably withheld.

9.1.1  Convenience Charge.  A per-Ticket Convenience Charge collected by Ticketmaster shall be assessed against purchasers of Tickets at all Distribution Channels, except that no Convenience Charge shall be assessed for purchases of Tickets through Sales Desk (to the extent Sales Desk is utilized manually by a Consumer or MSG personnel, i.e., not automated). The amount of the Convenience Charge for each Event shall be determined in the sole discretion of MSG, subject to Section 9.3.3 below.  Ticketmaster acknowledges and agrees that the Convenience Charge may be different for each Venue, for different Events at each Venue and for different price-scaled Tickets at the same Event.

42

9.1.2  Exclusion of Other Charges.  Ticketmaster shall not, without MSG's prior consent, charge Consumers any amounts in connection with the sale or delivery of Tickets other than the Ticket Face Value, the Convenience Charge, expedited delivery (e.g., UPS charges) and other delivery charges as set forth in Section 9.7 below, and the amounts referenced in Section 9.2.7 below and set forth in Exhibit B for Ticket transactions processed via the Products.

9.1.3  Refunds.  In the event that MSG cancels any Event (or any performance thereof), the funds held by Ticketmaster collected in connection with the Events shall be available for distribution by Ticketmaster to Consumers for refunds including Convenience Charges.  In the event that the amount of funds held by Ticketmaster is insufficient to make all refunds, MSG shall deliver the amount of such deficiency to Ticketmaster no later than twenty-four (24) hours after notice by Ticketmaster to MSG of the amount of such deficiency and verification thereof. In the event that any Event is canceled, postponed, or modified, Ticketmaster shall have the right to refund the Ticket price at the original point of purchase (e.g., by Telephone Sales or by the Ticketmaster Website).  In the alternative, the purchaser of a Ticket to such Event shall have the right to exchange such Ticket pursuant to any exchange policy that may be adopted by MSG.  If the purchaser of the Ticket obtains a refund, Ticketmaster shall not be entitled to retain the TM Fee (as set forth in Section 9.2.1 below) with respect to such Ticket.

9.2  Ticketmaster Compensation.

9.2.1  TM Fees.  In consideration of Ticketmaster's services hereunder, Ticketmaster shall be entitled to receive the respective amounts identified below on each Ticket sold through the Distribution Channels and on each Primary Sale of Tickets sold through 3P Resale Platforms via Open Distribution as set forth in Section 3.14 (the "TM Fees") and certain other fees set forth in Exhibit B to this Agreement. The TM Fees are broken down by the types of events to which the Tickets relate (each, a "Ticket Class"):

9.2.1.1  Subject to the exceptions set forth in the provisions that follow this Section 9.2.1.1, the TM Fees for Tickets for each Ticket Class shall be as follows:

- MSG Major League Teams:  $6.50 per Ticket
- MSG-Owned Non-Major League Content:  $1.75 per Ticket
- MSG Venue Tours:  $1.00 per Ticket
- Non-MSG-Owned Events and MSG-Promoted Non-Owned Events:  $3.50 per Ticket

9.2.1.2  The TM Fees set forth above shall be subject to the following exceptions: (i) the TM Fee on the sale of a Ticket for an MSG Major League Team for a Ticket Face Value of less than $30.00 shall be $1.75; (ii) the TM Fee on the sale of Group Tickets to Knicks and Rangers via AccountManager shall be as set forth in Exhibit B; (iii) there shall be no TM Fee on other Group Sales, Subscriptions, or Tickets sold via the Box Office and/or Sales Desk (to the extent Sales Desk is not manually utilized by a Consumer or MSG personnel in connection with such sales); and (iv) there shall be no TM Fee on Events for which all Tickets are free (e.g., Fanfests, League draft parties).

9.2.1.3  For avoidance of doubt, each of the TM Fees set forth above shall remain constant with respect to each Ticket Class over the Term.

43

9.2.3  <u>Sales Through Related Third-Party Marketers</u>.  Ticketmaster shall not be entitled to a TM Fee with respect to sales made through Related Third-Party Marketers.

9.2.4  <u>Sales Through Unrelated Third-Party Marketers</u>.  If, pursuant to Section 3.3(7) above, Ticketmaster is provided the right to process and deliver Tickets sold by an Unrelated Third-Party Marketer and Ticketmaster accepts such right and provides such services, then Ticketmaster shall be entitled to the relevant TM Fee for each Ticket sold by that Unrelated Third-Party Marketer in accordance with the terms of this Agreement.  If Ticketmaster is not offered the right to process and deliver Tickets sold by an Unrelated Third-Party Marketer, then MSG shall pay to Ticketmaster the TM Fee with respect to Tickets sold by that Unrelated Third-Party Marketer that would otherwise have been due Ticketmaster had such Tickets been sold through Ticketmaster.  If Ticketmaster is offered the right to process and deliver Tickets sold by an Unrelated Third-Party Marketer but declines or waives such right, Ticketmaster shall not be entitled to receipt of any TM Fee with respect to Tickets sold by that Unrelated Third-Party Marketer.

9.2.5  <u>Sales Through Third Party Resale Marketplaces</u>.  Ticketmaster shall be entitled to the TM Fees on all Tickets sold via 3P Resale Platforms; provided, for avoidance of doubt, that such Tickets shall not be deemed "Volume Bonus Generating Tickets" as defined and set forth in Section 9.4.3 below.

9.2.6  <u>License Fees for the Products</u>.  Ticketmaster hereby waives all license fees and maintenance fees associated with the Products.

9.2.7  <u>Transaction Fees for Transactions Using the Products</u>.  The transaction fees associated with the use of the transaction capabilities of the Products are set forth in Exhibit B attached hereto (the "<u>Transaction Fees</u>").  MSG shall process the Ticketmaster AccountManager transactions and Ticketmaster may deduct the related Transaction Fees, if any, less the related Transaction Fee Royalties from other amounts owed to MSG under this Agreement (or, alternatively, MSG may direct Ticketmaster to invoice MSG for such Transaction Fees).  In the event that MSG elects to charge Subscribers or others (if applicable) an amount for the transaction capabilities of the Products in addition to the Transaction Fees listed in Exhibit B, the additional amount charged shall be divided equally between MSG and Ticketmaster, and the amount paid to MSG shall be included in Transaction Fee Royalties.  All Transaction Fees may be increased upon mutual agreement of the parties.

9.3  <u>Credit Cards and Other Methods of Payment</u>.

9.3.1  <u>Acceptance of Methods of Payment</u>.  MSG hereby authorizes Ticketmaster, and Ticketmaster hereby agrees, to accept, in connection with sales of Tickets, (i) American Express, MasterCard, Visa, Discover and Diners' Club credit cards (and any other credit card, debit card or payment card), (ii) automated clearing house (ACH) payments, (iii) other electronic methods of payment (e.g., prepaid cards and "Chase Pay") and (iv) membership/loyalty program reward points backed by those program sponsors which Ticketmaster in its reasonable discretion chooses to authorize as a method of payment and which may hereafter be approved by Ticketmaster.

9.3.2  Credit Card Processing.

9.3.2.1  TM Charge.  Ticketmaster shall provide TM Charge to MSG for use in processing MSG's credit card sales of Tickets from the Box Offices utilizing the TM System and for use in processing transactions using the Products.  MSG shall be charged and shall owe no license and maintenance fees for TM Charge.  TM Charge shall at all times be compatible with Ticketmaster's technology solutions and include the following features:

- immediate credit card authorization for Ticket sales using major credit cards;
- ability to accept all major credit cards, including Visa, MasterCard, American Express, Discover and Diners' Club;
- ability to generate printed receipts for Consumers and the Box Offices at the time of sale;
- ability to settle MSG's credit card transactions after the close of Ticketmaster's business day;
- deposit of funds directly in MSG's specified merchant bank accounts; and
- daily accessibility by MSG to reports regarding authorized and settled transactions.

9.3.2.2  Processor.  MSG has established its own merchant numbers as necessary to process the credit cards that MSG wishes to accept.  Ticketmaster shall transmit data relating to Ticket sales made by MSG using TM Charge to Ticketmaster's credit card processor (the "Processor").  The Processor will then transmit such data to the applicable credit card company for payment to MSG, subject to MSG having entered into the applicable MSG Processor Agreements (as defined in Section 9.3.2.5 below).  Ticketmaster shall use its best efforts to ensure the accuracy and promptness of delivery of information transferred from the Processor to MSG via TM Charge, but Ticketmaster does not guarantee the accuracy and timeliness of such information.  MSG shall comply with all applicable credit card association or company guidelines (e.g., EMV card dipping for all retail transactions and using customers' address information and additional security information for all card-not-present transactions).

9.3.2.3  Information Provided by MSG.  The parties agree and acknowledge that MSG has (x) provided Ticketmaster with the account name and location for Ticketmaster to use for the transmission of sales data and (y) notified Ticketmaster and the Processor of the account(s) where MSG wishes settlement deposits to be made by the Processor.  MSG shall be responsible for promptly notifying Ticketmaster and the Processor, if applicable, of any changes to the information provided pursuant to this Section 9.3.2.

9.3.2.4  Processor Reports.  Ticketmaster shall provide MSG with daily transaction reports of authorized and settled transactions via direct data feeds through secured APIs and/or via CopyNode (or any successor technology).  MSG shall review, on a regular basis, all reports provided to MSG by Ticketmaster.  MSG also agrees that, for operational and monitoring purposes, the Processor may provide Ticketmaster with processing and settlement reports related to sales of Tickets using TM Charge.

9.3.2.5  Effect of Termination of Ticketmaster's Processor Agreement.  Ticketmaster has entered into an agreement with the Processor, and MSG has entered into a separate

HIGHLY CONFIDENTIAL    LNE-LIT24-001185627

agreement with such Processor (the "MSG Processor Agreement"). If Ticketmaster elects to use a different credit card processor, it shall provide ninety (90) days' written notice to MSG, after which MSG shall enter into an agreement with such new processor; provided, however, that MSG shall not be obligated to enter into any such agreement that would result in increased obligations to MSG or provide for costs and rates less favorable than those contained in the MSG Processor Agreement.

9.3.3  Credit Card Charges on Ticket Sales. Ticketmaster shall be responsible for payment of all credit card company charges for Tickets sold via the Distribution Channels, including those on any Convenience Charge. Except as provided in Section 9.3.4, MSG shall set the Convenience Charge to include an amount equal to 2.4% of the Ticket Face Value (the "Credit Card Fee Allocation"), and Ticketmaster shall be entitled to retain the Credit Card Fee Allocation for all Tickets sold via the Distribution Channels in which the Consumer uses a credit, debit or other electronic payment card to purchase Tickets. Notwithstanding the foregoing, MSG shall have the option to exclude credit card company charges from the Convenience Charges, provided that MSG shall nevertheless pay the Credit Card Fee Allocation to Ticketmaster in such cases. The percentage rate in this Section shall be subject to increase due to increases to the interbank rates imposed on Ticketmaster; provided, however, that no increase shall be imposed unless the rate exceeds 2.4%. Ticketmaster shall notify MSG of any such increases promptly and, upon the request of MSG, shall provide reasonable evidence of such increase.

9.3.4  Credit Card Charges on TM Charge. In connection with MSG's credit card sales of Tickets utilizing and authorized via TM Charge using either Visa or MasterCard, the Processor shall, deduct the following percentages of transactions processed on a daily basis as merchant fees:

Using Visa or MasterCard:

| | |
|---|---|
| Credit card present | 2.079% |
| Credit card not present | 2.098% |

Ticketmaster represents that the fees charged to MSG for use of TM Charge are a reasonable accurate blended rate of the actual costs incurred by Ticketmaster. Such fees are subject to increases and decreases equal to any actual increases or decreases in fees charged to Ticketmaster by the Processor or equal to actual increases or decreases in credit card association or credit card company fees (such as interchange, assessments or other charges). Ticketmaster shall notify MSG of any such increases promptly, and upon the request of MSG, shall provide reasonable evidence of such increase. MSG shall be responsible for any additional charges incurred pursuant to MSG's separate agreement with Paymentech. MSG shall also be responsible for any other amounts charged to Ticketmaster (if any) by the Processor for processing MSG's transactions, including, without limitation, Chargebacks (except as otherwise provided herein), fraudulent credit card use and additional charges for failure to meet the specific timing or other qualifications of the applicable credit card association or company. In the event that MSG desires to process any credit cards other than Visa or MasterCard utilizing TM Charge, then the fees for such service shall be mutually agreed upon by MSG and the Processor, and MSG shall enter into its own merchant agreements with the Processor.

9.3.5  Payment of Credit Card Charges on Product Transactions.  With respect to transactions made via the Products that are processed by MSG, MSG shall be responsible for paying the credit card company charge at the rates set forth in Section 9.3.4 above, and any Chargebacks related thereto.  MSG shall be responsible for any additional charges incurred pursuant to MSG's separate agreement with Paymentech.

9.3.6  Chargebacks.  Ticketmaster shall be responsible for all credit card chargebacks relating to sales of Tickets on the Distribution Channels and relating to transactions described in Exhibit B involving the Products.  MSG shall be responsible for all credit card chargebacks relating to sales of Tickets at its Box Offices.

9.4  Ticketmaster Payments to MSG.

9.4.1  Signing Bonus.  Within thirty (30) days of the execution of this Agreement by the parties, Ticketmaster shall pay to MSG Fifteen Million Dollars ($15,000,000) (the "Signing Bonus").  The Signing Bonus shall not be refundable except as set forth in Sections 9.4.1.1 below.  The payment of the Signing Bonus shall be made by wire transfer pursuant to instructions to be provided by MSG.  Additionally, during any Automatic Month-to-Month Renewal, Ticketmaster shall pay MSG, monthly, the amount of $250,000, reflecting the monthly proration of the Signing Bonus extended to such additional period of the Term.

9.4.1.1  Signing Bonus Recoupment; MSG Default.  If Ticketmaster terminates this Agreement as a result of an event of default by MSG pursuant to Section 13.4 below, Ticketmaster shall be entitled to a refund only of the unamortized portion of the Signing Bonus actually paid to MSG as of the effective date of such termination, based on a total Signing Bonus of Fifteen Million Dollars to be amortized over five (5) Contract Years (or sixty (60) months).

9.4.2  Ticket Royalties.  Ticketmaster shall pay to MSG for each Ticket sold by Ticketmaster through its Distribution Channels an amount by which the Convenience Charge assessed on that Ticket exceeds the TM Fee (if applicable) and any applicable Credit Card Fee Allocation (hereinafter, "Ticket Royalties").

9.4.3  Volume Bonus.  All Tickets to the Events sold via the TM System for which Ticketmaster receives (and does not refund) a TM Fee shall be considered "Volume Bonus Generating Tickets."  To the extent that, in any Contract Year, sales of Volume Bonus Generating Tickets exceed the threshold levels set forth below for each Ticket Class, Ticketmaster shall pay MSG bonuses (each, a "Volume Bonus").  The threshold levels and per-Ticket bonuses with respect to each Ticket Class shall be as follows:

9.4.3.1  MSG Major League Team Ticket sales:

- $0.00 on the first 150,000 Tickets sold in any Contract Year
- $0.25 on Tickets 150,001-200,000 sold in any Contract Year
- $0.50 on Tickets 200,001-250,000 sold in any Contract Year
- $0.75 on Tickets 250,001-300,000 sold in any Contract Year
- $1.00 on Tickets 300,001-350,000 sold in any Contract Year
- $1.25 on Tickets 350,001-400,000 sold in any Contract Year
- $1.50 on Tickets 400,001-450,000 sold in any Contract Year

47

- $1.75 on Tickets 450,001-500,000 sold in any Contract Year
- $2.00 on Tickets 500,001-550,000 sold in any Contract Year
- $2.25 on Tickets 550,001-600,000 sold in any Contract Year
- $2.50 on Tickets 600,001-650,000 sold in any Contract Year
- $2.75 on Tickets 650,001-700,000 sold in any Contract Year
- $3.00 on all Tickets in excess of 700,000 sold in any Contract Year

9.4.3.2  MSG-Owned Non-Major League Content Ticket sales:

- $0.00 on the first 600,000 Tickets sold in any Contract Year
- $0.25 on Tickets 600,001-850,000 sold in any Contract Year
- $0.50 on Tickets 850,001-1,100,000 sold in any Contract Year
- $0.75 on all Tickets in excess of 1,100,000 sold in any Contract Year

9.4.3.3  MSG Venue Tours Ticket sales:

- $0.00 on the first 30,000 Tickets sold in any Contract Year
- $0.05 on Tickets 30,001-130,000 sold in any Contract Year
- $0.10 on Tickets 130,001-230,000 sold in any Contract Year
- $0.15 on Tickets 230,001-330,000 sold in any Contract Year
- $0.20 on Tickets 330,001-430,000 sold in any Contract Year
- $0.25 on all Tickets in excess of 430,000 sold in any Contract Year

9.4.3.4:  Combined Non-MSG-Owned Events and MSG-Promoted Non-Owned Events Ticket sales:

- $0.00 on the first 2,750,000 Tickets sold in any Contract Year
- $1.08 on Tickets 2,750,001-3,250,000 sold in any Contract Year
- $1.33 on Tickets 3,250,001-3,750,000 sold in any Contract Year
- $1.58 on all Tickets in excess of 3,750,000 sold in any Contract Year

In the event that there is an Automatic Month-to-Month Renewal of this Agreement, Volume Bonus payments and thresholds shall continue on the aforementioned terms.

9.4.4  Transaction Fee Royalties.  MSG shall be entitled to receive royalties ("Transaction Fee Royalties") from Ticketmaster with respect to transactions using the Products, provided that Ticketmaster receives (and does not refund) the Transaction Fee associated with such Transaction Fee Royalty.

9.4.5  MSG Resale Participation Amount.  Ticketmaster shall pay to MSG the MSG Resale Participation Amounts defined and described, and on the schedule set forth, in Section 10.1.

9.4.6  Sponsorship Fees.  Ticketmaster shall pay to MSG the Sponsorship Fees defined and described, and on the schedule set forth, in Section 11.5.

9.4.7  Authentication Delay Payment.  Ticketmaster shall pay to MSG $3,000,000 (the "Authentication Delay Payment") within thirty (30) days of the execution of this Agreement

48

in consideration for MSG's agreement to delay Ticketmaster's performance of its Authentication obligations pursuant to Section 3.6 hereof from a delivery date of March 1, 2018 (as previously agreed by the parties) to March 1, 2019 (the "Authentication Delay Period"). In the event of a termination of this Agreement by Ticketmaster as a result of an event of default by MSG pursuant to Section 13.4 below, which termination occurs prior to March 1, 2019, MSG shall repay to Ticketmaster a pro rata portion of the Authentication Delay Payment covering the remainder of the Authentication Delay Period that follows the effective date of the termination.

9.4.8 Performance Make Good Payments. In connection with (i) a performance issue that occurred during Contract Year 2 and (ii) the provision of resale services relating to the Forum under the Prior Secondary Market Agreement, in addition to all other payments set forth above, Ticketmaster shall pay to MSG $3,642,000 within thirty (30) days of the execution of this Agreement.

