**From**:      Donna Westmoreland [donna@930.com]
**Sent**:      11/14/2018 5:39:07 PM
**To**:        Seth Hurwitz [leseth@aol.com]; Gena Gordon [gena@930.com]
**Subject**:   Fwd: Signed Agreement
**Attachments**:   Merriweather Post Pavilion Fully Executed User Agreement_11122018.pdf; Untitled attachment 00013.htm

Begin forwarded message:

**From:** Geoff Carns <geoff.carns@ticketmaster.com>
**Subject: Re: Signed Agreement**
**Date:** November 14, 2018 at 9:27:04 AM EST
**To:** Donna Westmoreland <donna@930.com>
**Cc:** David Marcus <david.marcus@ticketmaster.com>, Jean Parker <jeanp@930.com>

Attached is a fully executed agreement for your files. Really appreciate all your efforts to get this agreement over the line. We look forward to putting it in a drawer, and moving forward with a successful partnership.

g

---

**From:** Donna Westmoreland <donna@930.com>
**Date:** Tuesday, November 13, 2018 at 1:04 PM
**To:** Geoff Carns <geoff.carns@ticketmaster.com>
**Cc:** David Marcus <david.marcus@ticketmaster.com>, Jean Parker <jeanp@930.com>
**Subject:** Signed Agreement

Hi Geoff -

Attached please find the signed agreement.  Please send along the executed when you have a moment, and let me know if you have questions.  I believe you already have the W-9.  Please advise if you need me to resend.

Best,
Donna

# *ticketmaster*®

## USER AGREEMENT

THIS USER AGREEMENT ("Agreement") is entered into as of November 12, 2018 and is made effective as of November 12, 2018 ("Effective Date"), by and between Ticketmaster L.L.C., a Virginia limited liability company ("Ticketmaster"), and It's My Amphitheater, Inc., a Maryland corporation ("Principal") (Ticketmaster and Principal are sometimes collectively referred to as the "parties" and individual as a "party"). This Agreement consists of this User Agreement, and any Exhibits attached hereto which are incorporated herein by this reference. The meanings of all capitalized terms used in this Agreement are set forth in Section 13 hereof. In consideration of the mutual promises and covenants set forth herein, the parties hereby agree as follows:

**1.      TERM.** The initial term of this Agreement shall begin on the Effective Date and shall continue until October 31, 2019 (the "Initial Term"), and shall be automatically renewed for three successive one (1) year terms following the initial Term ("Renewal Term"), unless either party hereto notifies the other party in writing, not less than ninety (90) nor more than one hundred twenty (120) days prior to the end of the initial Term or the then current renewal period, of its intention not to renew this Agreement. Notwithstanding anything above-stated to the contrary, Principal may terminate this Agreement in its sole discretion within sixty (60) days after the expiration of the Initial Term even if no notice of an intention not to renew the Agreement was previously provided.

**2.      TICKET SALES RIGHTS AND OBLIGATIONS; EXCLUSIVITY.**
         (a)      Grant of Rights: Principal hereby grants to Ticketmaster, and Ticketmaster accepts from Principal, the right during the Term of this Agreement, to be the exclusive seller, as Principal's agent, of all Tickets for the Sellable Capacity for every Attraction via any and all means and methods, including on the Internet, by telephone, computer, IVR, outlets, television, clubs, auctions, VIP packages, presales, upsells, or by any other means of distribution, whether existing now or at any time in the future, at the Facility. Except as provided in Section 2(b) of this Agreement, Principal shall ensure that the entire Sellable Capacity for every Attraction at the Facility shall be made available for distribution on the TM System.
         (b)      Sales by Principal: Subject to the terms of this Section 2, Principal retains the right to: (i) sell single Tickets from the Facility Box Office to persons physically present at the Facility Box Office; (ii) sell Season/Contract Tickets including unmanifested box tickets; (iii) provide Tickets spread among various seating categories up to a maximum of eight percent (8%) of the Sellable Capacity for each Attraction for distribution through legitimate fan clubs in accordance with Ticketmaster's current fan club policies; (iv) conduct Group Sales of Tickets; and (v) provide a reasonable number of House Seats for any Attraction. None of the fees and charges set forth in Section 3 of this Agreement (other than Payment Processing Fees set forth in Section 3(a) or 3(d)(ii), as applicable) shall apply to the sale of the tickets specified in this Section 2(b) unless such tickets are sold through the TM System.
         (c)      No Third Party Systems or Services: Principal shall not directly or indirectly use, sponsor, promote, advertise, authorize or permit the use of any third party that promotes, engages in or facilitates the sale, resale or issuance of tickets.
         (d)      No Minimum Sales: It is agreed and understood that neither Ticketmaster nor Principal guarantees or will guarantee that any minimum or fixed number of Tickets will be sold through the TM System for any Attraction and that Principal does not guarantee or commit to any number of Attractions.
         (e)      Ticketmaster Obligations: During the Term, Ticketmaster shall provide remote ticketing services (including, but not limited to, online ticket sales, computer, IVR and call center sales) access to and use of the Ticketmaster system, website design, and hosting and all Hardware to provide those services as described herein (including but not limited to granting Partner access to the Ticketmaster System) (collectively, the "Services") on the terms and conditions specified in this Agreement and otherwise in a manner consistent with industry standards.
         (e)      Acknowledgement by Principal: Principal acknowledges that Ticketmaster acts as the agent of certain third parties that may be a direct or indirect competitor of Principal. Principal also acknowledges that Ticketmaster has entered and may in the future (including during the Term of this Agreement) enter into new business relationships with other third parties, including those in the entertainment and sports industry, such as performers who perform at the Facility, for a variety of services. Principal further acknowledges that any such sales or services or solicitations to provide such sales or services as contemplated under this subsection do not compete with Principal or conflict with this Agreement or Ticketmaster's rights, duties or obligations under this Agreement.

**3.      CHARGES AND FEES.** Except as otherwise expressly set forth in this Agreement (e.g., TM Charge fees, TM+, VIP Packages, Platinum Tickets, etc.), Ticketmaster shall not receive any inside charges or processing fees from Principal or otherwise charge Principal for any for the products provided and services expressly provided for under this Agreement. In addition, Ticketmaster will facilitate Principal's free parking upsells at no additional cost to consumers or Principal, provided that such parking upsell is not an additional charge to consumers.
         (a)      Except as otherwise expressly set forth in this Agreement, the sole compensation Ticketmaster shall receive for the products provided and services expressly provided for under this Agreement shall be the right to add a convenience charge to ticket prices in the following amounts:





The convenience charges set forth above shall be deemed to include payment authorization and processing ("Payment Processing Fees")

In the event applicable law prohibits the assessment of such fees against consumers, Ticketmaster and Principal shall agree on alternative means for compensating Ticketmaster for its services in amounts reasonably comparable to those set forth in this Agreement, and as permitted by applicable law.

(b)



(c)    Mail Fee:  Ticketmaster shall be entitled to assess and receive a fee in the against purchasers of Tickets using the U.S. mail method of delivery (the "Mail Fee").  The Mail Fee retained by Ticketmaster is subject to automatic annual increase

(d)    TM Charge:  Principal has elected to activate the electronic payment processing system within the TM System that utilizes the global banking association networks to authorize electronic payment for purchases of Tickets to Attractions sold by Principal from the Facility Box Office as permitted under this Agreement ("TM Charge").  In connection therewith, the defined term "Software" shall be deemed to include TM Charge and the following additional terms and conditions in this subsection (f) shall apply:

(i)    TM Charge Operation:  Ticketmaster shall transmit data relating to Ticket sales made by Principal using TM Charge to Ticketmaster's credit card processor, provided Ticketmaster has received Principal's merchant number(s) and other necessary information for Ticketmaster to use for the transmission of sales data.  Principal shall be responsible for promptly notifying Ticketmaster and Processor, if applicable, of any changes to the information provided pursuant to this Section.  Processor will then transmit such data to the applicable credit card company for payment to Principal, subject to Principal having entered into the applicable Principal Processor Agreements (as further described below).  Ticketmaster shall use its best efforts to ensure the accuracy of information transferred from the Processor via TM Charge, but Ticketmaster does not guarantee the accuracy and timeliness of such information.  Principal shall comply with all applicable credit card association or company guidelines (e.g. swiping all retail transactions and using customer address information for all non-face-to-face transactions).  Ticketmaster shall provide Principal with daily transaction reports regarding authorized and settled transactions.  Principal shall review, on a regular basis, all reports provided to Principal by Ticketmaster.  Principal also agrees that, for operational and monitoring purposes, the Processor may provide Ticketmaster with processing and settlement reports related to sales of Tickets using TM Charge.

