Q2PAKanC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

MASAHIDE KANAYAMA,

                    Plaintiff,

          v.                              26 Civ. 1402 (JPO)

SCOTT KOWAL, ET AL.,

                                          Conference

                    Defendant.

------------------------------x
                                          New York, N.Y.
                                          February 26, 2026
                                          3:28 p.m.

Before:

                    HON. J. PAUL OETKEN,

                                          District Judge

                         APPEARANCES

LAW OFFICES OF ROBERT TSIGLER
     Attorneys for Plaintiff
BY:  MICHAEL ZIGISMUND
     JARED FLANERY


JAY CLAYTON
     United States Attorney for the
     Southern District of New York
BY:  MICHAEL MAIMIN
     ARIEL COHEN
     Assistant United States Attorneys

Q2PAKanC

(Case called)

THE DEPUTY CLERK:  Starting with the plaintiff, counsel, please state your name for the record.

MR. ZIGISMUND:  On behalf of Dr. Kanayama, this is Michael Zigismund, spelled Z-I-G-I-S-M-U-N-D, from the Law Offices of Robert Tsigler.

Good afternoon, your Honor.

THE COURT:  Good afternoon.

MR. ZIGISMUND:  And, your Honor, before continuing, I just want to state for the Court's information that my colleague Jared Flanery is here as well.  He is not admitted in S.D.N.Y.  However, he's been helping me out on this case.  And for the purposes of these proceedings, if we can admit *pro hac vice*, I would request that.

THE COURT:  Okay.  That's fine.

MR. ZIGISMUND:  Thank you.

THE COURT:  And, counsel for defendant?

MS. COHEN:  Good afternoon, your Honor.

Ariel Cohen and Michael Maimin representing Scott Kowal and the government.

MR. MAIMIN:  Good afternoon.

THE COURT:  Good afternoon.  You all can remain seated if you like and just speak into the microphone.

I scheduled this in response to the petition filed by Dr. Kanayama last week and the request for an emergency stay.

Q2PAKanC

I've reviewed the parties' materials, including the government's memorandum in response, which was filed yesterday.

So, Mr. Zigismund, you'll be speaking for the petitioner?

MR. ZIGISMUND:  I certainly can, your Honor.

THE COURT:  I guess the first -- I mean, you've read the government's response, yes?

MR. ZIGISMUND:  Yes, your Honor.

THE COURT:  So, I mean, the first question I have is, is it correct that the petitioner did not raise any allegations of torture in his submissions to the state department?

MR. ZIGISMUND:  Not quite, your Honor.  He did.  They were implicit in various arguments related to persecution by the Japanese government.  I think the distinction that the government may have been trying to make, from my reading of their submissions, is that no claim under the convention against torture explicitly was made.

That we do agree with.  But in terms of claims about persecution from the government, that was made.

THE COURT:  Okay.  But you're arguing that the October 2025 determination, October 16th, 2025 determination by the state department, your first claim, I guess, is that it failed to consider his convention on torture claim and therefore I should stay this and grant habeas relief.  But if he didn't raise a convention on torture claim, how can the

Q2PAKanC

state department be faulted in that determination for not

addressing it?

MR. ZIGISMUND:  It's just, your Honor, to that point,

it's just simply something that is required by the statute,

FARRA, that it be addressed and that a determination be made

with respect to torture.  So that's our point.

THE COURT:  Okay.  And the Second Circuit, as you

know, in *Kapoor v. DeMarco*, did hold that Section 1252(a)(4)

bars courts from exercising habeas jurisdiction over CAT claims

raised by individuals facing extradition.  So how does that not

preclude a habeas petition from being entertained?

MR. ZIGISMUND:  The circumstances in *Kapoor* are

distinct and substantially distinct from this case.  Namely,

that the argument by *Kapoor* in that case rang in the convention

against torture.  Specifically, the argument was the state

department made a determination on the basis of XYZ; we,

*Kapoor*, disagree with that determination, let's hash that out.

And the second department correctly said, no, we can't do that,

we don't have jurisdiction.

Here, we're not making an argument that the

determination under the convention against torture or any

determination having to do with torture was wrong.  Rather,

we're saying that no such determination was made at all.

