

**LIVE NATION**
325 N. Maple Dr.
Beverly Hills, CA 90210
Tel 310-867-7000

February 13, 2023

Via E-mail

The Honorable Farrah Khan, Mayor
The Honorable Tammy Kim, Vice Mayor
The Honorable Larry Agran, City Councilmember
The Honorable Mike Carroll, City Councilmember
The Honorable Kathleen Treseder, City Councilmember

Re:    Great Park Amphitheater in Irvine, California

Dear Mayor Khan and Irvine City Councilmembers,

Live Nation is committed to working diligently with the City of Irvine to negotiate the terms of a definitive agreement for a permanent amphitheater in the Great Park. We bring to this discussion years of partnership with the community and the City staff, as well as an extensive history of successful operations with large amphitheaters in Irvine. In light of the February 8 staff report and upcoming City Council meeting on February 14, we are providing you with documents that clarify our positions and approach for the proposed amphitheater.

We have an impeccable record of bringing the best live entertainment and most popular music artists to the City of Irvine over the last 42 years. Irvine Meadows Amphitheatre, which opened in 1981, had a capacity of 16,000 and delighted fans from across Southern California every summer until 2016. FivePoint Amphitheatre opened, in partnership with the City of Irvine and the FivePoint Development Corporation, on October 5, 2017 as a temporary home for live music, fulfilling a vision that started in 1999 for the Great Park to house an amphitheater. We opened this 12,000-capacity venue with the shared goal of one day building a permanent, world-class amphitheater for live music to continue to thrive outdoors in the City. We have made significant investments in the FivePoint Amphitheatre and are committed to investing in the future of live music in Irvine.

Live music has been an integral part of the cultural fabric of the community, and many Irvine residents have had unforgettable live experiences attending Irvine Meadows Amphitheatre or FivePoint Amphitheatre. Whether they saw their first concert under the stars or learned the ropes of the music industry with a summer job, these venues have contributed positively to the community. Live Nation has been proud to play a part in helping create these memories. Our operations have also made a significant economic impact in the community, employing thousands of local crew members and union members from throughout Irvine and Orange County. In 2022 alone, our operations and fan spending generated $26.5 million in economic output throughout Irvine at restaurants, hotels and other establishments, and $1.9 million of local and state tax revenue.

As long-standing contributors to the local community, we appreciate the opportunity to clarify items detailed in the matrix submitted as part of the City Council agenda for the February 14 meeting. Many of the statements in the City-generated matrix do not accurately reflect our positions. This document is based on a working draft that has been amended through meetings and discussions between Live Nation and City employees and council members over the last several months. Recent presentations shared with residents have provided out-of-date information that does not accurately reflect the current state of our discussions or Live Nation's desire to quickly reach an agreement.

Given the evolution of these discussions, it is important we clarify a number of points and express our sincere commitment to entering a long-term deal that continues our years-long partnership with the City of Irvine.

No. 1:24-cv-03973-AS
Defs' Trial Exhibit
**DX-0781**

CITY_OF_IRVINE_014267

Mayor Khan and City Councilmembers
February 13, 2023
Page 2

We are committed to investing $20 million in this amphitheater and building a world-class amphitheater at the approved budget of $130 million. The original deal that the City and Live Nation agreed is sound in design and economic structure. Live Nation has not deviated from our original agreement. Additionally, we are enclosing the latest capital budget, which should enable the City and Live Nation to build a world class amphitheater at the approved budget.

Reducing the size of the amphitheater will reduce the economic benefit to the City and its residents. Reducing the capacity of the amphitheater will reduce the number of world-class artists who have traditionally played in Irvine. The size of both FivePoint Amphitheatre (12,000 capacity) and Irvine Meadows (16,000 capacity) attracted the world's most popular musical artists and comedians to the community. Throughout the years at these venues, we have entertained approximately 15 million fans with incredible artists, including the Eagles, Janet Jackson, Stevie Nicks, Jimmy Buffett, Rush, Orange County's own No Doubt, KROQ's Weenie Roast, Oingo Boingo, Irvine's own Young the Giant, and thousands of other artists. In the last few years, FivePoint Amphitheatre specifically has hosted many popular shows from the likes of Jason Aldean, Backstreet Boys, Kevin Hart, Fish Fest, Train, Zac Brown Band, Dave Matthews Band and more. Many artists would likely have to pass the market if the venue capacity is reduced. Our current proposal is designed to continue to attract the same caliber of talent the community has enjoyed since 1981.

Reducing the size of the amphitheater will not reduce noise impact in the community and may actually increase noise impact. We conduct our operations so that there are minimal noise impacts on our neighbors. For more than four decades, we have worked in good faith with the City at both Irvine Meadows Amphitheatre and FivePoint Amphitheatre on sound restrictions and mitigation measures to ensure sound remains at the agreed-upon decibel levels. At FivePoint Amphitheatre, per our agreement with the City, we notify artists of the existing noise ordinance and then monitor sound from inside the venue, at the property line and in surrounding neighborhoods at multiple points throughout every show.

It is our view that the existing sound study commissioned by the City does not include all of the mitigation measures that would be in effect at the proposed venue. We have engaged the independent experts at Metropolitan Acoustics to conduct more in-depth studies that will take into account additional mitigation factors, using new information from our proposed design and construction of the facility. These factors include land mass/berm, speaker placement and height, location of bass speakers below the stage, sound measuring at mix position with maximum dB and more. We welcome the opportunity to review our findings with the City to develop and agree upon appropriate acoustic parameters to the benefit of our neighbors as well as continue to conduct sound studies throughout development.

Additionally, the sound impacts of a smaller outdoor venue would likely be similar to a large amphitheater and could arguably be intensified as the mitigating factors listed above may not all be included in a smaller amphitheater design.

We have an incredible track record of partnering with City Planning and the Irvine Police Department for traffic and parking procedures. For more than four decades we have worked collaboratively with and followed the recommendations of the Irvine Police Department, the City of Irvine staff, and traffic and parking consultants on how many crew members we hire and the placement of staff to assist with parking and traffic at each event. The current capacity of FivePoint Amphitheatre has minimal effects on neighborhood traffic and we anticipate similarly low levels of traffic and parking impacts for the new venue.

Enclosed is an updated version of the discussion matrix reflecting our current positions on key issues, a new redlined draft of the DCOA, plus a top-line summary of cost estimates. We encourage the use of these documents as a road map to move forward in completing the agreement between the City of Irvine and Live Nation.

2

CITY_OF_IRVINE_014268

**DX-0781.0002**

Mayor Khan and City Councilmembers
February 13, 2023
Page 3

We look forward to reiterating our commitment to the City and to the amphitheater at the meeting on February 14. It is our sincere desire to continue a long and successful partnership with the citizens, businesses and music lovers of Irvine and Orange County. We are ready to move forward together and are enthusiastic about the future of live music at the new amphitheater.

Please don't hesitate to contact us at 310-867-7000 to discuss any of this further.

Sincerely,

*Tom See*

Tom See
COO, Live Nation Venues

*Geni Lincoln*

Geni Lincoln
President, Concerts, California Region

**LIVE NATION**

Enclosures

cc:     Oliver Chi
        Bob Roux
        Jordan Zachary
        Bret Gallagher
        Ben Weeden
        Sheila Small, Esq.
        Sean Matsler, Esq.
        Dave Wensley, Esq.

CITY_OF_IRVINE_014269

**Live Nation / City of Irvine Deal Point Status Summary Sheet**

| | Issue | Council Approved Deal Point | Live Nation Current Proposal |
|---|---|---|---|
| 1. | Design | a) LN hires and manages design contractor through construction documents. | a) ~~Final CDs shifted to City, approximately $2M-$4M cost.~~ LN revised DCOA provides for LN to hire and manage DC through CDs |
| | | b) City reviews at 50% and 100% CDs | b) ~~Not applicable, because CDs shifted to City.~~ LN revised DCOA retains City review of CDs at 50% and 100% |
| | | c) Cost estimates provided at 50% and 100% CD | c) ~~Cost estimates shifted to City.~~ LN revised DCOA provides for cost estimates at 50% and100% CDs |
| | | d) City has sole discretion on design. | d) ~~All design issues require LN approval~~ LN-revised DCOA provides City sole discretion, and only gives LN approval for any material reduction in scope or quality of Facility change orders. |
| | | e) 25% cap on design expenditures. | e) ~~Design expenditures cap removed.~~ LN revised DCOA provides for 25% cap on City design expenditures |
| 2. | Construction | a) City builds "warm shell" of facility; LN purchases and installs all FF&E. | a) ~~FF&E Costs shifted to the City, approximately $25M-$50M cost.~~ LN revised DCOA provides for City to build warm shell Facility and LN to install FF&E. |
| | | b) City final approval of all change orders | b) ~~Mutual approval of Change orders~~ LN revised DCOA provides for mutual approval only for City initiated change orders that reduce the scope or quality of the Facility and/or amenities to be constructed by City or delay the schedule to complete same |
| 3. | Costs | a) Total cost up to $130M; LN to provide $20M; Irvine share up to $110M. | a) ~~Total cost up to $150M; LN to provide $20M; Irvine share up to $130M~~ Latest budget is right around $134MM, LN to provide $20MM. |
| | | b) LN to pay possessory interest tax. | b) ~~City to pay possessory interest tax.~~ LN has asked City to confirm if LN operations will be exempt from real estate taxes due to City exempt status |
| | | c) No credit required for LN costs at temporary amp. | c) ~~City to pay credit for LN costs at temporary years.~~ LN asked City to consider if LN could re[...] |

**Formatted:** Left, Indent: Left:  0.05", Space Before: 2.35 pt, Line spacing:  Exactly 11.05 pt, Font Alignment: Baseline

CITY_OF_IRVINE_014270

| | | | |
|---|---|---|---|
| | | | LN capital expenditures required to keep operating at temporary Five Point Amphitheater for next 2 years. |
| | | | d) ~~City to pay LN liquidated damages if construction is not timely completed~~LN revised DCOA retracted request for liquidated damages but asked to discuss consequences for late completion of the Facility by City |
| 4. | Revenues | a) LN base operating fee of $3.5M/yr inflated 3%/yr | a) No change. Accepted by LN |
| | | b) No charge for parking. | b) LN has right to charge and retain revenue for parking. LN revised DCOA provides for LN to retain VIP parking revenue, no revenue for standard parking included in ticket pricing and City to retain any parking charges for City Events. |
| | | c) Restriction on LN licensing amphitheater to 3rd parties | c) ~~LN allowed to license to 3rd parties (e.g., wireless) and retain revenue~~ LN revised DCOA retracts this requested concept. |
| | | d) Silent on naming rights | d) LN to own and retain revenues from naming rights. Correct Potential sponsorship naming revenues included in LN budgets and Framework document approved by Council gave LN 100% of all sponsorship revenue. |
| 5. | Operations | a) LN provides minimum 25 shows/yr @10,000 attendees. | a) ~~10,000 attendee threshold removed.~~ LN revised DCOA retains 25 shows @ 10,000 attendees subject to ultimate venue size, but note Framework document approved by Council did not include 10,000 attendee requirement. |
| | | b) Prices, regulations, advertising, and alcohol standards to match comparable facilities in So Cal. | b) ~~Prices, regulations, advertising, and alcohol standards to match temporary amp.~~LN revised DCOA provides for standard of comparable facilities and amphitheaters located in the Southern California area |
| | | c) Customer Satisfaction Standards included. | c) ~~No customer satisfaction standards.~~ LN revised DCOA provides for LN to achieve level of customer satisfaction meeting the Applicable Standard and Live Nation Code of Conduct |
| | | d) Event scheduling coordinated with City. | d) ~~No event coordination with City; scheduling of City events more restricted.~~ LN revised DCOA retains process for coordinating scheduling with City |
| | | e) Third party use agreements approved by City | e) ~~No City approval required for third party use agreements.~~ LN revised DCOA provides for Third Party Rental Program and |

CITY_OF_IRVINE_014271

| | | | | |
|---|---|---|---|---|
| | | | f)  VIP Area use in connection with events only.

g)  City cannot hold events > 10,000 attendees for live music in the Great Park | provides draft Facility Rental Program and LN Standard Form Third Party License Agreement.

f)  ~~Language requiring VIP Area use only in connection with events removed.~~ LN revised DCOA provides for VIP Area use only in connection with LN Events

g)  LN desires exclusive rights to events of 5,000 or more, and ROFR on events >5,000 in the Great Park and Framework document approved by Council provided LN these rights. |
| 6. | Maintenance | | a)  $5/ticket maintenance fee, increases 10% every 3 yrs.

b)  LN responsible for amphitheater complex, including refreshes to FF&E | a)  ~~No increase in ticket surcharge.~~  LN revised DCOA reinstates Ticket Surcharge increases

b)  Obligation to refresh every 10 years removed; requirement for replacement/reserve account removed. LN revised DCOA to provide for more explicit LN maintenance obligations including 11 page LN Maintenance Elements.  LN willing to consider replacement reserve once final budget is established and City reviews LN extensive maintenance program exhibit |
| 7. | Noise | | a)  Must comply with noise ordinance standards

b)  Must comply with noise contours map | a)  ~~Deleted noise ordinance compliance requirement.~~  LN revised DCOA includes noise ordinance compliance. LN concern only with City ability to alter ordinance and create non-compliance in future

b)  ~~Deleted noise contour map compliance~~ LN revised DCOA reinstated.

c)  ~~No payments for noise violations; removed meet and confer~~ LN revised DCOA reinstated noise violation payment provision

d)  ~~LN required only to use commercially reasonable efforts~~ |
| 8. | Remedies and Enforcement | | a)  City agreeable provisions on assignments, indemnification, release, representations, casualty, termination, liquidated damages, consequential damages, and confidentiality. | a)  ~~LN revisions/rewrites to each category.~~ These provisions are very nuanced.  LN requested commercially reasonable modifications to allocate risks between City and LN relative to indemnity and release, LDs. Termination rights for Major LN Default, vs any minor breach, etc.  Parties have never discussed LN's proposals on these subjects to date. |

CITY_OF_IRVINE_014272



CITY_OF_IRVINE_014273

| Summary report: Litera Compare for Word 11.3.0.46 Document comparison done on 2/8/2023 3:12:11 PM | |
|---|---|
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Inactive | |
| **Original DMS:** iw://imanage.coxcastle.com/CCNDMS/16206418/7 | |
| **Modified DMS:** iw://imanage.coxcastle.com/CCNDMS/16206418/9 | |
| **Changes:** | |
| **Add** | 794 |
| Delete | 119 |
| Move From | 5 |
| Move To | 5 |
| **Table Insert** | 4 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 1 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 928 |

CITY_OF_IRVINE_014274

DESIGN, CONSTRUCTION, AND OPERATION AGREEMENT

THIS DESIGN, CONSTRUCTION, AND OPERATION AGREEMENT ("**Agreement**") is made and entered into as of _____, **2023** ("**Date of Agreement**"), between the CITY OF IRVINE, a California municipal corporation and charter city ("**City**") and LIVE NATION WORLDWIDE, INC., a Delaware corporation ("**Live Nation**"). Each of City and Live Nation may be referred to hereinafter individually as a "**Party**" and collectively as the "**Parties**."

## RECITALS

A.      City owns in fee and/or has a leasehold interest in that certain real property that has been designated for development of a metropolitan park known as the "Great Park," located in the City of Irvine, County of Orange, State of California ("**Great Park**"). A depiction of the Great Park is attached hereto as Exhibit "A" and incorporated herein by this reference.

B.      Live Nation has extensive experience in the entertainment industry, including in the operation of amphitheaters and in the promotion and booking of concerts and other live events.

C.      City desires to develop a ~~first class~~**first-class** amphitheater facility (the "**Facility**") within the Great Park and to provide for first class management and operation of the Facility.

D.      In consultation with Live Nation, City has identified an approximately twenty-five (25) acre site within the area of the Great Park generally located north of Great Park Boulevard adjacent to the Skyhawk roundabout (the "**Site**") for development of the Facility. The location of the Site is shown by star designation on Exhibit "A", and the Site is more particularly described on Exhibit "B", which is incorporated herein by this reference. **As used herein, the Site shall mean all areas of the Facility within the fenced boundaries of the Site as shown on Exhibit "A" and as constructed by City as provided herein.**

E.      Live Nation and City now wish to set forth the terms and conditions under which City will construct, and thereafter Live Nation will operate, manage, and maintain the Facility, and market and manage all "Events" (as defined herein) held at the Facility.

F.      The fulfillment generally of this Agreement is in the vital and best interests of the City of Irvine and the welfare of its residents, and in accordance with the public purposes and provisions of applicable federal, state, and local laws and requirements.

Based upon the foregoing Recitals, which are incorporated into this Agreement by reference, and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by both Parties, City and Live Nation hereby agree as follows:

1.      Definitions.  The following terms shall have the meanings given in this section.

a.      "**Affiliate**" means any person or entity **(an "Affiliate Entity")** directly or indirectly, through one or more intermediaries, controlling, controlled by or under common control with Live Nation, which, if Live Nation is a partnership or limited liability company, shall include each of the constituent members or partners, respectively thereof. The term "control" as used in the immediately preceding sentence, means, with respect to a person that is a corporation, the right to the exercise,



CITY_OF_IRVINE_014275

**DX-0781.0009**

directly or indirectly, of more than fifty percent (50%) of the voting rights attributable to the shares of the controlled corporation, and, with respect to a person that is not a corporation, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled person.

b.     "**Amphitheater**" means an outdoor amphitheater with a sellable viewable seating capacity of approximately, but not **less than _____ thousand ( )[TBD] and not** to exceed (except with the prior written consent of City, which consent City may withhold in its sole and absolute discretion), fourteen thousand (14,000).

c.     "**Applicable Law**" means any applicable statute, rule, regulation, ordinance, order, directive, code, interpretation, judgment, decree, injunction, writ, award, permit, license, authorization, or requirement of any court, board, agency, commission, office, division, subdivision, department, body, authority of the United States, the State of California, City, including, without limitation, City's Municipal Code, and any other governmental unit with jurisdiction over the Site or over the operation of the Facility.

d.     "**Applicable Standard**" means:

    i.     Except as defined in subsection ii below, a standard of performance, operation (including bookings) and maintenance equal to or exceeding those generally applicable to comparable first class live entertainment facilities operated by Live Nation or an Affiliate **Entity** in the United States.

    ii.    With respect to prices, regulation of advertising, and serving of alcoholic beverages and products, the standard shall be equal to comparable facilities and amphitheaters located in the Southern California area.

e.     "**Business Day**" means a day on which the City of Irvine is open for business.

f.     "**CD**" shall have the meaning ascribed thereto in Section 4.1.

g.     "**CEQA**" means the California Environmental Quality Act, Public Resources Code Section 21000, et seq.

h.     "**City Amphitheater Use Operating Expenses**" means all actual, documented costs incurred by Live Nation in connection with a City Event, including, without limitation, set-up and clean-up costs, and costs for providing any services (including, without limitation, concession services) requested by City or a City User (as applicable).

i.     "**City and City Personnel**" means, collectively, City and the Great Park Corporation, and their respective elected and appointed boards, members, officials, officers, agents, contractors, employees, volunteers, representatives, professional consultants, and attorneys.

j.     "**City Completion Notice**" shall have the meaning ascribed thereto in Section 6.2.



CITY_OF_IRVINE_014276

**DX-0781.0010**

k.    "**City Designated User**" means a third party that City authorizes to use the Amphitheater for a City Event.

l.    "**City Event**" means an event held at the Amphitheater that is organized and/or controlled by City or by a City Designated User; provided, however, that if a City Event takes place on more than one (1) day, each day shall constitute a separate City Event.

m.    "**City Identification/Signage**" means signage identifying the City of Irvine, with lettering and design at least as prominent in size, style and design as any non-City entity is identified, ~~and~~ including the City of Irvine seal.

n.    "**City Luxury Box**" means one (1) luxury box within the Amphitheater of a comparable size and with comparable design and amenities to other luxury boxes at the Facility to be fully owned, and available for exclusive use, by City. The location of the City Luxury Box is depicted on the Preliminary Site Plan attached hereto and incorporated herein by this reference.

o.    "**City Maintenance Elements**" means the maintenance elements and activities set forth in Exhibit "D", which is incorporated herein by this reference. **[City to provide]**

p.    "**Commencement Date**" means the earlier of (i) the date on which (a) Live Nation completes installation and/or construction of the Live Nation FF&E, and (b) City issues a final Certificate of Occupancy for the Facility, and (ii) the date that is six (6) calendar months after City delivers to Live Nation a City Completion Notice.

q.    "**Construction Budget**" shall have the meaning ascribed thereto in Section 4.3.

r.    "**Date of Agreement**" shall have the meaning ascribed thereto in the Preamble.

s.    "**DD**" shall have the meaning ascribed thereto in Section 4.1.

t.    "**Effective Date**" means the date that all statutory filing limitation periods with respect to the findings, determinations, and/or certifications made by City to enable the development and operation of the Facility to move forward, including, without limitation, any findings, determination, and/or certifications made (i) pursuant to CEQA, and (ii) with respect to the Surplus Land Act, Government Code 54200 et seq., have expired with no appeals or actions (including litigation) taken or filed (any of the foregoing, "**Agreement Claims**"), or, if any are so taken or filed, then upon the resolution of the Agreement Claims upon terms acceptable to each of City and Live Nation, in their respective sole and absolute discretion.

u.    "**Events**" means all events (whether single or multi-day) held, conducted or presented at the Amphitheater, which are promoted by Live Nation or an Affiliate **Entity** and are not City Events; provided, however, that each day of a multi-day Event shall constitute an individual Event. By way of illustration and not by limitation, events featuring the following types of entertainment, artists and/or activities shall be included within the definition of Events:

i.    Live and recorded music performances and festivals;


CITY_OF_IRVINE_014277

**DX-0781.0011**

    ii.    Theatrical performances and national Broadway tours;

    iii.    Children's shows and entertainment;

    iv.    Comedy performers;

    v.    Sporting events;

    vi.    Film debuts, film festivals and art festivals;

    vii.    Ticketed special events for corporate and public rentals for functions such as school musicals, graduations and similar ceremonies.

v.    "**Facility**" collectively means all improvements situated within the Site and developed for use in conjunction with the Amphitheater, including, without limitation, the following:

    i.    The Amphitheater;

    ii.    Office space to support Facility operations;

    iii.    Concession sales areas and other improvements necessary to support the Facility;

    iv.    The City Luxury Box;

    v.    All other luxury boxes and seating incorporated into the Amphitheater;

    vi.    VIP Area improvements including perimeter walls/enclosures, access, canopies and supporting improvements;

    vii.    Parking areas and circulation to support back of house operations, including, without limitation, employees, management, concessionaires, deliveries, tour buses and customary touring trucks, and performers; and

    viii.    Perimeter enclosure and ticketed entry facilities.

w.    "**Facility Design Concepts**" shall have the meaning ascribed thereto in Section 4.1.  As of the Date of Agreement, the Parties contemplate the Facility Design Concepts shall be as set forth in the Preliminary Site Plan.

x.    "**Facility Rental Program**" means a~~the~~ rental program ~~to be developed by Live Nation and approved by City, with~~**for the Facility substantially as outlined on Exhibit "H" attached hereto (subject to approval by City of the final form thereof.** such approval not to be unreasonably withheld or delayed**)**, that sets forth the terms and conditions under which Live Nation is able to rent the Facility, or components thereof, to Third-Party Users.

y.    "**Force Majeure**" shall have the meaning ascribed thereto in Section 23.


