**Term Sheet for Resolution of *United States et al. v. Live Nation Entertainment Inc.*, No. 1:24-cv-03973-AS (S.D.N.Y.)**

This term sheet ("Term Sheet") sets forth the material terms of the agreement[1] in principle between the U.S. Department of Justice Antitrust Division (the "Division") and Live Nation Entertainment Inc. ("Live Nation") in connection with the civil litigation filed by the United States and its State co-plaintiffs, No. 1:24-cv-03973-AS (S.D.N.Y.). This Term Sheet constitutes resolution of Live Nation's civil liabilities arising out of the Division's litigation. To facilitate the resolution of the Division's litigation, the Division and Live Nation would agree to the following, which pertains to Major Concert Venues unless otherwise specified:

1. **Primary Ticketing Distribution Enablement.**

    a. Ticketmaster will develop and implement a standardized API or other measures for the listing, verification, authentication and delivery of primary tickets that will provide the option to distribute primary tickets using any third-party primary marketplaces chosen by the venue, which will be made available to any venue, at the election of the venue, that utilizes Ticketmaster's back-office system of record technology ("TM Back-end"). Ticketmaster will not use any contracting, pricing, technological, or other means to restrict venue choice of primary ticketing marketplaces. Ticketmaster will also facilitate the automated transfer of tickets/ticket barcodes for all primary tickets sold using third-party primary ticket exchanges without the imposition of additional fees (above those comparable to similar open ticketing arrangements) or additional steps on the part of ticket purchasers. For avoidance of doubt, the transfer process for any ticket appropriately resold on a secondary marketplace after initially being sold in another primary ticket marketplace shall be handled the same as any other transfer — i.e., it shall take place fully within the ecosystem (website, app) of the primary ticket issuer. Ticketmaster shall have this functionality fully in place within 9 months of the entry of the decree.

    b. In addition to the forward-looking exclusivity prohibitions set forth below, to ensure the measures described above can be used by venues under any existing contracts that remain in effect, Ticketmaster will provide venues the option to loosen exclusivity provisions in existing primary ticketing contracts that have more than four years remaining as of the date of the entry of the decree. Upon entry of the decree, and on each one-year anniversary of the entry of the decree (until such point less than four years remain on any existing agreement), Ticketmaster will provide all such venues an option to exempt from any exclusivity commitments and for the remainder of the contract term up to 20% of primary tickets, provided the venue agrees to a pro rata adjustment to economic arrangements Ticketmaster has agreed to make under an assumption of exclusivity.

---

[1] No agreement can be final until it has been reduced to a proposed final judgment signed by all parties and the requirements under the Antitrust Civil Procedures and Penalties Act (the "Tunney Act") are satisfied.

    c. Ticketmaster will allow all venues under existing contracts to evaluate the new distribution capabilities described above, including by waiving exclusivity and allowing the venue to try other primary marketplaces for an event each year remaining in their contract, with such events chosen by the venue.

2. **Primary Ticketing Contracts.**

    a. Ticketmaster must offer TM Back-end as a standalone product and must allow venues to use multiple back-end systems if the venue chooses.

    b. With respect to its marketplace as it pertains to Major Concert Venues, Ticketmaster shall offer Major Concert Venues the option to choose, and enter, a fully exclusive agreement for a maximum term of four years. Ticketmaster must also offer Major Concert Venues the option to choose, and enter, a nonexclusive agreement whereby a certain portion of primary tickets (at the venue's election) are not exclusive. For avoidance of doubt, such partial exclusivity agreements (with at least 20% of the venue's tickets not exclusive) will not be subject to the four-year maximum term applicable to 100% exclusive agreements, to the extent that the Major Concert Venue expresses a desire for a longer contract term, and/or a competitor submits a longer term offer. Major Concert Venues must be informed that the exclusive and non-exclusive options exist.

    c. With respect to Ticketmaster's marketplace as it pertains to Amphitheaters that Live Nation owns, operates or controls, Live Nation will permit any promoter to distribute up to 50% of all primary tickets for that event through any primary ticketing marketplace.

    d. Ticketmaster will cap its service fees in Amphitheaters that Live Nation owns, operates or controls at 15%.

    e. Ticketmaster will not use any user information collected in connection with the transfer of a ticket on third-party primary marketplaces.

    f. Ticketmaster may not initiate early renewal contract negotiations with a venue. Nor may Ticketmaster condition any financial terms on the venue's agreement to forgo an RFP process. Ticketmaster may not include auto-renewal provisions in any new ticketing contracts and must waive any auto-renewal terms in existing ticketing contracts.

3. **Divestiture of Venues.** Live Nation will divest ownership and/or control of the concert venues identified in Appendix A. Upon divestiture, these concert venues will conduct a new ticketing RFP.

4.  **No Reacquisition.** Live Nation shall not reacquire ownership or control of divested assets during the term of the decree.

5.  **Artist Access to Amphitheaters.** Live Nation will allow artists to rent amphitheaters owned, operated, or controlled by Live Nation regardless of whether the artist also retains Live Nation to provide promotional services. Live Nation must offer rental terms to artists using a third-party promoter that are at least as favorable as those offered to Live Nation-promoted artists. For the avoidance of doubt, Live Nation may not refuse artists access to its amphitheaters where the artist has engaged a promoter other than Live Nation to secure access to a Live Nation amphitheater.

6.  **Artist Access to Other Venues.** Live Nation will not enter into any booking agreement or co-promotion agreement with a Major Concert Venue that provides Live Nation with exclusive or preferred access to the venue. Live Nation will waive any exclusivity or preferred access rights of any existing booking or co-promotion agreement with a Major Concert Venue. Live Nation likewise will not enter into any agreement with a Major Concert Venue that requires the venue or another promoter to co-promote non-Live Nation promoted concerts with Live Nation. Live Nation will waive any such rights under existing agreements with Major Concert Venues. For clarity, any non-Live Nation promoted events shall be entitled to comparable rental terms as Live Nation, including proportional costs associated with any one time or ongoing fixed expenses.

