DX-1393(26)

Bates: SG-CID-00000712 – SG-CID-00000748

SeatGeek and Cincinnati FC Ticketing Contract

Execution Version

## SPONSORSHIP AGREEMENT

This Sponsorship Agreement, dated as of June __, 2019, (including the Ticketing Agreement and all other exhibits hereof, this "Agreement" or "Sponsorship Agreement"), is entered into by and between Fussball Club Cincinnati, LLC ("Club Operator"), West End Ventures, LLC ("StadCo" and together with Club Operator, "Licensor"), and SeatGeek, Inc. ("Sponsor" or "SeatGeek").

### RECITALS

**WHEREAS,** Club Operator operates FC Cincinnati, a soccer club in MLS;

**WHEREAS,** StadCo will operate the Stadium, a sports and entertainment facility to be constructed in the West End neighborhood of Cincinnati, Ohio;

**WHEREAS,** FC Cincinnati will play its Home Games at the Interim Stadium for the 2019 and 2020 MLS Seasons and expects to play its Home Games at the Stadium beginning in the 2021 MLS Season;

**WHEREAS,** MLS has appointed Club Operator to serve as its exclusive agent with authority to license local commercial affiliations, including the right to license the use of the Club Marks and Player Likenesses in conjunction with such local commercial affiliations, all subject to MLS approval;

**WHEREAS,** Licensor has the authority to grant certain rights in connection with Home Games at the Interim Stadium;

**WHEREAS,** Sponsor has entered into that certain Official Sponsor Agreement with SUM, effective as of November 17, 2016 ("Official Sponsor Agreement");

**WHEREAS,** Licensor and Sponsor desire to enter into an agreement whereby Licensor: (1) grants to Sponsor certain Rights in connection with the Club, the Stadium, Games and (if applicable) Local Game Distributions; (2) grants to Sponsor certain exclusive rights to use the Licensor Marks and/or Player Likenesses in Sponsor's Commercial Category in connection with the advertising and promotion of certain of Sponsor's Products/Services/Retail Operations in accordance with the terms and conditions of this Agreement; and (3) engages Sponsor as its exclusive ticketing service provider pursuant to the Ticketing Agreement.

**WHEREAS,** Licensor and Sponsor desire to enter into this Agreement to mutually promote the success of Sponsor, Club, Stadium and MLS.

**NOW, THEREFORE,** in consideration of the mutual promises set forth herein and for good and valuable consideration, the receipt of which is hereby acknowledged, Licensor and Sponsor agree as follows:

1.    **DEFINITIONS.** Capitalized terms used herein shall have the following definitions set forth in this Section 1. Other capitalized terms used, but not defined, in this Agreement shall have the meanings set forth in the Ticketing Agreement:

"Advertising Materials" shall mean any and all (i) general promotional, advertising, packaging, collateral or other display materials, (ii) media, (iii) promotions, (iv) advertising and promotional concepts (including, but not limited to, slogans, campaigns or programs), or (v) any other creative, content or product created or prepared by or on behalf of Sponsor or any authorized third-party that displays any of the Club Marks and is used in connection with Sponsor's Products/Services/Retail Operations, including in or around any Facility or in furtherance of any Pass-Through Rights. Without limiting the generality of the foregoing, such materials may include, without limitation, television, radio, print, outdoor, industrial and point-of-sale materials as well as any materials used in connection with the Digital Platforms.

"Affiliate" shall mean an entity or person that, directly, or indirectly, through one or more intermediaries controls, is controlled by, or is under common control with a party now known or hereafter in the future during the Term.

"Agreement" shall have the meaning set forth in the Preamble hereof.

"Announcements" shall have the meaning set forth in Section 6.C. of this Agreement.

"Appearances" shall have the meaning set forth in Section 6.G. of this Agreement.

"Applicable Laws" shall mean all laws, regulations, and governmental rules and standards applicable to a party's obligations, actions or inactions under this Agreement or the Ticketing Agreement.

