DX-1393(63)

Bates: SG-CID-00001714 – SG-CID-00001747

SeatGeek and Portland Timbers Sponsorship Contract

## SPONSORSHIP AGREEMENT

This Sponsorship Agreement, dated as of October 30, 2018 (including the Ticketing Agreement and all other exhibits hereof, this "Agreement" or "Sponsorship Agreement"), is entered into by and between (a) Portland Timbers ("Club Operator" or "Licensor"), and (b) SeatGeek, Inc. ("Sponsor" or "SeatGeek").

### RECITALS

**WHEREAS,** Club Operator operates Portland Timbers ("Club"), a soccer club in MLS;

**WHEREAS,** MLS has appointed Club Operator to serve as its exclusive agent with authority to license local commercial affiliations, including the right to license the use of the Club Marks and Player Likenesses in conjunction with such local commercial affiliations, all subject to MLS approval;

**WHEREAS,** Sponsor has entered into that certain Official Sponsor Agreement with SUM, effective as of November 17, 2016 ("Official Sponsor Agreement");

**WHEREAS,** Licensor and Sponsor desire to enter into an agreement whereby Licensor: (1) grants to Sponsor certain Rights in connection with the Club, Games and (if applicable) Local Game Distributions; (2) grants to Sponsor certain exclusive rights to use the Licensor Marks and/or Player Likenesses in Sponsor's Commercial Category in connection with the advertising and promotion of certain of Sponsor's Products/Services/Retail Operations in accordance with the terms and conditions of this Agreement; and (3) engages Sponsor as its exclusive ticketing service provider pursuant to the Ticketing Agreement.

**WHEREAS,** Licensor and Sponsor desire to enter into this Agreement to mutually promote the success of Sponsor, Club and MLS.

**NOW, THEREFORE,** in consideration of the mutual promises set forth herein and for good and valuable consideration, the receipt of which is hereby acknowledged, Licensor and Sponsor agree as follows:

1.    **DEFINITIONS.** Capitalized terms used herein shall have the following definitions set forth in this Section 1. Other capitalized terms used, but not defined, in this Agreement shall have the meanings set forth in the Ticketing Agreement:

"Advertising Materials" shall mean any and all (i) general promotional, advertising, packaging, collateral or other display materials, (ii) media, (iii) promotions, (iv) advertising and promotional concepts (including, but not limited to, slogans, campaigns or programs), or (v) any other creative, content or product created or prepared by or on behalf of Sponsor or any authorized third-party that displays any of the Club Marks and is used in connection with Sponsor's Products/Services/Retail Operations, including in or around any Facility or in furtherance of any Pass-Through Rights. Without limiting the generality of the foregoing, such materials may include, without limitation, television, radio, print, outdoor, industrial and point-of-sale materials as well as any materials used in connection with the Digital Platforms.

"Affiliate" shall mean an entity or person that, directly, or indirectly, through one or more intermediaries controls, is controlled by, or is under common control with a party now known or hereafter in the future during the Term.

"Agreement" shall have the meaning set forth in the Preamble hereof.

"Announcements" shall have the meaning set forth in Section 6.C. of this Agreement.

"Appearances" shall have the meaning set forth in Section 6.G. of this Agreement.

"Applicable Laws" shall mean all laws, regulations, and governmental rules and standards applicable to a party's obligations, actions or inactions under this Agreement or the Ticketing Agreement.

"Applicable Privacy Laws" shall mean Applicable Laws of the United States of America governing the protection and privacy of data relating to this Agreement, including, without limitation, Purchaser Data.

"Claim" or "Claims" shall have the meaning set forth in Section 8.A. of this Agreement.

"Club" shall have the meaning set forth in the Recitals to this Agreement.

"Club Marks" shall mean the official trade name, symbol and mascot (whether registered or not), if any, of Club, as may be developed by, or on behalf of, Club, and/or other trademarks or copyrights owned and/or used by MLS and Licensor, but specifically excluding the MLS Marks.

"Commercial Sponsors" shall mean all MLS sponsors, MLS suppliers, Licensor sponsors, Licensor suppliers or other entities granted a license to use the MLS Marks and/or Licensor Marks or other commercial identification rights in connection with (and approved by), with respect to the Club Marks, the League.

"Commercial Spots" shall have the meaning set forth in Section 6.E. of this Agreement.

"Competitor" shall mean any third party that is engaged in a material respect in the business of the sale, resale or issuance of tickets.

"Confidential Information" shall have the meaning set forth in Section 12.G.i of this Agreement.

"Deal Terms" shall mean the business terms agreed to by and between Licensor and Sponsor as set forth in Exhibit A attached hereto and made a part hereof.

"Designation(s)" shall have the meaning set forth in Section 2.B. of this Agreement.

