DX-1394(10)

Bates: AEG-CID-0000750445 – AEG-CID-0000750468

AXS and Tiebreaker Productions, LLC Ticketing Services Agreement (Forest Hills Stadium)



## TICKETING SERVICES AGREEMENT

FOREST HILLS STADIUM
Primary and Secondary Market Sales and Services

This Ticketing Services Agreement (the "Agreement") is entered into as of this 15 day of December, 2016 by and between AXS Group LLC, a Delaware limited liability company ("AXS") and Tiebreaker Productions, LLC, a New York limited liability company ("Client") with reference to the following facts:

WHEREAS, AXS, through itself and its affiliated companies owns and operates proprietary, web-based electronic ticketing systems and applications and systems for the original sale, issuance, resale and/or transfer of tickets to entertainment and sporting events and other rights associated with such events; collects and analyzes consumer data; and conducts consumer marketing activities and other services in support of the foregoing (the "System"); and

WHEREAS, Client desires to utilize the AXS System in connection with ticketing operations for events scheduled or presented by Client at the venue described in Section 1(b) hereof (the "Events") and to engage AXS as its agent for providing ticketing services to the public and other services for the Events, on the terms and conditions set forth herein.

NOW THEREFORE, in consideration of the foregoing and the mutual promises set forth herein and for other good and valuable consideration, the parties hereto agree as follows:

1.    **Term; Exclusive Rights**.

(a)    Term.  The term of this Agreement will start on December 15, 2016  (the "Effective Date"), and shall continue for five (5) years thereafter, i.e., until November 30, 2021 (the "Term").  Notwithstanding the above, if the term of the license agreement between Client and The Westside Tennis Club (the "Venue License Agreement") is not extended per the terms of Venue License Agreement, or otherwise replaced such that Client continues to have the right to schedule and present Events at the Venue, AXS acknowledges and agrees that the Term may be terminated by Client effective as of October 1, 2019 (or if later, the date that the Venue License Agreement expires or is terminated) with no less than ninety (90) days' prior written notice provided by Client; provided that the Client shall repay to AXS a portion of the Advance (defined in Section 2) in an amount equal to the lesser of the unrecouped balance as of the effective date of the termination or $███████, the pro rata portion of the Advance remaining unearned as of the end of year three of the Term.

(b)    Exclusive Rights. During the Term, AXS shall serve as Client's sole and exclusive provider of ticketing software sales and services for the Events at the Venue (as defined below) in the primary market and in the secondary market.  Client grants AXS the

1

Tiebreaker-ForestHills_Agreement_Final (12.22.2016).docx

Highly Confidential

AEG-CID-0000750445

**DX-1394.0242**

sole and exclusive right to sell all tickets (other than Excluded Tickets as defined in Paragraph 1.(c) below) via any means (now known or to be discovered) in connection with Client's Event(s) at the Forest Hills Stadium, located at One Tennis Place, Forest Hills, NY 11375 (the "Venue"), including by Internet and call centers.  Client shall place the entire manifest of Tickets on the AXS System for each Event (including the Excluded Tickets as defined in Paragraph 1.(c) below, but Client shall retain the right to direct the Excluded Tickets from the manifest subject to Paragraph 1 (c)).  In connection with the sale, resale or issuance of tickets, other than with respect to Excluded Tickets, Client will not endorse, promote or authorize the use of any third party Internet site, ticketing company, ticket reseller, ticket exchange, or software system.   Furthermore, each party will use its commercially reasonable efforts to not sell tickets to any person or entity that it believes will re-sell tickets to Client's Event(s).  In addition, Client will use AXS's Flash Seats technology in the Venue, and AXS and Client shall share resale revenue generated from the Flash Seats technology with Client in the amounts set forth in Exhibit A and Paragraph 2, below.  The Flash Seats technology facilitates the Venue's creation of a proprietary, branded and controlled secondary market marketplace.  Regarding secondary market ticketing operations, Client agrees that during the Term, (i) it shall not endorse, support, integrate with, or receive revenue or any other compensation from any other secondary ticket marketplace (any marketplace pursuant to which ticket holders may sell or otherwise transfer their tickets and/or the rights associated therewith to others), including, without limitation, eBay, StubHub, RazorGator or Ticketmaster (except as may be required by AXS's resale partner(s)); and (ii) all tickets to all Events, shall be transferable by the holder thereof on AXS's or its affiliate's secondary ticketing marketplace.

(c)    Excluded Tickets.  Client retains the right to sell the following "Excluded Tickets": (i) distribution of no more than 8% of an Event's tickets, through legitimate fan clubs consistent with industry custom and practice; and (ii) distribution of tickets through distribution channels other than AXS shall be as mutually approved by Client and AXS, not to be unreasonably withheld.

2.    **Flash Seats Marketplace Revenue Advance and Client Share**. Client agrees to enable Flash Seats as the only free method of ticket delivery in the primary and secondary markets and to incorporate the Flash Seats Marketplace on the AXS ticket purchase page on the Platform.  AXS will provide Client with a recoupable advance in the amount of $▮▮▮▮▮▮ ("the Advance"), payable within 30 days of execution of this Agreement.  Such Advance shall be recoupable and non-returnable (except as provided in Section 1 (a) above) and shall be recouped by AXS solely against the Client's ▮% share of Flash Seats Marketplace fee revenue ("Secondary Marketplace Transaction Fees", as defined in Exhibit A to this Agreement). For purpose of clarity, AXS will retain Client's ▮% share of Secondary Marketplace Transaction Fees until the total Secondary Marketplace Transaction Fees equal $▮▮▮▮▮, after which time AXS shall pay ▮% of the Secondary Marketplace Transaction Fees to Client.  At the end of each year of the Term, a pro rata portion of the Advance will become fully earned by Client and non-recoupable to AXS (e.g., at the end of year one, $▮▮▮▮ of the Advance is non-recoupable, at the end of year two, $▮▮▮▮ of the Advance is non-recoupable, at the end of year three, $▮▮▮▮ of the Advance is non-recoupable, at the end of year four, $▮▮▮ of the Advance is non-recoupable and at the end of year five, $▮▮▮▮ of the Advance is non-recoupable.)

3.    **License to Client and AXS**.

2

Tiebreaker-ForestHills_Agreement_Final (12.22.2016).docx

Highly Confidential                                                                                          AEG-CID-0000750446

**DX-1394.0243**

(a)     <u>License from AXS to Client</u>.  AXS hereby grants to Client a non-exclusive, non-transferable license to use the Platform, the Hardware listed in <u>Exhibit B</u>, and/or other products described herein throughout the Term.  AXS grants Client a limited, non-exclusive, non-transferable license during the Term to access and use the AXS Platform (subject to Client's having a valid Account as described in <u>Exhibit C</u> below), solely for Client's internal business use. Client's rights in the AXS Platform will be limited to those expressly granted in this Section 3.  AXS and its licensors reserve all rights and licenses in and to the AXS Platform not expressly granted to Client under this Agreement.

(b)     <u>Definition of Platform</u>.  The term "Platform" shall mean the current version of AXS's proprietary software and related applications and documentation for the sale, resale, transfer and management of tickets, including any computer application, program, documents, text, photographs, videos, pictures, animation, sound recordings or code consisting of a series of instructions or statements (including data), executable or otherwise usable on computers and located on equipment owned and/or operated by AXS which may be provided, accessed, and utilized by Client for the sale and management of tickets, and any enhancements, upgrades, new releases, new versions and modifications thereto during the Term (other than any software products which are determined, in AXS's sole discretion, to be successor products or extensions to existing products rather than updates to existing products). This Agreement does not apply to human readable source code, and in no event shall AXS be obligated to provide source code for any Software.

