DX-1394(38)

Bates: AEG-CID-0000807602 – AEG-CID-0000807621

AXS and West Wing Live, LLC Ticketing Services Agreement

DX-1394.0689

CONFIDENTIAL



## TICKETING SERVICES AGREEMENT

This Ticketing Services Agreement (this "Agreement") is entered into as of this ___ day of July, 2019 (the "Effective Date"), by and between AXS Group LLC, a Delaware limited liability company ("AXS") and West Wing Live LLC, an Illinois limited liability company ("Client") (each of AXS and Client may also be referred to herein as a "Party"), with reference to the following facts:

WHEREAS, AXS, through itself and its affiliated companies owns and operates proprietary, web-based electronic ticketing systems and applications and systems for the original sale, issuance, resale and/or transfer of tickets to entertainment and sporting events and other rights associated with such events, including but not limited to axs.com (and any successor websites or country specific variations thereof, as well as related mobile platforms) and operation of the AXS Official Resale marketplace which facilitates the creation of a proprietary, branded and controlled resale marketplace ("AXS Official Resale"); and in connection therewith AXS collects and analyzes consumer data, conducts consumer marketing activities, and provides other services in support of the foregoing (collectively, the "AXS Platform"); and

WHEREAS, Client desires to utilize the AXS Platform in connection with ticketing operations and to engage AXS as its agent for providing ticketing and other services to the public with respect to all entertainment events (the "Events") that take place at the West Wing Live concert venue, located at 2120 South Jefferson Street, Chicago, IL 60616 ("WWL" or the "Venue"), on the terms and conditions set forth herein.

NOW THEREFORE, in consideration of the foregoing and the mutual promises set forth herein and for other good and valuable consideration, the parties hereto agree as follows:

1.    Term.  The initial term of this Agreement shall commence on the Effective Date or such date that ticket sales commence for Events as to the Venue (whichever is later) and shall continue for five (5) years after the first Event takes place (the "Term"). Notwithstanding the foregoing to the contrary, the Parties shall work cooperatively and consistently with the terms and provisions of this Agreement with respect to settling all Events for which tickets were first sold prior to expiration of the Term, but which Events are not scheduled to be held until after expiration of the Term, including, without limitation, use of and access to the AXS Platform to facilitate ticket sales and settlement after expiration of the Term.

1

Highly Confidential                                    AEG-CID-0000807602

2.     Ticket Sales Rights. During the Term, AXS shall serve as Client's sole and exclusive provider of primary and resale ticketing software sales and services with respect to the Events at the Venue, and AXS shall have the sole and exclusive right to sell all tickets via any means (now known or to be discovered) in connection with all Events at the Venue. Client shall place the entire manifest of tickets on the AXS Platform for each Event at the Venue. In connection with the sale, resale or issuance of tickets, Client will not endorse, support, integrate with, promote, receive revenue or any other compensation from or authorize the use of, any third party Internet site related to the sale of tickets, ticketing company, or software system related to the sale of tickets. Client will use its reasonable best efforts to not sell tickets to any person or entity that Client believes will re-sell tickets to Client's Event(s) contrary to the intention of this Agreement.  For example, sales to brokers shall not be permitted without the consent of AXS and the payment to AXS of a standard per-ticket fee. AXS will provide secondary market/resale services for tickets to the Events at fees consistent with Exhibit A, Section 1 of this Agreement.

3.     License to Client; AXS IP Rights.  AXS hereby grants Client a limited, non-exclusive, non-transferable license to access and use the AXS Platform and Hardware (as listed in Exhibit A) and AXS IP (defined below) solely for Client's internal business use, throughout the Term. AXS and its licensors reserve all rights and licenses in and to the AXS Platform not expressly granted to Client under this Agreement. All intellectual property and proprietary rights as may be developed and/or provided by AXS to Client in connection with the AXS Platform and/or Services pursuant to this Agreement (the "AXS IP"), shall be and remain the property of AXS and its licensors and no portion thereof may be used, disclosed, transmitted, transferred, sold, assigned, leased or otherwise disposed of, or made available for access by third parties, or be commercially exploited by or on behalf of Client, its employees or agents, except as expressly provided in this Agreement.

4.     Financial Incentives.

(a)     Signing Bonus.  AXS will pay Client a signing bonus of ███████ dollars ($███████) (the "Signing Bonus") with respect to WWL, within five (5) days of the Effective Date, subject to Nick Karounos's ("Karounos") prior or concurrent execution and delivery of a guaranty to AXS in the form attached hereto as Exhibit B (the "Guaranty").

(b)     Advance.  AXS will also pay Client a fully-recoupable advance of ███████ dollars ($██████) (the "Advance"), which shall be payable in two installments as follows: ██████ dollars ($███████) shall be paid within thirty (30) business days after the Effective Date (the "First Advance Payment"), and the second payment of ██████ dollars ($███████) shall be paid within sixty (60) days after the Effective Date (the "Second Advance Payment"), with all such payments being conditioned on and subject to Client's principal's concurrent execution and delivery of the Guaranty. AXS will recoup the Advance from service fee revenue collected above the contracted primary AXS Fees detailed in Exhibit A (e.g., the Client Fees). AXS will credit the amount of Client Fees against the amount of the Advance until fully recouped,

2

Highly Confidential

AEG-CID-0000807603

**DX-1394.0691**

after which time AXS shall commence payment of fees to Client according to the revenue sharing detailed in Exhibit A.

