DX-1394(83)

Bates: AEG-CID-0000818595 – AEG-CID-0000818609

AXS and Stanford Live Ticketing Services Agreement

DX-1394.1332



## TICKETING SERVICES AGREEMENT

### Frost Amphitheatre

This Ticketing Services Agreement (this "Agreement") is entered into as of February 16, 2022 (the "Effective Date"), by and between AXS Group LLC, a Delaware limited liability company ("AXS"), and The Board of Trustees of the Leland Stanford Junior University, an institution of higher education and a trust having corporate powers under the laws of the State of California ("Stanford University"), acting herein and hereunder by and through its operating or business sub-unit known as Stanford Live ("Operator" in the Booking Agreement and or "Client"), with reference to the following facts:

WHEREAS, AXS owns and operates AXS.com and the related back office ticketing systems and applications for the sale, issuance, resale and transfer of tickets and other rights associated with such events, including a primary market interface known as "Fansight", a marketplace which facilitates the creation of a proprietary, branded and controlled resale marketplace, and a co-mingled seat map that offers both primary and resale tickets for sale on the same seating map (collectively, the "AXS Platform"); and

WHEREAS, Stanford, acting by and through and solely on behalf of Operator, has entered into a separate booking agreement contract with AEG Presents, LLC ("AEGP") dated August 13, 2021 and made effective as of May 1, 2019 (the "Booking Agreement") pursuant to which AEGP has rights to control ticket sales for those entertainment events (herein, the "Events") defined and referred to in the Booking Agreement as "GV Events" and booked by AEGP and scheduled or presented at the venue currently known as Frost Amphitheater, located at 351 Lasuen St., Stanford, California (the "Venue"), on the terms and conditions set forth in the Booking Agreement;

WHEREAS, pursuant to the Booking Agreement, AEGP has selected AXS to perform ticketing services for the Events, and Client therefore desires to appoint AXS to provide ticketing services for Events, and AXS has agreed to perform such ticketing services, all on the terms and conditions set forth herein.

NOW THEREFORE, in consideration of the foregoing and the mutual promises set forth herein and for other good and valuable consideration, the parties hereto agree as follows:

1.　　Term.　　The term of this Agreement ("Term") shall commence on the Effective Date of this Agreement above and shall continue through whichever of the following is the first to occur:  (a) AEGP, pursuant to the Booking Agreement, selects and designates a person or entity other than AXS to perform ticketing services for the Events; (b) the term of the Booking Agreement, including any renewal periods, expires or sooner

1

Highly Confidential

AEG-CID-0000818595

**DX-1394.1333**

terminates; and (c) this Agreement terminates by mutual agreement of the Parties or in accordance with its terms. After the date of expiration of the Term or sooner termination of this Agreement, the parties shall work cooperatively with respect to conducting and completing all financial settlements hereunder, including with respect to ticket sales for Events for which tickets were first sold prior to such date, but which Events are not scheduled to be held until after such date, including, without limitation, use of and access to the AXS Platform to facilitate ticket sales and settlement after such date. In addition, the Term may be extended in accordance with Section 13(g) below regarding Force Majeure events. In the event that the Booking Agreement is terminated by AEGP due to the breach or default thereunder by Client or, AXS may, at AXS's option, terminate this Agreement with no further obligations to Stanford University or Client other than conducting and completing all financial settlements as required by this Agreement.

