# EXHIBIT PX0712 B

Financial Institution (Name of Bank): Bridgewater Bank
Account Type: Checking
Account Number: ███████
Bank ACH Transfer Number: ███████
Branch Address:  Northstar Center West
625 Marquette Ave, Suite 100
Minneapolis, MN 55402
Branch Phone Number: 952-746-3939

Ticketmaster shall collect all Ticket Receipts derived from Ticket sales for Attractions made by Ticketmaster and shall initiate payment of Ticket Receipts to which Principal is entitled on Friday of each week with respect to TM System Ticket sales made by Ticketmaster during Monday through Sunday of the week preceding such payment date.  Initiation of the settlement payment via direct deposit shall constitute full performance by Ticketmaster of its obligation to make such settlement payment to Principal or to any person whatsoever. If funds to which Principal is not entitled are deposited into Principal's Account, Principal shall direct the Bank to return said funds.  Principal hereby releases Ticketmaster from liability for delays or errors beyond Ticketmaster's reasonable control, including but not limited to any errors resulting from any inaccurate or outdated Account information provided by Principal or bank processing delays, or for any related damages.  Principal acknowledges and agrees that direct deposit of such funds may require up to two (2) business days for Bank processing.  In the event of an error, Principal also authorizes the initiation of a debit to Principal's Account to correct the error.  Each weekly settlement payment shall be accompanied by a written accounting.  Principal shall designate an email address (set forth below its signature line of this Agreement) for delivery of such accounting and information regarding Attractions and Ticket sales, and shall promptly notify Ticketmaster of any changes to such email address.  The direct deposit authorization provided herein shall remain in full force and effect until Ticketmaster has received written notification from Principal of its termination in such time and such manner as to afford Ticketmaster a reasonable opportunity to act upon it.

(b)    Cancelled Attractions: Refunds: In the event that any Attraction for which Ticketmaster sold Tickets is cancelled, postponed, or modified (e.g., substitute acts) for any reason (each, a "Cancelled Attraction"), the Account Balance shall be held and made available for distribution by Ticketmaster to Ticket purchasers entitled to refunds for Tickets for Cancelled Attractions purchased from Ticketmaster.  For purposes of this Agreement, the term "Account Balance" shall mean the amount of funds held at any time by Ticketmaster on account of Ticket sales for that specific Attraction, less the amount of Ticket sales proceeds which Ticketmaster is entitled to retain hereunder. Principal authorizes Ticketmaster to refund the Ticket price at the original point of purchase (e.g., at Outlets or by Internet Sales or Telephone Sales) in such manner (e.g. by crediting the consumer's credit card) and at such time (e.g. before or after the scheduled date of the performance of such Attraction) as Ticketmaster, in its sole discretion, determines and to exchange Tickets pursuant to any exchange policy that may be adopted by Principal and Ticketmaster.  It is agreed and understood that Ticketmaster is the Ticket selling agent of Principal and therefore Ticketmaster's agreement to make any refunds as the agent of Principal is subject and limited to Ticketmaster holding or receiving from Principal the full amount of funds necessary to make refunds to all Ticket purchasers properly entitled to a refund.  Principal shall be responsible for all refunds and exchanges of Tickets initially purchased from the Facility Box Office.

(c)    Chargebacks: Ticketmaster reserves the right to deduct from Principal's settlement, any Chargebacks that Ticketmaster receives from its merchant bank, for up to eighteen (18) months after the occurrence of an Attraction. For purposes of this Agreement, "Chargebacks" shall mean the amounts that the merchant bank is charged back by a cardholder or a card issuer under the card organization's rules (e.g. cardholder dispute, fraud, declined transaction, returned Tickets for Cancelled Attractions, etc.).

