# EXHIBIT PX0712 C

(i.e. fan club holds); or (iii) for legitimate promotional purposes (e.g. radio station promotions); provided that House Seats Tickets shall not be distributed to the general public.

"Inside Charges" means the amounts Ticketmaster charges Principal to sell, issue and process Tickets utilizing the TM System pursuant to this Agreement.

"Internet Sales" means all sales of Tickets over the Internet.

"Liquidated Damages Amount" is defined in Section 12(c) hereof.

"Material Financial Event" is defined in Section 6(d) hereof.

"On-Sale Date" is defined in Section 4(a) hereof.

"Outlet" means a retail Ticket selling agency (other than the Facility Box Office) where Tickets for an Attraction are made available and offered for sale to the public through the TM System.

"sale and sell" and any derivations thereof in this Agreement shall include any distribution for consideration, by any means or method (including without limitation, on the Internet or by auction) and shall include resales.

"Season/Contract Tickets" means specifically designated Tickets sold directly by Principal on an annual basis across all Attractions or across all of a category of Attractions (i.e., luxury suites, club level seats and season tickets).

"Sellable Capacity" means the admission capacity of the Facility for any particular Attraction.

"Set-Up Information" is defined in Section 4(a) hereof.

"Telephone Sales" means all sales of Tickets through the TM System by telephone, and if applicable, interactive voice response (IVR) and similar means.

"Term" is defined in Section 1 hereof.

"Ticket" means a printed, electronic or other type of evidence of the right, option or opportunity to occupy space at or to enter or attend an Attraction or Attractions even if not evidenced by any physical manifestation of such right, such as a "smart card", including, without limitation, tickets printed via *ticketFast*™ at home technology.

"TicketFast®" means the TM.com Website method of Ticket delivery which allows purchasers to print Tickets from a computer.

"Ticket Receipts" means the Face Value of a Ticket, plus any fees added to the Face Value and retained by Principal, less the applicable Inside Charges (exclusive of Ticketmaster Taxes in jurisdictions in which Principal is required to remit Attraction Taxes to the applicable taxing authority), Payment Processing Fees, and less any Principal Taxes for jurisdictions in which Ticketmaster is required to remit Principal Taxes to the applicable taxing authority.

"TM.com Website" means any Internet websites owned, operated and maintained by Ticketmaster, including, without limitation, any co-branded versions and any version distributed through any broadband distribution platform or through any platform or device including television, broadband and wireless technologies.

"TM System" means the hardware, software, the TM.com Website, related procedures and personnel, and repair and maintenance services established and maintained by Ticketmaster and its affiliates for the purpose of selling, distributing, auditing and controlling the sale of Tickets for Attractions, including, without limitation, at Outlets, by Internet Sales and by Telephone Sales.

14.    **MISCELLANEOUS.**

(a)    Governing Law/Jurisdiction: This Agreement shall be interpreted and governed by the laws of the State of Minnesota, without reference to conflict of laws principles. Each of the parties hereto agrees that the state courts, and the United States federal courts, that are located in the State of Minnesota shall each have subject matter jurisdiction hereunder and personal jurisdiction over each of the parties hereto. Each such party hereby consents thereto, and hereby waives any right it may have to assert the doctrine of forum non conveniens or to object to venue to the extent that any proceeding is conducted in accordance with the foregoing provision.

(b)    Waiver of Jury Trial: In the event the parties are required for any reason to submit any dispute hereunder to trial, the parties expressly agree to waive the right to a jury trial, because the parties hereto, all of whom are represented by counsel, believe that the complex commercial and professional aspects of their dealing with one another make a jury determination neither desirable nor appropriate.

(c)    Entire Agreement: Modification: This Agreement constitutes the entire and exclusive agreement between the parties hereto with respect to the subject matter hereof and supersedes and cancels all previous oral or written communications, proposals, agreements, and commitments. No modification to this Agreement, nor any waiver of any rights, shall be effective unless assented to in writing by the party to be charged and the waiver of any breach or default shall not constitute a waiver of any other right hereunder or any subsequent breach or default. A party's delay in enforcing its rights hereunder shall not be construed as a waiver of such rights or remedies.

