CONFIDENTIAL

## MULTI-EVENT INCENTIVE AGREEMENT

This Multi-Event Incentive Agreement ("Agreement") is effective as of January 1, 2023 ("Effective Date"), by and between Live Nation Worldwide, Inc., a Delaware corporation with a business address of 111 East Wacker Drive, Suite 1400, Chicago, Illinois 60601 ("Live Nation"), and Village of Rosemont, 6920 North Mannheim Road, Rosemont, Illinois 60018 ("Operator").

A.     Operator manages and/or operates an arena located in Rosemont, Illinois currently known as the *Allstate Arena* ("Venue").

B.     Live Nation is an entertainment company whose business includes, among other things, talent buying for concerts and the production and promotion of live entertainment events.

C.     In recognition of the larger (but non-exclusive) relationship between the parties, Operator and Live Nation desire to enter into an agreement that provides incentives to Live Nation to book and promote live music concerts, comedy events and other mutually approved entertainment events (individually, an "Event", and collectively, the "Events") presented by Live Nation at the Venue.

NOW THEREFORE, for and in consideration of the mutual covenants and promises contained herein, Operator and Live Nation agree as follows:

1.     Financial Terms for Live Nation Events. Unless otherwise agreed in writing by the parties, the following incentive terms will apply as between Live Nation and Operator to each Event presented by Live Nation at the Venue during the Term.

(a)     Incentive Payment. Unless otherwise agreed by the Parties in writing, Operator will pay to Live Nation an event incentive payment ("Incentive Payment") for each Ticket Sold at each Event presented by Live Nation at the Venue during each Contract Year in accordance with the chart set forth below.  The term "Contract Year" shall mean each (12) month period beginning January 1st and ending December 31th during the Term. For purposes of this Agreement, "Ticket Sold" means any manifested or unmanifested ticket sold solely in connection with a specific single Event. Notwithstanding the foregoing, any contracted ticket sold to licensed suite holders shall be excluded from the Incentive Payment. The Incentive Payment is retroactive to the first ticket sold during each Contract Year once a new tier is reached. Payment for the retroactive difference in the Incentive Payment, if any, will be made via wire transfer within thirty (30) days of settlement of the Event at which a new tier is reached.

| Total Tickets Sold Per Contract Year | Incentive Payment |
|---|---|
| 1 – 104,999 | ■ ) |
| 105,000 – 139,999 | ■ ) |
| 140,000 – 189,000 | ■ ) |
| 190,000 – 225,000 | ■ ) |
| 225,001 + | ■ ) |



Ex. No
PX1071
1:24-cv-03973

Exhibit
JX-1195
J. Waack    6/16/25

RMT00001

CONFIDENTIAL

(b)    Notwithstanding the foregoing, for any Event presented by Live Nation during the Term which features a Korean Pop Act, as mutually determined between the Parties in writing ("K-Pop Event"), Operator shall pay Live Nation an Incentive Payment equal to Five Dollars ($5.00) for each Ticket Sold. Furthermore, each Ticket Sold to an applicable K-Pop Event shall be included when calculating Total Tickets Sold per Contract Year for purposes of determining the Incentive Payment for all other Events.

(c)    Special Promotional Vehicles. Notwithstanding the foregoing, all tickets sold "off-platform" (including, without limitation, Group On and National Concert Week) will not be paid an Incentive payment, but they shall be included when calculating Total Tickets Sold per Contract Year for purposes of determining the Incentive Payment for all other Events.

2.    Incentive and Rental Terms. Operator agrees that it will not provide to any other individual or entity a more favorable financial annual multi-show arrangement for the Venue than is provided to Live Nation in connection with this Agreement, nor shall it quote any other individual or entity a more favorable rent or house nut costs for an individual Event at the Venue than is offered to Live Nation for the same artist.

3.    Live Nation Affiliates. The Parties acknowledge and agree that, as used in this agreement, Live Nation Worldwide, Inc. (and the defined term "Live Nation") includes all other divisions or business units of Live Nation Entertainment, including, without limitation, those known as Global Touring, Theatres and Clubs (which includes House of Blues Entertainment), Insomniac, Auris Presents, Frank Productions, NS2, and C3 Presents (each, a "Live Nation Affiliate"). For the avoidance of doubt, any Event presented by a Live Nation Affiliate shall receive the Incentive Payment under this Agreement for the applicable Contract Year.

