**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

## Form 10-K

☐  ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2024,
or

☐  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from          to
Commission File Number 001-32601

# LIVE NATION ENTERTAINMENT, INC.

(Exact name of registrant as specified in its charter)

| Delaware | | 20-3247759 |
|---|---|---|
| (State of Incorporation) | | (I.R.S. Employer Identification No.) |

9348 Civic Center Drive
Beverly Hills, CA 90210
(Address of principal executive offices, including zip code)
(310) 867-7000
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Trading Symbol(s) | Name of Each Exchange on which Registered |
|---|---|---|
| Common Stock, $.01 Par Value per Share | LYV | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act:
None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   ☒ Yes   ☐ No

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   ☐ Yes   ☒ No

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   ☒ Yes   ☐ No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large Accelerated Filer | ☒ | Accelerated Filer | ☐ |
|---|---|---|---|
| Non-accelerated Filer | ☐ | Smaller Reporting Company | ☐ |
| | | Emerging Growth Company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.   ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered accounting firm that prepared or issued its audit report.   ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements.   ☒

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b).   ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   ☐ Yes   ☒ No

On June 30, 2024, the last business day of the registrant's most recently completed second fiscal quarter, the aggregate market value of the Common Stock beneficially held by non-affiliates of the registrant was approximately $   14.8 billion. (For purposes hereof, directors, executive officers and 10% or greater stockholders have been deemed affiliates).

On February 13, 2025, there were 233,401,156 outstanding shares of the registrant's common stock, $0.01 par value per share, including 2,288,158 shares of unvested restricted stock awards and excluding 408,024 shares held in treasury.

Ex. No
PX1013
1:24-cv-03973

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of our Definitive Proxy Statement for the 2025 Annual Meeting of Stockholders, expected to be filed within 120 days of our fiscal year end, are incorporated by reference into Part III.

**LIVE NATION ENTERTAINMENT, INC.**
**INDEX TO FORM 10-K**

| | | Page |
|---|---|---|
| **PART I** | | |
| ITEM 1. | BUSINESS | 2 |
| ITEM 1A. | RISK FACTORS | 13 |
| ITEM 1B. | UNRESOLVED STAFF COMMENTS | 26 |
| ITEM 1C. | CYBERSECURITY | 27 |
| ITEM 2. | PROPERTIES | 28 |
| ITEM 3. | LEGAL PROCEEDINGS | 28 |
| **PART II** | | |
| ITEM 5. | MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES | 29 |
| ITEM 6. | [RESERVED] | 29 |
| ITEM 7. | MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 30 |
| ITEM 7A. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 47 |
| ITEM 8. | FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA | 48 |
| ITEM 9. | CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE | 99 |
| ITEM 9A. | CONTROLS AND PROCEDURES | 99 |
| ITEM 9B. | OTHER INFORMATION | 101 |
| ITEM 9C. | DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS | 101 |
| **PART III** | | |
| ITEM 10. | DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE | 101 |
| ITEM 11. | EXECUTIVE COMPENSATION | 101 |
| ITEM 12. | SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS | 101 |
| ITEM 13. | CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE | 101 |
| ITEM 14. | PRINCIPAL ACCOUNTING FEES AND SERVICES | 101 |
| **PART IV** | | |
| ITEM 15. | EXHIBITS AND FINANCIAL STATEMENT SCHEDULES | 102 |
| ITEM 16. | FORM 10-K SUMMARY | 109 |

**LIVE NATION ENTERTAINMENT, INC.**

**GLOSSARY OF KEY TERMS**

| | |
|---|---|
| AOCI | Accumulated other comprehensive income (loss) |
| AOI | Adjusted operating income (loss) |
| Company | Live Nation Entertainment, Inc. and subsidiaries |
| FASB | Financial Accounting Standards Board |
| GAAP | United States Generally Accepted Accounting Principles |
| GTV | Gross transaction value |
| Liberty Media | Liberty Media Corporation |
| Live Nation | Live Nation Entertainment, Inc. and subsidiaries |
| LNE | Live Nation Entertainment, Inc. |
| SEC | United States Securities and Exchange Commission |
| SOFR | Secured Overnight Financing Rate |
| VIE | Variable interest entity (as defined under GAAP) |
| Ticketmaster | The ticketing business of the Company |

**PART I**

*"Live Nation" (which may be referred to as the "Company," "we," "us" or "our") means Live Nation Entertainment, Inc. and its subsidiaries, or one of our segments or subsidiaries, as the context requires.*

**Special Note About Forward-Looking Statements**

Certain statements contained in this Form 10-K (or otherwise made by us or on our behalf from time to time in other reports, filings with the SEC, news releases, conferences, internet postings or otherwise) that are not statements of historical fact constitute "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Exchange Act of 1934, as amended, notwithstanding that such statements are not specifically identified. Forward-looking statements include, but are not limited to, statements about our financial position, business strategy, competitive position, potential growth opportunities, potential operating performance improvements, the effects of competition, the effects of future legislation or regulations and plans and objectives of our management for future operations. We have based our forward-looking statements on our beliefs and assumptions considering the information available to us at the time the statements are made. Use of the words "may," "should," "continue," "plan," "potential," "anticipate," "believe," "estimate," "expect," "intend," "outlook," "could," "target," "project," "seek," "predict," or variations of such words and similar expressions are intended to identify forward-looking statements but are not the exclusive means of identifying such statements.

Forward-looking statements are not guarantees of future performance and are subject to risks and uncertainties that could cause actual results to differ materially from those in such statements. Factors that could cause actual results to differ from those discussed in the forward-looking statements include, but are not limited to, those set forth under Item 1A.—Risk Factors as well as other factors described herein or in our quarterly and other reports we file with the SEC (collectively, "cautionary statements"). Based upon changing conditions, should any risk or uncertainty that has already materialized, or should one or more of the currently unrealized risks or uncertainties materialize, or should any underlying assumptions prove incorrect, actual results may vary materially from those described in any forward-looking statements. All subsequent written and oral forward-looking statements attributable to us or persons acting on our behalf are expressly qualified in their entirety by the applicable cautionary statements. You are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date on which they are made. We do not intend to update these forward-looking statements, except as required by applicable law.

## ITEM 1.   BUSINESS

### Our Company

We believe that we are the largest live entertainment company in the world, connecting over 788 million fans across all of our concerts and ticketing platforms in 51 countries during 2024.

We believe we are the largest producer of live music concerts in the world, based on total fans that attend Live Nation events as compared to events of other promoters, connecting 151 million fans to approximately 11,000 artists at 54,000 events in 2024. Live Nation owns, operates, has exclusive booking rights for or has an equity interest for which we have a significant influence in 394 venues globally, including *House of Blues*® music venues and prestigious locations such as *The Fillmore*® in San Francisco, *Brooklyn Bowl*® in New York City, the Hollywood Palladium in Los Angeles, the Moody Center© arena in Austin, the Ziggo Dome in Amsterdam, 3Arena in Dublin, Royal Arena in Copenhagen and Spark Arena in Auckland. We believe we are one of the world's leading artist management companies based on the number of artists represented. Our artist management companies manage music artists and acts across all music genres.

We believe we are the world's leading live entertainment ticketing sales and marketing company, based on the number of tickets we sell. Ticketmaster provides ticket sales services and marketing and distribution globally through *www.ticketmaster.com* and *www.livenation.com* and our mobile apps, other websites and numerous retail outlets, distributing over 637 million tickets through our systems in 2024. Ticketmaster serves approximately 11,500 clients worldwide across multiple event categories, providing ticketing services for leading arenas, stadiums, festival and concert promoters, professional sports franchises and leagues, college sports teams, performing arts venues, museums and theaters.

We believe our global footprint is one of the world's largest music advertising networks for corporate brands and includes one of the world's leading ecommerce websites based on a comparison of gross sales of top internet retailers.

Our principal executive offices are located at 9348 Civic Center Drive, Beverly Hills, California 90210 (telephone: 310-867-7000). Our principal website is *www.livenationentertainment.com*. Live Nation is listed on the New York Stock Exchange, trading under the symbol "LYV."

2

**Our Strategy**

Our strategy is to grow our global leadership position in live entertainment, promote more shows, sell more tickets and partner with more sponsors, thereby increasing our revenue, earnings and cash flow. We serve artists, venues and sports teams and leagues to secure content and tickets; we invest in technology to build innovative products which advance our ticketing, digital presence, including mobile platforms, and advertising; and we are paid by advertisers that want to connect their brands with our passionate fan base.

Our core businesses surrounding the promotion of live events include ticketing and sponsorship and advertising. We believe our focus on growing these businesses will increase shareholder value as we continue to enhance our revenue streams and achieve economies of scale with our global platforms. We also continue to strengthen our core operations, further expanding into global markets and optimizing our cost structure. We execute on our strategy and thereby grow and innovate through the initiatives listed below.

- *Expand our Concert Platform.* We will deliver more shows, grow our fan base and increase our ticket sales by continuing to build our portfolio of concerts globally, expanding our business into additional top global music markets, and further building our presence in existing markets. This includes investing capital expenditures in new venues and enhancements to existing venues. Through our culture of serving artists and a focus on supporting the development of emerging artists, we believe we can continue to expand our concert base.

- *Grow our Revenue per Show.* We will grow our revenue per show across our venues through more effective ticket pricing, broader ticketing distribution and more targeted promotional marketing. We will also grow our onsite fan monetization by improving ease of purchase, through improved onsite food and beverage and other products, merchandising, and enhanced experiences for our fans.

- *Invest in our Ticketing Platform.* We will continue to invest in our ticketing enterprise system and develop innovative products to better serve our enterprise clients and continue to build our global client base. These include technological and digital transformations, enhanced marketing capabilities, and improved analytical tools to meet the needs of venues, event organizers and our fans.

- *Grow our Marketplace Capabilities.* We are focused on selling tickets through a wide set of sales channels including mobile, online and affiliate partners while continuing to broaden our digital rollout. We will grow the volume of secondary tickets sold through a trusted environment for fan ticket exchanges, allowing our fans to have a dependable, secure destination for secondary ticket acquisition for all events. Within this, we will continue to invest in tools that reduce fraud and help artists and teams determine how to get their tickets into the hands of real fans. Lastly, we are focused on leveraging our platform by growing non-service fee revenue streams including insurance, additional enterprise tools, payment integration and other upsells.

- *Grow Sponsorship and Advertising Partnerships.* We will continue to drive growth in our sponsorship relationships and capture a larger share of the global music sponsorship market by further monetizing our fan base and growing our portfolio of brands. We will focus on expanding existing partnerships and developing new corporate sponsor partners to provide them with targeted strategic programs, accessing the fans attending our shows. We will continue to develop and to scale new products in order to drive onsite and digital revenue.

**Our Strengths**

We believe we have unique resources that are unmatched in the live entertainment industry.

- *Fans.* During 2024, we connected over 788 million fans to their favorite live events. Our database of fans and their interests provides us with the means to efficiently communicate to them about shows they are likely to be interested in.

- *Artists.* We have extensive relationships with artists ranging from those just beginning their careers to established superstars. In 2024, we promoted shows for approximately 11,000 artists globally. In addition, through our artist management companies, we managed more than 380 artists in 2024.

- *Digital Platforms and Ticketing.* We own and operate various branded websites, both in the United States and abroad, which are customized to reflect services offered in each jurisdiction. Our primary commercial websites, *www.livenation.com* and *www.ticketmaster.com*, together with our other branded ticketing websites, are designed to promote ticket sales for live events. We also have both Live Nation and Ticketmaster mobile apps that our fans can use to access event information and buy tickets.

- *Distribution Network*. We believe that our global network of promoters, venues and festivals provides us with a strong position in the live concert industry. We believe we have one of the largest global networks of live entertainment businesses in the world, with offices in 47 countries worldwide. In addition, we own, lease, operate, have exclusive booking rights for, or have an equity interest for which we have a significant influence in 394 venues and have operations located across 51 countries as of the end of 2024, making us, we believe, the second largest operator of music venues in the world. We also believe that we are one of the largest music festival producers in the world with 137 festivals globally in 2024. In addition, we believe that our global ticketing distribution network    with approximately 11,500 clients worldwide in 2024    makes us the largest ticketing network in the world.

- *Sponsors*. We monetize our physical and digital assets through long-term sponsorship agreements and advertising. We employ a sales force of approximately 760 people that worked with more than 1,500 sponsors during 2024, through a combination of strategic partnerships, local venue-related deals, national agreements and digital campaigns, both in North America and internationally. Our sponsors include some of the most well-recognized national and global brands across diverse sectors including consumer, financials and leisure, such as Citibank, $O_2$, Mastercard, Cisco, Red Bull and Anheuser Busch (each of these brands is a registered trademark of the sponsor).

## Our Industry

We operate in the following main industries within the live entertainment business: live music events, music venue operations, the provision of management and other services to artists and athletes, ticketing services and sponsorship and advertising sales.

The live music industry includes concert promotion and/or production of music events or tours. Typically, to initiate live music events or tours, booking agents work with artists. Booking agents then work with promoters, who will contract with them or with artists directly, to promote events. Promoters earn revenue primarily from the sale of tickets. Artists are paid by the promoter under one of several different formulas, which may include fixed guarantees and/or a percentage of ticket sales or event profits. In addition, promoters may also reimburse artists for certain costs of production, such as sound and lights. Under guaranteed payment formulas, promoters assume the risks of unprofitable events. Promoters may renegotiate lower guarantees or cancel events because of insufficient ticket sales in order to reduce their losses. Promoters can also reduce the risk of losses by entering into global or national touring agreements with artists and including the right to offset lower performing shows against higher performing shows on the tour in the determination of overall artist fees. Artist managers primarily provide services to music artists to manage their careers. The artist manager negotiates on behalf of the artist and is paid a fee, generally as a percentage of the artist's earnings.

We believe the artist-fan connection is the source of nearly all commercial value and as a result, our artists receive the majority of all ticketing revenue. For music tours, four to eight months typically elapse between initially booking artists and the first performances. Artists, in conjunction with promoters, managers and booking agents, set ticket prices and advertising plans. Promoters market events, sell tickets, rent or otherwise provide venues and arrange for local production services, such as stages and equipment.

Venue operators typically contract with promoters to have their venues rented for specific events on specific dates and receive fixed fees and/or percentages of ticket sales as rental income. In addition, venue operators provide services such as concessions, parking, security, ushering and ticket scanning at the gate, and receive some or all of the revenue from concessions, merchandise, parking and premium seating.

Ticketing services generally refers to the sale of tickets primarily through online and mobile channels, but also include sales through phone, outlet and box office channels. Ticketing companies will contract with venues and/or promoters to sell tickets to events over a period of time, generally three to five years. The ticketing company generally gets paid a fixed fee per ticket sold or a percentage of the total ticket service charges. The ticketing company receives the cash for the ticket sales and related service charges at the time the ticket is sold and periodically remits these receipts to the venue and/or promoter after deducting its fee. Venues will often also sell tickets through a local box office at the venue using the ticketing company's technology. Venues set the ticketing service fee to be charged on tickets and typically retain the majority of these fees.

Ticketing resale services generally refers to the sale of tickets by a holder who originally obtained the tickets from a venue or other entity. Resale tickets are also referred to as secondary tickets. Generally, the ticket resale company is paid a service charge when the ticket is resold and the remaining ticket value is paid to the holder.

The sponsorship and advertising industry within the live entertainment business involves the sale of international, national, regional and local advertising and promotional programs to a variety of companies to advertise or promote their brand, product or service. These sponsorships typically include venue and festival naming rights, onsite venue signage, online and in-app advertisements and exclusive partner rights in various categories such as credit card, beverage, travel and telecommunications, and may include venue and festival event pre-sales and onsite product activation.

**Our Business**

Our reportable segments are Concerts, Ticketing and Sponsorship & Advertising.

*Concerts*. Our Concerts segment principally involves the global promotion of live music events in our owned or operated venues and in rented third-party venues, the operation and management of music venues, the production of music festivals across the world, the creation of associated content and the provision of management and other services to artists. Including intersegment revenue, our Concerts business generated $19.0 billion, or 82%, of our total revenue during 2024. We promoted more than 54,000 live music and other events in 2024. While our Concerts segment traditionally operates year-round, we experience higher revenue during the second and third quarters due to the seasonal nature of shows at our outdoor amphitheaters and festivals, which primarily occur from May through October. We expect our seasonality trends to evolve as we continue to expand our global operations.

As a promoter, we earn revenue primarily from the sale of tickets and pay artists under one of several formulas, including a fixed guaranteed amount and/or a percentage of ticket sales or event profits. For each event we promote, we either use a venue we own or operate, or rent a third-party venue. Revenue is generally impacted by the number of events, volume of ticket sales and ticket prices. Event costs such as artist fees and production expenses are included in direct operating expenses and are typically substantial in relation to the revenue. As a result, significant increases or decreases in promotion revenue do not typically result in comparable changes to operating income.

As a venue operator, we generate revenue primarily from the sale of concessions, parking, premium seating, rental income and ticket rebates or service charges earned on tickets sold under ticketing agreements. In our amphitheaters, the sale of concessions is outsourced and we receive a share of the net revenue from the concessionaire, which is recorded in revenue with limited associated direct operating expenses. Revenue generated from venue operations typically has a higher margin than promotion revenue and therefore typically has a more direct relationship to changes in operating income. As we have continued to build our skill at venue operations, this has become an increasingly large part of our Concerts strategy, with a substantial focus on building our global owned or operated venue platform.

As a festival promoter, we typically book artists, secure festival sites, provide for third-party production services, sell tickets and advertise events to attract fans. We also provide or arrange for third parties to provide operational services as needed such as concessions, merchandising and security. We earn revenue from the sale of tickets and typically pay artists a fixed guaranteed amount. We also earn revenue from the sale of concessions, camping fees and service charges earned on tickets sold. For each event, we either use a festival site we own or rent a third-party festival site. Revenue is generally impacted by the number of events, volume of ticket sales and ticket prices. Event costs such as artist fees and production expenses are included in direct operating expenses and are typically substantial in relation to the revenue. Since the artist fees are typically fixed guarantees for these events, significant increases or decreases in festival promotion revenue will generally result in comparable changes to operating income.

*Ticketing*. Our Ticketing segment is primarily an agency business that sells tickets for events on behalf of its clients and retains a portion of the service charge as its fee. We sell tickets for our events and also for third-party clients across multiple live event categories, providing ticketing services for leading arenas, stadiums, amphitheaters, music clubs, concert promoters, professional sports franchises and leagues, college sports teams, performing arts venues, museums and theaters. We sell tickets through mobile apps, websites and ticket outlets. Our Ticketing segment also manages our online activities including enhancements to our websites and product offerings. Including intersegment revenue, our Ticketing business generated $3.0 billion, or 13%, of our total revenue during 2024, which excludes the face value of tickets sold and is net of the fees paid to our ticketing clients. Through all of our ticketing services, we sold approximately 331 million tickets in 2024 on which we were paid fees for our services. In addition, approximately 307 million tickets were sold, for which we did not receive a fee, using our Ticketmaster systems, including season seat packages, our venue clients' box offices, and other channels. Our ticketing sales are impacted by fluctuations in the availability of events for sale to the public, which may vary depending upon event scheduling by our clients. As ticket sales increase, related ticketing operating income generally increases as well.

We sell tickets on behalf of our clients through our ticketing platforms across the world. We generally enter into written agreements with individual clients to provide primary ticketing services for specified multi-year periods, typically ranging from three to five years. Pursuant to these agreements, clients and their content partners generally determine and then tell us what tickets will be available for sale, when such tickets will go on sale to the public and what the ticket price will be, sometimes with our analytical support. Agreements with venue clients in North America and Australia generally grant us exclusive rights to sell tickets for all events presented at the relevant venue for which tickets are made available to the general public. Agreements with promoter clients in other international markets generally grant us the right to an allocation of tickets for events presented by a given promoter at any venue, unless that venue is already covered by an existing exclusive agreement with our ticketing business or another ticketing service provider. Similarly, in such international markets we have venue agreements which provide Ticketmaster an allocation of tickets for all events at those venues. While we generally have the right to sell a substantial portion of our clients' tickets, venue and promoter clients often sell and distribute a portion of their tickets in-house through their box office and season ticket programs. In addition, under many written agreements between promoters and our clients, and generally subject to Ticketmaster approval, the client may allocate certain tickets for artist, promoter, agent and venue use and do not make those tickets available for sale by us. Due to these and other permitted third-party ticket distribution channels, we do not always sell all of our clients' tickets, even at venues where we are the exclusive primary ticketing service provider, and the amount of tickets that we sell varies from client to client and from event to event, and also varies as to any given client from year to year. We pay our clients for the rights to sell certain tickets, generally in the form of upfront payments, a portion of service fee revenue and the portion of other services at low or no cost.

We currently offer ticket resale services, sometimes referred to as secondary ticketing, principally through our integrated inventory platform, league/team platforms and other platforms internationally. We enter into arrangements with the holders of tickets previously distributed by a venue or other source to post those tickets for sale at a purchase price equal to a new sales price, determined by the ticket holder, plus a service fee paid by the buyer. The seller in this circumstance receives the new sales price less a seller service fee.

*Sponsorship & Advertising*. Our Sponsorship & Advertising segment employs a sales force that creates and maintains relationships with sponsors through a combination of strategic, international, national and local opportunities that allow businesses to reach customers through our concert, festival, venue and ticketing assets, including advertising on our websites. We work with our corporate clients to help create marketing programs that support their business goals and connect their brands directly with fans and artists. We also develop, book and produce custom events or programs for our clients' specific brands, which are typically presented exclusively to the clients' consumers. These custom events can involve live music events with talent and media, using both online and traditional outlets. Including intersegment revenue, our Sponsorship & Advertising business generated $1.2 billion, or 5%, of our total revenue during 2024. We typically experience higher revenue in the second and third quarters as a large portion of sponsorships are usually associated with our outdoor venues and festivals, which are primarily used in or occur from May through October. We expect our seasonality trends to evolve as we continue to expand our global operations.

We believe that we have a unique opportunity to connect the music fan to corporate sponsors and therefore seek to optimize this relationship through strategic sponsorship programs. We continue to also pursue the sale of national and local sponsorships, both domestically and internationally, and placement of advertising, including signage, online advertising and promotional programs. Many of our venues have naming rights sponsorship programs. We believe national and international sponsorships allow us to maximize our network of venues and festivals and to arrange multi-venue or multi-festival branding opportunities for advertisers. Our local and venue-focused sponsorships include venue signage, promotional programs, onsite activation, hospitality and tickets, and are derived from a variety of client companies across various industry categories.

**Live Nation Venue Details**

In the live entertainment industry, venue types generally consist of:

- *Stadiums*   Stadiums are multi-purpose facilities, often housing local sports teams. Stadiums typically have 30,000 or more seats. Although they are the largest venues available for live music, they are not specifically designed for live music.

- *Amphitheaters*   Amphitheaters are generally outdoor venues with between 5,000 and 30,000 seats that are used primarily in the summer season. We believe they are popular because they are designed specifically for concert events, with premium seat packages and better lines of sight and acoustics.

- *Arenas*   Arenas are indoor venues that are used as multi-purpose facilities, often housing local sports teams. Arenas typically have between 5,000 and 20,000 seats. Because they are indoors, they are able to offer amenities that other similar-sized outdoor venues cannot, such as luxury suites and premium club memberships. As a result, we believe they are popular for higher-priced concerts aimed at audiences willing to pay for these amenities.

6

- *Theaters*    Theaters are indoor venues that are built primarily for music events, but may include theatrical performances. These venues typically have a capacity of between 1,000 and 6,500. Theaters represent less risk to concert promoters because they have lower fixed costs associated with hosting a concert and may provide a more appropriately-sized venue for developing artists and more artists in general. Because these venues have a smaller capacity than an amphitheater or arena, they do not offer as much economic upside on a per show basis. Theaters can also be used year-round.

- *Clubs*    Clubs are indoor venues that are built primarily for music events, but may also include comedy clubs. These venues typically have a capacity of less than 1,000 and often without full fixed seating. Because of their small size, they do not offer as much economic upside, but they also represent less risk to a concert promoter because they have lower fixed costs associated with hosting a concert and also may provide a more appropriately-sized venue for developing artists. Clubs can also be used year-round.

- *Restaurants & Music Halls*    Restaurants & Music Halls are indoor venues that offer customers an integrated live music, entertainment and dining experience. This category includes our *House of Blues®* and *Brooklyn Bowl®* venues whose live music halls are specially designed to provide optimum acoustics and typically can accommodate between 1,000 to 2,000 guests. A full-service restaurant and bar is located adjacent to the live music hall. We believe that the strength of the brand and the quality of the food, service and unique atmosphere in our restaurants attract customers to these venues independently from a live music event and generate a significant amount of repeat business from local customers

- *Festival Sites*    Festival sites are outdoor locations used primarily in the summer season to stage large single-day or multi-day concert events featuring several artists on multiple stages. Depending on the location, festival site capacities can range from 10,000 to over 100,000 fans per day. We believe they are popular because of the value provided to the fan by packaging several artists together for an event. While festival sites only host a few events each year, they can provide higher operating income because we are able to generate income from many different services provided at the event.

- *Other Venues*    Other venues includes restaurants and exhibition and convention halls that typically are not used for live music events.

The following table summarizes the number of venues by type that we owned, leased, operated, had exclusive booking rights for or had an equity interest over which we had a significant influence as of December 31, 2024:

| Venue Type | Capacity | Owned | Leased | Operated | Exclusive Booking Rights | Equity Interest | Total |
|---|---|---|---|---|---|---|---|
| Stadium | More than 30,000 | | 2 | 1 | | | 3 |
| Amphitheater | 5,000 - 30,000 | 10 | 44 | 1 | 18 | | 73 |
| Arena | 5,000 - 20,000 | 3 | 15 | 2 | 5 | | 25 |
| Theater | 1,000 - 6,500 | 10 | 76 | 9 | 32 | 2 | 129 |
| Club | Less than 1,000 | 5 | 56 | 1 | 13 | | 75 |
| Restaurants & Music Halls | 1,000 - 2,000 | 2 | 15 | | | | 17 |
| Festival Sites [1] | Varies | 2 | | 53 | | | 55 |
| Other Venues | Varies | | 14 | | 1 | 2 | 17 |
| Total venues in operation | | 32 | 222 | 67 | 69 | 4 | 394 |
| | | | | | | | |
| Venues currently under construction | | | 13 | | | 1 | 14 |
| Venues not currently in operation | | 2 | | | 5 | 3 | 10 |
| | | | | | | | |
| Total venues in operation by location: | | | | | | | |
| North America | | 22 | 169 | 25 | 68 | 4 | 288 |
| International | | 10 | 53 | 42 | 1 | | 106 |

[1]    Operated festival sites includes multi-year agreements providing us the right to use public or private land for a defined period of time leading up to and continuing after the festival. We may enter into multiple agreements for a single festival site or use the same site for multiple festivals. We have aggregated the agreements for each festival site and reported them as one festival site.

7

**Competition**

Competition in the live entertainment industry is intense. We believe that we compete primarily on the basis of our ability to deliver quality music events, sell tickets and provide enhanced fan and artist experiences. We believe that our primary strengths include:

- the quality of service delivered to our artists, fans, ticketing clients and corporate sponsors;

- our track record and reputation in promoting and producing live music events and tours both domestically and internationally;

- our artist relationships;

- our global footprint;

- the quality of our ticketing software and services;

- our ecommerce site and effective marketing capabilities;

- our diverse distribution platform of venues;

- the scope, effectiveness and expertise of our advertising and sponsorship programs; and

- our financial stability.

Although we believe that our products and services currently compete favorably with respect to such factors, we cannot provide any assurance that we can maintain our competitive position against current and potential competitors, especially those with significantly greater brand recognition, or greater financial, marketing, technical and other resources.

In the markets in which we promote music concerts, we face competition from other promoters and venue operators. We believe that barriers to entry into the promotion services business are low and that certain local promoters are increasingly expanding the geographic scope of their operations.

Some of our competitors in the live music promotion industry are Anschutz Entertainment Group, or AEG, Another Planet Entertainment, CTS Eventim, Jam Productions, Ltd., I.M.P., Outback Presents and TEG Dainty in addition to numerous smaller regional companies and various casinos and venues in North America, Europe, Asia and Australia. AEG operates under a number of different names including AEG Presents, Concerts West, Frontier Touring, Goldenvoice and Messina Touring Group. Some of our competitors in the live music industry have a stronger presence in certain markets, have access to other sports and entertainment venues and may have greater financial resources in those markets, which may enable them to gain a greater competitive advantage in relation to us.

In markets where we own or operate a venue, we compete with other venues to serve artists likely to perform in that general region. Consequently, touring artists have various alternatives to our venues when scheduling tours. Our main competitors in venue management include ASM Global, Madison Square Garden Entertainment Corp., The Nederlander Organization and Bowery Presents, in addition to numerous smaller regional companies in North America, Europe, Australia and New Zealand. Some of our competitors in venue management may have more attractive or a greater number of venues in certain markets, and may have greater financial resources in those markets.

The ticketing services industry includes the sale of tickets primarily through online and mobile channels, but also through telephone and ticket outlets. The transition to online and mobile ticket purchases has made it easier for technology-based companies to offer primary ticketing services and standalone, automated ticketing systems that enable venues to perform their own ticketing services or utilize self-ticketing systems. In the online environment, we compete with other websites, online event sites and ticketing companies to provide event information, sell tickets and provide other online services such as fan clubs and artist websites.

We experience competition from other national, regional and local primary ticketing service providers to secure new venue clients and to reach fans for events. Resale, or secondary, ticketing services have created more aggressive buying of primary tickets whereby certain brokers are using automated internet "bot" technology to attempt to buy the best tickets when they go on sale, notwithstanding federal and state prohibitions. We actively develop and apply methods to mitigate the impact of these bots, however, the bot technology constantly evolves and changes. The internet allows fans and other ticket resellers to reach a vastly larger audience through the aggregation of inventory on resale websites and marketplaces, and provides consumers with more convenient access to tickets for a larger number and greater variety of events.

We also face significant and increasing competition from companies that sell self-ticketing systems, as well as from venues that choose to integrate self-ticketing systems into their existing operations or acquire primary ticketing service providers. Our competitors include primary ticketing companies such as Tickets.com, AXS, Paciolan, Inc., CTS Eventim AG, Eventbrite, eTix, SeatGeek, Ticketek, See Tickets and Dice; secondary ticketing companies such as StubHub, Vivid Seats, Viagogo and SeatGeek; and many others, including large technology and ecommerce companies that could enter these markets.

Our main competitors at the local market level for sponsorships and advertising dollars include local sports teams, which often offer state-of-the-art venues, strong brand association and attractive local media packages, as well as festivals, theme parks and other local events. On the national level, our competitors include the major sports leagues that sell sponsorships combined with significant national media packages.

**Government Regulations**

We are subject to federal, state and local laws, both domestically and internationally, governing matters such as:

- privacy and the protection of personal or sensitive information;
- compliance with the United States Foreign Corrupt Practices Act, the United Kingdom Bribery Act 2010 and similar regulations in other countries;
- primary ticketing and ticket resale services;
- construction, renovation and operation of our venues;
- licensing, permitting and zoning, including noise ordinances;
- human health, safety, security and sanitation requirements;
- the service of food and alcoholic beverages;
- working conditions, labor, minimum wage and hour, citizenship and employment laws;
- compliance with the Americans with Disabilities Act of 1990 ("ADA"), the United Kingdom's Disability Discrimination Act of 1995 ("DDA") and similar regulations in other countries;
- hazardous and non-hazardous waste and other environmental protection laws;
- sales and other taxes and withholding of taxes;
- marketing activities via the telephone and online; and
- historic landmark rules.

We believe that we are materially in compliance with these laws.

We are required to comply with federal, state and international laws regarding privacy and the storing, sharing, use, disclosure and protection of personally identifiable information and user data, an area that is increasingly subject to legislation and regulations in numerous jurisdictions around the world, including the European Union's GDPR (as defined and discussed below in Item 1A.   Risk Factors) and the California Consumer Protection Act.

We are required to comply with the laws of the countries in which we operate and also the United States Foreign Corrupt Practices Act and the United Kingdom Bribery Act 2010 regarding anti-bribery regulations. These regulations make it illegal for us to pay, promise to pay or receive money or anything of value to, or from, any government or foreign public official for the purpose of directly or indirectly obtaining or retaining business. This ban on illegal payments and bribes also applies to agents or intermediaries who use funds for purposes prohibited by the statute.

From time to time, federal, state, local and international authorities and/or consumers commence investigations, inquiries or litigation with respect to our compliance with applicable consumer protection, advertising, unfair business practice, antitrust (and similar or related laws) and other laws, particularly as related to primary ticketing and ticket resale services.

The regulations relating to our food service operations in our venues are many and complex. A variety of regulations at various governmental levels relating to the handling, preparation and serving of food, the cleanliness of food production facilities and the hygiene of food-handling personnel are enforced primarily at the local public health department level.

We also must comply with applicable licensing laws, as well as state and local service laws, commonly called dram shop statutes. Dram shop statutes generally prohibit serving alcoholic beverages to certain persons such as an individual who is intoxicated or a minor. If we violate dram shop laws, we may be liable to third parties for the acts of the customer. Although we generally hire outside vendors to provide these services at our larger operated venues and regularly sponsor training programs designed to minimize the likelihood of such a situation, we cannot guarantee that intoxicated or minor customers will not be served or that liability for their acts will not be imposed on us.

We are also required to comply with the ADA, the DDA and certain state statutes and local ordinances that, among other things, require that places of public accommodation, including our websites as well as existing and newly constructed venues, be accessible to customers with disabilities. The ADA and the DDA require that venues be constructed to permit persons with disabilities full use of a live entertainment venue. The ADA and the DDA may also require that certain modifications be made to existing venues to make them accessible to customers and employees who are disabled. In order to comply with the ADA, the DDA and other similar ordinances, we may face substantial capital expenditures in the future.

From time to time, governmental bodies have proposed legislation that could affect our business. For example, some legislatures have proposed laws in the past that would impose potential liability on us and other promoters and producers of live music events for entertainment taxes and for incidents that occur at our events, particularly relating to drugs and alcohol. Some jurisdictions have also proposed legislation that would restrict ticketing methods or mandate ticket practices.

In addition, we and our venues are subject to extensive environmental laws and regulations relating to the use, storage, disposal, emission and release of hazardous and non-hazardous substances, as well as zoning and noise level restrictions which may affect, among other things, the hours of operations of and the type of events we can produce at our venues.

**Our People and Culture**

Bringing more than 54,000 events to life and connecting over 788 million fans across all of our concerts and ticketing platforms, as we did in 2024, is a massive undertaking, made possible by our thousands of employees spread across 47 countries. Our teams come together every day to grow our business, and we recognize our people are the key to our success   whether they're putting on a show at one of our venues, selling tickets, working with our brand partners or supporting our businesses in a myriad of other ways.

***Taking Care of Our Own***

Our core value with our employees is "taking care of our own," which means a top priority is making sure that every employee can rely on us to go above just providing standard compensation and benefits by offering assistance for a range of planned and unplanned situations. We also ensure that our employees have direct access to senior executives to raise concerns and share ideas. Our programs are structured under eight core pillars, designed to support key life moments:

- <u>Taking Care of Yourself</u>: To enhance overall happiness and wellness, we offer flexible vacation time, free ticket perks, in-house and on-demand virtual meditation sessions, crisis support, crowdfunding networks, and more. We launched Sober Nation to provide sobriety and recovery support for our employees and help destigmatize addiction and recovery in the industry. In 2024, we extended our offerings to include part-time club staff and partnered with artists to host events at our headquarters highlighting the intersection of sobriety and mental health.

- <u>Taking Care of Your Health</u>: Beyond a full suite of medical, dental and vision benefits, we provide access totelehealth and telemedicine platforms available to employees and their family members enrolled in our medical plan.

- <u>Taking Care of Your Mental Health</u>: Our mental well-being offerings include free virtual mental health coaching or therapy sessions, group support sessions, 24/7 counselor support line, and both in-person and virtual meditation and yoga sessions. In 2024, we extended our offerings to include part-time club staff.

- <u>Taking Care of Your Family</u>: We provide assistance with fertility needs such as egg-freezing, egg-donation and IVF, as well as adoption or surrogacy, primary caregiver leave for new parents, sick leave to care for loved ones, and leave for bereavement or end-of-life care.

- <u>Taking Care of Your Career</u>: Our School of Live learning and development center at our Los Angeles headquarters has furthered our career advancement opportunities including leadership workshops for mid-career employees. In 2024, we expanded offerings to include more global live and on-demand learning and professional development and coaching opportunities for employees. We also offer recognition for successful patent recipient applications and tuition reimbursement to further ongoing education.

- <u>Taking Care of Your Wealth</u>: To support long-term financial goals, we traditionally provide 401(k) or pension matching, a stock reimbursement program, and student loan repayment assistance. In 2024, we expanded our $20.00 per hour minimum wage to our part-time club and seasonal amphitheater staff based on tenure.

- <u>Taking Care of Our Own</u>: During life's most difficult moments, we offer employees financial support to help them through a variety of crises, including unexpected deaths, natural disasters, and escaping domestic violence. Through the end of 2024, our Crew Nation global relief fund has provided financial support to over 16,000 live music crews in over 50 countries to which we have donated over $15 million since March 2020.

- <u>Taking Care of Others</u>: In order to empower our employees to get involved in causes that are meaningful to them, we provide paid time off for them to volunteer in their local communities.

*Our People*

We aspire to foster a workplace where all employees can contribute fully and feel valued. Some programs key to this mission include:

- Promotion and Pay: Ongoing reviews of positions and compensation with the goal of ensuring that all employees across Live Nation are paid appropriately and provided with promotion opportunities.

- Employee Resource Groups: Our employee-led groups, with executive leaders as sponsors, offer programming across our teams that promotes growth and connection through collaboration, professional development, networking, nonprofit support and community outreach.

- Our Workforce: As a global organization, we are committed to valuing and respecting all backgrounds, experiences, abilities and perspectives that enrich our workforce, and reflect our artist community and fan base.

- Industry Engagement: In 2024, we partnered with various nonprofit organizations to launch music business intensive courses and paid internship programs to introduce the next generation of industry newcomers to the technical skills required to succeed in careers in the live industry.

*Human Capital*

Our compensation philosophy is focused on attracting and retaining talented individuals who contribute to our values and help lead our dynamic and innovative environment. To determine market-competitive pay for our employees, we use a combination of entertainment and technology industry benchmarks.

We are committed to encouraging and rewarding pay-for-performance that is aligned with business objectives in the best interest of our shareholders for long-term growth and profitability. We further strive to reward individual achievements and contributions that are both aligned with and supportive of our short- and long-term goals and core business values. We believe that our efforts in these areas are working and contributing to the overall success of the Company, as evidenced by accolades such as obtaining a Great Place to Work® certification (2017-19, 2022-24), placing on Forbes' World's Best Employers List (2023), America's Best Large Employers List (2022-24) and America's Dream Employers List (2025), placing on TIME's World's Best Companies (2023) and 100 Most Influential Companies (2023), Newsweek's America's Best of the Best (2024) and placing on Fortune's World's Most Admired Companies List (2018-21, 2024, 2025), Most Innovative Companies List (2024) and 500 List (2010-2020, 2023, 2024).

As of December 31, 2024, we had approximately 16,200 full-time employees. Our staffing needs vary significantly throughout the year and we also employ seasonal and part-time employees, primarily for our live music venues and festivals. At the end of 2024, we employed approximately 16,000 seasonal and part-time employees and during peak seasonal periods, particularly in the summer months, we employed as many as 34,500 seasonal and part-time employees in 2024.

**Labor Relations**

The stagehands at some of our venues and other employees are subject to collective bargaining agreements. Our union agreements typically have a term of three years and thus regularly expire and require negotiation in the course of our business. We believe that we have good relationships with our employees and other unionized labor involved in our events, and there have been no related significant work stoppages in the past three years. Upon the expiration of any of our collective bargaining agreements, however, we may be unable to renegotiate on terms favorable to us, and our business operations at one or more of our facilities may be interrupted as a result of labor disputes or difficulties and delays in the process of renegotiating our collective bargaining agreements. In addition, our business operations at one or more of our facilities may also be interrupted as a result of labor disputes by outside unions attempting to unionize a venue even though we do not have unionized labor at that venue currently. A work stoppage at one or more of our owned or operated venues or at our promoted events could have a material adverse effect on our business, results of operations and financial condition. We cannot predict the effect that a potential work stoppage will have on our business operations.

**Information About Our Executive Officers**

Set forth below are the names, ages and current positions of our executive officers and other significant employees as of February 13, 2025.

| Name | Age | Position |
|---|---|---|
| Michael Rapino | 59 | President, Chief Executive Officer and Director |
| Omar Al-Joulani | 47 | Co-President  U.S. Concerts and President  Touring |
| Carlos Alvarez | 50 | Chief Technology Officer  Ticketmaster |
| Joe Berchtold | 60 | President and Chief Financial Officer |
| Brian Capo | 58 | Senior Vice President  Chief Accounting Officer |
| Liz Dyer | 39 | Senior Vice President  Human Resources |
| Arthur Fogel | 71 | Chairman  Global Music and President  Global Touring |
| Kaitlyn Henrich | 34 | Senior Vice President  Corporate Communications and Social Impact |
| John Hopmans | 66 | Executive Vice President  Mergers and Acquisitions and Strategic Finance |
| Bob Roux | 67 | President  U.S. Concerts |
| Michael Rowles | 59 | General Counsel and Secretary |
| Russell Wallach | 59 | President  Sponsorship and Advertising |
| Michael Wichser | 46 | Chief Operating Officer  Ticketmaster |
| Mark Yovich | 50 | President  Ticketmaster |
| Jordan Zachary | 42 | Co-President  U.S. Concerts and President  Regions U.S. Concerts |

*Michael Rapino* is our President and Chief Executive Officer and has served in this capacity since August 2005. He has also served on our board of directors since December 2005. Mr. Rapino has worked for us or our predecessors since 1999.

*Omar Al-Joulani* is our Co-President of U.S. Concerts and President of Touring and has served in this capacity since September 2021. Prior to that, Mr. Al-Joulani served in various North America touring roles since joining us in March 2010.

*Carlos Alvarez* is our Chief Technology Officer of Ticketmaster and has served in this capacity since September 2020. Prior to that, Mr. Alvarez served in various information technology roles since joining us in August 2014.

*Joe Berchtold* is our President and Chief Financial Officer. He has served as President since December 2017 and Chief Financial Officer since July 2021. Prior to that, Mr. Berchtold served as our Chief Operating Officer since joining us in April 2011.

*Brian Capo* is our Senior Vice President and Chief Accounting Officer and has served in this capacity since joining us in December 2007.

*Liz Dyer* is our Senior Vice President of Human Resources and has served in this capacity since September 2020. Prior to that, Ms. Dyer served in various human resources roles since joining us in April 2016.

*Arthur Fogel* is the Chairman of our Global Music group and President of our Global Touring division and has served in these capacities since 2005. Mr. Fogel has worked for us or our predecessors since 1999.

*Kaitlyn Henrich* is our Senior Vice President of Corporate Communications and Social Impact and has served in this capacity since January 2022. Prior to that, Ms. Henrich served in various corporate communications roles since joining us in January 2016.

*John Hopmans* is our Executive Vice President of Mergers and Acquisitions and Strategic Finance and has served in this capacity since joining us in April 2008.

*Bob Roux* is President of our U.S. Concerts division and has served in this capacity since October 2010. Mr. Roux has worked for us or our predecessors since 1990.

*Michael Rowles* is our General Counsel and has served in this capacity since joining us in March 2006 and as our Secretary since May 2007.

*Russell Wallach* is President of our Sponsorship and Advertising division and has served in this capacity since July 2006. Mr. Wallach has worked for us or our predecessors since 1996.

12

*Michael Wichser* is our Chief Operating Officer of Ticketmaster and has served in this capacity since January 2021. Prior to that, Mr. Wichser served in various mergers and acquisitions and strategy and development roles since joining us in September 2014.

*Mark Yovich* is President of Ticketmaster and has served in this capacity since December 2020. Prior to that, Mr. Yovich served as President of Ticketmaster's International division since November 2011. Mr. Yovich has worked for us or our predecessors since 2000.

*Jordan Zachary* is our Co-President of U.S. Concerts and President of Regions U.S. Concerts and has served in this capacity since April 2021. Prior to that, Mr. Zachary served in various strategy and development roles since joining us in April 2015.

**Available Information**

We are required to file annual, quarterly and current reports, proxy statements and other information with the SEC. You may read and copy any materials we have filed with the SEC at the SEC's Public Reference Room at 100 F Street, NE, Washington, DC 20549. You may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. Our filings with the SEC are also available to the public through the SEC's website at *www.sec.gov*.

You can find more information about us online at our investor relations website located at*www.investors.livenationentertainment.com*. Our Annual Report on Form 10-K, our Quarterly Reports on Form 10-Q, our Current Reports on Form 8-K and any amendments to those reports are available free of charge on our website as soon as reasonably practicable after we electronically file such material with the SEC. The information posted on or accessible through our website is not incorporated into this Annual Report on Form 10-K.

**ITEM 1A.   RISK FACTORS**

*You should carefully consider each of the following risks and all of the other information set forth in this Annual Report. The following risks relate principally to our business and operations, our leverage and our common stock. If any of the risks and uncertainties develop into actual events, this could have a material adverse effect on our business, financial condition or results of operations. In that case, the trading price of our common stock could decline.*

**Risks Relating to Our Business and the Live Events and Ticketing Industries**

**Our business is highly sensitive to public tastes and is dependent on our ability to secure popular artists and other live music events, and we and our ticketing clients may be unable to anticipate or respond to changes in consumer preferences, which may result in decreased demand for our services.**

Our business is highly sensitive to rapidly changing public tastes and is dependent on the availability of popular artists and events. Our live entertainment business depends in part on our ability to anticipate the tastes of consumers and to offer events that appeal to them. Since we rely on unrelated parties to create and perform at live music events, any unwillingness to tour or lack of availability of popular artists could limit our ability to generate revenue. In particular, there are a limited number of artists that can headline a major North American or global tour or who can sell out larger venues, including many of our amphitheaters. If those artists do not choose to tour, or if we are unable to secure the rights to their future tours, then our concerts business would be adversely affected. Our artist management business could be adversely affected if the artists it represents do not tour or perform as frequently as anticipated, or if such tours or performances are not as widely attended by fans as anticipated due to changing tastes, general economic conditions or otherwise. Our ticketing business relies on third parties to create and perform live entertainment, sporting and leisure events and to price tickets to such events. Accordingly, our ticketing business' success depends, in part, upon the ability of these third parties to correctly anticipate public demand for particular events, as well as the availability of popular artists, entertainers and teams.

In addition, our live entertainment business typically books our live music tours four to eight months in advance of the beginning of the tour and often agrees to pay an artist a fixed guaranteed amount prior to our receiving any revenue. Therefore, if the public is not receptive to the tour, or we or an artist cancel the tour, we may incur a loss for the tour depending on the amount of the fixed guarantee or incurred costs relative to any revenue earned, as well as revenue we could have earned at booked venues. We have cancellation insurance policies in place to cover a portion of our losses if an artist cancels a tour but such policies may not be sufficient and are subject to deductibles. Furthermore, consumer preferences change from time to time, and our failure to anticipate, identify or react to these changes could result in reduced demand for our services, which would adversely affect our business, financial condition and results of operations.

13

***Our business depends on relationships between key promoters, executives, agents, managers, artists and clients and any adverse changes in these relationships could adversely affect our business, financial condition and results of operations.***

The live music business is uniquely dependent upon personal relationships, as promoters and executives within live music companies such as ours leverage their existing network of relationships with artists, agents and managers in order to secure the rights to the live music tours and events which are critical to our success. Due to the importance of those industry contacts to our business, the loss of any of our promoters, officers or other key personnel could adversely affect our business. Although we have entered into long-term agreements with many of those individuals described above to protect our interests in those relationships, we can give no assurance that all or any of these key employees or managers will remain with us or will retain their associations with key business contacts, including music artists, as some agreements between a manager and an artist are not for a fixed period of time and are instead terminable at will.

The success of our ticketing business depends, in significant part, on our ability to maintain and renew relationships with existing clients and to establish new client relationships. We anticipate that, for the foreseeable future, the substantial majority of our Ticketing segment revenue will be derived from both online and mobile sales of tickets. We also expect that revenue from primary ticketing services, which consists primarily of our portion of per ticket convenience charges and per order service fees, will continue to comprise the substantial majority of our Ticketing segment revenue. We cannot provide assurances that we will be able to maintain existing client contracts, or enter into or maintain new client contracts, on acceptable terms, if at all, and the failure to do so could have a material adverse effect on our business, financial condition and results of operations.

Another important component of our success is our ability to maintain existing and to build new relationships with third-party distribution channels, advertisers, sponsors and service providers. Any adverse change in these relationships, including the inability of these parties to fulfill their obligations to our businesses for any reason, could adversely affect our business, financial condition and results of operations.

***We face intense competition in the live music and ticketing industries, and we may not be able to maintain or increase our current revenue, which could adversely affect our business, financial condition and results of operations.***

Our businesses are in highly competitive industries, and we may not be able to maintain or increase our current revenue due to such competition. The live music industry competes with other forms of entertainment for consumers' discretionary spending and within this industry we compete with other venues to book artists, and, in the markets in which we promote music concerts, we face competition from other promoters and venue operators. Our competitors compete with us for key employees who have relationships with popular music artists and who have a history of being able to book such artists for concerts and tours. These competitors may engage in more extensive development efforts, undertake more far-reaching marketing campaigns, adopt more aggressive pricing policies and make more attractive offers to existing and potential artists. Due to increasing artist influence and competition to attract and maintain artist clients, we may enter into agreements on terms that are less favorable to us, which could negatively impact our financial results. Our competitors may develop services, advertising options or music venues that are equal or superior to those we provide or that achieve greater market acceptance and brand recognition than we achieve. Within the live music industry, our artist management business also competes with numerous other artist management companies and individual managers in the United States alone, both to discover new and emerging artists and to represent established artists. Across the live music industry, it is possible that new competitors may emerge and rapidly acquire significant market share.

Our ticketing business faces significant competition from other national, regional and local primary ticketing service providers to secure new and retain existing clients on a continuous basis. Additionally, we face significant and increasing challenges from companies that sell self-ticketing systems and from clients who choose to self-ticket, through the integration of such systems into their existing operations or the acquisition of primary ticket services providers or by increasing sales through venue box offices and season and subscription sales. We also face competition in the resale of tickets from resale marketplaces and from other ticket resellers with online distribution capabilities. The advent of new technology, particularly as it relates to online ticketing, has amplified this competition. The intense competition that we face in the ticketing industry could cause the volume of our ticketing services business to decline. As we are also a content provider and venue operator we may face direct competition with our prospective or current primary ticketing clients, who primarily include live event content providers. This direct competition with our prospective or current primary ticketing clients could result in a decline in the number of ticketing clients we have and a decline in the volume of our ticketing business, which could adversely affect our business, financial condition and results of operations.

14

Other variables related to the competitive environment that could adversely affect our financial performance by, among other things, leading to decreases in overall revenue, the number of sponsors, event attendance, ticket prices and fees or profit margins include:

- an increased level of competition for advertising dollars, which may lead to lower sponsorships as we attempt to retain advertisers or which may cause us to lose advertisers to our competitors offering better programs that we are unable or unwilling to match;
- unfavorable fluctuations in operating costs, including increased guarantees to artists, which we may be unwilling or unable to pass through to our customers via higher ticket prices;
- inability or unwillingness to fund the significant up-front cash requirements associated with our touring and ticketing businesses due to insufficient cash on hand or capacity under our senior secured credit facility, which could result in the loss of key tours to competitors or the inability to secure and retain ticketing clients;
- competitors' offerings that may include more favorable terms than we do in order to obtain agreements for new venues or ticketing arrangements or to obtain events for the venues they operate;
- technological changes and innovations that we are unable to adopt or are late in adopting that offer more attractive entertainment alternatives than we or other live entertainment providers currently offer, which may lead to a reduction in attendance at live events, a loss of ticket sales or lower ticket fees; and
- other entertainment options available to our audiences that we do not offer.

***Our success depends, in significant part, on entertainment, sporting and leisure events and economic and other factors adversely affecting such events could have a material adverse effect on our business, financial condition and results of operations.***

A decline in attendance at or reduction in the number of live entertainment, sporting and leisure events may have an adverse effect on our revenue and operating income. In addition, during periods of economic slowdown and recession, many consumers have historically reduced their discretionary spending and advertisers have reduced their advertising expenditures. The impact of economic slowdowns on our business is difficult to predict, but they may result in reductions in ticket sales, sponsorship opportunities and our ability to generate revenue. The risks associated with our businesses may become more acute in periods of a slowing economy or recession, which may be accompanied by a decrease in attendance at live entertainment, sporting and leisure events. Many of the factors affecting the number and availability of live entertainment, sporting and leisure events are beyond our control. For instance, certain sports leagues have experienced labor disputes leading to threatened or actual player lockouts. Any such lockouts that result in shortened or canceled seasons would adversely impact our business to the extent that we provide ticketing services to the affected teams both due to the loss of games and ticketing opportunities as well as the possibility of decreased attendance following such a lockout due to adverse fan reaction.

Our business depends on discretionary consumer and corporate spending. Many factors related to corporate spending and discretionary consumer spending, including economic conditions affecting disposable consumer income such as unemployment levels, fuel prices, interest rates, changes in tax rates and tax laws that impact companies or individuals, and inflation can significantly impact our operating results. Business conditions, as well as various industry conditions, including corporate marketing and promotional spending and interest levels, can also significantly impact our operating results. These factors can affect attendance at our events, premium seat sales, sponsorship, advertising and hospitality spending, concession and merchandise sales, as well as the financial results of sponsors of our venues, events and the industry. Negative factors such as challenging economic conditions and public concerns over terrorism and security incidents, particularly when combined, can impact corporate and consumer spending, and one negative factor can impact our results more than another. There can be no assurance that consumer and corporate spending will not be adversely impacted by current economic conditions, or by any future deterioration in economic conditions, thereby possibly impacting our operating results and growth.

15

***We are dependent upon our ability to lease, acquire and develop live music venues, and if we are unable to do so on acceptable terms, or at all, our results of operations could be adversely affected.***

Our Concerts and Sponsorship & Advertising segments require access to venues to generate revenue from live music events. For these events, we use venues that we own, but we also operate a number of our live music venues under various agreements which include leases with third parties, ownership through an equity interest or booking agreements, which are agreements where we contract to book the events at a venue for a specific period of time. Our long-term success in the live music business will depend in part on the availability of venues, our ability to lease these venues and our ability to enter into booking agreements upon their expiration. As many of these agreements are with third parties over whom we have little or no control, we may be unable to renew these agreements or enter into new agreements on acceptable terms or at all, and may be unable to obtain favorable agreements with venues. Our ability to renew these agreements or obtain new agreements on favorable terms depends on a number of other factors, many of which are also beyond our control, such as national and local business conditions and competition from other promoters. If the cost of renewing these agreements is too high or the terms of any new agreement with a new venue are unacceptable or incompatible with our existing operations, we may decide to forego these opportunities. There can be no assurance that we will be able to renew these agreements on acceptable terms or at all, or that we will be able to obtain attractive agreements with substitute venues, which could have a material adverse effect on our results of operations.

We may continue to expand our operations through the development of live music venues and the expansion of existing live music venues, which poses a number of risks, including

- construction of live music venues may result in cost overruns, delays or unanticipated expenses;
- desirable sites for live music venues may be unavailable or costly;
- the attractiveness of our current venues may deteriorate over time; and
- competition may impact our ability to earn attractive returns on our investments.

Growth or maintenance of our existing revenue depends in part on consistent investment in our venues. Therefore, we expect to continue to make substantial capital improvements to meet long-term increasing demand, improve value and grow revenue. We frequently have a number of significant capital projects underway. Numerous factors, many of which are beyond our control, may influence the ultimate costs and timing of various capital improvements.

The amount of capital expenditures can vary significantly from year to year. In addition, actual costs could vary materially from our estimates if our assumptions about the quality of materials, equipment or workmanship required or the cost of financing such expenditures were to change. Construction is also subject to governmental permitting processes which, if changed, could materially affect the ultimate cost.

Additionally, the market potential of live music venue sites cannot be precisely determined, and our live music venues may face competition in markets from unexpected sources. Newly constructed live music venues may not perform up to our expectations. We face significant competition for potential live music venue locations and for opportunities to acquire existing live music venues. Because of this competition, we may be unable to add to or maintain the number of our live music venues on terms we consider acceptable.

***There is the risk of personal injuries and accidents in connection with our live music events, which could subject us to personal injury or other claims and increase our expenses, as well as reduce attendance at our live music events, causing a decrease in our revenue.***

There are inherent risks involved with producing live music events. As a result, personal injuries and accidents have occurred, and may in the future occur, from time to time, which could subject us to claims and liabilities for personal injuries. Incidents in connection with our live music events at any of our venues or festival sites that we own or rent could also result in claims, reducing operating income or reducing attendance at our events, which could cause a decrease in our revenue. We have been subject to wrongful death claims and are currently subject to other litigation. In addition, while we have security protocols in place at our events, illegal drug use or alcohol consumption at our events could result in negative publicity, adverse consequences (including illness, injury or death) to the persons engaged in such activities or others, and litigation against us. While we maintain insurance policies that provide coverage within limits that are sufficient, in management's judgment, to protect us from material financial loss for personal injuries sustained by persons at our venues or events or accidents in the ordinary course of business, there can be no assurance that such insurance will be adequate at all times and in all circumstances.

16

***Poor weather adversely affects attendance at our live music events, which could negatively impact our financial performance from period to period.***

We promote and/or ticket many live music events. Weather conditions surrounding these events affect sales of tickets, concessions and merchandise, among other things. Poor weather conditions can have a material effect on our results of operations particularly because we promote and/or ticket a finite number of events. Increased weather variability due to climate change exacerbates weather-related issues we face. Due to weather conditions, we may be required to cancel or reschedule an event to another available day or a different venue, which would increase our costs for the event and could negatively impact the attendance at the event, as well as concession and merchandise sales. Poor weather can affect current periods as well as successive events in future periods.

### Risks Relating to Information Technology, Cybersecurity and Intellectual Property

***The success of our ticketing business and other operations depends, in part, on the integrity of our systems and infrastructure, as well as affiliate and third-party computer systems, computer networks and other communication systems. System interruption and the lack of integration and redundancy in these systems and infrastructure may have an adverse impact on our business, financial condition and results of operations.***

System interruption and the lack of integration and redundancy in the information systems and infrastructure, both of our own ticketing systems and other computer systems and of affiliate and third-party software, computer networks and other communications systems service providers on which we rely, may adversely affect our ability to operate websites, process and fulfill transactions, respond to customer inquiries and generally maintain cost-efficient operations. Such interruptions could occur by virtue of natural disaster, malicious actions such as hacking or acts of terrorism or war, or human error. In addition, the loss of some or all of certain key personnel could require us to expend additional resources to continue to maintain our software and systems and could subject us to systems interruptions. The large infrastructure plant that is required to operate our systems requires an ongoing investment of time, money and effort to maintain or refresh hardware and software and to ensure it remains at a level capable of servicing the demand and volume of business that Ticketmaster receives. Failure to do so may result in system instability, degradation in performance, or unfixable security vulnerabilities that could adversely impact both the business and the consumers utilizing our services.

While we have backup systems for certain aspects of our operations, disaster recovery planning by its nature cannot be sufficient for all eventualities. In addition, we may not have adequate insurance coverage to compensate for losses from a major interruption. If any of these adverse events were to occur, it could adversely affect our business, financial condition and results of operations.

***Data loss or other breaches of our network security could materially harm our business and results of operations, and the processing, storage, use and disclosure of personal or sensitive information could give rise to liabilities and additional costs as a result of governmental regulation, litigation and conflicting legal requirements relating to personal privacy rights.***

Due to the nature of our business, we process, store, use, transfer and disclose certain personal or sensitive information about our customers and employees. Penetration of our network or other misappropriation or misuse of personal or sensitive information and data, including credit card information and other personally identifiable information, could cause interruptions in our operations and subject us to increased costs, litigation, inquiries and actions from governmental authorities, and financial or other liabilities. In addition, security breaches, incidents or the inability to protect information could lead to increased incidents of ticketing fraud and counterfeit tickets. Security breaches and incidents could also significantly damage our reputation with consumers, ticketing clients and other third parties, and could result in significant costs related to remediation efforts, such as credit or identity theft monitoring.

17

Although we have developed systems and processes that are designed to protect customer and employee information and to prevent security breaches or incidents (which could result in data loss or other harm or loss), such measures cannot provide absolute security or certainty. It is possible that advances in computer and hacker capabilities, new variants of malware, the development of new penetration methods and tools, inadvertent violations of company policies or procedures or other developments could result in a compromise of customer or employee information or a breach of the technology and security processes that are used to protect customer and employee information. The techniques used to obtain unauthorized access, automate or expedite transactions or other activities on our platform, disable or degrade service or sabotage systems (or otherwise bring about one or more of these effects) may change frequently and as a result, may be difficult for our business to detect for long periods of time and may impact the efficacy of our defenses and/or the products and services we provide. In addition, despite our best efforts, we may be unaware of or unable to anticipate these techniques or implement adequate preventative measures. We have expended significant capital and other resources to protect against and remedy such potential security breaches, incidents and their consequences, including the establishment of a dedicated cybersecurity organization within our larger technology environment, and will continue to do so in the future.

We also face risks associated with security breaches and incidents affecting third parties with which we are affiliated or with which we otherwise conduct business. In particular, hardware, software or applications we develop or procure from third parties may contain, and have contained, defects in design or manufacture and/or may pose a security risk that could unexpectedly compromise information security, but none of which have been material to date. Consumers are generally concerned with the security and privacy of the internet, and any publicized security problems affecting our businesses and/or third parties may discourage consumers from doing business with us, which could have an adverse effect on our business, financial condition and results of operations.

In addition to the above concerns related to network and data security, the collection, transfer, use, disclosure, security and retention of personal or sensitive information and other user data are governed by existing and evolving federal, state and international laws. We have expended significant capital and other resources to keep abreast of the evolving privacy landscape, including the establishment of a dedicated global privacy organization within our legal team. However, our business could be adversely affected if legislation or regulations are expanded to require changes in business practices or policies (including, for example, practices or policies regarding the collection, transfer, use, disclosure, security, and retention of personal or sensitive information), or if governing jurisdictions interpret or implement legislation or regulations in a manner which negatively affects our business, financial condition and/or results of operations. Due to the changes in the data privacy regulatory environment, we may incur additional costs and challenges to our business that restrict or limit our ability to collect, transfer, use, disclose, secure, or retain personal or sensitive information. These changes in data privacy laws may require us to modify our current or future products, services, programs, practices or policies, which may in turn impact the products and services available to our customers.

Regulators and government enforcement actions worldwide are imposing significant fines against companies for data privacy violations. Our business operations, including our ticketing business, involve the collection, transfer, use, disclosure, security, and disposal of personal or sensitive information in various locations around the world, including the European Union ("E.U."), where the General Data Protection Regulation ("GDPR") governs data privacy and can result in the imposition of significant fines and penalties. In addition, following the withdrawal of the United Kingdom ("U.K.") from the E.U. on December 31, 2020, we were required to separately comply with the U.K.'s data protection law, under which additional fines and penalties could be imposed independent of the GDPR. U.K. data protection law has continued to evolve and, notwithstanding the current E.U. decision that allows data to be transferred from the E.U. to the U.K., we anticipate additional changes to U.K. data protection law within the next 12-18 months. In the United States, several states (including California, Virginia, and Colorado) have required us to update our policies and procedures to continue to protect data as required under those laws. State and federal legislators in the United States continue to consider, and enact, new privacy laws, which may require further updates to ensure compliance. Additional changes to data privacy laws and regulations around the world, including in the E.U., U.K., and/or the United States, could lead to additional compliance costs and could increase our overall risk.

As we expand our operations into new jurisdictions, the costs associated with compliance with applicable local data privacy laws and regulations increases. It is possible that government or industry regulation in these markets will require us to deviate from our standard processes and/or make changes to our products, services and operations, which will increase operational cost and risk.

18

Our failure or the failure of the various third-party vendors and service providers with which we are affiliated or otherwise conduct business to comply with applicable federal, state or international laws and regulations and/or to comply with our privacy policies and/or or any compromise of security that results in the unauthorized collection, transfer, use or disclosure of personal or sensitive information or other user data may result in negative publicity resulting in reputation or brand damage, may discourage potential users from purchasing tickets or trying our products and services, and may result in proceedings/fines by governmental agencies and/or private litigation brought by consumers; the realization of one or all of the foregoing could adversely affect our business, financial condition and results of operations.

***We may fail to adequately protect our intellectual property rights or may be accused of infringing upon intellectual property rights of third parties.***

We regard our intellectual property rights, including patents, trademarks and domain names, copyrights, trade secrets and similar intellectual property (as applicable) as critical to our success. We also rely heavily upon software codes, informational databases and other components that make up our products and services.

We have been granted trademark registrations and patents and/or have trademark and patent applications pending with the United States Patent and Trademark Office and/or various foreign authorities for various proprietary trademarks, technologies and other inventions. Any patent or trademark application filed may not result in a patent or trademark registration being issued, or existing or future patents or trademarks may not be adjudicated valid by a court or be afforded adequate protection against competitors. Likewise, the issuance of a patent or trademark registration to us does not mean that its processes, inventions or trademark will not be found to infringe upon rights previously issued to third parties. We rely on a combination of laws and contractual restrictions with employees, customers, suppliers, affiliates and others to establish and protect these proprietary rights. Despite these precautions, it may be possible for a third party to copy or otherwise obtain and use our intellectual property without authorization which, if discovered, might require legal action to correct. In addition, third parties may independently and lawfully develop substantially similar intellectual properties.

**Risks Relating to Governmental Regulation and Litigation**

***We operate in international markets which subject us to risks associated with the legislative, judicial, accounting, regulatory, political and economic risks and conditions specific to such markets, which could adversely affect our business, financial condition and results of operations.***

We provide services in various jurisdictions abroad through a number of brands and businesses that we own and operate, as well as through joint ventures, and we expect to continue to expand our international presence. We face, and expect to continue to face, additional risks in the case of our existing and future international operations, including:

- political instability, adverse changes in diplomatic relations and unfavorable economic and business conditions in the markets in which we currently have international operations or into which we may expand, particularly in the case of emerging markets;
- more restrictive or otherwise unfavorable government regulation of the live entertainment and ticketing industries, which could result in increased compliance costs and/or otherwise restrict the manner in which we provide services and the amount of related fees charged for such services;
- limitations on the enforcement of intellectual property rights;
- limitations on the ability of foreign subsidiaries to repatriate profits or otherwise remit earnings;
- adverse tax consequences due both to the complexity of operating across multiple tax regimes as well as changes in, or new interpretations of, international tax treaties and structures;
- expropriations of property and risks of renegotiation or modification of existing agreements with governmental authorities;
- diminished ability to legally enforce our contractual rights in foreign countries;
- limitations on technology infrastructure, which could limit our ability to migrate international operations to a common ticketing system;
- variability in venue security standards and accepted practices;
- lower levels of internet usage, credit card usage and consumer spending in comparison to those in the United States; and

19

- difficulties in managing operations and adapting to consumer desires due to distance, language and cultural differences, including issues associated with (i) business practices and customs that are common in certain foreign countries but might be prohibited by United States law and our internal policies and procedures, and (ii) management and operational systems and infrastructures, including internal financial control and reporting systems and functions, staffing and managing of foreign operations, which we might not be able to do effectively or cost-efficiently.

As we expand into new markets these risks will be intensified and will have the potential to impact a greater percentage of our business and operating results. Our ability to expand our international operations into new jurisdictions, or further into existing jurisdictions will depend, in significant part, on our ability to identify potential acquisition candidates, joint venture or other partners, and enter into arrangements with these parties on favorable terms, as well as our ability to make continued investments to maintain and grow existing international operations. If the revenue generated by international operations is insufficient to offset expenses incurred in connection with the maintenance and growth of these operations, our business, financial condition and results of operations could be materially and adversely affected. In addition, in an effort to make international operations in one or more given jurisdictions profitable over the long term, significant additional investments that are not profitable over the short term could be required over a prolonged period.

In foreign countries in which we operate, a risk exists that our employees, contractors or agents could, in contravention of our policies, engage in business practices prohibited by applicable United States laws and regulations, such as the United States Foreign Corrupt Practices Act, as well as the laws and regulations of other countries prohibiting corrupt payments to government officials such as the United Kingdom Bribery Act 2010. We maintain policies prohibiting such business practices and have in place global anti-corruption compliance and training programs designed to ensure compliance with these laws and regulations. Nevertheless, the risk remains that one or more of our employees, contractors or agents, including those based in or from countries where practices that violate such United States laws and regulations or the laws and regulations of other countries may be customary, as well as those associated with newly-acquired businesses, will engage in business practices that are prohibited by our policies, circumvent our compliance programs and, by doing so, violate such laws and regulations. Any such violations, even if prohibited by our internal policies, could result in fines, criminal sanctions against us and/or our employees, prohibitions on the conduct of our business and damage to our reputation, which could adversely affect our business, financial condition and results of operations.

Given our substantial operations as a tour sponsor in the U.K. and E.U., we face risks and uncertainties relating to travel into and out of these jurisdictions for touring artists and supporting personnel. A European visa-waiver system (ETIAS European Travel Information and Authorization System) will be required for visitors from 60 visa-exempt countries to enter 30 European countries for a short stay, expected to come into force mid-2025. All United States citizens travelling to the E.U. will need to register with ETIAS. In the U.K. an Electronic Travel Authorization scheme (ETA) is now in operation. All visitors who do not need a visa for short stays to the U.K. must apply for an ETA.

***We are subject to extensive governmental regulation, and our failure to comply with these regulations could adversely affect our business, financial condition and results of operations.***

Our operations are subject to federal, state and local statutes, rules, regulations, policies and procedures, both domestically and internationally, which are subject to change at any time, governing matters such as:

- privacy laws and protection of personal or sensitive information, as more particularly described above under the risk factor related to our processing, storage, use and disclosure of personal or sensitive information;
- compliance with the United States Foreign Corrupt Practices Act, the United Kingdom Bribery Act 2010 and similar regulations in other countries, as more particularly described above under the risk factor related to our international operations;
- primary ticketing and ticket resale services;
- construction, renovation and operation of our venues;
- licensing, permitting and zoning, including noise ordinances;
- human health, safety, security and sanitation requirements;
- the service of food and alcoholic beverages;
- working conditions, labor, minimum wage and hour, citizenship and employment laws;
- compliance with the ADA and the DDA;
- hazardous and non-hazardous waste and other environmental protection laws;
- sales and other taxes and withholding of taxes;
- marketing activities via the telephone and online; and
- historic landmark rules.

20

Our failure to comply with these laws and regulations could result in proceedings/fines against us by governmental agencies and private actions brought by consumers, which if material, could adversely affect our business, financial condition and results of operations. While we attempt to conduct our business and operations in a manner that we believe to be in compliance with such laws and regulations, there can be no assurance that a law or regulation will not be interpreted or enforced in a manner contrary to our current understanding of the law or regulation. In addition, the promulgation of new laws, rules and regulations could restrict or unfavorably impact our business, which could decrease demand for services, reduce revenue, increase costs and/or subject us to additional liabilities. For example, some legislatures have proposed laws in the past that would impose potential liability on us and other promoters and producers of live music events for entertainment taxes and for incidents that occur at our events, particularly relating to drugs and alcohol. New legislation could be passed that may negatively impact our business, such as provisions that have recently been proposed in various jurisdictions. Additionally, governmental actions such as the current sanctions by the United States Department of the Treasury's Office of Foreign Assets Control and European regulators on certain Russian individuals and entities, as well as other sanctions elsewhere in the world, could restrict or limit our business activities in certain areas or subject us to sanction for noncompliance, even if inadvertent.



21



**General Risks Relating to our Business and Operations**

*We may be adversely affected by the occurrence of extraordinary events, such as terrorist attacks or disease epidemics, such as the COVID-19 pandemic.*

The occurrence and threat of extraordinary events, such as terrorist attacks, intentional or unintentional mass-casualty incidents, public health concerns such as contagious disease outbreaks, natural disasters or similar events, may deter artists from touring and/or substantially decrease the use of and demand for our services and the attendance at live music events, which may decrease our revenue or expose us to substantial liability. The terrorism and security incidents in the past, military actions in foreign locations, periodic elevated terrorism alerts and fears from publicized contagious disease outbreaks have raised numerous challenging operating factors, including public concerns regarding air travel, military actions and additional national or local catastrophic incidents, causing a nationwide disruption of commercial and leisure activities.

In the event of actual or threatened terrorism events, some artists may refuse to travel or book tours, which could adversely affect our business. Attendance at events may decline due to fears over terrorism and contagious disease outbreaks, which could adversely impact our operating results. There have been terrorist attacks at events that we have promoted or with which we have otherwise been involved, which have resulted in lawsuits questioning, among other things, the adequacy of the security precautions at these events. While we are constantly evaluating the security precautions for our events in an effort to ensure the safety of the public, no security measures can guarantee safety and there can be no assurances that we won't face liabilities, which could be substantial and materially impact our operating results, in connection with such terrorist attacks at our events. In addition, we hold a large number of events at third-party venues that we do not own or operate. While we do not have direct control over the security at such venues, there can be no guarantees that victims of a terrorism or casualty event at such venues will not seek to impose, or ultimately be successful in imposing, liability on us.

The global COVID-19 pandemic had a material negative impact on our business and operating results. During the height of the pandemic, we ceased all Live Nation tours and closed our venues to support global efforts at social distancing and mitigating the spread of the virus, and to comply with restrictions put in place by various governmental entities. While our operations have largely returned to normal, any resurgence of the pandemic, or outbreaks causing localized endemics in markets where we have significant operations, would adversely affect our business, financial condition and results of operations. Each of our segments depends on live music and sporting events in order to generate most of its revenue. There can be no assurances that new outbreaks of COVID-19 or other epidemics will not again cause operations in impacted markets to close and/or revert to restrictions on activities experienced during the height of the pandemic for an unknown duration of time.

While we have health and safety programs designed to mitigate the risks that are inherent in the staging of concerts and other events, as well as those associated with extraordinary occurrences or actions that may take place at our events, there can be no assurances that these programs will be sufficient to fully cover every possibility. Despite our best efforts, some occurrences or actions are difficult to foresee and adequately plan for, which could lead to fan, vendor and/or employee harm resulting in fines, penalties, legal costs and reputational risk that could materially and adversely impact our business and results of operations.

***Exchange rates may cause fluctuations in our results of operations that are not related to our operations.***

Because we own assets overseas and derive revenue from our international operations, we may incur currency translation losses or gains due to changes in the values of foreign currencies relative to the United States Dollar. We cannot predict the effect of exchange rate fluctuations upon future operating results. For the year ended December 31, 2024, our international operations accounted for approximately 38% of our revenue. We cannot predict the future relationship between the United States Dollar and the currencies used by our international businesses, principally the British Pound, Euro, Australian Dollar, Canadian Dollar and Mexican Peso. We experienced foreign exchange rate operating income of $29.6 million for the year ended December 31, 2023 and foreign exchange operating losses of $52.4 million and $39.8 million for the years ended December 31, 2024 and December 31, 2022, respectively, which impacted our operating income (loss). See Item 7A.   Quantitative and Qualitative Disclosures about Market Risk

***We may enter into future acquisitions and take certain actions in connection with such transactions, including actions taken to comply with antitrust, competition and other regulations, that could affect our business and results of operations; if we are unsuccessful in our future acquisition endeavors, our business could be adversely impacted.***

Our future growth rate depends in part on our selective acquisition of additional businesses. A portion of our growth has been attributable to acquisitions. We may be unable to identify other suitable targets for further acquisition or make further acquisitions at favorable prices. If we identify a suitable acquisition candidate, our ability to successfully complete the acquisition would depend on a variety of factors, and may include our ability to obtain financing on acceptable terms and requisite government approvals. In addition, the credit agreement for our senior secured credit facility restricts our ability to make certain acquisitions. In connection with future acquisitions, we could take certain actions that could adversely affect our business, including:

- using a significant portion of our available cash;
- issuing equity securities, which would dilute current stockholders' percentage ownership;
- incurring substantial debt;
- incurring or assuming contingent liabilities, known or unknown;
- incurring amortization expenses related to intangibles; and
- incurring large accounting write-offs or impairments.

In addition, acquisitions involve inherent risks which, if realized, could adversely affect our business and results of operations, including those associated with:

- integrating the operations, financial reporting, technologies and personnel of acquired companies, including establishing and maintaining a system of internal controls appropriate for a public company environment;
- managing geographically dispersed operations;
- the diversion of management's attention from other business concerns;
- the inherent risks in entering markets or lines of business in which we have either limited or no direct experience;
- the potential loss of key employees, customers and strategic partners of acquired companies; and
- the impact of laws and regulations relating to antitrust at the state, federal and international levels, which could significantly affect our ability to complete acquisitions and expand our business.

23

*Our operations are seasonal and our results of operations vary from quarter to quarter and year over year, so our financial performance in certain financial quarters or years may not be indicative of, or comparable to, our financial performance in subsequent financial quarters or years.*

We believe our financial results and cash needs will vary greatly from quarter to quarter and year to year depending on, among other things, the timing of tours, tour cancellations, event ticket on-sales, capital expenditures, seasonal and other fluctuations in our operating results, the timing of guaranteed payments and receipt of ticket sales and fees, financing activities, acquisitions and investments and receivables management. Because our results may vary significantly from quarter to quarter and year to year, our financial results for one quarter or year cannot necessarily be compared to another quarter or year and may not be indicative of our future financial performance in subsequent quarters or years. Typically, we experience our lowest financial performance in the first and fourth quarters of the calendar year as our outdoor venues are primarily used, and our festivals primarily occur, during May through October. In addition, the timing of tours of top grossing acts can impact comparability of quarterly results year over year and potentially annual results. The timing of event on-sales by our ticketing clients can also impact this comparability. In addition, the seasonality of our businesses could create cash flow management risks if we do not adequately anticipate and plan for periods of decreased activity, which could negatively impact our ability to execute on our strategy, which in turn could harm our results of operations.

The following table sets forth our operating income (loss) for the last eight fiscal quarters (in thousands)

| | 2024 As Revised | | 2023 As Revised |
|---|---|---|---|
| March 31 [1] | $ (41,390) | $ | 131,152 |
| June 30 [1] | 465,819 | | 381,599 |
| September 30 [1] | 639,525 | | 653,658 |
| December 31 | (239,444) | | (81,476) |

[1] See further discussion in Part II    Financial Information    Item 8.    Financial Statements and Supplementary Data    Note 2    Correction of Errors in Previously Reported Consolidated Financial Statements. For the three months ended September 30, 2023, the revision increased our operating income by $35.1 million. For the three months ended June 30, 2023, the revision decreased our operating income by $4.8 million. For the three months ended March 31, 2024 and March 31, 2023, the revision decreased our operating income by $4.9 million and $11.6 million, respectively.

*Costs associated with, and our ability to obtain, adequate insurance could adversely affect our profitability and financial condition.*

We currently secure insurance programs to address our various insurable risks with terms, conditions and costs that management deems appropriate for our business. However, heightened concerns and challenges regarding property, casualty, business interruption, contingency and other insurance coverage have resulted from terrorist and other security incidents along with varying weather-related conditions, pandemics and other incidents. Any such events that are of a massive scale causing significant losses to insurance providers could negatively impact the insurance marketplace, and as a result, we may experience increased difficulty obtaining sufficiently high policy limits of coverage at a cost we believe to be reasonable, including coverage for acts of terrorism, cyber attacks, weather-related damage and disruptions and other perils associated with our operations, including communicable diseases and/or pandemics, artist illnesses and/or inability to perform, and other general casualty matters. We have experienced a significant increase in our cost to obtain insurance over the past several years, though it is difficult to gauge the portion of this increase that is due to conditions in the insurance marketplace generally versus that attributable to our claims history for the mass casualty, cybersecurity, the global COVID-19 pandemic, event cancellations, and other incidents that we have faced. We have a material investment in property and equipment at each of our venues, which are generally located near major cities and which hold events typically attended by a large number of fans. We also have a significant investment in technology, including our ticketing systems. At December 31, 2024, we had property and equipment with a net book value of $2.4 billion. We cannot guarantee that future increases in insurance costs and difficulties obtaining high policy limits will not adversely impact our profitability, thereby possibly impacting our operating results and growth.

We cannot provide assurance that our insurance policy coverage limits, including insurance coverage for property, casualty, artists, business interruption losses, cyber attacks and acts of terrorism, would be adequate under the circumstances should one or multiple events occur at or near any of our business locations, or that our insurers would have adequate financial resources to sufficiently or fully pay our related claims or damages. We cannot guarantee that adequate coverage limits will be available, offered at a reasonable cost, or offered by insurers with sufficient financial soundness. The occurrence of such an incident or incidents affecting any one or more of our business facilities could have a material adverse effect on our financial position and future results of operations if asset damage and/or company liability were to exceed insurance coverage limits or if an insurer were unable to sufficiently or fully pay our related claims or damages.

***We depend upon unionized labor for the provision of some of our services and any work stoppages or labor disturbances could disrupt our business; potential union pension obligations could cause us to incur unplanned liabilities.***

The stagehands at some of our venues and other employees are subject to collective bargaining agreements. Our union agreements typically have a term of three years and thus regularly expire and require negotiation in the ordinary course of our business. Upon the expiration of any of our collective bargaining agreements, however, we may be unable to negotiate new collective bargaining agreements on terms favorable to us, and our business operations may be interrupted as a result of labor disputes or difficulties and delays in the process of renegotiating our collective bargaining agreements. In addition, our business operations at one or more of our facilities may also be interrupted as a result of labor disputes by outside unions attempting to unionize a venue even though we do not have unionized labor at that venue currently. We have also been threatened with picketing from time to time. A work stoppage or picketing at one or more of our owned or operated venues or at our promoted events could have a material adverse effect on our business, financial condition and results of operations. We cannot predict the effect that a potential work stoppage or picketing would have on our business.

We participate in, and make recurrent contributions to, various multiemployer pension plans that cover many of our current and former union employees. Our required recurrent contributions to these plans could unexpectedly increase during the term of a collective bargaining agreement due to ERISA laws that require additional contributions to be made when a pension fund enters into critical status, which may occur for reasons that are beyond our control. In addition, we may be required by law to fulfill our pension withdrawal liability with respect to any multiemployer pension plans from which we may withdraw or partially withdraw. Our potential withdrawal liability will increase if a multiemployer pension plan in which we participate has significant underfunded liabilities. Any unplanned or greater than expected multiemployer pension liabilities could have a material adverse effect on our business, financial condition and results of operations.

### Risks Relating to Our Leverage

***We have a large amount of debt and lease obligations that could restrict our operations and impair our financial condition. The agreements governing our senior secured credit facility and certain of our other indebtedness impose restrictions on us that limit the discretion of management in operating our business and that, in turn, could impair our ability to meet our obligations under our debt.***

The agreements governing our senior secured credit facility and certain of our other indebtedness include restrictive covenants that, among other things, restrict our ability to:

- incur additional debt;
- pay dividends and make distributions;
- make certain investments;
- repurchase our stock and prepay certain indebtedness;
- create liens;
- enter into transactions with affiliates;
- modify the nature of our business;
- enter into sale-leaseback transactions;
- transfer and sell material assets; and
- merge or consolidate.

In addition, our senior secured credit facility includes other restrictions, including requirements to maintain certain financial ratios. Our failure to comply with the terms and covenants of our indebtedness could lead to a default under the terms of the governing documents, which would entitle the lenders to accelerate the indebtedness and declare all amounts owed due and payable.

As of December 31, 2024, our total indebtedness, excluding unamortized debt discounts and debt issuance costs of $53.3 million, was $6.5 billion. Our available borrowing capacity under the revolving portion of our senior secured credit facility at that date was $1.68 billion, with outstanding letters of credit of $20.9 million. We may also incur significant additional indebtedness in the future.

Our substantial indebtedness could have adverse consequences, including:

- making it more difficult for us to satisfy our obligations;
- increasing our vulnerability to adverse economic, regulatory and industry conditions;
- limiting our ability to obtain additional financing for future working capital, capital expenditures, acquisitions and other purposes;
- requiring us to dedicate a substantial portion of our cash flow from operations to fund payments on our debt, thereby reducing funds available for operations and other purposes;
- limiting our flexibility in planning for, or reacting to, changes in our business and the industry in which we operate;
- making us more vulnerable to increases in interest rates; and

- placing us at a competitive disadvantage compared to our competitors that have less debt.

***To service our debt and lease obligations and to fund potential acquisitions, artist and ticketing advances and capital expenditures, we will require a significant amount of cash, which depends on many factors beyond our control.***

Our ability to service our debt and lease obligations and to fund potential acquisitions, artist and ticketing advances and capital expenditures will require a significant amount of cash, which depends on many factors beyond our control. Our ability to make payments on and to refinance our debt will also depend on our ability to generate cash in the future. This is, to an extent, subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond our control.

We cannot provide assurance that our business will generate sufficient cash flow or that future borrowings will be available to us in an amount sufficient to enable us to pay our debt or to fund our other liquidity needs. If our future cash flow from operations and other capital resources is insufficient to pay our obligations as they mature or to fund our liquidity needs, we may be forced to reduce or delay our business activities and capital expenditures, sell assets, obtain additional equity capital or restructure or refinance all or a portion of our debt on or before maturity. In addition, the terms of our existing debt, including our senior secured credit facility, and other future debt may limit our ability to pursue any of these alternatives.

These measures might also be unsuccessful or inadequate in permitting us to meet scheduled debt service or lease obligations. We may be unable to restructure or refinance our obligations and obtain additional debt or equity financing or sell assets on satisfactory terms or at all. Capital markets have been volatile in the recent past; a downturn could negatively impact our ability to access capital should the need arise. As a result, the inability to meet our debt or lease obligations could cause us to default on those obligations. Any such defaults could materially harm our financial condition and liquidity.

See Item 7.   Management's Discussion and Analysis of Financial Condition and Results of Operations   Contractual Obligations and Commitments   Firm Commitments for further discussion.

***We depend on the cash flows of our subsidiaries in order to satisfy our obligations.***

We rely on distributions and loans from our subsidiaries to meet our payment requirements under our obligations. If our subsidiaries are unable to pay dividends or otherwise make payments to us, we may not be able to make debt service payments on our obligations. We conduct substantially all of our operations through our subsidiaries. Our operating cash flows and consequently our ability to service our debt is therefore principally dependent upon our subsidiaries' earnings and their distributions of those earnings to us and may also be dependent upon loans or other payments of funds to us by those subsidiaries. Our subsidiaries are separate legal entities and may have no obligation, contingent or otherwise, to pay any amount due pursuant to our obligations or to make any funds available for that purpose. Our foreign subsidiaries generate a portion of our operating cash flows. Although we do not intend to repatriate these funds from our foreign subsidiaries in order to satisfy payment requirements in the United States, we would be required to accrue and pay United States state income taxes as well as any applicable foreign withholding or transaction taxes on future repatriations. These taxes could be substantial and could have a material adverse effect on our financial condition and results of operations. In addition, the ability of our subsidiaries to provide funds to us may be subject to restrictions under our senior secured credit facility and may be subject to the terms of such subsidiaries' future indebtedness, as well as the availability of sufficient surplus funds under applicable law.

***Conversion of our convertible notes may dilute the ownership interest of existing stockholders and may affect our per share results and the trading price of our common stock.***

The issuance of shares of our common stock upon conversion of our convertible notes may dilute the ownership interests of existing stockholders. Issuances of stock on conversion may also affect our per share results of operations. Any sales in the public market of our common stock issuable upon such conversion could adversely affect prevailing market prices of our common stock.

## ITEM 1B.   UNRESOLVED STAFF COMMENTS

None.

**ITEM 1C.    CYBERSECURITY**

Our Board of Directors (the "Board") is responsible for overseeing our risk management program and cybersecurity is a critical element of this program. The Information Security and Privacy team leads cybersecurity risk management for our business. Effective Cyber Risk Management is foundational to our Information Security and Privacy program and is based on recognized frameworks established by the National Institute of Standards and Technology (NIST). Our Information Security and Privacy Risk Management program includes processes and controls for the business to ensure that cybersecurity risks are identified and responded to promptly. These range from formal processes that are triggered in certain circumstances, to detective controls and technology that we use to identify and manage risks. Information Security and Privacy's Risk Management process is consistent with our Enterprise Risk Management Policy, which describes how we manage risks generally. The Information Security and Privacy team also engages with external consultants to ensure best practices in our Cyber Risk Management.

**Cybersecurity Risk Management and Strategy**

Our cybersecurity risk management and strategy focus on several areas:

• **Risk Identification and Reporting:** We have implemented a comprehensive, cross-functional approach to assessing, identifying, and managing material cybersecurity threats and incidents. The program includes controls and procedures to properly identify, classify, and escalate certain cybersecurity incidents to provide management visibility and obtain an assessment from management as to the public disclosure and reporting of material incidents in a timely manner. The Information Security and Privacy team's responsibilities include:

- Conducting privacy impact assessments;

- Rating cyber risk severity, coordinating remediation, and monitoring cyber risks within our enterprise risk register;

- Cyber threat intelligence functions, including monitoring cybercrime and geopolitical developments;

- Supporting mergers and acquisitions activities, including integration of newly acquired businesses;

- Performing security architecture reviews, both of existing enterprise systems and those of newly acquired organizations;

- Monitoring and ensuring Payment Card Industry Data Security Standard (PCI-DSS) compliance where required across the enterprise; and

- Conduct and supervision of penetration testing.

• **Technical Safeguards:** We have implemented technical safeguards that are designed to protect our information systems from cybersecurity threats, including firewalls, intrusion prevention and detection systems, anti-malware functionality, and access controls, which are evaluated and improved through vulnerability assessments and cybersecurity threat intelligence, as well as outside audits and certifications. The Information Security and Privacy team also manages and carries out logging, and vulnerability and application scanning, to support the identification of cyber risks.

• **Incident Response and Recovery Planning:** We maintain comprehensive incident response, business continuity, and disaster recovery plans designed to guide our response to cybersecurity incidents. We also conduct regular tabletop exercises to test these plans and ensure personnel are familiar with their roles in a response scenario.

• **Third-Party Risk Management (TPRM):** We maintain a comprehensive, risk-based approach to identifying and overseeing material cybersecurity threats presented by third parties, including vendors, service providers, and other external users of our systems, as well as the systems of third parties that could adversely impact our business in the event of a material cybersecurity incident affecting those third-party systems, including any outside auditors or consultants who advise on our cybersecurity systems.

• **Education and Awareness:** We provide regular, mandatory training for all levels of employees regarding cybersecurity threats to equip our employees with effective tools to address cybersecurity threats, and to communicate our evolving information security policies, standards, processes, and practices.

**Governance**

The Board, in coordination with our Global Data Governance Board (GDGB) and the Audit Committee, oversees our risk management program, including the management of cybersecurity threats. The GDGB receives regular presentations and reports on developments in the cybersecurity space, including risk management practices, recent developments, evolving standards, vulnerability assessments, third-party and independent reviews, the threat environment, technological trends, and information security.

The Chief Information Security and Privacy Officer (CISPO) is the risk manager overseeing the organization's information security risk management function. As the Risk Manager, the CISPO is responsible for the administration of the information security risk management program, policy, and procedures. This includes ensuring that risks are properly identified, assessed, managed, and reported as prescribed by the organization. The Risk Manager also has the responsibility of promoting an effective risk management culture through regular training across the organization. The CISPO has direct communication with senior executives regarding cybersecurity risks and works collaboratively with our leadership to respond to and manage the response to cybersecurity incidents. The CISPO has nearly 20 years of legal and data protection experience with a focus on Information Security, Privacy, and Abuse Prevention.

**Material Effects of Cybersecurity Incidents**

Risks from cybersecurity threats, including as a result of any previous cybersecurity incidents, have not materially affected us, including its business strategy, results of operations, or financial condition. Further information regarding cybersecurity risks can be found in Item 1A. Risk Factors - Risks Relating to Information Technology, Cybersecurity and Intellectual Property.

**ITEM 2.    PROPERTIES**

As of December 31, 2024, we own, operate or lease 216 entertainment venues throughout North America and 105 entertainment venues internationally. We have a lease ending June 30, 2030 for our corporate headquarters in Beverly Hills, California, used primarily by our executive group and certain of our domestic operations management staff. We also lease office space and other facilities in 47 countries that support our Concerts, Ticketing and Sponsorship & Advertising segment operations. We believe our venues and facilities are generally well-maintained and in good operating condition and have adequate capacity to meet our current business needs.

Our leases are for varying terms ranging from monthly to multi-year. These leases can typically be for terms of three to 10 years for our office leases and five to 25 years for our venue leases, and many include renewal options. There is no significant concentration of venues under any one lease or subject to negotiation with any one landlord. We believe that an important part of our management activity is to negotiate suitable lease renewals and extensions.

**ITEM 3.    LEGAL PROCEEDINGS**

Information regarding our legal proceedings can be found in Part II   Financial Information   Item 8. Financial Statements and Supplementary Data   Note 8   Commitments and Contingent Liabilities.

**PART II—FINANCIAL INFORMATION**

**ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES**

Our common stock was listed on the New York Stock Exchange under the symbol "LYV" beginning on December 21, 2005. There were 2,515 stockholders of record as of February 13, 2025. This figure does not include an estimate of the indeterminate number of beneficial holders whose shares may be held of record by brokerage firms and clearing agencies.

**Purchase of Equity Securities**

The following table provides information regarding repurchases of our common stock during the quarter ended December 31, 2024.

| Period | Total Number of Shares Purchased [1] | Average Price Paid per Share [1] | Total Number of Shares Purchased as Part of Publicly Announced Program [2] | Maximum Fair Value of Shares that May Yet Be Purchased Under the Program [2] |
|---|---|---|---|---|
| October 2024 | | | | |
| November 2024 | 132,425 | $140.50 | | |
| December 2024 | 2,044 | $135.95 | | |
| | 134,469 | | | |

[1] Represents shares of common stock that employees surrendered as part of the default option to satisfy withholding taxes in connection with the vesting of restricted stock awards under our stock incentive plan. Pursuant to the terms of our stock plan, such shares revert to available shares under the plan.

[2] We do not have a publicly announced program to purchase shares of our common stock. Accordingly, there were no shares purchased as part of a publicly announced program.

**Dividend Policy**

Information regarding our dividend policy can be found in Part II    Financial Information    Item 8.    Financial Statements and Supplementary Data    Note 11    Equity.

**Recent Sales of Unregistered Securities**

None.

**ITEM 6. [RESERVED]**

29

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*You should read the following discussion of our financial condition and results of operations together with the audited consolidated financial statements and notes to the consolidated financial statements included elsewhere in this Annual Report. This discussion contains forward-looking statements that involve risks and uncertainties. The forward-looking statements are not historical facts, but rather are based on current expectations, estimates, assumptions and projections about our industry, business and future financial results. Our actual results could differ materially from the results contemplated by these forward-looking statements due to a number of factors, including those discussed under Item 1A.   Risk Factors and other sections in this Annual Report.*

*The following discussion of our financial condition and results of operations generally discusses 2024 and 2023 items along with year-over-year comparisons between these two years. Discussion of 2022 items and year-over-year comparisons between 2023 and 2022 can be found in Item 7   Management's Discussion and Analysis of Financial Condition and Results of Operations in our 2023 Annual Report on Form 10-K.*

**Executive Overview**

In 2024, we saw demand for the live experience growing across the globe with emerging to superstar acts performing to packed houses across all genres and in venues big and small. After a record 2023 fueled by our highest volume of stadium shows ever, we surpassed last year's revenue results. ███████████████████████████████████████████████ we grew our AOI by double-digits and our underlying businesses thrived in 2024. Our Concerts segment generated over $0.5 billion in AOI for the first time ever, growing by over 50%. We added over 5 million fans and nearly 5,000 additional shows in Concerts, with new venues added to our global footprint and plans to open more in the year ahead.

Our overall revenue increased by $429 million, or 2%, to $23.2 billion as compared to last year. The increase in revenue was $664 million without the impact of changes in foreign exchange rates. Operating income for the year declined by $260 million or 24% ██████████████████████████████████████████ partially offset by stronger performance in our Concerts and Sponsorship segments. The decrease in operating income was $208 million without the impact of changes in foreign exchange rates. Consolidated AOI for the year increased by $265 million, or 14%, to $2.1 billion this year. The increase in AOI was $320 million without the impact of changes in foreign exchange rates.

Our event-related deferred revenue balance increased by $336 million, or 11%, to $3.3 billion as of December 31, 2024 compared to December 31, 2023. This, coupled with current ticket sales for 2025, suggests ongoing strong demand for concerts, making us confident in our continued success in the year ahead.

For the year, we experienced unfavorable foreign currency translation impacts of $235 million on revenues, $52 million on operating income and $55 million on AOI. The majority of the impacts came from Latin American currencies.

All of the segment financial comments below are based on reported foreign currency exchange rates.

Our Concerts segment revenue for the year increased by $283 million, or 2% compared to 2023, from $18.7 billion to $19.0 billion. The growth in revenue was the result of more fans enjoying their favorite artists and spending more money at events to maximize their unique live experiences. Approximately 151 million fans attended our shows in the year, our largest annual fan count ever, compared to approximately 146 million last year, for growth of over 5 million or 4%. The growth was relatively evenly distributed across our global markets with notable strength in the United States, Latin America and Asia-Pacific. Growth in amphitheater, arena and theater & club fan count drove the increase in show attendance. In particular, arena fan count increased by almost 8 million fans to over 50 million fans globally. Some of the larger acts touring globally in the year included Coldplay, Pink, Metallica and Olivia Rodrigo, reflecting the global diversified base of our artists.

Concerts AOI for the year increased by $209 million, or 65%, compared to 2023, from $320 million to $530 million. Our ancillary revenue spending at our United States amphitheater shows was over $44 per fan for the year, growing by nearly $1 over 2023, driven by higher food and beverage spending as well as merchandise and premium offerings. After extensive renovations, our Jones Beach amphitheater re-opened on Long Island and produced double-digit growth on premium seating, concessions and VIP club revenues. Similarly the Estadio GNP stadium (formerly known as Foro Sol) re-opened in Mexico City over the summer, offering fans an elevated concert-going experience with several new VIP lounges and additional points of sale for all fans.

Our Ticketing segment revenue for the year increased by $29 million, or 1%, compared to 2023, from $2.96 billion to $2.99 billion. We sold 331 million fee-bearing tickets in 2024 compared to 329 million tickets last year, essentially flat for the year. GTV for the year was $34.7 billion, down $1 billion, or 3% compared to 2023. Despite some sales headwinds during the year and a tough 2023 comparison with respect to stadium activity, the year ended on an encouraging note with the fourth quarter coming in as our highest quarter ever for transacted ticket sales and GTV. This resulted in a record fourth quarter for Ticketing across all of our key financial metrics    revenue, operating income and AOI.

Ticketing AOI for the year was $1.1 billion, roughly in line with our 2023 results. We signed 22.8 million net new tickets in 2024, of which 14.3 million, or roughly 60%, are from clients outside of North America, highlighting the significance of our international operations and our global expansion opportunity  This gives us confidence that our ticketing platforms  features and functionalities will continue to fuel growth going forward.

Our Sponsorship & Advertising segment revenue for the year increased by $100 million, or 9%, compared to 2023 from $1.1 billion to $1.2 billion. The increase was largely driven by our international divisions with new naming rights and other deals for Estadio GNP in Mexico City, newly acquired festivals in Colombia, additional sponsorable content in Mexico and the timing of the Rock in Rio Brazil and Portugal festivals which play every two years. Sponsorship & Advertising AOI increased by $89 million, or 13%, compared to 2023, from $675 million to $764 million.

We are optimistic about the long-term potential of our Company and are focused on the key elements of our business model: expanding our global platforms to connect artists and fans.

31

**Consolidated Results of Operations**

| | Year Ended December 31, | | | | | % Change 2024 vs 2023 | | % Change 2023 vs 2022 |
| | 2024 | | | 2023 | 2022 | | | |
| | As Reported | Currency Impacts | Constant Currency* | As Revised | As Revised | As Reported | Constant Currency* | As Revised |
| | | | *(in thousands)* | | | | | |
| Revenue | $ 23,155,625 | $ 235,038 | $ 23,390,663 | $ 22,726,317 | $ 16,681,254 | 2% | 3% | 36% |
| Operating expenses: | | | | | | | | |
| Direct operating expenses | 17,328,154 | | | 17,250,530 | 12,347,611 | 0.4% | | 40% |
| Selling, general and administrative expenses | 4,096,424 | | | 3,557,167 | 2,955,884 | 15% | | 20% |
| Depreciation and amortization | 549,923 | | | 516,797 | 449,976 | 6% | | 15% |
| Gain on disposal of operating assets | (11,015) | | | (13,927) | (32,082) | (21)% | | (57)% |
| Corporate expenses | 367,629 | | | 330,817 | 237,834 | 11% | | 39% |
| Operating income | 824,510 | 52,365 | 876,875 | 1,084,933 | 722,031 | (24)% | (19)% | 50% |
| Operating margin | 3.6% | | 3.7% | 4.8% | 4.3% | | | |
| Interest expense | 325,974 | | | 350,244 | 278,483 | | | |
| Loss on extinguishment of debt | 2,563 | | | 18,504 | | | | |
| Interest income | (156,254) | | | (237,818) | (77,620) | | | |
| Equity in losses (earnings) of nonconsolidated affiliates | 16,675 | | | 5,455 | (10,571) | | | |
| Other expense (income), net | (103,874) | | | 35,274 | 41,215 | | | |
| Income before income taxes | 739,426 | | | 913,274 | 490,524 | | | |
| Income tax expense (benefit) | (391,698) | | | 209,476 | 115,941 | | | |
| Net income | 1,131,124 | | | 703,798 | 374,583 | | | |
| Net income attributable to noncontrolling interests | 234,837 | | | 146,905 | 108,143 | | | |
| Net income attributable to common stockholders of Live Nation | $ 896,287 | | | $ 556,893 | $ 266,440 | | | |

---

\*   Constant currency is a non-GAAP financial measure. We calculate currency impacts as the difference between current period activity translated using the current period's currency exchange rates and the comparable prior period's currency exchange rates. We present constant currency information to provide a framework for assessing how our underlying businesses performed excluding the effect of foreign currency rate fluctuations.

*Revenue*

Revenue increased $429.3 million during the year ended December 31, 2024 as compared to the prior year driven by increased revenue in our Concerts segment of $283.4 million, Ticketing segment of $29.2 million and Sponsorship & Advertising segment of $99.8 million as further discussed within each segment's operating results.

*Operating income*

Operating income decreased $260.4 million during the year ended December 31, 2024 as compared to the prior year primarily driven by decreased operating income in our Concerts segment of $313.2 million, ███████████████████████████████████████, and Ticketing segment of $20.7 million. These decreases in operating income were partially offset by increased operating income in our Sponsorship & Advertising segment of $99.2 million as further discussed within each segment's operating results.

*Interest expense*

Interest expense decreased $24.3 million during the year ended December 31, 2024 as compared to the prior year primarily driven by lower debt balance throughout 2024 as compared to 2023.

*Interest income*

Interest income decreased $81.6 million during the year ended December 31, 2024 as compared to the prior year primarily attributed to lower rate of return on our cash and cash equivalents in 2024 and a decrease in our cash and cash equivalents.

*Other expense (income), net*

For the year ended December 31, 2024, we had $103.9 million of other income, net, which primarily includes mark to market adjustments for certain investments in nonconsolidated affiliates of $99.2 million. For the year ended December 31, 2023, we had $35.3 million of other expense, net, which includes net foreign exchange rate losses of $74.5 million partially offset by mark to market adjustments for certain investments in nonconsolidated affiliates of $46.5 million. The net foreign exchange rate gains and losses result primarily from revaluation of certain foreign currency denominated net assets held internationally.

*Income taxes*

For the year ended December 31, 2024, we had a net tax benefit of $391.7 million on income before income taxes of $739.4 million compared to a net tax expense of $209.5 million on income before income taxes of $913.3 million for 2023. In 2024, the net income tax benefit consisted of $518.3 million of tax benefit related to United States federal income taxes, $127.0 million of tax expense related to foreign entities and $0.4 million of tax benefit related to state and local income taxes. The net decrease in tax expense of $601.2 million is related to a valuation allowance release, due to changes in judgment regarding the realizability of certain deferred tax assets.

*Net income attributable to noncontrolling interests*

Net income attributable to noncontrolling interests increased $87.9 million during the year ended December 31, 2024 as compared to the prior year primarily due to higher operating results from certain concert businesses during 2024 as compared to the prior year.

**Non-GAAP Measures**

*Consolidated AOI*

Consolidated AOI is a non-GAAP financial measure that we define as consolidated operating income (loss) before certain acquisition expenses (including ongoing legal costs stemming from the Ticketmaster merger, changes in the fair value of accrued acquisition-related contingent consideration obligations, and acquisition-related severance and compensation), amortization of non-recoupable ticketing contract advances, depreciation and amortization (including goodwill impairment), loss (gain) on disposal of operating assets, and stock-based compensation expense. We also exclude from AOI the impact of estimated or realized liabilities for settlements or damages arising out of the Astroworld matter that exceed our estimated insurance recovery, due to the significant and non-recurring nature of the matter. Ongoing legal costs associated with defense of these claims, such as attorney fees, are not excluded from AOI.

We use AOI to evaluate the performance of our operating segments. We believe that information about AOI assists investors by allowing them to evaluate changes in the operating results of our portfolio of businesses separate from non-operational factors that affect net income (loss), thus providing insights into both operations and the other factors that affect reported results. AOI is not calculated or presented in accordance with GAAP. A limitation of the use of AOI as a performance measure is that it does not reflect the periodic costs of certain amortizing assets used in generating revenue in our business. Accordingly, AOI should be considered in addition to, and not as a substitute for, operating income (loss), net income (loss), and other measures of financial performance reported in accordance with GAAP. Furthermore, this measure may vary among other companies; thus, AOI as presented herein may not be comparable to similarly titled measures of other companies.

The following table sets forth the reconciliation of consolidated operating income to consolidated AOI for the years ended December 31, 2024, 2023 and 2022:

| | 2024 | 2023 As Revised | 2022 As Revised |
|---|---|---|---|
| | | *(in thousands)* | |
| Operating income [1] | $ 824,510 | $ 1,084,933 | $ 722,031 |
| Acquisition expenses | 128,513 | 93,664 | 68,078 |
| Amortization of non-recoupable ticketing contract advance | 88,717 | 83,693 | 79,043 |
| Depreciation and amortization | 549,923 | 516,797 | 449,976 |
| Gain on sale of operating assets | (11,015) | (13,927) | (32,082) |
| ▮▮▮▮▮▮▮ | 454,902 | | |
| Stock-based compensation expense | 110,348 | 115,959 | 110,049 |
| Consolidated AOI [1] | $ 2,145,898 | $ 1,881,119 | $ 1,397,095 |

[1]  For the years ended December 31, 2023 and December 31, 2022, the revision increased our operating income and consolidated AOI by $18.7 million for 2023 and decreased our operating income and consolidated AOI by $10.1 million for 2022, respectively. See further discussion in Part II   Financial Information   Item 8.   Financial Statements and Supplementary Data   Note 2   Correction of Errors in Previously Reported Consolidated Financial Statements.

34

**Segment Overview**

Information regarding our use of AOI to evaluate the performance of our operating segments can be found in Part II   Financial Information   Item 8.   Financial Statements and Supplementary Data   Note 12   Segments and Revenue Recognition.

*Concerts*

Revenue and related costs for events are generally deferred and recognized when the event occurs. All advertising costs incurred during the year for shows in future years are expensed at the end of the year. If a current year event is rescheduled into a future year, all advertising costs incurred to date are expensed in the period when the event is rescheduled.

Concerts direct operating expenses include artist fees, event production costs, show-related marketing and advertising expenses, along with other costs.

To judge the health of our Concerts segment, we primarily monitor the number of confirmed events and fan attendance in our network of operated and third-party venues, talent fees, average paid attendance, market ticket pricing, advance ticket sales and the number of major artist clients under management. In addition, at our operated venues and festivals, we monitor ancillary revenue per fan and premium ticket sales. For business that is conducted in foreign markets, we also compare the operating results from our foreign operations to prior periods without the impact of changes in foreign exchange rates.

*Ticketing*

Revenue related to ticketing service charges is recognized when the ticket is sold for our third-party clients. For our own events, where our concert promoters or venues control ticketing, revenue is deferred and recognized when the event occurs. GTV represents the total amount of the transaction related to a ticket sale and includes the face value of the ticket as well as the service charge. We use GTV to evaluate changes in ticket fee revenue that are driven by the pricing of our service charges.

Ticketing direct operating expenses include call center costs and credit card fees, along with other costs.

To judge the health of our Ticketing segment, we primarily review the GTV and the number of tickets sold through our primary and secondary ticketing operations, the number of clients renewed or added and the average royalty rate paid to clients who use our ticketing services. In addition, we review the number of visits to our websites, cost of customer acquisition, the purchase conversion rate, and the overall number of customers in our database. For business that is conducted in foreign markets, we also compare the operating results from our foreign operations to prior periods without the impact of changes in foreign exchange rates.

*Sponsorship & Advertising*

Revenue related to sponsorship and advertising programs is recognized over the term of the agreement or operating season as the benefits are provided to the sponsor unless the revenue is associated with a specific event, in which case it is recognized when the event occurs.

Sponsorship & Advertising direct operating expenses include fulfillment costs related to our sponsorship programs, along with other costs.

To judge the health of our Sponsorship & Advertising segment, we primarily review the revenue generated through sponsorship arrangements and online advertising, and the percentage of expected revenue under contract. For business that is conducted in foreign markets, we also compare the operating results from our foreign operations to prior periods without the impact of changes in foreign exchange rates.

35

**Key Operating Metrics**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2024** | **2023** | **2022** |
| | *(in thousands except estimated events)* | | |
| **Concerts** [1] | | | |
| Estimated events: | | | |
| North America [2] | 36,673 | 33,629 | 29,170 |
| International | 18,014 | 16,430 | 14,475 |
| Total estimated events | 54,687 | 50,059 | 43,645 |
| Estimated fans: | | | |
| North America [2] | 86,563 | 81,252 | 69,693 |
| International | 64,486 | 64,538 | 51,459 |
| Total estimated fans | 151,049 | 145,790 | 121,152 |
| **Ticketing** [3] | | | |
| Estimated number of fee-bearing tickets sold | 330,567 | 329,116 | 280,862 |
| Estimated number of non-fee-bearing tickets sold | 307,164 | 291,295 | 269,814 |
| Total estimated tickets sold | 637,731 | 620,411 | 550,676 |

---

(1)  Events generally represent a single performance by an artist. Fans generally represent the number of people who attend an event. Festivals are counted as one event in the quarter in which the festival begins, but the number of fans is based on the days the fans were present at the festival and thus can be reported across multiple quarters. Events and fan attendance metrics are estimated each quarter.

(2)  North America refers to our events and fans within the United States and Canada.

(3)  The fee-bearing tickets estimated above include primary and secondary tickets that are sold using our Ticketmaster systems or that we issue through affiliates. This metric includes primary tickets sold during the year regardless of event timing, except for our own events where our concert promoters or venues control ticketing which are reported when the events occur. The non-fee-bearing tickets estimated above include primary tickets sold using our Ticketmaster systems, through season seat packages and our venue clients' box offices, along with tickets sold on our "do it yourself" platform. These ticketing metrics are net of any refunds requested and any cancellations that occurred during the period and up to the time of reporting of these consolidated financial statements.

**Segment Operating Results**

**Concerts**

Our Concerts segment operating results were, and discussions of significant variances are, as follows:

| | | Year Ended December 31, | | | | | | % Change 2024 vs 2023 | % Change 2023 vs 2022 |
|---|---|---|---|---|---|---|---|---|---|
| | | 2024 | | 2023 | | 2022 | | | |
| | | | | As Revised | | As Revised | | | As Revised |
| | | | | (in thousands) | | | | | |
| Revenue [1] | $ | 19,024,302 | $ | 18,740,913 | $ | 13,494,100 | | 2% | 39% |
| Direct operating expenses [2] | | 16,041,350 | | 16,001,769 | | 11,334,178 | | 0.2% | 41% |
| Selling, general and administrative expenses | | 3,005,885 | | 2,497,983 | | 2,083,637 | | 20% | 20% |
| Depreciation and amortization | | 370,108 | | 320,680 | | 260,238 | | 15% | 23% |
| Gain on disposal of operating assets | | (11,094) | | (10,804) | | (30,810) | | 3% | (65)% |
| Operating loss [3] | $ | (381,947) | $ | (68,715) | $ | (153,143) | | * | 55% |
| Operating margin | | (2.0)% | | (0.4)% | | (1.1)% | | | |
| AOI [3] | $ | 529,748 | $ | 320,397 | $ | 174,840 | | 65% | 83% |
| AOI margin | | 2.8% | | 1.7% | | 1.3% | | | |

\*      Percentages are not meaningful.

[1]      See further discussion in Part II   Financial Information   Item 8.   Financial Statements and Supplementary Data   Note 2   Correction of Errors in Previously Reported Consolidated Financial Statements. For the year ended December 31, 2023, the revision decreased revenue by $22.8 million.

[2]      For the years ended December 31, 2023 and December 31, 2022, the revision decreased direct operating expenses by $17.7 million and $5.1 million, respectively.

[3]      For the years ended December 31, 2023 and December 31, 2022, the revision decreased operating income and AOI by $5.1 million as well as increased operating income and AOI by $5.1 million, respectively.

*Revenue*

Concerts revenue increased $283.4 million during the year ended December 31, 2024 as compared to the prior year attributable to acquisitions and new venues of $335.1 million as well as increased show count and fan growth. In particular, higher arena and amphitheater shows and related fan count partially offset by fewer stadium shows contributed to the increase in revenue.

*Operating results*

Concerts AOI increased $209.4 million during the year ended December 31, 2024 as compared to the prior year primarily driven by an increase in revenues from the number of shows discussed above partially offset by increased selling general and administrative expenses related to additional compensation expenses fueled by growth from our venue footprint and additional global activity.

**Ticketing**

Our Ticketing segment operating results were, and discussions of significant variances are, as follows:

| | | Year Ended December 31, | | | | | | % Change 2024 vs 2023 | % Change 2023 vs 2022 |
|---|---|---|---|---|---|---|---|---|---|
| | | 2024 | | 2023 | | 2022 | | | |
| | | | | As Revised | | As Revised | | | As Revised |
| | | | | (in thousands) | | | | | |
| Revenue | $ | 2,988,685 | $ | 2,959,477 | $ | 2,238,618 | | 1% | 32% |
| Direct operating expenses [1] | | 1,089,608 | | 1,067,937 | | 809,173 | | 2% | 32% |
| Selling, general and administrative expenses | | 888,198 | | 855,070 | | 711,574 | | 4% | 20% |
| Depreciation and amortization | | 100,329 | | 105,256 | | 109,778 | | (5)% | (4)% |
| Loss (gain) on disposal of operating assets | | 41 | | 39 | | (197) | | 5% | * |
| Operating income [2] | $ | 910,509 | $ | 931,175 | $ | 608,290 | | (2)% | 53% |
| Operating margin | | 30.5% | | 31.5% | | 27.2% | | | |
| AOI [2] | $ | 1,123,588 | $ | 1,140,133 | $ | 812,714 | | (1)% | 40% |
| AOI margin | | 37.6% | | 38.5% | | 36.3% | | | |

---

\*    Percentages are not meaningful.

[1]    See further discussion in Part II    Financial Information    Item 8.    Financial Statements and Supplementary Data    Note 2    Correction of Errors in Previously Reported Consolidated Financial Statements. For the years ended December 31, 2023 and December 31, 2022, the revision decreased direct operating expenses by $23.8 million and increased direct operating expenses by $15.2 million, respectively.

[2]    For the years ended December 31, 2023 and December 31, 2022, the revision increased operating income and AOI by $23.8 million as well as decreased operating income and AOI by $15.2 million, respectively.

*Revenue*

Ticketing revenue increased $29.2 million during the year ended December 31, 2024 as compared to the prior year. Ticket sales and gross transaction value for concerts, sporting and family & arts events were largely in line with 2023. For concert events, higher sales for arena and amphitheater shows were mostly offset by a reduction in stadium shows, coming off a record year of stadium activity in 2023.

*Operating results*

Ticketing AOI decreased $16.5 million and operating income decreased $20.7 million during the year ended December 31, 2024 as compared to the prior year primarily driven by higher selling, general and administrative expenses attributable to improving the user experience and reducing friction during high demand on-sales.

**Sponsorship & Advertising**

Our Sponsorship & Advertising segment operating results were, and discussions of significant variances are, as follows:

| | | Year Ended December 31, | | | % Change 2024 vs 2023 | % Change 2023 vs 2022 |
|---|---|---|---|---|---|---|
| | 2024 | | 2023 | 2022 | | |
| | | | (in thousands) | | | |
| Revenue | $ 1,195,019 | $ | 1,095,217 | $ 968,146 | 9% | 13% |
| Direct operating expenses | 242,536 | | 245,297 | 225,724 | (1)% | 9% |
| Selling, general and administrative expenses | 197,565 | | 184,158 | 155,305 | 7% | 19% |
| Depreciation and amortization | 62,934 | | 72,969 | 60,318 | (14)% | 21% |
| Loss on sale of operating assets | 38 | | | | * | * |
| Operating income | $ 691,946 | $ | 592,793 | $ 526,799 | 17% | 13% |
| Operating margin | 57.9% | | 54.1% | 54.4% | | |
| AOI | $ 763,777 | $ | 675,137 | $ 591,972 | 13% | 14% |
| AOI margin | 63.9% | | 61.6% | 61.1% | | |

---

* Percentages are not meaningful.

*Revenue*

Sponsorship & Advertising revenue increased $99.8 million during the year ended December 31, 2024 as compared to the prior year primarily driven by increased sponsorship activity from our international markets and onsite sponsorships.

*Operating results*

Sponsorship & Advertising AOI increased $88.6 million and operating income increased $99.2 million during the year ended December 31, 2024 as compared to the prior year. These increases were primarily due to increased revenues from sponsorship activity discussed above.

39

**Liquidity and Capital Resources**

Our cash is centrally managed on a worldwide basis. Our primary short-term liquidity needs are to fund general working capital requirements, capital expenditures and debt service requirements while our long-term liquidity needs are primarily related to acquisitions and debt repayment. Our primary sources of funds for our short-term liquidity needs will be cash flows from operations and borrowings under our amended senior secured credit facility, while our long-term sources of funds will be from cash flows from operations, long-term bank borrowings and other debt or equity financings. We may from time to time engage in open market purchases of our outstanding debt securities or redeem or otherwise repay such debt.

Our balance sheet reflects cash and cash equivalents of $6.1 billion at December 31, 2024 and $6.2 billion at December 31, 2023. Included in the December 31, 2024 and 2023 cash and cash equivalents balances are $1.6 billion and $1.5 billion, respectively, of cash received that includes the face value of tickets sold on behalf of our ticketing clients and their share of service charges, which we refer to as client cash. We generally do not utilize client cash for our own financing or investing activities as the amounts are payable to clients on a regular basis. Our foreign subsidiaries held approximately $3.3 billion in cash and cash equivalents, excluding client cash, at December 31, 2024. We generally do not repatriate these funds, but if we did, we would need to accrue and pay United States state income taxes as well as any applicable foreign withholding or transaction taxes on future repatriations.

We may from time to time enter into borrowings under our revolving credit facility. If the original maturity of these borrowings is 90 days or less, we present the borrowings and subsequent repayments on a net basis in the statement of cash flows to better represent our financing activities. Our balance sheet reflects total net debt of $6.4 billion and $6.6 billion, respectively, at December 31, 2024 and December 31, 2023. Our weighted-average cost of debt, excluding unamortized debt discounts and debt issuance costs on our term loans and notes, was 4.4% at December 31, 2024, with approximately 93% of our debt at fixed rates. Our weighted-average cost of debt for short-term borrowings outstanding at December 31, 2024, excluding unamortized debt discounts and debt issuance costs on our term loans and notes, was 5.0%.

Our cash and cash equivalents are held in accounts managed by third-party financial institutions and consist of cash in our operating accounts and invested cash. Cash held in non-interest-bearing and interest-bearing operating accounts in many cases exceeds the Federal Deposit Insurance Corporation insurance limits. The invested cash is in interest-bearing funds consisting primarily of bank deposits and money market funds. While we monitor cash and cash equivalents balances in our operating accounts on a regular basis and adjust the balances as appropriate, these balances could be impacted if the underlying financial institutions fail. To date, we have experienced no loss or lack of access to our cash and cash equivalents; however, we can provide no assurances that access to our cash and cash equivalents will not be impacted by adverse conditions in the financial markets.

For our Concerts segment, we often receive cash related to ticket revenue in advance of the event, which is recorded in deferred revenue until the event occurs. In the United States, this cash is largely associated with events in our owned or operated venues, notably amphitheaters, festivals, theaters and clubs. Internationally, this cash is from a combination of both events in our owned or operated venues, as well as events in third-party venues associated with our promoter's share of tickets in allocation markets. With the exception of some upfront costs and artist advances, which are recorded in prepaid expenses until the event occurs, we pay the majority of event-related expenses at or after the event. Artists are paid when the event occurs under one of several different formulas, which may include fixed guarantees and/or a percentage of ticket sales or event profits, net of any advance they have received. When an event is cancelled, any cash held in deferred revenue is reclassified to accrued expenses as those funds are typically refunded to the fan within 30 days of event cancellation  When a show is rescheduled, fans have the ability to request a refund if they do not want to attend the event on the new date, although historically we have had low levels of refund requests for rescheduled events.

We view our available cash as cash and cash equivalents, less ticketing-related client cash, less event-related deferred revenue, less accrued expenses due to artists and cash collected on behalf of others, plus event-related prepaid expenses. This is essentially our cash available to, among other things, repay debt balances, make acquisitions, and finance capital expenditures.

Our intra-year cash fluctuations are impacted by the seasonality of our various businesses. Examples of seasonal effects include our Concerts segment, which reports the majority of its revenue in the second and third quarters. Cash inflows and outflows depend on the timing of event-related payments but the majority of the inflows generally occur prior to the event. See " Seasonality" below. We believe that we have sufficient financial flexibility to fund these fluctuations and to access the global capital markets on satisfactory terms and in adequate amounts, although there can be no assurance that this will be the case, and capital could be less accessible and/or more costly given current economic conditions. We expect cash flows from operations and borrowings under our amended senior secured credit facility, along with other financing alternatives, to satisfy working capital requirements, capital expenditures and debt service requirements for at least the succeeding year. We may need to incur additional debt or issue equity to make other strategic acquisitions or investments. There can be no assurance that such financing will be available to us on acceptable terms or at all. We may make significant acquisitions in the near term, subject to limitations imposed by our financing agreements and market conditions.

40

The lenders under our revolving loans and counterparty to our interest rate hedge agreement consists of banks and other third-party financial institutions. While we currently have no indications or expectations that such lenders will be unable to fund their commitments as required, we can provide no assurances that future funding availability will not be impacted by adverse conditions in the financial markets. Should an individual lender default on its obligations, the remaining lenders would not be required to fund the shortfall, resulting in a reduction in the total amount available to us for future borrowings, but would remain obligated to fund their own commitments. Should the counterparty to our interest rate hedge agreement default on its obligation, we could experience higher interest rate volatility during the period of any such default.

**Sources of Cash**

In December 2024, we issued $1.1 billion principal amount of 2.875% convertible senior notes due 2030. In conjunction with this issuance, we used the net proceeds to repay $585.0 million outstanding amounts under our senior secured revolving credit facility, to repurchase $316.0 million aggregate principal amount of the 2.0% convertible senior notes due 2025 and related repurchase premiums, fees and accrued interest of $98.0 million, paid debt issuance costs of $18.1 million, with any remaining proceeds available for general corporate purposes.

In November 2024, we amended our senior secured credit facility and added a new venue expansion revolving credit facility of $400.0 million, which resulted in a total available revolving borrowing capacity of $1.7 billion.

During the three months ended March 31, 2024, we repaid $370.0 million outstanding amounts under our senior secured revolving credit facility that had been outstanding as of December 31, 2023. No material gain or loss was recorded as a result of this repayment.

In November 2023, we amended our senior secured credit facility to include a $1.3 billion revolving credit facility in addition to the existing $950.0 million term loan B facility. The $1.3 billion revolving credit facility refinanced our existing $630.0 million revolving credit facilities and we drew down $370.0 million at closing to repay in full our outstanding $367.5 million delayed draw term A loan facility and related accrued interest and fees. The delayed draw term A loan facility was permanently retired upon being repaid in full.

In February 2023, we amended our senior secured credit facility. The amendments provides for, among other things: (i) replacement of the benchmark reference rate of the Eurodollar Rate (as defined in the Credit Agreement) with the Term SOFR Rate for borrowings denominated in United States Dollars and for each Alternative Currency (as defined in the Credit Agreement), a corresponding reference rate, as set forth in the Amended Credit Agreement, (ii) deletion of the provisions regarding Canadian bankers' acceptances, and (iii) the addition of our ability to draw letters of credit in Canadian Dollars.

In January 2023, we issued $1.0 billion principal amount of 3.125% convertible senior notes due 2029. In conjunction with this issuance, we used approximately $485.8 million of the net proceeds to repurchase $440.0 million aggregate principal amount of the 2.5% convertible senior notes due 2023, entered into capped call transactions at a cost of $75.5 million, paid debt issuance costs of $15.0 million, with any remaining proceeds available for general corporate purposes.

In December 2022, we entered into a $126.7 million Euro denominated loan due in 2024 with a floating interest rate of three month Euribor plus 3.0% per annum related to an asset acquisition in Europe. In December 2024, we extended the maturity of the Euro denominated loan to December 2025.

### Debt Instruments

Information regarding our various debt instruments can be found in Part II    Financial Information    Item 8.    Financial Statements and Supplementary Data    Note 5    Long-Term Debt.

### Debt Covenants

Information regarding our debt covenants can be found in Part II    Financial Information    Item 8.    Financial Statements and Supplementary Data    Note 5    Long-Term Debt.

### Subsequent Event

On February 18, 2025, we utilized $84.8 million of our existing cash balance to repay the remaining aggregate principal amount of the 2.0% convertible senior notes due February 2025 plus accrued interest and we issued 182,560 shares of common stock to the convertible holders.

**Uses of Cash**

*Acquisitions*

During 2024, we completed various acquisitions that resulted in cash paid, net of cash acquired, of $98.3 million.

*Capital Expenditures*

Venue and ticketing operations require ongoing investment in our existing venues and ticketing systems to address fan and artist expectations, technological industry advances and various federal, state and/or local regulations.

We categorize capital outlays between revenue generating capital expenditures and maintenance capital expenditures. Revenue generating capital expenditures are primarily focused on our global venue expansion strategy as we connect more artists to their global fan base and major renovations to buildings to enhance the fan experience and drive improvements in our hospitality efforts including onsite spending and premium experiences. In addition, in Ticketing, we continue to develop new ticketing tools and technology enhancements. Revenue generating capital expenditures can also include smaller projects whose purpose is to increase revenue and/or improve operating income. Maintenance capital expenditures are associated with the renewal and improvement of existing venues and technology systems, web development and administrative offices. Capital expenditures typically increase during periods when our venues are not in operation since that is the time that such improvements can be completed.

Our capital expenditures, including accruals for amounts incurred but not yet paid for, but net of expenditures funded by outside parties such as landlords and noncontrolling interest partners or expenditures funded by insurance proceeds, consisted of the following:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | | 2024 | | 2023 | | 2022 |
| | | | | (in thousands) | | |
| Revenue generating capital expenditures | $ | 499,220 | $ | 321,885 | $ | 237,603 |
| Maintenance capital expenditures | | 133,411 | | 131,866 | | 126,957 |
| Total capital expenditures | $ | 632,631 | $ | 453,751 | $ | 364,560 |

For the years ended December 31, 2024, 2023 and 2022, $5.0 million, $15.0 million and $12.4 million, respectively, of insurance proceeds and landlord or noncontrolling interest partner reimbursements have been excluded from capital expenditures in the table above.

Revenue generating capital expenditures for 2024 increased from the same period of the prior year primarily due to enhancements at our theaters and amphitheaters in the United States as well as a stadium in Mexico.

We expect capital expenditures to be approximately $900 million to $1.0 billion for the year ending December 31, 2025 with approximately 85% dedicated to revenue generating projects, including $700 million to $800 million of spend relating to our venue expansion and enhancement plans. Some of the more significant projects in 2025 include an extensive renovation of an arena in Hamilton, Ontario in Canada and the new Riverside Amphitheater outside of Kansas City, Missouri which will open in 2026. In the third quarter of 2025, our new stadium in Bogota, Colombia will open, with capacity for 40,000 fans, further strengthening our presence in Latin America. Approximately $250 million of our capital expenditure estimate is being funded outside our cash flow by third party equity partners, sponsors, pre-selling certain premium rights and project-based debt.

**Cash Flows**

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | | 2024 | | 2023 | | 2022 |
| | | | | As Revised | | As Revised |
| | | | | (in thousands) | | |
| Cash provided by (used in): | | | | | | |
| Operating activities | $ | 1,725,175 | $ | 1,362,974 | $ | 1,835,047 |
| Investing activities | $ | (854,281) | $ | (695,805) | $ | (784,691) |
| Financing activities | $ | (658,550) | $ | (87,281) | $ | (143,340) |

42

### Operating Activities

Cash provided by operating activities increased $362.2 million for the year ended December 31, 2024 as compared to the prior year primarily due to an overall increase in net income combined with changes in operating assets and liabilities partially offset by higher deferred income taxes, lower provision for uncollectible accounts receivable, changes in fair value of contingent considerations from certain acquisitions and higher gains on mark-to-market of investments in nonconsolidated affiliates during 2024.

### Investing Activities

Cash used in investing activities increased $158.5 million for the year ended December 31, 2024 as compared to the prior year primarily due to higher purchases of property, plant and equipment in 2024 for revenue generating capital expenditures and cash paid for acquisitions, net of cash acquired, which were partially offset by lower advances in notes receivable and higher collections of notes receivable due to timing. See " Uses of Cash" above for further discussion.

### Financing Activities

Cash used in financing activities increased $571.3 million for the year ended December 31, 2024 as compared to the prior year primarily due to higher payments of our long-term debt as a result of the repayment of outstanding amounts under our senior secured revolving credit facility, repayment of the principal amount on our 4.875% senior notes and the repurchase of a portion of our 2.0% convertible senior notes. These repayments were partially offset by higher proceeds of debt in 2024 from the issuance of our 2.875% convertible senior notes and draw down from our senior secured revolving credit facility as compared to 2023. See " Sources of Cash" above for further discussion.

## Contractual Obligations and Commitments

### Firm Commitments

We have future cash obligations for our debt obligations and operating lease liabilities. We lease office space, certain equipment and many of the venues used in our concert operations under long-term operating leases. Some of our lease agreements contain renewal options and annual rental escalation clauses (generally tied to the consumer price index), as well as provisions for our payment of utilities and maintenance. Information regarding our scheduled maturities of our outstanding debt obligations (excluding unamortized debt discounts and issuance costs) and operating lease liabilities can be found in Part II  Financial Information  Item 8.  Financial Statements and Supplementary Data  Note 5  Long-Term Debt and  Note 4  Leases, respectively.

We also have minimum payments associated with non-cancelable contracts related to our operations, such as artist guarantees and client ticketing agreements. As part of our ongoing capital projects, we will enter into construction-related commitments for future capital expenditure work. Information regarding our minimum payments for non-cancelable contracts and capital expenditures commitments can be found in Part II  Financial Information  Item 8.  Financial Statements and Supplementary Data  Note 8  Commitments and Contingent Liabilities as of December 31, 2024 and thus do not represent all expected expenditures for those periods.

The estimated interest payments, and expected payments of contingent and deferred consideration liabilities as of December 31, 2024 are as follows:

| | Total | | 2025 | | 2026 | | 2027 | | 2028 | | 2029 | | Thereafter |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | **Payments Due by Period** | | | | | | |
| | | | | | | | *(in thousands)* | | | | | | |
| Estimated interest payments | $ | 801,532 | $ | 288,800 | $ | 255,401 | $ | 149,741 | $ | 66,325 | $ | 34,662 | $ | 6,603 |
| Contingent and deferred consideration | | 61,531 | | 40,764 | | 8,211 | | 6,345 | | 368 | | 365 | | 5,478 |
| Total | $ | 863,063 | $ | 329,564 | $ | 263,612 | $ | 156,086 | $ | 66,693 | $ | 35,027 | $ | 12,081 |

### Guarantees of Third-Party Obligations

As of December 31, 2024 and 2023, we guaranteed the debt of third parties of approximately $19.4 million and $19.4 million, respectively, primarily related to maximum credit limits on employee and tour-related credit cards and obligations under a venue management agreement.

## Seasonality

Information regarding the seasonality of our business can be found in Part II  Financial Information  Item 8.  Financial Statements and Supplementary Data  Note 1  The Company and Summary of Significant Accounting Policies.

43

**Market Risk**

We are exposed to market risks arising from changes in market rates and prices, including movements in foreign currency exchange rates and interest rates.

*Foreign Currency Risk*

We have operations in countries throughout the world. The financial results of our foreign operations are measured in their local currencies. Our foreign subsidiaries also carry certain net assets or liabilities that are denominated in a currency other than that subsidiary's functional currency. As a result, our financial results could be affected by factors such as changes in foreign currency exchange rates or weak economic conditions in the foreign markets in which we have operations. We operate in certain countries that are hyper-inflationary, for example Argentina, however the impact of these currencies did not have a material impact on our statement of operations for the year ended December 31, 2024. Our foreign operations reported an operating income of $744.4 million for the year ended December 31, 2024. We estimate that a 10% change in the value of the United States dollar relative to foreign currencies would change our operating income for the year ended December 31, 2024 by $74.4 million. As of December 31, 2024, our most significant foreign exchange exposure included the Euro, British Pound, Australian Dollar, Canadian Dollar and Mexican Peso. This analysis does not consider the implication such currency fluctuations could have on the overall economic conditions of the United States or other foreign countries in which we operate or on the results of operations of our foreign entities. In addition, the reported carrying value of our assets and liabilities, including the total cash and cash equivalents held by our foreign operations, will also be affected by changes in foreign currency exchange rates.

We primarily use forward currency contracts, in addition to options, to reduce our exposure to foreign currency risk associated with short-term artist fee commitments. At December 31, 2024, we had forward currency contracts outstanding with an aggregate notional amount of $283.1 million.

*Interest Rate Risk*

Our market risk is also affected by changes in interest rates. We had $6.5 billion of total debt, excluding unamortized debt discounts and issuance costs, outstanding as of December 31, 2024. Of the total amount, we had $6.0 billion of fixed-rate debt and $457.6 million of floating-rate debt.

Based on the amount of our floating-rate debt as of December 31, 2024, each 25-basis point increase or decrease in interest rates would increase or decrease our annual interest expense and cash outlay by approximately $1.1 million. This potential increase or decrease is based on the simplified assumption that the level of floating-rate debt remains constant with an immediate across-the-board increase or decrease as of December 31, 2024 with no subsequent change in rates for the remainder of the period.

In January 2020, we entered into an interest rate swap agreement that is designated as a cash flow hedge for accounting purposes to effectively convert a portion of our floating-rate debt to a fixed-rate basis. The swap agreement expires in October 2026, has a notional amount of $500 million and ensures that a portion of our floating-rate debt does not exceed 3.445%.

**Recent Accounting Pronouncements**

Information regarding recently issued and adopted accounting pronouncements can be found in Item 8.    Financial Statements and Supplementary Data    Note 1    The Company and Summary of Significant Accounting Policies.

44

**Critical Accounting Policies and Estimates**

The preparation of our financial statements in conformity with GAAP requires management to make estimates, judgments and assumptions that affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities at the date of the financial statements and the reported amount of revenue and expenses during the reporting period. On an ongoing basis, we evaluate our estimates that are based on historical experience and on various other assumptions that are believed to be reasonable under the circumstances. The result of these evaluations forms the basis for making judgments about the carrying values of assets and liabilities and the reported amount of revenue and expenses that are not readily apparent from other sources. Because future events and their effects cannot be determined with certainty, actual results could differ from our assumptions and estimates, and such difference could be material. Management believes that the following accounting estimates are the most critical to aid in fully understanding and evaluating our reported financial results, and they require management's most difficult, subjective or complex judgments, resulting from the need to make estimates about the effect of matters that are inherently uncertain. The following narrative describes these critical accounting estimates, the judgments and assumptions and the effect if actual results differ from these assumptions where applicable.

*Consolidation*

Our consolidated financial statements include all of our accounts, including our majority owned and controlled subsidiaries and VIEs for which we are the primary beneficiary. Intercompany accounts among the consolidated businesses have been eliminated in consolidation. Net income (loss) attributable to noncontrolling interests is reflected in the statements of operations.

Typically, we consolidate entities in which we own more than 50% of the voting common stock and control operations and also VIEs for which we are the primary beneficiary. Investments in nonconsolidated affiliates in which we own more than 20% of the voting common stock or otherwise exercise significant influence over operating and financial policies, but not control of the nonconsolidated affiliate, are accounted for using the equity method of accounting. Investments in nonconsolidated affiliates in which we own less than 20% of the voting common stock and do not exercise significant influence over operating and financial policies are accounted for at fair value unless the investment does not have a readily determinable fair value in which case the investment is accounted for at cost less any impairment.

*Business Combinations*

We account for our business combinations under the acquisition method of accounting. Identifiable assets acquired, liabilities assumed and any noncontrolling interest in the acquiree are recognized and measured as of the acquisition date at fair value. Additionally, contingent consideration is recorded at fair value on the acquisition date and classified as a liability. Goodwill is recognized to the extent by which the aggregate of the acquisition-date fair value of the consideration transferred and any noncontrolling interest in the acquiree exceeds the recognized basis of the identifiable assets acquired, net of assumed liabilities. Determining the fair value of assets acquired, liabilities assumed and noncontrolling interest requires management's judgment and often involves the use of significant estimates and assumptions, including assumptions with respect to future cash flows, discount rates and asset lives among other items. In addition, when we have acquisitions where substantially all of the fair value of assets acquired is concentrated in a single asset or group of similar assets, we account for the acquisitions as asset acquisitions.

*Intangibles*

We classify intangible assets as definite-lived or indefinite-lived. Definite-lived intangibles include revenue-generating contracts, client/vendor relationships, trademarks and naming rights, technology, non-compete agreements, and venue management and leasehold agreements, all of which are amortized either on a straight-line basis over the respective lives of the agreements, typically 3 to 10 years, or on a basis more representative of the time pattern over which the benefit is derived. We periodically review the appropriateness of the amortization periods related to our definite-lived intangible assets. These assets are stated at cost or fair value at the date of acquisition. Indefinite-lived intangibles consist of trade names and cryptocurrency assets which are not subject to amortization. Our amortization expense is presented as a separate line item, with depreciation expense, in the statements of operations. There is no amortization expense included in direct operating expenses, selling, general and administrative expenses or corporate expenses.

We test for possible impairment of definite-lived intangible assets whenever events or circumstances change, such as a current period operating cash flow loss combined with a history of, or projections of, operating cash flow losses or a significant adverse change in the manner in which the asset is intended to be used, which could indicate that the carrying amount of the asset may not be recoverable. If indicators exist, we compare the estimated undiscounted future cash flows related to the asset to the carrying value of the asset. If the carrying value is greater than the estimated undiscounted future cash flow amount, an impairment charge is recorded based on the difference between the fair value and the carrying value. Any such impairment charge is recorded in depreciation and amortization in the statements of operations. For the years ended December 31, 2024, 2023 and 2022, there were no significant impairment charges.

We test for possible impairment of indefinite-lived intangible assets at least annually. Depending on facts and circumstances, qualitative factors may first be assessed to determine whether the existence of events and circumstances indicate that it is more likely than not that an indefinite-lived intangible asset is impaired. If it is concluded that it is more likely than not impaired, we perform a quantitative impairment test by comparing the fair value with the carrying amount. When specific assets are determined to be impaired, the cost basis of the asset is reduced to reflect the current fair value. The impairment loss calculations require management to apply judgment in estimating future cash flows, expected future revenue, discount rates and royalty rates that reflect the risk inherent in future cash flows. For the years ended December 31, 2024, 2023 and 2022, there were no significant impairment charges.

### *Goodwill*

We review goodwill for impairment annually, as of October 1, using a two-step process. We also test goodwill for impairment in other periods if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount or when we change our reporting units.

The first step is a qualitative evaluation as to whether it is more likely than not that the fair value of any of our reporting units is less than its carrying value using an assessment of relevant events and circumstances. Examples of such events and circumstances include historical financial performance, industry and market conditions, macroeconomic conditions, reporting unit-specific events, historical results of goodwill impairment testing and the timing of the last performance of a quantitative assessment. We also considered changes in discount rates, market multiples, carrying values and forecast since the last quantitative test. If any reporting units are concluded to be more likely than not impaired, or if that conclusion cannot be determined qualitatively, a second step is performed for that reporting unit utilizing a quantitative approach.

For the year ended December 31, 2024, as part of a refresh of the fair values of reporting units, as of July 1, 2024, three of our reporting units were assessed under quantitative analysis to support future qualitative evaluation. As of October 1, as required by our policy to perform goodwill tests annually as of October 1, these three reporting units were also assessed under the initial qualitative evaluation and did not advance to the quantitative analysis. As of October 1, the remaining three reporting units with goodwill were assessed under quantitative analysis to support future qualitative evaluation. All of our reporting units assessed under the quantitative analysis primarily used a discounted cash flows methodology, with a lesser weighting attributed to the market multiple approach. The discounted cash flows methodology estimates fair value by discounting the reporting unit's estimated future cash flows using a weighted-average cost of capital that reflects current market conditions and the risk profile of the reporting unit. Under the market multiple approach, the estimated fair value of the reporting unit was estimated by applying market multiples derived from stock prices of companies that are engaged in the same or similar lines of business as the reporting unit and that are actively traded on a free and open market. The derived multiples are then applied to the reporting unit's financial metrics

For the year ended December 31, 2023, as part of our annual test for impairment, one of our reporting units, which accounted for approximately 12% of our goodwill at December 31, 2023, was assessed under the quantitative analysis. The remaining reporting units with goodwill were assessed under the initial qualitative evaluation and did not advance to the quantitative analysis.

For the year ended December 31, 2022, as part of our annual test for impairment, all of our reporting units with goodwill were assessed under the initial qualitative evaluation and did not advance to the quantitative analysis. No impairment charges were recorded for the years ended December 31, 2024, 2023 and 2022.

### *Revenue Recognition*

Revenue from the promotion or production of an event in our Concerts segment is recognized when the event occurs. Revenue collected in advance of the event is recorded as deferred revenue until the event occurs. Revenue collected from sponsorship agreements, which is not related to a single event, is classified as deferred revenue and recognized over the term of the agreement or operating season as the benefits are provided to the sponsor.

Revenue from our ticketing operations primarily consists of service fees charged at the time a ticket for an event is sold in either the primary or secondary markets. For primary tickets sold to our concert and festival events, where our concert promoters control ticketing, the revenue for the associated ticket service charges collected in advance of the event is recorded as deferred revenue until the event occurs and these service charges are shared between our Ticketing and Concerts segments. For primary tickets sold for events of third-party clients and secondary market sales, the revenue is recognized at the time of the sale and is recorded by our Ticketing segment.

We account for taxes that are externally imposed on revenue producing transactions on a net basis.

*Litigation Accruals*

We are currently involved in certain legal proceedings and, as required, have accrued our estimate of the probable costs for the resolution of these claims. Management's estimates used have been developed in consultation with counsel and are based upon an analysis of potential results, assuming a combination of litigation and settlement strategies. It is possible, however, that future results of operations for any particular period could be materially affected by changes in our assumptions or the effectiveness of our strategies related to these proceedings.

*Income Taxes*

We account for income taxes using the liability method which results in deferred tax assets and liabilities based on differences between financial reporting bases and tax bases of assets and liabilities and are measured using the enacted tax rates expected to apply to taxable income in the periods in which the deferred tax asset or liability is expected to be realized or settled. We assess the realizability of our deferred tax assets, considering all relevant factors, at each reporting period. As almost all earnings from our continuing foreign operations are permanently reinvested and not distributed, our income tax provision does not include additional United States state and foreign withholding or transaction taxes on those foreign earnings that would be incurred if they were distributed. It is not practicable to determine the amount of state and foreign income taxes, if any, that might become due in the event that any remaining available cash associated with these earnings were distributed.

The FASB guidance for income taxes prescribes a recognition threshold and a measurement attribute for the financial statement recognition and measurement of tax positions taken or expected to be taken in a tax return. For those benefits to be recognized, a tax position must be more likely than not to be sustained upon examination by taxing authorities. The amount recognized is measured as the largest amount of benefit that is more likely than not to be realized upon ultimate settlement.

We have established a policy of including interest related to tax loss contingencies in income tax expense (benefit) in the statements of operations.

We treat the taxes due on future Global Intangible Low-Taxed Income ("GILTI") inclusions in United States taxable income as a current-period expense when incurred.

## ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

Required information is within Item 7.    Management's Discussion and Analysis of Financial Condition and Results of Operations    Market Risk.

ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

**Report of Independent Registered Public Accounting Firm**

To the Stockholders and the Board of Directors of Live Nation Entertainment, Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Live Nation Entertainment, Inc. (the Company) as of December 31, 2024 and 2023, the related consolidated statements of operations, comprehensive income, changes in equity and cash flows for each of the three years in the period ended December 31, 2024, and the related notes and financial statement schedule listed in the Index at Item 15(a)2 (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2024 and 2023, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2024, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2024, based on criteria established in Internal Control Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework), and our report dated February 20, 2025 expressed an unqualified opinion thereon.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matter**

The critical audit matter communicated below is a matter arising from the current period audit of the financial statements that was communicated or required to be communicated to the audit committee and that: (1) relates to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective or complex judgments. The communication of the critical audit matter does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the account or disclosure to which it relates.

*Description of the Matter*

*Goodwill impairment assessment*

As discussed in Note 1 to the consolidated financial statements, management conducts a goodwill impairment assessment annually, and when events or changes in circumstances indicate that it is more likely than not that the carrying value of a reporting unit exceeds its fair value. For one reporting unit with goodwill of $337 million, the Company performed a quantitative assessment as part of their annual impairment assessment as of October 1, 2024. No goodwill impairment charges were recorded for the year ended December 31, 2024.

Auditing the Company's annual goodwill impairment test was complex due to the significant judgment in estimating the fair value of the reporting unit when a quantitative assessment of fair value is performed. In particular, the fair value estimate was sensitive to significant assumptions, such as changes in the weighted average cost of capital and projected margins, which are affected by expectations about future market or economic conditions.

*How We Addressed the Matter in Our Audit*

We obtained an understanding, evaluated the design and tested the operating effectiveness of controls over the Company's goodwill impairment review process, including controls over management's review of the significant assumptions described above.

To test the estimated fair value of the Company's reporting unit, we performed audit procedures that included, among others, assessing the valuation methodologies used, testing the significant assumptions described above and testing the completeness and accuracy of the underlying data the Company used in its analyses. For example, we compared the projected margins used in the valuation to actual historical, current industry and economic trends and assessed the historical accuracy of management's estimates. With the assistance of our internal valuation specialists, we also developed an independent range for the weighted average cost of capital and compared it to the weighted average cost of capital determined by management. We performed sensitivity analyses of the significant assumptions to evaluate the changes in the fair value of the reporting unit that would result from changes in the assumptions.

/s/ Ernst & Young LLP

We have served as the Company's auditor since 2005.

Los Angeles, California
February 20, 2025

49

**LIVE NATION ENTERTAINMENT, INC.**

**CONSOLIDATED BALANCE SHEETS**

| | December 31, 2024 | December 31, 2023 As Revised |
|---|---|---|
| | *(in thousands, except share data)* | |
| **ASSETS** | | |
| Current assets | | |
| Cash and cash equivalents | $ 6,095,424 | $ 6,231,866 |
| Accounts receivable, less allowance of $72,663 and $82,350, respectively | 1,747,316 | 2,024,649 |
| Prepaid expenses | 1,247,184 | 1,147,581 |
| Restricted cash | 10,685 | 7,090 |
| Other current assets | 189,528 | 122,163 |
| Total current assets | 9,290,137 | 9,533,349 |
| Property, plant and equipment, net | 2,441,872 | 2,101,463 |
| Operating lease assets | 1,618,033 | 1,606,389 |
| Intangible assets | | |
| Definite-lived intangible assets, net | 985,812 | 1,161,621 |
| Indefinite-lived intangible assets, net | 380,558 | 377,349 |
| Goodwill | 2,620,911 | 2,691,466 |
| Long-term advances | 520,482 | 623,154 |
| Other long-term assets | 1,780,966 | 934,849 |
| Total assets | $ 19,638,771 | $ 19,029,640 |
| **LIABILITIES AND EQUITY** | | |
| Current liabilities | | |
| Accounts payable, client accounts | $ 1,859,678 | $ 1,866,864 |
| Accounts payable | 242,978 | 267,493 |
| Accrued expenses | 3,057,334 | 3,030,812 |
| Deferred revenue | 3,721,092 | 3,398,028 |
| Current portion of long-term debt, net | 260,901 | 1,134,386 |
| Current portion of operating lease liabilities | 153,406 | 158,421 |
| Other current liabilities | 62,890 | 128,430 |
| Total current liabilities | 9,358,279 | 9,984,434 |
| Long-term debt, net | 6,177,168 | 5,459,026 |
| Long-term operating lease liabilities | 1,680,266 | 1,686,091 |
| Other long-term liabilities | 477,763 | 488,159 |
| Commitments and contingent liabilities | | |
| Redeemable noncontrolling interests | 1,126,302 | 859,930 |
| Stockholders' equity | | |
| Preferred stock   Series A Junior Participating, $0.01 par value; 20,000,000 shares authorized; no shares issued and outstanding | | |
| Preferred stock, $0.01 par value; 30,000,000 shares authorized; no shares issued and outstanding | | |
| Common stock, $0.01 par value; 450,000,000 shares authorized; 234,771,759 and 233,711,176 shares issued and 234,363,735 and 233,303,152 shares outstanding in 2024 and 2023, respectively | 2,313 | 2,298 |
| Additional paid-in capital | 2,059,746 | 2,367,918 |
| Accumulated deficit | (1,546,819) | (2,443,106) |
| Cost of shares held in treasury | (6,865) | (6,865) |
| Accumulated other comprehensive income (loss) | (335,112) | 27,450 |
| Total Live Nation stockholders' equity | 173,263 | (52,305) |
| Noncontrolling interests | 645,730 | 604,305 |
| Total equity | 818,993 | 552,000 |
| Total liabilities and equity | $ 19,638,771 | $ 19,029,640 |

See Notes to Consolidated Financial Statements

**LIVE NATION ENTERTAINMENT, INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | | Year Ended December 31, | | |
|---|---|---|---|---|
| | | 2024 | 2023 | 2022 |
| | | | As Revised | As Revised |
| | | *(in thousands except share and per share data)* | | |
| Revenue | $ | 23,155,625 $ | 22,726,317 $ | 16,681,254 |
| Operating expenses: | | | | |
| Direct operating expenses | | 17,328,154 | 17,250,530 | 12,347,611 |
| Selling, general and administrative expenses | | 4,096,424 | 3,557,167 | 2,955,884 |
| Depreciation and amortization | | 549,923 | 516,797 | 449,976 |
| Gain on disposal of operating assets | | (11,015) | (13,927) | (32,082) |
| Corporate expenses | | 367,629 | 330,817 | 237,834 |
| Operating income | | 824,510 | 1,084,933 | 722,031 |
| Interest expense | | 325,974 | 350,244 | 278,483 |
| Loss on extinguishment of debt | | 2,563 | 18,504 | |
| Interest income | | (156,254) | (237,818) | (77,620) |
| Equity in losses (earnings) of nonconsolidated affiliates | | 16,675 | 5,455 | (10,571) |
| Other expense (income), net | | (103,874) | 35,274 | 41,215 |
| Income before income taxes | | 739,426 | 913,274 | 490,524 |
| Income tax expense (benefit) | | (391,698) | 209,476 | 115,941 |
| Net income | | 1,131,124 | 703,798 | 374,583 |
| Net income attributable to noncontrolling interests | | 234,837 | 146,905 | 108,143 |
| Net income attributable to common stockholders of Live Nation | $ | 896,287 $ | 556,893 $ | 266,440 |
| | | | | |
| Basic net income per common share available to common stockholders of Live Nation | $ | 2.77 $ | 1.35 $ | 0.53 |
| Diluted net income per common share available to common stockholders of Live Nation | $ | 2.74 $ | 1.34 $ | 0.52 |
| Weighted average common shares outstanding: | | | | |
| Basic | | 230,124,255 | 228,628,390 | 224,809,558 |
| Diluted | | 236,352,449 | 230,977,326 | 231,556,866 |
| | | | | |
| Reconciliation to net income available to common stockholders of Live Nation: | | | | |
| Net income attributable to common stockholders of Live Nation | $ | 896,287 $ | 556,893 $ | 266,440 |
| Accretion of redeemable noncontrolling interests | | (258,076) | (247,438) | (146,770) |
| Net income available to common stockholders of Live Nation   basic | $ | 638,211 $ | 309,455 $ | 119,670 |
| Convertible debt interest, net of tax | | 9,187 | | |
| Net income available to common stockholders of Live Nation   diluted | $ | 647,398 $ | 309,455 $ | 119,670 |

See Notes to Consolidated Financial Statements

LIVE NATION ENTERTAINMENT, INC.
CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2024 | 2023 As Revised (in thousands) | 2022 As Revised |
| Net income | $ 1,131,124 | $ 703,798 | $ 374,583 |
| Other comprehensive income, net of tax: | | | |
| Unrealized gain on cash flow hedge | 10,529 | 5,225 | 49,529 |
| Realized loss (gain) on cash flow hedge | (18,361) | (17,158) | 312 |
| Foreign currency translation adjustments | (354,730) | 129,459 | 12,883 |
| Comprehensive income | 768,562 | 821,324 | 437,307 |
| Comprehensive income attributable to noncontrolling interests | 234,837 | 146,905 | 108,143 |
| Comprehensive income attributable to common stockholders of Live Nation | $ 533,725 | $ 674,419 | $ 329,164 |

See Notes to Consolidated Financial Statements

52

**LIVE NATION ENTERTAINMENT, INC.**

**CONSOLIDATED STATEMENTS OF CHANGES IN EQUITY**

Live Nation Stockholders' Equity

| | Common Shares Issued | Common Stock | Additional Paid-In Capital | Accumulated Deficit | Cost of Shares Held in Treasury | Accumulated Other Comprehensive Income (Loss) | Noncontrolling Interests | Total Equity | Redeemable Noncontrolling Interests |
|---|---|---|---|---|---|---|---|---|---|
| | | | | (in thousands, except share data) | | | | | (in thousands) |
| **Revised Balances at December 31, 2021** | 221,964,734 | $ 2,220 | $ 2,897,695 | $ (3,326,961) | $ (6,865) | $ (152,800) | $ 394,197 | $ (192,514) | $ 547,338 |
| Cumulative effect of change in accounting principle | | | (95,986) | 60,522 | | | | (35,464) | |
| Non-cash and stock-based compensation | | | 223,136 | | | | | 223,136 | |
| Common stock issued under stock plans, net of shares withheld for employee taxes | 2,598,569 | 26 | (120,524) | | | | | (120,498) | |
| Exercise of stock options | 3,934,799 | 39 | 5,883 | | | | | 5,922 | |
| Acquisitions | | | | | | | 6,846 | 6,846 | 30,532 |
| Purchases of noncontrolling interests | | | (64,601) | | | | (7,778) | (72,379) | (5,848) |
| Sales of noncontrolling interests | | | | | | | (336) | (336) | |
| Redeemable noncontrolling interests fair value adjustments | | | (147,323) | | | | | (147,323) | 147,230 |
| Contributions received | | | | | | | 17,400 | 17,400 | 25 |
| Cash distributions | | | | | | | (79,887) | (79,887) | (20,773) |
| Other | | | 36 | | | | 30,580 | 30,616 | (46,184) |
| Comprehensive income (loss): | | | | | | | | | |
| Net income | | | | 266,440 | | | 100,344 | 366,784 | 7,799 |
| Unrealized gain on cash flow hedge | | | | | | 49,529 | | 49,529 | |
| Realized loss on cash flow hedge | | | | | | 312 | | 312 | |
| Foreign currency translation adjustments | | | | | | 12,883 | | 12,883 | |
| **Revised Balances at December 31, 2022** | 228,498,102 | 2,285 | 2,698,316 | (2,999,999) | (6,865) | (90,076) | 461,366 | 65,027 | 660,119 |
| Non-cash and stock-based compensation | 58 | | 110,021 | | | | | 110,021 | |
| Common stock issued under stock plans, net of shares withheld for employee taxes | 239,765 | 2 | (9,486) | | | | | (9,484) | |
| Exercise of stock options | 890,566 | 9 | 19,255 | | | | | 19,264 | |
| Repurchase of 2.5% convertible senior notes due 2023 | 156,750 | 2 | (27,327) | | | | | (27,325) | |
| Capped call transactions for 3.125% convertible senior notes due 2029 | | | (75,500) | | | | | (75,500) | |
| Acquisitions | | | | | | | 129,700 | 129,700 | 47,375 |
| Purchases of noncontrolling interests | | | (100,940) | | | | (35,549) | (136,489) | (11,402) |
| Redeemable noncontrolling interests fair value adjustments | | | (246,421) | | | | | (246,421) | 246,421 |
| Contributions received | | | | | | | 17,517 | 17,517 | 85 |
| Cash distributions | | | | | | | (163,301) | (163,301) | (76,318) |
| Other | | | | | | | 71,800 | 71,800 | (30,483) |
| Comprehensive income (loss): | | | | | | | | | |
| Net income | | | | 556,893 | | | 122,772 | 679,665 | 24,133 |
| Unrealized gain on cash flow hedge | | | | | | 5,225 | | 5,225 | |
| Realized gain on cash flow hedge | | | | | | (17,158) | | (17,158) | |
| Foreign currency translation adjustments | | | | | | 129,459 | | 129,459 | |
| **Revised Balances at December 31, 2023** | 229,785,241 | 2,298 | 2,367,918 | (2,443,106) | (6,865) | 27,450 | 604,305 | 552,000 | 859,930 |
| Non-cash and stock-based compensation | | | 109,986 | | | | | 109,986 | |
| Common stock issued under stock plans, net of shares withheld for employee taxes | 658,278 | 7 | (59,763) | | | | | (59,756) | |
| Exercise of stock options | 852,097 | 8 | 26,044 | | | | | 26,052 | |
| Repurchase of 2.0% convertible senior notes due 2025 | | | (94,033) | | | | | (94,033) | |
| Acquisitions | | | | | | | 56,295 | 56,295 | 45,357 |
| Purchases of noncontrolling interests | | | (30,049) | | | | (14,966) | (45,015) | (32,296) |
| Redeemable noncontrolling interests fair value adjustments | | | (260,357) | | | | | (260,357) | 261,416 |
| Contributions received | | | | | | | 3,000 | 3,000 | |
| Cash distributions | | | | | | | (167,948) | (167,948) | (77,632) |
| Other | 23 | | | | | | (4,182) | (4,182) | 3,916 |
| Comprehensive income (loss): | | | | | | | | | |
| Net income | | | | 896,287 | | | 169,226 | 1,065,513 | 65,611 |
| Unrealized gain on cash flow hedge | | | | | | 10,529 | | 10,529 | |
| Realized gain on cash flow hedge | | | | | | (18,361) | | (18,361) | |
| Foreign currency translation adjustments | | | | | | (354,730) | | (354,730) | |
| **Balances at December 31, 2024** | 231,295,639 | $ 2,313 | $ 2,059,746 | $ (1,546,819) | $ (6,865) | $ (335,112) | $ 645,730 | $ 818,993 | $ 1,126,302 |

See Notes to Consolidated Financial Statements

**LIVE NATION ENTERTAINMENT, INC.**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | | Year Ended December 31, | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| | | As Revised | As Revised |
| | | (in thousands) | |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | |
| Net income | $ 1,131,124 | $ 703,798 | $ 374,583 |
| Reconciling items: | | | |
| Depreciation | 300,003 | 266,590 | 225,770 |
| Amortization of definite-lived intangibles and indefinite-lived intangibles impairment loss | 249,920 | 250,207 | 224,206 |
| Amortization of non-recoupable ticketing contract advances | 88,717 | 83,693 | 79,043 |
| Deferred income taxes | (708,570) | (44,018) | 7,199 |
| Amortization of debt issuance costs and discounts | 17,794 | 16,884 | 16,448 |
| Provision for uncollectible accounts and loans receivable | 1,002 | 78,336 | 68,612 |
| Loss on extinguishment of debt | 2,563 | 18,504 | |
| Stock-based compensation expense | 110,348 | 115,959 | 110,049 |
| Unrealized changes in fair value of contingent consideration | (21,721) | 40,151 | 56,704 |
| Equity in losses of nonconsolidated affiliates, net of distributions | 32,371 | 30,522 | 14,912 |
| Gain on mark-to-market of investments in nonconsolidated affiliates | (102,929) | (47,878) | (22,638) |
| (Gain) loss on forward currency exchange contracts | (15,393) | 5,635 | 927 |
| Other, net | (11,159) | (18,123) | 3,785 |
| Changes in operating assets and liabilities, net of effects of acquisitions and dispositions: | | | |
| Decrease (increase) in accounts receivable | 181,430 | (525,739) | (444,503) |
| Increase in prepaid expenses and other assets | (22,192) | (202,834) | (267,945) |
| Increase in accounts payable, accrued expenses and other liabilities | 13,782 | 450,370 | 1,028,172 |
| Increase in deferred revenue | 478,085 | 140,917 | 359,723 |
| Net cash provided by operating activities | 1,725,175 | 1,362,974 | 1,835,047 |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | |
| Advances of notes receivable | (119,213) | (181,801) | (115,992) |
| Collections of notes receivable | 52,303 | 17,057 | 20,527 |
| Investments made in nonconsolidated affiliates | (45,683) | (54,922) | (91,186) |
| Purchases of property, plant and equipment | (646,634) | (438,604) | (347,206) |
| Cash paid for acquisition of right-of-use assets | (20,000) | | |
| Cash paid for acquisitions, net of cash acquired | (98,307) | (17,534) | (257,191) |
| Purchases of intangible assets | (8,522) | (36,653) | (6,080) |
| Proceeds from sale of investments in nonconsolidated affiliates | 19,594 | 1,524 | 3,863 |
| Other, net | 12,181 | 15,128 | 8,574 |
| Net cash used in investing activities | (854,281) | (695,805) | (784,691) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | |
| Proceeds from long-term debt, net of debt issuance costs | 1,671,842 | 1,061,026 | 122,251 |
| Payments on long term debt including extinguishment costs | (1,959,725) | (730,643) | (45,792) |
| Contributions from noncontrolling interests | 3,000 | 19,602 | 15,021 |
| Distributions to noncontrolling interests | (245,580) | (239,619) | (100,660) |
| Purchases of noncontrolling interests, net | (69,935) | (113,768) | (48,306) |
| Payments for capped call transactions | | (75,500) | |
| Proceeds from exercise of stock options | 26,052 | 19,264 | 35,775 |
| Taxes paid for net share settlement of equity awards | (59,756) | (9,484) | (76,925) |
| Payments for deferred and contingent consideration | (23,733) | (17,757) | (44,220) |
| Other, net | (715) | (402) | (484) |
| Net cash used in financing activities | (658,550) | (87,281) | (143,340) |
| Effect of exchange rate changes on cash, cash equivalents and restricted cash | (345,191) | 38,874 | (174,614) |
| Net (decrease) increase in cash, cash equivalents and restricted cash | (132,847) | 618,762 | 732,402 |
| Cash, cash equivalents and restricted cash at beginning of period | 6,238,956 | 5,620,194 | 4,887,792 |
| Cash, cash equivalents and restricted cash at end of period | $ 6,106,109 | $ 6,238,956 | $ 5,620,194 |
| **SUPPLEMENTAL DISCLOSURE** | | | |
| Cash paid during the year for: | | | |
| Interest, net of interest income | $ 131,234 | $ 57,367 | $ 180,878 |
| Income taxes, net of refunds | $ 253,652 | $ 175,148 | $ 43,859 |

See Notes to Consolidated Financial Statements

54

**LIVE NATION ENTERTAINMENT, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 1—THE COMPANY AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

*History*

Live Nation was incorporated in Delaware on August 2, 2005 in preparation for the contribution and transfer by Clear Channel Communications, Inc. of substantially all of its entertainment assets and liabilities to us. We completed this separation on December 21, 2005 and became a publicly traded company on the New York Stock Exchange trading under the symbol "LYV."

On January 25, 2010, we merged with Ticketmaster Entertainment LLC and it became a wholly-owned subsidiary of Live Nation. Effective with the merger, Live Nation, Inc. changed its name to Live Nation Entertainment, Inc.

*Seasonality*

Our Concerts and Sponsorship & Advertising segments typically experience higher revenue and operating income in the second and third quarters as our outdoor venue concerts and festivals primarily occur from May through October in most major markets. Our Ticketing segment revenue is impacted by fluctuations in the availability and timing of events for sale to the public, which vary depending upon scheduling by our clients.

Cash flows from our Concerts segment typically have a slightly different seasonality as partial payments are often made for artist performance fees and production costs for tours in advance of the date the related event tickets go on sale. These artist fees and production costs are expensed when the event occurs. Once tickets for an event go on sale, we generally begin to receive payments from ticket sales in advance of when the event occurs. In the United States, this cash is largely associated with events in our operated venues, notably amphitheaters, festivals, theaters and clubs. Internationally, this cash is from a combination of both events in our owned or operated venues, as well as events in third-party venues associated with our promoters' share of tickets in allocation markets. We record these ticket sales as revenue when the event occurs. Our seasonality also results in higher balances in cash and cash equivalents, accounts receivable, prepaid expenses, accrued expenses and deferred revenue at different times in the year.

We expect our seasonality trends to evolve as we continue to expand our global operations.

*Basis of Presentation and Principles of Consolidation*

Our consolidated financial statements include all of our accounts, including our majority owned and controlled subsidiaries and VIEs for which we are the primary beneficiary. Intercompany accounts among the consolidated businesses have been eliminated in consolidation. Net income (loss) attributable to noncontrolling interests is reflected in the statements of operations.

Typically, we consolidate entities in which we own more than 50% of the voting common stock and control operations and also VIEs for which we are the primary beneficiary. Investments in nonconsolidated affiliates in which we own more than 20% of the voting common stock or otherwise exercise significant influence over operating and financial policies but not control of the nonconsolidated affiliate are accounted for using the equity method of accounting. Investments in nonconsolidated affiliates in which we own less than 20% of the voting common stock and do not exercise significant influence over operating and financial policies are accounted for at fair value unless the investment does not have a readily determinable fair value in which case the investment is accounted for at cost less any impairment.

All of our cash flow activity reflected on the consolidated statements of cash flows is presented net of any non-cash transactions so the amounts reflected may be different than amounts shown in other places in our consolidated financial statements that are based on accrual accounting and therefore include non-cash amounts. For example, purchases of property, plant and equipment reflected on the consolidated statements of cash flows reflect the amount of cash paid during the year for these purchases and does not include the impact of the changes in accrued expenses related to capital expenditures during the year.

*Variable Interest Entities*

In the normal course of business, we enter into joint ventures or make investments in companies that will allow us to expand our core business and enter new markets. In certain instances, such ventures or investments may be considered a VIE because the equity at risk is insufficient to permit it to carry on its activities without additional financial support from its equity owners. In determining whether we are the primary beneficiary of a VIE, we assess whether we have the power to direct activities that most significantly impact the economic performance of the entity and have the obligation to absorb losses or the right to receive benefits from the entity that could potentially be significant to the VIE. The activities we believe most significantly impact the economic performance of our VIEs include the unilateral ability to approve the annual budget, to terminate key management and to approve entering into agreements with artists, among others. We have certain rights and obligations related to our involvement in the VIEs, including the requirement to provide operational cash flow funding.

As of December 31, 2024 and 2023, excluding intercompany balances and allocated goodwill and intangible assets, there were approximately $840 million and $940 million of assets and $578 million and $592 million of liabilities, respectively, related to VIEs included in our balance sheets. None of our VIEs are significant on an individual basis.

*Nonconsolidated Affiliates*

In general, nonconsolidated investments in which we own more than 20% of the common stock or otherwise exercise significant influence over an affiliate are accounted for under the equity method. We review the value of equity method investments and record impairment charges in the statements of operations for any decline in value that is determined to be other-than-temporary. If we obtain control of a nonconsolidated affiliate through the purchase of additional ownership interest or changes in the governing agreements, we remeasure our investment to fair value first and then apply the accounting guidance for business combinations. Any gain or loss resulting from the remeasurement to fair value is recorded as a component of other expense (income), net in the statements of operations.

*Cash, Cash Equivalents and Restricted Cash*

Cash and cash equivalents include all highly liquid investments with an original maturity of three months or less. Our cash and cash equivalents include domestic and foreign bank accounts as well as interest-bearing accounts consisting primarily of bank deposits and money market accounts managed by third-party financial institutions. These balances are stated at cost, which approximates fair value.

Restricted cash primarily consists of cash held in escrow accounts to fund capital improvements of certain leased or operated venues. The cash is held in these accounts pursuant to the related lease or operating agreement.

Included in the December 31, 2024 and 2023 cash and cash equivalents balance is $1.6 billion and $1.5 billion, respectively, of cash received that includes the face value of tickets sold on behalf of our ticketing clients and their share of service charges ("client cash"), which amounts are to be remitted to these clients. We generally do not utilize client cash for our own financing or investing activities as the amounts are payable to our clients on a regular basis. These amounts due to our clients are included in accounts payable, client accounts.

Cash held in interest-bearing operating accounts in many cases exceeds the Federal Deposit Insurance Corporation insurance limits. To reduce our credit risk, we monitor the credit standing of the financial institutions that hold our cash and cash equivalents; however, these balances could be impacted in the future if the underlying financial institutions fail. To date, we have experienced no loss of or lack of access to our cash or cash equivalents; however, we can provide no assurances that access to our cash and cash equivalents will not be impacted in the future by adverse conditions in the financial markets.

*Allowance for Doubtful Accounts*

We evaluate the collectability of our accounts receivable based on a combination of factors. Generally, we record reserves based on the amount of cash we expect to receive when an account receivable balance is established. Our reserve estimate is primarily based on our historical accounts receivable write-offs. We adjust the historical reserve estimate applied to current accounts receivable when events or circumstances change, such as changes in current economic conditions or there is a significant deterioration in our accounts receivable aging, indicating that the reserve estimate may be insufficient to cover the expected loss. We generally apply a portfolio approach to all of our accounts receivable based on reporting unit unless there are facts and circumstances that indicate a specific group of customers is at greater risk of nonpayment.

We believe that the credit risk with respect to trade receivables is limited due to the large number and the geographic diversification of our customers.

*Prepaid Expenses*

The majority of our prepaid expenses relate to event expenses including show advances and deposits and other costs directly related to future concert events. For advances that are expected to be recouped over a period of more than twelve months, the long-term portion of the advance is classified as long-term advances. These prepaid costs are charged to operations upon completion of the related events.

Ticketing contract advances, which can be either recoupable or non-recoupable, represent amounts paid in advance to our clients pursuant to ticketing agreements and are reflected in prepaid expenses or in long-term advances if the amount is expected to be recouped or recognized over a period of more than twelve months. Recoupable ticketing contract advances are generally recoupable against future royalties earned by our clients, based on the contract terms, over the life of the contract. Non-recoupable ticketing contract advances, excluding those amounts paid to support clients' advertising costs, are fixed additional incentives occasionally paid by us to secure the contract with certain clients and are typically amortized over the life of the contract on a straight-line basis.

Artist advances and ticketing contract advances are reviewed for recoverability whenever circumstances change, such as extended delays in an artist's touring cycle, a decline in an artist's tour earnings, lack of events on sale for a ticketing client or a decline in a client's ticket sales, indicating that the advance may not be recoupable over the term of the agreement. We review various factors, including past recoupment amounts, timing of an artist's last tour, expectations of future tours, ticketing clients' historical ticket sales and expectations of clients' future ticket sales, to determine if we believe the advance will recoup as expected. If an advance is not expected to be fully recoupable, a reserve is established to reduce the advance to the amount we expect to recoup. The reserves are recorded as a component of direct operating expenses in our consolidated statements of operations.

*Business Combinations*

During 2024, 2023 and 2022, we completed several acquisitions that were accounted for as business combinations under the acquisition method of accounting. When we make these acquisitions, we often acquire a controlling interest without buying 100% of the business. These acquisitions and the related results of operations were not significant on either an individual basis or in the aggregate for the years ended December 31, 2024, 2023 and 2022.

We account for our business combinations under the acquisition method of accounting. Identifiable assets acquired, liabilities assumed and any noncontrolling interest in the acquiree are recognized and measured as of the acquisition date at fair value. Additionally, any contingent consideration is recorded at fair value on the acquisition date and classified as a liability. Goodwill is recognized to the extent by which the aggregate of the acquisition-date fair value of the consideration transferred and any noncontrolling interest in the acquiree exceeds the recognized basis of the identifiable assets acquired, net of assumed liabilities. Determining the fair value of assets acquired, liabilities assumed and noncontrolling interests requires management's judgment and often involves the use of significant estimates and assumptions, including assumptions with respect to future cash flows, discount rates and asset lives among other items. In addition, when we have acquisitions where substantially all of the fair value of assets acquired is concentrated in a single asset or group of similar assets, we account for the acquisitions as asset acquisitions.

*Property, Plant and Equipment*

Property, plant and equipment are stated at cost or fair value at the date of acquisition. Depreciation is computed using the straight-line method over their estimated useful lives, which are typically as follows:

Buildings and improvements - 10 to 50 years

Computer equipment and capitalized software - 3 to 10 years

Furniture and other equipment - 3 to 10 years

Leasehold improvements are depreciated over the shorter of the economic life or associated lease term. Expenditures for maintenance and repairs are charged to operations as incurred, whereas expenditures for asset renewal and improvements are capitalized. There is no depreciation expense included in direct operating expenses, selling, general and administrative expenses or corporate expenses. Our depreciation expense is presented as a separate line item, with amortization expense, in the statements of operations.

We test for possible impairment of property, plant and equipment whenever events or circumstances change, such as a current period operating cash flow loss combined with a history of, or projections of, operating cash flow losses or a significant adverse change in the manner in which the asset is intended to be used, which could indicate that the carrying amount of the asset may not be recoverable. If indicators exist, we compare the estimated undiscounted future cash flows related to the asset to the carrying value of the asset. If the carrying value is greater than the estimated undiscounted future cash flow amount, an impairment charge is recorded based on the difference between the fair value and the carrying value. Any such impairment charge is recorded in depreciation and amortization in the statements of operations. The impairment loss calculations require management to apply judgment in estimating future cash flows and the discount rates that reflect the risk inherent in future cash flows.

### *Intangible Assets*

We classify intangible assets as definite-lived or indefinite-lived. Definite-lived intangibles include revenue-generating contracts, client/vendor relationships, trademarks and naming rights, technology, non-compete agreements, and venue management and leasehold agreements, all of which are amortized either on a straight-line basis over the respective lives of the agreements, typically 3 to 10 years, or on a basis more representative of the time pattern over which the benefit is derived. We periodically review the appropriateness of the amortization periods related to our definite-lived intangible assets  These assets are stated at cost or fair value at the date of acquisition  Indefinite lived intangibles consist of trade names and cryptocurrency assets which are not subject to amortization  Our amortization expense is presented as a separate line item, with depreciation expense, in the statements of operations. There is no amortization expense included in direct operating expenses, selling, general and administrative expenses or corporate expenses.

We test for possible impairment of definite-lived intangible assets whenever events or circumstances change, such as a current period operating cash flow loss combined with a history of, or projections of, operating cash flow losses or a significant adverse change in the manner in which the asset is intended to be used, which could indicate that the carrying amount of the asset may not be recoverable  If indicators exist, we compare the estimated undiscounted future cash flows related to the asset to the carrying value of the asset  If the carrying value is greater than the estimated undiscounted future cash flow amount, an impairment charge is recorded based on the difference between the fair value and the carrying value. Any such impairment charge is recorded in depreciation and amortization in the statements of operations. For the years ended December 31, 2024, 2023 and 2022, there were no significant impairment charges.

We test for possible impairment of indefinite-lived intangible assets at least annually. Depending on facts and circumstances, qualitative factors may first be assessed to determine whether the existence of events and circumstances indicate that it is more likely than not that an indefinite-lived intangible asset is impaired. If it is concluded that it is more likely than not impaired, we perform a quantitative impairment test by comparing the fair value with the carrying amount  When specific assets are determined to be impaired, the cost basis of the asset is reduced to reflect the current fair value. Any such impairment charge is recorded in depreciation and amortization in the statements of operations. The impairment loss calculations require management to apply judgment in estimating future cash flows, expected future revenue, discount rates and royalty rates that reflect the risk inherent in future cash flows. For the years ended December 31, 2024, 2023 and 2022, there were no significant impairment charges.

### *Goodwill*

We review goodwill for impairment annually, as of October 1, using a two-step process. We also test goodwill for impairment in other periods if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount or when we change our reporting units.

The first step is a qualitative evaluation as to whether it is more likely than not that the fair value of any of our reporting units is less than its carrying value using an assessment of relevant events and circumstances. Examples of such events and circumstances include historical financial performance, industry and market conditions, macroeconomic conditions, reporting unit-specific events, historical results of goodwill impairment testing and the timing of the last performance of a quantitative assessment. We also considered changes in discount rates, market multiples, carrying values and forecast since the last quantitative test. If any reporting units are concluded to be more likely than not impaired, or if that conclusion cannot be determined qualitatively, a second step is performed for that reporting unit utilizing a quantitative approach.

For the year ended December 31, 2024, as part of a refresh of the fair values of reporting units, as of July 1, 2024,three of our reporting units were assessed under quantitative analysis to support future qualitative evaluation. As of October 1, as required by our policy to perform goodwill tests annually as of October 1, 2024 these three reporting units were also assessed under the initial qualitative evaluation and did not advance to the quantitative analysis. As of October 1, 2024, the remaining three reporting units with goodwill were assessed under quantitative analysis to support future qualitative evaluation. All of our reporting units assessed under the quantitative analysis primarily used a discounted cash flows methodology, with a lesser weighting attributed to the market multiple approach. The discounted cash flows methodology estimates fair value by discounting the reporting unit's estimated future cash flows using a weighted-average cost of capital that reflects current market

conditions and the risk profile of the reporting unit. Under the market multiple approach, the estimated fair value of the reporting unit was estimated by applying market multiples derived from stock prices of companies that are engaged in the same or similar lines of business as the reporting unit and that are actively traded on a free and open market. The derived multiples are then applied to the reporting unit's financial metrics.

For the year ended December 31, 2023, as part of our annual test for impairment, one of our reporting units, which accounted for approximately12% of our goodwill at December 31, 2023, was assessed under the quantitative analysis. The remaining reporting units with goodwill were assessed under the initial qualitative evaluation and did not advance to the quantitative analysis.

For the year ended December 31, 2022, as part of our annual test for impairment, all of our reporting units with goodwill were assessed under the initial qualitative evaluation and did not advance to the quantitative analysis. No impairment charges were recorded for the years ended December 31, 2024, 2023 and 2022.

### Leases

We lease office space, many of our concert venues, festival sites and certain equipment. We record a lease asset and liability on our consolidated balance sheets at the inception of the lease or when we take possession of the leased space or equipment, if later, based on the required payments over the term of the lease. We do not recognize a lease asset or liability for leases with an initial term of twelve months or less, including multi-year festival site leases where the sum of the non-consecutive periods of rental time is less than twelve months. Rent expense for these short-term leases is generally recognized on a straight-line basis over the lease term.

Some of our lease agreements contain annual rental escalation clauses, as well as provisions for us to pay the related utilities and maintenance. We have elected to account for the lease components (i.e., fixed payments including rent and parking) and non-lease components (i.e., common-area maintenance costs) as a single lease component.

Many of our lease agreements contain renewal options that can extend the lease for additional terms typically ranging from one to ten years. Renewal options at the discretion of the lessor are included in the lease term while renewal options at our discretion are generally not included in the lease term unless they are reasonably certain to be exercised.

In addition to fixed rental payments, many of our leases contain contingent rental payments based on a percentage of revenue, tickets sold or other variables, while others include periodic adjustments to rental payments based on the prevailing inflationary index or market rental rates. Contingent rent obligations are not included in the initial measurement of the lease asset or liability and are recognized as rent expense in the period that the contingency is resolved. Our leases do not contain any material residual value guarantees or restrictive covenants.

We measure our lease assets and liabilities using an incremental borrowing rate which varies from lease to lease depending on geographical location and length of the lease.

### Accounts Payable, Client Accounts

Accounts payable, client accounts consists of contractual amounts due to our ticketing clients which includes the face value of tickets sold and the clients' share of service charges.

### Income Taxes

We account for income taxes using the liability method which results in deferred tax assets and liabilities based on differences between financial reporting bases and tax bases of assets and liabilities and are measured using the enacted tax rates expected to apply to taxable income in the periods in which the deferred tax asset or liability is expected to be realized or settled. We assess the realizability of our deferred tax assets, considering all relevant factors, at each reporting period. As almost all earnings from our continuing foreign operations are permanently reinvested and not distributed, our income tax provision does not include additional United States state and foreign withholding or transaction taxes on those foreign earnings that would be incurred if they were distributed. It is not practicable to determine the amount of state and foreign income taxes, if any, that might become due in the event that any remaining available cash associated with these earnings were distributed.

The FASB guidance for income taxes prescribes a recognition threshold and a measurement attribute for the financial statement recognition and measurement of tax positions taken or expected to be taken in a tax return. For those benefits to be recognized, a tax position must be more likely than not to be sustained upon examination by taxing authorities. The amount recognized is measured as the largest amount of benefit that is more likely than not to be realized upon ultimate settlement.

We have established a policy of including interest related to tax loss contingencies in income tax expense (benefit) in the statements of operations.

We treat the taxes due on future Global Intangible Low-Taxed Income ("GILTI") inclusions in United States taxable income as a current-period expense when incurred.

59

*Revenue Recognition*

Revenue from the promotion or production of an event in our Concerts segment is recognized when the event occurs. Consideration collected in advance of the event is recorded as deferred revenue until the event occurs. Revenue collected from sponsorship agreements, which is not related to a single event, is classified as deferred revenue and recognized over the term of the agreement or operating season as the benefits are provided to the sponsor.

Revenue from our ticketing operations primarily consists of service fees charged at the time a ticket for an event is sold in either the primary or secondary markets. For primary tickets sold to our concert and festival events, where our concert promoters control ticketing, the revenue for the associated ticket service charges collected in advance of the event is recorded as deferred revenue until the event occurs and these service charges are shared between our Ticketing and Concerts segments. For primary tickets sold for events of third-party clients and secondary market sales, the revenue is recognized at the time of the sale and is recorded by our Ticketing segment. Amortization of nonrecoupable ticketing contract advances is recorded as a reduction to revenue.

We account for taxes that are externally imposed on revenue producing transactions on a net basis.

*Gross versus Net Revenue Recognition*

We report revenue on a gross or net basis based on management's assessment of whether we act as a principal or agent in the transaction. To the extent we act as the principal, revenue is reported on a gross basis. The determination of whether we act as a principal or an agent in a transaction is based on an evaluation of whether we have control of the good or service before it is transferred to the customer. Our Ticketing segment's revenue, which primarily consists of service fees from its ticketing operations, is recorded net of the face value of the ticket as we generally act as an agent in these transactions.

*Business Interruption Insurance Recovery*

We record revenue or offset expense for covered business interruptions in the period we determine it is probable we will be compensated for the costs incurred or the applicable contingencies with the insurance company are resolved for lost revenue. This may result in business interruption insurance recoveries being recorded in a period subsequent to the period we experience lost revenue and/or incurred the expenses from a covered event that are being reimbursed. For the years ended December 31, 2024, 2023 and 2022, we recorded business interruption insurance recoveries of $51.3 million, $41.5 million and $38.8 million, respectively. The recoveries were for a variety of claims and primarily recorded as revenue.

*Foreign Currency*

Results of operations for foreign subsidiaries and foreign equity investees are translated into United States dollars using the average exchange rates during the year. The assets and liabilities of those subsidiaries and investees are translated into United States dollars using the exchange rates at the balance sheet date. The related translation adjustments are recorded in a separate component of stockholders' equity in AOCI. Foreign currency transaction gains and losses are included in the statements of operations and include the impact of revaluation of certain foreign currency denominated net assets or liabilities held internationally. For the year ended December 31, 2024, we recorded net foreign currency transaction gains of $14.7 million. For the years ended December 31, 2023 and December 31, 2022, we recorded net foreign currency transaction losses of $74.5 million and $55.8 million, respectively.

*Advertising Expense*

We record advertising expense in the year that it is incurred. Throughout the year, general advertising expenses are recognized as they are incurred, but event-related advertising for concerts is recognized once the event occurs. If an event is rescheduled into the following year, the advertising costs are expensed in the period the event is rescheduled. However, all advertising costs incurred during the year and not previously recognized are expensed at the end of the year. Advertising expenses of $750.9 million, $706.2 million and $588.0 million for the years ended December 31, 2024, 2023 and 2022, respectively, were recorded as a component of direct operating expenses. Advertising expenses of $54.6 million, $47.7 million and $32.0 million for the years ended December 31, 2024, 2023 and 2022, respectively, were recorded as a component of selling, general and administrative expenses.

*Direct Operating Expenses*

Direct operating expenses include artist fees, event-related marketing and advertising expenses, rent expense for events in third-party venues, credit card fees, telecommunication and data communication costs associated with our call centers, commissions paid on tickets distributed through independent sales outlets away from the box office, and salaries and wages related to seasonal employees at our venues along with other costs, including ticket stock and shipping. These costs are primarily variable in nature.

*Selling, General and Administrative Expenses*

Selling, general and administrative expenses include salaries and other compensation costs related to full-time employees, fixed rent, travel and entertainment, legal expenses and consulting along with other costs.

*Non-cash and Stock-based Compensation*

We follow the fair value recognition provisions in the FASB guidance for stock compensation. Stock-based compensation expense includes compensation expense for all share-based payments using the estimated grant date fair value. Stock-based compensation expense is adjusted for forfeitures as they occur.

The fair value for options in Live Nation stock is estimated on the date of grant using the Black-Scholes option-pricing model. The fair value of the options is amortized to expense on a straight-line basis over the options' vesting period. We use an expected volatility based on an even weighting of our own traded options and historical volatility. We use a weighted-average expected life based on historical experience calculated with the assistance of outside consultants. The risk-free rate for periods within the expected life of the option is based on the United States Treasury note rate.

The fair value of restricted stock awards and deferred stock awards, which is generally the stock price on the date of grant, is amortized to expense on a straight-line basis over the vesting period except for restricted stock awards and deferred stock awards with minimum performance or market targets as their vesting condition. The performance-based awards are amortized to expense on a graded basis over the vesting period to the extent that it is probable that the performance criteria will be met. Market-based award fair values are estimated using a Monte Carlo simulation model and are then amortized to expense on a graded basis over the derived service period, which is estimated as the median weighted average vesting period from the Monte Carlo simulation models. However, unlike awards with a service or performance condition, the expense for market-based awards will not be reversed solely because the market condition is not satisfied.

*Use of Estimates*

The preparation of consolidated financial statements in conformity with GAAP requires management to make estimates, judgments, and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes including, but not limited to, legal, tax and insurance accruals, acquisition accounting and impairments. We base our estimates on historical experience and on various other assumptions that are believed to be reasonable under the circumstances. Actual results could differ from those estimates.

*Accounting Standards Updates (ASU)*

In June 2022, the FASB issued ASU 2022-03, "*Fair Value Measurement (Topic 820): Fair Value Measurement of Equity Securities Subject to Contractual Sale Restrictions*," which clarifies guidance for fair value measurement of an equity security subject to a contractual sale restriction and establishes new disclosure requirements for such equity securities. We adopted this guidance on January 1, 2024. The adoption did not and is not expected to have a material impact on our consolidated financial statements.

In November 2023, the FASB issued ASU 2023-07, "*Segment Reporting (Topic 280): Improvements to Reportable Segment Disclosures*," which expands segment disclosures by requiring disclosure of significant segment expenses that are regularly provided to the chief operating decision maker ("CODM") and included within each reported measure of segment profit or loss, an amount and description of its composition for other segment items, and interim disclosures of a reportable segment's profit or loss. We adopted this guidance as of January 1, 2024 for the year ended December 31, 2024 and retrospectively for the years ended December 31, 2023 and 2022, respectively. The Company's Chief Executive Officer is the CODM and evaluates the operating performance of the Company's operating segments based on AOI. The CODM uses segment AOI for evaluating performance of each segment and for making decisions on allocating capital and other resources to each segment. We have not identified any segments expenses that are considered significant and segment expenses are not regularly provided to the CODM. Other segments items are direct operating expenses and selling, general and administrative expenses (excluding acquisition expenses, amortization of non-recoupable ticketing contract advance, Astroworld estimated loss contingencies and stock-based compensation expense) which is the difference between each operating segment's revenue and AOI as shown in Note 12   Segments and Revenue Recognition. The adoption did not have a material impact on the Company's consolidated financial statements.

In December 2023, the FASB issued ASU 2023-09, "*Income Taxes (Topic 740): Improvements to Income Tax Disclosures*" which prescribes standardized categories and disaggregation of information in the reconciliation of provision for income taxes, requires disclosure of disaggregated income taxes paid, and modifies other income tax-related disclosure requirements. This guidance is effective for annual periods beginning after December 15, 2024 with early adoption permitted. ASU 2023-09 should be applied on a prospective basis, but retrospective application is permitted. The Company is currently evaluating the impact of adopting this guidance.

In November 2024, the FASB issued ASU 2024-03, "*Income Statement Reporting Comprehensive Income Expense Disaggregation Disclosures (Subtopic 220-40): Disaggregation of Income Statement Expenses*," which requires the disclosure of additional information related to certain costs and expenses, including amounts of inventory purchases, employee compensation, and depreciation and amortization included in each income statement line item. The guidance also requires disclosure of the total amount of selling expenses and the Company's definition of selling expenses. This guidance is effective for annual reporting periods beginning after December 15, 2026 and interim reporting periods within annual periods beginning after December 15, 2027, with early adoption permitted. The guidance is to be applied either prospectively to financial statements issued for reporting periods after the effective date or retrospectively to any or all prior periods presented in the financial statements. The Company is currently evaluating the impact of adopting this guidance.

**NOTE 2—CORRECTION OF ERRORS IN PREVIOUSLY REPORTED CONSOLIDATED FINANCIAL STATEMENTS**

As previously disclosed in our Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2024, in calculating our income taxes for the three and nine months ended September 30, 2024, we identified errors in our previously issued financial statements for the years ended December 31, 2023 and December 31, 2022 related to the measurement of income tax expense for certain foreign subsidiaries statutory earnings. These errors were non-cash items that had no impact to our cash paid for income taxes.

We assessed the materiality of these errors, using both quantitative and qualitative factors, in accordance with the SEC Staff Accounting Bulletin ("SAB") No. 99 "Materiality" and SAB 108 "Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements" codified in ASC 250 "Accounting Changes and Error Corrections" and concluded these errors (including when aggregated with other errors discussed below) were immaterial to all of the previously issued consolidated financial statements but, if corrected in the current year, would be material to the current year. Under ASC 250, such prior-year misstatements which, if corrected in the current year would be material to the current year, must be corrected by adjusting the prior-year financial statements. Correcting prior-year financial statements for such immaterial errors does not require previously filed reports to be amended.

In addition to the errors related to the income tax provision as noted above, we recorded other errors to correct prior periods as presented below. These errors were not previously recorded, as we concluded that they were immaterial individually and in aggregate to our previously issued consolidated financial statements.

The effects of the error corrections on our unaudited consolidated statements of operations and comprehensive income (loss) for the three months ended March 31, 2024, June 30, 2023 and March 31, 2023, as well as for the six months ended June 30, 2024 and June 30, 2023 are presented in the tables below. There were no errors in our previously issued statements of cash flows that impacted net operating, investing and financing activities for the three months ended June 30, 2024 and March 31, 2024. We have disclosed the effects of the error corrections on our previously issued financial statements for the three and nine months ended September 30, 2023 as well as our consolidated balance sheet as of December 31, 2023 in our Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2024. Furthermore, the effects of the error corrections on our consolidated statements of operations, comprehensive income (loss), and cash flows for the years ended December 31, 2023 and December 31, 2022 are also presented in the tables below.

The consolidated statements of stockholders' equity for the years ended December 31, 2023 and December 31, 2022 have also been revised to reflect the impacts to net earnings and redeemable noncontrolling interests.

62

The following table presents the impact of correcting the errors on the affected line items of our consolidated statements of operations for the three months ended March 31, 2024 and for the six months ended June 30, 2024. There was no revision for the three months ended June 30, 2024.

| | Three Months Ended March 31, 2024 | | | Three Months Ended June 30, 2024 | Six Months Ended June 30, 2024 |
| | As Reported | Adjustments | As Revised | As Reported | As Revised |
|---|---|---|---|---|---|
| | *(unaudited, in thousands except per share data)* | | | | |
| Direct operating expenses | $ 2,646,457 | $ 4,883 | $ 2,651,340 | $ 4,408,209 | $ 7,059,549 |
| Operating income (loss) | (36,507) | (4,883) | (41,390) | 465,819 | 424,429 |
| Income (loss) before income taxes | 3,197 | (4,883) | (1,686) | 456,392 | 454,706 |
| Income tax expense | 35,414 | 5,605 | 41,019 | 80,164 | 121,183 |
| Net income (loss) | (32,217) | (10,488) | (42,705) | 376,228 | 333,523 |
| Net income attributable to noncontrolling interests | 14,516 | (2,746) | 11,770 | 78,258 | 90,028 |
| Net income (loss) attributable to common stockholders of Live Nation | (46,733) | (7,742) | (54,475) | 297,970 | 243,495 |
| Basic net income (loss) per common share available to common stockholders of Live Nation | (0.53) | (0.03) | (0.56) | 1.05 | 0.48 |
| Diluted net income (loss) per common share available to common stockholders of Live Nation | (0.53) | (0.03) | (0.56) | 1.03 | 0.48 |

The following table presents the impact of correcting the errors on the affected line items of our consolidated statements of comprehensive income (loss) for the three months ended March 31, 2024 and for the six months ended June 30, 2024. There was no revision for the three months ended June 30, 2024.

| | Three Months Ended March 31, 2024 | | | Three Months Ended June 30, 2024 | Six Months Ended June 30, 2024 |
| | As Reported | Adjustments | As Revised | As Reported | As Revised |
|---|---|---|---|---|---|
| | *(unaudited, in thousands)* | | | | |
| Net income (loss) | $ (32,217) | $ (10,488) | $ (42,705) | $ 376,228 | $ 333,523 |
| Comprehensive income (loss) | (23,849) | (10,488) | (34,337) | 217,654 | 183,317 |
| Comprehensive income attributable to noncontrolling interests | 14,516 | (2,746) | 11,770 | 78,258 | 90,028 |
| Comprehensive income (loss) attributable to common stockholders of Live Nation | (38,365) | (7,742) | (46,107) | 139,396 | 93,289 |

63

The following table presents the impact of correcting the errors on the affected line items of our consolidated statements of operations for the three months ended March 31, 2023, June 30, 2023 and for the six months ended June 30, 2023:

| | Three Months Ended March 31, 2023 | | | Three Months Ended June 30, 2023 | | | Six Months Ended June 30, 2023 |
| | As Reported | Adjustments | As Revised | As Reported | Adjustments | As Revised | As Revised |
|---|---|---|---|---|---|---|---|
| | *(unaudited, in thousands except per share data)* | | | | | | |
| Revenue | $ 3,127,390 | $ (2,831) | $ 3,124,559 | $ 5,630,723 | $ (2,209) | $ 5,628,514 | $ 8,753,073 |
| Direct operating expenses | 2,115,589 | 8,793 | 2,124,382 | 4,164,778 | 2,563 | 4,167,341 | 6,291,723 |
| Operating income | 142,776 | (11,624) | 131,152 | 386,371 | (4,772) | 381,599 | 512,751 |
| Income before income taxes | 68,032 | (11,624) | 56,408 | 372,985 | (4,772) | 368,213 | 424,621 |
| Income tax expense | 23,840 | | 23,840 | 41,648 | 11,313 | 52,961 | 76,801 |
| Net income | 44,192 | (11,624) | 32,568 | 331,337 | (16,085) | 315,252 | 347,820 |
| Net income attributable to noncontrolling interests | 47,361 | (13,120) | 34,241 | 37,655 | 7,577 | 45,232 | 79,473 |
| Net income (loss) attributable to common stockholders of Live Nation | (3,169) | 1,496 | (1,673) | 293,682 | (23,662) | 270,020 | 268,347 |
| Basic net income (loss) per common share available to common stockholders of Live Nation | (0.25) | | (0.25) | 1.04 | (0.11) | 0.93 | 0.69 |
| Diluted net income (loss) per common share available to common stockholders of Live Nation | (0.25) | | (0.25) | 1.02 | (0.10) | 0.92 | 0.68 |

The following table presents the impact of correcting the errors on the affected line items of our consolidated statements of comprehensive income for the three months ended March 31, 2023, June 30, 2023 and for the six months ended June 30, 2023:

| | Three Months Ended March 31, 2023 | | | Three Months Ended June 30, 2023 | | | Six Months Ended June 30, 2023 |
| | As Reported | Adjustments | As Revised | As Reported | Adjustments | As Revised | As Revised |
|---|---|---|---|---|---|---|---|
| | *(unaudited, in thousands)* | | | | | | |
| Net income | $ 44,192 | $ (11,624) | $ 32,568 | $ 331,337 | $ (16,085) | $ 315,252 | $ 347,820 |
| Comprehensive income | 116,843 | (11,624) | 105,219 | 408,015 | (16,085) | 391,930 | 497,149 |
| Comprehensive income attributable to noncontrolling interests | 47,361 | (13,120) | 34,241 | 37,655 | 7,577 | 45,232 | 79,473 |
| Comprehensive income attributable to common stockholders of Live Nation | 69,482 | 1,496 | 70,978 | 370,360 | (23,662) | 346,698 | 417,676 |

The following table presents the impact of correcting the errors on the affected line items of our consolidated statements of operations for the year ended December 31, 2023:

| | | Year Ended December 31, 2023 | | |
| --- | --- | --- | --- | --- |
| | As Reported | Adjustments | | As Revised |
| | | (in thousands except per share data) | | |
| Revenue | $ 22,749,073 | $ (22,756) | $ | 22,726,317 |
| Direct operating expenses | 17,292,016 | (41,486) | | 17,250,530 |
| Operating income | 1,066,203 | 18,730 | | 1,084,933 |
| Income before income taxes | 894,544 | 18,730 | | 913,274 |
| Income tax expense | 160,227 | 49,249 | | 209,476 |
| Net income | 734,317 | (30,519) | | 703,798 |
| Net income attributable to noncontrolling interests | 171,037 | (24,132) | | 146,905 |
| Net income attributable to common stockholders of Live Nation | 563,280 | (6,387) | | 556,893 |
| Basic net income per common share available to common stockholders of Live Nation | 1.38 | (0.03) | | 1.35 |
| Diluted net income per common share available to common stockholders of Live Nation | 1.37 | (0.03) | | 1.34 |

The following table presents the impact of correcting the errors on the affected line items of our consolidated statements of comprehensive income for the year ended December 31, 2023:

| | | Year ended December 31, 2023 | | |
| --- | --- | --- | --- | --- |
| | As Reported | Adjustments | | As Revised |
| | | (in thousands) | | |
| Net income | $ 734,317 | $ (30,519) | $ | 703,798 |
| Comprehensive income | 851,843 | (30,519) | | 821,324 |
| Comprehensive income attributable to noncontrolling interests | 171,037 | (24,132) | | 146,905 |
| Comprehensive income attributable to common stockholders of Live Nation | 680,806 | (6,387) | | 674,419 |

The following table presents the impact of correcting the errors on the affected line items of our consolidated statement of cash flow for the year ended December 31, 2023:

| | | Year Ended December 31, 2023 | | |
| --- | --- | --- | --- | --- |
| | As Reported | Adjustments | | As Revised |
| | | (in thousands) | | |
| Net income | $ 734,317 | $ (30,519) | $ | 703,798 |
| Increase in accounts receivable | (550,670) | 24,931 | | (525,739) |
| Increase in accounts payable, accrued expenses and other liabilities | 460,496 | (10,126) | | 450,370 |
| Increase in deferred revenue | 133,023 | 7,894 | | 140,917 |
| Net cash provided by operating activities | 1,370,794 | (7,820) | | 1,362,974 |
| Net increase in cash, cash equivalents and restricted cash | 626,582 | (7,820) | | 618,762 |
| Cash, cash equivalents and restricted cash at beginning of period | 5,612,374 | 7,820 | | 5,620,194 |

The following table presents the impact of correcting the errors on the affected line items of our consolidated statements of operations for the year ended December 31, 2022:

| | | Year Ended December 31, 2022 | | | |
| | | As Reported | Adjustments | | As Revised |
| | | | (in thousands except per share data) | | |
| Direct operating expenses | $ | 12,337,524 | $ | 10,087 | $ | 12,347,611 |
| Operating income | | 732,118 | | (10,087) | | 722,031 |
| Other expense, net | | 36,379 | | 4,836 | | 41,215 |
| Income before income taxes | | 505,447 | | (14,923) | | 490,524 |
| Income tax expense | | 96,254 | | 19,687 | | 115,941 |
| Net income | | 409,193 | | (34,610) | | 374,583 |
| Net income attributable to noncontrolling interests | | 113,207 | | (5,064) | | 108,143 |
| Net income attributable to common stockholders of Live Nation | | 295,986 | | (29,546) | | 266,440 |
| Basic net income per common share available to common stockholders of Live Nation | | 0.66 | | (0.13) | | 0.53 |
| Diluted net income per common share available to common stockholders of Live Nation | | 0.64 | | (0.12) | | 0.52 |

The following table presents the impact of correcting the errors on the affected line items of our consolidated statements of comprehensive income for the year ended December 31, 2022:

| | | Year Ended December 31, 2022 | | | |
| | | As Reported | Adjustments | | As Revised |
| | | | (in thousands) | | |
| Net income | $ | 409,193 | $ | (34,610) | $ | 374,583 |
| Other comprehensive income, net of tax, foreign currency translation adjustments | | 8,047 | | 4,836 | | 12,883 |
| Comprehensive income | | 467,081 | | (29,774) | | 437,307 |
| Comprehensive income attributable to noncontrolling interests | | 113,207 | | (5,064) | | 108,143 |
| Comprehensive income attributable to common stockholders of Live Nation | | 353,874 | | (24,710) | | 329,164 |

The following table presents the impact of correcting the errors on the affected line items of our consolidated statement of cash flow for the for the year ended December 31, 2022:

| | | Year Ended December 31, 2022 | | | |
| | | As Reported | Adjustments | | As Revised |
| | | | (in thousands) | | |
| Net income | $ | 409,193 | $ | (34,610) | $ | 374,583 |
| Increase in accounts receivable | | (463,977) | | 19,474 | | (444,503) |
| Increase in accounts payable, accrued expenses and other liabilities | | 1,002,158 | | 26,014 | | 1,028,172 |
| Increase in deferred revenue | | 367,617 | | (7,894) | | 359,723 |
| Net cash provided by operating activities | | 1,832,063 | | 2,984 | | 1,835,047 |
| Effect of exchange rate changes on cash, cash equivalents and restricted cash | | (179,450) | | 4,836 | | (174,614) |
| Net increase in cash, cash equivalents and restricted cash | | 724,582 | | 7,820 | | 732,402 |
| Cash, cash equivalents and restricted cash at end of period | | 5,612,374 | | 7,820 | | 5,620,194 |

## NOTE 3—LONG-LIVED ASSETS, INTANGIBLES, AND GOODWILL

### Property, Plant and Equipment, Net

Property, plant and equipment includes expenditures for the construction of new venues, major renovations to existing buildings or buildings that are being added to our venue network, the development of new ticketing tools and technology enhancements along with the renewal and improvement of existing venues and technology systems, web development and administrative offices.

Property, plant and equipment consisted of the following:

| | December 31, | | |
|---|---|---|---|
| | 2024 | | 2023 |
| | (in thousands) | | |
| Land, buildings and improvements | $ 2,325,929 | $ | 2,043,595 |
| Computer equipment and capitalized software | 867,294 | | 888,065 |
| Furniture and other equipment | 757,803 | | 646,966 |
| Construction in progress | 386,880 | | 317,028 |
| Property, plant and equipment, gross | 4,337,906 | | 3,895,654 |
| Less: accumulated depreciation | 1,896,034 | | 1,794,191 |
| Property, plant and equipment, net | $ 2,441,872 | $ | 2,101,463 |

*Definite-lived Intangible Assets*

The following table presents the changes in the gross carrying amount and accumulated amortization of definite-lived intangible assets for the years ended December 31, 2024 and 2023:

| | Revenue-generating contracts | Client / vendor relationships | Venue management | Trademarks and naming rights | Technology and Other [1] | Total |
|---|---|---|---|---|---|---|
| | | | *(in thousands)* | | | |
| **Balance as of December 31, 2022:** | | | | | | |
| Gross carrying amount | $ 824,785 | $ 563,210 | $ 148,022 | $ 188,596 | $ 35,736 | $ 1,760,349 |
| Accumulated amortization | (316,581) | (209,518) | (58,588) | (97,931) | (27,109) | (709,727) |
| Net | 508,204 | 353,692 | 89,434 | 90,665 | 8,627 | 1,050,622 |
| Gross carrying amount: | | | | | | |
| Acquisitions and additions current year | 136,117 | 46,767 | 77,329 | | 21,789 | 282,002 |
| Acquisitions and additions prior year | (1,830) | (6,681) | (11) | | | (8,522) |
| Foreign exchange | 57,797 | 17,070 | 3,960 | 8,151 | (104) | 86,874 |
| Other [2] | (91,612) | (36,930) | (2,512) | (13,254) | (37,201) | (181,509) |
| Net change | 100,472 | 20,226 | 78,766 | (5,103) | (15,516) | 178,845 |
| Accumulated amortization: | | | | | | |
| Amortization | (103,756) | (75,994) | (22,186) | (18,390) | (17,303) | (237,629) |
| Foreign exchange | (7,900) | (3,019) | (1,132) | (1,448) | (408) | (13,907) |
| Other [2] | 91,612 | 36,882 | 2,688 | 13,733 | 38,775 | 183,690 |
| Net change | (20,044) | (42,131) | (20,630) | (6,105) | 21,064 | (67,846) |
| **Balance as of December 31, 2023:** | | | | | | |
| Gross carrying amount | 925,257 | 583,436 | 226,788 | 183,493 | 20,220 | 1,939,194 |
| Accumulated amortization | (336,625) | (251,649) | (79,218) | (104,036) | (6,045) | (777,573) |
| Net | 588,632 | 331,787 | 147,570 | 79,457 | 14,175 | 1,161,621 |
| Gross carrying amount: | | | | | | |
| Acquisitions and additions current year | 68,453 | 52,406 | 35,273 | 7,331 | 7,551 | 171,014 |
| Acquisitions and additions prior year | 826 | 4,066 | 3 | | | 4,895 |
| Foreign exchange | (96,995) | (32,993) | (6,954) | (14,096) | (709) | (151,747) |
| Other [2] | (77,947) | (39,343) | (23,930) | (14,240) | (825) | (156,285) |
| Net change | (105,663) | (15,864) | 4,392 | (21,005) | 6,017 | (132,123) |
| Accumulated amortization: | | | | | | |
| Amortization | (111,711) | (86,637) | (23,978) | (17,791) | (9,142) | (249,259) |
| Foreign exchange | 29,331 | 12,013 | 2,185 | 5,096 | 89 | 48,714 |
| Other [2] | 79,707 | 39,892 | 24,066 | 11,763 | 1,432 | 156,860 |
| Net change | (2,673) | (34,732) | 2,273 | (932) | (7,621) | (43,685) |
| **Balance as of December 31, 2024:** | | | | | | |
| Gross carrying amount | 819,594 | 567,572 | 231,180 | 162,488 | 26,237 | 1,807,071 |
| Accumulated amortization | (339,298) | (286,381) | (76,945) | (104,968) | (13,667) | (821,259) |
| Net | $ 480,296 | $ 281,191 | $ 154,235 | $ 57,520 | $ 12,570 | $ 985,812 |

[1] Other primarily includes intangible assets for non-compete agreements.

[2] Other primarily includes netdowns of fully amortized or impaired assets.

68

Included in the current year acquisitions amounts above for 2024 are definite-lived intangible assets primarily associated with the acquisitions of certain festival promotion, venue and artist management businesses located in the United States.

Included in the current year acquisitions amounts above for 2023 are definite-lived intangible assets primarily associated with the acquisitions of certain venue and artist management businesses located in the United States, a concert and festival promotion business in Australia, a promotion business in South America, as well as additions for music publishing rights.

The additions to definite-lived intangible assets from acquisitions have weighted-average lives as follows:

|  | Weighted-Average Life | |
| --- | --- | --- |
|  | 2024 | 2023 |
|  | (in years) | |
| Revenue-generating contracts | 9 | 5 |
| Client/vendor relationships | 5 | 4 |
| Trademarks and naming rights | 6 | 0 |
| Technology | 3 | 3 |
| Venue management | 6 | 11 |
| All categories | 7 | 8 |

Amortization of definite-lived intangible assets for the years ended December 31, 2024, 2023 and 2022 was $249.3 million, $237.6 million and $216.9 million, respectively.

The following table presents our estimate of amortization expense for each of the five succeeding fiscal years for definite-lived intangible assets that exist at December 31, 2024:

|  | (in thousands) |
| --- | --- |
| 2025 | $ 223,347 |
| 2026 | $ 187,016 |
| 2027 | $ 149,931 |
| 2028 | $ 129,323 |
| 2029 | $ 109,702 |

As acquisitions and dispositions occur in the future and the valuations of intangible assets for recent acquisitions are completed, amortization expense may vary.

### Indefinite-lived Intangibles

We have indefinite-lived intangible assets which consist of trade names and cryptocurrency assets. These indefinite-lived intangible assets had a carrying value of $80.6 million and $377.3 million as of December 31, 2024 and 2023, respectively.

69

*Goodwill*

The following table presents the changes in the carrying amount of goodwill in each of our reportable segments for the years ended December 31, 2024 and 2023:

| | Concerts | Ticketing | Sponsorship & Advertising | Total |
|---|---|---|---|---|
| | | | *(in thousands)* | |
| **Balance as of December 31, 2022:** | | | | |
| Goodwill | $ 1,349,426 | $ 979,742 | $ 635,575 | $ 2,964,743 |
| Accumulated impairment losses | (435,363) | | | (435,363) |
| Net | 914,063 | 979,742 | 635,575 | 2,529,380 |
| | | | | |
| Acquisitions   current year | 90,298 | | | 90,298 |
| Acquisitions   prior year | 1,657 | 143 | | 1,800 |
| Dispositions | (6,183) | | | (6,183) |
| Foreign exchange | 4,381 | 32,645 | 39,145 | 76,171 |
| | | | | |
| **Balance as of December 31, 2023:** | | | | |
| Goodwill | 1,439,579 | 1,012,530 | 674,720 | 3,126,829 |
| Accumulated impairment losses | (435,363) | | | (435,363) |
| Net | 1,004,216 | 1,012,530 | 674,720 | 2,691,466 |
| | | | | |
| Acquisitions   current year | 41,095 | 507 | 1,015 | 42,617 |
| Acquisitions   prior year | 4,136 | | | 4,136 |
| Foreign exchange | (22,708) | (48,816) | (45,784) | (117,308) |
| | | | | |
| **Balance as of December 31, 2024:** | | | | |
| Goodwill | 1,462,102 | 964,221 | 629,951 | 3,056,274 |
| Accumulated impairment losses | (435,363) | | | (435,363) |
| Net | $ 1,026,739 | $ 964,221 | $ 629,951 | $ 2,620,911 |

Included in the current year acquisitions amounts above for 2024 is goodwill primarily associated with the acquisitions of an artist management business and certain festival and concert promotion businesses located in the United States.

Included in the current year acquisitions amounts above for 2023 is goodwill primarily associated with the acquisitions of certain venue and festival promotion businesses located in the United States and Europe as well as a promotion business in South America.

We are in various stages of finalizing our acquisition accounting for recent acquisitions, which include the use of external valuation consultants, and the completion of this accounting could result in a change to the associated purchase price allocations, including goodwill and the allocation between segments.

*Investments in Nonconsolidated Affiliates*

During the year ended December 31, 2024, 2023 and 2022, there were no significant sales of investments in nonconsolidated affiliates

## NOTE 4—LEASES

The significant components of operating lease expense are as follows:

| | | Year Ended December 31, | | |
|---|---|---|---|---|
| | | 2024 | | 2023 |
| | | (in thousands) | | |
| Operating lease cost | $ | 264,339 | $ | 274,731 |
| Variable and short-term lease cost | | 182,372 | | 205,768 |
| Sublease income | | (6,006) | | (7,687) |
| Net lease cost | $ | 440,705 | $ | 472,812 |

Many of our leases contain contingent rent obligations based on revenue, tickets sold or other variables. Contingent rent obligations, including those related to subsequent changes in the prevailing index or market rate after lease inception, are not included in the initial measurement of the lease asset or liability and are recorded as rent expense in the period that the contingency is resolved.

Supplemental cash flow information for our operating leases is as follows:

| | | Year Ended December 31, | | |
|---|---|---|---|---|
| | | 2024 | | 2023 |
| | | (in thousands) | | |
| Cash paid for amounts included in the measurement of lease liabilities | $ | 249,052 | $ | 259,664 |
| Lease assets obtained in exchange for lease obligations, net of terminations | $ | 249,501 | $ | 181,729 |

Future maturities of our operating lease liabilities at December 31, 2024 are as follows:

| | | (in thousands) |
|---|---|---|
| 2025 | $ | 258,840 |
| 2026 | | 225,767 |
| 2027 | | 251,785 |
| 2028 | | 234,272 |
| 2029 | | 213,955 |
| Thereafter | | 1,943,700 |
| Total lease payments | | 3,128,319 |
| Less: Interest | | 1,294,647 |
| Present value of lease liabilities | $ | 1,833,672 |

The weighted average remaining lease term and weighted average discount rate for our operating leases are as follows

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2024 | | 2023 |
| Weighted average remaining lease term (in years) | 14.5 | | 13.0 |
| Weighted average discount rate | 6.24 % | | 6.16 % |

As of December 31, 2024, we have additional operating leases that have not yet commenced with total lease payments of $201.1 million. These operating leases, which are not included on our consolidated balance sheets, have commencement dates ranging from January 2025 to June 2030 with lease terms ranging from 3 to 28 years.

## NOTE 5—LONG-TERM DEBT

In November 2024, we amended our senior secured credit facility and added a new venue expansion revolving credit facility of $400.0 million, which resulted in a total available revolving borrowing capacity of $1.7 billion. In November 2024, we repaid $575.0 million principal outstanding on our 4.875% senior notes. In December 2024, we issued $1.1 billion principal amount of 2.875% convertible senior notes due 2030 and repurchased $316.0 million aggregate principal amount of the 2.0% convertible senior notes due 2025.

Long-term debt, which includes finance leases, consisted of the following:

| | December 31, | |
| --- | --- | --- |
| | 2024 | 2023 |
| | *(in thousands)* | |
| Senior Secured Credit Facility: | | |
| Term loan B | $ 828,163 | $ 836,903 |
| Revolving credit facility | | 370,000 |
| 6.5% Senior Secured Notes due 2027 | 1,200,000 | 1,200,000 |
| 3.75% Senior Secured Notes due 2028 | 500,000 | 500,000 |
| 4.875% Senior Notes due 2024 | | 575,000 |
| 5.625% Senior Notes due 2026 | 300,000 | 300,000 |
| 4.75% Senior Notes due 2027 | 950,000 | 950,000 |
| 2.0% Convertible Senior Notes due 2025 | 83,957 | 400,000 |
| 3.125% Convertible Senior Notes due 2029 | 1,000,000 | 1,000,000 |
| 2.875% Convertible Senior Notes due 2030 | 1,100,000 | |
| Other debt | 529,257 | 511,210 |
| Total principal amount | 6,491,377 | 6,643,113 |
| Less: unamortized discounts and debt issuance costs | (53,308) | (49,701) |
| Total debt, net of unamortized discounts and debt issuance costs | 6,438,069 | 6,593,412 |
| Less: current portion | 260,901 | 1,134,386 |
| Total long-term debt, net | $ 6,177,168 | $ 5,459,026 |

Future maturities of debt at December 31, 2024 are as follows:

| | *(in thousands)* |
| --- | --- |
| 2025 | $ 260,901 |
| 2026 | 1,421,182 |
| 2027 | 2,153,632 |
| 2028 | 1,515,468 |
| 2029 | 1,103,078 |
| Thereafter | 37,116 |
| Total | $ 6,491,377 |

All debt without a stated maturity date is considered current and is reflected as maturing in the earliest period shown in the table above. See Note 7   Fair Value Measurements for discussion of the fair value measurement of our debt.

*Amended Senior Secured Credit Facility*

In November 2024, we amended our senior secured credit facility and entered into Amendment No. 12 (the "Amendment") to our Credit Agreement (as amended by Amendment No. 12, the "Amended Credit Agreement"). The Amendment provides for, among other things, a new $400.0 million revolving credit facility to be used for venue financing or other general corporate purposes, which resulted in a revolving credit facility with a total available borrowing capacity of up to $1.7 billion including a $250.0 million sublimit for the issuance of letters of credit and a $100.0 million sublimit for swingline borrowings. The revolving credit facility allows for a $780.0 million sublimit for borrowings in U.S. Dollars, Euros, or Sterling, and a $260.0 million sublimit for borrowings in those or one or more other approved non-U.S. currencies. The revolving credit facility will be available to us and, if designated in the future, certain of our foreign subsidiaries. The Amended Credit Agreement provides for the right, subject to certain conditions, to increase the term B loan and revolving facilities by an amount not to exceed an amount equal to the sum of (x) $1.625 billion, (y) the aggregate principal amount of voluntary prepayments of the term B loans and permanent reductions of the revolving credit facility commitments, in each case, other than from proceeds of long-term indebtedness, and (z) additional amounts so long as the senior secured leverage ratio, on a pro-forma basis after giving effect to such increase, is no greater than 4.50x.

Our obligations under the Amended Credit Agreement will continue to be guaranteed by the majority of our direct and indirect domestic subsidiaries, subject to certain exceptions, and the obligations of the foreign subsidiary borrowers, if any, will be guaranteed by us, the majority of our direct and indirect domestic subsidiaries, and by certain of our wholly-owned foreign subsidiaries. The obligations under the Amended Credit Agreement and the guarantees will continue to be secured by a lien on substantially all of our tangible and intangible personal property and the domestic subsidiaries that are guarantors, and by a pledge of substantially all of the shares of stock, partnership interests and limited liability company interests of our direct and indirect domestic subsidiaries and 65% of each class of capital stock of any first-tier foreign subsidiaries and, if there are any foreign borrowers, by certain of the assets of such foreign borrowers and certain foreign subsidiaries, subject to limited exceptions.

The interest rates per annum applicable to the revolving credit facility under the amended senior secured credit facility are, at our option, equal to either Term SOFR plus 1.75% or a base rate (as defined in the Credit Agreement) plus 0.75%.

The interest rates per annum applicable to the term loan B are, at our option, equal to either Term Benchmark Loans or RFR Loans (as defined in the Credit Agreement) plus 1.75% or a base rate plus 0.75%. We have an interest rate swap agreement that ensures the interest rate on $500 million principal amount of our outstanding term loan B does not exceed 3.445% through October 2026. For the term loan B, we are required to make quarterly payments of $2.4 million with the balance due at maturity in October 2026. We are also required to make mandatory prepayments of the loan, subject to specified exceptions, from excess cash flow and with the proceeds of asset sales, debt issuances and specified other events.

We are required to pay a commitment fee of 0.35% per year on the undrawn portion available under the revolving credit facility and variable fees on outstanding letters of credit. Based on our outstanding letters of credit of $20.9 million, $1.68 billion was available for future borrowings from our revolving credit facility as of December 31, 2024.

The revolving credit facility matures on November 5, 2029, provided, that if (x) any of the term loan B, our 6.5% Senior Secured Notes due 2027, or our 4.75% Senior Notes due 2027 remain outstanding on the date that is ninety-one days prior to the stated maturity thereof in an aggregate principal amount in excess of $500.0 million and (y) our consolidated free cash on such date is less than the sum of such outstanding principal amount plus $500.0 million, then the maturity date of the amended senior secured credit facility will instead be such date.

During the three months ended December 31, 2024, we repaid $585.0 million under our senior secured revolving credit facility, which was used to repay the $575.0 million principal amount plus accrued interest on our 4.875% senior notes that matured on November 1, 2024. No material gain or loss was recorded as a result of this repayment.

During the three months ended March 31, 2024, we repaid $70.0 million of principal related to our revolving credit facility that had been outstanding as of December 31, 2023. No material gain or loss was recorded as a result of this repayment.

*6.5% Senior Secured Notes Due 2027*

At December 31, 2024, we had $1.2 billion principal amount of 6.5% senior secured notes due 2027. Interest on the notes is payable semi-annually in cash in arrears on May 15 and November 15 of each year and the notes will mature on May 15, 2027. On or after May 15, 2023 we may redeem some or all of the notes at any time at redemption prices starting at 104.875% of their principal amount, plus any accrued and unpaid interest to the date of redemption. We must make an offer to redeem the notes at 101% of their aggregate principal amount, plus accrued and unpaid interest to the repurchase date, if we experience certain defined changes of control. The notes are secured by a first priority lien on substantially all of the tangible and intangible personal property of LNE and LNE's domestic subsidiaries that are guarantors, and by a pledge of substantially all of the shares of stock, partnership interests and limited liability company interests of our direct and indirect domestic subsidiaries and 65% of each class of capital stock of any first-tier foreign subsidiaries, subject to certain exceptions.

*3.75% Senior Secured Notes due 2028*

At December 31, 2024, we had $500.0 million principal amount of 3.75% senior secured notes due 2028. Interest on the notes is payable semi-annually in cash in arrears on January 15 and July 15 of each year, and will mature on January 15, 2028. On or after January 15, 2024, we may redeem some or all of the notes at any time at redemption prices starting at 102.813% of their principal amount, plus any accrued and unpaid interest to the date of redemption. We must make an offer to redeem the notes at 101% of their aggregate principal amount, plus accrued and unpaid interest to the repurchase date, if we experience certain defined changes of control. The notes are secured by a first priority lien on substantially all of the tangible and intangible personal property of LNE and LNE's domestic subsidiaries that are guarantors, and by a pledge of substantially all of the shares of stock, partnership interests and limited liability company interests of our direct and indirect domestic subsidiaries.

*5.625% Senior Notes Due 2026*

At December 31, 2024, we had $300.0 million principal amount of 5.625% senior notes due 2026. Interest on the notes is payable semi-annually in cash in arrears on March 15 and September 15 of each year, and the notes will mature on March 15, 2026. On or after March 15, 2021, we may redeem some or all of the notes at any time at redemption prices that start at 104.219% of their principal amount, plus any accrued and unpaid interest to the date of redemption. We must make an offer to redeem the notes at 101% of their aggregate principal amount, plus any accrued and unpaid interest to the repurchase date, if we experience certain defined changes of control.

*4.75% Senior Notes Due 2027*

At December 31, 2024, we had $950.0 million principal amount of 4.75% senior notes due 2027. Interest on the notes is payable semi-annually in cash in arrears on April 15 and October 15 of each year, and will mature on October 15, 2027. On or after October 15, 2022, we may redeem some or all of the notes at any time at redemption prices starting at 103.563% of their principal amount, plus any accrued and unpaid interest to the date of redemption. We must make an offer to redeem the notes at 101% of their aggregate principal amount, plus accrued and unpaid interest to the repurchase date, if we experience certain defined changes of control.

*2.0% Convertible Senior Notes Due 2025*

At December 31, 2024, we had $84.0 million principal amount of 2.0% convertible senior notes due 2025. Interest on the notes is payable semiannually in arrears on February 15 and August 15, at a rate of 2.0% per annum. The notes will mature on February 15, 2025. On or after November 15, 2024, the notes are convertible without condition, at an initial conversion rate of 9.4469 shares of our common stock per $1,000 principal amount of notes, subject to adjustment, which represents a 50.0% conversion premium based on the last reported sale price for our common stock of $70.57 on January 29, 2020 prior to issuing the notes. Upon conversion, the notes will be settled with a combination of cash and shares of common stock. Assuming we fully settled the remaining notes in shares, the maximum number of shares that could be issued to satisfy the conversion is currently 1.2 million.

As of December 31, 2024, the value of the remaining notes, if converted and fully settled in shares, exceeded the principal amount of the notes by $18.8 million.

*3.125% Convertible Senior Notes due 2029*

At December 31, 2024, we had $1.0 billion principal amount of 3.125% convertible senior notes due 2029 (the "2029 Notes"). Interest on the 2029 Notes is payable semi-annually in arrears on January 15 and July 15, beginning July 15, 2023, at a rate of 3.125% per annum. The notes will mature on January 15, 2029. The notes will be convertible, under certain circumstances, until October 15, 2028, and on or after such date without condition, at an initial conversion rate of 9.2259 shares of our common stock per $1,000 principal amount of notes, subject to adjustment, which represents a 50% conversion premium based on the last reported sale price for our common stock of $72.26 on January 9, 2023 prior to issuing the debt. Upon conversion, the notes may be settled in, at our election, shares of common stock or cash or a combination of cash and shares of common stock. Assuming we fully settle the notes in shares, the maximum number of shares that could be issued to satisfy the conversion is 13.8 million as of December 31, 2024.

We may redeem for cash all or any portion of the notes, at our option, on or after January 21, 2026 and before the 41st scheduled trading day before the maturity date, if the sales price of our common stock reaches specified targets as defined in the indenture. The redemption price will equal 100% of the principal amount of the notes plus accrued interest, if any.

If we experience a fundamental change, as defined in the indenture governing the notes, the holders of the 2029 Notes may require us to purchase for cash all or a portion of their notes, subject to specified exceptions, at a price equal to 100% of the principal amount of the notes plus accrued and unpaid interest, if any.

74

As of December 31, 2024, the remaining period for the unamortized debt issuance costs balance of $10.7 million was approximately four years and the value of the notes, if converted and fully settled in shares, exceeded the principal amount of the notes by $194.8 million. As of December 31, 2024, the effective interest rate on the notes was 3.17%.

In connection with the issuance of the 2029 Notes, we entered into privately negotiated capped call transactions with several counterparties. The cap price of the capped call transactions is initially $144.52, which represents a premium of 100% over the last reported sale price of the Company's common stock on January 9, 2023. The cost of the capped call transactions was $5.5 million and was charged to additional paid-in capital.

### 2.875% Convertible Senior Notes due 2030

In December 2024, we issued $1.1 billion principal amount of 2.875% convertible senior notes due 2030 (the "2030 Notes"). Interest on the 2030 Notes is payable semi-annually in arrears on January 15 and July 15, beginning July 15, 2025, at a rate of 2.875% per annum. The notes will mature on January 15, 2030. The notes will be convertible, under certain circumstances, until October 15, 2029, and on or after such date without condition, at an initial conversion rate of 5.2005 shares of our common stock per $1,000 principal amount of notes, subject to adjustment, which represents a 40.0% conversion premium based on the last reported sale price for our common stock of $137.35 on December 3, 2024 prior to issuing the debt. Upon conversion, the notes may be settled in, at our election, shares of common stock or cash or a combination of cash and shares of common stock. Assuming we fully settle the notes in shares, the maximum number of shares that could be issued to satisfy the conversion is 8.0 million as of December 31, 2024.

We may redeem for cash all or any portion of the notes, at our option, on or after January 24, 2028 and before the 41st scheduled trading day before the maturity date, if the sales price of our common stock reaches specified targets as defined in the indenture. The redemption price will equal 100% of the principal amount of the notes plus accrued interest, if any.

If we experience a fundamental change, as defined in the indenture governing the notes, the holders of the 2030 Notes may require us to purchase for cash all or a portion of their notes, subject to specified exceptions, at a price equal to 100% of the principal amount of the notes plus accrued and unpaid interest, if any.

As of December 31, 2024, the remaining period for the unamortized debt issuance costs balance of $17.8 million was approximately five years and the value of the notes, if converted and fully settled in shares, did not exceed the principal amount of the notes. As of December 31, 2024, the effective interest rate on the notes was 2.913%.

### Interest Cost on Convertible Senior Notes

The following table summarizes the amount of pre-tax interest cost recognized on the convertible senior notes due 2025, 2029 and 2030 for the year ended December 31, 2024, convertible senior notes due 2025 and 2029 for the year ended December 31, 2023 and convertible senior notes due 2023 and 2025 for the year ended December 31, 2022:

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2024 | | 2023 | | 2022 |
| | | | | (in thousands) | | |
| Interest cost recognized relating to: | | | | | | |
| Contractual interest coupon | $ | 41,202 | $ | 27,460 | $ | 21,750 |
| Amortization of debt issuance costs | | 4,095 | | 3,912 | | 3,710 |
| Total interest cost recognized on the convertible senior notes | $ | 45,297 | $ | 31,372 | $ | 25,460 |

### Debt Extinguishment

In conjunction with the issuance of the 2030 Notes, we used the net proceeds to repay $85.0 million outstanding amounts under our senior secured revolving credit facility and to repurchase $316.0 million principal amount of the 2.0% convertible notes due 2025, resulting in a loss on extinguishment of debt of $2.0 million and a charge to additional paid-in capital for the induced conversion of $94.0 million.

On October 31, 2024, we drew down $585.0 million from our senior secured revolving credit facility, and on November 1, 2024, we used these funds to repay the $575.0 million principal amount plus accrued interest on our 4.875% senior notes.

In conjunction with the issuance of the 2029 Notes, we used approximately $485.8 million of the net proceeds to repurchase $440.0 million aggregate principal amount of the 2.5% convertible senior notes due 2023 resulting in a loss on extinguishment of debt of $18.5 million and a charge to additional paid-in capital for the induced conversion of $27.3 million. On March 15, 2023, we redeemed the remaining $110.0 million aggregate principal amount of the 2.5% convertible senior notes and issued 156,750 common shares of stock.

*Other Debt*

As of December 31, 2024, other debt includes $275.0 million due in 2026 acquired as part of an acquisition of a controlling interest in a venue business in the United States during 2023, $120.4 million for a Euro denominated note due in 2025, debt to noncontrolling interest partners of $29.4 million and capital leases of $4.8 million. Our other debt has a weighted average cost of debt of 4.4% and maturities at various dates through September 2050.

*Debt Covenants*

Our amended senior secured credit facility contains a number of restrictions that, among other things, require us to satisfy a financial covenant and restrict our and our subsidiaries' ability to incur additional debt, make certain investments and acquisitions, repurchase our stock and prepay certain indebtedness, create liens, enter into agreements with affiliates, modify the nature of our business, enter into sale-leaseback transactions, transfer and sell material assets, merge or consolidate, and pay dividends and make distributions (with the exception of subsidiary dividends or distributions to the parent company or other subsidiaries on at least a pro-rata basis with any noncontrolling interest partners). Non-compliance with one or more of the covenants and restrictions could result in the full or partial principal balance of the credit facility becoming immediately due and payable. The amended senior secured credit facility agreement contains a financial covenant that requires us to maintain a maximum ratio of consolidated net debt to consolidated EBITDA (both as defined in the Amended Credit Agreement) that ranges from 6.75x to 5.25x, with the first step down of 0.50x occurring on March 31, 2026 and additional step downs of 0.50x occurring annually thereafter.

The indentures governing our 6.5% senior secured notes, 3.75% senior secured notes, 4.75% senior notes and 5.625% senior notes contain covenants that limit, among other things, our ability and the ability of our restricted subsidiaries to incur certain additional indebtedness and issue preferred stock, make certain distributions, investments and other restricted payments, sell certain assets, agree to any restrictions on the ability of restricted subsidiaries to make payments to us, merge, consolidate or sell all of our assets, create certain liens, and engage in transactions with affiliates on terms that are not on an arms-length basis. Certain covenants, including those pertaining to incurrence of indebtedness, restricted payments, asset sales, mergers, and transactions with affiliates will be suspended during any period in which the notes are rated investment grade by both rating agencies and no default or event of default under the indenture has occurred and is continuing. All of these notes contain two incurrence-based financial covenants, as defined, requiring a minimum fixed charge coverage ratio of 2.0x and a maximum secured indebtedness leverage ratio of 3.5x.

Some of our other subsidiary indebtedness includes restrictions on entering into various transactions, such as acquisitions and disposals, and prohibits payment of ordinary dividends. They also have financial covenants including minimum consolidated EBITDA to consolidated net interest payable, minimum consolidated cash flow to consolidated debt service, maximum consolidated debt to consolidated EBITDA and minimum liquidity, all as defined in the applicable debt agreements.

As of December 31, 2024, we believe we were in compliance with all of our debt covenants related to our senior secured credit facility and our corporate senior secured notes, senior notes and convertible senior notes. We expect to remain in compliance with all of these covenants throughout 2025.

*Subsequent Event*

On February 18, 2025, we utilized $84.8 million of our existing cash balance to repay the remaining aggregate principal amount of the 2.0% convertible senior notes due February 2025 plus accrued interest and we issued 182,560 shares of common stock to the convertible holders.

76

**NOTE 6—DERIVATIVE INSTRUMENTS**

We primarily use forward currency contracts and options to reduce our exposure to foreign currency risk associated with short-term artist fee commitments. We may also enter into forward currency contracts to minimize the risks and/or costs associated with changes in foreign currency rates on forecasted operating income. These instruments have not been designated as hedging instruments and any change in fair value is reported in earnings during the period of the change. Our foreign currency derivative activity, including the related fair values, are not material to any period presented.

In January 2020, we entered into an interest rate swap agreement that is designated as a cash flow hedge for accounting purposes to effectively convert a portion of our floating-rate debt to a fixed-rate basis. The swap agreement expires in October 2026, has a notional amount of $500 million and ensures that a portion of our floating-rate debt does not exceed 3.445%. The principal objective of this contract is to reduce the variability of the cash flow in our variable rate interest payments associated with our senior secured credit facility term loan B, thus reducing the impact of interest rate changes on future interest expense. Cash flows associated with the interest rate swap agreement are reflected as cash flows from operating activities within our consolidated statements of cash flows. As of December 31, 2024, there is no ineffective portion or amount excluded from effectiveness testing.

As a cash flow hedge, the effective portion of the loss on the derivative instrument was reported as a component of other comprehensive loss. Amounts are deferred in other comprehensive loss and reclassified into earnings in the same line item associated with the forecasted transaction in the period or periods during which the hedged transaction affects earnings.

We do not enter into derivative instruments for speculative or trading purposes and do not anticipate any significant recognition of derivative activity through the income statement in the future related to the instruments currently held. See Note 7   Fair Value Measurements for further discussion and disclosure of the fair values for our derivative instruments.

**NOTE 7—FAIR VALUE MEASUREMENTS**

*Recurring*

We currently have various financial instruments carried at fair value, such as marketable securities, derivatives and contingent consideration, but do not currently have nonfinancial assets and liabilities that are required to be measured at fair value on a recurring basis. Our financial assets and liabilities are measured using inputs from all levels of the fair value hierarchy as defined in the FASB guidance for fair value. For this categorization, only inputs that are significant to the fair value are considered. The three levels are defined as follows:

Level 1   Inputs are unadjusted quoted prices in active markets for identical assets or liabilities that can be accessed at the measurement date.

Level 2   Inputs include quoted prices for similar assets and liabilities in active markets, quoted prices for identical or similar assets or liabilities in markets that are not active, inputs other than quoted prices that are observable for the asset or liability (i.e., interest rates, yield curves, etc.) and inputs that are derived principally from or corroborated by observable market data by correlation or other means (i.e., market corroborated inputs).

Level 3   Unobservable inputs that reflect assumptions about what market participants would use in pricing the asset or liability. These inputs would be based on the best information available, including our own data.

77

In accordance with the fair value hierarchy described above, the following table shows the fair value of our financial assets and liabilities that are required to be measured at fair value on a recurring basis, which are classified on the balance sheets as cash and cash equivalents, other current assets, other long-term assets, other current liabilities and other long-term liabilities:

| | Fair Value Measurements at December 31, 2024 | | | | Fair Value Measurements at December 31, 2023 | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 | Total | Level 1 | Level 2 | Level 3 | Total |
| | (in thousands) | | | | (in thousands) | | | |
| **Assets:** | | | | | | | | |
| Cash equivalents | $ 734,814 | $ | $ | $ 734,814 | $ 580,126 | $ | $ | $ 580,126 |
| Interest rate swaps | | 29,251 | | 29,251 | | 39,232 | | 39,232 |
| Forward currency contracts | | 9,462 | | 9,462 | | 156 | | 156 |
| Investments in nonconsolidated affiliates | 122 | | | 122 | 865 | | | 865 |
| Total | $ 734,936 | $ 38,713 | $ | $ 773,649 | $ 580,991 | $ 39,388 | $ | $ 620,379 |
| **Liabilities:** | | | | | | | | |
| Equity awards | $ | $ | $ 6,300 | $ 6,300 | $ | $ | $ 5,938 | $ 5,938 |
| Forward currency contracts | | 380 | | 380 | | 6,468 | | 6,468 |
| Put option | | | | | | | 2,980 | 2,980 |
| Contingent consideration | | | 48,311 | 48,311 | | | 106,265 | 106,265 |
| Total | $ | $ 380 | $ 54,611 | $ 54,991 | $ | $ 6,468 | $ 115,183 | $ 121,651 |

Cash equivalents consist of money market funds. Fair values for cash equivalents are based on quoted prices in an active market. The fair value for our interest rate swap is based upon inputs corroborated by observable market data with similar tenors. Fair values for forward currency contracts are based on observable market transactions of spot and forward rates. The fair value of our investments in nonconsolidated affiliates are based quoted prices in an active market.

Certain equity awards are based on the Company's annual performance goals and achievement criteria. These awards are accounted for as liability-classified awards under GAAP and have performance goals that, if met, are vested quarterly over a period of up to two years, with the number of shares of common stock determined based on the Company's grant date stock price.

Certain third parties have a put option to sell to us their noncontrolling interest in one of our subsidiaries and such put option is carried at fair value using Level 3 inputs. The put option is triggered by the occurrence of specific events, one of which is certain to occur, that requires us to buy the noncontrolling interest. The redemption price for the put option is a variable amount based on a formula linked to historical earnings. We have recorded a current liability for the put option which is valued based on the historic results of that subsidiary. Changes in the fair value are recorded in selling, general and administrative expenses.

We have certain contingent consideration obligations related to acquisitions which are measured at fair value using Level 3 inputs. The amounts due to the sellers are based on the achievement of agreed-upon financial performance metrics by the acquired companies where the contingent obligation is either earned or not earned. We record the liability at the time of the acquisition based on the present value of management's best estimates of the future results of the acquired companies compared to the agreed-upon metrics. Subsequent to the date of acquisition, we update the original valuation to reflect current projections of future results of the acquired companies and the passage of time. Accretion of, and changes in the valuations of, contingent consideration are reported in selling, general and administrative expenses. See Note 8 Commitments and Contingent Liabilities for additional information related to the contingent payments.

Due to their short maturity, the carrying amounts of accounts receivable, accounts payable and accrued expenses approximated their fair values at December 31, 2024 and 2023.

Our outstanding debt held by third-party financial institutions is carried at cost, adjusted for discounts or debt issuance costs. Our debt is not publicly traded and the carrying amounts typically approximate fair value for debt that accrues interest at a variable rate, which are considered to be Level 2 inputs.

The following table presents the estimated fair values of our senior secured notes, senior notes and convertible senior notes at December 31, 2024 and 2023:

| | Estimated Fair Value at: | | | |
| | December 31, 2024 | | December 31, 2023 | |
| | Level 2 | | | |
| | (in thousands) | | | |
|---|---|---|---|---|
| 6.5% Senior Secured Notes due 2027 | $ | 1,213,896 | $ | 1,222,608 |
| 3.75% Senior Secured Notes due 2028 | $ | 472,635 | $ | 469,515 |
| 4.875% Senior Notes due 2024 [1] | $ | | $ | 570,412 |
| 5.625% Senior Notes due 2026 | $ | 299,529 | $ | 297,606 |
| 4.75% Senior Notes due 2027 | $ | 919,049 | $ | 913,653 |
| 2.0% Convertible Senior Notes due 2025 [2] | $ | 103,032 | $ | 423,668 |
| 3.125% Convertible Senior Notes due 2029 | $ | 1,365,560 | $ | 1,136,160 |
| 2.875% Convertible Senior Notes due 2030 [2] | $ | 1,105,852 | $ | |

[1]    In November 2024, we repaid $575.0 million principal amount outstanding on our 4.875% senior notes.

[2]    In December 2024, we issued $1.1 billion principal amount of 2.875% convertible senior notes due 2030 and repurchased $316.0 million aggregate principal amount of the 2.0% convertible senior notes due 2025.

The estimated fair value of our third-party fixed-rate debt is based on quoted market prices in active markets for the same or similar debt, which are considered to be Level 2 inputs.

### Non-recurring

For the year ended December 31, 2024, we recorded a gain related to an investment in a nonconsolidated affiliate of $1.8 million, as well as, a gain related to a warrant in a nonconsolidated affiliate of $41.5 million, as a component of other income, net. To calculate the gain on the investment, we remeasured the investment to fair value of $42.2 million using an observable price from orderly transactions for a similar investment of the same issuer. We remeasured the warrant to fair value of $66.9 million using an option pricing model.

For the year ended December 31, 2024, we also recorded a gain related to an investment in a nonconsolidated affiliate of $4.4 million, as a component of other income, net. The gain was related to the acquisition of a controlling interest in a concert business, which was previously accounted for as an equity-method investment. To calculate the gain, we remeasured the investment to fair value of $35.9 million using the income approach method.

The key inputs in these fair value measurements include a future cash flow projection, including revenue, profit margins, and adjustment related to discount for lack of marketability. The key inputs used for these non-recurring fair value measurements are considered Level 3 inputs.

For the years ended December 31, 2023 and 2022, there were no significant non-recurring fair value measurements.

79

## NOTE 8—COMMITMENTS AND CONTINGENT LIABILITIES

We have non-cancelable contracts related to minimum performance payments with various artists, other event-related costs and nonrecoupable ticketing contract advances. We also have commitments relating to additions to property, plant, and equipment under certain construction commitments for facilities and venues.

As of December 31, 2024, our future minimum payments under non-cancelable contracts and capital expenditure commitments consist of the following:

|  | Non-cancelable Contracts | | Capital Expenditures | |
|---|---|---|---|---|
|  | | *(in thousands)* | | |
| 2025 | $ | 2,641,395 | $ | 32,841 |
| 2026 | | 907,072 | | 6,759 |
| 2027 | | 312,236 | | 5,273 |
| 2028 | | 398,417 | | 3,572 |
| 2029 | | 149,307 | | 7,501 |
| Thereafter | | 481,198 | | 62,621 |
| Total | $ | 4,889,625 | $ | 118,567 |

Certain agreements relating to acquisitions provide for deferred purchase consideration payments at future dates. A liability is established at the time of the acquisition for these fixed payments. For obligations payable at a date greater than twelve months from the acquisition date, we apply a discount rate to calculate the present value of the obligations. As of December 31, 2024, we have accrued $1.5 million in other current liabilities and $11.8 million in other long-term liabilities and, as of December 31, 2023, we had accrued $14.9 million in other current liabilities and $6.8 million in other long-term liabilities, related to these deferred purchase consideration payments.

We have contingent obligations related to acquisitions which were accounted for as business combinations. Contingent consideration associated with business combinations is recorded at fair value at the time of the acquisition and reflected at current fair value for each subsequent reporting period thereafter until settled. We record these fair value changes in our statements of operations as selling, general and administrative expenses. The contingent consideration is generally subject to payout following the achievement of future performance targets and a portion is expected to be payable in the next twelve months. As of December 31, 2024, we have accrued $39.3 million in other current liabilities and $9.0 million in other long-term liabilities and, as of December 31, 2023, we had accrued $83.9 million in other current liabilities and $22.3 million in other long-term liabilities, representing the fair value of these estimated payments. The last contingency period for which we have an outstanding contingent payment is for the period ending July 2049. See Note 7   Fair Value Measurements for further discussion related to the valuation of these contingent payments.

As of December 31, 2024 and 2023, we guaranteed the debt of third parties of approximately $19.4 million and $19.4 million, respectively, primarily related to maximum credit limits on employee and tour-related credit cards and obligations under a venue management agreement.



81

## NOTE 9—CERTAIN RELATIONSHIPS AND RELATED-PARTY TRANSACTIONS

**Transactions Involving Related Parties**

There were no significant related-party transactions for certain relationships discussed below.

*Liberty Media*

Two current members of our board of directors were originally nominated by Liberty Media pursuant to a stockholder agreement. These directors receive directors' fees and stock-based awards on the same basis as other non-employee members of our board of directors.

*Atlanta Braves*

One current member of Liberty Media's board of directors has a significant ownership interest in Atlanta Braves Holdings, Inc. ("Atlanta Braves"). We lease a venue from, and provide ticketing services to the Atlanta Braves and pay royalty fees and non-recoupable ticketing contract advances. We also receive transaction fees for tickets the Atlanta Braves sells using our ticketing software.

*Sirius XM*

Our Chief Executive Officer is a member of the board of directors of Sirius XM Holdings Inc. ("Sirius XM"), a satellite radio company that is a subsidiary of Liberty Media. From time to time, we purchase advertising from Sirius XM.

**Transactions Involving Equity Method Investees**

We conduct business with certain of our equity method investees in the ordinary course of business. Transactions primarily relate to venue rentals and ticketing services. Revenue of $8.9 million, $27.9 million and $40.7 million were earned in 2024, 2023 and 2022, respectively, and expenses of $5.8 million, $6.3 million and $13.7 million were incurred in 2024, 2023 and 2022, respectively, from these equity investees for services rendered or provided in relation to these business ventures.

As of December 31, 2024 and 2023, we had accounts receivable and notes receivable balances of $8.0 million and $13.3 million, respectively, due from certain of our equity investees.

## NOTE 10—INCOME TAXES

Significant components of the provision for income tax expense (benefit) are as follows:

| | Year Ended December 31, | | |
| | 2024 | 2023 As Revised (in thousands) | 2022 As Revised |
|---|---|---|---|
| **Current:** | | | |
| Federal | $ 39,122 | $ 1,250 | $ 658 |
| Foreign | 253,442 | 229,073 | 103,320 |
| State | 24,308 | 23,171 | 4,764 |
| Total current | 316,872 | 253,494 | 108,742 |
| **Deferred:** | | | |
| Federal | (557,399) | 5,982 | 6,223 |
| Foreign | (126,423) | (51,209) | (397) |
| State | (24,748) | 1,209 | 1,373 |
| Total deferred | (708,570) | (44,018) | 7,199 |
| Income tax expense (benefit) | $ (391,698) | $ 209,476 | $ 115,941 |

The domestic income before income taxes was $31.8 million, $237.5 million and $217.0 million for 2024, 2023 and 2022, respectively. Foreign income before income taxes was $707.6 million, $675.8 million and $273.5 million for the years ended ended December 31, 2024, 2023 and 2022, respectively.

82

Significant components of our deferred tax liabilities and assets are as follows

| | December 31, | | |
|---|---|---|---|
| | 2024 | | 2023 |
| | *(in thousands)* | | |
| Deferred tax liabilities: | | | |
| Intangible assets | $ 282,200 | $ | 327,249 |
| Leases | 210,904 | | 205,757 |
| Other | 45,075 | | 38,132 |
| Hedge investments | 5,395 | | 7,394 |
| Prepaid expenses | 3,802 | | 3,494 |
| Total deferred tax liabilities | 547,376 | | 582,026 |
| Deferred tax assets: | | | |
| Net operating loss carryforwards | 763,205 | | 812,034 |
| Accrued expenses | 251,416 | | 180,268 |
| Leases | 244,476 | | 239,503 |
| Capitalized research and development | 90,477 | | 67,516 |
| Interest limitation | 69,128 | | 53,698 |
| Other | 61,555 | | 30,580 |
| Foreign tax and other credit carryforwards | 51,153 | | 51,351 |
| Intangible assets | 12,411 | | 48,088 |
| Equity compensation | 10,831 | | 11,504 |
| Total gross deferred tax assets | 1,554,652 | | 1,494,542 |
| Valuation allowance | 569,495 | | 1,194,374 |
| Total net deferred tax assets | 985,157 | | 300,168 |
| Net deferred tax assets (liabilities) | $ 437,781 | $ | (281,858) |

Each reporting period, we evaluate the realizability of all of our deferred tax assets in each tax jurisdiction. The Company recorded valuation allowances of $69.5 million and $1.2 billion as of December 31, 2024 and 2023, respectively. Deferred income tax assets and liabilities are recorded related to net operating losses and temporary differences between the book and tax basis of assets and liabilities expected to produce tax deductions and income in the future. The realization of these assets depends on recognition of sufficient future taxable income in specific tax jurisdictions in which those temporary differences or net operating losses relate.

In assessing the need for a valuation allowance, the Company considers whether it is more likely than not that some portion or all of the deferred tax assets will not be realized using available positive and negative evidence, including future reversals of temporary differences, tax-planning strategies and future taxable income, to estimate whether sufficient future taxable income will be generated to permit use of deferred tax assets. A significant piece of objective negative evidence evaluated is the cumulative loss incurred over recent years. Such objective negative evidence limits the Company's ability to consider other subjective positive evidence.

At December 31, 2023, the Company maintained a valuation allowance related to federal, state and foreign deferred tax assets, as there was insufficient evidence to overcome the substantial negative evidence of being in a three year cumulative loss position. At December 31, 2024, the Company is no longer in a three year cumulative loss position and concluded that it is appropriate to release the valuation allowance against a portion of its federal deferred tax assets due to the sustained positive performance and the expected future taxable income. The remaining valuation allowance primarily relates to investments in consolidated partnership and various state and foreign operating losses.

At December 31, 2024 and 2023, we recorded a net deferred tax asset of $437.8 million and a net deferred tax liability of $281.9 million, respectively, due principally to differences in financial reporting and tax bases in assets acquired in business combinations.

As of December 31, 2024, we have United States federal, state and foreign deferred tax assets related to net operating loss carryforwards of $15.1 million, $124.5 million and $423.6 million, respectively. Based on current statutory carryforward periods, the operating loss carryforwards will expire on various dates beginning in 2025. Our net operating losses may be subject to statutory limitations on the amount that can be used in any given year.

As of December 31, 2024, we have United States federal and state deferred tax assets related to credits of $25.4 million and $25.7 million, respectively. Based on current statutory carryforward periods, the credits will expire on various dates beginning in 2031.

The reconciliation of income tax computed at the United States federal statutory rates to income tax expense (benefit) is:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | | 2024 | | 2023 | | 2022 |
| | | | | As Revised | | As Revised |
| | | | | (in thousands) | | |
| Income tax expense at United States statutory rate of 21% | $ | 155,280 | $ | 187,854 | $ | 106,144 |
| Differences between foreign and United States statutory rates | | 70,469 | | 86,537 | | 34,585 |
| State income taxes, net of federal tax benefits | | 27,844 | | 22,889 | | 4,893 |
| Nondeductible items | | 23,898 | | 25,959 | | 32,907 |
| United States income inclusions and exclusions | | (10,332) | | 28,450 | | (78,061) |
| Non-United States income inclusions and exclusions | | (9,466) | | (63,691) | | (30,783) |
| Tax contingencies | | 674 | | 6,191 | | 728 |
| Tax expense from acquired goodwill | | | | 7,953 | | 7,596 |
| Other, net | | 166 | | 784 | | (879) |
| Change in valuation allowance | | (650,231) | | (93,450) | | 38,811 |
| | $ | (391,698) | $ | 209,476 | $ | 115,941 |

Income tax expense (benefit) is principally attributable to a non-cash benefit related to the release of the valuation allowance offset by our earnings in foreign tax jurisdictions and state income taxes.

Amounts included in differences between foreign and United States statutory rates are impacted by changes in the mix of international earnings subject to various tax rates which can differ greatly in their proximity to the United States statutory rate.

Amounts included in non United States income inclusions and exclusions include the favorable inclusion of Mexico s income from subsidiaries

Amounts included in United States income inclusions and exclusions include unfavorable inclusions for GILTI under the provisions associated with the Tax Cuts and Jobs Act ("TCJA").

Nondeductible items for all years presented include the impact of increased nondeductible expenses pursuant to the provisions of the TCJA including nondeductible executive compensation.

The change in valuation allowance for each period presented resulted primarily from changes in the income (loss) within jurisdictions with full valuation allowances.

The other category consists of current and deferred adjustments related to payable and deferred tax assets.

The following table summarizes the activity related to our unrecognized tax benefits:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2024 | | 2023 | | 2022 | |
| | | | *(in thousands)* | | | |
| Balance at January 1 | $ | 30,466 | $ | 22,996 | $ | 21,330 |
| Additions: | | | | | | |
| Increase for current year positions | | 1,451 | | 2,333 | | 751 |
| Increase for prior year positions | | 1,001 | | 4,453 | | 896 |
| Interest and penalties for prior years | | 255 | | 1,063 | | 160 |
| Reductions: | | | | | | |
| Statute lapse for prior year positions | | (3) | | | | |
| Settlements for prior year positions | | (3,166) | | (379) | | (141) |
| Foreign exchange | | (312) | | | | |
| Balance at December 31 | $ | 29,692 | $ | 30,466 | $ | 22,996 |

If we were to prevail on all uncertain tax positions, the net effect would be a decrease to our income tax provision of approximately $.7 million. The remaining $26.0 million is related to various tax credits and would remain in place until the statute of limitation for those years expires. As of December 31, 2024, it is not expected that the total amounts of unrecognized tax benefits will increase or decrease materially within the next year.

We regularly assess the likelihood of additional assessments in each taxing jurisdiction resulting from current and subsequent years' examinations. Liabilities for income taxes are established for future income tax assessments when it is probable there will be future assessments and the amount can be reasonably estimated. Once established, liabilities for uncertain tax positions are adjusted only when there is more information available or when an event occurs necessitating a change to the liabilities. As of December 31, 2024, we believe that the resolution of income tax matters for open years will not have a material effect on our consolidated financial statements although the resolution of income tax matters could impact our effective tax rate for a particular future period.

The tax years 2010 through 2024 remain open to examination by the primary tax jurisdictions to which we are subject.

### Recent Tax Legislation

In August 2022, the Inflation Reduction Act (IRA) was enacted in the United States, which includes health care, clean energy, and income tax provisions. The income tax provisions amend the Internal Revenue Code to include a 15% corporate alternative minimum tax effective for tax years beginning after December 31, 2022. On September 12, 2024, the Internal Revenue Service released proposed regulations which provide guidance on the application of the corporate alternative minimum tax. The Company is assessing the impact of the proposed regulations; however, there is no material impact for the current period. The Company will continue to monitor to ensure our financial results and related tax disclosures are in compliance with the IRA tax legislation.

On December 20, 2021, the Organization for Economic Co-operation and Development ("OECD") released Pillar Two model rules designed to ensure large multinational enterprises ("MNE") pay a minimum level of tax arising in each jurisdiction they operate. Over 135 jurisdictions joined a plan to update key elements of the international tax system and provide for a coordinated system of taxation that imposes top-up tax on profits arising in a jurisdiction whenever the effective rate is below the minimum rate. Effective January 1, 2024, many of these jurisdictions have enacted a global 15% minimum effective tax rate. This minimum rate applies to MNE's with consolidated revenue above €750 million. While additional guidance is expected from the OECD, the current Pillar Two rules do not have a material impact to our financial statement income or tax cash flows for the current period. The Company will continue to monitor further guidance from the OECD and evaluate any impact it may have to our consolidated financial results.

## NOTE 11—EQUITY

### Common Stock

The following table reconciles common stock reported in the consolidated statements of changes in equity to the consolidated balance sheets.

| | December 31, | |
| --- | --- | --- |
| | 2024 | 2023 |
| Common shares issued as reported in the consolidated statement of changes in equity | 231,295,639 | 229,785,241 |
| Unissued retirement eligible restricted stock awards | | 4,125 |
| Unvested restricted stock awards | 1,480,062 | 1,472,906 |
| Unvested deferred stock awards issued | 1,996,058 | 2,448,904 |
| Common shares issued as reported in the consolidated balance sheets | 234,771,759 | 233,711,176 |

Unvested restricted stock awards and unvested deferred stock awards issued will be reflected in the statements of changes in equity at the time of vesting.

For the years ended December 31, 2024, 2023 and 2022, we issued 1.5 million, 1.1 million and 6.5 million shares, respectively, of common stock in connection with stock option exercises and vesting of restricted stock awards.

### Common Stock Reserved for Future Issuance

Common stock of approximately 12.4 million shares as of December 31, 2024 is reserved for future issuances under the stock incentive plan (including 1.5 million options, 1.5 million restricted stock awards and 2.0 million deferred stock awards currently granted).

### Noncontrolling Interests

Common securities held by the noncontrolling interests that do not include put arrangements exercisable outside of our control are recorded in equity, separate from our stockholders' equity.

The purchase or sale of additional ownership in an already controlled subsidiary is recorded as an equity transaction with no gain or loss recognized in net income (loss) or comprehensive income (loss) as long as the subsidiary remains a controlled subsidiary. For the years ended December 31, 2024, 2023 and 2022, we acquired all or additional equity interests in several companies that did not have a significant impact to equity either on an individual basis or in the aggregate. The following schedule reflects the change in ownership interests for these transactions:

| | Year Ended December 31, | | | | | |
| | 2024 | | 2023 | | 2022 | |
| | | | As Revised | | As Revised | |
| | | | (in thousands) | | | |
|---|---|---|---|---|---|---|
| Net income attributable to common stockholders of Live Nation | $ | 896,287 | $ | 556,893 | $ | 266,440 |
| Transfers of noncontrolling interests: | | | | | | |
| Changes in Live Nation's additional paid-in capital for purchases of noncontrolling interests, net of transaction costs | | (30,049) | | (100,940) | | (64,601) |
| Changes in Live Nation's additional paid-in capital for sales of noncontrolling interests, net of transaction costs | | | | | | |
| Net transfers of noncontrolling interests | | (30,049) | | (100,940) | | (64,601) |
| Change from net income attributable to common stockholders of Live Nation and net transfers of noncontrolling interests | $ | 866,238 | $ | 455,953 | $ | 201,839 |

### Redeemable Noncontrolling Interests

We are subject to put arrangements where the holders of the noncontrolling interests can require us to repurchase their shares at specified dates in the future or within specified periods in the future Certain of these puts can be exercised earlier upon the occurrence of triggering events as specified in the agreements. The redemption amounts for these puts are either at a fixed amount, at fair value at the time of exercise or a variable amount based on a formula linked to earnings. In accordance with the FASB guidance for business combinations, the redeemable noncontrolling interests are recorded at their fair value at acquisition date. For put arrangements that are not currently redeemable, we accrete to the estimated redemption value over the period from the date of issuance to the earliest redemption date of the individual puts, with the offset recorded to additional paid-in capital. Decreases in accretion are only recognized to the extent that increases had been previously recognized. The estimated redemption values that are based on a formula linked to future earnings are computed each reporting period using projected cash flows, and the estimated redemption values that are based on fair value at the time of exercise are computed each reporting period by applying a multiple to projected earnings, both of which take into account the current expectations regarding profitability and the timing of revenue-generating events. The balances are reflected in our balance sheets as redeemable noncontrolling interests outside of permanent equity.

Our estimate of redemption amounts for puts that are redeemable at fixed or determinable prices on fixed or determinable dates for the years ended December 31, 2025, 2026, 2027, 2028 and 2029 are $606.0 million, $574.7 million, $72.0 million, $67.5 million and $29.8 million, respectively.

### Transactions with Noncontrolling Interest Partners

We have loaned or advanced money to noncontrolling interest partners under the terms of the partnership operating agreements, promissory notes or other arrangements. As of December 31, 2024, we had outstanding notes receivable and prepayments of $50.0 million in other long-term assets, and as of December 31, 2023, we had outstanding notes receivable and prepayments of $1.9 million in other current assets and $50.0 million in other long-term assets.

87

*Accumulated Other Comprehensive Income (Loss)*

The following table presents changes in the components of AOCI, net of taxes, for the years ended December 31, 2024, 2023 and 2022:

| | Cash Flow Hedges | Foreign Currency Items As Revised (in thousands) | Total As Revised |
|---|---:|---:|---:|
| **Revised Balance at December 31, 2021** | $ (8,558) | $ (144,242) | $ (152,800) |
| Other comprehensive income before reclassifications | 49,529 | 12,883 | 62,412 |
| Amount reclassified from AOCI | 312 | | 312 |
| Net other comprehensive income | 49,841 | 12,883 | 62,724 |
| **Balance at December 31, 2022** | 41,283 | (131,359) | (90,076) |
| Other comprehensive income before reclassifications | 5,225 | 129,459 | 134,684 |
| Amount reclassified from AOCI | (17,158) | | (17,158) |
| Net other comprehensive income (loss) | (11,933) | 129,459 | 117,526 |
| **Balance at December 31, 2023** | 29,350 | (1,900) | 27,450 |
| Other comprehensive income (loss) before reclassifications | 10,529 | (354,730) | (344,201) |
| Amount reclassified from AOCI | (18,361) | | (18,361) |
| Net other comprehensive loss | (7,832) | (354,730) | (362,562) |
| **Balance at December 31, 2024** | $ 21,518 | $ (356,630) | $ (335,112) |

See Note 7   Fair Value Measurements for further discussion and disclosure of the fair value of our interest rate swap that has been designated as a cash flow hedge.

*Earnings per Share*

Basic net income (loss) per common share is computed by dividing the net income (loss) available to common stockholders by the weighted average number of common shares outstanding during the period. The calculation of diluted net income (loss) per common share includes the effects of the assumed exercise of any outstanding stock options, the assumed vesting of shares of restricted and deferred stock awards and the assumed conversion of our convertible senior notes, where dilutive.

The following table sets forth the computation of weighted average common shares outstanding:

| | Year Ended December 31, | | |
|---|---:|---:|---:|
| | 2024 | 2023 | 2022 |
| Weighted average common shares   basic | 230,124,255 | 228,628,390 | 224,809,558 |
| Effect of dilutive shares: | | | |
| Stock options and restricted stock | 2,686,001 | 2,348,936 | 6,747,308 |
| Convertible senior notes | 3,542,193 | | |
| Weighted average common shares   diluted | 236,352,449 | 230,977,326 | 231,556,866 |

The following table shows securities excluded from the calculation of diluted net income per common share because such securities were anti-dilutive:

| | Year Ended December 31, | | |
|---|---:|---:|---:|
| | 2024 | 2023 | 2022 |
| Options to purchase shares of common stock | | 3,750 | 3,750 |
| Restricted and deferred stock awards   unvested | 1,518,940 | 2,527,463 | 2,218,563 |
| Conversion shares related to convertible senior notes | 14,946,450 | 13,004,660 | 11,864,035 |
| Number of anti-dilutive potentially issuable shares excluded from diluted common shares outstanding | 16,465,390 | 15,535,873 | 14,086,348 |

**NOTE 12   SEGMENTS AND REVENUE RECOGNITION**

Our reportable segments are Concerts, Ticketing and Sponsorship & Advertising. We use AOI to evaluate the performance of our operating segments and define AOI as operating income (loss) before certain acquisition expenses (including ongoing legal costs stemming from the Ticketmaster merger, changes in the fair value of accrued acquisition-related contingent consideration obligations, and acquisition-related severance and compensation), amortization of non-recoupable ticketing contract advances, depreciation and amortization (including goodwill impairment), loss (gain) on disposal of operating assets, and stock-based compensation expense. We also exclude from AOI the impact of estimated or realized liabilities for settlements or damages arising out of the Astroworld matter that exceed our estimated insurance recovery, due to the significant and non recurring nature of the matter  Ongoing legal costs associated with defense of these claims, such as attorney fees, are not excluded from AOI. AOI assists investors by allowing them to evaluate changes in the operating results of our portfolio of businesses separate from non-operational factors that affect net income (loss), thus providing insights into both operations and the other factors that affect reported results.

Revenue and expenses earned and charged between segments are eliminated in consolidation. Our capital expenditures below include accruals for amounts incurred but not yet paid for, but are not reduced by reimbursements received from outside parties such as landlords and noncontrolling interest partners or replacements funded by insurance proceeds.

We manage our working capital on a consolidated basis. Accordingly, segment assets are not reported to, or used by, our management to allocate resources to or assess performance of our segments, and therefore, total segment assets and related depreciation and amortization have not been presented.

There were no customers that individually accounted for more than 10% of our consolidated revenue in any year.

The Company's Chief Executive Officer is the chief operating decision maker ("CODM") and evaluates the operating performance of our operating segments based on AOI. The CODM uses segment AOI for evaluating performance of each segment and for making decisions on allocating capital and other resources to each segment. We have not identified any segment expenses that are considered significant and segment expenses are not regularly provided to the CODM. Other segments items are direct operating expenses and selling, general and administrative expenses (excluding acquisition expenses, amortization of non-recoupable ticketing contract advance, Astroworld estimated loss contingencies and stock-based compensation expense) which is the difference between each operating segment's revenue and AOI.

*Concerts*

Our Concerts segment involves the promotion of live music events globally in our owned or operated venues and in rented third-party venues, the production of music festivals, the operation and management of music venues, the creation or streaming of associated content and the provision of management and other services to artists. This segment generates revenue from the promotion or production of live music events and festivals in our owned or operated venues and in rented third-party venues, artist management commissions and the sale of merchandise for music artists at events. As a promoter and venue operator, we earn revenue primarily from the sale of tickets, concessions, merchandise, parking, ticket rebates or service charges on tickets sold by Ticketmaster or third-party ticketing platforms, and rental of our owned or operated venues. As an artist manager, we earn commissions on the earnings of the artists and other clients we represent, primarily derived from clients' earnings for concert tours. Over 97% of Concerts' revenue, whether related to promotion, venue operations, artist management or artist event merchandising, is recognized on the day of the related event. The majority of consideration for our Concerts segment is collected in advance of or on the day of the event. Consideration received in advance of the event is recorded as deferred revenue or in long-term liabilities if the event is more than twelve months from the balance sheet date. Any consideration not collected by the day of the event is typically received within three months after the event date.

*Ticketing*

Our Ticketing segment involves the management of our global ticketing operations, including providing ticketing software and services to clients, and consumers with a marketplace, both online and mobile, for tickets and event information, and is responsible for our primary ticketing website, *www.ticketmaster.com*. Ticket fee revenue is generated from convenience and order processing fees, or service charges, charged at the time a ticket for an event is sold in either the primary or secondary markets. A significant portion of our service charges are payable to the venue and credit card vendors. The Ticketing segment is primarily an agency business that sells tickets for events on behalf of its clients, which include venues, concert promoters, professional sports franchises and leagues, college sports teams, theater producers and museums. This segment records revenue arising from convenience and order processing fees, regardless of whether these fees are related to tickets sold in the primary or secondary market, and regardless of whether these fees are associated with our concert events or third-party clients' concert events. We do not record the face value of the tickets as revenue. Ticket fee revenue is recognized when the ticket is sold for third-party clients and secondary market sales, as we have no further obligation to our client's customers following the sale of the ticket. For our concert events where our concert promoters control ticketing, ticket fee revenue is recognized when the event occurs because we also have the obligation to deliver the event to the fan. The delivery of the ticket to the fan is not considered a distinct performance obligation for our concert events because the fan cannot receive the benefits of the ticket unless we also fulfill our obligation to deliver the event. The majority of ticket fee revenue is collected within the month of the ticket sale. Revenue received from the sale of tickets in advance of our concert events is recorded as deferred revenue or in other long-term liabilities if the date of the event is more than twelve months from the balance sheet date. Reported revenue is net of any refunds made or committed to and also the impact of any cancellations of events that occurred during the period and up to the time of filing these consolidated financial statements.

Ticketing contract advances, which can be either recoupable or non-recoupable, represent amounts paid in advance to our clients pursuant to ticketing agreements and are reflected in prepaid expenses or in long-term advances if the amount is expected to be recouped or recognized over a period of more than twelve months. Recoupable ticketing contract advances are generally recoupable against future royalties earned by the client, based on the contract terms, over the life of the contract Royalties are typically earned by the client when tickets are sold Royalties paid to clients are recorded as a reduction to revenue when the tickets are sold and the corresponding service charge revenue is recognized. Non-recoupable ticketing contract advances, excluding those amounts paid to support clients' advertising costs, are fixed additional incentives occasionally paid by us to certain clients to secure the contract and are typically amortized over the life of the contract on a straight-line basis as a reduction to revenue. At December 31, 2024 and 2023, we had ticketing contract advances of $158.1 million and $143.9 million, respectively, in prepaid expenses and $128.9 million and $135.6 million, respectively, in long-term advances. We amortized $88.7 million, $83.7 million and $79.0 million for the years ended December 31, 2024, 2023 and 2022 respectively, related to non-recoupable ticketing contract advances.

*Sponsorship & Advertising*

Our Sponsorship & Advertising segment manages the development of strategic sponsorship programs in addition to the sale of international, national and local sponsorships and placement of advertising such as signage, promotional programs, rich media offerings, including advertising associated with live streaming and music-related content, and ads across our distribution network of venues, events and websites. This segment generates revenue from sponsorship and marketing programs that provide its sponsors with strategic, international, national and local opportunities to reach customers through our venue, concert and ticketing assets, including advertising on our websites These programs can also include custom events or programs for the sponsors specific brands, which are typically experienced exclusively by the sponsors' customers. Sponsorship agreements may contain multiple elements, which provide several distinct benefits to the sponsor over the term of the agreement, and can be for a single or multi-year term. We also earn revenue from exclusive access rights provided to sponsors in various categories such as ticket pre-sales, beverage pouring rights, venue naming rights, media campaigns, signage within our venues, and advertising on our websites. Revenue from sponsorship agreements is allocated to the multiple elements based on the relative stand-alone selling price of each separate element, which are determined using vendor-specific evidence, third-party evidence or our best estimate of the fair value. Revenue is recognized over the term of the agreement or operating season as the benefits are provided to the sponsor unless the revenue is associated with a specific event, in which case it is recognized when the event occurs. Revenue is collected in installment payments during the year, typically in advance of providing the benefit or the event. Revenue received in advance of the event or the sponsor receiving the benefit is recorded as deferred revenue or in other long-term liabilities if the date of the event is more than twelve months from the balance sheet date.

At December 31, 2024, we had contracted sponsorship agreements with terms greater than one year that had approximately $1.5 billion of revenue related to future benefits to be provided by us. We expect to recognize, based on current projections, approximately 41%, 29%, 16% and 14% of this revenue in 2025, 2026, 2027 and thereafter, respectively.

The following table presents the results of operations for our reportable segments for the years ending December 31, 2024, 2023 and 2022

| | Concerts | Ticketing | Sponsorship & Advertising | Other & Eliminations | Corporate | Consolidated |
|---|---|---|---|---|---|---|
| | | | (in thousands) | | | |
| **2024** | | | | | | |
| Revenue | $ 19,024,302 | $ 2,988,685 | $ 1,195,019 | $ (52,381) | $ | $ 23,155,625 |
| % of Consolidated Revenue | 82.2% | 12.9% | 5.2% | (0.3)% | | |
| Other Segment Items | 18,494,554 | 1,865,097 | 431,242 | (24,121) | 242,955 | 21,009,727 |
| AOI | $ 529,748 | $ 1,123,588 | $ 763,777 | $ (28,260) | $ (242,955) | $ 2,145,898 |
| Intersegment revenue | $ 29,633 | $ 22,220 | $ 528 | $ (52,381) | $ | $ |
| Capital expenditures | $ 491,691 | $ 87,925 | $ 24,507 | $ | $ 33,508 | $ 637,631 |
| **2023** | | | | | | |
| Revenue [1] | $ 18,740,913 | $ 2,959,477 | $ 1,095,217 | $ (69,290) | $ | $ 22,726,317 |
| % of Consolidated Revenue | 82.5% | 13.0% | 4.8% | (0.3)% | | |
| Other Segment Items | 18,420,516 | 1,819,344 | 420,080 | (29,716) | 214,974 | 20,845,198 |
| AOI [2] | $ 320,397 | $ 1,140,133 | $ 675,137 | $ (39,574) | $ (214,974) | $ 1,881,119 |
| Intersegment revenue | $ 17,773 | $ 51,517 | $ | $ (69,290) | $ | $ |
| Capital expenditures | $ 346,392 | $ 68,991 | $ 18,250 | $ | $ 35,118 | $ 468,751 |
| **2022** | | | | | | |
| Revenue | $ 13,494,100 | $ 2,238,618 | $ 968,146 | $ (19,610) | $ | $ 16,681,254 |
| % of Consolidated Revenue | 80.9% | 13.4% | 5.8% | (0.1)% | | |
| Other Segment Items | 13,319,260 | 1,425,904 | 376,174 | (5,061) | 167,882 | 15,284,159 |
| AOI [2] | $ 174,840 | $ 812,714 | $ 591,972 | $ (14,549) | $ (167,882) | $ 1,397,095 |
| Intersegment revenue | $ 12,821 | $ 8,643 | $ | $ (21,464) | $ | $ |
| Capital expenditures | $ 277,133 | $ 70,739 | $ 19,383 | $ (17) | $ 9,680 | $ 376,918 |

Prior period revenue was revised as further discussed in Note 2   Correction of Errors in Previously Reported Consolidated Financial Statements. For the year ended December 31, 2023, the revision decreased our Concerts segment revenue by $22 8 million

Prior period AOI was revised as further discussed in Note 2   Correction of Errors in Previously Reported Consolidated Financial Statements. For the years ended December 31, 2023 and December 31, 2022, the revision decreased our Concerts segment AOI by $5.1 million and increased AOI by $5.1 million, respectively. For the years ended December 31, 2023 and December 31, 2022, the revision increased our Ticketing segment AOI by $23.8 million and decreased AOI by $15.2 million, respectively.

The following table sets forth the reconciliation of consolidated AOI to operating income for the for the years ended December 31, 2024, 2023 and 2022:

| | 2024 | 2023 | 2022 |
|---|---|---|---|
| | | *(in thousands)* | |
| AOI [1] | $ 2,145,898 | $ 1,881,119 | $ 1,397,095 |
| Acquisition expenses | 128,513 | 93,664 | 68,078 |
| Amortization of non-recoupable ticketing contract advance | 88,717 | 83,693 | 79,043 |
| Depreciation and amortization | 549,923 | 516,797 | 449,976 |
| Gain on sale of operating assets | (11,015) | (13,927) | (32,082) |
| ▮▮▮▮▮▮▮▮ | 454,902 | | |
| Stock-based compensation expense | 110,348 | 115,959 | 110,049 |
| Operating income [1] | $ 824,510 | $ 1,084,933 | $ 722,031 |

[1] For the years ended December 31, 2023 and December 31, 2022, the revision increased our AOI and operating income by $18.7 million for 2023 and decreased our AOI and operating income by $10.1 million for 2022, respectively. See further discussion in Note 2   Correction of Errors in Previously Reported Consolidated Financial Statements.

### Deferred Revenue

The majority of our deferred revenue is typically classified as current and is shown as a separate line item on the consolidated balance sheets. Deferred revenue that is not expected to be recognized within the next twelve months is classified as long-term and reflected in other long-term liabilities on the consolidated balance sheets. At December 31, 2024, 2023 and 2022, we had current deferred revenue of $3.7 billion, $3.4 billion and $3.1 billion, respectively.

The table below summarizes the amount of prior year current deferred revenue recognized during the years ended December 31, 2024 and 2023:

| | December 31, | |
|---|---|---|
| | 2024 | 2023 |
| | *(in thousands)* | |
| Concerts | $ 3,046,474 | $ 2,757,149 |
| Ticketing | 176,901 | 142,940 |
| Sponsorship & Advertising | 96,988 | 126,530 |
| | $ 3,320,363 | $ 3,026,619 |

92

## NOTE 13—STOCK-BASED COMPENSATION

In December 2005, we adopted our 2005 Stock Incentive Plan, which has been amended and/or restated on several occasions. In connection with our merger with Ticketmaster Entertainment LLC, we adopted the Amended and Restated Ticketmaster 2008 Stock & Annual Incentive Plan. The plans authorize us to grant stock option awards, director shares, stock appreciation rights, restricted stock and deferred stock awards, other equity-based awards and performance awards. We have granted restricted stock awards, options to purchase our common stock and deferred stock awards to employees, directors, consultants, and our affiliates under the stock incentive plans at no less than the fair market value of the underlying stock on the date of grant. The stock incentive plans contain anti-dilutive provisions that require the adjustment of the number of shares of our common stock represented by, and the exercise price of, each option for any stock splits or stock dividends. The ten-year term of the Ticketmaster plan expired in August 2018; accordingly, no new awards may be granted under that plan but outstanding awards shall continue in full force and effect in accordance with their terms.

The following is a summary of stock-based compensation expense we recorded during the respective periods:

|  | Year Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
|  | 2024 | | 2023 | | 2022 | |
|  | (in thousands) | | | | | |
| Selling, general and administrative expenses | $ | 50,668 | $ | 40,751 | $ | 45,214 |
| Corporate expenses |  | 59,680 |  | 75,208 |  | 64,835 |
| Total | $ | 110,348 | $ | 115,959 | $ | 110,049 |

As of December 31, 2024, there was $103.9 million of total unrecognized compensation cost related to stock-based compensation arrangements for stock options, restricted stock and deferred stock awards. This cost is expected to be recognized over a weighted-average period of 2.4 years.

### Stock Options

Stock options are granted for a term not exceeding ten years and the non-vested options are generally forfeited in the event the employee, director or consultant terminates his or her employment or relationship with us or one of our affiliates. Any options that have vested at the time of termination are forfeited to the extent they are not exercised within the applicable post-employment exercise period provided in their option agreements. These options typically vest over one to four years. In 2024, 2023 and 2022, no stock options were granted.

The following table presents a summary of our stock options outstanding at the dates given, and stock option activity for the period between such dates ("Price" reflects the weighted average exercise price per share):

|  | Year Ended December 31, | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
|  | 2024 | | | | 2023 | | | | 2022 | | | |
|  | Options | | Price | | Options | | Price | | Options | | Price | |
|  | (in thousands, except per share data) | | | | | | | | | | | |
| Outstanding January 1 | 2,366 | $ | 32.85 | | 3,257 | $ | 29.78 | | 7,720 | $ | 18.24 | |
| Exercised | (851) | | 30.57 | | (891) | | 21.63 | | (4,461) | | 9.79 | |
| Forfeited or expired | (1) | | 63.29 | | — | | | | (2) | | 70.26 | |
| Outstanding December 31 | 1,514 | $ | 34.12 | | 2,366 | $ | 32.85 | | 3,257 | $ | 29.78 | |
| Exercisable December 31 | 1,513 | $ | 34.09 | | 2,362 | $ | 32.78 | | 3,171 | $ | 29.02 | |
| Weighted average fair value per option granted | | $ | | | | $ | | | | $ | | |

The total intrinsic value of stock options exercised during the years ended December 31, 2024, 2023 and 2022 was $0.4 million, $58.3 million and $390.9 million, respectively. Cash received from stock option exercises for the years ended December 31, 2024, 2023 and 2022 was $26.1 million, $19.3 million and $35.8 million, respectively.

There were 7.4 million shares available for future grants under the stock incentive plan at December 31, 2024. Upon share option exercise or vesting of restricted or deferred stock, we issue new shares or treasury shares to fulfill these grants. Vesting dates on the stock options is March 2025, and expiration dates range from January 2025 to March 2031 at exercise prices and average contractual lives as follows:

| Range of Exercise Prices | Outstanding as of 12/31/24 | Weighted Average Remaining Contractual Life | Weighted Average Exercise Price | | Exercisable as of 12/31/24 | Weighted Average Remaining Contractual Life | Weighted Average Exercise Price | |
|---|---|---|---|---|---|---|---|---|
| | (in thousands) | (in years) | | | (in thousands) | (in years) | | |
| $15.00 - $19.99 | 510 | 1.1 | $ | 19.36 | 510 | 1.1 | $ | 19.36 |
| $20.00 - $24.99 | 5 | 1.3 | $ | 23.43 | 5 | 1.3 | $ | 23.43 |
| $25.00 - $29.99 | 484 | 2.2 | $ | 28.99 | 484 | 2.2 | $ | 28.99 |
| $30.00 - $44.99 | 145 | 3.2 | $ | 44.05 | 145 | 3.2 | $ | 44.05 |
| $45.00 - $60.99 | 357 | 4.2 | $ | 56.79 | 357 | 4.2 | $ | 56.79 |
| $61.00 - $89.99 | 13 | 6.0 | $ | 74.39 | 12 | 6.0 | $ | 73.19 |

The total intrinsic value of options outstanding and options exercisable as of December 31, 2024 was $144.4 million and $144.4 million, respectively

*Restricted Stock*

We have granted restricted stock awards to our employees, directors and consultants under our stock incentive plan. These common shares carry a legend which typically restricts their transferability for a term of one to five years and are forfeited in the event the recipient's employment or relationship with us is terminated prior to the lapse of the restriction. In addition, certain restricted stock awards require us or the recipient to achieve minimum performance targets in order for these awards to vest.

For the year ended December 31, 2024, we granted 0.3 million shares of restricted stock and 0.4 million shares of performance-based awards, respectively, under our stock incentive plan. These awards will all vest on the grant date or over a period of one year to four years with the exception of the performance-based awards which will vest within two years if the performance criteria are met.

For the year ended December 31, 2023, we granted 0.4 million shares of restricted stock and 0.4 million shares of performance-based awards, respectively, under our stock incentive plan. These awards will all vest on the grant date or over a period of two months to four years with the exception of the performance-based awards which will vest within two years if the performance criteria are met.

For the year ended December 31, 2022, we granted 1.8 million shares of restricted stock and 0.2 million shares of performance-based awards, respectively, under our stock incentive plan. These awards will vest on the grant date or over a period of one month to six years with the exception of the performance-based awards which will vest within two years if the performance criteria are met.

94

The following table presents a summary of our unvested restricted stock awards outstanding at December 31, 2024, 2023 and 2022 ( Price reflects the weighted average share price at the date of grant):

| | Restricted Stock | | |
| | Awards | | Price |
| | (in thousands, except per share data) | | |
|---|---|---|---|
| Unvested at December 31, 2021 | 860 | $ | 78.48 |
| Granted | 2,002 | | 103.34 |
| Forfeited | (22) | | 80.57 |
| Vested | (1,844) | | 99.68 |
| Unvested at December 31, 2022 | 996 | $ | 89.22 |
| Granted | 841 | | 70 51 |
| Forfeited | (7) | | 92.06 |
| Vested | (357) | | 89.93 |
| Unvested at December 31, 2023 | 1,473 | $ | 78.34 |
| Granted | 749 | | 96.49 |
| Forfeited | (32) | | 85.51 |
| Vested | (710) | | 81.84 |
| Unvested at December 31, 2024 | 1,480 | $ | 85.70 |

The total grant date fair market value of the shares issued upon the vesting of restricted stock awards during the years ended December 31, 2024, 2023 and 2022 was $8.1 million, $32.2 million and $183.8 million, respectively.

**Deferred Stock**

We granted deferred stock awards to our employees where the employees are entitled to receive shares of common stock in the future. Deferred stock can only be settled in stock as determined at the time of the grant. All of the deferred stock awards require us to achieve minimum market conditions in order for these awards to issue and vest.

For the year ended December 31, 2024, we granted 33 thousand shares of deferred stock awards with market conditions under the Company's stock incentive plans. These awards will vest over five years if specified stock prices are achieved over a specific number of days during the five years

For the year ended December 31, 2023, we granted 0.3 million shares of deferred stock awards with market conditions under the Company's stock incentive plans. These awards will vest over five years if specified stock prices are achieved over a specific number of days during the five years.

For the year ended December 31, 2022, we granted 2.2 million shares of deferred stock awards with market conditions under our stock incentive plans. These awards will vest over five to six years if specified stock prices are achieved over a specific number of days during the five to six years.

The following assumptions were used to calculate the fair value of the deferred stock awards with market conditions on the date of grant:

| | Year Ended December 31, | | |
| | 2024 | 2023 | 2022 |
|---|---|---|---|
| Risk-free interest rate | 4.17 % | 4.47 % | 2.85% - 3.69% |
| Volatility factors | 40.57 % | 39.33 % | 45.10% - 45.99% |
| Weighted average expected life (in years) | 4.84 | 5.22 | 5.27 |

95

The following table presents a summary of our unvested deferred stock awards outstanding at December 31, 2024, 2023 and 2022 ("Price" reflects the weighted average grant date fair value):

| | Deferred Stock | | |
| | Awards | | Price |
| | (in thousands, except per share data) | | |
|---|---:|---|---:|
| Unvested at December 31, 2021 | 2,192 | $ | 26.56 |
| Awarded | 2,160 | | 59.79 |
| Forfeited | | | |
| Vested | (2,192) | | 26.56 |
| Unvested at December 31, 2022 | 2,160 | $ | 59.79 |
| Awarded | 289 | | 70.47 |
| Forfeited | | | |
| Vested | | | |
| Unvested at December 31, 2023 | 2,449 | $ | 61.05 |
| Awarded | 33 | | 76.61 |
| Forfeited | | | |
| Vested | (486) | | 66.87 |
| Unvested at December 31, 2024 | 1,996 | $ | 59.89 |

**NOTE 14    OTHER INFORMATION**

| | | December 31, | | |
|---|---|---|---|---|
| | | 2024 | | 2023 As Revised |
| | | (in thousands) | | |
| The following details the components of "Other current assets": | | | | |
| Inventory | $ | 50,145 | $ | 45,141 |
| Notes receivable | | 32,018 | | 43,846 |
| Other | | 107,365 | | 33,176 |
| Total other current assets | $ | 189,528 | $ | 122,163 |
| | | | | |
| The following details the components of "Other long-term assets": | | | | |
| Investments in nonconsolidated affiliates | $ | 504,194 | $ | 447,494 |
| Deferred income tax assets | | 577,932 | | 42,840 |
| Notes receivable | | 226,021 | | 176,133 |
| Other | | 472,819 | | 268,382 |
| Total other long-term assets | $ | 1,780,966 | $ | 934,849 |
| | | | | |
| The following details the components of "Accrued expenses": | | | | |
| Accrued compensation and benefits | $ | 512,531 | $ | 529,987 |
| Accrued event expenses | | 934,560 | | 1,154,861 |
| Accrued insurance | | 316,967 | | 264,770 |
| Accrued legal | | 284,544 | | 24,515 |
| Collections on behalf of others | | 120,873 | | 82,253 |
| Accrued ticket refunds | | 18,263 | | 21,196 |
| Other | | 869,596 | | 953,230 |
| Total accrued expenses | $ | 3,057,334 | $ | 3,030,812 |
| | | | | |
| The following details the components of "Other current liabilities": | | | | |
| Contingent and deferred purchase consideration | $ | 40,801 | $ | 98,835 |
| Other | | 22,089 | | 29,595 |
| Total other current liabilities | $ | 62,890 | $ | 128,430 |
| The following details the components of "Other long-term liabilities": | | | | |
| Deferred income tax liabilities | $ | 140,151 | $ | 324,698 |
| Deferred revenue | | 120,064 | | 60,555 |
| Contingent and deferred purchase consideration | | 20,735 | | 29,161 |
| Other | | 196,813 | | 73,745 |
| Total other long-term liabilities | $ | 477,763 | $ | 488,159 |

## NOTE 15—GEOGRAPHIC DATA

The following table provides revenue and long-lived assets, including operating lease assets, for our foreign operations included in the consolidated financial statements:

| | Europe | | Other Foreign | | Total Foreign | | Domestic | | Consolidated Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | *(in thousands)* | | | | | |
| **2024** | | | | | | | | | | |
| Revenue | $ | 4,621,210 | $ | 4,160,359 | $ | 8,781,569 | $ | 14,374,056 | $ | 23,155,625 |
| Long-lived assets, including operating lease assets | $ | 825,909 | $ | 348,913 | $ | 1,174,822 | $ | 2,885,083 | $ | 4,059,905 |
| **2023** | | | | | | | | | | |
| Revenue [1] | $ | 4,425,854 | $ | 4,085,191 | $ | 8,511,045 | $ | 14,215,272 | $ | 22,726,317 |
| Long-lived assets, including operating lease assets | $ | 819,426 | $ | 306,725 | $ | 1,126,151 | $ | 2,581,701 | $ | 3,707,852 |
| **2022** | | | | | | | | | | |
| Revenue | $ | 3,160,268 | $ | 2,474,495 | $ | 5,634,763 | $ | 11,046,491 | $ | 16,681,254 |
| Long-lived assets, including operating lease assets | $ | 771,230 | $ | 226,752 | $ | 997,982 | $ | 2,061,076 | $ | 3,059,058 |

[1] For the year ended December 31, 2023, the revision decreased our domestic revenue by $22.8 million. See further discussion in Note 2   Correction of Errors in Previously Reported Consolidated Financial Statements.

**ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

None.

**ITEM 9A. CONTROLS AND PROCEDURES**

**Evaluation of Disclosure Controls and Procedures**

We have established disclosure controls and procedures to ensure that material information relating to our company, including our consolidated subsidiaries, is made known to the officers who certify our financial reports and to other members of senior management and our board of directors.

Based on their evaluation as of December 31, 2024, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) are effective to ensure that (1) the information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms, and (2) the information we are required to disclose in such reports is accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

Our management, including our Chief Executive Officer and Chief Financial Officer, does not expect that our disclosure controls and procedures or internal controls will prevent all possible errors and fraud. Our disclosure controls and procedures are, however, designed to provide reasonable assurance of achieving their objectives, and our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures are effective at that reasonable assurance level.

**Management's Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rule 13a-15(f) under the Securities Exchange Act of 1934, as amended. Our management conducted an evaluation of the effectiveness of our internal control over financial reporting based on the 2013 framework in *Internal Control   Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). Based on its evaluation, our management concluded that our internal control over financial reporting was effective as of December 31, 2024.

Ernst & Young LLP, an independent registered public accounting firm, has issued an attestation report on our internal control over financial reporting. The attestation report is included herein.

**Changes in Internal Control Over Financial Reporting**

There have been no changes in our internal control over financial reporting during the fourth quarter of the fiscal year ended December 31, 2024 that have materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

**Report of Independent Registered Public Accounting Firm**

To the Stockholders and the Board of Directors of Live Nation Entertainment, Inc.

**Opinion on Internal Control Over Financial Reporting**

We have audited Live Nation Entertainment, Inc.'s internal control over financial reporting as of December 31, 2024, based on criteria established in Internal Control    Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). In our opinion, Live Nation Entertainment, Inc. (the Company) maintained, in all material respects, effective internal control over financial reporting as of December 31, 2024, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the 2024 consolidated financial statements of the Company and our report dated February 20, 2025 expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control Over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Ernst & Young LLP

Los Angeles, California
February 20, 2025

**ITEM 9B. OTHER INFORMATION**

No director or officer adopted or terminated any Rule 10b5-1 plan, or any other written trading arrangement that meets the requirements of a 'hon-Rule 10b5-1 trading arrangement" during the fourth quarter of the fiscal year ended December 31, 2024.

**ITEM 9C. DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS**

Not applicable.

**PART III**

**ITEM 10.**            **DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE**

Other than the information set forth under Item 1. Business    Information About Our Executive Officers, the information required by this Item is incorporated by reference to our Definitive Proxy Statement, expected to be filed within 120 days of our fiscal year end.

**ITEM 11.**            **EXECUTIVE COMPENSATION**

The information required by this Item is incorporated by reference to our Definitive Proxy Statement, expected to be filed within 120 days of our fiscal year end.

**ITEM 12.**            **SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS**

The information required by this Item is incorporated by reference to our Definitive Proxy Statement, expected to be filed within 120 days of our fiscal year end.

**ITEM 13.**            **CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE**

The information required by this Item is incorporated by reference to our Definitive Proxy Statement, expected to be filed within 120 days of our fiscal year end.

**ITEM 14.**            **PRINCIPAL ACCOUNTING FEES AND SERVICES**

The information required by this Item is incorporated by reference to our Definitive Proxy Statement, expected to be filed within 120 days of our fiscal year end.

**PART IV**

**ITEM 15. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES**

(a)1. Financial Statements.

The following consolidated financial statements are included in Item 8:

Report of Independent Registered Public Accounting Firm (PCAOB ID: 42)                                    48

Consolidated Balance Sheets as of December 31, 2024 and 2023[1]                                           50

Consolidated Statements of Operations for the Years Ended December 31, 2024, 2023 and 2022[1]            51

Consolidated Statements of Comprehensive Income for the Years Ended December 31, 2024, 2023 and 2022[1]  52

Consolidated Statements of Changes in Equity for the Years Ended December 31, 2024, 2023 and 2022[1]     53

Consolidated Statements of Cash Flows for the Years Ended December 31, 2024, 2023 and 2022[1]            54

Notes to Consolidated Financial Statements                                                               55

[1] Prior period financial statements were revised as further discussed in Part II    Financial Information   Item 8.   Financial Statements   Note 2   Correction of Errors in Previously Reported Consolidated Financial Statements.

(a)2. Financial Statement Schedule.

The following financial statement schedule for the years ended December 31, 2024, 2023 and 2022 is filed as part of this report and should be read in conjunction with the consolidated financial statements.

**Schedule II Valuation and Qualifying Accounts**

All other schedules for which provision is made in the applicable accounting regulation of the SEC are not required under the related instructions or are inapplicable, and therefore have been omitted.

102

**LIVE NATION ENTERTAINMENT, INC.**

**SCHEDULE II**

**VALUATION AND QUALIFYING ACCOUNTS**

**Allowance for Doubtful Accounts**

| Description | Balance at Beginning of Period | Charges of Costs, Expenses and Other | Write-off of Accounts Receivable | Other | Balance at End of Period |
|---|---|---|---|---|---|
| | | | (in thousands) | | |
| Year ended December 31, 2022 | $ 50,491 | $ 29,281 | $ (10,364) | $ (6,114) | $ 63,294 |
| Year ended December 31, 2023 | $ 63,294 | $ 32,645 | $ (10,771) | $ (2,818) | $ 82,350 |
| Year ended December 31, 2024 | $ 82,350 | $ 10,430 | $ (22,901) | $ 2,784 | $ 72,663 |

103

**LIVE NATION ENTERTAINMENT, INC.**

**SCHEDULE II**

**VALUATION AND QUALIFYING ACCOUNTS**

**Deferred Tax Asset Valuation Allowance**

| Description | Balance at Beginning of Period | Charges of Costs, Expenses and Other | Deletions | Other [1] | Balance at End of Period |
|---|---|---|---|---|---|
| | | | *(in thousands)* | | |
| Year ended December 31, 2022 | $ 1,219,496 | $ 38,811 | $ | $ (17,426) | $ 1,240,881 |
| Year ended December 31, 2023 | $ 1,240,881 | $ (93,450) | $ | $ 46,943 | $ 1,194,374 |
| Year ended December 31, 2024 | $ 1,194,374 | $ (650,231) | $ | $ 25,352 | $ 569,495 |

[1] During 2024, 2023 and 2022, the valuation allowance was adjusted for acquisitions, divestitures and foreign currency adjustments.

104

(a)3  Those exhibits required by Item 601 of Regulation S-K

| Exhibit No. | Exhibit Description | Incorporated by Reference | | | | Filed Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit No. | Filing Date | |
| 3.1 | Amended and Restated Certificate of Incorporation of Live Nation Entertainment, Inc., as amended. | 10-K | 001-32601 | 3.1 | 2/25/2010 | |
| 3.2 | Certificate of Amendment to the Amended and Restated Certificate of Incorporation of Live Nation Entertainment, Inc. | 8-K | 001-32601 | 3.1 | 6/7/2013 | |
| 3.3 | Sixth Amended and Restated Bylaws of Live Nation Entertainment, Inc. | 8-K | 001-32601 | 3.1 | 6/17/2022 | |
| 4.1 | Form of Certificate of Designations of Series A Junior Participating Preferred Stock. | 8-K | 001-32601 | 4.2 | 12/23/2005 | |
| 4.2 | Description of Securities. | 10-K | 001-32601 | 4.2 | 3/01/2021 | |
| 10.1 | Stockholder Agreement, dated February 10, 2009, among Live Nation, Inc., Liberty Media Corporation, Liberty USA Holdings, LLC and Ticketmaster Entertainment, Inc. | 8-K | 001-32601 | 10.2 | 2/13/2009 | |
| 10.2 | Registration Rights Agreement, dated January 25, 2010, among Live Nation, Inc., Liberty Media Corporation and Liberty Media Holdings USA, LLC. | 8-K | 001-32601 | 10.1 | 1/29/2010 | |
| 10.3 | Form of Indemnification Agreement. | 10-K | 001-32601 | 10.23 | 2/25/2010 | |
| 10.4 § | Live Nation Entertainment, Inc. 2005 Stock Incentive Plan, as amended and restated as of March 21, 2024. | 8-K | 001-32601 | 10.1 | 6/14/2024 | |
| 10.5 § | Amended and Restated Ticketmaster Entertainment, Inc. 2008 Stock and Annual Incentive Plan. | S-8 | 333-164507 | 10.1 | 1/26/2010 | |
| 10.6 § | Amendment No. 1 to the Amended and Restated Ticketmaster Entertainment, Inc. 2008 Stock and Annual Incentive Plan. | 10-Q | 001-32601 | 10.1 | 11/4/2010 | |
| 10.7 § | Form Stock Option Agreement for the Live Nation Entertainment, Inc. 2005 Stock Incentive Plan, as amended and restated as of March 21, 2024. | 10-Q | 001-32601 | 10.2 | 6/14/2024 | |
| 10.8 § | Form Restricted Stock Award Agreement for the Live Nation Entertainment, Inc. 2005 Stock Incentive Plan, as amended and restated as of March 21, 2024. | 10-Q | 001-32601 | 10.3 | 6/14/2024 | |
| 10.9 § | Form Stock Option Agreement for the Amended and Restated Ticketmaster Entertainment, Inc. 2008 Stock and Annual Incentive Plan. | 10-Q | 001-32601 | 10.4 | 5/6/2021 | |
| 10.10 § | Form Restricted Stock Award Agreement for the Amended and Restated Ticketmaster Entertainment, Inc. 2008 Stock and Annual Incentive Plan | 10-Q | 001-32601 | 10.5 | 5/6/2021 | |
| 10.11 § | Form of Performance Share Award Agreement for the Live Nation Entertainment, Inc. 2005 Stock Incentive Plan, as amended and restated as of March 21, 2024. | 8-K | 001-32601 | 10.4 | 6/14/2024 | |
| 10.12 § | Amended and Restated Live Nation, Inc. Stock Bonus Plan. | 8-K | 001-32601 | 10.1 | 1/25/2010 | |
| 10.13 § | Employment Agreement, entered into July 1, 2022, by and between Live Nation Entertainment, Inc. and Michael Rapino. | 8-K | 001-32601 | 10.1 | 7/6/2022 | |
| 10.14 § | Performance Share Award Agreement, entered into July 1, 2022, by and between Live Nation Entertainment, Inc. and Michael Rapino. | 8-K | 001-32601 | 10.2 | 7/6/2022 | |
| 10.15 § | Employment Agreement, effective as of January 1, 2023, by and between Live Nation Entertainment, Inc. and Joe Berchtold. | 8-K | 001-32601 | 10.1 | 12/23/2022 | |

| Exhibit No. | Exhibit Description | Incorporated by Reference | | | | Filed Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit No. | Filing Date | |
| 10.16 § | Employment Agreement, effective as of January 1, 2023, by and between Live Nation Entertainment, Inc. and Michael Rowles. | 8-K | 001-32601 | 10.2 | 12/23/2022 | |
| 10.17 § | Employment Agreement, effective as of January 1, 2022, between Live Nation Worldwide, Inc. and Brian Capo. | 10-Q | 001-32601 | 10.1 | 5/5/2022 | |
| 10.18 § | Employment Agreement, effective as of January 1, 2024, between Live Nation Entertainment, Inc. and John Hopmans. | 8-K | 001-32601 | 10.1 | 10/13/2023 | |
| 10.19 | Credit Agreement entered into as of May 6, 2010, among Live Nation Entertainment, Inc., the Foreign Borrowers party thereto, the Guarantors identified therein, the Lenders party thereto, JPMorgan Chase Bank, N.A., as Administrative Agent and Collateral Agent, JPMorgan Chase Bank, N.A., Toronto Branch, as Canadian Agent and J.P. Morgan Europe Limited, as London Agent. | 10-Q | 001-32601 | 10.4 | 8/5/2010 | |
| 10.20 | Amendment No. 1, to the Credit Agreement, dated as of June 29, 2012, entered into by and among Live Nation Entertainment, Inc., the relevant Credit Parties identified therein, the Lenders party thereto, and JPMorgan Chase Bank, N.A., as administrative agent for the Lenders. | 10-Q | 001-32601 | 10.2 | 8/7/2012 | |
| 10.21 | Amendment No. 2 to the Credit Agreement, dated as of August 16, 2013, entered into by and among Live Nation Entertainment, Inc., the Guarantors identified therein, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent for the Lenders, JPMorgan Chase Bank, N.A., Toronto Branch, as Canadian agent and J.P. Morgan Europe Limited, as London agent. | 10-Q | 001-32601 | 10.2 | 5/6/2014 | |
| 10.22 | Amendment No. 3 to the Credit Agreement, dated as of October 31, 2016, entered into by and among Live Nation Entertainment, Inc., the Guarantors identified therein, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, JPMorgan Chase Bank, N.A., Toronto Branch, as Canadian agent, J.P. Morgan Europe Limited, as London agent and the lenders from time to time party thereto. | 10-K | 001-32601 | 10.26 | 2/23/2017 | |
| 10.23 | Amendment No. 4 to the Credit Agreement, dated June 27, 2017, entered into by Live Nation Entertainment, Inc., the Guarantors identified therein, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, JPMorgan Chase Bank, N.A., Toronto Branch, as Canadian agent, J. P. Morgan Europe Limited, as London agent and the lenders from time to time party thereto. | 10-Q | 001-32601 | 10.2 | 8/9/2017 | |
| 10.24 | Amendment No. 5 to the Credit Agreement, dated as of March 28, 2018, among Live Nation Entertainment, Inc., the Guarantors identified therein, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, JPMorgan Chase Bank, N.A., Toronto Branch, as Canadian agent, J.P. Morgan Europe Limited, as London agent and the lenders from time to time party thereto. | 10-Q | 001-32601 | 10.3 | 5/3/2018 | |

106

| Exhibit No. | Exhibit Description | Incorporated by Reference | | | | Filed Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit No. | Filing Date | |
| 10.25 | Amendment No. 6 to the Credit Agreement, dated as of October 17, 2019, among Live Nation Entertainment, Inc., the Guarantors identified therein, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, JPMorgan Chase Bank, N.A., Toronto Branch, as Canadian agent, J.P. Morgan Europe Limited, as London agent and the lenders from time to time party thereto. | 10-K | 001-32601 | 10.28 | 2/27/2020 | |
| 10.26 | Amendment No. 7 to the Credit Agreement, dated as of April 9, 2020, among Live Nation Entertainment, Inc., the Guarantors identified therein, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, JPMorgan Chase Bank, N.A., Toronto Branch as Canadian Agent, J.P. Morgan Europe Limited, as London Agent and the lenders from time to time party thereto. | 10-Q | 001-32601 | 10.1 | 8/5/2020 | |
| 10.27 | Amendment No. 8 to the Credit Agreement, dated as of July 29, 2020, among Live Nation Entertainment, Inc., the Guarantors identified therein, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, JPMorgan Chase Bank, N.A., Toronto Branch as Canadian Agent, J.P. Morgan Europe Limited, as London Agent and the lenders from time to time party thereto. | 10-Q | 001-32601 | 10.1 | 11/5/2020 | |
| 10.28 | Amendment No. 9 to the Credit Agreement, dated as of January 26, 2022, among Live Nation Entertainment, Inc., the Guarantors identified therein, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, JPMorgan Chase Bank, N.A., Toronto Branch as Canadian Agent, J.P. Morgan Europe Limited, as London Agent and the lenders from time to time party thereto. | 10-K | 001-32601 | 10.31 | 2/23/2022 | |
| 10.29 | Amendment No. 10 to the Credit Agreement, dated as of February 8, 2023, among Live Nation Entertainment, Inc., the Guarantors identified therein, and JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, JPMorgan Chase Bank, N.A., Toronto Branch as Canadian Agent, J.P. Morgan Europe Limited, as London Agent and the lenders from time to time party thereto. | 10-Q | 001-32601 | 10.4 | 5/4/2023 | |
| 10.30 | Amendment No. 11 to the Credit Agreement, dated as of November 16, 2023, among Live Nation Entertainment, Inc., the Guarantors identified therein, and JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, JPMorgan Chase Bank, N.A., Toronto Branch as Canadian Agent, J.P. Morgan Europe Limited, as London Agent and the lenders from time to time party thereto. | 10-K | 001-32601 | 10.30 | 2/22/2024 | |
| 10.31 | Amendment No. 12 to the Credit Agreement, dated as of November 5, 2024, among Live Nation Entertainment, Inc., the Guarantors identified therein, and JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, JPMorgan Chase Bank, N.A., Toronto Branch as Canadian Agent, J.P. Morgan Europe Limited, as London Agent and the lenders from time to time party thereto. | | | | | X |
| 10.32 | Incremental Term Loan Joinder Agreement No. 1, dated August 20, 2012, by and among Live Nation Entertainment, Inc., JPMorgan Chase Bank, N.A., as administrative agent, each Incremental Term Loan Lender defined therein and the relevant Credit Parties identified therein. | 10-Q | 001-32601 | 10.2 | 11/5/2012 | |

| Exhibit No. | Exhibit Description | Incorporated by Reference | | | | Filed Herewith |
| --- | --- | --- | --- | --- | --- | --- |
| | | Form | File No. | Exhibit No. | Filing Date | |
| 10.33 | Indenture, dated as of March 20, 2018, by and among Live Nation Entertainment, Inc., the Guarantors defined therein, and The Bank of New York Mellon Trust Company, N.A., as trustee. | 10-Q | 001-32601 | 10.1 | 5/3/2018 | |
| 10.34 | First Supplemental Indenture, entered into as of October 17, 2019, among Live Nation Entertainment, Inc., the Guarantors identified therein, and The Bank of New York Mellon Trust Company, N.A., as trustee | 10-K | 001-32601 | 10.45 | 2/27/2020 | |
| 10.35 | Second Supplemental Indenture, entered into as of May 20, 2020, among Live Nation Entertainment, Inc., the Guarantors identified therein, and The Bank of New York Mellon Trust Company, N.A., as trustee. | 10-Q | 001-32601 | 10.4 | 8/5/2020 | |
| 10.36 | Third Supplemental Indenture, entered into as of November 16, 2023, among Live Nation Entertainment, Inc., the Guarantors identified therein, and The Bank of New York Mellon Trust Company, N.A., as trustee. | 10-K | 001-32601 | 10.51 | 2/22/2024 | |
| 10.37 | Indenture, dated as of March 20, 2018, between Live Nation Entertainment, Inc., and HSBC Bank USA, National Association, as trustee. | 10-Q | 001-32601 | 10.2 | 5/3/2018 | |
| 10.38 | Indenture dated as of October 17, 2019 by and among Live Nation Entertainment, Inc., and U.S. Bank National Association, as trustee. | 10-K | 001-32601 | 10.47 | 2/27/2020 | |
| 10.39 | First Supplemental Indenture, entered into as of May 20, 2020, among Live Nation Entertainment, Inc., the Guarantors identified therein, and U.S. Bank National Association, as trustee. | 10-Q | 001-32601 | 10.5 | 8/5/2020 | |
| 10.40 | Second Supplemental Indenture, entered into as of November 16, 2023, among Live Nation Entertainment, Inc., the Guarantors identified therein, and U.S. Bank Trust Company, National Association, as trustee. | 10-K | 001-32601 | 10.55 | 2/22/2024 | |
| 10.41 | Indenture dated as of February 3, 2020 between Live Nation Entertainment, Inc. and HSBC Bank USA, National Association, as trustee. | 10-Q | 001-32601 | 10.1 | 5/7/2020 | |
| 10.42 | Indenture, dated as of May 20, 2020 by and among Live Nation Entertainment, Inc., the Guarantors identified therein and U.S. Bank National Association, as trustee and notes collateral agent. | 10-Q | 001-32601 | 10.2 | 8/5/2020 | |
| 10.43 | First Supplemental Indenture, entered into as of November 16, 2023, among Live Nation Entertainment, Inc., the Guarantors identified therein, and U.S. Bank Trust Company, National Association, as trustee and notes collateral agent | 10-K | 001-32601 | 10.58 | 2/22/2024 | |
| 10.44 | Indenture, dated as of January 4, 2021 by and among Live Nation Entertainment, Inc., the Guarantors identified therein and U.S. Bank National Association, as trustee and notes collateral agent. | 10-Q | 001-32601 | 10.1 | 5/6/2021 | |
| 10.45 | First Supplemental Indenture, entered into as of November 16, 2023, among Live Nation Entertainment, Inc., the Guarantors identified therein, and U.S. Bank Trust Company, National Association, as trustee and notes collateral agent. | 10-K | 001-32601 | 10.60 | 2/22/2024 | |
| 10.46 | Indenture, dated as of January 12, 2023 by and among Live Nation Entertainment, Inc., the Guarantors identified therein and HSBC Bank USA National Association, as trustee. | 10-Q | 001-32601 | 10.1 | 5/4/2023 | |
| 10.47 | Form of Base Capped Call Confirmation. | 10-Q | 001-32601 | 10.2 | 5/4/2023 | |
| 10.48 | Form of Additional Capped Call Confirmation. | 10-Q | 001-32601 | 10.3 | 5/4/2023 | |

| Exhibit No. | Exhibit Description | Incorporated by Reference | | | | Filed Herewith |
| --- | --- | --- | --- | --- | --- | --- |
| | | Form | File No. | Exhibit No. | Filing Date | |
| 10.49 | Indenture, dated as of December 6, 2024 by and among Live Nation Entertainment, Inc., the Guarantors identified therein and HSBC Bank USA National Association, as trustee. | | | | | X |
| 14.1 | Code of Business Conduct and Ethics. | 10-K | 001-32601 | 14.1 | 3/01/2021 | |
| 19.1 | Insider Trading Policy. | 10-K | 001-32601 | 96 | 2/22/2024 | |
| 21.1 | Subsidiaries of the Company. | | | | | X |
| 23.1 | Consent of Ernst & Young LLP. | | | | | X |
| 24.1 | Power of Attorney (see signature page). | | | | | X |
| 31.1 | Certification of Chief Executive Officer. | | | | | X |
| 31.2 | Certification of Chief Financial Officer. | | | | | X |
| 32.1 | Section 1350 Certification of Chief Executive Officer. | | | | | X |
| 32.2 | Section 1350 Certification of Chief Financial Officer. | | | | | X |
| 97 | Policy for Recovery of Erroneously Awarded Compensation | 10 K | 001 32601 | 97 | 2 22 2024 | |
| 101.INS | XBRL Instance Document - The instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the inline XBRL document. | | | | | X |
| 101.SCH | XBRL Taxonomy Schema Document. | | | | | X |
| 101.CAL | XBRL Taxonomy Calculation Linkbase Document. | | | | | X |
| 101.DEF | XBRL Taxonomy Definition Linkbase Document. | | | | | X |
| 101.LAB | XBRL Taxonomy Label Linkbase Document. | | | | | X |
| 101.PRE | XBRL Taxonomy Presentation Linkbase Document. | | | | | X |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101) | | | | | X |

§   Management contract or compensatory plan or arrangement.

We have not filed long-term debt instruments of our subsidiaries where the total amount under such instruments is less than ten percent of the total assets of the Company and its subsidiaries on a consolidated basis. However, we will furnish a copy of such instruments to the Commission upon request.

**ITEM 16. FORM 10-K SUMMARY**

Not applicable.

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on February 20, 2025.

LIVE NATION ENTERTAINMENT, INC.

By:            /s/ Michael Rapino
                          **Michael Rapino**
                **President and Chief Executive Officer**

110

**POWER OF ATTORNEY**

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints, jointly and severally, Michael Rapino and Joe Berchtold, and each of them, as his or her true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution, for him or her and in his or her name, place and stead, in any and all capacities, to sign any and all amendments to this Annual Report on Form 10-K, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection therewith, as fully to all intents and purposes as he or she might or could do in person, hereby ratifying and confirming all that said attorneys in fact and agents, or any of them, or their or his or her substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Name | Title | Date |
|---|---|---|
| /s/ Michael Rapino<br>Michael Rapino | President, Chief Executive Officer and Director | February 20, 2025 |
| /s/ Joe Berchtold<br>Joe Berchtold | Chief Financial Officer | February 20, 2025 |
| /s/ Brian Capo<br>Brian Capo | Chief Accounting Officer | February 20, 2025 |
| /s/ Maverick Carter<br>Maverick Carter | Director | February 20, 2025 |
| s  Ping Fu<br>Ping Fu | Director | February 20, 2025 |
| /s/ Jeffrey T. Hinson<br>Jeffrey T. Hinson | Director | February 20, 2025 |
| /s/ Chad Hollingsworth<br>Chad Hollingsworth | Director | February 20, 2025 |
| /s/ Jimmy Iovine<br>Jimmy Iovine | Director | February 20, 2025 |
| /s/ James S. Kahan<br>James S. Kahan | Director | February 20, 2025 |
| /s/ Gregory B. Maffei<br>Gregory B. Maffei | Director | February 20, 2025 |
| /s/ Randall T. Mays<br>Randall T. Mays | Director | February 20, 2025 |
| /s/ Richard A. Paul<br>Richard A. Paul | Director | February 20, 2025 |
| /s/ Latriece Watkins<br>Latriece Watkins | Director | February 20, 2025 |

EXHIBIT 10.31

*Execution Version*

**Amendment No. 12**, dated as of November 5, 2024 (this "Amendment"), to that certain credit agreement among LIVE NATION ENTERTAINMENT, INC., a Delaware corporation (the "Parent Borrower"), the "Guarantors" identified in such Credit Agreement, JPMORGAN CHASE BANK, N.A., as Administrative Agent and Collateral Agent, JPMORGAN CHASE BANK, N.A., TORONTO BRANCH, as Canadian Agent, J.P. MORGAN EUROPE LIMITED, as London Agent and the lenders from time to time party thereto (as such credit agreement has been amended, restated, modified and supplemented from time to time to date, the "Credit Agreement"); capitalized terms used and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement.

WHEREAS, Section 11.01 of the Credit Agreement provides that the Credit Parties and the Required Lenders may amend the Credit Agreement and the other Credit Documents for certain purposes;

WHEREAS, the Borrower has requested (a) new Venue Expansion Revolving Commitments (as defined in Exhibit A hereto) in the aggregate amount of $400,000,000 to be established as a new Revolving Facility under the Credit Agreement and (b) an extension of the Initial Revolving Termination Date with respect to the existing Dollar Revolving Commitments, the existing Limited Currency Revolving Commitments and the existing Multicurrency Revolving Commitments under the Credit Agreement;

WHEREAS, each Lender with new Venue Expansion Revolving Commitments, existing Dollar Revolving Commitments, existing Limited Currency Revolving Commitments and existing Multicurrency Revolving Commitments has executed this Amendment in its capacity as a Revolving Lender and has agreed to consent to this Amendment;

WHEREAS, each Person identified on Schedule I hereto and which has executed this Amendment, whether or not a Revolving Lender immediately prior to the Amendment No. 12 Effective Date, has severally agreed to provide (i) Venue Expansion Revolving Commitments, (ii) Dollar Revolving Commitments, (iii) Limited Currency Revolving Commitments and (iv) Multicurrency Revolving Commitments, in the respective amounts set forth opposite such Persons' names on Schedu e I hereto under the captions "Venue Expansion Revolving Committed Amount", "Dollar Revolving Committed Amount", "Limited Currency Revolving Committed Amount" and "Multicurrency Revolving Committed Amount", respectively; and

NOW, THEREFORE, in consideration of the premises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

Section 1.        **Amendment**. The Credit Agreement is, effective as of the Amendment No. 12 Effective Date (as defined below), hereby amended to delete the stricken text (indicated textually in the same manner as the following example: ~~stricken text~~) and to add the double-underlined text (indicated textually in the same manner as the following example: double-underlined text) as set forth in the pages of the Credit Agreement attached as Exhibit A hereto (which, for clarity, reflects the amendments made pursuant to Amendments Nos. 1 through 11 to the Credit Agreement, and such Credit Agreement, the "Amended Credit Agreement"). Each Person identified on Schedule I hereto party to this Amendment agrees to provide the Revolving Commitments set forth opposite such Person's name on Schedule I hereto and approves this Amendment; if such Person was not a Lender immediately prior to the Amendment No. 12 Effective Date (such Person, a "New Revolving Lender"), execution of this Amendment by such Person constitutes such Person's irrevocable agreement to become a Lender as of the Amendment No. 12 Effective Date.

Each Schedule attached as Exhibit B hereto hereby replaces the corresponding Schedule to the Credit Agreement.

The Credit Agreement is hereby supplemented with the Exhibit 2.13-7 attached as Exhibit C hereto.

Section 2.      **Effectiveness**. Section 1 of this Amendment shall become effective on the date that the conditions in Sections 5.01 and 5.02 of the Amended Credit Agreement are satisfied (the "Amendment No. 12 Effective Date") at which time the Credit Agreement in effect prior to date hereof shall be replaced in its entirety by the Amended Credit Agreement.

On the Amendment No. 12 Effective Date, each Person that was a Revolving Lender immediately prior to the Amendment No. 12 Effective Date (an "Existing Revolving Lender") shall assign to each of the New Revolving Lenders, and each of the New Revolving Lenders shall purchase from each of the Existing Revolving Lenders, at the principal amount thereof , such interests in the Revolving Loans outstanding on the Amendment No. 12 Effective Date as shall be necessary in order that, after giving effect to all such assignments and purchases, such Dollar Revolving Loans, Limited Currency Revolving Loans and Multicurrency Revolving Loans will be held by the Existing Revolving Lenders and New Revolving Lenders ratably in accordance with their Dollar Revolving Commitments, Limited Currency Revolving Commitments and Multicurrency Revolving Commitments, respectively, after giving effect to this Amendment. It being understood and agreed that no prepayment notice and no Loan Notice shall be required to be delivered in connection with the assignment and reallocation set forth in this paragraph.

Section 3.      **Counterparts; Integration; Effectiveness**. This Amendment may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Amendment constitutes the entire contract among the parties relating to the subject matter hereof and supersedes any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. This Amendment shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Amendment by telecopy or other electronic imaging means shall be as effective as delivery of a manually executed counterpart of this Amendment.

Section 4.      **Applicable Law**. THIS AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

Section 5.      **Headings**. Section headings herein are included for convenience of reference only and shall not affect the interpretation of this Amendment.

Section 6.      **Effect of Amendment**. Except as expressly set forth herein, (i) this Amendment shall not by implication or otherwise limit, impair, constitute a waiver of or otherwise affect the rights and remedies of the Lenders, the Administrative Agent or any other Agent, in each case under the Credit Agreement or any other Credit Document; provided, that each Lender party hereto waives its right to reimbursement under Section 3.05 of the Amended Credit Agreement solely as it relates to any prepayment (or deemed prepayment) of any Loan on the Amendment No. 12 Effective Date, and (ii) shall not alter, modify, amend or in any way affect any of the terms, conditions, obligations, covenants or agreements contained in the Credit Agreement or any other provision of either such agreement or any other Credit Document. Each and every term, condition, obligation, covenant and agreement contained in the Credit Agreement, after giving effect to this Amendment, or any other Credit Document is hereby ratified and re-affirmed in all respects and shall continue in full force and effect. After giving effect to this Amendment, each Credit Party reaffirms its obligations under the Credit Documents to which it is party and its prior grant and the validity of the Liens granted by it pursuant to the Collateral Documents, with all such Liens continuing in full force and effect after giving effect to this Amendment. This Amendment shall constitute a Credit Document for purposes of the Credit Agreement and from and after the Amendment No. 12 Effective Date, all references to the Credit Agreement in any Credit Document and all references in the Credit Agreement to "this Agreement", "hereunder", "hereof" or words of like import referring to the Credit Agreement, shall, unless expressly provided otherwise, refer to the Amended Credit Agreement. Each of the Credit Parties hereby (i) consents to this Amendment, (ii) confirms that all obligations of such Credit Party under the Credit Documents to which such Credit Party is a party shall continue to apply to the Credit Agreement as amended hereby and (iii) agrees that all security interests granted by it pursuant to any Credit Document (whether before, on or after the Amendment No. 12 Effective Date) shall secure (and continue to secure) the Obligations under the Credit Documents as amended by this

2

Amendment. The parties hereto acknowledge and agree that the amendment of the Credit Agreement pursuant to this Amendment and all other Credit Documents amended and/or executed and delivered in connection herewith shall not constitute a novation of the Credit Agreement and the other Credit Documents as in effect prior to the Amendment No. 12 Effective Date.

Section 7.        **SUBMISSION TO JURISDICTION; WAIVER OF VENUE; SERVICE OF PROCESS**. EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN THE BOROUGH OF MANHATTAN AND OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF SUCH STATE SITTING IN THE BOROUGH OF MANHATTAN AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AMENDMENT OR ANY OTHER CREDIT DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AMENDMENT OR IN ANY OTHER CREDIT DOCUMENT SHALL AFFECT ANY RIGHT THAT ANY PARTY HERETO MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AMENDMENT OR ANY OTHER CREDIT DOCUMENT AGAINST ANY OTHER PARTY HERETO OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AMENDMENT OR ANY OTHER CREDIT DOCUMENT IN ANY COURT REFERRED TO IN THE PRIOR PARAGRAPH OF THIS SECTION. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 11.02 OF THE CREDIT AGREEMENT. NOTHING IN THIS AMENDMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

Section 8.        **WAIVER OF JURY TRIAL**. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AMENDMENT OR ANY OTHER CREDIT DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AMENDMENT AND THE OTHER CREDIT DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

*[The remainder of this page is intentionally left blank]*

3

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed by their respective authorized officers as of the day and year first above written.

**LIVE NATION ENTERTAINMENT, INC.**

By:        /s/ Michael Rowles

Name:        Michael Rowles

Title:        Executive Vice President, General Counsel and Secretary

[Signature Page to Amendment No. 12]

**ARTIST NATION MANAGEMENT GROUP, LLC**
**ASSEMBLY ROOM STUDIOS, LLC**
**AXIS NATION, LLC**
**BARON GLOBAL, INC.**
**C3 BOOKING, LLC**
**C3 PRESENTS, L.L.C.**
**C3P EMO'S LLC**
**CELLAR DOOR VENUES, INC.**
**CONNECTICUT AMPHITHEATER**
**DEVELOPMENT CORPORATION**
**EIGHT BALL PRICING SOLUTIONS, LLC**
**ELEMENT1 MANAGEMENT, LLC**
**F AND F CONCESSIONS, INC.**
**FACULTY MANAGEMENT, LLC**
**FACULTY PRODUCTIONS, LLC**
**FESTIVAL HOLDINGS, L.L.C.**
**FRONT GATE TICKETING SOLUTIONS, LLC**
**HARD EVENTS LLC**
**HOFESH, LLC**
**IO MEDIA, INC.**
**IOMEDIA TECHNOLOGIES, LLC**
**LIVE NATION LGTOURS (USA), LLC**
**LIVE NATION MARKETING, INC.**
**LIVE NATION MTOURS (USA), INC.**
**LIVE NATION PRODUCTIONS, LLC**
**LIVE NATION TICKETING, LLC**
**LIVE NATION TOURING (USA), INC.**
**LIVE NATION USHTOURS (USA), LLC**
**LIVE NATION UTOURS (USA), INC.**
**LIVE NATION WORLDWIDE, INC.**
**MBA ARTIST MANAGEMENT COMPANY, LLC**
**MICROFLEX 2001 LLC**
**NEW ERA FARMS, LLC**
**NEW YORK THEATER, LLC**
**NOC, INC.**
**REIGNDEER ENTERTAINMENT, LLC**
**RIVAL LABS, INC.**
**SPALDING ENTERTAINMENT, LLC**
**TICKETMASTER L.L.C.**
**TICKETMASTER NEW VENTURES**
**HOLDINGS, INC.**
**TICKETWEB, LLC**
**TM VISTA INC.**
**TNA TOUR II (USA) INC.**

[Signature Page to Amendment No. 12]

**UNIVERSE INC.**
**WOLFSON ENTERTAINMENT, INC.**


By:          /s/ Michael Rowles
Name:      Michael Rowles
Title:        Executive Vice President, General Counsel and Secretary


**BIG LOUD MOUNTAIN MANAGEMENT, LLC**
**FH JV HOLDINGS, LLC**
**HILLSIDE PRODUCTIONS, INC.**
**LMG MANAGEMENT LLC**
**PIZZA FRIDAY PRODUCTIONS, LLC**
**REBEL ARTIST MANAGEMENT, LLC**
**REIGNDEER ENTERTAINMENT CORP.**


By:          /s/ Michael Rowles
Name:      Michael Rowles
Title:        General Counsel and Secretary

[Signature Page to Amendment No. 12]

**BIGCHAMPAGNE, LLC**

By:        TICKETMASTER L.L.C., its Sole Member
By:        /s/ Michael Rowles
Name:    Michael Rowles
Title:     Executive Vice President, General Counsel and Secretary

**BLUES AT THE DEPOT, LLC**
**FILLMORE MINNEAPOLIS CORP.**
**FILLMORE NEW ORLEANS CORP.**
**HOB ACE OF SPADES CORP.**
**HOB BOARDWALK, INC.**
**HOB CAFE CORP.**
**HOB CHICAGO, INC.**
**HOB DEPOT CORP.**
**HOB ENTERTAINMENT, LLC**
**HOB GRAND RAPIDS, LLC**
**HOB HIFI DALLAS CORP**
**HOB MARINA CITY, INC.**
**HOB MARQUIS CORP.**
**HOB PUNCH LINE PENN CORP.**
**HOB PUNCH LINE S.F. CORP.**
**HOB QUEEN THEATER CORP.**
**HOB ROSE CITY MH CORP.**
**HOB ROXIAN CORP.**
**HOB SEATTLE CORP.**
**HOB SUMMIT MH CORP.**
**HOB VARSITY CORP.**
**HOUSE OF BLUES ANAHEIM**
**RESTAURANT CORP.**
**HOUSE OF BLUES CLEVELAND, LLC**
**HOUSE OF BLUES CONCERTS, INC.**
**HOUSE OF BLUES DALLAS RESTAURANT CORP.**
**HOUSE OF BLUES HOUSTON RESTAURANT CORP.**
**HOUSE OF BLUES LAS VEGAS RESTAURANT CORP.**
**HOUSE OF BLUES MYRTLE BEACH RESTAURANT CORP.**
**HOUSE OF BLUES NEW ORLEANS RESTAURANT CORP.**

[Signature Page to Amendment No. 12]

**HOUSE OF BLUES ORLANDO RESTAURANT CORP.**
**HOUSE OF BLUES RESTAURANT HOLDING CORP.**
**HOUSE OF BLUES SAN DIEGO, LLC**
**HOUSE OF BLUES SAN DIEGO RESTAURANT CORP.**
**LIVE NATION BOGART, LLC**
**LIVE NATION CHICAGO, INC.**
**MICHIGAN LICENSES, LLC**
**NO LIMIT ENTERTAINMENT LLC**
**SPACELAND PRODUCTIONS LLC**
**STATESIDE GROUP, LLC**
**STUBB'S AUSTIN RESTAURANT COMPANY LC**
**THE ECHO LLC**
**VAN BUREN GROUP HOLDINGS, LLC**
**VN WAUKEE CORP**

By:        /s/ Michael Rowles
Name:      Michael Rowles
Title:     President

**CONNECTICUT PERFORMING ARTS PARTNERS**

By:        NOC, INC.
By:        CONNECTICUT AMPHITHEATER
           DEVELOPMENT CORPORATION, its
           general partners

By:        /s/ Michael Rowles
Name:      Michael Rowles
Title:     Executive Vice President, General Counsel and Secretary

[Signature Page to Amendment No. 12]

**LIVE NATION STUDIOS HOLDINGS, LLC**
**TICKETSTODAY, LLC**
**WILTERN RENAISSANCE LLC**

By:          LIVE NATION WORLDWIDE, INC., its
                   Sole Member

By:          <u>/s/ Michael Rowles</u>
Name:        Michael Rowles
Title:         Executive Vice President, General Counsel and Secretary

[Signature Page to Amendment No. 12]

JPMORGAN CHASE BANK, N.A.,
as Administrative Agent, Collateral Agent, Lender, L/C Issuer and Swing Line Lender

By:            /s/ Inderjeet Aneja
Name:          Inderjeet Aneja
Title:         Executive Director

[Signature Page to Amendment No. 12]

GOLDMAN SACHS BANK USA, as a Lender and L/C Issuer

By:        /s/ Dan Starr
           Name: Dan Starr
           Title: Authorized Signatory

[Signature Page to Amendment No. 12]

Morgan Stanley Senior Funding, Inc., as a Lender

By:           /s/ Michael King
                    Name: Michael King
                    Title: Vice President

Morgan Stanley Bank, N.A. as a Lender

By:           /s/ Michael King
                    Name: Michael King
                    Title: Authorized Signatory

[Signature Page to Amendment No. 12]

Citibank, N.A., as a Lender and L/C Issuer

By:      /s/ Elizabeth Minnella Gonzalez
           Name: Elizabeth Minnella Gonzalez
           Title: Vice President & Managing Director

[Signature Page to Amendment No. 12]

THE BANK OF NOVA SCOTIA, as a Lender

By:        /s/ Joseph Ward
           Name: Joseph Ward
           Title: Managing Director

[Signature Page to Amendment No. 12]

HSBC Bank USA, National Association, as a Lender and L/C Issuer

By:      /s/ Tim Haavaldsen

            Name: Tim Haavaldsen

            Title: Vice President

[Signature Page to Amendment No. 12]

MIZUHO BANK, LTD., as a Lender and L/C Issuer

By:        /s/ Tracy Rahn
           Name: Tracy Rahn
           Title: Managing Director

[Signature Page to Amendment No. 12]

Bank of America, N.A., as a Lender and L/C Issuer

By:       /s/ Haley Heslip
          Name: Haley Heslip
          Title: Director

[Signature Page to Amendment No. 12]

MUFG Bank, Ltd., as a Lender and L/C Issuer

By:        <u>/s/ Peter Sender</u>
              Name: Peter Sender
              Title: Vice President

[Signature Page to Amendment No. 12]

Truist Bank, as a Lender and L/C Issuer

By:        /s/ Alfonso Brigham
                Name: Alfonso Brigham
                Title: Director

[Signature Page to Amendment No. 12]

WELLS FARGO BANK, N.A. as a Lender and L/C Issuer

By:  /s/ Jack Stutesman
Name: Jack Stutesman
Title: Director

[Signature Page to Amendment No. 12]

U.S. Bank National Association, as a Lender and L/C Issuer

By:        /s/ Steven J. Correll
           Name: Steven J. Correll
           Title: Senior Vice President

[Signature Page to Amendment No. 12]

Citizens Bank, N.A., as a Lender and L/C Issuer

By:        /s/ Izabela Algave
           Name: Izabela Algave
           Title: Vice President

[Signature Page to Amendment No. 12]

Schedule I

Dollar Revolving Commitments

| Dollar Revolving Lender | Dollar Revolving Committed Amount | Dollar Revolving Commitment Percentage |
|---|---|---|
| JPMorgan Chase Bank, N.A. | $31,000,000.00 | 11.923076924% |
| Goldman Sachs Bank USA | $20,000,000.00 | 7.692307692 |
| Morgan Stanley Senior Funding, Inc. | $20,000,000.00 | 7.692307692 |
| Citibank, N.A. | $20,000,000.00 | 7.692307692 |
| The Bank of Nova Scotia | $20,000,000.00 | 7.692307692 |
| HSBC Bank USA, National Association | $20,000,000.00 | 7.692307692 |
| Mizuho Bank, Ltd. | $20,000,000.00 | 7.692307692 |
| Bank of America, N.A. | $20,000,000.00 | 7.692307692 |
| MUFG Bank, Ltd. | $20,000,000.00 | 7.692307692 |
| Truist Bank | $20,000,000.00 | 7.692307692 |
| Wells Fargo Bank, National Association | $20,000,000.00 | 7.692307692 |
| U.S. Bank National Association | $14,500,000.00 | 5.576923078 |
| Citizens Bank, National Association | $14,500,000.00 | 5.576923078 |
| **Total** | **$260,000,000.00** | **100.000000000%** |

Limited Currency Revolving Commitments

| Limited Currency Revolving Lender | Limited Currency Revolving Committed Amount | Limited Currency Revolving Commitment Percentage |
|---|---|---|
| JPMorgan Chase Bank, N.A. | $91,333,333.37 | 11.709401715% |
| The Bank of Nova Scotia | $80,000,000.00 | 10.256410257% |
| Goldman Sachs Bank USA | $58,333,333.33 | 7.478632478 |
| Morgan Stanley Bank, N.A. | $58,333,333.33 | 7.478632478 |
| Citibank, N.A. | $58,333,333.33 | 7.478632478 |
| HSBC Bank USA, National Association | $58,333,333.33 | 7.478632478 |
| Mizuho Bank, Ltd. | $58,333,333.33 | 7.478632478 |
| Bank of America, N.A. | $58,333,333.33 | 7.478632478 |
| MUFG Bank, Ltd. | $58,333,333.33 | 7.478632478 |
| Truist Bank | $58,333,333.33 | 7.478632478 |
| Wells Fargo Bank, National Association | $58,333,333.33 | 7.478632478 |
| U.S. Bank National Association | $41,833,333.33 | 5.363247863 |
| Citizens Bank, National Association | $41,833,333.33 | 5.363247863 |
| **Total** | **$780,000,000.00** | **100.000000000%** |

Multicurrency Revolving Commitments

| Multicurrency Revolving Lenders | Multicurrency Revolving Committed Amount | Multicurrency Revolving Commitment Percentage |
|---|---|---|
| JPMorgan Chase Bank, N.A. | $32,666,666.63 | 12.564102549 |
| Goldman Sachs Bank USA | $21,666,666.67 | 8.333333335% |
| Morgan Stanley Bank, N.A. | $21,666,666.67 | 8.333333335% |
| Citibank, N.A. | $21,666,666.67 | 8.333333335% |
| HSBC Bank USA, National Association | $21,666,666.67 | 8.333333335% |
| Mizuho Bank, Ltd. | $21,666,666.67 | 8.333333335% |
| Bank of America, N.A. | $21,666,666.67 | 8.333333335% |
| MUFG Bank, Ltd. | $21,666,666.67 | 8.333333335% |
| Truist Bank | $21,666,666.67 | 8.333333335% |
| Wells Fargo Bank, National Association | $21,666,666.67 | 8.333333335% |
| U.S. Bank National Association | $16,166,666.67 | 6.217948718% |
| Citizens Bank, National Association | $16,166,666.67 | 6.217948718% |
| **Total** | **$260,000,000.00** | **100.000000000%** |

Venue Expansion Revolving Commitments

| Venue Expansion Revolving Lender | Venue Expansion RevolvingCommitted Amount | Venue Expansion Revolving Commitment Percentage |
|---|---|---|
| JPMorgan Chase Bank, N.A. | $45,000,000.00 | 11.250000000% |
| Goldman Sachs Bank USA | 31,000,000.00 | 7.750000000 |
| Morgan Stanley Bank, N.A. | 31,000,000.00 | 7.750000000 |
| Citibank, N.A. | 31,000,000.00 | 7.750000000 |
| The Bank of Nova Scotia | 31,000,000.00 | 7.750000000 |
| HSBC Bank USA, National Association | 31,000,000.00 | 7.750000000 |
| Mizuho Bank, Ltd. | 31,000,000.00 | 7.750000000 |
| Bank of America, N.A. | 31,000,000.00 | 7.750000000 |
| MUFG Bank, Ltd. | 31,000,000.00 | 7.750000000 |
| Truist Bank | 31,000,000.00 | 7.750000000 |
| Wells Fargo Bank, National Association | 31,000,000.00 | 7.750000000 |
| U.S. Bank National Association | 22,500,000.00 | 5.625000000 |
| Citizens Bank, National Association | 22,500,000.00 | 5.625000000 |
| **Total** | **$400,000,000.00** | **100.000000000%** |

Exhibit A

**AMENDED CREDIT AGREEMENT**

[See attached.]

**CREDIT AGREEMENT**
dated as of May 6, 2010

as amended by Amendment No. 1 on June 29, 2012,
as amended by Amendment No. 2 on August 16, 2013,
as amended by Amendment No. 3 on October 31, 2016,
as amended by Amendment No. 4 on June 27, 2017,
as amended by Amendment No. 5 on March 28, 2018,
as amended by Amendment No. 6 on October 17, 2019,
and as amended by Amendment No. 7 on April 9, 2020,
as amended by Amendment No. 8 on July 29, 2020,
as amended by Amendment No. 9 on January 26, 2022,
as amended by Amendment No. 10 on February 8, 2023,
as amended by Amendment No. 11 on November 16, 2023
as amended by Amendment No. 12 on November 5, 2024

among

**LIVE NATION ENTERTAINMENT, INC.,**
as Parent Borrower,

**CERTAIN FOREIGN SUBSIDIARIES OF THE PARENT BORROWER**,
as Foreign Borrowers,

**CERTAIN SUBSIDIARIES OF THE BORROWER**,
as Guarantors,

**THE LENDERS PARTY HERETO**,

**JPMORGAN CHASE BANK, N.A.**,
as Administrative Agent and Collateral Agent,

**JPMORGAN CHASE BANK, N.A., TORONTO BRANCH**,
as Canadian Agent,

**J.P. MORGAN EUROPE LIMITED**,
as London Agent,

**JP MORGAN CHASE BANK, N.A.**,

**GOLDMAN SACHS BANK USA**,

**MORGAN STANLEY SENIOR FUNDING, INC.**,

**CITIBANK, N.A.**,

**THE BANK OF NOVA SCOTIA,**

**HSBC SECURITIES (USA) INC.**,

**MIZUHO BANK, LTD.**,

**BOFA SECURITIES, INC.**,

**MUFG BANK, LTD.**,

**TRUIST SECURITIES, INC.**,

**WELLS FARGO SECURITIES, LLC**,

**U.S. BANK NATIONAL ASSOCIATION**
and

**CITIZENS BANK, N.A.**,
as Joint Lead Arrangers and Joint Bookrunners

-2-

**TABLE OF CONTENTS**

Section                                                                                          Page

                                                                                                 ~~1~~2

ARTICLE I DEFINITIONS AND ACCOUNTING TERMS

                                                                                                 ~~1~~2
1.01          Defined Terms.

                                                                                                 ~~59~~60
1.02          Interpretative Provisions.
1.03          Accounting Terms and Provisions.                                                    60
1.04          Rounding.                                                                           ~~60~~61
1.05          Times of Day.                                                                       61
1.06          Exchange Rates; Currency Equivalents.                                               61
1.07          Additional Alternative Currencies.                                                  ~~61~~62
1.08          Additional Borrowers.                                                               ~~61~~62
1.09          Change of Currency.                                                                 62
1.10          Letter of Credit Amounts.                                                           ~~62~~63
1.11          Limited Condition Acquisitions.                                                     ~~62~~63
1.12          Divisions.                                                                          ~~63~~64
1.13          Interest Rates; Benchmark Notification.                                             ~~63~~64

                                                                                                 64

ARTICLE II COMMITMENTS AND CREDIT EXTENSIONS

                                                                                                 64
2.01          Commitments.
2.02          Borrowings, Conversions and Continuations.                                          ~~69~~70
2.03          Additional Provisions with Respect to Letters of Credit.                            ~~71~~72
2.04          Additional Provisions with Respect to Swingline Loans.                              ~~77~~78
2.05          Repayment of Loans.                                                                 ~~78~~80
2.06          Prepayments.                                                                        ~~79~~80
2.07          Termination or Reduction of Commitments.                                            ~~83~~84
2.08          Interest.                                                                           ~~83~~85
2.09          Fees.                                                                               ~~84~~85
2.10          Computation of Interest and Fees.                                                   ~~85~~87
2.11          Payments Generally; Applicable Agent's Clawback.                                    ~~85~~87
2.12          Sharing of Payments by Lenders.                                                     ~~87~~88
2.13          Evidence of Debt.                                                                   ~~87~~89
2.14          [Reserved].                                                                         ~~88~~90
2.15          [Reserved].                                                                         ~~88~~90
2.16          Defaulting Lenders.                                                                 ~~88~~90
2.17          Extended Term Loans and Extended Revolving Commitments.                             ~~90~~92
2.18          Refinancing Term Loans.                                                             ~~92~~94
2.19          Replacement Revolving Commitments.                                                  ~~94~~95

ARTICLE III TAXES, YIELD PROTECTION AND ILLEGALITY ............................................................ 9597

3.01        Taxes. ........................................................................................................................ 9597
3.02        Illegality. ................................................................................................................... 98100
3.03        Alternate Rate of Interest. ........................................................................................ 98100
3.04        Increased Cost; Capital Adequacy. ......................................................................... 101103
3.05        Compensation for Losses. ......................................................................................... 102104
3.06        Mitigation Obligations; Replacement of Lenders. .................................................. 103105
3.07        Survival Losses. ........................................................................................................ 103105
3.08        Additional Reserve Costs. ......................................................................................... 104105

ARTICLE IV GUARANTY ............................................................................................................... 104106

4.01        The Guaranty. ........................................................................................................... 104106
4.02        Obligations Unconditional. ....................................................................................... 104106
4.03        Reinstatement. ........................................................................................................... 105107
4.04        Certain Waivers. ........................................................................................................ 106107
4.05        Remedies. ................................................................................................................... 106107
4.06        Rights of Contribution. ............................................................................................. 106108
4.07        Guaranty of Payment; Continuing Guaranty. .......................................................... 106108
4.08        Keepwell. ................................................................................................................... 106108

ARTICLE V CONDITIONS PRECEDENT TO CREDIT EXTENSIONS ........................................... 107108

5.01        Conditions to Amendment No. 1112 Effective Date .................................................. 107108
5.02        Conditions to All Credit Extensions. ......................................................................... 109111
5.03        First Credit Extension to each Foreign Borrower. .................................................... 109111
5.04        [Reserved] ................................................................................................................... 110

ARTICLE VI REPRESENTATIONS AND WARRANTIES ............................................................... 110112

6.01        Existence, Qualification and Power. ......................................................................... 110112
6.02        Authorization; No Contravention. ............................................................................. 111112
6.03        Governmental Authorization; Other Consents. ........................................................ 111112
6.04        Binding Effect. ........................................................................................................... 111112
6.05        Financial Statements. ............................................................................................... 111113
6.06        No Material Adverse Effect. ...................................................................................... 111113
6.07        Litigation. .................................................................................................................. 112113
6.08        No Default. ................................................................................................................. 112113
6.09        Ownership of Property; Liens. ................................................................................... 112113
6.10        Environmental Matters. ............................................................................................ 112113
6.11        Taxes. ........................................................................................................................ 112114
6.12        ERISA Compliance. ................................................................................................... 112114

| | | |
|---|---|---|
| 6.13 | Labor Matters. | ~~113~~114 |
| 6.14 | Subsidiaries. | ~~113~~114 |
| 6.15 | Margin Regulations; Investment Company Act. | ~~113~~115 |
| 6.16 | Disclosure. | ~~113~~115 |
| 6.17 | Compliance with Laws. | ~~114~~115 |
| 6.18 | Insurance. | ~~114~~115 |
| 6.19 | Solvency. | ~~114~~115 |
| 6.20 | Intellectual Property; Licenses, Etc. | ~~114~~116 |
| 6.21 | Collateral Matters. | ~~114~~116 |
| 6.22 | Status of Obligations. | ~~115~~116 |
| 6.23 | Immunities, Etc. | ~~115~~117 |
| 6.24 | Anti-Money Laundering, Economic Sanctions Laws and Anti-Corruption Laws. | ~~115~~117 |
| 6.25 | EEA Financial Institution. | ~~116~~117 |

ARTICLE VII AFFIRMATIVE COVENANTS ~~116~~117

| | | |
|---|---|---|
| 7.01 | Financial Statements. | ~~116~~117 |
| 7.02 | Certificates; Other Information. | ~~117~~118 |
| 7.03 | Notification. | ~~118~~120 |
| 7.04 | Preservation of Existence. | ~~119~~120 |
| 7.05 | Payment of Taxes and Other Obligations. | ~~119~~120 |
| 7.06 | Compliance with Law. | ~~119~~121 |
| 7.07 | Maintenance of Property. | ~~119~~121 |
| 7.08 | Insurance. | ~~120~~121 |
| 7.09 | Books and Records. | ~~120~~121 |
| 7.10 | Inspection Rights. | ~~120~~121 |
| 7.11 | Use of Proceeds. | ~~120~~122 |
| 7.12 | Joinder of Subsidiaries as Guarantors. | ~~121~~122 |
| 7.13 | Pledge of Capital Stock. | ~~122~~123 |
| 7.14 | Pledge of Other Property. | ~~122~~123 |
| 7.15 | Further Assurances Regarding Collateral. | ~~122~~124 |
| 7.16 | Rating. | ~~123~~124 |
| 7.17 | Ownership of Foreign Borrowers. | ~~123~~124 |
| 7.18 | ~~Redemption of 2022 Senior Notes. 123~~[Reserved]. | 124 |
| 7.19 | Post-Closing Matters. | ~~123~~124 |

ARTICLE VIII NEGATIVE COVENANTS ~~123~~124

| | | |
|---|---|---|
| 8.01 | Liens. | ~~123~~124 |
| 8.02 | Investments. | ~~126~~127 |
| 8.03 | Indebtedness. | ~~129~~130 |
| 8.04 | Mergers and Dissolutions. | ~~133~~134 |
| 8.05 | Dispositions. | ~~133~~134 |
| 8.08 | Change in Accounting Practices or Fiscal Year. | ~~135~~136 |
| 8.09 | Transactions with Affiliates. | ~~136~~137 |

| 8.10 | Financial Covenant | ~~136~~137 |
| 8.11 | [Reserved]. | ~~136~~138 |
| 8.12 | Limitation on Subsidiary Distributions. | ~~136~~138 |
| 8.13 | Amendment of Material Documents. | ~~137~~139 |
| 8.14 | Sale and Leaseback Transactions. | ~~137~~139 |
| 8.15 | Swap Contracts. | ~~138~~139 |

**ARTICLE IX EVENTS OF DEFAULT AND REMEDIES** | | ~~138~~139 |

| 9.01 | Events of Default. | ~~138~~139 |
| 9.02 | Remedies upon Event of Default. | ~~140~~142 |
| 9.03 | Application of Funds. | ~~141~~142 |

**ARTICLE X AGENTS** | | ~~142~~143 |

| 10.01 | Appointment and Authorization of the Agents. | ~~142~~143 |
| 10.02 | Rights as a Lender. | ~~143~~144 |
| 10.03 | Exculpatory Provisions. | ~~143~~144 |
| 10.04 | Reliance by Agents. | ~~144~~145 |
| 10.05 | Delegation of Duties. | ~~144~~145 |
| 10.06 | Resignation of an Agent. | ~~144~~145 |
| 10.07 | Non-Reliance on Agents and Other Lenders; Erroneous Payments. | ~~145~~146 |
| 10.08 | No Other Duties. | ~~146~~147 |
| 10.09 | Agents May File Proofs of Claim. | ~~146~~147 |
| 10.10 | Collateral and Guaranty Matters. | ~~147~~148 |
| 10.11 | Withholding Tax. | ~~147~~148 |
| 10.12 | Treasury Management Agreements and Swap Contracts. | ~~148~~149 |
| 10.13 | Credit Bidding. | ~~148~~149 |
| 10.14 | Borrower Communications. | 150 |

**ARTICLE XI MISCELLANEOUS** | | ~~149~~151 |

| 11.01 | Amendments, Etc. | ~~149~~151 |
| 11.02 | Notices; Effectiveness; Electronic Communication. | ~~152~~154 |
| 11.03 | No Waiver; Cumulative Remedies; Enforcement. | ~~154~~156 |
| 11.04 | Expenses; Indemnity; Damage Waiver. | ~~154~~156 |
| 11.05 | Payments Set Aside. | ~~156~~158 |
| 11.06 | Successors and Assigns. | ~~156~~158 |
| 11.07 | Treatment of Certain Information; Confidentiality. | ~~161~~163 |
| 11.08 | Right of Setoff. | ~~162~~164 |
| 11.09 | Interest Rate Limitation. | ~~162~~164 |
| 11.10 | Counterparts; Integration; Effectiveness. | ~~162~~165 |
| 11.11 | Survival of Representations and Warranties. | ~~163~~165 |
| 11.12 | Severability. | ~~163~~165 |
| 11.13 | Replacement of Lenders. | ~~163~~165 |

| 11.14 | Governing Law; Jurisdiction; Etc. | 164167 |
| 11.15 | Waiver of Jury Trial. | 165167 |
| 11.16 | USA PATRIOT Act Notice. | 165167 |
| 11.17 | Designation as Senior Debt. | 165168 |
| 11.18 | Limitation on Foreign Credit Party Obligations. | 165168 |
| 11.19 | No Advisory or Fiduciary Responsibility. | 165168 |
| 11.20 | Acknowledgement and Consent to Bail-In of EEA Financial Institutions. | 166168 |
| 11.21 | Judgment Currency; Submission to Jurisdiction. | 166169 |
| 11.22 | Acknowledgement Regarding Any Supported QFCs | 167169 |
| 11.23 | Restricted Lenders | 168170 |

**SCHEDULES**

| | |
|---|---|
| Schedule 1.01A | Designated Sale and Leaseback Assets |
| Schedule 1.01C | Amendment No. ~~11~~12 Effective Date Guarantors |
| Schedule 1.01D | HOBE Excluded Assets |
| Schedule 1.01E | Certain Capital Stock |
| Schedule 1.01F | Letter of Credit Cap |
| Schedule 6.14 | Subsidiaries |
| Schedule 6.21 | Filings and Recordings |
| Schedule 7.19 | Post-Closing Matters |
| Schedule 8.01 | Existing Liens |
| Schedule 8.02(b) | Existing Investments |
| Schedule 8.02(x) | Designated Investments |
| Schedule 8.03 | Existing Indebtedness |
| ~~Schedule 8.05~~ | ~~Designated Assets~~ |
| Schedule 8.06(b) | Certain Restricted Payments |
| Schedule 11.02 | Notice Addresses |

**EXHIBITS**

| | |
|---|---|
| Exhibit 1.01A | Form of Foreign Borrower Agreement |
| Exhibit 1.01B | Form of Foreign Borrower Termination |
| Exhibit 1.01C | Form of U.S. Pledge Agreement |
| Exhibit 1.01D | Form of U.S. Security Agreement |
| Exhibit 2.02 | Form of Loan Notice |
| Exhibit 2.13-1 | Form of Dollar Revolving Note |
| Exhibit 2.13-2 | Form of Limited Currency Revolving Note |

| Exhibit 2.13-3 | Form of Multicurrency Revolving Note |
| Exhibit 2.13-4 | Form of Swingline Note |
| Exhibit 2.13-5 | [Reserved] |
| Exhibit 2.13-6 | Form of Term B-4 Note |
| Exhibit 2.13-7 | Form of Venue Expansion Revolving Note |
| Exhibit 3.01(e)-1 | Form of United States Tax Compliance Certificate (For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes) |
| Exhibit 3.01(e)-2 | Form of United States Tax Compliance Certificate (For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes) |
| Exhibit 3.01(e)-3 | Form of United States Tax Compliance Certificate (For Non-U.S. Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes) |
| Exhibit 3.01(e)-4 | Form of United States Tax Compliance Certificate (For Non-U.S. Participants That Are Partnerships For U.S. Federal Income Tax Purposes) |
| Exhibit 7.02(b) | Form of Compliance Certificate |
| Exhibit 7.12 | Form of Joinder Agreement |
| Exhibit 11.06(b) | Form of Assignment and Assumption |
| Exhibit 11.06(j) | Loan Offer Provisions |

**CREDIT AGREEMENT**

This CREDIT AGREEMENT (this "Credit Agreement") is entered into as of May 6, 2010 (and amended by Amendment No. 1 on June 29, 2012, as further amended by Amendment No. 2 on August 16, 2013, as further amended by Amendment No. 3 on October 31, 2016, as further amended by Amendment No. 4 on June 27, 2017, as further amended by Amendment No. 5 on March 28, 2018, as further amended by Amendment No. 6 on October 17, 2019, as further amended by Amendment No. 7 on April 9, 2020, as further amended by Amendment No. 8 on July 29, 2020, as further amended by Amendment No. 9 on January 26, 2022, as further amended by Amendment No. 10 on February 8, 2023 and, as further amended by Amendment No. 11 on November 16, 2023 and as further amended by Amendment No. 12 on November 5, 2024), among LIVE NATION ENTERTAINMENT, INC., a Delaware corporation (the " Parent Borrower"), the Foreign Borrowers party hereto from time to time (together with the Parent Borrower, the "Borrowers"), the Guarantors identified herein, the Lenders party hereto, JPMORGAN CHASE BANK, N.A., as Administrative Agent and Collateral Agent, JPMORGAN CHASE BANK, N.A., TORONTO BRANCH, as Canadian Agent and J.P. MORGAN EUROPE LIMITED, as London Agent.

**W I T N E S S E T H**

WHEREAS, the Borrowers and the Guarantors have requested that the Lenders provide revolving credit and term loan facilities for the purposes set forth herein;

WHEREAS, the Lenders have agreed to make the requested facilities available on the terms and conditions set forth herein;

WHEREAS, as of the Amendment No. 10 Effective Date, immediately prior to the effectiveness of Amendment No. 10, (x) Term B-4 Loans (as defined in this Credit Agreement immediately prior to the effectiveness of Amendment No. 10, the "Existing Term B-4 Loans") in an aggregate principal amount of $845,643,987.36 were outstanding (the "Amendment No. 10 Existing Term B-4 Loans"), which bear interest as of the Amendment No. 10 Effective Date at a rate per annum equal to 6.312500% (which represents the Eurodollar Rate (as defined in this Credit Agreement immediately prior to the effectiveness of Amendment No. 10) plus the Applicable Percentage for the Existing Term B-4 Loans) (the "Amendment No. 10 Existing Term B-4 Loan Interest Rate") with a one month Interest Period ending on February 21, 2023 (the "Amendment No. 10 Existing Term B-4 Loan Interest Period Termination Date " and such Interest Period, the "Amendment No. 10 Existing Term B-4 Loan Interest Period") and (y) Delayed Draw Term A Loans (as defined in this Credit Agreement immediately prior to the effectiveness of Amendment No. 10) in an aggregate principal amount of $382,500,000.00 were outstanding, which bear interest as of the Amendment No. 10 Effective Date at a rate per annum equal to 6.875000% (which represents the Eurodollar Rate (as defined in this Credit Agreement immediately prior to the effectiveness of Amendment No. 10) plus the Applicable Percentage for the existing Delayed Draw Term A Loans (as defined in this Credit Agreement immediately prior to the effectiveness of Amendment No. 10)) with a one month Interest Period ending on February 28, 2023; and

WHEREAS, as of the Amendment No. 11 Effective Date, the Borrower shall prepay the Delayed Draw Term A Loans in full and amend this Credit Agreement to increase the Revolving Commitments (as defined in this Credit Agreement immediately prior to the effectiveness of Amendment No. 11) and extend the maturity of the Revolving Facility (as defined in this Credit Agreement immediately prior to the effectiveness of Amendment No. 11) and make certain other changes hereto.

WHEREAS, as of the Amendment No. 12 Effective Date, the Borrower shall amend this Credit Agreement to establish the Venue Expansion Revolving Facility and extend the maturity of the Revolving Facilities (as defined in this Credit Agreement immediately prior to the effectiveness of Amendment No. 12 but to also include the Venue Expansion Revolving Facility from and after the Amendment No. 12 Effective Date) and make certain other changes hereto.

NOW, THEREFORE, in consideration of these premises and the mutual covenants and agreements contained herein, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

# ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

**1.01   Defined Terms.**

As used in this Credit Agreement, the following terms have the meanings provided below:

"2024 Senior Unsecured Notes" means the $575.0 million aggregate outstanding principal amount of 4.875% of Senior Notes due 2024 of Parent Borrower, which matured and were repaid in full on November 1, 2024.

"2024 Senior Notes Refinancing" means the incurrence by the Parent Borrower of Indebtedness in the form of senior unsecured notes on or after the Amendment No. 12 Effective Date in an aggregate principal amount not exceeding the amount applied to, without duplication (x) repay Revolving Loans borrowed to refinance or repay the 2024 Senior Unsecured Notes at maturity and/or (y) to the extent the immediately preceding clause (x) does not apply, replenish balance sheet cash used to repay such Revolving Loans.

"2024 Senior Notes Refinancing Indebtedness" means Indebtedness incurred by the Parent Borrower described in the definition of "2024 Senior Notes Refinancing", provided that such Indebtedness would satisfy the requirements of clauses (2)(iii), (2)(iv) and (2)(vi) of Section 8.03(l) at the time it is incurred irrespective of whether it is actually incurred pursuant to Section 8.03(l)(2).

"2025 Convertible Notes" means the $400.0 million aggregate principal amount of 2.000% of convertible senior notes due 2025 of the Parent Borrower.

"2025 Convertible Notes Indenture" means the indenture, dated February 3, 2020, governing the 2025 Convertible Notes.

"2025 Convertible Notes Refinancing" means the occurrence of both (a) the incurrence by the Parent Borrower of Convertible Indebtedness on or after the Amendment No. 12 Effective Date and (b) (i) the repurchase of 2025 Convertible Notes after the Amendment No. 12 Effective Date and after the date of incurrence of Convertible Indebtedness referred to in clause (a) (so long as, in the case of this clause (i), such repurchase occurs prior to the maturity of the 2025 Convertible Notes) and/or (ii) the repayment of 2025 Convertible Notes at maturity.

"2025 Convertible Notes Refinancing Indebtedness" means unsecured Convertible Indebtedness incurred by the Parent Borrower described in clause (a) of the definition of "2025 Convertible Notes Refinancing", provided that (x) such Indebtedness would satisfy the requirements of clause (2)(ii) of Section 8.03(l) at the time it is incurred irrespective of whether it is actually incurred pursuant to Section 8.03(l)(2), (y) no Subsidiary shall be an obligor with respect to the 2025 Convertible Notes Refinancing Indebtedness and (z) such Indebtedness has a stated maturity (or equivalent concept in the form of a stated mandatory repurchase or redemption date, if any) no earlier than the Initial Revolving Termination Date and has a Weighted Average Life to Maturity that is no shorter than the Term B-4 Loans.

"2029 Convertible Notes" means the $1,000.0 million aggregate principal amount of 3.125% of convertible senior notes due 2029 of the Parent Borrower.

"2029 Convertible Notes Indenture" means the indenture, dated January 12, 2023, governing the 2029 Convertible Notes.

~~"2024 Senior Unsecured Notes" means the $575.0 million aggregate outstanding principal amount of 4.875% of Senior Notes due 2024 of the Parent Borrower~~.

"2026 Senior Unsecured Notes" means the $300.0 million aggregate outstanding principal amount of 5.625% of Senior Notes due 2026 of the Parent Borrower.

2

"2027 Senior Unsecured Notes" means the $950.0 million aggregate outstanding principal amount of 4.750% of Senior Notes due 2027 of the Parent Borrower.

"2027 Senior Secured Notes" means the $1,200.0 million aggregate outstanding principal amount of 6.500% of Senior Notes due 2027 of the Parent Borrower.

"2028 Senior Secured Notes" means the $500.0 million aggregate outstanding principal amount of 3.750% of Senior Notes due 2028 of the Parent Borrower.

"Academy Music Group" means AMG and its Subsidiaries.

"Acquisition" means the purchase or acquisition (whether in one or a series of related transactions) by any Person of (a) more than fifty percent (50%) of the Capital Stock with ordinary voting power of another Person or (b) all or substantially all of the property (other than Capital Stock) of another Person or division or line of business or business unit of another Person, whether or not involving a merger or consolidation with such Person.

"Additional Credit Extension Amendment" means an amendment to this Credit Agreement (which may, at the option of the Administrative Agent and the Parent Borrower, be in the form of an amendment and restatement of this Credit Agreement) providing for any Incremental Revolving Commitments, Incremental Revolving Facilities or Incremental Term Loans pursuant to Section 2.01(f), Extended Term Loans and/or Extended Revolving Commitments pursuant to Section 2.17, Refinancing Term Loans pursuant to Section 2.18, and/or Replacement Revolving Commitments pursuant to Section 2.19, which shall be consistent with the applicable provisions of this Credit Agreement and otherwise reasonably satisfactory to the parties thereto. Each Additional Credit Extension Amendment shall be executed by the L/C Issuer and/or the Swingline Lender (to the extent Section 11.01 would require the consent of the L/C Issuer and/or the Swingline Lender, respectively, for the amendments effected in such Additional Credit Extension Amendment), the Administrative Agent, the Credit Parties and the other parties specified in Section 2.01(f), 2.17, 2.18 or 2.19, as applicable, of this Credit Agreement (but not any other Lender not specified in Section 2.01(f), 2.17, 2.18 or 2.19, as applicable, of this Credit Agreement), but shall not effect any amendments that would require the consent of each affected Lender or all Lenders pursuant to Section 11.01. Any Additional Credit Extension Amendment shall include conditions for closing documentation, all to the extent reasonably requested by the Administrative Agent.

"Additional Term B-4 Commitment" means the commitment of the Additional Term B-4 Lender to make a term loan on the Amendment No. 6 Effective Date in an aggregate amount equal to $950.0 million minus the aggregate principal amount of the Converted Term B-3 Loans of all Lenders (which aggregate amount of Additiona Term B-4 Commitment is equal to $103,419,112.78).

"Additional Term B-4 Lender" means the Person identified as such in Amendment No. 6.

"Adjusted AUD Rate" means, with respect to any Term Benchmark Borrowing denominated in Australian Dollars for any Interest Period, an interest rate per annum equal to (a) the AUD Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate; *provided that*, if the Adjusted AUD Rate as so determined would be less than the Floor, such rate shall be deemed to be equal to the Floor for the purposes of this Credit Agreement.

"Adjusted Brazilian Real Rate" means, with respect to any Term Benchmark Borrowing denominated in Brazilian Real for any Interest Period, an interest rate per annum equal to (a) the Brazilian Real Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate; *provided that* if the Adjusted Brazilian Real Rate as so determined would be less than the Floor, such rate shall be deemed to be equal to the Floor for the purposes of this Credit Agreement.

"Adjusted CIBOR Rate" means, with respect to any Term Benchmark Borrowing denominated in Danish Krone for any Interest Period, an interest rate per annum equal to (a) the CIBOR Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate; *provided that* if the Adjusted CIBOR Rate as so determined would be less than the Floor, such rate shall be deemed to be equal to the Floor for the purposes of this Credit Agreement.

"Adjusted Daily Simple RFR" means, (i) with respect to any RFR Borrowing denominated in Sterling, an interest rate per annum equal to (a) the Daily Simple RFR for Sterling, *plus* b) 0.0326%, (ii) with respect to any RFR Borrowing denominated in Swiss Francs, an interest rate per annum equal to (a) the Daily Simple RFR for Swiss Francs, *plus* (b) 0.0326%, (iii) with respect to any RFR Borrowing denominated in Dollars, an interest rate per annum equal to (a) the Daily Simple RFR for Dollars*plus* b) with respect to the Term B-4 Loans only, 0.10% and (iv) with respect to any RFR Borrowing denominated in Canadian Dollars, an interest rate per annum equal to (a) the Daily Simple RFR for Canadian Dollars, *plus* b) 0.29547%; *provided that* if the Adjusted Daily Simple RFR as so determined would be less than the Floor, such rate shall be deemed to be equal to the Floor for the purposes of this Credit Agreement.

"Adjusted EURIBOR Rate" means, with respect to any Term Benchmark Borrowing denominated in Euros for any Interest Period, an interest rate per annum equal to (a) the EURIBOR Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate; *provided that* if the Adjusted EURIBOR Rate as so determined would be less than the Floor, such rate shall be deemed to be equal to the Floor for the purposes of this Credit Agreement.

"Adjusted STIBOR Rate" means, with respect to any Term Benchmark Borrowing denominated in Swedish Krona for any Interest Period, an interest rate per annum equal to (a) the STIBOR Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate; *provided that* if the Adjusted STIBOR Rate as so determined would be less than the Floor, such rate shall be deemed to be equal to the Floor for the purposes of this Agreement.

"Adjusted Term CORRA Rate" means, with respect to any Term Benchmark Borrowing denominated in Canadian Dollars for any Interest Period, an interest rate per annum equal to (a) Term CORRA for such Interest Period plus (b) 0.29547% for a one month interest period or 0.32138% for a three month interest period; *provided that*, if the Adjusted Term CORRA Rate as so determined would be less than the Floor, such rate shall be deemed to be equal to the Floor for the purposes of this Credit Agreement.

"Adjusted Term SOFR Rate" means, with respect to any Term Benchmark Borrowing denominated in Dollars for any Interest Period, an interest rate per annum equal to (a) the Term SOFR Rate for such Interest Period *plus* (b) with respect to the Term B-4 Loans only, 0.10%; *provided that*, with respect to the Revolving Loans and the Term B-4 Loans, if the Adjusted Term SOFR Rate as so determined would be less than the Floor, such rate shall be deemed to be equal to the Floor for the purposes of this Credit Agreement.

"Adjusted TIBOR Rate" means, with respect to any Term Benchmark Borrowing denominated in Japanese Yen for any Interest Period, an interest rate per annum equal to (a) the TIBOR Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate; *provided that* if the Adjusted TIBOR Rate as so determined would be less than the Floor, such rate shall be deemed to be equal to the Floor for the purposes of this Credit Agreement.

"Adjusted TIIE Rate" means, with respect to any Term Benchmark Borrowing denominated in Mexican Pesos for any Interest Period, an interest rate per annum equal to the product of (a) the TIIE Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate; *provided that*, if the Adjusted TIIE Rate as so determined would be less than the Floor, such rate shall be deemed to be equal to the Floor for the purposes of this Credit Agreement.

"Administrative Agent" means JPMCB in its capacity as administrative agent for the Lenders under any of the Credit Documents, or any successor administrative agent.

"Administrative Agent Fee Letter" means that certain administrative agent fee letter dated as of the Closing Date between the Parent Borrower and JPMCB.

"Administrative Agent's Office" means the Administrative Agent's address and, as appropriate, account as set forth on Schedule 11.02, or such other address or account as the Administrative Agent may from time to time notify the Parent Borrower and the Lenders.

"Administrative Questionnaire" means an administrative questionnaire for the Lenders in a form supplied by the Administrative Agent.

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Agent" means any of the Administrative Agent, the Canadian Agent, the London Agent or the Collateral Agent.

"Agent Parties" has the meaning assigned to such term in Section 11.02(c).

"Aggregate Commitments" means the aggregate principal amount of the Revolving Commitments and the Additional Term B-4 Commitment.

"Agreement Currency" has the meaning assigned to such term in Section 11.21.

"Aggregate Dollar Revolving Commitments" means the Dollar Revolving Commitments of all the Lenders.

"Aggregate Dollar Revolving Committed Amount" has the meaning provided in Section 2.01(a)(i).

"Aggregate Limited Currency Revolving Commitments" means the Limited Currency Revolving Commitments of all the Lenders.

"Aggregate Limited Currency Revolving Committed Amount" has the meaning provided in Section 2.01(a)(ii).

"Aggregate Multicurrency Revolving Commitments" means the Multicurrency Revolving Commitments of all Lenders.

"Aggregate Multicurrency Revolving Committed Amount" has the meaning provided in Section 2.01(a)(iii).

"Aggregate Revolving Commitment Percentage" means, as to each Revolving Lender at any time, a fraction (expressed as a percentage carried to the ninth decimal place), the numerator of which is such Revolving Lender's Revolving Committed Amount at such time and the denominator of which is the Aggregate Revolving Committed Amount at such time.

"Aggregate Revolving Commitments" means the sum of the Revolving Commitments of all Revolving Lenders.

"Aggregate Revolving Committed Amount" means the collective reference to the Aggregate Dollar Revolving Committed Amount, the Aggregate Limited Currency Revolving Committed Amount and, the Aggregate Multicurrency Revolving Committed Amount and the Aggregate Venue Expansion Revolving Committed Amount.

"Aggregate Venue Expansion Revolving Commitments" means the Venue Expansion Revolving Commitments of all Lenders.

"Aggregate Venue Expansion Revolving Committed Amount" has the meaning provided in Section 2.01(a)(iv).

"AIL Group" means Amphitheatre Ireland Limited and its Subsidiaries.

"AIL Indebtedness" means Indebtedness of any Person comprising part of the AIL Group in an aggregate amount for all such Indebtedness not exceeding the Dollar Equivalent of €40,000,000 at any time outstanding.

"Allocated Amount" has the meaning assigned to such term in Amendment No. 6.

"Alternative Currency" means each of Euros, Canadian Dollars, Sterling, Danish Krone, Swedish Krona, Australian Dollars, Japanese Yen, Mexican Pesos, Brazilian Real and Swiss Francs, and any other currency added as an

5

"Alternative Currency" pursuant to Section 1.07 hereof (any such other currency so added, an "Other Alternative Currency").

"Alternative Currency Fronting Lender" means, with respect to any Fronted Currency Loan, each Multicurrency Revolving Lender that (a) has indicated in writing to the Administrative Agent and the Parent Borrower that it can fund Fronted Currency Loans in such Fronted Currency, (b) has agreed, in its sole discretion, in writing to act as an Alternative Currency Fronting Lender hereunder with respect to such Fronted Currency and (c) has been approved in writing by the Administrative Agent (unless such Alternative Currency Fronting Lender is the same Person as the Administrative Agent) and the Parent Borrower as an Alternative Currency Fronting Lender with respect to such Fronted Currency. The Administrative Agent shall notify the Multicurrency Revolving Lenders of the identity of each Alternative Currency Fronting Lender. With respect to each Borrowing of Fronted Currency Loans, there shall be only one Alternative Currency Fronting Lender (but for the avoidance of doubt, there may be more than one Alternative Currency Fronting Lender at any time, including for the same Fronted Currency, and in such case, the Parent Borrower shall determine which Alternative Currency Fronting Lender shall make such Fronted Currency Loan).

"Alternative Currency L/C Obligations" means any L/C Obligations arising from an Alternative Currency Letter of Credit.

"Alternative Currency L/C Sublimit" means $100.0 million.

"Alternative Currency Letter of Credit" means any Letter of Credit denominated in an Alternative Currency.

"Alternative Currency Sublimit" means $100.0 million.

"Amendment No. 2 Effective Date" means August 16, 2013.

"Amendment No. 3" means Amendment No. 3 to this Credit Agreement, dated as of the Amendment No. 3 Effective Date, by and among the Parent Borrower, the Guarantors, the Administrative Agent and the Lenders party thereto.

"Amendment No. 3 Effective Date" means October 31, 2016.

"Amendment No. 4" means Amendment No. 4 to this Credit Agreement, dated as of the Amendment No. 4 Effective Date, by and among the Parent Borrower, the Guarantors, the Administrative Agent and the Lenders party thereto.

"Amendment No. 4 Effective Date" means June 27, 2017.

"Amendment No. 5 Effective Date" means March 28, 2018.

"Amendment No. 6" means Amendment No. 6 to this Credit Agreement, dated as of October 17, 2019, by and among the Parent Borrower, the Guarantors, the Administrative Agent and the Lenders party thereto.

"Amendment No. 6 Effective Date" has the meaning specified in Amendment No. 6 (for the avoidance of doubt, the Amendment No. 6 Effective Date is October 17, 2019).

"Amendment No. 7" means Amendment No. 7 to this Credit Agreement, dated as of April 9, 2020, by and among the Parent Borrower, the Guarantors, the Administrative Agent and the Lenders party thereto.

"Amendment No. 7 Effective Date" has the meaning specified in Amendment No. 7 (for the avoidance of doubt, the Amendment No. 7 Effective Date is April 9, 2020).

"Amendment No. 8" means Amendment No. 8 to this Credit Agreement, dated as of July 29, 2020, by and among the Parent Borrower, the Guarantors, the Administrative Agent and the Lenders party thereto.

"Amendment No. 8 Effective Date" has the meaning specified in Amendment No. 8 (for the avoidance of doubt, the Amendment No. 8 Effective Date is July 29, 2020).

"Amendment No. 10" means Amendment No. 10 to this Credit Agreement, dated as of February 8, 2023, by and among the Parent Borrower and the Administrative Agent.

"Amendment No. 10 Effective Date" has the meaning specified in Amendment No. 10 (for the avoidance of doubt, the Amendment No. 10 Effective Date is February 8, 2023).

"Amendment No. 10 Existing Term B-4 Loans" shall have the meaning set forth in the Recitals hereof.

"Amendment No. 10 Existing Term B-4 Loan Interest Payment Date" shall have the meaning set forth in Section 2.08(e).

"Amendment No. 10 Existing Term B-4 Loan Interest Period" shall have the meaning set forth in the Recitals hereof.

"Amendment No. 10 Existing Term B-4 Loan Interest Period Termination Date" shall have the meaning set forth in the Recitals hereof.

"Amendment No. 10 Existing Term B-4 Loan Interest Rate" shall have the meaning set forth in the Recitals hereof.

"Amendment No. 11" means Amendment No. 11 to this Credit Agreement, dated as of November 16, 2023, by and among the Parent Borrower, the Guarantors, the Administrative Agent and the Lenders party thereto.

"Amendment No. 11 Effective Date" has the meaning specified in Amendment No. 11 (for the avoidance of doubt, the Amendment No. 11 Effective Date is November 16, 2023).

"Amendment No. 12" means Amendment No. 12 to this Credit Agreement, dated as of November 5, 2024, by and among the Parent Borrower, the Guarantors, the Administrative Agent and the Lenders party thereto.

"Amendment No. 12 Effective Date" has the meaning specified in Amendment No. 12 (for the avoidance of doubt, the Amendment No. 12 Effective Date is November 5, 2024).

"AMG" means Academy Music Holdings Ltd., a company incorporated in England and Wales.

"AMG Indebtedness" means Indebtedness of any Person comprising part of the Academy Music Group in an aggregate amount for all such Indebtedness not exceeding the Dollar Equiva ent of £60,000,000 at any time outstanding.

"Anti-Corruption Laws" has the meaning provided in Section 6.24(a).

"Applicable Agent" means (a) with respect to a Loan denominated in Dollars or a Letter of Credit denominated in any Approved Currency, or with respect to any payment that does not relate to any Loan, Borrowing or Letter of Credit, the Administrative Agent, (b) with respect to a Loan denominated in Canadian Dollars, the Canadian Agent and (c) with respect to a Loan denominated in any other Alternative Currency, the London Agent.

"Applicable Agent's Office" means such Applicable Agent's address and, as appropriate, account as set forth on Schedule 11.02, or such other address or account as such Applicable Agent may from time to time notify the Parent Borrower and the Lenders.

"Applicable Disposition Amount" means $950.0 million increased by $50.0 million on each January 1 beginning on January 1, 2020 minus the aggregate amount (measured at the fair market value thereof) of all Property Disposed of

7

pursuant to Section 8.05 (other than Dispositions of Designated Assets) from and after the Amendment No. 6 Effective Date.

"Applicable Measurement Date" has the meaning provided in Section 8.01(p).

"Applicable Pari Passu Debt" has the meaning provided in Section 2.06(b)(ii).

"Applicable Parties" has the meaning provided in Section 10.14(c).

"Applicable Percentage" means (i) with respect to Revolving Loans, Swingline Loans (it being understood that all Swingline Loans shall be Base Rate Loans) and Letter of Credit Fees, 1.75% per annum in the case of any Revolving Loans bearing interest by reference to the Adjusted Term SOFR Rate or any other Relevant Rate and 0.75% per annum in the case of any Base Rate Loans, (ii) with respect to Term B-4 Loans, 1.75% per annum in the case of any Term Benchmark Loans or RFR Loans and 0.75% per annum in the case of any Base Rate Loans, and (iii) with respect to any other Class of Term Loans, as specified in the Additional Credit Extension Amendment related thereto (it being understood that Amendment No. 6 constitutes the Additional Credit Extension Amendment in respect of the Term B-4 Loans).

"Applicable Time" means, with respect to any borrowings and payments in any Alternative Currency, the local time in the place of settlement for such Alternative Currency as may be determined by the Applicable Agent or the applicable L/C Issuer, as applicable, to be necessary for timely settlement on the relevant date in accordance with normal banking procedures in the place of payment.

"Approved Borrower Portal" has the meaning assigned to it in Section 10.14(a).

"Approved Currency" means each of Dollars and each Alternative Currency.

"Approved Fund" means any Fund that is administered, managed or underwritten by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 11.06) and accepted by the Administrative Agent and, if required by Section 11.06, the Parent Borrower, in substantially the form of Exhibit 11.06(b) or any other form approved by the Administrative Agent.

"Attributable Principal Amount" means (a) in the case of capital leases, the amount of capital lease obligations determined in accordance with GAAP, (b) in the case of Synthetic Leases, an amount determined by capitalization of the remaining lease payments thereunder as if it were a capital lease determined in accordance with GAAP, and (c) in the case of Sale and Leaseback Transactions, the present value (discounted in accordance with GAAP at the debt rate implied in the applicable lease) of the obligations of the lessee for rental payments during the term of such lease.

"AUD Rate" means, with respect to any Term Benchmark Borrowing denominated in Australian Dollars and for any Interest Period, a rate per annum equal to the AUD Screen Rate at approximately 11:00 a.m., Sydney, Australia time, on the first day of such Interest Period (and, if such day is not a Business Day, then on the immediately preceding Business Day).

"AUD Screen Rate" means with respect to any Interest Period, the average bid reference rate administered by ASX Benchmarks Pty Limited (ACN 616 075 417) (or any other Person that takes over the administration of such rate) for Australian dollar bills of exchange with a tenor equal in length to such Interest Period as displayed on page BBSY of the Reuters screen (or, in the event such rate does not appear on such Reuters page, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate as shall be selected by the Administrative Agent from time to time in its reasonable discretion) at or about 11:00 a.m. (Sydney, Australia time) on the first day of such Interest Period (and, if such day is

8

not a Business Day, then on the immediately preceding Business Day). If the AUD Screen Rate shall be less than 0.00%, the AUD Screen Rate shall be deemed to be 0.00% for purposes of this Agreement.

"Australian Dollars" or "AU$" means the lawful currency of Australia.

"Auto-Extension Letter of Credit" has the meaning provided in Section 2.03(b)(iii).

"Available Tenor" means, as of any date of determination and with respect to the then-current Benchmark for any Approved Currency, as applicable, any tenor for such Benchmark  or component thereof) or payment period for interest calculated with reference to such Benchmark (or component thereof), as applicable, that is or may be used for determining the length of an Interest Period for any term rate or otherwise, for determining any frequency of making payments of interest calculated pursuant to this Credit Agreement as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to clause (e) of Section 3.03.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legis ation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bankruptcy Code": Title 11 of the United States Code.

"Base Rate" means in the case of Loans denominated in Dollars, for any day, a rate *per annum* equal to the greatest of (a) the Prime Rate in effect on such day,  b) the NYFRB Rate in effect on such day plus ½ of 1% and (c) the Adjusted Term SOFR Rate for a one month Interest Period as published two U.S. Government Securities Business Days prior to such day (or if such day is not a U.S. Government Securities Business Day, the immediately preceding U.S. Government Securities Business Day) plus 1%; provided that for the purpose of this definition, the Adjusted Term SOFR Rate for any day shall be based on the Term SOFR Reference Rate at approximately 5:00 a.m. Chicago time on such day (or any amended publication time for the Term SOFR Reference Rate, as specified by the CME Term SOFR Administrator in the Term SOFR Reference Rate methodology). Any change in the Base Rate due to a change in the Prime Rate, the NYFRB Rate or the Adjusted Term SOFR Rate shall be effective from and including the effective date of such change in the Prime Rate, the NYFRB Rate or the Adjusted Term SOFR Rate, respectively. If the Base Rate is being used as an alternate rate of interest pursuant to Section 3.03 (for the avoidance of doubt, only until the Benchmark Replacement has been determined pursuant to Section 3.03(b)), then the Base Rate shall be the greater of clauses (a) and (b) above and shall be determined without reference to clause (c) above; provided, that with respect to the Revolving Loans, the Swingline Loans and the Term B-4 Loans, the Base Rate shall in no event be less than 1.0% per annum. The "Prime Rate" is a rate set by JPMCB based upon various factors including its costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in such rate announced by JPMCB shall take effect at the opening of business on the day specified in the public announcement of such change.

"Base Rate Loan" means a Loan that bears interest based on the Base Rate.

"Benchmark" means, initially, with respect to any (i) RFR Loan in any Approved Currency, the applicable Relevant Rate for such Approved Currency or (ii) Term Benchmark Loan, the applicable Relevant Rate for such Approved Currency; *provided* that if a Benchmark Transition Event or a Term CORRA Reelection Event, and the related Benchmark Replacement Date have occurred with respect to the applicable Relevant Rate or the then-current

9

Benchmark for such Approved Currency, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to clause (b) of <u>Section 3.03</u>.

"<u>Benchmark Replacement</u>" means, for any Available Tenor, the first alternative set forth in the order below that can be determined by the Administrative Agent for the applicable Benchmark Replacement Date; *provided* that, in the case of any Loan denominated in an Alternative Currency (other than any Loan denominated in Canadian Dollars), "Benchmark Replacement" shall mean the alternative set forth in clause (2) below:

(1)    in the case of any Loan denominated in Dollars, the Adjusted Daily Simple RFR for Dollars and/or in the case of any Loan denominated in Canadian Do lars, the Adjusted Daily Simple RFR for Canadian Dollars;

(2)    the sum of: (a) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrower as the replacement for the then-current Benchmark for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for the then-current Benchmark for syndicated credit facilities denominated in the applicable Approved Currency at such time in the United States and (b) the related Benchmark Replacement Adjustment;

*provided that* notwithstanding anything to the contrary in this Agreement or in any other Credit Document, upon the occurrence of a Term CORRA Reelection Event, and the delivery of a Term CORRA Notice, on the applicable Benchmark Replacement Date the "Benchmark Replacement" shall revert to and shall be deemed to be the Adjusted Term CORRA Rate.

With respect to the Revolving Loans and the Term B-4 Loans, if the Benchmark Replacement as determined pursuant to clause (1) or (2) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Credit Agreement and the other Credit Documents.

"<u>Benchmark Replacement Adjustment</u>" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement for any applicable Interest Period and Available Tenor for any setting of such Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body on the applicable Benchmark Replacement Date and/or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for syndicated credit facilities denominated in the applicable Approved Currency at such time.

"<u>Benchmark Replacement Conforming Changes</u>" means, with respect to any Benchmark Replacement and/or any Term Benchmark Loan denominated in Dollars, any technical, administrative or operational changes (including changes to the definition of "Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "RFR Business Day," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, length of lookback periods, the applicability of breakage provisions, and other technical, administrative or operational matters) that the Administrative Agent decides may be appropriate to ref ect the adoption and implementation of such Benchmark and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of such Benchmark exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Credit Agreement and the other Credit Documents).

"Benchmark Replacement Date" means, with respect to any Benchmark, the earliest to occur of the following events with respect to such then-current Benchmark:

(1)    in the case of clause (1) or (2) of the definition of "Benchmark Transition Event," the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(2)    in the case of clause (3) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be no longer representative; provided, that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

(3)    in the case of a Term CORRA Reelection Event, the date that is thirty (30) days after the date a Term CORRA Notice (if any) is provided to the Lenders and the Parent Borrower pursuant to Section 3.03(c).

For the avoidance of doubt, (i) if the event giving rise to the Benchmark Replacement Date occurs on the same day as, but earlier than, the Reference Time in respect of any determination, the Benchmark Replacement Date will be deemed to have occurred prior to the Reference Time for such determination and (ii) the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (1) or (2) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" means, with respect to any Benchmark, the occurrence of one or more of the following events with respect to such then-current Benchmark:

(1)    a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(2)    a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the NYFRB, the CME Term SOFR Administrator, the central bank for the Approved Currency applicable to such Benchmark, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), in each case, which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(3)    a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are no longer, or as of a specified future date will no onger be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Unavailability Period" means, with respect to any Benchmark, the period (if any) (x) beginning at the time that a Benchmark Replacement Date pursuant to ~~clauses~~clause (1) or (2) of that definition has occurred if, at such time, no Benchmark Replacement has replaced such then-current Benchmark for all purposes hereunder and under any Credit Document in accordance with Section 3.03 and (y) ending at the time that a Benchmark Replacement has replaced such then-current Benchmark for all purposes hereunder and under any Credit Document in accordance with Section 3.03.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"BHC Act Affiliate" of a party means an "affiliate' (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Borrower Obligations" means, without duplication, (a) all advances to, and debts, liabilities, obligations, covenants and duties of, any Borrower arising under any Credit Document or otherwise with respect to any Loan or Letter of Credit, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Borrower of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding, (b) unless otherwise designated in writing by Parent Borrower and such Hedge Bank (as defined below), all obligations under any Swap Contract between Parent Borrower or any of its Subsidiaries (other than an Unrestricted Subsidiary) and the Administrative Agent, any Lead Arranger, any Lender or Affiliate of the Administrative Agent, a Lead Arranger or a Lender or any Person that was the Administrative Agent, a Lead Arranger, a Lender or Affiliate of the Administrative Agent, a Lead Arranger or a Lender at the time it entered into such Swap Contract, (each, in such capacity, a "Hedge Bank"), other than any Swap Contract entered into in connection with any Permitted Bond Hedge Transaction or any Permitted Warrant Transaction and (c) unless otherwise designated in writing by Parent Borrower and such Treasury Management Bank (as defined below), all obligations under any Treasury Management Agreement between Parent Borrower or any of its Subsidiaries (other than an Unrestricted Subsidiary) and the Administrative Agent, any Lender or Affiliate of the Administrative Agent or a Lender or any Person that was the Administrative Agent, a Lender or Affiliate of the Administrative Agent or a Lender at the time it entered into such Treasury Management Agreement (each, in such capacity, a "Treasury Management Bank"); provided that Excluded Swap Obligations shall not be a Borrower Obligation of any Guarantor that is not a Qualified ECP Guarantor.

"Borrowers" has the meaning provided in the preamble hereto.

"Borrowing" means (a) a borrowing consisting of simultaneous Loans of the same Type and, in the case of Term Benchmark Loans, having the same Interest Period, or (b) a borrowing of Swingline Loans, as appropriate.

"Brazilian Real" or "R$" means the lawful money of Brazil.

"Brazilian Real Rate" means, with respect to any Term Benchmark Borrowing denominated in Brazilian Real and for any Interest Period, the "Brazilian Real Screen Rate".

"Brazilian Real Screen Rate" means the interest rate, as set forth by the central bank or other supervisor in Brazil, as applicable, which is responsible for supervising or determining the interest rate with a tenor equal in length to such Interest Period as displayed on a publicly available page or screen of an information service that publishes such rates, as selected by the Administrative Agent from time to time in its reasonable discretion, with the Reference Time to be determined by the Administrative Agent in its reasonable discretion.

"Business Day" means, any day (other than a Saturday or a Sunday) on which banks are open for business in New York City; provided that, in addition to the foregoing, a Business Day shall (a) in relation to Loans denominated in Japanese Yen and in relation to the calculation or computation of TIBOR or the Japanese Prime Rate, any day (other

than a Saturday or a Sunday) on which banks are open for business in Japan, (b) in relation to Loans denominated in Euros and in relation to the calculation or computation of EURIBOR, any day which is a TARGET Day, (c) in relation to RFR Loans and any interest rate settings, fundings, disbursements, settlements or payments of any such RFR Loan, or any other dealings in the applicable Approved Currency of such RFR Loan, any such day that is only a RFR Business Day, (d) in relation to Loans referencing the Adjusted Term SOFR Rate and any interest rate settings, fundings, disbursements, settlements or payments of any such Loans referencing the Adjusted Term SOFR Rate or any other dealings of such Loans referencing the Adjusted Term SOFR Rate, any such day that is a U.S. Government Securities Business Day, (e) in relation to Loans denominated in Swedish Krona and in relation to the calculation or computation of STIBOR, any day except Saturday, Sunday and any day which shall be in Stockholm a legal holiday or a day on which banking institutions are authorized or required by law or other government action to close in Stockholm, (f) in relation to Loans denominated in Danish Krone and in relation to the calculation and computation of CIBOR, any day (other than a Saturday or Sunday) on which banks are open for business in Copenhagen, Denmark, (g) in relation to Loans denominated in Canadian Dollars and in calculation or computation of CORRA or the Canadian Prime Rate, any day (other than a Saturday or a Sunday) on which banks are open for dealings in Canadian Dollars in Toronto, Canada and (h) in relation to Loans denominated in any other Approved Currency or any interest rate settings, fundings, disbursements, settlements or payments of any CBR Loan, any date (other than a Saturday or a Sunday) on which dealings in such Approved Currency are carried on in the principal financial center of such Approved Currency.

"Canadian Agent" means JPMorgan Chase Bank, N.A., Toronto Branch, in its capacity as Canadian agent for the Lenders hereunder, or any successor Canadian agent.

~~"Canadian Borrower" means the Parent Borrower or any Subsidiary that is incorporated or otherwise organized under the laws of Canada or any political subdivision thereof that has been designated as a Foreign Borrower pursuant to Section 1.08 and, in each case that has not ceased to be a Foreign Borrower as provided in Section 1.08.~~

"Canadian Dollars" and "C$" means the lawful currency of Canada.

"Canadian Prime Rate" means, on any day, the rate determined by the Administrative Agent to be the rate equal to the PRIMCAN Index rate that appears on the Bloomberg screen at 10:15 a.m. Toronto time on such day (or, in the event that the PRIMCAN Index is not published by Bloomberg, any other information services that publishes such index from time to time, as selected by the Administrative Agent in its reasonable discretion); provided, that if the foregoing rate shall be less than 0.00%, such rate shall be deemed to be 0.00% for purposes of this Agreement. Any change in the Canadian Prime Rate due to a change in the PRIMCAN Index shall be effective from and including the effective date of such change in the PRIMCAN Index.

"Capital Expenditures" means, as to any Person, expenditures with respect to property, plant and equipment during such period which should be capitalized in accordance with GAAP (including the Attributable Principal Amount of capital leases). The following items will be excluded from the definition of "Capital Expenditures": (a) expenditures to the extent funded by insurance proceeds, condemnation awards or payments pursuant to a deed in lieu thereof, (b) expenditures to the extent made through barter transactions and (c) non-cash capital expenditures required to be booked as capital expenditures in accordance with GAAP.

"Capital Stock" means (a) in the case of a corporation, capital stock, (b) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of capital stock, (c) in the case of a partnership, partnership interests (whether general or limited), (d) in the case of a limited liability company, membership interests and (e) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person (but excluding, in each case, any debt security that is convertible into, or exchangeable for, Capital Stock). For the avoidance of doubt, a debt security that is convertible into, or exchangeable for, cash and/or Capital Stock, in an amount determined by reference to the price of such Capital Stock, will be deemed to satisfy the requirements of the exclusion set forth in the final parenthetical of the preceding sentence.

13

"Cash Collateralize" has the meaning provided in Section 2.03(g).

"Cash Equivalents" means (a) securities issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof (provided that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than twelve (12) months from the date of acquisition, (b) Dollar-denominated time deposits, money market deposits and certificates of deposit of (i) any Lender that accepts such deposits in the ordinary course of such Lender's business, (ii) any domestic commercial bank of recognized standing having capital and surplus in excess of $500.0 million or (iii) any bank whose short-term commercial paper rating from S&P is at least A-1 or from Moody's is at least P-1, in each case with maturities of not more than two hundred seventy (270) days from the date of acquisition, (c) commercial paper issued by any issuer bearing at least an "A-2" rating for any short-term rating provided by S&P and/or Moody's and maturing within two hundred seventy (270) days of the date of acquisition, (d) repurchase agreements entered into by the Parent Borrower with a bank or trust company (including any of the Lenders) or recognized securities dealer having capital and surplus in excess of $500.0 million for direct obligations issued by or fully guaranteed by the United States and having, on the date of purchase thereof, a fair market value of at least one hundred percent (100%) of the amount of the repurchase obligations, (e) Investments (classified in accordance with GAAP as current assets) in money market investment programs registered under the Investment Company Act of 1940, as amended, that are administered by reputable financial institutions having capital and surplus of at least $500.0 million and the portfolios of which are limited to Investments of the character described in the foregoing subclauses hereof, (f) shares of mutual funds if no less than 95% of such funds' investments satisfy the provisions of clauses a) through (e) above, and (g) in the case of any Foreign Subsidiary, short-term investments of comparable credit quality (or the best available in such Foreign Subsidiary's jurisdiction) and tenor to those referred to in clauses (a) through (f) above which are customarily used for cash management purposes in any country in which such Foreign Subsidiary operates.

"CBR Loan" means a Loan that bears interest at a rate determined by reference to the Central Bank Rate or the Japanese Prime Rate.

"CBR Spread" means the Relevant Rate, applicable to such Loan that is replaced by a CBR Loan.

"Central Bank Rate" means, the greater of (I)(A) for any Loan denominated in (a) Sterling, the Bank of England (or any successor thereto)'s "Bank Rate" as published by the Bank of England (or any successor thereto) from time to time, (b) Euro, one of the following three rates as may be selected by the Administrative Agent in its reasonable discretion: (1) the fixed rate for the main refinancing operations of the European Central Bank (or any successor thereto), or, if that rate is not published, the minimum bid rate for the main refinancing operations of the European Central Bank (or any successor thereto), each as published by the European Central Bank (or any successor thereto) from time to time, (2) the rate for the marginal lending facility of the European Central Bank (or any successor thereto), as published by the European Central Bank (or any successor thereto) from time to time or (3) the rate for the deposit facility of the central banking system of the Participating Member States, as published by the European Central Bank (or any successor thereto) from time to time, (c) Swiss Francs, the policy rate of the Swiss National Bank (or any successor thereto) as published by the Swiss National Bank (or any successor thereto) from time to time, (d) Swedish Krona, the Swedish Riksbank's (or any successor's thereto) "repo rate" (Sw. reporänta) as published by the Swedish Riksbank (or any successor thereto) from time to time and in effect on such day and (e) any other Alternative Currency determined after the Amendment No. 1112 Effective Date, a central bank rate as determined by the Administrative Agent in its reasonable discretion; plus (B) the applicable Central Bank Rate Adjustment and (II) the Floor.

"Central Bank Rate Adjustment" means, for any day, for any Loan denominated in (a) Euro, a rate equal to the difference (which may be a positive or negative value or zero) of (i) the average of the Adjusted EURIBOR Rate for the five most recent Business Days preceding such day for which the EURIBOR Screen Rate was available (excluding, from such averaging, the highest and the lowest Adjusted EURIBOR Rate applicable during such period of five Business Days) minus (ii) the Central Bank Rate in respect of Euro in effect on the  ast Business Day in such period, (b) Sterling, a rate equal to the difference (which may be a positive or negative value or zero) of (i) the average of Adjusted Daily Simple RFR for Sterling Borrowings for the five most recent RFR Business Days preceding such day for which Adjusted Daily Simple RFR for Sterling Borrowings was available (excluding, from

14

such averaging, the highest and the lowest such Adjusted Daily Simple RFR applicable during such period of five RFR Business Days) minus (ii) the Central Bank Rate in respect of Sterling in effect on the last RFR Business Day in such period, (c) Swiss Francs, a rate equal to the difference (which may be a positive or negative value or zero) of (i) the average of Adjusted Daily Simple RFR for Swiss Franc Borrowings for the five most recent RFR Business Days preceding such day for which SARON was available (excluding, from such averaging, the highest and the lowest such Adjusted Daily Simple RFR applicable during such period of five RFR Business Days) minus (ii) the Central Bank Rate in respect of Swiss Francs in effect on the last RFR Business Day in such period, (d) Swedish Krona, a rate equal to the difference (which may be a positive or negative value or zero) of (i) the average of the Adjusted STIBOR Rate for the five most recent Business Days preceding such day for which the STIBOR Screen Rate was available (excluding, from such averaging, the highest and the lowest Adjusted STIBOR Rate applicable during such period of five Business Days) minus (ii) the Central Bank Rate in respect of Swedish Krona in effect on the last Business Day in such period and (e) any other Alternative Currency determined after the Amendment No. ~~11~~12 Effective Date, a Central Bank Rate Adjustment as determined by the Administrative Agent in its reasonable discretion. For purposes of this definition, (x) the term Central Bank Rate shall be determined disregarding clause (B) of the definition of such term and (y) the EURIBOR Rate or the STIBOR Rate on any day shall be based on the EURIBOR Screen Rate or the STIBOR Screen Rate, on such day at approximately the time referred to in the definition of such term for deposits in the applicable Approved Currency for a maturity of one month.

"CFC" means a "controlled foreign corporation" within the meaning of Section 957 of the Internal Revenue Code.

"CFC Holdco" means any Domestic Subsidiary with no material assets other than the Capital Stock of one or more Foreign Subsidiaries that are CFCs.

"CIBOR Rate" means, with respect to any Term Benchmark Borrowing denominated in Danish Krone and for any Interest Period, the CIBOR Screen Rate at approximately 11:00 a.m. London time two business days prior to the commencement of such Interest Period (and, if such day is not a Business Day, then on the immediately preceding Business Day (as adjusted by Administrative Agent after 11:00 a.m. London time to reflect any error in the posted rate of interest or in the posted average annual rate of interest)), rounded to the nearest 1 100th of 1% (with .005% being rounded up).

"CIBOR Screen Rate" means, with respect to any Interest Period, the Copenhagen interbank offered rate published by the Danish Financial Benchmark Facility (or any other Person that takes over the administration of such rate) for Danish Krone with a tenor equal in length to such Interest Period as displayed on page CIBOR of the Reuters screen (or, in the event such rate does not appear on such Reuters page on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate as shall be selected by the Administrative Agent from time to time in its reasonable discretion) as of 11:00 a.m. London time two business days prior to the commencement of such Interest Period. If the CIBOR Screen Rate shall be less than 0.00%, the CIBOR Screen Rate shall be deemed to be 0.00% for purposes of this Agreement.

"Change in Law" means the occurrence, after the Amendment No. 6 Effective Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority provided, that (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall in each case, be deemed to have been introduced or adopted after the Amendment No. 6 Effective Date, regardless of the date enacted or adopted.

"Change of Control" means an event or series of events by which:

(a)    any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of such person or its

15

subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan unless such plan is part of a group) becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934), directly or indirectly, of forty percent (40%) or more of the equity securities of the Parent Borrower entitled to vote for members of the board of directors or equivalent governing body of the Parent Borrower on a fully diluted basis;

(b)    there shall be consummated any share exchange, consolidation or merger of the Parent Borrower pursuant to which the Parent Borrower's Capital Stock entitled to vote in the election of the board of directors of the Parent Borrower generally would be converted into cash, securities or other property, or the Parent Borrower sells, assigns, conveys, transfers, leases or otherwise disposes of all or substantially all of its assets, in each case other than pursuant to a share exchange, consolidation or merger of the Parent Borrower in which the holders of the Parent Borrower's Capital Stock entitled to vote in the election of the board of directors of the Parent Borrower generally immediately prior to the share exchange, consolidation or merger have, directly or indirectly, at least a majority of the total voting power in the aggregate of all classes of Capital Stock of the continuing or surviving entity entitled to vote in the election of the board of directors of such person generally immediately after the share exchange, consolidation or merger; or

(c)    a "change of control" or any comparable term under, and as defined in, any of the documentation relating to the Existing Notes shall have occurred.

"Class" means (i) with respect to any Commitment, its character as a Revolving Commitment, an Additional Term B-4 Commitment or any other group of Commitments (whether established by way of new Commitments or by way of conversion or extension of existing Commitments or Loans) designated as a "Class" in an Additional Credit Extension Amendment and (ii) with respect to any Loans, its character as a Revolving Loan, a Swingline Loan, a Term B-4 Loan or any other group of Loans (whether made pursuant to new Commitments or by way of conversion or extension of existing Loans) designated as a "Class" in an Additiona Credit Extension Amendment; provided that (x) in no event shall there be more than three Classes of Revolving Commitments or more than three Classes of Revolving Loans outstanding at any time and (y) notwithstanding anything to the contrary, the borrowing and repayment of Revolving Loans shall be made on a pro rata basis across all Classes of Revolving Loans (except to the extent that any applicable Additional Credit Extension Amendment provides that the Class of Revolving Loans established thereunder shall be entitled to less than pro rata treatment in repayments), and any termination of Revolving Commitments shall be made on a pro rata basis across all Classes of Revolving Commitments (except to the extent that any applicable Additional Credit Extension Amendment provides that the Class of Revolving Commitments established thereunder shall be entitled to less than pro rata treatment in reduction of Revolving Commitments). Commitments or Loans that have different maturity dates, pricing (other than upfront fees) or other terms shall be designated separate Classes.

"Closing Date" means May 6, 2010.

"CME Term SOFR Administrator" means CME Group Benchmark Administration Limited as administrator of the forward-looking term Secured Overnight Financing Rate (SOFR) (or a successor administrator).

"Collateral" means the collateral identified in, and at any time covered, or purported to be covered by, the Collateral Documents.

"Collateral Agent" means JPMCB in its capacity as collateral agent or security trustee, as applicable, for the Lenders under any of the Collateral Documents, or any successor collateral agent.

"Collateral Documents" means the U.S. Security Agreement, the U.S. Pledge Agreement, the Foreign Collateral Documents and any other documents executed and delivered in connection with the attachment or perfection (or the equivalent under applicable foreign law) of security interests granted to secure the Obligations.

"Commitment Fee Rate" means 0.35% per annum.

"Commitment Fees" has the meaning provided in Section 2.09(a).

"Commitment Period" means the period from and including the Amendment No.4412 Effective Date to the earlier of (a) (i) in the case of Revolving Loans and Swingline Loans, the Revolving Termination Date or (ii) in the case of the Letters of Credit, the L/C Expiration Date, or (b) in the case of the Revolving Loans, Swingline Loans and the Letters of Credit, the date on which the applicable Revolving Commitments shall have been terminated as provided herein.

"Commitments" means the Revolving Commitments, the L/C Commitments, the Swingline Commitment, the Additional Term B-4 Commitment and any other commitment to extend credit established pursuant to an Additional Credit Extension Amendment, as the context may require.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Compliance Certificate" means a certificate substantially in the form of Exhibit 7.02(b).

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated Capital Expenditures" means, for any period for the Consolidated Group, without duplication, all Capital Expenditures.

"Consolidated EBITDA" means, for any period for the Consolidated Group, Consolidated Net Income in such period plus, without duplication, (A) in each case solely to the extent decreasing Consolidated Net Income in such period: (a) consolidated interest expense (net of interest income), (b) provision for taxes, to the extent based on income or profits, (c) amortization and depreciation, (d) the amount of all costs and expenses incurred in connection with (x) the closing and initial funding of thisof the Credit AgreementDocuments or the Transactions, (y) the Ticketmaster Merger in an amount under this clause (y) not to exceed $85.0 million in the aggregate and (z) the acquisition of an aggregate of 51% of the Capital Stock of OCESA Entretenimiento S.A. de C.V. (" OCESA") and the integration of OCESA into the business of the Borrower and its Subsidiaries, in an amount under this clause (z) not to exceed $20.0 million in the aggregate, (e) the amount of all non-cash deferred compensation expense, (f) the amount of all expenses associated with the early extinguishment of Indebtedness, (g) any losses from sales of Property, other than from sales in the ordinary course of business, (h) any non-cash impairment loss of goodwill or other intangibles required to be taken pursuant to GAAP, (i) any non-cash expense recorded with respect to stock options or other equity-based compensation, (j) any extraordinary loss in accordance with GAAP, (k) any restructuring, non-recurring or other unusual item of loss or expense (including write-offs and write-downs of assets), other than any write-off or write-down of inventory or accounts receivable; provided that the aggregate amount added to Consolidated EBITDA pursuant to this clause (k) and clause (o) below in any four quarter period shall not exceed 20% of Consolidated EBITDA in such period (such percentage to be calculated prior to giving effect to any amounts added to Consolidated EBITDA for such period pursuant to this clause (k) or clause (o) below), (l) any non-cash loss related to discontinued operations, (m) any other non-cash charges (other than write-offs or write-downs of inventory or accounts receivab e), (n) fees and expenses incurred in connection with the making of acquisitions and other non-ordinary course Investments pursuant to Section 8.02, in an aggregate amount not to exceed $100.0 million in any four quarter period and (o) the amount of pro forma "run rate" cost savings, operating expense reductions and synergies (in each case net of actual amounts realized) related to any cost-savings initiative or acquisition or disposition outside of the ordinary course of business that are reasonably identifiable, factually supportable and projected by such person in good faith to result from actions that have been taken or with respect to which substantial steps have been taken or are expected to be taken (in the good faith determination of such person) within 24 months after the date such acquisition or disposition is consummated or such cost savings initiative is implemented, as the case may be; provided that the aggregate amount added to Consolidated EBITDA pursuant to this clause (o) and clause (k) above in any four quarter period shall not exceed 20% of Consolidated EBITDA in such period (such percentage to be calculated prior to giving effect to any amounts added to Consolidated EBITDA for such period pursuant to this clause (o) or clause (k) above); provided that (I) in the case

17

of any non-cash charge referred to in this definition of "Consolidated EBITDA" that relates to accruals or reserves for a future cash disbursement, such future cash disbursement shall be deducted from Consolidated EBITDA in the period when such cash is so disbursed and (II) if there shall exist one or more Specified Subsidiaries during such period, the amounts otherwise added to Consolidated EBITDA pursuant to any of clauses (A)(a) through (o) of this definition shall be reduced such that the contribution of any such Specified Subsidiary to such amounts is limited to the Specified Percentage applicable to such Specified Subsidiary minus (B) in each case solely to the extent increasing Consolidated Net Income in such period: (a) any extraordinary gain in accordance with GAAP, (b) any nonrecurring item of gain or income (including write-ups of assets), other than any write-up of inventory or accounts receivable, (c) any gains from sales of Property, other than from sales in the ordinary course of business, (d) any non-cash gain related to discontinued operations, and (e) the aggregate amount of all other non-cash items increasing Consolidated Net Income during such period; provided that (I) in the case of any non-cash item referred to in clause (B) of this definition of "Consolidated EBITDA" that relates to a future cash payment to the Parent Borrower or a Subsidiary, such future cash payment shall be added to Consolidated EBITDA in the period when such payment is so received by the Parent Borrower or such Subsidiary and (II) if there shall exist one or more Specified Subsidiaries during such period, the amounts otherwise subtracted from Consolidated EBITDA pursuant to any of clauses (B)(a) through (e) of this definition shall be increased such that the contribution of any such Specified Subsidiary to such amounts is limited to the Specified Percentage applicable to such Specified Subsidiary.

"Consolidated Excess Cash Flow" means, for any period for the Consolidated Group, (a) net cash provided by operating activities for such period as reported on the audited GAAP cash flow statement delivered under Section 7.01(a) minus (b) the sum of, in each case to the extent not otherwise reducing net cash provided by operating activities in such period, without duplication, (i) scheduled (including at maturity) principal payments (including payments of principal with respect to the Existing Convertible Notes required from time to time under the terms of the Existing Convertible Notes Indentures, as applicable) and payments of interest in each case made in cash on Consolidated Total Funded Debt during such period (including for purposes hereof, sinking fund payments, payments in respect of the principal components under capital leases and the like relating thereto), in each case other than in connection with a refinancing thereof (for the avoidance of doubt, no payments made ~~on~~ (x) on the Amendment No. 3 Effective Date with respect to the Term A-1 Loans or Term B-1 Loans, (y) on the Amendment No. 4 Effective Date with respect to the Term B-2 Loans, (z) on the Amendment No. 6 Effective Date with respect to the Term A-2 Loans or Term B-3 Loans, Original Revolving Commitments, Original Revolving Loans and Original Swingline Loans ~~and~~, (aa) ~~payments made~~ with respect to the Delayed Draw Term A Loans (as defined in this Credit Agreement immediately prior to the effectiveness of Amendment No. 11) or any Revolving Loans or Swingline Loans on the Amendment No. 11 Effective Date or (bb) with respect to any Revolving Loans or Swingline Loans on the Amendment No. 12 Effective Date shall in any case be included under this clause (i)), (ii) Consolidated Capital Expenditures made in cash during such period that are not financed with the proceeds of Indebtedness, an issuance of Capital Stock or from a reinvestment of Net Cash Proceeds referred to in Section 2.06(b)(ii), (iii) prepayments of Funded Debt during such period (other than prepayments of Loans owing under this Credit Agreement (except prepayments of Revolving Loans to the extent there is a simultaneous reduction in the Aggregate Revolving Commitments in the amount of such prepayment pursuant to Section 2.07) and other than such prepayments made with the proceeds of other Indebtedness); provided that, for the avoidance of doubt, no payments made ~~on~~ (A) on the Amendment No. 6 Effective Date with respect to the Original Revolving Commitments, Original Revolving Loans or Original Swingline Loans ~~and~~, (B) on the Amendment No. 11 Effective Date of Revolving Loans or Swingline Loans or (C) on the Amendment No. 12 Effective Date of Revolving Loans or Swingline Loans shall in any case be included under this clause (iii), (iv) to the extent not financed with the incurrence or assumption of Indebtedness or proceeds from an issuance of Capital Stock, Subject Dispositions, Specified Dispositions or Involuntary Dispositions, cash sums expended for Investments pursuant to Sections 8.02(b), (c) (to the extent such advances are not repaid to Parent Borrower or a Subsidiary),(e), (f), (g) (but with respect to expenditures for Investments pursuant to Section 8.02(e), (f) or (g), such expenditures shall only reduce Consolidated Excess Cash Flow pursuant to this clause (iv) to the extent such expenditures are not made in Parent Borrower or a Person that was not one of Parent Borrower's Subsidiaries prior to such expenditure), (i), (j), (k) (other than with respect to any amount expended on such Investments through the use of the Cumulative Credit), (z), (aa) or (cc) during such period or contractually committed to be made during the three months following the end of such period (but with respect to expenditures for Investments pursuant to Section 8.02(z), (aa) and (cc), such expenditures shall only reduce Consolidated Excess Cash Flow to the extent such expenditures are made in a Person

18

that was not one of Parent Borrower's Subsidiaries prior to such expenditure, and to the extent any contractually committed amounts reduced Consolidated Excess Cash Flow pursuant to this underlined clause (iv) during such period but the expenditures contemplated by such committed amounts are not so made during such three months, such committed amounts shall be added to Consolidated Excess Cash Flow for the period following such period (unless such expenditures otherwise reduce Consolidated Excess Cash Flow during such following period)), (v) without duplication of amounts deducted from Consolidated Excess Cash Flow in prior periods, the aggregate consideration required to be paid in cash by the Parent Borrower or any Subsidiary pursuant to binding contracts (the "Contract Consideration") entered into prior to or during such period relating to Consolidated Capital Expenditures to be consummated or made during the three months following the end of such period; provided that to the extent the aggregate amount of internally generated cash actually utilized to finance such Consolidated Capital Expenditures during such three months is less than the Contract Consideration, the amount of such shortfall shall be added to Consolidated Excess Cash Flow for the period following such period, (vi) to the extent such amounts increased net cash provided by operating activities in such period, (A) ticketing-related client funds collected by the Parent Borrower or any of its Subsidiaries, on behalf of Persons other than Parent Borrower or any of its Affiliates and (B) event-related deferred revenue of the Parent Borrower or any of its Subsidiaries, (vii) accrued expenses due from the Parent Borrower or any of its Subsidiaries to artists, as of the last date of such period and (viii) accrued expenses for cash collected by the Parent Borrower or any of its Subsidiaries on behalf of others for ticket sa es, as of the last date of such period, plus (c) to the extent such amounts decreased net cash provided by operating activities in such period, (A) ticketing related client funds remitted by the Parent Borrower or any of its Subsidiaries and (B) event-related deferred revenue of the Parent Borrower or any of its Subsidiaries.

"Consolidated Group" means the Parent Borrower and its consolidated Subsidiaries, as determined in accordance with GAAP.

"Consolidated Net Debt" means, at any time, (a) Consolidated Total Funded Debt, minus (b) if positive, the lesser of (x) $500.0 million and (y) the aggregate amount of Free Cash held on such date by the Consolidated Group (provided that with respect to any Specified Subsidiary, only the Specified Percentage of such Specified Subsidiary's Free Cash shall be included in this clause (y)).

"Consolidated Net Income" means, for any period for the Consolidated Group, the net income (or loss), determined on a consolidated basis (after any deduction for minority interests except in the case of any Credit Party) of the Consolidated Group in accordance with GAAP; provided that (i) in determining Consolidated Net Income, the net income of any Unrestricted Subsidiary or any other Person which is not a Subsidiary of the Parent Borrower or is accounted for by the Parent Borrower by the equity method of accounting shall be included only to the extent of the payment of cash dividends or cash distributions by such other Person to a member of the Consolidated Group during such period, (ii) for purposes of calculating Consolidated EBITDA when determining the Consolidated Total Leverage Ratio for any clause of Section 8.06 only, the net income of any Subsidiary of the Parent Borrower (other than a Domestic Guarantor) shall be excluded to the extent that the declaration or payment of cash dividends or similar cash distributions by that Subsidiary of that net income is not at the date of determination permitted by operation of its Organization Documents or any agreement, instrument or law applicable to such Subsidiary (other than to the extent such net income is actually received in cash by Parent Borrower or a Domestic Guarantor during such period from such Subsidiary and is not otherwise included in Consolidated Net Income) and (iii) the cumulative effect of any change in accounting principles shall be excluded. Consolidated Net Income shall be calculated on a Pro Forma Basis.

"Consolidated Net Leverage Ratio" means, as of the last day of any fiscal quarter the ratio of (i) Consolidated Net Debt on such day to (ii) Consolidated EBITDA of the Consolidated Group for the period of four (4) consecutive fiscal quarters ending on such day.

"Consolidated Tangible Assets" means, as of any date, Consolidated Total Assets as of such date, less, to the extent otherwise constituting Consolidated Total Assets, all of the Parent Borrower's and its Subsidiaries' goodwill, patents, tradenames, trademarks, copyrights, franchises, experimental expenses, organization expenses and any other assets classified as intangible assets in accordance with GAAP as shown on the most recent balance sheet of the Parent Borrower required to have been delivered pursuant to Section 7.01(a) or (b).

19

"Consolidated Total Assets" means the total assets of the Parent Borrower and its Subsidiaries on a consolidated basis determined in accordance with GAAP, as shown on the most recent balance sheet of the Parent Borrower required to have been delivered pursuant to Section 7.01(a) or (b) or, for the period prior to the time any such statements are required to be so delivered pursuant to Section 7.01(a) or (b), as shown on the financial statements referred to in the second sentence of Section 6.05.

"Consolidated Total Funded Debt" means, at any time, the principal amount of all Funded Debt of the Consolidated Group determined on a consolidated basis (it being understood and agreed that outstanding letters of credit, bankers' acceptances and similar facilities shall not constitute Funded Debt unless such letters of credit, bankers' acceptances or similar facilities have been drawn on and the resulting obligations have not been paid by the Parent Borrower).

"Consolidated Total Leverage Ratio" means, as of the last day of any fiscal quarter, the ratio of (i) Consolidated Total Funded Debt on such day to (ii) Consolidated EBITDA of the Consolidated Group for the period of four (4) consecutive fiscal quarters ending on such day.

"Contract Consideration" has the meaning assigned to such term in the definition of "Consolidated Excess Cash Flow".

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Convertible Indebtedness" means Indebtedness of the Parent Borrower permitted to be incurred under the terms of this Credit Agreement that is either (a) convertible or exchangeable into common stock of the Parent Borrower (and cash in lieu of fractional shares) and/or cash (in an amount determined by reference to the price of such common stock) or (b) sold as units with call options, warrants or rights to purchase or substantially equivalent derivative transactions) that are in each case exercisable for common stock of the Parent Borrower and/or cash (in an amount determined by reference to the price of such common stock).

"Converted Term B-3 Loan" means the Allocated Amount of each Term B-3 Loan held by a Term B-3 Amendment No. 6 Converting Lender on the Amendment No. 6 Effective Date immediately prior to the effectiveness of Amendment No. 6.

"CORRA" means the Canadian Overnight Repo Rate Average administered and published by the CORRA Administrator.

"CORRA Administrator" means the Bank of Canada (or any successor administrator).

"CORRA Determination Date" has the meaning specified in the definition of "Daily Simple CORRA".

"CORRA Rate Day" has the meaning specified in the definition of "Daily Simple CORRA".

"Corresponding Tenor" with respect to any Available Tenor means, as applicable, either a tenor (including overnight) or an interest payment period having approximately the same length (disregarding business day adjustment) as such Available Tenor.

"Covered Entity" means any of the following:

      (i)   a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(ii)    a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(iii)    a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Covered Party" has the meaning assigned to it in Section 11.22.

"Credit Agreement" has the meaning provided in the preamble hereto, as the same may be amended and modified from time to time.

"Credit Documents" means this Credit Agreement, Amendment No. 12, Amendment No. 11, Amendment No. 10, Amendment No. 9, Amendment No. 8, Amendment No. 7, Amendment No. 6, the Notes, the Collateral Documents, the Engagement Letter, the Administrative Agent Fee Letter, the Issuer Documents, the Joinder Agreements, any Foreign Borrower Agreements, any Foreign Borrower Terminations, any Revolving Lender Joinder Agreement, the First Lien Intercreditor Agreement, any guarantee of the Obligations by a Credit Party delivered to the Administrative Agent pursuant to the requirements of this Credit Agreement, any Additional Credit Extension Amendment, and any Incremental Term Loan Joinder Agreement.

"Credit Extension" means each of the following: (a) a Borrowing and (b) an L/C Credit Extension.

"Credit Parties" means the Parent Borrower, any Foreign Subsidiary that becomes a Foreign Borrower under Section 1.08 and any Guarantor.

"Credit Party Materials" has the meaning provided in Section 7.02.

"Cumulative Credit" means, with respect to any proposed use of the Cumulative Credit at any time, an amount equal to (a) the excess of (I) the amount of the Consolidated Excess Cash Flow for each full fiscal quarter of the Parent Borrower completed after December 31, 2013, to the extent the financial statements required to be delivered for the period ending on the last day of such fiscal quarter pursuant to Section 7.01(a) or (b) have been delivered and, to the extent the end of such fiscal quarter coincides with the end of a fiscal year of the Parent Borrower, all prepayments that may be (or, prior to the Amendment No. 2 Effective Date were) required pursuant to Section 2.06(b)(iv) with respect to the Consolidated Excess Cash Flow generated in such fiscal year have been made (provided that (A) to the extent the end of any fiscal quarter of the Parent Borrower does not coincide with the end of a fiscal year of the Parent Borrower, 25% of the Consolidated Excess Cash Flow generated in such fiscal quarter shall not be counted toward calculating the amount referred to in this clause (a) until the financial statements for the fiscal year in which fiscal quarter falls have been delivered pursuant to Section 7.01(a) and all prepayments that may be required pursuant to Section 2.06(b)(iv) with respect to the Consolidated Excess Cash Flow generated in such fiscal year have been made and (B) with respect to the fiscal year ending December 31, 2016, the amount that would have been required to be prepaid pursuant to Section 2.06(b)(iv) assuming that Section 2.06(b)(iv) had been used to make such prepayments) over (II) all such prepayments so made or required to be made (or with respect to the year ending December 31, 2016, assumed to be made) pursuant to Section 2.06(b)(iv); provided that the amount calculated under this clause (a) shall never be less than zero, plus (b) without duplication of any amounts referred to in clause (c), the aggregate amount of Net Cash Proceeds of any issuance of Qualified Capital Stock of the Parent Borrower (but not including any issuance or purchase referred to in Sections 8.02(c), 8.02 r) or 8.06(h)) after January 1, 2016 and at or prior to such time less the aggregate amount of Restricted Payments made since January 1, 2016 and through the Amendment No. 3 Effective Date pursuant to Sections 8.06(f) or (g) of this Credit Agreement (as in effect prior to the Amendment No. 3 Effective Date), excluding any Restricted Payments made to redeem, repurchase or otherwise acquire the 2020 Senior Notes (as defined in this Credit Agreement immediately prior to giving effect to the Amendment No. 5 Effective Date) plus (c) if positive, to the extent not otherwise reflected in Consolidated Excess Cash Flow, the amount of cash returns on any Investment made pursuant to Section 8.02(k) (other than any Investment subsequently deemed to be made pursuant to Section 8.02(e)) in a Person other than the Parent Borrower or a Subsidiary (to the extent such Investment was made through the use of the Cumulative Credit) resulting from interest payments, dividends, repayments of loans or advances or profits from Dispositions of Property, in each case

21

to the extent actually received by a Domestic Credit Party at or prior to such time (*provided* that any such cash returns in respect of amounts described in clause (c) above shall only increase the Cumulative Credit for purposes of determining the amount of the Cumulative Credit available for making Investments pursuant to Section 8.02(k)) plus (d) $125.0 million minus (e) the aggregate amount of Investments and Restricted Payments made since the Amendment No. 3 Effective Date pursuant to Sections 8.02(k) (excluding Investments subsequently deemed to have been made pursuant to Section 8.02(e)) and 8.06(f), respectively, through utilization of the Cumulative Credit (excluding such proposed use of the Cumulative Credit, but including any other simultaneous proposed use of the Cumulative Credit) (*provided* that Investments of amounts described in clause (c) above shall only decrease the Cumulative Credit for purposes of determining the amount of the Cumulative Credit available for making Investments pursuant to Section 8.02(k)) minus (f) without duplication of amounts subtracted under clause (a)(II) above, the ECF Application Amount for each fiscal year of the Parent Borrower, to the extent the financial statements for such fiscal year have been delivered pursuant to Section 7.01(a) less any voluntary prepayments of the Term Loans made during such fiscal year (other than (i) such voluntary prepayments made with the proceeds of Indebtedness, (ii) any prepayment of Term A-1 Loans or Term B-1 Loans made on the Amendment No. 3 Effective Date with the proceeds of (or conversion into) the Term A-2 Loans and Term B-2 Loans, (iii) any prepayment of Term B-2 Loans made on the Amendment No. 4 Effective Date with the proceeds of (or conversion into) Term B-3 Loans, (iv) any prepayment of Term A-2 Loans or Term B-3 Loans made on the Amendment No. 6 Effective Date with the proceeds of (or conversion into) the Term B-4 Loans and the proceeds of the 2027 Senior Notes and (v) any prepayment of Delayed Draw Term A Loans made on the Amendment No. 11 Effective Date).

"Daily Simple CORRA" means, for any day (a "CORRA Rate Day"), a rate per annum equal to CORRA for the day (such day "CORRA Determination Date") that is five (5) RFR Business Days prior to (i) if such CORRA Rate Day is an RFR Business Day, such CORRA Rate Day or (ii) if such CORRA Rate Day is not an RFR Business Day, the RFR Business Day immediately preceding such CORRA Rate Day, in each case, as such CORRA is published by the CORRA Administrator on the CORRA Administrator's website. Any change in Daily Simple CORRA due to a change in CORRA shall be effective from and including the effective date of such change in CORRA without notice to the Borrower. If by 5:00 p.m. (Toronto time) on any given CORRA Determination Date, CORRA in respect of such CORRA Determination Date has not been published on the CORRA Administrator's website and a Benchmark Replacement Date with respect to the Daily Simple CORRA has not occurred, then CORRA for such CORRA Determination Date will be CORRA as published in respect of the first preceding RFR Business Day for which such CORRA was published on the CORRA Administrator's website, so long as such first preceding RFR Business Day is not more than five (5) Business Days prior to such CORRA Determination ~~Day~~Date.

"Daily Simple RFR" means, for any day (an "RFR Interest Day"), an interest rate per annum equal to, for any RFR Loan denominated in (i) Sterling, SONIA for the day that is 5 RFR Business Days prior to (A) if such RFR Interest Day is an RFR Business Day, such RFR Interest Day or (B) if such RFR Interest Day is not an RFR Business Day, the RFR Business Day immediately preceding such RFR Interest Day, (ii) Swiss Francs, SARON for the day that is 5 RFR Business Days prior to (A) if such RFR Interest Day is an RFR Business Day, such RFR Interest Day or (B) if such RFR Interest Day is not an RFR Business Day, the Business Day immediately preceding such RFR Interest Day, (iii) Dollars, Daily Simple SOFR and (iv) Canadian Dollars, Daily Simple CORRA.

"Daily Simple SOFR" means, for any day (a "SOFR Rate Day"), a rate per annum equal to SOFR for the day (such day "SOFR Determination Date") that is five (5) RFR Business Days prior to (i) if such SOFR Rate Day is an RFR Business Day, such SOFR Rate Day or (ii) if such SOFR Rate Day is not an RFR Business Day, the RFR Business Day immediately preceding such SOFR Rate Day, in each case, as such SOFR is published by the SOFR Administrator on the SOFR Administrator's Website. Any change in Daily Simple SOFR due to a change in SOFR shall be effective from and including the effective date of such change in SOFR without notice to the Borrower.

"Danish Krone" or "Dkr" means the lawful currency of Denmark.

"Debtor Relief Laws" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

22

"Default" means any event, act or condition that constitutes an Event of Default or that, with notice, the passage of time, or both, would constitute an Event of Default.

"Default Rate" means an interest rate equal to (a) with respect to Obligations other than (i) Term Benchmark Loans and RFR Loans and (ii) Letter of Credit Fees, the Base Rate plus the Applicable Percentage, if any, applicable to such Loans plus two percent (2%) per annum; (b) with respect to Term Benchmark Loans or RFR Loans, the applicable Relevant Rate plus the Applicable Percentage, if any, applicable to such Loans plus two percent (2%) per annum; and (c) with respect to Letter of Credit Fees, a rate equal to the Applicable Percentage plus two percent (2%) per annum.

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"Defaulting Lender" means any Lender that (a) has failed to fund any portion of its Loans or participations in Letters of Credit or Swingline Loans required to be funded by it hereunder within three (3) Business Days of the date required to be funded by it hereunder unless such Lender notifies the Administrative Agent and the Parent Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, (b) has notified the Parent Borrower or the Applicable Agent that it does not intend to comply with any of its funding obligations under this Credit Agreement (unless such notification relates to such Lenders' obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three (3) Business Days after written request by the Applicable Agent or any applicable L/C Issuer, to confirm that it will comply with the terms of this Credit Agreement relating to its participation obligations in respect of all then outstanding Letters of Credit and Swingline Loans (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Parent Borrower), (d) has otherwise failed to pay over to the Applicable Agent, any applicable L/C Issuer or any other Lender any other amount required to be paid by it hereunder within three (3) Business Days of the date when due, unless the subject of a good faith dispute, (e) in the case of a Lender with a Commitment, Swingline Exposure or L/C Obligations, is insolvent or has become the subject of a bankruptcy or insolvency proceeding or Bail-In Action or (f) has any Affiliate that has Control of such Lender that is insolvent or that has become the subject of a bankruptcy or insolvency proceeding; provided that a Lender shall not qualify as a "Defaulting Lender" solely as the result of the acquisition or maintenance of an ownership interest in such Lender or any Person Controlling such Lender, or the exercise of Control over such Lender or any Person Controlling such Lender, by a governmental authority or an instrumentality thereof so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such governmental authority or instrumentality thereof) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.

"Delayed Draw Term A Commitments" has the meaning assigned to such term in this Credit Agreement immediately prior to giving effect to Amendment No. 11.

"Delayed Draw Term A Loans" has the meaning assigned to such term in this Credit Agreement immediately prior to giving effect to Amendment No. 11.

"Designated Assets" means the assets listed on Schedule 8.05.

"Designated Investments" means the Investments listed on Schedule 8.02(x).

"Designated Non-Cash Consideration" means the fair market value of non-cash consideration received by the Parent Borrower or any Subsidiary in connection with a Subject Disposition that is designated as "Designated Non-Cash Consideration" on the date received pursuant to a certificate of a Responsible Officer of the Parent Borrower setting forth the basis of such fair market value (with the amount of Designated Non-Cash Consideration in respect of any

23

Subject Disposition being reduced for purposes of Section 8.05 to the extent the Parent Borrower or any Subsidiary converts the same to cash or Cash Equivalents within 180 days following the closing of the applicable Subject Disposition).

"Designated Sale and Leaseback Assets" means the assets listed in Schedule 1.01A.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (including any Sale and Leaseback Transaction) of any Property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith (but excluding the making of any Investment pursuant to Section 8.02).

"Disqualified Capital Stock" means Capital Stock that (a) requires the payment of any dividends or distributions (other than dividends or distributions payable solely in shares of Capital Stock other than Disqualified Capital Stock) prior to the date that is the first anniversary of the Final Maturity Date or (b) matures or is mandatorily redeemable or subject to mandatory repurchase or redemption or repurchase at the option of the holders thereof, in whole or in part and whether upon the occurrence of any event, pursuant to a sinking fund obligation, on a fixed date or otherwise, in each case prior to the date that is the first anniversary of the Final Maturity Date (other than upon payment in full of the Obligations (other than contingent indemnification obligations for which no claim has been made) and termination of the Commitments).

"Dollar" or "$" means the lawful currency of the United States.

"Dollar Equivalent" means, for any amount, at the time of determination thereof, (a) if such amount is expressed in Dollars, such amount, (b) if such amount is expressed in an Alternative Currency, the equivalent of such amount in Dollars determined by using the rate of exchange for the purchase of Dollars with the Alternative Currency last provided (either by publication or otherwise provided to the Administrative Agent) by Reuters on the Business Day (New York City time) immediately preceding the date of determination or if such service ceases to be available or ceases to provide a rate of exchange for the purchase of Dollars with the Alternative Currency, as provided by such other publicly available information service which provides that rate of exchange at such time in place of Reuters chosen by the Administrative Agent in its sole discretion (or if such service ceases to be available or ceases to provide such rate of exchange, the equivalent of such amount in Dollars as determined by the Administrative Agent using any method of determination it deems appropriate in its sole discretion) and (c) if such amount is denominated in any other currency, the equivalent of such amount in Dollars as determined by the Administrative Agent using any method of determination it deems appropriate in its sole discretion.

"Dollar Facility L/C Obligations" means, at any date of determination, the Dollar Facility Percentage multiplied by the sum of (x) the aggregate Dollar Equivalent amount available to be drawn under all outstanding Letters of Credit at such date plus (y) the aggregate Dollar Equivalent amount of all L/C Borrowings at such date. For all purposes of this Credit Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"Dollar Facility Percentage" means, at any time, a fraction (expressed as a percentage carried to the ninth decimal place), the numerator of which is the Aggregate Dollar Revolving Committed Amount at such time and the denominator of which is the L/C Committed Amount at such time.

"Dollar L/C Issuer" means JPMCB, Goldman Sachs Bank USA, Morgan Stanley Bank, N.A., Citibank, N.A., The Bank of Nova Scotia, HSBC Bank USA, National Association, Mizuho Bank, Ltd., Bank of America, N.A., MUFG Bank, Ltd., Truist Bank, Wells Fargo Bank, National Association, U.S. Bank National Association and Citizens Bank, National Association, in their capacities as issuers of Letters of Credit hereunder, together with their respective successors in such capacity and any Dollar Revolving Lender approved by the Administrative Agent and the Parent Borrower; provided that no Lender shall be obligated to become an L/C Issuer hereunder. Each Dollar L/C Issuer may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates or branches of such L/C Issuer, in which case the term "Dollar L/C Issuer" shall include any such Affiliate or branch with respect

24

to Letters of Credit issued by such Affiliate or branch and for all purposes of the Credit Documents. References herein and in the other Credit Documents to the Dollar L/C Issuer shall be deemed to refer to the Dollar L/C Issuer in respect of the applicable Letter of Credit or to all Dollar L/C Issuers, as the context requires.

"Dollar Revolving Commitment" means, for each Dollar Revolving Lender, the commitment of such Lender to make Dollar Revolving Loans (and to share in Dollar Revolving Obligations) hereunder, under documentation relating to Incremental Revolving Commitments or pursuant to an Additional Credit Extension Amendment, in each case, in the amount of such Lender's Dollar Revolving Committed Amount, as such commitment may be increased or decreased pursuant to the other provisions hereof.

"Dollar Revolving Commitment Percentage" means, for each Dollar Revolving Lender, a fraction (expressed as a percentage carried to the ninth decimal place), the numerator of which is such Dollar Revolving Lender's Dollar Revolving Committed Amount and the denominator of which is the Aggregate Dollar Revolving Committed Amount. The Dollar Revolving Commitment Percentages as of the Amendment No. 11 12 Effective Date are set forth in Schedule I to Amendment No. 11 12 under the column entitled "Dollar Revolving Commitment Percentage".

"Dollar Revolving Committed Amount" means, for each Dollar Revolving Lender, the amount set forth in Schedule I to Amendment No. 11 12 under the row applicable to such Lender in the column entitled "Dollar Revolving Committed Amount", in the Assignment and Assumption by which such Dollar Revolving Lender became a Dollar Revolving Lender or in any documentation relating to Incremental Revolving Commitments or Additional Credit Extension Amendments, as such Dollar Revolving Committed Amount may be reduced or increased pursuant to the other provisions hereof.

"Dollar Revolving Facility" means the Aggregate Dollar Revolving Commitments and the provisions herein related to the Dollar Revolving Loans, the Swingline Loans and the Letters of Credit.

"Dollar Revolving Lenders" means the Persons listed on Schedule I to Amendment No. 11 12 under the heading "Dollar Revolving Lender" together with their successors and permitted assigns, and any Person that shall be designated a "Dollar Revolving Lender" pursuant to Incremental Revolving Commitments or an Additional Credit Extension Amendment in accordance with the provisions hereof.

"Dollar Revolving Loan" has the meaning provided in Section 2.01(a)(i).

"Dollar Revolving Notes" means the promissory notes, if any, given to evidence the Dollar Revolving Loans, as amended, restated, modified, supplemented, extended, renewed or replaced. A form of Dollar Revolving Note is attached as Exhibit 2.13-1.

"Dollar Revolving Obligations" means the Dollar Revolving Loans, the Dollar Facility L/C Obligations and the Swingline Loans.

"Domestic Credit Party" means any Credit Party that is organized under the laws of the United States of America, any state thereof or the District of Columbia.

"Domestic Guaranteed Obligations" has the meaning provided in Section 4.01(a).

"Domestic Guarantor" means any Guarantor that is a Domestic Subsidiary.

"Domestic Obligations" means the Obligations of the Domestic Credit Parties, including any Obligations of Parent Borrower or any Domestic Credit Party in the capacity as a guarantor of Obligations of a Foreign Borrower.

"Domestic Subsidiary" means any Subsidiary that is not a Foreign Subsidiary; provided that a CFC Holdco shall not be a Domestic Guarantor with respect to the Domestic Obligations.

25

"ECF Application Amount" means, with respect to any fiscal year of the Parent Borrower, the product of the ECF Percentage applicable to such fiscal year times the Consolidated Excess Cash Flow for such fiscal year.

"ECF Percentage" means, with respect to any fiscal year of the Parent Borrower ending after December 31, 2018, if the Senior Secured Leverage Ratio as of the last day of such fiscal year is (i) greater than or equal to 3.50:1.00, fifty percent (50%), (ii) greater than or equal to 3.25:1.00, but less than 3.50:1.00, twenty-five percent (25%) and (iii) less than 3.25:1.00, zero percent (0%).

"EEA Financial Institution" means (a) any institution established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any institution established in an EEA Member Country which is a subsidiary of an institution described in clausesclause  a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Yield" means, as to any Indebtedness, the effective yield on such Indebtedness, taking into account the interest rate, applicable interest rate margins, any interest rate floors or similar devices, interest rate indexes and all fees, including upfront or similar fees or original issue discount (amortized over the shorter of (x) the life of such Indebtedness and (y) the four years following the date of incurrence thereof) payable generally to lenders providing such Indebtedness, but excluding any commitment, underwriting or arrangement fees payable to any arranger (or affiliate thereof) in connection with the commitment or syndication of such Indebtedness, and not shared generally with the providers of such Indebtedness.

"Electronic Signature" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a person with the intent to sign, authenticate or accept such contract or record.

"Eligible Assignee" means (a) a Lender; (b) an Affiliate of a Lender; (c) an Approved Fund; and (d) any other Person (other than a natural person or a holding company, investment vehicle or trust for, or owned and operated by or for the primary benefit of a natural person) approved by the party or parties whose approval is required under Section 11.06(b); provided that notwithstanding the foregoing, except pursuant to a transaction pursuant to Section 11.06(j), "Eligible Assignee" shall not include the Parent Borrower or any of the Parent Borrower's Affiliates or Subsidiaries.

"EMU Legislation" means the legislative measures of the European Council for the introduction of, changeover to or operation of a single or unified European currency.

"Engagement Letter" means the Engagement Letter dated as of October 26, 2023 between the Parent Borrower and JPMCB.

"Environmental Laws" means any and all applicable federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, or governmental restrictions relating to pollution and the protection of the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Parent Borrower, any other Credit Party or any of their respective Subsidiaries resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to

26

any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with the Parent Borrower within the meaning of Section 414(b) or (c) of the Internal Revenue Code or, solely for purposes of Section 412 of the Internal Revenue Code, is treated as a single employer under Section 414 of the Internal Revenue Code.

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) with respect to any Pension Plan, the failure to satisfy the minimum funding standard under Section 412 of the Internal Revenue Code and Section 302 of ERISA, whether or not waived, the failure to make by its due date a required installment under Section 430(j) of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (c) a withdrawal by the Parent Borrower or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (d) a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) by the Parent Borrower or any ERISA Affiliate from a Multiemployer Plan resulting in withdrawal liability pursuant to Section 4201 of ERISA or notification that a Multiemployer Plan is insolvent pursuant to Section 4245 of ERISA or in "endangered" or "critical" status (within the meaning of Section 432 of the Internal Revenue Code or Section 305 of ERISA); (e) the filing of a notice of intent to terminate, the treatment of a Pension Plan or Multiemployer Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (f) an event or condition that constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; or (g) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Parent Borrower or any ERISA Affiliate.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"EURIBOR Rate" means, with respect to any Term Benchmark Borrowing denominated in Euros and for any Interest Period, the EURIBOR Screen Rate, two TARGET Days prior to the commencement of such Interest Period.

"EURIBOR Screen Rate" means the euro interbank offered rate administered by the European Money Markets Institute (or any other person which takes over the administration of that rate) for the relevant period displayed (before any correction, recalculation or republication by the administrator) on page EURIBOR01 of the Thomson Reuters screen (or any replacement Thomson Reuters page which displays that rate) or on the appropriate page of such other information service which publishes that rate from time to time in place of Thomson Reuters as of 11:00 a.m. Brussels time two TARGET Days prior to the commencement of such Interest Period. If such page or service ceases to be available, the Administrative Agent may specify another page or service displaying the relevant rate after consultation with the Borrower. If the EURIBOR Screen Rate shall be less than 0.00%, the EURIBOR Screen Rate shall be deemed to be 0.00% for purposes of this Agreement.

27

"Euro" and "€" mean the lawful currency of the Participating Member States introduced in accordance with the EMU Legislation.

"Event of Default" means any of the events specified in Section 9.01; provided that any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Excluded Acquisition" means any purchase or other acquisition, in one transaction or a series of related transactions, of assets, properties and/or Capital Stock with an aggregate fair market value not exceeding $50.0 million (or the Dollar Equivalent thereof).

"Excluded Account" means any deposit or securities account (a) used exclusively for payroll, and/or payroll, local, state, federal and other Taxes and/or other employee wage and benefit payments to or for the benefit of any Credit Party's employees, (b) used exclusively to pay all Taxes required to be collected, remitted or withheld, (c) which any Credit Party holds exclusively as an escrow, fiduciary or trust for the benefit of another Person (other than a Credit Party) or (d) actually pledged pursuant to Section 8.01(ee).

"Excluded Property" means (a) vehicles or other assets covered by a certificate of title or ownership, (b) fee interests in real property, (c) leasehold real property, (d) those assets as to which the Parent Borrower and the Administrative Agent shall reasonably determine in writing that the costs of obtaining such security interest are excessive in relation to the value of the security to be afforded thereby, (e) assets if the granting or perfecting of a security interest in such assets in favor of the Collateral Agent would violate any applicable Law (other than to the extent that any such term would be rendered ineffective pursuant to Section 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code of any applicable jurisdiction) or principles of equity, (f) any right, title or interest in any instrument, permit, lease, general intangible (other than Equity Interests), license, contract or agreement to the extent, but only to the extent that a grant of a security interest therein to secure the Obligations would, under the terms of such instrument, permit, lease, general intangible (other than Equity Interests), license, contract or agreement, result in a breach of the terms of, or constitute a default under, or result in the abandonment, termination, invalidation or unenforceability of, or require the consent of any Person other than a member of the Consolidated Group, which has not been obtained under such instrument, permit, lease, general intangible, license, contract or agreement (other than to the extent that any such term would be rendered ineffective pursuant to Section 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code of any applicable jurisdiction or any other applicable law (including, without limitation, Title 11 of the United States Code) or principles of equity), (g)(A) any Capital Stock listed on Schedule 1.01E and (B) any Capital Stock acquired after the Closing Date (other than Capital Stock in a Subsidiary issued or acquired after such Person became a Subsidiary) in accordance with this Credit Agreement if, and to the extent that, and for so long as, in the case of this clause (B), (i) such Capital Stock constitutes less than 100% of all applicable Capital Stock of such Person, and the Person or Persons holding the remainder of such Capital Stock are not Affiliates of the Parent Borrower, (ii) the granting or perfecting of a security interest in such assets in favor of the Collateral Agent would violate applicable law or a contractual obligation binding on such Capital Stock and (iii) with respect to such contractual obligations (other than contractual obligations in connection with limited liability company agreements, stockholders' agreements and other joint venture agreements), such obligation existed at the time of the acquisition of such Capital Stock and was not created or made binding on such Capital Stock in contemplation of or in connection with the acquisition of such Person, (h) any Property purchased with the proceeds of purchase money Indebtedness or that is subject to a capital lease, in each case, existing or incurred pursuant to Sections 8.03(b) or (c) if the contract or other agreement in which the Indebtedness and/or Liens related thereto is granted (or the documentation providing for such capital lease obligation) prohibits or requires the consent of any Person other than a member of the Consolidated Group as a condition to the creation of any other security interest on such Property, (i) the HOBE Excluded Assets, (j) Permitted Deposits, (k) inventory consisting of beer, wine or liquor, (l) any Capital Stock of Unrestricted Subsidiaries, (m) solely with respect to the Domestic Obligations, (A) any voting Capital Stock in any First-Tier Foreign Subsidiary or any CFC Holdco that is directly owned by a Domestic Credit Party in excess of 65% of the total outstanding voting Capital Stock and (B) any assets of any Foreign Subsidiary or any CFC Holdco, (n) deposit and securities accounts of Foreign Subsidiaries subject to Liens granted pursuant to Section 8.01(z), (o) Excluded Accounts, (p) any intent-to use Trademark (as defined in the U.S. Security Agreement) applications prior to the filing of a "Statement of Use", "Amendment to Allege Use" or similar filing with regard thereto, to the extent and solely during the period, in which the grant of a security interest therein may impair the

28

validity or enforceability of any Trademark that may issue from such intent to use Trademark application under applicable Law, (q) ticket inventory and Proceeds (as defined in the U.S. Security Agreement) thereof (including any deposit accounts holding such Proceeds) that are subject to a Lien, to the extent actually granted under Section 8.01(ee), (r) assets and Equity Interests that are secured by Liens granted pursuant to Section 8.01(hh) and (s) "margin stock" (within the meaning of Regulation U issued by the FRB); provided, however, that Excluded Property shall not include any Proceeds, substitutions or replacements of any Excluded Property referred to in clauses (a) through (s) (unless such Proceeds, substitutions or replacements would constitute Excluded Property referred to in clauses (a) through (s)).

"Excluded Sale and Leaseback Transaction" means any Sale and Leaseback Transaction with respect to Property owned by the Parent Borrower or any Subsidiary to the extent such Property is acquired after the Amendment No. ~~11~~12 Effective Date, so long as such Sale and Leaseback Transaction is consummated within 180 days of the acquisition of such Property.

"Excluded Subsidiary" means (a) any Immaterial Subsidiary, (b) any Unrestricted Subsidiary, (c) each Subsidiary of the Parent Borrower designated as such on Schedule 6.14 hereto, (d) each Subsidiary of the Parent Borrower that is not a Wholly Owned Subsidiary, (e) each Subsidiary designated as an "Excluded Subsidiary" by a written notice to the Administrative Agent; provided that such designation under this clause (e) shall constitute an Investment pursuant to Section 8.02, (f) any captive insurance subsidiaries or not-for-profit subsidiaries, (g) solely with respect to the Domestic Obligations, any Foreign Subsidiary or CFC Holdco and (h) unless otherwise agreed by Parent Borrower and the Administrative Agent, any Subsidiary of any of the foregoing Subsidiaries; provided further that a Foreign Borrower shall in no event be an Excluded Subsidiary.

"Excluded Swap Obligation" means, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the guarantee of such Guarantor or the grant of such security interest becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such guarantee or security interest is or becomes illegal.

"Excluded Taxes" means, any of the following Taxes imposed on or with respect to any Agent, any Lender, any L/C Issuer or any other recipient (a "Recipient") or required to be withheld or deducted from a payment to any Recipient, (a) Taxes imposed on or measured by such recipient's net income (however denominated), franchise Taxes and branch profits Taxes, in each case, (i) imposed as a result of such recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to Laws in effect at the time (i) such Lender becomes a party hereto (other than pursuant to an assignment request by the Parent Borrower under Section 11.13) or (ii) such Lender changes its Lending Office, except in each case to the extent that such Lender (or its assignor, if any) was entitled, immediately prior to the time of designation of a new Lending Office (or assignment), to receive additional amounts with respect to such withholding Tax pursuant to Section 3.01, (c) any Tax that is attributable to a Recipient's failure to comply with Section 3.01(e), and (d) any Tax imposed pursuant to FATCA.

"Existing Class" means a Class of Existing Term Loans or a Class of Existing Revolving Commitments.

"Existing Convertible Notes" means the 2025 Convertible Notes and the 2029 Convertible Notes.

"Existing Convertible Notes Indenture" means any of the 2025 Convertible Notes Indenture and the 2029 Convertible Notes Indenture.

29

"Existing High Yield Notes" means the Existing Senior Secured Notes and the Existing Senior Unsecured Notes.

"Existing Notes" means the Existing High Yield Notes and the Existing Convertible Notes.

"Existing Revolving Commitments" has the meaning specified in Section 2.17(b).

"Existing Senior Secured Notes" means the 2027 Senior Secured Notes and the 2028 Senior Secured Notes.

"Existing Senior Unsecured Notes " means the 2024 Senior Unsecured Notes, the 2026 Senior Unsecured Notes and the 2027 Senior Unsecured Notes.

"Existing Term B-4 Loans" shall have the meaning set forth in the Recitals hereof.

"Existing Term Loans" has the meaning specified in Section 2.17(a).

"Extended Class" means a Class of Extended Term Loans or a Class of Extended Revolving Commitments.

"Extended Revo ving Commitments" has the meaning specified in Section 2.17(b).

"Extended Term Loans" has the meaning specified in Section 2.17(a).

"Extending Lender" has the meaning specified in Section 2.17(c).

"Extension Effective Date" has the meaning specified in Section 2.17(c).

"Extension Election" has the meaning specified in Section 2.17(c).

"Extension Request" means a Revolving Credit Extension Request or a Term Loan Extension Request.

"Fair Value" has the meaning provided in the definition of the term "Solvent".

"FATCA" means Sections 1471 through 1474 of the Internal Revenue Code as of the Amendment No.1112 Effective Date (and any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future Treasury regulations or other official administrative interpretations thereof and any agreements entered into pursuant to current Section 1471(b) (or any amended or successor version described above) and any intergovernmental agreement implementing the foregoing and any fiscal or regulatory legislation, rules or practices adopted pursuant to such intergovernmental agreement.

"Federal Funds Effective Rate" means, for any day, the rate calculated by the NYFRB based on such day's federal funds transactions by depositary institutions, as determined in such manner as the NYFRB shall set forth on the NYFRB's Website from time to time, and pub ished on the next succeeding Business Day by the NYFRB as the federal funds effective rate.

"Final Maturity Date" means, at any time, the latest of the Initial Revolving Termination Date, the Term B-4 Loan Termination Date, any final maturity date applicable to any outstanding Incremental Term Loans at such time and any final maturity date specified in an Additional Credit Extension Amendment.

"First Lien Intercreditor Agreement" means that certain first lien intercreditor agreement dated as of May 20, 2020, among the Administrative Agent, as credit agreement collateral agent and authorized representative for the credit agreement secured parties, U.S. Bank National Association, as notes collateral agent and authorized representative for the notes secured parties, and the Domestic Credit Parties, as grantors,

"First-Tier Foreign Subsidiary" means any Foreign Subsidiary that is owned directly by a Domestic Credit Party.

30

"Floor" means the benchmark rate floor, if any, provided in this Credit Agreement (as of the execution of this Credit Agreement, the modification, amendment or renewal of this Credit Agreement or otherwise) with respect to the Adjusted Term SOFR Rate, Adjusted EURIBOR Rate, Adjusted TIBOR Rate, each Adjusted Daily Simple RFR, Adjusted CIBOR Rate, Adjusted STIBOR Rate, the Adjusted TIIE Rate, Adjusted AUD Rate, Adjusted Term CORRA Rate, the Japanese Prime Rate or the Central Bank Rate, as applicable. For the avoidance of doubt the initial Floor for each of Adjusted Term SOFR Rate, Adjusted EURIBOR Rate, Adjusted TIBOR Rate, each Adjusted Daily Simple RFR, Adjusted CIBOR Rate, Adjusted STIBOR Rate, Adjusted TIIE Rate, Adjusted AUD Rate, Adjusted Term CORRA Rate, the Japanese Prime Rate or the Central Bank Rate shall be 0.00%.

"Foreign Borrower Agreement" means a Foreign Borrower Agreement substantially in the form of Exhibit 1.01A hereto.

"Foreign Borrower Termination" means a Foreign Borrower Termination substantially in the form of Exhibit 1.01B hereto.

"Foreign Borrowers" means each Subsidiary of the Parent Borrower that becomes a Foreign Borrower pursuant to Section 1.08, in each case together with its successors and, in each case, that has not ceased to be a Foreign Borrower as provided in Section 1.08.

"Foreign Collateral Document" means each pledge, security or guarantee agreement or trust deed among the Collateral Agent and one or more Foreign Credit Parties that is reasonably acceptable to the Collateral Agent, together with each other agreement, instrument or document required or reasonably requested by the Administrative Agent to pledge, grant and/perfect the Lien on any property of any Foreign Credit Party.

"Foreign Credit Party" means any Credit Party other than a Domestic Credit Party.

"Foreign Disposition" has the meaning assigned to such term in Section 2.06(b)(vi).

"Foreign Guaranteed Obligations" has the meaning specified in Section 5.03(c).

"Foreign Guarantor" means any Guarantor that is a Foreign Subsidiary.

"Foreign Lender" means any Lender that is not a "United States person" as defined in Section 7701(a)(30) of the Internal Revenue Code.

"Foreign Obligations" means any Obligations of a Foreign Borrower or Foreign Guarantor (in each case in its capacity as such).

"Foreign Subsidiary" means any Subsidiary that is not organized under the laws of the United States of America, any state thereof, or the District of Columbia.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Free Cash" means cash and Cash Equivalents less (i) ticketing-re ated client funds, (ii) event-related deferred revenue, (iii) cash and Cash Equivalents subject to Liens granted pursuant to Section 8.01(ff) and (iv) accrued expenses due to artists and for cash collected on behalf of others for ticket sales plus event-related prepaids.

"Fronted Currencies" means Brazilian Real and any Other Alternative Currency agreed to by the Parent Borrower and the Administrative Agent.

"Fronted Currency Loan" means a Revolving Loan under the Multicurrency Revolving Facility made in a Fronted Currency.

31

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"Funded Debt" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)    all obligations for borrowed money, whether current or long-term (including the Loan Obligations hereunder), and all obligations evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)    all Venue Construction Indebtedness, all purchase money indebtedness (including indebtedness and obligations in respect of conditional sales and title retention arrangements, except for customary conditional sales and title retention arrangements with suppliers that are entered into in the ordinary course of business), and all indebtedness and obligations in respect of the deferred purchase price of property or services (other than trade accounts payable incurred in the ordinary course of business);

(c)    all direct obligations under letters of credit (including standby and commercial), bankers' acceptances and similar instruments;

(d)    the Attributable Principal Amount of capital leases;

(e)    the amount of all obligations of such person with respect to the redemption, repayment or other repurchase of any Disqualified Capital Stock (excluding accrued dividends that have not increased the liquidation preference of such Disqualified Capital Stock);

(f)    Support Obligations in respect of Funded Debt of another Person; and

(g)    Funded Debt of any partnership or joint venture or other similar entity in which such Person is a general partner or joint venturer, and has personal liability for such obligations, but only to the extent there is recourse to such Person for payment thereof;

provided, however, that the indebtedness of a Subsidiary of the Parent Borrower that is non-recourse to any of the Credit Parties and whose net income is excluded in the calculation of Consolidated Net Income due to the operation of clause (ii) of the definition thereof shall be excluded.

For purposes hereof, the amount of Funded Debt shall be determined (i) based on the outstanding principal amount in the case of borrowed money indebtedness under clause (a) and purchase money indebtedness and the deferred purchase obligations under clause (b), (ii) based on the maximum face amount in the case of letter of credit obligations and the other obligations under clause (c), (iii) based on the amount of Funded Debt that is the subject of the Support Obligations in the case of Support Obligations under clause (f), and (iv) with respect to the indebtedness of a Non-Wholly Owned Subsidiary of the Parent Borrower that was the subject of an Investment made following the Amendment No. 11 12 Effective Date, to the extent such indebtedness is non-recourse to any of the Credit Parties or any of their respective Subsidiaries (other than such Non-Wholly Owned Subsidiary or any Subsidiary of such Non-Wholly Owned Subsidiary that is not a Credit Party), such Non-Wholly Owned Subsidiary shall automatically be deemed a "Specified Subsidiary" (unless the Parent Borrower delivers a written notice to the Administrative Agent requesting that such Non-Wholly Owned Subsidiary not be designated a "Specified Subsidiary"), and the amount of such indebtedness of such Non-Wholly Owned Subsidiary or any Subsidiary of such Non-Wholly Owned Subsidiary that shall be included in this definition of "Funded Debt" be a percentage of such indebtedness (the "Specified Percentage") that is equal to the percentage of the aggregate outstanding Capital Stock of such Specified Subsidiary owned by the Parent Borrower and its Subsidiaries (other than such Specified Subsidiary); provided that (A) the Specified Percentage shall not be less than the percentage of such Specified Subsidiary's net income that is included in Consolidated Net Income (after giving effect to the operation of the second parenthetical phrase in the definition of Consolidated Net Income) and (B) together with any financial statements delivered pursuant to Section 7.01(a) or (b), the Parent Borrower shall provide when delivering such financial statements a brief reconciliation of

32

the Specified Percentage of the indebtedness referred to in this clause (iv) to the actual principal amount of such indebtedness.

"GAAP" has the meaning provided in Section 1.03(a).

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state, local, county, provincial or otherwise, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Granting Lender" has the meaning provided in Section 11.06(h).

"Guaranteed Obligations" shall mean the Domestic Guaranteed Obligations and the Foreign Guaranteed Obligations.

"Guarantors" means (a) as of the Amendment No. 1112 Effective Date, each Subsidiary of the Parent Borrower listed on Schedule 1.01C and (b) each other Person that becomes a Guarantor pursuant to the terms hereof, in each case together with its successors.

"Hazardous Materials" means all materials, substances or wastes characterized, classified or regulated as hazardous, toxic, pollutant, contaminant or radioactive under Environmental Laws, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes.

"Hedge Bank" has the meaning provided in the definition of "Borrower Obligations."

"HOBE Excluded Assets" means the assets listed on Schedule 1.01D hereto.

"Holdco Venue Construction Subsidiary" means any Subsidiary of the Parent Borrower whose sole assets are the Capital Stock of a Venue Construction Subsidiary and other immaterial incidental assets related thereto.

"Honor Date" has the meaning provided in Section 2.03(c)(i).

"Immaterial Subsidiary" means, at any date of determination, any Subsidiary of the Parent Borrower designated as such by the Parent Borrower that had assets representing 5.0% or less of the Parent Borrower's Consolidated Total Assets on, and generated less than 5.0% of the Parent Borrower's and its Subsidiaries' total revenues for the four quarters ending on, the last day of the most recent period at the end of which financial statements were required to be delivered pursuant to Section 7.01(a) or (b) or, if such date of determination is prior to the first delivery date under either such Section, on (or, in the case of revenues, for the four quarters ending on) the last day of the period of the most recent financial statements referred to in the second sentence of Section 6.05; provided that if all Domestic Subsidiaries that are individually "Immaterial Subsidiaries" have aggregate Total Assets that would represent 10.0% or more of the Parent Borrower's Consolidated Total Assets on such last day or generated 10.0% or more of the Parent Borrower's and its Subsidiaries' total revenues for such four fiscal quarters, then such number of Domestic Subsidiaries of the Parent Borrower as are necessary shall become Material Subsidiaries so that Domestic Subsidiaries that are "Immaterial Subsidiaries" have in the aggregate Total Assets that represent less than 10.0% of the Parent Borrower's Consolidated Total Assets and less than 10.0% of the Parent Borrower's and its Subsidiaries' total revenues as of such last day or for such four quarters, as the case may be (it being understood that any such determination with respect to revenues and assets shall be made on a Pro Forma Basis).

"Increase Period" has the meaning specified in Section 8.10.

"Incremental Base Amount" has the meaning provided in Section 2.01(f)(i)(x).

"Incremental Equivalent Debt" shall mean secured or unsecured Indebtedness of the Parent Borrower in the form of *pari passu* secured notes, junior lien term loans or notes or unsecured term loans or notes or bridge loans in lieu of the foregoing; provided that: (a) no Incremental Equivalent Debt shall be secured by any asset that does not constitute Collateral, (b) no Subsidiary of the Parent Borrower (other than a Domestic Credit Party) shall be an obligor with respect thereto, (c) no Incremental Equivalent Debt shall mature on or prior to the later of (x) Term B-4 Loan Termination Date and (y) the Initial Revolving Termination Date or have a shorter Weighted Average Life to Maturity than the Term B-4 Loans or have mandatory offers to purchase or mandatory prepayments that are more onerous than those applicable to the Term B-4 Loans (other than, with respect to maturity, customary extension rollover provisions (including by conversion or exchange) for bridge facilities, in which case, such maturity may be earlier than that of the Term B-4 Loans or the Initial Revolving Termination Date, as the case may be, if such maturity is automatically extended upon the initial maturity date to a date not earlier than the maturity date of the Term B-4 Loans or the Initial Revolving Termination Date, as the case may be), (d) to the extent secured on a *pari passu* basis with the Term Loans, shall be subject to a customary *pari passu* intercreditor agreement or, to the extent secured on a junior lien basis with the Term Loans, shall be subject to a customary junior priority intercreditor agreement, in each case, on terms that are reasonably satisfactory to the Administrative Agent, (e) subject to the Limited Condition Acquisition provisions in Section 1.11, no Default or Event of Default shall have occurred and be continuing or shall resu t after giving effect to any such Incremental Equivalent Debt (or, in the case of any Limited Condition Acquisition, no Event of Default under Section 9.01(a) or 9.01(f) as of the Transaction Agreement Date) shall exist and (f) the covenants, events of default, guarantees, collateral and other terms of which (other than interest rate and redemption premiums), taken as a whole, sha l not be more restrictive in any material respect to the Parent Borrower and its Subsidiaries than those applicable to the Term B-4 Loans under this Credit Agreement, as determined by the Parent Borrower in good faith, except to the extent such terms apply solely to any period after the Term B-4 Loan Termination Date or the Initial Revolving Termination Date, as the case may be; provided that any such Incremental Equivalent Debt may contain any financial maintenance covenant that is more restrictive to the Parent Borrower and its Subsidiaries than those in this Credit Agreement and that applies prior to the Term B-4 Loan Termination Date, so long as all Lenders also receive the benefit of such restrictive terms, and which amendment to this Credit Agreement to cause all Lenders to so receive the benefit of such restrictive terms shall not require the consent of any Lender.

"Incremental Loan Facilities" has the meaning provided in Section 2.01(f).

"Incremental Revolving Commitments" has the meaning provided in Section 2.01(f).

"Incremental Revolving Facility" has the meaning provided in Section 2.01(f).

"Incremental Term Loan" has the meaning provided in Section 2.01(f).

"Incremental Term Loan Joinder Agreement" means a lender joinder agreement, in a form reasonably satisfactory to the Administrative Agent, the Parent Borrower and each Lender extending Incremental Term Loans, executed and delivered in accordance with the provisions of Section 2.01(h).

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)    all Funded Debt;

(b)    net obligations under Swap Contracts;

(c)    Support Obligations in respect of Indebtedness of another Person; and

(d)    Indebtedness of any partnership or joint venture or other similar entity in which such Person is a general partner or joint venturer, and has personal liability for such obligations, but only to the extent there is recourse to such Person for payment thereof.

34

For purposes hereof, the amount of Indebtedness shall be determined (i) based on Swap Termination Value in the case of net obligations under Swap Contracts under clause (b) and (ii) based on the outstanding principal amount of the Indebtedness that is the subject of the Support Obligations in the case of Support Obligations under clause (c).

"Indemnified Taxes" means all Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Credit Party under any Credit Document.

"Indemnitee" has the meaning provided in Section 11.04(b).

"Information" has the meaning provided in Section 11.07.

"Initial Revolving Termination Date" has the meaning specified in the definition of "Revolving Termination Date".

"Interest Payment Date" means, (a) as to any Base Rate Loan (including Swingline Loans), the last Business Day of each March, June, September and December, the Revolving Termination Date and the date of the final principal amortization payment on the Term B-4 Loans, and, in the case of any Swingline Loan, any other dates as may be mutually agreed upon by the Parent Borrower and the Swingline Lender, (b) any Revolving Loan that is a RFR Loan, each date that is on the numerically corresponding day in each calendar month that is one month after the Borrowing of such Loan (or, if there is no such numerically corresponding day in such month, then the last day of such month) and the Revolving Termination Date, and (c) as to any Term Benchmark Loan, the last Business Day of each Interest Period for such Loan, the date of repayment of principal of such Loan, the Revolving Termination Date and the date of the final principal amortization payment on the Term B-4 Loans, as applicable, and in addition, where the applicable Interest Period exceeds three (3) months, the date every three (3) months after the beginning of such Interest Period. If an Interest Payment Date falls on a date that is not a Business Day, such Interest Payment Date shall be deemed to be the immediately succeeding Business Day.

"Interest Period" means, as to each Term Benchmark Loan, the period commencing on the date such Term Benchmark Loan is disbursed or converted to or continued as a Term Benchmark Loan and ending on the date one (1), three (3) or six (6) months thereafter (other than a Term Benchmark Borrowing in Canadian Dollars which ending date will be one (1) or three (3) months thereafter), as selected by the Parent Borrower in its Loan Notice; provided that:

(a)    any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the immediately succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the immediately preceding Business Day;

(b)    any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period;

(c)    no Interest Period with respect to any Revolving Loan shall extend beyond the Revolving Termination Date; and

(d)    no Interest Period with respect to the Term B-4 Loans shall extend beyond any principal amortization payment date for such Loans, except to the extent that the portion of such Loan comprised of Term Benchmark Loans that is expiring prior to the applicable principal amortization payment date plus the portion comprised of Base Rate Loans equals or exceeds the principal amortization payment then due;

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person of or in the Capital Stock, Indebtedness or other equity or debt interest of another Person, whether by means of (a) the purchase or other acquisition of Capital Stock of another Person, (b) a loan, advance or capital contribution to, guaranty or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in,

35

another Person, including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor undertakes any Support Obligation with respect to Indebtedness of such other Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"Involuntary Disposition" means the receipt by any member of the Consolidated Group of any cash insurance proceeds or condemnation awards payable by reason of theft, loss, physical destruction or damage, loss of use, taking or similar event with respect to any of its Property.

"IP Rights" has the meaning provided in Section 6.20.

"IRS" means the United States Internal Revenue Service.

"ISP" means, with respect to any Letter of Credit, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice (or such later version thereof as may be in effect at the time of issuance of such Letter of Credit).

"Issuer Documents" means, with respect to any Letter of Credit, the L/C Application and any other document, agreement or instrument entered into by a Borrower and an L/C Issuer (or in favor of an L/C Issuer) relating to such Letter of Credit.

"Japanese Prime Rate" means for any Loan denominated in Japanese Yen the greater of (a) (i) the Japanese local bank prime rate plus (ii) the Japanese Prime Rate Adjustment and (b) the Floor.

"Japanese Prime Rate Adjustment" means, for any day, for any Loan denominated in Japanese Yen, a rate equal to the difference (which may be a positive or negative value or zero) of (i) the average of the Adjusted TIBOR Rate for the five most recent Business Days preceding such day for which the TIBOR Screen Rate was available (excluding, from such averaging, the highest and the lowest Adjusted TIBOR Rate applicable during such period of five Business Days) minus (ii) the Japanese Prime Rate in effect on the last Business Day in such period; provided, that for purposes of this definition, the Japanese Prime Rate shall be determined disregarding clause (a)(ii) of the definition of such term. For purposes of this definition, the TIBOR Rate on any day shall be based on the TIBOR Screen Rate on such day at approximately the time referred to in the definition of such term for deposits in Japanese Yen for a maturity of one month.

"Japanese Yen" or "¥" means the lawful currency of Japan.

"Joinder Agreement" means a joinder agreement substantially in the form of Exhibit 7.12, executed and delivered in accordance with the provisions of Section 7.12.

"JPMCB" means JPMorgan Chase Bank, N.A.

"JPME" means J.P. Morgan Europe Limited.

"JPMorgan" means J.P. Morgan Securities LLC.

"Judgment Currency" has the meaning assigned to such term in Section 11.21.

"Laws" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes, executive orders and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, licenses, authorizations and permits of, and agreements with, any Governmental Authority, including, without limitation, Environmental Laws.

36

"L/C Advance" means, with respect to each Lender, such Lender's funding of its participation in any L/C Borrowing.

"L/C Application" means an application and agreement for the issuance or amendment of a Letter of Credit in the form from time to time in use by the applicable L/C Issuer.

"L/C Borrowing" means any extension of credit resulting from a drawing under any Letter of Credit that has not been reimbursed.

"L/C Commitment" means, with respect to the Dollar L/C Issuer or the Multicurrency L/C Issuer, the commitment of the Dollar L/C Issuer or the Multicurrency L/C Issuer to issue and to honor payment obligations under Letters of Credit and, with respect to each Revolving Lender, the commitment of such Revolving Lender to purchase participation interests in L/C Obligations up to the Dollar Equivalent of such Lender's Limited Currency Revolving Commitment Percentage thereof, in each case to the extent provided in Section 2.03(c).

"L/C Commitment Percentage" means, as to each L/C Revolving Lender at any time, a fraction (expressed as a percentage carried to the ninth decimal place), the numerator of which is the sum of such L/C Revolving Lender's Limited Currency Revolving Committed Amount and such L/C Revolving Lender's Dollar Revolving Committed Amount at such time and the denominator of which is the L/C Committed Amount at such time.

"L/C Committed Amount" means, at any time, the sum of the Aggregate Limited Currency Revolving Committed Amount plus the Aggregate Dollar Revolving Committed Amount at such time and as to any L/C Revolving Lender, its L/C Commitment Percentage of the L/C Committed Amount; provided that for the avoidance of doubt, the L/C Sublimit shall govern the maximum amount of L/C Obligations that may be outstanding pursuant to Section 2.01(b).

"L/C Credit Extension" means, with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the increase of the amount thereof.

"L/C Expiration Date" means the day that is seven (7) days prior to the Initial Revolving Termination Date (or, if such day is not a Business Day, the immediately preceding Business Day).

"L/C Issuer" means a Dollar L/C Issuer or a Multicurrency L/C Issuer, and "L/C Issuers" means, collectively, each Dollar L/C Issuer and Multicurrency L/C Issuer.

"L/C Obligation" means a Dollar Facility L/C Obligation or a Limited Currency Facility L/C Obligation, as the context may require, and "L/C Obligations" means Dollar Facility L/C Obligations and Limited Currency Facility L/C Obligations, collectively.

"L/C Revolving Lender" means a Dollar Revolving Lender or a Limited Currency Revolving Lender, and the "L/C Revolving Lenders" refers to the Dollar Revolving Lenders and the Limited Currency Revolving Lenders, collectively.

"L/C Sublimit" has the meaning provided in Section 2.01(b).

"LCA Election" has the meaning provided in Section 1.11.

"Lead Arrangers" means JPMorgan, Goldman Sachs Bank USA, Morgan Stanley Senior Funding, Inc., Citibank, N.A., The Bank of Nova Scotia, HSBC Securities (USA) Inc., Mizuho Bank, Ltd., BofA Securities, Inc., MUFG Bank, Ltd., Truist Securities, Inc., Wells Fargo Securities, LLC, U.S. Bank National Association and Citizens Bank, N.A.

"Lender" means each of the Persons identified as a "Lender" on the signature pages hereto (and, as appropriate, includes the Swingline Lender) and each Person who joins as a Lender pursuant to the terms hereof, together with its successors and permitted assigns.

"Lending Office" means, as to any Lender, the office or offices of such Lender set forth in such Lender's Administrative Questionnaire or such other office or offices as a Lender may from time to time provide notice of to the Parent Borrower and the Administrative Agent.

"Letter of Credit" means any letter of credit issued pursuant to this Credit Agreement.

"Letter of Credit Cap" means the amount set forth opposite each L/C Issuer on Schedule 1.01F; provided that such Schedule may be revised from time to time by the Parent Borrower, the Administrative Agent and such L/C Issuer to change such L/C Issuer's Letter of Credit Cap or by the Parent Borrower, the Administrative Agent and any new L/C Issuer to establish a Letter of Credit Cap for such new L/C Issuer.

"Letter of Credit Fees" has the meaning provided in Section 2.09(b)(i).

"Liabilities" has the meaning provided in the definition of the term "Solvent".

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property and any financing lease having substantially the same economic effect as any of the foregoing).

"Limited Condition Acquisition" means any Permitted Acquisition or other similar Investment by the Parent Borrower or one or more of its Restricted Subsidiaries permitted by this Credit Agreement whose consummation is not conditioned on the availability of, or on obtaining, third party acquisition financing and which is designated as a Limited Condition Acquisition to the Administrative Agent by the prior written election of the Parent Borrower.

"Limited Currency Facility L/C Obligations" means, at any date of determination, the Limited Currency Facility Percentage multiplied by the sum of (x) the aggregate Dollar Equivalent amount available to be drawn under all outstanding Letters of Credit at such date plus (y) the aggregate Dollar Equivalent of all L/C Borrowings at such date. For all purposes of this Credit Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"Limited Currency Facility Percentage" means, at any time, a fraction (expressed as a percentage carried to the ninth decimal place), the numerator of which is the Aggregate Limited Currency Revolving Committed Amount at such time and the denominator of which is the L/C Committed Amount at such time.

"Limited Currency Revolving Commitment" means, for each Limited Currency Revolving Lender, the commitment of such Lender to make Limited Currency Revolving Loans (and to share in Limited Currency Revolving Obligations) hereunder, under documentation relating to Incremental Revolving Commitments or pursuant to an Additional Credit Extension Amendment, in each case in the amount of such Lender's Limited Currency Revolving Committed Amount, as such commitment may be increased or decreased pursuant to the other provisions hereof.

"Limited Currency Revolving Commitment Percentage" means, for each Limited Currency Revolving Lender, a fraction (expressed as a percentage carried to the ninth decimal place), the numerator of which is such Limited Currency Revolving Lender's Limited Currency Revolving Committed Amount and the denominator of which is the Aggregate Limited Currency Revolving Committed Amount. The Limited Currency Revolving Commitment Percentages as of the Amendment No. 1112 Effective Date are set forth in Schedule I to Amendment No. 1112 under the column entitled "Limited Currency Revolving Commitment Percentage".

"Limited Currency Revolving Committed Amount" means, for each Limited Currency Revolving Lender, the amount set forth in Schedule I to Amendment No. 1112 under the row applicable to such Lender in the column entitled "Limited Currency Revolving Committed Amount", in the Assignment and Assumption by which such Limited Currency Revolving Lender became a Limited Currency Revolving Lender or in any documentation relating

to Incremental Revolving Commitments or Additional Credit Extension Amendments, as such Limited Currency Revolving Committed Amount may be reduced or increased pursuant to the other provisions hereof.

"Limited Currency Revolving Facility" means the Aggregate Limited Currency Revolving Commitments and the provisions herein related to the Limited Currency Revolving Loans and the Letters of Credit.

"Limited Currency Revolving Lenders" means the Persons listed on Schedule I to Amendment No.~~11~~12 under the heading "Limited Currency Revolving Lender" together with their successors and permitted assigns, and any Person that shall be designated a "Limited Currency Revolving Lender" pursuant to Incremental Revolving Commitments or an Additional Credit Extension Amendment in accordance with the provisions hereof.

"Limited Currency Revolving Loan" has the meaning provided in Section 2.01(a)(ii).

"Limited Currency Revolving Notes" means the promissory notes, if any, given to evidence the Limited Currency Revolving Loans, as amended, restated, modified, supplemented, extended, renewed or replaced. A form of Limited Currency Revolving Note is attached as Exhibit 2.13-2.

"Limited Currency Revolving Obligations" means the Limited Currency Revolving Loans and the Limited Currency Facility L/C Obligations.

"Loan" means any Revolving Loan, Swingline Loan, Term B-4 Loan or Incremental Term Loan, and the Base Rate Loans, RFR Loans and Term Benchmark Loans comprising such Loans.

"Loan Notice" means a notice of (a) a Borrowing of Loans (including Swingline Loans), (b) a conversion of Loans from one (1) Type to the other, or (c) a continuation of Term Benchmark Loans, which shall be substantially in the form of Exhibit 2.02.

"Loan Obligations" means the Revolving Obligations, Term B-4 Loans and Incremental Term Loans; provided that Excluded Swap Obligations shall not be a Loan Obligation of any Guarantor that is not a Qualified ECP Guarantor.

"Local Time" means (a) with respect to a Loan or Borrowing denominated in Dollars, New York City time, (b) with respect to a Loan or Borrowing denominated in Canadian Dollars, Toronto time and (c) with respect to a Loan or Borrowing denominated in any other Approved Currency, London time.

"London Agent" means JPME, in its capacity as London agent for the Lenders hereunder, or any successor London agent.

"Major Disposition" means any Subject Disposition (or any series of related Subject Dispositions) or any Involuntary Disposition (or any series of related Involuntary Dispositions), in each case resulting in the receipt by one or more members of the Consolidated Group of Net Cash Proceeds in excess of $100.0 million.

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, assets, properties, liabilities (actual or contingent) or financial condition of the Parent Borrower and its Subsidiaries, taken as a whole; (b) a material impairment of the rights and remedies of any Agent or any Lender under any material Credit Document; or (c) a material adverse effect upon the legality, validity, binding effect or the enforceability against any Credit Party of any material Credit Document to which it is a party.

"Material Permitted Acquisition" means a Permitted Acquisition involving consideration of $300.0 million or greater.

"Material Subsidiary" means each Subsidiary of the Parent Borrower other than an Excluded Subsidiary.

"Maximum Rate" has the meaning assigned to such term in Section 11.09.

"Mexican Peso" or "MXN" means the lawful money of Mexico.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Multicurrency L/C Issuer" means JPMCB, Goldman Sachs Bank USA, Morgan Stanley Bank, N.A., Citibank, N.A., The Bank of Nova Scotia, HSBC Bank USA, National Association, Mizuho Bank, Ltd., Bank of America, N.A., MUFG Bank, Ltd., Truist Bank, Wells Fargo Bank, National Association, U.S. Bank National Association and Citizens Bank, National Association, in their capacities as issuers of Letters of Credit hereunder, together with their respective successors in such capacity and any Limited Currency Revolving Lender approved by the Administrative Agent and the Parent Borrower; provided that no other Lender shall be obligated to become an L/C Issuer hereunder. References herein and in the other Credit Documents to the Multicurrency L/C Issuer shall be deemed to refer to the Multicurrency L/C Issuer in respect of the applicable Letter of Credit or to all Multicurrency L/C Issuers, as the context requires.

"Multicurrency Revolving Commitment" means, for each Multicurrency Revolving Lender, the commitment of such Lender to make Multicurrency Revolving Loans (and to share in Multicurrency Revolving Obligations) hereunder, under documentation relating to Incremental Revolving Commitments or pursuant to an Additional Credit Extension Amendment, in each case in the amount of such Lender's Multicurrency Revolving Committed Amount, as such commitment may be increased or decreased pursuant to the other provisions hereof.

"Multicurrency Revolving Commitment Percentage" means, for each Multicurrency Revolving Lender, a fraction (expressed as a percentage carried to the ninth decimal place), the numerator of which is such Multicurrency Revolving Lender's Multicurrency Revolving Committed Amount and the denominator of which is the Aggregate Multicurrency Revolving Committed Amount. The Multicurrency Revolving Commitment Percentages as of the Amendment No. 11 12 Effective Date are set forth in Schedule I to Amendment No. 11 12 under the column entitled "Multicurrency Revolving Commitment Percentage".

"Multicurrency Revolving Committed Amount" means, for each Multicurrency Revolving Lender the amount set forth in Schedule I to Amendment No. 11 12 under the row applicable to such Lender in the column entitled "Multicurrency Revolving Committed Amount", in the Assignment and Assumption by which such Multicurrency Revolving Lender became a Multicurrency Revolving Lender or in any documentation relating to Incremental Revolving Commitments or Additional Credit Extension Amendments, as such Multicurrency Revolving Committed Amount may be reduced or increased pursuant to the other provisions hereof.

"Multicurrency Revolving Facility" means the Aggregate Multicurrency Revolving Commitments and the provisions herein related to the Multicurrency Revolving Loans.

"Multicurrency Revolving Lenders" means the Persons listed on Schedule I to Amendment No. 11 12 under the heading "Multicurrency Revolving Lenders" together with their successors and permitted assigns, and any Person that shall be designated a "Multicurrency Revolving Lender" pursuant to Incremental Revolving Commitments or an Additional Credit Extension Amendment in accordance with the provisions hereof.

"Multicurrency Revolving Loan" has the meaning provided in Section 2.01(a)(iii).

"Multicurrency Revolving Notes" means the promissory notes, if any, given to evidence the Multicurrency Revolving Loans, as amended, restated, modified, supplemented, extended, renewed or replaced. A form of Multicurrency Revolving Note is attached as Exhibit 2.13-3.

"Multicurrency Revolving Obligations" means the Multicurrency Revolving Loans.

"Multiemployer Plan" means any employee pension benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Parent Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five (5) plan years, has made or been obligated to make contributions.

40

"Net Cash Proceeds" means the aggregate proceeds paid in cash or Cash Equivalents received by any member of the Consolidated Group in connection with any Subject Disposition, Involuntary Disposition or incurrence of Indebtedness or issuance of Capital Stock, net of (a) attorneys' fees, accountants' fees, investment banking fees, sales commissions, underwriting discounts, survey costs, title insurance premiums, and related search and recording charges, transfer Taxes, deed or mortgage recording Taxes, required debt payments and required payments of other obligations relating to the applicable asset to the extent such debt or obligations are secured by a Lien permitted hereunder (other than a Lien granted pursuant to a Credit Document) on such asset, other customary expenses and brokerage, consultant and other customary fees and expenses, in each case, actually incurred in connection therewith and directly attributable thereto, (b) Taxes paid or payable as a result thereof (estimated reasonably and in good faith by the Parent Borrower and after taking into account any available Tax credits or deductions and any tax sharing arrangements) and (c) solely with respect to a Subject Disposition, the amount of any reasonable reserve established in accordance with GAAP against any adjustment to the sale price or any liabilities (other than any Taxes deducted pursuant to clause (b) above) (i) related to any of the Property Disposed of in such Subject Disposition and (ii) retained by the Parent Borrower or any of the Subsidiaries including pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations (provided, however, the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability) shall be deemed to be Net Cash Proceeds from and after the date of such reduction). For purposes hereof, "Net Cash Proceeds" includes any cash or Cash Equivalents received upon the Disposition of any non-cash consideration received by any member of the Consolidated Group in any Subject Disposition or Involuntary Disposition.

"New Guarantor List" has the meaning provided in Section 7.12(a).

"New Venue" means, in any period of four quarters beginning on or after January 1, 2024, any Venue that is owned or leased, by the Parent Borrower or one of its Subsidiaries and that has become fully operational and has hosted concerts or other live entertainment under the Parent Borrower's or one of its Subsidiaries' management for at least one full fiscal quarter of the Parent Borrower for such period; *provided* that (a) a Venue that is leased shall only be deemed to be a "New Venue" if the initial term of such lease is no less than 20 years, (b) no Venue shall be deemed a "New Venue" unless the Parent Borrower produces a statement of stand-alone results of operations (a "New Venue Results of Operations") for such New Venue that is available to be provided to the Administrative Agent upon the Administrative Agent's request to Parent Borrower therefor (it being understood that no New Venue Results of Operations shall be required to be audited) and (c) no Venue shall be deemed a New Venue once such Venue has been in operation for four full fiscal quarters of the Parent Borrower.

"New Venue Results of Operations" has the meaning provided in the definition of "New Venue".

"New York Courts" means any New York State court or federal court of the United States of America sitting in New York City in the borough of Manhattan, and any appellate court from any thereof.

"New York UCC" means the Uniform Commercial Code as from time to time in effect in the State of New York.

"Non-Consenting Lender" has the meaning provided in Section 11.13(b).

"Non-Extension Notice Date" has the meaning provided in Section 2.03(b)(iii).

"Non-Wholly Owned Subsidiary" means any Subsidiary of Parent Borrower that is not a Wholly-Owned Subsidiary.

"Notes" means the Revolving Notes, the Swingline Note and the Term B-4 Notes.

"NYFRB" means the Federal Reserve Bank of New York.

"NYFRB Rate" means, for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day (or for any day that is not a Business Day, for the immediately preceding Business Day); provided that if none of such rates are published for any day that is a

41

Business Day, the term "NYFRB Rate" means the rate for a federal funds transaction quoted at 11:00 a.m. on such day received by the Administrative Agent from a Federal funds broker of recognized standing selected by it; provided, further, that if any of the aforesaid rates shall be less than zero, such rate shall be deemed to be zero for purposes of this Credit Agreement.

"NYFRB's Website" means the website of the NYFRB at http://www.newyorkfed.org, or any successor source.

"Obligations" means the Borrower Obligations and the Guaranteed Obligations, other than Excluded Swap Obligations.

"OCESA" has the meaning assigned to such term in the definition of "Consolidated EBITDA".

"OFAC" has the meaning assigned to such term in Section 6.24(a).

"Organization Documents" means (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Original Revolving Commitments" means the "Revolving Commitments" in effect under this Credit Agreement immediately prior to the Amendment No. 6 Effective Date.

"Original Revolving Loans" means the "Revolving Loans" made pursuant to the Original Revolving Commitments.

"Original Swing ine Loans" means the "Swingline Loans" made pursuant to the "Revolving Facility" in effect immediately prior to the Amendment No. 6 Effective Date.

"Other Alternative Currency" has the meaning assigned to such term in the definition of "Alternative Currency".

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Credit Document, or sold or assigned an interest in any Loan or Credit Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes arising from any payment made hereunder or under any other Credit Document or from the execution, delivery, registration or enforcement of, or otherwise with respect to, this Credit Agreement or any other Credit Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment pursuant to Section 11.13).

"Outstanding Amount" means (a) with respect to Revolving Loans on any date, the Dollar Equivalent amount of the aggregate outstanding principal amount thereof after giving effect to any Borrowings and prepayments or repayments of Revolving Loans occurring on such date; (b) with respect to Swingline Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any Borrowings and prepayments or repayments of Swingline Loans occurring on such date; (c) with respect to any L/C Obligations on any date, the Dollar Equivalent amount of the aggregate outstanding amount of such L/C Obligations on such date after giving effect to any L/C Credit Extension occurring on such date and any other changes in the aggregate amount of the L/C Obligations as of such date, including as a result of any reimbursements by any Borrower of Unreimbursed

42

Amounts; and (d) with respect to the Term B-4 Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any prepayments or repayments of the Term B-4 Loans on such date.

"Overnight Bank Funding Rate" means, for any day, (a) with respect to any amount denominated in Dollars, the rate comprised of both overnight federal funds and overnight eurodollar by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the NYFRB as set forth on the NYFRB's Website from time to time, and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate (from and after such date as the NYFRB shall commence to publish such composite rate) and (b) with respect to any amount denominated in an Alternative Currency, the rate of interest per annum at which overnight deposits in the applicable Alternative Currency, in an amount approximately equal to the amount with respect to which such rate is being determined, would be offered for such day by a branch or Affiliate of JPMCB in the applicable offshore interbank market for such currency to major banks in such interbank market.

"Parent Borrower" has the meaning provided in the preamble hereto, together with its successors and permitted assigns pursuant to Section 8.04.

"Participant" has the meaning provided in Section 11.06(d).

"Participant Register" has the meaning provided in Section 11.06(d).

"Participating Fronted Currency Lenders" means, with respect to any Fronted Currency, each Multicurrency Revolving Lender (other than any Alternative Currency Fronting Lender with respect to such Fronted Currency), unless such Multicurrency Revolving Lender has notified the Administrative Agent in writing (or via email) that it can make Revolving Loans in such Fronted Currency. For the avoidance of doubt, unless it has notified the Parent Borrower otherwise in writing, the Administrative Agent shall be a Participating Fronted Currency Lender.

"Participating Member State" means each state so described in any EMU Legislation.

"Patriot Act" means the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"Payment" has the meaning provided in Section 10.07(b).

"Payment Notice" has the meaning provided in Section 10.07(b)(ii).

"PBGC" means the Pension Benefit Guaranty Corporation.

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Parent Borrower or any ERISA Affiliate or to which the Parent Borrower or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five (5) plan years.

"Perfection Certificate" means that certain perfection certificate dated the Amendment No. ~~11~~12 Effective Date, executed and delivered by the Parent Borrower in favor of the Collateral Agent for the benefit of the holders of the Obligations, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time.

"Periodic Term CORRA Determination Day" has the meaning assigned to such term in the definition of "Term CORRA".

"Permitted Acquisition" means any Acquisition; provided that (i) no Default or Event of Default shall have occurred and be continuing or exist immediately after giving effect to such Acquisition (or, in the case of any Limited Condition Acquisition, no Event of Default under Section 9.01(a) or 9.01(f) shall have occurred and be continuing on the Transaction Agreement Date), (ii) subject to the Limited Condition Acquisition provisions, after giving effect

43

on a Pro Forma Basis to the Investment to be made, as of the last day of the most recently ended fiscal quarter at the end of which financial statements were required to have been delivered pursuant to Section 7.01(a) or (b) (or, prior to such first required delivery date for such financial statements pursuant to either such Section, as of the last day of the most recent period referred to in the second sentence of Section 6.05), the Parent Borrower would be in compliance with Section 8.10 (and if such Acquisition involves consideration greater than $500.0 million, then the Parent Borrower shall deliver a certificate of a Responsible Officer of the Parent Borrower as to the satisfaction of the requirements in this clause (ii)) and (iii) if such Acquisition involves consideration in excess of $500.0 million (or if the total of all consideration for all Acquisitions since the Amendment No. ~~11~~12 Effective Date exceeds $750.0 million), all assets acquired in such Acquisition shall be held by a Domestic Credit Party and all Persons acquired in such Acquisition shall become Domestic Guarantors; provided further that the Parent Borrower may elect to allocate consideration expended in such Acquisition for Property to be held by members of the Consolidated Group that are not Domestic Credit Parties or Acquisitions of Subsidiaries that are not Domestic Guarantors to Investments made pursuant to Sections 8.02(f), (k), (z), (aa), (cc) or, to the extent the consideration comes from a Foreign Subsidiary, Section 8.02(g), so long as capacity to make such Investments pursuant to the applicab e Section is available at the time of such allocation (and any consideration so allocated shall reduce capacity for Investments pursuant to such Sections to the extent that capacity for such Investments are limited by such Sections), and to the extent such consideration is in fact so allocated to one of such Sections in accordance with the foregoing requirements, such consideration shall not count toward the $500.0 million and $750.0 million limitations set forth in this clause (iii). Notwithstanding any provision herein to the contrary, clauses (ii) and (iii) shall not apply to Excluded Acquisitions.

"Permitted Bond Hedge Transaction" means any cal  or capped call option (or substantively equivalent derivative transaction) on the Parent Borrower's common stock purchased by the Parent Borrower in connection with the issuance of any Convertible Indebtedness; provided that the purchase price for such Permitted Bond Hedge Transaction, less the proceeds received by the Parent Borrower from the sale of any related Permitted Warrant Transaction, does not exceed the net proceeds received by the Parent Borrower from the sale of such Convertible Indebtedness issued in connection with the Permitted Bond Hedge Transaction.

"Permitted Business" means the businesses of the Parent Borrower and its Subsidiaries conducted on the Amendment No.~~11~~12 Effective Date and any business reasonably related, ancillary or complementary thereto and any reasonable extension thereof.

"Permitted Deposits" means, with respect to the Parent Borrower or any of its Subsidiaries, cash or cash equivalents (and all accounts and other depositary arrangements with respect thereto) securing customary obligations of such Person that are incurred in the ordinary course of business in connection with ticketing, promoting or producing live entertainment events.

"Permitted Liens" means Liens permitted pursuant to Section 8.01.

"Permitted Warrant Transaction" means any call option, warrant or right to purchase (or substantively equivalent derivative transaction) on the Parent Borrower's common stock sold by the Parent Borrower substantially concurrently with any purchase by the Parent Borrower of a related Permitted Bond Hedge Transaction.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established or maintained by the Parent Borrower or, with respect to any such plan that is subject to Section 412 of the Internal Revenue Code or Title IV of ERISA, any ERISA Affiliate.

"Platform" has the meaning provided in Section 7.02.

"Present Fair Saleable Value" has the meaning provided in the term "Solvent".

"primary obligor" has the meaning provided in the definition of "Support Obligations".

"Prime Rate" has the meaning provided in the definition of the term "Base Rate".

"Pro Forma Basis" and "Pro Forma Effect" mean, with respect to any Subject Disposition, Specified Disposition, Acquisition, New Venue, Incremental Loan Facilities, Incremental Equivalent Debt or the Transactions, (a) for purposes of determining the applicable pricing level under the definition of "Applicable Percentage", (b) determining compliance with the financial covenant and (c) conditions and the requirements of the definition of "Immaterial Subsidiary" hereunder, that such Subject Disposition, Specified Disposition, Acquisition, Incremental Loan Facilities, Incremental Equivalent Debt or the Transactions shall be deemed to have occurred as of the first day of the applicable period of four (4) consecutive fiscal quarters. Further, for purposes of making calculations on a "Pro Forma Basis" hereunder, (a) in the case of any Subject Disposition or Specified Disposition, (i) income statement items (whether positive or negative) attributable to the property, entities or business units that are the subject of such Subject Disposition or Specified Disposition shall be excluded to the extent relating to any period prior to the date thereof and (ii) Indebtedness paid or retired in connection with such Subject Disposition or Specified Disposition shall be deemed to have been paid and retired as of the first day of the applicable period; (b) in the case of any Acquisition, (i) income statement items (whether positive or negative) attributable to the property, entities or business units that are the subject thereof shall be included to the extent relating to any period prior to the date thereof and (ii) Indebtedness incurred in connection with such Acquisition shall be deemed to have been incurred as of the first day of the applicable period (and interest expense shall be imputed for the applicable period assuming prevailing interest rates hereunder); and (c) in the case of any New Venue, such New Venue Results of Operations (whether the Consolidated EBITDA or other New Venue Results of Operations therefor are positive or negative numbers) will be annualized such that if such New Venue has been in operation for (A) one fiscal quarter, such New Venue Results of Operations will be multiplied by four, (B) two fiscal quarters, such New Venue Results of Operations will be multiplied by two and (C) three fiscal quarters such New Venue Results of Operations will be multiplied by four-thirds.

"Pro Rata Share" means, with respect to each Lender at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of outstanding Term B-4 Loans, Dollar Revolving Commitments, Limited Currency Revolving Commitments, ~~or~~ Multicurrency Revolving Commitments or Venue Expansion Revolving Commitments, as applicable, of such Lender at such time and the denominator of which is the aggregate amount of Term B-4 Loans of all Lenders, Dollar Revolving Commitments of all Lenders, Limited Currency Revolving Commitments of all Lenders, ~~or~~ Multicurrency Revolving Commitments of all Lenders or Venue Expansion Revolving Commitments of all Lenders, as applicable, at such time; provided that if any such Revolving Commitments have been terminated, then the Pro Rata Share of each applicable Lender shall be determined based on the Pro Rata Share of such Lender immediately prior to such termination and after giving effect to any subsequent assignments made pursuant to the terms hereof.

"Property" means an interest of any kind in any property or asset, whether real, personal or mixed, and whether tangible or intangible.

"Public Lender" has the meaning provided in Section 7.02.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"QFC Credit Support" has the meaning assigned to it in Section 11.22.

"Qualified Capital Stock" means any Capital Stock of the Parent Borrower other than Disqualified Capital Stock.

"Qualified ECP Guarantor" means, in respect of any Swap Obligation, each Credit Party that has total assets exceeding $10.0 million at the time the relevant guarantee or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an

45

"eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Ratable Net Proceeds Share" means, at any time with respect to any Net Cash Proceeds of a Subject Disposition or Involuntary Disposition, the product of (x) such Net Cash Proceeds and (y) a fraction, the numerator of which is the aggregate principal amount of App icable Pari Passu Debt outstanding at such time and the denominator of which is sum of the (A) aggregate principal amount of the Revolving Loans and Swingline Loans outstanding at such time plus (B) aggregate principal amount of Term Loans outstanding at such time plus (C) aggregate principal amount of Applicable Pari Passu Debt outstanding at such time.

"Recipient" has the meaning provided in the definition of the term "Excluded Taxes".

"Reference Time" with respect to any setting of the then-current Benchmark means (1) if such Benchmark is the Term SOFR Rate, 5:00 a.m. (Chicago time) on the day that is two U.S. Government Securities Business Days preceding the date of such setting, (2) if such Benchmark is EURIBOR Rate, 11:00 a.m. (Brussels time) two TARGET Days preceding the date of such setting, (3) if such Benchmark is TIBOR Rate, 11:00 a.m. (Japan time) two Business Days preceding the date of such setting, (4) if, following a Benchmark Transition Event and Benchmark Replacement Date with respect to Term CORRA, the RFR for such Benchmark is Daily Simple CORRA, then four RFR Business Days prior to such setting, (5) if such Benchmark is the Adjusted Term CORRA Rate, 1:00 p.m. Toronto local time on the day that is two Business Day preceding the date of such setting, (6) if such Benchmark is CIBOR Rate, 11:00 a.m. (Copenhagen, Denmark time) two Business Days preceding the date of such setting, (7) if such Benchmark is STIBOR Rate, 11:00 a.m. (Stockholm, Sweden time) two Business Days preceding the date of such setting, (8) if such Benchmark is TIIE Rate, 11:00 a.m. (Mexico City time), on the Business Day of such setting, (9) if such Benchmark is AUD Rate, 11:00 a.m. (Sydney, Australia time), on the Business Day of such setting, (10) if the RFR for such Benchmark is SONIA, then five RFR Business Days prior to such setting, (11) if the RFR for such Benchmark is SARON, then five RFR Business Days prior to such setting, (12) if the RFR for such Benchmark is Daily Simple SOFR, then five RFR Business Days prior to such setting or (13) if such Benchmark is none of the Term SOFR Rate, the EURIBOR Rate, the TIBOR Rate, the STIBOR Rate, the TIIE Rate, the CIBOR Rate, the Daily Simple CORRA or the Adjusted Term CORRA Rate, the AUD Rate, SONIA, SARON or Daily Simple SOFR, the time determined by the Administrative Agent in its reasonable discretion.

"Refinancing Debt" has the definition set forth in Section 2.18(a).

"Refinancing Effective Date" has the meaning specified in Section 2.18(b).

"Refinancing Notes/Loans" has the meaning provided in Section 2.18(a).

"Refinancing Term Loans" has the meaning specified in Section 2.18(a).

"Register" has the meaning provided in Section 11.06(c).

"Registered Public Accounting Firm" has the meaning provided in the Securities Laws and shall be independent of the Parent Borrower as prescribed by the Securities Laws.

"Regulation D" means Regulation D of the FRB as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Regulation U" means Regulation U of the FRB as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Regulatory Authority" has the meaning specified in Section 11.07.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

46

"Relevant Governmental Body" means, (i) with respect to a Benchmark Replacement in respect of Loans denominated in Dollars, the Federal Reserve Board and/or the NYFRB, or a committee officially endorsed or convened by the Federal Reserve Board and/or the NYFRB or, in each case, any successor thereto, (ii) with respect to a Benchmark Replacement in respect of Loans denominated in Sterling, the Bank of England, or a committee officially endorsed or convened by the Bank of England or, in each case, any successor thereto, (iii) with respect to a Benchmark Replacement in respect of Loans denominated in Euros, the European Central Bank, or a committee officially endorsed or convened by the European Central Bank or, in each case, any successor thereto, (iv) with respect to a Benchmark Replacement in respect of Loans denominated in Swiss Francs, the Swiss National Bank, or a committee officially endorsed or convened by the Swiss National Bank or, in each case, any successor thereto, (v) with respect to a Benchmark Replacement in respect of Loans denominated in Japanese Yen, the Bank of Japan, or a committee officially endorsed or convened by the Bank of Japan or, in each case, any successor thereto, (vi) with respect to a Benchmark Replacement in respect of Loans denominated in Canadian Dollars, the Bank of Canada, or a committee officially endorsed or convened by the Bank of Canada or, in each case, any successor thereto and (vii) with respect to a Benchmark Replacement in respect of Loans denominated in any other currency, (a) the central bank for the currency in which such Benchmark Replacement is denominated or any central bank or other supervisor which is responsible for supervising either (1) such Benchmark Replacement or (2) the administrator of such Benchmark Replacement or (b) any working group or committee officially endorsed or convened by (1) the central bank for the currency in which such Benchmark Replacement is denominated, (2) any central bank or other supervisor that is responsible for supervising either (A) such Benchmark Replacement or (B) the administrator of such Benchmark Replacement, (3) a group of those central banks or other supervisors or (4) the Financial Stability Board or any part thereof.

"Relevant Rate" means (i) with respect to any Term Benchmark Borrowing denominated in Dollars, the Adjusted Term SOFR Rate, (ii) with respect to any Term Benchmark Borrowing denominated in Euros, the Adjusted EURIBOR Rate, (iii) with respect to any Term Benchmark Borrowing denominated in Japanese Yen, the Adjusted TIBOR Rate, (iv) with respect to any Term Benchmark Borrowing denominated in Swedish Krona, the Adjusted STIBOR Rate, (v) with respect to any Term Benchmark Borrowing denominated in Canadian Dollars, the Adjusted Term CORRA Rate, (vi) with respect to any Term Benchmark Borrowing denominated in Danish Krone, the Adjusted C BOR Rate, (vii) with respect to any Term Benchmark Borrowing denominated in Mexican Pesos, the Adjusted TIIE Rate, (viii) with respect to any Term Benchmark Borrowing denominated in Australian Dollars, the Adjusted AUD Rate, (ix) with respect to any RFR Borrowing denominated in Sterling, Swiss Francs, Dollars, or Canadian Dollars, the applicable Adjusted Daily Simple RFR, in each case, as applicable or (x) with respect to any Term Benchmark Borrowing denominated in Brazilian Real, the interest rate, as set forth by the central bank or other supervisor in Brazil, as applicable, which is responsible for supervising or determining the interest rate.

"Relevant Screen Rate" means (i) with respect to any Term Benchmark Borrowing denominated in Dollars, the Term SOFR Reference Rate, (ii) with respect to any Term Benchmark Borrowing denominated in Euros, the EURIBOR Screen Rate, (iii) with respect to any Term Benchmark Borrowing denominated in Swedish Krona, the STIBOR Screen Rate, (iv) with respect to any Term Benchmark Borrowing denominated in Danish Krone, the CIBOR Screen Rate, (v) with respect to any Term Benchmark Borrowing denominated in Mexican Pesos, the TIIE Screen Rate, (vi) with respect to any Term Benchmark Borrowing denominated in Australian Dollars, the AUD Screen Rate, (vii) with respect to any Term Benchmark Borrowing denominated in Canadian Dollars, Term CORRA or (viii) with respect to any Term Benchmark Borrowing denominated in Japanese Yen, the TIBOR Screen Rate, as applicable.

"Replaced Revolving Commitments" has the meaning specified in Section 2.19(a).

"Replacement Revolving Commitments" has the meaning specified in Section 2.19(a).

"Replacement Revolving Lender" has the meaning specified in Section 2.19(b).

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the thirty-day notice period to the PBGC has been waived by regulation.

47

"Request for Credit Extension" means (a) with respect to a Borrowing of Loans (including Swingline Loans), a Loan Notice and (b) with respect to an L/C Credit Extension, a L/C Application.

"Required Dollar Revolving Lenders" means, as of any date of determination, Lenders having more than fifty percent (50%) of the Aggregate Dollar Revolving Commitments or, if the Do lar Revolving Commitments shall have expired or been terminated, Lenders holding more than fifty percent (50%) of the aggregate principal amount of Dollar Revolving Obligations (including, in each case, the aggregate principal amount of each Lender's risk participation and funded participation in L/C Obligations and Swingline Loans).

"Required Lenders" means, as of any date of determination, Lenders having more than fifty percent (50%) of the sum of (i) the Additional Term B-4 Loan Commitments and Converted Term B-3 Loans (or, from and after the borrowings on the Amendment No. 6 Effective Date, the Term B-4 Loans), and (ii) the Aggregate Revolving Commitments (or, if the Revolving Commitments shall have expired or been terminated, the Revolving Obligations (including, in each case, the aggregate amount of each Lender's risk participation and funded participation in L/C Obligations and Swingline Loans)).

"Required L/C Lenders" means, as of any date of determination, Lenders having more than fifty percent (50%) of the sum of the Aggregate Dollar Revolving Commitments and the Aggregate Limited Currency Revolving Commitments at such date or, if the Dollar Revolving Commitments and the Limited Currency Revolving Commitments if the Revolving Commitments shall have expired or been terminated, Lenders holding more than fifty percent (50%) of the aggregate principal amount of sum of the Dol ar Revolving Obligations and Limited Currency Revolving Obligations (including, in each case, the aggregate principal amount of each Lender's risk participation and funded participation in L/C Obligations and Swingline Loans).

"Required Limited Currency Revolving Lenders" means, as of any date of determination, Lenders having more than fifty percent (50%) of the Aggregate Limited Currency Revolving Commitments or, if the Limited Currency Revolving Commitments shall have expired or been terminated, Lenders holding more than fifty percent (50%) of the aggregate principal amount of Limited Currency Revolving Loans made pursuant to the Limited Currency Revolving Commitments (including, in each case, the aggregate principal amount of each Lender's risk participation and funded participation in L/C Obligations).

"Required Multicurrency Revolving Lenders" means, as of any date of determination, Lenders having more than fifty percent (50%) of the Aggregate Multicurrency Revolving Commitments or, if the Multicurrency Revolving Commitments shall have expired or been terminated, Lenders holding more than fifty percent (50%) of the aggregate principal amount of Multicurrency Revolving Loans made pursuant to the Multicurrency Revolving Commitments.

"Required Revolving Lenders" means, as of any date of determination, Lenders having more than fifty percent (50%) of the Aggregate Revolving Commitments or, if the Revolving Commitments shall have expired or been terminated, Lenders holding more than fifty percent (50%) of the aggregate principal amount of Revolving Obligations (including, in each case, the aggregate principal amount of each Lender's risk participation and funded participation in L/C Obligations and Swingline Loans).

"Required Specified Currency Limited Currency/Multicurrency Revolving Lenders" means, as of any date of determination with respect to any currency other than Dollars, Lenders having more than fifty percent (50%) of the Aggregate Limited Currency Revolving Commitments and Aggregate Multicurrency Revolving Commitments that are required, under Section 2.01(a)(ii) or (iii) to make Revolving Loans in such currency or, if the Limited Currency Revolving Commitments or Multicurrency Revolving Commitments shall have expired or been terminated, Lenders holding more than fifty percent (50%) of the aggregate principal amount of Limited Currency Revolving Loans and Multicurrency Revolving Loans made in such currency.

"Required Term B-4 Lenders" means, as of any date of determination, Lenders holding more than fifty percent (50%) of the aggregate principal amount of Additional Term B-4 Commitment and Converted Term B-3 Loans (or, from and after the Amendment No. 6 Effective Date, the Term B-4 Loans).

48

"Required Venue Expansion Revolving Lenders" means, as of any date of determination, Lenders having more than fifty percent (50%) of the Aggregate Venue Expansion Revolving Commitments or, if the Venue Expansion Revolving Commitments shall have expired or been terminated, Lenders holding more than fifty percent (50%) of the aggregate principal amount of Venue Expansion Revolving Loans made pursuant to the Venue Expansion Revolving Commitments.

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Responsible Officer" means, as to any Credit Party, the chief executive officer, chief operating officer, the president, any executive vice president, the chief financial officer, the chief accounting officer, the treasurer, any assistant treasurer, any vice president, any senior vice president, the secretary, the general counsel or the deputy general counsel of such Credit Party, any manager of such Credit Party (if such Credit Party is a limited liability company) or the general partner of such Credit Party (if such Credit Party is a limited partnership). Any document delivered hereunder that is signed by a Responsible Officer of a Credit Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Credit Party, and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Credit Party.

"Restricted Lender" has the meaning provided in Section 11.23.

"Restricted Payment" means (i) any dividend or other distribution (whether in cash, securities or other property) with respect to any Capital Stock of any member of the Consolidated Group, (ii) any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Capital Stock or of any option, warrant or other right to acquire any such Capital Stock or (iii) any payment or prepayment of principa on or redemption, repurchase or acquisition for value of, any Subordinated Debt of any member of the Consolidated Group, any 2024 Senior Notes Refinancing Indebtedness, any 2025 Convertible Notes Refinancing Indebtedness or any Indebtedness of any member of the Consolidated Group that is incurred pursuant to (a) any of the Existing Notes, (b) Section 8.03(f), or (c) to the extent representing a refinancing of any 2024 Senior Notes Refinancing Indebtedness, any 2025 Convertible Notes Refinancing Indebtedness or any Indebtedness described in the foregoing clause (a) or (b), Section 8.03(l) except, in each case, any scheduled payment of principal (including at maturity).

"Restricted Subsidiary" means any Subsidiary that is not an Unrestricted Subsidiary.

"Revaluation Date" shall mean (a) with respect to any Loan denominated in any Alternative Currency, each of the following: (i) the date of the Borrowing of such Loan and (ii) (A) with respect to any Term Benchmark Loan, each date of a conversion into or continuation of such Loan pursuant to the terms of this Credit Agreement and (B) with respect to any RFR Loan, each date that is on the numerically corresponding day in each calendar month that is one month after the Borrowing of such Loan (or, if there is no such numerically corresponding day in such month, then the last day of such month); (b) with respect to any Letter of Credit denominated in an Alternative Currency, each of the following: (i) the date on which such Letter of Credit is issued, (ii) the first Business Day of each calendar month and (iii) the date of any amendment of such Letter of Credit that has the effect of increasing the face amount thereof; and (c) any additional date as the Administrative Agent may determine at any time when an Event of Default exists.

"Revolving Commitment" means, as to each Lender, the sum of such Lender's Dollar Revolving Commitment, Limited Currency Revolving Commitment and, Multicurrency Revolving Commitment and Venue Expansion Revolving Commitment and "Revolving Commitments" means, collectively, the Dollar Revolving Commitments, Limited Currency Revolving Commitments and, Multicurrency Revolving Commitments and Venue Expansion Revolving Commitments of all Revolving Lenders.

"Revolving Committed Amount" means, as to each Lender, the sum of such Lender's Dollar Revolving Committed Amount, Limited Currency Revolving Committed Amount and, Multicurrency Revolving Committed Amount and Venue Expansion Revolving Committed Amount.

49

"Revolving Credit Extension Request" has the meaning specified in Section 2.17(b).

"Revolving Faci ity" means the Dollar Revolving Facility, the Limited Currency Revolving Facility or, the Multicurrency Revolving Facility or the Venue Expansion Revolving Facility and "Revolving Facilities" means, collectively, the Dollar Revolving Facility, the Limited Currency Revolving Facility and, the Multicurrency Revolving Facility and the Venue Expansion Revolving Facility.

"Revolving Lender" means a Dollar Revolving Lender, a Limited Currency Revolving Lender or, a Multicurrency Revolving Lender or a Venue Expansion Revolving Lender and "Revolving Lenders" means the collective reference to the Dollar Revolving Lenders, the Limited Currency Revolving Lenders and, the Multicurrency Revolving Lenders and the Venue Expansion Revolving Lenders.

"Revolving Lender Joinder Agreement" means a joinder agreement, in a form to be agreed among the Administrative Agent, the Parent Borrower and each Lender with an Incremental Revolving Commitment or commitment under an Incremental Revolving Facility, executed and delivered in accordance with the provisions of Section 2.01(f).

"Revolving Loan" means a Dollar Revolving Loan, a Limited Currency Revolving Loan or, a Multicurrency Revolving Loan or a Venue Expansion Revolving Loan and "Revolving Loans" means, collectively, Dollar Revolving Loans, Limited Currency Revolving Loans and, Multicurrency Revolving Loans and Venue Expansion Revolving Loans.

"Revolving Notes" means the collective reference to the Dollar Revolving Notes, the Limited Currency Revolving Notes and, the Multicurrency Revolving Notes and the Venue Expansion Revolving Notes.

"Revolving Obligations" means the collective reference to the Dollar Revolving Obligations, the Limited Currency Revolving Obligations and, the Multicurrency Revolving Obligations and the Venue Expansion Revolving Obligations.

"Revolving Termination Date" means the fifth anniversary of the Amendment No. 11 12 Effective Date (such date, for the avoidance of doubt not giving effect to the immediately succeeding proviso, the "Initial Revolving Termination Date"); provided, that if, on the Triggering Date with respect to any Triggering Debt Instrument, the Springing Triggering Debt Condition with respect to such Triggering Debt Instrument is then applicable, then the Revo ving Termination Date shall instead be the Triggering Date with respect to such Triggering Debt Instrument.

"RFR" means, for any RFR Loan denominated in (a) Sterling, SONIA, (b) Swiss Francs, SARON, (c) Dollars, Daily Simple SOFR, and (d) Canadian Dollars, Daily Simple CORRA.

"RFR Borrowing" means, as to any Borrowing, the RFR Loans comprising such Borrowing.

"RFR Business Day" means, for any Loan denominated in (a) Sterling, any day except for (i) a Saturday, (ii) a Sunday or (iii) a day on which banks are closed for general business in London, (b) Swiss Francs, any day except for (i) a Saturday, (ii) a Sunday or (iii) a day on which banks are closed for the settlement of payments and foreign exchange transactions in Zurich, (c) Dollars, a U.S. Government Securities Business Day and (d) Canadian Dollars, any day except for (i) Saturday, (ii) a Sunday or (iii) a day on which commercial banks in Toronto are authorized or required by law to remain closed.

"RFR Interest Day" has the meaning specified in the definition of "Daily Simple RFR".

"RFR Loan" means a Loan that bears interest at a rate based on the Adjusted Daily Simple RFR.

"S&P" means Standard & Poor's Ratings Services, a division of McGraw Hill Financial Inc. and any successor thereto.

50

"Sale and Leaseback Transaction" means, with respect to the Parent Borrower or any Subsidiary, any arrangement, directly or indirectly, with any Person (other than a Domestic Credit Party) whereby the Parent Borrower or such Subsidiary shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

"Same Day Funds" means (a) with respect to disbursements and payments in Dollars, immediately avai able funds, and (b) with respect to disbursements and payments in an Alternative Currency, same day or other funds as may be determined by the Applicable Agent or the applicable L/C Issuer, as applicable, to be customary in the place of disbursement or payment for the settlement of international banking transactions in the relevant Alternative Currency.

"Sanctions" has the meaning provided in Section 6.24(a).

"Sarbanes-Oxley" means the Sarbanes-Oxley Act of 2002.

"SARON" means, with respect to any Business Day, a rate per annum equal to the Swiss Average Rate Overnight for such Business Day published by the SARON Administrator on the SARON Administrator's Website.

"SARON Administrator" means the SIX Swiss Exchange AG (or any successor administrator of the Swiss Average Rate Overnight).

"SARON Administrator's Website" means SIX Swiss Exchange AG's website, currently at https://www.six-group.com, or any successor source for the Swiss Average Rate Overnight identified as such by the SARON Administrator from time to time.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Section 2.02(b) Ratable Share" has the meaning provided in Section 2.02(b).

"Secured Party" has the meaning assigned to such term in the U.S. Security Agreement.

"Securities Laws" means the Securities Act of 1933, the Securities Exchange Act of 1934, Sarbanes-Oxley and the applicable accounting and auditing principles, rules, standards and practices promulgated, approved or incorporated by the SEC or the Public Company Accounting Oversight Board, as each of the foregoing may be amended and in effect on any applicable date hereunder.

"Senior Indebtedness" means Indebtedness of the Parent Borrower or any of its Subsidiaries that is not expressly subordinated in right of payment to any other Indebtedness of Parent Borrower or any of its Subsidiaries.

"Senior Secured Debt" means, at any time, Consolidated Total Funded Debt that constitutes Senior Indebtedness secured by a Lien on any Collateral.

"Senior Secured Leverage Ratio" means, as of the last day of any fiscal quarter, the ratio of (i) Senior Secured Debt on such day to (ii) Consolidated EBITDA of the Consolidated Group for the period of four (4) consecutive fiscal quarters ending on such day.

"Significant Subsidiary" means (1) any Subsidiary that satisfies the criteria for a "significant subsidiary" as defined in Article 1, Rule 1-02 of Regulation S-X under the Securities Laws, as such Regulation is in effect on the Amendment No. 11 12 Effective Date (with reference to 10% in such Rule being deemed to be 7.5% for the purposes of this definition), and (2) any Subsidiary that, when aggregated with all other Subsidiaries that are not otherwise Significant Subsidiaries and as to which any event described in Section 9.01(f) or (h) has occurred and is continuing, would constitute a Significant Subsidiary under clause (1) of this definition.

51

"SOFR" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator" means the NYFRB (or a successor administrator of the secured overnight financing rate).

"SOFR Administrator's Website" means the NYFRB's Website or any successor source for the secured overnight financing rate identified as such by the SOFR Administrator from time to time.

"SOFR Determination Date" has the meaning specified in the definition of "Daily Simple SOFR".

"SOFR Rate Day" has the meaning specified in the definition of "Daily Simple SOFR".

"Solvent" means, with respect to any Person, as of any date of determination, (a) the Fair Value and Present Fair Saleable Value of the aggregate assets of such Person exceeds the value of its Liabilities; (b) such Person will not have, as of such date, an unreasonably small amount of capital with which to conduct its business; (c) such Person will be able to pay its Liabilities as they mature or become absolute; and  d) the Fair Value and Present Fair Saleable Value of the aggregate assets of such Person exceeds the value of its Liabilities by an amount that is not less than the capital of such Person (as determined pursuant to Section 154 of the Delaware General Corporate Law). The term "Solvency" shall have an equivalent meaning. For the purposes of this definition, "Fair Value" means the aggregate amount at which the assets of the applicable entity (including goodwill) would change hands between a willing buyer and a willing seller, within a commercially reasonable amount of time, each having reasonable knowledge of the relevant facts, neither being under any compulsion to act and with equity to both; "Present Fair Saleable Value" means the aggregate amount of net consideration (giving effect to reasonable and customary costs of sale or Taxes) that could be expected to be realized if the aggregate assets of the applicable entity are sold with reasonable promptness in an arm's length transaction under present conditions for the sale of assets of comparable business enterprises; and "Liabilities" means all debts and other liabilities of the applicable entity, whether secured, unsecured, fixed, contingent, accrued or not yet accrued.

"SONIA" means, with respect to any Business Day, a rate per annum equal to the Sterling Overnight Index Average for such Business Day published by the SONIA Administrator on the SONIA Administrator's Website on the immediately succeeding Business Day.

"SONIA Administrator" means the Bank of England (or any successor administrator of the Sterling Overnight Index Average).

"SONIA Administrator's Website " means the Bank of England's website, currently at http://www.bankofeng and.co.uk, or any successor source for the Sterling Overnight Index Average identified as such by the SONIA Administrator from time to time.

"SPC" has the meaning provided in Section 11.06(h).

"Specified Disposition" means any Disposition referred to in clause (a) of the definition of "Subject Disposition", to the extent a material amount of Property is disposed of in such Disposition.

"Specified Intercompany Transfers" means a Disposition of Property by a Domestic Credit Party to a member of the Consolidated Group that is not a Domestic Credit Party.

"Specified Percentage" has the meaning assigned to such term in the definition of "Funded Debt".

"Specified Subsidiary" has the meaning assigned to such term in the definition of "Funded Debt".

"Spot Rate" for a currency means the rate determined by the Applicable Agent or an L/C Issuer, as applicable, to be the rate quoted by the Person acting in such capacity as the spot rate for the purchase by such Person of such currency with another currency through its principal foreign exchange trading office at approximately 11:00 a.m. (x) New York time, in the case of Canadian Dollars, or (y) London time, in the case of any other currency, in each case

on the date two (2) Business Days prior to the date as of which the foreign exchange computation is made;provided that the Applicable Agent or such L/C Issuer may obtain such spot rate from another financial institution designated by the Applicable Agent or such L/C Issuer if the Person acting in such capacity does not have as of the date of determination a spot buying rate for any such currency; provided, further, that such L/C Issuer may use such spot rate quoted on the date as of which the foreign exchange computation is made in the case of any Letter of Credit denominated in an Alternative Currency.

"Springing Triggering Debt Condition" means, with respect to any Triggering Debt Instrument as of the Triggering Date applicable to such Triggering Debt Instrument, that (A) the aggregate principal amount of such Triggering Debt Instrument outstanding as of such Triggering Date (a "Triggering Amount") is greater than $500.0 million and (B) the aggregate amount of Free Cash held by the Consolidated Group on such Triggering Date is less than the sum of (x) such Triggering Amount plus (y) $500.0 million.

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentage (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Federal Reserve Board to which the Administrative Agent is subject with respect to the Adjusted EURIBOR Rate, Adjusted TIBOR Rate, Adjusted TIIE Rate, Adjusted STIBOR Rate, Adjusted CIBOR Rate, Adjusted AUD Rate, as applicable, for eurocurrency funding (currently referred to as "Eurocurrency liabilities" in Regulation D) or any other reserve ratio or analogous requirement of any central banking or financial regulatory authority imposed in respect of the maintenance of the Commitments or the funding of the Loans. Such reserve percentage shall include those imposed pursuant to Regulation D. Term Benchmark Loans for which the associated Benchmark is adjusted by reference to the Statutory Reserve Rate (per the related definition of such Benchmark) shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Statutory Reserves" means (a) for any Interest Period for any Term Benchmark Loan in dollars, the average maximum rate at which reserves (including any marginal, supplemental or emergency reserves) are required to be maintained during such Interest Period under Regulation D by member banks of the United States Federal Reserve System in New York City with deposits exceeding one billion dollars against "Eurocurrency liabilities" (as such term is used in Regulation D), (b) for any Interest Period for any portion of a Borrowing in Swiss Francs, the average maximum rate at which reserves (including any marginal, supplemental or emergency reserves), if any, are in effect on such day for funding in Swiss Francs maintained by commercial banks which lend in Swiss Francs, (c) for any Interest Period for any portion of a Borrowing in Sterling, the average maximum rate at which reserves (including any marginal, supplemental or emergency reserves), if any, are in effect on such day for funding in Sterling maintained by commercial banks which lend in Sterling, (d) for any Interest Period for any portion of a Borrowing in Euros, the average maximum rate at which reserves (including any marginal, supplemental or emergency reserves), if any, are in effect on such day for funding in Euros maintained by commercial banks which lend in Euros, (e) for any Interest Period for any portion of a Borrowing in Swedish Krona, the average maximum rate at which reserves (including any marginal, supplemental or emergency reserves), if any, are in effect on such day for funding in Swedish Krona maintained by commercial banks which lend in Swedish Krona, (f) for any Interest Period for any portion of a Borrowing in Australian Dollars, the average maximum rate at which reserves (including any marginal, supplemental or emergency reserves), if any, are in effect on such day for funding in Australian Dollars maintained by commercial banks which lend in Australian Dollars, (g) for any Interest Period for any portion of a Borrowing in Danish Krone, the average maximum rate at which reserves (including any marginal, supplemental or emergency reserves), if any, are in effect on such day for funding in Danish Krone maintained by commercial banks which lend in Danish Krone, (h) for any Interest Period for any portion of a Borrowing in Brazilian Real, the average maximum rate at which reserves (including any marginal, supplemental or emergency reserves), if any, are in effect on such day for funding in Brazilian Real maintained by commercial banks which lend in Brazilian Real, (i) for any Interest Period for any portion of a Borrowing in Mexican Pesos, the average maximum rate at which reserves (including any marginal, supplemental or emergency reserves), if any, are in effect on such day for funding in Mexican Pesos maintained by commercial banks which lend in Mexican Pesos and (j) for any

53

Interest Period for any portion of a Borrowing in Japanese Yen, the average maximum rate at which reserves (including any marginal, supplemental or emergency reserves), if any, are in effect on such day for funding in Japanese Yen maintained by commercial banks which lend in Japanese Yen. Term Benchmark Loans shall be deemed to constitute Eurocurrency liabilities and to be subject to such reserve requirements without benefit of or credit for proration, exceptions or offsets which may be available from time to time to any Lender under Regulation D.

"Step-Up" has the meaning specified in Section 8.10.

"Sterling" and "£" mean the lawful currency of the United Kingdom.

"STIBOR Rate" shall mean, with respect to any Term Benchmark Borrowing denominated in Swedish Krona and for any Interest Period, the STIBOR Screen Rate at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period. If the STIBOR Rate shall be less than 0.00%, the STIBOR Rate shall be deemed to be 0.00% for purposes of this Credit Agreement.

"STIBOR Screen Rate" means, with respect to any Interest Period, the Stockholm interbank offered rate administered by the Swedish Bankers' Association (or any other person that takes over the administration of that rate) for deposits in Swedish Krona with a term equivalent to such Interest Period as displayed on the Reuters screen page that displays such rate (or, in the event such rate does not appear on such Reuters page, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate as shall be selected by the Administrative Agent from time to time in its reasonable discretion) as of 11:00 a.m. London time two business days prior to the commencement of such Interest Period. If the STIBOR Screen Rate shall be less than 0.00%, the STIBOR Screen Rate shall be deemed to be 0.00% for purposes of this Agreement.

"Subject Disposition" means any Disposition other than (a) Dispositions of damaged, worn-out or obsolete Property that, in the Parent Borrower's reasonable judgment, is no longer used or useful in the business of the Parent Borrower or its Subsidiaries; (b) Dispositions of inventory, services or other property in the ordinary course of business; (c) Dispositions of Property to the extent that (i) such Property is exchanged for credit against the purchase price of similar replacement Property or (ii) the proceeds of such Disposition are reasonably promptly applied to the purchase price of such replacement equipment or property; (d) licenses, sublicenses, leases and subleases not interfering in any material respect with the business of any member of the Consolidated Group; (e) sales or discounts of accounts receivable in connection with the compromise or collection thereof in the ordinary course of business; (f) any Disposition at any time by (i) a Domestic Credit Party to any other Domestic Credit Party, (ii) a Subsidiary that is not a Credit Party to a Domestic Credit Party, (iii) a Subsidiary that is not a Credit Party to another Subsidiary that is not a Credit Party, (iv) a Foreign Credit Party to any other Foreign Credit Party or (v) a Foreign Credit Party to any Foreign Subsidiary that is not a Foreign Credit Party (provided that the fair market value of Property Disposed of pursuant to this clause (v) shall not exceed $250.0 million in the aggregate in any fiscal year of the Parent Borrower); (g) Specified Intercompany Transfers; (h) the sale of Cash Equivalents; (i) an Excluded Sale and Leaseback Transaction; (j) Restricted Payments permitted by Section 8.06; (k) mergers and consolidations permitted by Section 8.04; (l) the granting of Liens permitted pursuant to Section 8.01; (m) a Disposition of Property, to the extent constituting the making of an Investment permitted pursuant to Section 8.02 (other than Section 8.02(a)); (n) Dispositions, in one transaction or a series of related transactions, of assets or other properties of the Parent Borrower or its Subsidiaries with a fair market value not exceeding $25.0 million (or, from and after the Term B-4 Loan Termination Date, $100.0 million ); provided that the aggregate amount of Dispositions that are not Subject Dispositions by the operation of this clause (n) shall not exceed $100.0 million (or, from and after the Term B-4 Loan Termination Date, $400.0 million) in the aggregate; (o) Dispositions related to the unwinding of any Swap Contract in accordance with its terms; (p) the settlement or early termination of any Permitted Bond Hedge Transaction or any related Permitted Warrant Transaction; and (q) to the extent acquired pursuant to an Investment that was not intended to be operated as part of the Parent Borrower's and its Subsidiaries' business, securities acquired pursuant to an Investment by the Parent Borrower or one of its Subsidiaries.

"Subordinated Debt" means (x) as to the Parent Borrower, any Funded Debt of the Parent Borrower that is expressly subordinated in right of payment to the prior payment of any of the Loan Obligations of the Parent Borrower and (y) as to any Guarantor, any Funded Debt of such Guarantor that is expressly subordinated in right of payment to the prior payment of any of the Loan Obligations of such Guarantor.

"Subsidiary" of a Person means (A) a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise Controlled, directly, or indirectly through one or more intermediaries, or both, by such Person or (B) any other Person that is a consolidated subsidiary of such Person under GAAP and designated as a Subsidiary of such Person in a certificate to the Administrative Agent by a financial or accounting officer of such Person. Unless otherwise provided, "Subsidiary" shall refer to a Subsidiary of the Parent Borrower; provided that an Unrestricted Subsidiary shall be deemed not to be a "Subsidiary" for purposes of this Credit Agreement and each other Credit Document provided further that any Subsidiary other than an Unrestricted Subsidiary shall be deemed to be a Restricted Subsidiary.

"Subsidiary Redesignation" has the meaning provided in the definition of "Unrestricted Subsidiary."

"Support Obligations" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness payable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness of the payment or performance of such Indebtedness, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien). The amount of any Support Obligations shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Support Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.

"Supported QFC" has the meaning assigned to it in Section 11.22.

"Swap Contract" means any and a l rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement.

"Swap Obligation" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination values determined in accordance therewith, such

55

termination values, and (b) for any date prior to the date referenced in clause (a), the amounts determined as the mark-to-market values for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"Swedish Krona" or "kr" means the lawful currency of Sweden.

"Swingline Borrowing" means a borrowing of a Swingline Loan pursuant to Section 2.01(c).

"Swingline Commitment" means, with respect to the Swingline Lender, the commitment of the Swingline Lender to make Swingline Loans, and with respect to each Lender, the commitment of such Lender to purchase participation interests in Swingline Loans.

"Swingline Exposure" means, at any time, the aggregate principal amount of all Swingline Loans outstanding at such time. The Swingline Exposure of any Dollar Revolving Lender at any time shall be its Dollar Revolving Commitment Percentage of the total Swingline Exposure at such time.

"Swingline Lender" means JPMCB in its capacity as such, together with any successor in such capacity.

"Swingline Loan" has the meaning provided in Section 2.01(c).

"Swingline Note" means the promissory note given to evidence the Swingline Loans, as amended, restated, modified, supplemented, extended, renewed or replaced. A form of Swingline Note is attached as Exhibit 2.13-4.

"Swingline Sublimit" has the meaning provided in Section 2.01(c).

"Swiss Franc" or "CHF" means the lawful currency of Switzerland.

"Synthetic Lease" means any synthetic lease, tax retention operating lease, off-balance sheet loan or similar off-balance sheet financing arrangement that is considered borrowed money indebtedness for tax purposes but is classified as an operating lease under GAAP.

"T2" means the real time gross settlement system operated by the Eurosystem, or any successor system.

"TARGET Day" means any day on which T2 (or, if such payment system ceases to be operative, such other payment system, if any, determined by the Administrative Agent to be a suitable replacement) is open for the settlement of payments in Euro.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Tax Returns" means any return, report or similar statement filed or required to be filed with respect to any Tax (including any attached schedules) including any informational return, claim for refund, amended return or declaration of estimated Tax.

"Term A Amortization Payment Date" shall have the meaning assigned to such term in Section 2.05(e).

"Term A-1 Loans" means the "Term A-1 Loans" under this Credit Agreement as in effect prior to giving effect to Amendment No. 3.

"Term A-2 Loans" means the "Term A-2 Loans" under this Credit Agreement as in effect prior to giving effect to Amendment No. 6.

56

"Term B-1 Loans" means the "Term B-1 Loans" under this Credit Agreement as in effect prior to giving effect to Amendment No. 3.

"Term B-2 Loans" means the "Term B-2 Loans" under this Credit Agreement as in effect prior to giving effect to Amendment No. 4.

"Term B-3 Amendment No. 6 Converting Lender" means each Term B-3 Lender that, in accordance with Amendment No. 6, provided the Administrative Agent with a counterpart to Amendment No. 6 executed by such Lender with the box "Term B-3 Lender Conversion Option" checked.

"Term B-3 Lenders" the Persons holding Term B-3 Loans immediately prior to the occurrence of the Amendment No. 6 Effective Date.

"Term B-3 Loans" means the "Term B-3 Loans" under this Credit Agreement as in effect prior to giving effect to Amendment No. 6.

"Term B-4 Lenders" means, prior to the funding of the initial Term B-4 Loans on the Amendment No. 6 Effective Date, the Additional Term B-4 Lender and any holder of a Converted Term B-3 Loan, and from and after funding of the Term B-4 Loans, those Lenders holding any Term B-4 Loans (including any Incremental Term Loans that are Term B-4 Loans), together with their successors and permitted assigns.

"Term B-4 Loan Termination Date" means the date that is the seventh anniversary of the Amendment No. 6 Effective Date.

"Term B-4 Loans" has the meaning provided in Section 2.01(e).

"Term B-4 Note" means the promissory notes substantially in the form of Exhibit 2.13-6, if any, given to evidence the Term B-4 Loans, as amended, restated, modified, supplemented, extended, renewed or replaced.

"Term Benchmark" when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted Term SOFR Rate, the Adjusted EURIBOR Rate, the Adjusted Term CORRA Rate, the Adjusted STIBOR Rate, the Adjusted CIBOR Rate, the Adjusted TIIE Rate, the Adjusted AUD Rate, the Adjusted Brazilian Real Rate or the Adjusted TIBOR Rate.

"Term CORRA" means, for any calculation with respect to any Term Benchmark Borrowing denominated in Canadian Dollars, the Term CORRA Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "Periodic Term CORRA Determination Day") that is two (2) Business Days prior to the first day of such Interest Period, as such rate is published by the Term CORRA Administrator; *provided*, *however*, that if as of 1:00 p.m. (Toronto time) on any Periodic Term CORRA Determination Day the Term CORRA Reference Rate for the applicable tenor has not been published by the Term CORRA Administrator and a Benchmark Replacement Date with respect to the Term CORRA Reference Rate has not occurred, then Term CORRA will be the Term CORRA Reference Rate for such tenor as published by the Term CORRA Administrator on the first preceding Business Day for which such Term CORRA Reference Rate for such tenor was published by the Term CORRA Administrator so long as such first preceding Business Day is not more than five (5) Business Days prior to such Periodic Term CORRA Determination Day.

"Term CORRA Administrator" means Candeal Benchmark Administration Services Inc., TSX Inc., or any successor administrator.

"Term CORRA Notice" means a notification by the Administrative Agent to the Lenders and the Parent Borrower of the occurrence of a Term CORRA Reelection Event.

57

"Term CORRA Reelection Event" means the determination by the Administrative Agent that (a) Term CORRA has been recommended for use by the Relevant Governmental Body, and is determinable for any Available Tenor, (b) the administration of Term CORRA is administratively feasible for the Administrative Agent and (c) a Benchmark Transition Event, has previously occurred resulting in a Benchmark Replacement in accordance with Section 3.03 that is not Term CORRA.

"Term CORRA Reference Rate" means the forward-looking term rate based on CORRA.

"Term SOFR Determination Day" has the meaning assigned to it under the definition of "Term SOFR Reference Rate".

"Term SOFR Rate" means, with respect to any Term Benchmark Borrowing denominated in Dollars and for any tenor comparable to the applicable Interest Period, the Term SOFR Reference Rate at approximately 5:00 a.m., Chicago time, two U.S. Government Securities Business Days prior to the commencement of such tenor comparable to the applicable Interest Period, as such rate is published by the CME Term SOFR Administrator.

"Term SOFR Reference Rate" means, for any day and time (such day, the "Term SOFR Determination Day"), with respect to any Term Benchmark Borrowing denominated in Dollars and for any tenor comparable to the applicable Interest Period, the rate per annum published by the CME Term SOFR Administrator and identified by the Administrative Agent as the forward-looking term rate based on SOFR. If by 5:00 pm (New York City time) on such Term SOFR Determination Day, the "Term SOFR Reference Rate" for the applicable tenor has not been published by the CME Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Rate has not occurred, then, so long as such day is otherwise a U.S. Government Securities Business Day, the Term SOFR Reference Rate for such Term SOFR Determination Day will be the Term SOFR Reference Rate as published in respect of the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate was published by the CME Term SOFR Administrator, so long as such first preceding U.S. Government Securities Business Day is not more than five (5) U.S. Government Securities Business Days prior to such Term SOFR Determination Day.

"Term Loan Extension Request" has the meaning specified in Section 2.17(a).

"Term Loans" means the Term B-4 Loans and any other Class established pursuant to an Additional Credit Extension Amendment.

"TIBOR Rate" means, with respect to any Term Benchmark Borrowing denominated in Japanese Yen and for any Interest Period, the TIBOR Screen Rate two Business Days prior to the commencement of such Interest Period.

"TIBOR Screen Rate" means the Tokyo interbank offered rate administered by the Ippan Shadan Hojin JBA TIBOR Administration (or any other person which takes over the administration of that rate) for the relevant currency and period displayed on page DTIBOR01 of the Reuters screen (or, in the event such rate does not appear on such Reuters page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate as selected by the Administrative Agent from time to time in its reasonable discretion) as published at approximately 1:00 p.m. Japan time two Business Days prior to the commencement of such Interest Period.

"Ticketmaster Merger" means the merger of Ticketmaster Entertainment, Inc. and Live Nation Merger Sub, an indirect wholly-owned Subsidiary of the Parent Borrower, pursuant to the Agreement and Plan of Merger, dated as of February 10, 2009, among Ticketmaster Entertainment, LLC, the Parent Borrower and Live Nation Merger Sub.

"TIIE Rate" means, with respect to any Term Benchmark Borrowing denominated in Mexican Pesos and for any Interest Period, the TIIE Screen Rate at approximately 11:00 a.m., Mexico City time, on the first day of such Interest Period (and, if such day is not a Business Day, then on the immediately preceding Business Day).

58

"TIIE Screen Rate" means the rate per annum equal to the Equilibrium Interbank Rate (Tasa de Interes Interbancaria de Equilibrio) for Mexican Pesos with a tenor equal to such Interest Period, as determined by Banco de Mexico and most recently published in the Mexican Official Gazette (Diario Oficial de la Federacion), as determined by the Administrative Agent (or, in the event such rate does not appear in such Official Gazette, any other rate determined by the Administrative Agent to be a similar rate published by Banco de Mexico, or on the appropriate page of such other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion).

"Total Assets" of any Person means the total assets of such Person as set forth on such Person's most recent balance sheet.

"Transaction Agreement Date" has the meaning provided in Section 1.11.

"Transactions" means (i) the borrowing of the Term B-4 Loans on the Amendment No. 6 Effective Date, (ii) the conversion of Term B-3 Loans of the Term B-3 Amendment No. 6 Converting Lenders into Term B-4 Loans, (iii) the establishment of the Delayed Draw Term A Commitments, (iv) the repayment of the Term A-2 Loans, the Term B-3 Loans that are not Converted Term B-3 Loans, the Original Revolving Loans and the Original Swingline Loans, (v) the termination of the Original Revolving Commitments, (vi) the redemption or satisfaction of the 2022 Senior Notes (as defined in Amendment No. 3), (vii) the incurrence of the 2027 Senior Notes, (viii) the establishment of the 2020-1 Incremental Revolving Commitments (as defined in Amendment No. 7) on the Amendment No. 7 Effective Date, (ix) the actions taken pursuant to Amendment No. 8, (x) the prepayment of the Delayed Draw Term A Loans and the other transactions taken pursuant to Amendment No. 11 ~~and~~, xi) the establishment of the Venue Expansion Revolving Commitments (as defined in Amendment No. 12) on the Amendment No. 12 Effective Date, and (xii) the payment of fees and expenses in connection with each of the foregoing clauses i) through (~~x~~xi).

"Treasury Management Agreement" means any agreement governing the provision of treasury or cash management services, including deposit accounts, funds transfer, automated clearinghouse, zero balance accounts, returned check concentration, controlled disbursement, lockbox, purchase cards, account reconciliation and reporting and trade finance services.

"Treasury Management Bank" has the meaning provided in the definition of "Borrower Obligations".

"Triggering Amount" has the meaning provided in the definition of "Springing Triggering Debt Condition".

"Triggering Date" with respect to any Triggering Debt Instrument, the date that is ninety-one (91) days prior to the stated maturity of such Triggering Debt Instrument.

"Triggering Debt Instrument" means any of the (x) Term B-4 Loans, (y) the 2027 Senior Secured Notes and (z) the 2027 Senior Unsecured Notes.

"Type" means, with respect to any Revolving Loan or Term Loan, its character as a Base Rate Loan, RFR Loan or a Term Benchmark Loan.

"UCC" means the Uniform Commercial Code in effect in any applicable jurisdiction from time to time.

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Unadjusted Benchmark Replacement" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"United States" or "U.S." means the United States of America.

"United States Tax Compliance Certificate" has the meaning provided in Section 3.01(e).

"Unreimbursed Amount" has the meaning provided in Section 2.03(c)(i).

"Unrestricted Subsidiary" means any Subsidiary acquired, purchased or invested in after the Amendment No. 6 Effective Date that is designated as an Unrestricted Subsidiary hereunder by written notice from the Parent Borrower to the Administrative Agent; provided that the Parent Borrower shall only be permitted to so designate a new Unrestricted Subsidiary so long as (a) no Default or Event of Default has occurred and is continuing or would result therefrom; (b) after giving effect on a pro forma basis to such designation, as of the last day of the most recently ended fiscal quarter at the end of which financial statements were required to have been delivered pursuant to Section 7.01(a) or (b) (or, prior to such first required delivery date for such financial statements pursuant to either such Section, as of the last day of the most recent period referred to in the second sentence of Section 6.05), the Parent Borrower would be in compliance with Section 8.10; (c) such Unrestricted Subsidiary shall be solely capitalized (to the extent capitalized by any Credit Party) through one or more investments permitted by Section 8.02(k), (r) or (aa); (d) without duplication of clause (c), when any pre-existing Subsidiary is designated as an Unrestricted Subsidiary, the portion of the aggregate fair value of the assets of such newly designated Unrestricted Subsidiary (proportionate to the applicable Borrower's or Subsidiary's equity interest in such Unrestricted Subsidiary) at the time of the designation thereof as an Unrestricted Subsidiary shall be treated as Investments pursuant to Section 8.02(k) or (aa) (it being understood that such aggregate fair value shall be set forth in a certificate of a Responsible Officer of the Parent Borrower, which certificate (x) shall be dated as of the date such subsidiary is designated as an Unrestricted Subsidiary, (y) shall have been delivered by the Parent Borrower to the Administrative Agent (for delivery to the Lenders) on or prior to the date of such designation and (z) shall set forth a reasonably detailed calculation of such aggregate fair value); and (e) with respect to the Existing High Yield Notes and any other material Indebtedness for borrowed money (to the extent the concept of an Unrestricted Subsidiary exists in such other material Indebtedness) and, in each case, any refinancing Indebtedness thereof, such Subsidiary shall have been designated an Unrestricted Subsidiary (or otherwise not be subject to the covenants and defaults except on a basis substantially similar to this Credit Agreement) under the documents governing such material Indebtedness permitted to be incurred or maintained herein. Any Unrestricted Subsidiary may be designated by the Parent Borrower to be a Restricted Subsidiary for purposes of this Credit Agreement (each, a "Subsidiary Redesignation"); provided that (i) no Default or Event of Default has occurred and is continuing or would result therefrom; (ii) after giving effect on a Pro Forma Basis to such designation, as of the last day of the most recently ended fiscal quarter at the end of which financial statements were required to have been delivered pursuant to Section 7.01(a) or (b) (or, prior to such first required delivery date for such financial statements pursuant to either such Section, as of the last day of the most recent period referred to in the second sentence of Section 6.05), the Parent Borrower would be in compliance with Section 8.10; (iii) all representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on and as of the date of such Subsidiary Redesignation (both before and after giving effect thereto), except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date (provided that representations and warranties that are qualified by materiality shall be true and correct in all respects); and (iv) the Parent Borrower shall have delivered to the Administrative Agent a certificate executed by a Responsible Officer, certifying to the best of such officer's knowledge, compliance with the requirements of preceding clauses (i) through (iii), inclusive, and containing the calculations and information required to evidence the same. The term "Unrestricted Subsidiary" shall also include any subsidiary of an Unrestricted Subsidiary. An Unrestricted Subsidiary, for as long as such Subsidiary remains an Unrestricted Subsidiary, shall be deemed to not be a Subsidiary or Borrower for all purposes under the Credit Documents. Notwithstanding the foregoing, a Foreign Borrower shall in no event be an Unrestricted Subsidiary.

60

"U.S. Government Securities Business Day" means any day except for (i) a Saturday, (ii) a Sunday or (iii) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"U.S. Lender" means any Lender that is a "United States person" as defined in Section 7701(a)(30) of the Internal Revenue Code.

"U.S. Pledge Agreement" means the pledge agreement substantially in the form of Exhibit 1.01C (it being understood that the pledgors party thereto and schedules thereto shall be reasonably satisfactory to the Administrative Agent), given by the Domestic Credit Parties, as pledgors, to the Collateral Agent to secure the Obligations, and any other pledge agreements that may be given by any Person pursuant to the terms hereof, in each case as the same may be amended and modified from time to time.

"U.S. Security Agreement" means the security agreement substantially in the form of Exhibit 1.01D (it being understood that the grantors party thereto and schedules thereto shall be reasonably satisfactory to the Administrative Agent), given by Domestic Credit Parties, as grantors, to the Collateral Agent to secure the Obligations, and any other security agreements that may be given by any Person pursuant to the terms hereof, in each case as the same may be amended and modified from time to time.

"U.S. Special Resolution Regime" has the meaning assigned to it in Section 11.22.

"Venue" means any location of the Parent Borrower or one of its Subsidiaries which is used for the staging of concerts or other forms of live entertainment.

"Venue Construction Indebtedness" means Indebtedness incurred by a Non-Wholly Owned Subsidiary (such Non-Wholly Owned Subsidiary incurring such Indebtedness in such capacity a "Venue Construction Subsidiary") for the purpose of financing the building or construction of a Venue that will be owned by such Non-Wholly Owned Subsidiary upon the completion thereof (and/or to finance the costs or expenses to be incurred in connection with such building or construction of such Venue).

"Venue Construction Subsidiary" has the meaning assigned to it in the definition of "Venue Construction Indebtedness".

"Venue Construction Subsidiary Percentage" means, as to any Venue Construction Subsidiary, the percentage of outstanding Equity Interests therein held by Parent Borrower or any of its Subsidiaries (other than such Venue Construction Subsidiary).

"Venue Expansion Revolving Commitment" means, for each Venue Expansion Revolving Lender, the commitment of such Lender to make Venue Expansion Revolving Loans (and to share in Venue Expansion Revolving Obligations) hereunder, under documentation relating to Incremental Revolving Commitments or pursuant to an Additional Credit Extension Amendment, in each case in the amount of such Lender's Venue Expansion Revolving Committed Amount, as such commitment may be increased or decreased pursuant to the other provisions hereof.

"Venue Expansion Revolving Commitment Percentage" means, for each Venue Expansion Revolving Lender, a fraction (expressed as a percentage carried to the ninth decimal place), the numerator of which is such Venue Expansion Revolving Lender's Venue Expansion Revolving Committed Amount and the denominator of which is the Aggregate Venue Expansion Revolving Committed Amount. The Venue Expansion Revolving Commitment Percentages as of the Amendment No. 12 Effective Date are set forth in Schedu e I to Amendment No. 12 under the column entitled "Venue Expansion Revolving Commitment Percentage".

"Venue Expansion Revolving Committed Amount" means, for each Venue Expansion Revolving Lender the amount set forth in Schedule I to Amendment No. 12 under the row applicable to such Lender in the column entitled "Venue Expansion Revolving Committed Amount", in the Assignment and Assumption by which such Venue Expansion Revolving Lender became a Venue Expansion Revolving Lender or in any documentation relating to Incremental

Revolving Commitments or Additional Credit Extension Amendments, as such Venue Expansion Revolving Committed Amount may be reduced or increased pursuant to the other provisions hereof.

"Venue Expansion Revolving Facility" means the Aggregate Venue Expansion Revolving Commitments and the provisions herein related to the Venue Expansion Revolving Loans.

"Venue Expansion Revolving Lenders" means the Persons listed on Schedule I to Amendment No. 12 under the heading "Venue Expansion Revolving Lenders" together with their successors and permitted assigns, and any Person that shall be designated a "Venue Expansion Revolving Lender" pursuant to Incremental Revolving Commitments or an Additional Credit Extension Amendment in accordance with the provisions hereof.

"Venue Expansion Revolving Loan" has the meaning provided in Section 2.01(a)(iv).

"Venue Expansion Revolving Notes" means the promissory notes, if any, given to evidence the Venue Expansion Revolving Loans, as amended, restated, modified, supplemented, extended, renewed or replaced. A form of Venue Expansion Revolving Note is attached as Exhibit 2.13-7.

"Venue Expansion Revolving Obligations" means the Venue Expansion Revolving Loans.

"Weighted Average Life to Maturity" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: i) the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payment of principal, including payment at final maturity, in respect thereof, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment by (ii) the then outstanding principal amount of such Indebtedness.

"Wholly Owned Subsidiary" means, with respect to any direct or indirect Subsidiary of any Person, that one hundred percent (100%) of the Capital Stock with ordinary voting power issued by such Subsidiary (other than directors' qualifying shares and investments by foreign nationals mandated by applicable Law) is beneficially owned, directly or indirectly, by such Person.

"Withholding Agent" means any Credit Party and the Applicable Agent.

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedu e and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

**1.02    Interpretive Provisions.**

With reference to this Credit Agreement and each other Credit Document, unless otherwise specified herein or in such other Credit Document:

ARTICLE I       The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on

62

such amendments, supplements or modifications set forth herein or in any other Credit Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and permitted assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Credit Document, shall be construed to refer to such Credit Document in its entirety and not to any particular provision thereof, (iv) all references in a Credit Document to "Articles," "Sections," "Exhibits" and "Schedules" shall be construed to refer to articles and sections of, and exhibits and schedules to, the Credit Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(a)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including," the words "to" and "until" each mean "to but excluding," and the word "through" means "to and including."

(b)    Section headings herein and in the other Credit Documents are included for convenience of reference only and shall not affect the interpretation of this Credit Agreement or any other Credit Document.

(c)    If a new Class of Revolving Commitments is established after the Amendment No. ~~11~~12 Effective Date pursuant to an Additional Credit Extension Amendment, references to "Revolving Commitments" herein shall mean all Classes of Revolving Commitments, unless the Additional Credit Extension Amendment provides otherwise with respect to any one or more particular references to "Revolving Commitments"; and references to "Revolving Facility," "Revolving Lender" and "Revolving Loan" shall also be subject to such rule of interpretation.

**1.03    Accounting Terms and Provisions.**

(a)    As used herein, "GAAP" means general y accepted accounting principles in effect in the United States as set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board from time to time applied on a consistent basis, subject to the provisions of this Section 1.03. All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financia calculations) required to be submitted pursuant to this Credit Agreement shall be prepared in conformity with, GAAP applied on a consistent basis in a manner consistent with that used in preparing the audited financial statements referenced in Section 6.05, except as otherwise specifically prescribed herein.

(b)    Notwithstanding any provision herein to the contrary, determinations of (i) the Consolidated Net Leverage Ratio, the Consolidated Total Leverage Ratio and the Senior Secured Leverage Ratio, for the purposes of determining compliance with covenants, conditions and the Incremental Loan Facilities and (ii) revenues for determining Material Subsidiaries and Immaterial Subsidiaries shall be made on a Pro Forma Basis.

(c)    If at any time any change in GAAP or in the consistent application thereof would affect the computation of any financial ratio or requirement set forth in any Credit Document, the Parent Borrower may, after giving written notice thereof to the Administrative Agent, determine all such computations on such a basis; provided that if any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Credit Document, and either the Parent Borrower or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Parent Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided further that, until so amended (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Parent Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Credit Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP. Notwithstanding any other provision contained herein, all

terms of an accounting or financial nature used herein shall be construed, and a l computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Financial Accounting Standards Board Accounting Standards Codification Topic 825 (or any other Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Parent Borrower or any of its Subsidiaries at "fair value", as defined therein.

(d)    Notwithstanding any change in GAAP after the Amendment No. 2 Effective Date that would require lease obligations that would be treated as operating leases as of the Amendment No. 2 Effective Date to be classified and accounted for as capital leases or otherwise reflected on the consolidated balance sheet of the Consolidated Group, such obligations shall continue to be treated as operating leases and be excluded from the definition of "Indebtedness" and other relevant definitions for all purposes under this Credit Agreement.

(e)    All references herein to consolidated financial statements of the Parent Borrower and its Subsidiaries or to the determination of any amount for the Parent Borrower and its Subsidiaries on a consolidated basis or any similar reference shall, in each case, be deemed to include each variable interest entity that the Parent Borrower is required to consolidate pursuant to Financial Accounting Standards Board Accounting Standards Codification Topic 810 as if such variable interest entity were a Subsidiary as defined herein.

### 1.04    Rounding.

Any financial ratios required to be maintained by the Parent Borrower pursuant to this Credit Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

### 1.05    Times of Day.

Unless otherwise provided, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

### 1.06    Exchange Rates; Currency Equivalents.

The Applicable Agent or the applicable L/C Issuer, as applicable, shall determine the Spot Rates as of each Revaluation Date to be used for calculating Dollar Equivalent amounts of L/C Credit Extensions and Outstanding Amounts denominated in Alternative Currencies. Such Spot Rates shall become effective as of such Revaluation Date and shall be the Spot Rates employed in converting any amounts between the applicable currencies until the next Revaluation Date to occur. Except for purposes of financial statements delivered hereunder or calculating covenants hereunder or except as otherwise provided herein, the applicable amount of any currency (other than Dollars) for purposes of the Credit Documents shall be such Dollar Equivalent amount as so determined by the Applicable Agent or the applicable L/C Issuer. For purposes of complying with covenants whose limitations or thresholds are denominated in United States dollars, the Dollar Equivalent of all amounts necessary to compute such compliance shall be used.

### 1.07    Additional Alternative Currencies.

Any Borrower may from time to time request that an additional currency be added as "Alternative Currency" provided that such requested currency is a lawful currency (other than Dollars) that is readily available and freely transferable and convertible into Dollars. Such request shall be subject to the approval of the Administrative Agent and each Multicurrency Revolving Lender, and, to the extent such Alternative Currency is proposed to be available under the Limited Currency Revolving Facility, each Limited Currency Revolving Lender; provided that if such "Alternative Currency" is to be used for Letters of Credit only, such request shall be subject only to the approval of the Administrative Agent and the Multicurrency L/C Issuer.

64

**1.08    Additional Borrowers.**

Notwithstanding anything in Section 11.01 to the contrary, following the Closing Date, the Parent Borrower may add one or more of its Foreign Subsidiaries that is a Wholly Owned Subsidiary as an additional Foreign Borrower under the Limited Currency Revolving Facility or Multicurrency Revolving Facility by delivering to the Administrative Agent a Foreign Borrower Agreement executed by such Subsidiary and the Parent Borrower. After (i) five Business Days have elapsed after such delivery and (ii) receipt by each Lender and the Administrative Agent of such documentation and other information reasonably requested by such Lender or the Administrative Agent, as the case may be (which documentation and information shall be reasonably satisfactory to such Lender), for purposes of complying with all necessary "know your customer" or other similar checks under all applicable laws and regulations, such Foreign Subsidiary shall for all purposes of this Credit Agreement be a Foreign Borrower hereunder; provided that each Foreign Borrower shall also be a Foreign Guarantor. Any obligations in respect of borrowings by any Foreign Subsidiary under this Credit Agreement will constitute "Obligations," "Foreign Obligations" and "Secured Obligations" for all purposes of the Credit Documents. If the applicable additional Foreign Borrower is organized or incorporated under the laws of, or for applicable Tax purposes is resident of or treated as engaged in a trade or business in, or having a paying agent in, any jurisdiction other than a jurisdiction under the laws of which at least one of the then-existing Borrowers is organized or incorporated on the date such Foreign Borrower Agreement is delivered to the Applicable Agent, as a condition to adding such Foreign Borrower, there shall be an amendment to the Credit Documents (including, without limitation, to Section 3.01 of this Credit Agreement and the definition of "Excluded Taxes"), if such amendment is reasonably necessary or appropriate as mutually determined by the Administrative Agent and Parent Borrower which amendment must be as mutually agreed by the Administrative Agent, the Parent Borrower, the applicable additional Foreign Borrower and each Limited Currency Revolving Lender and/or Multicurrency Revolving Lender (as applicable) (provided that no such amendment shall materially adversely affect the rights of any Lender that has not consented to such amendment). Upon the execution by the Parent Borrower and a Foreign Borrower and delivery to the Administrative Agent of a Foreign Borrower Termination with respect to such Foreign Borrower, such Foreign Borrower shall cease to be a Foreign Borrower and a party to this Credit Agreement; provided that no Foreign Borrower Termination will become effective as to any Foreign Borrower (other than to terminate such Foreign Borrower's right to make further Borrowings under this Credit Agreement) at a time when any Loan to or Letter of Credit issued to such Foreign Borrower shall be outstanding hereunder. Promptly following receipt of any Foreign Borrower Agreement or Foreign Borrower Termination, the Administrative Agent shall send a copy thereof to each Lender. Notwithstanding the foregoing, no such Foreign Subsidiary may become a Foreign Borrower if any Limited Currency Revolving Lender or Multicurrency Revolving Lender would be prohibited by applicable Law from making loans to such Foreign Subsidiary.

**1.09    Change of Currency.**

(a)    Each obligation of the Borrowers to make a payment denominated in the national currency unit of any member state of the European Union that adopts the Euro as its lawful currency after the Amendment No. 11 12 Effective Date shall be redenominated into Euro at the time of such adoption (in accordance with the EMU Legislation). If, in relation to the currency of any such member state, the basis of accrual of interest expressed in this Credit Agreement in respect of that currency shall be inconsistent with any convention or practice in the London interbank market for the basis of accrual of interest in respect of the Euro, such expressed basis shall be replaced by such convention or practice with effect from the date on which such member state adopts the Euro as its lawful currency; provided that if any Borrowing in the currency of such member state is outstanding immediately prior to such date, such replacement shall take effect, with respect to such Borrowing, at the end of the then current Interest Period.

(b)    Each provision of this Credit Agreement shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time specify to be appropriate to reflect the adoption of the Euro by any member state of the European Union and any relevant market conventions or practices relating to the Euro.

65

(c)     Each provision of this Credit Agreement also shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time specify to be appropriate to reflect a change in currency of any other country and any relevant market conventions or practices relating to the change in currency.

**1.10    Letter of Credit Amounts.**

Unless otherwise provided, all references herein to the amount of a Letter of Credit at any time shall be deemed to mean the Dollar Equivalent of the maximum face amount available to be drawn of such Letter of Credit after giving effect to all increases thereof contemplated by such Letter of Credit or the Issuer Documents related thereto, whether or not such maximum face amount is in effect at such time.

**1.11    Limited Condition Acquisitions.**

In connection with any action being taken in connection with a Limited Condition Acquisition for purposes of determining

(a)     whether any Indebtedness that is being incurred in connection with such Limited Condition Acquisition is permitted to be incurred in compliance with Section 8.03 or Section 2.01(f);

(b)     whether any Lien being incurred in connection with such Limited Condition Acquisition is permitted to be incurred in accordance with Section 8.01 or Section 2.01(f);

(c)     whether any other transaction undertaken or proposed to be undertaken in connection with such Limited Condition Acquisition complies with the covenants or agreements contained in this Credit Agreement; and

(d)     any calculation of the ratios or baskets, including the Consolidated Net Leverage Ratio, Senior Secured Leverage Ratio, Consolidated Total Leverage Ratio, Consolidated Net Income, Consolidated EBITDA and baskets determined by reference to Consolidated EBITDA, Consolidated Total Assets and Consolidated Tangible Assets and whether a Default or Event of Default exists in connection with the foregoing (other than in the case of each of clause (a), (b), (c) and (d) above, with respect to any Credit Extension under the Revolving Facility):

At the option of the Borrower (the Borrower's election to exercise such option in connection with any Limited Condition Acquisition, an "LCA Election"), the date that the definitive agreement for such Limited Condition Acquisition is entered into (the "Transaction Agreement Date") may be used as the applicable date of determination, as the case may be, in each case with such pro forma adjustments as are appropriate and consistent with the pro forma adjustment provisions set forth in the definition of "Pro Forma Basis," Consolidated EBITDA or "Consolidated Net Income". For the avoidance of doubt, if the Parent Borrower makes an LCA Election, (a) any fluctuation or change in the Consolidated Net Leverage Ratio, Senior Secured Leverage Ratio, Consolidated Total Leverage Ratio, Consolidated Net Income, Consolidated EBITDA, Consolidated Total Assets and/or Consolidated Tangible Assets of the Parent Borrower from the Transaction Agreement Date to the date of consummation of such Limited Condition Acquisition will not be taken into account for purposes of determining whether any Indebtedness or Lien that is being incurred in connection with such Limited Condition Acquisition is permitted to be incurred, or whether any other transaction undertaken in connection with such Limited Condition Acquisition by the Parent Borrower or any of the Restricted Subsidiaries complies with the Credit Documents and (b) after the Transaction Agreement Date and until such Limited Condition Acquisition is consummated or the definitive agreements in respect thereof are terminated or expire, such Limited Condition Acquisition and all transactions proposed to be undertaken in connection therewith (including without limitation the incurrence of Indebtedness and Liens) will be given Pro Forma Effect as if they occurred at the beginning of the most recently completed four consecutive fiscal quarter period for which financial statements have been delivered pursuant to Section 7.01(a) or (b) and ended on or prior to the Transaction Agreement Date when determining compliance of other transactions (including without limitation the incurrence of Indebtedness and Liens unrelated to such Limited Condition Acquisition) that are consummated after the Transaction Agreement Date and on or prior to the date of consummation of such Limited Condition Acquisition and

any such transactions (including without limitation any incurrence of Indebtedness and the use of proceeds thereof) will be deemed to have occurred on the Transaction Agreement Date and be outstanding thereafter for purposes of calculating any baskets or ratios under the Credit Documents after the Transaction Agreement Date and before the date of consummation of such Limited Condition Acquisition (or the date the definitive agreements in respect thereof are terminated or expire).

**1.12    Divisions.**

For all purposes under the Credit Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

**1.13    Interest Rates; Benchmark Notification.**

The interest rate on a Loan denominated in dollars or an Alternative Currency may be derived from an interest rate benchmark that may be discontinued or is, or may in the future become, the subject of regulatory reform. Upon the occurrence of a Benchmark Transition Event or a Term CORRA Reelection Event, Section 3.03(b) provides a mechanism for determining an alternative rate of interest. The Administrative Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to, the administration, submission, performance or any other matter related to any interest rate used in this Credit Agreement, or with respect to any alternative or successor rate thereto, or replacement rate thereof, including without limitation, whether the composition or characteristics of any such alternative, successor or replacement reference rate will be similar to, or produce the same value or economic equivalence of, the existing interest rate being replaced or have the same volume or liquidity as did any existing interest rate prior to its discontinuance or unavailability. The Administrative Agent and its affiliates and/or other related entities may engage in transactions that affect the calculation of any interest rate used in this Credit Agreement or any alternative, successor or alternative rate (including any Benchmark Replacement) and/or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower. The Administrative Agent may select information sources or services in its reasonable discretion to ascertain any interest rate used in this Credit Agreement, any component thereof, or rates referenced in the definition thereof, in each case pursuant to the terms of this Credit Agreement, and shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

**ARTICLE II**

**COMMITMENTS AND CREDIT EXTENSIONS**

**2.01    Commitments.**

Subject to the terms and conditions set forth herein:

(a)    Revolving Loans.

(i)    Dollar Revolving Loans. On and following the Amendment No. ~~11~~12 Effective Date, each Dollar Revolving Lender severally agrees to make revolving credit loans (the "Dollar Revolving Loans") in Dollars to the Parent Borrower from time to time on any Business Day prior to the Revolving Termination Date, provided that after giving effect to any such Dollar Revolving Loan, (x) with respect to the Dollar Revolving Lenders collectively, the Outstanding Amount of Dollar Revolving Obligations shall not exceed TWO HUNDRED SIXTY MILLION DOLLARS ($260 MILLION) (as such amount may be increased pursuant to Section 2.01(g) or decreased pursuant to Section 2.07 or 9.02(a), the "Aggregate

67

Dollar Revolving Committed Amount") and (y) with respect to each Dollar Revolving Lender individually, such Lender's Dollar Revolving Commitment Percentage of Dollar Revolving Obligations shall not exceed its respective Dollar Revolving Committed Amount. Dollar Revolving Loans may consist of Base Rate Loans, Term Benchmark Loans, RFR Loans or a combination thereof, as the Parent Borrower may request. Dollar Revolving Loans may be repaid and reborrowed in accordance with the provisions hereof.

(ii)    Limited Currency Revolving Loans. On and following the Amendment No. 1112 Effective Date, each Limited Currency Revolving Lender severally agrees to make revolving credit loans (the "Limited Currency Revolving Loans") in Dollars, Euros or Sterling to the Parent Borrower and each Foreign Borrower from time to time on any Business Day prior to the Revolving Termination Date; provided that after giving effect to any such Limited Currency Revolving Loan, (x) with respect to the Limited Currency Revolving Lenders collectively, the Outstanding Amount of Limited Currency Revolving Obligations shall not exceed SEVEN HUNDRED EIGHTY MILLION DOLLARS ($780 MILLION) (as such amount may be increased pursuant to Section 2.01(g) or decreased in accordance with the Section 2.07 or 9.02(a), the "Aggregate Limited Currency Revolving Committed Amount"), (y) with respect to each Limited Currency Revolving Lender individually, such Lender's Limited Currency Revolving Commitment Percentage of Limited Currency Revolving Obligations shall not exceed its respective Limited Currency Revolving Committed Amount and (z) the Outstanding Amount of all Limited Currency Revolving Obligations and Multicurrency Revolving Obligations denominated in an Alternative Currency shall not exceed the Alternative Currency Sublimit. Limited Currency Revolving Loans denominated in Dollars may consist of Base Rate Loans, Term Benchmark Loans, RFR Loans or a combination thereof, as the Borrowers may request. Limited Currency Revolving Loans denominated in Euros or Sterling must consist of Term Benchmark Loans or RFR Loans.

(iii)    Multicurrency Revolving Loans. On and following the Amendment No. 1112 Effective Date, each Multicurrency Revolving Lender severally agrees to make revolving credit loans (the "Multicurrency Revolving Loans") in one or more Approved Currencies to the Parent Borrower and each Foreign Borrower from time to time on any Business Day prior to the Revolving Termination Date; provided that after giving effect to any such Multicurrency Revolving Loan, (x) with respect to the Multicurrency Revolving Lenders collectively, the Outstanding Amount of Multicurrency Revolving Obligations shall not exceed TWO HUNDRED SIXTY MILLION DOLLARS ($260 MILLION) (as such amount may be increased pursuant to Section 2.01(g) or decreased in accordance with the Section 2.07 or 9.02(a), the "Aggregate Multicurrency Revolving Committed Amount"), (y) with respect to each Multicurrency Revolving Lender individually, such Lender's Multicurrency Revolving Commitment Percentage of Multicurrency Revolving Obligations shall not exceed its respective Multicurrency Revolving Committed Amount and (z) the Outstanding Amount of all Limited Currency Revolving Obligations and Multicurrency Revolving Obligations denominated in an Alternative Currency shall not exceed the Alternative Currency Sublimit. Multicurrency Revolving Loans denominated in Dollars may consist of Base Rate Loans, Term Benchmark Loans, RFR Loans or a combination thereof, as the Borrowers may request. Multicurrency Revolving Loans denominated in an Alternative Currency must consist of Term Benchmark Loans or RFR Loans.

(iv)    Venue Expansion Revolving Loans. On and following the Amendment No. 12 Effective Date, each Venue Expansion Revolving Lender severally agrees to make revolving credit loans (the "Venue Expansion Revolving Loans") in Dollars to the Parent Borrower from time to time on any Business Day prior to the Revolving Termination Date; provided that after giving effect to any such Venue Expansion Revolving Loan, (x) with respect to the Venue Expansion Revolving Lenders collectively, the Outstanding Amount of Venue Expansion Revolving Obligations shall not exceed FOUR HUNDRED MILLION DOLLARS ($400 MILLION) (as such amount may be increased pursuant to Section 2.01(g) or decreased in accordance with the Section 2.07 or 9.02(a), the "Aggregate Venue Expansion Revolving Committed Amount") and (y) with respect to each Venue Expansion Revolving Lender individually, such Lender's Venue Expansion Revolving Commitment Percentage of Venue Expansion Revolving Obligations shall not exceed its respective Venue Expansion Revolving Committed Amount. Venue Expansion Revolving Loans denominated in Dollars may consist of Base Rate Loans, Term Benchmark Loans, RFR Loans or a

combination thereof, as the Borrowers may request. Venue Expansion Revolving Loans may be repaid and reborrowed in accordance with the provisions hereof.

(b)    Letters of Credit. On and after the Amendment No. ~~11~~12 Effective Date, (x) each L/C Issuer, in reliance upon the commitments of the Revolving Lenders set forth herein, agrees (A) to issue Letters of Credit for the account of the Parent Borrower (or for the account of any member of the Consolidated Group, but in such case the Parent Borrower will remain obligated to reimburse such L/C Issuer for any and all drawings under such Letter of Credit, and the Parent Borrower acknowledges that the issuance of Letters of Credit for the account of members of the Consolidated Group inures to the benefit of the Parent Borrower, and the Parent Borrower acknowledges that the Parent Borrower's business derives substantial benefits from the business of such members of the Consolidated Group) on any Business Day, (B) to amend or extend Letters of Credit previously issued hereunder, and (C) to honor drawings under Letters of Credit; and (y) each L/C Revolving Lender severally agrees to purchase from the such L/C Issuer a participation interest in each Letter of Credit issued hereunder in an amount equal to the Dollar Equivalent of such L/C Revolving Lender's L/C Commitment Percentage thereof (and, in each case, with respect to the purchase of a participation in any Alternative Currency Letter of Credit, the purchase of such participation will also occur on each Revaluation Date); provided that (A) the Outstanding Amount of L/C Obligations shall not exceed TWO HUNDRED FIFTY MILLION DOLLARS ($250 MILLION) (as such amount may be decreased in accordance with the provisions hereof, the "L/C Sublimit"), (B) the Outstanding Amount of all Alternative Currency L/C Obligations shall not exceed the Alternative Currency L/C Sublimit, (C) with regard to the Revolving Lenders collectively, the Outstanding Amount of Revolving Obligations shall not exceed the Aggregate Revolving Committed Amount, (D) with regard to each Revolving Lender individually, such Revolving Lender's Aggregate Revolving Commitment Percentage of Revolving Obligations shall not exceed its respective Aggregate Revolving Committed Amount, (E) the Outstanding Amount of all Dollar Revolving Obligations shall not exceed the Dollar Equivalent of the Aggregate Dollar Revolving Committed Amount, (F) the Outstanding Amount of all Limited Currency Revolving Obligations shall not exceed the Dollar Equivalent of the Aggregate Limited Currency Revolving Committed Amount, (G) [Reserved], (H) the L/C Obligations do not exceed the L/C Committed Amount, and (I) no L/C Issuer shall be required to (but, in its sole discretion, may) issue, amend, extend or increase any Letter of Credit, if after giving effect thereto, there would be L/C Obligations arising from Letters of Credit issued by such L/C Issuer in excess of its Letter of Credit Cap (provided that this clause (I) shall not be construed to invalidate any L/C Obligations of any L/C Issuer in place as of the Amendment No. ~~11~~12 Effective Date). Subject to the terms and conditions hereof, the Parent Borrower's ability to obtain Letters of Credit shall be fully revolving, and accordingly the Parent Borrower may obtain Letters of Credit to replace Letters of Credit that have expired or that have been drawn upon and reimbursed.

(c)    Swingline Loans. During the Commitment Period, the Swingline Lender agrees, in reliance upon the commitments of the other Do lar Revolving Lenders set forth herein, to make revolving credit loans (the "Swingline Loans") to the Parent Borrower in Dollars on any Business Day; provided that (i) the Outstanding Amount of Swingline Loans shall not exceed ONE HUNDRED MILLION DOLLARS ($100.0 MILLION) (as such amount may be decreased in accordance with the provisions hereof, the "Swingline Sublimit"), (ii) with respect to the Dollar Revolving Lenders collectively, the Outstanding Amount of Dollar Revolving Obligations shall not exceed the Aggregate Dollar Revolving Committed Amount and (iii) with regard to each Revolving Lender individually, such Revolving Lender's Aggregate Revolving Commitment Percentage of Revolving Obligations shall not exceed its respective Aggregate Revolving Committed Amount. Swingline Loans shall be comprised solely of Base Rate Loans, and may be repaid and reborrowed in accordance with the provisions hereof. Immediately upon the making of a Swingline Loan, each Dollar Revolving Lender shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from the Swingline Lender a participation interest in such Swingline Loan in an amount equal to such Lender's Dollar Revolving Commitment Percentage thereof.

(d)    [Reserved].

(e)    Term B-4 Loans. (A) The Additional Term B-4 Lender agrees to make a term loan (in the amount equal to the Additional Term B-4 Commitment) to the Parent Borrower on the Amendment No. 6 Effective Date in a single advance in Dollars (together with each Term B-3 Loan converted into a Converted Term B-4 Loan as referred to in clause (B) below, the "Term B-4 Loans") and (B) each Converted Term B-3 Loan of each Term B-3

69

Amendment No. 6 Converting Lender shall be converted into a Term B-4 Loan of such Lender effective as of the Amendment No. 6 Effective Date in a principal amount equal to the principal amount of such Term B-3 Lenders' Converted Term B-3 Loan immediately prior to such conversion; provided that the Term B-4 Loans shall initially consist of Eurodollar Rate Loans (as defined in the Credit Agreement as of the Amendment No. 6 Effective Date). The Term B-4 Loans may consist of Base Rate Loans, Term Benchmark Loans, RFR Loans or a combination thereof, as the Parent Borrower may request. Amounts repaid on the Term B-4 Loans may not be reborrowed.

(f)    Incremental Loan Facilities. Any time after the Amendment No. 1112 Effective Date, any Borrower may, upon written notice to the Administrative Agent, establish additional credit facilities (collectively, the "Incremental Loan Facilities") by increasing the Aggregate Revolving Commitments hereunder as provided in Section 2.01(g) the "Incremental Revolving Commitments"), establishing one or more additional revolving credit facility tranches hereunder as provided in Section 2.01(g) (the "Incremental Revolving Facilities") or establishing new term loans or increasing the aggregate principal amount of any existing Term B-4 Loans hereunder as provided in Section 2.01(h) such new term loans or increased existing Term B-4 Loans, the "Incremental Term Loans"); provided that:

(i)    the aggregate principal amount of loans and commitments for all the Incremental Loan Facilities established after the Amendment No. 1112 Effective Date wi l not exceed an amount equal to the sum of (x) $1,625.0 million (the "Incremental Base Amount") minus the aggregate principal amount of Incremental Equivalent Debt incurred pursuant to Section 8.03(z)(i) and Incremental Loan Facilities established on or after the Amendment No. 1112 Effective Date pursuant to this clause (x), to the extent not reclassified under the second proviso below, plus (y) the aggregate principal amount of voluntary prepayments of the Term B-4 Loans pursuant to Section 2.06(a) and permanent reductions in the Revolving Commitments pursuant to Section 2.07 made prior to the date of such incurrence, in each case, other than from proceeds of long-term Indebtedness plus (z) additional amounts of Indebtedness that may be incurred at such time that would not cause the Senior Secured Leverage Ratio on a Pro Forma Basis (for the avoidance of doubt, after giving effect to such Incremental Loan Facilities (and the immediately following provisos)) as of the last day of the most recently ended fiscal quarter at the end of which financial statements were required to have been delivered pursuant to Section 7.01 a) or (b) (or, prior to such first required delivery date for such financial statements pursuant to either such Section, as of the last day of the most recent period referred to in the second sentence of Section 6.05) to exceed 4.50 to 1.00; provided further that, in each case, with respect to any Incremental Revolving Commitment or Incremental Revo ving Facility, the maximum amount of Revolving Loans available to be drawn thereunder is assumed to have been borrowed, but without giving effect to any incurrence under the Incremental Base Amount, that is incurred substantially simultaneously with amounts under this clause (z); provided further that the Borrowers shall be deemed to have utilized the amounts under clause (y) and (z) prior to utilization of the amounts under clause (x) and for purposes of determining compliance with this Section 2.01(f), in the event that any Incremental Loan Facility or Incremental Equivalent Debt (or any portion thereof) meets the criteria of Section 2.01(f)(i)(z) in the case of any Incremental Loan Facility or Section 8.03(z)(ii) in the case of Incremental Equivalent Debt, or the Incremental Base Amount, the Borrower may, in its sole discretion, at the time of incurrence, divide, classify, or reclassify, or at any later time divide, classify, or reclassify, such Indebtedness (or any portion thereof) in any manner that complies with this Section 2.01(f) and Section 8.03(z) on the date of such classification or any such reclassification, as applicable;

(ii)    subject to the Limited Condition Acquisition provisions, no Default or Event of Default shall have occurred and be continuing or shall result after giving effect to any such Incremental Loan Facility (or, in the case of any Limited Condition Acquisition, no Event of Default under Section 9.01(a) or 9.01(f) as of the Transaction Agreement Date) shall exist);

(iii)    the conditions to the making of a Credit Extension under Section 5.02 shall be satisfied;

(iv)    after giving effect on a Pro Forma Basis to the borrowings to be made pursuant to such Incremental Loan Facility, as of the last day of the most recently ended fiscal quarter at the end of which financial statements were required to have been delivered pursuant to Section 7.01(a) or (b) (or, prior to

70

such first required delivery date for such financial statements pursuant to either such Section, as of the last day of the most recent period referred to in the second sentence of Section 6.05), the Parent Borrower would be in compliance with Section 8.10 (and the Parent Borrower shall deliver a certificate of a Responsible Officer of the Parent Borrower as to the satisfaction of the requirements of this clause (iv) and clauses (ii) and (iii) above);

(v)    all Incremental Term Loans shall be borrowed by the Parent Borrower and guaranteed by the Domestic Guarantors; and

(vi)    the Incremental Revolving Commitments and Incremental Revolving Facilities may be of the Parent Borrower and any other Borrower and shall be guaranteed only by ~~Loan~~Credit Parties; provided that for the avoidance of doubt, the use of such Incremental Revolving Commitments and Incremental Revolving Facilities shall be subject to the L/C Sublimit, the Swingline Sublimit, the Alternative Currency L/C Sublimit and the Alternative Currency Sublimit.

In connection with the establishment of any Incremental Loan Facility, (A) neither of the Lead Arrangers or the Administrative Agent hereunder shall have any obligation to arrange for or assist in arranging for any Incremental Loan Facility, (B) any Incremental Loan Facility shall be subject to such conditions, including fee arrangements, as may be provided in connection therewith and (C) none of the Lenders shall have any obligation to provide commitments or loans for any Incremental Loan Facility.

(g)    Establishment of Incremental Revolving Commitments and Incremental Revolving Facilities. Subject to Section 2.01(f), any Borrower may (x) establish Incremental Revolving Commitments or Incremental Revolving Facilities by increasing the Aggregate Dollar Revolving Committed Amount, Aggregate Limited Currency Revolving Committed Amount ~~or,~~ Aggregate Multicurrency Revolving Committed Amount or Aggregate Venue Expansion Revolving Committed Amount hereunder and (y) establish Incremental Revolving Facilities; provided that:

(i)    any Person that is not a Revolving Lender that is proposed to be a Lender under any such increased Aggregate Revolving Committed Amount or Incremental Revolving Facility shall be reasonably acceptable to the Administrative Agent, any Person that is proposed to provide any such increased Aggregate Dollar Revolving Committed Amount (whether or not an existing Dollar Revolving Lender) or Aggregate Limited Currency Revolving Committed Amount (whether or not an existing Limited Currency Revolving Lender) shall be reasonably acceptable to each L/C Issuer and any Person that is proposed to provide any such increased Aggregate Dollar Revolving Committed Amount (whether or not an existing Dollar Revolving Lender) shall be reasonably acceptable to the Swingline Lender;

(ii)    any Incremental Revolving Facility shall not contain Swingline Loans or Letters of Credit under the Revolving Commitments;

(iii)    Persons providing commitments for the Incremental Revolving Commitments or Incremental Revolving Facilities pursuant to this Section 2.01(g) will provide a Revolving Lender Joinder Agreement;

(iv)    increases in the Aggregate Revolving Committed Amount will be in a minimum principal amount of $10.0 million and integral multiples of $5.0 million in excess thereof and Incremental Revolving Facilities shall be in a minimum principal amount of $5.0 million and integral multiples of $10.0 million;

(v)    in the case any Incremental Revolving Commitments are established, if any Revolving Loans are outstanding at the time of any such increase under the applicable Revolving Facility, either (x) each applicable Borrower will prepay such Revolving Loans on the date of effectiveness of the ncremental Revolving Commitments (including payment of any break-funding amounts owing under Section 3.05) or (y) each Lender with an Incremental Revolving Commitment shall purchase at par interests in each Borrowing of Revolving Loans then outstanding under the applicable Revolving Facility such that

71

immediately after giving effect to such purchases, each Borrowing thereunder shall be held by each Lender in accordance with its Pro Rata Share of such Revolving Facility (and, in connection therewith, each applicable Borrower shall pay all amounts that would have been payable pursuant to Section 3.05 had the Revolving Loans so purchased been prepaid on such date);

(vi)  the final maturity date of any Incremental Revolving Facility shall be no earlier than the Initial Revolving Termination Date and no Incremental Revolving Facility will require any scheduled amortization or mandatory commitment reduction prior to the Initial Revolving Termination Date;

(vii) the final maturity date of any Incremental Revolving Commitment shall be the same as the final maturity date of the Revolving Facility being increased (for the avoidance of doubt, and be subject to the same provisions of the definition of "Revolving Termination Date") and no Incremental Revolving Commitment will require any scheduled amortization or mandatory commitment reduction prior to the final maturity date of the Revolving Facility being increased; and

(viii) the Effective Yield with respect to any Incremental Revolving Facility shall be determined by the Parent Borrower and the Lenders of the ncremental Revolving Facility.

Any Incremental Revolving Commitment established hereunder shall have terms identical to the Dollar Revolving Commitments, Limited Currency Revolving Commitments or, Multicurrency Revolving Commitments or Venue Expansion Revolving Commitments, as the case may be, existing on the Amendment No.1112 Effective Date; provided that, if required to consummate an Incremental Revolving Commitment, the pricing, interest rate margins, rate floors and undrawn fees on the Revolving Facility being increased may be increased for all Lenders of such Revolving Facility without the consent of any Lender, but additional upfront or similar fees may be payable to the Lenders participating in the Incremental Revolving Commitment without any requirement to pay such amounts to any existing Lenders, it being understood that the Credit Parties and the Administrative Agent may make (without the consent of or notice to any other party) any amendment to reflect such increase in the Revolving Commitments.

Any Incremental Revolving Facility established hereunder shall be on terms to be determined by the Parent Borrower and the Lenders thereunder (and the Parent Borrower and the Administrative Agent may, without the consent of any other Lender, enter into an amendment to this Credit Agreement to appropriately include the Incremental Revolving Facilities hereunder); provided that, to the extent that such terms and documentation are not consistent with the applicable Revolving Facilities (except to the extent permitted by clause (vi) or (viii) above), they shall be reasonably satisfactory to the Administrative Agent; provided, further, that (x) without the consent of the Administrative Agent, such documentation may contain additional or more restrictive covenants than any then-existing Term Loans or Revolving Facility if such covenants are applicable only after the Final Maturity Date hereunder and (y) to the extent that any financial maintenance covenant is added for the benefit of any Incremental Revolving Facility that applies prior to the Final Maturity Date hereunder, no consent shall be required from the Administrative Agent or any Lender to the extent that such financial maintenance covenant is also added for the benefit of all of the Term Loans and Revo ving Facilities.

(h)     Establishment of Incremental Term Loans. Subject to Section 2.01(f), the Parent Borrower may, at any time, establish additional term loan commitments (including additional commitments for Term B-4 Loans) for Incremental Term Loans; provided that:

(i)     any Person that is not a Lender or Eligible Assignee that is proposed to be a Lender shall be reasonably acceptab e to the Administrative Agent;

(ii)    Persons providing commitments for the Incremental Term Loan pursuant to this Section 2.01(h) will provide an Incremental Term Loan Joinder Agreement;

72

(iii)  additional commitments established for the Incremental Term Loan will be in a minimum aggregate principal amount of $15.0 million and integral multiples of $5.0 million in excess thereof; provided that such commitments shall not be established on more than four (4) separate occasions;

(iv)  the final maturity date of any Incremental Term Loan shall be no earlier than the later of (A) the Term B-4 Loan Termination Date and (B) the Initial Revolving Termination Date;

(v)  the Effective Yield with respect to any  ncremental Term Loans shall be determined by the Parent Borrower and the Lenders of the Incremental Term Loans; and

(vi)  the Weighted Average Life to Maturity of any Incremental Term Loan shall not be shorter than the Term B-4 Loans (without giving effect to such Incremental Term Loans).

Any Incremental Term Loan established hereunder sha l be on terms to be determined by the Parent Borrower and the Lenders thereunder (and the Parent Borrower and the Administrative Agent may, without the consent of any other Lender, enter into an amendment to this Credit Agreement to appropriately include the Incremental Term Loans hereunder including, without limitation, to provide that such Incremental Term Loans shall share in mandatory prepayments on the same basis as the Term B-4 Loans); provided that, to the extent that such terms and documentation are not consistent with the Term B-4 Loans (except to the extent permitted by clause (iv), (v) or (vi) above and except to the extent of any market call provisions), they shall be reasonably satisfactory to the Administrative Agent; provided, further, that (x) without the consent of the Administrative Agent, such documentation may contain additional or more restrictive covenants than those contained herein if such covenants are applicable only after the Final Maturity Date hereunder and (y) to the extent that any financial maintenance covenant is added for the benefit of any Incremental Term Loans that applies prior to the Final Maturity Date hereunder, no consent shall be required from the Administrative Agent or any Lender to the extent that such financial maintenance covenant is also added for the benefit of all Lenders.

**2.02**  **Borrowings, Conversions and Continuations.**

(a)  Each Borrowing, each conversion of Loans from one Type to the other, and each continuation of a Term Benchmark Loan shall be made upon the applicable Borrower's irrevocable notice to the Applicable Agent by delivery to the Applicable Agent of a written Loan Notice appropriately completed and signed by a Responsible Officer of the applicable Borrower; provided that, if such Loan Notice is submitted through an Approved Borrower Portal, the foregoing signature requirement may be waived at the sole discretion of the Administrative Agent . Each such notice must be received by the Applicable Agent not later than (i) with respect to Term Benchmark Loans or RFR Loans, 12:00 noon (Local Time) three (3) Business Days (or, in the case of Limited Currency Revolving Loans or Multicurrency Revolving Loans denominated in Alternative Currency, four (4) Business Days) prior to the requested date of the Borrowing, conversion or continuation, as applicable, or (ii) with respect to Base Rate Loans, 12:00 noon (Local Time) on the requested date of the Borrowing, conversion or continuation, as applicable. Except in the case of any Revolving Loan that is borrowed to refinance a Swingline Loan or L/C Borrowing (which may be in an amount sufficient to refinance such Swingline Loan or L/C Borrowing), each Borrowing, conversion or continuation shall be in a principal amount of (i) with respect to Term Benchmark Loans or RFR Loans (A) denominated in Dollars, $1.0 million or a whole multiple of $1.0 million in excess thereof, (B) denominated in Euros, €1.0 million or a whole multiple of €1.0 million in excess thereof, (C) denominated in £, £1.0 million or a whole multiple of £1.0 million in excess thereof, (D) denominated in Canadian Dollars, C$1.0 million or a whole multiple of C$1.0 million in excess thereof, (E) denominated in Australian Dollars, AU$1.0 million or a whole multiple of AU$1.0 million in excess thereof, (F) denominated in Swiss Francs, CHF1.0 million or a whole multiple of CHF$1.0 million in excess thereof, (G) denominated in Swedish Krona, kr7.0 million or a whole multiple of kr7.0 million in excess thereof, (H) denominated in Danish Krone, Dkr2.0 million or a whole multiple of Dkr1.0 million in excess thereof, (I) denominated in Mexican Pesos, MXN5.0 mil ion or a whole multiple of MXN1.0 million in excess thereof, (J) denominated in Japanese Yen, ¥100.0 million or a whole multiple of ¥100.0 million n in excess thereof or (K) denominated in Brazilian Real, R$1.0 million or a whole multiple of R$1.0 million in excess thereof or (ii) with respect to Base Rate Loans, $1.0 million or a whole multiple of $100,000 in excess thereof. Each Loan Notice (whether telephonic or written) shall specify (i) whether such Borrower's request is with respect to Dollar

Revolving Loans, Limited Currency Revolving Loans, Multicurrency Revolving Loans~~or~~, Venue Expansion Revolving Loans or Term B-4 Loans, (ii) whether such request is for a Borrowing, conversion, or continuation, (iii) the requested date of such Borrowing, conversion or continuation (which shall be a Business Day), (iv) the principal amount of Loans to be borrowed, converted or continued, (v) the Type of Loans to be borrowed, converted or continued, (vi) if such Loans are Limited Currency Revolving Loans or Multicurrency Revolving Loans, the currency of such Loans (which shall be an Approved Currency) and (vii) if applicable, the duration of the Interest Period with respect thereto. If the applicable Borrower fails to specify a Type of Loan in a Loan Notice or if the applicable Borrower fails to give a timely notice requesting a conversion or continuation (other than with respect to Limited Currency Revolving Loans or Multicurrency Revolving Loans denominated in an Alternative Currency), then the applicable Loans shall be made as, or converted to, Base Rate Loans. Any automatic conversion to Base Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable Term Benchmark Loans. If the applicable Borrower requests a Borrowing of, conversion to, or continuation of Term Benchmark Loans in any Loan Notice, but fails to specify an Interest Period, the Interest Period will be deemed to be one (1) month. Each Lender at its option may make any Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that any exercise of such option shall not affect the obligation of the Parent Borrower or any other Borrower to repay such Loan in accordance with the terms hereof. Notwithstanding the foregoing, with respect to Term Benchmark Loans to be made under the Revolving Facility on the Amendment No. ~~11~~12 Effective Date in Dollars, the required notice may be received by the Applicable Agent no later than 12:00 noon on the Business Day prior to the Amendment No. ~~11~~12 Effective Date.

(b)     Following receipt of a Loan Notice, the Applicable Agent shall promptly notify each Lender of the amount of its Pro Rata Share of the applicable Loans (the "Section 2.02(b) Ratable Share"), and if no timely notice of a conversion or continuation is provided by the applicable Borrower, the Applicable Agent shall notify each Lender of the details of any automatic conversion to Base Rate Loans described in the preceding subsection. In the case of a Borrowing denominated in Dollars, each Lender shall make the amount of its Loan available to the Applicable Agent in Dollars in immediately available funds at the Applicable Agent's Office not later than 2:00 p.m. (New York time) on the Business Day specified in the applicable Loan Notice. In the case of a Borrowing denominated in an Alternative Currency, each Lender shall make the amount of its Loan (net of applicable acceptance fees) available to the Applicable Agent in the applicable Alternative Currency in immediately available funds at the Applicable Agent's Office not later than 2:00 p.m. (Local Time) on the Business Day specified in the applicable Loan Notice. Upon satisfaction of the applicable conditions set forth in Section 5.02 (and, if such Borrowing is the initial Credit Extension, Section 5.01), the Applicable Agent shall make all funds so received available to the applicable Borrower in like funds as received by the Applicable Agent either by (i) crediting the account of such Borrower on the books of the Applicable Agent with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to the Applicable Agent by such Borrower. Notwithstanding anything contained in any Credit Document to the contrary, with respect to any requested Fronted Currency Loan (i) the Section 2.02(b) Ratable Share of the Alternative Currency Fronting Lender(s) for the applicable Fronted Currency shall be determined as if the Alternative Currency Fronting Lender(s) ratably owned the Multicurrency Revolving Commitments of the Participating Fronted Currency Lenders (for the avoidance of doubt, it is understood and agreed that (A) for the purposes of determining Pro Rata Shares of the Multicurrency Revolving Lenders and the use of the Multicurrency Revolving Commitments, the Multicurrency Revolving Commitments of the Participating Fronted Currency Lenders shall be deemed to be used when the Alternative Currency Fronting Lender(s) make such Fronted Currency Loan and (B) the Pro Rata Shares of the Multicurrency Revolving Lenders shall not otherwise be affected by the transactions contemplated by this sentence), and such Section 2.02(b) Ratable Share for purposes of this clause (i) shall be notified in writing by the Administrative Agent upon request by the applicable Alternative Currency Fronting Lender(s), (ii) if such Fronted Currency Loan is not paid for any reason when due (at maturity, acceleration or otherwise), each Participating Fronted Currency Lender shall pay to the Alternative Currency Fronting Lender an amount in Dollars equal to the Dollar Equivalent of such Participating Fronted Currency Lender's Pro Rata Share (without giving effect to the immediately preceding clause (i)) under the Multicurrency Revolving Facility of such Fronted Currency Loan (which such payment to be made (x) if any applicable Alternative Currency Fronting Lender makes the request therefor prior to noon on any Business Day, on such Business Day and (y) if otherwise, on the Business Day following the request therefor by the applicable Alternative Currency Fronting Lender), and such payment shall be made by such Participating Fronted Currency Lender regardless of any circumstance whatsoever, including the occurrence of a Default, Event of Default

74

or the termination or expiration of the Multicurrency Revolving Commitments (and if such payment is not made by such Participating Fronted Currency Lender when required pursuant to this clause (ii), then interest (in Dollars) shall accrue on such payment at a rate equa to the greater of the applicable Overnight Bank Funding Rate from time to time in effect and a rate reasonably determined by the applicable Alternative Currency Fronting Lender in its sole discretion in accordance with banking industry rules on interbank compensation, and such payment and the interest thereon shall be due upon demand), (iii) the Participating Fronted Currency Lenders shall have no obligation to make any Loan in any Fronted Currency, and no Lender (other than the Alternative Currency Fronting Lenders) shall be liable or otherwise responsib e for the failure of the applicable Alternative Currency Fronting Lender(s) to make any Fronted Currency Loan, (iv) the interest on the Fronted Currency Loans made by each Alternative Currency Fronting Lender pursuant to the operation of this sentence shall be for the account of such Alternative Currency Fronting Lender, (v) if there is no Alternative Currency Fronting Lender for a particular Fronted Currency at any time, then no Fronted Currency Loans in such Fronted Currency shall be made at such time and (vi) the Alternative Currency Fronting Lender for any particular Fronted Currency may set limits on the aggregate amount of Revolving Loans that may be made by it in such Fronted Currency by notice to the Administrative Agent and the Parent Borrower.

(c)    Except as otherwise provided herein, without the consent of the Required Lenders, a Term Benchmark Loan may be continued or converted only on the last day of an Interest Period for such Term Benchmark Loan. During the existence of a Default or Event of Default, at the request of the Required Lenders or the Applicable Agent, (i) no Loan denominated in Dollars or Canadian Dollars may be requested as, converted to or continued as a Term Benchmark Loan and (ii) any outstanding Term Benchmark Loan (x) if denominated in Dollars, shall be converted to a Base Rate Loan on the last day of the Interest Period with respect thereto and (y) if denominated in Canadian Dollars, shall be converted to a Loan bearing interest at the Canadian Prime Rate plus the CBR Spread on the last day of the Interest Period with respect thereto.

(d)    The Applicable Agent shall promptly notify the applicable Borrower and the Lenders of the interest rate applicable to any Interest Period for Term Benchmark Loans or the interest rate applicable for RFR Loans, in each case, upon determination of such interest rate. The determination of the applicable Relevant Rate by the Applicable Agent shall be conclusive in the absence of manifest error. At any time that Base Rate Loans are outstanding, the Applicable Agent shall notify the Borrowers and the Lenders of any change in the Applicable Agent's prime rate used in determining the Base Rate promptly following the public announcement of such change.

(e)    After giving effect to all Borrowings, all conversions of Loans from one Type to the other, and all continuations of Loans as the same Type, there shall not be more than ten (10) Interest Periods in effect with respect to the Revolving Loans and Term B-4 Loans.

**2.03    Additional Provisions with Respect to Letters of Credit.**

(a)    Obligation to Issue or Amend.

(i)    No L/C Issuer shall issue any Letter of Credit if:

(A)    subject to Section 2.03(b)(iii), the expiry date of such requested Letter of Credit would occur more than twelve (12) months after the date of issuance or last extension, unless the Administrative Agent and such L/C Issuer have approved such expiry date;

(B)    the expiry date of any requested Letter of Credit would occur after the L/C Expiration Date, unless all the L/C Revolving Lenders have approved such expiry date;

(C)    with respect to a Letter of Credit to be issued by a Dollar L/C Issuer, such Letter of Credit is to be denominated in a currency other than Dollars; or

(D)    with respect to a Letter of Credit to be issued by a Multicurrency L/C Issuer, such Letter of Credit is to be denominated in a currency other than Dollars, Canadian Dollars, Euros or Sterling

75

(provided that the foregoing shall in no way limit the right of a Multicurrency L/C Issuer, in its sole discretion, to issue a Letter of Credit in any other Approved Currency).

(ii)    No L/C Issuer shall be under any obligation to issue, amend or extend any Letter of Credit if:

(A)    any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain such L/C Issuer from issuing, amending or extending such Letter of Credit, or any Law applicable to such L/C Issuer or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over such L/C Issuer shall prohibit, or request that such L/C Issuer refrain from, the issuance, amendment or extension of letters of credit generally or such Letter of Credit in particular or shall impose upon such L/C Issuer with respect to such Letter of Credit any restriction, reserve or capital requirement (for which such L/C Issuer is not otherwise compensated hereunder) not in effect on the Amendment No. 1112 Effective Date, or shall impose upon such L/C Issuer any unreimbursed loss, cost or expense that was not applicable on the Amendment No. 1112 Effective Date and that such L/C Issuer in good faith deems material to it;

(1)    the issuance, amendment or extension of such Letter of Credit would violate any Law applicable to such L/C Issuer;

(2)    except as otherwise agreed by such L/C Issuer and the Administrative Agent, such Letter of Credit is in an initial stated amount less than the Dollar Equivalent of $20,000;

(3)    without derogation of clauses (a)(i)(C) and (D) above, such Letter of Credit is to be denominated in a currency other than Dollars or an Alternative Currency (it being understood and agreed, for the avoidance of doubt, that no L/C Issuer will be required to issue any Letters of Credit in Brazilian Real);

(4)    except as otherwise agreed by such L/C Issuer, such Letter of Credit contains provisions for automatic reinstatement of the stated amount after any drawing thereunder;

(5)    any Dollar Revolving Lender or Limited Currency Revolving Lender is at that time a Defaulting Lender, unless such L/C Issuer has entered into arrangements, including the delivery of cash collateral, reasonably satisfactory to such L/C Issuer with the Parent Borrower or such Lender to eliminate the L/C Issuer's actual or potential L/C Obligations (after giving effect to Section 2.16) with respect to such Defaulting Lender arising from either the Letter of Credit then proposed to be issued or that Letter of Credit and all other L/C Obligations as to which such L/C Issuer has exposure; and

(6)    such Letter of Credit is a commercial Letter of Credit, unless such L/C Issuer otherwise consents, or if the issuance of such Letter of Credit would violate one or more policies of such L/C Issuer with respect to letters of credit.

(iii)  No L/C Issuer shall be under any obligation to amend any Letter of Credit if (A) such L/C Issuer would have no obligation at such time to issue such Letter of Credit in its amended form under the terms hereof; or (B) the beneficiary of such Letter of Credit does not accept the proposed amendment to such Letter of Credit.

(iv)  The applicable L/C Issuer shall act on behalf of the L/C Revolving Lenders with respect to any Letters of Credit issued by it and the documents associated therewith, and such L/C Issuer shall have all of the benefits and immunities (A) provided to the Administrative Agent in Article X with respect to any acts taken or omissions suffered by such L/C Issuer in connection with such Letters of Credit issued by it or proposed to be issued by it and Issuer Documents pertaining to such Letters of Credit as fully as if the term

76

"Administrative Agent" as used in Article X included such L/C Issuer with respect to such acts or omissions, and (B) as additionally provided herein with respect to such L/C Issuer.

(b)        Procedures for Issuance and Amendment; Auto-Extension Letters of Credit.

(i)     Each Letter of Credit shall be issued or amended, as the case may be, upon the request of any Borrower delivered to the applicable L/C Issuer (with a copy to the Administrative Agent) (or transmitted by electronic communication, including an Approved Borrower Portal, if arrangements for such transmission have been approved by the applicable L/C Issuer) in the form of a L/C Application, appropriately completed and signed by a Responsible Officer of such Borrower. Each such L/C Application must be received by the applicable L/C Issuer and the Administrative Agent (A) not later than 12:00 noon (New York time) at least three (3) Business Days prior to the proposed issuance date or date of amendment, as the case may be, of any Letter of Credit denominated in Dollars and (B) not later than 12:00 noon (Local Time) at least five (5) Business Days prior to the proposed issuance date or date of amendment, as the case may be, of any Letter of Credit denominated in an Alternative Currency (or, in each case, such later date and time as the applicable L/C Issuer and the Administrative Agent may agree in a particular instance in their sole discretion) prior to the proposed issuance date or date of amendment, as the case may be. In the case of a request for an initial issuance of a Letter of Credit, such L/C Application shall specify in form and detail reasonably satisfactory to the applicable L/C Issuer: (A) the proposed issuance date of the requested Letter of Credit (which shall be a Business Day); (B) the amount and currency thereof; (C) the expiry date thereof; (D) the name and address of the beneficiary thereof; (E) the documents to be presented by such beneficiary in case of any drawing thereunder; (F) the full text of any certificate to be presented by such beneficiary in case of any drawing thereunder; and (G) such other matters as such L/C Issuer may reasonably require. In the case of a request for an amendment of any outstanding Letter of Credit, such L/C Application shall specify in form and detail satisfactory to the applicable L/C Issuer: (A) the Letter of Credit to be amended; (B) the proposed date of amendment thereof (which shall be a Business Day); (C) the nature of the proposed amendment; (D) the purpose and nature of the requested Letter of Credit; and (E) such other matters as such L/C Issuer may reasonably require. Additionally, the Parent Borrower shall furnish to such L/C Issuer and the Administrative Agent such other documents and information pertaining to such requested Letter of Credit issuance or amendment, including any Issuer Documents, as such L/C Issuer or the Administrative Agent may require.

(ii)    Promptly after receipt of any L/C Application, the applicable L/C Issuer will confirm with the Administrative Agent (by telephone or in writing) that the Administrative Agent has received a copy of such L/C Application from the applicable Borrower and, if not, such L/C Issuer will provide the Administrative Agent with a copy thereof. Unless such L/C Issuer has received written notice from the Administrative Agent, any L/C Revolving Lender or any Credit Party, at least one (1) Business Day prior to the requested date of issuance or amendment of the applicable Letter of Credit, that one or more applicable conditions contained in Section 5.01 (if issued on the Amendment No. 1112 Effective Date) or 5.02 shall not then be satisfied, then, subject to the terms and conditions hereof, the applicable L/C Issuer shall, on the requested date, issue a Letter of Credit for the account of the applicable Borrower (or Subsidiary) or enter into the applicable amendment, as the case may be, in each case in accordance with such L/C Issuer's usual and customary business practices.

(iii)   If any Borrower so requests in any L/C Application, the applicable L/C Issuer may, in its sole and absolute discretion, agree to issue a Letter of Credit that has automatic extension provisions (each, an "Auto-Extension Letter of Credit"); provided that any such Auto-Extension Letter of Credit must permit such L/C Issuer to prevent any such renewal at least once in each twelve-month period (commencing with the date of issuance of such Letter of Credit) by giving prior notice to the beneficiary thereof not later than a day (the "Non-Extension Notice Date") in each such twelve-month period to be agreed upon at the time such Letter of Credit is issued (but in any event not later than 30 days prior to the scheduled expiry date thereof). Unless otherwise directed by the L/C Issuer, the applicable Borrower shall not be required to make a specific request to the applicable L/C Issuer for any such extension. Once an Auto-Extension Letter of Credit has been issued, the L/C Revolving Lenders shall be deemed to have authorized (but may not

77

require) the applicable L/C Issuer to permit the extension of such Letter of Credit at any time to an expiry date not later than the L/C Expiration Date, provided, however, that no L/C Issuer shall permit any such extension if (A) such L/C Issuer has determined that it would not be permitted or would have no obligation at such time to issue such Letter of Credit in its revised form (as extended) under the terms hereof (by reason of the provisions of Section 2.03(a) or otherwise), or (B) it has received notice (which may be by telephone or in writing) on or before the day that is five (5) Business Days before the Non-Extension Notice Date from the Administrative Agent or the applicable Borrower that one or more of the applicable conditions specified in Section 5.02 is not then satisfied, and in each case directing such L/C Issuer not to permit such extension.

(iv)  Promptly after its delivery of any Letter of Credit or any amendment to a Letter of Credit to an advising bank with respect thereto or to the beneficiary thereof, the applicable L/C Issuer will also deliver to the applicable Borrower and the Administrative Agent a true and complete copy of such Letter of Credit or amendment.

(c)        Drawings and Reimbursements; Funding of Participations.

(i)    Upon any drawing under any Letter of Credit, the applicable L/C Issuer shall notify the applicable Borrower and the Administrative Agent thereof. In the case of a Letter of Credit denominated in Dollars, the Parent Borrower shall reimburse such L/C Issuer in Dollars. In the case of a Letter of Credit denominated in Sterling or euros, the applicable Borrower shall reimburse such L/C  ssuer in Sterling or Euros, as applicable. In the case of a Letter of Credit denominated in an Alternative Currency other than Sterling or Euros, the applicable Borrower shall reimburse such L/C Issuer in such Alternative Currency unless (x) such L/C Issuer (at its option) shall have specified in such notice that it will require reimbursement in Dollars, or (y) in the absence of any such requirement for reimbursement in Dollars, the applicable Borrower shall have notified such L/C Issuer promptly following receipt of the notice of drawing that the applicable Borrower will reimburse such L/C Issuer in Dollars. In the case of any such reimbursement in Dollars of a drawing as of the applicable Revaluation Date under a Letter of Credit denominated in an Alternative Currency other than Sterling or Euros, such L/C Issuer shall notify the applicable Borrower of the Dollar Equivalent of the amount of the drawing promptly following the determination thereof. Not later than (x) 12:00 noon (New York time) on or prior to the date that is three (3) Business Days following the date that the applicable Borrower receives notice from any L/C Issuer of any payment by such L/C Issuer under a Letter of Credit to be reimbursed in Dollars, and (y) the Applicable Time on or prior to the date that is three (3) Business Days following the date the applicable Borrower receives notice from any L/C Issuer of any payment by such L/C Issuer under a Letter of Credit to be reimbursed in an Alternative Currency (each such date of payment by such L/C Issuer under a Letter of Credit, an "Honor Date"), the applicable Borrower shall reimburse such L/C Issuer through the Administrative Agent in Dollars or in the applicable Alternative Currency, as the case may be, in an amount equal to the amount of such drawing; provided, that such Borrower, and the applicable L/C Issuer may, each in their discretion, with the consent of the Administrative Agent and so long as such arrangements do not adversely affect the rights of any Lender in any material respect, enter into Letter of Credit cash collateral prefunding arrangements acceptable to them for the purpose of reimbursing Letter of Credit draws. If the applicable Borrower does not to reimburse the applicable L/C Issuer on the Honor Date, the Administrative Agent, at the request of such L/C Issuer, shall promptly notify each L/C Revolving Lender as of the Honor Date the Dollar Equivalent of such unreimbursed drawing (an "Unreimbursed Amount") and the amount of such L/C Revolving Lender's L/C Commitment Percentage thereof.

(ii)   Each L/C Revolving Lender shall upon any notice pursuant to Section 2.03(c)(i) make funds available to the Administrative Agent for the account of such L/C Issuer, in Dollars at the Administrative Agent's Office for payments in Dollars in an amount equal to its L/C Commitment Percentage of such Unreimbursed Amount not later than 1:00 p.m. (Local Time) on the Business Day specified in such notice by the Administrative Agent. With respect to any Unreimbursed Amount, the applicable Borrower shall be deemed to have incurred from the applicable L/C Issuer an L/C Borrowing in the amount of such Unreimbursed Amount, which L/C Borrowing shall be due and payable on demand

(together with interest) and shall bear interest at (i) through and including the third Business Day following the Honor Date, the rate of interest applicable to Revolving Loans that are Base Rate Loans and (ii) thereafter, the Default Rate. In such event, each L/C Revolving Lender's payment to the Administrative Agent for the account of such L/C Issuer pursuant to this Section 2.03(c)(ii) shall be deemed payment in respect of its participation in such L/C Borrowing and shall constitute an L/C Advance from such Revolving Lender in satisfaction of its participation obligation under this Section 2.03.

(iii)   Until an L/C Revolving Lender funds its L/C Advance pursuant to this Section 2.03(c) to reimburse the applicable L/C Issuer for any amount drawn under any Letter of Credit, interest in respect of such L/C Revolving Lender's L/C Commitment Percentage of such amount shall be solely for the account of such L/C Issuer.

(iv)   Each L/C Revolving Lender's obligation to make L/C Advances to reimburse the applicable L/C Issuer for amounts drawn under Letters of Credit, as contemplated by this Section 2.03(c), shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right that such L/C Revolving Lender may have against such L/C Issuer, the Parent Borrower or any other Person for any reason whatsoever; (B) the occurrence or continuance of a Default or Event of Default, (C) non-compliance with the conditions set forth in Section 5.02, or (D) any other occurrence, event or condition, whether or not similar to any of the foregoing; provided that such L/C Issuer shall have complied with the provisions of Section 2.03(b)(ii). No such making of an L/C Advance shall relieve or otherwise impair the obligation of each Borrower to reimburse any L/C Issuer for the amount of any payment made by such L/C Issuer under any Letter of Credit, together with interest as provided herein.

(v)   If any L/C Revolving Lender fails to make available to the Administrative Agent for the account of the L/C Issuer any amount required to be paid by such L/C Revolving Lender pursuant to the foregoing provisions of this Section 2.03(c) by the time specified in Section 2.03(c)(ii), such L/C Issuer shall be entitled to recover from such L/C Revolving Lender (acting through the Administrative Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to such L/C Issuer at a rate per annum equal to the greater of the Federal Funds Effective Rate and a rate determined by such L/C Issuer in accordance with banking industry rules on interbank compensation, plus any administrative, processing or similar fees customarily charged by such L/C Issuer in connection with the foregoing. If such Lender pays such amount (with interest and fees as aforesaid), the amount so paid shall constitute such Lender's L/C Advance in respect of the relevant L/C Borrowing. A certificate of the applicable L/C Issuer submitted to any applicable L/C Revolving Lender (through the Administrative Agent) with respect to any amounts owing under this clause (v) shall be conclusive absent manifest error.

(d)    Repayment of Participations.

(i)   At any time after any L/C Issuer has made a payment under any Letter of Credit and has received from any L/C Revolving Lender such L/C Revolving Lender's L/C Advance in respect of such payment in accordance with Section 2.03(c), if the Administrative Agent receives for the account of such L/C Issuer any payment in respect of the related Unreimbursed Amount or interest thereon (whether directly from the applicable Borrower or otherwise, including proceeds of cash collateral applied thereto by the Administrative Agent), the Administrative Agent will distribute to such L/C Revolving Lender its L/C Commitment Percentage (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such L/C Revolving Lender's L/C Advance was outstanding), in the same currency in which such L/C Revolving Lender's L/C Advance was made and in the same type of funds as those received by the Administrative Agent.

(ii)   If any payment received by the Administrative Agent for the account of any L/C Issuer pursuant to Section 2.03(c)(i) is required to be returned under any of the circumstances described in Section 11.05 (including pursuant to any settlement entered into by such L/C Issuer in its discretion), each L/C

79

Revolving Lender shall pay to the Administrative Agent for the account of such L/C Issuer its L/C Commitment Percentage thereof on demand of the Administrative Agent, plus interest thereon from the date of such demand to the date such amount is returned by such L/C Revolving Lender, at a rate per annum equal to the applicable Overnight Bank Funding Rate from time to time in effect. The obligations of the L/C Revolving Lenders under this clause shall survive the payment in full of the Obligations and the termination of this Credit Agreement.

(e)    Obligations Absolute. The obligation of each Borrower to reimburse the applicable L/C Issuer for each drawing under each Letter of Credit and to repay each L/C Borrowing shall be absolute, unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Credit Agreement under all circumstances, including the following:

(i)    any lack of validity or enforceability of such Letter of Credit, this Credit Agreement or any other Credit Document;

(ii)    the existence of any claim, counterclaim, setoff, defense or other right that any Borrower, any Subsidiary may have at any time against any beneficiary or any transferee of such Letter of Credit (or any Person for whom any such beneficiary or any such transferee may be acting), any L/C Issuer or any other Person, whether in connection with this Credit Agreement, the transactions contemplated hereby or by such Letter of Credit or any agreement or instrument relating thereto, or any unrelated transaction;

(iii)    any draft, demand, certificate or other document presented under such Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; or any loss or delay in the transmission or otherwise of any document required in order to make a drawing under such Letter of Credit;

(iv)    any payment by any L/C Issuer under such Letter of Credit against presentation of a draft or certificate that does not strictly comply with the terms of such Letter of Credit; or any payment made by any L/C Issuer under such Letter of Credit to any Person purporting to be a trustee in bankruptcy, debtor-in-possession, assignee for the benefit of creditors, liquidator, receiver or other representative of or successor to any beneficiary or any transferee of such Letter of Credit, including any arising in connection with any proceeding under any Debtor Relief Law;

(v)    any adverse change in the relevant exchange rates or in the availability of the relevant Alternative Currency to any Borrower or any Subsidiary or in the relevant currency markets generally; or

(vi)    any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, including any other circumstance that might otherwise constitute a defense available to, or a discharge of, any Borrower or any Subsidiary.

The applicable Borrower shall promptly examine a copy of each Letter of Credit and each amendment thereto that is delivered to such Borrower and, in the event of any claim of noncompliance with such Borrower's instructions or other irregularity, such Borrower will immediately notify the applicable L/C Issuer. The Borrowers shall be conclusively deemed to have waived any such claim against the applicable L/C Issuer and its correspondents unless such notice is given as aforesaid.

(f)    Role of the L/C Issuers in such Capacity. Each L/C Revolving Lender and each Borrower agree that, in paying any drawing under a Letter of Credit, no L/C Issuer shall have any responsibility to obtain any document (other than any sight draft, certificates and documents expressly required by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document. None of any L/C Issuer, the Administrative Agent, any of their respective Related Parties nor any correspondent, participant or assignee of any L/C Issuer shall be liable to any L/C Revolving Lender for (i) any action taken or omitted in connection herewith at the request or with the approval of the Required L/C Lenders; (ii) any action taken or omitted in the absence of gross negligence or willful misconduct (as determined by

80

a court of competent jurisdiction in a final, non-appealable judgment); or (iii) the due execution, effectiveness, validity or enforceability of any document or instrument related to any Letter of Credit or Issuer Document. Each Borrower hereby assumes all risks of the acts or omissions of any beneficiary or transferee with respect to such Borrower's use of any Letter of Credit; provided, however, that this assumption is not intended to, and shall not, preclude such Borrower's pursuing such rights and remedies as such Borrower may have against the beneficiary or transferee at law or under any other agreement. None of any L/C Issuer, the Administrative Agent, any of their respective Related Parties nor any correspondent, participant or assignee of any L/C Issuer, shall be liable or responsible for any of the matters described in clauses (i) through (vi) of Section 2.03(e); provided, however, that anything in such clauses to the contrary notwithstanding, each Borrower shall have a claim against each L/C Issuer, and each L/C Issuer shall be liable to each Borrower, to the extent, but only to the extent, of any direct, as opposed to consequential or exemplary, damages suffered by such Borrower that are determined by a court of competent jurisdiction in a final non-appealable judgment to have been caused by such L/C Issuer's willful misconduct or gross negligence (as determined by a court of competent jurisdiction in a final, non-appealable judgment) or such L/C Issuer's willful failure to pay under any Letter of Credit after the presentation to it by the beneficiary of a sight draft and certificate(s) strictly complying with the terms and conditions of a Letter of Credit. In furtherance and not in limitation of the foregoing, each L/C Issuer may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary, and each L/C Issuer shall not be responsible for the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, that may prove to be invalid or ineffective for any reason.

(g)    Cash Collateral. Upon the request of the Administrative Agent or the applicable L/C Issuer, (i) if any L/C Issuer has honored any full or partial drawing request under any Letter of Credit and such drawing has resulted in a L/C Borrowing, (ii) if, as of the L/C Expiration Date any Letter of Credit may for any reason remain outstanding and partially or wholly undrawn, or (iii) if the proviso in the definition of "Revolving Termination Date" shall become operative, the applicable Borrower shall immediately Cash Collateralize the then Outstanding Amount of all L/C Obligations (in each case, in an amount equal to 103% of such Outstanding Amount determined as of the date of such L/C Borrowing or the L/C Expiration Date as the case may be). The Administrative Agent may, at any time and from time to time after the initial deposit of cash collateral, request that additional cash collateral be provided in order to protect against the results of exchange rate fluctuations. For purposes hereof, "Cash Collateralize" means to pledge and deposit with or deliver to the Administrative Agent, for the benefit of the applicable L/C Issuer and the L/C Revolving Lenders, as collateral for such L/C Obligations, cash or deposit account balances pursuant to customary documentation in form and substance reasonably satisfactory to the Administrative Agent and such L/C Issuer (which documents are hereby consented to by the Lenders). Derivatives of such term have corresponding meanings. Cash collateral shall be maintained in blocked, interest bearing deposit accounts or money market fund accounts at the Administrative Agent.

(h)    Applicability of ISP. Unless otherwise expressly agreed by any L/C Issuer and the applicable Borrower when a Letter of Credit is issued, the rules of the ISP shall apply to each Letter of Credit.

(i)    Letters of Credit Issued for Subsidiaries. Notwithstanding that a Letter of Credit issued or outstanding hereunder is in support of any obligations of, or is for the account of any Subsidiary of the Parent Borrower, the Borrowers shall be obligated to reimburse the applicable L/C Issuer for any and all drawings under such Letter of Credit. The Borrowers hereby acknowledge that the issuance of Letters of Credit for the account of the Parent Borrower's Subsidiaries inures to the benefit of the Borrowers, and that each Borrower's business derives substantial benefits from the businesses of such Subsidiaries.

(j)    Letter of Credit Fees. The Borrowers shall pay Letter of Credit Fees as set forth in Section 2.09(b).

(k)    Conflict with Issuer Documents. In the event of any conflict between the terms hereof and the terms of any Issuer Document, the terms hereof shall control.

(l)    Addition of L/C Issuer. Parent Borrower may, at any time and from time to time, designate one or more additional Revolving Lenders to act as a Dollar L/C Issuer or a Multicurrency L/C Issuer under the terms of

this Credit Agreement, with the consent of the Administrative Agent (which consent shall not be unreasonably withheld or delayed) and such Revolving Lender. Any Revolving Lender designated as a Dollar L/C Issuer or Multicurrency L/C Issuer, as the case may be, pursuant to this Section 2.03(l) shall have all the rights and obligations of the Dollar L/C Issuer and Multicurrency L/C Issuer, respectively, under the Credit Documents with respect to Letters of Credit issued or to be issued by it, and all references in the Credit Documents to the term "L/C Issuer," "Dollar L/C Issuer" or "Multicurrency L/C Issuer" shall, with respect to such Letters of Credit, be deemed to refer to such Lender in its capacity as the L/C Issuer, as the context shall require. The Administrative Agent shall notify the Revolving Lenders of any such additional L/C Issuer. If at any time there is more than one L/C Issuer hereunder, Parent Borrower may, in its discretion, select which L/C Issuer is to issue any particular Letter of Credit.

### 2.04    Additional Provisions with Respect to Swingline Loans.

(a)    Borrowing Procedures. Each Swingline Borrowing shall be made upon the Parent Borrower's irrevocable notice to the Swingline Lender and the Administrative Agent by delivery to the Swingline Lender and the Administrative Agent of a written Loan Notice, appropriately completed and signed by a Responsible Officer of the Parent Borrower (which notice may be transmitted by electronic communication, including an Approved Borrower Portal, if arrangements for such transmission have been approved by the Administrative Agent). Each such notice must be received by the Swingline Lender and the Administrative Agent not later than 2:00 p.m. (New York time) on the requested borrowing date, and shall specify (i) the amount to be borrowed, which shall be a minimum of $100,000, and (ii) the requested borrowing date, which shall be a Business Day. Promptly after receipt by the Swingline Lender of any Loan Notice, the Swingline Lender will confirm with the Administrative Agent (by telephone or in writing) that the Administrative Agent has also received such Loan Notice and, if not, the Swingline Lender will notify the Administrative Agent (by telephone or in writing) of the contents thereof. Unless the Swingline Lender has received notice (by telephone or in writing) from the Administrative Agent prior to 3:00 p.m. (New York time) on the date of the proposed Swingline Borrowing (A) directing the Swingline Lender not to make such Swingline Loan as a result of the limitations set forth in this Article II, or (B) that one or more of the applicable conditions specified in Section 5.01 (if on the Amendment No. 7 Effective Date) and Section 5.02 is not then satisfied, then, subject to the terms and conditions hereof, the Swingline Lender will, not later than 4:00 p.m. (New York time) on the borrowing date specified in such Loan Notice, make the amount of its Swingline Loan available to the Parent Borrower at its office by crediting the account of the Parent Borrower on the books of the Swingline Lender in immediately available funds. The Swingline Lender shall not be required to make any Swingline Loan at any time when a Dollar Revolving Lender is a Defaulting Lender (except if all of the Swingline Exposure of such Defaulting Lender is reallocated pursuant to Section 2.16).

(b)    Refinancing.

(i)    The Swingline Lender at any time in its sole and absolute discretion may (and, in any event, within ten Business Days of the applicable Swingline Borrowing, shall) request that each Dollar Revolving Lender fund its risk participations in Swingline Loans in an amount equal to such Dollar Revolving Lender's Dollar Revolving Commitment Percentage of Swingline Loans then outstanding. Each Dollar Revolving Lender shall make an amount equal to its Dollar Revolving Commitment Percentage of the amount specified in such notice available to the Administrative Agent in immediately available funds for the account of the Swingline Lender at the Administrative Agent's Office not later than 1:00 p.m. (New York time) on the day specified in such notice. The Administrative Agent shall remit the funds so received to the Swingline Lender.

(ii)    Each Dollar Revolving Lender's funding of its risk participation in the relevant Swingline Loan and each Dollar Revolving Lender's payment to the Administrative Agent for the account of the Swingline Lender pursuant to Section 2.04(b)(i) shall be deemed payment in respect of such participation.

(iii)    If any Dollar Revolving Lender fails to make available to the Administrative Agent for the account of the Swingline Lender any amount required to be paid by such Dollar Revolving Lender pursuant to the foregoing provisions of this Section 2.04(b) by the time specified in Section 2.04(b)(i), the Swingline Lender shall be entitled to recover from such Dollar Revolving Lender  acting through the

82

Administrative Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to the Swingline Lender at a rate per annum equal to the greater of the Federal Funds Effective Rate and a rate determined by the Swingline Lender in accordance with banking industry rules on interbank compensation, plus any administrative, processing or similar fees customarily charged by the Swingline Lender in connection with the foregoing. If such Dollar Revolving Lender pays such amount (with interest and fees as aforesaid), the amount so paid shall constitute such Dollar Revolving Lender's funded participation in the relevant Swingline Loan. A certificate of the Swingline Lender submitted to any Dollar Revolving Lender (through the Administrative Agent) with respect to any amounts owing under this clause (iii) shall be conclusive absent manifest error.

(iv)    Each Dollar Revolving Lender's obligation to purchase and fund risk participations in Swingline Loans pursuant to this Section 2.04(b) shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right that such Dollar Revolving Lender may have against the Swingline Lender, the Parent Borrower or any other Person for any reason whatsoever, (B) the occurrence or continuance of a Default or Event of Default, (C) non-compliance with the conditions set forth in Section 5.02, or (D) any other occurrence, event or condition, whether or not similar to any of the foregoing; provided that Swingline Lender has complied with the provisions of Section 2.04(a). No such purchase or funding of risk participations shall relieve or otherwise impair the obligation of the Parent Borrower to repay Swingline Loans, together with interest as provided herein.

(c)    Repayment of Participations.

(i)    At any time after any Dollar Revolving Lender has purchased and funded a risk participation in a Swingline Loan, if the Swingline Lender receives any payment on account of such Swingline Loan, the Swingline Lender will distribute to such Dollar Revolving Lender its Dollar Revolving Commitment Percentage of such payment (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Dollar Revolving Lender's risk participation was funded) in the same funds as those received by the Swingline Lender.

(ii)    If any payment received by the Swingline Lender in respect of principal or interest on any Swingline Loan is required to be returned by the Swingline Lender under any of the circumstances described in Section 11.05 (including pursuant to any settlement entered into by the Swingline Lender in its discretion), each Dollar Revolving Lender shall pay to the Swingline Lender its Dollar Revolving Commitment Percentage thereof on demand of the Administrative Agent, plus interest thereon from the date of such demand to the date such amount is returned, at a rate per annum equal to the Federal Funds Effective Rate. The Administrative Agent will make such demand upon the request of the Swingline Lender. The obligations of the Dollar Revolving Lenders under this clause shall survive the payment in full of the Obligations and the termination of this Credit Agreement.

(d)    Interest for Account of Swingline Lender. The Swingline Lender shall be responsible for invoicing the Parent Borrower for interest on the Swingline Loans. Until each Dollar Revolving Lender funds its risk participation pursuant to this Section 2.04 of any Swingline Loan, interest in respect thereof shall be solely for the account of the Swingline Lender.

(e)    Payments Directly to Swingline Lender. The Parent Borrower shall make all payments of principal and interest in respect of the Swingline Loans directly to the Swingline Lender.

**2.05    Repayment of Loans.**

(a)    Revolving Loans. The Parent Borrower shall repay to the Dollar Revolving Lenders the Outstanding Amount of Dollar Revolving Loans on the Revolving Termination Date. Each Borrower shall repay to the Limited Currency Revolving Lenders the Outstanding Amount of the Limited Currency Revolving Loans made to it on the Revolving Termination Date. Each Borrower shall repay to the Multicurrency Revolving Lenders the

83

Outstanding Amount of Multicurrency Revolving Loans made to it on the Revolving Termination Date. Each Borrower shall repay to the Venue Expansion Revo ving Lenders the Outstanding Amount of Venue Expansion Revolving Loans made to it on the Revolving Termination Date.

(b)    Swingline Loans. The Parent Borrower shall repay to the Swingline Lender the Outstanding Amount of the Swingline Loans on the Revolving Termination Date.

(c)    [Reserved].

(d)    Term B-4 Loans. Starting with the last Business Day of December 2019, on the last Business Day of each March, June, September and December, the Parent Borrower shall repay an aggregate principal amount of Term B-4 Loans equal to 0.25% of the aggregate principal amount of all Term B-4 Loans funded or converted from Term B-3 Loans on the Amendment No. 6 Effective Date, and on the Term B-4 Loan Termination Date all Term B-4 Loans that are outstanding on the Term B-4 Loan Termination Date shall be repaid in full.

In the event any Incremental Term Loans, Refinancing Term Loans or Extended Term Loans are made, such Incremental Term Loans, Refinancing Term Loans or Extended Term Loans, as applicable, shall be repaid by the Parent Borrower in the amounts and on the dates set forth in the Additional Credit Extension Amendment with respect thereto and on the applicable maturity date thereof.

(e)    Term A-2 Loans and Term B-3 Loans. On the Amendment No. 6 Effective Date, all Term B-3 Loans that are not Converted Term B-3 Loans and all Term A-2 Loans, in each case, that are outstanding on the Amendment No. 6 Effective Date shall be repaid in full.

**2.06    Prepayments.**

(a)    Voluntary Prepayments. The Loans may be repaid in whole or in part without premium or penalty (except as set forth in the last paragraph of this Section 2.06(a) and, in the case of Loans other than Base Rate Loans, amounts payable pursuant to Section 3.05); provided that:

(i)    in the case of Loans other than Swingline Loans, (A) notice thereof must be received by 12:00 noon (Local Time) by the Applicable Agent (which notice may be transmitted by electronic communication, including an Approved Borrower Portal, if arrangements for doing so have been approved by the Applicable Agent) at least three (3) Business Days prior to the date of prepayment, in the case of Term Benchmark Loans or RFR Loans, and one (1) Business Day prior to the date of prepayment, in the case of Base Rate Loans, (B) any such prepayment shall be a minimum principal amount of (n) $1.0 million and integral multiples of $1.0 million in excess thereof, in the case of Term Benchmark Loans or RFR Loans denominated in Dollars, (o) €1.0 million and integral multiples of €1.0 million in excess thereof, in the case of Term Benchmark Loans denominated in Euros, (p) £1.0 million and integral multiples of £1.0 million in excess thereof, in the case of RFR Loans denominated in Sterling, (q) C$1.0 million and integral multiples of C$1.0 million in excess thereof, in the case of Term Benchmark Loans or RFR Loans denominated in Canadian Dollars, (r) kr7.0 million and integral multiples of kr7.0 million in excess thereof, in the case of Term Benchmark Loans denominated in Swedish Krona, (s) AU$1.0 mi lion and integral multiples of AU$1.0 million in excess thereof, in the case of Term Benchmark Loans denominated in Australian Dollars, (t) ¥100.0 million and integral multiples of ¥100.0 million thereof, in the case of Term Benchmark Loans denominated in Japanese Yen, (u) CHF1.0 million and integral multiples of CHF1.0 million thereof, in the case of RFR Loans denominated in Swiss Francs, (v) Dkr2.0 million and integral multiples of Dkr1.0 million in excess thereof, in the case of Term Benchmark Loans denominated in Danish Krone, (w) MXN5.0 million and integral multiples of MXN1.0 million in excess thereof, in the case of Term Benchmark Loans denominated in Mexican Pesos, (x) R$1.0 million and integral multiples of R$1.0 million in excess thereof, in the case of Term Benchmark Loans denominated in Brazilian Real and (y) $1.0 million and integral multiples of $100,000 in excess thereof, in the case of Base Rate Loans denominated in Dollars, or, in each case the entire remaining principal amount thereof, if less; and

84

(ii)    in the case of Swingline Loans, (A) notice thereof must be received by the Swingline Lender by 1:00 p.m. (New York time) on the date of prepayment (which notice may be transmitted by electronic communication, including an Approved Borrower Portal, if arrangements for doing so have been approved by the Swingline Lender) (with a copy to the Administrative Agent), and (B) any such prepayment shall be in the same minimum principal amounts as for advances thereof (or any lesser amount that may be acceptable to the Swingline Lender).

Each such notice of voluntary prepayment hereunder shall be irrevocable and shall specify the date and amount of such prepayment, the Loans and Types of Loans that are being prepaid and, if Term Benchmark Loans are to be prepaid, the Interest Period(s) of such Loans. The Applicable Agent will give prompt notice to the applicable Lenders of any prepayment on the Loans and the Lender's interest therein. Prepayments of Term Benchmark Loans hereunder shall be accompanied by accrued interest on the amount prepaid and breakage or other amounts due, if any, under Section 3.05. Notwithstanding the foregoing, a notice of voluntary prepayment delivered by the Parent Borrower may state that such notice is conditioned upon the effectiveness of other credit facilities, in which case such notice may be revoked by the Parent Borrower (by notice to the Applicable Agent on or prior to the specified effective date) if such condition is not satisfied. For the avoidance of doubt, all Original Revolving Commitments shall terminate on the Amendment No. 6 Effective Date and Parent Borrower shall repay a l outstanding Original Revolving Loans and Origina Swingline Loans, together with accrued and unpaid interest thereon.

(b)    Mandatory Prepayments. Subject in each case to Section 2.06(c):

(i)    Revolving Commitments.

(A)    If at any time (1) the Outstanding Amount of Dollar Revolving Obligations shall exceed the Aggregate Dollar Revo ving Committed Amount, (2) the Outstanding Amount of Limited Currency Revolving Obligations shall exceed the Aggregate Limited Currency Revolving Committed Amount, (3) the Outstanding Amount of Multicurrency Revolving Obligations shall exceed the Aggregate Multicurrency Revolving Committed Amount, (4) the Outstanding Amount of all Limited Currency Revolving Obligations and Multicurrency Revolving Obligations denominated in an Alternative Currency shall exceed the Alternative Currency Sublimit, (5) the Outstanding Amount of Venue Expansion Revolving Obligations shall exceed the Aggregate Venue Expansion Revolving Committed Amount, (6) the Outstanding Amount of Swingline Loans shall exceed the Swingline Sublimit and (67) the L/C Obligations shall exceed the L/C Sublimit or the L/C Committed Amount (in each case, other than solely as a result of changes in Spot Rates) immediate prepayment will be made on or in respect of the applicable Revolving Obligations in an amount equal to the difference; provided, however, that, except under the circumstances described in Section 2.03(a)(ii)(A)(5), 2.03(c), 2.03 d)(i), 2.03(g), 2.06 b)(i)(B), 2.16(d) or 9.02(c), L/C Obligations will not be Cash Collateralized hereunder until the Revolving Loans and Swingline Loans have been paid in full. If on any Revaluation Date and solely as a result of changes in Spot Rates, (i) the Outstanding Amount of Limited Currency Revolving Obligations shall exceed 105% of the Aggregate Limited Currency Revolving Committed Amount, (ii) the Outstanding Amount of Multicurrency Revolving Obligations shall exceed 105% of the Aggregate Multicurrency Revolving Committed Amount or (iii) the Outstanding Amount of all Limited Currency Revolving Obligations and Multicurrency Revolving Obligations denominated in an Alternative Currency shall exceed 105% of the Alternative Currency Sublimit, immediate prepayment will be made on or in respect of the applicable Revolving Obligations in an amount equal to the difference.

(B)    If the Administrative Agent or an L C Issuer notifies the Parent Borrower at any time that the Outstanding Amount of all L/C Obligations (whether or not as a result of a change in Spot Rates) at such time exceeds an amount equal to 103% (or, if all or partially as a result of a change in Spot Rates, 105%) of the L/C Sublimit then in effect, then, within two (2) Business Days after receipt of such notice, the Parent Borrower shall Cash Collateralize the L/C Obligations in an aggregate amount sufficient to reduce such Outstanding Amount as of such date of payment

85

to an amount not to exceed 100% of the L/C Sublimit. If the Administrative Agent or an L/C Issuer notifies the Parent Borrower at any time that the Outstanding Amount of all L/C Ob igations denominated in an Alternative Currency at such time exceeds an amount equal to 105% of the Alternative Currency L/C Sublimit then in effect, then, within two (2) Business Days after receipt of such notice, the Parent Borrower shall Cash Collateralize the L/C Obligations in an aggregate amount sufficient to reduce such Outstanding Amount as of such date of payment to an amount not to exceed 100% of the Alternative Currency L/C Sublimit. The Administrative Agent may, at any time and from time to time after the initial deposit of such cash collateral, request that additional cash collateral be provided in order to protect against the results of further exchange rate fluctuations.

(ii)    Subject Dispositions and Involuntary Dispositions. On or before the applicable date set forth in the next sentence, prepayment will be made on the Loan Obligations in an amount equal to one hundred percent (100%) of the Net Cash Proceeds received from any Subject Disposition or Involuntary Disposition by any member of the Consolidated Group occurring after the Amendment No. 11 12 Effective Date, but solely to the extent (x) the Net Cash Proceeds received in such Subject Disposition (or series of related Subject Dispositions) or Involuntary Disposition (or series of related Involuntary Dispositions) exceed $35.0 million, (y) the Net Cash Proceeds received in all Subject Dispositions or Involuntary Dispositions effected during the fiscal year in which the applicable Subject Disposition or Involuntary Disposition takes place exceeds $75.0 million and (z) such Net Cash Proceeds are not used to, subject to compliance with Section 8.02, acquire, maintain, develop, construct, improve, upgrade or repair Property or make Investments (other than inventory, accounts receivable, cash or Cash Equivalents) useful in the business of the Consolidated Group in any member of the Consolidated Group or to make investments in Permitted Acquisitions that are otherwise permitted hereunder within twelve (12) months of the date of such Subject Disposition or Involuntary Disposition (or to the extent contractually committed to be reinvested prior to the expiration of such twelve (12) month period, eighteen (18) months of the date of such Subject Disposition or Involuntary Disposition); provided that such a reinvestment shall not be permitted if an Event of Default sha l have occurred and be continuing at the time the Parent Borrower commits to make such reinvestment or, if no such commitment is made, the time the reinvestment is actually made, and in either such circumstance such Net Cash Proceeds shall be used to make prepayments on the Loans; provided further that, to the extent any Incremental Equivalent Debt is then outstanding and is secured by a Lien on the Collateral that is pari passu in priority with the Lien on the Collateral securing the Obligations and is required by the terms thereof to make a prepayment or make a repurchase offer from the net cash proceeds of such Subject Disposition or Involuntary Disposition ("Applicable Pari Passu Debt"), a portion of such Net Cash Proceeds not exceeding the Ratable Net Proceeds Share may be applied to prepay such Applicable Pari Passu Debt. Any such prepayment from any Net Cash Proceeds required by the previous sentence shall be made (x) in the case of a Major Disposition in respect of which the notice referred to in Section 7.02(g) has not been delivered on or before the fifteenth (15th) Business Day following the receipt of the Net Cash Proceeds from such Major Disposition or to the extent such notice does not indicate reinvestment is intended with the Net Cash Proceeds of such Major Disposition, on or before the twenty-fifth (25th) Business Day following receipt of such Net Cash Proceeds and (y) in any other case, promptly after the Parent Borrower determines that it will not reinvest such Net Cash Proceeds in accordance with the terms and limitations of the previous sentence, but in no event later than 366 days (or 546 days if a contractual commitment to reinvest such Net Cash Proceeds has been made within the initial 366-day period) following the receipt of such Net Cash Proceeds.

(iii)    Indebtedness. Prepayment will be made on the Loan Obligations in an amount equal to one hundred percent (100%) of the Net Cash Proceeds received from any incurrence or issuance of Indebtedness after the Amendment No. 11 12 Effective Date (other than Indebtedness expressly permitted to be incurred or issued pursuant to Section 8.03, (other than (a) Refinancing Debt and (b) initial borrowings under Replacement Revolving Commitments)); provided that prepayments required by initial borrowings under Replacement Revolving Commitments shall be applied only to borrowings under the Replaced Revolving Commitments (with reduction or termination of Revolving Commitments being replaced as required by clause (i) of the proviso to Section 2.19(a)); provided, further, that prepayments required by

86

initial borrowings or Refinancing Term Loans or incurrence of Refinancing Notes/Loans shall be applied only to borrowings under the Refinancing Term Loans (with reduction or termination of Revolving Commitments being replaced as required by clause (i) of the proviso to Section 2.18(a)). Any prepayment in respect of such Indebtedness hereunder will be payable on the Business Day following receipt by the Parent Borrower or other members of the Consolidated Group of the Net Cash Proceeds therefrom.

(iv)    Consolidated Excess Cash Flow. If for any fiscal year of the Parent Borrower ending after December 31, 2018 there shall be Consolidated Excess Cash Flow, then, on a date that is no later than five Business Days following the date that financial statements for such fiscal year are required to be delivered pursuant to Section 7.01(a) (without giving effect to any extension permitted pursuant to Section 7.01(a) due to a later filing deadline granted by the SEC for any such date that is prior to the Term B-4 Loan Termination Date), the Loan Obligations shall be prepaid by an amount equal to the ECF Application Amount for such fiscal year less any voluntary prepayments of Term Loans made during such fiscal year (other than such voluntary prepayments that are funded by the proceeds of Indebtedness and for the avoidance of doubt other than any prepayments made on the Amendment No. 11 Effective Date).

(v)    Term Benchmark Prepayment Account. If the Parent Borrower is required to make a mandatory prepayment of Term Benchmark Loans under this Section 2.06(b), so long as no Event of Default exists, the Parent Borrower shall have the right, in lieu of making such prepayment in full, to deposit an amount equal to such mandatory prepayment with the Applicable Agent in a cash collateral account maintained (pursuant to documentation reasonably satisfactory to the Applicable Agent) by and in the sole dominion and control of the Applicable Agent. Any amounts so deposited shall be held by the Applicable Agent as collateral for the prepayment of such Term Benchmark Loans and shall be applied to the prepayment of the applicable Term Benchmark Loans at the earliest of (x) the end of the current Interest Periods applicable thereto, (y) three months following the date of such deposit and (z) at the election of the Applicable Agent, upon the occurrence of an Event of Default. At the request of the Parent Borrower, amounts so deposited shall be invested by the Applicable Agent in Cash Equivalents maturing on or prior to the date or dates on which it is anticipated that such amounts will be applied to prepay such Term Benchmark Loans; any interest earned on such Cash Equivalents will be for the account of the Parent Borrower and the Parent Borrower will deposit with the Applicable Agent the amount of any loss on any such Cash Equivalents to the extent necessary in order that the amount of the prepayment to be made with the deposited amounts may not be reduced.

(vi)    Foreign Dispositions and Consolidated Excess Cash Flow. Notwithstanding any other provisions of this Section 2.06, (i) to the extent that any of or all the Net Cash Proceeds of any Subject Disposition or Involuntary Disposition by a Foreign Subsidiary (collectively, a "Foreign Disposition") or Consolidated Excess Cash Flow attributable to Foreign Subsidiaries are prohibited or delayed by applicable local law from being repatriated to the United States, the portion of such Net Cash Proceeds or Consolidated Excess Cash Flow so affected will not be required to be applied to prepay Loan Obligations at the times provided in this Section 2.06 but may be retained by the applicable Foreign Subsidiary so long, but only so long, as the applicable local law will not permit repatriation to the United States (the Parent Borrower hereby agreeing to cause the applicable Foreign Subsidiary to promptly take all commercially reasonable actions available under applicable ocal law to permit such repatriation), and once such repatriation of any of such affected Net Cash Proceeds or Consolidated Excess Cash Flow that, in each case, would otherwise be required to be used to make a prepayment pursuant to Section 2.06(b)(ii) or 2.06 b)(iv), is permitted under the applicable local law, such repatriation will be immediately effected and such repatriated Net Cash Proceeds or Consolidated Excess Cash Flow will be promptly (and in any event not later than ten Business Days after such repatriation) applied (net of additional Taxes payable or reserved against as a result thereof) to the prepayment of the Loan Obligations pursuant to this Section 2.06 and (ii) to the extent that the Parent Borrower has determined in good faith that repatriation of any of or all the Net Cash Proceeds of any Foreign Disposition or Foreign Subsidiary Consolidated Excess Cash Flow would have material adverse Tax cost consequences with respect to such Net Cash Proceeds or Consolidated Excess Cash Flow, such Net Cash Proceeds or Consolidated Excess Cash Flow so affected may be retained by the applicable Foreign Subsidiary; provided that, in the case of this clause (ii), on or

87

before the date on which any such Net Cash Proceeds so retained would otherwise have been required to be applied to reinvestments or prepayments pursuant to Section 2.06 b) or any such Consolidated Excess Cash Flow would have been required to be applied to prepayments pursuant to Section 2.06(b), the Parent Borrower applies an amount equal to such Net Cash Proceeds or Consolidated Excess Cash Flow to such reinvestments or prepayments, as applicable, as if such Net Cash Proceeds or Consolidated Excess Cash Flow had been received by the Parent Borrower rather than such Foreign Subsidiary, less the amount of additional Taxes that would have been payable or reserved against if such Net Cash Proceeds or Consolidated Excess Cash Flow had been repatriated (or, if less, the Net Cash Proceeds or Consolidated Excess Cash Flow that would be calculated if received by such Foreign Subsidiary).

(c)        Application. Within each Loan, prepayments wi l be applied first to Base Rate Loans and RFR Loans, then to Term Benchmark Loans in direct order of Interest Period maturities. In addition:

(i)        Voluntary Prepayments of Loans. Prepayments of the Term B-4 Loans pursuant to Section 2.06(a) shall be applied to either tranche of Term Loans as directed by the Parent Borrower (and, within such tranche, shall be applied to the payments required under Section 2.05(d) as directed by the Parent Borrower). Voluntary prepayments on the Loan Obligations will be paid by the Administrative Agent to the Lenders ratably in accordance with their respective interests therein.

(ii)        Mandatory Prepayments of Loans. Mandatory prepayments on the Loan Obligations will be paid by the Applicable Agent to the Lenders ratably in accordance with their respective interests therein; provided that:

(A)        Mandatory prepayments in respect of the Revolving Commitments under subsection (b)(i)(A) above shall be applied to the respective Revolving Obligations as appropriate.

(B)        Mandatory prepayments in respect of Subject Dispositions and Involuntary Dispositions under subsection (b)(ii) above, Indebtedness under subsection (b)(iii) and Consolidated Excess Cash Flow under subsection (b)(iv) above shall be applied (i) first to the Term B-4 Loans on a pro rata basis (in direct order of maturity and, within such tranche, shall be applied on a pro rata basis to the payments required under Section 2.05(d)), then (ii) to the Revolving Obligations (without permanent reduction of the Revolving Commitments); provided that prepayments in respect of Indebtedness under subsection (b)(iii) with the proceeds of Refinancing Debt or Replacement Revolving Commitments shall be applied only to the Loan or Commitment being refinanced.

**2.07    Termination or Reduction of Commitments.**

The Dollar Revolving Commitments, the Limited Currency Revolving Commitments or, the Multicurrency Revolving Commitments or the Venue Expansion Revolving Commitments (ratably among Dollar Revolving Commitments, the Limited Currency Revolving Commitments or, the Multicurrency Revolving Commitments or the Venue Expansion Revolving Commitments, as applicable) hereunder may be permanently reduced in whole or in part by notice from the Parent Borrower to the Administrative Agent; provided that (i) any such notice thereof must be received by 12:00 noon (New York time) at least five (5) Business Days prior to the date of reduction or termination and any such reduction or terminations shall be in a minimum amount of $1.0 million and integral multiples of $1.0 million in excess thereof; and (ii) the Commitments may not be reduced to an amount less than the Outstanding Amount of Loan Obligations then outstanding thereunder. The Administrative Agent will give prompt notice to the Lenders of any such reduction in Commitments. Any reduction of any Commitments shall be applied to the Commitment of each applicable Lender according to its Pro Rata Share. All commitment or other fees accrued with respect to any Commitment through the effective date of any termination thereof shall be paid on the effective date of such termination. A notice of termination of the Commitments delivered by the Parent Borrower may state that such notice is conditioned upon the effectiveness of other credit facilities, in which case such notice may be revoked by the Parent Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.

**2.08    Interest.**

(a)    Subject to the provisions of subsection (b) below, (i) each Term Benchmark Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the applicable Relevant Rate for such Interest Period plus the Applicable Percentage; (ii) each Loan that is a Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Percentage; (iii) each RFR Loan shall bear interest on the outstanding principal amount from the applicable borrowing date at a rate per annum equal to the applicable Adjusted Daily Simple RFR plus the Applicable Percentage, and (iv) each Swingline Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Percentage.

(b)    If any amount payable by the Borrowers under any Credit Document is not paid when due, then such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Law.

(c)    Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(d)    Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

(e)    With respect to the Amendment No. 10 Existing Term B-4 Loans, from and including the Amendment No. 10 Effective Date until the earlier of (x) the repayment of such Amendment No. 10 Existing Term B-4 Loans and (y) the Amendment No. 10 Existing Term B-4 Loan Interest Period Termination Date (such earlier date with respect to such Amendment No. 10 Existing Term B-4 Loans, the "Amendment No. 10 Existing Term B-4 Loan  nterest Payment Date"), the Amendment No. 10 Existing Term B-4 Loans shall continue to bear interest at the Amendment No. 10 Existing Term B-4 Loan Interest Rate, subject to any increase if not paid when due pursuant to Section 2.08(b). On the Amendment No. 10 Existing Term B-4 Loan Interest Payment Date, the Borrower shall pay interest in respect of the Amendment No. 10 Existing Term B-4 Loans accrued from and including the beginning of the Amendment No. 10 Existing Term B-4 Loan Interest Period to the Amendment No. 10 Existing Term B-4 Loan Interest Payment Date at the Amendment No. 10 Existing Term B-4 Loan Interest Rate. On the Amendment No. 10 Existing Term B-4 Loan Interest Period Termination Date, any Amendment No. 10 Existing Term B-4 Loans that remain outstanding shall be converted to Term Benchmark Loans or Base Rate Loans, as selected by the Borrower in accordance with Section 2.02.

**2.09    Fees.**

(a)    Commitment Fees. The Parent Borrower shall pay to the Administrative Agent for the account of (xw) each Dollar Revolving Lender in accordance with its Dollar Revolving Commitment Percentage, a commitment fee equal to the Commitment Fee Rate times the actual daily amount by which the Aggregate Dollar Revolving Committed Amount exceeds the sum of (i) the Outstanding Amount of Dollar Revolving Loans (but not, for the avoidance of doubt, any Swingline Loans) and (ii) the Outstanding Amount of Dollar Facility L/C Obligations, (yx) each Limited Currency Revolving Lender in accordance with its Limited Currency Revolving Commitment Percentage, a commitment fee equal to the Commitment Fee Rate times the actual daily amount by which the Aggregate Limited Currency Revolving Committed Amount exceeds the sum of (i) the Outstanding Amount of Limited Currency Revolving Loans and (ii) the Outstanding Amount of Limited Currency Facility L/C Obligations, and zy) each Multicurrency Revolving Lender in accordance with its Multicurrency Revolving Commitment Percentage, a commitment fee equal to the Commitment Fee Rate times the actual daily amount by which the Aggregate Multicurrency Revolving Committed Amount exceeds the Outstanding Amount of Multicurrency Revolving Loans other than Fronted Currency Loans and (z) each Venue Expansion Revolving Lender in accordance with its Venue Expansion Revolving Commitment Percentage, a commitment fee equal to the

89

Commitment Fee Rate times the actual daily amount by which the Aggregate Venue Expansion Revolving Committed Amount exceeds the Outstanding Amount of Venue Expansion Revolving Loans (the fees in clauses (w), (x), (y), and (z) collectively, the "Commitment Fees"). The Commitment Fees shall be due and payable in arrears on the last Business Day of each March, June, September and December, commencing on the first such date to occur after the Amendment No. 1112 Effective Date; provided that all accrued and unpaid Commitment Fees shall become due on the Revolving Termination Date.

(b)    Letter of Credit Fees.

(i)    Letter of Credit Fees. The Parent Borrower shall pay to the Administrative Agent, for the account of each L/C Revolving Lender in accordance with its L/C Commitment Percentage, a Letter of Credit fee, in Dollars, for each Letter of Credit, an amount equal to the Applicable Percentage for Revolving Loans that are Term Benchmark Loans multiplied by the daily maximum undrawn Outstanding Amount under such Letter of Credit (the "Letter of Credit Fees"). For purposes of computing the daily undrawn Outstanding Amount under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with Section 1.10. The Letter of Credit Fees shall be computed on a quarterly basis in arrears, and shall be due and payable on the tenth (10th) day of each January, April, July and October (for the Letter of Credit Fees accrued during the previous calendar quarter), commencing with the first such date to occur after the issuance of such Letter of Credit, on the L/C Expiration Date and thereafter on demand. If there is any change in the Applicable Percentage during any quarter, the daily amount available to be drawn under each Letter of Credit shall be computed and multiplied by the Applicable Percentage separately for each period during such quarter that such Applicable Percentage was in effect. Notwithstanding anything to the contrary contained herein, while any Event of Default has occurred and is continuing under Section 9.01(a), (f) or (h), all Letter of Credit Fees shall accrue at the Default Rate.

(ii)    Fronting Fee and Documentary and Processing Charges Payable to L/C Issuers. The Parent Borrower shall pay directly to each L/C Issuer for its own account a fronting fee with respect to each Letter of Credit issued by it, 0.125% of the daily undrawn Outstanding Amount under such Letter of Credit on a quarterly basis in arrears. Such fronting fee shall be due and payable on the tenth (10th) day of each January, April, July and October (for fronting fees accrued during the previous calendar quarter or portion thereof, in the case of the first payment), commencing with the first such date to occur after the issuance of such Letter of Credit, on the L/C Expiration Date and thereafter on demand. For purposes of computing the daily undrawn Outstanding Amount under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with Section 1.10. In addition, the applicable Borrower shall pay directly to each L/C Issuer for its own account the customary issuance, presentation, amendment and other processing fees, and other standard costs and charges, of the applicable L/C Issuer relating to letters of credit as from time to time in effect. Such customary fees and standard costs and charges are due and payable on demand and are nonrefundable.

(c)    [Reserved.]

(d)    Alternative Currency Fronting Currency Lender Fees. The Parent Borrower shall pay each Alternative Currency Fronting Lender such fronting fees (if any) with respect to Fronted Currency Loans as may be agreed among the Administrative Agent, such Alternative Currency Fronting Lender and the Parent Borrower at such times as may be agreed among the Administrative Agent, such Alternative Currency Fronting Lender and the Parent Borrower.

(e)    Other Fees. The Parent Borrower shall pay to the Lead Arrangers, for their own respective accounts, fees in the amounts and at the times specified in the Engagement Letter. The Parent Borrower shall also pay to the Administrative Agent, for its own account, fees in the amounts and at the times specified in the Administrative Agent Fee Letter. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever. The Administrative Agent Fee Letter is hereby ratified and confirmed in all respects by JPMCB and Parent Borrower, and both such parties agree that it shall remain effective on and following the Amendment No. 1112 Effective Date.

90

The applicable Borrower shall pay to the Lenders such fees as shall have been separately agreed upon in writing in the amounts and at the times so specified. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

**2.10    Computation of Interest and Fees.**

All computations of interest for Base Rate Loans when the Base Rate is determined by JPMCB's prime rate and computations of interest by reference to the Canadian Prime Rate shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed. All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year), or, in the case of interest in respect of Term Benchmark Loans or RFR Loans denominated in Alternative Currencies as to which market practice differs from the foregoing, in accordance with such market practice. Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.11(a), bear interest for one (1) day. Each determination by the Applicable Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

**2.11    Payments Generally; Applicable Agent's Clawback.**

(a)    General. All payments to be made by any Credit Party hereunder shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. All payments of principal and interest on any Loan shall be payable in the same currency as such Loan is denominated. All payments of fees pursuant to Section 2.09 shall be payable in Dollars. All payments in respect of Unreimbursed Amounts shall be payable in the currency provided in Section 2.03. All other payments herein shall be payable in the currency specified with respect to such payment or, if the currency is not specified, in Dollars. Except as otherwise expressly provided herein, all payments by the Borrowers shall be made to the Applicable Agent, for the account of the Lenders to which such payment is owed, at the Applicable Agent's Office in Same Day Funds not later than 3:00 p.m. Local Time on the date specified herein. The Applicable Agent will promptly distribute to each Lender its Pro Rata Share of such payment in like funds as received by wire transfer to such Lender's Lending Office. All payments received by the Applicable Agent after 3:00 p.m. Local Time shall be deemed received on the immediately succeeding Business Day and any applicable interest or fee shall continue to accrue. Subject to the definition of "Interest Period," if any payment to be made by the Borrowers shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)    (i) Funding by Lenders; Presumption by Applicable Agent. Unless the Applicable Agent shall have received notice from a Lender prior to the proposed time of any Borrowing that such Lender will not make available to the Applicable Agent such Lender's share of such Borrowing (net of applicable acceptance fees), the Applicable Agent may assume that such Lender has made such share available on such date in accordance with Section 2.02 and may, in reliance upon such assumption, make available to the applicable Borrower a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Borrowing (net of applicable acceptance fees) available to the Applicable Agent, then the applicable Lender and the applicable Borrower severally agree to pay to the Applicable Agent forthwith on demand such corresponding amount in Same Day Funds with interest thereon, for each day from and including the date such amount is made available to such Borrower to but excluding the date of payment to the Applicable Agent, at (A) in the case of a payment to be made by such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, plus any administrative, processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing and (B) in the case of a payment to be made by such Borrower, the interest rate applicable to Base Rate Loans. If such Borrower and such Lender shall pay such interest to the Applicable Agent for the same or an overlapping period, the Applicable Agent shall promptly remit to such Borrower the amount of such interest paid by such Borrower for such period. If such Lender pays its share of the applicable Borrowing to the Applicable Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing. Any payment by any Borrower shall be without prejudice to any

91

claim such Borrower may have against a Lender that shall have failed to make such payment to the Applicable Agent.

(ii)    Payments by the Borrowers; Presumptions by Applicable Agent. Unless the Applicable Agent shall have received notice from the applicable Borrower prior to the date on which any payment is due to the Applicable Agent for the account of the Lenders or the applicable L/C Issuer hereunder that the applicable Borrower will not make such payment, the Applicable Agent may assume that the applicable Borrower has made such payment on such date in accordance herewith and may, in re iance upon such assumption, distribute to the applicable Lenders or the applicable L/C Issuer, as the case may be, the amount due. In such event, if the applicable Borrower has not in fact made such payment, then each of the Lenders or the L/C Issuers, as the case may be, receiving any such payment severally agrees to repay to the Applicable Agent forthwith on demand the amount so distributed to such Lender or L/C Issuer, in Same Day Funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Applicable Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Applicable Agent in accordance with banking industry rules on interbank compensation.

A notice of the Applicable Agent to any Lender or any Borrower with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

(c)    Failure to Satisfy Conditions Precedent. If any Lender makes available to the Applicable Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the applicable Borrower by the Applicable Agent because the conditions to the applicable Credit Extension set forth in Article V are not satisfied or waived in accordance with the terms hereof, the Applicable Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(d)    Obligation of the Lenders Several. The obligations of the Lenders hereunder to make Loans, to fund participations in Letters of Credit and Swingline Loans and to make payments pursuant to Section 11.04(c) are several and not joint. The failure of any Lender to make any Loan, to fund any such participation or to make any payment under Section 11.04(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan, to purchase its participation or to make its payment under Section 11.04(c).

(e)    Funding Source. Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(f)    Insufficient Funds. If at any time insufficient funds are received by and available to the Applicable Agent to pay fully all amounts of principal, L/C Borrowings, interest and fees then due hereunder, such funds shall be applied (i) first, toward payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, toward payment of principal and L/C Borrowings then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal and L/C Borrowings then due to such parties.

**2.12    Sharing of Payments by Lenders.**

If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of the Loans made by it, or the participations in L/C Obligations or in Swingline Loans held by it resulting in such Lender's receiving payment of a proportion of the aggregate amount of such Loans, then the Lender receiving such greater proportion shall (a) notify the Applicable Agent of such fact, and (b) purchase (for cash at face value) participations in the Loans, subparticipations in L/C Obligations and Swingline Loans of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them; provided that:

92

(a)    if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(b)    the provisions of this Section shall not be construed to apply to (x) any payment made by any Borrower pursuant to and in accordance with the express terms of this Credit Agreement, (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans, amounts owing to it in respect of any subparticipations in L/C Obligations or Swingline Loans to any assignee or participant, other than to any Borrower or any Affiliate thereof (as to which the provisions of this Section shall apply) or (z) any payments made pursuant to Sections 2.17, 2.18 or 2.19.

Each Credit Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Credit Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Credit Party in the amount of such participation.

Notwithstanding anything to the contrary contained herein, the provisions of this Section 2.12 shall be subject to the express provisions of this Credit Agreement which require, or permit, differing payments to be made to non-Defaulting Lenders as opposed to Defaulting Lenders.

**2.13    Evidence of Debt.**

(a)    The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and evidenced by one or more entries in the Register maintained by the Administrative Agent, acting solely for purposes of Treasury Regulation Section 5f.103-1(c) as a non-fiduciary agent for the Borrowers, in each case in the ordinary course of business. Each other Agent shall promptly provide the Administrative Agent with all information needed to maintain such accounts in respect of the Loans administered by such Agent. The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrowers and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of any Borrower hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error. Upon the request of any Lender made through the Administrative Agent, the applicable Borrower shall execute and deliver to the Administrative Agent a Note for such Lender, which shall evidence such Lender's Loans in addition to such accounts or records. Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.

(b)    In addition to the accounts and records referred to in subsection (a) above, each Lender and the Administrative Agent shall maintain in accordance with its usual practice accounts or records and, in the case of the Administrative Agent, entries in the Register, evidencing the purchases and sales by such Lender of participations in Letters of Credit and Swingline Loans. In the event of any conflict between the accounts and records maintained by the Administrative Agent and the accounts and records of any Lender in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.

(c)    Each Lender having sold a participation in any of its Obligations, acting solely for this purpose as a non-fiduciary agent for the Borrowers, shall maintain a register for the recordation of the names and addresses of such Participants (and each change thereto, whether by assignment or otherwise) and the rights, interest or obligation of such Participants in any Obligation, in any Commitment and in any right to receive any payments hereunder.

93

**2.14**    **[Reserved].**

**2.15**    **[Reserved].**

**2.16**    **Defaulting Lenders.**

Notwithstanding any provision of this Credit Agreement to the contrary, if any Lender becomes a Defaulting Lender hereunder (as determined by the Administrative Agent or, in the case of clause (d) below, any applicable L/C Issuer), then the following provisions shall apply for so long as such Defaulting Lender is a Defaulting Lender:

(a)    the Administrative Agent (or the applicable L/C Issuer, as the case may be) shall promptly notify the Parent Borrower and each Lender that such Lender is a Defaulting Lender for purposes of this Credit Agreement;

(b)    fees under Section 2.09(a) shall cease to accrue on the Commitment of such Defaulting Lender (except to the extent reallocated pursuant to Section 2.16(e));

(c)    the Commitments and Loans of such Defaulting Lender shall be disregarded for all purposes of any determination of whether the Required Lenders, Required Revolving Lenders, Required Dollar Revolving Lenders, Required Venue Expansion Revolving Lenders, Required L/C Lenders, Required Limited Currency Revolving Lenders, Required Multicurrency Revolving Lenders or Required Term B-4 Lenders have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to Section 11.01);

(d)    if any Swingline Loan or Letter of Credit is outstanding at the time the notice described in clause (a) above is provided, the Parent Borrower shall within one Business Day following notice by the Administrative Agent (i) prepay such Swingline Loan and (ii) cash collateralize such Defaulting Lender's L/C Obligations in accordance with Section 2.03(a)(ii)(A)(5) and on terms similar to the procedures set forth in Section 2.03(g) for so long as such L/C Obligations are outstanding; provided that (A) to the extent the sum of the total Dollar Revolving Obligations (other than any Dollar Revolving Obligations constituting outstanding Dollar Revolving Loans made by any Defaulting Lender but including each Defaulting Lender's Dollar Facility L/C Obligations and Swingline Exposure) does not exceed the sum of the total Dollar Revolving Commitments (excluding the Dollar Revolving Commitment of any Defaulting Lender except to the extent of any outstanding Dollar Revolving Loans of such Defaulting Lender), the Administrative Agent may, by notice to the Dollar Revolving Lenders, elect to reallocate the Swingline Exposure among all non-Defaulting Lenders under the Dollar Revolving Facility by disregarding the Dollar Revolving Commitments of all Defaulting Lenders (except to the extent of any outstanding Dollar Revolving Loans of such Defaulting Lenders) for purposes of calculating each non-Defaulting Lender's Dollar Revolving Commitment Percentage, and to the extent the Administrative Agent elects to require such reallocation in accordance with the foregoing, no such Swingline Loan shall be required to be repaid pursuant to this Section 2.16(d) to the extent of such reallocation and (B) to the extent the sum of the total Dollar Revolving Obligations (other than any Dollar Revolving Obligations constituting outstanding Dollar Revolving Loans made by any Defaulting Lender but including each Defaulting Lender's Dollar Facility L/C Obligations and Swingline Exposure) plus the total Limited Currency Revolving Obligations (other than any Limited Currency Revolving Obligations constituting outstanding Limited Currency Revolving Loans made by any Defaulting Lender but including each Defaulting Lender's Limited Currency Facility L/C Obligations) does not exceed the sum of the total Dollar Revolving Commitments (excluding the Dollar Revolving Commitment of any Defaulting Lender except to the extent of any outstanding Dollar Revolving Loans of such Defaulting Lender) plus the total Limited Currency Revolving Commitments (excluding the Limited Currency Revolving Commitment of any Defaulting Lender except to the extent of any outstanding Limited Currency Revolving Loans of such Defaulting Lender), the Administrative Agent may, by notice to the Dollar Revolving Lenders and the Limited Currency Revolving Lenders, elect to reallocate the L/C Obligations among all non-Defaulting Lenders under the Dollar Revolving Facility and Limited Currency Revolving Facility by disregarding the Dollar Revolving Commitments and Limited Currency Revolving Commitments of all Defaulting Lenders (except to the extent of any outstanding Loans of such Defaulting Lenders) for purposes of calculating each non-Defaulting Lender's L/C Commitment Percentage, and to the extent the Administrative Agent elects to require such reallocation in accordance with the foregoing, no such L/C Obligations shall be required to be cash collateralized pursuant to this Section 2.16(d) to the extent of such reallocation; provided

94

that the reallocation pursuant to the foregoing shall not be permitted to the extent it would cause (x) any Dollar Revolving Lender's Dollar Revolving Obligations to exceed its Dollar Revolving Committed Amount or (y) any Limited Currency Revolving Lender's Limited Currency Revolving Obligations to exceed its Limited Currency Revolving Committed Amount;

(e)       to the extent:

        (i)    the Parent Borrower cash collateralizes any Defaulting Lender's L/C Obligations pursuant to Section 2.16(d), the Parent Borrower shall not be required to pay any fees to such Defaulting Lender pursuant to Section 2.09(b)(i) with respect to such Defaulting Lender's L/C Obligations during the period such Defaulting Lender's L/C Obligations are cash collateralized (but shall be reallocated pursuant to clause (ii) below);

        (ii)   the L/C Obligations of the non-Defaulting Lenders are reallocated pursuant to each applicable proviso to Section 2.16(d) above, then the fees payable to the Lenders pursuant to Section 2.09(b)(i) shall be adjusted proportionately to reflect such reallocation; or

        (iii) the Parent Borrower fails to cash collateralize any Defaulting Lender's L/C Obligations pursuant to Section 2.16(d) above and the L/C Obligations are not reallocated pursuant to either proviso, as applicable, to Section 2.16(d) above, then, without prejudice to any rights or remedies of any L/C Issuer or any Lender hereunder, then all fees that otherwise would have been payable to such Defaulting Lender pursuant to Section 2.09(b)(i) with respect to such Defaulting Lender's L/C Obligations shall be payable to each applicable L/C Issuer until such L/C Obligations are cash collateralized or reallocated pursuant to Section 2.16(d);

(f)       for purposes of determining:

        (i)    the amount of the total Commitments for purposes of Sections 2.01, 2.03 b) and 2.04(a), the Commitment of each Defaulting Lender shall be excluded therefrom (other than any portion of such Commitment pursuant to which there is then outstanding a Loan from such Defaulting Lender); and

        (ii)   the applicable L/C Obligations of any Lender with respect to any Letter of Credit that is issued, increased (to the extent of the increase only) or renewed (but, for the avoidance of doubt, not with respect to any other applicable L/C Obligations relating to any other Letter of Credit) during the period in which there is a Defaulting Lender or the Swingline Exposure of any Lender with respect to any Swingline Loan made during the period in which there is a Defaulting Lender, the Commitment of such Defaulting Lender shall be deemed to be zero; and

(g)       in the Administrative Agent's sole discretion:

        (i)    any prepayment of the principal amount of any Loans shall be applied solely to prepay the Loans of all non-Defaulting Lenders pro rata prior to being applied to the prepayment of any Loans of any Defaulting Lender; and

        (ii)   subject to Section 2.16(e)(iii), any amount payable to such Defaulting Lender pursuant to this Credit Agreement (whether on account of principal, interest, fees or otherwise and including any amount that would otherwise be payable to such Defaulting Lender pursuant to Section 2.12 or Section 3.06(b)) may, in lieu of being distributed to such Defaulting Lender, be retained by the Administrative Agent in a segregated non-interest bearing account and, subject to any applicable requirements of law, be applied at such time or times as may be determined by the Administrative Agent (i) first, pro rata, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent, applicable L/C Issuer or Swingline Lender hereunder, (ii)

second, pro rata, to the payment of any amounts owing to the Borrowers or the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Borrower or any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Credit Agreement and (iii) third, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction.

In the event that the Administrative Agent, the Parent Borrower, each applicable L/C Issuer and the Swingline Lender each agrees that a Defaulting Lender has adequately remedied all matters that caused such Lender to be a Defaulting Lender, the Administrative Agent shall promptly notify each Lender that such Lender has ceased to be a Defaulting Lender and, from and after the date of such notification, the Swingline Exposure and L/C Obligations of the Lenders shall be readjusted to reflect the inclusion of such Lender's Commitment and on such date such Lender shall purchase at par such of the Loans of the other Lenders (other than Swingline Loans) as the Administrative Agent shall determine may be necessary in order for such Lender to hold such Loans in accordance with its Dollar Facility Percentage and Limited Currency Facility Percentage.

**2.17    Extended Term Loans and Extended Revolving Commitments.**

(a)    Parent Borrower may at any time and from time to time request that all or a portion of the Term Loans of any Class (the Loans of such applicable Class, the "Existing Term Loans") be converted into a new Class of Term Loans (the Loans of such applicable Class, the "Extended Term Loans") with terms consistent with this Section 2.17. In order to establish any Extended Term Loans, the Parent Borrower shall provide a notice to the Administrative Agent (a "Term Loan Extension Request") setting forth the proposed terms of the Extended Term Loans to be established, which shall be substantially identical to those applicable to the Existing Term Loans from which such Extended Term Loans are to be converted, as determined by the Parent Borrower in good faith and such determination shall be conclusive evidence that such terms are substantially identical to such Existing Term Loans (unless a Lender shall have objected thereto in writing within 5 Business Days and has set forth such Lender's objections with specificity), except that:

(i)    the maturity date of the Extended Term Loans shall be later than the maturity date of the Existing Term Loans;

(ii)    all or any of the scheduled amortization payments of principal of the Extended Term Loans shall be delayed to later dates than the scheduled amortization payments of principal of the Existing Term Loans such that the amortization payments of principal with respect to such Extended Term Loans for the period prior to the maturity date of the Existing Term Loans is no greater than the amounts due immediately prior to such extension;

(iii)    (A) the interest rates (including through fixed interest rates), interest margins, rate floors, upfront fees, funding discounts, original issue discounts and premiums with respect to the Extended Term Loans may be different than those for the Existing Term Loans and (B) additional fees and/or premiums may be payable to the Extending Lenders providing such Extended Term Loans in addition to any of the items contemplated by the preceding clause (A);

(iv)    the Extended Term Loans may have optional prepayment terms (including call protection and prepayment premiums) and mandatory prepayment terms as may be agreed between the Parent Borrower and the Extending Lenders so long as such Extended Term Loans do not participate on a greater than pro rata basis in any such mandatory prepayments as compared to then-existing Term B-4 Lenders;

(v)    the Credit Parties may be subject to covenants and other terms for the benefit of the Extending Lenders that apply only after the Final Maturity Date of the Existing Term Loans (before giving effect to the Extended Term Loans); and

96

(vi)  no existing Lender shall be required to provide, consent to or convert into any Extended Term Loans and no Loans of such Lenders wil  be converted without such party's affirmative consent thereto.

(b)        The Borrowers may at any time and from time to time request that all or a portion of the Revolving Commitments of any Class (the Commitments of such applicable Class, the "Existing Revolving Commitments") be converted into a new Class of Revolving Commitments (the Commitments of such applicable Class, the "Extended Revolving Commitments") with terms consistent with this Section 2.17. In order to establish any Extended Revolving Commitments, the Borrowers shall provide a notice to the Administrative Agent (a "Revolving Credit Extension Request") setting forth the proposed terms of the Extended Revolving Commitments to be established, which terms shall be substantially identical to those applicable to the Existing Revolving Commitments, as determined by the Parent Borrower in good faith and such determination shall be conclusive evidence that such terms are substantially identical to such Existing Revolving Commitment (unless a Lender shall have objected thereto in writing within 5 Business Days and has set forth such Lender's objections with specificity), except that:

(i)    the maturity date of the Extended Revolving Commitments shall be later than the Initial Revolving Termination Date;

(ii)   (A) the interest rates, interest margins, rate floors, upfront fees, funding discounts, original issue discounts and premiums with respect to the Extended Revolving Commitments may be different than those for the Existing Revolving Commitments and/or (B) additional fees and/or premiums may be payable to the Extending Lenders in addition to or in lieu of any of the items contemplated by the preceding clause  A) and/or (C) the undrawn revolving credit commitment fee rate with respect to the Extended Revolving Commitments may be different than those for the Existing Revolving Commitments;

(iii)  the Credit Parties may be subject to covenants and other terms for the benefit of the Extending Lenders that apply only after the Initial Revolving Termination Date  before giving effect to the Extended Revolving Commitments); and

(iv)   no existing Lender shall be required to provide any Extended Revolving Commitments and no Existing Revolving Commitments will become Extended Revolving Commitments without such party's affirmative consent thereto.

(c)        Each Extension Request shall specify the date (the "Extension Effective Date") on which the applicable Borrower proposes that the conversion of an Existing Class into an Extended Class shall be effective, which shall be a date reasonably satisfactory to the Administrative Agent. Each Lender of an Existing Class that is requested to be extended shall be offered the opportunity to convert its Existing Class into the Extended Class on the same basis as each other Lender of such Existing Class. Any Lender (to the extent applicable, an "Extending Lender") wishing to have all or a portion of its Existing Class subject to such Extension Request converted into an Extended Class shall notify the Administrative Agent (an "Extension Election") on or prior to the date specified in such Extension Request of the amount of its Existing Class subject to such Extension Request that it has elected to convert into an Extended Class. In the event that the aggregate portion of the Existing Class subject to Extension Elections exceeds the amount of the Extended Class requested pursuant to the Extension Request, the portion of the Existing Class converted shall be allocated on a pro rata basis based on the amount of the Existing Class included in each such Extension Election. Notwithstanding the conversion of any Existing Revolving Commitment into an Extended Revolving Commitment, such Extended Revolving Commitment shall be treated identically with all Existing Revolving Commitments for purposes of the obligations of a Revolving Lender in respect of Swingline Loans under Section 2.01(c) and Letters of Credit under Section 2.03, except that the applicable Additional Credit Extension Amendment may provide that the maturity date for Swingline Loans and/or the Letters of Credit may be extended and the related obligations to make Swingline Loans and issue Letters of Credit may be continued so long as the Swingline Lender and/or the applicable L/C Issuer, as applicable, have consented to such extensions in their sole discretion (it being understood that no consent of any other Lender (other than the Extending Lenders) shall be

97

required in connection with any such extension). In no event may the Swingline Sublimit or the L/C Sublimit be increased without the consent of the Swingline Lender or each L/C Issuer, as the case may be.

(d)    An Extended Class shall be established pursuant to an Additional Credit Extension Amendment executed by the Extending Lenders (and the other Persons specified in the definition of "Additional Credit Extension Amendment" but no other existing Lender). No Additional Credit Extension Amendment shall provide for any Class of (x) Extended Term Loans in an aggregate principal amount that is less than $10.0 million or (y) Extended Revolving Commitments in an aggregate principal amount that is less than $5.0 million. In addition to any terms and changes required or permitted by Section 2.17(a), the Additional Credit Extension Amendment shall amend the scheduled amortization payments pursuant to Section 2.05 with respect to the Existing Term Loans from which the Extended Term Loans were converted to reduce each scheduled principal repayment amounts for the Existing Term Loans in the same proportion as the amount of Existing Term Loans to be converted pursuant to such Additional Credit Extension Amendment.

(e)    Notwithstanding anything to the contrary contained in this Credit Agreement, on the Extension Effective Date, (i) the principal amount of each Existing Term Loan shall be deemed reduced by an amount equal to the principal amount converted into an Extended Term Loan, (ii) the amount of each Existing Revolving Commitment shall be deemed reduced by an amount equal to the amount converted into an Extended Revolving Commitment and (iii) if, on any Extension Effective Date, any Loans of any Extending Lender are outstanding under the applicable Existing Revolving Commitments, such Loans (and any related participations) shall be deemed to be converted into Loans (and related participations) made pursuant to the Extended Revolving Commitments in the same proportion as such Extending Lender's Existing Revolving Commitments are converted to Extended Revolving Commitments.

(f)    This Section 2.17 shall supersede any provisions in Section 2.12 or Section 11.01 to the contrary. Each Extended Class shall be documented by an Additional Credit Extension Amendment executed by the Extending Lenders providing such Extended Class (and the other persons specified in the definition of "Additional Credit Extension Amendment" but no other existing Lender), and the Additional Credit Extension Amendment may provide for such amendments to this Credit Agreement and the other Credit Documents as may be necessary or appropriate in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions of this Section 2.17.

**2.18    Refinancing Term Loans.**

(a)    The Parent Borrower may at any time and from time to time, with the consent of the Administrative Agent (not to be unreasonably withheld or delayed), request the establishment of one or more additional Classes of term loans under this Credit Agreement or an increase to an existing Class of term loans under this Credit Agreement (in each case, "Refinancing Term Loans") or one or more series of debt securities or term loans ("Refinancing Notes/Loans"; and together with Refinancing Term Loans, the "Refinancing Debt"); provided that:

(i)    the proceeds of such Refinancing Debt shall be used, concurrently or substantially concurrently with the incurrence thereof, solely to refinance all or any portion of any outstanding Term Loans;

(ii)    each Class of Refinancing Term Loans shall be in an aggregate amount of $5.0 million or any whole multiple of $1.0 million in excess thereof (or such other amount necessary to repay any Class of outstanding Term Loans in full);

(iii)    such Refinancing Debt shall be in an aggregate principal amount not greater than the aggregate principal amount of Term Loans to be refinanced plus any accrued interest, fees, costs, premiums and expenses related thereto (including any original issue discount or upfront fees);

(iv)  the final maturity date of such Refinancing Debt shall be later than the maturity date of the Term Loans being refinanced, and the Weighted Average Life to Maturity of such Refinancing Debt shall be longer than the then remaining Weighted Average Life to Maturity of each Class of Term Loans being refinanced;

(v)  (A) the pricing, interest rate margins, rate floors, discounts, fees and optional and mandatory prepayment or redemption provisions  including premiums, if any) applicable to such Refinancing Debt shall be as agreed between the Parent Borrower and the providers of such Refinancing Debt so long as, in the case of any mandatory prepayment or redemption provisions, the providers of such Refinancing Debt do not participate on a greater than pro rata basis in any such prepayments as compared to Term B-4 Lenders being refinanced and (B) the covenants and other terms applicable to such Refinancing Term Loans (excluding those terms described in the immediately preceding clause (A)), which shall be as agreed between the Parent Borrower and the lenders providing such Refinancing Debt, shall not be materially more restrictive (when taken as a whole) to the Parent Borrower and its Restricted Subsidiaries than those applicable to any Class of Term Loans then outstanding under this Credit Agreement, as determined by the Parent Borrower in good faith, except to the extent such covenants and other terms apply solely to any period after the Final Maturity Date applicable under this Credit Agreement (after giving effect to such Refinancing Debt) or such covenants or other terms apply equally for the benefit of the other Lenders; provided that it is understood and agreed that Refinancing Debt may be guaranteed by Subsidiaries that are Domestic Credit Parties (but not other Subsidiaries); provided, further, that to the extent that any financial maintenance covenant is added for the benefit of such Refinancing Debt that applies prior to the Final Maturity Date hereunder, no consent shall be required from the Administrative Agent or any Lender to the extent that such financial maintenance covenant is also added for the benefit of all Lenders (after giving effect to such Refinancing Debt);

(vi)  no existing Lender shall be required to provide any Refinancing Debt; and

(vii) (A) the Refinancing Term Loans shall rank pari passu in right of payment and security with the existing Term B-4 Loans and (B) the Refinancing Notes/Loans may be (x) secured by Collateral on a pari passu basis with the existing Term B-4 Loans, (y) secured by Collateral on a junior lien basis to the existing Term B-4 Loans or (z) unsecured; provided, further, that in the case of clause (x) or clause (y), the holders of such Refinancing Notes/Loans or their representative is or becomes party to a customary intercreditor agreement reasonably satisfactory to the Administrative Agent and the Parent Borrower and all such Liens are subject to such intercreditor agreement.

(b)  Each such notice shall specify (x) the date (each, a "Refinancing Effective Date") on which the Parent Borrower proposes that the Refinancing Debt be made, which shall be a date reasonably acceptable to the Administrative Agent and (y) in the case of Refinancing Term Loans, the identity of the Persons (each of which shall be a Person that would be an Eligible Assignee (for this purpose treating a Lender of Refinancing Term Loans as if it were an assignee)) whom the Parent Borrower proposes would provide the Refinancing Term Loans and the portion of the Refinancing Term Loans to be provided by each such Person. On each Refinancing Effective Date, each Person with a commitment for a Refinancing Term Loan or Refinancing Notes/Loans shall make a Refinancing Term Loan to the Parent Borrower, and/or purchase Refinancing Notes/Loans from the Parent Borrower, in a principal amount equal to such Person's commitment therefor.

(c)  This Section 2.18 shall supersede any provisions in Section 2.12 or Section 11.01 to the contrary (but shall be in addition to and not in lieu of the second paragraph of Section 11.01). The Refinancing Term Loans shall be documented by an Additional Credit Extension Amendment executed by the Persons providing the Refinancing Term Loans (and the other Persons specified in the definition of "Additional Credit Extension Amendment" but no other existing Lender), and the Additional Credit Extension Amendment may provide for such amendments to this Credit Agreement and the other Credit Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Parent Borrower, to effect the provisions of this Section 2.18. The Refinancing Notes/Loans shall be established pursuant to documentation which shall be consistent with the provisions set forth in Section 2.18(a).

**2.19    Replacement Revolving Commitments.**

(a)       The Borrowers may at any time and from time to time, with the consent of the Administrative Agent (not to be unreasonably withheld or delayed), request the establishment of one or more additional Classes of Revolving Commitments ("Replacement Revolving Commitments") to replace all or a portion of any existing Classes of Revolving Commitments under this Credit Agreement ("Replaced Revolving Commitments"); provided that:

(i)    substantially concurrently with the effectiveness of the Replacement Revolving Commitments, all or an equivalent portion of the Revolving Commitments in effect immediately prior to such effectiveness shall be terminated, and all or an equivalent portion of the Revolving Loans and Swingline Loans then outstanding, together with all interest thereon, and all other amounts accrued for the benefit of the Revo ving Lenders, shall be repaid or paid (it being understood, however, than any Letters of Credit issued and outstanding under the Replaced Revolving Commitments shall be deemed to have been issued under the Replacement Revolving Commitments if the amount of such Letters of Credit would exceed the remaining amount of commitments under the Replaced Revo ving Commitments after giving effect to the reduction contemplated hereby);

(ii)    such Replacement Revolving Commitments shall be in an aggregate amount not greater than the aggregate amount of Replaced Revolving Commitments to be replaced plus any accrued interest, fees, costs and expenses related thereto (including any upfront fees);

(iii)    the final maturity date of such Replacement Revolving Commitments shall be later than the Initial Revolving Termination Date;

(iv)    the L/C Sublimit and the Swingline Sublimit under such Replacement Revolving Commitments shall be as agreed between the Borrowers, the Lenders providing such Replacement Revolving Commitments, the Administrative Agent, the L/C Issuer (or any replacement L/C Issuer) and the Swingline Lender (or any replacement Swingline Lender); provided that in no event may the Swingline Sublimit or the L/C Sublimit be increased without the consent of the Swingline Lender (other than a replacement Swingline Lender with respect to such Replacement Revolving Commitment) or each L/C Issuer (other than a replacement L/C Issuer with respect to such Replacement Revolving Commitment), as the case may be;

(v)    (A) the pricing, rate floors, discounts, fees and optional prepayment or redemption provisions applicable to such Replacement Revolving Commitments shall be as agreed between the Borrowers and the Replacement Revolving Lenders so long as, in the case of any optional prepayment or redemption provisions, such Replacement Revolving Lenders do not participate on a greater than pro rata basis in any such prepayments as compared to Replaced Revolving Commitments and (B) the covenants and other terms applicable to such Replacement Revolving Commitments (excluding those terms described in the immediately preceding clause (A)), which shall be as agreed between the Borrowers and the lenders providing such Replacement Revolving Commitments, shall not be more favorable (when taken as a whole) to the lenders providing the Replacement Revolving Commitments than those applicable to the Replaced Revolving Commitments (as determined by the Parent Borrower in good faith), except to the extent such covenants and other terms apply solely to any period after the Final Maturity Date applicable under this Credit Agreement (before giving effect to the Replacement Revolving Commitments) or such covenants or other terms apply equally for the benefit of the other Lenders; provided that it is understood and agreed that the Replacement Revolving Commitments may be guaranteed by Subsidiaries that are Domestic Credit Parties (but not other Subsidiaries, except in the case of Replacement Revolving Commitments of Foreign Borrowers, which may be guaranteed by any Guarantors);

(vi)    no existing Lender shall be required to provide any Replacement Revolving Commitments;

100

(vii) the Replacement Revolving Commitments shall rank pari passu in right of payment and security with the existing Revolving Commitments;

(viii) any Loans under a Replacement Revolving Commitment will be drawn and participate in Letters of Credit and Swingline Loans on a pro rata basis with any existing Revolving Commitments.

(b)        Each such notice shall specify (x) the date on which the Borrowers propose that the Replacement Revolving Commitments become effective, which shall be a date reasonably acceptable to the Administrative Agent and (y) the identity of the Persons (each of which shall be a Person that would be an Eligible Assignee (for this purpose treating a Lender of Replacement Revolving Commitments as if it were an assignee)) whom the Borrowers propose would provide the Replacement Revolving Commitments (each such person, a "Replacement Revolving Lender") and the portion of the Replacement Revolving Commitments to be provided by each such Person.

(c)        This Section 2.19 shall supersede any provisions in Section 2.12 or Section 11.01 to the contrary. The Replacement Revolving Commitments shall be documented by an Additional Credit Extension Amendment executed by the Persons providing the Replacement Revolving Commitments (and the other Persons specified in the definition of "Additional Credit Extension Amendment" but no other existing Lender), and the Additional Credit Extension Amendment may provide for such amendments to this Credit Agreement and the other Credit Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrowers, to effect the provisions of this Section 2.19.

## ARTICLE III

## TAXES, YIELD PROTECTION AND ILLEGALITY

**3.01   Taxes.**

(a)        Payments Free of Taxes. Except as otherwise required by Law (as determined in the good faith discretion of the applicable Withholding Agent), any and all payments by or on account of any obligation of the Credit Parties hereunder or under any other Credit Document shall be made free and clear of and without reduction or withholding for any Taxes; provided that if the applicable Withholding Agent shall be required by applicable Law (as determined in the good faith discretion of the applicable Withholding Agent) to deduct or withhold any Taxes from such payments, then (i) if the Tax in question is an Indemnified Tax or an Other Tax, the sum payable by the applicable Credit Party shall be increased as necessary so that after all required deductions or withholdings have been made (including deductions or withholdings applicable to additional sums payable under this Section 3.01) the Applicable Agent or Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions or withholdings been made, (ii) the applicable Withholding Agent shall make such deductions or withholdings and (iii) the applicable Withholding Agent shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Law.

(b)        Payment of Other Taxes. Without limiting the provisions of subsection (a) above, the applicable Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Law.

(c)        Indemnification by the Applicable Borrower. Without duplication of any amounts payable under Section 3.01(a), the applicable Borrower shall indemnify the Applicable Agent and each Lender within 10 days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 3.01) payable by the Applicable Agent or such Lender, as the case may be, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability, together with any reasonable supporting documentation, delivered to the applicable Borrower by a Lender (with a copy to the Administrative Agent), or by the Applicable Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error. Upon the reasonable request of any Credit Party, the Lenders, and the Applicable Agent agree

101

to use their reasonable efforts to cooperate with such Credit Party (at such Credit Party's direction and expense) in contesting the imposition of, or claiming a refund of, any Indemnified Taxes or Other Taxes paid by such Credit Party, whether directly to a Governmental Authority or pursuant to this Section 3.01, that such Credit Party reasonably believes were not correctly or legally asserted by the relevant Governmental Authority unless such Lender or the Applicable Agent, as the case may be, determines in good faith that pursuing such a contest or refund would be materially disadvantageous to it.

(d)    Evidence of Payments. As soon as reasonably practicable after any payment of Taxes pursuant to this Section 3.01 or Other Taxes by a Credit Party to a Governmental Authority, such Credit Party shall deliver to the Applicable Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Applicable Agent.

(e)    Status of Lenders. Each Lender shall, at such times as are reasonably requested by the applicable Borrower or the Applicable Agent, provide such Borrower and the Applicable Agent with any documentation prescribed by Law, or reasonably requested by such Borrower or the Applicable Agent, certifying as to any entitlement of such Lender to an exemption from, or reduction in, any withholding Tax with respect to any payments to be made to such Lender under the Credit Documents. Each such Lender shall, whenever a lapse in time or change in circumstances renders such documentation expired, obsolete or inaccurate in any material respect, deliver promptly to such Borrower and the Applicable Agent updated or other appropriate documentation (including any new documentation reasonably requested by the applicable Withholding Agent) or promptly notify such Borrower and the Applicable Agent of its legal ine igibility to do so. For the avoidance of doubt, unless the applicable Withholding Agent has received forms or other documentation satisfactory to it indicating that payments under any Credit Document to or for a Lender are not subject to withholding Tax or are subject to such Tax at a reduced rate pursuant to an applicable tax treaty, the applicable Withholding Agent shall withhold amounts required to be withheld by applicable Law from such payment at the maximum applicable withholding rate.

Without limiting the generality of the foregoing, in the event that any Borrower is not a Foreign Borrower:

(i)    Each U.S. Lender shall deliver to the Parent Borrower and the Administrative Agent on or before the date on which it becomes a party to this Credit Agreement (and from time to time thereafter when required by Law or upon the reasonable request of the Parent Borrower or the Administrative Agent) two properly completed and duly signed original copies of Internal Revenue Service Form W-9 (or any successor form) certifying that such Lender is exempt from U.S. federal backup withholding,

(ii)    Each Foreign Lender sha l deliver to the Parent Borrower and the Administrative Agent on or before the date on which it becomes a party to this Credit Agreement (and from time to time thereafter when required by Law or upon the reasonable request of the Parent Borrower or the Administrative Agent) whichever of the following is applicable:

(A)    two duly completed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E (or any successor forms) claiming eligibility for benefits of an income tax treaty to which the United States of America is a party.

(B)    two duly completed copies of Internal Revenue Service Form W-8ECI (or any successor forms),

(C)    in the case of a Lender claiming the benefits of the exemption for portfolio interest under Section 871(h) or Section 881(c) of the Internal Revenue Code, (x) a certificate, in substantially the form of Exhibit 3.01(e)-1, -2, -3, or -4 (any such certificate a "United States Tax Compliance Certificate"), or any other form approved by the Administrative Agent, to the effect that such Lender is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, (B) a "10 percent shareholder" of the Parent Borrower within the meaning of Section 881(c)(3)(B) of the Internal Revenue Code, or (C) a "controlled foreign corporation"

102

described in Section 881(c)(3)(C) of the Internal Revenue Code, and that no payments in connection with the Credit Documents are effectively connected with such Lender's conduct of a U.S. trade or business and (y) two duly completed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E (or any successor forms),

(D)     to the extent a Lender is not the beneficial owner (for example, where the Lender is a partnership, or is a Lender that has granted a participation), Internal Revenue Service Form W-8IMY (or any successor forms) of the Lender, accompanied by a Form W-8ECI, W-8BEN or W-8BEN-E, United States Tax Compliance Certificate, Form W-9, Form W-8IMY (or other successor forms) or any other required information from each beneficial owner, as applicable (provided that, if the Lender is a partnership (and not a participating Lender) and one or more direct or indirect partners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate shall be provided by such Lender on behalf of such direct or indirect partner(s)),

(E)     any other form prescribed by applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable Laws to permit the applicable Withholding Agent to determine the withholding or deduction required to be made on any payments to such Lender under the Credit Documents, or

(F)     the Administrative Agent (and any assignee or successor) will deliver, to the Parent Borrower, on or prior to the execution and delivery of this Credit Agreement (or, assignment or succession, if applicable), either (i) (A) two (2) executed copies of IRS Form W-8ECI with respect to any amounts payable to the Administrative Agent for its own account and (B) two (2) duly completed copies of IRS Form W-8IMY (certifying that it is either a "qualified intermediary" or a "U.S. branch") for the amounts the Administrative Agent receives for the account of others, or (ii) two (2) executed copies of IRS Form W-9, whichever is applicable, and in each case of (i) and (ii), with the effect that the Parent Borrower can make payments to the Administrative Agent on behalf of the Lenders without any deduction or withholding of any U.S. federal withholding Taxes.

(iii)  If a payment made to a Lender under any Credit Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Sections 1471(b) or 1472(b) of the Internal Revenue Code, as applicable), such Lender shall deliver to the Parent Borrower and the Administrative Agent at the time or times prescribed by Law and at such time or times reasonably requested by the Parent Borrower or the Administrative Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Internal Revenue Code) and such additional documentation reasonably requested by the Parent Borrower or the Administrative Agent as may be necessary for the Parent Borrower and the Administrative Agent to comply with their FATCA obligations, to determine whether such Lender has or has not complied with such Lender's FATCA obligations and to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this clause 3.01(e)(iii), FATCA shall include any amendments made to FATCA after the date of this Credit Agreement.

Notwithstanding any other provision of this clause (e), a Lender shall not be required to deliver any documentation that such Lender is not legally eligible to deliver. Each Lender hereby authorizes the Applicable Agent to deliver to the Borrowers and any successor Applicable Agent any documentation delivered by the Lender to the Applicable Agent pursuant to this Section 3.01(e).

(f)     Treatment of Certain Refunds. If the Applicable Agent or any Lender determines, in its reasonable discretion, exercised in good faith, that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by any Credit Party or with respect to which a Credit Party has paid additional amounts pursuant to this Section 3.01, it shall pay to the applicable Credit Party an amount equal to such refund (but only to

103

the extent of indemnity payments made, or additional amounts paid, by the Credit Party under this Section 3.01 with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all reasonable out-of-pocket expenses (including any Taxes imposed with respect to the refund) of such Agent or such Lender, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that the applicable Credit Party, upon the request of the Applicable Agent or such Lender, agrees to repay the amount paid over to such Credit Party ( plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Applicable Agent or such Lender in the event the Applicable Agent or such Lender is required to repay such refund to such Governmental Authority. This subsection shall not be construed to require the Applicable Agent or any Lender to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to any Credit Party or any other Person. Notwithstanding anything to the contrary, in no event will any Lender be required to pay any amount to any Credit Party the payment of which would place such Lender in a less favorable net after-tax position that such Lender or would have been in if the Indemnified Tax or other Tax giving rise to such refund had never been imposed.

(g)     Payments made by the Applicable Agent. For the avoidance of doubt, any payments made by the Applicable Agent to any Lender shall be treated as payments made by the applicable Credit Party.

(h)     [Reserved].

(i)     Issuing Banks and Swingline Lenders. For the avoidance of doubt, for purposes of this Section 3.01, the term "Lender" shall include any L/C Issuer and the Swingline Lender, and "Law" includes FATCA.

(j)     Treatment of Advances. From and after the Amendment No. 3 Effective Date, solely for purposes of FATCA, the Borrowers and the Administrative Agent shall treat, and the Lenders hereby authorize the Borrowers and the Administrative Agent to treat, this Credit Agreement and all advances hereunder (including advances already outstanding) as no longer qualifying as "grandfathered obligations" within the meaning of Treasury Regulation section 1.1471-2(b)(2)(i).

**3.02    Illegality.**

If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund Term Benchmark Loans or RFR Loans, or to determine or charge interest rates based upon the applicable Relevant Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on notice thereof by such Lender to the Parent Borrower through the Administrative Agent, any obligation of such Lender to make or continue Term Benchmark Loans or RFR Loans or to convert Loans that are Base Rate Loans to Term Benchmark Loans or RFR Loans shall be suspended until such Lender notifies the Administrative Agent and the Parent Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, the Parent Borrower shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all Term Benchmark Loans or RFR Loans of such Lender to Base Rate Loans, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Term Benchmark Loans or RFR Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such Term Benchmark Loans or RFR Loans. Upon any such prepayment or conversion, the Parent Borrower shall also pay accrued interest on the amount so prepaid or converted.

**3.03    Alternate Rate of Interest.**

(a)     Subject to clauses (b), (c), (d), (e) and (f) of this Section 3.03, if:

(i)     the Administrative Agent determines (which determination shall be conclusive absent manifest error) (A) prior to the commencement of any Interest Period for a Term Benchmark Borrowing, that adequate and reasonable means do not exist for ascertaining Adjusted Term SOFR Rate, the Adjusted EURIBOR Rate, the Adjusted CIBOR Rate, the Adjusted STIBOR Rate, the Adjusted Term CORRA Rate,

104

the Adjusted AUD Rate, the Adjusted TIIE Rate, the Adjusted Brazilian Real Rate or the Adjusted TIBOR Rate (including because the Relevant Screen Rate is not available or published on a current basis), for the applicable Approved Currency and such Interest Period or (B) at any time, that adequate and reasonable means do not exist for ascertaining the applicable Adjusted Daily Simple RFR for the applicable Approved Currency; or

(ii) the Administrative Agent is advised by the Required Lenders (or, to the extent relating to Term Benchmark Loans or RFR Loans in currencies other than Dollars, the Required Specified Currency Limited Currency/Multicurrency Revolving Lenders, as applicable) that (A) prior to the commencement of any Interest Period for a Term Benchmark Borrowing, the Adjusted Term SOFR Rate, the Adjusted EURIBOR Rate, the Adjusted CIBOR Rate, the Adjusted STIBOR Rate, the Adjusted Term CORRA Rate, the Adjusted AUD Rate, the Adjusted TIIE Rate, the Adjusted Brazilian Real Rate or the Adjusted TIBOR Rate for the applicable Approved Currency and such Interest Period will not adequately and fairly reflect the cost to such Lenders (or Lender) of making or maintaining their Loans (or its Loan) included in such Borrowing for the applicable Approved Currency and such Interest Period or (B) at any time, the applicable Adjusted Daily Simple RFR for the applicable Approved Currency will not adequately and fair y reflect the cost to such Lenders (or Lender) of making or maintaining their Loans (or its Loan) included in such Borrowing for the applicable Approved Currency;

then the Administrative Agent shall give notice thereof to the Parent Borrower and the Lenders by telephone, telecopy or electronic mail as promptly as practicable thereafter and, until (x) the Administrative Agent notifies the Parent Borrower and the Lenders that the circumstances giving rise to such notice no longer exist with respect to the relevant Benchmark and (y) the Parent Borrower delivers a new Loan Notice in accordance with the terms of Section 2.02, (A) for Loans denominated in Dollars, (1) any Loan Notice that requests the conversion of any Revolving Loan or Term Loan to, or continuation of any Revolving Loan or Term Loan as, a Term Benchmark Borrowing and any Loan Notice that requests a Term Benchmark Loan shall instead be deemed to be a Loan Notice, for (x) a RFR Borrowing denominated in Dollars so long as the Adjusted Daily Simple RFR for Dollar Borrowings is not also the subject of Section 3.03(a)(i) or (ii) above or (y) a Base Rate Borrowing if the Adjusted Daily Simple RFR for Dollar Borrowings also is the subject of Section 3.03(a)(i) or (ii) above and (2) any Loan Notice that requests a RFR Borrowing shall instead be deemed to be a Loan Notice, as applicable, for a Base Rate Borrowing and (B) for Loans denominated in an Alternative Currency, any Loan Notice that requests the conversion of any Revolving Loan or Term Loan to, or continuation of any Revolving Loan or Term Loan as, a Term Benchmark Borrowing and any Loan Notice that requests a Term Benchmark Borrowing or an RFR Borrowing, in each case, for the relevant Benchmark, shall be ineffective; provided that if the circumstances giving rise to such notice affect only one Type of Borrowings, then all other Types of Borrowings shall be permitted. Furthermore, if any Term Benchmark Loan or RFR Loan in any Approved Currency is outstanding on the date of the Borrower's receipt of the notice from the Administrative Agent referred to in this Section 3.03(a) with respect to a Relevant Rate applicable to such Term Benchmark Loan or RFR Loan, then until (x) the Administrative Agent notifies the Parent Borrower and the Lenders that the circumstances giving rise to such notice no longer exist with respect to the relevant Benchmark and (y) the Parent Borrower delivers new Loan Notice in accordance with the terms of Section 2.02, (A) for Loans denominated in Dollars, (1) any Term Benchmark Loan shall on the last day of the Interest Period applicable to such Loan, be converted by the Administrative Agent to, and shall constitute, (x) a RFR Borrowing denominated in Dollars so long as the Adjusted Daily Simple RFR for Dollar Borrowings is not also the subject of Section 3.03(a)(i) or (ii) above or (y) a Base Rate Loan if the Adjusted Daily Simple RFR for Dollar Borrowings also is the subject of Section 3.03(a)(i) or (ii) above, on such day, and (2) any RFR Loan shall on and from such day be converted by the Administrative Agent to, and shall constitute a Base Rate Loan and (B) for Loans denominated in an Alternative Currency, (1) any Term Benchmark Loan shall, on the last day of the Interest Period applicable to such Loan bear interest at the Central Bank Rate (or in the case of (i) the Japanese Yen, the Japanese Prime Rate and (ii) Canadian Dollars, the Canadian Prime Rate) for the applicable Alternative Currency plus the CBR Spread; provided that, if the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that the Central Bank Rate (or in the case of (i) the Japanese Yen, the Japanese Prime Rate and (ii) Canadian Dollars, the Canadian Prime Rate) for the applicable Alternative Currency cannot be determined, any outstanding affected Term Benchmark Loans denominated in any Alternative Currency shall, at the Parent Borrower's election prior to such day: (A) be prepaid by the Parent Borrower on such day or (B) solely for the purpose of calculating the interest rate

105

applicable to such Term Benchmark Loan, such Term Benchmark Loan denominated in any Alternative Currency shall be deemed to be a Term Benchmark Loan denominated in Dollars and shall accrue interest at the same interest rate applicab e to Term Benchmark Loans denominated in Dollars at such time and (2) any RFR Loan shall bear interest at the Central Bank Rate (or in the case of Canadian Dollars, the Canadian Prime Rate) for the applicable A ternative Currency plus the CBR Spread; provided that, if the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that the Central Bank Rate (or in the case of Canadian Dollars, the Canadian Prime Rate) for the applicable Alternative Currency cannot be determined, any outstanding affected RFR Loans denominated in any Alternative Currency, at the Parent Borrower's election, shall either (A) be converted into Base Rate Loans denominated in Dollars (in an amount equal to the Dollar Equivalent of such Alternative Currency) immediately or (B) be prepaid in full immediately.

(b)      Notwithstanding anything to the contrary herein or in any other Credit Document (and any Swap Contract shall be deemed not to be a "Credit Document" for purposes of this Section 3.03), if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior to the Reference Time in respect of any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (1) of the definition of "Benchmark Replacement" with respect to Dollars and/or Canadian Dollars for such Benchmark Replacement Date, such Benchmark Replacement wi l replace such Benchmark for all purposes hereunder and under any Credit Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Credit Agreement or any other Credit Document (and in the case of this subclause (x), all interest on Loans bearing interest at the rate equal to such Benchmark Replacement will be payable on a monthly basis) and (y) if a Benchmark Replacement is determined in accordance with clause (2) of the definition of "Benchmark Replacement" with respect to any Approved Currency for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Credit Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Credit Agreement or any other Credit Document so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders of each affected Class.

(c)      Notwithstanding anything to the contrary herein or in any other Credit Document, the Administrative Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Credit Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Credit Agreement or any other Credit Document. Notwithstanding anything to the contrary herein or in any other ~~Loan~~Credit Document and subject to the proviso below in this paragraph, with respect to a Loan denominated in Canadian Dollars, if a Term CORRA Reelection Event and its related Benchmark Replacement Date have occurred prior to the Reference Time in respect of any setting of the then-current Benchmark, then the applicable Benchmark Replacement will replace the then-current Benchmark for all purposes hereunder or under any ~~Loan~~Credit Document in respect of such Benchmark setting and subsequent Benchmark settings, without any amendment to, or further action or consent of any other party to, this Agreement or any other ~~Loan~~Credit Document; *provided* that, this clause (c) shall not be effective unless the Administrative Agent has delivered to the Lenders and the Borrower a Term CORRA Notice.  For the avoidance of doubt, the Administrative Agent shall not be required to deliver a Term CORRA Notice after the occurrence of a Term CORRA Reelection Event and may do so in its sole discretion.

(d)      The Administrative Agent will promptly notify the Borrower and the Lenders of (i) any occurrence of a Benchmark Transition Event, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any Benchmark Replacement Conforming Changes, (iv) the removal or reinstatement of any tenor of a Benchmark pursuant to clause (e) below and (v) the commencement or conclusion of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 3.03, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest

106

error and may be made in its or their sole discretion and without consent from any other party to this Credit Agreement or any other Credit Document, except, in each case, as expressly required pursuant to this Section 3.03.

(e)        Notwithstanding anything to the contrary herein or in any other Credit Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Rate, EURIBOR Rate, CIBOR Rate, Term CORRA Rate, AUD Rate, TIIE Rate, STIBOR Rate or TIBOR Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regu atory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is or will be no longer representative, then the Administrative Agent may modify the definition of "Interest Period" for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause  i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or(B) is not, or is no longer, subject to an announcement that it is or will no longer be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(f)        Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any request for a Term Benchmark Borrowing or RFR Borrowing of, conversion to or continuation of Term Benchmark Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, either (x) the Borrower will be deemed to have converted any request for a Term Benchmark Borrowing denominated in Dollars into a request for a Borrowing of or conversion to (A) an RFR Borrowing denominated in Dollars so long as the Adjusted Daily Simple RFR for Dollar Borrowings is not the subject of a Benchmark Transition Event or (B) a Base Rate Borrowing if the Adjusted Daily Simple RFR for Dollar Borrowings is the subject of a Benchmark Transition Event or (y) any Term Benchmark Borrowing or RFR Borrowing denominated in an Alternative Currency shall be ineffective. During any Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of the Base Rate. Furthermore, if any Term Benchmark Loan or RFR Loan in any Approved Currency is outstanding on the date of the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period with respect to a Relevant Rate applicable to such Term Benchmark Loan or RFR Loan, then until such time as a Benchmark Replacement for such Approved Currency is implemented pursuant to this Section 3.03, (A) for Loans denominated in Dollars (1) any Term Benchmark Loan shall on the last day of the Interest Period applicable to such Loan be converted by the Administrative Agent to, and shall constitute, (x) an RFR Borrowing denominated in Dollars so long as the Adjusted Daily Simple RFR for Dollar Borrowings is not the subject of a Benchmark Transition Event or (y) Base Rate Loan if the Adjusted Daily Simple RFR for Dollar Borrowings is the subject of a Benchmark Transition Event, on such day and (2) any RFR Loan shall on and from such day be converted by the Administrative Agent to, and shall constitute a Base Rate Loan and (B) for Loans denominated in an Alternative Currency, (1) any Term Benchmark Loan shall, on the last day of the Interest Period applicable to such Loan bear interest at the Central Bank Rate (or in the case of (i) the Japanese Yen, the Japanese Prime Rate and (ii) Canadian Dollars, the Canadian Prime Rate) for the applicable Alternative Currency plus the CBR Spread; provided that, if the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that the Central Bank Rate (or in the case of (i) the Japanese Yen, the Japanese Prime Rate and (ii) Canadian Dollars, the Canadian Prime Rate) for the applicable Alternative Currency cannot be determined, any outstanding affected Term Benchmark Loans denominated in any Alternative Currency shall, at the Borrower's election prior to such day: (c) be prepaid by the Borrower on such day or (d) solely for the purpose of calculating the interest rate applicable to such Term Benchmark Loan, such Term Benchmark Loan denominated in any Alternative Currency shall be deemed to be a Term Benchmark Loan denominated in Dollars and shall accrue interest at the same interest rate applicable to Term Benchmark Loans denominated in Dollars at such time and (2) any RFR Loan shall bear interest at the Central Bank Rate (or in the case of Canadian Dollars, the Canadian Prime Rate) for the applicable Alternative Currency plus the CBR Spread; provided that, if the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that the Central Bank Rate

107

(or in the case of Canadian Dollars, the Canadian Prime Rate) for the applicable Alternative Currency cannot be determined, any outstanding affected RFR Loans denominated in any Alternative Currency, at the Borrower's election, shall either (A) be converted into Base Rate Loans denominated in Dollars  in an amount equal to the Dollar Equivalent of such Alternative Currency) immediately or (B) be prepaid in full immediately.

**3.04**    **Increased Cost; Capital Adequacy.**

(a)    Increased Costs Generally. If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement reflected in the Adjusted EURIBOR Rate, the Adjusted Term CORRA Rate, the Adjusted STIBOR Rate, the Adjusted CIBOR Rate, the Adjusted TIIE Rate, the Adjusted AUD Rate or the Adjusted TIBOR Rate, as applicable) or L/C Issuer;

(ii)    subject any Lender or L/C Issuer to any Tax of any kind whatsoever with respect to any Credit Document, any Letter of Credit, any participation in a Letter of Credit or any Loan made by it, or change the basis of taxation of payments to such Lender or L/C Issuer in respect thereof (except, in each case, for Indemnified Taxes or Other Taxes, any Taxes described in clauses (b) through (d) of the definition of "Excluded Taxes" and in the definition of "Connection Income Taxes"); or

(iii)    impose on any Lender or L/C Issuer or the London or Canadian interbank market any other condition, cost or expense (other than Taxes) affecting this Credit Agreement, Term Benchmark Loans or RFR Loans made by such Lender or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Term Benchmark Loan (or, in the case of clause (ii) above, any Loan), or of maintaining its obligation to make any such Loan, or to increase the cost to such Lender or L/C Issuer of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender or L/C Issuer hereunder (whether of principal, interest or any other amount) then, upon request of such Lender or L/C Issuer, the Parent Borrower will pay to such Lender or L/C Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or L/C Issuer, as the case may be, for such additional costs incurred or reduction suffered.

(b)    Capital Requirements. If any Lender or L/C Issuer determines that any Change in Law affecting such Lender or L/C Issuer or any Lending Office of such Lender or such Lender's or L/C Issuer's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's or L/C Issuer's capital or on the capital of such Lender's or L/C Issuer's ho ding company, if any, as a consequence of this Credit Agreement, the Commitments of such Lender or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by such L/C Issuer, to a level below that which such Lender or L/C Issuer or such Lender's or L/C Issuer's holding company could have achieved but for such Change in Law, then from time to time the Parent Borrower will pay to such Lender or L/C Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or L/C Issuer or such Lender's or L/C Issuer's holding company for any such reduction suffered.

(c)    Certificates for Reimbursement. A certificate of a Lender or L/C Issuer setting forth the amount or amounts necessary to compensate such Lender or L/C Issuer or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section and delivered to the Parent Borrower shall be conclusive absent manifest error. The Parent Borrower shall pay such Lender or L/C Issuer, as the case may be, the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)    Delay in Requests. Failure or delay on the part of any Lender or L/C Issuer to demand compensation pursuant to the foregoing provisions of this Section 3.04 shall not constitute a waiver of such Lender's or L/C Issuer's right to demand such compensation; provided that the Parent Borrower shall not be required to

108

compensate a Lender or L/C Issuer pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than nine (9) months prior to the date that such Lender or L/C Issuer, as the case may be, notifies the Parent Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or L/C Issuer's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

**3.05** **Compensation for Losses.**

Upon demand of any Lender (with a copy to the Administrative Agent) from time to time, the Parent Borrower shall promptly compensate such Lender for and hold such Lender harmless from any reasonable loss, cost or expense incurred by it as a result of:

(a)    any continuation, conversion, payment or prepayment of any Loan other than a RFR Loan or a Base Rate Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, pursuant to Section 2.01(g)(v), by reason of acceleration, or otherwise); or

(b)    any failure by the Parent Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan other than a RFR Loan or a Base Rate Loan on the date or in the amount notified by the Parent Borrower; or

(c)    any assignment of a Term Benchmark Loan on a day other than the last day of the Interest Period, as the case may be, therefor as a result of a request by the Parent Borrower pursuant to Section 11.13;

including any reasonable loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained. A certificate as to the amount of such payment or liability delivered to the Parent Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on behalf of a Lender, shall be conclusive absent manifest error. For the avoidance of doubt, notwithstanding the foregoing, no Lender shall demand, and the Borrower shall not be obligated to make, any funding loss payments pursuant to this Section 3.05 with respect to the payment of accrued interest on the Amendment No. 6 Effective Date with respect to the Converted Term B-3 Loans.

For purposes of calculating amounts payable by the Parent Borrower to the Lenders under this Section 3.05, each Lender shall be deemed to have funded each Term Benchmark Loan made by it at the Relevant Rate for such Loan by a matching deposit or other borrowing in the relevant reference-rate market for a comparable amount and for a comparable period, whether or not such Term Benchmark Loan was in fact so funded.

**3.06** **Mitigation Obligations; Replacement of Lenders.**

(a)    Designation of a Different Lending Office. If any Lender requests compensation under Section 3.04, or the Parent Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.02, as applicable, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Parent Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    Replacement of Lenders. If any Lender requests compensation under Section 3.04, or if any Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, the Parent Borrower may replace such Lender in accordance with Section 11.13.

(c)      Limitation on Additional Amounts, Etc. Notwithstanding anything to the contrary contained in this Article III of this Credit Agreement, unless a Lender gives notice to the Parent Borrower that it is obligated to pay an amount under this Article within nine (9) months after the latest of (i) the date the Lender incurs the respective increased costs, loss, expense or liability, reduction in amounts received or receivable or reduction in return on capital, (ii) the date such Lender has actual knowledge of its incurrence of the respective increased costs, loss, expense or liability, reductions in amounts received or receivable or reduction in return on capital or (iii) where the increased costs, loss, expense, liability, etc. relates to a third party claim (e.g., a Tax claim), the date on which the Lender has actual knowledge of such claim, then such Lender shall not be entitled to be compensated for such amounts by the Parent Borrower pursuant to this Article III to the extent any portion of such amounts are directly attributable (e.g., late penalties payable on a third party claim) to such Lender's failure to provide notice within the required period.

### 3.07    Survival Losses.

All of the Parent Borrower's obligations under this Article III shall survive termination of the Aggregate Commitments and repayment of all other Obligations hereunder, resignation of the Applicable Agent and any assignment of rights by, or replacement of, any Lender or L/C Issuer.

### 3.08    Additional Reserve Costs.

(a)      [Reserved].

(b)      For so long as any Lender is required to comply with reserve assets, liquidity, cash margin or other requirements of any monetary or other authority (including any such requirement imposed by the European Central Bank, the European System of Central Banks or the Bank of Canada, but excluding requirements reflected in the Statutory Reserves) in respect of any of such Lender's Term Benchmark Loans, such Lender shall be entitled to require the Parent Borrower to pay, contemporaneously with each payment of interest on each of such Lender's Loans subject to such requirements, additional interest on such Loan at a rate per annum specified by such Lender to be the cost to such Lender of complying with such requirements in relation to such Loan.

(c)      Any additional interest owed pursuant to paragraph (a) or (b) above shall be determined in reasonable detail by the applicable Lender, which determination shall be conclusive absent manifest error, and notified to the Parent Borrower (with a copy to the Administrative Agent) at least five Business Days before each date on which interest is payable for the applicable Loan, and such additional interest so notified to the Parent Borrower by such Lender shall be payable to the Administrative Agent for the account of such Lender on each date on which interest is payable for such Loan.

## ARTICLE IV

## GUARANTY

### 4.01    The Guaranty.

(a)      Each of the Parent Borrower and the Domestic Guarantors hereby jointly and severally guarantees to the Administrative Agent and each of the holders of the Obligations, as hereinafter provided, as primary obligor and not as surety, the prompt payment of the Borrower Obligations (the "Domestic Guaranteed Obligations") in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration, as a mandatory cash collateralization or otherwise) strictly in accordance with the terms thereof. The Domestic Guarantors hereby further agree that if any of the Domestic Guaranteed Obligations are not paid in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration, as a mandatory cash collateralization or otherwise), the Domestic Guarantors will, jointly and severally, promptly pay the same, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Domestic Guaranteed Obigations, the same will be promptly paid in full when due (whether at extended maturity, as a mandatory prepayment, by acceleration, as a mandatory cash collateralization or otherwise) in accordance with the terms of such extension or renewal.

110

(b)        Notwithstanding any provision to the contrary contained herein, in any other of the Credit Documents, Swap Contracts or other documents relating to the Domestic Guaranteed Obligations, the obligations of each Domestic Guarantor under this Credit Agreement and the other Credit Documents shall be limited to an aggregate amount equal to the largest amount that would not render such obligations subject to avoidance under the Debtor Relief Laws or any comparable provisions of any applicable state law.

  **4.02    Obligations Unconditional.**

The obligations of the Domestic Guarantors under Section 4.01 are joint and several, absolute and unconditional, irrespective of the value, genuineness, validity, regularity or enforceability of any of the Credit Documents or other documents relating to the Obligations, or any substitution, compromise, release, impairment or exchange of any other guarantee of or security for any of the Domestic Guaranteed Obligations, and, to the fullest extent permitted by applicable Law, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, it being the intent of this Section 4.02 that the obligations of the Domestic Guarantors hereunder shall be absolute and unconditional under any and all circumstances. Each Domestic Guarantor agrees that such Domestic Guarantor shall have no right of subrogation, indemnity, reimbursement or contribution against the Borrowers or any other Domestic Guarantor for amounts paid under this Article IV until such time as the Obligations have been irrevocably paid in full and the commitments relating thereto have expired or been terminated. Without limiting the generality of the foregoing, it is agreed that, to the fullest extent permitted by law, the occurrence of any one or more of the following shall not alter or impair the liability of any Domestic Guarantor hereunder, which shall remain absolute and unconditional as described above:

(a)        at any time or from time to time, without notice to any Domestic Guarantor, the time for any performance of or compliance with any of the Domestic Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

(b)        any of the acts mentioned in any of the provisions of any of the Credit Documents, or other documents relating to the Domestic Guaranteed Obligations or any other agreement or instrument referred to therein shall be done or omitted;

(c)        the maturity of any of the Domestic Guaranteed Obligations shall be accelerated, or any of the Obligations shall be modified, supp emented or amended in any respect, or any right under any of the Credit Documents or other documents relating to the Domestic Guaranteed Obligations, or any other agreement or instrument referred to therein shall be waived or any other guarantee of any of the Domestic Guaranteed Obligations or any security therefor shall be released, impaired or exchanged in whole or in part or otherwise dealt with;

(d)        any Lien granted to, or in favor of, the Administrative Agent or any of the holders of the Domestic Guaranteed Obligations as security for any of the Domestic Guaranteed Obligations shall fail to attach or be perfected; or

(e)        any of the Domestic Guaranteed Obligations shall be determined to be void or voidable (including, without limitation, for the benefit of any creditor of any Domestic Guarantor) or shall be subordinated to the claims of any Person (including, without imitation, any creditor of any Domestic Guarantor).

With respect to its obligations hereunder, each Domestic Guarantor hereby expressly waives diligence, presentment, demand of payment, protest, notice of acceptance of the guaranty given hereby and of extensions of credit that may constitute obligations guaranteed hereby, notices of amendments, waivers and supplements to the Credit Documents and other documents relating to the Domestic Guaranteed Obligations, or the compromise, release or exchange of collateral or security, and all notices whatsoever, and any requirement that the Administrative Agent or any holder of the Domestic Guaranteed Obligations exhaust any right, power or remedy or proceed against any Person under any of the Credit Documents or any other documents relating to the Domestic Guaranteed Obligations or any other agreement or instrument referred to therein, or against any other Person under any other guarantee of, or security for, any of the Obligations.

111

**4.03     Reinstatement.**

Neither the Domestic Guarantors' obligations hereunder nor any remedy for the enforcement thereof shall be impaired, modified, changed or released in any manner whatsoever by an impairment, modification, change, release or limitation of the liability of any Borrower, by reason of such Borrower's bankruptcy or insolvency or by reason of the invalidity or unenforceability of all or any portion of the Domestic Guaranteed Obligations. The obligations of the Domestic Guarantors under this Article IV shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of any Person in respect of the Domestic Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Obligations, whether as a result of any proceedings pursuant to any Debtor Relief Law or otherwise, and each Domestic Guarantor agrees that it will indemnify the Administrative Agent and each holder of Domestic Guaranteed Obligations on demand for all reasonable costs and expenses (including all reasonable fees, expenses and disbursements of any law firm or other counsel) incurred by the Administrative Agent or such holder of Domestic Guaranteed Obligations in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any Debtor Relief Law.

**4.04     Certain Waivers.**

Each Domestic Guarantor acknowledges and agrees that (a) the guaranty given hereby may be enforced without the necessity of resorting to or otherwise exhausting remedies in respect of any other security or collateral interests, and without the necessity at any time of having to take recourse against any Borrower hereunder or against any collateral securing the Domestic Guaranteed Obligations or otherwise, (b) it will not assert any right to require the action first be taken against any Borrower or any other Person (including any co-guarantor) or pursuit of any other remedy or enforcement of any other right and (c) nothing contained herein shall prevent or limit action being taken against the Borrowers hereunder, under the other Credit Documents or the other documents and agreements relating to the Domestic Guaranteed Obligations or from foreclosing on any security or collateral interests relating hereto or thereto, or from exercising any other rights or remedies available in respect thereof, if neither the applicable Borrower nor the Domestic Guarantors shall timely perform their obligations, and the exercise of any such rights and completion of any such foreclosure proceedings shall not constitute a discharge of the Domestic Guarantors' obligations hereunder unless as a result thereof, the Domestic Guaranteed Obligations shall have been indefeasibly paid in full and the commitments relating thereto shall have expired or been terminated, it being the purpose and intent that the Domestic Guarantors' obligations hereunder be absolute, irrevocable, independent and unconditional under all circumstances.

**4.05     Remedies.**

The Domestic Guarantors agree that, to the fullest extent permitted by law, as between the Domestic Guarantors, on the one hand, and the Administrative Agent and the holders of the Domestic Guaranteed Obligations, on the other hand, the Domestic Guaranteed Obligations may be declared to be forthwith due and payable as provided in Section 9.02 (and shall be deemed to have become automatically due and payable in the circumstances provided in Section 9.02) for purposes of Section 4.01, notwithstanding any stay, injunction or other prohibition preventing such declaration (or preventing the Domestic Guaranteed Obligations from becoming automatically due and payable) as against any other Person and that, in the event of such declaration (or the Domestic Guaranteed Obligations being deemed to have become automatically due and payable), the Domestic Guaranteed Obligations (whether or not due and payable by any other Person) shall forthwith become due and payable by the Domestic Guarantors for purposes of Section 4.01. The Domestic Guarantors acknowledge and agree that the Domestic Guaranteed Obligations are secured in accordance with the terms of the Collateral Documents and that the holders of the Domestic Guaranteed Obligations may exercise their remedies thereunder in accordance with the terms thereof.

**4.06     Rights of Contribution.**

The Domestic Guarantors hereby agree as among themselves that, in connection with payments made hereunder, each Domestic Guarantor shall have a right of contribution from each other Domestic Guarantor in accordance with applicable Law. Such contribution rights shall be subordinate and subject in right of payment to the Domestic

112

Guaranteed Obligations until such time as the Domestic Guaranteed Obligations have been irrevocably paid in full and the commitments relating thereto shall have expired or been terminated, and none of the Guarantors shall exercise any such contribution rights until the Domestic Guaranteed Obligations have been irrevocably paid in full and the commitments relating thereto shall have expired or been terminated.

**4.07    Guaranty of Payment; Continuing Guaranty.**

The guarantee in this Article IV is a guaranty of payment and not of collection, and is a continuing guarantee, and shall apply to all Domestic Guaranteed Obligations whenever arising.

**4.08    Keepwell.**

Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Credit Party to honor all of its obligations under this guarantee and any security interest granted under the U.S. Security Agreement in respect of Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 4.08 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 4.08, or otherwise under this guarantee, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP Guarantor under this Section 4.08 shall remain in full force and effect until the Obligations have been paid and performed in full. Each Qualified ECP Guarantor intends that this Section 4.08 constitute, and this Section 4.08 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Credit Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

**ARTICLE V**

**CONDITIONS PRECEDENT TO CREDIT EXTENSIONS**

**5.01    Conditions to Amendment No. ~~11~~12 Effective Date.**

The effectiveness of Amendment No. ~~11~~12 is subject to the satisfaction of the following conditions precedent:

(a)    Executed Amendment Agreement. The Administrative Agent shall have received (i) executed signature pages to (or consents authorizing the relevant party's consent to) Amendment No. ~~11~~12 from (A) Lenders constituting the Required Lenders under this Credit Agreement (prior to giving effect to Amendment No. ~~11~~12) and (B) each of the Credit Parties.

(b)    Opinions of Counsel. The Administrative Agent's receipt of a customary duly executed opinion of (i) Latham & Watkins LLP, counsel to the Credit Parties and (ii) Williams Mullen, Virginia counsel to the Credit Parties, in each case dated as of the Amendment No. ~~11~~12 Effective Date and reasonably satisfactory to the Administrative Agent.

(c)    Organization Documents, Etc. The Administrative Agent's receipt of a duly executed certificate of a Responsible Officer of each Credit Party, (i) attaching ~~each of~~ the following documents and certifying that each is true, correct and complete and in full force and effect as of the Amendment No. 12 Effective Date and/or (ii) certifying that the following documents have not been amended or modified since they were delivered to the Administrative Agent on the Amendment No. 11 Effective Date and are in full force and effect as of the Amendment No. 12 Effective Date:

(i)    Charter Documents. Copies of its articles or certificate of organization or formation, certified by the appropriate Governmental Authority of the jurisdiction of its organization or formation;

(ii)    Bylaws. Copies of its bylaws, operating agreement or partnership agreement;

113

(iii)    Resolutions. Copies of its resolutions approving and adopting Amendment No. 12 and the other Credit Documents to which it is a party, the transactions contemplated therein, and authorizing the execution and delivery thereof;

(iv)    Incumbency. Incumbency certificates identifying the Responsible Officers of such Credit Party that are authorized to execute Amendment No. ~~11~~12 and to act on such Credit Party's behalf in connection with Amendment No. ~~11~~12; and

(v)    Good Standing Certificates. Certificates of good standing or the equivalent (if any) from its jurisdiction of organization or formation, in each case certified as of a recent date by the appropriate Governmental Authority.

(d)    Officer Certificates. The following shall be true as of the Amendment No. ~~11~~12 Effective Date, and the Administrative Agent shal  have received a certificate or certificates of a Responsible Officer of the Parent Borrower, dated as of the Amendment No. ~~11~~12 Effective Date, certifying each of the following:

(i)    Consents. No consents, licenses or approvals are required in connection with the execution, delivery and performance by any Credit Party of Amendment No. ~~11~~12, other than as are in full force and effect and, to the extent requested by the Administrative Agent, are attached thereto;

(ii)    Material Adverse Effect. There shall have been no event or circumstance since December 31, ~~2022~~2023 that has had or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect;

(iii)    Material Litigation. There shall be no action, suit, investigation or proceeding pending in any court or before any arbitrator or Governmental Authority that would reasonably be expected to have a Material Adverse Effect; and

(iv)    Representations and Warranties; No Default. The conditions to the honoring of a Credit Extension set forth in Section 5.02(a) have been satisfied as of the Amendment No. ~~11~~12 Effective Date. As of the Amendment No. ~~11~~12 Effective Date and after giving effect thereto, no Default or Event of Default has occurred and is continuing.

(e)    Solvency. The Administrative Agent shall have received a customary certificate, dated as of the Amendment No. ~~11~~12 Effective Date, certified by the chief financial officer of the Parent Borrower, stating that the Parent Borrower and its Subsidiaries, on a consolidated basis after giving effect to the Transactions occurring on the Amendment No. ~~11~~12 Effective Date, are Solvent.

(f)    Fees and Expenses. (A) To the extent required by Amendment No. ~~11~~12, all accrued reasonable and documented out-of-pocket fees and expenses of the Lead Arrangers and the Agents (including the reasonable fees and expenses of counsel (limited to a single counsel plus one local counsel in any reasonably necessary jurisdiction for the Agents)) shall have been paid; provided that the Parent Borrower shall have received a reasonably detailed invoice therefor at least two (2) Business Days prior to the Amendment No. ~~11~~12 Effective Date, (B) each Venue Expansion Revolving Lender that is party to Amendment No. ~~11~~12 shall have received such fees based on the percentage of their respective Venue Expansion Revolving Commitments as of the Amendment No. ~~11~~12 Effective Date communicated to such Venue Expansion Revolving Lenders by the Administrative Agent and as agreed by the Parent Borrower and (C) all fees separately agreed to by the Parent Borrower and JPMCB to be payable on the Amendment No. ~~11~~12 Effective Date shall have been paid.

(g)    KYC Information and Beneficial Ownership Certificate. The Credit Parties shall have provided the documentation and other information to the Lenders that is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act. Further, to the extent the Parent Borrower qualifies as a "legal entity customer" under the Beneficial Ownership

114

Regulation, the Parent Borrower shall have provided, at least five days prior to the Amendment No. ~~11~~12 Effective Date, to any Lender that has requested, in a written notice to the Parent Borrower at least 10 days prior to the Amendment No. ~~11~~12 Effective Date, a Beneficial Ownership Certification (provided that, upon the execution and delivery by such Lender of its signature page to this Credit Agreement, the condition to deliver such Beneficial Ownership Certification shall be deemed to be satisfied).

(h)     Collateral Documents. The Credit Parties shall have ~~executed and delivered to the Collateral Agent an amended and restated U.S. Security Agreement and an amended and restated U.S. Pledge Agreement, duly executed by a Responsible Officer of the Parent Borrower and each Domestic Guarantor, and shall also have~~ delivered to the Collateral Agent:

(i)     such UCC financing statements as are necessary or appropriate, in the Collateral Agent's discretion, to perfect the security interests in the Collateral;

(ii)    certified copies of a recent date of requests for information or copies (Form UCC-1), or equivalent reports as of a recent date, listing all effective financing statements that name any Credit Party as debtor and that are fi ed in their respective jurisdictions of organizations; and

(iii)   an executed Perfection Certificate.

(i)     Insurance Certificates and Endorsements. ~~The~~Subject to Section 7.19, the Collateral Agent shall have received (to the extent not already in their possession) insurance certificates and endorsements naming the Collateral Agent, on behalf of the holders of the Obligations, as loss payee and/or additional insured, with respect to any such insurance providing coverage in respect of any Collateral under the Collateral Documents in accordance with Section 7.08.

(j)     Prepayment. All ~~principal and~~ accrued interest on ~~(i) the outstanding Delayed Draw Term A Loans and (ii)~~ the Revolving Loans and Swingline Loans under the existing Revolving Facilities, in each case immediately prior to the Amendment No. ~~11~~12 Effective Date, shall simultaneously with the Amendment No. ~~11~~12 Effective Date be paid in full. The then-outstanding Revolving Commitments under the existing Revolving Facilities, immediately prior to the Amendment No. ~~11~~12 Effective Date, shall simultaneously with the Amendment No. ~~11~~12 Effective Date be, terminated and all accrued Letter of Credit Fees and commitment fees related thereto shall simultaneously with the Amendment No. ~~11~~12 Effective Date be, paid.

(k)     Loan Notice. The Administrative Agent shall have received a Loan Notice with respect to any amounts being borrowed under the Venue Expansion Revolving Facility on the Amendment No. ~~11~~12 Effective Date in accordance with ~~the~~ Section 2.02.

Without limiting the generality of the provisions of Section 10.04, for purposes of determining compliance with the conditions specified in this Section 5.01, each Lender that has signed Amendment No. ~~11~~12 shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the Amendment No. ~~11~~12 Effective Date specifying its objection thereto.

**5.02    Conditions to All Credit Extensions.**

The obligation of each Lender and L/C Issuer to honor any Request for Credit Extension is subject to the satisfaction of the following conditions precedent:

(a)     The representations and warranties of the Parent Borrower and each other Credit Party contained in Article VI shall be true and correct in all material respects on and as of the date of such Credit Extension, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date (provided that representations and warranties that are qualified by materiality shall be true and correct in all respects).

115

(b)        No Default or Event of Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds thereof.

(c)        The Administrative Agent and, if applicable, the applicable L/C Issuer or the Swingline Lender shall have received a Request for Credit Extension in accordance with the requirements hereof.

Each Request for Credit Extension submitted by any Borrower shall be deemed to be a representation and warranty by such Borrower that the conditions specified in Sections 5.02(a) and (b) have been satisfied on and as of the date of the applicable Credit Extension.

### 5.03    First Credit Extension to each Foreign Borrower.

The obligation of each Lender to honor any initial request for a Loan by each Foreign Borrower or of any L/C Issuer to honor any initial request for a Letter of Credit by each Foreign Borrower is subject to the satisfaction of the following further conditions precedent:

(a)        The Administrative Agent shall have received an opinion of counsel for such Foreign Borrower and each Foreign Subsidiary provided for in clause (c) below reasonably acceptable to the Administrative Agent and covering such matters relating to the transactions contemplated hereby as the Administrative Agent may reasonably request;

(b)        The Administrative Agent shall have received all documents which it may reasonably request relating to the existence of such Foreign Borrower and such Foreign Subsidiary, its corporate authority for and the validity of its entry into its Foreign Borrower Agreement, this Credit Agreement, any other Credit Document and any amendments to the Credit Documents contemplated by Section 1.08 to which it a party, and any other matters relevant thereto, all in form and substance reasonably satisfactory to the Administrative Agent;

(c)        (i) Each of the Foreign Subsidiaries (other than an Excluded Subsidiary) shall have jointly and severally guaranteed to the Administrative Agent and each of the holders of the Foreign Obligations the prompt payment of the Foreign Obligations in full when due (whether at stated maturity, as a mandatory pre-payment, by acceleration, as a mandatory cash collateralization or otherwise) (the "Foreign Guaranteed Obligations") pursuant to one or more guarantees in form in substance reasonably satisfactory to the Administrative Agent and (ii) each of such Foreign Borrower and each such Foreign Subsidiary shall have executed and delivered to the Administrative Agent a Perfection Certificate in form and substance substantially consistent with that delivered on the Amendment No. 1112 Effective Date with respect to the Domestic Credit Parties and taken all actions necessary to create and perfect in favor of the Co lateral Agent for the benefit of the applicable Secured Parties in accordance with applicable law a security interest in its assets other than any Excluded Property pursuant to Foreign Collateral Documents in form and substance reasonably satisfactory to the Collateral Agent, including the delivery to the Collateral Agent of all certificates, if any, representing all of the Capital Stock of such Foreign Borrower or such Foreign Subsidiary (to the extent required by the applicable Collateral Document), together with undated stock transfer powers executed in blank, and all unsecured intercompany notes owing to such Foreign Borrower or Foreign Subsidiary (to the extent required by the applicable Collateral Documents), together with undated alonges executed in blank; provided that this clause (c) shall not require the creation or perfection of pledges of or security interests in particular assets of the Foreign Subsidiaries or guarantees from particular Foreign Subsidiaries if, to the extent and for so long as, the Administrative Agent, in consultation with the Parent Borrower, reasonably determines, in writing, that the cost to the Borrowers of creating or perfecting such pledges or security interests in such assets or obtaining such guarantees from Foreign Subsidiaries (in each case, taking into account, among other things (i) any material adverse Tax or other consequences to the Borrowers and the other Subsidiaries (including the imposition of withholding or other material Taxes or costs on Lenders) and (ii) with respect to security interests in Capita Stock in Persons that are not, directly or indirectly, wholly owned by the Parent Borrower, any restrictions on the creation or perfection of such security interests (including the costs of obtaining necessary consents and approvals from other holders (other than the Parent Borrower and its Affiliates) of Capital Stock in such Persons)) shall be commercia ly unreasonable in view of the benefits to be obtained by the Lenders therefrom (as reasonably determined, in writing, by the Parent Borrower and the Administrative Agent); provided, further, that until such time

116

as the Outstanding Amount of the Foreign Borrowers exceeds $500.0 million, only those Foreign Subsidiaries that are organized in a jurisdiction in which a Foreign Borrower is located shall be required to comply with this clause (c).

5.04 [Reserved].

**ARTICLE VI**

**REPRESENTATIONS AND WARRANTIES**

The Credit Parties represent and warrant to the Administrative Agent, the Lenders and the L/C Issuers that:

**6.01    Existence, Qualification and Power.**

Each Credit Party (a) is duly organized or formed, validly existing and (to the extent the concept is applicable in such jurisdiction) in good standing under the Laws of the jurisdiction of its incorporation or formation, (b) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) execute, deliver and perform its obligations under the Credit Documents to which it is a party and (ii) except to the extent it would not reasonably be expected to have a Material Adverse Effect, own its assets and carry on its business, and (c) except to the extent it would not reasonably be expected to have a Material Adverse Effect, is duly qualified and is licensed and in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license.

**6.02    Authorization; No Contravention.**

The execution, delivery and performance by each Credit Party of each Credit Document to which it is party have been duly authorized by all necessary corporate or other organizational action and do not (a) contravene the terms of such Credit Party's Organization Documents; (b) conflict with or result in any breach or contravention of, or the creation of any Lien (other than Permitted Liens) under, (i) any Contractual Obligation to which such Credit Party is party or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Credit Party or its Property is subject; or (c) violate any Law applicable to such Credit Party and the relevant Credit Documents, except, in the case of clause (b) or (c) of this Section 6.02 only, as would not reasonably be expected to have a Material Adverse Effect.

**6.03    Governmental Authorization; Other Consents.**

No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Credit Party of this Credit Agreement or any other Credit Document (other than (a) as have already been obtained and are in full force and effect, (b) filings to perfect security interests granted pursuant to the Credit Documents and (c) approvals, consents, exemptions, authorizations, or other actions, notices or filings the failure to procure which would not reasonably be expected to have a Material Adverse Effect).

**6.04    Binding Effect.**

Each Credit Document has been duly executed and delivered by each Credit Party that is party hereto or thereto. Each Credit Document constitutes legal, valid and binding obligations of such Credit Party, enforceable against such Credit Party in accordance with its terms, except to the extent the enforceability thereof may be limited by applicable Debtor Relief Laws affecting creditors' rights generally and by equitable principles of law (regardless of whether enforcement is sought in equity or at law) and implied covenants of good faith and fair dealing.

117

**6.05    Financial Statements.**

The audited combined balance sheets of the Parent Borrower and its Subsidiaries as of December 31, ~~2022~~2023 and the related combined statements of income or operations, shareholders' equity (or invested equity) and cash flows for the years ending December 31, ~~2020~~2021, December 31, ~~2021~~2022 and December 31, ~~2022~~2023, including the notes thereto,  i) were prepared in accordance with GAAP consistently applied throughout the periods covered thereby, except as otherwise expressly noted therein and (ii) fairly present the financial condition of the Parent Borrower and its Subsidiaries as of the date thereof and its results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein.

The unaudited combined balance sheets of the Parent Borrower and its Subsidiaries dated ~~September~~June  30, ~~2023~~2024, and the related combined statements of income or operations, shareholders' equity (or invested equity) and cash flows for the six months ended on that date (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present the financial condition of the Parent Borrower and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments.

**6.06    No Material Adverse Effect.**

Since December 31, ~~2022~~2023, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect.

**6.07    Litigation.**

There are no actions, suits or proceedings pending or, to the knowledge of the Parent Borrower, threatened, at law, in equity, in arbitration or before any Governmental Authority, by or against any member of the Consolidated Group or against any of their properties or revenues that either individually or in the aggregate would reasonably be expected to have a Material Adverse Effect.

**6.08    No Default.**

No Default or Event of Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Credit Agreement or any other Credit Document.

**6.09    Ownership of Property; Liens.**

Each of the Parent Borrower and its Subsidiaries has good and valid title in fee simple to, or a valid leasehold interest in, all its real property, and good title to, or a valid leasehold interest in or right to use, all its other material property, except as would not reasonably be expected to have a Material Adverse Effect, and the property of the Consolidated Group is subject to no Liens, other than Permitted Liens.

**6.10    Environmental Matters.**

Except with respect to any matters that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, none of the Parent Borrower or any of its Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability.

**6.11**    **Taxes.**

Except as would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect: (a) the Parent Borrower and each of its Subsidiaries (i) has timely filed (or has had filed on its behalf) all Tax returns required to be filed and (ii) has paid prior to delinquency all Taxes, whether or not shown on a Tax Return, levied or imposed upon it or its properties, income or assets otherwise due and payable (including in its capacity as a withholding agent), except for Taxes that are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided, in accordance with GAAP, if such contest suspends enforcement or collection of the claim in question; and (b) there are no current, pending or, to the knowledge of the Parent Borrower or any of its Subsidiaries, proposed Tax assessments, deficiencies, audits or other claims against or with respect to the Parent Borrower or any of its Subsidiaries.

**6.12**    **ERISA Compliance.**

(a)    Each Plan that is intended to qualify under Section 401(a) of the Internal Revenue Code has received a favorable determination letter from the IRS or an application for such a letter is currently pending before the IRS with respect thereto and, to the knowledge of the Parent Borrower, nothing has occurred that would prevent, or cause the loss of, such qualification except in such instances in which the failure to comply therewith either individually or in the aggregate would not reasonably be expected to have a Material Adverse Effect. Except as would not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect, (i) the Parent Borrower and each ERISA Affiliate have made all required contributions to each Pension Plan subject to Section 412 of the Internal Revenue Code and (ii) no application for a funding waiver or an extension of any amortization period pursuant to Section 412 of the Internal Revenue Code has been made with respect to any Pension Plan.

(b)    There are no pending or, to the knowledge of the Parent Borrower, threatened, claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that would reasonably be expected to have a Material Adverse Effect.

(c)    Except as would not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect, (i) no ERISA Event has occurred or is reasonably expected to occur; (ii) neither the Parent Borrower nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred that, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan; (iii) there has been no "prohibited transaction" (within the meaning of Section 4975 of the Internal Revenue Code) with respect to any Plan; and (iv) neither the Parent Borrower nor any ERISA Affiliate has engaged in a transaction that would reasonably be expected to be subject to Sections 4069 or 4212(c) of ERISA.

**6.13**    **Labor Matters.**

Except as would not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect, (a) as of the Amendment No.~~11~~12 Effective Date, there are no strikes, lockouts or slowdowns against the Parent Borrower or any of its Subsidiaries pending or, to the knowledge of Parent Borrower, overtly threatened to Parent Borrower or any of its Subsidiaries and (b) the hours worked by and payments made to employees of the Parent Borrower and its Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Federal, state, local or foreign law dealing with such matters.

**6.14**    **Subsidiaries.**

Set forth on Schedu e 6.14 is a list of all Subsidiaries of the Parent Borrower ~~immediately after giving effect to the Amendment No. 11 Effective Date~~as of December 31, 2023, together with the jurisdiction of organization~~, and ownership and ownership percentages of Capital Stock of each such Subsidiary as of such date~~. The outstanding Capital Stock of such Subsidiaries has been validly issued, is owned free of Liens (other than Permitted Liens) and, with respect to any outstanding shares of Capital Stock of a corporation, such shares have been validly issued and

119

are fully paid and non-assessable. As of the Amendment No. 11 Effective Date, the outstanding shares of Capital Stock of each Credit Party and each direct Subsidiary of any Credit Party are not subject to any buy-sell, voting trust or other shareholder agreement except as identified on <u>Schedule 6.14</u>.

**6.15** <u>**Margin Regulations; Investment Company Act**</u>.

(a) The Credit Parties are not engaged and will not engage, principally or as one of their important activities, in the business of purchasing or carrying "margin stock" (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock.

(b) None of the Credit Parties or any Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

**6.16** <u>**Disclosure.**</u>

(a) No written report, financial statement, certificate or other information (taken as a whole) furnished by or on behalf of any Credit Party to the Administrative Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Credit Agreement or delivered hereunder or under any other Credit Document (in each case, as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading, in each case as of the date such information is provided and as of the Amendment No. ~~11~~12 Effective Date; <u>provided</u> that, with respect to projected financial information and estimates, the Parent Borrower represents only that such information was prepared in good faith based upon assumptions be ieved to be reasonable at the time they were made.

(b) As of the Amendment No. ~~11~~12 Effective Date, the information included in the Beneficial Ownership Certification provided on or prior to the Amendment No. ~~11~~12 Effective Date to any Lender (if any) in connection with this Credit Agreement is true and correct in all material respects.

**6.17** <u>**Compliance with Laws.**</u>

Each member of the Consolidated Group is in compliance in all material respects with the requirements of all Laws and all orders, writs, injunctions, settlements or other material agreements with any Governmental Authority and decrees applicable to it or to its properties, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

**6.18** <u>**Insurance.**</u>

The Parent Borrower and each of its Subsidiaries maintain, in force, with financially sound and reputable insurance companies, and have paid all premiums and costs that are due and payable and are related to, insurance coverages in such amounts (with no materially greater risk retention) and against such risks under similar circumstances as are reasonably determined by the management of the Parent Borrower and its Subsidiaries to be sufficient in accordance with the usual and customary practices of companies of established repute engaged in the same or similar lines of business as the Parent Borrower and its Subsidiaries and operating in the same or similar locations, except to the extent reasonable self-insurance meeting the same standards is maintained with respect to such risks.

**6.19** <u>**Solvency.**</u>

As of the Amendment No. ~~11~~12 Effective Date, the Parent Borrower and its Subsidiaries, on a consolidated basis, are, and after giving effect to the transactions occurring on the Amendment No. ~~11~~12 Effective Date will be, Solvent.

**6.20** **Intellectual Property; Licenses, Etc.**

Except as would not reasonably be expected to have a Material Adverse Effect, as of the Amendment No. ~~11~~12 Effective Date, each Credit Party owns, or possesses the right to use, all of the trademarks, service marks, trade names, copyrights, patents, patent rights, franchises, licenses and other intellectual property rights (collectively, "IP Rights") that are reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other Person. As of the Amendment No. ~~11~~12 Effective Date, no claim or litigation regarding any of the foregoing is pending or, to the knowledge of the Credit Parties, threatened, that, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect. None of the IP Rights listed on Section 2 of Schedule 8.01 is material to the operation of the business of Parent Borrower and its Subsidiaries. No material IP Rights have been acquired or otherwise come into the possession of any Credit Party at any time following the Amendment No. 7 Effective Date through and including the Amendment No. ~~11~~12 Effective Date.

**6.21** **Collateral Matters.**

(a) Each of the Collateral Documents creates (or will create, as the case may be), as security for the Obligations purported to be secured thereby, subject to the provisions hereof and thereof, a legal, valid and enforceable security interest in favor of the Collateral Agent for the benefit of the applicable Secured Parties in all the Collateral subject to such Collateral Document (or comparable interest under foreign law in the case of foreign Collateral) and each such Collateral Document constitutes either (x) a fully perfected Lien on, and security interest in, all of the Collateral subject to such Collateral Document (except for Collateral for which the absence or failure of the Lien on such Collateral to be perfected would not constitute an Event of Default under Section 9.01(l)) or (y) a floating charge, fixed charge or security interest, as specified in the applicable Collateral Document, with respect to all of the Collateral subject to such Collateral Document, in each case in favor of the Collateral Agent and subject to no other Liens except Permitted Liens. The pledgor or assignor, as the case may be, under each Collateral Document has good title to all Collateral subject thereto free and clear of all Liens other than Permitted Liens. No filings or recordings are required in order to perfect the security interests created under the Collateral Documents except, (i) with respect to the Domestic Credit Parties, for filings or recordings listed on Schedule 6.21 (as amended by each Perfection Certificate delivered to the Administrative Agent after the Amendment No. ~~11~~12 Effective Date), all of which shall have been made on or prior to the Amendment No. ~~11~~12 Effective Date except as otherwise expressly provided in Schedule 6.21 (or such Perfection Certificates, as applicable) and Schedule 7.19 and (ii) with respect to the Foreign Credit Parties, the filings or recordings listed in a schedule to the applicable Collateral Documents similar in purpose to the schedule described in the foregoing clause (i).

(b) When the U.S. Security Agreement (or a short-form version thereof) is filed in the United States Patent and Trademark Office and the United States Copyright Office, the security interest created thereunder shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Domestic Credit Parties in the Intellectual Property (as such term is defined in the U.S. Security Agreement) in which a security interest may be perfected by filing, recording or registering a security agreement or analogous document in the United States Patent and Trademark Office or the United States Copyright Office, as applicable, in each case prior and superior in right to any other Person, other than with respect to the rights of Persons pursuant to Permitted Liens (it being understood that subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office may be necessary to perfect a lien on registered trademarks, trademark applications and copyrights acquired by the Domestic Credit Parties after the Amendment No. 11 Effective Date).

(c) The requirements set forth in Sections 7.12, 7.13 and 7.14 are satisfied.

(d) Notwithstanding the foregoing, it is agreed that the Credit Parties shall not be required to enter into control agreements with respect to their deposit accounts and securities accounts in order to perfect the Collateral Agent's Lien on the Collateral.

121

**6.22**    **Status of Obligations.**

The Obligations constitute Senior Indebtedness (and any other similar term defining Senior Indebtedness) under each indenture or other agreement governing any Subordinated Debt, if any, of the Parent Borrower or any other Credit Party.

**6.23**    **Immunities, Etc.**

Each Credit Party is subject to civil and commercial law with respect to its obligations under this Credit Agreement, and the execution, delivery and performance by it of this Credit Agreement and each other Credit Document to which it is a party constitutes and will constitute private and commercial acts rather than public or governmental acts. Each Credit Party has validly given its consent to be sued in respect of its obligations under this Credit Agreement and the other Credit Documents to which it is a party. Each Credit Party has waived every immunity (sovereign or otherwise) to which it or any of its properties would otherwise be entitled from any legal action, suit or proceeding, from jurisdiction of any court or from setoff or any legal process (whether service or notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) under the laws of the jurisdiction of its incorporation in respect of its obligations under this Credit Agreement and the other Credit Documents to which it is a party. The waiver by each Credit Party described in the immediately preceding sentence is legal, valid and binding on such Credit Party.

**6.24**    **Anti-Money Laundering, Economic Sanctions Laws and Anti-Corruption Laws.**

(a)    To the extent applicable, each of Parent Borrower and its Subsidiaries and their respective directors and officers, and to the knowledge of Parent Borrower and any other Credit Party, any employee, agent or Affiliate of Parent Borrower or any Subsidiary, is in compliance, in all material respects, with (i) the Trading with the Enemy Act, as amended, and other economic or financial sanctions imposed by the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("OFAC"), and economic sanctions administered by the United Nations Security Council, the European Union, the Hong Kong Monetary Authority or His Majesty's Treasury of the United Kingdom ("Sanctions"), (ii) the Patriot Act and (iii) laws, rules and regulations of any jurisdiction applicable to Borrower and its Subsidiaries relating to bribery, corruption or money laundering including, without limitation, the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder, and the UK Bribery Act ("Anti-Corruption Laws"). Each of Parent Borrower and its Subsidiaries, and any other Credit Party have instituted and maintain and will continue to maintain  policies and procedures designed to promote and achieve compliance with such laws and with the representation and warranty contained herein.

(b)    No part of the proceeds of the Loans will be used, directly or indirectly, in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws or applicable Sanctions.

(c)    No Credit Party, any Subsidiary of Parent Borrower or their respective directors and officers, nor, to the knowledge of any Credit Party, any employee, agent or Affiliate of a Credit Party or any Subsidiary of Parent Borrower, is the subject of any Sanctions, or owned or controlled by Persons that are the subject of any Sanctions, or located, organized or resident in a country or territory that is the target of Sanctions, including the Crimea, Donetsk and Luhansk regions of Ukraine, Cuba, Iran, North Korea and Syria. The proceeds of the Loans will not be used for the purpose of financing the activities of any Person, or in any country, region or territory, that, at the time of such financing, is the target of Sanctions, or in any manner that would result in the violation of Sanctions by any Person.

**6.25**    **EEA Financial Institution.**

No Credit Party is an EEA Financial Institution.

**ARTICLE VII**

**AFFIRMATIVE COVENANTS**

Until the Loan Obligations shall have been paid in full or otherwise satisfied, and the Commitments hereunder shall have expired or been terminated, the Parent Borrower will, and will cause each of its Subsidiaries to:

       **7.01**   **Financial Statements.**

Deliver to the Administrative Agent, each Lender and each L/C Issuer:

       (a)      not later than ninety (90) days after the end of each fiscal year of the Parent Borrower (or, if later, the latest date allowed by the SEC for the filing of Form 10-K for such fiscal year for the Parent Borrower (but no later than the date that is one hundred five (105) days after the end of such fiscal year of the Parent Borrower)), a consolidated balance sheet of the Parent Borrower as at the end of such fiscal year, and the related consolidated statements of income or operations, invested equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP, audited and accompanied by (1) a report and opinion of a Registered Public Accounting Firm of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards and applicable Securities Laws and shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit or other material qualification or exception and (2) if required by Section 404 of Sarbanes-Oxley, an attestation report of such Registered Public Accounting Firm as to the Parent Borrower's internal controls pursuant to Section 404 of Sarbanes-Oxley;

       (b)      not later than forty-five (45) days after the end of each of the first three (3) fiscal quarters of each fiscal year of the Parent Borrower (or, if later, the latest date allowed by the SEC for the filing of Form 10-Q for such fiscal quarter for the Parent Borrower (but no later than the date that is sixty (60) days after the end of such fiscal quarter of the Parent Borrower)), a consolidated balance sheet of the Parent Borrower and the Consolidated Group as at the end of such fiscal quarter, and the related consolidated statements of income or operations, invested equity and cash flows for such fiscal quarter and for the portion of the Parent Borrower's fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail and certified by a Responsible Officer of the Parent Borrower as fairly presenting the financial condition, results of operations, invested equity and cash flows of the Consolidated Group in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes; and

       (c)      simultaneously with the delivery of each set of consolidated financial statements referred to in Sections 7.01(a) and (b) above, if during any of the periods for which financial statements are required to be delivered hereunder the Parent Borrower shall have one or more material Unrestricted Subsidiaries, then such financial statements shall be accompanied by information in reasonable detail summarizing the material differences between the financial statements delivered hereunder and the results of operations and financial condition of the Parent Borrower and its Subsidiaries without giving effect to the results or condition of any such Unrestricted Subsidiaries.

As to any information contained in materials furnished pursuant to Section 7.02, the Parent Borrower shall not be separately required to furnish such information under subsection (a) or (b) above, but the foregoing shall not be in derogation of the obligation of the Parent Borrower to furnish the information and materials described in subsections (a) and (b) above at the times specified therein.

       **7.02**   **Certificates; Other Information.**

Deliver to the Administrative Agent, each Lender and each L/C Issuer:

(a)        within five (5) Business Days following the delivery of the financial statements referred to in Section 7.01(a), a certificate of its independent certified public accountants certifying such financial statements and stating that in making the examination necessary therefor no knowledge was obtained of any Default or Event of Default with respect to the financial covenant or, if any such Default or Event of Default shall exist, stating the nature and status of such event (which may be limited to the extent consistent with industry practice or the policy of the accounting firm);

(b)        within five (5) Business Days following each delivery of the financial statements referred to in Sections 7.01(a) and (b) (except as set forth in clause (i) below), a duly completed Compliance Certificate signed by a Responsible Officer of the Parent Borrower (i) setting forth computations in reasonable detail satisfactory to the Administrative Agent demonstrating compliance with the applicable financial covenant contained herein, (ii) certifying that no Default or Event of Default exists as of the date thereof (or the nature and extent thereof and proposed actions with respect thereto), (iii) setting forth a list of each Subject Disposition and Involuntary Disposition effected during the fiscal quarter or fiscal year, as the case may be, covered by such financial statements, to the extent the Net Cash Proceeds received in such Subject Disposition (or series of related Subject Dispositions) or Involuntary Disposition (or series of related Involuntary Dispositions) exceed $35.0 million or the Net Cash Proceeds received in all Subject Dispositions or Involuntary Dispositions effected during such fiscal year exceeds $75.0 million (or the elapsed portion of such fiscal year in the case of a Compliance Certificate relating to a fiscal quarter), and whether the Parent Borrower and its Subsidiaries intend to reinvest the Net Cash Proceeds thereof or to use such Net Cash Proceeds to prepay the Loans, (iv) a calculation of the Cumulative Credit (in reasonable detail) as of the last day of the period covered by such financial statements and (v) setting forth a list of (A) the Unrestricted Subsidiaries formed, acquired, divested, liquidated, merged or otherwise disposed of and (B) the Subsidiaries of the Parent Borrower designated as Unrestricted Subsidiaries or redesignated as a Restricted Subsidiary pursuant to a Subsidiary Redesignation, in each case during the period covered by such financial statements; provided that no such Compliance Certificate shall be required to be delivered in connection with the delivery of financial statements for the fiscal quarter ended September 30, 2019;

(c)        promptly upon receipt thereof, all notices of default under any Indebtedness having an aggregate principal amount of at least $150.0 million;

(d)        promptly, such additional information regarding the business, financial or corporate affairs of any Credit Party or any Subsidiary of a Credit Party, or compliance with the terms of the Credit Documents, as the Administrative Agent or any Lender (acting through the Administrative Agent) may from time to time reasonably request;

(e)        promptly after the furnishing thereof, copies of any material financial statement or report furnished to any holder of material Indebtedness of any Credit Party or of any of its Subsidiaries pursuant to the terms of any indenture, loan or credit or similar agreement and not otherwise required to be furnished to the Lenders pursuant to Section 7.01 or any other clause of this Section 7.02;

(f)        as soon as available, but in any event no more than ninety (90) days following the beginning of each fiscal year of the Parent Borrower, a detailed consolidated budget for the subsequent fiscal year (including a projected consolidated balance sheet and related statements of projected operations and cash flow as of the end of and for each fiscal quarter of such fiscal year and setting forth the assumptions used for purposes of preparing such budget) and, promptly when available, any significant revisions of such budget;

(g)        within 15 Business Days after the date of any Major Disposition, the Parent Borrower shall notify the Administrative Agent thereof and whether and to what extent the Net Cash Proceeds received therefrom is intended to be used to reinvest or make prepayments pursuant to Section 2.06(b)(ii); and

(h)        promptly following any request therefor, the Parent Borrower will provide documentation reasonably request by any Lender for purposes of compliance with the Beneficial Ownership Certification.

124

Documents required to be delivered pursuant to Section 7.01 or 7.02 may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Parent Borrower posts such documents, or provides a link thereto on the Parent Borrower's website on the internet at the website address listed on Schedule 11.02; or (ii) on which such documents are posted on the Parent Borrower's behalf on an internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent) including, to the extent the Lenders and the Administrative Agent have access thereto and such documents are available thereon, the EDGAR database and sec.gov; provided that the Parent Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents. Except for Compliance Certificates, the Administrative Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Parent Borrower with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

The Credit Parties hereby acknowledge that the Administrative Agent and/or the Lead Arrangers will make available to the Lenders and the L/C Issuers materials and/or information provided by or on behalf of the Credit Parties hereunder (collectively, the "Credit Party Materials") by posting the Credit Party Materials on IntraLinks or another similar electronic system (the "Platform") and that certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Credit Parties or their securities) (each, a "Public Lender"). The Credit Parties hereby agree that so long as any Credit Party is the issuer of any outstanding debt or equity securities that are registered or issued pursuant to a private offering or is actively contemplating issuing any such securities (1) all Credit Party Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" (which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof), or otherwise indicated to the Administrative Agent as being "PUBLIC"; (2) by marking or otherwise indicating the Credit Party Materials "PUBLIC," the Credit Parties shall be deemed to have authorized the Agents, the Lead Arrangers, the L/C Issuers and the Lenders to treat such Credit Party Materials as not containing any material non-public information with respect to the Credit Parties or their securities for purposes of United States federal and state securities laws (provided, however, that to the extent such Credit Party Materials constitute Information, they shall be treated as set forth in Section 11.07); (3) all Credit Party Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated as "Public Investor"; and (4) the Administrative Agent and the Lead Arrangers shall be entitled to treat any Credit Party Materials that are not marked or otherwise indicated "PUBLIC" as being suitable only for posting on a portion of the Platform not marked as "Public Investor."

       7.03   **Notification.**

Promptly, and in any event within two Business Days after any Responsible Officer of the Parent Borrower or any of its material Subsidiaries obtains knowledge thereof, notify the Administrative Agent, each Lender and each L/C Issuer of:

       (a)      the occurrence of any Default or Event of Default;

       (b)      the filing or commencement of any litigation, investigation or proceeding affecting any Credit Party which would reasonably be expected to have a Material Adverse Effect;

       (c)      the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, would reasonably be expected to result in liability of the Parent Borrower and its Subsidiaries in an aggregate amount exceeding $150.0 million; and

       (d)      any other occurrences or events that result in, or would reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this Section 7.03 shall be accompanied by a statement of a Responsible Officer of the Parent Borrower setting forth the details of the occurrence or event requiring such notice and any action taken or proposed to be taken with respect thereto.

**7.04    Preservation of Existence.**

Except as otherwise permitted hereunder, do all things necessary to preserve and keep in full force and effect (x) its existence and (y) its rights, franchises and authority, except (i) to the extent, in the case of clauses (x) (with respect to any Subsidiary only and not the Parent Borrower) and(y), that the failure to do so would not have a Material Adverse Effect, (ii) with respect to any Subsidiary or the Parent Borrower, to the extent otherwise permitted by Section 8.04 hereof, and (iii) for the liquidation or dissolution of Subsidiaries if the assets of such Subsidiaries, to the extent such assets exceed estimated liabilities, are acquired by the Parent Borrower or a Wholly Owned Subsidiary of the Parent Borrower in such liquidation or dissolution (and, in the case of assets of a Non-Wholly Owned Subsidiary, such assets are acquired by the Parent Borrower or a Wholly Owned Subsidiary of the Parent Borrower on a pro rata basis according to the Parent Borrower or such Wholly Owned Subsidiary's ownership in such Subsidiary); provided that Subsidiaries that are Guarantors may not be liquidated into Subsidiaries that are not Guarantors.

**7.05    Payment of Taxes and Other Obligations**

(a)    Except in each case to the extent that the failure to do so would not, individually or in the aggregate, have a Material Adverse Effect, pay and discharge (i) all Taxes imposed upon it, or upon its income or profits, or upon any of its properties, before they become delinquent (it being understood that, with respect to any Unrestricted Subsidiary, such Subsidiary shal  comply with this clause (i) to the extent that any such obligation to pay and discharge such Taxes may become an obligation of the Parent Borrower or any of its Subsidiaries (other than an Unrestricted Subsidiary)), (ii) all lawful claims (including claims for labor, material and supplies) that, if unpaid, might give rise to a Lien upon any of its properties, and (iii) except as prohibited hereunder, all of its other Indebtedness as it becomes due; provided that no such Person shall be required to pay any amount that is being contested in good faith by appropriate proceedings and for which adequate reserves, determined in accordance with GAAP, have been established, if such contest suspends enforcement or collection of the claim in question.

(b)    Timely and correctly fi e all Tax Returns required to be filed by it, except for failures to file that would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

**7.06    Compliance with Law.**

Comply with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority, a breach of which would result in a Material Adverse Effect, except where contested in good faith by appropriate proceedings diligently pursued. The Borrower will maintain in effect and enforce policies and procedures designed to ensure compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

**7.07    Maintenance of Property.**

Maintain and preserve its material properties and equipment in good repair, working order and condition, normal wear and tear and casualty and condemnation excepted, and make all repairs, renewals, replacements, extensions, additions, betterments and improvements thereto as may be necessary or proper, to the extent and in the manner customary for similar businesses, except where the failure to do so would not reasonably be expected to result in a Material Adverse Effect.

**7.08    Insurance.**

Maintain at all times in force and effect insurance in such amounts, covering such risks and liabilities and with such deductibles or self-insurance retentions as determined by the Parent Borrower in its reasonable business judgment.

126

The Collateral Agent shall be named as loss payee and/or additional insured, as its interests may appear, with respect to any such insurance providing coverage in respect of any Collateral under the Collateral Documents, and the Parent Borrower shall request that each provider of any such insurance to agree, by endorsement upon the policy or policies issued by it or by independent instruments furnished to the Collateral Agent, that it will give the Collateral Agent thirty (30) days' prior written notice (except for nonpayment, which shall be 10 days' prior written notice) before any such policy or policies shall be altered in any material respect or canceled, and that no act or default of any member of the Consolidated Group or any other Person shall affect the rights of the Collateral Agent or the Lenders under such policy or policies.

**7.09    Books and Records.**

Maintain (a) proper books of record and account, in which true and correct entries in conformity with GAAP shall be made of all financial transactions and matters involving the assets and business of the Parent Borrower or such Subsidiary, as the case may be, and (b) such books of record and account are in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Parent Borrower or such Subsidiary.

**7.10    Inspection Rights.**

Permit representatives and independent contractors of the Administrative Agent or any Lender (in the case of such Lender, coordinated through the Administrative Agent) to (i) to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Parent Borrower and (ii) visit and inspect any of its properties and examine its corporate, financial and operating records, once per fiscal year of the Parent Borrower at such reasonable times during normal business hours, upon reasonable advance notice to the Parent Borrower; provided, however, that when an Event of Default exists the Administrative Agent or any of its representatives or independent contractors or any Lender (in the case of such Lender, coordinated through the Administrative Agent) may do any of the foregoing at the expense of the Parent Borrower at any time during normal business hours. Notwithstanding any provision to the contrary, all meetings and inspections requested and held pursuant to this Section 7.10 are subject to applicable attorney-client privilege exceptions and compliance with non-disclosure and confidentiality agreements between the Parent Borrower, any of its Subsidiaries and third parties. The Administrative Agent and the Lenders shall give the Parent Borrower the opportunity to participate in any discussions with the Borrowers' accountants.

**7.11    Use of Proceeds.**

Use the proceeds of (a) the Term B-4 Loans to repay in full and terminate the Term B-3 Loans that are not Converted Term B-3 Loans, (b) the Revolving Loans drawn on the Amendment No. 11 Effective Date, to repay in full and terminate the Delayed Draw Term A Loans and Revolving Loans and Swingline Loans (in each case outstanding under the Credit Agreement as in effect immediately prior to the Amendment No. 11 Effective Date) ~~and~~, (c) the Revolving Loans and Swingline Loans drawn after the Amendment No. 11 Effective Date, for general corporate purposes, and (d) the Venue Expansion Revolving Loans drawn after the Amendment No. 12 Effective Date, for working capital and general corporate purposes, including new venue development and construction, and, in each case of clause (a) through (~~c~~d), not in contravention of any Law or of any Credit Document. No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately for any purpose that entails a violation of, or that is inconsistent with, the provisions of the Regulations of the Federal Reserve Board, including Regulation U.

**7.12    Joinder of Subsidiaries as Guarantors.**

(a)    Together and simultaneously with its delivery of a Compliance Certificate pursuant to Section 7.02(b), deliver a written notice setting forth a list (the "New Guarantor List") of all Subsidiaries that would be required to become Guarantors pursuant to Section 7.12(b)(I) or 7.12(b)(II) below which were formed, acquired (or other interests received), brought into existence (including, without limitation, upon the formation of any such

Subsidiary resulting from a division of a limited liability company) or that ceased to constitute Excluded Subsidiaries, in each case during the period covered by the financial statements attached to such Compliance Certificate (it being understood that with respect to the annual financial statements, the fourth quarter of such year is the period referenced in this clause (a)), which notice shall include information as to the jurisdiction of organization, the number and class of Capital Stock outstanding and ownership thereof (including options, warrants, rights of conversion or purchase relating thereto). Together with each delivery of the Compliance Certificate required to be delivered within five (5) Business Days of the delivery of financial statements pursuant to Section 7.01(a), deliver a list of all Subsidiaries that became Excluded Subsidiaries during the period covered by such financial statements.

(b)        With respect to the formation, acquisition (or other receipt of interests) or existence (including, without limitation, upon the formation of any Subsidiary resulting from a division of a limited liability company) of any Subsidiary that is not an Excluded Subsidiary (and with respect to any Subsidiary that ceases to be an Excluded Subsidiary), (I) in the case of any such Subsidiary that would constitute a Material Subsidiary (solely for the purposes of this clause (I), without giving effect to the proviso in the definition of "Immaterial Subsidiary" when determining whether such Subsidiary constitutes a Material Subsidiary), within forty-five (45) days (or such longer period as the Administrative Agent may agree in its sole discretion) of the formation, acquisition, cessation, division or other receipt of interests of any such Subsidiary and (II) in the case of any other Subsidiary that is not an Excluded Subsidiary (other than by reason of clause (a) of the definition of Excluded Subsidiary), no later than the earlier of (X) thirty (30) days from the date the New Guarantor List containing such Subsidiary was required to have been prepared and delivered pursuant to Section 7.12(a) and (Y) the date such Subsidiary incurs or guarantees Indebtedness for borrowed money with a principal amount of $150.0 million or greater (or such longer period as the Administrative Agent may agree in its sole discretion), cause, in the case of each of clauses (I) and (II), the joinder of such Subsidiary as (x) in the case of a Domestic Subsidiary, as a Guarantor of the Domestic Obligations (provided that a CFC Holdco shall not be a Guarantor of the Domestic Obligations) and any Foreign Obligations or (y) in the case of a Foreign Subsidiary, as a Guarantor of the Foreign Obligations, in each case pursuant to Joinder Agreements (or such other documentation in form and substance reasonably acceptable to the Administrative Agent) accompanied by Organization Documents, take all actions necessary to create and perfect a security interest in favor of the Collateral Agent for the benefit of the applicable Secured Parties in its assets to the extent required by the applicable Collateral Documents (including the delivery to the Collateral Agent of all intercompany notes owing to such Subsidiary), together with undated alonges executed in blank, and all filings required under applicable law (including filing of financing statements in such jurisdictions as may be reasonably requested by the Administrative Agent) and, if reasonably requested by the Administrative Agent, deliver favorable opinions of counsel to such Subsidiary, in form and substance reasonably satisfactory to the Administrative Agent; provided that (A) no Foreign Subsidiary shall be required to comply with any of the foregoing unless a Foreign Borrower has then been added and not terminated and (B) no Foreign Subsidiary located in a jurisdiction other than the jurisdiction of a Foreign Borrower shall be required to comply with any of the foregoing until such time as the Outstanding Amount of the Foreign Borrowers exceeds $500.0 million.

(c)        For the avoidance of doubt, if (i) an Excluded Subsidiary shall cease to be an Excluded Subsidiary, (ii) an Unrestricted Subsidiary shall be redesignated as a Subsidiary pursuant to a Subsidiary Redesignation or (iii) a Foreign Borrower shall have been added and a Foreign Subsidiary required to become a Guarantor pursuant to clause (b) above, such Subsidiary shall thereupon comply with the foregoing; provided that this Section 7.12 shall not require the creation or perfection of pledges of or security interests in particular assets of the Foreign Subsidiaries or guarantees from particular Foreign Subsidiaries if, to the extent and for so long as, the Administrative Agent and the Parent Borrower jointly determine, in writing, that the cost to the Borrowers of creating or perfecting such pledges or security interests in such assets or obtaining such guarantees from Foreign Subsidiaries (in each case, taking into account, among other things, (i) any material adverse Tax or other consequences to the Borrowers and the other Subsidiaries (including the imposition of withholding or other material Taxes or costs on Lenders) and (ii) with respect to security interests in Equity Interests in Persons that are not, directly or indirectly, wholly owned by the Parent Borrower, any restrictions on the creation or perfection of such security interests (including the costs of obtaining necessary consents and approvals from other holders (other than the Parent Borrower and its Affiliates) of Equity Interests in such Persons)) shall be commercially unreasonable in view of the benefits to be obtained by the Lenders therefrom.

128

### 7.13    Pledge of Capital Stock.

Pledge or cause to be pledged to the Collateral Agent for the benefit of the applicable Secured Parties to secure the Obligations, other than in the case of Excluded Property, one hundred percent (100%) of the issued and outstanding Capital Stock of each Subsidiary to the extent owned by a Credit Party within forty-five (45) days (or such longer period as the Administrative Agent may agree in its sole discretion) of its formation, acquisition or other receipt of such interests; provided that, solely with respect to the Domestic Obligations, the pledge of the Capital Stock of any CFC or any CFC Holdco shall be limited to Capital Stock representing sixty-five percent (65%) of the voting and 100% of non-voting issued Capital Stock of each such CFC and CFC Holdco to the extent directly owned by a Credit Party, in each case pursuant to the applicable Collateral Documents or pledge joinder agreements, together with, if reasonably requested by the Administrative Agent, opinions of counsel and any filings and deliveries reasonably requested by the Collateral Agent in connection therewith to perfect (but with respect to perfection under foreign laws, only to the extent required under Section 5.03 or Section 7.12) the security interests therein, all in form and substance reasonably satisfactory to the Administrative Agent.

### 7.14    Pledge of Other Property.

With respect to each Credit Party, pledge and grant a security interest in all of its personal property, tangible and intangib e, owned and leased (except (a) Excluded Property, (b) as otherwise set forth in Section 7.13 with respect to Capital Stock and (c) as otherwise set forth in the Collateral Documents) to secure (x) in the case of a Domestic Credit Party, the Obligations, and (y) in the case of a Foreign Credit Party, the Foreign Obligations, in each case within forty-five (45) days (or such longer period as the Administrative Agent may agree in its sole discretion) of the acquisition or creation thereof pursuant to such pledge and security agreements, joinder agreements or other documents as may be required, together with opinions of counsel and any filings and deliveries reasonably requested by the Collateral Agent in connection therewith to perfect (or the equivalent under applicable foreign laws) the security interests therein, all in form and substance reasonably satisfactory to the Administrative Agent.

### 7.15    Further Assurances Regarding Collateral.

(a)    Promptly upon request by the Administrative Agent, or any Lender through the Administrative Agent, (a) correct any material defect or error relating to the granting or perfection of security interests that may be discovered in any Credit Document or in the execution, acknowledgment, filing or recordation thereof, and (b) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent, or the Required Lenders through the Administrative Agent, may reasonably require from time to time in order to (i) carry out more effectively the purposes of the Credit Documents, (ii) to the fullest extent permitted by applicable law, subject any Credit Party's or any Credit Party's Subsidiaries' properties, assets, rights or interests to the Liens now or hereafter intended to be covered by any of the Collateral Documents, (iii) perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and any of the Liens intended to be created thereunder and (iv) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto the holders of the Obligations the rights granted to the holders of the Obligations under any Credit Document or under any other instrument executed in connection with any Credit Document to which any Credit Party or any Credit Party's Subsidiaries is or is to be a party, and cause each of the Parent Borrower's Subsidiaries to do so.

(b)    Notwithstanding anything to the contrary provided herein or in any Credit Document, the Parent Borrower and the Subsidiaries shall not be required to deliver control agreements with respect to deposit accounts or securities accounts.

### 7.16    Rating.

The Parent Borrower shall use its commercially reasonable efforts to obtain and maintain a corporate family and/or corporate credit rating, as applicable, and ratings in respect of this Credit Agreement, in each case, from each of Moody's and S&P.

129

**7.17**    **Ownership of Foreign Borrowers.**

Each of the Foreign Borrowers will, at all times, be a direct or indirect wholly owned subsidiary of the Parent Borrower.

**7.18**    **[Reserved].**

[Reserved].

**7.19**    **Post-Closing Matters.**

The Parent Borrower shall complete the tasks set forth on Schedule 7.19, in each case within the time limits specified on such schedule.

## ARTICLE VIII

## NEGATIVE COVENANTS

Until the Loan Obligations shall have been paid in full or otherwise satisfied, and the Commitments hereunder shall have expired or been terminated, the Parent Borrower will not, and will not permit any of its Subsidiaries to:

**8.01**    **Liens.**

Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)    Liens created pursuant to the Credit Documents;

(b)    Liens under the Collateral Documents given to secure obligations under Swap Contracts between any Credit Party and the Administrative Agent, any Lead Arranger, any Lender or Affiliate of a Lender or any Person that was the Administrative Agent, a Lead Arranger, a Lender or Affiliate of a Lender at the time it entered into such Swap Contract; provided that such Swap Contracts are otherwise permitted under Section 8.03;

(c)    Liens existing on the Amendment No. 1112 Effective Date and listed on Schedule 8.01, together with any extensions, replacements, modifications or renewals of the foregoing; provided that the collateral interests are not broadened or increased or secure any Property not secured by such Liens on the Amendment No. 1112 Effective Date (but shall be permitted to apply to after-acquired property affixed or incorporated into the property covered by such Lien and the proceeds and products of the foregoing);

(d)    Liens for Taxes, assessments or governmental charges or levies not yet due or to the extent non-payment thereof is permitted under Section 7.05;

(e)    statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, materialmen and suppliers and other Liens imposed by law or pursuant to customary reservations or retentions of title arising in the ordinary course of business; provided that such Liens secure only amounts not yet due and payable or, if due and payable, are unfiled and no other action has been taken to enforce the same, are not overdue by more than 30 days, or are being contested in good faith by appropriate proceedings for which adequate reserves determined in accordance with GAAP have been established (and as to which the property subject to any such Lien is not yet subject to a foreclosure, sale or loss proceeding on account thereof (other than a proceeding where foreclosure, sale or loss has been stayed));

(f)    Liens incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders,

130

statutory obligations (other than ob igations under ERISA), bids, leases, government contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money);

(g)    Liens in connection with attachments or judgments (including judgment or appeal bonds) that do not result in an Event of Default under Section 9.01(i);

(h)    easements, rights-of-way, covenants, conditions, restrictions (including zoning restrictions), declarations, rights of reverter, minor defects or irregularities in title and other similar charges or encumbrances, whether or not of record, that do not, in the aggregate, interfere in any material respect with the ordinary course of business of the Parent Borrower or its Subsidiaries;

(i)    Liens on property of any Person securing purchase money Indebtedness or Indebtedness in respect of Sale and Leaseback Transactions permitted under Section 8.14 (including capital leases and Synthetic Leases) of such Person, in each case to the extent incurred under Section 8.03(c) (or any refinancing of such Indebtedness incurred under Section 8.03(l)); provided that any such Lien attaches only to the Property financed or leased and such Lien attaches prior to, at the time of or within one hundred eighty (180) days after the later of the date of acquisition of such property or the date such Property is placed in service (or, in the case of Liens securing a refinancing of such Indebtedness pursuant to Section 8.03(l), any such Lien attaches only to the Property that was so financed with the proceeds of the Indebtedness so refinanced);

(j)    licenses, sublicenses, leases or subleases granted to others not interfering in any material respect with the business of any member of the Consolidated Group;

(k)    any interest or title of a lessor or sublessor under, and Liens arising from UCC financing statements (or equivalent filings, registrations or agreements in foreign jurisdictions) relating to, leases and subleases permitted by this Credit Agreement;

(l)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods and Liens deemed to exist in connection with Investments in repurchase agreements that constitute Investments permitted by Section 8.02 hereof;

(m)    normal and customary contractual rights of setoff upon deposits of cash or other Liens relating to bankers liens, rights of setoff or similar rights in favor of banks or other depository institutions not securing Indebtedness;

(n)    Liens of a collection bank arising under Section 4-210 of the UCC on items in the course of collection;

(o)    Liens on Property securing obligations incurred under Section 8.03(h) (or any refinancing of such Indebtedness incurred under Section 8.03(l)); provided that the Liens are not incurred in connection with, or in contemplation or anticipation of, the acquisition and do not attach or extend to any Property other than the Property so acquired (or, in the case of Liens securing a refinancing of such Indebtedness pursuant to Section 8.03(l), the Property acquired with the proceeds of the Indebtedness so refinanced);

(p)    other Liens; provided that such Liens do not secure principal obligations exceeding $500.0 million in an aggregate amount at any time outstanding; provided further that such amount shall be increased to the greater of (x) $750.0 million and (y) 40% of Consolidated EBITDA for the period of four fiscal quarters ending on the Applicable Measurement Date if, after giving pro forma effect to the incurrence of such obligations, as of the last day of the most recently ended fiscal quarter at the end of which financial statements were required to have been delivered pursuant to Section 7.01(a) or (b) (or, prior to such first required delivery date for such financial statements pursuant to either such Section, as of the last day of the most recent period referred to in the second sentence of Section 6.05 (such last day, in either case, the "Applicable Measurement Date")), the Consolidated Total Leverage Ratio would not be in excess of 4.50 to 1.00;

(q)      Liens in respect of any Indebtedness permitted under Section 8.03(g) to the extent such Liens extend only to Property of the Foreign Subsidiary or Foreign Subsidiaries incurring such Indebtedness (other than a Foreign Credit Party);

(r)      pledges and deposits and other Liens securing liability for reimbursement or indemnification obligations of (including obligations in respect of bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to the Parent Borrower or any Subsidiary;

(s)      Liens solely on any cash earnest money deposits made by the Parent Borrower or any of the Subsidiaries in connection with any letter of intent or purchase agreement in respect of any Investment permitted hereunder;

(t)      Liens securing obligations incurred pursuant to Section 8.03(n);

(u)      Liens on Capital Stock in joint ventures securing obligations of such joint venture, to the extent required by the terms of the organizational documents or material contracts of such joint venture;

(v)      Liens on goods or inventory the purchase, shipment or storage price of which is financed by a bank guarantee or bankers' acceptance issued or created for the account of the Parent Borrower or any Subsidiary in the ordinary course of business so long as such Liens are extinguished when such goods or inventory are delivered to the Parent Borrower or a Subsidiary; provided that such Lien secures only the obligations of the Parent Borrower or such Subsidiaries in respect of such bankers' acceptance or bank guarantee to the extent permitted under Section 8.03;

(w)      Liens securing insurance premiums financing arrangements; provided that such Liens are limited to the applicable unearned insurance premiums;

(x)      Liens in favor of any Credit Party; provided that if any such Lien shall cover any Collateral, the holder of such Lien shall execute and deliver to the Administrative Agent a subordination agreement in form and substance reasonably satisfactory to the Administrative Agent;

(y)      Liens on the Capital Stock of Unrestricted Subsidiaries;

(z)      Liens on deposits and accounts of Foreign Subsidiaries to secure Indebtedness incurred pursuant to Section 8.03(v);

(aa)      Liens on (i) assets of any member of the Academy Music Group securing AMG Indebtedness or (ii) on assets of any member of the AIL Group securing AIL Indebtedness;

(bb)    Liens on Permitted Deposits securing customary obligations that are incurred in the ordinary course of business;

(cc)      Liens on Collateral securing Obligations in respect of Refinancing Notes/Loans; provided that the holders of such Refinancing Notes/Loans or their representative is or becomes party to a customary intercreditor agreement and all such Liens are subject to such intercreditor agreement;

(dd)    Liens on the Collateral securing Incremental Equivalent Debt so long as such Liens are, to the extent secured on a *pari passu* basis with the Obligations, shall be subject to a customary *pari passu* intercreditor agreement or, to the extent secured on a junior lien basis with the Obligations, shall be subject to a customary junior priority intercreditor agreement, in each case, on terms that are reasonably satisfactory to the Administrative Agent;

(ee)    Liens on ticket inventory and Proceeds thereof (including on deposits accounts holding such Proceeds) securing Indebtedness not exceeding $150.0 million in an aggregate principal amount at any time

132

outstanding; provided that such Indebtedness shall only be used to finance advances to artists and performers and similar expenses;

(ff)    Liens on cash or Cash Equivalents for the purpose of defeasing or satisfing and discharging Indebtedness; provided that (A) such defeasance or satisfaction and discharge is permitted by this Credit Agreement, (B) such Liens apply for a period of no longer than 60 days prior to the effective date of such defeasance or satisfaction and discharge, as the case may be and (C) such Liens secure an amount no greater than the amount required under the instrument governing such Indebtedness to effectuate such defeasance or satisfaction and discharge;

(gg)    Liens on Collateral securing the Existing Senior Secured Notes incurred and outstanding pursuant to Section 8.03(k)(ii) and any refinancing thereof pursuant to Section 8.03(l), so long as such Liens are subject to the First Lien Intercreditor Agreement or another intercreditor agreement reasonably satisfactory to the Administrative Agent; and

(hh)    Liens securing Venue Construction Indebtedness incurred and outstanding pursuant to Section 8.03(bb) and any refinancing thereof pursuant to Section 8.03(l); provided that such Liens shall not extend to any assets or Equity Interests of the Parent Borrower or any of its Subsidiaries other than (i) the assets that are securing, or are subject to the applicable Venue Construction Indebtedness and other immaterial incidental assets related thereto and (ii) the Capital Stock of the applicable Venue Construction Subsidiary and the assets and Capital Stock of the applicable Holdco Venue Construction Subsidiary (if any); provided further such $500.0 million limitation set forth in this clause (hh) shall be calculated assuming the aggregate principal amount of Indebtedness secured pursuant to this clause (hh) constitutes the Venue Construction Subsidiary Percentage of the aggregate principal amount of such Indebtedness.

**8.02    Investments.**

Make or permit to exist any Investments, except:

(a)    cash and Cash Equivalents of or to be owned by the Parent Borrower or a Subsidiary;

(b)    Investments existing on, contractually committed or announced but unconsummated as of, the Amendment No. 11 Effective Date and set forth on Schedule 8.02(b) and any extensions, renewals or reinvestments thereof, so long as the aggregate amount of any Investment pursuant to this clause (b) is not increased at any time above the amount of such Investment existing on the Amendment No. 11 Effective Date, unless such increase is permitted by any clause of this Section 8.02 (other than by this clause (b)), in which case the capacity of such other clause shall be reduced by such increase;

(c)    loans or advances to officers, directors and employees and consultants of the Parent Borrower and Subsidiaries made for travel, entertainment, compensation, relocation and other ordinary business purposes in an aggregate amount not to exceed $40.0 million at any time outstanding or, to the extent not used as part of or to increase the Cumulative Credit, in connection with such person's purchase of equity of the Parent Borrower;

(d)    Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss and any prepayments and other credits to suppliers, clients, developers or purchasers or sellers of goods or services made in the ordinary course of business;

(e)    except to the extent constituting an Acquisition, Investments by the Parent Borrower and its Subsidiaries in Domestic Credit Parties;

(f)    Investments by the Parent Borrower and Domestic Subsidiaries in Restricted Subsidiaries that are not Domestic Credit Parties (and, in the case of a Permitted Acquisition, in Persons that become Subsidiaries that are

133

not Domestic Credit Parties upon consummation of such Permitted Acquisition) in an aggregate amount at any time not to exceed the greater of $1,500.0 million and 7.5% of Consolidated Tangible Assets at such time;

(g)        Investments by Foreign Subsidiaries in any member of the Consolidated Group (including other Foreign Subsidiaries) and, in the case of a Permitted Acquisition, in Persons that become a members of the Consolidated Group (including Foreign Subsidiaries) upon consummation of such Permitted Acquisition;

(h)        Support Obligations incurred pursuant to Section 8.03;

(i)        (i) Investments comprised of Permitted Acquisitions and (ii) Investments of any Person in existence at the time such Person becomes a Restricted Subsidiary (other than in Subsidiaries of any such Person); provided that such Investment was not made in connection with or in anticipation of such Person becoming a Restricted Subsidiary;

(j)        advances in the ordinary course of business to secure developer, promoter, manager and artist contracts of the Parent Borrower and its Subsidiaries;

(k)        Investments at any time outstanding in an aggregate amount not to exceed the greater of $1,500.0 million and 7.5% of Consolidated Tangible Assets at such time plus, so long as (x) no Default shall have occurred and be continuing or exist after giving effect thereto and (y) after giving effect on a Pro Forma Basis to the Investment to be made, as of the last day of the most recently ended fiscal quarter at the end of which financial statements were required to have been delivered pursuant to Section 7.01(a) or (b)  or, prior to such first required delivery date for such financial statements pursuant to either such Section, as of the last day of the most recent period referred to in the second sentence of Section 6.05), the Parent Borrower would be in compliance with Section 8.10 (and if the Investment is greater than $200.0 million, then the Parent Borrower shall deliver a certificate of a Responsible Officer of the Parent Borrower as to the satisfaction of the requirements in this clause (y)), the amount of the Cumulative Credit at such time; provided that if any Investment is made pursuant to this Section 8.02(k) in any Person that is not a Domestic Credit Party and such Person thereafter becomes a Domestic Credit Party, such Investment shall thereafter be deemed to have been made pursuant to Section 8.02(e);

(l)        Investments representing non-cash consideration received in connection with any Subject Disposition not prohibited pursuant to Section 8.05 and any other Disposition permitted by this Credit Agreement;

(m)        Investments in joint ventures in an aggregate amount not to exceed the greater of $800.0 million and 5.0% of Consolidated Tangible Assets at any time outstanding; provided, that if any Investment is made pursuant to this Section 8.02(m) in any Person that thereafter becomes a member of the Consolidated Group, such Investment shall thereafter be deemed to have been made pursuant to Section 8.02(g);

(n)        Swap Contracts allowed by Section 8.03(d);

(o)        Investments resulting from pledges and deposits under Section 8.01(f), (l), (r), (s) or (bb);

(p)        Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with or judgments against, customers and suppliers, in each case in the ordinary course of business or Investments acquired by the Parent Borrower as a result of a foreclosure by the Parent Borrower or any of the Subsidiaries with respect to any secured Investments or other transfer of title with respect to any secured Investment in default;

(q)        loans or advances or other similar transactions with customers, distributors, clients, developers, promoters, managers, suppliers or purchasers or sellers of goods or services, in each case, in the ordinary course of business, regardless of frequency;

(r)        to the extent not used as part of or increasing the Cumulative Credit, any Investment to the extent procured in exchange for the issuance of Qualified Capital Stock;

134

(s)    Investments to the extent consisting of the redemption, purchase, repurchase or retirement of any common Capital Stock permitted under Section 8.06;

(t)    advances in the form of a prepayment of expenses, so long as such expenses are being paid in accordance with customary trade terms of the Parent Borrower or such Subsidiary;

(u)    (A) guarantees by the Parent Borrower or any Subsidiary of operating leases or of other obligations that do not constitute Indebtedness, in each case entered into by the Parent Borrower or any Subsidiary in the ordinary course of business and (B) Investments consisting of guarantees permitted by Section 8.03;

(v)    Investments consisting of the non-exclusive licensing of intellectual property pursuant to joint marketing arrangements with other Persons otherwise permitted hereunder;

(w)    Investments consisting of Permitted Deposits;

(x)    Designated Investments set forth on Schedule 8.02(x);

(y)    Investments received in exchange for the making of Restricted Payments under Section 8.06(b);

(z)    Investments (A) in Subsidiaries (other than Unrestricted Subsidiaries) organized under the laws of a jurisdiction in Mexico, Central America or South America in an aggregate principal amount at any time outstanding not to exceed $1,000.0 million and (B) so long as the Parent Borrower and its Subsidiaries then own a majority of the outstanding voting and economic Equity Interests in OCESA, Investments for the Parent Borrower or any Subsidiary to purchase the remainder of the Equity Interests of OCESA not then owned by Parent Borrower or an Affiliate thereof;

(aa)    other Investments provided that, at the time of making such Investments, (x) no Event of Default shall have occurred and be continuing or would result therefrom and (y) on a pro forma basis, the Consolidated Total Leverage Ratio is equal to or less than 4.50 to 1.00;

(bb)    any payments in connection with a Permitted Bond Hedge Transaction;

(cc)    Investments in Subsidiaries (other than Unrestricted Subsidiaries) organized under the laws of a jurisdiction in Canada in an aggregate principal amount at any time outstanding not to exceed $150.0 million;

(dd)    any Investment in one or more Restricted Subsidiaries or Unrestricted Subsidiaries in the form of cash, Cash Equivalents and/or real property in an aggregate amount (with the amount of any Investment consisting of real property being valued at the fair market value thereof at the time such Investment is made) for all such Investments made pursuant to this Section 8.02(dd) not to exceed the greater of (I) $1,500.0 million and (II) 7.5% of Consolidated Tangible Assets at the time such Investment is made, so long as, if any such Investment is made in reliance of clause (B)(II) of this Section 8.02(dd), (x) no Default shall have occurred and be continuing or exist after giving effect thereto and (y) after giving effect on a Pro Forma Basis to the Investment to be made, as of the last day of the most recently ended fiscal quarter at the end of which financial statements were required to have been delivered pursuant to Section 7.01(a) or (b), the Parent Borrower would be in compliance with Section 8.10 (and if the Investment is greater than $100.0 million, then the Parent Borrower shall deliver a certificate of a Responsible Officer of the Parent Borrower as to the satisfaction of the requirements in this clause (y)); provided that if any Investment is made pursuant to this Section 8.02(dd) in any Person that is not a Domestic Credit Party and such Person thereafter becomes a Domestic Credit Party, such Investment shall thereafter be deemed to have been made pursuant to Section 8.02(e);

(ee)    any Investment in one or more Unrestricted Subsidiaries in the form of real property in an aggregate amount (with the amount of real property being valued at the fair market value thereof at the time such Investment is made) for all such Investments made pursuant to this Section 8.02(ee) not to exceed the greater of (I) $750.0 million and (II) 5.0% of Consolidated Tangible Assets at the time such Investment is made, so long as, if any

135

such Investment is made in reliance of clause (B)(II) of this Section 8.02(ee), (x) no Default shall have occurred and be continuing or exist after giving effect thereto and (y) after giving effect on a Pro Forma Basis to the Investment to be made, as of the last day of the most recently ended fiscal quarter at the end of which financial statements were required to have been delivered pursuant to Section 7.01(a) or (b), the Parent Borrower would be in compliance with Section 8.10 (and if the Investment is greater than $100.0 million, then the Parent Borrower shall deliver a certificate of a Responsible Officer of the Parent Borrower as to the satisfaction of the requirements in this clause (y)); provided that if any Investment is made pursuant to this Section 8.02(ee) in any Person that is not a Domestic Credit Party and such Person thereafter becomes a Domestic Credit Party, such Investment shall thereafter be deemed to have been made pursuant to Section 8.02(e); and

(ff)    to the extent undertaken to effect a corporate reorganization (or similar transaction or event) for operational or efficiency purposes or related to tax planning or tax reorganization, in each case, as determined in good faith by the Parent Borrower, Investments so long as, immediately after giving effect thereto, the security interest of the Lenders in the Collateral and the value of the ~~Guarantees~~guarantees given by the Guarantors, taken as a whole, are not materially impaired as a result of such Investments.

**8.03    Indebtedness.**

Create, incur, assume or suffer to exist any Indebtedness, except:

(a)    Indebtedness existing or arising under this Credit Agreement and the other Credit Documents;

(b)    Indebtedness existing on the Amendment No. 11 Effective Date set forth on Schedu e 8.03;

(c)    capital lease obligations and purchase money Indebtedness (including obligations in respect of capital leases) to finance the purchase, acquisition, construction, development, enlargement, repair or improvement of fixed or capital assets, at any time outstanding (when aggregated with the aggregate amount of refinancing Indebtedness outstanding at such time pursuant to Section 8.03(l) in respect of Indebtedness incurred pursuant to this Section 8.03(c)) not to exceed $500.0 million; provided that such Indebtedness when incurred shall not exceed the purchase price of the asset(s) financed;

(d)    obligations under Swap Contracts permitted by Section 8.15;

(e)    unsecured intercompany Indebtedness among members of the Consolidated Group to the extent permitted by Section 8.02(e), (f), (g), (k), (z), (aa), (cc), (dd), (ee) or (ff);

(f)    unsecured Indebtedness of the Parent Borrower to the extent (i) no Default or Event of Default has occurred and is continuing or would result from the incurrence thereof at such time; (ii) after giving pro forma effect to the incurrence of such Indebtedness (including application of the proceeds thereof), as of the last day of the most recently ended fiscal quarter at the end of which financial statements were required to have been delivered pursuant to Section 7.01(a) or (b) (or, prior to such first required delivery date for such financial statements pursuant to either such Section, as of the last day of the most recent period referred to in the second sentence of Section 6.05), the Parent Borrower would be in compliance with Section 8.10 (and if the Indebtedness incurred is greater than $300.0 million, then the Parent Borrower shall deliver a certificate of a Responsible Officer of the Parent Borrower as to the satisfaction of the requirements in this clause (ii)); (iii) such Indebtedness has a stated maturity no earlier than the later of (x) the Term B-4 Loans ~~any~~and  y) the Initial Revolving Termination Date, and has a Weighted Average Life to Maturity that is no shorter than the Term B-4 Loans (other than, with respect to maturity, customary extension rollover provisions (including by conversion or exchange) for bridge facilities, in which case, such maturity may be earlier than the  ater of (x) the Term B-4 Loans or (y) the Initial Revolving Termination Date, as the case may be, if such maturity is automatically extended upon the initial maturity date to a date not earlier than the later of (x) the maturity date of the Term B-4 Loans or (y) the Initia  Revolving Termination Date, as the case may be); (iv) such Indebtedness does not have prepayment or redemption events that are less favorable to the Parent Borrower and its Subsidiaries than those relating to the Term B-4 Loans, except, to the extent such Indebtedness consists of Convertible Indebtedness, for change of control and other events that are typical for that type of

136

Indebtedness (other than a scheduled "put" date prior to the later of (x) the maturity of the Term B-4 Loans and (y) the Initial Revolving Termination Date); and (v) such Indebtedness has other terms that are, in the case of this clause (v), taken as a whole, not materially less favorable to the Parent Borrower and its Subsidiaries than the terms of this Credit Agreement, as determined in good faith by the Parent Borrower (other than pricing, rate floors, discounts, fees, premiums and optional prepayment or redemption provisions and any provisions customary for convertible bonds); provided that such Indebtedness may benefit from unsecured guarantees from the Domestic Guarantors on the same basis as the Parent Borrower has issued such Indebtedness;

(g)    Indebtedness of Foreign Subsidiaries and guarantees thereof by other Foreign Subsidiaries, without duplication, in an aggregate principal amount at any time outstanding not to exceed the greater of (i) $1,500.0 million and (ii) 7.5% of Consolidated Tangible Assets at such time;

(h)    Indebtedness acquired or assumed pursuant to a Permitted Acquisition; provided that (a) such Indebtedness was not incurred in connection with, or in anticipation or contemplation of, such Permitted Acquisition and (b) after giving pro forma effect to the incurrence of such Indebtedness, as of the last day of the most recently ended fiscal quarter at the end of which financial statements were required to have been delivered pursuant to Section 7.01(a) or (b) (or, prior to such first required delivery date for such financial statements pursuant to either such Section, as of the last day of the most recent period referred to in the second sentence of Section 6.05), the Parent Borrower would be in compliance with Section 8.10;

(i)    Indebtedness arising under any performance or surety bond, completion bond or similar obligation entered into in the ordinary course of business consistent with past practice;

(j)    other Indebtedness of the Parent Borrower and its Subsidiaries (and guarantees thereof, without duplication) in an aggregate principal amount at any time outstanding not to exceed the greater of (i) $1,500.0 million and (ii) 7.5% of Consolidated Tangible Assets at such time;

(k)    Indebtedness incurred by the Parent Borrower under the Existing Notes (and any 2024 Senior Notes Refinancing Indebtedness (and, in each case, any guarantees by the Domestic Guarantors thereof, as applicable);

(l)    1) any 2025 Convertible Notes Refinancing Indebtedness and (2) any Indebtedness incurred pursuant to any refinancing of Indebtedness incurred or outstanding pursuant to Section 8.03(b), (c), (f), (h), (k) or, (bb) or (l)(1) (for the avoidance of doubt, after the initial incurrence of the 2025 Convertible Notes Refinancing Indebtedness), in each case of the foregoing clause (2), so long as (i) if the Indebtedness being refinanced is Subordinated Debt, then such refinancing Indebtedness shall be at least as subordinated in right of payment and otherwise to the Obligations as the Indebtedness being refinanced, (ii) unless permitted pursuant to another clause of this Section 8.03 (and reducing availability under such other clause), the principal amount of the refinancing Indebtedness is not greater than the principal amount of the Indebtedness being refinanced, together with any premium paid, and accrued interest thereon and reasonable fees in connection therewith and reasonable costs and expenses incurred in connection therewith, (iii) the final maturity and Weighted Average Life to Maturity of the refinancing Indebtedness is not earlier or shorter, as the case may be, than the Indebtedness being refinanced; provided that (x) in the case of a refinancing of the Existing High Yield Notes or any 2024 Senior Notes Refinancing Indebtedness, the final maturity and Weighted Average Life to Maturity of the refinancing Indebtedness is not earlier or shorter, as the case may be, than that of the Term B-4 Loans and the final maturity thereof is not earlier than the Initial Revolving Termination Date and (y) solely in the case of the initial refinancing of the 2029 Convertible Notes, the final maturity thereof (or equivalent concept in the form of a stated mandatory repurchase or redemption date, if any) and Weighted Average Life to Maturity of the refinancing Indebtedness is not earlier or shorter, as the case may be, than that of the Term B-4 Loans and the final maturity thereof (or equivalent concept in the form of a stated mandatory repurchase or redemption date, if any) is not earlier than the Initial Revolving Termination Date, (iv) no Subsidiary (other than a Domestic Credit Party) that is not an obligor with respect the Indebtedness to be refinanced shall be an obligor with respect to the refinancing Indebtedness, (v) in the case of the Existing Senior Secured Notes, the assets (if any) securing such refinancing Indebtedness constitutes Collateral and (vi) other than with respect to a refinancing of Convertible Indebtedness, in the case of this clause (vi), the material

137

terms (other than as to interest rate, which shall be on then market terms, or as otherwise specified in any of clauses (i) through (v) of this clause (l)) of the refinancing Indebtedness taken as a whole are at least as favorable to the Consolidated Group and the Lenders as under the Indebtedness being refinanced;

(m)    overdrafts paid within 10 Business Days;

(n)    Indebtedness in respect of trade letters of credit, warehouse receipts or similar instruments issued to support performance obligations (other than obligations in respect of Indebtedness) in the ordinary course of business;

(o)    Indebtedness supported by a Letter of Credit, in a principal amount not in excess of the stated amount of such Letter of Credit;

(p)    Indebtedness consisting of (i) the financing of insurance premiums or (ii) take or pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(q)    Indebtedness representing deferred compensation to employees of the Parent Borrower or any Subsidiary incurred in the ordinary course of business;

(r)    Indebtedness consisting of promissory notes issued by the Parent Borrower to current or former officers, directors and employees, their respective estates, spouses or former spouses issued in exchange for the purchase or redemption by the Parent Borrower of Qualified Capital Stock permitted by Section 8.06(f); provided that (a) the Parent Borrower shall be able to make a Restricted Payment pursuant to Section 8.06(f) in an amount equal to the principal amount of each such note at the time such note is issued, and an amount equal to the principal amount of each such note shall reduce the amount of Restricted Payments able to be made under Section 8.06(f) and (b) the Parent Borrower shall be able to make a Restricted Payment pursuant to Section 8.06(f) in the amount of any other payment on each such note at the time such payment is made, and each such payment shall reduce the Restricted Payments available to be able to be made under Section 8.06(f);

(s)    Indebtedness consisting of obligations of the Parent Borrower or any Subsidiary under deferred compensation, indemnification, adjustment of purchase or acquisition price or other similar arrangements incurred by such Person in connection with the Transactions and Permitted Acquisitions or any other Investment expressly permitted hereunder;

(t)    all premium (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (a) through (s) above and clauses (w) through (aa) below;

(u)    Support Obligations by any member of the Consolidated Group in respect of Indebtedness incurred under clauses (a) through (t) of this Section 8.03, solely to the extent such member of the Consolidated Group would have itself been able to originally incur such Indebtedness;

(v)    Indebtedness of Foreign Subsidiaries arising under Euro-denominated and Sterling-denominated cash pooling arrangements; provided that the net obligations (after notional offsets for pooling participants, cash and Cash Equivalents) for such shall not exceed €10,000,000 for Euro-denominated arrangements and £10,000,000 for Sterling-denominated, and such Indebtedness may benefit from cross-guarantees from pooling participants and a guarantee from the Parent Borrower;

(w)    AMG Indebtedness;

(x)    AIL Indebtedness and any Support Obligations by the Parent Borrower in respect of such AIL Indebtedness;

(y)    Indebtedness under Refinancing Notes/Loans;

138

(z)    Incremental Equivalent Debt in an aggregate principal amount not to exceed, for all the Incremental Equivalent Debt incurred after the Amendment No.~~11~~12 Effective Date, the sum of (i) the Incremental Base Amount, plus amounts referred to in Section 2.01(f)(i)(y) minus the aggregate principal amount of Incremental Loan Facilities incurred pursuant to Section 2.01(f)(i)(x) or (y) plus (ii) an additional amount of secured Incremental Equivalent Debt if, after giving Pro Forma Effect to the incurrence of such additional amount as of the last day of the most recently ended fiscal quarter at the end of which financial statements were required to have been delivered pursuant to Section 7.01(a) or (b) (or, prior to such first required delivery date for such financial statements pursuant to either such Section, as of the last day of the most recent period referred to in the second sentence of Section 6.05) as if any Indebtedness had been outstanding on the date of such incurrence on the last day of such period, the Senior Secured Leverage Ratio is equal to or less than 4.50:1.00; provided that, in each case, the maximum amount of Incremental Equivalent Debt available to be incurred is determined without giving effect to any incurrence under the Incremental Base Amount that is incurred substantially simultaneously with amounts under this clause (ii); provided further that the Borrowers shall be deemed to have utilized the amounts under clause (ii) prior to utilization of the amounts under clause (i);

(aa)    Indebtedness incurred by any Subsidiary of Parent Borrower organized under the laws of a jurisdiction of Australia (which is not guaranteed by any Subsidiary that is not organized under the laws of a jurisdiction of Australia) in an aggregate principal amount at any time outstanding not to exceed the Dollar Equivalent of AUS$75.0 million; and

(bb)    Venue Construction Indebtedness of Venue Construction Subsidiaries and the Holdco Venue Construction Subsidiaries in an aggregate principal amount not exceeding $500.0 million at any one time outstanding; provided that (x) notwithstanding anything to the contrary contained in this Section 8.03 or Section 8.02, no Venue Construction Indebtedness shall be an obligation of Parent Borrower or any Subsidiary other the applicable Venue Construction Subsidiary or Holdco Venue Construction Subsidiary and (y) such $500.0 million limitation set forth in this clause (bb) shall be calculated assuming the aggregate principal amount of Indebtedness incurred pursuant to this clause (bb) constitutes the Venue Construction Subsidiary Percentage of the aggregate principal amount of such Indebtedness.

For purposes of determining compliance with this Section 8.03, (A) Indebtedness need not be permitted solely by reference to one category of permitted Indebtedness (or any portion thereof) described in Sections 8.03(a) through (bb) but may be permitted in part under any relevant combination thereof, (B) in the event that an item of Indebtedness (or any portion thereof) meets the criteria of one or more of the categories of permitted Indebtedness (or any portion thereof) described in this Section 8.03(a) through (bb), the Parent Borrower may, in its sole discretion, classify, reclassify or divide such item of Indebtedness (or any portion thereof) in any manner that complies with this Section 8.03 and will be entitled to only include the amount and type of such item of Indebtedness (or any portion thereof) in one of the above clauses (or any portion thereof) and such item of ndebtedness (or any portion thereof) shall be treated as having been incurred or existing pursuant to only such clause or clauses (or any portion thereof) and (C) any Indebtedness that becomes 2025 Convertible Notes Refinancing Indebtedness (even if such Indebtedness, upon incurrence, was incurred in reliance on a provision of this Agreement other than Section 8.03(l)) shall be automatically reclassified as being incurred under Section 8.03(l) upon the repurchase and/or maturity of 2025 Convertible Notes referred to in the definition of 2025 Convertible Notes Refinancing); provided that (i) all Indebtedness outstanding under the Credit Documents will be deemed to have been incurred in reliance only on the exception in clause (a) of this Section 8.03, (ii) the Existing Notes and the 2024 Senior Notes Refinancing Indebtedness will be deemed to have been incurred in reliance only on the exception in clause (k) of this Section 8.03 (and any refinancing thereof pursuant to Section 8.03(l) ~~shall only be incurred pursuant to such Section 8.03(l)~~)), and (iii) Indebtedness incurred pursuant to Section 8.03(z) shall only be deemed to have been incurred under Section 8.03(z) and may not be reclassified between clauses (i) and (ii) of such Section 8.03(z); provided, further, that any Indebtedness incurred pursuant to Section 2.01(f)(i)(x) or (y) may not be reclassified to be incurred under any other provision (including, for the avoidance of doubt, any other clause in Section 2.01(f)).

139

**8.04    Mergers and Dissolutions.**

(a)      Enter into a transaction of merger or consolidation, except that:

(i)    a Domestic Subsidiary of the Parent Borrower may be a party to a transaction of merger or consolidation with the Parent Borrower or another Domestic Subsidiary of the Parent Borrower; provided that if the Parent Borrower is a party to such transaction, the Parent Borrower shall be the surviving Person; provided, further that if the Parent Borrower is not a party to such transaction but a Domestic Guarantor is, such Domestic Guarantor shall be the surviving Person or the surviving Person shall become a Domestic Guarantor immediately upon the consummation of such transaction;

(ii)    a Foreign Subsidiary may be party to a transaction of merger or consolidation with the Parent Borrower or a Subsidiary of the Parent Borrower other than a Domestic Guarantor (unless such Domestic Guarantor is the surviving party); provided that (A) if the Parent Borrower is a party thereto, it shall be the surviving entity, (B) if preceding clause (A) does not apply and if a Foreign Borrower is a party thereto, it shall be the surviving entity, (C) if neither preceding clause (A) nor preceding clause (B) applies and if a Foreign Guarantor is a party thereto, it shall be the surviving Person or the surviving Person shall become a Foreign Guarantor immediately following the consummation of such transaction, and (D) if a Domestic Subsidiary is not a party thereto, the surviving entity shall be a Foreign Subsidiary and the Parent Borrower and its Subsidiaries shall be in compliance with the requirements of Section 7.13;

(iii)  a Subsidiary may enter into a transaction of merger or consolidation in connection with a Subject Disposition effected pursuant to Section 8.05, so long as no more assets are Disposed of as a result of or in connection with any transaction undertaken pursuant to this clause (iii) than would otherwise have been allowed pursuant to Section 8.05; and

(iv)  the Parent Borrower or any Subsidiary may merge with any other Person in connection with an Investment permitted pursuant to Section 8.02 so long as the continuing or surviving Person shall be a Subsidiary, which shall be (x) a Domestic Guarantor if the merging Subsidiary was a Domestic Guarantor and (y) a Foreign Guarantor if the merging Subsidiary was a Foreign Guarantor and, in each case, which together with each of its Subsidiaries shall have complied with the requirements of Section 7.12; provided that following any such merger or consolidation involving the Parent Borrower, the Parent Borrower is the surviving Person.

(b)      Except pursuant to a transaction permitted by Section 8.04(a)(i), the Parent Borrower will not dissolve, liquidate or wind up its affairs.

Notwithstanding the foregoing and for the avoidance of doubt, in no event shall Parent Borrower reorganize, redomesticate or reincorporate in any jurisdiction other than a state of the United States of America or the District of Columbia.

**8.05    Dispositions.**

Make any Subject Disposition or Specified Intercompany Transfer, unless (i) in the case of a Subject Disposition only, at least seventy-five percent (75%) of the consideration received from each such Subject Disposition is cash or Cash Equivalents; provided, that for the purposes of this clause (i), the following shall be deemed to be cash: (A) any liabilities (as shown on the Parent Borrower or such Subsidiary's most recent balance sheet provided hereunder or in the footnotes thereto) of the Parent Borrower or such Subsidiary (other than liabilities that are by their terms subordinated to the Obligations) that are assumed by the transferee with respect to the applicable Disposition, (B) any securities received by the Parent Borrower or such Subsidiary from such transferee that are converted by the Parent Borrower or such Subsidiary into cash or Cash Equivalents (to the extent of the cash or Cash Equivalents received in the conversion) within 180 days following the closing of the applicable Subject Disposition and (C) any Designated Non-Cash Consideration in respect of such Subject Disposition having an aggregate fair market value, taken together with the Designated Non-Cash Consideration in respect of all other Subject Dispositions, not in

excess of $300.0 million (with the fair market value of each item of Designated Non-Cash Consideration being measured as of the time received), (ii) such Subject Disposition or Specified Intercompany Transfer is made at fair market value and (iii) the aggregate amount of Property so Disposed (valued at fair market value thereof) in all Subject Dispositions and Specified Intercompany Transfers does not exceed the Applicable Disposition Amount.

**8.06  Restricted Payments.**

Declare or make, directly or indirectly, any Restricted Payment, except that:

(a)    each Subsidiary may make Restricted Payments to the Parent Borrower or any Wholly Owned Subsidiary, or in the case of a Subsidiary that is not a Wholly Owned Subsidiary, to each equity holder of such Subsidiary on a pro rata basis (or on more favorable terms from the perspective of the Parent Borrower and its Wholly Owned Subsidiaries) based on their relative ownership interests, as required by such Non-Wholly Owned Subsidiary's organizational agreements or stockholders' agreements, or, solely to the extent required by law and involving de minimis amounts, on a non-pro rata basis to such equity holders;

(b)    Restricted Payments to purchase Capital Stock of (A) any Person listed on Schedule 8.06(b) or (B) any other Person that becomes a Domestic Guarantor upon such purchase, that in each case is not held by (i) Parent Borrower, (ii) any Subsidiary or (iii) an Affiliate of Parent Borrower or any of its Subsidiaries; provided that after giving effect thereto (x) as of the last day of the most recently ended fiscal quarter at the end of which financial statements were required to have been delivered pursuant to Section 7.01(a) or (b) (or, prior to such first required delivery date for such financial statements pursuant to either such Section, as of the last day of the most recent period referred to in the second sentence of Section 6.05), the Parent Borrower would be in compliance with Section 8.10 and (y) such Person becomes or continues to be a Subsidiary of the Parent Borrower;

(c)    any refinancing permitted pursuant to Section 8.03(l) shall be permitted (and for the avoidance of doubt, any 2024 Senior Notes Refinancing and any 2025 Convertible Notes Refinancing shall constitute a refinancing permitted pursuant to this Section 8.06(c));

(d)    any Investment permitted or not prohibited by Section 8.02 shall be permitted;

(e)    other Restricted Payments; provided that, at the time of making such Restricted Payments, (x) no Event of Default shall have occurred and be continuing or would result therefrom and (y) on a Pro Forma Basis, the Consolidated Total Leverage Ratio is equal to or less than 4.50 to 1.00;

(f)    the Parent Borrower may make Restricted Payments at any time in an aggregate amount not to exceed the greater of (i) $1,500.0 million and (ii) 7.5% Consolidated Tangible Assets at such time plus if after giving effect to such Restricted Payments (i) as of the last day of the most recently ended fiscal quarter at the end of which financial statements were required to have been delivered pursuant to Section 7.01(a) or (b) (or, prior to such first required delivery date for such financial statements pursuant to either such Section, as of the last day of the most recent period referred to in the second sentence of Section 6.05), (x) the Parent Borrower would be in compliance with Section 8.10 and (y) the Consolidated Net Leverage Ratio would not be in excess of 5.00:1.00 (and if the Restricted Payment is greater than $200.0 million, then the Parent Borrower shall deliver a certificate of a Responsible Officer of the Parent Borrower as to the satisfaction of the requirements in this clause (i)) and (ii) no Default shall have occurred and be continuing or exist after giving effect thereto, the amount of the Cumulative Credit at such time;

(g)    the Parent Borrower may make Restricted Payments consisting of payments or prepayments of principal on, or redemptions, repurchases or acquisitions for value of, its Indebtedness (i) in an aggregate amount for all such payments, prepayments, redemptions, repurchases and acquisitions not to exceed $300.0 million (measured in each case by the fair market value of the consideration given by the Parent Borrower in connection with such prepayments, redemptions, repurchases or acquisitions) and (ii) in the case of any payment, prepayment, redemption, repurchase and acquisition of any of the Existing Notes, any of the 2024 Senior Unsecured Notes (and in each case of the foregoing, any permitted refinancing thereof pursuant to Section 8.03(l), including, for the

141

avoidance of doubt, any 2024 Senior Notes Refinancing and any 2025 Convertible Notes Refinancing), additional amounts so long as, immediately after giving effect to such payment, prepayment, redemption, repurchase or acquisition, (x) as of the last day of the most recently ended fiscal quarter at the end of which financial statements were required to have been delivered pursuant to Section 7.01(a) or (b) (or, prior to such first required delivery date for such financial statements pursuant to either such Section, as of the last day of the most recent period referred to in the second sentence of Section 6.05), the Parent Borrower would be in compliance with Section 8.10 and (y) the aggregate Dollar Equivalent amount available to be drawn under the Revolving Facilities after giving effect to such Restricted Payments would exceed $100.0 million  and the Parent Borrower shall deliver a certificate of a Responsible Officer of the Parent Borrower as to the satisfaction of the requirements in this clause (ii));

(h)        to the extent not used as part of or increasing the Cumulative Credit, the Parent Borrower may purchase, redeem or otherwise acquire shares of its common Capital Stock with the proceeds received from the substantially concurrent issue of new shares of its common Capital Stock;

(i)        (i) the members of the Consolidated Group may prepay or repay intercompany Indebtedness otherwise permitted hereunder owed to other members of the Consolidated Group and (ii) to the extent constituting Restricted Payments, the Parent Borrower or any Restricted Subsidiary may enter into and consummate transactions expressly permitted by Section 8.04, Section 8.05, and Section 8.09;

(j)        repurchases of Capital Stock deemed to occur upon the "cashless exercise" of stock options or warrants, cashless tax withholding, stock appreciation rights or upon the vesting of restricted stock or restricted stock units if such Capital Stock represents the exercise price of such options or warrants or represents withholding taxes due upon such exercise or vesting shall be permitted;

(k)        to the extent constituting Restricted Payments, the delivery of common stock of Parent Borrower (together with cash in lieu of any fractional share) and, to the extent that, after giving pro forma effect to such Restricted Payment, as of the last day of the most recently ended fiscal quarter at the end of which financial statements were required to have been delivered pursuant to Section 7.01(a) or (b), the Parent Borrower would be in compliance with Section 8.10, the making of cash payments in connection with any conversion of Convertible Indebtedness issued as of or fol owing the Amendment No. 1112 Effective Date in an aggregate amount since the Amendment No. 1112 Effective Date not to exceed the sum of (i) the principal amount of such Convertible Indebtedness *plus* (ii) any payments received by the Parent Borrower or any of its Restricted Subsidiaries pursuant to the exercise, settlement or termination of any related Permitted Bond Hedge Transaction; and

(l)        any required payment with respect to, or required early unwind or settlement of, any Permitted Bond Hedge Transaction or Permitted Warrant Transaction, in each case, in accordance with the terms of the agreement governing such Permitted Bond Hedge Transaction or Permitted Warrant Transaction shall not constitute a Restricted Payment; provided that, in the case of this Section 8.06(l), to the extent any consideration other than the Parent Borrower's common stock is required to be paid under a Permitted Bond Hedge Transaction (other than, for the avoidance of doubt, the required payment of premium thereunder) or a Permitted Warrant Transaction as a result of the election of "cash settlement" (or substantially equivalent term) as the "settlement method" (or substantially equivalent term) thereunder by the Parent Borrower (or its Affiliates) (including in connection with the exercise and/or early unwind or settlement thereof), the payment of such cash shall constitute a Restricted Payment notwithstanding this clause (l) (and such Restricted Payment must be permitted pursuant to a clause of this Section 8.06 other than Section 8.06(l)).

**8.07    Change in Nature of Business.**

Engage in any material line of business other than a Permitted Business.

**8.08    Change in Accounting Practices or Fiscal Year.**

Change its (a) accounting policies or reporting practices, except as required by GAAP, or (b) fiscal year of the Parent Borrower or any Subsidiary.

142

**8.09    Transactions with Affiliates.**

Enter into any transaction of any kind with any Affiliate (including, for purposes of clarity, any Unrestricted Subsidiary) of the Parent Borrower (other than between or among (x) Domestic Credit Parties, (y) Foreign Credit Parties or (z) one or more Subsidiaries of the Parent Borrower that are not Credit Parties), whether or not in the ordinary course of business, other than (i) on fair and reasonable terms substantially as favorable in all material respects to the Parent Borrower or the applicable Subsidiary as would be obtainable by the Parent Borrower or such Subsidiary at the time in a comparable arm's-length transaction with a Person other than an Affiliate, (ii) Restricted Payments permitted by Section 8.06 (other than Section 8.06(c)) and (iii) Investments permitted by Section 8.02(c), (e), (f), (g), (s), (u), (w), (z), (cc), (dd), (ee), (ff), (or, to the extent that such transaction is with a Person that becomes an Affiliate of the Parent Borrower or a Subsidiary solely as a result of such transaction, any transaction pursuant to Section 8.02(i), (k), (m), (x) or (aa).

**8.10    Financial Covenant.**

(a)    As of any date listed in the table below, permit the Consolidated Net Leverage Ratio to exceed the ratio set forth opposite such date.

| Date | Consolidated Net Leverage Ratio |
|---|---|
| December 31, ~~2023~~2024 | 6.75:1.00 |
| March 31, ~~2024~~2025 | 6.75:1.00 |
| ~~June 30, 2024~~ | ~~6.75:1.00~~ |
| ~~September 30, 2024~~ | ~~6.75:1.00~~ |
| ~~December 31~~June 30, ~~2024~~2025 | 6.75:1.00 |
| September 30, 2025 | 6.75:1.00 |
| December 31, 2025 | 6.75:1.00 |
| March 31, ~~2025~~2026 | 6.25:1.00 |
| June 30, ~~2025~~2026 | 6.25:1.00 |
| September 30, ~~2025~~2026 | 6.25:1.00 |
| December 31, ~~2025~~2026 | 6.25:1.00 |
| March 31, ~~2026~~2027 | 5.75:1.00 |
| June 30, ~~2026~~2027 | 5.75:1.00 |
| September 30, ~~2026~~2027 | 5.75:1.00 |

| December 31, ~~2026~~2027 | 5.75:1.00 |
| March 31, ~~2027~~2028 and each fiscal quarter end date thereafter | 5.25:1.00 |

Notwithstanding the foregoing, upon the consummation of a Material Permitted Acquisition and until the completion of four fiscal quarters following such Material Permitted Acquisition (the "Increase Period"), if elected by the Parent Borrower by written notice to the Administrative Agent given on or prior to the date of consummation of such Material Permitted Acquisition, the maximum permitted Consolidated Net Leverage Ratio level for purposes of this covenant shall be increased by 0.50x for the relevant period (the "Step-Up") during such Increase Period; provided (i) that Increase Periods may not be successive unless the Consolidated Net Leverage Ratio would have been complied with for at least two fiscal quarters without giving effect to the Step-Up and (ii) from and after the Amendment No. ~~11~~12 Effective Date, there shall be a maximum of two Increase Periods in the aggregate under this Credit Agreement.

**8.11    [Reserved].**

**8.12    Limitation on Subsidiary Distributions.**

Directly or indirectly, create or otherwise cause or suffer to exist or become effective any encumbrance or restriction on the ability of any Restricted Subsidiary to (a) pay dividends or make any other distributions on its capital stock or any other interest or participation in its profits owned by the Parent Borrower or any Restricted Subsidiary, or pay any Indebtedness owed to the Parent Borrower or a Restricted Subsidiary, (b) make loans or advances to the Parent Borrower or any Restricted Subsidiary or (c) transfer any of its properties to the Parent Borrower or any Subsidiary, except for such encumbrances or restrictions existing under or by reason of (i) applicable Law; (ii) this Credit Agreement and the other Credit Documents; (iii) the Existing Notes, any 2024 Senior Notes Refinancing Indebtedness, and any 2025 Convertible Notes Refinancing Indebtedness; (iv) customary provisions restricting subletting or assignment of any lease governing a leasehold interest of a Subsidiary; (v) customary provisions restricting assignment of any agreement entered into by a Subsidiary in the ordinary course of business; (vi) any Lien permitted by Section 8.01 restricting the transfer of the property subject thereto; (vii) any agreement relating to the sale of any property permitted under Section 8.05 pending the consummation of such sale (provided that such encumbrances or restrictions are customary for such agreements); (viii) without affecting the Credit Parties' obligations under Sections 7.12, 7.13 or 7.14, customary provisions in partnership agreements, limited liability company organizational governance documents, stockholders agreements, asset sale and stock sale agreements and other similar agreements entered into in the ordinary course of business that restrict the transfer of ownership interests in such partnership, limited liability company or similar person; (ix) restrictions on cash or other deposits or net worth imposed by suppliers or landlords under contracts entered into in the ordinary course of business; (x) any instrument evidencing or governing Indebtedness assumed in connection with any Permitted Acquisition pursuant to Section 8.03(h), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person or the properties or assets of the Person so acquired; (xi) in the case of any Subsidiary that is not a Wholly Owned Subsidiary in respect of any matters referred to in clauses (b) and (c) above, such Person's Organization Documents or pursuant to any joint venture agreement or stockholders agreements solely to the extent of the Capital Stock of or property held in the subject joint venture or other entity; (xii) contracts or agreements in effect on the Amendment No. 11 Effective Date relating to Indebtedness existing on the Amendment No. 11 Effective Date and set forth on Schedule 8.03 or relating to AMG Indebtedness or AIL Indebtedness; (xiii) any restrictions imposed by any agreement incurred pursuant to Section 8.03(f) or pursuant to a refinancing of the Existing Notes, any 2024 Senior Notes Refinancing Indebtedness, or any 2025 Convertible Notes Refinancing Indebtedness, in each case to the extent such restrictions are not more restrictive, taken as a whole, than the restrictions contained in the Existing Notes as in effect on the Amendment No. ~~11~~12 Effective Date, such 2024 Senior Notes Refinancing, or such 2025 Convertible Notes Refinancing, as applicable, in each case as determined in good faith by the Parent Borrower; (xiv) customary net worth provisions contained in real property leases entered

144

into by the Parent Borrower or any Subsidiary, so long as the Parent Borrower has determined in good faith that such net worth provisions would not reasonably be expected to impair the ability of the Parent Borrower and its Subsidiaries to meet their ongoing obligations; (xv) any agreement in effect at the time any Person becomes a Subsidiary, so long as such agreement was not entered into in contemplation of such Person becoming a Subsidiary; (xvi) any agreement representing Indebtedness permitted under Section 8.03 of a Subsidiary of the Parent Borrower that is not a Credit Party; (xvii) restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business; (xviii) the buy-sell, voting trust and other shareholder arrangements set forth in Schedu e 6.14; (xix) any instrument evidencing or governing Indebtedness permitted pursuant to Section 8.03(z) or Section 8.03(aa), so long as such encumbrances and restrictions do not, when taken as a whole, materially and adversely affect ability of any Borrower to make interest, principal and fee payments to the Lenders hereunder (as determined in good faith by the Parent Borrower) and (xx) any refinancings that are otherwise permitted by the Credit Documents of the contracts, instruments or obligations referred to above; provided that such refinancings are no more materially restrictive, as determined in good faith by the Parent Borrower, with respect to such encumbrances and restrictions than those prior to such amendment or refinancing.

**8.13**    **Amendment of Material Documents.**

Amend, modify or waive any of its rights under its certificate of incorporation, by-laws or other organizational documents, in each case to the extent that such amendment, modification or waiver could reasonably be expected to be material and adverse to the Lenders.

**8.14**    **Sale and Leaseback Transactions.**

Enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred, except for any such sale of any fixed or capital assets that is made for cash consideration in an amount not less than the cost of such fixed or capital asset and is consummated within 180 days after the Parent Borrower or such Subsidiary acquires or completes the construction of such fixed or capital asset. Notwithstanding the foregoing, each of the Parent Borrower and its Subsidiaries may sell or transfer any (A) Designated Sale and Leaseback Asset or (B) one or more aircraft (so long as the fair market value, as determined in good faith by the Parent Borrower, of all such aircraft so rented and leased back pursuant to this clause (B) does not exceed, since the Amendment No. ~~11~~12 Effective Date, $100.0 million), and rent or lease it back (or rent or lease other property that it intends to use for substantially the same purpose or purposes as the property so sold or transferred), if (a) the Parent Borrower promptly gives notice of such sale to the Administrative Agent; (b) the Net Cash Proceeds of such sale or transfer are at least equal to fair market value  provided that in the event such sale or transfer (or series of related sales or transfers) involves an aggregate consideration of more than the Dollar Equivalent of $300.0 million, the Parent Borrower will obtain a written opinion from an independent accounting or appraisal firm of nationally recognized standing confirming that the consideration for such sale or transfer (or series of related sales or transfers) is fair, from a financial standpoint, to the Parent Borrower and its Subsidiaries or is not less favorable than those that might reasonably have been obtained in a comparable sale or transfer of such property, real or personal, at such time on an arm's-length basis from a Person that is not an Affiliate of the Parent Borrower); (c) at least 75% of the consideration received with respect to each such sale or transfer shall consist of cash, Cash Equivalents, Investments permitted by Section 8.02, liabilities assumed by the transferee, accounts receivable retained by the transferor or any combination of the foregoing; (d) in the event that such sale and leaseback results in a capital lease obligation or Synthetic Lease, such Indebtedness is permitted by Section 8.03(c); (e) no Default shall have occurred and be continuing or exist after giving effect thereto; and (f) after giving effect on a Pro Forma Basis to such Sale and Leaseback Transaction and any Indebtedness incurred in respect therewith, as of the last day of the most recently ended fiscal quarter at the end of which financial statements were required to have been delivered pursuant to Section 7.01(a) or (b) (or, prior to such first required de ivery date for such financial statements pursuant to either such Section, as of the last day of the most recent period referred to in the second sentence of Section 6.05), the Parent Borrower would be in compliance with Section 8.10 (and in the event such sale or transfer (or series of related sales or transfers) involves an aggregate consideration of more than the Dollar Equivalent of $300.0 million,

145

then the Parent Borrower shall deliver a certificate of a Responsible Officer of the Parent Borrower as to the satisfaction of the requirements in this clause (f)).

**8.15    Swap Contracts.**

Enter into any Swap Contract, except (a) Swap Contracts entered into to hedge or mitigate risks to which the Parent Borrower or any Subsidiary has actual exposure, (b) Swap Contracts entered into in order to effectively cap, collar or exchange (i) interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest bearing liability or investment of any Borrower or any Subsidiary and (ii) currency exchange rates, in each case in connection with the conduct of its business not for speculative purposes, and (c) any Permitted Bond Hedge Transaction or any Permitted Warrant Transaction.

**ARTICLE IX**

**EVENTS OF DEFAULT AND REMEDIES**

**9.01    Events of Default.**

Any of the following shall constitute an Event of Default:

(a)    Non-Payment. The Parent Borrower or any other Credit Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan or any amount of principal of any L/C Obligation, or (ii) within three (3) Business Days after the same becomes due or required to be paid herein, any interest on any Loan or any regularly accruing fee due hereunder or any other amount payable hereunder or under any other Credit Document; or

(b)    Specific Covenants. The Parent Borrower or any other Credit Party fails to perform or observe any term, covenant or agreement contained in any of Section 7.03(a), 7.11, 7.18 or Article VIII or, with respect to the existence of any Borrower only, Section 7.04; or

(c)    Other Defaults. The Parent Borrower or any other Credit Party fails to perform or observe any other covenant or agreement (not specified in subsections (a) or (b) above) contained in any Credit Document on its part to be performed or observed and such failure continues for thirty (30) calendar days after written notice to the defaulting party or the Parent Borrower by the Administrative Agent or the Required Lenders; or

(d)    Representations and Warranties. Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Parent Borrower or any other Credit Party herein, in any other Credit Document, or in any document delivered in connection herewith or therewith shall be false in any material respect when made or deemed made; or

(e)    Cross-Default. (i) Any member of the Consolidated Group (A) fails (beyond the period of grace (if any) provided in the instrument or agreement pursuant to which such Indebtedness was created) to make any payment when due (whether by scheduled maturity, interest, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness or Support Obligations (other than Indebtedness hereunder or Indebtedness under Swap Contracts) having a principal amount (with principal amount for the purposes of this clause (e) including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement), when taken together with the principal amount of all other Indebtedness and Support Obligations as to which any such failure has occurred, exceeding $500.0 million or (B) fails to observe or perform any other agreement or condition relating to any Indebtedness or Support Obligations or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which failure or other event is to cause, or to permit the holder or holders of such Indebtedness or the beneficiary or beneficiaries of such Support Obligations (or a trustee or agent on behalf of such holder or holders or beneficiary or

146

beneficiaries) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, or such Support Obligations to become payable or cash collateral in respect thereof to be demanded, which has an unpaid principal amount, when taken together with the unpaid principal amounts of all other Indebtedness and Support Obligations as to which any such failure or event has occurred, exceeding $500.0 million (it being understood, for the avoidance of doubt, that the satisfaction of any customary "conversion conditions" set forth in the instruments governing any Convertible Indebtedness will not be deemed to constitute a Default under this clause (B) on account of such satisfaction giving any holder of such Convertible Indebtedness the right to convert the same); or (ii) there occurs under any Swap Contract an "early termination date" (or term of similar import) resulting from (A) any event of default under such Swap Contract as to which the Parent Borrower or any Subsidiary is the "defaulting party" (or term of similar import) or (B) any "termination event" (or term of similar import) under such Swap Contract as to which the Parent Borrower or any Subsidiary is an "affected party" (or term of similar import) and, when taken together with all other Swap Contracts as to which events of default or events referred to in the immediately preceding clauses  A) or (B) are applicable, the Swap Termination Value owed by the Parent Borrower and its Subsidiaries exceeds $500.0 million; provided that this clause (e)(ii) shall not apply to any early payment requirement or unwinding or termination with respect to any Permitted Bond Hedge Transaction or Permitted Warrant Transaction, or satisfaction of any condition giving rise to or permitting the foregoing, in accordance with the terms thereof, so long as, in any such case, neither Parent Borrower nor any of its Affiliates is the "defaulting party" (or substantially equivalent term) under the terms of such Permitted Bond Hedge Transaction or Permitted Warrant Transaction, as applicable; or

(f)    Insolvency Proceedings, Etc. Any Credit Party or any Significant Subsidiary institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for sixty (60) calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for sixty (60) calendar days, or an order for relief is entered in any such proceeding; or

(g)    Change of Control. There shall have occurred a Change of Control of the Parent Borrower; or

(h)    Inability to Pay Debts; Attachment. Any Credit Party or any Significant Subsidiary becomes unable or admits in writing its inability or fails generally to pay its debts as they become due, or any writ or warrant of attachment or execution or similar process issued or levied against all or any material part of the property of any such Person and is not released, vacated or fully bonded within thirty (30) days after its issue or levy; or

(i)    Judgments. There is entered against any member of the Consolidated Group one or more final judgments or orders for the payment of money in an aggregate amount (as to all such judgments and orders) exceeding $500.0 million (to the extent not covered by independent third-party insurance as to which the insurer does not dispute coverage or otherwise discharged), and there is a period of 30 consecutive days during which a stay of enforcement of such judgments, by reason of a pending appeal or otherwise, is not in effect; or

(j)    ERISA. (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan that has resulted or would reasonably be expected to result in liability of a Credit Party in an aggregate amount in excess of $500.0 million, or (ii) a Credit Party or any ERISA Affi iate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal

147

liability under Section 4201 of ERISA under a Multiemployer Plan that has resulted or would reasonably be expected to result in liability of a Credit Party in an aggregate amount in excess of $500.0 million; or

(k)    Invalidity of Credit Documents. Any Credit Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Credit Party contests in any manner the validity or enforceability of any Credit Document; or any Credit Party denies that it has any or further liability or obligation under any Credit Document, or purports to revoke, terminate or rescind any Credit Document; or

(l)    Collateral Documents. Any Collateral Document after delivery thereof shall for any reason cease (or shall be asserted in writing by any Credit Party to cease) to create a valid and perfected first priority Lien to the extent required by the Collateral Documents (subject to no other Liens other than Liens permitted by Section 8.01) on Collateral that is (i) purported to be covered thereby and (ii) comprises Property which, when taken together with all Property as to which such a Lien has so ceased to be effective, has a fair market value in excess of $100.0 million (other than by reason of (x) the express release thereof pursuant to Section 10.10, (y) the failure of the Collateral Agent to retain possession of Collateral physically delivered to it or (z) the failure of the Collateral Agent to timely file UCC continuation statements); or

(m)    Subordinated Debt. Any Subordinated Debt of the Parent Borrower or any Credit Party or any guarantee of the Parent Borrower or any Credit Party in respect thereof shall cease, for any reason, to be validly subordinated to the Obligations, as provided in such Subordinated Debt or such guarantee, or the Parent Borrower, any Subsidiary, any Affiliate of the Parent Borrower or any Subsidiary, the trustee in respect of such Subordinated Debt (or any refinancing thereof pursuant to Section 8.03(l)) shall so assert in writing.

**9.02    Remedies upon Event of Default.**

If any Event of Default occurs and is continuing, the Administrative Agent shall, at the request of, or may, with the consent of, the Required Lenders, take any or all of the following actions:

(a)    declare the Commitments of the Lenders and the obligation of the L/C Issuers to make L/C Credit Extensions to be terminated, whereupon such Commitments and obligation shall be terminated;

(b)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Credit Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrowers;

(c)    require that the Parent Borrower Cash Collateralize the L/C Obligations (in an amount equal to the then Outstanding Amount thereof); and

(d)    exercise on behalf of itself and the Lenders all rights and remedies available to it or to the Lenders under the Credit Documents or applicable Law;

provided, however, that upon the occurrence of an Event of Default under Section 9.01(f) or (h), the obligation of each Lender to make Loans and any obligation of the L/C Issuers to make L/C Credit Extensions shall automatically terminate, the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable, and the obligation of the Parent Borrower to Cash Collateralize the L/C Obligations as aforesaid shall automatically become effective, in each case without further act of the Administrative Agent or any Lender.

9.03    **Application of Funds.**

After the exercise of remedies provided for in Section 9.02 (or after the Loans have automatically become immediately due and payable and the L/C Obligations have automatically been required to be Cash Collatera ized, in each case as set forth in the proviso to Section 9.02), any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order:

First, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including all reasonable fees, expenses and disbursements of any law firm or other counsel and amounts payable under Article III) payable to the Administrative Agent and the Collateral Agent, in each case in its capacity as such;

Second, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal, interest, Commitment Fees and Letter of Credit Fees) payable to the Lenders (including all reasonable fees, expenses and disbursements of any law firm or other counsel and amounts payable under Article III), ratably among the Lenders in proportion to the respective amounts described in this clause Second payable to them;

Third, to payment of that portion of the Obligations constituting accrued and unpaid Commitment Fees, Letter of Credit Fees and interest on the Loans, L/C Borrowings and other Obligations, ratably among the Lenders, the Swingline Lender and the L/C Issuers in proportion to the respective amounts described in this clause Third payable to them;

Fourth, to (a) payment of that portion of the Obligations constituting unpaid principal of the Loans and L/C Borrowings, (b) payment of breakage, termination or other amounts owing in respect of any Swap Contract between Parent Borrower or any of its Subsidiaries (other than an Unrestricted Subsidiary) and the Administrative Agent, any Lender or Affiliate of the Administrative Agent or a Lender or any Person that was the Administrative Agent, a Lead Arranger, a Lender or Affiliate of the Administrative Agent, a Lead Arranger or a Lender at the time it entered into such Swap Contract, (c) payments of amounts due under any Treasury Management Agreement between Parent Borrower or any of its Subsidiaries (other than an Unrestricted Subsidiary) and the Administrative Agent, any Lender or Affiliate of the Administrative Agent or a Lender or any Person that was the Administrative Agent, a Lender or Affiliate of the Administrative Agent or a Lender at the time it entered into such Treasury Management Agreement, to the extent such Treasury Management Agreement is permitted hereunder and (d) the Administrative Agent for the account of the L/C Issuers, to Cash Collateralize that portion of the L/C Obligations comprised of the aggregate undrawn amount of Letters of Credit, ratably among such parties in proportion to the respective amounts described in this clause Fourth payable to them; and

Last, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Parent Borrower or as otherwise required by Law.

provided that no amount received from any Foreign Credit Party or on account of any Collateral that is solely Collateral for the Foreign Obligations shall be applied pursuant to second, third or fourth clause of this paragraph to the extent such amounts do not constitute Foreign Obligations. Subject to Section 2.03(c), amounts used to Cash Collateralize the aggregate undrawn amount of Letters of Credit pursuant to clause Fourth above shall be applied to satisfy drawings under such Letters of Credit as they occur. If any amount remains on deposit as cash collateral after all Letters of Credit have either been fully drawn or expired, such remaining amount shall be applied to the other Obligations, if any, in the order set forth above.

Notwithstanding the foregoing, amounts received from the Borrowers or any Guarantor that is not a Qualified ECP Guarantor shall not be applied to the Obligations that are Excluded Swap Obligations.

149

**ARTICLE X**

**AGENTS**

10.01    **Appointment and Authorization of the Agents.**

(a)    Each of the Lenders and the L/C Issuers hereby irrevocably appoints (i) JPMCB to act on its behalf as the Administrative Agent and Collateral Agent, (ii) JPMorgan Chase Bank, N.A., Toronto Branch, to act on its behalf as the Canadian Agent and (iii) JPME to act on its behalf as the London Agent, in each case hereunder and under the other Credit Documents and authorizes each Agent to take such actions on its behalf and to exercise such powers as are delegated to the such Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article are solely for the benefit of the Agents, the Lenders and the L/C Issuers, and neither the Parent Borrower nor any other Credit Party shall have rights as a third party beneficiary of any of such provisions. The motivations of the Agents are commercial in nature and not to invest in the general performance or operations of the Borrowers.

(b)    Each Lender hereby irrevocably appoints, designates and authorizes the Collateral Agent to take such action on its behalf under the provisions of this Credit Agreement and each Collateral Document and to exercise such powers and perform such duties as are expressly delegated to it by the terms of this Credit Agreement or any Collateral Document, together with such powers as are reasonably incidental thereto. In this connection, the Collateral Agent, and any co-agents, sub-agents and attorneys-in-fact appointed by the Collateral Agent pursuant to Section 10.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Collateral Agent, shall be entitled to the benefits of all provisions of this Article X and Article XI (including Section 11.04(c), as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Credit Documents) as if set forth in full herein with respect thereto. Notwithstanding any provision to the contrary contained elsewhere herein or in any Collateral Document, no Agent shall have any duties or responsibilities, except those expressly set forth herein or therein, nor shall any Agent have or be deemed to have any fiduciary relationship with any Lender or participant, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Credit Agreement or any Collateral Document or otherwise exist against any Agent. Without limiting the generality of the foregoing sentence, the use of the term "agent" herein and in the Collateral Documents with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties. The Collateral Agent shall act on behalf of the Lenders with respect to any Collateral and the Collateral Documents, and the Collateral Agent shall have all of the benefits and immunities (i) provided to the Administrative Agent under the Credit Documents with respect to any acts taken or omissions suffered by the Collateral Agent in connection with any Collateral or the Collateral Documents as fully as if the term "Administrative Agent" as used in such Credit Documents included the Collateral Agent with respect to such acts or omissions, and (ii) as additionally provided herein or in the Collateral Documents with respect to the Collateral Agent.

(c)    Each L/C Issuer shall act on behalf of the Lenders with respect to any Letters of Credit issued by it and the documents associated therewith, and each L/C Issuer shall have all of the benefits and immunities (i) provided to the Agents in this Article X with respect to any acts taken or omissions suffered by any L/C Issuer in connection with Letters of Credit issued by it or proposed to be issued by it and Issuer Documents pertaining to such Letters of Credit as fully as if the term "Agent" as used in this Article X included such L/C Issuer with respect to such acts or omissions, and (ii) as additionally provided herein with respect to such L/C Issuer.

(d)    In addition to any other rights and remedies granted to the Administrative Agent and the Lenders in the Credit Documents, the Administrative Agent on behalf of the Lenders may exercise all rights and remedies of a secured party under the New York UCC or any other applicable law. Without limiting the generality of the foregoing, the Administrative Agent, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon any Credit Party or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived),

150

may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, or consent to the use by a Credit Party of any cash collateral arising in respect of the Collateral on such terms as the Administrative Agent deems reasonable, and/or may forthwith sell, lease, assign give an option or options to purchase or otherwise dispose of and deliver, or acquire by credit bid on behalf of the Lenders, the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of the Administrative Agent or any Lender or elsewhere, upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery, all without assumption of any credit risk.

**10.02    Rights as a Lender.**

Each Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as such Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Parent Borrower or any Subsidiary or other Affiliate thereof as if such Person were not an Agent hereunder and without any duty to account therefor to the Lenders.

**10.03    Exculpatory Provisions.**

The Agents and Lead Arrangers shall not have any duties or obligations except those expressly set forth herein and in the other Credit Documents. Without limiting the generality of the foregoing, the Agents and Lead Arrangers:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Credit Documents that the Agents are required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Credit Documents); provided that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Credit Document or applicable law; and

(c)    shall not, except as expressly set forth herein and in the other Credit Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Parent Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as an Agent or any of its or their Affiliates in any capacity.

No Agent shall be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 11.01 and 9.02) or (ii) in the absence of its own gross negligence or willful misconduct. The Agents shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to such Agent by the Parent Borrower, a Lender or an L/C Issuer.

No Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Credit Agreement or any other Credit Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Credit Agreement, any other Credit Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents or to assure that the

151

Liens granted to the Collateral Agent pursuant to any Collateral Document have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, (v) the value or the sufficiency of any Collateral or (vi) the satisfaction of any condition set forth in Article V or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to such Agent.

**10.04**   **Reliance by Agents.**

Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. Each Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan or the issuance of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender or an L/C Issuer, each Agent may presume that such condition is satisfactory to such Lender or such L/C Issuer unless such Agent shall have received notice to the contrary from such Lender or such L/C Issuer prior to the making of such Loan, or the issuance of such Letter of Credit. Each Agent may consult with legal counsel (who may be counsel for the Parent Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by them in accordance with the advice of any such counsel, accountants or experts.

**10.05**   **Delegation of Duties.**

Each Agent may perform any and all of their duties and exercise their rights and powers hereunder or under any other Credit Document by or through any one or more sub-agents appointed by such Agent. Any Agent and any such sub-agent may perform any and all of their duties and exercise their rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Agents, and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as wel  as activities as such Agent.

**10.06**   **Resignation of an Agent.**

Each of the Agents may at any time give notice of its resignation to the Lenders, the L/C Issuers and the Parent Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, with the consent of the Parent Borrower (provided that no consent shall be required if an Event of Default has occurred and is continuing), to appoint a successor, which (i) in the case of a resignation by the Administrative Agent or the Collateral Agent, shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States, (ii) in the case of a resignation by the Canadian Agent, shall be a bank with an office in Canada, or an Affiliate of any such bank with an office in Canada or (iii) in the case of a resignation by the London Agent, shall be a bank with an office in London, or an Affiliate of any such bank with an office in London. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders and the L/C Issuers, with the consent of the Parent Borrower ( provided that no consent shall be required if an Event of Default has occurred and is continuing), appoint a successor Agent meeting the qualifications set forth above; provided that if such Agent shall notify the Parent Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Credit Documents (except that in the case of any collateral security held by such Agent on behalf of the Lenders or the L/C Issuers under any of the Credit Documents, such retiring Agent shall continue to hold such collateral security until such time as a successor Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through such Agent shall instead be made by or to each Lender and each L/C Issuer directly, until such time as the Required Lenders appoint a successor Agent as provided for above in this Section. Upon the acceptance of a successor's appointment as an Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Credit Documents (if not already

discharged therefrom as provided above in this Section). The fees payable by the Parent Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Parent Borrower and such successor. After the retiring Agent's resignation hereunder and under the other Credit Documents, the provisions of this Article and Section 11.04 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as such Agent.

Any resignation by JPMCB as Administrative Agent or Collateral Agent, as the case may be, pursuant to this Section shall also constitute its resignation as Dollar L/C Issuer, Multicurrency L/C Issuer and Swingline Lender. Upon the acceptance of a successor's appointment as Administrative Agent or Collateral Agent, as the case may be, hereunder, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring L/C Issuers and Swingline Lender, (b) the retiring L/C Issuers and Swingline Lender shall be discharged from all of their respective duties and obligations hereunder or under the other Credit Documents, and (c) the successor L/C Issuers shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to the retiring L/C Issuers to effectively assume the obligations of the retiring L/C Issuers with respect to such Letters of Credit.

> **10.07**   <u>Non-Reliance on Agents and Other Lenders; Erroneous Payments</u>.

(a)        Each Lender and L/C Issuer acknowledges that it has, independently and without reliance upon any Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Credit Agreement. Each Lender and L/C Issuer also acknowledges that it will, independently and without reliance upon any Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Credit Agreement, any other Credit Document or any related agreement or any document furnished hereunder or thereunder.

(b)        (i) Each Lender and L/C Issuer hereby agrees that (x) if the Administrative Agent notifies such Lender or L/C Issuer that the Administrative Agent has determined in its sole discretion that any funds received by such Lender or L/C Issuer from the Administrative Agent or any of its Affiliates (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, a "Payment") were erroneously transmitted to such Lender or L/C Issuer (whether or not known to such Lender or L/C Issuer), and demands the return of such Payment (or a portion thereof), such Lender or L/C Issuer shall promptly, but in no event later than two (2) Business Days thereafter (or such later date as the Administrative Agent, may, in its sole discretion, specify in writing), return to the Administrative Agent the amount of any such Payment (or portion thereof) as to which such a demand was made in same day funds, together with interest thereon (except to the extent waived in writing by the Administrative Agent) in respect of each day from and including the date such Payment (or portion thereof) was received by such Lender or L/C Issuer to the date such amount is repaid to the Administrative Agent at the greater of the NYFRB Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect, and (y) to the extent permitted by applicable law, such Lender or L/C Issuer shall not assert, and hereby waives, as to the Administrative Agent, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Payments received, including without limitation any defense based on "discharge for value" or any similar doctrine. A notice of the Administrative Agent to any Lender or L/C Issuer under this Section 10.07(b) shall be conclusive, absent manifest error.

(ii)        Each Lender and L/C Issuer hereby further agrees that if it receives a Payment from the Administrative Agent or any of its Affiliates (x) that is in a different amount than, or on a different date from, that specified in a notice of payment sent by the Administrative Agent (or any of its Affiliates) with respect to such Payment (a "Payment Notice") or (y) that was not preceded or accompanied by a Payment Notice, it shall be on notice, in each such case, that an error has been made with respect to such Payment. Each Lender and L/C Issuer agrees that, in each such case, or if it otherwise becomes aware a Payment (or portion thereof) may have been sent in error, such Lender or L/C Issuer shall promptly notify the

Administrative Agent of such occurrence and, upon demand from the Administrative Agent, it shall promptly, but in no event later than one (1) Business Day thereafter (or such later date as the Administrative Agent, may, in its sole discretion, specify in writing), return to the Administrative Agent the amount of any such Payment (or portion thereof) as to which such a demand was made in same day funds, together with interest thereon (except to the extent waived in writing by the Administrative Agent) in respect of each day from and including the date such Payment (or portion thereof) was received by such Lender or L/C Issuer to the date such amount is repaid to the Administrative Agent at the greater of the NYFRB Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect.

(iii)    The Borrower and each other Credit Party hereby agrees that (x) in the event an erroneous Payment (or portion thereof) are not recovered from any Lender or L/C Issuer that has received such Payment (or portion thereof) for any reason, the Administrative Agent shall be subrogated to all the rights of such Lender or L/C Issuer with respect to such amount and (y) an erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Credit Party; provided, that this Section 10.07(b) shall not, in and of itself, be interpreted to increase (or accelerate the due date for), or have the effect of increasing (or accelerating the due date for), the Obligations of the Parent Borrower or any other Credit Party relative to the amount (and/or timing for payment) of the Obligations that would have been payable by the Parent Borrower or such other Credit Party had such erroneous Payment not been made by the Administrative Agent; provided, further, that for the avoidance of doubt, the immediately preceding clauses (x) and (y) shall not apply to the extent any such Payment is, and solely with respect to the amount of such Payment that is, comprised of funds received by the Administrative Agent from the Parent Borrower or any other Credit Party for the purpose of making such Payment.

(iv)    Each party's obligations under this Section 10.07(b) shall survive the resignation or replacement of the Administrative Agent or any transfer of rights or obligations by, or the replacement of, a Lender or L/C Issuer, the termination of the Commitments or the repayment, satisfaction or discharge of all Obligations under any Credit Document.

**10.08    No Other Duties.**

Anything herein to the contrary notwithstanding, none of the "Joint Lead Arrangers" and "Joint Bookrunners" listed on the cover page hereof shall have any powers, duties or responsibilities under this Credit Agreement or any of the other Credit Documents, except in its capacity, as applicable, as an Agent, a Lender or an L/C Issuer hereunder.

**10.09    Agents May File Proofs of Claim.**

In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Credit Party, any Agent (irrespective of whether the principal of any Loan or L/C Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Applicable Agent shall have made any demand on the Parent Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, L/C Obligations and all other Obligations (other than obligations under Swap Contracts or Treasury Management Agreements to which such Agent is not a party) that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the L/C Issuers and the Agents (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the L/C Issuers and the Agents and their respective agents and counsel and all other amounts due the Lenders, the L/C Issuers and the Agents under Sections 2.09 and 11.04) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

154

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and L/C Issuer to make such payments to such Agent and, in the event that such Agent shall consent to the making of such payments directly to the Lenders and the L/C Issuers, to pay to such Agent any amount due for the reasonable compensation, expenses, disbursements and advances of such Agent and its agents and counsel, and any other amounts due to such Agent under Sections 2.09 and 11.04.

Nothing contained herein shall be deemed to authorize the Applicable Agent to authorize or consent to or accept or adopt on behalf of any Lender or L/C Issuer any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize any Agent to vote in respect of the claim of any Lender in any such proceeding.

**10.10    Collateral and Guaranty Matters.**

The Lenders and the L/C Issuers irrevocably authorize the Administrative Agent and the Collateral Agent, at its option and in its discretion:

(a)    to release any Guarantor from its obligations under the Collateral Documents if such Person ceases to be a Subsidiary as a result of a transaction not prohibited hereunder, is designated as an Immaterial Subsidiary or is designated as an Excluded Subsidiary pursuant to clause (e) of the definition thereof, or if the conditions set forth in clause (b)(i) below are satisfied;

(b)    to release any Lien on any property granted to or held by the Collateral Agent under any Credit Document (i) upon termination of the Aggregate Commitments and payment in full of all Obligations (other than (A) contingent indemnification obligations not then due and payable and (B) obligations and liabilities under Swap Contracts and Treasury Management Agreements not then due and payable) and the expiration or termination of all Letters of Credit (or if any Letters of Credit shall remain outstanding, upon (x) the cash collateralization of the Outstanding Amount of Letters of Credit on terms satisfactory to the Administrative Agent and L/C Issuer or (y) the receipt by any applicable L/C Issuer of a backstop letter of credit on terms satisfactory to the Administrative Agent and such L/C Issuer), (ii) that is Disposed of as part of or in connection with any sale or other Disposition not prohibited hereunder or under any other Credit Document (other than any such sale or other Disposition to another Credit Party), or (iii) subject to Section 11.01, if approved, authorized or ratified in writing by the Required Lenders; and

(c)    to subordinate any Lien on any property granted to or held by the Collateral Agent under any Credit Document to the holder of any Lien on such property that is granted pursuant to Section 8.01(i) or (z).

Upon request by the Administrative Agent or the Collateral Agent at any time, the Required Lenders will confirm in writing the authority of the Collateral Agent to release or subordinate its interest in particular property and of the Administrative Agent to release any Guarantor from its obligations hereunder pursuant to this Section 10.10 in connection with a transaction permitted hereunder.

**10.11    Withholding Tax.**

To the extent required by any applicable Law, the Applicable Agent may deduct or withhold from any payment to any Lender under any Credit Document an amount equivalent to any applicable withholding Tax. If the IRS or any other authority of the United States or other jurisdiction asserts a claim that the Applicable Agent did not properly withhold Tax from amounts paid to or for the account of any Lender for any reason (including because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Applicable Agent of a change in circumstance that rendered the exemption from, or reduction of withholding Tax ineffective), such Lender shall indemnify and hold harmless the Agents (to the extent that the Applicable Agent has not already been reimbursed by the Borrowers pursuant to Sections 3.01 and 3.04 and without limiting or expanding the obligation of the Borrowers to do so) fully for all amounts paid, directly or indirectly, by the Applicable Agent as Tax or otherwise, together with all expenses incurred, including legal expenses and any out-of-pocket expenses, whether or not such Tax was correctly or legally imposed or asserted by the relevant Governmental Authority. A

155

certificate as to the amount of such payment or liability delivered to any Lender by the Applicable Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Applicable Agent to set off and apply any and all amounts at any time owing to such Lender under this Credit Agreement or any other Credit Document against any amount due to the Applicable Agent under this Section 10.11. The agreements in this Section 10.11 shall survive the resignation and/or replacement of the Applicable Agent, any assignment of rights by, or the replacement of, a Lender, the termination of this Credit Agreement and the repayment, satisfaction or discharge of all other Obligations. For the avoidance of doubt, for purposes of this Section 10.11, the term "Lender" shall include any L/C Issuer and the Swingline Lender.

### 10.12    Treasury Management Agreements and Swap Contracts.

Except as otherwise expressly set forth herein or in any Collateral Document, no Treasury Management Bank or Hedge Bank that obtains the guarantees hereunder or any Collateral by virtue of the provisions hereof or of any Collateral Document shall have any right to notice of any action or to consent to, direct or object to any action hereunder or under any other Credit Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral) other than in its capacity as a Lender and, in such case, only to the extent expressly provided in the Credit Documents. Notwithstanding any other provision of this Article X to the contrary, no Agent shall be required to verify the payment of, or that other satisfactory arrangements have been made with respect to, Obligations arising under Treasury Management Agreements and Swap Contracts unless the Administrative Agent has received written notice of such Obligations, together with such supporting documentation as the Administrative Agent may request, from the applicable Treasury Management Bank or Hedge Bank, as the case may be.

### 10.13    Credit Bidding.

The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Obligations (including by accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Sections 363, 1123 or 1129 of the Bankruptcy Code, or any similar laws in any other jurisdictions to which a Credit Party is subject, or (b) at any other sale, foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable law. In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid by the Administrative Agent at the direction of the Required Lenders on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that shall vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) for the asset or assets so purchased (or for the equity interests or debt instruments of the acquisition vehicle or vehicles that are issued in connection with such purchase). In connection with any such bid (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles and to assign any successful credit bid to such acquisition vehicle or vehicles (ii) each of the Secured Parties' ratable interests in the Obligations which were credit bid shall be deemed without any further action under this Credit Agreement to be assigned to such vehicle or vehicles for the purpose of closing such sale, (iii) the Administrative Agent shall be authorized to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or equity interests thereof, shall be governed, directly or indirectly, by, and the governing documents shall provide for, control by the vote of the Required Lenders or their permitted assignees under the terms of this Credit Agreement or the governing documents of the applicable acquisition vehicle or vehicles, as the case may be, irrespective of the termination of this Credit Agreement and without giving effect to the limitations on actions by the Required Lenders contained in Section 11.01 of this Credit Agreement), (iv) the Administrative Agent on behalf of such acquisition vehicle or vehicles shall be authorized to issue to each of the Secured Parties, ratably on account of the relevant Obligations which were credit bid, interests, whether as equity, partnership, limited partnership interests or membership interests, in any such acquisition vehicle and/or debt instruments issued by such acquisition vehicle, all without the need for any Secured Party or acquisition vehicle to take any further action, and (v) to the extent that Obligations that are assigned to an

156

acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of Obligations credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Secured Parties pro rata and the equity interests and/or debt instruments issued by any acquisition vehicle on account of such Obligations shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action. Notwithstanding that the ratable portion of the Obligations of each Secured Party are deemed assigned to the acquisition vehicle or vehicles as set forth in clause (ii) above, each Secured Party shall execute such documents and provide such information regarding the Secured Party (and/or any designee of the Secured Party which will receive interests in or debt instruments issued by such acquisition vehicle) as the Administrative Agent may reasonably request in connection with the formation of any acquisition vehicle, the formulation or submission of any credit bid or the consummation of the transactions contemplated by such credit bid.

**10.14    Borrower Communications**.

(a)    The Agents, the Lenders and the L/C Issuers agree that any Borrower may, but shall not be obligated to, make any Borrower Communications to any Agent through an electronic platform chosen by the applicable Agent to be its electronic transmission system (each, an "Approved Borrower Portal").

(b)    Although each Approved Borrower Portal and its primary web portal are secured with generally-applicable security procedures and policies implemented or modified by the applicable Agent from time to time (including, as of the Amendment No. 12 Effective Date, a user ID/password authorization system), each of the Lenders, each of the L/C Issuers and each Borrower acknowledges and agrees that the distribution of material through an electronic medium is not necessarily secure, that the Administrative Agent is not responsible for approving or vetting the representatives or contacts of any Borrower that are added to an Approved Borrower Portal, and that there may be confidentiality and other risks associated with such distribution. Each of the Lenders, each of the L/C Issuers and each Borrower hereby approves distribution of Borrower Communications through each Approved Borrower Portal and understands and assumes the risks of such distribution.

(c)    EACH APPROVED BORROWER PORTAL IS PROVIDED "AS IS" AND "AS AVAILABLE". THE APPLICABLE PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER COMMUNICATION, OR THE ADEQUACY OF THE APPLICABLE APPROVED BORROWER PORTAL AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN SUCH APPROVED BORROWER PORTAL AND THE BORROWER COMMUNICATIONS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY THE APPLICABLE PARTIES IN CONNECTION WITH THE BORROWER COMMUNICATIONS OR AN APPROVED BORROWER PORTAL. IN NO EVENT SHALL THE ADMINISTRATIVE AGENT, ANY JOINT LEAD ARRANGER, ANY JOINT BOOKRUNNER OR ANY OF THEIR RESPECTIVE RELATED PARTIES (COLLECTIVELY, "APPLICABLE PARTIES") HAVE ANY LIABILITY TO ANY CREDIT PARTY, ANY LENDER, ANY L/C ISSUER OR ANY OTHER PERSON OR ENTITY FOR DAMAGES OF ANY KIND, INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY BORROWER'S TRANSMISSION OF BORROWER COMMUNICATIONS THROUGH THE INTERNET OR AN APPROVED BORROWER PORTAL, EXCEPT TO THE EXTENT THAT SUCH LOSSES, DAMAGES OR EXPENSES ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION BY A FINAL AND NONAPPEALABLE JUDGMENT TO HAVE RESULTED FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH APPLICABLE PARTY; PROVIDED, HOWEVER, THAT IN NO EVENT SHALL ANY APPLICABLE PARTY HAVE ANY LIABILITY TO ANY CREDIT PARTY, LENDER, L/C ISSUER OR ANY OTHER PERSON FOR INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES (AS OPPOSED TO DIRECT OR ACTUAL DAMAGES).

(d)    "Borrower Communications" means, collectively, any Loan Notice, notice of prepayment, notice requesting the issuance, amendment or extension of a Letter of Credit or other notice, demand, communication,

157

information, document or other material provided by or on behalf of any Credit Party pursuant to any Credit Document or the transactions contemplated therein which is distributed by any Borrower to the applicable Agent through an Approved Borrower Portal.

(e)      Each of the Lenders, each of the L/C Issuers and each Borrower agrees that the applicable Agent may, but (except as may be required by applicable law) shall not be obligated to, store the Borrower Communications on the applicable Approved Borrower Portal in accordance with the applicable Agent's generally applicable document retention procedures and policies.

(f)      Nothing herein shall prejudice the right of any Borrower to give any notice or other communication pursuant to any Credit Document in any other manner specified in such Credit Document.

## ARTICLE XI

## MISCELLANEOUS

**11.01    Amendments, Etc.**

No amendment or waiver of, or any consent to deviation from, any provision of this Credit Agreement or any other Credit Document shall be effective unless in writing and signed by the Parent Borrower or the applicable Credit Party, as the case may be, and the Required Lenders and the Administrative Agent (at the direction of the Required Lenders), and each such amendment, waiver or consent shall be effective only in the specific instance and for the specific purpose for which it is given; provided, however, that:

(a)      without the consent of each Lender, no such amendment, waiver or consent shall:

(i)    amend or waive any condition precedent to the initial Credit Extension set forth inSection 5.01 or (solely with respect to the initial Credit Extension) any condition precedent set forth in Section 5.02,

(ii)    except to the extent permitted by Section 2.17, 2.18 or 2.19 to effectuate a transaction pursuant to Section2.17, 2.18 or 2.19, as the case may be, change any provision of this Credit Agreement regarding pro rata sharing or pro rata funding with respect to (A) the making of advances (including participations), (B) the manner of application of payments or prepayments of principal, interest, or fees, (C) the manner of application of reimbursement obligations from drawings under Letters of Credit, or (D) the manner of reduction of commitments and committed amounts,

(iii)    change any provision of this Section 11.01(a) (other than any such changes made pursuant to Amendment No. 6) or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder,

(iv)    release all or substantially all of the Collateral (other than as provided herein as of the Amendment No. 6 Effective Date), or

(v)    release all or substantially all of the value of the guarantees provided by the Domestic Guarantors or the Foreign Guarantors (other than as provided herein as of the Amendment No. 6 Effective Date) or, if any Foreign Subsidiary shall have been added as an additional Foreign Borrower pursuant to Section 1.08, release the Parent Borrower from its guarantee of the obligations in respect of any borrowings by such Foreign Borrower;

(b)    without the consent of each Lender adversely affected thereby, no such amendment, waiver or consent shall:

(i)    except to the extent permitted by Section 2.17, 2.18 or 2.19 to effectuate a transaction pursuant to Section 2.17, 2.18 or 2.19, as the case may be, extend or increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to Section 9.02), it being understood that the amendment or waiver of an Event of Default or a mandatory reduction or a mandatory prepayment in Commitments shall not be considered an increase in Commitments,

(ii)    waive non-payment or postpone any date fixed by this Credit Agreement or any other Credit Document for any payment of principal, interest, fees or other amounts due to any Lender hereunder or under any other Credit Document or change the scheduled final maturity of any Loan,

(iii)    reduce the principal of, or the rate of interest specified herein on, any Loan or L/C Borrowing or any fees or other amounts payable hereunder or under any other Credit Document; provided, however, that only the consent of the Required Lenders shall be necessary (A) to amend the definition of "Default Rate" or to waive any obligation of the applicable Borrower to pay interest or Letter of Credit Fees at the Default Rate or (B) to amend any financial covenant hereunder (or any defined term used therein) even if the effect of such amendment would be to reduce the rate of interest on any Loan or L/C Borrowing, or to reduce any fee payable hereunder, or

(iv)    except as otherwise expressly permitted in the Credit Documents as in effect on the Amendment No. 6 Effective Date, expressly subordinate any of the Obligations in right of payment to any other obligations or subordinate all or substantially all of the Liens securing the Obligations to Liens securing any other Indebtedness;

(c)    [Reserved]

(d)    unless signed by the Required Term B-4 Lenders, no such amendment, waiver or consent shall:

(i)    amend or waive the manner of application of any mandatory prepayment to the Term B-4 Loans under Section 2.06(c), or

(ii)    amend or waive the provisions of this Section 11.01(c) or the definition of "Required Term B-4 Lenders";

(e)    any such amendment, waiver or consent to any provision that relates to the Term B-4 Loan Commitments and/or Term B-4 Loans or the Revolving Commitments and/or Revo ving Loans but does not apply (or applies differently) to the other Commitments and/or Loans, shall also require the consent of the Required Term B-4 Lenders or Required Revolving Lenders, respectively;

(f)    any such amendment, waiver or consent to any provision that relates to (i) the Dollar Revolving Commitments or Dollar Revolving Loans, on the one hand, but not the Limited Currency Revolving Commitments, Multicurrency Revolving Commitments, Venue Expansion Revolving Commitments, Limited Currency Revolving Loans or, Multicurrency Revolving Loans or Venue Expansion Revolving Loans, on the other hand, (ii) the Limited Currency Revolving Commitments or Limited Currency Revolving Loans, on the one hand, but not the Dollar Revolving Commitments, Multicurrency Revolving Commitments, Venue Expansion Revolving Commitments, Dollar Revolving Loans or, Multicurrency Revolving Loans or Venue Expansion Revolving Loans, on the other hand or (iii) the Multicurrency Revolving Commitments or Multicurrency Revolving Loans, on the one hand, but not the Dollar Revolving Commitments, Limited Currency Revolving Commitments, Venue Expansion Revolving Commitments, Dollar Revolving Loans or, Limited Currency Revolving Loans or Venue Expansion Revolving Loans, on the other hand or (iv) the Venue Expansion Revolving Commitments or Venue Expansion Revolving

159

Loans, on the one hand, but not the Dollar Revolving Commitments, Limited Currency Revolving Commitments, Multicurrency Revolving Commitments, Dollar Revolving Loans, Limited Currency Revolving Loans or Multicurrency Revolving Loans, on the other hand, shall only require the consent of the Required Dollar Revolving Lenders, the Required Limited Currency Revolving Lenders or, the Required Multicurrency Revolving Lenders or Required Venue Expansion Revolving Lenders, respectively;

(g)    unless also signed by the Required Revolving Lenders, no such amendment, waiver or consent shall amend or waive (i) the provisions of this Section 11.01(g), (ii) the definition of "Required Revolving Lenders" or (iii) any condition precedent to any Credit Extension (other than the initial Credit Extension) set forth in Section 5.02 or Section 5.03;

(h)    unless also signed by the Required Dollar Revolving Lenders, no such amendment, waiver or consent shall amend or waive the provisions of this Section 11.01(h) or the definition of "Required Dollar Revolving Lenders";

(i)    unless also signed by the Required Limited Currency Revolving Lenders, no such amendment, waiver or consent shall amend or waive the provisions of this Section 11.01(i) or the definition of "Required Limited Currency Revolving Lenders";

(j)    unless also signed by the Required Multicurrency Revolving Lenders, no such amendment, waiver or consent shall amend or waive the provisions of this Section 11.01(j) or the definition of "Required Multicurrency Revolving Lenders";

(k)    unless also signed by the Required Venue Expansion Revolving Lenders, no such amendment, waiver or consent shall amend or waive the provisions of this Section 11.01(k) or the definition of "Required Venue Expansion Revolving Lenders";

(l)    (k) unless also consented to in writing by an L/C Issuer, no such amendment, waiver or consent shall affect the rights or duties of such L/C Issuer under this Credit Agreement or any Issuer Document relating to any Letter of Credit issued or to be issued by it;

(m)    (l) unless also consented to in writing by the Swingline Lender, no such amendment, waiver or consent shall affect the rights or duties of the Swingline Lender under this Credit Agreement;

(n)    (m) unless also consented to in writing by the Administrative Agent, no such amendment, waiver or consent shall affect the rights or duties of the Administrative Agent under this Credit Agreement or any other Credit Document;

(o)    (n) unless also consented to in writing by the Collateral Agent, no such amendment, waiver or consent shall affect the rights or duties of the Collateral Agent under this Credit Agreement or any other Credit Document; and

(p)    (o) unless also consented to in writing by each Lead Arranger, no such amendment, waiver or consent shall affect the rights or duties of such Lead Arranger this Credit Agreement or any other Credit Document;

provided, however, that notwithstanding anything to the contrary contained herein, (i) each Lender is entitled to vote as such Lender sees fit on any bankruptcy or insolvency reorganization plan that affects the Loans, (ii) each Lender acknowledges that the provisions of Section 1126(c) of the Bankruptcy Code of the United States supersedes the unanimous consent provisions set forth herein, (iii) the Required Lenders may consent to allow a Credit Party to use cash collateral in the context of a bankruptcy or insolvency proceeding, (iv) Section 11.06(h) may not be amended, waived or otherwise modified without the consent of each Granting Lender all or any part of whose Loans are being funded by a SPC at the time of such amendment, waiver or other modification, (v) the Engagement Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto and (vi) the

160

Administrative Agent Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto.

Notwithstanding anything herein to the contrary, the Borrowers and the Administrative Agent may, without the input or consent of any other Lender, effect such amendments to this Credit Agreement and the other Credit Documents as may be necessary or appropriate to effect the provisions of Section 2.01(f), 2.17, 2.18 or 2.19 (including to provide that additional Classes of Loans or Commitments shall (i) share ratably in the benefits of this Credit Agreement and the other Credit Documents with the Loan Obligations, (ii) to include appropriately the Lenders holding such Classes in any determination of the Required Lenders, Required Revolving Lenders and Required Term B-4 Lenders and (iii) to permit any such additional credit facilities which are term facilities to share ratably with the Term Loans in the application of prepayments and to permit any such credit facilities which are revolving credit facilities to share ratably with the Revolving Facility in the application of prepayments).

Notwithstanding anything to the contrary contained in this Section 11.01, (a) if the Administrative Agent and the Parent Borrower shall have jointly identified an obvious error (including, but not limited to, an incorrect cross-reference) or any error or omission of a technical nature, in each case, in any provision of any Credit Document, then the Administrative Agent and/or the Collateral Agent (acting in their sole discretion) and the Parent Borrower or any other relevant Credit Party shall be permitted to amend such provision or cure any ambiguity, defect or inconsistency and such amendment shall become effective without any further action or consent of any other party to any Credit Document, and (b) the Parent Borrower and the Administrative Agent and/or the Collateral Agent shall have the right to amend any Credit Document without notice to or consent of any other person to the extent described in the last paragraph of each of Sections 2.01(g) and (h) and in Section 1.08 or for the purpose of ensuring the enforceability of any local law pledge agreement entered into with respect to the Capital Stock of any Foreign Subsidiary.

Without the consent of any other person, the applicable Credit Party or Parties and the Administrative Agent and/or Collateral Agent may (in its or their respective sole discretion, or shall, to the extent required by any Credit Document) enter into any amendment or waiver of any Credit Document, or enter into any new agreement or instrument, to effect the granting, perfection, protection, expansion or enhancement of any security interest in any Collateral or additional property to become Collateral for the benefit of the holders of the Obligations, or as required by local law to give effect to, or protect any security interest for the benefit of the holders of the Obligations, in any property or so that the security interests therein comply with applicable requirements of Law.

No provision of any Credit Document relating to the Fronted Currency provisions shall be amended without the consent of the Alternative Currency Fronting Lender(s). At the request of the Administrative Agent or any Participating Fronted Currency Lender, the Parent Borrower and the Administrative Agent shall make such amendments to the provisions regarding Fronted Currency Loans as are reasonably requested by the Administrative Agent and such Participating Fronted Currency Lender in order to better effectuate the intent of such provisions, and such amendments shall not require the consent of any Lender or any other party hereto or to any Credit Document.

The Parent Borrower and the Administrative Agent shall enter into such amendments to the Credit Documents (without the consent of any other party) relating to the mechanics (in terms of determining index rates, borrowing times and notice periods, statutory reserves or otherwise) of Borrowings in any Alternative Currency as may be reasonably requested by the Administrative Agent to conform to the requirements of loans made in such Alternative Currency (as reasonably determined by the Administrative Agent), and the Administrative Agent shall notify the Limited Currency Revolving Lenders and the Multicurrency Revolving Lenders following the execution of any such amendments and such amendment shall become effective within five Business Days unless a Limited Currency Revolving Lenders or a Multicurrency Revolving Lenders shall have notified the Administrative Agent in writing of its objection thereto and the reason for any such objection prior to the end of such five Business Day period.

This Section 11.01 shall be subject to the provisions of the last sentence of Section 11.23.

161

11.02    **Notices; Effectiveness; Electronic Communication.**

(a)    <u>Notices Generally</u>. Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier or, with confirmation of receipt, electronic mail as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)    if to the Parent Borrower, an Agent, an L/C Issuer or the Swingline Lender, to the address, telecopier number, electronic mai address or telephone number specified for such Person on <u>Schedule 11.02</u>;

(ii)    if to any Credit Party other than the Parent Borrower, in care of the Parent Borrower at the address, telecopier number, electronic mail address or telephone number specified for such Parent Borrower on <u>Schedule 11.02</u>; and

(iii)    if to any other Lender, to the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, sha l be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient). Notices delivered through electronic communications to the extent provided in <u>subsection (b)</u> below, shall be effective as provided in such <u>subsection (b)</u>.

(b)    <u>Electronic Communications</u>. Notices and other communications to the Lenders and the L/C Issuers hereunder may be delivered or furnished by electronic communication (including <u>Approved Borrower Portals,</u> e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent; <u>provided</u> that the foregoing shall not apply to notices to any Lender or L/C ssuer pursuant to <u>Article II</u> if such Lender or L/C Issuer, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication <u>or through an Approved Borrower Portal</u>. The Administrative Agent or the Parent Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; <u>provided</u> that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent (a) to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, if available, return e-mail or other written acknowledgement) and (b) by facsimile shall be deemed received upon the sender's receipt of a notice of the successful transmission of such facsimile or upon the recipient's written acknowledgement of receipt of such facsimile; <u>provided</u>, in each case, that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing <u>clause (i)</u> of notification that such notice or communication is available and identifying the website address therefor.

(c)    THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE CREDIT PARTY MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE CREDIT PARTY MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT

PARTY IN CONNECTION WITH THE CREDIT PARTY MATERIALS OR THE PLATFORM. In no event shall any Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to any Credit Party, Lender, L/C Issuer or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of any Credit Party's or any Agent's transmission of Credit Party Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; provided, however, that in no event shall any Agent Party have any liability to any Credit Party, Lender, L/C Issuer or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)    Change of Address, Etc. Each of the Parent Borrower, each Agent, each L/C Issuer and the Swingline Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto. Each other Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Parent Borrower, each Agent, each L/C Issuer and the Swingline Lender. In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(e)    Reliance by each Agent, L/C Issuer and Lender. Each Agent, L/C Issuer and Lender shall be entitled to rely and act upon any notices (including telephonic Loan Notices and Loan Notices for Swingline Loans) purportedly given by or on behalf of any Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Borrowers shall indemnify each Agent, L/C Issuer, Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of any Borrower. All telephonic notices to and other telephonic communications with any Agent may be recorded by such Agent, and each of the parties hereto hereby consents to such recording.

### 11.03    No Waiver; Cumulative Remedies; Enforcement.

No failure by any Lender, L/C Issuer, Swingline Lender or Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

Notwithstanding anything to the contrary contained herein or in any other Credit Document, the authority to enforce rights and remedies hereunder and under the other Credit Documents against the Credit Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Section 9.02 for the benefit of all the Lenders and the L/C Issuers; provided, however, that the foregoing shall not prohibit (a) any Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as such Agent) hereunder and under the other Credit Documents, (b) any L/C Issuer or the Swingline Lender from exercising the rights and remedies that inure to its benefit (solely in its capacity as L/C Issuer or Swingline Lender, as the case may be) hereunder and under the other Credit Documents, (c) any Lender from exercising setoff rights in accordance with Section 11.08 (subject to the terms of Section 2.12), or (d) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Credit Party under any Debtor Relief Law; and provided, further, that if at any time there is no Person acting as Administrative Agent hereunder and under the other Credit Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to Section 9.02 and (ii) in addition to the matters set forth in clauses (b), (c) and (d) of the preceding proviso and subject to Section 2.12, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

163

**11.04    Expenses; Indemnity; Damage Waiver.**

(a)    <u>Costs and Expenses</u>. The Borrowers shall pay (i) all reasonable documented out-of-pocket expenses incurred by each Agent and its Affiliates and each Lead Arranger (including the reasonable and invoiced fees, charges and disbursements of any one counsel for any Agent, plus one local counsel in any jurisdiction reasonably necessary), in connection with the administration, syndication and closing of the credit facilities provided for herein, the preparation, due diligence, negotiation, execution, delivery and administration of this Credit Agreement and the other Credit Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated and whether or not such amendment or waiver becomes effective), (ii) all reasonable documented out-of-pocket expenses incurred by any L/C Issuer in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder and (iii) all reasonable documented out-of-pocket expenses incurred by any Agent, Lender, L/C Issuer or Lead Arranger (including the reasonable documented fees, charges and disbursements of one counsel to the Agents, Lenders and L/C Issuers taken as a whole, plus one local counsel to the Agents, Lenders, L/C Issuers and Lead Arrangers taken as a whole in each relevant jurisdiction and, in the event of any actual or potential conflict of interest, one additional counsel to each affected Agent, Lender, L/C Issuer and Lead Arranger plus one local counsel in each relevant jurisdiction for each affected Lender, Agent, L/C Issuer and Lead Arranger) in connection with the enforcement or protection of its rights (A) in connection with this Credit Agreement and the other Credit Documents, including its rights under this Section, or (B) in connection with the Loans made or Letters of Credit issued hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or Letters of Credit.

(b)    <u>Indemnification by the Borrowers</u>. The Borrowers shall indemnify each Agent (and any sub-agents thereof), Lender, L/C Issuer and Lead Arranger, and each Related Party of any of the foregoing Persons (each such Person being called an "<u>Indemnitee</u>") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including any settlement costs and reasonable fees, charges and disbursements of one counsel for any Indemnitee plus one local counsel in each reasonably necessary jurisdiction and in the event of any actual or perceived conflict of interest, one additional counsel for each affected party plus one additional local counsel in each reasonably necessary jurisdiction), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Borrowers or any other Credit Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Credit Agreement, any other Credit Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or, in the case of the Agents (and any sub-agents thereof) and their Related Parties only, the administration of this Credit Agreement and the other Credit Documents, (ii) any Loan or Letter of Credit or the use or proposed use of the proceeds therefrom (including any refusal by an L/C Issuer to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), (iii) any Environmental Liability related to the Parent Borrower or any of its Subsidiaries, or (iv) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Parent Borrower or any other Credit Party, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of comparative, contributory or sole negligence of the Indemnitee; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee, (y) result from any settlement entered into by any Indemnitee without the Parent Borrower's written consent, which shall not be unreasonably withheld or delayed, (y) result from disputes between and among Persons otherwise entitled to indemnification and to which Parent Borrower or any of its Subsidiaries is not a party (provided that this clause (y) shall not apply to disputes involving the Administrative Agent or any other agent or arranger in its capacity as such) or (z) result from a claim brought by the Parent Borrower or any other Credit Party against an Indemnitee for a breach in bad faith of such Indemnitee's obligations hereunder or under any other Credit Document, if the Parent Borrower or such Credit Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction. This <u>Section 11.04(b)</u> shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

164

(c)    Reimbursement by Lenders. To the extent that the Borrowers for any reason fails to indefeasibly pay any amount required under~~subsections~~subsection (a) or (b) of this Section to be paid by them to any Agent (or any sub-agent thereof), L/C Issuer or Related Party of any of the foregoing, each Lender severally agrees to pay to such Agent (or any such sub-agent), L/C Issuer or Related Party, as the case may be (but, in each case, without affecting the Borrowers' obligations with respect thereto), such Lender's Aggregate Revolving Commitment Percentage or, in the case of L/C Obligations, L/C Commitment Percentage (as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against such Agent (or any such sub-agent), L/C Issuer in its capacity as such, or Related Party of any of the foregoing acting for such Agent (or any such sub-agent) or L/C Issuer in connection with such capacity. The obligations of the Lenders under this subsection (c) are subject to the provisions of Section 2.11(d).

(d)    Waiver of Consequential Damages, Etc. To the fullest extent permitted by applicable law, the Borrowers shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Credit Agreement, any other Credit Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or Letter of Credit or the use of the proceeds thereof. No Indemnitee referred to in subsection (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through any Platform, Approved Borrower Portal, telecommunications, electronic or other information transmission systems in connection with this Credit Agreement or the other Credit Documents or the transactions contemplated hereby or thereby.

(e)    Payments. All amounts due under this Section shall be payable not later than ten (10) Business Days after demand therefor.

(f)    Survival. The agreements in this Section shall survive the resignation of any Agent and L/C Issuer, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.

### 11.05    Payments Set Aside.

To the extent that any payment by or on behalf of the Borrowers is made to any Agent, L/C Issuer or Lender, or any Agent, L/C Issuer or Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by any Agent, L/C Issuer or Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender and L/C Issuer several y agrees to pay to such Agent on demand its applicable share (without duplication) of any amount so recovered from or repaid by such Agent plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Effective Rate from time to time in effect. The obligations of the Lenders and the L/C Issuers under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Credit Agreement.

### 11.06    Successors and Assigns.

(a)    Successors and Assigns Generally. The provisions of this Credit Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither the Parent Borrower nor any other Credit Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender (other than in connection with a transaction permitted by Section 8.04) and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of subsection (b) of this Section 11.06, (ii) by way of participation in accordance with the provisions of subsection (d) of this Section 11.06, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of subsection (f) of this

165

Section 11.06 (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Credit Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section 11.06 and, to the extent expressly contemplated hereby, the Related Parties of each of each Agent, L/C Issuer and Lender) any legal or equitable right, remedy or claim under or by reason of this Credit Agreement.

(b)     Assignments by Lenders. Any Lender may at any time assign to one (1) or more Eligible Assignees all or a portion of its rights and obligations under this Credit Agreement (including all or a portion of its Commitment and the Loans (including for purposes of this subsection (b), participations in L/C Obligations and in Swingline Loans) at the time owing to it); provided that

(i)     except in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than (A) in the case of Revolving Commitments and Revolving Loans, $5.0 million, and (B) in the case each of the Term Loans, $500,000, unless, in each case, each of the Administrative Agent and, so long as no Event of Default pursuant to Section 9.01(a) or (f) has occurred and is continuing, the Parent Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed and provided that the Parent Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within five (5) Business Days after having received notice thereof), it being understood that assignments to a Lender or an Affiliate of a Lender or an Approved Fund shall not be subject to such minimum amounts;

(ii)     each partial assignment shall be made as an assignment of a proportionate part of all the assigning Dollar Revolving Lender's rights and obligations under this Credit Agreement with respect to the Dollar Revolving Loans and the Dollar Revolving Commitment assigned, except that this clause (ii) shall not apply to rights in respect of Swingline Loans;

(iii)     each partial assignment shall be made as an assignment of a proportionate part of all the assigning Limited Currency Revolving Lender's rights and obligations under this Credit Agreement with respect to the Limited Currency Revolving Loans and the Limited Currency Revolving Commitment assigned;

(iv)     each partial assignment shall be made as an assignment of a proportionate part of all the assigning Multicurrency Revolving Lender's rights and obligations under this Credit Agreement with respect to the Multicurrency Revolving Loans and the Multicurrency Revolving Commitment assigned;

(v)     each partial assignment shall be made as an assignment of a proportionate part of all the assigning Venue Expansion Revolving Lender's rights and obligations under this Credit Agreement with respect to the Venue Expansion Revolving Loans and the Venue Expansion Revolving Commitment assigned;

(vi)     each partial assignment shall be made as an assignment of a proportionate part of a l the assigning Term B-4 Lender's rights and obligations under this Credit Agreement with respect to the Term Loans or Additional Term B-4 Commitment assigned;

(vii)     (vi) any assignment of (A) a Dollar Revolving Commitment and Dollar Revolving Loans must be approved by the Administrative Agent, each Dollar L/C Issuer and the Swingline Lender and, so long as no Event of Default pursuant to Section 9.01(a) or (f) has occurred and is continuing, the Parent Borrower (each such approval not to be unreasonably withheld or delayed and provided that the Parent

166

Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within five (5) Business Days after having received notice thereof); provided that the Parent Borrower's approval shall not be required if the proposed assignee is a Revolving Lender, an Affiliate of a Revolving Lender or an Approved Fund; (B) a Limited Currency Revolving Commitment and Limited Currency Revolving Loans must be approved by the Administrative Agent and each Multicurrency L/C Issuer and, so long as no Event of Default pursuant to Section 9.01(a) or (f) has occurred and is continuing, the Parent Borrower (each such approval not to be unreasonably withheld or delayed and provided that the Parent Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within five (5) Business Days after having received notice thereof); provided that the Parent Borrower's approval shall not be required if the proposed assignee is a Revolving Lender, an Affiliate of a Revolving Lender or an Approved Fund; (C) a Multicurrency Revolving Commitment and Multicurrency Revolving Loans must be approved by the Administrative Agent and the Multicurrency L/C Issuers and, so long as no Event of Default pursuant to Section 9.01(a) or (f) has occurred and is continuing, the Parent Borrower (each such approval not to be unreasonably withheld or delayed and provided that the Parent Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within five (5) Business Days after having received notice thereof); provided that the Parent Borrower's approval shall not be required if the proposed assignee is a Revolving Lender, an Affiliate of a Revolving Lender or an Approved Fund; and (D) a Venue Expansion Revolving Commitment and Venue Expansion Revolving Loans must be approved by the Administrative Agent and, so long as no Event of Default pursuant to Section 9.01(a) or (f) has occurred and is continuing, the Parent Borrower (each such approval not to be unreasonably withheld or delayed and provided that the Parent Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within five (5) Business Days after having received notice thereof); provided that the Parent Borrower's approval shall not be required if the proposed assignee is a Revolving Lender, an Affiliate of a Revolving Lender or an Approved Fund and (E) the Term Loans must be approved by the Administrative Agent and, so long as no Event of Default pursuant to Section 9.01(a) or (f) has occurred and is continuing, the Parent Borrower (each such approval not to be unreasonably withheld or delayed and provided that the Parent Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within five (5) Business Days after having received notice thereof); provided that no approval shall be required if the proposed assignee is a Lender, an Affiliate of a Lender or an Approved Fund; and

(viii)    (vii) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee in the amount of $3,500, and the Eligible Assignee, if it shall not be a Lender, shall (A) deliver to the Administrative Agent an Administrative Questionnaire and (B) deliver to the applicable Borrower and the Applicable Agent the forms required to be delivered pursuant to Section 3.01(e);

Subject to acceptance and recording thereof by the Administrative Agent pursuant to subsection (c) of this Section 11.06, from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Credit Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Credit Agreement, and the assigning Lender thereunder shal , to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Credit Agreement (and, in the case of an Assignment and Assumption covering al of the assigning Lender's rights and obligations under this Credit Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05, and 11.04  subject to the requirements and limitations of such Sections) with respect to facts and circumstances occurring prior to the effective date of such assignment. Upon request, the applicable Borrower (at its expense) shall execute and deliver a Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Credit Agreement that does not comply with this subsection shall be treated for purposes of this Credit Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with subsection (d) of this Section 11.06.

167

(c)    Register. The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrowers, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and related interest amounts) of the Loans and L/C Obligations and the interest thereon owing and paid to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive absent manifest error, and the Borrowers, the Agents and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Credit Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by each of the Parent Borrower, the Agents, the Lenders (solely with respect to each Lender's own Loans and Commitments) and the L/C Issuers at any reasonable time and from time to time upon reasonable prior notice.

Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an Eligible Assignee, the Eligible Assignee's completed Administrative Questionnaire (unless the Eligib e Assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section 11.06 and any written consent to such assignment required by paragraph (b) of this Section 11.06, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register; provided that if either the assigning Lender or the Eligible Assignee shall have failed to make any payment required to be made by it pursuant to Section 2.02(b), 2.03(c), 2.04(b), 2.11 b) or 11.04(c), the Administrative Agent shall have no obligation to accept such Assignment and Assumption and record the information therein in the Register unless and until such payment shall have been made in full, together with all accrued interest thereon. No assignment shall be effective for purposes of this Credit Agreement unless it has been recorded in the Register as provided in this paragraph.

(d)    Participations. Any Lender may at any time, without the consent of, or notice to, the Borrowers or the Administrative Agent, sell participations to any Person (other than a natural person or the Parent Borrower or any of the Parent Borrower's Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Credit Agreement (including all or a portion of its Commitment and/or the Loans (including such Lender's participations in L/C Obligations and/or Swingline Loans) owing to it); provided that (i) such Lender's obligations under this Credit Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrowers, the Agents, the Lenders and the L/C Issuers shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Credit Agreement. Each Lender, acting solely for this purpose as a non-fiduciary agent of the Borrowers, shall maintain a register for the recordation of the names and addresses of such Participants and the rights, interests or obligations of such Participants in any Obligation, in any Commitment and in any right to receive any principal, interest and other payments thereunder (the "Participant Register"). The entries in the Participant Register shall be conclusive absent manifest error and the Borrowers and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Credit Agreement notwithstanding any notice to the contrary; provided that no Lender shall have the obligation to disclose all or a portion of the Participant Register (including the identity of the Participant or any information relating to a Participant's interest in any Loans or other obligations under any Credit Document) to any Person except to the extent that such disclosure is necessary in connection with a Tax audit or other proceeding to establish that any loans are in registered form for U.S. federal income Tax purposes under Section 5f.103-1(c) of the United States Treasury Regulations and Section 1.163-5(b) of the proposed United States Treasury Regulations.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Credit Agreement and to approve any amendment, modification or waiver of any provision of this Credit Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in Section 11.01(a)(iv) or (v) or, to the extent the Participant is affected thereby, Section 11.01(b)(i), (ii) or (iii). Subject to subsection (e) of this Section 11.06, each Participant (i) shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 (subject to the requirements and limitations of such Sections including the requirements under Section 3.01(e) (it being understood that the documentation required under Section 3.01(e) shall be delivered solely to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section 11.06 and (ii) shall be subject to Sections 3.06 and 11.13(a) to the same

168

extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section 11.06. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 11.08 as though it were a Lender; provided such Participant agrees to be subject to Section 2.12 as though it were a Lender.

(e)    Limitation upon Participant Rights. A Participant shall not be entitled to receive any greater payment under Section 3.01 or 3.04 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Parent Borrower's prior written consent to such sale, not to be unreasonably withheld or delayed (it being agreed, without limitation, that it will be reasonable for the Parent Borrower to withhold consent if giving consent would result in increased indemnification obligations at the time the participation takes effect or wou d be reasonably certain to result in increased indemnification obligations thereafter as a result of a Change in Law announced prior to the time the participation takes effect). For the avoidance of doubt, a Participant entitled to benefits under Section 3.01, 3.04 or 3.05 shall be subject to all of the limitations and requirements of such Sections as if it were a Lender (including, in the case of Section 3.01, all of the limitations in the definition of Excluded Taxes).

(f)    Certain Pledges. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Credit Agreement (including under its Note(s), if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other governmental authority; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)    Electronic Execution of Assignments. The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(h)    Special Purpose Funding Vehicles. Notwithstanding anything to the contrary contained herein, any Lender (a "Granting Lender") may grant to a specia purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Parent Borrower (an "SPC") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Credit Agreement; provided that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan, and (ii) if a SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof or, if it fails to do so, to make such payment to the Applicable Agent as is required under Section 2.11(b)(i). Each party hereto hereby agrees that no SPC shall be liable for any indemnity or similar payment obligation under this Credit Agreement for which a Lender would be liable, and the Granting Lender shall for all purposes, including the approva  of any amendment, waiver or other modification of any provision of any Credit Document, remain the lender of record hereunder. The making of a Loan by a SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Credit Agreement) that, prior to the date that is one (1) year and one (1) day after the payment in full of all outstanding commercial paper or other senior debt of any SPC, it will not institute against, or join any other Person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency, or liquidation proceeding under the laws of the United States or any State thereof. Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the Parent Borrower and the Administrative Agent and with the payment of a processing fee in the amount of $2,500, assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or guarantee or credit or liquidity enhancement to such SPC. Each SPC (i) shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05  subject to the requirements and limitations of such Sections) to the same extent as if it were a Granting Lender and had acquired its interest by assignment pursuant to Section 11.06(b) (it being understood that the documentation required under Section 3.01(e)

169

shall be delivered solely to the Granting Lender) and (ii) shall be subject toSections 3.06 and 11.13(a) to the same extent as if it were a Granting Lender and had acquired its interest by assignment pursuant to Section 11.06(b). A SPC shall not be entitled to receive any greater payment under Section 3.01, 3.04 or 3.05 than the applicable Granting Lender would have been entitled to receive with respect to the interest granted to such SPC unless the grant of the interest is made with the Parent Borrower's prior written consent to such grant, not to be unreasonably withheld or delayed (it being agreed, without imitation, that it will be reasonable for the Parent Borrower to withhold consent if giving consent would result in increased indemnification obligations at the time the grant to the SPC takes effect or would be reasonably certain to result in increased indemnification obligations thereafter as a result of a Change in Law announced prior to the time the grant to the SPC takes effect). For the avoidance of doubt, an SPC entitled to benefits under Section 3.01, 3.04 or 3.05 shall be subject to all of the limitations and requirements of such Sections as if it were a Granting Lender (including, in the case of Section 3.01, all of the limitations in the definition of Excluded Taxes).

(i)    Resignation as L/C Issuer or Swingline Lender After Assignment. Notwithstanding anything to the contrary contained herein, if at any time any L/C Issuer or Swingline Lender assigns all of its Commitment and Loans pursuant to subsection (b) above, such L/C Issuer or Swingline Lender may, (i) upon thirty (30) days' notice to the Parent Borrower and the Lenders, resign as L/C Issuer and/or (ii) upon thirty (30) days' notice to the Parent Borrower, resign as Swingline Lender. In the event of any such resignation as L/C Issuer or Swingline Lender, the Parent Borrower shall be entitled to appoint from among the Lenders a successor L/C Issuer or Swingline Lender hereunder; provided, however, that no failure by the Parent Borrower to appoint any such successor shall affect the resignation of such L/C Issuer or Swingline Lender as L/C Issuer or Swingline Lender, as the case may be. If any L/C Issuer resigns as L/C Issuer, it shall retain all the rights, powers, privileges and duties of an L/C Issuer hereunder with respect to all Letters of Credit outstanding as of the effective date of its resignation as L/C Issuer and all L/C Obligations with respect thereto (including the right to require the Lenders to fund risk participations in Unreimbursed Amounts pursuant to Section 2.03(c)). If any Swingline Lender resigns as Swingline Lender, it shall retain all the rights of the Swingline Lender provided for hereunder with respect to Swingline Loans made by it and outstanding as of the effective date of such resignation, including the right to require the Lenders to make Base Rate Loans or fund risk participations in outstanding Swingline Loans pursuant to Section 2.04(b). Upon the appointment of a successor L/C Issuer and/or Swingline Lender, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring L/C Issuer or Swingline Lender, as the case may be, and (b) the successor L/C Issuer shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to the retiring L/C Issuer to effectively assume the obligations of the retiring L/C Issuer with respect to such Letters of Credit.

(j)    Notwithstanding anything to the contrary contained herein, any Lender may assign all or any portion of its Term B-4 Loans to Parent Borrower or any of its Subsidiaries through (x) Dutch auctions open to all Lenders on a pro rata basis in accordance with procedures set forth in Exhibit 11.06(j) or (y) notwithstanding Sections 2.11 and 2.12 or any other provision in this Credit Agreement, open market purchases on a non-pro rata basis;provided that:

(i)    in connection with assignments pursuant to clause (x) above, Parent Borrower or such Subsidiary shall make an offer to all Lenders to take Term B-4 Loans by assignment pursuant to procedures set forth in Exhibit 11.06(j);

(ii)    upon the effectiveness of any such assignment, such Term B-4 Loans shall be retired, and shall be deemed cancelled and not outstanding for all purposes under this Credit Agreement;

(iii)    no Default or Event of Default shall exist or be continuing or would result therefrom;

(iv)    the Parent Borrower must represent and warrant, at the time of the offer and at the time of the assignment, either (x) it does not possess material non-public information with respect to Parent Borrower and its Subsidiaries or the securities of any of them that has not been disclosed to the Term B-4 Lenders generally (other than Term B-4 Lenders who elect not to receive such information) or (y) make a statement that such representation cannot be made; and

170

(v)    such purchases shall not be financed with the proceeds of a Revolving Loan or Swingline Loan.

**11.07    Treatment of Certain Information; Confidentiality.**

Each of the Agents, Lenders and L/C Issuers agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, trustees, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Credit Document or any action or proceeding relating to this Credit Agreement or any other Credit Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Credit Agreement, (ii) any actual or prospective counterparty (or advisors) to any swap, derivative transaction relating to the Borrowers and their obligations, (g) subject to each such Person being informed of the confidential nature of the Information and to their agreement to keep such Information confidential, to (i) an investor or prospective investor in securities issued by an Approved Fund that also agrees that Information shall be used solely for the purpose of evaluating an investment in such securities issued by the Approved Fund, (ii) a trustee, collateral manager, servicer, backup servicer, noteholder or secured party in securities issued by an Approved Fund in connection with the administration, servicing and reporting on the assets serving as collateral for securities issued by an Approved Fund, or (iii) a nationally recognized rating agency that requires access to information regarding the Credit Parties, the Loans and Credit Documents in connection with ratings issued in respect of securities issued by an Approved Fund, (h) with the consent of the Parent Borrower or (i) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to any Agent, Lender, L/C Issuer or any of their respective Affiliates on a nonconfidential basis from a source other than the Parent Borrower. In addition, the Administrative Agent and the Lenders may disclose the existence of this Credit Agreement and information about this Credit Agreement to market data collectors, similar service providers to the lending industry and service providers to the Lead Arrangers, Agents and the Lenders in connection with the administration of this Credit Agreement, the other Credit Documents, the Loans and the Commitments.

For purposes of this Section, "Information" means all information received from the Parent Borrower or any Subsidiary relating to the Parent Borrower or any Subsidiary or any of their respective businesses, other than any such information that is available to the any Agent, Lender or L/C Issuer on a nonconfidential basis prior to disclosure by the Parent Borrower or any Subsidiary. In the case of Information received from the Parent Borrower or any Subsidiary after the Amendment No. ~~11~~12 Effective Date, such Information is clearly identified at the time of delivery. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Agents, Lenders and L/C Issuers acknowledges that (a) the Information may include material non-public information concerning the Parent Borrower or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including federal and state securities Laws.

For the avoidance of doubt, nothing in this Section 11.07 shall prohibit any Person from voluntarily disclosing or providing any Information within the scope of this confidentiality provision to any governmental, regulatory or self-regulatory organization (any such entity, a "Regulatory Authority") to the extent that any such prohibition on disclosure set forth in this Section 11.07 shall be prohibited by the laws or regulations applicable to such Regulatory Authority.

171

**11.08    Right of Setoff.**

If an Event of Default shall have occurred and be continuing, each Lender, L/C Issuer and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender, L/C Issuer or any such Affiliate to or for the credit or the account of the Parent Borrower or any other Credit Party against any and all of the obligations of such Parent Borrower or such Credit Party now or hereafter existing under this Credit Agreement or any other Credit Document to such Lender or L/C Issuer, irrespective of whether or not such Lender or L/C Issuer shall have made any demand under this Credit Agreement or any other Credit Document and although such obligations of such Parent Borrower or such Credit Party may be contingent or unmatured or are owed to a branch or office of such Lender or L/C Issuer different from the branch or office holding such deposit or obligated on such indebtedness. The rights of each Lender, L/C Issuer and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender, L/C Issuer or their respective Affiliates may have. Each Lender and L/C Issuer agrees to notify the Parent Borrower and the Administrative Agent promptly after any such setoff and application; provided that the failure to give such notice shall not affect the validity of such setoff and application.

**11.09    Interest Rate Limitation.**

Notwithstanding anything to the contrary contained in any Credit Document, the interest paid or agreed to be paid under the Credit Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate"). If any Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principa , refunded to the applicable Borrower. In determining whether the interest contracted for, charged, or received by an Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

**11.10    Counterparts; Integration; Effectiveness.**

This Credit Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Credit Agreement and the other Credit Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 5.01, this Credit Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Credit Agreement by telecopy or other electronic imaging means shall be as effective as delivery of a manually executed counterpart of this Credit Agreement.

Delivery of an executed counterpart of a signature page of this Credit Agreement by telecopy, emailed pdf. or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Credit Agreement. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any document to be signed in connection with this Credit Agreement and the transactions contemplated hereby shall be deemed to include Electronic Signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, va idity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; provided that nothing herein shall require the Administrative Agent to accept electronic signatures in any form or format without its prior written consent. Without limiting the generality of the foregoing, each party hereto hereby (i) agrees that, for all purposes, including without

172

limitation, in connection with any workout, restructuring, enforcement of remedies, bankruptcy proceedings or litigation among the Administrative Agent, the Lenders and the Credit Parties, electronic images of this Credit Agreement or any other Credit Documents (in each case, including with respect to any signature pages thereto) shall have the same legal effect, validity and enforceability as any paper original, and (ii) waives any argument, defense or right to contest the validity or enforceability of the Credit Documents based solely on the lack of paper original copies of any Credit Documents, including with respect to any signature pages thereto.

**11.11    Survival of Representations and Warranties.**

All representations and warranties made hereunder and in any other Credit Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by each Agent and Lender, regardless of any investigation made by any Agent or Lender or on their behalf and notwithstanding that any Agent or Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied or any Letter of Credit shall remain outstanding.

**11.12    Severability.**

If any provision of this Credit Agreement or the other Credit Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Credit Agreement and the other Credit Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**11.13    Replacement of Lenders.**

(a)    If any Lender requests compensation under Section 3.04, or if any Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any other circumstance exists hereunder that gives the Parent Borrower the right to replace a Lender as a party hereto, then the Parent Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 11.06), all of its interests, rights and obligations under this Credit Agreement and the related Credit Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that:

(i)    the Parent Borrower shall have paid to the Administrative Agent the assignment fee specified in Section 11.06(b);

(ii)    such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and L/C Advances, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Credit Documents (including any amounts under Section 3.05) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Parent Borrower (in the case of all other amounts);

(iii)    in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter;

(iv)    such assignment does not conflict with applicable Laws; and

(v)    such assignment is recorded in the Register.

173

(b)        If, in connection with any proposed amendment, change, waiver, discharge or termination of any of the provisions of this Credit Agreement or any other Credit Document as contemplated by Section 11.01, the consent of the Required Lenders (or Required Limited Currency Revolving Lenders, Required Dollar Revolving Lenders or Required Term B-4 Lenders, as the case may be) is obtained but the consent of one or more of such other Lenders whose consent is required is not obtained (any such Lender whose consent is not obtained as described in this clause (b) being referred to as a "Non-Consenting Lender"), then, at the Borrower's request, any Eligible Assignee reasonably acceptable to the Administrative Agent that consents to such amendment, change, waiver, discharge or termination shall have the right to purchase from such Non-Consenting Lender, and such Non-Consenting Lender agrees that it shall, upon the Administrative Agent's request, sell and assign to such Eligible Assignee, all of the Commitments and Loans of such Non-Consenting Lender for an amount equal to the principal balance of all Loans and L/C Advances held by such Non-Consenting Lender and all accrued and unpaid interest and fees with respect thereto through the date of sale and payment to the Administrative Agent of the assignment fee under Section 11.06(b); provided, however, that such purchase and sale shall not be effective until (x) in the case of this clause (x), to the extent requested by the Administrative Agent, the Administrative Agent shall have received from such Eligible Assignee an agreement in form and substance satisfactory to the Administrative Agent and the Parent Borrower whereby such Eligible Assignee shall agree to be bound by the terms hereof and (y) such Non-Consenting Lender shall have received payments of all Loans and L/C Advances held by it and all accrued and unpaid interest and fees with respect thereto and all other amounts payable to it hereunder through the date of the sale, but upon the satisfaction of the requirements set forth in clause (x) (in the case of clause (x), if so requested by the Administrative Agent) and (y) of this proviso, such purchase and sale shall be deemed effective and such Eligible Assignee shall be deemed the holder of such Loans, Commitments and L/C Advances of such Non-Consenting Lender. Each Lender agrees that, if it becomes a Non-Consenting Lender, to the extent requested by the Administrative Agent, it shall execute and deliver to the Administrative Agent an Assignment and Assumption to evidence such sale and purchase and shall deliver to the Administrative Agent any Note (if the assigning Lender's Loans are evidenced by a Note) subject to such Assignment and Assumption.

A Lender that has assigned its interests, rights and obligations under this Credit Agreement and the related Credit Documents pursuant to this Section 11.13 shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05 and 11.04 (subject to the requirements and limitations of such Sections) with respect to facts and circumstances occurring prior to the effective date of such assignment.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Parent Borrower to require such assignment and delegation cease to apply.

####    11.14    Governing Law; Jurisdiction; Etc.

(a)        GOVERNING LAW. THIS CREDIT AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

(b)        SUBMISSION TO JURISDICTION. EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN THE BOROUGH OF MANHATTAN AND OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF SUCH STATE SITTING IN THE BOROUGH OF MANHATTAN AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS CREDIT AGREEMENT OR ANY OTHER CREDIT DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING  N THIS CREDIT AGREEMENT OR  N ANY OTHER CREDIT

174

DOCUMENT SHALL AFFECT ANY RIGHT THAT ANY PARTY HERETO MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS CREDIT AGREEMENT OR ANY OTHER CREDIT DOCUMENT AGAINST ANY OTHER PARTY HERETO OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)    WAIVER OF VENUE. EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT  T MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS CREDIT AGREEMENT OR ANY OTHER CREDIT DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)    SERVICE OF PROCESS. EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 11.02. NOTHING IN THIS CREDIT AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

**11.15    Waiver of Jury Trial.**

EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS CREDIT AGREEMENT OR ANY OTHER CREDIT DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS CREDIT AGREEMENT AND THE OTHER CREDIT DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**11.16    USA PATRIOT Act Notice.**

Each Lender that is subject to the Act (as hereinafter defined) and the Agents (for itself and not on behalf of any Lender) hereby notifies the Borrowers that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Borrowers, which information includes the name and address of the Borrowers and other information that will allow such Lender or Agent, as applicable, to identify such Borrower in accordance with the Patriot Act.

**11.17    Designation as Senior Debt.**

All Obligations shall be "Designated Senior Indebtedness" (or such similar defined term) for purposes of all documentation governing Subordinated Debt, to the extent such concept exists in the documentation governing such Subordinated Debt.

**11.18    Limitation on Foreign Credit Party Obligations.**

Notwithstanding anything to the contrary herein, no provision of this Credit Agreement shall render any Foreign Credit Party liable for the Obligations of any Domestic Credit Party.

**11.19**    **No Advisory or Fiduciary Responsibility.**

In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Credit Document), the Parent Borrower acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (i) (A) the arranging and other services regarding this Credit Agreement provided by the Agents and the Lead Arrangers are arm's-length commercial transactions between the Parent Borrower and its Affiliates, on the one hand, and the Agents and the other Lead Arrangers, on the other hand, (B) the Parent Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) the Parent Borrower is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Credit Documents; (ii) (A) each Agent, Lender and Lead Arranger is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Parent Borrower or any of its Affiliates, or any other Person and (B) no Agent, Lender or Lead Arranger has any obligation to the Parent Borrower or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Credit Documents; and (iii) the Agents, Lenders and the Lead Arrangers and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Parent Borrower and its Affiliates, and no Agent or any Lead Arranger has any obligation to disclose any of such interests to the Parent Borrower or its Affiliates. To the fullest extent permitted by law, the Borrowers hereby waive and release any claims that it may have against any Agent, Lender or Lead Arranger with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

**11.20**    **Acknowledgement and Consent to Bail-In of EEA Financial Institutions.**

Notwithstanding anything to the contrary in any Credit Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Credit Document may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Credit Agreement or any other Credit Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

**11.21**    **Judgment Currency; Submission to Jurisdiction.**

If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Credit Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given. The obligation of a Borrower in respect of any such sum due from it to the Administrative Agent or the Lenders hereunder or under the other Credit Documents shall, notwithstanding any judgment in a currency (the "Judgment Currency") other than that in

which such sum is denominated in accordance with the applicable provisions of this Credit Agreement (the "Agreement Currency"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency. If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent from a Borrower in the Agreement Currency, such Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or the person to whom such obligation was owing against such loss. If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent in such currency, the Administrative Agent agrees to return the amount of any excess to such Borrower (or to any other person who may be entitled thereto under applicable law).

By the execution and delivery of this Credit Agreement, each Credit Party (i) hereby designates and appoints Parent Borrower as its authorized agent upon which process may be served in any suit or proceeding arising out of or relating to this Credit Agreement that may be instituted in New York Courts, (ii) submits to the jurisdiction of any such court in any such suit or proceeding and (iii) agrees that service of process upon Parent Borrower and written notice of said service to Parent Borrower in accordance with the manner provided for notices in Section 11.02 shall be deemed in every respect effective service of process upon such Credit Party, in any such suit or proceeding. Each Credit Party further agrees to take any and all action, including the execution and filing of any and all such documents and instruments, as may be necessary to continue such designation and appointment of Parent Borrower in full force and effect so long as this Credit Agreement is in effect. To the extent that any Credit Party has or hereafter may acquire any immunity from jurisdiction of any court of (i) any jurisdiction in which it owns or leases property or assets or (ii) the United States or the State of New York or any political subdivision of either or from any legal process (whether through service of notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) with respect to itself or its property and assets or this Credit Agreement or any of the other Credit Documents or actions to enforce judgments in respect of any thereof, such Credit Party hereby irrevocably waives such immunity in respect of its obligations under the above-referenced documents, to the extent permitted by law. Nothing in this Credit Agreement, any other Credit Document will affect the right of any party to this Credit Agreement to serve process in any other manner permitted by law.

**11.22    Acknowledgement Regarding Any Supported QFCs** To the extent that the Credit Documents provide support, through a guarantee or otherwise, for Swap Contracts or any other agreement or instrument that is a QFC (such support "QFC Credit Support" and each such QFC a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Credit Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Credit Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Credit Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

**11.23** **Restricted Lenders**. In relation to each Lender that notifies the Administrative Agent and the Parent Borrower to such effect in writing (each, a "Restricted Lender"), Section 6.24, Section 7.06 and, solely as it relates to compliance with Section 6.24, Article V, shall only apply to such Restricted Lender to the extent that such provision would not result in (a) any violation of, conflict with or liability under EU Regulation (EC) 2271/96 or (b) a violation or conflict with section 7 of the German Foreign Trade and Payments Ordinance (*Außenwirtschaftsverordnung*) or a similar anti-boycott statute. The election of any Lender who elects to be a Restricted Lender shall remain in effect until such time as such Restricted Lender advises the Administrative Agent and the Parent Borrower in writing that it is no longer a Restricted Lender. In connection with any amendment, waiver, determination or direction relating to any part of Section 6.24, Section 7.06 and, solely as it relates to compliance with Section 6.24, Article V, of which such Restricted Lender does not have the benefit, the Commitments, Loans and Obligations of that Restricted Lender will be excluded for the purpose of determining whether the consent of the Required Lenders, Required Dollar Revolving Lenders, Required L/C Lenders, Required Limited Currency Revolving Lenders, Required Multicurrency Revolving Lenders, Required Venue Expansion Revolving Lenders, Required Revolving Lenders, Required Specified Currency Limited Currency/Multicurrency Revolving Lenders or Required Term B-4 Lenders, as applicable, has been obtained or whether the determination or direction by such Lenders has been made.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

178

**EXHIBIT 10.49**

*Execution Version*

LIVE NATION ENTERTAINMENT, INC.

AND

HSBC BANK USA, NATIONAL ASSOCIATION,

as Trustee

INDENTURE

Dated as of December 6, 2024

2.875% Convertible Senior Notes due 2030

**TABLE OF CONTENTS**

PAGE

ARTICLE 1
DEFINITIONS

| | | |
|---|---|---|
| *Section 1.01* | Definitions | 1 |
| *Section 1.02* | References to Interest | 14 |

ARTICLE 2
ISSUE, DESCRIPTION, EXECUTION, REGISTRATION AND EXCHANGE OF NOTES

| | | |
|---|---|---|
| | | 14 |
| *Section 2.01* | Designation and Amount | |
| *Section 2.02* | Form of Notes | 14 |
| *Section 2.03* | Date and Denomination of Notes; Payments of Interest and Defaulted Amounts | 15 |
| *Section 2.04* | Execution, Authentication and Delivery of Notes | 16 |
| *Section 2.05* | Exchange and Registration of Transfer of Notes; Restrictions on Transfer; Depositary | 17 |
| *Section 2.06* | Removal of Transfer Restrictions | 23 |
| *Section 2.07* | Mutilated, Destroyed, Lost or Stolen Notes | 23 |
| *Section 2.08* | Temporary Notes | 24 |
| *Section 2.09* | Cancellation of Notes Paid, Converted, Etc | 25 |
| *Section 2.10* | CUSIP Numbers | 25 |
| *Section 2.11* | Additional Notes; Repurchases | 25 |

ARTICLE 3
SATISFACTION AND DISCHARGE

| | | |
|---|---|---|
| | | 26 |
| *Section 3.01* | Satisfaction and Discharge | |

ARTICLE 4
PARTICULAR COVENANTS OF THE COMPANY

| | | |
|---|---|---|
| *Section 4.01* | Payment of Principal and Interest | 26 |
| *Section 4.02* | Maintenance of Office or Agency | 26 |
| *Section 4.03* | Appointments to Fill Vacancies in Trustee's Office | 27 |
| *Section 4.04* | Provisions as to Paying Agent | 27 |
| *Section 4.05* | Existence | 28 |
| *Section 4.06* | Rule 144A Information Requirement and Annual Reports; Additional Interest | 28 |
| *Section 4.07* | Stay, Extension and Usury Laws | 31 |
| *Section 4.08* | Compliance Certificate; Statements as to Defaults | 32 |

*Section 4.09*        Further Instruments and Acts                                                                    32

## ARTICLE 5
### LISTS OF HOLDERS AND REPORTS BY THE COMPANY AND THE TRUSTEE

*Section 5.01*        Lists of Holders                                                                               32
*Section 5.02*        Preservation and Disclosure of Lists                                                           32

## ARTICLE 6
### DEFAULTS AND REMEDIES

*Section 6.01*        Events of Default                                                                              32
*Section 6.02*        Acceleration; Rescission and Annulment                                                         34
*Section 6.03*        Additional Interest                                                                            35
*Section 6.04*        Payments of Notes on Default; Suit Therefor                                                    36
*Section 6.05*        Application of Monies Collected by Trustee                                                     37
*Section 6.06*        Proceedings by Holders                                                                         38
*Section 6.07*        Proceedings by Trustee                                                                         39
*Section 6.08*        Remedies Cumulative and Continuing                                                             39
*Section 6.09*        Direction of Proceedings and Waiver of Defaults by Majority of Holders                         39
*Section 6.10*        Notice of Defaults                                                                             40
*Section 6.11*        Undertaking to Pay Costs                                                                       40

## ARTICLE 7
### CONCERNING THE TRUSTEE

                                                                                                                     41
*Section 7.01*        Duties and Responsibilities of Trustee                                                         41
*Section 7.02*        Reliance on Documents, Opinions, Etc                                                           42
*Section 7.03*        No Responsibility for Recitals, Etc                                                            44
*Section 7.04*        Trustee, Paying Agents, Conversion Agents, Bid Solicitation Agent or Note Registrar May Own Notes  44
*Section 7.05*        Monies and Shares of Common Stock to Be Held in Trust                                          44
*Section 7.06*        Compensation and Expenses of Trustee                                                           44
*Section 7.07*        Officer's Certificate as Evidence                                                             45
*Section 7.08*        Eligibility of Trustee                                                                         45
*Section 7.09*        Resignation or Removal of Trustee                                                              46
*Section 7.10*        Acceptance by Successor Trustee                                                                47
*Section 7.11*        Succession by Merger, Etc                                                                      47
*Section 7.12*        Trustee's Application for Instructions from the Company                                        48

## ARTICLE 8
### CONCERNING THE HOLDERS

*Section 8.01*        Action by Holders                                                                              48

| | | |
|---|---|---|
| *Section 8.02* | Proof of Execution by Holders | 49 |
| *Section 8.03* | Who Are Deemed Absolute Owners | 49 |
| *Section 8.04* | Company-Owned Notes Disregarded | 49 |
| *Section 8.05* | Revocation of Consents; Future Holders Bound | 50 |

ARTICLE 9
HOLDERS' MEETINGS

| | | |
|---|---|---|
| *Section 9.01* | Purpose of Meetings | 50 |
| *Section 9.02* | Call of Meetings by Trustee | 50 |
| *Section 9.03* | Call of Meetings by Company or Holders | 51 |
| *Section 9.04* | Qualifications for Voting | 51 |
| *Section 9.05* | Regulations | 51 |
| *Section 9.06* | Voting | 52 |
| *Section 9.07* | No Delay of Rights by Meeting | 52 |

ARTICLE 10
SUPPLEMENTAL INDENTURES

| | | |
|---|---|---|
| *Section 10.01* | Supplemental Indentures Without Consent of Holders | 52 |
| *Section 10.02* | Supplemental Indentures with Consent of Holders | 53 |
| *Section 10.03* | Effect of Supplemental Indentures | 54 |
| *Section 10.04* | Notation on Notes | 55 |
| *Section 10.05* | Evidence of Compliance of Supplemental Indenture to Be Furnished to Trustee | 55 |

ARTICLE 11
CONSOLIDATION, MERGER, SALE, CONVEYANCE AND LEASE

| | | |
|---|---|---|
| *Section 11.01* | Company May Consolidate, Etc. on Certain Terms | 55 |
| *Section 11.02* | Successor Entity to Be Substituted | 56 |
| *Section 11.03* | Opinion of Counsel to Be Given to Trustee | 56 |

ARTICLE 12
IMMUNITY OF INCORPORATORS, STOCKHOLDERS, OFFICERS AND DIRECTORS

| | | |
|---|---|---|
| *Section 12.01* | Indenture and Notes Solely Corporate Obligations | 56 |

ARTICLE 13
CONVERSION OF NOTES

| | | |
|---|---|---|
| *Section 13.01* | Conversion Privilege | 57 |
| *Section 13.02* | Conversion Procedure; Settlement Upon Conversion | 60 |

| | | |
|---|---|---|
| Section 13.03 | Increased Conversion Rate Applicable to Certain Notes Surrendered in Connection with Make-Whole Fundamental Changes or a Redemption Notice | 65 |
| Section 13.04 | Adjustment of Conversion Rate | 67 |
| Section 13.05 | Adjustments of Prices | 77 |
| Section 13.06 | Shares to Be Fully Paid, Etc | 77 |
| Section 13.07 | Effect of Recapitalizations, Reclassifications and Changes of the Common Stock | 78 |
| Section 13.08 | Responsibility of Trustee | 79 |
| Section 13.09 | Stockholder Rights Plans | 80 |

## ARTICLE 14
### REPURCHASE OF NOTES AT OPTION OF HOLDERS

| | | |
|---|---|---|
| Section 14.01 | Repurchase at Option of Holders Upon a Fundamental Change | 80 |
| Section 14.02 | Withdrawal of Fundamental Change Repurchase Notice | 83 |
| Section 14.03 | Deposit of Fundamental Change Repurchase Price | 84 |
| Section 14.04 | Covenant to Comply with Applicable Laws Upon Repurchase of Notes | 85 |

## ARTICLE 15
### OPTIONAL REDEMPTION

| | | |
|---|---|---|
| Section 15.01 | Optional Redemption | 85 |
| Section 15.02 | Notice of Optional Redemption; Selection of Notes | 85 |
| Section 15.03 | Payment of Notes Called for Redemption | 87 |
| Section 15.04 | Restrictions on Redemption | 88 |

## ARTICLE 16
### MISCELLANEOUS PROVISIONS

| | | |
|---|---|---|
| Section 16.01 | Provisions Binding on Company's Successors | 88 |
| Section 16.02 | Official Acts by Successor Entity | 88 |
| Section 16.03 | Addresses for Notices, Etc | 88 |
| Section 16.04 | Governing Law; Jurisdiction | 89 |
| Section 16.05 | Evidence of Compliance with Conditions Precedent; Certificates and Opinions of Counsel to Trustee | 89 |
| Section 16.06 | Legal Holidays | 90 |
| Section 16.07 | No Security Interest Created | 90 |
| Section 16.08 | Benefits of Indenture | 90 |
| Section 16.09 | Table of Contents, Headings, Etc | 90 |
| Section 16.10 | Authenticating Agent | 90 |
| Section 16.11 | Execution in Counterparts | 91 |
| Section 16.12 | Severability | 91 |
| Section 16.13 | Waiver of Jury Trial | 91 |
| Section 16.14 | Force Majeure | 92 |

*Section 16.15*    Calculations                                                    92
*Section 16.16*    Applicable Law                                                  92
*Section 16.17*    Tax Matters                                                     92

**EXHIBIT**

Exhibit A    Form of Note                                                          A-1

INDENTURE dated as of December 6, 2024 between LIVE NATION ENTERTAINMENT, INC., a Delaware corporation, as issuer (the "**Company**," as more fully set forth in Section 1.01) and HSBC BANK USA, NATIONAL ASSOCIATION, a national banking association, as trustee (the "**Trustee**," as more fully set forth in Section 1.01).

WITNESSETH:

WHEREAS the Company has duly authorized the issuance of its 2.875% Convertible Senior Notes due 2030 (the "**Notes**"), initially in an aggregate principal amount not to exceed $1,100,000,000, and in order to provide the terms and conditions upon which the Notes are to be authenticated, issued and delivered, the Company has duly authorized the execution and delivery of this Indenture; and

WHEREAS, the Form of Note, the certificate of authentication to be borne by each Note, the Form of Notice of Conversion, the Form of Fundamental Change Repurchase Notice and the Form of Assignment and Transfer to be borne by the Notes are to be substantially in the forms hereinafter provided.

NOW, THEREFORE, THIS INDENTURE WITNESSETH:

That in order to declare the terms and conditions upon which the Notes are, and are to be, authenticated, issued and delivered, and in consideration of the premises and of the purchase and acceptance of the Notes by the Holders thereof, the Company covenants and agrees with the Trustee for the equal and proportionate benefit of the respective Holders from time to time of the Notes (except as otherwise provided below), as follows:

ARTICLE 1
DEFINITIONS

*Section 1.01    Definitions*. The terms defined in this Section 1.01 (except as herein otherwise expressly provided or unless the context otherwise requires) for all purposes of this Indenture and of any indenture supplemental hereto shall have the respective meanings specified in this Section 1.01. The words "herein," "hereof," "hereunder" and words of similar import refer to this Indenture as a whole and not to any particular Article, Section or other subdivision. The terms defined in this Article include the plural as well as the singular.

"**Additional Interest**" means all amounts, if any, payable pursuant to Section 4.06(d), Section 4.06(e) and Section 6.03, as applicable.

"**Additional Shares**" shall have the meaning specified in Section 13.03(a).

"**Affiliate**" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control," when used with respect to any specified Person means the power to direct or cause the direction of the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"**Applicable Law**" shall have the meaning specified in Section 16.16.

1

"**Bid Solicitation Agent**" means the Person appointed by the Company to solicit bids for the Trading Price of the Notes in accordance with Section 13.01(b)(i). The Company shall initially act as the Bid Solicitation Agent, although the Company may, from time to time, change the Bid Solicitation Agent.

"**Board of Directors**" means the board of directors of the Company or a committee of such board duly authorized to act for it hereunder.

"**Board Resolution**" means a copy of a resolution certified by the Secretary or an Assistant Secretary of the Company to have been duly adopted by the Board of Directors, and to be in full force and effect on the date of such certification, and delivered to the Trustee.

"**Business Combination Event**" shall have the meaning specified in Section 11.01.

"**Business Day**" means any day other than a Saturday or Sunday, that is neither a legal holiday nor a day on which commercial banks are authorized or required by law, regulation or executive order to close in The City of New York.

"**Capital Stock**" means, for any entity, any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated) stock issued by that entity.

"**Cash Settlement**" shall have the meaning specified in Section 13.02(a).

"**Clause A Distribution**" shall have the meaning specified in Section 13.04(c).

"**Clause B Distribution**" shall have the meaning specified in Section 13.04(c).

"**Clause C Distribution**" shall have the meaning specified in Section 13.04(c).

The term "**close of business**" means 5:00 p.m., New York City time.

"**Closing Price**" means, with respect to the Common Stock or any other security for which a Closing Price is to be determined, on any date, the closing sale price per share (or if no closing sale price is reported, the average of the bid and asked prices or, if more than one in either case, the average of the average bid and the average asked prices) on that date as reported for composite transactions by The New York Stock Exchange or, if the Common Stock or such other security, as the case may be, is not then listed on The New York Stock Exchange, as reported for composite transactions by the principal United States national or regional securities exchange on which the Common Stock or such other security is traded. The Closing Price will be determined without reference to after-hours or extended market trading. If the Common Stock or such other security is not listed for trading on a United States national or regional securities exchange on the relevant date, the "**Closing Price**" shall be the last quoted bid price for the Common Stock or such other security in the over-the-counter market on the relevant date as reported by OTC Markets Group Inc. or a similar organization. If the Common Stock or such other security is not so quoted, the "**Closing Price**" shall be the average of the mid-point of the last bid and asked prices for the Common Stock or such other security on the relevant date from each of at least three independent nationally recognized investment banking firms selected by the Company for this purpose. Any such determination shall be conclusive absent manifest error.

"**Combination Settlement**" shall have the meaning specified in Section 13.02(a).

"**Commission**" means the U.S. Securities and Exchange Commission.

"**Common Equity**" of any Person means Capital Stock of such Person that is generally entitled (a) to vote in the election of directors of such Person or (b) if such Person is not a corporation, to vote or otherwise participate in the selection of the governing body, partners, managers or others that will control the management or policies of such Person.

"**Common Stock**" means the common stock of the Company, par value $0.01 per share, at the date of this Indenture, subject to Section 13.07.

"**Company**" shall have the meaning specified in the first paragraph of this Indenture, and subject to the provisions of Article 11, shall include its successors and assigns.

"**Company Order**" means a written order of the Company, signed by (a) the Company's Chief Executive Officer, President, Executive or Senior Vice President or any Vice President (whether or not designated by a number or numbers or word or words added before or after the title "Vice President") and (b) any such other Officer designated in clause (a) of this definition or the Company's Treasurer or Assistant Treasurer or Secretary or any Assistant Secretary, and delivered to the Trustee.

"**Conversion Agent**" shall have the meaning specified in Section 4.02.

"**Conversion Date**" shall have the meaning specified in Section 13.02(c).

"**Conversion Obligation**" shall have the meaning specified in Section 13.01(a).

"**Conversion Price**" means as of any time, $1,000, *divided by* the Conversion Rate as of such time.

"**Conversion Rate**" shall have the meaning specified in Section 13.01(a). Whenever the Conversion Rate as of a particular date is referred to herein without setting forth a particular time on such date, such reference will be deemed to be to the Conversion Rate immediately after the close of business on such date.

"**Conversion Reference Period**" with respect to any Note surrendered for conversion means: (i) subject to clause (ii), if the relevant Conversion Date occurs prior to October 15, 2029, the 40 consecutive VWAP Trading Day period beginning on, and including, the third VWAP Trading Day immediately succeeding such Conversion Date; (ii) if the relevant Conversion Date occurs on or after the date of the Company's issuance of a Redemption Notice pursuant to Section 15.02 and on or prior to the second Business Day immediately preceding the relevant Redemption Date, the 40 consecutive VWAP Trading Days beginning on, and including, the 41st Scheduled Trading Day immediately preceding such Redemption Date; and (iii) subject to clause (ii), if the relevant Conversion Date occurs on or after October 15, 2029, the 40 consecutive VWAP Trading Days beginning on, and including, the 41st Scheduled Trading Day immediately preceding the Maturity Date.

"**Corporate Event**" shall have the meaning specified in Section 13.01(b)(iii).

3

"**Corporate Trust Office**" means the designated office of the Trustee at which at any time its corporate trust business shall be administered, which office at the date hereof is located at 452 5th Avenue, New York, NY 10018, Attention: CLTA Deal Management, or such other address as the Trustee may designate from time to time by notice to the Holders and the Company, or the principal corporate trust office of any successor trustee (or such other address as such successor trustee may designate from time to time by notice to the Holders and the Company).

"**Custodian**" means the Trustee, as custodian for The Depository Trust Company, with respect to the Global Notes, or any successor entity thereto.

"**Daily Conversion Value**" means, for each of the 40 consecutive VWAP Trading Days during the Conversion Reference Period, one-fortieth (1/40th) of the product of (a) the Conversion Rate on such VWAP Trading Day and (b) the Daily VWAP for such VWAP Trading Day.

"**Daily Measurement Value**" means the Specified Dollar Amount (if any), *divided by* 40.

"**Daily Settlement Amount**," for each of the 40 consecutive VWAP Trading Days during the Conversion Reference Period, shall consist of:

(a)    cash in an amount equal to the lesser of (i) the Daily Measurement Value and (ii) the Daily Conversion Value on such VWAP Trading Day; and

(b)    if such Daily Conversion Value on such VWAP Trading Day exceeds the Daily Measurement Value, a number of shares of Common Stock equal to (i) the difference between such Daily Conversion Value and the Daily Measurement Value, *divided by* (ii) the Daily VWAP for such VWAP Trading Day.

"**Daily VWAP**" means, for each of the 40 consecutive VWAP Trading Days during the relevant Conversion Reference Period, the per share volume-weighted average price as displayed under the heading "Bloomberg VWAP" on Bloomberg page "LYV <equity> AQR" (or its equivalent successor if such page is not available) in respect of the period from the scheduled open of trading until the scheduled close of trading of the primary trading session on such VWAP Trading Day (or if such volume-weighted average price is unavailable, the market value of one share of the Common Stock on such VWAP Trading Day determined, using a volume-weighted average method, by a nationally recognized independent investment banking firm retained for this purpose by the Company). The "**Daily VWAP**" shall be determined without regard to after-hours trading or any other trading outside of the regular trading session trading hours.

"**De-Legending Deadline Date**" means, with respect to any Note, the 15th day after the Free Trade Date of such Note; *provided*, *however*, that if such 15th day is after a Regular Record Date and on or before the next Interest Payment Date, then the De-Legending Deadline Date for such Note will instead be the Business Day immediately after such Interest Payment Date.

"**Default**" means any event that is, or after notice or passage of time, or both, would be, an Event of Default.

"**Default Settlement Method**" means, initially, Combination Settlement with a Specified Dollar Amount of $1,000 per $1,000 principal amount of Notes; *provided*, *however*, that the

4

Company may, from time to time, change the Default Settlement Method by sending notice of the new Default Settlement Method to the Holders, the Trustee and the Conversion Agent prior to October 15, 2029 as provided in the final paragraph of Section 13.02(a)(iii).

"**Defaulted Amounts**" means any amounts on any Note (including, without limitation, the Redemption Price, the Fundamental Change Repurchase Price, principal and interest) that are payable but are not punctually paid or duly provided for.

"**Deferred Additional Interest**" shall have the meaning specified in Section 4.06(h).

"**Deferred Additional Interest Demand Request**" shall have the meaning specified in Section 4.06(h).

"**Depositary**" means, with respect to each Global Note, the Person specified in Section 2.05(c) as the Depositary with respect to such Notes, until a successor shall have been appointed and become such pursuant to the applicable provisions of this Indenture, and thereafter, "**Depositary**" shall mean or include such successor.

"**Distributed Property**" shall have the meaning specified in Section 13.04(c).

"**Effective Date**" shall have the meaning specified in Section 13.03(c), except that, as used in Section 13.04 and Section 13.05, "**Effective Date**" means the first date on which shares of the Common Stock trade on the applicable exchange or in the applicable market, regular way, reflecting the relevant share split or share combination, as applicable.

"**Event of Default**" shall have the meaning specified in Section 6.01.

"**Ex-Dividend Date**" means the first date upon which a sale of the Common Stock does not automatically transfer the right to receive the relevant dividend or distribution from the seller of the Common Stock, regular way on the relevant exchange or in the relevant market for the Common Stock, to its buyer (in the form of due bills or otherwise). For the avoidance of doubt, any alternative trading convention on the applicable exchange or market in respect of the Common Stock under a separate ticker symbol or CUSIP number shall not be considered "regular way" for purposes of this definition.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, (and any successor statute) and the rules and regulations promulgated thereunder.

"**Exempted Fundamental Change**" means a Fundamental Change that satisfies each of the conditions set forth in Section 14.01(f) and with respect to which the Company validly invokes the provisions of such Section 14.01(f).

"**Expiration Date**" shall have the meaning specified in Section 13.04(e).

"**Form of Assignment and Transfer**" means the "Form of Assignment and Transfer" attached as Attachment 3 to the Form of Note attached hereto as Exhibit A.

"**Form of Fundamental Change Repurchase Notice**" means the "Form of Fundamental Change Repurchase Notice" attached as Attachment 2 to the Form of Note attached hereto as Exhibit A.

5

"**Form of Note**" means the "Form of Note" attached hereto as Exhibit A.

"**Form of Notice of Conversion**" means the "Form of Notice of Conversion" attached as Attachment 1 to the Form of Note attached hereto as Exhibit A.

"**Free Trade Date**" means, with respect to any Note, the date that is one year after the Last Original Issuance Date of such Note.

"**Freely Tradable**" means, with respect to any Note, that such Note would be eligible to be offered, sold or otherwise transferred pursuant to Rule 144 or otherwise if held by a Person that is not an Affiliate of the Company, and that has not been an Affiliate of the Company during the immediately preceding three months, without any requirements as to volume, manner of sale, availability of current public information or notice under the Securities Act (except that, during the six-month period beginning on, and including, the date that is six months after the Last Original Issuance Date of such Note, any such requirement as to the availability of current public information will be disregarded if the same is satisfied at that time); *provided*, *however*, that from and after the Free Trade Date of such Note, such Note will not be "Freely Tradable" unless such Note (x) is not identified by a "restricted" CUSIP or ISIN number; and (y) is not represented by any certificate that bears the Restricted Note Legend. For the avoidance of doubt, whether a Note is deemed to be identified by a "restricted" CUSIP or ISIN number or to bear the Restricted Note Legend is subject to Section 2.06.

"**Fundamental Change**" shall be deemed to have occurred if any of the following occurs:

(a)    except in connection with a transaction described in clause (b) below, a "person" or "group" within the meaning of Section 13(d) of the Exchange Act, other than the Company, its Wholly Owned Subsidiaries and the employee benefit plans of the Company and its Wholly Owned Subsidiaries, files a Schedule TO or any schedule, form or report under the Exchange Act disclosing that such person or group has become the direct or indirect "beneficial owner," as defined in Rule 13d-3 under the Exchange Act, of the Company's Common Stock representing more than 50% of the voting power of the Company's Common Stock;

(b)    the consummation of (i) any recapitalization, reclassification or change of the Common Stock (other than changes resulting from a subdivision or combination) as a result of which the Common Stock would be converted into, or exchanged for, stock, other securities, other property or assets; (ii) any share exchange, consolidation or merger of the Company pursuant to which the Common Stock will be converted into cash, securities or other property or assets; or (iii) any sale, lease or other transfer in one transaction or a series of transactions of all or substantially all of the consolidated assets of the Company and its Subsidiaries, taken as a whole, to any Person other than one of the Company's Wholly Owned Subsidiaries; *provided, however*, that a transaction described in clause (i) or (ii) in which the holders of the Company's Common Equity immediately prior to such transaction own, directly or indirectly, more than 50% of the voting power of all classes of Common Equity of the continuing or surviving corporation or transferee or the parent thereof immediately after such transaction, with such holders' proportional voting power immediately after such transaction being in substantially the same proportions as their respective voting power before such transaction, shall not be a Fundamental Change;

(c)    the stockholders of the Company approve any plan or proposal for the liquidation or dissolution of the Company; or

(d)    the Common Stock ceases to be listed or quoted on any of The New York Stock Exchange, The Nasdaq Global Select Market or The Nasdaq Global Market (or any of their respective successors);

*provided*, *however*, that a transaction or transactions described in clause (a) or (b) above shall not constitute a Fundamental Change, if at least 90% of the consideration received or to be received by the common stockholders of the Company, excluding cash payments for fractional shares and cash payments made pursuant to dissenters' appraisal rights, in connection with such transaction or transactions consists of shares of common stock that are listed or quoted on any of The New York Stock Exchange, The Nasdaq Global Select Market or The Nasdaq Global Market (or any of their respective successors) or will be so listed or quoted when issued or exchanged in connection with such transaction or transactions, and such transaction or transactions constitute a Share Exchange Event whose Reference Property is such consideration.

Solely for the purposes of this definition (but, for the avoidance of doubt, not for the "Make-Whole Fundamental Change" definition), any transaction or event described in both clause (a) and in clause (b)(i) or (ii) above (without regard to the proviso in clause (b)) will be deemed to occur solely pursuant to clause (b) above (subject to such proviso).

"**Fundamental Change Company Notice**" shall have the meaning specified in Section 14.01(c).

"**Fundamental Change Repurchase**" means any repurchase of Notes pursuant to Article 14.

"**Fundamental Change Repurchase Date**" shall have the meaning specified in Section 14.01(a).

"**Fundamental Change Repurchase Notice**" shall have the meaning specified in Section 14.01(b)(i).

"**Fundamental Change Repurchase Price**" shall have the meaning specified in Section 14.01(a).

"**Global Note**" shall have the meaning specified in Section 2.05(b).

"**Holder**," as applied to any Note, means any Person in whose name at the time a particular Note is registered on the Note Register.

"**Indenture**" means this instrument as originally executed or, if amended or supplemented as herein provided, as so amended or supplemented.

"**Initial Purchasers**" means Citigroup Global Markets Inc., J.P. Morgan Securities LLC, Goldman Sachs & Co. LLC, Morgan Stanley & Co. LLC, BofA Securities, Inc., HSBC Securities (USA) Inc., Mizuho Securities USA LLC, MUFG Securities Americas Inc., Scotia Capital (USA) Inc., Truist Securities, Inc., Wells Fargo Securities, LLC, Citizens JMP Securities, LLC, U.S. Bancorp Investments, Inc. and Allen & Company LLC.

"**Interest Payment Date**" means each January 15 and July 15 of each year, beginning on July 15, 2025 (or such other date as may be specified in the certificate representing the applicable Note).

"**Last Original Issuance Date**" means (a) with respect to any Notes issued pursuant to the Purchase Agreement, and any Notes issued in exchange therefor or in substitution thereof, the date of this Indenture; and (b) with respect to any Notes issued pursuant to Section 2.11, and any Notes issued in exchange therefor or in substitution thereof, either (i) the later of (x) the date such Notes are originally issued and (y) the last date any Notes are originally issued as part of the same offering pursuant to the exercise of an option granted to the initial purchaser(s) of such Notes to purchase additional Notes; or (ii) such other date as is specified in an Officer's Certificate delivered to the Trustee before the original issuance of such Notes.

"**Make-Whole Fundamental Change**" means any transaction or event that constitutes a Fundamental Change (as defined above and determined after giving effect to any exceptions to or exclusions from such definition, but without regard to the *proviso* in clause (b) of the definition thereof).

"**Market Disruption Event**" means (a) a failure by the primary U.S. national or regional securities exchange or market on which the Common Stock is listed or admitted for trading to open for trading during its regular trading session or (b) the occurrence or existence prior to 1:00 p.m., New York City time, on any Scheduled Trading Day for the Common Stock for more than one half-hour period in the aggregate during regular trading hours of any suspension or limitation imposed on trading (by reason of movements in price exceeding limits permitted by the relevant stock exchange or otherwise) in the Common Stock or in any options contracts or futures contracts relating to the Common Stock.

"**Maturity Date**" means January 15, 2030.

"**Measurement Period**" shall have the meaning specified in Section 13.01(b)(i).

"**Note**" or "**Notes**" shall have the meaning specified in the first paragraph of the recitals of this Indenture.

"**Note Register**" shall have the meaning specified in Section 2.05(a).

"**Note Registrar**" shall have the meaning specified in Section 2.05(a).

"**Notice of Conversion**" shall have the meaning specified in Section 13.02(b).

"**Notice of Default**" shall have the meaning specified in Section 6.01(g).

"**Notice of Election to Pay Deferred Additional Interest**" shall have the meaning specified in Section 4.06(h).

"**Offering Memorandum**" means the preliminary offering memorandum dated December 3, 2024, as supplemented by the related pricing term sheet dated December 3, 2024, relating to the offering and sale of the Notes.

8

"**Officer**" means, with respect to the Company, the President, the Chief Executive Officer, the Treasurer, the Assistant Treasurer, the Secretary, the Assistant Secretary, any Executive or Senior Vice President or any Vice President (whether or not designated by a number or numbers or word or words added before or after the title "Vice President").

"**Officer's Certificate**," when used with respect to the Company, means a certificate signed by an Officer and delivered to the Trustee. Each such certificate shall include the statements provided for in Section 16.05 if and to the extent required by the provisions of such Section. The Officer giving an Officer's Certificate pursuant to Section 4.08 shall be the principal executive, financial or accounting officer of the Company.

The term "**open of business**" means 9:00 a.m., New York City time.

"**Opinion of Counsel**" means an opinion in writing signed by legal counsel, who may be an employee of or counsel to the Company, or other counsel acceptable to the Trustee, that is delivered to the Trustee. Each such opinion shall include the statements provided for in Section 16.05 if and to the extent required by the provisions of such Section 16.05.

"**Optional Redemption**" shall have the meaning specified in Section 15.01.

"**outstanding**," when used with reference to Notes, shall, subject to the provisions of Section 8.04, mean, as of any particular time, all Notes authenticated and delivered by the Trustee under this Indenture, except:

(a)    Notes theretofore canceled by the Trustee or accepted by the Trustee for cancellation;

(b)    Notes, or portions thereof, that have become due and payable and in respect of which monies in the necessary amount shall have been deposited in trust with the Trustee or with any Paying Agent (other than the Company) or shall have been set aside and segregated in trust by the Company (if the Company shall act as its own Paying Agent);

(c)    Notes that have been paid pursuant to Section 2.07 or Notes in lieu of which, or in substitution for which, other Notes shall have been authenticated and delivered pursuant to the terms of Section 2.07 unless proof satisfactory to the Trustee is presented that any such Notes are held by protected purchasers in due course;

(d)    Notes converted pursuant to Article 13 and required to be cancelled pursuant to Section 2.09;

(e)    Notes repurchased by the Company pursuant to the penultimate sentence of Section 2.11; and

(f)    Notes redeemed pursuant to Article 15.

"**Partial Redemption Limitation**" shall have the meaning specified in Section 15.02(d).

"**Paying Agent**" shall have the meaning specified in Section 4.02.

9

"**Person**" means an individual, a corporation, a limited liability company, an association, a partnership, a joint venture, a joint stock company, a trust, an unincorporated organization or a government or an agency or a political subdivision thereof.

"**Physical Notes**" means permanent certificated Notes in registered form issued in denominations of $1,000 principal amount and integral multiples thereof.

"**Physical Settlement**" shall have the meaning specified in Section 13.02(a).

"**Predecessor Note**" of any particular Note means every previous Note evidencing all or a portion of the same debt as that evidenced by such particular Note; and, for the purposes of this definition, any Note authenticated and delivered under Section 2.07 in lieu of or in exchange for a mutilated, lost, destroyed or stolen Note shall be deemed to evidence the same debt as the mutilated, lost, destroyed or stolen Note that it replaces.

"**Purchase Agreement**" means that certain Purchase Agreement, dated as of December 3, 2024, among the Company and the Initial Purchasers.

"**Qualified Successor Entity**" means, with respect to a Business Combination Event, a corporation; *provided*, *however*, that a limited liability company, limited partnership or other similar entity will also constitute a Qualified Successor Entity with respect to such Business Combination Event if either (i) such Business Combination Event is an Exempted Fundamental Change; or (ii) both of the following conditions are satisfied: (1) either (x) such limited liability company, limited partnership or other similar entity, as applicable, is treated as a corporation or is a direct or indirect, Wholly Owned Subsidiary of, and disregarded as an entity separate from, a corporation, in each case for U.S. federal income tax purposes; or (y) (A) the Company has received an opinion of a nationally recognized tax counsel to the effect that such Business Combination Event will not be treated as an exchange under Section 1001 of the Internal Revenue Code of 1986, as amended, for Holders or beneficial owners of the Notes and (B) if such limited liability company, limited partnership or other similar entity is treated as a disregarded entity, its regarded parent is treated as a "United States person" under Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended; and (2) such Business Combination Event constitutes a Share Exchange Event whose Reference Property consists solely of any combination of cash in U.S. dollars and shares of common stock or other corporate common equity interests of an entity that is (x) treated as a corporation for U.S. federal income tax purposes; (y) duly organized and existing under the laws of the United States of America, any State thereof or the District of Columbia; and (z) a direct or indirect parent of the limited liability company, limited partnership or similar entity.

"**Record Date**" means, with respect to any dividend, distribution or other transaction or event in which the holders of Common Stock (or other applicable security) have the right to receive any cash, securities or other property or in which the Common Stock (or such other security) is exchanged for or converted into any combination of cash, securities or other property, the date fixed for determination of holders of the Common Stock (or such other security) entitled to receive such cash, securities or other property (whether such date is fixed by the Board of Directors, by statute, by contract or otherwise).

"**Redemption Date**" shall have the meaning specified in Section 15.02(a).

"**Redemption Notice**" shall have the meaning specified in Section 15.02(a).

10

"**Redemption Price**" means, for any Notes to be redeemed pursuant to Section 15.01, 100% of the principal amount of such Notes, *plus* accrued and unpaid interest on such Notes, if any, to, but excluding, the related Redemption Date (unless such Redemption Date falls after a Regular Record Date but on or prior to the immediately succeeding Interest Payment Date, in which case any unpaid interest accrued to the Interest Payment Date will be paid by the Company on or, at the Company's election, before such Interest Payment Date, to Holders of record of such Notes as of the close of business on such Regular Record Date, and the Redemption Price will be equal to 100% of the principal amount of such Notes to be redeemed).

"**Reference Property**" shall have the meaning specified in Section 13.07(a).

"**Reference Property Unit**" shall have the meaning specified in Section 13.07(a).

"**Regular Record Date**," with respect to any Interest Payment Date, means the January 1 or July 1 (whether or not such day is a Business Day) immediately preceding the applicable January 15 or July 15 Interest Payment Date, respectively.

"**Resale Restriction Termination Date**" shall have the meaning specified in Section 2.05(c).

"**Responsible Officer**" means, when used with respect to the Trustee, any officer within the corporate trust department of the Trustee, including any vice president, assistant vice president, assistant secretary, assistant treasurer, trust officer or any other officer of the Trustee who customarily performs functions similar to those performed by the Persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such person's knowledge of and familiarity with the particular subject and who shall have direct responsibility for the administration of this Indenture.

"**Restricted Note Legend**" shall have the meaning specified in Section 2.05(c).

"**Restricted Securities**" shall have the meaning specified in Section 2.05(c).

"**Rule 144**" means Rule 144 as promulgated under the Securities Act.

"**Rule 144A**" means Rule 144A as promulgated under the Securities Act.

"**Scheduled Trading Day**" means a day that is scheduled to be a Trading Day on the principal U.S. national or regional securities exchange on which the Common Stock is listed or admitted for trading or, if the Common Stock is not so listed or admitted for trading on any such exchange, "**Scheduled Trading Day**" means a Business Day.

"**Securities Act**" means the Securities Act of 1933, as amended, (and any successor statute) and the rules and regulations promulgated thereunder.

"**Settlement Amount**" shall have the meaning specified in Section 13.02(a)(iv).

"**Settlement Method**" means, with respect to any conversion of Notes, Physical Settlement, Cash Settlement or Combination Settlement, as elected (or deemed to have been elected) by the Company.

11

"**Settlement Notice**" shall have the meaning specified in Section 13.02(a)(iii).

"**Share Exchange Event**" shall have the meaning specified in Section 13.07(a).

"**Significant Subsidiary**" means a Subsidiary of the Company that would constitute a "significant subsidiary" within the meaning of Article 1, Rule 1-02 of Regulation S-X promulgated under the Securities Act as in effect on the date of this Indenture; *provided, however*, that if a Subsidiary meets the criteria of clause (1)(iii) of the definition of "significant subsidiary" in Rule 1-02(w) of Regulation S-X but not clause (1)(i) or (1)(ii) thereof, then such Subsidiary will be deemed not to be a Significant Subsidiary of that Person unless such Subsidiary's income from continuing operations before income taxes, exclusive of amounts attributable to any non-controlling interests, for the last completed fiscal year before the date of determination exceeds $150 million.

"**Specified Dollar Amount**" means the maximum cash amount per $1,000 principal amount of Notes to be received upon conversion (excluding cash in lieu of any fractional share) as specified in the Settlement Notice related to any converted Notes or as otherwise deemed to have been elected.

"**Spin-Off**" shall have the meaning specified in Section 13.04(c).

"**Stated Interest**" shall have the meaning specified in Section 2.03(a).

"**Stock Price**" shall have the meaning specified in Section 13.03(c).

"**Subsidiary**" means, with respect to any Person, any corporation, association, partnership or other business entity of which more than 50% of the total voting power of shares of Capital Stock or other interests (including partnership interests) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, general partners or trustees thereof is at the time owned or controlled, directly or indirectly, by (i) such Person; (ii) such Person and one or more Subsidiaries of such Person; or (iii) one or more Subsidiaries of such Person.

"**Successor Entity**" shall have the meaning specified in Section 11.01(a).

"**Trading Day**" means a day on which (i) trading in the Common Stock (or other security for which a closing sale price must be determined) generally occurs on The New York Stock Exchange or, if the Common Stock (or such other security) is not then listed on The New York Stock Exchange, on the principal other U.S. national or regional securities exchange on which the Common Stock (or such other security) is then listed or, if the Common Stock (or such other security) is not then listed on a U.S. national or regional securities exchange, on the principal other market on which the Common Stock (or such other security) is then traded and (ii) a Closing Price for the Common Stock (or such other security) is available on such securities exchange or market; *provided* that if the Common Stock (or such other security) is not so listed or traded, "**Trading Day**" means a Business Day.

"**Trading Price**" of the Notes on any date of determination means the average of the secondary market bid quotations per $1,000 principal amount of the Notes obtained by the Bid Solicitation Agent for $5,000,000 aggregate principal amount of the Notes at approximately 3:30 p.m., New York City time, on such determination date from three independent nationally

12

recognized securities dealers the Company selects; *provided* that (i) if three such bids cannot reasonably be obtained by the Bid Solicitation Agent, but two such bids are obtained, then the average of the two bids shall be used and (ii) if only one such bid can reasonably be obtained by the Bid Solicitation Agent, that one bid shall be used; *provided further* that if the Bid Solicitation Agent cannot reasonably obtain any such bids, then the Trading Price per $1,000 principal amount of Notes shall be deemed to be less than 98% of the product of the Closing Price of the Common Stock and the applicable Conversion Rate.

"**transfer**" shall have the meaning specified in Section 2.05(c).

"**Trigger Event**" shall have the meaning specified in Section 13.04(c).

"**Trust Indenture Act**" means the Trust Indenture Act of 1939, as amended, as it was in force at the date of execution of this Indenture; *provided*, *however*, that in the event the Trust Indenture Act of 1939 is amended after the date hereof, the term "Trust Indenture Act" shall mean, to the extent required by such amendment, the Trust Indenture Act of 1939, as so amended.

"**Trustee**" means the Person named as the "**Trustee**" in the first paragraph of this Indenture until a successor trustee shall have become such pursuant to the applicable provisions of this Indenture, and thereafter "**Trustee**" shall mean or include each Person who is then a Trustee hereunder.

"**Valuation Period**" shall have the meaning specified in Section 13.04(c).

"**VWAP Trading Day**" means a day on which (i) there is no Market Disruption Event and (ii) trading in the Common Stock generally occurs on The New York Stock Exchange or, if the Common Stock is not then listed on The New York Stock Exchange, on the principal other U.S. national or regional securities exchange on which the Common Stock is then listed or, if the Common Stock is not then listed on a U.S. national or regional securities exchange, on the principal other market on which the Common Stock is then listed or admitted for trading, except that if the Common Stock is not so listed or admitted for trading, "**VWAP Trading Day**" means a Business Day.

"**Wholly Owned Subsidiary**" means, with respect to any Person, any Subsidiary of such Person, except that, solely for purposes of this definition, the reference to "more than 50%" in the definition of "Subsidiary" shall be deemed replaced by a reference to "100%."

*Section 1.02       References to Interest*. Unless the context otherwise requires, any reference to interest on, or in respect of, any Note in this Indenture shall be deemed to include Additional Interest (including, if applicable, Deferred Additional Interest and interest on such Deferred Additional Interest) if, in such context, Additional Interest (including, if applicable, Deferred Additional Interest and interest on such Deferred Additional Interest) is, was or would be payable pursuant to any of Section 4.06(d), Section 4.06(e) or Section 6.03. Unless the context otherwise requires, any express mention of Additional Interest, Deferred Additional Interest and/or interest thereon in any provision hereof shall not be construed as excluding Additional Interest, Deferred Additional Interest and/or interest thereon in those provisions hereof where such express mention is not made.

## ARTICLE 2
### ISSUE, DESCRIPTION, EXECUTION, REGISTRATION AND EXCHANGE OF NOTES

Section 2.01    *Designation and Amount*. The Notes shall be designated as the "2.875% Convertible Senior Notes due 2030." The aggregate principal amount of Notes that may be authenticated and delivered under this Indenture is initially limited to $1,100,000,000, subject to Section 2.11 and except for Notes authenticated and delivered upon registration or transfer of, or in exchange for, or in lieu of other Notes to the extent expressly permitted hereunder.

Section 2.02    *Form of Notes*. The Notes and the Trustee's certificate of authentication to be borne by such Notes shall be substantially in the respective forms set forth in Exhibit A, the terms and provisions of which shall constitute, and are hereby expressly incorporated in and made a part of this Indenture. To the extent applicable, the Company and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby.

Any Global Note may be endorsed with or have incorporated in the text thereof such legends or recitals or changes not inconsistent with the provisions of this Indenture as may be required by the Custodian or the Depositary, or as may be required to comply with any applicable law or any regulation thereunder or with the rules and regulations of any securities exchange or automated quotation system upon which the Notes may be listed or traded or designated for issuance or to conform with any usage with respect thereto, or to indicate any special limitations or restrictions to which any particular Notes are subject.

Any of the Notes may have such letters, numbers or other marks of identification and such notations, legends or endorsements as the Officers executing the same may approve (execution thereof to be conclusive evidence of such approval) and as are not inconsistent with the provisions of this Indenture, or as may be required to comply with any law or with any rule or regulation made pursuant thereto or with any rule or regulation of any securities exchange or automated quotation system on which the Notes may be listed or designated for issuance, or to conform to usage or to indicate any special limitations or restrictions to which any particular Notes are subject.

Each Global Note shall represent such principal amount of the outstanding Notes as shall be specified therein and shall provide that it shall represent the aggregate principal amount of outstanding Notes from time to time endorsed thereon and that the aggregate principal amount of outstanding Notes represented thereby may from time to time be increased or reduced to reflect redemptions, repurchases, cancellations, conversions, transfers or exchanges permitted hereby. Any endorsement of a Global Note to reflect the amount of any increase or decrease in the amount of outstanding Notes represented thereby shall be made by the Trustee or the Custodian, at the direction of the Trustee, in such manner and upon instructions given by the Holder of such Notes in accordance with this Indenture. Payment of principal (including the Redemption Price and the Fundamental Change Repurchase Price, if applicable) of, and accrued and unpaid interest on, a Global Note shall be made to the Holder of such Note on the date of payment, unless a record date or other means of determining Holders eligible to receive payment is provided for herein.

Section 2.03    *Date and Denomination of Notes; Payments of Interest and Defaulted Amounts.*

(a)    The Notes shall be issuable in fully registered form without coupons in denominations of $1,000 principal amount and integral multiples thereof. Each Note shall be dated the date of its authentication. Each Note will accrue interest at a rate per annum equal to 2.875% (the "**Stated Interest**"), *plus* any interest in respect of any Defaulted Amounts or Additional Interest that may accrue pursuant to Section 2.03(c) or Section 4.06(d), Section 4.06(e)

14

and Section 6.03, respectively. Accrued interest on the Notes shall be computed on the basis of a 360-day year composed of twelve 30-day months (and for partial months, on the basis of the number of days actually elapsed in a 30-day month) and shall accrue from the first original issue date or from the most recent date to which interest is paid or duly provided for.

(b)    The Person in whose name any Note (or its Predecessor Note) is registered on the Note Register at the close of business on any Regular Record Date with respect to any Interest Payment Date shall be entitled to receive the interest payable on such Interest Payment Date. The principal amount of any Note (x) in the case of any Physical Note, shall be payable at the office or agency of the Company maintained by the Company for such purposes in the continental United States of America, which shall initially be the Corporate Trust Office and (y) in the case of any Global Note, shall be payable by wire transfer of immediately available funds to the account of the Depositary or its nominee. The Company shall pay interest (i) on any Physical Notes (A) to Holders holding Physical Notes having an aggregate principal amount of $5,000,000 or less, by check mailed to the Holders of these Notes at their address as it appears in the Note Register and (B) to Holders holding Physical Notes having an aggregate principal amount of more than $5,000,000, either by check mailed to each Holder or, upon application by such a Holder to the Note Registrar not later than the relevant Regular Record Date, by wire transfer in immediately available funds to that Holder's account within the United States, which application shall remain in effect until the Holder notifies, in writing, the Note Registrar to the contrary or (ii) on any Global Note by wire transfer of immediately available funds to the account of the Depositary or its nominee.

(c)    Any Defaulted Amounts shall forthwith cease to be payable to the Holder on the relevant payment date but shall accrue interest per annum at the rate borne by the Notes, subject to the enforceability thereof under applicable law, from, and including, such relevant payment date, and such Defaulted Amounts together with such interest thereon shall be paid by the Company, at its election in each case, as provided in clause (i) or (ii) below:

(i)    The Company may elect to make payment of any Defaulted Amounts to the Persons in whose names the Notes (or their respective Predecessor Notes) are registered at the close of business on a special record date for the payment of such Defaulted Amounts, which shall be fixed in the following manner. The Company shall notify the Trustee in writing of the amount of the Defaulted Amounts proposed to be paid on each Note and the date of the proposed payment (which shall be not less than 25 days after the receipt by the Trustee of such notice, unless the Trustee shall consent to an earlier date), and at the same time the Company shall deposit with the Trustee an amount of money equal to the aggregate amount to be paid in respect of such Defaulted Amounts or shall make arrangements satisfactory to the Trustee for such deposit on or prior to the date of the proposed payment, such money when deposited to be held in trust for the benefit of the Persons entitled to such Defaulted Amounts as in this clause provided. Thereupon the Company shall fix a special record date for the payment of such Defaulted Amounts which shall be not more than 15 days and not less than 10 days prior to the date of the proposed payment, and not less than 10 days after the receipt by the Trustee of the notice of the proposed payment. The Company shall promptly notify the Trustee in writing of such special record date and the Trustee, in the name and at the expense of the Company, shall cause notice of the proposed payment of such Defaulted Amounts and the special record date therefor to be sent to each Holder not less than 10 days prior to such special record date. Notice of the proposed payment of such Defaulted Amounts and the special record date therefor having been so mailed, such Defaulted Amounts shall be paid to the Persons in whose names the Notes (or their respective Predecessor Notes) are registered at the close of business on such special record date and shall no longer be payable pursuant to the following clause (ii) of this Section 2.03(c).

(ii)    The Company may make payment of any Defaulted Amounts in any other lawful manner not inconsistent with the requirements of any securities exchange or automated quotation system on which the Notes may be listed or designated for issuance, and upon such notice as may be required by such exchange or automated quotation

15

system, if, after notice given by the Company to the Trustee of the proposed payment pursuant to this clause, such manner of payment shall be deemed practicable by the Trustee.

*Section 2.04    Execution, Authentication and Delivery of Notes*. The Notes shall be signed in the name and on behalf of the Company by the manual or facsimile signature of an Officer.

At any time and from time to time after the execution and delivery of this Indenture, the Company may deliver Notes executed by the Company to the Trustee for authentication, together with a Company Order for the authentication and delivery of such Notes, and the Trustee in accordance with such Company Order shall authenticate and deliver such Notes, without any further action by the Company hereunder.

Only such Notes as shall bear thereon a certificate of authentication substantially in the form set forth on the Form of Note attached as Exhibit A hereto, executed manually by an authorized signatory of the Trustee (or an authenticating agent appointed by the Trustee as provided by Section 16.10), shall be entitled to the benefits of this Indenture or be valid or obligatory for any purpose. Such certificate by the Trustee (or such an authenticating agent) upon any Note executed by the Company shall be conclusive evidence that the Note so authenticated has been duly authenticated and delivered hereunder and that the Holder is entitled to the benefits of this Indenture.

In case any Officer of the Company who shall have signed any of the Notes shall cease to be such Officer before the Notes so signed shall have been authenticated and delivered by the Trustee, or disposed of by the Company, such Notes nevertheless may be authenticated and delivered or disposed of as though the person who signed such Notes had not ceased to be such Officer of the Company; and any Note may be signed on behalf of the Company by such persons as, at the actual date of the execution of such Note, shall be the Officers of the Company, although at the date of the execution of this Indenture any such person was not such an Officer.

*Section 2.05    Exchange and Registration of Transfer of Notes; Restrictions on Transfer; Depositary.*

(a)    The Company shall cause to be kept at the Corporate Trust Office a register (the register maintained in such office or in any other office or agency of the Company designated pursuant to Section 4.02, the "**Note Register**") in which, subject to such reasonable regulations as it may prescribe, the Company shall provide for the registration of Notes and of transfers of Notes. Such register shall be in written form or in any form capable of being converted into written form within a reasonable period of time. The Trustee is hereby initially appointed the "**Note Registrar**" for the purpose of registering Notes and transfers of Notes as herein provided. The Company may appoint one or more co-Note Registrars in accordance with Section 4.02.

Upon surrender for registration of transfer of any Note to the Note Registrar or any co-Note Registrar, and satisfaction of the requirements for such transfer set forth in this Section 2.05, the Company shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Notes of any authorized denominations and of a like aggregate principal amount and bearing such restrictive legends as may be required by this Indenture.

Notes may be exchanged for other Notes of any authorized denominations and of a like aggregate principal amount, upon surrender of the Notes to be exchanged at any such office or

16

agency maintained by the Company pursuant to Section 4.02. Whenever any Notes are so surrendered for exchange, the Company shall execute, and the Trustee shall authenticate and deliver, the Notes that the Holder making the exchange is entitled to receive, bearing registration numbers not contemporaneously outstanding.

All Notes presented or surrendered for registration of transfer or for exchange, repurchase or conversion shall (if so required by the Company, the Trustee, the Note Registrar or any co-Note Registrar) be duly endorsed, or be accompanied by a written instrument or instruments of transfer in form satisfactory to the Company and duly executed, by the Holder thereof or its attorney-in-fact duly authorized in writing.

No service charge shall be imposed by the Company, the Trustee, the Note Registrar, any co-Note Registrar or the Paying Agent for any exchange or registration of transfer of Notes, but the Company may require a Holder to pay a sum sufficient to cover any documentary, stamp or similar issue or transfer tax required in connection therewith as a result of the name of the Holder of new Notes issued upon such exchange or registration of transfer being different from the name of the Holder of the old Notes surrendered for exchange or registration of transfer.

None of the Company, the Trustee, the Note Registrar or any co-Note Registrar shall be required to exchange or register a transfer of (i) any Notes surrendered for conversion or, if a portion of any Note is surrendered for conversion, such portion thereof surrendered for conversion, (ii) any Notes, or a portion of any Note, surrendered for repurchase (and not withdrawn) in accordance with Article 14 or (iii) any Notes selected for redemption in accordance with Article 15, except the unredeemed portion of any Note being redeemed in part.

All Notes issued upon any registration of transfer or exchange of Notes in accordance with this Indenture shall be the valid obligations of the Company, evidencing the same debt, and entitled to the same benefits under this Indenture as the Notes surrendered upon such registration of transfer or exchange.

(b)    So long as the Notes are eligible for book-entry settlement with the Depositary, unless otherwise required by law, subject to the fourth paragraph from the end of Section 2.05(c) all Notes shall be represented by one or more Notes in global form (each, a "**Global Note**") registered in the name of the Depositary or the nominee of the Depositary. The transfer and exchange of beneficial interests in a Global Note that does not involve the issuance of a Physical Note shall be effected through the Depositary (but not the Trustee or the Custodian) in accordance with this Indenture (including the restrictions on transfer set forth herein) and the procedures of the Depositary therefor.

(c)    Subject to Section 2.06, every Note that bears or is required under this Section 2.05(c) to bear the legend set forth in this Section 2.05(c) (together with any Common Stock issued upon conversion of the Notes that is required to bear the legend set forth in Section 2.05(d), collectively, the "**Restricted Securities**") shall be subject to the restrictions on transfer set forth in this Section 2.05(c) (including the legend set forth below), unless such restrictions on transfer shall be eliminated or otherwise waived by written consent of the Company, and the Holder of each such Restricted Security, by such Holder's acceptance thereof, agrees to be bound by all such restrictions on transfer. As used in this Section 2.05(c) and Section 2.05(d), the term "**transfer**" encompasses any sale, pledge, transfer or other disposition whatsoever of any Restricted Security.

Subject to Section 2.06, until the date (the "**Resale Restriction Termination Date**") that is the later of (1) the date that is one year after the Last Original Issuance Date of the Notes, or

17

such shorter period of time as permitted by Rule 144 or any successor provision thereto, and (2) such later date, if any, as may be required by applicable law, any certificate evidencing such Note (and all securities issued in exchange therefor or substitution thereof, other than Common Stock, if any, issued upon conversion thereof, which shall bear the legend set forth in Section 2.05(d), if applicable) shall bear a legend (the "**Restricted Note Legend**") in substantially the following form (unless such Notes have been transferred pursuant to a registration statement that has become or been declared effective under the Securities Act and that continues to be effective at the time of such transfer, or sold pursuant to the exemption from registration provided by Rule 144 or any similar provision then in force under the Securities Act, or unless otherwise agreed by the Company in writing, with written notice thereof to the Trustee):

THIS SECURITY AND THE COMMON STOCK, IF ANY, ISSUABLE UPON CONVERSION OF THIS SECURITY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE " **SECURITIES ACT**"), AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE ACQUIRER:

(1)    REPRESENTS THAT IT AND ANY ACCOUNT FOR WHICH IT IS ACTING IS A "QUALIFIED INSTITUTIONAL BUYER" (WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT) AND THAT IT EXERCISES SOLE INVESTMENT DISCRETION WITH RESPECT TO EACH SUCH ACCOUNT, AND

(2)    AGREES FOR THE BENEFIT OF LIVE NATION ENTERTAINMENT, INC. (THE " **COMPANY**") THAT IT WILL NOT OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THIS SECURITY OR ANY BENEFICIAL INTEREST HEREIN PRIOR TO THE DATE THAT IS THE LATER OF (X) ONE YEAR AFTER THE LAST ORIGINAL ISSUE DATE HEREOF OR SUCH SHORTER PERIOD OF TIME AS PERMITTED BY RULE 144 UNDER THE SECURITIES ACT OR ANY SUCCESSOR PROVISION THERETO AND (Y) SUCH LATER DATE, IF ANY, AS MAY BE REQUIRED BY APPLICABLE LAW, EXCEPT:

(A)    TO THE COMPANY OR ANY SUBSIDIARY THEREOF, OR

(B)    PURSUANT TO A REGISTRATION STATEMENT THAT HAS BECOME EFFECTIVE UNDER THE SECURITIES ACT, OR

(C)    TO A PERSON REASONABLY BELIEVED TO BE A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, OR

(D)    PURSUANT TO AN EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT OR ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

PRIOR TO THE REGISTRATION OF ANY TRANSFER IN ACCORDANCE WITH CLAUSE (2)(D) ABOVE, THE COMPANY AND THE TRUSTEE RESERVE THE RIGHT TO REQUIRE THE DELIVERY OF SUCH LEGAL OPINIONS, CERTIFICATIONS OR OTHER EVIDENCE AS MAY REASONABLY BE REQUIRED IN ORDER TO DETERMINE THAT

18

THE PROPOSED TRANSFER IS BEING MADE IN COMPLIANCE WITH THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

No transfer of any Note prior to the Resale Restriction Termination Date will be registered by the Note Registrar unless the applicable box on the Form of Assignment and Transfer has been checked.

The Notes issued pursuant to the Purchase Agreement will initially be issued with a restricted CUSIP number.

Without limiting the generality of Section 2.06, any Note (or security issued in exchange or substitution therefor) (i) as to which such restrictions on transfer shall have expired in accordance with their terms, (ii) that has been transferred pursuant to a registration statement that has become effective or been declared effective under the Securities Act and that continues to be effective at the time of such transfer or (iii) that has been sold pursuant to the exemption from registration provided by Rule 144 or any similar provision then in force under the Securities Act, may, upon surrender of such Note for exchange to the Note Registrar in accordance with the provisions of this Section 2.05, be exchanged for a new Note or Notes, of like tenor and aggregate principal amount, which shall not bear the restrictive legend required by this Section 2.05(c) and shall not be assigned a restricted CUSIP number. The Company shall be entitled to instruct the Custodian in writing to so surrender any Global Note as to which any of the conditions set forth in clause (i) through (iii) of the immediately preceding sentence have been satisfied, and, upon such instruction, the Custodian shall so surrender such Global Note for exchange; and any new Global Note so exchanged therefor shall not bear the restrictive legend specified in this Section 2.05(c) and shall not be assigned a restricted CUSIP number.

Notwithstanding any other provisions of this Indenture (other than the provisions set forth in this Section 2.05(c)), a Global Note may not be transferred as a whole or in part except (i) by the Depositary to a nominee of the Depositary or by a nominee of the Depositary to the Depositary or another nominee of the Depositary or by the Depositary or any such nominee to a successor Depositary or a nominee of such successor Depositary and (ii) for exchange of a Global Note or a portion thereof for one or more Physical Notes in accordance with the second immediately succeeding paragraph.

The Depositary shall be a clearing agency registered under the Exchange Act. The Company initially appoints The Depository Trust Company to act as Depositary with respect to each Global Note. Initially, each Global Note shall be issued to the Depositary, registered in the name of Cede & Co., as the nominee of the Depositary, and deposited with the Trustee as Custodian.

If (i) the Depositary notifies the Company at any time that the Depositary is unwilling or unable to continue as depositary for the Global Notes and a successor depositary is not appointed within 90 days, (ii) the Depositary ceases to be registered as a clearing agency under the Exchange Act and a successor depositary is not appointed within 90 days, (iii) an Event of Default with respect to the Notes has occurred and is continuing and a beneficial owner of any Note requests that its beneficial interest therein be issued as a Physical Note or (iv) the Company and a beneficial owner of a Note agree, the Company shall execute, and the Trustee, upon receipt

19

of an Officer's Certificate and a Company Order for the authentication and delivery of Notes, shall authenticate and deliver (x) in the case of clause (iii) or (iv), a Physical Note to such beneficial owner in a principal amount equal to the principal amount of such Note corresponding to such beneficial owner's beneficial interest and (y) in the case of clause (i) or (ii), Physical Notes to each beneficial owner of the related Global Notes (or a portion thereof) in an aggregate principal amount equal to the aggregate principal amount of such Global Notes in exchange for such Global Notes, and upon delivery of the Global Notes to the Trustee such Global Notes shall be canceled.

Physical Notes issued in exchange for all or a part of the Global Note pursuant to this Section 2.05(c) shall be registered in such names and in such authorized denominations as the Depositary, pursuant to instructions from its direct or indirect participants or otherwise, or, in the case of clause (iii) or (iv) of the immediately preceding paragraph, the relevant beneficial owner, shall instruct the Trustee. Upon execution and authentication, the Trustee shall deliver such Physical Notes to the Persons in whose names such Physical Notes are so registered.

At such time as all interests in a Global Note have been converted, canceled, repurchased, redeemed or transferred, such Global Note shall be, upon receipt thereof, canceled by the Trustee in accordance with standing procedures and existing instructions between the Depositary and the Custodian. At any time prior to such cancellation, if any interest in a Global Note is exchanged for Physical Notes, converted, canceled, repurchased, redeemed or transferred to a transferee who receives Physical Notes therefor or any Physical Note is exchanged or transferred for part of such Global Note, the principal amount of such Global Note shall, in accordance with the standing procedures and instructions existing between the Depositary and the Custodian, be appropriately reduced or increased, as the case may be, and an endorsement shall be made on such Global Note, by the Trustee or the Custodian, at the direction of the Trustee, to reflect such reduction or increase.

None of the Company, the Trustee or any agent of the Company or the Trustee shall have any responsibility or liability for any aspect of the records relating to or payments made on account of beneficial ownership interests of a Global Note or maintaining, supervising or reviewing any records relating to such beneficial ownership interests. Neither the Trustee nor any agent shall have any responsibility or liability for any actions taken or not taken by the Depositary with respect to Global Notes.

(d)    Until the Resale Restriction Termination Date, any stock certificate representing Common Stock issued upon conversion of a Note shall bear a legend in substantially the following form (unless such Common Stock has been transferred pursuant to a registration statement that has become or been declared effective under the Securities Act and that continues to be effective at the time of such transfer, or pursuant to the exemption from registration provided by Rule 144 or any similar provision then in force under the Securities Act, or such Common Stock has been issued upon conversion of a Note that has transferred pursuant to a registration statement that has become or been declared effective under the Securities Act and that continues to be effective at the time of such transfer, or pursuant to the exemption from registration provided by Rule 144 or any similar provision then in force under the Securities Act, or unless otherwise agreed by the Company with written notice thereof to the Trustee and any transfer agent for the Common Stock):

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE " **SECURITIES ACT**"), AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH

20

THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE ACQUIRER:

(1)    REPRESENTS THAT IT AND ANY ACCOUNT FOR WHICH IT IS ACTING IS A "QUALIFIED INSTITUTIONAL BUYER" (WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT) AND THAT IT EXERCISES SOLE INVESTMENT DISCRETION WITH RESPECT TO EACH SUCH ACCOUNT, AND

(2)    AGREES FOR THE BENEFIT OF LIVE NATION ENTERTAINMENT, INC. (THE " **COMPANY**") THAT IT WILL NOT OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THIS SECURITY OR ANY BENEFICIAL INTEREST HEREIN PRIOR TO THE DATE THAT IS THE LATER OF (X) ONE YEAR AFTER THE LAST ORIGINAL ISSUE DATE OF THE SERIES OF NOTES UPON THE CONVERSION OF WHICH THIS SECURITY WAS ISSUED OR SUCH SHORTER PERIOD OF TIME AS PERMITTED BY RULE 144 UNDER THE SECURITIES ACT OR ANY SUCCESSOR PROVISION THERETO AND (Y) SUCH LATER DATE, IF ANY, AS MAY BE REQUIRED BY APPLICABLE LAW, EXCEPT:

(A)    TO THE COMPANY OR ANY SUBSIDIARY THEREOF, OR

(B)    PURSUANT TO A REGISTRATION STATEMENT THAT HAS BECOME EFFECTIVE UNDER THE SECURITIES ACT, OR

(C)    TO A PERSON REASONABLY BELIEVED TO BE A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, OR

(D)    PURSUANT TO AN EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT OR ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

PRIOR TO THE REGISTRATION OF ANY TRANSFER IN ACCORDANCE WITH CLAUSE (2)(D) ABOVE, THE COMPANY AND THE TRANSFER AGENT FOR THE COMPANY'S COMMON STOCK RESERVE THE RIGHT TO REQUIRE THE DELIVERY OF SUCH LEGAL OPINIONS, CERTIFICATIONS OR OTHER EVIDENCE AS MAY REASONABLY BE REQUIRED IN ORDER TO DETERMINE THAT THE PROPOSED TRANSFER IS BEING MADE IN COMPLIANCE WITH THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

Any such Common Stock (i) as to which such restrictions on transfer shall have expired in accordance with their terms, (ii) that has been transferred (or issued upon conversion of a Note that has been transferred) pursuant to a registration statement that has become or been declared effective under the Securities Act and that continues to be effective at the time of such transfer or (iii) that has been sold (or issued upon conversion of a Note that has been sold) pursuant to the exemption from registration provided by Rule 144 or any similar provision then in force under the Securities Act, may, upon surrender of the certificates representing such shares of Common Stock

21

for exchange in accordance with the procedures of the transfer agent for the Common Stock, be exchanged for a new certificate or certificates for a like aggregate number of shares of Common Stock, which shall not bear the restrictive legend required by this Section 2.05(d).

(e)    The Company shall use commercially reasonable efforts to prevent any of its controlled Affiliates from acquiring any Note (or any beneficial interest therein), unless any Notes acquired by any of them are promptly sent to the Trustee for cancellation. The Company shall cause any Note that is repurchased or owned by it to be surrendered to the Trustee for cancellation in accordance with Section 2.09.

(f)    The Trustee shall have no obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Indenture or under applicable law with respect to any transfer of any interest in any Note (including any transfers between or among Depositary participants or beneficial owners of interests in any Global Note) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by the terms of, this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

*Section 2.06    Removal of Transfer Restrictions.*  Without limiting the generality of any other provision of this Indenture (including Section 4.06(d) and Section 4.06(e)), the Restricted Note Legend affixed to any Note will be deemed, pursuant to this Section 2.06 and the footnote to such Restricted Note Legend, to be removed therefrom upon the Company's delivery to the Trustee of notice, signed on behalf of the Company by one of its Officers, to such effect (and, for the avoidance of doubt, such notice need not be accompanied by an Officer's Certificate or an Opinion of Counsel in order to be effective to cause such Restricted Note Legend to be deemed to be removed from such Note). If such Note bears a "restricted" CUSIP or ISIN number at the time of such delivery, then, upon such delivery, such Note will be deemed, pursuant to this Section 2.06 and the footnotes to the CUSIP and ISIN numbers set forth on the face of the certificate representing such Note, to thereafter bear the "unrestricted" CUSIP and ISIN numbers identified in such footnotes; *provided, however*, that if such Note is a Global Note and the Depositary thereof requires a mandatory exchange or other procedure to cause such Global Note to be identified by "unrestricted" CUSIP and ISIN numbers in the facilities of such Depositary, then (a) the Company shall effect such exchange or procedure as soon as reasonably practicable; and (b) for purposes of Section 4.06(e), such Global Note shall not be deemed to be identified by "unrestricted" CUSIP and ISIN numbers until such time as such exchange or procedure is effected.

*Section 2.07    Mutilated, Destroyed, Lost or Stolen Notes.*  In case any Note shall become mutilated or be destroyed, lost or stolen, the Company in its discretion may execute, and upon its written request the Trustee or an authenticating agent appointed by the Trustee shall authenticate and deliver, a new Note, bearing a registration number not contemporaneously outstanding, in exchange and substitution for the mutilated Note, or in lieu of and in substitution for the Note so destroyed, lost or stolen. In every case the applicant for a substituted Note shall furnish to the Company, to the Trustee and, if applicable, to such authenticating agent such security or indemnity as may be required by them to save each of them harmless from any loss, liability, cost or expense caused by or connected with such substitution, and, in every case of destruction, loss or theft, the applicant shall also furnish to the Company, to the Trustee and, if applicable, to such authenticating agent evidence to their satisfaction of the destruction, loss or theft of such Note and of the ownership thereof.

The Trustee or such authenticating agent may authenticate any such substituted Note and deliver the same upon the receipt of such security or indemnity as the Trustee, the Company and, if applicable, such authenticating agent may require. No service charge shall be imposed by the Company, the Trustee, the Note Registrar, any co-Note Registrar or the Paying Agent upon the issuance of any substitute Note, but the Company may require a Holder to pay a sum sufficient to

22

cover any documentary, stamp or similar issue or transfer tax required in connection therewith as a result of the name of the Holder of the new substitute Note being different from the name of the Holder of the old Note that became mutilated or was destroyed, lost or stolen. In case any Note that has matured or is about to mature or has been surrendered for required repurchase or for redemption or is about to be converted in accordance with Article 13 shall become mutilated or be destroyed, lost or stolen, the Company may, in its sole discretion, instead of issuing a substitute Note, pay or authorize the payment of or convert or authorize the conversion of the same (without surrender thereof except in the case of a mutilated Note), as the case may be, if the applicant for such payment or conversion shall furnish to the Company, to the Trustee and, if applicable, to such authenticating agent such security or indemnity as may be required by them to save each of them harmless for any loss, liability, cost or expense caused by or connected with such substitution, and, in every case of destruction, loss or theft, evidence satisfactory to the Company, the Trustee and, if applicable, any Paying Agent or Conversion Agent evidence of their satisfaction of the destruction, loss or theft of such Note and of the ownership thereof.

Every substitute Note issued pursuant to the provisions of this Section 2.07 by virtue of the fact that any Note is destroyed, lost or stolen shall constitute an additional contractual obligation of the Company, whether or not the destroyed, lost or stolen Note shall be found at any time, and shall be entitled to all the benefits of (but shall be subject to all the limitations set forth in) this Indenture equally and proportionately with any and all other Notes duly issued hereunder. To the extent permitted by law, all Notes shall be held and owned upon the express condition that the foregoing provisions are exclusive with respect to the replacement, redemption, payment, conversion or repurchase of mutilated, destroyed, lost or stolen Notes and shall preclude any and all other rights or remedies notwithstanding any law or statute existing or hereafter enacted to the contrary with respect to the replacement, redemption, payment, conversion or repurchase of negotiable instruments or other securities without their surrender.

Section 2.08    *Temporary Notes.* Pending the preparation of Physical Notes, the Company may execute and the Trustee or an authenticating agent appointed by the Trustee shall, upon written request of the Company, authenticate and deliver temporary Notes (printed or lithographed). Temporary Notes shall be issuable in any authorized denomination, and substantially in the form of the Physical Notes but with such omissions, insertions and variations as may be appropriate for temporary Notes, all as may be determined by the Company. Every such temporary Note shall be executed by the Company and authenticated by the Trustee or such authenticating agent upon the same conditions and in substantially the same manner, and with the same effect, as the Physical Notes. Without unreasonable delay, the Company shall execute and deliver to the Trustee or such authenticating agent Physical Notes (other than any Global Note) and thereupon any or all temporary Notes (other than any Global Note) may be surrendered in exchange therefor, at each office or agency maintained by the Company pursuant to Section 4.02 and the Trustee or such authenticating agent shall authenticate and deliver in exchange for such temporary Notes an equal aggregate principal amount of Physical Notes. Such exchange shall be made by the Company at its own expense and without any charge therefor. Until so exchanged, the temporary Notes shall in all respects be entitled to the same benefits and subject to the same limitations under this Indenture as Physical Notes authenticated and delivered hereunder.

Section 2.09    *Cancellation of Notes Paid, Converted, Etc*. The Company shall cause all Notes surrendered for the purpose of payment, repurchase, redemption, registration of transfer or exchange or conversion, if surrendered to any Person other than the Trustee (including any of the Company's agents, Subsidiaries or Affiliates), to be surrendered to the Trustee for cancellation. All Notes delivered to the Trustee shall be canceled promptly by it, and no Notes shall be authenticated in exchange thereof except as expressly permitted by any of the provisions of this Indenture. The Trustee shall dispose of canceled Notes in accordance with its customary

23

procedures and, after such disposition, shall deliver a certificate of such disposition to the Company, at the Company's written request in a Company Order.

*Section 2.10    CUSIP Numbers.* The Company in issuing the Notes may use "CUSIP" numbers (if then generally in use), and, if so, the Trustee shall use "CUSIP" numbers in all notices issued to Holders as a convenience to such Holders; *provided* that the Trustee shall have no liability for any defect in the "CUSIP" numbers as they appear on any Note, notice or elsewhere; provided further that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Notes or on such notice and that reliance may be placed only on the other identification numbers printed on the Notes. The Company shall promptly notify the Trustee in writing of any change in the "CUSIP" numbers.

*Section 2.11    Additional Notes; Repurchases.* The Company may, without the consent of the Holders and notwithstanding Section 2.01, reopen this Indenture and issue additional Notes hereunder with the same terms as the Notes initially issued hereunder (other than differences in the issue price and the date from which interest will accrue) in an unlimited aggregate principal amount; *provided* that if any such additional Notes are not fungible with the Notes initially issued hereunder for U.S. federal income tax purposes or securities law purposes, such additional Notes shall have a separate CUSIP number or have no CUSIP number. For the avoidance of doubt, notwithstanding any other provision of this Indenture to the contrary, for purposes of Section 4.06(d) and Section 4.06(e), in the event additional Notes are issued pursuant to this Section 2.11, references to the "Last Original Issuance Date" of the Notes with respect to such additional Notes shall refer only to such additional Notes. Prior to the issuance of any such additional Notes, the Company shall deliver to the Trustee a Company Order, an Officer's Certificate and an Opinion of Counsel, such Officer's Certificate and Opinion of Counsel to cover such matters, in addition to those required by Section 16.05, as the Trustee shall reasonably request. In addition, the Company may, to the extent permitted by law, and directly or indirectly (regardless of whether such Notes are surrendered to the Company), repurchase Notes in the open market or otherwise, whether by the Company or its Subsidiaries or through a private or public tender or exchange offer or through counterparties to private agreements, including by cash-settled swaps or other derivatives. The Company shall cause any Notes so repurchased (other than Notes repurchased pursuant to cash-settled swaps or other cash-settled derivatives) to be surrendered to the Trustee for cancellation in accordance with Section 2.09.

ARTICLE 3

SATISFACTION AND DISCHARGE

*Section 3.01    Satisfaction and Discharge.* This Indenture shall upon request of the Company contained in an Officer's Certificate cease to be of further effect, and the Trustee, at the expense of the Company, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture, when (a) (i) all Notes theretofore authenticated and delivered (other than Notes which have been destroyed, lost or stolen and which have been replaced, paid or converted as provided in Section 2.07) have been delivered to the Note Registrar for cancellation; or (ii) the Company has deposited with the Trustee or delivered to Holders, as applicable, after the Notes have become due and payable, whether on the Maturity Date, any Redemption Date, any Fundamental Change Repurchase Date, upon conversion or otherwise, cash or cash and/or shares of Common Stock or, if applicable, other Reference Property (in respect of conversions) sufficient in the opinion of a nationally recognized bank, appraisal firm or firm of independent public accountants to pay all of the outstanding Notes and all other sums due and payable under this Indenture by the Company; and (b) the Company has delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that all conditions precedent herein provided for relating to the satisfaction and discharge of this Indenture have been complied with; provided that such counsel may rely, as to matters of fact, on a certificate or certificates of the Company's Officers. Notwithstanding the satisfaction and discharge of this Indenture, the obligations of the Company to the Trustee under Section 7.06 shall survive.

24

ARTICLE 4

PARTICULAR COVENANTS OF THE COMPANY

*Section 4.01    Payment of Principal and Interest.*  The Company covenants and agrees that it will cause to be paid the principal (including the Redemption Price or Fundamental Change Repurchase Price, if applicable) of, and accrued and unpaid interest on, each of the Notes at the places, at the respective times and in the manner provided herein and in the Notes.

*Section 4.02    Maintenance of Office or Agency*.  The Company will maintain in the continental United States an office or agency where the Notes may be surrendered for registration of transfer or exchange or for presentation for payment or repurchase ("**Paying Agent**") or for conversion ("**Conversion Agent**") and where notices and demands to or upon the Company in respect of the Notes and this Indenture may be served. The Company will give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency. If at any time the Company shall fail to maintain any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office or the office or agency of the Trustee in the continental United States.

The Company may also from time to time designate as co-Note Registrars one or more other offices or agencies where the Notes may be presented or surrendered for any or all such purposes and may from time to time rescind such designations; *provided* that no such designation or rescission shall in any manner relieve the Company of its obligation to maintain an office or agency in the continental United States for such purposes. The Company will give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency. The terms "**Paying Agent**" and "**Conversion Agent**" include any such additional or other offices or agencies, as applicable.

The Company hereby initially designates the Trustee as the Paying Agent, Note Registrar, Custodian and Conversion Agent and the Corporate Trust Office as the office or agency in the continental United States where Notes may be surrendered for registration of transfer or exchange or for presentation for payment, redemption or repurchase or for conversion and where notices and demands to or upon the Company in respect of the Notes and this Indenture may be served.

*Section 4.03    Appointments to Fill Vacancies in Trustee's Office*  . The Company, whenever necessary to avoid or fill a vacancy in the office of Trustee, will appoint, in the manner provided in Section 7.09, a Trustee, so that there shall at all times be a Trustee hereunder.

*Section 4.04    Provisions as to Paying Agent.*

(a)    If the Company shall appoint a Paying Agent other than the Trustee, the Company will cause such Paying Agent to execute and deliver to the Trustee an instrument in which such agent shall agree with the Trustee, subject to the provisions of this Section 4.04:

(i) that it will hold all sums held by it as such agent for the payment of the principal (including the Redemption Price and the Fundamental Change Repurchase Price, if applicable) of, and accrued and unpaid interest on, the Notes in trust for the benefit of the Holders of the Notes;

(ii) that it will give the Trustee prompt notice of any failure by the Company to make any payment of the principal (including the Redemption Price and the Fundamental Change Repurchase Price, if applicable) of, and accrued and unpaid interest on, the Notes when the same shall be due and payable; and

25

(iii) that at any time during the continuance of an Event of Default, upon request of the Trustee, it will forthwith pay to the Trustee all sums so held in trust.

The Company shall, on or before each due date of the principal (including the Redemption Price and the Fundamental Change Repurchase Price, if applicable) of, or accrued and unpaid interest on, the Notes, deposit with the Paying Agent a sum sufficient to pay such principal (including the Redemption Price and the Fundamental Change Repurchase Price, if applicable) or accrued and unpaid interest, and (unless such Paying Agent is the Trustee) the Company will promptly notify the Trustee in writing of any failure to take such action; *provided* that if such deposit is made on the due date, such deposit must be received by the Paying Agent by 11:00 a.m., New York City time, on such date.

(b)    If the Company shall act as its own Paying Agent, it will, on or before each due date of the principal (including the Redemption Price and the Fundamental Change Repurchase Price, if applicable) of, and accrued and unpaid interest on, the Notes, set aside, segregate and hold in trust for the benefit of the Holders of the Notes a sum sufficient to pay such principal (including the Redemption Price and the Fundamental Change Repurchase Price, if applicable) and accrued and unpaid interest so becoming due and will promptly notify the Trustee in writing of any failure to take such action and of any failure by the Company to make any payment of the principal (including the Redemption Price and the Fundamental Change Repurchase Price, if applicable) of, or accrued and unpaid interest on, the Notes when the same shall become due and payable.

(c)    Anything in this Section 4.04 to the contrary notwithstanding, the Company may, at any time, for the purpose of obtaining a satisfaction and discharge of this Indenture, or for any other reason, pay, cause to be paid or deliver to the Trustee all sums or amounts held in trust by the Company or any Paying Agent hereunder as required by this Section 4.04, such sums or amounts to be held by the Trustee upon the trusts herein contained and upon such payment or delivery by the Company or any Paying Agent to the Trustee, the Company or such Paying Agent shall be released from all further liability but only with respect to such sums or amounts.

(d)    Any money and shares of Common Stock deposited with the Trustee or any Paying Agent, or then held by the Company, in trust for the payment of the principal (including the Redemption Price and the Fundamental Change Repurchase Price, if applicable) of, accrued and unpaid interest on and the consideration due upon conversion of any Note and remaining unclaimed for two years after such principal (including the Redemption Price and the Fundamental Change Repurchase Price, if applicable), interest or consideration due upon conversion has become due and payable shall be paid to the Company on request of the Company contained in an Officer's Certificate, or (if then held by the Company) shall be discharged from such trust; and the Holder of such Note shall thereafter, as an unsecured general creditor, look only to the Company for payment thereof, and all liability of the Trustee or such Paying Agent with respect to such trust money and shares of Common Stock, and all liability of the Company as trustee thereof, shall thereupon cease; *provided*, *however*, that each of the Trustee and Paying Agent shall withhold paying such money or securities back to the Company until, at the Company's expense, they publish (in no event later than five days after the Company requests repayment) in a newspaper of general circulation in The City of New York, or mail or send to each registered Holder, a notice stating that such money or securities shall be paid back to the Company if unclaimed after a date no less than 30 days from the date of such publication or notification.

Section 4.05    *Existence.* Subject to Article 11, the Company shall do or cause to be done all things necessary to preserve and keep in full force and effect its corporate existence.

Section 4.06    *Rule 144A Information Requirement and Annual Reports; Additional Interest.*

26

(a)    At any time the Company is not subject to Section 13 or 15(d) of the Exchange Act, the Company shall, so long as any of the Notes or any shares of Common Stock issuable upon conversion thereof shall, at such time, constitute "restricted securities" within the meaning of Rule 144(a)(3) under the Securities Act (assuming such securities have not been owned by an Affiliate of the Company), promptly provide to the Trustee and any Holder or beneficial owner of such Notes or any shares of Common Stock issuable upon conversion of such Notes and, upon written request, any securities analyst or prospective investors in such Notes or such shares of Common Stock, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act.

(b)    The Company shall file with the Trustee, within 15 days after the same are required to be filed with the Commission, copies of any documents or reports that the Company is required to file with the Commission pursuant to Section 13 or 15(d) of the Exchange Act (giving effect to any grace period provided by Rule 12b-25 under the Exchange Act). Any such document or report that the Company files with the Commission via the Commission's EDGAR system shall be deemed to be filed with the Trustee for purposes of this Section 4.06(b) at the time such documents are filed via the EDGAR system; *provided* that the Trustee shall have no obligation to determine whether such documents or reports have been filed via the EDGAR system.

(c)    Delivery of the reports and documents described in subsection (b) above to the Trustee is for informational purposes only, and the Trustee's receipt of such shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any of its covenants hereunder (as to which the Trustee is entitled to conclusively rely on an Officer's Certificate).

(d)    If, at any time during the six-month period beginning on, and including, the date that is six months after the Last Original Issuance Date of any Note, the Company fails to timely file any document or report that it is required to file with the Commission pursuant to Section 13 or 15(d) of the Exchange Act, as applicable (after giving effect to all applicable grace periods thereunder and other than reports on Form 8-K), or such Note is not otherwise Freely Tradable by Holders other than the Company's Affiliates or Holders that were the Company's Affiliates at any time during the three months preceding (as a result of restrictions pursuant to U.S. securities laws or the terms of this Indenture or the Notes), the Company shall pay Additional Interest on such Note. Except as described below, Additional Interest shall accrue on such Note at the rate of 0.50% per annum of the principal amount of such Note outstanding for each day during such period for which the Company's failure to file has occurred and is continuing or such Note is not otherwise Freely Tradable by Holders other than the Company's Affiliates (or Holders that were the Company's Affiliates at any time during the three months preceding) without restrictions pursuant to U.S. securities laws or the terms of this Indenture or the Notes. For purposes of this Section 4.06(d) (and, for the avoidance of doubt, not for purposes of Section 4.06(e)), the existence of a customary legend on any certificate representing the Notes referring to transfer restrictions under the Securities Act (including the Restricted Note Legend) will not be deemed to cause the Notes not to be "Freely Tradable" as provided above. As used in this Section 4.06(d), documents or reports that the Company is required to "file" with the Commission pursuant to Section 13 or 15(d) of the Exchange Act do not include documents or reports that the Company furnishes to the Commission pursuant to Section 13 or 15(d) of the Exchange Act.

(e)    If, and for so long as, the Restricted Note Legend has not been removed (including pursuant to Section 2.06), any Note is assigned a restricted CUSIP or any Note is not otherwise Freely Tradable by Holders other than the Company's Affiliates or Holders that were the Company's Affiliates at any time during the three months preceding (without restrictions pursuant to U.S. securities laws or the terms of this Indenture or the Notes) as of the De-Legending Deadline Date for such Note, the Company shall pay Additional Interest on such Note at a rate equal to 0.50% per annum of the principal amount of such Note outstanding until the Restricted Note Legend has been removed in accordance with Section 2.05(c) or Section 2.06, such Note is assigned an unrestricted CUSIP and such Note is Freely Tradable by Holders other than the Company's Affiliates (or Holders that were the Company's Affiliates at any time during

27

the three months preceding) without restrictions pursuant to U.S. securities laws or the terms of this Indenture or the Notes.

(f)    Additional Interest will be payable in arrears on each Interest Payment Date following accrual in the same manner as regular interest on the Notes.

(g)    In no event shall any Additional Interest that may accrue pursuant to Section 4.06(d) or Section 4.06(e), together with any interest that may accrue in the event the Company elects to pay Additional Interest in respect of an Event of Default relating to its failure to comply with its obligations as set forth under Section 6.03 (excluding any interest that accrues on any Deferred Additional Interest pursuant to Section 4.06(h)), accrue at a rate in excess of 0.50% per annum, regardless of the number of events or circumstances giving rise to the requirement to pay such Additional Interest.

(h)    Notwithstanding anything to the contrary in this Section 4.06, but subject to Section 4.06(j), Additional Interest that accrues on any Note for any period on or after the De-Legending Deadline Date of such Note will not be payable on any Interest Payment Date occurring on or after such De-Legending Deadline Date unless (1) a Holder (or an owner of a beneficial interest in a Global Note) has delivered to the Company and the Trustee, before the Regular Record Date immediately before such Interest Payment Date, a written notice (a "**Deferred Additional Interest Demand Request**") demanding payment of Additional Interest; or (2) the Company, in its sole and absolute discretion, elects, by sending notice of such election (a "**Notice of Election to Pay Deferred Additional Interest**") to Holders (with a copy to the Trustee) before such Regular Record Date, to pay such Additional Interest on such Interest Payment Date (any accrued and unpaid Additional Interest that, in accordance with this sentence, is not paid on such Interest Payment Date, "**Deferred Additional Interest**"). Without further action by the Company or any other Person, interest will accrue on such Deferred Additional Interest from, and including, such Interest Payment Date at a rate per annum equal to the rate per annum at which Stated Interest accrues on the Notes to, but excluding, the date on which such Deferred Additional Interest, together with accrued interest thereon, is paid. Once any accrued and unpaid Additional Interest becomes payable on an Interest Payment Date (whether as a result of the delivery of a written notice pursuant to clause (1) above or, if earlier, the Company's election to pay the same pursuant to clause (2) above), Additional Interest will thereafter not be subject to deferral pursuant to this Section 4.06(h).

(i)    Each reference in this Indenture or the Notes to any accrued interest (including in the definitions of the Redemption Price and the Fundamental Change Repurchase Price for any Note) or to any accrued Additional Interest includes, to the extent applicable, and without duplication, any Deferred Additional Interest, together with accrued and unpaid interest thereon. For the avoidance of doubt, the failure to pay any accrued and unpaid Additional Interest on an Interest Payment Date will not constitute a Default or an Event of Default under this Indenture or the Notes if such payment is deferred in accordance with Section 4.06(h). Otherwise, such a failure to pay will be subject to Section 6.01(b).

(j)    Notwithstanding anything to the contrary in this Indenture or the Notes, if (1) any unpaid Deferred Additional Interest exists on any Notes as of the close of business on the Regular Record Date immediately preceding the Maturity Date; (2) no Holder (or owner of a beneficial interest in a Global Note) has delivered a Deferred Additional Interest Demand Request in the manner set forth in Section 4.06(h) before such Regular Record Date; and (3) the Company has not sent a Notice of Election to Pay Deferred Additional Interest in the manner set forth in Section 4.06(h) before such Regular Record Date, then Deferred Additional Interest on each Note then outstanding will cease to accrue, and all Deferred Additional Interest, together with interest thereon, on such Note will be deemed to be extinguished on the following date: (a) if such Note is to be converted, the Conversion Date for such conversion (it being understood, for the avoidance of doubt, that the consideration due upon conversion of such Note therefor need not include, and the amount referred to in the fifth sentence of Section 13.02(h) need not include, the payment of any such Deferred Additional Interest or any interest thereon); and (b) in all other cases, the later of (x) the Maturity Date; and (y) the first date on which the Company has repaid the principal of,

28

and accrued and unpaid interest (other than such Deferred Additional Interest and any interest thereon) on, such Note in full.

(k)    If Additional Interest is payable by the Company pursuant to Section 4.06(d) or Section 4.06(e), the Company shall deliver to the Trustee an Officer's Certificate to that effect stating (i) the amount of such Additional Interest that is payable and (ii) the date on which such Additional Interest is payable, except that no such notice is required in respect of any Additional Interest that is deferred in accordance with Section 4.06(h). Unless and until a Responsible Officer of the Trustee receives at the Corporate Trust Office such a certificate, the Trustee may assume without inquiry that no such Additional Interest is payable. If the Company has paid Additional Interest directly to the Persons entitled to it, the Company shall deliver to the Trustee an Officer's Certificate setting forth the particulars of such payment. The Trustee shall not at any time be under any duty or responsibility to any Holder to determine the Additional Interest, or with respect to the nature, extent, or calculation of the amount of Additional Interest owed, or with respect to the method employed in such calculation of the Additional Interest.

(l)    Notwithstanding anything to the contrary in this Section 4.06, the Company shall not be required to pay Additional Interest pursuant to Section 4.06(d) or Section 4.06(e) (i) on any date on which (w) the Company shall have filed a shelf registration statement for the resale of the Notes and any shares of Common Stock issuable upon conversion of the Notes, (x) such shelf registration statement is effective and usable by Holders identified therein as selling security holders for the resale of the Notes and any shares of Common Stock issued upon conversion of the Notes, (y) the Holders may register the resale of their Notes under such shelf registration statement on terms customary for the resale of convertible securities offered in reliance on Rule 144A and (z) the Notes and/or shares of Common Stock sold pursuant to such shelf registration statement become Freely Tradable as a result of such sale or (ii) once the Company shall have complied with the requirements set forth in clause (i) above for a period of one year.

*Section 4.07    Stay, Extension and Usury Laws.*  The Company covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law or other law that would prohibit or forgive the Company from paying all or any portion of the principal of or interest on the Notes as contemplated herein, wherever enacted, now or at any time hereafter in force, or that may affect the covenants or the performance of this Indenture; and the Company (to the extent it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

*Section 4.08    Compliance Certificate; Statements as to Defaults.*  The Company shall deliver to the Trustee within 120 days after the end of each fiscal year of the Company (beginning with the fiscal year ending on December 31, 2024) an Officer's Certificate stating whether the signers thereof have knowledge of any failure by the Company to comply with all conditions and covenants then required to be performed under this Indenture and, if so, specifying each such failure and the nature thereof.

In addition, the Company shall deliver to the Trustee, as soon as possible, and in any event within 30 days after the occurrence of any Event of Default or Default, an Officer's Certificate setting forth the details of such Event of Default or Default, its status and the action that the Company is taking or proposing to take in respect thereof.

*Section 4.09    Further Instruments and Acts*. Upon request of the Trustee, the Company will execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purposes of this Indenture.

29

ARTICLE 5

LISTS OF HOLDERS AND REPORTS BY THE COMPANY AND THE TRUSTEE

*Section 5.01    Lists of Holders.*  At any time the Trustee is not acting as Note Registrar, the Company shall furnish or cause to be furnished to the Trustee, semi-annually, not more than 15 days after each January 1 and July 1 in each year beginning with July 1, 2025, and at such other times as the Trustee may request in writing, within 30 days after receipt by the Company of any such request (or such lesser time as the Trustee may reasonably request in order to enable it to timely provide any notice to be provided by it hereunder), a list in such form as the Trustee may reasonably require of the names and addresses of the Holders as of a date not more than 15 days (or such other date as the Trustee may reasonably request in order to so provide any such notices) prior to the time such information is furnished.

*Section 5.02    Preservation and Disclosure of Lists.*  The Trustee shall preserve, in as current a form as is reasonably practicable, all information as to the names and addresses of the Holders contained in the most recent list furnished to it as provided in Section 5.01 or maintained by the Trustee in its capacity as Note Registrar, if so acting. The Trustee may destroy any list furnished to it as provided in Section 5.01 upon receipt of a new list so furnished.

ARTICLE 6

DEFAULTS AND REMEDIES

*Section 6.01    Events of Default*. Each of the following events shall be an "**Event of Default**" with respect to the Notes:

(a)    default in the payment of principal of any Note when due on the Maturity Date, upon Optional Redemption, upon Fundamental Change Repurchase or otherwise;

(b)    default in the payment of any interest on any Note when due and payable, and such default continues for a period of 30 days past the applicable due date;

(c)    failure by the Company to issue a Fundamental Change Company Notice in accordance with Section 14.01(c) or notice of a Make-Whole Fundamental Change or a Share Exchange Event in accordance with Section 13.01(b)(iii), as required by this Indenture;

(d)    failure by the Company to comply with its obligations under Article 11;

(e)    following the exercise by the Holder of the right to convert a Note in accordance with Article 13 hereof, failure by the Company to deliver the applicable Conversion Obligation when due and such failure continues for a period of five Business Days or more;

(f)    default by the Company in its obligation to repurchase any Note, or any portion thereof, surrendered for repurchase pursuant to and in accordance with Article 14;

(g)    failure by the Company to perform or observe any other covenant or agreement in the Notes or this Indenture and such failure continues for 60 days after receipt by the Company of written notice from the Trustee to the Company or from the Holders of at least 25% in principal amount of the Notes then outstanding to the Trustee and the Company (such written notice with respect to any default, a "**Notice of Default**");

(h)    failure to pay when due at maturity (which failure continues after any applicable grace or notice period), or a default that results in the acceleration of any indebtedness for borrowed money of the Company or any Subsidiary of the Company (other than indebtedness that is non-recourse to the Company or any Subsidiary of the Company) in an aggregate amount of $150 million (or its foreign currency equivalent) or more, unless the acceleration is rescinded, stayed or annulled within 30 days after receipt by the Company of a Notice of Default;

30

(i)    one or more judgments for the payment of money in an aggregate amount in excess of $150 million (or its foreign currency equivalent) (to the extent not covered by independent third-party insurance as to which the insurer does not dispute coverage) shall be rendered against the Company or any of its Significant Subsidiaries and the same shall remain unpaid or undischarged for a period of 60 consecutive days during which execution shall not be effectively stayed;

(j)    commencement by the Company or any Significant Subsidiary of the Company of a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to the Company or any such Significant Subsidiary or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of the Company or any such Significant Subsidiary or any substantial part of its property, or consent, by the Company or any of its Significant Subsidiaries, to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or the making, by the Company or any of its Significant Subsidiaries, of a general assignment for the benefit of creditors, or failure, by the Company or any of its Significant Subsidiaries, generally to pay its debts as they become due; or

(k)    commencement of an involuntary case or other proceeding against the Company or any Significant Subsidiary of the Company seeking liquidation, reorganization or other relief with respect to the Company or such Significant Subsidiary or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of the Company or such Significant Subsidiary or any substantial part of its property, and such involuntary case or other proceeding shall remain undismissed and unstayed for a period of 30 consecutive days.

The foregoing shall constitute Events of Default whatever the reason for any such Event of Default and whether it is voluntary or involuntary or is effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body.

*Section 6.02    Acceleration; Rescission and Annulment.* If one or more Events of Default shall have occurred and be continuing, then, and in each and every such case (other than an Event of Default specified in Section 6.01(j) or Section 6.01(k) with respect to the Company), unless the principal of all of the Notes shall have already become due and payable, either the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes then outstanding determined in accordance with Section 8.04, by notice in writing to the Company (and to the Trustee if given by Holders), may declare 100% of the principal of, and accrued and unpaid interest on, all the Notes then outstanding to be immediately due and payable, and upon any such declaration the same shall become and shall automatically be immediately due and payable. If an Event of Default specified in Section 6.01(j) or Section 6.01(k) with respect to the Company occurs and is continuing, 100% of the principal of, and accrued and unpaid interest, if any, on, all Notes shall become and shall automatically be immediately due and payable.

The immediately preceding paragraph, however, is subject to the conditions that if, at any time after the principal of the Notes shall have been so declared due and payable, and before any judgment or decree for the payment of the monies due shall have been obtained or entered as hereinafter provided, the Company shall pay or shall deposit with the Trustee a sum sufficient to pay installments of accrued and unpaid interest upon all Notes and the principal of any and all Notes that shall have become due otherwise than by acceleration (with interest on overdue installments of accrued and unpaid interest to the extent that payment of such interest is enforceable under applicable law, and on such principal at the rate borne by the Notes at such time) and amounts due to the Trustee pursuant to Section 7.06, and if (1) rescission would not conflict with any judgment or decree of a court of competent jurisdiction and (2) any and all

31

existing Events of Default under this Indenture, other than the nonpayment of the principal of and accrued and unpaid interest, if any, on Notes that shall have become due solely by such acceleration, shall have been cured or waived pursuant to Section 6.09, then and in every such case (except as provided in the immediately succeeding sentence) the Holders of a majority in aggregate principal amount of the Notes then outstanding, by written notice to the Company and to the Trustee, may waive all Defaults or Events of Default with respect to the Notes and rescind and annul such declaration and its consequences and such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of this Indenture; but no such waiver or rescission and annulment shall extend to or shall affect any subsequent Default or Event of Default, or shall impair any right consequent thereon. Notwithstanding anything to the contrary herein, no such waiver or rescission and annulment shall extend to or shall affect any Default or Event of Default resulting from (i) the nonpayment of the principal (including the Redemption Price and the Fundamental Change Repurchase Price, if applicable) of, or accrued and unpaid interest on, any Notes, (ii) a failure to repurchase or redeem any Notes when required, (iii) a failure to pay or deliver, as the case may be, the consideration due upon conversion of the Notes or (iv) a default in respect of a covenant or provision hereof which under Article 10 cannot be modified or amended without the consent of each Holder of an outstanding Note affected.

Section 6.03    *Additional Interest.*

(a)    Notwithstanding anything in this Indenture or in the Notes to the contrary (but subject to Section 6.03(b)), to the extent the Company elects, the sole remedy for an Event of Default relating to the Company's failure to comply with its obligations as set forth in Section 4.06(b) shall after the occurrence of such an Event of Default consist exclusively of the right to receive Additional Interest on the Notes at a rate equal to 0.50% per annum of the principal amount of the Notes outstanding for each day on which such Event of Default is continuing during the 365-day period beginning on, and including, the date on which such an Event of Default first occurs to, but not including, the 365th day thereafter. Additional Interest payable pursuant to this Section 6.03 shall be payable in the same manner as Additional Interest payable pursuant to Section 4.06(d) and Section 4.06(e). On the 365th day after such Event of Default (if the Event of Default relating to the Company's failure to file is not cured or waived prior to such 365th day), such Additional Interest shall cease to accrue and the Notes shall be immediately subject to acceleration as provided in Section 6.02. The provisions of this paragraph will not affect the rights of Holders of Notes in the event of the occurrence of any Event of Default other than the Company's failure to comply with its obligations as set forth in Section 4.06(b). In the event the Company does not elect to pay Additional Interest following an Event of Default in accordance with this Section 6.03 or the Company elected to make such payment but does not pay the Additional Interest when due, the Notes shall be immediately subject to acceleration as provided in Section 6.02.

In order to elect to pay Additional Interest as the sole remedy during the first 365 days after the occurrence of any Event of Default described in the immediately preceding paragraph, the Company must notify all Holders of the Notes and, in writing, the Trustee and the Paying Agent, of such election prior to the beginning of such 365-day period. Upon the failure to timely give such notice, the Notes shall be immediately subject to acceleration as provided in Section 6.02.

(b)    Section 6.03(a) shall cease to be applicable (other than the requirement to pay any Additional Interest theretofore accrued pursuant to such Section) in the event and as of the date that the facts giving rise to the Event of Default under Section 4.06(b) shall also give rise to a default under, and result in the acceleration of, other indebtedness for borrowed money of the Company or its Subsidiaries (other than indebtedness that is non-recourse to the Company or any

32

of its Subsidiaries), in which case the Event of Default under Section 4.06(b) shall then be subject to the remedies otherwise applicable to Events of Default as provided in this Indenture (including acceleration pursuant to Section 6.02).

(c)    In no event shall any Additional Interest (excluding any interest that accrues on any Deferred Additional Interest pursuant to Section 4.06(h)) that may accrue in the event the Company elects to pay Additional Interest in respect of an Event of Default relating to its failure to comply with its obligations under Section 4.06(b) as set forth in this Section 6.03, together with any interest that may accrue pursuant to Section 4.06(d) or Section 4.06(e) accrue at a rate in excess of 0.50% per annum, regardless of the number of events or circumstances giving rise to the requirement to pay such Additional Interest.

Section 6.04    *Payments of Notes on Default; Suit Therefor.*  If an Event of Default described in clause (a) or (b) of Section 6.01 shall have occurred, the Company shall, upon demand of the Trustee, pay to the Trustee, for the benefit of the Holders of the Notes, the whole amount then due and payable on the Notes for principal and interest, if any, with interest on any overdue principal and interest, if any, at the rate borne by the Notes at such time, and, in addition thereto, such further amount as shall be sufficient to cover any amounts due to the Trustee under Section 7.06. If the Company shall fail to pay such amounts forthwith upon such demand, the Trustee, in its own name and as trustee of an express trust, may institute a judicial proceeding for the collection of the sums so due and unpaid, may prosecute such proceeding to judgment or final decree and may enforce the same against the Company or any other obligor upon the Notes and collect the moneys adjudged or decreed to be payable in the manner provided by law out of the property of the Company or any other obligor upon the Notes, wherever situated.

In the event there shall be pending proceedings for the bankruptcy or for the reorganization of the Company or any other obligor on the Notes under Title 11 of the United States Code, or any other applicable law, or in case a receiver, assignee or trustee in bankruptcy or reorganization, liquidator, sequestrator or similar official shall have been appointed for or taken possession of the Company or such other obligor, the property of the Company or such other obligor, or in the event of any other judicial proceedings relative to the Company or such other obligor upon the Notes, or to the creditors or property of the Company or such other obligor, the Trustee, irrespective of whether the principal of the Notes shall then be due and payable as therein expressed or by declaration or otherwise and irrespective of whether the Trustee shall have made any demand pursuant to the provisions of this Section 6.04, shall be entitled and empowered, by intervention in such proceedings or otherwise, to file and prove a claim or claims for the whole amount of principal and accrued and unpaid interest, if any, in respect of the Notes, and, in case of any judicial proceedings, to file such proofs of claim and other papers or documents and to take such other actions as it may deem necessary or advisable in order to have the claims of the Trustee (including any claim for the compensation, expenses, disbursements and advances of the Trustee, its agents and counsel) and of the Holders allowed in such judicial proceedings relative to the Company or any other obligor on the Notes, its or their creditors, or its or their property, and to collect and receive any monies or other property payable or deliverable on any such claims, and to distribute the same after the deduction of any amounts due to the Trustee under Section 7.06; and any receiver, assignee or trustee in bankruptcy or reorganization, liquidator, custodian or similar official is hereby authorized by each of the Holders to make such payments to the Trustee, as administrative expenses, and, in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due it for compensation, expenses, advances and disbursements, including agents and counsel fees, and including any other amounts due to the Trustee under Section 7.06, incurred by it up to the date of such distribution. To the extent that such payment of compensation, expenses, advances and disbursements out of the estate in any such proceedings shall be denied for any reason, payment of the same shall be secured by a lien on, and shall be paid out of, any and all distributions,

33

dividends, monies, securities and other property that the Holders of the Notes may be entitled to receive in such proceedings, whether in liquidation or under any plan of reorganization or arrangement or otherwise.

Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting such Holder or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

All rights of action and of asserting claims under this Indenture, or under any of the Notes, may be enforced by the Trustee without the possession of any of the Notes, or the production thereof at any trial or other proceeding relative thereto, and any such suit or proceeding instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment shall, after provision for the payment of the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, be for the ratable benefit of the Holders of the Notes.

In any proceedings brought by the Trustee (and in any proceedings involving the interpretation of any provision of this Indenture to which the Trustee shall be a party) the Trustee shall be held to represent all the Holders of the Notes, and it shall not be necessary to make any Holders of the Notes parties to any such proceedings.

In case the Trustee shall have proceeded to enforce any right under this Indenture and such proceedings shall have been discontinued or abandoned because of any waiver pursuant to Section 6.09 or any rescission and annulment pursuant to Section 6.02 or for any other reason or shall have been determined adversely to the Trustee, then and in every such case the Company, the Holders and the Trustee shall, subject to any determination in such proceeding, be restored respectively to their several positions and rights hereunder, and all rights, remedies and powers of the Company, the Holders and the Trustee shall continue as though no such proceeding had been instituted.

*Section 6.05    Application of Monies Collected by Trustee.* Any monies collected by the Trustee pursuant to this Article 6 with respect to the Notes shall be applied in the following order, at the date or dates fixed by the Trustee for the distribution of such monies, upon presentation of the several Notes, and, with respect to any Physical Notes, stamping thereon the payment, if only partially paid, and upon surrender thereof, if fully paid:

**First**, to the payment of all amounts due the Trustee (including any other role or capacities in which the Trustee acts with respect to the Notes) under Section 7.06;

**Second**, in case the principal of the outstanding Notes shall not have become due and be unpaid, to the payment of interest on, and any cash due upon conversion of, the Notes in default in the order of the date due of the payments of such interest and cash due upon conversion, as the case may be, with interest (to the extent that such interest has been collected by the Trustee) upon such overdue payments at the rate borne by the Notes at such time, such payments to be made ratably to the Persons entitled thereto;

**Third**, in case the principal of the outstanding Notes shall have become due, by declaration or otherwise, and be unpaid to the payment of the whole amount (including, if applicable, the payment of the Redemption Price, the Fundamental Change Repurchase Price and

34

any cash due upon conversion) then owing and unpaid upon the Notes for principal and interest, if any, with interest on the overdue principal and, to the extent that such interest has been collected by the Trustee, upon overdue installments of interest at the rate borne by the Notes at such time, and in case such monies shall be insufficient to pay in full the whole amounts so due and unpaid upon the Notes, then to the payment of such principal (including, if applicable, the Redemption Price, the Fundamental Change Repurchase Price and the cash due upon conversion) and interest without preference or priority of principal over interest, or of interest over principal or of any installment of interest over any other installment of interest, or of any Note over any other Note, ratably to the aggregate of such principal (including, if applicable, the Redemption Price, the Fundamental Change Repurchase Price and any cash due upon conversion) and accrued and unpaid interest; and

**Fourth**, to the payment of the remainder, if any, to the Company.

*Section 6.06    Proceedings by Holders.* Except to enforce the right to receive payment of principal (including, if applicable, the Redemption Price and the Fundamental Change Repurchase Price) or interest when due, or the right to receive payment or delivery of the consideration due upon conversion, no Holder of any Note shall have any right by virtue of or by availing of any provision of this Indenture to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Indenture, or for the appointment of a receiver, trustee, liquidator, custodian or other similar official, or for any other remedy hereunder, unless:

(a)    such Holder previously shall have given to the Trustee written notice of an Event of Default and of the continuance thereof, as herein provided;

(b)    Holders of at least 25% in aggregate principal amount of the Notes then outstanding shall have made written request upon the Trustee to institute such action, suit or proceeding in its own name as Trustee hereunder;

(c)    such Holders shall have offered to the Trustee such security or indemnity satisfactory to it against all costs, liability or expenses to be incurred therein or thereby;

(d)    the Trustee for 60 days after its receipt of such notice, request and offer of such security or indemnity, shall have neglected or refused to institute any such action, suit or proceeding; and

(e)    no direction that, in the opinion of the Trustee, is inconsistent with such written request shall have been given to the Trustee by the Holders of a majority of the aggregate principal amount of the Notes then outstanding within such 60-day period pursuant to Section 6.09,

it being understood and intended, and being expressly covenanted by the taker and Holder of every Note with every other taker and Holder and the Trustee that no one or more Holders shall have any right in any manner whatsoever by virtue of or by availing of any provision of this Indenture to affect, disturb or prejudice the rights of any other Holder (it being understood that the Trustee does not have an affirmative duty to ascertain whether or not such actions or forbearances are unduly prejudicial to such Holders), or to obtain or seek to obtain priority over or preference to any other such Holder, or to enforce any right under this Indenture, except in the manner herein provided and for the equal, ratable and common benefit of all Holders (except as otherwise provided herein). For the protection and enforcement of this Section 6.06, each and every Holder and the Trustee shall be entitled to such relief as can be given either at law or in equity.

35

Notwithstanding any other provision of this Indenture and any provision of any Note, the right of any Holder to receive payment or delivery, as the case may be, of (x) the principal (including the Redemption Price and the Fundamental Change Repurchase Price, if applicable) of, (y) accrued and unpaid interest, if any, on, and (z) the consideration due upon conversion of, such Note, on or after the respective due dates expressed or provided for in such Note or in this Indenture, or to institute suit for the enforcement of any such payment or delivery, as the case may be, on or after such respective dates against the Company shall not be impaired or affected without the consent of such Holder.

Section 6.07    *Proceedings by Trustee*. In case of an Event of Default, the Trustee may in its discretion proceed to protect and enforce the rights vested in it by this Indenture by such appropriate judicial proceedings as are necessary to protect and enforce any of such rights, either by suit in equity or by action at law or by proceeding in bankruptcy or otherwise, whether for the specific enforcement of any covenant or agreement contained in this Indenture or in aid of the exercise of any power granted in this Indenture, or to enforce any other legal or equitable right vested in the Trustee by this Indenture or by law.

Section 6.08    *Remedies Cumulative and Continuing*. Except as provided in the last paragraph of Section 2.07, all powers and remedies given by this Article 6 to the Trustee or to the Holders shall, to the extent permitted by law, be deemed cumulative and not exclusive of any thereof or of any other powers and remedies available to the Trustee or the Holders of the Notes, by judicial proceedings or otherwise, to enforce the performance or observance of the covenants and agreements contained in this Indenture, and no delay or omission of the Trustee or of any Holder of any of the Notes to exercise any right or power accruing upon any Default or Event of Default shall impair any such right or power, or shall be construed to be a waiver of any such Default or Event of Default or any acquiescence therein; and, subject to the provisions of Section 6.06, every power and remedy given by this Article 6 or by law to the Trustee or to the Holders may be exercised from time to time, and as often as shall be deemed expedient, by the Trustee or by the Holders. The Trustee may maintain a proceeding even if it does not possess any Notes or does not produce any Notes in the proceeding.

Section 6.09    *Direction of Proceedings and Waiver of Defaults by Majority of Holders*. The Holders of a majority of the aggregate principal amount of the Notes at the time outstanding determined in accordance with Section 8.04 shall have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee with respect to the Notes; *provided, however*, that (a) such direction shall not be in conflict with any rule of law or with this Indenture, and (b) the Trustee may take any other action deemed proper by the Trustee that is not inconsistent with such direction. The Trustee may refuse to follow any direction that it determines is unduly prejudicial to the rights of any other Holder or that would involve the Trustee in personal liability. The Holders of a majority in aggregate principal amount of the Notes at the time outstanding determined in accordance with Section 8.04 may on behalf of the Holders of all of the Notes waive any past Default or Event of Default hereunder and its consequences except (i) a default in the payment of accrued and unpaid interest, if any, on, or the principal (including any Redemption Price and any Fundamental Change Repurchase Price) of, the Notes when due that has not been cured pursuant to the provisions of Section 6.01, (ii) a failure by the Company to pay or deliver, as the case may be, the consideration due upon conversion of the Notes or (iii) a default in respect of a covenant or provision hereof which under Article 10 cannot be modified or amended without the consent of each Holder of an outstanding Note affected. Upon any such waiver the Company, the Trustee and the Holders of the Notes shall be restored to their former positions and rights hereunder; but no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereon. Whenever any Default or Event of Default hereunder shall have been waived as permitted by this Section 6.09, said Default or Event of Default shall for all purposes of the Notes and this Indenture be deemed to have been cured and to be not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereon.

36

*Section 6.10    Notice of Defaults*. The Trustee shall, (i) within 90 days after the occurrence and continuance of a Default of which a Responsible Officer has actual knowledge or (ii) if such Default is not actually known by a Responsible Officer at such time, promptly (but in any event within ten (10) Business Days) after a Responsible Officer obtains actual knowledge, send to all Holders as the names and addresses of such Holders appear upon the Note Register, notice of all Defaults known to a Responsible Officer, unless such Defaults shall have been cured or waived before the giving of such notice; *provided* that, except in the case of a Default in the payment of the principal of (including the Redemption Price and the Fundamental Change Repurchase Price, if applicable), or accrued and unpaid interest on, any of the Notes or a Default in the payment or delivery of the consideration due upon conversion, the Trustee shall be protected in withholding such notice if and so long as it in good faith determines that the withholding of such notice is in the interests of the Holders. The Trustee will not be deemed to have notice or be charged with knowledge of any Default unless written notice thereof has been received by a Responsible Officer, and such notice references the Notes and this Indenture and states on its face that a Default has occurred.

*Section 6.11    Undertaking to Pay Costs*. All parties to this Indenture agree, and each Holder of any Note by its acceptance thereof shall be deemed to have agreed, that any court may, in its discretion, require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees and expenses, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; *provided* that the provisions of this Section 6.11 (to the extent permitted by law) shall not apply to any suit instituted by the Trustee, to any suit instituted by any Holder, or group of Holders, holding in the aggregate more than 10% in principal amount of the Notes at the time outstanding determined in accordance with Section 8.04, or to any suit instituted by any Holder for the enforcement of the payment of the principal of or accrued and unpaid interest, if any, on any Note (including, but not limited to, the Redemption Price and the Fundamental Change Repurchase Price, if applicable) on or after the due date expressed or provided for in such Note or to any suit for the enforcement of the right to convert any Note, or receive the consideration due upon conversion, in accordance with the provisions of Article 13.

ARTICLE 7<br>CONCERNING THE TRUSTEE

*Section 7.01    Duties and Responsibilities of Trustee*. The Trustee, prior to the occurrence of an Event of Default and after the curing or waiver of all Events of Default that may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this Indenture. In the event an Event of Default has occurred and is continuing, the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs; *provided* that if an Event of Default occurs and is continuing, the Trustee will be under no obligation to exercise any of the rights or powers under this Indenture at the request or direction of any of the Holders unless such Holders have offered and, if requested, provided to the Trustee indemnity or security satisfactory to it against any costs, liability or expense that might be incurred by it in compliance with such request or direction.

No provision of this Indenture shall be construed to relieve the Trustee from liability for its own grossly negligent action, its own grossly negligent failure to act or its own willful misconduct, except that:

(a)    prior to the occurrence of an Event of Default and after the curing or waiving of all Events of Default that may have occurred:

37

(i)    the duties and obligations of the Trustee shall be determined solely by the express provisions of this Indenture, and the Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Indenture and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(ii)    in the absence of bad faith and willful misconduct on the part of the Trustee, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; but, in the case of any such certificates or opinions that by any provisions hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of any mathematical calculations or other facts stated therein);

(b)    the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer or Officers of the Trustee, unless it shall be proved, as determined by a court of competent jurisdiction by a final and non-appealable judgment, that the Trustee was grossly negligent in ascertaining the pertinent facts;

(c)    the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Holders of not less than a majority of the aggregate principal amount of the Notes at the time outstanding determined as provided in Section 8.04 relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture;

(d)    whether or not therein provided, every provision of this Indenture relating to the conduct or affecting the liability of, or affording protection to, the Trustee shall be subject to the provisions of this Section;

(e)    the Trustee shall not be liable in respect of any payment (as to the correctness of amount, entitlement to receive or any other matters relating to payment) or notice effected by the Company or any Paying Agent or any records maintained by any co-Note Registrar with respect to the Notes;

(f)    if any party fails to deliver a notice relating to an event the fact of which, pursuant to this Indenture, requires notice to be sent to the Trustee, the Trustee may conclusively rely on its failure to receive such notice as reason to act as if no such event occurred, unless a Responsible Officer of the Trustee had actual knowledge of such event;

(g)    in the absence of specific written investment direction from the Company, all cash received by the Trustee shall be placed in a non-interest bearing trust account, and in no event shall the Trustee be liable for the selection of investments or for investment losses or other costs, fees or expenses incurred in connection therewith or for losses incurred as a result of the liquidation of any such investment prior to its maturity date or the failure of the party directing such investments prior to its maturity date or the failure of the party directing such investment to provide timely written investment direction, and the Trustee shall have no obligation to invest or reinvest any amounts held hereunder in the absence of such specific written investment direction from the Company (but it is understood and agreed that the Trustee or its Affiliates are permitted to receive additional compensation or fees (that could be deemed to be in the Trustee's economic self-interest) associated with any investments hereunder);

(h)    in the event that the Trustee is also acting as Custodian, Note Registrar, Paying Agent, Conversion Agent, Bid Solicitation Agent or transfer agent hereunder, the rights and protections afforded to the Trustee pursuant to this Article 7, including, without limitation, its

38

right to be indemnified, shall also be afforded to such Custodian, Note Registrar, Paying Agent, Conversion Agent, Bid Solicitation Agent or transfer agent; and

(i)    any of the Trustee, its officers, directors, employees and affiliates may become the owner of, or acquire any interest in, any Notes with the same rights that they would have if the Trustee were not appointed hereunder, and may engage or be interested in any financial or other transaction with the Company and may act on, or as depositary, trustee or Trustee for, any committee or body of holders of Notes or in connection with any other obligations of the Company as freely as if the Trustee were not appointed hereunder.

None of the provisions contained in this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur personal financial liability in the performance of any of its duties or in the exercise of any of its rights or powers.

Section 7.02    *Reliance on Documents, Opinions, Etc*. Except as otherwise provided in Section 7.01:

(a)    the Trustee may conclusively rely and shall be fully protected in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, note, coupon or other paper or document, whether sent by letter, email, facsimile or other electronic communication, believed by it in good faith to be genuine and to have been signed or presented by the proper party or parties, even if it contains errors or is later deemed not authentic;

(b)    any request, direction, order or demand of the Company mentioned herein shall be sufficiently evidenced by an Officer's Certificate (unless other evidence in respect thereof be herein specifically prescribed); and any Board Resolution may be evidenced to the Trustee by a copy thereof certified by the Secretary or an Assistant Secretary of the Company;

(c)    the Trustee may consult with counsel and other professional advisors of its own choosing and require an Opinion of Counsel (at the expense of the Company) and any advice of such counsel or other professional advisors or Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted by it hereunder in good faith and in accordance with such advice or Opinion of Counsel, and the Trustee shall not be responsible for the content of any Opinion of Counsel in connection with this Indenture, whether delivered to it or on its behalf;

(d)    the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture or other paper or document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Company, personally or by agent or attorney at the expense of the Company and shall incur no liability of any kind by reason of such inquiry or investigation;

(e)    the Trustee shall not be bound to make any investigation as to the performance or observance of any of the covenants, agreements or other terms or conditions set forth in this Indenture;

(f)    the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents, custodians, nominees or attorneys and the Trustee shall not be responsible for any misconduct or negligence on the part of any agent, custodian, nominee or attorney appointed by it with due care hereunder;

(g)    the permissive rights of the Trustee enumerated herein shall not be construed as duties;

39

(h)     the Trustee shall not be required to give any bond or surety in respect of the performance of its powers and duties hereunder;

(i)     the Holders shall not have the right to compel disclosure of information made available to the Trustee in connection with this Indenture, unless otherwise required by applicable law or the express terms of this Indenture;

(j)     the Trustee shall have the right to participate in defense of any claim against it, even if defense is assumed by an indemnifying party;

(k)     the Trustee shall have no duty to make any documents available to the Holders unless otherwise required by applicable law or the express terms of this Indenture, *provided* that the Trustee shall provide a copy of this Indenture to a Holder upon proof that such Person is a Holder;

(l)     the Trustee may request that the Company deliver a certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture;

(m)     with respect to payments due with respect to the Notes, the Trustee (in its capacity as Trustee or as Paying Agent) shall only be obligated to pay amounts which it has actually received; and

(n)     the Trustee shall be entitled to take any action or to refuse to take any action which the Trustee regards as necessary for the Trustee to comply with any applicable law.

In no event shall the Trustee be liable for any special, indirect, punitive or consequential loss or damage, even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action. The Trustee shall not be charged with knowledge of any Default or Event of Default or any other fact, unless either (1) a Responsible Officer shall have actual knowledge of such Default or Event of Default or (2) written notice of such Default or Event of Default shall have been received by the Trustee at the Corporate Trust Office of the Trustee, from the Company or any Holder of the Notes, and such notice references the Notes and this Indenture.

*Section 7.03     No Responsibility for Recitals, Etc*. The recitals contained herein and in the Notes shall be taken as the statements of the Company, and the Trustee assumes no responsibility for the correctness of the same. The Trustee makes no representations as to the validity or sufficiency of this Indenture or of the Notes or other transaction documents. The Trustee shall not be accountable for the use or application by the Company of any Notes or the proceeds of any Notes authenticated and delivered by the Trustee in conformity with the provisions of this Indenture.

*Section 7.04     Trustee, Paying Agents, Conversion Agents, Bid Solicitation Agent or Note Registrar May Own Notes*. The Trustee, any Paying Agent, any Conversion Agent, Bid Solicitation Agent or Note Registrar, in its individual or any other capacity, may become the owner or pledgee of Notes with the same rights it would have if it were not the Trustee, Paying Agent, Conversion Agent, Bid Solicitation Agent or Note Registrar.

*Section 7.05     Monies and Shares of Common Stock to Be Held in Trust*. All monies and shares of Common Stock received by the Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received. Money and shares of Common Stock held by the Trustee in trust hereunder need not be segregated from other funds except to the extent required by law. The Trustee shall be under no liability for interest on any money or shares of Common Stock received by it hereunder and will not be deemed an investment manager.

40

Section 7.06    *Compensation and Expenses of Trustee* . The Company covenants and agrees to pay to the Trustee from time to time, and the Trustee shall be entitled to, such compensation for all services rendered by it hereunder in any capacity (which shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust) as mutually agreed to in writing between the Trustee and the Company, and the Company will pay or reimburse the Trustee upon its request for all reasonable expenses, disbursements and advances reasonably incurred or made by the Trustee in accordance with any of the provisions of this Indenture in any capacity thereunder (including (a) the reasonable compensation and the expenses and disbursements of its agents and counsel and of all Persons not regularly in its employ and (b) stamp, issue, registration, documentary or other taxes and duties) except any such expense, disbursement or advance as shall have been caused by its gross negligence, willful misconduct or bad faith. The Company also covenants to indemnify the Trustee in any capacity under this Indenture and any other document or transaction entered into in connection herewith and its agents and any authenticating agent for, and to hold them harmless against, any loss, claim, damage, liability or expense incurred without gross negligence, willful misconduct or bad faith on the part of the Trustee, its officers, directors, agents or employees, or such agent or authenticating agent, as the case may be, as determined by a court of competent jurisdiction by a final and non-appealable judgment, and arising out of or in connection with the acceptance or administration of this Indenture or in any other capacity hereunder, including the costs and expenses of defending themselves against any claim of liability in the premises or enforcing this Indenture (including this Section 7.06). The obligations of the Company under this Section 7.06 to compensate or indemnify the Trustee and to pay or reimburse the Trustee for expenses, disbursements and advances shall be secured by a senior claim to which the Notes are hereby made subordinate on all money or property held or collected by the Trustee, except, subject to the effect of Section 6.05, funds held in trust herewith for the benefit of the Holders of particular Notes. The Trustee's right to receive payment of any amounts due under this Section 7.06 shall not be subordinate to any other liability or indebtedness of the Company. The obligation of the Company under this Section 7.06 shall survive the satisfaction and discharge of this Indenture and the earlier resignation or removal or the Trustee. The Company need not pay for any settlement made without its consent, which consent shall be promptly given unless such settlement is unreasonable. The indemnification provided in this Section 7.06 shall extend to the officers, directors, agents and employees of the Trustee.

Without prejudice to any other rights available to the Trustee under applicable law, when the Trustee and its agents and any authenticating agent incur expenses or render services after an Event of Default specified in Section 6.01(j) or Section 6.01(k) occurs, the expenses and the compensation for the services are intended to constitute expenses of administration under any bankruptcy, insolvency or similar laws.

Section 7.07    *Officer's Certificate as Evidence* . Except as otherwise provided in Section 7.01, whenever in the administration of the provisions of this Indenture the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking or omitting any action hereunder, such matter (unless other evidence in respect thereof be herein specifically prescribed) may, in the absence of gross negligence, willful misconduct and bad faith on the part of the Trustee, be deemed to be conclusively proved and established by an Officer's Certificate delivered to the Trustee, and such Officer's Certificate, in the absence of gross negligence, willful misconduct and bad faith on the part of the Trustee, shall be full warrant to the Trustee for any action taken or omitted by it under the provisions of this Indenture upon the faith thereof.

Section 7.08    *Eligibility of Trustee* . There shall at all times be a Trustee hereunder which shall be a Person that is eligible pursuant to the Trust Indenture Act (as if the Trust Indenture Act were applicable hereto) to act as such and has a combined capital and surplus of at least $50,000,000. If such Person publishes reports of condition at least annually, pursuant to law or to the requirements of any supervising or examining authority, then for the purposes of this Section, the combined capital and surplus of such Person shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. If at any time

41

the Trustee shall cease to be eligible in accordance with the provisions of this Section, it shall resign immediately in the manner and with the effect hereinafter specified in this Article.

Section 7.09    *Resignation or Removal of Trustee.*

(a)    The Trustee may at any time resign by giving written notice of such resignation to the Company and by mailing notice thereof to the Holders at their addresses as they shall appear on the Note Register. Upon receiving such notice of resignation, the Company shall promptly appoint a successor trustee by written instrument, in duplicate, executed by order of the Board of Directors, one copy of which instrument shall be delivered to the resigning Trustee and one copy to the successor trustee. If no successor trustee shall have been so appointed and have accepted appointment within 60 days after the mailing of such notice of resignation to the Holders, the resigning Trustee may, upon ten Business Days' notice to the Company and the Holders, petition any court of competent jurisdiction for the appointment of a successor trustee, or any Holder who has been a bona fide holder of a Note or Notes for at least six months (or since the date of this Indenture) may, subject to the provisions of Section 6.11, on behalf of himself or herself and all others similarly situated, petition any such court for the appointment of a successor trustee. Such court may thereupon, after such notice, if any, as it may deem proper and prescribe, appoint a successor trustee.

(b)    In case at any time any of the following shall occur:

(i)  the Trustee shall cease to be eligible in accordance with the provisions of Section 7.08 and shall fail to resign after written request therefor by the Company or by any such Holder, or

(ii) the Trustee shall become incapable of acting, or shall be adjudged a bankrupt or insolvent, or a receiver of the Trustee or of its property shall be appointed, or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation,

then, in either case, the Company may by a Board Resolution remove the Trustee and appoint a successor trustee by written instrument, in duplicate, executed by order of the Board of Directors, one copy of which instrument shall be delivered to the Trustee so removed and one copy to the successor trustee, or, subject to the provisions of Section 6.11, any Holder who has been a bona fide holder of a Note or Notes for at least six months (or since the date of this Indenture) may, on behalf of himself or herself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor trustee. Such court may thereupon, after such notice, if any, as it may deem proper and prescribe, remove the Trustee and appoint a successor trustee. If the Trustee is removed, but no successor trustee has been appointed and accepted such appointment, the removed Trustee may, upon the terms and conditions and otherwise as in Section 7.09(a) provided, petition, at the expense of the Company, any court of competent jurisdiction for an appointment of a successor trustee.

(c)    The Holders of a majority in aggregate principal amount of the Notes at the time outstanding, as determined in accordance with Section 8.04, may at any time remove the Trustee and nominate a successor trustee that shall be deemed appointed as successor trustee unless within ten days after notice to the Company of such nomination the Company objects thereto, in which case the Trustee so removed or any Holder, upon the terms and conditions and otherwise as in Section 7.09(a) provided, may petition any court of competent jurisdiction for an appointment of a successor trustee.

(d)    Any resignation or removal of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section 7.09 shall become effective upon acceptance of appointment by the successor trustee as provided in Section 7.10.

42

Section 7.10    *Acceptance by Successor Trustee*. Any successor trustee appointed as provided in Section 7.09 shall execute, acknowledge and deliver to the Company and to its predecessor trustee an instrument accepting such appointment hereunder, and thereupon the resignation or removal of the predecessor trustee shall become effective and such successor trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, duties and obligations of its predecessor hereunder, with like effect as if originally named as Trustee herein; but, nevertheless, on the written request of the Company or of the successor trustee, the trustee ceasing to act shall, upon payment of any amounts then due it pursuant to the provisions of Section 7.06, execute and deliver an instrument transferring to such successor trustee all the rights and powers of the trustee so ceasing to act. Upon request of any such successor trustee, the Company shall execute any and all instruments in writing for more fully and certainly vesting in and confirming to such successor trustee all such rights and powers. Any trustee ceasing to act shall, nevertheless, retain a senior claim to which the Notes are hereby made subordinate on all money or property held or collected by such trustee as such, except for funds held in trust for the benefit of Holders of particular Notes, to secure any amounts then due it pursuant to the provisions of Section 7.06.

No successor trustee shall accept appointment as provided in this Section 7.10 unless at the time of such acceptance such successor trustee shall be eligible under the provisions of Section 7.08.

Upon acceptance of appointment by a successor trustee as provided in this Section 7.10, each of the Company and the successor trustee, at the written direction and at the expense of the Company, shall mail or cause to be mailed notice of the succession of such trustee hereunder to the Holders at their addresses as they shall appear on the Note Register. If the Company fails to mail such notice within ten days after acceptance of appointment by the successor trustee, the successor trustee shall cause such notice to be mailed at the expense of the Company.

Section 7.11    *Succession by Merger, Etc.* Any corporation or other entity into which the Trustee may be merged or converted or with which it may be consolidated, or any corporation or other entity resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any corporation or other entity succeeding to all or substantially all of the corporate trust business of the Trustee (including the administration of this Indenture), shall be the successor to the Trustee hereunder without the execution or filing of any paper or any further act on the part of any of the parties hereto; *provided* that in the case of any corporation or other entity succeeding to all or substantially all of the corporate trust business of the Trustee such corporation or other entity shall be eligible under the provisions of Section 7.08.

In case at the time such successor to the Trustee shall succeed to the trusts created by this Indenture, any of the Notes shall have been authenticated but not delivered, any such successor to the Trustee may adopt the certificate of authentication of any predecessor trustee or authenticating agent appointed by such predecessor trustee, and deliver such Notes so authenticated; and in case at that time any of the Notes shall not have been authenticated, any successor to the Trustee or an authenticating agent appointed by such successor trustee may authenticate such Notes either in the name of any predecessor trustee hereunder or in the name of the successor trustee; and in all such cases such certificates shall have the full force which it is anywhere in the Notes or in this Indenture provided that the certificate of the Trustee shall have; *provided*, *however*, that the right to adopt the certificate of authentication of any predecessor trustee or to authenticate Notes in the name of any predecessor trustee shall apply only to its successor or successors by merger, conversion or consolidation.

Section 7.12    *Trustee's Application for Instructions from the Company*. Any application by the Trustee for written instructions from the Company may, at the option of the Trustee, set forth in writing any action proposed to be taken or omitted by the Trustee under this

43

Indenture and the date on and/or after which such action shall be taken or such omission shall be effective. The Trustee shall not be liable for any action taken by, or omission of, the Trustee in accordance with a proposal included in such application on or after the date specified in such application (which date shall not be less than three Business Days after the date any officer that the Company has indicated to the Trustee should receive such application actually receives such application, unless any such officer shall have consented in writing to any earlier date), unless, prior to taking any such action (or the effective date in the case of any omission), the Trustee shall have received written instructions in accordance with this Indenture in response to such application specifying the action to be taken or omitted.

ARTICLE 8
CONCERNING THE HOLDERS

     *Section 8.01    Action by Holders*. Whenever in this Indenture it is provided that the Holders of a specified percentage of the aggregate principal amount of the Notes may take any action (including the making of any demand or request, the giving of any notice, consent or waiver or the taking of any other action), the fact that at the time of taking any such action, the Holders of such specified percentage have joined therein may be evidenced (a) by any instrument or any number of instruments of similar tenor executed by Holders in person or by agent or proxy appointed in writing, or (b) by the record of the Holders voting in favor thereof at any meeting of Holders duly called and held in accordance with the provisions of Article 9, or (c) by a combination of such instrument or instruments and any such record of such a meeting of Holders. Whenever the Company or the Trustee solicits the taking of any action by the Holders of the Notes, the Company or the Trustee may, but shall not be required to, fix in advance of such solicitation, a date as the record date for determining Holders entitled to take such action. The record date if one is selected shall be not more than fifteen days prior to the date of commencement of solicitation of such action.

     *Section 8.02    Proof of Execution by Holders*. Subject to the provisions of Section 7.01, Section 7.02 and Section 9.05, proof of the execution of any instrument by a Holder or its agent or proxy shall be sufficient if made in accordance with such reasonable rules and regulations as may be prescribed by the Trustee or in such manner as shall be satisfactory to the Trustee. The holding of Notes shall be proved by the Note Register or by a certificate of the Note Registrar. The record of any Holders' meeting shall be proved in the manner provided in Section 9.06.

     *Section 8.03    Who Are Deemed Absolute Owners*. The Company, the Trustee, any authenticating agent, any Paying Agent, any Conversion Agent and any Note Registrar may deem the Person in whose name a Note shall be registered upon the Note Register to be, and may treat it as, the absolute owner of such Note (whether or not such Note shall be overdue and notwithstanding any notation of ownership or other writing thereon made by any Person other than the Company or any Note Registrar) for the purpose of receiving payment of or on account of the principal (including any Redemption Price and any Fundamental Change Repurchase Price, if applicable) of and (subject to Section 2.03) accrued and unpaid interest on such Note, for conversion of such Note and for all other purposes; and neither the Company nor the Trustee nor any Paying Agent nor any Conversion Agent nor any Note Registrar shall be affected by any notice to the contrary. All such payments or deliveries so made to any Holder for the time being, or upon its order, shall be valid, and, to the extent of the sums or shares of Common Stock so paid or delivered, effectual to satisfy and discharge the liability for monies payable or shares deliverable upon any such Note. Notwithstanding anything to the contrary in this Indenture or the Notes following an Event of Default, any holder of a beneficial interest in a Global Note may directly enforce against the Company, without the consent, solicitation, proxy, authorization or any other action of the Depositary or any other Person, such holder's right to exchange such beneficial interest for a Note in certificated form in accordance with the provisions of this Indenture.

     *Section 8.04    Company-Owned Notes Disregarded*. Without limiting Section 2.11, in determining whether the Holders of the requisite aggregate principal amount of Notes have concurred in any direction, consent, waiver or other action under this Indenture, Notes that are

44

owned by the Company, by any Subsidiary thereof or by any Person directly or indirectly controlling or controlled by or under direct or indirect common control with the Company or any Subsidiary thereof shall be disregarded and deemed not to be outstanding for the purpose of any such determination; *provided* that for the purposes of determining whether the Trustee shall be protected in relying on any such direction, consent, waiver or other action only Notes that a Responsible Officer actually knows are so owned shall be so disregarded. Notes so owned that have been pledged in good faith may be regarded as outstanding for the purposes of this Section 8.04 if the pledgee shall establish to the satisfaction of the Trustee the pledgee's right to so act with respect to such Notes and that the pledgee is not the Company, a Subsidiary thereof or a Person directly or indirectly controlling or controlled by or under direct or indirect common control with the Company or a Subsidiary thereof. In the case of a dispute as to such right, any decision by the Trustee taken upon the advice of counsel shall be full protection to the Trustee. Upon request of the Trustee, the Company shall furnish to the Trustee promptly an Officer's Certificate listing and identifying all Notes, if any, known by the Company to be owned or held by or for the account of any of the above described Persons; and, subject to Section 7.01, the Trustee shall be entitled to accept such Officer's Certificate as conclusive evidence of the facts therein set forth and of the fact that all Notes not listed therein are outstanding for the purpose of any such determination.

*Section 8.05    Revocation of Consents; Future Holders Bound*. At any time prior to (but not after) the evidencing to the Trustee, as provided in Section 8.01, of the taking of any action by the Holders of the percentage of the aggregate principal amount of the Notes specified in this Indenture in connection with such action, any Holder of a Note that is shown by the evidence to be included in the Notes the Holders of which have consented to such action may, by filing written notice with the Trustee at its Corporate Trust Office and upon proof of holding as provided in Section 8.02, revoke such action so far as concerns such Note. Except as aforesaid, any such action taken by the Holder of any Note shall be conclusive and binding upon such Holder and upon all future Holders and owners of such Note and of any Notes issued in exchange or substitution therefor or upon registration of transfer thereof, irrespective of whether any notation in regard thereto is made upon such Note or any Note issued in exchange or substitution therefor or upon registration of transfer thereof.

ARTICLE 9
HOLDERS' MEETINGS

*Section 9.01    Purpose of Meetings.* A meeting of Holders may be called at any time and from time to time pursuant to the provisions of this Article 9 for any of the following purposes:

(a)    to give any notice to the Company or to the Trustee or to give any directions to the Trustee permitted under this Indenture, or to consent to the waiving of any Default or Event of Default hereunder (in each case, as permitted under this Indenture) and its consequences, or to take any other action authorized to be taken by Holders pursuant to any of the provisions of Article 6;

(b)    to remove the Trustee and nominate a successor trustee pursuant to the provisions of Article 7;

(c)    to consent to the execution of an indenture or indentures supplemental hereto pursuant to the provisions of Section 10.02; or

(d)    to take any other action authorized to be taken by or on behalf of the Holders of any specified aggregate principal amount of the Notes under any other provision of this Indenture or under applicable law.

*Section 9.02    Call of Meetings by Trustee*. The Trustee may at any time call a meeting of Holders to take any action specified in Section 9.01, to be held at such time and at such place as the Trustee shall determine. Notice of every meeting of the Holders, setting forth the time and

45

the place of such meeting and in general terms the action proposed to be taken at such meeting and the establishment of any record date pursuant to Section 8.01, shall be mailed to Holders of such Notes at their addresses as they shall appear on the Note Register. Such notice shall also be mailed to the Company. Such notices shall be mailed not less than 20 nor more than 90 days prior to the date fixed for the meeting.

Any meeting of Holders shall be valid without notice if the Holders of all Notes then outstanding are present in person or by proxy or if notice is waived before or after the meeting by the Holders of all Notes then outstanding, and if the Company and the Trustee are either present by duly authorized representatives or have, before or after the meeting, waived notice.

Section 9.03    *Call of Meetings by Company or Holders*. In case at any time the Company, pursuant to a Board Resolution, or the Holders of at least 10% of the aggregate principal amount of the Notes then outstanding, shall have requested the Trustee to call a meeting of Holders, by written request setting forth in reasonable detail the action proposed to be taken at the meeting, and the Trustee shall not have mailed the notice of such meeting within 20 days after receipt of such request, then the Company or such Holders may determine the time and the place for such meeting and may call such meeting to take any action authorized in Section 9.01, by mailing notice thereof as provided in Section 9.02.

Section 9.04    *Qualifications for Voting*. To be entitled to vote at any meeting of Holders a Person shall (a) be a Holder of one or more Notes on the record date pertaining to such meeting or (b) be a Person appointed by an instrument in writing as proxy by a Holder of one or more Notes on the record date pertaining to such meeting. The only Persons who shall be entitled to be present or to speak at any meeting of Holders shall be the Persons entitled to vote at such meeting and their counsel and any representatives of the Trustee and its counsel and any representatives of the Company and its counsel.

Section 9.05    *Regulations*. Notwithstanding any other provisions of this Indenture, the Trustee may make such reasonable regulations as it may deem advisable for any meeting of Holders, in regard to proof of the holding of Notes and of the appointment of proxies, and in regard to the appointment and duties of inspectors of votes, the submission and examination of proxies, certificates and other evidence of the right to vote, and such other matters concerning the conduct of the meeting as it shall think fit.

The Trustee shall, by an instrument in writing, appoint a temporary chairman of the meeting, unless the meeting shall have been called by the Company or by Holders as provided in Section 9.03, in which case the Company or the Holders calling the meeting, as the case may be, shall in like manner appoint a temporary chairman. A permanent chairman and a permanent secretary of the meeting shall be elected by vote of the Holders of a majority in aggregate principal amount of the Notes represented at the meeting and entitled to vote at the meeting.

Subject to the provisions of Section 8.04, at any meeting of Holders each Holder or proxyholder shall be entitled to one vote for each $1,000 principal amount of Notes held or represented by him or her; *provided*, *however*, that no vote shall be cast or counted at any meeting in respect of any Note challenged as not outstanding and ruled by the chairman of the meeting to be not outstanding. The chairman of the meeting shall have no right to vote other than by virtue of Notes held by it or instruments in writing as aforesaid duly designating it as the proxy to vote on behalf of other Holders. Any meeting of Holders duly called pursuant to the provisions of Section 9.02 or Section 9.03 may be adjourned from time to time by the Holders of a majority of the aggregate principal amount of Notes represented at the meeting, whether or not constituting a quorum, and the meeting may be held as so adjourned without further notice.

46

*Section 9.06    Voting*. The vote upon any resolution submitted to any meeting of Holders shall be by written ballot on which shall be subscribed the signatures of the Holders or of their representatives by proxy and the outstanding aggregate principal amount of the Notes held or represented by them. The permanent chairman of the meeting shall appoint two inspectors of votes who shall count all votes cast at the meeting for or against any resolution and who shall make and file with the secretary of the meeting their verified written reports in duplicate of all votes cast at the meeting. A record in duplicate of the proceedings of each meeting of Holders shall be prepared by the secretary of the meeting and there shall be attached to said record the original reports of the inspectors of votes on any vote by ballot taken thereat and affidavits by one or more Persons having knowledge of the facts setting forth a copy of the notice of the meeting and showing that said notice was mailed as provided in Section 9.02. The record shall show the aggregate principal amount of the Notes voting in favor of or against any resolution. The record shall be signed and verified by the affidavits of the permanent chairman and secretary of the meeting and one of the duplicates shall be delivered to the Company and the other to the Trustee to be preserved by the Trustee, the latter to have attached thereto the ballots voted at the meeting.

Any record so signed and verified shall be conclusive evidence of the matters therein stated.

*Section 9.07    No Delay of Rights by Meeting*. Nothing contained in this Article 9 shall be deemed or construed to authorize or permit, by reason of any call of a meeting of Holders or any rights expressly or impliedly conferred hereunder to make such call, any hindrance or delay in the exercise of any right or rights conferred upon or reserved to the Trustee or to the Holders under any of the provisions of this Indenture or of the Notes.

ARTICLE 10
SUPPLEMENTAL INDENTURES

*Section 10.01    Supplemental Indentures Without Consent of Holders.* Notwithstanding anything to the contrary in this Indenture or the Notes, the Company, when authorized by the resolutions of the Board of Directors and the Trustee, at the Company's expense, may from time to time and at any time enter into an indenture or indentures supplemental hereto for one or more of the following purposes:

(a)    to add guarantees with respect to the Notes or to secure the Notes;

(b)    to evidence the assumption by a Successor Entity of the obligations of the Company under this Indenture pursuant to Article 11;

(c)    in connection with any Share Exchange Event, to provide that the notes are convertible into Reference Property, subject to the provisions of Section 13.02, and make such related changes to the terms of the Notes to the extent expressly required by Section 13.07;

(d)    to irrevocably elect one Settlement Method or irrevocably eliminate one or more Settlement Methods or irrevocably elect a Specified Dollar Amount to be applicable to Combination Settlements; *provided, however*, that no such election or elimination shall affect any Settlement Method theretofore elected (or deemed to be elected) with respect to the conversion of any Note pursuant to the provisions of Article 13;

(e)    to surrender any right or power herein conferred upon the Company;

(f)    to add to the covenants or Events of Default of the Company for the benefit of the Holders;

(g)    to cure any ambiguity or correct or supplement any defect or inconsistency in this Indenture, *provided* that such action shall not adversely affect the interests of the Holders of the Notes in any material respect;

47

(h)    to modify or amend the Indenture to permit the qualification of the Indenture or any indenture supplemental thereto under the Trust Indenture Act;

(i)    to establish the form of the Notes, if issued in definitive form;

(j)    to evidence the acceptance of the appointment under this Indenture of a successor Trustee in accordance with the terms of this Indenture;

(k)    to conform, as necessary, the provisions of this Indenture or the Notes to the "Description of Notes" section of the Offering Memorandum, as set forth in an Officer's Certificate;

(l)    to provide for conversion rights of Holders of Notes if any reclassification or change of the Common Stock or any merger, consolidation or sale of all or substantially all of the Company's assets occurs; or

(m)    to change the Conversion Rate in accordance with this Indenture.

Upon the written request of the Company, the Trustee is hereby authorized to join with the Company in the execution of any such supplemental indenture, to make any further appropriate agreements and stipulations that may be therein contained, but the Trustee shall not be obligated to, but may in its discretion, enter into any supplemental indenture that affects the Trustee's own rights, duties or immunities under this Indenture or otherwise.

Any supplemental indenture authorized by the provisions of this Section 10.01 may be executed by the Company and the Trustee without the consent of the Holders of any of the Notes at the time outstanding, notwithstanding any of the provisions of Section 10.02.

Section 10.02    *Supplemental Indentures with Consent of Holders*. With the consent (evidenced as provided in Article 8) of the Holders of at least a majority of the aggregate principal amount of the Notes then outstanding (determined in accordance with Article 8 and including, without limitation, consents obtained in connection with a repurchase of, or tender or exchange offer for, Notes), the Company, when authorized by the resolutions of the Board of Directors and the Trustee, at the Company's expense, may from time to time and at any time enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Indenture or any supplemental indenture or of modifying in any manner the rights of the Holders; *provided, however*, that, without the consent of each Holder of an outstanding Note affected, no such supplemental indenture shall:

(a)    reduce the principal amount of, or change the Maturity Date or an Interest Payment Date of, any Note;

(b)    reduce or alter the manner of calculating the interest rate or extend the stated time for payment of interest on any Note;

(c)    reduce the Redemption Price or the Fundamental Change Repurchase Price of any Note, or change the time at which or circumstances under which any Note may or shall be repurchased or redeemed;

(d)    impair the right of any Holder to institute suit for the enforcement of any payment on or with respect to such Holder's Notes;

(e)    change the currency of payment of the Notes or interest on any Note;

48

(f)    make any change that adversely affects the repurchase option of a Holder pursuant to Article 14 or the right of a Holder to convert any Note or reduce the consideration receivable upon conversion of any Note except as otherwise permitted by the Indenture;

(g)    change the Company's obligation to maintain an office or agency as described in Section 4.02;

(h)    modify any of the provisions of this Article 10, or reduce the percentage of the aggregate principal amount of outstanding Notes required to amend, modify or supplement the Indenture or the Notes or waive an Event of Default, except to provide that certain other provisions of this Indenture cannot be modified or waived without the consent of the Holder of each outstanding Note affected thereby; or

(i)    reduce the percentage of Notes whose Holders must consent to an amendment.

Upon the written request of the Company, and upon the filing with the Trustee of evidence of the consent of Holders as aforesaid and subject to Section 10.05, the Trustee shall join with the Company in the execution of such supplemental indenture unless such supplemental indenture affects the Trustee's own rights, duties or immunities under this Indenture or otherwise, in which case the Trustee may in its discretion, but shall not be obligated to, enter into such supplemental indenture.

Holders do not need under this Section 10.02 to approve the particular form of any proposed supplemental indenture. It shall be sufficient if such Holders approve the substance thereof. After any such supplemental indenture under Section 10.01 or under this Section 10.02 becomes effective, the Company shall mail to the Holders a notice briefly describing such supplemental indenture. However, the failure to give such notice to all the Holders, or any defect in the notice, will not impair or affect the validity of the supplemental indenture.

*Section 10.03    Effect of Supplemental Indentures* . Upon the execution of any supplemental indenture pursuant to the provisions of this Article 10, this Indenture and the Notes shall be and be deemed to be modified and amended in accordance therewith and the respective rights, limitation of rights, obligations, duties and immunities under this Indenture of the Trustee, the Company and the Holders shall thereafter be determined, exercised and enforced hereunder subject in all respects to such modifications and amendments and all the terms and conditions of any such supplemental indenture shall be and be deemed to be part of the terms and conditions of this Indenture for any and all purposes.

*Section 10.04    Notation on Notes*. Notes authenticated and delivered after the execution of any supplemental indenture pursuant to the provisions of this Article 10 may, at the Company's expense, bear a notation in form approved by the Trustee as to any matter provided for in such supplemental indenture. If the Company or the Trustee shall so determine, new Notes so modified as to conform, in the opinion of the Trustee and the Board of Directors, to any modification of this Indenture contained in any such supplemental indenture may, at the Company's expense, be prepared and executed by the Company, authenticated by the Trustee (or an authenticating agent duly appointed by the Trustee pursuant to Section 16.10) and delivered in exchange for the Notes then outstanding, upon surrender of such Notes then outstanding.

*Section 10.05    Evidence of Compliance of Supplemental Indenture to Be Furnished to Trustee* . In addition to the documents required by Section 16.05, the Trustee shall receive an Officer's Certificate and an Opinion of Counsel as conclusive evidence that any supplemental indenture executed pursuant hereto is permitted or authorized by this Indenture.

ARTICLE 11
CONSOLIDATION, MERGER, SALE, CONVEYANCE AND LEASE

49

*Section 11.01    Company May Consolidate, Etc. on Certain Terms.*  Subject to the provisions of Section 11.02, the Company shall not consolidate with or merge with or into any other Person or convey, transfer, sell, lease or otherwise dispose of all or substantially all of its assets to another Person (a "**Business Combination Event**"), unless:

(a)    the resulting, surviving or transferee Person is the Company or, if not the Company, is a Qualified Successor Entity (such Qualified Successor Entity, the "**Successor Entity**") duly organized and existing under the laws of the United States of America, any State thereof or the District of Columbia, and the Successor Entity (if not the Company) shall expressly assume, by a supplemental indenture, executed and delivered to the Trustee, in form reasonably satisfactory to the Trustee, all of the obligations of the Company under the Notes and this Indenture; and

(b)    immediately after giving effect to such Business Combination Event, no Default or Event of Default shall have occurred and be continuing under this Indenture.

For purposes of this Section 11.01, the conveyance, transfer, sale, lease or other disposition of all or substantially all of the assets of one or more Subsidiaries of the Company to another Person, which assets, if held by the Company instead of such Subsidiaries, would constitute all or substantially all of the assets of the Company on a consolidated basis, shall be deemed to be the conveyance, transfer, sale, lease or other disposition of all or substantially all of the assets of the Company to another Person.

Notwithstanding anything to the contrary, the provisions of this Article 11 shall not apply to any transfer of assets between or among the Company and any one or more of its Wholly Owned Subsidiaries. For the avoidance of doubt, in the case of any such transfer, the transferee shall not succeed to, and the Company shall not be discharged from, its obligations under the Notes or this Indenture.

*Section 11.02    Successor Entity to Be Substituted* . In case of any Business Combination Event and upon the assumption by the Successor Entity, by supplemental indenture, executed and delivered to the Trustee and satisfactory in form to the Trustee, of the due and punctual payment of the principal of and accrued and unpaid interest on all of the Notes, the due and punctual delivery or payment, as the case may be, of any consideration due upon conversion of the Notes and the due and punctual performance of all of the covenants and conditions of this Indenture to be performed by the Company, such Successor Entity (if not the Company) shall succeed to and, except in the case of a lease of all or substantially all of the Company's assets, shall be substituted for the Company, with the same effect as if it had been named herein as the party of the first part. Such Successor Entity thereupon may cause to be signed, and may issue either in its own name or in the name of the Company any or all of the Notes issuable hereunder which theretofore shall not have been signed by the Company and delivered to the Trustee; and, upon the order of such Successor Entity instead of the Company and subject to all the terms, conditions and limitations in this Indenture prescribed, the Trustee shall authenticate and shall deliver, or cause to be authenticated and delivered, any Notes that previously shall have been signed and delivered by the Officers of the Company to the Trustee for authentication, and any Notes that such Successor Entity thereafter shall cause to be signed and delivered to the Trustee for that purpose. All the Notes so issued shall in all respects have the same legal rank and benefit under this Indenture as the Notes theretofore or thereafter issued in accordance with the terms of this Indenture as though all of such Notes had been issued at the date of the execution hereof. In the event of any such Business Combination Event (but not in the case of a lease), upon compliance with this Article 11 the Person named as the "Company" in the first paragraph of this Indenture (or any successor that shall thereafter have become such in the manner prescribed in this Article 11) may be dissolved, wound up and liquidated at any time thereafter and, except in the case of a lease, such Person shall be released from its liabilities as obligor and maker of the Notes and from its obligations under this Indenture and the Notes.

50

In case of any such Business Combination Event, such changes in phraseology and form (but not in substance) may be made in the Notes thereafter to be issued as may be appropriate.

Section 11.03    *Opinion of Counsel to Be Given to Trustee* . No such Business Combination Event shall be effective unless the Trustee shall receive an Officer's Certificate and an Opinion of Counsel as conclusive evidence that any such Business Combination Event and any such assumption and, if a supplemental indenture is required in connection with such Business Combination Event, such supplemental indenture, complies with the provisions of this Article 11.

ARTICLE 12

IMMUNITY OF INCORPORATORS, STOCKHOLDERS, OFFICERS AND DIRECTORS

Section 12.01    *Indenture and Notes Solely Corporate Obligations.* No recourse for the payment of the principal of or accrued and unpaid interest on any Note, nor for any claim based thereon or otherwise in respect thereof, and no recourse under or upon any obligation, covenant or agreement of the Company in this Indenture or in any supplemental indenture or in any Note, nor because of the creation of any indebtedness represented thereby, shall be had against any incorporator, stockholder, employee, agent, Officer or director or Subsidiary, as such, past, present or future, of the Company or of any successor entity, either directly or through the Company or any successor entity, whether by virtue of any constitution, statute or rule of law, or by the enforcement of any assessment or penalty or otherwise; it being expressly understood that all such liability is hereby expressly waived and released as a condition of, and as a consideration for, the execution of this Indenture and the issue of the Notes.

ARTICLE 13

CONVERSION OF NOTES

Section 13.01    *Conversion Privilege.*

(a)    Subject to and upon compliance with the provisions of this Article 13, each Holder of a Note shall have the right, at such Holder's option, to convert all or any portion (if the portion to be converted is $1,000 principal amount or an integral multiple thereof) of such Note (i) subject to satisfaction of the conditions described in Section 13.01(b), at any time prior to the close of business on the Business Day immediately preceding October 15, 2029 under the circumstances and during the periods set forth in Section 13.01(b), and (ii) regardless of the conditions described in Section 13.01(b), on or after October 15, 2029 and prior to the close of business on the second Scheduled Trading Day immediately preceding the Maturity Date, in each case, at an initial conversion rate of 5.2005 shares of Common Stock (subject to adjustment as provided in this Article 13, the "**Conversion Rate**") per $1,000 principal amount of Notes (subject to, and in accordance with, the settlement provisions of Section 13.02, the "**Conversion Obligation**").

(b)    (i)    Prior to the close of business on the Business Day immediately preceding October 15, 2029, a Holder may surrender all or any portion of its Notes for conversion at any time during the five Business Day period immediately after any ten consecutive Trading Day period (the "**Measurement Period**") in which the Trading Price per $1,000 principal amount of Notes, as determined following a request by a Holder of Notes in accordance with this subsection (b)(i), for each Trading Day of the Measurement Period was less than 98% of the product of the Closing Price of the Common Stock and the Conversion Rate on each such Trading Day. The Trading Prices shall be determined by the Bid Solicitation Agent pursuant to this subsection (b)(i) and the definition of Trading Price set forth in this Indenture. Unless the Company is acting as Bid Solicitation Agent, the Company shall provide written notice to the Bid Solicitation Agent of the three independent nationally recognized securities dealers selected by the Company pursuant to the definition of Trading Price, along with appropriate contact information for each. The Bid Solicitation Agent (if not the Company) shall have no obligation to determine the Trading Price per $1,000 principal amount of Notes unless the Company has requested such determination, and the Company shall have no obligation to make such request (or, if the Company is acting as Bid

51

Solicitation Agent, the Company shall have no obligation to determine the Trading Price per $1,000 principal amount of Notes) unless a Holder provides the Company with reasonable evidence that the Trading Price per $1,000 principal amount of Notes would be less than 98% of the product of the Closing Price of the Common Stock and the Conversion Rate, at which time the Company shall (if the Company is acting as Bid Solicitation Agent) or the Company shall instruct the Bid Solicitation Agent (if the Company is not acting as Bid Solicitation Agent), in writing, to determine the Trading Price per $1,000 principal amount of Notes beginning on the next Trading Day and on each successive Trading Day until the Trading Price per $1,000 principal amount of Notes is greater than or equal to 98% of the product of the Closing Price of the Common Stock and the Conversion Rate. If the Company does not instruct the Bid Solicitation Agent in writing to determine the Trading Price per $1,000 principal amount of Notes when obligated as provided in the preceding sentence, or if the Company instructs the Bid Solicitation Agent in writing to obtain bids and the Bid Solicitation Agent fails to make such determination, or if the Company is acting as Bid Solicitation Agent and the Company fails to determine the Trading Price per $1,000 principal amount of Notes when the Company is required to do so, then, in each case, the Trading Price per $1,000 principal amount of Notes shall be deemed to be less than 98% of the product of the Closing Price of the Common Stock and the Conversion Rate on each Trading Day of such failure. In the event that the Company is not acting as Bid Solicitation Agent and the Bid Solicitation Agent is required to determine the Trading Price, but cannot, in its own determination, act in such capacity, the Bid Solicitation Agent shall notify the Company and the Company shall promptly appoint a substitute Bid Solicitation Agent. If the Trading Price condition set forth above has been met, the Company shall so notify the Trustee and the Conversion Agent (if other than the Trustee) in accordance with Section 16.03 and shall so notify the Holders by issuing a press release or providing notice on the Company's website and, in respect of Global Notes, shall provide notice through the Depositary in accordance with the procedures thereof. If, at any time after the Trading Price condition set forth above has been met, the Trading Price per $1,000 principal amount of Notes is greater than or equal to 98% of the product of the Closing Price of the Common Stock and the Conversion Rate for such date, the Company shall so notify the Holders of the Notes, the Trustee and the Conversion Agent (if other than the Trustee) as described in the preceding sentence.

(ii)   If, prior to the close of business on the Business Day immediately preceding October 15, 2029, the Company elects to:

(A)    distribute to all holders of the Common Stock any rights or warrants (other than any issuance of rights, options or warrants issued under a shareholder rights plan that are (1) transferable with shares of the Common Stock, including upon conversion of a Note, and (2) not exercisable until the occurrence of a Trigger Event; *provided* that any such rights, options or warrants will be deemed distributed under this Section 13.01(b)(ii)(A) upon the separation of such rights, options or warrants from the Common Stock, or upon the occurrence of a Trigger Event) entitling them to purchase, for a period of not more than 45 calendar days after the Ex-Dividend Date for such distribution, shares of the Common Stock at a price per share that is less than the average of the Closing Prices of the Common Stock for the 10 consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the declaration date for such distribution; or

(B)    distribute to all holders of the Common Stock the Company's assets (including cash), debt securities or rights or warrants to purchase securities of the Company, which distribution has a per share value, as determined by the Board of Directors, exceeding 10% of the Closing Price of the Common Stock on the Trading Day immediately preceding the date of announcement for such distribution,

then, in either case, the Company shall notify all Holders of the Notes and, in writing, the Trustee and the Conversion Agent (if other than the Trustee), at least 50 Scheduled Trading Days prior to the Ex-Dividend Date for such distribution. Notwithstanding anything to the contrary in the

52

preceding sentence, if the Company is then otherwise permitted to settle conversions by Physical Settlement (and, for the avoidance of doubt, the Company has not elected another Settlement Method to apply, including pursuant to Section 13.02(a)(iii)), then the Company may instead elect to provide such notice at least 10 Scheduled Trading Days before such Ex-Dividend Date, in which case the Company shall be required to settle all conversions with a Conversion Date occurring on or after the date the Company provides such notice and on or before the Business Day immediately preceding the Ex-Dividend Date for such distribution (or any earlier announcement that such distribution will not take place) by Physical Settlement, and the Company shall describe the same in the notice. Notwithstanding anything to the contrary in this Indenture or the Notes, in the case of any separation of rights, options or warrants or the occurrence of a Trigger Event of the type described in Section 13.01(b)(ii)(A), the Company shall not be required to provide any related notice of convertibility pursuant to the preceding provisions before the Business Day after the first date on which the Company becomes aware that such separation or Trigger Event has occurred.

The Company shall notify the Holders of the Notes if the Notes become convertible pursuant to this Section 13.01(b)(ii) by issuing a press release or providing a notice on the Company's website and, in respect of Global Notes, shall provide notice through the Depositary in accordance with the procedures thereof. Once the Company has given such notice, a Holder may surrender all or any portion of its Notes for conversion at any time until the earlier of (1) the close of business on the Business Day immediately preceding the Ex-Dividend Date for such distribution and (2) the Company's announcement that such distribution will not take place, in each case, even if the Notes are not otherwise convertible at such time; *provided* that no Holder of a Note shall have the right to convert if the Holder otherwise would participate in such distribution without conversion in respect of Notes held by such Holder as if such Holder held a number of shares of Common Stock equal to the Conversion Rate for each $1,000 principal amount of Notes it holds.

(iii)    If a transaction or event that constitutes a Fundamental Change or a Make-Whole Fundamental Change occurs prior to the close of business on the Business Day immediately preceding October 15, 2029, or if the Company is a party to a Share Exchange Event (other than a Share Exchange Event that is solely to change the jurisdiction of the Company's organization and that does not constitute a Fundamental Change or a Make-Whole Fundamental Change) that occurs prior to the close of business on the Business Day immediately preceding October 15, 2029 (each such Fundamental Change, Make-Whole Fundamental Change or Share Exchange Event, a "**Corporate Event**"), in each case, regardless of whether a Holder has the right to require the Company to repurchase the Notes pursuant to Section 14.01, all or any portion of a Holder's Notes may be surrendered for conversion at any time from the effective date of such Corporate Event until 35 Trading Days after such effective date or, if such Corporate Event constitutes a Fundamental Change (other than an Exempted Fundamental Change), until the related Fundamental Change Repurchase Date. The Company shall notify Holders and, in writing, the Trustee and the Conversion Agent (if other than the Trustee) of any Corporate Event and the corresponding right to convert the Notes no later than the Business Day following the effective date of such Corporate Event. Such notice to the Holders shall be given by issuing a press release or providing a notice on the Company's website and, in respect of Global Notes, through the Depositary in accordance with the procedures thereof.

(iv)    Prior to the close of business on the Business Day immediately preceding October 15, 2029, a Holder may surrender all or any portion of its Notes for conversion at any time during any fiscal quarter commencing after the fiscal quarter ending on March 31, 2025 (and only during such fiscal quarter), if the Closing Price of the Common Stock

53

for at least 20 Trading Days (whether or not consecutive) during the period of 30 consecutive Trading Days ending on, and including, the last Trading Day of the immediately preceding fiscal quarter is greater than or equal to 130% of the Conversion Price on each applicable Trading Day.

(v)    If the Company calls any Notes for Optional Redemption pursuant to Article 15, then a Holder may surrender all or any portion of such Notes called for Optional Redemption (including, for the avoidance of doubt, any such Notes deemed called pursuant to the third paragraph of Section 15.02(d)) for conversion at any time prior to the close of business on the second Business Day immediately preceding the related Redemption Date, even if the Notes are not otherwise convertible at such time. After that time, the right to convert any such Notes pursuant to this subsection (b)(v) shall expire, unless the Company defaults in the payment of the Redemption Price, in which case a Holder of such Notes may convert all or any portion of such Notes until the Business Day immediately preceding the date on which the Redemption Price has been paid or duly provided for.

*Section 13.02    Conversion Procedure; Settlement Upon Conversion.*

(a)    Subject to this Section 13.02, Section 13.03(b) and Section 13.07(a), upon conversion of any Note, the Company shall pay or deliver, as the case may be, to the converting Holder, in respect of each $1,000 principal amount of Notes being converted, cash ("**Cash Settlement**"), shares of Common Stock, together with cash, if applicable, in lieu of delivering any fractional share of Common Stock in accordance with subsection (j) of this Section 13.02 ("**Physical Settlement**") or a combination of cash and shares of Common Stock, together with cash, if applicable, in lieu of delivering any fractional share of Common Stock in accordance with subsection (j) of this Section 13.02 ("**Combination Settlement**"), at its election, as set forth in this Section 13.02.

(i)    All conversions for which the relevant Conversion Date occurs on or after the Company's issuance of a Redemption Notice with respect to the Notes and on or prior to the second Business Day immediately preceding the related Redemption Date, all conversions for which the relevant Conversion Date occurs on or after October 15, 2029 and all conversions for which the Company has irrevocably elected to fix the Settlement Method to Physical Settlement pursuant to Section 13.01(b)(ii) shall be settled using the same Settlement Method.

(ii)    Except for any conversions for which the relevant Conversion Date occurs after the Company's issuance of a Redemption Notice with respect to the Notes and on or prior to the second Business Day immediately preceding the related Redemption Date, any conversions for which the relevant Conversion Date occurs on or after October 15, 2029 and any conversions for which the Company has irrevocably elected to fix the Settlement Method to Physical Settlement pursuant to Section 13.01(b)(ii), the Company shall use the same Settlement Method for all conversions with the same Conversion Date, but the Company shall not have any obligation to use the same Settlement Method with respect to conversions with different Conversion Dates.

(iii)    If, in respect of any Conversion Date (or the period described in the third immediately succeeding set of parentheses, as the case may be), the Company elects to deliver a notice (the "**Settlement Notice**") of the relevant Settlement Method in respect of such Conversion Date (or such period, as the case may be), the Company shall inform the Trustee and, through the Trustee, shall deliver such Settlement Notice to converting Holders no later than the close of business on the first VWAP Trading Day immediately following the relevant Conversion Date (or, in the case of any conversions for which the relevant Conversion Date occurs (x) on or after the date of issuance of a Redemption Notice with respect to the Notes and on or before the second Business Day immediately preceding the related Redemption Date, in such Redemption Notice or (y) on or after October 15, 2029, no later than October 15, 2029). With respect to any conversion, if the

54

Company does not elect a Settlement Method prior to the deadline set forth in the immediately preceding sentence, then the Company shall be deemed to have elected the Default Settlement Method with respect to such conversion. If the Company chooses Combination Settlement, it will specify the applicable Specified Dollar Amount. However, if the Company delivers a Settlement Notice electing Combination Settlement in respect of its Conversion Obligation but does not indicate a Specified Dollar Amount per $1,000 principal amount of Notes in such Settlement Notice, the Specified Dollar Amount per $1,000 principal amount of Notes shall be deemed to be $1,000. For the avoidance of doubt, the Company's failure to timely elect a Settlement Method or specify the applicable Specified Dollar Amount will not constitute a Default under this Indenture. Notwithstanding anything to the contrary herein, if the Company calls any Notes for redemption pursuant to Article 15 and the related Redemption Date is on or after October 15, 2029, then the Settlement Method that shall apply to all conversions with a Conversion Date that occurs on or after the date the Company sends the related Redemption Notice and on or before the second Business Day immediately preceding the such Redemption Date shall be set forth in such Redemption Notice and shall be the same Settlement Method that applies to all conversions with a Conversion Date that occurs on or after October 15, 2029.

The Company may, from time to time, change the Default Settlement Method prior to October 15, 2029 by sending notice of the new Default Settlement Method to the Holders (with a copy to the Trustee and the Conversion Agent); and the Company may, by notice to the Holders prior to October 15, 2029 (with a copy to the Trustee and the Conversion Agent), elect to irrevocably fix the Settlement Method or to irrevocably elect Combination Settlement and eliminate a Specified Dollar Amount or range of Specified Dollar Amounts, *provided* the Company is then otherwise permitted to elect the applicable Settlement Method(s). If the Company makes such an irrevocable election, then such election shall apply to all conversions of Notes with a Conversion Date that is on or after the date the Company sends such notice. In addition, if the Company irrevocably elects Combination Settlement and eliminates a Specified Dollar Amount or range of Specified Dollar Amounts, then the Company shall, if needed, simultaneously change the Default Settlement Method to Combination Settlement with a Specified Dollar Amount that is consistent with such irrevocable election. However, in all cases, no such irrevocable election or change of Default Settlement Method, as the case may be, will affect any Settlement Method theretofore elected (or deemed to be elected) with respect to any Note pursuant to this Indenture. For the avoidance of doubt, any such irrevocable election, if made, will be effective without the need to amend this Indenture or the Notes, including pursuant to Section 10.01(d) (but the Company may nonetheless choose to execute such an amendment at its option). If the Company changes the Default Settlement Method, if the Company irrevocably fixes the Settlement Method or if the Company irrevocably elects Combination Settlement and eliminates a Specified Dollar Amount or range of Specified Dollar Amounts, in each case, pursuant to this paragraph, then promptly (but in any event within two (2) Business Days of providing notice to Holders of such change or election) the Company shall either post the Default Settlement Method or such irrevocable election, as the case may be, on its website or disclose the same in a current report on Form 8-K (or any successor form) that is filed with, or furnished to, the Commission.

(iv) The cash, shares of Common Stock or combination of cash and shares of Common Stock in respect of any conversion of Notes (the "**Settlement Amount**") shall be computed as follows:

(A)    if Physical Settlement applies, the Company shall deliver to the converting Holder in respect of each $1,000 principal amount of Notes being converted a number of shares of Common Stock equal to the Conversion Rate in effect on the Conversion Date (*provided* that the Company shall deliver cash in lieu of fractional shares as described in Section 13.02(j));

(B)    if Cash Settlement applies, the Company shall pay to the converting Holder in respect of each $1,000 principal amount of Notes being converted cash in an amount equal to the sum of the Daily Conversion Values for each of the 40 consecutive VWAP Trading Days during the related Conversion Reference Period; and

(C)    if Combination Settlement applies, the Company shall pay or deliver, as the case may be, in respect of each $1,000 principal amount of Notes being converted, a Settlement Amount equal to the sum of the Daily Settlement Amounts for each of the 40 consecutive VWAP Trading Days during the related Conversion Reference Period.

(v) The Daily Settlement Amounts (if applicable) and the Daily Conversion Values (if applicable) shall be determined by the Company promptly following the last day of the Conversion Reference Period. Promptly after such determination of the Daily Settlement Amounts or the Daily Conversion Values, as the case may be, and the amount of cash payable in lieu of delivering any fractional share of Common Stock, the Company shall notify the Trustee and the Conversion Agent (if other than the Trustee) in writing of the Daily Settlement Amounts or the Daily Conversion Values, as the case may be, and the amount of cash payable in lieu of delivering fractional shares of Common Stock. The Trustee and the Conversion Agent (if other than the Trustee) shall have no responsibility for any such determination.

(b)    Subject to Section 13.02(e), before any Holder of a Note shall be entitled to convert a Note as set forth above, such Holder shall (i) in the case of a Physical Note (1) complete, manually sign and deliver an irrevocable notice to the Conversion Agent as set forth in the Form of Notice of Conversion (or a facsimile thereof) (a "**Notice of Conversion**") at the office of the Conversion Agent and state in writing therein the principal amount of Notes to be converted and the name or names (with addresses) in which such Holder wishes the certificate or certificates for any shares of Common Stock to be delivered upon settlement of the Conversion Obligation to be registered, (2) surrender such Notes, duly endorsed to the Company or in blank (and accompanied by appropriate endorsement and transfer documents), at the office of the Conversion Agent, (3) if required, furnish appropriate endorsements and transfer documents, (4) if required, pay all transfer or similar taxes as set forth in Section 13.02(d) and Section 13.02(e) and (5) if required, pay funds equal to interest payable on the next Interest Payment Date to which such Holder is not entitled as set forth in Section 13.02(h) and (ii) in the case of a Global Note, comply with the procedures of the Depositary in effect at that time and comply with Section 13.02(b)(3), (4) and (5). The Trustee (and if different, the Conversion Agent) shall notify the Company of any conversion pursuant to this Article 13 on the Conversion Date for such conversion. No Notice of Conversion with respect to any Notes may be surrendered by a Holder thereof if such Holder has also delivered a Fundamental Change Repurchase Notice to the Company in respect of such Notes and has not validly withdrawn such Fundamental Change Repurchase Notice in accordance with Section 14.02. A Holder of a Note may obtain copies of the required Form of Notice of Conversion from the Conversion Agent.

If more than one Note shall be surrendered for conversion at one time by the same Holder, the Conversion Obligation with respect to such Notes shall be computed on the basis of the aggregate principal amount of the Notes (or specified portions thereof to the extent permitted thereby) so surrendered.

56

(c)    A Note shall be deemed to have been converted immediately prior to the close of business on the date (the " **Conversion Date**") that the Holder has complied with the requirements set forth in subsection (b) above. Except as set forth in Section 13.03(b) and Section 13.07(a), the Company shall pay or deliver, as the case may be, the consideration due in respect of the Conversion Obligation on the second Business Day immediately following the relevant Conversion Date, if the Company elects Physical Settlement, or on the second Business Day immediately following the last VWAP Trading Day of the Conversion Reference Period, in the case of any other Settlement Method. If any shares of Common Stock are due to converting Holders, the Company shall issue or cause to be issued, and deliver to the Conversion Agent or to such Holder, or such Holder's nominee or nominees, a book-entry transfer of such shares of Common Stock through the Depositary for the full number of shares of Common Stock to which such Holder shall be entitled in satisfaction of the Company's Conversion Obligation.

(d)    In case any Note shall be surrendered for partial conversion, the Company shall execute and the Trustee shall authenticate and deliver to or upon the written order of the Holder of the Note so surrendered a new Note or Notes in authorized denominations in an aggregate principal amount equal to the unconverted portion of the surrendered Note, without payment of any service charge by the converting Holder but, if required by the Company or Trustee, with payment of a sum sufficient to cover any documentary, stamp or similar issue or transfer tax or similar governmental charge required by law or that may be imposed in connection therewith as a result of the name of the Holder of the new Notes issued upon such conversion being different from the name of the Holder of the old Notes surrendered for such conversion.

(e)    If a Holder submits a Note for conversion, the Company shall pay any documentary, stamp or similar issue or transfer tax due on the issue of any shares of Common Stock upon conversion, unless the tax is due because the Holder requests such shares to be issued in a name other than the Holder's name, in which case the Holder shall pay that tax. The Conversion Agent may refuse to deliver the certificates representing the shares of Common Stock being issued in a name other than the Holder's name until the Trustee receives a sum sufficient to pay any tax that is due by such Holder in accordance with the immediately preceding sentence.

(f)    Except as provided in Section 13.04, no adjustment shall be made for dividends on any shares of Common Stock issued upon the conversion of any Note as provided in this Article 13.

(g)    Upon the conversion of an interest in a Global Note, the Trustee, or the Custodian at the direction of the Trustee, shall make a notation on such Global Note as to the reduction in the principal amount represented thereby. The Company shall notify the Trustee in writing of any conversion of Notes effected through any Conversion Agent other than the Trustee.

(h)    Upon conversion, a Holder shall not receive any separate cash payment for accrued and unpaid interest, if any, except as set forth below. The Company's settlement of the full Conversion Obligation shall be deemed to satisfy in full its obligation to pay the principal amount of the Note and accrued and unpaid interest, if any, to, but not including, the relevant Conversion Date. As a result, accrued and unpaid interest, if any, to, but not including, the relevant Conversion Date shall be deemed to be paid in full rather than cancelled, extinguished or forfeited. Upon a conversion of Notes into a combination of cash and shares of Common Stock, accrued and unpaid interest will be deemed to be paid first out of the cash paid upon such conversion. Notwithstanding the foregoing, if Notes are converted with a Conversion Date occurring after a Regular Record Date but prior to the next Interest Payment Date, Holders of such Notes as of the close of business on such Regular Record Date will receive, on or, at the Company's election, before such Interest Payment Date, the full amount of interest payable on such Notes on such Interest Payment Date notwithstanding the conversion. Notes that are converted with a Conversion Date occurring after a Regular Record Date bur prior to the next Interest Payment Date, upon their surrender for such conversion, must be accompanied by funds equal to the amount of interest payable on such Notes so converted on such Interest Payment Date; *provided* that no such payment shall be required (1) if such Conversion Date is after the Regular Record Date immediately preceding the Maturity Date; (2) if the Company has specified

57

a Redemption Date that is after such Regular Record Date and on or prior to the second Business Day immediately following such Interest Payment Date; (3) if the Company has specified a Fundamental Change Repurchase Date that is after such Regular Record Date and on or prior to the Business Day immediately following such Interest Payment Date; or (4) to the extent of any Defaulted Amounts, if any Defaulted Amounts exist at the time of conversion with respect to such Notes. Therefore, for the avoidance of doubt, all Holders of record as of the close of business on the Regular Record Date immediately preceding the Maturity Date shall receive the full interest payment due on the Maturity Date regardless of whether their Notes have been converted following such Regular Record Date.

(i)    The Person in whose name the shares of Common Stock shall be issuable upon conversion shall become the stockholder of record as of the close of business on the relevant Conversion Date (if the Company elects to satisfy the related Conversion Obligation by Physical Settlement) or the last VWAP Trading Day of the relevant Conversion Reference Period (if the Company elects to satisfy the related Conversion Obligation by Combination Settlement), as the case may be. Upon a conversion of Notes, such Person shall no longer be a Holder of such Notes surrendered for conversion.

(j)    The Company shall not issue any fractional share of Common Stock upon conversion of the Notes and shall instead pay cash in lieu of delivering any fractional share of Common Stock issuable upon conversion based on the Daily VWAP for the relevant Conversion Date (in the case of Physical Settlement) or based on the Daily VWAP for the last VWAP Trading Day of the relevant Conversion Reference Period (in the case of Combination Settlement). For each Note surrendered for conversion, if the Company has elected Combination Settlement, the full number of shares that shall be issued upon conversion thereof shall be computed on the basis of the aggregate Daily Settlement Amounts for the relevant Conversion Reference Period and any fractional shares remaining after such computation shall be paid in cash.

Section 13.03    *Increased Conversion Rate Applicable to Certain Notes Surrendered in Connection with Make-Whole Fundamental Changes or a Redemption Notice.*

(a)    If (i) (A) the Effective Date of a Make-Whole Fundamental Change occurs prior to the Maturity Date or (B) the Company delivers a Redemption Notice with respect to any Notes pursuant to Section 15.02 and, in each case, (ii) a Holder elects to convert its Notes in connection with such Make-Whole Fundamental Change or a Holder of any Notes called for redemption pursuant to such Redemption Notice (including, for the avoidance of doubt, any Notes deemed called for redemption pursuant to the third paragraph of Section 15.02(d)) converts such Notes in connection with such Redemption Notice, as applicable, the Company shall, under the circumstances described below, increase the Conversion Rate for the Notes so surrendered for conversion by a number of additional shares of Common Stock (the "**Additional Shares**"), as provided below. A conversion of Notes shall be deemed for these purposes to be "in connection with" such Make-Whole Fundamental Change if the relevant Conversion Date occurs during the period from, and including, the Effective Date of the Make-Whole Fundamental Change up to, and including, the Business Day immediately prior to the related Fundamental Change Repurchase Date (or, in the case of an Exempted Fundamental Change or a Make-Whole Fundamental Change that would have been a Fundamental Change but for the *proviso* in clause (b) of the definition thereof, the 35th Trading Day immediately following the Effective Date of such Make-Whole Fundamental Change). A conversion of Notes called (or deemed called) for Optional Redemption shall be deemed for these purposes to be "in connection with" the related Redemption Notice if the relevant Conversion Date occurs during the period from, and including, the date of such Redemption Notice to, and including, the second Business Day immediately preceding the related Redemption Date.

(b)    Upon surrender of Notes for conversion in connection with a Make-Whole Fundamental Change pursuant to Section 13.01(b)(iii) or a Redemption Notice pursuant to Section 13.01(b)(v), the Company shall, at its option, satisfy the related Conversion Obligation by Physical Settlement, Cash Settlement or Combination Settlement in accordance with Section

58

13.02; *provided, however*, that if, following a Make-Whole Fundamental Change described in clause (b) of the definition of Fundamental Change, the Reference Property is composed entirely of cash, for any conversion of Notes following the Effective Date of such Make-Whole Fundamental Change, the Conversion Obligation shall be calculated based solely on the Stock Price for the transaction and shall be deemed to be an amount of cash per $1,000 principal amount of converted Notes equal to the Conversion Rate (including any adjustment for Additional Shares), *multiplied by* such Stock Price. In such event, the Conversion Obligation shall be paid to Holders in cash on the second Business Day following the Conversion Date. The Company shall notify the Holders of Notes of the Effective Date of any Make-Whole Fundamental Change and issue a press release announcing such Effective Date no later than fifteen days after such Effective Date.

(c)   The number of Additional Shares, if any, by which the Conversion Rate shall be increased shall be determined by reference to the table below, based on the date on which the Make-Whole Fundamental Change occurs or becomes effective, or the date of the relevant Redemption Notice, as the case may be (such date, as applicable, the "**Effective Date**") and the price paid (or deemed to be paid) per share of the Common Stock in the Make-Whole Fundamental Change or determined with respect to the Optional Redemption, as the case may be (the "**Stock Price**"). If all holders of the Common Stock receive in exchange for their Common Stock only cash in a Make-Whole Fundamental Change described in clause (b) of the Fundamental Change definition, the Stock Price shall be the cash amount paid per share. Otherwise, the Stock Price shall be the average of the Closing Prices of the Common Stock on the five Trading Days immediately prior to, but not including, the applicable Effective Date. The Board of Directors shall make appropriate adjustments to the Stock Price, in its good faith determination, to account for any adjustment to the Conversion Rate that becomes effective, or any event requiring an adjustment to the Conversion Rate where the Ex-Dividend Date, Effective Date (as such term is used in Section 13.04) or Expiration Date (as such term is used in Section 13.04) of the event occurs during such five consecutive Trading Day period.

(d)   The Stock Prices set forth in the first row of the table below (i.e., the column headers) shall be adjusted as of any date on which the Conversion Rate of the Notes is adjusted as described in Section 13.04. The adjusted Stock Prices shall equal the Stock Prices applicable immediately prior to such adjustment, *multiplied by* a fraction, the numerator of which is the Conversion Rate immediately prior to such adjustment giving rise to the Stock Price adjustment and the denominator of which is the Conversion Rate as so adjusted. The number of Additional Shares set forth in the table below shall be adjusted in the same manner and at the same time as the Conversion Rate as set forth in Section 13.04.

(e)   The following table sets forth the number of Additional Shares of Common Stock by which the Conversion Rate shall be increased per $1,000 principal amount of Notes pursuant to this Section 13.03 for each Stock Price and Effective Date set forth below:

| Effective Date | $137.35 | $160.00 | $180.00 | $192.29 | $220.00 | $249.98 | $300.00 | $400.00 | $500.00 | $750.00 | $1,300.00 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| December 6, 2024 | 2.0801 | 1.4843 | 1.1356 | 0.9760 | 0.7170 | 0.5378 | 0.3621 | 0.2006 | 0.1264 | 0.0450 | 0.0000 |
| January 15, 2026 | 2.0801 | 1.4207 | 1.0556 | 0.8914 | 0.6318 | 0.4596 | 0.2999 | 0.1639 | 0.1041 | 0.0378 | 0.0000 |
| January 15, 2027 | 2.0801 | 1.3375 | 0.9544 | 0.7862 | 0.5292 | 0.3686 | 0.2313 | 0.1256 | 0.0808 | 0.0298 | 0.0000 |
| January 15, 2028 | 2.0801 | 1.2365 | 0.8254 | 0.6512 | 0.4000 | 0.2589 | 0.1543 | 0.0849 | 0.0558 | 0.0209 | 0.0000 |
| January 15, 2029 | 2.0801 | 1.1162 | 0.6488 | 0.4631 | 0.2288 | 0.1279 | 0.0734 | 0.0433 | 0.0292 | 0.0110 | 0.0000 |
| January 15, 2030 | 2.0801 | 1.0495 | 0.3551 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 |

The exact Stock Prices and Effective Dates may not be set forth in the table above, in which case:

59

(i)  if the Stock Price is between two Stock Price amounts in the table above or the Effective Date is between two Effective Dates in the table, the number of Additional Shares shall be determined by straight-line interpolation between the number of Additional Shares set forth for the higher and lower Stock Price amounts and the two Effective Dates, as applicable, based on a 365- or 366-day year, as applicable;

(ii) if the Stock Price is in excess of $1,300.00 per share (subject to adjustment in the same manner as the Stock Prices set forth in the column headings of the table above pursuant to subsection (d) above), no Additional Shares shall be added to the Conversion Rate; and

(iii) if the Stock Price is less than $137.35 per share (subject to adjustment in the same manner as the Stock Prices set forth in the column headings of the table above pursuant to subsection (d) above), no Additional Shares shall be added to the Conversion Rate.

Notwithstanding the foregoing, in no event shall the number of Shares of Common Stock issuable upon conversion exceed 7.2806 shares of Common Stock per $1,000 principal amount of Notes, subject to adjustment in the same manner as the Conversion Rate pursuant to Section 13.04.

For the avoidance of doubt, if the Company calls less than all of the outstanding Notes for Optional Redemption, then the Notes not selected for Optional Redemption will not be entitled to an increase to the Conversion Rate, pursuant to the provisions above, in connection with such Optional Redemption, except to the extent provided in the third paragraph of Section 15.02(d).

(f)    Nothing in this Section 13.03 shall prevent an adjustment to the Conversion Rate pursuant to Section 13.04 in respect of a Make-Whole Fundamental Change.

*Section 13.04    Adjustment of Conversion Rate*. The Conversion Rate shall be adjusted from time to time by the Company if any of the following events occurs, except that the Company shall not make any adjustments to the Conversion Rate if Holders of the Notes participate (other than in the case of (x) a share split or share combination or (y) a tender or exchange offer), at the same time and upon the same terms as holders of the Common Stock and solely as a result of holding the Notes, in any of the transactions described in this Section 13.04, without having to convert their Notes, as if they held a number of shares of Common Stock equal to the Conversion Rate immediately prior to the event that otherwise would result in an adjustment pursuant to this Section 13.04, *multiplied* by the principal amount (expressed in thousands) of Notes held by such Holder.

(a)    If the Company issues shares of Common Stock as a dividend or distribution on shares of the Common Stock, or if the Company effects a share split or share combination, the Conversion Rate shall be adjusted based on the following formula:

$$CR' = CR_0 \times \frac{OS'}{OS_0}$$

where,

$CR_0$  =   the Conversion Rate in effect immediately prior to the open of business on the Ex-Dividend Date of such dividend or distribution, or immediately prior to the open of

60

business on the Effective Date of such share split or share combination, as applicable;

CR' = the Conversion Rate in effect immediately after the open of business on such Ex-Dividend Date or Effective Date;

$OS_0$ = the number of shares of Common Stock outstanding immediately prior to the open of business on such Ex-Dividend Date or Effective Date, as applicable; and

OS' = the number of shares of Common Stock outstanding immediately after giving effect to such dividend, distribution, share split or share combination.

Any adjustment made under this Section 13.04(a) shall become effective immediately after (x) the open of business on the Ex-Dividend Date for such dividend or distribution or (y) the open of business on the Effective Date for such share split or share combination, as applicable. If any dividend or distribution of the type described in this Section 13.04(a) is declared but not so paid or made, the Conversion Rate shall be immediately readjusted, effective as of the date the Board of Directors determines not to pay such dividend or distribution, to the Conversion Rate that would then be in effect if such dividend or distribution had not been declared.

(b)   If the Company distributes to all holders of the Common Stock any rights or warrants (other than rights issued pursuant to a shareholder rights plan) entitling them to purchase, for a period of not more than 45 calendar days after the Ex-Dividend Date of such distribution, shares of the Common Stock at a price per share that is less than the average of the Closing Prices of the Common Stock for the 10 consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the declaration date for such distribution, the Conversion Rate shall be increased based on the following formula:

$$CR' = CR_0 \times \frac{OS_0 + X}{OS_0 + Y}$$

where,

$CR_0$ = the Conversion Rate in effect immediately prior to the open of business on the Ex-Dividend Date for such distribution;

CR' = the Conversion Rate in effect immediately after the open of business on such Ex-Dividend Date;

$OS_0$ = the number of shares of Common Stock outstanding immediately prior to the open of business on such Ex-Dividend Date;

X = the total number of shares of Common Stock issuable pursuant to such rights or warrants; and

Y = the number of shares of Common Stock equal to the aggregate price payable to exercise such rights or warrants, *divided by* the average of the Closing Prices of the Common Stock over the 10 consecutive Trading Day period ending on, and

61

including, the Trading Day immediately preceding the Ex-Dividend Date for such distribution.

Any increase made under this Section 13.04(b) shall be made successively whenever any such rights or warrants are distributed and shall become effective immediately after the open of business on the Ex-Dividend Date for such distribution. If any right or warrant described in this Section 13.04(b) is not exercised or converted prior to the expiration of the exercisability or convertibility thereof, the Conversion Rate shall be readjusted to the Conversion Rate that would then be in effect if such right or warrant had not been so distributed. If such rights or warrants are not so distributed, the Conversion Rate shall be decreased to the Conversion Rate that would then be in effect if such Ex-Dividend Date for such distribution had not occurred.

For purposes of this Section 13.04(b) and for the purpose of Section 13.01(b)(ii)(A), in determining whether any rights or warrants entitle the holders to subscribe for or purchase shares of the Common Stock at less than such average of the Closing Prices of the Common Stock for the 10 consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the declaration date for such distribution, and in determining the aggregate exercise or conversion price payable for such shares of Common Stock, there shall be taken into account any consideration received by the Company for such rights or warrants and any amount payable on exercise or conversion thereof, with the value of such consideration, if other than cash, to be determined in good faith by the Board of Directors.

(c)    If the Company distributes shares of its Capital Stock, evidences of its indebtedness or other assets or property of the Company or rights, options or warrants to acquire its Capital Stock or other securities, to all holders of the Common Stock, excluding (i) dividends or distributions referred to in Section 13.04(a) or Section 13.04(b), (ii) dividends or distributions paid exclusively in cash, (iii) rights issued pursuant to a shareholder rights plan, except to the extent set forth in Section 13.09, (iv) a distribution in exchange for or upon conversion of the Common Stock pursuant to a Share Exchange Event, as to which Section 13.07 shall apply and (v) Spin-Offs as to which the provisions set forth below in this Section 13.04(c) shall apply (any of such shares of Capital Stock, evidences of indebtedness or other assets or property or rights, options or warrants to acquire Capital Stock or other securities, the "**Distributed Property**"), then the Conversion Rate shall be increased based on the following formula:

$$CR' = CR_0 \times \frac{SP_0}{SP_0 - FMV}$$

where,

$CR_0$    =    the Conversion Rate in effect immediately prior to the open of business on the Ex-Dividend Date for such distribution;

$CR'$    =    the Conversion Rate in effect immediately after the open of business on such Ex-Dividend Date;

$SP_0$    =    the average of the Closing Prices of the Common Stock over the 10 consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the Ex-Dividend Date for such distribution; and

62

FMV    =    the fair market value (as determined in good faith by the Company) of the Distributed Property with respect to each outstanding share of the Common Stock on the Ex-Dividend Date for such distribution.

Any increase made under the portion of this Section 13.04(c) above shall become effective immediately after the open of business on the Ex-Dividend Date for such distribution. If such distribution is not so paid or made, the Conversion Rate shall be decreased to the Conversion Rate that would then be in effect if such distribution had not been declared. Notwithstanding the foregoing, if "FMV" (as defined above) is equal to or greater than "$SP_0$" (as defined above), in lieu of the foregoing increase, each Holder of a Note shall receive, in respect of each $1,000 principal amount thereof, at the same time and upon the same terms as holders of the Common Stock receive the Distributed Property, the amount and kind of Distributed Property such Holder would have received if such Holder owned a number of shares of Common Stock equal to the Conversion Rate in effect on the Ex-Dividend Date for the distribution. If the Board of Directors determines the "FMV" (as defined above) of any distribution for purposes of this Section 13.04(c) by reference to the actual or when-issued trading market for any securities, it shall in doing so consider the prices in such market over the same period used in computing the Closing Prices of the Common Stock over the 10 consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the Ex-Dividend Date for such distribution.

With respect to an adjustment pursuant to this Section 13.04(c) where there has been a payment of a dividend or other distribution on the Common Stock of shares of Capital Stock of any class or series, or similar equity interest, of or relating to a Subsidiary or other business unit of the Company, that are, or, when issued, will be, listed or admitted for trading on a U.S. national securities exchange (a "**Spin-Off**"), the Conversion Rate shall be increased based on the following formula:

$$CR' = CR_0 \times \frac{FMV_0 + MP_0}{MP_0}$$

where,

$CR_0$    =    the Conversion Rate in effect immediately prior to the close of business on the last Trading Day of the Valuation Period;

$CR'$    =    the Conversion Rate in effect immediately after the close of business on the last Trading Day of the Valuation Period;

$FMV_0$    =    the average of the Closing Prices of the Capital Stock or similar equity interest distributed to holders of the Common Stock applicable to one share of the Common Stock (determined by reference to the definitions of Closing Price and Trading Day as set forth in Section 1.01, as if references therein to Common Stock were to such Capital Stock or similar equity interest) over the first 10 consecutive Trading Day period immediately following, and including, the Ex-Dividend Date of the Spin-Off (the "**Valuation Period**"); and

$MP_0$    =    the average of the Closing Prices of the Common Stock over the Valuation Period.

63

The increase to the Conversion Rate under the preceding paragraph shall become effective immediately after the close of business on the last Trading Day of the Valuation Period; *provided* that (x) in respect of any conversion of Notes for which Physical Settlement is applicable, if the relevant Conversion Date occurs during the Valuation Period, the references to "10" or "tenth" in the preceding paragraph shall be deemed replaced with such lesser number of Trading Days as have elapsed from, and including, the Ex-Dividend Date for such Spin-Off to, and including, such Conversion Date in determining the Conversion Rate as of such Conversion Date and (y) in respect of any conversion of Notes for which Cash Settlement or Combination Settlement is applicable, for any VWAP Trading Day that falls within the relevant Conversion Reference Period for such conversion and within the Valuation Period, the references to "10" or "tenth" in the preceding paragraph shall be deemed replaced with such lesser number of Trading Days as have elapsed from, and including, the Ex-Dividend Date for such Spin-Off to, and including, such VWAP Trading Day in determining the Conversion Rate as of such VWAP Trading Day.

If any dividend or distribution described in this Section 13.04(c) is declared but not paid or made, the Conversion Rate shall be readjusted to be the Conversion Rate that would then be in effect if such dividend or distribution had not been declared.

For purposes of this Section 13.04(c) (and subject in all respect to Section 13.09), rights, options or warrants distributed by the Company to all holders of the Common Stock entitling them to subscribe for or purchase shares of the Company's Capital Stock, including Common Stock (either initially or under certain circumstances), which rights, options or warrants, until the occurrence of a specified event or events ("**Trigger Event**"): (i) are deemed to be transferred with such shares of the Common Stock; (ii) are not exercisable; and (iii) are also issued in respect of future issuances of the Common Stock, shall be deemed not to have been distributed for purposes of this Section 13.04(c) (and no adjustment to the Conversion Rate under this Section 13.04(c) will be required) until the occurrence of the earliest Trigger Event, whereupon such rights, options or warrants shall be deemed to have been distributed and an appropriate adjustment (if any is required) to the Conversion Rate shall be made under this Section 13.04(c). If any such right, option or warrant, including any such existing rights, options or warrants distributed prior to the date of this Indenture, are subject to events, upon the occurrence of which such rights, options or warrants become exercisable to purchase different securities, evidences of indebtedness or other assets, then the date of the occurrence of any and each such event shall be deemed to be the date of distribution and Ex-Dividend Date with respect to new rights, options or warrants with such rights (in which case the existing rights, options or warrants shall be deemed to terminate and expire on such date without exercise by any of the holders thereof). In addition, in the event of any distribution (or deemed distribution) of rights, options or warrants, or any Trigger Event or other event (of the type described in the immediately preceding sentence) with respect thereto that was counted for purposes of calculating a distribution amount for which an adjustment to the Conversion Rate under this Section 13.04(c) was made, (1) in the case of any such rights, options or warrants that shall all have been redeemed or purchased without exercise by any holders thereof, upon such final redemption or purchase (x) the Conversion Rate shall be readjusted as if such rights, options or warrants had not been distributed and (y) the Conversion Rate shall then again be readjusted to give effect to such distribution, deemed distribution or Trigger Event, as the case may be, as though it were a cash distribution, equal to the per share redemption or purchase price received by a holder or holders of Common Stock with respect to such rights, options or warrants (assuming such holder had retained such rights, options or warrants), made to all holders of Common Stock as of the date of such redemption or purchase, and (2) in the case of

64

such rights, options or warrants that shall have expired or been terminated without exercise by any holders thereof, the Conversion Rate shall be readjusted as if such rights, options and warrants had not been distributed.

For purposes of Section 13.04(a), Section 13.04(b) and this Section 13.04(c), if any dividend or distribution to which this Section 13.04(c) is applicable also includes one or both of:

(A)   a dividend or distribution of shares of Common Stock to which Section 13.04(a) is applicable (the "**Clause A Distribution**"); or

(B)   a dividend or distribution of rights, options or warrants to which Section 13.04(b) is applicable (the "**Clause B Distribution**"),

then, in either case, (1) such dividend or distribution, other than the Clause A Distribution and the Clause B Distribution, shall be deemed to be a dividend or distribution to which this Section 13.04(c) is applicable (the "**Clause C Distribution**") and any Conversion Rate adjustment required by this Section 13.04(c) with respect to such Clause C Distribution shall then be made, and (2) the Clause A Distribution and Clause B Distribution shall be deemed to immediately follow the Clause C Distribution and any Conversion Rate adjustment required by Section 13.04(a) and Section 13.04(b) with respect thereto shall then be made, except that, if determined by the Company (I) the "Ex-Dividend Date" of the Clause A Distribution and the Clause B Distribution shall be deemed to be the Ex-Dividend Date of the Clause C Distribution and (II) any shares of Common Stock included in the Clause A Distribution or Clause B Distribution shall be deemed not to be "outstanding immediately prior to the open of business on such Ex-Dividend Date or Effective Date" within the meaning of Section 13.04(a) or "outstanding immediately prior to the open of business on such Ex-Dividend Date" within the meaning of Section 13.04(b).

(d)   If any cash dividend or distribution is made to all holders of the Common Stock, the Conversion Rate shall be adjusted based on the following formula:

$$CR' = CR_0 \times \frac{SP_0}{SP_0 - C}$$

where,

$CR_0$   =   the Conversion Rate in effect immediately prior to the open of business on the Ex-Dividend Date for such dividend or distribution;

$CR'$   =   the Conversion Rate in effect immediately after the open of business on the Ex-Dividend Date for such dividend or distribution;

$SP_0$   =   the Closing Price of the Common Stock on the Trading Day immediately preceding the Ex-Dividend Date for such dividend or distribution; and

$C$   =   the amount in cash per share the Company distributes to holders of the Common Stock.

65

Any increase pursuant to this Section 13.04(d) shall become effective immediately after the open of business on the Ex-Dividend Date for such dividend or distribution. If such dividend or distribution is declared but not so paid or made, the Conversion Rate shall be decreased, effective as of the date the Board of Directors determines not to pay or make such dividend or distribution, to be the Conversion Rate that would then be in effect if such dividend or distribution had not been declared. Notwithstanding the foregoing, if "C" (as defined above) is equal to or greater than "$SP_0$" (as defined above), in lieu of the foregoing increase, each Holder of a Note shall receive, for each $1,000 principal amount of Notes, at the same time and upon the same terms as holders of shares of the Common Stock, the amount of cash that such Holder would have received if such Holder owned a number of shares of Common Stock equal to the Conversion Rate on the Ex-Dividend Date for such cash dividend or distribution.

(e)     If the Company or any of its Subsidiaries make a payment in respect of a tender offer or exchange offer for the Common Stock, to the extent that the cash and value of any other consideration included in the payment per share of the Common Stock exceeds the Closing Price of the Common Stock on the Trading Day next succeeding the last date (such last date, the "**Expiration Date**") on which tenders or exchanges may be made pursuant to such tender or exchange offer, the Conversion Rate shall be increased based on the following formula:

$$CR' = CR_0 \times \frac{AC + (SP' \times OS')}{OS_0 \times SP'}$$

where,

$CR_0$  =  the Conversion Rate in effect immediately prior to the close of business on the tenth Trading Day immediately following such Expiration Date;

$CR'$  =  the Conversion Rate in effect immediately after the close of business on the tenth Trading Day immediately following such Expiration Date;

$AC$  =  the aggregate value of all cash and any other consideration (as determined in good faith by the Company) paid or payable for shares of Common Stock purchased in such tender or exchange offer;

$OS_0$  =  the number of shares of Common Stock outstanding immediately prior to such Expiration Date (including the shares of Common Stock purchased or exchanged pursuant to such tender or exchange offer);

$OS'$  =  the number of shares of Common Stock outstanding immediately after such Expiration Date (excluding the shares of Common Stock purchased or exchanged pursuant to such tender or exchange offer); and

$SP'$  =  the average of the Closing Prices of the Common Stock over the 10 consecutive Trading Days commencing on, and including, the Trading Day next succeeding such Expiration Date.

The increase to the Conversion Rate under this Section 13.04(e) shall become effective immediately after the close of business on the tenth Trading Day immediately following such

66

Expiration Date; *provided* that (x) in respect of any conversion of Notes for which Physical Settlement is applicable, if the relevant Conversion Date occurs during the 10 consecutive Trading Days immediately following, and including, the Trading Day next succeeding such Expiration Date, each reference to "10" or "tenth" in the preceding paragraph shall be deemed replaced with such lesser number of Trading Days as have elapsed from, and including, the Trading Day next succeeding such Expiration Date to, and including, such Conversion Date in determining the Conversion Rate as of such Conversion Date; and (y) in respect of any conversion of Notes for which Cash Settlement or Combination Settlement is applicable, for any VWAP Trading Day that falls within the relevant Conversion Reference Period for such conversion and within the 10 Trading Days immediately following, and including, the Trading Day next succeeding such Expiration Date, each reference to "10" or "tenth" in the preceding paragraph shall be deemed replaced with such lesser number of Trading Days as have elapsed from, and including, the Trading Day next succeeding such Expiration Date to, and including, such VWAP Trading Day in determining the Conversion Rate as of such VWAP Trading Day. If the Company or one of its Subsidiaries is obligated to purchase shares of Common Stock pursuant to any such tender or exchange offer, but the Company or such Subsidiary is permanently prevented by applicable law from effecting all or any such purchases or all or any portion of such purchases are rescinded, the Conversion Rate shall again be adjusted to be the Conversion Rate that would then be in effect if such tender or exchange offer had not been made or had only been made in respect of the purchases that had been effected.

(f)    Notwithstanding this Section 13.04 or any other provision of this Indenture or the Notes, if, in respect of any conversion of the Notes to which Physical Settlement applies or to which Combination Settlement applies and, on any VWAP Trading Day during the relevant Conversion Reference Period, shares of the Common Stock are deliverable as part of the Daily Settlement Amount for such VWAP Trading Day, any adjustment to the Conversion Rate described in clauses (a), (b), (c), (d) or (e) of this Section 13.04 becomes effective on any Ex-Dividend Date, and the Holder of such Notes would (i) receive shares of the Common Stock in respect of such conversion (in the case of Physical Settlement) or in respect of such VWAP Trading Day (in the case of Combination Settlement) based on an adjusted Conversion Rate and (ii) be a record holder of such shares of Common Stock as of the Record Date for the relevant dividend, distribution or other event giving rise to the adjustment to the Conversion Rate, then, notwithstanding the Conversion Rate adjustment provisions in this Section 13.04, in lieu of receiving shares of Common Stock at such an adjusted Conversion Rate, such Holder shall receive a number of shares of Common Stock based on the unadjusted Conversion Rate and such shares of Common Stock shall participate in the related dividend, distribution or other event giving rise to such adjustment.

(g)    If, in the case of any conversion of a Note, where either (x) Combination Settlement applies and on any VWAP Trading Day during the Conversion Reference Period corresponding to the Conversion Date for such Note, shares of Common Stock are deliverable as part of the Daily Settlement Amount for such VWAP Trading Day or (y) Physical Settlement applies to such conversion, and, in either case:

(i) the related Record Date for any issuance, dividend or distribution, the Effective Date for any share split or combination or the Expiration Date for any tender or exchange offer by the Company or its Subsidiaries that, in each case, would require an adjustment to the Conversion Rate pursuant to any of clauses (a), (b), (c), (d) or (e) of this Section 13.04 occurs on or prior to such Conversion Date (in the case of Physical Settlement) or such VWAP Trading Day (in the case of Combination Settlement);

(ii) the applicable Conversion Rate for such Conversion Date (in the case of Physical Settlement) or such VWAP Trading Day (in the case of Combination Settlement) will not reflect such adjustment; and

67

(iii) the shares of Common Stock that the Company shall deliver to the converting Holder for such conversion (in the case of Physical Settlement) or in respect of such VWAP Trading Day (in the case of Combination Settlement) are not entitled to participate in the relevant event (because such shares were not held by such Holder on the related Record Date, Effective Date, Expiration Date or otherwise),

then, solely for purposes of such conversion, the Company shall, without duplication, give effect to such adjustment in respect of such Conversion Date (in the case of Physical Settlement) or such VWAP Trading Day (in the case of Combination Settlement). In such case, if the date the Company is otherwise required to deliver the consideration due upon such conversion is before the first date on which the amount of such adjustment can be determined, then the Company shall delay the settlement of such conversion until the second Business Day after such first date.

(h)   Except as stated herein, the Company shall not adjust the Conversion Rate for the issuance of shares of the Common Stock or any securities convertible into or exchangeable for shares of the Common Stock or the right to purchase shares of the Common Stock or such convertible or exchangeable securities. If, however, the application of the formulas in clauses (a), (b), (c), (d) and (e) of this Section 13.04 would result in a decrease in the Conversion Rate, no adjustment to the Conversion Rate shall be made (except on account of share combinations, and without limiting the operation of any provision of Section 13.04 providing for the readjustment of the Conversion Rate).

(i)   In addition to those adjustments required by clauses (a), (b), (c), (d) and (e) of this Section 13.04, and to the extent permitted by applicable law and subject to the applicable rules of any exchange on which any of the Company's securities are then listed, the Company from time to time may increase the Conversion Rate by any amount for a period of at least 20 Business Days if the Company has determined that such increase would be in the Company's best interest. If the Company makes such a determination, it shall be conclusive. In addition, to the extent permitted by applicable law and subject to the applicable rules of any exchange on which any of the Company's securities are then listed, the Company may (but is not required to) in its sole discretion increase the Conversion Rate as the Company deems advisable to avoid or diminish any income tax to holders of the Company's Common Stock or rights to purchase the Company's Common Stock resulting from any dividend or distribution of Common Stock (or rights to acquire such Common Stock) or from any event treated as such for income tax purposes. Whenever the Conversion Rate is increased pursuant to this Section 13.04(i), the Company shall give in writing to the Trustee and the Conversion Agent (if other than the Trustee) and mail to the Holder of each Note at its last address appearing on the Note Register a written notice of the increase no later than the first day on which such increased Conversion Rate takes effect, and such notice shall state the increased Conversion Rate and the period during which it will be in effect.

(j)   Notwithstanding anything to the contrary in this Article 13, the Conversion Rate shall not be adjusted:

(i)  upon the issuance of any shares of Common Stock pursuant to any present or future plan providing for the reinvestment of dividends or interest payable on the Company's securities and the investment of additional optional amounts in shares of Common Stock under any plan;

(ii)  upon the issuance of any shares of Common Stock or options or rights to purchase those shares pursuant to any present or future employee, director or consultant benefit plan or program or employee stock purchase plan of or assumed by the Company or any of the Company's Subsidiaries;

(iii) upon the issuance of any shares of the Common Stock pursuant to any option, warrant, right or exercisable, exchangeable or convertible security not described in clause (ii) of this subsection and outstanding as of the date the Notes were first issued;

68

(iv) solely for a change in the par value of the Common Stock; or

(v) for accrued and unpaid interest, if any.

(k)    All calculations and other determinations under this Article 13 shall be made by the Company and shall be made to the nearest one-ten thousandth (1/10,000th) of a share. The Company shall not adjust the Conversion Rate pursuant to this Section 13.04 unless the adjustment would result in a change of at least 1% in the then-effective Conversion Rate. However, the Company shall carry forward any adjustment that it would otherwise have to make and take that adjustment into account in any subsequent adjustment. Notwithstanding the foregoing, all such carried-forward adjustments shall be made with respect to the Notes (i) in connection with any subsequent adjustment to the Conversion Rate that (taken together with such carried-forward adjustments) would result in a change of at least 1% in the Conversion Rate, (ii)(x) on the Conversion Date for any Notes (in the case of Physical Settlement) or (y) on each VWAP Trading Day of any Conversion Reference Period related to the conversion of Notes (in the case of Cash Settlement or Combination Settlement), (iii) on the date any Fundamental Change or Make-Whole Fundamental Change occurs, (iv) on the date the Company delivers a Redemption Notice for all or any Notes and (v) on October 15, 2029.

(l)    Whenever the Conversion Rate is adjusted as herein provided, the Company shall promptly file with the Trustee (and the Conversion Agent if not the Trustee) an Officer's Certificate setting forth the Conversion Rate after such adjustment and setting forth a brief statement of the facts requiring such adjustment. Unless and until a Responsible Officer of the Trustee shall have received such Officer's Certificate, the Trustee shall not be deemed to have knowledge of any adjustment of the Conversion Rate and may assume without inquiry that the last Conversion Rate of which it has knowledge is still in effect. Promptly after delivery of such certificate, the Company shall prepare a notice of such adjustment of the Conversion Rate setting forth the adjusted Conversion Rate and the date on which each adjustment becomes effective and shall mail such notice of such adjustment of the Conversion Rate to each Holder at its last address appearing on the Note Register of this Indenture. Failure to deliver such notice shall not affect the legality or validity of any such adjustment.

(m)    For purposes of this Section 13.04, the number of shares of Common Stock at any time outstanding shall not include shares of Common Stock held in the treasury of the Company so long as the Company does not pay any dividend or make any distribution on shares of Common Stock held in the treasury of the Company, but shall include shares of Common Stock issuable in respect of scrip certificates issued in lieu of fractions of shares of Common Stock.

Section 13.05    *Adjustments of Prices*. Whenever any provision of this Indenture requires the Company to calculate the Closing Prices, the Daily VWAPs, the Daily Conversion Values or the Daily Settlement Amounts over a span of multiple days (including a Conversion Reference Period and the period, if any, for determining the Stock Price for purposes of a Make-Whole Fundamental Change or a Redemption Notice), the Company shall make appropriate adjustments to each to account for any adjustment to the Conversion Rate that becomes effective, or any event requiring an adjustment to the Conversion Rate where the Ex-Dividend Date, Effective Date or Expiration Date, as the case may be, of the event occurs, at any time during the period when the Closing Prices, the Daily VWAPs, the Daily Conversion Values or the Daily Settlement Amounts are to be calculated.

Section 13.06    *Shares to Be Fully Paid, Etc* . The Company shall provide, free from preemptive rights, out of its authorized but unissued shares or shares held in treasury, sufficient shares of Common Stock to provide for conversion of the Notes from time to time as such Notes are presented for conversion (assuming that at the time of computation of such number of shares, all such Notes would be converted by a single Holder and that Physical Settlement were applicable). The Company covenants that all shares of Common Stock issued upon conversion of Notes will be fully paid and non-assessable by the Company and free from all taxes, liens and charges with respect to the issue thereof. The Company further covenants that if at any time the

69

Common Stock shall be listed on any national securities exchange or automated quotation system the Company will use commercially reasonable efforts to list and keep listed, so long as the Common Stock shall be so listed on such exchange or automated quotation system, any Common Stock issuable upon conversion of the Notes.

Section 13.07    *Effect of Recapitalizations, Reclassifications and Changes of the Common Stock .*

(a)    In the case of:

(i) any recapitalization, reclassification or change of the Common Stock (other than changes resulting from a subdivision or combination),

(ii) any consolidation, merger, binding share exchange or combination involving the Company, or

(iii) any sale, lease or other conveyance to another Person or entity of all or substantially all of the Company's assets,

in each case, as a result of which the Common Stock would be converted into, or exchanged for, stock, other securities, other property or assets (including cash or any combination thereof) (any such event, a "**Share Exchange Event**," and such stock, other securities, other property or assets, the "**Reference Property**," and the amount and kind of Reference Property that a holder of one share of Common Stock would be entitled to receive on account of such Share Exchange Event (without giving effect to any arrangement not to issue or deliver a fractional portion of any security or other property) a "**Reference Property Unit**"), then, at and after the effective time of such Share Exchange Event, (A) the consideration due upon conversion of any Note, and the conditions to any such conversion, shall be determined in the same manner as if each reference to any number of shares of Common Stock in Article 13 (or in any related definitions or provisions) were instead a reference to the same number of Reference Property Units; (B) the Daily VWAP shall be calculated based on the value of a Reference Property Unit; (C) for purposes of the definitions of "Fundamental Change" and "Make-Whole Fundamental Change," the term "Common Stock" shall be deemed to mean Common Equity (or ADRs or other interests in respect of Common Equity), if any, forming part of such Reference Property; and (D) for purposes of Article 15, each reference to any number of shares of Common Stock in Article 15 (or in any related definitions) will instead be deemed to be a reference to the same number of Reference Property Units. In addition, prior to or at the effective time of such Share Exchange Event, the Company or the successor or purchasing Person, as the case may be, shall execute with the Trustee a supplemental indenture permitted under Section 10.01(c) providing that the Notes will be convertible as described in this Section 13.07.

If the Share Exchange Event causes the Common Stock to be converted into, or exchanged for, the right to receive more than a single type of consideration (determined based in part upon any form of stockholder election), then the composition of the Reference Property Unit shall be deemed to be the weighted average of the types and amounts of consideration actually received by all holders of Common Stock. The Company shall notify Holders and, in writing, the Trustee and the Conversion Agent (if other than the Trustee) of such composition of the Reference Property Unit as soon as practicable after such determination is made. If the holders of the Common Stock receive only cash in such Share Exchange Event, then for all conversions for which the relevant Conversion Date occurs on or after the effective date of such Share Exchange Event (i) the consideration due upon conversion of each $1,000 principal amount of Notes shall be solely cash in an amount equal to the Conversion Rate in effect on the Conversion Date (as

70

may be increased by any Additional Shares pursuant to Section 13.03), *multiplied by* the price paid per share of Common Stock in such Share Exchange Event and (ii) the Company shall satisfy the Conversion Obligation by paying cash to converting Holders on or before the second Business Day immediately following the relevant Conversion Date.

Such supplemental indenture providing that the Notes will be convertible as described in the second immediately preceding paragraph shall, to the extent applicable, also provide for anti-dilution and other adjustments that shall be as nearly equivalent as is possible to the adjustments provided for in this Article 13. If, in the case of any Share Exchange Event, the Reference Property includes shares of stock, securities or other property or assets (including cash or any combination thereof) of a Person other than the successor or purchasing corporation, as the case may be, in such Share Exchange Event, then such supplemental indenture shall also be executed by such other Person and shall contain such additional provisions to protect the interests of the Holders of the Notes as the Company shall reasonably consider necessary by reason of the foregoing, including the provisions providing for the purchase rights set forth in Article 14.

(b)    When the Company executes a supplemental indenture pursuant to subsection (a) of this Section 13.07, the Company shall promptly file with the Trustee an Officer's Certificate briefly stating the reasons therefor, the kind or amount of cash, securities or property or asset that will comprise a Reference Property Unit after any such Share Exchange Event, any adjustment to be made with respect thereto and that all conditions precedent have been complied with, and shall promptly mail notice thereof to all Holders. The Company shall cause notice of the execution of such supplemental indenture to be mailed to each Holder, at its address appearing on the Note Register provided for in this Indenture, within 20 days after execution thereof. Failure to deliver such notice shall not affect the legality or validity of such supplemental indenture.

(c)    The Company shall not become a party to any Share Exchange Event unless its terms are consistent with this Section 13.07. None of the foregoing provisions shall affect the right of a holder of Notes to convert its Notes into cash, shares of Common Stock or a combination of cash and shares of Common Stock, as applicable, as set forth in Section 13.01 and Section 13.02 prior to the effective date of such Share Exchange Event.

(d)    The above provisions of this Section shall similarly apply to successive Share Exchange Events.

Section 13.08    *Responsibility of Trustee*. The Trustee and any other Conversion Agent shall not at any time be under any duty or responsibility to any Holder to determine the Conversion Rate (or any adjustment thereto) or whether any facts exist that may require any adjustment (including any increase) of the Conversion Rate, or with respect to the nature or extent or calculation of any such adjustment when made, or with respect to the method employed, or herein or in any supplemental indenture provided to be employed, in making the same. The Trustee and any other Conversion Agent shall not be accountable with respect to the validity or value (or the kind or amount) of any shares of Common Stock, or of any securities, property or cash that may at any time be issued or delivered upon the conversion of any Note; and the Trustee and any other Conversion Agent make no representations with respect thereto. Neither the Trustee nor any Conversion Agent shall be responsible for any failure of the Company to issue, transfer or deliver any shares of Common Stock or stock certificates or other securities or property or cash upon the surrender of any Note for the purpose of conversion or to comply with any of the duties, responsibilities or covenants of the Company contained in this Article. Without limiting the generality of the foregoing, neither the Trustee nor any Conversion Agent shall be under any responsibility to determine the correctness of any provisions contained in any supplemental indenture entered into pursuant to Section 13.07 relating either to the kind or amount of shares of stock or securities or property (including cash) receivable by Holders upon the conversion of their Notes after any event referred to in such Section 13.07 or to any adjustment to be made with respect thereto, but, subject to the provisions of Section 7.01, may

71

accept (without any independent investigation) as conclusive evidence of the correctness of any such provisions, and shall be protected in relying upon, the Officer's Certificate (which the Company shall be obligated to file with the Trustee prior to the execution of any such supplemental indenture) with respect thereto. Neither the Trustee nor the Conversion Agent shall be responsible for determining whether any event contemplated by Section 13.01(b) has occurred that makes the Notes eligible for conversion or no longer eligible therefor until the Company has delivered to the Trustee and the Conversion Agent the notices referred to in Section 13.01(b) with respect to the commencement or termination of such conversion rights, on which notices the Trustee and the Conversion Agent may conclusively rely, and the Company agrees to deliver such notices to the Trustee and the Conversion Agent immediately after the occurrence of any such event or at such other times as shall be provided for in Section 13.01(b).

Section 13.09    *Stockholder Rights Plans*. To the extent that the Company has a stockholder rights plan in effect upon conversion of the Notes into Common Stock, a Holder who converts Notes shall receive, in addition to the Common Stock, the rights under the rights plan (and the certificates representing the Common Stock upon such conversion shall bear such legends, if any, in each case as may be provided by the terms of any such stockholder rights plan, as the same may be amended from time to time), unless prior to any conversion, the rights have separated from the Common Stock, in which case the Conversion Rate shall be adjusted at the time of separation as if the Company distributed to all holders of Common Stock shares of the Company's Capital Stock, evidences of indebtedness or assets or property as described in Section 13.04(c) above, subject to readjustment in the event of the expiration, termination or redemption of such rights. A further adjustment shall occur as described in Section 13.04(c) if such rights become exercisable to purchase different securities, evidences of indebtedness or assets or property, subject to readjustment in the event of the expiration, termination or redemption of such rights. Notwithstanding anything to the contrary, the adoption or distribution of rights pursuant to a rights plan will not result in an adjustment to the Conversion Rate pursuant to Section 13.04 or this Section 13.09 except to the extent described in the preceding two sentences.

# ARTICLE 14
## REPURCHASE OF NOTES AT OPTION OF HOLDERS

Section 14.01    *Repurchase at Option of Holders Upon a Fundamental Change.*

(a)    If a Fundamental Change occurs at any time, each Holder shall have the right, at such Holder's option, to require the Company to repurchase for cash all of such Holder's Notes, or any portion thereof that is equal to $1,000 or an integral multiple of $1,000, on the date (the "**Fundamental Change Repurchase Date**") specified by the Company that is no less than 20 Business Days and no more than 40 calendar days after the date of the Fundamental Change Company Notice at a repurchase price equal to 100% of the principal amount thereof, *plus* any accrued and unpaid interest thereon to, but not including, the Fundamental Change Repurchase Date (the "**Fundamental Change Repurchase Price**"), unless the Fundamental Change Repurchase Date falls after a Regular Record Date but on or prior to the immediately succeeding Interest Payment Date to which such Regular Record Date relates, in which case the Company shall instead pay, on or, at the Company's election, before such Interest Payment Date, the full amount of such accrued and unpaid interest due on such Interest Payment Date to Holders of record as of the close of business on such Regular Record Date, and the Fundamental Change Repurchase Price shall be equal to 100% of the principal amount of Notes to be repurchased pursuant to this Article 14. The Fundamental Change Repurchase Date shall be subject to postponement in order to allow the Company to comply with any change in applicable law after the date of this Indenture.

(b)    Repurchases of Notes under this Section 14.01 shall be made, at the option of the Holder thereof, upon:

(i)    delivery to the Paying Agent by a Holder of a duly completed notice (the "**Fundamental Change Repurchase Notice**") in the form set forth in Attachment 2 to the Form of Note attached hereto as Exhibit A, if the Notes are Physical Notes, or in

72

compliance with the Depositary's procedures for surrendering interests in Global Notes, if the Notes are Global Notes, in each case, on or before the close of business on the Business Day immediately preceding the Fundamental Change Repurchase Date; and

(ii) delivery of the Notes, if the Notes are Physical Notes, to the Paying Agent at any time after delivery of the Fundamental Change Repurchase Notice (together with all necessary endorsements for transfer) at the Corporate Trust Office of the Paying Agent, or book-entry transfer of the Notes, if the Notes are Global Notes, in compliance with the procedures of the Depositary, in each case such delivery being a condition to receipt by the Holder of the Fundamental Change Repurchase Price therefor.

The Fundamental Change Repurchase Notice in respect of any Notes to be repurchased shall state:

(i)   if Physical Notes have been issued, the certificate numbers of the Notes to be delivered for repurchase;

(ii)   the portion of the principal amount of Notes to be repurchased, which must be $1,000 or an integral multiple thereof; and

(iii)   that the Notes are to be repurchased by the Company pursuant to the applicable provisions of the Notes and this Indenture;

*provided*, *however*, that if the Notes are Global Notes, the Fundamental Change Repurchase Notice must comply with appropriate Depositary procedures.

Notwithstanding anything herein to the contrary, any Holder delivering to the Paying Agent the Fundamental Change Repurchase Notice contemplated by this Section 14.01 shall have the right to withdraw, in whole or in part, such Fundamental Change Repurchase Notice by delivery of a written notice of withdrawal to the Paying Agent in accordance with Section 14.02 prior to the close of business on the Business Day immediately preceding the Fundamental Change Repurchase Date.

The Paying Agent shall promptly notify the Company of the receipt by it of any Fundamental Change Repurchase Notice or written notice of withdrawal thereof.

(c)   No later than 20 calendar days after the occurrence of the effective date of a Fundamental Change, the Company shall provide to all Holders of Notes, the Trustee and the Paying Agent (in the case of a Paying Agent other than the Trustee), a notice in writing (the " **Fundamental Change Company Notice**") of the occurrence of the effective date of the Fundamental Change and of the repurchase right at the option of the Holders arising as a result thereof and the procedures that each Holder of a Note must follow to require the Company to repurchase such Note. In the case of Physical Notes, such notice shall be by first class mail or, in the case of Global Notes, such notice shall be delivered in accordance with the applicable procedures of the Depositary. Each Fundamental Change Company Notice shall specify:

(i)  the events causing the Fundamental Change;

(ii)  the date of the Fundamental Change;

(iii) the last date on which a Holder may exercise the repurchase right pursuant to this Article 14;

(iv) the Fundamental Change Repurchase Price;

73

(v) the Fundamental Change Repurchase Date;

(vi) the name and address of the Paying Agent and the Conversion Agent, if applicable;

(vii) the Conversion Rate and, if applicable, any adjustments to the Conversion Rate;

(viii) that the Notes with respect to which a Fundamental Change Repurchase Notice has been delivered by a Holder may be converted only if the Holder withdraws the Fundamental Change Repurchase Notice in accordance with the terms of this Indenture; and

(ix) the procedures that Holders must follow to require the Company to repurchase their Notes.

No failure of the Company to give the foregoing notices and no defect therein shall limit the Holders' repurchase rights or affect the validity of the proceedings for the repurchase of the Notes pursuant to this Section 14.01.

At the Company's written request, the Trustee shall give such notice in the Company's name and at the Company's expense; *provided*, *however*, that, in all cases, the text of such Fundamental Change Company Notice shall be prepared by the Company.

(d)    Notwithstanding the foregoing, no Notes may be repurchased by the Company on any date at the option of the Holders upon a Fundamental Change if the principal amount of the Notes has been accelerated, and such acceleration has not been rescinded, on or prior to such date (except in the case of an acceleration resulting from a Default by the Company in the payment of the Fundamental Change Repurchase Price with respect to such Notes). The Paying Agent will promptly return to the respective Holders thereof any Physical Notes held by it during the acceleration of the Notes (except in the case of an acceleration resulting from a Default by the Company in the payment of the Fundamental Change Repurchase Price with respect to such Notes), or any instructions for book-entry transfer of the Notes in compliance with the procedures of the Depositary shall be deemed to have been cancelled, and, upon such return or cancellation, as the case may be, the Fundamental Change Repurchase Notice with respect thereto shall be deemed to have been withdrawn.

(e)    Notwithstanding anything to the contrary in this Indenture, the Company shall be deemed to satisfy its obligations to repurchase Notes upon a Fundamental Change pursuant to this Article 14 if one or more third parties conduct the repurchase offer and repurchase Notes surrendered for repurchase in a manner that would have satisfied the Company's obligations to do the same if conducted directly by the Company.

(f)    Notwithstanding anything to the contrary in this Indenture, the Company shall not be required to send a Fundamental Change Company Notice, or offer to repurchase or repurchase any Notes pursuant to this Article 14, in connection with a Fundamental Change occurring pursuant to clause (b)(i) or (b)(ii) (or pursuant to clause (a) that also constitutes a Fundamental Change pursuant to clause (b)(i) or (b)(ii)) of the definition thereof, if:

(i)    such Fundamental Change constitutes a Share Exchange Event for which the resulting Reference Property consists entirely of cash in U.S. dollars;

(ii)    immediately after such Fundamental Change, the Notes become convertible (pursuant to the provisions described in Section 13.07 and, if applicable, Section 13.03) into consideration that consists solely of U.S. dollars in an amount per $1,000 principal amount of Notes that equals or exceeds the Fundamental Change Repurchase Price per $1,000 principal amount of Notes (calculated assuming a

74

Fundamental Change Repurchase Date that results in a Fundamental Change Repurchase Price that includes the maximum amount of accrued interest); and

(iii) the Company timely sends the notice relating to such Fundamental Change required pursuant to Section 13.01(b)(iii).

Section 14.02    *Withdrawal of Fundamental Change Repurchase Notice.* A Fundamental Change Repurchase Notice may be withdrawn (in whole or in part) by means of a written notice of withdrawal delivered to the Corporate Trust Office of the Paying Agent in accordance with this Section 14.02 at any time prior to the close of business on the Business Day immediately preceding the Fundamental Change Repurchase Date, specifying:

(a)    the principal amount of the Notes with respect to which such notice of withdrawal is being submitted,

(b)    if Physical Notes have been issued, the certificate number of the Note in respect of which such notice of withdrawal is being submitted, and

(c)    the principal amount of such Note, if any, that remains subject to the original Fundamental Change Repurchase Notice, which portion must be in principal amounts of $1,000 or an integral multiple of $1,000;

*provided*, *however*, that if the Notes are Global Notes, the notice of withdrawal must comply with appropriate procedures of the Depositary.

Section 14.03    *Deposit of Fundamental Change Repurchase Price.*

(a)    The Company shall deposit with the Trustee (or other Paying Agent appointed by the Company, or if the Company is acting as its own Paying Agent, set aside, segregate and hold in trust as provided in Section 4.04) on or prior to 11:00 a.m., New York City time, on the Fundamental Change Repurchase Date an amount of money sufficient to repurchase all of the Notes to be repurchased at the appropriate Fundamental Change Repurchase Price. Subject to receipt of funds and/or Notes by the Trustee (or other Paying Agent appointed by the Company), payment for Notes surrendered for repurchase (and not withdrawn prior to the close of business on the Business Day immediately preceding the Fundamental Change Repurchase Date) will be made on the later of (i) the Fundamental Change Repurchase Date (*provided* the Holder has satisfied the conditions in Section 14.01) and (ii) the time of book-entry transfer or the delivery of such Note to the Trustee (or other Paying Agent appointed by the Company) by the Holder thereof in the manner required by Section 14.01 by mailing checks for the amount payable to the Holders of such Notes entitled thereto as they shall appear in the Note Register; *provided*, *however*, that payments to the Depositary shall be made by wire transfer of immediately available funds to the account of the Depositary or its nominee. The Trustee shall, promptly after such payment and upon written demand by the Company, return to the Company any funds in excess of the Fundamental Change Repurchase Price.

(b)    If by 11:00 a.m. New York City time, on the Fundamental Change Repurchase Date, the Trustee (or other Paying Agent appointed by the Company) holds money sufficient to make payment on all the Notes or portions thereof that are to be repurchased on such Fundamental Change Repurchase Date, then, with respect to the Notes that have been properly surrendered for repurchase and have not been validly withdrawn, immediately after the Fundamental Change Repurchase Date (i) such Notes will cease to be outstanding, (ii) interest will cease to accrue on such Notes (whether or not book-entry transfer of the Notes has been made or the Notes have been delivered to the Trustee or Paying Agent) and (iii) all other rights of the Holders of such Notes will terminate, other than the right to receive the Fundamental Change Repurchase Price and, if applicable, accrued and unpaid interest, upon book-entry transfer of such Notes or delivery of such Notes to the Trustee or Paying Agent.

75

(c)    Upon surrender of a Note that is to be repurchased in part pursuant to Section 14.01, the Company shall execute and the Trustee shall authenticate and deliver to the Holder a new Note in an authorized denomination equal in principal amount to the unrepurchased portion of the Note surrendered.

Section 14.04    *Covenant to Comply with Applicable Laws Upon Repurchase of Notes* . In connection with any repurchase offer, the Company will, if required:

(a)    comply with the provisions of Rule 13e-4, Rule 14e-1 and any other tender offer rules under the Exchange Act;

(b)    file a Schedule TO or any other required schedule under the Exchange Act; and

(c)    otherwise comply with all federal and state securities laws in connection with any offer by the Company to repurchase the Notes;

in each case, so as to permit the rights and obligations under this Article 14 to be exercised in the time and in the manner specified in this Article 14.

ARTICLE 15
OPTIONAL REDEMPTION

Section 15.01 *Optional Redemption*. No sinking fund is provided for the Notes. The Notes shall not be redeemable by the Company prior to January 24, 2028. On or after January 24, 2028, the Company may redeem (an "**Optional Redemption**") for cash all or any portion of the Notes (subject to the Partial Redemption Limitation), at the Company's option, on a Redemption Date occurring on or after January 24, 2028 and before the 41st Scheduled Trading Day before the Maturity Date, at the Redemption Price, but only if (i) the Notes are Freely Tradable as of the date on which the Company sends the related Redemption Notice, and all accrued and unpaid Additional Interest, if any, has been paid in full as of the most recent Interest Payment Date occurring on or before the date on which the Company sends such Redemption Notice; and (ii) the Last Reported Sale Price of the Common Stock has been at least 130% of the Conversion Price then in effect for each of at least 20 Trading Days (whether or not consecutive), including the Trading Day immediately preceding the date on which the Company provides the Redemption Notice in accordance with Section 15.02, during the 30 consecutive Trading Days ending on, and including, the Trading Day immediately preceding the date on which the Company provides such Redemption Notice in accordance with Section 15.02.

Section 15.02    *Notice of Optional Redemption; Selection of Notes.*

(a)    If the Company exercises its Optional Redemption right to redeem all or any part of the Notes pursuant to Section 15.01, it shall fix a date for redemption (each, a "**Redemption Date**") and it or, at its written request received by the Trustee not less than 53 Scheduled Trading Days (or, if the Company is relying on the second proviso to this sentence, 35 calendar days) prior to the Redemption Date (or such shorter period of time as may be acceptable to the Trustee), the Trustee, in the name of and at the expense of the Company, shall deliver or cause to be delivered a notice of such Optional Redemption (a "**Redemption Notice**") not less than 50 nor more than 65 Scheduled Trading Days prior to the Redemption Date to each Holder of Notes so to be redeemed as a whole or in part; *provided*, *however*, that, if the Company shall give such notice, it shall also give written notice of the Redemption Date to the Trustee and the Paying Agent (if other than the Trustee); *provided further*, that if, in accordance with Section 13.02, the Company elects to settle all conversions with a Conversion Date that occurs on or after the date on which the Company provides the Redemption Notice and on or before the second Business Day immediately preceding the relevant Redemption Date by Physical Settlement, then the Company may instead provide such Redemption Notice no less than 30 nor more than 60 calendar days before the Redemption Date. The Redemption Date must be a Business Day. Upon surrender of a Note that is to be redeemed in part pursuant to this Article 15, the Company shall execute and the

76

Trustee shall authenticate and deliver to the Holder a new Note in principal amount equal to the unredeemed portion of the Note surrendered.

(b)    A Redemption Notice, if delivered in the manner herein provided, shall be conclusively presumed to have been duly given, whether or not the Holder receives such Redemption Notice. In any case, failure to send such Redemption Notice or any defect in the Redemption Notice to the Holder of any Note designated for redemption as a whole or in part shall not affect the validity of the proceedings for the redemption of any other Note. A Redemption Notice, once sent, shall be irrevocable.

(c)    Each Redemption Notice shall specify:

(i)  the Redemption Date;

(ii)  the Redemption Price;

(iii) that on the Redemption Date, the Redemption Price will become due and payable upon each Note to be redeemed, and that interest thereon, if any, shall cease to accrue on and after the Redemption Date (except, if applicable, as provided in the parenthetical in the definition of Redemption Price);

(iv) that Holders of Notes called for Optional Redemption (or deemed called for Optional Redemption pursuant to the third paragraph of Section 15.02(d)) may surrender their Notes for conversion at any time prior to the close of business on the second Business Day immediately preceding the Redemption Date;

(v)  the procedures a converting Holder must follow to convert its Notes and the Settlement Method and Specified Dollar Amount (if applicable) for Conversion Dates occurring during the period set forth in Section 13.01(b)(v);

(vi) the Conversion Rate and, if applicable, the number of Additional Shares added to the Conversion Rate pursuant to Section 13.03;

(vii)  the CUSIP, ISIN or other similar numbers, if any, assigned to such Notes; and

(viii)  in case the Notes are to be redeemed in part only, that upon surrender of any Note to be redeemed in part, a new Note in principal amount equal to the unredeemed portion thereof shall be issued.

(d)    If the Company elects to redeem fewer than all of the outstanding Notes, at least $100,000,000 aggregate principal amount of Notes must be outstanding and not subject to Optional Redemption as of, and after giving effect to, delivery of the relevant Redemption Notice (such requirement, the "**Partial Redemption Limitation**"). If the Company is to redeem fewer than all of the outstanding Notes and the Notes to be redeemed are Global Notes, the Notes or portions thereof to be redeemed shall be selected by the Depositary in accordance with the applicable procedures of the Depositary. If the Company is to redeem fewer than all of the outstanding Notes and the Notes to be redeemed are not Global Notes, the Trustee shall select the Notes or portions thereof to be redeemed on a *pro rata* basis; *provided* that, in each case, Notes will be selected for Optional Redemption only in principal amounts of $1,000 or integral multiples of $1,000 in excess thereof.

(e)    If any Note selected for partial redemption is submitted for conversion in part after such selection, the portion of the Note submitted for conversion shall be deemed to be from the portion selected for Optional Redemption. In the event of any redemption in part, the Company shall not be required to register the transfer of or exchange for other Notes any Note so selected for redemption, in whole or in part, except the unredeemed portion of any Note being redeemed in part.

If the Company elects to call fewer than all of the outstanding Notes for Optional Redemption, and the Holder of any Note, or any owner of a beneficial interest in any Global Note, is reasonably not able to determine, before the close of business on the 42nd Scheduled Trading Day (or, if, pursuant to the second proviso of the first sentence of Section 15.02, the Company irrevocably elects Physical Settlement for all conversions with a Conversion Date that occurs on or after the date the Company sends the related Redemption Notice and on or before the second Business Day immediately preceding the related Redemption Date, the tenth calendar day) immediately preceding the relevant Redemption Date, whether such Note or beneficial interest, as applicable, is to be redeemed pursuant to such Optional Redemption, then such Holder or owner, as applicable, will be entitled to convert such Note or beneficial interest, as applicable, at any time before the close of business on the second Business Day immediately preceding such Redemption Date, and each such conversion shall be deemed to be of a Note called for redemption for purposes of this Article 15, Section 13.01(b)(v) and Section 13.03.

Section 15.03    *Payment of Notes Called for Redemption.*

(a)    If any Redemption Notice has been given in respect of the Notes in accordance with Section 15.02, the Notes shall become due and payable on the Redemption Date at the place or places stated in the Redemption Notice and at the applicable Redemption Price. On presentation of the Notes at the place or places stated in the Redemption Notice, the Notes shall be paid and redeemed by the Company at the applicable Redemption Price.

(b)    Subject to receipt of funds by the Paying Agent, payment for the Notes to be redeemed shall be made on the Redemption Date for such Notes. The Paying Agent shall, promptly after such payment and upon written demand by the Company, return to the Company any funds deposited pursuant to Section 4.04 in excess of the Redemption Price.

Section 15.04    *Restrictions on Redemption*. The Company may not redeem any Notes on any date if the principal amount of the Notes has been accelerated in accordance with the terms of this Indenture, and such acceleration has not been rescinded, on or prior to the Redemption Date (except in the case of an acceleration resulting from a Default by the Company in the payment of the Redemption Price with respect to such Notes).

ARTICLE 16
MISCELLANEOUS PROVISIONS

Section 16.01    *Provisions Binding on Company's Successors.*  All the covenants, stipulations, promises and agreements of the Company contained in this Indenture shall bind its successors and assigns whether so expressed or not.

Section 16.02    *Official Acts by Successor Entity.*  Any act or proceeding by any provision of this Indenture authorized or required to be done or performed by any board, committee or Officer of the Company shall and may be done and performed with like force and effect by the like board, committee or officer of any corporation or other entity that shall at the time be the lawful sole successor of the Company.

Section 16.03    *Addresses for Notices, Etc.*  Except as otherwise expressly provided herein, all notices and other communications provided for hereunder shall be sufficient if in writing and in English and (1) delivered in person, (2) mailed by first-class mail (certified or registered, return receipt requested), postage prepaid, or overnight air courier guaranteeing next day delivery or (3) sent by facsimile or electronic transmission in PDF form. Any notice or demand that by any provision of this Indenture is required or permitted to be given or served by the Trustee or by the Holders on the Company shall be deemed to have been sufficiently given or made for all purposes if given or served by being deposited postage prepaid by registered or certified mail in a post office letter box addressed (until another address is filed by the Company

78

with the Trustee) to Live Nation Entertainment, Inc., 9348 Civic Center Drive, Beverly Hills, CA 90210, fax: (310) 867-7158, Attention: General Counsel. Any notice, direction, request or demand hereunder to or upon the Trustee shall be deemed to have been sufficiently given or made, for all purposes, when received by the Trustee, if given or served by being deposited postage prepaid by registered or certified mail in a post office letter box addressed to the Corporate Trust Office.

The Trustee, by notice to the Company, may designate additional or different addresses for subsequent notices or communications.

Any notice or communication delivered or to be delivered to a Holder of Physical Notes shall be mailed to it by first class mail, postage prepaid, at its address as it appears on the Note Register and shall be sufficiently given to it if so mailed within the time prescribed; *provided* that notices given to Holders of Global Notes may be given through the facilities of the Depositary or any successor depositary, and any notice given in such manner will be deemed to have been given in writing. Any notice or communication delivered or to be delivered to a Holder of Global Notes shall be delivered in accordance with the applicable procedures of the Depositary and shall be sufficiently given to it if so delivered within the time prescribed.

Failure to mail a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders. If a notice or communication is mailed in the manner provided above, it is duly given, whether or not the addressee receives it.

In case by reason of the suspension of regular mail service or by reason of any other cause it shall be impracticable to give such notice to Holders by mail, then such notification as shall be made with the approval of the Trustee shall constitute a sufficient notification for every purpose hereunder.

*Section 16.04    Governing Law; Jurisdiction.* THIS INDENTURE AND EACH NOTE, AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS INDENTURE AND EACH NOTE, SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

The Company irrevocably consents and agrees, for the benefit of the Holders from time to time of the Notes and the Trustee, that any legal action, suit or proceeding against it with respect to obligations, liabilities or any other matter arising out of or in connection with this Indenture or the Notes may be brought in the courts of the State of New York or the courts of the United States located in the Borough of Manhattan, New York City, New York and, until amounts due and to become due in respect of the Notes have been paid, hereby irrevocably consents and submits to the non-exclusive jurisdiction of each such court *in personam*, generally and unconditionally with respect to any action, suit or proceeding for itself in respect of its properties, assets and revenues.

The Company irrevocably and unconditionally waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions, suits or proceedings arising out of or in connection with this Indenture brought in the courts of the State of New York or the courts of the United States located in the Borough of Manhattan, New York City, New York and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

Section 16.05    *Evidence of Compliance with Conditions Precedent; Certificates and Opinions of Counsel to Trustee.*    Upon any application or demand by the Company to the Trustee to take any action under any of the provisions of this Indenture (other than the initial application for authentication of Notes), the Company shall, if requested by the Trustee, furnish to the Trustee an Officer's Certificate and an Opinion of Counsel stating that such action is permitted by the terms of this Indenture.

Each Officer's Certificate and Opinion of Counsel provided for, by or on behalf of the Company in this Indenture and delivered to the Trustee with respect to compliance with this Indenture (other than the Officer's Certificates provided for in Section 4.08) shall include (a) a statement that the person signing such certificate is familiar with the requested action and this Indenture; (b) a brief statement as to the nature and scope of the examination or investigation upon which the statement contained in such certificate is based; (c) a statement that, in the judgment of such person, he or she has made such examination or investigation as is necessary to enable him or her to express an informed judgment as to whether or not such action is permitted by this Indenture; and (d) a statement as to whether or not, in the judgment of such person, such action is permitted by this Indenture.

Section 16.06    *Legal Holidays.* In any case where any Interest Payment Date, the Maturity Date, any Fundamental Change Repurchase Date, any Redemption Date or any settlement date falls on a day that is not a Business Day, then any action to be taken on such date need not be taken on such date, but may be taken on the next succeeding Business Day with the same force and effect as if taken on such date, and no interest shall accrue for the period from and after such Interest Payment Date, Maturity Date, Fundamental Change Repurchase Date, Redemption Date or settlement date, as the case may be, to that next succeeding Business Day.

Section 16.07    *No Security Interest Created*. Nothing in this Indenture or in the Notes, expressed or implied, shall be construed to constitute a security interest under the Uniform Commercial Code or similar legislation, as now or hereafter enacted and in effect, in any jurisdiction.

Section 16.08    *Benefits of Indenture.* Nothing in this Indenture or in the Notes, expressed or implied, shall give to any Person, other than the Holders, the parties hereto, any Paying Agent, any Conversion Agent, any authenticating agent, any Note Registrar and their successors hereunder, any benefit or any legal or equitable right, remedy or claim under this Indenture.

Section 16.09    *Table of Contents, Headings, Etc.* The table of contents and the titles and headings of the articles and sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part hereof, and shall in no way modify or restrict any of the terms or provisions hereof.

Section 16.10    *Authenticating Agent.* The Trustee may appoint an authenticating agent that shall be authorized to act on its behalf and subject to its direction in the authentication and delivery of Notes in connection with the original issuance thereof and transfers and exchanges of Notes hereunder, including under Section 2.04, Section 2.05, Section 2.07, Section 2.08, Section 10.04 and Section 14.03 as fully to all intents and purposes as though the authenticating agent had been expressly authorized by this Indenture and those Sections to authenticate and deliver Notes. For all purposes of this Indenture, the authentication and delivery of Notes by the authenticating agent shall be deemed to be authentication and delivery of such Notes "by the Trustee" and a certificate of authentication executed on behalf of the Trustee by an authenticating agent shall be deemed to satisfy any requirement hereunder or in the Notes for the Trustee's certificate of authentication. Such authenticating agent shall at all times be a Person eligible to serve as trustee hereunder pursuant to Section 7.08.

80

Any corporation or other entity into which any authenticating agent may be merged or converted or with which it may be consolidated, or any corporation or other entity resulting from any merger, consolidation or conversion to which any authenticating agent shall be a party, or any corporation or other entity succeeding to all or substantially all of the corporate trust business of any authenticating agent, shall be the successor of the authenticating agent hereunder, if such successor corporation or other entity is otherwise eligible under this Section 16.10, without the execution or filing of any paper or any further act on the part of the parties hereto or the authenticating agent or such successor corporation or other entity.

Any authenticating agent may at any time resign by giving written notice of resignation to the Trustee and to the Company. The Trustee may at any time terminate the agency of any authenticating agent by giving written notice of termination to such authenticating agent and to the Company. Upon receiving such a notice of resignation or upon such a termination, or in case at any time any authenticating agent shall cease to be eligible under this Section, the Trustee may appoint a successor authenticating agent (which may be the Trustee), shall give written notice of such appointment to the Company and shall mail notice of such appointment to all Holders as the names and addresses of such Holders appear on the Note Register.

The Company agrees to pay to the authenticating agent from time to time reasonable compensation for its services although the Company may terminate the authenticating agent, if it determines such agent's fees to be unreasonable.

The provisions of Section 7.02, Section 7.03, Section 7.04, Section 8.03 and this Section 16.10 shall be applicable to any authenticating agent.

If an authenticating agent is appointed pursuant to this Section 16.10, the Notes may have endorsed thereon, in addition to the Trustee's certificate of authentication, an alternative certificate of authentication in the following form:

_____,

as Authenticating Agent, certifies that this is one of the Notes described in the within-named Indenture.


By: _____

   Authorized Signatory

Section 16.11    *Execution in Counterparts.* This Indenture may be executed in any number of counterparts, each of which shall be an original, but such counterparts shall together constitute but one and the same instrument. The exchange of copies of this Indenture and of signature pages by facsimile or PDF transmission shall constitute effective execution and delivery of this Indenture as to the parties hereto and may be used in lieu of the original Indenture for all purposes. Signatures of the parties hereto transmitted by facsimile or PDF shall be deemed to be their original signatures for all purposes.

Section 16.12    *Severability.* In the event any provision of this Indenture or in the Notes shall be invalid, illegal or unenforceable, then (to the extent permitted by law) the validity, legality or enforceability of the remaining provisions shall not in any way be affected or impaired.

81

Section 16.13    *Waiver of Jury Trial* . EACH OF THE COMPANY AND THE TRUSTEE HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE NOTES OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 16.14    *Force Majeure*. In no event shall the Trustee be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Trustee shall use reasonable efforts that are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

Section 16.15    *Calculations*. Except as otherwise provided herein, the Company shall be responsible for making all calculations called for under the Notes. These calculations include, but are not limited to, determinations of the Closing Prices and/or Daily VWAPs of the Common Stock, the Daily Conversion Values, the Daily Settlement Amounts, accrued interest payable on the Notes and the Conversion Rate of the Notes. The Company shall make all these calculations in good faith and, absent manifest error, the Company's calculations shall be final and binding on Holders of Notes. Upon request from the Trustee or the Conversion Agent, the Company shall provide a schedule of its calculations to the Trustee or the Conversion Agent, as the case may be, and each of the Trustee and Conversion Agent is entitled to rely conclusively upon the accuracy of the Company's calculations without independent verification. The Trustee shall forward the Company's calculations to any Holder of Notes upon the request of that Holder at the sole cost and expense of the Company.

Section 16.16    *Applicable Law*. In order to comply with laws, rules, regulations and executive orders in effect from time to time applicable to banking institutions, including those relating to the funding of terrorist activities and money laundering ("**Applicable Law**"), the Trustee is required to obtain, verify and record certain information relating to individuals and entities which maintain a business relationship with the Trustee. Accordingly, the Company agrees to provide to the Trustee upon its reasonable request from time to time such identifying information and documentation as may be available to the Company in order to enable the Trustee to comply with Applicable Law.

Section 16.17    *Tax Matters*. Notwithstanding any other provision of this Indenture, if the Company or other applicable withholding agent pays withholding taxes or backup withholding on behalf of a Holder or beneficial owner as a result of an adjustment to the Conversion Rate, the Company or other applicable withholding agent may, at its option, set off such payments against payments of cash and shares of Common Stock on the Notes (or any payments on the Company's Common Stock) to, sales proceeds received by, or other funds or assets of, such Holder or beneficial owner. The Company shall give the Trustee notice of the set off of any such payments.

[*Remainder of page intentionally left blank*]

82

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed as of the date first written above.

LIVE NATION ENTERTAINMENT, INC.

By:    /s/ Joe Berchtold
Name: Joe Berchtold
Title: President and Chief Financial Officer

[*Signature Page to Indenture*]

HSBC BANK USA, NATIONAL ASSOCIATION,
 as Trustee


By:      /s/ Oneaka Hendricks
         Name: Oneaka Hendricks
         Title: Vice President


[*Signature Page to Indenture*]

**EXHIBIT A**

[FORM OF FACE OF NOTE]

[INCLUDE FOLLOWING LEGEND IF A GLOBAL NOTE]

[UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT HEREUNDER IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.]

[INCLUDE FOLLOWING LEGEND IF A RESTRICTED SECURITY]

[THIS SECURITY AND THE COMMON STOCK, IF ANY, ISSUABLE UPON CONVERSION OF THIS SECURITY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE ACQUIRER:

(1) REPRESENTS THAT IT AND ANY ACCOUNT FOR WHICH IT IS ACTING IS A "QUALIFIED INSTITUTIONAL BUYER" (WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT) AND THAT IT EXERCISES SOLE INVESTMENT DISCRETION WITH RESPECT TO EACH SUCH ACCOUNT, AND

(2) AGREES FOR THE BENEFIT OF LIVE NATION ENTERTAINMENT, INC. (THE "COMPANY") THAT IT WILL NOT OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THIS SECURITY OR ANY BENEFICIAL INTEREST HEREIN PRIOR TO THE DATE THAT IS THE LATER OF (X) ONE YEAR AFTER THE LAST ORIGINAL ISSUE DATE HEREOF OR SUCH SHORTER PERIOD OF TIME AS PERMITTED BY RULE 144 UNDER THE SECURITIES ACT OR ANY SUCCESSOR PROVISION THERETO AND (Y) SUCH LATER DATE, IF ANY, AS MAY BE REQUIRED BY APPLICABLE LAW, EXCEPT:

(A) TO THE COMPANY OR ANY SUBSIDIARY THEREOF, OR

(B) PURSUANT TO A REGISTRATION STATEMENT THAT HAS BECOME EFFECTIVE UNDER THE SECURITIES ACT, OR

(C) TO A PERSON REASONABLY BELIEVED TO BE A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, OR

(D) PURSUANT TO AN EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT OR ANY OTHER AVAILABLE

A-1

EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

PRIOR TO THE REGISTRATION OF ANY TRANSFER IN ACCORDANCE WITH CLAUSE (2)(D) ABOVE, THE COMPANY AND THE TRUSTEE RESERVE THE RIGHT TO REQUIRE THE DELIVERY OF SUCH LEGAL OPINIONS, CERTIFICATIONS OR OTHER EVIDENCE AS MAY REASONABLY BE REQUIRED IN ORDER TO DETERMINE THAT THE PROPOSED TRANSFER IS BEING MADE IN COMPLIANCE WITH THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.[1]]

---

[1]   This paragraph and the immediately preceding paragraph will be deemed to be removed from the face of this Note at such time when the Company delivers written notice to the Trustee of such deemed removal pursuant to Section 2.06 of the within-mentioned Indenture.

A-2

Live Nation Entertainment, Inc.

2.875% Convertible Senior Note due 2030

No. [_____]    [Initially]² $[_____]

CUSIP No. [_____] [*Insert for a "restricted" CUSIP number*: ³]
ISIN No. [_____] [*Insert for a "restricted" CUSIP number*: [²]]

Live Nation Entertainment, Inc., a corporation duly organized and validly existing under the laws of the State of Delaware (the " **Company**," which term includes any successor corporation or other entity under the Indenture referred to on the reverse hereof), for value received hereby promises to pay to [CEDE & CO.]⁴ [_____]⁵, or registered assigns, the principal sum [as set forth in the "Schedule of Exchanges of Notes" attached hereto] ⁶ [of $[_____]]⁷, which amount, taken together with the principal amounts of all other outstanding Notes, shall not, unless permitted by the Indenture, exceed $1,100,000,000 in aggregate at any time, in accordance with the rules and procedures of the Depositary, on January 15, 2030, and interest thereon as set forth below.

This Note shall bear interest at the rate of 2.875% per year from December 6, 2024, or from the most recent date to which interest had been paid or provided for to, but excluding, the next scheduled Interest Payment Date until January 15, 2030. Interest is payable semi-annually in arrears on each January 15 and July 15, commencing on July 15, 2025, to Holders of record at the close of business on the preceding January 1 and July 1 (whether or not such day is a Business Day), respectively. Additional Interest will be payable as set forth in Section 4.06(d), Section 4.06(e) and Section 6.03 of the within-mentioned Indenture, and any reference to interest on, or in respect of, any Note therein shall be deemed to include Additional Interest (including, if applicable, Deferred Additional Interest and interest on such Deferred Additional Interest) if, in such context, Additional Interest (including, if applicable, Deferred Additional Interest and interest on such Deferred Additional Interest) is, was or would be payable pursuant to any of such Section 4.06(d), Section 4.06(e) or Section 6.03, and any express mention of the payment of Additional Interest, Deferred Additional Interest and/or interest thereon in any provision therein shall not be construed as excluding Additional Interest, Deferred Additional Interest and/or interest thereon in those provisions thereof where such express mention is not made.

Any Defaulted Amounts shall accrue interest per annum at the rate borne by the Notes, subject to the enforceability thereof under applicable law, from, and including, the relevant payment date to, but excluding, the date on which such Defaulted Amounts shall have been paid by the Company, at its election, in accordance with Section 2.03(c) of the Indenture.

The Company shall pay the principal of and interest on this Note, if and so long as such Note is a Global Note, in immediately available funds to the Depositary or its nominee, as the case may be, as the registered Holder of such Note. As provided in and subject to the provisions of the Indenture, the

---

²   Include if a global note.

³   This Note will be deemed to be identified by CUSIP No. [     ] and ISIN No. [     ] from and after such time when the Company delivers, pursuant to Section 2.06 of the within-mentioned Indenture, written notice to the Trustee of the deemed removal of the Restricted Note Legend affixed to this Note.

⁴   Include if a global note.

⁵   Include if a physical note.

⁶   Include if a global note.

⁷   Include if a physical note.

A-3

Company shall pay the principal of any Notes (other than Notes that are Global Notes) at the office or agency designated by the Company for that purpose. The Company has initially designated the Trustee as its Paying Agent and Note Registrar in respect of the Notes and its agency in the United States of America, as a place where Notes may be presented for payment or for registration of transfer and exchange.

Reference is made to the further provisions of this Note set forth on the reverse hereof, including, without limitation, provisions giving the Holder of this Note the right to convert this Note into cash, shares of Common Stock or a combination of cash and shares of Common Stock, as applicable, on the terms and subject to the limitations set forth in the Indenture. Such further provisions shall for all purposes have the same effect as though fully set forth at this place.

**This Note, and any claim, controversy or dispute arising under or related to this Note, shall be construed in accordance with and governed by the laws of the State of New York.**

In the case of any conflict between this Note and the Indenture, the provisions of the Indenture shall control and govern.

This Note shall not be valid or become obligatory for any purpose until the certificate of authentication hereon shall have been signed manually by the Trustee or a duly authorized authenticating agent under the Indenture.

[*Remainder of page intentionally left blank*]

A-4

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed.

LIVE NATION ENTERTAINMENT, INC.

By: _____

Name:
Title:

A-5

TRUSTEE'S CERTIFICATE OF AUTHENTICATION

HSBC BANK USA, NATIONAL ASSOCIATION as Trustee, certifies that this is one of the Notes described in the within-named Indenture.

By: _____

    Authorized Signatory

Dated: _____

A-6

[FORM OF REVERSE OF NOTE]

Live Nation Entertainment, Inc.
2.875% Convertible Senior Note due 2030

This Note is one of a duly authorized issue of Notes of the Company, designated as its 2.875% Convertible Senior Notes due 2030 (the " **Notes**"), limited to the aggregate principal amount of $1,100,000,000 all issued or to be issued under and pursuant to an Indenture dated as of December 6, 2024 (the "**Indenture**"), between the Company and HSBC Bank USA, National Association (the " **Trustee**"), to which Indenture and all indentures supplemental thereto reference is hereby made for a description of the rights, limitations of rights, obligations, duties and immunities thereunder of the Trustee, the Company and the Holders of the Notes. Additional Notes may be issued in an unlimited aggregate principal amount, subject to certain conditions specified in the Indenture. Capitalized terms used in this Note and not defined in this Note shall have the respective meanings set forth in the Indenture.

In case certain Events of Default shall have occurred and be continuing, the principal of, and interest on, all Notes may be declared, by either the Trustee or Holders of at least 25% in aggregate principal amount of Notes then outstanding, and upon said declaration shall become, due and payable, in the manner, with the effect and subject to the conditions and certain exceptions set forth in the Indenture.

Subject to the terms and conditions of the Indenture, the Company will make all payments and deliveries in respect of the Fundamental Change Repurchase Price on the Fundamental Change Repurchase Date, the Redemption Price on the Redemption Date and the principal amount on the Maturity Date, as the case may be, to the Holder who surrenders a Note to a Paying Agent to collect such payments in respect of the Note. The Company will pay cash amounts in money of the United States that at the time of payment is legal tender for payment of public and private debts.

The Indenture contains provisions permitting the Company and the Trustee in certain circumstances, without the consent of the Holders of the Notes, and in certain other circumstances, with the consent of the Holders of not less than a majority in aggregate principal amount of the Notes at the time outstanding, evidenced as in the Indenture provided, to execute supplemental indentures modifying the terms of the Indenture and the Notes as described therein. It is also provided in the Indenture that, subject to certain exceptions, the Holders of a majority in aggregate principal amount of the Notes at the time outstanding may on behalf of the Holders of all of the Notes waive any past Default or Event of Default under the Indenture and its consequences.

No reference herein to the Indenture and no provision of this Note or of the Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay or deliver, as the case may be, the principal (including the Fundamental Change Repurchase Price and the Redemption Price, if applicable) of, accrued and unpaid interest on, and the consideration due upon conversion of, this Note at the place, at the respective times, at the rate and in the lawful money herein prescribed.

The Notes are issuable in registered form without coupons in denominations of $1,000 principal amount and integral multiples thereof. At the office or agency of the Company referred to on the face hereof, and in the manner and subject to the limitations provided in the Indenture, Notes may be exchanged for a like aggregate principal amount of Notes of other authorized denominations, without payment of any service charge but, if required by the Company or Trustee, with payment of a sum sufficient to cover any transfer or similar tax that may be imposed in connection therewith as a result of

A-7

the name of the Holder of the new Notes issued upon such exchange of Notes being different from the name of the Holder of the old Notes surrendered for such exchange.

The Notes shall be redeemable at the Company's option on or after January 24, 2028 in accordance with the terms and subject to the conditions specified in the Indenture. No sinking fund is provided for the Notes.

Upon the occurrence of a Fundamental Change, the Holder has the right, at such Holder's option, to require the Company to repurchase for cash all of such Holder's Notes or any portion thereof (in principal amounts of $1,000 or integral multiples thereof) on the Fundamental Change Repurchase Date at a price equal to the Fundamental Change Repurchase Price.

Subject to the provisions of the Indenture, the Holder hereof has the right, at its option, during certain periods and upon the occurrence of certain conditions specified in the Indenture, prior to the close of business on the second Scheduled Trading Day immediately preceding the Maturity Date, to convert any Notes or portion thereof that is $1,000 or an integral multiple thereof, into cash, shares of Common Stock or a combination of cash and shares of Common Stock, as applicable, at the Conversion Rate specified in the Indenture, as adjusted from time to time as provided in the Indenture.

A-8

ABBREVIATIONS

The following abbreviations, when used in the inscription of the face of this Note, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM = as tenants in common

UNIF GIFT MIN ACT = Uniform Gifts to Minors Act

CUST = Custodian

TEN ENT = as tenants by the entireties

JT TEN = joint tenants with right of survivorship and not as tenants in common
        Additional abbreviations may also be used though not in the above list.

A-9

SCHEDULE A[8]

## SCHEDULE OF EXCHANGES OF NOTES

Live Nation Entertainment, Inc.
2.875% Convertible Senior Notes due 2030

The initial principal amount of this Global Note is [_____] DOLLARS ($[_____]). The following increases or decreases in this Global Note have been made:

| Date of exchange | Amount of decrease in principal amount of this Global Note | Amount of increase in principal amount of this Global Note | Principal amount of this Global Note following such decrease or increase | Signature of authorized signatory of Trustee or Custodian |
|---|---|---|---|---|
| | | | | |

[8] Include if a global note.

A-10

**ATTACHMENT 1**

[FORM OF NOTICE OF CONVERSION]

Live Nation Entertainment, Inc.
2.875% Convertible Senior Notes due 2030

To: HSBC Bank USA, National Association

The undersigned registered owner of this Note hereby exercises the option to convert this Note, or the portion hereof (that is $1,000 principal amount or an integral multiple thereof) below designated, into cash, shares of Common Stock or a combination of cash and shares of Common Stock, as applicable, in accordance with the terms of the Indenture referred to in this Note, and directs that any cash payable and any shares of Common Stock issuable and deliverable upon such conversion, together with any cash for any fractional share, and any Notes representing any unconverted principal amount hereof, be issued and delivered to the registered Holder hereof unless a different name has been indicated below. If any shares of Common Stock or any portion of this Note not converted are to be issued in the name of a Person other than the undersigned, the undersigned will pay all documentary, stamp or similar issue or transfer taxes, if any in accordance with Section 13.02(d) and Section 13.02(e) of the Indenture. Any amount required to be paid to the undersigned on account of interest accompanies this Note. Capitalized terms used herein but not defined shall have the meanings ascribed to such terms in the Indenture.

Dated: _____    _____

_____

Signature(s)

Signature Guarantee

Signature(s) must be guaranteed by an eligible Guarantor Institution (banks, stock brokers, savings and loan associations and credit unions) with membership in an approved signature guarantee medallion program pursuant to Securities and Exchange Commission Rule 17Ad-15 if shares of Common Stock are to be issued, or Notes are to be delivered, other than to and in the name of the registered holder.

Fill in for registration of shares if to be issued, and Notes if to be delivered, other than to and in the name of the registered holder:

_____

(Name)

_____

(Street Address)

1

_____

(City, State and Zip Code)

Please print name and address

Principal amount to be converted (if less than all): $_____,000

NOTICE: The above signature(s) of the Holder(s) hereof must correspond with the name as written upon the face of the Note in every particular without alteration or enlargement or any change whatsoever.

_____

Social Security or Other Taxpayer Identification Number

2

**ATTACHMENT 2**

[FORM OF FUNDAMENTAL CHANGE REPURCHASE NOTICE]

Live Nation Entertainment, Inc.
2.875% Convertible Senior Notes due 2030

To: HSBC Bank USA, National Association

The undersigned registered owner of this Note hereby acknowledges receipt of a notice from Live Nation Entertainment, Inc. (the " **Company**") as to the occurrence of a Fundamental Change with respect to the Company and specifying the Fundamental Change Repurchase Date and requests and instructs the Company to pay to the registered holder hereof in accordance with Section 14.01 of the Indenture referred to in this Note (1) the entire principal amount of this Note, or the portion thereof (that is $1,000 principal amount or an integral multiple thereof) below designated, and (2) if such Fundamental Change Repurchase Date does not fall during the period after a Regular Record Date and on or prior to the corresponding Interest Payment Date, accrued and unpaid interest, if any, thereon to, but excluding, such Fundamental Change Repurchase Date. Capitalized terms used herein but not defined shall have the meanings ascribed to such terms in the Indenture.

In the case of Physical Notes, the certificate numbers of the Notes to be repurchased are as set forth below:

Dated: _____

_____
Signature(s)

_____
Social Security or Other Taxpayer Identification Number

Principal amount to be repaid (if less than all): $_____,000

NOTICE: The above signature(s) of the Holder(s) hereof must correspond with the name as written upon the face of the Note in every particular without alteration or enlargement or any change whatsoever.

1

**ATTACHMENT 3**

[FORM OF ASSIGNMENT AND TRANSFER]

Live Nation Entertainment, Inc.
2.875% Convertible Senior Notes due 2030

For value received _____ hereby sell(s), assign(s) and transfer(s) unto _____ (Please insert social security or Taxpayer Identification Number of assignee) the within Note, and hereby irrevocably constitutes and appoints _____ attorney to transfer the said Note on the books of the Company, with full power of substitution in the premises.

In connection with any transfer of the within Note occurring prior to the Resale Restriction Termination Date, as defined in the Indenture governing such Note, the undersigned confirms that such Note is being transferred:

☐    To Live Nation Entertainment, Inc. or a subsidiary thereof; or

☐    Pursuant to a registration statement that has become or been declared effective under the Securities Act of 1933, as amended; or

☐    Pursuant to and in compliance with Rule 144A under the Securities Act of 1933, as amended; or

☐    Pursuant to and in compliance with Rule 144 under the Securities Act of 1933, as amended, or any other available exemption from the registration requirements of the Securities Act of 1933, as amended.

1

Dated: _____    _____

_____

Signature(s)

_____

Signature Guarantee

Signature(s) must be guaranteed by an eligible Guarantor Institution (banks, stock brokers, savings and loan associations and credit unions) with membership in an approved signature guarantee medallion program pursuant to Securities and Exchange Commission Rule 17Ad-15 if Notes are to be delivered, other than to and in the name of the registered holder.

NOTICE: The signature on the assignment must correspond with the name as written upon the face of the Note in every particular without alteration or enlargement or any change whatsoever.

2

**EXHIBIT 21.1**

**Subsidiaries of Live Nation Entertainment, Inc.**

| _Domestic_ | _State or Jurisdiction of Incorporation or Organization_ |
| --- | --- |
| #JUSTAREGULARNATION, LLC | Delaware |
| 1200 Cermak LLC | Illinois |
| 3P Festival LLC | Delaware |
| 6 Washington Pool LLC | Delaware |
| 800 Liberace, LLC | Delaware |
| 801 Brickell LLC | Delaware |
| Academy LA, LLC | Delaware |
| ACMF, LLC | Texas |
| Archer Music Hall LLC | Pennsylvania |
| Arrive I LLC | Delaware |
| Arrive I Management, LLC | Delaware |
| Arrive II GP LLC | Delaware |
| Arrive II LP | Delaware |
| Arrive III LP | Delaware |
| Arrive Opportunities Fund I GP, LLC | Delaware |
| Arrive Opportunities Fund I SPV, LLC | Delaware |
| Arrive Opportunities Management, LLC | Delaware |
| Artist Nation Management Group, LLC | Delaware |
| Assembly Room Studios, LLC | Delaware |
| August Hall, LLC | Delaware |
| Auris Presents LLC | Illinois |
| Axis Nation, LLC | Virginia |
| Bamboozle Festival, LLC | Delaware |
| Baron Global, Inc. | Delaware |
| Beyond Fabrication, LLC | Delaware |
| Big Chicago LLC | Illinois |
| Big Loud Mountain Management, LLC | Tennessee |
| BigChampagne, LLC | Delaware |
| Black Lily Investment Fund, LLC | Delaware |
| Black Page Concessions, LLC | Delaware |
| Black Swan Hospitality LLC | Delaware |
| Blackout Merch LLC | Delaware |
| Blueprint Artist Management II, LLC | Delaware |
| Blues at the Depot, LLC | Utah |
| Boston Calling Events LLC | Delaware |
| Bottlerock Presents LLC | Delaware |
| Boundless Systems, LLC | Delaware |
| Bowery Ballroom, LLC | Delaware |
| Bowls Holdings, LLC | Delaware |
| Bowls Holdings DC, LLC | Delaware |
| Bowls Holdings Nashville, LLC | Delaware |
| Bowls Holdings Philadelphia, LLC | Delaware |
| Bowls Las Vegas, LLC | Delaware |

| *Domestic* | *State or Jurisdiction of Incorporation or Organization* |
|---|---|
| Broccoli City Festival, LLC | Delaware |
| Bromo, LLC | Florida |
| Brooklyn Bowl Las Vegas, LLC | Delaware |
| Brooklyn Bowls Present, LLC | Delaware |
| Brooklyn Paramount, LLC | Delaware |
| Buena Onda Presents, LLC | Delaware |
| By Any Means Management, LLC | Delaware |
| C2 Acquisitions, LLC | Delaware |
| C2 Acquisitions II, LLC | Delaware |
| C3 Booking, LLC | Texas |
| C3 Presents, L.L.C. | Texas |
| C3P Emo's, LLC | Texas |
| C3P Scoot Inn, LLC | Texas |
| Capitol OpCo, LLC | Delaware |
| Career Acquisitions, LLC | Delaware |
| Caring & Daring, LLC | Delaware |
| Catbird Music Festival Holdings, LLC | Delaware |
| Cellar Door Venues, Inc. | Florida |
| City in Motion LLC | Delaware |
| Cloud 9 Holdco LLC | Delaware |
| CN Holdco, LLC | Delaware |
| Coach HC LLC | Tennessee |
| Collectionzz, LLC | Delaware |
| Connecticut Amphitheater Development Corporation | Connecticut |
| Connecticut Performing Arts Partners | Connecticut |
| Country Music Holding Company, LLC | Delaware |
| Country Nation - Chicago, LLC | Delaware |
| Country Nation - DE, LLC | Delaware |
| Country Nation, LLC | Delaware |
| Crossroads Presents, LLC | Delaware |
| Cultivate Management, LLC | Delaware |
| Cumberland Amphitheatre Partners, LLC | Delaware |
| Dalton Entertainment, LLC | Delaware |
| DG Medios US, LLC | New York |
| DGXP Resorts LLC | Delaware |
| Diversified Production Services, LLC | Delaware |
| Do617 LLC | Delaware |
| Dome Opco, LLC | Delaware |
| EDC The Movie, LLC | Delaware |
| EDM Identity, LLC | Delaware |
| Eight Ball Pricing Solutions, LLC | Delaware |
| Ekho Events, LLC | Delaware |
| Element Artist Development, LLC | Delaware |
| Element1 Management, LLC | California |
| Emagen Talent Group, LLC | Delaware |
| Emagen WITH Music, LLC | Delaware |

| *Domestic* | *State or Jurisdiction of Incorporation or Organization* |
|---|---|
| Emagen WITH, LLC | Delaware |
| Emotional Nite Time, LLC | Delaware |
| Emporium Presents, LLC | Delaware |
| Equity Distribution LLC | Delaware |
| Equity Publishing LLC | Delaware |
| ESM Productions, LLC | Delaware |
| Event Support Group, LLC | Delaware |
| EW Experience Holdings, LLC | Delaware |
| F and F Concessions, Inc. | Illinois |
| Faculty Management, LLC | Delaware |
| Faculty Productions, LLC | Delaware |
| Femme it Forward, LLC | Delaware |
| Fenway Music Company, LLC | Delaware |
| Festival Holdings, L.L.C. | Virginia |
| Festival One, LLC | Delaware |
| FH JV Holdings, LLC | Delaware |
| Fillmore Minneapolis Corp. | Delaware |
| Fillmore New Orleans Corp. | Delaware |
| First Fleet Concerts, LLC | Delaware |
| FKMF, LLC | Delaware |
| Flus Ventures LLC | Delaware |
| Forecastle Ventures, LLC | Tennessee |
| Founders Entertainment, LLC | New York |
| FPC Live LLC | Wisconsin |
| FPSF Holding, LLC | Delaware |
| Frank Productions Concerts, LLC | Wisconsin |
| Frank Productions, LLC | Delaware |
| Freshjive, LLC | Delaware |
| Front Gate Ticketing Solutions, LLC | Delaware |
| Gel man Management LLC | Delaware |
| GHH KSA Trademark LLC | Delaware |
| Glow DC, LLC | Delaware |
| Glow Events, LLC | Delaware |
| Good World Creative, LLC | Delaware |
| Good World Productions, LLC | Delaware |
| Good World Ventures, LLC | Delaware |
| Gov Ball 2016, LLC | New York |
| Greenlight Media & Marketing, LLC | Delaware |
| Greenlight Studios, LLC | Virginia |
| Groot 1575 Alton LLC | Delaware |
| Groot 2660 NW 3rd Ave LLC | Delaware |
| Groot 2660 NW 3rd Ave Management LLC | Delaware |
| Groot 41st Street | Delaware |
| Groot 8th Street IP LLC | Delaware |
| Groot 8th Street LLC | Delaware |
| Groot 8th Street Management LLC | Delaware |

| *Domestic* | *State or Jurisdiction of Incorporation or Organization* |
| --- | --- |
| Groot Alton IP LLC | Delaware |
| Groot Alton Management LLC | Delaware |
| Groot Cocowalk LLC | Delaware |
| Groot Cocowalk Management LLC | Delaware |
| Groot Design District Hospitality, LLC | Florida |
| Groot Entertainment LLC | Delaware |
| Groot Forge, LLC | Delaware |
| Groot Hospitality Holdings, LLC | Delaware |
| Groot Hospitality LLC | Delaware |
| Groot LIV Las Vegas, LLC | Delaware |
| Groot Music Design District LLC | Delaware |
| Groot Papi Steak Restaurant LLC | Delaware |
| Groot PS Management LLC | Delaware |
| Groot Reign Makers Hotel Brand LLC | Delaware |
| Groot Sports LLC | Delaware |
| Groot Sports Management LLC | Delaware |
| Groot Stadium LLC | Delaware |
| Groot Steak LLC | Delaware |
| Groot WMP Hospitality LLC | Delaware |
| Groot Women's Club IP LLC | Delaware |
| Groot Women's Club LLC | Delaware |
| Groot Women's Club Management LLC | Delaware |
| Hard Events LLC | California |
| Heat Love Group, LLC | Texas |
| High Noon Saloon LLC | Wisconsin |
| Hijinx Festival Holdings, LLC | Delaware |
| Hillside Productions, Inc. (Freedom Hill) | Michigan |
| HOB Ace of Spades Corp. | Delaware |
| HOB Boardwalk, Inc. | Delaware |
| HOB Café Corp. | Delaware |
| HOB Chicago, Inc. | Delaware |
| HOB Depot Corp. | Delaware |
| HOB Entertainment, LLC | Virginia |
| HOB Grand Rapids, LLC | Delaware |
| HOB HiFi Dallas Corp. | Delaware |
| HOB Marina City Partners, L.P. | Delaware |
| HOB Marina City, Inc. | Delaware |
| HOB Marquis Corp. | Delaware |
| HOB Punch Line Chicago Corp. | Delaware |
| HOB Punch Line Dallas Corp. | Delaware |
| HOB Punch Line Penn Corp. | Delaware |
| HOB Punch Line S.F. Corp. | Delaware |
| HOB Queen Theater Corp. | Delaware |
| HOB Rose City MH Corp. | Delaware |
| HOB Roxian Corp. | Delaware |
| HOB Seattle Corp. | Delaware |

| *Domestic* | *State or Jurisdiction of Incorporation or Organization* |
|---|---|
| HOB Summit MH Corp. | Delaware |
| HOB Varsity Corp. | Delaware |
| Hofesh, LLC | Delaware |
| Hot Fire, LLC | Texas |
| House of Blues Anaheim Restaurant Corp. | Delaware |
| House of Blues Cleveland, LLC | Delaware |
| House of Blues Concerts, Inc. | California |
| House of Blues Dallas Restaurant Corp. | Delaware |
| House of Blues Houston Restaurant Corp. | Delaware |
| House of Blues Las Vegas Restaurant Corp. | Delaware |
| House of Blues Myrtle Beach Restaurant Corp. | Delaware |
| House of Blues New Orleans Restaurant Corp. | Delaware |
| House of Blues Orlando Restaurant Corp. | Delaware |
| House of Blues Restaurant Holding Corp. | Delaware |
| House of Blues San Diego Restaurant Corp. | Delaware |
| House of Blues San Diego, LLC | Delaware |
| Humilde Nation, LLC | Delaware |
| Hungry, Thirsty, Crazy, and Lucky, LLC | Texas |
| Innings, LLC | Delaware |
| Insomniac Holdings, LLC | Delaware |
| Insomniac Records, LLC | Delaware |
| Insomniac SD, LLC | Delaware |
| IO Media, Inc. | New York |
| IOMedia Technologies, LLC | New York |
| JMBLYA, LLC | Texas |
| K Dallas Beverage LLC (aka Komodo Dallas Beverage LLC) | Texas |
| KDTX Associates, LLC | Delaware |
| KDTX Management LLC | Delaware |
| Key Club Miami LLC | Delaware |
| Komodo Dallas, LLC | Texas |
| Komodo Las Vegas, LLC | Delaware |
| Lagos Arena Holdings, LLC | Delaware |
| Lakonia Entertainment LLC | Illinois |
| Lansdowne Boston Restaurant, LLC | Delaware |
| Levitate Music Festival, LLC | Delaware |
| Lionfish Management, LLC | Delaware |
| Live Nation Bogart, LLC | Delaware |
| Live Nation Chicago, Inc. | Delaware |
| Live Nation LGTours (USA), LLC | Delaware |
| Live Nation Marketing, Inc. | Delaware |
| Live Nation Merchandise, LLC | Delaware |
| Live Nation MTours (USA), Inc. | Delaware |
| Live Nation Paradise, LLC | Delaware |
| Live Nation Pioneer Holdings, LLC | Delaware |
| Live Nation Productions, LLC | Delaware |
| Live Nation Studios Holdings, LLC | Delaware |

| Domestic | State or Jurisdiction of Incorporation or Organization |
|---|---|
| Live Nation Studios Productions, LLC | Delaware |
| Live Nation Ticketing, LLC | Delaware |
| Live Nation Touring (USA), Inc. | Delaware |
| Live Nation Urban, LLC | Delaware |
| Live Nation UshTours (USA), Inc. | Delaware |
| Live Nation UTours (USA), Inc. | Delaware |
| Live Nation VenueCo, LLC | Delaware |
| Live Nation Worldwide, Inc. | Delaware |
| LMG Management Holdings, LLC | Delaware |
| LMG Management LLC | Delaware |
| LMG Management Ventures, LLC | Delaware |
| LMG Management Ventures III, LLC | Delaware |
| LN Charlotte Amphitheater VenueCo Holdings, LLC | Delaware |
| LN Charlotte Amphitheater VenueCo, LLC | Delaware |
| LN Indiana Amphitheater VenueCo Holdings, LLC | Delaware |
| LN Indiana Amphitheater VenueCo, LLC | Delaware |
| LN Missouri Amphitheater VenueCo Holdings, LLC | Delaware |
| LN Missouri Amphitheater VenueCo, LLC | Delaware |
| LN SHP C9, LLC | Delaware |
| LN SHP MP, LLC | Delaware |
| LN Virginia Amphitheater VenueCo Holdings, LLC | Delaware |
| LN Virginia Amphitheater VenueCo, LLC | Delaware |
| LN-HS Concerts, LLC | Delaware |
| Logjam Presents, LLC | Delaware |
| Lollapalooza, LLC | Delaware |
| LV Arena Company Holdings, LLC | Delaware |
| LV Arena Company, LLC | Delaware |
| Maniac Ventures, LLC | Delaware |
| Marcy Musik LLC | New York |
| Marquee Ventures MKE, LLC | Wisconsin |
| Marsantas LLC | Delaware |
| Maryland Festivals, LLC | Delaware |
| MBA Artist Management Company, LLC | Delaware |
| Meadowbrook Amphitheatre Holdings, LLC | Delaware |
| Merch Nation Holdings, LLC | Delaware |
| Merch Traffic, LLC | Delaware |
| Mercury Lounge, LLC | Delaware |
| MIA Festival Ho dings, LLC | Delaware |
| Michigan Licenses, LLC | Delaware |
| Microflex 2001 LLC | Delaware |
| Minny Festivals, LLC | Delaware |
| MP Concerts, LLC | Delaware |
| National Shows 2, LLC | Wisconsin |
| NAUD STREET, LLC | Delaware |
| NDMF, LLC | Texas |
| Neste Event Marketing, LLC | Delaware |

| *Domestic* | *State or Jurisdiction of Incorporation or Organization* |
| --- | --- |
| New Era Farms, LLC | Virginia |
| New IAMSPORTS, LLC | California |
| New York Theater, LLC | Delaware |
| No Limit Entertainment LLC | Delaware |
| NOC, Inc. | Connecticut |
| OC Festivals, LLC | Delaware |
| Palm Tree Crew Artist Management, LLC | Delaware |
| Papi Steak Las Vegas, LLC | Delaware |
| Parcel E. Holdco, LLC | Delaware |
| Phenom Productions, LLC | Delaware |
| Philly Artist Management, LLC | Delaware |
| Pioneer Coach Interiors, LLC | Tennessee |
| Pioneer Coach, LLC | Tennessee |
| Pioneer Production Logistics, LLC | Tennessee |
| Pioneer Production Transport, LLC | Tennessee |
| Pizza Friday Productions, LLC | Delaware |
| Portland Music Holdings, LLC | Delaware |
| Postfontaine Holdings, LLC | Delaware |
| Production Fleet Leasing, LLC | Tennessee |
| Production Group Holdings, LLC | Tennessee |
| Production Staffing Group, LLC | Delaware |
| PromoHouse, LLC | Delaware |
| Railbird Festival Holdings, LLC | Delaware |
| Rebel Artist Management, LLC | Delaware |
| Red Ginger SB, LLC | Florida |
| Red Mountain Entertainment, LLC | Delaware |
| Red75, LLC | Delaware |
| Red82, LLC | Delaware |
| Redrock Entertainment Services LLC | Delaware |
| ReignDeer Entertainment Corp. | California |
| ReignDeer Entertainment, LLC | Delaware |
| ReignDeer Investments, LLC | Delaware |
| Rimas Nation, LLC | Delaware |
| Rival Labs, Inc. | Delaware |
| Roc Nation Advertising LLC | Delaware |
| Roc Nation Distribution, LLC | Delaware |
| Roc Nation Latin Publishing, LLC | Delaware |
| Roc Nation, LLC | Delaware |
| Roc Nation Management, LLC | Delaware |
| Roc Nation Publishing, LLC | Delaware |
| Roc Nation Records, LLC | Delaware |
| Roc Nation Sports - Roc Nation Boxing, LLC | Delaware |
| Roc Nation Sports, LLC | Delaware |
| Roc Nation Studios, LLC | Delaware |
| Roc Nation Ventures, LLC | Delaware |
| Rock Fest Maryland, LLC | Delaware |

| Domestic | State or Jurisdiction of Incorporation or Organization |
|---|---|
| Rock in Rio USA, Inc. | Delaware |
| Rock World USA, LLC | Delaware |
| Rolling Loud, LLC | Delaware |
| RonRuss Red Ginger, LLC | Florida |
| S10 Entertainment & Media, LLC | Delaware |
| SAL & Co Management LP | Delaware |
| SC Management GP, Inc. | Delaware |
| Scheme Engine, LLC | Delaware |
| Scoremore Dreamville, LLC | Texas |
| ScoreMore Holdings, LLC | Delaware |
| Seven Candles, LLC | Delaware |
| Seven Peaks Festival, LLC | Delaware |
| SFX Financial Advisory Management Enterprises, Inc. | Delaware |
| Shakopee Partners, LLC | Delaware |
| Shaky Boots Fest, LLC | Georgia |
| Shaky Festivals Holdings, LLC | Delaware |
| Shaky Knees Fest, LLC | Georgia |
| SHN Festivals, LLC | Texas |
| Silk City Printing, LLC | Delaware |
| SME Entertainment Group LLC | Delaware |
| Soundcheck LLC | District of Colombia |
| Space Invaders, LLC | Florida |
| Space IP Licensing, LLC | Florida |
| Spaceland Productions, LLC | California |
| Space Park, LLC | Delaware |
| Spalding Entertainment, LLC | Tennessee |
| Split Second Management, LLC | Delaware |
| Starr Hill Presents Kansas, LLC | Virginia |
| Stateside Group, LLC | Delaware |
| Stubb's Austin Restaurant Company, LC | Texas |
| Swan Hospitality LLC | Florida |
| The Core Entertainment, LLC | Delaware |
| The Echo, LLC | California |
| Third & Hayden Holdco, LLC | Delaware |
| Third & Hayden MGMT, LLC | Delaware |
| Third & Hayden Publishing, LLC | Delaware |
| Third & Hayden Recordings, LLC | Delaware |
| ThreeDecadeAwakening, LLC | Delaware |
| Ticketmaster L.L.C. | Virginia |
| Ticketmaster New Ventures Holdings, Inc. | Delaware |
| Ticketmaster Pacific Acquisitions, Inc. | Delaware |
| Ticketstoday, LLC | Virginia |
| Ticketweb, LLC | Delaware |
| Timeline Management, LLC | Delaware |
| TM Vista Inc. | Virginia |
| TMF Holdco, LLC | Delaware |

- 8 -

| _Domestic_ | _State or Jurisdiction of Incorporation or Organization_ |
|---|---|
| TNA Tour II (USA) Inc. | Delaware |
| Top Hat Enterprises, LLC | Delaware |
| TX Music Club Adventures, LLC | Texas |
| Universe Inc. | Delaware |
| Upgraded, Inc. | Delaware |
| V Major, LLC | Delaware |
| Van Buren Group Holdings, LLC | Delaware |
| Vector Management LLC | Delaware |
| Veeps Inc. | Delaware |
| Vibee, LLC | Delaware |
| Virginia AmpCo, LLC | Delaware |
| VN Fillmore Denver Corp. | Delaware |
| VN Waukee Corp. | Delaware |
| Volta Beauty, LLC | Delaware |
| Voodoo Music Experience, LLC | Louisiana |
| Watch The Moonrise, LLC | Delaware |
| We Are Voices Entertainment, Inc. | Delaware |
| West Beverly Group, LLC | Delaware |
| West Wing Live, LLC | Illinois |
| Why Not Denver, LLC | Delaware |
| Why Not OC LLC | California |
| Why Not San Diego, LLC | Delaware |
| Wiltern Renaissance, LLC | Delaware |
| Wolfson Entertainment, Inc. | California |
| Women Nation, LLC | Delaware |
| YCFUNCO, LLC | Delaware |
| Ziggy's Pizza, LLC | Arizona |

| *International* | *State or Jurisdiction of Incorporation or Organization* |
|---|---|
| DF Entertainment, S.A. | Argentina |
| Live Nation Argentina S.A. | Argentina |
| Ash Assets Pty Ltd | Australia |
| Ash Sounds Pty Ltd | Australia |
| Brunswick Street Venue Pty Ltd | Australia |
| Cult Artists Pty Ltd | Australia |
| DNA Experiences Live Pty Ltd | Australia |
| Face to Face Touring Pty Ltd | Australia |
| Festival Hall Venue Management Pty Ltd | Australia |
| Four Fish Swimming Pty Ltd | Australia |
| Harvest Rock Pty Ltd | Australia |
| Hindley Street Music Hall Pty Ltd | Australia |
| Indian Ocean Venue Management Pty Ltd | Australia |
| Jubilee Street Management Pty Ltd | Australia |
| Kicks Entertainment Investments Pty Ltd | Australia |
| Kicks Entertainment Events Pty Ltd | Australia |
| Kicks Entertainment Projects Pty Ltd | Australia |
| Kicks Entertainment Productions Pty Ltd | Australia |
| Live Nation Australasia Pty Ltd | Australia |
| Live Nation Australia Festivals Pty Ltd | Australia |
| Live Nation Australia Venues Pty Ltd | Australia |
| Live Nation Holdings Australasia Pty Ltd | Australia |
| Live Nation Holdings Australasia 2 Pty Ltd | Australia |
| Live Nation Special Projects Pty Ltd | Australia |
| LN F2F Holdings Pty Ltd | Australia |
| LN Oldco Pty Ltd | Australia |
| Look up and Live Pty Ltd | Australia |
| Mellen Touring Pty Ltd | Australia |
| Moshtix Pty Ltd | Australia |
| Secret Sounds Group Pty Ltd | Australia |
| Secret Sounds Group Services Pty Ltd | Australia |
| Secret Sounds Pty Ltd | Australia |
| Secret Sounds Sponsorship Pty Ltd | Australia |
| Show Tickets Australia Pty Ltd | Australia |
| Southern Ocean Venues Pty Ltd | Australia |
| Splendour in the Grass Pty Ltd | Australia |
| T Shirt Printers Pty Limited | Australia |
| The Triffid Pty Ltd | Australia |
| Thirroul Theatre Management Pty Ltd | Australia |
| Ticketmaster Australasia Pty Ltd | Australia |
| TSP Merchandising Pty Ltd | Australia |

| *International* | *State or Jurisdiction of Incorporation or Organization* |
|---|---|
| Village Sounds Agency Pty Ltd | Australia |
| Goodlive Artists Austria GmbH | Austria |
| Live Nation Austria GmbH | Austria |
| OE SASR Beta Dreiunddreißigste Beteiligungsverwaltung GmbH | Austria |
| ASB N.V | Belgium |
| Be-At Venues NV | Belgium |
| Dour Music Festival SA | Belgium |
| GMM Festival B.V. | Belgium |
| Live Nation Belgium Holdings B.V. | Belgium |
| Live Nation B.V. | Belgium |
| Live Nation Festivals N.V. | Belgium |
| Ticketmaster Belgium N.V. | Belgium |
| We Love Entertainment B.V. | Belgium |
| SE – Engenharia Consultiva Ltda | Brazil |
| Live Nation Brasil Entretenimento Ltda. | Brazil |
| Live Nation Brasil Marketing LTDA. | Brazil |
| PragmaDev Tecnologia da Informação Ltda. | Brazil |
| Roc Nation Sports Brazil Ltd. fka The Agency Brasil Ltd. | Brazil |
| Rock City S.A. | Brazil |
| Rock World S.A. | Brazil |
| TFM Agency International (BVI) Ltd. | Brazil |
| The Agency International (BVI) Ltd. | Brazil |
| The Football Agencies Ltd. | Brazil |
| Ticketmaster Brasil LTDA | Brazil |
| 1853780 Ontario Inc. | Canada |
| 2617322 Ontario Inc. | Canada |
| Embrace Presents, Ltd. | Canada |
| Evenko, G.P. | Canada |
| Front Gate Ticketing Solutions Canada, Ltd. | Canada |
| Gestion Evenko Festival, Inc. | Canada |
| Impressario, Inc. | Canada |
| Live Nation Canada, Inc. | Canada |
| Live Nation Ontario Concerts GP, Inc. | Canada |
| Live Nation Ontario Concerts, L.P. | Canada |
| Manett Holdings (Canada) Limited | Canada |
| Midway Music Arcade Kitchen Ltd. | Canada |
| Revival Event Venue Inc. | Canada |
| The Axis Club  nc. (aka The Mod Club) | Canada |
| The Opera House Inc. | Canada |
| Ticketmaster Canada LP | Canada |
| Ticketmaster Canada ULC | Canada |

- 11 -

| *International* | *State or Jurisdiction of Incorporation or Organization* |
|---|---|
| Universe Experiences Inc, | Canada |
| Veld Music Festival Holdings Inc. | Canada |
| Veld Music Festival Inc. | Canada |
| Ticketmaster Cayman Finance Company Ltd. | Cayman Islands |
| Ticketmaster Middle East Limited | Cayman Islands |
| DG Medios SpA | Chile |
| Live Nation Chile SpA | Chile |
| SACA Producciones SpA | Chile |
| Ticketmaster Chile SpA | Chile |
| Compañía de Entretenimiento Colombia, S.A.S. | Colombia |
| OCESA Colombia, S.A.S. | Colombia |
| Promo Paramo S.A.S. | Colombia |
| Promotora Colombia, S.A.S. | Colombia |
| Ticket Colombia, S.A.S. | Colombia |
| Electronic Events d.o.o. | Croatia |
| Live Nation Adria d.o.o. | Croatia |
| Aquapath Limited | Cyprus |
| Echo Promotion s.r.o. | Czech Republic |
| Live Nation Czech Republic s.r.o. | Czech Republic |
| Ticketmaster Ceska republika, a.s | Czech Republic |
| Ticketpro Software s.r.o. | Czech Republic |
| Danish Venue Enterprise A/S | Denmark |
| I/S Heart and Festival | Denmark |
| Live Nation Denmark Aps | Denmark |
| Live Nation Denmark Management Holding Aps | Denmark |
| PDH Music A/S | Denmark |
| PDH Tour Accounts ApS | Denmark |
| Ticketmaster Danmark A/S | Denmark |
| We/Do Agency ApS | Denmark |
| Academy Music Group Limited | England & Wales |
| Academy Music Holdings Ltd | England & Wales |
| Angel Venues Limited | England & Wales |
| ANM2 Limited | England & Wales |
| Apollo Leisure Group Limited | England & Wales |
| Arena Island Limited | England & Wales |
| Artist Nation Management Limited | England & Wales |
| C I (Events) Limited | England & Wales |
| Cardiff Arena Operations Limited | England & Wales |
| Cardiff Arena Ventures Limited | England & Wales |
| Cream Events Limited | England & Wales |
| Cream G obal Limited | England & Wales |

| _International_ | _State or Jurisdiction of Incorporation or Organization_ |
| --- | --- |
| Cream Liverpool Limited | England & Wales |
| Cuffe and Taylor Limited | England & Wales |
| De-lux Merchandise Company Limited | England & Wales |
| DLT Events Limited | England & Wales |
| Electricland Limited | England & Wales |
| Festival Republic Limited | England & Wales |
| Finlaw 279 Limited | England & Wales |
| FREH Limited | England & Wales |
| Gafrus Limited | England & Wales |
| Globalgathering Group Limited | England & Wales |
| Gone Wild Events Limited | England & Wales |
| Hide & Seek Festival Ltd | England & Wales |
| HNOE Limited | England & Wales |
| Hot Festivals Limited | England & Wales |
| IME Music Limited | England & Wales |
| Isle of Wight Festival Limited | England & Wales |
| Live Nation (Music) UK Limited | England & Wales |
| Live Nation Apollo (Finco) Limited | England & Wales |
| Live Nation Apollo (Holdco) | England & Wales |
| Live Nation Apollo Limited | England & Wales |
| Live Nation Cardiff Holdings Limited | England & Wales |
| Live Nation Limited | England & Wales |
| Live Nation Merchandise Limited | England & Wales |
| LN-Gaiety Holdings Limited | England & Wales |
| LNGSJM Holdco Limited | England & Wales |
| Lollibop Festival Limited | England & Wales |
| MAMA & Company Limited | England & Wales |
| MAMA Festivals Limited | England & Wales |
| MAMA New Music Limited | England & Wales |
| Maztec Limited | England & Wales |
| Maztecrose Holdings Limited | England & Wales |
| Merch Traffic Limited | England & Wales |
| Metropo is Music Limited | England & Wales |
| Midland Concert Promotions Group Limited | England & Wales |
| Noisily Festival Limited | England & Wales |
| Nova Batida Festivals Limited | England & Wales |
| OnBlackheath Limited | England & Wales |
| Parklife Manchester Limited | England & Wales |
| Parallel Lines Promotions Limited | England & Wales |
| Plan B Management Limited | England & Wales |
| Quest Management (UK) Limited | England & Wales |

| International | State or Jurisdiction of Incorporation or Organization |
|---|---|
| Reading Festival Limited | England & Wales |
| Rewind Festival Limited | England & Wales |
| Roc Nation Sports Limited | England & Wales |
| Roc Nation UK limited | England & Wales |
| Roseclaim Limited | England & Wales |
| Safe Festivals Group Limited | England & Wales |
| Sands Heritage Ltd | England & Wales |
| Showsec International Limited | England & Wales |
| TAP Music Publishing Limited | England & Wales |
| The Football Agencies Limited | England & Wales |
| The Warehouse Project (Manchester) Limited | England & Wales |
| the17 Limited | England & Wales |
| Ticketmaster Europe Holdco Limited | England & Wales |
| Ticketmaster Sport Limited | England & Wales |
| Ticketmaster UK Limited | England & Wales |
| TM Number One Limited | England & Wales |
| Ugly Duckling Limited | England & Wales |
| UNation Limited | England & Wales |
| Live Nation Baltics OU | Estonia |
| Live Nation Estonia OU | Estonia |
| Events Club Oy | Finland |
| Full Production Oy | Finland |
| K2 Entertainment Oy | Finland |
| Live Nation Finland Oy | Finland |
| Ticketmaster Suomi Oy | Finland |
| VN Helsinki Oy | Finland |
| Atlas SAS | France |
| Entre Deux | France |
| Live Nation France 2006 | France |
| Live Nation France Festivals | France |
| Live Nation SAS | France |
| LNE France Holdings SAS | France |
| Ticketnet | France |
| Berlin Festival Gmbh & Co. KG | Germany |
| BF Berlin Festival Verwaltungs-GmbH | Germany |
| Cosmopop Gmbh | Germany |
| Der Bomber der Herzen GmbH & Co. KG | Germany |
| Der Bomber der Herzen Verwaltungsgesellschaft mbH | Germany |
| FRHUG Festival GmbH & Co. KG | Germany |
| FRHUG Verwaltungs-GmbH | Germany |
| Gastrobüro GmbH & Co. KG | Germany |

- 14 -

| *International* | *State or Jurisdiction of Incorporation or Organization* |
| --- | --- |
| Gastrobüro Verwaltungs GmbH | Germany |
| Goodlive Artists GmbH & Co. KG | Germany |
| Goodlive Artists Verwaltungs GmbH | Germany |
| Goodlive Festival GmbH | Germany |
| Goodlive GmbH | Germany |
| Heroes Festival GmbH | Germany |
| Herokey GmbH | Germany |
| Live Nation Brand Partnership & Media GmbH | Germany |
| Live Nation GmbH | Germany |
| Live Nation Holdings GmbH | Germany |
| Live Nation Theater GmbH | Germany |
| Lollapalooza GmbH | Germany |
| Nitelive Artists Verwaltungs GmbH | Germany |
| Seatwave Deutschland GmbH | Germany |
| Singer´s Getränke Shop GmbH & Co. KG | Germany |
| Singer´s Getränke Shop Verwaltungs GmbH | Germany |
| Superbloom Festival GmbH & Co. KG | Germany |
| Superbloom Festival Verwaltungs GmbH | Germany |
| SWMUNICH Accommodation GmbH | Germany |
| SWMUNICH Holdings GmbH | Germany |
| SWMUNICH Operations GmbH | Germany |
| SWMUNICH Parking GmbH | Germany |
| SWMUNICH Real Estate GmbH | Germany |
| Ticketmaster Deutschland Holding GmbH | Germany |
| Ticketmaster GmbH | Germany |
| Wanderlust Europe GmbH | Germany |
| Ticketmaster Hellas S.A. | Greece |
| EMF Holdings, Sociedad Anónima | Guatemala |
| AG Margate Propco 2 Limited | Guernsey |
| Clockenflap Presents Limited | Hong Kong |
| Clockenflap Festivals Limited | Hong Kong |
| Dancing Dragon Management Limited | Hong Kong |
| Fabled Records Limited | Hong Kong |
| Live Nation (HK) Limited | Hong Kong |
| Live Nation Electronic (Asia) Limited | Hong Kong |
| Live Nation Connects Hong Kong Limited | Hong Kong |
| Live Nation Venues (HK) Company Limited | Hong Kong |
| Media Nation Limited | Hong Kong |
| MMM Studio Limited | Hong Kong |
| Twenty Eight Group Holding Limited | Hong Kong |
| Live Nation Central & Eastern Europe Kft | Hungary |

- 15 -

| *International* | *State or Jurisdiction of Incorporation or Organization* |
| --- | --- |
| Ticketmaster India Private Limited | India |
| AIL Venue Finco Limited | Ireland |
| Amphitheatre Ireland Holdings Limited | Ireland |
| Amphitheatre Ireland Limited | Ireland |
| EP Republic Limited | Ireland |
| Live Nation Ireland Holdings Limited | Ireland |
| LNGH Ireland Limited | Ireland |
| Principle Management Limited | Ireland |
| The Ticket Shop Unlimited Company | Ireland |
| Ticketline Unlimited Company | Ireland |
| Ticket Shop Holdings (IOM) | Isle of Man |
| Ticket Shop One (IOM) Limited | Isle of Man |
| Ticket Shop Two (IOM) Limited | Isle of Man |
| Live Nation Israel Ltd. | Israel |
| Ticketmaster Israel Ltd | Israel |
| A Bass Concert Srl | Italy |
| Comcerto Srl | Italy |
| Get Live 2 Srl | Italy |
| Live Nation 2 Srl | Italy |
| Live Nation 3 Srl | Italy |
| Live Nation Italia Srl | Italy |
| Live Nation Italia 6 S.r.l. | Italy |
| Parcolimpico Srl | Italy |
| Ticketmaster Italia Srl | Italy |
| Live Nation Holding Japan GK | Japan |
| Live Nation Japan GK | Japan |
| Quicket Limited | Kenya |
| UAB Live Nation Lietuva | Lithuania |
| Live Nation Luxembourg Holdco 1 S.à.r.l. | Luxembourg |
| Live Nation Luxembourg Holdco 2 S.à.r.l. | Luxembourg |
| Banquetes a la Carta, S.A. de C.V. | Mexico |
| Car Sport Racing, S.A. de C.V. | Mexico |
| Enterteinvestments, S.A. de C.V. | Mexico |
| ETK Boletos, S.A. de C.V. | Mexico |
| Fundacion OCESA Entretenimiento, A.C. | Mexico |
| HNMPL México, S. de R.L. de C.V. | Mexico |
| Inmobiliaria de Centros de Espectáculos, S.A. de C.V. | Mexico |
| Logística Organizacional para la Integración de Eventos, S.A. de C.V. | Mexico |
| OCESA Entretenimiento, S.A. de C.V. | Mexico |
| OCESA Presenta, S.A. DE C.V. | Mexico |
| OCESA Promotora de Eventos, S. de R.L. de C.V. | Mexico |

- 16 -

| *International* | *State or Jurisdiction of Incorporation or Organization* |
|---|---|
| OCESA Promotora, S.A. de C.V. | Mexico |
| OISE Entretenimiento, SA de C.V. | Mexico |
| Operación y Comercialización Ideas Creativas, S.A. de C.V. | Mexico |
| Operadora de Centros de Espectáculos, S.A. de C.V. | Mexico |
| Representaciones de Exposiciones Mexico, S.A. de C.V. | Mexico |
| Sae Logística En Entretenimiento, S.A. de C.V. | Mexico |
| Sae Operación En Eventos, S.A. de C.V. | Mexico |
| Servicios Administrativos Del Entretenimiento, S.A. de C.V. | Mexico |
| Servicios de Protección Privada Lobo, S.A. de C.V. | Mexico |
| Sputnik Digital, S.A.P.I. de C.V. | Mexico |
| Ticketmaster New Ventures S. de R.L. de C.V. | Mexico |
| Venta de Boletos Por Computadora, S.A. de C.V. | Mexico |
| Live Nation Malaysia Sdn Bhd | Malaysia |
| Amsterdam Music Dome Exploitatie B.V. | Netherlands |
| Amsterdam Music Dome Properties B.V. | Netherlands |
| Art of Bookings B.V. | Netherlands |
| Artist and Business Transport Group B.V. | Netherlands |
| BEE 2 B.V. | Netherlands |
| Crowdcare B.V. | Netherlands |
| Event Design Holland B.V. | Netherlands |
| Festivals Limburg B.V. | Netherlands |
| Holland Event Marketing B.V. | Netherlands |
| Holland International Blues Festival B.V. | Netherlands |
| Insomniac Europe B.V. | Netherlands |
| Live Nation International Holdings B.V. | Netherlands |
| Live Nation Venues (Netherlands) B.V. | Netherlands |
| LN NL Venues Finco B.V. | Netherlands |
| LN NL Venues Holdings B.V. | Netherlands |
| LYV B.V. | Netherlands |
| Mojo Concerts B.V. | Netherlands |
| Mojo NL Hiphop B.V. | Netherlands |
| Mojo Works B.V. | Netherlands |
| Noctua B.V. | Netherlands |
| Security Company Security B.V. | Netherlands |
| Straight International Security B.V. | Netherlands |
| The Event Support Company B.V. | Netherlands |
| The Security Company Utrecht Holland Holding B.V. | Netherlands |
| Tickethour Nederland B.V. | Netherlands |
| Ticketmaster B.V. | Netherlands |
| Woo Hah! Partner B.V. | Netherlands |
| Endeavour Live Limited | New Zealand |

| _International_ | _State or Jurisdiction of Incorporation or Organization_ |
| --- | --- |
| Evenz Limited | New Zealand |
| Greenstone Entertainment Limited Partnership | New Zealand |
| Greenstone Entertainment GP Limited | New Zealand |
| Live Nation GE Holdings Limited | New Zealand |
| Live Nation NZ Festivals Limited | New Zealand |
| Live Nation NZ Limited | New Zealand |
| NZ Venue and Event Management Limited | New Zealand |
| QPAM Limited | New Zealand |
| R&V Live Nation Limited | New Zealand |
| San Fran Live Limited | New Zealand |
| Ticketmaster NZ Limited | New Zealand |
| Village Sounds Agency NZ Limited | New Zealand |
| Munyhub Online Ticketing Services Ltd | Nigeria |
| Ticket Shop (NI) Limited | Northern Ireland |
| ACT Agency AS | Norway |
| Bergen Live AS | Norway |
| Billettservice AS | Norway |
| Event og Media AS | Norway |
| Kadetten Festival AS | Norway |
| Live Nation Norway AS | Norway |
| Luger Norway AS | Norway |
| TimeOut Agency & Concerts AS | Norway |
| Tons of Rock Festival AS | Norway |
| DF Entertainment Paraguay SRL | Paraguay |
| Live Nation Peru S.A.C. | Peru |
| Ticketmaster Peru S.A. | Peru |
| Live Nation Philippines Inc. | Philippines |
| Ticketmaster Philippines, Inc | Philippines |
| Concert Supplies Sp. z o.o. | Poland |
| Live Nation Sp. z.o.o. | Poland |
| Music Marketing Sp. z.o.o. | Poland |
| Ticketmaster Poland Sp. z.o.o. | Poland |
| Live Nation Portugal Holdings S.A. | Portugal |
| Live Nation Portugal Venues S.A. | Portugal |
| Rock World Lisboa S.A. | Portugal |
| Live Nation Arabia Company LLC | Saudi Arabia |
| Ticketmaster Arabia Company LLC | Saudi Arabia |
| ABC3 Limited | Scotland |
| D.F. Concerts Limited | Scotland |
| King Tut's Recordings Limited | Scotland |
| Tecjet Limited | Scotland |

| *International* | *State or Jurisdiction of Incorporation or Organization* |
| --- | --- |
| Live Nation Business Consulting (Shanghai) Company Limited | Shanghai, China |
| Live Nation Electronic (Shanghai) Company Limited | Shanghai, China |
| KFK Shanghai Company Limited | Shanghai, China |
| Clockenflap Pte. Limited | Singapore |
| Imagine Media Agency Pte. Ltd. | Singapore |
| Live Nation (Singapore) Holdings Pte Ltd | Singapore |
| Live Nation Singapore Concerts Pte. Ltd. | Singapore |
| Live Nation Singapore Venues Pte Ltd | Singapore |
| Ticketmaster SG Pte Ltd | Singapore |
| Ticketmaster-Singapore Pte. Ltd. | Singapore |
| Big Concerts International Pty Ltd | South Africa |
| Big Concession Management Proprietary Limited | South Africa |
| Big Merchandise Proprietary Limited | South Africa |
| Live Nation Media and Sponsorship (Pty) Ltd | South Africa |
| Munyhub Online Ticketing Services (Pty) Ltd | South Africa |
| Ticketmaster South Africa (Pty) Ltd | South Africa |
| Live Nation Korea Corporation | South Korea |
| Better World Sociedade Unipessoal S.L. | Spain |
| Compania Editora de Talentos Internacionales S.A. | Spain |
| Giras Latinas, AIE | Spain |
| Live Nation Espana S.A.U. | Spain |
| Live Nation España Black Star, S.L. | Spain |
| Live Nation España Blue Lane, S.L. | Spain |
| Live Nation España Green Road, S.L. | Spain |
| Live Nation España Live For Fun S.L. | Spain |
| Live Nation España No Limits S.L. | Spain |
| Live Nation Espana Red Path, S.L. | Spain |
| Live Nation España Silver Tours S.L. | Spain |
| Mean Fiddler Spain, S.L. | Spain |
| Mediterranea Concerts, S.L. | Spain |
| Music On Tour 2020 AIE | Spain |
| Ocesa Seitrack Espana, S.L. | Spain |
| Planet Events S.A. | Spain |
| Rock in Rio Madrid S.A. | Spain |
| Ticketmaster Iberica SLU | Spain |
| Ticketmaster Spain SAU | Spain |
| Göta Lejon Live AB | Sweden |
| Live Brands Factory AB | Sweden |
| Live Nation Holding Nordic AB | Sweden |
| Live Nation Nordic AB | Sweden |
| Live Nation Sweden AB | Sweden |

| International | State or Jurisdiction of Incorporation or Organization |
|---|---|
| Lugerinc AB | Sweden |
| Neu Festival Live AB | Sweden |
| Sweden Rock Festival AB | Sweden |
| Ticketmaster New Ventures Holdings II AB | Sweden |
| Ticketmaster Sverige AB | Sweden |
| First Event AG | Switzerland |
| Live Nation Switzerland GmbH | Switzerland |
| Mainland Music AG | Switzerland |
| Ticketmaster Schweiz AG | Switzerland |
| Indievox Inc | Taiwan |
| Live Nation Taiwan Co., Ltd | Taiwan |
| Tixcraft Inc | Taiwan |
| Live Nation Tero Entertainment Co., Ltd | Thailand |
| Thaiticketmajor Company Limited | Thailand |
| Biletix Bilet Dagitim Basim ve Ticaret AS | Turkey |
| Munyhub Online Ticketing Services – SMC Limited | Uganda |
| Brag FZ-LLC | United Arab Emirates |
| Brag 2 FZ-LLC | United Arab Emirates |
| Live Nation Middle East FZ-LLC | United Arab Emirates |
| Ticketmaster Middle East Events LLC | United Arab Emirates |
| Ticketmaster Middle East FZ-LLC | United Arab Emirates |
| Ticketmaster Middle East North LLC | United Arab Emirates |
| DG Medios Uruguay SAS | Uruguay |
| Munyhub Online Ticketing Services Limited | Zambia |

**EXHIBIT 23.1**

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in the following Registration Statements:

(1) Registration Statement (Form S-8 No. 333-281760) pertaining to the 2005 Stock Incentive Plan, as amended and restated as of March 21, 2024, of Live Nation Entertainment, Inc.,

(2) Registration Statement (Form S-8 No. 333-206294) pertaining to the 2005 Stock Incentive Plan, as amended and restated as of March 19, 2015, of Live Nation Entertainment, Inc.,

(3) Registration Statement (Form S-8 No. 333-175139) pertaining to the 2005 Stock Incentive Plan, as amended and restated as of April 15, 2011 of Live Nation Entertainment, Inc.,

(4) Registration Statement (Form S-8 No. 333-164507) pertaining to the Amended and Restated Ticketmaster Entertainment, Inc. 2008 Stock and Annual Incentive Plan of Live Nation Entertainment, Inc.,

(5) Registration Statement (Form S-8 No. 333-164494) pertaining to the Amended and Restated Stock Bonus Plan of Live Nation, Inc.,

(6) Registration Statement (Form S-8 No. 333-164302) pertaining to the 2005 Stock Incentive Plan, as Amended and Restated of Live Nation, Inc.,

(7) Registration Statement (Form S-8 No. 333-157664) pertaining to the Employee Stock Bonus Plan of Live Nation, Inc.,

(8) Registration Statement (Form S-8 No. 333-149901) pertaining to the Employee Stock Bonus Plan of Live Nation, Inc.,

(9) Registration Statement (Form S-8 No. 333-132949) pertaining to the 2005 Stock Incentive Plan of Live Nation, Inc., and

(10) Registration Statement (Form S-8 No. 333-139178) pertaining to the Nonqualified Deferred Compensation Plan;

of our reports dated February 20, 2025, with respect to the consolidated financial statements of Live Nation Entertainment, Inc., and the effectiveness of internal control over financial reporting of Live Nation Entertainment, Inc., included in this Annual Report (Form 10-K) of Live Nation Entertainment, Inc. for the year ended December 31, 2024.

/s/ Ernst & Young LLP

Los Angeles, California
February 20, 2025

**EXHIBIT 31.1**

CERTIFICATION OF CHIEF EXECUTIVE OFFICER

**CERTIFICATION**

I, Michael Rapino, certify that:

1. I have reviewed this Annual Report on Form 10-K of Live Nation Entertainment, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in ight of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) designed such disclosure controls and procedures, or caused such disclosure contro s and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) disclosed in this report any change in the registrant's internal control over financia reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 20, 2025

By:       /s/ Michael Rapino
          Michael Rapino
          President and Chief Executive Officer

**EXHIBIT 31.2**

CERTIFICATION OF CHIEF FINANCIAL OFFICER

**CERTIFICATION**

I, Joe Berchtold, certify that:

1. I have reviewed this Annual Report on Form 10-K of Live Nation Entertainment, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in ight of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) designed such disclosure controls and procedures, or caused such disclosure contro s and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) disclosed in this report any change in the registrant's internal control over financia reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 20, 2025

By:       /s/ Joe Berchtold
             Joe Berchtold
             President and Chief Financial Officer

**EXHIBIT 32.1**

SECTION 1350 CERTIFICATION OF CHIEF EXECUTIVE OFFICER

In connection with this Annual Report of Live Nation Entertainment, Inc. (the "Company") on Form 10-K for the year ended December 31, 2024 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Michael Rapino, President and Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1. The report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the report fairly presents, in all material respects, the financial condition and results of operations of the Company.


Date: February 20, 2025


By:        /s/ Michael Rapino
           Michael Rapino
           President and Chief Executive Officer


A signed original of this written statement required by Section 906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

EXHIBIT 32.2

SECTION 1350 CERTIFICATION OF CHIEF FINANCIAL OFFICER

In connection with this Annual Report of Live Nation Entertainment, Inc. (the "Company") on Form 10-K for the year ended December 31, 2024 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Joe Berchtold, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1. The report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: February 20, 2025

By:      /s/ Joe Berchtold
        Joe Berchtold
        President and Chief Financial Officer

A signed original of this written statement required by Section 906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.