CONFIDENTIAL



## TICKETING SERVICES AGREEMENT

This Ticketing Services Agreement (this "Agreement") is entered into as of November 30, 2022 (the "Effective Date"), by and between AXS Group LLC, a Delaware limited liability company ("AXS") and Tiebreaker Productions, LLC, a New York limited liability company ("Client") with reference to the following facts:

WHEREAS, AXS owns and operates AXS.com and the related back office ticketing systems and applications for the sale, issuance, resale and transfer of tickets and other rights associated with such events, including a primary market interface known as "Fansight", a marketplace which facilitates the creation of a proprietary, branded and controlled resale marketplace, and a co-mingled seat map that offers both primary and resale tickets for sale on the same seating map (collectively, the "AXS Platform"); and

WHEREAS, Client desires to utilize the AXS Platform in connection with ticketing operations and to engage AXS as its agent for providing ticketing and other services to the public with respect to all entertainment events (each, an "Event") scheduled or presented by Client (i.e. events for which Client is the sole promoter or has the right to control sales of tickets) at the following venue currently known as Forest Hills Stadium, located at One Tennis Place, Forest Hills, NY 11375 (the "Venue") on the terms and conditions set forth herein. Tickets to the Events are referred to herein as the "Tickets."

NOW THEREFORE, in consideration of the foregoing and the mutual promises set forth herein and for other good and valuable consideration, the parties hereto agree as follows:

1.    Term.  The initial term of this Agreement shall commence on the Effective Date and shall continue through November 30, 2027 (the "Term"), unless terminated earlier or extended pursuant to the terms of the Agreement.  After the expiration of the Term, the parties shall work cooperatively with respect to conducting financial settlement of ticket sales for Events for which tickets were first sold prior to expiration of the Term, but which Events are not scheduled to be held until after expiration of the Term, including, without limitation, use of and access to the AXS Platform to facilitate ticket sales and settlement after expiration of the Term.   In addition, the Term may be extended in accordance with Section 13(c) below regarding Force Majeure events.

2.    Ticket Sales Rights.

(a)    Grant of Rights.  Except as otherwise set forth in this Agreement, AXS shall serve as Client's sole and exclusive provider of primary and resale ticketing software sales and services with respect to the Events and AXS shall have the sole and exclusive

1

No. 1:24-cv-03973-AS
Defs' Trial Exhibit
DX-0730

AEG-LIT-000057485

right to sell all tickets via any means (now known or to be discovered) in connection with all Events. Client shall place the entire manifest of tickets on the AXS Platform for each Event, and secondary market sales services shall be enabled pursuant to Section (b) below.  Client shall not directly or indirectly sponsor, promote, integrate with, receive any compensation from, advertise, authorize or permit the use of any third party website, system or service in connection with the sale, resale or issuance of tickets.  Client and AXS will each use its reasonable best efforts to not sell tickets to any person or entity that such party believes will re-sell tickets to Client's Event(s) contrary to the intention of this Agreement.  For example, sales to brokers shall not be permitted without the consent of AXS and the payment to AXS of a standard per-ticket fee pursuant to Exhibit A.  AXS will enable the co-mingled seat map and stand-alone marketplace (and will activate the resale tile) for the Events, and the parties shall share fee revenues from primary and secondary market sales of Tickets, consistent with Exhibit A of this Agreement.  Notwithstanding the foregoing, none of the previous obligations will apply to the Excluded Ticketing Activities.  As used herein, "Excluded Ticketing Activities" means the following, but only to the extent not to exceed amounts consistent with industry custom and practice: (i) allocation for "fan clubs" tennis club members consistent with current practice, (ii) any complimentary tickets provided by Client to the community, artist, performing act or event or members thereof, or their managers or agents, other VIPs, or for promotional purposes, and (iii) private or local cultural events for which tickets are not sold to the public, with each of (i), (ii) and (iii) all further subject to the condition that Excluded Ticketing Activities shall not be undertaken with the services of any competitor of AXS.

(b)    AXS Mobile ID Delivery; Resale Marketplace.

(i)    Ticket Delivery; Inventory Listings.  AXS Mobile ID will be the only free and the only electronic method of delivery of tickets, whether primary or resale, unless otherwise agreed in writing in advance.  The AXS Official Resale platform is on from the time that the first Ticket for an Event is sold, whether that Ticket is sold through a pre-sale or general public on sale, allowing the customer to list Tickets for resale.  Resale inventory will not be available for consumers to purchase until the start of the public on sale. For general admission events, resale Ticket listings will be available through the AXS Event Detail page via an "AXS Official Resale" tile; for reserved seating events, resale Ticket listings will be within the co-mingled seat map.

(ii)    "Sold Out" Rules.  Ticket sales for an Event will not be described as "Sold Out" (i.e., the Event pages will not include the words "sold out" in any description of the Event") on the AXS Platform or Venue website, unless it has been determined in writing by Client in its sole discretion.

