**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA, *et al.*,

           *Plaintiffs,*

      v.

LIVE NATION ENTERTAINMENT, INC.,
and TICKETMASTER L.L.C.,

           *Defendants.*

Case No. 1:24-cv-03973-(AS)

**ORAL ARGUMENT REQUESTED**

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF**
**THEIR MOTION TO STRIKE THE TESTIMONY OF**
**<u>DR. ROSA M. ABRANTES-METZ</u>**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

LEGAL STANDARD..............................................................................................................1

FACTUAL BACKGROUND ...................................................................................................2

I.      Dr. Abrantes-Metz's Treatment Of Payments To Venues In Her "Retained Amounts" Analysis Is Contrary To The Record And Her Testimony Regarding It Is A Deliberate Falsehood...................................................................................................2

II.     Dr. Abrantes-Metz's Opinion Regarding 2017–2024 Comparability Is Contrary To The Record ...................................................................................................................8

ARGUMENT ...........................................................................................................................12

III.    There Is No Basis In The Record For Dr. Abrantes-Metz's Argument That Fixed Payments To Venues Are Not Part Of The Price Of A Ticketing Services Contract........12

IV.     Dr. Abrantes-Metz's Testimony Should Be Excluded Because She Fabricated A Story That She Was Only Following Live Nation's Instructions .....................................14

V.      There Is No Basis For Permitting The Jury To Speculate What The Appropriate Quality Adjustment Is To The AXS Competitive Benchmark ..........................................16

CONCLUSION.........................................................................................................................18

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Alto v. Sun Pharm. Indus., Inc.*,
   2021 WL 4803582 (S.D.N.Y. Oct. 13, 2021), *judgment entered*, 2021 WL
   4805430 (S.D.N.Y. Oct. 14, 2021) ..................................................................................1

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002)..................................................................................1, 12

*AngioDynamics, Inc. v. C.R. Bard, Inc.*,
   537 F. Supp. 3d 273 (N.D.N.Y. 2021)...........................................................................17

*Boucher v. U.S. Suzuki Motor Corp.*,
   73 F.3d 18 (2d Cir. 1996) .............................................................................................16

*Campbell Indus. v. M/V Gemini*,
   619 F.2d 24 (9th Cir. 1980) ..........................................................................................15

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)........................................................................................................1

*Davis v. Carroll*,
   937 F. Supp. 2d 390 (S.D.N.Y. 2013).............................................................................2

*General Elec. Co. v. Joiner*,
   522 U.S. 136 (1997)........................................................................................................1

*Herman Schwabe, Inc. v. United Shoe Mach. Corp.*,
   297 F.2d 906 (2d Cir. 1962)..........................................................................................17

*In re Google Play Store Antitrust Litig.*,
   2023 WL 5532128 (N.D. Cal. Aug. 28, 2023) ...............................................................1

*In re Namenda Direct Purchaser Antitrust Litig.*,
   331 F. Supp. 3d 152 (S.D.N.Y. 2018)...........................................................................12

*In re NFL "Sunday Ticket" Antitrust Litig.*,
   2024 WL 3628118 (C.D. Cal. Aug. 1, 2024), *appeal argued*, No. 24-6107 (9th
   Cir. Mar. 9, 2026) ....................................................................................................1, 17

*In re Paoli R.R. Yard PCB Litig.*,
   35 F.3d 717 (3d Cir. 1994)..............................................................................................1

*In re Wholesale Grocery Products Antitrust Litig.*,
   946 F.3d 995 (8th Cir. 2019) ........................................................................................12

*Klein v. Meta Platforms, Inc.*,
   766 F. Supp. 3d 956 (N.D. Cal. Feb. 13, 2025) ............................................................2, 12, 13

*Rembrandt Vision Tech., L.P. v. Johnson & Johnson Vision Care, Inc.*,
   818 F.3d 1320 (Fed. Cir. 2016)................................................................................15, 16

*Rozier v. Ford Motor Co.*,
   573 F.2d 1332 (5th Cir. 1978) ......................................................................................16

*Weiner v. Snapple Beverage Corp.*,
   2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010)................................................................17

**RULES**

Fed. R. Evid. 104(a)..................................................................................................................2

Fed. R. Evid. 702 .........................................................................................................1, 2, 18

## INTRODUCTION

Defendants move to strike the testimony of Dr. Abrantes-Metz in its entirety on the ground that the notion of the benchmark "price" upon which she has built her damages study (the "Study") has no basis in the record, cannot provide the jury a reasonable basis for determining damages, and is therefore inadmissible under Federal Rule of Evidence 702. Separately, Defendants move to strike Dr. Abrantes-Metz's testimony because she committed perjury in claiming that her notion of price was based on instructions from Live Nation.

