**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>    *Plaintiffs,*<br><br>    v.<br><br>LIVE NATION ENTERTAINMENT, INC.,<br>and TICKETMASTER L.L.C.,<br><br>    *Defendants.* | Case No. 1:24-cv-03973-AS<br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SANCTIONS**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................4

ARGUMENT ................................................................................................................8

I.      Plaintiffs' and AEG's Conduct Was Improper ....................................................8

II.     The Court Should Exercise Its Inherent Authority to Sanction Plantiffs for Their
        Conduct ................................................................................................................13

CONCLUSION ................................................................................................................16

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991)...................................................................................................13

*Gen. Elec. Cap. Corp. v. DirecTV, Inc.*,
  1998 WL 34338502 (D. Conn. Aug. 19, 1998) ........................................................9

*Great Am. Ins. Co. v. Horab*,
  309 F.2d 262 (8th Cir. 1962) ..................................................................................14

*Grobee v. Corr. Corp. of Am.*,
  2014 WL 229266 (S.D. Cal. Jan. 17, 2014)..............................................................9

*Guinn v. Walt Disney Co.*,
  2023 WL 11752139 (C.D. Cal. Aug. 31, 2023)..........................................................9

*Harris v. SCA Rest. Corp.*,
  2014 WL 996249 (E.D.N.Y. Mar. 14, 2014)...........................................................13

*Lamborn v. Dittmer*,
  873 F.2d 522 (2d Cir. 1989)....................................................................................14

*Lee v. City of Troy*,
  559 F. Supp. 3d 73 (N.D.N.Y. 2021) ......................................................................13

*Ramsey v. Broy*,
  2010 WL 1251199 (S.D. Ill. Mar. 24, 2010) ..........................................................14

*Riley v. City of New York*,
  2015 WL 541346 (E.D.N.Y. Feb. 10, 2015)............................................................15

*Rossbach v. Montefiore Med. Ctr.*,
  81 F.4th 124 (2d Cir. 2023) ....................................................................................13

*United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of
  Am., AFL-CIO*,
  948 F.2d 1338 (2d Cir. 1991)..................................................................................13

*United States v. Philatelic Leasing, Ltd.*,
  601 F. Supp. 1554 (S.D.N.Y. 1985), *aff'd*, 794 F.2d 781 (2d Cir. 1986).........14, 15

### STATUTES

18 U.S.C. § 1512(b)................................................................................................12

**RULES**

D.C. Rules of Professional Conduct
    3.4(a) ................................................................................................................12
    3.4(f)................................................................................................................12
    4.4....................................................................................................................11

New York State Bar Association Rule
    3.4(a)(1) ...........................................................................................................12
    4.4....................................................................................................................11

**CONSTITUTIONAL PROVISIONS**

Cal. Const., Article I, § 1 ..............................................................................................9

**INTRODUCTION**

Anschutz Entertainment Group, Inc. ("AEG")—Live Nation's biggest competitor—has effectively been a plaintiff in this case for years, working behind the scenes to advocate that the Government bring this lawsuit, attempt to break up Live Nation, and at least eliminate Ticketmaster's right to offer the very exclusive ticketing agreements that AXS routinely enters into. Until trial, AEG's efforts appeared to be of the sort in which competitors often engage in antitrust cases like this: submitting white papers advocating for their self-serving positions and meeting with Plaintiffs to prepare AEG witnesses for trial. But in connection with the testimony of a former AEG employee (the "Witness"), AEG crossed the line into plainly inappropriate behavior and, unfortunately, Plaintiffs followed AEG over that line.

As the Court knows, an evidentiary dispute arose relating to the Witness and his departure from AEG. In discussions with Plaintiffs' counsel, Live Nation learned that long after discovery closed, AEG's outside counsel (1) *voluntarily*—not pursuant to any subpoena or formal litigation process—provided to Plaintiffs confidential, personal information relating to the Witness, (2) asked for Plaintiffs' "thoughts on how to use this" information with the Witness during this trial, and—most egregiously—(3) told Plaintiffs that "***We think there is a good chance he would try to avoid testifying if he knew this would come up***." ECF No. 1375-1 at 5. Upon receiving this, Plaintiffs did not report it to the Court, nor did they tell AEG's counsel this was inappropriate or even turn a blind eye. Instead, they chose to use this information to their advantage.

