UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES OF AMERICA, et al., | |
| *Plaintiffs,* | Case No.: 1:24-cv-03973-(AS) |
| v. | |
| LIVE NATION ENTERTAINMENT, INC. and TICKETMASTER L.L.C., | |
| *Defendants.* | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO STRIKE THE TESTIMONY OF DR. ROSA M. ABRANTES-METZ**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 6

LEGAL STANDARD ......................................................................................................... 7

ARGUMENT ...................................................................................................................... 8

I.    Dr. Abrantes-Metz Did Not Commit Perjury Or Testify Falsely ...................................... 8

    A.    Dr. Abrantes-Metz testified that she uses the term "retained amount" differently than Defendants and never meant to suggest otherwise. ........................................................... 10

    B.    Dr. Abrantes-Metz meant to describe the process by which she used Ticketmaster data, and Live Nation's instructions on how to interpret it, to determine retained amounts under her own definition. ...................................................................................................... 13

    C.    The Court has already cured any prejudice from the confusion that may have been caused and to the extent Defendants believe more clarification is required, they may themselves further address the issue at trial. .......................................................................... 15

II.    Dr. Abrantes-Metz Had Sufficient Economic And Realistic Factual Bases, Under Rule 702, For Excluding Upfront Payments ...................................................................................... 16

    A.    Dr. Abrantes-Metz's methodology remains unchanged and still admissible under Rule 702 ................................................................................................................................. 17

    B.    The Rule 702 inquiry is not limited to the admissible evidence presented at trial ....... 24

III.    Defendants' Claim That AXS Is Not a Reasonable Benchmark for Ticketmaster Is Unsupported by the Law and The Record ................................................................................. 25

    A.    AXS is a reasonable benchmark because it competes directly with Ticketmaster ....... 26

    B.    The law does not require a perfect comparator .......................................................... 27

    C.    Multiple categories of evidence demonstrate that AXS and Ticketmaster are sufficiently comparable .......................................................................................................... 28

CONCLUSION .................................................................................................................. 34

# TABLE OF AUTHORITIES

**Cases**                                                                                                                   **Page(s)**

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
No. 06-MD-1775, 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014), *report and
recommendation adopted*, 2015 WL 5093503 (E.D.N.Y. July 10, 2015) ...............................15

*In re Aluminum Warehousing Antitrust Litig.*,
No. 13-MD-2481, 336 F.R.D. 5 (S.D.N.Y. 2020) ....................................................................15

*Alves v. Affiliates Care of Putnam*,
No. 16-CV-1593, 2022 WL 1002817 (S.D.N.Y. Mar. 30, 2022) ...........................................28

*Bazemore v. Friday*,
478 U.S. 385 (1986)................................................................................................................18

*Bigelow v. RKO Radio Pictures*,
327 U.S. 251 (1946)..................................................................................................20, 23, 27

*Bocoum v. Daimler Trucks N. Am. LLC*,
2022 WL 902465 (S.D.N.Y. Mar. 28, 2022) ...........................................................................3

*Boucher v. U.S. Suzuki Motor Corp.*,
73 F.3d 18 (2d Cir. 1996)..........................................................................................................2

*Campbell Indus. v. M/V Gemini*,
619 F.2d 24 (9th Cir. 1980) ......................................................................................................7

*Campbell v. Metropolitan Property & Casualty Ins. Co.*,
239 F.3d 179 (2d Cir. 2001)....................................................................................................20

*Cason-Merenda v. Detroit Med. Ctr.*,
2013 WL 1721651 (E.D. Mich. Apr. 22, 2013)......................................................................22

*Celebrity Cruises Inc. v. Essef Corp.*,
434 F. Supp. 2d 169 (S.D.N.Y. 2006)......................................................................................22

*Clark v. Pennsylvania R.R. Co.*,
328 F.2d 591 (2d Cir. 1964)......................................................................................................7

*Columbia Sportswear N. Am., Inc. v. Seirus Innovative Accessories, Inc.*,
942 F.3d 1119 (Fed. Cir. 2019)..........................................................................................10, 11

*Daubert v. Merrell Dow Pharms.*,
509 U.S. 579 (1993)......................................................................................................18, 19, 22

*Dial Corp. v. News Corp.*,
   314 F.R.D. 108 (S.D.N.Y. 2015) ..................................................................................20, 22

*In re Digital Music Antitrust Litig.*,
   321 F.R.D. 64 (S.D.N.Y. 2017) .........................................................................................20

*In re: Gen. Motors LLC Ignition Switch Litig.*,
   2015 WL 9480448 (S.D.N.Y. Dec. 29, 2015) ...................................................................15

*In re Google Digit. Advert. Antitrust Litig.*,
   No. 21-MD-3010, 2025 WL 3562687 (S.D.N.Y. Dec. 12, 2025) ..............................15, 22, 27

*Gulf Coast Bank & Tr. Co. v. Great Lakes Ins. SE*,
   No. CV 23-1444, 2025 WL 1134454 (M.D. La. Apr. 16, 2025) ........................................3, 10

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
   451 U.S. 557 (1981)............................................................................................................22

*In re Joint E. & S. Dist. Asbestos Litig.*,
   52 F.3d 1124 (2d Cir. 1995)...............................................................................................19

*Kappen v. Bell*,
   No. 18-CV-05784 (CBA), 2022 WL 939847 (E.D.N.Y. Mar. 29, 2022)..................................4

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
   2025 WL 354671 (S.D.N.Y. Jan. 30, 2025) .................................................................. *passim*

*Klein v. Meta Platforms, Inc.*,
   766 F. Supp. 956 (N.D. Cal. Feb 13, 2025) .......................................................................18

*Kurtz v. Costco Wholesale Corp.*,
   818 F. App'x 57 (2d Cir. 2020) ..........................................................................................15

*In re NFL Sunday Ticket Antitrust Litig.*,
   2024 WL 3628118 (C.D. Cal. Aug. 1, 2024).......................................................................28

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*,
   5-MD-1720, 2022 WL 15053250 (S.D.N.Y. Oct. 26, 2022)..............................................3, 14

*Reed Constr. Data Inc. v. McGraw-Hill Companies, Inc.*,
   49 F. Supp. 3d 385 (S.D.N.Y. 2014)...............................................................................17, 18

*Rembrandt Vision Tech., L.P. v. Johnson & Johnson Vision Care, Inc.*,
   818 F.3d 1320 (Fed. Cir. 2016)..........................................................................................11

*Restivo v. Hessemann*,
   846 F.3d 547 (2d Cir. 2017)................................................................................................14

*Rmed Int'l, Inc. v. Sloan's Supermarkets, Inc.*,
No. 94 Civ.5587, 2002 WL 31780188 (S.D.N.Y. Dec. 11, 2002)..............................................3

*Rozier v. Ford Motor Co.*,
573 F.2d 1332 (5th Cir. 1978) .....................................................................................................11

*Simon & Simon, PC v. Align Tech., Inc.*,
350 F.R.D. 565 (N.D. Cal. 2023).................................................................................................22

*In re Specialist & Other Vessel Owner Limitation Actions*,
No. 16 Civ. 4643, 2020 WL 8665287 (S.D.N.Y. June 30, 2020)..............................................3

*U.S. Football League v. Nat'l Football League*,
842 F.2d 1335 (2d Cir. 1988)......................................................................................................23

*United States v. A & S Council Oil Co.*,
947 F.2d 1128 (4th Cir. 1991) ....................................................................................................19

*United States v. Bortnovsky*,
879 F.2d 30 (2d Cir. 1989)......................................................................................................4, 10

*United States v. Friedman*,
854 F.2d 535 (2d Cir. 1988).........................................................................................................4

*United States v. Gambino*,
59 F.3d 353 (2d Cir. 1995)............................................................................................................4

*United States v. Holladay*,
566 F.2d 1018 (5th Cir. 1978) ......................................................................................................4

*United States v. Peters*,
No. 3:18-CR-24 (VAB), 2019 WL 4139754 (D. Conn. Aug. 30, 2019) ...............................28

*United States v. Snype*,
441 F.3d 119 (2d Cir. 2006).........................................................................................................5

*Ventura v. United States*,
2024 WL 1929183 (S.D.N.Y. May 1, 2024) ..........................................................................19

*Washington v. Kellwood Co.*,
105 F. Supp. 3d 293 (S.D.N.Y. 2015)..................................................................................15, 27

*Wechsler v. Hunt Health Sys., Ltd.*,
381 F. Supp. 2d 135 (S.D.N.Y. 2003)........................................................................................19

*Zafiro v. United States*,
506 U.S. 534 (1993)........................................................................................................................5

iv

*Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*,
    571 F.3d 206 (2d Cir. 2009)....................................................................................................2

**Statutes**

18 U.S.C. § 1621............................................................................................................................3

**Other Authorities**

Fed. R. Evid. 702 ................................................................................................... *passim*

Fed. R. Evid. 705 ........................................................................................................20

29 Wright & Miller, Fed. Prac. & Proc. Evid. § 6274 (2d ed. 2025)............................................19

## INTRODUCTION

Defendants' motion to strike the testimony of Dr. Rosa Abrantes-Metz lacks factual or legal support. Defendants ask this Court to exclude the only expert testimony quantifying harm to fans. Defendants do so based on a perjury accusation and arguments under Rule 702 this Court already rejected. Nothing in the trial record warrants this "drastic remedy" precluding Plaintiffs from presenting their damages claim to the jury. Defendants' motion rests on three failing arguments.

