**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, et al., <br><br> Plaintiffs, <br><br> v. <br><br> LIVE NATION ENTERTAINMENT, INC., and TICKETMASTER L.L.C., <br><br> Defendants. | Case No. 1:24-cv-03973-AS |

**DECLARATION OF ROSA M. ABRANTES-METZ, PH.D.**

I, Rosa Abrantes-Metz, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. I am a Ph.D. economist specializing in industrial organization, finance, and econometrics. I am the Global Leader for the Digital Economy and Platform Markets and a Managing Director at Berkeley Research Group ("BRG"), a global consulting firm that provides economic, financial, and analytical advice across a range of disciplines. I have over twenty years of experience in economic consulting, including serving as an expert witness in federal and state court proceedings.

2. I submit this declaration in connection with *United States of America, et al. v. Live Nation Entertainment, Inc. and Ticketmaster L.L.C.*, Case No. 1:24-cv-03973 (S.D.N.Y.), in support of Plaintiffs' response to Defendants' motion seeking to strike my testimony and alleging that I made false statements under oath. The purpose of this declaration is to explain how I understood the questions that were asked at trial and why I answered them the way I did, and where I may have misspoken or been unclear. Since I did not always have an opportunity to

explain during my testimony at trial in front of the jury, I am now clarifying the factual bases for my prior sworn testimony and expert reports. I apologize for any confusion my answers may have caused for the Court or for the jury, which was certainly not my intent.

3. I previously submitted an Expert Report dated August 15, 2025 ("Opening Report"), and a Rebuttal Expert Report dated October 9, 2025 ("Rebuttal Report"), in the above-captioned action. I have also provided sworn deposition testimony in this case. The opinions expressed in my Opening and Rebuttal Reports and testimony reflect my independent professional judgment and were offered to a reasonable degree of economic certainty.

4. Nothing in this declaration alters, supplements, or contradicts the opinions set forth in my Opening and Rebuttal Reports. Rather, this declaration is intended to address issues raised by Defendants in their motion to strike my testimony.

## I. MY TESTIMONY AT TRIAL

5. On March 24 and 25, 2026, I testified at trial in this case. I have reviewed the transcript of my live testimony,[1] including the portions that Defendants have raised in their motion to strike my testimony.[2] I answered the questions from Defendants as I understood them, but I can see from the transcript that my answers could have caused confusion with respect to how I used the phrase "retained amount," and separately, how the information provided by Defendants was used to calculate what I define as "retained amount" in my analyses and opinions.

---

[1] Testimony of Dr. Rosa M. Abrantes-Metz, *United States of America, et al., v. Live Nation Entertainment, Inc. and Ticketmaster L.L.C.*, Case No. 24 CV 3973 (AS), March 24, 2026, and March 25, 2026 ("Abrantes-Metz Trial Testimony").

[2] Defendants' Memorandum of Law in Support of Their Motion to Strike the Testimony of Dr. Rosa M. Abrantes-Metz, *United States of America, et al., v. Live Nation Entertainment, Inc. and Ticketmaster L.L.C.*, Case No. 1:24-cv-03973-(AS), March 30, 2026.

6. Throughout my Opening and Rebuttal Reports, and during my testimony at trial, I have been consistent that the term "retained amount," as I use it, refers to the portion of the ticket price charged to the fan that Ticketmaster keeps.[3] This is the marginal per-ticket *price* Ticketmaster charges venues for primary ticketing services.[4] Ticketmaster has data that were used to calculate this price. I understand Ticketmaster has used some of that same data to answer other questions about venue-ticketer profitability that are not relevant to my assignment, and that Ticketmaster may refer to those calculations as amounts "retained" when doing so. But

---

[3] Expert Report of Rosa Abrantes-Metz, Ph.D., *United States of America, et al., v. Live Nation Entertainment, Inc. and Ticketmaster L.L.C.*, Case No. 1:24-cv-03973, August 15, 2025 ("Abrantes-Metz Opening Report"), ¶ 94 ("As noted above, I refer to the ticketer 'retained amount' (or 'ticketer charges') as the portion of these fees that is retained by the ticketer, net of rebates to venues (discussed below)."); ¶ 96 ("The sum of these different provisions (e.g., per ticket amount, per order amount, payment processing, split cap) forms the ticketer retained amount."); ¶ 109 ("I define the *retained amount* as the proceeds kept by the ticketing provider on a dollar-per-ticket basis, net of the proceeds designated to cover credit card processing expenses.") (emphasis in original); ¶ 115 ("The retained amounts reflect the dollar amount that Ticketmaster and AXS kept pursuant to their contractual arrangements with venues, net of the fees designated for payment processing."); and footnote 141 ("I refer to the ticketer 'retained amount' (or 'ticketer charges') as the portion of these fees that is retained by the ticketer, net of rebates to venues (discussed below).");

Rebuttal Expert Report of Rosa Abrantes-Metz, Ph.D., *United States of America, et al., v. Live Nation Entertainment, Inc. and Ticketmaster L.L.C.*, Case No. 1:24-cv-03973, October 9, 2025 ("Abrantes-Metz Rebuttal Report"), ¶ 108 ("The retained amount I analyze in my Opening Report is essentially the per-ticket price charged by Ticketmaster. It is not, nor was it intended to be, the net per-ticket profit retained by Ticketmaster. To arrive at that, one would of course deduct all manner of expenses—not just upfront payments as Dr. Budish and Mr. Meyer propose to do, but also employee salaries, rent, and all other operating expenses. That net profit number will—necessarily—be even lower than the 'upfront-payment adjusted' retained amount calculation. As a logical matter, it could even be negative. But it is not economically relevant."); and

Abrantes-Metz Trial Transcript, March 24, 2026, 2450:21-2451:6 ("Q. I put a chart you created on the screen. Could you please walk us through what this shows? A. I will explain this slide in more detail a little bit later, but for now, I would just like to ask the jurors to focus on the top, the red part of this bar. So this bar represents the total price paid by the consumer on average for an event ticketed by Ticketmaster, and it says it is $120. My analysis, the first step of my analysis, focuses on the red part of this bar, the $7. That's the Ticketmaster retained fees. That's the price that Ticketmaster charges for its ticketing services.").

[4] Abrantes-Metz Opening Report, ¶ 97 ("[…] Ticketmaster's retained amounts function like taxes. They are marginal costs imposed on the supplier (the venue), which the supplier then seeks to recover by increasing the price charged to consumers—and, as discussed above, can reasonably expect to recover, at least in part, based on the elasticity of consumer demand with respect to price. This mirrors the behavior of suppliers in traditional tax models, where a per-unit tax leads to higher consumer prices and lower net revenue for the supplier. As a result, consumers bear part of the cost, while suppliers absorb the rest."); and

Abrantes-Metz Rebuttal Report, ¶ 109 ("[…] The relevant economic question is the extent to which Ticketmaster's price charged to the venue marginally impacts the ticket *price* charged to fans. […].") (emphasis in original).

whatever Ticketmaster calls those calculations, I have never understood Ticketmaster to be using the term "retained amount" as I use it.

7. All of my answers during my cross and redirect examinations at trial were intended to be consistent with how I testified previously, which is that I defined retained amount as the part of the total price paid by the fan that Ticketmaster kept, and that, in order to calculate such price, I used data provided by Defendants and followed their instructions on how to calculate this price.[5] I never meant to suggest that by using the term "retained amount," I was merely taking a calculation that Live Nation uses internally and applying it here. That is not what I meant, and that is not what I did. I hope to take this opportunity to clear up any confusion regarding either the source of the phrase "retained amount" or the basis of its calculation, and dispel any suggestion that any portion of my testimony was fabricated or given in bad faith.

8. Perjury is a serious charge, and one that I take very seriously. I hold myself to the highest ethical standards in doing this work, and I would never lie or fabricate anything to support my analyses. It is not how I live my life, and I would not risk ruining a reputation I have worked hard to build over the last 25 years. Above all, lying in a court of law would be anathema to my own personal code of ethics.

---

[5] Videotaped deposition of Rosa M. Abrantes-Metz, Ph.D., *United States of America, et al., v. Live Nation Entertainment, Inc. and Ticketmaster L.L.C.*, Case No. 1:24-cv-03973 (AS) (SLC), October 31, 2025 ("Abrantes-Metz Deposition"), 177:13-178:23 ("Q. You say, 'I define the retained amount as the proceeds kept by the ticketing provider on a dollar-per-ticket basis, net of the proceeds designated to cover credit card processing expenses.' Right? A. Yes. Q. And you're defining that as a -- as what you call a retained amount, right? A. Yes. It is effectively the price charged by Ticketmaster to the venues. Q. Mm-hmm. So there's no – there's no footnotes in that paragraph, are there? A. No. There's a lot of footnotes in many others. I don't see a footnote here. Yeah. There's no citation to any evidence or economic authority for the definition of a retained amount, right? A. No. I am calling it retained amount. I could have called it the price. I could have called it anything I wanted, for that matter. But what matters is the definition. And the definition is that it contains the proceeds kept by the ticketing provider on a dollar-per-ticket basis, net of proceeds designated to cover credit card processing expenses.") and 180:15-20 ("Q. And, basically, you intend this as a proxy for price, even though you call it 'retained amount,' right? A. Yes. This is the price that Ticketmaster charges for its services, to the venues.").

