DX-1494

Licensed User Agreements

No. 1:24-cv-03973-AS

Defs' Trial Exhibit

**DX-1494**



DX-1494.0001

DX-1494(6)

Bates: LNE-01985107 - LNE-01985151

Licensed User Agreement between Sacramento Downtown Arena, LLC

## LICENSED USER AGREEMENT

THIS LICENSED USER AGREEMENT ("Agreement") is made and entered into as of January 24, 2017 and is effective as of July 1, 2015 ("Effective Date"), by and between Ticketmaster L.L.C., a Virginia limited liability company ("Ticketmaster"), and Sacramento Downtown Arena LLC, a Delaware limited liability company ("Principal").  This Agreement consists of this Licensed User Agreement and Exhibit A, Compensation, Exhibit B, Hardware, Exhibit C, TM+ Terms and Conditions, Exhibit D, New NBA Ticketing Platform Opt-in Addendum, Exhibit E, Product Functionality, Exhibit F, Upsell Terms, and any other Exhibits attached hereto which are incorporated herein by this reference.  The meanings of all capitalized terms used in this Agreement are set forth in Section 16 hereof.  In consideration of the mutual promises and covenants set forth herein, the parties hereby agree as follows:

1.      **TERM**:  The initial term of this Agreement (the "Term") shall begin on the Effective Date and shall continue through the fifth (5th) anniversary of the New Facility Opening Date (as defined in Section 16).  Notwithstanding the above, if for any reason nineteen percent (19%) or more of the scheduled regular season home games of the Sacramento Kings are not played at the Facility or a substitute location for which Ticketmaster has the rights to sell Tickets during any NBA season during the Term (e.g. by virtue of damage to the Facility, unless play continues at another venue where Ticketmaster provides ticketing, a player's strike, lockout, or other interruption or stoppage of the NBA season), then the Term shall be extended by an additional period of one (1) year and the financial terms for such additional year shall be the same as the immediately preceding Contract Year.  Thereafter, the Term shall automatically be renewed for successive one (1) year periods unless either party hereto notifies the other party in writing, not less than ninety (90) days prior to the end of the initial Term or the then current renewal period, of its intention not to renew this Agreement. Each twelve (12) month period commencing on July 1 and continuing through the following June 30 shall be a "Contract Year" as such term is used herein; provided, that the last Contract Year shall be the period commencing on July 1 and ending on the date on which this Agreement is terminated or expires.

2.      **TICKET SALES RIGHTS; EXCLUSIVITY**:

(a)      **Grant of Rights**:    Principal hereby grants to Ticketmaster, and Ticketmaster accepts from Principal, the right during the Term, to be the exclusive seller, as Principal's agent, of all Tickets for the Sellable Capacity for every Attraction via any and all means and methods, including on the Internet, by telephone, computer, IVR, outlets, television, clubs, auctions, VIP packages, presales, upsells, or by any other means of distribution, whether existing now or at any time in the future.  Principal shall ensure that the entire Sellable Capacity for every Attraction shall be made available for distribution on the TM System.

(b)      **Sales by Principal**: Subject to the terms of this Section 2, Principal retains the right to: (i) sell single Tickets from the Facility Box Office to persons physically present at the Facility Box Office; (ii) sell Season/Contract Tickets; (iii) conduct Group Sales of Tickets; (iv) provide a reasonable number of House Seats for any Attraction consistent with industry standards and past practices of the parties; and (v) sell Tickets through any Ticketmaster-approved third party distribution channel integrated with the TM System (e.g., Ticketmaster "Nexus Partner").

(c)      **No Third Party Systems or Services**: Except as set forth in subsection (b)(v) above, Principal shall not directly or indirectly use, sponsor, promote, advertise, authorize or permit the use of any third party that promotes, engages in or facilitates the sale, resale or issuance of tickets.

1

Sacramento Kings LUA 01132017

LNE CONFIDENTIAL BUSINESS INFORMATION                                                          LNE-01985107

**DX-1494.0243**

(d) **No Minimum Sales**: It is agreed and understood that neither Ticketmaster nor Principal guarantees or will guarantee that any minimum or fixed number of Tickets will be sold through the TM System for any Attraction.

(e) **Acknowledgement by Principal**: Principal acknowledges that Ticketmaster acts as the agent of certain third parties that may be a direct or indirect competitor of Principal. Principal also acknowledges that Ticketmaster has entered and may in the future (including during the Term) enter into new business relationships with other third parties, including those in the entertainment and sports industry, such as performers who perform at the Facility, for a variety of services. Principal further acknowledges that any such sales or services or solicitations to provide such sales or services as contemplated under this subsection do not compete with Principal or conflict with this Agreement or Ticketmaster's rights, duties or obligations under this Agreement.

3.  **COMPENSATION**:

(a) **Ticketmaster Charges and Fees**: In consideration for Ticketmaster's services provided hereunder as an agent of Principal, Ticketmaster shall be entitled to assess and receive charges and fees in the amounts set forth on Exhibit A, all of which charges and fees shall be assessed against consumers, except for Inside Charges and, at Principal's option, Archtics Transaction Fees, which shall be assessed against Principal. In the event applicable law prohibits the assessment of such fees against consumers, Ticketmaster and Principal shall agree on alternative means for compensating Ticketmaster for its services in amounts reasonably comparable to those set forth in this Agreement, and as permitted by applicable law. Notwithstanding the above, charges and fees with respect to any Attractions presented by Feld Entertainment (including, without limitation, Disney on Ice, Circus, and Motor Sports) ("Feld Attractions") at the Facility shall be determined pursuant to a separate national agreement between Ticketmaster and Feld Entertainment; provided, that Principal shall be entitled to receive a royalty (the "Feld Royalty") in the amount of ████████████████ of each per Ticket base Convenience Charge (i.e., exclusive of the Payment Processing Fees added to the Convenience Charge as set forth in Section 3(b)(i) following) which is received (and not refunded) by Ticketmaster in respect of any such Feld Attraction.

(b) **Payment Processing Fees**:

(i) **Sales by Ticketmaster via Telephone Sales and Internet Sales**: With respect to Tickets purchased with credit cards, debit cards, gift cards or any other methods of payment, the payment authorization and processing fees ("Payment Processing Fees") shall be passed on to Principal at the rates set forth on Exhibit A, which percentage rates shall be deducted by Ticketmaster from the Ticket sales proceeds, or, at Principal's option, upon notice to Ticketmaster, the Convenience Charge may be adjusted to include such Payment Processing Fees; provided, that the Convenience Charge will be rounded up to the nearest $0.05. Notwithstanding the above, with respect to any Feld Attractions, Principal agrees that Principal shall be obligated to pay for the Payment Processing Fees for Tickets to Feld Attractions, or shall obtain the agreement of Feld Entertainment to adjust the fees payable for such Feld Attractions to include the amount of such Payment Processing Fees; in any such event Ticketmaster shall not be obligated to absorb the Payment Processing Fees with respect to the Face Value of Tickets to any Feld Attractions.

(ii) **Sales at Outlets**: With respect to all purchases at Outlets, Payment Processing Fees shall be passed on to the Ticket purchaser at the rate set forth on Exhibit A by increasing the applicable Convenience Charge set forth on Exhibit A by the amount of such Payment Processing Fees; provided, that the Convenience Charge will be rounded up to the

2

Sacramento Kings LUA 01132017

**LNE CONFIDENTIAL BUSINESS INFORMATION**    LNE-01985108

**DX-1494.0244**

nearest $0.05.

(iii)    Principal Sales Using TM Charge: In connection with Principal's sales of Tickets utilizing electronic payments and authorized via TM Charge using either Visa or MasterCard, Ticketmaster's credit card processor ("Processor") shall deduct the merchant fees in an amount set forth on Exhibit A for transactions processed on a daily basis. The fees charged to Principal for use of TM Charge are subject to automatic increases equal to any actual increases in the Processor fees that Ticketmaster incurs. Principal shall also be responsible for any and all other amounts charged to Ticketmaster (if any) by a Processor for processing Principal's transactions (other than as a result of Ticketmaster's breach of any agreement to which it is a party or Ticketmaster's negligence or willful misconduct), including, without limitation, chargebacks, fraudulent credit card use and additional charges for failure to meet the specific timing or other qualifications of the applicable credit card association or company. In the event that Principal desires to process any credit or debit cards other than Visa or MasterCard utilizing TM Charge, then the fees for such service shall be mutually agreed upon by Principal and such credit card companies, and Principal shall enter into its own merchant agreement with such credit card companies.

(c)    **Compensation to Principal**:



(i)    **Signing Bonus**: Ticketmaster shall pay Principal a signing bonus ("Signing Bonus") in the total amount of ██████████████████████████████ payable as follows: (A) ██████████████████████████ payable within thirty (30) days of the full execution of the Agreement, and (B) ████████████████████ payable within thirty (30) days of the New Facility Opening Date. Ticketmaster's agreement to provide the Signing Bonus to Principal is based upon Ticketmaster's exclusive rights to sell Tickets for Attractions during the Term and is contingent upon and subject to certain terms as described below. In the event that Principal discontinues presenting the Attractions in reasonably the same manner as it has done prior to the date hereof, including without limitation, if the Sacramento Kings cease to play home games at the Facility for any reason during the Term (an "Attractions Termination") or in the event that the Agreement terminates before the fifth (5th) anniversary of the New Facility Opening Date, then Principal shall return to Ticketmaster, within thirty (30) days of such termination or Attractions Termination, a pro rata amount of the Signing Bonus for each month remaining of the full Term following the date of such termination or Attractions Termination. Any return of any portion of the Signing Bonus by Principal shall be by wire transfer or certified check.

(ii)    **Strategy Bonus**: Subject to the terms and conditions of this Section, beginning with the Contract Year starting July 1, 2016, Ticketmaster shall provide Principal with an annual strategy bonus (the "Strategy Bonus") in a total amount equal to ██ ██████████████████████, which shall consist of the following two items: (A) a cash payment in the amount of ██████████████████████ payable to Principal at the conclusion of each Contract Year in which Principal meets each of Ticketmaster's best practices for secondary market resales of Tickets (the "Resale Best Practices") as further described below; and (B) a product credit (the "Product Credit") in the amount of ██████████████████ for each Contract Year in which Principal meets the Resale Best Practices, which Product Credit may be used by Principal solely as a credit against the purchase of certain LiveAnalytics services from Ticketmaster. The parties acknowledge and agree that any unused Product Credit provided during any Contract Year up to an amount equal to ████████████████████ shall not expire at the conclusion such Contract Year, and such amount may be rolled forward for use solely in the immediately succeeding Contract Year (provided that all unused Product Credits shall expire upon the termination or expiration of the Agreement). For the avoidance of doubt, any unused Product Credit provided during any Contract Year in an amount up to ████████████

3

Sacramento Kings LUA 01132017

LNE CONFIDENTIAL BUSINESS INFORMATION                                   LNE-01985109

**DX-1494.0245**

██████████████ per Contract Year may be rolled forward for use solely in the immediately succeeding Contract Year (but not any subsequent Contract Year thereafter). The Product Credit, having no cash value, shall not at any time be payable directly to Principal. Furthermore, in the event Principal fails to meet the Resale Best Practices during any Contract Year for which Principal has used any portion of the Product Credit, Principal shall refund to Ticketmaster in cash, within thirty (30) days of the conclusion of such Contract Year, the entire amount of the Product Credit actually used by Principal for such Contract Year, or Ticketmaster may deduct the amount of such Product Credit actually used by Principal for such Contract Year from settlements due Principal in the following Contract Year. For purposes of this Section 3(c)(ii), the Resale Best Practices shall initially be as follows (unless otherwise mutually agreed to by the parties):

- The New NBA Ticketing Platform and TicketsNow shall be activated for all preseason and regular season NBA games within two (2) hours of the release of the NBA season schedule, with links from the TM.com Website to such secondary exchanges prior to the initial On-Sale Date for any such games.
- TM+ shall be activated upon any pre-sale of Tickets or the initial On-Sale Date for all preseason, regular season and postseason NBA games, and for all other Attractions occurring at the New Facility.
- All resale platforms shall be enabled for playoff games as soon as the team's position is clinched (i.e., within 30 minutes of clinching).
- All resale platforms shall be enabled for all possible home games immediately following the applicable playoff round being clinched (e.g., once the Kings clinch a playoff berth, all resale platforms shall be enabled for all potential home games (i.e., 3 or 4 home games) for such playoff berth).
- No less than seventy-two (72) hours prior to any Attraction, delayed delivery of Tickets shall be enabled (i.e., no PDF/printable Tickets released during delay period).
- Within twent four (24) hours of activation of any resale platforms, Season Ticket holders shall have the ability to post Tickets for resale.
- For Attractions which are not currently on sale, either (i) TM+ shall be enabled in an off-sale mode until the initial On-Sale Date, or (ii) such Attractions shall be featured on the TM.com Website with use of the enhanced off-sale Event Detail Page (EDP), with all applicable resale platform feeds available.
- Resale platforms shall remain enabled for all Attractions until the Attraction start time, or later (if possible).
- "Barcode Sync" (formally known as Archtics to "eibo" integration) shall be enabled upon Season Ticket holder activation or within twenty-four (24) hours of any resale platform activation.

Notwithstanding anything to the contrary set forth herein, Ticketmaster may, in its sole discretion, update the list of Resale Best Practices at the beginning of each Contract Year during the Term to the extent such updates are generally applicable for all NBA teams for which Ticketmaster provides services similar to the services set forth herein, and upon delivery of such updated list to Principal prior to the start of any Contract Year, such updated list shall apply for purposes of determining whether Principal meets the Resale Best Practices for each Contract Year thereafter (and qualifies for the Strategy Bonus for each such Contract Year), unless otherwise mutually agreed to by the parties, and until such time as Ticketmaster delivers a further updated list to Principal.

(iii)   **Technology Credit**:   Ticketmaster will ensure that Principal remains at the forefront of new or emerging technology as it relates to the ticketing industry by providing Principal an annual technology allowance (the "Technology Allowance") in the amount of ██████████████████████████████ payable within thirty (30) days of the start

4

Sacramento Kings LUA 01132017

of each Contract Year during the Term of the Agreement. The Technology Allowance may be used by Principal to purchase new or other technology products from Ticketmaster or third parties (subject to the exclusivity provision of this Agreement). In the event that the Agreement terminates before the conclusion of any Contract Year, then Principal shall return to Ticketmaster, within fourteen (14) days of such termination, a pro rata amount of that Contract Year's Technology Allowance that was actually paid to Principal by Ticketmaster based on the number of months during such Contract Year that the Agreement was in effect. Any return of such Technology Allowance by Principal shall be by wire transfer or certified check.

