DX-1494(8)

Bates: LNE-LIT24-000849257 - LNE-LIT24-000849299

Licensed User Agreement between Ticketmaster and Kiel Centers Partners, L.P.

## LICENSED USER AGREEMENT

THIS LICENSED USER AGREEMENT ("Agreement") is made and entered into as of September 6, 2016, and is effective as of July 1, 2016 ("Effective Date") for all Attractions with an On-Sale Date on or after the Effective Date, by and between Ticketmaster L.L.C., a Virginia limited liability company ("Ticketmaster"), and Kiel Center Partners, L.P., a Missouri limited partnership ("Principal"). This Agreement consists of this Licensed User Agreement and Exhibit A, Compensation, Exhibit B, Hardware, Exhibit C, TM+ Terms and Conditions, Exhibit D, NHL Opt-in Addendum, Exhibit E, TM Messenger Terms and Conditions, and any other Exhibits attached hereto which are incorporated herein by this reference. The meanings of all capitalized terms used in this Agreement are set forth in Section 16 hereof. In consideration of the mutual promises and covenants set forth herein, the parties hereby agree as follows:

1.    **TERM**:  The term of this Agreement (the "Term") shall begin on the Effective Date and shall continue through the fifth (5th) anniversary thereof, unless extended or earlier terminated pursuant to this Agreement. Notwithstanding the above, if for any reason fifteen percent (15%) or more of the scheduled home games are not played at the Facility or a substitute location for which Ticketmaster has the rights to sell Tickets during any NHL season during the Term (e.g. by virtue of damage to Scottrade Center, unless play continues at another venue where Ticketmaster provides ticketing, a player's strike, lockout, or other interruption or stoppage of the NHL season), then the Term of this Agreement shall be extended by an additional period of one (1) year and the financial terms for such additional year shall be the same as the immediately preceding Contract Year. Each twelve (12) month period commencing on July 1 and continuing through the following June 30 shall be a "Contract Year" as such term is used herein.

2.    **TICKET SALES RIGHTS; EXCLUSIVITY**:

(a)    **Grant of Rights**:  Except as otherwise expressly set forth in this Agreement, Principal hereby grants to Ticketmaster, and Ticketmaster accepts from Principal, the right during the Term of this Agreement, to be the exclusive seller, as Principal's agent, of all Tickets for the Sellable Capacity for every Attraction via any and all means and methods, including on the Internet, by telephone, computer, IVR, outlets, television, clubs, auctions, VIP packages, presales, upsells, or by any other means of distribution, whether existing now or at any time in the future. Except as otherwise expressly set forth in this Agreement, Principal shall ensure that the entire Sellable Capacity for every Attraction shall be made available for distribution on the TM System.

(b)    **Sales by Principal**:  Notwithstanding anything to the contrary in this Agreement, but subject to Section 2(c), Principal retains the right to: (i) sell single Tickets from the Facility Box Office to persons physically present at the Facility Box Office; (ii) sell Season/Contract Tickets; (iii) conduct Group Sales of Tickets; and (iv) provide a reasonable number (as determined in accordance with industry standards and past practices of the parties) of House Seats for any Attraction.

(c)    **Third Party Systems or Services**:  Principal shall not directly or indirectly use, sponsor, promote, advertise, authorize or expressly permit the use of any third party that promotes, engages in or facilitates the sale, resale or issuance of tickets.

1

St Louis Blues LUA 08232016

HIGHLY CONFIDENTIAL

LNE-LIT24-000849257

(d)    **No Minimum Sales**:    It is agreed and understood that neither Ticketmaster nor Principal guarantees or will guarantee that any minimum or fixed number of Tickets will be sold through the TM System for any Attraction.

(e)    **Acknowledgement by Principal**:    Principal acknowledges that Ticketmaster acts as the agent of certain third parties that may be a direct or indirect competitor of Principal.  Principal also acknowledges that Ticketmaster has entered and may in the future (including during the Term of this Agreement) enter into new business relationships with other third parties, including those in the entertainment and sports industry, such as performers who perform at the Facility, for a variety of services.   Principal further acknowledges that any such sales or services or solicitations to provide such sales or services as contemplated under this subsection do not compete with Principal or conflict with this Agreement or Ticketmaster's rights, duties or obligations under this Agreement.

3.    **COMPENSATION**:

(a)    **Ticketmaster Charges and Fees**:  In consideration for Ticketmaster's services provided hereunder, Ticketmaster shall be entitled to assess and receive charges and fees in the amounts set forth on Exhibit A, all of which charges and fees shall be assessed against consumers, except for Inside Charges and, at Principal's option, Archtics Transaction Fees, which shall be assessed against Principal. In the event applicable law prohibits the assessment of such fees against consumers, Ticketmaster and Principal shall agree on alternative means for compensating Ticketmaster for its services in amounts reasonably comparable to those set forth in this Agreement, and as permitted by applicable law. Notwithstanding the above, charges and fees with respect to any Attractions presented by Feld Entertainment (including, without limitation, Disney on Ice, Circus, and Motor Sports) ("Feld Attractions") at the Facility shall be determined pursuant to a separate national agreement between Ticketmaster and Feld Entertainment.

(b)    **Payment Processing Fees**:

(i)    **Sales by Ticketmaster via Telephone Sales and Internet Sales**: With respect to Tickets purchased with credit cards, debit cards, gift cards or any other methods of payment, the payment authorization and processing fees ("Payment Processing Fees") shall be passed on to Principal at the rates set forth on Exhibit A, which percentage rates shall be deducted by Ticketmaster from the Ticket sales proceeds, or, at Principal's option, upon notice to Ticketmaster, the Convenience Charge may be adjusted to include Principal's portion of such Payment Processing Fees, provided that the Convenience Charge will be rounded up to the nearest $0.05, to the extent such adjustment complies with Applicable Law.  Notwithstanding the above, with respect to any Feld Attractions, Principal agrees that Principal shall be obligated to pay for the Payment Processing Fees for Tickets to Feld Attractions, or shall obtain the agreement of Feld Entertainment to adjust the Convenience Charge to include the amount of such Payment Processing Fees; in any such event Ticketmaster shall not be obligated to absorb the Payment Processing Fees with respect to the Face Value of Tickets to any Feld Attractions. With respect to sales of Tickets by Ticketmaster, subject to Section 8(c) of this Agreement and Ticketmaster's right to deduct Payment Processing Fees at the rates set forth herein, Ticketmaster shall also be responsible for any and all other amounts charged by a Processor for for Ticketmaster's failure to meet the specific timing or other qualifications of the applicable credit card association or company, or any failure by Ticketmaster to comply with Applicable Law.

2

St Louis Blues LUA 08232016

DX-1494.0331

(ii)    Sales at Outlets:   With respect to all purchases at Outlets, Payment Processing Fees shall be passed on to the ticket purchaser at the rate set forth on Exhibit A by increasing the applicable Convenience Charge set forth on Exhibit A by the amount of such Payment Processing Fees, provided that the Convenience Charge will be rounded up to the nearest $0.05, to the extent such adjustment complies with Applicable Law. With respect to sales by Outlets, each Outlet shall also be responsible for any and all other amounts charged by a Processor for such Outlet's failure to meet the specific timing or other qualifications of the applicable credit card association or company, or any failure by such Outlet to comply with Applicable Law.

(iii)    Principal Sales Using TM Charge: In connection with Principal's sales of Tickets utilizing electronic payments and authorized via TM Charge using either Visa or MasterCard, Ticketmaster's credit card processor ("Processor") shall deduct the merchant fees in an amount set forth on Exhibit A for transactions processed on a daily basis.  The fees charged to Principal for use of TM Charge are subject to automatic adjustments equal to any actual adjustments in Ticketmaster's Processor fees.  Except as otherwise set forth in this Agreement, Principal shall also be responsible for any and all other amounts charged to Ticketmaster (if any) by a Processor for processing Principal's transactions, including, without limitation, chargebacks, fraudulent credit card use and additional charges for failure to meet the specific timing or other qualifications of the applicable credit card association or company or any failure by Principal to comply with Applicable Law.  In the event that Principal desires to process any credit or debit cards other than Visa or MasterCard utilizing TM Charge, then the fees for such service shall be mutually agreed upon by Principal and such credit card companies, and Principal shall enter into its own merchant agreement with such credit card companies.

(c)    **Compensation to Principal**:

(i)    Principal's Royalties:  Principal shall be entitled to receive Ticket sales royalties (collectively, "Royalties") from Ticketmaster in the amounts set forth on Exhibit A with respect to each Ticketmaster fee set forth on Exhibit A to the extent received (and not refunded) by Ticketmaster.   Notwithstanding the above, Payment Processing Fees and applicable taxes related to any Ticketmaster fees shall be deducted from the applicable fees before the Royalties are calculated. Principal shall not be entitled pursuant to this Agreement to Royalties with respect to any Tickets sold to any Feld Attractions at the Facility, or with respect to any House Seats distributed through fan clubs, if applicable.

(ii)    Curtain System Allowance:  Ticketmaster shall provide Principal with a one-time allowance (the "Curtain System Allowance") for Principal to purchase a new curtain system to be installed at the Facility, in an amount equal to     The Curtain System Allowance shall be paid to Principal within thirty (30) days following the execution of this Agreement.  In order to recoup Ticketmaster's payment of the Curtain System Allowance, Ticketmaster shall be entitled to increase the base Convenience Charges for each Attraction at the Facility (excluding Feld Attractions) in an amount equal to ▉ per Ticket (the amount of such increase, the "Curtain System Fee Bump"), and retain the entirety of such Curtain System Fee Bump until such time that the entire amount of the Curtain System Allowance is fully recouped by Ticketmaster from the aggregate Curtain System Fee Bumps received (and not refunded) by Ticketmaster.  In addition, if the Curtain System Allowance has not been fully recouped by Ticketmaster by June 30, 2019, the Curtain System Fee Bump shall be increased to the amount of ▉ per Ticket until such time that the entire amount of the Curtain System Allowance is fully recouped by Ticketmaster from the aggregate Curtain System Fee Bumps received (and not refunded) by Ticketmaster.  For avoidance of

3

St. Louis Blues LUA 08232016

HIGHLY CONFIDENTIAL

LNE-LIT24-000849259

doubt, the Convenience Charge Royalties to which Principal is entitled as set forth on Exhibit A shall only be payable on the base Convenience Charges, exclusive of the Curtain System Fee Bump, and no such Royalties shall be payable to Principal on the amount of the Curtain System Fee Bump. At the end of the Term or in the event of an earlier termination of this Agreement for any reason, if the Curtain System Allowance has not been fully recouped by Ticketmaster, Principal shall remit the outstanding balance of the Curtain System Allowance to Ticketmaster by wire transfer or certified check within fifteen (15) days after termination occurs.

(iii)    Product Credit:  Ticketmaster shall provide Principal with an annual credit ("Product Credit") in the amount of ████████████████████████ per Contract Year to be used by Principal, at Principal's optional discretion, as a credit against the purchase of certain LiveAnalytics services, with such LiveAnalytics services being subject to the parties entering into a separate software licensing agreement, if applicable, in connection therewith. A description of all LiveAnalytics services currently available as of the Effective Date through the Product Credit program will be provided to Principal by Ticketmaster promptly following execution of this Agreement.  The parties acknowledge and agree that the amount of any unused Product Credit provided during any Contract Year shall expire at the conclusion of such Contract Year, or upon the termination or expiration of the Agreement, whichever is earlier. For the avoidance of doubt, any unused Product Credit provided during any Contract Year shall not be rolled forward for use in any subsequent Contract Year. The Product Credit, having no cash value, shall not at any time be payable directly to Principal.

(iv)    Pricemaster Services in exchange for Single and/or Season Tickets:  In exchange for Principal providing Ticketmaster with mutually agreed single and/or Season/Contract Tickets for Blues hockey games at the Facility, at no additional charge, in an amount valued at ██████ each Contract Year during the Term, Ticketmaster shall provide Principal with certain Pricemaster services, at no additional charge, having a value of ██████ ████████████████████████ per Contract Year.  The determination as to which single and/or Season/Contract Tickets will be provided to Ticketmaster will be as mutually agreed to by the parties.

(vi)    Hardware Credit:  Ticketmaster shall provide Principal with a one-time credit ("Hardware Credit") in the amount of ████████████████████ to be used by Principal as a credit against Ticketmaster's purchase of certain additional equipment as mutually agreed (in addition to that certain Hardware listed with particularity on Exhibit B attached hereto) for Principal's use in connection with the subject matter hereof; provided that such additional equipment purchased pursuant to this Section shall be deemed "Hardware" for all purposes under the Agreement and shall be subject to the terms and conditions with respect to all Hardware as set forth in the Agreement.  Any unused Hardware Credit shall be forfeited upon the termination or expiration of the Agreement. The Hardware Credit, having no cash value, shall not at any time be payable directly to Principal.  All Ticketmaster purchases made hereunder shall be mutually approved by Principal in writing prior to Ticketmaster's purchase. To the extent that Ticketmaster's mutually approved purchase of any additional equipment for Principal's use in connection with the subject matter hereof at any time exceeds the Hardware Credit amount of ████████████████████████ in the aggregate during the Term, Ticketmaster shall invoice Principal for, and Principal shall pay to Ticketmaster within thirty (30) days of invoice receipt, such incremental amount in excess of ████████.  In the event Principal fails to pay such invoice when due, Ticketmaster may deduct the amount of such invoice from the settlements otherwise due and owing to Principal.

