DX-1494(15)

Bates: LNE22-000034492 - LNE22-000034534

Licensed User Agreement between Ticketmaster and GSW Arena, LLC

## LICENSED USER AGREEMENT

THIS LICENSED USER AGREEMENT ("Agreement") is entered into as of _____ __, 2019 and is made effective as of July 1, 2019 ("Effective Date"), by and between Ticketmaster L.L.C., a Virginia limited liability company ("Ticketmaster"), and GSW Arena LLC, a Delaware limited liability company ("Principal"). This Agreement consists of this Licensed User Agreement, and any Exhibits attached hereto which are incorporated herein by this reference. Upon the Effective Date, this Agreement shall supersede and replace that certain similar Licensed User Agreement dated February 28, 2015, by and between Ticketmaster and Principal (the "Prior Agreement"), which shall thereafter be null, void and of no further force or effect, except in connection with any Golden State Warriors home basketball games played at Oracle Arena through June 30, 2019. For clarity, the terms and conditions of the Prior Agreement shall continue to apply in full force and effect in connection with any Golden State Warriors home basketball games played at Oracle Arena through June 30, 2019. The meanings of all capitalized terms used in this Agreement are set forth in Section 16 hereof. In consideration of the mutual promises and covenants set forth herein, the parties hereby agree as follows:

1.    **TERM**: The initial term of this Agreement shall begin on the Effective Date and shall continue through June 30, 2025 (the "Initial Term"). Thereafter, the term of this Agreement shall automatically be renewed through June 30, 2029 (such four (4) year period commencing July 1, 2025 and continuing through June 30, 2029, the "Renewal Term"), unless Principal notifies Ticketmaster in writing, not less than ninety (90) days prior to the end of the Initial Term of its intention not to renew this Agreement. The Initial Term, together with the Renewal Term, if applicable, shall be collectively referred to herein as the "Term". If for any reason twenty percent (20%) or more of the regularly scheduled Golden State Warriors home games for a standard regular season of the NBA (which for purposes of this Section shall be calculated at a forty-one (41) game season) are not played at the Facility or a substitute location for which Ticketmaster has the rights to sell Tickets during any NBA regular season during the Term (e.g. by virtue of damage to the Facility, unless play continues at another venue where Ticketmaster provides ticketing, a player's strike, lockout, or other interruption or stoppage of the NBA regular season) (such period of time shall be referred to herein as the "Suspension Period"), then Principal shall pay a fee for the cancellation of each home game in the amount of ███████████████ for each regular season game less than forty-one (41) that is played during such season. Each twelve (12) month period during the Term commencing on July 1 and continuing through the following June 30 shall be a "Contract Year" as such term is used herein.

2.    **TICKET SALES RIGHTS; EXCLUSIVITY**:

(a)    **Grant of Rights**: Except as otherwise provided below in Section 2(b) of this Agreement, Principal hereby grants to Ticketmaster, and Ticketmaster accepts from Principal, the right during the Term of this Agreement, to be the exclusive seller, as Principal's agent, of all Tickets for the Sellable Capacity for every Attraction via any and all means and methods, including on the Internet, by telephone, computer, IVR, outlets, television, clubs, auctions, VIP packages, presales, upsells, or by any other means of distribution, whether existing now or at any time in the future. Except as otherwise provided below in Section 2(b) of this Agreement, Principal shall ensure that the entire Sellable Capacity for every Attraction shall be made available for distribution on the TM System.

(b)    **Sales by Principal**: Subject to the terms of Section 2(c) below, Principal retains the right to: (i) sell single Attraction Tickets from the Facility Box Office to persons

1

Chase Center GSW LUA 06062019a.docx

HIGHLY CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY AGREEMENT                LNE22-000034492

physically present at the Facility Box Office; (ii) sell Season/Contract Tickets; (iii) conduct Group Sales of Tickets; (iv) provide a reasonable number of House Seats for any Attraction; (v) sell and distribute Tickets through certain Ticketmaster-approved third party distribution channel partners in accordance with Ticketmaster's Nexus Partner program terms and conditions, and (vi) sell and distribute Tickets through Third Party Marketplaces using the TM Client Distribution Tool in accordance with the Open Distribution terms set forth in Section 4(j)(i) below.

(c)    **No Third Party Systems or Services**: Except for as provided in Section 2(b)(v) above and in Section 4(j) below, Principal shall not directly or indirectly sponsor, promote, advertise, or authorize the sale, resale or issuance of Tickets by any third party, or use any third party to sell, resell or issue Tickets.

(d)    **No Minimum Sales**:    It is agreed and understood that neither Ticketmaster nor Principal guarantees or will guarantee that any minimum or fixed number of Tickets will be sold through the TM System for any Attraction.

(e)    **Acknowledgement by Principal**:    Principal acknowledges that Ticketmaster acts as the agent of certain third parties that may be a direct or indirect competitor of Principal.  Principal also acknowledges that Ticketmaster has entered and may in the future (including during the Term of this Agreement) enter into new business relationships with other third parties, including those in the entertainment and sports industry, such as performers who perform at the Facility, for a variety of services.   Principal further acknowledges that any such sales or services or solicitations to provide such sales or services as contemplated under this subsection do not compete with Principal or conflict with this Agreement or Ticketmaster's rights, duties or obligations under this Agreement.

(f)    **Acknowledgement by Ticketmaster**:  Ticketmaster acknowledges that nothing set forth in this Agreement shall prevent Principal from purchasing from any third party customer data related to Attractions.

(g)    **Santa Cruz Warriors**.  In the event any Santa Cruz Warriors basketball games or other Santa Cruz Warriors LLC promoted events ("SCW Attractions") are scheduled to be held at the Facility, the parties intend for this Agreement to supersede any separate ticketing service agreement between Ticketmaster and Santa Cruz Warriors LLC ("SCW LUA") with respect to such SCW Attractions.  Accordingly, in the event any SCW Attractions are scheduled to be held at the Facility, Ticketmaster agrees to enter into, and Principal shall cause Santa Cruz Warriors LLC to enter into, an amendment to the SCW LUA providing for the foregoing.

3.    **COMPENSATION**:

(a)    **Ticketmaster Charges and Fees**:  In consideration for Ticketmaster's services provided hereunder as an agent of Principal, Ticketmaster shall be entitled to assess and receive charges and fees in the amounts set forth on Exhibit A, all of which charges and fees shall be assessed against consumers, except for Inside Charges and, at Principal's option, Archtics Transaction Fees, which shall be assessed against Principal.  In the event applicable law prohibits the assessment of such fees against consumers, Ticketmaster and Principal shall agree on alternative means for compensating Ticketmaster for its services in amounts reasonably comparable to those set forth in this Agreement, and as permitted by applicable law.

(b)    **Payment Processing Fees**:

2

HIGHLY CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY AGREEMENT    LNE22-000034493

**DX-1494.0658**

      (i)      <u>Sales by Ticketmaster via Telephone Sales and Internet Sales</u>: With respect to Tickets purchased from Ticketmaster with credit cards, debit cards, gift cards or any other electronic methods of payment, the payment authorization and processing fees ("Payment Processing Fees") shall be passed on to the Ticket purchaser by increasing the Convenience Charge to include such Payment Processing Fees, provided that the Convenience Charge will be rounded up to the nearest $0.05.

      (ii)      <u>Principal Sales Using TM Charge</u>: In connection with Principal's sales of Tickets utilizing electronic payments and authorized via TM Charge using either Visa or MasterCard, Ticketmaster's credit card processor ("Processor") shall deduct the merchant fees in an amount set forth on <u>Exhibit A</u> for transactions processed on a daily basis. The fees charged to Principal for use of TM Charge are subject to automatic increases equal to any actual increases in Ticketmaster's Processor fees. Principal shall also be responsible for any and all other amounts charged to Ticketmaster (if any) by a Processor for processing Principal's transactions, including, without limitation, chargebacks, fraudulent credit card use and additional charges for failure to meet the specific timing or other qualifications of the applicable credit card association or company. In the event that Principal desires to process any credit or debit cards other than Visa or MasterCard utilizing TM Charge, then the fees for such service shall be mutually agreed upon by Principal and such credit card companies, and Principal shall enter into its own merchant agreement with such credit card companies.

      (c)      <u>Sponsorship Allowance</u>:

      (i)      Subject to the terms described in this Section 3(c) and in Section 4(j)(ii)(E) of this Agreement below, Ticketmaster shall pay to Principal an annual sponsorship fee in the amount of ████████████████████████████████ (the "Sponsorship Allowance"). The Sponsorship Allowance shall be payable within thirty (30) days of the full execution of this Agreement, and within thirty (30) days of the first day of each Contract Year during the Term of this Agreement thereafter.

      (ii)      In exchange for the Sponsorship Allowance, Principal shall provide the sponsorship assets set forth in <u>Exhibit E1</u> attached hereto, and agrees to the application of the Resale Best Practices described in <u>Exhibit E2</u>.

      (iii)      Ticketmaster's agreement to provide the Sponsorship Allowance to Principal is also based on Ticketmaster's right to sell an aggregate of at least Seven Hundred Thousand (700,000) Tickets including tickets to attractions held at the SCW Facility (the "Sponsorship Sales Threshold") via any means now known or hereafter developed, including via facility box office sales, Internet Sales and Telephone Sales, under the terms of this Agreement and the SCW Agreement (and that are not the subject of a refund or Chargeback) during each Contract Year of the Term. In the event that the Sponsorship Sales Threshold has not been reached on or before expiration of any Contract Year during the Term, the Sponsorship Allowance for such Contract Year shall be reduced to the amount of ████████ ██████████████, and as a result thereof, Principal shall return to Ticketmaster, within thirty (30) days following the determination that the Sponsorship Sales Threshold has not been reached, ██████████████████████████ (the "Contingent Volume Sponsorship Return"). In the event Principal fails to return the full amount of any Contingent Volume Sponsorship Return when due, Ticketmaster shall have the right to deduct the unpaid amount of the Contingent Volume Sponsorship Return from any subsequent Sponsorship Allowance payments, Volume Incentive Payments, or settlement of Ticket Receipts hereunder.

      (iv)      In the event that the Agreement terminates for any reason prior to the conclusion of any Contract Year during the Term for which Principal has received the

3

Chase Center GSW LUA 06062019a.docx

HIGHLY CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY AGREEMENT      LNE22-000034494

DX-1494.0659

Sponsorship Allowance and the Sponsorship Sales Threshold for such Contract Year has not been reached, then Principal shall return to Ticketmaster, within thirty (30) days of such termination, a pro rata portion of the Sponsorship Allowance received for such Contract Year, based on the number of months of the applicable Contract Year remaining following such early termination date.  The Sponsorship Allowance received for purposes of the pro rata calculation shall take into account any Validation Reduction applicable for the then current Contract Year, but not any Ticketmaster deductions on account of Contingent Volume Sponsorship Returns or Validation Reductions applicable for any previous Contract Years.   For example, if the Agreement terminates early as of March 25, 2020, and no portion of the full ▮▮▮▮ Sponsorship Allowance for the then current Contract Year has been reduced as an Validation Reduction applicable for the then current Contract Year, then Principal would be required to return ▮▮▮▮ to Ticketmaster (▮▮▮▮ per month for the three remaining months of the then current Contract Year expiring June 30, 2020).

(v)    Any return of any portion of the Sponsorship Allowance by Principal shall be by wire transfer or certified check.

(d)    **Volume Incentive Payment:**  If Ticketmaster sells at least an aggregate of 850,000 non-complimentary primary Tickets including non-complimentary primary Tickets to attractions held at the SCW Facility (the "Volume Sales Threshold") via any means now known or hereafter developed, including via facility box office sales, Internet Sales and Telephone Sales, under the terms of this Agreement and the SCW Agreement (for which Ticketmaster receives a per Ticket convenience charge or inside fee, and that are not the subject of a refund or Chargeback) during any Contract Year of the Term, Principal shall be entitled to receive from Ticketmaster a volume incentive payment ("Volume Incentive Payment") in the amount of (i) $▮▮ for each such Ticket sold in excess of the Volume Sales Threshold during such Contract Year, or (ii) ▮▮▮▮▮▮, whichever is less.  For example, if Ticketmaster sells 900,000 such Tickets during the first Contract Year after the Effective Date hereof, Principal shall receive a Volume Incentive Payment in the amount of ▮▮▮▮▮▮▮▮ with respect to such Tickets, and if Ticketmaster sells such Tickets during the next Contract Year thereafter, Principal shall receive ▮▮▮▮▮▮ with respect to such Tickets. If Ticketmaster sells less than 850,000 such Tickets in any given Contract Year, Principal shall not be entitled to any Volume Incentive Payment for such Tickets sold in such Contract Year.  Any Volume Incentive Payment due Principal shall be paid to Principal within sixty (60) days of the conclusion of the applicable Contract Year in which such Volume Incentive Payment(s) are earned.



(e)    **Product Credit:** Ticketmaster shall provide Principal with an annual credit ("Product Credit") in the amount of ▮▮▮▮▮▮ per Contract Year to be used by Principal, at Principal's optional discretion, as a credit against the purchase of TM1 Agency services now existing or hereafter created, including, without limitation, LiveAnalytics, Blue Digital and/or Pricemaster services; provided, however, any external third party costs or advertising placements related to such services shall be borne directly by Principal without application of the Product Credit. The parties acknowledge and agree that up to ▮▮▮▮▮▮ of any unused Product Credit provided during any Contract Year shall not expire at the conclusion such Contract Year, but may be rolled forward for use in any subsequent Contract Year, provided that (a) the amount of any such unused Product Credit in excess of ▮▮▮▮▮▮ may not be rolled forward and shall expire at the conclusion such Contract Year, (b) in no event shall the aggregate Product Credit available for use in any Contract Year exceed ▮▮▮▮▮▮, and (c) any unused Product Credit shall expire upon the termination or



4

Chase Center GSW LUA 06062019a.docx

HIGHLY CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY AGREEMENT      LNE22-000034495

expiration of the Agreement. The Product Credit, having no cash value, shall not at any time be payable directly to Principal.

(f)    **Platinum Tickets and VIP Packages**:  The terms and conditions set forth in Exhibit F attached hereto shall apply in connection the sale of platinum Tickets and VIP Packages.

4.    **LICENSE AND USE OF HARDWARE AND SOFTWARE**:

(a)    **License**:  Ticketmaster hereby grants Principal a non-exclusive, non-transferable license to use the Hardware and Software (collectively, the "License") in exchange for the fees set forth herein.

