DX-1494(21)

Bates: LNE-LIT24-001678668 - LNE-LIT24-001678729

Licensed User Agreement between Ticketmaster and KSE Ticketing, LLC

# LICENSED USER AGREEMENT

THIS LICENSED USER AGREEMENT ("Agreement") is entered into as of May 17th, 2022 and is made effective as of July 1, 2021 ("Effective Date"), by and between Ticketmaster L.L.C., a Virginia limited liability company ("Ticketmaster"), and KSE Ticketing, LLC, a Colorado limited liability company ("Principal"). This Agreement consists of this Licensed User Agreement, and any Exhibits and Schedules attached hereto which are incorporated herein by this reference. The meanings of all capitalized terms used in this Agreement are set forth in Section 16 hereof. In consideration of the mutual promises and covenants set forth herein, the parties hereby agree as follows:

1.      **TERM**:  The term of this Agreement shall begin on July 1, 2021 and continue through June 30, 2031 unless terminated earlier pursuant to this Agreement (the "Term"). Each twelve (12) month period commencing on July 1 and continuing through the following June 30 shall be a "Contract Year" as such term is used herein.

2.      **TICKET SALES RIGHTS; EXCLUSIVITY**:

(a)      **Grant of Rights**:  Except as otherwise expressly provided in Section 2(b), Principal hereby grants to Ticketmaster, and Ticketmaster accepts from Principal, the right during the Term of this Agreement, to be the exclusive seller, as an agent for the Attractions, of all Tickets for the Sellable Capacity for every Attraction via any and all means and methods, including on the Internet, by telephone, computer, IVR, outlets, television, clubs, auctions, VIP packages, presales, upsells, or by any other means of distribution, whether existing now or at any time in the future.  Principal shall ensure that the entire Sellable Capacity for every Attraction shall be made available for distribution on the TM System in accordance with the terms and conditions of this Agreement.

(b)      **Sales by Principal**:  Notwithstanding anything to the contrary contained herein, but subject to the terms of Section 2(c), Principal retains the right to: (i) sell single Tickets from the Facility Box Office to persons physically present at the Facility Box Office; (ii) sell Season/Contract Tickets (excluding consignment sales to any party other than a Distribution Partner); (iii) conduct Group Sales of Tickets; (iv) provide a reasonable number of House Seats for any Attraction (which House Seats shall include all suites unless designated by Principal in its sole discretion from time to time); (v) permit third party distribution partners ("Ticketmaster Nexus Partners"), pursuant to agreements then in effect with Ticketmaster or otherwise approved by Ticketmaster from time to time, to sell Tickets to Attractions; and (vi) sell suites in its sole discretion throughout the Term.

(c)      **No Third Party Systems or Services**:  Except as provided in Section 2(b)(ii) (with respect to consignment sales of Season/Contract Tickets to a Distribution Partner) and 2(b)(v) (with respect to Ticketmaster Nexus Partners, Principal shall not directly or indirectly use, sponsor, promote, advertise, authorize or permit the use of any third party ticketing provider, seller, company or platform that promotes, engages in or facilitates the sale, resale or issuance of tickets for Attractions except as permitted in accordance with Exhibit C.  Notwithstanding the foregoing, the parties acknowledge and agree that certain Ticket purchasers may resell their Tickets, including participants in the Sports Distribution Program (as defined on Exhibit C), and such resales shall not constitute a violation of this Agreement.

1

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

**DX-1494.0944**

(d)    **No Minimum Sales**: It is agreed and understood that neither Ticketmaster nor Principal guarantees or will guarantee that any minimum or fixed number of Tickets will be sold through the TM System for any Attraction.

(e)    **Acknowledgement by Principal**:    Principal acknowledges that Ticketmaster acts as the agent of certain third parties that may be a direct or indirect competitor of Principal.  Principal also acknowledges that Ticketmaster has entered and may in the future (including during the Term of this Agreement) enter into new business relationships with other third parties, including those in the entertainment and sports industry, such as performers who perform at the Facility, for a variety of services.   Principal further acknowledges that any such sales or services or solicitations to provide such sales or services as contemplated under this subsection do not compete with Principal or conflict with this Agreement or Ticketmaster's rights, duties or obligations under this Agreement.

(f)    **Acknowledgement by Ticketmaster**:  Ticketmaster acknowledges that (i) Principal is acting as the agent of certain affiliated third parties that own or lease the Facilities; (ii) that the services performed hereunder are for Attractions to be held in or at the Facilities owned by such affiliates, and (iii) that each such affiliate is an intended third-party beneficiary of this Agreement.  A list of such affiliates in existence on the date hereof is attached hereto as Schedule 1.  Principal shall update such list from time to time, but the failure to have any affiliate specifically named on such exhibit shall not affect any affiliates rights to benefit from such services. In addition, Ticketmaster also acknowledges that Major League Soccer (MLS) has a lower division league associated with the Team that is not anticipated to play its home games at a Facility owned by an affiliate of Principal.  In such an instance, when this lower division MLS team is playing home games at a Facility not owned by an affiliate of Principal, tickets for these games may be sold using a third party ticketing system and this Agreement does not include any rights, benefits or privileges related to or in connection with such sales; provided, Ticketmaster shall have no obligation to integrate the TM System with such third party system.

3.    **COMPENSATION**:

(a)    **Ticketmaster Charges and Fees**:  In consideration for Ticketmaster's services provided hereunder as an agent of Principal, Ticketmaster shall be entitled to assess and receive charges and fees in the amounts set forth on Exhibit A, all of which charges and fees shall be assessed against consumers, except Archtics Transaction Fees, which shall be assessed against Principal. In the event applicable law prohibits the assessment of such fees against consumers, Ticketmaster and Principal shall agree on alternative means for Ticketmaster to receive compensation for its services in amounts reasonably comparable to those set forth in this Agreement, and as permitted by applicable law; provided that such alternate means do not have a material adverse economic impact on Principal in excess of the value of fees Ticketmaster would otherwise be entitled to under this Agreement absent such applicable law's application.

(b)    **Payment Processing Fees**:

(i)    Sales by Ticketmaster:  With respect to Tickets purchased from Ticketmaster with credit cards, debit cards, gift cards or any other methods of payment, the payment authorization and processing fees ("Payment Processing Fees") shall be passed on to Principal at the rates set forth on Exhibit A, which percentage rates shall be deducted by Ticketmaster from the Ticket sales proceeds, or, at Principal's option from time to time, upon

2

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL                                                                                    LNE-LIT24-001678669

notice to Ticketmaster, the Convenience Charge may be adjusted to include Principal's portion of such Payment Processing Fees, provided that the Convenience Charge will be rounded up to the nearest $0.05.

(ii) Principal Sales Using TM Charge: In connection with Principal's sales of Tickets utilizing electronic payments and authorized via TM Charge using either Visa or MasterCard, Ticketmaster's credit card processor ("Processor") shall deduct the merchant fees in an amount set forth on Exhibit A for transactions processed on a daily basis. The fees charged to Principal for use of TM Charge are subject to automatic increases equal to any actual increases in Ticketmaster's Processor fees as verified by Ticketmaster to Principal in writing. Principal shall also be responsible for any and all other amounts charged to Ticketmaster (if any) by a Processor for processing Principal's transactions, including, without limitation, Chargebacks (to the extent set forth in Section 8(c) below), fraudulent credit card use and additional charges for failure to meet the specific timing or other qualifications of the applicable credit card association or company. In the event that Principal desires to process any credit or debit cards other than Visa or MasterCard utilizing TM Charge, then the fees for such service shall be mutually agreed upon by Principal and such credit card companies, and Principal shall enter into its own merchant agreement with such credit card companies.

(c) **Compensation to Principal**:

(i) Sponsorship Allowances. Ticketmaster shall pay to Principal the following sponsorship allowances each Contract Year of the Term (collectively, the "Sponsorship Allowances"):

(x) an annual sponsorship allowance in the amount of ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ per Contract Year (subject to escalation in the amount of ▮▮▮▮▮▮▮▮ per Contract Year) to advertise and promote Ticketmaster as the source for the sale of all primary inventory Tickets to the Attractions (the "Primary Sponsorship Allowance"); and

(y) an annual sponsorship allowance in the amount of ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ Contract Year (subject to no annual escalation) to advertise and promote the TM Secondary Exchanges further described in Exhibit C attached hereto (the "Resale Sponsorship Allowance").

The Sponsorship Allowances shall be payable within thirty (30) days of the first day of each Contract Year during the Term of this Agreement. In exchange for the Sponsorship Allowances, Principal shall provide Ticketmaster a set of marketing assets, Season/Contract Tickets (including regular and post-season game Attractions and equivalent Tickets for non-Team Attractions), links, integrations and marketing designations, in each case, to be mutually agreed upon by the parties, which is equivalent in value to the total amount of the Sponsorship Allowances. With respect to designations, Ticketmaster shall have the exclusive right to refer to itself as the "Official Ticket Marketplace", "Official Ticketing Provider", "Official Event Ticket Access/Ticket Security Technology Provider", "Official Resale Marketplace", "Official Mobile Ticket Partner", "Official Ticket Platform", in each case, of each Facility and/or Team, and such other related designations as shall be approved by Principal from time to time in its reasonable discretion. In exchange for the Resale Sponsorship Allowance, Principal further agrees to the application of the Resale Best Practices described in Exhibit C. In the event that the Agreement terminates for any reason prior

3

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL

LNE-LIT24-001678670

**DX-1494.0946**

to the conclusion of any Contract Year during the Term for which Principal has received the Sponsorship Allowances, then Principal shall return to Ticketmaster, within thirty (30) days of such termination, a pro rata portion of the Sponsorship Allowances received for such Contract Year, based on the number of months of the applicable Contract Year remaining following such early termination date.

Notwithstanding anything to the contrary contained in this Agreement, in the event that fewer than eighty-two (82) NBA and NHL Team Attractions are held at the Ball Arena Facility in any Contract Year, unless any of the contemplated home games for either a NBA and/or NHL Team Attractions are played at another location either internationally or for example, the NHL game series in Lake Tahoe, California (the "Event Threshold"), including due to any Force Majeure Event (and for purposes of this provision, an NBA or NHL Team Attraction held at the Ball Arena Facility without a live audience in attendance or with a substantial reduction in seating capacity of at least eighty percent (80%) shall be treated as "non-held" Attractions), the Sponsorship Allowances due for such Contract Year shall be reduced ███████████████ , based on the number of NBA and NHL Team Attractions by which the Event Threshold exceeds the actual number of such Attractions held at the Facility during such Contract Year. For example, if a total of fifty (50) NBA and NHL Team Attractions are held at the Ball Arena Facility during a particular Contract Year, or thirty-two (32) Attractions less than the Event Threshold, the Sponsorship Allowances for such Contract Year shall be reduced by ███████████████████████████████████████████ ██████████ Principal shall refund any portion of the Sponsorship Allowances for the applicable Contract Year already paid by Ticketmaster to the extent such amount exceeds the reduced Sponsorship Allowance amount due for such Contract Year, such refund to be made within thirty (30) days of the conclusion of the applicable Contract Year. Any return of any portion of the Sponsorship Allowances by Principal shall be by wire transfer or certified check. Notwithstanding anything to the contrary set forth herein, it is expressly understood that if any Facility is undergoing a renovation or similar construction project which results in a reduction in the Sellable Capacity of Attractions held at such Facility during such renovation or construction, the Sponsorship Allowances for any Contract Year occurring during such renovation or construction shall not be affected by such project due solely to such reduction in Sellable Capacity unless the Sellable Capacity at such Facility is reduced by more than forty percent (40%) over the Sellable Capacity in effect at such Facility prior to the renovation/construction project.

        (ii)    Technology Allowance. Ticketmaster shall pay Principal a one-time allowance ("Technology Allowance") in the amount of ██████████ for the purchase of certain equipment and technology for Principal's use at each Facility in connection with the subject matter of this Agreement. The equipment and technology purchased with the Technology Allowance by Principal shall be owned and maintained by Principal and shall not be deemed "Hardware" for any purposes of this Agreement.

        (iii)    IOMEDIA Virtual Venue; Product Credit. Ticketmaster will, at no charge to Principal, cause its subsidiary/division IOMEDIA to develop, for Denver Nuggets and Colorado Avalanche, a 3D model of the Facility utilizing Virtual Venue services for various technological applications and platforms, including desktop, iPad, and mobile phones. In addition, Ticketmaster will provide Principal with a maximum $██████ product credit bank from the broader KSE consolidated product credit bank, to be used by Principal to activate and use Ticketmaster premium analytics and performance marketing services on behalf of Principal's tenants and affiliates, and/or for Virtual Venue updates throughout the Term based on

4

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

**DX-1494.0947**

configuration changes for the Nuggets and Avalanche, consistent with the teams' then-existing configuration.

### 4.    <u>LICENSE AND USE OF HARDWARE AND SOFTWARE</u>:

(a)    <u>**License**</u>:  Ticketmaster hereby grants Principal a non-exclusive, non-transferable license to use the Hardware and Software (collectively, the "License") in exchange for the fees set forth herein.

(b)    <u>**Use**</u>:  The Hardware and Software and all related materials may only be used by Principal in connection with the Attractions and only with systems used, operated and owned by Ticketmaster, and only for the purposes stated in this Agreement, and may not be utilized by or in connection with services, software, hardware or systems provided or supplied by any third party except as permitted under Section 4 (d)(ii).  Principal shall use the Hardware and Software in a careful and proper manner in accordance with instructions and materials provided by Ticketmaster and shall comply with and conform to all federal, state, county, municipal and other laws, ordinances and regulations in any way relating to the possession, use or maintenance of the Hardware and Software including, but not limited to, federal, state or other laws applicable to commercial emails. Principal may make a single copy of Archtics only to be used for archival or backup purposes; **COPYING FOR ANY OTHER PURPOSE IS PROHIBITED**. Except as otherwise provided in the immediately preceding sentence, Principal hereby agrees: (i) not to permit copying or reproduction of the Hardware or Software in any manner, including without limitation, use in a sharing arrangement or transmission over the Internet or over e-mail and similar electronic transmission; (ii) not to disassemble, re-manufacture, repair, re-configure, enhance, upgrade, modify, translate, adapt, create derivative works from or of, decompile or reverse engineer the Software in any way nor merge them into any other program for any purpose; (iii) not to transfer, license or sub-license, assign, rent, sell, grant, publish, disclose, display, dispose of or otherwise make available the Software, or any rights therein or copies or derivatives thereof, including other templates or working systems; (iv) not to delete, remove, change or otherwise alter any trademarks, copyright notices or other proprietary marks in or on the Hardware or Software, or any copies, modifications or partial copies thereof; (v) not to "hack," or attempt to "hack," any of the Software, the servers on which the Software is hosted or any other portion of the Ticketmaster network, or otherwise attempt to circumvent, or navigate outside of, the borders of such Software servers in any manner whatsoever; and (vi) not to perform any SQL database operations other than "SELECT" for any system production tables (i.e., tables starting with dba.t_<wildcard>) from any non-Archtics interface to the database (e.g., ISQL, Access, Crystal Reports, etc.).

(c)    <u>**Passwords**</u>:  Principal agrees that use of the TM System by Principal shall be restricted to a reasonable number of Principal's personnel having passwords in the event that Ticketmaster assigns such passwords.  Such passwords shall not be transferable without the written permission of Ticketmaster, which permission shall not be unreasonably delayed or withheld.  Upon Ticketmaster's reasonable written request, Principal (i) shall identify, as the case may be, the users (by name, position and site address), who use or view the TM System or from where the TM System is used, and (ii) shall cooperate with Ticketmaster to investigate any suspected misuse of the TM System.

(d)    <u>**TM Charge**</u>:

5

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL                                                                                          LNE-LIT24-001678672

**DX-1494.0948**

(i)     Use and Operation of TM Charge: Ticketmaster shall transmit data relating to Ticket sales made by Principal using TM Charge to Ticketmaster's credit card processor, provided Ticketmaster has received Principal's merchant number(s) and other necessary information for Ticketmaster to use for the transmission of sales data.  Principal shall be responsible for promptly notifying Ticketmaster and Processor, if applicable, of any changes to the information provided pursuant to this Section.  Processor will then transmit such data to the applicable credit card company for payment to Principal, subject to Principal having entered into the applicable Principal Processor Agreements (as further described below).   Principal and Ticketmaster shall each comply with all applicable credit card association or company guidelines (e.g. swiping all retail transactions and using customer address information for all non-face-to-face transactions). Ticketmaster shall provide Principal with daily transaction reports regarding authorized and settled transactions in Ticketmaster's standard reporting format for Ticketmaster clients.  Principal shall review, on a reasonably regular basis, all reports provided to Principal by Ticketmaster.  Principal also agrees that, for operational and monitoring purposes, the Processor may provide Ticketmaster with processing and settlement reports related to sales of Tickets using TM Charge.

