DX-1494(22)

Bates: LNE-LIT24-000116961 - LNE-LIT24-000117000

Licensed User Agreement between Ticketmaster and New York Islanders Hockey Club, L.P.

DX-1494.1006

# LICENSED USER AGREEMENT

THIS LICENSED USER AGREEMENT ("Agreement") is entered into as of July 14, 2021 ("Effective Date"), by and between Ticketmaster L.L.C., a Virginia limited liability company ("Ticketmaster"), on the one hand, and New York Arena Partners, LLC, a Delaware limited liability company ("NYAP"), New York Islanders Hockey Club, L.P., a New York limited partnership ("NYI"), on the other hand (NYI and NYAP, collectively, "Principal"). This Agreement consists of this Licensed User Agreement, and any Exhibits attached hereto which are incorporated herein by this reference. The meanings of all capitalized terms used in this Agreement are set forth in Section 16 hereof. In consideration of the mutual promises and covenants set forth herein, the parties hereby agree as follows:

1.     **TERM**:  The initial term of this Agreement shall begin on the Effective Date and shall continue through June 30, 2027 (the "Term").  Thereafter, the Term of this Agreement shall automatically be renewed for successive three (3) year periods unless either party hereto notifies the other party in writing, not less than ninety (90) days prior to the end of the initial Term or the then current renewal period, of its intention not to renew this Agreement.  Each twelve (12) month period commencing on July 1 and continuing through the following June 30 shall be a "Contract Year" as such term is used herein; provided, that the initial Contract Year shall commence on the Effective Date and continue through June 30, 2022.  Ticketmaster and Principal acknowledge and agree that this Agreement shall cover all NYI Season/Contract Ticket sales for the Facility, including those occurring prior to the Effective Date, notwithstanding the fact that Ticketmaster and NYI have an existing agreement governing Ticket sales for Nassau Veterans Memorial Coliseum and Barclays Center.

2.     **TICKET SALES RIGHTS; EXCLUSIVITY**:

(a)     **Grant of Rights**: Except as otherwise provided below in Section 2(b), in consideration for the licenses granted and services provided by Ticketmaster hereunder, and any compensation paid to Principal pursuant to this Agreement, Principal hereby grants to Ticketmaster, and Ticketmaster accepts from Principal, the right during the Term of this Agreement, to be the exclusive seller, as Principal's agent, of all Tickets for the Sellable Capacity for every Attraction via any and all means and methods, including on the Internet, by telephone, computer, IVR, outlets, television, clubs, auctions, VIP packages, presales, upsells, or by any other means of distribution, whether existing now or at any time in the future.  Except as set forth in Section 2(b), Principal shall ensure that the entire Sellable Capacity for every Attraction shall be made available for distribution on the TM System.

(b)     **Sales by Principal**:  Subject to the terms of Section 2(c), Principal retains the right to: (i) sell single Tickets from the Facility Box Office to persons physically present at the Facility Box Office; (ii) sell Season/Contract Tickets; (iii) conduct Group Sales of Tickets; and (iv) provide a reasonable number of House Seats for any Attraction.

(c)     **No Third Party Systems or Services**:

(i)     Except as expressly set forth in subsection (ii) below, Principal shall not directly or indirectly use, promote, advertise, authorize or permit the use of any third

1

HIGHLY CONFIDENTIAL

LNE-LIT24-000116961

**DX-1494.1007**

party that promotes, engages in or facilitates the sale, resale or issuance of Tickets for any Attraction, other than (i) Ticketmaster-approved third parties, or (ii) in connection with (A) media placements controlled by third parties, or (B) advertising and promotion with respect to Special Events (as such term is defined in the Sponsorship Agreement) and/or any other games that are not designated NYI "home games" at the Facility as set forth in Exhibit A, Section 1(a) of the Sponsorship Agreement, in each case, as expressly permitted pursuant to Section 1 of Exhibit A of the Sponsorship Agreement.  Ticketmaster acknowledges that Principal is under no obligation to take affirmative steps to prevent or limit Ticket holder from re-selling such tickets through any third party that promotes, engages in or facilitates the sale, resale or issuance of tickets.

(ii)    Notwithstanding Ticketmaster's right to be the exclusive seller of Tickets to the Attractions pursuant to this Section 2, Ticketmaster agrees to a limited waiver of its exclusive rights to permit Principal to sell up to ten percent (10%) of the Sellable Capacity for each NYI Attraction to a Distribution Partner who is willing to take an inventory position for such Tickets, and in consideration therefore, Principal agrees to the following terms:

(1)    the Distribution Partner shall be a participant in Ticketmaster's "Sports Distribution Program";

(2)    the Distribution Partner is hereby permitted to re-sell any Distributed Tickets purchased from Principal; provided, the Distribution Partner must always post such Distributed Tickets on TM+. The Distribution Partner may also re-sell such Distributed Tickets on any third-party resale platforms; provided, that all Distributed Tickets be listed on TM+ at prices no higher than the Distribution Partner posts such Distributed Tickets on any third-party resale platforms; and

(3)    Principal will follow the Resale Best Practices set forth on Exhibit C.

(d)    **No Minimum Sales**: It is agreed and understood that neither Ticketmaster nor Principal guarantees or will guarantee that any minimum or fixed number of Tickets will be sold through the TM System for any Attraction.

(e)    **Acknowledgement by Principal**:    Principal acknowledges that Ticketmaster acts as the agent of certain third parties that may be a direct or indirect competitor of Principal.  Principal also acknowledges that Ticketmaster has entered and may in the future (including during the Term of this Agreement) enter into new business relationships with other third parties, including those in the entertainment and sports industry, such as performers who perform at the Facility, for a variety of services.   Principal further acknowledges that any such sales or services or solicitations to provide such sales or services as contemplated under this subsection do not compete with Principal or conflict with this Agreement or Ticketmaster's rights, duties or obligations under this Agreement.

(f)    **Acknowledgement by Ticketmaster**: Ticketmaster acknowledges that nothing set forth in this Agreement shall prevent Principal from purchasing from any third party customer data related to Attractions.

2

HIGHLY CONFIDENTIAL

LNE-LIT24-000116962

DX-1494.1008

3.    **COMPENSATION**:

(a)    **Ticketmaster Charges and Fees**:  In consideration for the licenses granted and services provided by Ticketmaster hereunder as an agent of Principal, and any compensation paid to Principal pursuant to this Agreement, Ticketmaster shall be entitled to assess and receive charges and fees in the amounts set forth on Exhibit A, all of which charges and fees shall be assessed against consumers, except for Inside Charges and, at Principal's option, Archtics Transaction Fees, which shall be assessed against Principal. In the event applicable law prohibits the assessment of such fees against consumers, Ticketmaster and Principal shall agree on alternative means for compensating Ticketmaster for its services in amounts reasonably comparable to those set forth in this Agreement, and as permitted by applicable law. Notwithstanding the above, charges and fees with respect to any Attractions presented by Feld Entertainment (including, without limitation, Disney on Ice, Circus, and Motor Sports) ("Feld Attractions") at the Facility shall be determined pursuant to a separate national agreement between Ticketmaster and Feld Entertainment.

(b)    **Payment Processing Fees**:

(i)    Sales by Ticketmaster:  With respect to Tickets purchased from Ticketmaster with credit cards, debit cards, gift cards or any other electronic methods of payment, the payment authorization and processing fees ("Payment Processing Fees") shall be passed on to Principal at the rates set forth on Exhibit A, which percentage rates shall be deducted by Ticketmaster from the Ticket sales proceeds, or, at Principal's option, upon notice to Ticketmaster, the Convenience Charge may be adjusted to include Principal's portion of such Payment Processing Fees, provided that the Convenience Charge will be rounded up to the nearest $0.05. Notwithstanding the above, with respect to any Feld Attractions, Principal agrees that Principal shall be obligated to pay for the Payment Processing Fees for Tickets to Feld Attractions, or shall obtain the agreement of Feld Entertainment to adjust the fees payable for such Feld Attractions to include the amount of such Payment Processing Fees; in any such event Ticketmaster shall not be obligated to absorb the Payment Processing Fees with respect to the Face Value of Tickets to any Feld Attractions.

(ii)    Principal Sales Using TM Charge: In connection with Principal's sales of Tickets utilizing electronic payments and authorized via TM Charge using either Visa or MasterCard, Ticketmaster's credit card processor ("Processor") shall deduct the merchant fees in an amount set forth on Exhibit A for transactions processed on a daily basis.  The fees charged to Principal for use of TM Charge are subject to automatic increases equal to any actual increases in Ticketmaster's Processor fees.  Principal shall also be responsible for any and all other amounts charged to Ticketmaster (if any) by a Processor for processing Principal's transactions, (other than as a result of Ticketmaster's negligence, willful misconduct or material breach of any agreement to which it is a party), including, without limitation, chargebacks, fraudulent credit card use and additional charges for failure to meet the specific timing or other qualifications of the applicable credit card association or company.  In the event that Principal desires to process or accept any credit or debit cards or other electronic payment methods other than Visa or MasterCard utilizing TM Charge, then the fees for such service shall be mutually agreed upon by Principal and such credit card companies or payment providers, as applicable, and Principal shall enter into its own merchant agreement with such parties.

(c)    **Compensation to Principal**:

3

HIGHLY CONFIDENTIAL                                                                                                    LNE-LIT24-000116963

**DX-1494.1009**



(i)　**Volume Incentive Payments**:　In any　Contract Year in which Ticketmaster sells in excess of five hundred thousand (500,000) Tickets (the "Lower Threshold") but less than or equal to nine hundred thousand (900,000) Tickets (the "Upper Threshold") via Ticketmaster distribution channels for which Ticketmaster receives (and does not refund) a per Ticket Inside Charge or Archtics Transaction Fee (i.e., for single Ticket sales using AccountManager) then, Ticketmaster shall pay Principal $▮▮ per Ticket for each such Ticket sold in excess of the Lower Threshold up to an including the Upper Threshold.　For any Tickets sold via Ticketmaster distribution channels for which Ticketmaster receives (and does not refund) a per Ticket Inside Charge or Archtics Transaction Fee (i.e., for single Ticket sales using AccountManager) in excess of the Upper Threshold during any Contract Year, Ticketmaster shall pay Principal $▮▮ per Ticket for each such Ticket sold in excess of the Upper Threshold.　The payments described above are collectively referred to as "Volume Incentive Payments."　For example, if Ticketmaster sells ▮▮▮▮ such Tickets during any single Contract Year, Principal shall receive a Volume Incentive Payment in the amount of ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮, with respect to such Tickets.　If Ticketmaster sells less than 500,000 such Tickets in any given Contract Year, Principal shall not be entitled to any Volume Incentive Payment for such Tickets sold in such Contract Year.　Any Volume Incentive Payment due to Principal shall be paid to Principal within sixty (60) days of the conclusion of the applicable Contract Year in which such Volume Incentive Payment(s) are earned.

(ii)　**Marketing Sponsorship**:　Ticketmaster shall pay to Principal an annual marketing allowance (the "Marketing Sponsorship") to advertise and promote Ticketmaster as the "Official Ticket Marketplace of UBS Arena and/or the New York Islanders" in an amount equal to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Contract Year (subject to escalation in the amount of ▮▮▮▮▮▮ at the beginning of the third and fifth Contract Years, and every second Contract Year thereafter (seventh, ninth, etc.), if applicable). The Marketing Sponsorship shall be paid to Principal in two (2) equal installments on or before September 30 and January 30 of each Contract Year.　The parties acknowledge and agree the ▮▮▮▮▮▮▮ of the Marketing Sponsorship for each Contract Year is attributable to NYI Attractions (the "Islanders Sponsorship Allocation"), and the remaining ▮▮▮▮▮▮ of the annual Marketing Sponsorship for each Contract Year is attributable to all other Attractions at the Facility (e.g., concerts, etc.) (the "Facility Sponsorship Allocation").　In exchange for the Marketing Sponsorship, Principal shall provide Ticketmaster a set of marketing/media assets, links, integrations and designations equivalent in value to the total amount of the Marketing Sponsorship, and as further set forth in a sponsorship agreement to be entered into by the parties promptly following the execution of this Agreement (the "Sponsorship Agreement").　For avoidance of doubt, the Sponsorship Agreement shall contain a mechanism for reducing the Marketing Sponsorship payable by Ticketmaster for any Contract Year in which NHL games are not played or not played with fans.　In consideration for the Marketing Sponsorship, Principal further agrees to the application of the Resale Best Practices described in Exhibit C.

(iii)　**Product Credit**:　Ticketmaster shall provide Principal with an annual credit ("Product Credit") in the amount of ▮▮▮▮▮▮▮▮ per Contract Year for the initial three (3) Contract Years, and ▮▮▮▮▮▮▮▮▮ per Contract Year for each Contract Year thereafter during the Term, to be used by Principal, at Principal's discretion, as a credit against the purchase of any LiveAnalytics, Blue Digital, Virtual Venue, or other similar Ticketmaster premium performance media service license fees and charges (collectively, the "Ticketmaster Performance Media Services"); provided, however, any

4

external third party costs, advertising placements or Virtual Venue builds related to such services shall be borne directly by Principal without application of the Product Credit. Beginning in the second Contract Year and thereafter, the Product Credit available to Principal for any such Contract Year will be increased by an amount equal to ▉▉▉▉▉▉▉ of the total out-of-pocket costs spent by Principal on such Ticketmaster Performance Media Services during the prior Contract Year (i.e., in addition to application of the Product Credit for such Contract Year). For example, if Principal spends out-of-pocket $▉▉▉▉ on Ticketmaster Performance Media Services during the initial Contract Year, the Product Credit available to Principal for the second Contract year shall be ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉ ▉▉▉▉▉▉▉▉. The parties agree that costs spent by Principal on Ticketmaster Performance Media Services during the initial Contract Year shall include all costs spent beginning on December 3, 2020 through June 30, 2022. Notwithstanding the foregoing, the parties acknowledge and agree that the amount of any unused Product Credit provided during any Contract Year shall expire at the conclusion such Contract Year, or upon the termination or expiration of the Agreement, whichever is earlier. For the avoidance of doubt, any unused Product Credit provided during any Contract Year shall not be rolled forward for use in any subsequent Contract Year. The Product Credit, having no cash value, shall not at any time be payable directly to Principal. The service costs for the Ticketmaster Performance Media Services shall be consistent with prevailing pricing for such services offered Ticketmaster's other clients.

