**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> LIVE NATION ENTERTAINMENT, INC., <br> and TICKETMASTER L.L.C., <br><br> *Defendants.* | Case No. 1:24-cv-03973-(AS) <br><br> **ORAL ARGUMENT REQUESTED** |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO STRIKE THE TESTIMONY OF DR. ROSA M. ABRANTES-METZ**

**TABLE OF CONTENTS**

**Page**

ARGUMENT ..................................................................................................................1

I.      PLAINTIFFS' RESPONSES TO DR. ABRANTES-METZ'S FALSEHOODS
        MAKE NO SENSE ..............................................................................................1

II.     NOTHING IN PLAINTIFFS' PAPERS SOLVES DR. ABRANTES-METZ'S
        FUNDAMENTAL ERROR OF EXCLUDING UPFRONT PAYMENTS.........................4

III.    *DAUBERT* AND RULE 702 DO NOT PROVIDE SAFE HAVEN FOR
        EXPERTS TO TESTIFY IN A CONFUSING AND MISLEADING WAY ......................8

IV.     AXS AND TICKETMASTER WERE NOT OF COMPARABLE QUALITY
        FOR THE MAJORITY OF THE PERIOD DR. ABRANTES-METZ STUDIED ...........10

CONCLUSION.............................................................................................................11

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002)........................................................................................................8

*Campbell v. Metropolitan Property & Casualty Ins. Co.*,
239 F.3d 179 (2d Cir. 2001)......................................................................................................10

*Davis v. Carroll*,
937 F. Supp. 2d 390 (S.D.N.Y. 2013).........................................................................................9

*In re Air Cargo Shipping Services Antitrust Litig.*,
2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014), *report and recommendation
adopted*, 2015 WL 5093503 (E.D.N.Y. July 10, 2015)............................................................10

*In re Aluminum Warehousing Antitrust Litigation*,
336 F.R.D. 5 (S.D.N.Y. 2020) ....................................................................................................9

*In re Google Digit. Advert. Antitrust Litig.*,
2025 WL 3562687 (S.D.N.Y. Dec. 12, 2025) ..........................................................................10

*In re Google Play Store Antitrust Litig.*,
2023 WL 5532128, at *5 (N.D. Cal. Aug. 28, 2023)................................................................10

*In re Joint E. & S. Dist. Asbestos Litig.*,
52 F.3d 1124 (2d Cir. 1995)......................................................................................................10

*In re NFL "Sunday Ticket" Antitrust Litig.*,
2024 WL 3628118 (C.D. Cal. Aug. 1, 2024)..............................................................................9

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation*,
2022 WL 15053250 (S.D.N.Y. Oct. 26, 2022).........................................................................10

*In re Gen. Motors LLC Ignition Switch Litig.*,
2015 WL 9480448 (S.D.N.Y. Dec. 29, 2015) ............................................................................9

*Kurtz v. Costco Wholesale Corp.*,
818 F. App'x 57 (2d Cir. 2020) ................................................................................................10

*Laumann v. Nat'l Hockey League*,
117 F. Supp. 3d 299 (S.D.N.Y. 2015)..........................................................................................6

*Reed Construction Data v. McGraw-Hill Companies*,
49 F. Supp. 3d 385 (S.D.N.Y. 2014)............................................................................................9

*Restivo v. Hessemann,*
846 F.3d 547 (2d Cir. 2017)........................................................................................9

*U.S. Football League v. Nat'l Football League,*
842 F.2d 1335 (2d Cir. 1988)......................................................................................5

*United States v. A & S Council Oil Co.,*
947 F.2d 1128 (4th Cir. 1991) ...................................................................................10

*United States v. Frazier,*
387 F.3d 1244 (11th Cir. 2004) ...................................................................................3

*Ventura v. United States,*
2024 WL 1929183 (S.D.N.Y. May 1, 2024) .............................................................10

*Washington v. Kellwood Co.,*
105 F. Supp. 3d 293 (S.D.N.Y. 2015)..........................................................................9

*Wechsler v. Hunt Health Sys., Ltd.,*
381 F. Supp. 2d 135 (S.D.N.Y. 2003)........................................................................10

## RULES

Fed. R. Evid. 403 ...........................................................................................................3

Fed. R. Evid. 702 ..............................................................................................6, 8, 9, 10

iii

**ARGUMENT**

## I.    PLAINTIFFS' RESPONSES TO DR. ABRANTES-METZ'S FALSEHOODS MAKE NO SENSE

Plaintiffs' opposition and Dr. Abrantes-Metz's affidavit confirm, and further spotlight, her false and misleading testimony.

