April 6, 2026

**VIA ECF**

The Honorable Arun Subramanian
United States District Judge
United States District Court, Southern District of New York
500 Pearl Street, Courtroom 15A
New York, NY 10007-1312

**Re:**    *United States et al. v. Live Nation Entertainment, Inc. et al.*; **1:24-cv-03973-AS**

Dear Judge Subramanian:

At the Court's direction, Plaintiff States submit this letter with in-line responses to Defendants' letter seeking judgment as a matter of law under Federal Rule of Civil Procedure 50(a).  As shown below, Defendants are not entitled to this "extraordinary remedy" on any of Plaintiff States' claims.  *Meloff v. N.Y. Life Ins. Co.*, 240 F.3d 138, 145 (2d Cir. 2001) ("Such motions 'should be granted cautiously and sparingly.'" (quoting 9A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2524 (1995)).  Plaintiffs' evidence was sufficient to survive summary judgment in this case and is certainly sufficient to survive a Rule 50 motion upon the robust trial record.  "[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe."  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 151 (2000).  Defendants bear the burden and must specifically identify the particular legal and factual basis for each claim they contend is legally insufficient.  Fed. R. Civ. P. 50(a)(2); *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 17 (2d Cir. 1993) (reversing grant of Rule 50 motion where specificity requirement was not satisfied; the motion must identify why "a reasonable jury could only reach one conclusion"); *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53–54 (2d Cir. 1993) ("[T]he specificity requirement is obligatory.").  Defendants have failed to meet their lofty burden here.

### MAJOR CONCERT VENUE MARKET DEFINITION

**DEFENDANTS' ARGUMENT**

*First*, Defendants are moving for judgment as a matter of law on **all claims that rely on Plaintiffs' alleged primary ticketing services and primary concert ticketing services to "major concert venues" markets** (First Claim for Relief and Second Claim for Relief).

- Plaintiffs failed to prove that either of these is a relevant market as the law requires.

    - The evidence does not permit any reasonable jury to find that these are relevant antitrust markets, and without these markets, Plaintiffs' primary ticketing monopolization claim and their exclusive dealing claim fail.

    - First, there is no basis in the record for the "concert" limitation on the "primary concert ticketing services to major concert venues" market.  The record shows

without dispute that ticketing contracts are for all the ticketing needs of the venues, be that sports, concerts, family shows, or whatever else plays there. The only purpose the "concert" limitation serves is to inflate Ticketmaster's share.

o  Second, there is no basis in the record for limiting the markets to the 257 so-called "major concert venues."

▪ Plaintiffs presented no evidence that these venues have ever been actually discriminated against in any way, so on Defendants' reading of *FTC v. Meta Platforms, Inc.*, 811 F. Supp. 3d 67 (D.D.C. 2025), and *United States v. Eastman Kodak Co.*, 63 F.3d 95 (2d Cir. 1995), that is dispositive.

▪ Even if that is not dispositive, we are still left with a record without an HMT analysis or satisfaction of the *Brown Shoe* factors, because (a) there is no evidence that this grouping is the product of any preexisting industry recognition; (b) everyone agrees that Ticketmaster, SeatGeek and AXS compete across a broad group of stadiums, arenas, and amphitheaters; (c) the core ticketing technologies and services sold to all stadiums, arenas, and amphitheaters are the same; and (d) Plaintiffs presented no evidence that these venues have ever been actually discriminated against in any way. Those facts together do not permit a reasonable jury to find a relevant market limited to these 257 venues.

## PLAINTIFFS' RESPONSE

• The jury could reasonably find the existence of both of the ticketing markets for major concert venues ("MCVs") identified by Dr. Hill.

• First, there is ample testimony in the record from which the jury could find the ticketing market focused on concerts. There was ample testimony at trial that MCVs are particularly susceptible to Ticketmaster's market power because they depend on concert revenue much more than other venue types (such as stadiums). Hill, Trial Tr. 2089:22–2090:19 (testifying that amphitheaters and arenas are dependent on concerts for their profitability); Groetzinger, Trial Tr. 751:9–752:15 (testifying that SeatGeek targeted Major League Soccer stadiums because "[t]hey have either no concerts or very few concerts" and that all the other venues SeatGeek talked to that had concerts "expressed extreme levels of concern around the concert issue, … that if they moved to SeatGeek, they would lose concerts."); Khoury, Trial Tr. 1613:20–1614:19 (testifying that JUMP has attempted to move into markets outside of sports ticketing but have not been able to because, in part, the "feedback [JUMP] get[s] from team owners [is] that they're typically concerned about giving us the entertainment side and losing on some of the concerts that they have to run in their business."); *id.* 1649:12–15 (noting that team owners do not allow JUMP to take over concerts because they "typically are concerned of losing concert revenue by moving off of their current solutions."); Hill, Trial Tr. 2122:18–2124:3 (testifying that ticketers like Paciolan "haven't been able to use their success in other areas as a primary ticketer to enter into or expand in the market for primary concert tickets at major concert venues."); PX 508 at -879; Marcus, Trial Tr. 2841:10–2842:3 (internal Ticketmaster document calculating its

market share at 82% for the concert segment, separate and apart from other ticketing segments, for 2019); Marcus, Trial Tr. 2838:11–24 (concert category recognized and treated as distinct within Ticketmaster).

- Second, the jury could reasonably find the ticketing markets for MCVs above the 8,000-seat capacity and 10-concerts-per-year thresholds.

  o As an initial matter, the jury does not need to find "discrimination" against MCVs for a ticketing market at MCVs to be a relevant market—an argument the Court already rejected on summary judgment. ECF No. 1037 at 19 (citing *Am. Tobacco Co. v. United States*, 328 U.S. 781, 811 (1946)). Courts regularly define a relevant market around product characteristics (like 8,000-capacity MCVs) that are important for a segment of customers without any reference to or finding of discrimination against those customers. *United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1, 27–29 (D.D.C. 2022) (finding market for anticipated best-selling books with an advance of more than $250,000); *FTC. v. Sysco Corp.*, 113 F. Supp. 3d 1, 48 (D.D.C. 2015) (finding markets for both broadline foodservice distribution and broadline foodservice distribution to national customers); *2311 Racing LLC v. Nat'l Ass'n for Stock Car Auto Racing, LLC*, 809 F. Supp. 3d 371, 376–79 (W.D.N.C. 2025) (finding market for "the sale and purchase of premier stock car racing services"); *FTC. v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 169 (3d Cir. 2022) (finding market based on patient location and holding that there is no "rigid requirement that price discrimination must be feasible in every customer-based geographic market"). The question is not "discrimination" but rather whether the market is cognizable based on product substitution and the *Brown Shoe* factors. Indeed, the Court's jury instructions (correctly) make no reference to discrimination with respect to the relevant market.

  o There is ample evidence from which the jury could find that the primary ticketing services and primary concert ticketing services at 8,000-capacity MCVs that host 10 or more concerts per year are relevant markets. Courts have repeatedly held that markets need not be defined with mathematical precision; the jury could reasonably credit the relevant markets for MCVs even if there is some "fuzziness" around the fringes of a market. *Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d at 33 ("The Supreme Court has wisely recognized there is 'some artificiality' in any boundaries, but that 'such fuzziness' is inherent in bounding any market.") (cleaned up); *FTC. v. Tapestry, Inc.*, 755 F. Supp. 3d 386, 415 (S.D.N.Y. 2024) (markets need not be defined with precision) (citing cases).

  o **Dr. Hill Testimony**: Dr. Hill testified that the 8,000-capacity cutoff is a reasonable proxy for MCVs and commonly reflected in industry documents. Hill, Trial Tr. 2085:21–2086:25. He testified the same is true regarding the 10-concerts-per-year threshold. *Id.* 2087:4–16. This testimony, which on this motion must be credited over any testimony of Live Nation's experts in their case, is alone sufficient evidence to support the MCV market characteristic.

o **Live Nation/Ticketmaster Documents**: Live Nation's own internal documents and testimony at trial recognize venues with capacity of greater than 8,000-capacity as distinct. *See, e.g.*, PX 867 at -697 (Joe Taylor (Live Nation): "The standard cutoff for us between Boutique/Large Amp . . . is 8000 cap[acity]."); PX 326 at -543 (2018 Live Nation Board of Directors slide defining "[l]arge amphitheater[s] . . . as having capacity of 8,000 or greater"); Weeden Trial Tr. 3578:2–8 (in terms of capacity cutoff Live Nation looks at "somewhere between the 7,000 to 9,000 capacity range"); Roux, Trial Tr. 1320:11–18 (identifying competitors for artists that perform in "8,000-ish and above cap venues").

o **Stadiums**: There is a mountain of trial testimony and evidence supporting the exclusion of stadiums from the market because these venues have only a few concerts and are only played by superstar artists who can fill 30,000-plus seats. Hill, Trial Tr. 2089:1–18 (stadiums excluded from definition of major concert venues because they have much higher capacity and far fewer concerts); *id.* 2090:1–7 (stadiums excluded from definition of major concert venues because stadiums are much less dependent on concerts than major concert venues); *id.* 2091:3–2092:3 (artists who play at stadiums must sell far more tickets than artists who play at major concert venues); Geiger, Trial Tr. 484:18–485:2 (testifying that "the largest artists will play stadiums" and "[a]s it gets down the pyramid," smaller artists will "play arenas and then amphitheaters"); Marciano, Trial Tr. 947:23–24 (difference between a major concert venue and a stadium is based on "the amount of activity"); *id.* 947:25–948:2 ("the amount of artists that can play at 50,000 to 80,000 seats is usually a limited amount of artists every year that have the kind of popularity"); *id.* 948:15–17 (agreeing that stadiums "host fewer concerts than arenas and amphitheaters"); Perez, Trial Tr. 2433:1–8 ("[s]tadiums are primarily sports venues" that "may host just a handful of concerts a year" whereas amphitheaters "exclusively" host concerts and "concerts are a very material part of [arena]'s overall event count"); Roux, Trial Tr. 1276:1–22 (non-superstar artists pre-determine to play amphitheaters, while superstar artists like Taylor Swift and Beyonce can fill up stadiums); Groetzinger, Trial Tr. 924:25–925:4 ("And there's a large set of things specific to arenas about putting on a very high volume of events quickly. Even if an NFL stadium has concerts, they'll maybe have ten a year, maybe 20 as an absolute maximum; whereas arenas could be four in a week"); Hansen, Trial Tr. 3441:13–17 ("Most stadiums aren't specifically designed for concerts").

## MAJOR CONCERT VENUE MONOPOLY POWER

**DEFENDANTS' ARGUMENT** – Plaintiffs failed to prove monopoly power.

o At summary judgment, because Defendants just raised market definition, the Court held that monopoly power might exist in a targeted customer market even if it has not been exercised.

4

- o Now, regardless of market definition, the evidence does not permit any reasonable jury to find that Ticketmaster had power over price, control over output, the ability to exclude competition, or any other indicia of monopoly power.

## PLAINTIFFS' RESPONSE

- The jury can reasonably find that Live Nation/Ticketmaster has monopoly power in the ticketing markets for MCVs.

- As a legal matter, the jury can find that Live Nation/Ticketmaster has monopoly power in the ticketing markets based on the circumstantial evidence of Ticketmaster's market share and barriers to entry, as the Court's proposed jury instructions make clear. The Plaintiff States do **not** need to additionally show direct evidence of monopoly power (i.e., that Ticketmaster controlled price or excluded competition) on top of the indirect evidence. Indeed, in Section 2 monopolization cases, indirect evidence of monopoly power is far more common than direct evidence of monopoly power. *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) ("The existence of [monopoly] power ordinarily may be inferred from the predominant share of the market."); *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 99 (2d Cir. 1998) ("We have held that a market share of over 70 percent is usually 'strong evidence' of monopoly power.") (quoting *Broadway Delivery Corp. v. UPS*, 651 F.2d 122, 129 (2d Cir. 1981)); *United States v. Google LLC*, 747 F. Supp. 3d 1, 118 (D.D.C. 2024) [hereinafter *Google Search*] ("[T]he indirect evidence supporting the structural approach—a dominant market share fortified by barriers to entry—easily establishes Google's monopoly power in search."); *id.* at 107 ("Direct evidence of such pricing power is rarely available. So, courts more typically examine market structure in search of circumstantial evidence of monopoly power.") (citation modified)).

- Here, the jury could reasonably find that Live Nation has a durable market share that far exceeded 70% throughout the relevant period. Hill, Trial Tr. 2101:9–12 ("[H]ere I'm looking at Ticketmaster's share from 2017 on the left, to 2024, on the right. And you can see in that time period, Ticketmaster's share varies between 83 percent and 87 percent."); PX 508 at -879 (internal Ticketmaster document calculating its market share at 82% for the concert segment, separate and apart from other ticketing segments, for 2019); Marcus, Trial Tr. 2841:10–2842:3 (testifying about same); Marciano, Trial Tr. 1101:17–22 (Ticketmaster is "over ten times" the size of its next biggest competitor, AXS); PX 406 (Mr. Marcus writing that Ticketmaster is the "only company with the reach across artists, venues, and fans to influence retail ticketing in a way that creates industry-wide impact. We alone can move the market.")

- The jury could likewise reasonably find that Live Nation's dominant market share is protected by high barriers to entry.

