**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>LIVE NATION ENTERTAINMENT, INC.,<br>and TICKETMASTER L.L.C,<br><br>*Defendants.* | Case No. 1:24-cv-03973-AS |

**DECLARATION OF JUSTIN W. BERNICK IN RESPONSE TO**
**DEFENDANTS' MOTION FOR SANCTIONS**

I, Justin W. Bernick, am a partner at the law firm of Hogan Lovells US LLP, 555 13th Street, NW, Washington, DC 20004, and counsel for non-party Anschutz Entertainment Group, Inc. ("AEG") in the above-captioned matter. I am a member in good standing of the Bars of the Commonwealth of Virginia and District of Columbia. I respectfully submit this declaration in opposition to Defendants' Motion for Sanctions. The information contained in this declaration is based upon my personal knowledge, and if called upon as a witness, I could and would testify competently thereto.

1. I represented AEG during the investigation conducted by the Antitrust Division of the United States Department of Justice ("Antitrust Division") and the Attorneys General of multiple States that preceded the filing of this action. I have also represented AEG in connection with this action. AEG received Civil Investigative Demands from both the Antitrust Division and the Attorney General for the District of Columbia. AEG produced over 300,000 documents and gigabytes of data over the course of the investigation. In response to requests from counsel for the Antitrust Division and State Attorneys General, AEG employees participated in several calls and

1

meetings during which they answered questions about AEG's ticketing and promotions businesses, as well as the impact of Live Nation's and Ticketmaster's conduct on the ability of AEG and AXS to compete. I also assisted AEG in submitting written advocacy to counsel for the Antitrust Division and State Attorneys General that is now part of the discovery record in this case, including a September 19, 2023, white paper explaining Live Nation's unlawful conduct. Finally, I defended a deposition of Jay Marciano (Chairman and CEO of AEG Presents) conducted by the Antitrust Division during the investigation.

2.      Following the filing of the complaint in the above-captioned matter, AEG, and its subsidiary AXS, received an additional three subpoenas from Plaintiffs and Defendants in this matter and produced over 200,000 additional documents and more data. I defended the depositions of several AEG and AXS employees, including Mr. Marciano, Dan Beckerman (President and CEO of AEG), Bryan Perez (CEO of AXS), and Louis Messina (founder of Messina Touring Group, an AEG affiliate). AEG also continued to respond to additional requests for information from counsel for Plaintiffs.

3.      Rick Mueller, who was formerly President of North American for AEG Presents, departed AEG on May 7, 2024, and soon thereafter began working at Live Nation. Live Nation sought information from Mr. Mueller in discovery related to his time at AEG and agreed with counsel for AEG that the best way to proceed and protect AEG's confidentiality interests under its non-disclosure agreement with Mr. Mueller would be a deposition in which everyone could ensure that topics of discussion did not stray into sensitive areas.

4.      Mr. Mueller was deposed in this case by Collier Kelley, a Trial Attorney at the Antitrust Division, on July 23, 2025. Before the deposition, Mr. Kelley asked about the circumstances of Mr. Mueller's departure from AEG. After consulting with AEG, I explained

those circumstances to Mr. Kelley. After Mr. Mueller's deposition, Mr. Kelley informed me that he did not question Mr. Mueller regarding those circumstances because he obtained testimony favorable to Plaintiffs from Mr. Mueller about documents discussing Ticketmaster's quality. Mr. Kelley did not ask for any further information regarding Mr. Mueller's departure.

5.      Following the close of discovery, I attended meetings with counsel for Plaintiffs and the AEG witnesses Plaintiffs intended to call at trial, including meetings with Mr. Marciano on February 18 and March 5, 6, and 14; Mr. Perez on February 17 and March 22, and Mr. Messina on February 20. Because of the interruption caused by the Antitrust Division's settlement with Live Nation, Mr. Marciano's testimony that began on March 6 did not resume until March 16. At the Court hearing on March 9, I explained to the Court the need for clarity regarding the communications that Mr. Marciano may have with counsel for the State Attorneys General, who would be resuming his examination. With the Court's permission, I met with counsel for the State Attorneys General and Mr. Marciano on March 14 before his testimony resumed on March 16. Mr. Mueller was never discussed in any of my interactions with counsel for Plaintiffs during this time.

6.      On March 23, Adam Gitlin, Chief of the Antitrust and Nonprofit Enforcement Section, Office of the Attorney General for the District of Columbia, sent me an email asking for a call regarding Mr. Mueller and John Moore, co-founder of Bowery Presents. I spoke with Mr. Gitlin at 9:00 PM that evening. Mr. Gitlin asked me about the circumstances of Mr. Mueller's departure from AEG. Mr. Gitlin also asked me about Mr. Moore's views regarding the quality of AXS' ticketing services. I briefly explained the circumstances of Mr. Mueller's departure from AEG and said that I had not spoken with Mr. Moore regarding AXS. Mr. Gitlin said that Plaintiffs anticipated a cross-examination of Mr. Mueller favorable to Plaintiffs regarding Ticketmaster's quality, consistent with Mr. Mueller's deposition. But he asked me to provide whatever additional

3

information that AEG could provide regarding Mr. Mueller's departure from the company because that information could be important for the jury in evaluating Mr. Mueller's credibility. I said that I would follow up with AEG on both Mr. Mueller and Mr. Moore.

