**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>    *Plaintiffs,*<br><br>    v.<br><br>LIVE NATION ENTERTAINMENT, INC.,<br>and TICKETMASTER L.L.C.,<br><br>    *Defendants.* | Case No. 1:24-cv-03973-AS<br><br>**ORAL ARGUMENT REQUESTED** |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF**
<u>**DEFENDANTS' MOTION FOR SANCTIONS**</u>

To be clear, AEG's conduct is reprehensible and its excuses ring hollow. But this motion seeks to hold *Plaintiffs* responsible for the role they themselves played. On that score, the real-world facts contradict Plaintiffs' attempt to portray themselves as innocent bystanders in AEG's misconduct. Plaintiffs' opposition makes plain that, at every step of the way, they were seeking to use information they knew (or should have known) they had no lawful right to possess to gain leverage over the Witness. And AEG has now submitted a declaration that, if true, suggests Plaintiffs still have not been fully candid with the Court or Defendants about what transpired— including that Plaintiffs and AEG apparently had undisclosed email and telephone communications on this very same issue before the infamous "courthouse hallway" conversation.

Plaintiffs' opposition is remarkable both for what it says *and what it does not*, and demonstrates that the relief Defendants seek is proper.[1]

First, Plaintiffs do not argue that AEG lawfully disclosed any of this information, nor could they. Plaintiffs do not dispute that they *knew* from the face of the document that the agreement between the Witness and AEG prohibited AEG from disclosing not just the agreement itself *but also the circumstances underlying the agreement*, which is the very information Plaintiffs admit they intended to use. *See* Separation Agreement ¶ 7(a). Plaintiffs further do not dispute that, under California's Constitution, they had no right to receive any of this information without following the appropriate process to safeguard the Witness's privacy, which they did not do. In fact,

---

[1] Plaintiffs and AEG both accuse Defendants of filing an "unwarranted" and "improper" motion, but they ignore that the Court started the April 1 hearing by asking AEG's counsel, "Why shouldn't I sanction you for your conduct here?" and then invited Defendants to seek relief relating to this issue. Trial Tr. at 3696:17-18, 3704:6-12.

1

Plaintiffs concede that such a process was required, which further confirms they knew or should have known none of this was on the up and up.[2]  Opp. at 9 n.5, ECF No. 1386.

Moreover, Plaintiffs do not agree with AEG's only proffered excuse for producing the information at issue, *i.e.*, AEG's claim that it thought it had received a "legitimate request from a law enforcement agency."  ECF No. 1358 at 2.  To the contrary, Plaintiffs confirm they made only an "informal" request for unspecified information and that AEG voluntarily chose to respond by providing the pile of highly sensitive employee personnel information about the Witness and *third parties*.  Opp. at 6.  Indeed, Plaintiffs seem to concede that AEG may well have done something wrong in disclosing all of these materials but argue that the Court should not "impute AEG's conduct to Plaintiffs to justify … sanctions against Plaintiffs—not AEG."  Opp. at 1.  It rings hollow that Plaintiffs should bear no responsibility for AEG's conduct when Plaintiffs clearly were complicit in the grand scheme.  Regardless, this motion seeks to hold Plaintiffs responsible for what they did, not what AEG did.

Second, Plaintiffs do not mention AEG's March 24, 2026 email to Plaintiffs at all and do not even attempt to offer any innocent explanation for AEG stating "***We think there is a good chance he would try to avoid testifying if he knew this would come up***."  ECF No. 1375-1 at 5.  The only logical conclusion is that there is no innocent explanation, or, at the very least, Plaintiffs are unwilling to corroborate the only one AEG has offered.  Specifically, while Plaintiffs say a lot of things to try and defend themselves, they were seemingly unwilling to back AEG's preposterous

---

[2]  Notably Plaintiff the State of California did not embrace AEG's position that the California right to privacy has no application in this case.  *See* ECF No. 1388 at 12-13.  That is because it is beyond dispute that *if* Plaintiffs and AEG had followed proper procedure here, a California court (or this Court on a proper motion) would have conducted the balancing test the law requires and either would have precluded disclosure of the evidence altogether or would have ensured any disclosures were kept to the bare minimum with appropriate safeguards.  *See* ECF No. 1378 at 8.  None of the appropriate procedures was followed here.

claim that Plaintiffs wanted the Witness to testify and that was why AEG said what it said.  No one could credibly believe that Plaintiffs (or AEG) wanted this Witness to testify—his testimony unequivocally refutes a core pillar of Plaintiffs' entire case.  Plaintiffs also fail to explain why they did not immediately tell AEG that what the email said was improper or report AEG to the Court or to Defendants.  As officers of the Court, it was not right for them to turn a blind eye to what AEG was trying to do, much less seek to accomplish that same goal by pulling the previously agreed deal the night before the Witness was to testify and stating they were going to affirmatively use the improperly disclosed information during cross-examination.

