April 7, 2026

**VIA ECF**

The Honorable Arun Subramanian
United States District Judge
United States District Court, Southern District of New York
500 Pearl Street, Courtroom 15A
New York, NY 10007-1312

Re:    *United States et al. v. Live Nation Entertainment, Inc. et al.*; **1:24-cv-03973-AS**

Dear Judge Subramanian:

Defendants respectfully submit this letter in support of their motion to strike certain testimony of Dr. Hill regarding AXS and SeatGeek win-loss data (the "Hill Win-Loss Testimony") and to preclude Plaintiffs from relying on that testimony in closing arguments.

Plaintiffs' Rule 50 responses on April 1 and 6, 2026, revealed an issue Defendants have suspected, but have not been in a position to confirm until now:  Plaintiffs seek to use certain testimony of Dr. Nicholas Hill as a conduit for inadmissible hearsay as evidence to prove a cornerstone of Plaintiffs' case—that Live Nation conditions content on ticketing.  Indeed, as Plaintiffs boldly declared to the Court: "The jury could reasonably find—based on Dr. Hill's testimony and analyses alone—that Live Nation has systematically withheld content from venues that do not use Ticketmaster as their primary ticketer."  ECF No. 1387 at 14 ("Letter from J. Kessler to Hon. Arun Subramanian re *United States et al. v. Live Nation Entertainment, Inc. et al.*; 1:24-cv-03973-AS (S.D.N.Y. Apr. 6, 2026)).  And the first piece of evidence offered in support of that argument is Dr. Hill's testimony that consists of nothing more than Dr. Hill conveying the purported contents of certain AXS and SeatGeek win-loss records: "for AXS, 62 percent of those cases, ***they said*** it was due to concert withholding concerns on behalf of the venue, and for SeatGeek I found ***it was true*** for 67 percent of those opportunities."  *Id.* (emphasis added).  The Hill Win-Loss Testimony, which is based on hearsay and was offered—and apparently will continue to be offered—for the truth of the matter should be stricken from the record.  Plaintiffs should also be prohibited from using the Hill Win-Loss Testimony in closing arguments as evidence that venues choose Ticketmaster over other ticketers due to their belief that Live Nation would withhold concerts.

I.    **BACKGROUND**

Before trial, Defendants moved in limine (Defs.' MIL No. 1) to exclude various hearsay statements regarding what individuals allegedly heard about threats or content concerns or the like.  ECF No. 1018 at 1-5.  This motion expressly sought to exclude the win-loss information that was on Plaintiffs' exhibit list (Exhibit 1 hereto (PX0024), Exhibit 2 hereto (PX0027) and Exhibit 3 hereto (PX0283)) and the subject of a portion of Dr. Hill's analysis.  *Id.* at 4; *see also id.* at fn 3.  The Court ruled with respect to the win-loss information that "some of that might be hearsay within hearsay that lacks an exception, but some of it likely is not, so the parties should raise this as it comes up or the Court will address it in the context of representative exhibits that plaintiffs

plan to use." ECF No. 1079 at 3.  The Court also made clear that to the extent Plaintiffs seek to introduce any statements for a non-hearsay purpose, "the Court will ensure that third-party statements are brought in for these proper purposes and not as a guise to bring in statements for the truth of the matter asserted with no proper exception." *Id.*

