**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA, *et al.*,

       *Plaintiffs,*

       v.

LIVE NATION ENTERTAINMENT, INC.,
and TICKETMASTER L.L.C.,

       *Defendants.*

Case No. 1:24-cv-03973-AS

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW**
<u>**PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 50(A)**</u>

**TABLE OF CONTENTS**

**Page**

ARGUMENT ..................................................................................................................................1

I.  PLAINTIFFS' PRIMARY TICKETING MONOPOLIZATION CLAIM FAILS
    (FIRST CLAIM FOR RELIEF) .....................................................................................1

    A.  Plaintiffs Failed To Prove Their Alleged Primary Ticketing Markets ...................1

        1.  There Is No Basis For A Separate Primary *Concert* Ticketing
            Market ........................................................................................................2
        2.  Plaintiffs' Focus On "Major Concert Venues" Has No Basis ....................3
        3.  Even The *Brown Shoe* Factors Do Not Support Plaintiffs' Markets ...........5

    B.  Plaintiffs Failed To Prove Monopoly Power .........................................................7

    C.  Plaintiffs Failed To Prove Anticompetitive Effects ...............................................8

    D.  Plaintiffs Failed To Prove Exclusionary Conduct ...............................................12

        1.  Alleged Threats, Retaliation & Conditioning ..........................................13
        2.  Exclusive Dealing ....................................................................................17
        3.  OVG Ticketing Deal .................................................................................18

II.  PLAINTIFFS' TYING CLAIM FAILS (THIRD CLAIM FOR RELIEF) .......................19

    A.  Plaintiffs Failed To Prove Their Alleged "Large Amphitheater" Market .............19

    B.  Plaintiffs Failed To Prove That Their "Large Amphitheater" Market Is A
        National Market ...................................................................................................20

    C.  The Tying Claim Challenges Nothing But Live Nation's Lawful Policy Of
        Refusing To Deal With Its Competitors ...............................................................21

    D.  Plaintiffs Fail To Prove Anticompetitive Effects In A Tied Product Market ........21

    E.  Plaintiffs' Tying Claim Is Time-Barred...............................................................22

III.  PLAINTIFFS' AMPHITHEATER MONOPOLIZATION CLAIM FAILS
     (FOURTH CLAIM FOR RELIEF).................................................................................23

    A.  Plaintiffs Failed To Prove Their Alleged "Large Amphitheater" Market .............23

    B.  Plaintiffs Failed To Otherwise Prove Their Amphitheater Monopolization
        Claim....................................................................................................................23

IV.    PLAINTIFFS FAILED TO DEMONSTRATE ANTITRUST STANDING ....................25

    A.    Plaintiffs Failed To Demonstrate Antitrust Injury .................................................25

    B.    Plaintiffs Are Not Efficient Enforcers ....................................................................26

V.    PLAINTIFFS' STATE LAW CLAIMS FAIL ................................................................27

VI.    PLAINTIFFS' DAMAGES CLAIMS FAIL ..................................................................27

CONCLUSION.............................................................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Assoc. Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters*,
459 U.S. 519 (1983)........................................................................................26

*Bayou Bottling v. Dr. Pepper*,
725 F.2d 300 (5th Cir. 1984) ..........................................................................15

*Berkey Photo v. Eastman Kodak*,
603 F.2d 263 (2d Cir. 1979)........................................................................16, 22

*Blue Shield of Va. v. McCready*,
457 U.S. 465 (1982)........................................................................................26

*Bookhouse of Stuyvesant Plaza v. Amazon.com*,
985 F. Supp. 2d 612 (S.D.N.Y. 2013)..............................................................22

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962)..........................................................................................5

*Cinema Vill. Cinemart v. Regal Ent. Grp.*,
2016 WL 5719790 (S.D.N.Y. Sept. 29, 2016)...................................................22

*City of Groton v. Connecticut Light & Power Co.*,
662 F.2d 921 (2d Cir. 1981)............................................................................13

*City of New York v. Grp. Health*,
649 F.3d 151 (2d Cir. 2011)..............................................................................1

*City of Oakland v. Oakland Raiders*,
20 F.4th 441 (9th Cir. 2021) ...........................................................................24

*Corsearch, Inc. v. Thomson & Thomson*,
792 F. Supp. 305 (S.D.N.Y. 1992) ..................................................................25

*CSX Transportation v. Norfolk S. Ry.*,
114 F.4th 280 (4th Cir. 2024) .....................................................................22, 25

*Daniel v. Am. Bd. of Emergency Med.*,
428 F.3d 408 (2d Cir. 2005)............................................................................26

*Fed. Paper Bd. Co. v. Amata*,
693 F. Supp. 1376 (D. Conn. 1988)..................................................................19

*FTC v. Meta Platforms*,
    811 F. Supp. 3d 67 (D.D.C. 2025) ............................................................3, 5, 15, 25

*FTC v. Qualcomm*,
    969 F.3d 974 (9th Cir. 2020) ...........................................................................10

*FTC v. Sysco Corp.*,
    113 F. Supp. 3d 1 (D.D.C. 2015) ....................................................................20

*FTC v. Tapestry*,
    755 F. Supp. 3d 386 (S.D.N.Y. 2024)................................................................6

*FTC v. Warner Commc'ns.*,
    742 F.2d 1156 (9th Cir. 1984) (per curiam)......................................................6

*Ill. Tool Works v. Indep. Ink*,
    547 U.S. 28 (2006)...........................................................................................16

*In re Aluminum Warehousing*,
    833 F.3d 151 (2d Cir. 2016)............................................................................26

*In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*,
    44 F.4th 959 (10th Cir. 2022) ...............................................................9, 17, 18

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
    383 F. Supp. 3d 187 (S.D.N.Y. 2019)........................................................18, 19

*It's My Party v. Live Nation*,
    811 F.3d 676 (4th Cir. 2016) ......................................................................15, 19

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984), *abrogated on other grounds by Ill. Tool Works v. Indep.*
    *Ink*, 547 U.S. 28 (2006)..............................................................................15, 21

*K.M.B. Warehouse Dist. v. Walker Mfg.*,
    61 F.3d 123 (2d Cir. 1995).................................................................................9

*MacDermid Printing Sols. v. Cortron Corp.*,
    833 F.3d 172 (2d Cir. 2016)...........................................................................9, 10

*Nat'l Collegiate Athletic Ass'n v. Alston*,
    594 U.S. 69 (2021).............................................................................................9

*New York ex rel. Schneiderman v. Actavis PLC*,
    787 F.3d 638 (2d Cir. 2015)............................................................................8, 9

*New York v. Facebook*,
    549 F. Supp. 3d 6 (D.D.C. 2021) ...............................................................22, 25

*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018)............................................................................................3, 9

*PepsiCo v. Coca-Cola*,
  315 F.3d 101 (2d Cir. 2002)...................................................................................5, 6

*Race Tires Am. v. Hoosier Racing Tire*,
  614 F.3d 57 (3d Cir. 2010)........................................................................................17

*Shak v. JPMorgan Chase & Co.*,
  156 F. Supp. 3d 462 (S.D.N.Y. 2016).......................................................................9

*United States v. Eastman Kodak Co.*,
  63 F.3d 95 (2d Cir. 1995)..........................................................................................3

*United States v. Google LLC*,
  687 F. Supp. 3d 48 (D.D.C., Aug. 4, 2023) ..............................................................15

*United States v. Google LLC*,
  747 F. Supp. 3d 1 (D.D.C. 2024) ..............................................................................10

*United States v. Google LLC*,
  778 F. Supp. 3d 797 (E.D. Va. 2025) ......................................................................12

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) ..............................................................................8, 9, 10, 16

*United States v. Oracle Corp.*,
  331 F. Supp. 2d 1098 (N.D. Cal. 2004) ....................................................................6

*US Airways v. Sabre Holdings*,
  938 F.3d 43 (2d Cir. 2019).................................................................................22, 25

*Valassis Commc'ns v. News Corp.*,
  2019 WL 802093 (S.D.N.Y. Feb. 21, 2019)...........................................................13

*Virgin Atl. Airways Ltd. v. British Airways Plc*,
  257 F.3d 256 (2d Cir. 2001)...............................................................................9, 15, 17

**RULES**

Federal Rule of Civil Procedure 50(a) ............................................................................1

Live Nation Entertainment, Inc. and Ticketmaster L.L.C. ("Defendants") renew their motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a). Defendants previously filed a letter outlining the bases of their prior Rule 50(a) motion (ECF No. 1362), and a reply letter in further support of that motion (ECF No. 1389). Defendants submit this renewed motion out of an abundance of caution to preserve their arguments and incorporate additional evidence introduced during their case in chief.