9.5 Payment Schedule and Procedure.

9.5.1 Timing of Payments. Ticketmaster shall pay any amounts owed hereunder to MSG for (i) Ticket Receipts, (ii) Ticket Royalties (i.e., the Convenience Charge amount that exceeds the applicable TM Fee and Credit Card Fee Allocation) and (iii) Transaction Fee Royalties by wire transfer on a weekly basis (the "Weekly Wire") pursuant to instructions provided by MSG. Each weekly payment shall be delivered to MSG on Thursday of each week, covering Ticket sales made by Ticketmaster for Events during the period of Monday through Sunday preceding such payment date. Any Volume Bonuses, once earned in any Contract Year with respect to any Ticket Class, shall thereafter be payable to MSG, with respect to each week earned, together with the Weekly Wire for such week.

9.5.2 Event Accounting. Ticketmaster shall supply, promptly following each Event, a separate accounting supplying support data for the payments provided pursuant to Section 9.5.1 and, for each Event, identifying (i) the Ticket Receipts collected and, as a subcategory, the Venue Surcharges collected, (ii) the Convenience Charges collected, (iii) the number of Tickets sold for which Ticketmaster is entitled to a TM Fee (at each level, if more than one), (iv) the amount of TM Fees received, (v) the Ticket Royalties paid, (vi) the Transaction Fees collected and the Transaction Fee Royalties paid, (vii) the credit card fees collected pursuant to Section 9.3.3 and (viii) the Volume Bonuses paid (on a monthly basis), as well as any additional information agreed to between the parties. MSG shall be able to retrieve similar support data regarding sales of Tickets or other transactions processed via the Products from ARCHTICS and/or the TM System.

9.6 Counterfeit Tickets. It is agreed and understood that Ticketmaster shall not be liable to MSG for the printing and sale of counterfeit Tickets when such action is beyond the control of Ticketmaster, provided that Ticketmaster has taken reasonable efforts to prevent the printing and sale of counterfeit Tickets by adopting adequate control procedures (including control of its own ticket stock). MSG shall be entitled from time to time to review such control procedures and make recommendations for improvements, which Ticketmaster will consider implementing in good faith. Ticketmaster agrees to continue to use one or more of the following measures with respect to its own ticket stock: (i) use of "safety centers" in the stock; (ii) ultra-violet imprint (for black light detections); or (iii) radio-frequency identification (RFID) security.

49

9.7  Consumer Delivery Charges.  Ticketmaster and MSG shall agree annually on the fees chargeable to Consumers with respect to each of the following delivery methods, except that MSG shall solely determine the amount charged for any will call pick-up.  With respect to the 2017-18 Contract Year, such fees shall be as follows:

- Mobile Delivery:  $0.00
- Hard Stock Standard Mail:  $5.00 per order
- Will call pick-up for online and charge-by-phone purchases:  $5.00 per order
- PDF:  $0.00 (while available)

Ticketmaster shall retain all hard stock standard mailing fees; MSG shall retain any will call pick-up fees.

9.8  Premium Ticket Fees.  All premium ticket fees (e.g., Platinum Tickets, VIP packages) shall be split evenly between the parties, after deduction of credit card fees and any chargebacks.

9.9  Reformation.  In the event that any one or more of the Consumer charges contemplated in this Agreement, or that have otherwise been charged in the course of the parties' past practice, is for any reason held to be invalid, illegal or unenforceable in any respect, or if any law or regulation (or governing interpretation thereof) is changed to make any such Consumer charge illegal or otherwise unable to be imposed by the parties (in the reasonable determination of either party), the parties shall assess the relative financial impact of such as between the parties, and shall work in good faith to adjust other components of their financial relationship set forth and/or referenced in this Agreement in order to achieve parity with the parties' expected compensation from such Consumer charges absent such change in law or other invalidation.

9.10  Application of Financial Terms.  The financial terms of this Article IX will apply (including retroactively, as necessary) to all Events with respect to which the initial public on-sale of Tickets occurred after July 1, 2017, and to all performances of the 2017 run of the Christmas Spectacular. Except with respect to such 2017 Christmas Spectacular performance, the financial terms of the Prior Primary Market Agreement shall apply to all Events with respect to which the initial public on-sale of Tickets occurred prior to July 1, 2017.

## ARTICLE X

## SECONDARY MARKET TRANSACTIONS

10.1  Revenue Sharing.  It is understood and acknowledged by the parties that Ticketmaster may operate multiple Ticketmaster Resale Platforms, for which it charges fees to customers who transact ticket exchanges (as buyers and/or sellers), resulting in revenue to Ticketmaster, and it is the intention of the parties that MSG shall share in such revenue; provided that, except for the Ticketmaster Integrated Marketplace, Ticketmaster shall have no obligation to operate any such Ticketmaster Resale Platforms in respect of any Events.  For any Ticketmaster Resale Platforms operated by Ticketmaster in respect of the Events, MSG shall be entitled to a share in all Net Resale Revenue (the "MSG Resale Participation Amount"), as follows:

10.1.1  Owned Property Revenue Share.  With respect to the resale of Tickets for MSG Major League Teams and MSG-Owned Non-Major League Content, the MSG Resale Participation

Amount shall be (a) eighty percent (80%) of Net Resale Revenue derived from Ticketmaster Resale Platforms and (b) subject to Section 10.1.3, fifty percent (50%) of Net Resale Revenue derived from Ticketmaster Non-Promoted Resale Platforms.

10.1.2  Non-Owned Property Revenue Share.  With respect to the resale of Tickets for Non-MSG-Owned Events and MSG-Promoted Non-Owned Events, the MSG Resale Participation Amount shall be (a) twenty percent (20%) of Net Resale Revenue derived from Ticketmaster Resale Platforms and (b) subject to Section 10.1.3, ten percent (10%) of Net Resale Revenue derived from Ticketmaster Non-Promoted Resale Platforms.

10.1.3  Ticketmaster Resale Platform Minimum.  Notwithstanding anything else contained herein, in the event of the existence of one or more Ticketmaster Non-Promoted Resale Platforms during any Contract Year, should the MSG Resale Participation Amount derived solely from Ticketmaster Resale Platforms in such Contract Year be less than a certain threshold amount (the "Ticketmaster Resale Platform Minimum"), then Net Resale Revenue derived from Ticketmaster Non-Promoted Resale Platforms shall instead be deemed to have been derived from Ticketmaster Resale Platforms for purposes of Sections 10.1.1 and 10.1.2 (i.e., the MSG Resale Participation Amount shall be 80% and 20%, respectively, on such Net Resale Revenue) until such Ticketmaster Resale Platform Minimum is exceeded.  The Ticketmaster Resale Platform Minimum shall be (i) for the second Contract Year, 1.03% of the actual MSG Resale Participation Amount for the first Contract Year hereof, and (ii) for each subsequent Contract Year, 1.03% of the prior Contract Year's Ticketmaster Resale Platform Minimum.

10.1.4  Customer Acquisition Costs.  In calculating the MSG Resale Participation Amount, Customer Acquisition Costs shall be reviewed against the aggregate of Gross Resale Transaction Values for MSG Event Resale Transactions obtained through paid customer acquisition channels (i.e., paid SEM, social media, retargeting and display costs, and third-party affiliate channels).  Each Contract Year of the Term, Ticketmaster will spend a minimum of Four Hundred Thousand Dollars ($400,000) on Customer Acquisition Costs in connection with MSG Major League Teams and MSG-Owned Non-Major League Content (the "Minimum Annual CAC Spend").  Prior to the start of each month, Ticketmaster will identify for MSG that portion of the Minimum Annual CAC Spend that Ticketmaster will allocate for such month (the "Forecasted Monthly CAC Spend").  Ticketmaster shall determine the specific placements that comprise the Forecasted Monthly CAC Spend for such month and shall be solely responsible for paying all out-of-pocket Customer Acquisition Costs up to the amount of such Forecasted Monthly CAC Spend.  In the event that MSG directs that Ticketmaster spend in excess of the Forecasted Monthly CAC Spend for any month (the amount of such excess, the "Incremental MSG CAC Spend"), MSG shall have the right to direct the amount, placement and other details of such Incremental MSG CAC Spend, and Ticketmaster shall comply with such directions in making such Incremental MSG CAC Spend; provided that MSG shall be solely responsible for reimbursing Ticketmaster for the amount of all out-of-pocket Customer Acquisition Costs incurred by Ticketmaster in respect of such Incremental MSG CAC Spend.  At the conclusion of any Contract Year, to the extent that the total amount actually spent by Ticketmaster on Customer Acquisition Costs during such Contract Year is less than the Minimum Annual CAC Spend, Ticketmaster shall reimburse MSG for the amount of such deficiency.

HIGHLY CONFIDENTIAL
LNE-LIT24-001185633

10.1.5  MSG Resale Participation Amount Payments.  Within thirty (30) days following execution of this Agreement, Ticketmaster shall pay to MSG, in a lump sum, the appropriate MSG Resale Participation Amount covering all Quarters between the Effective Date and such execution date, along with reports setting forth each of Gross Resale Revenue, Net Resale Revenue, Fulfillment Costs and Customer Acquisition Costs with respect to each completed Quarter, as well as such other related information as MSG may reasonably request (such documentation, collectively, the "Quarterly Resale Reports").  Within thirty (30) days after the end of each Quarter thereafter (including, for avoidance of doubt, the Quarter in which execution of the Agreement occurs), Ticketmaster shall provide to MSG Quarterly Resale Reports with respect thereto.  Each Quarterly Resale Report (including the initial ones) shall also include a calculation of the amount of MSG Resale Participation Amount that accrued in such Quarter, based upon the amount of Net Resale Revenue for such Quarter and for the Contract Year to date and, for the purposes of calculating the MSG Quarterly Resale Participation Payments (defined below, and to be trued up at year-end as set forth below). Within thirty (30) days of the conclusion of each Quarter, Ticketmaster shall pay to MSG by wire transfer of immediately available funds to a bank account identified by MSG, the MSG Resale Participation Amount accrued for such Quarter (each, an "MSG Quarterly Resale Participation Payment").  Within thirty (30) days following the end of each Contract Year, Ticketmaster shall calculate the MSG Resale Participation Amount for the entire Contract Year and, to the extent that such amount differs from the sum of the MSG Quarterly Resale Participation Payments made by Ticketmaster to MSG for that Contract Year, the appropriate party shall, within ten (10) Business Days, pay such difference to the other party.

10.1.6  Books and Records.  Ticketmaster shall maintain such accurate and complete separate accounting and books and records as are necessary in order to prepare the Quarterly Resale Reports.  Such books and records shall be kept in accordance with GAAP and otherwise in a form reasonably satisfactory to MSG and shall account for all Gross Resale Revenue, Net Resale Revenue, Fulfillment Costs and Customer Acquisition Costs.

10.2  Customer Fees on Ticketmaster Resale Platforms.  Fees charged to Consumers who transact on the Ticketmaster Resale Platforms will be determined by Ticketmaster; provided that such fees are variably priced within industry standard ranges (approximately 20-30% of the Ticket sale price as of the date of execution of this Agreement); provided, further, that the "seller" fees for Team season ticket holders shall be determined by MSG in its sole discretion, but shall in no event be less than ten percent (10%) of the Ticket sale price for MSG Major League Team Events without Ticketmaster's approval (unless MSG pays to Ticketmaster the 20% of Net Resale Revenue that Ticketmaster would otherwise receive on a seller fee of at least 10% of the Ticket sale price for such MSG Major League Team Events).

10.3  Activation of Ticketmaster's Integrated Marketplace.  Whether the Ticketmaster Integrated Marketplace, with respect to any particular Event, will be activated for such Event and, if activated, will be presented to potential Consumers with a "soft landing" (i.e., showing only Tickets available for Primary Sale, until the potential Consumer elects to change the "view" to include Tickets available for Ticket Resale) or a "hard landing" (i.e., a "commingled landing," initially showing Tickets available both for Primary Sale and Ticket Resale), shall be governed as follows:

52

10.3.1  <u>MSG Major League Teams</u>.  With respect to each of the MSG Major League Teams, MSG shall have the right to elect, for each Contract Year, whether the Ticketmaster Integrated Marketplace shall be activated, as its default setting, during such Contract Year with a hard landing or with a soft landing.  MSG shall inform Ticketmaster of such election with respect to any Contract Year by the end of the prior Contract Year (i.e., by June 30), and Ticketmaster shall effect such election by activating the appropriate presentation for all such MSG Major League Team's Events (subject to Sections 10.3.4 and 10.3.5, below).  If MSG elects a hard landing page, Ticket inventory available for Primary Sales on such page shall be featured more prominently than Ticket inventory available for Ticket Resale by (i) ensuring that three (3) of the first five (5) Ticket options displayed on the Ticket listing are for Primary Sales, and (ii) not emphasizing Ticket inventory available for Ticket Resale to the detriment of Ticket inventory available for Primary Sales (e.g., flashing dots only for Ticket Resale Tickets, but excluding different color designations or disclaimers intended only to differentiate Primary Sales from Ticket Resale).  In addition, in the event of either election by MSG, the Ticketmaster Integrated Marketplace shall remain active through the start time of such MSG Major League Team games, subject to Section 10.3.4 below if a hard landing was elected.

10.3.2  <u>MSG-Owned Non-Major League Content and MSG-Promoted Non-Owned Events</u>.  With respect to MSG-Owned Non-Major League Content and MSG-Promoted Non-Owned Events, MSG shall determine whether, for any particular Event, the Ticketmaster Integrated Marketplace will be activated and, if so, whether and at what times a hard landing or soft landing will be presented.  If MSG determines that the Ticketmaster Integrated Marketplace will be activated with respect to any such Event, Ticketmaster shall pay to MSG the standard fee that it pays to third-party promoters (as of the execution of this Agreement, forty percent (40%) of Net Resale Revenues, net of Customer Acquisition Costs) with respect to such Event (a "<u>Promoter Resale Fee</u>").  The parties acknowledge and agree that MSG does not anticipate permitting activation of the Ticketmaster Integrated Marketplace with respect to any Christmas Spectacular Events.

10.3.3  <u>Non-MSG-Owned Events</u>.  With respect to Non-MSG-Owned Events, Ticketmaster shall be solely responsible, with respect thereto, for (i) obtaining any authorization from the promoters of such Events to activate the Ticketmaster Integrated Marketplace and (ii) paying to such promoters any required revenue share or other payments necessary to obtain such authorization; if no such authorization is obtained with respect to any Event, and evidence thereof is not provided to MSG upon request, then the Ticketmaster Integrated Marketplace will not be activated for such Event.

10.3.4  <u>Distressed Event Inventory for MSG Major League Teams</u>.  Notwithstanding anything else contained in this Section 10.3, if any MSG Major League Team Event that otherwise would have had the Ticketmaster Integrated Marketplace activated and presenting a hard landing (as a result of MSG's election under Section 10.3.1 above) has remaining publicly-available inventory of 2,000 or more Tickets (excluding customary holds) as of seven days prior to the Event, MSG shall notify Ticketmaster of such condition, and then all Venue Pages (including online and mobile) for such Event shall be reset by Ticketmaster to present a soft landing within one hour after such notification, which soft landing shall be presented until and through the occurrence of the Event; provided, however, that MSG, in good faith consultation with Ticketmaster throughout such seven-day period, shall consider reinstating a hard landing

HIGHLY CONFIDENTIAL    LNE-LIT24-001185635

presentation prior to the occurrence of the Event, and any decision to reinstate such hard landing presentation shall not be unreasonably withheld by MSG (e.g., in the event that the remaining inventory for the applicable Event is less than 500 Tickets with five days remaining until the occurrence of the Event, the parties anticipate that the hard landing presentation shall be reinstated).

10.3.5 Temporary/Single-Event Switch to Hard Landing. Nothing contained herein shall prohibit the parties from agreeing, with respect to any MSG Property for which a soft landing is the default setting, to switch a particular Event, including temporarily, to a hard landing (e.g., in the event of a sell-out). Neither such agreed-upon *ad hoc* switches, nor switches due to distressed event inventory under Section 10.3.4, shall affect the parties' other obligations hereunder.

10.4 Price Floors for MSG Major League Teams. MSG may set floors on the prices at which Tickets may be posted on Ticketmaster Resale Platforms for MSG Major League Teams; provided, however, that such price floors may not be set at a level higher than seventy percent (70%) of the Ticket Face Value.

10.5 Activation Dates for MSG Major League Teams. The dates on which Tickets for particular Events may be posted on Ticketmaster Resale Platforms shall be governed as follows:

10.5.1 Knicks and Rangers Season Tickets. Tickets sold to Knicks and Rangers season ticket holders may be posted on the Ticketmaster Resale Platforms immediately upon sale thereof (or upon later announcement of the Team schedules); provided, however, that, should MSG determine that the timing of such posting is causing damage to any partner relationship or is otherwise commercially inadvisable to MSG, the parties shall in good faith discuss modifying or rescinding this provision.

10.5.2 Knicks and Rangers Playoffs. Tickets to Knicks and Rangers playoff games, with respect to any playoff round, shall be permitted to be posted on the Ticketmaster Resale Platforms reasonably promptly (and in no event more than forty-eight (48) hours) after the release by the relevant league of the schedule for such round; provided, however, that, should MSG reasonably determine that the timing of such posting is causing direct and material damage to any partner relationship in which such partner has rights to an exclusive sales period, the parties shall in good faith discuss modifying or rescinding this provision on terms mutually agreed upon.

10.6 Promoter Primary Sales on Resale Platforms. Ticketmaster shall not knowingly permit or facilitate the Primary Sales of Tickets by any licensee of an MSG Venue (e.g., event promoters such as Live Nation) on any Resale Platform without the prior consent of MSG.

# ARTICLE XI

## SPONSORSHIP

11.1 Designation. Ticketmaster shall be, and Ticketmaster may market and promote itself (subject to MSG's approval rights and applicable League Regulations, as set forth in Section 21.12 below) during the Term as, the "Official Ticketing Partner", "Official Ticket Marketplace", Official Ticket Exchange" and/or "Official Resale Marketplace" of (i) the Arena, (ii) the Theater, (iii) RCMH,

(iv) the Beacon, (v) Chicago, (vi) the Knicks, (vii) the Rangers, and, to the extent MSG and Ticketmaster mutually agree, in writing, to re-deploy any portion of the Sponsorship Fees or element of the Sponsorship Benefits to apply to any of the following properties, (viii) the Liberty, (ix) the Westchester Knicks, (x) Counter Logic Gaming, and (xi) any New TM Venues added pursuant to Section 3.9 (each of (i) through (xi), as and when applicable, a "<u>Sponsored Property</u>" and, collectively, the "<u>Sponsored Properties</u>"), or as otherwise mutually agreed, and MSG shall not grant to any third party the right to market and/or promote itself with any such designation or similar designation, except as expressly permitted in Section 3.6.2.