(ii)    TM Charge Fees:  In connection with Principal's sales of Tickets utilizing electronic payments and authorized via TM Charge using either Visa or MasterCard, Ticketmaster's credit card processor ("Processor") shall deduct



IMP_SUB-0232990

. The fees charged to Principal for use of TM Charge are subject to automatic increases equal to any actual increases in Ticketmaster's Processor fees. Principal shall also be responsible for any and all other amounts charged to Ticketmaster (if any) by a Processor for processing Principal's transactions, including, without limitation, chargebacks, fraudulent credit card use and additional charges for failure to meet the specific timing or other qualifications of the applicable credit card association or company. In the event that Principal desires to process any credit or debit cards other than Visa or MasterCard utilizing TM Charge, then the fees for such service shall be mutually agreed upon by Principal and such credit card companies, and Principal shall enter into its own merchant agreement with such credit card companies.

(iii)    Effect of Termination of Ticketmaster's Processor Agreement: Ticketmaster has entered into an agreement with the Processor (the "Processor Agreement"), and Principal agrees to enter into an agreement with such Processor (the "Principal Processor Agreement") as soon as practicable after the date of this Agreement. The Principal Processor Agreement shall provide that if the related Processor Agreement expires or terminates, then the Principal Processor Agreement shall also expire or terminate without any early termination penalties or charges. In order to facilitate streamlined credit card authorization processing for Ticketmaster and its clients, Ticketmaster continues to seek to maintain relationships with superior processors throughout the Term of this Agreement. In the event that Ticketmaster elects to use a different Processor, Principal shall enter into an agreement with such new Processor if Principal desires to continue utilizing TM Charge, it being acknowledged and agreed by Principal, however, that use of certain Software (e.g., AccountManager) may require utilization of TM Charge.

(e)    Website Design and Hosting: Ticketmaster will provide, at no additional charge, reasonable website design services for up to one (1) Principal website (including, if applicable, through use of the services of a third party designated by Ticketmaster in its discretion) during the Term of this Agreement. Ticketmaster will also pay for the cost of monthly hosting services for such Principal website, it being understood, Ticketmaster reserves the right to charge Principal for any Principal website design and significant layout modification services requested by Principal following such website's initial design and launch.

(f)    TM+:    If elected by Principal in its discretion, Ticketmaster shall enable its proprietary, integrated primary and secondary market ticket inventory platform and technology on the TM.com Website, which platform and technology shall enable consumers searching for Tickets to an Attraction to simultaneously view Tickets available for initial sale directly by Principal pursuant to the Agreement, in addition to Tickets available for resale from other consumers (collectively, "TM+"), in accordance with the terms and conditions set forth on Exhibit B attached hereto. The parties acknowledge and agree, the terms "TM System" and "Software" as used in the Agreement shall be deemed to incorporate TM+ when TM+ is enabled.

(g)    Platinum Tickets and VIP Packages: If elected by Principal in its discretion, the terms and conditions set forth in Exhibit C attached hereto shall apply in connection the sale of Platinum Tickets and VIP Packages.

4.    **INSTALLATION AND SET-UP.**

(a)    Attraction Set-Up:    In order to effectively utilize Ticketmaster's distribution technologies, within a reasonable time before (but in no event less than the time period described below) the scheduled on-sale date of Tickets for each Attraction (the "On-Sale Date"), Principal shall furnish Ticketmaster with all necessary information with respect to the Attraction, including, without limitation, seating layout of the Facility, Ticket structure, discounts permissible, Attraction Taxes, Ticket header information, logos, entry information, vision and hearing information, wheelchair and other accessible seating information and such other information as is necessary for the proper sale of Tickets (collectively, the "Set-Up Information"). The parties intend that accessible seating tickets are handled as follows: Guests needing mobility accessible seats can purchase via Ticketmaster or the box office. Visually and hearing impaired guests call the Principal's office directly to purchase. Principal must provide the Set-Up Information to Ticketmaster at least five (5) business days prior to the On-Sale Date for new Attractions that do not utilize seating charts then existing in the TM System, and at least three (3) business days prior to the On-Sale Date for new Attractions that utilize seating charts then existing in the TM System. Ticketmaster shall have no responsibility and Principal shall indemnify and hold Ticketmaster harmless from and against any and all liabilities, claims, expenses (including court costs and reasonable attorneys' fees) and causes of action resulting from the inaccuracy of any Set-Up Information furnished by Principal pursuant hereto.

(b)    Will-Call Services: Principal shall notify Ticketmaster of Principal's will-call capabilities and will-call Facility Box Office hours. Principal shall verify the identity of each person picking up Tickets at will-call via a valid photo identification (government issued) and the credit card used in the Ticket sales transaction. Principal shall not release Tickets to any customer whose identity has not been so verified.

(c)    Ticket Stock. Principal shall be responsible for the security of Ticket stock in its possession, and the risk of loss of Ticket stock shall shift to Principal upon the delivery thereof to Principal or Principal's authorized representative, agent or employee.

5.    **ADVERTISING.**

(a)    Principal is responsible for all advertising, marketing and promotion of the Attraction(s). In all advertising or promotional material which Principal creates, causes to be produced, controls or recommends relating to any Attraction that references ticket sales, Principal shall include the Ticketmaster name, logos, and the applicable TM.com Website address. The repeated failure to prominently include the Ticketmaster name, logos, and the applicable TM.com Website



address in any advertising or promotion of an Attraction, without Ticketmaster's prior written approval, shall constitute a material breach of this Agreement and shall be cause for immediate termination of this Agreement by Ticketmaster.

(b)    All advertising, marketing and promotion information Principal creates shall remain the property of Principal.

(c)    Principal hereby grants to Ticketmaster the right, subject to Principal's approval, which shall not be unreasonably held, to advertise, in any medium determined by Ticketmaster, including on the TM.com Website or affiliated websites, Attractions and the availability of Tickets at the Facility Box Office, and by Internet Sales and Telephone Sales and, in connection therewith, to use the name and logo of Principal, the Attraction, the Facility and all other information respecting the Attraction.

(d)    Except as otherwise provided, each Party owns all proprietary rights in their respective brands, including without limitation trademark rights. Each Party agrees that, except as otherwise expressly permitted in the Agreement, it will not to take any action that would infringe, dilute or conflict with the other Party's ownership rights in its brands. The Parties hereby each grant the other a worldwide, limited, non-transferable, non-exclusive and royalty-free license to use their logos, tradenames and trademarks solely for the purposes of this Agreement and as long as this Agreement shall remain in effect. Neither Party shall use any content it creates that contains the other party's trademarks, logos or brands without first confirming that the depictions of these trademarks, logos or brands is accurate and acceptable and shall never use the other Party's trademarks, logos or brands in a negative manner or in a manner that would damage the goodwill associated therewith.

(e)    Purchaser Data:  Principal and Ticketmaster each has rights in the personally identifiable information with respect to persons who actually purchased tickets to Principal's Attractions through the TM System (whether by Telephone Sales or Internet Sales) ("Purchaser Data"), subject to the terms hereof.  Such use by Ticketmaster may include, without limitation, in development of new or upgraded Software at Principal's request, or for general market research on pricing when used in aggregate form with other Ticketmaster client consumer data. Each party agrees to use the Purchaser Data only in compliance with all applicable laws and administrative rulings and in accordance such party's own posted privacy policies. Each party shall implement and maintain reasonable security procedures and practices appropriate to the nature of the Purchaser Data to protect the Purchaser Data from unauthorized access, destruction, use, modification or disclosure.  Each party also agrees that if any portion of the Purchaser Data includes credit or debit card numbers and related information, each party shall comply with payment card industry standards.  Each party shall also include in any email communications that such party may make based on the Purchaser Data a mechanism to provide the recipient with the right to "opt-out" from receiving further communications from such party, and shall honor such opt-out preferences.