THE COURT:  Right.  But doesn't the principle and the

rule adopted in the decision apply with equal force to the

Q2PAKanC

argument you're making, i.e., that it's unreviewable under the statute?

MR. ZIGISMUND:  Your Honor, no.  Because of what *Kapoor* specifically says in two separate footnotes where what we're reading from those footnotes is there is potential reviewability.  The question for the Courts is:  Where?  Like, where, where do we draw that line?  But, certainly, at least as far as *Kapoor* is concerned, you can flip over to footnotes 14 and 16 in which the Court expressly allows for some sort of determination in certain cases having to do with torture allegations.  Allowing for review of those torture determinations.

And that, for example, in footnote 16, for example, you can flip at the beginning of it, just one sentence, this is a citation to the Supreme Court in *Munaf*, the Supreme Court case, the Supreme Court reverse judgment on a hypothetical extreme case in which the executive has determined that a detainee in custody is likely to be tortured, but decides to transfer him anyway.

Again, the point for our purposes is the Second Circuit in *Kapoor* understood the possibility of some -- there's a range -- that there is a range of review.  The question is what that range is.  And we believe that our case falls into that range.

I'm not sure if what I'm saying is clear or not, or if

Q2PAKanC

I could clarify.

THE COURT:  Okay.  I'll give the defendant, the government, a chance to respond to that point.

MS. COHEN:  Your Honor, the government categorically disagrees with petitioner's reading of *Kapoor*.  *Kapoor* says there is no reviewability, there's no carve out, and there is no range of review that *Kapoor* leaves open.

Footnote 14, which petitioner cited in his petition, does not -- it's talking about in the instance where Congress had not enacted such a bar, but such a bar does exist here. That bar is present in the Real ID Act.  That bar is present in the FARRA implementation -- the state department's regulations implementing FARRA, 22 C.F.R. 95.4, which says:  Decisions of the secretary concerning surrender of fugitives for extradition are matters of executive discretion, not subject to judicial review.

The Real ID Act then extends that bar to CAT claims. Nothing is left for reviewability after *Kapoor*.

THE COURT:  What about the footnote 16 cited by Mr. Zigismund that talks about in *Munaf*, the Supreme Court reserved judgment on a hypothetical extreme case in which the executive has determined that a detainee is likely to be tortured, but decides to transfer him anyway.

MS. COHEN:  May I read that footnote?

THE COURT:  Sure.

Q2PAKanC

MS. COHEN:  So I think, first, it's worth noting that the Supreme Court saying that this is a hypothetical extreme case; that is not present here.

We're in a position where the Supreme Court -- I mean, where the state department has not made such a determination about a detainee being likely to be -- the detainee is not likely to be tortured should he be in custody.

If we were in that situation, that might be different, but that is not the case here.

THE COURT:  And what about the point that Mr. Zigismund made that irrespective of whether a CAT claim is raised or torture is raised, the statute requires review of the issue prior to the determination that would have been made in October.  And second question, as a factual matter, was it in fact raised, if only implicitly.

MS. COHEN:  Your Honor, I think the statute or the U.S. -- the state department regulation implementing FARRA is very clear.  It says:  In each case where allegations relating to torture are made, or the issue is otherwise brought to the state department's attention, the issue is considered.  That's 22 C.F.R. 95.3(a).  Here, that no allegation was made as was made clear in the individual who reviewed Mr. Kanayama's application.  He wrote the declaration.  No CAT claim was made either explicitly or implicitly.  And the state department is not otherwise aware of any facts that would give rise to such a

Q2PAKanC

claim.

THE COURT:  Okay.

MS. COHEN:  And I think *Kapoor* also, it's worth noting that *Kapoor* also bars any, any sort of review, looking behind what the state department may have considered.  And that is *Kapoor* at 613.  They said in *Kapoor*, they argued that the state department failed to meaningfully review her allegation that she'd be likely tortured if she's extradited to India.  It's essentially the same thing that Mr. Kanayama is claiming here.  And that is barred.

THE COURT:  And then do you want to turn to the other issue.  How should I think about the, I guess, an asylum petition was filed in December.  I don't think I've seen the actual asylum petition.  But how should I think about how if -- whether and how that would effect the current petition and request for a stay?