CITY_OF_IRVINE_014278

DX-0781.0012

z.  "**Live Nation**" means Live Nation Worldwide, Inc., a Delaware corporation, or an Affiliate **Entity**. Acts of Live Nation's agents, officers, ~~employees~~ and other authorized representatives acting within the scope of their authority ~~or employment~~ shall be deemed to be acts of Live Nation for purposes of binding Live Nation to any obligation or duty hereunder.

aa.  "**Live Nation Capital Contribution**" shall have the meaning ascribed thereto in Section 5.

bb.  "**Live Nation Capital Contribution Delivery Date**" means **the later of (A)** (i) the date Live Nation submits to City construction cost estimates at 100% completion of CD, if said construction cost estimates do not exceed the Construction Budget, or (ii) the next Business Day following the date the City Council approves an increase in construction costs, if said construction cost estimates exceed the Construction Budget**, and (B) (i) receipt by City of all permits and approvals necessary to commence construction of the Facility, and (ii) commencement of construction of the Facility which shall mean commencement of grading activities on the Site**.

cc.  "**Live Nation Design Costs**" means all of the out-of-pocket costs incurred by Live Nation in connection with the design of the Facility, as evidenced by documentation reasonably acceptable to City.

dd.  "**Live Nation FF&E**" means all furniture, fixtures, and equipment necessary for operation of the Facility pursuant to the terms of this Agreement, including, without limitation, all stage fixed lighting and control systems (including, all individual Event lighting and sound equipment provided by performers), [all fixed sound equipment and control systems **– part of City Facility construction**], all seating (except terraced concrete seating decks), [stage, stage canopy **– part of City Facility construction vs. LN FF&E]** and any stage mounted equipment, all concession equipment, menu boards, sales kiosks, furnishing and equipping general offices, furnishing and equipping the VIP Area, hospitality areas, and performer space, erecting sponsorship signage, installing a phone and data system for the Facility, erecting barricade fencing, obtaining or erecting storage facilities, and all other back of house facilities and space [~~list to be expanded and modified as appropriate~~**Parties to clarify elements of LN FF&E vs. City Facility Improvements based on preliminary overall budget**].

ee.  "**Live Nation FF&E Costs**" shall have the meaning ascribed thereto in Section 6.5.

ff.  "**Live Nation Maintenance Elements**" means those elements of Live Nation FF&E and of the Facility which are to be maintained and repaired by Live Nation, as described on Exhibit "F", which is incorporated herein by this reference, and in Section 9.2.

gg.  "**Live Nation Maintenance Program**" shall have the meaning ascribed thereto in Section 9.2.

hh.  "**Non-Permitted Use**" means any use not described as a Permitted Use, unless approved in writing by City.  Non-Permitted Uses shall also include any of the



CITY_OF_IRVINE_014279

DX-0781.0013

activities listed in Live Nation's Prohibited Activities described in this Agreement as well as any use contrary to Applicable Law.

ii. "**Operating Season**" means the period of March 1 – November 15 in each calendar year during the Term; provided, however, that Live Nation shall have the right to hold Events outside of the Operating Season upon reasonable prior notice to City, subject to City's reasonable approval as to nature and timing of any such Events to be held outside of the Operating Season.

jj. "**Permitted Use**" means the operation of a first-class live entertainment venue together with ancillary uses thereto, **comparable to uses at comparable venues operated by Affiliate Entities (so long as complying with the Applicable Standard),** including, without limitation, operation of food and beverage service (including, without limitation, food storage, preparation, service and consumption and bar service and the sale and consumption of alcoholic beverages), the VIP Area, product exhibitions, meetings, fund raising events, charity events, broadcasting, recording, sale of concessions, and sale of merchandise related to the operations or events at the Facility, exhibiting of pay-per-view events, events for viewing on a screen, the display and sale of works of art, videotapes, promotional items, music, CDs, DVDs, and other items sold generally from time to time at live entertainment venues, and City Events.

kk. "**Preliminary Site Plan**" means the design and layout set forth in Exhibit "C".

ll. "**Schedule of Performance**" means the schedule for the performance of certain actions by City or Live Nation pursuant to the terms and conditions of this Agreement, attached to this Agreement as  Exhibit E.

mm. "**SD**" shall have the meaning ascribed thereto in Section 4.1.

nn. **"Sponsorships" shall have the meaning ascribed in Section 8.18.**

oo. nn. "**Third-Party Event**" means an event held at the Amphitheater by a Third-Party User.

pp. oo. "**Third-Party User**" means a person or entity that is not an Affiliate of Live Nation or a City Designated User.

qq. pp. "**VIP Area(s)**" means the area(s) within the Facility that provide a separate, private restaurant club**VIP food and beverage** venue and access to certain luxury boxes and premium seating within the Amphitheater, the location(s) of which are depicted on the Preliminary Site Plan.

2.    Term.

2.1    Initial Term.  The term of this Agreement ("**Term**") shall commence on the Effective Date and, subject to (i) the possibility of earlier termination as expressly provided for herein, and (ii) extension pursuant to the following paragraph, shall continue thereafter for thirty (30) years following the Commencement Date.



CITY_OF_IRVINE_014280

DX-0781.0014

2.2    Options to Extend.  Live Nation shall have two (2) options to extend the Term, in each instance, for a period of ten (10) additional years (each, an "Extension Period"), upon the terms and conditions set forth herein (each, an "**Option**").  In the event Live Nation elects to exercise an Option to extend the Term, Live Nation shall deliver to City written notice of its intent to exercise the Option in the manner set forth in Section 25.4 which requires a copy of the notice be sent to the City Attorney (an "**Option Exercise Notice**"), at least one hundred eighty (180) days prior to the expiration of the Term.  If an Event of Default of Live Nation under this Agreement is outstanding either at the time of Live Nation's delivery of an Option Exercise Notice or ~~at any time prior to~~**on** the first day of an Extension Period (or if any event shall have occurred which with the giving of notice or the passage of time or both would constitute an Event of Default, any such event a "**Pre-Default Event**")), then City may elect by delivering written notice to Live Nation within fifteen (15) Business Days after (i) Live Nation's delivery of an Option Exercise Notice, or (ii) the occurrence of the Pre-Default Event (as applicable), to reject Live Nation's exercise of its Option to extend, whereupon the extension shall be null and void unless Live Nation subsequently cures the Event of Default or Pre-Default Event (as applicable) within the number of days **thereafter** permitted under this Agreement for cure of the Event of Default or Pre-Default Event (as applicable) at issue.  If Live Nation elects to exercise an Option, the term "Term" as used herein shall include the respective Extension Period and all terms and conditions of this Agreement shall continue to apply.

3.    Schedule of Performance.  In addition to the timeframes set forth throughout this Agreement with respect to specific tasks, the Parties shall complete their respective tasks by the times set forth in the Schedule of Performance, subject in all events to Force Majeure.

4.    Design of Facility; Preparation of Construction Budget; and Constructability Reviews.

4.1    Design of Facility.

a.    Live Nation has developed the design concept for the Facility, based on the Preliminary Site Plan (collectively, the "**Facility Design Concepts**").

b.    Following the Parties' identification of the Facility Design Concepts, Live Nation shall, at its sole cost and expense, manage all architectural and engineering services required in connection with the design of the Facility, from Facility Design Concepts and schematic design ("**SD**") through completion of final construction documents ("**CD**").

c.    Upon Live Nation's completion of SD, 50% CD, and 100% CD drawings, Live Nation shall submit to City for review and approval such progress drawing sets. City shall verify that each progress drawing set represents sufficient progress to be deemed completion of SD, 50% CD, and 100% CD.  Should City determine, in City's sole ~~and absolute~~**commercially reasonable** discretion, that a progress drawing set is not sufficiently complete, Live Nation shall complete the additional design work required and resubmit the progress drawing set to City for City approval. Live Nation shall not proceed with additional design work until Live Nation has

CITY_OF_IRVINE_014281

DX-0781.0015

addressed all City comments to the progress drawings in a manner satisfactory to City in City's sole and absolute discretion, including any necessary value engineering, and until Live Nation has obtained written approval thereof from City. If Live Nation proceeds with further design work, prior to obtaining written approval of the progress drawing sets from City, Live Nation does so at its sole risk, and any such further design work that is not utilized shall not constitute a portion of the Live Nation Design Costs. City shall timely review each submittal by Live Nation pursuant to this Section 4.1.

d.  Additionally, upon City's request, Live Nation shall submit to City an electronic copy of progress drawing sets as of the date of the City's request. Live Nation shall use good faith efforts to address in the subsequent drawings in progress all City comments in a manner satisfactory to City in City's sole and absolute discretion, including any necessary value engineering, and obtaining written approval thereof from City.

4.2   Cost Estimates

a.  Within _____ (__) days following City's approval of completeness of the SD, and 50% CD drawing sets as defined by the City, Live Nation shall prepare and submit to City a comprehensive construction estimate covering all projected costs associated with construction of the facility.

b.  Within _____ (__) days following City's approval of the 100% CD drawing sets as defined by the City, City shall have prepared a comprehensive construction estimate covering all projected costs associated with construction of the Facility. City may also elect to have additional construction cost estimates completed at any time at its sole and absolute discretion, cost, and expense.

4.3   Construction Budget. **[City and LN to discuss total budget and what LN $20MM contribution will cover once preliminary budget is established]** As of the Date of Agreement, based on preliminary estimates, the Parties anticipate that the Facility will cost between One Hundred Twenty Million Dollars ($120,000,000) and One Hundred Thirty Million Dollars ($130,000,000) to construct. To that end, the Parties shall review the construction cost estimates prepared at completion of SD and shall meet and confer to prepare a construction budget (the "**Construction Budget**"). Following completion of each of the 50% CD drawing sets and 100% CD drawing sets, the Parties shall meet and confer, including to discuss potential value engineering solutions, as necessary to ensure that the costs to construct the Facility does not exceed the Construction Budget. If requested at any time by either the City or Live Nation, the Parties shall meet and confer to discuss potential value engineering solutions, and may elect to have the construction cost estimates updated to incorporate potential value engineering solutions.

4.4   Constructability Reviews. ~~Live Nation shall~~**City may**, at ~~its~~**City's** sole cost and expense, coordinate a customary constructability review at fifty-percent (50%) of CD to be completed by a third party selected by City in City's reasonable discretion. Following City's review of the constructability review, the Parties shall meet and confer to address any comments provided in connection with such constructability



CITY_OF_IRVINE_014282

review. City may, at its sole and absolute discretion, cost, and expense elect to have additional constructability reviews completed at any time. Following City's review of any such constructability review, the Parties shall meet and confer to address any comments provided in connection with such constructability review.

4.5     <u>Limitation on City Design Cost Obligations</u>. City shall, at City's sole cost and expense, manage all architectural and engineering services during bidding and construction administration; provided, however, that such costs shall not exceed twenty-five percent (25%) of the total cost of such professional services.

5.     <u>Live Nation Capital Contribution</u>. **[Parties to discuss application of LN contribution (as to Live Nation FF&E and other items) once preliminary budget is established]**On the Live Nation Capital Contribution Delivery Date, Live Nation shall deliver to an escrow company mutually acceptable to the Parties (the "**Escrow Holder**") funds in the amount of Twenty Million Dollars ($20,000,000) (the "**Live Nation Capital Contribution**") as a contribution towards the costs to be incurred by City to construct the Facility. Concurrently with such delivery, the Parties shall submit joint escrow instructions to the Escrow Holder that instruct the Escrow Holder to disburse the Live Nation Capital Contribution (i) to Live Nation, if this Agreement is terminated pursuant to the terms hereof prior to City's completion of the Facility, or (ii) to City, upon City's completion of construction of the Facility, as evidenced by City's issuance of a temporary Certificate of Occupancy for the Facility.

6.     <u>Construction of Facility</u>.

6.1     <u>Public Bidding</u>. City shall manage the bidding process and construction administration for the construction of the Facility. If the lowest responsible bidder's bid to construct the Facility exceeds the Construction Budget, City may, in its sole and absolute discretion, elect to reject all bids. In such event, the Parties shall meet and confer regarding potential value engineering solutions to meet the Construction Budget; provided, however, that any such solutions shall only be implemented if such solutions are mutually acceptable to City and Live Nation, each in their sole and absolute discretion. Following implementation of any such mutually acceptable value engineering solutions, City will rebid the Facility. City may repeat this process as necessary at its discretion. In addition, Live Nation may request to meet and confer with City if Live Nation becomes aware of any additional potential value engineering or improvements in the construction pricing climate, or if Live Nation desires to propose changes to the design of the Facility to reduce construction costs. In either of such events, if City agrees, in City's sole and absolute discretion, City shall rebid the Facility to address such additional value engineering, improvements, and/or design changes. If, despite the foregoing process, the lowest responsible bidder's bid to construct the Facility exceeds the Construction Budget and the Parties are not able to reach a solution that is satisfactory to each Party in their respective sole and absolute discretion, then either Party may terminate this Agreement by providing a notice of termination to the other Party. Upon such termination, the Parties shall be released from this Agreement without further obligations to the other Party as of the effective date of such termination; provided, however, that **(i) City shall reimburse Live Nation for the Live Nation Design Costs in an amount not exceeding Two Million Dollars ($2,000,000) no later than thirty (30) days after the termination date,**



CITY_OF_IRVINE_014283

**DX-0781.0017**

and (ii) the indemnification provisions hereof shall survive any such termination with respect to matters arising before the date of any such termination.

6.2    City Construction Obligations.  Within sixty (60) days following City's award of a construction contract following the bidding process conducted pursuant to Section 6.1, City shall, at its sole cost and expense, contract for and cause the construction of the Facility to commence, including installation of all major building systems (including, without limitation, roof, building envelopes, HVAC, mechanical, plumbing, electrical, lighting, terraced concrete seating decks, and all other elements of the Facility described in the CDs), and shall thereafter cause the construction to proceed diligently through completion.    Promptly following completion of construction as a "warm shell," as evidenced by City's issuance of a temporary Certificate of Occupancy for the Facility, City shall deliver written notice of such completion to Live Nation (the "**City Completion Notice**").

**6.3    Substantial Completion.  The term "Substantial Completion of the Facility" shall mean the date ("Delivery Date") on which all of the following have occurred: (i) City's delivery of possession of the Facility to Live Nation following City's delivery of a City Completion Notice with all elements of the Facility substantially complete (meaning when such work is complete in accordance with all Facility Permits and the final CDs (subject to mutually approved change orders) and Applicable Law, subject only to minor punch list items capable of being completed within ninety (90) days and with all** *of the Live Nation FF&E* **installed for opening and operation of the Facility (and including all utilities installed and in working order)); (ii) not less than ten (10) days' prior written notice by City and Live Nation have completed a walk-through inspection and punch list related to the Facility and all** *Live Nation FF&E (the* **parties agree that all punch list items must be capable of being completed within ninety (90) days); and (iii) City has provided Live Nation with at least ninety (90) days' prior written notice of the exact Delivery Date (the exact Delivery Date set forth in such notice is referred to herein as the "Noticed Delivery Date"). [Parties to discuss remedies or Base Operation Fee offset for significant City delay in reaching Substantial Completion]**

**6.4**    6.3 Live Nation Access.  Prior to issuance of the City Completion Notice, City shall permit Live Nation to access the Site to coordinate with City the installation of the Live Nation FF&E.

**6.5**    6.4 Live Nation Construction Consultant Obligations.  Throughout construction and until City issues a final Certificate of Occupancy for the Facility, Live Nation and Live Nation's third party architect which completed the CDs shall remain engaged with City in a design/consultant role.

**6.6**    6.5 Change Orders.

a.    City shall consult with Live Nation prior to approving any change orders. Live Nation shall provide a written response to City regarding any such change orders within five (5) Business Days after such consultation. Notwithstanding any such consultation, City shall have final decision-making authority with respect to change orders, regardless of whether any such change orders are requested and/or funded by Live Nation pursuant

CITY_OF_IRVINE_014284

**DX-0781.0018**

to paragraph b or c below. **; provided, however, any change orders that City desires to approve which reduce the scope or quality of the Facility and/or amenities to be constructed by City or delay the schedule to complete same shall be subject to mutual approval by City and Live Nation** *(which approval shall not be unreasonably withheld,* **conditioned or delayed by Live Nation).**

b.  If Live Nation does not support a change order proposed by City **but the same does not require mutual approval under Section 6.6(a) above**, Live Nation shall have the right to request an alternative resolution to such change order so long as Live Nation immediately funds one hundred percent (100%) of the amount equal to (i) the cost of the alternative resolution proposed by Live Nation, less (ii) the cost of the resolution proposed by City.

c.  The cost of all change orders that are a result of modifications requested by Live Nation subsequent to City's award of a construction contract shall be paid by Live Nation to the extent of any cost increases resulting from such change orders.

d.  Live Nation **and City** shall **each** immediately fund fifty percent (50%) of the cost of all change orders that are a result of errors and omissions in the bid documents.

**6.7**   ~~6.6~~ Live Nation FF&E.

a.  City Approval of Live Nation FF&E.  Not later than six (6) months following the date construction of the Facility commences, Live Nation shall submit to City the plans and specifications for the Live Nation FF&E for City review and approval, which approval shall not be unreasonably withheld or delayed. Live Nation shall promptly revise said plans and specifications to address any City comments. **In connection with any of the foregoing, City shall use its best efforts to assist Live Nation in obtaining all Live Nation-required permits and approvals for installation of its FF&E and for its operations (including without limitation applicable alcoholic beverage commission approvals) on terms and conditions acceptable to Live Nation in its reasonable discretion.**

b.  Installation/Construction of Live Nation FF&E.  Promptly following City's delivery of the City Completion Notice, Live Nation shall, at its sole cost and expense, shall commence, and thereafter diligently pursue to completion, the installation and/or construction (as applicable) of all of the Live Nation FF&E. Such installation and/or construction shall be done in a good and workmanlike manner, lien free, in compliance with all approved plans and permits required for the Live Nation FF&E, and in compliance with Applicable Law. ~~Prior to commencement~~ *~~of the Live Nation FF&E,~~* ~~Live Nation shall obtain and maintain a payment bond in the full amount of the cost of~~ *~~the Live Nation FF&E,~~* ~~using forms approved by City and naming City as obligee or dual obligee.~~ In the event the Facility achieves a LEED designation, Live Nation shall take no action in

CITY_OF_IRVINE_014285

DX-0781.0019

performing the Live Nation FF&E or performing subsequent alterations or improvements, or otherwise in operating the Facility, that would cause such designation to be lost.  Upon Live Nation's completion of installation and/or construction (as applicable) of the Live Nation FF&E, which completion **Live Nation** shall **use best efforts to cause to** occur not later than six (6) months following commencement, Live Nation shall notify City, in writing, of said completion, and shall submit to City for review and approval documentary evidence of Live Nation's out-of-pocket costs to design and install and/or construct (as applicable) the Live Nation FF&E (the "**Live Nation FF&E Costs**").  **Notwithstanding the foregoing, City shall provide early access to Live Nation to commence installation of Live Nation FF&E provided such early access does not interfere with the completion of the Facility by City.**

**6.8**    6.7 City Obligations Regarding Public Infrastructure.  City shall be responsible to construct and/or install (as applicable), and to thereafter maintain pursuant to City's maintenance program for public infrastructure owned by City, **the "berm" and all** roads, utilities, and street lighting, as necessary to support and service the Facility, which shall in all events remain on for at least one (1) hour before and after any Events at the Facility.  City shall **construct at its sole cost (and not as part of the Facility budget) and** make available for exclusive use by Live Nation during any Events (including for not less than two (2) hours before and for not less than two (2) hours after each Event) not less than four thousand five hundred (4,500) parking spaces located in the Great Park, within walking distance to the Facility (as reasonably determined by City) (the "**Event Parking Spaces**").  Live Nation shall have no responsibility for any costs related to any of such public infrastructure, including, without limitation, costs incurred to develop, use and maintain such infrastructure.  City shall not charge a parking fee for the use of any of the Event Parking Spaces unless City establishes a comprehensive parking program for the entire Great Park.  Live Nation shall not charge a parking fee for the use of any of the Event Parking Spaces unless Live Nation establishes and obtains City approval (which approval may be granted or withheld in City's sole and absolute discretion) of a parking program for the Event Parking Spaces that provides revenue sharing with City.(other than VIP parking).[Note to City – standard parking is included in Event ticket pricing, VIP parking revenue is part of Live Nation budgeted revenue]  City shall be entitled to all parking revenue charged by City, if any, for City Events.**

**6.9    Warranty; Latent Defects.  City shall fully warranty all elements of the Facility completed by or at the direction of City for the greater of one (1) year from completion or any applicable warranty period provided by any supplier or contractor.  City, at its sole cost and expense, shall be responsible for the repair and remediation of any and all structural defects to the Facility including roof, load bearing walls, foundations and terrace seating, asbestos, asbestos containing materials and/or latent defects in the Facility during the Term.**

7.    Engagement of Live Nation.  City hereby engages Live Nation, as an independent contractor and not as an agent of or for the City, to operate, manage and maintain the

CITY_OF_IRVINE_014286

**DX-0781.0020**

Facility during the Term of this Agreement. Live Nation hereby undertakes and agrees to act in such capacity in accordance with the provisions of this Agreement.