7.  **Termination of Agreement with Oak View Group.**

    a.  Live Nation shall terminate its ticketing services agreement with Oak View Group dated July 1, 2022, within 30 days.

    b.  Additionally, for any Oak View Group-managed venue that entered into a Ticketmaster contract since July 1, 2022, Live Nation shall: 1) disclose to the venue its Oak View Group contract and all payments it made to Oak View Group associated with the ticketing services agreement, including the $20 million payment of July 2022; and 2) allow the venue to conduct a new RFP process for primary ticketing services, at the election of the venue, without penalty. Live Nation shall propose a form of such disclosure, subject to approval by the United States in its sole discretion.

    c.  Live Nation shall not enter into a similar agreement with Oak View Group or any agreement with a venue's agent that rewards the agent for converting any ticketing contracts to Ticketmaster.

8.  **Content Steering and Retaliation.** The language of the decree will be revised to further clarify that Live Nation is prohibited from steering content based on the identity of the primary ticketer or the revenue that Live Nation receives by virtue of being the primary ticketer of a venue. Likewise, Live Nation is prohibited from retaliating in any way against a venue that selects a primary ticketer other than Ticketmaster.

9. **Artist Transparency.**

   a.  At an artist's request, Live Nation will provide the artist with all information (subject to standard privacy protection) on ticket purchasers for shows performed by that artist. Artists must be informed that this option exists.

   b.  All information will be subject to a non-disclosure agreement, subject to approval by the DOJ in its sole discretion, that enables artists to use data related to its past shows while reasonably protecting any competitively sensitive information, which includes not directly sharing such information with Live Nation competitors.

10. **Notification of Acquisitions.** Unless a transaction is otherwise subject to the reporting and waiting period requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, 15 U.S.C. §18a (the "HSR Act"), Live Nation and Ticketmaster will provide a notification (comparable to the notifications provided under the HSR Act) to the United States and the State Executive Committee[2] prior to directly or indirectly acquiring any assets of, control of, or any interest, including any financial, security, loan, equity or management interest, in any person[3] during the term of the decree, if such acquisition relates to the acquisition of ticketing, promotion service providers, or venues. Filings under the HSR Act for acquisitions of ticketing, promotion service providers, and/or venues will be provided to the State Executive Committee.

11. **Monitor.** The parties will endeavor to retain the current monitor. A monitor shall be in place for the duration of the decree. The monitor will have the power to retain a staff, subpoena documents, take depositions, and conduct interviews. The monitor will report to the Court, DOJ, and the State Executive Committee. The Monitor will send reports to the DOJ and the State Executive Committee on a quarterly basis and as requested.

12. **Term of Decree.** The decree will remain in force for eight years.

13. **Enforcement and Penalties.** Live Nation will agree to robust provisions to facilitate enforcement of the decree, such as anti-retaliation, non-interference, non-circumvention, and a divestiture trustee. Defendants agree to a penalty of $5 million for a violation of the consent decree. In the event of repeated violations of the consent decree that indicate the consent decree has failed to restore competition, Plaintiffs retain the ability to petition the court for additional relief.

   In consideration of the releases and dismissals set forth in this Term Sheet, Live Nation agrees to establish a Settlement Fund in the amount of $280,388,297 to settle claims for monetary relief and/or civil penalties brought by certain states, including but not limited to claims brought in their parens patriae capacities on behalf of natural persons in their respective states. The Settlement Fund is being paid, in part, as compensatory restitution in order to settle the damages claims of consumers in such states. Notice and claims

---

[2] Composition of this State Executive Committee is to be determined.

[3] "The word 'person' or 'persons' wherever used . . . shall be deemed to include corporations and associations existing under or authorized by the laws of either the United States, the laws of any of the Territories, the laws of any State, or the laws of any foreign country." 15 U.S.C. §12(a).

administration costs, taxes, any award of attorneys' fees and expenses to such states, or other payments authorized by the Court directly related to consumer redress in such states, shall be paid from the Settlement Fund.

In consideration of the monetary provisions and commitments contained in this Term Sheet, and as of the Effective Date, to the extent allowable by law, each state advancing a claim for monetary remedies will be deemed to have fully, finally, and forever released Live Nation from all claims that were or could have been asserted in this action or that relate to the facts and conduct alleged in the action, including claims of natural persons residing in such states.

March 13, 2026

Signed by:

Kyle W. Mach

5D563EC216C04AB...

Kyle W. Mach
On Behalf of Live Nation


Daniel Barnes

Daniel Barnes
Consumer Protection Division
Office of Iowa Attorney General

**Appendix A**

| Venue | City | State |
|---|---|---|
| Empower FCU | Syracuse | NY |
| Maine Savings Amphitheatre | Bangor | ME |
| BMO Pavilion | Milwaukee | WI |
| American Family Insurance Amphitheatre | Milwaukee | WI |
| Bethel Woods Center for the Arts | Bethel | NY |
| Germania Insurance Amphitheater | Austin | TX |
| Riverbend Music Center | Cincinnati | OH |
| Brandon Amphitheatre | Brandon | MS |
| Cynthia Woods Mitchell Pavilion | Woodlands | TX |
| Ford Idaho Center | Nampa | ID |
| Pine Knob Music Theatre | Clarkston | MI |
| Walmart Amphitheatre | Rogers | AR |
| Wharf Amphitheatre | Orange Beach | AL |