"Applicable Privacy Laws" shall mean Applicable Laws of the United States of America governing the protection and privacy of data relating to this Agreement, including, without limitation, Purchaser Data.

"Campeones Cup" shall mean the annual match played between the preceding calendar year's MLS Cup winner and the current calendar year's LigaMX Campeon de Campeones Cup winner.

"Claim" or "Claims" shall have the meaning set forth in Section 8.A. of this Agreement.

"Club" shall mean FC Cincinnati, a Division 1 outdoor professional soccer club commencing play in MLS in 2019.

HIGHLY CONFIDENTIAL

SG-CID-00000712

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first written above.

**FUSSBALL CLUB CINCINNATI, LLC**

By: _____
Name: G. Jeffrey Berding
Title: President

**WEST END VENTURES, LLC**

By: _____
Name: G. Jeffrey Berding
Title: President

**SEATGEEK, INC.**

By: _____
Name:    Russell D'Souza
Title:    COO

PURSUANT TO SECTION 10.D OF THIS AGREEMENT

Approved by:

**MAJOR LEAGUE SOCCER L.L.C.**

By: _____
Name:  WILLIAM E. ORDOWER
Title:  EVP

HIGHLY CONFIDENTIAL

SG-CID-00000729

**DX-1393.0636**

## SCHEDULE I

### EXCLUSIVE TICKET SALES SERVICES AGREEMENT

This Exclusive Ticket Sales Services Agreement ("Ticketing Agreement"), effective as of the date of the Sponsorship Agreement ("Effective Date"), is entered into by and between SeatGeek, Inc. ("SeatGeek"), Fussball Club Cincinnati, LLC ("FC Cincinnati"), West End Ventures, LLC ("StadCo" and together with FC Cincinnati, "Team"). This Ticketing Agreement consists of this Exclusive Ticket Sales Services Agreement, Exhibit A – Compensation, Exhibit B – Service Level Agreement, and any other Exhibits attached hereto, all of which are incorporated herein by this reference. Capitalized terms used, but not defined, in this Ticketing Agreement shall have the meanings set forth in the Sponsorship Agreement ("Sponsorship Agreement") to which this Ticketing Agreement is attached as Schedule 1.

### RECITALS

WHEREAS, SeatGeek offers on its own behalf and on behalf of third parties the SeatGeek Platform, comprising a proprietary search, sales and distribution platform for Tickets to Events, in both the primary and secondary Ticketing markets, including associated SaaS services and Software; and

WHEREAS, Team seeks to retain SeatGeek, on an exclusive basis as set forth herein, to provide Ticketing Services for Events;

NOW, THEREFORE, the parties hereto hereby agree as follows:

### AGREEMENT

1. Definitions. As used in this Ticketing Agreement, the following terms shall have the respective meanings indicated below:

i. "Event" and "Excluded Event" shall have the respective meanings set forth in the Sponsorship Agreement, except that for purposes of the Ticketing Agreement only, Excluded Event shall include any Home Games and other games played by the Club prior to January 1, 2020.

ii. "Sale," "Sell" and any derivations thereof in this Ticketing Agreement shall include any distribution of Tickets (whether for consideration or for no consideration), by any means or method (including, without limitation, on the Internet or by auction), and shall include resales.

iii. "Sellable Capacity" means the admission capacity of the Facility for any particular Event (excluding, for the avoidance of doubt, Tickets distributed in the manner contemplated by Section 2(v)).

iv. "Software" means SeatGeek's Ticketing system software and any other deliverables furnished by SeatGeek and/or for SeatGeek Platform access (including, but not limited to, APIs and SDKs) provided to Team or any third party by SeatGeek during the Term.

v. "Term," for purposes of the Ticketing Agreement only, means the Effective Date through December 31, 2025 except as otherwise set forth herein.

vi. "Ticket" means a printed, electronic or, to the extent then-supported by SeatGeek, other type of evidence of the right, option or opportunity to occupy space at or to enter or attend an Event, even if not evidenced by any physical manifestation of such right (e.g., an electronic image displayed on mobile device).

vii. "Ticket Receipts" means the amount of the Total Retail Price of a Ticket sold hereunder.

viii. "Total Retail Price" means the total price charged at checkout to include all fees, taxes, and shipping. For the avoidance of doubt, the "Total Retail Price" shall reflect the full amount that a consumer pays for a Ticket (i.e., the amount displayed on a consumer's credit card statement).