"Digital Platforms" shall mean any and all internet website(s), mobile app(s), social media account(s) (e.g., Snap, Twitter, Instagram, Facebook, Pinterest and Tumblr, as well as pages or microsites on platforms such as YouTube), bot(s) or other internet, electronic or digital media owned, operated, maintained and/or programmed by or on behalf of a party, including, without limitation, any co-branded versions and any versions distributed through or in connection with any third party and/or any platform or

1

HIGHLY CONFIDENTIAL

SG-CID-00001714

DX-1393.1701



C. Insurance Required of Certain Sponsors. Any other applicable insurance requirements are set forth in Exhibit B attached hereto.

D. Additional Insured. Sponsor's General Liability, Automobile (if required) and Liquor Liability (if required) policies shall include MLS Indemnified Parties as additional insureds.

E. Certificates of Insurance. In addition to the coverages required through this section, Sponsor's certificates shall state that the insurance is primary and noncontributory to any insurance of the MLS Indemnified Parties, the additional insured status of the MLS Indemnified Parties and that the Licensor shall be given thirty (30) days' notice of cancellation.



**10.    TERM, TERMINATION, BREACH.**

A. Term and Negotiation Periods. This Agreement shall become effective as of the date and year first written above (the "Effective Date") and shall remain in effect through [·] ("Term"), unless sooner terminated pursuant to the provisions of this Agreement. Beginning one hundred eighty (180) days prior to the expiration of the Term ("Negotiation Period"), the parties shall discuss in good faith terms and conditions pursuant to which they would mutually agree on an extension of the Term of this Sponsorship Agreement and/or the Ticketing Agreement. Any such extension, if agreed upon by the parties, shall be set forth in a writing executed by authorized representatives of each party. Sixty (60) days prior to the expiration of the Negotiation Period ("Third-Party Permitted Negotiation Date"), in the event that Sponsor and Licensor have not agreed in writing to extend the Term of this Sponsorship Agreement and/or the Ticketing Agreement, then Licensor may, directly or indirectly, negotiate with any third party with regard to the Rights in Sponsor's Commercial Category and Services under the Ticketing Agreement or Deal Terms. Prior to start of the Third-Party Permitted Negotiation Period, Licensor shall not, directly or indirectly, negotiate with any third party with regard to the exclusive rights in Sponsor's Commercial Category or the Service under the Ticketing Agreement.



December 31, 2023

B. Termination.

i. Breach. If either party or any officer, employee, agent, representative, sublicensee or manufacturer of either party materially breaches any of its obligations under this Agreement and if such breach (if curable) is not cured by the breaching party within thirty (30) days after the non-breaching party sends written notice of such breach to the breaching party specifically describing such breach (and in the event of a breach by Sponsor of the League Rules, then such written notice shall include the relevant excerpts of the League Rules, and Sponsor shall have ninety (90) days to cure same, if Sponsor had not previously been provided those portions of the League Rules it is then-alleged to have breached), then the non-breaching party shall have the right to terminate this Agreement (in whole or in part, in accordance with the terms

hereof) after such thirty (30)-day period effective immediately upon written notice; provided, that, subject to the remainder of this Section 10, in the event of any termination of this Sponsorship Agreement or the Ticketing Agreement the terminating party shall be obligated to terminate the entire relationship (i.e., a party electing to terminate either this Sponsorship Agreement or the Ticketing Agreement must terminate both this Sponsorship Agreement and the Ticketing Agreement).

ii. Bankruptcy. Either party may terminate this Agreement effective immediately upon written notice following the occurrence of one or more of the following events with respect to the other: (a) there is a cessation of operations or the institution against such party of a bankruptcy proceeding, dissolution, liquidation or the appointment of a trustee or a receiver, or (b) such party makes an assignment for the benefit of creditors or admits in writing that it is unable to pay its debts as they become due.