(c)     <u>Definition of Hardware</u>.  The term "Hardware" shall mean computer, telecommunications, printing, and other equipment provided by AXS to Client, including but not limited to, the Hardware described in <u>Exhibit B</u> attached hereto.

(d)     <u>License from Client to AXS</u>. Client shall provide to AXS in electronic form such documents, text, photographs, trade names, trademarks, advertising or other property, (including any such rights related to a specific Event) (the "Client Content") of Client as necessary in Client's discretion to enable AXS's performance of the Services. Client hereby grants to AXS a limited, personal, non-exclusive right and license to use and copy such Client Content, solely for the purposes of performing the Services.

4.     **Installation and Training**.  AXS will install the Hardware and Platform, and provide initial training as well as additional training when new features or changes to the Platform are rolled out, in connection with the use of same.  This training may be conducted via remote means (telephone, videoconference, or internet).

5.     **Maintenance, Support and Upgrades**.

(a)     <u>Included Support</u>.  AXS shall provide technical support with respect to the Platform on an as-needed basis during its standard support hours, which are 8:00 am to 10:00 pm PST.  Off-Hours support to Client is also available 7 days per week via phone, and via email at support@axs.com.  AXS shall also provide Client with a designated Account Manager, who may be contacted for support issues.   AXS also provides certain technical support via a "self-service solution" web page.

(b)     <u>Maintenance and Upgrades</u>.  Client is entitled to receive the full benefit of all upgrades to the features of the Platform on the same basis as such upgrades are made generally available to other similar clients. AXS can at its reasonable, good faith discretion

3

Tiebreaker-ForestHills_Agreement_Final (12.22.2016).docx

Highly Confidential

AEG-CID-0000750447

**DX-1394.0244**

perform maintenance and updates to the platform or Hardware, which may result in temporary unavailability. AXS will use its best efforts to provide written advance notice thereof to Client.

(c)     Availability. AXS agrees to use commercially reasonable efforts to make the System available to Client at all times during the Term of this Agreement except for planned downtime, which shall be planned in order to minimize negative impact on Client, and circumstances beyond AXS's control such as natural disaster or act of God. In the event of unplanned downtime or outage of the Platform, AXS agrees to provide appropriate written notice to Client and consumers and agrees to use all reasonable efforts to respond immediately.

(d)     New Products. In the event that Client desires to access additional features or functionality of a product covered in this Agreement where such additional features were not activated at the time of this Agreement, Client and AXS will mutually agree upon adjustments to the corresponding financial terms to activate said functionality which shall be set forth in a written amendment to this Agreement. In the event that Client desires a ticketing feature or functionality that other comparable ticketing software and systems providers provide to comparable clients (by way of example, Red Rocks Amphitheatre and Staples Center) but that AXS does not then offer, Client shall notify AXS thereof, and the parties shall mutually determine a good faith solution, such as AXS agreeing to permit Client to obtain such feature from a third party, AXS developing such feature or other mutually agreeable solution.

6.     **Accounting Procedures and Settlement**.

(a)     Settlement of Funds Received by AXS. AXS shall collect all proceeds from the sale of tickets to Event(s) made on AXS channels or via AXS's merchant accounts (e.g., in the case of box office sales using an AXS merchant account) and deposit all such proceeds into an account maintained by AXS. AXS shall make payments to Client each Tuesday via electronic delivery with respect to Events which occurred during the preceding Monday through Sunday, for all gross proceeds from ticket sales and taxes collected on behalf of Client in accordance with this Agreement, less all authorized AXS fees and credit card processing fees due to AXS and any other applicable charges authorized in the Agreement.

AXS shall remit such proceeds to Client's account at:

| Bank Name | JP Morgan Chase Bank N.A. |
|---|---|
| Bank Address | 500 Stanton Christina Road NCC Newark, DE 19713 |
| Account Number | Redacted - PII |
| Routing Number | ██████████ |

** Client shall provide AXS with other information reasonably requested by AXS in order to remit such payments.

(b)     Invoicing. In the event that ticket receipts received by AXS under Section (a) above are insufficient to cover AXS fees owing hereunder, AXS shall invoice for the

4

Tiebreaker-ForestHills_Agreement_Final (12.22.2016).docx

Highly Confidential

AEG-CID-0000750448

**DX-1394.0245**

fees. All such invoiced fees shall be due and payable within ten (10) days after date of the invoice.

(c)     Client's Secondary Marketplace Revenues.     No later than the fifth business day of the following month AXS shall submit to Client a monthly report (the "Monthly Revenue Report"), setting forth the following information in respect of Secondary Marketplace Services of the immediately preceding month: (i) the aggregate revenues collected with respect to sales of tickets to Events in the Secondary Marketplace (the "Secondary Marketplace Revenues") during such month; (ii) the portion of such Secondary Marketplace Revenues to which each party is entitled pursuant to this Agreement (as set forth in Exhibit A); and (iii) the amount of Secondary Marketplace Revenues due and owing each party. AXS shall pay to Client by ACH the amount of Secondary Marketplace Revenues due to Client as set forth in the Monthly Revenue Report, concurrent with AXS's delivery of the Monthly Revenue Report. In the event that Secondary Marketplace Revenues shall be due and owing AXS, AXS shall deduct the undisputed amounts thereof from the next settlement after five (5) days advance written notice to Client.

(d)     Reports. AXS will provide Client with online access to reports summarizing all applicable account activity.

(e)     Refunds / Charge Backs:

(i)     Cancelled Events: If an Event (or ticket sales for any such Event) is cancelled, postponed, rescheduled, suspended, or otherwise substantially modified by Client or as a result of Client's willful and wrongful or grossly negligent actions and/or failure to act (each considered a "Cancelled Event" for purposes of this Agreement), it is expressly understood and agreed that settlement shall be delayed, and, therefore, any monies otherwise due to Client shall be held by AXS to cover the undisputed costs and fees associated with refunds. To the extent that AXS has advanced monies to Client, Client shall refund such monies within five (5) days following written demand by AXS. Further, AXS shall be authorized to and may, in AXS's reasonable discretion, issue an appropriate refund and deduct the amounts of such refund(s). In the event insufficient funds are retained by and/or tendered to AXS to cover the refund and related fees, after first offsetting against amounts owed to Client hereunder, and AXS has a reasonable expectation that such amounts will not be offset within two (2) months, AXS shall have the right, but not the obligation, to refer all such refund requests to Client, in which case Client shall assume all responsibility (financial and otherwise) for properly handling said demands.

(iii)     Refund Demands (Non-Cancelled Events) or Other Chargebacks: Excluding legitimate purchaser requests which are routinely honored (and which, therefore, may be made by AXS), AXS shall promptly refer any demand for a refund for a Event that is not a Cancelled Event or not otherwise governed by Section 6(b)(i) directly to Client. Except for the gross negligence or willful misconduct of AXS, Client thereupon agrees to assume all responsibility (financial and otherwise) for properly evaluating and handling any said demand(s) and related chargebacks. In an effort to minimize fraud, AXS shall have the right to cancel orders that it reasonably believes is fraudulent. If AXS receives a chargeback inquiry that it reasonably believes may be valid prior to an Event, AXS may cancel the order. Upon written authorization from Client, AXS shall grant an appropriate refund and shall deduct the amount of such refund (and related undisputed

5

Tiebreaker-ForestHills_Agreement_Final (12.22.2016).docx

Highly Confidential                                                              AEG-CID-0000750449

**DX-1394.0246**

fees) from the amount due and payable to Client. AXS shall have no obligation to make any such refunds unless AXS has retained and/or is provided with sufficient funds to make such refunds.