(c)    Changed Circumstances.  The parties understand that the total amounts of the Bonus and the Advance were calculated based on the expectation of a five (5) year Term, i.e. based on annual bonus amounts of $▓▓▓▓ each, and annual advance amounts $▓▓▓▓ each, which AXS·is agreeing to provide to Client in up front lump sums as an accommodation to Client.  Accordingly, in the event that any of the following occurs:  (a) Client loses the rights to schedule and present Events at the Venue; (b) Client commits a default under its lease of the Venue which results in a termination of such lease (c) Client is transferred or sold and/or the rights to operate and book the Venue are transferred or sold and this Agreement is not assumed by a new entity acceptable to AXS; or (c) the Agreement is terminated prior to the end of the five (5) year Term for a reason other than a breach by AXS that remains uncured after all applicable notice and cure periods have expired; then AXS will have the option to terminate the Agreement as of the date such event occurred by delivering written notice to Client, and Client will then return to AXS the pro rata  portion (based on the amount of time then remaining in the Term) of the Signing Bonus and any unrecouped amount of the Advance.  For example, if the Agreement were to be terminated at the end of four (4) years, and at such point AXS had recouped $▓▓▓▓ of the Advance, Client would be deemed to have only earned $▓▓▓ of the bonus and therefore Client would reimburse AXS the amount of $▓▓▓ for unearned bonus payments, and $▓▓▓ for the unrecouped portion of the Advance.  Notwithstanding the foregoing, AXS shall have the option, in its sole discretion, to elect to extend the Term of the Agreement for an additional period of at least one (1) year in lieu of requesting such reimbursements.  In addition, in the event that an extraordinary event causes a pause in the normal course of business of the Venue such that Events are not presented (a "Dark Time") for a substantial or significant amount of time (i.e. one month or more), then the Term shall automatically be extended by an amount of time equal to the amount of Dark Time.  At the end of the five (5) year Term, in the event that AXS has not recouped the full amount of the Advance by the end of the initial Term, AXS and Client shall have the option to extend the Term of the Agreement for an additional period to be mutually agreed, or if the Term is not so extended, then Client shall immediately reimburse the then outstanding portion of the Advance. In the event that the Venue does not open on or before November 1, 2019, the parties shall mutually discuss an equitable adjustment to the terms, including providing AXS with the option to extend the Term of the Agreement, by an amount of time equal to the delay.

(d)    Average Annual Event Threshold.  Client has represented that at least sixty five (65) publicly ticketed Events ("Event Threshold") will be held at the Venue annually.  The parties shall meet at least annually, to discuss the calendar of Events and upcoming plans for the Venue.  In the event that the Event Threshold is not met in any year, the parties shall mutually discuss an equitable adjustment to the terms of this Agreement, and if no agreement is reached within sixty (60) days thereafter, AXS shall have the option to terminate this Agreement upon thirty (30) days notice to Client.

3

Highly Confidential                                    AEG-CID-0000807604

**DX-1394.0692**

5.    Accounting Procedures and Settlement. AXS shall collect all proceeds from the sale of tickets to the Event(s) at the Venue made on AXS channels via AXS' merchant accounts and deposit all such proceeds into an account maintained by AXS. AXS shall be entitled to deduct any credit card processing fees, credits against the Advance, other AXS fees as detailed in Exhibit A and any other applicable charges or withholdings as authorized by this Agreement, prior to disbursing the fees due to Client and the remaining net ticket proceeds (each, a "Settlement Payment") in the manner described below. Client shall be responsible for remitting any applicable taxes collected from consumers to the applicable taxing authorities.

(a)    Payment Schedule. For primary market sales, AXS shall make Settlement Payments to Client every Thursday to the account designated by Client in writing to AXS with respect to ticket sales that took place during the previous Monday through Sunday. For secondary market sales, AXS shall make Settlement Payments to Client monthly, by the tenth business day of the month with respect to sales that took place the previous month. Client shall provide AXS with other information reasonably requested by AXS in order to remit such payments.

(b)    Reports.    AXS will provide Client with online access to true, complete and correct reports summarizing all applicable account activity.

(c)    Refunds. Client may authorize AXS to grant refunds for any reason at Client's sole discretion, and in such event AXS shall deduct the amounts of such refunds and related chargebacks from the amount due and payable to Client, as applicable. If the amount due and payable to Client is insufficient to cover the refunds or an Event has been cancelled, either (i) Client shall immediately (no later than within forty-eight hours after notice by AXS to Client) provide AXS with sufficient funds to make such refunds or (ii) such amounts shall be deducted from the monies that will be owed to Client under this Agreement in the next settlement period(s). AXS shall have no obligation to make any such refunds unless AXS has retained and/or is provided with sufficient funds to make such refunds and shall proceed under option (ii) of this Section at its sole discretion.