2.    Event Ticket Sales Rights.

(a)    Grant of Rights. Except as otherwise set forth in this Agreement, AXS shall serve as Client's sole and exclusive provider of primary and resale ticketing software sales and services with respect to the Events. Except as otherwise set forth in this Agreement and the Booking Agreement, AXS shall have the sole and exclusive right to sell all tickets for the Events ("Event Tickets") via any lawful means (now known or to be discovered); Client shall place the entire manifest of Event Tickets on the AXS Platform for each Event; and Client shall not sponsor, promote, integrate with, receive any compensation from, advertise, authorize or permit the use of any third-party website, system or service in connection with the sale, resale or issuance of Event Tickets . Client and AXS will each use its reasonable best efforts to not sell Event Tickets to any person or entity that such Party believes is acquiring such Event Tickets solely for re-sale contrary to the intention of this Agreement (for example, sales by Client of Event Tickets to brokers shall not be permitted) without the consent of AXS and the payment to AXS of a standard per-ticket fee pursuant to Exhibit A. AXS will enable the co-mingled seat map and stand-alone marketplace (and will activate the resale tile) for the Events and Event Tickets, and the parties shall share fee revenues from primary and secondary market sales of Tickets, consistent with Exhibit A of this Agreement. Notwithstanding the foregoing, none of the previous obligations will apply to the Excluded Ticketing Activities. As used herein, "Excluded Ticketing Activities" means the following, (a) any Event Ticket-related activity by Client that is permitted by the Booking Agreement, i.e., Client's right to present concerts outside of the Booking Agreement with Goldenvoice, as outlined and use Stanford Live's preferred ticketing services and (b) any of the following, but only to the extent not exceeding amounts consistent with industry custom and practice: (i) allocation for "fan clubs" and donor ticket allocations (as outlined in the Goldenvoice and Stanford Live Booking Agreement), (ii) any complimentary tickets provided by Client to the artist, performing act or event or members thereof, or their managers or agents, other VIPs, or for promotional purposes, and (iii) private or local cultural events for which tickets are not sold to the public, with each of the foregoing sub-clauses (i), (ii) and (iii) all further subject to the condition that Excluded Ticketing Activities shall not be undertaken with the ticket selling services of any commercial competitor of AXS.

2

Highly Confidential

AEG-CID-0000818596

**DX-1394.1334**

(b)    All events at the Venue that are not GV Events, even if co-promoted with AEGP outside of the Booking Agreement, are not subject to this Agreement, and Client is not required to use AXS as its ticketing service provider with respect thereto; provided, however, Client may use AXS for an event at the Venue that is co-promoted with AEGP outside of the Booking Agreement if, and as long as, AEGP is using AXS as its sole ticket service provider for that event.

3.    License to Client; AXS IP Rights.  AXS hereby grants Stanford University, when acting by or through Client, a limited, non-exclusive, non-transferable license to access and use the AXS Platform and Equipment (as listed in Exhibit A) solely for Client's internal business use, throughout the Term.  AXS and its licensors reserve all rights and licenses in and to the AXS Platform not expressly granted to Client under this Agreement. All intellectual property and proprietary rights as may be developed and/or provided by AXS to Client in connection with the AXS Platform and/or services pursuant to this Agreement (the "AXS IP"), shall be and remain the property of AXS and its licensors and no portion thereof may be used, disclosed, transmitted, transferred, sold, assigned, leased or otherwise disposed of, or made available for access by third parties, or be commercially exploited by or on behalf of Client, its employees or agents, except as expressly provided in this Agreement.

4.    Fees and Services Details.  Details regarding fees and services with respect to Event Tickets are provided in Exhibit A attached hereto.

5.    Accounting Procedures and Settlement of Funds.

(a)    Payment Processing Services Performed by AXS.  AXS shall collect all proceeds from the sale of Event Tickets made on the AXS Platform or through AXS channels via AXS's merchant accounts and deposit all such proceeds into the account maintained by Stanford University that is described in Section 5(b) below, including any sales taxes owed and due.  Internet, mobile and call center (if applicable) sales of Event Tickets will be processed via an AXS merchant account owned by AXS.  AXS will provide Client with payment services and customer service for such sales, including use of AXS's merchant account, processing of credit card, debit card, digital wallets, and other payment types (e.g. PayPal) accepted on the AXS Platform, fraud reduction, and chargeback challenge administration services (collectively, the "Payment Services") in exchange for a processing fee equal to ███ percent (█%) of the applicable gross transaction value ("Payment Administration Fee"). The Payment Administration fee is calculated prior to assessing the applicable per ticket or per order fees and is included along with the service charge that is assessed to customers.  This Payment Administration Fee is intended to cover merchant bank fees, processing, gateway fees, chargeback challenge administration or any other fee associated with the merchant accounts or processing of payments for Event Tickets via the AXS merchant account, or processing of payments for secondary sales of Event Tickets via the AXS merchant account.  AXS will dispute chargebacks and assume risk on chargebacks sold via the AXS merchant account.  AXS shall be entitled to deduct the Payment Administration Fee and AXS Fees as detailed in Exhibit A and any other applicable charges or withholdings as authorized by this

3

Highly Confidential

AEG-CID-0000818597

**DX-1394.1335**

Agreement, prior to disbursing and the remaining net Event Ticket proceeds due to Client (each, a "Settlement Payment") in the manner described below. Details about sales and other transaction-based tax responsibility is further described below.