(d)    Insolvency: Deficiency Amounts: Security for Repayment: Principal shall provide immediate written notice to Ticketmaster in the event it files any voluntary or involuntary petition under the bankruptcy or insolvency laws or upon any appointment of a receiver for all or any portion of Principal's business or the assignment of all or substantially all of the assets of Principal for the benefit of creditors (each, a "Material Financial Event").  The parties agree that this Agreement constitutes a financial accommodation by Ticketmaster to Principal as such term is utilized in 11 U.S.C. § 365. If at any time, the Account Balance is not sufficient to pay for anticipated refunds or Chargebacks, Principal shall deliver the amount of such deficiency ("Deficiency Amount") to Ticketmaster no later than twenty-four (24) hours after notice by Ticketmaster to Principal. Ticketmaster shall have the right to setoff any Deficiency Amount against any amounts held by Ticketmaster on behalf of Principal. In the event of any Material Financial Event or in the event Principal has not paid any Deficiency Amount when due, Ticketmaster shall have the option to require Principal to provide additional security to Ticketmaster of a type (e.g., letter of credit, guaranty or performance bond) and in an amount as requested by Ticketmaster in its reasonable discretion, which Principal shall provide to Ticketmaster within ten (10) business days after Ticketmaster's request.  Ticketmaster reserves the right to suspend payment of Ticket Receipts in advance of the occurrence of Attractions and instead deliver Ticket Receipts to which Principal is entitled post-performance (i.e., Friday of each week with respect to Attractions that occurred Monday through Sunday of the week preceding such payment date).

(e)    Counterfeit Tickets: It is agreed and understood that Ticketmaster shall not be liable to Principal for the printing and sale of counterfeit Tickets, including, without limitation, TicketFast® Tickets.

(f)    Enforcement and Damage Costs: Principal agrees to pay Ticketmaster any and all reasonable costs and expenses, including, but not limited to, outside legal costs incurred by Ticketmaster, in connection with enforcement of this

*Execution copy 10/6/17*                                        3



LNE-LIT24-000571997

Agreement and in connection with damage to any equipment provided to Principal by Ticketmaster. Principal grants Ticketmaster the right to deduct any amounts owed by Principal to Ticketmaster from any amounts held by Ticketmaster on behalf of Principal.

(g)    Request for Taxpayer Identification Number and Certification:  Principal shall complete the required Form W-9 provided with this Agreement and return it to Ticketmaster with this Agreement for purposes of reporting to the Internal Revenue Service.

7.    TAXES.

(a)    Attraction Taxes: Principal shall be responsible for calculating any and all Attraction Taxes, for preparing and timely filing any and all tax returns or reports required to be filed in respect of any such Attraction Taxes, and for timely remitting Attraction Taxes to the appropriate taxing authority. Ticketmaster will collect and turn over to Principal the amounts to which Principal is entitled and all Ticketmaster Taxes as provided in Section 6(a). In the event that Ticketmaster pays any Attraction Taxes on behalf of Principal or Ticketmaster pays any Attraction Taxes due to a failure by Principal to provide Ticketmaster with the required writing or documentation of any Principal tax exemptions pursuant to Section 7(c) below, Principal shall promptly reimburse Ticketmaster for any and all such Attraction Taxes paid by Ticketmaster, including penalties and interest assessed with respect thereto (other than Attraction Taxes, penalties and interest that Ticketmaster pays directly out of Principal's Ticket Receipts), and shall also promptly reimburse Ticketmaster for any and all expenses (including reasonable attorneys' fees) or damages that result from the failure by Principal to properly calculate and timely remit Attraction Taxes assessed on all amounts received by Principal under this Agreement, to timely file all related returns or reports, or to timely reimburse Ticketmaster for any and all such Attraction Taxes, interest and penalties as provided above. Notwithstanding the foregoing, in the event that Ticketmaster is ever required by applicable law to remit Attraction Taxes directly on behalf of Principal and file related tax returns or reports, Ticketmaster shall have the right to do so upon notice to Principal, and thereafter "Ticket Receipts" shall be defined to be reduced by such Attraction Taxes.

(b)    Principal's Taxpayer ID Number: Principal certifies that Principal's federal taxpayer identification number (FEIN or SSN) is ████████.  Principal further certifies that its state taxpayer identification or registration number for the state in which the Facility is located is ████.

(c)    Principal's Tax Exemptions: Principal shall notify Ticketmaster in writing of any and all Principal tax exemptions (if applicable) and provide Ticketmaster with reasonable proof of Principal's tax exemptions.

8.    CONFIDENTIAL INFORMATION:

(a)    The parties acknowledge that by reason of their relationship hereunder, they may from time to time disclose information regarding their business, products, software technology, Intellectual Property and other information that is confidential and of substantial value to the other party, which value would be impaired if such information were disclosed to third parties ("Confidential Information"). The provisions of this Agreement shall be deemed to be Confidential Information.