(d)    Assignment: Without the prior written consent of Ticketmaster, Principal shall not (i) directly or indirectly assign, transfer, pledge or hypothecate its rights or obligations in this Agreement or any interest therein; or (ii) permit the Hardware (if any) or any part thereof to be used, or access to the Software or any part thereof to be had, by anyone other than Principal or Principal's authorized employees. Any such assignment shall not relieve Principal of any of its obligations hereunder. Without the prior written consent of Principal, Ticketmaster shall not assign or transfer its rights or obligations in this Agreement or any interest therein, except in the event of an assignment by Ticketmaster to any parent, subsidiary, affiliate or successor-in-interest (including, without limitation, a successor by virtue of an acquisition), in which event no such consent shall be required. Any assignment, transfer, pledge or hypothecation for which consent is required hereby and which is made without such consent shall be void. Notwithstanding the foregoing, Principal agrees and acknowledges that

*Execution copy 10/6/17*                    7



certain of Ticketmaster's duties and obligations under this Agreement may be performed on Ticketmaster's behalf by one or more of its parent, subsidiaries and affiliates, and no such performance shall be deemed to be an assignment or breach of this Agreement by Ticketmaster.

(e)      Relationship of the Parties: Each party is an independent contractor and not an agent or partner of, or joint-venturer with, the other party for any purpose other than as set forth in this Agreement (e.g., Ticketmaster is the agent of Principal with respect to ticket sales and distribution). Neither party by virtue of this Agreement shall have any right, power, or authority to act or create any obligation, express or implied, on behalf of the other party.

(f)      Delays: Neither party shall be liable or deemed in default, and no Event of Default shall be deemed to have occurred, as a result of any delay or failure in performance of this Agreement resulting directly or indirectly from any cause completely, solely and exclusively beyond the control of that party, but only for so long as such delay shall continue to prevent performance.

(g)      Severability: If any provision of this Agreement is found to be invalid or unenforceable in any jurisdiction (a) the validity or enforceability of such provision shall not in any way be affected with respect to any other jurisdiction, and the validity and enforceability of the remaining provisions shall not be affected; and (b) the parties shall replace such provision by one or more valid and enforceable provisions approximating the original provision as closely as possible.

(h)      Notices: Any notices required to be given under this Agreement must be sent to each party, in writing, at the address set forth immediately below the signature line hereto or at such address as may be provided by each party in writing from time to time, by certified or registered mail, return receipt requested or by an overnight courier. Notices will be deemed effective the day following sending if sent by overnight courier or five days after sending if sent by certified or registered mail. Settlement reports may be delivered from Ticketmaster to Principal by email; therefore Principal shall promptly notify Ticketmaster of any change to its email address set forth immediately below the signature line hereto.

(i)      Binding Agreement/Counterparts: The terms, conditions, provisions and undertakings of this Agreement shall be binding upon and inure to the benefit of each of the parties hereto and their respective successors and permitted assigns; provided, however, that this Agreement shall not be binding until executed by each of the parties. This Agreement may be executed in multiple counterparts which when taken together constitute a single instrument.

(j)      Legal Review: Each of the parties has had the opportunity to have its legal counsel review this Agreement on its behalf. **TICKETMASTER AND PRINCIPAL ACKNOWLEDGE THAT THEY HAVE READ AND UNDERSTAND THE FOREGOING REMEDIES PROVISIONS, INCLUDING THE PROVISIONS RELATING TO CURE, MEDIATION, LIQUIDATED DAMAGES, STATUTE OF LIMITATIONS AND WAIVER OF CLAIMS, AND BY THEIR SIGNATURES BELOW VOLUNTARILY AND KNOWINGLY AGREE TO BE BOUND BY ALL SUCH PROVISIONS.** If an ambiguity or question of intent arises with respect to any provision of this Agreement, this Agreement will be construed as if drafted jointly by the parties. The parties expressly agree that the construction and interpretation of this Agreement shall not be strictly construed against the drafter.

(k)      Attorneys' Fees: In addition to any other rights hereunder, the substantially prevailing party, as a court of competent jurisdiction (as provided above) may determine, in any claim or other dispute which relates to this Agreement, regardless of whether such claim or other dispute arises from a breach of contract, tort, violation of a statute or other cause of action, shall have the right to recover and collect from the other party its reasonable costs and expenses incurred in connection therewith, including, without limitation, its reasonable attorneys' fees. If a party substantially prevails on some aspects of such claim or dispute but not others, the court may apportion any award of costs or attorneys' fees in such manner as it deems equitable.

(l)      Client Listings: Principal's execution of this Agreement indicates approval for Principal to be listed as a Ticketmaster client in monthly newsletters for distribution to event industry clients, in product boiler plate information, and in future releases about Ticketmaster products and services for distribution to trade and consumer media. At any time, Principal may, in its sole discretion, direct Ticketmaster to stop using Principal's name for the purposes listed in this Section by sending notice to Ticketmaster via email at client.news@ticketmaster.com.