4.    Settlement / Verification. Settlement pursuant to this Agreement shall be completed as soon as reasonably possible following each Event. Unless otherwise mutually agreed in writing by the parties as to an alternate timeframe, any amounts due to a party shall be paid within five (5) business days of each Event. Operator shall make available to Live Nation copies of financial information reasonably necessary to verify payments due to Live Nation pursuant to this Agreement.

5.    Term. The term of this Agreement begins on the Effective Date and continues for a period of three (3) years (including any Event that falls within the Term for which an ELA has been executed by the parties prior to the Effective Date) (the "Term"). Thereafter, the Term of this Agreement will automatically renew for successive periods of one year each, unless a party delivers written notice of its intent to terminate at least thirty (30) days prior to the expiration of the then current one-year period. If (a) the parties confirm any Events during the Term that contemplate a performance date or dates within ninety (90) days after the expiration of the Term, and (b) the parties have not otherwise mutually agreed upon an incentive arrangement for such confirmed Events, then the financial terms of this Agreement shall still apply to such Events notwithstanding the termination.

6.    Termination. If (i) either party fails to pay any fees or other sums when due under this Agreement, (ii) either party fails to comply with or perform any of the material provisions of this Agreement, (iii) either party becomes insolvent or (iv) a petition is filed by or against either party under any foreign, federal or state statute for the benefit of creditors such as debt adjustment, liquidation, winding up, dissolution, reorganization or bankruptcy, or a custodian (as defined in 11 U.S.C. § 101), receiver or liquidator takes charge of any of such party's property, whether by judicial appointment, agreement or operation of law; then such party will be in default of this Agreement ("Event of Default"). If the defaulting party does not cure the Event of Default within thirty (30) calendar days after receipt of written notice from

2

RMT00002

CONFIDENTIAL

the non-defaulting party, the non-defaulting party will have the right to terminate this Agreement in addition to any other rights or remedies available in law or in equity to the non-defaulting party.

7.    No Lease Created. Live Nation's use of the Venue will be licensed on an Event-by-Event basis. Nothing contained herein will create a lease between Live Nation and Operator. The parties will mutually agree upon the terms of an event license agreement ("ELA") for each Event. Any conflict or ambiguity between this Agreement and the financial terms between the parties set forth in an ELA shall be resolved in favor of this Agreement. This Agreement shall govern notwithstanding any merger or integration clauses, or other similar provisions contained in such ELAs. This Agreement does not imply or create exclusivity on the part of either party.

8.    No Guaranteed Number of Events. Live Nation is not obligated to book any minimum number of Events at the Venue. In addition, Operator understands and acknowledges that the artists and their representatives, not Live Nation, have final control over venue selection. Operator further understands and acknowledges that various factors may influence choice of venue including, without limitation: (a) production capabilities and amenities of the venues under consideration; (b) suitability of the Venue for the artist's performance style; (c) artist preference; and (d) availability.

9.    Authority. Each party represents that (a) it has the full power and authority to enter into this Agreement and to engage in the transaction contemplated herein; (b) this Agreement, when fully executed by the parties, is a valid obligation of and is binding upon each party; (c) its respective undersigned has the authority to execute this Agreement on its behalf; and (d) no litigation or threatened claims of litigation exist that do or might adversely and materially affect its ability to fully perform its obligations hereunder.