(iii)    Method of Delivery Rules. In the event that Client would like to delay delivery of AXS Mobile ID tickets, a transfer delay can be requested through AXS Client Services (and in the case of a touring Event, will only be honored if a similar request is made of all venues on the tour).  All transfer delay requests should be submitted in advance of the Event being announced, and are subject to prior approval by AXS.  Client

2

Highly Confidential

AEG-LIT-000057486

**DX-0730.0002**

acknowledges that a transfer delay will prohibit any Tickets being transferred to other fans in advance of the transfer delay being lifted.

(iv)    Additional Exceptions. Any further exceptions to the process requirements outlined above shall be mutually agreed in advance in writing.

3.    License to Client; AXS IP Rights. AXS hereby grants Client a limited, non-exclusive, non-transferable license to access and use the AXS Platform and Equipment (as listed in Exhibit A) solely for Client's internal business use, throughout the Term. AXS and its licensors reserve all rights and licenses in and to the AXS Platform not expressly granted to Client under this Agreement. Subject to Section 6, all intellectual property and proprietary rights as may be developed and/or provided by AXS to Client in connection with the AXS Platform and/or services pursuant to this Agreement (the "AXS IP"), shall be and remain the property of AXS and its licensors and no portion thereof may be used, disclosed, transmitted, transferred, sold, assigned, leased or otherwise disposed of, or made available for access by third parties, or be commercially exploited by or on behalf of Client, its employees or agents, except as expressly provided in this Agreement.

4.    Fees and Services Details. Details regarding fees and services are provided in Exhibit A attached hereto.

5.    Accounting Procedures and Settlement of Funds.

(a)    Payment Processing Services Performed by AXS. AXS shall collect all proceeds from the sale of tickets to the Event(s) made on AXS channels via AXS' merchant accounts and deposit all such proceeds into an account maintained by AXS, including any sales taxes owed and due. Internet, mobile and call center (if applicable) sales will be processed via an AXS merchant account owned by AXS. AXS will provide Client with payment services and customer service for such sales, including use of AXS's merchant account, processing of credit card, debit card, digital wallets, and other payment types (e.g., PayPal) accepted on the AXS Platform, fraud reduction, and chargeback challenge administration services (collectively, the "Payment Services") in exchange for a processing fee equal to ▇▇▇▇▇▇▇▇ of the gross transaction value ("Payment Administration Fee"). The Payment Administration fee is calculated prior to assessing the applicable per ticket or per order fees and is included along with the service charge that is assessed to customers. This Payment Administration Fee is intended to cover merchant bank fees, processing, gateway fees, chargeback challenge administration or any other fee associated with the merchant accounts or processing of payments for Tickets to Client's Events via the AXS merchant account, or processing of payments for secondary sales of Tickets to Client's Events via the AXS merchant account. AXS will dispute chargebacks and assume risk on chargebacks sold via the AXS merchant account. AXS shall be entitled to deduct the Payment Administration Fee and AXS Fees as detailed in Exhibit A and any other applicable charges or withholdings as authorized by this Agreement, prior to disbursing and the remaining net ticket proceeds due to Client (each, a "Settlement Payment") in the manner described below. Details about sales and other transaction-based tax responsibility is further described in Section 11 below.

3

AEG-LIT-000057487

DX-0730.0003

(b)    Schedule of Settlement Payments. For so long as Anschutz Entertainment Group, Inc., ("AEG") or one of its subsidiaries maintains management rights (including management of Client's accounting) and controls at least twenty-five percent (25%) ownership interest in Client ("Management Interest"), AXS agrees to provide ticket proceeds to Client as follows: AXS shall collect all proceeds from the sale of tickets to Event(s) made on AXS channels or via AXS's merchant accounts (e.g., in the case of box office sales using an AXS merchant account) and deposit all such proceeds into an account maintained by AXS.  AXS shall make payments to Client via electronic delivery, weekly on Thursdays, with respect to sales of Tickets made (i.e., on an "Advance Basis") during the preceding Monday through Sunday, for all gross proceeds from ticket sales and taxes collected on behalf of Client in accordance with this Agreement, less all authorized AXS fees and credit card processing fees due to AXS and any other applicable charges authorized in the Agreement.  In the event that, during the Term, AEG no longer maintains a Management Interest in Client, then the settlement payments shall discontinue being made on an Advance Basis, and shall commence being paid weekly on Thursdays, with respect to Events which have been completed (i.e., on a "Post Event Basis") during the preceding Monday through Sunday.

AXS shall remit such proceeds to Client's account at:

| | |
|---|---|
| Bank Name | JP Morgan Chase Bank N.A. |
| Bank Address | 500 Stanton Christina Road NCC |
| | Newark, DE 19713 |
| Account Number |  |
| Routing Number | |

Client shall provide AXS with other information reasonably requested by AXS in order to remit such payments.