## LEGAL STANDARD

Federal Rule of Evidence 702 assigns a gatekeeping role to the district court "[a]t all stages" to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *In re Google Play Store Antitrust Litig.*, 2023 WL 5532128, at *5 (N.D. Cal. Aug. 28, 2023) (cleaned up); *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). Among other things, the district court should consider whether: (1) the testimony is grounded on sufficient data, (2) the testimony is the product of reliable principles and methods, and (3) the expert reliably applied the principles and methods to the facts of the case. *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002); Fed. R. Evid. 702. In the Second Circuit, "each step in the [expert's] analysis" must be "supported by good grounds." *Id*. at 267 (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994)).

An expert's testimony also must 'fit' the facts of the case. *See Daubert*, 509 U.S. at 591; *Alto v. Sun Pharm. Indus., Inc.*, 2021 WL 4803582, at *3 (S.D.N.Y. Oct. 13, 2021), *judgment entered*, 2021 WL 4805430 (S.D.N.Y. Oct. 14, 2021). Courts may exclude the opinion of an expert where there is too great an analytic gap between the facts and the opinion proffered. *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also In re NFL "Sunday Ticket" Antitrust Litig.*, 2024 WL 3628118, at *6-7 (C.D. Cal. Aug. 1, 2024), *appeal argued*, No. 24-6107 (9th Cir. Mar. 9,

1

2026)   (excluding expert testimony based on  "*ipse dixit* opinion untethered to an economic analysis of what would have likely occurred in the but-for world"); *Klein v. Meta Platforms, Inc.*, 766 F. Supp. 3d 956, 964-967 (N.D. Cal. Feb. 13, 2025) (excluding expert testimony concerning antitrust injury based on a theoretical conception of price inconsistent with market realities).

The admissibility of expert testimony under Rule 702 is a preliminary question of law for the district court to determine pursuant to Federal Rule of Evidence 104(a); when considering a motion to strike, the Court is not bound by the rules of evidence, except those on privilege.  Fed. R. Evid. 104(a).  Proponents of expert testimony, even in the context of motions to strike, must establish the Rule 702 elements "by a preponderance of the evidence."  *Davis v. Carroll,* 937 F. Supp. 2d 390, 411, 413–14 (S.D.N.Y. 2013).

## FACTUAL BACKGROUND

The foundation of the Study is the contention that Ticketmaster's "Retained Amount" is $2.30 per ticket greater than AXS's Retained Amount.  The integrity of that contention depends on (a) Dr. Abrantes-Metz's argument that her construct of Retained Amount is the price a venue pays for primary ticketing services, and (b) her argument that AXS and Ticketmaster offer reasonably comparable products and services, such that AXS can serve as a but-for benchmark and any higher Ticketmaster Retained Amount can be viewed as a monopoly overcharge.

**I.      DR. ABRANTES-METZ'S TREATMENT OF PAYMENTS TO VENUES IN HER "RETAINED AMOUNTS" ANALYSIS IS CONTRARY TO THE RECORD AND HER TESTIMONY REGARDING IT IS A DELIBERATE FALSEHOOD**

Dr. Abrantes-Metz's construct of the Retained Amount as a reasonable proxy for price is irreconcilable with the trial record.  And while we do not say this lightly, she has resorted to lying about the origins of this argument to defend her work and, in particular, to evade the critique that her concept of "Retained Amounts" was made out of whole cloth.

2

There is substantial record evidence about the economics of primary ticketing contracts with venues.  Beyond reasonable dispute is that these contracts routinely determine both the large upfront payment(s) the ticketing company makes *to the venue*, and the compensation the venue remits *to the ticketing company* in the form of service charges.  Plaintiffs' own expert, Dr. Hill, says so.  ECF No. 717-1 (Hill Report) ¶ 51.  It is unquestionably a two-way money flow that ticketing companies account for together to determine the price the ticketer receives in return for providing ticketing services.  The evidence on this is clear: the CEO of AEG, Jay Marciano, explained that these payments are "just an amortization of cash over the course of the agreement."  Trial Tr. 1177:14–19.  David Marcus, Head of Music at Ticketmaster, called it an "advance" against fee income.  Trial Tr. 2921:15–24.  The "DAT" analysis Ticketmaster uses to assess the economics of every ticketing deal converts fixed payments to a per ticket value which is subtracted from Ticketmaster's share of per ticket fees.[1]   DX-0553.0006.   The bottom line is what Ticketmaster calls "TM Retain (GM)," which is expressed both in terms of the aggregate gross margin Ticketmaster is likely to receive and a per ticket gross margin.  *Id.* at .0002.  To be clear, "TM Retain (GM)" is not the same as what Dr. Abrantes-Metz calls a "Retained Amount."

Dr. Abrantes-Metz simply pretends that upfront payments to venues play no role in determining the price venues pay for ticketing services when calculating her "Retained Amount." Prior to trial, she justified this by arguing that (a) fixed payments relate only to profit not price, and (b) she regarded fixed payments as fixed costs irrelevant to price.  Because she cited nothing in her reports to justify how she calculated "Retained Amounts," Defendants asked her at her deposition.