Through multiple conversations with Live Nation's counsel on the eve of the Witness's testimony, Plaintiffs threatened to use the information AEG provided them—sensitive personal information—on the stand with the Witness unless the Witness agreed to testify that he was terminated for "misconduct." As offensive as that was, Live Nation and the Witness agreed with

1

Plaintiffs' counsel on different wording of the question, temporarily resolving this matter. The Witness did not testify that day as scheduled—due to other testimony going longer than anticipated—and that night, Plaintiffs *backed out* of the agreement, admitted that AEG was helping Plaintiffs prepare for examination of the Witness, and took the position that Plaintiffs would use the information they obtained from AEG with the Witness on the stand for "bias." And they did all of this knowing that Live Nation would have no choice but to convey it to the Witness the night before he would testify.

It was not until after Defendants raised this issue with the Court that Defendants saw the cover email from AEG's counsel and exactly what he had sent to Plaintiffs—by his admission, at the direction of his client. It is simply inexcusable. It brazenly disregards multiple laws, ethical rules, and AEG's contractual obligations to the Witness—and yet that is not the half of it. The dossier of personal information wrongly disclosed to Plaintiffs was disclosed ***expressly*** in the hopes that it would dissuade the Witness from testifying. "***We think there is a good chance he would try to avoid testifying if he knew this would come up***." ECF No. 1375-1 at 5.

The reason AEG and Plaintiffs went to such lengths to prevent this particular witness from testifying is evident: his testimony contradicted the testimony of other AEG witnesses, in particular Jay Marciano and Brian Perez, that AXS's quality issues were mostly limited to before the pandemic and that AXS since has caught up with Ticketmaster. Plaintiffs' entire damages model—put forth by Dr. Rosa Abrantes-Metz—relies on the contention that AXS was of comparable quality to Ticketmaster. Likewise, if venues choose Ticketmaster because it is better, then Plaintiffs' theory regarding the effects of exclusivity and alleged threats and retaliation also fails. The Witness was also Defendants' last opportunity to get into evidence key documents from

the 2019–2024 time period showing that AXS's and AEG's own employees believed that Ticketmaster's quality was superior.  For example:

- August 2019 email stating: "[A]re we going to discuss lowlights like AXS?  I mean really, is there a plan?  It's the worst ticketing service, pathetic.  Will this be addressed ? … AXS was / is #3 in a 2 horse race. … It's a horrible burden that affects our business.  Is there an end in site?  Last thing we need to hear is from [AXS executives] when they're rolling out the next version of the turd.  Moore turds just need moore toilet paper and I'm wiped out."  DX-0267 at .0001.

- September 2019 email stating:  "There is major frustration with AXS service company wide."  DX-0268 at .0001.

- November 2022 email stating:  "[C]onfirmation that the AXs system still mostly stinks at simple, basic things that should NEVER be happening."  DX-0711 at .0001.

AEG wanted to stop this evidence from coming in.

We have now heard from AEG's counsel, Mr. Bernick, who would have this Court believe that when he turned over all this personal information and said, "***We think there is a good chance he would try to avoid testifying if he knew this would come up,***" he was actually expressing concern about the Witness ***not testifying*** because "Plaintiffs had expressed a preference that [the Witness] testify."  March 31, 2026 Ltr. from J. Bernick at 2 (ECF No. 1358).  That is preposterous.  No one can look at these circumstances and what Mr. Bernick said and believe that, nor is it consistent with what Mr. Gitlin—the Chief of the Antitrust and Nonprofit Enforcement Section, Office of the Attorney General for the District of Columbia, who solicited the information—has said or Plaintiffs' submissions to the Court in this regard.  Plaintiffs did not call the Witness, and they knew exactly why Defendants were calling him, which is why they approached Mr. Bernick for help.  This was all, at least for Plaintiffs, about undermining his credibility on key issues they were concerned about.  *See* ECF No. 1358 at 2 ("AEG did share Plaintiffs' legitimate concerns regarding the reliability of [the Witness's] testimony regarding AEG given the circumstances of his departure from the company.").  Mr. Bernick was saying that in addition to undermining the

3

Witness's credibility, this could dissuade him from testifying altogether. And while, to his credit, Plaintiffs' counsel was at first unwilling to play that game, others overruled him.