*First*, Defendants make the extraordinary accusation that Dr. Abrantes-Metz committed perjury when testifying regarding the term "retained amount." But the perjury standard requires a willful, material falsehood—not ambiguous answers to confusing questions under the pressure of cross-examination. Dr. Abrantes-Metz has always maintained that she uses "retained amount" to describe the price she calculated from her own economic analysis. The Court already cured any confusion by striking, without objection, portions of testimony in response to Defendants' objection. Defendants remain free to highlight any perceived inconsistencies through their examination of their own experts and in closing argument. Given the inflammatory nature of Defendants' accusations, Dr. Abrantes-Metz submits a declaration reaffirming that she did not willfully testify to any material falsehood. She will also appear in court to answer any questions.

*Second*, Defendants revive their previously rejected Rule 702 arguments that Dr. Abrantes-Metz should have deducted upfront payments from her retained amount calculations. This battle-of-the-experts argument goes to weight, not admissibility. Dr. Abrantes-Metz has advanced multiple independent economic bases for excluding upfront payments—each disclosed in her reports and testimony. Although Dr. Budish disagrees, that expert dispute is for the jury to resolve. The Court's gatekeeper role under Rule 702 is limited to ensuring that there is a realistic and non-speculative basis for the expert's assumptions and a non-junk science expertise being presented. Dr. Abrantes-Metz employed well-accepted principles to conclude that upfront payments should

not be used, because (1) such upfront payments are fixed costs irrelevant to marginal pricing; (2) they often represent consideration ticketers receive in exchange for sponsorship, advertising, or exclusivity rights; (3) AXS makes comparable upfront payments that Dr. Abrantes-Metz does not include, ensuring an apples to apples comparison; and (4) a separate regression analysis of total fan fees—which is calculated independently of retained amounts—confirms the reliability of her comparison.  Although Dr. Abrantes-Metz did not testify about all of these bases at trial, the Rule 702 analysis is not limited to trial evidence; experts are specifically permitted to base their opinions on inadmissible evidence. Dr. Abrantes-Metz's retained-amounts opinions satisfy Rule 702, and the jury should determine whether to credit them.

*Third*, Defendants challenge Dr. Abrantes-Metz's selection of AXS as a benchmark, but the Court already ruled that AXS is a "comparator that is 'sufficiently comparable to permit a degree of reliable comparison.'"  ECF No. 1094 at 9 (quoting *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 2025 WL 354671, at *34 (S.D.N.Y. Jan. 30, 2025)).  Trial testimony from venue operators, AXS's CEO, and Defendants' own witnesses confirms that ruling. Any disputes regarding AXS's product quality go to weight not admissibility, and are squarely within the jury's province.

The Court should deny Defendants' motion and permit the jury to decide whether to accept or reject Dr. Abrantes-Metz's overcharge estimates.

## LEGAL STANDARD

As detailed in Plaintiffs' opposition to Defendants' original motion to exclude Dr. Abrantes-Metz, Courts should exclude expert testimony only "if it is speculative or conjectural or based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith' or to be in essence 'an apples and oranges comparison.'"  *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213–14 (2d Cir. 2009) (quoting *Boucher v. U.S. Suzuki Motor Corp.*,

7

73 F.3d 18, 21 (2d Cir.1996)).  Expert testimony should be excluded only if it is "so fundamentally unsupported" that it offers "no assistance to the jury." *Bocoum v. Daimler Trucks N. Am. LLC*, 2022 WL 902465, at \*6 (S.D.N.Y. Mar. 28, 2022).  Striking expert testimony is a "drastic remedy," *Rmed Int'l, Inc. v. Sloan's Supermarkets, Inc.*, No. 94 Civ.5587, 2002 WL 31780188, at \*3 (S.D.N.Y. Dec. 11, 2002), and "inconsistent with the judicial preference for determination of issues on the merits," *In re Specialist & Other Vessel Owner Limitation Actions*, No. 16 Civ. 4643, 2020 WL 8665287, at \*2 (S.D.N.Y. June 30, 2020).

Challenges to the bases upon which an expert's opinions "affect the weight to be assigned" rather than admissibility. *Gulf Coast Bank & Tr. Co. v. Great Lakes Ins. SE*, No. CV 23-1444, 2025 WL 1134454, at \*4 (M.D. La. Apr. 16, 2025). "The most appropriate place to challenge the assumptions made by an expert is at trial on cross-examination and with countervailing expert testimony." *Id.* at \*5; *see also In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 5-MD-1720, 2022 WL 15053250, at \*27, n.19, \*31, n.20 (S.D.N.Y. Oct. 26, 2022) (rejecting exclusion of expert witness based on purported inconsistencies or mistakes in testimony and reports, but noting that these "may be a fertile ground for cross-examination"); Fed. R. Evid. 702 (advisory committee's note to 2000 amendment) ("'[S]ufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.")

**ARGUMENT**

**I.    Dr. Abrantes-Metz Did Not Commit Perjury Or Testify Falsely**

Despite leveling the grave accusation of perjury, Defendants do not cite the legal standard for perjury because they know they cannot come close to meeting it. Under the federal perjury statute, 18 U.S.C. § 1621, a witness can be guilty of perjury only if, while under oath, he or she "willfully and contrary to such oath states or subscribes any material matter which he does not

8

believe to be true." *United States v. Friedman*, 854 F.2d 535, 559–60 (2d Cir. 1988). "This language must be construed strictly." *Id.* at 560. Additionally, "[f]alse testimony may be distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory." *Kappen v. Bell*, No. 18-CV-05784 (CBA), 2022 WL 939847, at *7 (E.D.N.Y. Mar. 29, 2022) (internal quotation omitted). The Second Circuit has held that "even a direct conflict in testimony does not in itself constitute perjury." *United States v. Gambino*, 59 F.3d 353, 365 (2d Cir. 1995). When there is a direct conflict, "[i]t [is] for the jury to decide whether or not to credit the witness." *United States v. Bortnovsky*, 879 F.2d 30, 33 (2d Cir. 1989) (quoting *United States v. Holladay*, 566 F.2d 1018, 1019 (5th Cir. 1978) (per curiam)).

Defendants accuse Dr. Abrantes-Metz of "lying" and making statements in "bad faith," (Mem. 2, 15), supposedly to cover up her use of "a fictitious notion of Retained Amount" that appeared nowhere in Defendants' ordinary-course documents, and that they suffered prejudice as a result. *Id.* 14–16. As Dr. Abrantes-Metz explains in her accompanying declaration, she has always maintained that she used the phrase "retained amount" to describe the price she calculated based on *her own* analysis, and she never meant to suggest otherwise. *See, e.g.*, Abrantes-Metz Decl. ¶ 7. Her testimony, to the extent that it was ambiguous, confusing, or misleading, was the result of unclear questions from Defendants' counsel that conflated two separate issues Dr. Abrantes-Metz considered when determining "retained amounts," not the result of any lying or bad faith. *Id.* ¶¶ 16–17.

The Court has already cured any possible prejudice by striking a portion of her testimony at trial, and thus no further remedy is required. If further clarification is necessary, it can be provided without granting Defendants' extraordinary request to strike the entire testimony of Dr.

Abrantes-Metz,[1] which would leave Plaintiffs without an expert basis to present overcharge estimates to the jury.

### A. Dr. Abrantes-Metz testified that she uses the term "retained amount" differently than Defendants and never meant to suggest otherwise.

Plaintiffs do not dispute that Dr. Abrantes-Metz testified that "Live Nation itself calls those retained fees retained amounts," Trial Tr. 2498:7–8, nor that such testimony could be confusing because Live Nation has *not* used these words with the same meaning used in Dr. Abrantes-Metz's analysis. Dr. Abrantes-Metz accepts that her words may have conveyed a confusing meaning she did not intend. Abrantes-Metz Decl. ¶ 5. But she had no intent to mislead or lie. *Id.* ¶¶ 7–8. The confusion arose because Defendants' questions conflated (a) how she calculated the retained amounts with (b) the separate issue of whether Live Nation also used the words in its documents (with a different definition). *Id.* ¶¶ 9–14. The use of these terms to describe different things, combined with the difficulty of explaining the difference in use of those terms in response to certain cross-examination questions, caused further confusion.

When defense counsel asked her more clearly during trial about whether ordinary-course documents from Live Nation supported her calculation or definition of retained amounts, she said no:

> Q. My question is, in your reports, including your rebuttal report you did not cite to a single Ticketmaster document or any Ticketmaster testimony to support your definition of what you call a retained amount, did you? Yes or no?
>
> A. My back-up, no.
>
> Trial Tr. 2513:16–21.

---

[1] Should the Court determine further clarification is necessary, a limiting instruction would be appropriate. "As the Supreme Court has frequently observed, the law recognizes a strong presumption that juries follow limiting instructions." *United States v. Snype*, 441 F.3d 119, 129 (2d Cir. 2006) (citing *Zafiro v. United States*, 506 U.S. 534, 540–41 (1993)).

That is consistent with her testimony immediately prior that she was not relying upon Ticketmaster's use of the term to do her calculations:

> Q. You actually did not refer when you did that in your report or even in your rebuttal report to any Ticketmaster documents, did you?
>
> A. I can't recall, but the meaning of the word would not change. I could have called it apples or oranges. It would still be the price charged by Ticketmaster for its ticketing services.
>
> Trial Tr. 2513:8–14.

The very deposition testimony Defendants quote (Mem. 4) tracks her answers, as do her answers given at trial shortly thereafter:

> Q. OK. And we can agree, Ticketmaster actually doesn't refer to the concept of retained amounts in its normal course documents, does it, Doctor?
>
> A. Yes.
>
> Q. We can agree on that?
>
> A. Yes.
>
> Q. Got one.
>
> Trial Tr. 2514:16–22.