9. At my deposition and at trial, I was asked whether my retained amount definition required citation to economic authority or to Ticketmaster documents.[6] I answered no and explained that I could have used any label for the relevant price.[7] What I meant by this was that the specific label I used for this price did not matter – only that I studied Ticketmaster's marginal per-ticket price.[8] To be clear: some Ticketmaster documents use similar terms, and Live Nation's data instructions were the basis for implementing the calculation. My statements about the label were not meant to imply otherwise.

---

[6] Abrantes-Metz Deposition, 178:9-23 ("Q. Yeah. There's no citation to any evidence or economic authority for the definition of a retained amount, right? A. No. I am calling it retained amount. I could have called it the price. I could have called it anything I wanted, for that matter. But what matters is the definition. And the definition is that it contains the proceeds kept by the ticketing provider on a dollar-per-ticket basis, net of proceeds designated to cover credit card processing expenses"); and

Abrantes-Metz Trial Transcript, March 24, 2026, 2514:4-15 ("Q. And when you described the retained amount in your report, including your rebuttal report, you also didn't cite to any economic treatise or other authority in support of that definition, did you? Yes or no? A. Of which definition? Q. Your definition of retained amount. A. It is not my definition of retained amount, but as an economist, I didn't think I need to cite to an authority to define a price, so I guess the answer probably is not. Q. And it's your position that you could have as easily called your retained amounts anything you wanted, right? A. Right. That doesn't change the economic meaning.").

[7] Abrantes-Metz Deposition, 177:3-181:19 ("[…] Q. And you're defining that as a -- as what you call a retained amount, right? A. Yes. It is effectively the price charged by Ticketmaster to the venues. […] Q. Yeah. There's no citation to any evidence or economic authority for the definition of a retained amount, right? A. No. I am calling it retained amount. I could have called it the price. I could have called it anything I wanted, for that matter. But what matters is the definition. And the definition is that it contains the proceeds kept by the ticketing provider on a dollar-per-ticket basis, net of proceeds designated to cover credit card processing expenses. […] A. I don't recall. But, again, what's called doesn't make a difference. What makes a difference is what it means and the definition that I associate with the name chosen. Q. And, basically, you intend this as a proxy for price, even though you call it 'retained amount,' right? A. Yes. This is the price that Ticketmaster charges for its services, to the venues. […]"); and

Abrantes-Metz Trial Transcript, March 24, 2026, 2513:8-14 ("Q. You actually did not refer when you did that in your report or even in your rebuttal report to any Ticketmaster documents, did you? A. I can't recall, but the meaning of the word would not change. I could have called it apples or oranges. It would still be the price charged by Ticketmaster for its ticketing services.").

[8] Abrantes-Metz Deposition, 178:9-23 ("Q. Yeah. There's no citation to any evidence or economic authority for the definition of a retained amount, right? A. No. I am calling it retained amount. I could have called it the price. I could have called it anything I wanted, for that matter. But what matters is the definition. And the definition is that it contains the proceeds kept by the ticketing provider on a dollar-per-ticket basis, net of proceeds designated to cover credit card processing expenses"); and

Abrantes-Metz Trial Transcript, March 24, 2026, 2513:8-14 ("Q. You actually did not refer when you did that in your report or even in your rebuttal report to any Ticketmaster documents, did you? A. I can't recall, but the meaning of the word would not change. I could have called it apples or oranges. It would still be the price charged by Ticketmaster for its ticketing services.").

10. Language similar to the term "retained amount," including terms such as "TM Retain," appears in Ticketmaster's own ordinary course documents, including DX-0553, which was shown to me during my cross-examination.[9] But in the materials I have relied on in this case, Live Nation and Ticketmaster do not refer to the measure of price I am studying as a "retained amount," and I have never intended to suggest otherwise.

11. Separately, as I explain further below, the calculation of what I call the "retained amount" relied on guidance from Live Nation, which identified and defined the data fields and general ledger accounts corresponding to the relevant fee, contra-revenue, and variable royalty payment components.[10] Live Nation's guidance also implies that they use the phrase "amount retained" to refer to a measure of profitability to Ticketmaster from its relationships with venues, and that the available data were not sufficient to construct that measure.[11] However, I

---

[9] *See, e.g.,* DX-0553, at DX-0553.0002 ("TM Retain (GM)").

I note that this document does not use the phrase in the same way I do; instead, it uses it to refer to a "gross margin" concept, which nets out, among other things, sponsorship fees, a signing bonus, and Live Nation marketing expenses. *See* Abrantes-Metz Trial Transcript, March 25, 2026, 2575:25-2577:1 ("Q. Why don't we turn back, if we could, to a document that we looked at yesterday, which was Tab 8, DX 553. This, you'll recall, was one of those deal analysis documents that we looked at, this one for the Miami Heat? A. Yes. Q. If we go back, let's start at page 2, and you'll see again, that that has the ultimate gross margin of $2.33 there, right? A. Yes. Would it be possible to point me to the document in the binder? Q. Oh, yes. It's Tab 8. A. Thank you. Q. Just let me know when you're there. A. I am. Q. You see there, on page 2 of that document, the $2.33 figure that we looked at yesterday? A. Yes. Q. In the left hand side of that, I guess, section of the document, it says, "TM Retain GM." Do you see that? A. Yes. Q. Is that perhaps what you were referring to yesterday when you said you thought you had seen in Ticketmaster documents something about retained amount? A. It's one of them, but I — actually, it's not exactly the same document. It's a different document.").

[10] Abrantes-Metz Opening Report, footnote 333 ("Letter from Kelly S. Fayne to Jennifer Roualet, Re: Plaintiffs' Requests for Production for Data in *United States, et al. v. Live Nation, et al.* (1:24-cv-3973), June 27, 2025, at pp. 5-6.").

[11] Letter from Kelly S. Fayne (Latham & Watkins LLP) to Jennifer Roualet (U.S. Department of Justice), June 27, 2025, p. 5 ("[…] LNE-LIT24-DAT-000078 contains information sufficient to identify inside fees, outside fees, and ticket face value. However, LNELIT24-DAT-000078 does not contain a field, nor a combination of fields, that identifies the amount retained by Ticketmaster within each fee type. In particular, not all payments Ticketmaster makes to its partners are captured in this dataset, such as payments to credit card companies and fixed royalty payments to its venue clients. […].").

was not interested in that or any other measure of profitability, and the data were sufficient to construct the measure of price I was interested in studying.

12. I must therefore distinguish the following things. There is the question of the *economic concept* being studied, which may either be the marginal price collected by Ticketmaster on the sale of a ticket or a measure of the quasi-profitability earned by Ticketmaster on the sale of a ticket. There is the question of what *label* to attach to that concept being studied. And finally, there is the question of how that concept being studied is *calculated* using the available data.

13. To the first question, the economic concept I have always studied is the marginal price collected by Ticketmaster, i.e., the portion of the ticket price paid by customers that is allocated to (or "retained by") Ticketmaster. To the second question, I have consistently used the phrase "retained amount" to describe that object. This has apparently caused some confusion because Ticketmaster sometimes uses similar phrases to refer to different economic objects, measures of quasi-profitability. To the third and final question, I have relied on the guidance and technical definitions provided by Live Nation on how to calculate the marginal price I have studied.

14. Questions about my use of "retained amount" might refer to any of the following things, at least. They might refer to (i) the economic object and whether that is also used by Ticketmaster, or (ii) the phrase itself and whether that is also used by Ticketmaster, or (iii) whether the phrase is used by Ticketmaster to refer to that same economic object, or (iv) the supporting basis of the calculation and whether that is consistent with Ticketmaster's guidance and definitions.

15. To a seemingly straightforward question such as, "Does Ticketmaster use retained amount in any ordinary course document you relied upon?" the truthful answer would be "yes" if I

thought the context was in terms of phrases such as "retained amount" or "amount retained,"
or it could be "no" if I though the context was in terms of the marginal pricing concept I have
studied.

16. I reviewed my trial testimony, where I testified as follows:

> Q. You're quantifying how much of a hypothetical extra dollar of what you call "retained amounts" gets paid by ticket buyers as opposed to by venues, right?
>
> A. Let me clarify. I do not call retained amount. Live Nation itself calls those retained fees retained amounts. And after I clarify that, could you kindly repeat your question?
>
> …
>
> Q. Did I understand you correctly earlier to understand that you don't use the term retained amounts, Doctor, or did I misunderstand you?
>
> A. I think you misunderstood. I do not call it myself retained amount. I call it retained amount because it was called retained amount by Live Nation.[12]

17. When I was asked these questions, I understood counsel to be asking whether I had invented
the phrase "retained amount," and wanted to clarify that this phrase (or equivalent phrases) is
used by Ticketmaster. I believed that referring to the portion of the ticket price paid by fans
and retained by Ticketmaster as their "retained amount" was innocuous and properly
descriptive of what I was studying.[13] I had already explained during my direct testimony that
this is what I meant by the phrase "retained amount."[14] However, I can see how these answers

---

[12] Abrantes-Metz Trial Transcript, March 24, 2026, 2498:4-13 and 2498:19-24.