      (iv)    **Hardware Credit**: Ticketmaster shall provide Principal with a one-time credit ("Hardware Credit") in the amount of ▬▬▬▬▬▬▬▬▬▬▬▬▬▬ to be used by Principal as a credit against Ticketmaster's purchase of certain Hardware (in addition to that certain Hardware listed with particularity on Exhibit B attached hereto) for Principal's use at the New Facility; provided, however, any unused Hardware Credit remaining upon the date that is thirty (30) days following the New Facility Opening Date, or the date of any earlier termination of this Agreement, shall be forfeited upon such date. The Hardware Credit, having no cash value, shall not at any time be payable directly to Principal. To the extent that Ticketmaster's purchase of Hardware for Principal's use in connection with the subject matter hereof at any time exceeds the Hardware Credit amount, Ticketmaster shall invoice Principal for, and Principal shall pay to Ticketmaster within thirty (30) days of invoice receipt, such incremental amount in excess of the Hardware Credit. In the event Principal fails to pay such invoice when due, Ticketmaster may deduct the amount of such invoice from the settlements otherwise due and owing to Principal. The parties acknowledge and agree that, unless otherwise mutually agreed upon by the parties, any such equipment purchased by Ticketmaster in accordance with this Section 3(c)(v) shall at all times be deemed "Hardware" as such term is used in this Agreement.

      (v)    **Third Party Equipment Allowance**: Solely in the event Principal utilizes the services of a third party equipment procurer such as SkiData, Ticketmaster shall pay to Principal a one-time allowance in the amount of ▬▬▬▬▬▬▬▬▬▬▬▬▬▬ (the "Third Party Equipment Allowance") to be used by Principal solely for Principal's purchase of equipment through such third party which is necessary for utilization of the TM System, which additional equipment, unless otherwise mutually agreed upon by the parties, shall be owned, operated, supported and maintained by Principal at its own cost. For the avoidance of doubt, such additional equipment shall not be deemed "Hardware" for any purposes of the Agreement. In the event that the Agreement terminates before the third (3rd) anniversary of the New Facility Opening Date, then Principal shall return to Ticketmaster, within fourteen (14) days of such termination, one hundred percent (100%) of the total Third Party Equipment Allowance, and in the event that the Agreement terminates at any time following the third (3rd) anniversary of the New Facility Opening Date but before the fifth (5th) anniversary of the New Facility Opening Date, then Principal shall return to Ticketmaster, within fourteen (14) days of such termination, a pro rata amount of Third Party Equipment Allowance actually provided from Ticketmaster to Principal pursuant to the terms and conditions of this Section 3(c)(vi) for each month remaining of the full Term following the date of such termination. Any return of the Equipment Allowance by Principal shall be by wire transfer or certified check. Notwithstanding any terms herein to the contrary, any unpaid amount of the Third Party Equipment Allowance from Ticketmaster to Principal shall be forfeited upon the termination or expiration of the Agreement.

4.    **LICENSE AND USE OF HARDWARE AND SOFTWARE**:

    (a)    **License**: Ticketmaster hereby grants Principal a non-exclusive, non-transferable (except as permitted pursuant to Section 17(d)) license to use the Hardware and Software (collectively, the "License") in exchange for the fees set forth herein.

5

Sacramento Kings LUA 01132017

LNE CONFIDENTIAL BUSINESS INFORMATION          LNE-01985111

**DX-1494.0247**

(b)    Use:  The Hardware and Software and all related materials may only be used by Principal in connection with the Attractions, and only for the purposes stated in this Agreement, and may not be utilized by or in connection with services, software, hardware or systems provided or supplied by any third party.  Principal shall use the Hardware and Software in a careful and proper manner and shall comply with and conform to all federal, state, county, municipal and other laws, ordinances and regulations in any way relating to the possession, use or maintenance of the Hardware and Software including, but not limited to, federal, state or other laws applicable to commercial emails. Principal may make a single copy of Archtics only to be used for archival or backup purposes; **COPYING FOR ANY OTHER PURPOSE IS PROHIBITED.** Except as otherwise provided in the immediately preceding sentence or otherwise expressly stated in this Agreement, Principal hereby agrees: (i) not to permit copying or reproduction of the Hardware or Software in any manner, including without limitation, use in a sharing arrangement or transmission over the Internet or over e-mail and similar electronic transmission; (ii) not to disassemble, re-manufacture, repair, re-configure, enhance, upgrade, modify, translate, adapt, create derivative works from or of, decompile or reverse engineer the Software in any way nor merge them into any other program for any purpose; (iii) not to transfer, license or sub-license, assign, rent, sell, grant, publish, disclose, display, dispose of or otherwise make available the Software, or any rights therein or copies or derivatives thereof, including other templates or working systems; (iv) not to delete, remove, change or otherwise alter any trademarks, copyright notices or other proprietary marks in or on the Hardware or Software, or any copies, modifications or partial copies thereof; (v) not to "hack," or attempt to "hack," any of the Software, the servers on which the Software is hosted or any other portion of the Ticketmaster network, or otherwise attempt to circumvent, or navigate outside of, the borders of such Software servers in any manner whatsoever; and (vi) not to perform any SQL database operations other than "SELECT" for any system production tables (i.e., tables starting with dba.t_<wildcard>) from any non-Archtics interface to the database (e.g., ISQL, Access, Crystal Reports, etc.).

(c)    Passwords:  Principal agrees that use of the TM System by Principal shall be restricted to a reasonable number of Principal's personnel having passwords in the event that Ticketmaster assigns such passwords.  Such passwords shall not be transferable without the written permission of Ticketmaster, which permission shall not be unreasonably delayed or withheld.  Upon Ticketmaster's reasonable request, Principal (i) shall identify, as the case may be, the users (by name, position and site address), who use or view the TM System or from where the TM System is used, and (ii) shall provide to Ticketmaster access to any database which records access to the TM System.

(d)    **TM Charge:**

(i)    Use and Operation of TM Charge:  Ticketmaster shall transmit data relating to Ticket sales made by Principal using TM Charge to Ticketmaster's credit card processor, provided Ticketmaster has received Principal's merchant number(s) and other necessary information for Ticketmaster to use for the transmission of sales data.  Principal shall be responsible for promptly notifying Ticketmaster and Processor, if applicable, of any changes to the information provided pursuant to this Section.  Processor will then transmit such data to the applicable credit card company for payment to Principal, subject to Principal having entered into the applicable Principal Processor Agreements (as further described below).  Ticketmaster shall use its best efforts to ensure the accuracy of information transferred from the Processor via TM Charge, but Ticketmaster does not guarantee the accuracy and timeliness of such information. Principal shall comply with all applicable credit card association or company guidelines (e.g. swiping all retail transactions and using customer address information for all non-face-to-face transactions). Ticketmaster shall provide Principal with daily transaction reports regarding authorized and settled transactions.  Principal shall review, on a regular basis, all reports provided to Principal by Ticketmaster.  Principal also agrees that, for operational and monitoring purposes,

6

Sacramento Kings LUA 01132017

**DX-1494.0248**

the Processor may provide Ticketmaster with processing and settlement reports related to sales of Tickets using TM Charge.

(ii)     Effect of Termination of Ticketmaster's Processor Agreement: Ticketmaster has entered into an agreement with the Processor (the "Processor Agreement"), and Principal agrees to enter into an agreement with such Processor (the "Principal Processor Agreement") as soon as practicable after the date of this Agreement.  The Principal Processor Agreement shall provide that if the related Processor Agreement expires or terminates, then the Principal Processor Agreement shall also expire or terminate without any early termination penalties or charges.  In order to facilitate streamlined credit card authorization processing for Ticketmaster and its clients, Ticketmaster continues to seek to maintain relationships with superior processors throughout the Term.  In the event that Ticketmaster elects to use a different Processor, Principal shall enter into an agreement with such new Processor if Principal desires to continue utilizing TM Charge, it being acknowledged and agreed by Principal, however, that use of certain Software (e.g., AccountManager) may require utilization of TM Charge.

(e)     **Ticket Forwarding**: Principal shall notify all Subscribers that Subscribers may not utilize Ticket Forwarding in connection with any third party ticket transactions, such as forwarding to ticket brokers or any other Internet sites that utilize forwarding in connection with commercial applications.  Principal shall notify Ticketmaster as promptly as practicable if it becomes aware of any such activity; and Ticketmaster reserves the right to suspend any Subscriber from using the Software for any violations of the above or for violations of any other rules and regulations reasonably adopted by Ticketmaster and provided to Principal from time to time.

(f)     **Principal's Website/Interface Page**:  Beginning on or shortly after the execution of this Agreement, and subject to the completion of the installation of Archtics, Ticketmaster will develop the Interface Page that will enable Principal's Subscribers to access their account information and conduct "real-time" transactions by linking to the Interface Page from the Principal's Website.  The Interface Page may contain a short, related textual description of AccountManager features and shall contain Ticketmaster's designated wording and graphic depiction thereof, currently "by Ticketmaster."

(g)     **GroupManager Restrictions**:  All Group Sales must comply with the definition of Group Sales set forth in Section 16.  In the event that Ticketmaster determines that a Group Sale is not a valid Group Sale, Ticketmaster shall have the right to assess against Principal the amount of fees that Ticketmaster would otherwise have been entitled to assess under this Agreement with respect to any such Tickets had they been purchased through Ticketmaster as single Tickets, and not from Principal as a Group Sale.

(h)     **TM+**:  Ticketmaster shall enable its proprietary, integrated primary and secondary market ticket inventory platform and technology on the TM.com Website, which platform and technology shall enable consumers searching for Tickets to an Attraction to simultaneously view Tickets available for initial sale directly by Principal pursuant to this Agreement, in addition to Tickets available for resale from other consumers on a co-mingled landing page on the TM.com Website (collectively, "TM+"), in accordance with the terms and conditions set forth on Exhibit C attached hereto.

(i)     **Hosted Platform**:  During the Term, Ticketmaster shall host the Software and provide and maintain the Hosted Platform on which the Software will be installed and run, including provision of the physical environment including physical security, HVAC and power for the required server hardware for the Hosted Platform and the Software.  Ticketmaster will also provide access via certain Internet connectivity, by being responsible for network operation and

7

Sacramento Kings LUA 01132017

LNE CONFIDENTIAL BUSINESS INFORMATION                                     LNE-01985113

DX-1494.0249

availability from the public Internet up to the termination cables at the network interface card on the server hardware for the Hosted Platform. Ticketmaster will not be responsible for power at the Facility or Principal's connectivity to the Internet.

5.    **INSTALLATION AND SET-UP**:

(a)    **Infrastructure and Installation:**  Ticketmaster will install the Hardware furnished by Ticketmaster, and provide Principal with access to the Software.  Principal will provide (i) a redundant connectivity solution between the Facility and Ticketmaster's central computer facility for interfacing that satisfies Ticketmaster's minimum system requirements, and (ii) unless otherwise agreed to between the parties, any type of equipment and technology necessary to assist Ticketmaster in completing the installation of such Hardware or Software. Ticketmaster shall have no responsibility for any internal wiring or cabling (e.g., electrical, data lines, etc.) necessary for installation, operation or for proper functioning of the TM System at the Facility.

(b)    **Attraction Set-Up**: In order to effectively utilize Ticketmaster's distribution technologies, within a reasonable time before (but in no event less than the time period described below) the scheduled on-sale date of Tickets for each Attraction (the "On-Sale Date"), Principal shall furnish Ticketmaster with all necessary information with respect to the Attraction, including, without limitation, seating layout of the Facility, Ticket structure, discounts permissible, Attraction Taxes, any information necessary to calculate Attraction Taxes, if applicable, Ticket header information, logos, entry information, vision and hearing information, wheelchair and other accessible seating information and such other information as is necessary for the proper sale of Tickets (collectively, the "Set-Up Information").  The parties intend that all accessible seating Tickets that are available for sale to persons desiring accessible seating shall be made available for sale on the TM System and such accessible seating Tickets shall not be released into the general pool of Tickets that are available for sale until forty-eight (48) hours before an Attraction. Principal must provide the Set-Up Information to Ticketmaster at least five (5) business days prior to the On-Sale Date for new Attractions that do not utilize seating charts then existing in the TM System and at least three (3) business days prior to the On-Sale Date for new Attractions that utilize seating charts then existing in the TM System.  Ticketmaster shall have no responsibility and Principal shall indemnify and hold Ticketmaster harmless from and against any and all liabilities, claims, expenses (including court costs and reasonable attorneys' fees) and causes of action resulting from the inaccuracy of any Set-Up Information furnished by Principal pursuant hereto.

(c)    **Facility Box Office Will-Call Services**:  At all times during the Term, Principal shall maintain a designated Facility Box Office location for the pick-up of Tickets purchased through Internet Sales and Telephone Sales.  The pick-up location shall be open during the normal hours of operation of the Facility Box Office.  Principal shall notify Ticketmaster of Principal's will-call capabilities and will-call Facility Box Office hours.  Principal shall verify the identity of each person picking up Tickets at will-call via a valid photo identification (government issued) and the credit card used in the Ticket sales transaction.  Principal shall not release Tickets to any customer whose identity has not been so verified.

(d)    **Supplies**:    Principal shall be responsible for maintaining adequate nondurable operational supplies used at the Facility in connection with the operation of the Hardware and Software to assure continuous operations at the Facility.

(e)    **Ticket Stock**: Principal shall be responsible for the security of Ticket stock in its possession, and the risk of loss of Ticket stock shall shift to Principal upon the delivery thereof to Principal or Principal's authorized representative, agent or employee.

8

Sacramento Kings LUA 01132017

LNE CONFIDENTIAL BUSINESS INFORMATION                                            LNE-01985114

6.    <u>MAINTENANCE AND SUPPORT</u>:

(a)    <u>Hardware and Software Maintenance and Support</u>: Ticketmaster shall provide ordinary and routine maintenance and repair services and adequate support of the Hardware and Software at the Facility to meet the reasonably anticipated service needs of Principal from time to time in exchange for the fees set forth herein. In the event that such maintenance, repair or support is necessitated due to the negligence or willful misconduct of Principal, its employees, agents or representatives, Ticketmaster shall use commercially reasonable efforts to provide the same but Principal shall be responsible for paying Ticketmaster's out-of-pocket expenses in connection therewith. Support services will be provided, on a return call basis, during Ticketmaster's normal business hours by personnel qualified to answer telephone inquiries by Principal seeking advice on questions and problems. Non-emergency calls made at the end of the day, which require support services that would keep staff beyond normal working hours, will be deferred to the following business day. Support will be provided for off-hour critical system emergencies. Ticketmaster will not be obligated to continue to provide maintenance with respect to any version of any particular Software hosted by Principal for more than one year after a release by Ticketmaster of an upgraded version of the same Software. Ticketmaster shall maintain an archive of Principal's Archtics database for up to two (2) years in the format of Principal's then current Archtics version. Ticketmaster shall retain archives of Principal's Archtics database in excess of two (2) prior years in an offline form to be stored at Ticketmaster's data center, which prior archives shall not be updated to Principal's then current Archtics version; provided, that Ticketmaster shall extract data from such prior archives at Principal's request and deliver such data extracts to Principal.