4

St Louis Blues LUA 08232016

HIGHLY CONFIDENTIAL

LNE-LIT24-000849260

DX-1494.0333

4. **LICENSE AND USE OF HARDWARE AND SOFTWARE**:

(a) **License**: Ticketmaster hereby grants Principal a non-exclusive, non-transferable license to use the Hardware and Software (collectively, the "License") in exchange for the fees set forth herein.

(b) **Use**: The Hardware and Software and all related materials may only be used by Principal in connection with the Attractions and only with systems used, operated and owned by Ticketmaster, and only for the purposes stated in this Agreement, and may not be utilized by or in connection with services, software, hardware or systems provided or supplied by any third party. Principal shall use the Hardware and Software in a careful and proper manner in accordance with Ticketmaster's instructions and shall comply with and conform to all Applicable Laws in any way relating to the possession, use or maintenance of the Hardware and Software including, but not limited to, federal, state or other laws applicable to commercial emails. Principal may make a single copy of Archtics only to be used for archival or backup purposes; **COPYING FOR ANY OTHER PURPOSE IS PROHIBITED**. Except as otherwise provided in the immediately preceding sentence, Principal hereby agrees: (i) not to expressly permit copying or reproduction of the Hardware or Software in any manner, including without limitation, use in a sharing arrangement or transmission over the Internet or over e-mail and similar electronic transmission; (ii) not to disassemble, re-manufacture, repair, re-configure, enhance, upgrade, modify, translate, adapt, create derivative works from or of, decompile or reverse engineer the Software in any way nor merge them into any other program for any purpose; (iii) not to transfer, license or sub-license, assign, rent, sell, grant, publish, disclose, display, dispose of or otherwise make available the Software, or any rights therein or copies or derivatives thereof, including other templates or working systems; (iv) not to delete, remove, change or otherwise alter any trademarks, copyright notices or other proprietary marks in or on the Hardware or Software, or any copies, modifications or partial copies thereof; (v) not to "hack," or attempt to "hack," any of the Software, the servers on which the Software is hosted or any other portion of the Ticketmaster network, or otherwise attempt to circumvent, or navigate outside of, the borders of such Software servers in any manner whatsoever; and (vi) not to perform any SQL database operations other than "SELECT" for any system production tables (i.e., tables starting with dba.t_<wildcard>) from any non-Archtics interface to the database (e.g., ISQL, Access, Crystal Reports, etc.).

(c) **Passwords**: Principal agrees that use of the TM System by Principal shall be restricted to a reasonable number of Principal's personnel having passwords in the event that Ticketmaster assigns such passwords. Such passwords shall not be transferable without the written permission of Ticketmaster, which permission shall not be unreasonably delayed or withheld. Upon Ticketmaster's reasonable request, Principal (i) shall identify, as the case may be, the users (by name, position and site address), who use or view the TM System or from where the TM System is used, and (ii) shall provide to Ticketmaster access to any database which records access to the TM System, provided that any such access shall be subject to the confidentiality requirements set forth in Section 12.

(d) **TM Charge**:

(i) **Use and Operation of TM Charge**: Ticketmaster shall transmit data relating to Ticket sales made by Principal using TM Charge to Ticketmaster's credit card processor, provided Ticketmaster has received Principal's merchant number(s) and other necessary information for Ticketmaster to use for the transmission of sales data. Principal shall be responsible for promptly notifying Ticketmaster and Processor, if applicable, of any changes

5

St Louis Blues LUA 08232016

HIGHLY CONFIDENTIAL

LNE-LIT24-000849261

**DX-1494.0334**

to the information provided pursuant to this Section. Processor will then transmit such data to the applicable credit card company for payment to Principal, subject to Principal having entered into the applicable Principal Processor Agreements (as further described below). Ticketmaster shall use its reasonable best efforts to ensure the accuracy of information transferred from the Processor via TM Charge, but Ticketmaster does not guarantee the accuracy and timeliness of such information. Principal shall comply with all applicable credit card association or company guidelines (e.g. swiping all retail transactions and using customer address information for all non-face-to-face transactions). Ticketmaster shall provide Principal with daily transaction reports regarding authorized and settled transactions. Principal shall review, on a regular basis, all reports provided to Principal by Ticketmaster. Principal also agrees that, for operational and monitoring purposes, the Processor may provide Ticketmaster with processing and settlement reports related to sales of Tickets using TM Charge. Any processing and settlement reports arising out of this Agreement shall be subject to the confidentiality requirements of Section 12.

(ii)    Effect of Termination of Ticketmaster's Processor Agreement: Ticketmaster has entered into an agreement with the Processor (the "Processor Agreement"), and Principal agrees to use commercially reasonable efforts to enter into an agreement with such Processor (the "Principal Processor Agreement") as soon as practicable after the date of this Agreement. The Principal Processor Agreement shall provide that if the related Processor Agreement expires or terminates, then the Principal Processor Agreement shall also expire or terminate without any early termination penalties or charges. In order to facilitate streamlined credit card authorization processing for Ticketmaster and its clients, Ticketmaster continues to seek to maintain relationships with superior processors throughout the Term of this Agreement. In the event that Ticketmaster elects to use a different Processor, Ticketmaster shall notify Principal. Principal shall use commercially reasonable efforts to enter into an agreement with such new Processor if Principal desires to continue utilizing TM Charge, it being acknowledged and agreed by Principal, however, that use of certain Software (e.g., AccountManager) may require utilization of TM Charge. In the event Principal elects to use a different Processor, Principal shall notify Ticketmaster.

(e)    **Ticket Forwarding**:    Principal shall notify all Subscribers that Subscribers may not utilize Ticket Forwarding in connection with any commercial third party ticket transactions, such as forwarding to ticket brokers or any other Internet sites that utilize forwarding in connection with commercial applications. Principal shall notify Ticketmaster immediately if it becomes aware of any such activity; and Ticketmaster reserves the right to suspend any Subscriber from using the Software for any violations of the above or for violations of any other rules and regulations reasonably adopted by Ticketmaster from time to time. Nothing herein shall be deemed to restrict Subscribers from sharing or transferring Tickets on a private basis, or sharing or transferring Tickets through entities that have been reviewed and approved by Principal.

(f)    **Principal's Website/Interface Page**: Ticketmaster will develop the Interface Page that will enable Principal's Subscribers to access their account information and conduct "real-time" transactions by linking to the Interface Page from the Principal's Website. The Interface Page may contain a short, related textual description of AccountManager features and shall contain Ticketmaster's designated wording and graphic depiction thereof, currently "by Ticketmaster." Ticketmaster shall use commercially reasonable efforts to cause the Interface Page to be secure from hacking or third party access (other than users of the TM.com Website) and to meet all applicable industry standards for data security.

(g)    **GroupManager Restrictions**:    Principal may elect, at its discretion,

6

St Louis Blues LUA 08232016

HIGHLY CONFIDENTIAL                                                                LNE-LIT24-000849262

**DX-1494.0335**

whether to utilize Ticketmaster's GroupManager software and hosting services to manage Group Sales. If Principal elects to use GroupManager, it agrees that all Group Sales must comply with the definition of Group Sales set forth herein. Ticketmaster will instruct Principal on how to identify Group Sales that are not valid Group Sales. In the event that Ticketmaster determines and can demonstrate that a Group Sale is not a valid Group Sale, and that Principal knew or reasonably should have known that such Group Sale was not a valid Group Sale, Ticketmaster shall have the right to assess against Principal the amount of fees that Ticketmaster would otherwise have been entitled to assess under this Agreement with respect to any such Tickets had they been purchased through Ticketmaster as single Tickets, and not from Principal as a Group Sale.

(h)    **TM+**:  Ticketmaster shall enable its proprietary, integrated primary and secondary market ticket inventory platform and technology on the TM.com Website, which platform and technology shall enable consumers searching for Tickets to an Attraction to simultaneously view Tickets available for initial sale directly by Principal pursuant to this Agreement, in addition to Tickets available for resale from other consumers (collectively, "TM+"), in accordance with the terms and conditions set forth on Exhibit C attached hereto.

(i)    **Hosted Platform**: During the Term, Ticketmaster shall host the Archtics Software and provide and maintain the Hosted Platform on which the Archtics Software will be installed and run, including provision of the physical environment including physical security, HVAC and power for the required server hardware for the Hosted Platform and the Archtics Software. Ticketmaster will also provide access via certain Internet connectivity, by being responsible for network operation and availability from the public Internet up to the termination cables at the network interface card on the server hardware for the Hosted Platform. Ticketmaster will not be responsible for power at the Facility or Principal's connectivity to the Internet.

(j)    **Representations and Warranties**:    Ticketmaster represents and warrants that:

(i)    it is in compliance with all Applicable Laws and has obtained all applicable permits and licenses required of it in connection with the performance of its obligations under this Agreement;

(ii)    the Ticketmaster Hardware and Software complies in all material respects with the descriptions of functionality set forth herein;

(iii)    the Ticketmaster Hardware and Software and any material provided by Ticketmaster to Principal pursuant to this Agreement do not infringe upon the proprietary or intellectual property rights of any third party; and

(iv)    Ticketmaster has all the sufficient rights, including intellectual property rights, to grant the rights it grants to Principal under this Agreement.

The representations and warranties set out in this Section shall survive termination of this Agreement.

5.    **INSTALLATION AND SET-UP**:

(a)    **Infrastructure and Installation:** Ticketmaster will install the Hardware furnished by Ticketmaster, and provide Principal with access to the Software. Principal will

7

St Louis Blues LUA 08232016

HIGHLY CONFIDENTIAL

LNE-LIT24-000849263

**DX-1494.0336**

provide (i) a redundant connectivity solution between the Facility and Ticketmaster's central computer facility for interfacing that satisfies Ticketmaster's minimum system requirements, and (ii) unless otherwise agreed to between the parties, any type of equipment and technology necessary to assist Ticketmaster in completing the installation of such Hardware or Software. Other than providing any wiring instructions, Ticketmaster shall have no responsibility for any internal wiring or cabling (e.g., electrical, data lines, etc.) necessary for installation, operation or for proper functioning of the TM System at the Facility.

(b)     **Attraction Set-Up**:  In order to effectively utilize Ticketmaster's distribution technologies, within a reasonable time before (but in no event less than the time period described below) the scheduled on-sale date of Tickets for each Attraction (the "On-Sale Date"), Principal shall furnish Ticketmaster with all necessary information with respect to the Attraction, including, without limitation, seating layout of the Facility, Ticket structure, discounts permissible, Attraction Taxes, any information necessary to calculate Attraction Taxes, if applicable, Ticket header information, logos, entry information, vision and hearing information, wheelchair and other accessible seating information and such other information as is necessary for the proper sale of Tickets (collectively, the "Set-Up Information").  The parties intend that all accessible seating Tickets that are available for sale to persons desiring accessible seating shall be made available for sale on the TM System and such accessible seating Tickets shall not be released into the general pool of Tickets that are available for sale until forty-eight (48) hours before an Attraction.  Principal must provide the Set-Up Information to Ticketmaster at least five (5) business days prior to the On-Sale Date for new Attractions that do not utilize seating charts then existing in the TM System and at least three (3) business days prior to the On-Sale Date for new Attractions that utilize seating charts then existing in the TM System. Ticketmaster shall have no responsibility for the inaccuracy of any Set-Up Information furnished by Principal pursuant hereto.

(c)     **Facility Box Office Will-Call Services**:  At all times during the Term of this Agreement, Principal shall maintain a designated Facility Box Office location for the pick-up of Tickets purchased through Internet Sales and Telephone Sales.  The pick-up location shall be open during the normal hours of operation of the Facility Box Office.  Principal shall notify Ticketmaster of Principal's will-call capabilities and will-call Facility Box Office hours.  Principal shall verify the identity of each person picking up Tickets at will-call via a valid photo identification (government issued) and/or the credit card used in the Ticket sales transaction. Principal shall not release Tickets to any customer whose identity has not been reasonably verified.

(d)     **Supplies**:  Principal shall be responsible for maintaining adequate nondurable operational supplies used at the Facility in connection with the operation of the Hardware and Software to assure continuous operations at the Facility.

(e)     **Ticket Stock**:  Principal shall be responsible for the security of Ticket stock in its possession, and the risk of loss of Ticket stock shall shift to Principal upon the delivery thereof to Principal or Principal's authorized representative, agent or employee.