(b)    **Use**:  The Hardware and Software and all related materials may only be used by Principal in connection with the Attractions and only with systems used, operated and owned by Ticketmaster, and only for the purposes stated in this Agreement, and may not be utilized by or in connection with services, software, hardware or systems provided or supplied by any third party.  Principal shall use the Hardware and Software in a careful and proper manner and shall comply with and conform to all federal, state, county, municipal and other laws, ordinances and regulations in any way relating to the possession, use or maintenance of the Hardware and Software including, but not limited to, federal, state or other laws applicable to commercial emails. Principal may make a single copy of Archtics only to be used for archival or backup purposes; **COPYING FOR ANY OTHER PURPOSE IS PROHIBITED.**  Except as otherwise provided in the immediately preceding sentence, Principal hereby agrees: (i) not to permit copying or reproduction of the Hardware or Software in any manner, including without limitation, use in a sharing arrangement or transmission over the Internet or over e-mail and similar electronic transmission; (ii) not to disassemble, re-manufacture, repair, re-configure, enhance, upgrade, modify, translate, adapt, create derivative works from or of, decompile or reverse engineer the Software in any way nor merge them into any other program for any purpose; (iii) not to transfer, license or sub-license, assign, rent, sell, grant, publish, disclose, display, dispose of or otherwise make available the Software, or any rights therein or copies or derivatives thereof, including other templates or working systems; (iv) not to delete, remove, change or otherwise alter any trademarks, copyright notices or other proprietary marks in or on the Hardware or Software, or any copies, modifications or partial copies thereof; (v) not to "hack," or attempt to "hack," any of the Software, the servers on which the Software is hosted or any other portion of the Ticketmaster network, or otherwise attempt to circumvent, or navigate outside of, the borders of such Software servers in any manner whatsoever; and (vi) not to perform any SQL database operations other than "SELECT" for any system production tables (i.e., tables starting with dba.t_<wildcard>) from any non-Archtics interface to the database (e.g., ISQL, Access, Crystal Reports, etc.).

(c)    **Passwords**:  Principal agrees that use of the TM System by Principal shall be restricted to a reasonable number of Principal's personnel having passwords in the event that Ticketmaster assigns such passwords.  Such passwords shall not be transferable without the written permission of Ticketmaster, which permission shall not be unreasonably delayed or withheld.  Upon Ticketmaster's reasonable request, Principal (i) shall identify, as the case may be, the users (by name, position and site address), who use or view the TM System or from where the TM System is used, and (ii) shall provide to Ticketmaster access to any database which records access to the TM System.

(d)    **TM Charge**:

5

Chase Center GSW LUA 06062019a.docx

HIGHLY CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY AGREEMENT                    LNE22-000034496

**DX-1494.0661**

(i)    <u>Use and Operation of TM Charge</u>:  Ticketmaster shall transmit data relating to Ticket sales made by Principal using TM Charge to Ticketmaster's credit card processor, provided Ticketmaster has received Principal's merchant number(s) and other necessary information for Ticketmaster to use for the transmission of sales data.  Principal shall be responsible for promptly notifying Ticketmaster and Processor, if applicable, of any changes to the information provided pursuant to this Section.  Processor will then transmit such data to the applicable credit card company for payment to Principal, subject to Principal having entered into the applicable Principal Processor Agreements (as further described below).  Ticketmaster shall use its best efforts to ensure the accuracy of information transferred from the Processor via TM Charge, but Ticketmaster does not guarantee the accuracy and timeliness of such information.    Principal shall comply with all applicable credit card association or company guidelines (e.g. swiping all retail transactions and using customer address information for all non-face-to-face transactions). Ticketmaster shall provide Principal with daily transaction reports regarding authorized and settled transactions.  Principal shall review, on a regular basis, all reports provided to Principal by Ticketmaster.  Principal also agrees that, for operational and monitoring purposes, the Processor may provide Ticketmaster with processing and settlement reports related to sales of Tickets using TM Charge.

(ii)    <u>Effect of Termination of Ticketmaster's Processor Agreement</u>: Ticketmaster has entered into an agreement with the Processor (the "Processor Agreement"), and Principal agrees to enter into an agreement with such Processor (the "Principal Processor Agreement") as soon as practicable after the date of this Agreement.  The Principal Processor Agreement shall provide that if the related Processor Agreement expires or terminates, then the Principal Processor Agreement shall also expire or terminate without any early termination penalties or charges.  In order to facilitate streamlined credit card authorization processing for Ticketmaster and its clients, Ticketmaster continues to seek to maintain relationships with superior processors throughout the Term of this Agreement.  In the event that Ticketmaster elects to use a different Processor, Principal shall enter into an agreement with such new Processor if Principal desires to continue utilizing TM Charge, it being acknowledged and agreed by Principal, however, that use of certain Software (e.g., AccountManager) may require utilization of TM Charge.

(e)    <u>Principal's Website/Interface Page</u>:  Beginning on or shortly after the execution of this Agreement, and subject to the completion of the installation of Archtics, Ticketmaster will develop the Interface Page that will enable Principal's Subscribers to access their account information and conduct "real-time" transactions by linking to the Interface Page from the Principal's Website.   The Interface Page may contain a short, related textual description of AccountManager features and shall contain Ticketmaster's designated wording and graphic depiction thereof, currently "by Ticketmaster."

(f)    <u>Group Sales Restrictions</u>:   All Group Sales must comply with the definition of Group Sales hereunder.  In the event that Ticketmaster determines that a Group Sale is not a valid Group Sale, Ticketmaster shall have the right to assess against Principal the amount of fees that Ticketmaster would otherwise have been entitled to assess under this Agreement with respect to any such Tickets had they been purchased through Ticketmaster as single Tickets, and not from Principal as a Group Sale.

(g)    <u>Ticketmaster Secondary Exchange</u>:    Ticketmaster shall enable its Ticketmaster Secondary Exchange.  For any primary market ticket inventory sold through Ticketmaster Secondary Exchange, Ticketmaster shall continue to sell such tickets and settle the proceeds of such sales with Principal in accordance with the terms and conditions for such transactions as set forth in this Agreement.  For any secondary market ticket inventory sold through Ticketmaster Secondary Exchange, Ticketmaster shall assess its standard fees against

6

Chase Center GSW LUA 06062019a.docx

HIGHLY CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY AGREEMENT                    LNE22-000034497

**DX-1494.0662**

the buyers and sellers of such tickets in amounts as determined by Ticketmaster, and shall settle any revenue share on such amounts due Principal in accordance with the terms and conditions for such transactions set forth in Exhibit C attached hereto.

(h)    Hosted Platform:  Ticketmaster shall host the Archtics Software and provide and maintain the Hosted Platform on which such Software will be installed and run, including provision of the physical environment including physical security, HVAC and power for the required server hardware for the Hosted Platform and such Software.  Ticketmaster will also provide access via certain Internet connectivity, by being responsible for network operation and availability from the public Internet up to the termination cables at the network interface card on the server hardware for the Hosted Platform.  Ticketmaster will not be responsible for power at the Facility or Principal's connectivity to the Internet.

(i)    Presence: Equipment Allowance. Ticketmaster shall provide Principal with the use of Ticketmaster's proprietary access management system ("Presence") and all necessary Presence related equipment ("Presence Hardware"), which, among other things, enables the use of non-barcoded Tickets and allows for the identification of individual attendees accessing an Attraction (as opposed to the original Ticket purchasers only). Any Presence related equipment so provided shall be deemed "Hardware" for all purposes under this Agreement.    Alternatively, Principal may elect to use any third party Nexus Partner who has completed Ticketmaster's Nexus Presence Certification program for turnstile access at the Facility, and in connection therewith, Ticketmaster shall provide Principal with an equipment allowance ("Equipment Allowance") in the amount of up to ████████████████ ████████ for use by Principal towards (x) Principal's purchase of certain turnstile equipment from such third party Nexus Partner, provided Principal submits to Ticketmaster a copy of the third party Nexus Partner invoice(s) or receipt(s) evidencing the cost of such equipment, and (y) Principal's payment of any related Presence API integration and support costs for which Principal is responsible. Ticketmaster's provision of any Presence API integration and support services shall be subject to Ticketmaster's standard API terms and conditions.  For clarity, the Equipment Allowance shall not be used by Principal towards the purchase of any suite entry equipment or any other equipment unrelated to the turnstile access described above. Unless otherwise mutually agreed upon by the parties, any turnstile equipment purchased using the Equipment Allowance shall not be deemed "Hardware" for any purposes under this Agreement and shall not be subject to any of the terms and conditions respecting Hardware set forth hereunder.

(j)    **Open Distribution and Third Party Marketplace Validation**.

(i)    Open Distribution:  Ticketmaster shall provide Principal with in-house access to Ticketmaster's Ticket inventory management tool ("Client Distribution Tool") which allows Principal to directly distribute primary Tickets for GSW Attractions through any mutually agreed upon third party ticketing platform (each such mutually agreed upon third party ticketing platform, a "Third Party Marketplace"), subject to the terms and conditions below:

(A)    In the event Principal elects to activate an "Open Distribution" model as described above (i.e., elects to distribute any GSW Attraction Ticket inventory through a Third Party Marketplace using Ticketmaster's Client Distribution Tool) for any particular NBA season, Principal shall notify Ticketmaster of such election no later than June 30 immediately preceding such NBA season.

(B)    Principal will determine the volume of Ticket inventory to be distributed to Third Party Marketplaces, subject to a cap of ten percent (10%) of total Sellable Capacity for any GSW Attraction (exclusive of historic average ticket holds, group

7

Chase Center GSW LUA 06062019a.docx

HIGHLY CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY AGREEMENT    LNE22-000034498

**DX-1494.0663**

tickets, Season/Contract and partial/MiniPlan Tickets); provided, all such inventory posted to any Third Party Marketplaces shall be simultaneously made available for sale via Ticketmaster's distribution channels (including, TM+) at the same, or lower prices than such inventory is posted on any such Third Party Marketplaces.

(C)    No inventory may be made available through any Third Party Marketplace for the first seventy-two (72) hours following any regular season GSW Attraction on-sale, or the first twenty-four (24) hours following any playoff GSW Attraction on-sale.

(D)    Ticketmaster distribution channels will be treated no more restrictively than any Third Party Marketplace with regard to activation timing, sell times, price floors, landing states, fee flexibility, etc.

(E)    Ticketmaster shall receive from Principal a fee in an amount equal to ▮▮▮▮▮▮ of the Gross Transaction Value (as defined below) for all Ticket sales transactions conducted through any Third Party Marketplace, but in no event less than $▮▮ per Ticket. For purposes of this Section, the "Gross Transaction Value" shall be defined as the gross amount charged to the buyer of any Ticket sold through a Third Party Marketplace, inclusive of the Face Value of the Ticket, any markup or markdown to that Face Value, and any other charges or fees (including such fees determined by the Third Party Marketplace) which are added to the Face Value of such Ticket. Except for the foregoing fee, Ticketmaster shall not charge any other fees on GSW Attraction Ticket sales conducted through any Third Party Marketplace pursuant to this Section. For the avoidance of doubt, Principal shall be solely responsible for any seller fee charged by the applicable Third Party Marketplace in connection with Principal's sale of primary inventory through such Third Party Marketplace.

(F)    Notwithstanding any terms in Section 2(c) of this Agreement to the contrary, Principal may grant any Third Party Marketplace for which Open Distribution is activated the limited right to use the designation of "authorized retailer" of Principal (or similar designation to be mutually agreed upon by the parties), and to use Principal's pre-approved logo, in each case, solely on the Ticket purchase pages of such Third Party Marketplace's website or mobile platform featuring Principal's Attractions, and in such Third Party Marketplace's direct email campaigns. For the avoidance of doubt, Principal shall not grant any Third Party Marketplace the right to use Principal's images, designation and/or marks in any Third Party Marketplace's local or national traditional marketing, SEM/Social/programmatic marketing, or in the advertising of any Third Party Marketplace on any third party media or platform (including any Principal-controlled media or platforms).

(G)    For the avoidance of doubt, in any Contract Year in which Principal elects to activate an Open Distribution model, Principal shall still be subject to each of the Resale Best Practices described in Exhibit E2 attached hereto.

(ii)    **Third Party Marketplace Validation**:

(A)    Ticketmaster will exercise commercially reasonable efforts to enter into agreements with certain Third Party Marketplaces (each such agreement, an "Authorized Marketplace Agreement") pursuant to which Ticketmaster will provide validation for event Tickets sold or re-sold through certain Third Party Marketplaces to verify, via interface with the TM System, that buyers purchasing such Tickets through such Third Party Marketplaces are reasonably assured that such Tickets are valid for entry to the applicable event; provided, that any such Third Party Marketplace (i) agrees to be bound by Ticketmaster's

8

Chase Center GSW LUA 06062019a.docx

standard and reasonable API terms of use, (ii) meets Ticketmaster's minimum technology requirements for integration with Ticketmaster's validation tools such that Ticketmaster is not required to incur excessive additional development costs in respect of Ticketmaster's integration with such Third Party Marketplace, and (iii) provides Ticketmaster and the event's presenter with buyer and seller data (including, at minimum, first and last name and email address), as well as data setting forth the Ticket selling price and fees from each Ticket transaction on a disaggregated basis. Principal may elect to activate a "Third Party Marketplace Validation" model as described above for Tickets to GSW Attractions (i.e., elect for Ticketmaster to provide the above mentioned validation services for Tickets to GSW Attractions sold or resold through any Third Party Marketplace with which Ticketmaster has entered into an Authorized Marketplace Agreement), subject to the terms and conditions set forth below.

(B)    The terms of each applicable Authorized Marketplace Agreement shall be agreed to by Ticketmaster and the applicable Third Party Marketplace; provided, with respect to any fee paid by such Third Party Marketplace (a "Validation Fee") for the validation of Tickets to any GSW Attraction, Ticketmaster shall be entitled to retain a portion of such Validation Fee in an amount equal to ▓▓ of the Gross Transaction Value of each such GSW Attraction Ticket sold (and not refunded) through such Third Party Marketplace, and Ticketmaster shall pay the remainder of such Validation Fee, if any, to Principal.

(C)    Beginning January 1, 2020, Principal may negotiate its own additional financial incentives directly with StubHub, SeatGeek and/or VividSeats in respect of the Third Party Marketplace Validation of Tickets to GSW Attractions sold or re-sold through any such Third Party Marketplace upon such terms as are agreeable to Principal and the applicable Third Party Marketplace; provided, however, the technical aspects of such validation shall continue to be governed by Ticketmaster's applicable Authorized Marketplace Agreement with such Third Party Marketplace(s); and provided, further, Ticketmaster shall continue to receive a fee in an amount equal to ▓▓ of the Gross Transaction Value of each such Ticket sold through such Third Party Marketplace.