(ii)     Effect of Termination of Ticketmaster's Processor Agreement: Ticketmaster has entered into an agreement with the Processor (the "Processor Agreement"), and Principal agrees to enter into an agreement with such Processor (the "Principal Processor Agreement") as soon as practicable after the date of this Agreement.  The Principal Processor Agreement shall provide that if the related Processor Agreement expires or terminates, then the Principal Processor Agreement shall also expire or terminate without any early termination penalties or charges.  In order to facilitate streamlined credit card authorization processing for Ticketmaster and its clients, Ticketmaster continues to seek to maintain relationships with superior processors throughout the Term of this Agreement.  In the event that Ticketmaster elects to use a different Processor, Principal shall enter into an agreement with such new Processor if Principal desires to continue utilizing TM Charge, it being acknowledged and agreed by Principal, however, that use of certain Software (e.g., AccountManager) may require utilization of TM Charge.

(e)     **Principal's Website/Interface Page**: Beginning on or shortly after the execution of this Agreement but in any event no later than sixty days following the execution of this Agreement, and subject to the completion of the installation of Archtics, Ticketmaster will develop the Interface Page that will enable Principal's Subscribers to access their account information and conduct "real-time" transactions by linking to the Interface Page from the Principal's Website.  The Interface Page may contain a short, related textual description of AccountManager features and shall contain Ticketmaster's designated wording and graphic depiction thereof, currently "by Ticketmaster."

(f)     **Group Sales Restrictions**:  All Group Sales must comply with the definition of Group Sales hereunder.  In the event that Ticketmaster confirms that a Group Sale is not a valid Group Sale, Ticketmaster shall have the right to assess against Principal the amount of fees that Ticketmaster would otherwise have been entitled to assess under this Agreement with respect to any such Tickets had they been purchased through Ticketmaster as single Tickets, and not from Principal as a Group Sale.

(g)     **Hosted Platform**: During the Term, Ticketmaster shall host the Software and provide and maintain the Hosted Platform on which the Software will be installed and run,

6

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL                                                                                    LNE-LIT24-001678673

**DX-1494.0949**

including provision of the physical environment including physical security, HVAC and power for the required server hardware for the Hosted Platform and the Software. Ticketmaster will also provide access via certain Internet connectivity, by being responsible for network operation and availability from the public Internet up to the termination cables at the network interface card on the server hardware for the Hosted Platform. Ticketmaster will not be responsible for power at the Facility or Principal's connectivity to the Internet.

(h)    **TM Secondary Exchanges**. The terms and conditions set forth in Exhibit C attached hereto shall apply in connection with the operation of the TM Secondary Exchanges for the Attractions.

(i)    **TM1 Engagement**. At Principal's optional election upon written notice (email sufficing) to Ticketmaster, Ticketmaster shall provide Principal with use of an email permission marketing tool which shall be powered by a third party enterprise-level interactive software and marketing provider, and which shall be integrated with the TM System ("TM1 Engagement") in accordance with the terms and conditions set forth in Exhibit D attached hereto. The parties acknowledge and agree that "Software" as such term is used in the Agreement shall not be deemed to incorporate TM1 Engagement, it being understood that TM1 Engagement is a third party software solution. For the avoidance of doubt, the terms and conditions set forth in Exhibit D attached hereto shall not apply unless and until Principal provides written notice (email sufficing) to Ticketmaster electing to activate TM1 Engagement.

(j)    **Presence and Related Hardware**. Ticketmaster shall provide Principal with the use of Ticketmaster's proprietary access management system ("Presence") and certain Presence related equipment identified in Exhibit B attached hereto which, among other things, enables the use of non-barcoded Tickets and allows for the identification of individual attendees accessing an Attraction (as opposed to the original Ticket purchasers only).

(k)    **Platinum Tickets and VIP Packages**: The terms and conditions set forth in Exhibit E attached hereto shall apply in connection the sale of platinum Tickets and VIP Packages.

5.    **INSTALLATION AND SET-UP AT EACH FACILITY**:

At each Facility, as applicable:

(a)    **Infrastructure and Installation:** Ticketmaster will install the Hardware furnished by Ticketmaster, and provide Principal with access to the Software. Principal will provide (i) a redundant connectivity solution between the Facility and Ticketmaster's central computer facility for interfacing that satisfies Ticketmaster's minimum system requirements (which minimum requirements shall be provided in advance by Ticketmaster to Principal from time to time in writing), and (ii) unless otherwise agreed to between the parties, any type of equipment and technology necessary to assist Ticketmaster in completing the installation of such Hardware or Software. Ticketmaster shall have no responsibility for any internal wiring or cabling (e.g., electrical, data lines, etc.) necessary for installation, operation or for proper functioning of the TM System at the Facility.

(b)    **Attraction Set-Up**: In order to effectively utilize Ticketmaster's distribution technologies, within a reasonable time before (but in no event less than the time period described

7

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL

LNE-LIT24-001678674

below) the scheduled on-sale date of Tickets for each Attraction (the "On-Sale Date"), Principal shall furnish Ticketmaster with all necessary information with respect to the Attraction, including, without limitation, seating layout of the Facility, Ticket structure, discounts permissible, Attraction Taxes, any information necessary to calculate Attraction Taxes, if applicable, Ticket header information, logos, entry information, vision and hearing information, wheelchair and other accessible seating information and such other information as is necessary for the proper sale of Tickets (collectively, the "Set-Up Information").  The parties intend that all accessible seating Tickets that are available for sale to persons desiring accessible seating shall be made available for sale on the TM System and such accessible seating Tickets shall only be released into the general pool of Tickets in compliance with laws applicable to accessible seating.  Principal must provide the Set-Up Information to Ticketmaster at least five (5) business days prior to the On-Sale Date for new Attractions that do not utilize seating charts then existing in the TM System and at least three (3) business days prior to the On-Sale Date for new Attractions that utilize seating charts then existing in the TM System.  Ticketmaster shall have no responsibility for the accuracy of any Set-Up Information furnished by Principal pursuant hereto but is responsible for any errors in the Set-Up Information caused by Ticketmaster.

(c)    **Facility Box Office Will-Call Services**:  At all times during the Term of this Agreement, Principal shall maintain a designated Facility Box Office location for the pick-up of Tickets purchased through Ticketmaster distribution channels.  The pick-up location shall be open during the normal hours of operation of the Facility Box Office.  Principal shall notify Ticketmaster of Principal's will-call capabilities and will-call Facility Box Office hours.  Principal shall verify the identity of each person picking up Tickets at will-call via a valid photo identification (government issued) and the credit card used in the Ticket sales transaction.  Principal shall not release Tickets to any customer whose identity has not been so verified.

(d)    **Supplies**:    Principal shall be responsible for maintaining adequate nondurable operational supplies used at the Facility in connection with the operation of the Hardware and Software to assure continuous operations at the Facility.

(e)    **Ticket Stock**:  Ticketmaster shall be responsible for the security of Ticket stock in its possession prior to the delivery thereof to Principal or Principal's authorized representative, agent or employee. Principal shall be responsible for the security of Ticket stock in its possession, and the risk of loss of Ticket stock shall shift to Principal upon the delivery thereof to Principal or Principal's authorized representative, agent or employee.

6.    **MAINTENANCE AND SUPPORT AT EACH FACILITY**:

At each Facility, as applicable:

(a)    **Hardware and Software Maintenance and Support**:  Ticketmaster shall provide ordinary and routine maintenance and repair services and adequate support of the Hardware and Software at the Facility (including, without limitation, replacement of any defective or malfunctioning Hardware) to meet the reasonably anticipated service needs of Principal from time to time at no additional charge, provided that such maintenance, repair or support is not necessitated by the negligence or willful misconduct of Principal, its employees, agents or representatives.  Support services will be provided for critical system emergencies in accordance with the service support terms set forth on Exhibit F attached hereto.   Ticketmaster will not be obligated to continue to provide maintenance with respect to any version of any particular

8

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL                                                                                    LNE-LIT24-001678675

**DX-1494.0951**

Software hosted by Principal for more than one year after a release by Ticketmaster of an upgraded version of the same Software. Ticketmaster shall maintain an archive of Principal's Archtics database for up to two (2) years in the format of Principal's then current Archtics version.  Ticketmaster shall retain archives of Principal's Archtics database in excess of two (2) prior years in an offline form to be stored at Ticketmaster's data center, which prior archives shall not be updated to Principal's then current Archtics version; provided, that Ticketmaster shall extract data from such prior archives at Principal's request and deliver such data extracts to Principal.

      (b)    **Training of Principal's Employees**:  Principal shall staff the Facility Box Office with its employees for the proper operation of the TM System for Ticket sales made through the Facility.  Ticketmaster shall train, at its expense, Principal's employees who shall be reasonably necessary for the initial staffing of the Facility Box Office and for initial operation of the TM System for single ticket sales at the Facility.  Ticketmaster shall also provide additional training at its cost to other employees of Principal to the extent such training is necessary as a consequence of any changes initiated by Ticketmaster or any changes in Ticketmaster's method of operation.  To the extent of any change in personnel by Principal in connection with Facility Box Office sales requiring additional training beyond that initially contemplated hereunder, Principal agrees to absorb all of the commercially reasonable expenses (including any and all reasonable travel expenses) thereof, subject to a budget therefor approved by Principal.

      (c)    **Notification by Principal**:  In the event of any breakdown or malfunction in the operation of any of the Hardware or Software, or difficulties encountered in connection with access to any of the Software, Principal agrees to promptly notify Ticketmaster of any such breakdown, malfunction or difficulty to assist Ticketmaster in performing its obligations hereunder.

      (d)    **Access to Principal's Equipment and Data**:  Principal shall permit Ticketmaster, at Ticketmaster's sole discretion and expense and upon reasonable prior written notice, the right at a reasonable time to inspect Principal's pertinent sites and equipment (including any existing LAN or other network user monitor device) for the sole purpose of determining compliance with the terms of the License granted hereunder; *provided, however*, that Ticketmaster may not inspect Principal's pertinent sites and equipment on any day during which there will be an event at the applicable Facility without the prior written consent of Principal. Principal will provide Ticketmaster remote access to Principal's relevant installation, pertinent sites, equipment (including any existing LAN or other network user monitor device) upon reasonable written request and for a reasonable period of time and, to the extent permitted by applicable law, data related to the Hardware and Software through PC Anywhere in order to correctly diagnose faults in the equipment.  Failure to provide reasonable access may prohibit effective action by Ticketmaster and render Ticketmaster unable to proceed, and in such circumstances, Ticketmaster shall be under no liability for failure to perform its obligations hereunder.

      (e)    **Additional Archtics Services**:  With respect to initial implementation of Archtics, Ticketmaster shall also provide, at no additional cost to Principal, (i) on-site support from Ticketmaster's national or regional personnel, (ii) unique Archtics customization (e.g., diagrams, invoices, other executables, etc.), (iii) custom reporting, and (iv) customized on-line assistance (the services described in clauses (ii) through (iv) (which, for the avoidance of doubt, shall not include application programming interface ("API") related services as described in subsection (f) following) are referred to herein as "Customization Services".)  Up to two hours of Customization

9

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL

LNE-LIT24-001678676

**DX-1494.0952**

Services each week are included in the annual maintenance fees of Archtics listed on Exhibit A. Customization Services requested by Principal in excess of this level of support shall be charged to Principal in accordance with Ticketmaster's standard rates.

      (f)    **Ticketmaster API**.  At Principal's optional election upon written notice to Ticketmaster, Ticketmaster shall provide access and support to its existing API commands, data structures, protocols and other frameworks (the "Ticketmaster APIs"), subject to its standard program terms.  Principal may use the Ticketmaster APIs to build mutually agreeable software and/or applications containing business intelligence and pricing, fan experience, customer relationship management, and customer loyalty type functions to run on Principal's products, devices and/or services.  As part of the Ticketmaster API program set-up, Ticketmaster shall provide Principal with documentation describing how to use Ticketmaster API build, compile and deploy tools.  Ticketmaster shall also provide, at no additional cost to Principal, (i) up to two (2) total hours of technical phone support prior to Ticketmaster API program set-up, and (ii) up to one (1) hour of technical phone support per week (but no more than eight (8) total hours of such support during the Term) after Ticketmaster API program set-up. Any additional API support to be provided shall be subject to Ticketmaster's consent and at Ticketmaster's standard rate of $▮▮▮ per hour. Ticketmaster owns all rights, titles, and interest in and to the Ticketmaster APIs (and any Ticketmaster API related documentation or data made available by Ticketmaster to Principal under this subsection), and any Intellectual Property rights therein and thereto, and Principal has no ownership interest therein.

      7.    **ADVERTISING:**

      (a)    **Advertising on Tickets Fulfilled at Facility Box Office**:  For tickets fulfilled by Principal at the Facility Box Office, Principal may, at its sole discretion: (i) contract with the applicable naming rights partner for custom ticket stock and ticket envelopes; or (ii) have Ticketmaster provide, at Ticketmaster's own cost, Ticketmaster's standard ticket stock and ticket envelopes in which case Ticketmaster shall have the right to sell advertising on such ticket stock and ticket envelopes.

      (b)    **Ticketmaster Advertisements**:  Principal hereby grants to Ticketmaster the right, in Ticketmaster's sole discretion, to advertise, in any medium determined by Ticketmaster, including on the TM.com Website or affiliated websites, Attractions and the availability of Tickets at the Facility Box Office and via Ticketmaster distribution channels, and the availability of the Software and, in connection therewith, to use the name and logo of Principal, the Attraction, the Facility and all other information respecting the Attractions, subject to the pre-approval of Principal.  Principal further grants to Ticketmaster the right, in its sole discretion, to use the name and logo of Principal and Principal's Website address on the Interface Page. Notwithstanding anything contained in this Agreement to the contrary, in no event shall Ticketmaster's advertisements on the Interface Page (i) include competitors of advertisers, sponsors or promoters of Principal, the Attraction or the Facility for which Principal has provided written notice to Ticketmaster reasonably in advance or (ii) identify an endorsement by, or sponsorship or advertising relationship with, Principal, the Attraction or the Facility.

      (c)    **Principal Advertisements**:  Subject to Section 2 of this Agreement, Principal may, during the Term hereof, provide and place advertisements in any form of media which Principal shall desire to promote the availability of Tickets.  Principal shall cause the

CONFIDENTIAL        LNE-LIT24-001678677

Attractions' Websites to deeplink to specified web page(s) within the applicable TM.com Website where ticket purchasers can begin the process of purchasing Tickets to Attractions

        (d)    **Ticketmaster Client Style Guide**:  The look and feel of any and all links from Principal's Website to the Interface Page or the applicable TM.com Website are to be mutually agreed upon by the parties in good faith.  Principal shall comply with all terms and conditions of Ticketmaster's Client Style Guide, as it may be reasonably updated from time to time and with prior written notice to Principal.

        (e)    **Advertising Revenue**:  Ticketmaster and Principal shall separately receive and retain their respective income derived from advertising which each is entitled to sell under subsections (a), (b) and (c) above.

        (f)    **Banner Ads**:  Neither Principal nor Ticketmaster will serve banner ads or other promotional ad units of any kind or allow any third party to serve any such ad units on the Interface Page, without the other party's prior consent.

8.    **ACCOUNTING PROCEDURES**:

        (a)    **Payments by Ticketmaster**:  Principal hereby authorizes Ticketmaster and the financial institution(s) indicated below ("Bank") to deposit all settlement funds payable to Principal hereunder in the account listed below (such account(s), "Principal's Account"):

Financial Institution (Name of Bank): _____

Account Type: _____

Account Number: _____

Bank ACH Transfer Number: _____

Branch Address: _____

                     _____

                     _____

Branch Phone Number: _____

Ticketmaster shall collect all Ticket Receipts derived from Ticket sales made by Ticketmaster and shall initiate payment of Ticket Receipts to which Principal is entitled on Friday of each week with each weekly payment to be on account of TM System Ticket sales for Attractions made by Ticketmaster during Monday through Sunday of the week preceding such payment date.  Initiation of the settlement payment to Principal's Account on a timely basis via direct deposit shall constitute full performance by Ticketmaster of its obligation to make such settlement payment to Principal or to any person whatsoever.  If funds to which Principal is not entitled are deposited into Principal's Account, Principal authorizes Ticketmaster to direct the Bank to return said funds.  Principal hereby releases Ticketmaster from liability for reasonable delays or errors beyond Ticketmaster's reasonable control.  In the event of an error, Principal also authorizes the initiation of a debit to Principal's Account to correct the error, provided the error is set forth in an updated written accounting statement delivered to Principal.  Each weekly settlement payment shall be accompanied by a written accounting.  Principal shall designate an email address for delivery of such accounting and information regarding Attractions and Ticket sales, and shall promptly notify Ticketmaster of any changes to such email address.  The direct deposit authorization provided herein shall remain in full force and effect until Ticketmaster has received written notification from

11

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL                                                  LNE-LIT24-001678678

**DX-1494.0954**

Principal of its termination in such time and such manner as to afford Ticketmaster a reasonable opportunity to act upon it.