4. **LICENSE AND USE OF HARDWARE AND SOFTWARE**:

(a) **License**: In consideration for the exclusive Ticket sales rights granted Ticketmaster as provided above, Ticketmaster hereby grants Principal a non-exclusive, non-transferable (except as permitted pursuant to Section 17(d)) license to use the Hardware and Software (collectively, the "License") in exchange for the fees set forth herein.

(b) **Use**: The Hardware and Software and all related materials may only be used by Principal in connection with the Attractions and only with systems used, operated and owned by Ticketmaster, and only for the purposes stated in this Agreement, and may not be utilized by or in connection with services, software, hardware or systems provided or supplied by any third party. Principal shall use the Hardware and Software in a careful and proper manner and shall comply with and conform to all federal, state, county, municipal and other laws, ordinances and regulations in any way relating to the possession, use or maintenance of the Hardware and Software including, but not limited to, federal, state or other laws applicable to commercial emails. Principal may make a single copy of Archtics only to be used for data analytics and reporting, archival or backup purposes; **COPYING FOR ANY OTHER PURPOSE IS PROHIBITED**. Except as otherwise provided in the immediately preceding sentence or otherwise expressly in this Agreement, Principal hereby agrees: (i) to use commercially reasonable efforts not to permit copying or reproduction of the Hardware or Software in any manner, including without limitation, use in a sharing arrangement or transmission over the Internet or over e-mail and similar electronic transmission; (ii) not to disassemble, re-manufacture, repair, re-configure, enhance, upgrade, modify, translate, adapt, create derivative works from or of, decompile or reverse engineer the Software in any way nor merge them into any other program for any purpose; (iii) not to transfer, license or sub-license, assign, rent, sell, grant, publish, disclose, display, dispose of or otherwise make available the Software, or any rights therein or copies or derivatives thereof, including other templates or working systems; (iv) not to delete, remove, change or otherwise alter any trademarks, copyright notices or other proprietary marks in or on the Hardware or Software, or any copies, modifications or partial copies thereof; (v) not to "hack," or attempt to

5

HIGHLY CONFIDENTIAL

LNE-LIT24-000116965

"hack," any of the Software, the servers on which the Software is hosted or any other portion of the Ticketmaster network, or otherwise attempt to circumvent, or navigate outside of, the borders of such Software servers in any manner whatsoever; and (vi) not to perform any SQL database operations other than "SELECT" for any system production tables (i.e., tables starting with dba.t_<wildcard>) from any non-Archtics interface to the database (e.g., ISQL, Access, Crystal Reports, etc.).

(c) **Passwords**: Principal agrees that use of the TM System by Principal shall be restricted to a reasonable number of Principal's personnel having passwords in the event that Ticketmaster assigns such passwords. Such passwords shall not be transferable without the written permission of Ticketmaster, which permission shall not be unreasonably delayed, conditioned or withheld. Upon Ticketmaster's reasonable request, Principal (i) shall identify, as the case may be, the users (by name, position and site address), who use or view the TM System or from where the TM System is used, and (ii) shall provide to Ticketmaster, upon request, access to any database which records access to the TM System, except to the extent such database may include confidential information of Principal which Ticketmaster does not have a need to know for the purpose of fulfilling its obligations under this Agreement.

(d) **TM Charge**:

(i) <u>Use and Operation of TM Charge</u>: Ticketmaster shall transmit data relating to Ticket sales made by Principal using TM Charge to the Processor, provided Ticketmaster has received Principal's merchant number(s) and other necessary information for Ticketmaster to use for the transmission of sales data. Principal shall be responsible for promptly notifying Ticketmaster and Processor, if applicable, of any changes to the information provided pursuant to this Section. Processor will then transmit such data to the applicable credit card company for payment to Principal, subject to Principal having entered into the applicable Principal Processor Agreements (as further described below). Ticketmaster shall use its best efforts to ensure the accuracy of information transferred from the Processor via TM Charge, but Ticketmaster does not guarantee the accuracy and timeliness of such information. Principal shall comply with all applicable credit card association or company guidelines (e.g. swiping all retail transactions and using customer address information for all non-face-to-face transactions). Ticketmaster shall provide Principal with daily transaction reports regarding authorized and settled transactions. Principal shall review, on a regular basis, all reports provided to Principal by Ticketmaster. Principal also agrees that, for operational and monitoring purposes, the Processor may provide Ticketmaster with processing and settlement reports related to sales of Tickets using TM Charge.

(ii) <u>Effect of Termination of Ticketmaster's Processor Agreement</u>: Ticketmaster has entered into an agreement with the Processor (the "Processor Agreement"), and Principal agrees to enter into an agreement with such Processor (the "Principal Processor Agreement") as soon as practicable after the date of this Agreement. The Principal Processor Agreement shall provide that if the related Processor Agreement expires or terminates, then the Principal Processor Agreement shall also expire or terminate without any early termination penalties or charges. In order to facilitate streamlined credit card authorization processing for Ticketmaster and its clients, Ticketmaster continues to seek to maintain relationships with superior processors throughout the Term of this Agreement. In the event that Ticketmaster elects to use a different Processor, Principal shall enter into an agreement with such new Processor if Principal desires to continue utilizing TM Charge with respect to such new Processor, it being

6

HIGHLY CONFIDENTIAL

LNE-LIT24-000116966

**DX-1494.1012**

acknowledged and agreed by Principal, however, that use of certain Software (e.g., AccountManager) may require utilization of TM Charge.

(e) **Principal's Website/Interface Page**: Beginning on or shortly after the execution of this Agreement, and subject to the completion of the installation of Archtics, Ticketmaster will develop the Interface Page that will enable Principal's Subscribers to access their account information and conduct "real-time" transactions by linking to the Interface Page from the Principal's Website. The Interface Page may contain a short, related textual description of AccountManager features and shall contain Ticketmaster's designated wording and graphic depiction thereof, currently "by Ticketmaster."

(f) **Group Sales Restrictions**: All Group Sales must comply with the definition of Group Sales hereunder. In the event that Ticketmaster reasonably determines that a Group Sale is not a valid Group Sale, Ticketmaster shall have the right to assess against Principal the amount of fees that Ticketmaster would otherwise have been entitled to assess under this Agreement with respect to any such Tickets had they been purchased through Ticketmaster as single Tickets, and not from Principal as a Group Sale.

(g) **Hosted Platform**: During the Term, Ticketmaster shall host the Software and provide and maintain the Hosted Platform on which the Software will be installed and run, including provision of the physical environment including physical security, HVAC and power for the required server hardware for the Hosted Platform and the Software. Ticketmaster will also provide access via certain Internet connectivity, by being responsible for network operation and availability from the public Internet up to the termination cables at the network interface card on the server hardware for the Hosted Platform. Ticketmaster will not be responsible for power at the Facility or Principal's connectivity to the Internet.

(h) **TM Secondary Exchanges**: The terms and conditions set forth in Exhibit C attached hereto shall apply in connection with the operation of the TM Secondary Exchanges for the Attractions.

(i) **Presence and Related Hardware**. Ticketmaster shall, at no additional charge, provide Principal with the use of Ticketmaster's proprietary access management system ("Presence") and certain Presence related equipment identified in Exhibit B attached hereto (including all necessary Hardware to properly outfit the Facility (including the Facility Box Office and the provision of one printer to be located at NYI's off-site office location) (up to $⬛ in Hardware value)) which, among other things, enables the use of non-barcoded Tickets and allows for the identification of individual attendees accessing an Attraction (as opposed to the original Ticket purchasers only). In the event Principal elects to utilize a third-party Ticketmaster Nexus Partner for access control instead of Presence, Ticketmaster will provide API support and twenty (20) access control scanners for Principal's use, and make a one-time payment to Principal in the amount of ⬛ (the "Access Control Allowance") to be used by Principal for Principal's utilization of such third-party access control system. For the avoidance of doubt, except for the twenty (20) access control scanners provided by Ticketmaster, any such additional equipment purchased by Principal from any third-party Ticketmaster Nexus Partner for access control shall not be deemed "Hardware" for any purposes of the Agreement, and Principal shall be solely responsible for owning and maintain such additional equipment at its cost. In the event of any termination of this Agreement prior to the conclusion of the sixth (6th) Contract Year, Principal shall return a pro rata portion of any Access Control Allowance previously

HIGHLY CONFIDENTIAL

LNE-LIT24-000116967

**DX-1494.1013**

paid to Principal in an amount equal to ████████ per month for each month of the initial six (6) Contract Year Term remaining following such termination.

(j)      **Platinum Tickets and VIP Packages**: The terms and conditions set forth in Exhibit D attached hereto shall apply in connection with the sale of Platinum Tickets and VIP Packages.

5.      **INSTALLATION AND SET-UP**:

(a)      **Infrastructure and Installation:** Ticketmaster will install the Hardware furnished by Ticketmaster, and provide Principal with access to the Software. Principal will provide (i) a redundant connectivity solution between the Facility and Ticketmaster's central computer facility for interfacing that satisfies Ticketmaster's minimum system requirements and reasonable connectivity performance requirements of both parties, and (ii) unless otherwise agreed to between the parties, any type of equipment and technology necessary to assist Ticketmaster in completing the installation of such Hardware or Software. Ticketmaster shall have no responsibility for any internal wiring or cabling (e.g., electrical, data lines, etc.) necessary for installation, operation or for proper functioning of the TM System at the Facility.

(b)      **Attraction Set-Up**: In order to effectively utilize Ticketmaster's distribution technologies, within a reasonable time before (but in no event less than the time period described below) the scheduled on-sale date of Tickets for each Attraction (the "On-Sale Date"), Principal shall furnish Ticketmaster with all necessary information with respect to the Attraction, including, without limitation, seating layout of the Facility, Ticket structure, discounts permissible, Attraction Taxes, any information necessary to calculate Attraction Taxes, if applicable, Ticket header information, logos, entry information, vision and hearing information, wheelchair and other accessible seating information and such other information as is necessary for the proper sale of Tickets (collectively, the "Set-Up Information"). The parties intend that all accessible seating Tickets that are available for sale to persons desiring accessible seating shall be made available for sale on the TM System and such accessible seating Tickets shall not be released into the general pool of Tickets that are available for sale until forty-eight (48) hours before an Attraction. Principal must provide the Set-Up Information to Ticketmaster at least five (5) business days prior to the On-Sale Date for new Attractions that do not utilize seating charts then existing in the TM System and at least three (3) business days prior to the On-Sale Date for new Attractions that utilize seating charts then existing in the TM System. Ticketmaster shall have no responsibility and Principal shall indemnify and hold Ticketmaster harmless from and against any and all liabilities, claims, expenses (including court costs and reasonable attorneys' fees) and causes of action resulting from the inaccuracy of any Set-Up Information furnished by Principal pursuant hereto.

(c)      **Facility Box Office Will-Call Services**: At all times during the Term of this Agreement, Principal shall maintain a designated Facility Box Office location for the pick-up of Tickets purchased through Ticketmaster distribution channels. The pick-up location shall be open during the normal hours of operation of the Facility Box Office. Principal shall notify Ticketmaster of Principal's will-call capabilities and will-call Facility Box Office hours. Principal shall verify the identity of each person picking up Tickets at will-call via a valid photo identification (government issued) and the credit card or other electronic payment method used in the Ticket sales transaction. Principal shall not release Tickets to any customer whose identity has not been so verified.

8

HIGHLY CONFIDENTIAL                                                                                 LNE-LIT24-000116968

(d)     **Supplies**:   Principal shall be responsible for maintaining adequate nondurable operational supplies used at the Facility in connection with the operation of the Hardware and Software to assure continuous operations at the Facility.

(e)     **Ticket Stock**: Principal shall be responsible for the security of Ticket stock in its possession, and the risk of loss of Ticket stock shall shift to Principal upon the delivery thereof to Principal or Principal's authorized representative, agent or employee.

6.     **MAINTENANCE AND SUPPORT**:

(a)     **Hardware and Software Maintenance and Support**: Ticketmaster shall provide ordinary and routine maintenance and repair services and adequate support of the Hardware and Software at the Facility to meet the reasonably anticipated service needs of Principal from time to time and in accordance with industry standards at no additional charge, provided that such maintenance, repair or support is not necessitated by the negligence or willful misconduct of Principal, its employees, agents or representatives.   Support services will be provided, on a return call basis, during Ticketmaster's normal business hours by personnel qualified to answer telephone inquiries by Principal seeking advice on questions and problems. Non-emergency calls made at the end of the day, which require support services that would keep staff beyond normal working hours, will be deferred to the following business day.   Support will be provided for off-hour critical system emergencies.   Ticketmaster will not be obligated to continue to provide maintenance with respect to any version of Archtics used by Principal for more than one year after a release by Ticketmaster of an upgraded version of the same Software. Ticketmaster shall maintain an archive of Principal's Archtics database for up to two (2) years in the format of Principal's then current Archtics version.   Ticketmaster shall retain archives of Principal's Archtics database in excess of two (2) prior years in an offline form to be stored at Ticketmaster's data center, which prior archives shall not be updated to Principal's then current Archtics version; provided, that Ticketmaster shall extract data from such prior archives at Principal's request and deliver such data extracts to Principal.