*First*, Plaintiffs' excuse that Dr. Abrantes-Metz simply misunderstood the questions she was asked does not ring true.  It is impossible to square the actual testimony with Plaintiffs' suggestion that "Dr. Abrantes-Metz testified that she uses the term 'retained amount' differently than Defendants and never meant to suggest otherwise." Pls.' Opp'n at 10.  On cross examination, Dr. Abrantes-Metz interjected, in response to the first question she was asked that referred to Retained Amount that "I do not call [it] retained amount," but rather "Live Nation itself calls those retained fees retained amounts."  Trial Tr. 2498:1-10.  She—entirely unprompted and proactively—inserted into the conversation that "Live Nation itself calls those retained fees retained amounts." *Id.*  That's not what Defendants' counsel asked, and none of this came up on direct examination.

When Defendants' counsel followed up, asking if he misunderstood, Dr. Abrantes-Metz doubled down.  Defendants' counsel asked: "Did I understand you correctly earlier to understand that **you don't use the term retained amounts**, Doctor, or did I misunderstand you?"  Trial Tr. 2498:19-21 (emphasis added).  Dr. Abrantes-Metz testified: "I think you misunderstood.  **I do not call it myself retained amount.  I call it retained amount because it was called retained amount by Live Nation**."  Trial Tr. 2498:22-24 (emphasis added).  The "it" can only mean her assessment of Retained Amount.   And on redirect, Dr. Abrantes-Metz swore: "The retained amount calculation follows the ***instructions provided by Ticketmaster and Live Nation*** in their answers to questions from plaintiffs **on how to calculate these retained amounts**."  Trial Tr.

1

2593:11-23 (emphases added).  The inescapable meaning was that Defendants agreed with her usage of Retained Amount.

None of this can have come as a surprise to Dr. Abrantes-Metz.  Defendants raised these exact critiques during deposition, painstakingly walking through her definition of Retained Amount and her basis for it, including citing paragraph 109—the very paragraph her counsel used to refresh her recollection as to what her definition of retained amount is.  Abrantes-Metz Tr. 177:3-178:23, ECF No. 722-3; *see also id.* at 179:11-181:6 (confirming she was unaware of any Ticketmaster, AXS, or SeatGeek document referring to "retained amounts" or saying Ticketmaster considers her retained amounts to be the price charged to venues).  She made no mention of any reliance on any Live Nation document, much less any letters regarding data.  *Id.*  She professed no confusion then.

*Second*, neither Plaintiffs nor Dr. Abrantes-Metz explain the curious citation to footnote 333 of her opening report.  During a sidebar on redirect, Plaintiffs' counsel proffered that footnote as support for testimony that she followed "instructions" from Live Nation and Ticketmaster "**on how to calculate these retained amounts**."  Trial Tr. 2593:13-23 (emphasis added).  That citation did not support the testimony, as Plaintiffs' counsel later conceded to the Court.  Trial Tr. 2600:9-2602:7.  Dr. Abrantes-Metz now concedes it would not be accurate "to convey the impression that [she] was following instructions from Ticketmaster on how to defined the retained amount the way *Defendants* used the term."  Abrantes-Metz Decl. ¶¶ 25, 27 (emphasis in original), ECF No. 1382-1.