  - o **Capital costs**: Building and launching a ticketing platform is expensive. Groetzinger, Trial Tr. 748:13–23 (SeatGeek "invested a very large amount of money" to launch their primary ticketing business); *id.* 750:2–7 (SeatGeek has

spent "hundreds of millions of dollars on R&D over the last ten years on primary ticketing"); Perez, Trial Tr. 2323:23–2325:5 (competing with Ticketmaster for exclusive contracts with MCVs requires "a lot of patience and a lot of capital, because you have to spend all the money to build the platform first to satisfy all [the] use cases" for events at such venues); *id.* 2319:17–19 ("[I]n the last five years, it's been extraordinary growth in terms of the money that we're putting into the platform.").

o **Long-term exclusive contracts**: Live Nation's long-term exclusive contracts make it difficult for new entrants to obtain scale. Hill, Trial Tr. 2107:13–19 ("72 percent of major concert venues" locked up by Ticketmaster contracts for an average of 5.6 years); *id.* 2285:24–2286:8 (noting that in a scenario where 100 small ticketers with exclusive contracts do not lock up a market the same way a "firm with a very large portion of the market" can if it has a long-term exclusive contract); Marciano, Trial Tr. 1101:23–1102:3 (AXS's "biggest challenge" has been Ticketmaster's "exclusive ticketing contracts" with venues, which have made it "difficult for [AXS] to find ways to build a client base"); *id.* 936:20–937:8 (the "long-term exclusive contracts that Ticketmaster has with the major concert venues in the United States" require AXS to "turn the ticketing [for events they produce and promote] over to [its] direct competitor, which is Ticketmaster").

o **Ticketmaster brand dominance**: Ticketmaster's decades-long brand dominance makes it more difficult for rivals to enter or expand. *Google Search*, 747 F. Supp. 3d at 121 ("The entrenched buyer preferences enjoyed by Google are a major deterrent to market entry.") (citation modified); Perez, Trial Tr. 2325:6–18 (testifying that Ticketmaster's position as the largest ticketing company and concert promoter means that venues' ticketing decisions "typically . . . have a lot of non-ticketing aspects to them as opposed to just competing on the merits of the platform"); Granger, Trial Tr. 2647:8–10 (noting "[Ticketmaster] has the best name recognition, so when you are trying to sell tickets, it has a bit of a marketing halo" when discussing his preference for Ticketmaster); Groetzinger, Trial Tr. 922:22–923:1 ("[G]iven that there is only one dominant ticketing option [i.e., Ticketmaster] . . . it's very difficult for a venue to speak out against that dominant option."); PX 231 at -160 (Monumental Sports & Entertainment internal ticketing assessment listing "[e]stablished brand and infrastructure" as Ticketmaster's top "Pro").

## DEFENDANTS' ARGUMENT

▪ Plaintiffs presented no evidence of power over price. Dr. Hill had all the data to analyze that, yet reported no opinions about it and admitted he had no such evidence. Record evidence shows that Ticketmaster's share of ticketing contract revenues has been decreasing.

▪ There is no evidence of reduced provision of ticketing services, of fewer tickets being sold, or of fewer events taking place by virtue of anything that Ticketmaster has done.

- Ticketmaster has not been able to exclude competition. It clearly has more competitors and faces more competitive pressure than it did 15 years ago. But more importantly, it now faces effective competitors for every bidding opportunity to serve large venues.

- There is no evidence that Ticketmaster has reduced quality or, more importantly, held onto its market share despite reducing quality (as in *United States v. Google*, 778 F. Supp. 3d 797, 834 (E.D. Va. 2025)).

## PLAINTIFFS' RESPONSE

- Here again, the jury can find Live Nation/Ticketmaster's monopoly power on circumstantial evidence alone based on Ticketmaster's market share and barriers to entry. As courts have repeatedly held, the jury does not need to find that Live Nation/Ticketmaster actually raised prices, reduced output, or lowered quality to find that it is a monopolist. *Am. Tobacco Co. v. United States*, 328 U.S. 781, 811 (1946) ("[T]he material consideration in determining whether a monopoly exists is not that prices are raised and that competition actually is excluded but that power exists to raise prices or to exclude competition when it is desired to do so."); *FTC v. Surescripts, LLC*, 665 F. Supp. 3d 14, 47 (D.D.C. 2023) ("Courts have held that the existence of so-called 'calling cards' of a competitive market, such as falling prices and increased output, do not by themselves negate the existence of monopoly power as a matter of law."). If Defendants' standard for monopoly power were correct—and it is not—"a great many defendants with market power, such as Alcoa in the 1920s and perhaps even the former AT&T telephone monopoly, could be insulated from antitrust attack." *Allen-Myland, Inc. v. Int'l Bus. Machs. Corp.*, 33 F.3d 194, 211 (3d Cir. 1994).

- **Price**: In addition to the circumstantial evidence of its 80%-plus market share, there is direct evidence of Live Nation/Ticketmaster's power over price.

  - **Ticketmaster's high fees**: There was ample evidence at trial that Ticketmaster charges high fees and has raised those fees. Rapino, Trial Tr. 1408:13–15 ("Q. And it's true that on a $70 ticket, Ticketmaster fees can average $20 or more, correct? A. It could, yes."); Hill, Trial Tr. 2124:14–2125:9 (describing quantitative findings that fees went up by $4.33 in major concert venues that switched from a different primary ticketer to Ticketmaster, and in the same period, fees decreased by $3.82 when venues switched from Ticketmaster to another ticketer); *id.* 2125:10–14 ("Q. And to make sure I understand it, your data showed, if you switch to Ticketmaster, the fees to fans go up, and if you switch away from Ticketmaster, the fees to fans go down; is that correct? A. That is correct."); Rapino, Trial Tr. 1839:18–1840:3 ("Q. So the fans are paying higher concert ticket prices, and they're paying higher service fees, both, correct? A. Correct. Q. And is it correct that you have acknowledged receiving many complaints from music fans about Ticketmaster fees, correct, over the years? A. Around fees, yes"); Baker, Trial Tr. 1527:24–1531:14.

7

- o **<u>Ticketmaster documents reflect pricing power</u>**: The jury could find from Ticketmaster's own internal documents that it exercised market power to extract higher prices and profits. For example, Live Nation and Ticketmaster executives described Ticketmaster's double dipping on fees related to its Platinum pricing tool as being "difficult to defend" (Mr. Yovich), with Mr. Roux candidly stating regarding Ticketmaster: "How much money do we need to make!?!?" PX 1106; Marcus, Trial Tr. 2893:17–2893:19 (testifying about PX 1106 and the "boil the frog" strategy regarding Ticketmaster's Platinum fees). Mr. Baker, a Live Nation employee, commented that Ticketmaster charges "f***ing outrageous" fees to fans at Live Nation venues. PX 720; Baker Trial Tr. 1539:17–1540:1 (testifying about messages with another employee who said "I have VIP parking up to 250 Laugh out loud [LOL]," to which Baker responded, "I almost feel bad taking advantage of them, ha-ha-ha-ha-ha."); *id.* 1538:16–19 (describing the fee being charged by Ticketmaster for "VIP club admission" for a 2022 Kid Rock concert in Tampa as "f***ing outrageous"); PX 719 (chart showing the 33 percent increase in premier parking charges, with Mr. Baker commenting: "robbing them blind, baby."); PX 860, at -069 (2023 Ticketmaster "blueprint" showing revenue increase to $2.2 billion in 2022 from $1.5 billion in 2019), –075 ("service fee revenues continues [sic] to grow"), –077 ("service fee revenues from resale grows as Ticketmaster gains share"); PX 919 (describing Ticketmaster's 2024 pricing strategy and "the impact of shifting tix from pricemaster to plat on CM"); Marcus Trial Tr. 2887:3–2888:20 (testifying about Ticketmaster's new Platinum Pricing tool increasing profitability allowing Ticketmaster to retain "50% of outside fee on higher Platinum Ticket Price").

- o **<u>Dr. Abrantes-Metz overcharge testimony</u>**: Dr. Abrantes-Metz's testimony showed that Ticketmaster overcharged fans, which is direct evidence of pricing power. Total ticketing fees paid by consumers for Ticketmaster-ticketed events are higher than total fees for AXS-ticketed events. Abrantes-Metz Trial Tr. 2484:22–2484:23 ("Ticketmaster charges 70 percent more in terms of higher fees than AXS."); *id.* 2452:8–2452:17 (68 to 75 percent of overcharge is paid by the fans, and the rest is paid by the venues).

- o **<u>Ticketmaster profit margins</u>**: Ticketmaster has consistently maintained high profit margins—exceeding 35 percent—over many years, which is likewise evidence that the jury could reasonably find supports the existence of monopoly power. Rapino, Trial Tr. 1778:7–1779:8 (from 2022 to 2024, ticketing AOI margin was between 36 and 38%); *id.* 1902:18–21 (30% margin on ticketing); PX 475 at -382 (same); *Google Search*, 747 F. Supp. 3d at 179 (considering Google's "high and remarkably stable operating profits" when analyzing monopoly power); *McWane, Inc. v. FTC*, 783 F.3d 814, 838–39 (11th Cir. 2015) (same).

- o **<u>U.S. vs. Europe comparison</u>**: Finally, testimony at trial showed that ticketing fees in the United States are higher than in Europe, where ticketers generally have non-exclusive agreements with venues. Yovich, Trial Tr. 2802:11–2803:15; Marciano, Trial Tr. 1107:5–1108:25; Perez, Trial Tr. 2338:2–7 ("In the U.S.,

[ticket fees] can run around 25 percent of the face value of the ticket. In the UK, the market is really 12.5 percent.  And in France, it's 10 percent.").

- **Output**: Defendants' argument about a lack of evidence of restricted output is misplaced, because a monopolist restricting output is just one form of *direct* evidence of monopoly power.  As shown above, the jury can find Live Nation/Ticketmaster's monopoly power based on circumstantial evidence.  *Google Search*, 747 F. Supp. 3d at 123 ("[R]estricted output is simply a form of direct proof. Its absence is not fatal, as indirect evidence suffices to establish monopoly power.").  Market output had increased over the relevant time period in many of the most significant Section 2 cases, including *Standard Oil, AT&T*, *Microsoft*, and *Google Search*; that is no barrier to a finding of monopoly power.  Hill, Trial Tr. 2141:25–2143:3.

- **Excluded competitors**: Plaintiffs are not required to show that Ticketmaster excluded competitors entirely from the market, which is another form of direct evidence of monopoly power.  Although competitors have entered or exited on the fringes, Ticketmaster's market share has not decreased—and in fact has increased—and has been at monopoly levels for many years.  Hill, Trial Tr. 2101:1–12 (Ticketmaster's market share was between 83 percent and 87 percent from 2017 to 2024, excepting 2020 and 2021 due to COVID).  Moreover, there is substantial evidence that Live Nation/Ticketmaster's conduct substantially impaired the ability of rivals to grow and compete in the ticketing markets.  Khoury, Trial Tr. 1614:3–19 (noting that efforts to expand to concerts have been unsuccessful because team owners are concerned about "losing on some of the concerts that they have to run in their business"); *id.* 1649:12–15 (noting that team owners do not allow JUMP to take over concerts because they "typically are concerned of losing concert revenue by moving off of their current solutions"); PX 1226 (internal Paciolan emails noting that "1 for 6 [renewals retained by Paciolan] is telling – not to mention that we do not have a single chance to bid on a TM renewal this year while all of ours went to RFP – and the 1 new Spectra/OVG building that went to RFP we did not even have a chance to present before they awarded to TM."); *McWane*, 783 F.3d at 840 (complete exclusion is not required; finding anticompetitive effects where rivals' "growth was meaningfully (and deliberately) slowed" and their development into rivals that "could constrain [the monopolist's] monopoly power was stunted."); *accord United States v. Microsoft*, 253 F.3d 34, 71 (D.C. Cir. 2001).

- **Reduced quality**.  Here again, a monopolist reducing quality, or maintaining low quality, is another form of direct evidence of monopoly power that is not required.  Regardless, the jury heard extensive evidence from Live Nation's own witnesses and documents suggesting that Ticketmaster has held onto market share despite its reliance on outdated technology and persistent product failures.

  o Rapino, Trial Tr. 1862:11–15 (describing Ticketmaster as being held together with "**duct tape**" and confirming at trial that he has expressed this sentiment); PX 521 at -284; Yovich, Trial Tr. 2710:10–2711:16 (discussing PX 800) (90 percent of the tech executives not satisfied with Ticketmaster's delivery against its strategic plan); Yovich, Trial Tr. 2720:22–2722:3 (discussing PX 878); Yovich, Trial Tr. at

2694:17–2695 (confirming Host system was very important part of Ticketmaster technology" but was developed in 1977); PX 801 (Yovich stating that Ticketmaster has "the best people working in extreme circumstances, **with lots of old tech**"); PX 576 (onsale issue "affects their most important fans, and we are unable to execute a very simple task for at most 1500 tickets"); DX 790 at -0003 (Ticketmaster did not prioritize abuse prevention and "lack[ed] the tools and skillset to identify and manage sophisticated bots"); Marcus Tr. 2881:24–2882:23 (testifying about deposition testimony that "Ticketmaster is not investing enough in data science and data engineering"); Khoury, Trial Tr. 1616:24–1618:20 (describing limitations of Ticketmaster's "core ticketing engine" [Host] compared to JUMP's modern system); PX 783 at -334–43 (Ticketmaster internal document identifying "pain points & unmet needs" across fans, artists, and venues, and noting "[c]onfusing and error-filled sales are frustrating fans and degrading our brand"); Yovich, Trial Tr. 2717:15–2718:2 (testifying about PX 783).