7.      Mr. Perez began his testimony the morning of March 24. Mr. Gitlin and I spoke again at the courthouse that day about Mr. Mueller. I said that the circumstances of Mr. Mueller's departure were sufficiently sensitive that public disclosure of the information could potentially result in Mr. Mueller seeking to avoid testifying, and that AEG wanted to ensure the confidentiality of any information provided. Mr. Gitlin again emphasized that the State Attorneys General had no intention of publicly disclosing the information and that they wanted to move forward with their planned cross examination of Mr. Mueller.

8.      After I consulted with AEG, AEG provided me with certain documents regarding Mr. Mueller's departure from the company. I forwarded those documents to Mr. Gitlin at 4:12 PM on March 24. In my email, I asked Mr. Gitlin for his thoughts on how he intended to use the information and again emphasized that if there is "any possibility" of the documents becoming public, AEG would want an opportunity to object. Because Mr. Gitlin—like Mr. Kelley before him—had twice emphasized the value in cross-examining Mr. Mueller, I again cautioned that public disclosure of the information in the documents risked Mr. Mueller seeking to avoid testifying—an outcome I clearly understood Plaintiffs were themselves seeking to avoid.

9.      Mr. Gitlin called me on March 24 at 6:15 PM. In response to the question in my email, Mr. Gitlin explained that, at most, he would use one document created by AEG and not even arguably subject to any confidentiality obligation for impeachment, but only if Mr. Mueller denied the circumstances of his departure from the company. Mr. Gitlin said that the documents would be kept confidential and not used as exhibits or otherwise made public.

10.    On March 25 at 1:49 PM, I forwarded Mr. Gitlin an email in response to his separate question regarding Mr. Moore in which Mr. Moore relayed that "AXS is a great product."

11.    On March 25 at 9:33 PM, Mr. Gitlin asked me by email if AEG had any objection to his sharing of the particular document he intended to use for impeachment with Live Nation. While I understood that the documents were exempt from Plaintiffs' disclosure obligations under Rule 26(a)(3)(A) of the Federal Rules of Civil Procedure because they would be used, if at all, "solely for impeachment," AEG had no objection to disclosing the documents to counsel for Live Nation. I replied that AEG had no objection to the disclosure of the particular document Mr. Gitlin referenced.

12.    On March 26, Mr. Gitlin and I had several short calls regarding a dispute that had apparently arisen between Plaintiffs and Defendants regarding the use of the document to impeach Mr. Mueller. Mr. Gitlin asked if I could be at the courthouse for a hearing at 8:00 AM the next morning. I could not find a plane or train that would allow me to travel from Washington, DC to New York in time for the hearing. Mr. Gitlin proposed adding me to an email thread with the Court so that I could respond directly regarding my availability. I replied at 9:40 PM that I could not attend proceedings in person but would be happy to address any questions from the Court remotely at any time. I did not receive a response to my email or any questions from the Court.

13.    I understand that the Court decided at the 8:00 AM hearing on March 27 that Plaintiffs could not use the documents provided by AEG to impeach Mr. Mueller. Mr. Mueller testified on March 27 and was not asked about the documents. I presumed at that time that whatever issues had arisen the prior evening had been resolved.

14.    Later that day on March 27, non-party Inner City Press filed a motion seeking disclosure of letters regarding Mr. Mueller that Plaintiffs and Defendants had submitted to the

Court *in camera* the evening of March 26. Neither anyone at AEG nor I saw the letters until they were filed publicly on April 2. I was surprised when counsel for Defendants and counsel for Mr. Mueller responded to the Inner City Press motion on March 30 by not only requesting the continued sealing of the letters, but by arguing that AEG's disclosure of the documents to counsel for Plaintiffs was somehow illegal or an attempt to "dissuade" Mr. Mueller from testifying. AEG filed a response on March 31 explaining the above facts about AEG's interactions with counsel for Plaintiffs regarding Mr. Mueller—facts that I conveyed again orally at the hearing held by the Court on April 1.

15.     Counsel for AEG has not spoken to Mr. Mueller about his testimony in this matter or about the circumstances of his departure from AEG. Counsel for AEG has not spoken to counsel for Defendants about Mr. Mueller's testimony in this matter or discussed with counsel for Defendants how any documents regarding his departure from AEG might be used in this matter. Counsel for AEG did not participate in any of the communications with Jennifer Giordano, counsel for Defendants, and Mr. Gitlin regarding any agreement or understanding regarding how such documents might be used in this matter.

16.     The purpose of AEG's disclosure of the documents regarding Mr. Mueller's departure from AEG was to facilitate Plaintiffs' ability to impeach Mr. Mueller by attacking his credibility, a purpose expressly permitted by Rule 607 of the Federal Rules of Evidence. Consistent with other documents used for impeachment in this matter, I understood from Mr. Gitlin that the documents would be used for purposes of refreshing Mr. Mueller's recollection of the circumstances of his departure if—and only if—he misrepresented the circumstances of his departure under oath.

17.    Under Rule 26(a)(3)(A) of the Federal Rules of Civil Procedure, neither AEG nor Plaintiffs had any obligation to disclose to Defendants documents used solely for impeachment. No law, rule, or regulation was violated by obtaining or disclosing the documents, certainly in light of the confidential treatment that has been afforded the documents at AEG's request. Finally, neither AEG nor its counsel has attempted to intimidate, threaten, or otherwise dissuade Mr. Mueller from testifying in this matter. To the contrary, neither AEG nor its counsel ever approached Mr. Mueller or counsel for Defendants suggesting the information could be used if Mr. Mueller testified, and in every interaction I have had with both Mr. Gitlin and AEG regarding Mr. Mueller, AEG has sought to maintain the confidentiality of the documents.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 5, 2026, in Washington, D.C.

Respectfully submitted,

Justin Bernick