Third, and perhaps most concerning, Plaintiffs continue to offer *no explanation at all* for why they reneged at the last minute on the agreed deal about how they would question the Witness. If it was not for the improper purpose that AEG confessed to in its email, then why?  Plaintiffs' unwillingness to say, under oath, what they contend actually happened is telling.  Plaintiffs' initial intention may well have been to try to embarrass the Witness live on the stand—although that would have been problematic too given that Plaintiffs had no right to even have the information in the first place.  As the Court previously stated, that "could have created a really bad issue … the consequences [of which] would have been far worse."  Trial Tr. 3707:7-17.  In any event, Plaintiffs' plan clearly changed when they (i) pulled the deal at the 11th hour without any legitimate justification (Giordano Decl., ECF No. 1379 ¶ 5, Ex. 2), (ii) abandoned their initial stated intention to use only a single letter solely for "impeachment" and said they now thought all of the intimate details were "fair game for cross regarding bias" (ECF No. 1379-2); and (iii) refused to provide any of the documents they had received from AEG to Defendants (and indeed did not even disclose to Defendants that they had anything more than a single letter) (Giordano Decl. ¶¶ 2-3, 6-7).

Plaintiffs' sole defense to the non-disclosure issue is that, originally, they were going to use only the one letter and only for "impeachment."[3] Opp. at 5-6. But that does not help Plaintiffs for two reasons. First, it misses the critical predicate step that they had no lawful right to possess any of this information in the first place, so they should not have attempted to use it for anything, impeachment or otherwise. *Supra* at 1-2. Second, it does not explain why Plaintiffs continued to withhold the information *after* they veered away from their initial plan to use only a single letter for impeachment and instead decided to affirmatively use all the information to prove "bias." ECF No. 1379-2. Regardless, if they were acting in good faith, Plaintiffs would not have attempted to leverage their one-sided knowledge of the documents—which they knew Defendants did not possess—to try to get a litigation advantage. As it turns out, *none* of the documents Plaintiffs improperly obtained stated that "AEG terminated the witness for misconduct," which was the very specific wording Plaintiffs insisted the Witness had to admit or they would use the undisclosed documents to try to prove his bias. *See* Giordano Decl. ¶ 2.

Finally, Plaintiffs seek to avoid sanctions by claiming, basically, no harm no foul. But there indisputably was a foul—attempts to interfere with a witness's truthful testimony by using information Plaintiffs had no lawful right to possess and hid from Defendants—and also harm. To start, because Plaintiffs did not lawfully possess any of the information from AEG in the first place

---

[3] Plaintiffs' halfhearted suggestion that they did not violate the Court's ESI Order because, technically, they turned over the information within 3 business days, Opp. at 6, ignores that they only turned over the information when they did because the Court ordered them to do so. A party acting in good faith, knowing the Witness was set to testify in less than 3 business days, would have turned the information over to Defendants immediately. Moreover, it appears from Mr. Bernick's new declaration, if true, that Plaintiffs still to this day have not turned over everything the Court ordered them to turn over. Apparently, there was additional correspondence between AEG and Plaintiffs seeking information related to the Witness's testimony, and AEG also produced some information about Mr. Moore. *See* Bernick Decl., ECF No. 1388-1 ¶¶ 6, 10. Plaintiffs have not produced any of this to Defendants or to the Court.