Before trial, Defendants also moved to exclude Dr. Hill from acting as a conduit for presenting factual evidence to the jury. ECF No. 716 at 16-19.  The Court ruled, among other things, that "none of the experts will be able . . . to offer their interpretation of the qualitative evidence, or even to state whether or not certain things reflected in the evidence actually happened." *Id.* at 61:20-23.  The Court went on to explain that "[t]he most that Dr. Hill . . . would be able to do is to say that the expert saw evidence that X or Y occurred, describing what it was, and explaining how it supports the expert's opinion." *Id.* at 61:24-62:2.  With respect to hearsay in particular, the Court stated that "[w]hile Rule 703 permits the admission of an expert's opinion even if it is based on otherwise inadmissible hearsay . . . the facts [and] data themselves can be disclosed to the jury only if their probative value in helping the jury to evaluate the opinion substantially outweighs their prejudicial effect." *Id.* at 62:22-63:3.  The Court noted, "if the government wishes to disclose to the jury the underlying facts" to Dr. Hill's conclusions, then "unless that evidence was previously presented through another witness or otherwise admissible, for instance as a qualified business record or statement of a party opponent, then it would likely fail Rule 703's test, given that the evidence, if not proffered through the expert, would not otherwise enter the case." *Id.* at 63:7-16.  As the Court stated, the reason for that approach is, of course, to "assure that each side's experts will be able to present their complete opinions to the jury without the risk of smuggling in inadmissible evidence in the guise of an expert opinion." *Id.* at 63:16-19.

Before Dr. Hill took the stand, Defendants objected to the use of PDX005.43—his win/loss percentages—on the grounds that it was misleading to say any losses were "due to" content concerns and "included impermissible hearsay being offered for the truth of the matter." *See* Parties Joint Submission of Outstanding Disputes for March 22, 2026, at 3-4, aatched herto as Exhibit 4.  The Court overruled Defendants' objections: "As to slide 43, the objection is overruled. The disputes about the underlying data and what the data shows go to weight rather than admissibility.  And to the extent that the data is based on hearsay, the hearsay is not actually being presented to the jury, so there is no Rule 703 issue." Trial Tr. 2061:21–25.

Dr. Hill then testified on direct about PDX005.43, describing it as "data from AXS and SeatGeek that they keep in the ordinary course of running their business" where "their sales people will record opportunities," including "why they think they may have lost the account." Trial Tr. 2117:24-2118:5.  He then reported the 62% and 67% figures as his calculation of the percentage of cases in which AXS or Seatgeek lost to Tickemster "due to concert withholding concerns on behalf of the venue." Trial Tr. 2118:18–23 ("[W]hat I did was I looked at the reason why they identified as losing in this time period. And I found for AXS, 62 percent of those cases, they said it was due to concert withholding concerns on behalf of the venue, and for SeatGeek I found it was true for 67 percent of those opportunities.").

On redirect, Dr. Hill returned to PDX005.43 and repeated the characterization: "this is data they keep in the ordinary course recording the reasons why they believe they lost to Ticketmaster,"

and stated that "AXS . . . reported 62 percent of their losses at major concert venues were due to concert withholding concerns, and SeatGeek reported 67 percent." Trial Tr. 2284:17–2285:1.

During the Rule 50 argument on April 1, 2026, Mr. Kessler argued:

> Dr. Hill's testimony on the Salesforce won/loss data is overwhelming for the entire time period from 2019 to 2024. And they don't even address this. What he did is he testified he reviewed the AXS and SeatGeek win/loss data, which gives their contemporaneous reasons in their business records for why they were losing business to Ticketmaster. And what he found is that for AXS, 62 percent of the cases, when they lost, it was because due to the concert withholding activity that was turning out when they couldn't get content. For SeatGeek, it was true 67 percent of the time. This is throughout the entire period. They've done nothing to dispute that data. They barely touched it on their cross-examination of Dr. Hill. *And that alone gives the jury the basis to infer that there was conditioning evidence in terms of this*.

Trial Tr. 3734:1–15 (emphasis added).