## ARGUMENT

## I.    PLAINTIFFS' PRIMARY TICKETING MONOPOLIZATION CLAIM FAILS (FIRST CLAIM FOR RELIEF)

### A.    Plaintiffs Failed To Prove Their Alleged Primary Ticketing Markets

At trial, Plaintiffs tried to prove two primary ticketing markets: (1) a market for primary ticketing services to "major concert venues," and (2) a market for primary *concert* ticketing services to "major concert venues." Under Section 2 of the Sherman Act, "a plaintiff must allege a plausible relevant market in which competition will be impaired." *City of New York v. Grp. Health*, 649 F.3d 151, 155 (2d Cir. 2011). The issue in this case is that, even though there is no dispute about who *purchases* primary ticketing services from the likes of Ticketmaster, SeatGeek, and AXS—broadly, larger theaters, amphitheaters, arenas, and stadiums—Plaintiffs do not calculate market shares in reference to the addressable market. They ignore most of it, urging a customer-defined limitation on the market's scope that has no significant effect on the list of competitors, but dramatically affects market shares. Specifically, Plaintiffs' "concert ticketing services" construct removes sports tickets from the denominator, and their "major concert venues" construct removes hundreds of stadiums, arenas, and amphitheaters from the denominator. Trial Tr. 2196:2–2197:5 (Hill). In combination, they increase Ticketmaster's market share from something below 50% to the claimed 86%. Trial Tr. 2166:23–2167:8 (Hill).

1

Plaintiffs, however, have failed to elicit sufficient evidence to justify limiting the market to only certain customers ("major concert venues," defined as arenas and amphitheaters of over 8,000 capacity that hosted 10 or more concerts in at least one year from 2017 to 2024) and only certain tickets (concert tickets). Indeed, Plaintiffs *never presented any evidence* to the jury identifying the 257 venues they say are in their "major concert venue" markets. The jury cannot possibly find that this set of venues constitutes a market when Plaintiffs never even identified them.

        1.        **There Is No Basis For A Separate Primary *Concert* Ticketing Market**

This is a made-up product, as Plaintiffs introduced zero evidence of any primary ticketing contract or RFP with any arena or stadium that was only for concert tickets. *See* Trial Tr. 2187:12–20 (Hill); Trial Tr. 2177:1–24 (Hill). Rather, representatives from primary ticketing companies uniformly testified that they ticket all types of events at the venues they contract with—sports games, concerts, family shows, or any other event. Trial Tr. 2920:25–2921:11 (Marcus); Trial Tr. 2323:23–2325:5 (Perez); Trial Tr. 924:8–925:23 (Groetzinger); *see also* Trial Tr. 2186:15–2187:15 (Hill). Venue representatives likewise testified that the primary ticketers they contract with ticket all types of events at their venues. Trial Tr. 390:7–12 (Helgerson); Glickman Dep. 50:12–16. The actual contracts for primary ticketing services in the record cover both concerts and sports. DX-0186.0001; DX-0295.0004.

Plaintiffs' evidence consists of one page of one Ticketmaster presentation, which breaks down Ticketmaster's market shares into "verticals," one of which is "Concerts." PX-508 at -879. All that shows is that Ticketmaster can separate data it has about the tickets it distributes into these verticals. But so what? Surely no one would contend that the other verticals identified, *e.g.*, "NBA" or "NFL," are their own *antitrust product markets*. Nothing about this slide indicates that trade in primary ticketing services follows these distinctions, and it plainly does not. When a

2

ticketing contract is won or lost, all the tickets, not just some, are won or lost, and therefore affect market shares. Plaintiffs' remaining citations say nothing about whether primary ticketing companies or venues view primary concert ticketing services as a distinct product. The "area of effective competition" among primary ticketing companies plainly encompasses all the tickets that venues put up for bid and market share calculations omitting such tickets would be highly misleading. *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018).

2.    **Plaintiffs' Focus On "Major Concert Venues" Has No Basis**

Plaintiffs' focus on "major concert venues" also finds no basis in the record. Plaintiffs are trying to have it both ways. On the one hand, to avoid and distinguish *FTC v. Meta Platforms*, 811 F. Supp. 3d 67, 117 (D.D.C. 2025) (in a Section 2 case, a targeted customer market must be proven through "significant differences in price"), and *United States v. Eastman Kodak Co.*, 63 F.3d 95, 107 (2d Cir. 1995) ("probative evidence of systematic price discrimination" is required where the government's theory depends on a price discrimination market), Plaintiffs assert they are *not* pursuing a targeted customer market. ECF No. 861 at 2–6. Indeed, Plaintiffs effectively abandoned any "targeted" or "vulnerable" customer market in their case-in-chief. Even though Dr. Hill had a slide stating that "Distinct or targeted customers" are a "consideration[]" in market definition, PDX005.8, his direct testimony did not even acknowledge, let alone apply, the principles for defining targeted customer markets that Plaintiffs argued in opposing summary judgment. His only discussion of those principles came on cross examination, when Dr. Hill acknowledged "that the supposedly vulnerable 257 venues at issue" in Plaintiffs' alleged primary ticketing markets "*didn't*" pay more for primary ticketing services than other venues. Trial Tr. 2182:5–15 (Hill) (emphasis added). Nor did they get worse terms. Trial Tr. 2177:19–2179:6 (Hill).

3

And yet Plaintiffs have made it clear that their "major concert venue" markets are grounded in alleged customer "vulnerability" to the loss of concerts.  Dr. Hill asserted this as if it were an accepted principle of market definition:  when one is analyzing "conduct of some kind that may affect one group of consumers but not another … in those cases you may define the market around those vulnerable consumers."  Trial Tr. 2083:12–15 (Hill).  Plaintiffs also contend that testimony from rivals including Jack Groetzinger of SeatGeek and Edward Khoury of JUMP support their market definition because they testified that they believe arenas and large amphitheaters are more dependent on concert revenue than stadiums are.  ECF No. 1387 at 2.

But what case law permits that?  The only doctrine that permits market shares to be calculated solely with respect to allegedly vulnerable customers is the targeted customers doctrine that Plaintiffs refuse to follow.  That is, were Plaintiffs making that argument—which they foreswear—they would be able to calculate market shares within the targeted customer group.  *See* 2010 Horizontal Merger Guidelines at 17.  No other doctrine and no other case law allows shares to be calculated based on sales to particular customers because of some general notion of vulnerability.  Plaintiffs cite no other case for that proposition either—probably because if that were true, the license to gerrymander would be unlimited.  Every plaintiff would define markets around the group of customers creating the largest market share and justify it based on "vulnerability."  There is simply no principle of market definition law that allows this except what *Meta* and *Kodak* require.[1]

---

[1] Having said all that, Plaintiffs are also advancing inconsistent arguments about vulnerability, suggesting in their cross-examination of Dr. Carlton that perhaps the reason he does not find higher take rates or margins to "major concert venues" is because other venues are also vulnerable and paid the price for it.  Indeed, Plaintiffs' questioning of Dr. Carlton confirmed that they now think venues inside and outside the "major concert venue" market are similarly situated.  Trial Tr. 4055:25–4056:15.