11.2 <u>Sponsorship Benefits</u>. MSG shall provide Ticketmaster with the advertising and promotional rights listed in Exhibit F (attached hereto and incorporated herein by reference) (the "<u>Sponsorship Benefits</u>"), each for utilization solely with respect to the Sponsored Properties and as provided in Section 11.6.

11.3 <u>Intellectual Property Licenses</u>.

    11.3.1 <u>MSG Marks</u>.  MSG hereby grants to Ticketmaster a limited, non-exclusive, nontransferable license during the Term to use the name, nicknames, logos, colors, artwork, trademarks, trade names, service marks, trade dress and other identifying features of the Sponsored Properties owned, controlled, cleared for use by or on behalf of, and/or applied to be registered or registered by MSG (collectively, the "<u>MSG Marks</u>") in connection with the specific advertising and promotional benefits set forth herein, including Exhibit F, provided that Ticketmaster's use of the MSG Marks in connection with such advertising and promotional benefits shall be subject to all applicable League Regulations as set forth in Section 21.12 below, including, without limitation, with respect to the Team Territories, as defined in such Section, and provided that each and every use must be approved in advance by MSG, other than uses necessary to meet Ticketmaster's obligations hereunder.  For avoidance of doubt, use of the Team-related MSG Marks on any Ticketmaster website shall be confined to the applicable League Territory via a "gating" or similar mechanism.  Except as expressly provided herein, no right, property, license, permission or interest of any kind in or to the MSG Marks or any other trademark, service mark, logo, color combination, insignia or slogan is intended to be given or transferred to or acquired by Ticketmaster by the execution, performance or non-performance of this Agreement.  As clarification, Ticketmaster expressly understands, acknowledges and agrees that Ticketmaster shall have no right to use the name or likeness of any Team player, any Rockette or any other performer at any of the MSG Venues by virtue of this Agreement.  MSG hereby expressly reserves full rights to grant to others licenses to use the MSG Marks, except as provided by any exclusivity terms set forth in this Article XI.

    11.3.2 <u>Ticketmaster Marks</u>. Ticketmaster hereby grants to MSG a limited, non-exclusive, nontransferable license during the Term to use Ticketmaster's names, nicknames, logos, colors, artwork, trademarks, trade names, service marks, trade dress and other identifying features owned, controlled, cleared for use by or on behalf of, and/or applied to be registered or registered by Ticketmaster (collectively, the "<u>Ticketmaster Marks</u>") for the purpose of advertising, promotional and other materials for the production and presentation of the advertising and promotional benefits set forth herein, provided that each and every use must be approved in advance by Ticketmaster, other than uses necessary to meet MSG's obligations

hereunder. Except as expressly provided herein, no right, property, license, permission or interest of any kind in or to the Ticketmaster Marks or any other trademark, service mark, logo, color combination, insignia or slogan is intended to be given or transferred to or acquired by MSG by the execution, performance or non-performance of this Agreement. Ticketmaster hereby expressly reserves full rights to grant to others licenses to use the Ticketmaster Marks.

11.3.3   Cessation. Upon expiration or termination of this Agreement, each party shall immediately cease all use of the other's intellectual property (e.g., MSG Marks or Ticketmaster Marks) in every manner whatsoever and, in the event that either party fails to so cease using such intellectual property of the other party, without limiting any of the non-breaching party's rights or remedies at law or otherwise, the non-breaching party shall be entitled to money damages for such breach of this Agreement in an amount not less than five thousand dollars ($5,000.00) per occurrence and up to the maximum amount allowable by law or in equity. The terms of this Section 11.3.3 shall survive the expiration or earlier termination of this Agreement.

11.4   Advertising Materials.

11.4.1   MSG Approval. All advertising materials, including substitute advertising materials, prepared or produced by or on behalf of Ticketmaster pursuant to this Agreement shall be subject to MSG's prior approval (not to be unreasonably withheld or delayed) in each instance and for each use; provided that, once MSG has approved the initial materials for a specific purpose, any substantially similar materials to be used for the same purpose and, if applicable, in the same advertising campaign shall not require such prior approval (unless and until MSG informs Ticketmaster that the approval of use for such purpose is withdrawn).

11.4.2   Signage Preparation. MSG shall be responsible for, at its sole cost and expense, the production, installation, copy and maintenance charges of any initial advertising material for any signage, advertising and other materials set forth in Exhibit F; provided that the cost of any changes in any such materials requested by Ticketmaster shall be borne by Ticketmaster, shall be performed by the firm(s) designated or approved by MSG, and shall be payable to MSG (or the person or entity performing the services) within thirty (30) business days following Ticketmaster's receipt of the applicable invoice. To the extent applicable, Ticketmaster shall comply with MSG policies and procedures for the preparation, delivery, installation and visibility of advertising materials and for the use of the MSG Venues, including, but not limited to, all applicable union jurisdictional requirements. MSG agrees to supply the required electricity for the signage to be provided pursuant to Exhibit F; provided, however that MSG shall have the right, in its sole discretion, to refrain from supplying electricity to any such electronic advertising signs during any event(s) (other than any Team games) or portions thereof at which the blackout thereof is required for such event production.

11.4.3   Delivery of Advertising Material. Ticketmaster shall be responsible for, at its sole cost and expense, the delivery of all commercial advertising material to be used on telecasts as set forth in Exhibit F to MSG's traffic department, to such person as is designated by MSG, in such form and within such time period as may be reasonably requested by MSG, which in all events shall not be less than seventy-two (72) hours prior to the scheduled telecast. Any banners or signage granted under this Agreement that are positioned for television exposure during any event shall be subject to the requirements of any compliance standards and practices

56

or similar department of any third-party entity that is exploiting such event by means of television or other electronic media distribution.

11.4.4 <u>Other Expenses</u>. Except as otherwise specifically provided in this Article XI, each of the parties shall pay its own costs and expenses incurred in performing its respective obligations under such Article.

11.5 <u>Sponsorship Fees</u>. In consideration of the Sponsorship Benefits granted herein, Ticketmaster shall pay MSG the following annual sponsorship fees during the Initial Term (the "<u>Sponsorship Fees</u>"):

| | |
|---|---|
| Contract Year 1 (2017-18): | $1,825,000 |
| Contract Year 2 (2018-19): | $2,325,000 |
| Contract Year 3 (2019-20): | $2,575,000 |
| Contract Year 4 (2020-21): | $2,825,000 |
| Contract Year 5 (2021-22): | $3,325,000 |

The Sponsorship Fee for Contract Year 1 shall be paid in full within thirty (30) days of the execution of this Agreement. The Sponsorship Fees for each other Contract Year shall be paid in two equal installments, the first on or before July 1 of the relevant Contract Year, and the second on or before January 2 of such Contract Year. During any Automatic Month-to-Month Renewal, Ticketmaster shall pay to MSG, at the beginning of each month thereof, a prorated portion (one-twelfth) of the Contract Year 5 Sponsorship Fee, and MSG shall continue to deliver the Sponsorship Benefits that were being delivered at the end of the Initial Term (or such other Sponsorship Benefits as the parties may agree upon for such period).

11.6 <u>Sponsorship Category</u>. The parties agree that the Sponsorship Benefits shall be solely for the category of "ticketing services and/or marketplaces, including Primary Sales and Ticket Resale" (the "<u>Sponsorship Category</u>"), and Ticketmaster shall have no sponsorship, advertising or promotional rights with respect to any product or service that is not reasonably included within such defined Sponsorship Category.

11.7 <u>Exclusivity</u>.

11.7.1 <u>Team Exclusivity</u>. During the Term, MSG shall not, subject to Section 11.7.2.1 below, use, authorize the use of, advertise or promote the products or services of a third party that are within the Sponsorship Category, or such third parties with respect to such products or services ("<u>Competitive Products</u>"), nor grant any competitor in the Sponsorship Category the right to advertise any of its Competitive Products (or itself with respect to such Competitive Products) or to use promotional rights relating to the Teams to promote any of its Competitive Products (or itself with respect to such Competitive Products), in connection with any Team Events. Promotional rights in the Sponsorship Category with respect to such Team Events shall be subject to all applicable League Regulations as set forth in Section 21.12 of this Agreement.

11.7.2 <u>Venue Exclusivity</u>. During the Term, MSG shall not, subject to Section 11.7.2.1 below, use, authorize the use of, advertise or promote any Competitive Products, nor grant any competitor in the Sponsorship Category the right to advertise itself or any of its Competitive

 LNE-LIT24-001185639

Products, in connection with any of the Sponsored Properties, except that Ticketmaster acknowledges and agrees that the foregoing exclusivity is expressly limited as follows:

11.7.2.1 <u>Special Events</u>. MSG will not be precluded from licensing (or itself using, as applicable) any MSG Venue for Special Events, nor from promoting such Special Events or otherwise advertising in connection therewith, and the benefits afforded to Ticketmaster hereunder will not apply to any such Special Events. Accordingly, competitors in the Sponsorship Category may place signs or banners and otherwise advertise and promote their products using the MSG Marks (other than any composite logos) and/or customary marketing channels (including in MSG Venues) during and/or in connection with the applicable Special Event. Neither MSG nor any licensees of the MSG Venues for Special Events nor such licensees' sponsors shall be precluded from marketing and promoting a Special Event using the trademarks of Competitive Products; nor shall MSG nor any such licensees be precluded from permitting their third party sponsors to advertise and promote Competitive Products, inclusive of such use of the MSG Marks as is necessary to identify the venue of the event, whether within or outside of the MSG Venue. For purposes of this Agreement, "<u>Special Events</u>" shall mean and include each of the following: (A) any event (single or multi-day) in connection with which no Tickets (or only a limited number of Tickets) are sold to the general public, which may include, but shall not be limited to, certain private/semi-private concerts, tours or comedy shows, award shows, television programs (live or recorded), television specials, any Recordation (as defined in Section 11.7.2.2 below), trade shows, sales, exhibitions, shareholders meetings and sales meetings; (B) any event intended to honor one or more individuals or for which all or a substantial portion of the proceeds are intended to benefit one or more charities or other not-for-profit organizations or causes (and not, for the avoidance of doubt, events for which a small portion of the ticket price may be donated to any such charities); (C) any event produced or promoted by a third party licensee (or by MSG, in the case of an event that is part of a broader third party-produced tour) for which the title sponsor of such event is a Competitive Product (provided, any signage Ticketmaster is entitled to hereunder at an MSG Venue shall not be blocked, covered up and/or otherwise obstructed in connection with such event); and (D) any event(s) at which a performer, artist, producer or licensee (and/or promoter thereof) (an "<u>Act</u>") who is to perform during or is promoting such event is unwilling to permit, or is contractually restricted from permitting, advertising by any and all MSG sponsors (including Ticketmaster), and accordingly, all signage that any MSG sponsors are otherwise entitled to at an MSG Venue are to be blocked, covered up and/or otherwise obstructed in connection with such event.

11.7.2.2 <u>Blockage</u>. Any signage Ticketmaster is entitled to hereunder at an MSG Venue may be temporarily blocked, covered up and/or otherwise obstructed for, during and in connection with Special Events (except as set forth in subsection (C) of Section 11.7.2.1 above), and during any photo shoot or the filming, recording, streaming, broadcasting and/or other media recordation of movies, commercials and other audio and/or visual programs in or around any MSG Venue (a "<u>Recordation</u>").

11.7.2.3 <u>Bookings</u>. Nothing contained herein shall preclude MSG from booking any show that has a national sponsor that does business within the Sponsorship Category at any MSG

                                                    LNE-LIT24-001185640

Venue, nor prevent such show or its promoter from advertising or promoting such sponsor in such MSG Venue solely with respect to such show.

11.7.2.4  Third Party Retailer Marketing.  Nothing contained in this Article XI shall preclude MSG from permitting or participating in the activities expressly permitted in Sections 3.6.2 and 3.6.3.5 hereof.

11.7.2.5  Media.  Ticketmaster acknowledges and agrees that nothing in this Agreement shall grant Ticketmaster any exclusivity with respect to any media placement, including, but not limited to spot advertising (including television, radio, network websites and marquees), advertising and sponsorship of game telecasts and radio broadcasts (or portions thereof) or other television and radio programming; except that MSG shall not sell or otherwise provide to any Ticketmaster competitor, for promotion of its brand or its products or services in the Sponsorship Category, advertising on any Sponsored Property websites on which, or any in-venue signage of any MSG Venue that is a Sponsored Property in which, Ticketmaster has advertising assets pursuant to Exhibit F.

11. 8  Sponsorship Fee Adjustment and/or Make Goods.  Notwithstanding anything to the contrary contained in this Agreement, in the event that MSG cannot provide or is delayed in providing any of the Sponsorship Benefits that does not result from the cancellation of any Knicks or Rangers games for the reasons provided below, then MSG shall instead provide to Ticketmaster a substitute advertising or promotional benefit of comparable value, in MSG's reasonable discretion, as a "make good" for the loss of such Sponsorship Benefit.  Ticketmaster acknowledges and agrees that the non-delivery or delay of delivery of particular Sponsorship Benefits by MSG shall not constitute a breach of this Agreement, and "make goods" are Ticketmaster's sole and exclusive remedy for any such non-delivery.  In the event of the cancellation of more than seven (7) Knicks or more than seven (7) Rangers regular season home games (that are not concurrently or subsequently rescheduled to occur within the same season) as a result of a labor dispute, strike, lockout or other work stoppage of the Teams, and/or as a result of the renovation of the Arena (any such event, a "Delay"), the Sponsorship Fee due during the Contract Year of the Delay shall be adjusted according to the formula below, with such adjustment credited to the following Contract Year's Sponsorship Fee (or refunded to Ticketmaster if occurring in the final Contract Year):

$A \times (B \times (C/D))$ where:

$A$ = Sponsorship Fee for the Contract Year of the Delay

$B$ = Percentage weight for the Team(s) affected by the Delay as set forth below:

Knicks – 25%

Rangers – 15%

$C$ = Number by which the regular season home games played in the Contract Year affected by the Delay is less than the number of standard regular season home games played by the applicable Team when not affected by a Delay

$D$ = Forty-one (41)

HIGHLY CONFIDENTIAL                                                          LNE-LIT24-001185641

11.9  <u>Press Releases</u>.  Ticketmaster and MSG will regularly consult with each other with regard to the potential to issue press releases or conduct other press events that promote newsworthy aspects of the MSG-Ticketmaster relationship.

11.10  <u>Annual Meetings</u>.  The parties will endeavor to meet on an annual basis to discuss the sponsorship, the Sponsorship Benefits, and Ticketmaster's then-current marketing plans and goals.

11.11  <u>Late Payment</u>.  In the event that Ticketmaster does not make any payment of Sponsorship Fees and MSG Resale Participation Amounts within forty-five (45) days of the due date therefor, then, in addition to any other remedies MSG might have hereunder, including the right to terminate pursuant to Article XIII, Ticketmaster shall be liable for and pay interest charges on such delinquent amount(s) at the rate of ten percent (10%) per annum (or the maximum amount allowable by law, if lower) commencing with such due date and ending upon the receipt by MSG of payment of such delinquent amount(s) and accrued interest and, in addition, MSG shall be entitled, at its sole discretion, to withhold the delivery of the Sponsorship Benefits to Ticketmaster until such time as full payment is received by MSG.  If MSG elects to so withhold Sponsorship Benefits, Ticketmaster acknowledges and agrees that MSG shall not be deemed to be in breach of its own obligations under this Agreement by reason of withholding such benefits during the period of such non-payment by Ticketmaster, provided that such Sponsorship Benefits are reinstated and furnished to Ticketmaster as soon as is reasonably practicable following MSG's receipt of full payment due.

## ARTICLE XII

## MOST FAVORED CLIENT

12.1  <u>Most Favored Client: Finances and Services Generally</u>.  Ticketmaster shall promptly notify MSG if at any time during the Term Ticketmaster is party to any ticket service agreement in the United States concerning its ticketing and related services through which (whether pursuant to an oral or written agreement, by virtue of performance or otherwise) the other party receives, when taken as a whole, financial, technological and/or other terms and conditions more favorable than the terms provided to MSG under this Agreement.  If such an event occurs, then Ticketmaster shall offer MSG simultaneously with such notice the opportunity to modify the terms and conditions of this Agreement so as to make them at least as favorable as those so extended to such other party.

12.1.1  This Section 12.1 shall not apply with respect to any ticket service agreement Ticketmaster has or enters into with a Ticketmaster client that has an average annual ticket sales volume (of tickets that generate a TM Fee (or comparable fee) payable to Ticketmaster) that exceeds the number that is five hundred thousand (500,000) more than the average number of Tickets per year sold through the Distribution Channels for the Events.  For purposes of this Section 12.1.1, the average annual ticket sales volume for both MSG and the compared Ticketmaster client shall be measured based on sales over the most recent three calendar years.

12.2  <u>Most Favored Client:  Similar Venues</u>.  In addition to any obligation due and owing under Section 12.1 above, Ticketmaster shall promptly notify MSG if, at any time during the Term, Ticketmaster is party to any ticket services agreement in the United States with an owner, operator or booker of a venue located in the New York City Metropolitan Area, the Chicago Metropolitan Area, the Los Angeles Metropolitan Area or the metropolitan area (excluding Las Vegas) in which

any New TM Venue is located, and that venue is a Similar Venue to one of the MSG Venues located in that same metropolitan area (a "<u>Designated Venue</u>"), pursuant to which (whether pursuant to an oral or written agreement, by virtue of performance or otherwise) Ticketmaster receives an Average Per-Ticket Fee from the Designated Venue (the "<u>Designated Venue TM Fee</u>") with respect to any Contract Year, that is less than the Net Average TM Fee (as defined below) which Ticketmaster receives from MSG under this Agreement with respect to such Contract Year. Except as provided in Section 12.2.1 with respect to the Barclays Center in Brooklyn, New York, the "<u>Net Average TM Fee</u>" shall be calculated by subtracting from the Average Per-Ticket Fee Ticketmaster receives from MSG under this Agreement, a credit per ticket (the "<u>MFC Credit</u>") for the following four services and benefits which Ticketmaster provides to MSG on a cost-free basis and which Ticketmaster represents it does not currently provide to other owners, operators or bookers: (1) AccountManager Site Hosting; (2) the ability to sell tickets through Unrelated Third-Party Marketers (see Section 3.3(7)); (3) exclusive ownership of Consumer Data with respect to tickets purchased for the Events; and (4) the Central Computer (collectively, the "<u>MFC Credit Benefits</u>"). Ticketmaster and MSG agree that the value of the MFC Credit shall be $0.90 per ticket for the MFC Credit Benefits for the first Contract Year and shall escalate at the rate of $0.03 per Contract Year for each Contract Year thereafter during the Term. In the event that Ticketmaster provides one or more of the MFC Credit Benefits to a Designated Venue, for the purpose of determining whether the Designated Venue TM Fee for that Designated Venue is less than the Net Average TM Fee, the MFC Credit shall be deducted by 25% for each MFC Credit Benefit provided to that Designated Venue, for the purpose of calculating MSG's Net Average TM Fee. (For example, if Ticketmaster provided two of the MFC Credit Benefits on a cost-free or discounted basis to a Designated Venue in Year 3 of the Agreement, the MFC Credit would be reduced by 50% to $0.48.)