6.    <u>ACCOUNTING PROCEDURES</u>.

(a)    Payments by Ticketmaster:  Principal hereby authorizes Ticketmaster and the financial institution indicated below ("Bank") to deposit all settlement funds payable to Principal hereunder in the account listed below ("Principal's Account"):



Ticketmaster shall collect all Ticket Receipts derived from Ticket sales for Attractions made by Ticketmaster and shall initiate payment of Ticket Receipts and Royalties to which Principal is entitled on Wednesday of each week with respect to TM System Ticket sales made for Attractions by Ticketmaster during Monday through Sunday of the week preceding such payment date.  Initiation of the settlement payment via direct deposit shall constitute full performance by Ticketmaster of its obligation to make such settlement payment to Principal or to any person whatsoever. If funds to which Principal is not entitled are deposited into Principal's Account, then Principal will immediately return excess funds to Ticketmaster.  Principal hereby releases Ticketmaster from liability for delays or errors beyond Ticketmaster's reasonable control, including but not limited to any errors resulting from any inaccurate or outdated Account information provided by Principal or bank processing delays, or for any related damages.  Principal acknowledges and agrees that direct deposit of such funds may require up to two (2) business days for Bank processing.  Each weekly settlement payment shall be accompanied by a written accounting in sufficient detail for Principal to verify the accuracy of settlement payment amounts, ticket sales.  Principal shall designate an email address (set forth below its signature line of this Agreement) for delivery of such accounting and information regarding Attractions and Ticket sales, and shall promptly notify Ticketmaster of any changes to such email address. The direct deposit authorization provided herein shall remain in full force and effect until Ticketmaster has received written notification from Principal of its termination in such time and such manner as to afford Ticketmaster a reasonable opportunity to act upon it.

(b)    Cancelled Attractions; Refunds: In the event that any Attraction for which Ticketmaster sold Tickets is cancelled, postponed to a different date, or modified in such a manner that the headlining act is replaced (each, a "Cancelled



IMP Merriweather Post User Agreement_11082018.docx

Attraction"), Principal authorizes Ticketmaster to refund the Ticket price at the original point of purchase (e.g., by Internet Sales or Telephone Sales) in such manner (e.g. by crediting the consumer's credit card) and at such time (e.g. before or after the scheduled date of the performance of such Attraction) as Ticketmaster, in its reasonable discretion, determines, and to exchange Tickets pursuant to any exchange policy that may be mutually adopted by Ticketmaster and Principal. Ticketmaster may utilize any funds held on account of Principal for any Ticket sales to any Attraction ("Account Balance") to refund Face Value of the Ticket and any Royalties due Principal. It is agreed and understood that Ticketmaster is the Ticket selling agent of Principal and therefore Ticketmaster's agreement to make any refunds as the agent of Principal is subject and limited to Ticketmaster holding or receiving from Principal the full amount of funds necessary to make refunds of the Face Value of the Ticket and any Royalties paid to Principal to all Ticket purchasers properly entitled to a refund. Ticketmaster's current policy is to refund the convenience charges and processing fees with respect to Tickets for Cancelled Attractions. Ticketmaster may only change this policy prospectively and only upon giving Principal advance notice of this change. In addition to any other right to terminate without cause set forth in Sections 1 and 10 of this Agreement, Principal shall have the right to terminate this Agreement during any Initial Term of Renewal Term within twenty (20) days of notification of Ticketmaster's changing its policy with respect to refunding convenience charges and/or processing fees. Principal shall be responsible for all refunds and exchanges of Tickets initially purchased from the Facility Box Office.

    (c)    Chargebacks: Ticketmaster reserves the right to deduct from Principal's settlement, any Chargebacks that Ticketmaster receives from its merchant bank, for up to twelve (12) months after the occurrence of an Attraction, except to the extent such Chargebacks are caused by the negligent actions or omissions of Ticketmaster (e.g., failure to investigate a Chargeback or dispute illegitimate Chargebacks). For purposes of this Agreement, "Chargebacks" shall mean the amounts that the merchant bank is charged back by a cardholder or a card issuer under the card organization's rules (e.g. cardholder dispute, fraud, declined transaction, returned Tickets for Cancelled Attractions, etc.). A detailed summary of chargebacks will be sent to Principal in a format mutually agreed upon by the parties.

    (d)    Audit Rights: No more than once per calendar year during the Term of this Agreement, within twenty (20) days following Principal's written request, Ticketmaster shall make available to Principal (and any auditors, accountants or other professionals Principal shall engage) at Ticketmaster's relevant business office for audit, review, examination, extracting and/or copying, all such books and records, including, but not limited to, electronic records, relating to all Ticket Sales and all remittances and charges to Principal relating to this Agreement. Principal shall bear the expense of all such audits, reviews or examinations unless discrepancies are disclosed thereby

    (e)    Insolvency; Deficiency Amounts; Security for Repayment: Principal shall provide immediate written notice to Ticketmaster in the event it files any voluntary or involuntary petition under the bankruptcy or insolvency laws or upon any appointment of a receiver for all or any portion of Principal's business or the assignment of all or substantially all of the assets of Principal for the benefit of creditors (each, a "Material Financial Event"). The parties agree that this Agreement constitutes a financial accommodation by Ticketmaster to Principal as such term is utilized in 11 U.S.C. § 365. If at any time, the Account Balance is not sufficient to pay for anticipated refunds or Chargebacks, Principal shall deliver the amount of such deficiency ("Deficiency Amount") to Ticketmaster no later than twenty-four (24) hours after notice by Ticketmaster to Principal. Ticketmaster shall have the right to setoff any Deficiency Amount against any amounts held by Ticketmaster on behalf of Principal. In the event of any Material Financial Event or in the event Principal has not paid any Deficiency Amount when due, Ticketmaster shall have the option to require Principal to provide additional security to Ticketmaster of a type (e.g., letter of credit, guaranty or performance bond) and in an amount as requested by Ticketmaster in its sole discretion, which Principal shall provide to Ticketmaster within five (5) business days after Ticketmaster's request. Ticketmaster reserves the right to require Principal to provide current financial statements to Ticketmaster within five (5) business days after Ticketmaster's written request.

    (f)    Counterfeit Tickets: It is agreed and understood that Ticketmaster shall not be liable to Principal for the printing and sale of counterfeit Tickets.

    (g)    Request for Taxpayer Identification Number and Certification: Principal shall complete the required Form W-9 provided with this Agreement and return it to Ticketmaster with this Agreement for purposes of reporting to the Internal Revenue Service.

7.    TAXES.
    (a)    Attraction Taxes: Principal shall be responsible for calculating any and all Principal Taxes, for preparing and timely filing any and all tax returns or reports required to be filed in respect of any such Principal Taxes, and for timely remitting Principal Taxes to the appropriate taxing authority. Ticketmaster will collect and turn over to Principal the amounts to which Principal is entitled as provided in Section 6(a). In the event that Ticketmaster pays any Principal Taxes on behalf of Principal or Ticketmaster pays any Principal Taxes due to a failure by Principal to provide Ticketmaster with the required writing or documentation of any Principal tax exemptions pursuant to Section 7(c) below, Principal shall promptly reimburse Ticketmaster for any and all such Principal Taxes paid by Ticketmaster, including penalties and interest assessed with respect thereto (other than Principal Taxes, penalties and interest that Ticketmaster pays directly out of Principal's Ticket Receipts), and shall also promptly reimburse Ticketmaster for any and all expenses (including reasonable attorneys' fees) or damages that result from the failure by Principal to properly calculate and timely remit Principal Taxes assessed on all

IMP Merriweather Post User Agreement_11082018.docx



amounts received by Principal under this Agreement, to timely file all related returns or reports, or to timely reimburse Ticketmaster for any and all such Principal Taxes, interest and penalties as provided above. Notwithstanding the foregoing, in the event that Ticketmaster is ever required by applicable law to remit Principal Taxes directly on behalf of Principal and file related tax returns or reports, Ticketmaster shall have the right to do so upon notice to Principal, and thereafter "Ticket Receipts" shall be defined to be reduced by such Principal Taxes. Ticketmaster shall be responsible for calculating any and all Ticketmaster Taxes, for preparing and timely filing any and all tax returns or reports required to be filed in respect of any such Ticketmaster Taxes, and for timely remitting such Ticketmaster Taxes to the appropriate taxing authority.