MS. COHEN:  That's a good question, your Honor.  I think Dr. Kanayama claims that it requires a stay.  He notably cites no cases to support that argument.  And, in fact, we've found a few cases that say the opposite, that an asylum application has no effect on extradition proceedings.  And, in fact, even if an asylum application was granted, the state department can still rule that -- or still order the individual extradited regardless of the asylum determination.  That's the first circuit case that we cited.

THE COURT:  All right.  Anything else?

MS. COHEN:  I think we would just note that the asylum application, this recent habeas petition, it evinces some bad faith on behalf of the petitioner, and that obviously animates our arguments that we submitted to the Court and concerns on our end.

THE COURT:  So when you say "bad faith," explain what you mean.

MS. COHEN:  I think he, you know, as we noted in our motion for detention that Judge Ramos signed earlier today, while some counsel is telling, you know, coordinating with us about a surrender date, meanwhile other counsel is filing a petition for habeas based on these asylum claims that he did not bring to our attention, he did not bring to the government's attention, and we're finding out on the eve of this surrender date.

This decision was rendered by the state department in October.  This asylum application was submitted to USCIS in December 2025.  It is only a week or two before his surrender date, which has been coordinated at nauseam with Japanese authorities, that this eleventh hour habeas petition has appeared.

THE COURT:  And what's the status?  What does that order require?  The order that Judge Ramos signed today.

MS. COHEN:  Yes.  The order, which I have a copy for

if it would be helpful to the Court, requires that petitioner surrender to the U.S. Marshals on March 2nd, 2026.  And it's worth noting that it's the government's position that these habeas proceedings do not in fact effect that detention order.

In other words, should whatever the outcome of today happens, Mr. Kanayama would still be required to surrender on March 2nd and wait the outcome of these proceedings in federal custody.

THE COURT:  Okay.  And so the coordination has happened with Japanese authorities and the date is there.  So I assume it'll be, assuming the extradition happens on March 2nd, it will be prompt from that point?

MR. MAIMIN:  Yes, and I can speak to this.  I've been speaking at length with prior counsel, where we waited.  We gave them the courtesy of waiting as they petitioned the Supreme Court, as they sought a stay at the Supreme Court, as they sought a second stay at the Supreme Court.  And when the Supreme Court denied their second stay, I got in touch with prior counsel about a surrender date.  And we talked about various dates.  And I also coordinated, or OIA coordinated with Japanese authorities.  And, currently, the plan is for the Japanese authorities to come on March 3rd to transport him back.  And the reason he has to surrender on March 2nd is because flights to Japan don't leave after a certain hour, and the marshals were concerned there wouldn't be enough processing

Q2PAKanC

time that morning.  So, instead, it will be the day before.

Nonetheless, I've also been coordinating to make sure we have lists of medications, that Dr. Kanayama brings his medications basically to make sure that he is taken care of in their custody.  And we've also provided all of that to Japanese authorities as well.

THE COURT:  Okay.  Thank you.

One other question for Ms. Cohen or Mr. Maimin, so the section that we've been talking about, 8, U.S.C., 1252(a)(4), says that:  The petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review for any CAT claim.

So I'm just curious, was the October 16, 2025 letter determination the sort of thing that would have been reviewable under that language?  In other words, could a petition for review in the Second Circuit have been filed according to that language or not?  What's your understanding of that?

Does the question make sense?

MR. MAIMIN:  I think that the question makes sense.  I have to admit, I don't know offhand what the answer would be.  What I do know is that the -- is that to the extent that this was something that could have been brought up, that March 16th -- I'm sorry, that October 16th letter came out before our oral argument at the Second Circuit.  The Second Circuit was aware of it.  Counsel did not raise it, did not say

Q2PAKanC

we have an additional issue that we have to raise.

And, also, in terms of the odd timing of bringing this new habeas now, it's notable that -- and I'm sure that your Honor read in both Judge Ramos' opinion and Judge McMahon's opinion and then it's referred to but fairly quickly in the Second Circuit opinion -- these arguments that Japan is a horrible place to go and that they have a bad prison system, these were always out there.  This isn't a new revelation.  These were raised over and over again where they admitted frankly this has no place in an extradition proceeding because that's something that the Secretary of State has the sole discretion to decide.  But these were issues that came up.