8.    Operations and Management Obligations of Live Nation.

    8.1    General Operating Obligations. Subject to the provisions of this Agreement, Live Nation shall have the authority and responsibility to take all actions necessary or appropriate for the operation, management, promotion and maintenance of the Facility at the Applicable Standard, including but not limited to the following:

        a.    Employ or contract for such workers, mechanics, laborers, clerks, legal counsel, consultants, accountants and other employees and contractors as are reasonably necessary or appropriate in the management, maintenance and operation of the Facility;

        b.    Procure and pay for such materials, services, public utility services, supplies and equipment as are reasonably necessary or appropriate in the management, maintenance and operation of the Facility, consistent with the terms of this Agreement;

        c.    Procure and maintain in force and effect the policies of insurance required of Live Nation by this Agreement;

        d.    Use or permit the use of all or any part of the Facility for events consistent with the terms of this Agreement;

        e.    Operate or grant concession privileges for the vending and sale of food and beverages, including alcoholic beverages, programs, souvenirs, novelties, retail merchandise and similar articles, and other articles, or for the renting of any such articles, consistent with the terms of this Agreement;

        f.    City and Live Nation shall jointly agree on one or more prominent exterior locations at the Facility for installation and display of the City Identification/Signage, including, without limitation, on the marquee and at one or more prominent exterior locations at the Facility that include the name of the Facility.

        g.    Take and omit such other actions, enter into such other agreements, documents, and instruments, and engage in such other transactions, as are reasonably necessary or appropriate in connection with the management, operation, maintenance, improvement and administration of the Facility, consistent with the terms of this Agreement;

        h.    Administer all business operations and activities related to the Facility, except as otherwise specifically provided herein; and

        i.    Provide for all necessary on-site security at the Facility.

    8.2    General Performance Requirements. Except as otherwise expressly provided in this Agreement, Live Nation shall perform and furnish, during the Term of this



-13-

CITY_OF_IRVINE_014287

Agreement, all management services, labor and material appropriate to carry out its duties hereunder. Live Nation shall take all actions necessary to ensure the orderly and efficient administration, management and operation of the Facility, including the negotiation, execution and enforcement of, licenses, ticketing agreements or contracts, use agreements and ~~bookings~~**booking agreements** for the Facility **to which Live Nation or an Affiliate Entity is a party**. All licenses, use agreements, bookings and any other agreements pertaining to the use, operation, and maintenance of the Facility by Live Nation, except those pertaining to City Events, will be executed by Live Nation as manager of the Facility. Live Nation shall use its best efforts to secure first class, top demand Events throughout the Term.

8.3    Minimum Event Requirements. In each calendar year during the Term, subject to events of Force Majeure, Live Nation shall hold not less than twenty-five (25) Events ~~with~~**and shall use commercially reasonable efforts to cause at least twenty-five (25) Events each calendar year to have** not less than ten thousand (10,000) attendees each in the Amphitheater **[TBD based on ultimate Facility seating capacity]**.

8.4    Facility Scheduling Procedures. Not later than _____ of each calendar year during the Term, Live Nation shall provide to City an Event schedule for the next calendar year the ("**Live Nation Schedule**"). The Parties acknowledge and agree, however, that last minute bookings and schedule changes are common in the live entertainment industry. Changes to the Live Nation Schedule are permitted provided that Live Nation notifies City, in writing, of any change (i) within fifteen (15) days after Live Nation makes ~~the~~**a** change **that will impact any desired City Event scheduling**, and (ii) not less than __ (__) days before the Event in question. Live Nation shall not schedule any Event that ~~includes obscenity~~**is publicly known to include artist nudity in the performance**.

8.5    Times of Operation for Events, VIP Area, and Alcohol Service.

a.    Subject to the following sentence, Events with sound-amplification shall begin no earlier than _____ a.m.~~,~~ and shall end no later than 11:00 p.m. daily ~~on Friday and~~**Monday through** Saturday evenings. For Events with sound-amplification that occur on Sunday ~~– Thursday~~, such Events shall begin no earlier than _____ a.m., and shall end no later than ~~10:00 p.m~~**10:30 p.m.** Notwithstanding the foregoing, however, City shall have the right to impose additional **commercially reasonable** sound mitigation measures and requirements for the Facility, ~~including, without limitation, changing the permitted hours in which Events with sound-amplification may be held.~~**after consultation with Live Nation.[Sound amplification standards subject to development by LN and City sound consultants in process; more detailed mutually-agreed provisions should replace the last sentence here before signing]**

b.    Subject to paragraph c below, Alcohol sales shall cease at 11:00 p.m. daily.

CITY_OF_IRVINE_014288

DX-0781.0022

c.    Alcohol sales, "after-concert parties" and/or similar private gatherings following Events may continue within the VIP Area until 12:00 a.m., so long as such events do not involve external sound amplification, and are not audible outside of the Facility; provided, however, that the VIP Area may only be utilized by Live Nation in connection with Events at the Amphitheater.

8.6    Live Nation's Paid Ticketing Records; City Right to Audit.    Live Nation shall maintain during the Term of this Agreement, such ticketing reports, including backup data, of the number of all paid, dropped, and gross tickets for each Event (collectively, "**Records**") relating to this Agreement as are customary for business operations comparable to Live Nation's in order to ascertain the number of paid tickets to Events. Such Records shall be available upon reasonable request for City's inspection**. City acknowledges that Live Nation records are trade secrets and shall be maintained as confidential information by City and not subject to public records disclosures**. City shall have the right to conduct an audit of the Records for any year within the immediately prior three (3) year period. If any audit reveals that Live Nation underreported ticket sales, Live Nation shall promptly pay to City any unpaid Ticket Surcharges.  If any audit reveals that Live Nation underreported ticket sales by more than _____ percent (___), Live Nation shall be responsible for the cost of the audit.  City shall be responsible for the cost of any audit performed pursuant to this Section for which Live Nation is not responsible pursuant to the foregoing sentence.

8.7    Third-Party Events.  Live Nation may rent the Facility, or components thereof, to Third-Party Users for Third-Party Events.   Any such rentals shall be made in accordance with the Facility Rental Program **and Live Nation's Standard Form Venue License Agreement in the form attached hereto as Exhibit "I"**.

8.8    Customer Satisfaction.  Live Nation shall use ~~its best~~**diligent commercially reasonable** efforts to achieve a level of customer satisfaction meeting the Applicable Standard and **Live Nation Code of Conduct and** to promptly and satisfactorily resolve all customer complaints. Live Nation agrees to employ, as its General Manager in charge of management of the Facility, a person experienced in management of comparable first-class facilities meeting the Applicable Standard. Live Nation shall not ~~employ, nor continue to employ,~~**hire** any person as General Manager to whom City reasonably and in good faith objects. The General Manager shall be responsible for the overall operation of the Facility and will be the primary liaison with City's designated representative. The General Manager shall be an excellent operator and able to work closely with top performers and artists, community representatives, and City officials, employees and agents. Live Nation's General Manager shall meet with City's representative to discuss and attempt in good faith to resolve any customer complaints received by City, promptly following City's receipt of any such customer complaint.

8.9    Operation in Accordance with Applicable Standard.  Live Nation shall operate, and shall **use diligent commercially reasonable efforts to** cause Live Nation's subcontractors, concessionaires, vendors, licensees, users, broadcasters and others using the Facility, to operate and use the Facility in conformance with the Applicable Standard. Live Nation shall require by contract that all contractors

CITY_OF_IRVINE_014289

**DX-0781.0023**

operating in the Facility under Live Nation operate to the Applicable Standard, and shall enforce such requirement against all contractors.

8.10    Prohibited Activities.  Live Nation shall not do, or permit or authorize others to do, any of the following:

a.    Operate the Facility in any manner or for any purpose other than a Permitted Use;

b.    Knowingly or intentionally engage in any act which would, to an ordinarily prudent person in the position of Live Nation, be reasonably foreseeable to cause substantial or irreparable damage to the Facility;

c.    Abandon the Facility during the Term;

d.    Knowingly use or occupy, or knowingly permit the Facility or any part thereof to be used or occupied, for any unlawful, disreputable or ultra-hazardous use (including the prohibited or unauthorized use, storage or disposal of substance regulated as hazardous under California or federal law), or operate or conduct the business of the Facility in any manner known to constitute or give rise to a nuisance of any kind; provided that City recognizes and agrees that the holding of events in the Facility meeting the Applicable Standard shall not, in and of itself, constitute a nuisance **or disreputable use** for purposes of this Agreement;

e.    Make, authorize or permit any material modifications or alterations to the Facility except with the written approval of City, which approval City may withhold in its sole and absolute discretion; **(as used herein, material modifications or alterations shall mean modifications or alterations which cost in excess of $100,000 in any calendar year or which materially diminish the quality of the Facility). Live Nation shall be responsible for the cost of all permitting, maintenance and repairs related to such alterations and any such alterations shall be completed in a good and workmanlike manner and in compliance with all applicable laws, rules, codes and regulations applicable to the Facility and lien free (and Live Nation shall bond or discharge any liens promptly within 30 days of obtaining knowledge of same);**

f.    Make, authorize or permit any alterations of the sound amplification equipment approved by City in connection with City's approval of the Live Nation FF&E, except with the written approval of City, which approval City may withhold in its sole and absolute discretion; **provided, however, sound amplification equipment utilized by Facility performers shall be exempt from such City approval provided such sound amplification complies with the sound amplification standards of this Agreement;**

g.    Permit the holding of a flea market or used-goods sale at the Facility;

h.    Permit gambling within any portion of the Facility;



-16-

CITY_OF_IRVINE_014290

i.    Knowingly permit the Facility to be used for any illegal business or purpose;

j.    Enter into any agreements entailing the installation of any wireless structures (unrelated to Live Nation's direct operation of the Facility) in any portion of the Facility;

k.    License the use of any portion of the Facility for a period exceeding three (3) days to any third party without notifying City in advance and obtaining City's written approval; or

l.    Enter into any agreement that purports to grant to any third party any use or other rights in excess of the rights granted to Live Nation pursuant to this Agreement.

8.11    <u>Live Nation Vendors and Services Providers</u>.  Live Nation agrees to provide to City a list of proposed qualified users, subcontractors, vendors, licensees, concessionaires, and/or service contractors prior to entering into principal contracts for such services. City, through its designated representative, will have the right to discuss with Live Nation the list of qualified subcontractors, vendors, licensees, users, concessionaires, and service contractors, and Live Nation shall consider the opinion of the City, but nothing herein shall give City the right or authority to approve or disapprove of any of the persons or entities on said list. Notwithstanding the foregoing, Live Nation shall (i) not enter into any such principal contracts with a term that is greater than the Term of this Agreement, and (ii) be permitted to enter into principal contracts with its ~~Affiliates~~**Affiliate Entities** without having to submit to City a list of proposed users, subcontractors, vendors, licensees, concessionaires and/or service contractors, provided that the fees for using such ~~Affiliates~~**Affiliate Entities** are consistent with the fees charged at other such venues operated by Live Nation or its ~~Affiliates~~**Affiliate Entities** which are of comparable size and are reasonably consistent with Applicable Standards.

8.12    <u>Inventory and Supplies</u>.  Subject to the terms of this Agreement, all necessary and appropriate supplies and equipment for events and for the management and operation of the Facility shall be rented, leased or purchased by Live Nation. During the Term of this Agreement, Live Nation shall maintain an appropriate inventory of equipment and supplies. Equipment purchased by Live Nation and left at the Facility upon the expiration of the Term or earlier termination of this Agreement shall become the property of City after the expiration of the Term or earlier termination of this Agreement.

8.13    <u>Service Contracts</u>.  Live Nation may negotiate and enter into service contracts or agreements in the name of Live Nation which are reasonably necessary or appropriate in the ordinary course of business in operating the Facility, including contracts for electricity, engineering services, gas, telephone, staffing personnel, including guards and ushers, janitorial service, landscaping service, vermin extermination, concessions, radio, cable and television rights, and accounting services and other services.



CITY_OF_IRVINE_014291

DX-0781.0025

8.14    Management Services.    Live Nation shall furnish such management and supervisory services as are herein set forth in this Agreement in a manner consistent with the Applicable Standard.

8.15    Personnel Policy. Live Nation covenants for itself and all persons claiming under or through it, that there shall be no discrimination against any person on the basis of race, color, political or religious opinion or affiliation, creed, age, physical or mental handicap, sex, marital status, ancestry, national origin or sexual preference/orientation. Live Nation shall comply with Applicable Law regarding discrimination in employment and unlawful employment practices. Live Nation shall be an equal opportunity employer.

8.16    Condition of Facility Upon City's Issuance of Final Certificate of Occupancy. **Without limitation on City's obligations under this Agreement,** Live Nation shall accept the management, maintenance and operation of the Facility, in its condition as of date City issues a final Certificate of Occupancy for the Facility without any additional representation by any of City and City Personnel, other than the right to conduct an inventory; provided that City's delivery of the Facility to Live Nation shall constitute City's representation and warranty that the construction of the Facility City has been completed in a good and workmanlike manner, in compliance with the plans and specifications therefore approved by the Parties, in compliance with all Applicable Laws.

8.17    Operating Costs.    **Subject to City's obligations under this Agreement,** Live Nation shall be solely responsible for all expenses that Live Nation incurs in connection with operating and maintaining the Facility and carrying out its duties under this Agreement, including, without limitation, all of, the following:

    a.    Wages and salaries (including management fees) of all of Live Nation's employees engaged in the operation, maintenance and security of the Facility, including taxes, insurance and benefits paid to such employees;

    b.    All supplies and material used in the operation, maintenance, repair and security of the Facility;

    c.    Insurance expenses;

    d.    Utility costs, including, but not limited to, those associated with telephone service, electricity, gas, sewer, water, garbage removal and cable data transmission (but not initial hook-up or connection fees;

    e.    Repairs and general maintenance of the Facility (other than for City Maintenance Elements); and

    f.    Service or maintenance contracts with independent contractors for the operation, maintenance, repair, replacement or security of the Facility.

8.18    **[Note to City – LN Rent commitment and budget depend upon Sponsorship revenue to LN; it was in Framework document as well] Sponsorship Rights. Live Nation shall have the rights to all sponsor naming and participation and**



CITY_OF_IRVINE_014292

**DX-0781.0026**

all revenue derived therefrom as described in this Section 8.18 (collectively, "Sponsorships").

a.    Notwithstanding anything in this Agreement to the contrary, *during the Term, Live Nation shall* have the exclusive right to (i) sell sponsorship and advertising anywhere within the interior of the Facility and use such areas for purposes of advertising, marketing, and promotion of its and/or its Affiliates' business and/or upcoming Events of Live Nation and/or its Affiliates without having to obtain City's prior approval or consent, and (ii) procure naming rights sponsorship (including "name in title" and "name under title") deals for the Facility on the terms set forth below and to use such "name in title" and "name under title" names, logos and trade dress on Live Nation's signage.

b.    Live Nation may, at any time during the Term, present to City a proposal for a potential naming rights sponsorship for the Facility, even if no specific naming rights sponsor has been yet identified by Live Nation. Such proposal for Live Nation's review will be limited to the signage and other "onsite" branding elements that the naming rights sponsor would receive at and within the Facility. Such proposal will not include elements, rights or benefits for a naming rights sponsor that do not involve "onsite" elements in the Facility, including without limitation, tickets, promotion and marketing rights and inclusion in Live Nation's media.  City will have ten (10) business days during which to review the proposal and provide approval or reasonable disapproval (including the basis of any disapproval). If City does not respond with approval or reasonable disapproval within such period, the proposal shall be deemed approved.

c.    The business category and identity, and logo and trade dress, of any naming rights sponsor is not subject to City's prior approval. City will provide in writing the specific names of, or specific categories of, businesses that it deems inappropriate for a naming rights sponsorship of the Facility within ten (10) business days of the full and mutual execution of this Agreement. Any specific business or specific business category not included in such list will be deemed approved.

d.    Live Nation will retain all revenue derived from any and all such naming rights sponsorship deals.  Live Nation will document and draft the applicable sponsorship/naming rights agreement using its standard contract forms.

e.    Live Nation will exercise commercially reasonable efforts to ensure that City will be named as both an entity to be indemnified by the naming rights sponsor, and as an "additional insured" on the naming rights sponsor's insurance policy, in connection with the coverage such naming rights sponsor is required to maintain during the term of such sponsorship relationship.

CITY_OF_IRVINE_014293

**DX-0781.0027**

**8.19    Third Party Users.  Live Nation shall have the exclusive right to rent the Facility to third parties (each, a "Third Party User") and the exclusive right to hold all ticketed events for 5,000 or more persons within the Great Park. City shall provide Live Nation with a right of first refusal to promote any ticketed event held or sponsored by City in the Great Park for less than 5,000 people. [Note: These rights were in Framework document]**

9.    Repair and Maintenance Standards.

9.1    Live Nation Maintenance Obligations.  Throughout the Term, Live Nation shall maintain the Facility in a ~~first class~~**first-class** condition and repair, free from any unsanitary conditions and any conditions posing a fire hazard or other threat to health and safety, and all landscaping in a healthy condition, all consistent with the Applicable Standard.  With the exception of the City Maintenance Elements, Live Nation shall be solely responsible for all costs incurred by Live Nation in connection with its maintenance obligations pursuant to this Agreement.

9.2    Live Nation Maintenance Program; City Annual Maintenance Inspection.  ~~Prior to, and as a condition of, City providing the City Completion Notice, Live Nation shall have submitted to City and obtained City's approval of~~ *(which approval shall not be unreasonably withheld* ~~or delayed)~~ a written maintenance program (the "**Live Nation** **Maintenance Program**").  ~~The Live Nation Maintenance Program~~**Live Nation's maintenance of the Facility** shall include maintenance of all of the maintenance elements set forth on Exhibit "F", which is attached hereto and incorporated herein by this reference.  ~~Following City's approval of the~~ **and which includes Live Nation's typical "refresh" efforts for facilities comparable to the Facility (the "**Live Nation Maintenance Program~~, Live Nation shall comply with all of the terms and requirements therein.  The Live Nation Maintenance Program shall include, in addition to routine maintenance requirements to meet the standards set forth in clause i above, the Live Nation Update/Refresh Requirement~~**")**.  In addition to any other right of City to enter the Site, including for purposes of inspecting the Facility to determine Live Nation's compliance hereunder, on or before each ~~————~~**fifth (5th) year** during the Term, representatives of City shall have the right to, and shall, enter the Site and perform an annual maintenance inspection of the Facility to determine Live Nation's compliance with the Live Nation Maintenance Program. City shall notify Live Nation, in writing, of any maintenance deficiencies, and upon receipt of any such notification, Live Nation shall promptly correct the deficiency.

9.3    City Maintenance Elements.  Throughout the Term, City shall be responsible to fund the maintenance of the City Maintenance Elements.  Live Nation shall notify City, in writing, when maintenance is needed with respect to any City Maintenance Elements (other than maintenance provided under ongoing maintenance/service contracts let by City).  In connection with any such notice, Live Nation shall submit a budget for completing the subject City Maintenance Elements (any such budget, a "**City Maintenance Elements Budget**") to City.  Upon City's approval of a City Maintenance Elements Budget, which approval shall not be unreasonably withheld or delayed, Live Nation shall proceed to diligently complete the City Maintenance Elements.  Following completion of the City Maintenance Elements, Live Nation

CITY_OF_IRVINE_014294

DX-0781.0028

shall submit an invoice to City consistent with the City Maintenance Elements Budget. City shall have the right to inspect such complete work. Within thirty (30) days following City's receipt of any such invoice, City shall provide payment therefor to Live Nation; provided, however, that if City determines, in City's reasonable discretion, that the work has not been satisfactorily completed, City shall notify Live Nation, in writing, and Live Nation shall promptly complete such work to the reasonable satisfaction of City. In such event, City's payment for such work shall not be due and payable until thirty (30) days following Live Nation's satisfactory completion of such work.

9.4    Solid Waste Requirements. Live Nation shall be responsible for all solid waste requirements for the Facility.

9.5    No Capital Improvements. Except with respect to the Live Nation FF&E, Live Nation shall not be obligated to, and shall not, without City's written consent (which consent shall not be unreasonably withheld or delayed), perform any work that would constitute a capital improvement according to generally accepted accounting principles.

9.6 Live Nation Update/Refresh Program. Every ten (10) years *during the Term, Live Nation shall,* at Live Nation's sole cost and expense, conduct a comprehensive update and refresh of the *Live Nation FF&E (the* "**Live Nation Update/Refresh Program**"). The Live Nation Update/Refresh Program shall require Live Nation to expend, in connection with each such update and refresh, not less than fifty percent (50%) of the Live Nation FF&E Costs, increasing annually by ____ (__%).