2. Exclusivity; Distribution Partners.

i. Grant of Exclusive Rights. Except as specifically set forth herein, Team hereby grants to SeatGeek, and SeatGeek accepts from Team, the right during the Term of this Ticketing Agreement, to be the exclusive seller (i.e., exclusive as to third parties, as well as to Team and any Affiliate) of all Tickets for the Sellable Capacity for every Event, via any and all means and methods, including via the internet, apps, social media, bots, by telephone, computer, IVR, outlets, television, clubs, VIP packages, presales, upsells, or by any other means of distribution, whether existing now or at any time in the future. Without limiting the foregoing, except as specifically set forth herein with regard to Distribution Partners and Excluded Events, Team shall not, directly or indirectly, cause or permit any third party to use any Team, Club or Facility intellectual property in connection with the Sale of Tickets to Events. Team shall ensure that the entire Sellable Capacity for every Event shall be made available for distribution on the SeatGeek Platform.

HIGHLY CONFIDENTIAL

SG-CID-00000734

**DX-1393.0641**

SEATGEEK CONFIDENTIAL

ii.     Distribution Partners. SeatGeek acknowledges and agrees that certain third-party distribution partners, mutually agreed upon by the parties in writing, such agreement not to be unreasonably withheld ("Distribution Partners"), shall be permitted (a) to Sell Tickets to Events and (b) to use Team intellectual property in connection with such Sales, but only for the purposes of identifying themselves as "an official distribution partner" or "an official preferred partner" of Club ("Permitted Designation"); provided, however, that the Sale or other distribution of Tickets for Events by Distribution Partners shall be subject to (1) at SeatGeek's election, SeatGeek serving as the merchant of record or SeatGeek's receipt of the corresponding compensation set forth on Exhibit A for such transactions, (2) the use by any such Distribution Partner of the SeatGeek Platform as provided for herein, including any bar code requirements instituted by SeatGeek, (3) the use by any such Distribution Partners of the "powered by SeatGeek" designation, or other approved designation set forth herein, in connection with such Sales, (4) the requirement that any such Distribution Partner must comply with generally applicable terms and conditions for the Sale of Tickets for Events, including minimum prices for Tickets for Events, with which Team requires SeatGeek to comply and (5) the requirement that, except in connection with the Permitted Designation, Team shall not cause or permit any Distribution Partner to use any Team intellectual property or use any other designation to refer to its Sales of Tickets to Events. SeatGeek will authenticate Tickets (i.e., re-issue barcodes) on all Tickets Sales made by or on behalf of Distribution Partners. The parties agree that each Distribution Partner may be required by SeatGeek to display reasonably prominently a SeatGeek mark in connection with such Distribution Partner's Sale of Tickets to Events, in a manner to be reasonably and mutually agreed upon by SeatGeek and Team (e.g., "Powered by SeatGeek").