C. Effect of Termination. Termination of this Agreement as provided herein shall be without prejudice to any other rights or remedies which the terminating party may have. In the event that this Agreement terminates for any reason, all rights granted by either party to the other hereunder shall immediately revert to the grantor and the grantee shall immediately and permanently cease all use of the grantor's intellectual property (except for "fair use" as and to the extent permitted by Applicable Law), except that, in the event that this Agreement expires or terminates, and the Ticketing Agreement remains in effect, Sponsor shall retain the right to use Licensor Marks, in accordance with the terms of this Agreement, in connection with Sponsor's activation of its rights and furnishing of Services under the Ticketing Agreement. Upon the expiration or any termination of the Ticketing Agreement: (i) Sponsor shall, without demand, forthwith pay to Licensor all undisputed amounts due and owing pursuant thereto, (ii) Licensor shall cease use of the SeatGeek Platform; and (iii) Licensor shall, without demand, forthwith pay to Sponsor all undisputed amounts due and owing pursuant thereto. Upon the effective date of any termination or expiration of this Agreement each receiving party shall return, or at the disclosing party's request destroy, all copies of the disclosing party's Confidential Information, and all other property belonging to the disclosing party; provided, that, nothing in this section shall be construed to prohibit a receiving party from retaining such Confidential Information to the extent is required by law, any applicable rule of any regulatory or governmental body or organization, or its document retention policy, it being agreed that any such Confidential Information continue to be subject to the restrictions on use and obligation for confidential treatment contained herein (which shall survive for so long as copies of any Confidential Information remain). Notwithstanding the foregoing, Licensor and Sponsor agree that, in the event that a party elects to terminate the Ticketing Agreement pursuant to Section 10.B.i., any termination of this Agreement (which includes the Ticketing Agreement) during an MLS season shall be effective upon conclusion of such MLS season, other than for an uncured breach of the terms of Section 6.iii. of the Ticketing Agreement, in which case the termination shall be effective immediately. The parties agree to cooperate to transition in a commercially reasonable manner Services to

11

HIGHLY CONFIDENTIAL

SG-CID-00001724

Licensor prior to the effectiveness of any such termination (which may be at Sponsor's then-current professional service fees). Upon termination in accordance with this Section, (a) Sponsor shall, without demand, forthwith pay to Licensor all undisputed amounts due and owing pursuant hereto, (b) Licensor shall cease use of the SeatGeek Platform and (c) Licensor shall, without demand, forthwith pay to Sponsor all undisputed amounts due and owing pursuant hereto.

D. League Approval.

i. Sponsor acknowledges that Licensor will submit this Sponsorship Agreement (not including the Ticketing Agreement) for review by MLS and agrees that all of Licensor's obligations to Sponsor under this Sponsorship Agreement (not including the Ticketing Agreement) are subject to and conditioned upon MLS's written acceptance and approval of this Sponsorship Agreement in accordance with the provisions set forth below.

ii. In the event that, within ninety (90) days of the Effective Date, Licensor is unable to obtain written acceptance and approval from MLS, Licensor may terminate this Sponsorship Agreement (but not the Ticketing Agreement) by giving written notice of termination to Sponsor, which termination shall be effective upon the giving of such notice prior to the expiration of such ninety (90)-day period. If, by the end of such ninety (90)-day period, Licensor has neither notified Sponsor that MLS has accepted and approved this Sponsorship Agreement nor provided notice of termination, this Sponsorship Agreement shall remain in full force and effect in accordance with its terms. In the event this Sponsorship Agreement is terminated by Licensor pursuant to this provision, Licensor will (a) refund to Sponsor any amounts previously paid by Sponsor to Licensor pursuant to this Sponsorship Agreement and (b) reimburse Sponsor for its documented internal and external costs incurred in connection with the negotiation and implementation of this Sponsorship Agreement (including amounts paid to outside counsel, amounts paid to vendors retained in order to activate any of the sponsorship Rights or benefits set forth herein (and Licensor shall indemnify, defend and hold harmless Sponsor in accordance with the terms of this Agreement from and against any claims by any such vendors arising out of or related to such termination), etc.).

E. Equitable Relief. Each party acknowledges and agrees that in the event of a breach or threatened breach by the other party of any provision in this Agreement relating to the Licensor Marks, SeatGeek Platform, or Sponsor Marks, as applicable, the damage to the non-breaching party may be irreparable and extremely difficult to estimate, making any remedy at law or in damages inadequate and, accordingly, the non-breaching party shall be entitled to seek injunctive relief against the breaching party in such event in addition to any other relief (including damages) available to the non-breaching party.

F. Make-Goods. Except as set forth in Section 12.J., in the event that either Licensor's compliance with any provision or provisions of this Sponsorship Agreement or the provision of any Right (other than Licensor's obligation not to grant any third party any

sponsorship rights in the Sponsor Commercial Category) hereunder is: (i) prohibited, limited or otherwise restricted under the terms of any other agreement (including any League Rules, but not including any pre-existing agreement that Licensor may have entered into with a third party in respect of the Sponsor Commercial Category); (ii) becomes impossible, undesirable or impracticable for Licensor to provide hereunder in accordance herewith; or (iii) imposes an unforeseen economic burden on Licensor materially greater than it could have reasonably have expected, then the Licensor shall not be required to comply with such provision or provisions of this Sponsorship Agreement or otherwise provide such Unavailable Benefits and such noncompliance/failure shall not be deemed to be a breach of this Sponsorship Agreement by Licensor. However, with respect to any such Unavailable Benefit, the parties will consult in good faith regarding a substitute benefit having promotional value not materially less than that of the Unavailable Benefit (such value to be determined by good faith negotiation and agreement by the parties). For the avoidance of doubt, the foregoing shall be the Sponsor's exclusive remedy with respect to Unavailable Benefits. For the purposes of this Agreement, an "Unavailable Benefit" shall be a Right (other than Licensor's obligation not to grant any third party any sponsorship rights in connection with the Club in the Sponsor Commercial Category) that the Licensor cannot provide to Sponsor as a result of the occurrence of any event described in Section [12.J.i or ii].