(iv) <u>Other</u>:  Client may authorize (in writing) AXS to grant refunds for any other reason, at Client's sole discretion, and in such event AXS shall deduct the amounts of such refunds from the amount due and payable to Client.  If the amount due and payable to Client is insufficient to cover the refunds or an Event has been completed, Client shall immediately provide AXS with sufficient funds to make such refunds.  AXS shall have NO obligation to make any such refunds unless AXS has retained and/or is provided with sufficient fund to make such refunds.

(f) <u>Audit Right</u>.  At all times during the Term of this Agreement (i) Client shall have the right at its own expense to audit Ticket sales for Events and the collection of other income to assure compliance with the terms of this Agreement; and (ii) AXS shall have the right at its own expense to audit Ticket sales for Events made by Client to ensure compliance with this Agreement. AXS shall also have the right to audit Client's categorization of Excluded Tickets; and (iii) Client shall have the right at its own expense to audit AXS's compliance with the data privacy and security obligations set forth in this Agreement.  Any audits performed under this Subsection (f), shall be limited to one per year, unless otherwise specifically agreed in writing, and such audits should be performed at dates and times so as to ensure the least interference with the business operations of the parties involved therein.  In the event that the audit reveals an error in excess of five percent (5%) or more, then the party in error shall pay the reasonable external costs of such audit.   If any audit by Client under (iii) above reveals any deficiencies by AXS, Client shall (x) be entitled to reimbursement by AXS of all costs of the Audit and (y) have the right to terminate this Agreement immediately upon notice (subject to a mutually agreed upon transition period to allow for an orderly transition to an alternate provider) to AXS and in accordance with section 16(c) below.

7. **Sales Tax Responsibility**.

(a) If the sales revenues are subject to sales tax in Client's jurisdiction:

(i) AXS shall collect the applicable sales tax as a part of each ticket or other item's price sold by AXS via the System and will designate same and remit such amount to Client in trust for the benefit of the applicable state revenue department; and,

(ii) Upon receipt of the funds described herein (which shall include applicable sales tax), Client represents and warrants that it shall timely remit such sales tax to the applicable taxing authority without commingling or otherwise using such funds.

(b) If Client is responsible for remitting sales tax from revenues to the applicable state revenue department, AXS shall have the right to obtain, reasonably promptly following its written request to Client,

(i) copies of any and all sales tax returns and/or other related documents evidencing such remission of sales tax by Client to the applicable state revenue department; and,

Tiebreaker-ForestHills_Agreement_Final (12.22.2016).docx

Highly Confidential                                                                                  AEG-CID-0000750450

**DX-1394.0247**

(ii)     written assurances from Client that Client received advice that it had complied with its legal obligations with regard to the payment and reporting of such sales taxes to the applicable state revenue department.

(c)     Client stipulates, acknowledges and agrees that AXS is relying on Client to ensure that AXS has all the relevant information to ensure that sales subject to state or local sales taxes are sold in accordance with the law.  To the extent that sales taxes are remitted to the applicable state revenue department by Client, Client acknowledges that AXS is materially relying upon its representations regarding such sales taxes and Client's compliance therewith in entering into and performing this Agreement.

(d)     In addition to any other indemnities in this Agreement, except with respect to the gross negligence or willful misconduct of AXS, Client hereby agrees to indemnify and hold AXS harmless from the payment of any sales, use, or other transaction-based taxes, penalties, reasonable external attorney's fees, or interest related to any third party claim for default or alleged default in compliance, by Client, with such sales, use or other transaction-based tax laws.  In addition to any other indemnities in this Agreement, AXS hereby agrees to indemnify and hold Client harmless from any incorrect calculation of taxes or failure to remit as required by this Agreement or applicable law. This section shall survive the Term or termination of this Agreement for any reason, subject to the terms of the indemnification provisions below.

(e)     AXS will pay any taxes where required by law, and will provide all documentation thereof.

8.     **Assumption of Risk by Client**.

(a)     Client acknowledges and agrees that, despite AXS's best efforts, circumstances beyond AXS's control may cause disruption in the services provided by AXS.

(b)     Client therefore acknowledges and agrees that AXS will not be liable to Client for the following:

(i)     the printing and sale of counterfeit tickets, provided that AXS has used reasonable security measures;

(ii)     service interruptions or functionality impairments, including, without limitation, those caused by "firewalls", defects or other problems caused by third-party hardware or software, unless the same is not repaired within a reasonable amount of time;

(iii)     criminal or negligent act of any third party, unless such third party is related to AXS or such act arises from the gross negligence or willful misconduct of AXS;

(iv)     any Force Majeure condition (including, but not limited to, fire, accident, acts of God, severe weather conditions, power outages, telecommunication interruption, strikes or labor disputes, war or other violence, or any law, order, proclamation, regulation, ordinance, demand or requirement of any governmental agency; see Section 20); and/or

7

Tiebreaker-ForestHills_Agreement_Final (12.22.2016).docx

Highly Confidential

AEG-CID-0000750451

DX-1394.0248

(v)     AXS does not guarantee the capabilities or service agreements of third-party software platforms on which the Platform is based and will use its best commercially reasonable efforts to prevent interruption in service due to any third-party software. AXS is not responsible for delays in receipt due to spam blocking or deliverability prioritization of ISPs.

9.     **Client's Responsibilities**.

(a)     Client shall materially comply with all material duties and obligations imposed by this Agreement.

(b)     Other than provision of initial training and technical support as set forth herein, Client will be solely responsible for operation of the Platform and for creating and maintaining all aspects of its account (e.g., submitting and updating details and information related to Event(s).

(c)     Client shall be responsible for building Client's own Events and offers into the Platform, and for managing its inventory of tickets sold using the Platform.

(d)     Client shall always be responsible for monitoring and assuring that all information posted by Client in connection with Event(s) and/or AXS's services (such as, by way of example, ticket price, sales dates, and Event details) is, to its knowledge, accurate and up-to-date.  Any changes (other than to correct errors made by AXS which shall be corrected by AXS as soon as possible) required to be made by AXS shall be made as soon as practicable following written request by Client.  Client acknowledges that AXS (and its assigns and/or designees) shall be entitled to rely on information posted by and/or approved by Client.

(e)     Subject to AXS' obligation to provide the Hardware and Platform, Client shall provide all resources and facilities necessary to receive and utilize the services provided by AXS, including but not limited to (i) all box office management and ticket seller staff; and (ii) scanning staff to scan tickets of patrons entering the Venue.

(f)     Client shall be solely responsible for maintaining ticket allocations within legal limits and AXS shall not be responsible in any way for the over-selling of an Event, excluding any errors caused by AXS.

(g)     Client shall act within industry standards and shall notify AXS of any irregular patterns of purchases (or other events that would indicate criminal or negligent acts by a third party) of which Client becomes aware.  Similarly, AXS shall notify Client of any such events of which AXS becomes aware.