(d)    Cancelled Events. In the event that any Event is cancelled and not rescheduled, Client shall be responsible for effecting the payment of such refunds to purchasers who purchased tickets to the cancelled Event via the Venue box office, back office or any other Client-controlled sales channel and AXS shall be responsible for effecting the payment of such refunds to all other purchasers via AXS controlled channels. Where an AXS merchant account is used, all fees (with the exception of priority shipping) will be refunded along with the ticket price. In the event that AXS is not then currently holding enough ticket proceeds otherwise owing to Client in the next settlement payment to cover such refunds, AXS shall invoice Client for the deficiency and Client shall electronically deliver invoiced amounts into an account specified by AXS not later than two (2) business days after receipt of AXS's invoice therefore. If such amount is not received by AXS, such amount shall be deducted from the next settlement period(s) and/or AXS may, in its sole discretion, withhold payment of all refunds until it has received such invoiced amounts from Client.   AXS will make such

4

Highly Confidential    AEG-CID-0000807605

refunds for a period of thirty (30) days after the date upon which AXS is in possession of the required funds.   After such thirty (30) day period, Client shall be solely responsible for making all refunds and AXS shall have no further responsibility to make refunds with respect to the cancelled Event and shall have no liability with respect thereto.

6.      Data.

(a)      Purchaser Data. Client and AXS shall jointly own all data (i) provided by users of the AXS Platform for Client's Events at the time that such users purchase tickets to Events (the "Ticket Purchasers"), including but not limited to, names, email addresses, phone numbers, demographics, profiles, purchasing history, and other marketing or identifying information, so long as the Ticket Purchaser has consented to the collection and use of such information; and (ii) such other data regarding the Events as may be collected by AXS in the performance for Client of the Services (collectively, the "Purchaser Data").  Client grants to AXS a perpetual, worldwide, fully paid-up, non-exclusive, non-sublicensable right and license to use, analyze, modify, and copy the Purchaser Data for any lawful purpose deemed appropriate by AXS provided such purpose is for AXS's own benefit, including using such information for marketing and/or analytical purposes; to disclose to third parties de-identified or aggregated Purchaser Data; and to use all Purchaser Data for the purpose of providing AXS ticketing services (such as displaying ticketing purchase and transfer history) to such Ticket Purchasers, whether pursuant to this Agreement or otherwise; provided however, that notwithstanding the foregoing to the contrary, AXS shall have no right to, and shall not, sell, license, lease, convey or otherwise transfer to any third party, including its affiliates, any personally identifiable elements of the Purchaser Data, without the express prior written consent of Client.  AXS grants to Client a perpetual, worldwide, fully paid-up, non-exclusive right and license to use, analyze, modify, and copy the Purchaser Data for any lawful purpose deemed appropriate by Client, including using such information for marketing and/or analytical purposes; to disclose to third parties de-identified or aggregated Purchaser Data; and to use all Purchaser Data for providing any services to such Ticket Purchasers, whether pursuant to this Agreement or otherwise.  Client and AXS agree to collect, hold and use such information in compliance with all applicable laws and in accordance with applicable privacy policies.  Each of Client and AXS agrees to indemnify and hold harmless the other party, and their affiliates, officers, directors, agents and employees from and against any claim or lawsuit arising out of, or relating to the use of, Purchaser Data by the indemnifying party.  This Section 5(a) shall survive the termination of this Agreement.

(b)      Event Data. Client will furnish to AXS or enter into the electronic AXS Platform, as the case may be, all necessary information with respect to the proposed arrangement of the Venue for each Event, including seating layout, ticket prices and structure, permissible discounts, ticket header information, color logos, entry information, vision and hearing information, wheelchair and other accessible seating information and such other information as AXS may reasonably request or that may be necessary for the proper sale of tickets through the AXS Platform (collectively, "Event Data").  Included in such information will be Client's prepared disclaimer respecting refunds, Client's assumption of risk of injury and such other relevant information, as

5

Highly Confidential

AEG-CID-0000807606

**DX-1394.0694**

Client and AXS deem appropriate. Any Event Data or other content posted on the AXS Platform by Client shall be and remain Client's sole and exclusive property. Such Event Data shall be provided to AXS sufficiently in advance of any on-sale date or ticket sales for each Event. Client promptly will reimburse AXS for any additional costs it incurs as a result of changes made to this information after tickets for the applicable Event have been sold. Client shall be responsible for monitoring and assuring that Event Data or any other information posted by Client and/or AXS (including its assigns or designees) in connection with any Event(s) and/or the Services is accurate and up-to-date. Client acknowledges that AXS (and its assigns and/or designees) shall be entitled to rely on information posted by and/or approved by Client. Notwithstanding anything in this Agreement to the contrary, AXS will have no liability to Client under this Agreement for any act or omission by AXS in reliance on any Event Data so furnished by Client or in the event of any unreasonable delay or failure by Client to so furnish any Event Data.

       7.    <u>Representations and Warranties and Covenants</u>.