(b)    Schedule of Settlement Payments. AXS shall make Settlement Payments with respect to the Events to the following account (the "Settlement Account"), as to which Client represents that AEGP (Goldenvoice) has signatory rights as and to the extent provided for in the Booking Agreement:

Bank Name: Wells Fargo Bank
Bank Address: 420 Montgomery Street, San Francisco, CA 94104
Account Holder: The Board of Trustees Of The Leland Stanford Junior University
Account Name: The Board of Trustees Of The Leland Stanford Junior University Goldenvoice
Account Type: Checking
Account Number: [Redacted - PII]
Routing Number: ▮▮▮▮▮▮
SWIFT/BIC code: ▮▮▮▮▮▮
FEIN: ▮▮▮▮▮▮

AXS shall make Settlement Payments with respect to primary market ticket sales to such account weekly, every Thursday with respect to sales which took place during the previous Monday through Sunday, for so long as the Booking Agreement in effect with respect to presenting Events at the Venues. In the event that the Booking Agreement is no longer in effect at some point during the Term, then Settlement Payments shall thereafter be made with respect to Events which took place during the previous Monday through Sunday, instead of with respect to ticket sales made in the prior week. For secondary market sales, AXS shall make Settlement Payments with respect to Net Fees owing to Client monthly, on the 10th day following the end of the month in which the resale transaction occurred. Client shall ensure that AEGP shall have access to Settlement Payments deposited by AXS to the Settlement Account in accordance with the terms of the Booking Agreement.

(c)    Refunds/Cancelled Events.

(i)    For cancelled Events, or for any reason at Client's direction (such as for rescheduled Events), AXS will process refunds for sales of Event Tickets made via AXS's merchant account on AXS channels, and all fees (with the exception of priority shipping) will be refunded along with the ticket price. AXS will deduct the amounts of refunds and related chargebacks it makes from the next Settlement Payment that becomes due and payable to Client. In the event that AXS is not then currently holding sufficient ticket proceeds otherwise owing to Client in the next Settlement Payment to cover such refunds, AXS shall invoice Client and AEGP for the deficiency and Client or AEGP, as provided in the Booking Agreement, shall electronically deliver invoiced amounts into an account specified by AXS not later than two (2) business days after receipt of AXS's invoice therefore. If such amount is not received by AXS, such amount

4

shall be deducted from the next Settlement Payment(s) and/or AXS may, in its sole discretion, withhold payment of all refunds until it has received such invoiced amounts from Client or AEGP.  Typically, AXS will make refunds for a period of thirty (30) days after the date of the applicable Event.   After such thirty (30) day period, Client or AEGP, as provided in the Booking Agreement, shall be solely responsible for making all refunds and AXS shall have no further responsibility to make refunds as to such Event provided that AXS has previously remitted (or if it has not previously remitted, it shall within two (2) business days after receipt of Client's invoice therefore), via wire transfer to the Settlement Account, AXS's share of any convenience and/or processing fees and the Payment Administration Fees with respect to the applicable Event.

(ii)    With respect to sales of Event Tickets via Client-controlled channels (such as the Venue box office, back office or any other Client-controlled sales channel), Client shall be solely responsible for processing refunds of such Event Tickets to any Event that is cancelled or rescheduled.

(d)    <u>Reports</u>.  AXS will provide Client and AEGP with online access to reports summarizing all applicable account activity.

(e)    <u>Fraud Reduction</u>.  In an effort to minimize fraud, AXS shall have the right to cancel any orders for Event Tickets attempted on its merchant account that it reasonably believes are fraudulent, including, but not limited to the following circumstances:  (1) billing address information provided does not match the credit card billing address; (2) duplicate orders; (3) Event Ticket purchaser's name does not match the name on the credit card; and (4) random orders that cannot be verified by the card holder.  If AXS receives a chargeback inquiry prior to an Event relating to an order to purchase Event Tickets, AXS may cancel the order.

(f)    <u>Refund Determination and Payment Responsibility</u>.  With respect to sales of Event Tickets via Client's own merchant account (e.g., box office or internal house seat sales conducted from the Venue), Client shall be solely responsible for processing refunds of such Event Tickets to any Event that is cancelled or rescheduled. In such case, Client shall have the right, in its sole discretion, to determine what, if any, amounts are to be refunded to purchasers of primary market tickets to such Events.