(b)    Confidential Information shall not include information that (i) is or becomes generally available to the public other than as a result of the breach of the confidentiality obligations in this Agreement by the receiving party, (ii) is or has been independently acquired or developed by the receiving party without violating any of the confidentiality obligations in this Agreement, (iii) was within the receiving party's possession prior to it being furnished to the receiving party by or on behalf of the disclosing party, or (iv) is received from a source other than the disclosing party; provided that, in the case of (iii) and (iv) above, the source of such information was not known by the receiving party to be bound by a confidentiality obligation to the disclosing party or any other party with respect to such information.

(c)    Each party agrees that it will keep the Confidential Information strictly confidential and will not use in any way for its own account or the account of any third party, nor disclose to any third party, any Confidential Information revealed to it by the other party without the other party's prior written consent, except to the extent expressly permitted by this Agreement; provided, however, that the receiving party may disclose the Confidential Information, or any portion thereof, to its directors, officers, employees, legal and financial advisors, controlling persons and entities who need to know such information to perform such party's obligations under this Agreement and who agree to treat the Confidential Information in accordance with the confidential obligations in this Agreement. Each party shall use the same degree of care to avoid disclosure or use of the other party's Confidential Information as it employs with respect to its own Confidential Information of like importance and represents that it has adequate procedures to protect the secrecy of such Confidential Information including without limitation the requirement that employees have executed non-disclosure agreements which have the effect of adequately protecting Confidential Information.

(d)    In the event that either party receives a request to disclose all or any part of the Confidential Information under the terms of a subpoena, document request, notice of deposition or other legal proceeding, such party agrees to notify the other pursuant to Section 14(h) below, within forty-eight (48) hours after receipt of such legal document, and such party agrees to cooperate with the other in any attempt to obtain a protective order.

9.    INDEMNIFICATION:

(a)    Principal shall indemnify Ticketmaster and its parents, subsidiaries, and their officers, directors, employees and agents and their successors and assigns (collectively, for purposes of this Section, "Ticketmaster's Indemnitees") against, and hold Ticketmaster's Indemnitees harmless from, any and all claims, actions, damages, expenses (including court costs and reasonable attorneys' fees), obligations, losses, liabilities and liens, imposed on, incurred by, or asserted

CONFIDENTIAL                                                                LNE-LIT24-000571998

against Ticketmaster's Indemnitees occurring as a result of, or in connection with: (i) any Event of Default under this Agreement by Principal or any of its officers, directors, employees and agents (collectively, "Principal's Representatives"); (ii) use of the TM System (including without limitation any customization of Principal's Website or the Interface Page (if applicable) and any e-mail campaigns or distributions using the TM System) or possession and use of the Hardware (if any) by Principal or any of Principal's Representatives; (iii) any Attraction held or scheduled to be held at the Facility (including any injuries or deaths occurring at or in connection with any Attraction or the failure of any Attraction to occur or to occur in the manner advertised or promoted); (iv) a claim that Ticketmaster's release of the Purchaser Data to Principal violates any applicable law, rule or regulation; (v) Principal's use of the Purchaser Data; (vi) violations of laws relating to the resale of Tickets; or (vii) any email campaigns or distributions conducted by Ticketmaster on Principal's behalf or conducted by Principal including, without limitation, email campaigns or distributions in violation of federal, state or other laws applicable to commercial emails; except, in each case, to the extent that any such claims shall relate to Ticketmaster's negligence or willful misconduct with respect thereto.

(b)      Ticketmaster shall indemnify Principal and its parents, subsidiaries, and their officers, directors, employees and agents and their successors and assigns (collectively, for purposes of this Section, "Principal's Indemnitees") against, and hold Principal's Indemnitees harmless from, any and all claims, actions, damages, expenses (including court costs and reasonable attorneys' fees), obligations, losses, liabilities and liens, imposed on, incurred by, or asserted against, Principal's Indemnitees occurring as a result of, or in connection with: (i) any Event of Default under this Agreement by Ticketmaster; or any of its officers, directors, employees and agents or (ii) any alleged patent, trademark or copyright infringement asserted against Principal's Indemnitees with respect to Principal's use of the TM System; except, in each case, to the extent that any such claim shall relate to Principal's negligence or willful misconduct with respect thereto.

(c)      The indemnified party must notify the other party promptly in writing of any claim hereunder, and provide, at such other party's expense, all reasonably necessary assistance, information and authority to allow the other party to control the defense and settlement of such claim.