(m)      Survival of Terms: Any provision of this Agreement that contemplates performance or observance subsequent to any termination or expiration of this Agreement, including without limitation provisions related to use of the Software, purchaser data, limitations on liability, indemnification, confidential information, governing law and waivers of jury trials, shall survive any termination or expiration of this Agreement and continue in full force and effect.



CONFIDENTIAL                                                                      LNE-LIT24-000572002

IN WITNESS WHEREOF, Ticketmaster and Principal have caused this Agreement to be duly executed as of the date set forth below.

TICKETMASTER L.L.C.,
a Virginia limited liability company

By: _____

Print Name: Geoff Carns

Title: SVP, Venues & Promoters

Date: _____

Address:    Ticketmaster L.L.C.
            550 West Van Buren
            Chicago, IL 60607
Attn:       Sr. Director, Client Development

With a copy to:    Ticketmaster L.L.C.
                   7060 Hollywood Blvd.
                   Hollywood, CA 90028
                   Attn:   Senior Vice President,
                           Venues & Promoters

With a copy to:    Ticketmaster L.L.C.
                   7060 Hollywood Boulevard
                   Hollywood, CA  90028
Attn:              General Counsel

ARMORY HOSPITALITY, LLC,
a Minnesota limited liability company

By: _____

Print Name:  Nedal Abdul

Title:    Chief Manager

Date:    10/6/17

Address:    510 1st Avenue North, Suite 600
            Minneapolis, MN 55403
            612-332-8323
Fax:        612-332-0262
email address: ned@swervo.com



CONFIDENTIAL                                                                   LNE-LIT24-000572003

## EXHIBIT A

## HARDWARE

The parties desire to provide that Ticketmaster shall provide Principal access to the TM System and rent certain ticketing equipment to Principal for its use at the Facility Box Office to sell Principal Tickets to persons physically present at the Facility Box Office, and to conduct Group Sales and sales of Season/Contract Tickets upon the terms and conditions set forth in this Exhibit A.

1.      **Definitions.** The following terms shall have the respective meanings indicated below:

(a)      **Hardware:** Any equipment supplied by Ticketmaster to Principal during the Term of this Agreement.

(b)      **Software:** Ticketmaster's computerized ticketing software known and marketed as Ticketmaster Classic and any new versions thereof that are provided to Principal by Ticketmaster.

2.      **Principal Ticket Sales: Exclusivity.** Ticketmaster hereby grants to Principal the right to utilize the Hardware and Software to access Ticket sales data and information, sell Tickets to persons physically present at the Facility Box Office and to conduct Group Sales and sell Season/Contract Ticket sales during the Term in exchange for the fees set forth herein.

3.      **Hardware and Software Use Fees.** Ticketmaster shall provide to Principal, at no cost, with the use of the Hardware and the Software at the Facility Box Office in connection with Principal's printing of Ticket sales data reports and Principal's sales of Tickets pursuant to this Agreement during the Term.

4.      **Installation and Line Costs.** The installation costs with respect to the Hardware, the cost of all telephone line connections between Ticketmaster's central computer facility and the Facility Box Office, and all monthly telephone line costs with respect to the operation of the TM System between the Facility Box Office and the central computer facility, shall be borne solely by Principal.

5.      **Hardware and Software Maintenance and Support.** Ticketmaster shall provide ordinary and routine maintenance, repair and support of the Hardware and Software at the Facility at no additional cost to Principal, provided that such maintenance, repair or support is not necessitated by the negligence or willful misconduct of Principal, its employees, agents or representatives.

6.      **Protection of Hardware.** Principal acknowledges that the Hardware will be used by Principal at the Facility Box Office which location Ticketmaster does not own, operate or control. Accordingly, the parties agree as set forth below with respect to the Hardware:

(a)      **Loss and Damage:** Principal hereby assumes and shall bear the entire risk of loss and damage to the Hardware, ordinary wear and tear excepted, whether or not insured against, once installed, unless occasioned by the negligence of Ticketmaster, from any and every cause whatsoever from the date of delivery of the Hardware to the Facility Box Office until removal thereof following termination of this Agreement. No such loss or damage to the Hardware shall impair any obligation of Principal under the Agreement. In the event of loss or damage of any kind to any Hardware, Principal shall within thirty (30) days after such loss or damage:

(i)      Place the same, or replace the same with similar property, in good repair, condition and working order to the satisfaction of Ticketmaster; or

(ii)      Pay Ticketmaster in cash the full replacement cost of the Hardware, and Ticketmaster shall promptly install new hardware to replace the lost or damaged Hardware.