10.    Confidentiality. As used in this Agreement, the term "Confidential Information" shall mean any and all data and information (whether oral or written) that is disclosed by a party to the other party (i) which is specifically designated as confidential or proprietary or (ii) which the disclosing party reasonably expects to be treated as confidential based on the context of the disclosure and the nature of the information, including, without limitation, booking and production data and information (including, without limitation, artist-specific information), marketing data, information related to ancillary revenue sources, financial information related to other events, cost and expense data, revenue data, projections of business results, and all other information obtained from the books, records and properties of such party, and including marketing and customer data information which may in part be publicly available. The term "Confidential Information" does not include information which (iii) is or becomes generally available to the public other than as a result of a disclosure by the receiving party or its Representatives (as defined below), (iv) was available to the receiving party on a non-confidential basis prior to the disclosure to the receiving party pursuant to this Agreement, or (v) becomes available to the receiving party on a non-confidential basis from a source other than the disclosing party, provided that such source is not bound by a confidentiality agreement with the disclosing party. A receiving party may use Confidential Information of the disclosing party only for the limited purpose of the activities described in this Agreement. The receiving party shall receive and maintain all Confidential Information of the disclosing party in the strictest confidence. Without the prior written approval of the disclosing party or except as otherwise required by law or pursuant to a formal legal proceeding or investigative demand, the receiving party shall not disclose any Confidential Information to any person other than the receiving party's employees, directors and advisors (including legal, financial and accounting advisors) (collectively, "Representatives") who have a need to know such Confidential Information. The receiving party shall be responsible for any disclosure of Confidential Information by one of its Representatives that would constitute a breach of this Section if made by such party.

3

RMT00003

CONFIDENTIAL

11.    Governing Law. This Agreement shall be construed in accordance with the laws of the State of Illinois (without regard to principles of conflicts of laws). Any action, suit or proceeding to enforce this Agreement shall be brought exclusively in the federal or state courts located in the state of Illinois. The prevailing party in any court proceeding shall be entitled to recovery of reasonable attorney's fees and costs.

12.    Assignment. Neither party may assign or transfer any of its rights or obligations under this Agreement without the prior written consent of the other party, which shall not be unreasonably withheld or denied. This Agreement inures to the benefit of, and is binding upon, the parties and their respective permitted successors and assigns. Notwithstanding the foregoing, this Agreement or any part hereof may be assigned or transferred by Live Nation to an affiliate of Live Nation or any entity controlled by or under common control with Live Nation Worldwide, Inc. or by Operator to an affiliate of Operator or any entity controlled by or under common control with Operator without such prior written consent.

13.    Independent Contractors. The relationship of the parties under this Agreement shall be that of independent contractors and nothing herein or in any related document or representation shall be construed to create or imply any relationship of employment, agency, or any other relationship other than that of independent contractors. The parties acknowledge and agree that each is engaged in a separate and independent business, and neither shall state, represent, or imply any interest in or control over the business of the other.

14.    Severability. If any provision of this Agreement is determined to be illegal or unenforceable by an arbitrator, court or government agency of competent jurisdiction, this Agreement shall remain valid as though such provision had not been contained herein.

15.    Duplicates; Counterparts. This Agreement shall be executed in duplicate, each of which may be executed in any number of counterparts, all of which, when taken together as a whole, shall constitute a single, binding instrument. This Agreement may be executed by facsimile, PDF or any other similar electronic format.

16.    Compliance with Laws. Each party shall be responsible for complying with any and all applicable federal, state and local laws governing its respective obligations and activities conducted in connection with this Agreement.

17.    Notices. Any notices, consents or approval required or permitted under this Agreement will be properly given if in writing, whether personally delivered or forwarded by mail or overnight courier, postage prepaid, addressed to the following addresses (or such other addresses as may from time to time be designated in writing by each party):

To Live Nation:        Live Nation Worldwide, Inc.
                       Attn: Jason Wright
                       111 East Wacker Drive, Suite 1400
                       Chicago, IL 60601

With a copy to:        Live Nation Worldwide, Inc.
                       Legal Department – NA Concerts
                       Attn: Steven Kahana
                       9348 Civic Center Drive
                       Beverly Hills, CA 90210

4

RMT00004

CONFIDENTIAL

To Operator:        Allstate Arena
                    Attn: Patrick Nagle
                    6920 North Mannheim Road
                    Rosemont, IL 60018

18.     Entire Agreement. This Agreement and any applicable ELA (subject to the provisions herein) contains the entire agreement and understanding of the parties as to the matters contained in this Agreement. This Agreement may not be amended, revised, or terminated except by a writing signed by all parties. There are no oral or written representations, agreements, understandings, or circumstances which modify any of the provisions hereof.

ACCEPTED and AGREED:

Village of Rosemont

By: _____

Name:  Patrick R. Nagle

Title:  Allstate Arena - Executive Director

Live Nation Worldwide, Inc.

By: _____

Name:  Jason Wright

Title:  Live Nation President - Midwest

5

RMT00005