(c)    Invoicing.  In the event that ticket receipts received by AXS under Section (b) above are insufficient to cover AXS fees owing hereunder, AXS shall invoice for the fees.  All such invoiced fees shall be due and payable within ten (10) days after date of the invoice.

(d)    Client's Secondary Marketplace Revenues.  No later than the fifth business day of the following month AXS shall submit to Client a monthly report (the "Monthly Revenue Report"), setting forth the following information in respect of Secondary Marketplace Services of the immediately preceding month:  (i) the aggregate revenues collected with respect to sales of tickets to Events in the Secondary Marketplace (the "Secondary Marketplace Revenues") during such month; (ii) the portion of such Secondary Marketplace Revenues to which each party is entitled pursuant to this Agreement (as set forth in Exhibit A); and (iii) the amount of Secondary Marketplace Revenues due and owing each party.   AXS shall pay to Client by ACH the amount of Secondary Marketplace Revenues due to Client as set forth in the Monthly Revenue Report, concurrent with AXS's delivery of the Monthly Revenue Report. In the event that Secondary Marketplace Revenues shall be due and owing AXS, AXS shall deduct the

4

Highly Confidential    AEG-LIT-000057488

**DX-0730.0004**

undisputed amounts thereof from the next settlement after five (5) days advance written notice to Client.

        (e)     <u>Refunds/Cancelled Events</u>.



        (f)     <u>Reports</u>. AXS will provide Client with online access to reports summarizing all applicable account activity.

        (g)     <u>Fraud Reduction</u>. In an effort to minimize fraud, AXS shall have the right to cancel any orders attempted on its merchant account that it reasonably believes are fraudulent, including, but not limited to the following circumstances: (1) billing address information provided does not match the credit card billing address; (2) duplicate orders; (3) Ticket purchaser's name does not match the name on the credit card; and (4) random orders that cannot be verified by the card holder. If AXS receives a chargeback inquiry prior to an Event, AXS may cancel the order upon reasonable advance written notice to Client whenever practicable.

        (h)     <u>Refund Determination and Payment Responsibility</u>.



6.     <u>Data</u>.

        (a)     <u>Purchaser Data</u>. Client shall own all data (i) provided by users of the AXS Platform for Client's Events at the time that such users purchase tickets to Events (the "Ticket Purchasers"), including but not limited to, names, email addresses, phone

Highly Confidential

AEG-LIT-000057489

**DX-0730.0005**

numbers, demographics, profiles, purchasing history, and other marketing or identifying information, so long as the Ticket Purchaser has consented to the collection and use of such information; and (ii) such other data regarding the Events as may be collected by AXS in the performance for Client of the Services, including VIP ticket sales data (collectively, the "Purchaser Data"). AXS will endeavor to deliver Purchaser Data on or about the same day as the Settlement Payments are made.   Client grants AXS the right to use the Purchaser Data in connection with providing ticketing services and consistent with AXS standard business operations.  Client grants to AXS a perpetual, worldwide, fully paid-up, non-exclusive right and license to use, analyze, modify, and copy the Purchaser Data for any lawful purpose deemed appropriate by AXS, including using such information for marketing and/or analytical purposes; to disclose to third parties de-identified or aggregated Purchaser Data; and to use all Purchaser Data for the purpose of providing AXS ticketing services (such as displaying ticketing purchase and transfer history) to such Ticket Purchasers, whether pursuant to this Agreement or otherwise. AXS grants to Client a perpetual, worldwide, fully paid-up, non-exclusive right and license to use, analyze, modify, and copy the Purchaser Data for any lawful purpose deemed appropriate by Client, including using such information for marketing and/or analytical purposes; to disclose to third parties de-identified or aggregated Purchaser Data; and to use all Purchaser Data for providing any services to such Ticket Purchasers, whether pursuant to this Agreement or otherwise.  If the artist asks Client for Purchaser Data for their event, Client may provide such data to the artist or may request that AXS provide such Purchaser Data to the artist, which will be memorialized in a standard data sharing agreement.  Client and AXS agree to collect, hold and use such information in compliance with all applicable laws and in accordance with applicable privacy policies.  Each of Client and AXS agrees to indemnify and hold harmless the other party, and their affiliates, officers, directors, agents and employees from and against any claim or lawsuit brought by a third party arising out of, or relating to the use of, Purchaser Data by the indemnifying party.  This Section 6(a) shall survive the termination of this Agreement.