---

[1] In accounting terms, it is "contra-revenue."

Q. Yeah. There's *no citation to any evidence* or economic authority for the definition of a retained amount, right?

A. *No. I am calling it retained amount.* I could have called it the price. I could have called it anything I wanted, for that matter. …

Depo. Tr. 178:9–16 (emphasis added).

And when asked where she came up with her concept of Retained Amount, she unequivocally confirmed it was her own construction.

Q. Let's put it this way. Ticketmaster doesn't refer to the concept of retained amounts, as you've defined it, in its normal course documents, does it?

A. I don't particularly [re]call, no.

Depo. Tr. 179:10–16.

\*\*\*

Q. Now, can you point to ordinary course documents where Ticketmaster says it considers what you've calculated as retained amount to be the price that it charges venues?

A. I don't recall that it states that way. But the contracts show how much Ticketmaster is to receive from venues, and that is commonly interpreted by economists as the price of a service.

Depo. Tr. 180:21–181:6.

\*\*\*

Q. And what's your basis in the actual evidentiary record of the case, from any witness, to say that those upfront payments don't affect the price as reflected in the allocation of the total ticket fees?

Q. Has any witness said that?

THE WITNESS: It's a principle of economics.

Q. Has any witness said that that's how they do it?

A. I am the witness who is saying that, that that is a principle of economics. …

Depo. Tr. 240:22–241:17.

\*\*\*

4

It was therefore surprising and troubling when, under cross-examination at trial, Dr. Abrantes-Metz retreated from owning her "Retained Amount" construct and started contending, for the first time, that she derived her methodology from Live Nation's own definition of Retained Amount.

> Q. You're quantifying how much of a hypothetical extra dollar of what you call "retained amounts" gets paid by ticket buyers as opposed to by venues, right?
>
> A. Let me clarify. I do not call retained amount. Live Nation itself calls those retained fees retained amounts. And after I clarify that, could you kindly repeat your question?
>
> Q. Sure. You do recall we went through a deposition together, right?
>
> A. Yes, and I also recall reading it in documents and in data.
>
> Trial Tr. 2498:4–13.

***

> Q. Did I understand you correctly earlier to understand that you don't use the term retained amounts, Doctor, or did I misunderstand you?
>
> A. I think you misunderstood. I do not call it myself retained amount. I call it retained amount because it was called retained amount by Live Nation.
>
> Trial Tr. 2498:19–24.

***

She shortly later began claiming that she was calculating Retained Amount "follow[ing] instructions provided by Live Nation on how to calculate retained amounts." Trial Tr. 2513:16–24. She also began claiming that "[i]t is not my definition of retained amount," but rather "I followed Live Nation's documents." Trial Tr. 2514:4–19, 2515:16–22; *see also* Trial Tr. 2519:15–2520:1 ("I used the definition from Live Nation cited in my report.").

The next day, March 25, Abrantes-Metz took this argument to another level. On redirect, in response to a question by counsel for the Plaintiff State of California, she said:

> The retained amount calculation *follows the instructions provided by Ticketmaster and Live Nation in their answers to questions from plaintiffs on how to calculate*

5

*these retained amounts*.  In that letter, it was explained by Live Nation that the amount retained by Ticketmaster is composed of certain fees, part of the convenience fees, and it explains how the fees are calculated, it addresses issues related to different kinds of fees, such as inside or outside fees, et cetera.  And so that's how this allocation gets done.

Trial Tr. 2593:11–23.  At a sidebar conference, Plaintiffs' counsel proffered footnote 333 to the opening Abrantes-Metz report as the authority for that proposition.  Trial Tr. 2594:5–18.[2]  At the next break, the Court expressed its displeasure at the suggestion that this was a disclosed opinion and struck the testimony concerning these alleged instructions.  *See* Trial Tr. 2600:9–2602:25.  But the story does not end there because, since then, Defendants have gone back to review the Abrantes-Metz report, and the letter that allegedly contained these instructions and the broader record concerning this issue.

At their plain reading, neither footnote 333, which is in Dr. Abrantes-Metz's "Data Appendix," nor footnote 226, which references the Data Appendix, says that Dr. Abrantes-Metz's Retained Amount construction is something Live Nation calculates or endorses.  Footnote 333 references Kelly Fayne's June 27, 2025 letter, which states "[a]ccording to Live Nation, LNE-LIT24-DAT-000078 'contains information sufficient to identify inside fees, outside fees, and ticket face value.'"  Footnote 226 says "Ticketmaster's raw data allows calculations of retained amounts at the event level. . . .  See Data Appendix."

The letter cited in footnote 333 is one of numerous similar letters answering hundreds of questions that Defendants received from the Plaintiffs on the workings of Live Nation and Ticketmaster databases.  *See* Fayne Decl. ¶ 4; Ex. 1, at 1.  The questions are as in-the-weeds as it

---

[2] The timing of that citation is, at least, curious.  Dr. Abrantes-Metz was at that point testifying on redirect examination.  So it appears that Dr. Abrantes-Metz had supplied Plaintiffs' counsel with footnote 333 as something that she could be asked about if crossed on the basis for her definition of Retained Amount.