This blatant attempt to dissuade a witness from providing truthful testimony through intimidation is intolerable. And Plaintiffs' failure to report or at least not go along with this misconduct is likewise intolerable. Defendants respectfully request that the Court exercise its inherent authority to protect the integrity of these proceedings and to control the conduct of the parties appearing before it. Specifically, Defendants request that the Court sanction Plaintiffs for their conduct by (1) admitting into evidence, for the truth of the matter asserted, certain AEG documents relating to the quality of AXS as compared to Ticketmaster (*see* Appendix A), (2) instructing the jury that other documents previously admitted only for a limited purpose can now be considered for their truth (*see* Appendix B), and (3) issuing an instruction to the jury that (a) Plaintiffs and AEG have been closely coordinating throughout this case, (b) Plaintiffs improperly attempted to dissuade the Witness from testifying and/or influence his testimony, and (c) as a result, the jury may find that AEG and Plaintiffs feared that if all the facts concerning AXS quality came to light it would indicate that AXS was never of comparable quality to Ticketmaster.

## BACKGROUND

Since the 2010 merger, AEG has accused Live Nation and Ticketmaster of engaging in anticompetitive conduct and has assisted the Government in its litigation against Live Nation. AEG submitted multiple advocacy pieces to the Government during the pre-complaint investigation in this case in which it argued that Live Nation and Ticketmaster have market power in multiple markets and that Ticketmaster's long-term exclusive contracts violate the antitrust laws. And throughout this case, Plaintiffs have worked closely with AEG, including by preparing AEG witnesses for their deposition and trial testimony. As Live Nation's biggest competitor, AEG

4

stands to benefit if Live Nation loses this lawsuit.  AEG's counsel made plain that AEG wants Live Nation to "lose this case."  Trial Tr. 3705:6–11.

But during trial, AEG took it a step further: it took affirmative steps to prevent a key witness from giving critical testimony about his experience with ticketing systems during the time he worked at AEG.

The timeline of events relating to the Witness's testimony is important context for this motion.  First, AEG produced none of these materials during discovery.  Second, AEG itself identified Mr. Mueller as a relevant document custodian during discovery and Defendants and Plaintiffs took his deposition on July 23, 2025; still, none of these materials surfaced.  Finally, in the days leading up to the Witness's testimony (which was originally scheduled for March 26, 2026), Live Nation's counsel met with the Witness.  In those meetings, Live Nation's counsel observed that the Witness seemed concerned about questions that might come up regarding his departure from AEG.  Live Nation's counsel therefore reached out to Plaintiffs' counsel about whether Plaintiffs intended to question the Witness about the reasons for his departure from AEG.[1] Decl. of Jennifer L. Giordano in Supp. of Defs.' Mot. for Sanctions ("Giordano Decl.") ¶ 1.  In the course of those conversations, Plaintiffs' counsel disclosed that Plaintiffs had received information from AEG about the alleged circumstances of the Witness's departure as well as a notice of termination letter, signed by AEG, which Plaintiffs intended to use to impeach the Witness during his testimony if he did not agree to testify that AEG had terminated him for "misconduct."  *Id.* ¶ 2. Plaintiffs' counsel refused to send a copy of the notice of termination letter to Live Nation's counsel.  *Id.*

---

[1] Because of a non-disclosure agreement with AEG, Live Nation's counsel had not had normal access to the Witness previously.