Other testimony confirmed that Dr. Abrantes-Metz was not relying on Ticketmaster's definition of amounts "retained" to construct a methodology for her calculations but rather her own economic expertise to construct a proper measure of price:

> Q. And when you described the retained amount in your report, including your rebuttal report, you also didn't cite to any economic treatise or other authority in support of that definition, did you? Yes or no?
>
> A. Of which definition?
>
> Q. Your definition of retained amount.
>
> A. It is not my definition of retained amount, but as an economist, I didn't think I need to cite to an authority to define a price, so I guess the answer probably is not.

11

Q. And it's your position that you could have as easily called your retained amounts anything you wanted, right?

A. Right. That doesn't change the economic meaning.

Trial Tr. 2514:4–15.

More fundamentally, Dr. Abrantes-Metz has been consistent that, in her economic opinion, the way to describe what happens to the price paid by the fan to Ticketmaster is that it is "retained" by Ticketmaster. *See, e.g.*, Trial Tr. 2450:6–9, 2451:4–6. Fans pay Ticketmaster, which distributes various "amounts" to others involved in the transaction, and "retains" its portion. *See* Trial Tr. 2481:21–2482:1.

Defendants rely on *Campbell Indus. v. M/V Gemini*, 619 F.2d 24, 27 (9th Cir. 1980) to argue the Court must strike her testimony because Dr. Abrantes-Metz testified in "bad faith." Mem. 15 (quoting). That case is inapposite. When *Campbell Industries* referred to a trial court's power to exclude the bad faith use of witnesses at trial, it referred to the bad faith of counsel, not the witness. *See Clark v. Pennsylvania R.R. Co.*, 328 F.2d 591, 594–95 (2d Cir. 1964) (cited by *Campbell Industries*).

Regardless, Dr. Abrantes-Metz did not commit perjury under any plausible reading of the applicable legal standard. She may have misspoken, or been confused at times by the questioning, Abrantes-Metz Decl. ¶¶ 14–19, but confusion is not perjury or bad faith. Ticketmaster documents do use "retain" or "amounts retained" to describe certain amounts. *See, e.g.*, *id.* ¶ 10 & n.6 (citing DX-0553, at DX-0553.0002). But Dr. Abrantes-Metz did not mean to convey that those references supported her own independent methodology for calculating retained amounts to determine the price. Abrantes-Metz Decl. ¶¶ 18–34.

B.    **Dr. Abrantes-Metz meant to describe the process by which she used Ticketmaster data, and Live Nation's instructions on how to interpret it, to determine retained amounts under her own definition.**

Defendants claim Dr. Abrantes-Metz deliberately misled by answering, on cross-examination and redirect that her "retained amount" calculation "follow[s] instructions provided by Live Nation." Mem. 5 (quoting Trial Tr. 2513:16–24, 2514:4–19, 2515:16–22). But the full context makes clear that any confusion was unintentional—partly a product of Defendants' repeated efforts to ask the same question multiple ways seeking a "gotcha" moment. When Dr. Abrantes-Metz said, "I used the definition from Live Nation cited in my report," Trial Tr. 2519:15–2520:1 (quoted in Mem. 5), she was responding to a question about whether AXS used her definition of "retained amounts," *id.* 2519:11–17, and meant that when calculating retained amounts for AXS, she applied the same calculation that was applied to the Live Nation data. Abrantes-Metz Decl. ¶ 26. But the other fact, which brought in the confusion, is that she did, indeed, rely on instructions from Ticketmaster on how to interpret the data to calculate her measure of price. *Id.*

During the investigation and litigation, counsel for Live Nation responded to questions about Ticketmaster's extensive data production.[2] In certain letters, Live Nation explained its view of what amounts Ticketmaster retained, sometimes using the word "retain." *Id.* ¶ 10 & n.6.  What mattered is that Ticketmaster provided guidance on interpreting its data, and Dr. Abrantes-Metz used this guidance to devise the price metric calculation used to form her opinion. *See generally* Abrantes-Metz Rep. ¶ 215 & nn. 327–33 (data appendix); Abrantes-Metz Decl. ¶¶ 27–34

---

[2] As Defendants' motion to strike makes clear, the "data production process" was "extensive" during the "investigations that preceded this lawsuit." Fayne Decl. ¶ 1. This process spanned many years from at least November 2022 and involved "over 600 data-related questions in discovery alone," and resulted in "voluminous correspondence with Plaintiffs about Live Nation's data productions." Fayne Decl. ¶¶ 3–4, 6.

(explaining use of information in Live Nation correspondence). This is the point that she was inartfully trying to convey when she stated that "[t]he retained amount calculation *follows the instructions provided by Ticketmaster and Live Nation in their answers to questions from plaintiffs on how to calculate these retained amounts."* Mem. 5–6 (quoting Trial Tr. 2593:11–23) (emphasis in original); *accord* Trial Tr. 2513:16–24 (responding to question that asked about use of the term with a now-stricken reference to how she used Live Nation's instructions to do her analysis); Abrantes-Metz Decl. ¶¶ 15–21.

Dr. Abrantes-Metz had to name the price measure she calculated. Calling it "price" would have been confusing for different reasons, because Ticketmaster also charges fans amounts it does *not* keep. She used "retained amount," which did indeed correspond to the use of the word "retained" in Defendants' documents referring to different amounts. But she never meant to convey that she used Ticketmaster's meaning for these words to define *her* calculation. To the extent her testimony could be understood to convey such a meaning, she misspoke in a good-faith effort to describe her work. *Id.* ¶¶ 22–25.

That Ticketmaster may have calculated its own "retained" figures in ordinary-course profitability analysis, (Mem. 7), and included upfront payments does not make any part of Dr. Abrantes-Metz's testimony perjurious. That Ticketmaster subtracted upfront payments in its own profitability analyses was a fair topic for cross-examination that Defendants pursued. Dr. Abrantes-Metz explained why she did not make such deductions: "Q. You didn't analyze what fees charged to fans would look like if venues didn't get significant upfront payments, did you? A. No, because I studied price, not profitability."). Trial Tr. 2575:7–10; *see also id.* 2577:16–2578:21 (distinguishing Ticketmaster's "TM's Retain" calculations from her own).

14

> **C.      The Court has already cured any prejudice from the confusion that may have been caused and to the extent Defendants believe more clarification is required, they may themselves further address the issue at trial.**

During the extensive cross examination that the Court permitted, Dr. Abrantes-Metz repeatedly gave Defendants the answer they wanted to establish for the jury—Defendants never used "retained amounts" as she used it. *See* Trial Tr. 2513:16–2514:22. When redirect examination caused additional confusion (*id.* 2594:5–24), the Court struck the answer and gave a limiting instruction without objection from Plaintiffs' counsel.[3] *Id.* 2600:9–2602:25, 2605:3–9. This cured any prejudice.

To the extent Defendants believe more clarification is necessary, they can address it when Dr. Carlton testifies,[4] and in closing argument. *Gulf Coast*, 2025 WL 1134454, at *5 ("The most appropriate place to challenge the assumptions made by an expert is at trial on cross-examination and with countervailing expert testimony."). No further judicial sanction is needed, and the jury will decide Dr. Abrantes-Metz's credibility. *Bortnovsky*, 879 F.2d at 33.

*Columbia Sportswear N. Am., Inc. v. Seirus Innovative Accessories, Inc.*, 942 F.3d 1119 (Fed. Cir. 2019) is instructive. There, an expert misrepresented a patent reference at trial, but the district court denied Columbia's motion for a new trial, and the Federal Circuit agreed, noting that a "few lines of mistaken expert testimony" did not warrant further sanction where cross-

---

[3] Defendants insinuate that "Dr. Abrantes-Metz had supplied Plaintiffs' counsel with footnote 333 as something that she could be asked about on redirect if crossed on the basis for her definition of Retained Amount." Mem. 6 n.2. That is a baseless accusation, and Mr. Nakamura is flying in from California to attend Monday's hearing so that he will be available if the Court has any questions it wishes to pose to him about these allegations.

[4] Dr. Carlton has certainly reviewed the opinions and work of Dr. Abrantes-Metz sufficiently to opine that they are not based on a Ticketmaster document (*see, e.g.*, Carlton Rep. ¶ 104, n.167 ("She estimates the difference between the Ticketmaster and AXS retained amounts using a ticket-weighted regression and controlling for the ticket face value, venue, artist genre, and time effects."); Carlton Surrebuttal ¶ 64.

examination still occurred and "[t]he jury could have easily verified any representations about the reference." *Id.* at 1128.

*Columbia Sportswear* is in stark contrast to the facts in *Rembrandt*, a case cited by Defendants, where the expert lied about his personal involvement in testing and withheld test results from both parties that would have undermined the expert's testimony at trial, and the parties did not dispute that he testified falsely during trial.[5] *Rembrandt Vision Tech., L.P. v. Johnson & Johnson Vision Care, Inc.*, 818 F.3d 1320, 1322–25 (Fed. Cir. 2016). There is no comparison to Dr. Abrantes-Metz's confusing statements here, where subsequent exchanges gave Defendants the testimony they wanted. Moreover, Defendants cannot articulate why any confusion would make a substantive difference to the jury's determination of whether upfront payments should have been deducted. That issue has been presented through cross-examination of Dr. Abrantes-Metz and Dr. Budish's testimony and can be addressed in Dr. Carlton's testimony and closing arguments.