[13] Abrantes-Metz Trial Transcript, March 24, 2026, 2450:21-2451:6 ("Q. I put a chart you created on the screen. Could you please walk us through what this shows? A. I will explain this slide in more detail a little bit later, but for now, I would just like to ask the jurors to focus on the top, the red part of this bar.  So this bar represents the total price paid by the consumer on average for an event ticketed by Ticketmaster, and it says it is $120. My analysis, the first step of my analysis, focuses on the red part of this bar, the $7.  That's the Ticketmaster retained fees.  That's the price that Ticketmaster charges for its ticketing services.").

[14] Abrantes-Metz Trial Transcript, March 24, 2026, 2450:6-9 ("A. […] So I may mention these retained fees. Sometimes they show up under different names, but these retained fees are the effective price that Ticketmaster charges to venues."); 2451:3-6 ("[…] My analysis, the first step of my analysis, focuses on the red part of this bar,

could be misunderstood as suggesting that Ticketmaster used the phrase "retained amount" as I defined it.

18. I was then asked the following:

Q. My question is, in your reports, including your rebuttal report, you did not cite to a single Ticketmaster document or any Ticketmaster testimony to support your definition of what you call a retained amount, did you? Yes or no?

A. My back-up, no. My back-up documents followed by the instructions provided by Live Nation on how to calculate retained amounts, and those are part of my back-up documents that I used to calculate retained amounts.[15]

19. In my response, I tried to explain that I did not cite to a Ticketmaster document or authority to support using the phrase "retained amount" to describe the price concept I was studying, but that I did rely on Ticketmaster documents to support the details of the calculation of that price concept. There is no document I relied on that uses that exact term as I define it, however my backup materials include documents from Live Nation/Ticketmaster, namely Ticketmaster data sets, informed by correspondence from Live Nation that I cited in my Opening and Rebuttal Reports, that I have used to "support" how I defined "retained amount," in the economic sense of relying upon them for empirical analysis.

---

the $7. That's the Ticketmaster retained fees. That's the price that Ticketmaster charges for its ticketing services."); 2459:8-16 ("A. When I compare Ticketmaster to AXS, I use a regression model. For example, when I study their retained fees or the price of their services, I control for the events -- differences in the events between those that are ticketed by Ticketmaster versus those that are ticketed by AXS, because I do not want to wrongly attribute differences in the fees between Ticketmaster and AXS to the conduct when they actually because there are different artists and different venues and different other things."); and 2481:21-2482:6 ("Q. Could you also explain Ticketmaster retained fees and venue retained fees, please? A. Sure. These are fees called convenience or service and processing fees. And these are divided up between Ticketmaster and the venues. In gray is the venue average take of that, represented as $12, and in red is the part that is retained by Ticketmaster, $7. So that is the price that Ticketmaster charges for its services to the venues, $7, on average. And I just want to clarify, to avoid any confusion later, these are rounded numbers.").

[15] Abrantes-Metz Trial Transcript, March 24, 2026, 2513:16-24.

20. I understand that the Court struck the last sentence above as being unresponsive to the question counsel asked. I do not question the Court's ruling because I can see how my answer could suggest that I was relying on Defendants' definition of the phrase "retained amount." That was not my intention, and not the impression I want to leave with the jury.

21. I later testified:

> Q. OK.  Now, you also can't identify any Ticketmaster document that says your definition of retained amount, the one that you have used in this case, is a proper metric for measuring anything, can you, Doctor?
>
> A. I'm an economist, a trained economist, and I can calculate the price of a service. That is how it's calculated, and I followed Live Nation's documents.[16]

22. My answer was meant to convey two things. First, as an economist, I determined the appropriate economic concept to study – the marginal per-ticket *price*. Second, I relied on documents from Ticketmaster and Live Nation to calculate that price. I can see that this answer could be misunderstood to suggest that I, on my own judgment, determined which data fields to use in the calculation. I did not.

23. Finally, during my redirect examination, I was directed to paragraph 109 of my Opening Report to refresh my recollection on this subject, which states:

> […]  I define the *retained amount* as the proceeds kept by the ticketing provider on a dollar-per-ticket basis, net of the proceeds designated to cover credit card processing expenses. By netting out the portion designated to cover credit card processing expenses, I assume that those proceeds are, on average, equal to the actual payment processing expenses.[17]

---

[16] Abrantes-Metz Trial Transcript, March 24, 2026, 2515:16-22.

[17] Abrantes-Metz Opening Report, ¶ 109 ("To test whether Ticketmaster imposes higher charges on venues than competitors, I compare the amount that Ticketmaster retains for ticketing services to the amounts retained its closest full-service ticketing competitor, AXS. Formally, the ticketer collects all ticket proceeds from fans. It remits some of those proceeds to the venue, which in turn will remit some of those proceeds to artists/promoters. Some portion of ticket proceeds collected from fans is therefore retained by the ticketer. I define the *retained amount* as the proceeds

24. I then testified as follows:

> Q.  Dr. Abrantes-Metz, could you please explain to the jury what the retained amount is for the purposes of your analysis?
>
> A.  The retained amount calculation follows the instructions provided by Ticketmaster and Live Nation in their answers to questions from plaintiffs on how to calculate these retained amounts. In that letter, it was explained by Live Nation that the amount retained by Ticketmaster is composed of certain fees, part of the convenience fees, and it explains how the fees are calculated, it addresses issues related to different kinds of fees, such as inside or outside fees, et cetera. And so that's how this allocation gets done. Typically, it's a part of the convenience fee that gets divided up between venues.[18]

25. I understood that Plaintiffs' counsel was asking about the origins of the retained amount calculation as *I* had defined it for purposes of *my* analysis that I provided in my Opening Report at paragraph 109. I did not mean to convey the impression that I was following instructions from Ticketmaster on how to define the retained amount the way *Defendants* used the term.

26. When I testified that my calculation "follows the instructions provided by Ticketmaster and Live Nation,"[19] I was referring to the field-level implementation guidance they provided to me on how to interpret the data. Similarly, when I testified about the use of retained amounts

---

kept by the ticketing provider on a dollar-per-ticket basis, net of the proceeds designated to cover credit card processing expenses. By netting out the portion designated to cover credit card processing expenses, I assume that those proceeds are, on average, equal to the actual payment processing expenses.") (emphasis in original).

[18] Abrantes-Metz Trial Transcript, March 25, 2026, 2593:11-23. I note that I was not allowed to finish my answer, which would have continued "divided up between venues *and Ticketmaster*."

[19] Abrantes-Metz Trial Transcript, March 25, 2026, 2593:11-23 ("Q. Dr. Abrantes-Metz, could you please explain to the jury what the retained amount is for the purposes of your analysis? A. The retained amount calculation follows the instructions provided by Ticketmaster and Live Nation in their answers to questions from plaintiffs on how to calculate these retained amounts. In that letter, it was explained by Live Nation that the amount retained by Ticketmaster is composed of certain fees, part of the convenience fees, and it explains how the fees are calculated, it addresses issues related to different kinds of fees, such as inside or outside fees, et cetera. And so that's how this allocation gets done. Typically, it's a part of the convenience fee that gets divided up between venues.").

for AXS and said that "I used the definition from Live Nation cited in my report,"[20] I mean that the same calculation was applied using the AXS data fields. I did not mean to suggest either that Ticketmaster endorsed my economic concept of "retained amount" as a measure of price, or that I was using the different economic concept which Ticketmaster labeled a "retained amount" as the basis for my analysis.

27. Having reviewed the testimony, however, I can see that my answer could be misunderstood to suggest that I used Live Nation's instruction for how to analyze what *they* refer to as "retained amount," which I did not do, instead of using their definitions of data fields to analyze what *I* refer to as "retained amount," which I did do.

28. In sum: (i) it was my own expert judgment to study the per-ticket price charged by Ticketmaster for its ticketing services, which is the portion of the ticket price paid by fans that is allocated to (or retained by) Ticketmaster; (ii) I relied on Live Nation's data field guidance, provided in their letters, in forming and implementing that calculation; (iii) I adopted the phrase "retained amount" to describe the portion of the ticket price paid by fans that is allocated to (or retained by) Ticketmaster; (iv) phrases similar to "retained amount" are found in Ticketmaster documents; however (v) my use of the phrase "retained amount" differs from how Ticketmaster may use that same (or an equivalent) phrase. To the extent my testimony was imprecise in communicating these distinctions, or that I did not have the opportunity to clarify

---

[20] Abrantes-Metz Trial Transcript, March 24, 2026, 2519:11-2520:1 ("Q. Doctor, you would also agree that AXS doesn't refer to the concept of retained amounts in its normal course of business documents, does it? A. I don't recall. Q. OK. And you've been following the evidence in this case. You haven't heard any AXS witness testify to retained amounts in the way you've defined that in this case, have you? A. They have called them retained fees. Q. And you think that's using the same definition of retained amounts that you are using, Doctor? A. I used the definition from Live Nation cited in my report.").

them during my testimony, I sincerely regret the confusion. I did not mean to give any incorrect impression or mislead in any way.