(b)    <u>Training of Principal's Employees</u>: Principal shall staff the Facility Box Office with its employees for the proper operation of the TM System for Ticket sales made through the Facility. Ticketmaster shall train, at its expense, Principal's employees who shall be reasonably necessary for the initial staffing of the Facility Box Office and for initial operation of the TM System for single ticket sales at the Facility. Ticketmaster shall also provide additional training at its cost to other employees of Principal to the extent such training is necessary as a consequence of changes initiated by Ticketmaster or changes in Ticketmaster's method of operation. To the extent of any change in personnel by Principal in connection with Facility Box Office sales requiring additional training beyond that initially contemplated hereunder, Principal agrees to absorb all of the expenses (including any and all reasonable travel expenses) thereof.

(c)    <u>Notification by Principal</u>: In the event of any breakdown or malfunction in the operation of any of the Hardware or Software, or difficulties encountered in connection with access to any of the Software, Principal agrees to promptly notify Ticketmaster of any such breakdown, malfunction or difficulty to assist Ticketmaster in performing its obligations hereunder.

(d)    <u>Access to Principal's Equipment and Data</u>: Principal shall permit Ticketmaster, at Ticketmaster's sole discretion and upon reasonable written notice, the right at a reasonable time to inspect Principal's pertinent sites and equipment (including any existing LAN or other network user monitor device) for the purpose of determining compliance with the terms of the License granted hereunder. In order to correctly diagnose faults in the equipment and data related to the Software and Hardware, Principal will provide Ticketmaster 24 hour remote access to Principal's installation, pertinent sites, equipment (including any existing LAN or other network user monitor device) and user data through PC Anywhere. Failure to provide such access may prohibit effective action by Ticketmaster and render Ticketmaster unable to proceed, and in such circumstances, Ticketmaster shall be under no liability for failure to perform its obligations hereunder.

9

Sacramento Kings LUA 01132017

LNE CONFIDENTIAL BUSINESS INFORMATION                                    LNE-01985115

**DX-1494.0251**

(e)    **Additional Archtics Services**: With respect to initial implementation of Archtics, Ticketmaster shall also provide, at no additional cost to Principal, (i) on-site support from Ticketmaster's national or regional personnel, (ii) unique Archtics customization (e.g., diagrams, invoices, other executables, etc.), (iii) custom reporting, and (iv) customized on-line assistance (the services described in clauses (ii) through (iv) are referred to herein as "Customization Services".) Generally two hours of Customization Services each week are included in the annual maintenance fees of Archtics listed on Exhibit A. Customization Services that far exceed this level of support shall be charged to Principal in accordance with Ticketmaster's standard rates.

7.    **ADVERTISING**:

(a)    **Advertising on Tickets Fulfilled at Facility Box Office**: For tickets fulfilled by Principal at the Facility Box Office, Principal shall either (i) provide, or pay Ticketmaster to provide, its own blank custom ticket stock and ticket envelopes in which case Principal shall have the right to sell advertising on such ticket stock and ticket envelopes or (ii) have Ticketmaster provide Ticketmaster's standard ticket stock and ticket envelopes in which case Ticketmaster shall have the right to sell advertising on such ticket stock and ticket envelopes.

(b)    **Ticketmaster Advertisements**: Principal hereby grants to Ticketmaster the right, in Ticketmaster's sole discretion, to advertise, in any medium determined by Ticketmaster, including on the on the Interface Page, TM.com Website or affiliated websites, Attractions and the availability of Tickets at the Facility Box Office, at all Outlets, and by Internet Sales and Telephone Sales and the availability of the Software and, in connection therewith, to use the name and pre-approved logo of Principal, the Attraction, the Facility and all other information respecting the Attractions, provided that, Ticketmaster must obtain Principal's prior approval before using Principal's logo in any manner other than Ticketmaster's current, standard practices which are for the primary purpose of promoting Ticket sales and publication of such logos on the TM.com Website.

(c)    **Principal Advertisements**: Principal may, during the Term, provide and place advertisements in any form of media which Principal shall desire to promote the availability of Tickets, the TM.com Website and the Attractions (except on websites or other media operated by, or on behalf of, third parties that promote, engage in or facilitate the sale, resale or issuance of tickets); provided, however, that in the event Principal shall place any such advertisements, it shall use its commercially reasonable efforts to cause Ticketmaster's name, logos and if the advertisement relates to the availability of Tickets, the applicable TM.com Website address and charge-by-phone number and, if possible, the identity of the Outlets where Tickets may be purchased, to be displayed in the advertisement, as well as the address of the Facility. Principal shall cause Principal's Website to deeplink to specified web page(s) within the applicable TM.com Website where ticket purchasers can begin the process of purchasing Tickets to Attractions. Principal agrees to promote the availability of Tickets on the TM.com Website by including, at a minimum, one "above-the-fold" graphic Ticketmaster branded link to the TM.com Website on each web page featuring one or more of the Attractions on Principal's Website. Such link will include the TM.com Website graphic logo and a call to action such as "buy tickets."

(d)    **Ticketmaster Client Style Guide**: The look and feel of any and all links from Principal's Website to the Interface Page or the applicable TM.com Website are subject to Ticketmaster's prior approval. Principal shall comply with all terms and conditions of Ticketmaster's Client Style Guide, as it may be updated from time to time.

(e)    **Advertising Revenue**: Ticketmaster and Principal shall separately receive and retain their respective income derived from advertising which each is entitled to sell under subsections (a), (b) and (c) above.

10

Sacramento Kings LUA 01132017

**LNE CONFIDENTIAL BUSINESS INFORMATION**                                                    LNE-01985116

**DX-1494.0252**

(f)     **Banner Ads**:   Neither Principal nor Ticketmaster will serve banner ads or other promotional ad units of any kind or allow any third party to serve any such ad units on the Interface Page, without the other party's prior consent.

8.     **ACCOUNTING PROCEDURES**:

(a)     **Payments by Ticketmaster**:   Principal hereby authorizes and directs Ticketmaster and the financial institution indicated below ("Bank") to deposit all settlement funds payable to Principal hereunder in the account listed below ("Principal's Account"), and to deposit all settlement funds payable to Sacramento Kings Limited Partnership, which owns and operates the Sacramento Kings, hereunder in the account listed below ("TeamCo's Account", and together with Principal's Account, the "Accounts"):

Principal's Account:



TeamCo's Account:



Ticketmaster shall collect all Ticket Receipts derived from Ticket sales made by Ticketmaster and shall initiate payment of Ticket Receipts to which Principal or TeamCo is entitled within thirty (30) days of the conclusion of each calendar month, with each monthly payment to be on account of TM System Ticket sales made for Attractions by Ticketmaster during such month. Initiation of the settlement payment via direct deposit shall constitute full performance by Ticketmaster of its obligation to make such settlement payment to Principal, TeamCo, or to any person whatsoever. Principal hereby releases Ticketmaster from liability for delays or errors beyond Ticketmaster's reasonable control, including but not limited to any errors resulting from any inaccurate or outdated Account information provided by Principal or TeamCo, or bank processing delays or for any related damages. Principal acknowledges and agrees that direct deposit of such funds may require up to two (2) business days for Bank processing. In the event of an error, Principal also authorizes the initiation of a debit to the Account to correct the error. Each weekly settlement payment shall be accompanied by a written accounting.  Principal shall designate an email address (set forth below its signature line of this Agreement) for delivery of such accounting and information regarding Attractions and Ticket sales, and shall promptly notify Ticketmaster of any changes to such email address. The direct deposit authorization provided herein shall remain in

11

Sacramento Kings LUA 01132017

LNE CONFIDENTIAL BUSINESS INFORMATION                                                         LNE-01985117

**DX-1494.0253**

full force and effect until Ticketmaster has received written notification from Principal of its termination in such time and such manner as to afford Ticketmaster a reasonable opportunity to act upon it. In no event shall any amounts be paid to Principal without TeamCo's prior written consent. TeamCo shall be an intended third party beneficiary of this Section 8(a).

(b)    **Cancelled Attractions; Refunds**:  In the event that any Attraction for which Ticketmaster sold Tickets is cancelled, postponed, or substantially modified (e.g., substitute material portions of acts) for any reason (each, a "Cancelled Attraction"), the Account Balance shall be held and made available for distribution by Ticketmaster to Ticket purchasers entitled to refunds for Tickets for Cancelled Attractions purchased from Ticketmaster. For purposes of this Agreement, the term "Account Balance" shall mean the amount of funds held at any time by Ticketmaster on account of Ticket sales for all Attractions, less the amount of Ticket sales proceeds which Ticketmaster is entitled to retain hereunder. Principal authorizes Ticketmaster to refund the Ticket price at the original point of purchase (e.g., at Outlets or by Internet Sales or Telephone Sales) in such manner (e.g. by crediting the consumer's credit card) and at such time (e.g. before or after the scheduled date of the performance of such Attraction) as Ticketmaster, in its sole discretion, determines and to exchange Tickets pursuant to any exchange policy that may be adopted by Principal and Ticketmaster. It is agreed and understood that Ticketmaster is the Ticket selling agent of Principal and therefore Ticketmaster's agreement to make any refunds as the agent of Principal is subject and limited to Ticketmaster holding or receiving from Principal the full amount of funds necessary to make refunds to all Ticket purchasers properly entitled to a refund.  Principal and Ticketmaster agree that Ticketmaster shall be entitled to retain the Ticketmaster fees assessable with respect to the initial sale of Tickets to Cancelled Attractions. Principal shall be responsible for all refunds and exchanges of Tickets initially purchased from the Facility Box Office.

(c)    **Chargebacks**:  Ticketmaster reserves the right to deduct from Principal's or TeamCo's settlement, portions of any Chargebacks that Ticketmaster is assessed by its merchant bank related to the Face Value and any other amounts due from Ticketmaster to Principal or TeamCo, as applicable, for up to twelve (12) months after the occurrence of an Attraction. Ticketmaster shall be responsible for the remaining portions of any Chargebacks, except to the extent caused by Principal's failure to obtain signatures, swipe credit cards, or follow any procedures provided by Ticketmaster or the merchant bank with respect to acceptance of credit cards, including, but not limited to, cardholder verification instructions for will-call and other alternative Ticket delivery/pick-up services. For purposes of this Agreement, "Chargebacks" shall mean the amounts that the merchant bank is charged back by a cardholder or a card issuer under the card organization's rules (e.g., cardholder dispute, fraud, declined transaction, returned Tickets for Cancelled Attractions, etc.).

(d)    **Insolvency; Deficiency Amounts; Security for Repayment**:  Principal shall provide prompt written notice to Ticketmaster in the event it files any voluntary or involuntary petition under the bankruptcy or insolvency laws or upon any appointment of a receiver for all or any portion of Principal's or TeamCo's business or the assignment of all or substantially all of the assets of Principal or TeamCo for the benefit of creditors (each, a "Material Financial Event"). The parties agree that this Agreement constitutes a financial accommodation by Ticketmaster to Principal and TeamCo as such term is utilized in 11 U.S.C. §365. If at any time, the Account Balance is not sufficient to pay for anticipated refunds or Chargebacks, Principal shall, or shall cause TeamCo to, deliver the amount of such deficiency ("Deficiency Amount") to Ticketmaster no later than twenty-four (24) hours after notice by Ticketmaster to Principal. Ticketmaster shall have the right to setoff any Deficiency Amount against any amounts held by Ticketmaster on behalf of Principal or TeamCo. In the event of any Material Financial Event or in the event Principal or TeamCo has not paid any Deficiency Amount when due, Ticketmaster shall have the option to (i) require Principal or TeamCo to provide additional security to Ticketmaster of a type

12

Sacramento Kings LUA 01132017

**LNE CONFIDENTIAL BUSINESS INFORMATION**                                    LNE-01985118

**DX-1494.0254**

(e.g., letter of credit, guaranty or performance bond) and in an amount as requested by Ticketmaster in its sole discretion, which Principal or TeamCo shall provide to Ticketmaster within five (5) business days after Ticketmaster's request, and/or (ii) suspend payment of Ticket Receipts in advance of the occurrence of Attractions and instead deliver Ticket Receipts to which Principal or TeamCo is entitled post-performance (i.e. within thirty (30) days of the conclusion of each month with respect to Attractions that occurred during such month). Ticketmaster reserves the right to require Principal to provide current financial statements or other financial information to Ticketmaster within five (5) business days after Ticketmaster's written request.

(e)    **Counterfeit Tickets**: It is agreed and understood that Ticketmaster shall not be liable to Principal for the printing and sale of counterfeit Tickets, including, without limitation, TicketFast Tickets.

(f)    **Audit of Sales**: Up to one (1) time per Contract Year, (i) Principal shall have the right at its own expense to audit Ticket sales for Attractions by Ticketmaster to assure Ticketmaster's compliance with the terms of this Agreement, and (ii) Ticketmaster shall have the right at its own expense to audit Ticket sales for Attractions made by Principal and by others (including, without limitation, the promoter and sponsor of any Attraction, the act or event itself and Principal's Subscribers) to assure their compliance with the terms of this Agreement. In the event such audit reflects an under or overpayment to the auditing party, as the case may be, in an amount that exceeds ▮▮▮▮▮▮ of the total payments for the period under audit, then the other party shall pay the reasonable, out-of-pocket fees and expenses incurred by the auditing party in connection therewith.

(g)    **Archtics Transaction Fees**: Ticketmaster, at its option, may deduct Archtics Transaction Fees from the amounts owed to Principal under this Agreement or may invoice Principal for such fees.

(h)    **License and Maintenance Fees**: Any initial or one time license or maintenance fees set forth on Exhibit A shall be due and payable upon the execution of this Agreement. Thereafter, installments of license or maintenance fees set forth on Exhibit A shall be invoiced and payable on the first day of each Contract Year during the Term.

(i)    **Request for Taxpayer Identification Number and Certification**: Principal shall complete the required Form W-9 provided with this Agreement and return it to Ticketmaster with this Agreement for purposes of reporting to the Internal Revenue Service.

9.    **TAXES**:

(a)    **Taxes on Hardware**: Principal shall keep the Hardware free and clear of all levies, liens and encumbrances which are caused by Principal or under Principal's control and shall promptly reimburse Ticketmaster for all license fees, registration fees, assessments, charges and taxes, whether federal, state, county, municipal or other governmental or quasi-governmental, with respect to the Hardware located at the Facility, including, without limitation, use, excise and property taxes, and penalties and interest with respect thereto, except and excluding, however, any taxes based on or measured solely by Ticketmaster's net income.