6.     **MAINTENANCE AND SUPPORT**:

(a)     **Hardware and Software Maintenance and Support**:  Ticketmaster shall provide ordinary and routine maintenance and repair services and adequate support of the Hardware and Software at the Facility to meet the reasonably anticipated service needs of Principal from time to time at no additional charge, provided that such maintenance, repair or

8

St Louis Blues LUA 08232016

HIGHLY CONFIDENTIAL                                                 LNE-LIT24-000849264

DX-1494.0337

support is not necessitated by the negligence or willful misconduct of Principal, its employees, agents or representatives. Support services will be provided, on a return call basis, during Ticketmaster's normal business hours by personnel qualified to answer telephone inquiries by Principal seeking advice on questions and problems. Non-emergency calls made at the end of the day, which require support services that would keep staff beyond normal working hours, will be deferred to the following business day. Support will be provided for off-hour critical system emergencies. Ticketmaster will not be obligated to continue to provide maintenance with respect to any version of any particular Software hosted by Principal for more than one year after a release by Ticketmaster of an upgraded version of the same Software. Ticketmaster shall maintain an archive of Principal's Archtics database for up to two (2) years in the format of Principal's then current Archtics version. Ticketmaster shall retain archives of Principal's Archtics database in excess of two (2) prior years in an offline form to be stored at Ticketmaster's data center, which prior archives shall not be updated to Principal's then current Archtics version; provided, that Ticketmaster shall extract data from such prior archives at Principal's request and deliver such data extracts to Principal.

(b)    **Training of Principal's Employees**: Principal shall staff the Facility Box Office with its employees for the proper operation of the TM System for Ticket sales made through the Facility. Ticketmaster shall train, at its expense, Principal's employees who shall be reasonably necessary for the initial staffing of the Facility Box Office and for initial operation of the TM System for single ticket sales at the Facility. Ticketmaster shall also provide additional training at its cost to other employees of Principal to the extent such training is necessary as a consequence of changes initiated by Ticketmaster or changes in Ticketmaster's method of operation. To the extent of any change in personnel by Principal in connection with Facility Box Office sales requiring additional training beyond that initially contemplated hereunder, Principal agrees to absorb all of the expenses (including any and all reasonable travel expenses) thereof. Ticketmaster shall provide a complete set of training materials that Principal may use to cascade training to new employees as needed.

(c)    **Notification by Principal**: In the event of any breakdown or malfunction in the operation of any of the Hardware or Software, or difficulties encountered in connection with access to any of the Software, Principal agrees to promptly notify Ticketmaster of any such breakdown, malfunction or difficulty to assist Ticketmaster in performing its obligations hereunder.

(d)    **Access to Principal's Equipment and Data**: Principal shall permit Ticketmaster, at Ticketmaster's sole discretion and upon at least two (2) weeks written notice (unless otherwise mutually agreed), the right at a reasonable time to inspect Principal's pertinent sites and equipment (including any existing LAN or other network user monitor device) for the purpose of determining compliance with the terms of the License granted hereunder. In order to correctly diagnose faults in the equipment and data related to the Software and Hardware, Principal will provide Ticketmaster 24 hour remote access to Principal's installation, pertinent sites, equipment (including any existing LAN or other network user monitor device) and user data through PC Anywhere. Failure to provide such access may prohibit effective action by Ticketmaster and render Ticketmaster unable to proceed, and in such circumstances, Ticketmaster shall be under no liability for failure to perform its obligations hereunder. All Ticketmaster employees, agents or representatives participating in an on-site inspection of Principal's sites and equipment shall have been fully screened by Ticketmaster and shall agree to written confidentiality obligations in accordance with Section 12, hereof. Ticketmaster shall indemnify and hold Principal harmless from and against any and all liabilities, claims, expenses

9

St Louis Blues LUA 08232016

HIGHLY CONFIDENTIAL                                                                LNE-LIT24-000849265

(including court costs and reasonable attorneys' fees) and causes of action arising out of any conduct of such employees, agents or representatives while on-site.

(e)    **Additional Archtics Services**:  With respect to initial implementation of Archtics, Ticketmaster shall also provide, at no additional cost to Principal, (i) on-site support from Ticketmaster's national or regional personnel, (ii) unique Archtics customization (e.g., diagrams, invoices, other executables, etc.), (iii) custom reporting, and (iv) customized on-line assistance (the services described in clauses (ii) through (iv) are referred to herein as "Customization Services".)  Generally two hours of Customization Services each week are included in the annual maintenance fees of Archtics listed on Exhibit A.  Customization Services requested by Principal that far exceed this level of support shall only be charged to Principal if Principal gives prior written approval of any additional costs, in accordance with Ticketmaster's standard rates; provided, Ticketmaster shall have no obligation to provide such additional level of support without such approval.

7.    **ADVERTISING**:

(a)    **Advertising on Tickets Fulfilled at Facility Box Office**:  For tickets fulfilled by Principal at the Facility Box Office, Principal shall either (i) provide, or pay Ticketmaster to provide, its own blank custom ticket stock and ticket envelopes in which case Principal shall have the right to sell advertising on such ticket stock and ticket envelopes or (ii) have Ticketmaster provide Ticketmaster's standard ticket stock and ticket envelopes, at no cost to Principal, in which case Ticketmaster shall have the right to sell advertising on such ticket stock and ticket envelopes.

(b)    **Ticketmaster Advertisements**:  Principal hereby grants to Ticketmaster the right, in Ticketmaster's sole discretion, to advertise, in any medium determined by Ticketmaster, including on the TM.com Website or affiliated websites, Attractions and the availability of Tickets at the Facility Box Office, at all Outlets, and by Internet Sales and Telephone Sales and the availability of the Software and, in connection therewith, to use the name and logo of Principal, the Attraction, the Facility and all other information respecting the Attractions; provided, however, that Ticketmaster's use of such names and logos shall be subject to the prior review and approval of Principal (it being agreed that once a format is reviewed and approved by Principal, no additional review or approval of such format shall be required during the Term unless Principal generally changes its format during the Term). Principal further grants to Ticketmaster the right to use the pre-approved name and logo of Principal and Principal's Website address on the Interface Page.  Notwithstanding Ticketmaster's discretion to determine timing and content of its advertising, Ticketmaster agrees that it will actively advertise (consistent with Ticketmaster's clients generally) on the TM.com Website the availability of all Tickets to all Attractions at the Facility.

(c)    **Principal Advertisements**:  Principal may, during the Term hereof, provide and place advertisements in any form of media which Principal shall desire to promote the availability of Tickets, the TM.com Website and the Attractions (except on websites or other media operated by third parties that promote, engage in or facilitate the sale, resale or issuance of tickets).  Principal shall cause Principal's Website to deeplink to specified web page(s) within the applicable TM.com Website where ticket purchasers can begin the process of purchasing Tickets to Attractions.  Principal agrees to promote the availability of Tickets on the TM.com Website by including, at a minimum, one "above-the-fold" graphic Ticketmaster branded link to the TM.com Website on each web page featuring one or more of the Attractions on Principal's

10

St Louis Blues LUA 08232016

HIGHLY CONFIDENTIAL                                                                 LNE-LIT24-000849266

**DX-1494.0339**

Website.  Such link will include the TM.com Website graphic logo and a call to action such as "buy tickets."

(d)    **Ticketmaster Client Style Guide**: The look and feel of any and all links from Principal's Website to the Interface Page or the applicable TM.com Website are subject to Ticketmaster's prior approval.  Principal shall comply with all terms and conditions of Ticketmaster's client style guide, as it may be updated from time to time, upon written notice to Principal. Ticketmaster and Principal shall each designate an email address for delivery of required notices and approvals related to advertising hereunder.  Ticketmaster shall provide to Principal a copy of Ticketmaster's client style guide promptly following the execution of this Agreement.

(e)    **Advertising Revenue**:   Ticketmaster and Principal shall separately receive and retain their respective income derived from advertising which each is entitled to sell under subsections (a), (b) and (c) above.

(f)    **Banner Ads**:   Neither Principal nor Ticketmaster will serve banner ads or other promotional ad units of any kind or allow any third party to serve any such ad units on the Interface Page, without the other party's prior written consent.

8.    **ACCOUNTING PROCEDURES**:

(a)    **Payments by Ticketmaster**: Principal hereby authorizes Ticketmaster and the financial institution indicated below ("Bank") to deposit all settlement funds payable to Principal hereunder in the account listed below ("Principal's Account"):

Financial Institution (Name of Bank): __BANK INFORMATION ALREADY ON FILE _____
Account Type: _____
Account Number: _____
Bank ACH Transfer Number: _____
Branch Address: _____
_____
_____
Branch Phone Number: _____

Ticketmaster shall collect all Ticket Receipts derived from Ticket sales made by Ticketmaster and shall initiate payment to Principal of all Ticket Receipts and all Royalties to which Principal is entitled on Friday of each week with each weekly payment to be on account of TM System Ticket sales made for Attractions by Ticketmaster during Monday through Sunday of the week preceding such payment date. If funds to which Principal is not entitled are deposited into Principal's Account, Principal shall direct the Bank to return said funds.  Principal hereby releases Ticketmaster from liability for delays or errors beyond Ticketmaster's reasonable control, including but not limited to any errors resulting from any inaccurate or outdated Account information provided by Principal or bank processing delays, or for any related damages. Principal acknowledges and agrees that direct deposit of such funds may require up to two (2) business days for Bank processing. In the event of an error, Principal also authorizes the initiation of a debit to Principal's Account to correct the error.  Each weekly settlement payment shall be accompanied by a detailed written accounting.  Principal shall designate an email address (set forth below its signature line of this Agreement) for delivery of such accounting and information regarding Attractions and Ticket sales, and shall promptly notify Ticketmaster of any changes to such email address. The direct deposit authorization provided herein shall remain in

11

St Louis Blues LUA 08232016

HIGHLY CONFIDENTIAL

LNE-LIT24-000849267

**DX-1494.0340**

full force and effect until Ticketmaster has received written notification from Principal of its termination in such time and such manner as to afford Ticketmaster a reasonable opportunity to act upon it.

(b) **Cancelled Attractions; Refunds**: In the event that any Attraction for which Ticketmaster sold Tickets is cancelled, postponed, or modified (e.g., substitute acts) for any reason (each, a "Cancelled Attraction"), the Account Balance shall be held and made available for distribution by Ticketmaster to Ticket purchasers entitled to refunds for Tickets for Cancelled Attractions purchased from Ticketmaster. For purposes of this Agreement, the term "Account Balance" shall mean the amount of funds held at any time by Ticketmaster on account of Ticket sales for all Attractions, less the amount of Ticket sales proceeds which Ticketmaster is entitled to retain hereunder. Principal authorizes Ticketmaster to refund the Ticket price at the original point of purchase (e.g., at Outlets or by Internet Sales or Telephone Sales) in such manner (e.g. by crediting the consumer's credit card) and at such time (e.g. before or after the scheduled date of the performance of such Attraction) as Ticketmaster, in its sole discretion, determines and to exchange Tickets pursuant to any exchange policy that may be adopted by Principal and Ticketmaster. It is agreed and understood that Ticketmaster is the Ticket selling agent of Principal and therefore Ticketmaster's agreement to make any refunds as the agent of Principal is subject and limited to Ticketmaster holding or receiving from Principal the full amount of funds necessary to make refunds to all Ticket purchasers properly entitled to a refund. Principal and Ticketmaster agree that Ticketmaster shall be entitled to retain the Ticketmaster fees assessable with respect to the initial sale of Tickets to Cancelled Attractions. Principal shall be responsible for all refunds and exchanges of Tickets initially purchased from the Facility Box Office. All refunds shall be paid in accordance with the requirements of Applicable Law.

(c) **Chargebacks**: Ticketmaster reserves the right to deduct from Principal's settlement, portions of any Chargebacks that Ticketmaster is assessed by its merchant bank related to Principal's sale of Tickets, including the Face Value and any other amounts due from Ticketmaster to Principal for up to twelve (12) months after the occurrence of an Attraction, except to the extent such Chargebacks result from the negligence or wrongful conduct of Ticketmaster. Ticketmaster shall be responsible for the remaining portions of Chargebacks relating to the funds retained by Ticketmaster hereunder, except to the extent such Chargebacks result from the negligence or wrongful conduct of Principal. For purposes of this Agreement, "Chargebacks" shall mean the amounts that the merchant bank is charged back by a cardholder or a card issuer under the card organization's rules (e.g., cardholder dispute, fraud, declined transaction, returned Tickets for Cancelled Attractions, etc.).

(d) **Insolvency; Deficiency Amounts; Security for Repayment**: Each party shall provide immediate written notice to the other party in the event it files any voluntary or involuntary petition under the bankruptcy or insolvency laws or upon any appointment of a receiver for all or any portion of such party's business or the assignment of all or substantially all of the assets of such party for the benefit of creditors (each, a "Material Financial Event"). If at any time, the Account Balance is not sufficient to pay for reasonably anticipated refunds or Chargebacks, Ticketmaster shall notify Principal with a detailed explanation and accounting, (the "Deficiency Amount") Principal shall deliver the Deficiency Amount to Ticketmaster no later than twenty-four (24) hours after notice. In the event of any Material Financial Event or in the event Principal has not paid any Deficiency Amount when due, Ticketmaster shall have the option to require Principal to provide additional security to Ticketmaster of a type (e.g., letter of credit, guaranty or performance bond) and in an amount as requested by Ticketmaster in its reasonable discretion, which Principal shall provide to Ticketmaster within five (5) business days

12

St Louis Blues LUA 08232016

HIGHLY CONFIDENTIAL

LNE-LIT24-000849268

DX-1494.0341

after Ticketmaster's request, and/or suspend payment of Ticket Receipts in advance of the occurrence of Attractions and instead deliver Ticket Receipts to which Principal is entitled post-performance (i.e. Friday of each week with respect to Attractions that occurred Monday through Sunday of the week preceding such payment date).