(D)    Ticketmaster shall have no obligation to provide the foregoing Third Party Marketplace Validation services for any Non-GSW Attractions, but shall have the right to provide Third Party Marketplace Validation services for Tickets to Attractions promoted by Live Nation Worldwide, Inc. or any of its affiliates ("Live Nation Attractions"). Ticketmaster shall give notice to Principal in the event Live Nation elects to have Ticketmaster provide Third Party Marketplace Validation services for Tickets to any Live Nation Attractions, and it is understood Principal shall not receive any portion of the fees collected by Ticketmaster for the validation of any such Tickets to Live Nation Attractions sold through Third Party Marketplaces.

(E)    In the event a Third Party Marketplace Validation model is activated for Tickets to GSW Attractions during any Contract Year of the Term, the Sponsorship Allowance for such Contract Year shall be reduced by the amount of ▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓ the "Validation Reduction"). If it is known that a Third Party Marketplace Validation model will be activated for Tickets to GSW Attractions for any given Contract Year prior to Ticketmaster's payment of the Sponsorship Allowance to Principal for such Contract Year, Ticketmaster shall deduct the Validation Reduction from the Sponsorship Allowance prior to payment. If it is not known that a Third Party Marketplace Validation model for Tickets to GSW Attractions will be activated for any given Contract Year until after Ticketmaster has paid the Sponsorship Allowance to Principal for such Contract Year, Principal shall, within fifteen (15) days of the date of activation, return the Validation Reduction to Ticketmaster. In the event Principal fails to return the full amount of any Validation Reduction when due, Ticketmaster shall have the right to deduct the unpaid amount of the Validation Reduction from any

9

Chase Center GSW LUA 06062019a.docx

HIGHLY CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY AGREEMENT                     LNE22-000034500

subsequent Sponsorship Allowance payments, Volume Incentive Payments, or settlement of Ticket Receipts hereunder.

(F)    For the avoidance of doubt, in any Contract Year in which a Third Party Marketplace Validation model is activated for Tickets to GSW Attractions, Principal shall still be subject to each of the Resale Best Practices described in Exhibit E2 attached hereto.

5.    **INSTALLATION AND SET-UP:**

(a)    **Hardware Installation:** Ticketmaster will install the Hardware and provide Principal with access to the Software.  Principal will provide (i) connectivity and interfacing that satisfy Ticketmaster's minimum system requirements and (ii) unless otherwise agreed to between the parties, any type of equipment and technology necessary to assist Ticketmaster in completing the installation of the Software and Hardware.  Ticketmaster shall have no responsibility for any internal wiring or cabling (e.g., electrical, data lines, etc.) necessary for installation, operation or for proper functioning of the TM System at the Facility. The cost of all line connections between the central computer facility and the Facility and all monthly line costs with respect to the operation of the TM System between the Facility and the central computer facility shall be borne solely by Principal.

(b)    **Attraction Set-Up:** In order to effectively utilize Ticketmaster's distribution technologies, within a reasonable time before (but in no event less than the time period described below) the scheduled on-sale date of Tickets for each Attraction (the "On-Sale Date"), Principal shall furnish Ticketmaster with all necessary information with respect to the Attraction, including, without limitation, seating layout of the Facility, Ticket structure, discounts permissible, Attraction Taxes, any information necessary to calculate Attraction Taxes, if applicable, Ticket header information, logos, entry information, vision and hearing information, wheelchair and other accessible seating information and such other information as is necessary for the proper sale of Tickets (collectively, the "Set-Up Information").  The parties intend that all accessible seating Tickets that are available for sale to persons desiring accessible seating shall be made available for sale on the TM System and such accessible seating Tickets shall not be released into the general pool of Tickets that are available for sale until forty-eight (48) hours before an Attraction.  Principal must provide the Set-Up Information to Ticketmaster at least five (5) business days prior to the On-Sale Date for new Attractions that do not utilize seating charts then existing in the TM System and at least three (3) business days prior to the On-Sale Date for new Attractions that utilize seating charts then existing in the TM System. Ticketmaster shall have no responsibility and Principal shall indemnify and hold Ticketmaster harmless from and against any and all liabilities, claims, expenses (including court costs and reasonable attorneys' fees) and causes of action resulting from the inaccuracy of any Set-Up Information furnished by Principal pursuant hereto.

(c)    **Facility Box Office Will-Call Services:**  At all times during the Term of this Agreement, Principal shall maintain a designated Facility Box Office location for the pick-up of Tickets purchased through Internet Sales and Telephone Sales.  The pick-up location shall be open during the normal hours of operation of the Facility Box Office.  Principal shall notify Ticketmaster of Principal's will-call capabilities and will-call Facility Box Office hours.  Principal shall verify the identity of each person picking up Tickets at will-call via a valid photo identification (government issued) and the credit card used in the Ticket sales transaction. Principal shall not release Tickets to any customer whose identity has not been so verified.

10

Chase Center GSW LUA 06062019a.docx

HIGHLY CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY AGREEMENT                    LNE22-000034501

**DX-1494.0666**

(d)    **Supplies**:    Principal shall be responsible for maintaining adequate nondurable operational supplies used at the Facility in connection with the operation of the Hardware and Software to assure continuous operations at the Facility.

(e)    **Ticket Stock**:    Principal shall be responsible for the security of Ticket stock in its possession, and the risk of loss of Ticket stock shall shift to Principal upon the delivery thereof to Principal or Principal's authorized representative, agent or employee.

6.    **MAINTENANCE AND SUPPORT**:

(a)    **Hardware and Software Maintenance and Support**:    Ticketmaster shall, at a level consistent with industry standards, provide ordinary and routine maintenance and repair services, upgrades and adequate support of the Hardware and Software at the Facility to meet the reasonably anticipated service needs of Principal from time to time at no charge, provided that such maintenance, repair or support is not necessitated by the negligence or willful misconduct of Principal, its employees, agents or representatives.    Support services will be provided, on a return call basis, during Ticketmaster's normal business hours by personnel qualified to answer telephone inquiries by Principal seeking advice on questions and problems.    Non-emergency calls made at the end of the day, which require support services that would keep staff beyond normal working hours, will be deferred to the following business day.    Support will be provided for off-hour critical system emergencies.    Ticketmaster will not be obligated to continue to provide maintenance with respect to any version of any particular Software hosted by Principal for more than one year after a release by Ticketmaster of an upgraded version of the same Software. Ticketmaster shall maintain an archive of Principal's Archtics database for up to two (2) years in the format of Principal's then current Archtics version.    Ticketmaster shall retain archives of Principal's Archtics database in excess of two (2) prior years in an offline form to be stored at Ticketmaster's data center, which prior archives shall not be updated to Principal's then current Archtics version; provided, that Ticketmaster shall extract data from such prior archives at Principal's request and deliver such data extracts to Principal.

(b)    **Training of Principal's Employees**:    Principal shall staff the Facility Box Office with its employees for the proper operation of the TM System for Ticket sales made through the Facility.    Ticketmaster shall train, at its expense, Principal's employees who shall be reasonably necessary for the initial staffing of the Facility Box Office and for initial operation of the TM System for single ticket sales at the Facility.    Ticketmaster shall also provide additional training at its cost to other employees of Principal to the extent such training is necessary as a consequence of changes initiated by Ticketmaster or changes in Ticketmaster's method of operation.    To the extent of any change in personnel by Principal in connection with Facility Box Office sales requiring additional training beyond that initially contemplated hereunder, Principal agrees to absorb all of the expenses (including any and all reasonable travel expenses) thereof.

(c)    **Notification by Principal**:    In the event of any breakdown or malfunction in the operation of any of the Hardware or Software, or difficulties encountered in connection with access to any of the Software, Principal agrees to promptly notify Ticketmaster of any such breakdown, malfunction or difficulty to assist Ticketmaster in performing its obligations hereunder.

(d)    **Access to Principal's Equipment and Data**:    Principal shall permit Ticketmaster, at Ticketmaster's sole discretion and upon reasonable written notice, the right at a reasonable time to inspect Principal's pertinent sites and equipment (including any existing LAN or other network user monitor device) for the purpose of determining compliance with the terms of the License granted hereunder.    In order to correctly diagnose faults in the equipment

11

Chase Center GSW LUA 06062019a.docx

HIGHLY CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY AGREEMENT                    LNE22-000034502

**DX-1494.0667**

and data related to the Software and Hardware, Principal will provide Ticketmaster 24 hour remote access to Principal's installation, pertinent sites, equipment (including any existing LAN or other network user monitor device) and user data through PC Anywhere. Failure to provide such access may prohibit effective action by Ticketmaster and render Ticketmaster unable to proceed, and in such circumstances, Ticketmaster shall be under no liability for failure to perform its obligations hereunder.

(e)    **Additional Archtics Services**: With respect to initial implementation of Archtics, Ticketmaster shall also provide, at no additional cost to Principal, (i) on-site support from Ticketmaster's national or regional personnel, (ii) unique Archtics customization (e.g., diagrams, invoices, other executables, etc.), (iii) custom reporting, and (iv) customized on-line assistance (the services described in clauses (ii) through (iv) are referred to herein as "Customization Services".) Generally two hours of Customization Services each week are included in the annual maintenance fees of Archtics listed on <u>Exhibit A</u>. Customization Services that far exceed this level of support shall be charged to Principal in accordance with Ticketmaster's standard rates.

7.    <u>**ADVERTISING**</u>:

(a)    <u>**Advertising on Tickets Fulfilled at Facility Box Office**</u>: For tickets fulfilled by Principal at the Facility Box Office, Principal shall either (i) provide, or pay Ticketmaster to provide, its own blank custom ticket stock and ticket envelopes in which case Principal shall have the right to sell advertising on such ticket stock and ticket envelopes or (ii) have Ticketmaster provide Ticketmaster's standard ticket stock and ticket envelopes in which case Ticketmaster shall have the right to sell advertising on such ticket stock and ticket envelopes.

(b)    <u>**Ticketmaster Advertisements**</u>: Principal hereby grants to Ticketmaster the right, in Ticketmaster's sole discretion, to advertise, in any medium determined by Ticketmaster, including on the TM.com Website or affiliated websites, Attractions and the availability of Tickets at the Facility Box Office, and by Internet Sales and Telephone Sales and the availability of the Software and, in connection therewith, to use the name and logo of Principal, the Attraction, the Facility and all other information respecting the Attractions. Principal further grants to Ticketmaster the right, in its sole discretion, to use the name and logo of Principal and Principal's Website address on the Interface Page.

(c)    <u>**Principal Advertisements**</u>: Principal may, during the Term hereof, provide and place advertisements in any form of media which Principal shall desire to promote the availability of Tickets, the TM.com Website and the Attractions (except on websites or other media operated by, or on behalf of, third parties that promote, engage in or facilitate the sale, resale or issuance of tickets); provided, however, that in the event Principal shall place any such advertisements, it shall use its best efforts to cause Ticketmaster's name, logos and if the advertisement relates to the availability of Tickets, the applicable TM.com Website address to be displayed in the advertisement. Principal shall cause Principal's Website to deeplink to specified web page(s) within the applicable TM.com Website where ticket purchasers can begin the process of purchasing Tickets to Attractions. Principal agrees to promote the availability of Tickets on the TM.com Website by including, at a minimum, one "above-the-fold" graphic Ticketmaster branded link to the TM.com Website on each web page featuring one or more of the Attractions on Principal's Website. Such link will include the TM.com Website graphic logo and a call to action such as "buy tickets."

(d)    <u>**Ticketmaster Client Style Guide**</u>: The look and feel of any and all links from Principal's Website to the Interface Page or the applicable TM.com Website are subject to

12

Chase Center GSW LUA 06062019a.docx

HIGHLY CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY AGREEMENT                LNE22-000034503

**DX-1494.0668**

Ticketmaster's prior approval.   Principal shall comply with all terms and conditions of Ticketmaster's Client Style Guide, as it may be updated from time to time.

          (e)    **Advertising Revenue**:   Ticketmaster and Principal shall separately receive and retain their respective income derived from advertising which each is entitled to sell under subsections (a), (b) and (c) above.

          (f)    **Banner Ads**:   Neither Principal nor Ticketmaster will serve banner ads or other promotional ad units of any kind or allow any third party to serve any such ad units on the Interface Page or any related AccountManager/Archtics "click through" page (e.g., the AccountManager Security Checkpoint), without the other party's prior consent.

          (g)    **Branding on TM.com Website**:   Ticketmaster will "paint" the Attraction Detail Pages for the Attractions, the Team Pages and the Confirmation Pages for Attractions (collectively, "Custom Pages") on the TM.com Website which are presented to users who access the TM.com Website by linking directly from Principal's Website with Principal's branding and "look and feel", subject to co-existing and prominent top bar Ticketmaster branding on each of the Custom Pages and each party's reasonable approval of the "look and feel" thereof.   For avoidance of doubt, whenever the term "look and feel" is used above, it means the coloring of the background modules and lettering on the Custom Pages and Principal's branding on the top bar of the Custom Pages. It does not mean the functionality or the layout on Custom Pages, as these must remain the same in order for the Software to function without extensive revisions.   Ticketmaster shall also allow Principal to choose the colors of the main header bars for the Attraction Detail Pages for Attractions of major league sports teams owned by Principal ("Team Attraction Detail Pages") which are presented to users to access the Team Attraction Detail Pages via the TM.com Website. In addition, the Attraction Detail Pages for Attractions shall have one (1) space where Principal can include additional branding related to the Facility, and the Team Attraction Detail Pages shall have an additional space where Principal can include additional branding related to the team.   Ticketmaster will make changes to the Custom Pages' look and feel at Principal's request not more than once every three (3) months.   Such changes will be subject to Ticketmaster's approval, which will not be unreasonably withheld, and Ticketmaster will require sufficient time to implement changes from a technical point of view.   Ticketmaster will drop any branding provided to Principal pursuant to this Section when a user leaves the Custom Pages in deference to the rights of Ticketmaster's other clients.