(b)    **Cancelled Attractions; Refunds**:  In the event that any Attraction for which Ticketmaster sold Tickets is cancelled, postponed, or modified (e.g., substitute acts) for any reason (each, a "Cancelled Attraction"), the Account Balance shall be held and made available for distribution by Ticketmaster to Ticket purchasers entitled to refunds for Tickets for Cancelled Attractions purchased from Ticketmaster.  For purposes of this Agreement, the term "Account Balance" as it relates to any particular Facility shall mean the amount of funds held at any time by Ticketmaster on account of Ticket sales for all Attractions at a particular Facility.  In the event any particular Attraction is in postponed status at any particular Facility, such postponed Attraction will have no effect on any other Attractions at any other Facility, with such other Attractions at any other Facility continuing to be settled and all payments related thereto paid as contemplated hereunder. Principal authorizes Ticketmaster to refund the Ticket price at the original point of purchase (e.g., by Internet Sales) in such manner (e.g. by crediting the consumer's credit card) and at such time (e.g. before or after the scheduled date of the performance of such Attraction) as Ticketmaster, in its commercially reasonable discretion, determines and to exchange Tickets pursuant to all applicable laws and a reasonable and industry customary exchange policy that may be adopted by Ticketmaster.  It is agreed and understood that Ticketmaster is the Ticket selling agent of Principal for the Attractions and therefore Ticketmaster's agreement to make any refunds as the agent of Principal for the Attractions is subject and limited to Ticketmaster holding or receiving from Principal the full amount of funds necessary to make refunds to all Ticket purchasers properly entitled to a refund.  Ticketmaster's current policy is to refund the Ticketmaster service fees (excluding delivery fees) assessable with respect to the initial sale of Tickets to Cancelled Attractions. Ticketmaster shall notify Principal of any changes to such policy that apply to Ticketmaster's clients generally and are disclosed to consumers at the time of purchase. Principal shall be responsible for all refunds and exchanges of Tickets initially purchased from the Facility Box Office.

(c)    **Chargebacks**:  Ticketmaster reserves the right to deduct from (i) first, Principal's settlement for an Attraction and (ii) second, if such settlement is insufficient, from any other amounts due from Ticketmaster to Principal under this Agreement, for up to twelve (12) months after the occurrence of such Attraction, portions of any Chargebacks on primary ticket sales that Ticketmaster is assessed by its merchant bank related to the Face Value and any other amounts due from Ticketmaster to Principal. Ticketmaster shall be responsible for any Chargebacks on tickets sold in the secondary market and for the remaining portions of any Chargebacks on tickets sold in the primary market. For purposes of this Agreement, "Chargebacks" shall mean the amounts that the merchant bank is charged back by a cardholder or a card issuer under the card organization's rules (e.g., cardholder dispute, fraud, declined transaction, returned Tickets for Cancelled Attractions, etc.).

(d)    **Insolvency; Deficiency Amounts; Security for Repayment**:  Principal shall provide immediate written notice to Ticketmaster in the event it or any of its affiliates using the services hereunder files any voluntary or involuntary petition under the bankruptcy or insolvency laws or upon any appointment of a receiver for all or any portion of Principal's business or the assignment of all or substantially all of the assets of Principal for the benefit of creditors (each, a "Material Financial Event").  The parties agree that this Agreement constitutes a financial accommodation by Ticketmaster to Principal as such term is utilized in 11 U.S.C. §365. If at any time, the Account Balance is not sufficient to pay for anticipated refunds or Chargebacks, Principal

12

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL                                                                LNE-LIT24-001678679

**DX-1494.0955**

shall deliver the amount of such deficiency ("Deficiency Amount") to Ticketmaster no later than one (1) business day after notice by Ticketmaster to Principal.  Ticketmaster shall have the right to setoff any Deficiency Amount for an Attraction governed by this Agreement against any amounts held by Ticketmaster on behalf of Principal for any other Attraction governed by this Agreement.  In the event of any Material Financial Event or in the event Principal has not paid any Deficiency Amount when due, Ticketmaster shall have the option to (i) require Principal to provide additional security to Ticketmaster of a type (e.g., letter of credit, guaranty or performance bond) and in an amount as requested by Ticketmaster in its reasonable discretion, which Principal shall provide to Ticketmaster within five (5) business days after Ticketmaster's request and/or (ii) suspend payment of Ticket Receipts in advance of the occurrence of Attractions and instead deliver Ticket Receipts to which Principal is entitled post-performance (i.e. Friday of each week with respect to Attractions that occurred Monday through Sunday of the week preceding such payment date).

(e)     **Counterfeit Tickets; Fraud**:  It is agreed and understood that Ticketmaster shall not be liable to Principal for the printing and sale of counterfeit Tickets by third parties, except to the extent caused by fraud or the negligence or willful misconduct of Ticketmaster, in which case Ticketmaster shall be responsible for any and all liabilities in connection therewith, and Ticketmaster shall promptly inform Principal at any time that it obtains knowledge that counterfeit tickets to any Attraction have been sold or are circulating.  Ticketmaster shall use commercially reasonable efforts, consistent with industry practices, to reduce the incidence of fraud as part of the primary or secondary Ticket sale process using the TM System.

(f)     **Audit of Sales**:  At all times during the Term of this Agreement, (i) Principal shall have the right at its own expense to audit Ticket sales for Attractions by Ticketmaster to assure Ticketmaster's compliance with the terms of this Agreement, and (ii) Ticketmaster shall have the right at its own expense to audit Ticket sales for Attractions made by Principal and by others (including, without limitation, the promoter and sponsor of any Attraction, the act or event itself) to assure their compliance with the terms of this Agreement. In the event that the results of an audit pursuant to this Section 8(f) establish that the total amounts due to the auditing party hereunder for the period under audit have been under reported by five percent (5%) or more, then the non-auditing party shall pay to the auditing party such deficiency and shall pay the actual, reasonable and documented out-of-pocket cost of the audit.  If deficiency is less than five percent (5%), then the non-auditing party shall immediately pay the deficiency only.

(g)     **Archtics Transaction Fees**:  Ticketmaster, at its option, may deduct Archtics Transaction Fees from the amounts owed to Principal under this Agreement or may invoice Principal for such fees.

(h)     **License and Maintenance Fees**:  Any initial or one-time license or maintenance fees set forth on Exhibit A shall be due and payable upon the execution of this Agreement.  Thereafter, installments of license or maintenance fees set forth on Exhibit A shall be invoiced and payable on the first day of each Contract Year during the Term.

(i)     **Request for Taxpayer Identification Number and Certification**: Principal shall complete the required Form W-9 provided with this Agreement and return it to Ticketmaster with this Agreement for purposes of reporting to the Internal Revenue Service.

9.     **TAXES**:

13

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL                                                              LNE-LIT24-001678680

**DX-1494.0956**

(a) **Taxes on Hardware**: Principal shall promptly reimburse Ticketmaster for all applicable license fees, registration fees, assessments, charges and taxes, whether federal, state, county, municipal or other governmental or quasi-governmental, with respect to the Hardware located at the Facility, including, without limitation, applicable use, excise and property taxes, and penalties and interest with respect thereto, except and excluding, however, any taxes based on or measured solely by Ticketmaster's net income.

(b) **Attraction Taxes**: Principal shall be responsible for calculating any and all Principal Taxes, for preparing and timely filing any and all tax returns or reports required to be filed in respect of any such Principal Taxes, and for timely remitting Principal Taxes to the appropriate taxing authority. Ticketmaster will collect and turn over to Principal the amounts to which Principal is entitled as provided in Section 8(a). In the event that Ticketmaster, at Principal's request or consent, pays any Principal Taxes on behalf of Principal or Ticketmaster pays any Principal Taxes due to a failure by Principal to provide Ticketmaster with the required writing or documentation of any Principal tax exemptions pursuant to Section 9(d) below, Principal shall promptly reimburse Ticketmaster for any and all such Principal Taxes paid by Ticketmaster, including penalties and interest assessed with respect thereto (other than Principal Taxes, penalties and interest that Ticketmaster pays directly out of Principal's Ticket Receipts), and shall also promptly reimburse Ticketmaster for any and all expenses (including reasonable attorneys' fees) or damages that result from the failure by Principal to properly calculate and timely remit Principal Taxes assessed on all amounts received by Principal under this Agreement, to timely file all related returns or reports, or to timely reimburse Ticketmaster for any and all such Principal Taxes, interest and penalties as provided above. Notwithstanding the foregoing, in the event that Ticketmaster is ever required by applicable law to remit Principal Taxes directly on behalf of Principal and file related tax returns or reports, Ticketmaster shall have the right to do so upon notice to Principal, and thereafter "Ticket Receipts" shall be defined to be reduced by such Principal Taxes. Ticketmaster shall be responsible for calculating any and all Ticketmaster Taxes, for preparing and timely filing any and all tax returns or reports required to be filed in respect of any such Ticketmaster Taxes, and for timely remitting such Ticketmaster Taxes to the appropriate taxing authority. Ticketmaster shall indemnify and hold Principal harmless from any and all damages resulting from the failure by Ticketmaster to properly calculate and timely remit such Ticketmaster Taxes or any inaccuracies in the related tax returns or reports.

(c) **Principal's Taxpayer ID Number**: Principal certifies that Principal's federal taxpayer identification number (FEIN or SSN) is 20-8489179 and its state taxpayer identification or registration number is _____.

(d) **Principal's Tax Exemptions**: Principal shall notify Ticketmaster in writing of any and all Principal tax exemptions (if applicable) and provide Ticketmaster with reasonable proof of Principal's tax exemptions.

(e) **Taxes on License and Maintenance Fees**: The license and maintenance fees set forth on Exhibit A are exclusive of any sales, use, value added, excise or other taxes, and Principal shall be responsible for paying all such applicable taxes.

10. **LOSS AND DAMAGE TO THE HARDWARE; INSURANCE**:

(a) Subject to the provisions of Section 6 above, Principal acknowledges that the Hardware will be used by Principal at the Facility and that Ticketmaster does not own, operate

14

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL

LNE-LIT24-001678681

**DX-1494.0957**

or control such location.  Accordingly, Principal hereby assumes and shall bear the entire risk of loss and damage to the Hardware, ordinary wear and tear excepted, whether or not insured against, once installed, unless occasioned by the negligence or willful misconduct of Ticketmaster, from any and every cause whatsoever from the date of delivery of the Hardware to the Facility or Principal site until removal thereof following termination of this Agreement.  In the event of loss or damage of any kind to any Hardware, Principal, at its sole option, shall within thirty (30) days after such loss or damage:

(i)      Replace the same, or replace the same with similar property, in good repair, condition and working order to the satisfaction of Ticketmaster; or

(ii)      Pay Ticketmaster in cash the full replacement cost of the Hardware, and Ticketmaster shall promptly install new hardware to replace the lost or damaged Hardware.

(b)      Principal shall, at its own expense, provide and maintain at all times during the Term hereof the following insurance:

(i) Property insurance to protect the Hardware against loss caused by fire (with extended coverage), vandalism, malicious mischief, theft, or any other cause in an amount equal to the full replacement value of the Hardware.  Should Principal become unable to provide or maintain such insurance coverage, Principal shall promptly notify Ticketmaster in writing prior to the expiration of any such coverage, and, thereafter, Ticketmaster shall have the right, but shall not be obligated, to provide insurance coverage for the occurrences specified above and charge Principal the costs of such insurance coverage.

(ii) Commercial General Liability insurance with minimum limits of  per occurrence and ▮▮▮▮▮▮ in the aggregate.

Subject to the risks and liabilities assumed under this Agreement, such insurance provided and maintained by Principal as required by this Section 10(b) shall provide for the waiver of the insurer's right of subrogation against Ticketmaster.  Subject to the risks and liabilities assumed under this Agreement, the general liability policy shall include Ticketmaster, Live Nation Worldwide, Inc. and its respective parents, members, partners, affiliates, divisions and subsidiaries as an additional insured on a primary and non-contributory basis irrespective of any other insurance, whether collectible or not, with respect to the risks and liabilities assumed by Principal per this written Agreement.  Further, Principal shall provide for at least thirty (30) days' prior written notice of cancellation or non-renewal of such policies to Ticketmaster. Upon written request, Principal shall furnish Ticketmaster with certificates of insurance providing evidence as to its compliance with the provisions of this Section

(c)
Ticketmaster shall provide and maintain the following insurance: (i) Commercial General Liability insurance with minimum limits of ▮▮▮▮▮ per occurrence and ▮▮▮▮▮0 in the aggregate; (ii) If employees will be present on Principal's properties/sites/locations, Workers' Compensation as required by applicable State Law for all of employees and Employer's Liability Insurance with the following minimum limits: ▮▮▮▮▮ Limit of Liability Each Accident, ▮▮▮▮▮ Disease-Policy Limit, and ▮▮▮▮▮ Disease-Each Employee; (ii) If driving on Principal's properties/sites/locations Business Auto Liabilities including Any Auto or Owned, Non-Owned and Hired Automobile Coverage with minimum limit of ▮▮▮▮▮ Combined Single Limit; (iv)



15

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

Commercial Umbrella/Excess Liability Insurance for bodily injury and property damage liability must sit over primary Employer's Liability, Commercial General Liability and Commercial Automobile Liability with limits of $███████ each occurrence and aggregate; (v) Professional liability and errors and omissions coverage for claims for damages resulting from or arising out of any professional services provided by Ticketmaster in an amount of not less than $███████ per claim and aggregate; (vi) Cyber/ Network Security and Privacy Liability Insurance in an amount of not less than $███████ combined single limit to cover civil, regulatory and statutory damages, contractual damage, as well as data breach management exposure, and any loss of income or extra expense as a result of consumer data protection law, confidentiality information of Principal; (vii) Commercial Crime/Employee dishonesty coverage for a loss arising out of or in connection with any fraudulent or dishonest act committed by employees of the Vendor, in an amount of not less than $███████ single limit.  Coverage shall include third party liability coverage; and (viii) if Ticketmaster has any such exposure, then Property Insurance on all tools, equipment, and personal property of Ticketmaster for the full replacement value of such tools, equipment and personal property.  All policies of insurance, but for those under 10(c)(ii),(v), (vi) and (vii), shall include Principal and Kroenke Arena Company, LLC, Kroenke Stadium Services, Inc., Kroenke Soccer Stadium, LLC, KSE Soccer, Inc., Paramount Holdings, LLC, Denver Nuggets Partnership, LP, Colorado Avalanche, LLC, KSE Lacrosse, LLC and its respective parents, members, partners, affiliates, divisions and subsidiaries as an additional insured on a primary and non-contributory basis irrespective of any other insurance, whether collectible or not, with respect to the risks and liabilities assumed by Ticketmaster per this written Agreement. All policies shall include a waiver of subrogation in favor of additional insured parties.  Further, Ticketmaster shall provide for at least thirty (30) days' prior written notice of cancellation or non-renewal of such policies to Principal.  Upon written request, Ticketmaster shall furnish Principal with certificates of insurance providing evidence as to its compliance with the provisions of this Section.

11.    **TITLE**:

(a)    **Hardware/Software**: Principal covenants and agrees that the work product furnished under this Agreement (including the Hardware and Software) are, and shall at all times be and remain, the sole and exclusive property of Ticketmaster, and Principal shall have no right, title or interest therein or thereto except as a licensed user thereof.  Principal acknowledges and agrees that Ticketmaster has invention rights, copyrights, and other intellectual property rights in the TM System and the information contained therein which prohibit copying, sale, modification and re-manufacture of the TM System and information regarding the TM System and which will be enforced.  Principal hereby agrees that it will, whenever reasonably requested by Ticketmaster, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, agreements, instruments, and documents necessary or desirable, in form reasonably satisfactory to Ticketmaster, to protect the rights and ownership of Ticketmaster to such work product.  Principal shall, to the extent that is has knowledge, give Ticketmaster prompt written notice of any attachment or other judicial process affecting any item of Hardware.  Upon the expiration or termination of this Agreement, Principal shall return the Software and Hardware to Ticketmaster in good repair, condition and working order, ordinary wear and tear resulting from proper use thereof alone excepted, and any and all licenses and other rights to the Software and Hardware shall terminate with respect to Principal.

(b)    **Intellectual Property**: Each party shall retain all right, title and interest in and to its respective trademarks, service marks and trade names worldwide ("Intellectual Property") subject to a limited non-exclusive, non-transferable license necessary to perform this

16

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL

LNE-LIT24-001678683

Agreement. Each party grants the other a royalty-free, non-exclusive, non-transferable license, during the Term, within the territory, to include such party's pre-approved Intellectual Property solely in connection with the promotions and marketing contemplated in this Agreement. Subject to the terms of this Agreement, each party shall use the other's Intellectual Property only as provided in this Agreement, and shall not alter the Intellectual Property in any way, nor shall it act or permit action in any way that would impair the rights of owning party in its Intellectual Property. Each party acknowledges that its use of the other party's Intellectual Property shall not create any right, title or interest in or to such Intellectual Property and that any such use shall inure to the benefit of the owning party. Each party shall have the right to monitor the quality of the other party's use of its Intellectual Property. Additionally, each party shall notify the other promptly in writing of any known infringement of the other's Intellectual Property. Any references to a party's Intellectual Property shall contain the appropriate trademark, copyright or other legal notice provided from time to time by owning party.