(b)     **Training of Principal's Employees**:  Principal shall staff the Facility Box Office with its employees for the proper operation of the TM System for Ticket sales made through the Facility.   Ticketmaster shall train, at its expense, Principal's employees who shall be reasonably necessary for the initial staffing of the Facility Box Office and for initial operation of the TM System for single Ticket sales at the Facility, and upon Principal's request from time to time no more than once every two (2) Contract Years during the Term, shall provide refresher training, at its expense.  Ticketmaster shall also provide additional training at its cost to other employees of Principal to the extent such training is necessary as a consequence of changes initiated by Ticketmaster or changes in Ticketmaster's method of operation; such additional training may include the refresher training set forth above.  To the extent Principal determines any change in personnel by Principal in connection with Facility Box Office sales requires additional training by Ticketmaster beyond that initially contemplated hereunder, Principal agrees to absorb all of the out-of-pocket expenses (including any and all reasonable travel expenses) thereof.

(c)     **Notification by Principal**: In the event of any breakdown or malfunction in the operation of any of the Hardware or Software, or difficulties encountered in connection with access to any of the Software, Principal agrees to promptly notify Ticketmaster of any such breakdown, malfunction or difficulty to assist Ticketmaster in performing its obligations hereunder.

9

HIGHLY CONFIDENTIAL

LNE-LIT24-000116969

**DX-1494.1015**

       (d)     **Access to Principal's Equipment and Data**:  Principal shall permit Ticketmaster, at Ticketmaster's sole discretion and upon reasonable written notice, the right at a reasonable time to inspect Principal's pertinent sites and equipment (including any existing LAN or other network user monitor device) for the purpose of determining compliance with the terms of the License granted hereunder.  In order to correctly diagnose faults in the equipment and data related to the Software and Hardware, Principal will provide Ticketmaster 24-hour remote access to Principal's installation, pertinent sites, equipment (including any existing LAN or other network user monitor device) and user data through PC Anywhere, subject to Principal's reasonable security requirements.   Failure to provide such access may prohibit effective action by Ticketmaster and render Ticketmaster unable to proceed, and in such circumstances, Ticketmaster shall be under no liability for failure to perform its obligations hereunder.

       (e)     **Additional Archtics Services**:  With respect to initial implementation of Archtics, Ticketmaster shall also provide, at no additional cost to Principal, (i) on-site support from Ticketmaster's national or regional personnel, (ii) unique Archtics customization (e.g., diagrams, invoices, other executables, etc.), (iii) custom reporting, and (iv) customized on-line assistance (the services described in clauses (ii) through (iv) are referred to herein as "Customization Services".)  Two (2) hours of Customization Services each week are included in the annual maintenance fees of Archtics listed on <u>Exhibit A</u>.  Customization Services requested by Principal in excess of this level of support shall be charged to Principal in accordance with Ticketmaster's standard rates.

   7.     **ADVERTISING**:

       (a)     **Advertising on Tickets Fulfilled at Facility Box Office**:  For physical Tickets fulfilled by Principal at the Facility Box Office, Principal shall either (i) provide, or pay Ticketmaster to provide, its own blank custom ticket stock and ticket envelopes in which case Principal shall have the right to sell advertising on such ticket stock and ticket envelopes or (ii) have Ticketmaster provide Ticketmaster's standard ticket stock and ticket envelopes in which case Ticketmaster shall have the right to sell advertising on such ticket stock and ticket envelopes; provided, Ticketmaster shall use its best efforts to not place any advertisements on ticket stock and ticket envelopes for tickets fulfilled by Principal at the Facility Box Office for entities that compete in the same categories of Principal's sponsors, for which Principal has provided written notice of such sponsors to Ticketmaster in advance of Ticketmaster's delivery of such ticket stock and ticket envelopes.

       (b)     **Ticketmaster Advertisements**:  Principal hereby grants to Ticketmaster the right, in Ticketmaster's sole discretion, to advertise, in any medium determined by Ticketmaster, including on the TM.com Website or affiliated websites, Attractions and the availability of Tickets at the Facility Box Office and via Ticketmaster distribution channels, and the availability of the Software and, in connection therewith, to use the name and logo of Principal, the Attraction, the Facility and all other information respecting the Attractions.  Principal further grants to Ticketmaster the right, in its sole discretion, to use the name and logo of Principal and Principal's Website address on the Interface Page. Notwithstanding anything to the contrary herein, (i) Ticketmaster shall obtain Principal's prior approval in each instance before using Principal's logos in any manner other than Ticketmaster's current standard practices, which are for the primary purpose of promoting Principal's Ticket sales and (ii) in no event shall the use of such logos state or imply a sponsorship or endorsement relationship between Principal and any third party.

HIGHLY CONFIDENTIAL

LNE-LIT24-000116970

**DX-1494.1016**

(c)     **Principal Advertisements**:   Principal may, during the Term hereof, provide and place advertisements in any form of media which Principal shall desire to promote the availability of Tickets, the TM.com Website and the Attractions (except on websites or other media operated by, or on behalf of, third parties that promote, engage in or facilitate the sale, resale or issuance of tickets); provided, however, that in the event Principal shall place any such advertisements, it shall use its commercially reasonable efforts to cause Ticketmaster's name, logos and if the advertisement relates to the availability of Tickets, the applicable TM.com Website address to be displayed or hyperlinked in the advertisement.   Principal shall cause Principal's Website to deeplink to specified web page(s) within the applicable TM.com Website where ticket purchasers can begin the process of purchasing Tickets to Attractions.   Principal agrees to promote the availability of Tickets on the TM.com Website by including, at a minimum, one "above-the-fold" graphic Ticketmaster branded link to the TM.com Website on each web page featuring one or more of the Attractions on the Facility Website.  Such link will include the TM.com Website graphic logo and a call to action such as "buy tickets."

(d)     **Ticketmaster Client Style Guide**:  The look and feel of any and all links from Principal's Website to the Interface Page or the applicable TM.com Website are subject to Ticketmaster's prior approval, which shall not be unreasonably withheld, conditioned or delayed. Principal shall comply with all terms and conditions of Ticketmaster's Client Style Guide, as it may be updated from time to time.

(e)     **Principal Style Guide**: The look and feel of any and all links from the Interface Page or the applicable TM.com Website to Principal's Website are subject to Principal's prior approval, which shall not be unreasonably withheld, conditioned or delayed.  Ticketmaster shall comply with all terms and conditions of Principal's or its applicable affiliates' style guide(s), as it or they may be updated from time to time.

(f)     **Advertising Revenue**:   Ticketmaster and Principal shall separately receive and retain their respective income derived from advertising which each is entitled to sell under subsections (a), (b) and (c) above.

(g)     **Banner Ads**:   Neither Principal nor Ticketmaster will serve banner ads or other promotional ad units of any kind or allow any third party to serve any such ad units on the Interface Page, without the other party's prior consent.

8.     **ACCOUNTING PROCEDURES**:

(a)     **Payments by Ticketmaster**:   Principal hereby authorizes Ticketmaster and the financial institution indicated below ("Bank") to deposit all settlement funds payable to Principal hereunder in the account listed below or as otherwise designated by Principal in writing to Ticketmaster ("Principal's Account"), which Principal may change at any time upon prior written notice to Ticketmaster in accordance with this Agreement:

**For NYI Attractions:**
Financial Institution (Name of Bank): Capital One Bank
Account Type: Checking
Account Number: [ Redacted ]
Bank ACH Transfer Numbe[ Redacted ]
Branch Address: 1307 Walt Whitman Road, Melville, NY 11747

11

HIGHLY CONFIDENTIAL                                                                 LNE-LIT24-000116971

**DX-1494.1017**

Branch Phone Number: 631-531-2925

**For Attractions other than NYI Attractions and Volume Incentive Payments:**
Financial Institution (Name of Bank): Bank of America
Account Type: Checking
Account Number: [ **Redacted** ]
Bank ACH Transfer Number: [ Redacted ]

Ticketmaster shall collect all Ticket Receipts derived from Ticket sales made by Ticketmaster and shall initiate payment of Ticket Receipts to which Principal is entitled on Friday of each week with each weekly payment to be on account of TM System Ticket sales made by Ticketmaster during Monday through Sunday of the week preceding such payment date. Initiation of the settlement payment via direct deposit shall constitute full performance by Ticketmaster of its obligation to make such settlement payment to Principal or to any person whatsoever. If funds to which Principal is not entitled are deposited into Principal's Account, Principal authorizes Ticketmaster to direct the Bank to return said funds. Principal hereby releases Ticketmaster from liability for delays or errors beyond Ticketmaster's reasonable control, including but not limited to any errors resulting from any inaccurate or outdated Account information provided by Principal or bank processing delays, or for any related damages. Principal acknowledges and agrees that direct deposit of such funds may require up to two (2) business days for Bank processing. Each weekly settlement payment shall be accompanied by a written accounting. In the event of an error, Principal also authorizes the initiation of a debit to Principal's Account to correct the error. Principal shall designate an email address (set forth below its signature line of this Agreement) for delivery of such accounting and information regarding Attractions and Ticket sales, and shall promptly notify Ticketmaster of any changes to such email address. The direct deposit authorization provided herein shall remain in full force and effect until Ticketmaster has received written notification from Principal of its termination in such time and such manner as to afford Ticketmaster a reasonable opportunity to act upon it.

        (b)    **Cancelled Attractions; Refunds**: In the event that any Attraction for which Ticketmaster sold Tickets is cancelled, postponed, or materially modified (e.g., substitute material portions of acts) for any reason (each, a "Cancelled Attraction"), the Account Balance shall be held and made available for distribution by Ticketmaster to Ticket purchasers entitled to refunds for Tickets for Cancelled Attractions purchased from Ticketmaster. For purposes of this Agreement, the term "Account Balance" shall mean the amount of funds held at any time by Ticketmaster on account of Ticket sales for all Attractions, less the amount of Ticket sales proceeds which Ticketmaster is entitled to retain hereunder. Principal authorizes Ticketmaster to refund the Ticket price at the original point of purchase (e.g., by Internet Sales) in such manner (e.g. by crediting the consumer's credit card) and at such time (e.g. before or after the scheduled date of the performance of such Attraction) as Ticketmaster, in its sole reasonable discretion, determines and to exchange Tickets pursuant to any exchange policy that may be adopted by Ticketmaster and Principal. It is agreed and understood that Ticketmaster is the Ticket selling agent of Principal and therefore Ticketmaster's agreement to make any refunds as the agent of Principal is subject and limited to Ticketmaster holding or receiving from Principal the full amount of funds necessary to make refunds to all Ticket purchasers properly entitled to a refund. Principal and Ticketmaster agree that Ticketmaster shall be entitled to retain the Ticketmaster fees assessable with respect to the initial sale of Tickets to Cancelled Attractions, provided that no additional compensation shall be payable to, or fee assessed by, Ticketmaster with respect to any exchange of Tickets initially purchased from Ticketmaster for a new or re-scheduled

12

HIGHLY CONFIDENTIAL

LNE-LIT24-000116972

**DX-1494.1018**

Attraction. Principal shall be responsible for all refunds and exchanges of Tickets initially purchased from the Facility Box Office.

(c) **Chargebacks**: Ticketmaster reserves the right to deduct from Principal's settlement, portions of any Chargebacks that Ticketmaster is assessed by its merchant bank related to the Face Value, Processing Fee, and any other amounts due from Ticketmaster to Principal for up to twelve (12) months after the occurrence of an Attraction. Ticketmaster shall be responsible for the remaining portions of any Chargebacks, except to the extent caused by Principal's failure to obtain signatures, swipe credit cards, or follow any procedures provided by Ticketmaster or the merchant bank with respect to acceptance of credit cards, including, but not limited to, cardholder verification instructions for will-call and other alternative Ticket delivery/pick-up services. For purposes of this Agreement, "Chargebacks" shall mean the amounts that the merchant bank is charged back by a cardholder or a card issuer under the card organization's rules (e.g., cardholder dispute, fraud, declined transaction, returned Tickets for Cancelled Attractions, etc.).

(d) **Insolvency; Deficiency Amounts; Security for Repayment**: Principal shall provide prompt written notice to Ticketmaster in the event it files any voluntary or involuntary petition under the bankruptcy or insolvency laws or upon any appointment of a receiver for all or any portion of Principal's business or the assignment of all or substantially all of the assets of Principal for the benefit of creditors (each, a "Material Financial Event"). The parties agree that this Agreement constitutes a financial accommodation by Ticketmaster to Principal as such term is utilized in 11 U.S.C. §365. If at any time, the Account Balance is not sufficient to pay for anticipated refunds or Chargebacks, Principal shall deliver the amount of such deficiency ("Deficiency Amount") to Ticketmaster no later than twenty-four (24) hours after notice by Ticketmaster to Principal. Ticketmaster shall have the right to set off any Deficiency Amount against any amounts held by Ticketmaster on behalf of Principal. In the event of any Material Financial Event or in the event Principal has not paid any Deficiency Amount when due, Ticketmaster shall have the option to (i) require Principal to provide additional security to Ticketmaster of a type (e.g., letter of credit, guaranty or performance bond) and in an amount as requested by Ticketmaster in its sole discretion, which Principal shall provide to Ticketmaster within five (5) business days after Ticketmaster's request, or (ii) suspend payment of Ticket Receipts to which Principal is entitled in advance of the occurrence of Attractions and instead deliver Ticket Receipts to which Principal is entitled post-performance (i.e. Friday of each week with respect to Attractions that occurred Monday through Sunday of the week preceding such payment date).