So where did the reference to footnote 333 come from?  Nowhere in the 60+ pages of briefing and Dr. Abrantes-Metz's affidavit do Plaintiffs explain how Plaintiffs' counsel had a footnote at the ready that Dr. Abrantes-Metz had never before referenced in her trial testimony,

was not cited in the paragraph of her report that Plaintiffs' counsel used to refresh her recollection, and doesn't say what it was represented to say. One must assume Dr. Abrantes-Metz was the source, and that she provided it before direct examination began (since she and counsel could not communicate during the overnight break). That indicates a conscious, premeditated plan to give testimony creating the false impression that Dr. Abrantes-Metz defined Retained Amount based on instructions from Defendants.

*Finally*, the unfair and pervasive prejudice Defendants suffered was not and cannot be "cured" by the motions to strike that were granted, without explanation to the jury as to why. Most fundamentally, Dr. Abrantes-Metz concedes throughout her affidavit that she may have confused and misled the jury, e.g.:

- "I may have misspoken or been unclear." Abrantes-Metz Decl. ¶ 2.

- "I can see from the transcript that my answers may have caused confusion …" *Id.* ¶ 5; *see also id.* ¶¶ 22, 25, 27.

She did indeed create that confusion. That alone suffices to exclude her testimony. *See United States v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004) ("Because of the powerful and potentially misleading effect of expert evidence ... sometimes expert opinions that otherwise meet the admissibility requirements may still be excluded by applying Rule 403. Exclusion under Rule 403 is appropriate if the probative value of otherwise admissible evidence is substantially outweighed by its potential to confuse or mislead the jury."). Allowing her testimony to stand is highly prejudicial to Defendants and undermines Defendants' credibility, given that Dr. Abrantes-Metz has conflated in the jury's mind that every attack on her Retained Amount on cross can be read as an attack on some internal metric Defendants themselves use defined in the same way as Dr. Abrantes-Metz defines the term (when, again, that is not true).

3

## II.     NOTHING IN PLAINTIFFS' PAPERS SOLVES DR. ABRANTES-METZ'S FUNDAMENTAL ERROR OF EXCLUDING UPFRONT PAYMENTS

Nothing in Plaintiffs' opposition or Dr. Abrantes-Metz's affidavit solves the problem that—as Plaintiffs point out—tracked across three *Daubert* motions Defendants filed on the issue: Dr. Abrantes-Metz fails to account for upfront payments' effect on the very item she claims to measure—the price venues pay for ticketing services.

It is undisputed that ticketing prices have two main financial aspects—the fee split and upfront payments. *See, e.g.*, Trial Tr. 1177:14-19 (Marciano); Trial Tr. 2921:15-24 (Marcus); Trial Tr. 3815:10-17 (J. Johnson); *see also* Trial Tr. 2275:11-19 (Hill). Plaintiffs do not challenge that, and none of their arguments hold water.

*First*, upfront payments are not fixed costs relative to ticketing services contracts. Dr. Abrantes-Metz purports to calculate the "price" a venue pays a ticketer for providing ticketing services. Trial Tr. 2513:8-14 (Abrantes-Metz) ("[T]he meaning of the word would not change. I could have called it apples or oranges. It would still be the price charged by Ticketmaster for its ticketing services."). That price is set when the contract is agreed. It is undisputed that venues and ticketers negotiate upfront payments and fee splits at the same time. *See, e.g.*, Trial Tr. 2573:8-16 (Abrantes-Metz); *id.* at 1195:8-11 (Marciano); *id.* at 3815:10-17 (J. Johnson). And it is undisputed that ticketers, including in particular Ticketmaster, view upfront payments as affecting the per-ticket value they receive for their ticketing services. *See, e.g.*, Trial Tr. 3815:10-17 (J. Johnson); *id.* at 3356:5-20 (Hansen); DX-0553.0006. So whether Dr. Abrantes-Metz labels upfront payments "fixed" or anything else, they indisputably affect the "price" she is setting out to analyze.