- o **Dr. Abrantes-Metz's** empirical analyses of competitive outcomes between AXS and Ticketmaster, using quality identified by Defendants' expert Dr. Carlton, found that "while AXS lost to Ticketmaster 16.7 percent of the times due to technology and marketing reasons, quality under the Dr. Carlton methodology, Ticketmaster lost 21.1 percent of the time.  So a larger percentage."  Abrantes-Metz Trial Tr. 2470:1–23.

## DEFENDANTS' ARGUMENT

- ▪ Moreover, Plaintiffs adduced no evidence from which a reasonable jury could conclude that in the but-for world prices would have been lower, output higher, or quality better.

## PLAINTIFFS' RESPONSE

- Yet again, Live Nation/Ticketmaster entirely misstates the law.  The Plaintiff States are **not** required to create a but-for world absent Live Nation/Ticketmaster's anticompetitive conduct in a Section 2 monopolization case.  *Google Search*, 747 F. Supp. 3d at 154 ("To require that § 2 liability turn on a plaintiff's ability or inability to reconstruct the hypothetical marketplace absent a defendant's anticompetitive conduct would only encourage monopolists to take more and earlier anticompetitive action." (quoting *Microsoft*, 253 F.3d at 79)); *Standard Oil Co. v. United States*, 337 U.S. 293, 309–10 (1949) (holding, in Section 2 case, that but-for standard "would be a standard of proof if not virtually impossible to meet, at least most ill-suited for ascertainment by courts"); *McWane*, 783 F.3d at 837 ("[T]he government suitor need not show that competition is in fact less than it would be in some alternative universe in which the challenged conduct had not occurred." (quoting III Phillip E. Areeda, Herbert Hovenkamp & John Solow, Antitrust Law ¶ 657a2, at 162 (3d ed. 2007))); *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 484–85 (7th Cir. 2020).

## MAJOR CONCERT VENUES ANTICOMPETITIVE EFFECTS

### DEFENDANTS' ARGUMENT

- Plaintiffs failed to prove anticompetitive effects.

  o Regardless of the conduct theory, Plaintiffs were required to prove at the threshold that Ticketmaster's conduct harmed consumers—here, the "major concert venue" venue customers—which in the Second Circuit has only been done with evidence of changed prices, output or quality. *MacDermid Printing Sols. v. Cortron*, 833 F.3d 172, 183 (2d Cir. 2016).

  o The evidence does not permit any reasonable jury to find that venues have faced higher prices, worse quality, or lower output as a result of Ticketmaster's alleged conduct. Again:

    ▪ Plaintiffs presented no evidence of increases in price. Dr. Hill had all the data to analyze that, yet reported no opinions about it and admitted he had no such evidence. Record evidence shows that Ticketmaster's share of ticketing contract revenues has been decreasing.

    ▪ Plaintiffs presented no evidence of reduced output, whether by Ticketmaster or across the industry.

    ▪ Plaintiffs presented no evidence of reduced quality. The anecdotal attacks on Ticketmaster quality do not show the reduction of quality required under the law.

    ▪ Nor is there any other evidence that the challenged behavior has harmed competition.

  o Moreover, Plaintiffs adduced no evidence from which a reasonable jury could conclude that in the but-for world prices would have been lower, output higher, or quality better.

### PLAINTIFFS' RESPONSE

**Harm to competition**: The jury could reasonably find that Live Nation/Ticketmaster's willful maintenance of Ticketmaster's monopoly harmed competition.

- Contrary to Live Nation's argument, Plaintiff States do **not** need to show that Live Nation/Ticketmaster extracted a monopoly price (or reduced quality or output) to establish harm to competition. "If monopoly power has been acquired or maintained through improper means, the fact that the power has not been used to extract a monopoly price provides no succor to the monopolist." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 274 (2d Cir. 1979); *Ind. Fed'n of Dentists*, 476 U.S. 447, 461–62 (1986) (holding that finding "actual, sustained adverse effects on competition" was sufficient "even absent

11

proof that [the challenged conduct] resulted in higher prices"); *Google Search*, 747 F. Supp. 3d 1, 170–171 (finding harm to competition from Google's search monopolization despite no price or quality effects); *Sullivan v. NFL*, 34 F.3d 1091, 1101 (1st Cir. 1994) (injury to competition possible "regardless of [challenged conduct's] exact price effects").

- The "key question," instead, is whether Live Nation/Ticketmaster's exclusionary conduct (i.e., exclusive dealing, content withholding, the OVG deal, etc.) "reasonably appear[s] capable of significantly contributing to maintaining [Ticketmaster's] monopoly power in the" ticketing markets for MCVs. *Google Search*, 747 F. Supp. 3d at 153; *Microsoft*, 253 F.3d at 78–79 (in Section 2 cases, courts may "infer 'causation' from the fact that a defendant has engaged in anticompetitive conduct that 'reasonably appear[s] capable of making a significant contribution to . . . maintaining monopoly power.'" (quoting Areeda & Hovenkamp, ¶ 651c, at 78); *Viamedia*, 951 F.3d at 485 (same); *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 460 (9th Cir. 2021) (same). That is a fact question for the jury that Live Nation does not even address in its Rule 50 motion.

- Regardless, there is ample evidence from which the jury could find that Ticketmaster raised prices on venues and fans and provided a poor-quality product built on outdated and error-prone technology. *See supra* pp. 7–10.

- Finally, for the reasons described above, Plaintiff States are not required to create a but-for world or show anticompetitive effects in relation to a but-for world.

## DEFENDANTS' ARGUMENT

- Plaintiffs failed to prove exclusionary conduct: threats, retaliation, and conditioning.

  o The threats and retaliation theory Plaintiffs pleaded has not been proven in any way that would constitute actionable anticompetitive conduct.

    ▪ Under any conceivable legal standard, the few isolated instances of supposed threats and retaliation would plainly be insufficient to show a substantial restraint on competition in any market. The bulk of the evidence Plaintiffs adduced on this issue was hearsay that cannot be used to prove the truth of the matter asserted and/or was outside the relevant limitations period. While foreclosure is not strictly a quantitative test, there comes a point where the paucity of what a plaintiff has proven cannot support an inference that the practice "substantially forecloses" competition, particularly given the 15-year period at issue in this case and the many thousands of venue negotiations that took place during that period.

  o The "conditioning" theory that has become apparent over the course of this trial fails as a matter of law.

    ▪ There is no evidence that Live Nation truly conditions Live Nation-promoted concerts on a venue's use of Ticketmaster. Rather, the evidence

shows that Live Nation does thousands of shows in venues that do not use Ticketmaster.

▪ What Dr. Hill described as "conditioning" appears to be no more than a modest and legally insufficient self-preferencing claim.

▪ Plaintiffs are arguing that venues that do not choose Ticketmaster get a few less Live Nation-promoted concerts per year than those that do. Even assuming this is true, it would not be unlawful for Live Nation promoters to favor Ticketmaster to the extent that Plaintiffs' evidence shows. *See United States v. Google LLC*, 687 F. Supp. 3d 48, 83 (D.D.C. 2023) (granting summary judgment on claim that Google favored its own specialized websites over those of rivals); *Bayou Bottling, Inc. v. Dr. Pepper Co.*, 725 F.2d 300, 304 (5th Cir. 1984) (affirming summary judgment against plaintiffs on claims based on Coke bottler refusing to allow Pepsi products in vending machines it serviced; "Without anything more, these practices are not barred by the antitrust laws."). The Sherman Act contains no general prohibitions on self-preferencing by a vertically-integrated firm.

▪ There is also no evidence that the modest effect Plaintiffs claim is not explained by legitimate business concerns. The record shows that artists and promoters generally, including AEG artists and promoters, often prefer venues that Ticketmaster tickets. It also shows that artist teams may route shows to venues for demographic or other reasons.

## PLAINTIFFS' RESPONSE

• Defendants' exclusive agreements *alone* are sufficient exclusionary conduct for a Section 2 claim. In addition, Plaintiffs have shown a variety of other conduct by Ticketmaster to maintain its monopoly, including efforts to condition Live Nation content on use of Ticketmaster for primary ticketing services, reliance on proxies like OVG to recommend Ticketmaster to OVG-managed venues without disclosing its financial relationship to Ticketmaster, and others. The jury should not compartmentalize the various aspects of Defendants' anticompetitive conduct, as Defendants do in their Rule 50 motion. Rather, the question is whether *all* of the evidence, considered together in its totality, establishes that Live Nation/Ticketmaster engaged in exclusionary conduct that reasonably appears capable of contributing to the Ticketmaster ticketing monopoly. *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 355 (4th Cir. 2024), *cert. denied sub nom. Duke Energy Carolinas v. NTE Carolinas II, LLC*, 2026 WL 79821 (U.S. Jan. 12, 2026) ("[E]xclusionary conduct alleged under § 2 must be considered holistically."); *see, e.g., Cont'l Ore. Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("[T]he duty of the jury was to look at the whole picture and not merely at the individual figures in it."); *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 652–54 (2d Cir. 2015) (confirming that monopolization liability depends on the overall competitive effect of combined conduct that coerces consumers and impedes competition, rather than on isolated acts); *United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 604 (S.D.N.Y. 2025) ("Under § 2,

courts must avoid 'tightly compartmentalizing the various factual components' of the plaintiff's claims and 'wiping the slate clean after scrutiny of each.'") (quoting *City of Groton v. Conn. Light & Power Co.*, 662 F.2d 921, 928–29 (2d Cir. 1981)).

- As this Court recognized in its order on summary judgment, Plaintiffs are not pursuing a claim solely based on threats and retaliation—they are pursuing a monopolization claim. ECF No. 1037 at 35–39. The question therefore is not whether the threats resulted in "substantial foreclosure" *on their own*. Rather, the jury is entitled to consider that evidence, in combination with all the other challenged conduct, in determining whether Ticketmaster maintained its monopoly through exclusionary conduct. Tellingly, Defendants cite nothing for the (flatly incorrect) proposition that, to count as exclusionary conduct, the threats/retaliation and concert withholding—standing alone—must result in substantial foreclosure according to some unstated numerical threshold.

- Regardless, there is a mountain of evidence that Live Nation/Ticketmaster conditioned their providing a material number of concerts promoted by Live Nation to venues on those venues having selected Ticketmaster as their exclusive ticketer.

  o **Dr. Hill's testimony**: The jury could reasonably find—based on Dr. Hill's testimony and analyses alone—that Live Nation has systematically withheld content from venues that do not use Ticketmaster as their primary ticketer. Hill, Trial Tr. 2117:22–2118:23 (testifying that in reviewing widely used win-loss data from 2019–2024 in which AXS and SeatGeek lost out on bids to Ticketmaster, "for AXS, 62 percent of those cases, they said it was due to concert withholding concerns on behalf of the venue, and for SeatGeek I found it was true for 67 percent of those opportunities); *id.* 2116:7–20 (testifying that, at NBA and NHL arenas, venues got 14 Live Nation concerts while using a rival ticketer and 27 Live Nation concerts when using Ticketmaster); *id.* 2115:15–2116:5; (testifying the inverse is also true—NBA and NHL arenas lost shows when switching from Ticketmaster (17 shows) to another ticketer (11 shows)).

  o **Barclays Episode**: In 2021, after Barclays chose SeatGeek as its primary ticketing partner over Ticketmaster, Mr. Rapino made a "veiled threat that it was going to be difficult for [Live Nation] to put concerts at . . . Barclays Center." Abbamondi, Trial Tr. 260:24–261:5. Live Nation then carried out that veiled threat. After SeatGeek became Barclays Center's primary ticketer, the venue "saw a dramatic decline in Live Nation shows that were booked at the arena." *Id.* at 265:6–21. This decline had a "[s]ignificant[]" financial impact on Barclays Center, which made "essentially all of [its] profits from concerts." Abbamondi, Trial Tr. 267:20–23.

  o **Xcel Energy Center**: Mr. Helgerson testified that the Xcel Energy Center considered switching its primary ticketer from Ticketmaster to SeatGeek, and Live Nation made what he interpreted as "credible threat[s]" that "Live Nation could absolutely move their content to wherever they saw fit," which "would be almost catastrophic to [the Xcel Center]." Helgerson, Trial Tr. 397:17–398:9, 404:20–

405:2.  The Xcel Center signed with Ticketmaster again even though SeatGeek offered $1 million more per year than Ticketmaster.  Helgerson Tr. 406:7–407:7; PX 1293.

- o **SeatGeek "retaliation insurance" or "make-good" clauses**: The jury also heard evidence that SeatGeek paid "retaliation insurance"—to insure against Live Nation withholding shows after the switch away from Ticketmaster—to venues that were considering SeatGeek as their ticketer. Groetzinger, Trial Tr. 763:14–764:22; *see also* Perez, Trial Tr. 2327:22–2328:8 (venue required AXS to include "million-dollar content acquisition fund" to "somehow guarantee that [venue] will not lose Live Nation concerts").  SeatGeek offered this "retaliation insurance" on at least 15 separate occasions.  Groetzinger, Trial Tr. 764:23–765:1.  The "retaliation insurance" or make-good clauses have been triggered twice (Dallas Cowboys and Florida Panthers).  *Id.* 768:9–20; 775:4–24.