(and knew or should have known they should not have it), they should not have been permitted to ask *any* questions of the Witness based on that information.  Had Defendants known what the documents actually said with the context of what AEG's email said, Defendants never would have agreed to allow the Witness to be questioned based on that information at all.  Moreover, it is impossible to un-ring the bell and know how the Witness would have testified (or what his demeanor would have been) if he were not worried about sensitive details about his private life becoming public in this highly publicized trial.  Finally, given the late stage of this trial when Plaintiffs have already rested their case, Defendants do not have a non-prejudicial opportunity to question AEG's witnesses (Mr. Marciano and Mr. Perez) about the extent of their alignment with Plaintiffs, which clearly was far more than Defendants had even suspected and would have gone directly to *Mr. Marciano's and Mr. Perez's* credibility.  This was not merely a third party providing truthful information to a plaintiff in litigation.  It was an attempt by AEG to hurt its competitor by keeping the jury from hearing true facts unfavorable to Plaintiffs and AEG, and it was accomplished by breaching a confidentiality agreement and California law.  It is irrelevant whether Plaintiffs shared AEG's specific business motives, because Plaintiffs, for their own reasons, walked right over the line with AEG.  The remedies Defendants seek are directly tailored to redress the specific misconduct that happened here and the reason that it happened.

Contrary to Plaintiffs argument (Opp. at 11), the Court is well within its discretion to admit the documents at issue for their truth as an appropriate sanction because these documents were admissible.  As just one example, under Federal Rule of Evidence 807, there can be no doubt that the statements in those documents are admissible for their truth because they are "supported by sufficient guarantees of trustworthiness" and, given everything that has transpired, the documents themselves are "more probative on the point for which [they are] offered than any other evidence

that [Defendants] can obtain through reasonable efforts" at this stage of this trial. Under the circumstances, AEG's contemporaneous internal statements are *the* most probative evidence of the true facts at the time. The single out-of-Circuit case Plaintiffs cite, *Hershberger v. Ethicon Endo-Surgery, Inc.*, 2012 WL 1113955, at *5 (S.D. W. Va. Mar. 30, 2012) (Opp. at 3, 11), does not hold otherwise and did not even involve hearsay. That ruling applied to the particular evidence at issue there for which there was no conceivable argument that it was admissible. Here the documents are admissible; they simply have not yet been admitted (or admitted for their truth).

Given all of the circumstances here—including AEG and Plaintiffs asserting contradictory stories in their haste to point the finger at each other without accepting any responsibility for their own actions—there is no world in which Plaintiffs or AEG can be said to have been acting at all times in good faith, and the Court can easily find the level of bad faith necessary for an appropriate sanction. The fact that, unlike in some other cases, Plaintiffs did not try to bribe the Witness or point blank ask him to lie (Opp. at 7) does not mean they should escape sanctions. Misconduct comes in many different forms, and witness tampering can include "insinuat[ions]" that "highly embarrassing" material would be released about a witness if they chose to testify. *See Calloway Cleaning & Restoration, Inc. v. Burer*, 2024 WL 248572, at *4 (S.D. Ohio Jan. 23, 2024) (defendant's threat to release "highly embarrassing" "story" involving "salacious stuff" about witness was an "attempt at witness tampering"). The attempt to interfere with the fair presentation of evidence and to obstruct Defendants' access to evidence warrants an appropriate remedy. *See Harlan v. Lewis*, 982 F.2d 1255, 1257-59 (8th Cir. 1993) (affirming sanctions against defense counsel for attempts to influence witness testimony, including because the conduct violated Model Rule of Professional Conduct 3.4(a), and permitting cross-examination before the jury about counsel's "attempts to improperly influence [witness] opinions"). Indeed, Plaintiffs' own

6

authority, *Riley v. Marriott Int'l, Inc.*, 2014 WL 4794657, at \*7 (W.D.N.Y. Sept. 25, 2014) (cited Opp. at 3, 12) notes that an adverse inference instruction is "appropriate" "to deter [a party] from similar future conduct." Moreover, the State of California either expressly condoning or at least turning a blind eye to a violation of its own citizen's privacy rights under its own Constitution for tactical gain in litigation amply qualifies as "egregious conduct" justifying sanctions. *See id.* at \*7.