On April 5, 2026, at 3:30 p.m., Plaintiffs disclosed demonstrative PDX008.4—a retitled replication of PDX005.43—which they intended to use with Professor Carlton. Defendants objected, and prior to Professor Carlton's testimony, submitted their objections to both PDX008.4 and the planned cross-examination of Professor Carlton on the win/loss data by Plaintiffs to the Court in the nightly submission. *See* Parties' Joint Submission of Outstanding Disputes for April 5, 2026, at 3-9, Exhibit 5 hereto. In addition, Defendants asked for the following additional relief:

> (a) to strike Dr. Hill's testimony about the AXS and SeatGeek win/loss data (Tr. 2117:22-2118:23, 2284:12-2285:3) and to provide a limiting instruction about the striking of that testimony;
>
> (b) to preclude Plaintiffs from questioning Professor Carlton about that win/loss data;
>
> (c) to preclude Plaintiffs from using PDX008.4; and
>
> (d) to forbid Plaintiffs from arguing in closing that Dr. Hill's opinion provides any evidence that any venue in fact had a content concern.

*Id.* The next morning, the Court ruled that unless Defendants elicited testimony on the win/loss data from Professor Carlton, Plaintiffs would not be permitted to cross-examine him on it, and further invited Defendants to file a separate motion as it relates to Dr. Hill. Trial Tr. 3992:16-18, 3994:1-8.

Also on April 6, 2026, in their written response to the Rule 50 motion, Plaintiffs doubled down on their intent to use Hill's testimony on the win/loss data for the truth of the matter, citing Dr. Hill's testimony as part of a "mountain of evidence" that conditioning did *in fact* occur. *See* Dkt. 1387 at 14 (citing Hill Trial Tr. 2117:22–2118:23 and providing the following description of that testimony: "testifying that in reviewing widely used win-loss data from 2019–2024 in which

AXS and SeatGeek lost out on bids to Ticketmaster, 'for AXS, 62 percent of those cases, they said it was due to concert withholding concerns on behalf of the venue, and for SeatGeek I found it was true for 67 percent of those opportunities[']").

## II.    TESTIMONY AND DATA AT ISSUE

| Trial Tr. 2117:22-2118:23 | Q. Let's look at the next slide you prepared. Now, what issue are you examining with this data?<br><br>A. So in this case, I took data from AXS and SeatGeek that they keep in the ordinary course of running their business. So this is data where their sales people will record opportunities. So we had an opportunity to compete for a venue. When did the competition happen? Who won? And also in this data they recorded why they think they may have lost the account.<br><br>Q. What is that data called?<br><br>A. It's typically called win-loss data or salesforce.com data.<br><br>Q. Is that used by economists to study economic issues in their experience?<br><br>A. Yes. It's widely used.<br><br>Q. Let me understand. This data is the salespeople at AXS and SeatGeek, if they won a deal/a customer, or they lost a customer, one of the things they do would write down the reason they believe they lost it or won it, correct?<br><br>A. Correct. In addition to other information, that's right.<br><br>Q. What does that data show and for what period of time is this?<br><br>A. Sure. These data are from 2019 to 2024, and what I did was I looked at the reason why they identified as losing in this time period. And I found for AXS, 62 percent of those cases, they said it was due to concert withholding concerns on behalf of the venue, and for SeatGeek I found it was true for 67 percent of those opportunities. |
| Trial Tr. 2284:12-2285:3 | Q. Dr. Hill, you got asked some questions about the years in which you saw any evidence of threats of concerts being taken away if a venue didn't use Ticketmaster. You recall those questions?<br><br>A. I did.<br><br>Q. OK. Let's take a look, if we can, at slide 43 of your deck. Slide 43, this is -- remind the jury what this data is. |

| | A. So this is data from 2019 to 2024 from AXS and SeatGeek, and this is data they keep in the ordinary course recording the reasons why they believe they lost to Ticketmaster.

Q. And what does this data show the reasons they reported they have losses of Ticketmaster?

A. So for AXS, they reported 62 percent of their losses at major concert venues were due to concert withholding concerns, and SeatGeek reported 67 percent.