3.      **Even The *Brown Shoe* Factors Do Not Support Plaintiffs' Markets**

Assuming *arguendo* that the factors identified in *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962), could justify a targeted-customer market, Plaintiffs' trial evidence does not permit any reasonable jury to find that Plaintiffs' 257 venues are a relevant market.[2]

To start, Plaintiffs have presented no evidence on what is generally regarded to be the most important *Brown Shoe* factor, which is that "distinct customers" have a distinct sensitivity to price changes.  *See, e.g.*, *PepsiCo v. Coca-Cola*, 315 F.3d 101, 106-07 (2d Cir. 2002).  Dr. Hill did not testify at all about this.  He systematically avoided everything that gets to the core issue of whether "major concert venues" have less elastic demand and a higher willingness to pay for primary ticketing services than others.

Instead, when Dr. Hill testified, he emphasized "industry recognition" as key to his market definitions.  Yet Plaintiffs did not identify "a single document, anywhere in the millions of pages" reviewed by their expert, in which anyone views the primary ticketing market as limited to these 257 venues or any similar grouping of venues.  Trial Tr. 2168:3–7 (Hill).  And numerous industry participants indicated that they did not understand Plaintiffs' grouping of venues to align with "normal industry usage," and that they would not "group them that way."  Trial Tr. 530:16–25 (Geiger).  For instance, Jay Marciano, CEO of AEG Presents, testified that in AEG's view, "the most representative type of major concert venues are *stadiums*, arenas, and amphitheaters."  Trial Tr. 1146:16–24 (emphasis added).  Bryan Perez, CEO of AXS, testified that he views "any venue north of about 5,000 seats where major concert tours play" as a "major concert venue."  Trial Tr. 2397:5–2398:4.  Naturally, that definition would include stadiums, as well as a host of venues with

---

[2] Defendants do not believe the *Brown Shoe* factors are applicable here since they "use qualitative evidence as a proxy for substitutability," *Meta*, 811 F. Supp. 3d at 97, and there is no question of substitutability here.  All agree on the product and the set of ticketing companies that compete in Plaintiffs' alleged primary ticketing markets.

5,000 to 8,000 seats.  And Christian Lewis of Paciolan testified that he views any "venue capable of hosting a major concert" as a "major concert venue."  Lewis Dep. 43:15–44:20.  Again, that would include stadiums.[3]

Representatives from primary ticketing companies likewise indicated that they do not view competition in the industry as limited to Plaintiffs' major concert venues; rather, the same primary ticketing companies that compete to ticket those venues also compete to ticket other venues— clubs, theaters, amphitheaters, arenas, and stadiums.  Trial Tr. 2920:14–24 (Marcus); Trial Tr. 2398:18–2399:16 (Perez); Trial Tr. 1179:19–1181:11 (Marciano); Trial Tr. 804:19–807:17 (Groetzinger); Lewis Dep. 41:21–42:11.

This is not the kind of industry recognition that justifies narrow markets.  That usually happens only when the plaintiff's market aligns with how market participants describe the market in ordinary course documents, *e.g.*, *FTC v. Tapestry*, 755 F. Supp. 3d 386, 430–435 (S.D.N.Y. 2024), or when it aligns with the views of the industry generally, *e.g.*, *FTC v. Warner Commc'ns.*, 742 F.2d 1156, 1163 (9th Cir. 1984) (per curiam).  But it is not credited when it is just a made-for-litigation categorization not used in industry.  *PepsiCo*, 315 F.3d at 107.  For example, in *United States v. Oracle Corp.*, the government attempted to limit the relevant market to "high function" enterprise software sold to "Large Complex Enterprises."  331 F. Supp. 2d 1098, 1158–62 (N.D. Cal. 2004).  The market definition was rejected because (among other reasons) "'[h]igh function software,' as defined by plaintiffs, ha[d] no recognized meaning in the industry," *id.* at 1102, and

---

[3] Evidence regarding the exclusion of stadiums, on the other hand, is focused on the perspective of artists, not ticketers, and is therefore irrelevant to the question of "industry recognition" for this alleged ticketing market.  ECF No. 1387 at 4.  Regardless of which artists play stadiums, it is indisputable that the same ticketers compete for and offer the same services to stadiums that they do to other venues.

"Large Complex Enterprises" likewise had "no widely accepted meaning in the industry," *id*. at 1103.

Finally, Plaintiffs claim that they can justify the "major concert venue" market based on "peculiar characteristics" of the products themselves. But this too has not been proven. In his direct testimony, Dr. Hill said nothing about peculiar product characteristics in the alleged markets at issue, even though that was one of the four market definition considerations he listed on PDX005.8. Then on cross, he admitted that the core ticketing system offered to all amphitheaters, arenas, and stadiums is the same, across all primary ticketing companies. Trial Tr. 2175:8–11 (Hill). This was confirmed by Plaintiffs' other ticketing company witnesses. Trial Tr. 2318:22–2319:6 (Perez (AXS)); Trial Tr. 821:22–822:17 (Groetzinger (SeatGeek)); Christian Lewis Dep. 79:19–79:21 (Paciolan).

Finally, there is no basis for Plaintiffs entirely omitting stadiums from their alleged primary ticketing markets. With stadiums in the market and without arbitrarily ignoring sports and other kinds of tickets Dr. Hill omits, Ticketmaster's market share is, at most, 44%—roughly half Plaintiffs' preferred 86%. Trial Tr. 2166:23–2167:8 (Hill). The jury is practically instructed to find that Ticketmaster is a monopolist if the "major concert venue" market is permitted, when, with only the inclusion of stadiums, it is not a monopoly at all. All of the record evidence is that Ticketmaster, SeatGeek, and AXS (among others) compete for the ticketing rights to stadiums. There is no evidentiary basis for pretending otherwise.

## B.    Plaintiffs Failed To Prove Monopoly Power

There is no evidence in the record that could possibly suffice as direct evidence of monopoly pricing.

First, only evidence concerning the prices charged to *venues* for primary concert ticketing services could possibly be relevant. But Plaintiffs' evidence at trial focused heavily on fees *fans*

7

paid.  *See* ECF No. 1387 at 7–8.  And the problem with this is not just that it is outside the relevant market, but that this is an industry in which, if a venue is paid more for its ticketing rights (increasing its welfare as a consumer), that might result in higher fees to consumers.  Yet, in Dr. Hill's switching study, he does nothing to try to determine whether the higher consumer fees correspond to less venue compensation.  Trial Tr. 2277:3–2278:10 (Hill).[4]

Second, any argument that Ticketmaster's 35% operating margins could reasonably support the existence of monopoly power is baseless.  Dr. Hill testified that he was *not* saying that only a monopolist could earn such margins.  Trial Tr. 2184:4–11 (Hill).

Third, Dr. Abrantes-Metz's analysis should not be available for any purpose, especially as proof of monopoly power, ECF No. 1387 at 8—an issue she did not purport to address at all.  *See* Trial Tr. 2495:2–8 (Abrantes-Metz).

### C.    Plaintiffs Failed To Prove Anticompetitive Effects

Plaintiffs' primary ticketing monopolization claims fail because Plaintiffs adduced no evidence of market-wide, "anticompetitive effect[s]" in their alleged primary ticketing markets, which is a threshold requirement.  *United States v. Microsoft Corp.*, 253 F.3d 34, 58–59 (D.C. Cir. 2001).

There can be no serious debate as to the need for Plaintiffs to prove anticompetitive effects as a distinct element of their Section 2 claims.  The Second Circuit, in *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 652 (2d Cir. 2015), endorsed the D.C. Circuit's

---

[4] Additionally, Plaintiffs rely on evidence showing that "ticketing fees in the United States are higher than in Europe, where ticketers generally have non-exclusive agreements with venues," to attempt to demonstrate Ticketmaster's monopoly power.  ECF No. 1387 at 8-9.  But this evidence never should have been admitted; as explained in Defendants' motion *in limine* No. 9—which the Court denied—evidence of prices in Europe (outside the alleged relevant markets in this case) is irrelevant.  ECF No. 1018 at 20-21.

"*Microsoft* framework" under which the plaintiff bears an initial burden to show anticompetitive effects. *See Microsoft*, 253 F.3d at 58; *see also Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 486 (S.D.N.Y. 2016).