If during the Term of this Agreement, Ticketmaster is party to any such ticket services agreement with an owner, operator or booker of a Designated Venue as set forth above in this Section 12.2, Ticketmaster shall offer MSG simultaneously therewith the opportunity to modify the terms and conditions of this Agreement so as to reduce MSG's Average Per-Ticket Fee to an amount that is more favorable than the Designated Venue TM Fee by reducing the TM Fees herein in an amount sufficient to reduce MSG's Average Per-Ticket Fee below the Designated Venue TM Fee provided to such Designated Venue.

> 12.2.1 Ticketmaster acknowledges that the Barclays Center in Brooklyn, New York is a Designated Venue under this Agreement. For the purposes of determining whether or not the Barclays Center's Designated Venue TM Fee is more favorable than the Net TM Fee provided under this Agreement, there shall be no MFC Credit deducted.

12.3 <u>Most Favored Client: Ticket Resale Integration</u>. Ticketmaster shall promptly notify MSG if at any time during the Term Ticketmaster is party to any agreement in the United States concerning its ticketing and related services, other than its agreement with Major League Baseball, in which (whether pursuant to an oral or written agreement, by virtue of performance or otherwise) the other party receives the right and/or ability to directly integrate season ticket holder seats designated for resale into AccountManager (or its equivalent/successor technology), i.e., enables season ticket holders to sell and transfer tickets directly through AccountManager. If such an event occurs, then Ticketmaster shall offer MSG simultaneously with such notice the right and ability, and offer MSG any necessary technology, to do the same, on substantially similar terms.

61

12.4  TM-Owned Vendor Rates.  Ticketmaster agrees that any TM-Owned Vendor shall provide MSG its preferred rates generally offered to any Similar Venue (excluding any Similar Venues utilizing such TM-Owned Vendors' products or services on a "beta client" or test basis).

12.5  Representation as to Current Compliance.  As of the date hereof, Ticketmaster represents that it is not presently a party to any agreement with any third party, which, if entered into during the Term of this Agreement, would trigger the obligations set forth in this Article XII.

12.6  Non-Circumvention.  Ticketmaster shall not take any action, the purpose of which is to circumvent or frustrate the intent of the protections afforded to MSG under this Article XII.

12.7  Annual Certification.  Upon execution of this Agreement and thereafter on June 30 of each Contract Year, Ticketmaster shall provide MSG with a statement, signed by Jared Smith (or, if Jared Smith is no longer employed by Ticketmaster, by its Chief Executive Officer or President), as well as its General Counsel and Chief Financial Officer, certifying that Ticketmaster has performed adequate due diligence (including all calculations necessary pursuant to Section 12.2) to make a determination as to its compliance with each provision of this Article XII and that, having done so, Ticketmaster is in fact compliant with each provision of this Article XII.

## ARTICLE XIII

## EVENT OF DEFAULT/TERMINATION

13.1  Breach.  The occurrence of any of the following events, continued without cure by Ticketmaster for twenty-five (25) days (five (5) Business Days with respect to Section 13.1.1 below) after receipt by Ticketmaster of written notice thereof, shall constitute an event of default hereunder:

13.1.1  The nonpayment by Ticketmaster to MSG of any sums required to be remitted hereunder at the appropriate time provided therefor;

13.1.2  The default by Ticketmaster under any material term, covenant or condition of the Agreement, or breach by Ticketmaster of any material representation or warranty contained herein;

13.1.3  Any affirmative act of insolvency by Ticketmaster, whether voluntary or involuntary, or the filing by Ticketmaster or any third person against Ticketmaster of any petition or action under any bankruptcy, reorganization, insolvency or moratorium law or any other law or laws for the relief of, or relating to, debtors; provided, however, that no such act shall constitute an event of default unless and until Ticketmaster shall be unable to meet its obligations to MSG under the terms of this Agreement; and

13.1.4  The exposure of the Hardware or Software or any material portion thereof to any levy, seizure, assignment or sale for or by a creditor or governmental agency.

13.2  Upon the occurrence of any of the foregoing events of default, Ticketmaster shall, without demand, forthwith pay to MSG all amounts due and owing pursuant hereto, and MSG may at its option terminate this Agreement and require Ticketmaster to remove all Hardware from the MSG Venues at Ticketmaster's sole cost and expense.

HIGHLY CONFIDENTIAL  LNE-LIT24-001185644

13.3  No remedy referred to in Section 13.2 is intended to be exclusive, but each shall be cumulative and in addition to any other remedy provided for in this Agreement or as otherwise available to MSG at law or in equity.

13.4  The occurrence of any of the following events, continued without cure by MSG for twenty-five (25) days (five (5) Business Days with respect to Section 13.4.1 below) after receipt by MSG of written notice thereof, shall constitute an event of default hereunder:

13.4.1  The nonpayment by MSG to Ticketmaster of any sums required to be remitted hereunder at the appropriate time provided therefor;

13.4.2  The default by MSG under any material term, covenant or condition of the Agreement, or breach by MSG of any material representation or warranty contained herein;

13.4.3  Any affirmative act of insolvency by MSG, whether voluntary or involuntary, or the filing by MSG or any third person against MSG of any petition or action under any bankruptcy, reorganization, insolvency or moratorium law or any other law or laws for the relief of, or relating to, debtors; provided, however, that no such act shall constitute an Event of Default unless and until MSG shall be unable to meet its obligations to Ticketmaster under the terms of this Agreement; and

13.4.4  The exposure of a substantial part of MSG's property or any part of the Hardware to any levy, seizure, assignment or sale for or by a creditor or governmental agency.

13.5  Upon the occurrence of any of the above events of default, MSG shall, without demand, forthwith pay to Ticketmaster all amounts due and owing pursuant hereto, and Ticketmaster may at its option terminate this Agreement and remove all Hardware from the MSG Venues, provided that Ticketmaster's obligations under Section 13.7 below shall survive such termination and any removal of Hardware may only be done consistent with Ticketmaster's satisfaction of such obligations.

13.5.1  No remedy referred to in this Section 13.5 is intended to be exclusive but each shall be cumulative and in addition to any other remedy provided for in this Agreement or as otherwise available to Ticketmaster at law or in equity.

13.6  Reserved.

13.7  Transition Period.  Ticketmaster acknowledges that the services provided hereunder are essential to the effective operation of the MSG Venues and MSG's businesses. Ticketmaster shall, upon termination or expiration of this Agreement for any reason, for a period of up to one year following such termination or expiration (such period, the "Transition Period"), (i) provide MSG, to the extent reasonably requested or required by MSG, with the services (in accordance with and subject to the same financial terms and conditions) in effect at termination or expiration including, without limitation, continued sales of Tickets to Events with respect to which the on-sale commenced prior to the termination or expiration of the Agreement and/or during the Transition Period, (ii) reasonably cooperate with MSG with respect to any issues arising from such Events, (iii) provide reasonable and good faith assistance in the transition of the services provided by Ticketmaster hereunder to MSG or to a party designated by MSG, including without limitation providing reasonable documentation relating to the services provided hereunder, provided that such assistance or documentation shall not require or include the disclosure of any confidential or

63

proprietary information of Ticketmaster or the TM System, (iv) provide any of the MSG Information and the MSG Consumer Data required under the Agreement, including with respect to Events held after the termination or expiration of the Agreement, (v) reasonably communicate to prospective Ticket purchasers of Events that go on-sale after the termination or expiration of the Agreement regarding the availability of Tickets at alternative locations, and/or (vi) provide such other services or activities reasonably requested by MSG to facilitate the orderly transition to a third party of the performance of the services provided by Ticketmaster hereunder, at no additional cost except as set forth in section 13.7.1 below.

13.7.1 Transition Costs. Any reasonable costs incurred by Ticketmaster in excess of the costs customarily incurred by Ticketmaster in providing services hereunder during the Transition Period (the "Transition Costs") shall be the responsibility of MSG, except if this Agreement is terminated by MSG by reason of a Ticketmaster event of default, in which case all Transition Costs shall be borne by Ticketmaster. Transition Costs may include, but shall not be limited to, (i) costs for storage of equipment, (ii) costs for time and labor provided by Ticketmaster, including any reasonable and customary data transfer costs to migrate the MSG Consumer Data and the MSG Information from the Platform to MSG's or a third party's hosting environment if and as directed by MSG and (iii) shipping, storage or disposal of any equipment owned by MSG, unless otherwise agreed in writing.

## ARTICLE XIV

## TICKETMASTER'S REPRESENTATIONS AND WARRANTIES

14.1 Execution Date Ticketmaster Representations. As of the date hereof, Ticketmaster represents and warrants to MSG that:

14.1.1 Ticketmaster is a limited liability company duly organized and in good standing under the laws of the State of Delaware and has adequate power to enter into and perform this Agreement;

14.1.2 This Agreement has been duly authorized, executed and delivered on behalf of Ticketmaster and constitutes a valid, legal and binding agreement of Ticketmaster enforceable in accordance with its terms; and

14.1.3 The entering into and performance of this Agreement will not violate any judgment, order, law or regulation applicable to Ticketmaster or any provision of Ticketmaster's LLC agreement or other organizational documents, or result in any breach of, constitute a default under, or result in the creation of, any lien, charge, security interest or other encumbrance upon any assets of Ticketmaster, pursuant to any instrument to which Ticketmaster is a party or by which it or its assets may be bound.

14.2 Ongoing Ticketmaster Representations and Warranties. As of the date hereof and continuing for the Term of this Agreement, Ticketmaster represents and warrants to MSG that:

14.2.1 Ticketmaster owns all right, title and interest in and to the Hardware and all software (other than any third party software), and has licenses to use any third party software, necessary to perform all of its services hereunder and to grant the rights and licenses to MSG for the purposes of and under this Agreement;

HIGHLY CONFIDENTIAL                                                    LNE-LIT24-001185646

14.2.2  The Hardware and Software will perform, and the operation of the TM System will be undertaken (including, without limitation, all repair, upgrade, support, maintenance and service responsibilities), in a manner reasonably adequate for the performance of Ticketmaster's obligations under this Agreement; provided, however, that, subject to Ticketmaster's obligations as to the DR Requirements set forth herein, such warranties do not extend or become applicable with respect to any delays, stoppages or malfunctions which are caused by acts of any third parties which are not under, or which are caused by events or causes beyond, the reasonable control of Ticketmaster.  The Platform shall be suitable for MSG's intended purposes consistent with the service levels set forth in this Agreement;

14.2.3  All Hardware, Software (except for any software licensed or acquired from a third party developer that is provided by Ticketmaster as an option (currently, Sales Force/Marketing Cloud, Fevo, and GivEx), rather than Software Ticketmaster is required to provide under this Agreement) ("Optional Third-Party Software")) and the overall TM System shall constitute first-class, "state-of-the-art" technology as may be currently or hereafter available and in general use in the industry at any given time during the Term, and that Ticketmaster shall, from time to time, at its sole cost and expense, modify, adapt and update each and all of the foregoing so as to maintain each of them as first-class, "state-of-the-art" technology, including without limitation, taking industry standard (or greater) precautions to prevent loss, theft or unauthorized disclosure of the MSG Consumer Data and the MSG Information from the TM System (a "Data Loss Event").

14.2.3.1  Optional Third-Party Software provided by Ticketmaster shall perform at no less than industry standard levels.  To the extent that Ticketmaster offers to provide any optional services or functions that will rely in whole or in part on Optional Third-Party Software, it shall, at the time such offer is made, identify such Software as Optional Third-Party Software and advise MSG of the service or function it is intended to perform.

14.2.4  Ticketmaster has fully examined the Box Offices and MSG's Ticket selling requirements and procedures and, based upon such examination and the parties' past practice together, represents and warrants that the Hardware, Software and the TM System are fit for the ticket selling operations of major sports and entertainment venues, including the MSG Venues;

14.2.5  MSG is and will be able to utilize the TM System to view current raw data on a real-time daily basis on each calendar day, and to access archived data as soon as reasonably possible upon request.  MSG also is and will be able to generate customized reports with respect to all Tickets printed or sold on the TM System and all returns made on the TM System on a per performance and/or per Event basis, as the case may be;

14.2.6  Ticketmaster shall not make use of any consumer or similar lists, which may be supplied by MSG without the prior written approval of MSG, and any such lists shall remain the proprietary property of MSG, and Ticketmaster shall not sell any list designated as a customer list of any of the MSG Properties to any third party (but may sell or utilize lists which include Consumers who purchased Tickets, without being identified as such, as part of a more general designation of ticket purchasers);

14.2.7  The utilization of the TM System by Ticketmaster shall comply with all applicable federal, state and local laws, statutes, ordinances, rules, regulations and comparable

prescriptions; Ticketmaster shall comply with all applicable federal, state and local laws, rules and regulations in exercising any rights and/or carrying out its obligations hereunder, including without limitation with respect to any sweepstakes, giveaways or similar promotions conducted by Ticketmaster (without limitation, any of the foregoing shall be subject to the prior approval of MSG in each instance), and any relationship and/or interconnection between Ticketmaster's primary and secondary ticket businesses; Ticketmaster shall be responsible for the obtaining of all necessary and/or appropriate governmental licenses, permits or authorizations required of Ticketmaster in connection with such utilization, if any;

14.2.8  Ticketmaster, and any third party providing ticket services to Ticketmaster (to whom Ticketmaster may outsource any obligations hereunder if so approved by MSG) covered by SAS70/SSAE18 or PCI standards set forth in this section, shall (i) meet all applicable SAS 70 Type II (or its replacement SSAE 16 or any future version) requirements, (ii) ensure that the Platform and all components of the Software are covered by the Annual Report (to ensure a SAS-70 Type II hosting facility for the Platform) and provide written annual certifications thereof (via Annual Report or otherwise) on or prior to the anniversary of the Effective Date (and at such other times during the Term as MSG may reasonably request), (iii) ensure that the Platform and any changes made thereto continue to meet SAS-70 Type II (or its replacement SSAE 16 or any future version) requirements, and (iv) be duly certified compliant, and for the duration of the Term shall remain certified as compliant, with the latest, most current PCI-DSS version, including without limitation, all Software components that store, process, transmit and/or contain cardholder data, and further shall (A) provide certifications of such compliance at such times during the Term as MSG may reasonably request, (B) adopt reasonable applicable policies to achieve such compliance, (C) cooperate with MSG's qualified security assessor (QSA) (or other designated representative) as may be necessary with respect thereto, and (D) provide a copy of Ticketmaster's most recent letter of PCI-DSS compliance provided by Ticketmaster's QSA, at such times during the Term as MSG may reasonably request;

14.2.9  All necessary licenses, agreements, permits, waivers, releases, registrations, approvals and/or authorizations required in connection with this Agreement have been or shall be timely obtained and will be valid and sufficient for Ticketmaster's performance under this Agreement;

14.2.10  Each and every element of any commercials or advertisements provided by it have been, or will have been when provided, fully cleared for all formats and media, as applicable, whether now known or hereafter devised, throughout the world in perpetuity; and

14.2.11  The Ticketmaster Resale Platforms shall perform at a substantially similar level to that provided in past practice and no less than industry standard performance levels and at a level that is appropriate and sufficient to carry out Ticketmaster's obligations hereunder, supported by such technology as may be currently or hereafter available and in general use in the industry at any given time during the Term, and Ticketmaster shall, from time to time, at its sole cost and expense, modify, adapt and update the Ticketmaster Resale Platforms as necessary to maintain its performance at such levels, including without limitation, taking industry standard precautions to prevent a Data Loss Event.

HIGHLY CONFIDENTIAL

## ARTICLE XV

### MSG's REPRESENTATIONS AND WARRANTIES

15.1 Execution Date MSG Representations. As of the date hereof, MSG represents and warrants to Ticketmaster that:

15.1.1 MSG is a limited liability company duly organized and in good standing under the laws of the State of Delaware and has adequate power to enter into and perform this Agreement;

15.1.2 This Agreement has been duly authorized, executed and delivered on behalf of MSG and constitutes the valid, legal and binding agreement of MSG, enforceable in accordance with its terms;

15.1.3 The entering into and performance of this Agreement will not violate any judgment, order, law or regulation applicable to MSG or any provision of MSG's LLC agreement or other organizational documents, as the case may be, or result in any breach of, constitute a default under, or result in the creation of, any lien, charge, security interest or other encumbrance upon any assets of MSG or upon the Hardware or Software, pursuant to any instrument to which MSG is a party or by which it or its assets may be bound; and

15.1.4 MSG is the sole and exclusive owner and/or manager of the MSG Venues.

15.2 Ongoing MSG Representations and Warranties. As of the date hereof and continuing for the Term of this Agreement, MSG represents and warrants to MSG that:

15.2.1 All necessary licenses, agreements, permits, waivers, releases, registrations, approvals and/or authorizations required in connection with this Agreement have been or shall be timely obtained and will be valid and sufficient for MSG's performance under this Agreement; and

15.2.2 MSG shall comply with all applicable federal, state and local laws, rules and regulations in exercising any rights and/or carrying out its obligations hereunder, including without limitation with respect to any sweepstakes, giveaways or similar promotions conducted by MSG (without limitation, any of the foregoing that utilize any Ticketmaster Resale Platforms or Ticketmaster's services shall be subject to the prior approval of Ticketmaster in each instance).

## ARTICLE XVI

### PATENTS, TRADEMARK & COPYRIGHTS

16.1 Intellectual Property Claim Indemnity. Ticketmaster will defend and indemnify the MSG Indemnitees against any suit or proceeding brought against any of the MSG Indemnitees or to which any of the MSG Indemnitees may be subject insofar as it is based on a claim that the Hardware, Software or any other aspect of the TM System constitutes an infringement of any patent, trademark or copyright of the United States or any other intellectual property right or right of privacy of any third party, if notified promptly in writing and given authority, information and assistance (at Ticketmaster's expense) for the defense of such a suit or proceeding. In the event that use by MSG of the TM System is enjoined, Ticketmaster shall, at its own expense, either procure for MSG the right to continue to use the TM System, replace the same with a non-infringing product of comparable or better quality, modify the TM System so it becomes non-infringing and of comparable or better quality, or remove the TM System, in which case MSG

67

shall, nonetheless, retain all rights and remedies it may have against Ticketmaster at law or in equity.

16.2  Copyrights.  Ticketmaster shall not be liable to the MSG Indemnitees under any provision of this Article XVI if any patent or copyright infringement or claim thereof is based upon the use of the TM System in connection with any materials, hardware, software or devices not delivered or installed by Ticketmaster or where the TM System has at MSG's request been modified by or for MSG in a manner to become infringing.