(b)    Principal's Taxpayer ID Number: Principal certifies that Principal's federal taxpayer identification number ██████████. Principal further certifies that its state taxpayer identification or registration number for the state in which the Facility is located ██████.

(c)    Principal's Tax Exemptions: Principal shall notify Ticketmaster in writing of any and all Principal tax exemptions (if applicable) and provide Ticketmaster with reasonable proof of Principal's tax exemptions.

## 8.    CONFIDENTIAL INFORMATION:

(a)    The parties acknowledge that by reason of their relationship hereunder, they may from time to time disclose information regarding their business, products, software technology, Intellectual Property and other information that is confidential and of substantial value to the other party, which value would be impaired if such information were disclosed to third parties ("Confidential Information"). The provisions of this Agreement shall be deemed to be Confidential Information.

(b)    Confidential Information shall not include information that (i) is or becomes generally available to the public other than as a result of the breach of the confidentiality obligations in this Agreement by the receiving party, (ii) is or has been independently acquired or developed by the receiving party without violating any of the confidentiality obligations in this Agreement, (iii) was within the receiving party's possession prior to it being furnished to the receiving party by or on behalf of the disclosing party, or (iv) is received from a source other than the disclosing party; provided that, in the case of (iii) and (iv) above, the source of such information was not known by the receiving party to be bound by a confidentiality obligation to the disclosing party or any other party with respect to such information.

(c)    Each party agrees that it will keep the Confidential Information strictly confidential and will not use in any way for its own account or the account of any third party, nor disclose to any third party, any Confidential Information revealed to it by the other party without the other party's prior written consent, except to the extent expressly permitted by this Agreement; provided, however, that the receiving party may disclose the Confidential Information, or any portion thereof, to its directors, officers, employees, legal and financial advisors, who need to know such information to perform such party's obligations under this Agreement and who agree to treat the Confidential Information in accordance with the confidential obligations in this Agreement. Each party shall use the same degree of care to avoid disclosure or use of the other party's Confidential Information as it employs with respect to its own Confidential Information of like importance and represents that it has adequate procedures to protect the secrecy of such Confidential Information including without limitation the requirement that employees have executed non-disclosure agreements which have the effect of adequately protecting Confidential Information.

(d)    Notwithstanding anything otherwise provided in this Agreement, Ticketmaster agrees that it will not share with and shall assure that no other affiliate shares with the concert promotion and venue operation divisions of Live Nation Entertainment the following specific information: (1) Purchaser Data regarding purchasers of Tickets solely in their capacity as purchasers of Tickets to Principal's Attractions, and (2) individual Ticket sales data for Principal's Attractions.

(e)    In the event that either party receives a request to disclose all or any part of the Confidential Information under the terms of a subpoena, document request, notice of deposition or other legal proceeding, such party agrees to notify the other pursuant to Section 14(h) below, within forty-eight (48) hours after receipt of such legal document, and such party agrees to cooperate with the other in any attempt to obtain a protective order.

## 9.    INDEMNIFICATION:

(a)    Principal shall reimburse, indemnify, hold harmless and defend Ticketmaster and its parents, subsidiaries, and their officers, directors, employees and agents and their successors and assigns (collectively, for purposes of this Section, "Ticketmaster's Indemnitees") against, and hold Ticketmaster's Indemnitees harmless from, any and all claims, actions, damages, expenses (including court costs and reasonable attorneys' fees), obligations, losses, liabilities and liens, imposed on, incurred by, or asserted against Ticketmaster's Indemnitees occurring as a result of, or in connection with: (i) any Event of Default under this Agreement by Principal or any of its officers, directors, employees and agents (collectively, "Principal's Representatives"); (ii) misuse of the TM System (including without limitation any customization of Principal's Website or the Interface Page (if applicable) and any e-mail campaigns or distributions using the TM System) or misuse of the Hardware (if any) by Principal or any of Principal's Representatives; (iii) any third-party claims arising out of any Attraction held or scheduled to be held at the Facility (including any injuries or deaths occurring at or in connection with any Attraction or the failure of any Attraction to occur or to occur in the manner advertised or promoted); (iv) Principal's use or disclosure of the Purchaser Data; and/or (v) any email campaigns or distributions conducted by Ticketmaster on Principal's behalf as directed by Principal or conducted by Principal including, without limitation, email campaigns or distributions in violation of federal, state or other laws applicable to commercial emails; except, in each case, to the extent that any such claims shall relate to Ticketmaster's negligence or willful misconduct with respect thereto.

(b)    Ticketmaster shall reimburse, indemnify, hold harmless and defend Principal and its parents, subsidiaries,



and their officers, directors, employees and agents and their successors and assigns (collectively, for purposes of this Section, "Principal's Indemnitees") against, and hold Principal's Indemnitees harmless from, any and all claims, actions, damages, expenses (including court costs and reasonable attorneys' fees), obligations, losses, liabilities and liens, imposed on, incurred by, or asserted against, Principal's Indemnitees occurring as a result of, or in connection with: (i) any Event of Default under this Agreement by Ticketmaster; or any of its officers, directors, employees and agents; (ii) any alleged patent, trademark or copyright infringement asserted against Principal's Indemnitees with respect to Principal's use of the TM System; (iii) any third party claims resulting from outages of the TM System exceeding 48 hours in duration; and/or (iv) any loss of Purchaser Data by Ticketmaster; except, in each case, to the extent that any such claim shall relate to Principal's negligence or willful misconduct with respect thereto.

(c)        The indemnified party must notify the other party promptly in writing of any claim hereunder, and provide, at such other party's expense, all reasonably necessary assistance, information and authority to allow the other party to control the defense and settlement of such claim, should the other party elect to do so.

10.    **TERMINATION:**

(a)        This Agreement may be terminated during the Initial Term or any Renewal Term by Ticketmaster in the event Principal misuses the TM System (including without limitation any customization of Principal's Website or the Interface Page (if applicable) and any e-mail campaigns or distributions using the TM System), by Principal as a result of any outages of the TM System exceeding 48 hours in duration, or by either party in the event the other party discloses Confidential Data of the other party in violation of Section 8, or for any other material default in or material breach of the terms and conditions of this Agreement by the other party; provided that any such defaults continue after the other party has received written notice of default and thirty (30) business days (or ten (10) business days, in the case of a monetary default) to cure such default (each such occurrence, after the expiration of such cure period, shall be an "Event of Default"). This Agreement may also be terminated immediately and without demand to cure by either party should the other party file of any voluntary or involuntary petition under the bankruptcy or insolvency laws of any applicable jurisdiction, which petition is not dismissed within sixty (60) days of filing, or upon any appointment of a receiver for all or any portion of the other party's business, or any assignment of all or substantially all of the assets of such other party for the benefit of creditors. Upon an Event of Default by Ticketmaster, Ticketmaster shall, without demand, forthwith pay to Principal all amounts due and owing pursuant hereto, and Principal may, in addition to terminating this Agreement, require Ticketmaster to remove all Hardware from the Facility. Upon an Event of Default by Principal, Principal shall, without demand, forthwith pay to Ticketmaster all amounts due and owing pursuant hereto, and Principal authorizes Ticketmaster to setoff any amounts owed to Ticketmaster hereunder against any amounts held by Ticketmaster on behalf of Principal, and Ticketmaster may, in addition to terminating this Agreement, terminate Principal's right to access and use the TM System and take immediate possession of the Hardware and Software wherever the same may be located without demand, notice or court order.