So if there was a claim that he wanted asylum -- and part of the problem here is asylum has to do with removal as opposed to extradition, so that may have been the first problem that it doesn't really apply here because this is an extradition case.  But if there was a belief that asylum would nonetheless somehow offer a bar to extradition, there's been nearly ten years to raise that.  And it wasn't filed until after stays had been denied by every single court, including the supreme court, that all of a sudden the asylum petition filed on the basis of information that had been front and center for a decade at that point.

THE COURT:  All right.  Thank you.

Mr. Zigismund, anything you would like to add?

Q2PAKanC

MR. ZIGISMUND:  Yes.  I think I would like to address some of the points.  I would like to bring up what I consider to be a central point here.  And that is the distinction between a claim under CAT and a claim under the FARRA.

THE COURT:  But isn't it the same thing?  I mean, FARRA is the implementing statute for the treaty, right?

MR. ZIGISMUND:  Yes, for the purpose of extradition, yes.  And for our purposes, what FARRA has to say is what I did mention earlier and what we have in our documentation about the Department of State making a determination with respect to torture.

The point that I wanted to emphasize just now is that through much of the arguments that we just heard from the government and throughout the filings so far, in reading the arguments, I see an elision of the two.  And I think that if we read the two as being separate, the whole issue becomes clear. And so, for example, the question about, what was it, 1252, the one that specifically bars review of CAT claims in district court, you have to go through a petition for review that goes procedurally from immigration court.  And that makes sense. It's appropriate to address what an immigration judge says, what the PIA says, and then you go up as the statute says to the petition for review.

This is a completely different circumstance.  Where, yes, we then do have to deal with how *Kapoor* -- the statute,

Q2PAKanC

the regulations, and how *Kapoor* deals with it as well.  I just think that if we were to not take our position, which is that there is room for review in this narrow area, if we don't see that as a possibility, then what we're really doing is we're seeing the statute, FARRA, as written, meaning nothing at all.

And so, for example, the Department of State does not have to make a determination as to torture or human rights, et cetera, and then it's a question, okay, then why did Congress say that at all in their statute?

THE COURT:  But in *Kapoor* itself, there were references to both CAT and FARRA.  I mean, those were the claims and they talk about CAT, C-A-T, but they're clearly treating them both as within the scope of 1252, the statute that bars review.

I mean, and I guess you're trying to get around *Kapoor*, but I'm not sure I -- I don't see how you can get around *Kapoor*.  I mean, *Kapoor* was a situation where they're seeking review of the state department's rejection of a CAT claim, right?  Whereas, you want to say it wasn't even considered because there was no CAT claim raised.  If anything, I would think *a fortiori* it would be harder to get review where it wasn't even raised.  But, in any event, the language of *Kapoor* is quite broad.  It precludes review at all by a court.

MR. ZIGISMUND:  I would put it this way, your Honor, we are not trying to get around *Kapoor* at all.  I think our

Q2PAKanC

position is mutually inclusive with *Kapoor*.  Specifically, we're trying to fit ourselves into the statements from *Kapoor*, which do recognize room for review.

What we're trying to do is we're trying to distinguish *Kapoor* to say that *Kapoor* was dealing with a case in which questions of whether or not torture was possible was a reasonable determination to make or not.  That was an argument that rings in convention against torture.  That's debate over convention against torture that I think *Kapoor* makes a reasonable argument saying no, a district court cannot handle that on habeas.  However, in certain circumstances, CAT-type claims, specifically any claim having to do with torture and human rights, may be reviewable, including under FARRA where the FARRA statute specifically says the Department of State has to at least address it or at least has to make a determination when addressing it.

THE COURT:  So what is the relief?  I know you want a stay, but in the habeas petition, the relief you're seeking is to make the state department address the issue of torture?

MR. ZIGISMUND:  That's exactly right, to make a determination --

THE COURT:  Under that language that you say is mandatory?

MR. ZIGISMUND:  Exactly.

THE COURT:  Even though it wasn't raised as a claim.