**9.6    [Note to City: see Section 9.2 above re "refresh" and Live Nation Maintenance Program].**

9.7    Replacement Reserve. **[TBD - Once construction costs are known, parties can discuss a possible replacement reserve as part of overall deal economics]** Commencing on the Commencement Date, Live Nation shall annually set aside a minimum of ($_____) per year, increasing annually by _____ percent (__%), into a separate interest-bearing trust account (the "Replacement Reserve"). Funds in the Replacement Reserve shall be used only for Live ~~Nation Update/Refresh Program or~~**Nation's "refresh" efforts under Section 9.2,** for other capital repairs, capital improvements, and capital replacements to the Facility and equipment (other than those capital repairs, improvements, and replacements that are the obligation of City) which are normally capitalized under generally accepted accounting principles. The non-availability of funds in the Replacement Reserve does not in any manner relieve or lessen Live Nation's obligation to undertake any ~~Live Nation Update/Refresh~~**"refresh"** or any and all necessary capital repairs, improvements, or replacements and to continue to maintain the Facility as a first-class facility in the manner prescribed herein. Not less than once per year, Live Nation, at its expense, shall submit to City an accounting for the Replacement Reserve. Capital repairs to and replacement of the Facility shall include only those items with a useful life of ten (10) years or more [examples?]. Funds in the Replacement Reserve account may be withdrawn by Live Nation only ~~upon the~~**after ten (10) day's** prior written

CITY_OF_IRVINE_014295

approval of**notice to** the City Manager~~, which approval may be given or withheld in City Manager's reasonable discretion.~~ **(and if the City Manager reasonably objects to such withdrawal as not complying herewith, the parties shall discuss such objections before any withdrawal).**

10.    Special Rights of City.

10.1    Access by City Personnel.  Officers, employees, agents and other authorized persons of City in the performance of their official duties shall have access to the Facility at all reasonable times.

10.2    City Luxury Box.  City shall have the exclusive right to access and use the City Luxury Box.  Except with respect to its janitorial and maintenance responsibilities, Live Nation shall have no rights to access or use the City Luxury Box, or to allow any third party to access or use the City Luxury Box.

10.3    City Events.  In each year during the Term, City shall have the right to exclusive use, or at its election to permit a City User to use, on an exclusive basis, the Amphitheater, for up to five (5) City Events, pursuant to the following terms and requirements:

a.    City shall notify Live Nation, in writing, not less than ~~thirty~~**forty-five** (~~30~~**45**) days' prior to the date City or a City User (as applicable) desires to use the Amphitheater for a City Event (any such notice, a "**City Event Scheduling Notice**"); provided, however, that City may not schedule a City Event on any date on which, as of the date of the City Event Scheduling Notice, Live Nation has already scheduled a~~n~~ **or is holding, but has not yet booked, an** Event, as reflected in the Live Nation Schedule.  City or a City User (as applicable) shall have the right to place branding, sponsorship and other signage in the Amphitheater in connection with a City Event.  Following the conclusion of either of such events, City or the City User (as applicable) shall remove all such branding, sponsorship and other signage.

b.    Live Nation may require that any City User enter into Live Nation's standard license agreement **substantially in the form of Exhibit "I" attached hereto** prior to holding a City Event; provided, however, that the only payment the City User shall be required to make shall be payment of the City Amphitheater Use Operating ~~Costs~~**Expenses**.  Live Nation further shall have the right to require that a deposit be placed for the estimated City Amphitheater Use Operating Expenses for such event.

c.    In connection with any City Event, the City or City User (as applicable), shall be required to pay to Live Nation the City Amphitheater Use Operating Expenses.

d.    In the event that City or a City User (as applicable) requests that ticket sales for a City Event be managed by Live Nation, Live Nation shall not charge a service or transaction fee in connection with any such ticket sales~~.~~  ~~Further~~ **unless City shall require that Live Nation handle City's ticket sales. Subject to the foregoing**, promptly following such event, Live Nation shall


CITY_OF_IRVINE_014296

**DX-0781.0030**

pay to City or to the City User (as applicable) all gross ticket sales revenue collected by Live Nation in connection with the event.

11. Fees, Taxes and Assessments. During the Agreement Term, Live Nation shall pay all applicable governmental fees, charges and taxes resulting from its operations, management and use of the Facility**; provided, however, City represents and warrants that Live Nation shall be exempt from the payment of real property taxes and assessments, if any for the Site**.

12. Compliance with Laws. Live Nation shall, throughout the Term, comply with all Applicable Law respecting the use or manner of use of the Facility and operation thereof. Without limiting and in addition to the foregoing, Live Nation shall, throughout the Term, comply with City's noise ordinance **[Live Nation needs remedies if City changes ordinance in way that materially impairs our operations - TBD]**, and all conditions and environmental mitigation required pursuant to CEQA, including, without limitation causing any sound and/or noise emanating from the Facility to remain below both (i) the thresholds of significance utilized in the "Addendum to the Heritage Fields Project for a Permanent Amphitheater Within the Great Park (Planning Area 51)" ("**Addendum**"), and (2) the noise levels reflected in Figure 1 of Appendix D of the Addendum. **[Note to City – sound standards under development by City and Live Nation consultants – sound provisions in Section 12 TBD]**Live Nation shall obtain and keep in full force and effect all permits and licenses and other authorizations required for the use and operation of the Facility. Live Nation acknowledges ~~the City may add to or amend~~**that compliance with** the City's noise ordinance~~, which~~ may include dbc specific thresholds, speaker placement requirements, and may require operation controls at the mix board to comply with applicable regulations.

13. Compliance with Applicable Standard. Live Nation shall comply with the Applicable Standard in advertising and promoting events at the Facility and in all other aspects of its management, maintenance and operation of the Facility pursuant to this Agreement. Live Nation agrees that Events booked at the Facility will be of a quality that comparable managers would be willing to book at other similar venues operated by Live Nation or its ~~Affiliates~~**Affiliate Entities** meeting the Applicable Standard. City and Live Nation agree to meet and confer from time to time for purposes of developing and maintaining effective alcohol management and noise and crowd control programs.

14. Payments to City.

14.1 Base Operation Fee. During the Term, subject to abatement as expressly provided in this Agreement, Live Nation shall pay to City an annual base operation fee of Three Million Five Hundred Thousand Dollars ($3,500,000) per year, increasing annually by three percent (3%) (the "**Base Operation Fee**"). The first annual Base Operation Fee shall be due and payable on the Commencement Date, and shall be prorated if the Commencement Date is any date other than January 1. Each subsequent annual Base Operation Fee payment shall be due on January 1st. Live Nation shall receive a credit towards the first **Base** Operation Fee, in the amount of the Live Nation Design Costs, provided that such credit shall not exceed an aggregate of Two Million Dollars ($2,000,000). **[Parties to discuss potential credit for capital expenses by LN needed to operate at Five Point amphitheater]**



CITY_OF_IRVINE_014297

DX-0781.0031

14.2 <u>Ticket Surcharge</u>.  Live Nation shall include a maintenance surcharge on each ticket sold or otherwise issued in connection with an Event (the "Ticket Surcharge").

    a.    The initial amount of the Ticket Surcharge shall be Five Dollars ($5.00). During the Term, the Parties shall mutually agree on increases to the Ticket Surcharge; provided, however, that the Ticket Surcharge shall be increased by not less than ~~ten~~____ percent (~~10~~%) every three (3) years. **[Parties to discuss Ticket Surcharge increases]**

    b.    The Ticket Surcharge shall be split equally between the Parties.  Live Nation's fifty percent (50%) allocation of the Ticket Surcharge shall be deposited and maintained in a separate account~~,~~ and may be utilized by Live Nation only for costs incurred by Live Nation in performing Live Nation's maintenance obligations pursuant to this Agreement.  At Live Nation's election, Live Nation may deposit Live Nation's portion of the Ticket Surcharge into the Reserve Account.  Live Nation shall pay to City City's fifty percent (50%) allocation of the Ticket Surcharge on an annual basis on each January 1 for the immediately prior calendar year~~,~~ and may be utilized by City only for costs incurred by City in performing City's maintenance obligations pursuant to this Agreement, including, without limitation, the City Maintenance Elements.  Notwithstanding the foregoing, however, City shall have the right, in its sole and absolute discretion, to change the payment date for payment to City of City's fifty percent (50%) allocation of the Ticket Surcharge to monthly or quarterly.

14.3 <u>Default Interest</u>.  All payments required of Live Nation hereunder that are not paid within ten (10) days of the date such payment is due shall bear interest from the date due until paid at three percent (3%) over the prime rate described in the Wall Street Journal for the last Business Day of the calendar month immediately preceding the late payment. In no event, however, shall the charges permitted under this section or elsewhere in this Agreement, to the extent they are considered to be interest under law, exceed the maximum lawful rate of interest.

14.4 <u>Payment for Noise Violations</u>.  **[Parties to discuss]**City and Live Nation acknowledge that it is extremely difficult and impractical, if not impossible, to ascertain the amount of damages that would be suffered by City, in the event the Facility is operated **for an Event** in violation of the terms of Section 12 with respect to noise mitigation requirements and noise limitations and restrictions (any such violation, a "**Noise Violation**").  Having made diligent but unsuccessful attempts to ascertain the actual damages City would suffer, in the event of a Noise Violation, City and Live Nation agree that a reasonable estimate of City's damages with respect to the fourth Noise Violation in any Operating Season, is the amount of Ten Thousand Dollars ($10,000), ~~and~~**which amount shall also be payable** for each subsequent Noise Violation during the same Operating Season~~, twice the amount of the amount payable for the immediately prior Noise Violation~~ (the "**Noise Violation Payment Amount**").

Therefore, upon the occurrence of a Noise Violation, Live Nation shall immediately pay to City the Noise Violation Payment Amount.  Live Nation's payment of the

CITY_OF_IRVINE_014298

**DX-0781.0032**

foregoing amounts shall not constitute a "cure" of the applicable violation, and City retains all of its rights and remedies hereunder with respect to such violation.

Following the conclusion of each Operating Season, City and Live Nation shall meet and confer to discuss any Noise Violations and/or noise complaints that occurred during said Operating Season and potential mitigation activities and/or improvements to address the address the same.

15. Waiver of Liability. City assumes no responsibility for any damage or loss of Live Nation's personal property except to the extent directly caused by the gross negligence or willful misconduct of any of City and City Personnel. Live Nation agrees to hold City and City Personnel, and each of them, harmless from any damage or loss of Live Nation's personal property located within the Facility except to the extent directly caused by the gross negligence of willful misconduct of any of City and City Personnel.

16. Insurance.

   16.1 Commercial General Liability Insurance: Prior to, and as a condition to City's delivery to Live Nation of the City Completion Notice, Live Nation shall provide to City proof of commercial general liability insurance coverage for the Amphitheater for the protection of City for risks customarily covered by such insurance (including, but not limited to, coverage for premises/operation, products and completed operations, independent contractors, broad form property damage, liquor legal liability, and personal injury, including coverage for false arrest, false imprisonment, malicious prosecution, libel, slander, defamation and advertising) to the extent caused by Live Nation or its employees, agents, contractors or invitees in an amount not less than Five Million Dollars ($5,000,000) per occurrence and Ten Million Dollars ($10,000,000) aggregate.

   16.2 **[Live Nation to confirm if builder's risk insurance is available for FF&E installation]**Builder's Risk Insurance. Prior to, and as a condition to City's delivery to Live Nation of the City Completion Notice, Live Nation shall procure, and shall maintain until the Commencement Date, All-risk" builder's risk insurance for the full insurable value of the **Live Nation FF&E** work (including all stored material and equipment), as approved by City. This insurance shall include the interests of City and Live Nation (and their respective contractors and subcontractors of any tier to the extent of any insurable interest therein) in the work and shall insure against physical loss or damage including, without duplication of coverage, theft, vandalism and malicious mischief. If any materials or equipment will be stored offsite or will be in transit to the job site and are not covered under said "all-risk" builder's risk insurance, then Live Nation shall effect and maintain similar property insurance on such materials and equipment. Any loss insured under said "all-risk" builder's risk insurance shall be adjusted with City and Live Nation and made payable to City, as trustee for the insured, as their interests may appear

   16.3 Workers" Compensation Insurance. Prior to, and as a condition to City's delivery to Live Nation of the City Completion Notice, Live Nation shall procure and maintain, throughout the Term, workers' compensation insurance providing statutory benefits in compliance with Applicable Law.



CITY_OF_IRVINE_014299

16.4    Employer's Liability Insurance.  Prior to, and as a condition to City's delivery to Live Nation of the City Completion Notice, Live Nation shall procure and maintain, throughout the Term, employer's liability insurance with limits not less than: bodily injury by accident, $1,000,000 each accident; bodily injury by disease, $1,000,000 each employee; and bodily injury by disease, $1,000,000 policy limit.

16.5    **[Live Nation to confirm limits of liability of this coverage]**Automobile Liability Insurance.  Prior to, and as a condition to City's delivery to Live Nation of the City Completion Notice, Live Nation shall procure and maintain, throughout the Term, automobile liability coverage with limits not less than Five Million Dollars ($5,000,000) per occurrence and Five Million Dollars ($5,000,000) aggregate.

16.6    Additional Requirements.  All insurance required by this Section shall comply with the following: All primary coverage shall be written by an insurer that is nationally recognized with a policyholder's rating of at least A-, VIII, as listed from time to time by A.M. Best Insurance Reports. Each policy shall provide that it may not be cancelled, terminated, reduced or materially changed unless at least thirty (30) days prior notice thereof has been provided to City, except in case of cancellation or termination due to lapse for nonpayment, in which case only ten (10) days' notice shall be required. Each policy shall contain mutual waivers of all rights of subrogation for property damage. Each policy covering third-party liability shall contain a "cross-liability" endorsement or a "severability of interest" endorsement providing that coverage, to the maximum amount of the policy, will be available despite any suit between the insured and any additional insured under such policy. The insurance policies shall not in the aggregate have deductibles in excess of $1,500,000.**[LN confirming deductible cap]**

16.7    Certificates and Endorsements.  Except as specifically approved in writing by City, each policy of insurance required to be maintained by Live Nation under this Agreement must be issued by carriers licensed and approved to do business in California, having a general policyholder's rating of not less than "A-" and a financial rating of not less than "~~X~~**VIII**" **[Both per 16.6]** in the most current Best's Key Rating Guide.  Prior to conducting any operations under this Agreement, and at all times during the Term, Live Nation shall provide to City an original certificate(s) of insurance and original endorsements evidencing all insurance required hereunder.  Each certificate or policy of insurance shall indicate that coverage is primary and not contributing with any other insurance maintained by City, includes a Severability-of-Interest or Cross-Liability clause such as "The policy to which this endorsement is attached shall apply separately to each insured against whom a claim is brought, except with respect to the limits of the company's liability," and shall not be cancelled, modified or non-renewed except upon not less than thirty (30) days written notice to City, except for ten (10) days for non-payment of premium. Each policy, certificate and endorsement required hereunder shall be subject to the reasonable approval of City.  Within ten (10) days following insurance renewal, Live Nation shall file with City a signed complete certificate of insurance, with all endorsements provided herein, showing that such insurance coverage has been renewed or extended.

16.8    Property Insurance.  City shall at all times during the Term maintain in force insurance against fire, vandalism, malicious mischief and such other additional



CITY_OF_IRVINE_014300

DX-0781.0034

perils as maybe included in a standard "all risk" form, insuring all buildings and improvements, including without limitation, the Live Nation FF&E, in an amount equal to not less than their replacement cost and with deductibles or self-insured retentions, to the extent they exceed Fifty Thousand Dollars ($50,000), must be reasonably acceptable to City; provided, however, City shall not be required to maintain earthquake insurance.  Notwithstanding the foregoing, however, Live Nation shall be responsible to insure any movable personal property it brings onto the Site.

17.    Representations and Warranties.

17.1    **Live Nation is a subsidiary of a global, publicly-traded live entertainment business and is presently subject to various litigation and other legal proceedings in its ordinary course of business.  All significant pending lawsuits and legal proceedings other than ordinary litigation is disclosed as required in its public filings with the Securities and Exchange Commission. Subject to the foregoing,** Live Nation represents and warrants for itself, its owners and ~~Affiliates~~**Affiliate Entities** that there is no court action, arbitration, administrative proceeding, or to the best of Live Nation's knowledge, threatened court action, arbitration, administrative proceeding, on the date of this Agreement which would materially affect (1) the financial ~~condition~~**solvency** of Live Nation, its owners or ~~Affiliates~~**Affiliate Entities**, or (2) the ability of Live Nation to perform its obligations under this Agreement.

17.2    City represents and warrants that City has no notice or knowledge that any government agency considers the construction, operation or use of the Facility out of compliance with any Applicable Law or that any investigation has been commenced or is contemplated respecting any such possible failure of compliance.

17.3    Each of the Parties hereto represents and warrants that it has full power and authority to enter into this Agreement and to assume and perform all of its obligations under this Agreement, that it has obtained any and all approvals that may be required before it can execute and perform this Agreement, including approvals required by any loan documents, bond authorization, corporate articles and bylaws, city charter or state statute, regulation or court order, and that the persons executing this Agreement on its behalf have been duly authorized and are empowered to bind it to this Agreement, that the execution of this Agreement, and the performance by it of the actions anticipated by this Agreement neither breaches any contract with any third party, or constitutes any event, which, with the passage of time, or the giving of notice, or both, will breach any contract with any third party, and that this Agreement executed by it are or when fully delivered will be duly authorized, executed and delivered by it and will be valid, binding and enforceable obligations of it.

17.4    **City represents, warrants and covenants: (a) the Site is zoned for the uses contemplated by this Agreement, and all mitigation and other discretionary (including sewer) fees have been or will be paid by the City, so as to permit the Facility to be operated as intended by this Agreement without charge to Live Nation for any such fees; (b) this Agreement and the use of the Facility**

CITY_OF_IRVINE_014301

DX-0781.0035

**as permitted herein will not violate any conditions, covenants or restrictions, or other documents of record, affecting the Site; (c) on the Delivery Date, the Site and Facility shall be free and clear in all material respects of any Hazardous Materials, including asbestos, except as otherwise provided herein; (d) the Facility shall be seismically constructed or updated at the City's expense as required by law and/or local ordinance as may be applicable to Live Nation's proposed use, prior to Live Nation's occupancy of the Facility; (e) there are no pending condemnation proceedings, proposed special tax assessments or other adverse conditions relating to the Site; and (f) as of the Effective Date of this Agreement and as of the Delivery Date, the City possesses fee title ownership of the Site and has all requisite rights, title and interest appurtenant to the Site.**

18.    Indemnification.  In addition to any other specific indemnification or defense obligations of Live Nation set forth in this Agreement, Live Nation agrees to indemnify, defend (upon written request by City and with counsel reasonably acceptable to City) and hold harmless City and City Personnel from any and all losses, liabilities, charges, damages, claims, liens, causes of action, awards, judgments, costs and expenses, including, but not limited to reasonable attorney's fees of counsel retained by City, expert fees, and investigation costs, of whatever kind or nature (any of the foregoing, a "**Claim**" and collectively, the "**Claims**"), that are in any manner directly or indirectly caused, occasioned or contributed to in whole or in part, through any act, omission, fault or negligence, whether active or passive, of Live Nation or Live Nation's officers, agents, employees, independent contractors, subcontractors of any tier, or authorized representatives, relating in any manner to this Agreement, Live Nation's entry onto the Site and/or the Facility, Live Nation's operation and management of the Facility, or any authority or obligation exercised or undertaken by Live Nation under this Agreement, except to the extent any such Claims arise from the ~~gross~~ negligence or willful misconduct of any of City and City Personnel. Without limiting the generality of the foregoing, Live Nation's obligation to indemnify City shall include injury or death to any person or persons, damage to any property, regardless of where located, including the property of City, any workers' compensation or prevailing wage determination, claim or suit or any other matter arising from or connected with any goods or materials provided or services or labor performed regarding the Live Nation FF&E or the Site on behalf of Live Nation by any person or entity.

19.    Release.  Live Nation acknowledges, agrees, and represents to City that Live Nation is experienced in the design, development, and operation of amphitheaters similar to the Facility, that the Facility is being designed in consultation and coordination with Live Nation, and that as of Live Nation's entry onto the Site to construct and/or install the Live Nation FF&E, Live Nation has been given an adequate opportunity to review and inspect, and has approved all aspects, of the Site and Facility.  With the exception of the limited representations and warranties of City set forth in Section 8.16 **and 17**, Live Nation shall rely solely and exclusively upon the results of its review and active engagement and participation with City with respect to the design and construction of the Facility, as Live Nation may deem necessary or appropriate.  With the exception of the limited representations and warranties of City set forth in Section 8.16 **and 17**, City makes no representation or warranty to Live Nation relating to the suitability of the Facility for operation by Live Nation.

Live Nation shall accept operational control of the Facility without any liability of City whatsoever with respect to Live Nation's operations of the Facility.  With the exception

CITY_OF_IRVINE_014302

of the limited representations and warranties of City set forth in Section 8.16 **and 17**, Live Nation is accepting operational control of the Facility based on its own knowledge, inspection and investigation of the Facility and not as a result of any representations made by City or any employee, official, consultant or agent of City relating to the condition of the Facility.  With the exception of the limited representations and warranties of City set forth in Section 8.16 **and 17**, City hereby expressly and specifically disclaims any express or implied warranties regarding the Facility.

~~LIVE NATION, ON BEHALF OF ITSELF, ITS SUCCESSORS, AND ASSIGNS, WAIVES AND RELEASES CITY FROM ANY RIGHT OF ACTION THAT MAY BE AVAILABLE TO ANY OF THEM WITH RESPECT TO THE CONDITION OF THE FACILITY.   LIVE NATION ACKNOWLEDGES THE PROTECTIONS OF CIVIL CODE SECTION 1542 RELATIVE TO THE WAIVER AND RELEASE CONTAINED IN THIS SECTION 19, WHICH READS AS FOLLOWS:~~

~~A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.~~

~~BY INITIALING BELOW, LIVE NATION KNOWINGLY AND VOLUNTARILY WAIVES THE PROVISIONS OF SECTION 1542 SOLELY IN CONNECTION WITH THE WAIVERS AND RELEASES OF THIS SECTION 19:~~



~~Live Nation's Initials~~

20.   Damage or Destruction of the Facility.  If (i) the Facility shall be totally or materially destroyed by fire, casualty, or other cause or happening, and either (a) insurance proceeds are unavailable in an amount sufficient to rebuild the Facility, and the Parties do not reach a mutually acceptable solution for rebuilding the Facility (b) insurance proceeds are available in a sufficient amount, but ~~City elects, in its sole and absolute discretion, to not rebuild~~ the Facility~~,~~ **cannot reasonably be rebuilt within a period of twelve (12) months following the destruction,** or (c) insurance proceeds are available in a sufficient amount, but the Facility cannot be rebuilt within a period of _____(__) months following the destruction, or (ii) any lawful authority shall order demolition or removal of any portion of the Facility, so as to render it unfit for use as intended by this Agreement, including, without limitation the Permitted Uses and a sellable capacity of **not less than _____ thousand (     ) [TBD] and not more than** fourteen thousand (14,000), then this Agreement shall terminate as of the date of such destruction and subject to Section 25.15, all of Live Nation's liability hereunder shall cease from and after such date.  If the Facility shall be totally or materially destroyed as described in this paragraph but this Agreement does not terminate, then all payments due hereunder from the date of such destruction to the date the Facility has been rebuilt shall be proportionately abated.