iii.     API Requirements. SeatGeek shall make available its then-standard application programming interface, SDK or other digital interfaces (collectively, "APIs") to enable Distribution Partners' and Additional API Licensees' (defined below) permitted use of the SeatGeek Platform hereunder. Team shall cause each such Distribution Partner and Additional API Licensee, on a royalty-free basis: (a) to use such APIs (and not any other mechanism) to connect to the SeatGeek Platform; (b) to grant to SeatGeek the necessary rights and to provide to SeatGeek the assistance reasonably necessary in order to operate and maintain such APIs; and (c) to use such API access, including, without limitation, any and all reporting or other data or materials resulting therefrom, solely for the benefit of Team's internal business operations and for no other purpose whatsoever (provided, however, that Team shall not use such access, reporting, data, materials or other information to promote the sale of Tickets to single Events). SeatGeek shall grant to such Distribution Partners and Additional API Licensee the right to use such APIs on a royalty-free basis; provided, however, that such Distribution Partners and Additional API Licensees shall be required (x) to execute and comply with SeatGeek's then-current form API license agreement in connection with such use and (y) to maintain, at each such Distribution Partner's and Additional API Licensee's sole expense, whatever insurance coverage, hardware, software, systems, connectivity, networks and other information technology assets that may be required in order to use such API. (The requirements set forth in clauses (a), (b), (c), (x) and (y) of this Section 2(iii) shall be referred to herein as the "API Requirements.")

iv.     Sales by Team. Team retains the right, in each case using the SeatGeek Platform and subject to SeatGeek's receipt of the compensation set forth on Exhibit A: (a) to engage in primary sales of single Tickets from the Facility Box Office to persons physically present at the Facility Box Office; (b) to engage in primary sales of season/contract Tickets; and (c) to engage in group primary Sales of Tickets. Notwithstanding anything herein to the contrary, Team shall not, nor shall Team cause or permit any third party to, directly or indirectly, make Tickets available via any method (including via consignment) without the prior written consent of SeatGeek in each instance.

v.     Complimentary Seats. Team shall not, nor shall Team cause or permit any third party to, distribute or provide, directly or indirectly, for any individual Game more than the number of Tickets permitted to be distributed under the League's Team Complimentary Ticket Policy (the "Complimentary Ticket Cap"), provided, however, that in no event will the Complimentary Ticket Cap for any year exceed twenty-five hundred (2500) Tickets per Game without SeatGeek's prior written consent. For the 2019 MLS season, the Complimentary Ticket Cap is eighteen hundred (1800) Tickets per Game. The League will provide SeatGeek with written notice of changes to the Complimentary Ticket Cap. In the event a Team distributes Tickets in excess of the Complimentary Ticket Cap, then the Team will compensate SeatGeek for the complimentary seats over the Complimentary Ticket Cap as set forth in this Section 2(v) (provided, however, that, for the avoidance of doubt, Team shall not cause or permit any Competitor to distribute any such complimentary Tickets). In the event that the complimentary Tickets for any such Game exceed the Complimentary Ticket Cap, for every incremental complimentary Ticket, Team shall owe to SeatGeek the amounts set forth in the fee schedule in Exhibit A, applied to a price equal to the last sold price of a corresponding seat for a similar Game, as determined by SeatGeek. SeatGeek will consider in good faith exceptions to the terms of this Section 2(v) requested by Team (e.g., for non-profit Events), provided, that Team identifies such Events at least thirty (30) days in advance.

vi.     No Third-Party Systems or Services. Except for Distribution Partners and Additional API Licensees (to the limited extent expressly permitted by Section 2(iii), above) and with respect to Excluded Events (to the limited extent expressly permitted by the Sponsorship Agreement), Team shall not, directly or indirectly, use, sponsor, promote, advertise, authorize or permit the use of any Competitor products and services in SeatGeek's Commercial Category.

vii.     Access to On-Sale and Pre-Sale Tickets. Notwithstanding anything herein to the contrary, Team will cause SeatGeek to have the exclusive right (i.e., exclusive as to third parties, as well as to Team) to sell Tickets to any particular Event or series of Events at least seventy-two (72) hours prior to the time (e.g., the pre-sale date or on-sale) that any Distribution Partner has the right to sell Tickets to any such Event or Events.

24

HIGHLY CONFIDENTIAL

SG-CID-00000735

SEATGEEK CONFIDENTIAL

IN WITNESS WHEREOF, SeatGeek and Team have caused this Agreement to be duly executed as of the Effective Date.