11. **REPRESENTATIONS AND WARRANTIES**. Each party hereto represents and warrants to the other as follows:

A. It has the full power and authority to enter into this Agreement and to perform its obligations hereunder and thereunder.

B. Its execution and delivery of and its performance under this Agreement have been duly authorized by all necessary corporate, limited liability company or other action (as applicable), and have not, do not and will not conflict with, violate, result in a breach or default of or otherwise materially adversely affect any rights of any third person or entity, whether now existing or hereafter arising or occurring.

C. This Agreement is a legal, valid and binding obligation of it, enforceable against it in accordance with its terms.

D. No current litigation or claim exists or, to its knowledge, is pending or threatened, which does or would reasonably be expected to materially adversely affect its ability to fully perform its obligations hereunder.

E. The exercise of the Rights pursuant to this Agreement shall be subject to all Applicable Laws, regulations and decrees in the countries within which such Rights are to be exercised (including, without limitation, all applicable local, state, regional and national laws). All uses of the Licensor Marks by Sponsor shall comply with all Applicable Laws. All uses of the Sponsor Marks by Licensor shall comply with all Applicable Laws.

12

HIGHLY CONFIDENTIAL

SG-CID-00001725

**DX-1393.1712**

SEATGEEK CONFIDENTIAL

IN WITNESS WHEREOF, SeatGeek and Team have caused this Agreement to be duly executed as of the Effective Date.

| SEATGEEK, INC.<br>400 LAFAYETTE STREET, FLOOR 4<br>NEW YORK, NY 10003 | PORTLAND TIMBERS<br>1844 SW MORRISON<br>PORTLAND, OREGON |
|---|---|
| DocuSigned by:<br>By: _Russ D'Souza_<br>E5EF72B547014EC...<br>Name: Russ D'Souza | DocuSigned by:<br>By: _Mike Golub_<br>E5F95D50C5B14DE...<br>Name: Mike Golub |
| Title: President | Title: President of Business |
| Date: 11/1/2018 7:46:09 PM PDT | Date: 11/1/2018 2:56:03 PM PDT |



30

HIGHLY CONFIDENTIAL

SG-CID-00001743

**DX-1393.1730**

SEATGEEK CONFIDENTIAL

**EXHIBIT A**

**COMPENSATION**

I.    **Primary Sales**

- **Timbers/Thorns/T2 events, as well as events at the Facility that are promoted or controlled by or on behalf of Licensor or Team**: The SeatGeek Fee to be retained by SeatGeek,  will be ████████████
- **All Other events that are not promoted or controlled by or on behalf of Licensor or Team at the Facility**: The SeatGeek Fee to be retained by SeatGeek will be ████████████
- **Terms**
  - SeatGeek Fee is applied ████████████████████████████████ ████████████████████████████ .
  - SeatGeek Fee ████████████████████████████████████████
  - Team will retain sole control of dynamic fee structures on Team properties (e.g., Timbers.com, Club mobile application)

II.   **Secondary Sales**

- **Owned Channels and Distribution Partners**: SeatGeek will pay to Team ████████████ of total fee revenue generated on sales of Tickets to Events. The ████████████ shall be determined by SeatGeek provided that the total fee is consistent with industry standards.
- SeatGeek will distribute secondary Ticket inventory to Distribution Partners at a mutually agreed upon markup and in a mutually agreed upon quantity.  SeatGeek will pay to Team ████████████ of total fee revenue generated on the sales of Tickets.
- To the extent the total fees paid to Team under this Section II in any year during the Term is less than ███ ████████████████████████ , then SeatGeek will pay to Team the difference.

III.  **Additional Considerations**

- Team will retain sole control over wholesale pricing on all channels for Tickets
- Sponsorship ██████ : Team will receive an additional ████████████████████████ in sponsorship allotment for each incremental ████████████████ in total revenue from sales of Tickets to all Events at Stadium that uses SeatGeek ticketing ████████████████ ████████ in the prior year of the Term.
- SeatGeek will reimburse Team up to ████████████████████ per year during the Term for the Team's customer relationship management subscription fees.

31

HIGHLY CONFIDENTIAL

SG-CID-00001744

**DX-1393.1731**