(h)     Client shall maintain all Hardware components for the System located at the Venue in an environment that materially conforms to AXS' reasonable specifications and Client hereby assumes and will bear the entire risk of loss to any such Hardware components located at the Venue or otherwise in the care or custody of Client, except to the extent such loss or damages arises out of AXS's negligence or willful misconduct.  If any loss to any such Hardware occurs while in the care or custody of Client (ordinary wear and tear excepted), Client will, at its expense and election, either (i) repair or replace such Hardware in good working order to AXS 's reasonable satisfaction within thirty (30) days after such loss or damage, or (ii) pay AXS in cash the full replacement cost of such

8

Tiebreaker-ForestHills_Agreement_Final (12.22.2016).docx

Highly Confidential

AEG-CID-0000750452

**DX-1394.0249**

hardware and AXS promptly will install replacement Hardware. Client will pay AXS on a "time and materials" basis at its then-current best rates provided to clients for any configuration or other effort associated with the replacement of any hardware. Upon the expiration or termination of this Agreement, Client promptly will return to AXS all Hardware supplied by AXS at its expense in good repair, condition and working order, ordinary wear and tear excepted. Client will keep all such AXS Hardware free and clear of all liens, levies and encumbrances. Client shall not permanently remove or destroy any proprietary markings or any legends relating to restrictions on use of the System and/or Hardware.

(i)     As between the parties, Client shall be responsible for all cash collecting and handling responsibilities, including, but not limited to, security, armored car service (at Client's discretion), on-site safe deposits, banking deposits, and any other financial matters related to the Events.

(j)     Client, at its sole cost and expense, shall be responsible for purchasing, providing and maintaining all telecommunications and internet lines and connections necessary or appropriate for Client to properly use the Platform, and shall also be solely responsible for integrating the Platform and Hardware with Client's other equipment and facilities.

10.   **Data**.

(a)     Purchaser Data. AXS hereby acknowledges that Client is and shall at all times remain the sole owner of any and all data with respect to the ticket purchasers and other users of the System for purchases and inquiries of Events, including the names, addresses and other information collected from such persons by AXS in the performance of its obligations hereunder (the "Purchaser Data") and such other data as may be collected by AXS in the course of performing ticketing services for the Events (collectively with the Purchaser Data, the "Licensed Data.") Licensed Data includes:

(i) demographic and personal information (including, but not limited to, such user's contact information, age, gender, marital status, income and property value);

(ii) transaction information (including, but not limited to, the number of tickets purchased by the user, the revenue of Client attributable to such user's ticket purchases and the Event venue and seating information pertaining to such user's ticket purchases); and

(iii) email, marketing and behavioral data (including, but not limited to, data pertaining to participation in mailing campaigns).

(b)     Use by AXS. Notwithstanding the above, Client hereby grants to AXS a worldwide fully paid-up, non-exclusive, non-transferable, non-sublicensable right and license to use the Licensed Data during the Term as follows: (i) marketing AXS, tickets or events to persons who have opted in to receive communications from AXS in accordance with the AXS privacy policy; (ii) for internal analytical purposes with respect to technical performance of the System; and (iii) for the purpose of providing ticketing services (such as displaying ticketing purchase and transfer history) to ticket purchasers of tickets to Events, solely to the extent required to perform the services set forth in this Agreement. AXS is expressly prohibited from, directly or indirectly, renting, selling, leasing or distributing the Licensed Data or anything that incorporates in whole or in part the

9

Tiebreaker-ForestHills_Agreement_Final (12.22.2016).docx

Highly Confidential

AEG-CID-0000750453

Licensed Data including, without limitation, on an aggregated, de-identified basis. AXS represents and warrants that it has provided any necessary notice, has obtained any necessary consents, and has otherwise obtained all rights in the Licensed Data (as defined above) necessary to transfer such Data to Client for the purposes set forth in this Agreement. Client and AXS agree to use such information in compliance with all applicable laws and in accordance with applicable privacy policies.

        (c)     <u>Reservation of Rights</u>. Except for the rights and licenses expressly granted to AXS pursuant to this Agreement, as between Client and AXS, Client retains all right, title and interest in and to the Licensed Data. AXS agrees that it will not at any time attempt, or assist any third party in any attempt, to contest, dispute, object to or otherwise interfere with Client's ownership of or other rights in and to the Licensed Data.

        (d)     <u>Event Data</u>. Client will furnish to AXS or enter into the electronic Platform, as the case may be, all necessary information with respect to the proposed arrangement of the Venue for each Event, including seating layout, ticket prices and structure, permissible discounts, ticket header information, color logos, entry information, vision and hearing information, wheelchair and other accessible seating information and such other information as AXS may reasonably request or that may be necessary for the proper sale of tickets through the Platform (collectively, "Event Data"). Included in such information will be Client's prepared disclaimer respecting refunds, Client's assumption of risk of injury and such other relevant information as Client and AXS deem appropriate. Such Event Data shall be provided to AXS sufficiently in advance of any on-sale date or ticket sales for each Event. Client shall be responsible for monitoring and assuring that Event Data or any other information posted by Client and/or AXS (including its assigns or designees) in connection with any Event(s) and/or the Services is accurate and up-to-date. Client acknowledges that AXS (and its assigns and/or designees) shall be entitled to rely on information posted by and/or approved by Client.

        (e)     <u>Security</u>. AXS shall ensure that all Licensed Data and Event Data (collectively "Data") is safeguarded against unauthorized access, use, disclosure, modification, or deletion using industry-standard administrative, technological, and procedural safeguards. Such safeguards shall provide for no less than reasonable security of the Data and shall be implemented in accordance with applicable law and a comprehensive written information security program enacted by AXS. Such information security plan shall include, without limitation, the following safeguards:

        i.    the implementation and enforcement of industry -standard physical and logical access controls that limit access to the Data only to those employees or contractors of AXS who need such access to perform their job duties in order to service Client according to this Agreement, and in accordance with the terms set forth herein.

        ii.    The implementation and maintenance of organization-wide vulnerability detection and mitigation processes designed to discover and prevent common security risks, such as viruses, worms, or other common security vulnerabilities.

        iii.    The implementation and maintenance of Network security controls that include appropriate network firewalls, access and authentication controls, logging, and intrusion detection and protection systems.

        iv.    The implementation of secure software development practices, including reasonable review of any code for security vulnerabilities, and

10

Tiebreaker-ForestHills_Agreement_Final (12.22.2016).docx

Highly Confidential

AEG-CID-0000750454

**DX-1394.0251**

adherence to an established change management procedure.

Further, AXS must provide for regular information security risk assessments that assess likely risks to the security, confidentiality and integrity of the Data, implement reasonable measures designed to mitigate such risks, and perform regular audits to ensure that such mitigation measures have been implemented in a timely manner.

Finally, AXS must establish and maintain policies and procedures that ensure that AXS appropriately responds to actual and suspected Security Incidents and provide for monitoring, investigation, response, and notification, to the extent required by applicable law. For purpose of this Agreement, a "Security Incident," means any actual or suspected event that relates to (i) unauthorized access to AXS' or its service providers' computer systems or servers on which Data is stored; or (ii) unauthorized access to or use, disclosure, modification, storage, destruction, or loss of Data. AXS must immediately notify Client of any known or suspected Security Incident affecting Client's Data. AXS shall, and is solely responsible for the investigation of, response to, and, if appropriate, the notification of any individuals affected by a Security Incident that relates to the Data (collectively, the "Response") and all costs related thereto, including reasonable attorney's fees, provided, however, that in Client's sole discretion, Client may direct AXS' response to (including without limitation the form, content, and scope of any notification letters sent to individuals affected by the Security Incident) or assume responsibility for one or more aspects of the Response to a Security Incident(s), and AXS shall cooperate and promptly comply with Client's direction(s) and determination(s) (provided that, in all cases, AXS shall remain responsible for all costs related to the Response).