       (a)    Each of AXS and Client represent, warrant, and covenant to the other that: (i) it has the right and power to enter into this Agreement, to grant the rights hereunder, and to perform all terms hereof; (ii) it is duly organized and in good standing under the laws of its state of organization; (iii) the entering into and performance of this Agreement will not violate any judgment, order, law, contract, regulation, or agreement applicable to such party or violate the rights of any third party, or result in any breach of, or constitute a default under, any other agreement to which it is a party; (iv) the individual executing this Agreement, and whose signature appears below is duly authorized to execute this Agreement; and (v) it has been advised of its right to seek legal counsel of its own choosing in connection with the negotiation and execution of this Agreement.

       (b)    Client represents and warrants that it has the exclusive right to sell tickets as the owner (or owner's designee) of Event(s), and to grant AXS the exclusive right to sell tickets in connection with Event(s) as provided in Section 2 above.

       (c)    AXS represents and warrants that (i) it owns or has valid and sufficient rights to use and license all proprietary rights in and to the AXS Platform and all elements thereof, including with respect to all ticketing software, and (ii) the AXS Platform shall operate, function and be usable as intended in an uninterrupted (other than non-material short term interruptions consistent with industry standards), timely and good working manner.

       (d)    AXS will encrypt all Purchaser Data and Event Data while residing on the AXS Platform or data storage servers and devices using industry standard data encryption software;

       (e)    AXS will perform regular (not less than weekly) backups of Purchaser Data and Event Data; and will ensure that copies of the same are stored in an alternate data center or otherwise stored consistent with industry standards.

6

Highly Confidential              AEG-CID-0000807607

**DX-1394.0695**

(f)    AXS has and will maintain in effect at all times a service continuity plan that will enable AXS to resume primary functionality of the AXS Platform within 24 hours of any interruption or failure, subject to any force majeure event.

(g)    Each Party will comply with all laws, rules and regulations ("Laws") applicable to such party in any country in which they do business under this Agreement, including but not limited to such Laws as they may relate to collection, use or storage of data, including Purchaser Data.

(h)    Each Party shall be responsible to, and shall, remit to applicable taxing authorities any applicable taxes owed with respect to their own income or payments owing to such Party; i.e. Client shall be solely responsible for remitting taxes owing on transaction receipts collected by AXS and remitted to Client hereunder, and AXS shall be solely responsible for the amounts AXS retains as its fees hereunder.

(i)    Client and/or Karounos agree that any of the following may be considered an event of default by Client, in AXS's discretion:

(A) If Karounos sells Client or diminishes his ownership interest to less than a majority interest;

(B)    If the Venue does not open with a publicly ticketed Event, on or before November 1, 2019; or

(C)    If Client ceases presenting Events at the Venue, i.e. there is a stoppage of ticketed Events and Venue does not continuously remain open throughout the Term, with Tickets for Events available for sale on the AXS Platform.

8.    Disclaimer. Client agrees that, except as set forth in this Agreement, Client's and its ticket purchasers' use of the AXS IP are provided on an "AS IS," "AS AVAILABLE" basis without any warranties of any kind, whether express or implied, including, without limitation, the warranties of merchantability and fitness for a particular purpose by Client or its ticket purchasers.

9.    Limitation of Liability. Neither party shall be liable to the other party for any special, indirect, incidental, punitive, or consequential damages arising from or related to this Agreement or the operation or use of the AXS IP or the services. Nothing herein shall limit the ability of either party to obtain actual damages from the other upon the occurrence of a default following applicable cure periods. Neither party shall be liable to the other for (a) damages (regardless of their nature) for any delay or failure by such party to perform its obligations under this Agreement due to a Force Majeure event (as defined in Section 12(g) below); or (b) claims made of a subject of a legal proceeding against either party more than one year after any such cause of action first arose. Notwithstanding any other provision of this Agreement, AXS's liabilities under this Agreement whether under contract law, tort law, or otherwise shall not be greater than two (2) times (2x) the amounts charged by AXS pursuant to the terms of

7

AEG-CID-0000807608

**DX-1394.0696**

this Agreement in respect of the particular services performed by AXS from which such liabilities arose.

10.    Address for Notices. All notices and other communications required hereunder shall be made in writing and delivered to the following: physical addresses with a corresponding email to the following email addresses:

If notice to AXS:
AXS Group LLC
425 W. 11th Street
Los Angeles, CA 90015
ATTN:        Bryan Perez (bperez@axs.com), and
              Victoria von Szeliski (vvonszeliski@axs.com)

If notice to Client:
West Wing Live LLC
2120 S. Jefferson
Chicago, IL 60616
ATTN:        Nick Karounos (niko@spkentertainment.com)

With a copy to:
Much Shelist, P.C.
191 N. Wacker Drive, Suite 1800
Chicago, IL 60606
ATTN:        Harlan D. Kahn (hkahn@muchlaw.com)

11.    Termination.

(a)    Termination for Breach. Except as otherwise contemplated herein, either Party shall have the right to terminate this Agreement if the other Party commits any material or repeated breach of any of the provisions of this Agreement and (in the case of a breach which is capable of remedy) fails to remedy the same within thirty (30) days after receipt of written notice from the other Party giving full particulars of the breach and requiring it to be so remedied (provided if the default cannot be reasonably cured within such thirty (30) days, the breaching Party shall not be in default if such breaching Party commences efforts to cure such breach within such thirty (30) day period and thereafter diligently and in good faith continues to cure the default); provided that neither Party may terminate this Agreement if the terminating Party is at the time in material breach of any of the provisions of this Agreement (other than as caused by the other party's material breach).