6.    <u>Data</u>.

(a)    <u>Purchaser Data</u>. Client shall own all data (i) provided by users of the AXS Platform for Events at the time that such users purchase Event Tickets to Events (the "Ticket Purchasers"), including but not limited to, names, email addresses, phone numbers, demographics, profiles, purchasing history, and other marketing or identifying information, so long as the Ticket Purchaser has consented to the collection and use of such information via the mechanism provided by the AXS Platform for that purpose or otherwise; and (ii) such other data regarding or relating to the sale of Event Tickets as may be collected by AXS in the performance for Client of the Services (collectively, the "Purchaser Data").  Client grants AXS the right to use the Purchaser Data during the Term in connection with providing ticketing services for Events pursuant to this Agreement and

5

**DX-1394.1337**

consistent with AXS standard business operations. To the extent it legally may do so and subject to any explicit limitations inherent in the applicable Ticket Purchaser consents, Client grants to AXS a perpetual, worldwide, fully paid-up, non-exclusive right and license to use, analyze, modify, and copy the Purchaser Data for any lawful purpose deemed appropriate by AXS, including using such information for marketing and/or analytical purposes; to disclose to third parties de-identified or aggregated Purchaser Data that does not identify or include any personally identifying information regarding any individual; and to use all Purchaser Data for the purpose of providing AXS ticketing services (such as displaying ticketing purchase and transfer history) to such Ticket Purchasers, whether pursuant to this Agreement or otherwise. To the extent it legally may do so and subject to any explicit limitations inherent in the applicable Ticket Purchaser consents, AXS grants to Client a perpetual, worldwide, fully paid-up, non-exclusive right and license to use, analyze, modify, and copy the Purchaser Data for any lawful purpose deemed appropriate by Client, including using such information for marketing and/or analytical purposes; to disclose to third parties de-identified or aggregated Purchaser Data that does not identify or include any personally identifying information regarding any individual; and to use all Purchaser Data for providing any services to such Ticket Purchasers, whether pursuant to this Agreement or otherwise. Client and AXS agree to collect, hold and use such information in compliance with all applicable laws and in accordance with applicable privacy policies. Each of Client and AXS agrees to defend and indemnify the other Party, and their affiliates, officers, directors, agents and employees from and against any claim or lawsuit by a third party arising out of or relating to the use of Purchaser Data by the indemnifying Party. This Section 6(a) shall survive the termination of this Agreement.

(b)    Event Data. Client will furnish to AXS or enter into the electronic AXS Platform, as the case may be, all necessary information with respect to the proposed arrangement of the Venue for each Event, including seating layout, ticket prices and structure, permissible discounts, ticket header information, color logos, entry information, vision and hearing information, wheelchair and other accessible seating information and such other information as AXS may reasonably request or that may be necessary for the proper sale of Event Tickets through the AXS Platform (collectively, "Event Data"). Included in such information will be Client's prepared disclaimer respecting refunds, assumption of risk of injury and such other relevant information as Client deems appropriate or AXS reasonably requires. Such Event Data shall be provided to AXS sufficiently in advance of the on-sale date or any Event Ticket sales for each Event. Client promptly will reimburse AXS for any additional reasonable out-of-pocket costs it incurs as a result of changes made to this information by Client after Event Tickets for the applicable Event have been sold, other than correcting errors made or introduced by AXS. Client shall be responsible for monitoring and assuring that Event Data or any other information posted by Client and/or AXS (including its assigns or designees) in connection with any Event(s) and/or the Services is accurate and up to date, and AXS will promptly correct, at its expense, any errors made or introduced by AXS. Client acknowledges that AXS (and its assigns and/or designees) shall be entitled to rely on information posted by and/or approved by Client except to the AXS has actual knowledge that such information is incorrect or incomplete. Notwithstanding anything in this Agreement to the contrary, AXS

6

Highly Confidential

AEG-CID-0000818600

will have no liability to Client under this Agreement for any act or omission by AXS in reasonable reliance on any Event Data so furnished by Client or in the event of any delay or failure by Client to so furnish any Event Data.