## 10. TERMINATION:

(a)      This Agreement may be terminated by either party in the event of any material default in or material breach of the terms and conditions of this Agreement by the other party, after the other party has received written notice of default and thirty (30) business days (or ten (10) business days, in the case of a monetary default) to cure such default (each such occurrence, after the expiration of such cure period, shall be an "Event of Default"); or the filing of any voluntary or involuntary petition against the other party under the bankruptcy or insolvency laws of any applicable jurisdiction, which petition is not dismissed within sixty (60) days of filing, or upon any appointment of a receiver for all or any portion of the other party's business, or any assignment of all or substantially all of the assets of such other party for the benefit of creditors. Upon an Event of Default by Ticketmaster, Ticketmaster shall, without demand, forthwith pay to Principal all amounts due and owing pursuant hereto, and Principal may, in addition to terminating this Agreement, require Ticketmaster to remove all Hardware from the Facility. Upon an Event of Default by Principal, Principal shall, without demand, forthwith pay to Ticketmaster all amounts due and owing pursuant hereto, and Principal authorizes Ticketmaster to setoff any amounts owed to Ticketmaster hereunder against any amounts held by Ticketmaster on behalf of Principal, and Ticketmaster may, in addition to terminating this Agreement, terminate Principal's right to access and use the TM System and take immediate possession of the Hardware and Software wherever the same may be located without demand, notice or court order.

(b)      This Agreement may be terminated on ten (10) days' prior written notice, at the sole discretion of Ticketmaster in the event that more than 50% of Principal's assets or voting stock is sold or otherwise assigned to a third party.

(c)      This Agreement may be terminated by Ticketmaster in the event any act by Principal threatens to cause any infringement of any Ticketmaster (or Ticketmaster licensor) intellectual property or other property right, including without limitation, any copyright, license right or trade secret right, and Principal fails to refrain from so acting within ten (10) business days' written notice from Ticketmaster.

(d)      Upon the effective date of any termination or expiration of this Agreement, provisions regarding ownership of intellectual property rights, representations and warranties, confidentiality, indemnification, limitation of liability, non-solicitation, jurisdiction and venue shall remain in full force and effect; each party shall immediately cease the use of the other party's Intellectual Property; and each party shall return, or at the other party's request, destroy all copies of Confidential Information, and all other property belonging to and/or received from the other party.

(e)      No remedy referred to in this Section is intended to be exclusive, but each shall be cumulative and in addition to any other remedy herein or otherwise available at law or in equity, each and all of which are subject to the limitations contained in Section 12 hereof.

## 11. PRINCIPAL'S ACKNOWLEDGEMENTS.
Principal acknowledges that Ticketmaster's services under this Agreement are limited to serving as an agent of Principal for the distribution of Tickets, and that Ticketmaster does not guarantee (i) that short term interruptions of service will not occur during the Term hereof, (ii) that each person processing Ticket orders will be fully familiar with each or all of the Attractions, or (iii) that persons calling Ticketmaster charge-by-phone numbers will not be placed on hold. Principal further acknowledges and agrees that Ticketmaster may have many other events on the TM System concurrently with any Attraction and Ticketmaster has no responsibility whatsoever for the

*Execution copy 10/6/17*                5



CONFIDENTIAL                                                                     LNE-LIT24-000571999

marketing or promotion of any Attraction or the success of the Ticket sales for any Attraction, all of which is Principal's sole responsibility and obligation.

**12.    EXCLUSIVE REMEDIES FOR BREACH OF AGREEMENT.**

(a)    Opportunity to Cure: If either party believes that there exists a breach of this Agreement or if any controversy, claim, or dispute relating to this Agreement or any Attraction arises, such party must give written notice, pursuant to the terms hereof, to the other party within ten (10) business days of obtaining knowledge of such breach.  Such notice shall state the nature of the breach and the specific provision of this Agreement that the party believes has been breached. The other party shall have the applicable time period set forth in Section 10(a) above from the receipt of such notice to cure the breach.  Notwithstanding anything to the contrary set forth herein, if Principal fails to give notice of a breach pursuant to this Section, Principal shall waive its rights and remedies with respect to the subject matter of the breach.

(b)    Mediation: If a breach is not cured as provided for in Subsection (a) above, the parties agree to submit the dispute to non-binding mediation.  The mediator shall be jointly selected by the parties through an alternative dispute resolution organization in the city where the breach arose.  Neither party shall be bound by a recommendation of the mediator. However, any agreement reached during the mediation shall be final and binding. The parties shall equally share the cost of such mediation.