(b)      **Insurance:**

(i)      Principal shall, at its own expense, provide and maintain at all times during Term insurance to protect the Hardware against loss caused by fire (with extended coverage), vandalism, malicious mischief, theft, or any other cause in an amount equal to the full replacement value of the Hardware as determined by Ticketmaster. Should Principal become unable to provide or maintain such insurance coverage, Principal shall promptly notify Ticketmaster in writing prior to the expiration of any such coverage and, thereafter, Ticketmaster shall have the right, but shall not be obligated, to provide insurance coverage for the occurrences specified above and charge Principal the costs of such insurance coverage.

(ii)      Principal shall provide, at its sole expense, comprehensive general liability and property damage



*Execution copy 10/6/17*                                              10

CONFIDENTIAL                                                                      LNE-LIT24-000572004

insurance with minimum limits of ███████ per occurrence and ███████ in the aggregate, for its protection and the protection of Ticketmaster.

      (iii)    Except as expressly provided in clause (ii) above, all insurance provided and maintained by Principal shall be in such amounts, under such forms of policies, upon such terms, for such periods and written by such companies as Ticketmaster and Principal shall agree upon, and in all cases such insurance policies shall provide for the waiver of the insurer's right of subrogation against Principal and Ticketmaster. All policies of insurance shall include Ticketmaster, Live Nation Worldwide, Inc. and its landlords or licensors, if any, and their respective parents, members, partners, affiliates, divisions and subsidiaries as an additional named insured on a primary and non-contributory basis irrespective of any other insurance, whether collectible or not, with respect to the operations of Principal per this written Agreement. Further, such policies shall provide for at least thirty (30) days prior written notice of cancellation or non-renewal to Ticketmaster. Principal shall furnish Ticketmaster with certificates of such insurance or other evidence satisfactory to Ticketmaster as to its compliance with the provisions of this Section.

      (c)    **Hardware and Software is Personal Property**: Principal covenants and agrees that the Hardware and Software is, and shall at all times be and remain, personal property which shall, at all times, remain the sole and exclusive property of Ticketmaster and the Principal shall have no right, title or interest therein or thereto except as a licensed user thereof. If requested by Ticketmaster, Principal will obtain a certificate in form satisfactory to Ticketmaster from all parties with a real property interest in the premises wherein the Hardware may be located, waiving any claim with respect to the Hardware. Except as may be necessary to prevent damage to or destruction of the Hardware, Principal will not move the Hardware or permit such Hardware to be moved without Ticketmaster's prior written consent, which consent shall not be unreasonably withheld, and shall give Ticketmaster prompt written notice of any attachment or other judicial process affecting any item of Hardware.

      (d)    **Designation of Ownership**: If, at any time during the Term, Ticketmaster supplies the Principal with labels, plates or other markings stating that the Hardware is owned by Ticketmaster, Principal shall affix and keep the same in a prominent place on the Hardware in recognition of Ticketmaster's ownership of the same.

      (e)    **Use of Hardware and Software**: Principal shall use the Hardware in a careful and proper manner and shall comply with and conform to all federal, state, municipal and other laws, ordinances and regulations in any way relating to the possession, use or maintenance of the Hardware. Neither the Principal, nor its employees, agents, servants or representatives, shall alter, modify, copy or add to the Hardware or Software without the prior written consent of Ticketmaster.

      (f)    **Surrender of Hardware**: Upon the expiration or termination of this Agreement, Principal shall return the Hardware to Ticketmaster in good repair, condition and working order, ordinary wear and tear resulting from proper use thereof alone excepted.

      7.    **Taxes on Hardware**. Principal shall keep the Hardware free and clear of all levies, liens and encumbrances which are caused by Principal or under Principal's control and shall promptly reimburse Ticketmaster for all license fees, registration fees, assessments, charges and taxes, whether federal, state, county, municipal or other governmental or quasi-governmental, with respect to the Hardware located at Principal's Office, including, without limitation, use, excise and property taxes, and penalties and interest with respect thereto, except and excluding, however, any taxes based on or measured solely by Ticketmaster's net income.

      8.    **Training of Principal's Employees**. Ticketmaster shall provide a reasonable amount of training to Principal's employees who shall be reasonably necessary for the operation of the Hardware and Software at the Facility Box Office. To the extent of any change in personnel by Principal requiring additional training beyond that initially contemplated hereunder, Principal agrees to absorb all of the expenses thereof.