(b)  Event Data. Client will furnish to AXS or enter into the electronic AXS Platform, as the case may be, all necessary information with respect to the proposed arrangement of the Venue for each Event, including seating layout, ticket prices and structure, permissible discounts, ticket header information, color logos, entry information, vision and hearing information, wheelchair and other accessible seating information and such other information as AXS may reasonably request or that may be necessary for the proper sale of tickets through the AXS Platform (collectively, "Event Data").  Included in such information will be Client's prepared disclaimer respecting refunds, Client's assumption of risk of injury and such other relevant information, as Client and AXS deem appropriate.  Such Event Data shall be provided to AXS sufficiently in advance of any on-sale date or ticket sales for each Event. Client promptly will reimburse AXS for any additional costs it incurs as a result of changes made to this information after tickets for the applicable Event have been sold. Client shall be responsible for monitoring and assuring that Event Data or any other information posted by Client and/or AXS (including its assigns or designees) in connection with any Event(s) and/or the Services is accurate and up to date. Client acknowledges that AXS (and its assigns and/or designees) shall be entitled to rely on information posted by and/or approved by Client.  Notwithstanding

6

Highly Confidential                                                                                          AEG-LIT-000057490

**DX-0730.0006**

anything in this Agreement to the contrary, except for gross negligence or willful misconduct of AXS, AXS will have no liability to Client under this Agreement for any act or omission by AXS in reliance on any Event Data so furnished by Client or in the event of any delay or failure by Client to so furnish any Event Data.

7.      Representations and Warranties.

(a)      Each of AXS and Client represent, warrant, and covenant to the other that: (i) it has the right and power to enter into this Agreement, to grant the rights hereunder, and to perform all terms hereof; (ii) it is duly organized and in good standing under the laws of its state of organization;  (iii) the entering into and performance of this Agreement will not violate any judgment, order, law, contract, regulation, or agreement applicable to such party or violate the rights of any third party, or result in any breach of, or constitute a default under, any other agreement to which it is a party;  (iv) the individual executing this Agreement, and whose signature appears below is duly authorized to execute this Agreement; and (v) it has been advised of its right to seek legal counsel of its own choosing in connection with the negotiation and execution of this Agreement.

(b)      Client represents and warrants that it has the exclusive right to sell tickets as the owner (or owner's designee) of Event(s), and to grant AXS the exclusive right to sell tickets in connection with Event(s) as provided in Section 2 above.

(c)      AXS represents and warrants that (i) it owns or has valid and sufficient rights to use and license all proprietary rights in and to the AXS Platform and all elements thereof, including with respect to all ticketing software, and (ii) the AXS Platform shall operate, function and be usable as intended in an uninterrupted (other than non-material short term interruptions consistent with industry standards), timely and good working manner.

(d)      AXS will encrypt all Purchaser Data and Event Data while residing on the AXS Platform or data storage servers and devices using industry standard data encryption software.

(e)      AXS will perform regular (not less than weekly) backups of Purchaser Data and Event Data; and will ensure that copies of the same are stored in an alternate data center or otherwise stored consistent with industry standards.

(f)      AXS has and will maintain in effect at all times a service continuity plan that will enable AXS to resume primary functionality of the AXS Platform within 24 hours of any interruption or failure, subject to any force majeure event.

(g)      Each party will comply with all laws, rules and regulations ("Laws") applicable to such party in any country in which they do business under this Agreement, including but not limited to such Laws as they may relate to collection, use or storage of data, including Purchaser Data.  Client shall be solely responsible for compliance with all Laws with respect to Client's Events, including for remitting any applicable taxes collected from consumers to the applicable taxing authorities.

7

Highly Confidential

AEG-LIT-000057491

**DX-0730.0007**

(h)    Each Party shall be responsible to, and shall, remit to applicable taxing authorities any applicable taxes owed with respect to their own income or payments owing to such Party; i.e., Client shall be solely responsible for remitting taxes owing on transaction receipts collected by AXS and remitted to Client hereunder, and AXS shall be solely responsible for any taxes owed related to amounts AXS retains as its fees hereunder.

(i)    Each of Client and AXS agrees to indemnify and hold harmless the other party, and their affiliates, officers, directors, agents and employees from and against any claim or lawsuit brought by a third party arising out of or relating to a breach of its respective warranties and representations as set forth in this Paragraph 7.

8.    <u>Responsibility for Security Breaches</u>. AXS shall be responsible for the security (and any breaches thereto, except to the extent caused by Client) of the AXS Platform and the Software, and AXS shall take all reasonable precautions to protect and maintain the security of the AXS Platform in order to fulfill its obligations to Client at all times during the Term of this Agreement.  AXS agrees to indemnify and hold harmless Client, and its affiliates, officers, directors, agents and employees from and against any claim or lawsuit arising out of or relating to the security of the AXS Platform and the Software.