6

gets, as are the answers.  They are mostly about the meanings of esoteric database entries and how one data point relates to others.  In the cited letter, there is no question, let alone an answer, that is tantamount to, "How does Ticketmaster calculate the price for its primary ticketing services?" or, even, "Which data fields would we use to replicate what Ticketmaster views as its price for primary ticketing services?"

Dr. Abrantes-Metz cited to Question 17 in Live Nation's June 27, 2025, letter.  ECF No. 706-1 (Expert Report of Rosa M. Abrantes-Metz, Ph.D. (Aug. 15, 2025)) at n.333.  That question is also about a database: LNE-LIT24-DAT-000080.  The question is: "Please explain how to identify [with this database] the total outside fees (i.e., fees charged in addition to the ticket face value), total inside fees and total face-value charged to the fan and whether a field or combination of fields identifies the amount of each type of fee retained by Ticketmaster."  Live Nation answered:

> Live Nation does not use LNE-LIT24-DAT-000080 to identify fees or the payments Ticketmaster makes to its partners in the ordinary course.  LNE-LIT24-DAT-000078 [another database] contains information sufficient to identify inside fees, outside fees, and ticket face value.  However, LNE-LIT24-DAT-000078 *does not contain a field, nor a combination of fields, that identifies the amount retained by Ticketmaster within each fee type. In particular, not all payments Ticketmaster makes to its partners are captured in this dataset, such as payments to credit card companies and fixed royalty payments to its venue clients.*  Below, Live Nation lists the fields in LNE-LIT24- DAT-000078 that record (1) revenue earned by Ticketmaster, separated by outside fees, facility fees, inside fees, and face value; *and (2) contra-revenue and royalty payments from the inside and outside fees that Ticketmaster makes to its partners*.

That Live Nation went out of its way to raise the contra-revenue issue was no accident. Ticketmaster has never had a conception of its price that does not take into account payments to clients under a ticketing contract.  Live Nation has been telling Plaintiffs about the need to account for payments to venue clients from the outset of their investigations.  For example, in a September

2023 letter responding to the question, "Please explain whether there is a way to tell from the data included in LNE22-000148678 and LNE22-000148679 [client-level profit and loss statements] what portion of revenue and fees is kept by Ticketmaster," Live Nation stated:  "The portion of fee revenue that Ticketmaster retains after royalties paid to clients may generally be determined by subtracting the sum of "TotVarRoyalties - Total Variable Royalties" field and the "TotFixedRoyalties - Total Fixed Royalties" field from the "TotalCnP - Total Convenience and Processing" field."  Fayne Decl. ¶ 11; Ex. 6, at 2.

In light of this history, this time-of-trial assertion by Abrantes-Metz that she was simply "follow[ing] the instructions provided by Ticketmaster . . . on how to calculate these retained amounts" can only be regarded as a deliberate lie.  From her deposition, she knew that Defendants would cross-examine her on how she came up with this construct of Retained Amount, and to foil the line of cross she made up a story directly contradicting her deposition testimony that the Retained Amount was her work alone.  And she consciously tried to ground the lie in a further lie orchestrated to play out during redirect examination:  an absurd interpretation of a letter by Live Nation's lawyers that, to the extent it is relevant at all, "instructs" that one must do the opposite of what Dr. Abrantes-Metz has done here and consider fixed payments to venues.

## II. DR. ABRANTES-METZ'S OPINION REGARDING 2017–2024 COMPARABILITY IS CONTRARY TO THE RECORD

There is no longer any evidentiary basis for Dr. Abrantes-Metz's reliance on the AXS benchmark to construct the "price" differential that she attributes to the alleged conduct.  Her failure to account for the clear quality differential between AXS and Ticketmaster renders the benchmark unusable.  We start with three key admissions by Dr. Abrantes-Metz:

- She concedes that her analysis assumes that the ticketing services of AXS and Ticketmaster were of reasonably comparable quality throughout the entire period from 2017 through 2024.  Trial Tr. 2531:11–15, 2535:11–2536:7.

- She further concedes that differences in quality can lead to differences in price. Trial Tr. 2533:17–2534:23.

- She concedes that, if the jury finds that AXS and Ticketmaster were not reasonably comparable for any portion of the period she studied, she did not provide a methodology by which the jury could assess damages only for the period in which they were reasonably comparable. Trial Tr. 2566:12–2567:15.