On the morning of March 26, 2026—the day the Witness was originally expected to testify—Live Nation's counsel met with Plaintiffs' counsel to discuss whether the parties could reach an agreement regarding the scope of the testimony Plaintiffs would elicit. *Id.* ¶ 3. At that time, Plaintiffs' counsel showed Live Nation's counsel a copy of the notice of termination letter but did not allow Live Nation's counsel to retain a copy. *Id.* Because the letter did not use the word "misconduct," and due to concerns about the letter's authenticity and accuracy, Defendants refused to agree to allow Plaintiffs to question the Witness about whether he had been terminated for "misconduct." *See id.* ¶ 4. Instead, the parties reached an agreement on a specific question that the Witness could accurately answer, that Plaintiffs would not ask any other questions regarding the Witness's departure, and that Plaintiffs would not attempt to use the letter in Court. *Id.* Plaintiffs' counsel confirmed the agreement orally outside the courtroom and again by email that morning: "we have a deal." *Id.*; *see also* Ex. 1. On the afternoon of March 26, Plaintiffs' counsel again re-confirmed the parties' agreement. Giordano Decl. ¶ 4.

For scheduling reasons, the Witness did not testify on March 26, but rather was pushed over to March 27. *Id.* On the evening of March 26, Plaintiffs' counsel sent Live Nation's counsel an email stating that, "On further consideration, and review of what I provided this morning, Plaintiffs' position is that these issues are fair game for cross regarding bias." *Id.* ¶ 5; *see also* Ex. 2. Live Nation's counsel immediately spoke with Plaintiffs' counsel, who confirmed among other things that AEG had voluntarily provided him the letter *and* additional details regarding the alleged circumstances of the Witness's departure from AEG that had not been shared with Defendants. Giordano Decl. ¶ 5. During that conversation, Live Nation's counsel pressed for an explanation as to why an agreement that had been confirmed in writing and re-confirmed just a few hours prior

was suddenly being withdrawn. *Id.* Plaintiffs' counsel's only answer was that "other people" had encouraged him to abandon the deal. *Id.*

Live Nation then emailed the Court to request a conference to discuss the issue that evening. Ten minutes later, Plaintiffs' counsel finally provided Defendants' counsel a copy of the notice of termination letter that he had shown to Defendants' counsel outside the courtroom that morning. *Id.* ¶ 6. The Court held a conference that night and ordered Plaintiffs to provide the full set of materials that AEG had provided to Plaintiffs. *Id.* ¶ 7. The type of information AEG had revealed was shockingly personal—information about the Witness and other third parties of a kind that no law-abiding company ever just hands over to others. To make matters worse, the package included a contract between the Witness and AEG that contained a confidentiality provision prohibiting AEG from disclosing the contract and the circumstances underlying it to anyone. AEG had obviously breached its own agreement, and that should have been readily apparent to Plaintiffs. At this time, however, Plaintiffs did not disclose Mr. Bernick's cover email. The Court ordered Plaintiffs to send to the Court (*ex parte*) the correspondence between AEG and Plaintiffs on this issue. *Id.*

In court the next morning, the Court ruled that Plaintiffs would be held to the agreement they made with Live Nation—*i.e.*, that Plaintiffs could ask a specific question that the Witness could accurately answer, that Plaintiffs would not ask any other questions, and that Plaintiffs would not attempt to use the materials they received from AEG in court. Trial Tr. 3039:23–3040:6. The Court also ordered Plaintiffs to send to Live Nation the correspondence they had with AEG on this issue. Trial Tr. 3033:6–7.

It was not until after the Witness testified and was off the stand that Defendants' counsel had a chance to read the email correspondence between AEG and Plaintiffs that the Court had

ordered Plaintiffs to produce.  *Id.* ¶ 10.  In the cover email attaching the Witness's personal files, Justin Bernick (AEG's outside counsel and a partner at Hogan Lovells US LLP), wrote the following to Plaintiffs' counsel:

> Attached are the materials **Plaintiffs requested** regarding [the Witness]. …
> Please let us know your thoughts on how to use this, particularly if you believe there is any possibility of these documents … becoming public—we would want an opportunity to be heard on that issue.  **We think there is a good chance he would try to avoid testifying if he knew this would come up**.

ECF No. 1375-1 at 5 (emphasis added).

## ARGUMENT

### I.    PLAINTIFFS' AND AEG'S CONDUCT WAS IMPROPER

The conduct at issue is problematic on every level.  Yet neither AEG nor Plaintiffs will take any responsibility for it.  In their correspondence with the Court and at the hearing on April 1, they pointed the finger at each other.  But the most important facts are crystal clear.