## II.    Dr. Abrantes-Metz Had Sufficient Economic And Realistic Factual Bases, Under Rule 702, For Excluding Upfront Payments

On their third attempt to exclude Dr. Abrantes-Metz's testimony under Rule 702, Defendants again characterize a reasonable expert dispute about the economic treatment of upfront payments as "[b]eyond reasonable dispute" and "unquestionabl[e]." Mem. 3. With all due respect to Defendants, this is nothing more than a classic battle of experts for the jury, not the Court. *See* p. 17 n.6, *infra*.

---

[5] Defendants' only other citation again involved extreme misconduct, proven by clear and convincing evidence, of improper withholding of evidence responsive to discovery requests. *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1339–45 (5th Cir. 1978).

### A.    Dr. Abrantes-Metz's methodology remains unchanged and still admissible under Rule 702

Plaintiffs have twice briefed the factual and economic bases for Dr. Abrantes-Metz's opinion that while these upfront payments would be relevant to a profitability analysis, they were not relevant to the marginal pricing analysis and comparison which she presented to the jury in this case. Abrantes-Metz *Daubert* Opposition, ECF No. 743 at 21–24; Pls' Ltr re Defs' Mot to Exclude Abrantes-Metz, ECF No. 1064 at 1–5. These bases satisfy the Rule 702 threshold as they rest on realistic factual assumptions and standard economic analysis—not speculation or conjecture. ECF No. 1094 at 11–13; ECF No. 1278; Trial Tr. 1959–64.

Defendants devote the bulk of their Section III to arguing that Ticketmaster's internal "Deal Analysis" documents ("DATs") net out upfront payments per-ticket when assessing profitability. Mem. 13–14. Dr. Abrantes-Metz does not dispute that point; she acknowledged on cross-examination that at least one DAT she reviewed (the Miami Heat) calculated a "TM Retain (GM)" figure netting out upfront payments, and that she had seen other DATs do the same. Trial Tr. 2577:16–23, 2578:9–14. But that does not preclude her from applying her economic expertise to opine that while deducting upfront payments is relevant to profitability, they are not relevant to her marginal price comparison between Ticketmaster and AXS, an opinion grounded in standard economic analysis and satisfying Rule 702.

As Dr. Abrantes-Metz has explained, Ticketmaster's internal use of upfront payments is irrelevant to the economic question she addressed—namely, what is the marginal per-ticket price charged by Ticketmaster and AXS for its ticketing services, and whether the difference between those prices reflects an overcharge. Each of the following points provides a realistic basis for her opinion that upfront payments should be excluded from her retained amounts calculations.

17

*First*, Dr. Abrantes Metz concluded that upfront payments are fixed costs which would not impact a marginal pricing analysis. Abrantes-Metz Rebuttal Rep. ¶¶ 107-16; *see also* Abrantes-Metz Opening Rep.¶¶ 77, 83 & n.193. As a matter of marginal pricing, the ultimate all-in price for the ticket the venue charges the fan would not be impacted, in her opinion, by fixed costs such as upfront payments. As a matter of economics, fixed costs—incurred regardless of how many units are produced or sold—do not and should not affect marginal pricing.  Upfront payments are lump sums paid at contract inception, before a single ticket is sold, and before ticket volume is known. Trial Tr. 2579:12 (Abrantes-Metz); Trial Tr. 3250:5–3252:17 (Budish).  They are therefore not properly deducted when comparing marginal prices.

Dr. Abrantes-Metz articulated this opinion long before trial. Her reports cited standard economic authority for the proposition that fixed costs "do not vary with the quantity of output produced" and that lump-sum payments "do[] not distort incentives." Abrantes-Metz Opening Rep. ¶¶ 77, 83 & n.193; Abrantes-Metz Rebuttal Rep. ¶ 111. Dr. Abrantes-Metz explained the components of the price fans pay and how to calculate the amount retained by Ticketmaster from those prices and explained by upfront payments are irrelevant to the price fans pay. *See* Abrantes-Metz Opening Rep. ¶¶ 108–10; Abrantes-Metz Rebuttal Rep. ¶ 108.  The prices fans pay are determined by the per-ticket fees Ticketmaster charges, which is not impacted by upfront payments. Trial Tr. 2451:3–6, 2579:15–2580:3.

Some of the price fans pay goes to the artist and promoter, some goes to the venue, some goes to the credit card company, and some is retained by Ticketmaster. *See id.*; Abrantes-Metz Decl. ¶ 33. The contention that some of the fees could be considered by Ticketmaster to fund the upfront payment it made to a venue does not change the price that a fan pays. It would not make any economic sense to deduct a fixed cost like upfront payments, just as it would not make

18

economic sense to offset the retained amount by the amount Ticketmaster pays to deploy ticket scanners at a venue, or the overhead cost of paying employees. Trial Tr. 2585:10–16; Abrantes-Metz Decl. ¶ 34.

*Second*, the evidence shows that the upfront payments by Ticketmaster are provided in exchange for an economic consideration received by Ticketmaster for its own benefit, including, sponsorship rights, performance metrics, and exclusivity. Dr. Abrantes-Metz testified at trial that upfront payments "are a lump sum payment at the beginning, at the contract, that the venues receive, typically for other services, such as sponsorship agreements. So they're not typically just a cash-in for nothing in return." Trial Tr. 2579:7–14. As she further explained, "to the extent that they are payments for something else in an agreement between the venues and the ticketer, they're not part of the price of the ticketing service that the fans are paying, and, therefore, they should not be subtracted." *Id.* 2580:4–7. Her reports identified specific examples from Ticketmaster contracts (*see* Abrantes-Metz Opening Rep. ¶ 76 & n.182; Abrantes-Metz Rebuttal Rep.¶¶ 117(a), 118(b), 119(d)), which show upfront payments were made for sponsorship agreements, exclusivity, and other valuable rights.

Trial testimony confirmed this basis. John Abbamondi of BSE Global testified that sponsorship is "a fancy word for advertising" including "signage in a building" and "entitlement, so naming part of the building, a gate or the box office." Trial Tr. 229:11–24. The Ticketmaster-OVG agreement provided for $7.5 million in annual "sponsorship payments" on top of a $20 million upfront bonus. PX1078 at OVG-013704.

Dr. Budish conceded that upfront payments were, in many cases, in exchange for rights to of economic value to Ticketmaster. *See* Trial Tr. 3249:8–3253:10, 3249:21–3250:4. He further agreed that upfront payments could include performance metrics and exclusivity rights. *Id.*

19

3252:4–13. There is no factual dispute with Dr. Abrantes-Metz that the upfront payments provide economic value to Ticketmaster.  The only dispute is between the experts as to whether it is proper to deduct such payments when calculating price. *See Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017) (district court may not usurp the jury's role by resolving competing expert interpretations);  *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation*, No. 05-MD-1720, 2022 WL 15053250, at \*27, \*31 (S.D.N.Y. Oct. 26, 2022) (Rule 702 does not permit exclusion where criticisms reflect disagreements over assumptions, inputs, or methodology; such disputes are for the jury).[6]  That is not a proper basis for a Rule 702 challenge.

Dr. Abrantes-Metz raised this point in her Rebuttal Report, noting that Defendants drew "no distinctions between upfront payments relating to purchases of bona fide services and those that are purportedly an advance on future fees." *See* Abrantes-Metz Rebuttal Rep. ¶¶ 117–19 & n.215. Dr. Budish conceded he had not "adjust[ed his] calculation to account for the . . .

---

[6] *See also Kurtz v. Costco Wholesale Corp.*, 818 F. App'x 57, 62 (2d Cir. 2020) (failure to include variables affects probative value, not admissibility); *In re Aluminum Warehousing Antitrust Litigation*, No. 13-MD-2481, 336 F.R.D. 5, 30 (S.D.N.Y. 2020) (criticisms of regression variables and benchmarks affect weight, not admissibility); *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 314–19 (S.D.N.Y. 2015) (Rule 702 does not authorize courts to choose between competing expert methodologies); *In re: Gen. Motors LLC Ignition Switch Litig.*, 2015 WL 9480448, at \*3 (S.D.N.Y. Dec. 29, 2015) ("The fact that there is some evidence to impeach [expert's] opinion . . . goes, again, to its weight, not its admissibility."); *In re Google Digit. Advert. Antitrust Litig.*, No. 21-MD-3010, 2025 WL 3562687, at \*8–10, \*16 (S.D.N.Y. Dec. 12, 2025) (denying *Daubert* challenge where objections concerned omitted variables, modeling choices, and expert disagreement); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, No. 14-MD-2542, 2025 WL 354671, at \*11, \*34 (S.D.N.Y. Jan. 30, 2025) (rejecting exclusion based on imperfect benchmarks and modeling choices; comparator disputes go to weight, not admissibility); *In re Air Cargo Shipping Services Antitrust Litig.*, No. 06-MD-1775, 2014 WL 7882100, at \*18 (E.D.N.Y. Oct. 15, 2014), *report and recommendation adopted*, 2015 WL 5093503 (E.D.N.Y. July 10, 2015) (disputes over economic assumptions and damages modeling present classic jury questions).

sponsorship value" Ticketmaster received.  Trial Tr. 3250:14–25. The jury should decide this expert dispute.

*Third*, there is no dispute that AXS also made upfront payments, so any price analysis including them for Ticketmaster alone would be skewed. Dr. Abrantes-Metz's Rebuttal Report documented that "both ticketers frequently make upfront payments to venues" and that she "conducted the only review of upfront payments available in AXS agreements and found that AXS made upfront payments consistent with Ticketmaster's." Abrantes-Metz Rebuttal Rep. ¶¶ 116, 118–19.  Not including them for both companies was a reasonable, apples-to-apples comparison. *See* Trial Tr. 2585:17–2586:8.