## II. MY RETAINED AMOUNT DEFINITION AND CALCULATION

29. As I explained in my deposition and testified at trial, as a matter of *economics*, I needed to identify the portion of the **ticket price** paid by the fans that Ticketmaster retains.[21] I labeled this the "retained amount," which is the per-ticket price of ticketing services that Ticketmaster receives.[22]

30. As a matter of *procedure*, the calculation for this amount was guided by the answers in Live Nation's data letters detailed in paragraph 215 of my Opening Report, and related footnotes

---

[21] *See, e.g.,* Abrantes-Metz Deposition, 177:3-181:19 ("[…] Q. And you're defining that as a -- as what you call a retained amount, right? A. Yes. It is effectively the price charged by Ticketmaster to the venues. […] Q. Yeah. There's no citation to any evidence or economic authority for the definition of a retained amount, right? A. No. I am calling it retained amount. I could have called it the price. I could have called it anything I wanted, for that matter. But what matters is the definition. And the definition is that it contains the proceeds kept by the ticketing provider on a dollar-per-ticket basis, net of proceeds designated to cover credit card processing expenses. […] A. I don't recall. But, again, what's called doesn't make a difference. What makes a difference is what it means and the definition that I associate with the name chosen. Q. And, basically, you intend this as a proxy for price, even though you call it 'retained amount,' right? A. Yes. This is the price that Ticketmaster charges for its services, to the venues. […]").

Abrantes-Metz Trial Transcript, March 24, 2026, 2513:8-14 ("Q. You actually did not refer when you did that in your report or even in your rebuttal report to any Ticketmaster documents, did you? A. I can't recall, but the meaning of the word would not change. I could have called it apples or oranges. It would still be the price charged by Ticketmaster for its ticketing services.").

Abrantes-Metz Trial Transcript, March 25, 2026, 2575:5-10 ("Q. I guess that's fair. That kind of anticipates my next question. You didn't analyze what fees charged to fans would look like if venues didn't get significant upfront payments, did you? A. No, because I studied price, not profitability") and 2608:15-18 ("Q. And if from a ticketing company's perspective the marginal unit is the next contract that it gets, then you haven't studied what the marginal price for that is, have you? A. Correct. I studied the price per ticket.").

[22] Abrantes-Metz Opening Report, ¶ 94 ("As noted above, I refer to the ticketer 'retained amount' (or 'ticketer charges') as the portion of these fees that is retained by the ticketer, net of rebates to venues (discussed below)."); ¶ 96 ("The sum of these different provisions (e.g., per ticket amount, per order amount, payment processing, split cap) forms the ticketer retained amount."); ¶ 109 ("I define the *retained amount* as the proceeds kept by the ticketing provider on a dollar-per-ticket basis, net of the proceeds designated to cover credit card processing expenses."); ¶ 115 ("The retained amounts reflect the dollar amount that Ticketmaster and AXS kept pursuant to their contractual arrangements with venues, net of the fees designated for payment processing."); and footnote 141 ("I refer to the ticketer 'retained amount' (or 'ticketer charges') as the portion of these fees that is retained by the ticketer, net of rebates to venues (discussed below).").

329-333,[23] which is why I stated that I "follow[ed] the instructions" from Ticketmaster and Live Nation on how to calculate the retained amount.[24]

31. In particular, on June 27, 2025, Plaintiffs received a letter on behalf of Live Nation and Ticketmaster to "assist Plaintiffs in their review of Live Nation's productions,"[25] cited in footnote 333 of my Opening Report. The information provided "reflect[ed] Live Nation's understanding of the datafiles as of [that] date."[26] Among the questions posed by Plaintiffs was the following:

"For LNE-LIT24-DAT-000080 [supersedes DAT-000026]:

---

[23] Abrantes-Metz Opening Report, ¶ 215 ("I understand that, for Ticketmaster, Dr. Hill 'restrict[s] the web channel to ticket sales recorded in LNE-LIT24-DAT-000078.' This dataset, produced by Live Nation, contains Ticketmaster's '[p]rimary ticketing data for events held at particular venues, with the venue city and state identified' from 2015 to 2024. The information in LNE-LIT24-DAT-000078 is 'recorded as of the event date,' and 'contains revenues and costs at the event-level for events for which Ticketmaster was the ticketer.' Furthermore, LNE-LIT24-DAT-000078 'contains information about all fee-bearing tickets, with the exception of season tickets,' and 'contains a greater level of detail regarding the financial components of ticket revenue.' According to Live Nation, LNE-LIT24-DAT-000078 'contains information sufficient to identify inside fees, outside fees, and ticket face value.'") (citations omitted).

*See also*, Expert Report of Nicholas Hill, PhD, *United States of America, et al., v. Live Nation Entertainment, Inc. and Ticketmaster L.L.C.*, Case No. 1:24-cv-03973, August 1, 2025 ("Hill Opening Report"), ¶ 471 ("For Ticketmaster, AXS, SeatGeek, and Paciolan, I also have data about the channels through which tickets are sold. When possible, I use this data to differentiate tickets sold (and any associated face value and fees) through the web channel, season tickets, and tickets sold through all other distribution channels such as the box office or Ticketmaster affiliate and channel partners." (citations omitted)) and footnote 1031 ("For Ticketmaster, I restrict the web channel to ticket sales recorded in LNE-LIT24-DAT-000078, which includes all sales through Ticketmaster's Host ticketing platform. See Ltr. from K. Fayne to J. Roualet, 28 July 2025.").

[24] Abrantes-Metz Trial Transcript, March 25, 2026, 2593:11-23 ("Q. Dr. Abrantes-Metz, could you please explain to the jury what the retained amount is for the purposes of your analysis? A. The retained amount calculation follows the instructions provided by Ticketmaster and Live Nation in their answers to questions from plaintiffs on how to calculate these retained amounts. In that letter, it was explained by Live Nation that the amount retained by Ticketmaster is composed of certain fees, part of the convenience fees, and it explains how the fees are calculated, it addresses issues related to different kinds of fees, such as inside or outside fees, et cetera. And so that's how this allocation gets done. Typically, it's a part of the convenience fee that gets divided up between venues.").

[25] Letter from Kelly S. Fayne (Latham & Watkins LLP) to Jennifer Roualet (U.S. Department of Justice), June 27, 2025, p. 1.

[26] Letter from Kelly S. Fayne (Latham & Watkins LLP) to Jennifer Roualet (U.S. Department of Justice), June 27, 2025, p. 1.

14

Please explain how to identify the total outside fees (i.e., fees charged in addition to the ticket face value), total inside fees and total face-value charged to the fan and whether a field or combination of fields identifies the amount of each type of fee retained by Ticketmaster."[27]

32. Defendants' response was as follows:

"Live Nation does not use LNE-LIT24-DAT-000080 to identify fees or the payments Ticketmaster makes to its partners in the ordinary course. LNE-LIT24-DAT-000078 contains information sufficient to identify inside fees, outside fees, and ticket face value. However, LNE-LIT24-DAT-000078 does not contain a field, nor a combination of fields, that identifies the **amount retained** by Ticketmaster within each fee type. In particular, not all payments Ticketmaster makes to its partners are captured in this dataset, such as payments to credit card companies and fixed royalty payments to its venue clients. Below, Live Nation lists the fields in LNE-LIT24-DAT-000078 that record (1) revenue earned by Ticketmaster, separated by outside fees, facility fees, inside fees, and face value; and (2) contra-revenue and royalty payments from the inside and outside fees that Ticketmaster makes to its partners."[28]

---

[27] Letter from Kelly S. Fayne (Latham & Watkins LLP) to Jennifer Roualet (U.S. Department of Justice), June 27, 2025, p. 5.

[28] Letter from Kelly S. Fayne (Latham & Watkins LLP) to Jennifer Roualet (U.S. Department of Justice), June 27, 2025, pp. 5-6 (emphasis added).