(b)    **Attraction Taxes**: Principal shall be responsible for calculating any and all Attraction Taxes, for preparing and timely filing any and all tax returns or reports required to be filed in respect of any such Attraction Taxes, and for timely remitting Attraction Taxes to the appropriate taxing authority. Ticketmaster will collect and turn over to Principal the amounts to which Principal is entitled as provided in Section 8(a). In the event that Ticketmaster pays any Attraction Taxes on behalf of Principal or Ticketmaster pays any Attraction Taxes due to a failure

13

Sacramento Kings LUA 01132017

LNE CONFIDENTIAL BUSINESS INFORMATION                              LNE-01985119

**DX-1494.0255**

by Principal to provide Ticketmaster with the required writing or documentation of any Principal tax exemptions pursuant to Section 9(d) below, Principal shall promptly reimburse Ticketmaster for any and all such Attraction Taxes paid by Ticketmaster, including penalties and interest assessed with respect thereto (other than Attraction Taxes, penalties and interest that Ticketmaster pays directly out of Principal's Ticket Receipts), and shall also promptly reimburse Ticketmaster for any and all expenses (including reasonable attorneys' fees) or damages that result from the failure by Principal to properly calculate and timely remit Attraction Taxes assessed on all amounts received by Principal under this Agreement, to timely file all related returns or reports, or to timely reimburse Ticketmaster for any and all such Attraction Taxes, interest and penalties as provided above.  Notwithstanding the foregoing, in the event that Ticketmaster is ever required by applicable law to remit Attraction Taxes directly on behalf of Principal and file related tax returns or reports, Ticketmaster shall have the right to do so upon notice to Principal, and thereafter "Ticket Receipts" shall be defined to be reduced by such Attraction Taxes.  Upon Principal's request, Ticketmaster shall notify consumers prior to purchase of any Attraction Taxes that are applicable to such Attraction.

(c)    **Principal's Taxpayer ID Number**:  Principal certifies that Principal's federal taxpayer identification number (FEIN or SSN) is _61-1734905_.  Principal further certifies that its state taxpayer identification or registration number for the state in which the Facility is located is _California_.

(d)    **Principal's Tax Exemptions**:  Principal shall notify Ticketmaster in writing of any and all Principal tax exemptions (if applicable) and provide Ticketmaster with reasonable proof of Principal's tax exemptions.

(e)    **Taxes on License and Maintenance Fees**: The license and maintenance fees set forth on Exhibit A are exclusive of any sales, use, value added, excise or other taxes, and Principal shall be responsible for paying all such applicable taxes.

10.    **LOSS AND DAMAGE TO THE HARDWARE; INSURANCE**:

(a)    Principal acknowledges that the Hardware will be used by Principal at the Facility and that Ticketmaster does not own, operate or control such location.  Accordingly, Principal hereby assumes and shall bear the entire risk of loss and damage to the Hardware, ordinary wear and tear excepted, whether or not insured against, once installed, unless occasioned by the negligence or willful misconduct of Ticketmaster, from any and every cause whatsoever from the date of delivery of the Hardware to the Facility or Principal site until removal thereof following termination of this Agreement.  No such loss or damage to the Hardware shall impair any obligation of Principal under this Agreement.  In the event of loss or damage of any kind to any Hardware, Principal, at its sole option, shall within thirty (30) days after such loss or damage:

(i)    Place the same, or replace the same with similar property, in good repair, condition and working order to the satisfaction of Ticketmaster; or

(ii)    Pay Ticketmaster in cash the full replacement cost of the Hardware, and Ticketmaster shall promptly install new hardware to replace the lost or damaged Hardware.

(b)    Principal shall, at its own expense, provide and maintain at all times during the Term insurance to protect the Hardware against loss caused by fire (with extended coverage), vandalism, malicious mischief, theft, or any other cause in an amount equal to the full replacement value of the Hardware as determined by Ticketmaster.  Should Principal become unable to provide or maintain such insurance coverage, Principal shall promptly notify Ticketmaster in

14

Sacramento Kings LUA 01132017

LNE CONFIDENTIAL BUSINESS INFORMATION                    LNE-01985120

writing prior to the expiration of any such coverage, and, thereafter, Ticketmaster shall have the right, but shall not be obligated, to provide insurance coverage for the occurrences specified above and charge Principal the costs of such insurance coverage.

(c)    Principal shall provide, at its sole expense, comprehensive or commercial general liability and property damage insurance with minimum limits of ███████████ ████████ in the aggregate for its protection and the protection of Ticketmaster.

(d)    All insurance provided and maintained by Principal shall be in such amounts, under such forms of policies pursuant to this Section shall provide for the waiver of the insurer's right of subrogation against Principal and Ticketmaster. All policies of insurance shall include Ticketmaster, Live Nation Worldwide, Inc. and its landlords or licensors, if any, and their respective parents, members, partners, affiliates, divisions and subsidiaries as an additional named insured on a primary and non-contributory basis irrespective of any other insurance, whether collectible or not, with respect to the operations of Principal per this written Agreement. Further, such policies shall provide for at least thirty (30) days' prior written notice of cancellation, non-renewal or material modification to Ticketmaster. Principal shall furnish Ticketmaster with certificates of such insurance or other evidence satisfactory to Ticketmaster as to its compliance with the provisions of this Section.

11.    **TITLE**:

(a)    **Hardware/Software**: Principal covenants and agrees that the Software and Hardware and any deliverables or work product furnished under this Agreement are, and shall at all times be and remain, personal property which shall, at all times, remain the sole and exclusive property of Ticketmaster, and Principal shall have no right, title or interest therein or thereto except as a licensed user thereof. Principal acknowledges and agrees that Ticketmaster has invention rights, copyrights, and other intellectual property rights in the TM System and the information contained therein which prohibit copying, sale, modification and re-manufacture of the TM System and information regarding the TM System without the written consent of Ticketmaster and which will be enforced. Principal hereby agrees that it will, whenever reasonably requested by Ticketmaster, execute, acknowledge and deliver, or use commercially reasonable efforts to cause to be executed, acknowledged and delivered, agreements, instruments, and documents necessary or desirable, in form satisfactory to Ticketmaster, to protect the rights and ownership of Ticketmaster to and of the Software and Hardware, including but not limited to certificates from parties with a real property interest in the premises wherein the Hardware may be located waiving any claim with respect to the Hardware. Except as may be necessary to prevent damage to or destruction of the Hardware, Principal will not move the Hardware nor permit such Hardware to be moved without Ticketmaster's prior written consent, which consent shall not be unreasonably withheld, and shall give Ticketmaster prompt written notice of any attachment or other judicial process affecting any item of Hardware. Upon the expiration or termination of this Agreement, Principal shall return the Software and Hardware to Ticketmaster in good repair, condition and working order, ordinary wear and tear resulting from proper use thereof alone excepted, and any and all licenses and other rights to the Software and Hardware shall terminate with respect to Principal.

(b)    **Intellectual Property**: Each party shall retain all right, title and interest in and to its respective trademarks, service marks and trade names worldwide ("Intellectual Property") subject to a limited non-exclusive, non-transferable license necessary to perform this Agreement. Each party grants the other a royalty-free, non-exclusive, non-transferable license, during the Term, within the territory, to include such party's pre-approved Intellectual Property solely in connection with the promotions and marketing contemplated in this Agreement. Each party shall use the other's Intellectual Property only as provided, and shall not alter the Intellectual

15

Sacramento Kings LUA 01132017

LNE CONFIDENTIAL BUSINESS INFORMATION                                    LNE-01985121

**DX-1494.0257**

Property in any way, nor shall it act or permit action in any way that would impair the rights of owning party in its Intellectual Property. Each party acknowledges that its use of the other party's Intellectual Property shall not create any right, title or interest in or to such Intellectual Property. Each party shall have the right to monitor the quality of the other party's use of its Intellectual Property. If such party is not satisfied that the quality of the other party's use of its Intellectual Property, upon the first party's written notice, the other party shall, as reasonably required by the first party, suspend further use of such Intellectual Property, and work with first party to revise such use such that the quality standards are met and use of the Intellectual Property reflects positively upon the reputation of the first party. Additionally, each party shall notify the other promptly in writing of any known infringement of the other's Intellectual Property but such notifying party shall have no right to pursue a claim against any such infringer, such right being solely at the discretion of the party owning the Intellectual Property. Any references to a party's Intellectual Property shall contain the appropriate trademark, copyright or other legal notice provided from time to time by owning party.

(c) **Purchaser Data**: Principal and Ticketmaster each has rights in the personally identifiable information with respect to persons who actually purchased tickets to Principal's Attractions through the TM System (whether by outlets, Telephone Sales or Internet Sales) ("Purchaser Data"), subject to the terms hereof. Such use by Ticketmaster may include, without limitation, in development of new or upgraded Software at Principal's request, or for general market research on pricing when used in aggregate form with other Ticketmaster client consumer data. Each party agrees to use the Purchaser Data only in compliance with all applicable laws and administrative rulings and in accordance such party's own posted privacy policies. Each party agrees that if any portion of the Purchaser Data includes a person's name and that person's (i) social security number; (ii) driver's license or government identification number; or (iii) password and account identification, then such party shall implement and maintain reasonable security procedures and practices in accordance with industry standards and otherwise appropriate to the nature of the Purchaser Data to protect the Purchaser Data from unauthorized access, destruction, use, modification or disclosure. Each party also agrees that if any portion of the Purchaser Data in its possession includes credit or debit card numbers and related information, such party shall comply with payment card industry standards. Each party shall also include in any email communications that such party may make based on the Purchaser Data a mechanism to provide the recipient with the right to "opt-out" from receiving further communications from such party, and shall honor such opt-out preferences.

12.    **CONFIDENTIAL INFORMATION**:

(a)    The parties acknowledge that by reason of their relationship hereunder, they may from time to time disclose information regarding their business, products, software technology, Intellectual Property and other information that is confidential and of substantial value to the other party, which value would be impaired if such information were disclosed to third parties ("Confidential Information"). The provisions of this Agreement shall be deemed to be Confidential Information.

(b)    Confidential Information shall not include information that (i) is or becomes generally available to the public other than as a result of the breach of the confidentiality obligations in this Agreement by the receiving party, (ii) is or has been independently acquired or developed by the receiving party without violating any of the confidentiality obligations in this Agreement, (iii) was within the receiving party's possession prior to it being furnished to the receiving party by or on behalf of the disclosing party, or (iv) is received from a source other than the disclosing party; provided that, in the case of (iii) and (iv) above, the source of such information was not known by the receiving party to be bound by a confidentiality obligation to the disclosing party or any other party with respect to such information.

16

Sacramento Kings LUA 01132017

(c)      Each party agrees that it will keep the Confidential Information of the other party strictly confidential and will not use in any way for its own account or the account of any third party, nor disclose to any third party, any Confidential Information revealed to it by the other party without the other party's prior written consent, except to the extent expressly permitted by this Agreement; provided, however, that the receiving party may disclose the Confidential Information, or any portion thereof, to its directors, officers, employees, legal and financial advisors, controlling persons and entities who need to know such information to perform such party's obligations under this Agreement and who agree to treat the Confidential Information in accordance with the confidential obligations in this Agreement.  Each party shall use the same degree of care to avoid disclosure or use of the other party's Confidential Information as it employs with respect to its own Confidential Information of like importance and represents that it has adequate procedures to protect the secrecy of such Confidential Information including without limitation the requirement that employees have executed non-disclosure agreements which have the effect of adequately protecting Confidential Information.

(d)      In the event that either party receives a request to disclose all or any part of the Confidential Information under the terms of a subpoena, document request, notice of deposition or other legal proceeding, to the extent practicable, such party agrees to notify the other pursuant to Section 17(h) below, within forty-eight (48) hours after receipt of such legal document, and such party agrees to cooperate with the other in any attempt to obtain a protective order.

13.     **LIMITATION ON LIABILITY**:  In no event shall either party be liable for any indirect, consequential, exemplary, incidental, special or punitive damages, including also lost profits, lost savings, lost ticket revenues or lost opportunity costs, of any type or nature, or for events or circumstances beyond such party's control, even if such party has been advised of the possibility of such damages.  Neither occasional short term interruptions of service which are not unreasonable under comparable industry standards nor interruptions of service resulting from events or circumstances beyond Ticketmaster's reasonable control shall be cause for any liability or claim against Ticketmaster hereunder, nor shall any such occasion render Ticketmaster in default under this Agreement.

14.     **INDEMNIFICATION**:

(a)      Principal shall indemnify Ticketmaster and its affiliates, parents, subsidiaries, and their equityholders, officers, directors, employees, representatives and agents and their successors and assigns (collectively, for purposes of this Section, "Ticketmaster's Indemnitees") against, and hold Ticketmaster's Indemnitees harmless from, any and all claims, actions, damages, expenses (including court costs and reasonable attorneys' fees), obligations, losses, liabilities and liens, imposed on, incurred by, or asserted against Ticketmaster's Indemnitees occurring as a result of, or in connection with: (i) any Event of Default under this Agreement by Principal or any of its officers, directors, employees and agents (collectively, "Principal's Representatives"); (ii) use of the TM System (including without limitation any customization of Principal's Website or the Interface Page (if applicable) and any e-mail campaigns or distributions using the TM System) or possession and use of the Hardware (if any) by Principal or any of Principal's Representatives; (iii) any Attraction held or scheduled to be held at the Facility (including any injuries or deaths occurring at or in connection with any Attraction or the failure of any Attraction to occur or to occur in the manner advertised or promoted); (iv) a claim that Ticketmaster's release of the Purchaser Data to Principal violates any applicable law, rule or regulation; (v) Principal's collection, use or disclosure of any Purchaser Data; (vi) violations of laws relating to the resale of Tickets; or (vii) any email campaigns or distributions conducted by Ticketmaster on Principal's behalf or conducted by Principal including, without limitation, email

17

Sacramento Kings LUA 01132017

LNE CONFIDENTIAL BUSINESS INFORMATION                                                          LNE-01985123

**DX-1494.0259**

campaigns or distributions in violation of federal, state or other laws applicable to commercial emails; except, in each case, to the extent that any such claims shall relate to Ticketmaster's negligence or willful misconduct with respect thereto or is otherwise covered by Ticketmaster's indemnification of Principal as stated in subsection (b) below.

(b)    Ticketmaster shall indemnify Principal and its affiliates, parents, subsidiaries, and their equityholders, officers, managers, directors, employees, representatives, and agents and their successors and assigns (collectively, for purposes of this Section, "Principal's Indemnitees") against, and hold Principal's Indemnitees harmless from, any and all claims, actions, damages, expenses (including court costs and reasonable attorneys' fees), obligations, losses, liabilities and liens, imposed on, incurred by, or asserted against, Principal's Indemnitees occurring as a result of, or in connection with: (i) any Event of Default under this Agreement by Ticketmaster; or any of its officers, directors, employees and agents, (ii) Ticketmaster's collection, use or disclosure of any Purchaser Data, (iii) any alleged patent, trademark, copyright or other intellectual property infringement asserted against Principal's Indemnitees with respect to Principal's use of the TM System; except, in each case, to the extent that any such claim shall relate to Principal's negligence or willful misconduct with respect thereto or is otherwise covered by Principal's indemnification of Ticketmaster as stated in subsection (a) above.