(e)    **Counterfeit Tickets**: It is agreed and understood that Ticketmaster shall not be liable to Principal for the printing and sale of counterfeit Tickets, including, without limitation, TicketFast Tickets; provided that Ticketmaster has taken reasonable efforts to prevent the printing of such counterfeit Tickets by adopting adequate control procedures.

(f)    **Audit of Sales**:    At all times during the Term of this Agreement, (i) Principal shall have the right at its own expense to audit Ticket sales for Attractions by Ticketmaster to assure Ticketmaster's compliance with the terms of this Agreement, and (ii) Ticketmaster shall have the right at its own expense to audit Ticket sales for Attractions made by Principal and by others (including, without limitation, the promoter and sponsor of any Attraction, the act or event itself and Principal's Subscribers) to assure their compliance with the terms of this Agreement.

(g)    **Archtics Transaction Fees**:    Ticketmaster, at its option, may deduct Archtics Transaction Fees from the amounts owed to Principal under this Agreement or may invoice Principal for such fees.    Whether deducted or invoiced, Ticketmaster shall provide in advance to Principal a detailed accounting of such fees.

(h)    **License and Maintenance Fees**: License or maintenance fees set forth on Exhibit A shall be invoiced and payable on the first day of each Contract Year during the Term.

(i)    **Request for Taxpayer Identification Number and Certification**: Principal shall complete the required Form W-9 provided with this Agreement and return it to Ticketmaster with this Agreement for purposes of reporting to the Internal Revenue Service. Upon the reasonable request of Principal, Ticketmaster shall complete the required Form W-9 provided with this Agreement and return it to Principal.

9.    **TAXES**:

(a)    **Taxes on Hardware**: Principal shall keep the Hardware free and clear of all levies, liens and encumbrances which are caused by Principal or under Principal's control and shall promptly reimburse Ticketmaster for all license fees, registration fees, assessments, charges and taxes, whether federal, state, county, municipal or other governmental or quasi-governmental, with respect to the Hardware located at the Facility, including, without limitation, use, excise and property taxes, and penalties and interest with respect thereto, except and excluding, however, any taxes based on or measured solely by Ticketmaster's net income.

(b)    **Attraction Taxes**:    Principal shall be responsible for calculating any and all Principal Taxes, for preparing and timely filing any and all tax returns or reports required to be filed in respect of any such Principal Taxes, and for timely remitting Principal Taxes to the appropriate taxing authority. Ticketmaster will collect and turn over to Principal the amounts to which Principal is entitled as provided in Section 8(a). In the event that Ticketmaster pays any Principal Taxes on behalf of Principal or Ticketmaster pays any Principal Taxes due to a failure by Principal to provide Ticketmaster with the required writing or documentation of any Principal tax exemptions pursuant to Section 9(d) below, Principal shall promptly reimburse Ticketmaster

13

St Louis Blues LUA 08232016

HIGHLY CONFIDENTIAL

LNE-LIT24-000849269

for any and all such Principal Taxes paid by Ticketmaster, including penalties and interest assessed with respect thereto (other than Principal Taxes, penalties and interest that Ticketmaster pays directly out of Principal's Ticket Receipts), and shall also promptly reimburse Ticketmaster for any and all expenses (including reasonable attorneys' fees) or damages that result from the failure by Principal to properly calculate and timely remit Principal Taxes assessed on all amounts received by Principal under this Agreement, to timely file all related returns or reports, or to timely reimburse Ticketmaster for any and all such Principal Taxes, interest and penalties as provided above. Notwithstanding the foregoing, in the event that Ticketmaster is ever required by applicable law to remit Principal Taxes directly on behalf of Principal and file related tax returns or reports, Ticketmaster shall have the right to do so upon notice to Principal, and thereafter "Ticket Receipts" shall be defined to be reduced by such Principal Taxes. Ticketmaster shall be responsible for calculating any and all Ticketmaster Taxes, for preparing and timely filing any and all tax returns or reports required to be filed in respect of any such Ticketmaster Taxes, and for timely remitting such Ticketmaster Taxes to the appropriate taxing authority.

(c) **Principal's Taxpayer ID Number**: Principal certifies that Principal's federal taxpayer identification number (FEIN or SSN) is 43-1627537. Principal further certifies that its state taxpayer identification or registration number for the state in which the Facility is located is Missouri. Ticketmaster certifies that Ticketmaster's federal taxpayer identification number (FEIN or SSN) is __-_____. Principal further certifies that its state taxpayer identification or registration number for the state in which the Facility is located is _____.

(d) **Principal's Tax Exemptions**: Upon Ticketmaster's reasonable request therefor, Principal shall notify Ticketmaster in writing of any and all Principal tax exemptions (if applicable) and provide Ticketmaster with reasonable proof of Principal's tax exemptions.

(e) **Taxes on License and Maintenance Fees**: The license and maintenance fees set forth on Exhibit A are exclusive of any sales, use, value added, excise or other taxes, and Principal shall be responsible for paying all such applicable taxes.

10. **LOSS AND DAMAGE TO THE HARDWARE; INSURANCE:**

(a) Principal acknowledges that the Hardware will be used by Principal at the Facility and that Ticketmaster does not own, operate or control such location. Accordingly, Principal hereby assumes and shall bear the entire risk of loss and damage to the Hardware, ordinary wear and tear excepted, whether or not insured against, once installed, unless occasioned by the negligence or willful misconduct of Ticketmaster, from any and every cause whatsoever from the date of delivery of the Hardware to the Facility or Principal site until removal thereof following termination of this Agreement. No such loss or damage to the Hardware shall impair any obligation of Principal under this Agreement. In the event of loss or damage of any kind to any Hardware (unless occasioned by the negligence or willful misconduct of Ticketmaster), Principal, at its sole option, shall within thirty (30) days after such loss or damage:

(i) Place the same, or replace the same with similar property, in good repair, condition and working order to the reasonable satisfaction of Ticketmaster; or

(ii) Pay Ticketmaster in cash the full replacement cost of the Hardware, and Ticketmaster shall promptly install new hardware to replace the lost or damaged Hardware.

14

St Louis Blues LUA 08232016

HIGHLY CONFIDENTIAL

LNE-LIT24-000849270

(b)    Principal shall, at its own expense, provide and maintain at all times during the Term hereof insurance to protect the Hardware against loss caused by fire (with extended coverage), vandalism, malicious mischief, theft, or any other cause in an amount equal to the full replacement value of the Hardware as reasonably determined by Ticketmaster. Should Principal become unable to provide or maintain such insurance coverage, Principal shall promptly notify Ticketmaster in writing prior to the expiration of any such coverage, and, thereafter, Ticketmaster shall have the right, but shall not be obligated, to provide insurance coverage for the occurrences specified above and charge Principal the reasonable costs of such insurance coverage.

(c)    Principal shall provide, at its sole expense, comprehensive or commercial general liability and property damage insurance with minimum limits of ███████ per occurrence and ███████ in the aggregate for its protection and the protection of Ticketmaster.

(d)    All insurance provided and maintained by Principal pursuant to this Section shall provide for the waiver of the insurer's right of subrogation against Principal and Ticketmaster. All such policies of insurance shall include Ticketmaster, Live Nation Worldwide, Inc. and its landlords or licensors, if any, and their respective parents, members, partners, affiliates, divisions and subsidiaries as an additional named insured on a primary and non-contributory basis irrespective of any other insurance, whether collectible or not, with respect to the operations of Principal per this Agreement. Further, such policies shall provide for at least thirty (30) days' prior written notice of cancellation, non-renewal or material modification to Ticketmaster. Principal shall furnish Ticketmaster with certificates of such insurance or other evidence satisfactory to Ticketmaster as to its compliance with the provisions of this Section.

11.    **TITLE**:

(a)    **Hardware/Software**: Principal covenants and agrees that the Software and Hardware and any deliverables or work product furnished under this Agreement are, and shall at all times be and remain, personal property which shall, at all times, remain the sole and exclusive property of Ticketmaster, and Principal shall have no right, title or interest therein or thereto except as a licensed user thereof. Principal understands from Ticketmaster that Ticketmaster has invention rights, copyrights, and other intellectual property rights in the TM System and the information contained therein which prohibit copying, sale, modification and re-manufacture of the TM System and information regarding the TM System and which will be enforced. Principal hereby agrees that it will, whenever reasonably requested by Ticketmaster, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, agreements, instruments, and documents necessary or desirable, in form mutually satisfactory to Ticketmaster and Principal, to protect the rights and ownership of Ticketmaster to and of the Software and Hardware, including but not limited to certificates from parties with a real property interest in the premises wherein the Hardware may be located waiving any claim with respect to the Hardware. Except as may be necessary to prevent damage to or destruction of the Hardware, Principal will not move the Hardware nor permit such Hardware to be moved without Ticketmaster's prior written consent, which consent shall not be unreasonably withheld, and shall give Ticketmaster prompt written notice of any attachment or other judicial process affecting any item of Hardware. Upon the expiration or termination of this Agreement, Principal shall return the Software and Hardware to Ticketmaster in good repair, condition and working order, ordinary wear and tear resulting from proper use thereof alone excepted, and any and all licenses and other rights to the Software and Hardware shall terminate with respect to Principal.

15

St Louis Blues LUA 08232016

HIGHLY CONFIDENTIAL

LNE-LIT24-000849271

**DX-1494.0344**

(b)    **Intellectual Property**: Each party shall retain all right, title and interest in and to its respective trademarks, service marks and trade names worldwide ("Intellectual Property") subject to a limited non-exclusive, non-transferable license in favor of the other party necessary to perform this Agreement as set forth herein. Each party grants the other a royalty-free, non-exclusive, non-transferable license, during the Term, to include such party's pre-approved Intellectual Property solely in connection with the promotions and marketing contemplated in this Agreement. Each party shall use the other's Intellectual Property only as provided, and shall not alter the Intellectual Property in any way, nor shall it act or expressly permit action in any way that would impair the rights of owning party in its Intellectual Property. Each party acknowledges that its use of the other party's Intellectual Property shall not create any right, title or interest in or to such Intellectual Property. Each party shall have the right to monitor the quality of the other party's use of its Intellectual Property. Additionally, each party shall notify the other promptly in writing of any known infringement of the other's Intellectual Property. Any references to a party's Intellectual Property shall contain the appropriate trademark, copyright or other legal notice provided from time to time by owning party.

(c)    **Purchaser Data**: Principal and Ticketmaster each has rights in the personally identifiable information with respect to persons who actually purchased tickets to Principal's Attractions through the TM System (whether by outlets, Telephone Sales or Internet Sales) ("Purchaser Data"), subject to the terms hereof. Such use by Ticketmaster may include, without limitation, in development of new or upgraded Software at Principal's request, or for general market research on pricing when used in aggregate form with other Ticketmaster client consumer data. Each party agrees to use the Purchaser Data only in compliance with all Applicable Laws and administrative rulings and in accordance such party's own posted privacy policies. Each party agrees that if any portion of the Purchaser Data includes a person's name and that person's (i) social security number; (ii) driver's license or government identification number; or (iii) password and account identification, then each party shall implement and maintain reasonable security procedures and practices appropriate to the nature of the Purchaser Data to protect the Purchaser Data from unauthorized access, destruction, use, modification or disclosure. Each party also agrees that if any portion of the Purchaser Data includes credit, debit or prepaid card numbers and related information, each party shall comply with payment card industry standards. Each party shall also include in any email communications that such party may make based on the Purchaser Data a mechanism to provide the recipient with the right to "opt-out" from receiving further communications from such party and such party shall honor such opt-out preferences.

12.    **CONFIDENTIAL INFORMATION**:

(a)    The parties acknowledge that by reason of their relationship hereunder, they may from time to time disclose information regarding their business, products, software technology, Intellectual Property and other information that is confidential and of substantial value to the other party, which value would be impaired if such information were disclosed to third parties ("Confidential Information"). The provisions of this Agreement shall be deemed to be Confidential Information.

(b)    Confidential Information shall not include information that (i) is or becomes generally available to the public other than as a result of the breach of the confidentiality obligations in this Agreement by the receiving party, (ii) is or has been independently acquired or developed by the receiving party without violating any of the confidentiality obligations in this Agreement, (iii) was within the receiving party's possession prior to it being furnished to the receiving party by or on behalf of the disclosing party, or (iv) is

16

St. Louis Blues LUA 08232016

HIGHLY CONFIDENTIAL                                    LNE-LIT24-000849272

**DX-1494.0345**

received from a source other than the disclosing party; provided that, in the case of (iii) and (iv) above, the source of such information was not known by the receiving party to be bound by a confidentiality obligation to the disclosing party or any other party with respect to such information.