    8.    **ACCOUNTING PROCEDURES**:

          (a)    **Payments by Ticketmaster**:   Principal hereby authorizes Ticketmaster and the financial institution indicated below ("Bank") to deposit all settlement funds payable to Principal hereunder in the account listed below ("Principal's Account"):

**For ACH delivery:**
Bank Routing Number: ███████
Account Number: ████████
Account Name: GSW Arena, LLC

**For Wire Transfers:**
Bank Routing Number: ███████
SWIFT Code: ████████
General Bank Reference Address: JPMorgan Chase New York, NY 10004
Account Number: ██████

13

Chase Center GSW LUA 06062019a.docx

HIGHLY CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY AGREEMENT    LNE22-000034504

Account Name: GSW Arena, LLC

Ticketmaster shall collect all Ticket Receipts derived from Ticket sales made by Ticketmaster and shall initiate payment of Ticket Receipts to which Principal is entitled on Friday of each week with each weekly payment to be on account of TM System Ticket sales made for Attractions by Ticketmaster during Monday through Sunday of the week preceding such payment date. Initiation of the settlement payment via direct deposit shall constitute full performance by Ticketmaster of its obligation to make such settlement payment to Principal or to any person whatsoever. If funds to which Principal is not entitled are deposited into Principal's Account, Principal authorizes Ticketmaster to direct the Bank to return said funds. Principal hereby releases Ticketmaster from liability for delays or errors beyond Ticketmaster's reasonable control, including but not limited to any errors resulting from any inaccurate or outdated Account information provided by Principal or bank processing delays, or for any related damages. Principal acknowledges and agrees that direct deposit of such funds may require up to two (2) business days for Bank processing. In the event of an error, Principal also authorizes the initiation of a debit to Principal's Account to correct the error. Each weekly settlement payment shall be accompanied by a written accounting sent to ar@warriors.com. Principal shall designate an email address (set forth below its signature line of this Agreement) for delivery of such accounting and information regarding Attractions and Ticket sales, and shall promptly notify Ticketmaster of any changes to such email address. The direct deposit authorization provided herein shall remain in full force and effect until Ticketmaster has received written notification from Principal of its termination in such time and such manner as to afford Ticketmaster a reasonable opportunity to act upon it.

(b)    **Cancelled Attractions; Refunds**:  In the event that any Attraction for which Ticketmaster sold Tickets is cancelled, postponed, or modified (e.g., substitute acts) for any reason (each, a "Cancelled Attraction"), the Account Balance shall be held and made available for distribution by Ticketmaster to Ticket purchasers entitled to refunds for Tickets for Cancelled Attractions purchased from Ticketmaster. For purposes of this Agreement, the term "Account Balance" shall mean the amount of funds held at any time by Ticketmaster on account of Ticket sales for all Attractions, less the amount of Ticket sales proceeds which Ticketmaster is entitled to retain hereunder. Principal authorizes Ticketmaster to refund the Ticket price at the original point of purchase (e.g., by Internet Sales or Telephone Sales) in such manner (e.g. by crediting the consumer's credit card) and at such time (e.g. before or after the scheduled date of the performance of such Attraction) as Ticketmaster, in its sole discretion, determines and to exchange Tickets pursuant to any exchange policy that may be adopted by Principal and Ticketmaster. It is agreed and understood that Ticketmaster is the Ticket selling agent of Principal and therefore Ticketmaster's agreement to make any refunds as the agent of Principal is subject and limited to Ticketmaster holding or receiving from Principal the full amount of funds necessary to make refunds to all Ticket purchasers properly entitled to a refund. Principal and Ticketmaster agree that Ticketmaster shall be entitled to retain the Ticketmaster fees assessable with respect to the initial sale of Tickets to Cancelled Attractions, although no additional compensation shall be payable to, or fee assessed by, Ticketmaster with respect to the exchange of any Tickets initially purchased from Ticketmaster. Principal shall be responsible for all refunds and exchanges of Tickets initially purchased from the Facility Box Office.

(c)    **Chargebacks**:  Ticketmaster reserves the right to deduct from Principal's settlement, portions of any Chargebacks that Ticketmaster is assessed by its merchant bank related to the Face Value of Tickets, plus any fees added to such Face Value, for up to twelve (12) months after the occurrence of an Attraction. Ticketmaster shall be responsible for the remaining portions of any Chargebacks, except to the extent caused by Principal's failure to obtain signatures, swipe credit cards, or follow any procedures provided by Ticketmaster or the

14

Chase Center GSW LUA 06062019a.docx

HIGHLY CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY AGREEMENT                    LNE22-000034505

merchant bank with respect to acceptance of credit cards, including, but not limited to, cardholder verification instructions for will-call and other alternative Ticket delivery/pick-up services. For purposes of this Agreement, "Chargebacks" shall mean the amounts that the merchant bank is charged back by a cardholder or a card issuer under the card organization's rules (e.g., cardholder dispute, fraud, declined transaction, returned Tickets for Cancelled Attractions, etc.).

(d) **Insolvency; Deficiency Amounts; Security for Repayment**: Principal shall provide immediate written notice to Ticketmaster in the event it files any voluntary or involuntary petition under the bankruptcy or insolvency laws or upon any appointment of a receiver for all or any portion of Principal's business or the assignment of all or substantially all of the assets of Principal for the benefit of creditors (each, a "Material Financial Event"). The parties agree that this Agreement constitutes a financial accommodation by Ticketmaster to Principal as such term is utilized in 11 U.S.C. §365. If at any time, the Account Balance is not sufficient to pay for anticipated refunds or Chargebacks, Principal shall deliver the amount of such deficiency ("Deficiency Amount") to Ticketmaster no later than twenty-four (24) hours after notice by Ticketmaster to Principal. Ticketmaster shall have the right to set-off any Deficiency Amount against any amounts held by Ticketmaster on behalf of Principal. In the event of any Material Financial Event or in the event Principal has not paid any Deficiency Amount when due, Ticketmaster shall have the option to require Principal to provide additional security to Ticketmaster of a type (e.g., letter of credit, guaranty or performance bond) and in an amount as requested by Ticketmaster in its sole discretion, which Principal shall provide to Ticketmaster within five (5) business days after Ticketmaster's request, and/or to suspend payment of Ticket Receipts in advance of the occurrence of Attractions and instead deliver Ticket Receipts to which Principal is entitled post-performance (i.e. Friday of each week with respect to Attractions that occurred Monday through Sunday of the week preceding such payment date). Ticketmaster reserves the right to require Principal to provide current financial statements to Ticketmaster within five (5) business days after Ticketmaster's written request.

(e) **Counterfeit Tickets**: It is agreed and understood that Ticketmaster shall not be liable to Principal for the printing and sale of counterfeit Tickets.

(f) **Audit of Sales**: At all times during the Term of this Agreement, (i) Principal shall have the right at its own expense to audit Ticket sales for Attractions by Ticketmaster to assure Ticketmaster's compliance with the terms of this Agreement, and (ii) Ticketmaster shall have the right at its own expense to audit Ticket sales for Attractions made by Principal and by others (including, without limitation, the promoter and sponsor of any Attraction, the act or event itself and Principal's Subscribers) to assure their compliance with the terms of this Agreement.

(g) **Archtics Transaction Fees**: Ticketmaster, at its option, may deduct Archtics Transaction Fees from the amounts owed to Principal under this Agreement or may invoice Principal for such fees.

(h) **License and Maintenance Fees**: Installments of license or maintenance fees set forth on Exhibit A shall be invoiced and payable on the first day of each Contract Year during the Term.

(i) **Request for Taxpayer Identification Number and Certification**: Principal shall complete the required Form W-9 provided with this Agreement and return it to Ticketmaster with this Agreement for purposes of reporting to the Internal Revenue Service.

9. **TAXES**:

15

Chase Center GSW LUA 06062019a.docx

HIGHLY CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY AGREEMENT    LNE22-000034506

**DX-1494.0671**

(a)    <u>Taxes on Hardware</u>: Principal shall keep the Hardware free and clear of all levies, liens and encumbrances which are caused by Principal or under Principal's control and shall promptly reimburse Ticketmaster for all license fees, registration fees, assessments, charges and taxes, whether federal, state, county, municipal or other governmental or quasi-governmental, with respect to the Hardware located at the Facility, including, without limitation, use, excise and property taxes, and penalties and interest with respect thereto, except and excluding, however, any taxes based on or measured solely by Ticketmaster's net income.

(b)    <u>Attraction Taxes</u>:  Principal shall be responsible for calculating any and all Attraction Taxes, for preparing and timely filing any and all tax returns or reports required to be filed in respect of any such Attraction Taxes, and for timely remitting Attraction Taxes to the appropriate taxing authority.  Ticketmaster will collect and turn over to Principal the amounts to which Principal is entitled as provided in Section 8(a).  In the event that Ticketmaster pays any Attraction Taxes on behalf of Principal or Ticketmaster pays any Attraction Taxes due to a failure by Principal to provide Ticketmaster with the required writing or documentation of any Principal tax exemptions pursuant to Section 9(d) below, Principal shall promptly reimburse Ticketmaster for any and all such Attraction Taxes paid by Ticketmaster, including penalties and interest assessed with respect thereto (other than Attraction Taxes, penalties and interest that Ticketmaster pays directly out of Principal's Ticket Receipts), and shall also promptly reimburse Ticketmaster for any and all expenses (including reasonable attorneys' fees) or damages that result from the failure by Principal to properly calculate and timely remit Attraction Taxes assessed on all amounts received by Principal under this Agreement, to timely file all related returns or reports, or to timely reimburse Ticketmaster for any and all such Attraction Taxes, interest and penalties as provided above.  Notwithstanding the foregoing, in the event that Ticketmaster is ever required by applicable law to remit Attraction Taxes directly on behalf of Principal and file related tax returns or reports, Ticketmaster shall have the right to do so upon notice to Principal, and thereafter "Ticket Receipts" shall be defined to be reduced by such Attraction Taxes.

(c)    <u>Principal's Taxpayer ID Number</u>:  Principal certifies that Principal's federal taxpayer identification number (FEIN or SSN) is ██████████ .

(d)    <u>Principal's Tax Exemptions</u>:  Principal shall notify Ticketmaster in writing of any and all Principal tax exemptions (if applicable) and provide Ticketmaster with reasonable proof of Principal's tax exemptions.

(e)    <u>Taxes on License and Maintenance Fees</u>:  The license and maintenance fees set forth on <u>Exhibit A</u> are exclusive of any sales, use, value added, excise or other taxes, and Principal shall be responsible for paying all such applicable taxes.

10.    <u>LOSS AND DAMAGE TO THE HARDWARE; INSURANCE</u>:

(a)    Principal acknowledges that the Hardware will be used by Principal at the Facility and that Ticketmaster does not own, operate or control such location.  Accordingly, Principal hereby assumes and shall bear the entire risk of loss and damage to the Hardware, ordinary wear and tear excepted, whether or not insured against, once installed, unless occasioned by the negligence or willful misconduct of Ticketmaster, from any and every cause whatsoever from the date of delivery of the Hardware to the Facility or Principal site until removal thereof following termination of this Agreement.  No such loss or damage to the Hardware shall impair any obligation of Principal under this Agreement.  In the event of loss or damage of any kind to any Hardware, Principal, at its sole option, shall within thirty (30) days after such loss or damage:

16

Chase Center GSW LUA 06062019a.docx

HIGHLY CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY AGREEMENT                    LNE22-000034507

(i)     Place the same, or replace the same with similar property, in good repair, condition and working order to the reasonable satisfaction of Ticketmaster; or

(ii)     Pay Ticketmaster in cash the full replacement cost of the Hardware, and Ticketmaster shall promptly install new hardware to replace the lost or damaged Hardware.

(b)     Principal shall, at its own expense, provide and maintain at all times during the Term hereof insurance to protect the Hardware against loss caused by fire (with extended coverage), vandalism, malicious mischief, theft, or any other cause in an amount equal to the full replacement value of the Hardware as determined by Ticketmaster.  Should Principal become unable to provide or maintain such insurance coverage, Principal shall promptly notify Ticketmaster in writing prior to the expiration of any such coverage, and, thereafter, Ticketmaster shall have the right, but shall not be obligated, to provide insurance coverage for the occurrences specified above and charge Principal the costs of such insurance coverage.

(c)     Principal shall provide, at its sole expense, comprehensive or commercial general liability and property damage insurance with minimum limits of ███████ per occurrence and ███████ in the aggregate for its protection and the protection of Ticketmaster.

(d)     All insurance provided and maintained by Principal pursuant to this Section shall provide for the waiver of the insurer's right of subrogation against Principal and Ticketmaster.  All such policies of insurance shall include Ticketmaster and its landlords or licensors, if any, and their respective parents, members, partners, affiliates, divisions and subsidiaries as an additional named insured on a primary and non-contributory basis irrespective of any other insurance, whether collectible or not, with respect to the operations of Principal per this written Agreement.  Further, such policies shall provide for at least thirty (30) days' prior written notice of cancellation, non-renewal or material modification to Ticketmaster. Principal shall furnish Ticketmaster with certificates of such insurance or other evidence satisfactory to Ticketmaster as to its compliance with the provisions of this Section.

11.    **TITLE**:

(a)     **Hardware/Software**: Principal covenants and agrees that the Software and Hardware and any deliverables or work product furnished under this Agreement are, and shall at all times be and remain, personal property which shall, at all times, remain the sole and exclusive property of Ticketmaster, and Principal shall have no right, title or interest therein or thereto except as a licensed user thereof.  Principal acknowledges and agrees that Ticketmaster has invention rights, copyrights, and other intellectual property rights in the TM System and the information contained therein which prohibit copying, sale, modification and re-manufacture of the TM System and information regarding the TM System and which will be enforced.  Principal hereby agrees that it will, whenever reasonably requested by Ticketmaster, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, agreements, instruments, and documents necessary or desirable, in form satisfactory to Ticketmaster, to protect the rights and ownership of Ticketmaster to and of the Software and Hardware, including but not limited to certificates from parties with a real property interest in the premises wherein the Hardware may be located waiving any claim with respect to the Hardware.  Except as may be necessary to prevent damage to or destruction of the Hardware, Principal will not move the Hardware nor permit such Hardware to be moved without Ticketmaster's prior written consent, which consent shall not be unreasonably withheld, and shall give Ticketmaster prompt written notice of any attachment or other judicial process

17

Chase Center GSW LUA 06062019a.docx

affecting any item of Hardware. Upon the expiration or termination of this Agreement, Principal shall return the Software and Hardware to Ticketmaster in good repair, condition and working order, ordinary wear and tear resulting from proper use thereof alone excepted, and any and all licenses and other rights to the Software and Hardware shall terminate with respect to Principal.

(b) **Intellectual Property**: Each party shall retain all right, title and interest in and to its respective trademarks, service marks and trade names worldwide ("Intellectual Property") subject to a limited non-exclusive, non-transferable license necessary to perform this Agreement. Each party grants the other a royalty-free, non-exclusive, non-transferable license, during the Term, within the territory, to include such party's pre-approved Intellectual Property solely in connection with the promotions and marketing contemplated in this Agreement. Each party shall use the other's Intellectual Property only as provided, and shall not alter the Intellectual Property in any way, nor shall it act or permit action in any way that would impair the rights of owning party in its Intellectual Property. Each party acknowledges that its use of the other party's Intellectual Property shall not create any right, title or interest in or to such Intellectual Property. Each party shall have the right to monitor the quality of the other party's use of its Intellectual Property. Additionally, each party shall notify the other promptly in writing of any known infringement of the other's Intellectual Property. Any references to a party's Intellectual Property shall contain the appropriate trademark, copyright or other legal notice provided from time to time by owning party.