(c) **Purchaser Data**: Principal and Ticketmaster each has rights to use and process all personally identifiable information with respect to persons who actually purchased tickets to Principal's Attractions through the TM System that is not Principal Data (as defined in Exhibit G below) ("Purchaser Data") for any commercial purpose, subject to the terms of Exhibit G attached hereto. For avoidance of doubt, Ticketmaster may use aggregate consumer information and de-identified information to develop new or upgraded Software at Principal's request, or for general market research on pricing when used with Ticketmaster's other aggregate consumer information and de-identified information. Each party agrees to use the Purchaser Data only in compliance with all applicable laws and administrative rulings and in accordance such party's own posted privacy policies. Principal and Ticketmaster shall implement and maintain reasonable security procedures and practices appropriate to the nature of the Purchaser Data to protect the Purchaser Data from unauthorized access, destruction, use, modification or disclosure. Principal and Ticketmaster also agree that if any portion of the Purchaser Data includes credit or debit card numbers and related information, they each shall comply with payment card industry standards. Principal and Ticketmaster shall also include in any email communications that Principal or Ticketmaster may make based on the Purchaser Data a mechanism to provide the recipient with the right to "opt-out" from receiving further communications from Principal or Ticketmaster, as applicable and they each shall honor such opt-out preferences and share such opt-out requests with each other. For the purposes of Section 11, the terms "aggregate consumer information," "commercial purpose," "deidentified," "sale," and "sell" have the meanings ascribed to them in the California Consumer Privacy Act, Cal. Civ. Code § 1798.100 et seq ("CCPA"), and the term "personally identifiable information" has the meaning ascribed to "personal information" in the CCPA.

12. **CONFIDENTIAL INFORMATION**:

(a) The parties acknowledge that by reason of their relationship hereunder, they may from time to time disclose to each other information regarding their business, products, software technology, Intellectual Property and other information that is confidential and of substantial value to the other party, which value would be impaired if such information were disclosed to third parties ("Confidential Information"). The provisions of this Agreement shall be deemed to be Confidential Information.

(b) Confidential Information shall not include information that (i) is or becomes generally available to the public other than as a result of the breach of the confidentiality

17

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

**DX-1494.0960**

obligations in this Agreement by the receiving party, (ii) is or has been independently acquired or developed by the receiving party without violating any of the confidentiality obligations in this Agreement, (iii) was within the receiving party's possession prior to it being furnished to the receiving party by or on behalf of the disclosing party, or (iv) is received from a source other than the disclosing party; provided that, in the case of (iii) and (iv) above, the source of such information was not known by the receiving party to be bound by a confidentiality obligation to the disclosing party or any other party with respect to such information.

(c)     Each party agrees that it will keep the Confidential Information strictly confidential and will not use in any way for its own account or the account of any third party, nor disclose to any third party, any Confidential Information revealed to it by the other party without the other party's prior written consent, except to the extent expressly permitted by this Agreement; provided, however, that the receiving party may disclose the Confidential Information, or any portion thereof, to its directors, officers, employees, legal and financial advisors, lenders, controlling persons and entities who need to know such information to perform such party's obligations under this Agreement and who agree to treat the Confidential Information in accordance with the confidential obligations in this Agreement.  Each party shall use the same degree of care to avoid disclosure or use of the other party's Confidential Information as it employs with respect to its own Confidential Information of like importance and represents that it has adequate procedures to protect the secrecy of such Confidential Information including without limitation the requirement that employees have executed non-disclosure agreements which have the effect of adequately protecting Confidential Information.

(d)     In the event that either party receives a request to disclose all or any part of the Confidential Information under the terms of a subpoena, document request, notice of deposition or other legal proceeding, such party agrees to notify the other pursuant to Section 17(h) below, within forty-eight (48) hours after receipt of such legal document, and such party agrees to cooperate with the other (at the other party's cost and expense) in any attempt to obtain a protective order.

13.     **LIMITATION ON LIABILITY**:  In no event shall either party be liable for any indirect, consequential, exemplary, incidental, special or punitive damages, including also lost profits, lost savings, lost or destroyed data, lost ticket revenues, lost opportunity costs or any other economic loss, of any type or nature, or for events or circumstances beyond such party's control, even if such party has been advised of the possibility of such damages.

14.     **INDEMNIFICATION**:

(a)     Principal shall indemnify Ticketmaster and its parents, subsidiaries, affiliates, and their officers, directors, employees and agents and their successors and assigns (collectively, for purposes of this Section, "Ticketmaster's Indemnitees") against, and defend and hold Ticketmaster's Indemnitees harmless from, any and all claims, actions, damages, expenses (including court costs and reasonable attorneys' fees), obligations, losses, liabilities and liens, imposed on, incurred by, or asserted against Ticketmaster's Indemnitees occurring as a result of, or in connection with: (i) any Event of Default under this Agreement by Principal or any Principal's Indemnitee; (ii) Principal's use of the TM System, or possession and use of the Hardware by Principal or any Principal's Indemnitee, in each case other than as expressly permitted under this Agreement; (iii) any Attraction held at the Facility (including any injuries or deaths occurring at or in connection with any Attraction or the failure of any Attraction to occur or to occur in the manner

18

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL                                                                    LNE-LIT24-001678685

**DX-1494.0961**

advertised or promoted); (iv) Principal's use or disclosure of the Purchaser Data; (v) any email, text or similar campaigns or distributions conducted by Ticketmaster at Principal's direction, or conducted by Principal, including, without limitation, email, text or similar campaigns or distributions in violation of federal, state or other laws applicable to commercial emails; or (vi) any violation by Principal of any applicable law in its performance under this Agreement; except, in each case, to the extent that any such claims shall relate to Ticketmaster's negligence or willful misconduct or violation of applicable laws with respect thereto.

(b)     Ticketmaster shall indemnify Principal and its parents, subsidiaries, affiliates and their officers, directors, employees and agents and their successors and assigns (collectively, for purposes of this Section, "Principal's Indemnitees") against, and defend and hold Principal's Indemnitees harmless from, any and all claims, actions, damages, expenses (including court costs and reasonable attorneys' fees), obligations, losses, liabilities and liens, imposed on, incurred by, or asserted against, Principal's Indemnitees occurring as a result of, or in connection with: (i) any Event of Default under this Agreement by Ticketmaster or any Ticketmaster Indemnitee; (ii) any alleged patent, trademark or copyright infringement asserted against Principal's Indemnitees with respect to Principal's use of the TM System; (iii) Ticketmaster's use or disclosure of the Purchaser Data; (iv) any email, text or similar campaigns or distributions conducted by Ticketmaster (other than as set forth in Section 14(a)(v) above), including, without limitation, email, text or similar campaigns or distributions in violation of federal, state or other laws applicable to commercial emails; or (v) any violation by Ticketmaster of any applicable law in its performance under this Agreement; except, in each case, to the extent that any such claim shall relate to Principal's negligence or willful misconduct or violation of applicable laws with respect thereto.

(c)     The indemnified party must notify the other party promptly in writing of any claim hereunder, and provide, at such other party's expense, all reasonably necessary assistance, information and authority to allow the other party to control the defense and settlement of such claim.  If such claim for indemnification hereunder is based on a claim by a third party, the indemnifying party shall have the right to assume the control of the defense thereof, including, at its own expense, employment of counsel reasonably satisfactory to the indemnified party; provided, that the indemnified party may participate in any proceeding with counsel of its choice at its expense.  The indemnifying party shall not have the right to consent to the entry of any judgment or enter into any compromise or settlement with respect to any indemnifiable matters related to claims by third parties without the prior written consent of the indemnified party (not to be unreasonably withheld or delayed) unless the judgment or proposed compromise or settlement involves only the payment of monetary damages and such payment is paid in full by the indemnifying party.

15.     <u>**TERMINATION**</u>:

(a)     This Agreement may be terminated by either party in the event of any material default in or material breach of the terms and conditions of this Agreement by the other party, after the other party has received written notice of default and thirty (30) business days (or ten (10) business days, in the case of a monetary default) to cure such default (each such occurrence, after the expiration of such cure period, shall be an "Event of Default"); or the filing of any voluntary or involuntary petition against the other party under the bankruptcy or insolvency laws of any applicable jurisdiction, which petition is not dismissed within sixty (60) days of filing, or upon any appointment of a receiver for all or any portion of the other party's business, or any

19

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL                                                                    LNE-LIT24-001678686

assignment of all or substantially all of the assets of such other party for the benefit of creditors; provided, that, Ticketmaster will provide all reasonably necessary services and support (technical or otherwise) requested by Principal to transition ticketing services to Principal (or its designated ticketing partner) prior to the effective date of any such termination (for avoidance of doubt, Ticketmaster shall not be required to provide such services or support following the effective date of any such termination); provided, further, such services and support shall not require or result in the disclosure of any proprietary or Confidential Information relating to Ticketmaster, its business or the TM System.  Upon an Event of Default by Ticketmaster, Ticketmaster shall, without demand, forthwith pay to Principal all amounts due and owing pursuant hereto, and Principal may, in addition to terminating this Agreement, require Ticketmaster to remove all Hardware from the Facility.  Upon an Event of Default by Principal, Principal shall pay to Ticketmaster all amounts due and owing pursuant hereto as set forth in a detailed invoice summarizing the same that Ticketmaster provides to Principal, and Ticketmaster may terminate this Agreement. Subject to this Section 15 (a), upon the effective date of any such termination, Ticketmaster may terminate Principal's right to access and use the TM System and take immediate possession of the Hardware and Software wherever the same may be located without demand, notice or court order.

(b)     This Agreement may be terminated by Ticketmaster in the event any act by Principal threatens to cause any infringement of any Ticketmaster (or Ticketmaster licensor) intellectual property or other property right, including without limitation, any copyright, license right or trade secret right, and Principal fails to refrain from so acting within ten (10) business days' written notice from Ticketmaster.

(c)     Subject to the transition of ticketing service obligations set forth in Section 15(a), upon the effective date of any termination or expiration of this Agreement, provisions regarding ownership of intellectual property rights, representations and warranties, confidentiality, indemnification, limitation of liability, non-solicitation, jurisdiction and venue shall remain in full force and effect; each party shall immediately cease the use of the other party's Intellectual Property; and each party shall return, or at the other party's request, destroy all copies of Confidential Information, and all other property belonging to and/or received from the other party.

(d)     No remedy referred to in this Section is intended to be exclusive, but each shall be cumulative and in addition to any other remedy herein or otherwise available at law or in equity, each and all of which are subject to the limitations contained in Section 13 hereof.

16.     **DEFINITIONS**:  As used in this Agreement, the following terms shall have the respective meanings indicated below unless the context otherwise requires:

"AccountManager" means the Ticketmaster AccountManager software and hosting services that allow Subscribers to manage their Season/Contract Ticket accounts.

"Archtics" means Ticketmaster's software that delivers extensive season, miniplan and single ticket functionality in connection with the Ticketmaster host system and distribution channels for inventory control by Ticketmaster and Principal.

"Archtics Transaction Fees" means the amounts Ticketmaster charges for certain Software transactions as described in Exhibit A.

20

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL                                                           LNE-LIT24-001678687

**DX-1494.0963**

"Attraction" means a concert, sporting, entertainment or other act or event of any kind or nature whatsoever to be held at the Facility, including without limitation, the home games of the Denver Nuggets National Basketball Association (NBA) team, the Colorado Avalanche National Hockey League (NHL) team, the Colorado Rapids Major League Soccer (MLS) team and the Colorado Mammoth National Lacrosse League (NLL) team (each, a "Team"), but excluding (i) any game or event that is subject to the United States Olympic Committee, International Olympic Committee, United States Paralympic Committee or International Paralympics Committee, (ii) any NCAA-sanctioned tournament game, (iii) any MLS lower division home games for an affiliate of Principal held at another location other than a Facility; or (iv) any event presented by Cirque du Soleil in the parking lot of the Facility or, if mutually agreed upon, similar independent event productions presented in the parking lot of the Facility (collectively, "Independent Parking Lot Events"); provided, Principal shall use commercially reasonable efforts to cause Independent Parking Lot Events to have tickets to such Independent Parking Lot Events sold via the TM System pursuant to this Agreement or an arrangement directly between Ticketmaster and the Independent Parking Lot Events.

"Attraction Taxes" means any and all sales, amusement, admissions and other taxes, charges, fees, levies or other assessments measured by reference to a charge per Ticket sold or determined based upon the purchase price of a Ticket assessed by federal, state, county, municipal or other governmental or quasi-governmental authorities as a result of, or in connection with, any Attraction, including, without limitation, Principal Taxes and Ticketmaster Taxes as further described below.  To the extent such taxes relate to the funds paid or owed to Principal under this Agreement such portion of Attraction Taxes may also be referred to herein as Principal Taxes, and to the extent such taxes relate to fees or charges collected and retained by Ticketmaster under this Agreement, such portion of Attraction Taxes may also be referred to herein as Ticketmaster Taxes.

"Chargebacks" is defined in Section 8(c) hereof.

"Confidential Information" is defined in Section 12 hereof.

"Contract Year" is defined in Section 1 hereof.

"Convenience Charge" means the per Ticket amount charged to a consumer for the convenience of purchasing Tickets through the TM System.

"Distribution Partner" means a participating sales distribution partner in Ticketmaster's Sports Distribution Program.

"Event of Default" is defined in Section 15(a) hereof.

"Face Value" means the face price of a Ticket as determined by Principal, which shall be inclusive of all applicable Attraction Taxes and facility, parking and similar fees.

"Facility" means, for so long as Principal or one of more affiliates own, control and/or manage the operation at (i) the venue located at 1000 Chopper Circle, Denver, Colorado 80204 and currently known as Ball Arena; (ii) the venue located at 6000 Victory Way, Commerce City, Colorado 80022 and currently known as Dick's Sporting Goods Park; and (iii) the venue located at 1621 Glenarm Place, Denver, Colorado 80202 and currently known as Paramount

21

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

Theatre. Notwithstanding the foregoing, in the event Principal acquires, directly or indirectly (through one or more affiliates) the ownership, control, operation and/or management of any one additional venue (but only if Principal or one of its' affiliates control the operation of such venue) during the Term of this Agreement, Principal shall provide Ticketmaster with written notice of such acquisition within thirty (30) days and shall thereafter provide Ticketmaster the exclusive right of first negotiation for the provision of ticketing services at such venue, which exclusive right of negotiation shall extend for a period of ninety (90) days from the date of such notice; provided, however, if such venue has an existing agreement for ticketing services (an "Existing Ticketing Agreement"), the parties acknowledge and agree that such venue may continue to operate under the Existing Ticketing Agreement until its then-current expiration date (without renewal) and, to the extent Principal and Ticketmaster execute an agreement for Ticketmaster's provision of ticketing services at such venue, such agreement shall not take effect until the expiration of the Existing Ticketing Agreement.

"Facility Box Office" means the Facility's Ticket sales locations, if any, that are operated by Principal and located at the Facility.

"Group Sales" means sales of Tickets by Principal to: (i) a specific group consisting of at least ten (10) people for use by the group members to attend an Attraction as a group or part of a group sales initiative; or (ii) an organizational effort by members of such organization to attend an Attraction by providing a link for such members to purchase. In no event shall Group Sales consist of the sale of Tickets to a ticket resale platform or marketplace, professional ticket reseller or other individual or entity with the primary purpose of reselling such Tickets.

"Hardware" means all of that certain computer hardware, communications equipment, terminals and hook-ups (including replacements thereof) listed with particularity on <u>Exhibit B</u> or otherwise supplied by Ticketmaster to Principal at any time during the Term of this Agreement, but excluding (i) any computer hardware, communications equipment, terminals and hook-ups purchased by Principal or purchased by Ticketmaster for Principal's use from the Technology Credit to provide the connectivity to and interfacing with the TM System required under this Agreement, and (ii) any computer hardware, communications equipment, terminals and hook-ups purchased by Principal from Ticketmaster or purchased by Ticketmaster for Principal's use from the Technology Credit.

"Hosted Platform" shall mean the equipment, operating system, hardware and software specifications, and networking environment on and with which the TM System and Software are hosted by Ticketmaster, and additions or replacements to the foregoing which may be implemented by Ticketmaster in accordance with the terms of this Agreement.

"House Seats" means Tickets provided by Principal (i) to the Attraction's promoter, performing act or event, or their managers or agents (i.e. band holds); (ii) for distribution through legitimate fan clubs in accordance with current guidelines (i.e. fan club holds limited to (A) 10% of Sellable Capacity for Attractions with fan clubs using Ticketmaster's affiliate platform, TicketsToday for fan club Ticket distribution or, if mutually agreed upon by Ticketmaster, as requested by the performing act or event, or (B) 8% of Sellable Capacity for all other Attractions); (iii) for legitimate promotional purposes (e.g. radio station promotions); or (iv) for sales to internal stakeholders including but not limited to employees, partners, and affiliates; provided that House Seats Tickets shall not be distributed to the general public.