(e) **Counterfeit Tickets**: It is agreed and understood that Ticketmaster shall not be liable to Principal for the printing and sale of counterfeit Tickets.

(f) **Audit of Sales**: At all times during the Term of this Agreement, (i) Principal shall have the right at its own expense to audit Ticket sales for Attractions by Ticketmaster to assure Ticketmaster's compliance with the terms of this Agreement, and (ii) Ticketmaster shall have the right at its own expense to audit Ticket sales for Attractions made by Principal and by others (including, without limitation, the promoter and sponsor of any Attraction, and Principal's Subscribers) to assure their compliance with the terms of this Agreement. In the event such audit reflects an under or overpayment, as the case may be, to the auditing party, then the other party shall pay the reasonable out-of-pocket fees and expenses incurred by the auditing party in connection therewith.

13

HIGHLY CONFIDENTIAL

LNE-LIT24-000116973

**DX-1494.1019**

(g)    **Archtics Transaction Fees**:  Ticketmaster, at its option, may deduct Archtics Transaction Fees from the amounts owed to Principal under this Agreement or may invoice Principal for such fees.

(h)    **License and Maintenance Fees**:   Any installments of license or maintenance fees set forth on Exhibit A shall be invoiced and payable within thirty (30) days of the first day of each Contract Year during the Term.

(i)    **Request for Taxpayer Identification Number and Certification**: Principal shall complete the required Form W-9 provided with this Agreement and return it to Ticketmaster with this Agreement for purposes of reporting to the Internal Revenue Service.

9.    **TAXES**:

(a)    **Taxes on Hardware**: Subject to Section 17(d), Principal shall keep the Hardware free and clear of all levies, liens and encumbrances which are caused by Principal or under Principal's control and shall promptly reimburse Ticketmaster for all license fees, registration fees, assessments, charges and taxes, whether federal, state, county, municipal or other governmental or quasi-governmental, with respect to the Hardware located at the Facility, including, without limitation, use, excise and property taxes, and penalties and interest with respect thereto, except and excluding, however, any taxes based on or measured solely by Ticketmaster's net income.

(b)    **Attraction Taxes**:  Principal shall be responsible for calculating any and all Principal Taxes, for preparing and timely filing any and all tax returns or reports required to be filed in respect of any such Principal Taxes, and for timely remitting Principal Taxes to the appropriate taxing authority.  Ticketmaster will collect and turn over to Principal the amounts to which Principal is entitled as provided in Section 8(a).  In the event that Ticketmaster pays any Principal Taxes on behalf of Principal or Ticketmaster pays any Principal Taxes due to a failure by Principal to provide Ticketmaster with the required writing or documentation of any Principal tax exemptions pursuant to Section 9(d) below, Principal shall promptly reimburse Ticketmaster for any and all such Principal Taxes paid by Ticketmaster, including penalties and interest assessed with respect thereto (other than Principal Taxes, penalties and interest that Ticketmaster pays directly out of Principal's Ticket Receipts), and shall also promptly reimburse Ticketmaster for any and all expenses or damages that result from the failure by Principal to properly calculate and timely remit Principal Taxes assessed on all amounts received by Principal under this Agreement, to timely file all related returns or reports, or to timely reimburse Ticketmaster for any and all such Principal Taxes, interest and penalties as provided above. Notwithstanding the foregoing, in the event that Ticketmaster is ever required by applicable law to remit Principal Taxes directly on behalf of Principal and file related tax returns or reports, Ticketmaster shall have the right to do so upon notice to Principal, and thereafter "Ticket Receipts" shall be defined to be reduced by such Principal Taxes.  Ticketmaster shall be responsible for calculating any and all Ticketmaster Taxes, for preparing and timely filing any and all tax returns or reports required to be filed in respect of any such Ticketmaster Taxes, and for timely remitting such Ticketmaster Taxes to the appropriate taxing authority.

(c)    **Principal's Taxpayer ID Number**:   Principal certifies that Principal's federal taxpayer identification numbers (FEIN or SSN) are 82-2651084 (NYAP) and 11-2254417 (NYI).

14

    LNE-LIT24-000116974

**DX-1494.1020**

(d) **Principal's Tax Exemptions**: From time to time, Principal shall notify Ticketmaster in writing of any and all Principal tax exemptions (if applicable) and provide Ticketmaster with reasonable proof of Principal's tax exemptions.

(e) **Taxes on License and Maintenance Fees**: The license and maintenance fees set forth on Exhibit A are exclusive of any sales, use, value added, excise or other taxes, and Principal shall be responsible for paying all such applicable taxes.

10. **LOSS AND DAMAGE TO THE HARDWARE; INSURANCE**:

(a) Principal acknowledges that the Hardware will be used by Principal at the Facility and NYI offices and that Ticketmaster does not own, operate or control such locations. Accordingly, Principal hereby assumes and shall bear the entire risk of loss and damage to the Hardware, ordinary wear and tear excepted, whether or not insured against, once installed, unless occasioned by the negligence or willful misconduct of Ticketmaster, from any and every cause whatsoever from the date of delivery of the Hardware to the Facility or Principal site until removal thereof following termination of this Agreement. No such loss or damage to the Hardware shall impair any obligation of Principal or Ticketmaster under this Agreement. In the event of loss or damage of any kind to any Hardware, Principal, at its sole option, shall within thirty (30) days after such loss or damage:

(i) Replace the lost or damaged item with the same exact item, or replace the same with similar property, in good repair, condition and working order to the reasonable satisfaction of Ticketmaster; or

(ii) Pay Ticketmaster in cash the replacement cost of the Hardware, and Ticketmaster shall promptly install new hardware to replace the lost or damaged Hardware.

(b) Principal shall, at its own expense, provide and maintain at all times during the Term hereof property insurance to protect the Hardware against loss caused by fire (with extended coverage), vandalism, malicious mischief, theft, or any other cause in an amount equal to the full replacement value of the Hardware. Should Principal become unable to provide or maintain such insurance coverage, Principal shall promptly notify Ticketmaster in writing prior to the expiration of any such coverage, and, thereafter, Ticketmaster shall have the right, but shall not be obligated, to provide insurance coverage for the occurrences specified above and charge Principal the costs of such insurance coverage.

(c) Both parties shall provide, at their sole expense, commercial general liability and property damage coverage with minimum limits of $▮▮▮▮ per occurrence and $▮▮▮▮ in the aggregate.

(d) Ticketmaster shall provide, at its sole expense, technology errors and omissions or equivalent professional liability insurance providing coverage for claims arising out of the products and services to be provided under this Agreement, including Privacy, Data Breach and Network Security Liability coverage, with limits not less than $▮▮▮▮ for each claim. Coverage shall extend to breaches to and failures in electronic and physical security, ransomware attacks, breach of business confidential or proprietary information and invasion of or breach of an individual's privacy.

15

HIGHLY CONFIDENTIAL   LNE-LIT24-000116975

**DX-1494.1021**

(e)     Ticketmaster shall provide Worker's Compensation Insurance in the amounts required by statute, and Employers Liability Insurance in at least the following amounts: (a) Bodily Injury by Accident - $█████ each accident, (b) Bodily Injury by Disease - $1█████ each employee, and (c) Bodily Injury by Disease - $█████ policy limit to cover Ticketmaster's Employees.

(f)     Ticketmaster shall provide Automobile Liability Insurance with limits of not less than $1 million bodily injury/property damage per occurrence. Coverage shall include autos, hired and non-owned autos.

(g)     All insurance provided and maintained by each party shall be in such amounts, under such forms of policies pursuant to this Section and shall provide for the waiver of the insurer's right of subrogation against Principal and Ticketmaster, as applicable.  All of Principal's policies of insurance shall include Ticketmaster, Live Nation Worldwide, Inc. and its licensors, if any, and their respective parents, members, partners, affiliates, divisions and subsidiaries as an additional named insured on a primary and non-contributory basis irrespective of any other insurance, whether collectible or not, with respect to the operations of Principal per this written Agreement.  All of Ticketmaster's policies of insurance shall include New York Arena Partners, LLC, New York Islanders Hockey Club, L.P., and each of their respective licensors, if any, and their respective parents, members, partners, affiliates, divisions and subsidiaries as an additional named insured on a primary and non-contributory basis irrespective of any other insurance, whether collectible or not, with respect to claims arising out of the operations of Ticketmaster per this written Agreement.  Further, each party shall provide the other party at least thirty (30) days' prior written notice of cancellation, non-renewal or material modification of any such policies.  Each party shall, upon request, furnish the other with certificates of such insurance or other evidence satisfactory to the other party as to its compliance with the provisions of this Section.

11.    **TITLE**:

(a)     **Hardware/Software**: Principal covenants and agrees that the Software and Hardware and any deliverables or work product furnished under this Agreement are, and shall at all times be and remain, personal property which shall, at all times, remain the sole and exclusive property of Ticketmaster, and Principal shall have no right, title or interest therein or thereto except as a licensed user thereof.  Principal acknowledges and agrees that Ticketmaster has invention rights, copyrights, and other intellectual property rights in the TM System and the information contained therein which prohibit copying, sale, modification and re-manufacture of the TM System and information regarding the TM System and which will be enforced.  Principal hereby agrees that it will, whenever reasonably requested by Ticketmaster, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, agreements, instruments, and documents necessary or desirable, in form satisfactory to Ticketmaster, to protect the rights and ownership of Ticketmaster to and of the Software and Hardware, including but not limited to certificates from parties with a real property interest in the premises wherein the Hardware may be located waiving any claim with respect to the Hardware.  Except as may be necessary to prevent damage to or destruction of the Hardware, Principal will not move the Hardware nor permit such Hardware to be moved without Ticketmaster's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed, and shall give Ticketmaster prompt written notice of any attachment or other judicial process affecting any item of Hardware.  Upon the expiration or termination of this Agreement, Principal shall return the

16

HIGHLY CONFIDENTIAL

LNE-LIT24-000116976

Software and Hardware to Ticketmaster in good repair, condition and working order, ordinary wear and tear resulting from proper use thereof alone excepted, and any and all licenses and other rights to the Software and Hardware shall terminate with respect to Principal.

(b)    **Intellectual Property**:  Each party shall retain all right, title and interest in and to its respective trademarks, service marks and trade names worldwide ("Intellectual Property") subject to a limited non-exclusive, non-transferable license necessary to perform this Agreement.  Each party grants the other a royalty-free, non-exclusive, non-transferable license, during the Term, within the territory, to include such party's pre-approved Intellectual Property solely in connection with the promotions and marketing contemplated in this Agreement.  Each party shall use the other's Intellectual Property only as provided, and shall not alter the Intellectual Property in any way, nor shall it act or permit action in any way that would impair the rights of owning party in its Intellectual Property.  Each party acknowledges that its use of the other party's Intellectual Property shall not create any right, title or interest in or to such Intellectual Property.  Each party shall have the right to monitor the quality of the other party's use of its Intellectual Property.  Additionally, each party shall notify the other promptly in writing of any known infringement of the other's Intellectual Property.  Any references to a party's Intellectual Property shall contain the appropriate trademark, copyright or other legal notice provided from time to time by owning party.

(c)    **Purchaser Data**:   Principal and Ticketmaster each has rights in the personally identifiable information with respect to persons who actually purchased tickets to Principal's Attractions through the TM System ("Purchaser Data"), subject to the terms hereof.  Such use by Ticketmaster may include, without limitation, in development of new or upgraded Software at Principal's request, or for general market research on pricing when used in aggregate form with other Ticketmaster client consumer data.  Each party agrees to use the Purchaser Data only in compliance with all applicable laws and administrative rulings and in accordance with such party's own posted privacy policies.  Each party shall implement and maintain reasonable security procedures and practices appropriate to the nature of the Purchaser Data to protect the Purchaser Data from unauthorized access, destruction, use, modification or disclosure.  Each party agrees that if any portion of the Purchaser Data includes credit or debit card numbers and related information, it shall comply with payment card industry standards.  Each party shall also include in any email communications that it may make based on the Purchaser Data a mechanism to provide the recipient with the right to "opt-out" from receiving further communications from that party and that party shall honor such opt-out preferences.  Each party hereby agrees that it is responsible for the security of cardholder data that it possesses, including functions relating to storage, processing, and transmission thereof.  Each party covenants that it will comply with all applicable requirements to be considered compliant with the PCI Data Security Standard ("PCI DSS").  Each party shall indemnify and hold the other party harmless from and against any and all liabilities, claims, expenses and causes of action brought by any third party directly resulting from the indemnifying party's failure to be and remain PCI DSS compliant.

12.    **CONFIDENTIAL INFORMATION**:

(a)    The parties acknowledge that by reason of their relationship hereunder, they may from time to time disclose information regarding their business, products, software technology, Intellectual Property and other information that is confidential and of substantial value to the other party, which value would be impaired if such information were disclosed to third parties

HIGHLY CONFIDENTIAL                                                                                LNE-LIT24-000116977

**DX-1494.1023**

("Confidential Information"). The provisions of this Agreement shall be deemed to be Confidential Information.