Dr. Abrantes-Metz now focuses on what the *fan* pays. Abrantes-Metz Decl. ¶ 41. But as she admits, that is the second step in her analysis—how any overcharge is allocated among fans

4

and venues.  Trial Tr. 2449:21-2450:19 (Abrantes-Metz).  The first step in her analysis is where the price of ticketing services is set.  *Id.*  And that price, beyond any dispute, is set by negotiations among ticketers and venues—not fans.  Plaintiffs have *insisted* that Dr. Abrantes-Metz's damages theory does *not* directly evaluate harm in any downstream, fan-facing market—i.e., one where total fees are charged directly to fans.  And they could hardly say otherwise, given the Court rejected Plaintiffs' fan-facing ticketing market and all claims based on it.  Summary Judgment Order at 26-30, ECF No. 1037.  If Plaintiffs are trying to pivot now, the Court should exclude Dr. Abrantes-Metz's "new" model on the independent basis that a total fees analysis relies on an excluded fan-facing market.

*Second*, it is an overstatement to say that upfront payments are "in exchange for an economic consideration received by Ticketmaster"—sometimes they reflect other consideration, sometimes they don't.  Dr. Hill agrees.  Hill Rpt. ¶ 55; Trial Tr. 2275:11-19 (Hill).  And the very example Plaintiffs cite separates $7.5 million annual "sponsorship payments" from the $20 million upfront payment.  Pls.' Opp'n at 19 (citing PX1078).  Upfront payments, however labeled, are a fundamental part of ticketing deals, cannot be delinked from the overall economics, and indisputably affect the ticketing fee split.

*Third*, Plaintiffs' complaint that they lacked certain AXS data is unavailing.  Plaintiffs bear the burden of proving damages, and Dr. Abrantes-Metz has the responsibility to choose a dataset capable of answering the question at hand.  If the data necessary to conduct a reliable analysis were, in her opinion, not available, she could have chosen another metric (e.g., actual prices—she had all the contracts).  The consequence of that deficiency falls on the party bearing the burden of proof—not on the party challenging the analysis's reliability.  *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1379 (2d Cir. 1988) (Plaintiffs cannot "shift the burden of

proving the cause of damages" to Defendants). The Court's gatekeeping obligation under *Daubert* and Rule 702 does not permit a fundamentally incomplete analysis to go to the jury simply because the proponent chose not to gather the data required to make it whole. *Laumann v. Nat'l Hockey League*, 117 F. Supp. 3d 299, 315 (S.D.N.Y. 2015) ("expert opinions are inadmissible if they are not 'based on sufficient facts or data,' or on a reliable application of scientific methods ... no matter how burdensome or difficult collecting relevant data or devising methods to apply to that data may be").

*Fourth*, Plaintiffs claim that Dr. Abrantes-Metz's Figure 29 somehow affirms that her core damages finding—an alleged pass-through to fans of an overcharge to venues—is reliable despite ignoring upfront payments made to venues. It does not. Figure 29 has nothing to do with retained amounts. The Retained Amount analysis was in Part V.A.(1) of her report, entitled "Ticketmaster's Retained Amounts Are Supra-Competitive." That concludes with paragraph 125, which alleges based on the regression in Figure 21 that "Ticketmaster retains $2.30 per ticket more than AXS, all else equal." Figure 29 is not presented until some 30 pages later, near the end of Part V.B., which is the downstream analysis contending that some part of the $2.30 is passed on to fans. And it is not offered to substitute for or confirm the $2.30 figure, but rather to support the general idea of pass-through: that a higher retained amount results in higher total fees. Abrantes-Metz Rpt. ¶ 179. And on its face, the analysis underlying Figure 29 is not corroborative. Dr. Abrantes-Metz concludes that "total ticketing fees" fans paid are $3.19 higher at Ticketmaster-ticketed events than at AXS-ticketed events. Abrantes-Metz Rpt. ¶ 181. But that is virtually twice what she says fans are overcharged, using her Retained Amount analysis. Trial Tr. 2450:3-11.