- o **AEG Venues** Mr. Marciano of AEG similarly testified that AEG's venues "started losing Live Nation shows" after switching from Ticketmaster to AXS.  Marciano, Trial Tr. 1122:5–13.

- o **Live Nation documents on retaliation / coercion**: The jury could reasonably infer threats and retaliation from Ticketmaster's own documents and testimony. Campana, Trial Tr. 1450:1–23 (Live Nation's COO of US Concerts agreeing that his job was "not just to put the tours in the buildings, but to get the venues to [contract with] Ticketmaster"); PX 368 (Campana: "We have always looked at our job as needing to deliver both buildings for ticketing"); Campana, Trial Tr. 1440:7–23; PX 476 (confirming that Live Nation's Brad Wavra "told the venues who wanted to have the Jonas Brothers on that tour that they had to drop AXS as a ticketing service and use your ticketing service, Ticketmaster, in order to get the Jonas Brothers tour"); Evans, Trial Tr. 1693:10–1697:10 (discussing PX 408 and PX 444 and Live Nation's withholding of content from the HEB Center in response to the venue selecting a non-Ticketmaster primary ticketer).

- **Concert withholding is not "self-preferencing"**: The claim that Live Nation withhold concerts from venues that choose a rival ticketer is mere "self-preferencing" is wrong both legally and factually.  Based on the voluminous trial record described above, the jury could find that Defendants retaliated against venues that choose a rival ticketer by withholding or diverting concert content—which both undermines the competitive choice of venue customers and harms rivals (and raises their costs) through conduct that is not competition on the merits.  This type of affirmative interference with competition on the merits is precisely what Section 2 is designed to prevent. *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 229 (S.D.N.Y. 2019) ("A monopolist's conduct violates Section 2 if it '(1) tends to impair the opportunities of rivals, [and] also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way.'"); *Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d 180, 222 (S.D.N.Y. 2014) ("Specifically, § 2 proscribes the use of monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor." (cleaned up) (quoting *Eastman*

15

*Kodak*, 504 U.S. at 482–83)); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072-73 (10th Cir. 2013) (distinguishing a unilateral refusal to deal from an unlawful "assay by the monopolist into the marketplace—to limit the abilities of third parties to deal with rivals"); *Chase Mfg., Inc. v. Johns Manville Corp.*, 84 F.4th 1157, 1173 (10th Cir. 2023) ("We have never extended a refusal-to-deal-with-rivals analysis outside that situation . . . Indeed, as the United States points out, a refusal-to-deal framework applies to narrow situations often remedied by monopolists sharing their technology with rivals."); *X Corp. v. Bright Data Ltd.*, 2025 WL 1150704 (N.D. Cal. Apr. 18, 2025) (rejecting "duty to deal" defense where X Corp was not merely refusing to directly assist a competitor, but rather was "forcing its own customers not to deal" with them); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601–04 (1985) (refusal to provide rival ticketing access to ski mountains that were necessary to compete to maintain a monopoly violated Section 2).

## DEFENDANTS' ARGUMENT

- o In any event, the threats/retaliation/conditioning theory is not actionable without a showing of market power in the market for the product used as the basis of the alleged threats—here, concerts. Plaintiffs have not proven that.

## PLAINTIFFS' RESPONSE

- Defendants' argument (again provided with no supporting authority) that coercion/condition evidence can only count as exclusionary conduct if Live Nation has market power in concerts is wrong. Here again, the question is simply whether that conduct—considered holistically alongside all the other challenged conduct—is exclusionary conduct that contributed to the monopoly. That is a fact question for the jury. Defendants have no basis in the caselaw for adding an additional element to the Section 2 inquiry.

- Regardless, the jury could reasonably find that Live Nation **does** have market power in concerts and thus that Live Nation's concert withholding threats and practices carried substantial weight. This was barely disputed at trial: the jury heard evidence from Live Nation itself that Live Nation controls 75-80% of the concert content in the United States. PX 852; Evans, Trial Tr. 1663:12–1664:15. And Mr. Rapino testified that Live Nation is bigger now than it was in 2011, when he described Live Nation as "larger than every other promoter in the world combined," which gave Live Nation "incredible market power around the world." Rapino, Trial Tr. 1798:25–1799:14; Roux, Trial Tr. 1285:13–1286:6 (Mr. Roux testifying about PX 429 and confirming that Live Nation had a 49% market share among U.S. promoters, three times larger than the next-closest competitor); *In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d 403, 418 (S.D.N.Y. 2005) (market share over 30% is the "presumptive line for inferring market power").

16

**DEFENDANTS' ARGUMENT**

- Plaintiffs failed to prove exclusionary conduct: exclusive dealing.

  o First, it is undisputed that venues prefer and want exclusive contracts. There is no evidence that any venue was forced into an exclusive contract when it preferred a non-exclusive contract. This has been so for many years. *See Virgin Atl. Airways Ltd. v. Brit. Airways PLC,* 257 F.3d 256, 269 (2d Cir. 2001) (finding that business practices which have persisted for years without precluding rivals' market participation are presumptively legal).

  o Second, there is undisputed evidence that exclusive contracting is preferred by venues for efficiency reasons and to obtain the highest value for their ticketing rights. There is no basis in this record for a reasonable jury to find that the practice persists solely or mainly for its alleged benefits in preserving Ticketmaster's market position. In that setting, plaintiffs challenging exclusive dealing are required to prove that anticompetitive effects outweigh benefits, which Plaintiffs here have not attempted to do. *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959 (10th Cir. 2022) ("Thus, to present a triable issue of monopolization where the exclusive deals were entered into for a corresponding procompetitive benefit—here, lower prices—the plaintiff must 'prove that the . . . effect of the exclusion will be to raise prices above (and therefore reduce output below) the competitive level, or otherwise injure competition; [plaintiff] must show in other words that the anticompetitive effects (if any) of the exclusion outweigh any benefits to competition from it.'").

  o Third, there is no evidence from which a jury could reasonably conclude that exclusive contracting has resulted in Ticketmaster charging venues supracompetitive prices. The evidence in the record is that Ticketmaster's share of ticketing contract revenues has been decreasing. Nothing that Dr. Abrantes-Metz testified to could provide a basis for a reasonable jury to conclude otherwise.

**PLAINTIFFS' RESPONSE**

- As a legal matter, the jury can reasonably find that Ticketmaster's exclusive contracts are exclusionary if they were used to maintain Ticketmaster's monopoly. *Google Search*, 747 F. Supp. 3d at 152 (holding that exclusive dealing can "run afoul of the antitrust laws when used by a dominant firm to maintain its monopoly.") (quotation omitted); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012) ("The primary antitrust concern with exclusive dealing arrangements is that they may be used by a monopolist to strengthen its position, which may ultimately harm competition.")

- **Ticketmaster's long-term exclusive contracts**: It is undisputed that Live Nation/Ticketmaster entered into long-term exclusive agreements, averaging five years or more, with hundreds of venues across the nation. Yovich, Trial Tr. 2733:17–2734:5 (Ticketmaster's model in the United States is "to have multiyear exclusive deals with its

venues" that "usually" last five years and this model does not "var[y] by state."); Rapino, Trial Tr. 1844:2–17.

- o Live Nation/Ticketmaster's long-term exclusive contracts are pervasive—it is undisputed that Ticketmaster has such deals with at least one MCV in each of the Plaintiff states except for Vermont.  PX 1282; Trial Tr. 3272:10–3273:15 (reading stipulated facts to jury).

- o The jury could reasonably find that the long-term exclusive deals contributed to the "incredible moat around the castle" that Live Nation/Ticketmaster has built to protect its ticketing monopoly.  Rapino, Trial Tr. 1803:13–18 ("Q: Does that refresh your recollection that you had made statements that live Nation is a business model . . . that has an incredible moat around the castle? Mr. Rapino: Yeah, I read that, yes.").

- o Ticketmaster not only has long-term exclusive deals—it has aggressively policed those exclusive deals against any artist, venue, or competitor that tries to sell primary concert tickets outside the Ticketmaster platform. Marcus, Trial Tr. 2853:17–20 (confirming that "Ticketmaster has a long history of not only having exclusive contracts, but enforcing those exclusive contracts in the market."); Marcus, Trial Tr. 2854:6–2859:7 (testifying about communications with StubHub (PX 751 and PX 752) in which Live Nation's general counsel asserted that "Ticketmaster has a long history of defending its exclusive rights, which Mr. Rapino and the Live Nation management team fully supports."). Marcus, Trial Tr. 2860:9–2864:8 (testifying about PX 633 and aggressive enforcement actions against Kanye West).

- o Dr. Hill provided expert testimony on the role that long term exclusive agreements played in raising barriers to entry and expansion by competitors, including from inhibiting their ability to get to scale.  Hill, Trial Tr. 2105:16–2106:5 (long-term exclusive contracts reduce competition by disincentivizing competitor entry, investment, and expansion); *Id.* 2106:19–21 ("Q. Can [long-term exclusive contracts] have an impact on barriers to entry? A. Yes. So this is a form of a barrier to entry. It reduces the incentive for other firms to compete."). Competing expert testimony by Defendants on this point merely raises an issue of fact for the jury. Other ticketers testified about how Ticketmaster's long-term exclusive contracts pose barriers to their growth and ability to compete. Groetzinger, Trial Tr. 762:10–17 (testifying that the duration of exclusive contracts was a hurdle to competing because "if [SeatGeek] had a product that everyone thought was 20 times better than anything else out there and everyone wanted to move to tomorrow, for the most part, a substantial majority of venues could not because they are locked into a very long-term exclusive deal."); Marciano, Trial Tr. 1101:25–1102:3 (stating that the biggest challenge for AXS has been the "ticketing agreements that Ticketmaster has with the venues" because it has made it difficult for AXS "to find ways to build a client base."). While some venues have testified that they wanted exclusive

agreements, no venue witness has testified that it wanted long-term exclusive agreements of five or more years.

    o  Defendants ignore all of the evidence that Ticketmaster compounded the anticompetitive effects of the long-term exclusive agreements by seeking early renewals to avoid RFPs and deprive competitors of a chance to bid for customers. PX 835 ("Continue to aggressively pursue early renewal opportunities to avoid RFP processes."). Financial incentives were provided to the Ticketmaster sales force to both enter into longer-term exclusive agreements and to obtain early renewals to extend the terms of these exclusives for even longer. Johnson, Trial Tr. 3791:18–25 (agreeing that a part of its compensation of the Ticketmaster sales team involved in primary ticketing negotiations is incentivizing early renewals); *id.* 3899:24–3900:2 (agreeing that if a renewal happens "more than six months before the expiration of the contract," the member of Ticketmaster's sales force's bonus would go up.); *id.* 3923:24–3924:12 (testifying about PX 782 and agreeing that in 2024 Ticketmaster sales reps received a higher bonus based on securing longer term agreements).

- **<u>Coercion or forcing is not an element of exclusive dealing in a Section 2 case</u>**: As a matter of law, there is no requirement that Live Nation/Ticketmaster "forced" venues into accepting exclusive contracts. The question is whether the exclusive contracts contributed to the Ticketmaster monopoly, not whether the venues fought against them. The legal standard for Section 2—as reflected in the Court's proposed jury instructions—includes no "forcing" or acquiescence element with respect to exclusive dealing. That is simply not the law. *Google Search*, 747 F.Supp.3d at 144–145 (exclusive agreements still exclusionary, where they contributed to Google's search monopoly, despite willing counterparties including Apple); *McWane*, 783 F.3d at 833, 840 (upholding FTC's finding that exclusive dealing program was exclusionary despite it being "short-term and voluntary"); *PNY Techs., Inc. v. SanDisk Corp.*, 2014 WL 2987322, at *5 n.8 (N.D. Cal. July 2, 2014) ("PNY rightly points out that coercion is not a necessary element of the claim" for exclusive dealing).

    o  Regardless, the trial testimony showed that Live Nation benefited from the long-term exclusives and sought to extend exclusivity through early renewals and other means and coerced venues into entering into deals with Ticketmaster through conduct such as concert withholding and the OVG deal. The coercion issue therefore at most rases a fact issue for the jury, as the Court noted on summary judgment. Dkt. 1037 at 39 ("[A]lthough Live Nation argues that these threats aren't specific to exclusivity, a jury could find that it was understood that going with Live Nation meant going with an exclusive deal."). And, in any event, the testimony from some venues that they wanted exclusive agreements does not reduce the anticompetitive barrier to entry those agreements pose to competitors trying to compete with a monopolist. *ZF Meritor*, 696 F.3d at 284 ("[I]f the defendant occupies a dominant position in the market, its exclusive dealing arrangements invariably have the power to exclude rivals.").

19

- o Whether Defendants' long term, exclusive contracts have procompetitive benefits that outweigh anticompetitive effects is a fact question for the jury. The case Defendants cite, *In re EpiPen,* is not to the contrary and expressly held that coercion is "unnecessary to establish a successful exclusive dealing case." 44 F. 4th at 996. The exclusive contracts in that case were short-term and terminable on 90 days' notice or less. The court there found that, in the pharmaceutical industry context, those short, easily terminable contracts were a tool "to stimulate price competition" employed by the buyers in the market. *Id.* at 989. Those facts are far afield from this case.