It is all the more apparent that sanctions are warranted because Mr. Bernick's recent declaration suggests Plaintiffs may have been less than forthcoming with Defendants and the Court about what really transpired. In Plaintiffs' letter to the Court on March 26, 2026, Plaintiffs made it seem like all of this arose out of a chance "encounter[]" "outside the courtroom" during trial on March 23. ECF No. 1375-2 at 1. Plaintiffs repeated this suggestion in their Opposition. Opp. at 5 (arguing there was nothing wrong with AEG providing information "in response to a hallway conversation"). But Mr. Bernick now says it was more calculated in a way Plaintiffs have never disclosed. Specifically, Mr. Bernick says that on March 23, Mr. Gitlin "sent [him] an email asking for a call regarding Mr. Mueller and John Moore, co-founder of Bowery Presents," that the two of them spoke by phone that evening, and that he disclosed the circumstances of the Witness's departure in that call that evening on March 23. Bernick Decl. ¶ 6. According to Mr. Bernick, the hallway conversation did not happen until the next day, March 24, and by that time AEG had already disclosed the circumstances of the Witness's departure (which AEG had no right to disclose). *Id.* ¶ 7. Even more troubling, according to Mr. Bernick, after the hallway conversation, AEG apparently produced not only the employee personnel materials that the Court is aware of, but also produced information about Mr. Moore because of the exhibit Defendants intended to use between the Witness and Mr. Moore. *Id.* ¶ 10. Despite the Court ordering Plaintiffs to produce to the Court and to Defendants all documents received from AEG and all correspondence between

Plaintiffs and AEG relating to this issue, to date Plaintiffs have never produced the original email from Mr. Gitlin on March 23 that supposedly started this all, nor AEG's response about Mr. Moore. At this point, it is unclear what else Plaintiffs may have failed to disclose. Regardless, this lack of candor is not the behavior of a party acting in good faith, and the sanctions Defendants seek are more than justified. Mr. Gitlin's silence at the hearing on April 1 and failure to provide a sworn declaration under oath in support of Plaintiffs' opposition speaks volumes.

*    *    *

Defendants respectfully request that the Court order the following as a sanction against Plaintiffs for their own participation in the misconduct at issue: (1) admitting into evidence, for the truth of the matter asserted, certain AEG documents relating to the quality of AXS as compared to Ticketmaster (*see* Appendix A, ECF No. 1378-1), (2) instructing the jury that other documents previously admitted only for a limited purpose can now be considered for their truth (*see* Appendix B, ECF No. 1378-2), and (3) issuing an instruction to the jury that (a) Plaintiffs and AEG have been closely coordinating throughout this case, (b) Plaintiffs improperly attempted to dissuade the Witness from testifying and/or influence his testimony, and (c) as a result, the jury may find that AEG and Plaintiffs feared that if all the facts concerning AXS quality came to light it would indicate that AXS was never of comparable quality to Ticketmaster.

Dated: April 6, 2026

Respectfully submitted,

LATHAM & WATKINS LLP

 

_____

Alfred C. Pfeiffer (admitted *pro hac vice*)
   *Co-Lead Trial Counsel*
David R. Marriott
   *Co-Lead Trial Counsel*
Timothy L. O'Mara (admitted *pro hac vice*)
Jennifer L. Giordano
Kelly S. Fayne (admitted *pro hac vice*)
Andrew M. Gass (admitted *pro hac vice*)
Lindsey S. Champlin (admitted *pro hac vice*)
Robin L. Gushman (admitted *pro hac vice*)

505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600

1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

555 11th Street, NW, Suite 1000
Washington, D.C. 20004
(202) 637-2200

Al.Pfeiffer@lw.com
David.Marriott@lw.com
Tim.O'Mara@lw.com
Jennifer.Giordano@lw.com
Andrew.Gass@lw.com
Kelly.Fayne@lw.com
Lindsey.Champlin@lw.com
Robin.Gushman@lw.com

*Attorneys for Defendants Live Nation
Entertainment, Inc. and Ticketmaster L.L.C.*

CRAVATH, SWAINE & MOORE LLP

 

_____

Lauren A. Moskowitz
Jesse M. Weiss
Nicole M. Peles

Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 474-1000

lmoskowitz@cravath.com
jweiss@cravath.com
npeles@cravath.com

*Attorneys for Defendants Live Nation
Entertainment, Inc. and Ticketmaster L.L.C.*

## CERTIFICATE OF COMPLIANCE

I, Alfred C. Pfeiffer, an attorney duly admitted to practice before this Court, hereby certify pursuant to Local Rule 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rules"), Rule 8(C) of Judge Arun Subramanian's Individual Practices in Civil Cases ("Individual Rules"), that the foregoing Memorandum of Law was prepared using Microsoft Word, and contains 2,781 words. In making this calculation, I have relied on the word and page counts of the word-processing program used to prepare the document.

Dated:    April 6, 2026
        New York, New York

_____
Alfred C. Pfeiffer

10