Q. And did this cover the years 2019 through 2024?

A. It did. |
|---|---|

In his testimony, Dr. Hill told the jury what AXS and SeatGeek employees "said" or "reported" when they wrote down what some venue representative ostensibly said when AXS or SeatGeek lost a contract to Ticketmaster. Trial Tr. 2118:18-23; 2284:24-2285:1. According to Dr. Hill, for the 14 win-loss opportunities that underly his 67% and 62% estimates, the salespeople were told that they lost the contract "due to concert withholding concerns." Trial Tr. 2118:16–23.

As to the underlying data, "due to concert withholding concerns" is not precisely the entry in any win-loss database—rather, it is a categorization Dr. Hill applies to more detailed records. Both of the following are examples from the underlying documents:

-

  Ex. 1, tab: "Data," line 11.

-

  Ex. 3, line 91.

Of the 14 records that underpin comprising the 62% and 67% figures, all but three also have reasons listed that on their face are unrelated to content, and none contains the phrase "concert withholding concerns."

**LEGAL STANDARD**

Federal Rule of Evidence 702 assigns a gatekeeping role to the district court to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). "When information is reasonably relied upon by an expert and yet is admissible only for the purpose of assisting the jury in evaluating an expert's opinion, . . . [t]he information may be disclosed to the jury . . . only if the trial court finds that the probative value of the information in assisting the jury to evaluate the expert's opinion substantially outweighs its prejudicial effect." Fed. R. Evid. 703 advisory committee's note (2000 amendment). Even when otherwise inadmissible facts are disclosed to the jury, "the trial judge must give a limiting instruction upon request, informing the jury that the underlying information must not be used for substantive purposes." *See* Fed. R. Evid. 703 advisory committee's note (2000 amendment). Since the rule itself contemplates that such basis information cannot be used substantively—even when it has been disclosed—Plaintiffs cannot argue that same evidence for the truth of the matter asserted in closing. *See id*.

## ARGUMENT

### A. Dr. Hill's Testimony Contains Nothing More than Inadmissible Hearsay

The underlying win-loss data have not been offered—let alone admitted—into evidence.[1] Dr. Hill's testimony clearly contains second-, third- and possibly fourth-hand hearsay from that data. Specifically, the four layers of inadmissible hearsay are as follows: *(1) venue representative allegedly relayed beliefs to salesperson → (2) AXS and SeatGeek salespersons interpreted the statement and wrote it down in Salesforce or another program → (3) someone exported the data from Salesforce or another program to an Excel spreadsheet (which may or may not have been modified → (4) Dr. Hill interpreted the statements in the Excel to the jury*. The hearsay chain in *Boltex* (customer → salesperson → unidentified source → employee → jury) mirrors the chain here. *Boltex Mfg. Co. v. Galperti, Inc.*, 827 F. App'x 401, 407 & n.5 (5th Cir. 2020) (finding employee testimony regarding lost sales constituted inadmissible hearsay within hearsay where the employee's knowledge stemmed from statements made by customers to a salesperson, which were then relayed to the employee by an unidentified source). There, the Fifth Circuit found "[t]his is classic hearsay evidence," with certain portions constituting hearsay within hearsay. *Id.*; *see also Western Insulation, LP v. Moore*, 242 F. App'x 112, 121–22 & n.11 (4th Cir. 2007) (holding that the business records exception did not address the second level of hearsay where information in bid logs (data similar to win-loss) was based on out-of-court statements of agents of the company's customers, and that the customer statements themselves do not qualify for the business records exception because the source of information reported in a record cannot be identified). Similarly, in this case, Dr. Hill's affirmative win-loss testimony should be stricken because each layer of the data is infected by multiple layers of unexamined out-of-court statements. In fact, the Court has already given limiting instructions for similar hearsay of reasons for lost business. *See*

---

[1] It is dubious that the underlying data as it relates to win/loss reasons would have been admissible. *See Langbord v. United States Dep''t of the Treasury*, 832 F.3d 170, 195-96 (3d Cir. 2016) (affirming the district court's decision to allow an expert to testify as to certain "first-level" hearsay, but finding that the district court abused its discretion by admitting "embedded hearsay"—i.e., hearsay within hearsay—and allowing the expert to repeat "speculation and characterization of events by out-of-court declarants").