In the Second Circuit, there is no material distinction between the requirement to show anticompetitive effects in the context of a Section 2 claim and the corresponding requirement in a Section 1 claim. *See Actavis*, 787 F.3d at 652. That showing has always required "evidence of changed prices, output, or quality." *MacDermid Printing Sols. v. Cortron Corp.*, 833 F.3d 172, 183 (2d Cir. 2016). Recent Supreme Court cases from the rule of reason context are to the same effect. *See AmEx*, 585 U.S. at 549; *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 88 (2021). There is no Second Circuit case upholding a finding of anticompetitive effects based solely on intangibles such as "choice," nor "harm to the competitive process" that does *not* cause tangible consumer harm. *See In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 985 (10th Cir. 2022). And this is for good reason: conduct that harms the competitive "process" but does not have any adverse effect on customers is nothing more than harm to competitors by another name. If the law required otherwise, a litany of procompetitive conduct could be condemned with nothing more than evidence that competitors had to work harder to keep up.

*MacDermid* acknowledges that in the abstract, "reduced consumer choice *can* constitute harm to competition." 833 F.3d at 186 (emphasis added). But it manifestly does not hold that every instance of a reduction in consumer choice *does* constitute harm to competition. *Id*. at 183 n.42; *see also K.M.B. Warehouse Dist. v. Walker Mfg.*, 61 F.3d 123, 128 (2d Cir. 1995); *Virgin Atl. Airways Ltd. v. British Airways Plc*, 257 F.3d 256, 264–65 (2d Cir. 2001). And *MacDermid* expresses what can only fairly be described as a profound skepticism that a reduced choice theory

9

could lead to the *first* precedential opinion in this Circuit to uphold a finding of adverse effects without evidence of changed prices, output, or quality. *See* 833 F.3d at 183–84.

Plaintiffs have contended that they need only show that Ticketmaster's alleged exclusionary conduct "reasonably appear[s] capable of significantly contributing to maintaining [Ticketmaster's] monopoly power." ECF No. 1387 at 12. That is not the law for any Plaintiff in this case. Plaintiffs' cases all cite *Microsoft* for this proposition, but *Microsoft* made clear that its holding was limited to "actions seeking injunctive relief." 253 F.3d at 79. Subsequent cases likewise limited this standard to where "a regulator is seeking only injunctive relief." *United States v. Google LLC*, 747 F. Supp. 3d 1, 152–53 (D.D.C. 2024); *see FTC v. Qualcomm*, 969 F.3d 974, 987 (9th Cir. 2020) (noting this standard in case involving permanent injunction). That is not this case, where Plaintiffs are also seeking damages and penalties. The "somewhat relaxed" standard discussed in *Microsoft* might make sense in the context of a purely equitable government action. *Google*, 747 F. Supp. 3d at 152–53. Where the government is seeking to enjoin potentially exclusionary conduct, the relevant inquiry is whether that conduct might harm competition if allowed to continue. But where, as here, a plaintiff is bringing an actual monopolization claim, there is no basis to allow it to show harm to competition based on the theoretical possibility that the challenged conduct *might* have that effect. The plaintiff must show that the "reprehensible behavior has *contributed significantly* to the … maintenance of the monopoly." *Microsoft*, 253 F.3d at 79 (quoting Areeda ¶ 650c (1996)).

In all events, the issue now is squarely teed up: does *the record Plaintiffs developed at trial* allow a reasonable jury to find *actual* anticompetitive effects as the Second Circuit and prevailing Supreme Court precedent define them? Applying the law to the undisputed facts, there is no basis to find cognizable anticompetitive effects in any ticketing market.

10

*Price:*   The evidence does not permit any reasonable jury to find that "major concert venues" have faced higher prices market-wide as a result of any allegedly anticompetitive conduct. Dr. Hill did not conduct any pricing analysis of his own and squarely admitted that he is not claiming that "major concert venues" paid monopoly prices. Trial Tr. 2183:25–2184:3 (Hill). His work responding to Dr. Carlton led him to analyze whether "major concert venues" pay higher prices for primary ticketing services as compared to other venues and he found that they "didn't." Trial Tr. 2182:5–15 (Hill). And in fact, the evidence shows that Ticketmaster's share of ticketing contract revenues has been decreasing over time. Trial Tr. 2209:21–2210:9 (Hill). Plaintiffs failed to fill in this critical gap—instead, they recited anecdotal evidence about "high fees" paid *by fans* for tickets and ancillaries like VIP parking. ECF No. 1387 at 7–8. But price to *fans* is not the relevant inquiry in a market for services to *venues*. Moreover, Plaintiffs' evidence does not demonstrate that these fees are high in comparison to a relevant point of reference nor that they are high *because of* the alleged conduct. Their reference to the Abrantes-Metz "overcharge" analysis fares no better, *id.* at 8, since Dr. Abrantes-Metz admitted that she was "not offering any opinion about liability," and her analysis assumed*,* rather than proved, that any difference in price between Ticketmaster and AXS was a result of the alleged conduct and not the widely-acknowledged differences in quality. Trial Tr. 2495:6–14 (Abrantes-Metz).

*Output:*   Plaintiffs do not dispute that they have put on no evidence of reduced output, whether by Ticketmaster or in the primary ticketing industry generally. ECF No. 1387 at 9. Dr. Hill even admitted he did not study output. Trial Tr. 2274:10–15 (Hill). He did, however, acknowledge that the number of tickets sold at "major concert venues" "increased significantly" since 2017. Trial Tr. 2275:2–7 (Hill). Output increased.

11

*Quality:*  Plaintiffs also failed to prove that Ticketmaster reduced quality to "major concert venues."  Despite numerous anecdotal attacks on Ticketmaster's quality, Plaintiffs made no effort to establish that, on any quality metric, Ticketmaster provided *less* quality to any customers.  Nor, more importantly, have Plaintiffs offered evidence that Ticketmaster held onto its market share despite reducing quality, as in *United States v. Google LLC*, 778 F. Supp. 3d 797, 864 (E.D. Va. 2025).

Having nothing on price, output, or quality, Plaintiffs have advanced the extraordinary argument that all they need to show is that competition among primary ticketers was somehow tainted by virtue of a belief among venues that choosing SeatGeek or AXS would result in fewer Live Nation shows.  But that argument simply restates the conduct alleged, not what it led to in terms of higher prices or other tangible harm to the buyers in the market.  It would be one thing if Plaintiffs had shown that the *effect* of venues' supposed belief was that Ticketmaster could charge higher prices or worsen terms to its venue customers.  But there is no evidence of that at all.  To the contrary, all of the available evidence shows that SeatGeek, AXS, and others materially *discipline* the prices Ticketmaster can charge venues, irrespective of the content fears that Plaintiffs sought to focus on at trial.

### D.    Plaintiffs Failed To Prove Exclusionary Conduct

In their April 6 letter, Plaintiffs argued—for the first time—for an amorphous, "all of the evidence, considered together in its totality" gestalt theory in which they claim that their allegations of "threats and retaliation" must be considered "in combination with all the other challenged conduct" under the Section 2 ticketing monopolization claim.  ECF No. 1387 at 13–14.  This is tantamount to an admission that Plaintiffs have failed to adduce evidence on this front that would stand on its own.  But it is also wrong on the law—the Second Circuit has instructed courts in such cases to "analyze the various issues individually" and "reject[ed] the notion that if

there is a fraction of validity to each of the basic claims and the sum of the fractions is one or more, the plaintiffs have proved a violation of section 1 or section 2 of the Sherman Act." *City of Groton v. Connecticut Light & Power Co.*, 662 F.2d 921, 928–29 (2d Cir. 1981); *see also Valassis Commc'ns v. News Corp.*, 2019 WL 802093, at *10 (S.D.N.Y. Feb. 21, 2019). Defendants address the various forms of exclusionary conduct that Plaintiffs have alleged below.