16.3  Use of Trademarks.  In addition to any licenses granted under Section 11.3 hereof, each party hereby extends the other a non-exclusive license to use their respective trademarks, designs, logos, and domain names (the "Trademarks") for promotional purposes upon obtaining the other's prior written approval, which shall not be required in connection with the programming of Event information on the TM System, MSG's Ticket Network or MSG's Websites or promoting of the Events. Ticketmaster shall provide MSG with copy showing how MSG Trademarks will be used. MSG shall pre-approve the general layout and format of any MSG Trademarks to be used by Ticketmaster.

## ARTICLE XVII

## INDEMNITY; RISK OF LOSS; LIMITATION OF LIABILITY

17.1  Indemnity.

17.1.1  MSG's Indemnification Obligations.  In addition to its indemnification obligations otherwise expressly set forth herein, MSG shall indemnify, defend and hold harmless the Ticketmaster Indemnitees from and against all claims, actions, damages, expenses (including court costs and reasonable attorneys' fees), obligations, losses, liabilities and liens (collectively, "Claims") arising from or in connection with (i) MSG's improper use of the TM System or presentation of Events (excluding any Claims caused by Ticketmaster's negligence or willful misconduct), (ii) breach of any of MSG's obligations, representations or warranties herein, (iii) any Data Loss Event resulting from MSG's actions or omissions, (iv) MSG's performance of this Agreement, (v) MSG's actions, omissions to act or negligence, (vi) MSG's breach of any representation, warranty or agreement with Ticketmaster or any third parties, including, but not limited to, any Claims that may be filed or threatened relating to trademarks, trade names, service marks, copyrights, patents or claims regarding unfair competition, privacy or defamation, (vii) non-compliance by MSG with any laws, rules or regulations promulgated by any legislative, governmental or regulatory entity, (viii) a Claim in connection with MSG's use, possession or operation of the Hardware, (ix) a Claim in connection with MSG's use of the MSG Consumer Data or any Resale Consumer Data, but only to the extent such data was collected by Ticketmaster in compliance with relevant law, and/or (x) any consumer Claims or complaints relating to MSG's products or services; except, in each case, to the extent that any such Claim shall result from Ticketmaster's negligence or willful misconduct with respect thereto. Ticketmaster shall promptly notify MSG of any Claim or litigation to which the indemnity set forth in this Section 17.1.1 applies. MSG agrees to defend all actions to which such indemnity applies and to conduct the defense thereof at MSG's sole expense and by MSG's counsel, which counsel shall be reasonably satisfactory to Ticketmaster. Ticketmaster

HIGHLY CONFIDENTIAL                                                        LNE-LIT24-001185650

may not settle any suit, action or claim to which an indemnification obligation applies under this Section 17.1.1 without the prior written approval of MSG.

17.1.2  Ticketmaster's Indemnification Obligations.  In addition to its indemnification obligations otherwise expressly set forth herein, Ticketmaster shall indemnify, defend and hold harmless the MSG Indemnitees from and against all Claims arising from or in connection with (i) Ticketmaster's performance of this Agreement, (ii) the actions, omissions to act or negligence of Ticketmaster, (iii) Ticketmaster's breach of any representation, warranty, covenant or agreement with MSG or any third parties in each case including, but not limited to, any Claims that may be filed or threatened relating to trademarks, trade names, service marks, copyrights, patents or Claims regarding unfair competition, privacy or defamation, (iv) non-compliance by Ticketmaster with any laws, rules or regulations promulgated by any legislative, governmental or regulatory entity, (v) any consumer Claim in connection with Ticketmaster's use of the MSG Consumer Data or any Resale Consumer Data, (vi) any consumer Claims or complaints relating to Ticketmaster's products or services (e.g., that MSG Event Tickets authenticated via the TM System are not properly authenticated), (vii) any Data Loss Event resulting from Ticketmaster's acts or omissions and/or (viii) Ticketmaster's improper installation or maintenance of the TM System or improper operation of the TM System on Ticketmaster's premises; except, in each case, to the extent that any such Claim shall result from MSG's negligence or willful misconduct with respect thereto. MSG shall promptly notify Ticketmaster of any Claim or litigation to which the indemnity set forth in this Section 17.1.2 applies. Ticketmaster agrees to defend all actions to which such indemnity applies and to conduct the defense thereof at Ticketmaster's sole expense and by Ticketmaster's counsel, which counsel shall be reasonably satisfactory to MSG. MSG may not settle any suit, action or claim to which an indemnification obligation applies under this Section 17.1.2 without the prior written approval of Ticketmaster.

17.2.  Reserved.

17.3  Hardware Risk of Loss.  Ticketmaster hereby assumes and shall bear the entire risk of loss and damage to the Hardware at the Arena, ordinary wear and tear excepted, whether or not insured against, unless occasioned by the negligence of MSG, from any and every cause whatsoever from the date of installation at the Arena until removal thereof following expiration or termination of this Agreement. MSG hereby assumes and shall bear the entire risk of loss and damage to the Hardware, ordinary wear and tear excepted, whether or not insured against, once installed at the Theater, the Beacon, RCMH, Chicago, the Forum and any New TM Venues (collectively, the "Non-Arena MSG Venues"), unless occasioned by the negligence of Ticketmaster, from any and every cause whatsoever from the date of installation at the Non-Arena MSG Venues, until removal thereof following termination of this Agreement. No such loss or damage to the Hardware at the Non-Arena MSG Venues shall impair any obligation of MSG under this Agreement. In the event of loss or damage of any kind to any Hardware at the Non-Arena MSG Venues, MSG, at its sole option, shall place the same, or replace the same with similar property, in good repair, condition and working order to the satisfaction of Ticketmaster, within sixty (60) days of such loss or damage.

17.4  Limitation of Liability.  In the event of any breach of this Agreement by Ticketmaster or any malfunction or outage of the Hardware or Software or Ticketmaster's failure to provide required

HIGHLY CONFIDENTIAL                                         LNE-LIT24-001185651

maintenance service and to keep the TM System in operating condition, MSG shall be entitled to recover its financial loss to the extent caused by the above, including any direct expenses or costs, refunds or losses (including lost revenues) from any canceled event or lost ticket sales (as reasonably estimated and taking into account MSG's obligation to make commercially reasonable efforts to mitigate such loss). Except to the extent arising from Ticketmaster's gross negligence or willful misconduct, (i) Ticketmaster shall not be liable for incidental or consequential damages (other than as provided in the first sentence of this Section 17.4), or punitive damages, for any breach of this Agreement and (ii) occasional short-term interruptions of service which are not unreasonable under comparable industry standards and which are consistent with the limits set forth in Section 6.2 of this Agreement, shall not be cause for any liability or claim against Ticketmaster hereunder, nor shall any such occasion render Ticketmaster in default under this Agreement.

## ARTICLE XVIII

## INSURANCE

18.1 <u>Ticketmaster Insurance</u>. With respect to this Agreement and the products and services provided by Ticketmaster hereunder, Ticketmaster shall keep in effect at all times during the Term the following insurance coverages:

18.1.1 All-risk property damage insurance covering the Hardware located at the Arena; and

18.1.2 Comprehensive general and automobile liability insurance (inclusive of any umbrella policies) covering bodily injury and property damages (and including blanket contractual liability coverage) in the amount of Five Million Dollars ($5,000,000) per occurrence (inclusive of any umbrella coverage), and $10,000,000 in the aggregate, and, with respect to the general liability insurance naming The Madison Square Garden Company, MSG Sports & Entertainment, LLC, SportCo (if any) and their respective owners, partners, assigns, Affiliates (whether direct or indirect), and all directors, officers, employees, agents, licensees, successors and assigns as additional insureds.

18.2. <u>MSG Insurance</u>. With respect to this Agreement and the MSG Venues, MSG shall keep in effect at all times (i) all-risk property damage insurance covering the Hardware located at any Non-Arena MSG Venues at which Hardware is installed, and (ii) comprehensive general and automobile liability insurance (inclusive of any umbrella policies) covering bodily injury and property damages (and including blanket contractual liability coverage) in the amount of Five Million Dollars ($5,000,000) per occurrence (inclusive of any umbrella coverage), and $10,000,000 in the aggregate, and, with respect to the insurance on the Hardware and the general liability insurance, naming Ticketmaster, Live Nation Worldwide, Inc. and its landlords or licensors, if any, and their respective owners, partners, assigns, Affiliates (whether direct or indirect), and all directors, officers, employees, agents, licensees, successors and assigns as additional insureds as additional insureds.

18.3 <u>Errors and Omissions; Data Protection</u>. Each party shall maintain technology and professional liability coverage that covers all claims arising out of or relating to errors and omissions related to intellectual property infringement (excluding patent infringement), invasion of privacy, improper data disclosure, data misuse or data loss with minimum limits of at least

70

$10,000,000 for any one claim and $10,000,000 in the aggregate. Such insurance must explicitly address all the foregoing without limitation if caused by an employee of the applicable party or an independent contractor working on behalf of such party in performing services hereunder and must provide coverage for wrongful acts, claims, and lawsuits anywhere in the world. Data protection insurance must include coverage for the confidentiality/data breach, civil liability, regulatory investigations and notification costs resulting from a breach of confidentiality or breach of security by or on behalf of such party. Each insurance carrier must have an A.M. Best's rating of A-VII or better or an equivalent rating with Standard & Poor, Moody's or Fitch.

18.4  Certificates of Insurance. Ticketmaster and MSG shall, at all times during the Term, upon request, provide or have provided to each other certificates of insurance evidencing the existence of the insurance required hereunder and the inclusion of required additional insureds.

18.5  Notice of Cancellation. Each party will provide directly to the other party a minimum of thirty (30) days' advance written notice before cancellation, non-renewal or material change of coverage takes effect for the policy evidenced on the certificate of insurance, regardless of whether the cancellation, non-renewal or material change is effected by the insured party or the insurance carrier. Such cancellation or alteration shall not relieve the party of its continuing obligation to maintain insurance coverage in accordance with this section.

18.6  Waiver of Subrogation. All insurance provided and maintained by MSG and Ticketmaster shall provide for a waiver of the insurers' rights of subrogation against the other party.

18.7  Survival. The policies required herein must be kept in force during the life of the Agreement and for three years (either as a policy in force or extended reporting period) thereafter. Each party shall purchase an extended reporting period, or "tail coverage," if necessary to comply with this requirement, if the policy is not kept in force. Ticketmaster shall cause its subcontractors, including all persons hired by Ticketmaster who are not Ticketmaster's employees, who perform any part of the work hereunder, to procure and to maintain in full force and effect insurance of the types and amounts and meeting the requirements described in this Article XVIII, as appropriate.

18.8  Non-Waiver. A party's failure to provide insurance as required hereunder, or a party's failure to supply a certificate of insurance that complies with the requirements of this Article, or the failure of the other party to require evidence of insurance or to notify the insuring party of any breach by such party of the requirements of these provisions or deficiencies in the insurance obtained, shall not constitute a waiver by any party of any of these insurance requirements, or a waiver of any other terms and conditions herein, including a party's obligations to defend, indemnify and hold harmless the other party as required herein.

## ARTICLE XIX

### TAXES

19.1  Taxes on Hardware. MSG or Ticketmaster, as applicable, shall be responsible for all license fees, registration fees, assessments, charges and taxes, whether municipal, state or federal, with respect to the Hardware located at the MSG Venues, including, but not limited to, use, excise and property taxes, and penalties and interest with respect thereto.

                                                  LNE-LIT24-001185653

19.2 <u>Event Taxes</u>. MSG shall be responsible for the payment of all taxes or charges, measured by reference to a charge per Ticket sold or determined based upon the Ticket Face Value and any service charges or other fees levied against Consumers on any Primary Sale of Tickets and retained by MSG, due to any municipality, state or other governmental or quasi-governmental authority as a result of, or in connection with, any Event held at the MSG Venues (collectively, "<u>Event Taxes</u>") to the extent that such Event Taxes relate to funds paid or owed to MSG and for remitting same to the appropriate governmental authority. The foregoing notwithstanding, Ticketmaster shall be responsible for the payment of all Event Taxes to the extent that such Event Taxes relate to the TM Fee or Transaction Fees payable to and retained by Ticketmaster.

## ARTICLE XX

## ASSIGNMENT OR SUBLEASE

20.1 <u>By MSG</u>. Except as provided in Section 20.1.1 below, without the written consent of Ticketmaster, which shall not be unreasonably withheld or delayed, MSG shall not (i) assign, transfer, pledge or hypothecate its rights in this Agreement or any interest therein to any party or (ii) permit the Hardware or any part thereof to be used, or access to the Software or any part thereof to be had, by anyone other than MSG and MSG's authorized employees or agents, provided that (x) MSG may assign the Agreement to an Affiliate that is also a wholly-owned (whether directly or indirectly) subsidiary of the Madison Square Garden Company without Ticketmaster's consent and (y) MSG may assign this Agreement to a successor-in-interest (including, without limitation, a successor-in-interest by virtue of an acquisition of either one or more of MSG or the rights of one or more of MSG with respect to the operation of one more of the MSG Venues, provided that, in the case of an acquisition of less than all of the MSG Venues, only MSG's rights with respect to such acquired MSG Venue or MSG Venues shall be assigned) if such successor assumes the obligations of the Agreement, including the responsibility for Ticket Receipts previously advanced to MSG. Any assignment, transfer, pledge or hypothecation for which consent is required hereby and that is made without such consent shall be void.

20.1.1 <u>Potential Spin-Off</u>. Ticketmaster acknowledges that MSG is contemplating a corporate restructuring in which the Teams would be placed in a separate to-be-named corporate entity (for the purposes of this Agreement, "<u>SportsCo</u>"), which SportsCo shall be under common control with MSG (a "<u>Spin-Off</u>"). For avoidance of doubt, Ticketmaster's approval shall not be required for MSG to effect a Spin-Off, subject to SportsCo's execution of a joinder to this Agreement in accordance with Section 20.1.2. For the avoidance of doubt, the parties agree that, except as provided in the next subsection, such Spin-Off will not affect the rights and obligations under this Agreement of the parties with respect to the Teams.

20.1.2 <u>Further Cooperation</u>. Each of the parties hereto agrees to execute and deliver such additional and further documents and instruments as may be necessary or appropriate to carry out the intents and purposes of Section 20.1.1. Accordingly, in the event of a Spin-Off, MSG shall cause SportsCo to execute a joinder to this Agreement, pursuant to which SportsCo ratifies and agrees to the terms of this Agreement as if originally named a party hereto, and further expressly agrees to be bound by and subject to all rights and obligations of MSG hereunder as relates to the Teams and the Teams' Events, to the effect that Ticketmaster may enforce the terms of this Agreement directly against SportsCo as relates to the Teams. This

72

may also include any further documentation reasonably required by the NBA, the NHL or the WNBA, and, to the extent that any such league reasonably requires modifications to this Agreement in order to grant its approval of a Spin-Off, the parties shall work in good faith and use best efforts to agree upon such modifications, with the understanding that, with respect to any such modifications that may impair or reduce the rights, benefits and/or exclusivities granted to a party under this Agreement, the parties' goal in agreeing to any such modifications is that they would not change the core economic balance between the parties, and the parties would agree on revised terms (including economic terms) to adequately compensate the applicable party for any such impairment or reduction in its rights, benefits and/or exclusivities.

20.2  By Ticketmaster.  Without the prior written consent of MSG (which, if sought, shall not be unreasonably withheld or delayed), Ticketmaster shall not assign, transfer, pledge or hypothecate its rights in this Agreement or any interest therein to any party, provided that Ticketmaster may assign this Agreement to a successor-in-interest (including, without limitation, a successor-in-interest by virtue of an acquisition) if such successor assumes the obligations of the Agreement and succeeds to all, or substantially all, of Ticketmaster's assets.  Any assignment, transfer, pledge or hypothecation for which consent is required hereby and which is made without such consent shall be void.

## ARTICLE XXI

## MISCELLANEOUS

21.1  No Joint Venture.  The relationship of Ticketmaster and MSG hereunder shall in no way be construed to create a joint venture or partnership, or to constitute Ticketmaster as an agent or employee of MSG for any purpose other than as set forth herein.

21.2  Agreement Terms Non-Disclosure.  Each party agrees that it will not disclose to any third party any information which is not a matter of public record with respect to the financial terms or provisions of this Agreement, except as follows: (i) as part of its annual reporting or review procedure to its auditors, its attorneys and/or its banks; (ii) as part of its financing activities to underwriters, banks or other financial institutions; (iii) to the extent necessary to perform this Agreement; (iv) as may be required by court order, rule or regulation applicable to the conduct of its business, including the requirements of the Securities and Exchange Commission and any applicable national stock exchange; (v) to its attorneys, bankers and other advisors in connection with any corporate restructuring (including, in the case of MSG, a Spin-Off); and (vi) in order to enforce its rights pursuant to this Agreement.  No public announcement of the Agreement or any of the terms hereof shall be made without the joint written approval of the parties hereto.

21.3  Confidentiality.

21.3.1  Mutual Non-Disclosure Obligations.  The terms of this Agreement, including, without limitation, the financial terms and the duration of this Agreement, shall be deemed confidential, and shall not be disclosed by either party without the other's consent, except as specifically permitted in Section 21.2.  Furthermore, any information learned or received by one party (the "Receiving Party") about the other party (the "Disclosing Party") in the negotiation and/or performance of this Agreement shall be considered confidential, and shall not be disclosed by the Receiving Party to any third party without the Disclosing Party's prior written consent,

73

except (i) where such disclosure is appropriate in order to protect the Receiving Party's rights in the event of a default or breach by the other party or (ii) to the extent that the Receiving Party is required to make such disclosure by law, by legal process (including via deposition, interrogatories, requests for information, subpoena, civil investigative demand or other similar process) or by the rules and regulations of the Securities Exchange Commission, NASDAQ or any national securities exchange. Notwithstanding the foregoing, MSG's disclosure of this Agreement to any professional league having jurisdiction over the subject matter hereof, including, without limitation, the NHL, NBA and/or WNBA, as required by such league, shall not constitute a breach of this Agreement. All press releases, if any, relating to the subject matter of this Agreement shall be subject to the parties' mutual approval. The confidentiality obligations set forth herein shall survive the expiration or earlier termination of this Agreement.

21.3.2 <u>MSG Non-Dislosure Obligations</u>. MSG recognizes and acknowledges that the TM System as it now exists, including the Hardware and Software associated with the TM System and all improvements in the state of the art relative thereto, represents a valuable, special and unique asset of Ticketmaster. MSG consents and agrees that it will not, during or after the Term, disclose any information, design specifications, programs, listings, documentation or other supporting or related materials or information of any nature or description whatsoever relating to the TM System, the Hardware or the Software, or applications, adaptations and modifications thereof, whether now existing or developed in the future, to any person, firm, corporation, association or entity for any reason or purpose whatsoever; provided, however, that this covenant shall not apply with respect to any information which (i) becomes a matter of general knowledge within the public domain, (ii) MSG is obligated to disclose same by reason of any court order, rule or regulation applicable to the conduct of its business, or (iii) MSG discloses in order to enforce its rights pursuant to this Agreement. MSG further agrees and acknowledges that any remedy at law for any breach or threatened breach of the provisions of this Section and the covenants set forth herein will be inadequate and, accordingly, Ticketmaster may seek injunctive relief for any such breach or threatened breach of the provisions and covenants herein in addition to, and not in limitation of, any other remedies at law or in equity otherwise available to Ticketmaster. The expiration or termination of this Agreement by either party shall not terminate the continuing confidentiality obligations imposed on MSG by the terms of this Agreement.