(b)        This Agreement may be terminated on ten (10) days' prior written notice, at the sole discretion of Ticketmaster in the event that more than 50% of Principal's assets or voting stock is sold or otherwise assigned to a third party.

(c)        This Agreement may be terminated by either Party in the event any act by the other Party threatens to cause any infringement of that Party's Intellectual Property or other property right, including without limitation, any copyright, license right or trade secret right, and offending Party fails to refrain from so acting within ten (10) business days' written notice from the other party.

(d)        Upon the effective date of any termination or expiration of this Agreement for any reason, provisions regarding ownership of Intellectual Property rights, representations and warranties, confidentiality, indemnification, limitation of liability, non-solicitation, jurisdiction and venue shall remain in full force and effect; each party shall immediately cease the use of the other party's Intellectual Property; Ticketmaster shall immediately return to Principal a copy of all Purchaser Data regarding purchasers of Tickets solely in their capacity as purchasers of Tickets to Principal's Attractions; and each party shall otherwise return, or at the other party's request, destroy all copies of Confidential Information, and all other property belonging to and/or received from the other party.

(e)        No remedy referred to in this Section is intended to be exclusive, but each shall be cumulative and in addition to any other remedy herein or otherwise available at law or in equity, each and all of which are subject to the limitations contained in Section 12 hereof.

11.    **PRINCIPAL'S ACKNOWLEDGEMENTS.** Principal acknowledges that Ticketmaster's services under this Agreement are limited to serving as an agent of Principal for the distribution of Tickets, and that Ticketmaster does not guarantee (i) that short term interruptions of service will not occur during the Term hereof, (ii) that each person processing Ticket orders will be fully familiar with each or all of the Attractions, or (iii) that persons calling Ticketmaster charge-by-phone numbers will not be placed on hold, however commercially reasonable efforts will be made to limit the time on hold and email or call-back options will be provided. Principal further acknowledges and agrees that Ticketmaster may have many other events on the TM System concurrently with any Attraction and Ticketmaster has no responsibility whatsoever for the marketing or promotion of any Attraction or the success of the Ticket sales for any Attraction, all of which is Principal's sole responsibility and obligation.

12.    **EXCLUSIVE REMEDIES FOR BREACH OF AGREEMENT.**



IMP_SUB-0232995

(a)  **Opportunity to Cure:** Except for any system outage lasting longer than 48 hours, if either party believes that there exists a breach of this Agreement or if any controversy, claim, or dispute relating to this Agreement or any Attraction arises, such party must give written notice, pursuant to the terms hereof, to the other party within ten (10) business days of obtaining knowledge of such breach. Such notice shall state the nature of the breach and the specific provision of this Agreement that the party believes has been breached. The other party shall have the applicable time period set forth in Section 10(a) above from the receipt of such notice to cure the breach.

(b)  **Limitation of Liability:** In no event shall either party be liable for any exemplary or punitive damages. Except for a party's indemnification obligations for third party claims, neither party shall be liable for indirect, consequential or incidental damages, lost profits, lost savings, lost ticket revenues, lost opportunity costs or any other economic loss, of any type or nature, or for events or circumstances beyond such party's control, even if such party has been advised of the possibility of such damages. Neither occasional short term interruptions of service which are not unreasonable under comparable industry standards (but in no event in excess of forty-eight hours in duration) nor interruptions of service resulting from events or circumstances beyond a party's reasonable control shall be cause for any liability or claim for damages against such party hereunder. Except for Principal's indemnification obligations with respect to third party claims, under no circumstances shall Principal be directly liable to Ticketmaster for any Cancelled Attractions.

(c)  **Statute of Limitations:** No action, regardless of form, arising out of this Agreement, or alleging a breach, may be brought by either party more than one (1) year after the date the relevant Attraction occurred or was scheduled to occur (except as otherwise provided in Subsection 6(c) above with respect to Chargebacks).

13.  **DEFINITIONS.** As used in this Agreement, the following terms shall have the respective meanings indicated below unless the context otherwise requires:

"Account Balance" is defined in Section 6(a) hereof.

"Attraction" means a concert, sporting, entertainment or other act or event of any kind or nature whatsoever to be held at the Facility, with the exception of local, civic or charitable community events (unless otherwise mutually agreed upon by the parties, and subject to financial terms mutually agreed upon) and lawn group seats for the Capital Jazz Fest.

"Attraction Taxes" means any and all sales, amusement, admissions and other taxes, charges, fees, levies or other assessments measured by reference to a charge per Ticket sold or determined based upon the purchase price of a Ticket, assessed by federal, state, county, municipal or other governmental or quasi-governmental authorities as a result of, or in connection with, any Attraction, including Principal Taxes and Ticketmaster Taxes as further described below. To the extent such taxes relate to the funds paid or owed to Principal under this Agreement such portion of Attraction Taxes may also be referred to herein as Principal Taxes, and to the extent such taxes relate to portions of service charges (e.g. convenience charge, processing fee, etc.) collected and retained by Ticketmaster under this Agreement, such portion of Attraction Taxes may also be referred to herein as Ticketmaster Taxes.

"Cancelled Attraction" is defined in Section 6(b) hereof.

"Chargebacks" is defined in Section 6(c) hereof.

"Deficiency Amount" is defined in Section 6(e) hereof.

"Face Value" means the face price of a Ticket as determined by Principal, which shall be inclusive of all applicable Attraction Taxes and facility, parking and similar fees.

"Facility" means the venue located at 10475 Little Patuxent Parkway Columbia, MD and currently known as Merriweather Post Pavilion.

"Facility Box Office" means the Ticket sales locations that are operated by Principal or by the Facility management and located at the Facility and other venues operated by Principal, where Ticketmaster tickets are sold.

"Group Sales" means sales of Tickets by Principal to a group consisting of at least ten (10) people for use by the group members to attend an Attraction as a group. In no event shall Group Sales consist of the sale of Tickets to individuals to attend an event separately or for individuals to purchase Tickets with the intent to resell such Tickets.

"House Seats" means Tickets provided by Principal (i) to the Attraction's promoter, performing act or event, or their managers or agents (i.e. band holds); or (ii) for legitimate promotional purposes (e.g. radio station promotions); provided that House Seats Tickets shall not be distributed to the general public.

"Inside Charges" means the amounts Ticketmaster charges Principal to sell, issue and process Tickets utilizing the TM System under this Agreement.

"Internet Sales" means all sales of Tickets over the Internet, or via mobile or smart phone application.

"Liquidated Damages Amount" is defined in Section 12(c) hereof.

"Material Financial Event" is defined in Section 6(d) hereof.

"On-Sale Date" is defined in Section 4(a) hereof.

"sale and sell" and any derivations thereof in this Agreement shall include any distribution for consideration, by any means or method (including without limitation, on the Internet or by auction) and shall include resales.

"Season/Contract Tickets" means specifically designated Tickets sold directly by Principal on an annual basis across all Attractions or across all of a category of Attractions (i.e., luxury suites, club level seats and season tickets).

"Sellable Capacity" means the admission capacity of the Facility for any particular Attraction.

"Set-Up Information" is defined in Section 4(a) hereof.

"Telephone Sales" means all sales of Tickets through the TM System by telephone, and if applicable, interactive voice response (IVR) and similar means.



IMP_SUB-0232996

"Term" is defined in Section 1 hereof.

"Ticket" means a printed, electronic or other type of evidence of the right, option or opportunity to occupy space at or to enter or attend an Attraction or Attractions even if not evidenced by any physical manifestation of such right, such as a "smart card".

"Ticket Receipts" means the Face Value of a Ticket less the applicable Payment Processing Fees or Ticketmaster Taxes, and less any Principal taxes if Ticketmaster is required to remit Principal Taxes to any taxing authority.