Q2PAKanC

MR. ZIGISMUND:  Explicitly, right.  Even though it was not raised explicitly, yes.

THE COURT:  So you're not asking this Court to decide the question.  You're asking, essentially, a remand to the state department to take another look and consider the issue of torture?

MR. ZIGISMUND:  The answer is yes, your Honor, with respect to the first half of our argument.  There's a whole second argument.

THE COURT:  Right.

MR. ZIGISMUND:  Okay.

THE COURT:  Okay.  No, I understand.  But it's a little unusual to, you know, not raise that as a separate claim for all these years when it's based on nothing new, right?  I mean, isn't that forfeited or waived?

MR. ZIGISMUND:  Yes, your Honor, I did want to address that as well.

It's a question about -- it's a question that I think necessarily also asks what about filing for asylum in the first place at any of these times.  Because the reason, a primary reason for our filing the instant habeas, is because we filed an asylum application and that's currently in process.  And so that's our hook now for this current habeas.

So a preliminary question, a threshold question, would be why not file the I-589 application in the first place

Q2PAKanC

earlier.  And the answer is that is because it wasn't necessarily something that Dr. Kanayama would have wanted to do.

The primary reason for filing for asylum at all in the United States is somebody does not have status, like the applicant themselves, they don't have status, they would like status because they're afraid of going back to their home country.  That was not the case for Dr. Kanayama until it became clear he wasn't going to be able to say here.  And the reason for that is because he's been a permanent resident in the United States, so he actually does have status.  But now, all of a sudden, we have, after all this litigation, the supreme court putting a final that they're not going to be able to overturn this case.  Now my client is facing persecution and potential torture in his home country.  Therefore, the 589, the asylum application, was filed.  Therefore, we're here about a fresh habeas on different grounds.

THE COURT:  So tell me about the asylum application.  What does it argue?  What's it based on?

MR. ZIGISMUND:  The argument is about how the government of Japan is persecuting Dr. Kanayama in conjunction with elements of the society of Japan on the basis of religion.  And so this has to do with the prosecution simply because the prosecution is the sword that is being wielded against Dr. Kanayama.  And that's our key indication.  But the question

Q2PAKanC

then is why would -- why would the government of Japan focus its resources so heavily on Dr. Kanayama as opposed to so many others who have similar vandalism charges against themselves. And the claim in the asylum context is it's precisely because of Dr. Kanayama's position in the religious world, he's the head or one of the heads of a particular branch of Christianity that is on the outs in Japan.

THE COURT:  All right.  Okay.  Would you like to respond to anything?

MR. MAIMIN:  One thing briefly.  I think that part of the reason for a lot of the confusion here, this gets back to your question about the text of 1252(a)(4), is as the Second Circuit said in *Kapoor*, and this is at page 599, footnote two: The extradition process should not be confused with the immigration removal process.

And that's part of the problem here, part of the reason that the Second Circuit said in no uncertain terms that consistent with the test articulated by the supreme court, Section 1252(a)(4) contains a clear statement that specifically and unambiguously bars federal courts from exercising habeas jurisdiction to review CAT claims in extradition cases.

And the reason is because this is set up so that the CAT claims, to the extent they are reviewable, are only reviewable if they are coming out of the removal process.

As your Honor pointed out, 1252(a)(4) specifically

Q2PAKanC

refers to review by the Courts of appeals.  That has to do with removal, because as your Honor knows, for removal, you have the initial determination by an immigration judge, initial review, administrative review is had through the board of administrative appeals.  And then if the alien is unhappy with what happens there, there is a direct appeal to a court of appeals as opposed to a district court.

So it's saying this is a court of appeals, this is a removal issue.  And one way to really see that that's what the statute is doing is to go one subsection further and go to 1252(a)(5), which talks about orders of removal, and that you have no recourse by the appellate process throughout court of appeals.  And it does so using literally word for word the same language as (a)(4).  That is, it is putting the CAT claims in the same bucket as removal orders.  That is, these are claims that must be raised first through an immigration judge, administratively appealed through the board of immigration appeals, and then finally brought to the Court of Appeals if you're unhappy with that.