CITY_OF_IRVINE_014303

DX-0781.0037

If the Facility shall be partially destroyed by fire, casualty or other cause or happening, or be declared unsafe by any lawful authority, then it shall promptly be restored or made safe by City, at its sole cost and expense, and a proportional portion of the payments otherwise due from Live Nation to City shall abate until the Facility shall have been restored and put in proper condition for use pursuant to the terms of this Agreement. If the Facility cannot be restored or made safe after partial destruction or declaration of unsafe condition without cancelling or rescheduling more than two (2) years' of booked Events, then Live Nation, at its option, may cancel and terminate this Agreement in its entirety, and subject to Section 25.15, all of Live Nation's liability hereunder shall cease from and after the date of such destruction or declaration of unsafe condition.

21. <u>Eminent Domain</u>. In the event that the Facility or any material part thereof is taken by any governmental or other permitted authority using the power of eminent domain (or any conveyance in lieu thereof is effected) such that performance by either Party under this Agreement is rendered economically infeasible or a Party will be materially prevented from realizing the economic benefit of this Agreement absent such taking, then such Party may terminate this Agreement without further liability to the other Party, subject to Section 25.15. In the event of a taking, City shall receive the entire award or other compensation for (i) the land on which the Facility is situated and (ii) all improvements paid for by City. Live Nation may separately pursue a claim against the condemnor for the value of the Live Nation FF&E, Live Nation's personal property that Live Nation is entitled to remove under this Agreement and such other costs to which Live Nation may be entitled by Applicable Law.

22. <u>Intellectual Property</u>. Live Nation shall require in its contracts with persons holding or promoting events at the Facility that such persons shall obtain all necessary approvals for or arising from the use of patented and/or copyrighted materials, equipment, devices, processes, or dramatic rights used on or incorporated in the conduct of any events which Live Nation books at the Facility. Live Nation shall indemnify and hold City harmless from any breach of patent or copyright rights or patent or copyright infringements or violations of patent or copyright laws except this sentence shall not apply to City Events.

23. <u>Force Majeure</u>. Should any matter or condition beyond the reasonable control of City or Live Nation, such as, but not limited to, war, public emergency or calamity, fire, earthquake, flood, severe weather conditions, Act of God, strikes or labor disturbances, civil disturbances or riots, or any governmental restriction**, mandate, order or other directive** (any of the foregoing, an event of "**Force Majeure**"), prevent or delay performance of this Agreement in accordance with provisions hereof, in whole or in part, after the employment of ~~all~~ reasonably available and economically feasible means to overcome such condition, avoid delay and mitigate the effects thereof, performance of this Agreement by the Party affected thereby shall be suspended or excused to the extent commensurate with such interfering occurrence; provided that the Party availing itself of this section shall notify the other Party within twenty-one (21) days of its actual knowledge of commencement of such occurrence of the event of Force Majeure; and provided further that the time of suspension or excuse shall not extend beyond that reasonably necessitated by the occurrence of the event of Force Majeure. If the Facility is rendered inoperable by a Force Majeure event and such inoperability prevents the holding of Events during ~~an entire~~**any portion of an** Operating Season, then Live Nation's payment obligations to City shall be equitably abated in proportion to ~~Live Nation's documented~~

CITY_OF_IRVINE_014304

DX-0781.0038

~~loss directly attributable to such Force Majeure condition~~**the portion of the Operating Season during which the Facility was inoperable**.

24.    Default and Remedies.

24.1    Event of Default by Live Nation.  The occurrence of any of the following shall constitute an "**Event of Default**" by Live Nation hereunder:

a.    Live Nation fails to pay to City any amounts due hereunder, which failure continues for five (5) days after written notice thereof by City to Live Nation;

b.    the failure of Live Nation to observe or perform any of the covenants, conditions or provisions of this Agreement to be observed or performed by Live Nation, other than as described in any of the other subsections of this Section 24.1, where such failure shall continue for a period of thirty (30) days (unless a different time period is expressly provided for herein) after written notice thereof from City to Live Nation, provided that if the nature of such default is such that the same cannot be reasonably cured within a thirty (30) day period, Live Nation shall not be deemed in default if it diligently commences such cure within such period and thereafter diligently proceeds to rectify and cure such default but in no event shall the cure period exceed sixty (60) days;

c.    the making by Live Nation of any general assignment for the benefit of creditors;

d.    the attachment, execution or other judicial seizure of substantially all of Live Nation's assets located at the Site or of Live Nation's interest in this Agreement;

e.    Live Nation files a voluntary petition in bankruptcy or is adjudicated a bankrupt or insolvent, or files any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future bankruptcy or other similar law, or seeks or consents to or acquiesces in the appointment of any trustee, receiver or liquidator of Manger or of all or any substantial part of Live Nation's property, or makes any general assignment for the benefit of creditors, or admits in writing its inability to pay its debts generally as they become due;

f.    A court of competent jurisdiction enters an order, judgment or decree approving a petition filed against Live Nation seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar. relief under any present or future bankruptcy or other similar law;

g.    Any trustee, receiver or liquidator of Live Nation or of all or any substantial part of Live Nation's property is appointed without the consent or acquiescence of Live Nation; and such order, judgment, decree or appointment remains un-vacated or un-stayed for an aggregate of sixty (60) days (whether consecutive or nonconsecutive);



CITY_OF_IRVINE_014305

h.    Live Nation abandons or, subject to an event of Force Majeure, discontinues conducting its operations at the Facility for a period of thirty (30) days or more; **exclusive of typical seasonal non-operating months for the Facility and closure for completion of alterations and improvements to the Facility; or**

i.    Live Nation sells, transfers, hypothecates, encumbers or assigns its interest in this Agreement, whether voluntarily or involuntarily or by operation of law, in violation of the terms and conditions of this Agreement; ~~or~~**,**

~~j.   Live Nation is convicted of a felony after the Date of Agreement.~~

In addition to all of the other rights and remedies of City, upon the occurrence of an Event of Default City shall have the right to terminate this Agreement by providing a written notice of termination to Live Nation. **[Parties to discuss City remedies for LN default here and in 24.2.  Termination rights and Damage Amount remedy cannot be available to City for any and all defaults e.g. LN is late in payment by more than 5 days, City can terminate with over $20MM invested?]**

24.2   Liquidated Damages to City.

(a)    UPON THE OCCURRENCE, AFTER CITY AWARDS A BID FOR CONSTRUCTION OF THE FACILITY (THE "**BID AWARD DATE**"), OF AN EVENT OF DEFAULT BY LIVE NATION, CITY MAY TERMINATE THIS AGREEMENT WITHOUT ANY LIABILITY OF CITY TO LIVE NATION OR ANY OTHER PERSON ARISING FROM SUCH ACTIONS.  CITY AND LIVE NATION ACKNOWLEDGE THAT IT IS EXTREMELY DIFFICULT AND IMPRACTICAL, IF NOT IMPOSSIBLE, TO ASCERTAIN THE AMOUNT OF DAMAGES THAT WOULD BE SUFFERED BY CITY, IN THE EVENT OF A TERMINATION OF THIS AGREEMENT DUE TO THE OCCURRENCE, AFTER THE BID AWARD DATE, OF AN EVENT OF DEFAULT BY LIVE NATION UNDER THIS AGREEMENT.  HAVING MADE DILIGENT BUT UNSUCCESSFUL ATTEMPTS TO ASCERTAIN THE ACTUAL DAMAGES CITY WOULD SUFFER, IN THE EVENT OF A TERMINATION OF THIS AGREEMENT DUE TO THE OCCURRENCE, AFTER THE BID AWARD DATE, OF AN EVENT OF DEFAULT BY LIVE NATION, CITY AND LIVE NATION AGREE THAT A REASONABLE ESTIMATE OF CITY'S DAMAGES IN SUCH EVENT IS THE AMOUNT SET FORTH IN EXHIBIT "G" (WITH THE APPLICABLE AMOUNT AS SET FORTH IN EXHIBIT "G" REFERRED TO HEREINAFTER AS THE "**DAMAGE AMOUNT**").  THEREFORE, UPON THE TERMINATION OF THIS AGREEMENT BY CITY DUE TO THE OCCURRENCE, AFTER THE BID AWARD DATE, OF AN EVENT OF DEFAULT BY LIVE NATION, LIVE NATION SHALL IMMEDIATELY PAY TO CITY THE DAMAGE AMOUNT. RECEIPT OF THE DAMAGE AMOUNT SHALL BE CITY'S SOLE AND EXCLUSIVE DAMAGES REMEDY UPON THE OCCURRENCE, AFTER THE BID AWARD DATE, OF AN EVENT OF DEFAULT.



-32-

CITY_OF_IRVINE_014306

(b)    CITY ACKNOWLEDGES THE PROTECTIONS OF CIVIL CODE SECTION 1542 RELATIVE TO THE WAIVER AND RELEASE CONTAINED IN THIS SECTION 24.2, WHICH CIVIL CODE SECTION READS AS FOLLOWS:

A general release does not extend to claims which the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

(c)    BY INITIALING BELOW, CITY KNOWINGLY AND VOLUNTARILY WAIVES THE PROVISIONS OF SECTION 1542 SOLELY IN CONNECTION WITH THE WAIVERS AND RELEASES OF THIS SECTION 24.2:

_____

CITY'S INITIALS

24.3    <u>City Default</u>.  City shall be in default of this Agreement if City fails to perform one or more of its obligations hereunder and such failure continues for more than thirty (30) days after written notice thereof from Live Nation; provided that if the nature of City's default is such that more than thirty (30) days are reasonably necessary to cure, City shall not be in default if City commences to cure within the thirty (30) day period and thereafter diligently proceeds to complete such cure. Upon City's default, Live Nation shall have the right to:

a.    Cure City's default with the actual and reasonable cost thereof to be reimbursed by City within thirty (30) days of the receipt of an invoice and, failing such timely reimbursement, to offset the cost against payments next coming due from Live Nation to City; or

b.    Terminate this Agreement by providing a written notice of termination to City.

c.    Bring a legal action pursuant to Section 24.4 below.

24.4    <u>Legal Actions</u>.  In addition to any other rights or remedies and subject to the restrictions set forth in this Agreement, either Party may institute an action at law or equity to seek specific performance of the terms of this Agreement or to cure, correct or remedy any default, to recover damages for any default (subject to the restriction on Live Nation's rights to recover monetary damages against City set forth in the final clause of this sentence), or to obtain any other remedy consistent with the purpose of this Agreement; provided, however, that notwithstanding anything in the foregoing to the contrary, **(i)** in no event shall Live Nation be entitled to obtain ~~monetary~~**consequential** damages of any kind from City, including but not limited to damages for economic loss, lost profits, or any other economic or consequential damages of any kind**, and (ii) in no event shall City be entitled to damages for economic loss, lost profits, or any other economic or consequential damages of any kind**.

CITY_OF_IRVINE_014307

24.5 <u>Governing Law; Venue.</u>  The laws of the State of California shall govern the interpretation and enforcement of this Agreement without regard to conflict of law principles.  All legal actions must be instituted and maintained in the Superior Court of the County of Orange, State of California, in any other appropriate court in that county, or in the Federal District Court in the Central District of California.

24.6 <u>Rights and Remedies are Cumulative</u>.  Except as otherwise expressly stated in this Agreement, the rights and remedies of the Parties are cumulative and the exercise by either Party of one or more of such rights or remedies shall not preclude the exercise by it, at the same or different times, of any other rights or remedies for the same default or any other default by the other Party.

24.7 <u>Attorneys' Fees</u>.  If either Party to this Agreement is required to initiate or defend litigation in any way connected with this Agreement, the prevailing Party in such litigation, in addition to any other relief which may be granted, whether legal or equitable, shall be entitled to reasonable attorneys' fees.  If either Party to this Agreement is required to initiate or defend litigation with a third party because of the violation of any term or provision of this Agreement by the other Party, then the Party so litigating shall be entitled to reasonable attorneys' fees from the other Party to this Agreement.  Attorneys' fees shall include attorney's fees on any appeal, and in addition a Party entitled to attorney's fees shall be entitled to all other reasonable costs for investigating such action, retaining expert witnesses, taking depositions and discovery, and all other necessary costs incurred with respect to such litigation.  All such fees shall be deemed to have accrued on commencement of such action and shall be enforceable whether or not such action is prosecuted to judgment.

24.8 <u>Procedure After Termination</u>.  Upon expiration or termination of this Agreement, Live Nation shall promptly surrender and deliver to City the Facility and all other property which it is required to deliver to City in the condition existing at the Commencement Date, normal wear and tear and casualty excepted.  In the event of termination of this Agreement, Live Nation shall cooperate and coordinate with City and any new manager designated by City in order to assure an orderly transition of Live Nation's responsibilities hereunder.

25. <u>Miscellaneous</u>.

25.1 <u>Assignment</u>.  This Agreement may not be assigned, in whole or in part, by either Party without the written consent of the other Party, such consent not to be unreasonably withheld or delayed.    To be a valid assignment under this Agreement, any assignee must succeed to all of the rights and interests and assume all of the liabilities and obligations (including, without limitation, all operating losses) of the assignor under this. Agreement, and the assignee must agree to cure any prior default of this Agreement committed by the assignor, all in writing to the reasonable satisfaction of the non-assigning Party.  Notwithstanding anything herein to the contrary, the sale of the stock of Live Nation Worldwide, Inc., or the sale of the stock of the direct or indirect parent of Live Nation Worldwide, Inc., shall not constitute an assignment of this Agreement.  No agreement that Live Nation is authorized or empowered to enter into under this Agreement, including, without limitation, any concessionaire agreement, ticketing agreement, sponsorship agreement or service agreement, shall be an assignment of this



CITY_OF_IRVINE_014308

DX-0781.0042

Agreement or a default under this paragraph.  **Notwithstanding anything contained herein to the contrary, Live Nation shall have the right, without City's consent, to assign its rights, duties and obligations under this Agreement to any Live Nation Affiliate Entity, or to any entity determined by Live Nation to be necessary or desirable in connection with obtaining liquor licenses for the Facility (including, without limitation, to an unaffiliated non-profit corporation), or to any entity resulting from a consolidation, reorganization or merger or to a corporation acquiring all or substantially all of the assets of Live Nation, but Live Nation shall not be released after such assignment unless the assignee has a net worth in excess of _____ Million Dollars ($_____).**

25.2    <u>Merger, Integration and Amendment</u>.  Except as otherwise expressly stated or referenced herein, this Agreement is the entire integrated agreement of the Parties.  No other agreement, oral or written, prior or contemporaneous, except the Agreement, shall be deemed to exist between the Parties.  No subsequent agreement or any amendment of this Agreement shall be binding upon the Parties unless it is contained in a written document executed by properly authorized representatives of each Party.

25.3    <u>Approvals; Waiver</u>.  Except as otherwise expressly provided, whenever provision of this Agreement requires a review, determination or approval of a Party, such review, determination and approval (or notice of disapproval) shall be in writing and shall not be unreasonably withheld or delayed (except where such review, determination or approval is expressly made subject to the sole discretion or determination of a Party), and shall in any event be made within any time limit specified therefore or within thirty (30) days if no time limit is specified.  No consent or waiver, express or implied, by either Party to or of any breach of any covenant, condition or duty of the other, shall be construed as consent to or a waiver of any other breach of the same, or any other covenant, condition or duty.  No approval or review by City hereunder, or any right of approval or review by City, as to any matter or under any circumstances shall be deemed to constitute Live Nation as an agent for or acting on behalf of City.

25.4    <u>Notices, Demands, and Communications Between the Parties</u>.  Formal notices, demands, and communications between City and Live Nation shall be given either by (a) personal service, (b) delivery by reputable document delivery service such as Federal Express that provides a receipt showing date and time of delivery, (c) mailing in the United States mail, certified or first class mail, postage prepaid, or (d) e-mail, addressed to:

**To Live Nation:**

Live Nation Worldwide, Inc
9348          Civic          Center          Drive
Beverly          Hills,          California          90210
Attn: Bret Gallagher

And to:



CITY_OF_IRVINE_014309

DX-0781.0043

Live Nation Worldwide, Inc.
325      N.      Maple      Drive,      2nd      Floor
Beverly Hills, California 90210
Attn: CFO and Chief Counsel – Concerts

and to

Cox Castle & Nicholson, LLP
3121 Michelson Drive, Suite 200
Irvine, California 92612
Attn: David W. Wensley; Sean Matsler

**To**                                                      **City:**

City                    of                    Irvine
1          Civic                Center          Plaza
Irvine,              California              92606
Attn.:  City Manager

and                                                          to:

City                    of                    Irvine
1          Civic                Center          Plaza
Irvine,              California              92606
Attn.:                Great          Park      Director

and to:

City                    of                    Irvine
1          Civic                Center          Plaza
Irvine,              CA                    92606
Attn.:  City Attorney

Notices personally delivered or delivered by document delivery service shall be deemed effective upon receipt.  Notices mailed shall be deemed effective on the second Business Day following deposit in the United States mail.  Such written notices, demands, and communications shall be sent in the same manner to such other addresses as either Party may from time to time designate in writing

25.5    Non-liability of City Officials and Employees.  No member, official, employee, or contractor of City shall be personally liable to Live Nation in the event of any default or breach by City or for any amount which may become due to Live Nation or on any obligations under this Agreement.

25.6    Binding on Heirs.  This Agreement shall be binding upon the Parties hereto and their respective representatives, transferees, successors, and assigns; provided, however, that nothing in this Section is intended to modify or restrict the scope of the provisions set forth in Section 25.1.

25.7    Third Party Beneficiaries.  Except as expressly provided herein as to City and City Personnel, each of which is an intended third party beneficiary with the right, but



CITY_OF_IRVINE_014310

DX-0781.0044

not the obligation, to enforce the terms hereof, this Agreement shall not confer any rights or benefits on any third party.

25.8 Time of the Essence. Time is of the essence of this Agreement.

**25.8   Omitted. [Agreement has many ministerial time frames that should not be deemed material breaches due to this provision]**

25.9   <u>City Acting as Owner of Real Property</u>. Live Nation understands and agrees that City is entering into this Agreement in its proprietary capacity, as the holder of fee title to the Site, and not in its capacity as a regulatory agency of City. By entering into this Agreement, City is in no way modifying Live Nation's obligations to cause the Facility to be operated and managed in accordance with all Applicable Law, as provided herein.

25.10   Additional Documents. Each of the Parties to this Agreement, without further consideration, shall execute and deliver such additional documents and shall take other actions as may be reasonably required in order to fully effectuate all of the terms and provision of this Agreement.

25.11   Entire Agreement, Waivers, and Amendments. This Agreement incorporates all of the terms and conditions mentioned herein, or incidental hereto, and supersedes all negotiations and previous agreements between the Parties with respect to all or part of the subject matter hereof. All waivers of the provisions of this Agreement must be in writing and signed by the appropriate authorities of the Party to be charged. A waiver of the breach of the covenants, conditions or obligations under this Agreement by either Party shall not be construed as a waiver of any succeeding breach of the same or other covenants, conditions or obligations of this Agreement. Any amendment or modification to this Agreement must be in writing and executed by the appropriate authorities of City and Live Nation.

25.12   Interpretation. The terms of this Agreement shall be construed in accordance with the meaning of the language used and shall not be construed for or against either Party by reason of the authorship of this Agreement or any other rule of construction which might otherwise apply. The section headings are for purposes of convenience only, and shall not be construed to limit or extend the meaning of this Agreement. All references to the term "days" in this Agreement shall mean calendar days unless otherwise specifically indicated.

25.13   Severability. If any term, provision, covenant, or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remainder of this Agreement shall not be affected thereby to the extent such remaining provisions are not rendered impractical to perform taking into consideration the purposes of this Agreement.

25.14   Administration of Agreement. City shall maintain authority of this Agreement and the authority to implement this Agreement through its City Manager (or his or her duly authorized representative). The City Manager shall have the authority to make approvals, issue interpretations, execute documents, waive provisions, and/or enter into certain amendments of this Agreement on behalf of City so long as such actions do not materially or substantially change the uses or development



-37-

CITY_OF_IRVINE_014311

permitted on the Site or materially add to the costs incurred or to be incurred by City as specified herein. Such approvals, interpretations, waivers and/or amendments may include extensions of time to perform.

25.15   Termination. No termination of this Agreement shall release any Party in default and this Agreement shall survive for purposes of allowing a Party to enforce its rights and remedies under this Agreement in the event of a default, including, without limitation, the provisions of Section 24.1. All indemnification provisions shall survive the termination of this Agreement.

25.16   Authority to Execute. The person(s) executing this Agreement on behalf of the Parties hereto warrant that (a) such Party is duly organized and existing, (b) they are duly authorized to execute and deliver this Agreement on behalf of said Party, and (c) by so executing this Agreement, such Party is formally bound to the provisions of this Agreement.

25.17   Execution in Counterpart. This Agreement may be executed in several counterparts, and all so executed shall constitute one agreement binding on both Parties hereto, notwithstanding that both Parties are not signatories to the original or the same counterpart. Delivery of an executed counterpart of a signature page to this Agreement by e-mail, DocuSign or similar digital method shall be as effective as delivery of a "wet" manually executed counterpart of this Agreement.

25.18   No Joint Venture. It is understood that this Agreement is a contract that has been negotiated and voluntarily entered into by City and Live Nation and that Live Nation is an independent contractor and not an agent of the City. City and Live Nation hereby renounce the existence of any form of joint venture or partnership between them, and agree that nothing contained herein or in any document executed in connection herewith shall be construed as making City, on one hand, and Live Nation, its owners or Affiliates **or Affiliate Entities**, on the other hand, as joint venturers or partners. Live Nation is an independent contractor with the rights and obligations provided in this Agreement. The Parties acknowledge that City negotiated and executed this Contract for Live Nation's management skills.