SEATGEEK, INC.
400 LAFAYETTE STREET, FLOOR 4
NEW YORK, NY 10003

By: _____

Name: Russell D'Souza

Title:        COO

Date:        6/6/2019

FUSSBALL CLUB CINCINNATI, LLC
14 East 4th Street, Fourth Floor
Cincinnati, OH 45202

By: _____

Name: G. Jeffrey Berding

Title: President

Date: 6/3/2019

WEST END VENTURES, LLC
14 East 4th Street, Fourth Floor
Cincinnati, OH 45202

By: _____

Name: G. Jeffrey Berding

Title: President

Date: 6/3/2019

32

HIGHLY CONFIDENTIAL

SG-CID-00000743

**DX-1393.0650**

SEATGEEK CONFIDENTIAL

### EXHIBIT A

### COMPENSATION

I.  **Primary Sales**

**Team Primary Fee Structure**

SeatGeek will retain a variable percentage of Total Primary Team Ticketing Revenue as follows:

| ████████████ | % Retained by SeatGeek |
|---|---|
| ████████ | ███ |
| ██████ | ██ |



Team will set and retain all fees other than the percentage of sales retained by SeatGeek.

For clarity, SeatGeek will retain ███████████ the first ████████ in Total Primary Team Ticketing Revenue and ███████████████████ for Total Primary Team Ticketing Revenue greater than ████████ during any calendar year.

In the event Team or any of its affiliates owns any additional professional sports teams (including a women's or lower division professional soccer club or an XFL team) or other sports and entertainment properties with recurring events (such as an eSports team/franchise) and such team or property plays its home games at the Stadium or has recurring events at the Stadium, the primary ticketing revenue from such additional professional sports team or sports and entertainment property shall be included in the calculation of Total Primary Team Ticketing Revenue and shall be subject to the same terms and conditions.  In addition, any ticketed Team events and ticketed FC Cincinnati Foundation events (i.e. jersey reveal events, fan fests, meet the team events, etc.) shall be primary ticketing revenue and included in the calculation of Total Primary Team Ticketing Revenue and shall be subject to the same terms and conditions.

**Third Party Event Fee Structure**

SeatGeek shall retain ██████████████ of Total Primary Event Ticketing Revenue for all third party Events at the Stadium (i.e., not the Interim Stadium).  Total Primary Event Ticketing Revenue is defined as the ███████████████████████████

II.  **Secondary Sales**

Beginning on the Effective Date (and including the 2019 season), SeatGeek will rebate to Team a variable percentage of ████████████████████████ ██████████████████ received by SeatGeek according to ██████████ Team secondary Ticket Receipts transacted on the SeatGeek Platform, including fee revenue generated from any distributed secondary sales, in a calendar year as follows:



| ████████████ | % of ███ Secondary Fee Revenue Rebated |
|---|---|
| ███████ | ██ |

HIGHLY CONFIDENTIAL

SG-CID-00000744

**DX-1393.0651**

SEATGEEK CONFIDENTIAL



By way of example, if gross secondary ticketing revenue on the SeatGeek Platform in a calendar year is ███████████████████████ revenue associated with such sales is ███████████ of the Gross Secondary Ticketing Revenue, SeatGeek will pay to Team the following: ████████████████████████████████████████████████

In connection with the secondary sale of Team Tickets, the following considerations shall apply:
1. If on the SeatGeek Platform:
   a. Commingled inventory;
   b. No floor or ceiling on price; and
   c. SeatGeek shall set the ██████████
2. If through third party distribution channels:
   a. SeatGeek shall set the seller fee;
   b. The distribution partner shall set the buyer fee; and
   c. Standard inventory settings (e.g., price floor) shall be controlled by the distribution partner

34

HIGHLY CONFIDENTIAL

SG-CID-00000745

DX-1393.0652