11.      **Compliance with Laws**. Each party will comply with all laws, rules and regulations ("Laws") applicable to such party in any country in which they do business and that are applicable under this Agreement, including but not limited to such Laws as they may relate to collection, use or storage of data.  Client shall be solely responsible for compliance with all Laws governing the promotion and presentation of Events.

12.      **Intellectual Property; Protection of Hardware and Software**.

(a)      <u>Ownership of IP</u>.  AXS owns all proprietary rights in and to the AXS.com platform, ticketing system, Platform, and the "AXS" brand (or "Outbox" or "Veritix" brand, as applicable) including patent, copyright, trademark, service mark, trade secret, and other proprietary rights ("AXS IP").  Client agrees that, other than as provided for herein, it will not use or otherwise exploit (or permit any other person or entity under Client's control to use or otherwise exploit) AXS IP and/or AXS proprietary rights in and to its ticketing System and/or Platform without prior written consent of AXS.  Client further agrees that it will not take, or permit any other person or entity under Client's control to take, any action that would jeopardize or otherwise be contrary to AXS's rights, including, but not limited to, disassembling, cloning, decompiling, altering, or reverse engineering the same. Client shall not resell the Platform, services or any components thereof.  Client owns or has the rights to all proprietary rights in and to its brands, including patent, copyright, trademark, service mark, trade secret, and other proprietary rights ("Client IP"). AXS agrees that, other than as provided for herein, it will not use or otherwise exploit (or permit any other person or entity under AXS's control to use or otherwise exploit) Client IP and/or Client proprietary rights in and to its Client IP without prior written consent of Client.  AXS further agrees that it will not take, or permit any other person or entity under AXS' control to take,

11

Tiebreaker-ForestHills_Agreement_Final (12.22.2016).docx

Highly Confidential                                                                                                                AEG-CID-0000750455

**DX-1394.0252**

any action that would jeopardize or otherwise be contrary to Client's rights. AXS agrees not to take any action inconsistent with the intellectual property rights of Client.

(b)      Use of Marks.  Each party hereby grants to the other (and its designees) a non-exclusive license to use the trademarks and trade names (including any such rights related to the Event(s) referenced herein), in connection with the services contemplated by this Agreement.  With the prior written consent of the other party, either party may use the trademarks and trade names of the other in connection with the marketing of its services to third parties, provided that either party may withhold its consent for the use thereof in its sole discretion, and provided further that each party shall have the right to request amendments to or updates of its trademarks and tradenames used under this Agreement.

(c)      Ownership of Hardware and Platform.  The Platform and/or Hardware is, and shall remain, the property of AXS and Client shall have no rights or interests therein except the right to use the Platform and/or Hardware as set forth herein.  The Client hereby acknowledges that AXS is and shall at all times remain the sole owner of the Hardware, the Platform and all modifications, enhancements and changes thereto, regardless of any direct or indirect contribution that may have been made by the Client or any of its agents or representatives, which, as the case may be, is hereby assigned and transferred, in full ownership and with no additional consideration as that contained herein, to AXS.

(d)      Restrictions on Use.   Client is authorized to use the Platform and/or Hardware only for its own internal operation and only for ticketing of Events in accordance with the terms and conditions of this Agreement.

(e)      No Third Party Advertising.  AXS agrees that it shall not offer, sell, present or otherwise allow any third party advertising on AXS.com if clicked through or linked from foresthillstennis.com or where the forest hills webskin is appended to a link, as it pertains to ticketing or advertising of ticketing for Events.

(f)      No Removal of Markings.  Client shall not permanently remove or destroy any proprietary markings or any legends relating to restrictions on use of the Platform and/or Hardware.

(g)      No Modifications.   Neither Client nor any third party employed by Client shall copy, enhance or modify the Platform, develop software derivative of or interfacing with the Platform, merge the Platform with other software, or create software that emulates or performs substantially the same functions as the Platform without the prior written consent of AXS.  Client may not attempt to decompile any part of the Platform nor may it attempt to reverse engineer, reverse assemble, or create any similar software using the Platform or any knowledge acquired from AXS or the Platform and its operation, or knowingly allow anyone else to do so.

(h)      Trade Secrets.  The Client understands and agrees that the Platform and System constitutes the valuable property and trade secret of AXS, embodying substantial creative efforts which are secret, confidential, and not generally known by the public, and which secure to AXS a competitive advantage.  The Client agrees during the term of this Agreement and the license granted hereunder, to hold the Platform including any copies thereof and any documentation related thereto, in strict confidence and to not permit any

12

Tiebreaker-ForestHills_Agreement_Final (12.22.2016).docx

**DX-1394.0253**

person or entity to obtain access to it except as required for the Client's exercise of the license rights granted hereunder, subject to applicable law. The parties understand that all the material provided or produced under this Agreement may be subject to any applicable open records laws. In the event of a request to either party for disclosure of such information, the party receiving the request shall advise the other party of such request in order to give the objecting party the opportunity to object to the disclosure of any of its documents. In the event of the filing of a lawsuit to compel such disclosure, the party being requested to provide the information will tender all such material to the court for judicial determination of the issue of disclosure and, if the object party choosing to object it shall intervene in such lawsuit to protect and assert its claims of privilege against disclosure of such material or waive the same.

AXS and the Client understand and agree that the pricing, sales and other financial information related to this Agreement constitute the valuable property and trade secrets of the applicable party, which are secret, confidential, and not generally known by the public, and which secure to the applicable party, a competitive advantage. Each party therefore agrees during the Term of this Agreement, and thereafter, to hold such information in strict confidence and to not permit any person or entity to obtain access to it except as required for the performing its obligations hereunder, or except as required by applicable law.

13. **Indemnity**.

(a)    Client hereby agrees to defend, indemnify and hold harmless AXS and its directors, officers, shareholders, employees, agents, attorneys, representatives or any third party engaged by AXS hereunder (collectively, "AXS Indemnitees"), from and against all third party claims, actions, demands, costs, expenses, lawsuits and liabilities of any kind, including reasonable outside attorney's fees, imposed on, incurred by AXS as a result of (I) any breach by Client of this Agreement; (II) physical damage, personal harm, or death incurred in connection with an Event; (III) any cancellation, postponement, rescheduling, suspension, or modification of an Event by Client except for any claims arising from breach by AXS; (IV) Client's failure to allocate a sufficient number of tickets for an Event; or (VIII) Client's gross negligence or willful misconduct; each except to the extent of the negligence or willful misconduct of AXS.

(b)    AXS hereby agrees to defend, indemnify and hold harmless Client (including its successors, assigns, directors, officers, shareholders, employees, agents, attorneys and representatives) from and against all third party claims, actions, demands, costs, expenses, lawsuits and liabilities of any kind, including reasonable outside attorney's fees, imposed on, incurred by, or asserted against Client as a result of, or in connection with any breach by AXS of this Agreement, AXS' operation of the Platform, or AXS's gross negligence or willful misconduct. The indemnified party must notify the other party promptly in writing of any claim hereunder, and provide, at such other party's expense, all reasonably necessary assistance, information and authority to allow the other party to control the defense and settlement of such claim.

(c)    This section shall survive the Term or termination of this Agreement for any reason.