(b)    Extension of Term for Force Majeure. In the event of a Force Majeure event, the Term of the Agreement will be extended by the period of time that such Force Majeure Event results in the failure or delay of such Party in the performance of any obligation under this Agreement or by an amount of time equal to the time that Events

8

AEG-CID-0000807609

DX-1394.0697

were not capable of being scheduled or presented at the Venue as a result of such Force Majeure event.

(c)    Termination for Insolvency. AXS or Client (the "Insolvent Party") shall provide immediate written notice to the other Party in the event that any insolvency, assignment for the benefit of creditors, bankruptcy or similar proceedings are instituted by or against such Insolvent Party.  If such proceedings remain undismissed for a period of thirty (30) days after such institution, the other Party may immediately terminate this Agreement by written notice to the Insolvent Party.

(d)    Survival. The Parties' rights and obligations which, by their nature, would continue beyond termination, cancellation or expiration of this Agreement, including, without limitation, confidentiality provisions, product warranties and governing law, shall survive any such termination, expiration or cancellation.  The rights and remedies provided in this paragraph shall be cumulative and not exclusive of any rights or remedies provided by applicable laws.  Any termination of this Agreement shall not affect any right or claim hereunder that arises prior to such termination, which claims and rights shall survive any such termination.

12.    Miscellaneous Provisions.

(a)    Waiver.    The failure by either party at any time to require performance by the other party or to claim a breach of any provision of this Agreement shall not affect any subsequent breach or the right to require performance or to claim a subsequent breach.

(b)    Identification as Client.  Subject to prior written approval of Client as to form and content, AXS may use the name of and identity of Client as an AXS customer in advertising, publicity or similar materials distributed or displayed to prospective customers or others.

(c)    Severability.  If any term, provision or condition contained in this Agreement shall, to any extent, be ruled invalid or unenforceable by a court of competent jurisdiction, the remainder of this Agreement shall not be affected thereby, and each and every other term, provision and condition of this Agreement shall be enforceable to the fullest extent permitted by law.

(d)    Assignment.  This Agreement shall be binding upon and shall inure to the benefit of AXS and Client and their respective permitted successors and assigns. Neither party may assign, convey, or transfer any interest in any or all of this Agreement without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed; provided, however, that such consent shall not be required (i) in the case of a collateral assignment to a lender, (ii) in the case of an assignment to any purchaser successor-in-interest which acquires a party and is capable of performing all obligations of the assignor hereunder, throughout the Term, (iii) in the case of an assignment by Client of its interest in this Agreement in connection with a sale of the Venue, or (iv) in the case of an assignment of its interest in this

9

Highly Confidential

AEG-CID-0000807610

Agreement to a manager or an operator of the Venue, provided such manager or operator is capable of performing all obligations of assignor under this Agreement.

(e)  Entire Agreement; Amendments.  This Agreement and the exhibits attached hereto comprises the entire agreement between the parties and may not be modified or amended except by written instrument signed by authorized representatives of the parties.

(f)  Governing Law; Venue.  This Agreement shall be construed in accordance with and governed by the laws of the State of Illinois, without regard to the principles of conflict of law. Other than any claim for equitable or injunctive relief, all other claims, disputes and other matters in question between the parties arising out of or relating to this Agreement shall be decided by binding arbitration before one mutually agreed upon neutral arbitrator in Los Angeles, California in accordance with the Comprehensive Commercial Arbitration Rules of JAMS then in effect. Each party shall bear its own costs in connection therewith except that the prevailing party shall be entitled to recover, and the arbitrator shall be empowered to award, costs and reasonable attorneys' fees to the prevailing party.

(g)  Force Majeure.  The term "Force Majeure" means causes or events beyond the reasonable control of a party that result in the failure or delay of a party in the performance of any obligation under this Agreement, that include, without limitation, storms, floods, other acts of nature, fires, explosions, riots, pandemic outbreak, war or civil disturbance, strikes or other labor unrests, embargoes, and other governmental actions or regulations that would prohibit either Party from performing any of its obligations hereunder, delays in transportation and inability to obtain necessary labor, supplies, or manufacturing facilities. Neither party shall be liable or deemed in default as a result of any delay or failure in performance of this Agreement resulting from a Force Majeure event, but only for so long as such delay shall continue to prevent performance. In addition, when an Event is prevented by operation of law, or if an Event does not take place because of the occurrence of a Force Majeure event that prevents the performance under this Agreement by AXS or Client of a material obligation under this Agreement, Client and AXS agree that each party shall be due any and all reasonable costs and expenses, including amounts provided for in this Agreement, which have been incurred up to the time performance is excused.