7.    Representations and Warranties.

(a)    Each of AXS and Client represent, warrant, and covenant to the other that: (i) it has the right and power to enter into this Agreement, to grant the rights hereunder, and to perform all terms hereof; (ii) it is duly organized and in good standing under the laws of its state of organization; (iii) the entering into and performance of this Agreement by it will not violate any judgment, order, law, contract, regulation, or agreement applicable to such Party or result in any breach of, or constitute a default under, any other agreement to which it is a party; (iv) the individual executing this Agreement on its behalf, and whose signature appears below, is duly authorized to so execute this Agreement; and (v) it has been advised of its right to seek legal counsel of its own choosing in connection with the negotiation and execution of this Agreement.

(b)    Client represents and warrants that, except as provided in and subject to the Booking Agreement, it has the exclusive right to sell Event Tickets as the owner (or owner's designee) of Event(s), and to grant AXS the exclusive right to sell tickets in connection with Event(s) as provided in this Agreement.

(c)    AXS represents and warrants that (i) it owns or has valid and sufficient rights to sell Event Tickets in accordance with this Agreement, including use and license all proprietary rights in and to the AXS Platform and all elements thereof, including with respect to all ticketing software, and (ii) the AXS Platform shall operate, function and be usable as intended in an uninterrupted (other than non-material short term interruptions consistent with industry standards), timely and good working manner.

(d)    AXS will encrypt all Purchaser Data and Event Data while residing on the AXS Platform or data storage servers and devices using industry standard data encryption software.

(e)    AXS will perform regular (not less than weekly) backups of Purchaser Data and Event Data; and will ensure that copies of the same are stored in an alternate data center or otherwise stored consistent with industry standards.

(f)    AXS has and will maintain in effect at all times a service continuity plan that will enable AXS to resume primary functionality of the AXS Platform within 24 hours of any interruption or failure, subject to any force majeure event.

(g)    Each Party will comply with all laws, rules and regulations ("Laws") applicable to such Party in any country in which they do business under this Agreement, including but not limited to such Laws as they may relate to its collection, use or storage of data, including all Purchaser Data and Event Data.  AXS shall be solely responsible for compliance with all Laws with respect to its sale of Event Tickets. Except with respect to AXS sale of Event Tickets, Client shall be solely responsible for compliance with all Laws

7

Highly Confidential

AEG-CID-0000818601

DX-1394.1339

with respect to Client's Events.  The foregoing notwithstanding, the Party (AXS or Client, as the case may be) that is responsible for doing so under the applicable Law will collect from consumers and report and remit to the applicable taxing authorities any transaction taxes (e.g., sales tax, VAT) due with respect to the sale of Event Tickets, as provided in Section 11 below.

(h)    Each Party shall be responsible to, and shall, remit to applicable taxing authorities any applicable taxes owed with respect to their own income or payments owing to such Party (i.e., Client shall be solely responsible for remitting income taxes owing on transaction receipts collected by AXS and remitted to Client hereunder, and AXS shall be solely responsible for any income taxes owed related to amounts AXS retains or is paid as its fees hereunder).

8.    <u>Responsibility for Security Breaches</u>.

(a)    AXS shall be responsible for the security (and any breaches thereto, except to the extent caused by Client) of the AXS Platform and the Software, and AXS shall take all reasonable precautions to protect and maintain the security of the AXS Platform, the Software and the Purchaser Data and Event Data stored by it from theft or unauthorized access or use, in order to fulfill its obligations to Client at all times during the Term of this Agreement.  AXS agrees to indemnify and hold harmless Client, and its affiliates, officers, directors, agents and employees from and against any claim or lawsuit arising out of or relating to the security of the AXS Platform and the Software or such data storage.

(b)    AXS will not knowingly include or introduce, and will use industry standard practices and commercially reasonable efforts to prevent the AXS Platform and the Software from containing, any computer virus, trojan horse, spyware, worm, logic bomb, trap door, back door, timer, clock, counter, keystroke tracker, adware, ransomware, automatically executed code, disabling devices or other limiting design, instruction, or routine or any other analogous or new type, form or method of malicious software code or method of infection ("Malware") of any type or sort.  AXS will perform regular (not less than weekly) scans of the AXS Platform and the Software, using industry standard tools, to detect and isolate or delete the existence of Malware. If AXS learns or believes the AXS Platform or the Software contains any Malware, then it shall, at its expense, promptly correct, repair, replace or exchange the affected portion thereof so as to eliminate the Malware and its effects.