(c)    Liquidated Damages: Principal and Ticketmaster agree that if any action is brought for an alleged breach by Ticketmaster, then damages for any breach, including any alleged acts of negligence or other tort, regardless of the form in which any legal or equitable action may be brought, would be impractical or extremely difficult to measure. Accordingly, the parties agree that if there is a breach by Ticketmaster, then Principal's damages shall be limited to the lesser of (i) Ticketmaster's compensation received pursuant to Section 3 above with respect to the Attraction(s) allegedly adversely affected by the breach, or (ii) ▮▮▮▮▮ dollars ▮▮▮▮▮ ) ("Liquidated Damages Amount"); provided, however, that this provision shall not limit Ticketmaster's obligation to remit Ticket proceeds to Principal as required herein, and shall not limit Principal's indemnity obligations pursuant to the terms hereof.  The parties agree that the Liquidated Damages Amount is not a penalty, but is a reasonable estimate, under the circumstances existing on the Effective Date, of what the damages would be in the event of a breach by Ticketmaster.  **NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, PRINCIPAL AGREES TO LIMIT TICKETMASTER'S LIABILITY UNDER THIS AGREEMENT AND WITH RESPECT TO ANY BREACH OR WITH RESPECT TO ANY ACT OR OMISSION RELATING TO ANY ATTRACTION, WHETHER OR NOT SUCH BREACH OR ACT OR OMISSION IS DEEMED TO BE A TORT OR BREACH, TO THE LIQUIDATED DAMAGES AMOUNT.**

(d)    Statute of Limitations: No action, regardless of form, arising out of this Agreement, or alleging a breach, may be brought by either party more than six (6) months after the date knowledge of the relevant Attraction occurred or was scheduled to occur (except as otherwise provided in Subsection 6(c) above with respect to Chargebacks).

**13.    DEFINITIONS.** As used in this Agreement, the following terms shall have the respective meanings indicated below unless the context otherwise requires:

"Account Balance" is defined in Section 6(a) hereof.

"Attraction" means a concert, sporting, entertainment or other act or event of any kind or nature whatsoever to be held at the Facility, but excluding any private events (e.g., benefits, fundraisers, auctions and/or galas).

"Attraction Taxes" means any and all sales, amusement, admissions and other taxes, charges, fees, levies or other assessments measured by reference to a charge per Ticket sold or determined based upon the purchase price of a Ticket, assessed by federal, state, county, municipal or other governmental or quasi-governmental authorities as a result of, or in connection with, any Attraction, including Principal Taxes and Ticketmaster Taxes as further described below. To the extent such taxes relate to the funds paid or owed to Principal under this Agreement such portion of Attraction Taxes may also be referred to herein as Principal Taxes, and to the extent such taxes relate to fees or charges collected and retained by Ticketmaster under this Agreement, such portion of Attraction Taxes may also be referred to herein as Ticketmaster Taxes.

"Cancelled Attraction" is defined in Section 6(b) hereof.

"Chargebacks" is defined in Section 6(c) hereof.

"Deficiency Amount" is defined in Section 6(d) hereof.

"Face Value" means the face price of a Ticket as determined by Principal, which shall be inclusive of all applicable Attraction Taxes and facility, parking and similar fees.

"Facility" means any venues owned, controlled, operated or managed by Principal, directly or indirectly through one or more affiliates, or where Principal otherwise controls the rights or has the authority to sell tickets to any event, including, but not limited to the venue(s) located at 500 South 6th Street Minneapolis, MN and currently known as Minneapolis Armory.

"Facility Box Office" means the Ticket sales locations that are operated by Principal or by the Facility management and located at the Facility.

"Group Sales" means sales of Tickets by Principal to a group consisting of at least fifteen (15) people for use by the group members to attend an Attraction as a group.  In no event shall Group Sales consist of the sale of Tickets to individuals to attend an event separately or for individuals to purchase Tickets with the intent to resell such Tickets.

"House Seats" means Tickets provided by Principal (i) to the Attraction's promoter, performing act or event, or their managers or agents (i.e. band holds); (ii) for distribution through legitimate fan clubs in accordance with current guidelines

CONFIDENTIAL                                                                                 LNE-LIT24-000572000