*Execution copy 10/6/17*               11

## EXHIBIT B

## TM+ TERMS AND CONDITIONS

1.      Capitalized terms used but not defined herein have the meaning assigned to such terms in the Agreement, and the terms "TM System" and "Software" as used in the Agreement shall be deemed to incorporate TM+.

2.      Ticketmaster shall enable TM+ for all Attractions in accordance with the settlement terms set forth in this Exhibit B below.

### TM+ Settlement Terms

- For any primary market ticket inventory sold through TM+, Ticketmaster shall continue to sell such tickets and settle the proceeds of such sales with Principal in accordance with the terms and conditions for such transactions as set forth in the Agreement.

- For any secondary market ticket inventory sold through TM+, Ticketmaster shall assess its standard fees against the buyers and sellers of such tickets in amounts as determined by Ticketmaster, which amounts currently include: (i) a seller fee generally in an amount up to ███ percent ███ of the ticket posting price (i.e., the price set by the seller upon posting such ticket for sale), and (ii) a buyer fee generally in an amount up to ███ percent ███ of the ticket listing price (i.e., the posting price plus the seller fee), with a ███ minimum.

  - Principal shall be entitled to receive from Ticketmaster ███ percent ███) of the Net Resale Fees collected (and not refunded or subject to chargeback) by Ticketmaster on account of Principal's secondary market ticket sales through TM+ (the "TM+ Revenue Share").

  - For purposes of this Exhibit B, "Net Resale Fees" shall be defined as the gross amount collected from the new purchaser of a secondary market inventory ticket via TM+ less (i) the proceeds paid to the ticket seller, (ii) an amount equal to ███ of the gross amount collected from the new purchaser (to cover credit card processing fees), (iii) any applicable sales, admission or similar tax, and (iv) ███ of the gross amount collected from the new purchase (to cover certain customer acquisition costs (e.g., SEM).

  - The TM+ Revenue Share will be paid to Principal on a quarterly basis for all such sales occurring in any calendar quarter, on or before the thirtieth (30th) day of the month following each calendar quarter. In the event that any Attraction for which Ticketmaster has made any TM+ Revenue Share payment to Principal becomes a Cancelled Attraction, Principal shall promptly repay to Ticketmaster the amount of such TM+ Revenue Share payments in respect of such Cancelled Attraction.

  - Each settlement relating to the TM+ Revenue Share pursuant to this Exhibit B shall be accompanied by a report of the applicable transactions during such settlement period.



CONFIDENTIAL                                                                LNE-LIT24-000572006

| Form **W-9** | **Request for Taxpayer** | Give form to the |
|---|---|---|
| (Rev. October 2007) | **Identification Number and Certification** | requester. Do not |
| Department of the Treasury Internal Revenue Service | | send to the IRS. |

Name (as shown on your income tax return)

Business name, if different from above

Check appropriate box: ☐ Individual/Sole proprietor  ☐ Corporation  ☐ Partnership
☐ Limited liability company. Enter the tax classification (D=disregarded entity, C=corporation, P=partnership) ► ........
☐ Other (see instructions) ►                                    ☐ Exempt payee

Address (number, street, and apt. or suite no.)            Requester's name and address (optional)

City, state, and ZIP code

List account number(s) here (optional)

### Part I    Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on Line 1 to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see How to get a TIN on page 3.

Note. If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

Social security number

or

Employer identification number

### Part II    Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. citizen or other U.S. person (defined below).

Certification instructions. You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. See the instructions on page 4.

| Sign Here | Signature of U.S. person ► | Date ► |
|---|---|---|

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

## Purpose of Form

A person who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income.

Note. If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

Definition of a U.S. person. For federal tax purposes, you are considered a U.S. person if you are:

● An individual who is a U.S. citizen or U.S. resident alien,

● A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States,

● An estate (other than a foreign estate), or

● A domestic trust (as defined in Regulations section 301.7701-7).

Special rules for partnerships. Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax on any foreign partners' share of income from such business. Further, in certain cases where a Form W-9 has not been received, a partnership is required to presume that a partner is a foreign person, and pay the withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid withholding on your share of partnership income.

The person who gives Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States is in the following cases:

● The U.S. owner of a disregarded entity and not the entity,

Cat. No. 10231X                                            Form **W-9** (Rev. 10-2007)

*Execution copy 10/6/17*                     13



CONFIDENTIAL                                    LNE-LIT24-000572007