9.    <u>Disclaimer</u>. Client agrees that, except as set forth in this Agreement, Client's and its ticket purchasers' use of the services and the AXS IP are provided on an "AS IS," "AS AVAILABLE" basis without any warranties of any kind, whether express or implied, including, without limitation, the warranties of merchantability and fitness for a particular purpose by Client or its ticket purchasers.

10.    <u>Limitation of Liability</u>.  Neither party shall be liable to the other party for any special, indirect, incidental, punitive, or consequential damages arising from or related to this Agreement or the operation or use of the AXS IP or the services.   Nothing herein shall limit the ability of either party to obtain actual damages from the other upon the occurrence of a default following applicable cure periods.  Neither party shall be liable to the other for (a) damages (regardless of their nature) for any delay or failure by such party to perform its obligations under this Agreement due to a Force Majeure event (as defined in Section 14(g) below).

11.    <u>Sales Tax Responsibility</u>. When using its merchant bank account, AXS will collect proceeds of all tickets and ancillary items sold on Client's behalf under this Agreement using the AXS Platform, including any applicable taxes, including without limitation admission, sales or other local or state taxes, owed and due on transactions made by AXS or expenditures made on Client's behalf as detailed on the settlement report. Any such taxes or other hard costs as set forth in the settlement report will be deducted by AXS and remitted to Client, the Venue or to the applicable taxing authority or payee from the settlement proceeds, all as detailed further below and in the applicable settlement report.

Highly Confidential

AEG-LIT-000057492

**DX-0730.0008**

(a)     Client is fully responsible for remitting any sales tax due from revenues related to primary market sales to the applicable state revenue department.  AXS shall have the right to obtain, reasonably promptly upon its written request to Client:

(i)     copies of any and all sales tax returns and/or other related documents evidencing such remission of sales tax by Client to the applicable state revenue department; and,

(ii)     written assurances from Client that Client complied with its legal obligations with regard to the payment and reporting of such sales taxes to the applicable state revenue department.

(b)     To the extent that Client is remitting sales taxes to the applicable state revenue department, Client acknowledges that AXS is materially relying upon its representations regarding such sales taxes and Client's compliance therewith in entering into and performing this Agreement.

(c)     For all resale or secondary market transactions on the AXS Platform, AXS will be responsible for all tax programming, collection, filing and remittance of sales and other taxes collected to the applicable taxing authorities with jurisdiction over the applicable ticketed Event.

(d)     In addition to any other indemnities in this Agreement, both Parties hereby agree to indemnify and hold the other harmless from the payment of any sales, use, or other transaction-based taxes, penalties, attorney's fees, or interest on the transactions contemplated by this Agreement or reasonably related to any default or alleged default in compliance, by Client or AXS, with such sales, use or other transaction-based tax laws as each party is responsible for.  This section shall survive the Term or termination of this Agreement for any reason.

12.     <u>Address for Notices</u>. All notices and other communications required hereunder shall be made in writing and delivered to the following: physical addresses with a corresponding email to the following email addresses:

<u>If notice to AXS</u>:
AXS Group LLC
425 W. 11th Street
Los Angeles, CA 90015
ATTN: Victoria von Szeliski (**vvonszeliski@axs.com**), General Counsel

<u>If notice to Client</u>:
Tiebreaker Productions, LLC c/o Bowery Presents
53 W 23rd Street, 5th Floor
New York, NY 10010
Attn: Don Simpson (**dsimpson@bowerypresents.com**), Chief Operating Officer

<u>*With copies to*</u>:

9

Highly Confidential

AEG-LIT-000057493

**DX-0730.0009**

c/o AEG Presents LLC
425 W. 11th Street, Suite 400
Los Angeles, CA 90015
ATTN: ATTN: notices@aegpresents.com

And

500 Park Avenue
2nd Floor
New York, NY 10022
Attn: Michael Barry, Esq.(mbarry@samlyncapital.com)

13.     Termination.  The parties shall have the following termination rights:

(a)     Termination for Breach.  Except as otherwise contemplated herein and subject to a pro-rata return of the Sponsorship Payment as set forth in Section 13(d) below, either party shall have the right to terminate this Agreement if the other party commits any material or repeated breach of any of the provisions of this Agreement and (in the case of a breach which is capable of remedy) fails to remedy the same within thirty (30) days after receipt of written notice from the other party giving full particulars of the breach and requiring it to be so remedied (provided if the default cannot be reasonably cured within such thirty (30) days, the breaching party shall not be in default if such breaching party commences efforts to cure such breach within such thirty (30) day period and thereafter diligently and in good faith continues to cure the default); provided that neither party may terminate this Agreement if the terminating party is at the time in material breach of any of the provisions of this Agreement (other than as caused by the other party's material breach).