At this point, it is indisputable that AXS and Ticketmaster were not of comparable quality prior to the COVID-19 pandemic. Even AXS and its sister companies at AEG say as much. The CEO of AEG Presents, Jay Marciano, acknowledged that, in October 2019, AEG believed the AXS technology platform "lagged behind Ticketmaster," that AXS's reputation as a ticketer was "tarnished," and that he was evaluating whether AXS had "the right management team." Trial Tr. 1154:12–24. Rick Mueller, President of North America at AEG, wrote to the head of AXS, Bryan Perez, in 2019 that there was "major frustration with AXS service company wide." DX-0268.0001. In August 2019, John Moore of The Bowery Presents (an AEG subsidiary) referred to AXS as "the worst ticketing service, pathetic," asking if it could be written off and "we do a TM deal." DX-0267.0001. The "[l]ast thing we need to hear [is] when they're rolling out the next version of the turd," said Mr. Moore. *Id.* As Mr. Mueller explained, "John [Moore] was suggesting we sunset the AXS ticketing service system as sunk cost and move over to using Ticketmaster as a platform." Trial Tr. 3060:13–17. When Mr. Moore asked an artist's manager "for a comparison to his [Ticketmaster] experiences," he was told AXS was and is "#3 in a 2 horse race." DX-0267.0001.

As Mr. Marciano testified, AXS needed to be substantially rebuilt during the pandemic to address serious quality issues and a tarnished reputation. Trial Tr. 1168:9–14. The testimony of Mr. Perez, Trial Tr. 2319:14–19, and Mr. Mueller, Trial Tr. 3050:8–18, is to the same effect, as are numerous contemporaneous AXS and AEG documents. But the record does not support an

9

assumption of comparability even after the pandemic.  As of May of 2021, Mr. Perez believed that AXS had no answer for Ticketmaster's Pricemaster tool, and he was receiving requests from AEG's own concert promoters for AXS to develop something like it.  Trial Tr. 2377:7–15.  But by 2024, AXS's version was still "in beta mode," and "wasn't in use" by concert promoters at AEG.  Trial Tr. 3051:8–19.  In 2022, another AEG promoter described the "AXS system" as one that "still mostly stinks at simple, basic things that should NEVER be happening."  DX-0711.0001.  And Rob Pohly, part-owner of Forest Hills Stadium, forwarded one of these complaints to Mr. Mueller with the simple assessment: "This is why Ticketmaster is better."  *Id.*  In October 2023, Mr. Perez received feedback from Mr. Marciano that Mr. Perez "characterized as the complete unreliability of the reporting app that AXS was building." Trial Tr. 2374:24–2375:5.

John Abbamondi, CEO of BSE Global, testified that in 2021, his team at Barclays concluded that AXS was a "vanilla, uninspiring technology," and that AXS's "client-facing teams had been unimpressive." Trial Tr. 328:9–14.[3]  Messina Touring Group, one of the concert promoters within the AEG family, Trial Tr. 2378:20–22, chose Ticketmaster over AXS when they had the choice even in 2021 because they perceived Ticketmaster to be better for the artists they promoted.  Trial Tr. 2380:16–21.

Mr. Mueller testified that "most of the AEG concert promoters were frustrated with the AXS ticketing system" and that "[m]any of the promoters at AEG would have preferred to be using

---

[3] Barclays, of course, chose SeatGeek over both Ticketmaster and AXS.  SeatGeek has been much more successful than AXS in acquiring ticketing contracts at independent arenas and stadiums (i.e., those that are not part of the AEG family).  SeatGeek would appear to be the obvious competitive benchmark for Ticketmaster in this space.  It is therefore important context that Abrantes-Metz chose AXS as her benchmark because her own calculations of Retained Amount indicates that SeatGeek charges *more* than Ticketmaster, implying no damages.  *See* Trial Tr. 2526:17–2527:19; ECF No. 722-1 (Abrantes-Metz Rpt., Ex. G.2.); ECF No. 722-2 (Abrantes-Metz Rpt., Ex. G.2.).

the Ticketmaster system." Trial Tr. 3056:2–11. Mr. Mueller testified that, from 2019 to 2024, "Ticketmaster was a better product" than AXS. Trial Tr. 3050:19–22. He testified that AXS had significant crashes with the Coachella on-sale after 2021. Trial Tr. 3067:4–10. When asked directly whether AXS ever offered a ticketing product of "comparable quality" to Ticketmaster between 2019 and 2024, Mr. Mueller answered unequivocally: "They did not." Trial Tr. 3072:19–22.

On the current record, no one can be heard to argue that AXS could be considered reasonably comparable to Ticketmaster before, at earliest, late 2021. *See* Trial Tr. 1168:18–1169:1 (conceding AXS was not comparable to Ticketmaster until late 2021); *id.* at 1117:15–1118:1 (Marciano acknowledging that AXS "struggled in ticketing for a few years" due to Ticketmaster's "30-year head start" and that AXS used the COVID shutdown to catch up); *id.* at 1154:6–18 (Marciano agreeing that AXS's "technology platform and product development lagged behind Ticketmaster" as of October 2019); *id.* at 308:5-7 (Abbamondi agreeing that "Ticketmaster is one of the best ticketers in the world"). Accordingly, since Dr. Abrantes-Metz's analysis assumes comparable quality, there is no basis for using the AXS price as any kind of competitive benchmark for at least the pre-2022 period. But from an admissibility perspective, the time period hardly matters because Dr. Abrantes-Metz's analysis was constructed around a single, seven-year average differential in the Ticketmaster and AXS Retained Amounts that assumes reasonable comparability both before and after the pandemic. Her analysis does not give the jury any reasoned basis for adjusting the claimed damages if they reject the comparability hypothesis for any period of time.[4] Nor does she provide the jury any reasoned basis for adjusting the claimed damages