**First, AEG had no lawful basis to disclose the Witness's personal information to Plaintiffs, and Plaintiffs should have known that from the face of the documents**.  AEG's separation agreement with the Witness, a copy of which was included in the packet of materials that AEG provided to Plaintiffs, is labeled in all capital letters as a "CONFIDENTIAL SEPARATION AGREEMENT" and spells out AEG's confidentiality obligations unambiguously. As discussed during the April 1 hearing, that confidentiality provision prohibits AEG from revealing not just the agreement itself, but also the matters underlying the formation of the agreement, *i.e.*, the exact type of information AEG's counsel disclosed in his email to Plaintiffs. All of that should have been apparent to Plaintiffs on the face of the document, and thus they should have known they had solicited and received information they had no lawful right to possess.

In addition, as a California-based company, AEG knows that the Witness (who also resides in California) has a right to privacy under the California Constitution that AEG is not free to

8

unilaterally violate. *See Grobee v. Corr. Corp. of Am.*, 2014 WL 229266, at \*2 (S.D. Cal. Jan. 17, 2014) ("Under California law, personnel records of employees are protected by California's constitutional right of privacy." (citing Cal. Const., art. I, § 1)); *see also Gen. Elec. Cap. Corp. v. DirecTV, Inc.*, 1998 WL 34338502, at \*2 (D. Conn. Aug. 19, 1998) ("Article I, section 1 of the California Constitution creates an 'inalienable right' to privacy."). The State of California is a plaintiff in this case. AEG turned this information over to the State of California too, not just to the District of Columbia. And the State of California had no right to this information, which plainly affects the privacy rights of its citizens, without following the appropriate process to safeguard that privacy, none of which was done here. *Guinn v. Walt Disney Co.*, 2023 WL 11752139, at \*7 (C.D. Cal. Aug. 31, 2023) (before a court can order production of "personnel records [including] files 'that the employer maintains relating to the employee's performance or to any grievance concerning the employee,'" the court "*must* balance the particular privacy interests at stake against the strength of legitimate and important countervailing interests" (emphasis added)).

AEG's only answer is to say that it thought its hallway chat with Plaintiffs' counsel in the middle of trial was somehow a "legitimate request from a law enforcement agency." ECF No. 1358 at 2; Trial Tr. 3706:6–12. Setting aside the fact that there is no hallway "request from a law enforcement agency" exception to the privacy protections of the California Constitution, this story is also plainly untrue—as the Court noted, this was "not an inquiry from a law enforcement agency. [It was] just a lawyer asking if you have any dirt on the witness that's about to come up[.]" Trial Tr. 3706:18–20. Plaintiffs' counsel himself was unwilling to support AEG's story at the hearing. Trial Tr. 3710:21–23. Plaintiffs' counsel did not say anything to support AEG's version because he had already told Defendants' counsel it was not true.

Defendants' counsel specifically asked Plaintiffs' counsel if AEG had produced the information pursuant to any type of formal process, such as a subpoena or any other formal request, and Plaintiffs' counsel confirmed they had not. Giordano Decl. ¶ 8. To the contrary, Plaintiffs' counsel confirmed that AEG's counsel *voluntarily* turned over this information. *Id.* The voluntary nature of this particular disclosure is also apparent from the fact that—unlike the nearly 700,000 other documents AEG has produced in this case—these particular documents have no Bates stamps nor is there any indication on the documents or in Mr. Bernick's email that they were being produced pursuant to the Protective Order in this case. AEG had no right to voluntarily turn over these confidential personnel records.

That said, were the Court to buy Mr. Bernick's story, that would just lay the problem squarely at Plaintiffs' door. If Plaintiffs had made a legitimate request for these materials through proper discovery procedures, then the Witness would have had advance notice many months ago and no doubt would have attempted to quash it under Rule 45, likely obviating the eleventh-hour drama in its entirety. But even if AEG had been able to comply with such a request, this Court's August 28, 2024 Order Governing ESI Discovery requires non-parties to make productions "*simultaneously to Plaintiffs and Defendants*" (which AEG has complied with numerous times previously) and, if the non-party does not do so, then Plaintiffs have to produce the documents to Defendants. ECF No. 249 at 16–17. That did not happen here. Instead, Plaintiffs apparently intended to leverage the mere existence of the documents to try to dissuade the Witness from testifying altogether.