Dr. Budish stated a "proper take rate comparison . . . would need to include upfront fees for both companies," but conceded that he had not done so. Trial Tr. 3253:2–12.  When asked whether he had "analyzed any upfront fee data for AXS," he admitted: "I don't have access—I don't have that data available to me." *Id.* 3252:22–3253:1. Including upfront payments for Ticketmaster alone would present a fundamentally skewed analysis. It would have been improper for Dr. Abrantes-Metz to adjust for Ticketmaster where no comparable data existed to replicate such an adjustment for AXS. *See* Abrantes-Metz Rebuttal Rep. ¶¶ 116, 118–20.

*Fourth*, as the Court knows, Dr. Abrantes-Metz performed a robustness check, a further basis for finding that her opinions satisfied Rule 702. Dr. Abrantes-Metz did not simply assume that her overcharge analysis based on Ticketmaster's retained amounts was correct. Instead, she conducted a separate cross-check analysis to ensure the reliability of her results. To reach her primary overcharge opinion, she calculated the overcharge by first establishing that Ticketmaster retains $2.30 more per ticket than AXS, (Abrantes-Metz Opening Rep. ¶ 110), and the pass-through rate to consumers. Abrantes-Metz Opening Rep. ¶¶ 177–78. Then, as a robustness check the

21

validity and reliability of these results, she conducted a separate and additional regression analysis modeling *total fees paid by fans* at Ticketmaster versus AXS-ticketed events—a metric that does not depend on the computation of retained amounts—and is therefore not sensitive to any particular treatment of upfront payments in her retained amount calculation that are the subject of Defendants' *Daubert* challenge. Abrantes-Metz Opening Rep. ¶¶ 179–83. This regression of consumer-paid fees rather than the ticketer's retained amounts confirmed the reliability of her retained amounts regression without any deduction for upfront payments.

Figure 29 presents that analysis. Abrantes-Metz Opening Rep. ¶¶ 179–83 & Fig. 29.  The analysis shows that, on average, total ticketing fees paid by consumers for Ticketmaster-ticketed events are $3.19 higher than total fees for AXS-ticketed events. *Id.* The persistence of this gap is consistent with Dr. Abrantes-Metz's calculated overcharge based on her definition of retained amounts, (Abrantes-Metz Opening Rep. ¶ 182), which underscores the reliability of her opinions under Rule 702. Contrary to Live Nation's argument, the fact that the total fees are higher when Ticketmaster is the ticketer demonstrates that upfront payments do not lower fees. This fact considered in light of Ticketmaster's higher retained amounts support the thesis that Ticketmaster simply charges higher fees, which are not somehow offset by its upfront payments.

As the Court noted, Defendants did not even respond when Plaintiffs raised this robustness in opposing the prior *Daubert* motion (*see* Trial Tr. at 3765:16–23). Nor did they address it in the instant motion. While Defendants and Dr. Budish may disagree with Dr. Abrantes-Metz's treatment of upfront payments in her price comparison, they have no Rule 702 basis for exclusion. *See* p. 17 n.6, *supra*.

This case is entirely distinguishable from *Reed Const. Data Inc. v. McGraw-Hill Companies, Inc.*, 49 F. Supp. 3d 385, 403 (S.D.N.Y. 2014). In *Reed*, the court excluded an expert's

opinion because the omitted variable—construction volume data—was "essential," and the expert conceded it had a "significant and negative" effect, and that data "could theoretically have effects in two opposite directions." *Id.* at 403–04. Here, by contrast, economic theory distinguishes between fixed costs and profit (which upfront payments affect) and marginal pricing (which they do not). The parties do not dispute what the data is, only whether—as a matter of economic theory— it makes sense to include upfront payments for Ticketmaster data only (see third point above). Defendants' experts have not even attempted to show, much less established, the kind of "significant and negative" correlation found in *Reed* that would render upfront payments an essential omitted variable from Dr. Abrantes-Metz's analyses. This falls into what *Reed* called a "normal[]" argument of failure to include variables, which goes to "probativeness, not its admissibility," and that "[w]hether those [types of] omissions impermissibly biased the results was a matter for the jury to decide." *Id.* at 400–01 (cleaned up) (citing *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (Brennan, J., concurring)).

Ultimately, Dr. Abrantes-Metz bases her opinions with respect to the calculation of retained amounts without deducting upfront payments on her experience as an expert in economics, and on economic principles—the same opinions she expressed in her rebuttal report (¶ 108), in her deposition testimony (Dep. Tr. 236:22–241:17), in her trial testimony, (Trial Tr. 2579:7–2586:4), and that she continues to express today (Decl. ¶¶ 27–35). That opinion is not an "unsupported" conception excludable under Rule 702. Mem. 12 (citing *Klein v. Meta Platforms, Inc.*, 766 F. Supp. 956 (N.D. Cal. Feb 13, 2025)). It is backed up by a realistic view of the facts and standard principles of economic analysis. The Court has previously heard extensive argument on the upfront payments issue, Hearing Tr. 29:16–56:9, and ultimately found Dr. Abrantes-Metz's opinions to be

admissible. ECF No. 1094 at 8–13. The trial record has not provided any change in her analysis that would warrant its exclusion now.

**B.     The Rule 702 inquiry is not limited to the admissible evidence presented at trial**

The Court raised the question of whether it could still consider Dr. Abrantes Metz' robustness analysis, presented in Figure 29, even though that analysis was not presented to the jury during her testimony. Trial Tr. 3760:22–3762:4. The answer is yes. In fact, the Court is obliged to do so under Rule 702.

Whether expert testimony meets the admissibility standard under Rule 702 and *Daubert* is a question for the Court that is wholly separate from the jury question of whether expert testimony is credible and it is not limited to the consideration of admissible existence presented at the trial. *In re Joint E. & S. Dist. Asbestos Litig.*, 52 F.3d 1124, 1132 (2d Cir. 1995) ("The 'admissibility' and 'sufficiency' of scientific evidence necessitate different inquiries and involve different stakes."). Under Rule 702, "[a]dmissibility entails a *threshold* inquiry over whether a certain piece of evidence ought to be admitted at trial." *Id.* "The trier of fact, on the other hand, is tasked with considering the sufficiency, or weight, of admitted expert testimony, and does so only after an opponent has an opportunity to challenge the expert testimony with vigorous cross-examination, presentation of contrary evidence, and summation." *Wechsler v. Hunt Health Sys., Ltd.*, 381 F. Supp. 2d 135, 141 (S.D.N.Y. 2003) (internal quotation omitted). Indeed, because an expert may base his opinions on inadmissible evidence, *see United States v. A & S Council Oil Co.*, 947 F.2d 1128, 1134 (4th Cir. 1991), the Rule 702 inquiry necessarily involves a court considering whatever bases the expert relies upon, without regard to whether it will ever be presented to the jury at trial.

Here, the Court has already denied Defendants' prior challenge to the admissibility of Dr. Abrantes-Metz's testimony and did not know whether any of the underlying bases for her opinions

24

would or would not be presented to the jury. Nonetheless, once that Rule 702 determination is made, the opinions of the expert may be presented to the jury and there is no requirement that any of the underlying bases for the admissible opinion also be presented to the jury. *See* 29 Wright & Miller, Fed. Prac. & Proc. Evid. § 6274 (2d ed. 2025).

*Daubert* contemplates that admissibility is determined *before* testimony is presented. *Daubert*, 509 U.S. at 592–93. Once that determination is made, there is no Rule 702 requirement that the expert present all bases for her admissible opinions to the jury. Defendants were free to cross-examine Dr. Abrantes-Metz on any bases, whether or not presented, but the decision to provide the jury with one fewer reason why her analysis was correct does not change the Rule 702 inquiry. *See Ventura v. United States*, 2024 WL 1929183, at *17 (S.D.N.Y. May 1, 2024); Fed. R. of Evid.705. With the admissibility threshold already cleared, it is now up to the jury to determine the credibility and weight of Dr. Abrantes-Metz's testimony. *See Campbell v. Metropolitan Property & Casualty Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001).

### III.    Defendants' Claim That AXS Is Not a Reasonable Benchmark for Ticketmaster Is Unsupported by the Law and The Record

Defendants' revived Rule 702 challenge to Dr. Abrantes-Metz's use of AXS as a benchmark rests on the mistaken premise that a comparator must be identical in every respect in order to be relied upon by an expert.  That is not the law.  Rule 702 requires only that a benchmark be sufficiently comparable to permit a reliable economic inference, and courts recognize that real-world markets rarely produce perfect comparators. *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946) (cautioning against a standard that "would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain"); *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 119 (S.D.N.Y. 2015)  ("[T]he selection of perfectly comparable benchmark firms aside from [defendant] is impossible where

[defendant's] alleged monopoly prevents comparable firms from operating within its market.").
Extensive documentary, testimonial, and empirical evidence supports Dr. Abrantes-Metz's opinion
that AXS is a reasonable benchmark. Any disputes regarding comparator quality present classic
fact issues for the jury. .*In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 78 (S.D.N.Y. 2017); *see*
page 17 and n. 6, *supra*.

The Court already ruled on this issue. On February 27, the Court ruled that AXS "presents
an issue that plainly goes to the weight of Abrantes-Metz's testimony, rather than its threshold
admissibility," finding AXS a "comparator that is 'sufficiently comparable to permit a degree of
reliable comparison.'" ECF No. 1094 at 9 (quoting *Keurig*, 2025 WL 354671, at *34). Trial
evidence has only confirmed that ruling.