33. Defendants' response established that the data file LNE-LIT24-DAT-000078 "contains information sufficient to identify inside fees, outside fees, and ticket face value."[29] Moreover, Defendants "list[ed] the fields" in the data file LNE-LIT24-DAT-000078 "that record (1) revenue earned by Ticketmaster," and "(2) the contra-revenue and royalty payments […] that Ticketmaster makes to its partners."[30]

34. In addition, the response established two limitations to the data, both of which I considered in forming my opinions:

   a. *First*, the data in LNE-LIT24-DAT-000078 are not sufficient to determine "the amount retained by Ticketmaster ***within each fee type***" (emphasis added).[31] However, this limitation is of no consequence, as I made no attempt to identify retained amounts *within each fee type* and never claimed to have done so.

   b. *Second*, the data in LNE-LIT24-DAT-000078 do not include "payments to credit card companies and ***fixed*** royalty payments to its venue clients" (emphasis added).[32] This limitation is of minimal consequence because, as I will again explain below, the fixed royalty payments (such as upfront payments) are irrelevant to the economic object of interest in my analyses (i.e., the portion of the ticket price paid

---

[29] Letter from Kelly S. Fayne (Latham & Watkins LLP) to Jennifer Roualet (U.S. Department of Justice), June 27, 2025, p. 5.

[30] Letter from Kelly S. Fayne (Latham & Watkins LLP) to Jennifer Roualet (U.S. Department of Justice), June 27, 2025, p. 5.

[31] Letter from Kelly S. Fayne (Latham & Watkins LLP) to Jennifer Roualet (U.S. Department of Justice), June 27, 2025, p. 5 ("However, LNE-LIT24-DAT-000078 does not contain a field, nor a combination of fields, that identifies the amount retained by Ticketmaster within each fee type.").

[32] Letter from Kelly S. Fayne (Latham & Watkins LLP) to Jennifer Roualet (U.S. Department of Justice), June 27, 2025, p. 5 ("In particular, not all payments Ticketmaster makes to its partners are captured in this dataset, such as payments to credit card companies and fixed royalty payments to its venue clients.").

by fans that Ticketmaster retains). And while knowing the actual payments to credit card companies would have been ideal, I approximated that by using the amount allocated to pay credit card companies.

35. In the end, the calculation of retained amount that I use (i.e., the portion of the ticket price paid by fans and retained by Ticketmaster) is simply "(1) revenue earned by Ticketmaster" (calculated per Live Nation's instructions),[33] minus "(2) contra-revenue and royalty payments […] that Ticketmaster makes to its partners" (calculated per Live Nation's instructions),[34] minus (3) amounts associated with credit card processing payments (identified per general ledger codes).

36. The dispute here appears to be one of semantics. By that I mean, if I had simply adopted a different phraseology, such as "ticketer fees" instead of "retained amount," I think these arguments would have largely been avoided. Defendants imply in their letter that they use the

---

[33] Letter from Kelly S. Fayne (Latham & Watkins LLP) to Jennifer Roualet (U.S. Department of Justice), June 27, 2025, pp. 5-6 ("Below, Live Nation lists the fields in LNE-LIT24DAT-000078 that record (1) revenue earned by Ticketmaster, separated by outside fees, facility fees, inside fees, and face value […] • Outside fees (excluding the facility fee): sum {400000, 400010, 400015, 400095, 405000, 405010, 405020, 405030, 405040, 405046, 405050, 405060} • Facility fee (considered an outside fee): 'glalias_id_contract_management = 205100-Client Liab FV FF' when 'zuonr_fvff_id = FVFF-ZP02.' • Inside fees: sum {400040, 400045, 400060, 400070, 410000, 421081} • Face value (including inside fees): sum the following general ledger accounts. ▪ 'glalias_id_contract_management = 205100-Client Liab FV FF' and 'zuonr_fvff_id = FVFF-ZP01' ▪ 'glalias_id_contract_management = 205100-Client Liab FV FF' and 'zuonr_fvff_id = FVFF-ZP40' ▪ 'glalias_id_contract_management = 205100-Client Liab FV FF' and 'zuonr_fvff_id = PKGV-ZP40' ▪ 'glalias_id_contract_management = 205100-Client Liab FV FF' and 'zuonr_fvff_id = PKGV-ZP41' ▪ 'glalias_id_contract_management = 205100-Client Liab FV FF' and 'zuonr_fvff_id = PKGP-ZP45' ▪ 'glalias_id_contract_management = 205100-Client Liab FV FF' and 'zuonr_fvff_id = PKGP-ZP46.'").

[34] Letter from Kelly S. Fayne (Latham & Watkins LLP) to Jennifer Roualet (U.S. Department of Justice), June 27, 2025, pp. 5-6 ("Below, Live Nation lists the fields in LNE-LIT24DAT-000078 that record […] (2) contra-revenue and royalty payments from the inside and outside fees that Ticketmaster makes to its partners. […] • Payments to clients or venues recorded at the event-level in the ordinary course: ▪ Contra-revenues: sum {400001, 400061, 400080, 405001, 405011, 405021, 405031, 405041} ▪ Variable royalties: sum {500000, 500005, 500010, 500016, 500017, 500020, 500140, 500145, 500146, 500150, 500155, 500156, 500165, 500180, 500190, 500195, 500900}.").

phrase "amount retained" to refer not to price but to a quasi-profitability measure.[35] Since I use that same phrase in reference to price, Defendants object that I did not follow their instructions to calculate the *alternative* economic object that they label "amount retained" (or similar terms). This leads to a claim that I am making an error in how to calculate the retained amount, rather than simply making a different choice on what to call the retained amount.

37. Instead, as I have tried to explain in my testimony, I use the phrase "retained amount" to refer to the portion of a ticket price paid by the fans and retained by Ticketmaster, and I have followed Live Nation's instructions on how to use their data to determine which fields are necessary to make that calculation of what *I* define as the "retained amount."

## III. CONSIDERATION OF UPFRONT PAYMENTS

38. My definition of retained amount differs from Defendants' definition because we consider upfront payments differently. As I testified at trial, upfront payments are lump sum transfers from a ticketer to a venue.[36] As a general matter, economists do not think of lump-sum

---

[35] Letter from Kelly S. Fayne (Latham & Watkins LLP) to Jennifer Roualet (U.S. Department of Justice), June 27, 2025, p. 5 ("[…] LNE-LIT24-DAT-000078 contains information sufficient to identify inside fees, outside fees, and ticket face value. However, LNELIT24-DAT-000078 does not contain a field, nor a combination of fields, that identifies the amount retained by Ticketmaster within each fee type. In particular, not all payments Ticketmaster makes to its partners are captured in this dataset, such as payments to credit card companies and fixed royalty payments to its venue clients. […].").

[36] Abrantes-Metz Trial Transcript, March 25, 2026, 2579:7-2580:7 ("Q. Let's pick up where Mr. Pfeiffer left off. So just to make sure we're all on the same page, what do you understand upfront payments to be with respect to this case? A. They are a lump sum payment at the beginning, at the contract, that the venues receive, typically for other services, such as sponsorship agreements. So they're not typically just a cash-in for nothing in return. Q. Could you talk more about a sponsorship payment and how you considered whether an upfront payment was a sponsored payment in your analysis? A. Well, the upfront payment -- so my analysis relates to the following: My analysis is determining whether if fees change, the excess fees, the fees charged by Ticketmaster, whether they're going to be passed on to the fans. That was my analysis. And in order to do so, I showed yesterday what are the various components of the prices — the fee space, the part that is retained by Ticketmaster, that bar chart with all the colors, the face value, the fees that are paid to the venues, et cetera. Nowhere there are upfront payments. Upfront payments are not part of the price; they are part of the profitability. So, to the extent that they are payments for something else

payments as affecting marginal pricing, and here, as I tried to make clear, the upfront payments are in exchange for something of economic value to Ticketmaster.[37]

39. Dr. Budish cites the existence of upfront payments in the contracts for Ticketmaster and for other ticketing companies, like SeatGeek. As described in my Rebuttal Report, Dr. Budish's rebuttal report, for example, cites "Sponsorship" Agreements and an "Exclusive Ticketing and Sponsorship Term Sheet" as referring to Ticketmaster contracts that include an upfront payment in exchange for Ticketmaster receiving sponsorship or exclusivity rights.[38]

40. That is consistent with other testimony I cited in my Rebuttal Report for the fact that other ticketers make similar payments. Because both Ticketmaster and its competitors, including AXS, frequently make large upfront payments to venues, it supports my determination that

---

in an agreement between the venues and the ticketer, they're not part of the price of the ticketing service that the fans are paying, and, therefore, they should not be subtracted.").

*See also*, Abrantes-Metz Rebuttal Report, ¶ 111 ("Perhaps Dr. Budish or Mr. Meyer means to suggest that the upfront payments would affect the economic incidence on fans because the upfront payments change the cost to the venue. Neither expert actually makes such an argument. But if that is the concern, I would point out that by their nature, 'upfront payments' are lump-sum transfers from Ticketmaster to the venue and hence, as a matter of economics, should have no impact on marginal costs and hence pricing.").