(c)    The indemnified party must notify the other party promptly in writing of any claim hereunder, and provide, at such other party's expense, all reasonably necessary assistance, information and authority to allow the other party to control the defense and settlement of such claim; provided that the indemnifying party may only settle or compromise a claim with the prior written approval of the indemnified party (which approval shall not be unreasonably withheld or delayed), except that no such approval shall be required if the settlement or compromise (i) provides only for payment of money damages which are paid fully by the indemnifying party, (ii) does not include any admission of wrongdoing or guilt on the part of indemnified party, and (iii) includes a full release of indemnified party and its directors, officers, employees and agents from any further claims, lawsuits, damages, liabilities, costs and expenses that the third party bringing the claim has, has had, or may thereafter have. If the indemnified party provides notice of a claim as set forth above and is not notified within twenty (20) days thereafter that the indemnifying party intends to defend the claim, the indemnified party shall be entitled to defend such claim, and settle or compromise such claim, subject to the indemnification provided for herein.

## 15.    TERMINATION:

(a)    This Agreement may be terminated by either party in the event of any material default in or material breach of the terms and conditions of this Agreement by the other party, after the other party has received written notice of default and thirty (30) business days (or ten (10) business days, in the case of a monetary default) to cure such default (each such occurrence, after the expiration of such cure period, shall be an "Event of Default"); or the filing of any voluntary or involuntary petition against the other party under the bankruptcy or insolvency laws of any applicable jurisdiction, which petition is not dismissed within sixty (60) days of filing, or upon any appointment of a receiver for all or any portion of the other party's business, or any assignment of all or substantially all of the assets of such other party for the benefit of creditors. Upon an Event of Default by Ticketmaster, Ticketmaster shall, without demand, forthwith pay to Principal all amounts due and owing pursuant hereto, and Principal may, in addition to terminating this Agreement, require Ticketmaster to remove all Hardware from the Facility. Upon an Event of Default by Principal, Principal shall, without demand, forthwith pay to Ticketmaster all amounts due and owing pursuant hereto, and Principal authorizes Ticketmaster to set off any amounts owed to Ticketmaster hereunder against any amounts held by Ticketmaster on behalf of Principal,

18

Sacramento Kings LUA 01132017

LNE CONFIDENTIAL BUSINESS INFORMATION                                    LNE-01985124

and Ticketmaster may, in addition to terminating this Agreement, terminate Principal's right to access and use the TM System and take immediate possession of the Hardware and Software wherever the same may be located without demand, notice or court order.

(b)    Upon the effective date of any termination or expiration of this Agreement, provisions regarding ownership of intellectual property rights, representations and warranties, confidentiality, indemnification, limitation of liability, non-solicitation, jurisdiction and venue shall remain in full force and effect; each party shall immediately cease the use of the other party's Intellectual Property; and each party shall return, or at the other party's request, destroy all copies of Confidential Information, and all other property belonging to and/or received from the other party.

(c)    No remedy referred to in this Section is intended to be exclusive, but each shall be cumulative and in addition to any other remedy herein or otherwise available at law or in equity, each and all of which are subject to the limitations contained in Section 13 hereof.

16.    **DEFINITIONS**:  As used in this Agreement, the following terms shall have the respective meanings indicated below unless the context otherwise requires:

"AccessManager" means the Ticketmaster AccessManager software which interfaces with the TM System to facilitate certain reporting systems and to provide various enhanced services to the patron admissions process through the use of bar codes or other media printed on Tickets.

"AccountManager" means the Ticketmaster AccountManager software and hosting services that allow Subscribers to manage their Season/Contract Ticket accounts.

"Archtics" means Ticketmaster's software that delivers extensive season, miniplan and single ticket functionality in connection with the Ticketmaster host system and distribution channels for inventory control by Ticketmaster and Principal.

"Archtics Transaction Fees" means the amounts Ticketmaster charges for certain Software transactions as described in Exhibit A.

"Attraction" means a concert, sporting, entertainment or other act or event of any kind or nature whatsoever to be held at the Facility.

"Attraction Taxes" means any and all sales, amusement, admissions and other taxes, charges, fees, levies or other assessments measured by reference to a charge per Ticket sold or determined based upon the purchase price of a Ticket assessed by federal, state, county, municipal or other governmental or quasi-governmental authorities as a result of, or in connection with, any Attraction, including Principal Taxes and Ticketmaster Taxes as further described below. To the extent such taxes relate to the funds paid or owed to Principal under this Agreement such portion of Attraction Taxes may also be referred to herein as Principal Taxes, and to the extent such taxes relate to fees or charges collected and retained by Ticketmaster under this Agreement, such portion of Attraction Taxes may also be referred to herein as Ticketmaster Taxes. Attraction Taxes include any capital fund or other fees imposed by the City of Sacramento on a per Ticket basis.

"Chargebacks" is defined in Section 8(c) hereof.

"Confidential Information" is defined in Section 12 hereof.

"Contract Year" is defined in Section 1 hereof.

19

Sacramento Kings LUA 01132017

LNE CONFIDENTIAL BUSINESS INFORMATION                                LNE-01985125

**DX-1494.0261**

"Convenience Charge" means the per Ticket amount charged to a consumer for the convenience of purchasing Tickets through the TM System.

"Event of Default" is defined in Section 15(a) hereof.

"Face Value" means the face price of a Ticket as determined by Principal, which shall be inclusive of all applicable Attraction Taxes and facility and similar fees.

"Facility" means (i) the venue located at 1 Sports Parkway, Sacramento, California, and currently known as Sleep Train Arena, and (ii) the venue located at 547 L Street, Sacramento, California and currently known as Golden 1 Center (the "New Facility"). Notwithstanding the above, prior to Principal's entry into an agreement with any third party to provide ticketing services on behalf of Principal with respect to any other venue which Principal (directly or indirectly through one or more affiliates) owns, operates or otherwise controls the rights or has the authority to issue or sell tickets to any event at such venue, Ticketmaster shall have the exclusive right of negotiation with Pacers with respect to the provision of such ticketing services by Ticketmaster for such venue, until such date that is ninety (90) days following the date that Principal (directly or indirectly through one or more affiliates) acquires such ownership, operation, control or authority (the "Exclusive Negotiation Period"), and Principal shall engage in good faith negotiations with Ticketmaster for such services during such Exclusive Negotiation Period; provided, that in the event the parties fail to reach an agreement for such ticketing services by the conclusion of such Exclusive Negotiation Period, Principal shall have the right to enter into such an agreement for ticketing services in respect of such venue with any third party.

"Facility Box Office" means the Facility's Ticket sales locations that are operated by Principal and located at the Facility.

"Gross Transaction Value" means, for any primary market sales transaction of Tickets, the Face Value of such Tickets, plus any consumer fees or charges (e.g., Convenience Charges and Processing Fees) added to the Face Value of such Tickets, excluding delivery fees (e.g., the Mail Fee or expedited delivery fees such as UPS or FedEx). For the avoidance of doubt, the Gross Transaction Value shall also exclude the Upsell Price (as further described in Exhibit F) of any Upsell Product added to a Ticket purchase.

"GroupManager" means the Ticketmaster GroupManager software and hosting services that allow Principal and Principal's customers to manage their group ticket experience.

"Group Sales" means sales of Tickets by Principal to a group consisting of at least fifteen (15) people for use by the group members to attend an Attraction as a group. In no event shall Group Sales consist of the sale of Tickets to individuals to attend an event separately or for individuals to purchase Tickets with the intent to resell such Tickets.

"Hardware" means all of that certain computer hardware, communications equipment, terminals and hook-ups (including replacements thereof) listed with particularity on Exhibit B or otherwise supplied by Ticketmaster to Principal at any time during the Term, but excluding (i) any computer hardware, communications equipment, terminals and hook-ups purchased by Principal to provide the connectivity to and interfacing with the TM System required under this Agreement, and (ii) any computer hardware, communications equipment, terminals and hook-ups purchased by Principal from Ticketmaster.

"Hosted Platform" shall mean the equipment, operating system, hardware and software specifications, and networking environment on and with which the TM System and Software are

20

Sacramento Kings LUA 01132017

LNE CONFIDENTIAL BUSINESS INFORMATION                                    LNE-01985126

**DX-1494.0262**

hosted by Ticketmaster, and additions or replacements to the foregoing which may be implemented by Ticketmaster in accordance with the terms of this Agreement.

"House Seats" means Tickets provided by Principal (i) to the Attraction's promoter, performing act or event, or their managers or agents (i.e. band holds); (ii) for distribution through legitimate fan clubs in accordance with current guidelines (i.e. fan club holds); or (iii) for legitimate promotional purposes (e.g. radio station promotions); provided that House Seats Tickets shall not be distributed to the general public.

"Inside Charges" means the amounts Ticketmaster charges Principal to sell, issue and process Tickets utilizing the TM System pursuant to this Agreement.

"Intellectual Property" is defined in Section 11(b) hereof.

"Interface Page" means a co-branded web page interface for use with Software transactions designed, created and maintained by Ticketmaster to have, in general, the look and feel of Principal's Website and hosted on Ticketmaster's web servers.

"Internet Sales" means all sales of Tickets over the Internet.

"License" is defined in Section 4(a) hereof.

"MiniPlan Tickets" means specifically designated Tickets sold directly by Principal to a single consumer on an annual or season basis across a set of at least two (2) Attractions.

"New Facility Opening Date" means the date on which the first Attraction (for which Tickets are sold to the general public) occurs at the New Facility.

"Outlet" means a retail Ticket selling agency (other than the Facility Box Office) where Tickets for an Attraction are made available and offered for sale to the public through the TM System; provided, Ticketmaster shall have no obligation to maintain any network of such retail Ticket selling agencies during the Term.

"Payment Processing Fees" is defined in Section 3(b).

"Principal's Website" means an Internet website(s) owned, operated and maintained by Principal, which shall contain links to the Interface Page.

"Processing Fee" means the per order amount charged by Ticketmaster to a consumer for purchasing Tickets via Internet Sales or Telephone Sales through the TM System.

"Purchaser Data" is defined in Section 11(c) hereof.

"sale and sell" and any derivations thereof in this Agreement shall include any distribution for consideration, by any means or method (including without limitation, on the Internet or by auction) and shall include resales.

"Season/Contract Tickets" means specifically designated Tickets sold directly by Principal on an annual basis across all Attractions or across all of a category of Attractions (i.e., luxury suites sold on an annual basis, club level seats sold on an annual basis and season tickets).

"Sellable Capacity" means the admission capacity of the Facility for any particular Attraction, excluding suites.

21

Sacramento Kings LUA 01132017

LNE CONFIDENTIAL BUSINESS INFORMATION                                        LNE-01985127

**DX-1494.0263**

"Software" means Ticketmaster's ticketing system software known and marketed as Ticketmaster Classic, AccessManager, TM Charge, TM+, the New NBA Ticketing Platform (as described in Exhibit D attached hereto), and the additional ticket sales software and Internet-based premium Ticketmaster services that include Archtics, AccountManager, GroupManager, and any new versions thereof or any other deliverables for TM System access provided to Principal by Ticketmaster during the Term.

"Subscribers" means any person who holds an account on Principal's AccountManager.

"Telephone Sales" means all sales of Tickets through the TM System by telephone, interactive voice response (IVR) and similar means.

"Term" is defined in Section 1 hereof.

"Ticket" means a printed, electronic or other type of evidence of the right, option or opportunity to occupy space at or to enter or attend an Attraction or Attractions even if not evidenced by any physical manifestation of such right, such as a "smart card", including, without limitation, tickets printed via TicketFast print-at-home technology.

"TicketFast®" means the TM.com Website method of Ticket delivery which allows purchasers to print Tickets from a computer.

"Ticket Forwarding" means the ability of Subscribers to forward Tickets purchased through AccountManager to a recipient with a valid email address.

"Ticket Receipts" means the Face Value of all Tickets sold by Ticketmaster, plus any Convenience Charges and Processing Fees retained by Principal, less any applicable Inside Charges (exclusive of Ticketmaster Taxes in jurisdictions in which Principal is required to remit Attraction Taxes to the applicable taxing authority) and Payment Processing Fees, and less any Principal Taxes for jurisdictions in which Ticketmaster is required to remit Principal Taxes to the applicable taxing authority.

"TM Charge" means the electronic payment processing system within the TM System that utilizes the global banking association networks to authorize electronic payment for purchases of Tickets to Attractions sold by Principal from the Facility Box Office as permitted under this Agreement.

"TM.com Website" means any Internet websites owned, operated and maintained by Ticketmaster, including, without limitation, any co-branded versions and any version distributed through any broadband distribution platform or through any platform or device including television, broadband and wireless technologies.

"TM System" means the Hardware, Software, TM.com Website, related procedures and personnel, and repair and maintenance services established and maintained by Ticketmaster and its affiliates for the purpose of selling, distributing, auditing and controlling the sale of Tickets for Attractions, including, without limitation, at Outlets, by Internet Sales, by Telephone Sales and the processing of transactions through the Software.

17.    **MISCELLANEOUS**:

(a)    **Governing Law/Jurisdiction**: This Agreement shall be interpreted and governed by the laws of the State of California, without reference to conflict of laws principles.

22

Sacramento Kings LUA 01132017

LNE CONFIDENTIAL BUSINESS INFORMATION    LNE-01985128

Each of the parties hereto agrees that the state courts, and the United States federal courts, that are located in Sacramento or San Francisco in the State of California shall each have subject matter jurisdiction hereunder and personal jurisdiction over each of the parties hereto. Each such party hereby consents thereto, and hereby waives any right it may have to assert the doctrine of forum non conveniens or to object to venue to the extent that any proceeding is conducted in accordance with the foregoing provision.

(b)     **Waiver of Jury Trial**:  In the event the parties are required for any reason to submit any dispute hereunder to trial, the parties expressly agree to waive the right to a jury trial, because the parties hereto, all of whom are represented by counsel, believe that the complex commercial and professional aspects of their dealing with one another make a jury determination neither desirable nor appropriate.

(c)     **Entire Agreement; Modification**:  This Agreement constitutes the entire and exclusive agreement between the parties hereto with respect to the subject matter hereof and supersedes and cancels all previous oral or written communications, proposals, agreements, and commitments including but not limited to that certain Licensed User Agreement by and between Ticketmaster and King Arco Arena Limited Partnership, predecessor-in interest to Principal, dated as of March 3, 2004, as amended from time to time thereafter (collectively, as amended, the "Prior Agreement").  Notwithstanding the above, the charges and fees applicable to Tickets sales set forth in the Prior Agreement shall continue to apply with regards to Attractions occurring solely at the Facility currently knowns as Sleep Train Arena, until the closure of such Facility.  No modification to this Agreement, nor any waiver of any rights, shall be effective unless assented to in writing by the party to be charged and the waiver of any breach or default shall not constitute a waiver of any other right hereunder or any subsequent breach or default.  A party's delay in enforcing its rights hereunder shall not be construed as a waiver of such rights or remedies.