(c)     Each party agrees that it will keep the Confidential Information of the other party strictly confidential and will not use in any way for its own account or the account of any third party, nor disclose to any third party, any Confidential Information of the other party revealed to it by the other party without the other party's prior written consent, except to the extent expressly permitted by this Agreement; provided, however, that the receiving party may disclose the Confidential Information, or any portion thereof, to its directors, officers, employees, legal and financial advisors, controlling persons and entities who need to know such information to perform such party's obligations under this Agreement and who agree to treat the Confidential Information in accordance with the confidential obligations in this Agreement. Each party shall use the same degree of care to avoid disclosure or use of the other party's Confidential Information as it employs with respect to its own Confidential Information of like importance and represents that it has adequate procedures to protect the secrecy of such Confidential Information including without limitation the requirement that employees, representatives, and agents with access to the Confidential Information have executed non-disclosure agreements which have the effect of adequately protecting Confidential Information.

(d)     In the event that either party receives a request to disclose all or any part of the Confidential Information of the other party under the terms of a subpoena, document request, notice of deposition or other legal proceeding, such party agrees to notify the other pursuant to Section 17(h) below, within forty-eight (48) hours after receipt of such legal document, and such party agrees to cooperate with the other in any attempt to obtain a protective order at the sole cost of the other party seeking the protective order.

13.     **LIMITATION ON LIABILITY**: In no event shall either party be liable pursuant to this Agreement for any indirect, consequential, exemplary, incidental, special or punitive damages, including also lost profits, lost savings, lost or destroyed data, lost ticket revenues, lost opportunity costs or any other economic loss, of any type or nature, or for events or circumstances beyond such party's control, even if such party has been advised of the possibility of such damages. Neither occasional short term interruptions of service which are not unreasonable under comparable industry standards nor interruptions of service resulting from events or circumstances beyond a party's reasonable control shall be cause for any liability or claim against such party hereunder, nor shall any such occasion render such party in default under this Agreement.

14.     **INDEMNIFICATION**:

(a)     Principal shall indemnify Ticketmaster and its parents, subsidiaries, and their officers, directors, employees and agents and their successors and assigns (collectively, for purposes of this Section, "Ticketmaster's Indemnitees") against, and hold Ticketmaster's Indemnitees harmless from, any and all claims, actions, damages, expenses (including court costs and reasonable attorneys' fees), obligations, losses, liabilities and liens, imposed on, incurred by, or asserted against Ticketmaster's Indemnitees occurring as a result of, or in connection with: (i) any Event of Default under this Agreement by Principal or any of Principal's officers, directors, employees and agents (collectively, "Principal's Representatives"); (ii) use of the TM System (including without limitation any customization of Principal's Website or the Interface Page (if applicable) and any e-mail campaigns or distributions using the TM System),

17

St Louis Blues LUA 08232016

HIGHLY CONFIDENTIAL                                                    LNE-LIT24-000849273

**DX-1494.0346**

or possession and use of the Hardware (if any), by Principal or any of Principal's Representatives; (iii) any Attraction held or scheduled to be held at the Facility (including any injuries or deaths occurring at or in connection with any Attraction or the failure of any Attraction to occur or to occur in the manner advertised or promoted); (iv) Principal's use of the Purchaser Data; or (v) any advertising, email campaigns or distributions conducted by Ticketmaster on Principal's behalf or conducted by Principal including, without limitation, advertising, email campaigns or distributions in violation of Applicable Laws applicable to commercial emails; except, in each case, to the extent that any such claims arise out of Ticketmaster's negligence or willful misconduct with respect thereto.

(b)    Ticketmaster shall indemnify Principal and its parents, subsidiaries, and their officers, directors, employees and agents and their successors and assigns (collectively, for purposes of this Section, "Principal's Indemnitees") against, and hold Principal's Indemnitees harmless from, any and all claims, actions, damages, expenses (including court costs and reasonable attorneys' fees), obligations, losses, liabilities and liens, imposed on, incurred by, or asserted against, Principal's Indemnitees occurring as a result of, or in connection with: (i) any Event of Default under this Agreement by Ticketmaster or any of Ticketmaster's officers, directors, employees and agents; (ii) Ticketmaster's use of the Purchaser Data; (iii) any advertising, email campaigns or distributions conducted by Ticketmaster (other than as set forth in subsection (a)(v) above), including, without limitation, advertising, email campaigns or distributions in violation of Applicable Laws applicable to commercial emails; or (iv) any alleged patent, trademark or copyright infringement asserted against Principal's Indemnitees with respect to Principal's use of the Hardware, Software, TM System or any other materials provided by Ticketmaster hereunder; except, in each case, to the extent that any such claim arises out of Principal's negligence or willful misconduct with respect thereto.

(c)    The indemnified party must notify the other party promptly in writing of any claim hereunder, and provide, at such other party's expense, all reasonably necessary assistance, information and authority to allow the other party to control the defense and settlement of such claim. The indemnifying party shall control any settlement of a third party claim related to this Agreement, except to the extent that a settlement requires any actions or conduct by or restrictions on the indemnified party, in which case the prior approval of the Indemnified party must be obtained, which approval shall not be unreasonably withheld. If the indemnified party elects to use counsel of its own choosing, it may do so but at the indemnified party's own cost.

15.    **TERMINATION**:

(a)    This Agreement may be terminated by either party upon written notice to the other party in the event of any material default in or material breach of the terms and conditions of this Agreement by the other party, after the other party has received written notice of default (which notice shall provide a detailed description of the default) which default is not cured within thirty (30) calendar days (or ten (10) business days, in the case of a monetary default) from the date of receipt of such notice or the filing of any voluntary or involuntary petition against the other party under the bankruptcy or insolvency laws of any applicable jurisdiction, which petition is not dismissed within sixty (60) days of filing, or upon any appointment of a receiver for all or any portion of the other party's business, or any assignment of all or substantially all of the assets of such other party for the benefit of creditors (each such occurrence, after the expiration of the above referenced cure period, shall be an "Event of Default");. Subject to Section 15(c) below, upon Ticketmaster's receipt of a notice of termination

18

St Louis Blues LUA 08232016

HIGHLY CONFIDENTIAL                                    LNE-LIT24-000849274

due to an Event of Default by Ticketmaster, Ticketmaster shall, without further demand, forthwith pay to Principal all amounts due and owing pursuant hereto and Ticketmaster authorizes Principal to setoff any amounts owed to Principal hereunder against any amounts held by Principal on behalf of Ticketmaster or owed to Ticketmaster by Principal.    Principal may, in addition to terminating this Agreement, require Ticketmaster to remove all Hardware from the Facility.    Subject to Section 15(f) below, upon Principal's receipt of a notice of termination due to an Event of Default by Principal, Principal shall, without further demand, forthwith pay to Ticketmaster all amounts due and owing pursuant hereto, and Principal authorizes Ticketmaster to setoff any amounts owed to Ticketmaster hereunder against any amounts held by Ticketmaster on behalf of Principal or owed to Principal by Ticketmaster. Subject to Section 15(f), Ticketmaster may, in addition to terminating this Agreement, terminate Principal's right to access and use the TM System and take immediate possession of the Hardware and Software wherever the same may be located without demand, notice or court order.

(b)    This Agreement may be terminated by Ticketmaster on thirty (30) days' prior written notice, at the sole discretion of Ticketmaster, in the event that more than 50% of Principal's assets or voting stock is sold or otherwise assigned to a third party.

(c)    This Agreement may be terminated by either party in the event any act by the other party threatens to cause any infringement of such party (or such party's licensor) intellectual property or other property right, including without limitation, any copyright, license right or trade secret right, and Principal fails to refrain from so acting within ten (10) business days' written notice from the notifying party; provided, the foregoing shall not be deemed to restrict Principal from using the Ticketmaster Hardware and Software as intended as expressly set forth herein.

(d)    Upon the effective date of any termination or expiration of this Agreement, provisions regarding ownership of intellectual property rights, representations and warranties, confidentiality, indemnification, limitation of liability, non-solicitation, jurisdiction and venue shall remain in full force and effect; each party shall immediately cease the use of the other party's Intellectual Property; and each party shall return, or at the other party's request, destroy all copies of Confidential Information, and all other property belonging to and/or received from the other party.

(e)    No remedy referred to in this Section is intended to be exclusive, but each shall be cumulative and in addition to any other remedy herein or otherwise available at law or in equity, each and all of which are subject to the limitations contained in Section 13 hereof.

(f)    At the expiry of the Term or pursuant to an earlier termination of this Agreement for any reason, each party undertakes to to cooperate in good faith to wind down the arrangements set forth herein,  in order to minimize any disruptions or  impacts of any transition process prior to and after the termination or expiration of this Agreement.    This includes providing to Principal any Purchaser Data reasonably required to enable Principal to migrate from the Ticketmaster Hardware and Software to another program.

16.    **DEFINITIONS**: As used in this Agreement, the following terms shall have the respective meanings indicated below unless the context otherwise requires:

"AccessManager" means the Ticketmaster AccessManager software which interfaces with the TM System to facilitate certain reporting systems and to provide various enhanced

19

St Louis Blues LUA 08232016

HIGHLY CONFIDENTIAL

LNE-LIT24-000849275

**DX-1494.0348**

services to the patron admissions process through the use of bar codes or other media printed on Tickets.

"AccountManager" means the Ticketmaster AccountManager software and hosting services that allow Subscribers to manage their Season/Contract Ticket accounts.

"Applicable Law" means any applicable federal, state and/or local laws and regulations together with any applicable payment network rules, including Visa, MasterCard, American Express and Discover rules, as well as Automated Clearing House (ACH) rules.

"Archtics" means Ticketmaster's software that delivers extensive season, miniplan and single ticket functionality in connection with the Ticketmaster host system and distribution channels for inventory control by Ticketmaster and Principal.

"Archtics Transaction Fees" means the amounts Ticketmaster charges for certain Software transactions as described in Exhibit A.

"Attraction" means a concert, sporting, entertainment or other act or event of any kind or nature whatsoever to be held at the Facility.

"Attraction Taxes" means any and all sales, amusement, admissions and other taxes, charges, fees, levies or other assessments measured by reference to a charge per Ticket sold or determined based upon the purchase price of a Ticket assessed by federal, state, county, municipal or other governmental or quasi-governmental authorities as a result of, or in connection with, any Attraction, including Principal Taxes and Ticketmaster Taxes as further described below. To the extent such taxes relate to the funds paid or owed to Principal under this Agreement such portion of Attraction Taxes may also be referred to herein as "Principal Taxes," and to the extent such taxes relate to portions of service charges (e.g. Convenience Charge, Processing Fee, etc.) collected and retained by Ticketmaster under this Agreement, such portion of Attraction Taxes may also be referred to herein as "Ticketmaster Taxes."

"Chargebacks" is defined in Section 8(c) hereof.

"Confidential Information" is defined in Section 12 hereof.

"Contract Year" is defined in Section 1 hereof.

"Convenience Charge" means the per Ticket amount charged by Ticketmaster to a consumer for the convenience of purchasing Tickets through the TM System.

"Event of Default" is defined in Section 15(a) hereof.

"Face Value" means the face price of a Ticket as determined by Principal, which shall be inclusive of all applicable Attraction Taxes and facility, parking and similar fees related to the Ticket.

"Facility" means any venues owned, controlled, operated or managed by Principal, directly or indirectly through one or more affiliates, or where Principal otherwise controls the rights or has the authority to sell tickets to any event, including, but not limited to the venue(s) located at 1401 Clark Avenue, St. Louis, Missouri, and currently known as Scottrade Center.

20

St Louis Blues LUA 08232016

HIGHLY CONFIDENTIAL                                                        LNE-LIT24-000849276

**DX-1494.0349**

"Facility Box Office" means the Facility's Ticket sales locations that are operated by Principal and located at the Facility.

"GroupManager" means the Ticketmaster GroupManager software and hosting services that allow Principal and Principal's customers to manage their group ticket experience.

"Group Sales" means sales of Tickets by Principal to a group consisting of at least fifteen (15) people for use by the group members to attend an Attraction as a group. In no event shall Group Sales consist of the sale of Tickets to individuals to attend an event separately or for individuals to purchase Tickets who Principal knows have intent to resell such Tickets.

"Hardware" means all of that certain computer hardware, communications equipment, terminals and hook-ups (including replacements thereof) listed with particularity on Exhibit B or otherwise supplied by Ticketmaster to Principal at any time during the Term of this Agreement, but excluding (i) any computer hardware, communications equipment, terminals and hook-ups purchased by Principal to provide the connectivity to and interfacing with the TM System required under this Agreement, and (ii) any computer hardware, communications equipment, terminals and hook-ups purchased by Principal from Ticketmaster.

"Hosted Platform" shall mean the equipment, operating system, hardware and software specifications, and networking environment on and with which the TM System and Archtics Software are hosted by Ticketmaster, and additions or replacements to the foregoing which may be implemented by Ticketmaster in accordance with the terms of this Agreement.