(c) **Purchaser Data**: Principal and Ticketmaster each has rights in the personally identifiable information with respect to persons who actually purchased tickets to Principal's Attractions through the TM System (whether by Telephone Sales or Internet Sales) ("Purchaser Data"), subject to the terms hereof. Such use by Ticketmaster may include, without limitation, in development of new or upgraded Software at Principal's request, or for general market research on pricing when used in aggregate form with other Ticketmaster client consumer data. Each party agrees to use the Purchaser Data only in compliance with all applicable laws and administrative rulings and in accordance such party's own posted privacy policies. Principal agrees that if any portion of the Purchaser Data includes a person's name and that person's (i) social security number; (ii) driver's license or government identification number; or (iii) password and account identification, then Principal shall implement and maintain reasonable security procedures and practices appropriate to the nature of the Purchaser Data to protect the Purchaser Data from unauthorized access, destruction, use, modification or disclosure. Principal also agrees that if any portion of the Purchaser Data includes credit or debit card numbers and related information, Principal shall comply with payment card industry standards. Principal shall also include in any email communications that Principal may make based on the Purchaser Data a mechanism to provide the recipient with the right to "opt-out" from receiving further communications from Principal and Principal shall honor such opt-out preferences. Ticketmaster hereby agrees that it is responsible for the security of cardholder data that it possesses, including functions relating to storage, processing, and transmission thereof. Ticketmaster covenants that it will comply with all applicable requirements to be considered compliant with the PCI Data Security Standard (PCI DSS). Upon request of Principal not more than two (2) times during any Contract Year, Ticketmaster agrees to provide to Principal reasonable evidence of its then-most recent annual validation of compliance. Ticketmaster will promptly notify Principal if it learns that it is no longer PCI DSS compliant and will promptly provide Principal the steps being taken to remediate such non-compliance. Ticketmaster shall indemnify and hold Principal harmless from and against any and all liabilities, claims, expenses (including court costs and reasonable attorneys' fees) and causes of action brought by any third party directly resulting from Ticketmaster's failure to be and to remain PCI DSS compliant.

12. **CONFIDENTIAL INFORMATION**:

18

HIGHLY CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY AGREEMENT                LNE22-000034509

**DX-1494.0674**

(a)    The parties acknowledge that by reason of their relationship hereunder, they may from time to time disclose information regarding their business, products, software technology, Intellectual Property and other information that is confidential and of substantial value to the other party, which value would be impaired if such information were disclosed to third parties ("Confidential Information"). The provisions of this Agreement shall be deemed to be Confidential Information.

(b)    Confidential Information shall not include information that (i) is or becomes generally available to the public other than as a result of the breach of the confidentiality obligations in this Agreement by the receiving party, (ii) is or has been independently acquired or developed by the receiving party without violating any of the confidentiality obligations in this Agreement, (iii) was within the receiving party's possession prior to it being furnished to the receiving party by or on behalf of the disclosing party, or (iv) is received from a source other than the disclosing party; provided that, in the case of (iii) and (iv) above, the source of such information was not known by the receiving party to be bound by a confidentiality obligation to the disclosing party or any other party with respect to such information.

(c)    Each party agrees that it will keep the Confidential Information strictly confidential and will not use in any way for its own account or the account of any third party, nor disclose to any third party, any Confidential Information revealed to it by the other party without the other party's prior written consent, except to the extent expressly permitted by this Agreement; provided, however, that the receiving party may disclose the Confidential Information, or any portion thereof, to its directors, officers, employees, legal and financial advisors, controlling persons and entities who need to know such information to perform such party's obligations under this Agreement and who agree to treat the Confidential Information in accordance with the confidential obligations in this Agreement. Each party shall use the same degree of care to avoid disclosure or use of the other party's Confidential Information as it employs with respect to its own Confidential Information of like importance and represents that it has adequate procedures to protect the secrecy of such Confidential Information including without limitation the requirement that employees have executed non-disclosure agreements which have the effect of adequately protecting Confidential Information.

(d)    In the event that either party receives a request to disclose all or any part of the Confidential Information under the terms of a subpoena, document request, notice of deposition or other legal proceeding, such party agrees to notify the other pursuant to Section 17(h) below, within forty-eight (48) hours after receipt of such legal document, and such party agrees to cooperate with the other in any attempt to obtain a protective order.

13.    **LIMITATION ON LIABILITY**:  In no event shall either party be liable for any indirect, consequential, exemplary, incidental, special or punitive damages, including also lost profits, lost savings, lost or destroyed data, lost ticket revenues, lost opportunity costs or any other economic loss, of any type or nature, or for events or circumstances beyond such party's reasonable control, even if such party has been advised of the possibility of such damages. Neither occasional short term interruptions of service which are not unreasonable under comparable industry standards nor interruptions of service resulting from events or circumstances beyond Ticketmaster's reasonable control shall be cause for any liability or claim against Ticketmaster hereunder, nor shall any such occasion render Ticketmaster in default under this Agreement.

19

Chase Center GSW LUA 06062019a.docx

HIGHLY CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY AGREEMENT                    LNE22-000034510

**DX-1494.0675**

14.    **INDEMNIFICATION**:

(a)    Principal shall indemnify Ticketmaster and its parents, subsidiaries, and their officers, directors, employees and agents and their successors and assigns (collectively, for purposes of this Section, "Ticketmaster's Indemnitees") against, and hold Ticketmaster's Indemnitees harmless from, any and all claims, actions, damages, expenses (including court costs and reasonable attorneys' fees), obligations, losses, liabilities and liens, imposed on, incurred by, or asserted against Ticketmaster's Indemnitees occurring as a result of, or in connection with: (i) any Event of Default under this Agreement by Principal or any of its officers, directors, employees and agents (collectively, "Principal's Representatives"); (ii) use of the TM System (including without limitation any customization of Principal's Website or the Interface Page (if applicable) and any e-mail campaigns or distributions using the TM System) or possession and use of the Hardware (if any) by Principal or any of Principal's Representatives; (iii) any Attraction held or scheduled to be held at the Facility (including any injuries or deaths occurring at or in connection with any Attraction or the failure of any Attraction to occur or to occur in the manner advertised or promoted); (iv) a claim that Ticketmaster's release of the Purchaser Data to Principal violates any applicable law, rule or regulation; (v) Principal's use of the Purchaser Data; (vi) violations of laws relating to the resale of Tickets; or (vii) any email campaigns or distributions conducted by Ticketmaster on Principal's behalf or conducted by Principal including, without limitation, email campaigns or distributions in violation of federal, state or other laws applicable to commercial emails; except, in each case, to the extent that any such claims shall relate to Ticketmaster's negligence or willful misconduct with respect thereto.

(b)    Ticketmaster shall indemnify Principal and its parents, subsidiaries, and their officers, directors, employees and agents and their successors and assigns (collectively, for purposes of this Section, "Principal's Indemnitees") against, and hold Principal's Indemnitees harmless from, any and all claims, actions, damages, expenses (including court costs and reasonable attorneys' fees), obligations, losses, liabilities and liens, imposed on, incurred by, or asserted against, Principal's Indemnitees occurring as a result of, or in connection with: (i) any Event of Default under this Agreement by Ticketmaster; or any of its officers, directors, employees and agents or (ii) any alleged patent, trademark or copyright infringement asserted against Principal's Indemnitees with respect to Principal's use of the TM System; except, in each case, to the extent that any such claim shall relate to Principal's negligence or willful misconduct with respect thereto.

(c)    The indemnified party must notify the other party promptly in writing of any claim hereunder, and provide, at such other party's expense, all reasonably necessary assistance, information and authority to allow the other party to control the defense and settlement of such claim.

15.    **TERMINATION**:

(a)    This Agreement may be terminated by either party in the event of any material default in or material breach of the terms and conditions of this Agreement by the other party, after the other party has received written notice of default and thirty (30) business days (or ten (10) business days, in the case of a monetary default) to cure such default (each such occurrence, after the expiration of such cure period, shall be an "Event of Default"); or the filing of any voluntary or involuntary petition against the other party under the bankruptcy or insolvency laws of any applicable jurisdiction, which petition is not dismissed within sixty (60) days of filing, or upon any appointment of a receiver for all or any portion of the other party's business, or any assignment of all or substantially all of the assets of such other party for the benefit of creditors. Upon an Event of Default by Ticketmaster, Ticketmaster shall, without demand, forthwith pay to Principal all amounts due and owing pursuant hereto, and Principal

20

Chase Center GSW LUA 06062019a.docx

HIGHLY CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY AGREEMENT    LNE22-000034511

**DX-1494.0676**

may, in addition to terminating this Agreement, require Ticketmaster to remove all Hardware from the Facility. Upon an Event of Default by Principal, Principal shall, without demand, forthwith pay to Ticketmaster all amounts due and owing pursuant hereto, and Principal authorizes Ticketmaster to offset any amounts owed to Ticketmaster hereunder against any amounts held by Ticketmaster on behalf of Principal, and Ticketmaster may, in addition to terminating this Agreement, terminate Principal's right to access and use the TM System and take immediate possession of the Hardware and Software wherever the same may be located without demand, notice or court order.

(b)    This Agreement may be terminated upon written notice by a party, effective as of the conclusion of such Contract Year, in the event of the sale of (i) all or substantially all the assets of the other party or (ii) more than 50% of the voting stock of the other party in one or more related transactions (other than in connection with a corporate restructuring of such party).

(c)    This Agreement may be terminated by a party in the event any act by the other party during the Term infringes the terminating party's (or such party's licensor) intellectual property or other property right, including without limitation, any copyright, license right or trade secret right, and the other party fails to cease such infringement within ten (10) business days' following written notice from the terminating party.

(d)    Upon the effective date of any termination or expiration of this Agreement, provisions regarding ownership of intellectual property rights, representations and warranties, confidentiality, indemnification, limitation of liability, non-solicitation, jurisdiction and venue shall remain in full force and effect; each party shall immediately cease the use of the other party's Intellectual Property; and each party shall return, or at the other party's request, destroy all copies of Confidential Information, and all other property belonging to and/or received from the other party.

(e)    No remedy referred to in this Section is intended to be exclusive, but each shall be cumulative and in addition to any other remedy herein or otherwise available at law or in equity, each and all of which are subject to the limitations contained in Section 13 hereof.

16.    <u>DEFINITIONS</u>: As used in this Agreement, the following terms shall have the respective meanings indicated below unless the context otherwise requires:

"AccessManager" means the Ticketmaster AccessManager software which interfaces with the TM System to facilitate certain reporting systems and to provide various enhanced services to the patron admissions process through the use of bar codes or other media printed on Tickets.

"AccountManager" means the Ticketmaster AccountManager software and hosting services that allow Subscribers to manage their Season/Contract Ticket accounts.

"Archtics" means Ticketmaster's software that delivers extensive season, miniplan and single ticket functionality in connection with the Ticketmaster host system and distribution channels for inventory control by Ticketmaster and Principal.

"Archtics Transaction Fees" means the amounts Ticketmaster charges for certain Software transactions as described in <u>Exhibit A</u>.

21

Chase Center GSW LUA 06062019a.docx

HIGHLY CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY AGREEMENT                LNE22-000034512

"Attraction" means a concert, sporting, entertainment or other act or event of any kind or nature whatsoever to be held at the Facility, including, but not limited to the home games played at the Facility featuring the NBA basketball team currently known as the Golden State Warriors ("GSW Attractions"). "Non-GSW Attraction" shall mean any Attraction that is not a GSW Attraction.

"Attraction Taxes" means any and all sales, amusement, admissions and other taxes, charges, fees, levies or other assessments measured by reference to a charge per Ticket sold or determined based upon the purchase price of a Ticket assessed by federal, state, county, municipal or other governmental or quasi-governmental authorities as a result of, or in connection with, any Attraction.

"Chargebacks" is defined in Section 8(c) hereof.

"Confidential Information" is defined in Section 12 hereof.

"Contract Year" is defined in Section 1 hereof.

"Convenience Charge" means the per Ticket amount charged to a consumer for the convenience of purchasing Tickets through the TM System.

"Event of Default" is defined in Section 15(a) hereof.

"Face Value" means the face price of a Ticket as determined by Principal, which shall be inclusive of all applicable Attraction Taxes and facility, parking and similar fees.

"Facility" means that certain multi-purpose arena under construction in the Mission Bay neighborhood of San Francisco, located at 1601 3rd Street, San Francisco, CA and currently known as Chase Center, by whatever name such arena shall be known during the Term.

"Facility Box Office" means the Facility's Ticket sales locations that are operated by Principal and located at the Facility.

"Group Sales" means sales of Tickets by Principal to a group consisting of at least fifteen (15) people for use by the group members to attend an Attraction as a group. In no event shall Group Sales consist of the sale of Tickets to individuals to attend an event separately or for individuals to purchase Tickets with the intent to resell such Tickets.

"Hardware" means all of that certain computer hardware, communications equipment, terminals and hook-ups (including replacements thereof) listed with particularity on Exhibit B or otherwise supplied by Ticketmaster to Principal at any time during the Term of this Agreement, but excluding (i) any computer hardware, communications equipment, terminals and hook-ups purchased by Principal to provide the connectivity to and interfacing with the TM System required under this Agreement, and (ii) any computer hardware, communications equipment, terminals and hook-ups purchased by Principal from Ticketmaster.

"Hosted Platform" shall mean the equipment, operating system, hardware and software specifications, and networking environment on and with which the Archtics Software is hosted by Ticketmaster, and any additions or replacements to the foregoing which may be implemented by Ticketmaster in accordance with the terms of this Agreement.

"House Seats" means Tickets provided by Principal (i) to the Attraction's promoter, performing act or event, or their managers or agents (i.e. band holds); (ii) for distribution

22

Chase Center GSW LUA 06062019a.docx

HIGHLY CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY AGREEMENT                    LNE22-000034513

through legitimate fan clubs in accordance with current guidelines (i.e. fan club holds); (iii) for legitimate promotional purposes (e.g. radio station promotions); or (iv) to fulfill reasonable non-public internal management requests (e.g., employees, sponsors, players and their families, etc.); provided that House Seats shall not be distributed to the general public.

"Inside Charges" means the amounts Ticketmaster charges Principal to sell, issue and process Tickets utilizing the TM System pursuant to this Agreement.

"Intellectual Property" is defined in Section 11(b) hereof.