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL    LNE-LIT24-001678689

**DX-1494.0965**

"Inside Charge" means an amount deducted and retained by Ticketmaster from certain Ticket sales as further described in <u>Exhibit A</u>.

"Intellectual Property" is defined in Section 11(b) hereof.

"Interface Page" means a co-branded web page interface for use with Software transactions designed, created and maintained by Ticketmaster to have, in general, the look and feel of Principal's Website and hosted on Ticketmaster's web servers.

"Internet Sales" means all sales of Tickets over the Internet, or via mobile or smart phone application.

"License" is defined in Section 4(a) hereof.

"MiniPlan Tickets" means specifically designated Tickets sold directly by Principal to a single consumer on an annual or season basis across a set of at least two (2) Attractions.

"Payment Processing Fees" is defined in Section 3(b).

"Principal's Website" means an Internet website(s) owned, operated and maintained by Principal, which shall contain links to the Interface Page.

"Processing Fee" means the per order amount charged by Ticketmaster to a consumer for purchasing Tickets via Ticketmaster distribution channels through the TM System.

"Purchaser Data" is defined in Section 11(c) hereof.

"sale and sell" and any derivations thereof in this Agreement shall include any distribution for consideration, by any means or method (including without limitation, on the Internet or by auction) and shall include resales.

"Season/Contract Tickets" means specifically designated Tickets sold directly by Principal on an annual basis across all Attractions or across all of a category of Attractions (i.e., luxury suites, club level seats and season tickets).

"Sellable Capacity" means the actual admission capacity of a Facility as established by Principal for any particular Attraction, not to exceed the maximum capacity permitted at such time by applicable law.

"Software" means Ticketmaster's ticketing system software known and marketed as Ticketmaster Classic, TM Charge, TM+, Presence and the additional ticket sales software and Internet-based premium Ticketmaster services that include Archtics, Hosted Platform and AccountManager, and any new versions thereof or any other deliverables for TM System access provided to Principal by Ticketmaster during the Term.

"Subscribers" means any person who holds an account on Principal's AccountManager.

"Term" is defined in Section 1 hereof.

23

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL                                                                                              LNE-LIT24-001678690

**DX-1494.0966**

"Ticket" means a printed, electronic or other type of evidence of the right, option or opportunity to occupy space at or to enter or attend an Attraction or Attractions even if not evidenced by any physical manifestation of such right, such as a "smart card".

"Ticket Forwarding" means the ability of Subscribers to forward Tickets purchased through AccountManager to a recipient with a valid email address.

"Ticket Printing" means the ability of Subscribers to download their Season/Contract Tickets from their AccountManager account and to print such Season/Contract Tickets from their personal computers.

"Ticket Receipts" means the Face Value of a Ticket sold by Ticketmaster less any Payment Processing Fees or Ticketmaster Taxes, and less any Principal Taxes if Ticketmaster is required to remit Principal Taxes to any taxing authority.

"TM Charge" means the electronic payment processing system within the TM System that utilizes the global banking association networks to authorize electronic payment for purchases of Tickets to Attractions sold by Principal from the Facility Box Office as permitted under this Agreement.

"TM.com Website" means any Internet websites owned, operated and maintained by Ticketmaster, including, without limitation, any co-branded versions and any version distributed through any broadband distribution platform or through any platform or device including television, broadband and wireless technologies.

"TM System" means the Hardware, Software, TM.com Website, related procedures and personnel, and repair and maintenance services established and maintained by Ticketmaster and its affiliates (including the ticketing platform of Ticketmaster's affiliate, Universe) for the purpose of selling, distributing, auditing and controlling the sale of Tickets for Attractions, including, without limitation, by Internet Sales, and the processing of transactions through the Software.

17.    **MISCELLANEOUS**:

(a)    **Governing Law/Jurisdiction**:  This Agreement shall be interpreted and governed by the laws of the State of California, without reference to conflict of laws principles. Each of the parties hereto agrees that the state courts, and the United States federal courts, that are located in the City and County of Los Angeles in the State of California shall each have subject matter jurisdiction hereunder and personal jurisdiction over each of the parties hereto.  Each such party hereby consents thereto, and hereby waives any right it may have to assert the doctrine of forum non conveniens or to object to venue to the extent that any proceeding is conducted in accordance with the foregoing provision.

(b)    **Waiver of Jury Trial**:  In the event the parties are required for any reason to submit any dispute hereunder to trial, the parties expressly agree to waive the right to a jury trial, because the parties hereto, all of whom are represented by counsel, believe that the complex commercial and professional aspects of their dealing with one another make a jury determination neither desirable nor appropriate.

24

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL

LNE-LIT24-001678691

**DX-1494.0967**

(c)    **Entire Agreement; Modification**:  This Agreement constitutes the entire and exclusive agreement between the parties hereto with respect to the subject matter hereof and supersedes and cancels all previous oral or written communications, proposals, agreements, and commitments, including that certain Term Sheet dated October 31, 2019 between the parties' affiliates.  No modification to this Agreement, nor any waiver of any rights, shall be effective unless assented to in writing by the party to be charged and the waiver of any breach or default shall not constitute a waiver of any other right hereunder or any subsequent breach or default.  A party's delay in enforcing its rights hereunder shall not be construed as a waiver of such rights or remedies.

(d)    **Assignment**:  Without the prior written consent of Ticketmaster, Principal shall not (i) directly or indirectly assign, transfer, pledge or hypothecate its rights or obligations in this Agreement or any interest therein, except (x) as security in connection with financing agreements of Principal or any of its affiliates or (y) in the event of an internal corporate reorganization or inter-company assignment by Principal (or the transfer of equity interests in Principal) to any parent, subsidiary, or affiliate, in which event no such consent shall be required; or (ii) permit the Hardware (if any) or any part thereof to be used, or access to the Software or any part thereof to be had, by anyone other than Principal or Principal's authorized employees or affiliates within a Facility.  Any such assignment shall not relieve Principal of any of its obligations hereunder. Without the prior written consent of Principal, Ticketmaster shall not assign, transfer, pledge or hypothecate its rights or obligations in this Agreement or any interest therein, except (x) as security in connection with financing agreements of Ticketmaster or any of its affiliates or (y) in the event of an internal corporate reorganization or inter-company assignment by Ticketmaster (or the transfer of equity interests in Ticketmaster) to any parent, subsidiary, or affiliate, in which event no such consent shall be required.  Any such assignment shall not relieve Ticketmaster of any of its obligations hereunder. Notwithstanding the foregoing, Principal and Ticketmaster agree and acknowledge that certain of their respective duties and obligations under this Agreement may be performed by one or more of its parent, subsidiaries and affiliates, and no such performance shall be deemed to be an assignment or breach of this Agreement by Ticketmaster or Principal.

(e)    **Relationship of the Parties**:  Each party is an independent contractor and not an agent or partner of, or joint-venturer with, the other party for any purpose other than as set forth in this Agreement (e.g., Ticketmaster is the agent of Principal with respect to ticket sales and distribution).  Neither party by virtue of this Agreement shall have any right, power, or authority to act or create any obligation, express or implied, on behalf of the other party.

(f)    **Delays**:  Neither party shall be liable or deemed in default, and no Event of Default shall be deemed to have occurred, as a result of any delay or failure in performance of this Agreement resulting directly or indirectly from any cause completely, solely and exclusively beyond the control of that party, but only for so long as such delay shall continue to prevent performance.

(g)    **Severability**:  If any provision of this Agreement is found to be invalid or unenforceable in any jurisdiction (a) the validity or enforceability of such provision shall not in any way be affected with respect to any other jurisdiction, and the validity and enforceability of the remaining provisions shall not be affected; and (b) the parties shall replace such provision by one or more valid and enforceable provisions approximating the original provision as closely as possible.

25

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL    LNE-LIT24-001678692

**DX-1494.0968**

(h)    **Notices**:  Any notices required to be given under this Agreement must be sent to each party, in writing, at the address set forth immediately below the signature line hereto or at such address as may be provided by each party in writing from time to time, by same day hand delivery or by an overnight courier.  Notices will be deemed effective upon receipt of hand delivered or on the day following sending if sent by overnight courier.  Settlement reports may be delivered from Ticketmaster to Principal by email provided at Principals request; therefore Principal and Ticketmaster shall promptly notify the other of any change to its email address set forth immediately below the signature line hereto.  Ticketmaster shall also provide such settlement report via Ticketmaster's online reporting portal available to all Ticketmaster clients.

(i)    **Binding Agreement/Counterparts**:  The terms, conditions, provisions and undertakings of this Agreement shall be binding upon and inure to the benefit of each of the parties hereto and their respective successors and permitted assigns; provided, however, that this Agreement shall not be binding until executed by each of the parties.  This Agreement may be executed in multiple counterparts which when taken together constitute a single instrument.

(j)    **Legal Review**:  Each of the parties has had the opportunity to have its legal counsel review this Agreement on its behalf.  If an ambiguity or question of intent arises with respect to any provision of this Agreement, this Agreement will be construed as if drafted jointly by the parties.  The parties expressly agree that the construction and interpretation of this Agreement shall not be strictly construed against the drafter.

(k)    **Attorneys' Fees**:  In addition to any other rights hereunder, the substantially prevailing party, as a court of competent jurisdiction (as provided above) may determine, in any claim or other dispute which relates to this Agreement, regardless of whether such claim or other dispute arises from a breach of contract, tort, violation of a statute or other cause of action, shall have the right to recover and collect from the other party its reasonable costs and expenses incurred in connection therewith, including, without limitation, its reasonable attorneys' fees.  If a party substantially prevails on some aspects of such claim or dispute but not others, the court may apportion any award of costs or attorneys' fees in such manner as it deems equitable.

(l)    **Client Listings**:  Principal's execution of this Agreement indicates approval for Principal to be listed as a Ticketmaster client in monthly newsletters for distribution to event industry clients, in product boiler plate information, and in future releases about Ticketmaster products and services for distribution to trade and consumer media, in each case with the prior approval of Principal as to the nature and content of such listing and releases.  At any time, Principal may, in its sole discretion, direct Ticketmaster to stop using Principal's name for the purposes listed in this Section by sending notice to Ticketmaster via email at client.news@ticketmaster.com.

(m)    **Survival of Terms**:  Any provision of this Agreement that contemplates performance or observance subsequent to any termination or expiration of this Agreement, including without limitation provisions related to use of the Software, purchaser data, limitations on liability, indemnification, confidential information, governing law and waivers of jury trials, shall survive any termination or expiration of this Agreement and continue in full force and effect.

26

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL                                                                                    LNE-LIT24-001678693

[Signature Page Follows.]

27

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL                                                                 LNE-LIT24-001678694

IN WITNESS WHEREOF, Ticketmaster and Principal have caused this Licensed User Agreement to be duly executed as of the Effective Date.

| | |
|---|---|
| TICKETMASTER L.L.C., a Virginia limited liability company | KSE TICKETING, LLC, a Colorado limited liability company |

By: *kurt Schwartzkopf*

Print Name: Kurt Schwartzkopf

Title: EVP, Co-Head of Sports

Date: 5/17/2022

Address:      Ticketmaster L.L.C.
              7060 Hollywood Blvd.
              Hollywood, CA 90028
Attn:         EVP, Co-Head of Sports

With a copy to:

              Ticketmaster L.L.C.
              7060 Hollywood Boulevard
              2nd Floor
              Hollywood, CA  90028
Attn:         General Counsel

By: *Matthew Hutchings*

Print Name: Matthew Hutchings

Title: EVP, COO

Date: 5/17/2022

Address:
1000 Chopper Circle
Denver, Colorado 80204
Attn: Matt Hutchings & Bruce Glazer

C/o KSE
1000 Chopper Circle
Denver, Colorado 80204
Attn: Keirstin Beck, EVP General Counsel

28

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL

**DX-1494.0971**

Schedule 1

Principal's Affiliates

Kroenke Arena Company, LLC
Kroenke Stadium Services, Inc.
Kroenke Soccer Stadium, LLC
KSE Soccer, Inc.
Paramount Holdings, LLC
Denver Nuggets Partnership, LP
Colorado Avalanche, LLC
KSE Lacrosse, LLC

29

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL

LNE-LIT24-001678696

**DX-1494.0972**

## EXHIBIT A

## COMPENSATION

1.  **Charges and Fees**.

    (a)  **Convenience Charge (Per Ticket) and Processing Fee (Per Order)**: The per Ticket Convenience Charges and per order Processing Fees shall be determined and (subject to the terms below) retained by Principal during the Term of this Agreement. In the event any per Ticket fee or per order fee in any single transaction is less than the applicable Inside Charge due Ticketmaster as set forth in subsection (b) following, Ticketmaster reserves the right to invoice Principal for the amount of such Inside Charge, or to setoff such amount against any funds held by Ticketmaster on account of Principal.

    (b)  **Inside Charges**:

| Type of Ticket | Per Ticket Inside Charge | Per Order Inside Charge |
|---|---|---|
| For all Tickets sold via the Facility Box Office | ███ | ███ |
| For Parking/Upsell Tickets sold via Ticketmaster distribution channels | ███ | ███ |
| For Facility Tour Tickets sold via Ticketmaster distribution channels | ███ | ███ |
| For Tickets to Colorado High School Activities Association (CHSAA) Attractions sold via Ticketmaster distribution channels | ███ | ███ |
| For Tickets to all other Attractions sold via Ticketmaster distribution channels | ███ | ███ |

    (c)  **Delivery Fees**.

        (i)  **Mail Fee**. Ticketmaster shall be entitled to assess and retain a fee in the amount of $███ per order against purchasers of Tickets using the U.S. mail method of delivery (the "Mail Fee"). Ticketmaster shall be responsible for any applicable taxes or Payment Processing Fees (calculated at the rate set forth below), on such amount.

        (ii)  **Mobile and Credit Card Entry Delivery**. Ticketmaster shall not assess any mobile delivery fee or credit card entry delivery fee against purchasers of Tickets using the mobile and/or credit card entry methods of delivery.

        (iii)  **Will Call Fee**. Ticketmaster shall be entitled to assess a fee in the amount of $███ per order (or such higher amount as determined by Principal in its sole discretion from time to time on a per Attraction basis) against purchasers of Tickets using the will call method of Ticket fulfillment ("Will Call Fee"), and shall pay Principal the entirety of such Will Call Fee, less

30

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL　　　　　　　　　　　　　　　　　　　　　LNE-LIT24-001678697

**DX-1494.0973**

applicable taxes or Payment Processing Fees (calculated at the rate set forth below, and if not passed on to consumers) on such additional amount.

    (d)    **Archtics Fees**:

        (i)    Archtics Transaction Fees:

| **Type of Software Transaction** | **Amount of Archtics Transaction Fee** |
|---|---|
| **AccountManager Transactions** | |
| New Season/Contract Ticket sales | |
| MiniPlan Ticket sales | |
| Suite additionals | |
| Right of first refusal to purchase Tickets | |
| Per invoice processing | |
| Ticket Forwarding | |
| Single Ticket sales to Subscribers | |
| Single Ticket or multi-day pass sales processed through Archtics for non-Team Attractions (e.g., music festivals) | |
| Ticket Printing | |
| Self Service Group Sales via AccountManager | |

In the event Principal elects to charge Subscribers for the Software transactions in addition to and above the applicable Archtics Transaction Fees charged by Ticketmaster as set forth above, such additional amount charged by Principal shall be divided equally between Principal and Ticketmaster.

        (ii)    Archtics License and Maintenance Fees:

31

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL
LNE-LIT24-001678698

**DX-1494.0974**

| Software | License Fees | Maintenance Fees |
|---|---|---|
| **Archtics** | | |
| **Hosted Platform** | | |
| **Archtics** – Sybase Adaptive Server Anywhere | | |
| **AccountManager** | | |



2. **Payment Processing Fees**:

| Type of Sale | Percentage Rate |
|---|---|
| Ticketmaster distribution channels | ▮ of Face Value of Tickets plus any fees added to the Face Value |
| Principal Sales using TM Charge | ▮ of Face Value of Tickets plus any fees added to the Face Value |

Any percentage rates set forth above are subject to automatic increase due to actual increases in the interbank rates imposed on Ticketmaster as verified by Ticketmaster to Principal in writing.

3. **Facility Fees**.  For the avoidance of doubt, any facility fee established by Principal included in the Ticket price shall be paid to Principal in its entirety as part of the Ticket Receipts for the applicable Attraction.

32

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL

LNE-LIT24-001678699

**DX-1494.0975**

## EXHIBIT B

### HARDWARE

| Quantity | Description |
| --- | --- |
| 3 | Cisco 4321 |
| 60 | JanAm XT2 |
| 15 | Boca Lemur-S |

Any other equipment provided by Ticketmaster during the Term at no charge to Principal in excess of the Technology Credit.