(b) Confidential Information shall not include information that (i) is or becomes generally available to the public other than as a result of the breach of the confidentiality obligations in this Agreement by the receiving party, (ii) is or has been independently acquired or developed by the receiving party without violating any of the confidentiality obligations in this Agreement, (iii) was within the receiving party's possession prior to it being furnished to the receiving party by or on behalf of the disclosing party, or (iv) is received from a source other than the disclosing party; provided that, in the case of (iii) and (iv) above, the source of such information was not known by the receiving party to be bound by a confidentiality obligation to the disclosing party or any other party with respect to such information.

(c) Each party agrees that it will keep the Confidential Information strictly confidential and will not use in any way for its own account or the account of any third party, nor disclose to any third party, any Confidential Information revealed to it by the other party without the other party's prior written consent, except to the extent expressly permitted by this Agreement; provided, however, that (i) the receiving party may disclose the Confidential Information, or any portion thereof, to its directors, officers, employees, agents, legal and financial advisors, controlling persons and entities who need to know such information to perform such party's obligations under this Agreement and who agree to treat the Confidential Information in accordance with the confidential obligations in this Agreement, and (ii) Principal may disclose this Agreement to its and its affiliates' lenders and the NHL. Each party shall use the same degree of care to avoid disclosure or use of the other party's Confidential Information as it employs with respect to its own Confidential Information of like importance and represents that it has adequate procedures to protect the secrecy of such Confidential Information including without limitation the requirement that employees have executed non-disclosure agreements which have the effect of adequately protecting Confidential Information.

(d) In the event that either party receives a request to disclose all or any part of the Confidential Information under the terms of a subpoena, document request, notice of deposition or other legal proceeding, such party agrees to notify the other pursuant to Section 17(h) below, within forty-eight (48) hours after receipt of such legal document, and such party agrees to cooperate with the other in any attempt to obtain a protective order.

13. **LIMITATION ON LIABILITY**: In no event shall either party be liable for any indirect, consequential, exemplary, incidental, special or punitive damages, including also lost profits, lost savings, lost ticket revenues, lost opportunity costs or any other economic loss, of any type or nature, or for events or circumstances beyond that party's reasonable control, even if that party has been advised of the possibility of such damages. Neither occasional short term interruptions of service which are not unreasonable under comparable industry standards nor interruptions of service resulting from events or circumstances beyond Ticketmaster's reasonable control shall be cause for any liability or claim against Ticketmaster hereunder, nor shall any such occasion render Ticketmaster in default under this Agreement, so long as Ticketmaster uses commercially reasonable efforts to remedy such interruptions of services.

14. **INDEMNIFICATION**:

(a) Principal shall indemnify Ticketmaster and its parents, subsidiaries,

18

affiliates and their owners, officers, directors, employees, representatives and agents and their successors and assigns (collectively, for purposes of this Section, "Ticketmaster's Indemnitees") against, and hold Ticketmaster's Indemnitees harmless from, any and all claims, actions, damages, expenses (including court costs and reasonable attorneys' fees), obligations, losses, liabilities and liens, imposed on, incurred by, or asserted against Ticketmaster's Indemnitees occurring as a result of, or in connection with: (i) any Event of Default under this Agreement by Principal or any of its officers, directors, employees and agents (collectively, "Principal's Representatives"); (ii) misuse of the TM System (including without limitation any customization of Principal's Website or the Interface Page (if applicable) and any e-mail campaigns or distributions using the TM System) or possession and use of the Hardware (if any) by Principal or any of Principal's Representatives; (iii) any Attraction held or scheduled to be held at the Facility (including any injuries or deaths occurring at or in connection with any Attraction or the failure of any Attraction to occur or to occur in the manner advertised or promoted); (iv) Principal's use or disclosure of the Purchaser Data; or (v) any email campaigns or distributions conducted by Ticketmaster on Principal's behalf, with Licensee's prior written approval, or conducted by Principal including, without limitation, email campaigns or distributions in violation of federal, state or other laws applicable to commercial emails; except, in each case, to the extent that any such claims shall relate to Ticketmaster's negligence or willful misconduct with respect thereto or is otherwise covered by Ticketmaster's indemnification of Principal as stated in subsection (b) below.

(b)     Ticketmaster shall indemnify Principal and its parents, subsidiaries, affiliates and their owners, officers, directors, employees, representatives and agents and their successors and assigns (collectively, for purposes of this Section, "Principal's Indemnitees") against, and hold Principal's Indemnitees harmless from, any and all claims, actions, damages, expenses (including court costs and reasonable attorneys' fees), obligations, losses, liabilities and liens, imposed on, incurred by, or asserted against, Principal's Indemnitees occurring as a result of, or in connection with: (i) any Event of Default under this Agreement by Ticketmaster; or any of its officers, directors, employees and agents, (ii) any alleged patent, trademark, copyright or other intellectual property infringement asserted against Principal's Indemnitees with respect to Principal's use of the TM System, or (iii) Ticketmaster's use or disclosure of the Purchaser Data; except, in each case, to the extent that any such claim shall relate to Principal's negligence or willful misconduct with respect thereto or is otherwise covered by Principal's indemnification of Ticketmaster as stated in subsection (a) above.

(c)     The indemnified party must notify the other party promptly in writing of any claim hereunder, and provide, at such other party's expense, all reasonably necessary assistance, information and authority to allow the other party to control the defense and settlement of such claim; provided that the indemnifying party may only settle or compromise a claim with the prior written approval of the indemnified party (which approval shall not be unreasonably withheld or delayed), except that no such approval shall be required if the settlement or compromise (i) provides only for payment of money damages which are paid fully by the indemnifying party and/or, where intellectual property rights of third parties are involved, provides only for limitations on continued use of materials or items covered by such third party intellectual property rights, (ii) does not include any admission of wrongdoing or guilt on the part of indemnified party, and (iii) includes a full release of indemnified party and its directors, officers, employees and agents from any further claims, lawsuits, damages, liabilities, costs and expenses that the third party bringing the claim has, has had, or may thereafter have. If the indemnified party provides notice of a claim as set forth above and is not notified within fifteen (15) days

19

HIGHLY CONFIDENTIAL

LNE-LIT24-000116979

**DX-1494.1025**

following written request by the indemnified party that the indemnifying party intends to defend the claim, the indemnified party shall be entitled to defend such claim, and settle or compromise such claim, subject to the indemnification provided for herein.

15. **TERMINATION**:

(a)    This Agreement may be terminated by either party in the event of any material default in or material breach of the terms and conditions of this Agreement by the other party, after the other party has received written notice of default and thirty (30) business days (or ten (10) business days, in the case of a monetary default) to cure such default (each such occurrence, after the expiration of such cure period, shall be an "Event of Default"); or the filing of any voluntary or involuntary petition against the other party under the bankruptcy or insolvency laws of any applicable jurisdiction, which petition is not dismissed within sixty (60) days of filing, or upon any appointment of a receiver for all or any portion of the other party's business, or any assignment of all or substantially all of the assets of such other party for the benefit of creditors. Upon an Event of Default by Ticketmaster, Ticketmaster shall, without demand, forthwith pay to Principal all amounts due and owing pursuant hereto, and Principal may, in addition to terminating this Agreement, require Ticketmaster to remove all Hardware from the Facility.  Upon an Event of Default by Principal, Principal shall, without demand, forthwith pay to Ticketmaster all amounts due and owing pursuant hereto, and Principal authorizes Ticketmaster to set off any amounts owed to Ticketmaster hereunder against any amounts held by Ticketmaster on behalf of Principal, and Ticketmaster may, in addition to terminating this Agreement, terminate Principal's right to access and use the TM System and take immediate possession of the Hardware and Software wherever the same may be located without demand, notice or court order.

(b)    This Agreement may be terminated by either party in the event the other infringes the terminating party's intellectual property or other property right, including without limitation, any copyright, license right or trade secret, and the other party fails to cease such infringement within ten (10) business days' written notice from the terminating party.

(c)    Upon the effective date of any termination or expiration of this Agreement, provisions regarding ownership of intellectual property rights, representations and warranties, confidentiality, indemnification, limitation of liability, non-solicitation, jurisdiction and venue shall remain in full force and effect; each party shall immediately cease the use of the other party's Intellectual Property; and each party shall return, or at the other party's request, destroy all copies of Confidential Information, and all other property belonging to and/or received from the other party.

(d)    No remedy referred to in this Section is intended to be exclusive, but each shall be cumulative and in addition to any other remedy herein or otherwise available at law or in equity, each and all of which are subject to the limitations contained in Section 13 hereof.

16.    **DEFINITIONS**:  As used in this Agreement, the following terms shall have the respective meanings indicated below unless the context otherwise requires:

"AccountManager" means the Ticketmaster AccountManager software and hosting services that allow Subscribers to manage their Season/Contract Ticket accounts.

20

HIGHLY CONFIDENTIAL                                                    LNE-LIT24-000116980

**DX-1494.1026**

"Archtics" means Ticketmaster's software that delivers extensive season, miniplan and single ticket functionality in connection with the Ticketmaster host system and distribution channels for inventory control by Ticketmaster and Principal.

"Archtics Transaction Fees" means the amounts Ticketmaster charges for certain Software transactions as described in Exhibit A.

"Attraction" means a concert, sporting, entertainment or other act or event of any kind or nature whatsoever to be held at the Facility, excluding local or civic events for which there is not generally a charge for admission (e.g., graduations or community events).

"Attraction Taxes" means any and all sales, amusement, admissions and other taxes, charges, fees, levies or other assessments measured by reference to a charge per Ticket sold or determined based upon the purchase price of a Ticket assessed by federal, state, county, municipal or other governmental or quasi-governmental authorities as a result of, or in connection with, any Attraction, including Principal Taxes and Ticketmaster Taxes as further described below. To the extent such taxes relate to the funds paid or owed to Principal under this Agreement such portion of Attraction Taxes may also be referred to herein as Principal Taxes, and to the extent such taxes relate to fees or charges collected and retained by Ticketmaster under this Agreement, such portion of Attraction Taxes may also be referred to herein as Ticketmaster Taxes.

"Chargebacks" is defined in Section 8(c) hereof.

"Confidential Information" is defined in Section 12 hereof.

"Contract Year" is defined in Section 1 hereof.

"Convenience Charge" means the per Ticket amount charged to a consumer for the convenience of purchasing Tickets through the TM System.

"Distribution Partner" shall mean a professional ticket distribution partner who takes an inventory position for Tickets and distributes those Tickets via TM+ and third-party resale platforms. For clarity, an inventory position means the Distribution Partner will purchase primary inventory (and inventory will not be available on a consignment basis).

"Distributed Tickets" shall mean the Tickets for which a Distribution Partner takes an inventory position, as permitted by Section 2(c).

"Event of Default" is defined in Section 15(a) hereof.

"Face Value" means the face price of a Ticket as determined by Principal, which shall be inclusive of all applicable Attraction Taxes and facility, parking and similar fees.

"Facility" means the venue located at 2150 Hempstead Turnpike, Elmont, NY 11003, and currently known as UBS Arena.

"Facility Box Office" means the Facility's Ticket sales locations that are operated by Principal and located at the Facility.

21

HIGHLY CONFIDENTIAL

LNE-LIT24-000116981

**DX-1494.1027**

"Group Sales" means sales of Tickets by Principal to a group consisting of at least fifteen (15) people for use by the group members to attend an Attraction as a group.  In no event shall Group Sales consist of the sale of Tickets to individuals to attend an event separately or for individuals to purchase Tickets with the primary purpose of reselling such Tickets.

"Hardware" means all of that certain computer hardware, communications equipment, terminals and hook-ups (including replacements thereof) listed with particularity on <u>Exhibit B</u> or otherwise supplied by Ticketmaster to Principal at any time during the Term of this Agreement, but excluding (i) any computer hardware, communications equipment, terminals and hook-ups purchased by Principal to provide the connectivity to and interfacing with the TM System required under this Agreement, and  (ii) any computer hardware, communications equipment, terminals and hook-ups purchased by Principal from Ticketmaster.

"Hosted Platform" shall mean the equipment, operating system, hardware and software specifications, and networking environment on and with which the TM System and Software are hosted by Ticketmaster, and additions or replacements to the foregoing which may be implemented by Ticketmaster in accordance with the terms of this Agreement.

"House Seats" means Tickets provided by Principal (i) to the Attraction's promoter, performing act or event, or their managers or agents (i.e. band holds); (ii) for distribution through legitimate fan clubs in accordance with current guidelines (i.e. fan club holds); (iii) for legitimate promotional or charitable purposes (e.g. radio station promotions); or (iv) to fulfill reasonable non-public internal management requests (e.g., employees, sponsors, players and their families), provided that House Seats Tickets shall not be distributed to the general public.

"Inside Charges" means the amounts Ticketmaster charges Principal to sell, issue and process Tickets utilizing the TM System under this Agreement.

"Intellectual Property" is defined in Section 11(b) hereof.

"Interface Page" means a co-branded web page interface for use with Software transactions designed, created and maintained by Ticketmaster to have, in general, the look and feel of Principal's Website and hosted on Ticketmaster's web servers.

"Internet Sales" means all sales of Tickets over the Internet, or via mobile or smart phone application.

"License" is defined in Section 4(a) hereof.