What Plaintiffs are seizing on is paragraph 182, in which Dr. Abrantes-Metz says that the finding in Figure 29 that Ticketmaster fees are $3.19 higher than AXS fees is consistent with her

earlier finding about the Ticketmaster Retained Amount. But that is a far cry from corroboration. At best, Figure 29 indicates that what Dr. Abrantes-Metz observes downstream, in terms of fees, does not impeach her Retained Amount analysis upstream. But it could not possibly corroborate that, or act as a robustness check, because it is studying a different level of the market. Dr. Abrantes-Metz's two-step approach is fundamental to her damages.



Trial Tr. 2449:21-2450:19 (Abrantes-Metz); Pls.' Opening Presentation at slides 83, 85, ECF No. 1163-1. She starts with an alleged overcharge in the venue-facing ticketing market, and then looks at how much of that alleged harm the venue allocates to downstream fans. The Retained Amount error destroys the foundation of the first step and therefore everything that follows.

Figure 29 is not a robustness check anyway. A robustness check must actually "check" the potential econometric error at issue—here, the failure to account for upfront payments when considering how much Ticketmaster gets to "retain" in return for providing ticketing services. A robustness check "fixes" the econometric error—such as an omission of a key variable—to see if the results change. If the results change, the omission may be a serious one that affects the

7

conclusions. If they don't, the robustness check indicates that the omission doesn't materially affect the results or conclusions. Figure 29 cannot be a robustness check because it was not designed to determine whether accounting for upfront payments matters. It also, like her other analysis, ignores upfront payments. Indeed, Figure 29 ignores the contractual price of ticketing services sold to venues altogether. It is just an analysis of fee differentials without any consideration of the deal terms between ticketers and venues. For all Dr. Abrantes-Metz knows, the downstream Ticketmaster fees could be higher because Ticketmaster gave the venues larger fixed payments than AXS, which necessitated higher fees. Or venues may have thought that Ticketmaster deserved more money than AXS because of higher quality, but that too necessitated higher fees. Figure 29 sheds no light on this at all.

## III.    *DAUBERT* AND RULE 702 DO NOT PROVIDE SAFE HAVEN FOR EXPERTS TO TESTIFY IN A CONFUSING AND MISLEADING WAY

Plaintiffs suggest that because Dr. Abrantes-Metz disagrees with Defendants' characterization of upfront payments, the dispute is merely a "battle of the experts" for the jury. Pls.' Opp'n at 16. Not so. Rule 702's gatekeeping function requires more than an expert's *ipse dixit*; it requires each step in the expert's analysis to be "supported by good grounds." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). Here, Plaintiffs' opposition underscores the insufficiency of Dr. Abrantes-Metz's justification for excluding upfront payments for the following reasons.

Experts must ground their testimony in reliable principles and methods. The only evidence Plaintiffs marshal to support Dr. Abrantes-Metz's untethered analysis is an amorphous assertion that her opinion "is backed up by a realistic view of the facts and standard principles of economic analysis." Pls.' Opp'n at 23. That bland statement is inconsistent with the uncontroverted evidence of how Ticketmaster and AXS both view upfront payments; it is also insufficient under Rule 702.

8

Rule 702 requires the proponent to establish each element "by a preponderance of the evidence." *Davis v. Carroll*, 937 F. Supp. 2d 390, 411, 413-14 (S.D.N.Y. 2013). An abstract invocation of "economic principles" cannot substitute for engagement with the factual record. *See In re NFL "Sunday Ticket" Antitrust Litig.*, 2024 WL 3628118, at *6-7 (C.D. Cal. Aug. 1, 2024). Dr. Abrantes-Metz offers no serious engagement with the reality that ticketing contracts involve payments to and from venues that are invariably netted to understand what the ticketing company is paid. Plaintiffs have offered nothing to fill the gap.