- **Price effects**: Again, Plaintiff States do not need to show that Ticketmaster used its ticketing monopoly to extract a supracompetitive price. *Berkey Photo*, 603 F.2d at 274; *see supra* pp. 11–12. Regardless, as described earlier, there is plenty of evidence that Ticketmaster used its monopoly power to charge high prices, both to venues and to fans. The Defendants are wrong about Dr. Abrantes-Metz as well: If the jury credits her overcharge calculation, that is quintessential evidence that Ticketmaster charged a supracompetitive price.

## DEFENDANTS' ARGUMENT

- Plaintiffs failed to prove exclusionary conduct: Oak View Group ("OVG") ticketing deal.

  - o The testimony about the OVG agreement was limited and proved nothing anticompetitive. A venue management company was paid to advocate for Ticketmaster but was not required even to recommend Ticketmaster when there was a better offer from others. Indeed, after the OVG contract was entered, OVG venues entered ticketing contracts with AXS. There is no antitrust theory that makes the agreement between OVG and Ticketmaster unlawful.

  - o The claim Plaintiffs' complaint pleaded about OVG more broadly strongarming venues into using Ticketmaster was nowhere to be found at trial.

## PLAINTIFFS' RESPONSE

- The jury could reasonably conclude that Ticketmaster's 2022 agreement with OVG is exclusionary conduct that contributed to Ticketmaster's monopoly. The OVG episode is classic Section 2 exclusionary conduct that "tends to impair the opportunities of rivals" in a way that impedes, rather than advances, competition on the merits. *In re Keurig*, 383 F. Supp. 3d at 229.

  - o Chris Granger, CEO of OVG, testified at trial that Ticketmaster agreed to pay OVG $70 million over 10 years (in addition to a $20 million "signing bonus") to "advocate" for Ticketmaster at the more than 200 venues that OVG manages in the United States on terms favorable to Ticketmaster—while keeping this paid advocacy arrangement a secret from the venues in violation of OVG's fiduciary duty to them. Granger, Trial Tr. 2662:25–2666:8, 2665:14–23.

20

- o Under the 2022 deal, the jury heard extensive testimony that OVG steered its managed venues into exclusive ticketing deals with Ticketmaster without competitive bidding that would have allowed rivals like AXS to compete for the contracts.  Granger, Trial Tr. 2632:10–2635:15; Perez, Trial Tr. 2331:4–6 (AXS CEO Bryan Perez testifying that "[h]istorically, [AXS] has not been invited" to compete for OVG-managed venues); PX 781 at -703–04 (Ticketmaster "Deal & Client Summary" for the Charleston Civic Center noting that the OVG-managed venue "agreed to disregard" its typical "formal RFP requirement" and "sole source the negotiations with Ticketmaster" after "[v]enue leadership [e.g., OVG] lobbied the city"); *see also* Yovich, Trial Tr. 2738:19–2741:12 (discussing PX 781).

  - o For example, at the XL Arena in Hartford, Connecticut, OVG in 2023 steered an exclusive ticketing contract to Ticketmaster without obtaining competitive bids.  Granger, Trial Tr. 2637:3–2638:8. After the City of Hartford found out about the no-bid process, the City reopened the bidding—with the City, rather than OVG, running the RFP—and AXS won the contract by offering the XL Center better economic terms than Ticketmaster.  Granger, Trial Tr. 2638:3–19; Perez, Trial Tr. 2331:25–2332:7.

- Defendants' arguments about OVG are all fact issues that must be resolved by the jury.  For example, Defendants claim that OVG was "not required even to recommend Ticketmaster when there was a better offer from others" is belied by the trial record.  Rapino, Trial Tr. 1879:16–1882:8 (agreeing that OVG was contractually obligated to advocate for Ticketmaster); Granger, Trial Tr. 2665:20–23 ("Q. But under your agreement with Ticketmaster, you can't give the cons of Ticketmaster.  You have to advocate for Ticketmaster, correct? A. We have to advocate for the values of Ticketmaster, yes."); *id.* 2666:6–8 ("Q. They overcame your paid advocacy for Ticketmaster and chose a competing ticketer, correct? A. Yes, but that's great. That's their choice.").

## **LARGE AMPHITHEATERS MARKET DEFINITION**

## **DEFENDANTS' ARGUMENT**

*Second*, Defendants are moving for judgment as a matter of law on **all claims that rely on Plaintiffs' alleged "large amphitheaters" market** (Third Claim for Relief and Fourth Claim for Relief).

- Plaintiffs failed to prove a relevant market.

  - o The evidence does not permit a reasonable jury to find that this alleged market—defined as amphitheaters with a capacity of 8,000 or more and that hosted 10 or more concerts in at least one year from 2017 to 2024—is a relevant antitrust market, and without this market, Plaintiffs' tying claim and amphitheater monopolization claim fail.

  - o The evidence has shown that artists (the alleged consumers in this market) routinely substitute arenas and other venues for large amphitheaters, which is *prima facie*

21

evidence of a broader market.  And yet Plaintiffs have no HMT analysis supporting their narrower market, nor any other proof that artists would not switch to other venues if Live Nation increased the price of its amphitheaters.

o There is no evidence from which a reasonable jury could conclude that the *Brown Shoe* factors are satisfied with respect to the market as Plaintiffs have specifically defined it.

o The evidence that some parts of Live Nation's *portfolio* of large amphitheaters is required for "amp tours" does not, as a matter of law, support Plaintiffs' market definition.  Plaintiffs did not allege any kind of portfolio market based on a seller's ability to compete with "a geographically dispersed footprint," as in *FTC v. Sysco*, 113 F. Supp. 3d 1 (D.D.C. 2015).

**PLAINTIFFS' RESPONSE**

**Market Definition**: The jury could reasonably find the relevant market of large amphitheaters facing artists identified by Dr. Hill.

- For the same reasons described above with respect to the ticketing markets, the jury could reasonably credit the 8,000-capacity cutoff for large amphitheaters.  *See supra* pp. 3–4. Live Nation's own documents recognized the distinction between Large and Boutique Amphitheaters, with an 8,000-person capacity cut off between those categories.  *See, e.g.*, PX 867 at -697 (Joe Taylor (Live Nation): "The standard cutoff for us between Boutique/Large Amp . . . is 8000 cap[acity]."); PX 326 at -543 (2018 Live Nation Board of Directors slide defining "[l]arge amphitheater[s] . . . as having capacity of 8,000 or greater"); Weeden Trial  Tr. 3578:2–8 (in  terms  of  capacity cutoff Live  Nation looks at "somewhere between the 7,000 to 9,000 capacity range").

- Based on the extensive evidence presented at trial, the jury could reasonably find that large amphitheaters facing artists is a distinct market (separate from arenas and other venues) based on the *Brown Shoe* factors.

  o Based on Dr. Hill's testimony alone, a reasonable jury could find the existence of the market for Large Amphitheaters facing artists.  Hill, Trial Tr. 2128:3–10 (amphitheaters have peculiar characteristics, like being outdoors and available in the summer months), 2129:2–10 (among artists who had previously done amphitheater tours, "61 percent of them, if they did another tour in amphitheater season, they did an amp tour.").

  o Unlike arenas, amphitheaters are purpose-built for concerts and have distinct characteristics that are uniquely tailored to musical performances (e.g., amphitheaters are outdoor venues with lawn seating, better acoustics, and a unique atmosphere that is well-suited for musical concerts).  Lovett, Dep. Tr., 33:6–9 ("A lot of the time, amphitheaters are built with concerts in mind, acoustically but also experientially. And arenas often have other purposes"); Hurwitz, Trial Tr. 670:1–2 ("the amphitheater when it's done right, is a happy place for everyone"); *Id*. 665:3–

22

16 (testifying that amphitheater and arena are distinct from each other); PX 1013 at 6 ("Amphitheaters are generally outdoor venues" and are "designed specifically for concert events, with premium seat packages and better lines of sight and acoustics").

o The jury heard testimony that there are many artists that prefer to play in amphitheaters, particularly in the summer months when the weather is warm. Roux, Trial Tr. 1271:23–25 (agreeing that "[m]any of the non-superstar artists have predetermined to play amps"); PX 422; *see also* Hurwitz, Trial Tr. 668:6–669:1; Marciano, Trial Tr. 949:5–7 ("There are some artists that love playing outdoors in the summer."); *id*. 952:19–25 ("Maggie Rogers and Muse . . . said we want to play an amphitheater tour").  And some artists construct tours that are predominantly played at amphitheaters.  Geiger, Trial Tr. 495:18–24 ("Jimmy Buffett, Dave Matthews; Tom Petty[' s]…audience[s] loved being outdoors and being on the lawns."); Roux, Trial Tr. 1377:21–23 (agreeing that "there are some artists who like to play outdoors in the summertime."); Marciano, Trial Tr. 949:7–9 ("The classic outdoor artist would have been, say, Jimmy Buffett, who believed that his fans wanted to drink margaritas, drink beer, be outside."); Hurwitz, Trial Tr. 674:19–23, 669:6–10; PX 893 at -867 ("Current Amphitheater Tours . . . could include . . . Nelly / TLC[,] . . . Santana[,] . . . Nickelback[,] . . . [and] Lynyrd Skynyrd"); Roux, Trial Tr. 1281:22–1282:4.

## LARGE AMPHITHEATERS - TYING

### DEFENDANTS' ARGUMENT

- Plaintiffs failed to prove their tying claim.

  o The evidence has made clear that this claim challenges nothing but Live Nation's lawful policy of refusing to deal with its promoter competitors.  There is no evidence that an artist, an agent, or a manager ever sought to rent a venue directly, let alone was presented with a tying arrangement when they did.  Nor have Plaintiffs adduced any evidence from which a reasonable jury could conclude that when promoters rent venues, they are doing so as the legal agents of artists.

  o There is no evidence from which a reasonable jury could conclude that Live Nation ties access to its amphitheaters to promoting a broader tour.  To the contrary, the only artist testimony in the case (from Ben Lovett) proved that this did not happen.

### PLAINTIFFS' RESPONSE

- The jury could reasonably find that all elements of the tying claim are met—(1) market power in the tying product; (2) two separate products (renting large amphitheaters and providing concert promotion services); (3) conditioning or coercion; and (4) anticompetitive effect (to the extent the Rule of Reason applies).

23

- **Artists pick the venues where they perform**: It was undisputed at trial—from Live Nation's own top executives—that it is the artists, not the promoters, who chose the venues where they play.  Lewis, Trial Tr. 2004:22–24 ("Q. Who decides where an artist is going to play during a tour? A. The artist decides."); Roux, Trial Tr. 1336:4–7 ("Q. And in terms of the actual venues, the buildings where the artist is going to play, who ultimately decides where they're going to play?  A. Artist does."); Geiger, Trial Tr. 495:7–9.  The artists are thus the economic actors who seek to rent the tying product of Large Amphitheaters, and the promoters are simply acting as their agents when they enter into agreements to rent a Large Amphitheater on their behalf.  Under antitrust law, it is economic substance, not legal formality, that determines these issues.  ECF No. 1037 at 31–33 (denying summary judgment on tying claim due in part to genuine dispute of material fact regarding the specifics of the artist/promotor relationship).

- **Artists are required to use Live Nation Promoters in order to secure access to Large Amphitheaters owned or operated by Live Nation:** The evidence is overwhelming that Live Nation requires artists to use Live Nation promoters as a condition of playing at Live Nation's Large Amphitheaters.  Roux, Trial Tr. 1298:6–8 ("Q. If an artist wants to play a Live Nation amphitheater, they need to sign up for Live Nation promotion, correct? A. They do."); Rapino, Trial Tr. 1853:1–2 ("[Y]eah, we don't let rival promoters, competitors, in our venues."); Weeden, Trial Tr. 3633:1–4 ("Q. And it's because in Live Nation amphitheaters, artists, and the venue has to use Live Nation promoter services to get into that venue, correct? A. Yes, that's correct.").

  o Contrary to Defendants' suggestion, testimony from individual artists is not needed to establish Live Nation's (admitted) tying policy. *Park v. Thomson Corp.*, 2007 WL 119461, at *4 (S.D.N.Y. Jan. 11, 2007) ("When a policy of conditioned sales is demonstrated, proof of coercion on an individual basis is unnecessary"); *Hill v. A-T-O, Inc.*, 535 F.2d 1349, 1355 (2d Cir. 1976) ("An unremitting policy of tie-in, if accompanied by sufficient market power in the tying product to appreciably restrain competition in the market for the tied product constitutes the requisite coercion").  And regardless, there was testimony and evidence, as shown below, of individual instances in which Live Nation prevented artists from performing at Live Nation Large Amphitheaters unless they used Live Nation promoters.