Trial Tr. 2610:21-2611:3 ("Members of the jury, you heard testimony yesterday from Mr. Perez about concerns that he heard from members of his business development team concerning the loss of business at the Vivint Center and the Gas South Arena. You may consider the fact of those statements to Mr. Perez, but you may not consider whether those statements that Mr. Perez did not personally hear were in fact made or not or whether the concerns were true or not.")

The Court anticipated precisely the situation that has occurred. In its February 19, 2026 ruling the Court stated "if the government wishes to disclose to the jury the underlying facts – the e-mail or deposition testimony showing that the venue was threatened or that X or Y artist loved amphitheaters – and unless that evidence was previously presented through another witness or otherwise admissible, for instance as a qualified business record or statement of a party opponent, then it would likely fail Rule 703's test, given that the evidence, if not proffered through the expert, would not otherwise enter the case." Feb. 19, 2026 Hearing Tr. at 63:7-16. The reason for the Court's approach is, of course, to "assure that each side's experts will be able to present their complete opinions to the jury without the risk of smuggling in inadmissible evidence in the guise of an expert opinion." *Id.* at 63:16-19.

### B. Dr. Hill's Testimony Cannot Be Salvaged as Expert Opinion

"A party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (internal quotation marks omitted). In the Hill Win-Loss-Testimony, Dr. Hill is not offering expert testimony regarding otherwise inadmissible evidence. "If for example, Dr. Hill wants to explain that he based the conclusion on evidence he saw concerning, for instance, a venue or evidence that artists expressed their preference for amphitheaters that, in itself, poses no issue." Feb. 19, 2026 Hearing Tr. at 63:3-7. Instead, he is regurgitating.

In the Hill Win-Loss-Testimony, Dr. Hill does not explain how he based his conclusions on win-loss data he saw. Rather, he testifies about what business people "said" about what a venue said. Trial Tr. 2118:16–23. Compounding the issue rather than resolving it, Dr. Hill does not perfectly replicate what the underlying win-loss data actually says. For instance, he does not mention that the win-loss records contain other apparent reasons for the lost opportunity like ██████████████████████████████████████████████████████████████ *See* Ex. 1, tab: "Data," line 11. He provides a reinterpretation, explaining that each of these records is an instance when "***they said*** it was due to concert withholding concerns on behalf of the venue." Trial Tr. 2118:16–23 (emphasis added).

Dr. Hill's interpretation is not the work of an expert economist. Rather, it is an example of exactly why courts disallow hearsay evidence for the truth of the matter asserted—there is no one to testify to the reliability of the interpretation. *See, e.g., Marvel Characters,* 726 F.3d 119 at 136 (affirming exclusion of expert testimony that relied on hearsay statements to speculate as to the motivation and intent of certain parties); *United States v. Dukagjini*, 326 F.3d 45, 59 (2d Cir. 2003) (where the expert "was repeating hearsay evidence without applying any expertise whatsoever," the testimony enables the proponent "to circumvent the rules prohibiting hearsay"; recognizing that the cross-examination of the expert does not cure the defect because "it is the out-

of-court declaration of another, not subject to cross-examination, that is being put before the jury for the truth of the matter asserted").