### 1.    <u>Alleged Threats, Retaliation & Conditioning</u>

At summary judgment, Plaintiffs promised abundant "[e]vidence of Defendants' years-long campaign of threats and retaliation," ECF No. 771 at 33, and commenced their case with evidence relating to alleged content leveraging, a sure sign that they consider that particularly powerful evidence for a jury. And yet, there is hardly any recent evidence of threats or retaliation, especially since it is undisputed that Live Nation promotes "thousands" of shows in venues not ticketed by Ticketmaster. Trial Tr. 1920:22–1921:7 (Rapino). It is really just the Barclays episode (from 2021)—a far cry from the "mountain of evidence" Plaintiffs continue to invoke.[5][6] ECF No. 1387 at 14.

---

[5] The other supposed "threats" that Plaintiffs have invoked—relating to the Xcel Center/Minnesota Wild (2019), the H-E-B Center (2017), and a Jonas Brothers tour (2019)—happened before the statute of limitations period (*i.e.*, pre-May 2020). *See* ECF No. 1387 at 14-15. If the Court had properly granted Defendants' motion *in limine* No. 5 (ECF No. 1018 at 12), including Defendants' multiple attempts to renew that motion with respect to specific exhibits at trial, *see* Trial Tr. 1570:23-1571:19, the *only* alleged threat in the record would be the one relating to Barclays. (While the Court excluded certain documents on these grounds, the Court admitted into evidence many pre-2020 documents and related testimony over Defendants' objections.) That is plainly insufficient.

[6] During trial, the Court admitted, over Defendants' objections, multiple exhibits and portions of testimony that should have been excluded on hearsay grounds, including evidence showing alleged threats and retaliation. *See, e.g.*, PX-230 (Helgerson); Trial Tr. 752:7-10 (Groetzinger); Trial Tr. 1610:22-1611:14, 1614:12-19, 1649:7-15 (Khoury); PX-389 (Evans); PX-412 (Evans); PX-392 (Evans); PX-250 (Granger); PX-231 (Van Stone). On the other hand, the Court sustained Plaintiffs' objections to a number of Defendants' exhibits—some of which proved lack of threats or retaliation—on the basis that they contained inadmissible hearsay. *See, e.g.*, PX-644, PX-783, PX-800 (Yovich); Azoff Dep. 83:12-86:3, 89:18-90:9 (Azoff); DX-465, DX-473, DX-476

Plaintiffs have attempted to repair these issues primarily by relying on Dr. Hill's improper verbatim reading of rival ticketer win-loss data from dozens of venues, which, as the Court has now held, contain multiple levels of hearsay. *See* Trial Tr. 2117:24–2118:23; Trial Tr. 4473:4–4475:3. Other than relying on the inadmissible win-loss hearsay, Plaintiffs have shifted their case toward claiming that Defendants engage in a form of "conditional dealing" because they allegedly send fewer Live Nation-promoted shows to venues that switch away from Ticketmaster. That certainly is the thrust of Dr. Hill's testimony related to the demonstratives in PDX005.35–41. Dr. Hill purports to show a decreased show count for venues that switch away from Ticketmaster for six venues. Assuming for present purposes that this is true, it does not show actionable anticompetitive conduct, and the jury should not be allowed to consider it as such. In any event, the Court should not have admitted this "content-shifting" analysis—which Defendants moved to exclude *in limine* (ECF No. 1018 at 7).

And there are multiple flaws with Dr. Hill's analysis. First, there is no reasonable inference from the evidence presented that any differences in show count are intentional and strategic and not, for example, because rational concert promoters would be less attracted to SeatGeek or AXS venues, Trial Tr. 3060:2–3061:20 (Mueller), or because of innocuous, unrelated reasons like demographic shifts, Trial Tr. 2970:7–24 (Al-joulani). Dr. Hill admitted that his analysis of show counts did not assess the reasons behind any observed switching. Trial Tr. 2248:8–2249:2 (Hill). Nor is there evidence upon which a reasonable jury could conclude that Live Nation has the power over routing that this theory implies.

---

(Jacoby); Trial Tr. 3493:9-15, 3504:8-13, 3502:11-22, 3506:15-22, 3507:20-3508:2, 3515:24-3516:4 (Jacoby). If the Court had properly excluded Plaintiffs' evidence and admitted Defendants' evidence, there is no question that there would not be a legally sufficient basis to find for Plaintiffs, particularly on their theory that Defendants "threatened" and "retaliated" against venues.

14

Additionally, there is no principle of U.S. antitrust law that requires Live Nation to route the same number of concerts to non-Ticketmaster venues as it routes to Ticketmaster venues. The most this evidence suggests is that Live Nation engages in a modest amount of "self-preferencing," which is not unlawful under U.S. law. *See United States v. Google LLC,* 687 F. Supp. 3d 48, 78–83 (D.D.C., Aug. 4, 2023); *Bayou Bottling v. Dr. Pepper*, 725 F.2d 300, 304 (5th Cir. 1984); Herbert Hovenkamp, Antitrust and Self-Preferencing, *Antitrust*, Vol. 38, No. 1, Fall 2023, at 5.

Plaintiffs' only response is that "concert withholding is not 'self-preferencing,'" ECF No. 1387 at 15, but that just begs the question, *What is it then?*

There is, of course, a "conditioning" offense called tying. But a tying arrangement in this setting would require some kind of overt, coercive condition that to get Live Nation-promoted concerts a venue must use Ticketmaster. *See, e.g.*, *It's My Party v. Live Nation*, 811 F.3d 676, 684–87 (4th Cir. 2016) (Live Nation did not tie its venues to its promotion services where artists were merely encouraged, not required, to use the venues); *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984), *abrogated on other grounds by Ill. Tool Works v. Indep. Ink*, 547 U.S. 28 (2006). There is no claim that Live Nation or Ticketmaster links concerts to ticketing in a way that constitutes actionable tying. *See* Trial Tr. 1920:22–1921:7 (Rapino) (thousands of Live Nation shows in non-Ticketmaster buildings). So concert withholding is not tying. There are also cases concerning conditional discounts, *e.g.*, better pricing in exchange for some measure of "loyalty." *See, e.g.*, *Virgin Atlantic*, 257 F.3d at 265. There is no claim that Live Nation or Ticketmaster offer loyalty discounts or even offer to reward loyalty with more concerts.

There are cases in which conditional dealing is viewed as a form of exclusive dealing. *See Meta*, 66 F.4th at 304. But not only is that not Plaintiffs' theory here, there is no way it could be

15

because of the modest "penalty" venues pay even under Dr. Hill's analysis (and assuming the reduced show count is entirely intentional and strategic). *See Microsoft*, 253 F.3d at 70.

However they want to label it, Plaintiffs' case as presented at trial is no more than an observation that, for reasons their expert did not study, a handful of Ticketmaster venues got a few more shows than non-Ticketmaster venues. Dr. Hill did not even claim this disadvantages AXS, which has its own concerts to offer venues. And while the evidence may show that this has been an issue for SeatGeek, it does not allow the jury to conclude that this has foreclosed competition. SeatGeek dealt with the issue with make-good promises. The antitrust laws do not require Defendants to refrain from enjoying the advantages of vertical integration. *See Berkey Photo v. Eastman Kodak*, 603 F.2d 263, 276 (2d Cir. 1979).

In any event, the threats/retaliation/conditioning theory is not actionable without a showing of market power in the market for the product used as the basis of the alleged threats—here, concerts. Plaintiffs have not proven that.

As a matter of law, any kind of content leveraging claim, however described, would need to be grounded in a showing of market power in a well-defined market for the "dominant" good used as the "lever." *See* Hovenkamp, Antitrust and Self-Preferencing at 6. This requirement, of course, would be indisputable if the "conditioning" was, in fact, tying. *Ill. Tool Works v. Indep. Ink*, 547 U.S. 28, 46 (2006). It makes no sense to think that a lesser form of conditioning would be actionable without the same showing. There has been no showing that Live Nation has the market power in a well-defined market that any self-preferencing theory requires.