21.4 <u>Notices</u>. Any notice required or permitted to be given by the provisions hereof shall be conclusively deemed to have been received by a party hereto on the day it is delivered to such party at the address indicated below (or at such other address as such party shall specify to the other party in writing), or, if sent by registered or certified mail, on the third Business Day after the day on which mailed, addressed to such party at such address:

If to Ticketmaster:          Ticketmaster L.L.C.
                             430 West 15th Street
                             New York, NY 10011
                             Attn: Marla Ostroff

With a copy to:              Ticketmaster L.L.C.

HIGHLY CONFIDENTIAL                    LNE-LIT24-001185656

EXECUTION COPY

|  | 7060 Hollywood Boulevard |
|  | Los Angeles, California 90028 |
|  | Attn: Legal Department |

If to MSG:    MSG Sports & Entertainment, LLC
Two Pennsylvania Plaza, 14th Floor
New York, NY 10121
Attn: John Abbamondi, Executive Vice President,
Ticketing, Suites & Corporate Hospitality

With a copy to:    MSG Sports & Entertainment, LLC
Two Pennsylvania Plaza, 19th Floor
New York, NY 10121
Attn: SVP, Legal & Business Affairs, Sports Operations

21.5   Effect of Waiver.   No delay or omission to exercise any right or remedy in favor of Ticketmaster or MSG upon any breach or default hereunder shall impair any such right or remedy or be construed to be a waiver of any such breach or default; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval on the part of Ticketmaster or MSG of any breach or default theretofore and thereafter under this Agreement, or of any provision or condition hereof, must be made in writing and shall be effective only to the extent specifically set forth in such writing.

21.6   Applicable Law; Venue.   This Agreement shall be governed by, and construed in accordance with, the internal law of the State of New York, without regard to the choice of law rules thereof. Any dispute in connection with this Agreement shall be subject to the exclusive jurisdiction of the courts (state or federal, as applicable) located, respectively, in the County of New York and the Southern District of New York.

21.7   Additional Documents.   Each of the parties hereto agrees to execute and deliver such additional and further documents and instruments as may be necessary or appropriate to carry out the intents and purposes of this Agreement.

21.8   Counterparts.   This Agreement may be executed in one or more counterparts, all of which shall be deemed to be one and the same document.

21.9   Severability.   In the event that any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement, but this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein. Further, in the event that any provision of this Agreement is held to be unenforceable by virtue of its scope, but may be made enforceable by a limitation thereof, such provision shall be deemed to be amended to the minimum extent necessary to render it enforceable under the laws of the jurisdiction in which enforcement is sought.

75

21.10 <u>Binding Effect</u>. The terms, conditions, provisions and undertakings of this Agreement shall be binding upon and inure to the benefit of each of the parties hereto and their respective successors and assigns.

21.11 <u>Amendments</u>. This Agreement shall not be changed, modified, altered or amended in any respect without the mutual consent of the parties hereto, which consent shall be evidenced by a written amendment to this Agreement executed by the parties hereto.

21.12 <u>Subservience</u>. Notwithstanding anything to the contrary contained in this Agreement, this Agreement (as clarification, including without limitation all rights, benefits and any exclusivities) is subject in all respects to all present and future federal, state and municipal laws, regulations, rules, orders and decisions (including, without limitation, those of the Federal Communications Commission) and all present and future contracts entered into by, as well as the Constitution, By-Laws and all other rules, board resolutions and regulations of the NHL, NBA, WNBA, their respective Commissioners' offices, and all other leagues, entities or organizations having jurisdiction over the advertising and promotional rights and benefits set forth herein (collectively, "<u>League Regulations</u>"), including without limitation all relevant territorial restrictions including, without limitation, relevant league territorial marketing restrictions (with respect to the Rangers, throughout the New York City Metropolitan Area (i.e., extending fifty (50) miles from New York City); with respect to the Knicks and Liberty, extending to the nearer of one hundred fifty (150) miles from New York City and the outer limits of any other counterpart team's exclusive marketing territory). Notwithstanding the foregoing, in the event that application of any NHL, NBA or WNBA or other League Regulation would impair or reduce the rights, benefits and/or exclusivities set forth in this Agreement that a party would be entitled to absent application of such League Regulation, or otherwise render certain terms of this Agreement impossible or impracticable, then the parties shall negotiate to amend this Agreement (including any financial terms) in good faith to mitigate any such impairment or reduction in rights, benefits or exclusivities caused by the application of such League Regulation.

21.13 <u>Headings</u>. The headings and captions of this Agreement are for convenience of reference only, and shall in no way modify or affect the meaning or construction of any of the terms or provisions hereof.

21.14 <u>Injunctive Relief</u>. It is understood and agreed by the parties that monetary damages would not be a sufficient remedy for breaches of this Agreement as such breaches would relate to confidentiality under Sections 21.2 or 21.3 above or the improper use of the MSG Marks or the Ticketmaster Marks, as applicable. As such, the non-breaching party shall therefore be entitled to equitable relief, including injunction and specific performance, as a remedy for any such breach. Such remedies shall not be deemed to be the exclusive remedies for such a breach, but shall be in addition to all other remedies available at law or equity to the non-breaching party.

21.15 <u>Force Majeure</u>. Neither party shall be liable for any act or any failure to act occasioned by *force majeure* (i.e., Act of God, act of nature, national emergency, war (declared or undeclared), act or threat of terrorism (including, without limitation, safety or security concerns relating thereto), labor dispute, lockout, strike, termination of programming, breakdown of origination or transmission facilities, interruption or preemption due to an event of overriding public interest or importance, legal enactment, government order or regulation or any other cause beyond the reasonable control of such party).

HIGHLY CONFIDENTIAL    LNE-LIT24-001185658

21.16  <u>Audit Rights</u>.  In addition to MSG's specific audit rights pursuant to Section 7.2 herein, each party shall provide to the other all information reasonably necessary for the other party to verify the accuracy of each payment and performance of all obligations hereunder, and such other information for such purpose as the other party may from time to time reasonably request.  If requested, the accuracy and completeness of such information will be certified by a senior executive officer of the party providing such information to the best of such executive's knowledge after appropriate investigation.  Each party will have reasonable and customary audit rights.

21.17  <u>Sophisticated Parties</u>.  Each party to this Agreement represents and acknowledges that it is a sophisticated commercial party capable of understanding all of the terms of this Agreement, that it has had an opportunity to review this Agreement with its counsel, and that it enters this Agreement with full knowledge of the terms of the Agreement.

21.18  <u>Entire Agreement</u>.  This Agreement and the exhibits attached hereto set forth the entire understanding and agreement of the parties hereto with respect to its subject matter and supersede all prior understandings or agreements between the parties relating to the same subject matter. Any amendments or modifications to this Agreement shall be in writing, as mutually agreed upon by the parties.

IN WITNESS WHEREOF, the undersigned parties hereto have caused this Agreement to be duly executed by their authorized representatives.

MSG SPORTS & ENTERTAINMENT, LLC

By:

Name: John Abbamondi

Title: EV P, Tickets, Clubs & Premium Hospitality

2/61/19

TICKETMASTER L.L.C.

By:

Name:

Title: JARED TSON ITH

PRESIDENT

HIGHLY CONFIDENTIAL                                                                      LNE-LIT24-001185659

EXECUTION COPY

## EXHIBIT A

### HARDWARE

| MSG | | Radio City | | Beacon | | Chicago Theater | | Forum | |
|---|---|---|---|---|---|---|---|---|---|
| Item | Qty | Item | Qty | Item | Qty | Item | Qty | Item | Qty |
| Cisco Router | 2 | Cisco Router | 1 | Cisco Router | 1 | Cisco Router | 1 | Cisco Router | 3 |
| AM Server | 1 | AM Server | 1 | AM Server | 1 | AM Server | 1 | AM Server | 1 |
| AccessControl Scanners | 54 | AccessControl Scanners | 26 | | | Cisco AP | 4 | AccessControl Scanners | 40 |
| EMV/Chip & Pin CC readers | 23 | Cisco AP | 5 | AccessControl Scanners | 15 | AccessControl Scanners | 11 | EMV/Chip & Pin CC readers | 13 |
| Workstations | 22 | Workstations | 8 | Workstations | 6 | Workstations | 6 | Workstations | 12 |
| Boca Ticket Printer | 34 | EMV/Chip & Pin CC readers | 8 | EMV/Chip & Pin CC readers | 4 | EMV/Chip & Pin CC readers | 4 | Boca Ticket Printer | 19 |
| | | Boca Ticket Printer | 18 | Boca Ticket Printer | 6 | Monitor | 6 | | |
| | | 3Com Switch | 2 | | | Cisco Switch | 1 | | |
| | | | | | | Boca Ticket Printer | 6 | | |
| | | | | | | Epson Report Printer | 2 | | |
| | | | | | | UPS | 1 | | |

MSG shall be responsible for supplying all network (including wireless, once MSG transitions to a wireless network, which is currently expected to be complete in 2018) infrastructure in all Venues.

Ticketmaster shall provide primary connectivity to and for Chicago into all of Ticketmaster's systems including the TM System and the TM Data Center. MSG shall provide such primary connectivity for the Arena, RCMH, the Beacon, the Forum and any New TM Venues. Ticketmaster shall also provide all backup secondary connectivity to all MSG Venues.

HIGHLY CONFIDENTIAL

LNE-LIT24-001185660

## EXHIBIT B

### PRODUCTS AND TRANSACTION FEES

1. <u>Premium Ticketmaster Products to Be Provided</u>. Ticketmaster shall provide MSG with each of the products set forth below (the "<u>Products</u>") upon the terms and conditions set forth herein:

(a) ARCHTICS, capable of using the executable code and associated online documentation and instruction manuals of the ARCHTICS modules listed below:

| Module Names | Number of Concurrent Users |
|---|---|
| Ticketmaster ARCHTICS GUI/TE Version | Unlimited |
| Sybase Adaptive Server Anywhere | Unlimited |
| ARCHTICS External Host Interface Module (for use with Ticketmaster AccountManager and Ticketmaster AccessManager) | Unlimited |

(b) AccountManager; and

(c) AccessManager.

2. <u>Transaction Fees and Transaction Fee Royalties</u>.

| Type of Transaction Fee | Amount of Transaction Fee | Transaction Fee Royalties |
|---|---|---|
| Ticketmaster AccountManager Transactions | | |
| Tickets purchased via right of first refusal | $3.00 per Ticket, but only if such sale is conducted through AccountManager | 50% of Transaction Fee |
| Per invoice processing | No Fee | None |
| Ticket Forwarding | No Fee | None |
| Internal Ticket Forwarding | No Fee | None |
| Single Ticket sales to Subscribers | Convenience Charge determined pursuant to Section 9.1.1 of the Agreement | Convenience Charge less TM Fee |
| TicketFast | No Fee | None |

79

| Type of Transaction Fee | Amount of Transaction Fee | Transaction Fee Royalties |
|---|---|---|
| ARCHTICS AccountManager Transactions | | |
| Group Sales made via AccountManager | $1.25 per Ticket (except that, if Ticketmaster enters into separate arrangements with the NHL, NBA and/or WNBA, MSG shall be entitled to the benefit of such arrangements with respect to any applicable team's events) | 50% of Group Sales Fee |

3. Use of Products.

   (a) Password Restrictions. Use of the Products by MSG shall be restricted to those persons having passwords, and such passwords shall not be transferred without written permission from Ticketmaster, which permission shall not be unreasonably delayed or withheld. Upon Ticketmaster's reasonable request, MSG shall identify the users (by name and position), or sites (by address) that use or view the Products and shall provide to Ticketmaster upon request access to any database that permits access to the Products.

   (b) Limits/Controls. MSG shall determine the limits and controls with respect to Ticket Forwarding transactions, except that any limit or control that requires modification of a Designated AccountManager Page shall require the prior mutual consent of Ticketmaster, which shall not be unreasonably withheld.

4. Respective AccountManager Responsibilities. MSG shall create links on certain of MSG's websites (the "MSG AccountManager Websites") to the Designated AccountManager Pages, and Ticketmaster shall allow Consumer access to AccountManager through such Designated AccountManager Pages. MSG shall, at its sole cost and expense, be solely and fully responsible for upkeep, maintenance and all other operational expenses of the MSG AccountManager Websites. MSG's failure to meet the technical requirements necessary to allow AccountManager to properly function in conjunction with MSG's databases will relieve Ticketmaster of its obligations to provide Consumer access via such websites until after such failure is remedied by MSG. Ticketmaster will notify MSG of such technical requirements in writing from time to time.

5. Marketing and Advertising via AccountManager.

   (a) MSG's advertising rights on the Designated AccountManager Pages are set forth in Section 8.3 of the Agreement.

80

(b) Ticketmaster may, in its sole discretion, advertise the availability of the Products, including (i) use of MSG's name and logo and the addresses of the MSG AccountManager Websites and promoting to Subscribers and other Consumers and potential Consumers that the Products are offered by MSG, and (ii) use of MSG's name and logo and the addresses of the MSG AccountManager Websites on the Designated AccountManager Page and on the applicable Ticketmaster Website; provided that Ticketmaster has, in each instance, obtained MSG's written approval, which shall not be unreasonably withheld, as well as, with respect to use of MSG's AccountManager Websites, the approval of the NBA, the WNBA and/or the NHL, each to the extent applicable and required under agreements between MSG and such organizations. Such advertisement may be in any form of media which Ticketmaster desires (subject to any restrictions set forth in Section 4.11 of the Agreement regarding advertising on Tickets).

6. Maintenance and Support of the Products. In addition to the support services provided in Article VI of the Agreement, Ticketmaster shall provide maintenance of the Products during the Term as follows:

(a) The services of qualified personnel to answer telephone inquiries by MSG seeking advice on questions and problems will be provided on a return-call basis during Ticketmaster's normal business hours of 8 a.m.-5 p.m. ET (EST or EDT, as applicable; excluding holidays) at either its New York office or its Virginia office. For emergency calls, Ticketmaster shall respond no later than twenty-four (24) hours after having received any oral or written request by MSG for Products maintenance assistance. Non-emergency calls made near the end of or after normal business hours that require staff support that would keep them beyond such normal business hours to achieve resolution will be deferred to the following business day.

(b) In the event that any Product problems cannot be resolved by telephone inquiry, Ticketmaster shall provide on-site support at no charge to MSG. Ticketmaster reserves the right to reasonably determine whether reported problems are faults in the Software or improvement requests.

(c) Ticketmaster's obligation to provide Product maintenance and support services shall not expire prior to the expiration of the Term, or any renewal or extension thereof; provided that, should MSG choose not to accept an upgrade of a Product, Ticketmaster shall not be obligated to continue to provide software maintenance and support services with respect to any version of such Product for more than one year after the release by Ticketmaster of the unaccepted upgrade thereof.

HIGHLY CONFIDENTIAL                                                                 LNE-LIT24-001185663

## EXHIBIT C

### DISASTER RECOVERY REQUIREMENTS

Ticketmaster shall maintain two (2) DSS-PCI compliant DR Sites. Currently, the DR Sites are located in Ashburn, VA and Chandler, AZ. Each DR Site shall be set up to function as a primary or backup data center with capability for real-time ticket processing and sales of Tickets and re-routing of incoming calls and online transactions to continue processing Ticket sales notwithstanding a disaster or critical malfunction. In the DR Sites, Ticketmaster shall house dual sets of servers for all Ticketmaster's systems and redundant network configurations, including, without limitation, for the Hosting Services, credit card payment systems and Distribution Channels, which will be fault-tolerant to ensure network availability of the TM System at a level comparable to the TM Data Center for all Ticket processing/purchasing. These DR Sites shall be equipped with redundant capabilities/power, HVAC and data circuits, as well as backup generators and warm backup servers, necessary core network components and load balanced servers with reserve capacity for the Hosting Services, and real-time data application in order to provide the Hosting Services to MSG. Hardware such as data filers, routers, VPN concentrators, switches and load balancers shall be installed in pairs in each DR Site. Ticketmaster shall continuously mirror the MSG Information and the MSG Consumer Data onto the servers at a DR Site. Data volumes and databases on the TM Data Center shall be continuously replicated between the TM Data Center and the backup DR Site as well as placed on tape, which shall then be moved to offsite secure storage. In the event of a catastrophic failure of a primary DR Site, all services will be cut over to a backup DR Site. Any cut-over from any DR Site to another will be an immediate failover to ensure reasonably continuous (i.e., no interruptions shall exceed four (4) hours) business operations. Ticketmaster shall also provide prompt notice of such failure to MSG's designees by email and/or phone. Ticketmaster shall periodically (i.e., at least once every six months) test each DR Site to verify that it is functional and meets all of the requirements set forth herein, and such testing shall be certified to MSG annually as part of Ticketmaster's certification pursuant to Section 12.7 of this Agreement.

82

## EXHIBIT D

## DATA SECURITY ADDENDUM

1.  For purposes of this Addendum.

1.1  "Confidential Information" shall be defined as all non-public information of MSG, including without limitation, information relating to MSG's or its affiliates' business, technology, know-how or proprietary processes, including without limitation, MSG's consumer data, marketing, suppliers, sources of materials, finances, accounting, business relationships, employees, and any other trade secrets, consumers' credit card data consisting of the full primary account number, name, expiration date and/or service code, card validation codes/values, full magnetic stripe data, PINs, and PIN blocks used to authenticate cardholders and/or authorize payment card transactions. "Confidential Information" shall not include (i) any information that enters the public domain through no fault of Ticketmaster, (ii) any information that is made available to Ticketmaster from a source other than MSG that is not bound by a confidentiality agreement with MSG, or (iii) any information that is independently developed by Ticketmaster without reference or access to the Confidential Information and which independent development is supported by documentary evidence.

1.2  "Covered Data" means Personal Data and Confidential Information, regardless of whether it is in individual, aggregate, de-identified, anonymized, hashed or encrypted form and regardless of the media in which it is contained.

1.3  "Personal Data" means any information relating to an identified or identifiable individual. An identifiable individual is one who can be identified, directly or indirectly, in particular by reference to an identifier such as a name, an identification number, location data, an online identifier or to one or more factors specific to the physical, physiological, genetic, mental, economic, cultural or social identity of that individual.

1.4  "Process" and "Processing" mean any operation or set of operations performed on Covered Data or on sets of Covered Data, whether or not by automated means, such as collection, recording, organization, creating, structuring, storage, adaptation or alteration, retrieval, consultation, use, disclosure by transmission, dissemination or otherwise making available, alignment or combination, restriction, erasure or destruction.

1.5  "GDPR" means the General Data Protection Regulation (Regulation (EU) 2016/679).