"TM.com Website" means any Internet websites owned, operated and maintained by Ticketmaster, including, without limitation, any co-branded versions and any version distributed through any broadband distribution platform or through any platform or device including television, broadband and wireless technologies.

"TM System" means the hardware, software, the TM.com Website, related procedures and personnel, and repair and maintenance services established and maintained by Ticketmaster and its affiliates for the purpose of selling, distributing, auditing and controlling the sale of Tickets for Attractions, including, without limitation, by Internet Sales and by Telephone Sales.

14.    **MISCELLANEOUS.**

(a)    <u>Governing Law/Jurisdiction</u>: This Agreement shall be interpreted and governed by the laws of the State of Maryland, without reference to conflict of laws principles. Each of the parties hereto agrees that the state courts, and the United States federal courts, that are located in the State of Maryland shall each have subject matter jurisdiction hereunder and personal jurisdiction over each of the parties hereto. Each such party hereby consents thereto, and hereby waives any right it may have to assert the doctrine of forum non conveniens or to object to venue to the extent that any proceeding is conducted in accordance with the foregoing provision.

(b)    <u>Waiver of Jury Trial</u>: In the event the parties are required for any reason to submit any dispute hereunder to trial, the parties expressly agree to waive the right to a jury trial, because the parties hereto, all of whom are represented by counsel, believe that the complex commercial and professional aspects of their dealing with one another make a jury determination neither desirable nor appropriate.

(c)    <u>Entire Agreement; Modification</u>: This Agreement constitutes the entire and exclusive agreement between the parties hereto with respect to the subject matter hereof and supersedes and cancels all previous oral or written communications, proposals, agreements, representations and commitments. No modification to this Agreement, nor any waiver of any rights, shall be effective unless assented to in writing by the party to be charged and the waiver of any breach or default shall not constitute a waiver of any other right hereunder or any subsequent breach or default. A party's delay in enforcing its rights hereunder shall not be construed as a waiver of such rights or remedies.

(d)    <u>Assignment</u>: Without the prior written consent of Ticketmaster, Principal shall not (i) directly or indirectly assign, transfer, pledge or hypothecate its rights or obligations in this Agreement or any interest therein; or (ii) permit the Hardware (if any) or any part thereof to be used, or access to the Software or any part thereof to be had, by anyone other than Principal or Principal's authorized employees. Any such assignment shall not relieve Principal of any of its obligations hereunder. Without the prior written consent of Principal, Ticketmaster shall not assign or transfer its rights or obligations in this Agreement or any interest therein, except in the event of an assignment by Ticketmaster to any parent, subsidiary, affiliate or successor-in-interest (including, without limitation, a successor by virtue of an acquisition), in which event no such consent shall be required. Any assignment, transfer, pledge or hypothecation for which consent is required hereby and which is made without such consent shall be void. Notwithstanding the foregoing, Principal agrees and acknowledges that certain of Ticketmaster's duties and obligations under this Agreement may be performed on Ticketmaster's behalf by one or more of its parent, subsidiaries and affiliates, and no such performance shall be deemed to be an assignment or breach of this Agreement by Ticketmaster.

(e)    <u>Relationship of the Parties</u>: Each party is an independent contractor and not an agent or partner of, or joint-venturer with, the other party for any purpose other than as set forth in this Agreement (e.g., Ticketmaster is the agent of Principal with respect to ticket sales and distribution). Neither party by virtue of this Agreement shall have any right, power, or authority to act or create any obligation, express or implied, on behalf of the other party.

(f)    <u>Delays</u>: Neither party shall be liable or deemed in default, and no Event of Default shall be deemed to have occurred, as a result of any delay or failure in performance of this Agreement resulting directly or indirectly from any cause completely, solely and exclusively beyond the control of that party, but only for so long as such delay shall continue to prevent performance.

(g)    <u>Severability</u>: If any provision of this Agreement is found to be invalid or unenforceable in any jurisdiction (a) the validity or enforceability of such provision shall not in any way be affected with respect to any other jurisdiction, and the validity and enforceability of the remaining provisions shall not be affected; and (b) the parties shall replace such provision by one or more valid and enforceable provisions approximating the original provision as closely as possible.

(h)    <u>Notices</u>: Any notices required to be given under this Agreement must be sent to each party, in writing, at the address set forth immediately below the signature line hereto or at such address as may be provided by each party in writing from time to time, by certified or registered mail, return receipt requested or by an overnight courier. Notices will be deemed effective the day following sending if sent by overnight courier or five days after sending if sent by certified or registered mail. Settlement reports may be delivered from Ticketmaster to Principal by email; therefore Principal shall promptly notify Ticketmaster of any change to its email address set forth immediately below the signature line hereto.



IMP_SUB-0232997

(i)　　Binding Agreement/Counterparts:  The terms, conditions, provisions and undertakings of this Agreement shall be binding upon and inure to the benefit of each of the parties hereto and their respective successors and permitted assigns; provided, however, that this Agreement shall not be binding until executed by each of the parties.  This Agreement may be executed in multiple counterparts which when taken together constitute a single instrument

(j)　　Attorneys' Fees:  In addition to any other rights hereunder, the substantially prevailing party, as a court of competent jurisdiction (as provided above) may determine, in any claim or other dispute which relates to this Agreement, regardless of whether such claim or other dispute arises from a breach of contract, tort, violation of a statute or other cause of action, shall have the right to recover and collect from the other party its reasonable costs and expenses incurred in connection therewith, including, without limitation, its reasonable attorneys' fees.  If a party substantially prevails on some aspects of such claim or dispute but not others, the court may apportion any award of costs or attorneys' fees in such manner as it deems equitable.

(k)　　Client Listings:  Principal's execution of this Agreement indicates approval for Principal to be listed as a Ticketmaster client in monthly newsletters for distribution to event industry clients, in product boiler plate information, and in future releases about Ticketmaster products and services for distribution to trade and consumer media.  At any time, Principal may, in its sole discretion, direct Ticketmaster to stop using Principal's name for the purposes listed in this Section by sending notice to Ticketmaster via email at client.news@ticketmaster.com.

(l)　　Facility Agreements:  In the event that any Attraction is held at a facility with which Ticketmaster now has, or may at the time of the Attraction have, a ticket service agreement, then, if such ticket service agreement covers the Attraction, this Agreement shall be superseded by such ticket service agreement and shall not apply with respect to such Attraction.

(m)　　Survival of Terms:  Any provision of this Agreement that contemplates performance or observance subsequent to any termination or expiration of this Agreement, including without limitation provisions related to use of the Software, purchaser data, limitations on liability, indemnification, confidential information, governing law and waivers of jury trials, shall survive any termination or expiration of this Agreement and continue in full force and effect.

IN WITNESS WHEREOF, Ticketmaster and Principal have caused this Agreement to be duly executed as of the date set forth below.

TICKETMASTER L.L.C.,
a Virginia limited liability company

By:

Print Name: Geoff Carns

Title: SVP, Venues & Promoters

Date: 11·13·18

Address:　　Ticketmaster L.L.C.
　　　　　　7060 Hollywood Blvd.
　　　　　　Hollywood, CA 90028
Attn:　　　　SVP, Venues & Promoters

With a copy to:　Ticketmaster L.L.C.
　　　　　　9500 Medical Center Dr., Suite 200
　　　　　　Largo, MD 20774
　　　　　　Attn:  VP, Client Development


IT'S MY AMPHITHEATER, INC.,
a Maryland corporation

By:

Print Name: Donna Westmoreland

Title: C.O.O.