This is very different from the extradition process which vests extraordinary discretion in the Secretary of State.  And here, the Secretary of State has made his decision.  There were all sorts of other procedural safeguards along the way, including of course the question of extraditability, which we've had nine years of litigation over.  But where every

single court along the way has made its decision.

So you don't get to go and say, well, if this were a deportation, I think I shouldn't be removed, and therefore, don't extradite me.  Those are two entirely different processes.  And we aren't talking here about removal or deportation.  We're talking solely about extradition and what may or may not happen with extradition, where there's a specific process and that process has been followed to a T here.

Finally, I think that it's important that we heard about this convention against torture that it was, quote, implied in the asylum papers that this may be an issue, and the question isn't whether the Secretary of State considered -- got it wrong, but whether he consider it at all.  Where the Secretary of State, who has no legal obligation whatsoever to say I've considered everything but chose to do so in both the affidavit to this Court as well as the letter to Kanayama's counsel, said I've considered everything.  There's no requirement that then there be magic words that he say, including torture allegations that weren't made but that I implicitly read in between the lines of an asylum application that didn't exist at the time that I made this decision.

There is no magic words requirement here.  This is simply an extradition proceeding and the rules on extradition as the Second Circuit made clear in *Kapoor* are simple, which is

Q2PAKanC

you don't get to raise this claim via a habeas petition in order to stay extradition.

THE COURT:  Okay.  All right.  Thank you all for your arguments.  I'll be issuing a decision shortly.  If no one else has to add anything, has anything to add, I will adjourn.

Did you want to add anything else, anyone?

MR. FLANERY:  I might, your Honor, just briefly add in response to the government's argument from the First Circuit that asylum has no effect on extradition proceedings, that that case actually does count in some effect, including possibly resolving an asylum adjudication before extradition proceedings.

THE COURT:  Okay.  I'll take another look at that.

MR. ZIGISMUND:  Yes, your Honor.  I have a few things to add.

THE COURT:  Mm-hmm.

MR. ZIGISMUND:  About the -- I did want to address the First Circuit argument.  There happens to -- so, first of all, one of those cases that was cited also has the following language that is preferable for Dr. Kanayama.  "The government's indication of foreign policy considerations is not sufficient to defeat the specific and compelling interests in favor of reaching the asylum merits sooner rather than later ."

So that would support the argument of please allow the asylum process to continue before extraditing to a potentially

Q2PAKanC

dangerous country.  And that is in fact that the second argument of ours that the asylum statutes themselves require that the asylum process continue, and be properly reviewed, the idea here is if we were to extradite Dr. Kanayama, that those statutes would be violated, the ones that say that the review of asylum applications shall proceed.  That's in our documents. I haven't quite heard or read in the papers something, at least to me, compelling in response.

I forgot when mentioning the First Circuit argument, that being, again, the tension between extradition proceedings and asylum, there is also another case out of -- so this happens to be a district court, the Western District out of Louisiana.  There's very little case law generally, but this one is potentially useful, this is *U.S. v. Porumb*, P-O-R-U-M-B, this is 420 F.Supp. 3d 517.

THE COURT:  Could you give me that again.  420 F.Supp?

MR. ZIGISMUND:  Sure.  Yes.  3d 517.

THE COURT:  Okay.

MR. ZIGISMUND:  And it stands for the proposition that extradition cannot proceed when asylum is granted.

And so, again, this is, to be fair, not our circumstance, we don't have asylum granted.  But again, it is hand in glove with the idea that asylum should be allowed at least to proceed.

I think there was one -- I just wanted to address, I

Q2PAKanC

am not inclined to go into any amount of detail on this, just because it can get pretty hairy pretty quickly, but this idea of bad faith. I just want to state or assert for the record that I really don't think that there's any bad faith. I do think there's a lot of litigation. There are a bunch of overlapping, crisscrossing areas of law that are available to vindicate Dr. Kanayama's rights, and he's just simply exercising them. I don't think there's any bad faith and I say that respectfully to all parties.

THE COURT:  All right.  Did you all want to add anything?  Okay.

All right.  Thank you, all.

MR. ZIGISMUND:  Thank you, your Honor.

THE COURT:  We're adjourned.

(Adjourned)