25.19   Facility Not To Be Used As Security. Live Nation shall not pledge or permit the Facility to be used as security for any loan or obligation of Live Nation and shall not permit the filing of any lien against the Facility property on account of any work performed by or for Live Nation or any contract to which Live Nation is a party. In the event a lien is filed against the Facility or any part thereof relating to any agreement made by Live Nation, Live Nation shall promptly cause such lien to be removed by filing an appropriate bond. Notwithstanding the foregoing, City shall have the right to pledge or permit the Site or Facility to be used as security for any loan or obligation of City without the prior consent of Live Nation, provided any such action does not affect the operations of the Facility pursuant to this Agreement. **and provided City obtains for the benefit of Live Nation a commercially reasonable non-disturbance agreement satisfactory to Live Nation which provides that Live Nation's rights under this Agreement will not be disturbed by any foreclosure or other realization upon such security. Live Nation shall at all times and from time to time have the right to encumber by mortgage, deed of trust, or security agreement ("Mortgage") Live Nation's interests under this Agreement, together with** *the Live Nation FF&E,* **fixtures,**


CITY_OF_IRVINE_014312

**equipment and personalty situated at the Facility and all rents, issues, profits, revenues, and other income to be derived by Live Nation from all of the foregoing, to secure such loans from time to time made by any person, firm or corporation to Live Nation; provided, however, that no such Mortgage shall in any event encumber City's fee title and interest in and to the Site and the Facility.**

25.20 Telecommunications Structures. Nothing in this Agreement, other than the conditions of this section, shall be construed to limit City from entering into any lease or other agreement with third parties for uses of the Facility for the installation of telecommunication structures, including cellular towers or antenna or emergency radio towers or antenna, where such towers or antennas do not interfere with Live Nation's use of the Facility.

25.21 No Alterations to Facility Without Live Nation Consent. Following City's completion of construction of the Facility, City agrees that it shall not make or allow the making of any alteration or improvement to the Facility without Live Nation's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

**25.22 Estoppel Certificates. Within twenty (20) days after written request from either Party in connection with a sale, financing, assignment or other transfer of such party's interest in this Agreement, the non-requesting Party shall execute and deliver to the requesting Party or its designee (and the requesting Party and each designee may rely thereon) an estoppel certificate substantially in the form attached hereto as Exhibit __ certifying (a) that this Agreement is unmodified (except for any amendments or modifications specifically stated) and in full force and effect (as modified or amended, if at all), (b) the date through which the Base Operation Fee has been paid by Live Nation, (c) acknowledging that there are not, to such Party's knowledge, any uncured defaults on the part of the other Party hereunder or specifying such defaults if any are claimed, and (d) the Commencement Date and the expiration date of the Term.**

**25.23 Non-Disclosure. City and Live Nation agree that the terms of this Agreement are confidential and constitute proprietary information of the parties hereto. Each of the parties hereto agrees that such party, and its respective partners, officers, directors, employees, agents and attorneys, shall not disclose the terms and conditions of this Lease to any other person without the prior written consent of the other party hereto except pursuant to an order of a court of competent jurisdiction; provided, however, that each party may disclose the terms hereof to its lenders or prospective lenders or its accountants who audit its financial statements or prepare its tax returns, to any prospective transferee of all or any portions of its interests hereunder, to any governmental entity agency or person to whom disclosure is required by applicable law or regulation and to its attorneys, including without limitation in connection with any action brought to enforce the terms of this Lease, on account of the breach or alleged breach hereof or to seek a judicial determination of the rights or obligations of the parties hereunder.**

**25.24 Press Releases. [Parties to discuss coordination of press releases]**


CITY_OF_IRVINE_014313

**25.25**  **Recordation of Memorandum of Agreement.  This Agreement shall not be recorded by either Party.  At Live Nation's request, City shall execute, acknowledge and delivery to Live Nation a memorandum of this Agreement in recordable form which Live Nation shall be authorized to record in the Official Records of Orange County, California.**

Signatures on following page.

CITY_OF_IRVINE_014314

DX-0781.0048

IN WITNESS WHEREOF, City and Live Nation have executed this Agreement as of the date first written above.

**CITY:**

**CITY OF IRVINE,**
a California municipal corporation and charter city

By:     _____
              Oliver C. Chi, City Manager

ATTEST:

_____
Carl Petersen, City Clerk

APPROVED AS TO FORM:
RUTAN & TUCKER, LLP

_____
Jeffrey T. Melching, City Attorney

**LIVE NATION:**

**LIVE NATION WORLDWIDE, INC.,** a Delaware corporation

By:  _____
Its:  _____

By:  _____
Its:  _____

-41-

CITY_OF_IRVINE_014315

DX-0781.0049

**EXHIBIT "A"**

**DEPICTION OF GREAT PARK**



882/048170-0002
18109497.6 a12/09/22a02/13/23

**EXHIBIT "A"**

CITY_OF_IRVINE_014316

DX-0781.0050

**EXHIBIT "B"**

**LEGAL DESCRIPTION AND DEPICTION OF SITE**

**[Exhibit to depict Site and off-site parking and other elements to be completed by City as part of Facility construction and critical off-site infrastructure]**

[To be inserted prior to execution]



**EXHIBIT "B"**

CITY_OF_IRVINE_014317

**DX-0781.0051**

# EXHIBIT "C"

## PRELIMINARY FACILITY DESIGN



EXHIBIT "C"

CITY_OF_IRVINE_014318

EXHIBIT "D"

**CITY MAINTENANCE ELEMENTS**

[~~To~~ **City to provide and to** be inserted prior to execution]



CITY_OF_IRVINE_014319

DX-0781.0053

**EXHIBIT "E"**

**SCHEDULE OF PERFORMANCE**

**[LN design team working on design and estimating for this Schedule]**

| Task | Time for Performance |
|---|---|
| Live Nation to submit SD to City | |
| Live Nation to submit comprehensive construction cost estimates | |
| City to provide comments to SD to Live Nation | |
| Live Nation to revise SD as necessary to obtain City approval | |
| Live Nation to submit 50% CD to City | |
| Live Nation to submit comprehensive construction cost estimates and **City to obtain** constructability review **if desired** | |
| City to provide comments to 50% CD to Live Nation, and Parties meet and confer if necessary | |
| Live Nation to revise 50% CD as necessary to obtain City approval | |
| Live Nation to submit 100% CD to City | |
| City to prepare construction cost estimate | |
| City to provide comments to 100% CD to Live Nation, and Parties meet and confer if necessary | |
| Live Nation to revise 100% CD as necessary to obtain City approval | |
| City commence public bidding | |
| City award construction contract | |
| City commences construction of Facility | |
| City provides City Completion Notice to Live Nation | |



**EXHIBIT "E"**

CITY_OF_IRVINE_014320

**DX-0781.0054**

| Task | Time for Performance |
|---|---|
| Live Nation commences installation and/or construction of Live Nation FF&E | |
| Live Nation completes installation and/or construction of Live Nation FF&E | |
| Live Nation commences operations at Facility | |

892/048170/0993
18109497.6 s12/09/22 a02/13/23

CITY_OF_IRVINE_014321

**DX-0781.0055**

**EXHIBIT "F"**

**LIVE NATION MAINTENANCE ELEMENTS**

[To be inserted prior to execution]

Below is an outline for reference that will be used by Live Nation maintenance staff and vendors to maintain the Facility.

**LIGHTING AND ELECTRICAL**

January / May – Maintenance staff does the following:
Test and log results of all lighting and electrical receptacle fixtures such as:

- Seating lighting.
- Emergency lighting.
- Walkway lighting and receptacles.
- Office, building and storage room lighting and receptacles.
- Tower lighting.
- Pole lighting.
- Sign lighting.
- Do minor repairs and improvements if necessary and log procedure.
- Order supplies and maintain proper inventories.
- Change lamps on all non-working light fixtures and log activity.
- Test all electrical panels, and log all deficiencies.
- Test emergency generator and log results.
- Prepares bid specifications for major repair work if necessary. Standard bid procedure is:
  - Send out bid specification to contractors.
  - Meet with electrical contractors to review bid specifications.
  - Receive bid responses, and select contractor to perform work in conjunction with the General Manager.
  - Electrical contractor repairs all non-working light fixtures, electrical wiring, and receptacles.
  - Maintenance staff checks and logs repair work, notes any deficiency, and calls back contractor to complete work if necessary.

**May / October**

- Relevant above steps repeated on or near the 1st of the month and immediately following a reported outage or noted deficiency.
- Temporary lighting added as necessary by Director of Maintenance.

**October / December**

- Non-HVAC and unnecessary electrical panels turned off for winter.
- Repairs and improvements made to deficient electrical systems by maintenance staff or electrical contractor if necessary.



**EXHIBIT "F"**

CITY_OF_IRVINE_014322

**PLUMBING**

**January / May – Maintenance staff performs:**

- Minor repairs and improvements.
- Turns on water throughout facility, and repairs al leaks.
- Perform tests and logs all office, building and walkway plumbing fixtures, boilers and pumps.
- Logs all non-working plumbing fixtures.
- Orders and logs all supplies.
- Performs limited repairs on non-working plumbing fixtures and logs such.
- Prepares bid specifications for repair work and follows same bid procedure if necessary.
- Checks and logs repair work, logs any deficiency, and contractor called back to complete work if necessary.
- Replenishes fuel for boilers.

**May / October**

- Steps above repeated on or near the 4th of the month or immediately following reported outage or noted deficiency.
- Maintenance staff monitors fuel level on boilers, and replenishes as needed.

**October / December**

- Turn off and flush water lines.
- Repairs or improvements made to deficient plumbing systems by maintenance staff or plumbing contractor.

**FIRE PROTECTION**

**January / May – Maintenance staff to perform:**

- Minor repairs and improvements.
- Replace all fire hoses and verify that fire extinguishers are in the proper locations and in proper working order and log such.
- Fire protection services and inspects all fire extinguishers and hoses.
- Maintenance staff checks and logs all fire extinguishers and water hoses for inspection tags and proper working conditions, deficiencies are noted, and contractor called back to complete work if necessary.

**May / October**

- Appropriate steps above are repeated based on conditions on or near the 8th of every month.

**October / December**

- Fire hoses are put away for winter.
- Contractor or maintenance staff does repair and improvement work where necessary.

**EXHIBIT "E"**

-2-

CITY_OF_IRVINE_014323

**DX-0781.0057**

**SEATING**

**January / May – Maintenance staff to perform:**

- Minor repairs and improvements.
- Test and log condition of all seat bottoms, backs, cupholders, and seat frames.
- Repairs seats and orders new ones if needed then logs seat parts.

**May / October**

- Repeat above steps on or near the 12th of each month and immediately following reported deficiency.

**October / December**

- Inventory remaining seat parts.
- Order new seat parts
- Repair and improvements done by maintenance staff or contractor if necessary.

**CONCRETE AND MASONRY**

**January / May – Maintenance staff to perform:**

- Review of all concrete and masonry structures for their current condition and log such.
- Identify all concrete and masonry deficiencies.
- Minor repairs and improvements where necessary.
- Bid procedure commences if necessary.
- Mason and concrete contractors make repairs to deficient structures.
- Maintenance staff checks and logs repair work, notes any deficiency, and calls back contractor to complete work if necessary.

**May / October**

- Repeat steps above on or near the 15th of each month or immediately following deficiency report.

**October / December**

- Repairs and improvements done by maintenance staff or contractor if necessary.

**ELEVATORS**

**January / May –Maintenance staff mainly oversees elevator contractor:**

- Elevator contractor unwraps freight elevator motors, and puts freight elevator cars back in service.



**EXHIBIT "E"**

-3-

CITY_OF_IRVINE_014324

- **Elevator contractor takes passenger elevator cars off Sabbath schedule and puts on normal service.**
- **Elevator contractor conducts first month's preventative maintenance on all elevators and identifies any needed major or minor repairs.**
- **Minor repairs and improvements done by maintenance staff if required. Contractor performs major repair work.**
- **Maintenance staff performs tests and logs on elevators, notes deficiencies, calls back contractor to make repairs if necessary.**

### May / October

- **Elevator contractor performs monthly preventative maintenance on all elevators.**
- **Maintenance staff performs and logs limited maintenance (sweeping tracks on each level), and tests elevators on the 20th of each month, notes deficiencies, and calls contractor for repairs if necessary.**

### October / December

- **Elevator contractor sends freight elevator cars to top floor, turns off elevators, and wraps freight elevator motors and controls.**
- **Elevator contractor places passenger cars in Sabbath schedule mode.**
- **Maintenance staff reviews and logs elevator contractor's work, notes any deficiencies, calls contractor back if necessary to complete work.**
- **Repairs and improvements are done if necessary by maintenance staff or contractor.**

## ROOFING

### January / May – Maintenance staff to perform:

- **Reviews and logs all roofing systems, and notes deficiencies.**
- **Performs limited maintenance (caulking seams).**
- **Does bid procedure and hires contractor if necessary.**
- **Major repairs and improvements completed by contractor.**
- **Maintenance staff reviews repair work, notes deficiencies, and calls back contractor if necessary.**

### May / October

- **Maintenance staff repeats steps above on or near the 24th of each month and immediately following a reported deficiency.**

### October / December

- **Large repairs and improvements performed by contractor if necessary.**

## FLOORING

### January / May – Maintenance staff to perform:



**EXHIBIT "E"**

-4-

CITY_OF_IRVINE_014325

- **Reviews and logs condition of all flooring systems, and notes deficiencies.**
- **Performs limited maintenance (caulking seams).**
- **Prepares bid specifications and completes bid process if necessary.**
- **Major repairs and improvements done by flooring contractor.**
- **Maintenance staff reviews repair work, notes deficiencies, and calls back contractor if necessary.**

**May / October**

- **Maintenance staff repeats steps above on or near the 26th of each month and immediately following a reported deficiency.**

**October / December**

- **Large repairs and improvements performed by contractor.**

**PAINTING**

**January / May – Maintenance staff to perform:**

- **Reviews and logs the conditions of all exposed steel systems and building surfaces, and notes deficiencies.**
- **Performs limited painting repairs (interior buildings).**
- **Prepares bid specifications and completes bid process if necessary.**
- **Contractor performs repairs.**
- **Maintenance staff reviews repair work, notes deficiencies, and calls back contractor if necessary.**

**May / October**

- **Maintenance staff repeats steps above on or near the 28th of each month and immediately following a reported deficiency.**

**October / December**

- **Large repairs and improvements performed by contractor.**

**PAINTING**

**January / May – Maintenance staff to perform:**

- **Reviews and logs the conditions of all exposed steel systems and building surfaces, and notes deficiencies.**
- **Performs limited painting repairs (interior buildings).**
- **Prepares bid specifications and completes bid process if necessary.**
- **Contractor performs repairs.**
- **Maintenance staff reviews repair work, notes deficiencies, and calls back contractor if necessary.**

**May / October**



**EXHIBIT "E"**

-5-

CITY_OF_IRVINE_014326

- Maintenance staff repeats steps above on or near the 28th of each month and immediately following a reported deficiency.

**October / December**

- Large repairs and improvements performed by contractor.

## HVAC

**January / May – Maintenance staff to perform:**

- Reviews and logs condition of all HVAC systems, and notes deficiencies.
- Perform limited maintenance (changing filters and adjusting thermostats).
- Remove portable heaters when necessary.
- Installs window air conditioning units when necessary.
- Prepares bid specifications and completes bid process.
- HVAC contractor performs repairs, and performs preseason preventative maintenance on large air conditioning unit in elevator computer room.
- Maintenance staff reviews repair work, notes deficiencies, and calls back contractor if necessary.

**May / October**

- Maintenance staff repeats steps above on or near the 30th of each month and immediately following a reported deficiency.

**October / December**

- HVAC contractor prepares heaters for winter.
- Maintenance staff installs temporary heating units in appropriate locations.
- Contractor completes large repairs and improvements.

The procedures outlined above reflect a lot of redundancy and that is by design. It is important to have repetitive procedures in place that staff routinely follow to ensure all the details are covered and the facility is kept in top condition.

In addition to regular year-round maintenance of the Jones Beach Theater, there will be an in-dept procedure of de-winterization and winterization of all the facilities every year. This process is again done throughout our system and we have a high level of expertise gained from the past that can be transferred over to Jones Beach.

Again, the key will be to have systematic, efficient procedures established and in place for the people who will be performing the work. A grid similar to the one attached (Exhibit B) will be developed and implemented immediately once it becomes our responsibility to maintain the facility. The following is an outline to be used as reference for developing detailed procedures.

## WINTERIZATION

**Production**



**EXHIBIT "E"**

-6-

CITY_OF_IRVINE_014327

The production of winterization takes place immediately following the last concert. The complete process should take three days. The following items are to be completed:

**EXHIBIT "E"**
-7-

CITY_OF_IRVINE_014328

**DX-0781.0062**

**Main Stage, Mix position and second stage tear down and storage**

**The Main Stage, Mix position and second stage scrims and canopies are taken off their steel frames. The scrims and canopies are folded and stored in a dry place. Any hardware is marked and stored. The frames are secured and anchored for the winter. Any steel defects are noted and replaced.**

**Electrical system tear down and storage**

**The temporary electrical control system (chain motors) for the Main Stage is disconnected, dismantled and stored for the winter. All temporary stage and loud-out area lighting is disconnected, dismantled and stored for the winter. Defective equipment and supplies are noted.**

**Video tear down and storage**

**The video projectors are removed from their housing, cleaned and stored in a temperature-controlled environment for the winter. The sponsor scrims above and below the video screens are dismantled and secured with steel cables for the winter. Video screens are lowered and left for the winter. Video camera and mixing gear are removed from the venue by the vendor. Climate resistant video housing is secured and covered.**

**Audio tear down and storage**

**All Main Stage, balcony reinforcement, and second stage audio gear is dismantled, cable coiled, and removed, stored, and serviced by the vendor.**

**Spot light tear down and storage**

**The Spotlights are crated, stands dismantled, and power supplies are disconnected. All are removed from the spot gallery and sent to vendor for testing, repair, and storage.**

**Dressing room and stage furniture storage**

**Dressing room furniture is stacked, covered, and stored. All loose furniture and garbage receptacles are stacked and stored.**

**Plumbing tear down**

**Plumbing contractor flushes out water lines and treats plumbing fixtures for winter.**

**Miscellaneous**

**Any miscellaneous activities are completed: air conditioner removed from windows, windows boarded up, folding chairs dismantled and stored, and VIP padded seats covered with plastic. Backstage areas and restrooms are thoroughly cleaned. Towels cleaned and stored. Forklifts and gas tanks are picked up by the vendor and removed from venue.**



**EXHIBIT "E"**

-8-

CITY_OF_IRVINE_014329

862/048170/0982
18109497 6 a12/09/22a02/13/23

**EXHIBIT "E"**
-9-

CITY_OF_IRVINE_014330

DX-0781.0064

**Front of house**

**The Front of House winterization procedures begins during the production winterization and extends for about three weeks thereafter.**

**Television monitor teardown and storage**

**All television monitors are removed from the suites and concession stand areas, boxed, and stored for the winter.**

**Tent and party furniture tear down and storage**

**Tents are dismantled and removed by the contractor. All party furniture is cleaned, stacked, and stored for the winter.**

**Event equipment and sign tear down and storage**

**Event equipment, tables, chairs, garbage receptacles, benches, bike racks are stacked and stored for the winter. All signs and banners are removed, cleaned, and stored. Sign contractor dismantles and removes large signs.**

**Sponsor equipment and tear down**

**Sponsor equipment and cars are removed from venue or stored for the winter. Suites are cleaned and refrigerators turned off.**

**Box Office tear down and storage**

**Box Office dismantles and boxes equipment and supplies for winter. Ticketmaster dismantles and removes their equipment for winter.**

**Elevator tear down**

**Elevator contractor raises freight elevator cars to top level, turns off cars, and wraps motor electrical switchgear for winter. Elevator contractor set Sabbath schedule on passenger elevators for winter.**

**Plumbing tear down**

**Plumbing contractor shuts off water source, flushes lines and treats plumbing fixtures.**

**Concessions & Merchandise**

**Merchandise, food and beverage subcontractors remove equipment from concourse areas and store for winter. Buildings are cleaned. Awning canvas front cover removed and stored.**



**EXHIBIT "E"**

-10-

CITY_OF_IRVINE_014331

**Miscellaneous**

**Cleaning contractor power washes garbage receptacles, seating area, stairs, and concourses. HVAC contractor services, tests, and sets heating thermostat systems. A final walk through is done and remaining details completed.**

**DE-WINTERIZATION**

**Production**

**The production de-winterization takes place three weeks prior to the first concert. The complete process should take four days. Forklifts and gas tanks are delivered two days before. The following items are to be completed:**

**Main Stage, Mix Position and Second Stage installation**

**The Main Stage, Mix position and Second Stage scrims and canopies are removed from storage, cleaned, and installed on the steel frame. Additional hardware is bought as needed and any extra is stored. The additional anchors are removed from the frames and stored. Any steel defects are noted and replaced.**

**Electrical system installation**

**The temporary electrical control system (chain motors) for the Main Stage is removed from storage, installed and tested. All temporary stage and load-out area lighting and is removed from storage, installed and tested. Additional supplies are bought and extra is stored.**

**Video installation**

**The video projectors are removed from storage and installed in their housing. The sponsor scrims above and below the video screens are removed from storage and installed. The video screens are raised to their operational level. The video vendor transports, installs, and tests video camera and mixing gear.**

**Audio installation**

**All Main Stage, balcony reinforcement, and second stage audio gear is brought by vendor and installed.**

**Spot light installation**

**Spotlights are brought by vendor, uncrated, taken to the gallery, stands connected, and power supplies are also connected. Spotlights are tested. Additional lamps are ordered.**

**Dressing room and stage furniture installation**



**EXHIBIT "E"**

-11-

CITY_OF_IRVINE_014332

**DX-0781.0066**

Dressing room furniture is uncovered, cleaned, and set-up. All loose stage furniture and garbage receptacles are removed from storage and set up. Backstage areas and restrooms are thoroughly cleaned.