14.    **Insurance**. Without in any way limiting or altering the indemnification requirements of AXS pursuant to this Agreement, AXS shall, at its sole expense, procure and at all times maintain during the term of this Agreement all of the following insurance: (i)

13

Tiebreaker-ForestHills_Agreement_Final (12.22.2016).docx

Highly Confidential

AEG-CID-0000750457

DX-1394.0254

commercial general liability insurance of not less than $2,000,000 each occurrence and $5,000,000 in the aggregate; (ii) business auto liability insurance and, if necessary, commercial umbrella liability insurance with a limit of not less than $1,000,000 each accident; (iii) workers compensation insurance with statutory benefits as required by any state or federal law, including "other states" insurance and employer's liability insurance with limits not less than $1,000,000 each accident for bodily injury by accident or $1,000,000 each employee for bodily injury by disease; (iv) electronic media and cyber liability insurance coverage with minimum aggregate policy limits of not less than $2,000,000 per occurrence and $5,000,000 in aggregate covering liabilities arising from: (a) breaches of security, including media liability coverage and breach notification coverage; (b) violation of any right to privacy, breach of federal, state, or foreign security and/or privacy laws or regulations; and, (c) data theft, damage, destruction, or corruption, including without limitation, unauthorized access, unauthorized use, identity theft, theft of personally identifiable information or confidential corporate information, transmission of a computer virus or other type of malicious code. The insurance required hereunder shall be considered primary and non-contributory insurance and all insurance carried by Client, its agents, employees, and the parties for which it is operating, shall be considered secondary in relation thereto.  Concurrently with the execution of this Agreement and at such other times as reasonably requested by Client, AXS shall deliver to Client certificates of insurance confirming the existence of the insurance required by this Agreement and which shall endorse Client and its respective parents, affiliates, officers, directors, representatives, employees, subcontractors and any other party reasonably designated by Client as additional insureds.

15. **Non-Disclosure Covenants**.

(a)    AXS and Client acknowledge that, in carrying out the terms of this Agreement, each party may be required to utilize, and/or may otherwise gain access to, one another's Confidential Information. AXS and Client hereby agree that it is in the best business interests of both Parties to insist on the strict confidentiality of any Confidential Information.  In recognition thereof and except as otherwise provided in this Agreement:

(i)    AXS and Client hereby covenant and agree not to disclose to anyone any Confidential Information of the other party, or directly or indirectly, individually, or through a corporation or other person utilize Confidential Information of the other party for its own benefit, or for the benefit of third parties.

(ii)    AXS and Client shall exercise reasonable efforts to ensure the continued confidentiality of all Confidential Information known by, disclosed or made available to each other, excluding any disclosure required by applicable law or subpoena or similar order.

(b)    "Confidential Information" as that term is used in this Agreement, shall include any material or information pertaining to or containing knowledge or information of any type whatsoever of a confidential nature relating to the actual or anticipated business of AXS or Client, including, without limitation, each party's intellectual property, all Data, all types of trade secrets, pricing information, employee lists, vendor lists, marketing plans, management organization information, business plans, and/or financial records, which is of tangible or intangible value to either Party and is not public information or is not otherwise generally known or available.  This Agreement and the terms and conditions hereof shall also be considered Confidential Information.  Confidential Information shall

14

Tiebreaker-ForestHills_Agreement_Final (12.22.2016).docx

Highly Confidential                                                                                    AEG-CID-0000750458

**DX-1394.0255**

NOT include information which: (i) at the time of disclosure to the receiving party is in the public domain through no wrongful act or omission of the disclosing party; (ii) as shown by written records, is already known by the receiving party; (iii) is revealed to the receiving party by a third party who the receiving party has no reason to believe does not thereby breach any obligation of confidentiality and who discloses such information in good faith; or (iv) is independently developed by the receiving party without breach of this Agreement, as demonstrated by documentation or other evidence.

16. Termination Rights.

(a) Termination by Client. In the event AXS shall be in material breach or material default of any of the material terms, conditions, or covenants of this Agreement, including, without limitation, the payment when due of the fees set forth hereunder, and such breach or default has not been cured, to the extent such breach or default is capable of being cured, within   forty-five (45) days (or thirty (30) days with respect to any monetary breach or default) after the receipt of Client's written notice to AXS, then in addition to any other rights or remedies it may have, Client shall have the immediate right in its sole discretion, to terminate this agreement without penalty, and subject to a mutually agreed upon transition period to allow for an orderly transition to an alternate provider. If this Agreement is terminated on a day other than the first day of a calendar month, then the amount due and payable by Client for services already received by Client shall be prorated on a per diem basis.

(b) Termination by AXS. In the event Client shall be in material breach or material default of any of the material terms, conditions or covenants of this Agreement, including, without limitation, the payment when due of the fees set forth hereunder, and such breach or default has not been cured, to the extent such breach or default is capable of being cured, within forty-five (45) days (or thirty (30) days with respect to any monetary breach or default) after the receipt of AXS's written notice to Client, then in addition to any other rights or remedies it may have, AXS shall have the immediate right, in its sole discretion, to terminate this Agreement, subject to a mutually agreed upon transition period to allow for an orderly transition to an alternate provider.

(c) Effect of Termination. Termination of this Agreement shall not relieve either party of its obligation to pay all fees or other amounts that have accrued or are otherwise owing the other party under this Agreement, such as the parties' rights and obligations under the System license sections, Purchaser Data, limitations on liability, indemnification, confidential information, governing law and waivers of jury trials, shall survive expiration or earlier termination of this Agreement.

(d) Retention of Unrecouped Portions of Advance. In the event of an early termination of the Agreement by Client resulting from a material breach by AXS that remains uncured after the notice and cure periods as set forth in subsection (a) above, such termination shall not give rise to any claim for repayment of the Advance.    In the event of an early termination of the Agreement by AXS resulting from a material breach by Client that remains uncured after the notice and cure periods as set forth in subsection (b) above, Client shall return to AXS an amount equal to the lesser of the unrecouped portion of the Advance as of the effective date of the termination or the pro rata portion of the Advance remaining unearned as of the effective date of the termination. For example, in the event that the Agreement is terminated as of the last day of the 4th year of the Term because of *a material breach by Client* which remains uncured after the notice and cure

15

Tiebreaker-ForestHills_Agreement_Final (12.22.2016).docx

Highly Confidential

AEG-CID-0000750459

**DX-1394.0256**

periods have expired, and AXS has recouped $▉▉▉ of the Advance as of such time from the Secondary Marketplace Transaction Fees, then Client shall refund the amount of $▉▉▉ to AXS, but if the Agreement is terminated as of the last day of the 4th year of the Term because of *a material breach by AXS* which remains uncured after the notice and cure periods have expired, and AXS has recouped $▉▉▉ of the Advance as of such time from the Secondary Marketplace Transaction Fees, then Client shall not owe any refund of the unrecouped amount of the Advance to AXS.

17. **Representations and Warranties**.

(a)     Each of AXS and Client represent, warrant, and covenant to the other that: (i) it has the right and power to enter into this Agreement, to grant the rights hereunder, and to perform all terms hereof; (ii) it is duly organized and in good standing under the laws of its state of organization;  (iii) the entering into and performance of this Agreement will not violate any judgment, order, law, contract, regulation, or agreement applicable to such party or violate the rights of any third party, or result in any breach of, or constitute a default under, any other agreement to which it is a party;  (iv) the individual executing this Agreement, and whose signature appears below is duly authorized to execute this Agreement; and (v) it has been advised of its right to seek legal counsel of its own choosing in connection with the negotiation and execution of this Agreement.

(b)     Client represents and warrants that it has the exclusive right to sell tickets as the owner (or owner's designee) of Event(s), and to grant AXS the exclusive right to sell tickets in connection with Event(s) as provided in Section 1.

18. **Miscellaneous**.