(h)  Electronic Signature; Counterparts.  This Agreement, and any other documents requiring a signature hereunder, may be executed via fax, email, or other electronic means, and in one or more counterparts, each of which will constitute an original.

*[Signature Page Follows]*

10

Highly Confidential

AEG-CID-0000807611

**DX-1394.0699**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date set forth above.

**WEST WING LIVE LLC**

By: _____

Officer
Name: Nick P. Karounos

Its: Manager

**AXS GROUP LLC**

By: _____

Officer
Name: BRYAN PEREZ

Its: CEO

11

Highly Confidential                                         AEG-CID-0000807612

**DX-1394.0700**

**EXHIBIT A**

**FEES AND SERVICES DETAILS**

1.    Ticket and Order Fees to AXS and Client.  AXS and Client shall share in the fees assessed on sales made via the AXS Platform, in the amounts set forth below, subject to recoupment of the Advance as detailed in Section 4 above and the chart below:

| Type of Fee | Minimum Net Fee | AXS Fee | Client Revenue |
|---|---|---|---|
| Primary Market – Per ticket sold via web/mobile/phone | $██, until full recoupment of Advance | $██ per ticket* | ██% of Net Fees above AXS Fee, after recoupment of Advance |
| Primary Market – Per ticket sold via Box Office | N/A | ████ | ██% of Fees if applicable, after recoupment of Advance |
| AXS Premium/VIP/Merchandise Sales | Minimum ██% Net Outside Fee, and ██% Net Inside Fee | ██% of Net Fees | ██% of Net Fees |
| Season Tickets & Series Plans (e.g., Theatrical Series, Seat License Offerings, etc.) | N/A | $██ per ticket per event | ██% of Net Fees above AXS Fee, after recoupment of Advance |
| Secondary (Resale) Market Sales | Minimum ██% Gross Buyer Fee, ██% Gross Seller Fee | ██% of Net Fees | ██% of Net Fees |
| Per Order Handling Fee | N/A | TBD | TBD |
| USPS Delivery Fee | N/A | $██ per order | ██% AXS Fee (or $██ per order), after recoupment of Advance |
| Delivery Fee – Digital (AXS Mobile ID)** and Will Call | N/A | Waived | N/A |

\* The AXS Fee for Primary Market tickets will increase $██ per ticket per year.

\*\*AXS Mobile ID will be the only free and only digital or electronic method of delivery.

12

Highly Confidential                                                                 AEG-CID-0000807613

**DX-1394.0701**

AXS will pay Client on a regular basis not less frequently than once per week by ACH transfer of funds for all tickets sold for all Events from the date and time that AXS last paid Client. The Parties shall endeavor to establish a regular payment date each week.

Client shall have the ability to sell and deliver box office, internal and complimentary tickets (i.e. tickets with zero face value) at no charge, provided that if Client sells or distributes such tickets through any channel or partner for value or sells or provides such tickets for resale, then the appropriate per ticket AXS Fee pursuant to the chart above shall apply and shall be paid by Client. The term "Net" when used with a fee described above, refers to the credit card processing fee being deducted prior to determining revenue sharing amounts.

2.    Credit Card Processing.

(a)    Sales Made by AXS. All Internet, mobile and call center (if applicable) sales will be processed via an AXS merchant account owned by AXS. AXS will provide Client with credit card processing services, for a processing fee equal to ▉% (passed on to the consumer) of the gross transaction value, which is calculated prior to deducting the applicable AXS ticket, handling, and/or order fees described above and is included within the service charge (or buyer fee, if secondary market sales) that is assessed to the customer. This processing fee includes merchant bank fees, processing, gateway fees, chargeback challenge administration or any other fee associated with the merchant account or processing of credit card payments. AXS will dispute chargebacks and assume risk on chargebacks sold via the AXS merchant account.

(b)    Sales Made at the Venue. Client will utilize its own merchant account for at-Venue or box office sales, and shall be responsible for any credit card fees and chargebacks related to sales via its merchant account as applicable and for remitting all taxes to the applicable taxing authority.

3.    AXS Ticketing Technology. AXS ticketing software and technology that shall be included within the AXS Platform includes, but is not limited to, features such as self-serve inventory management tools and point of sale support and integration. More specifically, the AXS Platform includes:
- Tickets to Events can be made available for sale to the general public on the AXS Platform (i.e. the Platform is capable of "primary" market ticketing sales);
- Tickets to Events can be posted for resale, and the primary and resale tickets can be made available in a "Co-mingled" marketplace, with an interactive seat map;
- Access to the both a Web-based electronic ticketing system for original sales of tickets to Events and a PC-based ticket selling system designed for use in box offices; and
- Client shall receive the number of end-user licenses reasonably necessary in order to provide use of the AXS Platform during the Term in accordance with the terms and conditions hereof.