9.    <u>Disclaimer</u>. Client agrees that, except as set forth in this Agreement, Client's and its ticket purchasers' use of the ticketing services are, and the AXS IP is provided hereunder, on an "AS IS," "AS AVAILABLE" basis without any warranties of any kind, whether express or implied, including, without limitation, the warranties of merchantability and fitness for a particular purpose by Client or its ticket purchasers.

10.    <u>Limitation of Liability</u>.  Neither Party shall be liable to the other Party for any special, indirect, incidental, punitive, or consequential damages arising from or related to

8

Highly Confidential    AEG-CID-0000818602

**DX-1394.1340**

this Agreement or the operation or use of the AXS IP or the services.  Nothing herein shall limit the ability of either Party to obtain actual damages from the other upon the occurrence of a default following applicable cure periods.  Neither Party shall be liable to the other for (a) damages (regardless of their nature) for any delay or failure by such Party to perform its obligations under this Agreement due to a Force Majeure event (as defined in Section 12(g) below).

11.    Sales Tax Responsibility. When using its merchant bank account, AXS will collect proceeds of all Event Tickets and ancillary items sold on Client's behalf under this Agreement using the AXS Platform, including any applicable taxes, including without limitation admission, sales or other local or state taxes, owed and due on transactions made by AXS or expenditures made on Client's behalf as detailed on the Settlement Payments reports. Any such taxes or other hard costs as set forth in the settlement report will be deducted by AXS and remitted to Client or to the applicable taxing authority or payee from the settlement proceeds, all as detailed further below and in the applicable settlement report.

(a)    Subject to any contrary requirements of applicable Law, Client is responsible for reporting and remitting any sales tax, collected and remitted to it by AXS, as described above that is due from revenues related to primary market sales of Event Tickets to the applicable tax authority.  AXS is responsible for so reporting and remitting any such sales tax that it collects and does remit to Client for Client's payment to the applicable tax authority.  Each Party shall have the right to obtain, reasonably promptly upon its written request to the other Party:

(i)    copies of any and all sales tax returns and/or other related documents evidencing such remission of sales tax by such other Party to the applicable tax authority; and,

(ii)    written assurances from such other Party that it has timely and fully complied with its legal obligations with regard to the payment and reporting of such sales taxes to the applicable tax authority.

(b)    To the extent that a Party is remitting sales taxes to the applicable tax authority, such Party acknowledges that the other Party is materially relying upon its representations regarding such sales taxes and such other Party's compliance with its obligations under applicable Law and this Agreement therewith in entering into and performing this Agreement.

(c)    For all resale or secondary market transactions on the AXS Platform, AXS will be responsible for all tax programming, collection, filing and remittance of sales and other taxes collected to the applicable taxing authorities with jurisdiction over the applicable ticketed Event.

(d)    In addition to any other indemnities in this Agreement, each Party hereby agrees to indemnify and hold the other harmless from the payment of any sales, use, or other transaction-based taxes that this Agreement makes such Party's obligation to

9

**DX-1394.1341**

collect and remit on the transactions contemplated by this Agreement (and any penalties, and interest for failure to timely report and remit the same) or reasonably related to any default or alleged default in compliance by such Party with such sales, use or other transaction-based tax laws. This section shall survive the Term or termination of this Agreement for any reason.

12.    Address for Notices. All notices and other communications required hereunder shall be made in writing and delivered to the following: physical addresses with a corresponding email to the following email addresses:

If notice to AXS:
AXS Group LLC
425 W. 11th Street
Los Angeles, CA 90015
ATTN: Victoria von Szeliski (**vvonszeliski@axs.com**), General Counsel

If notice to Client:
[The Board of Trustees of the Leland Stanford Junior University]
Stanford University
485 Broadway, 3rd Floor, Mail Code 8838
Redwood City, CA  94063
ATTN: Kinsey Haffner (**kinseyh@stanford.edu**, General Counsel

13.    Termination. The parties shall have the following termination rights:

(a)    Termination for Breach. Except as otherwise contemplated herein, a Party shall have the right to terminate this Agreement if the other Party commits any material or repeated breach of any of the provisions of this Agreement and (in the case of a breach which is capable of remedy) fails to remedy the same within thirty (30) days after receipt of written notice from the other Party giving a reasonably detailed description of the particulars of the breach and requiring it to be so remedied (provided if the default cannot be reasonably cured within such thirty (30) days, the breaching Party shall not be in default if such breaching Party commences efforts to cure such breach within such thirty (30) day period and thereafter diligently and in good faith continues to cure the default); provided that such Party may not terminate this Agreement if at the time it itself also is in material breach of any of the provisions of this Agreement (other than as caused by the other Party's material breach).