(b)     Termination for Insolvency. AXS or Client (the "Insolvent Party") shall provide immediate written notice to the other party in the event that any insolvency, assignment for the benefit of creditors, bankruptcy or similar proceedings are instituted by or against such Insolvent Party.  If such proceedings remain undismissed for a period of thirty (30) days after such institution, the other party may immediately terminate this Agreement by written notice to the Insolvent Party, subject to the repayment by Client of the Sponsorship Payment as described in Section 13(d), if Client is the Insolvent Party.

(c)     Survival. The parties' rights and obligations which, by their nature, would continue beyond termination, cancellation or expiration of this Agreement, including, without limitation, confidentiality provisions, product warranties and governing law, shall survive any such termination, expiration or cancellation.  The rights and remedies provided in this paragraph shall be cumulative and not exclusive of any rights or remedies provided by applicable laws.  Any termination of this Agreement shall not affect any right or claim hereunder that arises prior to such termination, which claims and rights shall survive any such termination.

10

Highly Confidential

AEG-LIT-000057494

**DX-0730.0010**

(d)    Return of Portion of Sponsorship Payment. In the event of termination of this Agreement prior to the end of the Term, and only if (i) Client commits a material breach after written notice to Client and fails to remedy the same within thirty (30) days after receipt of written notice from AXS giving full particulars of the breach and requiring it to be so remedied (provided if the default cannot be reasonably cured within such thirty (30) days, Client shall not be in default if Client commences efforts to cure such breach within such thirty (30) day period and thereafter diligently and in good faith continues to cure the default); provided that AXS shall not receive the benefit of this Section 13(d) if AXS is at the time in material breach of any of the provisions of this Agreement (other than as caused by the other party's material breach); or, (ii) Client is the Insolvent Party, then Client shall return the pro-rata portion of the unearned Sponsorship Payment (the "Reimbursement Amount") to AXS in the manner set forth as follows: for example, if the Agreement is terminated after the conclusion of year 3 of the Term, the Reimbursement Amount shall be calculated as $2/5^{th}$ of the Sponsorship Payment or ███████. AXS may offset any unrecouped amounts of the Reimbursement Amount against future Settlement Payments, or invoice Client for the Reimbursement Amount, which Client shall then remit electronically into an account specified by AXS within five (5) business days after receipt of AXS's invoice.

14.    Miscellaneous Provisions.

(a)    Waiver. The failure by either party at any time to require performance by the other party or to claim a breach of any provision of this Agreement shall not affect any subsequent breach or the right to require performance or to claim a subsequent breach.

(b)    Identification as Client. Subject to prior written approval of Client as to form and content, AXS may use the name of and identity of Client as an AXS customer in advertising, publicity or similar materials distributed or displayed to prospective customers or others, provided however that use of the Forest Hills Stadium name requires the Club's consent.

(c)    Severability. If any term, provision or condition contained in this Agreement shall, to any extent, be ruled invalid or unenforceable by a court of competent jurisdiction, the remainder of this Agreement shall not be affected thereby, and each and every other term, provision and condition of this Agreement shall be enforceable to the fullest extent permitted by law.

(d)    Assignment. This Agreement shall be binding upon and shall inure to the benefit of AXS and Client and their respective permitted successors and assigns. Neither party may assign, convey, or transfer any interest in any or all of this Agreement without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed; provided, however, that such consent shall not be required (i) in the case of a collateral assignment to a lender, (ii) in the case of an assignment to any purchaser successor-in-interest which acquires a party and is capable of performing all obligations of the assignor hereunder, throughout the Term, (iii) in the case of an assignment by Client of its interest in this Agreement in connection with a sale of the Venue, or (iv) in the case of an assignment of its interest in this Agreement to a manager

Highly Confidential    AEG-LIT-000057495

**DX-0730.0011**

or an operator of the Venue, provided such manager or operator is capable of performing all obligations of assignor under this Agreement.

(e)     Entire Agreement; Amendments.  This Agreement and the exhibits attached hereto comprises the entire agreement between the parties and may not be modified or amended except by written instrument signed by authorized representatives of the parties.

(f)     Governing Law; Venue.  This Agreement shall be construed in accordance with and governed by the laws of the State of New York, without regard to the principles of conflict of law. Other than any claim for equitable or injunctive relief, which shall only be brought in a District Court in New York County, New York, all other claims, disputes and other matters in question between the parties arising out of or relating to this Agreement shall be decided by binding arbitration before one mutually agreed upon neutral arbitrator in New York, New York in accordance with the Comprehensive Commercial Arbitration Rules of JAMS then in effect. Each party shall bear its own costs in connection therewith except that the prevailing party shall be entitled to recover, and the arbitrator shall be empowered to award, costs and reasonable attorneys' fees to the prevailing party.

(g)     Force Majeure.  The term "Force Majeure" means causes or events beyond the reasonable control of a party that result in the failure or delay of a party in the performance of any obligation under this Agreement but only if such cause of the cessation or delay shall have a direct and adverse effect on the performance of the obligation. Neither party shall be liable or deemed in default as a result of any delay or failure in performance of this Agreement resulting from any such Force Majeure event, but only for so long as such delay shall continue to prevent performance.