---

[4] Dr. Abrantes-Metz seemed to argue that because she calculated the retained amounts year-by-year, the jury could ignore the values from the pre-pandemic years and just focus on the values for later years. That doesn't work; it doesn't even make sense. If AXS quality relative to Ticketmaster

should the jury find that quality differences between Ticketmaster and AXS (at any point in time) explain only *some* but not all of the difference between the two companies' Retained Amounts. Her analysis is an all-or-nothing exercise that is no longer remotely consistent with the record evidence.

## ARGUMENT

**III.    THERE IS NO BASIS IN THE RECORD FOR DR. ABRANTES-METZ'S ARGUMENT THAT FIXED PAYMENTS TO VENUES ARE NOT PART OF THE PRICE OF A TICKETING SERVICES CONTRACT**

In every case, "each step" in an expert's analysis must be "supported by good grounds." *Amorgianos*, 303 F.3d at 265. Here, Dr. Abrantes-Metz's Study rises or falls based on her first step, which purports to determine the monopoly overcharge to venues that then, allegedly, gets passed-through to fans. And nothing could be more fundamental to that first step than how one defines the price of a ticketing contract. If that's wrong, everything that follows is wrong, too. *See In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 171–72 (S.D.N.Y. 2018) (excluding expert conclusion drawn "without any analysis of the market and corporate conditions"); *see also In re Wholesale Grocery Products Antitrust Litig.*, 946 F.3d 995, 1002–03 (8th Cir. 2019) (upholding exclusion of expert's opinions for "[falling] short of incorporating all aspects of the relevant markets to demonstrate the veracity of the [competitive] benchmark chosen").

The recent decision in *Klein v. Meta Platforms, Inc.,* 766 F. Supp. 3d 956, 964-967 (N.D. Cal. Feb. 13, 2025), excluded an expert's testimony because it was based on an unsupported conception of price. Separate plaintiff groups of users and advertisers sued Meta Platforms, Inc.

---

improved after the pandemic, one should see the differential between AXS and Ticketmaster "prices" decrease. Her analysis suggests it increased, i.e., the overcharge to venues became larger as AXS became more competitive. Since that makes no sense, the Study appears to imply that AXS became even less comparable to Ticketmaster over time.

12

("Meta") for illegally acquiring and maintaining a monopoly in the "personal social network services" market. *Id.* at 959. In seeking class certification, plaintiffs offered the testimony of a well-qualified economist who opined that in the absence of anticompetitive conduct, Meta would have had to "pay users for their data to retain robust user engagement." *Id.* This unusual injury theory was born of necessity; users do not pay Meta to use Facebook, so there was no basis for predicting a traditional price increase. *See id.* at 960. The economist, therefore, asserted that under competition Meta would have charged a "negative price," paying users $5.00/month to get their data. *See id.*

The district court found that while conceptually this was not "bunkum," there was no evidence that any "participant in the PSNS market has ever competed by paying users." *Id.* at 963. The "undisputed record about the real world" was that they did not. *Id.* Since the expert's proposed testimony was no "more than a fanciful application of economic theory untethered to real-world evidence," it was inadmissible. *Id.* So it is here. The "undisputed record about the real world" of primary ticketing companies is that their contracts with venues involve payments to and from the venues that are invariably netted to understand what the ticketing company is paid. That is evident in each and every one of the DAT forms used to approve ticketing deals and it is also evident in each and every ticketing contract. It is evident in gigabytes of accounting records capturing contra-revenue from fixed payments to venues. And yet Dr. Abrantes-Metz has testified over and over again that Ticketmaster "retains" its share of service charges without regard to what it pays the venue for the opportunity to distribute its tickets. She has told the jury that Ticketmaster retains $7.00 per ticket on average when, as the Miami Heat example shows, the per ticket value of fixed payments to the venue can cancel out most of that. In his report, Mr. Paul Meyer notes that in the 2017-2024 period Dr. Abrantes-Metz purported to study, "Live Nation's U.S. Ticketing

13

segment reported total fixed amortization of non-recoupable advances and fixed royalty payments of over $1.4 billion, $948 million of which was attributed to primary ticketing." ECF No. 794-1 (Expert Report of Paul K. Meyer) ¶ 340. That $948 million is over three times the entire damages claim.