**Second**, **the conduct of Plaintiffs' counsel and AEG's counsel raises serious concerns regarding their compliance with ethical rules**. It is difficult to conceive how AEG possibly could have believed it was acting ethically by disclosing, outside discovery, the full package of

materials that they disclosed to Plaintiffs, which they expressly stated might dissuade the Witness from testifying. *See, e.g.*, New York State Bar Association Rule 4.4 ("In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass or harm a third person or use methods of obtaining evidence that violate the legal rights of such a person."); D.C. Rules of Professional Conduct 4.4 ("In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or knowingly use methods of obtaining evidence that violate the legal rights of such a person.").

AEG seeks to wriggle out of the obvious import of its own words by claiming that it actually "preferred that [the Witness] testify because the testimony might be helpful to Plaintiffs' case." ECF No. 1358 at 2. Seriously? The Witness was deposed in this case in July 2025. Everyone—including AEG—has known since then that his testimony would fundamentally undermine Plaintiffs' case and that contemporaneous documents that could only come into evidence at trial through the Witness would confirm his testimony. The Witness has never been on Plaintiffs' trial witness list. No one who heard his testimony could credibly believe Plaintiffs (or AEG) wanted him to testify or that Plaintiffs genuinely thought he would be helpful to *their* case. They didn't and he wasn't. It is frankly absurd to even suggest that Plaintiffs thought it would be helpful for the jury to see AEG's own concert promoters calling AXS "the worst ticketing service, pathetic," "#3 in a 2 horse race," a "horrible burden that effects our business" and a "turd," and also asking AEG to "write [AXS] off" so AEG could "do a [Ticketmaster] deal." DX-0267 at .0001. Mr. Bernick's email meant what it plainly says. AEG hoped that if Plaintiffs were to "use" the information AEG had improperly disclosed, there was a "good chance [the Witness] would try to avoid testifying." ECF No. 1375-1 at 5. And, unfortunately, based on what transpired, it seems

11

that Plaintiffs attempted to do just that when they pulled an agreed deal at the last minute with no other reasonable explanation ever provided to Defendants or the Court.

The Court correctly noted that the plan Plaintiffs and AEG hatched did not succeed in preventing the Witness from testifying because Defendants caught on in time to allow the Court to intervene and hold the Plaintiffs to their agreement. But even an attempt to manipulate judicial proceedings is deserving of punishment to protect the sanctity of the judicial process. Indeed, in addition to the ethical rules cited above, the federal witness tampering statute protects against not just completed misconduct but also *attempted* misconduct. 18 U.S.C. § 1512(b) ("Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, ***or attempts to do so***, or engages in misleading conduct toward another person, with intent to … influence, delay, or prevent the testimony of any person in an official proceeding … shall be fined under this title or imprisoned not more than 20 years, or both." (emphasis added)). Mr. Bernick's email—which states that "there is a good chance [the Witness] would try to avoid testifying if he knew this [*i.e.*, the public disclosure of his personal information] would come up," ECF No. 1375-1 at 5—and Plaintiffs' conduct after receiving it raise a serious concern that Plaintiffs and AEG intended to try to dissuade him from testifying or at least influence his testimony.

Finally, it should not be forgotten that, however Plaintiffs came to possess the documents they should have known they had no right to possess, they made the problem worse by withholding those documents from Defendants for tactical gain. *See, e.g.*, New York State Bar Association Rule 3.4(a)(1) (a lawyer shall not "suppress any evidence that the lawyer or the client has a legal obligation to reveal or produce"); D.C. Rules of Professional Conduct 3.4(a), (f) (a lawyer shall not "[o]bstruct another party's access to evidence …" or "[r]equest a person other than a client to refrain from voluntarily giving relevant information to another party …"). Indeed, not only did

12

they fail to immediately disclose them, but also Plaintiffs refused to provide Defendants with a copy of the agreement when asked, and Defendants only found out about the remaining materials—*i.e.*, that Plaintiffs were actually given voluminous files—when the Court ordered the disclosure. There is no part of this story that evidences either AEG or Plaintiffs acting properly.