A.    **AXS is a reasonable benchmark because it competes directly with
Ticketmaster**

Defendants do not contest that Dr. Abrantes-Metz's method of calculating damages—the
"yardstick" or "benchmark" method—is "widely accepted." The central inquiry under Rule 702
is thus whether AXS as the chosen benchmark provides a reasonable basis for comparison. *Keurig*,
2025 WL 354671, at *34. Courts do not require that benchmark firms be identical; rather, the
comparator need only be sufficiently similar to permit meaningful comparison. *Id.*

Dr. Abrantes-Metz testified extensively about characteristics making AXS an appropriate
benchmark, including that both AXS and Ticketmaster are: (i) full service ticketers; (ii) focused
on primary ticketing; (iii) vertically integrated with promoters; (iv) provide ticketing services for
similarly priced events as measured by the face value of tickets; and (v) offer similar core
functionality and service features making them comparable from a quality perspective. *E.g.*, Trial
Tr. 2462:5–2464:18, 2586:10–2587:14; Abrantes-Metz Opening Rep. ¶ 111 & n.213. The first

four comparator characteristics are undisputed. Only the last one is disputed, and that dispute presents nothing more than a fact issue going to weight, not admissibility.

Economic principles favor selecting the closest real-world comparator operating at a meaningful scale. AXS is Ticketmaster's largest competitor in primary ticketing, accounting for approximately 9.3% of tickets from 2018–2024 (excluding 2020). Trial Tr. 2465:19–2466:18 (PDX006.13); Abrantes-Metz Opening Rep. Ex. G.1. Neither SeatGeek nor Paciolan approaches AXS in share of primary ticketing events. Trial Tr. 2465:21–2466:6; Abrantes-Metz Opening Rep. Ex. G.1.[7] Defendants' own expert conceded that AXS successfully competed for venues against Ticketmaster "throughout the period 2018 to today," and agreed that customers selecting AXS found the product "[a]cceptable." Trial Tr. 3244:10–20. He confirmed that venues selected AXS notwithstanding his view that Ticketmaster sells more tickets. Trial Tr. 3244:21–25.

Selecting the largest available in-market competitor as the benchmark is a straightforward and conservative methodological choice consistent with accepted economic practice. Defendants' disagreements "go to the weight of the evidence, not [the] methodology," and therefore do not "warrant exclusion under *Daubert*." *In re Google Digit. Advert. Antitrust Litig.*, No. 21-MD-3010, 2025 WL 3562687, at *8 (S.D.N.Y. Dec. 12, 2025).

### B.    The law does not require a perfect comparator

Defendants' argument improperly demands that AXS be a "perfectly comparable benchmark firm." That is not the governing legal standard. Courts recognize that benchmark firms seldom replicate the "Utopian ideal" of identical comparators. *Keurig*, 2025 WL 354671, at

---

[7] Defendants suggest in a footnote that Dr. Abrantes-Metz selected AXS over SeatGeek because SeatGeek's retained amounts exceed Ticketmaster's. This is false. Dr. Abrantes-Metz testified that she considered but rejected SeatGeek as a benchmark because it had only a 0.5% share of MCV primary ticketing, operated mostly as a secondary-market ticketer focused on sports, and was not vertically integrated with a promoter. Trial Tr. 2464:20–2466:11.

*11 (quoting *Celebrity Cruises Inc. v. Essef Corp.*, 434 F. Supp. 2d 169, 189 (S.D.N.Y. 2006)); *see also Simon & Simon, PC v. Align Tech., Inc.*, 350 F.R.D. 565, 573–74 (N.D. Cal. 2023) (allowing benchmark despite presence of premium and value segments and explaining that differences in brand recognition and product positioning do not render a comparator unreliable under Rule 702).

Plaintiffs are not required to demonstrate "strict identity between the benchmark and the hypothetical free market." *Cason-Merenda v. Detroit Med. Ctr.,* 2013 WL 1721651, at *6 (E.D. Mich. Apr. 22, 2013) (citing *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566–67 (1981)). Such a standard would be "unworkable and unfair," particularly where defendants' alleged monopoly limits competitors' ability to operate at scale. *Dial Corp.*, 314 F.R.D. at 118–19; *Bigelow*, 327 U.S. at 264. Antitrust plaintiffs are entitled to "considerable latitude" in proving damages where defendant conduct has distorted market outcomes. *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1378 (2d Cir. 1988). A benchmark need only be "sufficiently comparable to permit a degree of reliable comparison." *Keurig*, 2025 WL 354671, at *34.

C. **Multiple categories of evidence demonstrate that AXS and Ticketmaster are sufficiently comparable**

1. *Market Participants Treated AXS and Ticketmaster as Close Substitutes*

Venues repeatedly evaluated AXS and Ticketmaster in head-to-head competitions. For example, AXS CEO Perez testified that AXS won Gas South Arena from Ticketmaster in 2012, its first third-party client. Trial Tr. 2329:25–2330:1, 2386:17–20. Mr. Van Stone of Monumental Sports testified that during its 2015 RFP process, it viewed AXS's user interface, Waiting Room technology and mobile tools as competitive strengths. Trial Tr. 3316:22–3318:14; PX0231 at -164, -166. In addition, BSE Global considered AXS alongside both SeatGeek and Ticketmaster in 2021. Trial Tr. 1214:6–14; *see also* PX0087; DX-0708.0001 (2022 AXS Competitor Insights stating that clients "perceive AXS and Ticketmaster to have product parity"); PX0860 at -063 (June

28

2023 Ticketmaster Blueprint Deck identifying AXS as a primary ticketing competitor with similar market position); PX0800 at -538 (August 2023 Ticketmaster Tech Exec Stakeholder deck listing client feedback that the "[t]ransfer process is easier on AXS app" than Ticketmaster's).

Ticketmaster's own internal documents recognized AXS's comparable functionality and competitive threat throughout the relevant period, spanning 2014 through 2023—well before and after the 2020 dividing line Defendants argue for:

- On a "Competitive Landscape" slide Ticketmaster acknowledged that "AXS has launched many comparable features with potential to more aggressively approach clients." PX0673 at 3.

- Clients considered AXS alongside Ticketmaster and SeatGeek in platform selection decisions. Trial Tr. 1214:15–25; PX0087.

- AXS internal competitive assessments reported that clients "perceive AXS and Ticketmaster to have product parity." DX-0708.0001.

- Ticketmaster strategy materials identified AXS as a primary competitor with similar market positioning. PX0860 at -063.

- Ticketmaster documents reflected client feedback that the transfer process was easier on AXS's app. PX0800 at -538.

These documents demonstrate that industry participants viewed AXS and Ticketmaster as comparable alternatives throughout the study period. Evidence from both periods confirms that AXS was a reasonable choice as a comparator for Ticketmaster. Trial Tr. 2319:1–20, 2333:7–18, 2335:1–15, 2343:24–2344:2, 2420:6–18, 2343:3–14 (Perez); Trial Tr. 2802:1–10 (Yovich); Trial Tr. 3084:12-20 (Mueller); DX-0708.0001; PX0800 at 19, 44; PX0860 at 18–19, 60–61, 63.

### 2. *Empirical Evidence Confirms the Use of AXS as a Comparator*

Dr. Abrantes-Metz also conducted empirical analyses evaluating competitive outcomes between AXS and Ticketmaster, including win-loss data and measures of quality identified by Defendants' expert Dr. Carlton. These empirical tests demonstrated that AXS and Ticketmaster exhibited comparable performances across multiple measures. Trial Tr. 2468:11–2470:23

29

(PDX006.16–17); Abrantes-Metz Rebuttal Rep.  ¶¶ 61–62 & figs. 2–3. Her analysis found that "the data does not show that Ticketmaster possesses a consistent quality advantage over AXS but rather indicated that quality is a more frequent factor in Ticketmaster's losses than in AXS's losses." Abrantes-Metz Rebuttal Rep. ¶ 62; Trial Tr. 2468:15–2469:1, 2470:20–23.

Moreover, Dr. Abrantes-Metz found "no statistically significant difference between Ticketmaster and AXS" in per-ticket revenue. Abrantes-Metz Opening Rep. ¶ 114.  AXS and Ticketmaster serviced similarly priced events: average face values at MCV amphitheaters from 2018 to 2024 were $60.49 (AXS) versus $62.79 (Ticketmaster)—a negligible difference—with "[v]ery similar" results at MCV arenas. Abrantes-Metz Opening Rep. ¶ 111 & fig. 17; Trial Tr. 2482:19–2485:8. Her empirical analysis further undermined Defendants' argument that quality differences explain the price differential: if quality differences had materially narrowed over time and accounted for price differences, one would expect prices to converge correspondingly, yet the empirical evidence shows the opposite.  Trial Tr. 2589:19–2590:2.  This empirical testing independently supports comparability.