[37] Abrantes-Metz Trial Transcript, March 25, 2026, 2579:7-2580:7 ("Q. Let's pick up where Mr. Pfeiffer left off. So just to make sure we're all on the same page, what do you understand upfront payments to be with respect to this case? A. They are a lump sum payment at the beginning, at the contract, that the venues receive, typically for other services, such as sponsorship agreements. So they're not typically just a cash-in for nothing in return. Q. Could you talk more about a sponsorship payment and how you considered whether an upfront payment was a sponsored payment in your analysis? A. Well, the upfront payment -- so my analysis relates to the following: My analysis is determining whether if fees change, the excess fees, the fees charged by Ticketmaster, whether they're going to be passed on to the fans. That was my analysis. And in order to do so, I showed yesterday what are the various components of the prices — the fee space, the part that is retained by Ticketmaster, that bar chart with all the colors, the face value, the fees that are paid to the venues, et cetera. Nowhere there are upfront payments. Upfront payments are not part of the price; they are part of the profitability. So, to the extent that they are payments for something else in an agreement between the venues and the ticketer, they're not part of the price of the ticketing service that the fans are paying, and, therefore, they should not be subtracted.").

[38] Abrantes-Metz Rebuttal Report, ¶ 116 ("Dr. Budish and Mr. Meyer ignore the robust case evidence that ticketers, besides Ticketmaster, regularly make upfront payments to venues. Dr. Budish even acknowledges that SeatGeek 'frequently makes large upfront payments to ticketers' that can exceed millions of dollars, yet he does not recognize that including upfront payments would affect AXS's per-ticket retained amounts similarly to Ticketmaster's. As I demonstrate below, there is ample case evidence that establishes that upfront payments are commonplace in the ticketing industry—regardless of ticketer—and that AXS makes similar upfront payments to Ticketmaster." (citations omitted)) and footnote 215.

excluding upfront payments would affect AXS's per-ticket retained amounts similarly to Ticketmaster's.[39]

41. While upfront payments, like any amount of money paid in connection with a ticketing arrangement, can certainly affect the *profitability* of a ticketing arrangement, they are not a

---

[39] Abrantes-Metz Rebuttal Report, ¶¶ 114-119 ("Nor does either Dr. Budish or Mr. Meyer demonstrate that upfront payments have any bearing on AXS's suitability as a damages benchmark. In my analysis, I do not calculate damages based on the absolute per-ticket amount retained by Ticketmaster. Instead, I conduct an analysis to calculate the *difference* in the per-ticket retained amount between AXS and Ticketmaster. Neither Dr. Budish nor Mr. Meyer conducted any analysis that demonstrates how the results of this calculation would change if upfront payments were included. Additionally, Dr. Budish and Mr. Meyer fail to provide any theoretical explanation of why including upfront payments would decrease the difference in retained amounts between Ticketmaster and AXS. Mr. Meyer claims, without evidence, that by excluding upfront payments from my calculations, 'results of any alleged excess amount retained by Ticketmaster' are 'overstated.' Without providing evidence that including upfront payments would decrease retained amounts for Ticketmaster more than for AXS, there is no basis to establish that my damages model overstates Ticketmaster's *excess* retained amounts. Dr. Budish and Mr. Meyer ignore the robust case evidence that ticketers, besides Ticketmaster, regularly make upfront payments to venues. Dr. Budish even acknowledges that SeatGeek 'frequently makes large upfront payments to ticketers' that can exceed millions of dollars, yet he does not recognize that including upfront payments would affect AXS's per-ticket retained amounts similarly to Ticketmaster's. As I demonstrate below, there is ample case evidence that establishes that upfront payments are commonplace in the ticketing industry—regardless of ticketer—and that AXS makes similar upfront payments to Ticketmaster. Several executives have testified that upfront payments are commonplace in the ticketing industry, as shown below: a. Todd Glickman (Comcast Spectacor): 'Q. Do you have an understanding of whether upfront payments are common in the industry? […] A. Yeah, I mean, certainly there could be sign-on bonuses, sponsorships, whatnot, very, very, very common. It's a part of the overall economics of the deal.' b. Robert Henson, Jr. (City of Norfolk): 'Q. Does the City receive any upfront payments as part of its ticketing contract? A. In the past, I think so. I think, yeah, they do. Q. Do you have an understanding whether that's common in the industry? A. I think it's very common in the industry. Equipment, you know, scanners, computers, all that needs to be updated and kept up to a certain level. So a lot of that, I think, goes into -- into the equipment to continue to operate.' c. Danielle du Toit (SeatGeek): 'Q. To win business, SeatGeek has made some big upfront payments to clients, correct? A. Same as competition. Yes.' Additionally, multiple depositions specifically identify AXS as offering upfront payments to venues: a. Christian Lewis (Paciolan): 'Q. And are you aware of whether other ticketing companies also offer venues upfront financial payments or inducements to try to win primary ticketing contracts? A. Yes. Q. And Ticketmaster does that? A. To our knowledge, yes. Q. And SeatGeek does that? A. To our knowledge, yes. Q. And AXS does that? A. To our knowledge, yes. Q. Any other ticketing companies that you're aware of that offer upfront payments to venues or clients? A. Those would be the three most notable.' b. Bryan Perez (AXS): 'Q. Now, you agree that many concert venues also receive sponsorship payments, upfront advances, or other similar financial inducements, in exchange for entering into multiyear, exclusive contracts; right? […] THE WITNESS: Yes. […] Q. AXS's own exclusive ticketing contracts typically include some type of financial inducement for the venue; right? […] THE WITNESS: It's hard to say typically. They often do. But many times they don't. […] Q. But for large venues, they frequently do; correct? A. Frequently.' AXS's contracts also include upfront payments. For example: a. On August 1, 2016, AXS signed a ticketing service agreement with The Bowery Presents, providing an aggregate signing bonus of $10,000,000. b. On May 12, 2016, AXS signed a five-year amended ticketing contract with Sugarloaf Gwinnett Center, LLC, which owns Gas South Arena, providing an aggregate signing bonus of $500,000. c. On October 1, 2020, AXS signed a ticketing agreement with JAM Productions, Ltd., providing an aggregate signing bonus of $1,850,000. d. On November 30, 2022, AXS signed a ticketing agreement with Tiebreaker Productions, which covers events at Forest Hills Stadium, providing an aggregate sponsorship payment of $2,000,000." (citations omitted)).

component of the ticket *price* paid by fans.[40] Fans are not a party to the upfront payments. Fans do not receive upfront payments, nor do they make them. When I break down the ticket price paid by fans, no portion of it is allocated to "upfront payments."

42. A central question I need to answer is, when a *fan* purchases a $120 ticket, how is that $120 allocated to the different parties? On average, some goes to the artist and promoter ($93), some goes to the venue ($17), some goes to the credit card company ($3), and some goes to (or is "retained by") Ticketmaster ($7). That fully accounts for the $120. Nothing is missing, and nothing is left over. I explained this at length in my testimony when describing the following demonstrative:[41]

---

[40] Abrantes-Metz Rebuttal Report, ¶ 109 ("The economic incidence of costs is based on the price charged, not profits kept. The relevant economic question is the extent to which Ticketmaster's *price* charged to the venue marginally impacts the ticket *price* charged to fans. The profitability of Ticketmaster (or the venue, for that matter) is not a factor in that analysis. Economists routinely ask, "If the price of the input is $X, how will that affect the price of the final good?" Economists do not ask Dr. Budish's or Mr. Meyer's question, 'If the quasi-net profit of the input is $Y, how will that affect the price of the final good?'") (emphasis in original).

[41] PDX006, at PDX006.6 (citing Abrantes-Metz Opening Report, Figure 8 and Abrantes-Metz Rebuttal Report, Attachment 1: Figure 8).

PDX006, at PDX006.22 (citing Abrantes-Metz Opening Report, ¶¶ 60-65, 72, and 110, footnotes 138, 173, and 177, Figures 6-8; and Abrantes-Metz Rebuttal Report, Attachment 1: Figures 6-8).

Abrantes-Metz Trial Transcript, March 24, 2026, 2480:20-2482:6 ("Q. So what did you do to analyze – I'm sorry, I withdraw that. I have put on the screen a chart that you created. What does this show? A. This chart shows the components of the average Ticketmaster ticket price paid by fans for primary concert ticketing at major concert venues from 2017 to 2024. So what is this? I looked and studied Ticketmaster data and calculated the average price for an event ticketed by Ticketmaster out of 237 million tickets that were in the data that were relevant for the analysis, and the average price paid by the consumer is $120 out of all of these tickets. Q. What is the artist promoter face value at the bottom? A. Well, that is the dark part in blue that we see as $93. So that's the part of the ticket that is set by the artist promoter and is paid to the artist promoter. And here it is defined so that it doesn't have any other fees included. So if it says artist/promoter face value, it's really just the part that goes to the artist and the promoter. Q. And what are credit card fees? A. Those are fees that are commonly charged by the ticketer to pay credit card companies for the processing of the credit card as the payment method for the ticket. Q. What are venue facility fees in this chart? A. Those are in green. They represent $5, and those fees go to the venues only. Q. Could you also explain Ticketmaster retained fees and venue retained fees, please? A. Sure. These are fees called convenience or service and processing fees. And these are divided up between Ticketmaster and the venues. In gray is the venue average take of that, represented as $12, and in red is the part that is retained by Ticketmaster, $7. So that is the price that Ticketmaster charges for its services to the venues, $7, on average. And I just want to clarify, to avoid any confusion later, these are rounded numbers.").