(d)     **Assignment**:  Without the prior written consent of Ticketmaster, Principal shall not (i) directly or indirectly assign, transfer, pledge or hypothecate its rights or obligations in this Agreement or any interest therein; or (ii) permit the Hardware (if any) or any part thereof to be used, or access to the Software or any part thereof to be had, by anyone other than Principal or Principal's authorized employees, in each case except in the event of an assignment by Principal to any parent, subsidiary, affiliate or successor-in-interest (including, without limitation, a successor by virtue of an acquisition) which is not a competitor of Ticketmaster, in which event no such consent shall be required.  Any such assignment shall not relieve Principal of any of its obligations hereunder.  Without the prior written consent of Principal, Ticketmaster shall not assign or transfer its rights or obligations in this Agreement or any interest therein, except in the event of an assignment by Ticketmaster to any parent, subsidiary, affiliate or successor-in-interest (including, without limitation, a successor by virtue of an acquisition), in which event no such consent shall be required.  Any assignment, transfer, pledge or hypothecation for which consent is required hereby and which is made without such consent shall be void.  Notwithstanding the foregoing, Principal agrees and acknowledges that certain of Ticketmaster's duties and obligations under this Agreement may be performed on Ticketmaster's behalf by one or more of its parent, subsidiaries and affiliates, and no such performance shall be deemed to be an assignment or breach of this Agreement by Ticketmaster.  In the event Principal assigns this Agreement pursuant to this Section, Principal shall require in writing that Principal's permitted assignee expressly agrees to assume this Agreement, including responsibility for the return of any pro rata amount of the Signing Bonus to Ticketmaster in the event the Signing Bonus is not fully earned by Principal or such assignee and fully recouped by Ticketmaster during the Term in accordance with the terms set forth in Section 3(c)(i), but in no event would such assumption relieve Principal of its obligation related to such pro rata amount of the Signing Bonus.

23

Sacramento Kings LUA 01132017

LNE CONFIDENTIAL BUSINESS INFORMATION                                                                    LNE-01985129

(e)    **Relationship of the Parties**: Each party is an independent contractor and not an agent or partner of, or joint-venturer with, the other party for any purpose other than as set forth in this Agreement (e.g., Ticketmaster is the agent of Principal with respect to ticket sales and distribution). Neither party by virtue of this Agreement shall have any right, power, or authority to act or create any obligation, express or implied, on behalf of the other party.

(f)    **Delays**: Neither party shall be liable or deemed in default, and no Event of Default shall be deemed to have occurred, as a result of any delay or failure in performance of this Agreement resulting directly or indirectly from any cause completely, solely and exclusively beyond the control of that party, but only for so long as such delay shall continue to prevent performance.

(g)    **Severability**: If any provision of this Agreement is found to be invalid or unenforceable in any jurisdiction (a) the validity or enforceability of such provision shall not in any way be affected with respect to any other jurisdiction, and the validity and enforceability of the remaining provisions shall not be affected; and (b) the parties shall replace such provision by one or more valid and enforceable provisions approximating the original provision as closely as possible.

(h)    **Notices**: Any notices required to be given under this Agreement must be sent to each party, in writing, at the address set forth immediately below the signature line hereto or at such address as may be provided by each party in writing from time to time, by certified or registered mail, return receipt requested or by an overnight courier. Notices will be deemed effective upon receipt. Settlement reports may be delivered from Ticketmaster to Principal by email; therefore Principal shall promptly notify Ticketmaster of any change to its email address set forth immediately below the signature line hereto.

(i)    **Binding Agreement/Counterparts**: The terms, conditions, provisions and undertakings of this Agreement shall be binding upon and inure to the benefit of each of the parties hereto and their respective successors and permitted assigns; provided, however, that this Agreement shall not be binding until executed by each of the parties. This Agreement may be executed in multiple counterparts which when taken together constitute a single instrument.

(j)    **Legal Review**: Each of the parties has had the opportunity to have its legal counsel review this Agreement on its behalf. If an ambiguity or question of intent arises with respect to any provision of this Agreement, this Agreement will be construed as if drafted jointly by the parties. The parties expressly agree that the construction and interpretation of this Agreement shall not be strictly construed against the drafter.

(k)    **Attorneys' Fees**: In addition to any other rights hereunder, the substantially prevailing party, as a court of competent jurisdiction (as provided above) may determine, in any claim or other dispute which relates to this Agreement, regardless of whether such claim or other dispute arises from a breach of contract, tort, violation of a statute or other cause of action, shall have the right to recover and collect from the other party its reasonable costs and expenses incurred in connection therewith, including, without limitation, its reasonable attorneys' fees. If a party substantially prevails on some aspects of such claim or dispute but not others, the court may apportion any award of costs or attorneys' fees in such manner as it deems equitable.

(l)    **Client Listings**: Principal's execution of this Agreement indicates approval for Principal to be listed as a Ticketmaster client in monthly newsletters for distribution to event industry clients, in product boiler plate information, and in future releases about Ticketmaster products and services for distribution to trade and consumer media. At any time, Principal may,

24

Sacramento Kings LUA 01132017

LNE CONFIDENTIAL BUSINESS INFORMATION                            LNE-01985130

in its sole discretion, direct Ticketmaster to stop using Principal's name for the purposes listed in this Section by sending notice to Ticketmaster via email at client.news@ticketmaster.com.

(m) **Survival of Terms**: Any provision of this Agreement that contemplates performance or observance subsequent to any termination or expiration of this Agreement, including without limitation provisions related to use of the Software, purchaser data, limitations on liability, indemnification, confidential information, governing law and waivers of jury trials, shall survive any termination or expiration of this Agreement and continue in full force and effect.

IN WITNESS WHEREOF, Ticketmaster and Principal have caused this Licensed User Agreement to be duly executed as of the date set forth below.

TICKETMASTER L.L.C.,
a Virginia limited liability company

By: _____

Print Name: Kurt Schwartzkopf

Title: SVP, NBA Teams and Arenas

Date: _1/24/17_____

Ticketmaster L.L.C.
1444 Wazee Street
Denver, CO 80202

Attn:     SVP, NBA Teams and Arenas

**With a copy to:**

Ticketmaster L.L.C.
7060 Hollywood Boulevard
Los Angeles, CA 90028
Attn:     Legal Department

SACRAMENTO DOWNTOWN ARENA LLC,
a Delaware limited liability company

By: _____

Print Name: _John Rinehart_

Title: _CFO_____

Date: _1/24/17_____

Address: _500 David J Stern Walk_
_Sacramento, Ca. 95814_

email address: ███████████████

**With a copy to:**

_Adam Klein_
_Katten Muchin Rosenman LLP_
_525 W. Monroe Street_
_Chicago IL. 60661_
Attn:   _Adam Klein_
███████████████████

Acknowledged and agreed to by Sacramento Kings Limited Partnership ("TeamCo") with respect to TeamCo's obligations under Section 8:

SACRAMENTO KINGS LIMITED PARTNERSHIP

By: _____

Print Name: _John Rinehart_

Title: _CFO_____

Date: _1/24/17_____

25

Sacramento Kings LUA 01132017

**LNE CONFIDENTIAL BUSINESS INFORMATION**                                        LNE-01985131

26

Sacramento Kings LUA 01132017

LNE CONFIDENTIAL BUSINESS INFORMATION                    LNE-01985132

**DX-1494.0268**

## EXHIBIT A

## COMPENSATION

1.      **Charges and Fees**. The parties agree and acknowledge that the fees set forth in this Exhibit A shall be effective for all Attractions other than those Attractions occurring at the Facility currently known as Sleep Train Arena. For Attractions occurring at the Facility currently known as Sleep Train Arena, the fees set forth in the Prior Agreement shall apply to Ticket sales for such Attractions until the closure of such Facility; provided, however, that as of the Effective Date of this Agreement, the Royalties payable to Principal (as defined in Section 3(f) of the Prior Agreement) with respect to such fees set forth therein shall increase to the amount of ▮▮ of the applicable fee. In addition, with respect to the fees and charges set forth in this Exhibit A, for a period of ninety (90) days following the conclusion of the second full Contract Year following the New Facility Open Date, the parties shall meet to discuss in good faith an amendment to the fee terms of this Exhibit A.

    (a)      **Convenience Charge (Per Ticket) and Processing Fee (Per Order)**: The per Ticket Convenience Charges and per order Processing Fees shall be determined and (subject to the terms set forth herein) retained by Principal during the Term (excluding Feld Attractions as further described in Section 3(a) of the Agreement); provided, however, that (i) such fees shall not exceed general market rates assessed for events at similarly situated venues; (ii) for any Attractions other than Sacramento Kings Attractions, Attractions presented by Live Nation Entertainment or its affiliates, or Feld Attractions, the Convenience Charges shall not be less than ▮▮ per Ticket for any Tickets with a Face Value of ▮▮▮▮, or ▮▮ of the Face Value for any Tickets with a Face Value of ▮▮ and above; and (iii) in the event any per Ticket fee or per order fee in any single transaction is less than the applicable Inside Charge due Ticketmaster as set forth in subsection (b) following, Ticketmaster reserves the right to invoice Principal for the amount of such Inside Charge, or to setoff such amount against any funds held by Ticketmaster on account of Principal.

    (b)      **Inside Charges**:

| Type of Attraction/Ticket | |
|---|---|
| Sacramento Kings Attractions—Season/Contract Tickets | ▮ |
| Sacramento Kings Attractions—all other Ticket types (e.g., individual and Group Sales Tickets) | ▮ |
| Attractions presented by Live Nation Entertainment or its affiliates (and any replacement thereof or successor thereto) – all Ticket types (excluding Artist Platinum Tickets as described in subsection 1(e) of this Exhibit A below) | ▮ |
| All other Attractions (excluding Feld Attractions) –all Ticket types (excluding Artist Platinum Tickets as described in subsection 1(e) of this Exhibit A below) | ▮ |

At the beginning of each of the first and third Contract Years which start after the New Facility Opening Date, the Inside Charges due Ticketmaster set forth above shall be subject to automatic increase as follows:

27

Sacramento Kings LUA 01132017

LNE CONFIDENTIAL BUSINESS INFORMATION                                        LNE-01985133



| Type of Attraction/Ticket | |
|---|---|
| Sacramento Kings Attractions—Season/Contract Tickets | |
| Sacramento Kings Attractions—all other Ticket types (e.g., individual and Group Sales Tickets) | |
| All other Attractions (including Attractions presented by Live Nation Entertainment or its affiliates (and any replacement thereof or successor thereto), but excluding Feld Attractions) – all Ticket types | |

(c)    **Mail Fee**. Ticketmaster shall be entitled to assess and receive a fee in the amount of ▇ per order against purchasers of Tickets using the U.S. mail method of delivery (the "Mail Fee"). The Mail Fee is subject to automatic increase equal to any increases (rounded up to the nearest $0.05) to the postal rates. Principal may elect to increase the Mail Fee by an additional amount not to exceed ▇ per order, and Principal shall retain the entirety of such additional amount for each Mail Fee received (and not refunded) by Ticketmaster, less applicable taxes or Payment Processing Fees (calculated at the same rate for credit card transactions as set forth below in Section 3 of this Exhibit A) on such additional amount.

(d)    **Archtics Fees**:

(i)    Archtics Transaction Fees:



| Type of Software Transaction AccountManager Transactions | |
|---|---|
| Season/Contract Ticket sales (including renewals) | |
| MiniPlan Ticket sales (including renewals) | |
| Suite additionals* | |
| Right of first refusal to purchase Tickets* | |
| Per invoice processing* | |
| Ticket Forwarding* | |
| Internal Ticket Forwarding * | |

Sacramento Kings LUA 01132017

28

LNE CONFIDENTIAL BUSINESS INFORMATION

LNE-01985134



| Type of Software Transaction | |
|---|---|
| Single Ticket sales to Subscribers | |
| Seat exchanges/upgrades* | |
| **GroupManager Transactions** | |
| Group Sales | |
| Corporate Group Sales (sales to a group via a link on an emailed invitation or on an entity's intranet) | |

For any Archtics transactions identified with (*) above, the applicable Archtics Transaction Fee to be determined by Principal shall not, unless otherwise mutually agreed to by the parties, exceed an amount which is ▮▮▮▮▮▮ greater than the amount of the applicable Archtics Transaction Fee which was in effect for each such transaction prior to the Effective Date of this Agreement.

(ii)    Archtics License and Maintenance Fees:

| Software | |
|---|---|
| **Archtics -- Hosted Platform** | |
| **Archtics** – Sybase Adaptive Server Anywhere | |
| **AccountManager** | |
| **GroupManager** | |

(e)    **Platinum Tickets and VIP Packages:**

(i)    VIP and/or Platinum Events.  Principal authorizes VIP Packages and Artist Platinum Tickets (as defined below) for certain Attractions (the "VIP and/or Platinum Events") to be made available for sale by the applicable Attraction's artist or promoter ("Artist/Promoter") through Ticketmaster's ticketing system, under the terms of Ticketmaster's agreement with the applicable Artist/Promoter ("Artist/Promoter Agreement").  The parties acknowledge that such Artist Platinum Tickets and the Tickets for any VIP Package are provided to the applicable Artist/Promoter by Principal as part of the "artist" hold for any VIP and/or Platinum Event.

(ii)    Definitions.  For purposes of this Agreement:

"Artist Platinum Tickets" refer to any dynamically-priced Tickets that represent the most select category of seats for an Event resulting from proximity to stage or other superior amenities, as determined at the reasonable discretion of the applicable Artist/Promoter and Ticketmaster;

29

Sacramento Kings LUA 01132017

LNE CONFIDENTIAL BUSINESS INFORMATION                                      LNE-01985135

**DX-1494.0271**

and

"VIP Packages" mean Ticket packages which entitle the purchaser of the Ticket to additional benefits to be fulfilled by the Artist/Promoter, including but not limited to, access to unique experiences surrounding the Attraction and/or unique merchandise.

(iii)    Pricing and Fees. The terms of this Agreement, including the determination of pricing for Platinum Tickets or VIP Packages (other than the Face Value of the underlying Ticket included in any VIP Package) shall not govern the sale of Artist Platinum Tickets or VIP Packages for such VIP and/or Platinum Events, and do not restrict, limit or negate, in whole or in part, the rights of the Artist/Promoter to sell such Platinum Tickets or VIP Packages to any VIP and/or Platinum Event through Ticketmaster pursuant to the Artist/Promoter Agreement. Accordingly, any fee assessed by Ticketmaster against the Artist/Promoter in exchange for the marketing, distribution, customer service and support provided by Ticketmaster in connection with the sale of Artist Platinum Tickets (the "Platinum Fee") or VIP Packages (the "VIP Package Fee") shall be as negotiated between Ticketmaster and the Artist/Promoter under the Artist/Promoter Agreement. For avoidance of doubt, the Platinum Fee and VIP Package Fee shall not be included in the Gross Transaction Value for Ticket sales for purposes of determining the Inside Charges due Ticketmaster pursuant to subsection 1(b) of this Exhibit A above

(iv)    Artist Platinum Ticket Settlement. Settlement of proceeds for Artist Platinum Ticket sales by Ticketmaster shall be made to the applicable Artist/Promoter, pursuant to the Artist/Promoter Agreement with Ticketmaster, and not to Principal. Any amounts due and owing by the applicable Artist/Promoter to Principal with respect to Artist Platinum Tickets shall be determined according to any arrangement directly between Principal and the applicable Artist/Promoter for such Platinum Event. For avoidance of doubt, such Artist Platinum Ticket sales proceeds shall not be included as part of the Gross Transaction Value of Ticket sales for purposes of determining the Inside Charges due Ticketmaster pursuant to subsection 1(b) of this Exhibit A above.