"House Seats" means Tickets provided by Principal (i) to the Attraction's promoter, performing act or event, or their managers or agents (i.e. band holds); (ii) for distribution through legitimate fan clubs in accordance with current guidelines (i.e. fan club holds); or (iii) for legitimate promotional purposes (e.g. radio station promotions); provided that House Seats Tickets shall not be distributed to the general public.

"Inside Charges" means the amounts Ticketmaster charges Principal to sell, issue and process Tickets utilizing the TM System under this Agreement.

"Intellectual Property" is defined in Section 11(b) hereof.

"Interface Page" means a co-branded web page interface for use with Software transactions designed, created and maintained by Ticketmaster to have, in general, the look and feel of Principal's Website and hosted on Ticketmaster's web servers.

"Internet Sales" means all sales of Tickets over the Internet.

"License" is defined in Section 4(a) hereof.

"MiniPlan Tickets" means specifically designated Tickets sold directly by Principal to a single consumer on an annual or season basis across a set of at least two (2) Attractions.

"Outlet" means a retail Ticket selling agency (other than the Facility Box Office) where Tickets for an Attraction are made available and offered for sale to the public through the TM System.

"Payment Processing Fees" is defined in Section 3(b).

21

St Louis Blues LUA 08232016

HIGHLY CONFIDENTIAL                                                              LNE-LIT24-000849277

**DX-1494.0350**

"Principal's Website" means an Internet website(s) owned, operated and maintained by Principal, which shall contain links to the Interface Page.

"Processing Fee" means the per order amount charged by Ticketmaster to a consumer for purchasing Tickets via Internet Sales or Telephone Sales through the TM System.

"Purchaser Data" is defined in Section 11(c) hereof.

"Royalties" is defined in Section 3(c)(i) hereof.

"sale and sell" and any derivations thereof in this Agreement shall include any distribution for consideration, by any means or method (including without limitation, on the Internet or by auction) and shall include resales.

"Season/Contract Tickets" means specifically designated Tickets sold directly by Principal on an annual basis across all Attractions or across all of a category of Attractions (i.e., luxury suites, club level seats and season tickets).

"Sellable Capacity" means the admission capacity of the Facility for any particular Attraction.

"Software" means Ticketmaster's ticketing system software known and marketed as Ticketmaster Classic, AccessManager, TM Charge, TM+, and the additional ticket sales software and Internet-based premium Ticketmaster services that include Archtics, AccountManager, GroupManager, and any new versions thereof or any other deliverables for TM System access provided to Principal by Ticketmaster during the Term.

"Subscribers" means any person who holds an account on Principal's AccountManager.

"Telephone Sales" means all sales of Tickets through the TM System by telephone, interactive voice response (IVR) and similar means.

"Term" is defined in Section 1 hereof.

"Ticket" means a printed, electronic or other type of evidence of the right, option or opportunity to occupy space at or to enter or attend an Attraction or Attractions even if not evidenced by any physical manifestation of such right, such as a "smart card", including, without limitation, tickets printed via TicketFast print-at-home technology.

"TicketFast®" means the TM.com Website method of Ticket delivery which allows purchasers to print Tickets from a computer.

"Ticket Forwarding" means the ability of Subscribers to forward Tickets purchased through AccountManager to a recipient with a valid email address.

"Ticket Receipts" means the Face Value of a Ticket sold by Ticketmaster less any applicable Inside Charges, Payment Processing Fees or Ticketmaster Taxes with respect to such Ticket, and less any Principal Taxes with respect to such Ticket if Ticketmaster is required to remit Principal Taxes to any taxing authority.

22

St Louis Blues LUA 08232016

LNE-LIT24-000849278

**DX-1494.0351**

"TM Charge" means the electronic payment processing system within the TM System that utilizes the global banking association networks to authorize electronic payment for purchases of Tickets to Attractions sold by Principal from the Facility Box Office as permitted under this Agreement.

"TM.com Website" means any Internet websites owned, operated and maintained by Ticketmaster, including, without limitation, any co-branded versions and any version distributed through any broadband distribution platform or through any platform or device including television, broadband and wireless technologies.

"TM System" means the Hardware, Software, TM.com Website, related procedures and personnel, and repair and maintenance services established and maintained by Ticketmaster and its affiliates for the purpose of selling, distributing, auditing and controlling the sale of Tickets for Attractions, including, without limitation, at Outlets, by Internet Sales, by Telephone Sales and the processing of transactions through the Software.

17.    **MISCELLANEOUS**:

(a)    **Governing Law/Jurisdiction**: This Agreement shall be interpreted and governed by the laws of the State of Delaware, without reference to conflict of laws principles. Each of the parties hereto agrees that the state courts, and the United States federal courts, that are located in the State of Missouri shall each have subject matter jurisdiction hereunder and personal jurisdiction over each of the parties hereto.  Each such party hereby consents thereto, and hereby waives any right it may have to assert the doctrine of forum non conveniens or to object to venue to the extent that any proceeding is conducted in accordance with the foregoing provision.

(b)    **Waiver of Jury Trial**: In the event the parties are required for any reason to submit any dispute hereunder to trial, the parties expressly agree to waive the right to a jury trial, because the parties hereto, all of whom are represented by counsel, believe that the complex commercial and professional aspects of their dealing with one another make a jury determination neither desirable nor appropriate.

(c)    **Entire Agreement; Modification**: This Agreement constitutes the entire and exclusive agreement between the parties hereto with respect to the subject matter hereof and supersedes and cancels all previous oral or written communications, proposals, agreements, and commitments with respect to the subject matter hereof. No modification to this Agreement, nor any waiver of any rights hereunder, shall be effective unless assented to in writing by the party to be charged and the waiver of any breach or default shall not constitute a waiver of any other right hereunder or any subsequent breach or default.  A party's delay in enforcing its rights hereunder shall not be construed as a waiver of such rights or remedies.

(d)    **Assignment**: Without the prior written consent of Ticketmaster, Principal shall not (i) directly or indirectly assign, transfer, pledge or hypothecate its rights or obligations in this Agreement or any interest therein except in the event of an assignment by Principal to any parent, subsidiary, affiliate or successor-in-interest (including, without limitation, a successor by virtue of an acquisition) which is not a competitor of Ticketmaster, in which event no such consent shall be required; or (ii) permit the Hardware (if any) or any part thereof to be used, or access to the Software or any part thereof to be had, by anyone other than Principal or Principal's authorized employees. Any such assignment shall not relieve Principal of any of its obligations hereunder.  Without the prior written consent of Principal, Ticketmaster shall not

23

St Louis Blues LUA 08232016

HIGHLY CONFIDENTIAL

LNE-LIT24-000849279

**DX-1494.0352**

assign or transfer its rights or obligations in this Agreement or any interest therein, except in the event of an assignment by Ticketmaster to any parent, subsidiary, affiliate or successor-in-interest (including, without limitation, a successor by virtue of an acquisition), in which event no such consent shall be required. Any such assignment shall not relieve Ticketmaster of any of its obligations hereunder. Any assignment, transfer, pledge or hypothecation by either party for which consent is required hereby and which is made without such consent shall be void. Notwithstanding the foregoing, each party agrees and acknowledges that certain of the other party's duties and obligations under this Agreement may be performed on such other party's behalf by one or more of its parent, subsidiaries and affiliates, and no such performance shall be deemed to be an assignment or breach of this Agreement by such other party.

(e)    **Relationship of the Parties**: Each party is an independent contractor and not an agent or partner of, or joint-venturer with, the other party for any purpose other than as set forth in this Agreement (e.g., Ticketmaster is the agent of Principal with respect to ticket sales and distribution). Neither party by virtue of this Agreement shall have any right, power, or authority to act or create any obligation, express or implied, on behalf of the other party.

(f)    **Delays**: Neither party shall be liable or deemed in default, and no Event of Default shall be deemed to have occurred, as a result of any delay or failure in performance of this Agreement resulting directly or indirectly from any cause completely, solely and exclusively beyond the control of that party, but only for so long as such delay shall continue to prevent performance.

(g)    **Severability**: If any provision of this Agreement is found to be invalid or unenforceable in any jurisdiction (a) the validity or enforceability of such provision shall not in any way be affected with respect to any other jurisdiction, and the validity and enforceability of the remaining provisions shall not be affected; and (b) the parties shall replace such provision by one or more valid and enforceable provisions approximating the original provision as closely as possible.

(h)    **Notices**: Any notices required to be given under this Agreement must be sent to each party, in writing, at the address set forth immediately below the signature line hereto or at such address as may be provided by each party in writing from time to time, by certified or registered mail, return receipt requested or by an overnight courier. Notices will be deemed effective the day following sending if sent by overnight courier or five days after sending if sent by certified or registered mail. Settlement reports may be delivered from Ticketmaster to Principal by email; therefore Principal shall promptly notify Ticketmaster of any change to its email address set forth immediately below the signature line hereto.

(i)    **Binding Agreement/Counterparts**: The terms, conditions, provisions and undertakings of this Agreement shall be binding upon and inure to the benefit of each of the parties hereto and their respective successors and permitted assigns; provided, however, that this Agreement shall not be binding until executed by each of the parties. This Agreement may be executed in multiple counterparts which when taken together constitute a single instrument.

(j)    **Legal Review**: Each of the parties has had the opportunity to have its legal counsel review this Agreement on its behalf. If an ambiguity or question of intent arises with respect to any provision of this Agreement, this Agreement will be construed as if drafted jointly by the parties. The parties expressly agree that the construction and interpretation of this Agreement shall not be strictly construed against the drafter.

24

St Louis Blues LUA 08232016

                                                                 LNE-LIT24-000849280

**DX-1494.0353**

(k)    **Attorneys' Fees**: In addition to any other rights hereunder, the substantially prevailing party, as a court of competent jurisdiction (as provided above) may determine, in any claim or other dispute which relates to this Agreement, regardless of whether such claim or other dispute arises from a breach of contract, tort, violation of a statute or other cause of action, shall have the right to recover and collect from the other party its reasonable costs and expenses incurred in connection therewith, including, without limitation, its reasonable attorneys' fees incurred in connection therewith.  If a party substantially prevails on some aspects of such claim or dispute but not others, the court may apportion any award of costs or attorneys' fees in such manner as it deems equitable.

(l)    **Client Listings**:  Principal's execution of this Agreement indicates approval for Principal to be listed as a Ticketmaster client in monthly newsletters for distribution to event industry clients, in product boiler plate information, and in future releases about Ticketmaster products and services for distribution to trade and consumer media. At any time, Principal may, in its sole discretion, direct Ticketmaster to stop using Principal's name for the purposes listed in this Section by sending notice to Ticketmaster via email at client.news@ticketmaster.com.

(m)    **Survival of Terms**:  Any provision of this Agreement that contemplates performance or observance subsequent to any termination or expiration of this Agreement, including without limitation provisions related to use of the Software, purchaser data, limitations on liability, indemnification, confidential information, governing law and waivers of jury trials, shall survive any termination or expiration of this Agreement and continue in full force and effect.

(n)    **Force Majeure**:  Neither party shall be in default or liable for any loss or damage resulting from delays in performance or from failure to perform or comply with terms of this Agreement due to any causes beyond its reasonable control, which causes include, but are not limited to, Acts of God or the public enemy; riots and insurrections; storms; floods; war; fire; strikes and other labor difficulties (whether or not the party is in a position to concede to such demands); embargoes; judicial action; lack of or inability to obtain export permits or approvals, necessary labor, materials, energy, components or machinery; and acts of civil or military authorities.

25

St Louis Blues LUA 08232016

HIGHLY CONFIDENTIAL                                                    LNE-LIT24-000849281

**DX-1494.0354**

IN WITNESS WHEREOF, Ticketmaster and Principal have caused this Licensed User Agreement to be duly executed as of the date set forth below.

TICKETMASTER L.L.C.,
a Virginia limited liability company

By: _____

Print Name: _KURT SCHWARTZKOPF_

Title: _SVP NBA/NHL ARENAS_

Date: _9/6/16_

Address: _2399 Blake St #120_
_Denver, CO 80205_

Attn:    General Manager

**With a copy to:**

    Ticketmaster L.L.C.
    7060 Hollywood Boulevard
    2nd Floor
    Hollywood, CA 90028
Attn:    General Counsel

KIEL CENTER PARTNERS, L.P.,
a Missouri limited partnership

By: _____

Print Name: _PHIL SUADLE_

Title: _CFO_

Date: _9/6/16_

Address: _1401 CLARK AVE_
_ST. LOUIS MO_
_63103_

email address: ████████████████

**With a copy to:**

    Bryan Cave LLP
    211 N. Broadway, Suite 3600
    St. Louis, MO 63102
Attn:    Ryan S. Davis

26

St Louis Blues LUA 08232016

HIGHLY CONFIDENTIAL

LNE-LIT24-000849282

DX-1494.0355

## EXHIBIT A

### COMPENSATION

1.  **Ticketmaster Charges and Fees**.