"Interface Page" means a co-branded web page interface for use with Software transactions designed, created and maintained by Ticketmaster to have, in general, the look and feel of Principal's Website and hosted on Ticketmaster's web servers.

"Internal Ticket Forwarding" means the ability of Principal to forward a reasonable number of House Seats Tickets (other than Tickets for fan clubs) directly from Archtics to a recipient with a valid email address.

"Internet Sales" means all sales of Tickets over the Internet, or via mobile or smart phone application.

"License" is defined in Section 4(a) hereof.

"Payment Processing Fees" is defined in Section 3(b).

"Principal's Website" means an Internet website(s) owned, operated and maintained by Principal, which shall contain links to the Interface Page.

"Processing Fee" means the per order amount charged by Ticketmaster to a consumer for purchasing Tickets via Internet Sales or Telephone Sales through the TM System.

"Purchaser Data" is defined in Section 11(c) hereof.

"sale and sell" and any derivations thereof in this Agreement shall include any distribution for consideration, by any means or method (including without limitation, on the Internet or by auction) and shall include resales.

"SCW Facility" means the arena at which the Santa Cruz Warriors plays substantially all of its home games during the Term.

"Season/Contract Tickets" means specifically designated Tickets sold directly by Principal on an annual basis across all Attractions or across all of a category of Attractions (i.e., luxury suites, club level seats and season tickets).

"Sellable Capacity" means the admission capacity of the Facility for any particular Attraction.

"Software" means Ticketmaster's ticketing system software known and marketed as Ticketmaster Classic, AccessManager, TM Charge, Ticketmaster Secondary Exchange, Presence, and the additional ticket sales software and Internet-based premium Ticketmaster services that include Archtics, Hosted Platform, AccountManager, and any new versions thereof or any other deliverables for TM System access provided to Principal by Ticketmaster during the Term.

23

Chase Center GSW LUA 06062019a.docx

HIGHLY CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY AGREEMENT                    LNE22-000034514

DX-1494.0679

"Subscribers" means any person who holds an account on Principal's AccountManager.

"Telephone Sales" means all sales of Tickets through the TM System by telephone, interactive voice response (IVR) and similar means.

"Term" is defined in Section 1 hereof.

"Ticket" means a printed, electronic or other type of evidence of the right, option or opportunity to occupy space at or to enter or attend an Attraction or Attractions even if not evidenced by any physical manifestation of such right, such as a "smart card",

"Ticket Forwarding" means the ability of Subscribers to forward Tickets purchased through AccountManager to a recipient with a valid email address.

"Ticket Receipts" means the Face Value of all Tickets sold by Ticketmaster, plus any Convenience Charges and Processing Fees retained by Principal, less any applicable Inside Charges (exclusive of Ticketmaster Taxes in jurisdictions in which Principal is required to remit Attraction Taxes to the applicable taxing authority) and Payment Processing Fees, and less any Principal Taxes for jurisdictions in which Ticketmaster is required to remit Principal Taxes to the applicable taxing authority.

"Ticketmaster Secondary Exchange" means any software, web site, platform or functionality provided, operated or hosted by Ticketmaster which allows ticket holders to post such tickets for sale to third parties (e.g., the NBA Ticketing Platform, TM+ and TicketsNow.com).

"TM+" means the proprietary, integrated primary and secondary market ticket inventory platform and technology on the TM.com Website, which platform and technology shall enable consumers searching for Tickets to an Attraction to simultaneously view Tickets available for initial sale directly by Principal pursuant to this Agreement, in addition to Tickets available for resale from other consumers.

"TM Charge" means the electronic payment processing system within the TM System that utilizes the global banking association networks to authorize electronic payment for purchases of Tickets to Attractions sold by Principal from the Facility Box Office as permitted under this Agreement.

"TM.com Website" means any Internet websites owned, operated and maintained by Ticketmaster, including, without limitation, any co-branded versions and any version distributed through any broadband distribution platform or through any platform or device including television, broadband and wireless technologies.

"TM System" means the Hardware, Software, TM.com Website, related procedures and personnel, and repair and maintenance services established and maintained by Ticketmaster and its affiliates for the purpose of selling, distributing, auditing and controlling the sale of Tickets for Attractions, including, without limitation, by Internet Sales, by Telephone Sales and the processing of transactions through the Software.

17.    **MISCELLANEOUS**:

(a)    **Governing Law/Jurisdiction**: This Agreement shall be interpreted and governed by the laws of the State of California, without reference to conflict of laws principles.

24

Chase Center GSW LUA 06062019a.docx

HIGHLY CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY AGREEMENT    LNE22-000034515

**DX-1494.0680**

Each of the parties hereto agrees that the state courts, and the United States federal courts, that are located in the State of California shall each have subject matter jurisdiction hereunder and personal jurisdiction over each of the parties hereto.  Each such party hereby consents thereto, and hereby waives any right it may have to assert the doctrine of forum non conveniens or to object to venue to the extent that any proceeding is conducted in accordance with the foregoing provision.

(b)    **Waiver of Jury Trial**:  In the event the parties are required for any reason to submit any dispute hereunder to trial, the parties expressly agree to waive the right to a jury trial, because the parties hereto, all of whom are represented by counsel, believe that the complex commercial and professional aspects of their dealing with one another make a jury determination neither desirable nor appropriate.

(c)    **Entire Agreement; Modification**:  This Agreement constitutes the entire and exclusive agreement between the parties hereto with respect to the subject matter hereof and supersedes and cancels all previous oral or written communications, proposals, agreements, and commitments.  No modification to this Agreement, nor any waiver of any rights, shall be effective unless assented to in writing by the party to be charged and the waiver of any breach or default shall not constitute a waiver of any other right hereunder or any subsequent breach or default.  A party's delay in enforcing its rights hereunder shall not be construed as a waiver of such rights or remedies.

(d)    **Assignment**:  Without the prior written consent of Ticketmaster, Principal shall not (i) directly or indirectly assign, transfer, pledge or hypothecate its rights or obligations in this Agreement or any interest therein; or (ii) permit the Hardware (if any) or any part thereof to be used, or access to the Software or any part thereof to be had, by anyone other than Principal or Principal's authorized employees.  Any such assignment shall not relieve Principal of any of its obligations hereunder.  Without the prior written consent of Principal, Ticketmaster shall not assign or transfer its rights or obligations in this Agreement or any interest therein, except in the event of an assignment by Ticketmaster to any parent, subsidiary, affiliate or successor-in-interest (including, without limitation, a successor by virtue of an acquisition), in which event no such consent shall be required.  Any assignment, transfer, pledge or hypothecation for which consent is required hereby and which is made without such consent shall be void. Notwithstanding the foregoing, Principal agrees and acknowledges that certain of Ticketmaster's duties and obligations under this Agreement may be performed on Ticketmaster's behalf by one or more of its parent, subsidiaries and affiliates, and no such performance shall be deemed to be an assignment or breach of this Agreement by Ticketmaster.

(e)    **Relationship of the Parties**:  Each party is an independent contractor and not an agent or partner of, or joint-venturer with, the other party for any purpose other than as set forth in this Agreement (e.g., Ticketmaster is the agent of Principal with respect to ticket sales and distribution).  Neither party by virtue of this Agreement shall have any right, power, or authority to act or create any obligation, express or implied, on behalf of the other party.

(f)    **Delays**:  Neither party shall be liable or deemed in default, and no Event of Default shall be deemed to have occurred, as a result of any delay or failure in performance of this Agreement resulting directly or indirectly from any cause completely, solely and exclusively beyond the control of that party, but only for so long as such delay shall continue to prevent performance.

(g)    **Severability**:  If any provision of this Agreement is found to be invalid or unenforceable in any jurisdiction (a) the validity or enforceability of such provision shall not in

25

Chase Center GSW LUA 06062019a.docx

HIGHLY CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY AGREEMENT                    LNE22-000034516

**DX-1494.0681**

any way be affected with respect to any other jurisdiction, and the validity and enforceability of the remaining provisions shall not be affected; and (b) the parties shall replace such provision by one or more valid and enforceable provisions approximating the original provision as closely as possible.

(h)     **Notices**:  Any notices required to be given under this Agreement must be sent to each party, in writing, at the address set forth immediately below the signature line hereto or at such address as may be provided by each party in writing from time to time, by certified or registered mail, return receipt requested or by an overnight courier.  Notices will be deemed effective the day following sending if sent by overnight courier or five days after sending if sent by certified or registered mail.  Settlement reports may be delivered from Ticketmaster to Principal by email; therefore Principal shall promptly notify Ticketmaster of any change to its email address set forth immediately below the signature line hereto.

(i)     **Binding Agreement/Counterparts**:  The terms, conditions, provisions and undertakings of this Agreement shall be binding upon and inure to the benefit of each of the parties hereto and their respective successors and permitted assigns; provided, however, that this Agreement shall not be binding until executed by each of the parties.  This Agreement may be executed in multiple counterparts which when taken together constitute a single instrument.

(j)     **Legal Review**:  Each of the parties has had the opportunity to have its legal counsel review this Agreement on its behalf.  If an ambiguity or question of intent arises with respect to any provision of this Agreement, this Agreement will be construed as if drafted jointly by the parties.  The parties expressly agree that the construction and interpretation of this Agreement shall not be strictly construed against the drafter.

(k)     **Attorneys' Fees**:  In addition to any other rights hereunder, the substantially prevailing party, as a court of competent jurisdiction (as provided above) may determine, in any claim or other dispute which relates to this Agreement, regardless of whether such claim or other dispute arises from a breach of contract, tort, violation of a statute or other cause of action, shall have the right to recover and collect from the other party its reasonable costs and expenses incurred in connection therewith, including, without limitation, its reasonable attorneys' fees.  If a party substantially prevails on some aspects of such claim or dispute but not others, the court may apportion any award of costs or attorneys' fees in such manner as it deems equitable.

(l)     **Client Listings**:  Principal's execution of this Agreement indicates approval for Principal to be listed as a Ticketmaster client in monthly newsletters for distribution to event industry clients, in product boiler plate information, and in future releases about Ticketmaster products and services for distribution to trade and consumer media.  At any time, Principal may, in its sole discretion, direct Ticketmaster to stop using Principal's name for the purposes listed in this Section by sending notice to Ticketmaster via email at client.news@ticketmaster.com.

(m)     **Survival of Terms**:  Any provision of this Agreement that contemplates performance or observance subsequent to any termination or expiration of this Agreement, including without limitation provisions related to use of the Software, purchaser data, limitations on liability, indemnification, confidential information, governing law and waivers of jury trials, shall survive any termination or expiration of this Agreement and continue in full force and effect.

26

Chase Center GSW LUA 06062019a.docx

HIGHLY CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY AGREEMENT          LNE22-000034517

**DX-1494.0682**

IN WITNESS WHEREOF, Ticketmaster and Principal have caused this Licensed User Agreement to be duly executed as of the date set forth below.

TICKETMASTER L.L.C.,
a Virginia limited liability company

By: _____

Print Name: Kurt Schwartzkopf

Title: SVP, NBA/NHL Arenas

Date: 6 - 9 - 19

Address: 2399 Blake St #120
Denver, CO
80205

Attn:    SVP, NBA/NHL Arenas

**With a copy to:**

Ticketmaster L.L.C.
7060 Hollywood Boulevard
2nd Floor
Hollywood, CA  90028
Attn:    General Counsel


GSW ARENA LLC,
a Delaware limited liability company

By: _____

Print Name: Brandon Schneider

Title: Chief Revenue Officer

Date: 6/11/19

Address:    1011 Broadway
Oakland, CA 94607
Attn:    Chief Revenue Officer
email address: ██████████

**With a copy to:**

GSW ARENA LLC
1011 Broadway
Oakland, CA 94607
Attn:    General Counsel

27

Chase Center GSW LUA 06062019a.docx

HIGHLY CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY AGREEMENT                                    LNE22-000034518

**DX-1494.0683**

## EXHIBIT A

### COMPENSATION

1.    **Charges and Fees.**

(a)    **Convenience Charge (Per Ticket) and Processing Fee (Per Order):** The per Ticket Convenience Charges and per order Processing Fees shall be determined and (subject to the terms set forth herein) retained by Principal during the Term of this Agreement; provided, however, in the event that (i) the per Ticket Convenience Charges for Non-GSW Attraction Tickets in any single transaction exceeds the amount of $▮ per Ticket (subject to escalation in the amount of $▮ per Ticket on the first day of the second, third, fourth and fifth Contract Years during the Term) (the "Non-GSW Attraction Per Ticket Fee Cap"), then Principal and Ticketmaster shall each retain ▮▮▮▮ of any amount of such aggregate per Ticket fees for such transaction in excess of the Non-GSW Attraction Per Ticket Fee Cap, or (ii) the per order Processing Fees for Non-GSW Attraction Tickets in any single transaction exceeds the amount of $▮ per order (the "Non-GSW Attraction Per Order Fee Cap"), then Principal and Ticketmaster shall each retain ▮▮▮▮ of any amount of such aggregate per order fees for such transaction in excess of the Non-GSW Attraction Per Order Fee Cap. For clarity, the Non-GSW Attraction Per Ticket Fee Cap shall not be subject to any automatic escalation during the sixth, seventh, eighth, ninth or tenth Contract Years during the Term. In the event any per Ticket Convenience Charges or per order Processing Fee in any single transaction is less than the applicable Inside Charge due Ticketmaster as set forth in subsection (b) following, Ticketmaster reserves the right to invoice Principal for the amount of such Inside Charge, or to setoff such amount against any funds held by Ticketmaster on account of Principal, unless mutually agreed upon otherwise by the parties.

(b)    **Inside Charges:**

| Type of Ticket | Per Ticket Inside Charge | Per Order Inside Charge |
|---|---|---|
| For all Tickets to Non-GSW Attractions sold or distributed via Facility Box Office sales, Internet Sales and Telephone Sales | ▮ per Ticket | $▮ per order (for all Ticketmaster Internet Sales and Telephone Sales, but excluding Facility Box Office sales) |
| For all Tickets to GSW Attractions sold or distributed via Ticketmaster Telephone Sales and Internet Sales | ▮ per Ticket | $▮ per order |

The Inside Charges for all Tickets set forth above shall be subject to automatic increase on the first day of the second, third, fourth and fifth Contract Years during the Term in the amount of $▮ per Ticket or $▮10 per order, as applicable. For clarity, the Inside Charges for all Tickets set forth above shall not be subject to any automatic increase during the sixth, seventh, eighth, ninth or tenth Contract Years during the Term.