33

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL

LNE-LIT24-001678700

**DX-1494.0976**

## EXHIBIT C

### TICKETMASTER SECONDARY EXCHANGE TERMS AND CONDITIONS

1.      Definitions. All terms used herein and not otherwise defined shall have the meanings set forth in the Agreement:

"Exchange Fees" means the amounts Ticketmaster charges buyers and sellers to purchase or sell Tickets via TM Secondary Exchanges.

"Exchange Net Revenue" means the gross amount collected (and not refunded) from each purchaser of a secondary market Ticket through any TM Secondary Exchange for any Attraction, less (i) the proceeds paid to the Ticket seller, (ii) an amount equal to ▮▮▮ of the gross amount collected from such purchaser (to cover credit card processing fees and chargebacks); (iii) any sales tax collected from the purchaser, as applicable; and (iv) actual out-of-pocket customer acquisition costs incurred by Ticketmaster on such transactions, e.g., costs to unaffiliated third parties on search engine marketing (SEM), display advertising, and commissions to third party affiliates of Ticketmaster linking customers to such TM Secondary Exchange).

"TM+" means Ticketmaster's proprietary, integrated primary and secondary market ticket inventory platform and technology on the TM.com Website (including, for the avoidance of doubt, mobile applications), which platform and technology enables consumers searching for Tickets to an Attraction to simultaneously view Tickets available for initial sale directly from the Facility, in addition to Tickets available for resale from other consumers.

"TM Secondary Exchange" means any software, website, platform or functionality provided, operated or hosted by Ticketmaster which allows Ticket holders to post such Tickets for sale to third parties, which includes TM+ and the official NBA-branded or NHL-branded secondary market resale sites.

2.      Exchange Fees. With respect to any TM Secondary Exchange, Ticketmaster shall assess its standard fees (consistent with market rates) against the buyers and sellers of Tickets sold through such TM Secondary Exchanges in amounts as determined by Ticketmaster in accordance with general industry standards. Notwithstanding the foregoing, the parties may mutually agree to reduce or waive the Exchange Fees on an Attraction-by-Attraction basis.

3.      Resale Revenue Share.

(a)      Team Attractions. With respect to any Team Attractions, Ticketmaster shall pay to Principal a revenue share on any Exchange Net Revenue received (and not refunded or subject to Chargeback) by Ticketmaster which is in excess of ▮▮▮▮▮▮▮▮▮▮▮ in any Contract Year (the "Revenue Share Threshold"). Once the Revenue Share Threshold is met in any Contract Year with respect to Team Attractions, Principal shall be entitled to receive a revenue share with respect to all additional Exchange Net Revenue (i.e., in excess of the Revenue Share Threshold), to the extent received (and not refunded or subject to Chargeback) during such Contract Year by Ticketmaster for any Team Attractions, in an amount equal to ▮▮▮▮ ▮▮▮ of such excess Exchange Net Revenue (the "Team Attraction Resale Revenue Share").

34

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

**DX-1494.0977**

(b)  All Other Attractions. With respect to any non-Team Attraction, Ticketmaster shall pay to Principal a revenue share on any Exchange Net Revenue received (and not refunded or subject to Chargeback) during such Contract Year by Ticketmaster for any Team Attractions, in an amount equal to ▮▮▮▮▮▮▮▮▮ of such Exchange Net Revenue (the "Non-Team Attraction Resale Revenue Share, and together with the Team Attraction Resale Revenue Share, the "Resale Revenue Share").

(c)  Settlement. The Resale Revenue Share to which Principal is entitled shall be due and payable to Principal on a quarterly basis within thirty (30) days after the conclusion of each calendar quarter during the Term. Principal shall be provided with documentation supporting the calculation of the Resale Revenue Share with the final settlement for each quarter. Notwithstanding anything contained in this Agreement to the contrary, Ticketmaster shall be solely and exclusively responsible for any additional royalties or revenue shares to be paid to third party event owners/promoters pursuant to any agreements between Ticketmaster and such event owners/promoters, such as Live Nation, AEG, Feld Entertainment, etc., if any.

4.  Resale Best Practices. With respect to the operation of TM Secondary Exchanges, the following practices (the "Resale Best Practices") shall apply unless: (i) mutually agreed upon by the parties; or (ii) when required by (as opposed to preferred by) the organizer/promoter of the Attraction on a tour-wide basis:

(a) TM Secondary Exchanges shall be activated for Ticket postings for all preseason and regular season Attractions upon the release of the season schedules, with links from the TM.com Website to such resale platforms prior to the initial On-Sale Date for any such Team Attractions;

(b) For all consumer traffic originating from the TM.com Website and Ticketmaster-controlled platforms, TM+ shall be activated with a co-mingled landing state upon any pre-sale of Tickets or the initial On-Sale Date for all preseason, regular season and postseason Team Attractions. For all consumer traffic originating from Principal's Website and Principal-controlled platforms, either (i) TM+ shall be activated with a co-mingled landing state upon any pre-sale of Tickets or the initial On-Sale Date for all preseason, regular season and postseason Team Attractions or (ii) Principal shall remit to Ticketmaster a payment in the amount of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ for any such Team Attraction which is not activated with a co-mingled landing state;

(c) All TM Secondary Exchanges shall be enabled for playoff games as soon as the team's position is clinched;

(d) All TM Secondary Exchanges shall be enabled for all playoff rounds (all games) at once, even if all rounds are unconfirmed;

(e) For Attractions which are not currently on sale, either (i) TM+ shall be enabled in an off-sale mode until the initial On-Sale Date, or (ii) such Attractions shall be featured on the TM.com Website with use of the offsale EDP, with all applicable marketing modules and resale feeds available at that time (or shortly thereafter);

(f) TM Secondary Exchanges shall remain enabled for all Attractions until the Attraction start time, or later (if possible);

(g) "Barcode Sync" (formally known as Archtics to "eibo" integration) shall be enabled upon Season Ticket holder activation or within twenty-four (24) hours of any TM Secondary Exchange activation; and

(h) All TM Secondary Exchanges shall remain active for all Attractions through one (1) hour past Attraction start time unless otherwise mutually agreed upon by the parties.

35

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL

LNE-LIT24-001678702

(i) Principal may distribute Tickets to a Distribution Partner, where consignment means tickets are purchased below such tickets' face value or the only compensation for tickets are tied to a revenue share, for Team Attractions, and only to a Distribution Partner that is a licensed participant in Ticketmaster's "Sports Distribution Program". Principal shall ensure that if any such Distribution Partner resells such distributed Tickets through any third party resale marketplace, such Tickets must be simultaneously posted for resale through the TM Secondary Exchanges at the same, or lower prices than such inventory is posted on any such third party resale marketplace.

(j) Subject to any applicable legal prohibitions in Colorado, there shall be no price floors or other pricing restrictions on Tickets posted for resale through TM Secondary Exchanges.

36

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL

LNE-LIT24-001678703

**DX-1494.0979**

## EXHIBIT D

## TM1 ENGAGEMENT TERMS AND CONDITIONS

At Principal's optional election upon written notice (email sufficing) to Ticketmaster, Ticketmaster shall make TM1 Engagement available for Principal's use in exchange for the fees set forth in Schedule 1 attached hereto.

At the time of TM1 Engagement activation, Principal shall select an annual subscription plan. Thereafter, during the Term of the Agreement, Principal shall have the opportunity to upgrade Principal's current plan to a higher one, or downgrade to any lower plan, upon written notice to Ticketmaster and payment of the new annual subscription fee; provided, that such new plan shall not take effect until the beginning of the next Contract Year. For the avoidance of doubt, any unsent emails comprising the annual sent messages threshold and any unused Ticketmaster professional services hours for Principal's plan during each Contract Year shall expire at the conclusion of each such Contract Year, and no TM1 Engagement credit of any kind shall be provided to Principal in connection with such unsent emails and/or unused hours.

Ticketmaster shall invoice Principal for the full amount of the annual subscription fee applicable for Principal's current plan at the beginning of each Contract Year during the Term of the Agreement; provided, if applicable, for any partial Contract Year remaining following the date of TM1 Engagement activation, Ticketmaster shall invoice Principal upon TM1 Engagement activation a pro rata amount of the annual subscription fee applicable for Principal's selected plan (based on a prorated number of emails and professional services hours for such plan). In the event Principal exceeds the applicable email threshold for Principal's current plan in any Contract Year, Ticketmaster shall invoice Principal at that time for the incremental amount of the annual subscription fee applicable to such higher volume of emails sent.

In the event Principal elects to purchase additional Principal user licenses and/or additional Ticketmaster professional services hours, in each case, for any given Contract Year to supplement the number of user licenses and professional services hours currently included in Principal's subscription plan for such Contract Year as set forth in Schedule 1 attached hereto,, Ticketmaster shall invoice Principal for the additional fees applicable in connection therewith at the time of such election. In the event Principal elects to activate Ticketmaster's Premium Automation Package in accordance with the terms set forth in Schedule 1 attached hereto, Ticketmaster shall invoice Principal for the additional annual fee applicable in connection therewith at the time of such election and at the beginning of each Contract Year during the Term of the Agreement thereafter, it being understood that any activation of Ticketmaster's Premium Automation Package shall be for the remaining Term of the Agreement (and not just for the remainder of the then-current Contract Year).

Ticketmaster shall provide all necessary maintenance and service support with respect to the use of TM1 Engagement, as described in Schedule 2 attached hereto. Ticketmaster agrees to absorb all fees and other amounts due to any third party in connection with the use of TM1 Engagement, and support costs with respect thereto.

Principal agrees to use TM1 Engagement only in compliance with all applicable laws and administrative rulings and in accordance with Ticketmaster's posted privacy policies. Principal shall also include in any non-transactional email communications that Principal may make using

37

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL                                                                LNE-LIT24-001678704

**DX-1494.0980**

TM1 Engagement a mechanism to provide the recipient with the right to "opt-out" from receiving further non-transactional email communications from Principal and Principal shall honor such opt-out preferences. Principal shall indemnify Ticketmaster's Indemnitees against, and hold Ticketmaster's Indemnitees harmless from, any and all claims, actions, damages, expenses (including court costs and reasonable attorneys' fees), obligations, losses, liabilities and liens, imposed on, incurred by, or asserted against Ticketmaster's Indemnitees occurring as a result of, or in connection with any email campaigns or distributions conducted by Principal including, without limitation, email campaigns or distributions in violation of federal, state or other laws applicable to commercial emails; except, in each case, to the extent that any such claims shall relate to Ticketmaster's negligence or willful misconduct or violation of applicable law with respect thereto.

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL

LNE-LIT24-001678705

**DX-1494.0981**

<u>Schedule 1 to Exhibit D</u>

| Plan | Annual Sent Messages | | | Annual Subscription Fee* | # of Principal User Licenses Included** | # of Ticketmaster Professional Services Hours Included*** | Ticketmaster's Premium Automation Package**** |
|---|---|---|---|---|---|---|---|
| Base | 0 | to | 1,000,000 | | 2 | 1 hour (Q&A call) | NOT INCLUDED |
| Plan 1 | 1,000,001 | to | 2,000,000 | | 2 | 5 hours/ year | |
| Plan 2 | 2,000,001 | to | 4,000,000 | | 3 | 10 hours/year | |
| Plan 3 | 4,000,001 | to | 6,000,000 | | 3 | 15 hours/year | |
| Plan 4 | 6,000,001 | to | 12,000,000 | | 3 | 20 hours/year | |
| Plan 5 | 12,000,001 | to | 18,000,000 | | 3 | 25 hours/year | |
| Plan 6 | 18,000,001 | to | 30,000,000 | | 4 | 30 hours/year | |
| Plan 7 | 30,000,001 | to | 48,000,000 | | 4 | 35 hours/year | |
| Plan 8 | 48,000,001 | or | More | Custom Pricing | Custom | Custom | |

*The annual subscription fees for each plan set forth in the schedule above shall be subject to automatic increase on the first day of the second Contract Year following the date of TM1 Engagement activation and on the first day of each Contract Year thereafter during the Term in the amount of ██ of the previous Contract Year's annual subscription fee for each such plan.

**Additional user licenses may be purchased by Principal for $██ per additional user license/ per Contract Year, and such $██ per additional user license/ per Contract Year fee shall not be pro-rated for any partial Contract Year except to the extent explicitly provided otherwise in the Exhibit to which this Schedule 1 is attached. Principal shall notify Ticketmaster of its election to purchase additional user licenses during each Contract Year for which Principal intends to use such additional user licenses, and Principal's election to purchase additional user licenses during any particular Contract Year shall not carry forward into the continued use of such additional user licenses during any subsequent Contract Years.

***Except to the extent explicitly provided otherwise in the Exhibit to which this Schedule 1 is attached, notwithstanding the chart above, the number of Ticketmaster professional service hours included in any annual subscription plan for which Ticketmaster has waived or has otherwise provided a credit or discount towards Principal's annual subscription fee shall be ██

***The amount of any unused Ticketmaster professional service hours included for any Contract Year shall expire at the conclusion such Contract Year, or upon the termination or expiration of the Agreement, whichever is earlier. For the avoidance of doubt, any unused Ticketmaster professional service hours included for any Contract Year shall not be rolled forward for use in any subsequent Contract Year.

***Additional Ticketmaster professional service hours may be purchased by Principal at the rate of $██ per additional hour, or at the bulk discount rate of $██ per additional hour where Principal purchases 50 or more hours in a single transaction, it being understood any such hours (including any of those purchased in bulk), consistent with the terms set forth above, shall expire at the conclusion of the Contract Year in which they were purchased, or upon the termination or expiration of the Agreement, whichever is earlier.

****Principal may elect to activate Ticketmaster's Premium Automation Package as an optional add-on for $██ per Contract Year, and such $██ per Contract Year fee shall not be pro-rated for any partial Contract Year except to the extent explicitly provided otherwise in the Exhibit to which this Schedule 1 is attached. For clarity, standard two-touch welcome

39

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL

LNE-LIT24-001678706

**DX-1494.0982**

automations are included with each Principal subscription plan and do not require activation of Ticketmaster's Premium Automation Package. Any activation of Ticketmaster's Premium Automation Package shall be for the remainder Term of the Agreement (and not just for the remainder of the then-current Contract Year).

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL

LNE-LIT24-001678707

**DX-1494.0983**

### Schedule 2 to Exhibit D

| Plan | Annual Sent Messages | | | TM1 Engagement Ticketmaster Support |
|------|------|----|------|------|
| Base | 0 | to | 1,000,000 | • Unlimited issue resolution technical support via Ticketmaster product support<br>• Implementation Services<br>• Industry-specific web-based training<br>• Industry-specific user guides<br>• Industry-specific best practices documentation and webinars<br>• Deliverability Support |
| Plan 1 | 1,000,001 | to | 2,000,000 | |
| Plan 2 | 2,000,001 | to | 4,000,000 | |
| Plan 3 | 4,000,001 | to | 6,000,000 | |
| Plan 4 | 6,000,001 | to | 12,000,000 | |
| Plan 5 | 12,000,001 | to | 18,000,000 | |
| Plan 6 | 18,000,001 | to | 30,000,000 | |
| Plan 7 | 30,000,001 | to | 48,000,000 | |
| Plan 8 | 48,000,001 | or | More | |

41

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL

LNE-LIT24-001678708

DX-1494.0984

## EXHIBIT E

## PLATINUM TICKETS AND VIP PACKAGES

### 1.    **Platinum Tickets and VIP Packages**

(a)    **Definitions**.

"Platinum Ticket" means any dynamically-priced Ticket that represents the most select category of seats for an Attraction resulting from proximity to stage or other superior amenities as mutually determined by Principal and Ticketmaster, which is sold by Ticketmaster on behalf of Principal.

"Platinum Ticket Fee" means a fee assessed by Ticketmaster against each Platinum Ticket purchaser in an amount equal to ███████████████ (which incorporates a Payment Processing Fee in the same percentage amount as set forth in the Agreement with respect to standard Ticket sales) of the Platinum Ticket Price (excluding any applicable delivery and processing fees) for each Platinum Ticket sold by Ticketmaster via the TM.com Website. Additionally, Ticketmaster shall charge Principal a "Platform Fee" in the amount of ██████ ███ of the Platinum Ticket Price (excluding any applicable delivery and processing fees), which shall be deducted from the Platinum Proceeds and retained by Ticketmaster prior to settlement. The Platinum Ticket Fee and the Platform Fee payable to Ticketmaster in connection with each sale of a Platinum Ticket shall be in lieu of any per Ticket Inside Charge otherwise due Ticketmaster under this Agreement in respect of standard Ticket sales.

"Platinum Ticket Price" means the total price a purchaser pays for a Platinum Ticket sold via the TM.com Website, inclusive of applicable taxes, but exclusive of the Platinum Ticket Fee. The Platinum Ticket Price shall initially be established by Principal in consultation with Ticketmaster, and any subsequent adjustments to the Platinum Ticket Price shall be administered in accordance with parameters accepted by Principal in advance.