"NYI Attraction" means any New York Islanders home game held at the Facility.

"Payment Processing Fees" is defined in Section 3(b).

"Principal's Website" means an Internet website(s) owned, operated and maintained by, or on behalf of, Principal, which shall contain links to the Interface Page.

"Processing Fee" means the per order amount charged by Ticketmaster to a consumer for purchasing Tickets via Ticketmaster distribution channels through the TM System.

22

HIGHLY CONFIDENTIAL

LNE-LIT24-000116982

"Purchaser Data" is defined in Section 11(c) hereof.

"sale and sell" and any derivations thereof in this Agreement shall include any distribution for consideration, by any means or method (including without limitation, on the Internet or by auction) and shall include resales.

"Season/Contract Tickets" means specifically designated Tickets sold directly by Principal on an annual basis across all Attractions or across all of a category of Attractions (i.e., luxury suites, club level seats and season tickets).

"Sellable Capacity" means the admission capacity of the Facility for any particular Attraction.

"Software" means Ticketmaster's ticketing system software known and marketed as Ticketmaster Classic, TM Secondary Exchanges, Presence, TM Charge, and the additional ticket sales software and Internet-based premium Ticketmaster services that include Archtics, Hosted Platform and AccountManager, and any new versions thereof or any other deliverables for TM System access provided to Principal by Ticketmaster during the Term.

"Subscribers" means any person who holds an account on Principal's AccountManager.

"Term" is defined in Section 1 hereof.

"Ticket" means a printed, electronic or other type of evidence of the right, option or opportunity to occupy space at or to enter or attend an Attraction or Attractions even if not evidenced by any physical manifestation of such right, such as a "smart card".

"Ticket Forwarding" means the ability of Principal or Subscribers to forward House Seats Tickets directly to a recipient with a valid email address.

"Ticket Receipts" means the Face Value of all Tickets sold by Ticketmaster, plus any Convenience Charges and Processing Fees retained by Principal, less any applicable Inside Charges (exclusive of Ticketmaster Taxes in jurisdictions in which Principal is required to remit Attraction Taxes to the applicable taxing authority) and Payment Processing Fees, and less any Principal Taxes for jurisdictions in which Ticketmaster is required to remit Principal Taxes to the applicable taxing authority.

"TM Charge" means the electronic payment processing system within the TM System that utilizes the global banking association networks to authorize electronic payment for purchases of Tickets to Attractions sold by Principal from the Facility Box Office as permitted under this Agreement.

"TM.com Website" means any Internet websites owned, operated and maintained by Ticketmaster, including, without limitation, any co-branded versions and any version distributed through any broadband distribution platform or through any platform or device including television, broadband and wireless technologies.

"TM System" means the Hardware, Software, TM.com Website, related procedures and personnel, and repair and maintenance services established and maintained by Ticketmaster and

23

HIGHLY CONFIDENTIAL                                                                                    LNE-LIT24-000116983

**DX-1494.1029**

its affiliates for the purpose of selling, distributing, auditing and controlling the sale of Tickets for Attractions, including, without limitation, by Internet Sales, and the processing of transactions through the Software.

17.    **MISCELLANEOUS**:

(a)    **Governing Law/Jurisdiction**:  This Agreement shall be interpreted and governed by the laws of the State of New York, without reference to conflict of laws principles. Each of the parties hereto agrees that the state courts, and the United States federal courts, that are located in Nassau County, in the State of New York shall each have subject matter jurisdiction hereunder and personal jurisdiction over each of the parties hereto.  Each such party hereby consents thereto, and hereby waives any right it may have to assert the doctrine of forum non conveniens or to object to venue to the extent that any proceeding is conducted in accordance with the foregoing provision.

(b)    **Waiver of Jury Trial**:  In the event the parties are required for any reason to submit any dispute hereunder to trial, the parties expressly agree to waive the right to a jury trial, because the parties hereto, all of whom are represented by counsel, believe that the complex commercial and professional aspects of their dealing with one another make a jury determination neither desirable nor appropriate.

(c)    **Entire Agreement; Modification**:  This Agreement constitutes the entire and exclusive agreement between the parties hereto with respect to the subject matter hereof and supersedes and cancels all previous oral or written communications, proposals, agreements, and commitments.  No modification to this Agreement, nor any waiver of any rights, shall be effective unless assented to in writing by the party to be charged and the waiver of any breach or default shall not constitute a waiver of any other right hereunder or any subsequent breach or default.  A party's delay in enforcing its rights hereunder shall not be construed as a waiver of such rights or remedies.

(d)    **Assignment**:  Without the prior written consent of Ticketmaster, Principal shall not (i) directly or indirectly assign, transfer, pledge or hypothecate its rights or obligations in this Agreement or any interest therein; or (ii) permit the Hardware (if any) or any part thereof to be used, or access to the Software or any part thereof to be had, by anyone other than Principal or Principal's authorized employees, in each case except in the event of an assignment by Principal to any parent, subsidiary, affiliate or successor-in-interest (including, without limitation, a successor by virtue of an acquisition) which is not a direct competitor of Ticketmaster, or as collateral security pursuant to Principal's debt or financing agreements in effect from time to time, in which event no such consent shall be required.  Any such assignment shall not relieve Principal of any of its obligations hereunder.  Without the prior written consent of Principal, Ticketmaster shall not assign or transfer its rights or obligations in this Agreement or any interest therein, except in the event of an assignment by Ticketmaster to any parent, subsidiary, affiliate or successor-in-interest (including, without limitation, a successor by virtue of an acquisition), in which event no such consent shall be required.  Any assignment, transfer, pledge or hypothecation for which consent is required hereby and which is made without such consent shall be void. Notwithstanding the foregoing, Principal agrees and acknowledges that certain of Ticketmaster's duties and obligations under this Agreement may be performed on Ticketmaster's behalf by one or more of its parent, subsidiaries and affiliates, and no such performance shall be deemed to be an assignment or breach of this Agreement by Ticketmaster.

24

HIGHLY CONFIDENTIAL                                                                                   LNE-LIT24-000116984

**DX-1494.1030**

(e)    **Relationship of the Parties**: Each party is an independent contractor and not an agent or partner of, or joint-venturer with, the other party for any purpose other than as set forth in this Agreement (e.g., Ticketmaster is the agent of Principal with respect to ticket sales and distribution).  Neither party by virtue of this Agreement shall have any right, power, or authority to act or create any obligation, express or implied, on behalf of the other party.

(f)    **Force Majeure**:  Neither party will be liable or responsible to the other party, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement, when and to the extent such failure or delay is caused by or results from acts beyond the impacted party's control, including, without limitation, the following force majeure events ("Force Majeure Events"):  (a) acts of God; (b) flood, fire, earthquake, explosion, pandemic or epidemic; (c) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, riot, or other civil unrest; (d) government order or law; (e) actions, embargoes, or blockades in effect on or after the date of this Agreement; (f) action by any governmental authority; (g) national or regional emergency; (h) strikes, labor stoppages or slowdowns, or other industrial disturbances; and (i) shortage of adequate power.  The impacted party shall use commercially reasonable efforts to end the failure or delay and ensure the effects of such Force Majeure Events are minimized. The impacted party shall resume the performance of its obligations as soon as reasonably practicable after the removal of the cause.

(g)    **Severability**:  If any provision of this Agreement is found to be invalid or unenforceable in any jurisdiction (a) the validity or enforceability of such provision shall not in any way be affected with respect to any other jurisdiction, and the validity and enforceability of the remaining provisions shall not be affected; and (b) the parties shall replace such provision by one or more valid and enforceable provisions approximating the original provision as closely as possible.

(h)    **Notices**:  Any notices required to be given under this Agreement must be sent to each party, in writing, at the address set forth immediately below the signature line hereto or at such address as may be provided by each party in writing from time to time, by certified or registered mail, return receipt requested or by an overnight courier.  Notices will be deemed effective the day following sending if sent by overnight courier or five days after sending if sent by certified or registered mail.  Settlement reports may be delivered from Ticketmaster to Principal by email with confirmation reply email from recipient; therefore Principal shall promptly notify Ticketmaster of any change to its email address set forth immediately below the signature line hereto.

(i)    **Binding Agreement/Counterparts**: The terms, conditions, provisions and undertakings of this Agreement shall be binding upon and inure to the benefit of each of the parties hereto and their respective successors and permitted assigns; provided, however, that this Agreement shall not be binding until executed by each of the parties.  This Agreement may be executed in multiple counterparts, including .pdf and facsimile copies, which when taken together constitute a single instrument.

(j)    **Legal Review**: Each of the parties has had the opportunity to have its legal counsel review this Agreement on its behalf.  If an ambiguity or question of intent arises with respect to any provision of this Agreement, this Agreement will be construed as if drafted jointly

25

HIGHLY CONFIDENTIAL                                                                    LNE-LIT24-000116985

**DX-1494.1031**

by the parties.  The parties expressly agree that the construction and interpretation of this Agreement shall not be strictly construed against the drafter.

(k)    **Attorneys' Fees**: In addition to any other rights hereunder, the substantially prevailing party, as a court of competent jurisdiction (as provided above) may determine, in any claim or other dispute which relates to this Agreement, regardless of whether such claim or other dispute arises from a breach of contract, tort, violation of a statute or other cause of action, shall have the right to recover and collect from the other party its reasonable costs and expenses incurred in connection therewith, including, without limitation, its reasonable attorneys' fees.  If a party substantially prevails on some aspects of such claim or dispute but not others, the court may apportion any award of costs or attorneys' fees in such manner as it deems equitable.

(l)    **Client Listings**: Principal's execution of this Agreement indicates approval for Principal to be listed as a Ticketmaster client in monthly newsletters for distribution to event industry clients, in product boiler plate information, and in future releases about Ticketmaster products and services for distribution to trade and consumer media.  At any time, Principal may, in its sole discretion, direct Ticketmaster to stop using Principal's name for the purposes listed in this Section by sending notice to Ticketmaster via email at client.news@ticketmaster.com.

(m)    **Survival of Terms**:  Any provision of this Agreement that contemplates performance or observance subsequent to any termination or expiration of this Agreement, including without limitation provisions related to use of the Software, payments of amounts owed for a previously completed Contract Year, payment upon an Event of Default, Purchaser Data, limitations on liability, indemnification, confidential information, governing law and waivers of jury trials, shall survive any termination or expiration of this Agreement and continue in full force and effect.

(l)    **Subordination**.  This Agreement is subject and subordinate in all respects to the National Hockey League's constitution, by-laws, and all rules, regulations and agreements of the NHL, as the same may be amended, supplemented or otherwise modified from time to time (the "League Rules").  Notwithstanding the foregoing, to the extent that application of any League Rule effective following the date hereof would materially impair or reduce the benefits either party would reasonably be entitled to under the terms of this Agreement absent application of such League Rule, or otherwise render certain terms of this Agreement impossible or impracticable, the parties agree to negotiate in good faith for a modification or amendment of this Agreement (including any financial terms) on such commercially reasonable terms to give effect to such League Rule and reasonably mitigate any impairment or reduction in benefits caused by its application.

[Signature Page Follows]

26

HIGHLY CONFIDENTIAL                                        LNE-LIT24-000116986

**DX-1494.1032**

IN WITNESS WHEREOF, Ticketmaster and Principal have caused this Licensed User Agreement to be duly executed as of the date set forth below.

**TICKETMASTER L.L.C.,**
a Virginia limited liability company

DocuSigned by:

*kurt Schwartzkopf*

By: ___77C669CE4FE8405___

Print Name: Kurt Schwartzkopf

Title: SVP - Arenas

Date: ___7/16/2021___

Address: _____

_____

_____

Attn: _____

**With a copy to:**

        Ticketmaster L.L.C.
        7060 Hollywood Boulevard
        2nd Floor
        Hollywood, CA  90028
Attn:   General Counsel

**NEW YORK ARENA PARTNERS, LLC,**
a Delaware limited liability company

*Zachary klein*

By: ___48F358C62C3A457___

Print Name: Zachary H. Klein

Title: General Counsel

Date: ___7/16/2021___

**NEW YORK ISLANDERS HOCKEY CLUB, L.P.,**
a New York limited partnership

DocuSigned by:

*Zachary klein*

By: ___48F358C62C3A457___

Print Name: Zachary H. Klein

Title: General Counsel

Date: ___7/16/2021___

Address:    15 Verbena Avenue

            Floral Park, NY 11001

email address: █████████████████

With a copy to:

            New York Islanders Hockey Club, L.P.

            15 Verbena Avenue

            Floral Park, NY 11001

Attn:       Chief Financial Officer

27

                                                                LNE-LIT24-000116987

**DX-1494.1033**

EXHIBIT A

COMPENSATION

1.    **Charges and Fees**.

(a)    **Convenience Charge (Per Ticket) and Processing Fee (Per Order)**: The per Ticket Convenience Charges and per order Processing Fees shall be determined and (subject to the terms set forth herein) retained by Principal during the Term of this Agreement; provided, however, in the event the per Ticket Convenience Charges in any single transaction exceeds the amount of $███ per Ticket (subject to escalation in the amount of $███ per Ticket per Contract Year) (the "Standard Per Ticket Fee Cap"), or in the event the per order Processing Fee in any single transaction exceeds the amount of $███ per order (subject to escalation in the amount of $███ per order per Contract Year) (the "Standard Per Order Fee Cap"), then Principal and Ticketmaster shall each retain ████████████ of any amount of such aggregate per Ticket and/or order fees for such transaction in excess of the Standard Per Ticket Fee Cap and/or Standard Per Order Fee Cap, as applicable.  In addition, in the event any per Ticket fee or per order fee in any single transaction is less than the applicable Inside Charge due Ticketmaster as set forth in subsection (b) following, Ticketmaster reserves the right to invoice Principal for the difference between such per Ticket fee or per order fee and the amount of such Inside Charge, or to setoff such amount against any funds held by Ticketmaster on account of Principal.