The Court has already underscored the centrality of *Reed Construction Data v. McGraw-Hill Companies*, 49 F. Supp. 3d 385 (S.D.N.Y. 2014), explicitly identifying upfront payments as the variable of concern and telling Plaintiffs that this "was the one issue that the Court really honed in on as being a potential problem." Trial Tr. 3760:10-21. Dr. Abrantes-Metz has done precisely what *Reed* forbids: she omitted upfront payments entirely from her analysis despite their central role in the prices that ticketers charge to venues, she offered no empirical test or sensitivity analysis to justify that omission, and instead simply declared—without evidentiary support—that lump-sum payments "should have no impact on marginal costs and hence pricing." Abrantes-Metz Rpt. ¶ 111. Because Dr. Abrantes-Metz failed to account for this critical variable, her analysis is unreliable and inadmissible.[1]

---

[1] Plaintiffs attempt to recast this as a "dispute ... between the experts as to whether it is proper to deduct such payments when calculating price" (Pls.' Opp'n at 20), but cite no cases saying that unreliable expert opinions can go to the jury. The cases Plaintiffs cite in Section II(A) at most say that if two experts offer competing *reliable* analyses, the court may not resolve the debate by excluding the opinions of one of the experts. *See Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017) (courts can exclude expert opinions if they are speculative, based on unrealistic assumptions, or show too great an analytical gap); *In re Aluminum Warehousing Antitrust Litigation*, 336 F.R.D. 5, 30 (S.D.N.Y. 2020) ("*assuming the testimony of competing experts is reliable*, it is for the factfinder to determine each expert's trustworthiness") (emphasis added); *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 314-19 (S.D.N.Y. 2015) (finding that courts should not resolve debatable *but reliable* methodological differences by exclusion); *In re Gen.*

Finally, to the extent that Plaintiffs are implying that *Daubert* solely applies *before* an expert testifies (Pls.' Opp'n at 25), that's not the law.  The Court's gatekeeping obligation under Rule 702 is not a one-time checkpoint that, once passed, can never be revisited.  *See In re Google Play Store Antitrust Litig.*, 2023 WL 5532128, at *5 (N.D. Cal. Aug. 28, 2023).  *Daubert* and Rule 702 do not provide safe haven for experts to stand up before the jury and present their opinions in a confusing and misleading way.  Plaintiffs cite no cases that say otherwise.[2]

## IV.    AXS AND TICKETMASTER WERE NOT OF COMPARABLE QUALITY FOR THE MAJORITY OF THE PERIOD DR. ABRANTES-METZ STUDIED

Plaintiffs spend nearly nine pages trying to defend why AXS is a reasonable benchmark.  Whatever Plaintiffs may have to say about later periods, AXS and Ticketmaster were not of comparable quality, at minimum, until some point after the pandemic.  Plaintiffs do not meaningfully address that issue.  At most, Plaintiffs argue that there is evidence in the record that

---

*Motors LLC Ignition Switch Litig.*, 2015 WL 9480448, at *3 (S.D.N.Y. Dec. 29, 2015) (finding that the expert's opinions are based on data of a type reasonably relied upon by experts).  Other cases Plaintiffs cite are additionally inapposite.  *See, e.g.*, *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation*, 2022 WL 15053250, at *27, *31 (S.D.N.Y. Oct. 26, 2022) (context-specific ruling not generally applicable); *Kurtz v. Costco Wholesale Corp.*, 818 F. App'x 57, 62 (2d Cir. 2020) (concerning a predominance inquiry under Rule 23, not a *Daubert* challenge); *In re Google Digit.  Advert.  Antitrust Litig.*, 2025 WL 3562687, at *8-10, *16 (S.D.N.Y. Dec. 12, 2025) (challenging the expert's conclusion not the methodology); *In re Air Cargo Shipping Services Antitrust Litig.*, 2014 WL 7882100, at *18 (E.D.N.Y. Oct. 15, 2014), report and recommendation adopted, 2015 WL 5093503 (E.D.N.Y. July 10, 2015) (challenging the relevance of the expert's conclusion, not the methodology).