- **Live Nation enforced its conditioning policy to deny access to Large Amphitheaters to any artists who were not using Live Nation promoters.**

  o The jury heard evidence that Live Nation repeatedly denied artists access to its amphitheaters when those artists used a competing promoter.  For example, Live Nation turned down a Disney show that would have generated $400,000 in profit, just for renting Live Nation's amphitheater for one day, after Mr. Rapino intervened because a rival promoter was involved in the deal.  PX 648 at -526; Roux, Trial Tr. 1288:5–1293:15; *see also* Lewis Trial Tr. 1992:4–1995:18 (testifying about PX 813, an email in which Live Nation individuals did not let Ben Platt, who was promoted by AEG, perform at the Hollywood Bowl because Live Nation "paid a

24

premium for the Bowl to keep AEG from having access within [its] season."); *id.* 1996:10–1998:3 (testifying about PX 754, an email in which Lewis refuses to allow Kem and Babyface, who were being promoted by AEG, to perform at the Live Nation's Concord Pavilion because Live Nation "[n]eed[s] the message to be, you can only play amps with us.").

o The anticompetitive effects of this tying are incurred by both artists and promoters. Artists suffer competitive harm because they are deprived of their choice of promoters. The elimination of such choice is a recognized antitrust harm. *See infra* p. 28. They also lose the benefit of price and quality competition from the promoters who cannot compete to represent them at Large Amphitheaters. Campana, Trial Tr. 1489:2–12; PX 417 at "Strategic Justification" (Excel) (predicting "considerable talent savings" due to decreased competition).

o Anticompetitive effects are also incurred by the promoters who are blocked from competing to represent artists in Large Amphitheaters. Such competitive harm has long been recognized in tying cases, where excluded competitors are often the plaintiffs. *Viamedia*, 951 F.3d at 481–82 (plaintiff that "[sought] only an opportunity for fair competition" in the tied market at issue was "an appropriate plaintiff to seek damages based on exclusionary conduct that forced it out of that market"). The States have standing to bring this tying claim to redress the harm to competition to both artists and excluded promoters. *See infra* pp. 34–35.

- **Refusal to deal doctrine is inapposite**: Defendants' attempt to characterize their tying arrangement as a lawful "refusal to deal" has already been rejected by the Court, Dkt. 483 at 3, and is not sufficient to defeat Plaintiffs' claim, *Viamedia*, 951 F.3d at 472 (holding that a "tying claim does not fail as a matter of law simply because it was implemented by refusing to deal with an intermediary."); *Eastman Kodak*, 504 U.S. at 463 n.8; *Novell,* 731 F.3d at 1072; *Chase*, 84 F.4th at 1173; *Google,* 778 F. Supp. 3d at 867.

## DEFENDANTS' ARGUMENT

o There is no basis in the record to find that any alleged tying implied by Live Nation's policy of refusing to deal with its promoter competitors would be illegal *per se*, meaning, *inter alia*, (a) illegal in the absence of proof of substantial foreclosure in a proven relevant market for the tied product and (b) irrespective of legitimate business justifications.

## PLAINTIFFS' RESPONSE

- *Per Se* **Violation**: If the jury finds that Live Nation has market power in the tying market for Large Amphitheaters and has conditioned access to those amphitheaters on purchasing Live Nation's promotion services, that is a per se violation of Section 1 of the Sherman Act and the jury need not find anticompetitive effects, unlike a rule of reason claim. *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 133 n.5 (2d Cir. 2001) (Sotomayor, J.) (*per se* tying claim does not required showing of anticompetitive effects, unlike a rule of reason claim) (citing *United States v. IBM Corp.*, 163 F.3d 737, 741 (2d Cir. 1998)); *Park*,

2007 WL 119461, at *7 n.4 ("Where a tying arrangement is illegal *per se*, a plaintiff need not establish the anticompetitive effects element."); *see also United States v. Aiyer*, 33 F.4th 97, 118 n.17 (2d Cir. 2022) ("We reiterate that, in a *per se* case, resulting anticompetitive effects need not be proved.").

- **<u>Live Nation's Market Power</u>**: A reasonable jury could find that Live Nation has a durable market share, in the market for Large Amphitheaters, that exceeds 70% throughout the limitations period—which establishes ***monopoly power***, not just market power. *Eastman Kodak*, 504 U.S. at 481 ("Monopoly power under § 2 requires, of course, something greater than market power under § 1.").

  o Large Amphitheaters owned, leased, operated, or exclusively booked by Live Nation account for 78 percent of the Large Amphitheaters in the United States. Hill, Trial Tr. 2130:13–21; Roux, Trial Tr. 1238:17–1239:2 (testifying that Live Nation owns or operates the vast majority of top amphitheaters in the United States); *id.* 1238:4–1243:13 (discussing PX 592 and testifying that Live Nation owned 23 of the top 25 amphitheaters in the United States); *id.* 1239:20–1240:9 (testifying that, as of 2018, Live Nation owned, operated, or exclusively booked 62 out of the top 100 amphitheaters in the world and has added six more from top 100 list since then); *id.* 1404:18–1405:14 (testifying that Live Nation controls the only large amphitheater in ***40 markets*** across the United States, including in major cities such as Boston, Atlanta, Tampa, and Indianapolis); Hurwitz, Trial Tr. 665:17–19 (confirming Live Nation and IMP are the only entities that operate amphitheaters in the United States); Marciano, Trial Tr. 948:20–22 (Live Nation controls most of the amphitheaters in the United States); Hill, Trial Tr. 2133:4–7 ("It would be difficult to do a truly nationwide tour of large amphitheaters without dealing with Live Nation. You can see that in most of these metro areas, Live Nation controls all of the large amphitheaters.").

  o Live Nation's profits and profitability at large amphitheaters are far higher than at other venue types where Live Nation does not have a monopoly, which the jury could reasonably find is additional supporting evidence of Live Nation's market power in the Large Amphitheater market. *McWane*, 783 F.3d at 838 (noting the "most powerful evidence of anticompetitive harm" was that company's "prices and profit margins for domestic fittings were notably higher than prices for imported fittings, which faced greater competition"). Mr. Roux confirmed that Live Nation's profitability per fan for large amphitheaters increased much more than at other venue types like boutique amphitheaters and clubs. Roux, Trial Tr. 1308:5–16 (testifying about PX 787). Similarly, profitability at the show level was significantly higher for large amphitheaters when compared to the other types of venues. Roux, Trial Tr. 1309:13–16 (confirming that "profits at large amphitheaters more than doubled, and, in fact, they nearly tripled, between 2019 and 2024"); *id.* at 1417:7–12 (testifying about PX 702, which showed Live Nation makes 361 percent more profit at Large Amphitheaters compared to arenas while artists only make 16 percent more).

26

- **High barriers to entry in the Large Amphitheater market**: Live Nation's dominant market share is protected by high barriers to entry.

  o It is very expensive to build Large Amphitheaters—with a single amphitheater sometimes costing more than $100 million.  Weeden, Trial Tr. 3583:4–3584:25 (Live Nation spent $107 million and $54 million to build new amphitheaters in Kansas City and Minneapolis, respectively, and an additional $105 million to renovate the Jones Beach amphitheater).

  o Entry or expansion in the Large Amphitheater market would not be timely, likely, and sufficient to prevent Live Nation from exercising market power, because it would take years for a rival to build a competing amphitheater network. Marciano, Trial Tr. 953:7–14 (AEG estimated it would take around 20 years to build "even a network of 20 amphitheaters").

## DEFENDANTS' ARGUMENT

  o Plaintiffs have failed to prove, as required in the Second Circuit, that the alleged tying caused substantial foreclosure or anticompetitive effects in a proven relevant market for the tied product.

## PLAINTIFFS' RESPONSE

As an initial matter, Plaintiff States do not need to prove anticompetitive effects for the *per se* tying violation.  And the Court has already rejected Defendants' argument that the jury needs to find anticompetitive effects in a "proven relevant market" for promotion services. *E.g.*, Dkt. 1094 at 2–5.

- Regardless, the jury could reasonably find multiple anticompetitive effects from Live Nation's tying policy.

- **Elimination of artist choice**: The elimination of artists' competitive choice, with respect to their promoter, establishes harm to competition.  *Viamedia,* 951 F.3d at 475-76 ("By forcing out its only competitor in the market for ad rep services and forcing its MVPD competitors to turn over 100% of their spot avails, Comcast eliminated competition in the market for ad rep services and the market for the sale of local spot avails," which are "prototypical antitrust harms."); *United States v. JetBlue Airways Corp.*, 712 F. Supp. 3d 109, 153 (D. Mass. 2024) (the "elimination of a product option that consumers value is a cognizable harm to competition"); *Lucasys Inc. v. PowerPlan, Inc.*, 576 F. Supp. 3d 1331, 1350–51 (N.D. Ga. 2021) (conduct that "depriv[ed] customers of choice, and thereby prevented them from accessing lower-cost, higher-quality options" is harm to competition); *Pfizer Inc. v. Johnson & Johnson*, 333 F. Supp. 3d 494, 502 (E.D. Pa. 2018) (antitrust injury present where conduct "limited competitive options for end payors, providers, and patients" in a health care market).

27

- **Reduced output**: Further, the jury could reasonably find that Live Nation's tying policy has reduced output (e.g., the availability of amphitheater shows) for both promoters and artists at Large Amphitheaters.

  o Mr. Weeden and others testified that—even in the prime summer months—Live Nation's large amphitheaters are dark on more than 65 percent of Fridays and Saturdays. Weeden, Trial Tr. 3609:10–3614:18; PX 825; Roux, Trial Tr. 1294:18–1297:17.

  o Live Nation executives (including Mr. Weeden) internally attributed the "dark days" to Live Nation's tying policy on promoters and specifically noted that the Greek Theater in Los Angeles—which is open to any promoter—had greater output than Live Nation amphitheaters. PX 1129; Weeden, Trial Tr. 3630:14–3634:11 (Mr. Weeden testifying about his statement that if Live Nation allowed non-Live Nation promoters into their venues, they would be "cutting deals left and right."); PX 1129 ("If proctor and gamble can't fill Walmarts shelves then Walmart finds other suppliers."); *id.* ("Check out an open room like the Greek in LA. They have 40 more shows to go!!").

- **Foreclosure of rival promoters**: Finally, Live Nation's tying policy has harmed competition among promoters because the jury could reasonably find that it has completely foreclosed non-Live Nation promoters from promoting national amphitheater tours. Hurwitz, Trial Tr. 669–674 (Mr. Hurwitz testifying that Live Nation is effectively the only company capable of promoting amphitheater tours in the United States); Geiger, Trial Tr. 502:6–13 (AEG could not run amphitheater tours because its artist clients could not "get into the facilities."); Marciano, Trial Tr. 952:12–952:18 ("Q. Has AEG ever promoted an amphitheater tour? A. We have not. Q. And why not? A. We don't have access to those amphitheaters. Q. Does AEG even bid for amphitheater tours? A. Agents know not to call us because they know we can't have access to those amphitheaters."); Weeden Trial Tr. 3634:4–3634:8 (agreeing that another Live Nation executive observed that "when artists don't have to use Live Nation at a venue, like [at] The Greek" amphitheater in Los Angeles, they choose non-Live Nation promoters); PX 754 (internal Live Nation email declining to work with tour promoted by AEG and stating "[n]eed the message to be, you can only play amps with us"); Lewis, Trial Tr. 1996:11–1998:3 (testimony on PX 754). As previously discussed, the tying case law specifically recognizes harm to the excluded competitors as a harm to competition in a tying case and the State Plaintiffs have standing to seek to redress these harms.

### LARGE AMPHITHEATERS MONOPOLY POWER

### DEFENDANTS' ARGUMENT

- Plaintiffs failed to prove their amphitheater monopolization claim.

  o "[A] Section 2 claim requires not mere growth by acquisition, but the willful maintenance or acquisition of monopoly power[.]" Summ. J. Opinion (ECF No. 1037) at 33.

28

o The scant evidence Plaintiffs presented about Live Nation's acquisition of "control" over large amphitheaters does not allow a reasonable jury to find monopolization.

o First, Dr. Hill testified that Live Nation achieved the alleged 70% share in large amphitheaters in 2018, outside the 4-year limitations period. Under *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 301 (D.C. Cir. 2023), any action challenging that set of acquisitions is time-barred and/or subject to laches.

o For 10 of the 16 amphitheaters allegedly "acquired," Live Nation only acquired booking rights, *i.e.*, it was hired by the venue owner to take over the booking function. No evidence was put into the record that could justify counting those as comparable to owning a venue or operating it under a long-term lease.

o Another venue was allegedly "acquired" simply because Live Nation entered into an operating agreement with the venue owner. No evidence was put into the record that could justify counting that as comparable to owning a venue or operating it under a long-term lease.

o The remaining four venues were purchased or leased, but Plaintiffs offered no evidence about the effects of those acquisitions on competition.

    ▪ Moreover, of these four venues, only two (Hayden Homes Amphitheater and Bank NH Pavilion) were purchased or leased within the limitations period. The other two fall far outside that period (Ameris Bank Amphitheater in 2016 and Utah First Credit Union Amphitheater in 2017). Plaintiffs cannot use non-limitations-period conduct to support this claim. *See Meta*, 66 F.4th at 295-301 (dismissing States' 2020 case premised on 2012 and 2014 acquisitions of Instagram and WhatsApp based on laches, and noting that forced divestiture now would have "severe consequences" given the integration of those platforms into Meta). And Plaintiffs have put on little to no evidence specific to the only amphitheater acquisitions that count (Hayden Homes and Bank NH).

## PLAINTIFFS' RESPONSE

- The jury could reasonably find that Live Nation maintained its monopoly in the Large Amphitheater market (as described above) through a course of anticompetitive conduct.

- **Amphitheater acquisitions**: Live Nation increased its market share of the Large Amphitheater market during the limitations period through acquisitions. Hill, Trial Tr. 2134:24–2137:3 (describing acquisitions). In fact, if Live Nation had not acquired the amphitheaters that it did over the limitations period, its market share would have decreased. *Id.* 2135:5–20 (testifying that, if Live Nation had not acquired other large amphitheaters, its market share would have decreased by 10% instead of increasing by 12%.). As Dr. Hill testified, those acquisitions offset new market entry and thus reduced competition. *Id.* 2136:13–20.