Additionally, Dr. Hill's' mere adding up of the win-loss records to report how frequently unnamed business people said something—in fact, he even layered his own interpretation onto hearsay evidence before arriving at those tallies—is not the work of expert economist.  He testified: "And I found for AXS, 62 percent of those cases, they said it was due to concert withholding concerns on behalf of the venue, and for SeatGeek I found it was true for 67 percent of those opportunities." Trial Tr. 2118:16-23.  Counting alone is not expert testimony.  *See Golden Unicorn Enters., Inc. v. Audible, Inc.*, 682 F. Supp. 3d 368, 379 (S.D.N.Y. 2023) (excluding expert whose methodology consisted of using "the 'sum' function on Microsoft Excel," which the court characterized as "simple addition" rather than expert analysis), *aff'd*, No. 23-7407-cv, 2024 WL 5182671, at *3  (2d Cir. 2024) (affirming that "simple arithmetic" is not "expert analysis"); *FPP, LLC v. Xaxis US*, LLC, No. 14 CV 6172-LTS-AJP, 2017 WL 11456572, at *1–2 (S.D.N.Y. Feb. 13, 2017) (excluding expert report where expert "conducts simple arithmetic to calculate the resulting damages amount" and thus "does nothing more than arithmetic" that would not "help the trier of fact") (citation omitted);  *United States v. Mejia*, 545 F.3d 179, 195 (2d Cir. 2008) (finding expert testimony erroneously admitted where it was based on records that could have been introduced through "lay witness testimony" and "intelligently interpreted and understood" by the jury without expert explanation).

### C.  Defendants Motion Is Not Untimely

The question was raised as to why this motion was not made immediately after Dr. Hill testified and Plaintiffs argued that the motion is untimely as a result.  Trial Tr. 3986:17–3987:10.

First, Defendants raised this issue multiple times.  Trial Tr. 3982:14–3983:14 ("we raised it in our motion *in limine* before trial" and "we raised it a second time before Dr. Hill testified about this slide"); Trial Tr. 2061:21–25 (in ruling on slide 43, this Court held "And to the extent that the data is based on hearsay, the hearsay is not actually being presented to the jury, so there is no Rule 703 issue").

Second, until they closed their case, Plaintiffs could have called a witness to testify to both the underlying data and Dr. Hill's representation on what it purportedly meant.  Plaintiffs claim that Defendants should have alerted them to this so they could have done so.  Trial Tr. 3986:17–3987:10 ("Well, if they raised an objection two weeks ago, before I closed, and your Honor had said, oh, you're going to have to establish a foundation, Mr. Kessler, then I would have done that."). But it is not Defendants' burden to ensure that Plaintiffs—represented by experienced antitrust counsel from a national law firm and approximately 30 state attorney general's offices—properly admit the facts on which their expert relies.  Rather, the burden of doing so rests upon Plaintiffs, as proponents of the purported expert testimony.  *Bank of Am., N.A. v. Bear Stearns Asset Mgmt.*, 969 F. Supp. 2d 339, 349 (S.D.N.Y. 2013) (the offering party "bears the burden of establishing by a preponderance of the evidence that [their] proffered expert testimony meets the admissibility requirements of Rule 702").  They have plainly failed to do so.

8

Third, Plaintiffs' intent to use Dr. Hill's testimony as a mere conduit for inadmissible hearsay – namely as part of a "mountain of evidence" that conditioning did *in fact* occur – only manifested itself in the last week. When Dr. Hill testified, it was not nearly as apparent as it is today how Plaintiffs would seek to use that testimony. Indeed, even the Court, in overruling Defendants' objection to the slide in Dr. Hill's demonstratives about the win-loss data stated: "to the extent that the data is based on hearsay, the hearsay is not actually being presented to the jury, so there is no Rule 703 issue.[2] Trial Tr. 2061:21-25. This week it has become clear—after Plaintiffs orally argued their response to Defendants' Rule 50 motion last week, Trial Tr. 3734:4-15, disclosed Dr. Hill's win/loss slide to be used during their examination of Professor Carlton, and then predominantly featured their position in their written opposition to Defendants' Rule 50 motion—that Plaintiffs actually intend to present the hearsay for its truth to the jury unless they are prevented from doing so.