Plaintiffs now argue the jury could find that Live Nation has market power in "concerts." ECF No. 1387 at 16. To the extent they mean "concert promotion services to artists," the Court already rejected that alleged market at summary judgment. ECF No. 1037 at 12. And to the extent

Plaintiffs are invoking the "market for concert booking services and promotion services to venues" alleged in their complaint, that fails too. After the Court's summary judgment ruling, Plaintiffs argued that this alleged "concert booking" market was the "locus of Live Nation's threats to divert shows from venues unless they use Ticketmaster's ticketing services," and that there was a "genuine issue of fact both on the market's existence and Live Nation's monopoly power therein." ECF No. 1057 at 4. But Plaintiffs presented no evidence whatsoever about that supposed "concert booking" market at trial, let alone any evidence that Defendants have market power in it. Indeed, Dr. Hill said *nothing* about it when he testified.

2. **Exclusive Dealing**

Plaintiffs also failed to prove exclusionary conduct in the form of exclusive dealing. First, it is undisputed that venues prefer exclusive contracts, including long-term exclusive contracts. Trial Tr. 1172:21–24 (Marciano); Glickman Dep. 50:17–51:3, 131:23–132:19; Brown Dep. 57:13–16, 57:21–58:12; Trial Tr. 302:21–25, 324:09–11, 327:4–6, 327:4–6 (Abbamondi); Trial Tr. 705:5–11 (Hurwitz); Marion Dep. 71:16–25; Henson Dep. 51:23–52:10, 50:13–25; Nagle Dep. 33:14–34:6; Lewis Dep. 55:3–56:1; Paul Dep. 49:6–50:4; Johnson Dep. 54:21–56:5; Smith Dep. 72:10–73:6; Trial Tr. 2227:22–25 (Hill); Trial Tr. 3277:10–3278:10 (Van Stone). There is no evidence that any venue was forced into an exclusive contract when it preferred a non-exclusive contract. This has been so for many years. *See Virgin Atlantic,* 257 F.3d at 269. And there is no coercion if venues preferred exclusive contracts. *Race Tires Am. v. Hoosier Racing Tire*, 614 F.3d 57, 78 (3d Cir. 2010); *see also EpiPen*, 44 F.4th at 991–1000.

Second, there is undisputed evidence that exclusive contracting is preferred by venues for efficiency reasons and to obtain the highest value for their ticketing rights. Trial Tr. 324:9–11; 327:4–6 (Abbamondi); Marion Dep. 71:16–25; Henson Dep. 51:23–52:10; Brown Dep. 57:21–58:12; Nagle Dep. 33:14–34:6; Lewis Dep. 55:3–56:1; Paul Dep. 49:6–50:4. There is no basis in

17

this record for a reasonable jury to find that the practice persists solely or mainly for its alleged benefits in preserving Ticketmaster's market position.  In that setting, plaintiffs challenging exclusive dealing are required to prove that anticompetitive effects outweigh benefits, which Plaintiffs here have not attempted to do.  *EpiPen*, 44 F.4th at 986.

Third, there is no evidence from which a jury could reasonably conclude that exclusive contracting has resulted in Ticketmaster charging venues supracompetitive prices.  The evidence in the record is that Ticketmaster's share of ticketing contract revenues has been decreasing.  Trial Tr. 3863:22–3867:7 (Johnson).  Nothing that Dr. Abrantes-Metz testified to could provide a basis for a reasonable jury to conclude otherwise.

### 3.    **OVG Ticketing Deal**

Plaintiffs also failed to prove that the ticketing agreement between Oak View Group ("OVG") and Ticketmaster constitutes exclusionary conduct.  The testimony about the OVG agreement was limited—indeed, Plaintiffs called only one witness from OVG (Chris Granger) in their case—and proved nothing anticompetitive.  A venue management company was paid to advocate for Ticketmaster but was not required even to recommend Ticketmaster when there was a better offer from others.  Trial Tr. 2619:10–15, 2646:7–10 (Granger).  Indeed, after the OVG contract was entered, OVG venues entered ticketing contracts with AXS.  Trial Tr. 2646:11–18 (Granger).

The Sherman Act does not allow every conceivable business practice to be challenged on the theory that it "tends to impair the opportunities of rivals." *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 229 (S.D.N.Y. 2019).  If the OVG ticketing agreement is to go to the jury, there needs to be something particular about that agreement that harms consumers, is inconsistent with competition on the merits, *and* "tends to impair the

opportunities of rivals" unreasonably. *Id.* Neither the agreement itself nor the undisputed testimony from Mr. Granger permit those conclusions.

This is obviously a claim grounded in the alleged breach of fiduciary duty by OVG to some (by no means all) of the "OVG 360" venues. But that does not make this an antitrust claim. *See Fed. Paper Bd. Co. v. Amata*, 693 F. Supp. 1376, 1382–3 (D. Conn. 1988). Plaintiffs have not shown half of what might make the OVG ticketing deal unlawful.[7]

## II.    PLAINTIFFS' TYING CLAIM FAILS (THIRD CLAIM FOR RELIEF)

### A.    Plaintiffs Failed To Prove Their Alleged "Large Amphitheater" Market

Plaintiffs failed to prove that their "large amphitheater" market—amphitheaters with a capacity of 8,000 or more and that hosted 10 or more concerts in at least one year from 2017 to 2024—is a relevant antitrust market, and without this market their tying claim fails. The evidence has shown that artists (the alleged consumers in this market) routinely substitute arenas and other venues for large amphitheaters, which is *prima facie* evidence of a broader market. Trial Tr. 523:11–14 (Geiger); Trial Tr. 688:12–23 (Hurwitz); Trial Tr. 2988:21–2989:10 (Al-joulani); Trial Tr. 2007:8–11 (Lewis); Trial Tr. 1379:14–17 (Roux); Trial Tr. 4241:8–12, 4247:11–22 (Capshaw); Trial Tr. 4287:9–24, 4306:14–4309:6 (Yurukoglu). And yet Plaintiffs have no HMT analysis supporting their narrower market, nor any other proof that artists would not switch to other venues if Live Nation increased the price of its amphitheaters. That is why summary judgment was granted to Live Nation in *It's My Party*. 811 F.3d at 682–83. Of course, Dr. Hill prepared a study attempting to show that, but the Court ruled it was inadmissible. ECF No. 1037 at 12.

---

[7] Additionally, to the extent Plaintiffs claim that Ticketmaster's fan club policy is anticompetitive, the evidence at trial disproves that. Trial Tr. 4266:3-19 (Capshaw).

Plaintiffs have no alternative evidence that could support a jury finding of a separate large amphitheater market. In particular, there is no evidence from which a reasonable jury could conclude that the *Brown Shoe* factors are satisfied with respect to the market as Plaintiffs have specifically defined it. Rather, the evidence demonstrates that there is no such thing as an industry-recognized category of "large amphitheaters" consisting of amphitheaters with capacity of 8,000 or more and 10 or more shows per year. Trial Tr. 1300:9–21, 1383:17–24 (Roux); Trial Tr. 483:21–484:2 (Geiger); Trial Tr. 3000:11–20 (Al-joulani); Trial Tr. 3578:2–8 (Weeden); Trial Tr. 3443:19–23 (Hansen); Trial Tr. 947:5–10 (Marciano). Additionally, the evidence that some parts of Live Nation's *portfolio* of large amphitheaters is required for "amphitheater tours" does not, as a matter of law, support Plaintiffs' market definition. Plaintiffs did not allege any kind of portfolio market based on a seller's ability to compete with "a geographically dispersed footprint," as in *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 40–42 (D.D.C. 2015).

Finally, as with their "major concert venue" market, Plaintiffs *never presented any evidence* to the jury identifying the 87 amphitheaters they say are in their "large amphitheater" market. The jury cannot possibly find that this set of amphitheaters constitutes a market.

**B.    Plaintiffs Failed To Prove That Their "Large Amphitheater" Market Is A National Market**

Plaintiffs' theory that their "large amphitheater" market is a national market would require a finding that an amphitheater in Phoenix, Arizona competes with an amphitheater in New York City for a given stop on a tour. That is nonsensical. The more commonsense outcome of (for example) an amphitheater in Phoenix raising its price is that the artist will substitute to another venue in the Phoenix area, not that the artist will substitute to an amphitheater in New York. Trial Tr. 4300:15–4301:19 (Yurukoglu).