2.  This Addendum applies to Covered Data that Ticketmaster receives from MSG, or otherwise Processes for or on behalf of MSG, in connection with the Agreement.

3.  The provisions of this Addendum shall survive the termination or expiration of the Agreement for so long as Ticketmaster or its direct or indirect subcontractors have custody, control or possession of the Covered Data.

4.  Information Security and Privacy Management.

5.1  Information Security Policy. Ticketmaster shall establish and maintain an information security program that is designed to meet the objectives of PCI-DSS, applicable law, applicable industry standards and best practices. Ticketmaster shall have a security and privacy policy that provides guidance to its personnel to ensure the confidentiality and integrity of all Covered

83

Data, and that provides instructions regarding the steps to take in the event of a compromise or other anomalous event of such Covered Data. The policy must address the following key points: delegation and assignment of responsibilities for security and privacy; management oversight for the policy and its deployment; means for managing security and privacy within the enterprise; policies and procedures for data confidentiality and privacy and data protection and access to and handling of Covered Data; and planning for incident response in the event of a breach of security or unauthorized disclosure of Covered Data.

5.2 Information Security Program.   Ticketmaster shall (a) implement physical, technical and administrative safeguards to protect all Covered Data in accordance with the PCI-DSS, applicable requirements of law, applicable industry standards and best practices and (b) maintain standards and procedures to address the configuration, operation and management of systems and networks, services and Covered Data, as are appropriate under the circumstances to protect data against unauthorized or unlawful processing, disclosure, accidental loss, destruction or damage.   Without limitation, Ticketmaster shall implement the following as appropriate: (i) the pseudonymization and encryption of Personal Data; (ii) the ability to ensure the ongoing confidentiality, integrity, availability and resilience of Processing systems and services; (iii) the ability to restore the availability and access to Covered Data in a timely manner in the event of a physical or technical incident; (iv) a process for regularly testing, assessing and evaluating the effectiveness of technical and organizational measures for ensuring the security of the Processing; and (v) firewalls, intrusion detection systems, locking file cabinets and other appropriate state-of-the-art physical and electronic security mechanisms.   In assessing the appropriate level of security, Ticketmaster shall in particular take account of the risks presented by the Processing, in particular from accidental or unlawful destruction, loss, alteration, unauthorized disclosure of, or access to the Covered Data.

5.3 Standards and Procedures.   Such standards and procedures employed by Ticketmaster shall include: security controls; identification and patching of security vulnerabilities; change control process and procedures; problem management; access controls and identification/authentication mechanisms to ensure appropriate levels of access by authorized personnel; software controls; continuous monitoring of all systems used to provide Ticketmaster's Services under the Agreement; and incident detection and management.

5.4 PCI-DSS Compliance Reporting.   Each year, upon request, Ticketmaster shall furnish MSG with a copy of Ticketmaster's most recent letter of PCI-DSS compliance provided by a third-party assessor.

6.     Reserved.

7.     Access to and Use of Covered Data and/or Systems.

7.1 Limited Use.   Ticketmaster understands and acknowledges that MSG is providing access to Covered Data, and/or access to MSG's Ticket Network to Ticketmaster in order to perform the services to be provided under the Agreement (the "Services") between MSG and Ticketmaster to which this is attached as an Exhibit.   Ticketmaster will Process Covered Data only in accordance with the Agreement or otherwise on documented instructions from MSG, including with regard to transfers of Personal Data, unless required to do so by European Union, member state law, or other applicable law to which Ticketmaster is subject.   In such case, Ticketmaster shall inform MSG of that legal requirement before Processing, unless

otherwise required by applicable law, including any law that prohibits providing such information on important grounds of public interest within the meaning of the GDPR.

Ticketmaster represents and warrants that it will not itself, nor permit any third party to, access, use and/or retain any Covered Data or access MSG's Ticket Network for any purpose other than that necessary for Ticketmaster to perform the Services, unless specifically authorized by MSG in writing; provided that Ticketmaster retains the right to use consumer data for customer service related to ticket purchases, ticket fulfillment and notification, consumer preferences (including any email alerts) to the extent the consumer has opted in to receive such alerts or otherwise identified such preferences, and as otherwise expressly permitted under the Agreement. Ticketmaster shall not voluntarily disclose Covered Data to any third party unless specifically authorized or directed to do so by MSG.

7.2  Ticketmaster shall, as soon as reasonably practicable, inform MSG if, in Ticketmaster's opinion, an instruction from MSG infringes the GDPR or other European Union or member state data protection provisions.

7.3  Authorization.  Ticketmaster will restrict access to the Covered Data and systems at all times to only those employees or subcontractors whose access is necessary to performing the Services; provided, however, that Ticketmaster may subcontract the collection or other Processing of Personal Data only in compliance with applicable law, including the conditions for subcontracting set forth in the GDPR.  Ticketmaster will ensure that the persons Ticketmaster authorizes to Process the Covered Data have committed themselves to confidentiality or are under an appropriate statutory obligation of confidentiality.  Without limiting the foregoing, Ticketmaster will take steps to ensure that any natural person acting under the authority of the Ticketmaster and who has access to Personal Data does not Process the Personal Data except in accordance with the Agreement or otherwise on instructions from MSG unless required to do so by applicable law, including European Union or member state law as described above. Unless prohibited under applicable law, Ticketmaster shall perform background checks on all persons authorized by Ticketmaster to Process Covered Data.

7.4  The TM Data Centers shall have industry standard fire suppressant capability and Ticketmaster's hardware shall be located in a data room only accessible by authorized individuals whose entry and exit to the data room are logged and such log information securely stored.

8.    Notification Obligations.

8.1  "Covered Data Breach" means a breach of security leading to the accidental or unlawful destruction, loss, alteration, unauthorized disclosure of, or access to, Covered Data.  Where Personal Data is involved, Ticketmaster will comply with the Personal Data breach-related obligations directly applicable to it under the GDPR.  Taking into account the nature of Processing and the information available to Ticketmaster, Ticketmaster will assist MSG in complying with obligations of MSG, including, if applicable, by:

8.1.1  Within 48 hours of discovery of a Covered Data Breach, informing MSG of the Covered Data Breach by contacting its Chief Information Security Officer at security@msg.com;

85

8.1.2  Within such time period, and without undue delay as the information becomes available after that (and in any event at least once each day that there is new information), informing MSG (via security@msg.com) of the following (and of any reasonably available information that could help MSG independently assess the following):

8.1.2.1  The nature of the Covered Data Breach, including, if Personal Data is affected and where possible, the categories and approximate number of data subjects concerned and the categories and approximate number of Personal Data records concerned;

8.1.2.2  The likely consequences of the Covered Data Breach; and

8.1.2.3  Measures taken or proposed to be taken by Ticketmaster to address the Covered Data Breach, including, where appropriate, measures to mitigate its possible adverse effects; and

8.1.3  Where Personal Data is affected, promptly providing MSG with other information and records sufficient to document MSG's and Ticketmaster's compliance with the applicable Personal Data breach-related requirements of the GDPR.

8.2  Ticketmaster shall terminate any Ticketmaster personnel, or to Ticketmaster's knowledge, other personnel with access to Covered Data, for cause, where related to such personnel's potential or actual misuse or compromise of Covered Data or systems or Ticketmaster's systems or networks that directly support the Covered Data.

8.3  Ticketmaster shall notify MSG promptly of any request for disclosure or inquiry regarding Covered Data from a third party.

8.4  Ticketmaster shall notify MSG promptly of any law enforcement or administrative investigation or inquiry into suspected misuse or abuse of Ticketmaster's systems or network that directly support Covered Data.

8.5  Unless required by law, Ticketmaster shall not disclose to any other parties any Covered Data Breach that directly supports Covered Data except as mutually agreed to by MSG. Ticketmaster will also provide prompt feedback to MSG about any impact that a possible or actual Covered Data Breach may or will have on MSG or its user community.  In accordance with its obligations under this Section 8.5, Ticketmaster will use best efforts to notify MSG of the possible or actual Covered Data Breach as soon as reasonably practicable, or, if applicable, permitted by the investigating authority.

8.6  Following a Covered Data Breach involving Personal Data, Ticketmaster will provide reasonable assistance and cooperation to MSG to (a) reduce the risk to individuals whose Personal Data was involved, or (b) otherwise help MSG qualify for an exemption from a legal requirement to notify an individual or a supervisory authority of the Covered Data Breach involving Personal Data.

9.      Deletion of MSG Data.  Ticketmaster will, at the election of MSG, return to MSG and/or securely destroy all Covered Data upon the end of the provision of services relating to Processing except to the extent that applicable law, including European Union or member state law, requires storage of the Covered Data.  Deleted data must be non-readable and non-retrievable in accordance with the methods described in the Federal Trade Commission's Disposal Rule, 16 C.F.R. § 682.3.

HIGHLY CONFIDENTIAL                                         LNE-LIT24-001185668

10.     External Connections.  With regard to all external connections into the TM System and MSG's Ticket Network (to the extent accessed through Ticketmaster), Ticketmaster shall maintain technology controls, including, by way of example and not limitation, firewalls, security monitoring and alerting systems (i.e., intrusion detection/prevention systems) and implement and maintain secure remote access solutions for its personnel.

11.     GDPR Requirements.  The parties agree to the following additional GDPR requirements, to the extent applicable:

11.1  Taking into account the nature of the Processing, Ticketmaster will assist MSG by appropriate technical and organizational measures, insofar as this is possible, for the fulfilment of MSG's obligation to respond to requests by individuals (or their representatives) for exercising their rights under the GDPR (such as rights to access their Personal Data).

11.2  Ticketmaster will assist MSG in ensuring MSG's compliance with the security obligations of the GDPR, as relevant to Ticketmaster's role in Processing the Personal Data, taking into account the nature of Processing and the information available to Ticketmaster.

11.3  Ticketmaster will provide reasonable assistance to and cooperation with MSG for MSG's performance of a data protection impact assessment of the Processing or proposed Processing of the Personal Data involving Ticketmaster.

11.4  Ticketmaster will provide reasonable assistance to and cooperation with MSG for MSG's consultation with supervisory authorities in relation to the Processing or proposed Processing of the Personal Data involving Ticketmaster.

11.5  Without prejudice to Ticketmaster's confidentiality obligations to MSG, Ticketmaster will, in coordination with MSG, comply with any applicable obligation of Ticketmaster itself under the GDPR to consult with a supervisory authority in relation to its Processing or proposed Processing of the Personal Data.

11.6  Ticketmaster will make readily available to MSG all information necessary to demonstrate compliance with this Addendum.

11.7  Ticketmaster will make readily available to MSG all information necessary for MSG to comply with MSG's recordkeeping obligations under the GDPR with respect to Ticketmaster's Processing of the Personal Data.

11.8  Once the GDPR takes effect in the European Economic Area jurisdictions that are outside the European Union (currently Iceland, Liechtenstein and Norway), references in this Addendum to the European Union and its member states shall be deemed amended to include such jurisdictions, consistent with their adoption of the GDPR.

HIGHLY CONFIDENTIAL                                                          LNE-LIT24-001185669

EXECUTION COPY

## EXHIBIT E
## SERVICE LEVEL AGREEMENT

**Uptime Guarantee.** Ticketmaster shall work in a diligent manner to resolve any down time issues, with the Hosting Services relating to the TM System and ARCHTICS.

1. The TM System and ARCHTICS shall maintain a 99.9% uptime level, which means that the TM System will be accessible and fully operational ("Uptime") 99.9% of the time during any calendar month, except as provided below.

2. "Uptime Percentage" will be calculated each calendar month as follows:

$$\left[ \left( \frac{Total - Non\text{-}excluded}{Total} \right) * 100 \right] = Uptime\ Percentage$$

Where the following terms have the respective meanings set forth below:

2.1 "Total" constitutes the total number of minutes in the applicable calendar month.

2.2 "Non-excluded" constitutes the total number of minutes of TM System and ARCHTICS Unavailability during the applicable calendar month that is not attributable to Excluded Events. "Unavailability" means the inability of MSG to access and use the TM System and ARCHTICS for purposes of processing Primary Sales of Tickets as described in this Agreement.

2.3 "Excluded Events" include the following:

a. Planned downtime, which shall be (i) scheduled nightly maintenance occurring between the hours of 2:00 a.m. and 4:00 a.m. (in the time zone of the relevant MSG Venue), and (ii) any period for which Ticketmaster gives 24 hours or more written notice that the Platform will be unavailable, not to exceed once per 30-day period.

b. The inability of MSG to access the Software to the extent due to internet, telecommunications, MSG-hosted hardware, MSG software, or MSG or third party acts or omissions (but excluding those of Ticketmaster and its third party suppliers of Software).

3. For any partial calendar month covered by the Agreement, the Uptime Percentage for that period will be calculated based on the total number of minutes in that portion of that calendar month. Upon request, Ticketmaster shall deliver to MSG a report containing statistics on Uptime Percentage for any month in which Ticketmaster fails to maintain an Uptime Percentage of 99.9% or higher, as required above.

4. If Ticketmaster fails to maintain an Uptime Percentage of 99.5% or above in a given calendar month, the parties will, following good faith discussions, mutually agree upon an appropriate financial payment to MSG, which shall be based upon historical figures, analytical data and any other means deemed appropriate for calculation of MSG's actual

88

HIGHLY CONFIDENTIAL

lost profits from Primary Sales of Tickets during the actual time period of any Unavailability occurring during such month.

5. If Ticketmaster fails to maintain an Uptime percentage of 99.4% or above in any two (2) calendar months in any six-month period during the Term, in addition to any other rights MSG has at law, in equity or under the Agreement, MSG shall have the right to terminate this Agreement.

89

LNE-LIT24-001185671

EXECUTION COPY

## EXHIBIT F
## SPONSORSHIP ASSETS

I. <u>2017-18 Contract Year</u>:

   A. During the Period July 1, 2017 through January 21, 2018 only, Ticketmaster received the following benefits, subject to all NBA and NHL League Regulations in accordance with Section 21.12 of the Agreement, and NBA and NHL telecast partner rules, regulations and blackouts:

- <u>Arena</u>:
  - o Inclusion on LED ribbon rotations in the Arena prior to the start of all publicly-ticketed scheduled non-Team events, subject to availability, and timing as reasonably determined by MSG.
  - o Inclusion on IPTV screen rotations in the Arena during all events for which MSG controls all such IPTVs, including IPTVs located on (i) Level 2 (Chase Square), (ii) Level 6 (Madison Concourse), and (iii) Level 8 (Garden Concourse) of the Arena, subject to availability and contractual limitations imposed by artists and/or promoters, with timing as reasonably designated by MSG.
  - o Inclusion on stickers placed in box office windows.
  - o An aggregate of four thousand (4,000) fifteen-second (0:15) commercial spots on the Seventh Avenue marquee (located in front of the 2 Penn Plaza building; the "<u>Seventh Avenue Marquee</u>"), exact timing to be reasonably determined by MSG.
  - o Three 4-week flights (i.e., approximately 2,800 ninety-second spots per flight or other comparable rotation schedule as designated by MSG) on MSG's digital outdoor signage (approximately 7 digital boards) located on Eighth Avenue, 31st Street and 33rd Street (excludes the Seventh Avenue Marquee), for the periods (i) October 30, 2017 through November 26, 2017, (ii) November 27, 2017 through December 24, 2017, and (iii) December 25, 2017 through January 21, 2018.
  - o Inclusion in pre-concert emails sent by MSG to the MSG e-mail database, with all details to be reasonably determined by MSG.
- <u>Theater</u>:
  - o Inclusion on Theater interior plasma screen rotations for all publicly-ticketed scheduled events, timing as reasonably determined by MSG.
  - o Inclusion on stickers placed in box office windows.
- <u>RCMH</u>:
  - o Inclusion on RCMH interior plasma screen rotations for all publicly-ticketed scheduled events, timing as reasonably determined by MSG.
  - o Inclusion on stickers placed in box office windows.
- <u>Beacon</u>:
  - o Inclusion on stickers placed in box office windows.
- <u>Chicago</u>:
  - o Inclusion on Chicago interior and exterior plasma screen rotations for all publicly-ticketed scheduled events, timing as reasonably determined by MSG.

90

- o Inclusion on stickers placed in box office windows.
- NY Knicks:
  - o Season Ticket Communications:
    - ∗ Opportunity to distribute collateral materials provided by Ticketmaster (at its sole expense) at the "Subscriber Central" booth located on the 6th Floor of the Arena.
    - ∗ Logo inclusion in season subscriber ticket backs (excluding season subscriber tickets associated with the Delta Club and JPMorgan Chase Club).
  - o Print Ad: One full-page, four-color print advertisement in the Knicks game day program for all home games.
  - o Yearbook: One full-page advertisement in the Knicks team yearbook.
  - o Pocket Schedule: Logo inclusion in the Knicks pocket schedule.
  - o Ribbon LED: One minute of in-game exposure via ribbon LED during each Knicks regular season home game, timing as reasonably determined by MSG.
  - o Gardenvision Features:
    - ∗ One pre-game in-Arena Gardenvision feature during each Knicks regular season home game at the Arena, timing as reasonably determined by MSG.
    - ∗ One in-Arena Gardenvision feature during each Knicks regular season home game at the Arena, including logo display on Gardenvision and a corresponding public address announcement, timing as reasonably determined by MSG.
  - o Email Inclusion:
    - ∗ Three (3) dedicated emails sent by MSG to the Knicks e-mail database, with all details to be as reasonably determined by MSG following good faith consultation with Ticketmaster.
    - ∗ Opportunity for Ticketmaster to send at least one email ("hot matchups" or otherwise mutually agreed upon subject matter) to the Ticketmaster database, with all details to be mutually agreed upon.
  - o Website Inclusion: Fixed placement on the following subpages of the Knicks website located at NYKnicks.com (the "Knicks Website"): (i) homepage banner ad, (ii) logo inclusion on the TicketsCentral page, (iii) footer on the schedule page, (iv) schedule page links, (v) navigation drop down logo inclusion, (vi) footer link, (vii) individual ticket logo inclusion, (viii) next game box logo inclusion and (ix) pre-roll on select videos. All details as reasonably determined by MSG in good faith.
- NY Rangers:
  - o Season Ticket Communications:
    - ∗ Opportunity to distribute collateral materials provided by Ticketmaster (at its sole expense) at the "Subscriber Central" booth located on the 6th Floor of the Arena.
    - ∗ Logo inclusion in season subscriber ticket backs (excluding season subscriber tickets associated with the Delta Club and JPMorgan Chase Club).