Date: 11/12/2018

Address:　　6112 Lenox Rd.
　　　　　　Bethesda, MD 20817

email address: donna@930.com

With a copy to:  Merriweather Post Pavilion
　　　　　　10475 Little Patuxent Parkway
　　　　　　Columbia, MD 21044
　　　　　　Attn:  General Manager


With a copy to:　Ticketmaster L.L.C.
　　　　　　7060 Hollywood Boulevard
　　　　　　Hollywood, CA  90028
Attn:　　　　General Counsel

IMP Merriweather Post User Agreement_11082018.docx

IMP_SUB-0232998

## EXHIBIT A

### HARDWARE

The parties desire to provide that Ticketmaster shall provide Principal access to the TM System and rent certain ticketing equipment to Principal for its use at the Facility Box Office upon the terms and conditions set forth in this Exhibit A.

1.    **Definitions.** The following terms shall have the respective meanings indicated below:

(a)    **Hardware**: Any and all equipment supplied by Ticketmaster to Principal during the Term of this Agreement and as necessary for Principal to use the TM System.

(b)    **Software**: Ticketmaster's computerized ticketing software known and marketed as Ticketmaster Classic and any new versions thereof that are provided to Principal by Ticketmaster.

2.    **Hardware and Software Use Fees.** Ticketmaster shall provide to Principal, at no cost, with the use of the Hardware (including scanners) and the Software at the Facility Box Office during the Term. Ticketmaster shall, in its reasonable determination, regularly replace any Hardware that becomes obsolete or beyond its useful life. Ticketmaster shall, in its reasonable determination, regularly update the Software so as to provide Principal with the most current version in use by Ticketmaster. Traditional paper ticket stock shall be provided to Principal at no cost.

3.    **Installation and Line Costs.** The installation costs with respect to the Hardware, the cost of all telephone line connections between Ticketmaster's central computer facility and the Facility Box Office, and all monthly telephone line costs with respect to the operation of the TM System between the Facility Box Office and the central computer facility, shall be borne solely by Principal.

4.    **Hardware and Software Maintenance and Support.** Ticketmaster shall provide ordinary and routine maintenance, repair and support of the Hardware and Software at the Facility at no additional cost to Principal, provided that such maintenance, repair or support is not necessitated by the negligence or willful misconduct of Principal, its employees, agents or representatives.

5.    **Protection of Hardware.** Principal acknowledges that the Hardware will be used by Principal at the Facility Box Office which location Ticketmaster does not own, operate or control. Accordingly, the parties agree as set forth below with respect to the Hardware:

(a)    **Loss and Damage**: Principal hereby assumes and shall bear the entire risk of loss and damage to the Hardware, ordinary wear and tear and obsolescence excepted, whether or not insured against, once installed, unless occasioned by the negligence of Ticketmaster, from any and every cause whatsoever from the date of delivery of the Hardware to the Facility Box Office until removal thereof following termination of this Agreement. No such loss or damage to the Hardware shall impair any obligation of Principal under the Agreement. In the event of loss or damage of any kind to any Hardware, Principal shall within thirty (30) days after such loss or damage:

(i)    Place the same, or replace the same with similar property, in good repair, condition and working order to the satisfaction of Ticketmaster; or

(ii)    Pay Ticketmaster in cash the full replacement cost of the Hardware, and Ticketmaster shall promptly install new hardware to replace the lost or damaged Hardware.

(b)    **Insurance**:

(i)    Principal shall, at its own expense, provide and maintain at all times during Term insurance to protect the Hardware against loss caused by fire (with extended coverage), vandalism, malicious mischief, theft, or any other cause in an amount equal to the full replacement value of the Hardware as determined by Ticketmaster. Should Principal become unable to provide or maintain such insurance coverage, Principal shall promptly notify Ticketmaster in writing prior to the expiration of any such coverage and, thereafter, Ticketmaster shall have the right, but shall not be obligated, to provide insurance coverage for the occurrences specified above and charge Principal the costs of such insurance coverage.

(ii)    ████████████████████████████████████████████████████

(iii)    Except as expressly provided in clause (ii) above, all insurance provided and maintained by

Principal shall be in such amounts, under such forms of policies, upon such terms, for such periods and written by such companies as Ticketmaster and Principal shall agree upon, and in all cases such insurance policies shall provide for the waiver of the insurer's right of subrogation against Principal and Ticketmaster. All policies of insurance shall include Ticketmaster and its landlords or licensors, if any, and their respective parents, members, partners, affiliates, divisions and subsidiaries as an additional named insured on a primary and non-contributory basis irrespective of any other insurance, whether collectible or not, with respect to the operations of Principal per this written Agreement. Further, such policies shall provide for at least thirty (30) days prior written notice of cancellation or non-renewal to Ticketmaster. Principal shall furnish Ticketmaster with certificates of such insurance or other evidence satisfactory to Ticketmaster as to its compliance with the provisions of this Section.

(c)  **Hardware and Software is Personal Property**. Principal covenants and agrees that the Hardware and Software is, and shall at all times be and remain, personal property which shall, at all times, remain the sole and exclusive property of Ticketmaster and the Principal shall have no right, title or interest therein or thereto except as a licensed user thereof. If requested by Ticketmaster, Principal will obtain a certificate in form satisfactory to Ticketmaster from all parties with a real property interest in the premises wherein the Hardware may be located, waiving any claim with respect to the Hardware. Except as may be necessary to prevent damage to or destruction of the Hardware, Principal will not move the Hardware or permit such Hardware to be moved without Ticketmaster's prior written consent, which consent shall not be unreasonably withheld, and shall give Ticketmaster prompt written notice of any attachment or other judicial process affecting any item of Hardware.

(d)  **Designation of Ownership**: If, at any time during the Term, Ticketmaster supplies the Principal with labels, plates or other markings stating that the Hardware is owned by Ticketmaster, Principal shall affix and keep the same in a prominent place on the Hardware in recognition of Ticketmaster's ownership of the same.

(e)  **Use of Hardware and Software**: Principal shall use the Hardware in a careful and proper manner and shall comply with and conform to all federal, state, municipal and other laws, ordinances and regulations in any way relating to the possession, use or maintenance of the Hardware. Neither the Principal, nor its employees, agents, servants or representatives, shall alter, modify, copy or add to the Hardware or Software without the prior written consent of Ticketmaster.

(f)  **Surrender of Hardware**: Upon the expiration or termination of this Agreement, Principal shall return the Hardware to Ticketmaster in good repair, condition and working order, ordinary wear and tear resulting from proper use thereof alone excepted.

6.  **Taxes on Hardware**. Principal shall keep the Hardware free and clear of all levies, liens and encumbrances which are caused by Principal or under Principal's control and shall promptly reimburse Ticketmaster for all license fees, registration fees, assessments, charges and taxes, whether federal, state, county, municipal or other governmental or quasi-governmental, with respect to the Hardware located at Principal's Office, including, without limitation, use, excise and property taxes, and penalties and interest with respect thereto, except and excluding, however, any taxes based on or measured solely by Ticketmaster's net income.

7.  **Training of Principal's Employees**. Ticketmaster shall provide a reasonable amount of training to Principal's employees who shall be reasonably necessary for the operation of the Hardware and Software at the Facility Box Office. To the extent of any change in personnel by Principal requiring additional training beyond that initially contemplated hereunder, Principal agrees to absorb all of the expenses thereof.



IMP_SUB-0233000

## **EXHIBIT B**

### **TM+ Terms and Conditions**

Ticketmaster shall enable TM+ for all Attractions in accordance with the settlement terms set forth in this Exhibit B below.

**TM+ Settlement Terms**

- For any primary market ticket inventory sold through TM+, Ticketmaster shall continue to sell such tickets and settle the proceeds of such sales with Principal in accordance with the terms and conditions for such transactions as set forth in the Agreement.

- For any secondary market ticket inventory sold through TM+, Ticketmaster shall assess its standard fees against the buyers and sellers of such tickets in amounts as determined by Ticketmaster, which amounts currently include:



- **TM+ Revenue Share:**



- The TM+ Revenue Share will be paid to Principal on a quarterly basis for all such sales occurring in any calendar quarter, on or before the thirtieth (30th) day of the month following each calendar quarter. In the event that any Attraction for which Ticketmaster has made any TM+ Revenue Share payment to Principal becomes a Cancelled Attraction, Principal shall promptly repay to Ticketmaster the amount of such TM+ Revenue Share payments in respect of such Cancelled Attraction.