**Plumbing turned on**

Plumbing contractor turns on water sources and plumbing fixtures. Plumbing contractor repairs leaks where needed.

**Miscellaneous**

Any miscellaneous activities are completed: air conditioner placed in windows, boards removed from windows, folding chairs removed from storage and connected, and VIP padded seats uncovered.

## FRONT OF HOUSE

Front of House de-winterization takes place six weeks prior to the first event.

**Television monitor installation**

All television monitors are removed from storage and installed in the suites and concession stand areas, boxed, and stored for the winter.

**Sponsor, tent and party furniture installation**

Sponsor equipment and cars are brought to and installed at venue. Suites are cleaned. Suite refrigerators are turned on, untied, and cleaned. Tents are brought by the contractor and installed. All party furniture is removed from storage, cleaned, and set up.

**Event equipment and sign tear down and storage**

Event equipment, tables, chairs, garbage receptacles, benches, bike racks are removed from storage and set-up in appropriate location. All signs and banners are removed from storage, cleaned, and installed in appropriate location. Sign contractor brings and installs large signs.

**Box Office installation**

Box Office staff installs equipment and supplies for upcoming season. Ticketmaster installs their equipment for winter.

**Elevator installation**

Elevator contractor unwraps freight elevator car's switchgear, turns on motors, services, and test cars. Elevator contractor turns off Sabbath schedule, services, and test passenger cars.

**Concessions & Merchandise**



**EXHIBIT "E"**

-12-

CITY_OF_IRVINE_014333

Merchandise, food and beverage subcontractors remove from storage and install equipment to concourse areas. Buildings are cleaned.

EXHIBIT "E"

-13-

CITY_OF_IRVINE_014334

DX-0781.0068

**Plumbing turned on**

**Plumbing contractor turns on water source, water lines, and plumbing fixtures.**

**Miscellaneous**

**HVAC contractor services and tests air conditioner and heating equipment. A final walk through is done and remaining details completed. Cleaning contractor power washes garbage receptacles, seating area, stairs, and concourses.**



**EXHIBIT "E"**

-14-

CITY_OF_IRVINE_014335

**EXHIBIT "G"**

**DAMAGE AMOUNT**

[To be inserted prior to execution]



CITY_OF_IRVINE_014336

DX-0781.0070

**LIVE NATION RENTAL PROGRAM**

(Added graphics)

**Amphitheatre Rental Plan**

# VENUE RENTALS AND AVAILABILITY

Live Nation believes that in order to maximize the Irvine Amphitheater's proposed annual music events, the venue should be open for all qualified promoters and event organizers. This facet of our overall booking efforts is designed to ensure we don't miss any complementary programming opportunities. We will implement a venue rental plan targeting other potential users. The plan would include how those proposed events fit within our budget, appropriate rental rates, calendar management procedures, and a venue licensing agreement that ensures the tenant's ability to produce a high quality and complementary event for the venue. Our proven systems of managing venue calendars will also ensure clarity and proper communication with the City of Irvine for their annual events to be held at the Irvine Amphitheatre.

### *Calendar Management*

In order to have a fair and organized way of booking and contracting events, Live Nation uses the industry standard "hold" system in the calendar management of a venue. To maximize potential events and organize various outside users that may be qualified in booking an event, our calendar management system initially positions the users who "hold" the date in sequential order. Our system, additionally requires an outside user's capacity to fund a deposit.

### *Rental Rate Sheet*

Live Nation will conduct a venue analysis to determine a rental rate sheet for the facility. Factors to be taken into account include, facilities of similar size, capability and market conditions. Venue rental categories will include but are not limited to rent, variable event costs and overhead reimbursements.

### *Rental License Agreement*

A venue rental license agreement will be issued by Live Nation to the potential licensee detailing both financial components and responsibilities. This will include items such as license period, costs / fees, payment schedules, insurance coverage and additional requirements that are applicable.

### *Final Authority On Rental Decisions*

Live Nation will maintain the right of first refusal on available dates in the management of the event calendar for the Irvine Amphitheatre. Live Nation will retain the authority to determine eligible outside renters of the venue based on the above described process and other factors to be potentially established with the City of Irvine.

**LIVE NATION**

**EXHIBIT "I"**

**LIVE NATION VENUE LICENSE AGREEMENT FORM**

**VENUE LICENSE AGREEMENT**

**AGREEMENT DATE ("Effective Date")**

**LICENSEE NAME (i.e. Music Promoter, Inc.) ("Licensee") and Live Nation Worldwide, Inc. ("LN") do hereby agree on the following terms, conditions and definitions with regard to Licensee licensing the premises described below to host Licensee's upcoming event:**

| | |
|---|---|
| **LICENSEE CONTACT INFORMATION:** | **LICENSEE ADDRESS** |
| | **Attn: LICENSEE CONTACT'S NAME** |
| | **LICENSEE PHONE AND EMAIL** |
| **EVENT:** | **DESCRIPTION OF EVENT ("Event")** |
| **VENUE:** | **VENUE NAME in CITY, STATE ("Venue")** |
| **SPACE:** | **PORTION OF VENUE BEING RENTED (i.e. whole house, music hall, lobby, etc.) ("Space")** |
| **COSTS/FEES:** | |
| **License Fee:** | **$LICENSE FEE (the "License Fee")** |
| **Services included in License Fee** | **SERVICES INCLUDED IN LICENSE FEE (i.e. use of Venue, house sound and lights, security, etc. as applicable) (the "Included Services")** |
| **Estimated Additional Production & Operations Expenses:** | **$ESTIMATED ADDITIONAL EXPENSES (as detailed in Exhibit B) (the "Estimated Additional Production and Operating Expenses")** |
| Projected costs based on the staging requirements of the Event (cost overruns shall be payable pursuant to the Section 2 of Exhibit A attached hereto). | |
| **Merchandising:** | **SPLIT% Artist / SPLIT% LN; SPLIT% Artist / SPLIT% LN (for CD/DVD) (collectively, the "Merchandise Split")** |
| **LICENSE PERIOD:** | |
| **Load In:** | **START OF LOAD IN – start of Event Period** |
| **Event Date and Times:** | **START OF EVENT - END OF EVENT ("Event Period")** |
| **Load Out:** | **end of Event Period – END OF LOAD OUT (collectively, the "License Period")** |

CITY_OF_IRVINE_014338

**DX-0781.0072**

**PAYMENT SCHEDULE:**

| | |
|---|---|
| **Initial Deposit:** | **$DEPOSIT AMOUNT; due DATE** |
| **Second Deposit:** | **$DEPOSIT AMOUNT; due DATE [DELETE THIS LINE IF NO SECOND DEPOSIT]** |
| **Balance of Amounts Due to LN:** | **CHOOSE ONE OF THE FOLLOWING: 3 business days before the Event To be offset from ticket sales** |
| **Liquidated Damages Upon Cancellation (other than due to a Force Majeure Occurrence or material breach by LN):** | **the License Fee plus any unrecoupable expenses incurred by LN in connection with the Event (the "Liquidated Damages")** |

**OTHER TERMS:**

| | |
|---|---|
| **Venue Capacity:** | **CAPACITY** |
| **Expected Attendance** | |
| **Age Restriction:** | **CHOOSE ONE OF THE FOLLOWING: All Ages 18+ 21+** |
| **Facility Fee** | **$FACILITY FEE per paid ticket (to be retained by LN) [DELETE THIS LINE IF FACILITY FEE]** |
| **Origination Fee (if applicable):** | **$ORIGINATION FEE** |

**ADDITIONAL REQUIREMENTS:**

| | |
|---|---|
| **Estimated production and operations requirements in writing (including personnel, equipment, time, etc. for technical set up, rehearsals, etc.) due by:** | **DATE** |
| **Certificate of Insurance due by:** | **3 business days prior to the Event.** |
| **Additional Insureds to be listed on Certificate of Insurance:** | **Live Nation Worldwide, Inc. and its landlords, if any, and their respective parents, members, partners, affiliates, divisions and subsidiaries, and their respective officers, directors, shareholders, employees, agents and representatives shall be listed as Additional Insured with respect to the operations of the Named Insured. Coverage naming the Additional Insureds shall be on a primary and non-contributory basis irrespective of any other insurance, whether collectible or not, to the extent of Licensee's liability as described in this Agreement.** |
| **Executed copy of Agreement due by:** | **DATE** |

**Licensee's Designee (whom Licensee warrants has/have full authority to commit Licensee's funds and to authorize expenditures of monies on Licensee's behalf in connection with the Event):**

**Name:         LICENSEE CONTACT**

**LN's standard terms and conditions are attached hereto as Exhibit A and incorporated herein. Licensee and LN hereby execute this Agreement as of the Effective Date:**

| **LIVE NATION WORLDWIDE, INC.:** | **LICENSEE:** |
|---|---|
| **By:** _____ | **By:** _____ |
| **Name:** _____ | **Name:** _____ |

**2**

**Updated 8.14.20**

CITY_OF_IRVINE_014339

**Title:** _____     **Title:** _____

**Date:** _____     **Date:** _____

Updated 8.14.20

3

CITY_OF_IRVINE_014340

DX-0781.0074

**Exhibit A**

**Terms and Conditions**

1. **Term.**

   A. **The term of this Agreement ("Term") shall be from the Effective Date through the License Period, not to include final invoicing and payment.**

   B. **LN hereby grants to Licensee the privilege and license to use the Space and other LN designated portions of the Venue necessary for production of the Event during the License Period.**

   C. **Upon the expiration of the License Period or the termination of this Agreement for any reason whatsoever prior to the expiration of the Term, Licensee shall immediately quit and surrender the Venue to LN. Licensee shall remove any goods or property brought onto the Venue. Licensee shall reimburse LN for all costs and expenses incurred by LN in the removal of such goods or property if this provision is not complied with.**

2. **Financial Settlement.**

   A. **In consideration of the grant of the license to use the Venue and the provision of the Included Services, Licensee shall pay to LN the License Fee in the amount and according to the payment schedule on the first page of this Agreement. Licensee further agrees to pay LN for the costs and charges for all additional staffing, production and operational services provided by LN in connection with the Event, including, without limitation, the Estimated Additional Production and Operations Expenses described on the first page of this Agreement and Exhibit B. The Estimated Additional Production and Operations Expenses are a good faith estimate by LN but are not intended as a representation or warranty as to the amount of expenditures that will be required to be incurred for the production of the Event in accordance with Licensee's requirements or requests.**

   B. **Licensee shall pay to LN all amounts as due according to the payment schedule on the first page of this Agreement. If any payment is not received by LN when due, LN may terminate this Agreement. At settlement of the Event, LN will deliver to Licensee a final invoice setting forth the actual charges incurred at the Event, and Licensee agrees to promptly pay any outstanding amounts within three (3) business days following the Event.**

   C. **If the Event is ticketed, LN will have a first right of offset on all box office receipts for the Event to secure payment of all amounts owed to LN by Licensee hereunder. LN will have the right to retain from the box office receipts all outstanding amounts related to the Event at time of settlement. If box office receipts, net of taxes and applicable fees, are greater than the License Fee and total Event expenses, the excess will be paid to Licensee at settlement of the Event.**

   D. **The Deposits listed on the first page of this Agreement are non-refundable unless otherwise provided in this Agreement. If the Event is ticketed, and Licensee has not taken in an amount sufficient to cover the payment of all amounts owed to LN by Licensee, LN may demand and Licensee shall pay to LN an additional deposit ("Additional Deposit").**

   E. **Licensee acknowledges that by virtue of entering into this Agreement, LN will forgo other opportunities for the use of the Venue on the scheduled date of the Event and will incur substantial non-recoverable expenses. The parties acknowledge that the lost opportunity costs will be difficult if not impossible to ascertain. As a result, if Licensee cancels the Event at any time following execution of this Agreement, Licensee shall pay LN, as liquidated damages and not as a penalty, an amount equal to the liquidated damages upon cancellation described on the first page of this Agreement ("Liquidated Damages"). All cancellation notices must be made in writing. The Liquidated Damages, less any Deposit(s) or Additional Deposit already received, shall be paid to LN by Licensee within three (3) business days following Licensee's cancellation of the Event.**

   F. **Federal, state, or local government capacity restrictions, social-distancing protocols, or other health and safety measures ("Health Restrictions") that require a reduction in the Venue Capacity shall not constitute a Force Majeure Occurrence, as defined in Section 16H below; provided however, if Health Restrictions reduce the Venue Capacity to less than 50% of Expected Attendance, the parties shall work together in good faith to reschedule the Event to a mutually-agreeable date in the future ("Rebooked Event"). LN shall retain the Deposit to apply to the Rebooked Event.**

3. **Parking. The following shall apply if parking is ordinarily available at the Venue:**

**A-1**

CITY_OF_IRVINE_014341

A. **All parking operations shall be conducted by Venue personnel unless otherwise agreed in writing by LN. All proceeds of such parking operations shall be retained solely by LN. Notwithstanding the foregoing, should Licensee elect not to charge its guests for parking, the cost for parking shall be added as a line item expense to Exhibit B.**

B. **Specialized parking spaces may be provided but shall not be guaranteed for Licensee's employees and guests, in locations designated by LN. LN shall not be responsible, under any circumstances, for any loss or damage occurring to automobiles brought to the Venue by Licensee's employees, subcontractors or guests.**

4. **Merchandise and Concessions.**

   A. **Unless otherwise agreed by LN, LN's designated food and beverage concessionaire (the "LN Concessionaire") shall provide all food and beverage service and retain one hundred percent (100%) of the profits there from. Unless otherwise agreed by LN, LN's designated merchandise vendor shall sell all merchandise and retain the portion of merchandise revenue, net of tax, credit card processing fees and bootleg security, as applicable, according to the Merchandise Split provided on the first page of this Agreement.**

   B. **In the event that LN permits Licensee to utilize a non-LN catering service ("Outside Caterer") to provide food services, Licensee shall ensure that the Outside Caterer abides by the following:**

      i. **Outside Caterer shall not provide any beverage service.**

      ii. **Outside Caterer shall indemnify and hold LN, LN's landlord and the LN Concessionaire harmless from any claims, suits, losses, injuries, liability and damages (including reasonable attorneys' fees and court costs) (collectively, "Claims") arising out of or related to the Outside Caterer's acts, omissions, negligence or services.**

      iii. **Outside Caterer shall comply with the insurance requirements set forth in Section 14E.**

5. **Ticketing.**

   A. **If the Event is to be ticketed, all ticket sales for the Event shall be conducted through the LN box office and the facilities of LN's designated ticketing agent, Ticketmaster. All ticket sales shall be subject to applicable taxes, credit card processing fees, service fees, Facility Fees and/or parking fees as provided by LN. LN reserves the right to retain a reasonable number of complimentary tickets and pre/post party passes for the Event for LN's use. LN may have non-manifested corporate boxes and/or premium seats, for which tickets will not be included in the gross ticket receipts. If applicable, LN will provide all premium seat customers (including, without limitation, box and season seats) at the Venue with tickets for their regular seats for the Event at no cost to LN.**

   B. **LN may, but shall not be required to, make ticket refunds (or partial refunds) for cause. Cause shall include, without limitation, seats blocked by equipment (when exchange for a comparable location is not possible), failure of any performance of the Event to begin when scheduled by Licensee and failure to hold any performance of the Event. In addition to any other monies owed to LN, Licensee shall pay LN for LN's share of lost gross receipts from such tickets and for all costs associated with such refunds, except when caused by any failure of LN to perform under this Agreement.**

6. **Advertising and Promotion. Licensee shall be responsible for producing and paying for any and all advertising and promotional materials in connection with the Event. All such materials shall be subject to the prior approval of LN. Licensee acknowledges and agrees that, notwithstanding any marketing or other related assistance which may be provided by LN (although LN is not obligated to provide same), LN has made no representation or warranty and disclaims any purported or actual representation or warranty as to the results and/or success which can be expected from the Event, including, without limitation, ticket sales and/or the profitability of the Event. Licensee acknowledges and agrees that LN shall in no way be responsible for the actual results from and/or the success, financial or otherwise, of the Event.**

7. **Booth / Commercial Space. In the event that Licensee desires to sell booth/commercial space ("Booth Space") at the Venue to vendors or exhibitors, or otherwise permit vendors or exhibitors at the Venue in connection with the Event, Licensee shall comply with the following provisions:**

   A. **Licensee will first obtain LN's approval of each Booth.**

   B. **Licensee will be solely responsible for causing Booths to comply with applicable law and applicable Venue rules and regulations.**

**A-2**

CITY_OF_IRVINE_014342

    **C.** Licensee will be solely responsible for ensuring payment of any and all taxes or other fees associated with the Booths or the use of the Booth Space.

**8.** **Recording Rights/ Photography.** Unless Licensee executes the LN Recording Addendum, Licensee shall not conduct or permit any photography, film, video, audio or other recording of the Event to take place. Notwithstanding the foregoing, Licensee's guests may photograph and record the Event for their personal use unless otherwise restricted by Event talent.

**9.** **Charitable Donations.** In the event that LN permits and Licensee obtains the right to collect charitable donations in connection with the Event, Licensee shall comply with all Applicable Laws (defined below) in connection with the solicitation and collection of such donations. Licensee further agrees that it will be solely responsible for all tax and other liability related to such donations.

**10.** Use and Condition of Venue.

    **A.** Acceptance of Venue. Licensee accepts the condition of the Venue *as is* and agrees to return the Venue to LN in the same condition as accepted by Licensee. Licensee has examined the Venue and is satisfied with the condition, fitness and order thereof.

    **B.** No Alterations or Improvements. Licensee shall not paint, drill into or in any way mar or deface any part of the Venue. Licensee shall pay LN for the cost of repairing any damage to the Venue caused by the Event within three (3) business days following the Event.

    **C.** Maintenance of Venue. Licensee shall keep the Venue in an orderly condition and cause all refuse and debris to be properly discarded.

    **D.** Operational Protocols. Without limitation of any of Licensee's obligations herein, Licensee shall comply, and ensure that all of Licensee's employees, agents, volunteers, contractors, patrons, guests, invitees, participants and performing artists involved in the Event (together with Licensee, "Licensee Parties") comply with all LN and Venue rules, regulations, and health and safety protocols related to the use and occupancy of the Venue, the operation of the Event, and/or any standards related to COVID-19 or other public health emergencies (collectively, "Operational Protocols"). Operational Protocols may include, without limitation, staggered arrival and departure times, temperature checks, pre-sanitization requirements, physical distancing, masks/face coverings, food & beverage service and handling, and requiring persons developing or exhibiting symptoms to leave the Venue.

    **E.** Abandoned Property. LN will have the full right to collect and have custody of all articles and personal property left on the Venue or at the Venue after the expiration of the Term. Any property so left will be deemed abandoned by Licensee and may be disposed of by LN, as LN sees fit, without any liability for any loss, damages or costs associated with such disposal, which liability will rest solely with Licensee.

    **F.** PROHIBITED OBJECTS AND ACTIVITIES AT VENUE. UNLESS OTHERWISE AGREED IN WRITING BY LN, THE FOLLOWING SHALL NOT BE PERMITTED INTO THE VENUE OR THE SURROUNDING PROPERTY AT ANY TIME: OUTSIDE ALCOHOLIC BEVERAGES; INTERACTIVE PHYSICAL GAMES; MECHANICAL RIDES; BODY ART AND PIERCING; EXOTIC ANIMALS; PYROTECHNICS; TEMPORARY STAGING; OR FLASHING OR STROBE LIGHTING.

**11.** Representations, Warranties and Covenants.

    **A.** LN hereby represents and warrants that it has full power and authority to enter into this Agreement and to engage in the transaction contemplated hereby and that this Agreement is a valid obligation of LN and is binding upon LN.

    **B.** Licensee hereby represents and warrants that it has full power and authority to enter into this Agreement and to engage in the transaction contemplated hereby and that this Agreement is a valid obligation of the Licensee and is binding upon the Licensee.

    **C.** Licensee and the other Licensee Parties shall comply with all applicable statutes, rules, regulations, protocols, guidelines (including health and safety guidelines), and orders, interpretation, or application of any governmental authority, or court (collectively, "Applicable Laws") Applicable Laws, in connection with the Event. Licensee will be responsible for obtaining and paying for all licenses or permits necessary for holding the Event, including, without limitation, tax requirements and any permits required by governmental authorities for pyrotechnics or laser use.

    **D.** Licensee represents and warrants that it owns or otherwise has the right to use the name of the Event and any trademarks and logos related thereto and any creative materials, including performing artist images,

**A-3**

CITY_OF_IRVINE_014343

**DX-0781.0077**

used in connection with the Event, and that the use of such name and creative materials shall not infringe the rights of any third party.

**E.** Licensee represents and warrants that any and all use or performance of copyrighted material in connection with this Event has been duly licensed and authorized by the appropriate performing rights organizations (including, without limitation, BMI, SESAC and ASCAP), copyright owners or their representatives and that any license or royalty fees owed to such persons or entities shall be paid by Licensee. Furthermore, Licensee agrees to indemnify and hold LN harmless from any and all Claims incurred as a result of any violations of such intellectual property rights or the laws relating thereto. Notwithstanding the foregoing, LN reserves the right to collect such payments from Licensee at Event settlement and remit to appropriate parties on Licensee's behalf.

**F.** In the event Licensee is unable to meet the requirements of Section 11.E. above and if LN so elects, LN may warrant that it has been duly licensed and authorized by the appropriate performing rights organizations (including, without limitation, BMI, SESAC and ASCAP), copyright owners or their representatives for the use or performance of copyrighted material in connection with the Event at the Venue. Any license or royalty fees owed to such persons or entities shall be paid by Licensee.