(a)     Waiver.  No breach of any provision of this Agreement can be waived unless in writing.  Waiver of any one breach shall not be deemed to be a waiver of any other breach of the same or any other provision hereof.

(b)     Entire Agreement; Amendments.  This Agreement (including any Exhibits attached hereto and any other documentation incorporated herein) constitutes the entire agreement between the parties as to the subject matter of this Agreement, and may be amended only by a written agreement executed by the parties at the time of the modification.

(c)     Client Identification.  Subject to prior written approval of Client as to form and content, AXS may use the name of and identity of Client as an AXS customer in advertising, publicity or similar materials distributed or displayed to prospective customers or others.

(d)     Severability.   If any term, provision or condition contained in this Agreement shall, to any extent, be ruled invalid or unenforceable by a court of competent jurisdiction, the remainder of this Agreement shall not be affected thereby, and each and every other term, provision and condition of this Agreement shall be enforceable to the fullest extent permitted by law.

(e)     Notice Required for Breach.  Neither party shall be deemed to be in breach of any obligations under this Agreement unless and until that party is notified by the other party, in writing, in detail of the alleged breach and that party fails to cure that alleged

16

Tiebreaker-ForestHills_Agreement_Final (12.22.2016).docx

Highly Confidential                                                                    AEG-CID-0000750460

**DX-1394.0257**

breach within thirty (30) days after receipt of the written notice. All notices and other communications required hereunder shall be made in writing and shall be deemed to have been duly given and effective:

(i) on the date of delivery, if delivered personally;

(ii) on the earlier of the fourth (4th) day after mailing or the date of the return receipt acknowledgment, if mailed, postage prepaid, by certified or registered mail, return receipt requested;

(iii) on the following day if sent by nationally recognized overnight courier service such as Federal Express; or (iv) on the date of transmission, if sent by facsimile, e-mail or other similar communications equipment; to the respective parties at the following addresses, or at such other addresses as the parties shall designate by written notice to the other:

> If notice to AXS:
> AXS Group LLC
> 425 W. 11th Street
> Los Angeles, CA 90015
> ATTN: Victoria von Szeliski
>
> If notice to Client:
> Tiebreaker Productions, LLC
> 500 Park Avenue, 2nd floor, NY NY 10022
> Attn: Michael Barry, Esq.
>
> With a copy to:
> AEG Live LLC
> Attn: General Counsel
> 425 W. 11th Street
> Los Angeles, CA 90015

(f)     Waiver of Jury Trial.  In the event the parties are required for any reason to submit any dispute hereunder to trial, the parties expressly agree to waive the right to a jury trial, because the parties hereto, all of whom are represented by counsel, believe that the complex commercial and professional aspects of their dealing with one another make a jury determination neither desirable nor appropriate.

(g)     Assignment. Client shall not directly or indirectly assign, transfer, pledge or hypothecate its rights or obligations in this Agreement or any interest therein, or permit the Platform or to be used by anyone other than Client's employees, without the prior written consent of AXS, which shall not be unreasonably withheld, or in the event of an assignment by Client to any parent, subsidiary, affiliate or successor in interest (including, without limitation, a successor by virtue of an acquisition), in which event no such consent shall be required.  Any such assignment shall not relieve Client of any of its obligations hereunder.  AXS shall not assign or transfer its rights or obligations in this Agreement or any interest therein without the prior written consent of Client, except in the event of an assignment by AXS to any parent, subsidiary, affiliate or successor-in-interest (including, without limitation, a successor by virtue of an acquisition), in which event no such consent

17

Tiebreaker-ForestHills_Agreement_Final (12.22.2016).docx

Highly Confidential

**DX-1394.0258**

shall be required.  Any assignment, transfer, pledge or hypothecation for which consent is required hereby and which is made without such consent shall be void.

(h)    Governing Law; Venue. This Agreement shall be construed in accordance with and governed by the laws of the State of New York, without regard to the principles of conflict of law. AXS and Client acknowledge and agree that this Agreement shall not be deemed to have been prepared by, or drafted by, any particular party hereto, and that the normal rule of construction (to the effect that any ambiguities are to be resolved against the drafting party) shall not be employed in the interpretation of this Agreement.  Other than any claim for equitable or injunctive relief, all other claims, disputes and other matters in question between the parties arising out of or relating to this Agreement shall be decided by binding arbitration before one mutually agreed upon neutral arbitrator in New York, New York in accordance with the Comprehensive Commercial Arbitration Rules of JAMS then in effect.  The determination and award of the arbitrator shall be based upon application of existing substantive statutes and case law, interpretation in accordance with applicable contract law of this Agreement and the evidence presented by the parties to the arbitrators.  Each party shall bear its own costs in connection therewith except that the prevailing party shall be entitled to recover, and the arbitrator shall be empowered to award, costs and reasonable attorneys' fees to the prevailing party.

(i)    Force Majeure.  The parties to this Agreement will be excused from the performance of this Agreement in whole or in part by reason of any of the following causes, to the extent provided herein: (a) when an Event is prevented by operation of law; or (b) if an Event does not take place because of the occurrence of a Force Majeure event that prevents the performance under this Agreement by AXS or Client of a material obligation under this Agreement, Client agrees that each party shall be due any and all reasonable costs and expenses, including amounts provided for in this Agreement, which have been incurred up to the time performance is excused.

(j)    Electronic Signature; Counterparts.  This Agreement, and any other documents requiring a signature hereunder, may be executed via fax, email, or other electronic means, and in one or more counterparts, each of which will constitute an original.

**[Signature Page Follows]**

18

Tiebreaker-ForestHills_Agreement_Final (12.22.2016).docx

Highly Confidential                                        AEG-CID-0000750462

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**AXS GROUP LLC,**
a Delaware limited liability company

By: _Bryan Perez_    1/9/2017
Name:  Bryan Perez
Title:  President & CEO

**TIEBREAKER PRODUCTIONS, LLC**
a New York limited liability company

By: _Michael Barry_    1/6/2017
Name:    Michael Barry
Title:
        Authorized Signatory

19

Tiebreaker-ForestHills_Agreement_Final (12.22.2016).docx

Highly Confidential

AEG-CID-0000750463

**DX-1394.0260**

## EXHIBIT A

## AXS FEES

1.     **Service Charges, Processing Charges, and Mail Fees**.  Client shall determine the face value of Tickets and the amounts of other related fees, including service charges, processing fees, facility fees, admission fees, parking fees and other similar fees, and Client shall inform AXS of the details of all such fees, provided that such fees shall be at least in the amounts necessary for AXS to receive its fees hereunder.  All per ticket and per order fees shall automatically increase in an amount equal to $███ per ticket/order per year, on each anniversary of the start of the Term.  Client shall promptly provide AXS with any and all other relevant facts and information required for the sale of Tickets in a timely fashion and reasonable notice of any changes in such prices and fees.

| | |
|---|---|
| **AXS Ticket Fee** | $███ per ticket (web/phone) |
| **AXS Premium Rebate** | ██% of Net Fee (██% of Gross Price) / Client keeps ██% |
| **Box Office Fee** | $███ |
| **Order Processing Fee** | $███ |
| **Mail Fee** | $███ per order |
| **Flash Seats Delivery Fee** | $███ |
| **Call Center Services Fee** | $███ per ticket sold by phone (passed on to customer) |
| **Credit Card Fee** | ██% of transaction price, will be added to service fee |
| **Season Plans & Packages** | $██ per ticket per event |

2.     **Credit Card Fee and Chargeback Costs**.  Subject to AXS receiving the ██% credit card fee, AXS shall be responsible for credit card fees and chargebacks. The credit card fee shall pay for associated credit card expenses, including processing, gateway fees, charge backs or any other fee associated with the merchant account or processing of credit card payments, and shall be subject to increase to account for increases to the interbank rates, which increases shall not exceed the actual amount of any such interbank rate increase. All gross monies processed will be subject to the credit card processing fee, whether the item has a service charge / delivery fee or not.  Client will cooperate with AXS and its merchant bank in any efforts to reverse chargebacks and Client shall comply with reasonable chargeback and fraud prevention control procedures.