13

Highly Confidential

4.    <u>AXS Anywhere Discovery and Distribution Program</u>. Client may choose to allocate primary market tickets through any of AXS' third party distribution partners, such as Groupon and Goldstar (each, a "Distribution Partner"). Upon receipt of written direction from Client, AXS shall provide the appropriate Distribution Partner access to an AXS system API for the relevant Event(s) at no cost to Client (though AXS reserves the right to charge the Distribution Partner or any relevant third party negotiated amounts for such access). AXS shall be due the per ticket AXS fees for any ticket sold by any Distribution Partners and such ticket shall also be subject to any separate terms negotiated between AXS and the applicable Distribution Partner(s).

5.    <u>AXS Marketing Support</u>.  AXS will provide the following additional marketing support, at no additional cost unless otherwise noted, to Client:
- AXS Discovery partnerships, including but not limited to, Spotify, Facebook, Songkick, Bandsintown and YouTube, expanding consumers' ability to find the Events;
- Client branded purchase experience that integrates primary and resale inventory;
- Events will be featured on AXS.com;
- Various detail pages (event, venue, promote, etc.) will promote Events and available ticketing options;
- Client will receive AXS.com database marketing support in Chicago and surrounding areas;
- AXS social media support;
- Designated Account Manager;
- AXS Intelligence Analytics Platform;
- AXS Advantage email tools at favorable rates; and
- Fan-initiated Event alerts and AXS-triggered emails.

6.    <u>Set-Up/Conversion/Training/Support/Upgrades</u>. The AXS setup fee will be waived for Client.  Training and support will be provided at no cost to Client. System upgrades that are generally made available to all AXS clients will be made available to Client at no cost.

7.    <u>AXS Call Center</u>.  AXS will provide consumer facing call center services for sales of Client's Event tickets at no cost to Client (other than the per ticket and per order described above which is passed on to consumer).   AXS' consumer call center is open seven days a week from 9:00am – 11:00pm (EST).

8.    <u>Connectivity/Equipment</u>. Client will be responsible for standard Internet connections to AXS for Box Office and Wi-Fi connectivity for Access Control locations. AXS will provide the below equipment to Client during the term of agreement at no charge. AXS will own the equipment and will be responsible for maintenance and upgrades of equipment. Client is responsible for any equipment damage due to its neglect.

| Item | Quantity |
|---|---|
| PC/Monitors | TBD |

14

**DX-1394.0703**

| BOCA Printers | TBD |
| Hand Held Scanners | TBD |
| Cradle Chargers | TBD |
| Web Design (skin) | No charge |

AXS can provide additional technical support to Client, details to be mutually agreed.

9.    Ticket Stock.  AXS Branded ticket stock can be provided at no charge. Client is responsible for paying for Client branded ticket stock or AXS will support a Client branded Eticket at no charge.

10.    Optional Value Added Services.  At Client's option, a new website for each Venue can be built by Carbonhouse (an affiliate of AXS) and fully integrated with AXS.com for "publish once" functionality. AXS will cover build and monthly support costs on a site mutually agreed with Client. Additional features and custom development can be agreed subject to additional pricing payable by Client.

15

Highly Confidential

AEG-CID-0000807616

**DX-1394.0704**

# EXHIBIT B

## ADVANCE OF FUNDS – GUARANTY AGREEMENT

[To Be Attached]

16

Highly Confidential

AEG-CID-0000807617

**DX-1394.0705**

## ADVANCE OF FUNDS – GUARANTY AGREEMENT

This Advance of Funds – Guaranty Agreement ("Guaranty Agreement") is made and entered into by and between Nick Karounos, an individual residing in Illinois ("Karounos" or "Guarantor"), and AXS Group LLC, a Delaware limited liability company ("AXS").

WHEREAS, Karounos is a substantial majority owner of Client (Karounos. holds more than █% of the membership interests of Client);

WHEREAS, Client and AXS are parties to that certain Ticketing Services Agreement dated as of the Effective Date set forth therein (the "Agreement") pursuant to which Client appointed AXS as Client's agent for ticket sales on the AXS Platform (as defined in the Agreement) with respect to the Events at the Venue, and to collect and remit ticket proceeds to Client, all subject to and in the manner set forth in the Ticketing Services Agreement;

WHEREAS, Client has the sole and exclusive rights to appoint ticketing sales services for Events at the Venue;

WHEREAS, Client desires to receive certain financial incentives under the Agreement that are exceptions to AXS' standard policies, including (a) that AXS shall provide a Signing Bonus in the amount of ███████ Dollars as detailed in Section 4(a) of the Agreement and (b) that AXS shall provide an Advance against revenue sharing payments otherwise payable from AXS to Client with respect to the Events in the amount of ███████ Dollars as detailed in Section 4(b) of the Agreement; and

WHEREAS, AXS is willing to make exceptions to its policies and accommodate Client's requests, subject to Client's continued full performance of its obligations under the Agreement and Guarantor's continued performance consistent with the terms of this Guaranty Agreement, and the parties' full execution and delivery of this Guaranty Agreement.

NOW THEREFORE, the parties hereto agree as follows:

1.      Definitions. All capitalized terms used and not otherwise defined herein shall have the meanings set forth for such terms in the Agreement.