(b)    Termination for Insolvency. A Party (the "Insolvent Party") shall provide immediate written notice to the other Party in the event that any insolvency, assignment for the benefit of creditors, bankruptcy or similar proceedings are instituted by or against such Insolvent Party. If such proceedings remain undismissed for a period of thirty (30) days after such institution, such other Party may terminate this Agreement by written notice to the Insolvent Party.

10

Highly Confidential                                                          AEG-CID-0000818604

**DX-1394.1342**

(c)    Survival. The parties' rights and obligations which, by their nature, would continue beyond termination, cancellation or expiration of this Agreement, including, without limitation, confidentiality provisions, product warranties and governing law, shall survive any such termination, expiration or cancellation.   The rights and remedies provided in this paragraph shall be cumulative and not exclusive of any rights or remedies provided by applicable laws.  Any termination of this Agreement shall not affect any right or claim hereunder that arises prior to such termination, which claims and rights shall survive any such termination.

14.    Miscellaneous Provisions.

(a)    Waiver.  The failure by either Party at any time to require performance by the other Party or to claim a breach of any provision of this Agreement shall not affect any subsequent breach or the right to require performance or to claim a subsequent breach.

(b)    Identification as Client.  Unless it has prior written approval of Client as to the particular usage, form and content, AXS may not use the name of and identity of Client as an AXS customer in advertising, publicity or similar materials distributed or displayed to prospective customers or others.  For clarity, this Section 14(a) does not apply to AXS' display in the AXS Platform of identifying information about Client, the Venue or Events provided by Client pursuant to Section6.

(c)    Severability. If any term, provision or condition contained in this Agreement shall, to any extent, be ruled invalid or unenforceable by a court of competent jurisdiction, the remainder of this Agreement shall not be affected thereby, and each and every other term, provision and condition of this Agreement shall be enforceable to the fullest extent permitted by law.

(d)    Assignment.  This Agreement shall be binding upon and shall inure to the benefit of AXS and Stanford University and their respective permitted successors and assigns.  Neither such Party may assign, convey, or transfer any interest in any or all of this Agreement without the prior written consent of the other Party, which consent shall not be unreasonably withheld or delayed; provided, however, that such consent shall not be required (i) in the case of a collateral assignment to a lender, (ii) in the case of an assignment to any purchaser successor-in-interest which acquires a Party and is capable of performing all obligations of the assignor under this Agreement throughout the then remainder of the Term, or (iii) in the case of an assignment by Stanford University of its interest in this Agreement in connection with a sale of the Venue or an assignment of the Booking Agreement, or (iv) in the case of an assignment of its interest in this Agreement to a third party manager or an operator of the Venue provided such manager or operator is capable of performing all obligations of assignor under this Agreement throughout the then remainder of the Term.

(e)    Entire Agreement; Amendments. This Agreement and the exhibits attached hereto comprises the entire agreement between the parties and may not be modified or amended except by written instrument signed by authorized representatives of the parties.

11

Highly Confidential                                                                 AEG-CID-0000818605

**DX-1394.1343**

(f)    Governing Law; Venue.  This Agreement shall be construed in accordance with and governed by the laws of the State of California, without regard to the principles of conflict of law. Other than any claim for equitable or injunctive relief, which shall only be brought in a District Court in San Francisco County, California, all other claims, disputes and other matters in question between the parties arising out of or relating to this Agreement shall be decided by binding arbitration before one mutually agreed upon neutral arbitrator in San Francisco, California in accordance with the Comprehensive Commercial Arbitration Rules of JAMS then in effect. Each Party shall bear its own costs in connection therewith except that the prevailing Party shall not be entitled to recover, and the arbitrator shall not be empowered to award, costs and reasonable attorneys' fees to the prevailing Party.