(h)     Electronic Signature; Counterparts.  This Agreement, and any other documents requiring a signature hereunder, may be executed via email, or other electronic means, and in one or more counterparts, each of which will constitute an original.

12

Highly Confidential

AEG-LIT-000057496

**DX-0730.0012**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date set forth above.

## TIEBREAKER PRODUCTIONS, LLC

By: _Rick Mueller_

Officer
Name: Rick Mueller

Its: President, AEG Presents North America

## AXS GROUP LLC

By: _Bryan Perez_

Officer
Name: Bryan Perez

Its: CEO

13

Highly Confidential

AEG-LIT-000057497

**DX-0730.0013**

## EXHIBIT A

### FEES AND SERVICES DETAILS

1.    <u>Sponsorship Payment from AXS to Client</u>.  AXS will provide Client with a sponsorship allowance, calculated at the rate of ▮▮▮▮▮ per year of the Term, for a total of ▮▮▮▮▮ ("Sponsorship Payment") (based on five (5) full years of Events for which Tickets will be made available for sale on the AXS Platform) in connection with the promotion and marketing of the Events to be used by Client (including box office, in-venue and AXS branding activations), each of which shall be provided to AXS on an exclusive basis in the category of ticketing (primary and/or resale), in the manner  listed on Exhibit B attached hereto) (the "Sponsorship Assets"). As an accommodation to Client, AXS will pay the full amount of the Sponsorship Allowance up front, but such allowance shall be deemed earned at the rate of ▮▮▮▮▮ per each year that the sponsorship assets are delivered by Client to AXS.  AXS will remit the Sponsorship Payment to Client within thirty (30) days after receipt of an invoice therefor and after full execution of this Agreement. Upon execution of the Agreement, the parties will discuss and mutually agree upon an implementation schedule for all sponsorship assets, and Client will use its commercially reasonable efforts to implement such elements in accordance with such schedule.

2.    <u>Ticket and Order Fees to AXS and Client</u>.  The AXS Platform enables AXS to charge a per Ticket "use" fee ("Use Fee") and per order delivery fees to consumers (collectively the "Service Charges") either as an additional charge on top of the ticket price or included in the base ticket price.  In all cases, Client agrees that AXS shall be due its share of the Service Charges as provided herein regardless of whether such fees are (i) included in or (ii) added to the base ticket price. AXS and Client shall share in the fees assessed on sales made via the AXS Platform, in the amounts set forth below.  For the avoidance of doubt, (a) Client has the sole right to determine the amount of the per Ticket Use Fee and (b) fees such as facility fees and charity add-ons ("Other Fees") are not Service Charges subject to the AXS fees (other than the Payment Administration Fee, which shall still be owing on Other Fees), and therefore, ▮▮▮▮▮ of such Other Fees amounts shall be remitted to Client.  Any such adjustment will be agreed to in writing (attached to the Agreement, acknowledged via DocuSign, or via an exchange of emails).

| Type of Fee | Minimum Fee | AXS Fee | Client Revenue |
|---|---|---|---|
| Primary Market – tickets sold via AXS channels (e.g., web, phone) | Standard AEG/AXS Fee Schedule | ▮▮▮ | ▮▮▮ |
| Box Office/Internal/Comp Tickets | N/A | ▮▮▮ | ▮▮▮ |
| AXS Premium | Outside fee of ▮▮▮ of the base ticket or item price for AXS | ▮▮▮ | ▮▮▮ |

14

Highly Confidential

AEG-LIT-000057498

**DX-0730.0014**

| | | | |
|---|---|---|---|
| | Premium plus inside fee of ▉ of the base ticket or item price for AXS Premium | | |
| VIP Tickets/Packages | Inside Charge: ▉ of the Lift, not to exceed ▉<br><br>Outside Charge: currently ▉ of the final VIP Tickets/Package Price for Tickets/Packages $150 or more<br><br>For Tickets/Packages $149.99 or less: the Convenience Fee shall ▉ the amount of the AXS Ticket Fee for non-VIP Tickets/Packages | ▉ | |
| Secondary (Resale) Market Sales | Inside Charge: current seller fee is ▉ of the Resale Ticket price<br><br>Outside Charge: current buyer fee is ▉ of the Resale Ticket price | | |
| Per Order Delivery Fee – Standard Mail (if applicable) | ▉ | | |
| Per Order Delivery Fee – Digital (AXS Mobile ID) and Will Call | ▉ | | |
| Season Plans & Packages | | | |

\* *The AXS Fee will increase by* ▉ *per Ticket, each year starting in year three (3) of the Agreement Term if the average Ticket sales for the first two (2) years of the Agreement Term not average at least 200,000 in service chargeable Tickets (i.e., a Ticket where the purchaser paid a service charge inclusive of the AXS's per Ticket fee) per year.*

\*\*The term "Net" when used with a fee, refers to the Payment Administration Fee being deducted prior to determining fees listed above and revenue sharing amounts.