We presume Plaintiffs will say that none of this matters because the Study is based on a comparison to AXS and she is ignoring fixed payments AXS makes to venues too. This is specious. The logic, if one can call it that, would only hold if, after accounting for both Ticketmaster and AXS payments to venues, the Study found the same $2.30/ticket "overcharge." There is no evidence of that because Abrantes-Metz did not even study, let alone report opinions, on the issue. This made-up, untested possibility does not save the Study.

## IV. DR. ABRANTES-METZ'S TESTIMONY SHOULD BE EXCLUDED BECAUSE SHE FABRICATED A STORY THAT SHE WAS ONLY FOLLOWING LIVE NATION'S INSTRUCTIONS

Before trial began, Dr. Abrantes-Metz put forward a damages model based on a fictitious notion of Retained Amount, but at least she took responsibility for it. When deposed, she adamantly claimed it was the product of her expert judgment as an economist that did not need to be based on how Ticketmaster thought about its price.

> Q. Has any witness said that that's how they do it?
>
> A. *I am the witness who is saying that,* that that is a principle of economics. …
>
> Depo. Tr. 241:13-241:17 (emphasis added).

Then, on the stand, Dr. Abrantes-Metz surfaced out of nowhere a false story about how she had been following "Live Nation's instructions," that Retained Amount was something in Live Nation documents and data, and she didn't invent "Retained Amount" but Live Nation did. *See* Trial Tr. 2498:1–24, 2593:11–23.

14

A lie like this one on a central issue in this case – the proper measure of price – requires a strong remedy, not merely striking the specific questions and answers during Dr. Abrantes-Metz's testimony in which she told the lie. It is grounds for a mistrial. *See Rembrandt Vision Tech., L.P. v. Johnson & Johnson Vision Care, Inc.*, 818 F.3d 1320, 1328–29 (Fed. Cir. 2016) (it was an abuse of discretion for a district court not to grant a motion for a mistrial where expert lied about his involvement in testing).

A lesser but effective remedy is striking Dr. Abrantes-Metz's testimony—all of it. "A district court is vested with broad discretion to make discovery and evidentiary rulings conducive to the conduct of a fair and orderly trial. Within this discretion lies the power to exclude or admit expert testimony, and to exclude testimony of witnesses whose use at trial is in bad faith or would unfairly prejudice an opposing party." *Campbell Indus. v. M/V Gemini*, 619 F.2d 24, 27 (9th Cir. 1980) (citations omitted). Defendants submit that bad faith and unfair prejudice are both present here.

The bad faith is palpable. Dr. Abrantes-Metz concocted a story to deal with the criticism she knew she would receive that her Retained Amount was made up and contrary to Ticketmaster's ordinary course practices, accounting records, and documents. She seeded the falsehood in her answers during cross examination and tried to reap the benefits of the untruth on redirect, when she would first say that she was following instructions in a letter from Live Nation. But the June 27, 2025, letter that she referred to—in a footnote to an Appendix to her report—does not support this argument in the least. It undermines it. Live Nation has never said or done anything to suggest that it thought one could determine the price of a ticketing contract without regard to fixed payments and Live Nation consistently told Plaintiffs that fees received needed to be offset by fixed payments. *See* Fayne Decl. ¶¶ 10–11.

15

The prejudice is clear as well.  The jury heard this false story and must be wondering whether there is some truth to it.  It also derailed the cross-examination Dr. Abrantes-Metz correctly expected about how her Retained Amount was a contrivance.  Prejudice in this setting does not need to be "of such nature as to alter the result in the case." *Rembrandt Vision Tech.*, 818 F.3d at 1327 (motion for mistrial).  It is enough that it "would have made a difference in the way [opposing] counsel approached the case or prepared for trial" if the witness hadn't lied.  *Id.*; *see also Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1339 (5th Cir. 1978) (motion for mistrial).

When all is said and done, the jury was presented with a damages study based on a spurious definition of price, and the expert sponsoring the study lied about how she came up with the definition.  For either or both of those reasons, the Abrantes-Metz testimony should be stricken.

## V.    THERE IS NO BASIS FOR PERMITTING THE JURY TO SPECULATE WHAT THE APPROPRIATE QUALITY ADJUSTMENT IS TO THE AXS COMPETITIVE BENCHMARK

Dr. Abrantes-Metz's entire damages methodology depends on her assumption that AXS is a "reasonably comparable" benchmark for Ticketmaster.  Otherwise, she is unable to justify the assumption that the difference between Ticketmaster's "Retained Amount" and AXS's "Retained Amount" is solely due to anticompetitive conduct.  Trial Tr. 2533:17–2534:23 (conceding that differences in quality can lead to differences in price).

The Second Circuit has held that a "trial judge should exclude expert testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (internal quotation marks omitted).  As discussed above, her benchmark is and will remain contradicted by the evidence at trial.  Yet, Dr. Abrantes-Metz has not provided a methodology to adjust her damages figure if the jury finds AXS and

16

Ticketmaster were not comparable for any period between 2017 to 2024. Trial Tr. 2566:12–2567:15 ("that is true"). This is a fatal deficiency.