## II.    THE COURT SHOULD EXERCISE ITS INHERENT AUTHORITY TO SANCTION PLANTIFFS FOR THEIR CONDUCT

The question, then, is what to do about Plaintiffs and AEG's misconduct. "A federal court possesses … 'inherent powers, not conferred by rule or statute, to manage their own affairs so as to achieve the orderly and expeditious disposition of cases'" including the power to "police the conduct of attorneys as officers of the court." *Lee v. City of Troy*, 559 F. Supp. 3d 73, 83 (N.D.N.Y. 2021) (citations omitted)); *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) ("Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." (citation omitted)). A "primary aspect" of the "discretion that attends a federal court's inherent power is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Rossbach v. Montefiore Med. Ctr.*, 81 F.4th 124, 141 (2d Cir. 2023) (citation omitted); *see also United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 948 F.2d 1338, 1345 (2d Cir. 1991) (court has the "inherent power" to sanction for improper conduct, which "stems from the very nature of courts and their need to be able to manage their own affairs so as to achieve the orderly and expeditious disposition of cases" (citation omitted)).

AEG and Plaintiffs' bad faith attempts to intimidate the Witness and to deter or influence the Witness's testimony warrant sanctions. "It is beyond dispute that witness tampering is extremely serious misconduct." *Harris v. SCA Rest. Corp.*, 2014 WL 996249, at \*4 (E.D.N.Y.

13

Mar. 14, 2014) (cleaned up). As a result, courts impose extremely harsh sanctions. *See Ramsey v. Broy*, 2010 WL 1251199, at *4 (S.D. Ill. Mar. 24, 2010) ("[T]ampering by the parties deserves the harshest sanction that the Court can deliver given the seriousness of the matter and in order to protect the judicial process."). Indeed, "[i]t is generally held that, in a civil case, evidence that a litigant, or his agent, has attempted to influence or suppress a witness is receivable as an admission or as an indication of the litigant's consciousness that his case is weak or unfounded or that his claim is false or fraudulent." *Great Am. Ins. Co. v. Horab*, 309 F.2d 262, 264 (8th Cir. 1962); *see also United States v. Philatelic Leasing, Ltd.*, 601 F. Supp. 1554, 1566 (S.D.N.Y. 1985) (if a party "seeks to suppress … relevant evidence, such conduct may be taken as an admission that the true facts would defeat the position the party is seeking to maintain"), *aff'd*, 794 F.2d 781 (2d Cir. 1986); *Lamborn v. Dittmer*, 873 F.2d 522, 526 (2d Cir. 1989) ("It has always been understood … that a party's falsehood or other fraud in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoilation, and all similar conduct is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit." (citation omitted)).

Live Nation submits that two sanctions are appropriate. <u>First</u>, the Court should exercise its inherent authority to admit into evidence, for the truth of the matter asserted, certain AEG documents relating to the quality of AXS as compared to Ticketmaster. This includes both documents that have not yet been offered in evidence, as well as documents the Court previously admitted only for a limited purpose. *See* Appendix A & Appendix B. This is exactly the type of evidence that Plaintiffs and AEG attempted to prevent the jury from hearing when they tried to dissuade the Witness from testifying. These documents constitute credible, contemporaneous

14

evidence of the facts as they existed at the relevant times. The jury should have full access to the contemporaneous facts that Plaintiffs attempted to hide through their malfeasance and should not be forced to rely solely on the memory of witness testimony alone over a nearly seven week trial. Additionally, since Defendants did not have the opportunity to question AEG's witnesses (Mr. Marciano and Mr. Perez) about the extent of their alignment with Plaintiffs, this penalty will help to repair some of the damage done to Defendants and will allow the jury to see those witnesses' own contemporaneous words.