      **i.**      Evidence Demonstrates Comparable Fan-Facing Functionality

Consumer testimony further confirms comparability.  Fan witness Callie Brennan testified that AXS and Ticketmaster platforms are "extremely similar" from a user perspective.  Trial Tr. 1423:12–22. Ticketmaster's internal documents acknowledged the "[t]ransfer process is easier on AXS app" and identified areas where AXS offerings were competitive or superior, including mobile ID functionality, digital ticket management, and transfer functionality. PX0800 at 44; PX0860 at 18–19, 60–61.

ii.    The Trial Evidence Shows Ticketmaster Experienced Material
       Quality Limitations Comparable To Or Even Worse, Than Those
       Attributed to AXS

Defendants base much of their attack on quality incidents AXS experienced. Mem. 9–12. But the trial evidence supports Dr. Abrantes-Metz's opinion that Ticketmaster experienced comparable quality challenges. Live Nation CEO Michael Rapino conceded that Ticketmaster's technology was "ancient" and "held together with duct tape." Trial Tr. 1862:5–21; PX0521. Rapino further conceded it was "pretty common" for Mr. Yovich to write him with product problems. Trial Tr. 1862:22–25. Other witnesses corroborated these concerns:

- Edward Khoury testified that Host, Ticketmaster's core ticketing engine, was "built to sell tickets at the box office" in the 1970s and "has a lot of limitations," Trial Tr. 1617:22–1618:6, including a required nightly outage during which "you could not purchase tickets." *Id.* 1618:2–15. He confirmed that modernization was a "Ticketmaster problem, not an "industry problem," and that modernization efforts had not "come to fruition." *Id.* 1649:5–8, 1620:4–12.

- Yovich confirmed that Host was built in 1977 and remains in use. Trial Tr. 2695:2–2697:10. His email to Rapino about the Taylor Swift Eras Tour on-sale (PX0555) stated that "several areas of the system had failures," including legacy pages needing migration. Abrantes-Metz Rebuttal Rep. ¶ 46–47 & nn.130–32.

- Ticketmaster's SWOT analyses and "Voice of the Customer" reports repeatedly identified technology weaknesses, including "[l]egacy tech and products creates drag on innovation" and "[c]omplex technology." Abrantes-Metz Rebuttal ¶ 38 & n.102. Clients described Ticketmaster's technology as "old, rigid," "arcane & patched," with an "[a]ntiquated product" and "[t]ech limitations [that] were serious." *Id.* ¶¶ 41, 43 & nn.111–15.

This testimony confirms the same legacy technology remained in use since 1977, undermining the premise that Ticketmaster enjoyed a meaningful quality advantage pre-2020. Mar. 25 Trial Tr. 2694:16–2695:3. Clients reported ongoing issues both before and after 2021. PX0800 at -499, -524; PX0801; Trial Tr. 1619:24–1620:4 (Khoury); Trial Tr. 2707:10–2708:9 (Yovich).

Even Dr. Budish acknowledged Ticketmaster's quality issues. He agreed that "[b]ots … acquiring tickets at the expense of fans" evidences poor quality, that "[t]icket management tools

31

are difficult to use and unreliable" "is not evidence of good quality," and that "not meeting fan needs" on customer service "is not good." Trial Tr. 3208:1–3209:8; PX0783 at -335 ("Confusing and error-filled sales are frustrating fans and degrading our brand.").

The record shows both companies had significant quality issues, supporting Dr. Abrantes-Metz's opinion that AXS was a reasonable benchmark. Any factual disputes are for the jury. As Jay Marciano testified, ticketing quality issues are universal: "I don't think there isn't a week that goes by that there isn't somewhere, someplace that someone is having a problem with the ticketing company." Trial Tr. 1116:24-1117:10.

### iii. Any Differences In Pre-2020 AXS Quality Do Not Disqualify AXS As A Reasonable Benchmark For Dr. Abrantes-Metz's Analysis

The record shows that (1) market participants viewed AXS and Ticketmaster as comparable throughout the study period, (2) Ticketmaster suffered severe technology deficiencies during the same pre-2020 years it claims AXS was inferior, and (3) empirical data is inconsistent with quality differences explaining the pricing differential. Even assuming AXS quality was weaker in earlier years, that does not disqualify it as a benchmark. Rule 702 does not require static product characteristics; a comparator need only be sufficiently comparable to permit reliable inference. *Keurig*, 2025 WL 354671, at *34.

Moreover, including the earlier years—when Defendants contend AXS quality was weaker—results in a lower damages estimate, making Dr. Abrantes-Metz's analysis conservative. Trial Tr. 2473:12–2474:10. If quality differences had narrowed over time, the price differential should have narrowed correspondingly. Instead, retained fee differences are larger in later periods, demonstrating that alleged early-period quality differences cannot explain the observed pricing gap. Trial Tr. 2589:19–2590:8.

32

**iv.**        There Is No Basis For The Court To Reconsider Its Rule 702
               Determination That AXS Is A Reasonable Benchmark

Defendants have failed to advance any ground for revisiting the Court's prior Rule 702 ruling. Courts routinely accept benchmark analyses covering periods during which competitors evolve. *Keurig*, 2025 WL 354671, at *11; *Google Digit. Advert.*, 2025 WL 3562687, at *8–10; *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 314–19 (S.D.N.Y. 2015). To the extent AXS could not match Ticketmaster's offerings in earlier years, that situation would have been caused by Defendants' unlawful conduct impeding competitors from scaling, which is not a basis for excluding testimony. *Bigelow*, 327 U.S. at 264.

Defendants cannot find support from *In re NFL Sunday Ticket Antitrust Litigation*, 2024 WL 3628118 (C.D. Cal. Aug. 1, 2024). There, the expert's testimony was excluded because the "model [] was developed based on speculation and *ipse dixit* opinion." *Id.* at *7. Unlike here, *Sunday Ticket* did not involve a rival firm as the benchmark; the expert modeled a but-for world of professional football based on college football, without evidence that college sports would be comparable. *Id.* at *3, *6. Dr. Abrantes-Metz relies on Ticketmaster's largest in-market competitor offering the same core service, with empirical analyses demonstrating comparability. Her benchmark is grounded in real-world competitive conditions, not speculation.

Defendants' arguments reduce to the contention that AXS was a lower-quality product than Ticketmaster—the very type of factual dispute that must be resolved by the jury. *See Alves v. Affiliates Care of Putnam*, No. 16-CV-1593, 2022 WL 1002817, at *8 (S.D.N.Y. Mar. 30, 2022); *Peters*, 2019 WL 4139754 at *11; *see* page 17 & n.6, *supra*. Rule 702 does not authorize exclusion on that basis.

## CONCLUSION

For all of the reasons expressed above, the Court should deny Defendants' motion to strike the testimony of Dr. Abrantes-Metz.

Dated April 3, 2026                         Respectfully Submitted,


                                            /s/ Jeffrey L. Kessler

                                            Jeffrey L. Kessler
                                            Eva W. Cole
                                            Johanna Rae Hudgens
                                            200 Park Avenue
                                            New York, NY 10166
                                            Tel: (212) 294-6700
                                            Fax: (212) 294-4700
                                            jkessler@winston.com
                                            ewcole@winston.com
                                            jhudgens@winston.com

                                            Jeanifer E. Parsigian (*pro hac vice*)
                                            **WINSTON & STRAWN LLP**
                                            101 California Street, 21st Floor
                                            San Francisco, CA 94111
                                            Tel: (415) 591-1000
                                            Fax: (415) 591-1400
                                            jparsigian@winston.com

                                            Joshua Hafenbrack (*pro hac vice*)
                                            **WINSTON & STRAWN LLP**
                                            1901 L Street NW
                                            Washington, DC 20036
                                            Tel: (202) 282-5000
                                            Fax: (202) 282-5100
                                            jhafenbrack@winston.com

                                            *Counsel for Plaintiff State of New York*


[*additional signature pages below*]


34

/s/ Robert A. Bernheim
Robert A. Bernheim (admitted *pro hac vice*)
Office of the Arizona Attorney General
Consumer Protection & Advocacy Section
2005 N. Central Avenue
Phoenix, AZ 85004
Telephone: (602) 542-3725
Fax: (602) 542-4377
Email: Robert.Bernheim@azag.gov
*Attorney for Plaintiff State of Arizona*

/s/ Brent Nakamura
Brent Nakamura (admitted *pro hac vice)*
Supervising Deputy Attorney General
Office of the Attorney General
California Department of Justice
300 South Spring Street
Los Angeles, CA 90013
Telephone: (213) 269-6000
Email: Brent.Nakamura@doj.ca.gov
*Attorney for Plaintiff State of California*

/s/ Conor J. May
Conor J. May (admitted *pro hac vice*)
Assistant Attorney General
Antitrust Unit
Colorado Department of Law
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email: Conor.May@coag.gov
*Attorney for Plaintiff State of Colorado*

/s/ Nicole Demers
Victoria Maria Orton Field (admitted *pro hac vice*)
Assistant Attorney General
Office of the Attorney General of Connecticut
165 Capitol Avenue
Hartford, CT 06106
Telephone: 860-808-5030
Email: nicole.demers@ct.gov
*Attorney for Plaintiff State of Connecticut*
/s/ Adam Gitlin

Adam Gitlin (admitted *pro hac vice*)
Chief, Antitrust and Nonprofit Enforcement Section
Office of the Attorney General for the District of Columbia
400 6th Street NW, 10th Floor
Washington, DC 20001
Email: Adam.Gitlin@dc.gov
*Attorney for Plaintiff District of Columbia*

/s/ Lizabeth A. Brady
Lizabeth A. Brady
Director, Antitrust Division
Florida Office of the Attorney General
PL-01 The Capitol
Tallahassee, FL 32399-1050
Telephone: 850-414-3300
Email: Liz.Brady@myfloridalegal.com
*Attorney for Plaintiff State of Florida*

/s/ Richard S. Schultz
Richard S. Schultz (admitted *pro hac vice*)
Assistant Attorney General
Office of the Illinois Attorney General
Antitrust Bureau
115 S. LaSalle Street, Floor 23
Chicago, Illinois 60603
Telephone: (872) 272-0996
Email: Richard.Schultz@ilag.gov
*Attorney for Plaintiff State of Illinois*