21

43. It is true that some of that $7 could be thought of as funding a previous upfront payment to this venue. Since money is fungible, some could also be thought of as funding future upfront payments to a different venue. Some of that same $7 could also be thought of as funding Ticketmaster employees' salaries or other expenses it incurs. As I noted in my Rebuttal Report, it would not make sense to remove expenses related to ticket scanners deployed at a given venue when calculating the impact on fans, either.[42] Taking into account how Ticketmaster *uses* the $7 doesn't change the fact that the *price* of Ticketmaster's services is $7. The *profit* from Ticketmaster's services is, of course, less than $7, but my analysis is based not on the ticketing contract's *profitability*, but solely on the *price* charged.

---

[42] Abrantes-Metz Rebuttal Report, ¶ 108 ("The retained amount I analyze in my Opening Report is essentially the per-ticket *price* charged by Ticketmaster. It is not, nor was it intended to be, the *net per-ticket profit* retained by Ticketmaster. To arrive at that, one would of course deduct all manner of expenses—not just upfront payments as Dr. Budish and Mr. Meyer propose to do, but also employee salaries, rent, and all other operating expenses. That net profit number will—necessarily—be even lower than the 'upfront-payment adjusted' retained amount calculation. As a logical matter, it could even be negative. But it is not economically relevant.") (emphasis in original).

44. I referred to this $7 portion of the ticket price retained by Ticketmaster as Ticketmaster's "retained amount."[43] That is the economic object I have always been studying. It is a price concept. Defendants have argued that rather than studying price, I should instead study a quasi-profitability concept, which subtracts from that price an amount to cover "upfront payments." That quasi-profitability concept is a concept to which Ticketmaster has also applied the label "retained," sometimes in close proximity to "amount," from time to time. This risks a semantic confusion when I say that I am studying "retained amounts." The label is of no economic importance. I could change my analysis to be in terms of "ticketer price" instead of "retained amount," and nothing would be affected.

45. It has become clear that calling "retained amount" to the part of the total price paid by the fan that Ticketmaster keeps has caused much confusion, given how Defendants and I use it differently, and I was understandably questioned about it both at deposition and at trial. I acknowledge with hindsight that a different name would have been preferable, but a name change alone would not alter any of my analyses, as I believe this is the correct way to study the price impact on fans due to the alleged conduct.

46. Defendants' concept of an amount of the fee "retained" after certain expenses could be important to measure if one wanted to assess whether Ticketing Contract A was more or less

---

[43] Abrantes-Metz Trial Transcript, March 24, 2026, 2450:21-2451:6 ("Q. I put a chart you created on the screen. Could you please walk us through what this shows? A. I will explain this slide in more detail a little bit later, but for now, I would just like to ask the jurors to focus on the top, the red part of this bar.  So this bar represents the total price paid by the consumer on average for an event ticketed by Ticketmaster, and it says it is $120. My analysis, the first step of my analysis, focuses on the red part of this bar, the $7.  That's the Ticketmaster retained fees.  That's the price that Ticketmaster charges for its ticketing services."); and 2481:21-2482:6 ("Q. Could you also explain Ticketmaster retained fees and venue retained fees, please? A. Sure. These are fees called convenience or service and processing fees. And these are divided up between Ticketmaster and the venues. In gray is the venue average take of that, represented as $12, and in red is the part that is retained by Ticketmaster, $7.  So that is the price that Ticketmaster charges for its services to the venues, $7, on average. And I just want to clarify, to avoid any confusion later, these are rounded numbers.").

profitable than Ticketing Contract B. It is a concept that could be important for Ticketmaster in assessing whether its upfront payments are too large. But it is not a concept that matters to my analysis. When the fan paid $120 for the ticket, $7 went to Ticketmaster's services. "Upfront payments" do not alter that reality. Whether that transaction was profitable for Ticketmaster in the sense that the $7 easily accounted for "upfront payments," or whether that transaction was unprofitable because it did not, (i) does not make any difference to the fan; (ii) does not change the fact the price paid was $7; (iii) does not affect whether $7 was to any extent a supra-competitive price; and (iv) does not affect whether the final $120 was consequently supra-competitive.

47. I understand that there may be confusion on whether "upfront payments" affect marginal pricing. As I explained in my Rebuttal Report and my testimony, fixed or lump-sum costs or revenues do not affect marginal pricing.[44] That is an elementary principle of economics.

---

[44] Abrantes-Metz Rebuttal Report, ¶ 111 ("But if that is the concern, I would point out that by their nature, 'upfront payments' are lump-sum transfers from Ticketmaster to the venue and hence, as a matter of economics, should have no impact on marginal costs and hence pricing").

Abrantes-Metz Deposition, 233:6-234:14 ("Q. Yeah. So any upfront payments that are made are irrelevant to the question of what is and is not a supracompetitive retained amount or price, right? THE WITNESS: No. That is not only because of that. It is because it is common in the industry. I have no prior to believe that it would be different in the actual and but-for world. Commonly, upfront payments are made, and a service is provided, such as advertising and sponsorship benefits. It is a lump-sum payment with respect to the ticketing services and does not affect marginal decisions. And to the extent that they were to affect marginal decisions, such as the pricing of the ticketing service itself, it would have been reflected in the data that I studied, and, therefore, they would have been accounted there, in the data that I study and that I use to estimate my apportioning analysis.") and 235:18-236:23 ("Q. If you go to Paragraph 107 of your rebuttal report, and over on the portion on Page 64, the second full sentence on that page says, 'The sum and substance of the criticism appears to be that if upfront payments are deducted, the value of Ticketmaster's retained amounts will appear lower.' And you go on to say, 'That is tautologically true,' right? A. Yes. If you deduct a positive number from something else positive, that number will get lower. Q. And you mentioned earlier the issue of marginal decisions. Your understanding is that when ticketers and venues are negotiating for how they will allocate the total ticketing fees among them, that they only look at marginal costs and don't take into account lump sum payments; is that right? THE WITNESS: Well, they take into account those for their profit calculations. But decisions on prices are determined by marginal effects. That's a principle of economics.") (objections omitted).

Abrantes-Metz Trial Testimony, March 25, 2026, 2571:21-2572:12 ("Q. Thank you. Now, you didn't deduct upfront payments when you were calculating retained amounts in this case, did you? A. That's correct. Q. And if I recall

48. To understand why accounting for "upfront payments" is not economically sensible, consider the following hypothetical. A ticketer makes an upfront payment to a venue, say $50,000. The venue then hosts a concert. For that concert, 25,000 tickets are sold at an average price of $120, and fans are, to whatever extent and due to some conduct, "overcharged" when they purchase those tickets at those prices. Obviously, the extent of that overcharge to these fans– if any – depends only on the prices they paid, and therefore cannot depend on any second concert that the venue may or may not host. Yet, if I were to account for "upfront payments" as Defendants insist, I would reach the (nonsensical) conclusion that *the overcharge to the fans of the first concert depends on how many tickets are sold to the second concert.*

49. By Defendants' logic, if few tickets are sold to the second concert, or suppose for now if the second concert is simply canceled, then the entirety of the $50,000 "upfront payment" must be discounted against the prices of the first concert and thereby reduce any measure of their overcharge. In this example, the $50,000 upfront payment would be allocated across the 25,000

---

correctly, you testified at your deposition that you didn't do so because upfront payments don't affect the marginal decision on price; is that correct? A. Could you please show me where I said that in my deposition? Q. Absolutely. It's quite near where we just were. If you'd look at page 240, starting at line 5 and running through line 21. (Pause) A. Yes. Q. Does that refresh your recollection that you said that upfront payments do not affect the marginal decision on price? A. Yes."); and 2579:7-2580:7 ("Q. Let's pick up where Mr. Pfeiffer left off. So just to make sure we're all on the same page, what do you understand upfront payments to be with respect to this case? A. They are a lump sum payment at the beginning, at the contract, that the venues receive, typically for other services, such as sponsorship agreements.  So they're not typically just a cash-in for nothing in return. Q. Could you talk more about a sponsorship payment and how you considered whether an upfront payment was a sponsored payment in your analysis? A. Well, the upfront payment -- so my analysis relates to the following: My analysis is determining whether if fees change, the excess fees, the fees charged by Ticketmaster, whether they're going to be passed on to the fans. That was my analysis. And in order to do so, I showed yesterday what are the various components of the prices — the fee space, the part that is retained by Ticketmaster, that bar chart with all the colors, the face value, the fees that are paid to the venues, et cetera.  Nowhere there are upfront payments.  Upfront payments are not part of the price; they are part of the profitability. So, to the extent that they are payments for something else in an agreement between the venues and the ticketer, they're not part of the price of the ticketing service that the fans are paying, and, therefore, they should not be subtracted.").

tickets sold to the first concert, and the ticketer price should be reduced by $2 per ticket.[45] On the other hand, if many tickets are sold for the second concert – perhaps another 25,000 tickets – the "upfront payment" would be divided across all those tickets for both concerts, and the adjustment to the ticketer price of the first concert (and the second concert also) would be just $1 per ticket.[46] If Ticketmaster, according to the evidence (and on average), keeps $7 of the $120 ticket price paid by the fan,[47] then subtracting the upfront payment from the amount retained by Ticketmaster for the first concert would be calculated as either $5 or $6, depending on the outcome of the second concert (i.e., depending on whether no tickets were sold for the

---

[45] 25,000 tickets at $120 each (25,000 × $120 = $3,000,000) minus $50,000 in upfront payments yields $2,950,000 in revenue ($3,000,000 - $50,000 = $2,950,000). Dividing that revenue net of upfront payments by the 25,000 tickets yields a ticket price of $118 ($2,950,000 ÷ 25,000 = $118), $2 lower than the ticket price of $120. Or, simply, $50,000 in upfront payments, divided by 25,000 tickets from the first concert, equals $2 ($50,000 ÷ 25,000 = $2).