(v)    VIP Package Settlement. Settlement of proceeds (excluding the Face Value of the underlying Ticket included in any VIP Package) for VIP Package sales by Ticketmaster shall be made to the applicable Artist/Promoter, pursuant to the Artist/Promoter Agreement with Ticketmaster, and not to Principal. For avoidance of doubt, such VIP Package sales proceeds (exclusive of the Face Value of the underlying Ticket included in such VIP Package) shall not be included in the Gross Transaction Value of the applicable Ticket for purposes of determining the Inside Charge due Ticketmaster as set forth in subsection 1(b) of this Exhibit A above).

(vi)    Royalties. Notwithstanding anything to the contrary above, for any VIP and/or Platinum Event, Principal shall be entitled to receive from Ticketmaster a royalty on each VIP Package Fee or Platinum Fee collected (and not refunded or subject to Chargeback) by Ticketmaster, in an amount equal to fifty-six percent (56%) of the VIP Package Fee or Platinum Fee, as applicable.

2.    **Payment Processing Fees**:

| Type of Sale | |
|---|---|
| Telephone Sales and Internet Sales | |

30

Sacramento Kings LUA 01132017

LNE CONFIDENTIAL BUSINESS INFORMATION                                    LNE-01985136

**DX-1494.0272**

| Outlet Sales | ███████████████████ |
| Principal Sales using TM Charge | ███████████████████ |

Any percentage rates set forth above are subject to automatic increase due to increases in the interbank rates imposed on Ticketmaster.

31

Sacramento Kings LUA 01132017

LNE CONFIDENTIAL BUSINESS INFORMATION

LNE-01985137

**DX-1494.0273**

## EXHIBIT B

### HARDWARE



32

Sacramento Kings LUA 01132017

LNE CONFIDENTIAL BUSINESS INFORMATION                                      LNE-01985138

**DX-1494.0274**

## EXHIBIT C

### TM+ TERMS AND CONDITIONS

Ticketmaster shall enable TM+ for all Attractions in accordance with the settlement terms set forth in this Exhibit C below.

### TM+ Settlement Terms

- For any primary market ticket inventory sold through TM+, Ticketmaster shall continue to sell such tickets and settle the proceeds of such sales with Principal in accordance with the terms and conditions for such transactions as set forth in the Agreement.

- For any secondary market ticket inventory sold through TM+ for any Sacramento Kings games presented by Principal, Ticketmaster shall assess its standard fees against the buyers and sellers of such tickets, and settle any revenue share on such amounts due Principal, in accordance with the terms and conditions set forth in the New NBA Ticketing Platform opt-in addendum attached as Exhibit D to this Agreement.

- For any secondary market ticket inventory sold through TM+ for any other Attraction (i.e., non-Sacramento Kings games) (the "Non-Team Attractions"), but excluding any Feld Attractions, Ticketmaster shall assess its standard fees against the buyers and sellers of such tickets in amounts as determined by Ticketmaster, and Principal shall be entitled to receive from Ticketmaster ███████████ of the Net Resale Fees collected (and not refunded or subject to chargeback) by Ticketmaster on account of Principal's secondary market ticket sales through TM+ for any Non-Team Attractions (the "TM+ Revenue Share").

- For purposes of this Exhibit C, "Net Resale Fees" shall be defined as the gross amount collected from the new purchaser of a secondary market inventory ticket for any Non-Team Attraction via TM+ less (i) the proceeds paid to the ticket seller, (ii) an amount equal to ███ of the gross amount collected from the new purchaser (to cover credit card processing fees), and (iii) any applicable sales, admission or similar tax.

- The TM+ Revenue Share for any Sacramento Kings games will be paid to Principal on an annual basis for all such sales occurring in any Contract Year, on or before the thirtieth (30th) day of the month following each Contract Year.  The TM+ Revenue Share for all Non-Team Attractions will be paid to Principal on a quarterly basis for all such sales occurring in any calendar quarter, on or before the thirtieth (30th) day of the month following each calendar quarter.  In the event that any Attraction for which Ticketmaster has made any TM+ Revenue Share payment to Principal becomes a Cancelled Attraction, Principal shall promptly repay to Ticketmaster the amount of such TM+ Revenue Share payments in respect of such Cancelled Attraction.

- Each settlement relating to the TM+ Revenue Share pursuant to this Exhibit C shall be accompanied by a report of the applicable transactions during such settlement period.

33

Sacramento Kings LUA 01132017

LNE CONFIDENTIAL BUSINESS INFORMATION

LNE-01985139

DX-1494.0275

## EXHIBIT D

### New NBA Ticketing Platform Opt-in Addendum

Sacramento Downtown Arena LLC, a Delaware limited liability company
One Sports Parkway
Sacramento, CA 95834
Attn: John Rinehart

      Re:    Participation in New NBA Ticketing Platform

Dear John:

      This letter (this "Amendment") will confirm the agreement between Ticketmaster L.L.C. ("Ticketmaster") and Sacramento Downtown Arena LLC, a Delaware limited liability company, on behalf of the Sacramento Kings ("Team"), regarding the participation by Team in the NBA-branded online marketplace for initial or primary market NBA ticket sales, and secondary market or fan-to-fan NBA ticket resales and exchanges within the broader ticket marketplace (the "New NBA Ticketing Platform"), to be developed and operated by Ticketmaster pursuant to the terms and conditions of the agreement between Ticketmaster and NBA Media Ventures, LLC ("NBAMV"), WNBA Enterprises, LLC ("WNBAE"), NBA Development League ("NBADL" and, together with NBAMV and WNBAE, the "NBA Parties") dated as of July 1, 2012 (the "NBA Agreement"). This Amendment amends Team's current Licensed User Agreement with Ticketmaster, as the same may be amended from time to time (as amended, the "Licensed User Agreement") to incorporate terms and conditions of the NBA Agreement relating to the secondary market resale of Team's game tickets through the New NBA Ticketing Platform as set forth herein. Capitalized terms used but not defined herein have the meaning assigned to such terms in the Licensed User Agreement.

      This Amendment shall be effective as of the Effective Date (as defined below) and remain in full force and effect throughout the earlier of (i) the term of the Licensed User Agreement, and (ii) the term of the NBA Agreement (currently expiring on September 30, 2017), including any renewal or extension thereof, unless sooner terminated pursuant to the terms and conditions of the NBA Agreement (the "Term").

      Team hereby agrees to participate in the New NBA Ticketing Platform as of September 1, 2012 (the "Effective Date") in accordance with the terms and conditions set forth below:

### 1.   Definitions

      For purposes of this Amendment:

(1) "Year" means any contract year of the NBA Agreement, defined as a twelve (12) month accounting period (falling within the term of the NBA Agreement) commencing October 1 and concluding September 30.

(2) "Direct Costs" means, with respect to the purchase of Team's game tickets through any Ticketmaster Secondary Exchange, the following items: (i) credit card fees and chargebacks (together, calculated at the rate of ███ of the gross transaction value), (ii) fulfillment costs, (iii) applicable taxes attributable to Secondary Exchange Fees (it being understood that any taxes attributable to the ticket sales price shall not be deemed a "Direct Cost"), and (iv) actual out-of-pocket customer acquisition costs (e.g., costs to unaffiliated third parties on search

34

Sacramento Kings LUA 01132017

LNE CONFIDENTIAL BUSINESS INFORMATION

LNE-01985140

**DX-1494.0276**

engine marketing (SEM) related to Team's game tickets or on commissions required to be paid by Ticketmaster to unaffiliated third parties for completed game ticket transactions consummated by customers that linked to any Ticketmaster Secondary Exchange directly from the applicable third party) that, in each case, are directly attributable to any such ticket purchase and incurred by Ticketmaster.

(3) "Secondary Exchange Fees" means the amount of any fees or charges collected (and not charged back or refunded) by Ticketmaster from a seller or buyer of Team's game tickets for any such ticket (exclusive of the agreed upon ticket sales price) that is sold on or through any Ticketmaster Secondary Exchange, net only of Direct Costs; provided, that the amount of the fees charged to such buyers and sellers (other than for professional ticket resellers) shall be subject to the approval of Team, so long as the total of such buyer and seller fees in each such ticket transaction equals at least ███████████████████████████████ ████████████ of the agreed upon ticket sales price (unless otherwise agreed to by the parties). Notwithstanding the foregoing, "Secondary Exchange Fees" shall be deemed to exclude any fees or charges collected by Ticketmaster from professional ticket resellers for services utilized by such professional ticket resellers on any Ticketmaster Secondary Exchange that are incidental to the sale of a game ticket (e.g., ticket transfer technology).

(4) "Sell-Through Rate" means, for any Attraction, a percentage calculated as the total number of tickets (of all ticket types, including group sales and season tickets, but excluding suites and complimentary tickets) which are sold (and not refunded or charged back) for the Attraction, plus fifty percent (50%) of complimentary tickets distributed for the Attraction, with such difference divided by the total Sellable Capacity for the Attraction.

(5) "Target Sell-Through Rate" means the following percentages for each applicable Year:

| Year | Target Sell-Through Rate |
| --- | --- |
| October 1, 2015 – September 30, 2016 | ██████ |
| October 1, 2016 – September 30, 2017 | ██████ |

Beginning with the Year starting October 1, 2017 and for each Year thereafter, the Target Sell-Through Rate shall be determined based on the actual Sell-Through Rate for the prior Year, as follows:

(i) If the average actual Sell-Through Rate for all game Attractions during the prior Year is lower than the Target Sell-Through Rate for such Year by three percentage points or more, the Target Sell-Through Rate for the succeeding Year shall be decreased to the percentage in the following table which is immediately lower than the prior Year's average actual Sell-Through Rate:



| Potential Target Sell-Through Rates |
| --- |
| ██████ |
| |
| ██████ |
| |

For example, if the average actual Sell-Through Rate for the Year beginning October 1, 2016 is ██████ (i.e., five and one-half percentage points lower than the Target Sell-Through Rate of ████), then the Target Sell-Through Rate for the Year beginning October 1, 2017 shall be ██████ (i.e., the percentage in the table above which is immediately lower than ██████). If the average actual Sell-Through Rate for all game Attractions during the prior Year is lower than the Target Sell-Through Rate for such

35

Sacramento Kings LUA 01132017

LNE CONFIDENTIAL BUSINESS INFORMATION

LNE-01985141

**DX-1494.0277**

Year by less than three percentage points, the Target Sell-Through Rate for the succeeding Year shall remain the same as the prior Year.

(ii) If the average actual Sell-Through Rate for all game Attractions during the prior Year is higher than the Target Sell-Through Rate for such Year by three percentage points or more, the Target Sell-Through Rate for the succeeding Year shall be increased to the percentage in the preceding table (in subsection (5)(i) above) which is immediately higher than the prior Year's average actual Sell-Through Rate. If the average actual Sell-Through Rate for all game Attractions during the prior Year is higher than the Target Sell-Through Rate for such Year by less than three percentage points, the Target Sell-Through Rate for the succeeding Year shall remain the same as the prior Year.



(iii) For avoidance of doubt, the maximum Target Sell-Through Rate for any Year shall be ███ , and the minimum Target Sell-Through Rate for any Year shall be ███

(6) "Ticketmaster Secondary Exchange" means any software, web site, platform or functionality provided, operated or hosted by Ticketmaster (and not, for the avoidance of doubt, by any third party) which allows ticket holders to post such tickets for sale to third parties (e.g., TM+ and TicketsNow.com).

## 2.    Team Controlled Media Deliverables; Integrated Ticketmaster Media

During each Year, Team shall provide Ticketmaster with the specific media deliverables set forth on Schedule 1 attached hereto and incorporated herein by this reference (the "Team Controlled Media"), which Team Controlled Media shall be used solely for the promotion of the New NBA Ticketing Platform. In addition, during each Year, Team shall enable the specific Ticketmaster media assets on the applicable "Event Details Pages" (EDP) for Team's Attractions on the TM.com Website as set forth on Schedule 2 attached hereto and incorporated herein by this reference (the "Ticketmaster Integrated Media"); provided, however, Ticketmaster reserves the right to discontinue any such Ticketmaster Integrated Media asset upon notice to the NBA Parties and Team.

## 3.    Team Revenue Share

In consideration for Team's provision of the Team Controlled Media and enabling of the Ticketmaster Integrated Media, notwithstanding anything to the contrary set forth in the Licensed User Agreement, Ticketmaster shall pay to Team an amount equal to ██████████ of all Secondary Exchange Fees from the sale of Team's game tickets on any Ticketmaster Secondary Exchange for any game Attractions with an actual Sell-Through Rate that meets or exceeds the Target Sell-Through Rate for the applicable Year, or ██████████ of all Secondary Exchange Fees from the sale of Team's game tickets on any Ticketmaster Secondary Exchange for any game Attractions with an actual Sell-Through Rate that fall below the Target Sell-Through Rate for the applicable Year (the "Team Resale Revenue Share").

## 4.    Team Marks

36

Sacramento Kings LUA 01132017

LNE CONFIDENTIAL BUSINESS INFORMATION

LNE-01985142

**DX-1494.0278**

Subject to and in accordance with the terms and conditions set forth in the Licensed User Agreement relating to Ticketmaster's use of Team's marks and logos, Ticketmaster shall have the right to use Team's individual marks and logos on the New NBA Ticketing Platform and in connection with marketing, advertising and other means for promotion of the New NBA Ticketing Platform.

## 5.   Team Designation

Ticketmaster shall have the right to use the following Team-specific designation in connection with marketing, advertising and using other means for promotion of the New NBA Ticketing Platform: "Official Ticket Exchange of the Sacramento Kings" or as otherwise mutually agreed by Ticketmaster and Team.

## 6.   Reporting

Within thirty (30) days of the end of each quarter during each Year, Ticketmaster shall furnish Team with full and accurate statements showing the calculation of total Secondary Exchange Fees (and all Direct Costs relating to such Secondary Exchange Fees) for the preceding quarter. Notwithstanding anything to the contrary set forth in the Licensed User Agreement, Team further consents to Ticketmaster furnishing the same statements to the NBA Parties to verify Ticketmaster's compliance with the NBA Agreement.