    (a)    **Convenience Charge (Per Ticket)**:

**St. Louis Blues Attractions**:

| Face Value of Ticket | Convenience Charge |
|---|---|
| ███████████████████ | |

**Other Sports Attractions**:

| Face Value of Ticket | Convenience Charge |
|---|---|
| ███████████████████ | |

**All other Attractions (including Concerts and Family Attractions)**:

| Face Value of Ticket | Convenience Charge |
|---|---|
| ███████████████████ | |

The Convenience Charges set forth above for all Attractions shall be subject to automatic increase on July 1, 2018 and on July 1 of every other Contract Year thereafter during the Term in the amount of the greater of ███ per Ticket or ██ of the previous Contract Year's Convenience Charge (rounded up to the nearest ███).

    (b) **Processing Fee (Per Order)**:

27

St Louis Blues LUA 08232016

HIGHLY CONFIDENTIAL

LNE-LIT24-000849283

**DX-1494.0356**

| Type of Sale | Processing Fee |
|---|---|
| Outlet sales | ███ |
| Telephone Sales and Internet Sales | |

The Processing Fees set forth above for Telephone Sales and Internet Sales for all Attractions shall increase on July 1, 2018 and on July 1 of every other Contract Year thereafter during the Term in the amount of ███ per order.

(c)    **Inside Charges**:

| Type of Sale / Type of Ticket | Inside Charge |
|---|---|
| Outlet sales / All Tickets | ███ per Ticket |
| Telephone Sales and Internet Sales / All Tickets | Payment Processing Fees set forth below] |
| Other Tickets (including complimentary Tickets) printed by or on behalf of Principal | ███ per Ticket |
| All Sales / Parking Tickets | ███ per Ticket |

(d)    **Mail Fee**. Ticketmaster shall be entitled to assess and receive a fee in the amount of ███ per order against purchasers of Tickets using the U.S. mail method of delivery (the "Mail Fee"). The Mail Fee is only subject to automatic increase in an amount equal to the amount of any increases to the postal rates (rounded up to the nearest ███). Principal may elect to increase the Mail Fee by an additional amount not to exceed ███ per order, and Principal shall retain the entirety of such additional amount for each Mail Fee received (and not refunded) by Ticketmaster, less applicable taxes or Payment Processing Fees (calculated at the same rate for credit card transactions as set forth below) on such additional amount.

(e)    **Archtics Fees**:

(i)    Archtics Transaction Fees:

| Type of Software Transaction | Amount of Archtics Transaction Fee |
|---|---|
| **AccountManager Transactions** | |
| New Season/Contract Ticket sales | ███ per seat |
| MiniPlan Ticket sales | ███ per Ticket |
| Flex Plans | ███ per Ticket |
| Seat Exchange and Upgrades | ███ per Ticket |
| Special upsells (parking, dinner and merchandise) | ███ per Ticket |
| Per invoice processing | ███ per payment processed |
| Ticket Forwarding | ███ per Ticket |
| Single Ticket sales to Subscribers | The Convenience Charge for such Tickets set forth above less any Royalties due to Principal in connection with such Tickets |
| Ticket Printing | ███ per Ticket |

28

St Louis Blues LUA 08232016

HIGHLY CONFIDENTIAL

LNE-LIT24-000849284

**DX-1494.0357**

| Type of Software Transaction | Amount of Archtics Transaction Fee |
|---|---|
| GroupManager / Promo Code Transactions | |
| Group Sales / Promo Codes | ▓ per Ticket |

In the event Principal elects to charge Subscribers for the Software transactions in addition to and above the applicable Archtics Transaction Fees charged by Ticketmaster as set forth above, such additional amount charged by Principal up to an amount equal to the Archtics Transaction Fee may be retained by Principal and any excess amount charged by Principal shall be divided equally between Principal and Ticketmaster.

(ii)    Archtics License and Maintenance Fees:

| Software | License Fees | Maintenance Fees |
|---|---|---|
| Archtics – Hosted Platform | Waived | N/A |
| Archtics – Sybase Adaptive Server Anywhere | Includes thirty-nine (39) connections for Principal's use at no charge. A fee of ▓ per connection per Contract Year shall be charged for additional connections requested by Principal. | N/A |
| AccountManager | Waived | N/A |
| GroupManager | Waived | N/A |

(f)    **TM Messenger**:    Ticketmaster shall provide Principal with use of an email permission marketing tool which shall be powered by the third party enterprise-level interactive software and marketing provider, ExactTarget, and which shall be integrated with the TM System ("TM Messenger") in accordance with the terms and conditions set forth in Exhibit E attached hereto.  For the avoidance of doubt, the parties acknowledge and agree that the "Software" as such term is used in the Agreement shall not be deemed to incorporate TM Messenger, it being understood that TM Messenger is a third party software solution.

2.    **Payment Processing Fees**:

| Type of Sale | Percentage Rate |
|---|---|
| Telephone Sales and Internet Sales | ▓ of Face Value of Tickets, plus any fees added to the Face Value of Tickets |
| Outlet Sales | ▓ of Face Value of Tickets, plus any fees added to the Face Value of Tickets |
| Principal Sales using TM Charge | ▓ of Face Value of Tickets, plus any fees added to the Face Value of Tickets |

Any percentage rates set forth above are subject to automatic increase due to increases in the interbank rates imposed on Ticketmaster.

3.    **Principal's Royalties**.

29

St Louis Blues LUA 08232016

HIGHLY CONFIDENTIAL

LNE-LIT24-000849285

**DX-1494.0358**

| Type of Attraction / Type of Royalty | Amount of Royalty |
|---|---|
| **Live Nation-promoted Attractions:** | |
| Convenience Charge Royalty | ▮ of the Convenience Charge |
| Processing Fee Royalty | ▮ of the Convenience Charge |
| All other Attractions (excluding Feld Attractions) / Convenience Charge Royalty: | |
| July 1, 2016 – June 30, 2019 | ▮ of the Convenience Charge |
| July 1, 2019 and after | ▮ of the Convenience Charge |
| All other Attractions (excluding Feld Attractions) / Processing Fee Royalty: | |
| July 1, 2016 – June 30, 2019 | ▮ of the Processing Fee |
| July 1, 2019 and after | ▮ of the Processing Fee |

30

St Louis Blues LUA 08232016

HIGHLY CONFIDENTIAL

LNE-LIT24-000849286

## EXHIBIT B

### HARDWARE

| Quantity | Description |
| --- | --- |
| 1 | Router |
| 1 | Switch |
| 2 | AccessManager servers |
| 1 | UPS |
| 50 | Handheld Scanners |
| 39 | Zebra Printers |
| 15 | Thin Clients |
| 16 | Monitors |
| 15 | Credit Card Readers |
| 22 | Ticket Printers |

31

St Louis Blues LUA 08232016

HIGHLY CONFIDENTIAL

LNE-LIT24-000849287

**DX-1494.0360**

## EXHIBIT C

## TM+ TERMS AND CONDITIONS

1.      Capitalized terms used but not defined herein have the meaning assigned to such terms in the Agreement, and the terms "TM System" and "Software" as used in the Agreement shall be deemed to incorporate TM+.

2.      Ticketmaster shall enable TM+ for all Attractions, subject to any restrictions established by Principal including timing of activation or price floors and caps on any secondary market ticket inventory available through TM+, in accordance with the settlement terms set forth in this Exhibit C below.

### TM+ Settlement Terms

- For any primary market ticket inventory sold through TM+, Ticketmaster shall continue to sell such tickets and settle the proceeds of such sales with Principal in accordance with the terms and conditions for such transactions as set forth in the Agreement.

- For any secondary market ticket inventory sold through TM+ for any St. Louis Blues NHL games presented by Principal, Ticketmaster shall assess its standard fees against the buyers and sellers of such tickets, and settle any revenue share on such amounts due Principal, in accordance with the terms and conditions for all Ticketmaster Secondary Exchanges as set forth in the NHL Opt-In Addendum attached to the Agreement as Exhibit D.

- For any secondary market ticket inventory sold through TM+ for any other Attraction (i.e., non-NHL games) (the "Non-Team Attractions"), Ticketmaster shall assess its standard fees against the buyers and sellers of such tickets in amounts as determined by Ticketmaster, which amounts currently include: (i) a seller fee generally in an amount up to twelve percent (███ of the ticket posting price (i.e., the price set by the seller upon posting such ticket for sale), and (ii) a buyer fee generally in an amount up to fifteen percent (███ of the ticket listing price (i.e., the posting price plus the seller fee), with a $██ minimum.

- Principal shall be entitled to receive from Ticketmaster ████████████ of the Net Resale Fees collected (and not refunded or subject to chargeback) by Ticketmaster on account of Principal's secondary market ticket sales through TM+ for any Non-Team Attractions (the "TM+ Revenue Share").

- For purposes of this Exhibit C, "Net Resale Fees" shall be defined as the gross amount collected from the new purchaser of a secondary market inventory ticket via TM+ less (i) the proceeds paid to the ticket seller, (ii) an amount equal to ███ of the gross amount collected from the new purchaser (to cover credit card processing fees), and (iii) any applicable sales, admission or similar tax.

- The TM+ Revenue Share will be paid to Principal on a quarterly basis for all such sales occurring in any calendar quarter, on or before the thirtieth (30th) day of the month following each calendar quarter. In the event that any Attraction for which Ticketmaster has made any TM+ Revenue Share payment to Principal becomes a Cancelled

32

St. Louis Blues LUA 08232016

HIGHLY CONFIDENTIAL    LNE-LIT24-000849288

Attraction, Principal shall promptly repay to Ticketmaster the amount of such TM+ Revenue Share payments in respect of such Cancelled Attraction.

- Each settlement relating to the TM+ Revenue Share pursuant to this <u>Exhibit C</u> shall be accompanied by a detailed report of the applicable transactions during such settlement period.

33

St Louis Blues LUA 08232016

HIGHLY CONFIDENTIAL

LNE-LIT24-000849289

**DX-1494.0362**

## EXHIBIT D

## NHL OPT-IN ADDENDUM

This Addendum confirms the agreement between Ticketmaster and Principal d/b/a/ the St. Louis Blues ("Team") regarding the participation by Team in the NHL-branded online marketplace for secondary market or fan-to-fan NHL ticket resales and exchanges within the broader ticket marketplace (the "NHL Secondary Ticketing Platform"), as developed and operated by Ticketmaster pursuant to the terms and conditions of the agreement between Ticketmaster and NHL Enterprises, L.P. ("NHLE"), NHL Enterprises Canada, L.P. ("NHLEC"), and NHL Interactive CyberEnterprises, LLC ("NHL ICE" and, together with NHLE and NHLEC, the "NHL Parties") dated as of February 14, 2013 (the "NHL Agreement").

Team hereby agrees to participate in the NHL Secondary Ticketing Platform in accordance with the terms and conditions set forth below:

### 1. Definitions

For purposes of this Addendum:

(1) "Year" means any contract year of the NHL Agreement, defined as a twelve (12) month accounting period (falling within the term of the NHL Agreement) commencing July 1 and concluding June 30.

(2) "Direct Costs" means with respect to the purchase of Team's game tickets through any Ticketmaster Secondary Exchange, the following items: (i) credit card fees and chargebacks (together, calculated at the rate of ▮▮▮▮ of the gross transaction value), (ii) fulfillment costs, (iii) applicable taxes attributable to Secondary Exchange Fees (it being understood that any taxes attributable to the ticket sales price shall not be deemed a "Direct Cost"), and (iv) actual out-of-pocket customer acquisition costs (e.g., (x) costs to unaffiliated third parties on search engine marketing (SEM) related to Team's game tickets, including for Team-specific, or league and general industry search terms, (y) rebates and commissions required to be paid by Ticketmaster to unaffiliated third parties for completed game ticket transactions consummated by customers that linked to any Ticketmaster Secondary Exchange directly from the applicable third party, or (z) retargeting and display and social media costs) that, in each case, are directly attributable to any such ticket purchase (whether secondary market tickets or, where applicable (e.g., TM+), primary market tickets) and incurred by Ticketmaster.

(3) "Resale Best Practices" means each of the following:

    a. Team shall activate NHL Secondary Ticketing Platform postings (including for Season Ticket holders) on day of schedule release;

    b. Team shall activate TM+ postings (including for Season/Contract Ticket holders) on or before individual Team game pre-sales or on-sales;

    c. Team shall activate co-mingled landing page on TM+ for all Team games; and

    d. For each Season/Contract Ticket price level, the price floor at which any of Team's game tickets from the same price level may be posted on any Ticketmaster

34

St. Louis Blues LUA 08232016

LNE-LIT24-000849290

**DX-1494.0363**

Secondary Exchange shall be no higher than ▉ below the Season Ticket price for such price level.

(4) "Secondary Exchange Fees" means the amount of any fees or charges collected (and not charged back or refunded) by Ticketmaster from a seller or buyer of Team's game tickets for any such ticket (exclusive of the agreed upon ticket sales price) that is sold on or through any Ticketmaster Secondary Exchange, net only of Direct Costs.

(5) "Ticketmaster Secondary Exchange" means any software, web site, platform or functionality provided, operated or hosted by Ticketmaster which allows ticket holders to post such tickets for sale to third parties (e.g., TM+ and the NHL Secondary Ticketing Platform).