(c)    **Delivery Fees:**

(i)    **Mail Fee.** Ticketmaster shall be entitled to assess and receive a fee in the amount of $▮ per order against purchasers of Tickets to Attractions using the U.S. mail method of delivery (the "Mail Fee"). The Mail Fee retained by Ticketmaster is subject to

28

Chase Center GSW LUA 06062019a.docx

HIGHLY CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY AGREEMENT

LNE22-000034519

DX-1494.0684

automatic increase equal to any increases (rounded up to the nearest $0.05) to the postal rates).

(ii)    Mobile and Credit Card Entry Delivery. Ticketmaster shall not assess any mobile  delivery fee or credit card entry delivery fee against purchasers of Tickets using the mobile and/or credit card entry methods of delivery.

(iii)    Will Call Fee: Ticketmaster shall assess a fee in the amount of $▇ per order against Ticket purchasers electing to pick-up Tickets at will-call (the "Will Call Fee"), and shall pay Principal the entirety of such Will Call Fee (exclusive of any Payment Processing Fees as set forth in Section 2 below) as a Royalty.

(e)    **Archtics Fees**:

(i)    Archtics Transaction Fees:

| Type of Software Transaction | Amount of Archtics Transaction Fee |
|---|---|
| **AccountManager Transactions** | |
| New Season/Contract Ticket sales | $▇ per seat |
| Suite additionals | $▇ per Ticket |
| Right of first refusal to purchase Tickets | $▇ per Ticket |
| Per invoice processing | $▇ per payment processed |
| Ticket Forwarding | $▇ per Ticket |
| Single Ticket sales to Subscribers | $▇ per Ticket |
| Ticket Printing | $▇ per Ticket |
| Self Service Group Sales via AccountManager | $▇ per Ticket |

(ii)    Archtics License and Maintenance Fees:



| Software | License Fees | Maintenance Fees |
|---|---|---|
| **Archtics** | | |
| **Hosted Platform** | | |
| **Archtics – Sybase Adaptive Server Anywhere** | | |

29

Chase Center GSW LUA 06062019a.docx

HIGHLY CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY AGREEMENT    LNE22-000034520

**DX-1494.0685**

| Software | License Fees | Maintenance Fees |
|---|---|---|
| AccountManager | ██████ | ██ |

2.    **Payment Processing Fees:**

| Type of Sale | Percentage Rate |
|---|---|
| Telephone Sales and Internet Sales | For Non-GSW Attractions: ██ of Face Value of Tickets plus any fees added to the Face Value<br><br>For GSW Attractions: ████ of Face Value of Tickets plus any fees added to the Face Value |
| Principal Sales using TM Charge | For Non-GSW Attractions: █% of Face Value of Tickets plus any fees added to the Face Value<br><br>For GSW Attractions: ████ of Face Value of Tickets plus any fees added to the Face Value |

Any percentage rates set forth above are subject to automatic increase equal to any actual and reasonable increase in the interbank rates imposed on Ticketmaster; provided, such actual increases are consistent with generally applicable market rate increases.

Chase Center GSW LUA 06062019a.docx

HIGHLY CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY AGREEMENT                    LNE22-000034521

**DX-1494.0686**

## EXHIBIT B

### HARDWARE

[TBD]

| Quantity | Description | Value |
|----------|-------------|-------|

31

Chase Center Golden State Warriors LUA 06082019.docx

HIGHLY CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY AGREEMENT                    LNE22-000034522

**DX-1494.0687**

## EXHIBIT C

## Ticketmaster Secondary Exchange Terms and Conditions

Ticketmaster shall enable the Ticketmaster Secondary Exchange for all Attractions in accordance with the settlement terms set forth in this Exhibit C below.

### GSW Attractions:

*   For any secondary market ticket inventory sold through the Ticketmaster Secondary Exchange for any GSW Attractions presented by Principal, Ticketmaster shall assess fees against the buyers and sellers of such tickets, and Ticketmaster shall settle any revenue share on such amounts due Principal, in each case, in accordance with the terms and conditions set forth in Exhibit D.

### Non-GSW Attractions:

*   For any secondary market Ticket inventory sold through the Ticketmaster Secondary Exchange for Non-GSW Attractions, Principal shall be entitled to receive from Ticketmaster ▮▮▮▮▮▮▮▮ of the Net Resale Fees collected (and not refunded or subject to chargeback) by Ticketmaster on account of secondary market ticket sales through the Ticketmaster Secondary Exchange (the "Non-GSW Resale Revenue Share").

*   For purposes of this Exhibit C, "Net Resale Fees" shall be defined as the gross amount collected from the new purchaser of a secondary market inventory ticket via the Ticketmaster Secondary Exchange less (i) the proceeds paid to the ticket seller, (ii) an amount equal to ▮▮▮ of the gross amount collected from the new purchaser (to cover credit card processing fees), (iii) any applicable sales, admission or similar tax, and (iv) amount equal to ▮▮▮ of the gross amount collected from the purchaser of any Ticket purchased via TM+ (to cover certain customer acquisition costs incurred by Ticketmaster).

*   The Non-GSW Resale Revenue Share for Non-GSW Attractions will be paid to Principal on a monthly basis for all such sales occurring in any month, on or before the end of the following month. In the event that any Non-GSW Attraction for which Ticketmaster has made any Non-GSW Resale Revenue Share payment to Principal becomes a Cancelled Attraction, Principal shall promptly repay to Ticketmaster the amount of such Non-GSW Resale Revenue Share payments in respect of such Cancelled Attraction.

*   Each settlement relating to the Non-GSW Resale Revenue Share pursuant to this Exhibit C shall be accompanied by a report of the applicable transactions during such settlement period.

32

Chase Center Golden State Warriors LUA 06082019.docx

HIGHLY CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY AGREEMENT                LNE22-000034523

**DX-1494.0688**

## EXHIBIT D

## GSW ATTRACTION: RESALE TRANSACTIONS

This Exhibit sets forth terms and conditions regarding the participation by Principal in each of the Ticketmaster Secondary Exchanges, including the NBA-branded online marketplace for initial or primary market NBA ticket sales, and secondary market or fan-to-fan NBA ticket resales and exchanges within the broader ticket marketplace (the "NBA Ticketing Platform"), as developed and operated by Ticketmaster pursuant to the terms and conditions of the agreement between Ticketmaster and NBA Media Ventures, LLC ("NBAMV"), WNBA Enterprises, LLC ("WNBAE"), NBA Development League ("NBADL" and, together with NBAMV and WNBAE, the "NBA Parties") dated as of October 1, 2017 (the "NBA Agreement").

1.    Definitions

For purposes of this Exhibit:

(1) "Direct Costs" means with respect to the purchase of Principal's Tickets through any Ticketmaster Secondary Exchange, the credit card fees (calculated at the rate of ███ of the gross transaction value), Chargebacks, fulfillment costs, applicable taxes attributable to Secondary Exchange Fees, and actual out-of-pocket customer acquisition costs that, in each case, are directly attributable to any such ticket purchase and incurred by Ticketmaster (it being understood that any taxes attributable to the Ticket sales price shall not be deemed a "Direct Cost"). Notwithstanding the foregoing, customer acquisition costs directly attributable to such ticket purchases (e.g., spending on Search Engine Marketing/Optimization (SEM/SEO)) shall be capped at ███ of the gross transaction value of such ticket purchases as measured on a per Contract Year basis, unless otherwise approved by Principal.

(2) "Secondary Exchange Fees" means the amount of any fees or charges collected (and not charged back or refunded) by Ticketmaster from a seller or buyer of Principal's Tickets (including, if applicable, any broker markups applied by Ticketmaster on such transactions) for any such Ticket (exclusive of the agreed upon Ticket sales price) that is sold on or through any Ticketmaster Secondary Exchange, net only of Direct Costs.

2.    Principal Controlled Media Deliverables; Integrated Ticketmaster Media

During each Contract Year, Principal shall provide Ticketmaster with the specific media deliverables set forth on Schedule 1 attached hereto and incorporated herein by this reference

33

Chase Center Golden State Warriors LUA 06082019.docx

HIGHLY CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY AGREEMENT

LNE22-000034524

**DX-1494.0689**

(the "Principal Controlled Media"). In addition, during each Contract Year, Principal shall enable the specific Ticketmaster media assets on the applicable "Event Details Pages" (EDP) for Principal's Attractions on the TM.com Website as set forth on Schedule 2 attached hereto and incorporated herein by this reference (the "Ticketmaster Integrated Media"); provided, however, Ticketmaster reserves the right to discontinue any such Ticketmaster Integrated Media asset upon notice to the NBA Parties and Principal.

### 3. Principal Revenue Share

In consideration for Principal's provision of the Principal Controlled Media and enabling of the Ticketmaster Integrated Media, Ticketmaster shall pay to Principal ████████ of all Secondary Exchange Fees from the sale of Principal's GSW Attraction Tickets on any Ticketmaster Secondary Exchange during any Contract Year (the "GSW Resale Revenue Share"). The GSW Resale Revenue Share payable to Principal hereunder shall be due and payable within thirty (30) days of the conclusion of each month during the Term.

### 4. Principal Marks

During the Term, subject to and in accordance with the terms and conditions set forth in the Agreement relating to Ticketmaster's use of Principal's marks and logos, Ticketmaster shall have the right to use Principal's individual marks and logos on the NBA Ticketing Platform and in connection with marketing, advertising and other means for promotion of the NBA Ticketing Platform.

### 5. Principal Designation

During the Term, Ticketmaster shall have the right to use the following Principal-specific designation in connection with marketing, advertising and using other means for promotion of the NBA Ticketing Platform: "Official Ticket Exchange of the Golden State Warriors" or as otherwise mutually agreed by Ticketmaster and Principal.

### 6. Reporting

Within thirty (30) days of the end of each quarter during each Contract Year, Ticketmaster shall furnish Principal with full and accurate statements showing the calculation of total Secondary Exchange Fees (and all Direct Costs relating to such Secondary Exchange Fees) for the preceding quarter. Notwithstanding anything to the contrary set forth in the Agreement, Principal further consents to Ticketmaster furnishing the same statements to the NBA Parties to verify Ticketmaster's compliance with the NBA Agreement.

Chase Center Golden State Warriors LUA 06082019.docx

HIGHLY CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY AGREEMENT                    LNE22-000034525

DX-1494.0690

## Schedule 1 to EXHIBIT D

### PRINCIPAL CONTROLLED MEDIA DELIVERABLES

- Until TM+ (i.e., integrated single and resale Ticket inventory) is enabled on Ticketmaster.com and provided that resale inventory has been enabled on the NBA Ticketing Platform, Principal shall provide Ticketmaster a drop down link to a Ticketmaster Secondary Exchange in Principal's homepage navigation bar on each page of the Principal's section of the NBA.com network that includes such navigation bar;
- Each Contract Year, Ticketmaster shall have the opportunity to receive one (1) advertisement to appear run-of-site on Warriors.com for 250,000 impressions, which advertisement can be no larger than 40KB and shall be provided to Club in .gif or .jpg file format;
- Each Contract Year, Principal shall provide contextual links to the NBA Ticketing Platform on the schedule page of Principal's section of the NBA.com network and/or other relevant pages within Principal's section of the NBA.com network (e.g. schedule page "buy tickets" link or ticketing page "find tickets" link;
- Each Contract Year, Ticketmaster shall be the sponsor of one (1) page on Warriors.com.  Such page shall include a drop down link, a permanent link to a Ticketmaster site on the footer and links on the schedule page of Warriors.com or other pages as determined by Club in its sole discretion;
- Each Contract Year, Principal shall (a) include a mention of Ticketmaster in emails by Principal to subscribers of the "Warriors Insider" email distribution list where the primary purpose of such email is to drive ticket sales and (b) distribute one (1) dedicated email marketing Ticketmaster's services to subscribers of the "Warriors Insider" email distribution list.  The content of such email blasts to be as mutually agreed upon by the parties; and
- Each Contract Year, Principal shall include a mention of Ticketmaster in posts on various Warriors social media channels (i.e. Facebook, Twitter, Instagram) where the primary purpose of such email is to drive ticket sales;

Tracking and Reporting by Principal:
- Principal to use Ticketmaster created URLs with tracking built in on all digital assets in this Exhibit C.
- Principal to provide, by March 1st and August 1st during each Contract Year, reporting on assets in use.
- At its sole cost and expense, Ticketmaster shall have the right to independently audit the execution of all assets, and Principal agrees to reasonably cooperate with any such audit at no cost or expense to Principal.

35

Chase Center Golden State Warriors LUA 06082019.docx

HIGHLY CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY AGREEMENT

LNE22-000034526

DX-1494.0691

## Schedule 2 to EXHIBIT D

### TICKETMASTER INTEGRATED MEDIA

- Resale Tab on the EDP that will direct consumers to a Ticketmaster Secondary Exchange;
- Interactive Seat Map (ISM) advertisement on the EDP that appears once a consumer begins searching for seats on the ISM;
- "Limited Availability" module on the EDP that appears on a static seat map when seating sections are sold out or have limited inventory remaining; and
- Dynamic module that appears after a consumer's search for tickets from the applicable EDP generates a "No Tickets Found" (NTF) page search result on the TM.com Website (based upon the search parameters selected by such consumer), which dynamic module offers such consumer the opportunity to purchase alternative tickets through a Ticketmaster Secondary Exchange.

36

Chase Center Golden State Warriors LUA 06082019.docx

HIGHLY CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY AGREEMENT                    LNE22-000034527

**DX-1494.0692**

## EXHIBIT E1

### SPONSORSHIP ASSETS

Ticketmaster and Principal will mutually agree on a set of marketing and sponsorship assets, to position and promote Ticketmaster as the Official Ticketing Partner/Marketplace of the Chase Center and of the Golden State Warriors, including exclusive rights within the primary and secondary market ticketing business to use Principal's pre-approved official logos and marks in connection therewith. Additionally, Ticketmaster and Principal will mutually agree on an amount of Tickets to be used by Ticketmaster each Contract Year for GSW Attractions and Non-GSW Attractions. The value of the sponsorship benefits, media integration, branding rights, and Attraction Tickets to be provided by Principal shall be commensurate with the value of the Sponsorship Allowance.