"Platinum Proceeds" means the Platinum Ticket Price collected by Ticketmaster, which, for the avoidance of doubt, shall not include the Platinum Ticket Fee.

"VIP Package(s)" means Ticket packages which entitle the purchaser of the Ticket to additional benefits, including but not limited to, access to unique experiences surrounding the artist, Attraction and/or unique merchandise.

"VIP Package Fee" means a fee assessed by Ticketmaster in the amount of ████████████████ (which incorporates a Payment Processing Fee in the same percentage amount as set forth in the Agreement with respect to standard Ticket sales) of the VIP Package Price, which amount shall be charged to the VIP Package purchaser in addition to the VIP Package Price.

42

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

"VIP Package Price" means the total price of the VIP Package paid by the purchaser as set by Principal, inclusive of the Face Value of the Ticket and applicable taxes.

"VIP Package Proceeds" means the VIP Package Price, which, for the avoidance of doubt shall not include the VIP Package Fee.

(b)    **Platinum Tickets**.

(i)    Platinum Ticket Set-Up Information.  Principal will provide Ticketmaster with notice of its desire to have Ticketmaster enable a Platinum Ticket offer for any applicable Attraction, and shall provide Ticketmaster with required Set-Up Information in respect of such offer so that Ticketmaster may set up the offer for sale through the TM.com Website.

(ii)    Platinum Ticket Fulfillment.  Ticketmaster shall fulfill Platinum Ticket orders in the same manner as standard Tickets through Ticketmaster's ordinary distribution channels as requested by the purchaser.

(iii)    Platinum Ticket Settlement.  Ticketmaster shall pay Principal the Platinum Proceeds, less the Platform Fee, for each Platinum Ticket sold by Ticketmaster during a calendar week along with settlement of Ticket Receipts for the applicable week. Principal shall be responsible for remitting any applicable taxes on the Platinum Ticket Price, and Ticketmaster shall be responsible for remitting any applicable taxes on the Platinum Ticket Fee.  Notwithstanding the foregoing, in the event that Ticketmaster is ever required by applicable law to remit taxes on the Platinum Ticket Price directly on behalf of Principal, Ticketmaster shall have the right to do so upon notice to Principal.  Except as provided otherwise above, settlements of Platinum Proceeds shall be made in accordance with and subject to the accounting and refund procedures set forth in this Agreement.

(iv)    Platinum Ticket Fee Royalty.  Principal shall be entitled to receive from Ticketmaster a royalty in the amount ▮▮▮▮▮▮▮▮▮▮ of each Platinum Ticket Fee received (and not refunded or subject to chargeback) by Ticketmaster.  Notwithstanding the above, Payment Processing Fees, delivery fees, processing fees, and taxes (in each case, if any) related to any Platinum Ticket Fee shall, if not passed on to consumers, be deducted from the Platinum Ticket Fees before the Platinum Ticket Fee royalties are calculated. Neither party makes any representation that any specific number of Platinum Tickets nor any amount of Platinum Ticket Fee royalties shall be available in connection with any Attraction for which the sale of Platinum Tickets has been enabled.  Platinum Ticket Fee royalties shall be paid to Principal during a calendar week along with the settlement of Ticket Receipts for the applicable week.

(c)    **VIP Packages**.

(i)    VIP Package Offer Information.  Principal will provide Ticketmaster with reasonable advance written notice of its desire to have Ticketmaster enable a VIP Package, which notice shall include an accurate and complete description of the VIP Package content, applicable dates for the sales campaign, and any other information reasonably requested by

43

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL                                                                              LNE-LIT24-001678710

**DX-1494.0986**

Ticketmaster (the "Offer Information"). Notwithstanding anything to the contrary, Ticketmaster shall not be obligated to offer a VIP Package for an Attraction if, in the reasonable discretion of Ticketmaster, the VIP Package is not appropriate for sale via the TM.com Website. Ticketmaster and Principal will work together to develop appropriate messaging appearing on the TM.com Website to inform all purchasers of VIP Package elements and benefits. Ticketmaster shall have final control over any and all messaging on the TM.com Website, and reserves the right to reject any messaging proposed by Principal for any reason, including, without limitation, size constraints. Notwithstanding the foregoing, Ticketmaster shall have no responsibility or liability in the event that information (including Offer Information) provided to Ticketmaster by Principal relating to the VIP Package, is incorrect or incomplete, and Principal shall indemnify, defend and hold Ticketmaster's Indemnitees harmless from any and all claims, actions, damages, expenses (including court costs and reasonable attorneys' fees), obligations, losses, liabilities and liens, imposed on, incurred by, or asserted against Ticketmaster's Indemnitees occurring as a result of, or in connection with the Offer Information except, in each case, to the extent that any such claims shall relate to Ticketmaster's negligence or willful misconduct or violation of applicable law with respect thereto.

(ii)    <u>VIP Package Fulfillment</u>.

(1)    <u>Ticketmaster Responsibilities</u>. Ticketmaster will control access to the VIP Package by distributing to each applicable purchaser a unique barcode which will allow the purchaser to redeem the VIP Package elements from Principal at the Attraction. Ticketmaster shall be responsible solely for enabling a barcode for each Purchaser to use to redeem the VIP Package elements, together with instructions for redemption (including (i) that Principal is the party responsible for fulfilling the VIP Package elements, (ii) the time frames during which redeeming purchasers may redeem the VIP Package elements, and (iii) the relevant Principal customer service contact information for purposes of handling customer support issues relating to such redemption). Ticketmaster shall be responsible for customer service inquiries relating solely to enabling the barcode.

(2)    <u>Principal Responsibilities</u>. Principal shall allow purchasers to redeem the VIP Package elements at the Facility. Principal shall be responsible for performing all fulfillment, redemption and delivery obligations, and customer service related to all fulfillment and delivery of VIP Package elements, and all costs associated therewith, and shall indemnify, defend and hold Ticketmaster's Indemnitees harmless from any and all claims, costs (including court costs and reasonable attorneys' fees), liabilities, obligations, losses, liabilities and liens related to, or occurring as a result of or in connection with, fulfillment, redemption and delivery of the VIP Package elements except, in each case, to the extent that any such claims shall relate to Ticketmaster's negligence or willful misconduct or violation of applicable law with respect thereto.

(iii)    <u>VIP Package Settlement</u>.

(1)    Ticketmaster shall pay Principal the VIP Package Proceeds for each VIP Package sold by Ticketmaster during a calendar week along with settlement of Ticket Receipts for the applicable week. Notwithstanding anything to the contrary, Principal shall not

44

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

**DX-1494.0987**

receive any payment, nor shall a sale be deemed to have been made, if any VIP Package is the subject of a chargeback or for which Ticketmaster refunds the Ticket portion of the VIP Package.

(2)     Principal agrees that it shall be responsible for all refunds related to the VIP Package elements to the extent the VIP Package Proceeds are received by Principal, and to the extent Ticketmaster receives any such requests, Ticketmaster shall refer the purchaser to a customer service number provided by Principal to Ticketmaster for such customer service issues. In no event shall Ticketmaster be liable for a refund of the VIP Package elements except to the extent the related VIP Package Proceeds were received by it. In addition, Principal shall be responsible for all Chargebacks related to the VIP Packages, and Ticketmaster shall have the right to deduct amounts due for Chargebacks from the VIP Package Proceeds otherwise payable by Ticketmaster to Principal. In the event such VIP Package Proceeds are inadequate to cover actual Chargebacks, Principal shall be responsible for, and shall refund to Ticketmaster within ten (10) days of Ticketmaster's written notice all amounts related to all Chargebacks of VIP Packages sold by Ticketmaster.

(3)     Principal shall be responsible for remitting any applicable taxes on the VIP Package Price, and Ticketmaster shall be responsible for remitting any applicable taxes on the VIP Package Fee. Notwithstanding the foregoing, in the event that Ticketmaster is ever required by applicable law to remit taxes on the VIP Package Price directly on behalf of Principal, Ticketmaster shall have the right to do so upon notice to Principal.

(iv)     VIP Package Fee Royalty. Principal shall be entitled to receive from Ticketmaster a royalty in the amount of ▊▊▊▊▊▊ of each VIP Package Fee received (and not refunded or subject to chargeback) by Ticketmaster. Notwithstanding the above, Payment Processing Fees, and taxes (in each case, if any) related to any VIP Package Fee shall be deducted from the VIP Package Fees before the VIP Package Fee royalties are calculated. Neither party makes any representation that any specific number of VIP Packages nor any amount of VIP Package Fee royalties shall be available in connection with any Attraction for which the sale of VIP Packages has been enabled. VIP Package Fee royalties shall be paid to Principal during a calendar week along with settlement of Ticket Receipts for the applicable week.

45

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL

LNE-LIT24-001678712

**DX-1494.0988**

## EXHIBIT F

## SERVICE SUPPORT TERMS

Ticketmaster shall (a) provide the services at a standard at least equal to that generally furnished by first-class ticketing companies in the United States and not less than the quality of similar services furnished by Ticketmaster to its other customers (collectively, the "Standard") and (b) ensure that the TM System is fully operational and available to Principal and its customers (actual or potential) with 99.5% Uptime to Principal each month ("Commitments"), subject to the remainder of this Exhibit F.

Without limiting the generality of the foregoing:

Uptime.  Uptime % = 100% x (Scheduled Uptime Minutes – Unscheduled Outage Minutes) divided by (Scheduled Uptime Minutes), rounded up or down to the nearest one-tenth of a percent (xx.x%).

"Outage" shall mean the features and functionality of the TM System and/or Hosted Platform material to the processing of Tickets are unavailable such that Tickets to Attractions cannot be sold, paid for, or delivered on the TM System, Hosted Platform and/or Facility Box Office.

"Scheduled Maintenance" means periods during which the TM System and/or Hosted Platform has an Outage due to routine maintenance, provided that: (i) Ticketmaster provides Principal with written notice (a) if such Outage for Scheduled Maintenance occurring outside the hours of 2:00 a.m. and 6:00 a.m. (Pacific time) will be less than one (1) hour, at least forty-eight (48) hours in advance, and (b) if such Outage for Scheduled Maintenance occurring outside the hours of 2:00 a.m. and 6:00 a.m. (Pacific time) will be one (1) to four (4) hours, at least ninety-six (96) hours in advance; (ii) Scheduled Maintenance shall be primarily performed between the hours of 2:00 a.m. and 6:00 a.m. (Pacific time).

"Scheduled Uptime Minutes" shall mean the difference between (i) total minutes in the applicable month and (ii) minutes in that month in which there is an Outage due to Scheduled Maintenance.

"Unscheduled Outage Minutes" shall mean all those minutes in which there is an Outage, excluding (i) minutes arising from Scheduled Maintenance and (ii) minutes arising from any Exclusion listed below.

Unscheduled Outage Minutes shall be counted from the time Ticketmaster is notified of an Outage (whether from Principal, a customer or otherwise) to the time that such Outage is resolved.  The Ticketmaster support service administrator shall promptly notify Principal of any Outage and the resolution thereof, it being agreed that if Principal objects promptly to a notification that an Outage has been fully resolved and has demonstrated proof therefor, then the Unscheduled Outage Minutes shall be deemed to have continued until the Outage has been fully resolved.

46

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL

LNE-LIT24-001678713

DX-1494.0989

Ticketmaster shall implement and maintain monitoring and measuring mechanisms that are sufficient to measure and record the degree to which Ticketmaster has or has not satisfied the service levels set forth herein and shall provide Principal with reports thereof sufficient to enable Principal and Ticketmaster to verify Ticketmaster's compliance therewith for each calendar month. No more frequently than two (2) times per calendar year, upon Principal's reasonable advance written notice to Ticketmaster, Principal shall have the right to inspect, copy, verify and audit such records during normal working hours to verify the accuracy of such reports. As of the date of this Agreement, Ticketmaster employs both external monitoring services and a Network Operations Center (NOC) monitoring solution that is at (or exceeds) the Standard to track the performance of the TM System and Hosted Platform.

Exclusions to Unscheduled Outage Minutes:

(a) Failure of any non-Ticketmaster provided hardware, software or other equipment provided by Principal and used by Principal_in connection with the Hosted Platform and/or Facility Box Office to the extent that it causes the Unscheduled Outage Minutes;

(b) Circumstances arising from the actions or inactions of Principal in breach of the Agreement; or

(c) Emergency maintenance necessitated by a potential security vulnerability.

Help Desk and Technical Support. Ticketmaster shall provide the following response services:

| Incident Priority | Description | Acknowledge Receipt of Call |
|---|---|---|
| **Critical System Emergency – Priority 1** | The Software (or a material component thereof) is inoperable, no workaround is possible, and Principal is unable to use the Software. Ticketmaster agrees that it will provide a response by a qualified member of its staff to begin to diagnose and to correct a Priority 1 fault as soon as reasonably possible but not later than thirty (30) minutes after notification by Principal. Ticketmaster will continue to use best effort endeavors to resolve Priority 1 faults as soon as reasonably possible. The resolution will be delivered to Principal as a work-around or as an emergency fix. If Ticketmaster delivers an acceptable work-around, the severity classification will drop to a Priority 2 or lower. If required, the problem will be given to Ticketmaster's sustained engineering group for review, prioritization and resolution. Solutions will then be made available via the next major release or on an interim basis, as determined by Ticketmaster.<br><br>Examples are:<br><br>○ Problem has caused Principal to cease processing and cannot continue until problem is resolved. | Respond within thirty (30) minutes |

47

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL                                                                 LNE-LIT24-001678714

| Incident Priority | Description | Acknowledge Receipt of Call |
|---|---|---|
| | ○ Problem causes data corruption (i.e., files are no longer in sync). | |
| **High – Priority 2** | The Software is operational but the functionality is seriously affected. Principal is able to use the Software, but is restricted or experiencing some limitations. Ticketmaster agrees that it will provide a response by a qualified member of its staff to begin to diagnose and correct a Priority 2 fault as soon as reasonably possible but no later than one (1) hour after notification by Principal. If Ticketmaster delivers an acceptable work-around, the severity classification will drop to a Priority 3 or lower. If required the problem will be elevated to Ticketmaster's sustained engineering group for review, prioritization and resolution along with other Priority 2 issues. Solutions will then be made available via the next major release or on an interim basis, as determined by Ticketmaster.<br><br>Examples are:<br><br>1. The issues caused processing delays which are inconvenient to Principal, but the process does complete accurately.<br>2. A value appears incorrectly on a report, however the underlying processing is valid. | Respond within one (1) business hour |
| **Medium-Priority 3** | The Software is operational but a problem has been identified and one or more specific functions of the Software either provides incorrect results or does not operate as documented. Ticketmaster agrees that it will provide a response by a qualified member of its staff to begin to diagnose and correct a Priority 3 fault as soon as reasonably possible but no later than twenty-four (24) hours after notification by Principal. If Ticketmaster determines that the requirement is unique to Principal's operations and classifies the fault as an enhancement, Ticketmaster will notify Principal within two weeks with an appropriate recommendation and estimate for resolving the issue.<br><br>Examples are: | Respond within twenty-four (24) hours |

48

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL

LNE-LIT24-001678715

**DX-1494.0991**

| Incident Priority | Description | Acknowledge Receipt of Call |
|---|---|---|
| | I. Issue reported is unique to Principal and not critical.<br>II. Principal experiences a slight difficulty in completing task.<br>III. Screen entry is inconsistent or unnatural. | |
| **Low – Priority 4** | Questions on use of the Software, and enhancement requests. | Respond within two (2) business days |

If an Unscheduled Outage occurs, then, without limiting any other rights or remedies available to Principal, Ticketmaster will promptly (i) investigate, assemble and preserve pertinent information with respect to, and report on the causes of, such Outage, including performing a root cause analysis of the problem; (ii) advise Principal of the status of remedial efforts being undertaken with respect to such Outage; (iii) use commercially reasonable efforts to minimize the impact of and correct the problem; and (iv) use commercially reasonable efforts to take appropriate preventive measures designed to prevent the recurrence of such Outage.

If an outage materially affecting the Principal's operations occurs, including but not limited to service disruptions with integration partners, API feeds, delivery of data, or payment processing, Ticketmaster shall use commercially reasonable efforts to notify Principal as soon as practicable following such occurrence and identify that issue, suspected causes, scope, and other available information and shall continually update Principal on efforts made to restore normal operating conditions.

If there is a failure by Ticketmaster to meet the Commitments herein more than twice in a twelve (12) month period, then Principal shall be permitted to terminate the Agreement on not fewer than thirty (30) days' prior written notice, unless during such thirty (30) day period, Ticketmaster implements relevant patches or upgrades to address the underlying cause of the failure in a manner to be reasonably assured that the Commitments will be maintained without an additional failure in the immediately succeeding six (6) months (a "Cure"); provided, further that in the event of a failure to maintain the Commitments occurs within six (6) months of a Cure, then Principal shall have the right to terminate the Agreement on fifteen (15) days' prior written notice without any additional right to cure.  In the event of a termination pursuant to the foregoing, such termination shall be effective as contemplated by Section 15(d) of the Agreement.