Notwithstanding anything to the contrary, Principal may elect to increase the per Ticket Convenience Charges for a specific Attraction by an amount requested by and paid to the promoter or presenter of such Attraction (the amount of such increase payable to promoter, a "Promoter Bump").  In the event of any Promoter Bump, the Convenience Charge shall be further increased by an amount equal to the Promoter Bump (such additional amount, the "TM/Principal Fee Bump") and Ticketmaster and Principal shall each retain ████████████ of such TM/Principal Fee Bump. Principal shall be responsible for paying the Promoter Bump to the applicable promoter or presenter of the Attraction.

(b)    **Inside Charges**:

Principal shall pay Ticketmaster the following Inside Charges:

| Type of Ticket | Per Ticket Inside Charge | Per Order Inside Charge |
|---|---|---|
| For the following Tickets sold by Principal: Tickets sold to all Attractions via the Facility Box Office, Season/Contract Tickets, Group Sales, and House Seats | ███ | |
| For Tickets sold to NYI Attractions and college sports Attractions via Ticketmaster distribution channels | ███ | |
| For Tickets sold to all other (i.e., non-NYI) Attractions via Ticketmaster distribution channels | ███ | |

28

HIGHLY CONFIDENTIAL                                                                          LNE-LIT24-000116988

DX-1494.1034

| Type of Ticket | Per Ticket Inside Charge | Per Order Inside Charge |
|---|---|---|
| For merchandise and other upsells | ███████████████ | ███████████████ |

*The per Ticket Inside Charges for all Tickets sold via Ticketmaster distribution channels set forth above shall be subject to automatic increase on the first day of the second Contract Year and on the first day of each Contract Year thereafter during the Term in the amount of $▇▇▇ per Ticket.

**The per order Inside Charges for all Tickets sold via Ticketmaster distribution channels set forth above shall be subject to automatic increase on the first day of the second Contract Year and on the first day of each Contract Year thereafter during the Term in the amount of $▇▇▇ per order.

Notwithstanding the above, the parties will confer together in good faith with respect to Ticketmaster waiving its Inside Charges for certain community and/or charitable Attractions for which complimentary Tickets are distributed and/or no revenue is retained by Principal on the sale of Tickets to such Attractions.

(c) **Delivery Fees**.

(i) **Mail Fee**. Ticketmaster shall be entitled to assess and receive a fee in the amount of $▇▇▇ per order against purchasers of Tickets using the U.S. mail method of delivery (the "Mail Fee").

(ii) **Mobile and Credit Card Entry Delivery**. Ticketmaster shall not assess any mobile delivery fee or credit card entry delivery fee against purchasers of Tickets using the mobile, and/or credit card entry methods of delivery.

(iii) **Will Call Fee**. Ticketmaster shall be entitled to assess a fee in the amount of $▇▇▇ per order against purchasers of Tickets using the will call method of Ticket fulfillment ("Will Call Fee"), and shall pay Principal the entirety of such Will Call Fee, less applicable taxes or Payment Processing Fees (calculated at the rate set forth below) on such additional amount.

(d) **Parking Passes**: Ticketmaster shall be entitled to assess and retain a Convenience Charge in the amount of $▇▇▇ per Ticket for each parking pass sold via Ticketmaster distribution channels (excluding, for the avoidance of doubt, parking passes sold to Subscribers via AccountManager).

(e) **Archtics Fees**:

Principal shall pay Ticketmaster the following Archtics Fees, which shall under no circumstances be combined with or additive to Inside Charges:

(i) Archtics Transaction Fees:

29

**DX-1494.1035**

| Type of Software Transaction | Amount of Archtics Transaction Fee | |
|---|---|---|
| **AccountManager Transactions** | | |
| New Season/Contract Ticket sales; House Seats | $■ per seat | |
| MiniPlan Ticket sales | Same Seat MiniPlans with 4 or more Attractions: | $■ per seat |
| | Different Seat MiniPlans with 6 or more Attractions: | $■ per seat |
| | Same Seat MiniPlans with 2 to 3 Attractions: | $■ per seat |
| | Different Seat MiniPlans with 2 to 5 Attractions: | $■ per seat |
| Suite additionals | $■ per Ticket | |
| Right of first refusal to purchase Tickets | $■ per Ticket | |
| Per invoice processing | $■ per payment processed | |
| Ticket Forwarding | $■ per Ticket | |
| Single Ticket sales to Subscribers (e.g., Season/Contract Ticket holders) | The Inside Charge for such Tickets set forth above | |
| Self Service Group Sales via AccountManager | $■ per Ticket | |

In the event Principal elects to charge Subscribers for the Software transactions in addition to and above the applicable Archtics Transaction Fees charged by Ticketmaster as set forth above, such additional amount charged by Principal up to an amount equal to the Archtics Transaction Fee may be retained by Principal and any excess amount charged by Principal shall be divided equally between Principal and Ticketmaster.

(ii)    Archtics License and Maintenance Fees:



| Software | License Fees | Maintenance Fees |
|---|---|---|
| **Archtics – Hosted Platform** | | |
| **Archtics – User Licenses** | | |
| **AccountManager** | | |

HIGHLY CONFIDENTIAL

LNE-LIT24-000116990

**DX-1494.1036**

Ticketmaster will provide maintenance and repair services and support for all Software and Hardware at the highest level of industry standards at no additional charge.

2.    **Payment Processing Fees**:

| Type of Sale | Percentage Rate |
|---|---|
| Ticketmaster distribution channels | ▮▮▮ of Face Value of Tickets plus any fees added to the Face Value |
| Principal Sales using TM Charge | ▮▮▮ of all transactions processed |
| Resale using TM Secondary Exchanges | See Exhibit C |

Any percentage rates set forth above are subject to automatic increase due to any actual and reasonable increases in the interbank rates imposed on Ticketmaster.

31

HIGHLY CONFIDENTIAL    LNE-LIT24-000116991

**DX-1494.1037**

## EXHIBIT B

## HARDWARE

To be mutually determined by the parties following a site survey.

32

HIGHLY CONFIDENTIAL

LNE-LIT24-000116992

**DX-1494.1038**

DocuSign Envelope ID: 8A0402A1-0540-3107-97-DEC54CFB6307BB

## EXHIBIT C

### TICKETMASTER SECONDARY EXCHANGE TERMS AND CONDITIONS

1.      Definitions. All terms used herein and not otherwise defined shall have the meanings set forth in the Agreement:

"Exchange Fees" means the amounts Ticketmaster charges buyers and sellers to purchase or sell Tickets via TM Secondary Exchanges.

"Exchange Net Revenue" means the gross amount collected (and not refunded) from each purchaser of a secondary market Ticket through any TM Secondary Exchange for any Attraction, less (i) the proceeds paid to the Ticket seller, (ii) an amount equal to ▓▓▓ of the gross amount collected from such purchaser (to cover credit card processing fees), (iii) chargebacks; (iv) any sales tax collected from the purchaser, as applicable; and (v) actual out-of-pocket customer acquisition costs incurred by Ticketmaster on such transactions (e.g., costs to unaffiliated third parties on search engine marketing (SEM), display advertising, or commissions to third party affiliates of Ticketmaster linking customers to such TM Secondary Exchange).

"TM+" means Ticketmaster's proprietary, integrated primary and secondary market ticket inventory platform and technology on the TM.com Website (including, for the avoidance of doubt, mobile applications), which platform and technology enables consumers searching for Tickets to an Attraction to simultaneously view Tickets available for initial sale directly from Principal, in addition to Tickets available for resale from other consumers.

"TM Secondary Exchange" means any software, website, platform or functionality provided, operated or hosted by Ticketmaster which allows Ticket holders to post such Tickets for sale to third parties, which includes TM+, the NHL-branded official exchange site, and the Ticketmaster-branded secondary market resale site "TicketExchange by Ticketmaster."

2.      Exchange Fees. With respect to any TM Secondary Exchange, Ticketmaster shall assess its standard Exchange Fees for Tickets sold through such TM Secondary Exchanges in amounts as determined by Ticketmaster in accordance with general industry standards; provided, Ticketmaster will price buyer and non-season ticket holder seller fees so as to maximize revenue, which may differ by Attractions or over time for the same Attractions.  The seller fee for Season/Contract Ticket holder sellers shall be ▓▓▓▓▓▓▓▓ of the posting price, unless otherwise agreed to by the parties in writing.

For any primary market ticket inventory sold through TM+, Ticketmaster shall continue to sell such tickets and settle the proceeds of such sales with Principal in accordance with the terms and conditions for such transactions as set forth in the Agreement.

3.      Resale Revenue Share.  Ticketmaster shall pay to Principal a revenue share on any Exchange Net Revenue received (and not refunded or subject to Chargeback) by Ticketmaster in an amount equal to: (a) ▓▓▓▓▓▓ of such Exchange Net Revenue for NYI Attractions, and (b) ▓▓▓▓▓ of such Exchange Net Revenue for all other (i.e., non-NYI Attractions) (clauses (a) and (b), collectively, the "Resale Revenue Share").  The Resale Revenue Share to

33

HIGHLY CONFIDENTIAL

LNE-LIT24-000116993

DX-1494.1039

which Principal is entitled shall be due and payable to Principal on a quarterly basis within thirty (30) days after the conclusion of each calendar quarter during the Term. Principal shall be provided with documentation supporting the calculation of the Resale Revenue Share with the final settlement for each quarter. In the event that any Attraction for which Ticketmaster has made any Resale Revenue Share payment to Principal becomes a Cancelled Attraction, Principal shall promptly repay to Ticketmaster the amount of such Resale Revenue Share payments in respect of such Cancelled Attraction. In addition, with respect to Principal's Season/Contract Ticket holders who resold their Tickets to any such Cancelled Attraction through AccountManager, Principal will be responsible for recovering the seller proceeds directly from such Season/Contract Ticket holders, and remitting such proceeds to Ticketmaster in order to process refunds in respect of such secondary market transactions.

4.      Reporting. Each settlement relating to the Resale Revenue Share pursuant to this Exhibit C shall be accompanied by a report of the applicable transactions during such settlement period.

5.      Resale Best Practices. The parties agree that the following best practices shall apply in connection with Ticketmaster's operation of the TM Secondary Exchanges (the "Resale Best Practices"):

1. "Barcode Sync" (formally known as Archtics to "eibo" integration) shall be enabled concurrently upon Season/Contract Ticket holder and/or broker activation via AccountManager or on the day the season schedule is announced.
2. TM+ shall remain active for all NYI Attractions through sixty (60) minutes past the Attraction start time.
3. Ticket delivery shall be mobile only or RFID embedded season seat holder cards or RFID embedded hard stock or other defined technologies available at the time, provided vendor(s) is a Ticketmaster Nexus Partner as an option for ticket purchasers (including broker/ season ticket holder / plan holders / groups / premium) for all Attractions.
4. TM+ shall be activated for ticket postings for all NYI Attractions upon the release of the season schedules plus 72 hours with links from the TM.com website to TM+ for any such NYI Attractions. Any delay in activation would be a reduction in Marketing Sponsorship due Principal in the amount of $▮▮▮▮ per day.
5. TM+ activated for the playoffs for all games/all rounds at clinch.
6. For NYI Attractions, Principal will be permitted to set resale price floors for Season/Contract Ticket resale postings on TM+ at ▮▮ ▮▮▮ ▮▮ of the Season/Contract Ticket price of such Ticket. Prior to the start of each season (starting in the second Contract Year), Ticketmaster will review the foregoing resale floor percentage applicable to such Contract Year to determine if adjustments are needed. Both parties agree that the floor can never be any higher than ▮▮▮▮▮▮▮ of the Season/Contract Ticket price for such Ticket, but can be reduced to any lower percentage (including elimination of any price floor) at Principal's discretion.
7. Any broker consolidation agreements entered into by Principal with brokers shall not include "single consignment" options unless mutually agreed upon. Should consignment allocations be mutually agreed to by Ticketmaster, any inventory allocated must be presented on TM+ at the same (or better) pricing as offered to third party resale platforms.
8. TM+ shall be activated with a "comingled" landing presentation (primary and secondary inventory viewable) upon any pre-sale of Tickets or the initial On-Sale Date for all regular season and postseason NYI Attractions. If any NYI Attraction is set to "soft" landing presentation (primary inventory only viewable), Principal will pay Ticketmaster directly a

34

**DX-1494.1040**

$█████ penalty per Attraction, subject to a cap of $██████ per Contract Year, with no more than fifteen (15) total NYI Attractions permitted to exhibit a soft landing presentation during any single regular season of 41 home games. Should any of the permitted fifteen (15) soft landing NYI Attractions reach a primary inventory sell-through of 90% of total Sellable Capacity (not including suites/boxes/single seat listings or team holds), Ticketmaster will automatically activate a comingled landing presentation to adjust for high demand.  For any NYI Attraction that is switched to a comingled landing presentation as set forth above by October 1 of the applicable season (provided such comingled presentation remains until that Attraction plays off), such Attraction will not be subject to the $████ penalty described above. For avoidance of doubt, any NYI Attraction with a soft landing presentation that has not reached a primary inventory sell-through of ninety percent (90%) of total Sellable Capacity as outlined above by October 1 of the applicable season will be assessed the $█████ penalty even if such Attractions reach a ninety percent (90%) sell-through following October 1 of such season.