[2] The cases Plaintiffs rely on in Section II(B) are otherwise unavailing.  Dr. Abrantes-Metz is not testifying about "plainly widely accepted" theories (*see Campbell v. Metropolitan Property & Casualty Ins.  Co.*, 239 F.3d 179 (2d Cir. 2001)), and the issues here do not concern the independent admissibility of underlying facts or data supporting her opinions (*see Ventura v. United States*, 2024 WL 1929183 (S.D.N.Y. May 1, 2024)) or whether the district court erred in entering judgment as a matter of law (*see In re Joint E. & S. Dist.  Asbestos Litig.*, 52 F.3d 1124, 1132 (2d Cir. 1995)).  Plaintiffs' remaining authorities, *United States v. A & S Council Oil Co.*, 947 F.2d 1128, 1135 (4th Cir. 1991), and *Wechsler v. Hunt Health Sys., Ltd.*, 381 F. Supp. 2d 135, 141 (S.D.N.Y. 2003), reinforce that full examination of an expert's opinion is permitted and that the trier of fact assesses the sufficiency of expert testimony after the opposing party has had the opportunity for "vigorous cross-examination, presentation of contrary evidence."

AXS and Ticketmaster compete, and AXS has won some ticketing contracts since 2012. That does not address the question of comparable quality. If it did, any ticketer who won a ticketing contract at any time between 2017-2024 could be said to be of comparable quality. The record is that AXS simply was not of comparable quality to Ticketmaster until, at earliest, late 2021 following significant "catch-up" investment during the pandemic shutdown of the live music industry. Trial Tr. 1168:18-1169:1 (Marciano). That is dispositive. Plaintiffs do not dispute that Dr. Abrantes-Metz's analysis depends on AXS and Ticketmaster being of comparable quality throughout the period she measured, from 2017-2024. Dr. Abrantes-Metz agreed that "if a factfinder were ultimately to determine that AXS and Ticketmaster were not of comparable quality for any portion of the period that you have analyzed, [she] didn't disclose a methodology by which they could calculate what portion of the overcharge for that time period was not properly awarded as damages." Trial Tr. 2567:7-15 (Abrantes-Metz). Her testimony is therefore not useful to the jury and should be stricken.

## CONCLUSION

The Court should strike the testimony of Dr. Abrantes-Metz in its entirety.

Dated: April 4, 2026

Respectfully submitted,

LATHAM & WATKINS LLP

_____

Alfred C. Pfeiffer (admitted *pro hac vice*)
    *Co-Lead Trial Counsel*
David R. Marriott
    *Co-Lead Trial Counsel*
Timothy L. O'Mara (admitted *pro hac vice*)
Jennifer L. Giordano
Kelly S. Fayne (admitted *pro hac vice*)
Andrew M. Gass (admitted *pro hac vice*)
Lindsey S. Champlin (admitted *pro hac vice*)
Robin L. Gushman (admitted *pro hac vice*)

505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600

1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

555 11th Street, NW, Suite 1000
Washington, D.C. 20004
(202) 637-2200

Al.Pfeiffer@lw.com
David.Marriott@lw.com
Tim.O'Mara@lw.com
Jennifer.Giordano@lw.com
Andrew.Gass@lw.com
Kelly.Fayne@lw.com
Lindsey.Champlin@lw.com
Robin.Gushman@lw.com

*Attorneys for Defendants Live Nation*
*Entertainment, Inc. and Ticketmaster L.L.C.*

CRAVATH, SWAINE & MOORE LLP

_____

Lauren A. Moskowitz
Jesse M. Weiss
Nicole M. Peles

Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 474-1000

lmoskowitz@cravath.com
jweiss@cravath.com
npeles@cravath.com

*Attorneys for Defendants Live Nation*
*Entertainment, Inc. and Ticketmaster L.L.C.*

**CERTIFICATE OF COMPLIANCE**

I, Alfred C. Pfeiffer, an attorney duly admitted to practice before this Court, hereby certify pursuant to Local Rule 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rules"), Rule 8(C) of Judge Arun Subramanian's Individual Practices in Civil Cases ("Individual Rules"), that the foregoing Memorandum of Law was prepared using Microsoft Word, and contains 3,443 words. In making this calculation, I have relied on the word and page counts of the word-processing program used to prepare the document.

Dated:    April 4, 2026
          New York, New York


_____
Alfred C. Pfeiffer

13