- In addition to acquisitions, Live Nation also acquired the lease or exclusive booking rights at many additional Large Amphitheaters, both before and during the limitations period. Roux, Trial Tr. 1235:4–21 (testifying that aside from the LA Philharmonic, Live Nation has exclusive booking rights to the Hollywood Bowl); Campana, Trial Tr. 1473:23–1475:3 (testifying that Live Nation has had the exclusive booking rights to Riverbend Music Center since the building has opened); Weeden, Trial Tr. 3590:22–3591:4 (testifying that Live Nation recently extended its lease for Glen Helen Amphitheater).

- Contrary to Defendants' argument, there is no material difference, for purposes of the Section 2 amphitheater monopolization claim, whether Live Nation owns or exclusively operates/books a venue. In either case, Live Nation controls which artists can play those venues. Weeden Trial Tr. 3609:2–3609:4 ("Q. . . . Mr. Weeden, when Live Nation controls the calendar at that venue, it controls what artist plays there, correct? A. Yeah, that would be correct."). Indeed, the jury heard that Live Nation tracks the amphitheaters it controls to include **both** owned and operated amphitheaters and exclusively booked amphitheaters, as Mr. Roux's testimony showed. *See supra* p. 26.

- **Acquisitions were used to block the entry of competitors.** : The jury could reasonably find that Live Nation pursued an acquisition strategy to maintain its monopoly and exclude competitors. For example, Mr. Roux testified that he used the "Velvet Hammer" with respect to a nascent amphitheater operator in the South, Red Mountain—by threatening to withhold Live Nation concert content if Red Mountain tried to compete with Live Nation in the amphitheater market. PX 451 at -497 ("Either we are together or we are competitors."); Roux, Trial Tr. 1248:22–1249:8; *id.* 1250:2–5 ("Q. You wanted no confusion that if Red Mountain was going to be a competitor to Live Nation, they were not going to have access to Live Nation artists, correct? A. That is correct."); PX 415 at -183 ("Can't get complacent and let small guys encroach from the edges."). Although Live Nation acquired Red Mountain in 2018, the jury is entitled to consider that evidence when determining whether Live Nation's course of conduct, as a whole, contributed to the willful maintenance of its monopoly, including with respect to Live Nation's continuing pattern of acquisitions. *See also* Campana, Trial Tr. 1483:11–1484:25 (discussing PX 417); PX 715 at -356 (Campana: "Please do not send emails that state you want to 'crush' a Competitor. Not the language we want to be seeing in emails when reviewed by the DOJ"); Campana, Trial Tr. 1490:22-1494:20 (discussing PX 715); *Berkey Photo*, 603 F.3d at 295–96; *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 709–10 (1962); *Sidibe v. Sutter Heath*, 103 F.4th 675, 693 (9th Cir. 2024).

- **Extending exclusivity on money-losing amphitheaters**: In addition to acquisitions, Live Nation repeatedly extended leases and exclusivity over Large Amphitheaters to prevent competitors from gaining a foothold in the market, even when those amphitheaters were losing money for Live Nation.

  o For example, Mr. Roux testified about Live Nation extending its lease on the Montage, an amphitheater in Scranton, Pa., despite its "poor performance and low

show count" so as to "not give up a venue which competitor could snap up." Roux, Trial Tr. 1260:11–1263:6 (testifying about PX 885); *see also* Weeden, Trial Tr. 3648:24–3649:5 (confirming that the Montage was "operating at a loss").

    o   Mr. Weeden testified about other money-losing amphitheaters that Live Nation kept under its control. Weeden, Trial Tr. 3645:19–3647:5 (testifying about PX 850 and acknowledging that Live Nation renewed the leases of four amphitheaters despite operating at a financial loss with a "relatively low show count"); *id.* 3647:18–3648:4 (testifying about suggestion in PX 850 at -626 that Live Nation "consider getting out of" four amphitheater leases that lose $10 million AOI combined, but agreeing he wouldn't even raise that suggestion with senior Live Nation executives because they are "going to continue to seek [to renew those] leases even though they're losing money and they have a low show count").

- **Demolishing amphitheater and demanding restrictive deed**: With respect to an amphitheater in Birmingham, Alabama, Live Nation just this year required as a condition of sale that the existing amphitheater be demolished and that the city include a restrictive covenant in the deed that the site could not be used as an entertainment venue that could compete with the Large Amphitheater that Live Nation is opening 20 miles away. Weeden, Trial Tr. 3655:9–3657:13.

## LARGE AMPHITHEATERS ANTICOMPETITIVE EFFECTS

### DEFENDANTS' ARGUMENT

    o   Plaintiffs completely failed to prove harm to artists (the alleged customer in Plaintiffs' market) from these acquisitions. The evidence has shown that artists actually make <u>more</u> money at amphitheaters than at other venues, because the amphitheaters' ancillary revenues allow the artists to demand more of the door. But that aside, there was no effort by Plaintiffs to prove that the acquisitions allowed Live Nation to raise prices, reduce output, or reduce quality.

    o   None of the evidence Plaintiffs adduced about the price of parking or lawn chairs has any connection to the number of amphitheaters that Live Nation owns, operates, or controls. It is irrelevant to Plaintiffs' amphitheater monopolization claim.

### PLAINTIFFS' RESPONSE

- For all the reasons described earlier with respect to the ticketing monopolies, under well-established law Plaintiff States do not need to show higher prices or lower quality to establish harm to competition from Live Nation's willful maintenance of its monopoly over the Large Amphitheater market. *See supra* pp. 11–12.

- Regardless, Live Nation's Large Amphitheater monopolization has harmed competition in multiple respects.

31

- **Depriving artists of competitive choice**: Live Nation's monopoly has deprived artists of competitive choice, because artists cannot construct a nationwide tour that includes Large Amphitheaters without playing in Live Nation amphitheaters using Live Nation promoters. *See supra* pp. 28–29 (evidence that artists cannot conduct national tour using rival amphitheaters); *id.* p. 28 (citing *Viamedia* and other cases on the elimination of competitive choice establishing harm to competition).

- **Higher prices to artists**: Further, the jury could reasonably find that Live Nation's amphitheater monopoly has harmed artists by depriving them of the competition that would result in higher pay and better terms from both Live Nation and other amphitheater operators.

  o For example, PX 858 shows that Live Nation internally modeled that—if it faced a competing amphitheater in the Dallas market—it would lose shows and need to increase payments to artists.  PX 858 (modeling that competition in Dallas market would require increasing artist split from 94% to 97%); Roux Trial Tr. 1264:19-1271:16; *see also* Campana Trial Tr. 1486:21–1487:10, 1489:1–6 ("Q. Okay. Now, let's move on. It's correct, is it not, as this document indicates, that when you have to compete with someone else for talent to promote in a market, that competition could cause you to increase how much you pay the artist, correct? Mr. Campana: Basic premise of competition, yes, sir.")

  o Additionally, Mr. Roux's ordinary-course emails show that, when artists have determined to play amphitheaters, Live Nation does not need to negotiate with those artists as much or offer them higher guaranteed payments. PX 422 at -676 (Mr. Roux: "Artists have pre-determined to play Amps when we get the call, and these are the acts or tours, where we may have some room for tighter negotiations and deals."); PX 893 at -866 (Mr. Roux: "Don't push Guarantees to get 'True Amp Tours' confirmed.  When we know they are likely playing Amphitheaters we are going to get those in most cases, so don't need to press above deals we've already submitted.").

- Apart from artists, Live Nation's amphitheater monopolization harms **promoters** and **fans** as well.  As government antitrust enforcers, the Plaintiff States are entitled to prosecute monopolization based on harm to *any* consumer or competitor, not just the direct purchasers in the market. *E.g., City of Oakland v. Oakland Raiders*, 20 F.4th 441, 455 n.10 (9th Cir. 2021) (distinguishing ability of U.S. government "to sue anyone who violates the antitrust laws" from standing requirements for private plaintiffs) (quoting  Areeda & Hovenkamp ¶ 335).

- **Promoters**: As described earlier, non-Live Nation promoters are excluded from conducting nationwide amphitheater tours because of Live Nation's Large Amphitheater monopolization.  *See supra* pp. 28–29.

32

- **Fans**: Fans have paid dramatically increased and unjustifiable fees at Live Nation-owned amphitheaters and other venues, with Live Nation's profits likewise increasing dramatically.

  o Testimony from Ben Baker showed how Ticketmaster charges unjustifiable fees to fans at Live Nation amphitheaters specifically. *See supra* pp. 7–8. And Mr. Roux testified that from 2019 to 2022 there was a 32% increase in the "spend per fan" and a 46% increase in Live Nation's per-fan profits at Live Nation's large amphitheaters. Roux, Trial Tr. 1298:9–1304:7 (testifying about PX 501).

  o Defendants are wrong that excessively high fees on ancillary items like parking, and Live Nation's policy to ban lawn chairs and charge customers increasing fees to rent them, is irrelevant. As Dr. Hill and Mr. Roux testified, Live Nation controls all the Large Amphitheaters in many markets across the country. Hill, Trial Tr. 2133:17–24; Roux, Trial Tr. 1229:3–7. The jury could reasonably find that such charges would be lower if Live Nation faced greater competition, particularly given Mr. Roux's testimony that Live Nation nearly *tripled* its profits at Large Amphitheaters between 2019 and 2024. Roux, Trial Tr. 1309:13–16.

## STATE-LAW CLAIMS

### DEFENDANTS' ARGUMENT

*Third*, Defendants are moving for judgment as a matter of law on **all state-law claims**.

- The state-law claims brought under state statutes that are congruent with the Sherman Act fail for the same reasons noted above.

### PLAINTIFFS' RESPONSE

- For the reasons set forth above, Defendants' arguments with respect to Plaintiffs' Sherman Act claims are without merit. Consequently, Plaintiffs' state-law claims brought under state statutes that are congruent with the Sherman Act should likewise be submitted to the jury.

### DEFENDANTS' ARGUMENT

- The state-law claims brought under other state statutes fail because Plaintiffs have adduced no evidence of harm to competition in any particular state.

### PLAINTIFFS' RESPONSE

**Nationwide Impact**: Plaintiffs put forth sufficient evidence that Defendants' unlawful conduct impacts all states.

- Live Nation's anticompetitive policies and conduct reached into every state.

- o Live Nation maintained national policies with respect to long term exclusive ticketing agreements, and not permitting non-Live Nation promoters at Live Nation owned venues, including Large Amphitheaters, with no exceptions for any states.

  - As demonstrated above, Live Nation had a nationwide policy of seeking and enforcing long-term, exclusive ticketing contracts for its venues across the country. *See supra* p. 18.

  - Live Nation also had a company-wide policy to not let non-Live Nation promoters into their owned or operated venues. *Id.*

- o Live Nation/Ticketmaster's long-term exclusive ticketing contracts are pervasive— it is undisputed that Ticketmaster has such deals with at least one MCV in each of the Plaintiff states except for Vermont. PX 1282; Trial Tr. 3272:10–3273:15 (reading stipulated facts to jury).

- o Vermont law also applies because consumers in Vermont who seek to attend concerts in a neighboring state would be impacted by Defendants' anticompetitive behavior. *Foti Fuels, Inc. v. Kurrle Corp.*, 90 A.3d 885, 891–92 (Vt. 2013) (law applies if violation occurs "in the consumer marketplace").

- o The jury heard testimony from Dr. Hill about the reach of Live Nation's network of large amphitheaters throughout the country and demonstrated the nationwide scope with a map reflecting large amphitheaters across the United States. Hill, Trial Tr. 2133:4–7.

- o Defendants themselves refer to tours as "national." Campana, Trial Tr. 1497:20–1498:22; Rapino, Trial Tr. 1906:20–1907:4 (stating that Live Nation's "job is like Federal Express. You are figuring out what is the best way for this artist to tour….[and] Now it's global because, so it's not just the U.S. anymore."); PX 348 (Slide noting under "Overview," "Produce award-winning strategy and creative for a Summer-long national amp promotion.").

- o State antitrust laws apply to nationwide antitrust violations. *See In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 721–22, 724 (N.D. Ill. 2016) (antitrust injury where defendants' conduct "forc[ed] plaintiffs to pay supracompetitive prices," and rejecting the argument that interstate conduct defeats state-law claims because the court saw "no reason why the intrastate effect of the interstate anticompetitive conduct would not be reached by the laws of these states" where end payors paid overcharges in-state); *In re Remicade Antitrust Litig.*, 345 F. Supp. 3d 566, 585–87 (E.D. Pa. 2018) (holding that state antitrust impact satisfied where purchasers in the state "paid supracompetitive, artificially inflated prices," and rejecting arguments that plaintiffs must plead conduct occurring wholly within the state); *In re Niaspan Antitrust Litig.*, 464 F. Supp. 3d 678, 709, 711 (E.D. Pa. 2020) ("Antitrust injury occurs the moment that a purchaser incurs an overcharge," and explaining that antitrust injury is defined as "the payment of an overcharge, not the net economic

consequences after reimbursement or pass on," including for state-law indirect purchaser claims); *In re Namenda Indirect Purchaser Antitrust Litig.*, 2021 WL 2403727, at *39–40 (S.D.N.Y. June 11, 2021) (finding, based on a nationwide market, that it was "safe to assume that [defendant's products] (and therefore the consequences of its allegedly illegal behavior) reached all of the states implicated.").