### D. The Window To Cure Dr. Hill's Reliance on Hearsay Closed with Plaintiffs' Case

"The appropriate way to adduce factual details of specific past events is, where possible, through persons who witnessed those events. And the jobs of judging these witnesses' credibility and drawing inferences from their testimony belong to the factfinder." *Marvel Characters* 726 F.3d 119, at 136 (citing *Nimely v. City of New York*, 414 F.3d 381, 397–98 (2d Cir.2005)) (internal quotation marks omitted). The win-loss data were always, of course, hearsay, and also include hearsay within hearsay. But until their case closed, Plaintiffs still had a window of opportunity to try and cure the issue and salvage Dr. Hill's reliance on such hearsay. (Notably, this antitrust case was somewhat unusual in that Plaintiffs' liability expert did not testify at the conclusion of their case.)

But that "cure" never happened. Plaintiffs never even attempted to admit the data underlying Dr. Hill's testimony or any other AXS or SeatGeek win/loss data into evidence.[3] Nor

---

[2] Consistent with this guidance, and applicable Second Circuit law, before Dr. Hill took the stand, Defendants objected to PDX005.43, the demonstrative regarding Dr. Hill's win-loss analysis, that Plaintiffs intended to present to the jury during his testimony. *See* Ex. 4 (Parties' Joint Submission of Outstanding Disputes for March 22, 2026, at 3 (Mar. 22, 2026)). Defendants argued, among other things, that Dr. Hill had not verified that the actual cause of the lost contract was withholding concerns, and the data themselves often list multiple reasons for the loss not just content. *Id.* The Court, in overruling the objection, stated that "disputes about the underlying data and what the data shows go to weight rather than admissibility. And to the extent that the data is based on hearsay, the hearsay is not actually being presented to the jury, so there is no Rule 703 issue." Trial Tr. 2061:21-25.

[3] Plaintiffs' counsel characterized the win-loss data as "business records" during the Rule 50 argument, stating that Dr. Hill "reviewed the AXS and SeatGeek win loss data, which gives their contemporaneous reasons in their business records for why they were losing business to Ticketmaster." Trial Tr. 3734:4–15. But labeling something a "business record" in argument does not make it one. No custodian from AXS or SeatGeek ever authenticated Ex. 1, Ex. 2, or Ex. 3 or any of the other data that Dr. Hill may have reviewed. No foundation was laid under FRE 803(6), despite opportunities to do so. Moreover, it is unclear what the specific origin of any of this data is. Indeed, at least with respect to Ex. 1, it appears that AXS created this for litigation purposes.

did they ask Mr. Perez (who testified after Dr. Hill) a single question about the data Dr. Hill relied on or AXS's win/loss data more generally.  Trial Tr. 3981:14–3982:12 ("Bryan Perez was here; they didn't ask him. He would have been one of the obvious people to ask about this data"). Instead, on cross-examination, Mr. Perez conceded that AXS had only been told on certain occasions that "content" was "*a* factor" and that AXS does not know how much of a factor it was for any given venue.  Trial Tr. 2381:18-2382:14 (emphasis added).  Mr. Perez's testimony certainly provided no support for the notion that "62 percent of their losses at major concert venues were due to concert withholding concerns."  And Plaintiffs never called another SeatGeek witness to sponsor and admit their win-loss data having not done so during Mr. Groetzinger's testimony. As such, Plaintiffs rested their case without even attempting to make the evidentiary connection necessary to try to save Dr. Hill's testimony.   Because of this, Dr. Hill's testimony on the origin of the data itself turned out to be unsupported by the record in Plaintiffs' case.  Indeed, as discussed above Dr. Hill testified "I took data from AXS and SeatGeek that they keep in the ordinary course of running their business," Trial Tr. 2117:24-25; "this is data where their salespeople will record opportunities," Trial Tr. 2117:25-2118:2; and the data reflects what "they" (the businesspeople who did not testify) "recorded and why they think they may have lost the account," Trial Tr. 2118:2-5.  However, no one from SeatGeek or AXS testified that this is how the data should be interpreted, nor did Dr. Hill testify to any basis for his insights into the inner workings of SeatGeek and AXS business people.