20

**C.     The Tying Claim Challenges Nothing But Live Nation's Lawful Policy Of Refusing To Deal With Its Competitors**

The evidence has made clear that Plaintiffs' tying claim challenges nothing but Live Nation's lawful policy of refusing to deal with its promoter competitors.  Even assuming arguendo that an unremitting policy would qualify as coercion, Live Nation's policy was not unremitting, and there is no evidence that it was.  In addition, there is no evidence that an artist, agent, or manager ever sought to rent a venue directly, let alone was presented with a tying arrangement when they did.  Rather, the undisputed evidence proves that it is *promoters* who rent venues.  Trial Tr. 2988:2–16 (Al-joulani); Trial Tr. 1340:7–9, 1340:23–25 (Roux); Trial Tr. 2257:9–19 (Hill). Nor have Plaintiffs adduced any evidence from which a reasonable jury could conclude that when promoters rent venues, they are doing so as the legal agents of artists.  And there is no evidence from which a reasonable jury could conclude that Live Nation ties access to its amphitheaters to promoting a broader tour.  To the contrary, the only artist testimony in the case (from Ben Lovett) unequivocally proved that this did not happen.  Lovett Dep. 109:21–111:4.

**D.     Plaintiffs Fail To Prove Anticompetitive Effects In A Tied Product Market**

As Defendants have previously explained, all tying claims in the Second Circuit require proof of anticompetitive effects in a tied-product market.  ECF Nos. 1048, 1051.  Plaintiffs seem to think that they can evade this requirement by calling their tying claim *per se*, but Plaintiffs have no unqualified right to the *per se* rule.  ECF No. 1059 at 9–12.  Plaintiffs' alleged tie is not one of those limited "types of [] arrangements [that] are deemed unreasonable as a matter of law." *Jefferson Parish*, 466 U.S. at 9; ECF No. 1059 at 9–12.  As the Court's proposed jury instructions recognize, Plaintiffs must demonstrate anticompetitive effects.  To do so, they must show harm to consumers, *i.e.*, artists.  They have not done so.

21

Plaintiffs claim to show elimination of "artists' competitive choice, with respect to their promoter," ECF No. 1387 at 27, but their evidence merely demonstrates the effects of Live Nation's lawful refusal-to-deal policy.  Plaintiffs have no evidence that artists were forced to use Live Nation for promotion services at venues other than Live Nation amphitheaters.  The record is the opposite.  Lovett Dep. 109:21–111:4.  "[E]limination of competition is not in itself a separate actionable harm" and "to the extent the elimination of competition harms competitors rather than consumers or competition as a whole, it is not a market harm under the Sherman Act."  *Cinema Vill. Cinemart v. Regal Ent. Grp.*, 2016 WL 5719790, at *4–5 (S.D.N.Y. Sept. 29, 2016); *see also Bookhouse of Stuyvesant Plaza v. Amazon.com*, 985 F. Supp. 2d 612, 620 (S.D.N.Y. 2013).  Evidence that *promoters* cannot promote at Live Nation amphitheaters thus does not suffice.

E.    **Plaintiffs' Tying Claim Is Time-Barred**

It is undisputed that Live Nation's policy to not rent its amphitheaters to rival promoters has been in place for years—well before the limitations period started in May 2020—and there is no evidence that it changed since 2020.  Trial Tr. 1387:16–1388:4 (Roux).  Plaintiffs cannot hold Defendants liable for this pre-limitations period policy.  For this claim, Plaintiffs are not seeking damages based on customers (*i.e.*, artists) allegedly paying too much.  Rather, Plaintiffs proffer a theory of harm to artists and promoters that is based entirely on Live Nation's policy excluding rival promoters and thus depriving artists of their choice of promoter.  *See* ECF No. 1387 at 27-28.  As a matter of law, this theory of harm accrued "at the time anticompetitive conduct occurs," *i.e.*, at the time Live Nation adopted its policy, which was years before May 23, 2020.  *Berkey Photo*, 603 F.2d at 295–297; *see CSX Transportation v. Norfolk S. Ry.*, 114 F.4th 280, 288 (4th Cir. 2024); *US Airways v. Sabre Holdings*, 938 F.3d 43, 68 (2d Cir. 2019); *see also New York v. Facebook*, 549 F. Supp. 3d 6, 35–36 (D.D.C. 2021).

22

## III.    PLAINTIFFS' AMPHITHEATER MONOPOLIZATION CLAIM FAILS (FOURTH CLAIM FOR RELIEF)

### A.    Plaintiffs Failed To Prove Their Alleged "Large Amphitheater" Market

For the reasons stated above, *see* Section II.A, Plaintiffs failed to prove their alleged "large amphitheater" market.  Their amphitheater monopolization claim fails as a result.

### B.    Plaintiffs Failed To Otherwise Prove Their Amphitheater Monopolization Claim

There was hardly any development of Plaintiffs' amphitheater monopolization claim during trial.  Dr. Hill's discussion of this on direct amounts to two points:  (1) Live Nation increased its market share of large amphitheaters through "acquisitions or entering into new control agreements," and (2) "if a large firm acquires a significant number of rivals, it increases its share in a concentrated market, then that's usually presumed to be likely to reduce competition."  Trial Tr. 2135:5–2136:3 (Hill).  Then, on cross, Dr. Hill admitted that "[m]ost of the control [acquired since 2015] was through exclusive booking," and "an exclusive booker, doesn't control the venue."  Trial Tr. 2269:3–10 (Hill).  Hill also admitted that he had not analyzed the specifics of any exclusive booking agreement, Trial Tr. 2269:19–25 (Hill), and that he had not realized that Live Nation had since lost several of these booking contracts, Trial Tr. 2265:15–2266:11 (Hill).  Indeed, some of Dr. Hill's cited amphitheaters are booked by third-party promoters today.  *See, e.g.*, Trial Tr. 1405:15–1406:6 (Roux); Trial Tr. 4258:25–4259:7 (Capshaw).

As for actual acquisitions of amphitheaters (by ownership or lease), there were only four since 2015 that Dr. Hill identified in his report, yet Dr. Hill admitted he did not "evaluate any of them individually."  Trial Tr. 2271:2–4 (Hill).  Only one of those has been featured in any significant testimony:  the Ameris Bank Amphitheater north of Atlanta that Live Nation acquired operating rights to in 2016.  *See* Trial Tr. 1481:9–24 (Campana).  There is no evidence in the record that arguably suggests anticompetitive effects from the acquisition of Utah First Credit Union

23

Amphitheater, the Hayden Homes Amphitheater, or the Bank NH Pavilion.  The record actually reflects the opposite: the acquisitions, both of these specific amphitheaters as well as more broadly, led to benefits for fans and artists.  Trial Tr. 1507:2–1508:9 (Campana); *see also* Trial Tr. 1417:18–1418:15 (Roux); Trial Tr. 2008:15–2009:6 (Lewis); Trial Tr. 668:16–24 (Hurwitz); Smith Dep. 17:4–18:13, 21:12–22:1, 27:2–13, 29:8–30:15, 32:21–33:22, 40:23–41:4.   And there is no evidence of anticompetitive effects to artists—the supposed customers in this market—at all. Plaintiffs assert that artists pay higher prices, but they have no actual evidence in support.

Moreover, none of the evidence Plaintiffs adduced about the prices fans have paid for parking, VIP tickets, or lawn chairs has any connection to the number of amphitheaters that Live Nation owns, operates, or controls.  It is irrelevant to Plaintiffs' amphitheater monopolization claim, including because fans are not the customers in Plaintiffs' alleged relevant market—artists are.  Moreover, none of this evidence—including the exhibits introduced during Mr. Baker's testimony, PX-719, PX-720, and Mr. Baker's testimony about those exhibits—should have been admitted.  As explained in Defendants' motion to exclude this evidence (ECF No. 1144), these documents are highly prejudicial, inflammatory, and highly irrelevant.