LNE-LIT24-001185673

EXECUTION COPY

- o Print Ad: One full-page, four-color print advertisement in the Rangers game day program for all home games.
- o Yearbook: One full-page advertisement in the Rangers team yearbook.
- o Pocket Schedule: Logo inclusion in the Rangers pocket schedule.
- o Ribbon LED: One minute of in-game exposure via ribbon LED during each Rangers regular season home game, timing as reasonably determined by MSG.
- o Gardenvision Features:
  - ＊ One pre-game in-Arena Gardenvision feature during each Rangers regular season home game at the Arena, timing as reasonably determined by MSG.
  - ＊ One in-Arena Gardenvision feature during each Rangers regular season home game at the Arena, including logo display on Gardenvision and a corresponding public address announcement, timing as reasonably determined by MSG.
- o Email Inclusion:
  - ＊ Two (2) dedicated emails sent by MSG to the Rangers e-mail database, with all details to be reasonably determined by MSG following good faith consultation with Ticketmaster.
  - ＊ Opportunity for Ticketmaster to send at least one email ("hot matchups" or otherwise mutually agreed upon subject matter) to the Ticketmaster database, with all details to be mutually agreed upon.
- o Website Inclusion: Fixed placement on the following subpages of the Rangers website located at NYRangers.com (the "Rangers Website"): (i) homepage banner ad, (ii) logo inclusion on the TicketsCentral page, (iii) footer on the schedule page, (iv) schedule page links, (v) navigation drop down logo inclusion, (vi) footer link, (vii) individual ticket logo inclusion, (viii) next game box logo inclusion and (ix) pre-roll on select videos. All details as reasonably determined by MSG in good faith.
- • Media:
  - o Two (2) thirty-second (0:30) commercial spots during each Knicks regular season radio broadcast produced by or on behalf of MSG.
  - o Two (2) thirty-second (0:30) commercial spots during each Rangers regular season radio broadcast produced by or on behalf of MSG.

B. During the period from January 22, 2018 through June 30, 2018 only, Ticketmaster received the following benefits, subject to all NBA and NHL League Regulations in accordance with Section 21.12 of the Agreement, and NBA and NHL telecast partner rules, regulations and blackouts, and all specific details as reasonably determined by MSG:

- • Arena:
  - o Inclusion on LED ribbon rotations in the Arena prior to the start of select publicly-ticketed scheduled non-Team Events, subject to availability, with timing as reasonably determined by MSG and subject to limitations, restrictions and prohibitions imposed by Acts.
  - o A minimum of 3.5 minutes of rotational digital signage on IPTV screen rotations in the Arena during all Events for which MSG controls all such IPTVs, including IPTVs located on (i) Level 6 (Madison Concourse) and (ii) Level 8

92

LNE-LIT24-001185674

(Garden Concourse) of the Arena, subject to availability and limitations, restrictions and prohibitions imposed by Acts, with timing as reasonably designated by MSG.
- o Inclusion on stickers placed in box office windows.
- o An aggregate of four thousand (4,000) fifteen-second (0:15) commercial spots on the Seventh Avenue Marquee (located on the west side of Seventh Avenue in front of the 2 Pennsylvania Plaza building), exact timing to be reasonably determined by MSG.
- Theater:
  - o Inclusion on one static or animated promotional spot in the rotation of the Theater lobby interior plasma screen rotations for select publicly-ticketed scheduled Events, timing as reasonably determined by MSG and subject to limitations imposed by Acts.
  - o Inclusion on stickers placed in box office windows.
- RCMH:
  - o Inclusion on stickers placed in box office windows.
- Beacon:
  - o Inclusion on stickers placed in box office windows.
- Chicago:
  - o Inclusion on stickers placed in box office windows.
- NY Knicks:
  - o LED Ribbon:  One minute of in-game exposure via LED ribbon during each Knicks regular season and playoffs home game at the Arena, timing as reasonably determined by MSG.
  - o Gardenvision Feature:  One in-Arena Gardenvision feature during each Knicks regular season and playoff home game at the Arena, including logo display on Gardenvision and a corresponding public address announcement, timing as reasonably determined by MSG.
  - o Pole Pad Signage:  Inclusion on the both sides of the bottom pads on both basketball pole pads.  Pole pad signage is visible in-Arena and during local telecasts by MSG.
- NY Rangers:
  - o LED Ribbon:  One minute of in-game exposure via LED ribbon during each Rangers regular season home game, timing as reasonably determined by MSG.
  - o Gardenvision Features:   One in-Arena Gardenvision feature during each Rangers regular season and playoff home game at the Arena, including logo display on Gardenvision and a corresponding public address announcement, timing as reasonably determined by MSG.

II.    **Subsequent Contract Years (i.e., 2018-19, 2019-20, 2020-21 and 2021-22):**  During each Contract Year (starting in the 2018-19 Contract Year), Ticketmaster shall receive the following benefits, subject to all NBA and NHL League Regulations in accordance with Section 21.12 of the Agreement, and NBA and NHL telecast partner rules, regulations and blackouts:

- Official Designations: Subject to MSG's prior approval in each instance and for each use, Ticketmaster shall have (i) the exclusive right to use the designation "Official Ticketing Partner" of each of the Sponsored Properties, and (ii) the non-exclusive right to use the designation "Official Partner" of each of the Sponsored Properties.
- Box Office Entitlements: Ticketmaster shall be the entitlement sponsor of each of the Box Offices located at the Arena, RCMH, Beacon and Chicago, in promotions and advertising by MSG as follows: the "Ticketmaster Box Office at Madison Square Garden," "Ticketmaster Box Office at Radio City Music Hall," "Ticketmaster Box Office at The Beacon Theatre" and "Ticketmaster Box Office at The Chicago Theatre" (or such other designations as may be mutually agreed upon in writing) (collectively, the "Sponsored Box Offices").
  - o There will be no other entitlement sponsor of the Sponsored Box Offices (i.e., no other sponsor will have a lock-up logo associated with the Sponsored Box Offices).
  - o Ticketmaster shall be included in lock-up logos (i.e., combinations of MSG Marks and Ticketmaster Marks) to be used in connection with the Sponsored Box Offices, the specific design (and other elements) of which shall be mutually agreed upon between the parties. MSG shall own all right, title, and interest in and to the lock-up logos (excluding any Ticketmaster Marks (as defined herein) and other Ticketmaster-controlled intellectual property contained therein). As space allows, MSG shall include the appropriate lock-up logo in/on the following:
    - ＊ A minimum of one static sign to be located at each of the Sponsored Box Office locations.
    - ＊ Inclusion on stickers placed in Sponsored Box Office windows.
    - ＊ Inclusion in certain advertising and promotional materials and related sales materials prepared by or on behalf of MSG promoting ticket sales.
    - ＊ Opportunity to be included in enhancements/décor at the RCMH Box Office during certain events (e.g., holiday décor).

- Arena:
  - o Arena Marks: Subject to MSG's prior approval in accordance with Sections 11.3 and 11.4 of the Agreement, Ticketmaster shall have the non-exclusive right to use the logos and marks of the Arena in promotional, marketing and advertising materials.
  - o Seventh Avenue Marquee Spots: An aggregate of four thousand (4,000) fifteen-second (0:15) commercial spots on the Seventh Avenue Marquee, exact timing to be reasonably determined by MSG.
  - o Digital Out-of-Home Signage: Three (3) four-week flights (i.e., approximately 2,800 ninety-second spots per flight or other comparable rotation schedule as designated by MSG) on MSG's digital outdoor signage (approximately 7 digital boards) located on Eighth Avenue, 31st Street and 33rd Street (excludes the Seventh Avenue Marquee), exact timing to be reasonably determined by MSG.

94

- o IPTV Rotations: A minimum of 3.5 minutes of rotational digital signage on IPTV screen rotations in the Arena during select events for which MSG controls all such IPTVs, including IPTVs located on (i) Level 6 (Madison Concourse) and (ii) Level 8 (Garden Concourse) of the Arena, subject to availability and limitations imposed by Acts, with timing as reasonably determined by MSG.

- Concert Series at the Arena:
  - o Designation: Subject to MSG's prior approval in accordance with Sections 11.3 and 11.4 of the Agreement, Ticketmaster shall have the non-exclusive right to use the designation "Official Partner" of the Arena Concert Series (as defined herein) and the logos and marks of the Arena Concert Series in promotional, marketing and advertising materials.
  - o Concert Series at the Arena: The "Arena Concert Series" shall mean music and comedy Events that take place at the Arena during the Term (excluding certain Special Events), subject to approvals and requirements of any Act involved in determining the requirements of each such Event. For avoidance of doubt, as between the parties, MSG shall be solely responsible for all aspects of booking events for the Arena Concert Series (including, without limitation, selecting the performers and securing the date(s) of each Arena Concert Series Event). Ticketmaster acknowledges that (i) its designation with respect to the Arena Concert Series does not grant to Ticketmaster any inclusion in any advertising for Arena Concert Series events, and (ii) the Arena Concert Series has and may continue to have other official partners (including, without limitation, a presenting partner).
  - o Calendar Promotions: Opportunity to conduct promotions and/or advertising in connection with upcoming events on the calendar for the Arena Concert Series, subject to MSG's prior written approval in each instance (including, without limitation, of the promotion and creative elements related thereto). Such agreed-upon promotions shall: (A) include a two (2) calendar month period and reflect all Arena Concert Series events that are scheduled to take place during such period (MSG shall have the right, in its sole discretion, to increase the time period to be referenced in such calendar promotion); (B) not reference with specificity any particular Arena Concert Series event and/or Act; and (C) have no Arena Concert Series event or Act's name appear (or, in the case of an audio-only promotion, be featured) more prominently than any other Arena Concert Series event or Act's name contained therein.
  - o LED Ribbon Rotation: Inclusion in LED ribbon messaging prior to the start of Arena Concert Series events, subject to availability and limitations imposed by Acts, and with timing to be reasonably determined by MSG.

- New York Knicks:
  - o Knicks Marks: Subject to MSG's prior approval in accordance with Sections 11.3 and 11.4 of the Agreement, Ticketmaster shall have the non-exclusive right to use the logos and marks of the Knicks in promotional, marketing and

95

advertising materials, subject to all applicable NBA League Regulations in accordance with Section 21.12 of the Agreement.

o Courtside LED Signage: One minute (1:00) of courtside LED signage during each non-nationally televised Knicks regular season home game, timing as reasonably determined by MSG.

o LED Ribbon: Three minutes (3:00) of in-game exposure via LED ribbon during each Knicks regular season and playoff home game, timing as reasonably determined by MSG.

o Gardenvision Feature: One in-Arena Gardenvision feature during each Knicks regular season and playoff home game at the Arena, including logo display on Gardenvision and a corresponding public address announcement, timing as reasonably determined by MSG.

o Pole Pad Signage: Inclusion on both sides of the bottom pads on both basketball pole pads. Pole pad signage is visible in-Arena and during local telecasts by MSG.

o Knicks Experiences: A total of five (5) Knicks experiences (e.g., Knicks Shoot-Around access) at a total of five (5) Knicks regular season home games at the Arena (i.e., one experience per game), with the type of experiences and specific games to be determined by MSG in its sole discretion. Each experience shall be available for up to four (4) Ticketmaster-invited guests and shall include a ticket for each experience guest to the applicable Knicks game.

  ▪ Ticketmaster may utilize select assets granted to it hereunder (e.g., IPTV rotations, Gardenvision) to promote availability of the experiences, subject to MSG's prior approval in accordance with Section 11.4 of the Agreement.

  ▪ For avoidance of doubt, Ticketmaster is responsible for all aspects of selecting its attendees, directly coordinating with such attendees, and communicating all final logistics to MSG in advance of each applicable game.

* New York Rangers:

  o Rangers Marks: Subject to MSG's prior approval in accordance with Sections 11.3 and 11.4 of the Agreement, Ticketmaster shall have the non-exclusive right to use the logos and marks of the Rangers in promotional, marketing and advertising materials, subject to all applicable NHL League Regulations in accordance with Section 21.12 of the Agreement.

  o Dasherboards: One pair of in-Arena dasherboards (one camera-visible) at each Rangers pre-season and regular season home game.

  o LED Ribbon: Three minutes (3:00) of in-game exposure via LED ribbon during each Rangers regular season and playoff home game, timing as reasonably determined by MSG.

  o Gardenvision Feature: One in-Arena Gardenvision feature during each Rangers regular season and playoff home game at the Arena, including logo display on Gardenvision and a corresponding public address announcement, timing as reasonably determined by MSG.

HIGHLY CONFIDENTIAL                                                                 LNE-LIT24-001185678

- o Rangers Experiences: A total of five (5) Rangers experiences (e.g., Rangers Penalty Box) at a total of five (5) Rangers regular season home games at the Arena (i.e., one experience per game), with the type of experiences and specific games to be determined by MSG in its sole discretion. Each experience shall be available for up to four (4) Ticketmaster-invited guests and shall include a ticket for each experience guest to the applicable Rangers game.
  - ※ Ticketmaster may utilize select assets granted to it hereunder (e.g., IPTV rotations, Gardenvision) to promote availability of the experiences, subject to MSG's prior approval in accordance with Section 11.4 of the Agreement.
  - ※ For avoidance of doubt, Ticketmaster is responsible for all aspects of selecting its attendees, directly coordinating with such attendees, and communicating all final logistics to MSG in advance of each applicable game.

- Digital:
  - o Knicks Single Game Ticket Link: Logo inclusion, with a click-through hyperlink to the Ticketmaster website (located at www.ticketmaster.com or any successor website), on the "Single Game Tickets" icon located on the "Ticket Central" subpage of the Knicks Website, exact placement as determined by MSG.
  - o Knicks Ticket Page Inclusion: Logo inclusion on the top black bar of the "Ticket Central" subpage of the Knicks Website, exact placement as determined by MSG.
  - o Rangers Ticket Page Inclusion: Presenting partner of the "Ticket Page" subpage of the Rangers Website and Ticketmaster brand integration (e.g., page-skin on the outer-edge of the page), exact details and placement as determined by MSG.
  - o Knicks Schedule Page Inclusion: Logo inclusion on the "Schedule Page" subpage of the Knicks Website, exact placement as determined by MSG.
  - o Rangers Schedule Page Inclusion: Logo inclusion on the "Schedule Page" subpage of the Rangers Website and Ticketmaster brand integration (e.g., page-skin on the outer-edge of the page), exact placement as determined by MSG.
  - o Social Media Platform: Presenting partner of the "This Week" (or other comparable title or concept as determined by MSG in its discretion) social media platform, which will include logo inclusion in (i) one Knicks post per week during each applicable Contract Year's Knicks regular season schedule, (ii) one Rangers post per week during each applicable Contract Year's Rangers regular season schedule and (iii) one Arena Concert Series post per week (all year).

- Public Relations
  - o Once prior to or at the beginning of each season, Ticketmaster will receive placement on Madison Square Garden, New York Rangers and New York Knicks public relations messages, with information mutually agreed upon by

the parties promoting the relationship between Madison Square Garden and Ticketmaster.

HIGHLY CONFIDENTIAL

LNE-LIT24-001185680

EXECUTION COPY

## EXHIBIT G
## MSG-TM TECHNOLOGY DEVELOPMENT PLAN
*(Attached)*

99

LNE-LIT24-001185681


**THE MADISON SQUARE GARDEN COMPANY**

Confidential

LNE-LIT24-001185682

## MSG-TM Technology Development Plan

- MSG and TM to jointly agree on key development goals for the partnership (including the below)
- Timetable, metrics and Service Level Agreements (SLAs) to be discussed and revised with the two operational teams and added to this document

| Item | Detail |
|---|---|
| 1. Core Operations | • Provision of all required core ticketing systems and technology for MSG ticket sales and operations<br>  ○ Any new features/updates to be implemented for MSG on a priority basis (e.g., "10% button") |
| 2. Presence | • Successful rollout of Presence with all capabilities required for MSG operations<br>  ○ WCC, Forum, Chicago Theater, Beacon: TBD, but prior to rollout for Arena/Theater<br>  ○ MSG Arena and Theater: July 1, 2018 |
| 3. Client Support | • Parties to agree on SLA<br>• Client support in line with current operations<br>• Addition of after-hours support and required human response time to fix issues<br>• Define clear mechanism for identifying, reporting and resolving any bugs (e.g., Integrated Seat Map image resolution issue with unclear precise seat/row of purchase) |
| 4. Conversion Rates | • TM to achieve defined increases in conversation rates over life of deal (mobile and desktop), with periodic improvement targets to be mutually agreed; TM to provide timely and detailed reports on page views, conversions, etc. |
| 5. Host Event Analytics | • TM to provide data and analytics capabilities for Host events with the same level of reporting detail as currently available for Archtics |
| 6. Ticket Management (App and Mobile) | • Branded, native ticket management (buy/sell/transfer tickets) included in MSG/team apps<br>• Mobile responsive season ticket portal experience (mobile Account Manager)<br>• Improvement of app and mobile consumer experience to meet modern user expectations (i.e., in line with competing ticketing marketplaces) |
| 7. Open Distribution Platform | • Access token validation, authentication and delivery services for open platform<br>• Timing and completeness of customer data to match that available for sales through TM primary platform |
| 8. Product Advisory Board | • Quarterly meetings/calls with TM and TM's top [10-20] to share key learnings, updates and development goals<br>• Board to meet regularly and include permanent representation from MSG |
| 9. Purchaser Data Sharing | • Direct secure API link to share all ticket buyer basic data and any purchased appends |

HIGHLY CONFIDENTIAL

**Confidential**

LNE-LIT24-001185683

|  |  |
|---|---|
|  | ○ MSG to receive all consumer data available to TM. To the extent TM bears cost to purchase any data from 3rd party sources, MSG to have right to purchase at TM's cost |
|  | • To include at least: source of traffic/referring site (via MSG digital property or other), payment type, method/device use for payment and encrypted tokenized identifiers (e.g., HVB buyer identification project) |
| 10. Monthly TM/MSG Meeting | • Meeting to cover two key areas with representation from Operations, Technology and Data teams<br>• Results to Date: Recent learnings, data updates, what is working/not working<br>• What's Next: MSG to share plans for upcoming campaigns (renewal launch, individual ticket sales launch, etc.) and TM to share latest technical and product roadmap |
| 11. Fraud Prevention | • MSG and TM to jointly assess fraudulent activity and work together to develop metrics and plan for continued improvement to reduce fraudulent activity going forward |
| 12. PCI Compliance | • Mechanism for all ticket purchasers (including season ticketholders, groups, staff, etc.) to input credit card data and transact directly with TM (including mobile purchases)<br>• Point-to-point encryption on credit card data, with no unencrypted data in MSG systems<br>• Security patch updates to TM systems on a regular basis (high and critical within 30 days and 60 days for all others) |
| 13. Additional Secure APIs | • Transition from file-based communication of data to all data feeds available in real-time secure APIs |
| 14. Financial Reporting | • Robust financial reporting systems such that all wire transfers are accompanied with detailed backup of ticket sales for both primary and secondary (e.g., Content Type, GTV, volume) |
| 15. House Seats | • TM to share secure API enabling MSG to manage and reserve venue ticket inventory (comps/VIP/staff)<br>• Functionality to also include capability for individual to reserve seat in system and for TM system to auto-send email that will allow that individual to directly enter credit card information (PCI solve) |
| 16. Information Security | • TM to provide regular (timing to be mutually agreed) information security reports (e.g., vulnerability scans, penetration testing results and remediation efforts) |

HIGHLY CONFIDENTIAL