- Each settlement relating to the TM+ Revenue Share pursuant to this Exhibit B shall be accompanied by a report of the applicable transactions during such settlement period.



IMP_SUB-0233001

## EXHIBIT C

### PLATINUM TICKETS AND VIP PACKAGES

#### Platinum Tickets and VIP Packages

 (a) **Definitions**.

 "Platinum Ticket" means any dynamically-priced Ticket that represents the most select category of seats for an Attraction resulting from proximity to stage or other superior amenities as mutually determined by Principal and Ticketmaster, which is sold by Ticketmaster on behalf of Principal (and not, for the avoidance of doubt, the artist/performing act or promoter of the applicable Attraction). Accordingly, "Platinum Tickets" exclude Tickets provided by Principal to the artist/performing act or promoter of the applicable Attraction as part of an "artist" or similar hold, to be sold or distributed by Ticketmaster on behalf of such third party (i.e., where Principal and the promoter are not the same party). For the avoidance of doubt, where Principal designates such Tickets for the applicable promoter or artist of the Attraction to sell such Tickets pursuant to such promoter or artist's agreement with Ticketmaster (i.e., where Principal and the promoter are not the same party), Principal shall not be entitled to settlement of any proceeds relating to such artist/promoter platinum Tickets.

 "Platinum Ticket Fee" means a



The Platinum Ticket Fee and the Platform Fee payable to Ticketmaster in connection with each sale of a Platinum Ticket shall be in lieu of any per Ticket Convenience Charge or Inside Charge otherwise due Ticketmaster under this Agreement in respect of standard Ticket sales.

 "Platinum Ticket Price" means the total price a purchaser pays for a Platinum Ticket sold via the TM.com Website, but exclusive of the Platinum Ticket Fee. The Platinum Ticket Price shall initially be established by Principal in consultation with Ticketmaster, and any subsequent adjustments to the Platinum Ticket Price shall be administered in accordance with parameters accepted by Principal in advance.

 "Platinum Proceeds" means the Platinum Ticket Price collected by Ticketmaster, which, for the avoidance of doubt, shall not include the Platinum Ticket Fee.

 "VIP Package(s)" means Ticket packages which entitle the purchaser of the Ticket to additional benefits to be fulfilled solely by Principal (and not, for the avoidance of doubt, the artist or performing act of any Attraction), including but not limited to, access to unique experiences surrounding the Attraction and/or unique merchandise.



 "VIP Package Price" means the total price of the VIP Package paid by the purchaser as set by Principal, inclusive of the Face Value of the Ticket and applicable taxes, but exclusive of the VIP Package Fee.

 "VIP Package Proceeds" means the VIP Package Price, which, for the avoidance of doubt shall not include the VIP Package Fee.

 (b) **Platinum Tickets**.

 (i) Platinum Ticket Set-Up Information.  Principal will provide Ticketmaster with notice of its desire to have Ticketmaster enable a Platinum Ticket offer for any applicable Attraction, and shall provide Ticketmaster with required Set-Up Information in respect of such offer so that Ticketmaster may set up the offer for sale through the TM.com Website.

 (ii) Platinum Ticket Fulfillment.  Ticketmaster shall fulfill Platinum Ticket orders in the same manner as standard Tickets through Ticketmaster's ordinary distribution channels as requested by the purchaser.

(iii)     Platinum Ticket Settlement.   Ticketmaster shall pay Principal the Platinum Proceeds, less the Platform Fee, for each Platinum Ticket sold by Ticketmaster post-performance, no later than two (2) weeks following the occurrence of the Attraction to which such Platinum Ticket relates.   Except as provided otherwise in the immediately preceding sentence, such settlements shall be made in accordance with and subject to the accounting and refund procedures set forth in this Agreement.

(iv)



(c)     **VIP Packages.**

(i)     VIP Package Offer Information.   Principal will provide Ticketmaster with reasonable advance written notice of its desire to have Ticketmaster enable a VIP Package, which notice shall include an accurate and complete description of the VIP Package content, applicable dates for the sales campaign, and any other information reasonably requested by Ticketmaster (the "Offer Information").   Notwithstanding anything to the contrary, Ticketmaster shall not be obligated to offer a VIP Package for an Attraction if, in the reasonable discretion of Ticketmaster, the VIP Package is not appropriate for sale via the TM.com Website.   Ticketmaster and Principal will work together to develop appropriate messaging appearing on the TM.com Website to inform all purchasers of VIP Package elements and benefits. Ticketmaster shall have final control over any and all messaging on the TM.com Website, and reserves the right to reject any messaging proposed by Principal for any reason, including, without limitation, size constraints.   Notwithstanding the foregoing, Ticketmaster shall have no responsibility or liability in the event that information (including Offer Information) provided to Ticketmaster by Principal relating to the VIP Package, is incorrect or incomplete, and Principal shall indemnify, defend and hold Ticketmaster's Indemnitees harmless from any and all claims, actions, damages, expenses (including court costs and reasonable attorneys' fees), obligations, losses, liabilities and liens, imposed on, incurred by, or asserted against Ticketmaster's Indemnitees occurring as a result of, or in connection with the Offer Information.

(ii)     VIP Package Fulfillment.

(1)     Ticketmaster Responsibilities.   Ticketmaster will control access to the VIP Package by distributing to each applicable purchaser a unique barcode which will allow the purchaser to redeem the VIP Package elements from Principal at the Attraction.   Ticketmaster shall be responsible solely for enabling a barcode for each Purchaser to use to redeem the VIP Package elements, together with instructions for redemption (including (i) that Principal is the party responsible for fulfilling the VIP Package elements, (ii) the time frames during which redeeming purchasers may redeem the VIP Package elements, and (iii) the relevant Principal customer service contact information for purposes of handling customer support issues relating to such redemption).   Ticketmaster shall be responsible for customer service inquiries relating solely to enabling the barcode.

(2)     Principal Responsibilities.   Principal shall allow purchasers to redeem the VIP Package elements at the Facility.   Principal shall be responsible for performing all fulfillment, redemption and delivery obligations, and customer service related to all fulfillment and delivery of VIP Package elements, and all costs associated therewith, and shall indemnify, defend and hold Ticketmaster's Indemnitees harmless from any and all claims, costs (including court costs and reasonable attorneys' fees), liabilities, obligations, losses, liabilities and liens related to, or occurring as a result of or in connection with, fulfillment, redemption and delivery of the VIP Package elements.

(iii)     VIP Package Settlement.

(1)     Ticketmaster shall pay Principal the VIP Package Proceeds for each VIP Package sold by Ticketmaster during a calendar week along with settlement of Ticket Receipts for the applicable week.   Notwithstanding anything to the contrary, Principal shall not receive any payment, nor shall a sale be deemed to have been made, if any VIP Package is the subject of a chargeback or for which Ticketmaster refunds the Ticket portion of the VIP Package.

(2)     Principal agrees that it shall be responsible for all refunds related to the VIP Package elements, and to the extent Ticketmaster receives any VIP Package element refund requests, Ticketmaster shall refer the purchaser to a customer service number provided by Principal to Ticketmaster for such customer service issues.   In no event



shall Ticketmaster be liable for a refund of the VIP Package elements. In addition, Principal shall be responsible for all Chargebacks related to the VIP Packages, and Ticketmaster shall have the right to deduct amounts due for Chargebacks from the VIP Package Proceeds otherwise payable by Ticketmaster to Principal. In the event such VIP Package Proceeds are inadequate to cover actual Chargebacks, Principal shall be responsible for, and shall refund to Ticketmaster within ten (10) days of Ticketmaster's written notice all amounts related to all Chargebacks of VIP Packages sold by Ticketmaster.

(3)  Principal and Ticketmaster shall each be responsible for remitting any applicable taxes on the amounts such party retains from the sale of VIP Packages.

(iv)





_SUB-0233004

IMP_SUB-0233005

IMP_SUB-0233006