**12.** **Indemnification.**

**A.** In addition to any other indemnification requirements set forth herein, Licensee agrees to indemnify, defend and hold harmless LN and LN's landlord(s), if any, and their respective parents, members, partners, affiliates, divisions and subsidiaries, and their respective officers, directors, shareholders, employees, agents and representatives (collectively, "LN Parties") from and against any and all Claims, including for bodily injury and property damage, arising or alleged to have arisen out of: (i) any act or omission of any of the Licensee Parties; (ii) any allegation that the name of the Event and any trademarks or logos related thereto, or the use of any creative materials, including performing artist images, in connection with the Event infringe the rights of any third party; (iii) Licensee's breach of any of the provisions of this Agreement; and/or (iv) alleged exposure of any of a Licensee Party to or contraction by a Licensee Party of any communicable disease or illness (including COVID-19) or any bacteria, virus, or other pathogen capable of causing a communicable disease or illness ("Communicable Disease") in connection with the Event, whether occurring before, during or after the Event, however caused or contracted. The parties agree, however, that Licensee shall not be obligated to defend or indemnify a LN Party for any Claims that arise out of such LN Party's gross negligence or willful misconduct.

**B.** Licensee agrees that to the extent any Licensee Party places any material, equipment and other property ("Licensee Property") in the Venue, they do so at their own risk and Licensee hereby releases, indemnifies, defends, and holds harmless the LN parties from all claims for any damage or injury to any Licensee Property.

**C.** The indemnification provisions contained throughout this Agreement shall survive the termination of this Agreement.

**13.** **Limitation of Liability and Waiver of Claims.**

**A.** Licensee will be solely responsible for the conduct and activities of all Licensees Parties and, for purposes of this Agreement, such conduct and activities shall be deemed conduct and activities of Licensee.

**B.** Neither party will, under any circumstances, be liable for any incidental, punitive, exemplary, speculative or any consequential damages arising out of the services provided under this Agreement; provided that the foregoing shall not be construed to cover any third party Claim with respect to which Licensee has committed to indemnify LN.

**C.** Licensee agrees to use and occupy the Venue and instruct all other Licensee Parties that they will use and occupy the Venue at their own risk. Notwithstanding implementation of the Operational Protocols, Licensee specifically acknowledges that an inherent risk of exposure to Communicable Disease exists in any public place where people are present. COVID-19 is an extremely contagious disease that can lead to severe illness and death. According to the Centers for Disease Control and Prevention, senior citizens and those with underlying medical conditions are especially vulnerable. LICENSEE ACKNOWLEDGES ON ITS BEHALF, AND ON BEHALF OF THE LICENSEE PARTIES, THAT LICENSEE AND THE LICENSEE PARTIES VOLUNTARILY ASSUME ANY AND ALL RISKS RELATED TO EXPOSURE TO COVID-

A-4

CITY_OF_IRVINE_014344

19 AS WELL AS ANY OTHER COMMUNICABLE DISEASE FROM THE EVENT AND THE VENUE AND HEREBY RELEASE THE LN PARTIES FROM LIABILITY IN CONNECTION THEREWITH.

14. **Insurance Requirements.**

    **A.** Licensee will maintain and pay all premium costs for the following insurance coverages in amounts not less than specified throughout the duration of the Term:

        **i.** Statutory Workers' Compensation including Employer's Liability Insurance, subject to limits of not less than One Million Dollars ($1,000,000.00), affording coverage under applicable worker's compensation laws. Licensee will cause, if allowed by law, its workers' compensation carrier to waive insurer's right of subrogation with respect to the LN Parties.

        **ii.** Commercial General Liability Insurance for limits of not less than One Million Dollars ($1,000,000.00) per occurrence Bodily Injury and Property Damage combined; One Million Dollars ($1,000,000.00) per occurrence Personal and Advertising Injury; Two Million Dollars ($2,000,000.00) aggregate Products and Completed Operations Liability; One Hundred Thousand Dollars ($100,000.00) Fire Legal Liability, and Two Million Dollars ($2,000,000.00) general aggregate limit per event. The policy shall be written on an occurrence basis.

        **iii.** Automobile Liability Insurance with a limit of not less than One Million Dollars ($1,000,000.00) combined and covering all owned, non-owned and hired vehicles.

        **iv.** Umbrella Liability Insurance at not less than Four Million Dollars ($4,000,000.00) limit providing excess coverage over all limits and coverages noted in policies ii. and iii. above. This policy shall be written on an occurrence basis.

    **B.** Policies ii., iii. and iv. above shall list Live Nation Worldwide, Inc. and its landlords, if any, and their respective parents, members, partners, affiliates, divisions and subsidiaries, and their respective officers, directors, shareholders, employees, agents and representatives as "Additional Insureds" with respect to any and all claims arising from Licensee's operations. Licensee is responsible for any and all costs for such coverages or waivers. Policy ii. above may not be written on a 1996 or earlier ISO General Liability coverage form.

    **C.** At least three (3) business days prior to the Event date, Licensee shall provide LN Certificate(s) of Insurance compliant with the aforementioned required endorsements. The certificate holder shall be Live Nation Worldwide, Inc. and the Additional Insured language shall be exactly as described above. Such coverage shall be primary and not contributory to any insurance maintained by LN and contain a waiver of subrogation in favor of LN. All required insurance will be placed with carriers licensed to do business in the applicable state, have a rating in the most current edition of A.M. Best's Property Casualty Key Rating Guide that is reasonably acceptable to LN. Licensee will provide thirty (30) days written notice of cancellation or non-renewal to LN. Failure of Licensee to provide the requested certificates, or failure of LN to specifically request such certificates, shall not limit or release Licensee of its obligations or liabilities hereunder.

    **D.** The insurance obligations stated in this section are independent of, and shall not be affected by the scope or validity of, any other indemnity or insurance provisions in other sections of this Agreement.

    **E.** Licensee will ensure that all of its contractors (including, without limitation, sponsors, Booth Vendors and Outside Caterers) who will be entering the Venue to engage in any business activity will maintain the following insurance coverages: (i) Statutory Workers Compensation, including employer's liability, with a limit of not less than One Million Dollars ($1,000,000.00) per occurrence; (ii) Commercial General Liability with a limit of not less than One Million Dollars ($1,000,000.00) per occurrence; and (iii) Business Automobile Liability for all owned, hired or non-owned vehicles to be driven onto the Venue, with a combined single limit of not less than One Million Dollars ($1,000,000.00). Satisfactory evidence of coverage must be provided to LN upon request. LN reserves the right to require higher insurance limits depending on the nature of services being provided by the contractor.

15. **Sponsorships and Signage.**

    **A.** Licensee understands and agrees that LN has entered into signage and sponsorship relationships related to the Venue for which LN will retain all proceeds. LN reserves all rights to display signage and conduct activations at, on or near the Venue property. No signs or advertising boards or activations, other than

A-5

CITY_OF_IRVINE_014345

those authorized by LN, will be allowed into, on or near the Venue. Licensee will not mark, cover or attempt to modify any signage at, on or near the Venue.

**B.** Licensee is required to obtain LN's prior written approval of any sponsorship relationships into which Licensee desires to enter for the Event.

**16.** Miscellaneous.

**A.** Third Party Beneficiaries. This Agreement does not confer any rights or benefits upon any persons or entities other than LN and Licensee and their permitted, respective successors and assigns. There are no third party beneficiaries.

**B.** Relationship of the Parties. Nothing contained in this Agreement will be deemed to constitute LN and Licensee as partners or joint venturers. Each party acknowledges and agrees that it neither has nor will give the appearance or impression of having any legal authority to bind or commit the other party in any way. Licensee agrees that it will be solely responsible for the payment of all wages, federal, state and local income taxes, as well as all workers' compensation insurance requirements for all personnel it supplies pursuant to this Agreement.

**C.** Entire Agreement and Modification. This Agreement contains the entire agreement between the parties relating to the subject matter hereof and all prior agreements related hereto which are not contained herein are terminated. This Agreement may not be amended, revised or terminated except by a written instrument executed by the party against which enforcement of the amendment, revision or termination is asserted.

**D.** Assignment. Neither this Agreement nor any part hereof shall be transferred, conveyed or assigned by Licensee without the prior written consent of LN.

**E.** Applicable Law. This Agreement shall be governed by and construed in accordance with the laws of the state in which the Venue is located, without giving effect to its choice of law principles.

**F.** Use by LN. It is specifically agreed and understood that LN has the right to occupy and use the Venue during the Term and to license any portion thereof, provided that such use or license does not unreasonably interfere with Licensee's use of the Venue.

**G.** Utilities. No interruption or malfunction of any utility services, whether such services are provided by LN or arranged for by Licensee, shall: (i) constitute an eviction or disturbance of Licensee's use and possession of the Venue or a breach by LN of any obligations hereunder; (ii) render LN liable for damages; or (iii) entitle Licensee to be relieved of any obligations hereunder. In the event of any such interruption of service provided by LN, LN shall be obligated only to use reasonable diligence to restore such service.

**H.** Force Majeure. The failure of any party hereto to comply with the terms and conditions hereof because of a "Force Majeure Occurrence" shall not be deemed a breach of this Agreement. "Force Majeure Occurrence" shall be defined to include, without limitation, Acts of God, strikes, labor disputes, war, fire, earthquake, serious weather anomalies such as hurricane, tornado, cyclone, typhoon, blizzard, tidal wave, tsunami or flood, acts of public enemies, acts of terrorism, epidemic, action of federal, state or local governmental authorities, or other event or reason beyond the reasonable control of a party that, in each case makes the non-performing party's performance impossible or impractical. In the event of a cancellation of the Event due to a Force Majeure Occurrence, each party shall be relieved of its obligations hereunder with respect to the performance so prevented and neither party shall be obligated to compensate the other for any expenses incurred in connection with such cancellation and LN shall refund any Deposits received from Licensee in connection with the Event.

**I.** Taxes. Any and all sales tax, amusement tax or other tax imposed by local, state, provincial or federal government as a result of the presentation of the Event in connection with this Agreement hereunder, shall be the responsibility of and paid for by Licensee at the time required by law (excepting any state or federal income tax imposed on LN). If Licensee is tax exempt, Licensee must provide a copy of Licensee's tax exemption certificate issued by the state in which the Venue is located to LN no less than three (3) business days prior to the Event.

**J.** Prevailing Party. If either party institutes an action or proceeding against the other to enforce the terms of this Agreement, then the prevailing party in such action or proceeding will be entitled to recover from the other party the reasonable attorneys' fees and costs incurred therein. For purposes of this Section, a prevailing party shall include, without limitation, a party who brings an action against the other party by

A-6

CITY_OF_IRVINE_014346

reason of the other party's breach or default of this Agreement and obtains substantially the relief sought, whether by compromise, settlement or judgment.

K.  **No Waiver of Rights and Invalidity.** If either party fails to enforce any of the provisions of this Agreement or any rights or fails to exercise any election provided in this Agreement, it will not be considered to be a waiver of those provisions, rights or elections or in any way affect the validity of this Agreement. If any term, provision, covenant or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of this Agreement will remain in full force and effect and will in no way be affected, impaired or invalidated.

L.  **Notices.** All notices given hereunder shall be in writing and shall be deemed to have been duly given if delivered personally with receipt acknowledged or sent by registered or certified mail or equivalent, if available, return receipt requested, or by email (which shall be confirmed by a writing sent by registered or certified mail or equivalent on the same day that such email is sent), or by nationally recognized overnight courier for next day delivery, addressed or sent to the parties at the addresses set forth herein with a copy to Live Nation Worldwide, Inc., 325 N. Maple Drive, Beverly Hills, CA, 90210; Attention: Legal Department.

M.  **Counterparts.** This Agreement may be executed by facsimile and PDF and in any number of counterparts, and each of such counterparts shall be deemed an original.


**ACCEPTED AND AGREED as of the date and year first above written.**

**LIVE NATION WORLDWIDE, INC.:**          **LICENSEE:**


By: _____          By: _____

A-7

CITY_OF_IRVINE_014347

**Exhibit B**
**Estimated Additional Production & Operations Expenses**

CITY_OF_IRVINE_014348

DX-0781.0082

## LN RECORDING ADDENDUM

This LN Recording Addendum (this "Addendum") supplements the Venue License Agreement (the "Agreement") dated DATE by and between LICENSEE NAME ("Licensee") and Live Nation Worldwide, Inc. ("LN").

1. All capitalized terms used but not defined in this Addendum shall have the same meanings set forth in the Agreement.

2. License. LN hereby grants Licensee the right to enter into the Venue on the Event date to film, photograph, record, broadcast and/or transmit the Event (collectively, "Record" or "Recording"). Licensee may Record solely in locations approved by Venue staff. Licensee may not use additional lighting without the approval of Venue staff. Licensee may not digitally manipulate or otherwise alter the image of the Venue without the prior written consent of LN. Licensee must work with a Venue coordinator in preparing and undertaking the planning, logistics and execution of Recording and to abide by all reasonable recommendations and requirements of the coordinator.

3. Clearances and Equipment.
    A. Licensee will be responsible for obtaining and paying all required rights and clearances that may be necessary in connection with Recording the Event, including without limitation releases from the artists and musicians, and licenses from applicable publishers, record labels, public performance organizations and any other third party rights holders.
    B. Licensee will be responsible for all costs associated with Recording, including without limitation equipment, set-up/load-in, security, office space and equipment, catering and supplemental labor. LN may require payment in advance of Recording at its discretion and will provide Licensee with an estimate of such costs when possible.

4. Ownership. Subject to the following, Licensee and its assigns will own all rights in and to the footage and other material resulting from Recording the Event ("Material").
    A. Licensee may use the Material for non-commercial archival and editorial purposes. Licensee will have no right to use the Material in whole or in part for any commercial purpose without the written consent of LN and the performing artist(s), where applicable. A commercial purpose includes without limitation the license or sale of the Material in any media now known or hereafter created, and the use of the Material for advertising or promoting the Event or Licensee and its assigns.
    B. Upon payment of the Origination Fee and any union fees described below, Licensee may use the Material for a commercial purpose throughout the universe, in perpetuity, in any manner and in any media, whether now known or later created.

5. Union Fees. Licensee will be responsible for any and all fees due to Venue staff as may be required under Venue's collective bargaining agreements for Recording the Event. LN may require payment of such fees in advance of the Recording at its discretion and will provide Licensee with an estimate of the fees when possible. If Licensee and its assignees subsequently choose to exploit the Material for a commercial purpose as described above, Licensee must pay additional fees to LN to cover required fees due to Venue staff.

6. LN Properties. Licensee will not use any LN or Venue names, marks or other properties owned by LN or its affiliated companies or sponsors (collectively "Properties") in connection with the Material without the express written consent by LN. Notwithstanding the foregoing, Licensee may include Properties in the Material solely as they may appear on signs on display at the Venue at the time of Recording; provided that to the extent any signs display third party trademarks, Licensee will either (1) obtain the necessary consent from the third party to include its trademarks in the Material, or (2) blur the trademarks within the Material so that they are not distinguishable. LN and Venue will be credited in any broadcast or other

CITY_OF_IRVINE_014349

publication of the Recording as follows: "Recorded at [VENUE NAME] by permission of Live Nation Worldwide, Inc.".

7. **No Disparaging Remarks.** Licensee represents, warrants and covenants that the Material and the exploitation of the Material will not include any disparaging remarks, comments or actions about or toward the Venue or the Released Parties.

8. **Insurance.** If the Recording is being used for non-editorial commercial purposes, in addition to any other insurance requirements set forth herein, Licensee shall maintain appropriate Errors and Omissions coverage ("E & O Coverage") applicable to the Recording with limits of not less than One Million Dollars ($1,000,000.00). Such E & O Coverage shall have standard coverage, including, but not limited to, defamation, infringement of copyright, infringement of rights in material to be broadcast or in the manner of presentation thereof, invasion of privacy rights and unauthorized use of material.

**ACCEPTED AND AGREED:**

| LICENSEE: | LIVE NATION WORLDWIDE, INC. |
|---|---|
| By: _____ | By: _____ |
| Name: _____ | Name: _____ |
| Title: _____ | Title: _____ |
| Date: _____ | Date: _____ |

**B - 2**

CITY_OF_IRVINE_014350

## TABLE OF CONTENTS

**Page**

1.  Definitions .................................................................................................. 1

2.  Term ........................................................................................................... 6
    2.1    Initial Term ................................................................................... 6
    2.2    Options to Extend ........................................................................ 6

3.  Schedule of Performance ......................................................................... 7

4.  Design of Facility; Preparation of Construction Budget; and Constructability
    Reviews ...................................................................................................... 7
    4.1    Design of Facility ......................................................................... 7
    4.2    Cost Estimates ............................................................................ 8
    4.3    Construction Budget .................................................................... 8
    4.4    Constructability Reviews ............................................................. 8
    4.5    Limitation on City Design Cost Obligations ................................. 9

5.  Live Nation Capital Contribution ............................................................... 9

6.  Construction of Facility ............................................................................. 9
    6.1    Public Bidding ............................................................................. 9
    6.2    City Construction Obligations .................................................... 10
    6.3    Live Nation Construction Consultant Obligations ..................... 10
    6.4    Change Orders .......................................................................... 10
    6.5    Live Nation FF&E ....................................................................... 10
    6.6    City Obligations Regarding Public Infrastructure ..................... 11

7.  Engagement of Live Nation .................................................................... 12

8.  Operations and Management Obligations of Live Nation ........................ 12
    8.1    General Operating Obligations .................................................. 12
    8.2    General Performance Requirements ......................................... 13
    8.3    Minimum Event Requirements .................................................. 13
    8.4    Facility Scheduling Procedures ................................................ 13
    8.5    Times of Operation for Events, VIP Area, and Alcohol Service .. 13
    8.6    Live Nation's Paid Ticketing Records; City Right to Audit ........... 14
    8.7    Third-Party Events ..................................................................... 14
    8.8    Customer Satisfaction ............................................................... 14
    8.9    Operation in Accordance with Applicable Standard .................. 15
    8.10   Prohibited Activities ................................................................... 15
    8.11   Live Nation Vendors and Services Providers ............................ 16
    8.12   Inventory and Supplies .............................................................. 16
    8.13   Service Contracts ...................................................................... 16
    8.14   Management Services ................................................................ 17
    8.15   Personnel Policy ........................................................................ 17
    8.16   Condition of Facility Upon City's Issuance of Final Certificate of
           Occupancy .................................................................................. 17
    8.17   Operating Costs ......................................................................... 17



CITY_OF_IRVINE_014351

**Page**

9.    Repair and Maintenance Standards ............................................................................. 18
      9.1    Live Nation Maintenance Obligations ................................................................ 18
      9.2    Live Nation Maintenance Program; City Annual Maintenance
             Inspection ......................................................................................................... 18
      9.3    City Maintenance Elements .............................................................................. 18
      9.4    Solid Waste Requirements ............................................................................... 19
      9.5    No Capital Improvements ................................................................................. 19
      9.6    Live Nation Update/Refresh Program ............................................................... 19
      9.7    Replacement Reserve ...................................................................................... 19

10.   Special Rights of City ................................................................................................. 19
      10.1   Access by City Personnel ................................................................................ 20
      10.2   City Luxury Box ................................................................................................ 20
      10.3   City Events ....................................................................................................... 20

11.   Fees, Taxes and Assessments ................................................................................... 21

12.   Compliance with Laws ................................................................................................ 21

13.   Compliance with Applicable Standard ......................................................................... 21

14.   Payments to City ........................................................................................................ 21
      14.1   Base Operation Fee ......................................................................................... 21
      14.2   Ticket Surcharge .............................................................................................. 21
      14.3   Default Interest ................................................................................................ 22
      14.4   Payment for Noise Violations ........................................................................... 22

15.   Waiver of Liability ....................................................................................................... 23

16.   Insurance ................................................................................................................... 23
      16.1   Commercial General Liability Insurance ........................................................... 23
      16.2   Builder's Risk Insurance ................................................................................... 23
      16.3   Workers" Compensation Insurance ................................................................... 24
      16.4   Employer's Liability Insurance .......................................................................... 24
      16.5   Automobile Liability Insurance .......................................................................... 24
      16.6   Additional Requirements ................................................................................... 24
      16.7   Certificates and Endorsements ........................................................................ 24
      16.8   Property Insurance ........................................................................................... 25

17.   Representations and Warranties ................................................................................. 25

18.   Indemnification ........................................................................................................... 26

19.   Release ...................................................................................................................... 26

20.   Damage or Destruction of the Facility ......................................................................... 27

21.   Eminent Domain ......................................................................................................... 28

22.   Intellectual Property .................................................................................................... 28

CITY_OF_IRVINE_014352

DX-0781.0086

23.    Force Majeure ........................................................................................... 28

24.    Default and Remedies ............................................................................... 29
        24.1    Event of Default by Live Nation ..................................................... 29
        24.2    Liquidated Damages to City ........................................................... 30
        24.3    City Default .................................................................................... 31
        24.4    Legal Actions ................................................................................. 31
        24.5    Governing Law; Venue ................................................................... 32
        24.6    Rights and Remedies are Cumulative ............................................ 32
        24.7    Attorneys' Fees ............................................................................. 32
        24.8    Procedure After Termination .......................................................... 32

25.    Miscellaneous............................................................................................ 33
        25.1    Assignment.................................................................................... 33
        25.2    Merger, Integration and Amendment............................................. 33
        25.3    Approvals; Waiver.......................................................................... 33
        25.4    Notices, Demands, and Communications Between the Parties ...... 33
        25.5    Non-liability of City Officials and Employees ................................. 34
        25.6    Binding on Heirs ............................................................................ 35
        25.7    Third Party Beneficiaries ............................................................... 35
        25.8    Time of the Essence ...................................................................... 35
        25.9    City Acting as Owner of Real Property ........................................... 35
        25.10   Additional Documents .................................................................... 35
        25.11   Entire Agreement, Waivers, and Amendments............................... 35
        25.12   Interpretation................................................................................. 35
        25.13   Severability ................................................................................... 36
        25.14   Administration of Agreement.......................................................... 36
        25.15   Termination.................................................................................... 36
        25.16   Authority to Execute....................................................................... 36
        25.17   Execution in Counterpart................................................................ 36
        25.18   No Joint Venture ............................................................................ 36
        25.19   Facility Not To Be Used As Security............................................... 37
        25.20   Telecommunications Structures ..................................................... 37
        25.21   No Alterations to Facility Without Live Nation Consent.................... 37


CITY_OF_IRVINE_014353