3.     **Secondary Marketplace Transaction Fees**.  Client shall have the right to determine the amount of all buyer convenience fees and transfer fees (collectively, the Secondary Marketplace Transaction Fees) to be charged to customers using the Secondary Marketplace; provided, however, that the aggregate transaction fees with respect to each transaction on the Secondary Marketplace shall be equal or greater than ██% of the purchase price for each ticket or right to enter an Event and provided that AXS receives the ██% credit card fee.  "Purchase price" shall mean the price paid by a customer for a ticket or right to enter an Event, not including any fees or taxes paid by such

20

Tiebreaker-ForestHills_Agreement_Final (12.22.2016).docx

Highly Confidential                                                                    AEG-CID-0000750464

**DX-1394.0261**

customer.   After the deduction of the ▉% of gross transaction value for credit card fees, AXS shall be entitled to retain ▉% of all such Secondary Marketplace Transaction Fees and AXS shall pay ▉% of all such transaction fees to Client.

21

Tiebreaker-ForestHills_Agreement_Final (12.22.2016).docx

Highly Confidential

AEG-CID-0000750465

**DX-1394.0262**

## EXHIBIT B

## HARDWARE SCHEDULE

Throughout the Term, AXS will provide Client with the Hardware listed below, at no additional cost to Client.

| Item | Responsible Party | Quantity | Cost |
|---|---|---|---|
| Platform License | AXS | 1 | Included |
| Ticket Scanners | AXS | TBD | Included |
| Thermal Ticket Printers | AXS | TBD | Included |
| Workstations (screen, computer, keyboard, printer* for seller staff) | AXS | TBD | Included |
| Wireless Connectivity | Client | n/a | n/a |
| Hardwired Internet | Client | TBD | n/a |
| Physical Box Office Location | Client | TBD | n/a |

22

Tiebreaker-ForestHills_Agreement_Final (12.22.2016).docx

Highly Confidential

AEG-CID-0000750466

**DX-1394.0263**

## EXHIBIT C

## SERVICES AND SUPPORT DETAILS

1.      **Call Center Services**. AXS shall maintain a call center that utilizes phone numbers designated, selected, and approved by Client, from time to time, for the purpose of selling tickets for Events and enabling the delivery of such tickets to customers, and for customer service.  AXS shall add, at Client's expense as mutually agreed to by the parties, additional phone numbers for the call center from time to time promptly after receipt of a written request from Client.  If Client desires to change a phone number and notifies AXS in writing, AXS shall, at Client's expense, use commercially reasonable efforts to make all necessary changes such that the new phone number may be used in connection with the call center. As between Client and AXS, Client shall have the exclusive right, at its expense, to retain and use the phone numbers upon the expiration or sooner termination of the Agreement, subject to the requirements of the applicable phone service provider. AXS shall control and bear the expense of staffing, operating, and maintaining the call center. AXS shall staff and operate the call center each day during the Term, from 6:00 a.m. to 8:00 p.m., Pacific time, subject to downtime for holidays unless there is an Event scheduled for such holiday, and in the case of a force majeure event, and shall provide instructions to customers who contact the call center outside of such hours as to how such customers can purchase tickets from the call center, facility box office or Internet Ticketing System. AXS agrees to use commercially reasonable efforts to have sufficient staff on hand to answer calls within an average speed of three (3) minutes. AXS agrees to arrange for increased staffing for specific Events for which Client provides sufficient advance notice to AXS that such Events are reasonably contemplated to result in a significantly increased volume of calls to the call center.

2.      **Technical Support Procedures and Services**.

(a)      AXS maintains a technical support staff and an automated request tracking system to assure that Client's support requests are serviced with quality.  AXS's Support Center technical support team is available by email (support@axs.com) or telephone (866.482.7877) from 8:00 a.m. – 10:00 p.m. pacific time. AXS maintains around-the-clock support for Severity 1 System issues, with a dedicated reporting hotline. Client's AXS Relationship Manager and Relationship Executive are available on a 24/7 basis to address critical needs.

(b)      To request technical support or to report an issue that requires resolution, Client may either send an email describing the request or issue to support@axs.com; or call the AXS Support Center hotline (866.482.7877).  All Severity 1 System Issues must be reported through this telephone hotline.

(c)      Support Service Prioritization and Delivery. Requests received through the Support Request Procedures will be addressed by category:  Support Requests, System Issues or Other Requests.

(i)      Support Requests. AXS will respond to all questions regarding or requests for assistance with configuration or operating the system ("**Support Requests**") within four (4) business hours; provided, however, that any Support Requests reported

23

Tiebreaker-ForestHills_Agreement_Final (12.22.2016).docx

Highly Confidential                                                                                              AEG-CID-0000750467

**DX-1394.0264**

through the Support Request Procedures after hours will be reviewed within one (1) hour after the start of the next regular business day.

        (ii)    <u>System Issues</u>. AXS will assign one of the following severity levels to all reports that the system is not functioning in accordance with the specifications set forth in the System Documentation ("System Issues"):

•    Severity 1:  an issue that materially impacts Client's ability to conduct business/process orders and payments.  AXS will provide around-the-clock support for Severity 1 issues.

•    Severity 2:  a material issue for which a functional workaround sufficient to allow Client to conduct business and process orders and payments exists.  AXS will address and resolve Severity 2 issues as rapidly as possible within normal business hours.

•    Severity 3: an issue that does not have a material effect on Client's business or the operation of the system.  AXS will address and resolve Severity 3 issues in the normal course of its business through system updates.

        (iii)    <u>Other Requests</u>. AXS will work with Client to accommodate all Other Requests, such as requests for training, new features, or other services.

        3.    **Ticket Stock**. Client may order, at its cost, custom, private labeled Client ticket stock, through AXS certified printers. Client may utilize its own ticket stock; provided that such stock meets the basic AXS ticket stock standards (e.g., size, type, thickness, weight, etc.) and the manufacturers' standards for printing devices in use at the Venues. The AXS logo shall appear on all seat locators.

        4.    **Authorized User Accounts**.  In order to access and use the AXS Platform, Client will need to register and create an account ("Account").  Client agrees to provide accurate, current and complete information about the Client Account to AXS, which includes all individual Authorized User Accounts. "Authorized User" means an employee of Client who has been authorized by the Client and assigned a unique username-password combination to access and use the AXS Platform. AXS reserves the right to suspend or terminate the Client Account or any individual Authorized User's Account, if any information provided during the registration process or thereafter is or becomes inaccurate, false or misleading. Each party is responsible for maintaining the confidentiality of Client's passwords and Account, including all user names and passwords information assigned to its Authorized Users, and each party agrees to notify the other if it becomes aware that any of the passwords is lost, stolen, or disclosed to an unauthorized third-party, or otherwise may have been compromised.

24

Tiebreaker-ForestHills_Agreement_Final (12.22.2016).docx

Highly Confidential

AEG-CID-0000750468

**DX-1394.0265**