2.      Guarantee. Guarantor understands and agrees that AXS is providing Client with the Signing Bonus and the Advance, as an accommodation to Client, before the Venue is open and before Ticket sales have commenced. Consequently, AXS is providing a substantial outlay of funds before there is any opportunity to earn any revenue with respect to Ticket sales, and Guarantor therefore agrees to provide this Guaranty Agreement to AXS on the terms herein.

17

Highly Confidential

AEG-CID-0000807618

**DX-1394.0706**

3.    Terms of Payment.  Initiation of payment of the Signing Bonus and Advance consistent with the Terms of the Agreement shall constitute full performance by AXS of its obligation to make such payments to Client.  Guarantor hereby guarantees the full and faithful performance of each and every obligation of Client with respect to the Signing Bonus and the Advance under the Agreement.  The obligations of Guarantor under this Guaranty Agreement are absolute and Guarantor waives any and all rights to offset, deduct or withhold any payments or charges due under the Agreement or this Guaranty Agreement for any reason whatsoever. If funds to which Client is not entitled for the Events are deposited in error into Client's account, including prior to the Advance being fully recouped or thereafter, Client authorizes AXS to direct the bank to return said funds to correct the error.  Client hereby releases AXS from liability for delays or errors beyond AXS's reasonable control.

4.    Deficiency Amounts. Guarantor shall provide immediate written notice to AXS in the event either Guarantor files any voluntary or involuntary petition under the bankruptcy or insolvency laws or upon any appointment of a receiver for all or any portion of their respective businesses or the assignment of all or substantially all of their respective assets for the benefit of creditors, and Guarantor agrees that the Advance constitutes a financial accommodation by AXS to Client. AXS shall have the right to setoff any deficiency amount with respect to the Signing Bonus or the Advance against any amounts held by AXS on behalf of Client.  In the event of any material financial event or in the event Client has not paid any deficiency amount of the Advance or Signing Bonus when due, AXS shall have the option to require Guarantor to provide additional security to AXS as requested by AXS in its sole discretion, and/or to suspend payment of ticket proceeds until the amount of any unpaid Advance has been fully recouped.

5.    Default; Acceleration.

(a)    If a default occurs, interest will accrue on all amounts due under this Guaranty Agreement at the lesser of ▆ percent (▆%) compounded annually, and the highest rate permitted by law, until such default is cured by Guarantor.

(b)    Upon the occurrence of a default, all sums then payable under the r this Guaranty Agreement will at the option of AXS become immediately due and payable without further demand.  In addition, AXS shall have the right to offset any unpaid amounts against any other ticket proceeds otherwise payable from AXS to Client.

(c)    AXS's failure to exercise any remedy set forth herein or any other remedy provided by law upon the occurrence of a default does not constitute a waiver of the right to exercise any remedy at any subsequent time in respect to the same or any other default. The acceptance by AXS of any payment that is less than the total of all amounts due and payable at the time of such payment does not constitute a waiver of the right to exercise any of the foregoing remedies or options at that time or at any subsequent

18

Highly Confidential                                                                                    AEG-CID-0000807619

**DX-1394.0707**

time, or nullify any prior exercise of any such remedy or option, without the express consent of AXS, except as and to the extent otherwise provided by law.

    6.    Waivers.

    (a)    Guarantor hereby waives diligence, presentment, protest and demand, and notice of protest, notice of demand, notice of dishonor, and notice of non-payment of the Signing Bonus and/or Advance. Guarantor expressly agree that this Guaranty Agreement or any payment hereunder may be extended from time to time, and that AXS may accept further security or release any security for the Signing Bonus and/or Advance, all without in any way affecting the liability of Guarantor.

    (b)    Any extension of time for payment of this Guarantor Agreement or any installment hereof made by agreement of AXS with any person now or hereafter liable for payment of this Guaranty Agreement must not operate to release, discharge, modify, change or affect the original liability of the Guarantor under this Guarantor Agreement, either in whole or in part.

    7.    Miscellaneous.

    (a)    Guarantor promises to pay all costs and expenses, including reasonable attorney's fees, incurred by AXS in the enforcement of the provisions of this Guaranty Agreement, regardless of whether suit is filed to seek enforcement.

    (b)    At the end of the Term of the Agreement or in the event of an earlier termination of this Guaranty Agreement for any reason, if AXS has elected consistent with its rights in the Agreement to recoup any portion of Signing Bonus and/or if there is any portion of the Advance which has not been fully recouped by AXS within 10 days after such termination, Guarantor shall remit the outstanding balance of either to AXS.

*[Signature Page Follows]*

19

Highly Confidential

AEG-CID-0000807620

**DX-1394.0708**

IN WITNESS WHEREOF, the parties have entered into this Guaranty Agreement as of the Effective Date of the Agreement.


**NICK KAROUNOS**

Signature: _____


**AXS GROUP LLC**

Signature: _____

Name: _____

Its: _____

20

Highly Confidential                                                    AEG-CID-0000807621

**DX-1394.0709**