(g)    Force Majeure.  The term "Force Majeure" means causes or events beyond the reasonable control of a Party that result in the temporary or permanent closure by Stanford University of the Venue for Events or a failure or delay of a Party in the performance of any obligation under this Agreement, that would prohibit such Party from performing any of its obligations hereunder; and the duration of such Force Majeure event shall be defined as the "Force Majeure Period").  A Party shall not be liable or deemed in default as a result of any delay or failure in its performance of this Agreement resulting from any such Force Majeure event, but only for so long as such Force Majeure event shall continue or continue to prevent such performance plus a period thereafter as reasonably required for such performance to resume. In the event that, at any time after the Effective Date, there is a suspension of Event Ticket sales due to a Force Majeure event, the Term of the Agreement shall be automatically extended by an amount of time equal to the corresponding Force Majeure Period.

(h)    Electronic Signature; Counterparts.  This Agreement, and any other documents requiring a signature hereunder, may be executed via fax, email, or other electronic means, and in one or more counterparts, each of which will constitute an original.

[*Signature Page to Follow*]

12

Highly Confidential                                                          AEG-CID-0000818606

**DX-1394.1344**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date set forth above.

**THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY**

By: Chris Lorway (Feb 16, 2022 18:26 PST)

Name:_____

Its:_____


**AXS GROUP LLC**

By:_____

Name: Bryan Perez

Its: CEO

13

Highly Confidential

AEG-CID-0000818607

**DX-1394.1345**

## EXHIBIT A

### FEES AND BOX OFFICE EQUIPMENT

1.    <u>Ticket and Order Fees to AXS and Client</u>.  The AXS Platform enables AXS to charge a per Event Ticket fee and per order delivery fees to consumers (collectively the "Service Charges") either as an additional charge on top of the Event Ticket price or included in its base ticket price.  In all cases, Client agrees that AXS shall be due its share of the Service Charges as provided herein regardless of whether such fees are (i) included in or (ii) added to the base ticket price of an Event Ticket.  AXS and Client shall share in the fees assessed on sales of Event Tickets made via the AXS Platform, in the amounts set forth below.

| Type of Fee | Minimum Fee* | AXS Fee | Client Revenue |
|---|---|---|---|
| Primary Market – tickets sold via AXS channels (e.g., web, phone) | Standard AEGP/AXS Fee Schedule | ▉% of Net Fees | ▉% of Net Fees |
| Box Office/Internal | N/A | Waived | ▉% of Fees if applicable |
| AXS Premium | Outside fee of ▉% plus inside fee of ▉% | ▉% of Net Fees | ▉% of Net Fees |
| Secondary (Resale) Market Sales | Current buyer fee is ▉%, and current seller fee is ▉% of gross transaction value | ▉% of Net Fees | ▉% of Net Fees |
| Per Order Delivery Fee – Standard Mail | $▉ | $▉ | ▉% of Net Fees above AXS Fee |
| Per Order Delivery Fee – Digital (AXS Mobile ID)** and Will Call | N/A | Waived | N/A |

*The term "Net" when used with a fee, refers to the Payment Administration Fee being deducted prior to determining fees listed above and revenue sharing amounts.

** AXS Mobile ID will be the only method of delivery unless otherwise agreed.

2.    <u>Connectivity/Equipment</u>. Client or AEGP, as required or contemplated by the Booking Agreement, will be responsible for reliable and stable Internet connections to the AXS Platform for box office operations relating to Events, including sales of Event Tickets, and Client will be responsible for Wi-Fi connectivity for all Venue access control locations. During the Term, AXS will provide Client with the use of standard box office equipment items reasonably determined necessary by AXS or AEGP (e.g., computer, ticket or seat locator printer, access control scanning equipment). AXS will own the equipment it provides and will be responsible for upgrading such equipment (including its

14

Highly Confidential                                                                                   AEG-CID-0000818608

**DX-1394.1346**

software and firmware) and for all maintenance, repair and replacement thereof, provided, however, that Client will be responsible for any loss or damage of such equipment caused by Client's neglect and for the return of such equipment to AXS at the end of the Term.

       3.    <u>Event Ticket Stock</u>.  Client is responsible for paying for Client branded Event Ticket stock; AXS will support a Client branded e-ticket for the Events at no charge.

15

Highly Confidential

AEG-CID-0000818609

**DX-1394.1347**