AXS Mobile ID will be the only method of delivery unless otherwise agreed.

15

Highly Confidential

AEG-LIT-000057499

**DX-0730.0015**

2.   AXS Ticketing Technology. AXS ticketing software and technology that shall be included within the AXS Platform includes, but is not limited to, features such as self-serve inventory management tools and point of sale support and integration.  More specifically, the AXS Platform includes:

- Patented AXS Mobile ID Ticketing Ecosystem
- Real-Time Ticket Sales and Financial Reporting
- Box Office Point of Sale
- 24x7 support and all available standard upgrades
- Designated Account Manager
- Access Control Ticket Scanning Software
- AXS IQ or such other business intelligence and analytics platform used at such time by AXS
- AXS Promoter Mobile Reporting App
- Point of Sale support and integration
- Client to receive a 3-D seating map and quantity of any 2-D seating map shall be mutually determined.

3.   AXS Anywhere Discovery and Distribution Program.  Client may choose to allocate primary market tickets through any of AXS' third party distribution partners, such as Groupon and Goldstar (each, a "Distribution Partner"). Upon receipt of written direction from Client, AXS shall provide the appropriate Distribution Partner access to an AXS Platform API for the relevant Event(s) a████████ to Client (though AXS reserves the right to charge the Distribution Partner or any relevant third party negotiated amounts for such access). AXS shall be due the per ticket AXS Fees for any ticket sold by any Distribution Partners and such ticket shall also be subject to any separate terms negotiated between AXS and the applicable Distribution Partner(s).

4.   AXS Marketing Support. AXS will provide the following additional marketing support, at ████████████ unless otherwise noted, to Client:
- Client's Events will be featured on AXS.com;
- Variety of detail pages available (Event, Venue promo, Series, Artist and more) to promote Client Events and available ticketing options;
- Featured placements on AXS.com;
- Client will receive AXS.com database marketing support in local and surrounding areas;
- AXS Discovery partnerships such as Spotify, Facebook, Songkick, Bandsintown and YouTube, expanding consumers' ability to find the Events;
- AXS social media support; and
- AXS Customized emails to targeted consumers of AXS's opt-in customer database.

5.   AXS Contact Center.  AXS will provide consumer facing customer support from its contact center during standard operating hours at ████████████ to Client. AXS's contact center is available via phone, email, or chat seven days a week.

16

Highly Confidential                                                                    AEG-LIT-000057500

DX-0730.0016

6.  Implementation, Initial Training and AXS Upgrades. The AXS setup fee will be waived for Client.  Initial implementation and AXS Platform system training will be included and web training will be offered ▮▮▮ to Client. Upgrades to the AXS Platform that are generally made available to all AXS clients will also be made available to Client at ▮▮▮.

7.  Connectivity/Equipment. Client will be responsible for reliable and stable Internet connections to the AXS Platform for Box Office operations including sales of Tickets and for Wi-Fi connectivity for all Access Control locations. During the Term, AXS will provide Client with the use of the Equipment listed below. AXS will own the equipment and will be responsible for maintenance thereof, provided, however, that Client will be responsible for any loss or damage of the Equipment due to Client's neglect or beyond reasonable wear and tear, and for the return of the Equipment to AXS at the end of the Term.

Equipment Schedule

| Item | Quantity |
|---|---|
| HP All-in-One Box Office Kit (desktops) | TBD |
| Boca Printers | TBD |
| Handheld Scanners | TBD |
| Zebra Printers | TBD |
| Waterproof Scanners | |

8.  Ticket Stock.  Client is responsible for paying for Client branded ticket stock or AXS will support a Client branded e-ticket at no charge.

17

Highly Confidential

AEG-LIT-000057501

**DX-0730.0017**

## EXHIBIT B

## SPONSORSHIP ASSETS

## [TBD to be negotiated further/Subject to AXS and Client Review]

Subject to the terms of the Agreement, Client and AXS will negotiate in good faith providing AXS with certain Sponsorship Assets during each year of the Term, each of which, to the extent agreed upon in writing, shall be provided to AXS on an exclusive basis in the category of ticketing (primary and/or resale) (i.e., no other person or entity in the ticketing category shall be provided with any of such Sponsorship Assets and/or rights).

The categories of Sponsorship Assets shall generally include the following, subject to additions and modifications mutually agreed upon by the parties.

- ██████████████

- ███████████

- ██████████

- ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████

18

Highly Confidential

AEG-LIT-000057502

**DX-0730.0018**