Courts exclude "benchmarking analyses that attribute all [] claimed losses to a defendant's misconduct, without making any effort to isolate the losses actually attributable to that conduct from the impact of other significant differences between the [company] and the chosen benchmark." *AngioDynamics, Inc. v. C.R. Bard, Inc.*, 537 F. Supp. 3d 273, 342 (N.D.N.Y. 2021) (citing *Herman Schwabe, Inc. v. United Shoe Mach. Corp.*, 297 F.2d 906, 911 (2d Cir. 1962) and *Weiner v. Snapple Beverage Corp.*, 2010 WL 3119452, at *7 (S.D.N.Y. Aug. 5, 2010)).

*Sunday Ticket*, 2024 WL 3628118, illustrates that an expert's speculative but-for world benchmark is fatal. There, subscribers alleged that the NFL and its member teams conspired to inflate the price of the out-of-market game package, Sunday Ticket. *See id.* at *1. Plaintiffs' damages expert, Dr. Rascher, opined that in the but-for world, every out-of-market game was free, which resulted in the entirety of subscribers' payments as damages. *See id.* at *3.

The court excluded Dr. Rascher's testimony, holding that without a rational economic basis for his assumptions, Dr. Rascher provided only an "*ipse dixit* opinion untethered to an economic analysis of what would likely have occurred in the but-for world." *Id.* at *6. Without a model grounded in economic reality showing how defendants and their broadcasting partners would have arrived at a price of zero, Dr. Rascher's opinion could not stand. *See id.* at *5.

Dr. Abrantes-Metz's comparability assumption is similarly without economic or evidentiary basis. It is directly contradicted by AXS and AEG executives, who testified that AXS was "struggling" with a "tarnished reputation" and did not reach comparability until late 2021 at the earliest, *see supra* Section II. As Dr. Abrantes-Metz testified "not one cent" of her $2.30 estimated overcharge is attributable to any factor other than the alleged conduct.

17

Dr. Abrantes-Metz's testimony should be stricken because she offers no model—and concedes she has none—to account for the undisputed quality gap between her chosen benchmark and Ticketmaster during a substantial portion of the relevant time period, if not all of it.  On this record, her $2.30 figure is not a damages calculation at all.  It is more in the nature of an opening bid in a process by which the jury would guess at the appropriate adjustment between two companies of different quality, technological capability, track record, and brand reputation.  But nothing in Rule 702 allows a deficient benchmarking analysis to be presented to a jury on the grounds that the jury could "fix" the analysis with its own speculation about what the expert might have found had she acknowledged and accounted for quality differences.  The Court's gatekeeper role does not allow it to invite that process.  Dr. Abrantes-Metz's benchmark is baseless, rendering her testimony inadmissible.

**CONCLUSION**

For the foregoing reasons, the Court should strike the testimony of Dr. Abrantes-Metz in its entirety.

Dated: March 30, 2026

LATHAM & WATKINS LLP

Alfred C. Pfeiffer (admitted *pro hac vice*)
   *Co-Lead Trial Counsel*
David R. Marriott
   *Co-Lead Trial Counsel*
Andrew M. Gass (admitted *pro hac vice*)
Timothy L. O'Mara (admitted *pro hac vice*)
Jennifer L. Giordano
Kelly S. Fayne (admitted *pro hac vice*)
Lindsey S. Champlin (admitted *pro hac vice*)
Robin L. Gushman (admitted *pro hac vice*)

CRAVATH, SWAINE & MOORE LLP

Lauren A. Moskowitz
Jesse M. Weiss
Nicole M. Peles

Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 474-1000

505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600

1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

555 11th Street, NW, Suite 1000
Washington, D.C. 20004
(202) 637-2200

Al.Pfeiffer@lw.com
David.Marriott@lw.com
Tim.O'Mara@lw.com
Jennifer.Giordano@lw.com
Andrew.Gass@lw.com
Kelly.Fayne@lw.com
Lindsey.Champlin@lw.com
Robin.Gushman@lw.com

*Attorneys for Defendants Live Nation
Entertainment, Inc. and Ticketmaster L.L.C.*

lmoskowitz@cravath.com
jweiss@cravath.com
npeles@cravath.com

*Attorneys for Defendants Live Nation
Entertainment, Inc. and Ticketmaster L.L.C.*

19

## CERTIFICATE OF COMPLIANCE

I, Alfred C. Pfeiffer, an attorney duly admitted to practice before this Court, hereby certify pursuant to Local Rule 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rules"), Rule 8(C) of Judge Arun Subramanian's Individual Practices in Civil Cases ("Individual Rules"), that the foregoing Memorandum of Law was prepared using Microsoft Word, and contains 5,764 words.  In making this calculation, I have relied on the word and page counts of the word-processing program used to prepare the document.

Dated:    March 30, 2026
          New York, New York


_____
Alfred C. Pfeiffer