Second, the Court should issue an instruction to the jury, pursuant to its inherent authority, that (a) Plaintiffs and AEG have been closely coordinating throughout this case, (b) Plaintiffs improperly attempted to dissuade the Witness from testifying and/or influence his testimony and (c) as a result, the jury may find that AEG and Plaintiffs feared that if all the facts concerning AXS quality came to light it would indicate that AXS was never of comparable quality to Ticketmaster. This instruction is consistent with the many cases holding that harsh sanctions should be issued for the serious offense of attempting to interfere with a witness's testimony, and that a party's attempt to suppress relevant evidence may be taken "as an admission that the true facts would defeat the position the party is seeking to maintain." *United States v. Philatelic Leasing, Ltd.*, 601 F. Supp. at 1566; *see supra* at 13–14; *see also Riley v. City of New York*, 2015 WL 541346, at *12 (E.D.N.Y. Feb. 10, 2015) (upon finding witness tampering, "notifying the jury of Plaintiff's witness tampering and permitting the jury to draw an adverse inference against Plaintiff based on the witness tampering allegations"). In trying to dissuade the Witness from testifying—and thereby keep out key documents disproving Plaintiffs' theory—Plaintiffs and AEG were trying to convince the jury that AXS and Ticketmaster are, in fact, equivalent in quality when the evidence unambiguously demonstrates that they are not (and have not been during the relevant time period).

15

Defendants' requested instruction is necessary to return Live Nation to the position it would be in absent the egregious misconduct by Plaintiffs and AEG.

## CONCLUSION

For the reasons stated above, Live Nation respectfully requests that the Court sanction Plaintiffs for their misconduct by (1) admitting into evidence, for the truth of the matter asserted, certain AEG documents relating to the quality of AXS as compared to Ticketmaster (*see* Appendix A), (2) instructing the jury that other documents previously admitted only for a limited purpose can now be considered for their truth (*see* Appendix B), and (3) issuing an instruction to the jury that (a) Plaintiffs and AEG have been closely coordinating throughout this case, (b) Plaintiffs improperly attempted to dissuade the Witness from testifying and/or influence his testimony, and (c) as a result, the jury may find that AEG and Plaintiffs feared that if all the facts concerning AXS quality came to light it would indicate that AXS was never of comparable quality to Ticketmaster.

Dated: April 2, 2026

Respectfully submitted,

LATHAM & WATKINS LLP

_____

Alfred C. Pfeiffer (admitted *pro hac vice*)
   *Co-Lead Trial Counsel*
David R. Marriott
   *Co-Lead Trial Counsel*
Timothy L. O'Mara (admitted *pro hac vice*)
Jennifer L. Giordano
Kelly S. Fayne (admitted *pro hac vice*)
Andrew M. Gass (admitted *pro hac vice*)
Lindsey S. Champlin (admitted *pro hac vice*)
Robin L. Gushman (admitted *pro hac vice*)

505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600

1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

555 11th Street, NW, Suite 1000
Washington, D.C. 20004
(202) 637-2200

Al.Pfeiffer@lw.com
David.Marriott@lw.com
Tim.O'Mara@lw.com
Jennifer.Giordano@lw.com
Andrew.Gass@lw.com
Kelly.Fayne@lw.com
Lindsey.Champlin@lw.com
Robin.Gushman@lw.com

*Attorneys for Defendants Live Nation*
*Entertainment, Inc. and Ticketmaster L.L.C.*

CRAVATH, SWAINE & MOORE LLP

_____

Lauren A. Moskowitz
Jesse M. Weiss
Nicole M. Peles

Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 474-1000

lmoskowitz@cravath.com
jweiss@cravath.com
npeles@cravath.com

*Attorneys for Defendants Live Nation*
*Entertainment, Inc. and Ticketmaster L.L.C.*

17

## CERTIFICATE OF COMPLIANCE

I, Alfred C. Pfeiffer, an attorney duly admitted to practice before this Court, hereby certify pursuant to Local Rule 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rules"), Rule 8(C) of Judge Arun Subramanian's Individual Practices in Civil Cases ("Individual Rules"), that the foregoing Memorandum of Law was prepared using Microsoft Word, and contains 5,212 words.  In making this calculation, I have relied on the word and page counts of the word-processing program used to prepare the document.

Dated:    April 2, 2026
          New York, New York

                                                 Alfred C. Pfeiffer

18