/s/ Jesse Moore
Jesse Moore (admitted *pro hac vice*)
Deputy Attorney General
Office of the Indiana Attorney General
302 W. Washington St., Fifth Floor
Indianapolis, IN 46204
Telephone: 317-232-4956
Email: Jesse.Moore@atg.in.gov
*Attorney for Plaintiff State of Indiana*

/s/ Christopher Teters
Christopher Teters (admitted *pro hac vice*)
Assistant Attorney General
Public Protection Division
Office of Kansas Attorney General

35

120 S.W. 10th Avenue, 2nd Floor
Topeka, KS 66612-1597
Telephone: (785) 296-3751
Email: chris.teters@ag.ks.gov
*Attorney for Plaintiff State of Kansas*

/s/ Mario Guadamud
Mario Guadamud (admitted *pro hac vice*)
Louisiana Office of Attorney General
1885 North Third Street
Baton Rouge, LA 70802
Telephone: (225) 326-6400
Fax: (225) 326-6498
Email: GuadamudM@ag.louisiana.gov
*Attorney for Plaintiff State of Louisiana*

/s/ Schonette J. Walker
Schonette J. Walker (admitted *pro hac vice*)
Assistant Attorney General
Chief, Antitrust Division
200 St. Paul Place, 19th floor
Baltimore, Maryland 21202
Telephone: (410) 576-6470
Email: swalker@oag.state.md.us
*Attorney for Plaintiff State of Maryland*

/s/ Katherine W. Krems
Katherine W. Krems (admitted *pro hac vice*)
Assistant Attorney General, Antitrust Division
Office of the Massachusetts Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (617) 963-2189
Email: Katherine.Krems@mass.gov
*Attorney for Plaintiff Commonwealth of Massachusetts*

/s/ LeAnn D. Scott
LeAnn D. Scott (admitted *pro hac vice*)
Assistant Attorney General
Corporate Oversight Division
Michigan Department of Attorney General

P.O. Box 30736
Lansing, MI 48909
Telephone: (517) 335-7632
Email: ScottL21@michigan.gov
*Attorney for Plaintiff State of Michigan*

/s/ Zach Biesanz
Zach Biesanz
Senior Enforcement Counsel
Antitrust Division
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
Saint Paul, MN 55101
Telephone: (651) 757-1257
Email: zach.biesanz@ag.state.mn.us
*Attorney for Plaintiff State of Minnesota*

/s/ Lucas J. Tucker
Lucas J. Tucker (admitted *pro hac vice*)
Senior Deputy Attorney General
Office of the Nevada Attorney General
Bureau of Consumer Protection
100 N. Carson St.
Carson City, NV 89701
Email: ltucker@ag.nv.gov
*Attorney for Plaintiff State of Nevada*

/s/ Zachary Frish
Zachary A. Frish (admitted *pro hac vice*)
Assistant Attorney General
Consumer Protection & Antitrust Bureau
New Hampshire Attorney General's Office
Department of Justice
1 Granite Place South
Concord, NH 03301
Telephone: (603) 271-2150
Email: zachary.a.frish@doj.nh.gov
*Attorney for Plaintiff State of New Hampshire*

/s/ Andrew F. Esoldi
Andrew F. Esoldi
Deputy Attorney General
Division of Law
Antitrust Litigation and Competition Enforcement

36

124 Halsey Street, 5th Floor
Newark, NJ 07101
Telephone: (609) 696-5465
Email: Andrew.Esoldi@law.njoag.gov
*Attorney for Plaintiff State of New Jersey*

*/s/ Evan Crocker*
Evan Crocker (admitted *pro hac vice*)
Assistant Attorney General, Division Director
Consumer Affairs Division
New Mexico Department of Justice
201 3ʳᵈ St NW, Suite 300
Albuquerque, NM 87102
Telephone: (505) 494-8973
Email: ecrocker@nmdoj.gov
*Attorney for Plaintiff State of New Mexico*

*/s/ Jonathan H. Hatch*
Jonathan H. Hatch
Assistant Attorney General
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8598
Email: jonathan.hatch@ag.ny.gov
*Attorney for Plaintiff State of New York*

*/s/ Francisco Benzoni*
Francisco Benzoni (admitted *pro hac vice*)
Special Deputy Attorney General
Brian Rabinovitz (admitted *pro hac vice*)
Special Deputy Attorney General
North Carolina Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
Telephone: (919) 716-6000
Facsimile: (919) 716-6050
Email: fbenzoni@ncdoj.gov
Email: brabinovitz@ncdoj.gov
*Attorneys for Plaintiff State of North Carolina*

*/s/ Sarah Mader*
Sarah Mader (admitted *pro hac vice)*

Assistant Attorney General
Antitrust Section
Office of the Ohio Attorney General
30 E. Broad St., 26th Floor
Columbus, OH 43215
Telephone: (614) 466-4328
Email: Sarah.Mader@OhioAGO.gov
*Attorney for Plaintiff State of Ohio*

*/s/ Gina Ko*
Gina Ko (admitted *pro hac vice*)
Assistant Attorney General
Antitrust, False Claims, and Privacy Section
Oregon Department of Justice
100 SW Market St.,
Portland, Oregon 97201
Telephone: (971) 673-1880
Fax: (503) 378-5017
Email: Gina.Ko@doj.oregon.gov
*Attorney for Plaintiff State of Oregon*

*/s/ Joseph S. Betsko*
Joseph S. Betsko (admitted *pro hac vice*)
Assistant Chief Deputy Attorney General
Antitrust Section
Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
Telephone: (717) 787-4530
Email: jbetsko@attorneygeneral.gov
*Attorney for Plaintiff Commonwealth of Pennsylvania*

*/s/ Paul T.J. Meosky*
Paul T.J. Meosky (admitted *pro hac vice*)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400, ext. 2064
Fax: (401) 222-2995
Email: pmeosky@riag.ri.gov
*Attorney for Plaintiff State of Rhode Island*

*/s/ Jared Q. Libet*
Jared Q. Libet (admitted pro hac vice)

Assistant Deputy Attorney General
Office of the Attorney General of South Carolina
P.O. Box 11549
Columbia, South Carolina 29211
Telephone: (803) 734-5251
Email: jlibet@scag.gov
Attorney for Plaintiff State of South Carolina

/s/ Hamilton Millwee
Hamilton Millwee (admitted *pro hac vice*)
Assistant Attorney General
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 38202
Telephone: (615) 291-5922
Email: Hamilton.Millwee@ag.tn.gov
*Attorney for Plaintiff State of Tennessee*

/s/ Diamante Smith
Diamante Smith (admitted pro hac vice)
Assistant Attorney General, Antitrust Division
Office of the Attorney General of Texas
P.O. Box 12548
Austin, TX 78711-2548
Telephone: (512) 936-1162
*Attorney for Plaintiff State of Texas*

/s/ Marie W.L. Martin
Marie W.L. Martin (admitted *pro hac vice*)
Deputy Division Director,
Antitrust & Data Privacy Division
Utah Office of Attorney General
160 East 300 South, 5th Floor
P.O. Box 140830
Salt Lake City, UT 84114-0830
Telephone: 801-366-0375
Email: mwmartin@agutah.gov
*Attorney for Plaintiff State of Utah*

/s/ Sarah L. J. Aceves
Sarah L. J. Aceves (admitted *pro hac vice*)
Assistant Attorney General

Consumer Protection and Antitrust Unit
Vermont Attorney General's Office
109 State Street
Montpelier, VT 05609
Telephone: (802) 828-3170
Email: sarah.aceves@vermont.gov
*Attorney for Plaintiff State of Vermont*

/s/ David C. Smith
David C. Smith (admitted *pro hac vice*)
Assistant Attorney General
Office of the Attorney General of Virginia
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 692-0588
Facsimile: (804) 786-0122
Email: dsmith@oag.state.va.us
*Attorney for Plaintiff Commonwealth of Virginia*

/s/ Ashley A. Locke
Ashley A. Locke (admitted *pro hac vice*)
Assistant Attorney General
Antitrust Division
Washington Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
Telephone: (206) 389-2420
Email: Ashley.Locke@atg.wa.gov
*Attorney for Plaintiff State of Washington*

/s/ Douglas L. Davis
Douglas L. Davis (admitted *pro hac vice*)
Senior Assistant Attorney General
Consumer Protection and Antitrust Section
West Virginia Office of Attorney General
P.O Box 1789
Charleston, WV 25326
Telephone: (304) 558-8986
Fax: (304) 558-0184
Email: douglas.l.davis@wvago.gov
*Attorney for Plaintiff State of West Virginia*

/s/ Caitlin M. Madden
Caitlin M. Madden (admitted *pro hac vice*)
Assistant Attorney General

Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
Telephone: (608) 267-1311
Email: caitlin.madden@wisdoj.gov
*Attorney for Plaintiff State of Wisconsin*


/s/ William T. Young

William T. Young
Assistant Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
Telephone: (307) 777-7847
Email: william.young@wyo,gov
*Attorney for the Plaintiff State of Wyoming*

**CERTIFICATE OF COMPLIANCE WITH LOCAL CIVIL RULE 7.1(c)**

I hereby certify that the foregoing Memorandum of Law in Support of Plaintiffs' Opposition to Defendants' Motion to Strike the Testimony of Dr. Rosa M. Abrantes-Metz complies with the wordcount limitation in Local Civil Rule 7.1(c). According to the word processing software used to prepare this document, the memorandum contains 8,750 words, excluding the parts of the documents exempted by Local Civil Rule 7.1(c).

Dated: April 3, 2026

*/s/ Jeffrey L. Kessler*

Jeffrey L. Kessler