[46] If 50,000 tickets are sold in total for both concerts, then the upfront payment of $50,000 – which, as a fixed payment, does not depend on subsequent ticket sales – would be divided across all tickets in both concerts, for an average of $1 per ticket ($50,000 ÷ 50,000 = $1).

[47] Abrantes-Metz Opening Report, Figure 8.

Abrantes-Metz Rebuttal Report, Attachment 1: Figure 8.

PDX006, at PDX006.6 (citing Abrantes-Metz Opening Report, Figure 8 and Abrantes-Metz Rebuttal Report, Attachment 1: Figure 8).

PDX006, at PDX006.22 (citing Abrantes-Metz Opening Report, ¶¶ 60-65, 72, and 110, footnotes 138, 173, and 177, Figures 6-8; and Abrantes-Metz Rebuttal Report, Attachment 1: Figures 6-8).

Abrantes-Metz Trial Transcript, March 24, 2026, 2480:20-2482:6 ("Q. So what did you do to analyze – I'm sorry, I withdraw that. I have put on the screen a chart that you created. What does this show? A. This chart shows the components of the average Ticketmaster ticket price paid by fans for primary concert ticketing at major concert venues from 2017 to 2024. So what is this? I looked and studied Ticketmaster data and calculated the average price for an event ticketed by Ticketmaster out of 237 million tickets that were in the data that were relevant for the analysis, and the average price paid by the consumer is $120 out of all of these tickets. Q. What is the artist promoter face value at the bottom? A. Well, that is the dark part in blue that we see as $93. So that's the part of the ticket that is set by the artist promoter and is paid to the artist promoter. And here it is defined so that it doesn't have any other fees included. So if it says artist/promoter face value, it's really just the part that goes to the artist and the promoter. Q. And what are credit card fees? A. Those are fees that are commonly charged by the ticketer to pay credit card companies for the processing of the credit card as the payment method for the ticket. Q. What are venue facility fees in this chart? A. Those are in green. They represent $5, and those fees go to the venues only. Q. Could you also explain Ticketmaster retained fees and venue retained fees, please? A. Sure. These are fees called convenience or service and processing fees. And these are divided up between Ticketmaster and the venues. In gray is the venue average take of that, represented as $12, and in red is the part that is retained by Ticketmaster, $7. So that is the price that Ticketmaster charges for its services to the venues, $7, on average. And I just want to clarify, to avoid any confusion later, these are rounded numbers.").

second concert, or instead 25,000 tickets were sold for the second concert). But the overcharge to fans on the first concert – if any – would of course logically be the same, regardless of how many tickets were sold for the second concert, because the prices they paid don't change based on the outcome of the second concert. Therefore, analyzing prices net of upfront payments as Defendants insist serves only to cloud and confuse the matter of damages to fans.

50. Upfront payments certainly affect the *profitability* of the ticketing arrangement. Whether the venue hosts the second concert or how many tickets are sold certainly affects the arrangement's *profitability*. But it does not affect the *price* and therefore the ultimate overcharge to fans.

51. A separate robustness check in my Opening Report confirms that this is the case. The purpose of the analysis is to test whether Ticketmaster-ticketed events have higher total ticketing fees than AXS-ticketed events, which would be expected if greater retained amounts led to higher fees.[48]

---

[48] Abrantes-Metz Opening Report, ¶¶ 179-183 ("In Section V.A.1 above I demonstrate that Ticketmaster's retained amounts are higher than AXS's retained amounts. If greater retained amounts lead to greater fees, then one should find that Ticketmaster-ticketed events have higher total ticketing fees than do AXS-ticketed events. This is what I find. I compare the total ticketing fees at AXS-ticketed events with those at Ticketmaster-ticketed events. I use multiple regression analysis to control for other factors that may impact ticketing fees. In my regression models, the dependent variable (i.e., the variable the regression is trying to 'explain') is the total ticketing fee for the event on a dollar-per-ticket basis (e.g., $15 per ticket). This includes Facility Fees, Convenience Charges, Processing Fees, and all other fees paid by the fan above and beyond the face value set by the artist/promoter. The key explanatory variable of interest is an indicator variable equal to one if the event was ticketed by Ticketmaster, and equal to zero if the event was ticketed by AXS. The other explanatory variables in the model include the average face value for the event (on a dollar-per-ticket basis), venue fixed effects, artist genre fixed effects, day-of-week fixed effects, calendar month fixed effects, and calendar year fixed effects. The results from this regression analysis are presented in Figure 29. I weight by total tickets sold, which gives larger events more influence in the regression. The coefficient on the key explanatory variable of interest, which is an indicator variable equal to one if the event was ticketed by Ticketmaster, is positive and statistically significant. That coefficient estimate is 3.19, indicating that total ticketing fees for Ticketmaster-ticketed events are, on average, $3.19 per ticket higher than total ticketing fees for AXS-ticketed events. This evidence is consistent with Ticketmaster's higher retained amounts resulting in higher total ticketing fees for Ticketmaster-ticketed events. I also note that these results, while numerically greater, are nevertheless statistically consistent with my estimated overcharge on retained amounts from Section V.A and my estimated impact of retained amounts on ticketing fees from Section V.B.2. That is, if Ticketmaster overcharges on retained amounts by $2.30 per ticket, on average, and if between $0.68 and $0.75 per dollar is reflected in higher fees, then we should expect that ticketing fees for Ticketmaster events would be higher than AXS by between $1.56

27

52. To perform this comparison, I used multiple regression analysis to compare the total ticketing fees paid by fans at Ticketmaster- and AXS-ticketed events while controlling for other factors that may impact ticketing fees. This analysis measures, on a dollar-per-ticket basis, all fees paid by the fan beyond the ticket's face value set by the artist or promoter, including facility, convenience/service, processing, and all other fees. It does not depend in any way on the method used to compute retained amounts (i.e., as either a price or a quasi-profitability measure).

53. As presented in Figure 29 and discussed in paragraph 181 of my Opening Report, the results show that Ticketmaster-ticketed events have total ticketing fees that are, on average, $3.19 higher than AXS-ticketed events.[49] This result is consistent with Ticketmaster's higher retained amounts leading to higher total ticketing fees, but, again, does not depend in any way on any calculation of retained amounts.

54. Although numerically higher, this result is reasonably consistent with my conclusion that Ticketmaster overcharges on retained amounts by an average of $2.30 per ticket. The fact that this difference between Ticketmaster and AXS total fees persists even when analyzing total

---

to $1.72, on average. Those amounts are within a reasonable confidence interval of the fee difference estimated below. Consistent with this analysis, I have also seen evidence of market participants discussing the high fees on Ticketmaster events. For example, a promoter indicated that the Ticketmaster Fees were 'more than 1/3 the cost of the face ticket.'" (citations omitted)).

[49] Abrantes-Metz Opening Report, ¶ 181 ("The results from this regression analysis are presented in Figure 29. I weight by total tickets sold, which gives larger events more influence in the regression. The coefficient on the key explanatory variable of interest, which is an indicator variable equal to one if the event was ticketed by Ticketmaster, is positive and statistically significant. That coefficient estimate is 3.19, indicating that total ticketing fees for Ticketmaster-ticketed events are, on average, $3.19 per ticket higher than total ticketing fees for AXS-ticketed events. This evidence is consistent with Ticketmaster's higher retained amounts resulting in higher total ticketing fees for Ticketmaster-ticketed events" (citations omitted).

*See also*, Abrantes-Metz Rebuttal Report, Attachment 1: Figure 29.

fees paid by fans shows that the $2.30 overcharge that I calculate is not the result of the particular computation of retained amounts.

55. Based on all my analyses, I still express the same opinion that it was correct to exclude upfront payments from Ticketmaster to venues when calculating the price charged by Ticketmaster for its ticketing services and when comparing it to the price charged by AXS for its ticketing services.

56. I declare under penalty of perjury that the foregoing is true and correct.


Executed on April 3, 2026

_____

Rosa M. Abrantes-Metz, Ph.D.

29