## 7.   Discounted Products and Services

Throughout the Term, notwithstanding anything to the contrary set forth in the Licensed User Agreement, Ticketmaster shall provide Team with the products and services (or any successor products or services that provide substantially the same functions) set forth on Schedule 3 attached hereto at the discounted rates set forth on Schedule 3.

## 8.   Conflicting Terms

In the event a conflict arises between this Amendment and the terms and conditions of the Licensed User Agreement, the terms and conditions of this Amendment shall control. Except as specifically set forth herein to the contrary, all of the terms and conditions of the Licensed User Agreement are in full force and effect, shall continue in full force and effect throughout the term and are hereby ratified and confirmed by the parties.

Please acknowledge your agreement with and acceptance of the terms and conditions of this Amendment by having a copy of this Amendment executed where indicated below.

Sincerely,

TICKETMASTER, L.L.C.

By: _____

Name: _Kurt Schwartzkopf_

Title: _SVP NBA NHL Arenas_

AGREED TO AND ACCEPTED BY:

KINGS ARENA LIMITED PARTNERSHIP

By: _____
Name: _John Rinehart_
Title: _CFO_

37

Sacramento Kings LUA 01132017

LNE CONFIDENTIAL BUSINESS INFORMATION                                    LNE-01985143

**DX-1494.0279**

## Schedule 1 to Exhibit D

### TEAM CONTROLLED MEDIA DELIVERABLES

- Drop down link to the New NBA Ticketing Platform in the Team's homepage navigation bar on each page of the Team's section of the NBA.com network that includes such navigation bar;
- Permanent link to the New NBA Ticketing Platform in the Team's homepage footer for each page of the Team's section of the NBA.com network that includes such footer;
- Contextual links to the New NBA Ticketing Platform on the schedule page of the Team's section of the NBA.com network and/or other relevant pages within the Team's section of the NBA.com network;
- Eight (8) dedicated email campaigns to the Team's database promoting the New NBA Ticketing Platform each Contract Year, subject to replacement with alternative media as mutually agreed to by Ticketmaster and the NBA Parties based on the performance or effectiveness of the campaigns;
- Bi-weekly ticket messages promoting the New NBA Ticketing Platform on Team-controlled social networking platforms each Contract Year; and
- Banner ad inventory on Team web site pages (e.g., schedule page, tickets page, etc.) with ads promoting the New NBA Ticketing Platform to be provided by Ticketmaster.

38

Sacramento Kings LUA 01132017

LNE CONFIDENTIAL BUSINESS INFORMATION                                    LNE-01985144

**DX-1494.0280**

### Schedule 2 to Exhibit D

TICKETMASTER INTEGRATED MEDIA

- Resale Tab on the EDP that will direct consumers to a Ticketmaster Secondary Exchange;
- Interactive Seat Map (ISM) advertisement on the EDP that appears once a consumer begins searching for seats on the ISM;
- "Limited Availability" module on the EDP that appears on a static seat map when seating sections are sold out or have limited inventory remaining; and
- Dynamic module that appears after a consumer's search for tickets from the applicable EDP generates a "No Tickets Found" (NTF) page search result on the TM.com Website (based upon the search parameters selected by such consumer), which dynamic module offers such consumer the opportunity to purchase alternative tickets through a Ticketmaster Secondary Exchange.

39

Sacramento Kings LUA 01132017

LNE CONFIDENTIAL BUSINESS INFORMATION                    LNE-01985145

**DX-1494.0281**

## Schedule 3 to Exhibit D

### DISCOUNTED PRODUCTS AND SERVICES

1. <u>Live Analytics Services</u>:  Ticketmaster shall charge the following transaction fees with respect to Team's use of Live Analytics:

- Fan Match:
  - o  Processing CPM: ▮▮▮▮ discount off of current standard rates)
  - o  Matched Records CPM: ▮▮▮▮ discount off of current standard rates)
- Fan Profile:
  - o  Standard CPM: ▮▮▮▮ discount off of current standard rates)
  - o  Enhanced CPM: ▮▮▮▮ discount off of current standard rates)
- Fan Score:
  - o  RFP CPM: ▮▮▮▮ discount off of current standard rates)
  - o  Propensity: ▮▮▮▮ discount off of current standard rates)
  - o  DII: ▮▮▮▮ discount off of current standard rates)
  - o  Personic X: ▮▮▮▮ discount off of current standard rates)
- Fan Profile + Fan Score:
  - o  Fan Profile Enhance Package & All Four Fan Score CPM: ▮▮▮▮ discount off of standard rates)
- Prospect Models:
  - o  Initial Model: ▮▮▮▮ discount off of current standard rates)
- Retention Models:
  - o  Initial Model: ▮▮▮▮ discount off of current standard rates)

2. <u>PriceMaster</u>:  For the first Contract Year, Ticketmaster shall charge a ▮▮▮▮ fee with no commission in connection with Team's use of PriceMaster, representing a ▮▮▮▮ discount off Ticketmaster's standard rate for such service.  For each Contract Year thereafter, Ticketmaster shall charge a ▮▮▮▮ discount off of the then-current standard rate for such service.

40

Sacramento Kings LUA 01132017

**LNE CONFIDENTIAL BUSINESS INFORMATION**                                        **LNE-01985146**

**DX-1494.0282**

## EXHIBIT E

## PRODUCT FUNCTIONALITY

Beginning with the 2016-17 NBA season (unless otherwise specified below) and throughout the remaining Term of the Agreement, Ticketmaster agrees to support the following functionality:

**Access Control** – Ticketmaster agrees to make its AccessManager Authentication API available to Skidata (provided Skidata is a Nexus partner in good standing), so that Skidata hardware can make real-time authentication calls to AccessManager, which is tightly coupled with the TM System.

**Access Control** – Ticketmaster will work with Principal to provide a proximity-based authentication solution for entry into the Facility; provided, such solution will not be provided by the start of the 2016-17 NBA season. However, Ticketmaster will work with Principal to be one of Ticketmaster's first NBA clients to leverage this technology once a reserved seating solution is made available by Ticketmaster for venues of similar size to the Facility.

**Price Codes** –Ticketmaster will support up to 32 seating zones with pricing flexibility within each seating zone across all platforms. The target is a minimum of 256 base prices within each seating zone; Ticketmaster will keep Principal informed about the specific pricing granularity as the design evolves. For the 2016-17 NBA season, Archtics currently supports over 500 different price levels within the 32 seating zones.

**Mobile Experience** – The TM System will support the ability for a user to purchase single game tickets across desktop, tablet, and mobile channels. Throughout the purchase flow, users must have reasonably equivalent access and ability to purchase primary Tickets as they do secondary Tickets (i.e., a user will not be given the option to purchase secondary inventory only when primary inventory of equal price or better fit the user's selected parameters).

**Push Notifications** – The TM System will support the ability for a Ticket purchaser to call up or present a game ticket via their mobile device on either a Ticketmaster mobile app or Principal's team mobile app; provided such team mobile app has the certified Ticketmaster ticket management SDK embedded.

**Food & Beverage POS** – Ticketmaster will support functionality that would allow Ticket purchasers to place a per-Attraction food & beverage credit associated with their seat and access rights token via a pre-defined ticket-type and/or price code and make that information available to Principal's POS system. The value of such credit can be an upsell to the base ticket price across all channels or packaged into the base price as a pricing component for tickets sold from the Archtics platform.

41

Sacramento Kings LUA 01132017

LNE CONFIDENTIAL BUSINESS INFORMATION                                          LNE-01985147

**DX-1494.0283**

## EXHIBIT F

## UPSELL TERMS

1.    **Defined Terms**. As used in this Exhibit, the following terms shall have the respective meanings indicated below unless the context otherwise requires:

"Upsell" means offering a Ticket purchaser the option to purchase the Upsell Product for the Upsell Price following the purchase of a Ticket to an Attraction on the TM.com Website.

"Upsell Fee" means the greater of (i) ▌▌▌▌▌▌▌▌▌▌ (before taxes and shipping charges, if applicable), or (ii) $▌▌▌ in each case, plus Payment Processing Fees on the Upsell Price (calculated at the same rate for single Ticket sales as set forth in the Agreement), which amounts shall be deducted by Ticketmaster from the Upsell Price as an Inside Charge.

"Upsell Price" means the price to be determined by Principal that will be added to the purchaser's Ticket order solely for the Upsell component of the purchase transaction.

"Upsell Proceeds" means the Upsell Price less the Upsell Fee.

"Upsell Product" means the merchandise or services to be fulfilled solely by Principal (and not, for the avoidance of doubt, the artist/performing act or promoter of the applicable Attraction) offered in any Upsell.

2.    **Upsell Offer Information**. Principal will provide Ticketmaster with reasonable advance written notice of its desire to have Ticketmaster enable an Upsell, which notice shall include an accurate and complete description of the Upsell Product, applicable dates for the sales campaign, and any other information reasonably requested by Ticketmaster (the "Offer Information"). Notwithstanding anything to the contrary, Ticketmaster shall not be obligated to offer an Upsell for an Attraction if, in the reasonable discretion of Ticketmaster, the Upsell Product elements are not appropriate for sale via the TM.com Website. Ticketmaster and Principal will work together to develop appropriate messaging appearing on the TM.com Website to inform all purchasers of Upsells. Ticketmaster shall have final control over any and all messaging on the TM.com Website, and reserves the right to reject any messaging proposed by Principal for any reason, including, without limitation, size constraints. Notwithstanding the foregoing, Ticketmaster shall have no responsibility or liability in the event that information (including Offer Information) provided to Ticketmaster by Principal relating to the Upsell is incorrect or incomplete, and Principal shall indemnify, defend and hold Ticketmaster's Indemnitees harmless from any and all claims, actions, damages, expenses (including court costs and reasonable attorneys' fees), obligations, losses, liabilities and liens, imposed on, incurred by, or asserted against Ticketmaster's Indemnitees occurring as a result of, or in connection with the Offer Information.

3.    **Fulfillment**.

(a)    Ticketmaster Responsibilities. Ticketmaster will control access to the Upsell by distributing to each applicable purchaser a unique voucher or other evidence of purchase which will allow the purchaser to redeem the Upsell Product from Principal at the Attraction. Ticketmaster shall be responsible solely for enabling such evidence of redemption for each purchaser to use to redeem the Upsell Product, together with instructions for redemption (including (i) that Principal is the party responsible for fulfilling the Upsell Product, (ii) the time frames during which redeeming purchasers may redeem the Upsell Product, and (iii) the relevant Principal customer service contact information for purposes of handling customer support issues

42

Sacramento Kings LUA 01132017

LNE CONFIDENTIAL BUSINESS INFORMATION

LNE-01985148

DX-1494.0284

relating to such redemption). Ticketmaster shall be responsible for customer service inquiries relating solely to enabling the evidence of redemption.

(b)    Principal Responsibilities. Principal shall allow purchasers to redeem the Upsell Product at the Facility. Principal shall be responsible for performing all fulfillment, redemption and delivery obligations, and customer service related to all fulfillment and delivery of Upsell Products, and all costs associated therewith, and shall indemnify, defend and hold Ticketmaster's Indemnitees harmless from any and all claims, costs (including court costs and reasonable attorneys' fees), liabilities, obligations, losses, liabilities and liens related to, or occurring as a result of or in connection with, fulfillment, redemption and delivery of the Upsell Product.

4.    **Settlement**.

(a)    Ticketmaster shall pay Principal the Upsell Proceeds for each Upsell Product sold by Ticketmaster during a calendar week along with settlement of Ticket Receipts for the applicable week, and such settlements shall otherwise be made in accordance with and subject to the accounting and refund procedures set forth in the Agreement. Notwithstanding anything to the contrary, Principal shall not receive any payment, nor shall a sale be deemed to have been made, if any Upsell is the subject of a Chargeback or for which Ticketmaster refunds the Ticket portion of the Upsell.

(b)    Principal agrees that it shall be responsible for all refunds related to the Upsell Product, and to the extent Ticketmaster receives any Upsell Product refund requests, Ticketmaster shall refer the purchaser to a customer service number provided by Principal to Ticketmaster for such customer service issues. In no event shall Ticketmaster be liable for a refund of the Upsell Product. In addition, Principal shall be responsible for all Chargebacks related to the Upsells, and Ticketmaster shall have the right to deduct amounts due for Chargebacks from the Upsell Proceeds otherwise payable by Ticketmaster to Principal. In the event such Upsell Proceeds are inadequate to cover actual Chargebacks, Principal shall be responsible for, and shall refund to Ticketmaster within ten (10) days of Ticketmaster's written notice all amounts related to all Chargebacks of Upsell Products sold by Ticketmaster.

(c)    Principal and Ticketmaster shall each be responsible for remitting any applicable taxes on the amounts such party retains from the sale of Upsell Products.

43

Sacramento Kings LUA 01132017

LNE CONFIDENTIAL BUSINESS INFORMATION                                    LNE-01985149

**DX-1494.0285**

| Form **W-9**<br>(Rev. October 2007)<br>Department of the Treasury<br>Internal Revenue Service | **Request for Taxpayer<br>Identification Number and Certification** | Give form to the<br>requester. Do not<br>send to the IRS. |

Name (as shown on your income tax return)
Sacramento Downtown Arena, LLC

Business name, if different from above

Check appropriate box: ☐ Individual/Sole proprietor  ☐ Corporation  ☐ Partnership
☑ Limited liability company. Enter the tax classification (D=disregarded entity, C=corporation, P=partnership) ▶ ........
☐ Other (see instructions) ▶

☐ Exempt payee

Address (number, street, and apt. or suite no.)
500 David J Stern Walk

Requester's name and address (optional)

City, state, and ZIP code
Sacramento Ca.   95814

List account number(s) here (optional)

**Part I    Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. The TIN provided must match the name given on Line 1 to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see How to get a TIN on page 3.

Note. If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

| Social security number |
| - - |

or

| Employer identification number |
| 611734905 |

**Part II    Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. citizen or other U.S. person (defined below).

Certification instructions. You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. See the instructions on page 4.

| Sign<br>Here | Signature of<br>U.S. person ▶ | _____, CFO   Date ▶ 1/24/17 |

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

## Purpose of Form

A person who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income.

Note. If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

Definition of a U.S. person. For federal tax purposes, you are considered a U.S. person if you are:

● An individual who is a U.S. citizen or U.S. resident alien,

● A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States,

● An estate (other than a foreign estate), or

● A domestic trust (as defined in Regulations section 301.7701-7).

Special rules for partnerships. Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax on any foreign partners' share of income from such business. Further, in certain cases where a Form W-9 has not been received, a partnership is required to presume that a partner is a foreign person, and pay the withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid withholding on your share of partnership income.

The person who gives Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States is in the following cases:

● The U.S. owner of a disregarded entity and not the entity,

Cat. No. 10231X                                       Form **W-9** (Rev. 10-2007)

44

Sacramento Kings LUA 01132017

LNE CONFIDENTIAL BUSINESS INFORMATION                                       LNE-01985150

**LNE CONFIDENTIAL BUSINESS INFORMATION**                                                                 **LNE-01985151**

**DX-1494.0287**