## 2. Team Controlled Media Deliverables

During each Year, Team shall provide Ticketmaster with the specific media deliverables set forth on Schedule 1 attached hereto and incorporated herein by this reference (the "Team Controlled Media"), which Team Controlled Media shall be used solely for the promotion of the NHL Secondary Ticketing Platform or TM+.

## 3. Revenue Share

In consideration for Team's provision of the Team Controlled Media, notwithstanding anything to the contrary set forth in the Licensed User Agreement, Ticketmaster shall pay to Team an amount equal to ▉ of all Secondary Exchange Fees from the sale of Team's game tickets on any Ticketmaster Secondary Exchange during each Year (the "Team Resale Revenue Share"); provided, however, in the event Team meets each of the Resale Best Practices for all transactions of Team's game tickets on any Ticketmaster Secondary Exchange for the applicable Year, the Team Resale Revenue Share shall be increased to ▉ of all Secondary Exchange Fees in excess of ▉ for the applicable Year. For example, if Team meets each of the Resale Best Practices for all transactions of Team's game tickets on any Ticketmaster Secondary Exchange in a particular Year, and the total Secondary Exchange Fees for such Year equals ▉, then Team shall receive a Team Resale Revenue Share of ▉ on the first ▉ of Secondary Exchange Fees for such Year, and ▉ on the remaining ▉ of Secondary Exchange Fees for such Year.

## 4. Team Marks and Marketing

Subject to and in accordance with the terms and conditions set forth in the Agreement relating to Ticketmaster's use of Team's marks and logos, Ticketmaster shall have the right to use Team's individual marks and logos on the NHL Secondary Ticketing Platform and in connection with marketing, advertising and other means for promotion of the NHL Secondary Ticketing Platform. In addition, Team shall not market, advertise or promote, or grant rights to any third party to operate, market, advertise or promote on its behalf, any secondary market resale platform or site.

## 5. Team Designation

In addition to any designation for the NHL Secondary Ticketing Platform permitted under the NHL Agreement, Ticketmaster shall have the right to use the following Team-specific

35

St Louis Blues LUA 08232016

HIGHLY CONFIDENTIAL

LNE-LIT24-000849291

**DX-1494.0364**

designation in connection with marketing, advertising and using other means for promotion of sales of Team's tickets on the NHL Secondary Ticketing Platform: "Official Ticket Exchange of the St. Louis Blues", "Official Resale Partner of the St. Louis Blues", and any other designation mutually agreed to by Ticketmaster and Team.

## 6.    Settlement and Reporting

Notwithstanding anything to the contrary set forth in the Licensed User Agreement, Ticketmaster shall pay to Team its share of Team Resale Revenue Share proceeds within thirty (30) days of the conclusion of each month of any Contract Year with respect to any Secondary Exchange Fees collected during the immediately preceding month.   Within thirty (30) days of the end of each quarter during each Year, Ticketmaster shall furnish Team with full and accurate statements showing the calculation of total Secondary Exchange Fees (and all Direct Costs relating to such Secondary Exchange Fees, and Team Resale Revenue Share payments) for the preceding quarter.   Notwithstanding anything to the contrary set forth in the Agreement, Team further consents to Ticketmaster furnishing the same statements to the NHL Parties to verify Ticketmaster's compliance with the NHL Agreement.

36

St. Louis Blues LUA 08232016

HIGHLY CONFIDENTIAL

LNE-LIT24-000849292

**DX-1494.0365**

## Schedule 1 to Exhibit D

### TEAM CONTROLLED MEDIA DELIVERABLES

- Drop down link to the NHL Secondary Ticketing Platform in the Team's universal pages navigation bar tickets option drop down menu on each page of the Team's section of the NHL.com network that includes such navigation bar;
- Permanent link to the NHL Secondary Ticketing Platform in the Team's homepage footer for each page of the Team's section of the NHL.com network that includes such footer;
- Link to the NHL Secondary Ticketing Platform on the schedule page next to each game of the Team's section of the NHL.com network and other relevant pages within the Team's section of the NHL.com network;
- Contextual (copy and link or banner) links to the NHL Secondary Ticketing Platform on the tickets page of the Team's section of the NHL.com network and other relevant pages within the Team's section of the NHL.com network;
- Contextual (copy and link or banner) links to the NHL Secondary Ticketing Platform on any FAQ pages of the Team's section of the NHL.com network including but not limited to Ticket FAQ and Season Ticket Holder FAQ and other relevant pages within the Team's section of the NHL.com network;
- Eight (8) dedicated email campaigns to the Team's database promoting the NHL Secondary Ticketing Platform each Year, with schedule to be mutually agreed upon but available for use throughout pre-season, regular season and post-season;
- Newsletter inclusion in each Team newsletter (Season Ticket Holder newsletter, fan newsletter, pre-game newsletter) with banner OR text and logo and links;
- Ten (10) dedicated social messages on all Team social media platforms, including but not limited to Facebook and Twitter, with schedule to be mutually agreed upon but available for use throughout pre-season, regular season and post-season;
- Banner ad inventory in all sizes used on Team's web site pages ( including but not limited to home page, schedule page, tickets page) with ads promoting the NHL Secondary Ticketing Platform to be provided by Ticketmaster;
- Banner or copy with link to the NHL Secondary Ticketing Platform on Team's Search Results Page when users search for tickets or NHL Secondary Platform;
- Inclusion on Team's controlled mobile site and mobile application if available with banners and/or links link to the NHL Secondary Ticketing Platform;
- Three (3) thirty second (:30) videoboard signage during the course of each Team home game; one minute per period;
- Three (3) minutes of exclusive LED/Megatron static signage during the course of each Team home game; one minute per period;
- Two (2) thirty second (:30) television commercial advertisements in each pre-season, in-season and post-season Team home game broadcast;
- Two (2) thirty second (:30) radio commercial advertisements in each pre-season, in-season and post-season Team home game broadcast;
- One (1) color print ad inclusion in Season Ticket Holder ticket mailing, with ad to be sent to Team, and printed and distributed by Team if Team is printing the inclusion for the mailing;
- One (1) vertical/horizontal full page color advertisement in each Team game night program, and one (1) full page color advertisement in Team's official yearbook;
- Team's box office to use Ticket Office Referral language to be provided by Ticketmaster to direct fans to NHL Secondary Ticketing Platform for all sold games.
- In-game promotion that includes thirty second (:30) videoboard, PA and LED support.

37

St Louis Blues LUA 08232016

HIGHLY CONFIDENTIAL                                                    LNE-LIT24-000849293

**DX-1494.0366**

In addition to the deliverables listed above, Team will make reasonable best efforts to include mentions of the NHL Secondary Ticketing Platform where appropriate (e.g., sold out games, box office referrals, telephone representative referrals, etc.) and available (e.g., text, social media, website, box office, sales representatives, etc.).

Tracking and Reporting by Team:
- Team to use Ticketmaster created URLs with tracking built in on all digital assets provided pursuant to this Schedule.
- Team to provide monthly reporting on assets in use to ensure all assets are all being executed properly, as well as a full end of season report by August 1 at the end of each season.
- Ticketmaster shall have the right to independently audit the execution and value of all assets to ensure such assets meet the value requirements of this Schedule, or if not, to determine whether alternative assets are necessary, and Team agrees to reasonably cooperate with any such audit.

38

St Louis Blues LUA 08232016

HIGHLY CONFIDENTIAL                                                        LNE-LIT24-000849294

**DX-1494.0367**

## EXHIBIT E

### TM MESSENGER TERMS AND CONDITIONS

Ticketmaster shall provide Principal with TM Messenger services in accordance with the terms and conditions set forth in this Exhibit E below.

Ticketmaster shall make TM Messenger available for Principal's use in exchange for an annual subscription fee based on the volume of emails sent using TM Messenger in any given Contract Year as set forth in Schedule 1 attached hereto.

During the Term of the Agreement, Principal shall have the opportunity to upgrade Principal's current plan to a higher one, or downgrade to any lower plan, upon written notice to Ticketmaster and payment of the new annual subscription fee; provided, that such new plan shall not take effect until the beginning of the next Contract Year. For the avoidance of doubt, any unsent emails comprising the annual sent messages threshold for Principal's plan during each Contract Year shall expire at the conclusion of each such Contract Year, and no TM Messenger credit of any kind shall be provided to Principal in connection with such unsent emails.

Ticketmaster shall invoice Principal for the full amount of the annual subscription fee applicable for Principal's current plan at the beginning of each Contract Year during the Term of the Agreement. Additionally, in the event Principal exceeds the applicable email threshold for Principal's current plan in any Contract Year, Ticketmaster shall invoice Principal at that time for the incremental amount of the annual subscription fee applicable to such higher volume of emails sent. In the event Principal fails to pay any undisputed TM Messenger related invoice within thirty (30) days of issuance, Ticketmaster may deduct the amount of such invoice from the settlements otherwise due and owing to Principal under the Agreement, or Ticketmaster may elect to terminate the provision of TM Messenger services.

Ticketmaster shall provide all necessary maintenance and service support with respect to the use of TM Messenger based on the selected annual subscription plan, as described in the corresponding support plan set forth in Schedule 2, attached hereto.

Ticketmaster agrees to absorb all fees and other amounts due ExactTarget in connection with the use of TM Messenger, and support costs with respect thereto.

Ticketmaster represents and warrants with respect to the TM Messenger program that:

(i) it is in compliance with all Applicable Laws and has obtained all applicable permits and licenses required of it in connection with the performance of its obligations under this Agreement;

(ii) the TM Messenger hardware and software complies in all material respects with the descriptions of functionality set forth herein;

(iii) the TM Messenger hardware and software do not infringe upon the proprietary or intellectual property rights of any third party; and

(iv) Ticketmaster has all the sufficient rights, including intellectual property rights, to

39

St Louis Blues LUA 08232016

HIGHLY CONFIDENTIAL

LNE-LIT24-000849295

**DX-1494.0368**

grant the rights it grants to Principal under this Exhibit E.

The representations and warranties set out in this Exhibit E shall survive termination of this Agreement.

40

St Louis Blues LUA 08232016

HIGHLY CONFIDENTIAL

LNE-LIT24-000849296

**DX-1494.0369**

HIGHLY CONFIDENTIAL

## Schedule 1 to Exhibit E

| Plan | Annual Sent Messages | | | Annual Subscription Fee * |
|------|------|-----|------|------|
| Base | 0 | to | 2,000,000 | ███ |
| Plan 1 | 2,000,001 | to | 4,000,000 | |
| Plan 2 | 4,000,001 | to | 6,000,000 | |
| Plan 3 | 6,000,001 | to | 12,000,000 | |
| Plan 4 | 12,000,001 | to | 18,000,000 | |
| Plan 5 | 18,000,001 | to | 30,000,000 | |
| Plan 6 | 30,000,001 | to | 48,000,000 | |
| Plan 7 | 48,000,001 | or | More | |

*The annual subscription fees for each plan set forth in the schedule above shall be subject to automatic increase on the first day of the second Contract Year and on the first day of each Contract Year thereafter during the Term in the amount of ███ of the previous Contract Year's annual subscription fee for each such plan.

41

St Louis Blues LUA 08232016

LNE-LIT24-000849297

HIGHLY CONFIDENTIAL

**Schedule 2 to Exhibit E**

| Plan | # of Annual Messages | Support Plan | Tier 1 Support TM Product Support Desk | Tier 2 Support TM Product Support Desk | Tier 3 Support TM Product Support Desk & TM Business Consultants |
|---|---|---|---|---|---|
| Base | 0 - 2,000,000 | • Unlimited Tier 1 Support<br>• Implementation Services<br>• Group Training - 3 Sessions<br>• HTML Templates - 3 Per Year<br>• User Documentation<br>• Whitepapers & Best Practices | • Problem/Resolution Scenarios<br>• Documentation Requests<br>• Best Practices<br>• Deliverability Assistance<br>• Account Changes & Administration<br>• Plan Changes | • HTML Programming & Designing<br>• In-Depth Troubleshooting<br>• Problem/Resolution<br>• Best Practices<br>• Deliverability Assistance<br>• Account Changes & Administration | [illegible] |
| Plan 1<br>Plan 2 | 2,000,000 - 6,000,000 | • Unlimited Tier 2 Support<br>• Optional Business Consulting Services @ $250/hr | | | |
| Plan 3<br>Plan 4 | 6,000,000 - 18,000,000 | • Unlimited Tier 2 Support<br>• Dedicated Training - 4 Session<br>• Business Consultation - 2 Sessions | | | |
| Plan 5<br>Plan 6<br>Plan 7 | [illegible] | • Unlimited Tier 3 Support<br>• Dedicated Business Consulting Services [illegible] | | | |

\* All services in Tier 1 offered to Tier 2, and all services in Tier 1 & 2 offered to Tier 3.

42

St. Louis Blues LUA 08232016

LNE-LIT24-00084298

**DX-1494.0371**

43

St Louis Blues LUA 08232016

HIGHLY CONFIDENTIAL

LNE-LIT24-000849299

DX-1494.0372