37

Chase Center Golden State Warriors LUA 06082019.docx

HIGHLY CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY AGREEMENT

LNE22-000034528

**DX-1494.0693**

## EXHIBIT E2

## RESALE BEST PRACTICES

The following practices (the "Resale Best Practices") shall apply with respect to the operation of all secondary market resales of Tickets via any Ticketmaster Secondary Exchanges:

(a) Ticketmaster Secondary Exchanges shall be activated for Ticket postings for all preseason and regular season GSW Attractions upon the release of the season schedules, with links from the TM.com Website to such resale platforms prior to the initial On-Sale Date for any such GSW Attractions;

(b) TM+ shall be activated with a co-mingled landing state upon any pre-sale of Tickets or the initial On-Sale Date for all preseason, regular season and postseason GSW Attractions, as well as for all Non-GSW Attractions other than (i) those Non-GSW Attractions presented by a third party promoter who has elected to deactivate TM+ for all such events presented by such third party promoter at other venues and (ii) in certain other limited cases as mutually agreed upon by the parties;

(c) All Ticketmaster Secondary Exchanges shall be enabled for playoff games as soon as the Golden State Warriors position is clinched;

(d) All Ticketmaster Secondary Exchanges shall be enabled for all playoff rounds (all games) at once, even if all rounds are unconfirmed;

(e) For GSW Attractions which are not currently on sale, either (i) TM+ shall be enabled in an off-sale mode until the initial On-Sale Date, or (ii) such GSW Attractions shall be featured on the TM.com Website with use of the offsale EDP, with all applicable marketing modules and resale feeds available at that time;

(f) Ticketmaster Secondary Exchanges shall remain enabled for all GSW Attractions until the Attraction start time, or later (if possible);

(g) "Barcode Sync" (formally known as Archtics to "eibo" integration) shall be enabled upon Season Ticket holder activation or within twenty-four (24) hours of any TM Secondary Exchange activation;

(h) All Ticketmaster Secondary Exchanges shall remain active for all GSW Attractions through one (1) hour past Attraction start time;

(i) The TicketFast/print-at-home (i.e. PDF) method of Ticket delivery shall be eliminated as an option for Ticket purchasers for all Attractions;

(j) List codes will be allowed for trusted brokers on payment plans; and

(k) Principal shall not, without a commercially reasonable purpose as mutually agreed upon by the parties (for example, where other third party marketplaces selling secondary market tickets to Principal's Attractions are setting price floors), set any Ticketmaster Secondary Exchange price floors, and Ticketmaster shall have ability to set buyer and seller fees for all Ticketmaster Secondary Exchanges at its discretion, which may differ by Attractions or over time for the same Attractions.

Notwithstanding anything to the contrary set forth herein, the parties may mutually agree to update the list of Resale Best Practices prior to the start of any Contract Year, and such mutually agreed upon updated list shall apply for the Resale Best Practices to be met for each Contract Year thereafter, until such time as the parties may mutually agree on a further updated list of Resale Best Practices.

38

Chase Center Golden State Warriors LUA 06082019.docx

HIGHLY CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY AGREEMENT                LNE22-000034529

**DX-1494.0694**

EXHIBIT F

PLATINUM TICKETS AND VIP PACKAGES

1.    **Platinum Tickets and VIP Packages**

    (a)    **Definitions.**

        "Platinum Ticket" means any dynamically-priced Ticket that represents the most select category of seats for a non-GSW Attraction resulting from proximity to stage or other superior amenities as mutually determined by Principal and Ticketmaster which is sold by Ticketmaster on behalf of Principal (and not, for the avoidance of doubt, the artist/performing act or promoter of the applicable Attraction). Accordingly, "Platinum Tickets" exclude Tickets provided by Principal to the artist/performing act or promoter of the applicable Attraction as part of an "artist" or similar hold, to be sold or distributed by Ticketmaster on behalf of such third party. For the avoidance of doubt, where Principal designates such Tickets for the applicable promoter or artist of the Attraction to sell such Tickets pursuant to such promoter or artist's agreement with Ticketmaster (the "Artist/Promoter Platinum Agreement"), the settlement of any proceeds relating to such artist/promoter platinum Tickets shall be pursuant to the terms of the Artist/Promoter Platinum Agreement, and not the terms of this Agreement.

        "Platinum Ticket Fee" means a fee assessed by Ticketmaster against each Platinum Ticket purchaser in an amount equal to ████% (which incorporates a Payment Processing Fee in the same percentage amount as set forth in the Agreement with respect to standard Ticket sales) of the Platinum Ticket Price (excluding any applicable delivery and processing fees) for each Platinum Ticket sold by Ticketmaster via the TM.com Website. Additionally, Ticketmaster shall charge Principal a "Platform Fee" in the amount of ████████ (████ of the Platinum Ticket Price (excluding any applicable delivery and processing fees), which shall be deducted from the Platinum Proceeds as an Inside Charge prior to settlement. The Platinum Ticket Fee and the Platform Fee payable to Ticketmaster in connection with each sale of a Platinum Ticket shall be in lieu of any per Ticket Convenience Charge or Inside Charge otherwise due Ticketmaster under this Agreement in respect of standard Ticket sales.

        "Platinum Ticket Price" means the total price a purchaser pays for a Platinum Ticket sold via the TM.com Website, but exclusive of the Platinum Ticket Fee. The Platinum Ticket Price shall initially be established by Principal in consultation with Ticketmaster, and any subsequent adjustments to the Platinum Ticket Price shall be administered in accordance with parameters accepted by Principal in advance.

        "Platinum Proceeds" means the Platinum Ticket Price collected by Ticketmaster, which, for the avoidance of doubt, shall not include the Platinum Ticket Fee.

        "VIP Package(s)" means Ticket packages which entitle the purchaser of the Ticket to additional benefits to be fulfilled solely by Principal (and not, for the avoidance of doubt, the artist or performing act of any Attraction), including but not limited to, access to unique experiences surrounding the Attraction and/or unique merchandise.

        "VIP Package Fee" means a fee assessed by Ticketmaster in the amount of 14.8% (which incorporates a Payment Processing Fee in the same percentage amount as set

39

Chase Center Golden State Warriors LUA 06082019 docx

HIGHLY CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY AGREEMENT                    LNE22-000034530

DX-1494.0695

forth in the Agreement with respect to standard Ticket sales) of the VIP Package Price, which amount shall be charged to the VIP Package purchaser.

"VIP Package Price" means the total price of the VIP Package paid by the purchaser as set by Principal, inclusive of the Face Value of the Ticket and applicable taxes, but exclusive of the VIP Package Fee.

"VIP Package Proceeds" means the VIP Package Price, which, for the avoidance of doubt shall not include the VIP Package Fee.

(b)    **Platinum Tickets.**

(i)    Platinum Ticket Set-Up Information. Principal will provide Ticketmaster with notice of its desire to have Ticketmaster enable a Platinum Ticket offer for any applicable Attraction, and shall provide Ticketmaster with required Set-Up Information in respect of such offer so that Ticketmaster may set up the offer for sale through the TM.com Website.

(ii)    Platinum Ticket Fulfillment. Ticketmaster shall fulfill Platinum Ticket orders in the same manner as standard Tickets through Ticketmaster's ordinary distribution channels as requested by the purchaser.

(iii)    Platinum Ticket Settlement. Ticketmaster shall pay Principal the Platinum Proceeds, less the Platform Fee, for each Platinum Ticket sold by Ticketmaster during a calendar week along with the settlement of Ticket Receipts for the applicable week. Except as provided otherwise in the immediately preceding sentence, such settlements shall be made in accordance with and subject to the accounting and refund procedures set forth in this Agreement.

(iv)    Platinum Ticket Fee Royalty. Principal shall be entitled to receive from Ticketmaster a royalty in the percentage amount of: ▮▮▮▮▮▮▮▮▮▮ with respect to each Platinum Ticket Fee received (and not refunded or subject to chargeback) by Ticketmaster. Notwithstanding the above, Payment Processing Fees, delivery fees, processing fees, and taxes (in each case, if any) related to any Platinum Ticket Fee shall be deducted from the Platinum Ticket Fees before the Platinum Ticket Fee royalties are calculated. Neither party makes any representation that any specific number of Platinum Tickets nor any amount of Platinum Ticket Fee royalties shall be available in connection with any Attraction for which the sale of Platinum Tickets has been enabled. Platinum Ticket Fee royalties shall be paid to Principal during a calendar week along with the settlement of Ticket Receipts for the applicable week.

(c)    **VIP Packages.**

(i)    VIP Package Offer Information. Principal will provide Ticketmaster with reasonable advance written notice of its desire to have Ticketmaster enable a VIP Package, which notice shall include an accurate and complete description of the VIP Package content, applicable dates for the sales campaign, and any other information reasonably requested by Ticketmaster (the "Offer Information"). Notwithstanding anything to the contrary, Ticketmaster shall not be obligated to offer a VIP Package for an Attraction if, in the reasonable discretion of Ticketmaster, the VIP Package is not appropriate for sale via the TM.com Website. Ticketmaster and Principal will work together to develop appropriate messaging appearing on the TM.com Website to inform all purchasers of VIP Package elements and benefits. Ticketmaster shall have final control over any and all messaging on the TM.com Website, and

40

Chase Center Golden State Warriors LUA 06082019.docx

reserves the right to reject any messaging proposed by Principal for any reason, including, without limitation, size constraints. Notwithstanding the foregoing, Ticketmaster shall have no responsibility or liability in the event that information (including Offer Information) provided to Ticketmaster by Principal relating to the VIP Package, is incorrect or incomplete, and Principal shall indemnify, defend and hold Ticketmaster's Indemnitees harmless from any and all claims, actions, damages, expenses (including court costs and reasonable attorneys' fees), obligations, losses, liabilities and liens, imposed on, incurred by, or asserted against Ticketmaster's Indemnitees occurring as a result of, or in connection with the Offer Information.

(ii)     VIP Package Fulfillment.

(1)     Ticketmaster Responsibilities.  Ticketmaster will control access to the VIP Package by distributing to each applicable purchaser a unique barcode which will allow the purchaser to redeem the VIP Package elements from Principal at the Attraction. Ticketmaster shall be responsible solely for enabling a barcode for each Purchaser to use to redeem the VIP Package elements, together with instructions for redemption (including (i) that Principal is the party responsible for fulfilling the VIP Package elements, (ii) the time frames during which redeeming purchasers may redeem the VIP Package elements, and (iii) the relevant Principal customer service contact information for purposes of handling customer support issues relating to such redemption).  Ticketmaster shall be responsible for customer service inquiries relating solely to enabling the barcode.

(2)     Principal Responsibilities.  Principal shall allow purchasers to redeem the VIP Package elements at the Facility.  Principal shall be responsible for performing all fulfillment, redemption and delivery obligations, and customer service related to all fulfillment and delivery of VIP Package elements, and all costs associated therewith, and shall indemnify, defend and hold Ticketmaster's Indemnitees harmless from any and all claims, costs (including court costs and reasonable attorneys' fees), liabilities, obligations, losses, liabilities and liens related to, or occurring as a result of or in connection with, fulfillment, redemption and delivery of the VIP Package elements.

(iii)     VIP Package Settlement.

(1)     Ticketmaster shall pay Principal the VIP Package Proceeds for each VIP Package sold by Ticketmaster during a calendar week along with settlement of Ticket Receipts for the applicable week.  Notwithstanding anything to the contrary, Principal shall not receive any payment, nor shall a sale be deemed to have been made, if any VIP Package is the subject of a chargeback or for which Ticketmaster refunds the Ticket portion of the VIP Package.

(2)     Principal agrees that it shall be responsible for all refunds related to the VIP Package elements, and to the extent Ticketmaster receives any VIP Package element refund requests, Ticketmaster shall refer the purchaser to a customer service number provided by Principal to Ticketmaster for such customer service issues.  In no event shall Ticketmaster be liable for a refund of the VIP Package elements.  In addition, Principal shall be responsible for all Chargebacks related to the VIP Packages, and Ticketmaster shall have the right to deduct amounts due for Chargebacks from the VIP Package Proceeds otherwise payable by Ticketmaster to Principal.  In the event such VIP Package Proceeds are inadequate to cover actual Chargebacks, Principal shall be responsible for, and shall refund to Ticketmaster within ten (10) days of Ticketmaster's written notice all amounts related to all Chargebacks of VIP Packages sold by Ticketmaster.

41

Chase Center Golden State Warriors LUA 06082019.docx

HIGHLY CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY AGREEMENT                    LNE22-000034532

(3)     Principal and Ticketmaster shall each be responsible for remitting any applicable taxes on the amounts such party retains from the sale of VIP Packages.

(iv)     VIP Package Fee Royalty.  Principal shall be entitled to receive from Ticketmaster a royalty in the percentage amount of: ███████████ with respect to each VIP Package Fee received (and not refunded or subject to chargeback) by Ticketmaster. Notwithstanding the above, Payment Processing Fees, and taxes (in each case, if any) related to any related to any VIP Package Fee shall be deducted from the VIP Package Fees before the VIP Package Fee royalties are calculated. Neither party makes any representation that any specific number of VIP Packages nor any amount of VIP Package Fee royalties shall be available in connection with any Attraction for which the sale of VIP Packages has been enabled. VIP Package Fee royalties shall be paid to Principal during a calendar week along with settlement of Ticket Receipts for the applicable week.

42

Chase Center Golden State Warriors LUA 06082019.docx

HIGHLY CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY AGREEMENT                    LNE22-000034533

**DX-1494.0698**

**Form W-9**
(Rev. October 2007)
Department of the Treasury
Internal Revenue Service

**Request for Taxpayer
Identification Number and Certification**

Give form to the requester. Do not send to the IRS.

Name (as shown on your income tax return)

Business name, if different from above

Check appropriate box: ☐ Individual/Sole proprietor  ☐ Corporation  ☐ Partnership
☐ Limited liability company. Enter the tax classification (D=disregarded entity, C=corporation, P=partnership) ▶ ........
☐ Other (see instructions) ▶

☐ Exempt payee

Address (number, street, and apt. or suite no.)

Requester's name and address (optional)

City, state, and ZIP code

List account number(s) here (optional)

**Part I    Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. The TIN provided must match the name given on Line 1 to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see How to get a TIN on page 3.

Note. If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

Social security number

or

Employer identification number

**Part II    Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. citizen or other U.S. person (defined below).

Certification instructions. You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. See the instructions on page 4.

Sign Here    Signature of U.S. person ▶         Date ▶

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

### Purpose of Form

A person who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income.

Note. If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

Definition of a U.S. person. For federal tax purposes, you are considered a U.S. person if you are:

● An individual who is a U.S. citizen or U.S. resident alien,

● A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States,

● An estate (other than a foreign estate), or

● A domestic trust (as defined in Regulations section 301.7701-7).

Special rules for partnerships. Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax on any foreign partners' share of income from such business. Further, in certain cases where a Form W-9 has not been received, a partnership is required to presume that a partner is a foreign person, and pay the withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid withholding on your share of partnership income.

The person who gives Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States is in the following cases:

● The U.S. owner of a disregarded entity and not the entity,

Cat. No. 10231X    Form **W-9** (Rev. 10-2007)

43

Chase Center Golden State Warriors LUA 06082019.docx

HIGHLY CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY AGREEMENT        LNE22-000034534

**DX-1494.0699**