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL

LNE-LIT24-001678716

**DX-1494.0992**

## EXHIBIT G

## DATA SHARING TERMS

In connection with the Agreement, the parties anticipate that they will process Personal Information (as defined below). To the extent that the parties will process such Personal Information, the parties agree to the following terms for the purposes of ensuring compliance with applicable privacy and data security laws and regulations, including the handling of consumer rights requests.

## DEFINITIONS

**"Data Breach"** means any breach of security that resulted, or reasonably could result, in the accidental or unlawful destruction, loss, alteration, unauthorized disclosure of, or unauthorized access to (including unauthorized internal access to) Personal Information related to this Agreement.

"**Personal Information**" means any information that: (i) identifies, relates to, describes, is reasonably capable of being associated with, or could be reasonably linked, directly or indirectly, with a particular individual or household, or (ii) can be used in conjunction with other personal or identifying information to identify or locate a specific individual, or (iii) is defined as "Personal Information", "PII", "Personally Identifiable Information", or "Personal Data" by applicable privacy and/or data security laws.

**"Principal Data"** means all information collected through Principal's Archtics and Account Manager services that is processed by Ticketmaster at Principal's instruction.

**"Process"** or **"Processing"** means any operation or set of operations that is performed on Personal Information or on sets of Personal Information, whether or not by automated means.

**"Purchaser Data"** means the information as defined and identified in Section 11(c) of the Agreement.

**"Share"** means sharing, renting, releasing, disclosing, disseminating, making available, transferring, or otherwise communicating orally, in writing, or by electronic or other means, Personal Information to a third party for cross-context behavioral advertising, whether or not for monetary or other valuable consideration.

In consideration of the parties' respective Processing of Purchaser Data, it is agreed as follows:

1. **Purchaser Data and Principal Data**

    1.1. Each party shall comply with its obligations under all applicable privacy and data protection laws and regulations, including but not limited to the California Consumer Privacy Act (Cal. Civ. Code § 1798.100 et seq.) ("CCPA"). For the purposes of this Exhibit,

50

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

**DX-1494.0993**

all terms defined by the CCPA, including "business purpose," "service provider," "sale," and "sell" shall have the meanings ascribed to them in the CCPA.

1.2. Ticketmaster shall:

(a) disclose Purchaser Data to Principal only in compliance with Cal. Civ. Code § 1798.140(t)(2)(A); and

(b) fully indemnify, hold harmless and defend Principal and its directors, officers, employees, agents, stockholders and affiliates (collectively, "Indemnified Parties") from and against all claims, demands, actions, suits, damages, liabilities, losses, settlements, judgments, costs and expenses (including but not limited to reasonable attorney's fees and costs) (collectively, "Claims"), whether or not involving a third party claim, which arise out of or relates to any enforcement action of any regulator based on, or in connection with, Ticketmaster's breach of this Section 1.2.

1.3. Principal is solely responsible for controlling the collection, Processing, and Sharing of all Principal Data once received by Ticketmaster, and, with respect to all Principal Data, Ticketmaster is a service provider to Principal for the business purposes of providing the services described in the Agreement (collectively, the "Specified Business Purpose").

1.4. In accordance with Ticketmaster's obligations as a service provider to Principal, Ticketmaster certifies that it (a) understands, and will comply with, the applicable restrictions set forth in the CCPA and (b) agrees that:

1.4.1.  Ticketmaster shall Process all Principal Data on behalf of Principal only;

1.4.2.  Ticketmaster is prohibited from retaining, using, or disclosing Principal Data for any purpose other than for the Specified Business Purpose, including, without limitation, from retaining, using, or disclosing such Principal Data (A) for a purpose other than the Specified Business Purpose or (B) outside of the direct business relationship between the relevant data subject and Principal (and Ticketmaster on behalf of Principal);

1.4.3.  Ticketmaster shall not further collect, use, or disclose Principal Data except as necessary to provide the services described in the Agreement;

1.4.4.  Ticketmaster shall not sell or share Principal Data for any reason;

1.4.5.  Ticketmaster shall keep Principal Data confidential and implement and maintain (and require any subprocessors (defined below) that have access to Principal Data to maintain) a comprehensive, effective, and documented information security

51

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL

LNE-LIT24-001678718

program appropriate to the nature of Principal Data that: (A) contains administrative, technical, and physical safeguards to identify, assess and protect against any reasonably foreseeable, anticipated, or actual threats or hazards (whether internal or external) to the security or integrity of Principal Data (including threats of loss, theft, unauthorized access, use, disclosure or other unauthorized Processing of Principal Data or any failure of security controls protecting Principal Data), whether contained in tangible or intangible records, (B) is compliant with accepted security standards in the industry (C) complies with all applicable privacy and/or data security laws;

1.4.6. Ticketmaster shall provide Principal with assistance, as Principal may reasonably request or as needed based upon a consumer request, to enable Principal to comply with obligations imposed on Principal in relation to Principal Data, including, but not limited to, providing any assistance with data subject rights requests, or other legal binding obligations, which may include, litigation holds and responding to orders of a court or regulatory authority with jurisdiction;

1.4.7. Where Ticketmaster engages another party to Process Principal Data (a "subprocessor"), obligations providing for at least an equal level of data protection, as established by the Agreement, shall be imposed on that subprocessor by way of a written contact

1.4.8. Ticketmaster shall: (A) notify Principal as soon as possible, and as far as it is legally permitted to do so, of any access request or disclosure of data request which concerns Principal Data (or any part thereof) by any governmental or other regulatory authority, or by a court or other authority of competent jurisdiction, and (B) not disclose or release, as far as it is legally permitted to do so, any Principal Data in response to such request served on Ticketmaster without first consulting in good faith with, and obtaining the written consent of, Principal.

1.4.9. Ticketmaster shall provide assistance, as reasonably requested by Principal (and at Principal's cost), in connection with any audits or inspections of any competent regulatory authority or government body to the extent such audit relates to the Processing of Principal Data under the Agreement;

1.4.10. Ticketmaster shall, upon Principal's request, at the latest, however, upon termination or expiration of the Agreement, delete or return (while respecting data protection and security measures) to Principal all Principal Data and delete all existing copies unless the country's laws to which Ticketmaster is subject to require a longer retention period;

52

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL

LNE-LIT24-001678719

**DX-1494.0995**

1.4.11. Ticketmaster shall not, unless otherwise explicitly permitted by applicable law, combine Principal Data with Personal Information it (A) receives from or on behalf of another person or third party or (B) collects from its own interactions with the applicable data subject;

1.4.12. Ticketmaster shall notify Principal immediately if Ticketmaster determines it can no longer meet any of its obligations under this Section 1.4;

1.4.13. Upon request from Principal based on Principal's determination in its sole discretion that there may be an unauthorized use of personal information, Ticketmaster shall promptly take reasonable steps requested by Principal to stop and remediate such potential unauthorized use; and

1.4.14. Ticketmaster shall provide Principal with reasonable assistance and work with Principal in good faith to fully resolve and remediate any potential breach of this Agreement by Ticketmaster with respect to Principal Data.

## 2. Security

2.1. The parties shall implement and maintain reasonable technical and organizational measures to safeguard Purchaser Data, including, at a minimum, the 20 controls listed in the Center for Internet Security's Critical Security Controls and the guidelines in the California Attorney General's 2016 Data Breach Report.

2.2. In the event either party becomes aware of a Data Breach involving Purchaser Data, the party that discovers the breach shall (unless prohibited under applicable law):

2.2.1. Promptly following discovery (and the party shall use commercially reasonable efforts within twenty-four (24) hours following discovery), report the Data Breach to the other party (to Ticketmaster at CSIRT@LiveNation.com, and to Principal at ███████████████           ████████████████        and ███████████████

2.2.2. Promptly provide the other party with a written report detailing, to the extent such information is known, the likely reasons for the Data Breach, possible root causes and impact, individuals impacted, location of individuals impacted, and data elements impacted;

2.2.3. Provide assistance, at no additional cost, that may be reasonably required to manage and remediate the Data Breach; and

53

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL

LNE-LIT24-001678720

**DX-1494.0996**

2.2.4.  Take immediate remedial action to secure the Purchaser Data and to prevent re-occurrences of the same or similar incident and provide the other party with details of such remedial action.

2.3. In the event of a Data Breach involving Purchaser Data, the impacted party shall be responsible for making any relevant or applicable notifications to the applicable regulatory authority and to individuals/residents (at its own expense) but shall refrain from taking any other action that could predictably harm the interest or affect the reputation of the other party. The impacted party shall not issue press or media statements or comments about a Data Breach involving Purchaser Data that names the other party unless it has obtained prior written consent.

2.4. In the event Ticketmaster becomes aware of a Data Breach involving Principal Data, Ticketmaster shall (unless prohibited under applicable law):

2.4.1.  Promptly following discovery (and Ticketmaster shall use commercially reasonable efforts within twenty-four (24) hours following discovery), report the Data Breach to Principal at rick.schoenhals@teamkse.com and zsolt.molnar@teamkse.com;

2.4.2.  Promptly provide Principal with a written report detailing, to the extent such information is known, the likely reasons for the Data Breach, possible root causes and impact, individuals impacted, location of individuals impacted, and data elements impacted;

2.4.3.  Provide assistance, at no additional cost, that may be reasonably required to manage and remediate the Data Breach;

2.4.4.  Take immediate remedial action to secure the Principal Data and to prevent re-occurrences of the same or similar incident and provide the other party with details of such remedial action; and

2.4.5.  Not make any statement or notification to any data subject, regulatory authority, or otherwise, regarding the Data Breach without the prior written approval of Principal.

## 3.  Cooperation

3.1. In the event either party receives any correspondence, inquiry, complaint or claim from an individual (with the exception of Data Subject Access Requests as addressed in Section 4.1 below), regulator or other third party relating to the processing of Purchaser or Principal Data ("**Correspondence**"), it shall promptly inform the other party giving full details of the same, and the parties shall cooperate reasonably and in good faith in order to enable the relevant party or parties to respond to the Correspondence in a manner

54

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

**DX-1494.0997**

compliant with applicable privacy and data security laws and regulations. If either party is required by law to disclose the Personal Information contained within the Purchaser or Principal Data to law enforcement or government authorities, the party shall notify the other party in writing and liaise with the other party in good faith before complying with such disclosure request.

## 4. Data Subject Access Requests

4.1. Each party shall be entirely responsible for responding to data subject access, deletion, and do not sell requests relating to Purchaser Data that such party receives from individuals under the CCPA. On reasonable notice from the other party, but no more than once per calendar year, each party shall provide the other party with a copy of the data subject rights request log to confirm compliance with the CCPA. If the data subject requests data held by the other party, the receiving party shall provide the individual with the appropriate email address to contact the other party directly. Such email addresses include: privacy@livenation.com for Ticketmaster, and privacy.office@teamkse.com for Principal.

## 5. Final Provisions

5.1. In the case of any conflict or inconsistency between any of the terms or conditions of the Agreement or this Exhibit G, the terms or conditions of this Exhibit G shall control.

5.2. If a provision of this Exhibit G is or becomes ineffective, in whole or in part, or if there is an omission, the remaining provisions of this Exhibit G shall remain unaffected. In place of the ineffective provision, and to fill the omission, the parties shall agree on a reasonable provision which comes - to the extent legally possible - closest to what the parties agreed or would have agreed if they had considered this point.

55

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL

LNE-LIT24-001678722

| Form **W-9**<br>(Rev. October 2007)<br>Department of the Treasury<br>Internal Revenue Service | **Request for Taxpayer<br>Identification Number and Certification** | Give form to the<br>requester. Do not<br>send to the IRS. |
|---|---|---|

Name (as shown on your income tax return)

Business name, if different from above

Check appropriate box: ☐ Individual/Sole proprietor  ☐ Corporation  ☐ Partnership
☐ Limited liability company. Enter the tax classification (D=disregarded entity, C=corporation, P=partnership) ▶ _____
☐ Other (see instructions) ▶

☐ Exempt payee

Address (number, street, and apt. or suite no.)    Requester's name and address (optional)

City, state, and ZIP code

List account number(s) here (optional)

**Part I**  **Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. The TIN provided must match the name given on Line 1 to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

Note. If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

Social security number

or

Employer identification number

**Part II**  **Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. citizen or other U.S. person (defined below).

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. See the instructions on page 4.

**Sign Here**  Signature of U.S. person ▶                Date ▶

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

## Purpose of Form

A person who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income.

Note. If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

- An individual who is a U.S. citizen or U.S. resident alien,
- A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States,
- An estate (other than a foreign estate), or
- A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax on any foreign partners' share of income from such business. Further, in certain cases where a Form W-9 has not been received, a partnership is required to presume that a partner is a foreign person, and pay the withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid withholding on your share of partnership income.

The person who gives Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States is in the following cases:

- The U.S. owner of a disregarded entity and not the entity,

Cat. No. 10231X    Form **W-9** (Rev. 10-2007)

56

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL    LNE-LIT24-001678723

DX-1494.0999

57

$0b606e139c4b$E014BA6FB1BB443FB8FABD69D7BC141F.docx

CONFIDENTIAL

LNE-LIT24-001678724

**DX-1494.1000**

**DocuSign**

## Certificate Of Completion

Envelope Id: DA8ACA9F598843DF983568DDE3195283                                      Status: Completed
Subject: Please DocuSign: KSE Denver LUA 05162022_Final.docx
Source Envelope:
Document Pages: 57                      Signatures: 2                                Envelope Originator:
Certificate Pages: 5                    Initials: 0                                 Scott Aller
AutoNav: Enabled                                                                    2000 W Loop S
EnvelopeId Stamping: Enabled                                                        Houston, TX 77027
Time Zone: (UTC-08:00) Pacific Time (US & Canada)                                   scott.aller@ticketmaster.com
                                                                                    IP Address: ███████████

## Record Tracking

Status: Original                        Holder: Scott Aller                         Location: DocuSign
        5/17/2022 9:47:36 AM                    scott.aller@ticketmaster.com

| Signer Events | Signature | Timestamp |
|---|---|---|
| kurt Schwartzkopf<br>kurt.schwartzkopf@ticketmaster.com<br>EVP,Co-Head of Sports NBA/NHL Arenas<br>Security Level: Email, Account Authentication (None) | *kurt Schwartzkopf*<br>77C689CE4FE6405...<br><br>Signature Adoption: Pre-selected Style<br>Signed by link sent to<br>kurt.schwartzkopf@ticketmaster.com<br>Using IP Address: ███████████<br>Signed using mobile | Sent: 5/17/2022 9:57:00 AM<br>Viewed: 5/17/2022 10:01:40 AM<br>Signed: 5/17/2022 10:01:56 AM |
| Electronic Record and Signature Disclosure:<br>    Accepted: 3/24/2021 11:16:46 AM<br>    ID: 90908821-2bbb-4cd1-81fd-cffe3f404f9b | | |
| Matthew Hutchings<br>████████████████████<br>EVP & COO<br>Security Level: Email, Account Authentication (None) | *Matthew Hutchings*<br>7BAEAD15CDA349A...<br><br>Signature Adoption: Pre-selected Style<br>Signed by link sent to<br>████████████████<br>Using IP Address: ███████████ | Sent: 5/17/2022 10:01:59 AM<br>Viewed: 5/17/2022 10:05:05 AM<br>Signed: 5/17/2022 10:05:35 AM |
| Electronic Record and Signature Disclosure:<br>    Accepted: 5/17/2022 10:05:05 AM<br>    ID: a7bb5b3d-ecb5-417a-819b-b039e208144b | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

**DX-1494.1001**

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 5/17/2022 9:57:00 AM |
| Certified Delivered | Security Checked | 5/17/2022 10:05:05 AM |
| Signing Complete | Security Checked | 5/17/2022 10:05:35 AM |
| Completed | Security Checked | 5/17/2022 10:05:35 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

CONFIDENTIAL

LNE-LIT24-001678726

**DX-1494.1002**

Electronic Record and Signature Disclosure created on: 9/23/2020 12:03:16 PM
Parties agreed to: kurt Schwartzkopf, Matthew Hutchings

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Live Nation Corporate (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

CONFIDENTIAL                                     LNE-LIT24-001678727

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Live Nation Corporate:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: markhoder@livenation.com

**To advise Live Nation Corporate of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at markhoder@livenation.com and in the body of such request you must state: your previous email address, your new email address.  We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Live Nation Corporate**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to markhoder@livenation.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Live Nation Corporate**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

CONFIDENTIAL

LNE-LIT24-001678728

**DX-1494.1004**

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to markhoder@livenation.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Live Nation Corporate as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Live Nation Corporate during the course of your relationship with Live Nation Corporate.

CONFIDENTIAL                                                                                                  LNE-LIT24-001678729

**DX-1494.1005**