35

HIGHLY CONFIDENTIAL

LNE-LIT24-000116995

**DX-1494.1041**

## EXHIBIT D

## PLATINUM TICKETS AND VIP PACKAGES

1.    **Platinum Tickets and VIP Packages**

    (a)    **Definitions**.

        "Platinum Ticket" means any dynamically-priced Ticket that represents the most select category of seats for an Attraction (other than an Attraction in connection with the NHL or other sports team whose home arena is the Facility) resulting from proximity to stage or other superior amenities as mutually determined by Principal and Ticketmaster, which is sold by Ticketmaster on behalf of Principal (and not, for the avoidance of doubt, the artist/performing act or promoter of the applicable Attraction). Accordingly, "Platinum Tickets" exclude Tickets provided by Principal to the artist/performing act or promoter of the applicable Attraction as part of an "artist" or similar hold, to be sold or distributed by Ticketmaster on behalf of such third party. For the avoidance of doubt, where Principal designates such Tickets for the applicable promoter or artist of the Attraction to sell such Tickets pursuant to such promoter or artist's agreement with Ticketmaster (the "Artist/Promoter Platinum Agreement"), the settlement of any proceeds relating to such artist/promoter platinum Tickets shall be pursuant to the terms of the Artist/Promoter Platinum Agreement, and not the terms of this Agreement.

        "Platinum Ticket Fee" means a fee assessed by Ticketmaster against each Platinum Ticket purchaser in an amount equal to ▓▓▓▓ (which incorporates a Payment Processing Fee in the same percentage amount as set forth in the Agreement with respect to standard Ticket sales) of the Platinum Ticket Price (excluding any applicable delivery and processing fees) for each Platinum Ticket sold by Ticketmaster via the TM.com Website. Additionally, Ticketmaster shall charge Principal a "Platform Fee" in the amount of ▓▓▓▓▓▓ ▓▓▓ of the Platinum Ticket Price (excluding any applicable delivery and processing fees), which shall be deducted from the Platinum Proceeds as an Inside Charge prior to settlement. The Platinum Ticket Fee and the Platform Fee payable to Ticketmaster in connection with each sale of a Platinum Ticket shall be in lieu of any per Ticket Convenience Charge or Inside Charge otherwise due Ticketmaster under this Agreement in respect of standard Ticket sales.

        "Platinum Ticket Price" means the total price a purchaser pays for a Platinum Ticket sold via the TM.com Website, inclusive of applicable taxes, but exclusive of the Platinum Ticket Fee. The Platinum Ticket Price shall initially be established by Principal in consultation with Ticketmaster, and any subsequent adjustments to the Platinum Ticket Price shall be administered in accordance with parameters accepted by Principal in advance.

        "Platinum Proceeds" means the Platinum Ticket Price collected by Ticketmaster, which, for the avoidance of doubt, shall not include the Platinum Ticket Fee.

        "VIP Package(s)" means Ticket packages for an Attraction (other than an Attraction in connection with the NHL or other sports team whose home arena is the Facility) which entitle the purchaser of the Ticket to additional benefits to be fulfilled solely by Principal (and not, for the avoidance of doubt, the artist or performing act of any Attraction), including but not limited to, access to unique experiences surrounding the Attraction and/or unique merchandise.

36

HIGHLY CONFIDENTIAL

LNE-LIT24-000116996

**DX-1494.1042**

"VIP Package Fee" means a fee assessed by Ticketmaster in the amount of ███ (which incorporates a Payment Processing Fee in the same percentage amount as set forth in the Agreement with respect to standard Ticket sales) of the VIP Package Price, which amount shall be charged to the VIP Package purchaser in addition to the VIP Package Price. The VIP Package Fee is in lieu of any per Ticket Convenience Charge or Inside Charge otherwise due Ticketmaster under this Agreement in respect of standard Ticket sales.

"VIP Package Price" means the total price of the VIP Package paid by the purchaser as set by Principal, inclusive of the Face Value of the Ticket and applicable taxes.

"VIP Package Proceeds" means the VIP Package Price, which, for the avoidance of doubt shall not include the VIP Package Fee.

(b)    **Platinum Tickets**.

(i)    Platinum Ticket Set-Up Information.  Principal will provide Ticketmaster with notice of its desire to have Ticketmaster enable a Platinum Ticket offer for any applicable Attraction, and shall provide Ticketmaster with required Set-Up Information in respect of such offer so that Ticketmaster may set up the offer for sale through the TM.com Website.

(ii)    Platinum Ticket Fulfillment.  Ticketmaster shall fulfill Platinum Ticket orders in the same manner as standard Tickets through Ticketmaster's ordinary distribution channels as requested by the purchaser.

(iii)    Platinum Ticket Settlement.  Ticketmaster shall pay Principal the Platinum Proceeds, less the Platform Fee, for each Platinum Ticket sold by Ticketmaster during a calendar week along with settlement of Ticket Receipts for the applicable week. Principal shall be responsible for remitting any applicable taxes on the Platinum Ticket Price, and Ticketmaster shall be responsible for remitting any applicable taxes on the Platinum Ticket Fee.  Notwithstanding the foregoing, in the event that Ticketmaster is ever required by applicable law to remit taxes on the Platinum Ticket Price directly on behalf of Principal, Ticketmaster shall have the right to do so upon notice to Principal.  Except as provided otherwise above, settlements of Platinum Proceeds shall be made in accordance with and subject to the accounting and refund procedures set forth in this Agreement.

(iv)    Platinum Ticket Fee Royalty.  Principal shall be entitled to receive from Ticketmaster a royalty in the amount of ███████ of each Platinum Ticket Fee received (and not refunded or subject to chargeback) by Ticketmaster.  Notwithstanding the above, Payment Processing Fees, delivery fees, processing fees, and taxes (in each case, if any) related to any Platinum Ticket Fee shall be deducted from the Platinum Ticket Fees before the Platinum Ticket Fee royalties are calculated. Neither party makes any representation that any specific number of Platinum Tickets nor any amount of Platinum Ticket Fee royalties shall be available in connection with any Attraction for which the sale of Platinum Tickets has been enabled. Platinum Ticket Fee royalties shall be paid to Principal during a calendar week along with the settlement of Ticket Receipts for the applicable week.

(c)    **VIP Packages**.

37

HIGHLY CONFIDENTIAL

LNE-LIT24-000116997

**DX-1494.1043**

        (i)     <u>VIP Package Offer Information</u>.  Principal will provide Ticketmaster with reasonable advance written notice of its desire to have Ticketmaster enable a VIP Package, which notice shall include an accurate and complete description of the VIP Package content, applicable dates for the sales campaign, and any other information reasonably requested by Ticketmaster (the "Offer Information").  Notwithstanding anything to the contrary, Ticketmaster shall not be obligated to offer a VIP Package for an Attraction if, in the reasonable discretion of Ticketmaster, the VIP Package contains content prohibited from sale via the TM.com Website (e.g., pornography, gambling, etc.).  Ticketmaster and Principal will work together to develop appropriate messaging appearing on the TM.com Website to inform all purchasers of VIP Package elements and benefits.  Ticketmaster shall have final control over any and all messaging on the TM.com Website, and reserves the right to reject any messaging proposed by Principal for any reasonable reason, including, without limitation, size constraints.  Notwithstanding the foregoing, Ticketmaster shall have no responsibility or liability in the event that information (including Offer Information) provided to Ticketmaster by Principal relating to the VIP Package, is incorrect or incomplete, and Principal shall indemnify, defend and hold Ticketmaster's Indemnitees harmless from any and all claims, actions, damages, expenses, obligations, losses, liabilities and liens, imposed on, incurred by, or asserted against Ticketmaster's Indemnitees occurring as a result of, or in connection with the Offer Information.

        (ii)     <u>VIP Package Fulfillment</u>.

        (1)     <u>Ticketmaster Responsibilities</u>.  Ticketmaster will control access to the VIP Package by distributing to each applicable purchaser a unique barcode which will allow the purchaser to redeem the VIP Package elements from Principal at the Attraction.  Ticketmaster shall be responsible solely for enabling a barcode for each Purchaser to use to redeem the VIP Package elements, together with instructions for redemption (including (i) that Principal is the party responsible for fulfilling the VIP Package elements, (ii) the time frames during which redeeming purchasers may redeem the VIP Package elements, and (iii) the relevant Principal customer service contact information for purposes of handling customer support issues relating to such redemption).  Ticketmaster shall be solely responsible for customer service inquiries relating to enabling the barcode.

        (2)     <u>Principal Responsibilities</u>.  Principal shall allow purchasers to redeem the VIP Package elements at the Facility.  Principal shall be responsible for performing all fulfillment, redemption and delivery obligations, and customer service related to all fulfillment and delivery of VIP Package elements, and all costs associated therewith, and shall indemnify, defend and hold Ticketmaster's Indemnitees harmless from any and all claims, actions, damages, expenses, liabilities, obligations, losses, liabilities and liens related to, or occurring as a result of or in connection with, fulfillment, redemption and delivery of the VIP Package elements.

        (iii)     <u>VIP Package Settlement</u>.

        (1)     Ticketmaster shall pay Principal the VIP Package Proceeds for each VIP Package sold by Ticketmaster during a calendar week along with settlement of Ticket Receipts for the applicable week.  Notwithstanding anything to the contrary, Principal shall not receive any payment, nor shall a sale be deemed to have been made, if any VIP Package is the subject of a chargeback or for which Ticketmaster refunds the Ticket portion of the VIP Package.

38

HIGHLY CONFIDENTIAL                                    LNE-LIT24-000116998

**DX-1494.1044**

(2)     Principal agrees that it shall be responsible for all refunds related to the VIP Package elements, and to the extent Ticketmaster receives any VIP Package element refund requests, Ticketmaster shall refer the purchaser to a customer service number provided by Principal to Ticketmaster for such customer service issues.  In no event shall Ticketmaster be liable for a refund of the VIP Package elements.  In addition, Principal shall be responsible for all Chargebacks related to the VIP Packages, and Ticketmaster shall have the right to deduct amounts due for Chargebacks from the VIP Package Proceeds otherwise payable by Ticketmaster to Principal.  In the event such VIP Package Proceeds are inadequate to cover actual Chargebacks, Principal shall be responsible for, and shall refund to Ticketmaster within ten (10) days of Ticketmaster's written notice all amounts related to all Chargebacks of VIP Packages sold by Ticketmaster.

(3)     Principal shall be responsible for remitting any applicable taxes on the VIP Package Price, and Ticketmaster shall be responsible for remitting any applicable taxes on the VIP Package Fee.  Notwithstanding the foregoing, in the event that Ticketmaster is ever required by applicable law to remit taxes on the VIP Package Price directly on behalf of Principal, Ticketmaster shall have the right to do so upon notice to Principal.

(iv)     <u>VIP Package Fee Royalty</u>.  Principal shall be entitled to receive from Ticketmaster a royalty in the amount of ▮▮▮▮▮▮▮▮▮▮▮▮ of each VIP Package Fee received (and not refunded or subject to chargeback) by Ticketmaster.  Notwithstanding the above, Payment Processing Fees, and taxes (in each case, if any) related to any related to any VIP Package Fee shall be deducted from the VIP Package Fees before the VIP Package Fee royalties are calculated. Neither party makes any representation that any specific number of VIP Packages nor any amount of VIP Package Fee royalties shall be available in connection with any Attraction for which the sale of VIP Packages has been enabled. VIP Package Fee royalties shall be paid to Principal during a calendar week along with settlement of Ticket Receipts for the applicable week.

39

HIGHLY CONFIDENTIAL

LNE-LIT24-000116999

**DX-1494.1045**

| Form **W-9** (Rev. October 2007) Department of the Treasury Internal Revenue Service | **Request for Taxpayer Identification Number and Certification** | Give form to the requester. Do not send to the IRS. |
|---|---|---|

Name (as shown on your income tax return)

Business name, if different from above

Check appropriate box: ☐ Individual/Sole proprietor   ☐ Corporation   ☐ Partnership
☐ Limited liability company. Enter the tax classification (D=disregarded entity, C=corporation, P=partnership) ▶ _____
☐ Other (see instructions) ▶                                                                                    ☐ Exempt payee

Address (number, street, and apt. or suite no.)                          Requester's name and address (optional)

City, state, and ZIP code

List account number(s) here (optional)

## Part I   Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on Line 1 to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

Note. If this account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

| Social security number |
|---|

or

| Employer identification number |
|---|

## Part II   Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and
3. I am a U.S. citizen or other U.S. person (defined below).

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. See the instructions on page 4.

| Sign Here | Signature of U.S. person ▶ | Date ▶ |
|---|---|---|

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

### Purpose of Form

A person who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income.

Note. If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

- An individual who is a U.S. citizen or U.S. resident alien,
- A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States,
- An estate (other than a foreign estate), or
- A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax on any foreign partners' share of income from such business. Further, in certain cases where a Form W-9 has not been received, a partnership is required to presume that a partner is a foreign person, and pay the withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid withholding on your share of partnership income.

The person who gives Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States is in the following cases:

- The U.S. owner of a disregarded entity and not the entity,

Cat. No. 10231X                                        Form **W-9** (Rev. 10-2007)

40

HIGHLY CONFIDENTIAL                                                        LNE-LIT24-000117000

**DX-1494.1046**