## DAMAGES

### DEFENDANTS' ARGUMENT

*Fourth*, Defendants are moving for judgment as a matter of law on **damages** for the reasons stated in Defendants' motion to strike Dr. Abrantes-Metz's testimony, filed on March 30, 2026 (ECF Nos. 1347, 1348).  Moreover, Plaintiffs are unable to disaggregate the effects of indisputably lawful and allegedly unlawful conduct.

### PLAINTIFFS' RESPONSE

For the reasons set forth in Plaintiffs' opposition to Defendants' motion to strike Dr. Abrantes-Metz's testimony (ECF Nos. 1382, 1382-1), Plaintiffs have offered sufficient evidence of damages such that a reasonable jury could decide that Plaintiffs are entitled to their claimed damages.

*[signatures on following page]*

Dated  April 6, 2026

Respectfully Submitted,

/s/ Jeffrey L. Kessler

Jeffrey L. Kessler
Eva W. Cole
Johanna Rae Hudgens
200 Park Avenue
New York, NY 10166
Tel: (212) 294-6700
Fax: (212) 294-4700
jkessler@winston.com
ewcole@winston.com
jhudgens@winston.com

Jeanifer E. Parsigian (*pro hac vice*)
**WINSTON & STRAWN LLP**
101 California Street, 21st Floor
San Francisco, CA 94111
Tel: (415) 591-1000
Fax: (415) 591-1400
jparsigian@winston.com

Joshua Hafenbrack (*pro hac vice*)
**WINSTON & STRAWN LLP**
1901 L Street NW
Washington, DC 20036
Tel: (202) 282-5000
Fax: (202) 282-5100
jhafenbrack@winston.com

*Counsel for Plaintiff State of New York*

/s/ Robert A. Bernheim
Robert A. Bernheim (admitted *pro hac vice*)
Office of the Arizona Attorney General
Consumer Protection & Advocacy Section
2005 N. Central Avenue
Phoenix, AZ 85004
Telephone: (602) 542-3725
Fax: (602) 542-4377
Email: Robert.Bernheim@azag.gov
*Attorney for Plaintiff State of Arizona*

/s/ Brent Nakamura
Brent Nakamura (admitted *pro hac vice)*
Supervising Deputy Attorney General
Office of the Attorney General
California Department of Justice
300 South Spring Street
Los Angeles, CA 90013
Telephone: (213) 269-6000
Email: Brent.Nakamura@doj.ca.gov
*Attorney for Plaintiff State of California*

*/s/ Conor J. May*
Conor J. May (admitted *pro hac vice*)
Assistant Attorney General
Antitrust Unit
Colorado Department of Law
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email: Conor.May@coag.gov
*Attorney for Plaintiff State of Colorado*

*/s/ Nicole Demers*
Victoria Maria Orton Field (admitted *pro hac vice*)
Assistant Attorney General
Office of the Attorney General of Connecticut
165 Capitol Avenue
Hartford, CT 06106
Telephone: 860-808-5030
Email: nicole.demers@ct.gov
*Attorney for Plaintiff State of Connecticut*

*/s/ Adam Gitlin*
Adam Gitlin (admitted *pro hac vice*)
Chief, Antitrust and Nonprofit Enforcement Section
Office of the Attorney General for the District of Columbia
400 6th Street NW, 10th Floor
Washington, DC 20001
Email: Adam.Gitlin@dc.gov
*Attorney for Plaintiff District of Columbia*

*/s/ Lizabeth A. Brady*
Lizabeth A. Brady
Director, Antitrust Division
Florida Office of the Attorney General
PL-01 The Capitol
Tallahassee, FL 32399-1050
Telephone: 850-414-3300
Email: Liz.Brady@myfloridalegal.com
*Attorney for Plaintiff State of Florida*

*/s/ Richard S. Schultz*
Richard S. Schultz (admitted *pro hac vice*)

Assistant Attorney General
Office of the Illinois Attorney General
Antitrust Bureau
115 S. LaSalle Street, Floor 23
Chicago, Illinois 60603
Telephone: (872) 272-0996
Email: Richard.Schultz@ilag.gov
*Attorney for Plaintiff State of Illinois*

*/s/ Jesse Moore*
Jesse Moore (admitted *pro hac vice*)
Deputy Attorney General
Office of the Indiana Attorney General
302 W. Washington St., Fifth Floor
Indianapolis, IN 46204
Telephone: 317-232-4956
Email: Jesse.Moore@atg.in.gov
*Attorney for Plaintiff State of Indiana*

*/s/ Christopher Teters*
Christopher Teters (admitted *pro hac vice*)
Assistant Attorney General
Public Protection Division
Office of Kansas Attorney General
120 S.W. 10th Avenue, 2nd Floor
Topeka, KS 66612-1597
Telephone: (785) 296-3751
Email: chris.teters@ag.ks.gov
*Attorney for Plaintiff State of Kansas*

*/s/ Mario Guadamud*
Mario Guadamud (admitted *pro hac vice*)
Louisiana Office of Attorney General
1885 North Third Street
Baton Rouge, LA 70802
Telephone: (225) 326-6400
Fax: (225) 326-6498
Email: GuadamudM@ag.louisiana.gov
*Attorney for Plaintiff State of Louisiana*

*/s/ Schonette J. Walker*
Schonette J. Walker (admitted *pro hac vice*)
Assistant Attorney General
Chief, Antitrust Division

37

200 St. Paul Place, 19th floor
Baltimore, Maryland 21202
Telephone: (410) 576-6470
Email: swalker@oag.state.md.us
*Attorney for Plaintiff State of Maryland*

/s/ *Katherine W. Krems*
Katherine W. Krems (admitted *pro hac vice*)
Assistant Attorney General, Antitrust Division
Office of the Massachusetts Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (617) 963-2189
Email: Katherine.Krems@mass.gov
*Attorney for Plaintiff Commonwealth of Massachusetts*

/s/ *LeAnn D. Scott*
LeAnn D. Scott (admitted *pro hac vice*)
Assistant Attorney General
Corporate Oversight Division
Michigan Department of Attorney General
P.O. Box 30736
Lansing, MI 48909
Telephone: (517) 335-7632
Email: ScottL21@michigan.gov
*Attorney for Plaintiff State of Michigan*

/s/ *Zach Biesanz*
Zach Biesanz
Senior Enforcement Counsel
Antitrust Division
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
Saint Paul, MN 55101
Telephone: (651) 757-1257
Email: zach.biesanz@ag.state.mn.us
*Attorney for Plaintiff State of Minnesota*

/s/ *Lucas J. Tucker*
Lucas J. Tucker (admitted *pro hac vice*)
Senior Deputy Attorney General
Office of the Nevada Attorney General

Bureau of Consumer Protection
100 N. Carson St.
Carson City, NV 89701
Email: ltucker@ag.nv.gov
*Attorney for Plaintiff State of Nevada*

/s/ *Zachary Frish*
Zachary A. Frish (admitted *pro hac vice*)
Assistant Attorney General
Consumer Protection & Antitrust Bureau
New Hampshire Attorney General's Office
Department of Justice
1 Granite Place South
Concord, NH 03301
Telephone: (603) 271-2150
Email: zachary.a.frish@doj.nh.gov
*Attorney for Plaintiff State of New Hampshire*

/s/ *Andrew F. Esoldi*
Andrew F. Esoldi
Deputy Attorney General
Division of Law
Antitrust Litigation and Competition Enforcement
124 Halsey Street, 5th Floor
Newark, NJ 07101
Telephone: (609) 696-5465
Email: Andrew.Esoldi@law.njoag.gov
*Attorney for Plaintiff State of New Jersey*

/s/ *Evan Crocker*
Evan Crocker (admitted *pro hac vice*)
Assistant Attorney General, Division Director
Consumer Affairs Division
New Mexico Department of Justice
201 3rd St NW, Suite 300
Albuquerque, NM 87102
Telephone: (505) 494-8973
Email: ecrocker@nmdoj.gov
*Attorney for Plaintiff State of New Mexico*

/s/ *Jonathan H. Hatch*
Jonathan H. Hatch
Assistant Attorney General

Office of the New York State Attorney
General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8598
Email: jonathan.hatch@ag.ny.gov
*Attorney for Plaintiff State of New York*

*/s/ Francisco Benzoni*
Francisco Benzoni (admitted *pro hac vice*)
Special Deputy Attorney General
Brian Rabinovitz (admitted *pro hac vice*)
Special Deputy Attorney General
North Carolina Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
Telephone: (919) 716-6000
Facsimile: (919) 716-6050
Email: fbenzoni@ncdoj.gov
Email: brabinovitz@ncdoj.gov
*Attorneys for Plaintiff State of North
Carolina*

*/s/ Sarah Mader*
Sarah Mader (admitted *pro hac vice)*
Assistant Attorney General
Antitrust Section
Office of the Ohio Attorney General
30 E. Broad St., 26th Floor
Columbus, OH 43215
Telephone: (614) 466-4328
Email: Sarah.Mader@OhioAGO.gov
*Attorney for Plaintiff State of Ohio*

*/s/ Gina Ko*
Gina Ko (admitted *pro hac vice*)
Assistant Attorney General
Antitrust, False Claims, and Privacy
Section
Oregon Department of Justice
100 SW Market St.,
Portland, Oregon 97201
Telephone: (971) 673-1880
Fax: (503) 378-5017
Email: Gina.Ko@doj.oregon.gov
*Attorney for Plaintiff State of Oregon*

*/s/ Joseph S. Betsko*
Joseph S. Betsko (admitted *pro hac vice*)
Assistant Chief Deputy Attorney General
Antitrust Section
Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
Telephone: (717) 787-4530
Email: jbetsko@attorneygeneral.gov
*Attorney for Plaintiff Commonwealth of
Pennsylvania*

*/s/ Paul T.J. Meosky*
Paul T.J. Meosky (admitted *pro hac vice*)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400, ext. 2064
Fax: (401) 222-2995
Email: pmeosky@riag.ri.gov
*Attorney for Plaintiff State of Rhode Island*

*/s/ Jared Q. Libet*
Jared Q. Libet (admitted pro hac vice)
Assistant Deputy Attorney General
Office of the Attorney General of South
Carolina
P.O. Box 11549
Columbia, South Carolina 29211
Telephone: (803) 734-5251
Email: jlibet@scag.gov
Attorney for Plaintiff State of South
Carolina

*/s/ Hamilton Millwee*
Hamilton Millwee (admitted *pro hac vice*)
Assistant Attorney General
Office of the Attorney General and
Reporter
P.O. Box 20207
Nashville, TN 38202
Telephone: (615) 291-5922
Email: Hamilton.Millwee@ag.tn.gov
*Attorney for Plaintiff State of Tennessee*

39

/s/ Diamante Smith
Diamante Smith (admitted pro hac vice)
Assistant Attorney General, Antitrust
Division
Office of the Attorney General of Texas
P.O. Box 12548
Austin, TX 78711-2548
Telephone: (512) 936-1162
*Attorney for Plaintiff State of Texas*

/s/ Marie W.L. Martin
Marie W.L. Martin (admitted *pro hac vice*)
Deputy Division Director,
Antitrust & Data Privacy Division
Utah Office of Attorney General
160 East 300 South, 5th Floor
P.O. Box 140830
Salt Lake City, UT 84114-0830
Telephone: 801-366-0375
Email: mwmartin@agutah.gov
*Attorney for Plaintiff State of Utah*

/s/ Sarah L. J. Aceves
Sarah L. J. Aceves (admitted *pro hac vice*)
Assistant Attorney General
Consumer Protection and Antitrust Unit
Vermont Attorney General's Office
109 State Street
Montpelier, VT 05609
Telephone: (802) 828-3170
Email: sarah.aceves@vermont.gov
*Attorney for Plaintiff State of Vermont*

/s/ David C. Smith
David C. Smith (admitted *pro hac vice*)
Assistant Attorney General
Office of the Attorney General of Virginia
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 692-0588
Facsimile: (804) 786-0122
Email: dsmith@oag.state.va.us
*Attorney for Plaintiff Commonwealth of Virginia*

/s/ Ashley A. Locke
Ashley A. Locke (admitted *pro hac vice*)
Assistant Attorney General
Antitrust Division
Washington Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
Telephone: (206) 389-2420
Email: Ashley.Locke@atg.wa.gov
*Attorney for Plaintiff State of Washington*

/s/ Douglas L. Davis
Douglas L. Davis (admitted *pro hac vice*)
Senior Assistant Attorney General
Consumer Protection and Antitrust Section
West Virginia Office of Attorney General
P.O Box 1789
Charleston, WV 25326
Telephone: (304) 558-8986
Fax: (304) 558-0184
Email: douglas.l.davis@wvago.gov
*Attorney for Plaintiff State of West Virginia*

/s/ Caitlin M. Madden
Caitlin M. Madden (admitted *pro hac vice*)
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
Telephone: (608) 267-1311
Email: caitlin.madden@wisdoj.gov
*Attorney for Plaintiff State of Wisconsin*

/s/ William T. Young
William T. Young
Assistant Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
Telephone: (307) 777-7847
Email: william.young@wyo,gov
*Attorney for the Plaintiff State of Wyoming*

40