### E.  Plaintiffs Should Be Prohibited from Smuggling in Hearsay Through Dr. Hill and From Arguing that Hearsay to the Jury in Closing

Plaintiffs wrote in their Rule 50 filing on April 6: "there is a mountain of evidence that Live Nation/Ticketmaster conditioned their providing a material number of concerts promoted by Live Nation to venues on those venues having selected Ticketmaster as their exclusive ticketer." ECF No. 1387 at 14.  Plaintiffs explain that the "jury could reasonably find—based on Dr. Hill's testimony and analyses alone—that Live Nation has systematically withheld content from venues that do not use Ticketmaster as their primary ticketer." *Id.*  The Hill Win-Loss Testimony quoted as evidence unveils the artifice: "[F]or AXS, 62 percent of those cases, *they said* it was due to concert withholding concerns on behalf of the venue, and for SeatGeek I found *it was true* for 67 percent of those opportunities)." *Id.*  Dr. Hill does nothing in this Hill Win-Loss Testimony other than (1) convey what AXS and SeatGeek businesspeople meant when they reported what venues said to them, and (2) count the records according to his interpretation of what those businesspeople meant.

Because Plaintiffs are not offering the Hill Win-Loss Testimony for any purpose other than as a delivery mechanism for alleged third-party out of court statements for the truth of the matter asserted, the testimony should both be stricken and Plaintiffs should not be able to present it to the jury in closing.

---

Ex. 1 (there is a "cover" tab in the Excel file that says "confidential" and has a AEG-CID number). Finally, even if the spreadsheets were business records, the embedded hearsay within those spreadsheets is not itself admissible. *See Western Insulation, LP v. Moore*, 242 F. App'x 112, 121–22 & n.11 (4th Cir. 2007).

For the reasons stated above, Live Nation respectfully moves the Court for the following relief:

(a) to strike Dr. Hill's testimony about the AXS and SeatGeek win/loss data (Tr. 2117:22-2118:23, 2284:12-2285:3) and to provide a limiting instruction about the striking of that testimony;

(b) to preclude Plaintiffs from arguing in closing that Dr. Hill's opinion provides any evidence that any venue in fact had a content concern

Defendants thank the Court for its attention to this matter.

*[signatures on following page]*

11

Dated:  April 7, 2026

Respectfully submitted,

LATHAM & WATKINS LLP

CRAVATH, SWAINE & MOORE LLP

Alfred C. Pfeiffer (admitted *pro hac vice*)
   *Co-Lead Trial Counsel*
David R. Marriott
   *Co-Lead Trial Counsel*
Andrew M. Gass (admitted *pro hac vice*)
Timothy L. O'Mara (admitted *pro hac vice*)
Jennifer L. Giordano
Kelly S. Fayne (admitted *pro hac vice*)
Lindsey S. Champlin (admitted *pro hac vice*)
Robin L. Gushman (admitted *pro hac vice*)

505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600

1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

555 11th Street, NW, Suite 1000
Washington, D.C. 20004
(202) 637-2200

Al.Pfeiffer@lw.com
David.Marriott@lw.com
Andrew.Gass@lw.com
Tim.O'Mara@lw.com
Jennifer.Giordano@lw.com
Kelly.Fayne@lw.com
Lindsey.Champlin@lw.com
Robin.Gushman@lw.com

*Attorneys for Defendants Live Nation
Entertainment, Inc. and Ticketmaster L.L.C.*

Lauren A. Moskowitz
Jesse M. Weiss
Nicole M. Peles

Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 474-1000

lmoskowitz@cravath.com
jweiss@cravath.com
npeles@cravath.com

*Attorneys for Defendants Live Nation
Entertainment, Inc. and Ticketmaster L.L.C.*

cc:    All counsel of record (via ECF)