Recognizing that they have no cognizable theory of harm on their amphitheater monopolization claim, Plaintiffs have pivoted to a novel theory: that "[a]s government antitrust enforcers, the Plaintiff States are entitled to prosecute monopolization based on harm to *any* consumer or competitor, not just the direct purchasers in the market."  ECF No. 1387 at 32.  But the case they cite states that the "*United States government*"—not the states—need not show "standing" to sue.  *See City of Oakland v. Oakland Raiders*, 20 F.4th 441, 455 n.10 (9th Cir. 2021) (emphasis added).  Regardless, Plaintiffs' theories of harm render this claim time-barred just like their tying claim.  *See supra* Section II.E.  The vast majority, if not all, of the exclusionary conduct

alleged to support this claim occurred prior to May 23, 2020. *Facebook, Inc.*, 549 F. Supp. 3d at 35–36; *Sabre*, 938 F.3d at 68–69. Even if some of the acquisitions and/or booking agreements that Plaintiffs contend are anticompetitive took place within the limitations period, that does not solve the problem, because Plaintiffs have no way to disaggregate the lawful (pre-limitations period) acquisitions from the allegedly unlawful ones. *See CSX*, 114 F.4th at 292.

Plaintiffs' amphitheater monopolization claim fails for other reasons. This claim is essentially a monopolization-by-acquisitions claim similar to *Meta*, a case in which Judge Boasberg presided over a six-week trial to consider nothing other than the effects of the Instagram and WhatsApp acquisitions. 811 F. Supp. 3d 67. While the FTC lost that case on monopoly power, it at least presented extensive and sophisticated evidence about the competitive effects of the acquisitions. Plaintiffs here have not. They seem to want the jury to make the same presumption Dr. Hill made, even though in a Section 2 case challenging acquisitions, no such presumptions apply. *Corsearch, Inc. v. Thomson & Thomson*, 792 F. Supp. 305, 325–26 (S.D.N.Y. 1992); *see also* ECF No. 1037 at 33. And worse, they want those presumptions to apply to exclusive *booking* agreements, which Dr. Hill admitted are not akin to ownership. Trial Tr. 2269:3–10 (Hill).

## IV.    PLAINTIFFS FAILED TO DEMONSTRATE ANTITRUST STANDING

### A.    Plaintiffs Failed To Demonstrate Antitrust Injury

As Defendants argued in their motion to dismiss and motion for summary judgment, Plaintiffs fail to demonstrate antitrust injury because their alleged injury (higher fees paid by fans in their States) does not occur in the market where competition purportedly is restrained (the venue-facing primary ticketing markets). ECF No. 273 at 17–23; ECF No. 689 at 37–39. Just before trial, the Court dismissed Plaintiffs' fan-facing market, eliminating the supposed market where Plaintiffs said their injuries occurred. ECF No. 1037 at 26. And at trial, Plaintiffs' damages'

25

expert—Dr. Abrantes-Metz—testified that her damages model depends only on injuries in the venue-facing market. Trial Tr. 2452:18–2453:10; 2487:8–10; 2490:1–13 (Abrantes-Metz). It is now crystal clear that fans do not participate "in the very market that is directly restrained"—which means they cannot demonstrate antitrust injury. *In re Aluminum Warehousing*, 833 F.3d 151, 161 (2d Cir. 2016).

There is no evidence whatsoever in the trial record that the "inextricably intertwined" exception to this rule set forth in *Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982), is satisfied. "[T]o assess the plausibility of a putative plaintiff's claim to antitrust injury as being 'inextricably intertwined' with the injury the defendants ultimately sought to inflict, courts ask whether the plaintiff was 'manipulated or utilized by [defendant] as a *fulcrum, conduit or market force* to injure competitors or participants in the relevant product and geographical markets." *Aluminum Warehousing*, 833 F.3d at 161 (citations omitted, emphasis added). There is no evidence that Defendants somehow manipulated *fans* as a "fulcrum" or "conduit" to injure *venues* or anyone else in the venue-facing market. Plaintiffs failed to demonstrate antitrust injury.

## B.    Plaintiffs Are Not Efficient Enforcers

Trial has also revealed that Plaintiffs are not efficient enforcers of the antitrust claims alleged. *See Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 443 (2d Cir. 2005). Plaintiffs have now taken the position that the *venues* are the injured victims and that fans are just injured derivatively. Trial Tr. 2452:18–2453:10; 2487:8–10; 2490:1–13 (Abrantes-Metz). It is the venues, not the fans (or the Plaintiffs in their *parens patriae* capacities) "whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement." *Assoc. Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters*, 459 U.S. 519, 542 (1983).

## V.    PLAINTIFFS' STATE LAW CLAIMS FAIL

Plaintiffs' state-law claims brought under state statutes that are congruent with the Sherman Act, or that share any of the elements discussed above (such as market definition), fail for the same reasons detailed above.  Additionally, all of Plaintiffs' state-law claims fail for the independent reason that Plaintiffs adduced no evidence of harm to competition in any particular state.

## VI.    PLAINTIFFS' DAMAGES CLAIMS FAIL

Defendants move for judgment as a matter of law on damages for the reasons stated in Defendants' motion to strike Dr. Abrantes-Metz's testimony, filed on March 30, 2026 (ECF No. 1348).  Defendants also incorporate the arguments in their prior motions relating to Dr. Abrantes-Metz.  ECF Nos. 704, 790, 1192, 1348, 1385.  Moreover, Plaintiffs are unable to disaggregate the effects of indisputably lawful and allegedly unlawful conduct.  If Dr. Abrantes-Metz's testimony is struck, Plaintiffs have no basis for their damages claim.

### CONCLUSION

The Court should enter judgment as a matter of law for Defendants on all remaining claims.

*[Signatures on following page]*

27

Dated: April 8, 2026

Respectfully submitted,

LATHAM & WATKINS LLP                CRAVATH, SWAINE & MOORE LLP

_____              _____
Andrew M. Gass (admitted *pro hac vice*)      Lauren A. Moskowitz
Alfred C. Pfeiffer (admitted *pro hac vice*)   Jesse M. Weiss
   Co-Lead Trial Counsel            Nicole M. Peles
David R. Marriott
   Co-Lead Trial Counsel            Two Manhattan West
Timothy L. O'Mara (admitted *pro hac vice*)    375 Ninth Avenue
Jennifer L. Giordano                New York, NY 10001
Kelly S. Fayne (admitted *pro hac vice*)       (212) 474-1000
Lindsey S. Champlin (admitted *pro hac vice*)
Robin L. Gushman (admitted *pro hac vice*)     lmoskowitz@cravath.com
                                    jweiss@cravath.com
505 Montgomery Street, Suite 2000   npeles@cravath.com
San Francisco, CA 94111
(415) 391-0600                      *Attorneys for Defendants Live Nation*
                                    *Entertainment, Inc. and Ticketmaster L.L.C.*
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

555 11th Street, NW, Suite 1000
Washington, D.C. 20004
(202) 637-2200

Al.Pfeiffer@lw.com
David.Marriott@lw.com
Tim.O'Mara@lw.com
Jennifer.Giordano@lw.com
Andrew.Gass@lw.com
Kelly.Fayne@lw.com
Lindsey.Champlin@lw.com
Robin.Gushman@lw.com

*Attorneys for Defendants Live Nation*
*Entertainment, Inc. and Ticketmaster L.L.C.*

28

## CERTIFICATE OF COMPLIANCE

I, Andrew M. Gass, an attorney duly admitted to practice before this Court, hereby certify pursuant to Local Rule 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rules"), Rule 8(C) of Judge Arun Subramanian's Individual Practices in Civil Cases ("Individual Rules"), that the foregoing Memorandum of Law was prepared using Microsoft Word, and contains 8,743 words.  In making this calculation, I have relied on the word and page counts of the word-processing program used to prepare the document.

Dated:    April 8, 2026
          New York, New York

_____
Andrew M. Gass