# EXHIBIT 15

| | |
|---|---|
| **From:** | Gushman, Robin (Bay Area) |
| **Sent:** | Tuesday, March 3, 2026 6:50 PM |
| **To:** | 'Strong, Curtis (ATR)'; Subramanian NYSD Chambers; Dahlquist, David (ATR); Sweeney, Bonny (ATR); Thornburgh, John (ATR); Markel, Arianna (ATR); Cohen, Alex (ATR); jonathan.hatch@ag.ny.gov; Pfeiffer, Al (Bay Area); Marriott, David (NY); Gass, Andrew (Bay Area); O'Mara, Tim (Bay Area); Giordano, Jennifer (DC); Champlin, Lindsey (DC); Fayne, Kelly (Bay Area); lmoskowitz@cravath.com; jweiss@cravath.com; npeles@cravath.com; rreiland@cravath.com |
| **Cc:** | Arun Subramanian |
| **Subject:** | RE: United States v. Live Nation 24cv3973 Curative Instructions |

Dear Judge Subramanian,

Defendants also do not have proposed edits to the Court's proposed instructions.

Respectfully,

**Robin L. Gushman**

**LATHAM & WATKINS LLP**
505 Montgomery Street | Suite 2000 | San Francisco, CA 94111-6538
D: +1.415.646.7830

---

**From:** Strong, Curtis (ATR) <Curtis.Strong@usdoj.gov>
**Sent:** Tuesday, March 3, 2026 6:48 PM
**To:** Subramanian NYSD Chambers <SubramanianNYSDChambers@nysd.uscourts.gov>; Dahlquist, David (ATR) <David.Dahlquist@usdoj.gov>; Sweeney, Bonny (ATR) <Bonny.Sweeney@usdoj.gov>; Thornburgh, John (ATR) <John.Thornburgh@usdoj.gov>; Markel, Arianna (ATR) <Arianna.Markel@usdoj.gov>; Cohen, Alex (ATR) <Alex.Cohen@usdoj.gov>; jonathan.hatch@ag.ny.gov; Pfeiffer, Al (Bay Area) <Al.Pfeiffer@lw.com>; Marriott, David (NY) <David.Marriott@lw.com>; Gass, Andrew (Bay Area) <Andrew.Gass@lw.com>; O'Mara, Tim (Bay Area) <Tim.O'Mara@LW.com>; Giordano, Jennifer (DC) <Jennifer.Giordano@lw.com>; Champlin, Lindsey (DC) <Lindsey.Champlin@lw.com>; Fayne, Kelly (Bay Area) <Kelly.Fayne@lw.com>; Gushman, Robin (Bay Area) <Robin.Gushman@lw.com>; lmoskowitz@cravath.com; jweiss@cravath.com; npeles@cravath.com; rreiland@cravath.com
**Cc:** Arun Subramanian <Arun_Subramanian@nysd.uscourts.gov>
**Subject:** RE: United States v. Live Nation 24cv3973 Curative Instructions

Dear Judge Subramanian,

Plaintiffs have no proposed edits to the Court's proposed instructions below.

Respect ully,

Curtis W. Strong
United States Department o  Justice
Antitrust Division
450 Fi th Street, NW
Washington, DC 20001
202-322-6840

curtis.strong@usdoj.gov

---

**From:** Subramanian NYSD Chambers <SubramanianNYSDChambers@nysd.uscourts.gov>
**Sent:** Tuesday, March 3, 2026 3:57 PM
**To:** Dahlquist, David (ATR) <David.Dahlquist@usdoj.gov>; Sweeney, Bonny (ATR) <Bonny.Sweeney@usdoj.gov>; Thornburgh, John (ATR) <John.Thornburgh@usdoj.gov>; Markel, Arianna (ATR) <Arianna.Markel@usdoj.gov>; Cohen, Alex (ATR) <Alex.Cohen@usdoj.gov>; Strong, Curtis (ATR) <Curtis.Strong@usdoj.gov>; jonathan.hatch@ag.ny.gov; Al.Pfeiffer@lw.com; David.Marriott@lw.com; Andrew.Gass@lw.com; Tim.O'Mara@LW.com; Jennifer.Giordano@lw.com; Lindsey.Champlin@lw.com; Kelly.Fayne@lw.com; Robin.Gushman@lw.com; lmoskowitz@cravath.com; jweiss@cravath.com; npeles@cravath.com; rreiland@cravath.com
**Cc:** Arun Subramanian <Arun_Subramanian@nysd.uscourts.gov>
**Subject:** [EXTERNAL] United States v. Live Nation 24cv3973 Curative Instructions

Counsel:

Following on our conversation earlier, below are two proposed curative instructions for tomorrow.

**#1:** You heard in opening statements that the United States is not seeking damages. Under the Sherman Act, the statute under which the United States filed this lawsuit, the United States does not have the right to seek damages. Although the plaintiff states are seeking damages, the United States is seeking different relief, which will be the Court's responsibility to decide and not the jury's. You should not infer anything from the fact that the United States is not seeking damages.

**#2:** You just heard testimony about something called a consent decree. That is merely an agreement between the government and a private party. This case is not about violations of the consent decree, and plaintiffs are not alleging in this case that defendants violated the consent decree. You should not draw any conclusions about any violation or lack of violation of that decree.

**Chambers of The Honorable Arun Subramanian**
United States District Court
Southern District of New York
500 Pearl Street, Courtroom 15A
New York, NY 10007

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>LIVE NATION ENTERTAINMENT, INC.,<br>and TICKETMASTER L.L.C.,<br><br>Defendants. | Case No. 1:24-cv-03973-AS |

<u>PLAINTIFFS' PROPOSED JURY INSTRUCTIONS</u>

Pursuant to Rule 51(a) of the Federal Rules of Civil Procedure and the Court's Individual

Practices in Civil Cases, Paragraph D, Plaintiffs the States of Arizona, California, Colorado,

Connecticut, Florida, Illinois, Indiana, Kansas, Louisiana, Maryland, Michigan, Minnesota, Nevada,

New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, Oregon, Rhode Island,

South Carolina, Tennessee, Texas, Utah, Vermont, Washington, West Virginia, Wisconsin, and

Wyoming, the Commonwealths of Massachusetts, Pennsylvania, and Virginia, and the District of

Columbia, acting by and through their respective Attorneys General (collectively, "Plaintiff States"),

together with Defendants Live Nation Entertainment, Inc., and Ticketmaster L.L.C. (collectively,

"Defendants"), respectfully request that the Court provide the following instructions to the jury. For

those instructions where the parties could not reach agreement, Plaintiffs and Defendants have

separately set forth their proposed instruction together with short arguments, including citations to

supporting authority.

1

# Contents

Post-Instruction No. 1 ................................................................................................. 6

GENERAL INTRODUCTION .................................................................................... 6

Post-Instruction No. 2 ................................................................................................. 7

THE PARTIES ............................................................................................................. 7

Post-Instruction No. 3 ............................................................................................... 13

EVIDENCE IN THE CASE ...................................................................................... 13

Post-Instruction No. 4 ............................................................................................... 14

WITNESS CREDIBILITY ........................................................................................ 14

Post-Instruction No. 5 ............................................................................................... 16

USE OF DEPOSITIONS AS EVIDENCE ................................................................ 16

Post-Instruction No. 6 ............................................................................................... 17

EXPERT TESTIMONY ............................................................................................. 17

Post-Instruction No. 7 ............................................................................................... 18

SUMMARY OF CONTENTIONS ............................................................................ 18

Post-Instruction No. 8 ............................................................................................... 22

BURDEN OF PROOF—PREPONDERANCE OF THE EVIDENCE ....................... 22

Post-Instruction No. 9 ............................................................................................... 23

MONOPOLIZATION ELEMENTS ........................................................................... 23

Post-Instruction No. 10 ............................................................................................. 25

RELEVANT MARKET—GENERAL ....................................................................... 25

**Post-Instruction No. 11** ........................................................................................... 28

**RELEVANT PRODUCT MARKET** ........................................................................... 28

**MONOPOLIZATION—MONOPOLY POWER** ........................................................ 34

**Post-Instruction No. 13** ........................................................................................... 36

**EXISTENCE OF MONOPOLY POWER—DIRECT PROOF** ..................................... 36

**EXISTENCE OF MONOPOLY POWER—INDIRECT PROOF** ................................. 39

**MONOPOLIZATION: MAINTAINING MONOPOLY POWER THROUGH**

**ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT** ........................................ 44

**ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT—EXAMPLES** ............... 50

**Post-Instruction No. 16** ........................................................................................... 53

**ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT—EXCLUSIVE DEALING -**

**SHERMAN ACT SECTION 2** ................................................................................... 53

**PROCOMPETITIVE BENEFITS** ............................................................................. 56

**BALANCING THE COMPETITIVE EFFECTS** ....................................................... 58

**EXCLUSIVE DEALING—SHERMAN ACT SECTION 1** ......................................... 59

**UNLAWFUL TYING** .................................................................................................. 65

**UNLAWFUL TYING—PROOF OF CONDITIONING** .............................................. 71

**UNLAWFUL TYING—INVOLVEMENT OF A NOT INSUBSTANTIAL VOLUME OF**

**INTERSTATE COMMERCE WITH RESPECT TO THE TIED PRODUCT** ........................ 73

**STATE LAW CLAIMS** ............................................................................................... 75

**CONGRUENT STATE CLAIMS** ............................................................................... 76

CALIFORNIA UNFAIR COMPETITION LAW  (CAL. BUS. & PROF. CODE § 17200 *ET SEQ.*) ........................................................................................................ 82

FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT  (FLA. STAT. § 501.204) ................................................................................................................ 87

ILLINOIS ANTITRUST ACT (740 ILCS 10/1 *ET SEQ.*) ............................................. 91

KANSAS RESTRAINT OF TRADE ACT  (KAN. STAT. ANN. § 50-101 *ET SEQ.*) .................. 94

DONNELLY ACT   (NEW YORK GENERAL BUSINESS LAW §§ 340 *ET SEQ.*).................... 96

SOUTH CAROLINA   UNFAIR TRADE PRACTICES ACT   (S.C. CODE ANN. § 39-5-10 ET SEQ.) ...................................................................................................................... 98

TENNESSEE TRADE PRACTICES ACT  (TENN. CODE ANN. §§ 47-25-101 AND 102)... 101

VERMONT CONSUMER PROTECTION ACT   (9 V.S.A. § 2451 ET SEQ.) ......................... 103

STATES DAMAGES AND OVERCHARGE ................................................................ 105

INJURY AND CAUSATION ....................................................................................... 109

DAMAGES INSTRUCTIONS—GENERAL ................................................................ 113

Post-Instruction No. 34 ............................................................................................. 115

COMPENSATORY DAMAGES—OVERCHARGE .................................................... 115

Post-Instruction No. 35 ............................................................................................. 117

BASIS FOR CALCULATING DAMAGES ................................................................. 117

Post-Instruction No. 35P ........................................................................................... 119

CALCULATION OF MONETARY RECOVERY FOR VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW  (CAL. BUS. & PROF. CODE § 17200 ET SEQ.).............. 119

4

**Post-Instruction No. 36**................................................................................................. 122

**FINAL INSTRUCTIONS**.............................................................................................. 122

*DUTY TO DELIBERATE/UNANIMOUS VERDICT*........................................................ 122

*SELECTION OF FOREPERSON*................................................................................... 123

*RETURN OF VERDICT* ............................................................................................... 123

*JUROR OATH* ............................................................................................................. 123

**Post-Instruction No. 1**

## GENERAL INTRODUCTION

Now that you have heard the evidence and the argument, it is my duty to instruct you about the applicable law. It is your duty to follow the law as I state it. You must apply the law to the facts as you find them from the evidence in the case. Do not single out one instruction as stating the law, but consider the instructions as a whole. Do not be concerned about the wisdom of any rule of law stated by me. You must follow and apply the law.

Nothing I say in these instructions indicates I have any opinion about the facts of the case. You, not I, have the duty to determine the facts.

You must perform your duties as jurors without bias or prejudice as to any party. The law does not permit you to be controlled by sympathy, prejudice, or public opinion. The parties expect that you will carefully and impartially consider all the evidence, follow the law as it is now being given to you, and reach a just unanimous verdict, regardless of the consequences.

**Authority**: *Nike, Inc. v. Lululemon USA Inc.*, Final Jury Instructions at 3, 1:23-cv-00771-AS (S.D.N.Y.).

6

**Post-Instruction No. 2**

## THE PARTIES

The Plaintiffs are 33 individual States and the District of Columbia. The Defendants in this case are Live Nation Entertainment, Inc. and Ticketmaster L.L.C. Live Nation is the parent company of Ticketmaster, its wholly owned subsidiary. Under the law, you must treat Live Nation and Ticketmaster as a single entity when evaluating whether they violated the Sherman Act.

Unless otherwise stated, these instructions apply to all parties.

**Plaintiffs' Authority**: Adapted 4 Modern F. Jury Instructions-Civil P 79.02, 79-5; *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 777 (1984) ("[a]ny anticompetitive activities of corporations and their wholly owned subsidiaries meriting antitrust remedies may be policed adequately [because] the enterprise is fully subject to Section 2 of the Sherman Act"); *id.* at 771-72 (explaining that "the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise . . . [because a] parent and its wholly owned subsidiary have a complete unity of interest . . . [and] in reality a parent and a wholly owned subsidiary *always* have a unity of purpose or a common design. They share a common purpose whether or not the parent keeps a tight rein over the subsidiary") (citation omitted and emphasis in original); *id.* at 772 ("Antitrust liability should not depend on whether a corporate subunit is organized as an unincorporated division or a wholly owned subsidiary," and a company's decisions "to choose one structure over the other are not relevant to whether the enterprise's conduct seriously threatens competition.") *Caribe BMW, Inc. v. Bayerische Motoren Werke Aktiengesellschaft*, 19 F.3d 745, 749-50 (1st Cir. 1994) (Breyer, C.J.) (applying *Copperweld* in the Robinson Patman context, and explaining that the *Copperweld* "Court saw an identity of economic interest between parent and wholly owned subsidiary that, considered in terms of the economically oriented antitrust laws, warrants regarding them as one"); *Arandell Corp. v. Centerpoint Energy Services, Inc.*, 900 F.3d 623, 630 (9th Cir. 2018) ('[w]here there is substantial common ownership, ... individual firms function as an economic unit and are generally treated as a single entity.'") (holding subsidiary could be liable for anticompetitive conduct of parent by "selling gas at rigged prices and distributing the inflated profits to its parent"); *Lenox MacLaren Surgical Corporation v. Medtronic, Inc.*, 847 F.3d 1221, 1236 (10th Cir. 2017) ("Rather, in a single-enterprise situation, it is the affiliated corporations' collective conduct—i.e., the conduct of the *enterprise* they jointly compose—that matters; it is the *enterprise* which must be shown to satisfy the elements of a monopolization or attempted monopolization claim.") (collecting cases where courts "held that a parent can be liable for subsidiary-level anticompetitive activity" "when the parent controls, dictates or encourages the subsidiary's anticompetitive conduct" (cleaned up)); *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1070 (D. Colo. 2004) ("When the parent controls, directs, or encourages the subsidiary's anticompetitive conduct, the parent engages in sufficient independent conduct to be held directly liable as a single enterprise with the subsidiary under the Sherman Act.").

**Plaintiffs' Position:** Defendants' proposed instruction that each Plaintiff must meet its burden of proof for each of its claims, as drafted, is likely to be confusing to the jury and, in any event, is

7

unsupported by Defendants' cited authorities. With respect to the federal antitrust claims, the Plaintiff States have asserted the same claims and intend to jointly present evidence in support of those claims at trial and California's claims rely on the same common nucleus of facts. There is no legal requirement for each of the Plaintiffs to independently present evidence to the jury multiple times. The cases cited by Defendants are inapposite. In *Phillips v. Potter,* "each Plaintiff br[ought] separate factual allegations supporting the same claim – [a] sexually hostile environment." 2008 WL 11492752, at *30 (N.D. Ohio Mar. 31, 2008). But here, for the federal claims, all Plaintiffs base their claims on the exact same factual allegations.

Of course, to the extent a Plaintiff State has also brought a separate state law claim or sought damages, it will be responsible for ensuring the evidence at trial supports those claims, but each such Plaintiff State believes that the evidence overlaps significantly with evidence supporting the federal antitrust claims. Defendants' proposed instruction is overly broad and would seem to require that each State independently put forward the necessary evidence, even though such evidence overlaps substantially both with the federal claims and across state law and state damages claims. Defendants' cherry-picked quotation from *Phillips* fairs no better. *Phillips* merely stands for the proposition that one plaintiff's "testimony about events that occurred in 2001 are not admissible or relevant to [other plaintiffs'] claims of harassment beginning in 2004." *Id.* at *31. There is no parallel to the joint claims brought by the State Plaintiffs here.

The *Radmanovich* case involved a class certification decision where the court highlighted as a key issue "that each plaintiff would need to come forth with proof of how the pattern or practice of discrimination impacted her." *Radmanovich v. Combined Ins. Co. of Am.*, 216 F.R.D. 424, 436 (N.D. Ill. 2003). The court noted a finding of a commonly alleged "pattern or practice" alone would be insufficient to establish liability on any individual's claim. *See id.* at 439. But no such showing of individualized impact is required for any of the federal antitrust claims alleged here, except to the extent certain Plaintiff States seek damages or to independently prove liability under their laws, for which they each intend to offer sufficient evidence at trial within the time allotted by the Court. Indeed, in *Orchestrate,* cited by Defendants, the court did not compartmentalize evidence between Plaintiffs but rather allowed Plaintiffs to argue "that evidence of damages to one may possibly be used as evidence of damages to the other where damages overlap." *Orchestrate HR, Inc. v. Trombetta*, 2017 WL 273669, at *8 (N.D. Tex. Jan. 20, 2017) (denying in part defendants' motion in limine). And *Louisiana Crawfish Producers Ass'n-W. v. Amerada Hess Corp.*, 2015 WL 10571063, at *11 (W.D. La. Nov. 23, 2015), merely confirmed that when an individual plaintiff pursues monetary recovery for damages it experienced, it must prove the amount of damages incurred. No such requirement applies to the Plaintiff States when seeking to enforce the federal antitrust laws, outside of specific damages claims.

Further, Defendants' proposed instruction that the jury must consider each Defendant separately and in isolation misstates the law. Under the antitrust laws, a parent and its wholly owned subsidiary are viewed as a single entity with a complete unity of interest. In *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984), the Supreme Court overturned "a long-settled rule" permitting Section 1 Sherman Act antitrust liability for "intra-enterprise" coordinated conduct between a parent and its wholly owned subsidiary. *Id.* at 777, 784. In doing so, however, the Court held that "[a]ny anticompetitive activities of [such enterprises] meriting antitrust remedies may be policed adequately without resort to an intra-enterprise conspiracy doctrine" as "the enterprise is fully subject to § 2 of the Sherman Act." 467 U.S. at 776-77.  The *Copperweld* Court reasoned that

8

"the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise . . . [because a] parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one . . . [and] in reality a parent and a wholly owned subsidiary *always* have a unity of purpose or a common design. They share a common purpose whether or not the parent keeps a tight rein over the subsidiary" (emphasis added). *Id.* at 771-72. Significant to the dispute here, the Court also barred the consideration of multi-factor tests to determine whether corporate entities could be considered a "single entity" "[a]s applied to a wholly owned subsidiary" because such a test is "inadequate to preserve the Sherman Act's distinction between unilateral and concerted conduct." *Id.* at 772 n. 18 (noting that "[a]t least when a subsidiary is wholly owned, however, these factors are not sufficient to describe a separate economic entity for purposes of the Sherman Act" because "[t]hey cannot overcome the basic fact that the ultimate interests of the subsidiary and the parent are identical, so the parent and the subsidiary *must* be viewed as a single economic unit") (emphasis added).

Courts have been near uniform in applying this rule in antitrust cases. *See, e.g., Fraser v. Major League Soccer, LLC*, 284 F.3d 47, 58 (1st Cir. 2002) (Boudin, J.) (explaining that it is settled law under *Copperweld* that a "parent and its wholly owned subsidiary . . . share[ ] a 'complete unity of interests'") (quoting *Copperweld*, 467 U.S. at 771); *Caribe BMW, Inc. v. Bayerische Motoren Werke Aktiengesellschaft*, 19 F.3d 745, 749-50 (1st Cir. 1994) (Breyer, C.J.) (explaining that the *Copperweld* "[c]ourt saw an identity of economic interest between a parent and wholly owned subsidiary that, considered in terms of the economically oriented antitrust laws, warrants regarding them as one [because] [a]ny claimed instance of truly 'independent,' owner-hostile, subsidiary decisionmaking would meet with the skeptical question, 'But, if the subsidiary acts contrary to its parent's economic interest, why does the parent not replace the subsidiary's management?' Given the strength of that joint economic interest, we do not see how a case-specific judicial examination of 'actual' parental control would help achieve any significant antitrust objective"); *United States v. Waste Mgmt., Inc.*, 743 F.2d 976, 978-79 (2d Cir. 1984) (post-*Copperweld*, attributing without discussion subsidiaries' activities and market shares to parent corporation for purposes of Clayton Act merger analysis).

Defendants' reliance on a smattering of non-antitrust cases and some out-of-circuit, inapposite antitrust cases do not support a rejection of *Copperweld* here. *See, e.g.*, *United States v. Bestfoods*, 524 U.S. 51, 61-62 (1998) (discussing "general principle[s] of corporate law" in the context of CERCLA); *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir. 1993) (considering a franchisee's efforts to collect an arbitral breach-of-contract award against a franchisor's parent company); *In re Outpatient Medical Center Employee Antitrust Litig.*, 630 F. Supp. 3d 968, 991 (N.D. Ill. 2022) (considering liability of a parent company that purchased defendant company, which was already engaging in Section 1 conspiracy with co-defendants); *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 857 (10th Cir. 1999) (declining to consider a non-insurance company "as an insurance company on the same horizontal level as [co-defendant insurance companies] merely because [non-insurance] company happens to be the wholly owned subsidiary of [a parent company] which owns other subsidiaries which are insurance companies"). Other cases cited by Defendants undercut their position here. *See, e.g.*, *Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 633 (9th Cir. 2018) (finding parent and subsidiary should be treated as a single entity for purposes of Sherman Act claim and chastising defendants for trying to "have the *Copperweld* doctrine both ways [by] insist[ing] both (1) that two affiliates are incapable of

9

conspiring with each other for purposes of Section 1 of the Sherman Act because they 'always' share a 'unity of purpose,' and (2) that one affiliate may escape liability for its own conduct . . . by disavowing the anticompetitive intent of the other, even where the two acted together" because "*Copperweld* 'foreclose[d]' a result that would allow sophisticated companies to evade Section 2 liability by spreading anticompetitive schemes over multiple affiliates").

Finally, even assuming arguendo that Defendants' cited authorities were applicable to the facts and circumstances here—they are not—Plaintiffs have presented evidence at trial that Live Nation is "involved" in the alleged conduct of its wholly owned subsidiary, such that they should be considered a single entity even under a more restrictive test. Notably, Defendants request a separate instruction premised on their "vertical integration," claiming that their existence as a single entity provides a defense to liability, while insisting through this instruction that they be treated as entirely separate entities as a matter of law. This charge should be denied as legally and factually baseless and likely to confuse the jury.

**Defendants' Authority**: *North Am. Soccer League, LLC v. U.S. Soccer Federation, Inc.*, Final Jury Instructions at 7, No. 1:17-cv-5495, ECF No. 531 (E.D.N.Y. Jan. 31, 2025); *Phillips v. Potter*, No. 1:05 CV 1852, 2008 WL 11492752, at *31 (N.D. Ohio Mar. 31, 2008) ("It is well understood that each Plaintiff must prove her own individual claims."); *Radmanovich v. Combined Ins. Co. of Am.*, 216 F.R.D. 424, 439 (N.D. Ill. 2003) ("Each plaintiff will be responsible for establishing the elements of her own claims."); *Orchestrate HR, Inc. v. Trombetta*, No. 3:13-CV-2110-KS, 2017 WL 273669, at *8 (N.D. Tex. Jan. 20, 2017) ("It is elementary that each plaintiff must prove its own damages."); *Louisiana Crawfish Producers Ass'n-W. v. Amerada Hess Corp.*, No. CV 6:10-0348, 2015 WL 10571063, at *11 (W.D. La. Nov. 23, 2015) ("Each plaintiff must necessarily prove his or her case."); *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries."; collecting cases); *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir. 1993); *In re Outpatient Medical Center Employee Antitrust Litig.*, 630 F. Supp. 3d 968, 991 (N.D. Ill. 2022) ("Courts have declined to extend *Copperweld* to allow § 1 liability for both a parent and its subsidiary 'even where there is no evidence that both were involved in the challenged conduct.'" (quoting *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 857 (10th Cir. 1999))); *id.* ("[C]ourts continue to find a parent liable only when it was directly involved in the anticompetitive conduct." (citing *Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 633 (9th Cir. 2018))); *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 857 (10th Cir. 1999) ("Plaintiffs wish to extend *Copperweld* to hold that a subsidiary and its parent, or a subsidiary and a sister subsidiary, can be considered one entity for all § 1 purposes, and either one can be liable for conspiring to restrain trade, even where there is no evidence that both were involved in the challenged conduct. We reject this extension."); *In re Pa. Title Ins. Antitrust Litig.*, 648 F. Supp. 2d 663, 688-89 (E.D. Pa. 2009) ("[W]hen a 'parent controls, directs, or encourages the subsidiary's anticompetitive conduct, the parent engages in sufficient independent conduct to be held directly liable as a single enterprise with the subsidiary under the Sherman Act.'"; dismissing claims against corporate parents); *McCray v. Fidelity Nat'l Title Ins. Co.*, 636 F. Supp. 2d 322, 334 (D. Del. 2009) (dismissing "the claims against the corporate parent defendants" for failure to allege "facts sufficient to infer... direct involvement"), *aff'd*, 682 F.3d 229 (3d Cir. 2012); *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1237 (10th Cir. 2017) ("[A]lthough we agree that Lenox was entitled to pursue its § 2 claims against Defendants as a single enterprise, and to prove those claims based on the actions of the enterprise as a whole, Lenox was still required to come

10

forward with evidence that each defendant independently participated in the enterprise's scheme, to justify holding that defendant liable as part of the enterprise."); *Climax Molybdenum Co. v. Molychem, L.L.C.*, 414 F. Supp. 2d 1007, 1012 (D. Colo. 2005) ("When the parent controls, dictates or encourages the subsidiary's anticompetitive conduct, the parent engages in sufficient independent conduct to be held directly liable as a single enterprise with the subsidiary under the Sherman Act.").

**Defendants' Argument**:  Defendants object to Plaintiffs' treatment of Live Nation and Ticketmaster "as a single entity" here and throughout these instructions.  Under "well-settled principles of corporate law, . . . parent corporations and their subsidiaries a[re] legally distinct entities." *Balintulo v. Ford Motor Co.*, 796 F.3d 160, 168 (2d Cir. 2015).  And "a parent corporation . . . is not liable for the acts of its subsidiaries," or vice versa. *United States v. Bestfoods*, 524 U.S. 51, 61 (1998).  A parent corporation may be held liable for the acts of its subsidiaries only under certain narrow circumstances, such as "under a veil-piercing, alter ego, or respondeat superior theory." *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1237 (10th Cir. 2017); *see Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir. 1993).  Plaintiffs have not alleged those theories here, it is far too late to do so now, and doing so would be futile in any event.  Plaintiffs must prove their claims against each Defendant separately.

Contrary to Plaintiffs' contention, *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984), does not justify collapsing legally separate and distinct parent and subsidiary entities in all antitrust cases.  *Copperweld* considered the "intra-enterprise conspiracy doctrine" and held only that a parent company "and its wholly owned subsidiary [] are incapable of conspiring with each other for purposes of § 1 of the Sherman Act."  467 U.S. at 758, 777.  Plaintiffs have not alleged any intra-enterprise conspiracy between Live Nation and Ticketmaster.  Nor have they cited any on-point authority suggesting that *Copperweld* displaces the traditional rule of corporate separateness absent such an allegation.  *Caribe BMW, Inc. v. Bayerische Motoren Werke Aktiengesellschaft* discussed *Copperweld* in the disparate context of the Robinson-Patman Act to determine whether a parent company and subsidiary selling the *exact same product* may be considered a "single seller."  19 F.3d 745, 748-49 (1st Cir. 1994).  That is not the situation here.  And *Arandell Corp. v. Centerpoint Energy Services, Inc.* involved a situation where the plaintiffs sought to hold a parent and a subsidiary liable for a price-fixing scheme that was perpetrated by the parent and in which the subsidiary participated by selling natural gas at prices rigged by the parent.  900 F.3d 623, 625 (9th Cir. 2018).  The Ninth Circuit reasoned that the subsidiary could be held liable for the parent's actions because the subsidiary engaged in "coordinated activity in furtherance of the anticompetitive scheme of its parent." *Id.* at 632.  But that case says nothing about whether a parent that is not even engaged in the same business as the subsidiary may be held liable for the subsidiary's actions.

Importantly, courts have expressly declined to follow the approach advocated by Plaintiffs here.  "Courts have declined to extend *Copperweld* to allow § 1 liability for both a parent and its subsidiary '[] where there is no evidence that both were involved in the challenged conduct.'" *In re Outpatient Medical Center Employee Antitrust Litig.*, 630 F. Supp. 3d 968, 991 (N.D. Ill. 2022) (quoting *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 857 (10th Cir. 1999)).  And "courts continue to find a parent liable only when it was directly involved in the anticompetitive conduct," and thus is being held liable for its own conduct, not that of its subsidiary. *Id.* (citing *Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 633 (9th Cir. 2018)); *see also In re Pa. Title Ins. Antitrust Litig.*, 648 F. Supp. 2d 663, 688-89 (E.D. Pa. 2009) (dismissing claims against corporate parents); *McCray v. Fidelity Nat'l Title Ins. Co.*, 636 F. Supp. 2d 322, 334 (D. Del. 2009) (dismissing "claims against

11

the corporate parent defendants" for failure to allege "facts sufficient to infer . . . direct involvement"), *aff'd*, 682 F.3d 229 (3d Cir. 2012).

As this Court likewise recognized in pre-trial proceedings, to hold entities within the same corporate family liable for the same conduct, "there must be evidence of the involvement of the two parts of the corporate family in the scheme." 2/27/26 Hearing Tr. at 154:7-9; *see Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1237 (10th Cir. 2017) ("[A]lthough we agree that Lenox was entitled to pursue its § 2 claims against Defendants as a single enterprise, and to prove those claims based on the actions of the enterprise as a whole, Lenox was still required to come forward with evidence that each defendant independently participated in the enterprise's scheme, to justify holding that defendant liable as part of the enterprise."). Defendants object to Plaintiffs instructions that merely lump Defendants together without making clear that to hold Live Nation liable for Ticketmaster's conduct, Live Nation must have independently and directly participated in that conduct. In particular, Live Nation must have "control[led], dictate[d] or encourage[d]" Ticketmaster's conduct such that it engaged in sufficient independent conduct to be held directly liable itself. *Climax Molybdenum Co. v. Molychem, L.L.C.*, 414 F. Supp. 2d 1007, 1012 (D. Colo. 2005); *In re Pa. Title Ins. Antitrust Litig.*, 648 F. Supp. 2d 663, 688-89 (E.D. Pa. 2009). Plaintiffs' instructions completely omit that requirement and thus err in stating the law. Moreover, Plaintiffs err in lumping Defendants together for purposes of the amphitheater-related claims. There is no allegation, nor could there be as a matter of law, that Ticketmaster "controls, dictates or encourages" Live Nation's conduct with respect to those venues.

Additionally, it is well-established that each plaintiff in a case must "prove her own individual claims." *Phillips v. Potter*, No. 1:05 CV 1852, 2008 WL 11492752, at *31 (N.D. Ohio Mar. 31, 2008). And each plaintiff must prove how the conduct at issue "impacted her." *Radmanovich v. Combined Ins. Co. of Am.*, 216 F.R.D. 424, 436 (N.D. Ill. 2003). In particular, Plaintiff States have brought several individual claims and damages claims, which each State must prove for itself. Plaintiffs entirely and opportunistically omit this point throughout their proposed instructions. Defendants' edits to this instruction seek to make clear to the jury at the outset that it must assess whether each Plaintiff has proven its case against each Defendant separately.

12

**Post-Instruction No. 3**

### EVIDENCE IN THE CASE

Unless you are otherwise instructed, the evidence in the case consists of the sworn testimony of the witnesses regardless of who may have called the witness, all exhibits received in evidence regardless of who may have produced them, and all facts and events that may have been admitted, stipulated to, or taken judicial notice of.

Statements and arguments by the lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statement, closing arguments, and at other times is intended to help you understand the evidence, but it is not evidence. However, as I explained at the beginning of this trial, the lawyers on both sides have agreed on certain facts known as stipulations, and you must treat those facts as proven.

Any question to which I have sustained an objection and evidence that I have ordered stricken must be entirely disregarded.

**Authority**: *Nike, Inc. v. Lululemon USA Inc.*, Final Jury Instructions at 5-6, 1:23-cv-00771-AS (S.D.N.Y.).

**Post-Instruction No. 4**

## WITNESS CREDIBILITY

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

1.      the opportunity and ability of the witness to see or hear or know the things testified to;

2.      the witness's memory;

3.      the witness's manner while testifying;

4.      the witness's interest in the outcome of the case, if any;

5.      the witness's bias or prejudice, if any;

6.      whether other evidence contradicted the witness's testimony;

7.      the reasonableness of the witness's testimony in light of all the evidence; and

8.      any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently. You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said. On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of

14

witnesses who testify.  What is important is how believable the witnesses were, and how much weight you think their testimony deserves.

**Authority**: Adapted 9th Circuit Manual of Model Civil Jury Instruction 1.14 (2025 ed.).

**Post-Instruction No. 5**

## USE OF DEPOSITIONS AS EVIDENCE

During the trial, certain testimony has been presented by way of deposition. The deposition consisted of sworn, recorded answers to questions asked of the witness in advance of the trial by the attorneys. The testimony of a witness who, for some reason, is not present to testify from the witness stand may be presented under oath on a videotape. Such testimony is entitled to the same consideration and is to be judged as to credibility, weighed, and otherwise considered by you in the same way as if the witness had been present and testified from the witness stand.

**Authority**: Adapted Fed. Jury Prac. & Instr. § 105:02 (6th ed.).

**Post-Instruction No. 6**

### EXPERT TESTIMONY

You have heard testimony from a number of witnesses who were designated by the respective parties as "experts." These designated witnesses are allowed to express opinions on matters about which they may have special knowledge and training. This testimony is presented to you on the theory that someone who is experienced in a particular field may be able to assist you in understanding the evidence and in reaching your independent decision on the facts.

In weighing this type of testimony, you may consider the witness's qualifications, opinions, reasons for testifying, as well as all the other considerations that ordinarily apply when you are deciding whether to believe a witness's testimony.

The expert witness's testimony was based on particular facts, as the witness obtained knowledge of them and testified to them before you, or as the attorneys who questioned the designated witness asked them to assume. You may reject such a witness's opinion if you find the facts in the case to be different from those that formed the basis for the opinion.

You may give "expert" testimony whatever weight, if any, you find it deserves in light of all of the evidence in the case and the witness's interest in the proceeding, including any compensation for work the expert may have received. You should not, however, accept the testimony merely because it is given by a designated "expert," nor should you substitute it for your own reason, judgment, and common sense. The determination of the facts in this case rests solely with you.

**Authority**: *United States of America, et al. ex rel. Uri Bassan v. Omnicare, Inc.,* Joint Proposed Jury Instructions at 13, 1:15-cv-04179-CM-VF, ECF No. 747 (S.D.N.Y. Apr. 23, 2025)

17

**Post-Instruction No. 7**

## SUMMARY OF CONTENTIONS

As I did at the start of the case, I will give you a summary of each side's positions in this case. I will then provide you with detailed instructions on what Plaintiffs must prove to win on each of their claims.

*Section 2: Monopolization*

The first issue you will be asked to decide is whether Plaintiffs have proved by a preponderance of the evidence that Defendants have violated Section 2 of the Sherman Act by unlawfully monopolizing any of the three alleged markets:

1.    Primary concert ticketing services to major concert venues (primary concert ticketing).

2.    Primary ticketing services to major concert venues (primary ticketing).

3.    Use of large amphitheaters by artists (amphitheaters).

There are certain requirements that Plaintiffs must prove to show that Defendants illegally monopolized a market, which I will explain in more detail in a few minutes. In general, however, to prove monopolization for each of the proposed relevant markets, Plaintiffs must show by a preponderance of the evidence that Defendants possessed monopoly power in that market and acquired or maintained monopoly power in that market by engaging in anticompetitive acts. It is up to you to decide whether Plaintiffs have proven Defendants are liable for monopolization as to all markets, no markets, or only as to some markets.

Plaintiffs allege that Defendants engaged in a variety of anticompetitive conduct, including, but not limited to: conditioning or threatening to condition access to Live Nation content on a venue's use of Ticketmaster; retaliation against venues that use rival ticketers; acquiring control

18

over competitors; inducing potential competitors not to compete; imposing long-term exclusive ticketing contracts and requiring artists to use Live Nation as their promoter if the artists want to perform in large amphitheaters controlled by Defendants.

*Section 1: Exclusive Dealing and Tying*

In addition to alleging that Defendants monopolized certain markets, Plaintiffs also allege that Defendants violated Section 1 of the Sherman Act through unlawful exclusive dealing and tying. You will need to consider the exclusive dealing and tying claims under Section 1 separate from and in addition to the monopolization claims.

First, Plaintiffs allege that Defendants engaged in unlawful exclusive dealing by entering into certain primary ticketing contracts with venues. There are different elements Plaintiffs must prove for you to find Defendants liable for unlawful exclusive dealing. In general, to prove unlawful exclusive dealing Plaintiffs must prove by a preponderance of the evidence that Defendants possess substantial market power in a relevant market and entered into exclusive contracts with venues that impeded competition.

Second, Plaintiffs allege that Defendants engaged in an unlawful tying arrangement by requiring artists who wanted to use Defendants' large amphitheaters to also use Defendants' promotion services. In general, for this claim, Plaintiffs must prove by a preponderance of the evidence that Defendants illegally tied artists' use of their large amphitheaters to the use of Defendants' promotion services.

The final issue you will be asked to decide is whether some of the Plaintiff States are entitled to damages because fans attending concerts in those States overpaid for tickets due to Defendants' anticompetitive conduct.

19

**Plaintiffs' Authority**: Am. Compl. (ECF No. 257); Answer (ECF No. 498); *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) ("The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."); *United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 609, 611-612 (S.D.N.Y. 2025); *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984).

**Plaintiffs' Position**: Plaintiffs have proposed a neutral statement of the case that outlines the basic facts of the litigation, succinctly summarizes Plaintiffs' claims as set forth in the Amended Complaint, and provides a straightforward preview of Defendants' defenses as well as a high-level overview of the applicable law. Defendants' proposed instruction misstates Plaintiffs' allegations, misstates the applicable legal standards, and advocates for Defendants' anticipated defenses.

In the first substantive paragraph ("Section 2 Monopolization") Defendants incorrectly state the allegations Plaintiffs made in the Amended Complaint, which states that Live Nation, in conjunction with its wholly owned subsidiary, Ticketmaster, monopolized the two primary ticketing markets. Amended Compl. at 85. Defendants also incorrectly assert that Live Nation and Ticketmaster must be treated as separate entities for liability purposes, notwithstanding a long line of cases to the contrary, as explained above at Post Instruction No. 2.

As in earlier instructions, Defendants' proposed exclusive dealing instruction misstates the law by requiring the jury to consider each contract individually and in isolation, as explained below at Post-Instruction No. 18; *see also* ECF No. 1037 at 41–42 ("To endorse Live Nation's argument for all Section 1 claims would be a coup for antitrust defendants. Section 1 exclusive dealing claims would become virtually impossible to bring, as the anticompetitive effect of any individual contract would be minimal except for in the most extreme cases."). And as to tying, Defendants' proposed instruction again artificially inflates Plaintiffs' burden by contending Plaintiffs must prove artists "*would* have preferred to use a different concert promoter" rather than simply that they "might" have preferred to do so. *See Jefferson Parish*, 466 US. at 12.

The final two paragraphs regarding damages may potentially confuse the jury by suggesting that Plaintiffs are required to prove each element of every claim to recover on any of them, which is not accurate. And given that the Court will be providing detailed damages instructions later, no further reference is necessary here and will instead be duplicative and waste time.

**Defendants' Authority:** ABA Model Instr. 3.A.1, 2.D.5; *Dickson v. Microsoft Corporation*, 309 F.3d 193, 203-05 (4th Cir. 2002) (declining to consider licensing agreements between Microsoft and various OEMs in the aggregate and analyzing each agreement "individually" instead); *Howard Hess Dental Laboratories v. Dentsply International*, 602 F.3d 239, 255-56 (3d Cir. 2010) (requiring plaintiffs to show that "every single agreement" between a manufacturer and its dealers had anticompetitive effect); *Gibson v. Cendyn Group*, 148 F.4th 1069, 1087 (9th Cir. 2025) (finding that "a grouping of individual agreements could not be 'aggregated' for the purposes of determining whether together they acted as an unreasonable restraint of trade," and requiring that the agreements "have a 'discrete effect' on competition"); *Panini America v. Fanatics*, 2025 WL 753954, at *9 (S.D.N.Y. Mar. 10, 2025) (refusing to "consider the effects of [] six exclusive deals together" and considering the effect of each separately instead); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466

20

U.S. 2, 12 (1984) ("[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms."); ECF No. 257 (Am. Compl.); ECF No. 777 at 41 (Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment); *Washington v. Chimei Innolux Corp.*, 659 F.3d 842, 848 (9th Cir. 2011) ("[A] statutory *parens patriae* action may well result in a settlement that does not include restitution to victims of the fraud, but only results in penalties paid to the public treasury."); *Broselow v. Fisher*, 319 F.3d 605, 608 (3d Cir. 2003) (individuals have no right to funds collected through *parens patriae* claims because such funds are not collected "under an assignment" from those individuals); *New York by Vacco v. Reebok Int'l*, 96 F.3d 44, 49 (2d Cir. 1996) (individuals are not entitled to distributions from the settlement of a *parens patriae* suit); N.Y. Exec. § 63(12) ("monies recovered or obtained under this subdivision" are subject to N.Y. State Fin. § 4(11), which requires that the funds "be deposited in the state treasury" and not disbursed "except pursuant to an appropriation").

**Defendants' Argument**:  Defendants' edits to this instruction align it with the proposed instructions on the law below.

Additionally, Defendants seek to make clear, for the reasons explained above, that each Defendant's liability for each claim must be assessed separately.  *See* Defendants' Argument on Post-Instruction No. 2 (The Parties); *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries.").  Defendants also seek to make clear that not all States are seeking damages, and the jury may consider damages only if the States seeking damages prove liability on certain claims. Finally, Defendants' proposal reiterates this Court's instruction provided at the start of trial that the jury should not assume any State residents will receive any portion of the States' damages, if any, and that the jury members will not receive any portion of those damages.  Voir Dire Tr. at 16:12-19.

Defendants object to Plaintiffs' use of the terms "major concert venues" and "large amphitheaters" here and throughout these instructions to the extent those terms are used without making clear that Plaintiffs have attached those terms to sets of venues Plaintiffs curated for this litigation.  Without such clarification, those terms are prejudicial and misleading because they give the jury the misimpression that as a factual matter, there is industry recognition and acceptance of distinct categories of venues called "major concert venues" and "large amphitheaters," when that is an issue disputed between the parties and for the jury to decide.

21

**Post-Instruction No. 8**

### BURDEN OF PROOF—PREPONDERANCE OF THE EVIDENCE

As I instructed you earlier, in this case, Plaintiffs must prove each element of a particular claim by a preponderance of the evidence. This means that the fact that is to be proven is more likely true than not, as the evidence in favor of the fact being true is enough to tip the scale, even if slightly, in its favor.

**Plaintiffs' Authority**: *Nike, Inc. v. Lululemon USA Inc.*, Final Jury Instructions at 6, 1:23-cv-00771-AS (S.D.N.Y.); Adapted 9th Cir. Manual of Model Civ. Jury Instr. 1.6 (2025 ed.); Fed. Jury Prac. & Instr. § 104:01 (6th ed.); *Ostrowski v. Atl. Mut. Ins. Cos.*, 968 F.2d 171, 187 (2d Cir. 1992) ("[T]he court should instruct the jury that it is to conclude that a fact has been proven by a preponderance of the evidence if it 'finds that the scales tip, however slightly, in favor of the party with the burden of proof' as to that fact.").

**Plaintiffs' Position**: Plaintiffs have proposed a simplified instruction based on the cited authorities that briefly explains the preponderance standard. Defendants' proposed instruction fails to include language that even "slightly" tipping the scales is sufficient (despite that language appearing in the source Defendants cite, and the Court using similar language in its preliminary instructions to the jury). *See* 3.2.2026 Tr. at 5:18–6:6. Defendants' proposal is also confusing to the extent it can be read to suggest that Plaintiffs must prevail on every element of every claim in order to win on any one of them.

**Defendants' Authority:** Fed. Jury Prac. & Instr. § 104:01.

**Defendants' Argument**:  Defendants' proposal tracks verbatim the model federal jury instruction on preponderance of the evidence.  Defendants object to Plaintiffs' watered down burden of proof instruction.  Plaintiffs' "tip the scale, even if slightly" language does not appear in the model federal jury instruction or in the model instructions for any court of appeals.  *See* Notes, Fed. Jury Prac. & Instr. § 104:01.

**Post-Instruction No. 9**

## MONOPOLIZATION ELEMENTS

Plaintiffs allege Defendants unlawfully monopolized the following markets:

(1)    primary concert ticketing services to major concert venues;

(2)    primary ticketing services to major concert venues; and

(3)    the use of large amphitheaters by artists;

Plaintiffs have brought three monopolization claims in total, one for each of these markets. The alleged monopolization of any one of these three alleged markets is a distinct claim that you are to consider separately. To prevail on a monopolization claim, Plaintiffs must prove the following elements by a preponderance of the evidence:

(1)    Defendants possessed monopoly power in a relevant market; and

(2)    Defendants maintained monopoly power through anticompetitive conduct.

If you find that Plaintiffs have failed to prove either of these elements for a particular claim, then you must find for Defendants and against Plaintiffs on that particular claim only. If you find that Plaintiffs have proven each of these elements by a preponderance of the evidence for a particular claim, then you must find for Plaintiffs and against Defendants on that particular claim.

I will now provide you with further instructions on these elements.

**Plaintiffs' Authority**: *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) ("The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."); *see E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 441 (4th Cir. 2014); Adapted ABA Model Instr. 3.A.1; Am. Compl. (ECF No. 257) ¶¶ 224-32, 249-64.

**Plaintiffs' Position:** Plaintiffs' proposal hews closely to the ABA Model Instruction, adapted to fit the circumstances of this case. Specifically, Plaintiffs identify the three remaining markets here. Plaintiffs propose a minor modification that captures the fact that Plaintiffs have alleged monopolization in three separate markets, instructing the jury that "[t]he alleged monopolization of any one of these three markets is a distinct claim that you are to consider separately."

23

Defendants' proposal incorrectly renames and mischaracterizes the three markets as alleged in Plaintiffs' complaint which would likely confuse the jury and prejudice Plaintiffs, as Plaintiffs are entitled to have the jury be instructed to assess Plaintiffs' actual claims as they are presented at trial. Defendants again incorrectly assert that Defendants should be treated as separate entities for liability, which Plaintiffs address in Post-Instruction No. 2.

**Defendants' Authority:** ECF No. 257 (Am. Compl.); Adapted ABA Model Instr. 3.A.1; Adapted *North Am. Soccer League, LLC v. U.S. Soccer Federation, Inc.*, Final Jury Instructions at 48, No. 1:17-cv-5495, ECF No. 531 (E.D.N.Y. Jan. 31, 2025); *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (To violate Section 2, "a monopolist's act must have an 'anticompetitive effect.' That is, it must harm the competitive *process* and thereby harm consumers."); *In re Google Digital Advertising Antitrust Litig.*, 627 F. Supp. 3d 346, 380 (S.D.N.Y. 2022) (conduct "must have an anticompetitive effect in order to form the basis of a monopolization claim"); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005) ("[T]he exclusionary conduct must have an anti-competitive effect."); *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) (an element of a Section 2 violation is "the willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident").

**Defendants' Argument**: Defendants object to Plaintiffs' two-element structure. The ABA model jury instruction on the elements of a Section 2 monopolization claim contains five elements. *See* ABA Model Instr. 3.A.1. In line with that instruction, jury instructions given to juries in numerous cases contain four to five elements. *See, e.g.*, *North Am. Soccer League, LLC v. U.S. Soccer Federation, Inc.*, Final Jury Instructions at 48, No. 1:17-cv-5495, ECF No. 531 (E.D.N.Y. Jan. 31, 2025). Parties frequently do not dispute, and thus exclude, as here, the requirement that "defendant's conduct occurred in or affected interstate or foreign commerce." ABA Model Instr. 3.A.1. Defendants propose a similar four-element structure here.

There is a reason why juries are not instructed using Plaintiffs' two-element structure—it is confusing and might lead the jury to miss important parts of the analysis, such as market definition and anticompetitive effects. Defining the relevant market is the threshold step in analyzing the antitrust claims in this case. *Ohio v. American Express Co.*, 585 U.S. 529, 542 (2018); *Berkey Photo v. Eastman Kodak*, 603 F.2d 263, 268-69 (2d Cir. 1979) ("It is, of course, a basic principle in the law of monopolization that the first step in a court's analysis must be a definition of the relevant markets."). And market definition is hotly disputed in this case. By burying market definition within the element on monopoly power, Plaintiffs improperly seek to obfuscate that element before the jury. Plaintiffs also err in entirely omitting any element on harm even though it is well-established that a Section 2 violation requires proof of competitive harm and anticompetitive effects. *See, e.g.*, *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (To violate Section 2, "a monopolist's act must have an 'anticompetitive effect.' That is, it must harm the competitive *process* and thereby harm consumers."); *In re Google Digital Advertising Antitrust Litig.*, 627 F. Supp. 3d 346, 380 (S.D.N.Y. 2022) (conduct "must have an anticompetitive effect in order to form the basis of a monopolization claim"). Indeed, Plaintiffs did not dispute this element during summary judgment briefing, *see* ECF No. 777 at 26-36 (Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment), yet they erroneously omit it here and throughout these instructions.

24

**Post-Instruction No. 10**

### RELEVANT MARKET—GENERAL

The purpose of defining a relevant market in an antitrust case like this one is to identify the market participants and the competitive pressures that actually restrain Defendants' ability to raise prices, restrict output, reduce quality, or exclude competition. Several markets can exist at the same time, including submarkets alongside broader markets. For example, within the broader market for shoes, there may also be separate submarkets for men's, women's, and children's shoes.

You can find that a relevant market exists even if you are not certain of the precise boundaries of that market; it is sufficient that a market generally contains products or services that are reasonable substitutes for each other from the perspective of actual customers. The purpose of defining a relevant market is to make sure that the identified products are capable of being monopolized—that is, the market is broad enough that if a single company controlled it, that company would have the ability to raise prices, restrict output, reduce quality, or exclude competition.

In assessing each monopolization claim, you are required to make a judgment about whether Defendants have monopoly power in a relevant market. To make this judgment, you must be able to determine what, if any, economic forces restrain Defendants' freedom to set prices for the products or services they provide that are at issue in this case, or restrict the extent to which they provide those products or services.

The most likely and most important restraining force will be actual and potential competition from other firms and their products or services. This includes the firms and products or services most likely to act as strict restraints on Defendants' power to set prices above competitive levels because customers would switch to them if Defendants set their own prices too high. The firms and products or services that exert such primary restraining force are within what is called the relevant market.

25

**Plaintiffs' Authority**: Adapted ABA Model Instr. 3.A.3; *Cf FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460 (1986) ("the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition"); *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 339 (2d Cir. 2024) ("Two products are reasonably interchangeable where there is sufficient cross-elasticity of demand—that is, where consumers would respond to a slight increase in the price of one product by switching to another product." (citation and quotation omitted)); *Brown Shoe v. United States*, 370 U.S. 294, 325, 336 (1962) (a relevant product market should "correspond to the commercial realities of the industry," and within the boundaries of a product market "well defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes"); *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956) (a "market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use, and qualities considered"); *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 611, 612 n.31 (1953) ("The 'market,' as most concepts in law or economics, cannot be measured by metes and bounds" and "[f]or every product, substitutes exist. But a relevant market cannot meaningfully encompass that infinite range. The circle must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn"); *Balaklaw v. Lovell*, 14 F.3d 793, 799 (2d Cir. 1994).

**Plaintiffs' Position:** Plaintiffs' proposed instruction is derived from ABA Model Instruction and adds two additional explanatory paragraphs at the beginning of the instruction. Plaintiffs added additional explanatory language so the jury would better understand the purpose and objective of defining a relevant market in antitrust cases. In *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 339 (2d Cir. 2024), the Second Circuit reiterated that a relevant market can be determined by looking at the reasonable interchangeability of use or the cross-elasticity of demand between the product at issue and potential close substitutes for it.

In addition, Plaintiffs added language so the jury would understand that narrower relevant markets may exist within broader relevant markets. In *Brown Shoe v. United States*, the Supreme Court held that the outer bounds of a product market are determined by "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." 370 U.S. 294, 325 (1962). However, within broad markets, "well defined submarkets may exist which in themselves, constitute product markets for antitrust purposes." *Id.*; *see also Grinnell*, 384 U.S. at 570 ("In § 2 cases under the Sherman Act, as in § 7 cases under the Clayton Act there may be submarkets that are separate economic entities."); *P&L Develop., LLC v. Gerber Prods. Co.*, 715 F. Supp. 3d 435, 459 (E.D.N.Y. 2024) ("[a] product market can be limited to a particular category of buyers," with a relevant market of "sales of store-brand infant formula to [] retailers" rather than to all "end-user consumers"); *Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242, 249, 249-52 n.8 (1959) (affirming liability for Sherman Act §§1 and 2 violations based upon the relevant market of "promotion of championship boxing contests," as distinct from "all professional boxing events," even though any boxing event "includes one ring, two boxers and one referee fighting under the same rules before . . . spectators," relying "[b]y analogy" on a case involving "the Clayton Act's 'line of commerce.'") (citing *United States v. E.I. Du Pont De Nemours & Co.*, 353 U.S. 586, 593-97 (1957)).

Plaintiffs object to Defendants' proposed instruction that a relevant market "includes all firms and products or services that act or likely could act as restraints on the relevant Defendant's power to set prices as they please because customers could switch to these competing firms if the relevant Defendant set its own prices too high." This overstates the relevant standard in two ways. First, even

26

a monopolist's power to set prices is always restrained to some degree – as is cautioned by the "*Cellophane* fallacy." *See, e.g.*, *United States v. Eastman Kodak Co.*, 853 F. Supp. 1454, 1469 (W.D.N.Y. 1994) (explaining that "every monopolist faces an elastic demand at its profit-maximizing output and price" because "at a high enough price, even poor substitutes look good to the consumer") (cleaned up).  For similar reasons, contrary to Defendants proposed language, a relevant market does not consist of "all" firms or products that exert *any* restraining force — the restraining force must be sufficient to prevent the monopolist from imposing a price increase. *See Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 339 (2d Cir. 2024) ("Two products are reasonably interchangeable where there is '*sufficient* cross-elasticity of demand'—that is, 'where consumers *would* respond to a slight increase in the price of one product by switching to another product.'" (emphasis added)). Second, the relevant question is not whether customers "could" conceivably switch to products outside the relevant market—as suggested by Defendants' proposal—but whether customers in fact "would" switch in sufficient numbers to constrain a price increase or worsening of terms. *Id.*

**Defendants' Authority:** Adapted ABA Model Instr. 3.A.3; *Berkey Photo v. Eastman Kodak*, 603 F.2d 263, 268-69 (2d Cir. 1979) ("It is, of course, a basic principle in the law of monopolization that the first step in a court's analysis must be a definition of the relevant markets."); *City of New York v. Grp. Health*, 649 F.3d 151, 155 (2d Cir. 2011) (To state an antitrust claim, "a plaintiff must allege a plausible relevant market in which competition will be impaired."); *United States v. Eastman Kodak Co.*, 63 F.3d 95, 104 (2d Cir. 1995) ("Without a definition of the relevant market, there is no way to measure a company's ability to act as a monopolist."); *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018) (before assessing "direct evidence" of "anticompetitive effects," we must "first define the relevant market").

**Defendants' Objection**:  Defendants object to Plaintiffs' discussion of "submarkets."  That concept does not appear in the ABA model instruction on general market definition, is irrelevant here, and is likely to confuse and mislead the jury.  *See FTC v. Meta Platforms, Inc.*, 2025 WL 3458822, at *28 (D.D.C. Dec. 2, 2025) (the concept of "submarkets" can be "misleading" because "[t]he only relevant concept is the product market").  Moreover, Plaintiffs' alleged ticketing markets survived summary judgment on the theory that they are targeted customer markets, which are distinct from the concept of "submarkets."  That concept thus does not need to be raised for the first time in this case in the Court's instructions to the jury.  Defendants' proposed instruction tracks the ABA model jury instruction and is sufficient to give the jury an introduction to market definition.

27

**Post-Instruction No. 11**

## RELEVANT PRODUCT MARKET

A relevant product market must consist of all products or services that are reasonably interchangeable in the eyes of customers of those products or services. In other words, the relevant product market includes the products or services that a customer believes are reasonably interchangeable or reasonable substitutes for each other. This is a practical test taking into account actual behavior of buyers and marketing efforts of sellers. It looks to the practical realities of substitution, not theoretical substitution. A product market does not need to include all conceivable substitutes, but only those that a buyer would view as reasonably interchangeable. Accordingly, your analysis should focus on whether or not the products or services are economic substitutes, not simply whether they appear to be functionally similar. For instance, women's shoes may not be reasonably interchangeable with men's shoes. Even if both are functionally similar, consumers may not typically substitute one for the other.

There is no single correct market because markets can overlap and within a broad relevant market, there may be smaller markets that are relevant for certain conduct. The market does not need to be defined with mathematical precision. A party may sometimes argue that a proposed market is too narrow, too broad, or drawn with arbitrary boundaries. It is okay if there is some fuzziness in the boundary, which is inherent in defining any relevant market. As a result, isolated examples of potential substitutability, for example, do not mean a proposed market is invalid.

The parties disagree about the relevant product markets in this case. Plaintiffs allege that the three markets I just described to you are relevant product markets, while Defendants deny that those three markets are relevant product markets. Your task is to determine whether the evidence supports

the relevant markets, as proposed by Plaintiffs, or whether there is sufficient evidence to support broader or narrow relevant markets.

Different methods can be used to determine whether a market has been properly defined. One approach is to consider a variety of practical factors that can indicate whether a market is valid, such as:

- whether, as a matter of practical fact and the actual behavior of buyers, the products or services are reasonable substitutes for a buyer's needs;

- the relationship between the price of one product or service and sales of another;

- the presence or absence of specialized vendors;

- the perceptions in the industry or the public as to whether the products or services are in separate markets;

- the views of Defendants regarding who their respective competitors are;

- the existence or absence of different customer groups or distribution channels;

- whether the product or service has distinct characteristics and uses from other services;

- whether the product or service has distinct customers from other services;

- whether particular customers or groups of customers can be targeted for price increases or a worsening of terms; and

- any other evidence of how a product or service's price, quality, or total output is constrained by other services.

If you find there is sufficient evidence to prove that there is a relevant product market for any claim, then you should continue to evaluate the remainder of that claim. However, if you find that Plaintiffs have failed to provide sufficient evidence that there is a relevant market for a given claim, then you must find in Defendants' favor on that claim.

29

**Plaintiffs' Authority**: ABA Model Instr. 3.A.4; *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 335 (S.D.N.Y. 2001), *modified*, 183 F. Supp. 2d 613 (S.D.N.Y. 2001), *and aff'd*, 344 F.3d 229 (2d Cir. 2003), *and enforced*, No. 98 CIV. 7076 (BSJ), 2007 WL 1741885 (S.D.N.Y. June 15, 2007) ("A relevant product market is composed of products that have reasonable interchangeability, in the eyes of consumers, with what the defendant sells." (quotation marks and citation omitted)); *Brown Shoe v. United States*, 370 U.S. 294, 325, 336 (1962) (relevant product market should "correspond to the commercial realities of the industry" and within the boundaries of a product market "well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes"); *United States v. U.S. Sugar Corp.*, 73 F.4th 197, 204-07 (3d Cir. 2023) (affirming district court's application of *Brown Shoe* practical indicia); *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956) ("[A] market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use, and qualities considered."); *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 611, 612 n.31 (1953) ("The 'market,' as most concepts in law or economics, cannot be measured by metes and bounds" and "[f]or every product, substitutes exist. But a relevant market cannot meaningfully encompass that infinite range. The circle must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn."); *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966) ("In § 2 cases under the Sherman Act, as in § 7 cases under the Clayton Act, there may be submarkets that are separate economic entities"); *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 202 (D.D.C. 2018) (recognizing that some "fuzziness is inherent in bounding any market"); *Phila. Nat'l Bank*, 374 U.S. 321, 360 n.37 (1963) ("[F]uzziness would seem inherent in any attempt to delineate the relevant geographical market."); *see also United States v. Eastman Kodak Co.*, 63 F.3d 95, 103, 105 (2d Cir. 1995); *F.T.C. v. Swedish Match*, 131 F. Supp. 2d 151, 160 (D.D.C. 2000); *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 339 (2d Cir. 2024); *Teradata Corp. v. SAP SE,* 124 F.4th 555, 565-66, 569-70 (9th Cir. 2024); *Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242, 249-50, 252 n.8 (1959); *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 228 (2d Cir. 1999) ("It is important to remember that a market is any grouping of sales whose sellers, if unified by a hypothetical cartel or merger, could profitably raise prices significantly above the competitive level. If the sales of other producers substantially constrain the price-increasing ability of the hypothetical cartel, these others are part of the market." (cleaned up)); *United States v. Continental Can Co.*, 378 U.S. 441, 457 (1964) (holding that "nothing [] preclude[d]" the Court from defining a relevant market that "was not pressed upon the District Court" by either party, so long as it was supported by the evidence); *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 978 n.9 (9th Cir. 2023) (rejecting defendant's "radical argument that, where parties offer dueling market definitions, the case immediately ends if the [factfinder] finds the record supports the defendant's proposed market (or a third in-between market . . .) rather than the plaintiff's market"); *United States v. Energy Solutions, Inc.*, 265 F. Supp. 3d 415, 437 (D. Del. 2017) (defining broader relevant markets than the government asserted, because "[t]he court's decision to not further sub-divide the markets does not end the analysis").

**Plaintiffs' Position**: Plaintiffs' proposed instruction is based on the ABA Model Instruction with certain adjustments to clarify how reasonable interchangeability of products is properly assessed, how economic substitution is evaluated (based on examples drawn from caselaw), and how the outer boundaries of product markets are properly defined.

In particular, Plaintiffs have proposed additional language to instruct the jury that the focus is on economic substitution rather than merely functional similarities in products. *See Regeneron Pharms.,*

30

*Inc. v. Novartis Pharma AG*, 96 F.4th 327, 340 (2d Cir. 2024) ("Rather, the applicable analysis is whether or not the products are *economic* substitutes, not whether they appear to be functionally similar. This analysis turns on economic differences, such as a lack of cross-elasticity of demand or reasonable interchangeability among products.") (holding that identical medication in vials and pre-filled syringes could be in separate product markets). Additionally, Plaintiffs' proposed instructions explain to jurors that the outer boundaries of a relevant market may be "fuzzy" and need not be defined by precise metes and bounds or mathematical precision. *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 202 (D.D.C. 2018) (recognizing that some "fuzziness is inherent in bounding any market") (citation omitted); *cf. United States v. Phila. Nat'l Bank*, 374 U.S. 321, 360 n.37 (1963) ("[F]uzziness would seem inherent in any attempt to delineate the relevant geographical market."); *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 611 (1953) ("The 'market,' as most concepts in law or economics, cannot be measured by metes and bounds"); *id.* at 613 n.31 ("For every product, substitutes exist. But a relevant market cannot meaningfully encompass that infinite range. The circle must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn").

Additionally, Plaintiffs' proposed instruction introduces the concept that multiple valid relevant markets may exist for functionally similar products, which may not be intuitive to jurors. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 326 (1962) ("Applying these considerations to the present case, we conclude that the record supports the District Court's finding that the relevant lines of commerce are men's, women's, and children's shoes."); *United States v. Apple, Inc.*, 2025 WL 1829127, at *7 (D.N.J. June 30, 2025) (recognizing product markets for both smartphones and "performance smartphones" and collecting cases); *United States v. Am. Airlines Grp. Inc.*, 675 F. Supp. 3d 65, 118 (D. Mass. 2023) (declining to decide between alternative markets because "there may be multiple relevant markets or sub-markets, any of which might appropriately be examined to assess the competitive effects of a restraint"), *aff'd*, 121 F.4th 209 (1st Cir. 2024); *U.S. Airways, Inc. v. Sabre Holdings Corp.*, No. 11-cv-2725, 2022 WL 874945, at *7-10 (S.D.N.Y. Mar. 24, 2022) (finding that the defendant could have monopoly power in both narrower "Sabre-only product market" and broader market for "GDS services").

**Defendants' Authority**: ABA Model Instr. 3.A.4; *United States v. United States Sugar Corp.*, 2022 WL 4544025, at *25 (D. Del. Sept. 28, 2022), aff'd, 73 F.4th 197 (3d Cir. 2023) ("In reality, what the Government is asking the Court to do is figure out which market allows the Government to prevail and then to use that market. The Court declines to do so."); *United States v. Sabre Corp.*, 452 F. Supp. 3d 97, 142 n.20 (D. Del. 2020) ("[T]o the extent DOJ is now inviting the Court to 'unilaterally change the defective market allegations if necessary to save its case,' it would be wrong for the Court to do so under the circumstances here, which include that both parties (and the Court) have already devoted enormous resources to the case the government chose to bring."); *Continental Trend Resources, Inc. v. OXY USA Inc.*, 44 F.3d 1465, 1481 n.19 (10th Cir. 1995) (rejecting "later attempt[] to redefine the relevant market" because "plaintiffs are saddled with their Complaint filed in this Court"), *vacated on other grounds*, 517 U.S. 1216 (1996); *Pastore v. Bell Telephone Co.*, 24 F.3d 508, 512-13 (3d Cir. 1994) ("hold[ing] plaintiffs to their own contention" regarding market definition).

**Defendants' Argument**:  Defendants object to Plaintiffs' statement that the jury may find "broader or narrow[er]" markets than those alleged by Plaintiffs.  To start, none of this appears in the ABA model instruction on relevant product markets.  Next, Plaintiffs have not cited a single case in which

31

*a jury* was told it could find any markets it pleased, regardless of the markets alleged by the plaintiff and notwithstanding that all of the parties' evidence regarding monopoly power, anticompetitive conduct, anticompetitive effects, etc. was premised on the alleged markets.  Indeed, *this Court* did not even find markets beyond those alleged by Plaintiffs.  After determining that Plaintiffs' concert booking, promotions, and fan-facing ticketing markets were not properly defined, this Court dismissed all claims based on those markets rather than find different markets or give Plaintiffs the opportunity to take their case to the jury in the hopes that the jury would find different markets.  ECF No. 1037; *see also* 1/23/26 Tr. at 77:10-78:1 (noting that Plaintiffs "are not relying on a market that includes stadiums," so "if the MCV market is not properly defined, then the [claims] that would rely on that definition would be out").

Like this Court, courts have repeatedly declined plaintiffs' invitation to define markets beyond those alleged.  *See, e.g.*, *United States v. United States Sugar Corp.*, 2022 WL 4544025, at \*25 (D. Del. Sept. 28, 2022), *aff'd*, 73 F.4th 197 (3d Cir. 2023) ("In reality, what the Government is asking the Court to do is figure out which market allows the Government to prevail and then to use that market. The Court declines to do so."); *United States v. Sabre Corp.*, 452 F. Supp. 3d 97, 142 n.20 (D. Del. 2020) ("[T]o the extent DOJ is now inviting the Court to 'unilaterally change the defective market allegations if necessary to save its case,' it would be wrong for the Court to do so under the circumstances here, which include that both parties (and the Court) have already devoted enormous resources to the case the government chose to bring."); *Continental Trend Resources, Inc. v. OXY USA Inc.*, 44 F.3d 1465, 1481 n.19 (10th Cir. 1995) (rejecting "later attempt[] to redefine the relevant market" because "plaintiffs are saddled with their Complaint filed in this Court"), *vacated on other grounds*, 517 U.S. 1216 (1996); *Pastore v. Bell Telephone Co.*, 24 F.3d 508, 512-13 (3d Cir. 1994) ("hold[ing] plaintiffs to their own contention" regarding market definition).

Plaintiffs' cases are not to the contrary.  In *United States v. Continental Can Co.*, the Supreme Court determined that "combined glass and metal container industries" was a line of commerce in addition to the two found by the district court because it was "coextensive with the two industries, which were held to be lines of commerce," and "composed largely, if not entirely, of the more particularized end-use lines urged in the District Court by the Government."  378 U.S. 441, 457 (1964).  In other words, the Court held the government to its allegations, determining that the two lines urged by the government, in addition to the sum of those lines, were relevant lines of commerce.  Likewise in *United States v. Energy Solutions, Inc.*, the court rejected the government's four product markets that divided higher-activity from lower-activity waste and operational from decommissioning waste, determining that one of those distinctions was unnecessary—not that an entirely different market unrelated to the ones alleged was relevant.  265 F. Supp. 3d 415, 436-37 (D. Del. 2017).  Finally, in *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 978 n.9 (9th Cir. 2023), the Ninth Circuit cited *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1437 (9th Cir. 1995), without any further reasoning for the proposition Plaintiffs' quote, but in *Rebel*, the plaintiff had alleged another market "[i]n the alternative"—something Plaintiffs have not done here, *see* 1/23/26 Tr. at 77:10-78:1.

In short, Plaintiffs "are saddled" with the markets they alleged, *Continental Trend*, 44 F.3d at 1481 n.19, and no authority permits the Court or the jury to rewrite Plaintiffs' allegations on their behalf and decide an entirely different case than the one the "parties (and the Court) have already devoted enormous resources to," *Sabre*, 452 F. Supp. 3d at 142 n.20.

Additionally, Defendants object to Plaintiffs' relevant product market instruction because it fails to instruct the jury that the ticketing markets in this case are targeted customer markets, and to provide any guidance on analyzing such markets. Defendants propose relevant product market instructions that account for the targeted customer markets as well as traditional product market at issue here. Moreover, Defendants' proposed instructions explain the parties' disputes as to each alleged market and what the jury must find as to each alleged market to enable the jury to understand the unique and complex market definition analysis it must perform here.

Finally, Defendants propose omitting "product" in several places. The parties do not dispute market geography for any of the markets that remain in this case. Given that, there is no need to discuss the concept of "product" markets to distinguish them from "geographic" markets, and doing so may confuse the jury.

**Post-Instruction No. 12**

## MONOPOLIZATION—MONOPOLY POWER

If you find that Plaintiffs have proven any alleged relevant market by a preponderance of the evidence, then you should separately determine whether Defendants have monopoly power in that market. Monopoly power is the power to control prices, restrict output, or exclude competition in a relevant antitrust market.

Plaintiffs can prove monopoly power "directly," through direct evidence, or "indirectly," through indirect evidence. Either type of evidence may be sufficient to prove monopoly power. I will now provide further instructions about how you may determine whether Plaintiffs have met their burden of proving monopoly power in a relevant market.

**Plaintiffs' Authority**: Adapted ABA Model Instr. 3.A.2; *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 97-98 (2d Cir. 1998) ("Monopoly power … is the power to control prices or exclude competition") (quotation marks and citation omitted); *American Tobacco Co. v. United States*, 328 U.S. 781, 809 (1946) (defining monopoly power as the power to "exclude actual or potential competition from the field"); *see also Otter Tail Power Co. v. United States*, 410 U.S. 366, 378 (1973).

**Plaintiffs' Position:** Plaintiffs' proposal largely tracks the ABA Model Instruction but with certain edits for clarity and accuracy. It also clarifies that either direct or indirect evidence may be sufficient for the jury to find monopoly power.

Defendants proposed instruction first inserts two separate instructions (11D and 11D1) for the MCV-based and amphitheater-based markets. Defendants' preamble paragraphs are slanted in Live Nation's favor and are unnecessary and improper, because the jury will hear the parties positions in closing arguments and will have already been instructed on the separate markets in the court's summary of the allegations in Post-Instruction No. 7, making further instructions here unnecessary. In the first portion of their instruction (11D), Defendants also wrongfully suggest that Plaintiffs must prove worse prices or terms of service in order to prove their claims, because the MCV market is a targeted customer market. As this Court has already held, the standard tools used to determine whether reasonably interchangeability or cross-elasticity of demand is sufficient to define a relevant antitrust market—the *Brown Shoe* analysis or an HMT—apply equally to these markets. *See* ECF No. 1037 at 19–20. In the third portion of their instruction (11D2), Defendants continue to seek to instruct the jury to treat Defendants separately, as discussed above in Post Instruction No. 2. Plaintiffs have also deleted the additional sentence proposed by Defendants defining monopoly power as the ability to "profitably raise prices substantially" because it confusingly highlights only one of the manifestations of monopoly power set forth in the preceding sentence: "the power to control prices, restrict output, or exclude competition." Plaintiffs also object to Defendants' additional sentences related to

34

anticompetitive conduct, as later instructions separately instruct the jury on that distinct element of Plaintiffs' monopolization claims. Including discussion of anticompetitive conduct within the monopoly power instruction will only confuse the jury.

**Defendants' Authority:** ABA Model Instr. 3.A.2.

**Defendants' Argument**:  Defendants' edits to this instruction track the ABA model instruction on monopoly power.  Defendants object to Plaintiffs' modifications to that model instruction in ways that transparently lessen Plaintiffs' burden.  For instance, Plaintiffs delete language making clear that "monopoly power, in and of itself, is not unlawful," and that "a firm has monopoly power if it can profitably raise prices substantially above the competitive level for a significant period of time." ABA Model Instr. 3.A.2.

35

**Post-Instruction No. 13**

### EXISTENCE OF MONOPOLY POWER—DIRECT PROOF

Plaintiffs can provide direct proof of monopoly power in a relevant market via direct evidence through any one of these alternative ways.

*Raising or Maintaining Prices Above Competitive Levels*

One way Plaintiffs may prove that Defendants have monopoly power in a relevant market is to show that Defendants can profitably raise or maintain prices in the relevant market above a competitive level. Plaintiffs must prove that Defendants have the power to do so themselves—that is, without the assistance of, and despite competition from, any existing or potential competitors. Defendants can have monopoly power even if they do not charge prices above competitive levels, so long as they have the ability to maintain prices above competitive levels without losing so much business to other competitors that the price increase would become unprofitable and would have to be withdrawn.

- In Plaintiffs' alleged primary ticketing services markets, the prices in question are the fees retained by ticketers, such as Ticketmaster, when providing primary ticketing services to major concert venues.

- In Plaintiffs' alleged amphitheaters market, the prices in question are the prices that Plaintiffs claim artists pay to rent the amphitheaters.

To prove monopoly power in this way, Plaintiffs must prove that Defendants have the power to maintain prices above a competitive level for a significant period of time. If the Defendants attempted to maintain prices above competitive levels, but would lose so much business to other competitors that the price increase would become unprofitable and would have to be withdrawn, then Defendants do not have monopoly power.

*Reducing or Maintaining Quality or Output Below Competitive Levels*

36

Another way Plaintiffs may prove that Defendants have monopoly power is to show that Defendants have the ability to reduce or maintain the quality of products or services below competitive levels for a significant period of time. This is similar to the point I just described regarding price. If Defendants had the ability—even if unused—to reduce quality below competitive levels without losing so much business to other competitors that the quality reduction would become unprofitable and would have to be withdrawn, then Defendants have monopoly power.

*Power to Exclude Competition*

Alternatively, Plaintiffs may prove that Defendants have monopoly power by proving that Defendants have the ability to exclude or block competition. If you find that Defendants had the power to inhibit growth or expansion by existing competitors in a market or to prevent new competition from entering that market, then Defendants have monopoly power. This power to exclude may be shown by evidence of Defendants blocking competitors' ability to compete or of Defendants reducing or restricting the share of the market held by competitors.

**Plaintiffs' Authority**: Adapted ABA Model Instr. 3.A.8; *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 783 n.2 (6th Cir. 2002) ("the material consideration in determining whether a monopoly exists is not that prices are raised and that competition is excluded, but that power exists to raise prices or to exclude competition when it is desired to do so.") (quotation marks and citation omitted); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 274 (2d Cir.1979) ("[T]he fact that the power has not been used to extract improper benefits provides no succor to the monopolist."); *Cf. In re Google Digital Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 375 (S.D.N.Y. 2022) ("Harm to competition may be inferred through facts such as 'reduced output, increased prices and decreased quality' in the relevant market." (citation omitted)); *See United States v. Google LLC*, 747 F. Supp. 3d 1, 118 (D.D.C. 2024) ("Just as the power to raise price when it is desired to do so is proof of monopoly power, so too is the ability to degrade product quality without concern of losing consumers . . . ." (cleaned up)); *Cf. MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 182 (2d Cir. 2016) ("[A] plaintiff may offer direct evidence of harm to competition by proving higher prices, reduced output, or lower quality in the market as a whole.").

**Plaintiffs' Position:** Plaintiffs propose an expanded and clarified version of the ABA Model Instruction on direct proof of monopoly power. In particular, Plaintiffs have proposed additional language to clarify that the ability to charge prices above competitive levels is sufficient, even if a monopolist chooses not to exercise such power. *See Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 274 (2d Cir.1979) ("[T]he fact that the power has not been used to extract improper

benefits provides no succor to the monopolist."); *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 783 n.2 (6th Cir. 2002) ("[T]he material consideration in determining whether a monopoly exists is not that prices are raised and that competition is excluded, but that power exists to raise prices or to exclude competition when it is desired to do so.") Plaintiffs propose an additional short section on reducing or maintaining quality below competitive levels because both sides have put on evidence of product quality. It is well-recognized that a reduction in quality below competitive levels is the functional equivalent of a price increase to customers. *Cf. In re Google Digital Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 375 (S.D.N.Y. 2022) ("Harm to competition may be inferred through facts such as 'reduced output, increased prices and decreased quality' in the relevant market."). Defendants' version of this paragraph removes the requirement that new competitors would need to be able to enter the market in order to make the reduction in quality unprofitable, ignoring the potential presence of barriers to entry. Plaintiffs also object to Defendants' alterations to the "power to exclude competition" section it inserts language on the level of competition that is unnecessary and may confuse the jury.

**Defendants' Authority**: Adapted ABA Model Instr. 3.A.8; *United States v. Google LLC*, 747 F. Supp. 3d 1, 118 (D.D.C. 2024) ("Just as the power to raise price when it is desired to do so is proof of monopoly power, so too is the ability to degrade product quality without concern of losing consumers . . . ." (cleaned up)); *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 182 (2d Cir. 2016) ("[A] plaintiff may offer direct evidence of harm to competition by proving higher prices, reduced output, or lower quality in the market as a whole.").

**Defendants' Argument**:  Defendants object to Plaintiffs' modifications to the ABA model jury instruction on direct proof of monopoly power in ways that transparently lessen Plaintiffs' burden. For instance, Plaintiffs omit the two paragraphs proposed by Defendants on the ability to earn high profit margins, which are necessary to inform the jury that high profit margins alone do not entail monopoly power.  *See* ABA Model Instr. 3.A.8

**Post-Instruction No. 14**

## EXISTENCE OF MONOPOLY POWER—INDIRECT PROOF

As I instructed you earlier, Plaintiffs can establish monopoly power through direct proof or indirect proof. Either type of evidence may be sufficient to prove monopoly power. Now, I will instruct you on indirect proof.

Indirect evidence is evidence regarding the structure of the relevant market which may permit you to draw an inference that Defendants have the power to control price, restrict output, or exclude competition in the relevant market. Structural factors you may consider include market share, market share trends, barriers to entry, actual examples of entry and exit by other companies, and the number and size of competitors, each of which I will now explain in more detail.

*Market Share*

One factor that you should consider is Defendants' share of the relevant market. While market share is not the equivalent of monopoly power, it is relevant to your determination of whether Plaintiffs have proven monopoly power. A defendant must have a significant share of the market in order to possess monopoly power, but it need not be the only company operating within the market. The higher the company's share, the higher the likelihood that a company has monopoly power. A market share of 70% or greater is usually strong evidence of the existence of monopoly power. A market share below 50% is often not, on its own, strong evidence of monopoly power. But even if a company has a market share below 50%, the company can still have monopoly power depending on the nature of the market, including the size and competitiveness of other market participants and their ability to expand output or constrain Defendants' prices or quality. There is no bright-line rule. You should consider Defendants' market share in conjunction with other characteristics of the market—including the

39

factors I will discuss next—to determine whether Defendants have the ability to control prices, restrict output, or exclude competition.

*Market Share Trends*

The trend in Defendants' market share is something you may consider. An increasing or stable market share may strengthen an inference that a company has monopoly power, particularly where that company has a high market share, while a decreasing share might show that a company does not have monopoly power.

*Barriers to Entry*

You may also consider whether there are barriers to entry or expansion in or into the relevant market. Barriers to entry or expansion make it difficult for new competitors to enter the relevant market in a meaningful and timely way, or for existing competitors to sell more of a product that they already sell in the relevant market. Barriers to entry or expansion in might include, but are not limited to, the large financial and time investment required to build amphitheaters or other live entertainment venues, the large financial investment required to develop ticketing or other technologies, the need to satisfy governmental regulations, the lack of opportunities to bid for ticketing contracts due to the existence of long-term exclusive contracts or other factors, venues' reticence to switch ticketers due to switching costs and business risk, the need to enter into multiple markets simultaneously, or the need to achieve the necessary scale to credibly offer and market a range of live entertainment services to artists, venues, and fans across the relevant market or markets. Other barriers to entry might include relationships with artists or venues, data on fans' prior ticketing purchases and preferences, specialized marketing practices, the reputation of the companies already participating in the market (or the brand recognition of their products), and any other factor making entry difficult.

Evidence of low or no entry barriers may be evidence that Defendants do not have monopoly

40

power, regardless of Defendants' market share, because new competitors could enter easily, if Defendants attempted to raise prices or reduce quality for a substantial period of time. By contrast, evidence of barriers to entry along with high market share may support an inference that Defendants have monopoly power.

*Entry and Exit by Other Companies*

The history of entry and exit in the relevant market may be helpful to consider. Entry of new significant competitors or significant expansion of existing competitors may be evidence that Defendants lack monopoly power. On the other hand, departures from the market, or the failure of firms to enter the market or expand successfully, may support an inference that Defendants have monopoly power.

*Number and Size of Competitors*

You may consider whether Defendants' competitors are capable of effectively competing. In other words, you should consider whether the financial strength, market shares, and number of competitors act as a substantial check on Defendants' ability to price and adjust the quality of their services. If Defendants' competitors are strong or have large or increasing market shares this may be evidence that Defendants lack monopoly power in that market. On the other hand, if you determine that Defendants' competitors are weak or have small, stable, or declining market shares, this may support an inference that Defendants have monopoly power.

You may find that Defendants have monopoly power based on direct evidence, indirect evidence, or both. If you find that Defendants have monopoly power in any relevant market, then you must consider the remaining element of that monopolization claim. If you find that Defendants do not have monopoly power in a relevant market, then you must find for Defendants and against Plaintiffs on that monopolization claim as to that particular relevant market.

41

**Plaintiffs' Authority**: ABA Model Instr. 3.A.7; *New York v. Actavis, PLC*, No. 14 CIV. 7473, 2014 WL 7015198, at *37 (S.D.N.Y. Dec. 11, 2014), *aff'd sub nom. New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638 (2d Cir. 2015) ("depending on other market factors, courts in the Second Circuit have permitted findings of market power with shares less than 50%," such as "finding [a] market share less than 30% would not foreclose the possibility of proving monopoly power"); *Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.*, 651 F.2d 122, 129 (2d Cir.1981) ("[T]he higher a market share, the stronger is the inference of monopoly power."); *In re Google Digital Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 364 (S.D.N.Y. 2022) ("In this Circuit, there is no bright-line rule.").

**Plaintiffs' Position:** Plaintiffs' proposed instruction moves the first paragraph of the model instruction to the direct proof section for clarity, since that section appears first in the proposed instructions. Plaintiffs' proposal then lists the types of evidence the jury may consider as indirect evidence, adds additional clarifications to each section, and clarifies the language. In the market share section, Plaintiffs provide market share percentages to aid the jury in comparing market shares presented in this case to those that have been found to be sufficient indirect evidence of monopoly power. In *Tops Markets Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 98 (2d Cir. 1998), the Second Circuit noted that while "market share is not the functional equivalent of monopoly power, it nevertheless is highly relevant to the determination of monopoly power." The Second Circuit has also clarified that while a market share below 50% may rarely be evidence of monopoly power, a share between 50% and 70% can show monopoly power, and share above 70% is usually strong evidence of monopoly power, "when the evidence presents a fair jury issue of monopoly power, the jury should not be told that it must find monopoly power lacking below a specified share or existing above a specified share." *Id*. *See Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.*, 651 F.2d 122, 129 (2d Cir. 1981). In addition, Plaintiffs added additional details to the barriers to entry section to aid in the jury's understanding of the concept. Defendants' alterations to the introduction add repetitive language regarding structural factors. Their edits to the market share section wrongly insert a new market share threshold of 60% for a finding of monopoly, apparently based on *PepsiCo, Inc. v. Coca-Cola*, 315 F.3d 101 (2d Cir. 2002). But that instruction would be legal error: *PepsiCo* does not apply here, where the jury has heard evidence of Defendants' ability to exclude competition. Defendants' proposed instruction on finding monopoly power based on a market share below 50% is inconsistent with Second Circuit case law. Defendants' edits to the barriers-to-entry section insert inappropriate argument, and its edits to the entry and exit by other companies section inappropriately focus on "relatively high" profit margins. And Defendants' edits inappropriately lower the threshold for showing effective competition in the market.

**Defendants' Authority**: ABA Model Instr. 3.A.7; *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 109 (2d Cir. 2002) ("Absent additional evidence, such as an ability to control prices or exclude competition, a 64 percent market share is insufficient to infer monopoly power.").

**Defendants' Argument**: Defendants object to Plaintiffs' modifications to the ABA model jury instruction on indirect proof of monopoly power in ways that transparently lessen Plaintiffs' burden. For instance, Plaintiffs omit language making clear that regardless whether they use direct or indirect evidence, the evidence must "establish[] that defendant has the power to control prices and exclude competition," and that a market share below 50% is "not sufficient to support a conclusion that defendant has monopoly power." ABA Model Instr. 3.A.7. Defendants also object to Plaintiffs'

additions to the market share inquiry.  These additions are misleading as they fail to mention that even where a defendant's market share is above 70%, there must still be other evidence of monopoly power. *See United States v. Microsoft*, 253 F.3d 34, 54 (D.C. Cir. 2001) ("agree[ing]" that "even a predominant market share [of 95%] does not by itself indicate monopoly power").  They are also misleading because they suggest that other indirect evidence is relevant only where market share is low.  Finally, Defendants object to Plaintiffs' lengthy recitation of various aspects of their case as "barriers to entry."  Such recitation of Plaintiffs' allegations as part of the Court's instructions on the law improperly seeks to give the jury the misimpression that the Court agrees with Plaintiffs' allegations.  Defendants' edits to this instruction align it with the ABA model jury instruction.  And Defendants' addition that a market share above 60% is usually required is consistent with Second Circuit precedent.  *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 109 (2d Cir. 2002) ("Absent additional evidence, such as an ability to control prices or exclude competition, a 64 percent market share is insufficient to infer monopoly power."

**Post-Instruction No. 15**

### MONOPOLIZATION: MAINTAINING MONOPOLY POWER THROUGH ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT

If you find that Plaintiffs have met their burden of proving Defendants possessed monopoly power in a relevant market, then you must turn to the next element. Plaintiffs must prove by a preponderance of the evidence that Defendants maintained monopoly power in that relevant market through anticompetitive or exclusionary conduct or acts.

Anticompetitive or exclusionary acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market. Put another way, exclusionary conduct causes harm to competition by limiting the opportunities of competitors, and it either does not further competition on the merits or does so in an unnecessarily restrictive way. For example, foreclosing potential competitors from obtaining access to a key input, using monopoly power to destroy threatened competition, or using a strategic position to acquire exclusive privileges in an area where it otherwise faces competition can all constitute exclusionary conduct.

Harm to competition is different from harm to a single competitor or group of competitors. For example, the maintenance of monopoly power by supplying better or cheaper products or services, or possessing superior business skills, is not unlawful because the goal of the antitrust laws is to protect competition itself rather than any particular competitor's right to succeed. This is sometimes referred to as "competition on the merits." Mere possession of monopoly power, if lawfully acquired and maintained, does not violate the antitrust laws. It is also not unlawful if monopoly power is maintained because of luck.

44

In determining whether Defendants' conduct was anticompetitive or exclusionary, you should assess whether the conduct was consistent with competition on the merits, including whether the conduct provides benefits to consumers.

Plaintiffs are not required to prove every one of their specific allegations of exclusionary behavior, and Plaintiffs do not have to prove that Defendants' monopoly was maintained solely by exclusionary conduct. Rather Plaintiffs may meet their burden by proving, by a preponderance of the evidence, that the exclusionary conduct was reasonably capable of contributing significantly to Defendants' continued monopoly power in any relevant market. You must weigh the evidence as a whole and consider all of the alleged exclusionary conduct, including the interrelated effects of the different conduct in aggregate, not in isolation, to reach your determination as to whether Defendants' conduct was reasonably capable of contributing significantly to maintaining their monopoly. Accordingly, you should not wipe the slate clean after scrutinizing any individual facet of Defendants' conduct but rather examine Defendants' conduct—and its effect—as a whole.

If you find, for any of Plaintiffs' claims, that Plaintiffs have proven by a preponderance of the evidence that Defendants maintained monopoly power through anticompetitive or exclusionary acts, then you must find for Plaintiffs on that claim. If you find that Plaintiffs did not prove this element by a preponderance of the evidence, then you must find for Defendants and against Plaintiffs on that claim.

Next, I will describe some types of anticompetitive conduct that may be at issue here based on Plaintiffs' allegations, but it is up to you to decide what conduct by Defendants was proven by Plaintiffs and whether that conduct harmed competition.

**Plaintiffs' Authority**: ABA Model Instr. 3.A.9; *US Airways, Inc., for Am. Airlines, Inc. as Successor & Real Party in Int. v. Sabre Holdings Corp.*, Final Jury Instructions, 1:11cv2725, ECF No. 1207-8 at *18 (S.D.N.Y. May 19, 2022); *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 355 (4th Cir. 2024); *United States v. Microsoft Corp.*, 253 F.3d 34, 79 (D.C. Cir. 2001); *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99 (1962); *Otter Tail Power Co. v. United*

45

*States*, 410 U.S. 366, 377 (1973); *United States v. Griffith*, 334 U.S. 100, 107 (1948); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985); *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 452-53 (7th Cir. 2020); *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 229 (S.D.N.Y. 2019) ("A monopolist's conduct violates Section 2 if it '(1) tends to impair the opportunities of rivals, [and] also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way.'"); *Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d 180, 222 (S.D.N.Y. 2014) ("Specifically, § 2 proscribes the use of monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor." (cleaned up) (quoting *Eastman Kodak*, 504 U.S. at 482-83))).

**Plaintiffs' Position:** Plaintiffs' proposed instruction begins with the ABA model and adds to it additional explanation of what constitutes anticompetitive or exclusionary conduct based on Section 2 case law. In particular, Plaintiffs' proposal includes an additional sentence instructing the jury that it may consider whether the "conduct causes harm to competition by limiting the opportunities of competitors, and either does not further competition on the merits or does so in an unnecessarily restrictive way," drawing from language in *Aspen Skiing* and other cited cases. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985) ("The question whether Ski Co.'s conduct may properly be characterized as exclusionary cannot be answered by simply considering its effect on Highlands. In addition, it is relevant to consider its impact on consumers and whether it has impaired competition in an unnecessarily restrictive way. If a firm has been 'attempting to exclude rivals on some basis other than efficiency,' it is fair to characterize its behavior as predatory."); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 229 (S.D.N.Y. 2019) ("A monopolist's conduct violates Section 2 if it '(1) tends to impair the opportunities of rivals, [and] also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way.'").

Additionally, Plaintiffs proposed the subsequent sentence to explain to jurors some of the particular forms of conduct that the Supreme Court has previously held to be anticompetitive: "foreclosing potential competitors from obtaining access to a key input, using monopoly power to destroy threatened competition, or using a strategic position to acquire exclusive privileges in an area where it otherwise has competitors can all constitute exclusionary conduct." *See Otter Tail Power Co. v. United States*, 410 U.S. 366, 377 (1973); *United States v. Griffith,* 334 U.S. 100, 107 (1948)); *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 353 (4th Cir. 2024); *Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d 180, 222 (S.D.N.Y. 2014) ("Specifically, § 2 proscribes the use of monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor." (cleaned up) (quoting *Eastman Kodak*, 504 U.S. at 482-83)).

Plaintiffs' proposed instruction also provides guidance to jurors on how to evaluate the connection between the anticompetitive conduct alleged by Plaintiffs and the maintenance of any monopoly power by Defendants to avoid jurors incorrectly applying a "but-for" causation standard. Specifically, relying upon *United States v. Microsoft Corp.*, Plaintiffs propose jurors be told that "Plaintiffs may meet their burden by proving, by a preponderance of the evidence, that the exclusionary conduct was reasonably capable of contributing significantly to Defendants' continued monopoly power in any relevant market." 253 F.3d 34, 79 (2001).

Given the wide range of interrelated anticompetitive conduct alleged by Plaintiffs, much of which applies to multiple claims, Plaintiffs also believe it is important that the jury be instructed to consider the evidence as a whole, including its interrelated nature, consistent with the Supreme Court's

46

guidance in *Continental Ore* and the Fourth Circuit's recent opinion in *Duke Energy*. *See Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("In cases such as this, plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole; and in a case like the one before us, the duty of the jury was to look at the whole picture and not merely at the individual figures in it." (cleaned up)); *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 355 (4th Cir. 2024), cert. denied sub nom.; *Duke Energy Carolinas v. NTE Carolinas II, LLC*, 2026 WL 79821 (U.S. Jan. 12, 2026) ("Just as the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole, so too must a firm's exclusionary efforts be considered in their totality." (citation and quotation omitted)).

Defendants' proposed instruction, by contrast, misstates the law by narrowly defining anticompetitive conduct, failing to provide the jury with examples of such conduct, and imposing additional hurdles for Plaintiffs to clear that are unsupported by the case law. For example, Defendants' proposed language can be incorrectly interpreted to be exhaustive: "[h]arm to competition can include evidence of increased prices, decreased production levels, and reduced quality." However, courts have made clear that "harm to the competitive process" is itself sufficient harm to competition to render conduct anticompetitive. *See Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 453 (7th Cir. 2020) ("The fact that the categories of conduct here are conceptually related and may overlap should not cause confusion if we stay focused on the underlying inquiry: the conduct 'must harm the competitive process and thereby harm consumers.'"); *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998) (plaintiffs "must allege and prove harm, not just to a single competitor, but to the competitive process, i.e., to competition itself"). Defendants' proposed instruction appears to require near complete foreclosure of competition by conduct to be anticompetitive ("conduct that has made it very difficult or impossible for competitors to compete"), but Defendants identify no authority for such a high bar. As explained above, the correct test set forth in *Microsoft* requires Plaintiffs to show the conduct merely "was reasonably capable of contributing significantly to Defendants' continued monopoly power in any relevant market." *United States v. Microsoft Corp.*, 253 F.3d 34, 79 (2001).

Defendants' proposal incorrectly instructs the jury that anticompetitive conduct "must represent something more than the conduct of business that is part of the normal competitive process or commercial success." But "a monopolist is not free to take certain actions that a company in a competitive (or even oligopolistic) market may take, because there is no market constraint on a monopolist's behavior." *LePage's Inc. v. 3M*, 324 F.3d 141, 151-52 (3d Cir. 2003); *United States v. Google LLC*, 803 F. Supp. 3d 18, 142 (D.D.C. 2025) ("[C]onduct that is otherwise lawful when committed by a non-monopolist can be deemed anticompetitive when performed by a dominant firm.").

Defendants' proposal also vaguely and confusingly injects the concept of a "legitimate business purpose" and implies without further explanation that any conduct undertaken for a "business purpose" such as increased profits or market share is necessarily not anticompetitive. But that is not the law. As the Seventh Circuit explained in *Viamedia*, "a short-term profit sacrifice is neither necessary nor sufficient for conduct to be exclusionary." *Viamedia*, 951 F.3d at 462; *see also Delaware & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) ("The fact that profit maximization is a goal of the make or buy policy provides support for an argument that the policy is a legitimate

47

practice, but does not shield the policy from judicial scrutiny. A monopolist cannot escape liability for conduct that is otherwise actionable simply because that conduct also provides short-term profits."); *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 431 (2d Cir. 1945) ("[The monopolist] insists that it never excluded competitors; but we can think of no more effective exclusion than progressively to embrace each new opportunity as it opened, and to face every newcomer with new capacity already geared into a great organization, having the advantage of experience, trade connections and the elite of personnel. Only in case we interpret 'exclusion' as limited to maneuvers not honestly industrial, but actuated solely by a desire to prevent competition, can such a course, indefatigably pursued, be deemed not 'exclusionary.' So to limit it would in our judgment emasculate the Act; would permit just such consolidations as it was designed to prevent."); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1075-76 (10th Cir. 2013) ("[S]urely a monopolist can find ways to harm competition while still making money.").

To avoid confusion, any discussion of business purposes should be included in the subsequent instruction on procompetitive justifications. That instruction also properly clarifies that it is Defendants' burden to come forward with non-pretextual procompetitive justifications for the alleged conduct, rather than any generic "business purpose." *See Kodak*, 504 U.S. at 483, 485 (defendants' proffered business reasons must be "valid," "sufficient," "legitimate," and "competitive"); *Aspen Skiing*, 472 U.S. at 608-10; *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1212-14, 1218–20 (9th Cir. 1997). Defendants further misstate the law by suggesting that jurors "may not find that a company willfully acquired or maintained monopoly power through anticompetitive means if it has acquired or maintained that power through the exercise of superior foresight and skill, such as providing quality products or services." But this misstates the holding of *Grinnell* by creating a false dichotomy. *Grinnell* held that the maintenance of a monopoly "as a consequence of a superior product, business acumen, or historic accident" did not itself violate the Sherman Act, but the Court did not hold that a company with a superior product or business acumen that *also* engaged in anticompetitive conduct cannot be found liable under Section 2. Defendants' proposed instruction incorrectly suggests this to be the case.

**Defendants' Authority:** Adapted ABA Model Instr. 3.A.9, 1.C.3, 1.C.4.

**Defendants' Argument**: *First*, Defendants object to Plaintiffs' elimination of "willful acquisition," which is included in the ABA model jury instruction on anticompetitive conduct as well as in the caselaw. ABA Model Instr. 3.A.9; *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).

*Second*, Defendants object to Plaintiffs' modifications to the model instruction in ways that transparently lessen Plaintiffs' burden. For instance, Plaintiffs omit language regarding examples of harm to competition, a monopolist's ability to compete aggressively and charge monopoly prices without violating the law, and the difference between anticompetitive conduct and legitimate business conduct.

*Third*, Defendants object to Plaintiffs' insertion of language that they must prove only that "the exclusionary conduct was reasonably capable of contributing significantly to Defendants' continued monopoly power." That is not the law for any Plaintiff. Indeed, no Plaintiff even argued as much during summary judgment briefing. ECF No. 724 at 23 (Memorandum of Law in Support of Defendants' Motion for Summary Judgment); ECF No. 777 at 26-36 (Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment). Even if that standard might potentially apply "when a regulator is seeking only injunctive relief," *United States v. Google LLC*, 747 F. Supp.

48

3d 1, 152-53 (D.D.C. 2024), it has no place here where Plaintiff States are seeking monetary relief as well.

Defendants' proposal aligns this instruction with the ABA model jury instruction. It also combines subsequent instructions regarding procompetitive justifications and balancing competitive effects to reduce the length of the jury instructions and indicate to the jury that the latter analyses are all part of the anticompetitive conduct analysis.

**Post-Instruction No. 15P**

### ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT—EXAMPLES

Now I will provide additional detail on some of the anticompetitive and exclusionary conduct Plaintiffs have alleged Defendants engaged in. You should consider all of the evidence as a whole to decide whether any conduct by Defendants was anticompetitive or exclusionary.

*Content Conditioning and Long-Term Exclusivity*

Plaintiffs have alleged Defendants maintained monopoly power in the primary ticketing markets by engaging in conduct that led venues to believe that they would lose valuable Live Nation shows if they used primary ticketers other than Ticketmaster. Plaintiffs contend that Defendants did so through statements by employees and agents of Live Nation, including statements related to a venue's access to Live Nation shows in light of the venue's use of Ticketmaster. Plaintiffs also allege Live Nation retaliated against venues that use rival ticketers. Plaintiffs also allege that Defendants have engaged in other conduct to maintain exclusive or restrictive ticketing agreements with venues, including engaging in early renewals and insisting on long-term contracts. You should first consider whether Plaintiffs have proven by a preponderance of the evidence that Defendants engaged in the alleged conduct. If you find Defendants engaged in the alleged conduct, you should then consider what effect this conduct had on competition. You should consider whether this alleged conduct harmed competition for primary ticketing services by impairing the opportunities of rivals instead of competing on the merits or by impairing rivals' ability to compete in an unnecessarily restrictive way.

*Use of Large Amphitheaters to Exclude Rival Promoters*

Plaintiffs also have alleged that Defendants conditioned artists' use of large amphitheaters owned, operated, or controlled by Defendants on artists also purchasing promotion services from Defendants. You should first consider whether Plaintiffs have proven by a preponderance of the evidence that Defendants engaged in such conduct. If you find Defendants engaged in such conduct,

you should consider whether the alleged conduct diminished competition for artists' use of large amphitheaters by impairing the opportunities of rivals, instead of competing on the merits, or by impairing rivals' ability to compete in an unnecessarily restrictive way.

*Acquisitions*

Plaintiffs have alleged Defendants acquired control over competitors and potential competitors, thereby reducing competition in certain markets. Acquisitions can come in many forms, including the purchase of a company or venue or entering into contracts or other agreements that provide Defendants effective or practical control over a company or venue, even if they do not own that company or venue. As with the other alleged conduct, you should first consider whether Plaintiffs have proven by a preponderance of the evidence that Defendants engaged in such conduct.

If you find that Defendants engaged in such conduct, you should then consider what effect this conduct—taken as a whole—had on competition. Put another way, you should consider whether the alleged acquisitions harmed competition for primary ticketing services or artists' use of large amphitheaters by impairing the opportunities of rivals, instead of competing on the merits, or by impairing rivals' ability to compete in an unnecessarily restrictive way.

*Entering Agreements with Competitors*

Plaintiffs have alleged Defendants entered into various agreements with Oak View Group that reduced or restricted competition in one or more markets, either by leading to Oak View Group or Live Nation not competing in certain markets or by distorting the competitive process within those markets.

If you find that Defendants engaged in such conduct, you should then consider what effect this conduct—taken as a whole—had on competition. For example, you should consider whether this conduct had the effect of preventing or excluding competition for ticketing services not by furthering

51

competition on the merits but by impairing the opportunities of rivals or engaging in the conduct in an unnecessarily restrictive way.

The previous examples are not exhaustive of the types of anticompetitive conduct because anticompetitive conduct comes in many forms. You should consider the evidence as a whole in deciding whether any of Defendants' conduct was anticompetitive.

**Plaintiffs' Authority**: *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 414 (2004) (anticompetitive conduct can take many forms because "the means of illicit exclusion, like the means of legitimate competition, are myriad") (quoting *United States v. Microsoft*, 253 F.3d 34, 58 (D.C. Cir. 2001) (en banc)); *Viamedia, Inc. v. Comcast Corp.,* 951 F.3d 429, 453 (7th Cir. 2020) ("Conduct that can harm competition may fit into more than one of these court-devised categories" and thus "[t]he fact that the categories of conduct here are conceptually related and may overlap should not cause confusion if we stay focused on the underlying inquiry: the conduct 'must harm the competitive process and thereby harm consumers.'") (quoting *Microsoft*, 253 F.3d at 58); Areeda & Hovenkamp, *Antitrust Law*,  ¶ 777a (Although "the standard for a §2 violation is significantly stricter in its power assessment [than for a § 1 claim], it is broader and less categorical in its definition of proscribed conduct."); *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 488 (1992) (Scalia, J., dissenting) ("Our § 2 monopolization doctrines are similarly directed to discrete situations in which a defendant's possession of substantial market power, combined with his exclusionary or anticompetitive behavior, threatens to defeat or forestall the corrective forces of competition and thereby sustain or extend the defendant's agglomeration of power. Where a defendant maintains his substantial market power, his activities are examined through a special lens: Behavior that might otherwise not be of concern to the antitrust laws—or that might even be viewed as procompetitive— can take on exclusionary connotations when practiced by a monopolist." (cleaned up)).

**Plaintiffs' Position**: Plaintiffs have proposed this instruction in order to provide clarity for the jury on the types of alleged anticompetitive conduct it may consider when evaluating the evidence in this case, utilizing the earlier general instruction on anticompetitive conduct. Plaintiffs have drafted the instructions in a neutral manner that does not presume the evidence has proven any of the alleged conduct and without indicating what ultimate outcome the jury should reach as to whether any particular conduct was or was not anticompetitive.

**Defendants' Argument**: Defendants object to Plaintiffs' instruction reciting their allegations of anticompetitive conduct. This recitation of Plaintiffs' allegations has no place in the Court's official instructions on the law. Such recitation risks prejudice because it might give the jury the misimpression that Plaintiffs' allegations are part of the law, or that the Court (which determines the law) agrees with them. If the Court allows these instructions, Defendants reserve the right to propose alternative instructions that state Defendants' position against Plaintiffs' allegations.

**Post-Instruction No. 16**

### ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT—EXCLUSIVE DEALING - SHERMAN ACT SECTION 2

Plaintiffs have alleged that Defendants entered into long-term, exclusive primary ticketing contracts with major concert venues that generally require the venue to use Ticketmaster as the exclusive primary ticketer for all events or for all concerts. This is a category of conduct known as "exclusive dealing," and there are special standards that apply only to exclusive dealing conduct, which I will explain to you now. You should not apply these standards when considering other forms of alleged anticompetitive conduct.

I will now explain to you what an exclusive agreement is.

Exclusive agreements require a buyer of a product or service to obtain that product or service exclusively—or nearly exclusively—from one supplier for a period of time. There are several forms of exclusive dealing arrangements. The arrangement may take the form of an agreement, arrangement, or practice forbidding the buyer from purchasing the product or service from the supplier's competitors, a requirements contract committing the buyer to purchase all of its requirements of specific products or services from the supplier, or a pricing policy that creates a substantial disincentive to purchase from competitors. Some practices may operate as partial exclusive dealing contracts. Others may operate as de facto exclusive dealing contracts by limiting the practical ability of the buyer to obtain the specific products or services from other suppliers.

To establish that an exclusive dealing, or partial exclusive dealing, arrangement amounts to exclusionary conduct under Section 2 of the Sherman Act, Plaintiffs must establish by a preponderance of the evidence that the Defendants entered into one or more exclusive agreements between the buyers (major concert venues) and the supplier (Defendants).

53

If you find that such an agreement existed, you must then determine whether the agreement or agreements had a substantial adverse effect on competition for primary ticketing services to major concert venues. Plaintiffs may prove the agreement had a substantial adverse effect on competition through direct evidence, circumstantial evidence, or both. When evaluating whether the agreement adversely affected competition there is no set formula and you may assess some or all of the following factors: (i) the extent of Defendants' market power; (ii) whether the agreements foreclose a substantial share of the market for primary ticketing services; the test is not total foreclosure, but rather whether the exclusive dealing barred a substantial number of competitors or severely restricted the market's ambit; (iii) the duration of the contract: a contract of shorter duration is less likely to harm competition than one of longer duration; (iv) whether likely or actual anticompetitive effects are outweighed by procompetitive effects; (v) whether Live Nation engaged in coercive behavior; (vi) the ability of venues to terminate the contract, and (vii) whether competitors use similar contracts.

**Plaintiffs' Authority**: Adapted ABA Model Instr. 2.D.5, 1.C.2., 2.E.8; *United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 609, 611-612, (S.D.N.Y. 2025).

**Plaintiffs' Position**: Plaintiffs have proposed an instruction that closely tracks the three relevant ABA Model Instructions for exclusive dealing, combining two of them for purposes of streamlining. Plaintiffs' only substantive alterations consist of (i) clarifying that exclusive deals may be "nearly exclusive," consistent with other parts of the model instruction and case law, and (ii) providing the jury with guidance on sufficient foreclosure rates and other relevant factors for assessing competitive effects, based on *United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 609, 611-612, (S.D.N.Y. 2025) (citing *ZF Meritor*, 696 F.3d at 271-72).

Defendants' proposal is not based on an established model and misstates the law. First, it incorrectly suggests to jurors that the particular exclusive contracts at issue *here* are "presumptively procompetitive and lawful" based on caselaw describing certain exclusive contracts more generally across the economy. Whether the particular exclusive contracts at issue here are anticompetitive/procompetitive or lawful/unlawful depends on the particular facts and circumstances, as analyzed using the *ZF Meritor* factors that appear nowhere in Defendants' proposed instruction. Additionally, Defendants' proposed instruction misstates the law on coercion and is likely to confuse the jury. Defendants' proposal suggests the jury must find that customers "would have preferred to enter into a non-exclusive contract," but the relevant question, as with tying, is whether, but for Defendants' conduct, customers *might* have preferred a different arrangement such as a non-exclusive contract. *See supra* Plaintiffs' Position at Post-Instruction No. 7; *see also United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 611 (S.D.N.Y. 2025) (identifying

54

"evidence that the dominant firm engaged in coercive behavior" as only one of seven factors courts consider in assessing foreclosure). Additionally, Defendants' broad assertion that "it is not anticompetitive for a seller to agree to sell on an exclusive basis, even if that seller has monopoly power," finds no support in the cases cited, as the key question under Section 2 is whether Defendants' exclusive contracts foreclosed competition, here in furtherance of maintaining their ticketing monopolies.

**Defendants' Authority:** *In re Mylan N.V. Sec. Litig.*, 666 F. Supp. 3d 266, 291 (S.D.N.Y. 2023) ("With respect to exclusive dealing agreements, the Supreme Court has long held that such agreements, whether challenged under Section 1 or Section 2, are presumptively procompetitive and lawful."); *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 245 (2d Cir. 1997) ("[E]xclusive distributorship arrangements are presumptively legal."); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 284 (3d Cir. 2012) ("Exclusive dealing will generally only be unlawful where the market is highly concentrated, the defendant possesses significant market power, and there is some element of coercion present."); *Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*, 962 F.3d 1015, 1031 n.11 (8th Cir. 2020) (same); *Interface Grp., Inc. v. Massachusetts Port Auth.*, 816 F.2d 9, 11 (1st Cir. 1987) ("When there is no plausible connection between exclusive dealing and antitrust harm, courts have not hesitated to hold that dealing lawful."); *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 77-78 (3d Cir. 2010) ("coercion is a fundamental consideration" where customers have "freely entered into exclusive contracts with the respective suppliers"); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 189-90 (3d Cir. 2005); *In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 996 (10th Cir. 2022) ("We can [] generally presume exclusive deals are procompetitive. But this assumption is thrown out the window when record evidence suggests coercion by the monopolist.").

**Defendants' Argument**: Exclusive contracting is the core conduct that Plaintiffs challenge in their Section 1 claim and most of their Section 2 claims. Given its central role in this case, the jury should be instructed on the law of exclusive contracts. This instruction explains that exclusive contracts themselves are not unlawful, and they do not constitute anticompetitive or exclusionary conduct unless the seller coercively imposed them on customers. As multiple courts have recognized, this element of coercion is required with respect to exclusive contracts. *See, e.g.*, *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 284 (3d Cir. 2012); *Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*, 962 F.3d 1015, 1031 n.11 (8th Cir. 2020); *In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 996 (10th Cir. 2022). Without an instruction of this nature, the jury may erroneously believe that the mere fact of entering into exclusive contracts is anticompetitive. Defendants object to Plaintiffs' proposal, which might suggest that exclusive contracts are always anticompetitive if, for instance, they have a certain duration—a position long rejected by the Supreme Court. *See In re Mylan N.V. Sec. Litig.*, 666 F. Supp. 3d 266, 291 (S.D.N.Y. 2023) ("With respect to exclusive dealing agreements, the Supreme Court has long held that such agreements, whether challenged under Section 1 or Section 2, are presumptively procompetitive and lawful.").

**Post-Instruction No. 16P**

## PROCOMPETITIVE BENEFITS

If you find that Defendants engaged in anticompetitive conduct, then you may consider non-pretextual, procompetitive justifications for this conduct offered by Defendants.

A justification is pretextual if it was not the true reason for Defendants' conduct.

A justification is procompetitive if it promotes efficiency or quality or allows a company to offer a better product or service. For example, if Defendants' conduct is part of what supports the quality or functionality of the specific service of Defendants at issue, then that conduct may be procompetitive.

If you find that Defendants offered non-pretextual, procompetitive justifications for particular conduct, you must then determine whether Plaintiffs have proven by a preponderance of the evidence that the conduct was not reasonably necessary to achieve the benefits. In other words, if Plaintiffs have proven that the same benefits claimed by Defendants could have been achieved by other, reasonably available alternative means that would have created less harm to competition, then Defendants cannot use those claimed benefits to justify the conduct.

**Plaintiffs' Authority**: Adapted ABA Model Instr. 1.C.3; *US Airways, Inc. v. Sabre Holdings Corp.*, Final Jury Instructions at 19, 27, 1:11cv2725, ECF No. 1207-8 (S.D.N.Y. May 19, 2022); *Fed. Trade Comm'n v. Shkreli,* 581 F. Supp. 3d 579, 627 (S.D.N.Y. 2022) (a "monopolist may proffer nonpretextual procompetitive justifications for its conduct") (citation omitted); *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2162 (2021) (explaining that the defendant failed to show a "procompetitive benefit" because it "failed to establish that the challenged compensation rules have any direct connection to consumer demand" (cleaned up)); *Microsoft*, 253 F.3d at 72 (rejecting justification of "keeping developers focused upon Windows" as "competitively neutral"); *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 238 (2d Cir. 2003) ("If the defendants [provide a procompetitive justification for a challenged restraint], the government must prove either that the challenged restraint is not reasonably necessary to achieve the defendants' procompetitive justifications, or that those objectives may be achieved in a manner less restrictive of free competition.").

**Plaintiffs' Position**: Although Defendants subsume a similar instruction as a small part of their proposed instruction 19, Plaintiffs' position is that this explanation of how the jury should evaluate procompetitive justifications warrants emphasis as its own instruction, just like in the ABA Model.

**Defendants' Argument**: Defendants think separate instructions on procompetitive benefits and balancing the competitive effects are unnecessary, and Defendants propose folding those instructions into the instruction on anticompetitive conduct above. Doing so would reduce the length of these instructions, make clear to the jury that the balancing analysis is all part of the anticompetitive conduct element, and avoid any misimpression that Defendants bear any burden of proof in this case.

**Post-Instruction No. 16P2**

## BALANCING THE COMPETITIVE EFFECTS

If you find that the challenged conduct was reasonably necessary to achieve competitive benefits, then you must balance those competitive benefits against the competitive harm resulting from the same conduct.

If the competitive harm outweighs the competitive benefits, then the challenged conduct is exclusionary. If the competitive harm does not outweigh the competitive benefits, then the challenged conduct is not exclusionary. In conducting this analysis, you must consider the benefits and harm to competition and consumers, not just to a single competitor or group of competitors. Plaintiffs bear the burden of proving by a preponderance of the evidence that the anticompetitive effect of the conduct outweighs any qualifying pro-competitive benefits.

This concludes the instructions on Plaintiffs' monopolization claims. Once you've completed your deliberations following these monopolization instructions, you should mark on the jury form, for each market identified, whether or not Defendants unlawfully monopolized that market.

**Plaintiffs' Authority**: Adapted ABA Model Instr. 1.C.4; *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 238 (2d Cir. 2003) ("If the defendants [provide a procompetitive justification for a challenged restraint], the government must prove either that the challenged restraint is not reasonably necessary to achieve the defendants' procompetitive justifications, or that those objectives may be achieved in a manner less restrictive of free competition.").

**Plaintiffs' Position**: Although Defendants subsume a similar instruction as a small part of their proposed instruction 19, Plaintiffs' position is that this explanation of how the jury should evaluate procompetitive justifications warrants emphasis as its own instruction, just like in the ABA Model.

**Defendants' Argument**: Defendants think separate instructions on procompetitive benefits and balancing the competitive effects are unnecessary, and Defendants propose folding those instructions into the instruction on anticompetitive conduct above. Doing so would reduce the length of these instructions, make clear to the jury that the balancing analysis is all part of the anticompetitive conduct element, and avoid any misimpression that Defendants bear any burden of proof in this case.

**Post-Instruction No. 17**

### EXCLUSIVE DEALING—SHERMAN ACT SECTION 1

Plaintiffs separately claim that Defendants have engaged in unlawful exclusive dealing in violation of Section 1 of the Sherman Act by entering into long-term, exclusive primary ticketing contracts with major concert venues that generally require the venue to use Ticketmaster as the exclusive primary ticketer for all events or for all concerts. I have already instructed you on the special standards you are to consider when evaluating exclusive dealing conduct under Plaintiffs' Section 2 monopolization claim. I will now instruct you on how to evaluate exclusive dealing conduct under Plaintiffs' separate Section 1 exclusive dealing claim. Again, you should not apply these standards when considering other forms of alleged anticompetitive conduct.

To establish that an exclusive dealing, or partial exclusive dealing, arrangement violates Section 1 of the Sherman Act, Plaintiffs must establish each of the following elements by a preponderance of the evidence:

(1)    There is an agreement between the buyers (major concert venues) and the primary ticketing supplier (Defendants) that substantially forecloses the major concert venues from buying primary ticketing services from competing primary ticketing companies.

(2)    The agreement was an unreasonable restraint of trade that had a substantial adverse effect on competition for primary ticketing services. Plaintiffs may prove the agreement unreasonably restrained trade through direct evidence, circumstantial evidence, or both. When evaluating whether the agreement adversely affected competition, there is no set formula and you may assess some or all of the following factors: (i) whether the Defendants possess market power; (ii) whether the agreements foreclose a substantial share of the market for primary ticketing services to major concert venues—for your guidance, foreclosing roughly

40% of a relevant market can be considered a substantial share under Section 1 of the Sherman Act; (iii) the duration of the contract: a contract of shorter duration is less likely to harm competition than one of longer duration; (iv) whether likely or actual anticompetitive effects are outweighed by procompetitive effects; (v) whether Live Nation engaged in coercive behavior; (vi) the ability of venues to terminate the contract, and (vii) whether competitors use similar contracts.

(3) Defendants had substantial market power in at least one of the alleged ticketing markets. Market power has been defined as an ability to profitably raise prices for a sustained period of time above those prices that would be charged in a competitive market, or to exclude competition, or to force a purchaser to do something it would not do in a competitive market. Market power is understood to be less power over the market compared to monopoly power. A firm can have market power if it does not have monopoly power, but a firm that has monopoly power in a relevant market necessarily also has market power in that market. Even a firm with around 30% market share can have market power. A firm that has market power generally can charge higher prices for the same goods or services than a firm in the same market that does not possess market power. The ability to charge higher prices for better products or services, however, is not on its own market power. An important factor in determining whether Defendants possess market power in the alleged ticketing markets is their market share, that is, Defendants' percentage of the products or services sold in the relevant market by all competitors. Other factors that you may consider in determining whether Defendants have, or had, market power include whether Defendants are capable of raising or maintaining prices above competitive levels or reducing quality; or whether there are barriers to entry or expansion; or whether Defendants can exclude or have excluded competition or prevented competitors or potential competitors from entering the relevant market. I previously

instructed you on barriers to entry or expansion in connection with the Section 2 claims, and those same instructions apply here.

If Defendants do not possess a substantial market share, it is less likely that they possess market power and unlikely that the challenged restraint has resulted or will result in a substantial harmful effect on competition in the market. However, if Defendants do possess a substantial market share it is more likely that they possess market power and the challenged restraint has resulted or will result in a substantial effect on competition.

To violate Section 1 of the Sherman Act, the exclusive dealing agreement also must have occurred in or affected interstate commerce. Because the parties have agreed to this last element, you will not need to decide it.

If you find that Plaintiffs have failed to prove any one of these elements, then you must find for Defendants and against Plaintiffs on Plaintiffs' Section 1 exclusive dealing claim. If you find that Plaintiffs have proven all of these elements, then you must find for Plaintiffs and against Defendants on Plaintiffs' Section 1 exclusive dealing claim.

**Plaintiffs' Authority**: Adapted ABA Model Instr. 1.C.2, 2.D.5; *United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 609, 611-12, (S.D.N.Y. 2025) (setting forth exclusive dealing framework under Section 1 of the Sherman Act); *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 342 (S.D.N.Y. 2001) (ruling that MasterCard had "market power in the general purpose card network services market" where Mastercard had a "26%" market share), *modified,* 183 F. Supp. 2d 613 (S.D.N.Y. 2001), and *aff'd,* 344 F.3d 229 (2d Cir. 2003); *United States v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001) (Section 1 generally requires a roughly "40% standard drawn from the caselaw," while a Section 2 violation may "foreclose less than the roughly 40% or 50% share usually required in order to establish a [Section] 1 violation"); Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1821c ("[Foreclosure] [p]ercentages higher than 50 percent are routinely condemned when the practice is complete exclusion by a contract of fairly long duration.").

**Plaintiffs' Position:** As with the exclusive dealing instruction under Section 2, Plaintiffs' proposed instruction hews closely to the cited ABA Model Instructions and the language from *United States v. Visa*. 788 F. Supp. 3d 585, 609 (S.D.N.Y. 2025). Further, the Court has already rejected the premise that each agreement must be evaluated separately. ECF No. 1037 at 41–42.

**Defendants' Authority:** Adapted ABA Model Instr. 1.C.2, 2.D.5, 2.D.6, *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 116 (S.D.N.Y. 2015) ("In order to adequately plead foreclosure in a relevant market, a plaintiff first must properly define the relevant market."); *id.* at 117 ("It also is well established that exclusive agreements do not harm competition when there is competition to obtain the exclusive contract."); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 284 (3d Cir. 2012) ("Exclusive dealing will generally only be unlawful where the market is highly concentrated, the defendant possesses significant market power, and there is some element of coercion present."); *Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*, 962 F.3d 1015, 1031 n.11 (8th Cir. 2020) (same); *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 77-78 (3d Cir. 2010) ("coercion is a fundamental consideration" where customers have "freely entered into exclusive contracts with the respective suppliers"); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 189-90 (3d Cir. 2005); *In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 996 (10th Cir. 2022) ("We can [] generally presume exclusive deals are procompetitive. But this assumption is thrown out the window when record evidence suggests coercion by the monopolist."); *CoStar Grp., Inc. v. Comm. Real Estate Exch., Inc.*, 150 F.4th 1056, 1067 (9th Cir. 2025) ("[A] § 1 exclusive dealing claim requires a substantial foreclosure of competition."); *New York v. Meta Platforms, Inc.*, 66 F.4th 288, (D.C. Cir. 2023) (requiring "substantial market foreclosure"); *United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 609 (S.D.N.Y. 2025) ("[A]n exclusive dealing arrangement must 'foreclose competition in such a substantial share of the relevant market so as to adversely affect competition.'"); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720 (MKB), 2024 WL 1014159, at *26 (E.D.N.Y. Mar. 8, 2024) ("Moreover, it is settled law that, under the rule of reason, a plaintiff bears the burden of showing 'an actual adverse effect' on competition through increased prices, decreased output, or that the challenged conduct 'otherwise stifled competition.'"); *Dickson v. Microsoft Corporation*, 309 F.3d 193, 203-05 (4th Cir. 2002) (declining to consider licensing agreements between Microsoft and various OEMs in the aggregate and analyzing each agreement "individually" instead); *Howard Hess Dental Laboratories v. Dentsply International*, 602 F.3d 239, 255-56 (3d Cir. 2010) (requiring plaintiffs to show that "every single agreement" between a manufacturer and its dealers had anticompetitive effect); *Gibson v. Cendyn Group*, 148 F.4th 1069, 1087 (9th Cir. 2025) (finding that "a grouping of individual agreements could not be 'aggregated' for the purposes of determining whether together they acted as an unreasonable restraint of trade," and requiring that the agreements "have a 'discrete effect' on competition"); *Panini America v. Fanatics*, 2025 WL 753954, at *9 (S.D.N.Y. Mar. 10, 2025) (refusing to "consider the effects of [] six exclusive deals together" and considering the effect of each separately instead); *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 83-84 (3d Cir. 2010) (plaintiff was not denied the ability to compete merely because it did not receive an invitation to bid where it was "well aware of what [was] going on in the marketplace" and knew how to compete for exclusive contracts); *Paddock Publ'ns v. Chi. Tribune*, 103 F.3d 42, 45 (7th Cir. 1996) ("Competition-for-the-contract is a form of competition that antitrust laws protect rather than proscribe, and it is common."); *Ticketmaster v. Tickets.com*, 2003 WL 21397701 (C.D. Cal. Mar. 7, 2003), *aff'd*, 127 F. App'x 346 (9th Cir. 2005); *City of New York v. Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011) ("To state a claim under. . . §§ 1 or 2 of the Sherman Act. . . a plaintiff must allege a plausible relevant market in which competition will be impaired.").

**Defendants' Argument**: Defendants' edits to this instruction primarily accomplish four things.

*First*, they clarify that this claim is asserted only against Ticketmaster, not Live Nation. ECF No. 257 at 87-88 (Am. Compl.). Indeed, only Ticketmaster is a party to its primary ticketing contracts with venues, and Plaintiffs have not alleged any veil-piercing or like theory that would permit this claim against Live Nation. *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d

Cir. 1993) ("a contract under the corporate name of [either a parent corporation or its subsidiary] is not treated as that of both").

*Second*, Defendants' proposal makes clear that Plaintiffs must prove their Section 1 exclusive dealing claim for each challenged primary ticketing contract separately. As Defendants explained in their summary judgment briefing, exclusive dealing challenges under Section 1 cannot aggregate contracts, unlike under Section 2. ECF No. 724 at 32 (Memorandum of Law in Support of Defendants' Motion for Summary Judgment); *Dickson v. Microsoft Corporation*, 309 F.3d 193, 203-05 (4th Cir. 2002) (declining to consider licensing agreements between Microsoft and various OEMs in the aggregate and analyzing each agreement "individually" instead); *Howard Hess Dental Laboratories v. Dentsply International*, 602 F.3d 239, 255-56 (3d Cir. 2010) (requiring plaintiffs to show that "every single agreement" between a manufacturer and its dealers had anticompetitive effect); *Gibson v. Cendyn Group*, 148 F.4th 1069, 1087 (9th Cir. 2025) (finding that "a grouping of individual agreements could not be 'aggregated' for the purposes of determining whether together they acted as an unreasonable restraint of trade," and requiring that the agreements "have a 'discrete effect' on competition"); *Panini America v. Fanatics*, 2025 WL 753954, at *9 (S.D.N.Y. Mar. 10, 2025) (refusing to "consider the effects of [] six exclusive deals together" and considering the effect of each separately instead).

This Court rejected this argument at summary judgment on the basis that the cited cases are all conspiracy cases in which a plaintiff sued the hub and the spokes. ECF No. 1037 at 41-42. But that is not true of two of the four cases. Defendants thus respectfully request reconsideration. *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995) (reconsideration warranted where party can point to matters "that might reasonably be expected to alter the conclusion reached by the court"). In *Panini*, the plaintiff sued only the hub and no spokes, and the plaintiff did not allege any conspiracy claims. In other words, the *Panini* plaintiff alleged the same type of straightforward Section 1 exclusive dealing contract theory that Plaintiffs allege here. There is thus no factual basis to distinguish Judge Swain's ruling in *Panini* from this Court's summary judgment ruling—which created a direct split of authority between district courts in this district without citing a single case supporting its reading of Section 1. Every court to have directly considered and addressed the question of aggregation of contracts under Section 1 has held that, in the absence of proof that all the participants were part of a single conspiracy through a hub-and-spoke theory, aggregation of the contracts is improper. No court has held, as this Court did, that a defendant's liability under Section 1 turns on who else the plaintiffs chose to sue. It cannot be the law that a defendant is subject to a different legal standard under Section 1 only if plaintiffs choose not to sue the counterparties to the agreements.

This Court's reading of *Gibson* was also erroneous. In *Gibson*, the plaintiffs alleged two different Section 1 theories in their complaint—one based on a hub-and-spoke theory, and a separate one based on the aggregation of individual exclusive agreements. On appeal, plaintiffs abandoned the hub-and-spoke claim (as the Ninth Circuit expressly recognized, *see* 148 F.4th at 1079), so the only claim the Ninth Circuit addressed was whether it was appropriate to aggregate individual exclusive contracts with a common licensor under Section 1. The Ninth Circuit held unequivocally that is improper, as every other court to have addressed the question has held. This Court's ruling on summary judgment directly contradicts the Ninth Circuit's ruling, and these other cases.

This Court also cited *Standard Oil Co. v. United States*, 337 U.S. 293, 295 (1949), in support of its ruling. ECF No. 1037 at 42. But *Standard Oil* addressed Section 3 of the Clayton Act, not Section 1 of the Sherman Act, and the Supreme Court expressly disclaimed consideration of whether its decision

would be the same under Section 1 of the Sherman Act. *See* 337 U.S. at 314. *Standard Oil* thus presents no impediment to the conclusion many courts have reached—that Section 1 does not permit aggregation of contracts in the absence of proof that all the alleged participants acted together in a single conspiracy. Plaintiffs here, of course, have never alleged (and could never prove) that Ticketmaster acted together with all its venue clients in a single conspiracy. Because the Court's ruling on summary judgment was based on a mistaken reading of 3 of the 5 cases it cited, we respectfully request that the Court reconsider and reverse that ruling and hold that aggregation of contracts is not permitted in the circumstances of this case. Whether this legal holding may present a "coup for antitrust defendants" is not an appropriate basis to disregard settled law. ECF No. 1037 at 42. In any event, it does not. The legal basis for a claim that a series of individual exclusive contracts harms competition is Section 2, not Section 1. Interpreting Section 1 as this Court did actually creates a coup for antitrust plaintiffs, allowing them to try to make out a claim under Section 1 that they cannot prove under Section 2. There is no basis in Section 1 law for such a maneuver.

*Third*, Defendants' edits to the market power element align it with the ABA model jury instruction on market power. *See* ABA Model Instr. 1.C.2. Defendants object to Plaintiffs' comparison of market power to monopoly power. This comparison, and in particular Plaintiffs' provision of a market share percentage at which market power may be found, is prejudicial as it may cause the jury to ignore the market power analysis and find the market power element satisfied based only on Ticketmaster's market share.

*Fourth*, Defendants have added elements on market definition, coercion, substantial foreclosure, and anticompetitive effects because it is well-established that each of those inquiries must be satisfied in a Section 1 exclusive dealing claim. *City of New York v. Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011) ("To state a claim under . . . §§ 1 or 2 of the Sherman Act . . . a plaintiff must allege a plausible relevant market in which competition will be impaired."); *supra* Post-Instruction No. 16 (Anticompetitive or Exclusionary Conduct – Exclusive Dealing – Sherman Act Section 2); *United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 609 (S.D.N.Y. 2025) ("[A]n exclusive dealing arrangement must 'foreclose competition in such a substantial share of the relevant market so as to adversely affect competition.'"). Defendants' explanation of the substantial foreclosure element tracks the relevant ABA model jury instruction. *See* ABA Model Instr. 2.D.6. As does Defendants' explanation that the jury should consider whether venues wanted to enter into exclusive primary ticketing contracts, and whether Ticketmaster's competitors has an opportunity to compete for those contracts. *Id.*; *see Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 117 (S.D.N.Y. 2015) ("It also is well established that exclusive agreements do not harm competition when there is competition to obtain the exclusive contract."); *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 83-84 (3d Cir. 2010) (plaintiff was not denied the ability to compete merely because it did not receive an invitation to bid where it was "well aware of what [was] going on in the marketplace" and knew how to compete for exclusive contracts).

64

**Post-Instruction No. 18**

## UNLAWFUL TYING

Plaintiffs also claim that Defendants engaged in an unlawful tying arrangement in violation of Section 1 of the Sherman Act. Again, this is separate and apart from Plaintiffs' claims of monopolization and unlawful exclusive dealing and is subject to different rules, which I will explain now.

A tying arrangement is one in which the seller will sell one product or service (referred to as the tying product) only on the condition that buyers also purchase a different product or service (referred to as the tied product) from the seller, or that buyers at least agree not to purchase the tied product or service from any other seller. In this case, Plaintiffs claim that the tying product is the use of what they call "large amphitheaters" by artists, and the tied product is promotion services to artists . Plaintiffs claim that Defendants require artists to use Defendants' promotion services in order for those artists to be able to perform at large amphitheaters owned, operated, or controlled by Defendants.

To prevail on their tying claim, Plaintiffs must prove each of the following elements by a preponderance of the evidence:

1.    Th use of large amphitheaters by artists (the tying product) and promotion services to artists (the tied product) are separate and distinct products.

2.    Defendants conditioned artists' use of large amphitheaters on artists also purchasing Defendants' promotion services.

3.    Defendants have sufficient market power in the use of large amphitheaters by artists to enable Defendants to restrain competition for promotion services to artists. I have previously instructed you on the meaning of market power in connection with the exclusive dealing claim. The same rules apply in determining the existence of market power here. You may find that Defendants have market power with respect to the use of large amphitheaters by artists if, by

reason of some advantage, Defendants have the power to raise their prices, reduce quality, or restrict output for the use of large amphitheaters by artists without losing an appreciable amount of business or otherwise to force artists who purchase the use of large amphitheaters to do something that they would not do in a more competitive market.

4.      The alleged tying arrangement affected a not insubstantial volume of commerce in promotion services.

If you find that the evidence is sufficient to prove all four of these elements, then the tying arrangement is "per se" unlawful—which means that the tying arrangement is definitely unlawful and you may not consider any argument by Defendants that the tying arrangement has procompetitive benefits—and you must find for Plaintiffs and against Defendants on Plaintiffs' tying claim.

If you find that Plaintiffs have not proven the third element (that Defendants have market power in the use of large amphitheaters by artists), but that Plaintiffs have proven the other elements, then you may still find the tying arrangement unlawful if you find there have been actual anticompetitive effects with respect to promotion services to artists, such as increased prices paid by artists for promotions services, a reduced number of shows played by artists in large amphitheaters, or reduced quality of promotions services to artists. If you find that the evidence is insufficient to prove any one of these elements, then you must find for Defendants and against Plaintiffs on Plaintiffs' tying claim.

I will now provide additional detail on these elements, except for the first element of separate products, as both Plaintiffs and Defendants agree that element has been met.

**Plaintiffs' Authority**: Adapted ABA Model Instr. 2.E.1 and 2.E.3; ECF 1094 at 3-5; SJ Op., EC 1037 at 32-33; *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12-13, 26, 29 (1984) (if a defendant with market power over a tying product has forced or coerced customers into purchasing a separate, tied product, and a not insubstantial amount of commerce is affected for the tied product, then a Plaintiff has successfully "invok[ed] the per se rule against tying and thereby avoid[s] analysis of actual market conditions" because such a tie is inherently anticompetitive; if defendant has insufficient power in the tying market, however, the plaintiff, "[i]n order to prevail in the absence of

per se liability," must make "an inquiry into the actual effect . . . on competition"); *Fortner Enter., Inc. v. United States Steel Corp.*, 394 U.S. 495, 500-01 (1969) ("the per se doctrine['s] . . . requirement that a 'not insubstantial' amount of commerce be involved makes no reference to the scope of any particular market or to the share of that market foreclosed by the tie"; and the "inability to satisfy [the per se] standards" are not "fatal to a plaintiff's case" as "[a] plaintiff can still prevail on the merits whenever he can prove, on the basis of a more thorough examination of the purposes and effects of the standards involved"—i.e., through a rule of reason analysis—"that the general standards of the Sherman Act have been violated");*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 463 (1992); *N. Pacific R. Co. v. United States*, 356 U.S. 1, 7 (1958); *Hill v. A-T-O, Inc.*, 535 F.2d 1349, 1353 (2d Cir. 1976);   *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 133 n. 5 (2d Cir. 2001), *overruled on other grounds In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006); *accord United States v. IBM Corp.*, 163 F.3d 737, 741 (2d Cir. 1998); *Park Irmat Drug Corp. v. Optumrx, Inc.*, 152 F. Supp. 3d 127, 139 (S.D.N.Y. 2016); Areeda & Hovenkamp, Antitrust Law ¶ 1702 ; ; ; ("[a]rrangements not unlawful [per se] might be unlawful under the rule of reason . . . even in the absence of any 'tying' product over which the supplier has power, or of the 'separate products' that per se tying law requires"); *In re Wireless Services Antitrust Lit.*, 385 F. Supp. 2d 403, 414-15 ("where a tying arrangement may be condemned as illegal per se, plaintiffs need not allege, let alone prove, an element relevant to a rule-of-reason inquiry: i.e., anticompetitive effects in the tied market", and "the plaintiff is also relieved of the burden of rebutting any justifications the defendant may offer for the tie"; if, however, "the showing of market power is insufficient to find a per se violation of antitrust law, courts apply a rule of reason analysis at the fact-finding stage through a burden shifting scheme," pursuant to which a plaintiff may demonstrate "an actual adverse effect on competition" through "examining factors like reduced output, increased prices and decreased quality" or "significant barriers to entry into a particular market") (cleaned up).

**Plaintiffs' Position**: Plaintiffs combined ABA Model Instructions 2.E.1 (Unlawful Tying Arrangement) and 2.E.3 (Elements – Per Se Unlawful Tying) for brevity and clarity. Plaintiffs' proposal conforms closely to the ABA Model for both instructions. In paragraph one, Plaintiffs add the sentence with the language "separate and apart" to make it clear to the jurors that they are now considering a new claim. In paragraph two, Plaintiffs provide an illustrative example for the jurors, by specifying the type of conduct being alleged. In paragraph three, Plaintiffs list all five elements that are required to prove a tying claim in the Second Circuit: "first, a tying and a tied product; second, evidence of actual coercion by the seller that forced the buyer to accept the tied product; third, sufficient economic power in the tying product market to coerce purchaser acceptance of the tied product; fourth, anticompetitive effects in the tied market; and fifth, the involvement of a 'not insubstantial' amount of commerce in the 'tied' market." *Gonzalez v. St. Margaret's House Hous. Dev. Fund Corp.*, 880 F.2d 1514, 1516-17 (2d Cir. 1989); *accord E & L Consulting, Ltd. v. Doman Indus.*, 472 F.3d 23, 31 (2d Cir. 2006).

Defendants also attempt to insert an improper requirement of a separate relevant market for "promotion services to all touring artists" into their proposed instruction for Plaintiffs' unlawful tying claim. But as with Defendants' proposed Post-Instruction No. 16D, the Court already rejected the argument that Plaintiffs must define a separate market for the "tied" product market in denying Defendants' motion for reconsideration. ECF No. 1094 at 2-5 (concluding that "no Second Circuit or Supreme Court case says that a plaintiff must provide a formal market definition for the tied product," and finding the "nonbinding caselaw" cited by Defendants "unpersuasive"). Plaintiffs are

67

only required to "identify some separate product from the tying market and then establish that there are anticompetitive effects in the market for that tied product," *id.* at 5, as set forth in Plaintiffs' proposed instruction.

**Defendants' Authority**: Adapted ABA Model Instr. 2.E.1, 2.E.3; *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 71 (2d Cir. 1996) (noting "the 'fundamental principle of antitrust law that an illegal tying arrangement requires that at least two products and/or services be purchased by the same individual'"); *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 447 (2009) ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."); *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) ("[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'"); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 604-05 (1985) (jury instructed that "refusal to deal … 'does not violate Section 2 if valid business reasons exist for that refusal'"); *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 929 (4th Cir. 1990) ("In general, a seller has the right to choose with whom it wishes to deal."); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1066 (10th Cir. 2013) (Gorsuch, J.) ("[T]he antitrust laws rarely impose on firms—even dominant firms—a duty to deal with their rivals."); *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 305 (D.C. Cir. 2023) ("To consider Facebook's policy as a violation of § 2 would be to suppose that a dominant firm must lend its facilities to its potential competitors. That theory of antitrust law runs into problems under the Supreme Court's *Trinko* opinion.").

**Defendants' Argument**:  Defendants' position is that this claim should not be going to the jury at all.  In the Second Circuit, a tied product market is required to prove a tying claim, regardless whether the claim is a per se or rule of reason tying claim.  *See* ECF No. 1048; ECF No. 1051; ECF No. 1059 at 8-13; *Coniglio v. Highwood Servs., Inc.*, 495 F.2d 1286, 1292-93 (2d Cir. 1974) (affirming summary judgment of per se tying claim when there was no proper definition of tied product market, or evidence of anticompetitive effects in it); *Gonzalez v. St. Margaret's House Hous. Dev. Fund Corp.*, 880 F.2d 1514, 1516-19 (2d Cir. 1989) (listing "anticompetitive effects in the tied market" as an element of per se tying claim); *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 31-32 (2d Cir. 2006) (affirming dismissal of tying claim for failure to define tied product market because "an antitrust defendant charged with illegal tying is entitled to some specificity as to . . . the anticompetitive effects in a specified [tied] market, and the effect on the business of the plaintiff.").  At summary judgment, this Court deemed invalid the only tied product market alleged by Plaintiffs in this case.  ECF No. 1037 at 12.  Plaintiffs' tying claim thus failed as a matter of law and should have ended before trial.

To the extent that this claim is going to the jury at all, Defendants object to Plaintiffs' assertion that they have an unqualified right to instruct the jury that their tying claim is per se.  In *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, the Supreme Court made clear that only "*certain* tying arrangements" pose such "an unacceptable risk of stifling competition" that they are unreasonable "per se."  466 U.S. 2, 9 (1984) (emphasis added); *see Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 36 (2006) (*Jefferson Parish* "reject[ed] the application of a per se rule that all tying arrangements constitute antitrust violations").  The per se rule now applies only when the practice at issue lacks procompetitive or efficiency justifications.  *See, e.g.*, *United States v. Microsoft Corp.*, 253 F.3d 34, 94-95 (D.C. Cir. 2001) (en banc) (reversing application of per se tying rule where en banc court could not "comfortably say" that the alleged tie had "so little redeeming value and that there would

68

be so very little loss to society from its ban" that its invocation was justified).  Whether per se analysis applies is a question of law for the court, *not* (as Plaintiffs seem to think) every plaintiff's option.  *See id.* at 89-95; *Arizona v. Maricopa Cty. Med. Socy.*, 457 U.S. 332, 351 (1982) (characterizing the per se rule as a "rule of law"); *Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 922 F.3d 713, 727 (6th Cir. 2019) ("Whether challenged conduct belongs in the per se category is a question of law.").  And "it is only after considerable experience with certain business relationships that courts classify [tying arrangements] as per se violations." *Microsoft*, 253 F.3d at 90 (quoting *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 9 (1979)).

In short, Plaintiffs cannot take this claim to the jury as a per se tying claim unless the Court determines that the claim qualifies for per se analysis as a matter of law—which it does not.  Plaintiffs' alleged tie is not one of those limited "types of [] arrangements [that] are deemed unreasonable as a matter of law." *Jefferson Parish*, 466 U.S. at 9.  This is not a textbook tying case where a seller is saying to a buyer, "if you want X, you have to take Y."  Instead, the alleged tie arises in the context of a vertically integrated concert promoter and venue operator that has a policy of refusing to deal with its rivals.  Properly understood, this is not a tie at all—but a lawful refusal to deal.  Even if the Court disagrees, it is not the type of tie that courts have enough familiarity with to deem it per se unlawful.  At best for Plaintiffs, this would be a tie implemented through an intermediary, roughly equivalent to the one the Seventh Circuit allowed to proceed in *Viamedia*.  But even that was not a *per se* case—and there is no basis for the Court here to classify a rarely-if-ever-seen form of "tie" and put it in the legal bucket reserved for commercial arrangements that courts can confidently say, by virtue of experience, almost never have procompetitive justifications.  In other words, there is no basis in the law to treat Defendants' policy as something presumptively *unlawful*.  And Plaintiffs have identified "no close parallel in prior antitrust cases" to support per se condemnation. *Microsoft Corp.*, 253 F.3d at 84.  To the contrary, relieving Plaintiffs of the obligation to show any harm to competition would pose a real "risk[] of error [or] of deterring welfare-enhancing innovation." *Id.* at 89-90.  Should this Court allow Plaintiffs' tying claim to proceed as a per se claim, its decision would be in serious tension with *Jefferson Parish*, *Illinois Tool*, and *Microsoft*.

Accordingly, to the extent Plaintiffs can take this claim to the jury at all (and they cannot), it must proceed as a rule of reason claim, and the jury must be instructed that Plaintiffs must prove a tied product market and anticompetitive effects in that market.  Given that the Court has deemed invalid Plaintiffs' alleged tied product market involving promotion services to artists at "major concert venues," that should end the claim altogether.  But assuming the Court disagrees, the only alternative option (which Defendants press here not as a frontline argument, but only in the event that the Court rejects their frontline position and does believe the claim should go forward) is to put it to Plaintiffs to prove a tied product market involving promotion services to all artists at all venues.  Defendants have thus proposed that tied product market throughout their tying instructions.  But to be clear, Defendants' position is that Plaintiffs cannot be allowed to even attempt to prove that or any other tied product market after their only alleged market was deemed invalid, and this claim should not be going to the jury at all.

Additionally, Defendants' proposal includes an instruction on refusal to deal, as well as an element requiring the jury to determine whether artists or promoters are renters of amphitheaters.  "[A]n illegal tying arrangement requires that at least two products and/or services be purchased by *the same individual*." *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 71 (2d Cir. 1996) (emphasis

added).  If promoters are the purchasers, as Defendants contend, then there is no illegal tying arrangement involving artists.  Moreover, if promoters are the purchasers, then it is not unlawful for Live Nation to refuse to deal with those competitors.  *See Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 447 (2009) ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."); *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) ("[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'").  As this Court recognized at summary judgment, the issue of who is the purchaser is disputed between the parties and must be resolved by the jury.  ECF No. 1037 at 31-32.  The jury thus must be instructed to resolve that issue, as well as on the important refusal to deal principle that accompanies that issue.

**Post-Instruction No. 19**

## UNLAWFUL TYING—PROOF OF CONDITIONING

You may find that a tying arrangement exists between the use of large amphitheaters by artists and promotion services to artists if Defendants refused to allow artists to use large amphitheaters Defendants controlled unless artists also agreed to buy Defendants' promotion services.

You may also find that a tie exists if Defendants effectively coerced artists into buying Defendants' promotion services. To prove coercion, Plaintiffs must prove by a preponderance of the evidence that Defendants exploited their control over the use of large amphitheaters to force the artists into the purchase of promotion services, which the artists either did not want at all, or might have preferred to purchase from a different promoter on different terms, and that any appearance of choice was illusory. Mere sales pressure or persuasion is not coercion. You may find that Defendants have effectively tied these products if the only viable economic option for artists is to purchase the use of Defendants' large amphitheaters and Defendants' promotion services together. Coercion can be shown even if the artist thinks that the promoter did a good job or charged a fair price, because the key issue for this element is the lack of choice.

However, there is no coercion if the use of large amphitheaters by artists and promotion services are offered separately for sale and separate purchase is economically feasible. There is no requirement that Plaintiffs demonstrate coercion on an individual basis or that individual artists were coerced. An unremitting policy of a tie, if accompanied by sufficient market power in the use of large amphitheaters to appreciably restrain competition for promotion services constitutes the requisite coercion.

**Plaintiffs' Authority**: Adapted ABA Model Instr. 2.E.7; *Hill v. A-T-O, Inc.*, 535 F.2d 1349, 1355 (2d Cir. 1976); *Park v. Thomson Corp.*, 2007 WL 119461, at *4 (S.D.N.Y. Jan. 11, 2007).

**Plaintiffs' Position:** Plaintiffs' proposal conforms largely to the ABA Model Instruction, adding clarifying language to provide examples of the type of conduct Plaintiffs would need to prove to meet their burden. In the final paragraph, Plaintiffs add two sentences on the standard in the Second Circuit, recognized in *Hill v. A-T-O, Inc.*, 535 F.2d 1349, 1355 (2d Cir. 1976), that Plaintiffs can prove coercion by showing evidence of an unremitting policy of a tie, if accompanied by sufficient market power in the tying product (use of large amphitheaters) to appreciably restrain competition for the tied product (artist promotion services). Plaintiffs also object to Defendants' renaming of Plaintiffs' proposed relevant markets in a manner that is confusing, prejudicial, and misleading to the jury.

**Defendants' Authority**: Adapted ABA Model Instr. 2.E.7; *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984) ("[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms."); *Virgin Atl. Airways Ltd. v. Brit. Airways PLC*, 257 F.3d 256, 270 (2d Cir. 2001) ("An invalid tying arrangement conditions the purchase of one product to the purchase of a second product that the buyer either does not want or would have preferred to purchase elsewhere."); *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996) ("To prove a tying claim, a plaintiff must have "evidence of actual coercion by the seller that forced the buyer to accept the tied product."); *Unijax, Inc. v. Champion Int'l, Inc.*, 683 F.2d 678, 686 (2d Cir. 1982); *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 447 (2009) ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."); *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) ("[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'"); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 604-05 (1985) (jury instructed that "refusal to deal … 'does not violate Section 2 if valid business reasons exist for that refusal'"); *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 929 (4th Cir. 1990) ("In general, a seller has the right to choose with whom it wishes to deal."); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1066 (10th Cir. 2013) (Gorsuch, J.) ("[T]he antitrust laws rarely impose on firms—even dominant firms—a duty to deal with their rivals."); *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 305 (D.C. Cir. 2023) ("To consider Facebook's policy as a violation of § 2 would be to suppose that a dominant firm must lend its facilities to its potential competitors. That theory of antitrust law runs into problems under the Supreme Court's *Trinko* opinion.").

**Defendants' Argument**:  Defendants object to Plaintiffs' additions to this instruction that do not appear in the ABA model jury instruction on proof of conditioning.  In particular, Defendants object to Plaintiffs' statement that "coercion can be shown even if the artist thinks that the promoter did a good job or charged a fair price."  And Defendants object to Plaintiffs' language regarding "[a]n unremitting policy of a tie."  Defendants' edits align this instruction with the ABA model jury instruction and make clear that a tying arrangement is illegal only if the buyer was forced into purchasing "a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms."  *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984). Lastly, Defendants' proposal reiterates that mere refusal-to-deal with competitors is not unlawful.  *See* Defendants' Argument on Post-Instruction No. 18 (Unlawful Tying Against Live Nation).

**Post-Instruction No. 20**

## UNLAWFUL TYING—INVOLVEMENT OF A NOT INSUBSTANTIAL VOLUME OF INTERSTATE COMMERCE WITH RESPECT TO THE TIED PRODUCT

The last element is whether the alleged tying arrangement involved a not insubstantial amount of interstate commerce in promotion services.

For commerce to be considered interstate, it must have a nexus to commerce that affects or touches more than one state.

In determining whether the tying arrangement involved a not insubstantial amount of interstate commerce, you should consider the total dollar amount of Defendants' sales of promotion services in interstate commerce involved in the tying arrangement.

**Plaintiffs' Authority**: Adapted ABA Model Instr. 2.E.9; *Summit Health. Ltd. v. Pinhas*, 500 U.S. 322, 328 (1991) (affirming appellate court's description of interstate commerce requirement as requiring no more than a nexus to commerce that affects more than one state, even if "any actual impact on interstate commerce would be 'indirect' and 'fortuitous'"); *Fortner Enterprises, Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 501-02 (1969) ("requirement that a 'not insubstantial' amount of commerce be involved makes no reference to the scope of any particular market or to the share of that market foreclosed by the tie"; rather, "normally the controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely de minimis, is foreclosed to competitors by the tie"); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 16 (1984); *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992); *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 6-7 (1958) (requiring only that "a 'not insubstantial' amount interstate commerce is affected").

**Plaintiffs' Position:** Plaintiffs' proposed instruction generally follows the ABA Model with an additional sentence explaining what constitutes interstate commerce, drawing from the cited cases. Plaintiffs' have also revised the model language to more closely mirror the "not insubstantial" phrasing used by the Supreme Court in *Fortner Enterprises* and *Northern Pacific Railway Co*. Plaintiffs object to Defendants renaming of Plaintiffs' proposed markets as confusing, prejudicial, and misleading to the jury. Plaintiffs also object to Defendants' addition of the phrase "achieved by," which is vague and likely confusing. The relevant question is the amount of commerce "involved" in or "affected" by the alleged tying arrangement. *See Fortner Enterprises, Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 501-02 (1969) ("requirement that a 'not insubstantial' amount of commerce be involved makes no reference to the scope of any particular market or to the share of that market foreclosed by the tie"; rather, "normally the controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely de minimis, is foreclosed to competitors by the tie"); *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 6 (1958) (tying agreements are unreasonable "whenever a party has sufficient economic power with respect to the tying product to appreciably

73

restrain free competition in the market for the tied product and a 'not insubstantial' amount interstate commerce is affected").

**Defendants' Authority**: Adapted ABA Model Instr. 2.E.9; *Summit Health. Ltd. v. Pinhas*, 500 U.S. 322, 328 (1991) (affirming appellate court's description of interstate commerce requirement as requiring no more than a nexus to commerce that affects more than one state, even if "any actual impact on interstate commerce would be 'indirect' and 'fortuitous'"); *Fortner Enterprises, Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 501-02 (1969) ("requirement that a 'not insubstantial' amount of commerce be involved makes no reference to the scope of any particular market or to the share of that market foreclosed by the tie"; rather, "normally the controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely de minimis, is foreclosed to competitors by the tie"); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 16 (1984); *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992); *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 6-7 (1958) (requiring only that "a 'not insubstantial' amount interstate commerce is affected").

**Defendants' Argument**:  Defendants' edits align this instruction with the relevant ABA model jury instruction.  *See* ABA Model Instr. 2.E.9.  They also instruct the jury on substantial foreclosure, on which the parties have not provided a separate instruction, making clear that inquiry is distinct from the insubstantial volume of interstate commerce inquiry and requires a higher showing in the tied product market.

**Post-Instruction No. 21**

**STATE LAW CLAIMS**

In addition to the claims that the Plaintiff States have brought under the Sherman Act, some Plaintiff States have brought claims under their own state laws. I will proceed to instruct you on those state law claims now.

**Authority**: ECF No. 257 (Am. Compl.).

**Post-Instruction No. 22**

### CONGRUENT STATE CLAIMS

Plaintiffs claim that Defendants' conduct harmed competition nationwide, including in each of the Plaintiff States. Twenty-three Plaintiff States have state laws that are congruent with the Sherman Act. That means that these State laws require the same proof as a violation of Section 1 or 2 of the Sherman Act.

For these Plaintiff States, if you find that Plaintiffs have proven every element of a Sherman Act claim and Defendants' conduct harmed competition harmed competition nationwide, including in each Plaintiff State, then you must also find that the Plaintiff State has proven a violation of its State law.

- the Arizona Uniform State Antitrust Act, A.R.S. § 44-1401 *et seq.*;

- the Colorado Antitrust Act of 2023, Colo. Rev. Stat. 6-4-101, *et seq.*;

- the Connecticut Antitrust Act, Conn. Gen. Stat. § 35-24 *et seq.*;

- the District of Columbia Antitrust Act, D.C. Code § 28-4501 *et seq.*;

- the Florida Antitrust Act, Fla. Stat. § 542.15 *et seq.*;

- the Indiana Antitrust Act, Ind. Code §§ 24-1-2-1 and 24-1-2-2;

- the Louisiana Unfair Trade Practices Act, LSA-R.S. 51:1401 *et seq.*;

- the Maryland Antitrust Act, MD Commercial Law Code Ann. § 11-201 *et seq.*;

- the Michigan Antitrust Reform Act, MCL 445.771 *et seq.*;

- the Minnesota Antitrust Law of 1971, Minn. Stat. §§ 325D.49–325D.66;

- the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. § 598A.010 *et seq.*;

- the New Hampshire Revised Statutes Annotated § 356 *et seq.*;

- the New Jersey Antitrust Act, N.J.S.A. § 56:9-1 *et seq.*;

- the New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-1 and 57-1-2;

- the North Carolina Unfair or Deceptive Trade Practices Act, N.C.G.S. § 75-1 *et seq.*;

- the Valentine Act, Ohio Rev. Code Chapter 1331;

- the Rhode Island Antitrust Law, R.I. Gen. L. §§ 6-36-4 and 6-36-5;

- the Texas Business and Commerce Code § 15.01 *et seq.*;

- the Utah Antitrust Act, Utah Code §76-16-510;

- the Virginia Antitrust Act, Va. Code § 59.1-9.1 *et seq.*;

- the Washington Consumer Protection Act, Wash. Rev. Code §§ 19.86.030 and 19.86.040;

- the West Virginia Antitrust Act, W. Va. Code § 47-18-1 *et seq.*; and

- Wisconsin Statutes Chapter 133.

**Plaintiffs' Authority**: *In re Elec. Books Antitrust Litig.,* No 11 MD 2293 DLC, 12 Civ. 3394 (DLC) (S.D.N.Y 2011); *People ex rel. Woodward v. Colo. Springs Bd. of Realtors*, 692 P.2d 1055, 1061 (Colo. 1984); *Shea v. First Fed. Sav. & Loan Ass'n*, 439 A.2d 997, 1006-07 (Connecticut General Statutes sections 35-26 and 25-27 are substantively the same as Sections 1 and 2 of the Sherman Act); *District of Columbia v. Amazon.com, Inc.*, 320 A.3d 1073, 1079 (D.C. 2024) ("The two provisions of the D.C. Antitrust Act at issue here, D.C. Code § 28-4502 and § 28-4503, mirror sections 1 and 2 of the federal Sherman Antitrust Act, 15 U.S.C. § 1 and 15 U.S.C. § 2. In language that is opportune given the dearth of antitrust decisions in this court, the D.C. statute itself—in a provision labeled "Uniformity"—explicitly gives us the green light to rely upon federal courts' interpretations of the Sherman Act when interpreting the D.C. Antitrust Act."); Fla. Stat. §§ 542.16, 542.32 (In interpreting Florida Antitrust Act, "great weight [should] be given to the interpretations of the federal courts relating to comparable federal antitrust statutes); *Bi-Rite Oil Co. v. Ind. Farm Bureau Coop. Ass'n*, 720 F. Supp. 1363, 1378 (S.D. Ind. 1989), *aff'd*, 908 F.2d 200 (7th Cir. 1990) ("Indiana antitrust law . . . was substantially patterned after the federal Sherman Antitrust Act and references to decisional law under the Sherman Act may be made in construing Indiana antitrust provisions . . . ."); *Goldfinch Lab'y, P.C. v. Iowa Pathology Assocs., P.C.,* No. 4:24-CV-00168-RGE-HCA, 2024 WL 5205936, at *7 (S.D. Iowa Dec. 13, 2024); *Louisiana Power & Light Co. v. United Gas Pipe Line Co.,* 493 So. 2d 1149 (La. 1986), *superseded in part by statute,* La R.S. 51:122(B); *Neugebauer v. A. S. Abell Co.*, 474 F. Supp. 1053, 1071 (D. Md. 1979)(state law claims for exclusive dealing, tying, monopolization and others treated like federal claims under Sherman Act because Maryland Antitrust Act, Md. Code Ann., Comm. Law, Sec. 11-204(a)-(b) "were 'carefully and purposefully patterned after their counterparts in the federal law,'") (*citing* General Revisor's Note to the Maryland Antitrust Act); *Little Caesar Enterprises, Inc. v. Smith*, 895 F. Supp. 884, 898 (E.D. Mich. 1995) ("Michigan antitrust law is identical to federal law and follows the federal precedents."); *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 626 (Minn. 2007) (citing *Minn. Twins P'ship v. State*, 592 N.W.2d 847, 851 (Minn.1999))

77

("Minnesota antitrust law is generally interpreted consistently with federal antitrust law."); *Walker v. U-Haul Co. of Miss.*, 734 F.2d 1068, 1070 n.5 (5th Cir.), on reh'g, 747 F.2d 1011 (5th Cir. 1984) ("courts treat federal and Mississippi state antitrust claims as "analytically identical"); *Salem Grain Company, Inc. v. Consolidated Grain and Barge Co.*, 900 N.W.2d 909, 922 (Neb. 2017) ("The NCPA is Nebraska's version of the Sherman Act, but it also encompasses portions of other federal antitrust law, including the FTCA…Further, the act was intended to be an antitrust measure to protect Nebraska consumers from monopolies and price-fixing conspiracies."); *Furniture Royal, Inc. v. Schnadig Int'l Corp.*, No. 2:18-CV-318, 2018 WL 6574779, at *4 (D. Nev. Dec. 13, 2018) (analysis under Nevada Unfair Trade Practices Act "is the same as the Sherman Act"); *Kenneth E. Curran, Inc. v. Auclair Transp.*, 128 N.H. 743, 748-49 (1986); *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F2d 589, 593 (1st. Cir. 1993); *See Shire US, Inc. v. Allergan, Inc.*, 375 F. Supp. 3d 538, 546 (D.N.J. 2019) (the New Jersey Antitrust Act shall be construed in harmony with ruling judicial interpretations of comparable federal antitrust statutes) (quoting *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 402 n.11 (3d Cir. 2016)); *see also State v. Lawn King,* 417 A.2d 1025, 1032 (N.J. 1980) (finding that consonance between the federal and state enactments is required); *Romero v. Philip Morris, Inc.*, 2010-NMSC-035, ¶ 18, 148 N.M. 713, 242 P.3d 280 ("It is therefore the duty of the courts to ensure that New Mexico antitrust law does not deviate from federal interpretations of antitrust law."); *Rose v. Vulcan Materials*, 282 N.C. 643, 655 (1973); *C.K. & J.K., Inc. v. Fairview Shopping Ctr. Corp.*, 63 Ohio St. 2d 201, 204 (1980); *Johnson v. Microsoft Corp.*, 106 Ohio St. 3d 278, 284 (2005); *Northwest Medical Laboratories, Inc. v. Blue Cross and Blue Shield of Oregon, Inc.,* 775 P.2d 863, 868 (Or. App. 1989), *aff'd*, 310 Or. 72 (1990) (Oregon Antitrust Law should be interpreted consistently with federal antitrust law); R.R. Gen. Laws § 6-36-2(b) ("[t]his chapter shall be construed in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable, except where provisions of this chapter are expressly contrary to applicable federal provisions as construed"); Tex. Bus. & Comm. Code § 15.04 ("The purpose of this Act is to maintain and promote economic competition in trade and commerce occurring wholly or partly within the State of Texas and to provide the benefits of that competition to consumers in the state [and] shall be construed in harmony with federal judicial interpretations of comparable federal antitrust statutes to the extent consistent with this purpose."); Utah Code. § 76-16-502(2) ("The Legislature intends that the courts, in construing this part, will be guided by interpretations given by the federal courts to comparable federal antitrust statutes and by other state courts to comparable state antitrust statutes"); *Boeing Co. v. Sierracin Corp.,* 108 Wn.2d 38, 54, 738 P.2d 665, 677 (1987) (citing RCW 19.86.920); W.Va. Code § 47-18-16 (West Virginia Antitrust laws "shall be construed liberally and in harmony with ruling judicial interpretations of comparable federal antitrust statutes."); *Kessel v Mon. County Gen. Hosp. Co.*, 648 S.E.2d 366, 374 (W.Va. 2007); *Olstad v. Microsoft Corp.*, 2005 WI 121, ¶ 42 ("The pivotal language in the first two sections [of the Wisconsin antitrust act and Sherman Act] is nearly identical. This has led courts and commentators to refer to that first incarnation of Wisconsin's antitrust act as the 'Little Sherman Act.'"); *Pulp Wood Co. v. Green Bay Paper & Fiber Co.*, 157 Wis. 604, 625, 147 N.W. 1058 (1914) (Wisconsin antitrust law is a "copy of the federal statute" that "should receive the same interpretation that [is] placed on the federal act, from which it was taken".).

**Plaintiffs' Position:** The parties largely agree on the instructions regarding state laws that are congruent with the Plaintiffs' federal law claims, but several aspects of Defendants' proposed instructions are inaccurate.

First, as discussed above, for purposes of the claims at issue, Defendants should be considered together for purposes of liability. *See* Preliminary Instruction No. 1.

78

Second, Plaintiffs have alleged national markets for all claims at issue that may require proof of a relevant market, and Plaintiffs will collectively present evidence to prove that Defendants' conduct harmed competition nationwide. Defendants' proposal may suggest that each Plaintiff is independently required to put on a separate case, which is not correct. To avoid juror confusion while ensuring an evaluation of State impact, the jury should be instructed to determine whether Defendants' conduct "harmed competition nationwide, including in each Plaintiff State."

Third, Defendants have removed four states from the instruction without an adequate basis. For three states—Arizona, New Jersey, and Wisconsin—Defendants' objection appears to rest on a belief that these States are not empowered to bring *parens patriae* actions. Defendants' objection is misplaced for two reasons. As an initial matter, even if these states did not have *parens patriae* standing to bring damages claims, that does not preclude those states from seeking a jury to determine liability, given their claims for civil penalties. But more importantly, Defendants are incorrect; each state does in fact have standing to bring *parens patriae* claims. *See* A.R.S. § 21-102(F) (State of Arizona has the right to a jury in a civil action seeking, among other relief, civil penalties); *United States v. Apple, Inc.,* No. 24-CV-04055, 2025 WL 1829127, at *16–17 (D.N.J. June 30, 2025) (New Jersey has standing to bring *parens patriae* actions)*; In re Generic Pharmaceuticals Pricing Antitrust Litigation,* 605 F.Supp.3d 672, 679-80 (E.D. Pa 2022) (Iowa and New Jersey have standing to bring *parens patriae* actions); Wis. Stat. § 165.25(1m) (Wisconsin DOJ shall prosecute "any cause or matter … in which the state or the people of this state may be interested"); *State v. City of Oak Creek*, 232 Wis. 2d 612, 628 (2000) (Wisconsin Attorney General may bring a specific action where authorized by law).

Finally, for Indiana, Defendants' proposed instructions are superfluous for this phase of the trial and are likely to lead to juror confusion. Indiana is pursuing federal claims along with its state claims under the Indiana Antitrust Act, and its claim for damages under 15 U.S.C. § 15c are subject to the federal statute of limitations. To the extent Indiana's other claims for relief (*e.g.*, injunctive relief and penalties) are impacted an amendment to the Indiana Antitrust Act, those issues can be resolved during the second phase of the trial. Presenting the jury with additional dates is likely to cause unnecessary confusion and will not bear on the issues before them (liability and damages).

**Defendants' Authority**: *People ex rel. Woodward v. Colo. Springs Bd. of Realtors*, 692 P.2d 1055, 1061 (Colo. 1984); *Shea v. First Fed. Sav. & Loan Ass'n*, 439 A.2d 997, 1006–07 (Connecticut General Statutes sections 35-26 and 25-27 are substantively the same as Sections 1 and 2 of the Sherman Act); *District of Columbia v. Amazon.com, Inc.*, 320 A.3d 1073, 1079 (D.C. 2024) ("The two provisions of the D.C. Antitrust Act at issue here, D.C. Code § 28-4502 and § 28-4503, mirror sections 1 and 2 of the federal Sherman Antitrust Act, 15 U.S.C. § 1 and 15 U.S.C. § 2. In language that is opportune given the dearth of antitrust decisions in this court, the D.C. statute itself—in a provision labeled "Uniformity"—explicitly gives us the green light to rely upon federal courts' interpretations of the Sherman Act when interpreting the D.C. Antitrust Act."); Fla. Stat. §§ 542.16, 542.32 (In interpreting Florida Antitrust Act, "great weight [should] be given to the interpretations of the federal courts relating to comparable federal antitrust statutes); *Louisiana Power & Light Co. v. United Gas Pipe Line Co.*, 493 So. 2d 1149 (La. 1986), *superseded in part by statute*, La R.S. 51:122(B); *Neugebauer v. A. S. Abell Co.*, 474 F. Supp. 1053, 1071 (D. Md. 1979) (state law claims for exclusive dealing, tying, monopolization and others treated like federal claims under Sherman Act because Maryland Antitrust Act, Md. Code Ann., Comm. Law, Sec. 11-204(a)-(b) "were 'carefully and

purposefully patterned after their counterparts in the federal law,'") (*citing* General Revisor's Note to the Maryland Antitrust Act); *Little Caesar Enterprises, Inc. v. Smith*, 895 F. Supp. 884, 898 (E.D. Mich. 1995) ("Michigan antitrust law is identical to federal law and follows the federal precedents."); *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 626 (Minn. 2007) (citing *Minn. Twins P'ship v. State*, 592 N.W.2d 847, 851 (Minn.1999)) ("Minnesota antitrust law is generally interpreted consistently with federal antitrust law."); *Walker v. U-Haul Co. of Miss.*, 734 F.2d 1068, 1070 n.5 (5th Cir.), on reh'g, 747 F.2d 1011 (5th Cir. 1984) ("Courts treat federal and Mississippi state antitrust claims as 'analytically identical'"); *Salem Grain Company, Inc. v. Consolidated Grain and Barge Co.*, 900 N.W.2d 909, 922 (Neb. 2017) ("The NCPA is Nebraska's version of the Sherman Act, but it also encompasses portions of other federal antitrust law, including the FTCA…Further, the act was intended to be an antitrust measure to protect Nebraska consumers from monopolies and price-fixing conspiracies."); *Furniture Royal, Inc. v. Schnadig Int'l Corp.*, No. 2:18-CV-318, 2018 WL 6574779, at \*4 (D. Nev. Dec. 13, 2018) (analysis under Nevada Unfair Trade Practices Act "is the same as the Sherman Act"); *Kenneth E. Curran, Inc. v. Auclair Transp.,* 128 N.H. 743, 748-49 (1986); *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F2d 589, 593 (1st. Cir. 1993); *Romero v. Philip Morris, Inc.*, 2010-NMSC-035, ¶ 18, 148 N.M. 713, 242 P.3d 280 ("It is therefore the duty of the courts to ensure that New Mexico antitrust law does not deviate from federal interpretations of antitrust law."); *Rose v. Vulcan Materials*, 282 N.C. 643, 655 (1973); *C.K. & J.K., Inc. v. Fairview Shopping Ctr. Corp.*, 63 Ohio St. 2d 201, 204 (1980); *Johnson v. Microsoft Corp.*, 106 Ohio St. 3d 278, 284 (2005); R.R. Gen. Laws § 6-36-2(b) ("[t]his chapter shall be construed in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable, except where provisions of this chapter are expressly contrary to applicable federal provisions as construed."); Tex. Bus. & Comm. Code § 15.04 ("The purpose of this Act is to maintain and promote economic competition in trade and commerce occurring wholly or partly within the State of Texas and to provide the benefits of that competition to consumers in the state [and] shall be construed in harmony with federal judicial interpretations of comparable federal antitrust statutes to the extent consistent with this purpose."); Utah Code. § 76-16-502(2) ("The Legislature intends that the courts, in construing this part, will be guided by interpretations given by the federal courts to comparable federal antitrust statutes and by other state courts to comparable state antitrust statutes"); *Boeing Co. v. Sierracin Corp.,* 108 Wn.2d 38, 54, 738 P.2d 665, 677 (1987) (citing RCW 19.86.920); W.Va. Code § 47-18-16 (West Virginia Antitrust laws "shall be construed liberally and in harmony with ruling judicial interpretations of comparable federal antitrust statutes."); *New York, by James v. Niagara-Wheatfield Cent. Sch. Dist.*, 119 F.4th 270, 279 (2d Cir. 2024), *cert. denied sub nom. Niagara-Wheatfield Cent. Sch. Dist. v. New York*, 146 S. Ct. 324 (2025); *California v. Infineon Techs. AG*, 531 F. Supp. 2d 1124 (N.D. Cal. 2007) ("[N]othing in Arizona's antitrust statute grants the Attorney General *parens patriae* authority."); Iowa Code §§ 553.1 *et seq.* (no provision for *parens patriae* actions); N.J. Stat. Ann. §§ 56:9-1 *et seq.* (no provision for *parens patriae* actions); Vt. Stat. Ann. tit. 9 §§ 2451 *et seq.* (no provision for *parens patriae* actions); Wis. Stat. Ann. §§ 133.01 *et seq.* (no provision for *parens patriae* actions); *State v. City of Oak Creek*, 232 Wis. 2d 612, 627 (2000) ("The attorney general is devoid of the inherent power to initiate and prosecute litigation intended to protect or promote the interests of the state or its citizens and cannot act for the state as *parens patriae*."); *California v. Infineon Techs. AG*, 531 F. Supp. 2d 1124 (N.D. Cal. 2007) ("[T]here is no express grant of *parens patriae* authority to sue for damages on behalf of consumers in Wisconsin's antitrust statute."); Utah Code § 76-16-510.

**Defendants' Argument:** Defendants object to Plaintiffs' inclusion of Arizona, Indiana, New Jersey, and Wisconsin in this instruction.

Arizona, New Jersey, and Wisconsin lack parens patriae authority to bring their state-law claims. *See California v. Infineon Techs. AG*, 531 F. Supp. 2d 1124, 1165 (N.D. Cal. 2007) ("[N]othing in Arizona's antitrust statute grants the Attorney General *parens patriae* authority."); N.J. Stat. Ann. §§ 56:9-1 *et seq.* (no provision for *parens patriae* actions); Wis. Stat. Ann. §§ 133.01 *et seq.* (no provision for *parens patriae* actions); *State v. City of Oak Creek*, 232 Wis. 2d 612, 627 (2000) ("The attorney general is devoid of the inherent power to initiate and prosecute litigation intended to protect or promote the interests of the state or its citizens and cannot act for the state as *parens patriae*."); *California v. Infineon Techs. AG*, 531 F. Supp. 2d 1124 (N.D. Cal. 2007) ("[T]here is no express grant of *parens patriae* authority to sue for damages on behalf of consumers in Wisconsin's antitrust statute."). Plaintiffs have provided no authority to the contrary.

As for Indiana, the antitrust statute of Indiana did not authorize parens patriae actions until July 1, 2023. Ind. Code § 24-1-2-5.1 (granting parens patriae authority as of July 1, 2023). And the statutory amendment authorizing such actions does not apply retroactively. *Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-CV-02056 (MPS), 2025 WL 1207566, at *7 (D. Conn. Apr. 25, 2025) ("Indiana conceded that this amendment is not retroactive."). Accordingly, Defendants have provided a separate instruction for Indiana, making clear that it can only recover for each Defendant's conduct that harmed Indiana residents and competition in Indiana occurring after the date on which Indiana authorized parens patriae actions.

**Post-Instruction No. 23**

### CALIFORNIA UNFAIR COMPETITION LAW
### (CAL. BUS. & PROF. CODE § 17200 *ET SEQ.*)

The State of California alleges that Defendants have violated California's Unfair Competition Law, which prohibits corporations from engaging in unfair competition through unlawful or unfair business acts or practices.

For the State of California to prevail on its claim under the Unfair Competition Law, you must find that the State of California has proven each of the following elements by a preponderance of the evidence:

1.    Defendants engaged in a business act or practice;

2.    The act or practice is either unlawful or unfair.

The Unfair Competition Law imposes strict liability. It is not necessary for the State of California to show that Defendants intended to injure anyone.

You must find that the Defendants have violated the Unfair Competition Law if you find that Plaintiffs have satisfied the two elements above and find that Plaintiffs have proven by a preponderance of the evidence any one of the following: (1) the act or practice occurred within California; (2) the act or practice emanated from California; or (3) individuals in California were harmed by the act or practice

To determine whether acts or practices emanate from California, you may consider the location of the firm's headquarters, executives, or other employees involved in the conduct; where the relevant materials were created; where the relevant policies at issue were developed or executed; and where the firm conducts business.

*Unlawful*

To establish a violation of the unlawful prong of the California Unfair Competition Law, the State of California must prove by a preponderance of the evidence that Defendants have violated any

82

other law, and that the act or practice that violates that other law occurred within California or emanated from California or harmed individuals in California. Therefore, if you find for Plaintiffs on any other claim and that any associated act or practice occurred within California or emanated from California or harmed individuals in California, you must find that Defendants have violated the unlawful prong of California's Unfair Competition Law.

*Unfair*

To establish a violation of the unfair prong of the California Unfair Competition Law, the State of California must prove by a preponderance of evidence that Defendants have:

1.    engaged in conduct that threatens an incipient violation of the antitrust laws or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition; or

2.    engaged in a business act or practice for which the harm to consumers outweighs the utility of the conduct.

These tests are not mutually exclusive and you may find that Plaintiffs have proven a violation of (1) or (2) or both (1) and (2).

A business act or practice may be unfair even if not prohibited by some other law such as the Sherman Act. Plaintiffs do *not* need to define any relevant market as described in my prior instructions regarding the Sherman Act (Preliminary Instructions Nos. 10 and 11 and Post-Instructions Nos. 11 and 16 through 27 are not applicable) or perform any market definition exercise to prove a violation of the unfair prong (Post-Instructions Nos. 13 through 15 are not applicable). Plaintiffs do *not* need to establish any antitrust injury to prove a violation of the unfair prong (Post-Instruction Nos. 37 and 38 are not applicable).

In order to find a violation of the unfair prong of the Unfair Competition Law, you must also find that the act or practice that satisfies either test of that prong occurred of that prong within

83

California or emanated from California or harmed individuals in California.

**Plaintiffs' Authority**: *People v. Ashford Univ., LLC*, 100 Cal. App. 5th 485, 506-07, 519 (2024) (citing *Abbott Laboratories v. Superior Court*, 9 Cal. 5th 642, 651-652 (2020); *Fernandez v. CoreLogic Credco*, LLC, 593 F. Supp. 3d 974, 992 (S.D. Cal. 2022); *Ehret v. Uber Techs., Inc.*, 68 F. Supp. 3d 1121, 1131-32 (N.D. Cal. 2014) (finding that a plaintiff had plausibly alleged a "sufficient nexus" and that allegedly unlawful misrepresentations "emanated from California" where the plaintiff alleged misrepresentations were developed in California, contained on a website and application maintained in California, and that billing went through servers located in California); *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 598-99 (S.D. Cal. 2008); *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1000 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 681 (2024) ("As the UCL's three-prong structure makes clear, a business practice may be 'unfair,' and therefore illegal under the UCL, 'even if not specifically proscribed by some other law.'" (*citing Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999))); *Id.* ("First, to support 'any finding of unfairness to *competitors*,' a court uses the 'tethering' test, which asks whether the defendant's conduct 'threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.'" (quoting *Cel-Tech*, 20 Cal. 4th at 186-87); *Id.* ("Second, to support a finding of unfairness to consumers, a court uses the balancing test, which 'weigh[s] the utility of the defendant's conduct against the gravity of the harm to the alleged victim.'" (quoting *Progressive W. Ins. Co. v. Super. Ct.*, 135 Cal. App. 4th 263, 285 (2005) (citation omitted))); *Id.* at 1002 (rejecting the defendant's argument that the UCL "mandates trial courts to define a relevant market and then conduct the balancing test within that market (similar to the Rule of Reason)" because the defendant did "not cite to any California authority for this proposition" and that "such a rule runs contrary to California courts' repeated instruction that '[n]o inflexible rule can be laid down as to what conduct will constitute unfair competition.'" (quoting *Pohl v. Anderson*, 13 Cal. App. 2d 241, 242 (1936))); *In re Google Play Store Antitrust Litig.*, 147 F.4th 917, 933 n.3 (9th Cir. 2025) ("The UCL forbids not only 'unlawful' but 'unfair' conduct, thus allowing for liability even when there is a failure to prove an antitrust claim, as we held in *Epic Games, Inc. v. Apple Inc* . . . [t]he UCL claim survives independent of any antitrust liability").

**Plaintiffs' Position:** Plaintiffs have proposed an instruction that correctly describes the only two elements of California's Unfair Competition Law ("UCL") at issue here: (1) Defendants engaged in a business act or practice and (2) the act or practice is either unlawful or unfair. Cal. Bus. & Prof. Code § 17200 *et seq.*; *see Epic Games v. Apple*, 67 F.4th 946, 1000 (9th Cir. 2023) ("*Epic*"). The UCL is a strict liability statute. *See Hewlett v. Squaw Valley Ski Corp.*, 54 Cal. App. 4th 499, 520 (Cal. Ct. App. 1997) ("The [UCL] statute imposes strict liability. It is not necessary to show that the defendant intended to injure anyone.").

Plaintiffs' proposed instruction lists examples of the factors from caselaw that can be considered when evaluating whether conduct emanated from California for the purposes of out-of-state liability. *See People v. Ashford Univ., LLC,* 100 Cal. App. 5th 485, 518 (2024). Defendants' proposed instruction is unsupported by the cases they cite. In those cases, one factor was not enough to show that conduct emanated from California, but they do not stand for the proposition that one factor is always insufficient. *Sullivan v. Oracle,* which was specifically limited to the "circumstances of [that] case" as stipulated by the parties, declined to apply the UCL to nonresidents when the stipulated facts "identif[ed] only a single instance of relevant conduct occurring in California" that

84

was not "unlawful in the abstract." 51 Cal. 4th 1191, 1208 (2011). The court in *Aghaji v. Bank of America* noted that the plaintiffs failed to even "disclose what information they have that leads them to believe that the alleged violations occurred in . . . California facilities" and failed to allege a violation "in California as to any Plaintiff." 247 Cal. App. 4th 1110, 1119-20 (2016). *Norwest Mortgage v. Superior Court* is also distinguishable because in that case the harm to "nonresident members of the nationwide class" was "caused by conduct occurring outside of California's borders by actors headquartered and operating outside of California." 72 Cal. App. 4th 214, 228 (1999).

In addition, Plaintiffs' proposed instruction correctly states that the UCL applies where "individuals in California" were harmed. Defendant's proposed instruction, which requires harm to "California residents[,]" is inappropriate because the UCL applies to both residents and "nonresidents of California." *Ashford*, 100 Cal. App. 5th at 519, 524 (2024).

Finally, as many of the earlier jury instructions refer to relevant antitrust markets and other antitrust concepts, it is appropriate and necessary to instruct the jury that the UCL does not require any market definition or showing of antitrust injury. *Epic*, 67 F.4th at 1001-02 (rejecting defendant's argument that "the UCL mandates trial courts to define a relevant market and then conduct the balancing test within that market (similar to the Rule of Reason)" because defendant "does not cite any California authority for this proposition" and "such a rule runs contrary to California courts' repeated instruction that '[n]o inflexible rule can be laid down as to what conduct will constitute unfair competition'" (citation omitted)).

**Defendants' Authority**: *People v. Ashford Univ., LLC*, 100 Cal. App. 5th 485, 506-07, 519-20 (2024) (the trial court properly determined that defendants' conduct emanated from California and had cited "evidence that defendants were headquartered in San Diego, and Ashford's former presidents, admissions counselors, and the majority of admissions employees worked in San Diego"); *Fernandez v. CoreLogic Credco*, LLC, 593 F. Supp. 3d 974, 992 (S.D. Cal. 2022) (refusing to dismiss UCL claim and finding it plausible that unlawful conduct emanated from California in lawsuit brought by Maryland resident against a firm that had its principal place of business in California, management level employees in California, and that the policies and procedures at issue in this case were developed, designed, and implemented in California); *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1000 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 681 (2024) ("As the UCL's three-prong structure makes clear, a business practice may be 'unfair,' and therefore illegal under the UCL, 'even if not specifically proscribed by some other law.'" (*citing Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999))); *Id.* ("First, to support 'any finding of unfairness to *competitors*,' a court uses the 'tethering' test, which asks whether the defendant's conduct 'threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.'" (quoting *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 186-87 (1999))); *Id.* ("Second, to support a finding of unfairness to consumers, a court uses the balancing test, which 'weigh[s] the utility of the defendant's conduct against the gravity of the harm to the alleged victim.'" (*quoting Progressive W. Ins. Co. v. Super. Ct.*, 135 Cal. App. 4th 263, 285 (2005) (citation omitted))); *Aghaji v. Bank of America, N.A.*, 247 Cal. App. 4th 1110, 1119 (Cal. Ct. App. 2016) ("[P]laintiffs who are not California residents must also allege facts to show that the alleged violations occurred within California, because California's unfair competition law does not apply extraterritorially."); *id.* at 1119-20 (finding insufficient that defendant had "processing facilities and personnel in California" and that is "where the misapplied payments were received or that is from where the improper charges or

improper crediting of payments occurred"); *Norwest Mortgage, Inc. v. Superior Court*, 72 Cal. App. 4th 214, 222 (Cal. App. 1999) ("non-California residents for whom [defendant's] conduct. . . occurred in states other than California (Category III members)" could "not assert UCL claims"); *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1209 (Cal. 2011) ("that [defendant's] decision. . . was made in California does not, standing alone, justify applying the UCL to the nonresident plaintiffs' FLSA claims for overtime worked in other states.").

**Defendants' Argument:**  *First*, in order to simplify this instruction, Defendants propose a three-element structure rather than a two-element structure.  As Defendants understand it, California does not dispute that in addition to proving that each Defendant engaged in a business act or practice that was either unlawful or unfair, the State must prove a territorial nexus between that act or practice and California.  Listing the territorial nexus requirement with the other two requirements makes this instruction easier to understand for the jury and ensures that Defendants will not be prejudiced in the event that the jury overlooks the territorial nexus requirement because it is not listed as an element.

*Second*, Defendants object to California's language suggesting that "individuals in California [] harmed by the act or practice," without more, are covered by the Unfair Competition Law (UCL).  The caselaw distinguishes between California residents and non-residents, not between individuals within and outside California. *See Aghaji v. Bank of America, N.A.*, 247 Cal. App. 4th 1110, 1119 (Cal. Ct. App. 2016) ("[P]laintiffs who are not California residents must also allege facts to show that the alleged violations occurred within California, because California's unfair competition law does not apply extraterritorially."); *Norwest Mortgage, Inc. v. Superior Court*, 72 Cal. App. 4th 214, 222 (Cal. App. 1999) ("non-California residents for whom [defendant's] conduct . . . occurred in states other than California" could "not assert UCL claims"); *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1209 (Cal. 2011) ("that [defendant's] decision . . . was made in California does not, standing alone, justify applying the UCL to the nonresident plaintiffs' FLSA claims for overtime worked in other states").  California's proposed instruction is misleading and prejudicial to Defendants because it suggests that the UCL covers anyone who happened to be injured in California at some point, even if that person is a resident of a different State.

Importantly, if that interpretation of the UCL were right (it is not), then it is possible that Plaintiff States might obtain double recoveries in this lawsuit.  In other words, California could recover for a Texas resident who was injured in California at some point, and Texas could also recover for that Texas resident.  That prospect severely prejudices Defendants and violates the basic damages principle that "only a single recovery is allowed" for one injury.  *Conway v. Icahn & Co., Inc.*, 16 F.3d 504, 511 (2d Cir. 1994).

*Third*, Defendants object to California's recitation of things it need not prove (intent to injure, market definition, antitrust injury).  Defendants' proposed instruction—like all other instructions in this document—straightforwardly lists what Plaintiffs must prove to prevail.  Reciting elements that must not be proven adds unnecessary length and risks confusing the jury.

**Post-Instruction No. 24**

## FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT
### (Fla. Stat. § 501.204)

The State of Florida alleges that Defendants' anticompetitive conduct violated the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), which broadly prohibits persons from engaging in unfair methods of competition in the conduct of any trade or commerce.

To establish a violation of the FDUTPA based on anticompetitive conduct, Florida must prove by a preponderance of the evidence that Defendants engaged in an unfair method of competition. Even if the method of competition does not rise to the level of an antitrust violation, you may find it violates the FDUTPA if you find such method of competition was otherwise unfair.

*Unfair Methods of Competition*

An act is an "unfair method of competition" if the conduct goes beyond competition on the merits. Competition on the merits may include, for example, superior products or services, superior business skills, or truthful marketing and advertising practices. Conduct goes beyond competition on the merits if it is coercive, exploitative, collusive, abusive, deceptive, predatory, or exclusionary and tends to negatively affect competitive conditions.

Violations of antitrust laws constitute "unfair methods of competition" under the FDUTPA. Therefore, if you find that the State of Florida proves by a preponderance of the evidence that Defendants violated the Sherman Act, you may find that such conduct by Defendants also violated the FDUTPA.

**Plaintiffs' Authority**: Fla. Stat. § 501.204 (in construing prohibited conduct under FDUTPA, "due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. s. 45(a)(1)"); Fla. Stat. § 501.203(3)(b)-(c) (violations of FDUTPA may be based on, inter alia, "[t]he standards of unfairness and deception set forth and interpreted by the Federal Trade Commission or the federal courts" or "[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices"); Federal Trade Commission, Comm'n File No. P221202, Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act (Nov. 10, 2022) at 8-9; *See*

87

*United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) (distinguishing unlawful acquisition or maintenance of monopoly power from consequences of "a superior product, business acumen, or historic accident"); *see F.T.C. v. Sperry & Hutchinson*, 405 U.S. 233, 243-44 (1972) (construing Section 5 to reach conduct shown to exploit consumers); *Atlantic Refining Co. v. F.T.C.*, 381 U.S. 357, 369 (1965) (finding an unfair method of competition where the defendant "utilize[ed] … economic power in one market to curtail competition in another," which was "bolstered by actual threats and coercive practices"); *F.T.C. v. Texaco*, 393 U.S. 223, 228-29 (1968) (finding an unfair method of competition where the defendant used its "dominant economic power … in a manner which tended to foreclose competition"); *E.I. du Pont de Nemours v. F.T.C.*, 729 F.2d 128, 140 (2d Cir. 1984) (finding that unfair methods of competition includes practices that are "collusive, coercive, predatory, restrictive, or deceitful" as well as "exclusionary"); *Mack v. Bristol-Myers Squibb Co.*, 673 So. 2d 100, 104 (Fla. 1st DCA 1996) ("[T]he acts proscribed by subsection 501.204(1) include antitrust violations."); *Morris Commc'ns Corp. v. PGA Tour, Inc.,* 235 F. Supp. 2d 1269, 1286 (M.D. Fla. 2002), *aff'd,* 364 F.3d 1288 (11th Cir. 2004) ("FDUTPA is to be construed consistently with antitrust law."); *see also F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 454 (1986) ("unfairness" under the FTCA encompasses "practices that violate the Sherman Act and the other antitrust laws . . . but also practices that the [FTC] determines are against public policy for other reasons"); *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 609 (1953) (tying arrangement that violates § 1 of the Sherman Act "transgresses s 5 of the [FTCA], since minimally that section registers violations of the Clayton and Sherman Acts"); *Crawford v. Am. Title Ins. Co.*, 518 F.2d 217, 218-19 (5th Cir. 1975) ("[I]t has been uniformly held that 'a violation of the Sherman Act is an 'unfair method of competition' under the [FTCA].'") (citations omitted).

**Defendants' Authority**: Fla. Stat. § 501.204 (in construing prohibited conduct under FDUTPA, "due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. 45(a)(1)"); Fla. Stat. § 501.203(3)(b)-(c) (violations of FDUTPA may be based on, inter alia, "[t]he standards of unfairness and deception set forth and interpreted by the Federal Trade Commission or the federal courts" or "[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices"); Federal Trade Commission, Comm'n File No. P221202, Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act (Nov. 10, 2022) at 8-9; *See U.S. v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) (distinguishing unlawful acquisition or maintenance of monopoly power from consequences of "a superior product, business acumen, or historic accident"); *see Sperry & Hutchinson*, 405 U.S. at 905 (construing Section 5 to reach conduct shown to exploit consumers); *Atlantic Refining Co. v. Fed. Trade Comm'n*, 381 U.S. 357, 369 (1965) (finding an unfair method of competition where the defendant "utilize[ed] … economic power in one market to curtail competition in another," which was "bolstered by actual threats and coercive practices"); *Fed. Trade Comm'n v. Texaco*, 393 U.S. 223, 228-29 (1968) (finding an unfair method of competition where the defendant used its "dominant economic power … in a manner which tended to foreclose competition"); *E.I. du Pont de Nemours v. Fed. Trade Comm'n (Ethyl)*, 729 F.2d 128, 140 (finding that unfair methods of competition includes practices that are "collusive, coercive, predatory, restrictive, or deceitful" as well as "exclusionary"); *Mack v. Bristol-Myers Squibb Co.*, 673 So. 2d 100, 104 (Fla. 1st DCA 1996) ("[T]he acts proscribed by subsection 501.204(1) include antitrust violations."); *Morris Commc'ns Corp. v. PGA Tour, Inc.,* 235 F. Supp. 2d 1269, 1286 (M.D. Fla. 2002), *aff'd,* 364 F.3d 1288 (11th Cir. 2004) ("FDUTPA is to be construed consistently with antitrust law."); *see also F.T.C. v. Indiana Fedn. of Dentists*, 476 U.S. 447, 454 (1986) ("unfairness" under the FTCA encompasses "practices

that violate the Sherman Act and the other antitrust laws... but also practices that the [FTC] determines are against public policy for other reasons"); *Times-Picayune Pub. Co. v. U.S.*, 345 U.S. 594, 609 (1953) (tying arrangement that violates § 1 of the Sherman Act "transgresses s 5 of the [FTCA], since minimally that section registers violations of the Clayton and Sherman Acts"); *Crawford v. Am. Title Ins. Co.*, 518 F.2d 217, 218-19 (5th Cir. 1975) ("[I]t has been uniformly held that 'a violation of the Sherman Act is an 'unfair method of competition' under the [FTCA].'") (citations omitted); *Team Servs., Inc. v. Securitas Elec. Sec., Inc.*, No. 1:21-CV-21026-KMM, 2021 WL 9350987, at *5 (S.D. Fla. Aug. 9, 2021), *aff'd*, No. 22-12840, 2023 WL 6890660 (11th Cir. Oct. 19, 2023) ("FDUTPA applies only to action that occurred within the state of Florida."); *Millennium Comm'ns & Fulfillment, Inc. v. Office of Attorney General, Dep't of Legal Affairs*, 761 So. 2d 1256, 1262 (Fla. Ct. App. 2000) ("As we read FDUTPA, it seeks to prohibit unfair, deceptive and/or unconscionable practices which have transpired within the territorial boundaries of this state without limitation."); *Zarfati v. Artsana USA, Inc.*, No. 1:24-cv-21372-KMM, 2025 WL 373081, at *12 (S.D. Fla. Jan. 15, 2025) (plaintiffs stated a FDUTPA claim by alleging that "deceptive acts and unfair practices were at a minimum aimed at consumers in Florida"); Federal Trade Commission Act Amendments of 1994, codified as amended at 15 U.S.C. § 45(n) (1994) (codifying FTC Policy Statement on Unfairness (Dec. 17, 1980)), *appended to Int'l Harvester Co.*, 104 F.T.C. 949, 1070 (1984) ("The Commission shall have no authority under this section or section 57a of this title to declare unlawful an act or practice on the grounds that such act or practice is unfair unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition."); *Porsche Cars North America, Inc. v. Diamond*, 140 So. 3d 1090, 1097-98 (Fla. Ct. App. 2014) ("Following the clear and unambiguous directive of sections 501.203(3)(b), 501.204(2), and 501.202(3), Florida Statutes, we hold 1980 Policy Statement's definition of unfair trade practice should be used when interpreting FDUTPA.").

**Defendants' Argument:**  Defendants' proposed instruction requires that any unfair method of competition have been based in or directed toward Florida.  This requirement is well-established in Florida law:  FDUTPA seeks to prohibit unfair practices that "transpire[] within the territorial boundaries" of Florida. *Millennium Comm'ns & Fulfillment, Inc. v. Office of Attorney General, Dep't of Legal Affairs*, 761 So. 2d 1256, 1262 (Fla. Ct. App. 2000); *see also Team Servs., Inc. v. Securitas Elec. Sec., Inc.*, No. 1:21-CV-21026-KMM, 2021 WL 9350987, at *5 (S.D. Fla. Aug. 9, 2021), *aff'd*, No. 22-12840, 2023 WL 6890660 (11th Cir. Oct. 19, 2023) ("FDUTPA applies only to action that occurred within the state of Florida.").  Courts have interpreted FDUTPA to encompass acts occurring within Florida as well as acts "aimed at consumers" in the State. *Zarfati v. Artsana USA, Inc.*, No. 1:24-cv-21372-KMM, 2025 WL 373081, at *12 (S.D. Fla. Jan. 15, 2025).  A territorial nexus requirement must be included to reflect the proper scope of FDUTPA.

Defendants' proposed instruction also includes the requirement that an unfair act or practice must cause or be likely to cause a substantial injury.  FDUTPA embraces the Federal Trade Commission's (FTC) interpretations of Section 5(a)(1) of the Federal Trade Commission Act (FTCA).  Fla. Stat. § 501.204(2); *Porsche Cars North America, Inc. v. Diamond*, 140 So. 3d 1090, 1097-98 (Fla. Ct. App. 2014) ("Following the clear and unambiguous directive of sections 501.203(3)(b), 501.204(2), and 501.202(3), Florida Statutes, we hold 1980 Policy Statement's definition of unfair trade practice should be used when interpreting FDUTPA.").  The FTC's 1980 Policy Statements restrict authority under the FTCA to only those unfair acts that are "likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition."  Federal Trade Commission Act Amendments of 1994,

89

codified as amended at 15 U.S.C. § 45(n) (1994) (codifying FTC Policy Statement on Unfairness (Dec. 17, 1980)), *appended to Int'l Harvester Co.*, 104 F.T.C. 949, 1070 (1984).  That restriction of authority must be reflected here as well.

Defendants object to language in the second paragraph indicating that an unfair method of competition or an antitrust violation can violate FDUTPA.  This language is redundant as the next two paragraphs sufficiently explain those two ways of violating FDUTPA.  Repetition of this point adds unnecessary length and risks confusing the jury and prejudicing Defendants.  Moreover, Plaintiffs' allegations in this case have rested on antitrust violations, and Plaintiffs have not provided any theories or facts—let alone Florida-specific theories or facts—to support non-antitrust consumer protection violations.

**Post-Instruction No. 25**

## ILLINOIS ANTITRUST ACT
## (740 ILCS 10/1 *et seq.*)

The State of Illinois has brought claims under the Illinois Antitrust Act, 740 ILCS 10/1 *et seq*. Illinois' claims under the Illinois Antitrust Act are based on the same conduct as its claims under the Sherman Act.

The elements of proof for claims under this statute are the same as under Section 1 of the Sherman Act. If you find for Plaintiffs and against Defendants on Plaintiffs' claims under Section 1 of the Sherman Act for unlawful exclusive dealing and unlawful tying, and Illinois proves by a preponderance of the evidence that Defendants' conduct that harmed competition nationwide, including in Illinois, then you must find for the State of Illinois and against Defendants on those same claims under the Illinois Antitrust Act. If you find for Defendants on Plaintiffs' claims under Section 1 of the Sherman Act for unlawful exclusive dealing and unlawful tying, you must find for the Defendants under those same claims under the Illinois Antitrust Act.

For claims under the Illinois Antitrust Act involving the monopolization of the market for use of amphitheaters by artists using anticompetitive exclusionary practices, the elements of proof are the same as under Section 2 of the Sherman Act, except the State of Illinois must also prove that the Defendants unreasonably restrained trade or commerce by establishing or maintaining a monopoly by contract, combination, or conspiracy with one or more other persons. If you find for Plaintiffs and against Defendants on Plaintiffs' claims of monopolization of market for use of amphitheaters by artists, by using anticompetitive exclusionary practices under Section 2 of the Sherman Act, and Illinois proves by a preponderance of the evidence that Defendants unreasonably restrained trade or commerce by contract, combination, or conspiracy with one or more other persons, and that Defendants engaged in unlawful conduct that harmed competition nationwide, including in Illinois,

91

then you must also find for the State of Illinois on those claims under the Illinois Antitrust Act and against the Defendants. If you find for Defendants on Plaintiffs' claims of monopolization of the markets for amphitheaters, for venue booking services and artists promotion services by using anticompetitive exclusionary practices under Section 2 of the Sherman Act, or Illinois fails to prove the existence of a contract, combination, or conspiracy in connection with that claim, then you must find for Defendants for those claims under the Illinois Antitrust Act.

For the claim under the Illinois Antitrust Act involving the monopolization of primary concert ticketing and primary ticketing, the elements of proof are the same as under Section 2 of the Sherman Act, except the State of Illinois must prove that Defendants acted with the purpose of excluding competition or controlling, fixing, or maintaining prices in these relevant markets. If you find for Plaintiffs and against Defendants under Plaintiffs' claim of monopolization of primary concert ticketing or primary ticketing, and Illinois proves by a preponderance of evidence that Defendants acted with the purpose of excluding competition or controlling, fixing, or maintaining prices in these relevant markets, and Defendants engaged in unlawful conduct that harmed competition nationwide, including in Illinois, then you must also find for the State of Illinois on those same claims under the Illinois Antitrust Act and against Defendants. If you find for Defendants on Plaintiffs' claims under Section 2 of the Sherman Act related to the monopolization of primary concert ticketing orprimary ticketing, or that the State of Illinois fails to prove that Defendants acted with the purpose of excluding competition or controlling, fixing, or maintaining prices in the relevant market, then you must find for the relevant Defendants for that claim under the Illinois Antitrust Act.

**Plaintiffs' Authority:** 740 ILCS 10/3(2); 740 ILCS 10/3(3); 740 ILCS 10/11; *Gilbert's Ethan Allen Gallery v. Ethan Allen, Inc.*, 251 Ill. App. 3d 17, 24 (1993), *aff'd*, 162 Ill. 2d 99 (1994).

**Plaintiffs' Position:** The parties disputes regarding the Illinois's claims under the Illinois Antitrust Act ("IAA") in part mirror those discussed above. First, for the reasons stated regarding Post-

Instruction No. 25, Defendants' actions should be evaluated collectively. Second, as discussed above, Plaintiffs will collectively present evidence to prove that Defendants' conduct harmed competition nationwide. Defendants' proposal may suggest that Illinois is independently required to put on a separate case, which is not correct. To avoid juror confusion while ensuring an evaluation of State impact, the jury should be instructed to determine whether the evidence presented by Plaintiffs is sufficient to show that Defendants' conduct harmed competition in Illinois.

The parties agree that Illinois' claims under the IAA and Section 1 of the Sherman Act are congruent because the wording of the IAA is identical or similar to that of the Sherman Act. 740 ILCS 10/11; *Int'l Star Registry v. RGIFT Ltd.*, 2024 WL 3594644, *3 (N.D. Ill. July 31, 2024). With respect to Illinois's claims under Sections 3(2) and 3(3) of the IAA, those claims are largely congruent with Section 2 of the Sherman Act. Where additional proof elements are required, Illinois has added appropriate language in its proposed jury instructions consistent with Illinois' claims and the wording of Sections 3(2) and 3(3) of the IAA. *See* 740 ILCS 10/3(2); 740 ILCS 10/3(3); *Gilbert's Ethan Allen Gallery v. Ethan Allen, Inc.*, 251 Ill. App. 3d 17, 24 (1993), *aff'd*, 162 Ill. 2d 99 (1994). Plaintiffs revisions inappropriately delete instructions on Section 3(2) of the Illinois Antitrust Act. Conduct that violates Section 2 of the Sherman Act may violate both Sections 3(2) and 3(3) of the Illinois Antitrust Act, and instructing the jury on both is appropriate. *See Force Partners, LLC v. KSA Lighting & Controls, Inc.,* 2022 WL 580808, at *18 (N.D. Ill. February 25, 2022).

**Defendants' Authority:** *Gilbert's Ethan Allen Gallery v. Ethan Allen, Inc.*, 251 Ill. App. 3d 17, 24 (1993), *aff'd*, 162 Ill. 2d 99 (1994) ("[T]he Illinois Act requires more proof than section 2 of the Sherman Act for a court to find that a defendant violated section 3(3) of the Illinois Act, in that not only must the plaintiff prove that defendant established, maintained, used, or attempted to acquire monopoly power over any substantial part of trade or commerce but, in addition, plaintiff must prove that defendant did so for the purpose of excluding competition or controlling, fixing, or maintaining prices in that trade or market.").

**Defendants' Argument:**  For monopolization claims under the Illinois Antitrust Act, "not only must the plaintiff prove that defendant established, maintained, used, or attempted to acquire monopoly power over any substantial part of trade or commerce but, in addition, plaintiff must prove that defendant did so for the purpose of excluding competition or controlling, fixing, or maintaining prices in that trade or market." *Gilbert's Ethan Allen Gallery v. Ethan Allen, Inc.*, 251 Ill. App. 3d 17, 24 (1993), *aff'd*, 162 Ill. 2d 99 (1994).  Defendants' proposed instruction has added this additional element for monopolization claims under the Illinois Antitrust Act.  Defendants see no need to discuss the alleged markets separately in this instruction.

93

**Post-Instruction No. 26**

## KANSAS RESTRAINT OF TRADE ACT
### (Kan. Stat. Ann. § 50-101 *et seq.*)

The State of Kansas has brought claims under the Kansas Restraint of Trade Act, Kan. Stat. Ann. § 50-101 *et seq.* Kansas's claims under the Kansas Restraint of Trade Act are based on the same conduct as its claims under the Sherman Act.

For claims under the Kansas involving the restraint of competition by contracts, agreements, arrangements, or combinations, the elements of proof are the same as under Section 1 of the Sherman Act. If you find for Plaintiffs and against Defendants on Plaintiffs' claims under Section 1 of the Sherman Act regarding unlawful exclusive dealing or unlawful tying, and Kansas proves by a preponderance of the evidence that Defendants engaged in unlawful conduct that harmed competition nationwide, including in Kansas, then you must also find for the State of Kansas and against Defendants on those same claims under the Kansas Restraint of Trade Act. If you find for Defendants under Plaintiffs' claims under Section 1 of the Sherman Act for unlawful exclusive dealing or unlawful tying, you must find for Defendants under those same claims under the Kansas Restraint of Trade Act.

For claims under the Kansas Restraint of Trade Act involving monopolization, the elements of proof for claims under this statute are the same as under Section 2 of the Sherman Act, except the State of Kansas must also prove the existence of concerted or joint action with another party. If you find for Plaintiffs and against one or more Defendants on Plaintiffs' monopolization claims under Section 2 of the Sherman Act, and Kansas proves by a preponderance of the evidence that one or more Defendants acted jointly or in concert with another party, and that one or more Defendants' conduct harmed competition in Kansas, then you must also find for the State of Kansas on those same claims under the Kansas Restraint of Trade Act and against the relevant Defendants. If you find

94

for one or more Defendants on Plaintiffs' claims under Section 2 of the Sherman Act, or that the State of Kansas failed to prove that one or more Defendants acted jointly or in concert with another party, then you must find for the relevant Defendants under those claims under the Kansas Restraint of Trade Act.

**Plaintiffs' Authority:** Kan. Stat. Ann. §§ 50-102, 112, 163(b).

**Plaintiffs' Position:** Defendants appear to take the position that Kansas is not able to pursue state law claims analogous to Section 1 of the Sherman Act, based on a prior dismissal of its state law claims in the *In re Elec. Books Antitrust Litigation*. As discussed above (*see* Post-Instruction No. 25), the voluntary dismissal of a claim in prior litigation has no bearing on Kansas's ability to bring those claims here. And under Kansas's harmonization statute, the Kansas Restraint of Trade Act and Section 1 of the Sherman Act are congruent. *See* Kan. Stat. Ann. § 50-163(b).

**Defendants' Authority:** Memorandum Endorsing Plaintiff States' Motion to Voluntarily Dismiss Certain State Law Claims, *In re Elec. Books Antitrust Litig.*, No. 1:11-md-02293-DLC (S.D.N.Y, May 29, 2013), ECF No. 352 (voluntarily dismissing claim under Kansas Restraint of Trade Act); *In re Elec. Books Antitrust Litig.*, No. 11 MD 2293 DLC, 2014 WL 2535112, at *2 (S.D.N.Y. June 5, 2014) ("The States moved on May 28 to voluntarily dismiss all state law claims not congruent with Section 1 of the Sherman Act. The Court granted that motion on May 29."); *In re Effexor Antitrust Litig.*, 357 F. Supp. 3d 363, 394 (D.N.J. 2018) ("[T]he case law as well as the plain language of the Kansas. . . antitrust statute[] require concerted action between two parties. As such, allegations relating to [plaintiff]'s unilateral conduct fails to state a claim under the[] statute[].").

**Defendants' Argument:** Defendants have not been able to locate cases interpreting the Kansas Restraint of Trade Act consistently with the Sherman Act, or any statutory provision harmonizing the two statutes. In at least one case, Kansas voluntarily dismissed its claims under the Kansas Restraint of Trade Act "as not congruent with Section 1 of the Sherman Act." *In re Elec. Books Antitrust Litig.*, No. 11 MD 2293 DLC, 2014 WL 2535112, at *2 (S.D.N.Y. June 5, 2014); Memorandum Endorsing Plaintiff States' Motion to Voluntarily Dismiss Certain State Law Claims, *In re Elec. Books Antitrust Litig.*, No. 1:11-md-02293-DLC (S.D.N.Y, May 29, 2013), ECF No. 352 (voluntarily dismissing claims under Kansas Restraint of Trade Act). Defendants' proposed instruction thus interprets the Kansas Restraint of Trade Act as consistent with only Section 2 of the Sherman Act. Plaintiffs have provided no authority to the contrary. Moreover, the Kansas Restraint of Trade Act requires concerted action for monopolization claims, unlike Section 2 of the Sherman Act. *In re Effexor Antitrust Litig.*, 357 F. Supp. 3d 363, 394 (D.N.J. 2018) ("[T]he case law as well as the plain language of the Kansas . . . antitrust statute[] require concerted action between two parties. As such, allegations relating to [plaintiff]'s unilateral conduct fails to state a claim under the[] statute[]."). Defendants' proposed instruction includes this requirement.

95

**Post-Instruction No. 27**

## DONNELLY ACT
### (New York General Business Law §§ 340 *et seq.*)

The State of New York has brought claims under the Donnelly Act, New York General Business Law §§ 340 *et seq.* New York's claims under the Donnelly Act are based on the same conduct as its claims under the Sherman Act.

For claims under the Donnelly Act involving the restraint of competition by contracts, agreements, arrangements, or combinations, the elements of proof are the same as under Section 1 of the Sherman Act. If you find for Plaintiffs and against Defendants on Plaintiffs' claims under Section 1 of the Sherman Act regarding unlawful exclusive dealing or unlawful tying, and New York proves by a preponderance of the evidence that Defendants engaged in unlawful conduct that harmed competition nationwide, including in New York, then you must also find for the State of New York and against Defendants on those same claims under the Donnelly Act. If you find for Defendants under Plaintiffs' claims under Section 1 of the Sherman Act for unlawful exclusive dealing or unlawful tying, you must find for Defendants under those same claims under the Donnelly Act.

For claims under the Donnelly Act involving monopolization, the elements of proof are the same as under Section 2 of the Sherman Act, except the State of New York must also prove that the establishment or maintenance of the monopoly involved a contract, agreement, arrangement, or combination. If you find for Plaintiffs and against Defendants under Plaintiffs' monopolization claims under Section 2 of the Sherman Act, New York proves by a preponderance of the evidence that those monopolies were established or maintained through one or more contracts, agreements, arrangements, or combinations, and that Defendants engaged in unlawful conduct that harmed competition nationwide, including in New York,  then you must also find for the State of New York and against Defendants on those same claims under the Donnelly Act. If you find for Defendants on Plaintiffs' claims under Section 2 of the Sherman Act, or the State of New York fails to prove the existence of a

96

contract, agreement, arrangement, or combination in connection with that claim, then you must find

for Defendants under those claims under the Donnelly Act.

**Plaintiffs' Authority**: *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 68-69 (2d Cir. 2019); *New York v. Actavis, PLC*, No. 14 Civ. 7473, 2014 WL 7015198, at *43 (S.D.N.Y. Dec. 11, 2014); *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 370 (S.D.N.Y. 2012); *Saxe, Bacon & Bolan, P.C. v. Martindale-Hubbell, Inc.*, 710 F.2d 87, 90 (2d Cir. 1983) (citations omitted).

**Defendants' Authority**: *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 68–69 (2d Cir. 2019); *New York v. Actavis, PLC*, No. 14 Civ. 7473, 2014 WL 7015198, at *43 (S.D.N.Y. Dec. 11, 2014); *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 370 (S.D.N.Y. 2012); *Saxe, Bacon & Bolan, P.C. v. Martindale-Hubbell, Inc.*, 710 F.2d 87, 90 (2d Cir. 1983) (citations omitted).

**Defendants' Argument:**  Defendants' edits to this instruction make clear that New York must prove each Defendant's liability separately, as explained above.  *See* Defendants' Argument on Post-Instruction No. 2 (The Parties).

**Post-Instruction No. 28**

**SOUTH CAROLINA**
**UNFAIR TRADE PRACTICES ACT**
**(S.C. Code Ann. § 39-5-10 et seq.)**

The state of South Carolina alleges that Defendants' conduct violates the South Carolina Unfair Trade Practices Act (S.C. Code Ann. § 39-5-10 *et seq.*), SCUTPA provides that "[u]nfair methods of competition and unfair practices in the conduct of any trade or commerce are… unlawful."

For the State of South Carolina to prevail on this claim, you must find that:

1.     Defendants engaged in an act or practice in trade or commerce.

2.     The act or practice is unfair.

3.     The act or practice has an impact on the public interest.

The words "trade" and "commerce" include the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity or thing of value wherever situated, and any trade or commerce directly or indirectly affecting the people of South Carolina. Although the Act defines "trade and commerce" to include the previously mentioned activities, "trade and commerce" may also mean other activities that were not mentioned.

The act or practice alleged must be unfair or deceptive. An act or practice is "unfair" when it is offensive to public policy or when it is immoral, unethical, or oppressive. Whether an act or practice is unfair or deceptive within the meaning of the Act depends upon the surrounding facts and the impact of the transaction on the marketplace.

Unfair acts or practices in the conduct of trade or commerce have an impact upon the public interest if the acts or practices have the potential for repetition. While not the only means for showing potential repetition, potential for repetition may be shown by:

98

1.    showing the same kind of actions occurred in the past, thus making it likely they will

continue to occur absent deterrence; or

2.    showing the company's procedures create a potential for repetition of the unfair acts.

**Plaintiffs' Authority**: Roger L. Couch, *South Carolina Requests to Charge – Civil*, 2011; Ralph King Anderson, Jr., *South Carolina Requests to Charge - Civil*, 2009, §§ 34-1; 34-2, 34-3; *Chucks Feed & Seed Co. v. Ralston Purina Co.*, 810 F.2d 1289, 1292 (4th Cir. 1987); *Clarkson v. Orkin Exterminating Co.*, 761 F.2d 189, 191 (4th Cir. 1985) (the Act may be violated if there is a claim or representation that had the capacity or effect or tendency to deceive; plaintiff need not show intentional deception under South Carolina UTPA, but a plaintiff cannot prevail without showing at least a potential of deception); *Cheshire v. Coca-Cola Bottling Affiliated Inc.*, 758 F. Supp. 1098, 1101 (D.S.C. 1990); *State ex rel. Wilson v. Ortho-McNeil-Janssen Pharms.*, Inc., 414 S.C. 33, 777 S.E.2d 176 (2015); *Singleton v. Stokes Motor, Inc.*, 358 S.C. 369, 595 S.E.2d 461 (2004); *Crary v. Djebelli*, 329 S.C. 385, 496 S.E.2d 21 (1998); *York v. Conway Ford, Inc.*, 325 S.C. 170, 173, 480 S.E.2d 726, 728 (1997)(alleged acts or practices have the potential for repetition where defendant remains in the same business and faced with opportunities to repeat the conduct); *Taylor v. Medenica*, 324 S.C. 200, 479 S.E.2d 35 (1996); *Daisy Outdoor Advertising Co. v. Abbott*, 322 S.C. 489, 493-94, 473 S.E.2d 47, 49-50 (1996)(evidence of a potential for repetition, generally speaking, establishes the required public impact); *Adams v. G.J. Creel and Sons, Inc.*, 320 S.C. 274, 465 S.E.2d 84 (1995); *Foggie v. CSX Transp., Inc.*, 313 S.C. 98, 431 S.E.2d 587 (1993); *Camp v. Springs Mortgage Corp.*, 310 S.C. 514, 426 S.E.2d 304 (1993); *Haley Nursery Co. v. Forrest*, 298 S.C. 520, 381 S.E.2d 906 (1989); *Inman v. Ken Hyatt Chrysler Plymouth, Inc.*, 294 S.C. 240, 363 S.E.2d 691 (1988); *Wright v. Craft*, 372 S.C. 1, 640 S.E.2d 486 (Ct. App. 2006); *Wogan v. Kunze*, 366 S.C. 583, 606, 623 S.E.2d 107, 120 (Ct. App. 2005); *Robertson v. First Union Nat'l Bank*, 350 S.C. 339, 565 S.E.2d 309 (Ct. App. 2002); *DeBondt v. Carlton Motorcars, Inc.*, 342 S.C. 254, 536 S.E.2d 399 (Ct. App. 2000); *Prestwick Golf Club, Inc. v. Prestwick Limited Partnership*, 331 S.C. 385, 503 S.E.2d 184 (Ct. App. 1998); *Perry v. Green*, 313 S.C. 250, 437 S.E.2d 150 (Ct. App. 1993); *Baker v. Chavis*, 306 S.C. 203, 410 S.E.2d 600 (Ct. App. 1991); *Dowd v. Imperial Chrysler-Plymouth, Inc.*, 298 S.C. 439, 381 S.E.2d 212 (Ct. App. 1989); *Potomac Leasing Co. v. Bone*, 294 S.C. 494, 366 S.E.2d 26 (Ct. App. 1988); *Barnes v. Jones Chevrolet Co.*, 292 S.C. 607, 358 S.E.2d 156 (Ct. App. 1987); *Key Co. v. Fameco Distrib., Inc.*, 292 S.C. 524, 357 S.E.2d 476 (Ct. App. 1987); *Noack Enters., Inc. v. Country Corner Interiors*, 290 S.C. 475, 351 S.E.2d 347 (Ct. App. 1986); *State ex-rel. Medlock v. Nest Egg Soc'y Today, Inc.*, 290 S.C. 124, 128-29, 348 S.E.2d 381, 384 (Ct. App. 1986); *State ex- rel. McLeod v. Brown*, 278 S.C. 281, 283-84, 294 S.E.2d 781, 782-83 (Ct. App. 1982); S.C. Code Ann. § 39-5-10(b) (1985); S.C. Code Ann. § 39-5- 20(a) (1985); S.C. Code Ann. § 39-5- 50(a) (1985); S.C. Code Ann. § 39-5- 110(a) (1985); S.C. Code Ann. § 39-5-140 (1985); Federal Trade Commission, Comm'n File No. P221202, *Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission A*ct (Nov. 10, 2022).

**Plaintiffs' Position:** Defendants' proposed jury instructions for the South Carolina Unfair Trade Practices Act strike certain language defining the meaning of "trade and commerce" under the Unfair Trade Practices Act. Defendants provide no authority for their removal of this language, and it should be maintained.

99

**Defendants' Authority**: Roger L. Couch, *South Carolina Requests to Charge – Civil*, 2011; Ralph King Anderson, Jr., *South Carolina Requests to Charge – Civil*, 2009, §§ 34-1, 34-2, 34-3; ECF No. 257 ¶ 464 (Am. Compl.) ("Defendants' acts or practices alleged herein constitute "unfair methods of competition" under S.C. Code § 39-5-20.).

**Defendants' Argument:** *First*, Defendants object to South Carolina's statement that "'trade and commerce' may also mean other activities" not enumerated in the statute. The statutory definition sufficiently makes clear what "trade and commerce" means under SCUTPA. South Carolina's statement that it could also mean other things is confusing and inaccurate.

*Second*, Defendants object to inclusion of "deceptive" as no deceptive conduct has been alleged here.

*Third*, Defendants object to South Carolina's recitation of things it need not prove (actual impact and market definition). Defendants' proposed instruction—like all other instructions in this document— straightforwardly lists what the State must prove to prevail. Reciting elements that must not be proven adds unnecessary length and risks confusing the jury. Moreover, South Carolina's statement that it need not prove actual impact directly contradicts element three of the statute—"impact on the public interest." South Carolina's internally inconsistent proposed instruction is likely to confuse the jury and prejudice Defendants. And in any event, South Carolina has brought this action in parens patriae and thus must show that a "substantial segment of the state's population was injured." *New York, by James v. Niagara-Wheatfield Cent. Sch. Dist.*, 119 F.4th 270, 280 (2d Cir. 2024), *cert. denied sub nom. Niagara-Wheatfield Cent. Sch. Dist. v. New York*, 146 S. Ct. 324 (2025).

100

**Post-Instruction No. 29**

### TENNESSEE TRADE PRACTICES ACT
### (TENN. CODE ANN. §§ 47-25-101 AND 102)

The State of Tennessee has brought claims under the Tennessee Trade Practices Act. The State of Tennessee is authorized to bring claims under this Act only for conduct that occurred after April 23, 2024. So conduct that occurred before April 23, 2024 cannot form a basis for liability under this statute. If the State of Tennessee fails to provide evidence of conduct that occurred and harmed competition in Tennessee after April 23, 2024, you must find for Defendants on this claim.

For conduct that occurred after April 23, 2024, if you find that the State of Tennessee has proven every element of a Sherman Act Section 1 or Section 2 claim against Defendants, and that Defendants' conduct harmed competition in Tennessee, then you may find that the State of Tennessee has also proven the elements of the Tennessee Trade Practices Act against Defendants with respect to that claim.

**Plaintiffs' Authority**: Tenn. Code Ann. § 47-25-106.

**Plaintiffs' Position:** For the reasons stated above in connection with Preliminary Instruction No. 1, Defendants' liability should be assessed collectively.

**Defendants' Authority:** Tenn. Code Ann. § 47-25-106 (granting parens patriae authority as of April 23, 2024); *California v. Infineon Techs. AG*, 531 F. Supp. 2d 1124, 1170-71 (N.D. Cal. 2007) (recognizing that Tennessee previously lacked *parens patriae* authority); *State ex rel. Leech v. Levi Strauss & Co.*, No. 79-722-III, 1980 WL 4696, at *5 (Tenn. Ch. Sept. 25, 1980) (rejecting common-law parens patriae authority because such authority "must result from acts of the Legislature where the underlying public policy issues can be resolved and where essential procedural safeguards can be established"); *Connecticut v. Sandoz, Inc.*, No. 3:20-CV-00802(MPS), ECF No. 645 at 5-6 (D. Conn. Apr. 25, 2025) ("Tennessee's constitution prohibits retrospective laws, Tenn. Const. Art. 1, § 20. As such, statutes are presumed to operate prospectively absent clear indication from the legislature that the law is intended to apply retrospectively.. . . Here, the legislature did not clearly provide that the amendment to the TTPA be retroactive; therefore, the amendment is presumed to operate prospectively.").

**Defendants' Argument:** The Tennessee Trade Practices Act did not authorize parens patriae actions until April 23, 2024.  Tenn. Code Ann. § 47-25-106 (granting parens patriae authority as of April 23, 2024).  And the statutory amendment authorizing such actions does not apply retroactively.

101

*Connecticut v. Sandoz, Inc.*, No. 3:20-CV-00802(MPS), ECF No. 645 at 5-6 (D. Conn. Apr. 25, 2025) ("Tennessee's constitution prohibits retrospective laws, Tenn. Const. Art. 1, § 20. . . . Here, the legislature did not clearly provide that the amendment to the TTPA be retroactive; therefore, the amendment is presumed to operate prospectively."). Accordingly, Defendants' proposed instruction makes clear that Tennessee's recovery under the Tennessee Trade Practices Act is limited to each Defendant's conduct occurring after April 23, 2024 that harmed Tennessee residents and competition in Tennessee.

**Post-Instruction No. 29P**

## VERMONT CONSUMER PROTECTION ACT
### (9 V.S.A. § 2451 et seq.)

The State of Vermont alleges that Defendants' conduct violates the Vermont Consumer Protection Act (9 V.S.A § 2451 *et seq.*), which provides that "[u]nfair methods of competition in commerce and unfair or deceptive acts or practices in commerce are…unlawful."

For the State of Vermont to prevail on this claim, you must find that:

1.    Defendants engaged in an act or practice in commerce; and

2.    The act or practice is unfair or deceptive.

An act or practice occurs "in commerce" when it takes place in the consumer marketplace in the context of a defendant's business, rather than in a private transaction; and (2) it has a potential harmful effect on consumers, constituting a breach of duty owed to consumers.

The act or practice alleged must be unfair or deceptive. An act or practice is "unfair" when it (1) offends public policy even if it hasn't been previously considered unlawful; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers. Acts or practices are considered against public policy if they are in the realm of what is considered unfair as established by statutes, common law, or another established concept of unfairness.

An act is deceptive where (1) there is a representation, omission, or practice likely to mislead consumers; (2) the consumer interprets the message reasonably under the circumstances; and (3) the misleading effects must be material, that is, likely to affect the consumer's conduct or decision. Deception is measured objectively and looks to whether the representation or omission had the capacity or tendency to deceive a reasonable person. Actual injury does not need to be shown.

103

When the State of Vermont brings a claim under the Vermont Consumer Protection Act, there is no requirement for the State to prove intent by the defendant to have acted deceptively or unfairly.

**Plaintiffs' Authority**: *Concepts NREC, LLC v. Qiu*, No. 5:20-CV-133, 2025 WL 2052132, at *26 (D. Vt. July 21, 2025); *Foti Fuels, Inc. v. Kurrle Corp.,* 2013 VT 111, ¶ 22, 195 Vt. 524, 536, 90 A.3d 885, 893 (2013); *Carter v. Gugliuzzi,* 168 Vt. 48, 56, 716 A.2d 17, 23 (1998); *Peabody v. P.J.'s Auto Village, Inc.,* 153 Vt. 55, 57, 569 A.2d 460, 462 (1989); *Winton v. Johnson & Dix Fuel Corp.,* 147 Vt. 236, 244, 515 A.2d 371, 376 (1986); *In re Bristol-Myers Co.,* 102 F.T.C. 21 (1983); *Christie v. Dalmig, Inc.*, 136 Vt. 597, 601, 396 A.2d 1385, 1388 (1979); *F.T.C. v. Sperry & Hutchinson Co.,* 405 U.S. 233, 241 (1972).

**Plaintiffs' Position:** Defendants propose striking the instruction on the Vermont Consumer Protect Act on the apparent argument that Vermont does not have standing to maintain *parens patriae* claims. As discussed above (*see* Post-Instruction No. 22, this is not a basis for striking a jury instruction.

**Defendants' Argument:** Vermont lacks parens patriae authority to bring this claim. *See* Vt. Stat. Ann. tit. 9 §§ 2451 *et seq.* (no provision for *parens patriae* actions). Plaintiffs have provided no authority to the contrary.

104

**Post-Instruction No. 30**

### STATES DAMAGES AND OVERCHARGE

Twenty-one of the Plaintiff States—specifically, Arizona, Colorado, Connecticut, Florida, Illinois, Indiana, Michigan, Minnesota, Nevada, New Hampshire, New Jersey, New York, North Carolina, Pennsylvania, Rhode Island, South Carolina, Utah, Washington, West Virginia, Wisconsin, and the District of Columbia—are seeking damages from Defendants on behalf of fans who purchased primary concert tickets for events at major concert venues in those States. I may refer to these 24 States as "Plaintiff States claiming damages."

These Plaintiff States claiming damages allege that fans were overcharged on their purchases of primary concert tickets for events at major concert venues.

If you find that the Plaintiffs have proved that Defendants have monopolized the market for primary concert ticketing services to  major concerts in violation of Section 2 of the Sherman Act or those States' laws, or that Plaintiffs have proved Defendants have engaged in unlawful exclusive dealing in violation of Section 1 of the Sherman Act or those States' laws, or that Plaintiffs have proved Defendants have engaged in unlawful exclusive dealing in violation of Section 1 of the Sherman Act or those States' laws, then you must decide if each Plaintiff State claiming damages has proved by a preponderance of the evidence that fans were injured due to overcharges on their purchases of primary concert tickets for events at major concert venues.

If a Plaintiff State claiming damages proves Defendants overcharged fans for purchases of primary concert tickets for events at major concert venues in that state, then you must determine the amount of overcharge, if any, caused by Defendants on a per-ticket basis. You are not being asked to determine the total number of tickets or fans affected, only the average amount of overcharge that would apply to those purchases.

I remind you that neither you nor any member of your family will receive any portion of any

105

funds that the States may ultimately receive.

**Plaintiffs' Authority**: Adapted Final Jury Instructions at 54, *Innovative Health LLC v. Biosense Webster, Inc.*, Case No. 8:19-cv-1984 JVS (C.D. Cal. May 16, 2025); ABA Model Jury Instructions in Civil Antitrust Cases B-304.

**Plaintiffs' Position:** Plaintiffs have adapted nonargumentative damages instructions based on the ABA Model Jury Instructions and those used in *Innovative Health LLC v. Biosense Webster, Inc.* Defendants' proposed modifications misstate the relevant claims at issue or otherwise pose a risk of confusing the jury.

First, for the same reasons described with respect to prior instructions, Defendants' alternative names for Plaintiffs' proposed markets risk confusing the jury.

Second, Defendants again mischaracterize Plaintiffs' claims (as relevant to this instruction) as only against Ticketmaster, rather than both Defendants.

Third, the parties have agreed that issues of the total number of tickets sold to Plaintiff State residents, and any total damages, will be deferred to the remedies phase of the trial. 3.4.2026 Trial Tr. at 457:19–25. Instead, the jury will only be required to find a nationwide overcharge. *See id.* Defendants' proposed language focusing on State residents may mislead the jury to believe they are required to find elements of proof that have been deferred by mutual agreement to a later phase of trial. Plaintiffs' proposed instructions address all the necessary elements to establish injury and the fact of damage, as well as the existence of an overcharge, which is all that is required under the parties' agreement.

Fourth, as described above, Defendants' language stating that the jury should not "assume that any resident of any Plaintiff state will receive any portion of any money the Plaintiff States might ultimately recover" is unnecessary and potentially misleading. Any recovery under 15 U.S.C. § 15c likely will be returned to fans. As 15 U.S.C. Sections 15c and 15e explicitly contemplate, any funds recovered by the States "shall … be distributed in such manner as the district court in its discretion may authorize" and that any "distribution procedure adopted afford each person a reasonable opportunity to secure his appropriate portion of the net monetary relief." *Id.* § 15e. While, subject to the approval of the Court, some or all of the funds recovered *may* "be deemed a civil penalty by the court and deposited with the State as general revenues," there is no basis to instruct the jury to assume that will happen, or that the States will not try to distribute damages awards to residents. A reminder to the jury that neither they nor their families will personally recover funds is sufficient.

**Defendants' Authority:** ECF No. 777 at 41 (Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment); *Washington v. Chimei Innolux Corp.*, 659 F.3d 842, 848 (9th Cir. 2011) ("[A] statutory *parens patriae* action may well result in a settlement that does not include restitution to victims of the fraud, but only results in penalties paid to the public treasury."); *Broselow v. Fisher*, 319 F.3d 605, 608 (3d Cir. 2003) (individuals have no right to funds collected through *parens patriae* claims because such funds are not collected "under an assignment" from those individuals); *New York by Vacco v. Reebok Int'l*, 96 F.3d 44, 49 (2d Cir. 1996) (individuals are not entitled to distributions from the settlement of a *parens patriae* suit); N.Y. Exec. § 63(12) ("monies

recovered or obtained under this subdivision" are subject to N.Y. State Fin. § 4(11), which requires that the funds "be deposited in the state treasury" and not disbursed "except pursuant to an appropriation"); *New York, by James v. Niagara-Wheatfield Cent. Sch. Dist.*, 119 F.4th 270, 279 (2d Cir. 2024), *cert. denied sub nom. Niagara-Wheatfield Cent. Sch. Dist. v. New York*, 146 S. Ct. 324 (2025) ("A state suing *in parens patriae* must establish '(1) [an] injury to a sufficiently substantial segment of the state's population; (2) a quasi-sovereign interest; and (3) an inability for individual plaintiffs to obtain complete relief.'"); *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir. 1993) ("a contract under the corporate name of [either a parent corporation or its subsidiary] is not treated as that of both"); ECF No. 483 at 4 n.1 (Opinion and Order); *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 161 (2d Cir. 2016) ("to suffer antitrust injury, the putative plaintiff must be a participant in the very market that is directly restrained"); *Orchestrate HR, Inc. v. Trombetta*, No. 3:13-CV-2110-KS, 2017 WL 273669, at *8 (N.D. Tex. Jan. 20, 2017) ("It is elementary that each plaintiff must prove its own damages."); *U.S. Football League v. Nat'l Football League*, No. 84 CIVIL 7484PKL, 1986 WL 10620, at *34 (S.D.N.Y. July 31, 1986) ("I instruct you that each one of the plaintiffs must show the fact of its injury and the amount of its damage. Should you find that one of the plaintiffs was injured in fact and was damaged in its business or property, that does not necessarily mean that any other plaintiff was either injured or damaged."); *City of New York v. Beretta U.S.A. Corp.*, 315 F. Supp. 2d 256, 265 (E.D.N.Y. 2004) ("The doctrine of parens patriae grants standing to a state to sue on behalf of its citizens."); 15 U.S.C. § 15c(a)(1) (parens patriae authority is "on behalf of natural persons residing in such State").

**Defendants' Argument:**  Defendants' position is that the question of damages should not be presented to the jury at all.  At summary judgment, this Court deemed invalid the only market in which the "fans" on behalf of whom Plaintiff States are claiming damages even remotely participate.  Accordingly, Plaintiff States could never, and certainly cannot now, prove antitrust injury, and without such injury, they cannot obtain damages.  *See* Post-Instruction No. 31 (Injury and Causation).  "[T]o suffer antitrust injury, the putative plaintiff must be a participant in the very market that is directly restrained."  *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 161 (2d Cir. 2016).  The fans that Plaintiff States seek to represent do not meet this requirement, nor are the fans' alleged injuries "inextricably intertwined" with alleged injuries in other purported markets.  *In re DDAVP Direct Purchaser Antitrust Litigation* and *Blue Shield of Virginia v. McCready*—are distinguishable.  In *DDAVP*, the defendants' exclusionary conduct focused directly on the *same product* (a drug) that the plaintiffs purchased.  585 F.3d 677, 683, 688 (2d Cir. 2009).  And in *McCready*, the plaintiff alleged that she was a "consumer of *psychotherapeutic services* and that she had been injured by the defendants' conspiracy to restrain competition in the market *for such services*."  *Associated Gen. Contractors of California v. California State Council of Carpenters*, 459 U.S. 519, 538 (1983) (describing *McCready*, 457 U.S. 465, 484 (1982)) (emphasis added).  In such circumstances, "the consumers' injury is 'clearly foreseeable,' 'inextricably intertwined' with the anticompetitive conduct, and 'flows from that which makes [the] defendants' acts unlawful.'"  ECF No. 483 at 6 (Opinion and Order Denying Defendants' Motion to Dismiss) (citations omitted).  But that is not this case: fans purchase a different product, in a different market, than the product in the venue-facing market where the alleged conduct occurs and, as a result, the alleged conduct and any alleged injury to fans are not "inextricably intertwined."

Defendants propose the damages-related instructions here only if the question of damages is presented to the jury.  But to be clear, Defendants' frontline position is that it should not be presented to the jury at all.

107

As for Defendants' edits to this instruction, they clarify that each Plaintiff State claiming damages can only seek damages (1) on an individual, not collective, basis; and (2) from Ticketmaster, not Live Nation, who is not a party to the ticketing contracts that allegedly harm "fans." *Orchestrate HR, Inc. v. Trombetta*, No. 3:13-CV-2110-KS, 2017 WL 273669, at *8 (N.D. Tex. Jan. 20, 2017) ("It is elementary that each plaintiff must prove its own damages."); *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir. 1993) ("a contract under the corporate name of [either a parent corporation or its subsidiary] is not treated as that of both"). Defendants object to Plaintiffs' assertion that all Plaintiff States claiming damages can do so on the basis of an "average" overcharge—each Plaintiff "must show the fact of its injury and the amount of its damage." *U.S. Football League v. Nat'l Football League*, No. 84 CIVIL 7484PKL, 1986 WL 10620, at *34 (S.D.N.Y. July 31, 1986).

Defendants' edits also make clear that a Plaintiff State claiming damages may recover only if it has proven (1) injury to residents of its State who purchased primary concert tickets to events at "major concert venues," and (2) that Ticketmaster's alleged unlawful conduct caused the alleged injury. *See* Post-Instruction No. 31 (Injury and Causation).

108

**Post-Instruction No. 31**

### INJURY AND CAUSATION

Each Plaintiff State claiming damages is entitled to recover damages for the overcharges imposed by Defendants on behalf of their residents who purchased primary concert tickets to attend events at major concert venues in those States if they can establish these three elements of injury and causation:

1.    Residents purchasing tickets were in fact injured as a result of Defendants' alleged violations of the antitrust laws;

2.    Defendants' alleged unlawful conduct was a material cause of fans' injuries; and

3.    Those fans' injuries are of the type that the antitrust laws were intended to prevent.

The first element is sometimes referred to as "injury in fact" or "fact of damage." For each of the Plaintiff States claiming damages to establish that they are entitled to damages, they must prove that fans were injured as a result of Defendants' alleged monopolization of the market for services for primary concert tickets at major concert venues in violation of Section 2 of the Sherman Act, or for exclusive dealing in violation of Section 1 of the Sherman Act. Proving the fact of damage does not require each of the Plaintiff States claiming damages to prove the dollar value of fans' injuries. It requires only that the Plaintiff States claiming damages to prove that fans residing in that State were in fact injured by Defendants' alleged antitrust violations. If you find that the Plaintiff States claiming damages have proved that fans were in fact injured, you may then consider the amount of per-ticket overcharge. It is important to understand, however, that injury and amount of damage are different concepts and that you cannot consider the amount of any overcharge unless and until you have concluded that fans were in fact injured.

Each of the Plaintiff States claiming damages must also offer evidence that establishes by a preponderance of the evidence that Defendants' alleged unlawful conduct was a material cause of

injuries to fans in that State. This means that the Plaintiff States claiming damages must have proven that some overcharge was imposed on fans as a result of Defendants' alleged antitrust violation, and not some other cause. The Plaintiff States claiming damages are not required to prove that Defendants' alleged antitrust violations were the sole cause of fans' injuries; nor do they need to eliminate all other possible causes of injury. It is enough if each of the Plaintiff States claiming damages has proven that the alleged antitrust violation was a material cause of injury to fans purchasing tickets to events at major concert venues in that State.

Finally, each of the Plaintiff States claiming damages must establish that fans' alleged injuries are the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If fans' injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then fans' injuries are antitrust injuries. On the other hand, if fans' injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit consumers, then fans' injuries are not antitrust injuries and none of the Plaintiff States claiming damages may recover damages for those injuries under the antitrust laws.

When determining whether an antitrust injury occurred, you should consider whether Defendants monopolized the markets for primary ticketing services to major concert venues or primary concert ticketing services to major concert venues, or engaged in unlawful exclusive dealing in those markets. If you conclude that Defendants did monopolize either of those markets or engaged in unlawful exclusive dealing in those markets, you should consider whether fans suffer any consequences when purchasing primary concert tickets as a consequence of Defendants' monopolization of those markets. In reaching that determination, you should consider whether the alleged anticompetitive conduct by Defendants in either of those markets led to injuries to fans when they purchased primary tickets for concerts at major concert venues, and whether those injuries were

clearly foreseeable based on Defendants' conduct. You may also consider whether fan purchases of primary tickets at major concert venues were part of the economy endangered by Defendants' alleged anticompetitive conduct in those other markets. If you do find that fans' suffer consequences from Defendants' monopolization of those markets when purchasing primary concert tickets for major concert venues, you also may conclude the Plaintiff States claiming damages have established an antitrust injury.

In summary, if each of the Plaintiff States claiming damages can establish that fans purchasing tickets in that State were in fact injured by Defendants' conduct, that Defendants' conduct was a material cause of fans' injuries, and that fans' injuries were the type that the antitrust laws were intended to prevent, then each such Plaintiff State is entitled to recover for the overcharge imposed on fans who purchased concert tickets in each such Plaintiff State.

**Plaintiffs' Authority**: Adapted Final Jury Instructions at 52-53, *Innovative Health LLC v. Biosense Webster, Inc.*, Case No. 8:19-cv-1984 JVS (C.D. Cal. May 16, 2025); ABA Model Jury Instructions in Civil Antitrust Cases A-300, A-303; ABA Model Instr. 6.A.1; *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 479-84 (1982); *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009); *United States of Am. v. Live Nation Entm't, Inc.*, No. 1:24-cv-03973-AS (S.D.N.Y. Mar. 13, 2025) at 4-7; ECF No. 1037 at 42-43.

**Plaintiffs' Position:** Plaintiffs have adapted nonargumentative damages instructions based on the ABA Model Jury Instructions and those used in *Innovative Health LLC v. Biosense Webster, Inc.* Defendants' proposed modifications are unnecessary of misleading.

First, for the same reasons described with respect to prior instructions, Defendants' alternative names for Plaintiffs' proposed markets risk confusing the jury.

Second, Defendants again mischaracterize Plaintiffs' claims (as relevant to this instruction) as only against Ticketmaster, rather than both Defendants.

Third, Defendants' instructions misleadingly imply that their conduct must be the sole cause of any injury to fans, rather than a material cause of those injuries.

**Defendants' Authority**: ABA Model Instr. 6.A.1; *U.S. Football League v. Nat'l Football League*, No. 84 CIVIL 7484PKL, 1986 WL 10620, at *34 (S.D.N.Y. July 31, 1986) ("I instruct you that each one of the plaintiffs must show the fact of its injury and the amount of its damage. Should you find that one of the plaintiffs was injured in fact and was damaged in its business or property, that does not necessarily mean that any other plaintiff was either injured or damaged."); *City of New York v. Beretta*

111

*U.S.A. Corp.*, 315 F. Supp. 2d 256, 265 (E.D.N.Y. 2004) ("The doctrine of parens patriae grants standing to a state to sue on behalf of its citizens."); 15 U.S.C. § 15c(a)(1) (parens patriae authority is "on behalf of natural persons residing in such State"); *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 41 (2d Cir. 1986) ("Consequently, an essential element in plaintiffs' claim is that the injuries alleged would not have occurred *but for* Kodak's antitrust violation.").

**Defendants' Argument:**  Defendants' edits to this instruction align it with the previous instruction and were undertaken for the same reasons.  Additionally, Defendants' edits make clear that Ticketmaster's alleged antitrust violation must have been a but-for cause of the fans' alleged injuries. *See Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 41 (2d Cir. 1986) ("Consequently, an essential element in plaintiffs' claim is that the injuries alleged would not have occurred *but for* Kodak's antitrust violation.").

112

**Post-Instruction No. 32**

### DAMAGES INSTRUCTIONS—GENERAL

If you find that Defendants violated the antitrust laws and that this violation caused injury to fans who purchased primary tickets to events at major concert venues in any of the Plaintiff States, then you must determine the amount of the overcharge, if any, imposed by Defendants in those Plaintiff States. The fact that I am giving you instructions concerning the issue of damages does not mean that I believe any party should, or should not, prevail in this case. If you reach a verdict for Defendants on Plaintiffs' claims for monopolization of the market for services for primary concert tickets at major concert venues in violation of Section 2 of the Sherman Act and laws of the Plaintiff States claiming damages, or for exclusive dealing in violation of Section 1 of the Sherman Act and the Plaintiffs States claiming damages' laws, you should not consider the issue of damages and you may disregard the damages instruction that I am about to give.

Residents of the Plaintiff States claiming damages purchased primary concert tickets to attend live concert events at major concert venues in those States. The law provides that each Plaintiff State can recover any overcharges imposed by Defendants with respect to those ticket purchases, if you find that unlawful conduct was a material cause of those overcharges.

Antitrust damages are only compensatory, meaning their purpose is to put injured fans as near as possible in the position in which they would have been had the alleged antitrust violation not occurred. The law does not permit you to award any additional overcharge amount to punish a wrongdoer—what we sometimes refer to as punitive damages—or to deter particular conduct in the future. Furthermore, you are not permitted to award to any of the Plaintiff States an amount for attorneys' fees or the costs of maintaining this lawsuit.

**Plaintiffs' Authority**: Final Jury Instructions at 54, *Innovative Health LLC v. Biosense Webster, Inc.*, Case No. 8:19-cv-1984 JVS (C.D. Cal. May 16, 2025); ABA Model Instr. 6.B.1.

113

**Plaintiffs' Position:** Plaintiffs have adapted nonargumentative damages instructions based on the ABA Model Jury Instructions and those used in *Innovative Health LLC v. Biosense Webster, Inc.* Defendants' proposed modifications misstate the relevant claims at issue or otherwise pose a risk of confusing the jury. First, for the same reasons described with respect to prior instructions, Defendants' alternative names for Plaintiffs' proposed markets risk confusing the jury. Second, Defendants again mischaracterize Plaintiffs' claims (as relevant to this instruction) as only against Ticketmaster, rather than both Defendants. Third, Defendants unnecessarily repeat the specific claims at issue, which the jury will have previously been instructed on in Post Instruction No. 31.

**Defendants' Authority**: Final Jury Instructions at 54, *Innovative Health LLC v. Biosense Webster, Inc.*, Case No. 8:19-cv-1984 JVS (C.D. Cal. May 16, 2025); ABA Model Instr. 6.B.1; 15 U.S.C. § 15c(a)(1) ("The court shall exclude from the amount of monetary relief awarded in [a parent patriae] action any amount of monetary relief. . . which is properly allocable to. . . any business entity.").

**Defendants' Argument:**  Defendants' edits to this instruction align it with the previous damages-related instructions and were undertaken for the same reasons.  Additionally, they seek to make clear that the jury must have found specific antitrust violations, injury, and causation to proceed to the per-ticket overcharge issue.

114

**Post-Instruction No. 33**

### COMPENSATORY DAMAGES—OVERCHARGE

The Plaintiff States claiming damages contend that fans paid excessively high prices for primary tickets for live events at major concert venues because Defendants were charging ticketing fees that were inflated due to Defendants' antitrust violations; that is, higher prices than would have prevailed in a competitive market. If you find that the Plaintiffs have proven that Defendants violated the antitrust laws I previously described, and that the Plaintiff States claiming damages have satisfied the other elements for damages in my previous instructions, then the Plaintiff States claiming damages are entitled to recover, on behalf of fans, as damages, for those overcharges. That amount is the difference between what fans paid for primary tickets during the damages period and the price you find that fans would have paid in a competitive market.

You are being asked to determine the average per ticket overcharge amount for primary tickets purchased by fans for events at major concert venues in each of the Plaintiff States claiming damages. You are not being asked to determine the total number of tickets or fans affected by those overcharges.

**Plaintiffs' Authority**: Jury Instructions at 15-16, *Morelock Enterprises, Inc. v. Weyerhaeuser Co.*, 3:04-cv-00583-PA (D. Ore. Apr. 25, 2008).

**Plaintiffs' Position:** Plaintiffs have proposed a short nonargumentative instruction regarding the nature of overcharge damages. Defendants' proposed instruction complicates this instruction in a way that mischaracterizes Plaintiffs' claims and may otherwise be confusing for the jury.

First, for the same reasons described with respect to prior instructions, Defendants' alternative names for Plaintiffs' proposed markets risk confusing the jury.

Second, Defendants again mischaracterize Plaintiffs' claims (as relevant to this instruction) as only against Ticketmaster, rather than both Defendants.

Third, Defendants do not accurately describe the Plaintiff States' economic evidence about the basis of the overcharge to fans. While it is correct that the Plaintiff States' expert will testify that Defendants' increased ticketing fees are the cause of any injuries to fans, Defendants' instruction suggests that the only mechanism by which fans are injured is through a simple pass-through model in which venues are charged increased fees by Ticketmaster and those venues subsequently increase their fees to fans. As the Plaintiff States' expert will testify, because Ticketmaster sells tickets directly to fans, and the various components of a ticket depend on one another, Defendants' characterization of causation here

115

is not accurate. And regardless, given that causality may be a subject of dispute between experts at trial, attempting to characterize it in detail in a jury instruction is not appropriate.

**Defendants' Authority**: Jury Instructions at 15-16, *Morelock Enterprises, Inc. v. Weyerhaeuser Co.*, 3:04-cv-00583-PA (D. Ore. Apr. 25, 2008); 15 U.S.C. § 15c(a)(1) ("The court shall exclude from the amount of monetary relief awarded in [a parent patriae] action any amount of monetary relief. . . which is properly allocable to. . . any business entity.").

**Defendants' Argument:**  Defendants object to Plaintiffs' characterization of the alleged overcharge, which seeks to prejudice the jury by obfuscating the nature of the alleged overcharge and how it allegedly results.  Defendants' edits seek to make clear that the alleged overcharge at issue (1) relates to *fees* added to the face value of tickets, not the face value of tickets themselves; and (2) results from *venues* increasing those fees, not Ticketmaster.  Defendants' remaining edits align this instruction with the preceding damages instructions and were undertaken for the same reasons.

**Post-Instruction No. 34**

## BASIS FOR CALCULATING DAMAGES

You are permitted to make just and reasonable estimates in determining the amount of the average per-ticket overcharge. You are not required to calculate the amount of the overcharge with mathematical certainty or precision. However, the overcharge must have a reasonable basis in the evidence and must be based on reasonable, non-speculative assumptions and estimates. Each of the Plaintiff States claiming damages must prove the reasonableness of each of the assumptions upon which the damages calculation is based. But if you determine that Defendants violated the Sherman Act, Defendants bear the risk of any uncertainty in calculating damages created by their own wrongdoing.

If you find that any Plaintiff States claiming damages have provided a reasonable basis for determining damages, then you may find an overcharge amount so long as that amount is a just and reasonable estimate supported by the evidence.

If you find that any Plaintiff States failed to carry their burden of providing a reasonable basis for determining damages, then you may not find that any overcharge occurred.

**Plaintiffs' Authority**: Adapted ABA Model Instr. 6.B.3; *See, e.g., Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264–66 (1946) ("The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created."); *Story Parchment Co.,* 282 U.S. at 563 ("[I]t would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts."); *see also New York v. Julius Nasso Concrete Corp.*, 202 F.3d 82, 88 (2d Cir. 2000); *Nat'l Farmers' Org., Inc. v. Associated Milk Producers, Inc.*, 850 F.2d 1286, 1293 (8th Cir. 1988).

**Plaintiffs' Position:** Plaintiffs have proposed an adapted version of the ABA Model Jury Instructions for this instruction. Defendants' proposed instruction unnecessarily repeats the requirement for individual determinations for each State that is already covered in the existing instruction.

**Defendants' Authority**: Adapted ABA Model Instr. 6.B.3.

**Defendants' Argument:** Defendants' edits to this instruction align it with the preceding damages instructions and were undertaken for the same reasons.

Defendants object to Plaintiffs' statement that "Defendants bear the risk of uncertainty in calculating damages created by their own wrongdoing." This statement is highly prejudicial and might incline the jury to disregard this Court's instruction that its calculations must be "just and reasonable" under

117

all circumstances.  Indeed, in *Bigelow v. RKO Radio Pictures*, the Supreme Court held that "even where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guesswork."  327 U.S. 251, 264.  Rather, it must "make a just and reasonable estimate of the damage based on relevant data."  *Id.*  The Court reasoned that "[a]ny other rule," *i.e.*, a rule requiring "direct and positive proof," "would enable the wrongdoer to profit by his wrongdoing."  *Id.*  Plaintiffs' proposal takes that statement out of context and erroneously suggests to the jury that it may do exactly what the Supreme Court has forbidden.  "It is well-settled that the burden is on the plaintiff to establish its entitlement to recovery."  *Trs. of Plumbers & Pipefitters Nat. Pension Fund v. Daniel Weintraub & Assocs., Inc.*, 2007 WL 4125453, at *3 (E.D.N.Y. Nov. 16, 2007).  Plaintiffs' attempt to flip the burden is unavailing and should be rejected.

118

**Post-Instruction No. 34P**

**CALCULATION OF MONETARY RECOVERY FOR VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200 ET SEQ.)**

If you find that Defendants have violated California's Unfair Competition Law, then you must determine the amount of the average per ticket overcharge, if any, that individuals who purchased primary concert tickets for live concert events at major concert venues in California are entitled to recover. This overcharge must have resulted from Defendants imposing ticketing fees that were higher than they would have been but for any business act or practice that you have found violated the Unfair Competition Law.

The fact that I am giving you instructions concerning the issue of the amount of monetary recovery under California's Unfair Competition Law does not mean that I believe any party should, or should not, prevail in this case. If you reach a verdict for Defendants on California's Unfair Competition Law, you may disregard the monetary recovery instructions that I am about to give.

The average per ticket overcharge amount is the difference between what fans paid for primary concert tickets for live events at major concert venues in California and the price you find that fans would have paid without the business act or practice that violated the Unfair Competition Law.

In addition, if you found that the unlawful or unfair act or practice that Defendants engaged in emanated from California and harmed consumers who paid for primary concert tickets for live events at major concert venues outside of California, you should separately determine the amount of overcharge for those consumers.

In calculating the overcharge amount, you must use a reasonable basis of computation. Your calculation of the overcharge amount may be an approximation. Your computation must be supported by evidence. If you find that the State of California has failed to carry its burden of

119

providing a reasonable basis for determining the amount of the overcharge, then you may not find

any overcharge amount.

**Plaintiffs' Authority**: *People v. Ashford Univ., LLC*, 100 Cal. App. 5th 485, 506-07, 518-21 (2024) (citing *Abbott Laboratories v. Superior Court*, 9 Cal. 5th 642, 651–652 (2020)); *Ashford*, 100 Cal. App. 5th at 518-19 (the trial court properly determined that defendants' conduct emanated from California and had cited "evidence that defendants were headquartered in San Diego, and Ashford's former presidents, admissions counselors, and the majority of admissions employees worked in San Diego" and that, as an example, the UCL "could constitutionally be applied to the claims of nonresident class members" where the defendant was a California corporation with its principal place of business in California and the "brochures at issue were prepared in and distributed from California" (citation omitted); *Fernandez v. CoreLogic Credco*, LLC, 593 F. Supp. 3d 974, 992 (S.D. Cal. 2022) (refusing to dismiss UCL claim and finding it plausible that unlawful conduct emanated from California in lawsuit brought by Maryland resident
against a firm that had its principal place of business in California, management level employees in California, and that the policies and procedures at issue in this case were developed, designed, and implemented in California); *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 988 (9th Cir. 2015) ("Restitution under the UCL . . . must be of a measurable amount to restore to the plaintiff what has been acquired by the violation of the statute[], and that measurable amount must be supported by evidence" and "[i]n calculating damages, here restitution, California law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation" and that "the fact that the amount of damage may not be susceptible of exact proof or may be uncertain, contingent or difficult of ascertainment does not bar recovery" (citing *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 698 (2006), *Marsu, B.V. v. Walt Disney Co.*, 185 F.3d 932, 938-39 (9th Cir. 1999) (internal quotation marks omitted)). Jury Instructions at 15-16, *Morelock Enterprises, Inc. v. Weyerhaeuser Co.*, 3:04-cv-00583-PA (D. Ore. Apr. 25, 2008).

**Plaintiffs' Position:** Plaintiffs' request for the jury to be instructed on its request for monetary restitution under California's Unfair Competition law is both legally proper and in the interest of judicial efficiency. As stated in Plaintiffs' Joint Memorandum of Law in Support of Plaintiffs' Motion to Bifurcate Trial, the State of California believes that judicial efficiency is served by its request for monetary restitution being tried to the same jury as the liability claims. *See* ECF No. 528 at 7 n.3. The State of California's request for monetary restitution is based on the same evidence and testimony that will support the damages claims of the other states. Plaintiffs' monetary relief expert, Dr. Rosa Abrantes-Metz, calculates the amount of monetary restitution California seeks in the same manner as those of the damages states and presenting the same testimony in another phase of the trial would be inefficient and unnecessary. Further, the Federal Rules permit a jury to sit in an advisory capacity on equitable claims such as the State of California's monetary relief claim where, as here, judicial efficiency would be best served by a single jury considering the claim with others in the case. Fed. R. Evid. 39(c); 9 Wright & Miller, Federal Practice and Procedure: Civil 3d § 2335; *Starr Int'l Co. v. Am. Int'l Grp., Inc.*, 623 F. Supp. 2d 497, 502 (S.D.N.Y. 2009) ("Courts may empanel an advisory jury in order to maximize efficiency and convenience.").

**Defendants' Argument:** California has sought only equitable relief and civil penalties in this case. ECF No. 257 at 95 (Am. Compl.) (seeking "[i]njunctive, restitution and other equitable relief under

120

the UCL" and "[c]ivil penalties"). Indeed, "[a] UCL action is equitable in nature; damages cannot be recovered." *Cruz v. PacifiCare Health Systems, Inc.*, 30 Cal. 4th 303, 317 (Cal. 2003). Although the UCL provides for monetary recovery in the form of restitution, that too is viewed as an equitable remedy "[i]n the UCL context." *Id.* This Court has already decided that equitable remedies and civil penalties will be determined at a later phase, after the jury trial on liability and damages. Defendants object to California's attempt to relitigate that ruling and have its equitable remedies tried to the jury.

**Post-Instruction No. 35**

### FINAL INSTRUCTIONS

You are about to go into the jury room and begin your deliberations. If during those deliberations you want to see any of the exhibits, you may request that they be brought into the jury room. If you want any of the testimony read back to you, you may also request that. Please remember that it is not always easy to locate what you might want to read or hear, so be as specific as you possibly can in requesting exhibits or portions of the testimony.

Your requests for exhibits or testimony—in fact, any communication with the Court— should be made to me in writing, signed by your foreperson, and given to one of the marshals. In any event, do not tell me or anyone else how the jury stands on any issue until after a unanimous verdict is reached.

*Duty to Deliberate/Unanimous Verdict*

You will now retire to decide the case. It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement. Each of you must decide the case for yourselves, but you should do so only after a consideration of the case with your fellow jurors, and you should not hesitate to change an opinion when convinced that it is erroneous. Your verdict must be unanimous, but you are not bound to surrender your honest convictions concerning the effect or weight of the evidence for the mere purpose of returning a verdict or solely because of the opinion of other jurors. Discuss and weigh your respective opinions dispassionately, without regard to sympathy, without regard to prejudice or favor for either party, and adopt that conclusion which in your good conscience appears to be in accordance with the truth.

Again, each of you must make your own decision about the proper outcome of this case based on your consideration of the evidence and your discussions with your fellow jurors. No juror should surrender their conscientious beliefs solely for the purpose of returning a unanimous verdict.

*Selection of Foreperson*

When you retire, you should elect one member of the jury as your foreperson. That person will preside over the deliberations and speak for you here in open court.

Verdict forms have been prepared for your convenience. You will take these forms to the jury room and, when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date, and sign the form that sets forth the verdict upon which you unanimously agree. You will then return with your verdict to the courtroom. I will read the verdict form to you now.

*Return of Verdict*

After you have reached a verdict, your foreperson will fill in the form that has been given to you, each of you will sign it with the date and advise the marshal outside your door that you are ready to return to the courtroom.

I will stress that each of you should be in agreement with the verdict which is announced in court. Once your verdict is announced by your foreperson in open court and officially recorded, it cannot ordinarily be revoked.

*Juror Oath*

In determining the facts, you are reminded that you took an oath to render judgment impartially and fairly, without prejudice and without fear, solely upon the evidence in the case and the applicable law. I know that you will do this and reach a just and true verdict.

`UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA, et al.,

Plaintiffs,

v.

LIVE NATION ENTERTAINMENT, INC.,
and TICKETMASTER L.L.C.,

Defendants.

Case No. 1:24-cv-03973-AS

PLAINTIFFS'

UNITED STATES OF AMERICA, et al.,

Plaintiffs,

LIVE NATION ENTERTAINMENT, INC.,
and TICKETMASTER L.L.C.,

Defendants.

Case No. 1:24-cv-03973-AS

DEFENDANTS' PROPOSED JURY INSTRUCTIONS

Pursuant to Rule 51(a) of the Federal Rules of Civil Procedure and the Court's Individual

Practices in Civil Cases, Paragraph D, Plaintiffs the States of Arizona, California, Colorado,

Connecticut, Florida, Illinois, Indiana, Kansas, Louisiana, Maryland, Michigan, Minnesota, Nevada,

New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, Oregon, Rhode Island,

South Carolina, Tennessee, Texas, Utah, Vermont, Washington, West Virginia, Wisconsin, and

Wyoming, the Commonwealths of Massachusetts, Pennsylvania, and Virginia, and the District of

1

Columbia, acting by and through their respective Attorneys General (collectively, "Plaintiff States"), together with Defendants Live Nation Entertainment, Inc., and Ticketmaster L.L.C. (collectively, "Defendants"), respectfully request that the Court provide the following instructions to the jury. For those instructions where the parties could not reach agreement, Plaintiffs and Defendants have separately set forth their proposed instruction together with short arguments, including citations to supporting authority.

# Contents

Post-Instruction No. 1..............................................................................................86

Post-Instruction No. 1..............................................................................................6

GENERAL INTRODUCTION...................................................................................66

Post-Instruction No. 2..............................................................................................7

Post-Instruction No. 2..............................................................................................7

THE PARTIES...........................................................................................................77

Post-Instruction No. 3..............................................................................................810

EVIDENCE IN THE CASE.......................................................................................810

Post-Instruction No. 4..............................................................................................911

WITNESS CREDIBILITY .......................................................................................911

Post-Instruction No. 5..............................................................................................1113

USE OF DEPOSITIONS AS EVIDENCE................................................................1113

Post-Instruction No. 6..............................................................................................1214

EXPERT TESTIMONY.............................................................................................1214

Post-Instruction No. 7..............................................................................................1315

SUMMARY OF CONTENTIONS ............................................................................1315

Post-Instruction No. 8..............................................................................................1619

BURDEN OF PROOF—PREPONDERANCE OF THE EVIDENCE.............................1619

Post-Instruction No. 9..............................................................................................1720

MONOPOLIZATION ELEMENTS...........................................................................1720

Post-Instruction No. 10............................................................................................1822

MONOPOLIZATION ELEMENT #1: RELEVANT MARKET—GENERAL ................1822

Post-Instruction No. 11............................................................................................2024

**RELEVANT PRODUCT MARKET—General**........................................................**20**24

**Post-Instruction No. 11D**........................................................27

**RELEVANT PRODUCT MARKET—PRIMARY TICKETING MARKETS**......................27

**Post-Instruction No. 11D2**........................................................29

**RELEVANT PRODUCT MARKET—AMPHITHEATERS MARKET**..............................29

**Post-Instruction No. 12**........................................................31

**MONOPOLIZATION— ELEMENT #2: MONOPOLY POWER**......................................**23**31

**Post-Instruction No. 13**........................................................**24**

**Post-Instruction No. 13**........................................................32

**EXISTENCE OF MONOPOLY POWER—DIRECT PROOF**..........................................**24**32

**Post-Instruction No. 14**........................................................35

**EXISTENCE OF MONOPOLY POWER—INDIRECT PROOF**......................................**26**35

**Post-Instruction No. 15**........................................................39

**MONOPOLIZATION: MAINTAINING ELEMENT #3: WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY POWER THROUGH ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT**........................................................**30**39

**Post-Instruction No. 16**........................................................42

**ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT—EXAMPLES**..........................33

**Post-Instruction No. 16**........................................................36

**ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT—EXCLUSIVE DEALING - SHERMAN ACT SECTION 2**........................................................**36**42

**Post-Instruction No. 16D**........................................................44

**PROCOMPETITIVE BENEFITS**........................................................38
**THREATS AND RETALIATION**........................................................44
**BALANCING THE COMPETITIVE EFFECTS**........................................................39

**Post-Instruction No. 16D2**........................................................47

**VERTICAL INTEGRATION AND SELF-PREFERENCING**..........................................47

**Post-Instruction No. 16D3**........................................................49

MONOPOLIZATION ELEMENT #4: COMPETITIVE HARM ........................................49

Post-Instruction No. 17.............................................................................................51

EXCLUSIVE ~~DEALING~~DEALING AGAINST TICKETMASTER—SHERMAN ACT SECTION 1.............................................................................................................~~40~~51

Post-Instruction No. 18.............................................................................................57

UNLAWFUL TYING AGAINST LIVE NATION ..................................................~~43~~57

Post-Instruction No. 18D...........................................................................................62

UNLAWFUL TYING—IDENTITY OF THE PURCHASER ..................................62

Post-Instruction No. 18D2.........................................................................................63

UNLAWFUL TYING—PRESENCE OF TWO PRODUCTS ..................................63

Post-Instruction No. 19.............................................................................................64

UNLAWFUL TYING—PROOF OF CONDITIONING AND COERCION.....................~~46~~64

Post-Instruction No. 20.............................................................................................66

UNLAWFUL TYING—INVOLVEMENT OF A NOT INSUBSTANTIAL VOLUME OF INTERSTATE COMMERCE WITH RESPECT TO THE TIED PRODUCT AND SUBSTANTIAL FORECLOSURE IN TIED PRODUCT MARKET ..............................~~47~~66

Post-Instruction No. 21.............................................................................................67

STATE LAW CLAIMS............................................................................................~~49~~67

Post-Instruction No. 22.............................................................................................68

CONGRUENT STATE CLAIMS ...........................................................................~~50~~68

Post-Instruction No. 23.............................................................................................71

CALIFORNIA UNFAIR COMPETITION LAW  (Cal. Bus. & Prof. Code § 17200 *et seq.*)...................................................................................................................~~54~~71

Post-Instruction No. 24.............................................................................................75

FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT (Fla. Stat. § 501.204)~~57~~75

Post-Instruction No. 25.............................................................................................78

ILLINOIS ANTITRUST ACT (740 ILCS 10/1 *et seq.*) ........................................~~60~~78

Post-Instruction No. 25D ...........................................................................................................80

INDIANA ANTITRUST ACT (IND. CODE §§ 24-1-2-1 AND 24-1-2-2) ...............................80

Post-Instruction No. 26 .............................................................................................................81

KANSAS RESTRAINT OF TRADE ACT (Kan. Stat. Ann. § 50-101 *et seq.*) ...................~~63~~81

Post-Instruction No. 27 .............................................................................................................83

DONNELLY ACT (New York General Business Law §§ 340 *et seq.*) ...............................~~66~~83

Post-Instruction No. 28 .............................................................................................................85

SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT  (S.C. Code Ann. § 39-5-10 et seq.) ...........................................................................................................................................~~68~~85

Post-Instruction No. 29 .............................................................................................................87

TENNESSEE TRADE PRACTICES ACT  (TENN. CODE ANN. §§ 47-25-101 AND 102)~~70~~87

Post-Instruction No. 30 .............................................................................................................88

~~Vermont Consumer Protection Act  (9 V.S.A. § 2451 et seq.)~~ ...............................................~~71~~
STATES DAMAGES ~~AND OVERCHARGE~~CLAIMS ........................................................~~73~~88

Post-Instruction No. 31 .............................................................................................................91

INJURY AND CAUSATION .................................................................................................~~75~~91

Post-Instruction No. 31D ...........................................................................................................94

STATUTE OF LIMITATIONS ...................................................................................................94

Post-Instruction No. 32 .............................................................................................................97

DAMAGES INSTRUCTIONS—GENERAL .......................................................................~~78~~97

Post-Instruction No. ~~34~~33 ...................................................................................................~~79~~99

COMPENSATORY DAMAGES—OVERCHARGE.............................................................~~79~~99

Post-Instruction No. ~~35~~34 ................................................................................................~~80~~101

BASIS FOR CALCULATING ~~DAMAGES~~OVERCHARGE .......................................~~80~~101

~~Post-Instruction No. 35P~~ ........................................................................................................~~81~~

~~CALCULATION OF MONETARY RECOVERY FOR VIOLATION of the California Unfair Competition Law  (Cal. Bus. & Prof. Code § 17200 et seq.)~~ ...........................................~~81~~

6

**Post-Instruction No. 3635**........................................................................................83102

**FINAL INSTRUCTIONS**...............................................................................................83102
*Duty to Deliberate/Unanimous Verdict* ......................................................................83102
*Selection of Foreperson* ............................................................................................84103
*Return of Verdict* ......................................................................................................84103
*Juror Oath*.................................................................................................................84103

**<u>Post-Instruction No. 1</u>**

~~Post-Instruction No. 1~~

## GENERAL INTRODUCTION

Now that you have heard the evidence and the argument, it is my duty to instruct you about the applicable law. It is your duty to follow the law as I state it. You must apply the law to the facts as you find them from the evidence in the case. Do not single out one instruction as stating the law, but consider the instructions as a whole. Do not be concerned about the wisdom of any rule of law stated by me. You must follow and apply the law.

Nothing I say in these instructions indicates I have any opinion about the facts of the case. You, not I, have the duty to determine the facts.

You must perform your duties as jurors without bias or prejudice as to any party. The law does not permit you to be controlled by sympathy, prejudice, or public opinion. The parties expect that you will carefully and impartially consider all the evidence, follow the law as it is now being given to you, and reach a just unanimous verdict, regardless of the consequences.

**Authority**: *Nike, Inc. v. Lululemon USA Inc.*, Final Jury Instructions at 3, 1:23-cv-00771-AS (S.D.N.Y.).

9

**Post-Instruction No. 2**

**THE PARTIES**

As I instructed you earlier, the Plaintiffs are the [33] individual States and the District of Columbia. The Defendants in this case are Live Nation Entertainment, Inc. and Ticketmaster L.L.C. ~~Live Nation is the parent company of Ticketmaster, its wholly-owned subsidiary. Under the law, you must treat Live Nation and Ticketmaster as a single entity when evaluating whether they violated the Sherman Act.~~

There are multiple Plaintiffs and Defendants in this case, and different Plaintiffs are asserting different claims against different Defendants. You must decide each claim by each Plaintiff against each Defendant separately. Each Plaintiff must meet its own burden of proof for each of its claims and each Defendant is entitled to have the claims alleged against it determined based on its own conduct. In particular, each Plaintiff State must prove every element of its own claims.

Unless otherwise stated, these instructions apply to all parties.

**Plaintiffs' Authority**: Adapted 4 Modern F. Jury Instructions-Civil P 79.02, 79-5; *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 777 (1984) ("[a]ny anticompetitive activities of corporations and their wholly owned subsidiaries meriting antitrust remedies may be policed adequately [because] the enterprise is fully subject to Section 2 of the Sherman Act"); *id.* at 771-72 (explaining that "the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise . . . [because a] parent and its wholly owned subsidiary have a complete unity of interest . . . [and] in reality a parent and a wholly owned subsidiary *always* have a unity of purpose or a common design. They share a common purpose whether or not the parent keeps a tight rein over the subsidiary") (citation omitted and emphasis in original); *id.* at 772 ("Antitrust liability should not depend on whether a corporate subunit is organized as an unincorporated division or a wholly owned subsidiary," and a company's decisions "to choose one structure over the other are not relevant to whether the enterprise's conduct seriously threatens competition.") *Caribe BMW, Inc. v. Bayerische Motoren Werke Aktiengesellschaft*, 19 F.3d 745, 749-50 (1st Cir. 1994) (Breyer, C.J.) (applying *Copperweld* in the Robinson Patman context, and explaining that the *Copperweld* "Court saw an identity of economic interest between parent and wholly owned subsidiary that, considered in terms of the economically oriented antitrust laws, warrants regarding them as one"); *Arandell Corp. v. Centerpoint Energy Services, Inc.*, 900 F.3d 623, 630 (9th Cir. 2018) ('[w]here there is substantial common ownership, ... individual firms function as an economic unit and are generally treated as a single entity.'") (holding subsidiary could be liable for anticompetitive conduct of parent by "selling gas at rigged prices and distributing the inflated profits to its parent"); *Lenox MacLaren Surgical Corporation v. Medtronic, Inc.*, 847 F.3d 1221, 1236 (10th Cir. 2017) ("Rather, in a single-enterprise situation, it is the affiliated corporations' collective conduct—i.e., the conduct of the *enterprise* they

10

jointly compose—that matters; it is the *enterprise* which must be shown to satisfy the elements of a monopolization or attempted monopolization claim.") (collecting cases where courts "held that a parent can be liable for subsidiary-level anticompetitive activity" "when the parent controls, dictates or encourages the subsidiary's anticompetitive conduct" (cleaned up)); *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1070 (D. Colo. 2004) ("When the parent controls, directs, or encourages the subsidiary's anticompetitive conduct, the parent engages in sufficient independent conduct to be held directly liable as a single enterprise with the subsidiary under the Sherman Act.").

**Plaintiffs' Position:** Defendants' proposed instruction that each Plaintiff must meet its burden of proof for each of its claims, as drafted, is likely to be confusing to the jury and, in any event, is unsupported by Defendants' cited authorities. With respect to the federal antitrust claims, the Plaintiff States have asserted the same claims and intend to jointly present evidence in support of those claims at trial and California's claims rely on the same common nucleus of facts. There is no legal requirement for each of the Plaintiffs to independently present evidence to the jury multiple times. The cases cited by Defendants are inapposite. In *Phillips v. Potter,* "each Plaintiff br[ought] separate factual allegations supporting the same claim – [a] sexually hostile environment." 2008 WL 11492752, at *30 (N.D. Ohio Mar. 31, 2008). But here, for the federal claims, all Plaintiffs base their claims on the exact same factual allegations.

Of course, to the extent a Plaintiff State has also brought a separate state law claim or sought damages, it will be responsible for ensuring the evidence at trial supports those claims, but each such Plaintiff State believes that the evidence overlaps significantly with evidence supporting the federal antitrust claims. Defendants' proposed instruction is overly broad and would seem to require that each State independently put forward the necessary evidence, even though such evidence overlaps substantially both with the federal claims and across state law and state damages claims. Defendants' cherry-picked quotation from *Phillips* fairs no better. *Phillips* merely stands for the proposition that one plaintiff's "testimony about events that occurred in 2001 are not admissible or relevant to [other plaintiffs'] claims of harassment beginning in 2004." *Id.* at *31. There is no parallel to the joint claims brought by the State Plaintiffs here.

The *Radmanovich* case involved a class certification decision where the court highlighted as a key issue "that each plaintiff would need to come forth with proof of how the pattern or practice of discrimination impacted her." *Radmanovich v. Combined Ins. Co. of Am.*, 216 F.R.D. 424, 436 (N.D. Ill. 2003). The court noted a finding of a commonly alleged "pattern or practice" alone would be insufficient to establish liability on any individual's claim. *See id.* at 439. But no such showing of individualized impact is required for any of the federal antitrust claims alleged here, except to the extent certain Plaintiff States seek damages or to independently prove liability under their laws, for which they each intend to offer sufficient evidence at trial within the time allotted by the Court. Indeed, in *Orchestrate,* cited by Defendants, the court did not compartmentalize evidence between Plaintiffs but rather allowed Plaintiffs to argue "that evidence of damages to one may possibly be used as evidence of damages to the other where damages overlap." *Orchestrate HR, Inc. v. Trombetta*, 2017 WL 273669, at *8 (N.D. Tex. Jan. 20, 2017) (denying in part defendants' motion in limine). And *Louisiana Crawfish Producers Ass'n-W. v. Amerada Hess Corp.*, 2015 WL 10571063, at *11 (W.D. La. Nov. 23, 2015), merely confirmed that when an individual plaintiff pursues monetary recovery for damages it experienced, it must prove the amount of damages incurred. No

11

such requirement applies to the Plaintiff States when seeking to enforce the federal antitrust laws, outside of specific damages claims.

Further, Defendants' proposed instruction that the jury must consider each Defendant separately and in isolation misstates the law. Under the antitrust laws, a parent and its wholly owned subsidiary are viewed as a single entity with a complete unity of interest. In *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984), the Supreme Court overturned "a long-settled rule" permitting Section 1 Sherman Act antitrust liability for "intra-enterprise" coordinated conduct between a parent and its wholly owned subsidiary. *Id.* at 777, 784. In doing so, however, the Court held that "[a]ny anticompetitive activities of [such enterprises] meriting antitrust remedies may be policed adequately without resort to an intra-enterprise conspiracy doctrine" as "the enterprise is fully subject to § 2 of the Sherman Act." 467 U.S. at 776-77.  The *Copperweld* Court reasoned that "the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise . . . [because a] parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one . . . [and] in reality a parent and a wholly owned subsidiary *always* have a unity of purpose or a common design. They share a common purpose whether or not the parent keeps a tight rein over the subsidiary" (emphasis added). *Id.* at 771-72. Significant to the dispute here, the Court also barred the consideration of multi-factor tests to determine whether corporate entities could be considered a "single entity" "[a]s applied to a wholly owned subsidiary" because such a test is "inadequate to preserve the Sherman Act's distinction between unilateral and concerted conduct." *Id.* at 772 n. 18 (noting that "[a]t least when a subsidiary is wholly owned, however, these factors are not sufficient to describe a separate economic entity for purposes of the Sherman Act" because "[t]hey cannot overcome the basic fact that the ultimate interests of the subsidiary and the parent are identical, so the parent and the subsidiary *must* be viewed as a single economic unit") (emphasis added).

Courts have been near uniform in applying this rule in antitrust cases. *See, e.g.*, *Fraser v. Major League Soccer, LLC*, 284 F.3d 47, 58 (1st Cir. 2002) (Boudin, J.) (explaining that it is settled law under *Copperweld* that a "parent and its wholly owned subsidiary . . . share[ ] a 'complete unity of interests'") (quoting *Copperweld*, 467 U.S. at 771); *Caribe BMW, Inc. v. Bayerische Motoren Werke Aktiengesellschaft*, 19 F.3d 745, 749-50 (1st Cir. 1994) (Breyer, C.J.) (explaining that the *Copperweld* "[c]ourt saw an identity of economic interest between a parent and wholly owned subsidiary that, considered in terms of the economically oriented antitrust laws, warrants regarding them as one [because] [a]ny claimed instance of truly 'independent,' owner-hostile, subsidiary decisionmaking would meet with the skeptical question, 'But, if the subsidiary acts contrary to its parent's economic interest, why does the parent not replace the subsidiary's management?' Given the strength of that joint economic interest, we do not see how a case-specific judicial examination of 'actual' parental control would help achieve any significant antitrust objective"); *United States v. Waste Mgmt., Inc.*, 743 F.2d 976, 978-79 (2d Cir. 1984) (post-*Copperweld*, attributing without discussion subsidiaries' activities and market shares to parent corporation for purposes of Clayton Act merger analysis).

Defendants' reliance on a smattering of non-antitrust cases and some out-of-circuit, inapposite antitrust cases do not support a rejection of *Copperweld* here. *See, e.g.*, *United States v. Bestfoods*, 524 U.S. 51, 61-62 (1998) (discussing "general principle[s] of corporate law" in the context of CERCLA); *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir.

12

1993) (considering a franchisee's efforts to collect an arbitral breach-of-contract award against a franchisor's parent company); *In re Outpatient Medical Center Employee Antitrust Litig.*, 630 F. Supp. 3d 968, 991 (N.D. Ill. 2022) (considering liability of a parent company that purchased defendant company, which was already engaging in Section 1 conspiracy with co-defendants); *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 857 (10th Cir. 1999) (declining to consider a non-insurance company "as an insurance company on the same horizontal level as [co-defendant insurance companies] merely because [non-insurance] company happens to be the wholly owned subsidiary of [a parent company] which owns other subsidiaries which are insurance companies"). Other cases cited by Defendants undercut their position here. *See, e.g.*, *Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 633 (9th Cir. 2018) (finding parent and subsidiary should be treated as a single entity for purposes of Sherman Act claim and chastising defendants for trying to "have the *Copperweld* doctrine both ways [by] insist[ing] both (1) that two affiliates are incapable of conspiring with each other for purposes of Section 1 of the Sherman Act because they 'always' share a 'unity of purpose,' and (2) that one affiliate may escape liability for its own conduct . . . by disavowing the anticompetitive intent of the other, even where the two acted together" because "*Copperweld* 'foreclose[d]' a result that would allow sophisticated companies to evade Section 2 liability by spreading anticompetitive schemes over multiple affiliates").

Finally, even assuming arguendo that Defendants' cited authorities were applicable to the facts and circumstances here—they are not—Plaintiffs have presented evidence at trial that Live Nation is "involved" in the alleged conduct of its wholly owned subsidiary, such that they should be considered a single entity even under a more restrictive test. Notably, Defendants request a separate instruction premised on their "vertical integration," claiming that their existence as a single entity provides a defense to liability, while insisting through this instruction that they be treated as entirely separate entities as a matter of law. This charge should be denied as legally and factually baseless and likely to confuse the jury.

**Defendants' Authority**: *North Am. Soccer League, LLC v. U.S. Soccer Federation, Inc.*, Final Jury Instructions at 7, No. 1:17-cv-5495, ECF No. 531 (E.D.N.Y. Jan. 31, 2025); *Phillips v. Potter*, No. 1:05 CV 1852, 2008 WL 11492752, at *31 (N.D. Ohio Mar. 31, 2008) ("It is well understood that each Plaintiff must prove her own individual claims."); *Radmanovich v. Combined Ins. Co. of Am.*, 216 F.R.D. 424, 439 (N.D. Ill. 2003) ("Each plaintiff will be responsible for establishing the elements of her own claims."); *Orchestrate HR, Inc. v. Trombetta*, No. 3:13-CV-2110-KS, 2017 WL 273669, at *8 (N.D. Tex. Jan. 20, 2017) ("It is elementary that each plaintiff must prove its own damages."); *Louisiana Crawfish Producers Ass'n-W. v. Amerada Hess Corp.*, No. CV 6:10-0348, 2015 WL 10571063, at *11 (W.D. La. Nov. 23, 2015) ("Each plaintiff must necessarily prove his or her case."); *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries."; collecting cases); *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir. 1993); *In re Outpatient Medical Center Employee Antitrust Litig.*, 630 F. Supp. 3d 968, 991 (N.D. Ill. 2022) ("Courts have declined to extend *Copperweld* to allow § 1 liability for both a parent and its subsidiary 'even where there is no evidence that both were involved in the challenged conduct.'" (quoting *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 857 (10th Cir. 1999))); *id.* ("[C]ourts continue to find a parent liable only when it was directly involved in the anticompetitive conduct." (citing *Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 633 (9th Cir. 2018))); *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 857 (10th Cir. 1999) ("Plaintiffs wish to extend *Copperweld* to hold that a

13

subsidiary and its parent, or a subsidiary and a sister subsidiary, can be considered one entity for all § 1 purposes, and either one can be liable for conspiring to restrain trade, even where there is no evidence that both were involved in the challenged conduct. We reject this extension."); *In re Pa. Title Ins. Antitrust Litig.*, 648 F. Supp. 2d 663, 688-89 (E.D. Pa. 2009) ("[W]hen a 'parent controls, directs, or encourages the subsidiary's anticompetitive conduct, the parent engages in sufficient independent conduct to be held directly liable as a single enterprise with the subsidiary under the Sherman Act.'"; dismissing claims against corporate parents); *McCray v. Fidelity Nat'l Title Ins. Co.*, 636 F. Supp. 2d 322, 334 (D. Del. 2009) (dismissing "the claims against the corporate parent defendants" for failure to allege "facts sufficient to infer... direct involvement"), *aff'd*, 682 F.3d 229 (3d Cir. 2012); *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1237 (10th Cir. 2017) ("[A]lthough we agree that Lenox was entitled to pursue its § 2 claims against Defendants as a single enterprise, and to prove those claims based on the actions of the enterprise as a whole, Lenox was still required to come forward with evidence that each defendant independently participated in the enterprise's scheme, to justify holding that defendant liable as part of the enterprise."); *Climax Molybdenum Co. v. Molychem, L.L.C.*, 414 F. Supp. 2d 1007, 1012 (D. Colo. 2005) ("When the parent controls, dictates or encourages the subsidiary's anticompetitive conduct, the parent engages in sufficient independent conduct to be held directly liable as a single enterprise with the subsidiary under the Sherman Act.").

**Defendants' Argument**:  Defendants object to Plaintiffs' treatment of Live Nation and Ticketmaster "as a single entity" here and throughout these instructions.  Under "well-settled principles of corporate law, . . . parent corporations and their subsidiaries a[re] legally distinct entities."  *Balintulo v. Ford Motor Co.*, 796 F.3d 160, 168 (2d Cir. 2015).  And "a parent corporation . . . is not liable for the acts of its subsidiaries," or vice versa.  *United States v. Bestfoods*, 524 U.S. 51, 61 (1998).  A parent corporation may be held liable for the acts of its subsidiaries only under certain narrow circumstances, such as "under a veil-piercing, alter ego, or respondeat superior theory."  *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1237 (10th Cir. 2017); *see Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir. 1993).  Plaintiffs have not alleged those theories here, it is far too late to do so now, and doing so would be futile in any event.  Plaintiffs must prove their claims against each Defendant separately.

Contrary to Plaintiffs' contention, *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984), does not justify collapsing legally separate and distinct parent and subsidiary entities in all antitrust cases.  *Copperweld* considered the "intra-enterprise conspiracy doctrine" and held only that a parent company "and its wholly owned subsidiary [] are incapable of conspiring with each other for purposes of § 1 of the Sherman Act."  467 U.S. at 758, 777.  Plaintiffs have not alleged any intra-enterprise conspiracy between Live Nation and Ticketmaster.  Nor have they cited any on-point authority suggesting that *Copperweld* displaces the traditional rule of corporate separateness absent such an allegation.  *Caribe BMW, Inc. v. Bayerische Motoren Werke Aktiengesellschaft* discussed *Copperweld* in the disparate context of the Robinson-Patman Act to determine whether a parent company and subsidiary selling the *exact same product* may be considered a "single seller."  19 F.3d 745, 748-49 (1st Cir. 1994).  That is not the situation here.  And *Arandell Corp. v. Centerpoint Energy Services, Inc.* involved a situation where the plaintiffs sought to hold a parent and a subsidiary liable for a price-fixing scheme that was perpetrated by the parent and in which the subsidiary participated by selling natural gas at prices rigged by the parent.  900 F.3d 623, 625 (9th Cir. 2018).  The Ninth Circuit reasoned that the subsidiary could be held liable for the parent's actions because the subsidiary engaged in "coordinated activity in furtherance of the anticompetitive scheme of its parent."  *Id.* at 632.  But that case says nothing about whether a parent that is not even engaged in the same business as the subsidiary may be held liable for the subsidiary's actions.

14

Importantly, courts have expressly declined to follow the approach advocated by Plaintiffs here. "Courts have declined to extend *Copperweld* to allow § 1 liability for both a parent and its subsidiary '[] where there is no evidence that both were involved in the challenged conduct.'" *In re Outpatient Medical Center Employee Antitrust Litig.*, 630 F. Supp. 3d 968, 991 (N.D. Ill. 2022) (quoting *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 857 (10th Cir. 1999)). And "courts continue to find a parent liable only when it was directly involved in the anticompetitive conduct," and thus is being held liable for its own conduct, not that of its subsidiary. *Id.* (citing *Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 633 (9th Cir. 2018)); *see also In re Pa. Title Ins. Antitrust Litig.*, 648 F. Supp. 2d 663, 688-89 (E.D. Pa. 2009) (dismissing claims against corporate parents); *McCray v. Fidelity Nat'l Title Ins. Co.*, 636 F. Supp. 2d 322, 334 (D. Del. 2009) (dismissing "claims against the corporate parent defendants" for failure to allege "facts sufficient to infer . . . direct involvement"), *aff'd*, 682 F.3d 229 (3d Cir. 2012).

As this Court likewise recognized in pre-trial proceedings, to hold entities within the same corporate family liable for the same conduct, "there must be evidence of the involvement of the two parts of the corporate family in the scheme." 2/27/26 Hearing Tr. at 154:7-9; *see Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1237 (10th Cir. 2017) ("[A]lthough we agree that Lenox was entitled to pursue its § 2 claims against Defendants as a single enterprise, and to prove those claims based on the actions of the enterprise as a whole, Lenox was still required to come forward with evidence that each defendant independently participated in the enterprise's scheme, to justify holding that defendant liable as part of the enterprise."). Defendants object to Plaintiffs instructions that merely lump Defendants together without making clear that to hold Live Nation liable for Ticketmaster's conduct, Live Nation must have independently and directly participated in that conduct. In particular, Live Nation must have "control[led], dictate[d] or encourage[d]" Ticketmaster's conduct such that it engaged in sufficient independent conduct to be held directly liable itself. *Climax Molybdenum Co. v. Molychem, L.L.C.*, 414 F. Supp. 2d 1007, 1012 (D. Colo. 2005); *In re Pa. Title Ins. Antitrust Litig.*, 648 F. Supp. 2d 663, 688-89 (E.D. Pa. 2009). Plaintiffs' instructions completely omit that requirement and thus err in stating the law. Moreover, Plaintiffs err in lumping Defendants together for purposes of the amphitheater-related claims. There is no allegation, nor could there be as a matter of law, that Ticketmaster "controls, dictates or encourages" Live Nation's conduct with respect to those venues.

Additionally, it is well-established that each plaintiff in a case must "prove her own individual claims." *Phillips v. Potter*, No. 1:05 CV 1852, 2008 WL 11492752, at *31 (N.D. Ohio Mar. 31, 2008). And each plaintiff must prove how the conduct at issue "impacted her." *Radmanovich v. Combined Ins. Co. of Am.*, 216 F.R.D. 424, 436 (N.D. Ill. 2003). In particular, Plaintiff States have brought several individual claims and damages claims, which each State must prove for itself. Plaintiffs entirely and opportunistically omit this point throughout their proposed instructions. Defendants' edits to this instruction seek to make clear to the jury at the outset that it must assess whether each Plaintiff has proven its case against each Defendant separately.

15

**Post-Instruction No. 3**

**EVIDENCE IN THE CASE**

Unless you are otherwise instructed, the evidence in the case consists of the sworn testimony of the witnesses regardless of who may have called the witness, all exhibits received in evidence regardless of who may have produced them, and all facts and events that may have been admitted, stipulated to, or taken judicial notice of.

Statements and arguments by the lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statement, closing arguments, and at other times is intended to help you understand the evidence, but it is not evidence. However, as I explained at the beginning of this trial, the lawyers on both sides have agreed on certain facts known as stipulations, and you must treat those facts as proven.

Any question to which I have sustained an objection and evidence that I have ordered stricken must be entirely disregarded.

**Authority**: *Nike, Inc. v. Lululemon USA Inc.*, Final Jury Instructions at 5-6, 1:23-cv-00771-AS (S.D.N.Y.).

16

**Post-Instruction No. 4**

## WITNESS CREDIBILITY

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

1.      the opportunity and ability of the witness to see or hear or know the things testified to;

2.      the witness's memory;

3.      the witness's manner while testifying;

4.      the witness's interest in the outcome of the case, if any;

5.      the witness's bias or prejudice, if any;

6.      whether other evidence contradicted the witness's testimony;

7.      the reasonableness of the witness's testimony in light of all the evidence; and

8.      any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened.  People often forget things or make mistakes in what they remember.  Also, two people may see the same event but remember it differently.  You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said.  On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

17

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify.  What is important is how believable the witnesses were, and how much weight you think their testimony deserves.

**Authority**: Adapted 9th Circuit Manual of Model Civil Jury Instruction 1.14 (2025 ed.).

18

**Post-Instruction No. 5**

### USE OF DEPOSITIONS AS EVIDENCE

During the trial, certain testimony has been presented by way of deposition. The deposition consisted of sworn, recorded answers to questions asked of the witness in advance of the trial by the attorneys. The testimony of a witness who, for some reason, is not present to testify from the witness stand may be presented under oath on a videotape. Such testimony is entitled to the same consideration and is to be judged as to credibility, weighed, and otherwise considered by you in the same way as if the witness had been present and testified from the witness stand.

**Authority**: Adapted Fed. Jury Prac. & Instr. § 105:02 (6th ed.).

19

**Post-Instruction No. 6**

## EXPERT TESTIMONY

You have heard testimony from a number of witnesses who were designated by the respective parties as "experts." These designated witnesses are allowed to express opinions on matters about which they may have special knowledge and training. This testimony is presented to you on the theory that someone who is experienced in a particular field may be able to assist you in understanding the evidence and in reaching your independent decision on the facts.

In weighing this type of testimony, you may consider the witness's qualifications, opinions, reasons for testifying, as well as all the other considerations that ordinarily apply when you are deciding whether to believe a witness's testimony.

The expert witness's testimony was based on particular facts, as the witness obtained knowledge of them and testified to them before you, or as the attorneys who questioned the designated witness asked them to assume. You may reject such a witness's opinion if you find the facts in the case to be different from those that formed the basis for the opinion.

You may give "expert" testimony whatever weight, if any, you find it deserves in light of all of the evidence in the case and the witness's interest in the proceeding, including any compensation for work the expert may have received. You should not, however, accept the testimony merely because it is given by a designated "expert," nor should you substitute it for your own reason, judgment, and common sense. The determination of the facts in this case rests solely with you.

**Authority**: *United States of America, et al. ex rel. Uri Bassan v. Omnicare, Inc.,* Joint Proposed Jury Instructions at 13, 1:15-cv-04179-CM-VF, ECF No.- 747 (S.D.N.Y. Apr. 23, 2025

20

**Post-Instruction No. 7**

## SUMMARY OF CONTENTIONS

As I did at the start of the case, I will give you a summary of each side's positions in this case. I will then provide you with detailed instructions on what Plaintiffs must prove to win on each of their claims.

*Section 2: Monopolization*

The first issue you will be asked to decide is whether Plaintiffs have proved by a preponderance of the evidence that ~~Defendants have~~any Defendant violated Section 2 of the Sherman Act by unlawfully monopolizing any of the three alleged markets. As a reminder, Plaintiffs allege that Ticketmaster (but not Live Nation) monopolized the two alleged ticketing markets:

1.     Primary concert ticketing services to what Plaintiffs call "major concert venues" (primary concert ticketing).

2.     Primary ticketing services to what Plaintiffs call "major concert venues" (primary ticketing).

And Plaintiffs allege that Live Nation (but not Ticketmaster) monopolized the alleged amphitheater market:

3.     Use of what Plaintiffs call "large amphitheaters" by artists (amphitheaters).

There are certain requirements that Plaintiffs must prove to show that ~~Defendants~~either Defendant illegally monopolized a market, which I will explain in more detail in a few minutes. In general, however, to prove monopolization for each ~~of the proposed relevant markets~~separate market as to each Defendant, Plaintiffs must show by a preponderance of the evidence that ~~Defendants~~the alleged market is a valid antitrust market (i.e., one that is properly drawn), that the relevant Defendant (Live Nation or Ticketmaster) possessed monopoly power in that market ~~and~~, that the relevant Defendant willfully acquired or maintained monopoly power in that market by engaging in

21

anticompetitive acts, and that the relevant Defendant's anticompetitive acts harmed competition and caused anticompetitive effects in that market. You must assess monopolization for each market separately and for each Defendant separately. It is up to you to decide whether Plaintiffs have proven Defendants are liable for monopolization as to all markets, no markets, or only as to some markets, and as to both Defendants, only one Defendant, or neither Defendant.

~~Plaintiffs allege that Defendants engaged in a variety of anticompetitive conduct, including, but not limited to: conditioning or threatening to condition access to Live Nation content on a venue's use of Ticketmaster; retaliation against venues that use rival ticketers; acquiring control over competitors; inducing potential competitors not to compete; imposing long-term exclusive ticketing contracts and requiring artists to use Live Nation as their promoter if the artists want to perform in large amphitheaters controlled by Defendants.~~

*Section 1: Exclusive Dealing and Tying*

In addition to alleging that ~~Defendants~~each Defendant monopolized certain markets, Plaintiffs also allege that ~~Defendants~~Ticketmaster (but not Live Nation) violated Section 1 of the Sherman Act through unlawful exclusive dealing ~~and tying~~, and they allege that Live Nation (but not Ticketmaster) violated Section 1 of the Sherman Act through tying. You will need to consider the exclusive dealing and tying claims under Section 1 separate from and in addition to the monopolization claims.

First, Plaintiffs allege that ~~Defendants~~Ticketmaster engaged in unlawful exclusive dealing by entering into certain primary ticketing contracts with venues. There are different elements Plaintiffs must prove for you to find ~~Defendants~~Ticketmaster liable for unlawful exclusive dealing. In general, to prove unlawful exclusive dealing Plaintiffs must prove by a preponderance of the evidence that ~~Defendants possess~~Ticketmaster possesses substantial market power in a relevant market and entered into an exclusive ~~contracts~~contract with ~~venues~~a venue that ~~impeded~~, when judged on its own and not together with other contracts, substantially foreclosed competition in that relevant market.

22

Second, Plaintiffs allege that ~~Defendants~~Live Nation (but not Ticketmaster) engaged in an unlawful tying arrangement ~~by requiring artists who wanted to use Defendants' large~~related to certain amphitheaters ~~to also use Defendants' promotion services.~~that Live Nation owns or controls. In general, for this claim, Plaintiffs must prove by a preponderance of the evidence that ~~Defendants illegally tied artists'~~Live Nation forced artists who wanted to use these amphitheaters to also use Live Nation's promotion services when artists would have preferred to use ~~of their large amphitheaters to the use of Defendants' promotion services~~a different concert promoter.

~~the final issue you will be asked to decide is whether some of the Plaintiff States are entitled to damages because fans attending concerts in those States overpaid for~~

If and only if you decide that at least some of the Plaintiff States claiming damages proved every element of at least one of the primary ticketing monopolization claims or the Section 1 exclusive dealing claim against at least one Defendant, then the final issue you will be asked to decide is whether those (and only those) Plaintiff States are entitled to damages. You should not assume that any of the Plaintiff States are entitled to any damages merely because I am instructing you on the issue of damages.

~~tickets due to Defendants' anticompetitive conduct.~~

I remind you, as I did at the outset, that although the Plaintiff States are suing on behalf of the residents of their States who have purchased tickets from Ticketmaster to live events, you should not assume that any of those residents will receive any portion of any money the Plaintiff States may ultimately receive in this case. And neither you nor any member of your family will receive any portion of any funds that the States may receive.

**Plaintiffs' Authority**: Am. Compl. (ECF No. 257); Answer (ECF No. 498); *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) ("The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a

23

superior product, business acumen, or historic accident."); *United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 609, 611-612 (S.D.N.Y. 2025); *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984).

**Plaintiffs' Position**: Plaintiffs have proposed a neutral statement of the case that outlines the basic facts of the litigation, succinctly summarizes Plaintiffs' claims as set forth in the Amended Complaint, and provides a straightforward preview of Defendants' defenses as well as a high-level overview of the applicable law. Defendants' proposed instruction misstates Plaintiffs' allegations, misstates the applicable legal standards, and advocates for Defendants' anticipated defenses.

In the first substantive paragraph ("Section 2 Monopolization") Defendants incorrectly state the allegations Plaintiffs made in the Amended Complaint, which states that Live Nation, in conjunction with its wholly owned subsidiary, Ticketmaster, monopolized the two primary ticketing markets. Amended Compl. at 85. Defendants also incorrectly assert that Live Nation and Ticketmaster must be treated as separate entities for liability purposes, notwithstanding a long line of cases to the contrary, as explained above at Post Instruction No. 2.

As in earlier instructions, Defendants' proposed exclusive dealing instruction misstates the law by requiring the jury to consider each contract individually and in isolation, as explained below at Post-Instruction No. 18; *see also* ECF No. 1037 at 41–42 ("To endorse Live Nation's argument for all Section 1 claims would be a coup for antitrust defendants. Section 1 exclusive dealing claims would become virtually impossible to bring, as the anticompetitive effect of any individual contract would be minimal except for in the most extreme cases."). And as to tying, Defendants' proposed instruction again artificially inflates Plaintiffs' burden by contending Plaintiffs must prove artists "*would* have preferred to use a different concert promoter" rather than simply that they "might" have preferred to do so. *See Jefferson Parish*, 466 US. at 12.

The final two paragraphs regarding damages may potentially confuse the jury by suggesting that Plaintiffs are required to prove each element of every claim to recover on any of them, which is not accurate. And given that the Court will be providing detailed damages instructions later, no further reference is necessary here and will instead be duplicative and waste time.

**Defendants' Authority:** ABA Model Instr. 3.A.1, 2.D.5; *Dickson v. Microsoft Corporation*, 309 F.3d 193, 203-05 (4th Cir. 2002) (declining to consider licensing agreements between Microsoft and various OEMs in the aggregate and analyzing each agreement "individually" instead); *Howard Hess Dental Laboratories v. Dentsply International*, 602 F.3d 239, 255-56 (3d Cir. 2010) (requiring plaintiffs to show that "every single agreement" between a manufacturer and its dealers had anticompetitive effect); *Gibson v. Cendyn Group*, 148 F.4th 1069, 1087 (9th Cir. 2025) (finding that "a grouping of individual agreements could not be 'aggregated' for the purposes of determining whether together they acted as an unreasonable restraint of trade," and requiring that the agreements "have a 'discrete effect' on competition"); *Panini America v. Fanatics*, 2025 WL 753954, at *9 (S.D.N.Y. Mar. 10, 2025) (refusing to "consider the effects of [] six exclusive deals together" and considering the effect of each separately instead); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984) ("[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms."); ECF No. 257 (Am. Compl.); ECF No. 777 at 41 (Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment); *Washington v. Chimei Innolux Corp.*, 659

24

F.3d 842, 848 (9th Cir. 2011) ("[A] statutory *parens patriae* action may well result in a settlement that does not include restitution to victims of the fraud, but only results in penalties paid to the public treasury."); *Broselow v. Fisher*, 319 F.3d 605, 608 (3d Cir. 2003) (individuals have no right to funds collected through *parens patriae* claims because such funds are not collected "under an assignment" from those individuals); *New York by Vacco v. Reebok Int'l*, 96 F.3d 44, 49 (2d Cir. 1996) (individuals are not entitled to distributions from the settlement of a *parens patriae* suit); N.Y. Exec. § 63(12) ("monies recovered or obtained under this subdivision" are subject to N.Y. State Fin. § 4(11), which requires that the funds "be deposited in the state treasury" and not disbursed "except pursuant to an appropriation").

**Defendants' Argument**: Defendants' edits to this instruction align it with the proposed instructions on the law below.

Additionally, Defendants seek to make clear, for the reasons explained above, that each Defendant's liability for each claim must be assessed separately. *See* Defendants' Argument on Post-Instruction No. 2 (The Parties); *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries."). Defendants also seek to make clear that not all States are seeking damages, and the jury may consider damages only if the States seeking damages prove liability on certain claims. Finally, Defendants' proposal reiterates this Court's instruction provided at the start of trial that the jury should not assume any State residents will receive any portion of the States' damages, if any, and that the jury members will not receive any portion of those damages. Voir Dire Tr. at 16:12-19.

Defendants object to Plaintiffs' use of the terms "major concert venues" and "large amphitheaters" here and throughout these instructions to the extent those terms are used without making clear that Plaintiffs have attached those terms to sets of venues Plaintiffs curated for this litigation. Without such clarification, those terms are prejudicial and misleading because they give the jury the misimpression that as a factual matter, there is industry recognition and acceptance of distinct categories of venues called "major concert venues" and "large amphitheaters," when that is an issue disputed between the parties and for the jury to decide.

25

**Post-Instruction No. 8**

**BURDEN OF PROOF—PREPONDERANCE OF THE EVIDENCE**

As I instructed you earlier, in this case, Plaintiffs must prove ~~each~~ every essential element of ~~a particular claim~~ each of their claims against each Defendant by a preponderance of the evidence. ~~This~~ If Plaintiffs should fail to establish any essential element of one of their claims by a preponderance of the evidence against any Defendant, you should find for each such Defendant as to that claim.

~~means that the fact that is to be proven is more likely true than not, as the evidence in favor of the fact being true is enough to tip the scale, even if slightly, in its favor.~~

"To prove by a preponderance of the evidence" means to prove something is more likely than not. In determining whether any fact in issue has been proved by a preponderance of the evidence, unless otherwise instructed, you may consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

**Plaintiffs' Authority**: *Nike, Inc. v. Lululemon USA Inc.*, Final Jury Instructions at 6, 1:23-cv-00771-AS (S.D.N.Y.); Adapted 9th Cir. Manual of Model Civ. Jury Instr. 1.6 (2025 ed.); Fed. Jury Prac. & Instr. § 104:01 (6th ed.); *Ostrowski v. Atl. Mut. Ins. Cos.*, 968 F.2d 171, 187 (2d Cir. 1992) ("[T]he court should instruct the jury that it is to conclude that a fact has been proven by a preponderance of the evidence if it 'finds that the scales tip, however slightly, in favor of the party with the burden of proof' as to that fact.").

**Plaintiffs' Position**: Plaintiffs have proposed a simplified instruction based on the cited authorities that briefly explains the preponderance standard. Defendants' proposed instruction fails to include language that even "slightly" tipping the scales is sufficient (despite that language appearing in the source Defendants cite, and the Court using similar language in its preliminary instructions to the jury). *See* 3.2.2026 Tr. at 5:18–6:6. Defendants' proposal is also confusing to the extent it can be read to suggest that Plaintiffs must prevail on every element of every claim in order to win on any one of them.

**Defendants' Authority:** Fed. Jury Prac. & Instr. § 104:01.

**Defendants' Argument**: Defendants' proposal tracks verbatim the model federal jury instruction on preponderance of the evidence. Defendants object to Plaintiffs' watered down burden of proof instruction. Plaintiffs' "tip the scale, even if slightly" language does not appear in the model federal jury instruction or in the model instructions for any court of appeals. *See* Notes, Fed. Jury Prac. & Instr. § 104:01.

26

**Post-Instruction No. 9**

## MONOPOLIZATION ELEMENTS

Plaintiffs allege ~~Defendants~~that Ticketmaster (but not Live Nation) unlawfully monopolized the following markets:

 (1) ~~primary concert ticketing services to major concert venues;~~

 (1) primary <u>concert</u> ticketing services to <u>what Plaintiffs call "major concert venues"; and</u>

 (2) <u>primary ticketing services to what Plaintiffs call "</u>major concert venues~~; and~~<u>."</u>

<u>Plaintiffs allege that Live Nation (but not Ticketmaster) unlawfully monopolized the following market:</u>

 (3) the use of <u>what Plaintiffs call "</u>large amphitheaters<u>"</u> by artists~~;~~<u>.</u>

Plaintiffs have brought three monopolization claims in total, one for each of these <u>alleged</u> markets. The alleged monopolization of ~~any one~~<u>each</u> of these three alleged markets is a distinct claim that you are to consider separately <u>for the relevant Defendant, either Ticketmaster or Live Nation</u>. To prevail on a monopolization claim, Plaintiffs must prove the following elements by a preponderance of the evidence <u>as to each separate alleged market for each Defendant</u>:

 (1) ~~Defendants~~<u>the alleged market is a valid antitrust market;</u>

 ~~(1)~~(2) <u>the relevant Defendant</u> possessed monopoly power in ~~a relevant~~<u>that</u> market; ~~and~~

 (2) ~~Defendants maintained monopoly power through anticompetitive conduct.~~

 (3) <u>the relevant Defendant willfully acquired or maintained monopoly power in that market by engaging in anticompetitive conduct, instead of having superior products, business skill, or prior history; and</u>

 (4) <u>the relevant Defendant's anticompetitive conduct harmed competition in that market and caused anticompetitive effects in that market.</u>

27

If you find that Plaintiffs have failed to prove ~~either~~any of these elements for a particular claim~~, then you must find~~ for ~~Defendants~~a particular alleged market for the relevant Defendant, then you must find for the relevant Defendant and against Plaintiffs on that particular claim only. If you find that Plaintiffs have proven each of these elements by a preponderance of the evidence for a particular claim for a particular alleged market for the relevant Defendant, then you must find for Plaintiffs and against ~~Defendants~~the relevant Defendant on that particular claim only.

I will now provide you with further instructions on these elements.

**Plaintiffs' Authority**: *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) ("The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."); *see E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 441 (4th Cir. 2014); Adapted ABA Model Instr. 3.A.1; Am. Compl. (ECF No. 257) ¶¶ 224-32, 249-64.

**Plaintiffs' Position:** Plaintiffs' proposal hews closely to the ABA Model Instruction, adapted to fit the circumstances of this case. Specifically, Plaintiffs identify the three remaining markets here. Plaintiffs propose a minor modification that captures the fact that Plaintiffs have alleged monopolization in three separate markets, instructing the jury that "[t]he alleged monopolization of any one of these three markets is a distinct claim that you are to consider separately."

Defendants' proposal incorrectly renames and mischaracterizes the three markets as alleged in Plaintiffs' complaint which would likely confuse the jury and prejudice Plaintiffs, as Plaintiffs are entitled to have the jury be instructed to assess Plaintiffs' actual claims as they are presented at trial. Defendants again incorrectly assert that Defendants should be treated as separate entities for liability, which Plaintiffs address in Post-Instruction No. 2.

**Defendants' Authority:** ECF No. 257 (Am. Compl.); Adapted ABA Model Instr. 3.A.1; Adapted *North Am. Soccer League, LLC v. U.S. Soccer Federation, Inc.*, Final Jury Instructions at 48, No. 1:17-cv-5495, ECF No. 531 (E.D.N.Y. Jan. 31, 2025); *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (To violate Section 2, "a monopolist's act must have an 'anticompetitive effect.' That is, it must harm the competitive *process* and thereby harm consumers."); *In re Google Digital Advertising Antitrust Litig.*, 627 F. Supp. 3d 346, 380 (S.D.N.Y. 2022) (conduct "must have an anticompetitive effect in order to form the basis of a monopolization claim"); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005) ("[T]he exclusionary conduct must have an anti-competitive effect."); *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) (an element of a Section 2 violation is "the willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident").

**Defendants' Argument**: Defendants object to Plaintiffs' two-element structure. The ABA model jury instruction on the elements of a Section 2 monopolization claim contains five elements. *See* ABA

28

Model Instr. 3.A.1.  In line with that instruction, jury instructions given to juries in numerous cases contain four to five elements.  *See, e.g.*, *North Am. Soccer League, LLC v. U.S. Soccer Federation, Inc.*, Final Jury Instructions at 48, No. 1:17-cv-5495, ECF No. 531 (E.D.N.Y. Jan. 31, 2025).  Parties frequently do not dispute, and thus exclude, as here, the requirement that "defendant's conduct occurred in or affected interstate or foreign commerce."  ABA Model Instr. 3.A.1.  Defendants propose a similar four-element structure here.

There is a reason why juries are not instructed using Plaintiffs' two-element structure—it is confusing and might lead the jury to miss important parts of the analysis, such as market definition and anticompetitive effects.  Defining the relevant market is the threshold step in analyzing the antitrust claims in this case.  *Ohio v. American Express Co.*, 585 U.S. 529, 542 (2018); *Berkey Photo v. Eastman Kodak*, 603 F.2d 263, 268-69 (2d Cir. 1979) ("It is, of course, a basic principle in the law of monopolization that the first step in a court's analysis must be a definition of the relevant markets.").  And market definition is hotly disputed in this case.  By burying market definition within the element on monopoly power, Plaintiffs improperly seek to obfuscate that element before the jury.  Plaintiffs also err in entirely omitting any element on harm even though it is well-established that a Section 2 violation requires proof of competitive harm and anticompetitive effects.  *See, e.g.*, *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (To violate Section 2, "a monopolist's act must have an 'anticompetitive effect.'  That is, it must harm the competitive *process* and thereby harm consumers."); *In re Google Digital Advertising Antitrust Litig.*, 627 F. Supp. 3d 346, 380 (S.D.N.Y. 2022) (conduct "must have an anticompetitive effect in order to form the basis of a monopolization claim").  Indeed, Plaintiffs did not dispute this element during summary judgment briefing, *see* ECF No. 777 at 26-36 (Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment), yet they erroneously omit it here and throughout these instructions.

29

**Post-Instruction No. 10**

### <u>MONOPOLIZATION ELEMENT #1:</u> RELEVANT MARKET—GENERAL

~~The purpose of defining a relevant market in an antitrust case like this one is to identify the market participants and the competitive pressures that actually restrain Defendants' ability to raise prices, restrict output, reduce quality, or exclude competition. Several markets can exist at the same time, including submarkets alongside broader markets. For example, within the broader market for shoes, there may also be separate submarkets for men's, women's, and children's shoes.~~

<u>The first step in assessing each of Plaintiffs' separate monopolization claims against each Defendant is determining whether Plaintiffs have proven the alleged relevant market for that claim by a preponderance of the evidence. Defining the</u>

~~You can find that a relevant market exists even if you are not certain of the precise boundaries of that market; it is sufficient that a market generally contains products or services that are reasonable substitutes for each other from the perspective of actual customers. The purpose of defining a relevant market is to make sure that the identified products are capable of being monopolized—that is, the market is broad enough that if a single company controlled it, that company would have the ability to raise prices, restrict output, reduce quality, or exclude competition.~~

<u>relevant market is</u>

~~In assessing each monopolization claim,~~<u>essential because</u> you are required to make a judgment about whether ~~Defendants have~~<u>the relevant Defendant (Live Nation or Ticketmaster) has</u> monopoly power <u>and caused anticompetitive effects</u> in a ~~relevant~~<u>properly defined economic</u> market. To make this judgment, you must be able to determine what, if any, economic forces restrain ~~Defendants'~~<u>the relevant Defendant's</u> freedom to set prices for the products or services they provide ~~that are at issue in this case, or restrict the extent to which they provide~~ <u>, control output for those products or services, or degrade the quality of</u> those products or services.

30

The most likely and most important restraining force will be actual and potential competition from other firms and their products or services. This includes ~~the~~all firms and products or services ~~most~~that act or likely ~~to~~could act as ~~strict~~ restraints on ~~Defendants'~~the relevant Defendant's power to set prices ~~above competitive levels~~as it pleases because customers ~~would~~could switch to ~~them~~ these competing firms if ~~Defendants set their~~the relevant Defendant sets its own prices too high. All the firms and products or services that exert such ~~primary~~ restraining force are within what is called the relevant market.

**Plaintiffs' Authority**: Adapted ABA Model Instr. 3.A.3; *Cf FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460 (1986) ("the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition"); *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 339 (2d Cir. 2024) ("Two products are reasonably interchangeable where there is sufficient cross-elasticity of demand—that is, where consumers would respond to a slight increase in the price of one product by switching to another product." (citation and quotation omitted)); *Brown Shoe v. United States*, 370 U.S. 294, 325, 336 (1962) (a relevant product market should "correspond to the commercial realities of the industry," and within the boundaries of a product market "well defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes"); *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956) (a "market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use, and qualities considered"); *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 611, 612 n.31 (1953) ("The 'market,' as most concepts in law or economics, cannot be measured by metes and bounds" and "[f]or every product, substitutes exist. But a relevant market cannot meaningfully encompass that infinite range. The circle must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn"); *Balaklaw v. Lovell*, 14 F.3d 793, 799 (2d Cir. 1994).

**Plaintiffs' Position:** Plaintiffs' proposed instruction is derived from ABA Model Instruction and adds two additional explanatory paragraphs at the beginning of the instruction. Plaintiffs added additional explanatory language so the jury would better understand the purpose and objective of defining a relevant market in antitrust cases. In *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 339 (2d Cir. 2024), the Second Circuit reiterated that a relevant market can be determined by looking at the reasonable interchangeability of use or the cross-elasticity of demand between the product at issue and potential close substitutes for it.

In addition, Plaintiffs added language so the jury would understand that narrower relevant markets may exist within broader relevant markets. In *Brown Shoe v. United States*, the Supreme Court held that the outer bounds of a product market are determined by "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." 370 U.S. 294, 325 (1962). However, within broad markets, "well defined submarkets may exist which in themselves, constitute product markets for antitrust purposes." *Id.*; *see also Grinnell*, 384 U.S. at 570

31

("In § 2 cases under the Sherman Act, as in § 7 cases under the Clayton Act there may be submarkets that are separate economic entities."); *P&L Develop., LLC v. Gerber Prods. Co.*, 715 F. Supp. 3d 435, 459 (E.D.N.Y. 2024) ("[a] product market can be limited to a particular category of buyers," with a relevant market of "sales of store-brand infant formula to [] retailers" rather than to all "end-user consumers"); *Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242, 249, 249-52 n.8 (1959) (affirming liability for Sherman Act §§1 and 2 violations based upon the relevant market of "promotion of championship boxing contests," as distinct from "all professional boxing events," even though any boxing event "includes one ring, two boxers and one referee fighting under the same rules before . . . spectators," relying "[b]y analogy" on a case involving "the Clayton Act's 'line of commerce.'") (citing *United States v. E.I. Du Pont De Nemours & Co.*, 353 U.S. 586, 593-97 (1957)).

Plaintiffs object to Defendants' proposed instruction that a relevant market "includes all firms and products or services that act or likely could act as restraints on the relevant Defendant's power to set prices as they please because customers could switch to these competing firms if the relevant Defendant set its own prices too high." This overstates the relevant standard in two ways. First, even a monopolist's power to set prices is always restrained to some degree – as is cautioned by the "*Cellophane* fallacy." *See, e.g.*, *United States v. Eastman Kodak Co.*, 853 F. Supp. 1454, 1469 (W.D.N.Y. 1994) (explaining that "every monopolist faces an elastic demand at its profit-maximizing output and price" because "at a high enough price, even poor substitutes look good to the consumer") (cleaned up).  For similar reasons, contrary to Defendants proposed language, a relevant market does not consist of "all" firms or products that exert *any* restraining force — the restraining force must be sufficient to prevent the monopolist from imposing a price increase. *See Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 339 (2d Cir. 2024) ("Two products are reasonably interchangeable where there is '*sufficient* cross-elasticity of demand'—that is, 'where consumers *would* respond to a slight increase in the price of one product by switching to another product.'" (emphasis added)). Second, the relevant question is not whether customers "could" conceivably switch to products outside the relevant market—as suggested by Defendants' proposal—but whether customers in fact "would" switch in sufficient numbers to constrain a price increase or worsening of terms. *Id.*

**Defendants' Authority:** Adapted ABA Model Instr. 3.A.3; *Berkey Photo v. Eastman Kodak*, 603 F.2d 263, 268-69 (2d Cir. 1979) ("It is, of course, a basic principle in the law of monopolization that the first step in a court's analysis must be a definition of the relevant markets."); *City of New York v. Grp. Health*, 649 F.3d 151, 155 (2d Cir. 2011) (To state an antitrust claim, "a plaintiff must allege a plausible relevant market in which competition will be impaired."); *United States v. Eastman Kodak Co.*, 63 F.3d 95, 104 (2d Cir. 1995) ("Without a definition of the relevant market, there is no way to measure a company's ability to act as a monopolist."); *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018) (before assessing "direct evidence" of "anticompetitive effects," we must "first define the relevant market").

**Defendants' Objection**:  Defendants object to Plaintiffs' discussion of "submarkets."  That concept does not appear in the ABA model instruction on general market definition, is irrelevant here, and is likely to confuse and mislead the jury.  *See FTC v. Meta Platforms, Inc.*, 2025 WL 3458822, at *28 (D.D.C. Dec. 2, 2025) (the concept of "submarkets" can be "misleading" because "[t]he only relevant concept is the product market").  Moreover, Plaintiffs' alleged ticketing markets survived summary judgment on the theory that they are targeted customer markets, which are distinct from

32

the concept of "submarkets."  That concept thus does not need to be raised for the first time in this case in the Court's instructions to the jury.  Defendants' proposed instruction tracks the ABA model jury instruction and is sufficient to give the jury an introduction to market definition.

**Post-Instruction No. 11**

## RELEVANT PRODUCT MARKET—GENERAL

A relevant product market must consist of all products or services that are reasonably interchangeable in the eyes of customers of those products or services. In other words, the relevant product market includes the products or services that a customer believes are reasonably interchangeable or reasonable substitutes for each other. This is a practical test taking into account actual behavior of buyers and marketing efforts of sellers. It looks to the practical realities of substitution, not theoretical substitution. A product market does not need to include all conceivable substitutes, but only those that a buyer would view as reasonably interchangeable. Accordingly, your analysis should focus on whether or not the products or services are economic substitutes, not simply whether they appear to be functionally similar. For instance, women's shoes may not be reasonably interchangeable with men's shoes. Even if both are functionally similar, consumers may not typically substitute one for the other.

There is no single correct market because markets can overlap and within a broad relevant market, there may be smaller markets that are relevant for certain conduct. The market does not need to be defined with mathematical precision. A party may sometimes argue that a proposed market is too narrow, too broad, or drawn with arbitrary boundaries. It is okay if there is some fuzziness in the boundary, which is inherent in defining any relevant market. As a result, isolated examples of potential substitutability, for example, do not mean a proposed market is invalid.

The parties disagree about the relevant product markets in this case. Plaintiffs allege that the three markets I just described to you are relevant product markets, while Defendants deny that those three markets are relevant product markets. Your task is to determine whether the evidence supports

34

the ~~relevant~~three markets~~, as proposed~~ alleged by Plaintiffs~~, or whether there is sufficient evidence to support broader or narrow relevant markets~~.

~~Different methods can be used to determine whether a market has been properly defined. One approach is to consider a variety of practical factors that can indicate whether a market is valid, such as:~~

- ~~whether, as a matter of practical fact and the actual behavior of buyers, the products or services are reasonable substitutes for a buyer's needs;~~

**Plaintiffs' Authority (11)**: ABA Model Instr. 3.A.4; *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 335 (S.D.N.Y. 2001), *modified*, 183 F. Supp. 2d 613 (S.D.N.Y. 2001), *and aff'd*, 344 F.3d 229 (2d Cir. 2003), *and enforced*, No. 98 CIV. 7076 (BSJ), 2007 WL 1741885 (S.D.N.Y. June 15, 2007) ("A relevant product market is composed of products that have reasonable interchangeability, in the eyes of consumers, with what the defendant sells." (quotation marks and citation omitted)); *Brown Shoe v. United States*, 370 U.S. 294, 325, 336 (1962) (relevant product market should "correspond to the commercial realities of the industry" and within the boundaries of a product market "well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes"); *United States v. U.S. Sugar Corp.*, 73 F.4th 197, 204-07 (3d Cir. 2023) (affirming district court's application of *Brown Shoe* practical indicia); *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956) ("[A] market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use, and qualities considered."); *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 611, 612 n.31 (1953) ("The 'market,' as most concepts in law or economics, cannot be measured by metes and bounds" and "[f]or every product, substitutes exist. But a relevant market cannot meaningfully encompass that infinite range. The circle must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn."); *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966) ("In § 2 cases under the Sherman Act, as in § 7 cases under the Clayton Act, there may be submarkets that are separate economic entities"); *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 202 (D.D.C. 2018) (recognizing that some "fuzziness is inherent in bounding any market"); *Phila. Nat'l Bank*, 374 U.S. 321, 360 n.37 (1963) ("[F]uzziness would seem inherent in any attempt to delineate the relevant geographical market."); *see also United States v. Eastman Kodak Co.*, 63 F.3d 95, 103, 105 (2d Cir. 1995); *F.T.C. v. Swedish Match*, 131 F. Supp. 2d 151, 160 (D.D.C. 2000); *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 339 (2d Cir. 2024); *Teradata Corp. v. SAP SE,* 124 F.4th 555, 565-66, 569-70 (9th Cir. 2024); *Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242, 249-50, 252 n.8 (1959); *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 228 (2d Cir. 1999) ("It is important to remember that a market is any grouping of sales whose sellers, if unified by a hypothetical cartel or merger, could profitably raise prices significantly above the competitive level. If the sales of other producers substantially constrain the price-increasing ability of the hypothetical cartel, these others are part of the market." (cleaned up)); *United States v. Continental Can Co.*, 378 U.S. 441, 457 (1964) (holding that "nothing [] preclude[d]" the Court from defining a relevant market that "was not pressed upon the District Court" by either party, so long as it was supported by the

35

evidence); *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 978 n.9 (9th Cir. 2023) (rejecting defendant's "radical argument that, where parties offer dueling market definitions, the case immediately ends if the [factfinder] finds the record supports the defendant's proposed market (or a third in-between market . . .) rather than the plaintiff's market"); *United States v. Energy Solutions, Inc.*, 265 F. Supp. 3d 415, 437 (D. Del. 2017) (defining broader relevant markets than the government asserted, because "[t]he court's decision to not further sub-divide the markets does not end the analysis").

**Plaintiffs' Position (11)**: Plaintiffs' proposed instruction is based on the ABA Model Instruction with certain adjustments to clarify how reasonable interchangeability of products is properly assessed, how economic substitution is evaluated (based on examples drawn from caselaw), and how the outer boundaries of product markets are properly defined.

In particular, Plaintiffs have proposed additional language to instruct the jury that the focus is on economic substitution rather than merely functional similarities in products. *See Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 340 (2d Cir. 2024) ("Rather, the applicable analysis is whether or not the products are *economic* substitutes, not whether they appear to be functionally similar. This analysis turns on economic differences, such as a lack of cross-elasticity of demand or reasonable interchangeability among products.") (holding that identical medication in vials and pre-filled syringes could be in separate product markets). Additionally, Plaintiffs' proposed instructions explain to jurors that the outer boundaries of a relevant market may be "fuzzy" and need not be defined by precise metes and bounds or mathematical precision. *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 202 (D.D.C. 2018) (recognizing that some "fuzziness is inherent in bounding any market") (citation omitted); *cf. United States v. Phila. Nat'l Bank*, 374 U.S. 321, 360 n.37 (1963) ("[F]uzziness would seem inherent in any attempt to delineate the relevant geographical market."); *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 611 (1953) ("The 'market,' as most concepts in law or economics, cannot be measured by metes and bounds"); *id.* at 613 n.31 ("For every product, substitutes exist. But a relevant market cannot meaningfully encompass that infinite range. The circle must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn").

Additionally, Plaintiffs' proposed instruction introduces the concept that multiple valid relevant markets may exist for functionally similar products, which may not be intuitive to jurors. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 326 (1962) ("Applying these considerations to the present case, we conclude that the record supports the District Court's finding that the relevant lines of commerce are men's, women's, and children's shoes."); *United States v. Apple, Inc.*, 2025 WL 1829127, at *7 (D.N.J. June 30, 2025) (recognizing product markets for both smartphones and "performance smartphones" and collecting cases); *United States v. Am. Airlines Grp. Inc.*, 675 F. Supp. 3d 65, 118 (D. Mass. 2023) (declining to decide between alternative markets because "there may be multiple relevant markets or sub-markets, any of which might appropriately be examined to assess the competitive effects of a restraint"), *aff'd*, 121 F.4th 209 (1st Cir. 2024); *U.S. Airways, Inc. v. Sabre Holdings Corp.*, No. 11-cv-2725, 2022 WL 874945, at *7-10 (S.D.N.Y. Mar. 24, 2022) (finding that the defendant could have monopoly power in both narrower "Sabre-only product market" and broader market for "GDS services").

36

**Defendants' Authority**: ABA Model Instr. 3.A.4; *United States v. United States Sugar Corp.*, 2022 WL 4544025, at \*25 (D. Del. Sept. 28, 2022), aff'd, 73 F.4th 197 (3d Cir. 2023) ("In reality, what the Government is asking the Court to do is figure out which market allows the Government to prevail and then to use that market. The Court declines to do so."); *United States v. Sabre Corp.*, 452 F. Supp. 3d 97, 142 n.20 (D. Del. 2020) ("[T]o the extent DOJ is now inviting the Court to 'unilaterally change the defective market allegations if necessary to save its case,' it would be wrong for the Court to do so under the circumstances here, which include that both parties (and the Court) have already devoted enormous resources to the case the government chose to bring."); *Continental Trend Resources, Inc. v. OXY USA Inc.*, 44 F.3d 1465, 1481 n.19 (10th Cir. 1995) (rejecting "later attempt[] to redefine the relevant market" because "plaintiffs are saddled with their Complaint filed in this Court"), *vacated on other grounds*, 517 U.S. 1216 (1996); *Pastore v. Bell Telephone Co.*, 24 F.3d 508, 512-13 (3d Cir. 1994) ("hold[ing] plaintiffs to their own contention" regarding market definition).

**Defendants' Argument**:  Defendants object to Plaintiffs' statement that the jury may find "broader or narrow[er]" markets than those alleged by Plaintiffs.  To start, none of this appears in the ABA model instruction on relevant product markets.  Next, Plaintiffs have not cited a single case in which *a jury* was told it could find any markets it pleased, regardless of the markets alleged by the plaintiff and notwithstanding that all of the parties' evidence regarding monopoly power, anticompetitive conduct, anticompetitive effects, etc. was premised on the alleged markets.  Indeed, *this Court* did not even find markets beyond those alleged by Plaintiffs.  After determining that Plaintiffs' concert booking, promotions, and fan-facing ticketing markets were not properly defined, this Court dismissed all claims based on those markets rather than find different markets or give Plaintiffs the opportunity to take their case to the jury in the hopes that the jury would find different markets.  ECF No. 1037; *see also* 1/23/26 Tr. at 77:10-78:1 (noting that Plaintiffs "are not relying on a market that includes stadiums," so "if the MCV market is not properly defined, then the [claims] that would rely on that definition would be out").

Like this Court, courts have repeatedly declined plaintiffs' invitation to define markets beyond those alleged.  *See, e.g.*, *United States v. United States Sugar Corp.*, 2022 WL 4544025, at \*25 (D. Del. Sept. 28, 2022), *aff'd*, 73 F.4th 197 (3d Cir. 2023) ("In reality, what the Government is asking the Court to do is figure out which market allows the Government to prevail and then to use that market. The Court declines to do so."); *United States v. Sabre Corp.*, 452 F. Supp. 3d 97, 142 n.20 (D. Del. 2020) ("[T]o the extent DOJ is now inviting the Court to 'unilaterally change the defective market allegations if necessary to save its case,' it would be wrong for the Court to do so under the circumstances here, which include that both parties (and the Court) have already devoted enormous resources to the case the government chose to bring."); *Continental Trend Resources, Inc. v. OXY USA Inc.*, 44 F.3d 1465, 1481 n.19 (10th Cir. 1995) (rejecting "later attempt[] to redefine the relevant market" because "plaintiffs are saddled with their Complaint filed in this Court"), *vacated on other grounds*, 517 U.S. 1216 (1996); *Pastore v. Bell Telephone Co.*, 24 F.3d 508, 512-13 (3d Cir. 1994) ("hold[ing] plaintiffs to their own contention" regarding market definition).

Plaintiffs' cases are not to the contrary.  In *United States v. Continental Can Co.*, the Supreme Court determined that "combined glass and metal container industries" was a line of commerce in addition to the two found by the district court because it was "coextensive with the two industries, which were held to be lines of commerce," and "composed largely, if not entirely, of the more particularized end-use lines urged in the District Court by the Government."  378 U.S. 441, 457 (1964).  In other words,

37

the Court held the government to its allegations, determining that the two lines urged by the government, in addition to the sum of those lines, were relevant lines of commerce.  Likewise in *United States v. Energy Solutions, Inc.*, the court rejected the government's four product markets that divided higher-activity from lower-activity waste and operational from decommissioning waste, determining that one of those distinctions was unnecessary—not that an entirely different market unrelated to the ones alleged was relevant.  265 F. Supp. 3d 415, 436-37 (D. Del. 2017).  Finally, in *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 978 n.9 (9th Cir. 2023), the Ninth Circuit cited *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1437 (9th Cir. 1995), without any further reasoning for the proposition Plaintiffs' quote, but in *Rebel*, the plaintiff had alleged another market "[i]n the alternative"—something Plaintiffs have not done here, *see* 1/23/26 Tr. at 77:10-78:1.

In short, Plaintiffs "are saddled" with the markets they alleged, *Continental Trend*, 44 F.3d at 1481 n.19, and no authority permits the Court or the jury to rewrite Plaintiffs' allegations on their behalf and decide an entirely different case than the one the "parties (and the Court) have already devoted enormous resources to," *Sabre*, 452 F. Supp. 3d at 142 n.20.

Additionally, Defendants object to Plaintiffs' relevant product market instruction because it fails to instruct the jury that the ticketing markets in this case are targeted customer markets, and to provide any guidance on analyzing such markets.  Defendants propose relevant product market instructions that account for the targeted customer markets as well as traditional product market at issue here.  Moreover, Defendants' proposed instructions explain the parties' disputes as to each alleged market and what the jury must find as to each alleged market to enable the jury to understand the unique and complex market definition analysis it must perform here.

Finally, Defendants propose omitting "product" in several places.  The parties do not dispute market geography for any of the markets that remain in this case.  Given that, there is no need to discuss the concept of "product" markets to distinguish them from "geographic" markets, and doing so may confuse the jury.


**Post-Instruction No. 11D**

### RELEVANT PRODUCT MARKET—PRIMARY TICKETING MARKETS

For the alleged primary ticketing services and primary concert ticketing services markets, Plaintiffs have limited the scope of both markets to 257 venues that they call "major concert venues." According to Plaintiffs, these venues are amphitheaters and arenas with a capacity of 8,000 or more that hosted 10 or more concerts in at least one year from 2017 to 2024. Defendants dispute that it is appropriate to limit these markets just to that subset of venues; Defendants contend that Plaintiffs'

38

definition is too narrow because primary ticketing companies compete for many more customers, and therefore, that the relevant market should include other venues.

Plaintiffs alleged primary ticketing markets are what are known as "targeted customer markets" because they are focused on a subset of all customers of a particular product or service. In order for Plaintiffs to prove that each of these two markets should be limited solely to the 257 venues they call "major concert venues," Plaintiffs must prove that the 257 venues are in a unique position relative to other venues at which concerts take place in that Ticketmaster has and has exercised the power to impose on those venues worse prices or terms of service (for example, by charging higher prices for primary ticketing services) than are charged to other venues.

If you find that Plaintiffs have proven either of the alleged ticketing markets as relevant markets, then you should continue to evaluate the remainder of Plaintiffs' claims solely related to that alleged market. If you find that Plaintiffs have failed to prove either of these alleged markets, then you do not need to consider any other elements for claims related to that alleged market. Instead, you should find for Defendants and against Plaintiffs on all claims for which you found Plaintiffs failed to prove a relevant market.

**Plaintiffs' Position:** Plaintiffs object to Defendants' proposed instruction on targeted customer markets. The same legal standards for relevant product markets apply to all of Plaintiffs' alleged relevant markets, and therefore a single instruction addressing the *Brown Shoe* factors and the hypothetical monopolist test should apply to all, as proposed by Plaintiffs. *See* Post-Instruction No. 11.

**Defendants' Authority:** *FTC v. Whole Foods Mkt.*, 548 F.3d 1028, 1037-39 (D.C. Cir. 2008); *FTC v. Sysco*, 113 F. Supp. 3d 1, 37-39 (D.D.C. 2015); Merger Guidelines 44-45 (Dec. 18, 2023); *FTC v. Meta Platforms*, 2025 WL 3458822, at *35 (D.D.C. Dec. 2, 2025) ("So if there were a separate market for users who cared about friend content, then that market's borders must be shown by significant differences in price."); *United States v. Eastman Kodak Co.*, 63 F.3d 95, 104 (2d Cir. 1995) ("Having chosen to rebut Kodak's proposed market definition by relying on its theory of price discrimination, it was incumbent upon the government to produce probative evidence of systematic price discrimination, which it failed to do. In the absence of such proof, the district court properly rejected the government's theory."); *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018) (market definition must rest on "actual market realities"); *PepsiCo v. Coca-Cola*, 114 F. Supp. 2d 243, 249 (S.D.N.Y.

39

2000), *aff'd*, 315 F.3d 101 (2d Cir. 2002) (market definition requires "sufficient evidence from which a factfinder could conclude that the customer base should be viewed so narrowly").

**Defendants' Argument**:  Defendants' position is that Plaintiffs' alleged ticketing markets—and any claims premised on those markets—should not be presented to the jury at all.  As Defendants have explained, "if a plaintiff alleging actual monopoly seeks to define a market by reference to a subset of buyers of a given product, 'then that market's borders must be shown by significant differences in price' paid by those buyers compared with others outside the target set."  ECF No. 797 at 3 (quoting *FTC v. Meta Platforms*, 2025 WL 3458822, at *35 (D.D.C. Dec. 2, 2025)).  In other words, Plaintiffs must prove their targeted customer markets with evidence of actual price discrimination.  And the *Brown Shoe* factors are irrelevant to this analysis.  ECF No. 1059 at 5-6.  Plaintiffs have conceded that they have no evidence of actual price discrimination.  ECF No. 1000 at 65:13-66:3.  Accordingly, their targeted customer ticketing markets should have been held invalid at summary judgment, all claims premised on those markets should have been dismissed before trial, and this issue should not be going to the jury at all.  Defendants propose this instruction only because Plaintiffs' targeted customer ticketing markets erroneously continue to be part of this case.

To the extent that Plaintiffs' alleged ticketing markets and claims related to those markets are presented to the jury, Defendants maintain that the jury must be instructed that it is required to find evidence of actual price discrimination.  Indeed, during summary judgment proceedings, Plaintiffs distinguished *Meta* only on the basis that it was decided "after a full trial," effectively conceding that the *Meta* standard was the correct one to apply at trial.  ECF No. 1000 at 65:13-66:3.  The jury cannot find in favor of Plaintiffs' alleged ticketing markets without the evidence that is required to prove targeted customer markets—*i.e.*, evidence of actual price discrimination.

40

**Post-Instruction No. 11D2**

## RELEVANT PRODUCT MARKET—AMPHITHEATERS MARKET

Plaintiffs define their alleged amphitheater market to include only 87 amphitheaters, which Plaintiffs call "large amphitheaters." According to Plaintiffs, these are amphitheaters with capacity of 8,000 or more that hosted 10 or more concerts in at least one year from 2017 to 2024. Defendants contend this alleged market is not properly defined because it excludes other venues that are reasonable substitutes for "large amphitheaters," and it includes certain amphitheaters that do not qualify as "large amphitheaters." To prove this market, Plaintiffs must prove that artists in general do not view other types of venues, such as smaller amphitheaters or arenas, as reasonable substitutes for the class of large amphitheaters Plaintiffs selected.

To determine whether products are reasonably interchangeable or reasonable substitutes for each other, you may consider:

- whether artists substitute between large amphitheaters and other venues;

- consumers' views on whether the products are interchangeable;

- the relationship between the price of one product and sales of another;

- the presence or absence of specialized vendors;

- the perceptions of either industry or the public as to whether the products are in separate markets; and

- the views of Defendants regarding who their competitors are.

If you find that Plaintiffs have proven that the alleged amphitheaters market is properly drawn, then you should continue to evaluate the remainder of Plaintiffs' claims solely related to that market. If you find that Plaintiffs have failed to prove that the alleged amphitheaters market is

41

properly drawn, then you do not need to consider any other elements for claims related to this alleged market. Instead, you should find for Defendants and against Plaintiffs on all claims for which you found Plaintiffs failed to prove a relevant market.

**Plaintiffs' Position** : Plaintiffs object to a separate instruction limited to Plaintiffs' alleged markets for the use of large amphitheaters and primary ticketing for fans at major concert venues. The same legal framework, and therefore the same instructions, should apply to all of Plaintiffs' alleged markets. *See* Post-Instruction No. 11.

**Defendants' Argument (11D)**:  Defendants' position is that Plaintiffs' alleged ticketing markets—and any claims premised on those markets—should not be presented to the jury at all.  As Defendants have explained, "if a plaintiff alleging actual monopoly seeks to define a market by reference to a subset of buyers of a given product, 'then that market's borders must be shown by significant differences in price' paid by those buyers compared with others outside the target set."  ECF No. 797 at 3 (quoting *FTC v. Meta Platforms*, 2025 WL 3458822, at *35 (D.D.C. Dec. 2, 2025)).  In other words, Plaintiffs must prove their targeted customer markets with evidence of actual price discrimination.  And the *Brown Shoe* factors are irrelevant to this analysis.  ECF No. 1059 at 5-6.  Plaintiffs have conceded that they have no evidence of actual price discrimination.  ECF No. 1000 at 65:13-66:3.  Accordingly, their targeted customer ticketing markets should have been held invalid at summary judgment, all claims premised on those markets should have been dismissed before trial, and this issue should not be going to the jury at all.  Defendants propose this instruction only because Plaintiffs' targeted customer ticketing markets erroneously continue to be part of this case.

To the extent that Plaintiffs' alleged ticketing markets and claims related to those markets are presented to the jury, Defendants maintain that the jury must be instructed that it is required to find evidence of actual price discrimination.  Indeed, during summary judgment proceedings, Plaintiffs distinguished *Meta* only on the basis that it was decided "after a full trial," effectively conceding that the *Meta* standard was the correct one to apply at trial.  ECF No. 1000 at 65:13-66:3.  The jury cannot find in favor of Plaintiffs' alleged ticketing markets without the evidence that is required to prove targeted customer markets—*i.e.*, evidence of actual price discrimination.

**Defendants' Authority:**  Adapted ABA Model Instr. 3.A.4; *Geneva Pharm. Tech. v. Barr Labs.*, 386 F.3d 485, 496 (2d Cir. 2004) ("The relevant market is defined as all products 'reasonably interchangeable by consumers for the same purposes,' because the ability of consumers to switch to a substitute restrains a firm's ability to raise prices above the competitive level."); *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 394-400 (1956); *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) ("Products will be considered to be reasonably interchangeable if consumers treat them as 'acceptable substitutes.'").

**Defendants' Argument:** Defendants' proposed relevant product market instruction on Plaintiffs' alleged amphitheaters market, which involves traditional product market considerations, tracks the ABA model instruction on relevant product markets.  *See* ABA Model Instr. 3.A.4.

42

**Post-Instruction No. 12**

**MONOPOLIZATION— ELEMENT #2: MONOPOLY POWER**

If you find that Plaintiffs have proven any alleged relevant market by a preponderance of the evidence, then you should separately determine whether ~~Defendants have monopoly power in that market.~~ the relevant Defendant (Live Nation or Ticketmaster) has monopoly power in that market. To prove a monopolization claim, Plaintiffs must prove that the relevant Defendant has monopoly power in a relevant antitrust market. Monopoly power is the power to control prices, restrict output, or exclude competition in a relevant antitrust market. More precisely, a firm has monopoly power if it can profitably raise prices substantially above the competitive level for a significant period of time. However, possession of monopoly power, in and of itself, is not unlawful. As I will explain later, Plaintiffs must also prove that the relevant Defendant engaged in anticompetitive conduct that caused anticompetitive effects in the relevant market.

Plaintiffs can prove monopoly power "directly," through direct evidence, or "indirectly," through indirect evidence. Either type of evidence may be sufficient to prove monopoly power. I will now provide further instructions about how you may determine whether Plaintiffs have met their burden of proving monopoly power in a relevant market.

**Plaintiffs' Authority**: Adapted ABA Model Instr. 3.A.2; *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 97-98 (2d Cir. 1998) ("Monopoly power … is the power to control prices or exclude competition") (quotation marks and citation omitted); *American Tobacco Co. v. United States*, 328 U.S. 781, 809 (1946) (defining monopoly power as the power to "exclude actual or potential competition from the field"); *see also Otter Tail Power Co. v. United States*, 410 U.S. 366, 378 (1973).

**Plaintiffs' Position:** Plaintiffs' proposal largely tracks the ABA Model Instruction but with certain edits for clarity and accuracy. It also clarifies that either direct or indirect evidence may be sufficient for the jury to find monopoly power.

Defendants' proposed instruction first inserts two separate instructions (11D and 11D1) for the MCV-based and amphitheater-based markets. Defendants' preamble paragraphs are slanted in Live Nation's favor and are unnecessary and improper, because the jury will hear the parties positions in closing arguments and will have already been instructed on the separate markets in the court's summary of the

allegations in Post-Instruction No. 7, making further instructions here unnecessary. In the first portion of their instruction (11D), Defendants also wrongfully suggest that Plaintiffs must prove worse prices or terms of service in order to prove their claims, because the MCV market is a targeted customer market. As this Court has already held, the standard tools used to determine whether reasonably interchangeability or cross-elasticity of demand is sufficient to define a relevant antitrust  market—the *Brown Shoe* analysis or an HMT—apply equally to these markets. *See* ECF No. 1037 at 19–20. In the third portion of their instruction (11D2), Defendants continue to seek to instruct the jury to treat Defendants separately, as discussed above in Post Instruction No. 2. Plaintiffs have also deleted the additional sentence proposed by Defendants defining monopoly power as the ability to "profitably raise prices substantially" because it confusingly highlights only one of the manifestations of monopoly power set forth in the preceding sentence: "the power to control prices, restrict output, or exclude competition." Plaintiffs also object to Defendants' additional sentences related to anticompetitive conduct, as later instructions separately instruct the jury on that distinct element of Plaintiffs' monopolization claims. Including discussion of anticompetitive conduct within the monopoly power instruction will only confuse the jury.

**Defendants' Authority:** ABA Model Instr. 3.A.2.

**Defendants' Argument**:  Defendants' edits to this instruction track the ABA model instruction on monopoly power.  Defendants object to Plaintiffs' modifications to that model instruction in ways that transparently lessen Plaintiffs' burden.  For instance, Plaintiffs delete language making clear that "monopoly power, in and of itself, is not unlawful," and that "a firm has monopoly power if it can profitably raise prices substantially above the competitive level for a significant period of time."  ABA Model Instr. 3.A.2.

44

**Post-Instruction No. 13**

### EXISTENCE OF MONOPOLY POWER—DIRECT PROOF

Plaintiffs can provide direct proof of monopoly power in a relevant market via direct evidence through any one of these alternative ways.

*Raising or Maintaining Prices Above Competitive Levels*

One way Plaintiffs may prove that ~~Defendants have~~the relevant Defendant (Live Nation or Ticketmaster) has monopoly power in a relevant market is to show that ~~Defendants~~the relevant Defendant can profitably raise or maintain prices in the relevant market above a competitive level. Plaintiffs must prove that ~~Defendants have~~the relevant Defendant has the power to do so ~~themselves~~by itself—that is, without the assistance of, and despite competition from, any existing or potential competitors. ~~Defendants can have monopoly power even if they do not charge prices above competitive levels, so long as they have the ability to maintain prices above competitive levels without losing so much business to other competitors that the price increase would become unprofitable and would have to be withdrawn.~~

- In Plaintiffs' alleged primary ticketing services markets, the prices in question are what the ~~fees retained by~~ ticketers, such as Ticketmaster, ~~when providing primary ticketing services to~~ receive by way of compensation under the terms of their contracts with "major concert venues~~.~~," which is the fees they retain net of any payments the ticketer is required to make to the venue under the terms of the contract.

- In Plaintiffs' alleged amphitheaters market, the prices in question are the prices that Plaintiffs claim artists pay to rent the amphitheaters.

~~To prove monopoly power in this way,~~ Plaintiffs must also prove that ~~Defendants have~~the relevant Defendant (Live Nation or Ticketmaster) has the power to maintain prices above a

45

competitive level for a significant period of time. If the ~~Defendants~~relevant Defendant attempted to maintain prices above competitive levels, but would lose so much business to other competitors that the price increase would become unprofitable and would have to be withdrawn, then ~~Defendants do~~that Defendant does not have monopoly power.

The ability to earn high profit margins or a high rate of return does not necessarily mean that any Defendant has monopoly power. Other factors may enable a company without monopoly power to sell at higher prices or earn higher profit margins than its competitors, such as superior products or services, low costs, or superior advertising or marketing.

However, an ability to sell at higher prices or earn higher profit margins than other companies for similar goods or services over a long period of time may be evidence of monopoly power. By contrast, evidence that a defendant would lose a substantial amount of sales if it raised prices substantially, or that a defendant's profit margins were low compared to its competitors, or that a defendant's margins go up and down or are steadily decreasing, tends to suggest that the defendant does not have monopoly power.

*Reducing ~~or Maintaining~~ Quality Or Output Below Competitive Levels*

Another way Plaintiffs may prove that ~~Defendants have~~the relevant Defendant (Live Nation or Ticketmaster) has monopoly power is ~~to show~~by showing that ~~Defendants have~~the Defendant has the ability to reduce ~~or maintain~~ the quality of ~~products or services below competitive levels for a significant period of time.~~its product without losing meaningful sales.  This is similar to the point I just described regarding price. If ~~Defendants had~~ the ~~ability—even if unused—~~relevant Defendant attempted to reduce quality below competitive levels ~~without losing~~, but would lose so much business to other competitors that the ~~quality~~ reduction would become unprofitable and would have to be withdrawn, then ~~Defendants~~that Defendant does not have monopoly power.

46

Another way of showing monopoly power is through evidence that a firm has the ability to affect marketwide prices by reducing its own output.  Output for these purposes refers to the amount of its products or services that a firm chooses to produce.

*Power to Exclude Competition*

Alternatively, Plaintiffs may prove that Defendants have monopoly power by proving that Defendants have the ability to exclude or block competition. If you find that Defendants had the power to inhibit growth or expansion by existing competitors in a market or to prevent new competition from entering that market, then Defendants have monopoly power. This power to exclude may be shown by evidence of Defendants blocking competitors' ability to compete or of Defendants reducing or restricting the share of the market held by competitors.

Alternatively, Plaintiffs may prove that the relevant Defendant (Live Nation or Ticketmaster) has monopoly power by proving that the relevant Defendant has the ability to exclude competition.  Excluding competition means more than competing to keep one's business.  It means that a firm does not need to compete hard because it has been able to prevent other firms from competing effectively.  If new competitors can enter the relevant market or existing competitors can compete for new opportunities as they arise, then that Defendant does not have monopoly power.

**Plaintiffs' Authority**: Adapted ABA Model Instr. 3.A.8; *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 783 n.2 (6th Cir. 2002) ("the material consideration in determining whether a monopoly exists is not that prices are raised and that competition is excluded, but that power exists to raise prices or to exclude competition when it is desired to do so.") (quotation marks and citation omitted); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 274 (2d Cir.1979) ("[T]he fact that the power has not been used to extract improper benefits provides no succor to the monopolist."); *Cf. In re Google Digital Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 375 (S.D.N.Y. 2022) ("Harm to competition may be inferred through facts such as 'reduced output, increased prices and decreased quality' in the relevant market." (citation omitted)); *See United States v. Google LLC*, 747 F. Supp. 3d 1, 118 (D.D.C. 2024) ("Just as the power to raise price when it is desired to do so is proof of monopoly power, so too is the ability to degrade product quality without concern of losing consumers . . . ." (cleaned up)); *Cf. MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 182 (2d Cir. 2016) ("[A] plaintiff may offer direct evidence of harm to competition by proving higher prices, reduced output, or lower quality in the market as a whole.").

**Plaintiffs' Position:** Plaintiffs propose an expanded and clarified version of the ABA Model Instruction on direct proof of monopoly power. In particular, Plaintiffs have proposed additional language to clarify that the ability to charge prices above competitive levels is sufficient, even if a monopolist chooses not to exercise such power. *See Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 274 (2d Cir.1979) ("[T]he fact that the power has not been used to extract improper benefits provides no succor to the monopolist."); *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 783 n.2 (6th Cir. 2002) ("[T]he material consideration in determining whether a monopoly exists is not that prices are raised and that competition is excluded, but that power exists to raise prices or to exclude competition when it is desired to do so.") Plaintiffs propose an additional short section on reducing or maintaining quality below competitive levels because both sides have put on evidence of product quality. It is well-recognized that a reduction in quality below competitive levels is the functional equivalent of a price increase to customers. *Cf. In re Google Digital Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 375 (S.D.N.Y. 2022) ("Harm to competition may be inferred through facts such as 'reduced output, increased prices and decreased quality' in the relevant market."). Defendants' version of this paragraph removes the requirement that new competitors would need to be able to enter the market in order to make the reduction in quality unprofitable, ignoring the potential presence of barriers to entry. Plaintiffs also object to Defendants' alterations to the "power to exclude competition" section it inserts language on the level of competition that is unnecessary and may confuse the jury.

**Defendants' Authority**: Adapted ABA Model Instr. 3.A.8; *United States v. Google LLC*, 747 F. Supp. 3d 1, 118 (D.D.C. 2024) ("Just as the power to raise price when it is desired to do so is proof of monopoly power, so too is the ability to degrade product quality without concern of losing consumers . . . ." (cleaned up)); *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 182 (2d Cir. 2016) ("[A] plaintiff may offer direct evidence of harm to competition by proving higher prices, reduced output, or lower quality in the market as a whole.").

**Defendants' Argument**:  Defendants object to Plaintiffs' modifications to the ABA model jury instruction on direct proof of monopoly power in ways that transparently lessen Plaintiffs' burden. For instance, Plaintiffs omit the two paragraphs proposed by Defendants on the ability to earn high profit margins, which are necessary to inform the jury that high profit margins alone do not entail monopoly power.  *See* ABA Model Instr. 3.A.8.

48

**Post-Instruction No. 14**

### EXISTENCE OF MONOPOLY POWER—INDIRECT PROOF

~~As I instructed you earlier, Plaintiffs can establish monopoly power through direct proof or indirect proof. Either type of evidence may be sufficient to prove monopoly power. Now, I will instruct you on indirect proof.~~

Now I will instruct you on how Plaintiffs can provide indirect proof of monopoly power in a relevant market via indirect evidence.

Indirect evidence is evidence regarding the structure of the relevant market ~~which may permit you to draw an inference that Defendants~~. If this evidence establishes that the relevant Defendant (Live Nation or Ticketmaster) has the power to control price, restrict output, or exclude competition in the relevant market, then you may conclude that the Defendant has monopoly power in that market. By contrast, if the relevant Defendant does not have the power to control price, restrict output, or exclude competition in the relevant market~~.~~, then you may conclude that the Defendant lacks monopoly power. I will now explain the structural factors you may consider ~~include market share, market share trends, barriers to entry, actual examples of entry and exit by other companies, and the number and size of competitors, each of which I will now explain~~ in more detail.

*Market Share*

One factor that you should consider is ~~Defendants'~~the relevant Defendant's share of the relevant market. While market share is not the equivalent of monopoly power, it is relevant to your determination of whether Plaintiffs have proven monopoly power. ~~A defendant~~The relevant Defendant (Live Nation or Ticketmaster) must have a significant share of the market in order to possess monopoly power~~, but it need not be the only company operating within the market. The higher the company's share, the higher the likelihood that a company has monopoly power. A market share~~.

49

~~of 70% or greater is usually strong evidence of the existence of monopoly power. A market share below 50% is often not, on its own, strong evidence of monopoly power. But even if a company has a market share below 50%, the company can still have monopoly power depending on the nature of the market, including the size and competitiveness of other market participants and their ability to expand output or constrain Defendants' prices or quality. There is no bright-line rule. you should consider Defendants' market share in conjunction with other characteristics of the market—including the factors I will discuss next—to determine whether Defendants have the ability to control prices, restrict output, or exclude competition.~~

An inference of monopoly power usually requires a market share above 60%. A market share below 50% is rarely sufficient to support a conclusion that any Defendant has monopoly power. In evaluating whether the relevant Defendant's market share supports a finding of monopoly power, you should also consider other aspects of the relevant market, including market share trends, the existence of barriers to entry, the entry and exit by other companies, and the number and size of competitors. Along with the relevant Defendant's market share, these factors should inform you as to whether the relevant Defendant has monopoly power.

*Market Share Trends*

The trend in ~~Defendants'~~ the relevant Defendant's market share is something you may consider. An increasing ~~or stable~~ market share may strengthen an inference that a company has monopoly power, particularly where that company has a high market share, while a decreasing share might show that a company does not have monopoly power.

*Barriers to Entry*

You may also consider whether there are barriers to entry or expansion in or into the relevant market. Barriers to entry or expansion make it difficult for new competitors to enter the relevant market

in a meaningful and timely way, or for existing competitors to sell more of a product that they already sell in the relevant market. Barriers to entry or expansion in the alleged ticketing markets might include, ~~but are not limited to, the large financial and time investment required to build amphitheaters or other live entertainment venues, the~~ whether there is a large financial investment required to develop new ticketing ~~or other~~ technologies, ~~the need to satisfy governmental regulations, the lack of opportunities to bid for ticketing contracts due to the existence of long-term exclusive contracts or other factors, venues' reticence to switch ticketers due to switching costs and business risk, the need to enter into multiple markets simultaneously, or the need to achieve the necessary scale to credibly offer and market a range of live entertainment~~; whether existing ticketing companies do not have the capacity to sell primary ticketing services to ~~artists,~~more of the venues Plaintiffs call "major concert venues~~, and fans across the relevant market or markets. Other barriers to entry might include relationships with artists or venues, data on fans' prior ticketing purchases and preferences,~~"; whether there are specialized marketing practices~~,~~ to what Plaintiffs call "major concert venues"; and the reputation of the companies already participating in the market (or the brand recognition of their products~~), and any other factor making entry difficult.~~).

Evidence of low or no entry barriers in the alleged ticketing markets may be evidence that ~~Defendants do~~the relevant Defendant does not have monopoly power, regardless of ~~Defendants'~~the Defendant's market share, because new competitors could enter easily, ~~if Defendants~~or existing competitors could expand, if the Defendant attempted to raise prices or reduce quality for a substantial period of time. For example, you may consider evidence that other existing ticketing companies have the capacity and ability to sell primary ticketing services to some of what Plaintiffs call "major concert venues" if Ticketmaster tried to increase ticketing prices to venues as evidence that neither Defendant has monopoly power in the alleged ticketing markets, despite their alleged market shares. By contrast,

51

evidence of high barriers to entry along with high market share may support an inference that Defendants have monopoly power.

*Entry and Exit by Other Companies*

The history of entry and exit in the relevant market may be helpful to consider. Entry of new ~~significant~~ competitors or ~~significant~~ expansion of existing competitors may be evidence that ~~Defendants lack~~a defendant lacks monopoly power. On the other hand, departures from the market, or the failure of firms to enter the market ~~or expand successfully~~, particularly if prices and profit margins are relatively high, may support an inference that ~~Defendants have~~a defendant has monopoly power in that market.

*Number and Size of Competitors*

You may consider whether ~~Defendants'~~Live Nation's competitors in the alleged amphitheater market, or Ticketmaster's competitors in the alleged ticketing markets, are capable of effectively competing. In other words, you should consider whether the financial strength, market shares, and number of competitors act as a ~~substantial~~ check on ~~Defendants'~~each Defendant's ability to price ~~and adjust the quality of their~~its services. If ~~Defendants'~~Ticketmaster's competitors in the alleged ticketing markets are strong or have ~~large~~meaningful or increasing market shares, this may be evidence that ~~Defendants lack~~Ticketmaster lacks monopoly power in ~~that market.~~those markets. On the other hand, if you determine that ~~Defendants'~~Ticketmaster's competitors are weak or have small~~, stable,~~ or declining market shares, this may support an inference that ~~Defendants have~~ Ticketmaster has monopoly power. Similarly, if Live Nation's competitors in the alleged amphitheater market are strong or have meaningful or increasing market shares, this may be evidence that Live Nation lacks monopoly power in that market. On the other hand, if Live Nation's competitors are weak or have small or declining market shares, this may support an inference that Live Nation has monopoly power.

52

You may find that ~~Defendants have~~a Defendant has monopoly power based on direct evidence, indirect evidence, or both. If you find that ~~Defendants have~~a Defendant has monopoly power in ~~any~~a relevant market, then you must consider the remaining ~~element~~elements of ~~that~~Plaintiffs' monopolization claim as to that market and that Defendant only. If you find that ~~Defendants do~~a Defendant does not have monopoly power in a relevant market, then you must find for ~~Defendants~~that Defendant and against Plaintiffs on ~~that~~the monopolization claim as to that particular relevant market.

**Plaintiffs' Authority**: ABA Model Instr. 3.A.7; *New York v. Actavis, PLC*, No. 14 CIV. 7473, 2014 WL 7015198, at \*37 (S.D.N.Y. Dec. 11, 2014), *aff'd sub nom. New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638 (2d Cir. 2015) ("depending on other market factors, courts in the Second Circuit have permitted findings of market power with shares less than 50%," such as "finding [a] market share less than 30% would not foreclose the possibility of proving monopoly power"); *Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.*, 651 F.2d 122, 129 (2d Cir.1981) ("[T]he higher a market share, the stronger is the inference of monopoly power."); *In re Google Digital Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 364 (S.D.N.Y. 2022) ("In this Circuit, there is no bright-line rule.").

**Plaintiffs' Position:** Plaintiffs' proposed instruction moves the first paragraph of the model instruction to the direct proof section for clarity, since that section appears first in the proposed instructions. Plaintiffs' proposal then lists the types of evidence the jury may consider as indirect evidence, adds additional clarifications to each section, and clarifies the language. In the market share section, Plaintiffs provide market share percentages to aid the jury in comparing market shares presented in this case to those that have been found to be sufficient indirect evidence of monopoly power. In *Tops Markets Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 98 (2d Cir. 1998), the Second Circuit noted that while "market share is not the functional equivalent of monopoly power, it nevertheless is highly relevant to the determination of monopoly power." The Second Circuit has also clarified that while a market share below 50% may rarely be evidence of monopoly power, a share between 50% and 70% can show monopoly power, and share above 70% is usually strong evidence of monopoly power, "when the evidence presents a fair jury issue of monopoly power, the jury should not be told that it must find monopoly power lacking below a specified share or existing above a specified share." *Id. See Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.*, 651 F.2d 122, 129 (2d Cir. 1981). In addition, Plaintiffs added additional details to the barriers to entry section to aid in the jury's understanding of the concept. Defendants' alterations to the introduction add repetitive language regarding structural factors. Their edits to the market share section wrongly insert a new market share threshold of 60% for a finding of monopoly, apparently based on *PepsiCo, Inc. v. Coca-Cola*, 315 F.3d 101 (2d Cir. 2002). But that instruction would be legal error: *PepsiCo* does not apply here, where the jury has heard evidence of Defendants' ability to exclude competition. Defendants' proposed instruction on finding monopoly power based on a market share below 50% is inconsistent with Second Circuit case law. Defendants' edits to the barriers-to-entry

53

section insert inappropriate argument, and its edits to the entry and exit by other companies section inappropriately focus on "relatively high" profit margins. And Defendants' edits inappropriately lower the threshold for showing effective competition in the market.

**Defendants' Authority**: ABA Model Instr. 3.A.7; *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 109 (2d Cir. 2002) ("Absent additional evidence, such as an ability to control prices or exclude competition, a 64 percent market share is insufficient to infer monopoly power.").

**Defendants' Argument**:  Defendants object to Plaintiffs' modifications to the ABA model jury instruction on indirect proof of monopoly power in ways that transparently lessen Plaintiffs' burden. For instance, Plaintiffs omit language making clear that regardless whether they use direct or indirect evidence, the evidence must "establish[] that defendant has the power to control prices and exclude competition," and that a market share below 50% is "not sufficient to support a conclusion that defendant has monopoly power."  ABA Model Instr. 3.A.7.  Defendants also object to Plaintiffs' additions to the market share inquiry.  These additions are misleading as they fail to mention that even where a defendant's market share is above 70%, there must still be other evidence of monopoly power. *See United States v. Microsoft*, 253 F.3d 34, 54 (D.C. Cir. 2001) ("agree[ing]" that "even a predominant market share [of 95%] does not by itself indicate monopoly power").  They are also misleading because they suggest that other indirect evidence is relevant only where market share is low.  Finally, Defendants object to Plaintiffs' lengthy recitation of various aspects of their case as "barriers to entry."  Such recitation of Plaintiffs' allegations as part of the Court's instructions on the law improperly seeks to give the jury the misimpression that the Court agrees with Plaintiffs' allegations.  Defendants' edits to this instruction align it with the ABA model jury instruction.  And Defendants' addition that a market share above 60% is usually required is consistent with Second Circuit precedent. *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 109 (2d Cir. 2002) ("Absent additional evidence, such as an ability to control prices or exclude competition, a 64 percent market share is insufficient to infer monopoly power.

54

**Post-Instruction No. 15**

### MONOPOLIZATION~~: MAINTAINING~~ ELEMENT #3: WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY POWER THROUGH ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT

If you find that Plaintiffs have met their burden of proving ~~Defendants~~(a) a relevant market, and (b) that a Defendant possessed monopoly power in ~~a~~that relevant market, then you must turn to the ~~next~~third element~~.~~ of Plaintiffs' monopolization claim regarding that particular market and that particular Defendant. Plaintiffs must prove by a preponderance of the evidence that ~~Defendants~~the Defendant willfully acquired or maintained monopoly power in that relevant market through anticompetitive or exclusionary conduct or acts.

Anticompetitive or exclusionary acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market. ~~Put another way, exclusionary conduct causes~~ Harm to competition ~~by limiting the opportunities~~is different from harm to a single competitor or group of competitors, ~~and it either~~which does not ~~further~~ necessarily constitute harm to competition~~ on the merits or does so~~. Harm to competition can include evidence of increased prices, decreased production levels, and reduced quality, though not all increases in ~~an unnecessarily restrictive way. For example, foreclosing potential competitors from obtaining access to a key input, using monopoly power to destroy threatened competition, or using a strategic position to acquire exclusive privileges~~prices, decreases in ~~an area where it otherwise faces~~production levels or reductions in quality harm competition~~ can all constitute exclusionary conduct~~.

~~Harm to competition is different from harm to a single competitor or group of competitors. For example, the maintenance of monopoly power by supplying better or cheaper products or services, or possessing superior business skills, is not unlawful because the goal of the antitrust laws is to protect competition itself rather than any particular competitor's right to succeed. This is sometimes referred to as~~

55

"competition on the merits." Mere possession of monopoly power, if lawfully acquired and maintained, does not violate the antitrust laws. It is also not unlawful if monopoly power

The mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws. Similarly, the acquisition or maintenance of monopoly power by supplying better products or services, possessing superior business skills, or because of prior history or luck, is not unlawful. A monopolist may compete aggressively without violating the antitrust laws, and a monopolist may charge monopoly prices without violating the antitrust laws. A monopolist's conduct only becomes unlawful if the monopolist either obtained or maintained its monopoly power through anticompetitive acts.

is maintained because of luck.

The difference between anticompetitive conduct and conduct that has a legitimate business purpose can be difficult to determine. This is because all companies have a desire to increase their profits and increase their market share. These goals are an essential part of a competitive marketplace, and the antitrust laws do not make these goals—or the achievement of these goals—unlawful, as long as a company does not use anticompetitive means to achieve these goals.

In determining whether Defendants'a particular Defendant's conduct was anticompetitive or exclusionary, or whether it was legitimate business conduct, you should assessdetermine whether the conduct wasis consistent with competition on the merits, including whether the conduct provides benefits to consumers, and whether the conduct would make business sense apart from any effect it has on excluding competition or harming competitors.

Plaintiffs are not required to prove every one of their specific allegations of exclusionary behavior, and Plaintiffs do not have to prove that Defendants' monopoly was maintained solely by exclusionary conduct. Rather Plaintiffs may meet their burden by proving, by a preponderance of the evidence, that the exclusionary conduct was reasonably capable of contributing significantly to

56

Defendants' continued monopoly power in any relevant market. You must weigh the evidence as a whole and consider all of the alleged exclusionary conduct, including the interrelated effects of the different conduct in aggregate, not in isolation, to reach your determination as to whether Defendants' conduct was reasonably capable of contributing significantly to maintaining their monopoly. Accordingly, you should not wipe the slate clean after scrutinizing any individual facet of Defendants' conduct but rather examine Defendants' conduct—and its effect—as a whole.

The acts or practices that result in the acquisition or maintenance of monopoly power must represent something more than the conduct of business that is part of the normal competitive process or commercial success. They must represent conduct that has made it very difficult or impossible for competitors to compete and that was taken for no legitimate business reason. You may not find that a company willfully acquired or maintained monopoly power through anticompetitive means if it has acquired or maintained that power through the exercise of superior foresight and skill, such as providing quality products or services.

If you find, for any of Plaintiffs' claims, that Plaintiffs have proven by a preponderance of the evidence that Defendants

If you find that Plaintiffs have proven by a preponderance of the evidence that a particular Defendant engaged in anticompetitive or exclusionary conduct in a relevant market, then you may consider nonpretexual, procompetitive justifications for that conduct offered by that Defendant. If you find that Defendant has offered such justifications, then you must determine whether Plaintiffs have proven by a preponderance of the evidence that the anticompetitive or exclusionary conduct at issue was not reasonably necessary to achieve the procompetitive benefits claimed by that Defendant. If you find that the conduct was reasonably necessary to achieve the procompetitive benefits, then you must balance those benefits against the competitive harm resulting from that conduct. Conduct is anticompetitive and exclusionary only if its competitive harm outweighs its competitive benefits.

57

<u>If you find that any Defendant willfully acquired or</u> maintained monopoly power through anticompetitive or exclusionary ~~acts~~<u>conduct in a relevant market</u>, then you must ~~find for Plaintiffs on~~<u>consider the remaining element of Plaintiffs' monopolization claim as to</u> that ~~claim.~~<u>market and that Defendant.</u> If you find that ~~Plaintiffs~~<u>a Defendant</u> did not ~~prove this element by a preponderance of the evidence~~<u>willfully acquire or maintain monopoly power through anticompetitive or exclusionary conduct in a relevant market</u>, then you must find for ~~Defendants~~<u>that Defendant</u> and against Plaintiffs on ~~that~~<u>the monopolization</u> claim <u>as to that market</u>.

~~Plaintiffs are not required to prove every one of their specific allegations of exclusionary behavior, and Plaintiffs do not have to prove that Defendants' monopoly was maintained solely by exclusionary conduct. Rather Plaintiffs may meet their burden by proving, by a preponderance of the evidence, that the exclusionary conduct was reasonably capable of contributing significantly to Defendants' continued monopoly power in any relevant market. You must weigh the evidence as a whole and consider all of the alleged exclusionary conduct, including the interrelated effects of the different conduct in aggregate, not in isolation, to reach your determination as to whether Defendants' conduct was reasonably capable of contributing significantly to maintaining their monopoly. Accordingly, you should not wipe the slate clean after scrutinizing any individual facet of Defendants' conduct but rather examine Defendants' conduct — and its effect — as a whole.~~

~~If you find, for any of Plaintiffs' claims, that Plaintiffs have proven by a preponderance of the evidence that Defendants maintained monopoly power through anticompetitive or exclusionary acts, then you must find for Plaintiffs on that claim. If you find that Plaintiffs did not prove this element by a preponderance of the evidence, then you must find for Defendants and against Plaintiffs on that claim.~~

Next, I will describe some types of anticompetitive conduct that may be at issue here based on Plaintiffs' allegations, but it is up to you to decide what conduct by Defendants was proven by Plaintiffs and whether that conduct harmed competition.

**Plaintiffs' Authority**: ABA Model Instr. 3.A.9; *US Airways, Inc., for Am. Airlines, Inc. as Successor & Real Party in Int. v. Sabre Holdings Corp.*, Final Jury Instructions, 1:11cv2725, ECF No. 1207-8 at *18 (S.D.N.Y. May 19, 2022); *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 355 (4th Cir. 2024); *United States v. Microsoft Corp.*, 253 F.3d 34, 79 (D.C. Cir. 2001); *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99 (1962); *Otter Tail Power Co. v. United States*, 410 U.S. 366, 377 (1973); *United States v. Griffith*, 334 U.S. 100, 107 (1948); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985); *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 452-53 (7th Cir. 2020); *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 229 (S.D.N.Y. 2019) ("A monopolist's conduct violates Section 2 if it '(1) tends to impair the opportunities of rivals, [and] also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way.'"); *Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d 180, 222 (S.D.N.Y. 2014) ("Specifically, § 2 proscribes the use of monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor." (cleaned up) (quoting *Eastman Kodak*, 504 U.S. at 482-83))).

**Plaintiffs' Position:** Plaintiffs' proposed instruction begins with the ABA model and adds to it additional explanation of what constitutes anticompetitive or exclusionary conduct based on Section 2 case law. In particular, Plaintiffs' proposal includes an additional sentence instructing the jury that it may consider whether the "conduct causes harm to competition by limiting the opportunities of competitors, and either does not further competition on the merits or does so in an unnecessarily restrictive way," drawing from language in *Aspen Skiing* and other cited cases. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985) ("The question whether Ski Co.'s conduct may properly be characterized as exclusionary cannot be answered by simply considering its effect on Highlands. In addition, it is relevant to consider its impact on consumers and whether it has impaired competition in an unnecessarily restrictive way. If a firm has been 'attempting to exclude rivals on some basis other than efficiency,' it is fair to characterize its behavior as predatory."); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 229 (S.D.N.Y. 2019) ("A monopolist's conduct violates Section 2 if it '(1) tends to impair the opportunities of rivals, [and] also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way.'").

Additionally, Plaintiffs proposed the subsequent sentence to explain to jurors some of the particular forms of conduct that the Supreme Court has previously held to be anticompetitive: "foreclosing potential competitors from obtaining access to a key input, using monopoly power to destroy threatened competition, or using a strategic position to acquire exclusive privileges in an area where it otherwise has competitors can all constitute exclusionary conduct." *See Otter Tail Power Co. v. United States*, 410 U.S. 366, 377 (1973); *United States v. Griffith,* 334 U.S. 100, 107 (1948)); *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 353 (4th Cir. 2024); *Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d 180, 222 (S.D.N.Y. 2014) ("Specifically, § 2 proscribes the use of

59

monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor." (cleaned up) (quoting *Eastman Kodak*, 504 U.S. at 482-83)).

Plaintiffs' proposed instruction also provides guidance to jurors on how to evaluate the connection between the anticompetitive conduct alleged by Plaintiffs and the maintenance of any monopoly power by Defendants to avoid jurors incorrectly applying a "but-for" causation standard. Specifically, relying upon *United States v. Microsoft Corp.*, Plaintiffs propose jurors be told that "Plaintiffs may meet their burden by proving, by a preponderance of the evidence, that the exclusionary conduct was reasonably capable of contributing significantly to Defendants' continued monopoly power in any relevant market." 253 F.3d 34, 79 (2001).

Given the wide range of interrelated anticompetitive conduct alleged by Plaintiffs, much of which applies to multiple claims, Plaintiffs also believe it is important that the jury be instructed to consider the evidence as a whole, including its interrelated nature, consistent with the Supreme Court's guidance in *Continental Ore* and the Fourth Circuit's recent opinion in *Duke Energy*. *See Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("In cases such as this, plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole; and in a case like the one before us, the duty of the jury was to look at the whole picture and not merely at the individual figures in it." (cleaned up)); *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 355 (4th Cir. 2024), cert. denied sub nom.; *Duke Energy Carolinas v. NTE Carolinas II, LLC*, 2026 WL 79821 (U.S. Jan. 12, 2026) ("Just as the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole, so too must a firm's exclusionary efforts be considered in their totality." (citation and quotation omitted)).

Defendants' proposed instruction, by contrast, misstates the law by narrowly defining anticompetitive conduct, failing to provide the jury with examples of such conduct, and imposing additional hurdles for Plaintiffs to clear that are unsupported by the case law. For example, Defendants' proposed language can be incorrectly interpreted to be exhaustive: "[h]arm to competition can include evidence of increased prices, decreased production levels, and reduced quality." However, courts have made clear that "harm to the competitive process" is itself sufficient harm to competition to render conduct anticompetitive. *See Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 453 (7th Cir. 2020) ("The fact that the categories of conduct here are conceptually related and may overlap should not cause confusion if we stay focused on the underlying inquiry: the conduct 'must harm the competitive process and thereby harm consumers.'"); *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998) (plaintiffs "must allege and prove harm, not just to a single competitor, but to the competitive process, i.e., to competition itself"). Defendants' proposed instruction appears to require near complete foreclosure of competition by conduct to be anticompetitive ("conduct that has made it very difficult or impossible for competitors to compete"), but Defendants identify no authority for such a high bar. As explained above, the correct test set forth in *Microsoft* requires Plaintiffs to show the conduct merely "was reasonably capable of contributing significantly to Defendants' continued monopoly power in any relevant market." *United States v. Microsoft Corp.*, 253 F.3d 34, 79 (2001).

Defendants' proposal incorrectly instructs the jury that anticompetitive conduct "must represent something more than the conduct of business that is part of the normal competitive process or

60

commercial success." But "a monopolist is not free to take certain actions that a company in a competitive (or even oligopolistic) market may take, because there is no market constraint on a monopolist's behavior." *LePage's Inc. v. 3M*, 324 F.3d 141, 151-52 (3d Cir. 2003); *United States v. Google LLC*, 803 F. Supp. 3d 18, 142 (D.D.C. 2025) ("[C]onduct that is otherwise lawful when committed by a non-monopolist can be deemed anticompetitive when performed by a dominant firm.").

Defendants' proposal also vaguely and confusingly injects the concept of a "legitimate business purpose" and implies without further explanation that any conduct undertaken for a "business purpose" such as increased profits or market share is necessarily not anticompetitive. But that is not the law. As the Seventh Circuit explained in *Viamedia*, "a short-term profit sacrifice is neither necessary nor sufficient for conduct to be exclusionary." *Viamedia*, 951 F.3d at 462; *see also Delaware & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) ("The fact that profit maximization is a goal of the make or buy policy provides support for an argument that the policy is a legitimate practice, but does not shield the policy from judicial scrutiny. A monopolist cannot escape liability for conduct that is otherwise actionable simply because that conduct also provides short-term profits."); *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 431 (2d Cir. 1945) ("[The monopolist] insists that it never excluded competitors; but we can think of no more effective exclusion than progressively to embrace each new opportunity as it opened, and to face every newcomer with new capacity already geared into a great organization, having the advantage of experience, trade connections and the elite of personnel. Only in case we interpret 'exclusion' as limited to maneuvers not honestly industrial, but actuated solely by a desire to prevent competition, can such a course, indefatigably pursued, be deemed not 'exclusionary.' So to limit it would in our judgment emasculate the Act; would permit just such consolidations as it was designed to prevent."); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1075-76 (10th Cir. 2013) ("[S]urely a monopolist can find ways to harm competition while still making money.").

To avoid confusion, any discussion of business purposes should be included in the subsequent instruction on procompetitive justifications. That instruction also properly clarifies that it is Defendants' burden to come forward with non-pretextual procompetitive justifications for the alleged conduct, rather than any generic "business purpose." *See Kodak*, 504 U.S. at 483, 485 (defendants' proffered business reasons must be "valid," "sufficient," "legitimate," and "competitive"); *Aspen Skiing*, 472 U.S. at 608-10; *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1212-14, 1218–20 (9th Cir. 1997). Defendants further misstate the law by suggesting that jurors "may not find that a company willfully acquired or maintained monopoly power through anticompetitive means if it has acquired or maintained that power through the exercise of superior foresight and skill, such as providing quality products or services." But this misstates the holding of *Grinnell* by creating a false dichotomy. *Grinnell* held that the maintenance of a monopoly "as a consequence of a superior product, business acumen, or historic accident" did not itself violate the Sherman Act, but the Court did not hold that a company with a superior product or business acumen that *also* engaged in anticompetitive conduct cannot be found liable under Section 2. Defendants' proposed instruction incorrectly suggests this to be the case.

**Defendants' Authority:** Adapted ABA Model Instr. 3.A.9, 1.C.3, 1.C.4.

**Defendants' Argument**: *First*, Defendants object to Plaintiffs' elimination of "willful acquisition," which is included in the ABA model jury instruction on anticompetitive conduct as well as in the caselaw.  ABA Model Instr. 3.A.9; *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).

61

*Second*, Defendants object to Plaintiffs' modifications to the model instruction in ways that transparently lessen Plaintiffs' burden. For instance, Plaintiffs omit language regarding examples of harm to competition, a monopolist's ability to compete aggressively and charge monopoly prices without violating the law, and the difference between anticompetitive conduct and legitimate business conduct.

*Third*, Defendants object to Plaintiffs' insertion of language that they must prove only that "the exclusionary conduct was reasonably capable of contributing significantly to Defendants' continued monopoly power." That is not the law for any Plaintiff. Indeed, no Plaintiff even argued as much during summary judgment briefing. ECF No. 724 at 23 (Memorandum of Law in Support of Defendants' Motion for Summary Judgment); ECF No. 777 at 26-36 (Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment). Even if that standard might potentially apply "when a regulator is seeking only injunctive relief," *United States v. Google LLC*, 747 F. Supp. 3d 1, 152-53 (D.D.C. 2024), it has no place here where Plaintiff States are seeking monetary relief as well.

Defendants' proposal aligns this instruction with the ABA model jury instruction. It also combines subsequent instructions regarding procompetitive justifications and balancing competitive effects to reduce the length of the jury instructions and indicate to the jury that the latter analyses are all part of the anticompetitive conduct analysis.

62

Post-Instruction No. **15P**

### ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT—EXAMPLES

Now I will provide additional detail on some of the anticompetitive and exclusionary conduct Plaintiffs have alleged Defendants engaged in. You should consider all of the evidence as a whole to decide whether any conduct by Defendants was anticompetitive or exclusionary.

*Content Conditioning and Long-Term Exclusivity*

Plaintiffs have alleged Defendants maintained monopoly power in the primary ticketing markets by engaging in conduct that led venues to believe that they would lose valuable Live Nation shows if they used primary ticketers other than Ticketmaster. Plaintiffs contend that Defendants did so through statements by employees and agents of Live Nation, including statements related to a venue's access to Live Nation shows in light of the venue's use of Ticketmaster. Plaintiffs also allege Live Nation retaliated against venues that use rival ticketers. Plaintiffs also allege that Defendants have engaged in other conduct to maintain exclusive or restrictive ticketing agreements with venues, including engaging in early renewals and insisting on long-term contracts. You should first consider whether Plaintiffs have proven by a preponderance of the evidence that Defendants engaged in the alleged conduct. If you find Defendants engaged in the alleged conduct, you should then consider what effect this conduct had on competition. You should consider whether this alleged conduct harmed competition for primary ticketing services by impairing the opportunities of rivals instead of competing on the merits or by impairing rivals' ability to compete in an unnecessarily restrictive way.

*Use of Large Amphitheaters to Exclude Rival Promoters*

Plaintiffs also have alleged that Defendants conditioned artists' use of large amphitheaters owned, operated, or controlled by Defendants on artists also purchasing promotion services from Defendants. You should first consider whether Plaintiffs have proven by a preponderance of the evidence that Defendants engaged in such conduct. If you find Defendants engaged in such conduct,

63

you should consider whether the alleged conduct diminished competition for artists' use of large amphitheaters by impairing the opportunities of rivals, instead of competing on the merits, or by impairing rivals' ability to compete in an unnecessarily restrictive way.

*Acquisitions*

Plaintiffs have alleged Defendants acquired control over competitors and potential competitors, thereby reducing competition in certain markets. Acquisitions can come in many forms, including the purchase of a company or venue or entering into contracts or other agreements that provide Defendants effective or practical control over a company or venue, even if they do not own that company or venue. As with the other alleged conduct, you should first consider whether Plaintiffs have proven by a preponderance of the evidence that Defendants engaged in such conduct.

If you find that Defendants engaged in such conduct, you should then consider what effect this conduct—taken as a whole—had on competition. Put another way, you should consider whether the alleged acquisitions harmed competition for primary ticketing services or artists' use of large amphitheaters by impairing the opportunities of rivals, instead of competing on the merits, or by impairing rivals' ability to compete in an unnecessarily restrictive way.

*Entering Agreements with Competitors*

Plaintiffs have alleged Defendants entered into various agreements with Oak View Group that reduced or restricted competition in one or more markets, either by leading to Oak View Group or Live Nation not competing in certain markets or by distorting the competitive process within those markets.

If you find that Defendants engaged in such conduct, you should then consider what effect this conduct—taken as a whole—had on competition. For example, you should consider whether this conduct had the effect of preventing or excluding competition for ticketing services not by furthering

64

competition on the merits but by impairing the opportunities of rivals or engaging in the conduct in an unnecessarily restrictive way.

The previous examples are not exhaustive of the types of anticompetitive conduct because anticompetitive conduct comes in many forms. You should consider the evidence as a whole in deciding whether any of Defendants' conduct was anticompetitive.

**Plaintiffs' Authority**: *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 414 (2004) (anticompetitive conduct can take many forms because "the means of illicit exclusion, like the means of legitimate competition, are myriad") (quoting *United States v. Microsoft*, 253 F.3d 34, 58 (D.C. Cir. 2001) (en banc)); *Viamedia, Inc. v. Comcast Corp.,* 951 F.3d 429, 453 (7th Cir. 2020) ("Conduct that can harm competition may fit into more than one of these court-devised categories" and thus "[t]he fact that the categories of conduct here are conceptually related and may overlap should not cause confusion if we stay focused on the underlying inquiry: the conduct 'must harm the competitive process and thereby harm consumers.'") (quoting *Microsoft*, 253 F.3d at 58); Areeda & Hovenkamp, *Antitrust Law*, ¶ 777a (Although "the standard for a §2 violation is significantly stricter in its power assessment [than for a § 1 claim], it is broader and less categorical in its definition of proscribed conduct."); *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 488 (1992) (Scalia, J., dissenting) ("Our § 2 monopolization doctrines are similarly directed to discrete situations in which a defendant's possession of substantial market power, combined with his exclusionary or anticompetitive behavior, threatens to defeat or forestall the corrective forces of competition and thereby sustain or extend the defendant's agglomeration of power. Where a defendant maintains his substantial market power, his activities are examined through a special lens: Behavior that might otherwise not be of concern to the antitrust laws—or that might even be viewed as procompetitive— can take on exclusionary connotations when practiced by a monopolist." (cleaned up)).

**Plaintiffs' Position**: Plaintiffs have proposed this instruction in order to provide clarity for the jury on the types of alleged anticompetitive conduct it may consider when evaluating the evidence in this case, utilizing the earlier general instruction on anticompetitive conduct. Plaintiffs have drafted the instructions in a neutral manner that does not presume the evidence has proven any of the alleged conduct and without indicating what ultimate outcome the jury should reach as to whether any particular conduct was or was not anticompetitive.

**Defendants' Argument:** Defendants object to Plaintiffs' instruction reciting their allegations of anticompetitive conduct. This recitation of Plaintiffs' allegations has no place in the Court's official instructions on the law. Such recitation risks prejudice because it might give the jury the misimpression that Plaintiffs' allegations are part of the law, or that the Court (which determines the law) agrees with them. If the Court allows these instructions, Defendants reserve the right to propose alternative instructions that state Defendants' position against Plaintiffs' allegations.

65

**Post-Instruction No. 16**

## ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT—EXCLUSIVE DEALING - SHERMAN ACT SECTION 2

I will now provide some additional detail on one particular type of anticompetitive or exclusionary conduct Plaintiffs have alleged in this case. Plaintiffs have alleged that ~~Defendants~~Ticketmaster entered into long-term, exclusive primary ticketing contracts with what Plaintiffs call "major concert venues" that generally require the venue to use Ticketmaster as the exclusive primary ticketer for all events or for all concerts. ~~This is a category of conduct known as~~ Such contracts are called "exclusive dealing~~," and there are special standards that apply only to exclusive dealing conduct, which I will explain to you now. You should not apply these standards when considering other forms of alleged anticompetitive conduct.~~

~~I will now explain to you what an exclusive agreement is.~~

~~Exclusive agreements require a buyer of a product or service to obtain that product or service exclusively—or nearly exclusively—from one supplier for a period of time. There are several forms of exclusive dealing arrangements. The arrangement may take the form of an agreement, arrangement, or practice forbidding the buyer from purchasing the product or service from the supplier's competitors, a requirements contract committing the buyer to purchase all of its requirements of specific products or services from the supplier, or a pricing policy that creates a substantial disincentive to purchase from competitors. Some practices may operate as partial Exclusive dealing contracts. Others may operate as de facto exclusive dealing contracts by limiting the practical ability of the buyer to obtain the specific products or services from other suppliers.~~

" contracts because they require buyers, here certain venues, to buy a product or service exclusively (or almost exclusively) from one seller, here Ticketmaster, for a period of time. Exclusive dealing contracts

66

To establish that an exclusive dealing, or partial exclusive dealing, arrangement amounts to exclusionary conduct under Section 2 of the Sherman Act, Plaintiffs must establish by a preponderance of the evidence that the Defendants entered into one or more exclusive agreements between the buyers (major concert venues) and the supplier (Defendants).

If you find that such an agreement existed, you must then determine whether the agreement or agreements had a substantial adverse effect on competition for primary ticketing services to major concert venues. Plaintiffs may prove the agreement had a substantial adverse effect on competition through direct evidence, circumstantial evidence, or both. When evaluating whether the agreement adversely affected competition there is no set formula and you may assess some or all of the following factors: (i) the extent of Defendants' market power; (ii) whether the agreements foreclose a substantial share of the market for primary ticketing services; the test is not total foreclosure, but rather whether the exclusive dealing barred a substantial number of competitors or severely restricted the market's ambit; (iii) the duration of the contract: a contract of shorter duration is less likely to harm competition than one of longer duration; (iv) whether likely or actual anticompetitive effects are outweighed by procompetitive effects; (v) whether Live Nation engaged in coercive behavior; (vi) the ability of

are presumptively procompetitive and lawful, but they can be anticompetitive in certain circumstances as I will explain to you now.

Exclusive contracts can be anticompetitive where a seller uses its monopoly power to force a customer to enter into an exclusive contract when the customer would have preferred to enter into a non-exclusive contract so that the customer could buy from multiple different sellers. However, where a customer wants an exclusive contract and only wants to buy from a single seller, it is not ordinarily anticompetitive for a seller to agree to sell on an exclusive basis, even if that seller has monopoly power. Customers are permitted to freely choose the terms on which they want to buy goods or

67

services. To be anticompetitive, the seller has to use its monopoly power to coerce a customer into an exclusive contract that the customer did not want at all or would have preferred to be non-exclusive.

Here Plaintiffs allege that Ticketmaster coerced certain venues into signing exclusive primary ticketing contracts when those venues would have preferred non-exclusive ticketing contracts. You may find Ticketmaster's contracting practices to be anticompetitive or exclusionary only if you find that Ticketmaster coerced venues into accepting exclusive primary ticketing contracts. If you find that the venues wanted exclusive primary ticketing contracts and freely chose to enter into exclusive contracts, then it is not anticompetitive or exclusionary for Ticketmaster to enter into exclusive ticketing contracts with those venues.

**Plaintiffs' Authority**: Adapted ABA Model Instr. 2.D.5, 1.C.2., 2.E.8; *United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 609, 611-612, (S.D.N.Y. 2025).

**Plaintiffs' Position**: Plaintiffs have proposed an instruction that closely tracks the three relevant ABA Model Instructions for exclusive dealing, combining two of them for purposes of streamlining. Plaintiffs' only substantive alterations consist of (i) clarifying that exclusive deals may be "nearly exclusive," consistent with other parts of the model instruction and case law, and (ii) providing the jury with guidance on sufficient foreclosure rates and other relevant factors for assessing competitive effects, based on *United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 609, 611-612, (S.D.N.Y. 2025) (citing *ZF Meritor*, 696 F.3d at 271-72).

Defendants' proposal is not based on an established model and misstates the law. First, it incorrectly suggests to jurors that the particular exclusive contracts at issue *here* are "presumptively procompetitive and lawful" based on caselaw describing certain exclusive contracts more generally across the economy. Whether the particular exclusive contracts at issue here are anticompetitive/procompetitive or lawful/unlawful depends on the particular facts and circumstances, as analyzed using the *ZF Meritor* factors that appear nowhere in Defendants' proposed instruction. Additionally, Defendants' proposed instruction misstates the law on coercion and is likely to confuse the jury. Defendants' proposal suggests the jury must find that customers "would have preferred to enter into a non-exclusive contract," but the relevant question, as with tying, is whether, but for Defendants' conduct, customers *might* have preferred a different arrangement such as a non-exclusive contract. *See supra* Plaintiffs' Position at Post-Instruction No. 7; *see also United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 611 (S.D.N.Y. 2025) (identifying "evidence that the dominant firm engaged in coercive behavior" as only one of seven factors courts consider in assessing foreclosure). Additionally, Defendants' broad assertion that "it is not anticompetitive for a seller to agree to sell on an exclusive basis, even if that seller has monopoly power," finds no support in the cases cited, as the key question under Section 2 is whether Defendants' exclusive contracts foreclosed competition, here in furtherance of maintaining their ticketing monopolies.

68

**Defendants' Authority:** *In re Mylan N.V. Sec. Litig.*, 666 F. Supp. 3d 266, 291 (S.D.N.Y. 2023) ("With respect to exclusive dealing agreements, the Supreme Court has long held that such agreements, whether challenged under Section 1 or Section 2, are presumptively procompetitive and lawful."); *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 245 (2d Cir. 1997) ("[E]xclusive distributorship arrangements are presumptively legal."); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 284 (3d Cir. 2012) ("Exclusive dealing will generally only be unlawful where the market is highly concentrated, the defendant possesses significant market power, and there is some element of coercion present."); *Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*, 962 F.3d 1015, 1031 n.11 (8th Cir. 2020) (same); *Interface Grp., Inc. v. Massachusetts Port Auth.*, 816 F.2d 9, 11 (1st Cir. 1987) ("When there is no plausible connection between exclusive dealing and antitrust harm, courts have not hesitated to hold that dealing lawful."); *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 77-78 (3d Cir. 2010) ("coercion is a fundamental consideration" where customers have "freely entered into exclusive contracts with the respective suppliers"); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 189-90 (3d Cir. 2005); *In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 996 (10th Cir. 2022) ("We can [] generally presume exclusive deals are procompetitive. But this assumption is thrown out the window when record evidence suggests coercion by the monopolist.").

**Defendants' Argument**: Exclusive contracting is the core conduct that Plaintiffs challenge in their Section 1 claim and most of their Section 2 claims. Given its central role in this case, the jury should be instructed on the law of exclusive contracts. This instruction explains that exclusive contracts themselves are not unlawful, and they do not constitute anticompetitive or exclusionary conduct unless the seller coercively imposed them on customers. As multiple courts have recognized, this element of coercion is required with respect to exclusive contracts. *See, e.g.*, *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 284 (3d Cir. 2012); *Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*, 962 F.3d 1015, 1031 n.11 (8th Cir. 2020); *In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 996 (10th Cir. 2022). Without an instruction of this nature, the jury may erroneously believe that the mere fact of entering into exclusive contracts is anticompetitive. Defendants object to Plaintiffs' proposal, which might suggest that exclusive contracts are always anticompetitive if, for instance, they have a certain duration—a position long rejected by the Supreme Court. *See In re Mylan N.V. Sec. Litig.*, 666 F. Supp. 3d 266, 291 (S.D.N.Y. 2023) ("With respect to exclusive dealing agreements, the Supreme Court has long held that such agreements, whether challenged under Section 1 or Section 2, are presumptively procompetitive and lawful.").

69

Post-Instruction No. 16P

### PROCOMPETITIVE BENEFITS

If you find that Defendants engaged in anticompetitive conduct, then you may consider non-pretextual nonpretexual, procompetitive justifications for this that conduct offered by Defendants.

A justification is pretextual if it was not the true reason for Defendants' conduct.

A justification is procompetitive if it promotes efficiency or quality or allows a company to offer a better product or service. For example, if Defendants' conduct is part of what supports the quality or functionality of the specific service of Defendants at issue, then that conduct may be procompetitive.

If you find that Defendants that Defendant. If you find that Defendant has offered non-pretextual, procompetitive such justifications for particular conduct, , then you must then determine whether Plaintiffs have proven by a preponderance of the evidence that the anticompetitive or exclusionary conduct at issue was not reasonably necessary to achieve the benefits. In other words, if Plaintiffs have proven that the same procompetitive benefits claimed by Defendants could have been achieved by other, reasonably available alternative means that would have created less harm to competition, then Defendants cannot use those claimed benefits to justify the conduct.

**Plaintiffs' Authority (16P)**: Adapted ABA Model Instr. 1.C.3; *US Airways, Inc. v. Sabre Holdings Corp.*, Final Jury Instructions at 19, 27, 1:11cv2725, ECF No. 1207-8 (S.D.N.Y. May 19, 2022); *Fed. Trade Comm'n v. Shkreli,* 581 F. Supp. 3d 579, 627 (S.D.N.Y. 2022) (a "monopolist may proffer nonpretextual procompetitive justifications for its conduct") (citation omitted); *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2162 (2021) (explaining that the defendant failed to show a "procompetitive benefit" because it "failed to establish that the challenged compensation rules have any direct connection to consumer demand" (cleaned up)); *Microsoft*, 253 F.3d at 72 (rejecting justification of "keeping developers focused upon Windows" as "competitively neutral"); *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 238 (2d Cir. 2003) ("If the defendants [provide a procompetitive justification for a challenged restraint], the government must prove either that the challenged restraint is not reasonably necessary to achieve the defendants' procompetitive justifications, or that those objectives may be achieved in a manner less restrictive of free competition.").

70

**Plaintiffs' Position**: Although Defendants subsume a similar instruction as a small part of their proposed instruction 19, Plaintiffs' position is that this explanation of how the jury should evaluate procompetitive justifications warrants emphasis as its own instruction, just like in the ABA Model.

**Defendants' Argument:** Defendants think separate instructions on procompetitive benefits and balancing the competitive effects are unnecessary, and Defendants propose folding those instructions into the instruction on anticompetitive conduct above.  Doing so would reduce the length of these instructions, make clear to the jury that the balancing analysis is all part of the anticompetitive conduct element, and avoid any misimpression that Defendants bear any burden of proof in this case.

~~Post-Instruction No. 16P2~~

~~**BALANCING THE COMPETITIVE EFFECTS**~~

~~If you find that the challenged conduct was reasonably necessary to achieve competitive~~ procompetitive benefits, then you must balance those ~~competitive~~ benefits against the competitive harm resulting from ~~the same~~that conduct.

~~If the~~ Conduct is anticompetitive and exclusionary only if its competitive harm outweighs ~~the competitive benefits, then the challenged conduct is exclusionary. If the competitive harm does not outweigh the competitive benefits, then the challenged conduct is not exclusionary. In conducting this analysis, you must consider the benefits and harm to competition and consumers, not just to a single competitor or group of competitors. Plaintiffs bear the burden of proving by a preponderance of the evidence that the anticompetitive effect of the conduct outweighs any qualifying pro-~~its competitive benefits.

If you find that any Defendant willfully acquired or maintained monopoly power through anticompetitive or exclusionary conduct in a relevant market, then you must consider the remaining element of Plaintiffs' monopolization claim as to that market and that Defendant. If you find that a Defendant did not willfully acquire or maintain monopoly power through anticompetitive or exclusionary conduct in a relevant market, then you must find for that Defendant and against Plaintiffs on the monopolization claim as to that market.

**Plaintiffs' Authority**: Adapted ABA Model Instr. 1.C.4; *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 238 (2d Cir. 2003) ("If the defendants [provide a procompetitive justification for a challenged restraint], the government must prove either that the challenged restraint is not reasonably necessary to achieve the defendants' procompetitive justifications, or that those objectives may be achieved in a manner less restrictive of free competition.").

**Plaintiffs' Position**: Although Defendants subsume a similar instruction as a small part of their proposed instruction 19, Plaintiffs' position is that this explanation of how the jury should evaluate procompetitive justifications warrants emphasis as its own instruction, just like in the ABA Model.

72

**Defendants' Argument (16P & 16P2)**: Defendants think separate instructions on procompetitive benefits and balancing the competitive effects are unnecessary, and Defendants propose folding those instructions into the instruction on anticompetitive conduct above.  Doing so would reduce the length of these instructions, make clear to the jury that the balancing analysis is all part of the anticompetitive conduct element, and avoid any misimpression that Defendants bear any burden of proof in this case.

**Post-Instruction No. 16D**

## THREATS AND RETALIATION

Plaintiffs have also alleged that Ticketmaster engaged in anticompetitive or exclusionary conduct by threatening venues with the loss of Live Nation content if they did not choose Ticketmaster for ticketing, and/or by retaliating against venues who did not choose Ticketmaster by withholding Live Nation content. These allegations of threats and/or retaliation cannot qualify as anticompetitive or exclusionary conduct unless you find that Live Nation has market power in a market for promoting all concerts to all artists at all venues. The same instructions regarding market definition and monopoly power that I provided to you earlier apply here. You must find the aforementioned market for concerts and that Live Nation has market power in that market before considering whether any allegations regarding threats and/or retaliation constitute anticompetitive or exclusionary conduct.

If you consider this alleged conduct, you must take care to distinguish between, on the one hand, affirmative acts of threatening venues or retaliating against venues and, on the other hand, concerns that a venue might have about how the choice of a ticketing provider might affect its ability to compete with other venues for concerts. Only affirmative acts of threatening venues or retaliating against venues can support this part of Plaintiffs' case. Likewise, that a venue might perceive an advantage in obtaining Live Nation promoted concerts because Ticketmaster is an affiliated company is not, in itself, proof of threats or retaliation. There is no challenge in this case to the merger of Live Nation and Ticketmaster, so the corporate affiliation alone is not probative of threats or retaliation.

If you find that Ticketmaster threatened one or more venues with the loss of Live Nation content if they did not choose Ticketmaster for ticketing, and/or retaliated against one or more venues who did not choose Ticketmaster by withholding Live Nation content, you must consider whether that behavior was sufficiently widespread that it amounted to meaningful foreclosure of competition in the

74

relevant ticketing market.  You may consider both qualitative and quantitative evidence of foreclosure; for example:

- the number of threats or instances of retaliation Plaintiffs have proven

- the number of major concert venues, ticketing contracts and concert routing decisions in the same period of time;

- whether threats were made privately or disseminated broadly;

- whether Ticketmaster's rivals were able to develop counterstrategies for addressing the effects of threats or retaliation;

- whether Live Nation has monopoly power in concert promotion.

**Plaintiffs' Position (16D)**: Plaintiffs object to Defendants' proposed additional instruction as misleading, inaccurate, and unnecessary.  The Court's decision denying Defendants' motion for reconsideration forecloses Defendants' proposed requirement that the jury also must find "that Live Nation has market power in a market for promoting all concerts to all artists at all venues." In that decision, the Court rejected the identical argument Defendants raise here, holding that "Live Nation tries to add a market-definition requirement where there otherwise isn't one." Dkt. 1094 at 5. Rather, as the Court correctly explained, Plaintiffs' "theory is that Live Nation entrenches its monopoly power in a *single* market using threats and coercion," and while "[t]hose threats and coercion may be based on a product in another market," there is no requirement that Plaintiffs "must define that market too." *Id.* at 6.

The Court's decision denying Defendants' motion for reconsideration forecloses Defendants' proposed requirement that the jury also must find "that Live Nation has market power in a market for promoting all concerts to all artists at all venues." In that decision, the Court rejected the identical argument Defendants raise here, holding that "Live Nation tries to add a market-definition requirement where there otherwise isn't one." Dkt. 1094 at 5. Rather, as the Court correctly explained, Plaintiffs' "theory is that Live Nation entrenches its monopoly power in a single market using threats and coercion," and while "[t]hose threats and coercion may be based on a product in another market," there is no requirement that Plaintiffs "must define that market too." *Id.* at 6.

**Defendants' Authority**:  *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 230 (2d Cir. 1999) ("Whatever the continued scope of monopoly leveraging claims as independent causes of action," such a theory at a minimum requires "monopoly power in one market" that the defendant uses "to foreclose competition, to gain a competitive advantage, or to destroy a competitor in another distinct market."); *Kaufman v. Time Warner*, 836 F.3d 137, 143 (2d. Cir. 2016) ("[M]arket power in the tying product—is essential to a would-be monopolist's coercion via tie-in. Without the leverage of market power, a seller's inefficient tie-in will fail because a rational consumer will buy the tying

75

product from the seller's competitor. . . . Hence, without market power, there is little risk of anticompetitive harm from the seller's tie-in."); *LePage's Inc. v. 3M*, 324 F.3d 141, 155-56 (3d Cir. 2003) (bundling theory requires "exploitation of the seller's monopoly power"); *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (requiring harm to "competitive *process*"); *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 183 (2d Cir. 2016) (requiring plaintiffs to offer grounds to "believe that the defendant's behavior will harm competition market-wide"); *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 96 (2d Cir. 1998) ("Before a factfinder may consider the harms and benefits of the challenged behavior, a plaintiff initially must show that the challenged action had an *actual* adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice."); *Giordano v. Saks Inc.*, 654 F. Supp. 3d 174, 208 (E.D.N.Y. 2023), *aff'd sub nom. Giordano v. Saks & Co. LLC*, No. 23-600-CV, 2025 WL 799270 (2d Cir. Mar. 13, 2025) (while "[p]laintiffs and those similarly situated suffered a certain amount of restricted job mobility as a result of the non-hire agreements, this does not lead to the conclusion that the no-hire agreements created an adverse effect on competition market-wide").

**Defendants' Argument**: Defendants' position is that Plaintiffs' threats/retaliation evidence should have never been presented to the jury, and the jury should not be permitted to consider Plaintiffs' threats/retaliation theory.  *See* ECF No. 1049.  At summary judgment, this Court determined that Plaintiffs' alleged concert promotion market was invalid, thus preventing Plaintiffs from proving that Live Nation wields market power in that market.  *See* ECF No. 1037 at 12.  Without such proof, there is no lawful basis for a jury to find that it violates the antitrust laws for Defendants to "condition" the provision of Live Nation concerts to venues on the venues' choice of Ticketmaster as their primary ticketer.  While it is still unclear precisely which doctrinal rubric Plaintiffs' "conditioning" claims fall under, the closest fit seems to be a "monopoly leveraging" theory.  But there can be no leveraging of a monopoly (here, in concert promotions) to gain unfair advantage in an adjacent market (here, ticketing) without the existence of a monopoly (in concert promotions) in the first place.  *See AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 230 (2d Cir. 1999) ("[w]hatever the continued scope of monopoly leveraging claims as independent causes of action," such a theory at a minimum requires "monopoly power in one market" that the defendant uses "to foreclose competition, to gain a competitive advantage, or to destroy a competitor in another distinct market").  Nor can this constitute an actionable tie, which would not be unlawful absent market power in the tying product market.  *See Kaufman v. Time Warner*, 836 F.3d 137, 143 (2d. Cir. 2016) ("[M]arket power in the tying product— is essential to a would-be monopolist's coercion via tie-in.  Without the leverage of market power, a seller's inefficient tie-in will fail because a rational consumer will buy the tying product from the seller's competitor. . . . Hence, without market power, there is little risk of anticompetitive harm from the seller's tie-in.").  And a bundling theory fares no better, because that too requires a showing of "exploitation of the seller's monopoly power." *LePage's Inc. v. 3M*, 324 F.3d 141, 155-56 (3d Cir. 2003).  In short, Plaintiffs must prove market power in a concert promotion market for their "conditioning" theory to succeed, and they cannot do so because their alleged concert promotion market has failed.

To the extent that the jury is allowed to consider Plaintiffs' threats/retaliation theory at all (and it should not be), it must be instructed that a showing of market power in concerts is required before it may do so.  Given that Plaintiffs' alleged concert promotion market involving artists at "major concert venues" has failed, Defendants propose a concert promotion market involving all artists at all venues. But to be clear, Defendants' frontline position is that Plaintiffs cannot be allowed to even attempt to

76

prove this market or any other concert promotion market given that their only alleged market was deemed invalid, and this theory should not go to the jury at all.

Plaintiffs' "conditioning" theory separately fails if Plaintiffs cannot show market-wide harm resulting from the alleged threats/retaliation. Plaintiffs must prove that the alleged threats/retaliation "harm the competitive process and thereby harm consumers." *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001). Isolated instances of supposed misconduct cannot, as a matter of law, harm the competitive process; Plaintiffs must offer grounds to "believe that the defendant's behavior will harm competition market-wide." *See MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 183 (2d Cir. 2016) (citation and quotation marks omitted).

**Post-Instruction No. 16D2**

### VERTICAL INTEGRATION AND SELF-PREFERENCING

You have heard evidence in this case that Live Nation is vertically integrated, meaning that it participates in multiple related businesses such as concert promotion, ticketing and venues. It is not unlawful for a company to combine multiple businesses that are related to one another or are part of the same supply chain. Plaintiffs do not have a claim in this case in which they contend that vertical integration is in itself unlawful.

If a business is vertically integrated and produces the products or services it needs internally, it will sometimes use its own products or services rather than purchasing those products or services from another company. For instance, a manufacturer might distribute its own products rather than hire another company to handle the distribution. It is not unlawful for a business to prefer to use its own goods or services rather than those of a third party. Evidence that Live Nation prefers to favor its own businesses that promote concerts, own and operate venues, and provide ticketing services does not by itself establish unlawful conduct. Nor is it unlawful for Live Nation promoters to prefer to use Ticketmaster's ticketing services instead of third-party ticketing services.

As you consider whether Plaintiffs have proven that Ticketmaster coerced certain venues into signing exclusive primary ticketing contracts, you should consider both that it is not unlawful for a business to prefer to use its own goods or services rather than those of a third party and that it is not unlawful for a company to be "vertically integrated."

**Plaintiffs' Position (16D2)**: Plaintiffs object to Defendants' proposed additional instruction as misleading, inaccurate, and unnecessary. Ultimately, vertical integration is a potential procompetitive justification, and Plaintiffs have separately proposed a thorough instruction on procompetitive benefits. As such, any discussion of vertical integration (if warranted at all) belongs within the broader procompetitive benefits instruction. *See United States v. Microsoft Corp.*, 253 F.3d 34, 89 (D.C. Cir. 2001) ("[W]e do not find that Microsoft's integration is welfare-enhancing or that it should be absolved of tying liability."); *United States v. Google LLC*, 778 F. Supp. 3d 797, 868 (E.D. Va. 2025) (considering and rejecting vertical integration as a procompetitive justification). In addition, the instruction is confusing because even the Supreme Court acknowledged "vertical

78

integration" "is an indefinite term without explicit meaning." United States v. Columbia Steel Co., 334 U.S. 495, 525 (1948).

Separately, the cases cited by Defendants do not stand for the sweeping assertions that vertical integration is per se lawful and any conduct ostensibly related to it is immune from antitrust scrutiny. Port Dock was a decision limited almost entirely to antitrust standing, which is not at issue here (and for the United States is not applicable). To the extent that case discussed vertical integration, it was limited to a producer in one market's "vertical expansion into another level of the same product market," i.e. the distribution level. *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 124, 126 (2d Cir. 2007) (recognizing that in other cases involving different facts, such vertical expansion could be actionable); *see also Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 465 (7th Cir. 2020) (noting that Port Dock acknowledged this). That does not resemble the facts here, where the alleged markets are distinct but related and do not involve multiple production levels (e.g., supplier and distributor) within a single supply chain. *See Port Dock*, 507 F.3d at 127 (explaining that Eastman Kodak was distinct, for example, because it "involved a claim of leveraging monopoly power over one product market into a distinct product market, . . . rather than vertical integration in one product market.").

Likewise, while the court in Jack Walters recognized that vertical integration alone is not an inherently unlawful category of conduct—and Plaintiffs do not allege as such in this case— nevertheless, "[o]f course if [a company] set about to [vertically integrate] in an unlawful fashion it would not be immune from liability just because it had an unexceptionable end in view. But that is only because, as we have noted, a conspiracy to attain a lawful end by unlawful means is actionable." *Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 710-11 (7th Cir. 1984) (also acknowledging "monopolistic firms might integrate vertically in order to deny supplies or outlets to competitors, or to make it more costly for new firms to enter the market (because they would have to enter at more than one level of production or distribution)").

Similarly, *Columbia Steel* did not hold that vertically integrated companies are somehow immune from antitrust laws, but rather "the fact that [companies] were integrated did not insulate them from the [Sherman] act." *Columbia Steel Co.*, 334 U.S. at 522. Columbia Steel also discussed Paramount Pictures and the factors "considered to be significant in determining the legality of vertical integration" hence the "without more" caveat included within the very quote Defendants use. *Id.* at 524-525. Likewise, the AT&T court held, "vertical integration may be unlawful under the Sherman Act if it creates monopoly power and is accompanied by an intent to exclude competition. Moreover, when activity among vertically-related affiliates restrains trade it violates the antitrust laws." *United States v. Am. Tel. & Tel. Co.*, 524 F. Supp. 1336, 1373 (D.D.C. 1981) (emphasis added). As in AT&T, the "government here did not attempt to prove that vertical integration itself amounts to anticompetitive conduct," and therefore the proposed instruction is irrelevant and confusing to the jury. *Id.*

Defendants' citation to *Dreamstime* stands for the opposite of what Defendants advance here. There, the Ninth Circuit held plaintiffs' allegations "that Google 'self-preferenced' Google Images in its search results . . . could be taken to show harm to Dreamstime in the online search market for images*." Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1141-42 (9th Cir. 2022) (emphasis added). However, the court affirmed dismissal of the claim there because the plaintiff disavowed any reliance on the theory of harm in the market. *Id.*

79

**Defendants' Authority:** *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 123-25 (2d Cir. 2007); *Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 710-11 (7th Cir. 1984) ("[V]ertical integration is not an unlawful or even a suspect category under the antitrust laws."); *United States v. Columbia Steel Co.*, 334 U.S. 495, 525 (1948) ("It seems clear to us that vertical integration, as such without more, cannot be held violative of the Sherman Act."); *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1141-42 (9th Cir. 2022) (claim that defendant "self-preferenced," among other things, did not "plausibly state a claim for anticompetitive conduct"); *United States v. Am. Tel. & Tel. Co.*, 524 F. Supp. 1336, 1373 (D.D.C. 1981) ("Clearly, vertical integration is not prohibited per se. . . and even an alleged monopolist has the right to compete vigorously."); *Reazin v. Blue Cross and Blue Shield of Kansas, Inc.*, 899 F.2d 951, 976 (10th Cir. 1990) (jury instruction that actions "were 'in and of themselves…not illegal or violative of the antitrust laws'" had "correctly reminded the jury that 'vertical integration . . . in and of itself is not violative of any law, including antitrust laws.'"); *Becker v. Egypt News Co., Inc.*, 713 F.2d 363, 366 (8th Cir. 1983) ("Since vertical integration by monopolists can have procompetitive effects, a refusal to deal to accomplish this integration, 'as such without more, cannot be held violative of the Sherman Act.'" (quoting *United States v. Columbia Steel Co.*, 334 U.S. 495, 525 (1948))); *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 689 (4th Cir. 2016) ("vertical integration has generally been permitted despite its apparent similarity to tying" and "[a] single firm incorporating separate but closely related processes can often be far more efficient than various independent entities"); *Auburn News Co., Inc. v. Providence Journal Co.*, 659 F.2d 273, 278 (1st Cir. 1981) ("[V]ertical integration can result in economic advantage to society" and "be a good faith effort to do business in more efficient ways."); *Theatre Party Associates, Inc. v. Shubert Organization, Inc.*, 695 F. Supp. 150, 155 (S.D.N.Y. 1988) ("[A] manufacturer or seller is free to control the distribution of its own product, [and] can unilaterally terminate or replace independent distributors and vertically integrate without violating the antitrust laws. Vertical integration without more, even by a monopolist, does not offend [the Sherman Act]." (citation omitted)); *United States v. Google LLC*, 803 F. Supp. 3d 18, 158 (D.D.C. 2025) ("The court will not hobble Google's competitiveness by prohibiting self-preferencing of its own . . . technologies . . . ."); *Belfiore v. New York Times Co.*, 826 F.2d 177, 181 (2d Cir. 1987) (Because "vertical integration even by a monopolist publisher 'does not, without more, offend Section 2' … [s]ummary judgment was proper on the monopolization claim." (citation omitted)); *Viacom Int'l Inc. v. Time Inc.*, 785 F. Supp. 371, 379 (S.D.N.Y. 1992) ("It is of course axiomatic that the antitrust laws do not operate to prevent a vertically integrated firm from reaping the rewards of its efficiency or to punish a company that profits from its expertise and innovativeness."); *S.W.B. New England, Inc. v. R.A.B. Food Grp., LLC.*, No. 06CIV. 15357GEL, 2008 WL 540091, at *5 (S.D.N.Y. Feb. 27, 2008) ("The fact that a defendant has a large market share 'does not change [the] analysis' that 'vertical integration does not violate antitrust laws.'" (citation omitted)).

**Defendants' Argument**: This instruction clarifies that the mere fact of Live Nation owning multiple businesses is not unlawful. *Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 710-11 (7th Cir. 1984) ("[V]ertical integration is not an unlawful or even a suspect category under the antitrust laws."). It also clarifies that those businesses' preference to deal with other Live Nation-owned businesses is likewise not unlawful. *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1141-42 (9th Cir. 2022) (claim that defendant "self-preferenced," among other things, did not "plausibly state a claim for anticompetitive conduct"). This instruction is necessary because Plaintiffs have repeatedly suggested that Live Nation's ownership of multiple businesses, *i.e.*, the so-called "fly-wheel," and Live Nation promoters' preference to use Live Nation-owned venues or venues that use Ticketmaster is inherently anticompetitive. Without this instruction, Plaintiffs' arguments may mislead the jury as to the law.

**Post-Instruction No. 16D3**

## MONOPOLIZATION ELEMENT #4: COMPETITIVE HARM

The final monopolization element Plaintiffs must prove by a preponderance of the evidence is that the relevant Defendant's (Live Nation's or Ticketmaster's) alleged anticompetitive or exclusionary acts harmed competition and caused anticompetitive effects in the relevant market. Although it may be relevant to the inquiry, harm that occurs to individual competitors is not enough, by itself, to demonstrate harm to competition generally. That is, harm to a single competitor or group of competitors does not necessarily mean that there has been harm to competition.

A harmful effect on competition, or competitive harm, refers to (a) a reduction in competition, that then (b) results in harm to the relevant customers. It means that customers lost lower prices, increased output, or higher product quality. If the challenged conduct did not result in customers paying higher prices, receiving lower quality products or services, or experiencing decreased output, then there has been no competitive harm.

Here, the relevant customers in the alleged ticketing markets are what Plaintiffs call "major concert venues." So you have to decide whether Plaintiffs proved that any anticompetitive conduct you may find actually harmed those "major concert venues," such as by causing them to pay higher prices for primary ticketing services or receiving lower quality ticketing services.

The relevant customers in the alleged market for amphitheaters are artists. So you have to decide whether Plaintiffs proved that any anticompetitive conduct you may find relevant to Plaintiffs' amphitheater market actually harmed artists by, for example, requiring them to pay higher prices to rent amphitheaters, having lower quality amphitheaters to play concerts in, or having fewer amphitheaters to play.

If you find that Plaintiffs have proven by a preponderance of the evidence that any anticompetitive or exclusionary acts by a Defendant in an alleged market actually harmed competition

81

in that market, then you must find for Plaintiffs and against that Defendant on the monopolization claim as to that market. If, however, you find that Plaintiffs did not prove by a preponderance of the evidence that anticompetitive or exclusionary acts by a Defendant in an alleged market actually harmed competition in that market, then you must find for that Defendant and against Plaintiffs on the monopolization claim as to that market. I remind you that you must consider and decide each claim against each Defendant in each alleged market separately.

This concludes the instructions on Plaintiffs' monopolization claims.

**Plaintiffs' Position (16D3):** Plaintiffs object to Defendants proposed instruction on a "fourth" element of monopolization. As discussed above, this additional element is not among the "two elements" identified by the Supreme Court in *Grinnell*. *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). It appears to be in part duplicative of earlier instructions on anticompetitive conduct, which definitionally is conduct capable of having an anticompetitive effect, and in part an additional element Defendants have created from whole-cloth. As with earlier proposed instructions, Defendants' proposal here that Plaintiffs must show conduct "harmed competition and caused anticompetitive effects in the relevant market" ignores case law that harm to the competitive process is itself an anticompetitive effect. *See Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 453 (7th Cir. 2020) ("The fact that the categories of conduct here are conceptually related and may overlap should not cause confusion if we stay focused on the underlying inquiry: the conduct 'must harm the competitive *process* and thereby harm consumers.'" (emphasis in original)); *Nynex Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998) (plaintiffs "must allege and prove harm, not just to a single competitor, but to the competitive process, i.e., to competition itself"). Additionally, Defendants' proposed instructions distinguishing between harm to individual competitors and harm to the competition is duplicative of earlier instructions.

For the reasons addressed in Plaintiffs' opposition to Defendants' motion for summary judgment, Defendants' proposed instruction requiring Plaintiffs to prove actual effects in the form of "customers paying higher prices, receiving lower quality products or services, decreased output or the loss of some other competitive benefit," is incorrect. Plaintiffs' proposed instructions correctly state Plaintiffs' burden to establish liability here, which is to show harm to competition. Evidence of price or quality effects can help establish liability under Section 2, and Plaintiffs will present evidence of such effects at trial, including in connection with State Plaintiffs' damages claims.

**Defendants' Authority:** Adapted ABA Instr. 1.C.2; *MacDermid Printing Sols. v. Cortron*, 833 F.3d 172, 183 (2d Cir. 2016) ("[I]n no precedential opinion in this Circuit has a plaintiff successfully proved an adverse effect on competition without offering evidence of changed prices, output, or quality."); *Hasbrouck v. Texaco, Inc.*, 842 F.2d 1034, 1040 (9th Cir. 1987), *aff'd*, 496 U.S. 543 (1990) ("The purpose of drawing a distinction between harm to competition and harm to competitors is to point out that not all acts that harm competitors harm competition."); *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (To violate Section 2, "a monopolist's act must have an 'anticompetitive

82

effect.' That is, it must harm the competitive *process* and thereby harm consumers."); *In re Google Digital Advertising Antitrust Litig.*, 627 F. Supp. 3d 346, 380 (S.D.N.Y. 2022) (conduct "must have an anticompetitive effect in order to form the basis of a monopolization claim"); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005) ("[T]he exclusionary conduct must have an anti-competitive effect.").

**Defendants' Argument**: As noted above, proof of competitive harm and anticompetitive effects is required in a Section 2 claim, and Defendants object to Plaintiffs' complete exclusion of this element from the monopolization analysis.  *See* Defendants' Argument on Post-Instruction No. 9 (Monopolization Elements).  The Second Circuit has explained that this showing requires "evidence of changed prices, output, or quality." *MacDermid Printing Sols. v. Cortron*, 833 F.3d 172, 183 (2d Cir. 2016).  Defendants' proposed instruction aligns with this requirement and the ABA model jury instruction on competitive harm.  *See* ABA Instr. 1.C.2.

**Post-Instruction No. 17**

### EXCLUSIVE DEALING AGAINST TICKETMASTER—SHERMAN ACT SECTION 1

Plaintiffs separately claim that ~~Defendants have~~Ticketmaster has engaged in unlawful exclusive dealing in violation of Section 1 of the Sherman Act by entering into long-term, exclusive primary ticketing contracts with what Plaintiffs call "major concert venues" that generally require the venue to use Ticketmaster as the exclusive primary ticketer for all events or for all concerts. This claim is only against Ticketmaster, not Live Nation. I have already instructed you on ~~the special standards you are~~how to ~~consider when evaluating~~evaluate exclusive dealing conduct under Plaintiffs' Section 2 monopolization ~~claim~~claims. I will now instruct you on how to evaluate exclusive dealing conduct under Plaintiffs' separate Section 1 exclusive dealing claim. ~~Again, you should not apply these standards when considering other forms of alleged anticompetitive conduct.~~

To establish that an exclusive dealing~~, or partial exclusive dealing,~~ arrangement violates Section 1 of the Sherman Act, Plaintiffs must establish each of the following elements by a preponderance of the evidence for each agreement separately:

(1)    There is an agreement between one of the ~~buyers (major concert~~ venues~~)~~ that Plaintiffs refer to as "major concert venues" and ~~the primary ticketing supplier (Defendants)~~Ticketmaster that substantially forecloses the ~~major concert venues~~venue from buying primary ticketing services from competing primary ticketing companies.

~~(2)    The agreement was an unreasonable restraint of trade that had a substantial adverse effect on competition for primary ticketing services. Plaintiffs may prove the agreement unreasonably restrained trade through direct evidence, circumstantial evidence, or both. When evaluating whether the agreement adversely affected competition, there is no set formula and you may assess some or all of the following factors: (i) whether the Defendants~~

84

~~possess market power; (ii) whether the agreements foreclose a substantial share of the market for primary ticketing services to major concert venues—for your guidance, foreclosing roughly 40% of a relevant market can be considered a substantial share under Section 1 of the Sherman Act; (iii) the duration of the contract: a contract of shorter duration is less likely to harm competition than one of longer duration; (iv) whether likely or actual anticompetitive effects are outweighed by procompetitive effects; (v) whether Live Nation engaged in coercive behavior; (vi) the ability of venues to terminate the contract, and (vii) whether competitors use similar contracts.~~

(2)     ~~Defendants had~~ There is a relevant market limited to what Plaintiffs call "major concert venues" for (a) primary ticketing services, and/or (b) primary concert ticketing services. If you did not find that Plaintiffs proved either of these markets, there is nothing else for you to consider on this claim for any such markets. You must find for Ticketmaster and against Plaintiffs on the Section 1 Exclusive Dealing claim for all such markets. If you found that Plaintiffs proved either of these alleged ticketing markets, then you should go on to consider whether Plaintiffs proved the other elements of this claim for that market.

(3)     Ticketmaster has substantial market power in at least one of the alleged ticketing markets. Market power has been defined as an ability to profitably raise prices for a sustained period of time above those prices that would be charged in a competitive market~~, or to exclude competition, or to force a purchaser to do something it would not do in a competitive market. Market power is understood to be less power over the market compared to monopoly power. A firm can have market power if it does not have monopoly power, but a firm that has monopoly power in a relevant market necessarily also has market power in that market. Even a firm with around 30% market share can have market power. A firm that has~~. A firm that possesses market power generally can charge higher prices for the same goods or services than

85

a firm in the same market that does not possess market power. The ability to charge higher prices for better products or services, however, is not ~~on its own~~ market power. An important factor in determining whether ~~Defendants possess~~Ticketmaster possesses market power in the alleged ticketing markets is ~~their~~Ticketmaster's market share, that is, ~~Defendants'~~its percentage of the products or services sold in the relevant market by all competitors. Other factors that you may consider in determining whether ~~Defendants have, or had,~~Ticketmaster has market power include ~~whether Defendants are capable~~the existence of ~~raising or maintaining prices above competitive levels or reducing quality; or whether there are~~ barriers to entry or expansion~~; or whether Defendants can exclude or have excluded competition or prevented competitors or~~ by potential competitors ~~from entering the relevant market.~~. I previously instructed you on barriers to entry or expansion in connection with the Section 2 claims, and those same instructions apply here.

~~If Defendants do not possess a substantial market share, it is less likely that they possess market power and unlikely that the challenged restraint has resulted or will result in a substantial harmful effect on competition in the market. However, if Defendants do possess a substantial market share it is more likely that they possess market power and the challenged restraint has resulted or will result in a substantial effect on competition.~~

~~To violate Section 1 of the Sherman Act, the exclusive dealing agreement also must have occurred in or affected interstate commerce. Because the parties have agreed to this last element, you will not need to decide it.~~

    (4)    Ticketmaster used its alleged market power in the alleged market to coerce the venue into an exclusive contract that the venue did not want at all or would have preferred to be non-exclusive. Coercion here means the same thing as I instructed you with respect to the Section 2 claim earlier.

(5)    The agreement substantially foreclosed competition in the alleged market.

(6)    The alleged foreclosure of competition caused anticompetitive effects in the alleged market. Anticompetitive effects has the same meaning as I instructed you on the Section 2 claim above.

In determining whether Ticketmaster coerced any venue to enter into an exclusive contract and whether any individual contract substantially foreclosed competition on the merits, it is important to consider whether the venue wanted an exclusive contract and whether other ticketing competitors had the opportunity to compete for the contract, even if they ultimately did not do so. An opportunity to compete does not require proof of a public bidding process or a specific invitation from the venue to bid. A competitor is considered to have had an opportunity to compete for a contract if it is aware of what is going on in the marketplace generally and is generally aware of how to compete for contracts with the venue.

In determining whether any exclusive contract with a venue substantially foreclosed competition, it is also relevant to consider the percentage of the market foreclosed by the contract and the length of the foreclosure. Where an exclusive dealing contract forecloses less than 20 percent of the market, this indicates that the harm from the foreclosure of competition is not substantial because there are alternatives available. Similarly, the shorter the duration of the contract, the less likely it is to harm competition. The longer the contract's duration, the more likely that the harm to competition will be greater, unless it is clear that there was vigorous competition on the merits to win the longer contract or the buyer as a practical matter can terminate the agreement on short notice without cause and without significant penalty.

Plaintiffs must prove these elements for each challenged agreement. To prove that each challenged agreement caused anticompetitive effects, Plaintiffs must prove that the agreement, judged

87

on its own and not aggregated together with other challenged agreements, caused substantial harm to competition.

If you find that Plaintiffs have failed to prove any one of these elements for any agreement they challenge, then you must find for ~~Defendants~~Ticketmaster and against Plaintiffs on Plaintiffs' Section 1 exclusive dealing claim. If you find that Plaintiffs have proven all of these elements for each of the agreements they challenge, then you must find for Plaintiffs and against ~~Defendants~~Ticketmaster on Plaintiffs' Section 1 exclusive dealing claim.

**Plaintiffs' Authority**: Adapted ABA Model Instr. 1.C.2, 2.D.5; *United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 609, 611-12, (S.D.N.Y. 2025) (setting forth exclusive dealing framework under Section 1 of the Sherman Act); *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 342 (S.D.N.Y. 2001) (ruling that MasterCard had "market power in the general purpose card network services market" where Mastercard had a "26%" market share), *modified*, 183 F. Supp. 2d 613 (S.D.N.Y. 2001), and *aff'd*, 344 F.3d 229 (2d Cir. 2003); *United States v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001) (Section 1 generally requires a roughly "40% standard drawn from the caselaw," while a Section 2 violation may "foreclose less than the roughly 40% or 50% share usually required in order to establish a [Section] 1 violation"); Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1821c ("[Foreclosure] [p]ercentages higher than 50 percent are routinely condemned when the practice is complete exclusion by a contract of fairly long duration.").

**Plaintiffs' Position:** As with the exclusive dealing instruction under Section 2, Plaintiffs' proposed instruction hews closely to the cited ABA Model Instructions and the language from *United States v. Visa*. 788 F. Supp. 3d 585, 609 (S.D.N.Y. 2025). Further, the Court has already rejected the premise that each agreement must be evaluated separately. ECF No. 1037 at 41–42.

**Defendants' Authority:** Adapted ABA Model Instr. 1.C.2, 2.D.5, 2.D.6, *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 116 (S.D.N.Y. 2015) ("In order to adequately plead foreclosure in a relevant market, a plaintiff first must properly define the relevant market.");at 117 ("It also is well established that exclusive agreements do not harm competition when there is competition to obtain the exclusive contract."); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 284 (3d Cir. 2012) ("Exclusive dealing will generally only be unlawful where the market is highly concentrated, the defendant possesses significant market power, and there is some element of coercion present."); *Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*, 962 F.3d 1015, 1031 n.11 (8th Cir. 2020) (same); *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 77-78 (3d Cir. 2010) ("coercion is a fundamental consideration" where customers have "freely entered into exclusive contracts with the respective suppliers"); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 189-90 (3d Cir. 2005); *In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 996 (10th Cir. 2022) ("We can [] generally presume exclusive deals are procompetitive. But this assumption is thrown out the window when record evidence suggests coercion by the monopolist."); *CoStar Grp., Inc. v. Comm. Real Estate Exch., Inc.*, 150 F.4th 1056, 1067 (9th Cir. 2025) ("[A] § 1 exclusive dealing claim requires a substantial

88

foreclosure of competition."); *New York v. Meta Platforms, Inc.*, 66 F.4th 288, (D.C. Cir. 2023) (requiring "substantial market foreclosure"); *United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 609 (S.D.N.Y. 2025) ("[A]n exclusive dealing arrangement must 'foreclose competition in such a substantial share of the relevant market so as to adversely affect competition.'"); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720 (MKB), 2024 WL 1014159, at *26 (E.D.N.Y. Mar. 8, 2024) ("Moreover, it is settled law that, under the rule of reason, a plaintiff bears the burden of showing 'an actual adverse effect' on competition through increased prices, decreased output, or that the challenged conduct 'otherwise stifled competition.'"); *Dickson v. Microsoft Corporation*, 309 F.3d 193, 203-05 (4th Cir. 2002) (declining to consider licensing agreements between Microsoft and various OEMs in the aggregate and analyzing each agreement "individually" instead); *Howard Hess Dental Laboratories v. Dentsply International*, 602 F.3d 239, 255-56 (3d Cir. 2010) (requiring plaintiffs to show that "every single agreement" between a manufacturer and its dealers had anticompetitive effect); *Gibson v. Cendyn Group*, 148 F.4th 1069, 1087 (9th Cir. 2025) (finding that "a grouping of individual agreements could not be 'aggregated' for the purposes of determining whether together they acted as an unreasonable restraint of trade," and requiring that the agreements "have a 'discrete effect' on competition"); *Panini America v. Fanatics*, 2025 WL 753954, at *9 (S.D.N.Y. Mar. 10, 2025) (refusing to "consider the effects of [] six exclusive deals together" and considering the effect of each separately instead); *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 83-84 (3d Cir. 2010) (plaintiff was not denied the ability to compete merely because it did not receive an invitation to bid where it was "well aware of what [was] going on in the marketplace" and knew how to compete for exclusive contracts); *Paddock Publ'ns v. Chi. Tribune*, 103 F.3d 42, 45 (7th Cir. 1996) ("Competition-for-the-contract is a form of competition that antitrust laws protect rather than proscribe, and it is common."); *Ticketmaster v. Tickets.com*, 2003 WL 21397701 (C.D. Cal. Mar. 7, 2003), *aff'd*, 127 F. App'x 346 (9th Cir. 2005); *City of New York v. Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011) ("To state a claim under. . . §§ 1 or 2 of the Sherman Act. . . a plaintiff must allege a plausible relevant market in which competition will be impaired.").

**Defendants' Argument**: Defendants' edits to this instruction primarily accomplish four things.

*First*, they clarify that this claim is asserted only against Ticketmaster, not Live Nation. ECF No. 257 at 87-88 (Am. Compl.). Indeed, only Ticketmaster is a party to its primary ticketing contracts with venues, and Plaintiffs have not alleged any veil-piercing or like theory that would permit this claim against Live Nation. *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir. 1993) ("a contract under the corporate name of [either a parent corporation or its subsidiary] is not treated as that of both").

*Second*, Defendants' proposal makes clear that Plaintiffs must prove their Section 1 exclusive dealing claim for each challenged primary ticketing contract separately. As Defendants explained in their summary judgment briefing, exclusive dealing challenges under Section 1 cannot aggregate contracts, unlike under Section 2. ECF No. 724 at 32 (Memorandum of Law in Support of Defendants' Motion for Summary Judgment); *Dickson v. Microsoft Corporation*, 309 F.3d 193, 203-05 (4th Cir. 2002) (declining to consider licensing agreements between Microsoft and various OEMs in the aggregate and analyzing each agreement "individually" instead); *Howard Hess Dental Laboratories v. Dentsply International*, 602 F.3d 239, 255-56 (3d Cir. 2010) (requiring plaintiffs to show that "every single agreement" between a manufacturer and its dealers had anticompetitive effect); *Gibson v. Cendyn Group*, 148 F.4th 1069, 1087 (9th Cir. 2025) (finding that "a grouping of individual agreements could not be 'aggregated' for the purposes of determining whether together they acted as an unreasonable restraint of trade," and requiring that the agreements "have a 'discrete effect' on competition"); *Panini*

89

*America v. Fanatics*, 2025 WL 753954, at \*9 (S.D.N.Y. Mar. 10, 2025) (refusing to "consider the effects of [] six exclusive deals together" and considering the effect of each separately instead).

This Court rejected this argument at summary judgment on the basis that the cited cases are all conspiracy cases in which a plaintiff sued the hub and the spokes. ECF No. 1037 at 41-42. But that is not true of two of the four cases. Defendants thus respectfully request reconsideration. *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995) (reconsideration warranted where party can point to matters "that might reasonably be expected to alter the conclusion reached by the court"). In *Panini*, the plaintiff sued only the hub and no spokes, and the plaintiff did not allege any conspiracy claims. In other words, the *Panini* plaintiff alleged the same type of straightforward Section 1 exclusive dealing contract theory that Plaintiffs allege here. There is thus no factual basis to distinguish Judge Swain's ruling in *Panini* from this Court's summary judgment ruling—which created a direct split of authority between district courts in this district without citing a single case supporting its reading of Section 1. Every court to have directly considered and addressed the question of aggregation of contracts under Section 1 has held that, in the absence of proof that all the participants were part of a single conspiracy through a hub-and-spoke theory, aggregation of the contracts is improper. No court has held, as this Court did, that a defendant's liability under Section 1 turns on who else the plaintiffs chose to sue. It cannot be the law that a defendant is subject to a different legal standard under Section 1 only if plaintiffs choose not to sue the counterparties to the agreements.

This Court's reading of *Gibson* was also erroneous. In *Gibson*, the plaintiffs alleged two different Section 1 theories in their complaint—one based on a hub-and-spoke theory, and a separate one based on the aggregation of individual exclusive agreements. On appeal, plaintiffs abandoned the hub-and-spoke claim (as the Ninth Circuit expressly recognized, *see* 148 F.4th at 1079), so the only claim the Ninth Circuit addressed was whether it was appropriate to aggregate individual exclusive contracts with a common licensor under Section 1. The Ninth Circuit held unequivocally that is improper, as every other court to have addressed the question has held. This Court's ruling on summary judgment directly contradicts the Ninth Circuit's ruling, and these other cases.

This Court also cited *Standard Oil Co. v. United States*, 337 U.S. 293, 295 (1949), in support of its ruling. ECF No. 1037 at 42. But *Standard Oil* addressed Section 3 of the Clayton Act, not Section 1 of the Sherman Act, and the Supreme Court expressly disclaimed consideration of whether its decision would be the same under Section 1 of the Sherman Act. *See* 337 U.S. at 314. *Standard Oil* thus presents no impediment to the conclusion many courts have reached—that Section 1 does not permit aggregation of contracts in the absence of proof that all the alleged participants acted together in a single conspiracy. Plaintiffs here, of course, have never alleged (and could never prove) that Ticketmaster acted together with all its venue clients in a single conspiracy. Because the Court's ruling on summary judgment was based on a mistaken reading of 3 of the 5 cases it cited, we respectfully request that the Court reconsider and reverse that ruling and hold that aggregation of contracts is not permitted in the circumstances of this case. Whether this legal holding may present a "coup for antitrust defendants" is not an appropriate basis to disregard settled law. ECF No. 1037 at 42. In any event, it does not. The legal basis for a claim that a series of individual exclusive contracts harms competition is Section 2, not Section 1. Interpreting Section 1 as this Court did actually creates a coup for antitrust plaintiffs, allowing them to try to make out a claim under Section 1 that they cannot prove under Section 2. There is no basis in Section 1 law for such a maneuver.

90

*Third*, Defendants' edits to the market power element align it with the ABA model jury instruction on market power.  *See* ABA Model Instr. 1.C.2.  Defendants object to Plaintiffs' comparison of market power to monopoly power.  This comparison, and in particular Plaintiffs' provision of a market share percentage at which market power may be found, is prejudicial as it may cause the jury to ignore the market power analysis and find the market power element satisfied based only on Ticketmaster's market share.

*Fourth*, Defendants have added elements on market definition, coercion, substantial foreclosure, and anticompetitive effects because it is well-established that each of those inquiries must be satisfied in a Section 1 exclusive dealing claim.  *City of New York v. Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011) ("To state a claim under . . . §§ 1 or 2 of the Sherman Act . . . a plaintiff must allege a plausible relevant market in which competition will be impaired."); *supra* Post-Instruction No. 16 (Anticompetitive or Exclusionary Conduct – Exclusive Dealing – Sherman Act Section 2); *United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 609 (S.D.N.Y. 2025) ("[A]n exclusive dealing arrangement must 'foreclose competition in such a substantial share of the relevant market so as to adversely affect competition.'").  Defendants' explanation of the substantial foreclosure element tracks the relevant ABA model jury instruction.  *See* ABA Model Instr. 2.D.6.  As does Defendants' explanation that the jury should consider whether venues wanted to enter into exclusive primary ticketing contracts, and whether Ticketmaster's competitors has an opportunity to compete for those contracts.  *Id.*; *see Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 117 (S.D.N.Y. 2015) ("It also is well established that exclusive agreements do not harm competition when there is competition to obtain the exclusive contract."); *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 83-84 (3d Cir. 2010) (plaintiff was not denied the ability to compete merely because it did not receive an invitation to bid where it was "well aware of what [was] going on in the marketplace" and knew how to compete for exclusive contracts).

**Post-Instruction No. 18**

## UNLAWFUL TYING AGAINST LIVE NATION

Plaintiffs also claim that ~~Defendants~~Live Nation engaged in an unlawful tying arrangement in violation of Section 1 of the Sherman Act. This claim is against Live Nation, and not Ticketmaster. Again, this is separate and apart from Plaintiffs' claims of monopolization and unlawful exclusive dealing and is subject to different rules, which I will explain now.

A tying arrangement is one in which the seller will sell one product or service (referred to as the tying product) only on the condition that buyers also purchase a different product or service (referred to as the tied product) from the seller, or that buyers at least agree not to purchase the tied product or service from any other seller. In this case, Plaintiffs claim that the tying product is the use of what they call "large amphitheaters" by artists, and the tied product is promotion services to all touring artists. Plaintiffs claim that ~~Defendants require~~Live Nation requires all touring artists to use ~~Defendants'~~Live Nation's promotion services ~~in order for~~if those artists ~~to be able~~want to perform at so-called "large amphitheaters" owned, operated, or controlled by ~~Defendants~~Live Nation.

In assessing Plaintiffs' tying claim, you should know that, as a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing. This means that businesses have no general duty to deal with their competitors. Live Nation has no obligation to rent its amphitheaters to rival promoters. And it is not unlawful for Live Nation to refuse to do so.

If you find that Live Nation's rival promoters want to rent Live Nation's amphitheaters so that they can win promotion business from artists instead of Live Nation, and that Live Nation's lawful refusal to rent to its rival promoters is what causes artists to choose Live Nation as their promoter, then you must find for Live Nation and against Plaintiffs on the Section 1 tying claim.

92

To prevail on their tying claim, Plaintiffs must prove each of the following elements by a preponderance of the evidence:

1. ~~Th use of large amphitheaters~~

1. Artists themselves, and not Live Nation's concert promoter competitors, directly rent amphitheaters from Live Nation;

2. ~~by artists (the tying product) and promotion services to artists (the tied product) are separate and distinct products.~~

2. The use (i.e., rental) of so-called "large amphitheaters" by artists (the tying product) and promotion services to all touring artists (the tied product) are separate and distinct products. If you previously found that Plaintiffs failed to prove that artists' use of so-called "large amphitheaters" is a relevant market, then you should not go on to consider any other element of this claim. Instead, you should find for Live Nation and against Plaintiffs on the Section 1 tying claim. Only if you found that Plaintiffs proved that alleged market should you go on to consider whether Plaintiffs proved the other elements of this claim. Additionally, you must find that promotion services to all touring artists is a relevant market. The same market definition instructions I provided to you in connection with Plaintiffs' monopolization claims apply here. If you find that promotion services to all touring artists is not a relevant market, then you should not go on to consider any other element of this claim. Instead, you should find for Live Nation and against Plaintiffs on the Section 1 tying claim. Only if you find that Plaintiffs proved that promotion services to all touring artists is a relevant market should you go on to consider whether Plaintiffs proved the other elements of this claim.

3. ~~Defendants~~Live Nation conditioned artists' use of so-called "large amphitheaters" on artists also purchasing ~~Defendants'~~Live Nation's promotion services.

4. ~~Defendants have~~ Live Nation has sufficient market power ~~in~~with respect to the use of what Plaintiffs call "large amphitheaters" by artists to enable ~~Defendants~~Live Nation to restrain competition ~~for~~as to promotion services to all touring artists. I have previously instructed you on the meaning of market power in connection with the exclusive dealing claim. The same rules apply in determining the existence of market power here. ~~You may find that Defendants have market power with respect to the use of large amphitheaters~~

4. ~~by artists if, by reason of some advantage, Defendants have the power to raise their prices, reduce quality, or restrict output for the use of large amphitheaters by artists without losing an appreciable amount of business or otherwise to force artists who purchase the use of large amphitheaters to do something that they would not do in a more competitive market.~~

5. The alleged tying arrangement has unreasonably restrained trade in that it had a substantial adverse effect in the market for promotion services to all touring artists, for example by raising the price of promotion services paid by those artists, or by lowering the quality or amount of those services. I have previously instructed you on competitive harm and anticompetitive effects in connection with Plaintiffs' monopolization claims. The same rules apply in determining substantial adverse effect here.

~~5.~~6. The alleged tying arrangement affected a not insubstantial volume of interstate commerce in promotion services to artists.

If you find that ~~the evidence is sufficient to prove~~Plaintiffs have proved all ~~four~~six of these elements, then ~~the tying arrangement is "per se" unlawful — which means that the tying arrangement is definitely unlawful and you may not consider any argument by Defendants that the tying arrangement has procompetitive benefits and~~ you must find for Plaintiffs and against ~~Defendants~~Live Nation on Plaintiffs' tying claim.

94

If you find that Plaintiffs have not proven the third element (that Defendants have market power in the use of large amphitheaters by artists), but that Plaintiffs have proven the other elements, then you may still find the tying arrangement unlawful if you find there have been actual anticompetitive effects with respect to promotion services to artists, such as increased prices paid by artists for promotions services, a reduced number of shows played by artists in large amphitheaters, or reduced quality of promotions services to artists. If you find that the evidence is insufficient to prove any one of these elements, then you must find for Defendants and against Plaintiffs on Plaintiffs' tying claim.

If you find that Plaintiffs have failed to prove any one of these elements, then you must find for Live Nation and against Plaintiffs on Plaintiffs' tying claim.

I will now provide additional detail on these elements, except for the first element of separate products, as both Plaintiffs and Defendants agree that element has been met.

**Plaintiffs' Authority**: Adapted ABA Model Instr. 2.E.1 and 2.E.3; ECF 1094 at 3-5; SJ Op., EC 1037 at 32-33; *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12-13, 26, 29 (1984) (if a defendant with market power over a tying product has forced or coerced customers into purchasing a separate, tied product, and a not insubstantial amount of commerce is affected for the tied product, then a Plaintiff has successfully "invok[ed] the per se rule against tying and thereby avoid[s] analysis of actual market conditions" because such a tie is inherently anticompetitive; if defendant has insufficient power in the tying market, however, the plaintiff, "[i]n order to prevail in the absence of per se liability," must make "an inquiry into the actual effect . . . on competition"); *Fortner Enter., Inc. v. United States Steel Corp.*, 394 U.S. 495, 500-01 (1969) ("the per se doctrine['s] . . . requirement that a 'not insubstantial' amount of commerce be involved makes no reference to the scope of any particular market or to the share of that market foreclosed by the tie"; and the "inability to satisfy [the per se] standards" are not "fatal to a plaintiff's case" as "[a] plaintiff can still prevail on the merits whenever he can prove, on the basis of a more thorough examination of the purposes and effects of the standards involved"—i.e., through a rule of reason analysis—"that the general standards of the Sherman Act have been violated");*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 463 (1992); *N. Pacific R. Co. v. United States*, 356 U.S. 1, 7 (1958); *Hill v. A-T-O, Inc.*, 535 F.2d 1349, 1353 (2d Cir. 1976);  *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 133 n. 5 (2d Cir. 2001), *overruled on other grounds In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006); *accord United States v. IBM Corp.*, 163 F.3d 737, 741 (2d Cir. 1998); *Park Irmat Drug Corp. v. Optumrx, Inc.*, 152 F. Supp. 3d 127, 139 (S.D.N.Y. 2016); Areeda & Hovenkamp, Antitrust Law ¶ 1702 ; ; ; ("[a]rrangements not unlawful [per se] might be unlawful under the rule of reason . . . even in the absence of any 'tying' product over which the supplier has power, or of the 'separate products' that per se tying law requires"); *In re Wireless Services Antitrust*

95

*Lit.*, 385 F. Supp. 2d 403, 414-15 ("where a tying arrangement may be condemned as illegal per se, plaintiffs need not allege, let alone prove, an element relevant to a rule-of-reason inquiry: i.e., anticompetitive effects in the tied market", and "the plaintiff is also relieved of the burden of rebutting any justifications the defendant may offer for the tie"; if, however, "the showing of market power is insufficient to find a per se violation of antitrust law, courts apply a rule of reason analysis at the fact-finding stage through a burden shifting scheme," pursuant to which a plaintiff may demonstrate "an actual adverse effect on competition" through "examining factors like reduced output, increased prices and decreased quality" or "significant barriers to entry into a particular market") (cleaned up).

**Plaintiffs' Position**: Plaintiffs combined ABA Model Instructions 2.E.1 (Unlawful Tying Arrangement) and 2.E.3 (Elements – Per Se Unlawful Tying) for brevity and clarity. Plaintiffs' proposal conforms closely to the ABA Model for both instructions. In paragraph one, Plaintiffs add the sentence with the language "separate and apart" to make it clear to the jurors that they are now considering a new claim. In paragraph two, Plaintiffs provide an illustrative example for the jurors, by specifying the type of conduct being alleged. In paragraph three, Plaintiffs list all five elements that are required to prove a tying claim in the Second Circuit: "first, a tying and a tied product; second, evidence of actual coercion by the seller that forced the buyer to accept the tied product; third, sufficient economic power in the tying product market to coerce purchaser acceptance of the tied product; fourth, anticompetitive effects in the tied market; and fifth, the involvement of a 'not insubstantial' amount of commerce in the 'tied' market." *Gonzalez v. St. Margaret's House Hous. Dev. Fund Corp.*, 880 F.2d 1514, 1516-17 (2d Cir. 1989); *accord E & L Consulting, Ltd. v. Doman Indus.*, 472 F.3d 23, 31 (2d Cir. 2006).

Defendants also attempt to insert an improper requirement of a separate relevant market for "promotion services to all touring artists" into their proposed instruction for Plaintiffs' unlawful tying claim. But as with Defendants' proposed Post-Instruction No. 16D, the Court already rejected the argument that Plaintiffs must define a separate market for the "tied" product market in denying Defendants' motion for reconsideration. ECF No. 1094 at 2-5 (concluding that "no Second Circuit or Supreme Court case says that a plaintiff must provide a formal market definition for the tied product," and finding the "nonbinding caselaw" cited by Defendants "unpersuasive"). Plaintiffs are only required to "identify some separate product from the tying market and then establish that there are anticompetitive effects in the market for that tied product," *id.* at 5, as set forth in Plaintiffs' proposed instruction.

**Defendants' Authority**: Adapted ABA Model Instr. 2.E.1, 2.E.3; *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 71 (2d Cir. 1996) (noting "the 'fundamental principle of antitrust law that an illegal tying arrangement requires that at least two products and/or services be purchased by the same individual'"); *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 447 (2009) ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."); *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) ("[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'"); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 604-05 (1985) (jury instructed that "refusal to deal … 'does not violate Section 2 if valid business reasons exist for that refusal'"); *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 929 (4th Cir. 1990) ("In general, a seller has the right to choose with whom it wishes to deal."); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1066 (10th Cir. 2013) (Gorsuch, J.) ("[T]he antitrust laws rarely

96

impose on firms—even dominant firms—a duty to deal with their rivals."); *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 305 (D.C. Cir. 2023) ("To consider Facebook's policy as a violation of § 2 would be to suppose that a dominant firm must lend its facilities to its potential competitors. That theory of antitrust law runs into problems under the Supreme Court's *Trinko* opinion.").

**Defendants' Argument**: Defendants' position is that this claim should not be going to the jury at all. In the Second Circuit, a tied product market is required to prove a tying claim, regardless whether the claim is a per se or rule of reason tying claim. *See* ECF No. 1048; ECF No. 1051; ECF No. 1059 at 8-13; *Coniglio v. Highwood Servs., Inc.*, 495 F.2d 1286, 1292-93 (2d Cir. 1974) (affirming summary judgment of per se tying claim when there was no proper definition of tied product market, or evidence of anticompetitive effects in it); *Gonzalez v. St. Margaret's House Hous. Dev. Fund Corp.*, 880 F.2d 1514, 1516-19 (2d Cir. 1989) (listing "anticompetitive effects in the tied market" as an element of per se tying claim); *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 31-32 (2d Cir. 2006) (affirming dismissal of tying claim for failure to define tied product market because "an antitrust defendant charged with illegal tying is entitled to some specificity as to . . . the anticompetitive effects in a specified [tied] market, and the effect on the business of the plaintiff."). At summary judgment, this Court deemed invalid the only tied product market alleged by Plaintiffs in this case. ECF No. 1037 at 12. Plaintiffs' tying claim thus failed as a matter of law and should have ended before trial.

To the extent that this claim is going to the jury at all, Defendants object to Plaintiffs' assertion that they have an unqualified right to instruct the jury that their tying claim is per se. In *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, the Supreme Court made clear that only "*certain* tying arrangements" pose such "an unacceptable risk of stifling competition" that they are unreasonable "per se." 466 U.S. 2, 9 (1984) (emphasis added); *see Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 36 (2006) (*Jefferson Parish* "reject[ed] the application of a per se rule that all tying arrangements constitute antitrust violations"). The per se rule now applies only when the practice at issue lacks procompetitive or efficiency justifications. *See, e.g.*, *United States v. Microsoft Corp.*, 253 F.3d 34, 94-95 (D.C. Cir. 2001) (en banc) (reversing application of per se tying rule where en banc court could not "comfortably say" that the alleged tie had "so little redeeming value and that there would be so very little loss to society from its ban" that its invocation was justified). Whether per se analysis applies is a question of law for the court, *not* (as Plaintiffs seem to think) every plaintiff's option. *See id.* at 89-95; *Arizona v. Maricopa Cty. Med. Socy.*, 457 U.S. 332, 351 (1982) (characterizing the per se rule as a "rule of law"); *Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 922 F.3d 713, 727 (6th Cir. 2019) ("Whether challenged conduct belongs in the per se category is a question of law."). And "it is only after considerable experience with certain business relationships that courts classify [tying arrangements] as per se violations." *Microsoft*, 253 F.3d at 90 (quoting *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 9 (1979)).

In short, Plaintiffs cannot take this claim to the jury as a per se tying claim unless the Court determines that the claim qualifies for per se analysis as a matter of law—which it does not. Plaintiffs' alleged tie is not one of those limited "types of [] arrangements [that] are deemed unreasonable as a matter of law." *Jefferson Parish*, 466 U.S. at 9. This is not a textbook tying case where a seller is saying to a buyer, "if you want X, you have to take Y." Instead, the alleged tie arises in the context of a vertically integrated concert promoter and venue operator that has a policy of refusing to deal with its rivals. Properly understood, this is not a tie at all—but a lawful refusal to deal. Even if the Court disagrees, it is not the type of tie that courts have enough familiarity with to deem it per se unlawful. At best for Plaintiffs, this would be a tie implemented through an intermediary, roughly equivalent to the one the Seventh Circuit allowed to proceed in *Viamedia*. But even that was not a *per se* case—and there is no

97

basis for the Court here to classify a rarely-if-ever-seen form of "tie" and put it in the legal bucket reserved for commercial arrangements that courts can confidently say, by virtue of experience, almost never have procompetitive justifications. In other words, there is no basis in the law to treat Defendants' policy as something presumptively *unlawful*. And Plaintiffs have identified "no close parallel in prior antitrust cases" to support per se condemnation. *Microsoft Corp.*, 253 F.3d at 84. To the contrary, relieving Plaintiffs of the obligation to show any harm to competition would pose a real "risk[] of error [or] of deterring welfare-enhancing innovation." *Id.* at 89-90. Should this Court allow Plaintiffs' tying claim to proceed as a per se claim, its decision would be in serious tension with *Jefferson Parish*, *Illinois Tool*, and *Microsoft*.

Accordingly, to the extent Plaintiffs can take this claim to the jury at all (and they cannot), it must proceed as a rule of reason claim, and the jury must be instructed that Plaintiffs must prove a tied product market and anticompetitive effects in that market. Given that the Court has deemed invalid Plaintiffs' alleged tied product market involving promotion services to artists at "major concert venues," that should end the claim altogether. But assuming the Court disagrees, the only alternative option (which Defendants press here not as a frontline argument, but only in the event that the Court rejects their frontline position and does believe the claim should go forward) is to put it to Plaintiffs to prove a tied product market involving promotion services to all artists at all venues. Defendants have thus proposed that tied product market throughout their tying instructions. But to be clear, Defendants' position is that Plaintiffs cannot be allowed to even attempt to prove that or any other tied product market after their only alleged market was deemed invalid, and this claim should not be going to the jury at all.

Additionally, Defendants' proposal includes an instruction on refusal to deal, as well as an element requiring the jury to determine whether artists or promoters are renters of amphitheaters. "[A]n illegal tying arrangement requires that at least two products and/or services be purchased by *the same individual*." *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 71 (2d Cir. 1996) (emphasis added). If promoters are the purchasers, as Defendants contend, then there is no illegal tying arrangement involving artists. Moreover, if promoters are the purchasers, then it is not unlawful for Live Nation to refuse to deal with those competitors. *See Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 447 (2009) ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."); *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) ("[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'"). As this Court recognized at summary judgment, the issue of who is the purchaser is disputed between the parties and must be resolved by the jury. ECF No. 1037 at 31-32. The jury thus must be instructed to resolve that issue, as well as on the important refusal to deal principle that accompanies that issue

98

**Post-Instruction No. 18D**

### UNLAWFUL TYING—IDENTITY OF THE PURCHASER

An illegal tying arrangement requires that at least two products and/or services be purchased by one buyer. Therefore, the first thing you must decide is who is the customer that actually purchases the alleged tying product here, which is rental of amphitheaters. By that I mean you need to decide who is the economic actor that seeks to rent the amphitheater, assumes the contractual obligation to pay for the use of the amphitheater, and bears the economic risks from the rental agreement. Plaintiffs contend that artists are the customers that rent amphitheaters. Live Nation contends that promoters, not artists, are the customers that rent amphitheaters.

If you decide that promoters, not artists, are the customers that rent amphitheaters, you should find for Live Nation and against Plaintiffs on this claim. If, however, you find that artists are the customers that rent amphitheaters from Live Nation, you should go on to consider whether Plaintiffs have proven the other elements of this claim.

**Plaintiffs' Position:** Defendants proposed instruction would impose a heightened standard for Plaintiffs to prove tying claims that finds no support in the case law. As described in the previous instruction, Plaintiffs are required to meet five elements in the Second Circuit. *See* Post-Instruction No. 18. Further, other courts have rejected the requirement that a consumer must "directly" acquire the tying product from the seller, including the Seventh Circuit in *Viamedia, Inc. v. Comcast Corp.*, which recognized "fundamentally, a tying claim does not fail as a matter of law simply because it was implemented by refusing to deal with an intermediary." 951 F.3d 429, 472 (7th Cir. 2020). There, Comcast provided two services: (1) it maintained an advertising "interconnect" platform, (2) and it provided "ad rep services" to cable television providers (MVPDs). Viamedia was a competing provider of ad rep services, and some of the ads to be aired on their customers MVPDs' channels (but sold through Viamedia) had to be placed through the Comcast-controlled Interconnect. Viamedia alleged that Comcast required MVPDs to hire Comcast as their ad rep if they wanted access to the Comcast-controlled "Interconnect." *Id.* at 436, 466. The Seventh Circuit rejected the argument that the "refusal to deal" doctrine allowed Comcast to prohibit MVPDs from connecting to the Interconnect through Viamedia (*i.e.*, tying), stating: "The fact that the arrangements were structured so that ownership of the slot avails [ads] passed from MVPDs to Viamedia does not affect this analysis. In applying the antitrust laws, we care more about economic substance than about form." *Id*. at 470. The United States Supreme Court also agreed in *Jefferson Parish*, 466 U.S. at 22-23, 28 n.4, that patients are consumers for the use of hospital operating rooms and anesthesiology services even if they do not choose or directly pay the

99

anesthesiologist. The same is true in this case. The fact that artists use promoters as intermediaries to purchase the use of amphitheaters does not change the analysis of the economic substance of these transactions. *Viamedia*, 951 F.3d at 470.

**Defendants' Authority:** *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 71 (2d Cir. 1996) (noting "the 'fundamental principle of antitrust law that an illegal tying arrangement requires that at least two products and/or services be purchased by the same individual'").

**Defendants' Argument**: As explained, resolution of who rents amphitheaters from Live Nation is essential to the tying analysis. *See* Defendants' Argument on Post-Instruction No. 18 (Unlawful Tying Against Live Nation). "[A]n illegal tying arrangement requires that at least two products and/or services be purchased by *the same individual*." *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 71 (2d Cir. 1996) (emphasis added). If promoters are the purchasers, then there is no illegal tying arrangement involving artists, as Plaintiffs' contend. And if promoters are the purchasers, then it is not unlawful for Live Nation to refuse to deal with those competitors. *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 447 (2009) ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."); *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) ("[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'").

100

**Post-Instruction No. 18D2**

### UNLAWFUL TYING—PRESENCE OF TWO PRODUCTS

To determine whether use of so-called "large amphitheaters" by artists and promotion services to artists are separate and distinct products, you should consider whether there would be demand for each of them if they were offered separately. If enough artists would want to purchase the use of so-called "large amphitheaters" and promotion services separately to induce venues and promoters generally to provide each service separately, then each service is a separate service. On the other hand, if there is very little demand for artists to buy one of the services by itself, that is, without the other service, then the use of the so-called "large amphitheaters" by artists and promotion services to all touring artists are not two separate products for the purposes of the tying claim, even if they are sometimes sold separately.

Services may be separate services even if one of them is useless without the other. The relevant issue is whether there is sufficient demand from customers to induce sellers to provide them separately, even if the customer needs to obtain both products from one or more suppliers.

**Plaintiffs' Argument:** Defendants attempt to insert an improper requirement of a separate relevant market for "promotion services to all touring artists" into their proposed instruction for Plaintiffs' unlawful tying claim. But as with Defendants' proposed Post-Instruction No. 16D, the Court already rejected the argument that Plaintiffs must define a separate market for the "tied" product market in denying Defendants' motion for reconsideration. Dkt. 1094 at 2-5 (concluding that "no Second Circuit or Supreme Court case says that a plaintiff must provide a formal market definition for the tied product," and finding the "nonbinding caselaw" cited by Defendants "unpersuasive"). Plaintiffs are only required to "identify some separate product from the tying market and then establish that there are anticompetitive effects in the market for that tied product," *id.* at 5, as set forth in Plaintiffs' proposed instruction.

**Defendants' Authority**: Adapted ABA Model Instr. 2.E.5.

**Defendants' Argument**:  Defendants' proposal tracks the ABA model instruction.  *See* ABA Model Instr. 2.E.5.

101

**Post-Instruction No. 19**

## UNLAWFUL TYING—PROOF OF CONDITIONING AND COERCION

You may find that ~~aa~~n illegal tying arrangement exists between the use of so-called "large amphitheaters" by artists and promotion services to touring artists only if ~~Defendants refused to allow artists to use~~ you find that Live Nation conditioned the rental of its so-called "large amphitheaters ~~Defendants controlled unless artists also agreed~~" on an artist's agreement to buy ~~Defendants'~~Live Nation's promotion services when the artists would have preferred to buy promotion services elsewhere.

~~You may also~~To find that ~~a tie~~an illegal tying arrangement exists ~~if Defendants~~, you must also find that Live Nation effectively coerced artists into buying ~~Defendants'~~Live Nation's promotion services in order to rent the so-called "large amphitheaters" controlled by Live Nation. To prove coercion, Plaintiffs must prove by a preponderance of the evidence that ~~Defendants~~Live Nation exploited ~~their~~its control over the use of so-called "large amphitheaters~~"~~ controlled by Live Nation to force ~~the~~ artists into the purchase of promotion services, which the artists either did not want at all, or ~~might~~would have preferred to purchase from a different promoter on different terms, and that any appearance of choice was illusory. ~~Mere sales pressure or persuasion is not coercion. You may find that Defendants have effectively tied these products if the only viable economic option for artists is to purchase the use of Defendants' large amphitheaters and Defendants' promotion services together. Coercion can be shown even if the artist thinks that the promoter did a good job or charged a fair price, because the key issue for this element is the lack of choice.~~

~~However, There is no coercion if the use of large amphitheaters by artists and promotion services are offered separately for sale and separate purchase is economically feasible. There is no requirement~~

102

There is no coercion if artists would have purchased promotion services from Live Nation anyway, regardless of any alleged tie.

~~that Plaintiffs demonstrate coercion on an individual basis or that individual artists were coerced. An unremitting policy of a tie, if accompanied by sufficient market power in the use of large amphitheaters to appreciably restrain competition for promotion services constitutes the requisite coercion.~~

You may not find that Live Nation coerced artists merely because of its policy of refusing to rent its amphitheaters to rival promoters.

**Plaintiffs' Authority**: Adapted ABA Model Instr. 2.E.7; *Hill v. A-T-O, Inc.*, 535 F.2d 1349, 1355 (2d Cir. 1976); *Park v. Thomson Corp.*, 2007 WL 119461, at *4 (S.D.N.Y. Jan. 11, 2007).

**Plaintiffs' Position:** Plaintiffs' proposal conforms largely to the ABA Model Instruction, adding clarifying language to provide examples of the type of conduct Plaintiffs would need to prove to meet their burden. In the final paragraph, Plaintiffs add two sentences on the standard in the Second Circuit, recognized in *Hill v. A-T-O, Inc.*, 535 F.2d 1349, 1355 (2d Cir. 1976), that Plaintiffs can prove coercion by showing evidence of an unremitting policy of a tie, if accompanied by sufficient market power in the tying product (use of large amphitheaters) to appreciably restrain competition for the tied product (artist promotion services). Plaintiffs also object to Defendants' renaming of Plaintiffs' proposed relevant markets in a manner that is confusing, prejudicial, and misleading to the jury.

**Defendants' Authority**: Adapted ABA Model Instr. 2.E.7; *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984) ("[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms."); *Virgin Atl. Airways Ltd. v. Brit. Airways PLC*, 257 F.3d 256, 270 (2d Cir. 2001) ("An invalid tying arrangement conditions the purchase of one product to the purchase of a second product that the buyer either does not want or would have preferred to purchase elsewhere."); *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996) ("To prove a tying claim, a plaintiff must have "evidence of actual coercion by the seller that forced the buyer to accept the tied product."); *Unijax, Inc. v. Champion Int'l, Inc.*, 683 F.2d 678, 686 (2d Cir. 1982); *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 447 (2009) ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."); *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) ("[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'"); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 604-05 (1985) (jury instructed that "refusal to deal … 'does not violate Section 2 if valid business reasons exist for that refusal'"); *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 929 (4th Cir. 1990) ("In general, a seller has the right to choose with whom it wishes to deal."); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064,

103

1066 (10th Cir. 2013) (Gorsuch, J.) ("[T]he antitrust laws rarely impose on firms—even dominant firms—a duty to deal with their rivals."); *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 305 (D.C. Cir. 2023) ("To consider Facebook's policy as a violation of § 2 would be to suppose that a dominant firm must lend its facilities to its potential competitors. That theory of antitrust law runs into problems under the Supreme Court's *Trinko* opinion.").

**Defendants' Argument**:  Defendants object to Plaintiffs' additions to this instruction that do not appear in the ABA model jury instruction on proof of conditioning.  In particular, Defendants object to Plaintiffs' statement that "coercion can be shown even if the artist thinks that the promoter did a good job or charged a fair price."  And Defendants object to Plaintiffs' language regarding "[a]n unremitting policy of a tie."  Defendants' edits align this instruction with the ABA model jury instruction and make clear that a tying arrangement is illegal only if the buyer was forced into purchasing "a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984).  Lastly, Defendants' proposal reiterates that mere refusal-to-deal with competitors is not unlawful. *See* Defendants' Argument on Post-Instruction No. 18 (Unlawful Tying Against Live Nation).

**Post-Instruction No. 20**

**UNLAWFUL TYING—INVOLVEMENT OF A NOT INSUBSTANTIAL VOLUME OF INTERSTATE COMMERCE WITH RESPECT TO THE TIED PRODUCT AND SUBSTANTIAL FORECLOSURE IN TIED PRODUCT MARKET**

The ~~last~~next element is whether the alleged tying arrangement involved a not insubstantial amount of interstate commerce in promotion services and resulted in substantial foreclosure of competition in the market for concert promotion services to touring artists.

For commerce to be considered interstate, it must have a nexus to commerce that affects or touches more than one state. In determining whether the tying arrangement involved a not insubstantial amount of interstate commerce, you should consider the total dollar amount of ~~Defendants'~~Live Nation's sales of promotion services to all touring artists in interstate commerce ~~involved in~~achieved by the tying arrangement. in absolute terms.

With respect to substantial foreclosure of competition, there is no substantial foreclosure if only a small percentage of sales of promotion services to all touring artists was affected by the tying arrangement.

**Plaintiffs' Authority**: Adapted ABA Model Instr. 2.E.9; *Summit Health. Ltd. v. Pinhas*, 500 U.S. 322, 328 (1991) (affirming appellate court's description of interstate commerce requirement as requiring no more than a nexus to commerce that affects more than one state, even if "any actual impact on interstate commerce would be 'indirect' and 'fortuitous'"); *Fortner Enterprises, Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 501-02 (1969) ("requirement that a 'not insubstantial' amount of commerce be involved makes no reference to the scope of any particular market or to the share of that market foreclosed by the tie"; rather, "normally the controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely de minimis, is foreclosed to competitors by the tie"); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 16 (1984); *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992); *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 6-7 (1958) (requiring only that "a 'not insubstantial' amount interstate commerce is affected").

**Plaintiffs' Position:** Plaintiffs' proposed instruction generally follows the ABA Model with an additional sentence explaining what constitutes interstate commerce, drawing from the cited cases. Plaintiffs' have also revised the model language to more closely mirror the "not insubstantial" phrasing used by the Supreme Court in *Fortner Enterprises* and *Northern Pacific Railway Co*. Plaintiffs object to Defendants renaming of Plaintiffs' proposed markets as confusing, prejudicial, and misleading to the jury. Plaintiffs also object to Defendants' addition of the phrase "achieved by," which is vague and likely confusing. The relevant question is the amount of commerce "involved" in or "affected" by the

105

alleged tying arrangement. *See Fortner Enterprises, Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 501-02 (1969) ("requirement that a 'not insubstantial' amount of commerce be involved makes no reference to the scope of any particular market or to the share of that market foreclosed by the tie"; rather, "normally the controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely de minimis, is foreclosed to competitors by the tie"); *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 6 (1958) (tying agreements are unreasonable "whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount interstate commerce is affected.").

**Defendants' Authority**: Adapted ABA Model Instr. 2.E.9; *Summit Health. Ltd. v. Pinhas*, 500 U.S. 322, 328 (1991) (affirming appellate court's description of interstate commerce requirement as requiring no more than a nexus to commerce that affects more than one state, even if "any actual impact on interstate commerce would be 'indirect' and 'fortuitous'"); *Fortner Enterprises, Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 501-02 (1969) ("requirement that a 'not insubstantial' amount of commerce be involved makes no reference to the scope of any particular market or to the share of that market foreclosed by the tie"; rather, "normally the controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely de minimis, is foreclosed to competitors by the tie"); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 16 (1984); *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992); *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 6-7 (1958) (requiring only that "a 'not insubstantial' amount interstate commerce is affected").

**Defendants' Argument**:  Defendants' edits align this instruction with the relevant ABA model jury instruction.  *See* ABA Model Instr. 2.E.9.  They also instruct the jury on substantial foreclosure, on which the parties have not provided a separate instruction, making clear that inquiry is distinct from the insubstantial volume of interstate commerce inquiry and requires a higher showing in the tied product market.

**Post-Instruction No. 21**

## STATE LAW CLAIMS

In addition to the claims that the Plaintiff States have brought under the Sherman Act, some Plaintiff States have brought claims under their own state laws. I will proceed to instruct you on those state law claims now.

**Authority**: ECF No. 257 (Am. Compl.).

107

**Post-Instruction No. 22**

## CONGRUENT STATE CLAIMS

~~Certain~~ Plaintiffs ~~claim that Defendants' conduct harmed competition nationwide, including in each~~are alleging violations of ~~the Plaintiff States. Twenty-three Plaintiff States have~~ their state laws that are congruent with Section 1 or 2 of the Sherman Act. That means ~~that~~ these state laws ~~require~~have the same ~~proof~~elements as ~~a violation of~~ Section 1 or 2 of the Sherman Act.

~~For these Plaintiff States,~~ If you find that ~~Plaintiffs have~~a Plaintiff State has proven every element of a Sherman Act ~~claim~~ Section 1 or 2 claim for a particular Defendant, and ~~Defendants'~~that the particular Defendant's conduct harmed competition ~~harmed competition nationwide, including~~ in ~~each~~that Plaintiff State, then for the state statutes listed below, you must ~~also~~ find that the Plaintiff State has also proven ~~a violation~~the elements of its State ~~law.~~

~~the Arizona Uniform State~~statute as to that particular Defendant. If you find that a Plaintiff State ~~Antitrust Act, A.R.S. § 44-1401 et seq.;~~ has not proven every element of any Sherman Act claim for a particular Defendant, or that the particular Defendant's conduct did not harm competition in that Plaintiff State, then for the state statutes listed below, you must find for that Defendant and against that Plaintiff State.

- ~~Ann. §~~the Colorado Antitrust Act of 2023, Colo. Rev. Stat. 6-4-101, *et seq.*;

- the Connecticut Antitrust Act, Conn. Gen. Stat. § 35-24 *et seq.*;

- the District of Columbia Antitrust Act, D.C. Code § 28-4501 *et seq.*;

- the Florida Antitrust Act, Fla. Stat. § 542.15 *et seq.*;

- ~~the Indiana Antitrust Act, Ind. Code §§ 24-1-2-1 and 24-1-2-2;~~

- the Louisiana Unfair Trade Practices Act, LSA-R.S. 51:1401 *et seq.*;

- the Maryland Antitrust Act, MD Commercial Law Code Ann. § 11-201 *et seq.*;

- the Michigan Antitrust Reform Act, MCL 445.771 *et seq.*;

108

- the Minnesota Antitrust Law of 1971, Minn. Stat. §§ 325D.49–325D.66;

- the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. § 598A.010 *et seq.*;

- the New Hampshire Revised Statutes Annotated § 356 *et seq.*;

- the New Jersey Antitrust Act, N.J.S.A. § 56:9-1 *et seq.*;

- the New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-1 and 57-1-2;

- the North Carolina Unfair or Deceptive Trade Practices Act, N.C.G.S. § 75-1 *et seq.*;

- the Valentine Act, Ohio Rev. Code Chapter 1331;

- the Rhode Island Antitrust Law, R.I. Gen. L. §§ 6-36-4 and 6-36-5;

- the Texas Business and Commerce Code § 15.01 *et seq.*;

- the Utah Antitrust Act, Utah Code §76-16-510;

- the Virginia Antitrust Act, Va. Code § 59.1-9.1 *et seq.*;

- the Washington Consumer Protection Act, Wash. Rev. Code §§ 19.86.030 and 19.86.040; and

- the West Virginia Antitrust Act, W. Va. Code § 47-18-1 *et seq.*; and Wisconsin Statutes Chapter 133.

**Plaintiffs' Authority**: *In re Elec. Books Antitrust Litig.,* No 11 MD 2293 DLC, 12 Civ. 3394 (DLC) (S.D.N.Y 2011); *People ex rel. Woodward v. Colo. Springs Bd. of Realtors*, 692 P.2d 1055, 1061 (Colo. 1984); *Shea v. First Fed. Sav. & Loan Ass'n*, 439 A.2d 997, 1006-07 (Connecticut General Statutes sections 35-26 and 25-27 are substantively the same as Sections 1 and 2 of the Sherman Act); *District of Columbia v. Amazon.com, Inc.*, 320 A.3d 1073, 1079 (D.C. 2024) ("The two provisions of the D.C. Antitrust Act at issue here, D.C. Code § 28-4502 and § 28-4503, mirror sections 1 and 2 of the federal Sherman Antitrust Act, 15 U.S.C. § 1 and 15 U.S.C. § 2. In language that is opportune given the dearth of antitrust decisions in this court, the D.C. statute itself—in a provision labeled "Uniformity"—explicitly gives us the green light to rely upon federal courts' interpretations of the Sherman Act when interpreting the D.C. Antitrust Act."); Fla. Stat. §§ 542.16, 542.32 (In interpreting Florida Antitrust Act, "great weight [should] be given to the interpretations of the federal courts relating to comparable federal antitrust statutes); *Bi-Rite Oil Co. v. Ind. Farm Bureau Coop. Ass'n*, 720 F. Supp. 1363, 1378 (S.D. Ind. 1989), *aff'd*, 908 F.2d 200 (7th Cir. 1990) ("Indiana antitrust law . . . was substantially patterned after the federal Sherman Antitrust Act and references to decisional law under the Sherman Act may be made in construing Indiana antitrust provisions . . . ."); *Goldfinch Lab'y, P.C. v. Iowa Pathology Assocs., P.C.,* No. 4:24-CV-00168-RGE-HCA, 2024 WL 5205936, at

109

*7 (S.D. Iowa Dec. 13, 2024); *Louisiana Power & Light Co. v. United Gas Pipe Line Co.,* 493 So. 2d 1149 (La. 1986), *superseded in part by statute,* La R.S. 51:122(B); *Neugebauer v. A. S. Abell Co.*, 474 F. Supp. 1053, 1071 (D. Md. 1979)(state law claims for exclusive dealing, tying, monopolization and others treated like federal claims under Sherman Act because Maryland Antitrust Act, Md. Code Ann., Comm. Law, Sec. 11-204(a)-(b) "were 'carefully and purposefully patterned after their counterparts in the federal law,'") (*citing* General Revisor's Note to the Maryland Antitrust Act); *Little Caesar Enterprises, Inc. v. Smith*, 895 F. Supp. 884, 898 (E.D. Mich. 1995) ("Michigan antitrust law is identical to federal law and follows the federal precedents."); *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 626 (Minn. 2007) (citing *Minn. Twins P'ship v. State*, 592 N.W.2d 847, 851 (Minn.1999)) ("Minnesota antitrust law is generally interpreted consistently with federal antitrust law."); *Walker v. U-Haul Co. of Miss.*, 734 F.2d 1068, 1070 n.5 (5th Cir.), on reh'g, 747 F.2d 1011 (5th Cir. 1984) ("courts treat federal and Mississippi state antitrust claims as "analytically identical"); *Salem Grain Company, Inc. v. Consolidated Grain and Barge Co.*, 900 N.W.2d 909, 922 (Neb. 2017) ("The NCPA is Nebraska's version of the Sherman Act, but it also encompasses portions of other federal antitrust law, including the FTCA…Further, the act was intended to be an antitrust measure to protect Nebraska consumers from monopolies and price-fixing conspiracies."); *Furniture Royal, Inc. v. Schnadig Int'l Corp.*, No. 2:18-CV-318, 2018 WL 6574779, at *4 (D. Nev. Dec. 13, 2018) (analysis under Nevada Unfair Trade Practices Act "is the same as the Sherman Act"); *Kenneth E. Curran, Inc. v. Auclair Transp.,* 128 N.H. 743, 748-49 (1986); *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F2d 589, 593 (1st. Cir. 1993); *See Shire US, Inc. v. Allergan, Inc.*, 375 F. Supp. 3d 538, 546 (D.N.J. 2019) (the New Jersey Antitrust Act shall be construed in harmony with ruling judicial interpretations of comparable federal antitrust statutes) (quoting *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 402 n.11 (3d Cir. 2016)); *see also State v. Lawn King,* 417 A.2d 1025, 1032 (N.J. 1980) (finding that consonance between the federal and state enactments is required); *Romero v. Philip Morris, Inc.*, 2010-NMSC-035, ¶ 18, 148 N.M. 713, 242 P.3d 280 ("It is therefore the duty of the courts to ensure that New Mexico antitrust law does not deviate from federal interpretations of antitrust law."); *Rose v. Vulcan Materials*, 282 N.C. 643, 655 (1973); *C.K. & J.K., Inc. v. Fairview Shopping Ctr. Corp.*, 63 Ohio St. 2d 201, 204 (1980); *Johnson v. Microsoft Corp.*, 106 Ohio St. 3d 278, 284 (2005); *Northwest Medical Laboratories, Inc. v. Blue Cross and Blue Shield of Oregon, Inc.,* 775 P.2d 863, 868 (Or. App. 1989), *aff'd*, 310 Or. 72 (1990) (Oregon Antitrust Law should be interpreted consistently with federal antitrust law); R.R. Gen. Laws § 6-36-2(b) ("[t]his chapter shall be construed in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable, except where provisions of this chapter are expressly contrary to applicable federal provisions as construed"); Tex. Bus. & Comm. Code § 15.04 ("The purpose of this Act is to maintain and promote economic competition in trade and commerce occurring wholly or partly within the State of Texas and to provide the benefits of that competition to consumers in the state [and] shall be construed in harmony with federal judicial interpretations of comparable federal antitrust statutes to the extent consistent with this purpose."); Utah Code. § 76-16-502(2) ("The Legislature intends that the courts, in construing this part, will be guided by interpretations given by the federal courts to comparable federal antitrust statutes and by other state courts to comparable state antitrust statutes"); *Boeing Co. v. Sierracin Corp.,* 108 Wn.2d 38, 54, 738 P.2d 665, 677 (1987) (citing RCW 19.86.920); W.Va. Code § 47-18-16 (West Virginia Antitrust laws "shall be construed liberally and in harmony with ruling judicial interpretations of comparable federal antitrust statutes."); *Kessel v Mon. County Gen. Hosp. Co.*, 648 S.E.2d 366, 374 (W.Va. 2007); *Olstad v. Microsoft Corp.*, 2005 WI 121, ¶ 42 ("The pivotal language in the first two sections [of the Wisconsin antitrust act and Sherman Act] is nearly identical. This has led courts and commentators to refer to that first incarnation of Wisconsin's antitrust act as the 'Little Sherman Act.'"); *Pulp Wood Co. v. Green Bay Paper & Fiber Co.*, 157 Wis. 604, 625, 147 N.W. 1058 (1914)

(Wisconsin antitrust law is a "copy of the federal statute" that "should receive the same interpretation that [is] placed on the federal act, from which it was taken".).

**Plaintiffs' Position:** The parties largely agree on the instructions regarding state laws that are congruent with the Plaintiffs' federal law claims, but several aspects of Defendants' proposed instructions are inaccurate.

First, as discussed above, for purposes of the claims at issue, Defendants should be considered together for purposes of liability. *See* Preliminary Instruction No. 1.

Second, Plaintiffs have alleged national markets for all claims at issue that may require proof of a relevant market, and Plaintiffs will collectively present evidence to prove that Defendants' conduct harmed competition nationwide. Defendants' proposal may suggest that each Plaintiff is independently required to put on a separate case, which is not correct. To avoid juror confusion while ensuring an evaluation of State impact, the jury should be instructed to determine whether Defendants' conduct "harmed competition nationwide, including in each Plaintiff State."

Third, Defendants have removed four states from the instruction without an adequate basis. For three states—Arizona, New Jersey, and Wisconsin—Defendants' objection appears to rest on a belief that these States are not empowered to bring *parens patriae* actions. Defendants' objection is misplaced for two reasons. As an initial matter, even if these states did not have *parens patriae* standing to bring damages claims, that does not preclude those states from seeking a jury to determine liability, given their claims for civil penalties. But more importantly, Defendants are incorrect; each state does in fact have standing to bring *parens patriae* claims. *See* A.R.S. § 21-102(F) (State of Arizona has the right to a jury in a civil action seeking, among other relief, civil penalties); *United States v. Apple, Inc.,* No. 24-CV-04055, 2025 WL 1829127, at *16–17 (D.N.J. June 30, 2025) (New Jersey has standing to bring *parens patriae* actions)*; In re Generic Pharmaceuticals Pricing Antitrust Litigation,* 605 F.Supp.3d 672, 679-80 (E.D. Pa 2022) (Iowa and New Jersey have standing to bring *parens patriae* actions); Wis. Stat. § 165.25(1m) (Wisconsin DOJ shall prosecute "any cause or matter … in which the state or the people of this state may be interested"); *State v. City of Oak Creek*, 232 Wis. 2d 612, 628 (2000) (Wisconsin Attorney General may bring a specific action where authorized by law).

Finally, for Indiana, Defendants' proposed instructions are superfluous for this phase of the trial and are likely to lead to juror confusion. Indiana is pursuing federal claims along with its state claims under the Indiana Antitrust Act, and its claim for damages under 15 U.S.C. § 15c are subject to the federal statute of limitations. To the extent Indiana's other claims for relief (*e.g.*, injunctive relief and penalties) are impacted an amendment to the Indiana Antitrust Act, those issues can be resolved during the second phase of the trial. Presenting the jury with additional dates is likely to cause unnecessary confusion and will not bear on the issues before them (liability and damages).

**Defendants' Authority**: *People ex rel. Woodward v. Colo. Springs Bd. of Realtors*, 692 P.2d 1055, 1061 (Colo. 1984); *Shea v. First Fed. Sav. & Loan Ass'n*, 439 A.2d 997, 1006–07 (Connecticut General Statutes sections 35-26 and 25-27 are substantively the same as Sections 1 and 2 of the Sherman Act); *District of Columbia v. Amazon.com, Inc.*, 320 A.3d 1073, 1079 (D.C. 2024) ("The two provisions of the D.C. Antitrust Act at issue here, D.C. Code § 28-4502 and § 28-4503, mirror sections 1 and 2 of the federal Sherman Antitrust Act, 15 U.S.C. § 1 and 15 U.S.C. § 2. In language that is

111

opportune given the dearth of antitrust decisions in this court, the D.C. statute itself—in a provision labeled "Uniformity"—explicitly gives us the green light to rely upon federal courts' interpretations of the Sherman Act when interpreting the D.C. Antitrust Act."); Fla. Stat. §§ 542.16, 542.32 (In interpreting Florida Antitrust Act, "great weight [should] be given to the interpretations of the federal courts relating to comparable federal antitrust statutes); *Louisiana Power & Light Co. v. United Gas Pipe Line Co.*, 493 So. 2d 1149 (La. 1986), *superseded in part by statute*, La R.S. 51:122(B); *Neugebauer v. A. S. Abell Co.*, 474 F. Supp. 1053, 1071 (D. Md. 1979) (state law claims for exclusive dealing, tying, monopolization and others treated like federal claims under Sherman Act because Maryland Antitrust Act, Md. Code Ann., Comm. Law, Sec. 11-204(a)-(b) "were 'carefully and purposefully patterned after their counterparts in the federal law,'") (*citing* General Revisor's Note to the Maryland Antitrust Act); *Little Caesar Enterprises, Inc. v. Smith*, 895 F. Supp. 884, 898 (E.D. Mich. 1995) ("Michigan antitrust law is identical to federal law and follows the federal precedents."); *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 626 (Minn. 2007) (citing *Minn. Twins P'ship v. State*, 592 N.W.2d 847, 851 (Minn.1999)) ("Minnesota antitrust law is generally interpreted consistently with federal antitrust law."); *Walker v. U-Haul Co. of Miss.*, 734 F.2d 1068, 1070 n.5 (5th Cir.), on reh'g, 747 F.2d 1011 (5th Cir. 1984) ("Courts treat federal and Mississippi state antitrust claims as 'analytically identical'"); *Salem Grain Company, Inc. v. Consolidated Grain and Barge Co.*, 900 N.W.2d 909, 922 (Neb. 2017) ("The NCPA is Nebraska's version of the Sherman Act, but it also encompasses portions of other federal antitrust law, including the FTCA…Further, the act was intended to be an antitrust measure to protect Nebraska consumers from monopolies and price-fixing conspiracies."); *Furniture Royal, Inc. v. Schnadig Int'l Corp.*, No. 2:18-CV-318, 2018 WL 6574779, at *4 (D. Nev. Dec. 13, 2018) (analysis under Nevada Unfair Trade Practices Act "is the same as the Sherman Act"); *Kenneth E. Curran, Inc. v. Auclair Transp.,* 128 N.H. 743, 748-49 (1986); *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F2d 589, 593 (1st. Cir. 1993); *Romero v. Philip Morris, Inc.*, 2010-NMSC-035, ¶ 18, 148 N.M. 713, 242 P.3d 280 ("It is therefore the duty of the courts to ensure that New Mexico antitrust law does not deviate from federal interpretations of antitrust law."); *Rose v. Vulcan Materials*, 282 N.C. 643, 655 (1973); *C.K. & J.K., Inc. v. Fairview Shopping Ctr. Corp.*, 63 Ohio St. 2d 201, 204 (1980); *Johnson v. Microsoft Corp.*, 106 Ohio St. 3d 278, 284 (2005); R.R. Gen. Laws § 6-36-2(b) ("[t]his chapter shall be construed in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable, except where provisions of this chapter are expressly contrary to applicable federal provisions as construed."); Tex. Bus. & Comm. Code § 15.04 ("The purpose of this Act is to maintain and promote economic competition in trade and commerce occurring wholly or partly within the State of Texas and to provide the benefits of that competition to consumers in the state [and] shall be construed in harmony with federal judicial interpretations of comparable federal antitrust statutes to the extent consistent with this purpose."); Utah Code. § 76-16-502(2) ("The Legislature intends that the courts, in construing this part, will be guided by interpretations given by the federal courts to comparable federal antitrust statutes and by other state courts to comparable state antitrust statutes"); *Boeing Co. v. Sierracin Corp.,* 108 Wn.2d 38, 54, 738 P.2d 665, 677 (1987) (citing RCW 19.86.920); W.Va. Code § 47-18-16 (West Virginia Antitrust laws "shall be construed liberally and in harmony with ruling judicial interpretations of comparable federal antitrust statutes."); *New York, by James v. Niagara-Wheatfield Cent. Sch. Dist.*, 119 F.4th 270, 279 (2d Cir. 2024), *cert. denied sub nom. Niagara-Wheatfield Cent. Sch. Dist. v. New York*, 146 S. Ct. 324 (2025); *California v. Infineon Techs. AG*, 531 F. Supp. 2d 1124 (N.D. Cal. 2007) ("[N]othing in Arizona's antitrust statute grants the Attorney General *parens patriae* authority."); Iowa Code §§ 553.1 *et seq.* (no provision for *parens patriae* actions); N.J. Stat. Ann. §§ 56:9-1 *et seq.* (no provision for *parens patriae* actions); Vt. Stat. Ann. tit. 9 §§ 2451 *et seq.* (no provision for *parens patriae* actions); Wis. Stat. Ann. §§ 133.01 *et seq.* (no provision for *parens patriae* actions); *State v.*

112

*City of Oak Creek*, 232 Wis. 2d 612, 627 (2000) ("The attorney general is devoid of the inherent power to initiate and prosecute litigation intended to protect or promote the interests of the state or its citizens and cannot act for the state as *parens patriae*."); *California v. Infineon Techs. AG*, 531 F. Supp. 2d 1124 (N.D. Cal. 2007) ("[T]here is no express grant of *parens patriae* authority to sue for damages on behalf of consumers in Wisconsin's antitrust statute."); Utah Code § 76-16-510.

**Defendants' Argument:**  Defendants object to Plaintiffs' inclusion of Arizona, Indiana, New Jersey, and Wisconsin in this instruction.

Arizona, New Jersey, and Wisconsin lack parens patriae authority to bring their state-law claims.  *See California v. Infineon Techs. AG*, 531 F. Supp. 2d 1124, 1165 (N.D. Cal. 2007) ("[N]othing in Arizona's antitrust statute grants the Attorney General *parens patriae* authority."); N.J. Stat. Ann. §§ 56:9-1 *et seq.* (no provision for *parens patriae* actions); Wis. Stat. Ann. §§ 133.01 *et seq.* (no provision for *parens patriae* actions); *State v. City of Oak Creek*, 232 Wis. 2d 612, 627 (2000) ("The attorney general is devoid of the inherent power to initiate and prosecute litigation intended to protect or promote the interests of the state or its citizens and cannot act for the state as *parens patriae*."); *California v. Infineon Techs. AG*, 531 F. Supp. 2d 1124 (N.D. Cal. 2007) ("[T]here is no express grant of *parens patriae* authority to sue for damages on behalf of consumers in Wisconsin's antitrust statute.").  Plaintiffs have provided no authority to the contrary.

As for Indiana, the antitrust statute of Indiana did not authorize parens patriae actions until July 1, 2023.  Ind. Code § 24-1-2-5.1 (granting parens patriae authority as of July 1, 2023).  And the statutory amendment authorizing such actions does not apply retroactively.  *Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-CV-02056 (MPS), 2025 WL 1207566, at *7 (D. Conn. Apr. 25, 2025) ("Indiana conceded that this amendment is not retroactive.").  Accordingly, Defendants have provided a separate instruction for Indiana, making clear that it can only recover for each Defendant's conduct that harmed Indiana residents and competition in Indiana occurring after the date on which Indiana authorized parens patriae actions.

113

**Post-Instruction No. 23**

### CALIFORNIA UNFAIR COMPETITION LAW
### (CAL. BUS. & PROF. CODE § 17200 *ET SEQ.*)

The State of California alleges that ~~Defendants have~~each Defendant has violated California's Unfair Competition Law, which prohibits ~~corporations from engaging in~~ unfair competition through unlawful or unfair business acts or practices.

For the State of California to prevail on its claim under the Unfair Competition Law, you must find that the State of California has proven each of the following elements by a preponderance of the evidence as to each Defendant:

1. ~~Defendants~~The Defendant engaged in a business act or practice;

~~1.~~2. The act or practice occurred within California, emanated from California, or harmed California residents; and

~~2.~~3. The act or practice is either unlawful or unfair.

~~The Unfair Competition Law imposes strict liability. It is not necessary for the State of California to show that Defendants intended to injure anyone.~~

~~You must find that the Defendants have violated the Unfair Competition Law if you find that Plaintiffs have satisfied the two elements above and find that Plaintiffs have proven by a preponderance of the evidence any one of the following: (1) the act or practice occurred within California; (2) the act or practice emanated from California; or (3) individuals in California were harmed by the act or practice~~

To determine whether acts or practices emanate from California, you may consider the location of the firm's headquarters, executives, or other employees involved in the conduct; where the relevant materials were created; where the relevant policies at issue were developed or executed; and where the firm conducts business. It is sufficient for the State of California to prove by a preponderance of

114

the evidence that several of these factors show that the acts or practices at issue emanated from California, but any single factor alone, without more, is insufficient to show that the acts or practices at issue emanated from California.

*Unlawful*

To establish a violation of the unlawful prong of the California Unfair Competition Law, the State of California must prove by a preponderance of the evidence that ~~Defendants have~~each Defendant has violated ~~any other~~another law, and that the act or practice that ~~violates~~violated that other law occurred within California or emanated from California or harmed ~~individuals in~~California residents. Therefore, if you find for Plaintiffs on ~~any other~~another claim and that ~~any~~the associated act or practice occurred within California or emanated from California or harmed ~~individuals in~~California residents, you must find that ~~Defendants have~~the Defendant who committed that act or practice violated the unlawful prong of California's Unfair Competition Law.

*Unfair*

To establish a violation of the unfair prong of the California Unfair Competition Law, the State of California must prove by a preponderance of evidence that ~~Defendants have~~each Defendant has:

1.    engaged in conduct that threatens an incipient violation of the antitrust laws or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition; or

2.    engaged in a business act or practice for which the harm to consumers outweighs the utility of the conduct.

These tests are not mutually exclusive and you may find that Plaintiffs have proven a violation of (1) or (2) or both (1) and (2).

A business act or practice may be unfair even if not prohibited by some other law such as the Sherman Act. ~~Plaintiffs do *not* need to define any relevant market as described in my prior instructions~~

115

~~regarding the Sherman Act (Preliminary Instructions Nos. 10 and 11 and Post-Instructions Nos. 11 and 16 through 27 are not applicable) or perform any market definition exercise to prove a violation of the unfair prong (Post-Instructions Nos. 13 through 15 are not applicable). Plaintiffs do *not* need to establish any antitrust injury to prove a violation of the unfair prong (Post-Instruction Nos. 37 and 38 are not applicable).~~

In order to find a violation of the unfair prong of the Unfair Competition Law, you must also find that the act or practice that satisfies either test of that prong occurred ~~of that prong~~ within California or emanated from California or harmed ~~individuals in~~ California. residents.

**Plaintiffs' Authority**: *People v. Ashford Univ., LLC*, 100 Cal. App. 5th 485, 506-07, 519 (2024) (citing *Abbott Laboratories v. Superior Court*, 9 Cal. 5th 642, 651-652 (2020); *Fernandez v. CoreLogic Credco*, LLC, 593 F. Supp. 3d 974, 992 (S.D. Cal. 2022); *Ehret v. Uber Techs., Inc.*, 68 F. Supp. 3d 1121, 1131-32 (N.D. Cal. 2014) (finding that a plaintiff had plausibly alleged a "sufficient nexus" and that allegedly unlawful misrepresentations "emanated from California" where the plaintiff alleged misrepresentations were developed in California, contained on a website and application maintained in California, and that billing went through servers located in California); *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 598-99 (S.D. Cal. 2008); *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1000 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 681 (2024) ("As the UCL's three-prong structure makes clear, a business practice may be 'unfair,' and therefore illegal under the UCL, 'even if not specifically proscribed by some other law.'" (*citing Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999))); *Id.* ("First, to support 'any finding of unfairness to *competitors*,' a court uses the 'tethering' test, which asks whether the defendant's conduct 'threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.'" (quoting *Cel-Tech*, 20 Cal. 4th at 186-87); *Id.* ("Second, to support a finding of unfairness to consumers, a court uses the balancing test, which 'weigh[s] the utility of the defendant's conduct against the gravity of the harm to the alleged victim.'" (quoting *Progressive W. Ins. Co. v. Super. Ct.*, 135 Cal. App. 4th 263, 285 (2005) (citation omitted))); *Id.* at 1002 (rejecting the defendant's argument that the UCL "mandates trial courts to define a relevant market and then conduct the balancing test within that market (similar to the Rule of Reason)" because the defendant did "not cite to any California authority for this proposition" and that "such a rule runs contrary to California courts' repeated instruction that '[n]o inflexible rule can be laid down as to what conduct will constitute unfair competition.'" (quoting *Pohl v. Anderson*, 13 Cal. App. 2d 241, 242 (1936))); *In re Google Play Store Antitrust Litig.*, 147 F.4th 917, 933 n.3 (9th Cir. 2025) ("The UCL forbids not only 'unlawful' but 'unfair' conduct, thus allowing for liability even when there is a failure to prove an antitrust claim, as we held in *Epic Games, Inc. v. Apple Inc* . . . [t]he UCL claim survives independent of any antitrust liability").

**Plaintiffs' Position:** Plaintiffs have proposed an instruction that correctly describes the only two elements of California's Unfair Competition Law ("UCL") at issue here: (1) Defendants engaged in

116

a business act or practice and (2) the act or practice is either unlawful or unfair. Cal. Bus. & Prof. Code § 17200 *et seq.*; *see Epic Games v. Apple*, 67 F.4th 946, 1000 (9th Cir. 2023) ("*Epic*"). The UCL is a strict liability statute. *See Hewlett v. Squaw Valley Ski Corp.*, 54 Cal. App. 4th 499, 520 (Cal. Ct. App. 1997) ("The [UCL] statute imposes strict liability. It is not necessary to show that the defendant intended to injure anyone.").

Plaintiffs' proposed instruction lists examples of the factors from caselaw that can be considered when evaluating whether conduct emanated from California for the purposes of out-of-state liability. *See People v. Ashford Univ., LLC,* 100 Cal. App. 5th 485, 518 (2024). Defendants' proposed instruction is unsupported by the cases they cite. In those cases, one factor was not enough to show that conduct emanated from California, but they do not stand for the proposition that one factor is always insufficient. *Sullivan v. Oracle,* which was specifically limited to the "circumstances of [that] case" as stipulated by the parties, declined to apply the UCL to nonresidents when the stipulated facts "identif[ed] only a single instance of relevant conduct occurring in California" that was not "unlawful in the abstract." 51 Cal. 4th 1191, 1208 (2011). The court in *Aghaji v. Bank of America* noted that the plaintiffs failed to even "disclose what information they have that leads them to believe that the alleged violations occurred in . . . California facilities" and failed to allege a violation "in California as to any Plaintiff." 247 Cal. App. 4th 1110, 1119-20 (2016). *Norwest Mortgage v. Superior Court* is also distinguishable because in that case the harm to "nonresident members of the nationwide class" was "caused by conduct occurring outside of California's borders by actors headquartered and operating outside of California." 72 Cal. App. 4th 214, 228 (1999).

In addition, Plaintiffs' proposed instruction correctly states that the UCL applies where "individuals in California" were harmed. Defendant's proposed instruction, which requires harm to "California residents[,]" is inappropriate because the UCL applies to both residents and "nonresidents of California." *Ashford*, 100 Cal. App. 5th at 519, 524 (2024).

Finally, as many of the earlier jury instructions refer to relevant antitrust markets and other antitrust concepts, it is appropriate and necessary to instruct the jury that the UCL does not require any market definition or showing of antitrust injury. *Epic*, 67 F.4th at 1001-02 (rejecting defendant's argument that "the UCL mandates trial courts to define a relevant market and then conduct the balancing test within that market (similar to the Rule of Reason)" because defendant "does not cite any California authority for this proposition" and "such a rule runs contrary to California courts' repeated instruction that '[n]o inflexible rule can be laid down as to what conduct will constitute unfair competition'" (citation omitted)).

**Defendants' Authority**: *People v. Ashford Univ., LLC*, 100 Cal. App. 5th 485, 506-07, 519-20 (2024) (the trial court properly determined that defendants' conduct emanated from California and had cited "evidence that defendants were headquartered in San Diego, and Ashford's former presidents, admissions counselors, and the majority of admissions employees worked in San Diego"); *Fernandez v. CoreLogic Credco*, LLC, 593 F. Supp. 3d 974, 992 (S.D. Cal. 2022) (refusing to dismiss UCL claim and finding it plausible that unlawful conduct emanated from California in lawsuit brought by Maryland resident against a firm that had its principal place of business in California, management level employees in California, and that the policies and procedures at issue in this case were developed, designed, and implemented in California); *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1000 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 681 (2024) ("As the UCL's three-prong structure makes clear, a

117

business practice may be 'unfair,' and therefore illegal under the UCL, 'even if not specifically proscribed by some other law.'" (*citing Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999))); *Id.* ("First, to support 'any finding of unfairness to *competitors*,' a court uses the 'tethering' test, which asks whether the defendant's conduct 'threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.'" (quoting *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 186-87 (1999))); *Id.* ("Second, to support a finding of unfairness to consumers, a court uses the balancing test, which 'weigh[s] the utility of the defendant's conduct against the gravity of the harm to the alleged victim.'" (*quoting Progressive W. Ins. Co. v. Super. Ct.*, 135 Cal. App. 4th 263, 285 (2005) (citation omitted))); *Aghaji v. Bank of America, N.A.*, 247 Cal. App. 4th 1110, 1119 (Cal. Ct. App. 2016) ("[P]laintiffs who are not California residents must also allege facts to show that the alleged violations occurred within California, because California's unfair competition law does not apply extraterritorially."); *id.* at 1119-20 (finding insufficient that defendant had "processing facilities and personnel in California" and that is "where the misapplied payments were received or that is from where the improper charges or improper crediting of payments occurred"); *Norwest Mortgage, Inc. v. Superior Court*, 72 Cal. App. 4th 214, 222 (Cal. App. 1999) ("non-California residents for whom [defendant's] conduct. . . occurred in states other than California (Category III members)" could "not assert UCL claims"); *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1209 (Cal. 2011) ("that [defendant's] decision. . . was made in California does not, standing alone, justify applying the UCL to the nonresident plaintiffs' FLSA claims for overtime worked in other states.").

**Defendants' Argument:**  *First*, in order to simplify this instruction, Defendants propose a three-element structure rather than a two-element structure.  As Defendants understand it, California does not dispute that in addition to proving that each Defendant engaged in a business act or practice that was either unlawful or unfair, the State must prove a territorial nexus between that act or practice and California.  Listing the territorial nexus requirement with the other two requirements makes this instruction easier to understand for the jury and ensures that Defendants will not be prejudiced in the event that the jury overlooks the territorial nexus requirement because it is not listed as an element.

*Second*, Defendants object to California's language suggesting that "individuals in California [] harmed by the act or practice," without more, are covered by the Unfair Competition Law (UCL).  The caselaw distinguishes between California residents and non-residents, not between individuals within and outside California. *See Aghaji v. Bank of America, N.A.*, 247 Cal. App. 4th 1110, 1119 (Cal. Ct. App. 2016) ("[P]laintiffs who are not California residents must also allege facts to show that the alleged violations occurred within California, because California's unfair competition law does not apply extraterritorially."); *Norwest Mortgage, Inc. v. Superior Court*, 72 Cal. App. 4th 214, 222 (Cal. App. 1999) ("non-California residents for whom [defendant's] conduct . . . occurred in states other than California" could "not assert UCL claims"); *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1209 (Cal. 2011) ("that [defendant's] decision . . . was made in California does not, standing alone, justify applying the UCL to the nonresident plaintiffs' FLSA claims for overtime worked in other states"). California's proposed instruction is misleading and prejudicial to Defendants because it suggests that the UCL covers anyone who happened to be injured in California at some point, even if that person is a resident of a different State.

Importantly, if that interpretation of the UCL were right (it is not), then it is possible that Plaintiff States might obtain double recoveries in this lawsuit.  In other words, California could recover for a Texas resident who was injured in California at some point, and Texas could also recover for that

118

Texas resident.  That prospect severely prejudices Defendants and violates the basic damages principle that "only a single recovery is allowed" for one injury.  *Conway v. Icahn & Co., Inc.*, 16 F.3d 504, 511 (2d Cir. 1994).

*Third*, Defendants object to California's recitation of things it need not prove (intent to injure, market definition, antitrust injury).  Defendants' proposed instruction—like all other instructions in this document—straightforwardly lists what Plaintiffs must prove to prevail.  Reciting elements that must not be proven adds unnecessary length and risks confusing the jury.

119

**Post-Instruction No. 24**

**FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT (FLA. STAT. § 501.204)**

The State of Florida alleges that Defendants' anticompetitive conduct violated the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), which broadly prohibits persons from engaging in unfair methods of competition in the conduct of any trade or commerce. based in or directed toward the State of Florida.

To establish a violation of the FDUTPA based on anticompetitive conduct, Florida must prove by a preponderance of the evidence that ~~Defendants~~each Defendant engaged in an unfair method of competition. ~~Even if the method of competition does not rise to the level of an antitrust violation, you may find it violates the FDUTPA if you find such method of competition was otherwise unfair.~~

*Unfair Methods of Competition*

~~An act is an "unfair~~A method of competition is "unfair" if the conduct goes beyond competition on the merits. Competition on the merits may include, for example, superior products or services, superior business skills, or truthful marketing and advertising practices. Conduct goes beyond competition on the merits if it is coercive, exploitative, collusive, abusive, deceptive, predatory, or exclusionary and tends to ~~negatively affect competitive conditions~~foreclose competition. To be "unfair," the act or practice must cause or be likely to cause substantial injury to consumers which is not reasonably avoidable and not outweighed by countervailing benefits to consumers or to competition.

Violations of antitrust laws also constitute "unfair methods of competition" under the FDUTPA. Therefore, if you find that the State of Florida proves by a preponderance of the evidence that ~~Defendants~~each Defendant violated the Sherman Act through conduct based in or directed toward the State of Florida, you may find that such conduct by ~~Defendants~~such Defendant also violated the FDUTPA.

**Plaintiffs' Authority**: Fla. Stat. § 501.204 (in construing prohibited conduct under FDUTPA, "due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. s. 45(a)(1)"); Fla. Stat. § 501.203(3)(b)-(c) (violations of FDUTPA may be based on, inter alia, "[t]he standards of unfairness and deception set forth and interpreted by the Federal Trade Commission or the federal courts" or "[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices"); Federal Trade Commission, Comm'n File No. P221202, Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act (Nov. 10, 2022) at 8-9; *See United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) (distinguishing unlawful acquisition or maintenance of monopoly power from consequences of "a superior product, business acumen, or historic accident"); *see F.T.C. v. Sperry & Hutchinson*, 405 U.S. 233, 243-44 (1972) (construing Section 5 to reach conduct shown to exploit consumers); *Atlantic Refining Co. v. F.T.C.*, 381 U.S. 357, 369 (1965) (finding an unfair method of competition where the defendant "utilize[ed] … economic power in one market to curtail competition in another," which was "bolstered by actual threats and coercive practices"); *F.T.C. v. Texaco*, 393 U.S. 223, 228-29 (1968) (finding an unfair method of competition where the defendant used its "dominant economic power … in a manner which tended to foreclose competition"); *E.I. du Pont de Nemours v. F.T.C.*, 729 F.2d 128, 140 (2d Cir. 1984) (finding that unfair methods of competition includes practices that are "collusive, coercive, predatory, restrictive, or deceitful" as well as "exclusionary"); *Mack v. Bristol-Myers Squibb Co.*, 673 So. 2d 100, 104 (Fla. 1st DCA 1996) ("[T]he acts proscribed by subsection 501.204(1) include antitrust violations."); *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 235 F. Supp. 2d 1269, 1286 (M.D. Fla. 2002), *aff'd,* 364 F.3d 1288 (11th Cir. 2004) ("FDUTPA is to be construed consistently with antitrust law.");  *see also F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 454 (1986) ("unfairness" under the FTCA encompasses "practices that violate the Sherman Act and the other antitrust laws . . . but also practices that the [FTC] determines are against public policy for other reasons"); *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 609 (1953) (tying arrangement that violates § 1 of the Sherman Act "transgresses s 5 of the [FTCA], since minimally that section registers violations of the Clayton and Sherman Acts"); *Crawford v. Am. Title Ins. Co.*, 518 F.2d 217, 218-19 (5th Cir. 1975) ("[I]t has been uniformly held that 'a violation of the Sherman Act is an 'unfair method of competition' under the [FTCA].'") (citations omitted).


**Defendants' Authority**: Fla. Stat. § 501.204 (in construing prohibited conduct under FDUTPA, "due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. 45(a)(1)"); Fla. Stat. § 501.203(3)(b)-(c) (violations of FDUTPA may be based on, inter alia, "[t]he standards of unfairness and deception set forth and interpreted by the Federal Trade Commission or the federal courts" or "[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices"); Federal Trade Commission, Comm'n File No. P221202, Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act (Nov. 10, 2022) at 8-9; *See U.S. v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) (distinguishing unlawful acquisition or maintenance of monopoly power from consequences of "a superior product, business acumen, or historic accident"); *see Sperry & Hutchinson*, 405 U.S. at 905 (construing Section 5 to reach conduct shown to exploit consumers); *Atlantic Refining Co. v. Fed. Trade Comm'n*, 381 U.S. 357, 369 (1965) (finding an unfair method of competition where the defendant "utilize[ed] … economic power in one market to curtail competition in another," which was "bolstered by actual threats and coercive practices"); *Fed. Trade Comm'n v.*

121

*Texaco*, 393 U.S. 223, 228-29 (1968) (finding an unfair method of competition where the defendant used its "dominant economic power … in a manner which tended to foreclose competition"); *E.I. du Pont de Nemours v. Fed. Trade Comm'n (Ethyl)*, 729 F.2d 128, 140 (finding that unfair methods of competition includes practices that are "collusive, coercive, predatory, restrictive, or deceitful" as well as "exclusionary"); *Mack v. Bristol-Myers Squibb Co.*, 673 So. 2d 100, 104 (Fla. 1st DCA 1996) ("[T]he acts proscribed by subsection 501.204(1) include antitrust violations."); *Morris Commc'ns Corp. v. PGA Tour, Inc.,* 235 F. Supp. 2d 1269, 1286 (M.D. Fla. 2002), *aff'd,* 364 F.3d 1288 (11th Cir. 2004) ("FDUTPA is to be construed consistently with antitrust law."); *see also F.T.C. v. Indiana Fedn. of Dentists*, 476 U.S. 447, 454 (1986) ("unfairness" under the FTCA encompasses "practices that violate the Sherman Act and the other antitrust laws... but also practices that the [FTC] determines are against public policy for other reasons"); *Times-Picayune Pub. Co. v. U.S.*, 345 U.S. 594, 609 (1953) (tying arrangement that violates § 1 of the Sherman Act "transgresses s 5 of the [FTCA], since minimally that section registers violations of the Clayton and Sherman Acts"); *Crawford v. Am. Title Ins. Co.*, 518 F.2d 217, 218-19 (5th Cir. 1975) ("[I]t has been uniformly held that 'a violation of the Sherman Act is an 'unfair method of competition' under the [FTCA].'") (citations omitted); *Team Servs., Inc. v. Securitas Elec. Sec., Inc.*, No. 1:21-CV-21026-KMM, 2021 WL 9350987, at *5 (S.D. Fla. Aug. 9, 2021), *aff'd*, No. 22-12840, 2023 WL 6890660 (11th Cir. Oct. 19, 2023) ("FDUTPA applies only to action that occurred within the state of Florida."); *Millennium Comm'ns & Fulfillment, Inc. v. Office of Attorney General, Dep't of Legal Affairs*, 761 So. 2d 1256, 1262 (Fla. Ct. App. 2000) ("As we read FDUTPA, it seeks to prohibit unfair, deceptive and/or unconscionable practices which have transpired within the territorial boundaries of this state without limitation."); *Zarfati v. Artsana USA, Inc.*, No. 1:24-cv-21372-KMM, 2025 WL 373081, at *12 (S.D. Fla. Jan. 15, 2025) (plaintiffs stated a FDUTPA claim by alleging that "deceptive acts and unfair practices were at a minimum aimed at consumers in Florida"); Federal Trade Commission Act Amendments of 1994, codified as amended at 15 U.S.C. § 45(n) (1994) (codifying FTC Policy Statement on Unfairness (Dec. 17, 1980)), *appended to Int'l Harvester Co.*, 104 F.T.C. 949, 1070 (1984) ("The Commission shall have no authority under this section or section 57a of this title to declare unlawful an act or practice on the grounds that such act or practice is unfair unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition."); *Porsche Cars North America, Inc. v. Diamond*, 140 So. 3d 1090, 1097-98 (Fla. Ct. App. 2014) ("Following the clear and unambiguous directive of sections 501.203(3)(b), 501.204(2), and 501.202(3), Florida Statutes, we hold 1980 Policy Statement's definition of unfair trade practice should be used when interpreting FDUTPA.").

**Defendants' Argument:**  Defendants' proposed instruction requires that any unfair method of competition have been based in or directed toward Florida.  This requirement is well-established in Florida law:  FDUTPA seeks to prohibit unfair practices that "transpire[] within the territorial boundaries" of Florida. *Millennium Comm'ns & Fulfillment, Inc. v. Office of Attorney General, Dep't of Legal Affairs*, 761 So. 2d 1256, 1262 (Fla. Ct. App. 2000); *see also Team Servs., Inc. v. Securitas Elec. Sec., Inc.*, No. 1:21-CV-21026-KMM, 2021 WL 9350987, at *5 (S.D. Fla. Aug. 9, 2021), *aff'd*, No. 22-12840, 2023 WL 6890660 (11th Cir. Oct. 19, 2023) ("FDUTPA applies only to action that occurred within the state of Florida.").  Courts have interpreted FDUTPA to encompass acts occurring within Florida as well as acts "aimed at consumers" in the State. *Zarfati v. Artsana USA, Inc.*, No. 1:24-cv-21372-KMM, 2025 WL 373081, at *12 (S.D. Fla. Jan. 15, 2025).  A territorial nexus requirement must be included to reflect the proper scope of FDUTPA.

122

Defendants' proposed instruction also includes the requirement that an unfair act or practice must cause or be likely to cause a substantial injury. FDUTPA embraces the Federal Trade Commission's (FTC) interpretations of Section 5(a)(1) of the Federal Trade Commission Act (FTCA). Fla. Stat. § 501.204(2); *Porsche Cars North America, Inc. v. Diamond*, 140 So. 3d 1090, 1097-98 (Fla. Ct. App. 2014) ("Following the clear and unambiguous directive of sections 501.203(3)(b), 501.204(2), and 501.202(3), Florida Statutes, we hold 1980 Policy Statement's definition of unfair trade practice should be used when interpreting FDUTPA."). The FTC's 1980 Policy Statements restrict authority under the FTCA to only those unfair acts that are "likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." Federal Trade Commission Act Amendments of 1994, codified as amended at 15 U.S.C. § 45(n) (1994) (codifying FTC Policy Statement on Unfairness (Dec. 17, 1980)), *appended to Int'l Harvester Co.*, 104 F.T.C. 949, 1070 (1984). That restriction of authority must be reflected here as well.

Defendants object to language in the second paragraph indicating that an unfair method of competition or an antitrust violation can violate FDUTPA. This language is redundant as the next two paragraphs sufficiently explain those two ways of violating FDUTPA. Repetition of this point adds unnecessary length and risks confusing the jury and prejudicing Defendants. Moreover, Plaintiffs' allegations in this case have rested on antitrust violations, and Plaintiffs have not provided any theories or facts—let alone Florida-specific theories or facts—to support non-antitrust consumer protection violations.

123

**Post-Instruction No. 25**

### ILLINOIS ANTITRUST ACT (740 ILCS 10/1 *ET SEQ.*)

The State of Illinois has brought claims under the Illinois Antitrust Act~~, 740 ILCS 10/1 *et seq*. Illinois' claims under the Illinois Antitrust Act are based on the same conduct as its claims under the Sherman Act.~~

~~.~~ The elements of proof for claims under this statute are the same as under Section 1 of the Sherman Act. If you find for Plaintiffs and against <u>one or more</u> Defendants on Plaintiffs' claims under Section 1 of the Sherman Act for unlawful exclusive dealing and unlawful tying, and Illinois proves by a preponderance of the evidence that <u>one or more</u> Defendants' conduct ~~that~~ harmed competition ~~nationwide, including~~ in Illinois, then you must find for the State of Illinois and against ~~Defendants~~<u>the relevant Defendant</u> on those same claims under the Illinois Antitrust Act. If you find for <u>one or more</u> Defendants on Plaintiffs' claims under Section 1 of the Sherman Act for unlawful exclusive dealing and unlawful tying, you must find for the ~~Defendants~~<u>relevant Defendant</u> under those same claims under the Illinois Antitrust Act.

For claims under the Illinois Antitrust Act involving ~~the monopolization of the market for use of amphitheaters by artists using anticompetitive exclusionary practices, the elements of proof are the same as under Section 2 of the Sherman Act, except the State of Illinois must also prove that the Defendants unreasonably restrained trade or commerce by establishing or maintaining a monopoly by contract, combination, or conspiracy with one or more other persons. If you find for Plaintiffs and against Defendants on Plaintiffs' claims of monopolization of market for use of amphitheaters by artists, by using anticompetitive exclusionary practices under Section 2 of the Sherman Act, and Illinois proves by a preponderance of the evidence that Defendants unreasonably restrained trade or commerce by contract, combination, or conspiracy with one or more other persons, and that~~

~~Defendants engaged in unlawful conduct that harmed competition nationwide, including in Illinois, then you must also find for the State of Illinois on those claims under the Illinois Antitrust Act and against the Defendants. If you find for Defendants on Plaintiffs' claims of monopolization of the markets for amphitheaters, for venue booking services and artists promotion services by using anticompetitive exclusionary practices under Section 2 of the Sherman Act, or Illinois fails to prove the existence of a contract, combination, or conspiracy in connection with that claim, then you must find for Defendants for those claims under the Illinois Antitrust Act.~~

~~For the claim under the Illinois Antitrust Act involving the monopolization of primary concert ticketing and primary ticketing, the elements of proof are the same as under Section 2 of the Sherman Act, except the State of Illinois must~~monopolization, the elements of proof are the same as under Section 2 of the Sherman Act, except the State of Illinois must also prove that Defendants acted with the purpose of excluding competition or controlling, fixing, or maintaining prices in ~~these~~the relevant ~~markets~~market. If you find for Plaintiffs and against one or more Defendants under Plaintiffs' ~~claim~~claims under Section 2 of ~~monopolization of primary concert ticketing or primary ticketing~~the Sherman Act, and Illinois proves by a preponderance of evidence that one or more Defendants acted with the purpose of excluding competition or controlling, fixing, or maintaining prices in ~~these~~the relevant ~~markets~~market, and ~~Defendants engaged in unlawful~~that one or more Defendants' conduct ~~that~~ harmed competition ~~nationwide, including~~ in Illinois, then you must also find for the State of Illinois on those same claims under the Illinois Antitrust Act and against ~~Defendants.~~the relevant Defendant. If you find for one or more Defendants on Plaintiffs' claims under Section 2 of the Sherman Act ~~related to the monopolization of primary concert ticketing or~~~~primary ticketing~~, or that the State of Illinois fails to prove that one or more Defendants acted with the purpose of excluding competition or controlling, fixing, or maintaining prices in the relevant market, then you must find for the relevant Defendants for that claim under the Illinois Antitrust Act.

125

**Plaintiffs' Authority:** 740 ILCS 10/3(2); 740 ILCS 10/3(3); 740 ILCS 10/11; *Gilbert's Ethan Allen Gallery v. Ethan Allen, Inc.*, 251 Ill. App. 3d 17, 24 (1993), *aff'd*, 162 Ill. 2d 99 (1994).

**Plaintiffs' Position:** The parties disputes regarding the Illinois's claims under the Illinois Antitrust Act ("IAA") in part mirror those discussed above. First, for the reasons stated regarding Post-Instruction No. 25, Defendants' actions should be evaluated collectively. Second, as discussed above, Plaintiffs will collectively present evidence to prove that Defendants' conduct harmed competition nationwide. Defendants' proposal may suggest that Illinois is independently required to put on a separate case, which is not correct. To avoid juror confusion while ensuring an evaluation of State impact, the jury should be instructed to determine whether the evidence presented by Plaintiffs is sufficient to show that Defendants' conduct harmed competition in Illinois.

The parties agree that Illinois' claims under the IAA and Section 1 of the Sherman Act are congruent because the wording of the IAA is identical or similar to that of the Sherman Act. 740 ILCS 10/11; *Int'l Star Registry v. RGIFT Ltd.*, 2024 WL 3594644, *3 (N.D. Ill. July 31, 2024). With respect to Illinois's claims under Sections 3(2) and 3(3) of the IAA, those claims are largely congruent with Section 2 of the Sherman Act. Where additional proof elements are required, Illinois has added appropriate language in its proposed jury instructions consistent with Illinois' claims and the wording of Sections 3(2) and 3(3) of the IAA. *See* 740 ILCS 10/3(2); 740 ILCS 10/3(3); *Gilbert's Ethan Allen Gallery v. Ethan Allen, Inc.*, 251 Ill. App. 3d 17, 24 (1993), *aff'd*, 162 Ill. 2d 99 (1994). Plaintiffs revisions inappropriately delete instructions on Section 3(2) of the Illinois Antitrust Act. Conduct that violates Section 2 of the Sherman Act may violate both Sections 3(2) and 3(3) of the Illinois Antitrust Act, and instructing the jury on both is appropriate. *See Force Partners, LLC v. KSA Lighting & Controls, Inc.,* 2022 WL 580808, at *18 (N.D. Ill. February 25, 2022).

**Defendants' Authority:** *Gilbert's Ethan Allen Gallery v. Ethan Allen, Inc.*, 251 Ill. App. 3d 17, 24 (1993), *aff'd*, 162 Ill. 2d 99 (1994) ("[T]he Illinois Act requires more proof than section 2 of the Sherman Act for a court to find that a defendant violated section 3(3) of the Illinois Act, in that not only must the plaintiff prove that defendant established, maintained, used, or attempted to acquire monopoly power over any substantial part of trade or commerce but, in addition, plaintiff must prove that defendant did so for the purpose of excluding competition or controlling, fixing, or maintaining prices in that trade or market.").

**Defendants' Argument:** For monopolization claims under the Illinois Antitrust Act, "not only must the plaintiff prove that defendant established, maintained, used, or attempted to acquire monopoly power over any substantial part of trade or commerce but, in addition, plaintiff must prove that defendant did so for the purpose of excluding competition or controlling, fixing, or maintaining prices in that trade or market." *Gilbert's Ethan Allen Gallery v. Ethan Allen, Inc.*, 251 Ill. App. 3d 17, 24 (1993), *aff'd*, 162 Ill. 2d 99 (1994). Defendants' proposed instruction has added this additional element for monopolization claims under the Illinois Antitrust Act. Defendants see no need to discuss the alleged markets separately in this instruction.

**Post-Instruction No. 25D**

### INDIANA ANTITRUST ACT (IND. CODE §§ 24-1-2-1 AND 24-1-2-2)

126

The State of Indiana has brought claims under the Indiana Antitrust Act. The State of Indiana is authorized to bring claims under this Act only for conduct that occurred after July 1, 2023. So conduct that occurred before July 1, 2023 cannot form a basis for liability under this statute. If the State of Indiana fails to provide evidence of conduct that occurred and harmed competition in Indiana after July 1, 2023, you must find for Defendants on this claim.

For conduct that occurred after July 1, 2023, if you find that the State of Indiana has proven every element of a Sherman Act Section 1 or Section 2 claim against a particular Defendant, and that the particular Defendant's conduct harmed competition in Indiana, then you may find that the State of Indiana has also proven the elements of the Indiana Antitrust Act as to that particular Defendant.

**Plaintiffs' Authority**: Ind. Code § 24-1-2-5.1 (2008), 2008 Ind. Legis. Serv. P.L. 125-2008 (H.E.A. 1179) (WEST) (stating that the attorney general may bring an action on behalf of the State for injuries or damages sustained directly or indirectly as a result of a violation of Indiana's Antitrust Act); *Bd. Of Commissioner's of Howard Cty. v. Kokomo City Plan Comm.,* 330 N.E. 2d 92, 101 (Ind. 1975) (recognizing "a state may act as *parens patriae* on behalf of its citizens"); Ind. Code § 4-6-3-2 ("attorney general shall have charge of and direct the prosecution of all civil actions that are brought in the name of the state of Indiana…"); "It shall be the duty of the attorney general . . . to institute appropriate proceedings to prevent and restrain violations of the provisions of this chapter or any other statute or the common law relating to the subject matter of this chapter and to prosecute any person or persons guilty of having violated any of the penal provisions thereof . . . The attorney general may file such proceedings upon the attorney general's own relation or that of any private person in any circuit or superior court of the state, without applying to such court for leave, when the attorney general shall deem it the attorney general's duty so to do." Indiana Code § 24-1-2-5; see also Ind. Code § 24-1-1-2 ("It is hereby made the duty of the attorney general of the state to enforce this section by due process of law."); *Bi-Rite Oil Co. v. Ind. Farm Bureau Coop. Ass'n*, 720 F. Supp. 1363, 1378 (S.D. Ind. 1989), *aff'd*, 908 F.2d 200 (7th Cir. 1990) ("Indiana antitrust law . . . was substantially patterned after the federal Sherman Antitrust Act and references to decisional law under the Sherman Act may be made in construing Indiana antitrust provisions . . . .").

**Plaintiffs' Position**: Indiana's state law claims are not time limited as Defendants contend. The amendments in 2023 had the effect of adding specific penalties, and clarifying authority that already resided with the Indiana Attorney General. The Indiana Supreme Court has held that the state has *parens patriae* authority to act on behalf of its citizens, and Indiana's Antitrust Act provided the Attorney General with authority to bring claims for injuries or damages sustained directly or indirectly prior to the amendments in 2023.  Defendants' proposed instruction erroneously appears to

127

limit any liability for antitrust violations that Indiana is duly authorized to enforce. Indiana should be included in Post-Instruction 22 and Post-Instruction 25D should not be issued.

**Defendants' Authority:** Ind. Code § 24-1-2-5.1 (granting parens patriae authority as of July 1, 2023); *State ex rel. Steers v. Crim. Ct. of Lake Cnty.*, 232 Ind. 443, 447 (1953) ("the Attorney General of Indiana has no common law powers, and that his rights, powers and duties are statutory"); *Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-CV-02056 (MPS), 2025 WL 1207566, at *7 (D. Conn. Apr. 25, 2025) ("Indiana conceded that this amendment is not retroactive.").

**Defendants' Argument:**  The Indiana Antitrust Act did not authorize parens patriae actions until July 1, 2023.  Ind. Code § 24-1-2-5.1 (granting parens patriae authority as of July 1, 2023).  And the statutory amendment authorizing such actions does not apply retroactively. *Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-CV-02056 (MPS), 2025 WL 1207566, at *7 (D. Conn. Apr. 25, 2025) ("Indiana conceded that this amendment is not retroactive.").  Accordingly, Defendants' proposed instruction makes clear that Indiana's recovery under the Indiana Antitrust Act is limited to each Defendant's conduct occurring after July 1, 2023 that harmed Indiana residents and competition in Indiana.

128

**Post-Instruction No. 26**

## KANSAS RESTRAINT OF TRADE ACT (KAN. STAT. ANN. § 50-101 *ET SEQ.*)

The State of Kansas has brought claims under the Kansas Restraint of Trade Act~~, Kan. Stat. Ann. § 50-101 *et seq*. Kansas's claims under the Kansas Restraint of Trade Act are based on the same conduct as its claims under the Sherman Act.~~

~~For claims under the Kansas involving the restraint of competition by contracts, agreements, arrangements, or combinations, the elements of proof are the same as under Section 1 of the Sherman Act. If you find for Plaintiffs and against Defendants on Plaintiffs' claims under Section 1 of the Sherman Act regarding unlawful exclusive dealing or unlawful tying, and Kansas proves by a preponderance of the evidence that Defendants engaged in unlawful conduct that harmed competition nationwide, including in Kansas, then you must also find for the State of Kansas and against Defendants on those same claims under the Kansas Restraint of Trade Act. If you find for Defendants under Plaintiffs' claims under Section 1 of the Sherman Act for unlawful exclusive dealing or unlawful tying, you must find for Defendants under those same claims under the Kansas Restraint of Trade Act.~~

. The elements of proof for monopolization claims under this statute are the same as under Section

~~For claims under the Kansas Restraint of Trade Act involving monopolization, the elements of proof for claims under this statute are the same as under Section~~ 2 of the Sherman Act, except the State of Kansas must also prove the existence of concerted or joint action with another party. If you find for Plaintiffs and against one or more Defendants on Plaintiffs' monopolization claims under Section 2 of the Sherman Act, and Kansas proves by a preponderance of the evidence that one or more Defendants acted jointly or in concert with another party, and that one or more Defendants' conduct harmed competition in Kansas, then you must also find for the State of Kansas on those same claims under the

129

Kansas Restraint of Trade Act and against the relevant Defendants. If you find for one or more Defendants on Plaintiffs' claims under Section 2 of the Sherman Act, or that the State of Kansas failed to prove that one or more Defendants acted jointly or in concert with another party, then you must find for the relevant Defendants under those claims under the Kansas Restraint of Trade Act.

**Plaintiffs' Authority:** Kan. Stat. Ann. §§ 50-102, 112, 163(b).

**Plaintiffs' Position:** Defendants appear to take the position that Kansas is not able to pursue state law claims analogous to Section 1 of the Sherman Act, based on a prior dismissal of its state law claims in the *In re Elec. Books Antitrust Litigation*. As discussed above (*see* Post-Instruction No. 25), the voluntary dismissal of a claim in prior litigation has no bearing on Kansas's ability to bring those claims here. And under Kansas's harmonization statute, the Kansas Restraint of Trade Act and Section 1 of the Sherman Act are congruent. *See* Kan. Stat. Ann. § 50-163(b).

**Defendants' Authority:** Memorandum Endorsing Plaintiff States' Motion to Voluntarily Dismiss Certain State Law Claims, *In re Elec. Books Antitrust Litig.*, No. 1:11-md-02293-DLC (S.D.N.Y, May 29, 2013), ECF No. 352 (voluntarily dismissing claim under Kansas Restraint of Trade Act); *In re Elec. Books Antitrust Litig.*, No. 11 MD 2293 DLC, 2014 WL 2535112, at *2 (S.D.N.Y. June 5, 2014) ("The States moved on May 28 to voluntarily dismiss all state law claims not congruent with Section 1 of the Sherman Act. The Court granted that motion on May 29."); *In re Effexor Antitrust Litig.*, 357 F. Supp. 3d 363, 394 (D.N.J. 2018) ("[T]he case law as well as the plain language of the Kansas. . . antitrust statute[] require concerted action between two parties. As such, allegations relating to [plaintiff]'s unilateral conduct fails to state a claim under the[] statute[].").

**Defendants' Argument:**  Defendants have not been able to locate cases interpreting the Kansas Restraint of Trade Act consistently with the Sherman Act, or any statutory provision harmonizing the two statutes.  In at least one case, Kansas voluntarily dismissed its claims under the Kansas Restraint of Trade Act "as not congruent with Section 1 of the Sherman Act." *In re Elec. Books Antitrust Litig.*, No. 11 MD 2293 DLC, 2014 WL 2535112, at *2 (S.D.N.Y. June 5, 2014); Memorandum Endorsing Plaintiff States' Motion to Voluntarily Dismiss Certain State Law Claims, *In re Elec. Books Antitrust Litig.*, No. 1:11-md-02293-DLC (S.D.N.Y, May 29, 2013), ECF No. 352 (voluntarily dismissing claims under Kansas Restraint of Trade Act).  Defendants' proposed instruction thus interprets the Kansas Restraint of Trade Act as consistent with only Section 2 of the Sherman Act.  Plaintiffs have provided no authority to the contrary.  Moreover, the Kansas Restraint of Trade Act requires concerted action for monopolization claims, unlike Section 2 of the Sherman Act. *In re Effexor Antitrust Litig.*, 357 F. Supp. 3d 363, 394 (D.N.J. 2018) ("[T]he case law as well as the plain language of the Kansas . . . antitrust statute[] require concerted action between two parties. As such, allegations relating to [plaintiff]'s unilateral conduct fails to state a claim under the[] statute[].").  Defendants' proposed instruction includes this requirement.

**Post-Instruction No. ~~28~~ 27**

**DONNELLY ACT (NEW YORK GENERAL BUSINESS LAW §§ 340 *ET SEQ.*)**

The State of New York has brought claims under the Donnelly Act, New York General Business Law §§ 340 *et seq.* New York's claims under the Donnelly Act are based on the same conduct as its claims under the Sherman Act.

For claims under the Donnelly Act involving the restraint of competition by contracts, agreements, arrangements, or combinations, the elements of proof are the same as under Section 1 of the Sherman Act. If you find for Plaintiffs and against <u>one or more</u> Defendants on Plaintiffs' claims under Section 1 of the Sherman Act regarding unlawful exclusive dealing or unlawful tying, and New York proves by a preponderance of the evidence that <u>one or more</u> Defendants engaged in unlawful conduct that harmed competition ~~nationwide, including~~ in New York, then you must also find for the State of New York and against ~~Defendants~~<u>the relevant Defendant</u> on those same claims under the Donnelly Act. If you find for <u>one or more</u> Defendants under Plaintiffs' claims under Section 1 of the Sherman Act for unlawful exclusive dealing or unlawful tying, you must find for ~~Defendants~~<u>the relevant Defendant</u> under those same claims under the Donnelly Act.

For claims under the Donnelly Act involving monopolization, the elements of proof are the same as under Section 2 of the Sherman Act, except the State of New York must also prove that the establishment or maintenance of the monopoly involved a contract, agreement, arrangement, or combination. If you find for Plaintiffs and against <u>one or more</u> Defendants under Plaintiffs' monopolization claims under Section 2 of the Sherman Act, <u>and</u> New York proves by a preponderance of the evidence that those monopolies were established or maintained through one or more contracts, agreements, arrangements, or combinations, and that <u>one or more</u> Defendants engaged in unlawful conduct that harmed competition ~~nationwide, including~~ in New York, then you must also find for the

131

State of New York and against ~~Defendants~~the relevant Defendant on those same claims under the Donnelly Act. If you find for one or more Defendants on Plaintiffs' claims under Section 2 of the Sherman Act, or the State of New York fails to prove the existence of a contract, agreement, arrangement, or combination in connection with that claim, then you must find for ~~Defendants~~the relevant Defendant under those claims under the Donnelly Act.

**Plaintiffs' Authority**: *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 68-69 (2d Cir. 2019); *New York v. Actavis, PLC*, No. 14 Civ. 7473, 2014 WL 7015198, at *43 (S.D.N.Y. Dec. 11, 2014); *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 370 (S.D.N.Y. 2012); *Saxe, Bacon & Bolan, P.C. v. Martindale-Hubbell, Inc.*, 710 F.2d 87, 90 (2d Cir. 1983) (citations omitted).

**Defendants' Authority**: *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 68–69 (2d Cir. 2019); *New York v. Actavis, PLC*, No. 14 Civ. 7473, 2014 WL 7015198, at *43 (S.D.N.Y. Dec. 11, 2014); *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 370 (S.D.N.Y. 2012); *Saxe, Bacon & Bolan, P.C. v. Martindale-Hubbell, Inc.*, 710 F.2d 87, 90 (2d Cir. 1983) (citations omitted).

**Defendants' Argument:**  Defendants' edits to this instruction make clear that New York must prove each Defendant's liability separately, as explained above.  *See* Defendants' Argument on Post-Instruction No. 2 (The Parties).

132

**Post-Instruction No. ~~29~~ 28**

### SOUTH CAROLINA -
### ~~UNFAIR TRADE PRACTICES ACT~~ UNFAIR TRADE PRACTICES ACT
### (S.C. CODE ANN. § 39-5-10 ET SEQ.)

The state of South Carolina alleges that ~~Defendants'~~each Defendant's conduct violates the South Carolina Unfair Trade Practices Act (S.C. Code Ann. § 39-5-10 *et seq*.), SCUTPA provides that "[u]nfair methods of competition and unfair [] acts or practices in the conduct of any trade or commerce are… unlawful."

For the State of South Carolina to prevail on this claim, you must find for each Defendant separately that:

1.    ~~Defendants~~The Defendant engaged in an act or practice in trade or commerce.

2.    The act or practice is unfair.

3.    The act or practice has an impact on the public interest.

The words "trade" and "commerce" include the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity or thing of value wherever situated, and any trade or commerce directly or indirectly affecting the people of South Carolina. ~~Although the Act defines "trade and commerce" to include the previously mentioned activities, "trade and commerce" may also mean other activities that were not mentioned.~~

The act or practice alleged must be unfair ~~or deceptive~~. An act or practice is "unfair" when it is offensive to public policy or when it is immoral, unethical, or oppressive. Whether an act or practice is unfair ~~or deceptive~~ within the meaning of the Act depends upon the surrounding facts and the impact of the transaction on the marketplace.

133

Unfair acts or practices in the conduct of trade or commerce have an impact upon the public interest if the acts or practices have the potential for repetition. While not the only means for showing potential repetition, potential for repetition may be shown by:

1.    showing the same kind of actions occurred in the past, thus making it likely they will continue to occur absent deterrence; or

2.    showing the company's procedures create a potential for repetition of the unfair acts.

**Plaintiffs' Authority**: Roger L. Couch, *South Carolina Requests to Charge – Civil*, 2011; Ralph King Anderson, Jr., *South Carolina Requests to Charge - Civil*, 2009, §§ 34-1; 34-2, 34-3; *Chucks Feed & Seed Co. v. Ralston Purina Co.*, 810 F.2d 1289, 1292 (4th Cir. 1987); *Clarkson v. Orkin Exterminating Co.*, 761 F.2d 189, 191 (4th Cir. 1985) (the Act may be violated if there is a claim or representation that had the capacity or effect or tendency to deceive; plaintiff need not show intentional deception under South Carolina UTPA, but a plaintiff cannot prevail without showing at least a potential of deception); *Cheshire v. Coca-Cola Bottling Affiliated Inc.*, 758 F. Supp. 1098, 1101 (D.S.C. 1990); *State ex rel. Wilson v. Ortho-McNeil-Janssen Pharms.*, Inc., 414 S.C. 33, 777 S.E.2d 176 (2015); *Singleton v. Stokes Motor, Inc.*, 358 S.C. 369, 595 S.E.2d 461 (2004); *Crary v. Djebelli*, 329 S.C. 385, 496 S.E.2d 21 (1998); *York v. Conway Ford, Inc.*, 325 S.C. 170, 173, 480 S.E.2d 726, 728 (1997)(alleged acts or practices have the potential for repetition where defendant remains in the same business and faced with opportunities to repeat the conduct); *Taylor v. Medenica*, 324 S.C. 200, 479 S.E.2d 35 (1996); *Daisy Outdoor Advertising Co. v. Abbott*, 322 S.C. 489, 493-94, 473 S.E.2d 47, 49-50 (1996)(evidence of a potential for repetition, generally speaking, establishes the required public impact); *Adams v. G.J. Creel and Sons, Inc.*, 320 S.C. 274, 465 S.E.2d 84 (1995); *Foggie v. CSX Transp., Inc.*, 313 S.C. 98, 431 S.E.2d 587 (1993); *Camp v. Springs Mortgage Corp.*, 310 S.C. 514, 426 S.E.2d 304 (1993); *Haley Nursery Co. v. Forrest*, 298 S.C. 520, 381 S.E.2d 906 (1989); *Inman v. Ken Hyatt Chrysler Plymouth, Inc.*, 294 S.C. 240, 363 S.E.2d 691 (1988); *Wright v. Craft*, 372 S.C. 1, 640 S.E.2d 486 (Ct. App. 2006); *Wogan v. Kunze*, 366 S.C. 583, 606, 623 S.E.2d 107, 120 (Ct. App. 2005); *Robertson v. First Union Nat'l Bank*, 350 S.C. 339, 565 S.E.2d 309 (Ct. App. 2002); *DeBondt v. Carlton Motorcars, Inc.*, 342 S.C. 254, 536 S.E.2d 399 (Ct. App. 2000); *Prestwick Golf Club, Inc. v. Prestwick Limited Partnership*, 331 S.C. 385, 503 S.E.2d 184 (Ct. App. 1998); *Perry v. Green*, 313 S.C. 250, 437 S.E.2d 150 (Ct. App. 1993); *Baker v. Chavis*, 306 S.C. 203, 410 S.E.2d 600 (Ct. App. 1991); *Dowd v. Imperial Chrysler-Plymouth, Inc.*, 298 S.C. 439, 381 S.E.2d 212 (Ct. App. 1989); *Potomac Leasing Co. v. Bone*, 294 S.C. 494, 366 S.E.2d 26 (Ct. App. 1988); *Barnes v. Jones Chevrolet Co.*, 292 S.C. 607, 358 S.E.2d 156 (Ct. App. 1987); *Key Co. v. Fameco Distrib., Inc.*, 292 S.C. 524, 357 S.E.2d 476 (Ct. App. 1987); *Noack Enters., Inc. v. Country Corner Interiors*, 290 S.C. 475, 351 S.E.2d 347 (Ct. App. 1986); *State ex-rel. Medlock v. Nest Egg Soc'y Today, Inc.*, 290 S.C. 124, 128-29, 348 S.E.2d 381, 384 (Ct. App. 1986); *State ex- rel. McLeod v. Brown*, 278 S.C. 281, 283-84, 294 S.E.2d 781, 782-83 (Ct. App. 1982); S.C. Code Ann. § 39-5-10(b) (1985); S.C. Code Ann. § 39-5- 20(a) (1985); S.C. Code Ann. § 39-5- 50(a) (1985); S.C. Code Ann. § 39-5- 110(a) (1985); S.C. Code Ann. § 39-5-140 (1985); Federal Trade Commission, Comm'n File No. P221202, *Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Ac*t (Nov. 10, 2022).

134

**Plaintiffs' Position:** Defendants' proposed jury instructions for the South Carolina Unfair Trade Practices Act strike certain language defining the meaning of "trade and commerce" under the Unfair Trade Practices Act. Defendants provide no authority for their removal of this language, and it should be maintained.

**Defendants' Authority**: Roger L. Couch, *South Carolina Requests to Charge – Civil*, 2011; Ralph King Anderson, Jr., *South Carolina Requests to Charge – Civil*, 2009, §§ 34-1, 34-2, 34-3; ECF No. 257 ¶ 464 (Am. Compl.) ("Defendants' acts or practices alleged herein constitute "unfair methods of competition" under S.C. Code § 39-5-20.).

**Defendants' Argument:**    *First*, Defendants object to South Carolina's statement that "'trade and commerce' may also mean other activities" not enumerated in the statute.  The statutory definition sufficiently makes clear what "trade and commerce" means under SCUTPA.  South Carolina's statement that it could also mean other things is confusing and inaccurate.

*Second*, Defendants object to inclusion of "deceptive" as no deceptive conduct has been alleged here.

*Third*, Defendants object to South Carolina's recitation of things it need not prove (actual impact and market definition).  Defendants' proposed instruction—like all other instructions in this document— straightforwardly lists what the State must prove to prevail.  Reciting elements that must not be proven adds unnecessary length and risks confusing the jury.  Moreover, South Carolina's statement that it need not prove actual impact directly contradicts element three of the statute—"impact on the public interest."  South Carolina's internally inconsistent proposed instruction is likely to confuse the jury and prejudice Defendants.  And in any event, South Carolina has brought this action in parens patriae and thus must show that a "substantial segment of the state's population was injured." *New York, by James v. Niagara-Wheatfield Cent. Sch. Dist.*, 119 F.4th 270, 280 (2d Cir. 2024), *cert. denied sub nom. Niagara-Wheatfield Cent. Sch. Dist. v. New York*, 146 S. Ct. 324 (2025).

135

**Post-Instruction No. ~~30~~ 29**

## TENNESSEE TRADE PRACTICES ACT
## (TENN. CODE ANN. §§ 47-25-101 AND 102)

The State of Tennessee has brought claims under the Tennessee Trade Practices Act. The State of Tennessee is authorized to bring claims under this Act only for conduct that occurred after April 23, 2024. So conduct that occurred before April 23, 2024 cannot form a basis for liability under this statute. If the State of Tennessee fails to provide evidence of conduct that occurred and harmed competition in Tennessee after April 23, 2024, you must find for Defendants on this claim.

For conduct that occurred after April 23, 2024, if you find that the State of Tennessee has proven every element of a Sherman Act Section 1 or Section 2 claim against ~~Defendants~~a particular Defendant, and that ~~Defendants'~~the particular Defendant's conduct harmed competition in Tennessee, then you may find that the State of Tennessee has also proven the elements of the Tennessee Trade Practices Act ~~against Defendants with respect~~as to that claim and that particular Defendant.

**Plaintiffs' Authority**: Tenn. Code Ann. § 47-25-106.

**Plaintiffs' Position:** For the reasons stated above in connection with Preliminary Instruction No. 1, Defendants' liability should be assessed collectively.

**Defendants' Authority:** Tenn. Code Ann. § 47-25-106 (granting parens patriae authority as of April 23, 2024); *California v. Infineon Techs. AG*, 531 F. Supp. 2d 1124, 1170-71 (N.D. Cal. 2007) (recognizing that Tennessee previously lacked *parens patriae* authority); *State ex rel. Leech v. Levi Strauss & Co.*, No. 79-722-III, 1980 WL 4696, at *5 (Tenn. Ch. Sept. 25, 1980) (rejecting common-law parens patriae authority because such authority "must result from acts of the Legislature where the underlying public policy issues can be resolved and where essential procedural safeguards can be established"); *Connecticut v. Sandoz, Inc.*, No. 3:20-CV-00802(MPS), ECF No. 645 at 5-6 (D. Conn. Apr. 25, 2025) ("Tennessee's constitution prohibits retrospective laws, Tenn. Const. Art. 1, § 20. As such, statutes are presumed to operate prospectively absent clear indication from the legislature that the law is intended to apply retrospectively.. . . Here, the legislature did not clearly provide that the amendment to the TTPA be retroactive; therefore, the amendment is presumed to operate prospectively.").

**Defendants' Argument:** The Tennessee Trade Practices Act did not authorize parens patriae actions until April 23, 2024. Tenn. Code Ann. § 47-25-106 (granting parens patriae authority as of April 23, 2024). And the statutory amendment authorizing such actions does not apply retroactively. *Connecticut v. Sandoz, Inc.*, No. 3:20-CV-00802(MPS), ECF No. 645 at 5-6 (D. Conn. Apr. 25, 2025) ("Tennessee's constitution prohibits retrospective laws, Tenn. Const. Art. 1, § 20. . . . Here, the

136

legislature did not clearly provide that the amendment to the TTPA be retroactive; therefore, the amendment is presumed to operate prospectively."). Accordingly, Defendants' proposed instruction makes clear that Tennessee's recovery under the Tennessee Trade Practices Act is limited to each Defendant's conduct occurring after April 23, 2024 that harmed Tennessee residents and competition in Tennessee.

**Plaintiffs' Authority**: Tenn. Code Ann. § 47-25-106.

137

**Post-Instruction No. 30P 30**

### VERMONT CONSUMER PROTECTION ACT
### (9 V.S.A. § 2451 et seq.)

The State of Vermont alleges that Defendants' conduct violates the Vermont Consumer Protection Act (9 V.S.A § 2451 *et seq.*), which provides that "[u]nfair methods of competition in commerce and unfair or deceptive acts or practices in commerce are…unlawful."

For the State of Vermont to prevail on this claim, you must find that:

1.      Defendants engaged in an act or practice in commerce; and

2.      The act or practice is unfair or deceptive.

An act or practice occurs "in commerce" when it takes place in the consumer marketplace in the context of a defendant's business, rather than in a private transaction; and (2) it has a potential harmful effect on consumers, constituting a breach of duty owed to consumers.

The act or practice alleged must be unfair or deceptive. An act or practice is "unfair" when it (1) offends public policy even if it hasn't been previously considered unlawful; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers. Acts or practices are considered against public policy if they are in the realm of what is considered unfair as established by statutes, common law, or another established concept of unfairness.

An act is deceptive where (1) there is a representation, omission, or practice likely to mislead consumers; (2) the consumer interprets the message reasonably under the circumstances; and (3) the misleading effects must be material, that is, likely to affect the consumer's conduct or decision. Deception is measured objectively and looks to whether the representation or omission had the capacity or tendency to deceive a reasonable person. Actual injury does not need to be shown.

138

~~When the State of Vermont brings a claim under the Vermont Consumer Protection Act, there~~

~~is no requirement for the State to prove intent by the defendant to have acted deceptively or unfairly.~~

**Plaintiffs' Authority**: *Concepts NREC, LLC v. Qiu*, No. 5:20-CV-133, 2025 WL 2052132, at *26 (D. Vt. July 21, 2025); *Foti Fuels, Inc. v. Kurrle Corp.,* 2013 VT 111, ¶ 22, 195 Vt. 524, 536, 90 A.3d 885, 893 (2013); *Carter v. Gugliuzzi,* 168 Vt. 48, 56, 716 A.2d 17, 23 (1998); *Peabody v. P.J.'s Auto Village, Inc.,* 153 Vt. 55, 57, 569 A.2d 460, 462 (1989); *Winton v. Johnson & Dix Fuel Corp.,* 147 Vt. 236, 244, 515 A.2d 371, 376 (1986); *In re Bristol-Myers Co.,* 102 F.T.C. 21 (1983); *Christie v. Dalmig, Inc.*, 136 Vt. 597, 601, 396 A.2d 1385, 1388 (1979); *F.T.C. v. Sperry & Hutchinson Co.,* 405 U.S. 233, 241 (1972).

**Plaintiffs' Position:** Defendants propose striking the instruction on the Vermont Consumer Protect Act on the apparent argument that Vermont does not have standing to maintain *parens patriae* claims. As discussed above (*see* Post-Instruction No. 22, this is not a basis for striking a jury instruction.

**Defendants' Argument:** Vermont lacks parens patriae authority to bring this claim. *See* Vt. Stat. Ann. tit. 9 §§ 2451 *et seq.* (no provision for *parens patriae* actions). Plaintiffs have provided no authority to the contrary.

139

Post-Instruction No. 31

## STATES DAMAGES AND OVERCHARGECLAIMS

[Twenty-one] of the Plaintiff States—specifically, Arizona, Colorado, Connecticut, Florida, Illinois, Indiana, Michigan, Minnesota, Nevada, New Hampshire, New Jersey, New York, North Carolina, Pennsylvania, Rhode Island, South Carolina, Utah, Washington, West Virginia, Wisconsin, and the District of Columbia—are seeking damages from DefendantsTicketmaster on behalf of fans who purchased primary concert tickets for events at what Plaintiffs call "major concert venues in those States.." I may refer to these 24[21] States as "Plaintiff States claiming damages." The Plaintiff States claiming damages allege that residents of their States were overcharged on purchases of primary concert tickets for events at so-called "major concert venues."

These Plaintiff States claiming damages allege that fans were overcharged on their purchases of primary concert tickets for events at major concert venues.

If you find that any Plaintiff State claiming damages

If you find that the Plaintiffs have proved that Defendants haveTicketmaster monopolized the market for primary concert ticketing services to so-called "major concerts venues" in violation of Section 2 of the Sherman Act or those States' laws, or that Plaintiffs have proved Defendants have engaged in unlawful exclusive dealing in violation of Section 1 of the Sherman Act or those States' laws, or that Plaintiffs have proved Defendants haveproved that Ticketmaster engaged in unlawful exclusive dealing in violation of Section 1 of the Sherman Act or those States' laws, then you must decide if each Plaintiff State claiming damages has proved by, as a preponderanceresult of the evidence any such violation, residents of that fans Plaintiff State were injured due to overcharges on their purchases of overcharged for primary concert tickets for events at so-called "major concert venues." If any Plaintiff State claiming damages fails to prove that as a result of Ticketmaster's conduct, residents of its particular State were overcharged for primary concert tickets, then that State is not

140

entitled to any damages, and you need not do any further analysis for that State.

If ~~a~~any Plaintiff State claiming damages proves ~~Defendants~~ that residents of its State were overcharged ~~fans~~as a result of the violations I just described, then you must determine whether that Plaintiff State has proved by a preponderance of the evidence the amount that residents of that particular Plaintiff State were overcharged on a per-ticket basis for their purchases of primary concert tickets for events at so-called "major concert venues ~~in that state, then you must determine the amount of overcharge, if any, caused by Defendants on a per-ticket basis.~~." You are not being asked to determine the total number of tickets or ~~fans~~ticket purchasers affected~~,~~. You are only being asked to determine the ~~average amount of~~per-ticket overcharge ~~that would apply to those purchases.~~ in each Plaintiff State claiming damages.

I remind you that you should not assume that any resident of any Plaintiff State claiming damages will receive any portion of any money the Plaintiff States might ultimately recover in this case. And neither you nor any member of your family will receive any portion of any funds that the States may ultimately receive.

I will now provide further instructions on what each Plaintiff State claiming damages must prove before you may calculate any per-ticket overcharge for that State, and how you must calculate any such overcharge.

**Plaintiffs' Authority**: Adapted Final Jury Instructions at 54, *Innovative Health LLC v. Biosense Webster, Inc.*, Case No. 8:19-cv-1984 JVS (C.D. Cal. May 16, 2025); ABA Model Jury Instructions in Civil Antitrust Cases B-304.

**Plaintiffs' Position:** Plaintiffs have adapted nonargumentative damages instructions based on the ABA Model Jury Instructions and those used in *Innovative Health LLC v. Biosense Webster, Inc.* Defendants' proposed modifications misstate the relevant claims at issue or otherwise pose a risk of confusing the jury.

First, for the same reasons described with respect to prior instructions, Defendants' alternative names for Plaintiffs' proposed markets risk confusing the jury.

141

Second, Defendants again mischaracterize Plaintiffs' claims (as relevant to this instruction) as only against Ticketmaster, rather than both Defendants.

Third, the parties have agreed that issues of the total number of tickets sold to Plaintiff State residents, and any total damages, will be deferred to the remedies phase of the trial. 3.4.2026 Trial Tr. at 457:19–25. Instead, the jury will only be required to find a nationwide overcharge. *See id.* Defendants' proposed language focusing on State residents may mislead the jury to believe they are required to find elements of proof that have been deferred by mutual agreement to a later phase of trial. Plaintiffs' proposed instructions address all the necessary elements to establish injury and the fact of damage, as well as the existence of an overcharge, which is all that is required under the parties' agreement.

Fourth, as described above, Defendants' language stating that the jury should not "assume that any resident of any Plaintiff state will receive any portion of any money the Plaintiff States might ultimately recover" is unnecessary and potentially misleading. Any recovery under 15 U.S.C. § 15c likely will be returned to fans. As 15 U.S.C. Sections 15c and 15e explicitly contemplate, any funds recovered by the States "shall … be distributed in such manner as the district court in its discretion may authorize" and that any "distribution procedure adopted afford each person a reasonable opportunity to secure his appropriate portion of the net monetary relief." *Id.* § 15e. While, subject to the approval of the Court, some or all of the funds recovered *may* "be deemed a civil penalty by the court and deposited with the State as general revenues," there is no basis to instruct the jury to assume that will happen, or that the States will not try to distribute damages awards to residents. A reminder to the jury that neither they nor their families will personally recover funds is sufficient

**Defendants' Authority:** ECF No. 777 at 41 (Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment); *Washington v. Chimei Innolux Corp.*, 659 F.3d 842, 848 (9th Cir. 2011) ("[A] statutory *parens patriae* action may well result in a settlement that does not include restitution to victims of the fraud, but only results in penalties paid to the public treasury."); *Broselow v. Fisher*, 319 F.3d 605, 608 (3d Cir. 2003) (individuals have no right to funds collected through *parens patriae* claims because such funds are not collected "under an assignment" from those individuals); *New York by Vacco v. Reebok Int'l*, 96 F.3d 44, 49 (2d Cir. 1996) (individuals are not entitled to distributions from the settlement of a *parens patriae* suit); N.Y. Exec. § 63(12) ("monies recovered or obtained under this subdivision" are subject to N.Y. State Fin. § 4(11), which requires that the funds "be deposited in the state treasury" and not disbursed "except pursuant to an appropriation"); *New York, by James v. Niagara-Wheatfield Cent. Sch. Dist.*, 119 F.4th 270, 279 (2d Cir. 2024), *cert. denied sub nom. Niagara-Wheatfield Cent. Sch. Dist. v. New York*, 146 S. Ct. 324 (2025) ("A state suing *in parens patriae* must establish '(1) [an] injury to a sufficiently substantial segment of the state's population; (2) a quasi-sovereign interest; and (3) an inability for individual plaintiffs to obtain complete relief.'"); *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir. 1993) ("a contract under the corporate name of [either a parent corporation or its subsidiary] is not treated as that of both"); ECF No. 483 at 4 n.1 (Opinion and Order); *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 161 (2d Cir. 2016) ("to suffer antitrust injury, the putative plaintiff must be a participant in the very market that is directly restrained"); *Orchestrate HR, Inc. v. Trombetta*, No. 3:13-CV-2110-KS, 2017 WL 273669, at *8 (N.D. Tex. Jan. 20, 2017) ("It is elementary that each plaintiff must prove its own damages."); *U.S. Football League v. Nat'l Football League*, No. 84 CIVIL 7484PKL, 1986 WL 10620, at *34 (S.D.N.Y. July 31, 1986) ("I

142

instruct you that each one of the plaintiffs must show the fact of its injury and the amount of its damage. Should you find that one of the plaintiffs was injured in fact and was damaged in its business or property, that does not necessarily mean that any other plaintiff was either injured or damaged."); *City of New York v. Beretta U.S.A. Corp.*, 315 F. Supp. 2d 256, 265 (E.D.N.Y. 2004) ("The doctrine of parens patriae grants standing to a state to sue on behalf of its citizens."); 15 U.S.C. § 15c(a)(1) (parens patriae authority is "on behalf of natural persons residing in such State").

**Defendants' Argument:** Defendants' position is that the question of damages should not be presented to the jury at all. At summary judgment, this Court deemed invalid the only market in which the "fans" on behalf of whom Plaintiff States are claiming damages even remotely participate. Accordingly, Plaintiff States could never, and certainly cannot now, prove antitrust injury, and without such injury, they cannot obtain damages. *See* Post-Instruction No. 31 (Injury and Causation). "[T]o suffer antitrust injury, the putative plaintiff must be a participant in the very market that is directly restrained." *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 161 (2d Cir. 2016). The fans that Plaintiff States seek to represent do not meet this requirement, nor are the fans' alleged injuries "inextricably intertwined" with alleged injuries in other purported markets. *In re DDAVP Direct Purchaser Antitrust Litigation* and *Blue Shield of Virginia v. McCready*—are distinguishable. In *DDAVP*, the defendants' exclusionary conduct focused directly on the *same product* (a drug) that the plaintiffs purchased. 585 F.3d 677, 683, 688 (2d Cir. 2009). And in *McCready*, the plaintiff alleged that she was a "consumer of *psychotherapeutic services* and that she had been injured by the defendants' conspiracy to restrain competition in the market *for such services*." *Associated Gen. Contractors of California v. California State Council of Carpenters*, 459 U.S. 519, 538 (1983) (describing *McCready*, 457 U.S. 465, 484 (1982)) (emphasis added). In such circumstances, "the consumers' injury is 'clearly foreseeable,' 'inextricably intertwined' with the anticompetitive conduct, and 'flows from that which makes [the] defendants' acts unlawful.'" ECF No. 483 at 6 (Opinion and Order Denying Defendants' Motion to Dismiss) (citations omitted). But that is not this case: fans purchase a different product, in a different market, than the product in the venue-facing market where the alleged conduct occurs and, as a result, the alleged conduct and any alleged injury to fans are not "inextricably intertwined."

Defendants propose the damages-related instructions here only if the question of damages is presented to the jury. But to be clear, Defendants' frontline position is that it should not be presented to the jury at all.

As for Defendants' edits to this instruction, they clarify that each Plaintiff State claiming damages can only seek damages (1) on an individual, not collective, basis; and (2) from Ticketmaster, not Live Nation, who is not a party to the ticketing contracts that allegedly harm "fans." *Orchestrate HR, Inc. v. Trombetta*, No. 3:13-CV-2110-KS, 2017 WL 273669, at *8 (N.D. Tex. Jan. 20, 2017) ("It is elementary that each plaintiff must prove its own damages."); *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir. 1993) ("a contract under the corporate name of [either a parent corporation or its subsidiary] is not treated as that of both"). Defendants object to Plaintiffs' assertion that all Plaintiff States claiming damages can do so on the basis of an "average" overcharge— each Plaintiff "must show the fact of its injury and the amount of its damage." *U.S. Football League v. Nat'l Football League*, No. 84 CIVIL 7484PKL, 1986 WL 10620, at *34 (S.D.N.Y. July 31, 1986).

Defendants' edits also make clear that a Plaintiff State claiming damages may recover only if it has proven (1) injury to residents of its State who purchased primary concert tickets to events at "major concert venues," and (2) that Ticketmaster's alleged unlawful conduct caused the alleged injury. *See* Post-Instruction No. 31 (Injury and Causation).

143

**Post-Instruction No.** ~~32~~ 31

**INJURY AND CAUSATION**

Each Plaintiff State claiming damages is entitled to recover damages ~~for the overcharges imposed by Defendants on behalf of their residents~~ only if it can establish these three elements of injury and causation:

Residents in its State who purchased primary concert tickets to attend events at what Plaintiffs refer to as "major concert venues ~~in those States if they can establish these three elements of injury and causation:~~

1. ~~Residents purchasing tickets~~" were in fact injured as a result of ~~Defendants'~~ Ticketmaster's alleged violations of the antitrust laws;

~~2. Defendants' alleged unlawful conduct was a material cause of fans' injuries; and~~

2. Those injuries would not have occurred but for Ticketmaster's alleged antitrust violation; and

3. Those ~~fans'~~ injuries are of the type that the antitrust laws were intended to prevent.

The first element is sometimes referred to as "injury in fact" or "fact of damage." For each of the Plaintiff States claiming damages to establish that ~~they are~~it is entitled to damages, ~~they~~it must prove that ~~fans~~residents of its State who purchased primary concert tickets to attend events at any of the so-called "major concert venues" were injured as a result of ~~Defendants'~~Ticketmaster's alleged monopolization of the market for ~~services for~~ primary concert tickets at so-called "major concert venues" in violation of Section 2 of the Sherman Act, or for exclusive dealing in violation of Section 1 of the Sherman Act. ~~Proving the fact of damage does not require each of the Plaintiff States claiming damages to prove the dollar value of fans' injuries. It requires only that the Plaintiff States claiming damages to prove that fans residing in that State were in fact injured by Defendants' alleged antitrust violations. If you find that the Plaintiff States claiming damages have proved that fans were in fact~~

144

~~injured, you may then consider the amount of per-ticket overcharge.~~ It is important to understand~~, however,~~ that injury and amount of damage are different concepts and that you cannot consider the amount of any overcharge alleged by any particular State unless and until you have concluded that fans in that State were in fact injured.

Each ~~of the~~ Plaintiff ~~States~~State claiming damages must also offer evidence that establishes by a preponderance of the evidence that ~~Defendants' alleged unlawful conduct was a material cause of~~ injuries to ~~fans~~residents in that State~~.~~ would not have occurred but for Ticketmaster's alleged unlawful conduct. This means that ~~the~~each Plaintiff ~~States~~State claiming damages must have proven that some overcharge was imposed on ~~fans as a result of Defendants'~~residents in its State because of Ticketmaster's alleged antitrust violation, and ~~not some other cause. The Plaintiff States claiming damages are~~that such overcharge would not ~~required to prove that Defendants' alleged antitrust violations were the sole cause of fans' injuries; nor do they need to eliminate all other possible causes of injury. It is enough if each of the Plaintiff States claiming damages has proven that~~have been imposed but for the alleged antitrust violation ~~was a material cause of injury to fans purchasing tickets to events at major concert venues in that State.~~.

Finally, each of the Plaintiff States claiming damages must establish that ~~fans'~~the alleged injuries to residents of its State are the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If ~~fans'~~the alleged injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then ~~fans'~~the alleged injuries are antitrust injuries. On the other hand, if ~~fans'~~the alleged injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit artists, venues, or consumers, then ~~fans'~~the alleged injuries are not antitrust injuries and none of the Plaintiff States claiming damages ~~may~~can recover damages for those injuries under the antitrust laws.

145

~~When determining whether an antitrust injury occurred, you should consider whether Defendants monopolized the markets for primary ticketing services to major concert venues or primary concert ticketing services to major concert venues, or engaged in unlawful exclusive dealing in those markets. If you conclude that Defendants did monopolize either of those markets or engaged in unlawful exclusive dealing in those markets, you should consider whether fans suffer any consequences when purchasing primary concert tickets as a consequence of Defendants' monopolization of those markets. In reaching that determination, you should consider whether the alleged anticompetitive conduct by Defendants in either of those markets led to injuries to fans when they purchased primary tickets for concerts at major concert venues, and whether those injuries were clearly foreseeable based on Defendants' conduct. You may also consider whether fan purchases of primary tickets at major concert venues were part of the economy endangered by Defendants' alleged anticompetitive conduct in those other markets. If you do find that fans' suffer consequences from Defendants' monopolization of those markets when purchasing primary concert tickets for major concert venues, you also may conclude the Plaintiff States claiming damages have established an antitrust injury.~~

In summary, if each of the Plaintiff States claiming damages can establish that ~~fans purchasing tickets in that~~residents of its State who purchased primary concert tickets to events at so-called "major concert venues" were in fact injured by ~~Defendants'~~Ticketmaster's conduct, that ~~Defendants' conduct was a material cause of fans'~~such injuries would not have occurred but for Ticketmaster's conduct, and that ~~fans'~~such injuries were the type that the antitrust laws were intended to prevent, then each such Plaintiff State is entitled to recover for the overcharge ~~imposed on fans who purchased concert tickets~~paid by such residents in each such Plaintiff State.

**Plaintiffs' Authority**: Adapted Final Jury Instructions at 52-53, *Innovative Health LLC v. Biosense Webster, Inc.*, Case No. 8:19-cv-1984 JVS (C.D. Cal. May 16, 2025); ABA Model Jury Instructions in Civil Antitrust Cases A-300, A-303; ABA Model Instr. 6.A.1; *Blue Shield of Virginia v. McCready*,

146

457 U.S. 465, 479-84 (1982); *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009); *United States of Am. v. Live Nation Entm't, Inc.*, No. 1:24-cv-03973-AS (S.D.N.Y. Mar. 13, 2025) at 4-7; ECF No. 1037 at 42-43.

**Plaintiffs' Position:** Plaintiffs have adapted nonargumentative damages instructions based on the ABA Model Jury Instructions and those used in *Innovative Health LLC v. Biosense Webster, Inc.* Defendants' proposed modifications are unnecessary of misleading.

First, for the same reasons described with respect to prior instructions, Defendants' alternative names for Plaintiffs' proposed markets risk confusing the jury.

Second, Defendants again mischaracterize Plaintiffs' claims (as relevant to this instruction) as only against Ticketmaster, rather than both Defendants.

Third, Defendants' instructions misleadingly imply that their conduct must be the sole cause of any injury to fans, rather than a material cause of those injuries.

**Defendants' Authority**: ABA Model Instr. 6.A.1; *U.S. Football League v. Nat'l Football League*, No. 84 CIVIL 7484PKL, 1986 WL 10620, at *34 (S.D.N.Y. July 31, 1986) ("I instruct you that each one of the plaintiffs must show the fact of its injury and the amount of its damage. Should you find that one of the plaintiffs was injured in fact and was damaged in its business or property, that does not necessarily mean that any other plaintiff was either injured or damaged."); *City of New York v. Beretta U.S.A. Corp.*, 315 F. Supp. 2d 256, 265 (E.D.N.Y. 2004) ("The doctrine of parens patriae grants standing to a state to sue on behalf of its citizens."); 15 U.S.C. § 15c(a)(1) (parens patriae authority is "on behalf of natural persons residing in such State"); *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 41 (2d Cir. 1986) ("Consequently, an essential element in plaintiffs' claim is that the injuries alleged would not have occurred *but for* Kodak's antitrust violation.").

**Defendants' Argument:** Defendants' edits to this instruction align it with the previous instruction and were undertaken for the same reasons. Additionally, Defendants' edits make clear that Ticketmaster's alleged antitrust violation must have been a but-for cause of the fans' alleged injuries. *See Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 41 (2d Cir. 1986) ("Consequently, an essential element in plaintiffs' claim is that the injuries alleged would not have occurred *but for* Kodak's antitrust violation.").

147

**Post-Instruction No. ~~33~~ 31D**

## STATUTE OF LIMITATIONS

A statute of limitations establishes a time limit for bringing a lawsuit. In doing so, the law seeks to eliminate stale claims, to promote justice by preventing surprises, and to provide security and stability to human affairs. Statutes of limitations ensure that a plaintiff does not wait, sleep on their rights, and allow damages to accumulate before bringing suit.

The statute of limitations for the claims in this case does not permit recovery for any injury to residents in any State suffered prior to May 23, 2020. This means that any alleged anticompetitive conduct that occurred prior to May 23, 2020, and any injury resulting from that conduct, is time-barred. You can only find that each Plaintiff has proved the required elements of injury and causation if they have proven both that (i) the injury occurred on or after May 23, 2020 and (ii) that injury was caused by anticompetitive conduct that occurred on or after May 23, 2020. You may not base any finding of injury or your overcharge calculation for damages on any anticompetitive conduct that occurred prior to May 23, 2020, regardless of whether you believe the conduct was unlawful and regardless of whether the harm or damages from that conduct continued after May 23, 2020.

While you may not consider injury or harm resulting from conduct that occurred before May 23, 2020, Plaintiffs have introduced evidence about conduct occurring before May 23, 2020 solely as background or context for the acts that took place on or after May 23, 2020. It is important that you consider this evidence only as background for the alleged conduct or injury that took place *after* May 23, 2020. Otherwise, this evidence has expired and cannot support Plaintiffs' claims.

**Plaintiffs' Position (31D):** The Plaintiff States do not dispute that their damages claims in this action are subject to a four-year statute of limitations. But pursuant to the parties' agreement to defer determination of damages (beyond a jury finding on the overcharge), the impact of any statute of limitations on damages can be resolved by the Court. No jury determination on this issue is needed.

**Defendants' Authority**: *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 69 (2d Cir. 2019); 15 U.S.C. § 15b ("Any action to enforce any cause of action under [the Sherman Act] shall be forever barred unless commenced within four years after the cause of action accrued."); *Zenith Radio Corp.*

148

*v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971) (a plaintiff may recover only those damages which he has suffered within the limitations period); *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) ("[T]he commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period."); *CSX Transp., Inc. v. Norfolk S. Ry. Co.*, 114 F.4th 280, 286 (2024) ("Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business."); *id.* at 289 ("[M]ere silence or inaction from a defendant—even though the allegedly unlawful conspiracy to exclude a plaintiff remains in effect—isn't enough to restart the limitations period. Instead, an affirmative act—like a promise to act in the future—is required."); *id.* ("an overt act … must be a new and independent act that is not merely a reaffirmation of a previous act" (quoting *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 600 (6th Cir. 2014)); *id.* at 292 ("[I]n … antitrust cases, [a] plaintiff cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period."); *Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265, 271 (8th Cir. 2004) ("Only where the monopolist actively reinitiates the anti-competitive policy and enjoys benefits from that action can the continuing violation theory apply."); *Z Techs.*, 753 F.3d at 599-600 (concluding that the law "clearly indicate[s] that price increases following a merger or acquisition are not overt acts" and explaining that the Court "ha[s] not discovered a case, let alone a Sixth Circuit authority, nor has [the plaintiff] identified one, in which the continuing violations doctrine has been applied to price increases following a merger or acquisition."); *Chalmers v. Nat'l Collegiate Athletic Ass'n*, No. 24 CIV. 5008 (PAE), 2025 WL 1225168, at *8 (S.D.N.Y. Apr. 28, 2025), *aff'd,* No. 25-1307-CV, 2025 WL 3628416 (2d Cir. Dec. 15, 2025) ("The continuing violation doctrine, however, is heavily disfavored in the Second Circuit and courts have been loath to apply it absent a showing of compelling circumstances.. . . [The doctrine] would also permit plaintiffs who know of the defendant's pattern of activity simply to wait, 'sleeping on their rights,' as the pattern continues and treble damages accumulate.") (internal quotation marks and citations omitted); *SEC v. Kelly*, 663 F.Supp.2d 276, 288 (S.D.N.Y. 2009) (continuous accrual applies "only to 'continual unlawful acts, not continual ill effects from a single violation'"); *Madison Square Garden, L.P. v. Nat'l Hockey League*, No. 7 Civ. 8455, 2008 WL 4547518, at *10 (S.D.N.Y. Oct. 10, 2008) ("continued. . . enforcement of pre-existing policies" does not constitute new overt act); *US Airways*, 938 F.3d at 68 ("performance of a contract [i]s a manifestation of the 'overt act,' the decision to enter the contract, rather than an independent overt act of its own"); *In re Libor-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 NRB, 2015 WL 4634541, at *125 (S.D.N.Y. Aug. 4, 2015) (continuing violation doctrine does not apply where "only the injurious effects continued into the limitations period"); *Klehr*, 521 U.S. at 190 ("Nor can the presence of the new act help them recover for the injuries caused by pre-1989 acts."); *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 457 (2009) (rejecting attempt to "alchemize [different claims] into a new form of antitrust liability"); *Am. President Lines, LLC v. Matson, Inc.*, 775 F. Supp. 3d 379, 402 (D.D.C. 2025), dismissed, No. 25-7051, 2025 WL 1649080 (D.C. Cir. June 6, 2025) (finding it "unworkable" to consider a "course of conduct" theory "beyond conspiracies"); *Limestone Dev. Corp. v. Vill. Of Lemont, Ill.*, 520 F.3d 797, 801 (7th Cir. 2008) (the continuing violation doctrine applies when conduct does not amount to an actionable claim "until a series of wrongful acts blossoms into an injury on which suit can be brought"); *CTS Corp. v. Waldburger*, 573 U.S. 1, 7 (2014) ("[A] statute of limitations creates 'a time limit for suing in a civil case, based on the date when the claim accrued.'"); Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application § 320a (2025) ("Limitation serves the same functions in antitrust as elsewhere in the law: to put old liabilities to rest, to relieve courts and parties from 'stale' claims where the best evidence may no longer be available, and to create incentives for those who believe themselves wronged to investigate and bring

149

their claims promptly, particularly when they are known or can be determined."); *Rotella v. Wood*, 528 U.S. 549, 555 (2000) (noting "the basic policies of all limitations provisions: repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities"); *Gabelli v. SEC*, 568 U.S. 442, 448-49 (2013) ("Statutes of limitations are intended to 'promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.' They provide 'security and stability to human affairs.' We have deemed them 'vital to the welfare of society,' and concluded that 'even wrongdoers are entitled to assume that their sins may be forgotten.'"); *Seets v. Anne Arundel County*, 40 F. App'x 744, 750-51 (4th Cir. 2002) (instructing jury on statute of limitations).

**Defendants' Argument**:  Plaintiffs erroneously omit any instruction on the statute of limitations despite previously conceding it applied. This instruction is necessary both to notify the jury what a statute of limitations is and explain that the applicable statutes of limitations materially limit the manner in which Plaintiffs can try to establish Defendants' liability and collect damages.  ECF No. 1019 at 12-15 (Memorandum of Law in Support of Defendants' Motions in Limine); ECF No. 704 at 14-18 (Memorandum of Law in Support of Defendants' Motion to Exclude Dr. Rosa M. Abrantes-Metz); ECF No. 1079 at 5 (Order on Motions in Limine).

The law is clear that Plaintiffs are legally precluded from recovering for any injury suffered prior to May 23, 2020.  *See* 15 U.S.C. § 15b; *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971) (a plaintiff may recover only those damages which he has suffered within the limitations period); *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 69 (2d Cir. 2019); *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) ("[T]he commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period."). While the Court has allowed Plaintiffs to introduce evidence of time-barred conduct as background, Plaintiffs may rely on such conduct only to contextualize the non-time-barred conduct.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002); *Fitzgerald v. Henderson*, 251 F.3d 345, 365 (2d Cir. 2001) (evidence of conduct pre-dating the statute of limitations must be "relevant to events during the period"); ECF No. 1079 at 5 (Order on Motions in Limine).  Plaintiffs may not attempt to bootstrap their damages claims to "injuries caused by other predicate acts that took place outside the limitations period." *Klehr*, 521 U.S. at 190.

Moreover, although the Court, not the jury, would determine whether any Plaintiff is entitled to any penalty, statutes of limitations also apply to Plaintiffs' penalties claims, some of which are even less than four years.  *See, e.g.*, S.C. Code § 39-5-150 ("No action may be brought under this article more than three years after discovery of the unlawful conduct which is the subject of the suit.").  Plaintiffs' equitable claims are also subject to the doctrine of laches.  *See New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 40 (D.D.C. 2021) ("the doctrine of laches [] applies to parens patriae suits"); *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 301 (D.C. Cir. 2023) (applying laches).  So the evidence Plaintiffs can rely on to try to prove liability for those claims also must post-date May 23, 2020.

150

**Post-Instruction No. 32**

### DAMAGES INSTRUCTIONS—GENERAL

If you find that ~~Defendants violated~~any Plaintiff State claiming damages proved that Ticketmaster monopolized the ~~antitrust laws~~alleged market for primary concert ticketing in violation of Section 2 of the Sherman Act, or that Ticketmaster engaged in unlawful exclusive dealing in violation of Section 1 of the Sherman Act, and ~~that this~~you also find that the Plaintiff State proved that any such violation caused injury to ~~fans~~residents of its State who purchased primary concert tickets to events at so-called "major concert venues ~~in any of the Plaintiff States~~" within the statute of limitations, then you must determine the amount of the overcharge, if any, ~~imposed~~paid by ~~Defendants in~~ those residents in that Plaintiff ~~States~~State. The fact that I am giving you instructions concerning the issue of damages does not mean that I believe any ~~party~~Plaintiff should, or should not, prevail in this case. If you reach a verdict for ~~Defendants~~Ticketmaster on Plaintiffs' claims for monopolization of the alleged market for ~~services for~~ primary concert tickets at so-called "major concert venues" in violation of Section 2 of the Sherman Act and laws of the Plaintiff States claiming damages, or for exclusive dealing in violation of Section 1 of the Sherman Act and the laws of the Plaintiffs States claiming ~~damages' laws~~damages, you should not consider the issue of damages, and you may disregard the damages instruction that I am about to give.

~~Residents of the Plaintiff States claiming damages purchased primary concert tickets to attend live concert events at major concert venues in those States. The law provides that each Plaintiff State can recover any overcharges imposed by Defendants with respect to those ticket purchases, if you find that unlawful conduct was a material cause of those overcharges.~~

The law provides that each Plaintiff State claiming damages can recover based on the amount of per-ticket overcharge imposed on primary concert tickets purchased by residents of that State for events at one or more of the venues Plaintiffs call "major concert venues," only if you find that the

151

overcharge was caused by the conduct that you have found to be unlawful.

Antitrust damages are only compensatory, meaning their purpose is to put injured fanspersons, if any, as near as possible in the position in which they would have been had the alleged antitrust violation not occurred. The law does not permit you to award any additional overcharge amount to punish a wrongdoer—what we sometimes refer to as punitive damages—or to deter particular conduct in the future. Furthermore, you are not permitted to award to any of the Plaintiff States an amount for attorneys' fees or the costs of maintaining this lawsuit. Again, you are only being asked to determine the per-ticket overcharge paid by ticket purchasers in each Plaintiff State that proves the violations I described and meets the injury and causation requirements I described.

**Plaintiffs' Authority**: Final Jury Instructions at 54, *Innovative Health LLC v. Biosense Webster, Inc.*, Case No. 8:19-cv-1984 JVS (C.D. Cal. May 16, 2025); ABA Model Instr. 6.B.1.

**Plaintiffs' Position:** Plaintiffs have adapted nonargumentative damages instructions based on the ABA Model Jury Instructions and those used in *Innovative Health LLC v. Biosense Webster, Inc.* Defendants' proposed modifications misstate the relevant claims at issue or otherwise pose a risk of confusing the jury. First, for the same reasons described with respect to prior instructions, Defendants' alternative names for Plaintiffs' proposed markets risk confusing the jury. Second, Defendants again mischaracterize Plaintiffs' claims (as relevant to this instruction) as only against Ticketmaster, rather than both Defendants. Third, Defendants unnecessarily repeat the specific claims at issue, which the jury will have previously been instructed on in Post Instruction No. 31.

**Defendants' Authority**: Final Jury Instructions at 54, *Innovative Health LLC v. Biosense Webster, Inc.*, Case No. 8:19-cv-1984 JVS (C.D. Cal. May 16, 2025); ABA Model Instr. 6.B.1; 15 U.S.C. § 15c(a)(1) ("The court shall exclude from the amount of monetary relief awarded in [a parent patriae] action any amount of monetary relief. . . which is properly allocable to. . . any business entity.").

**Defendants' Argument:** Defendants' edits to this instruction align it with the previous damages-related instructions and were undertaken for the same reasons. Additionally, they seek to make clear that the jury must have found specific antitrust violations, injury, and causation to proceed to the per-ticket overcharge issue.

**Post-Instruction No. ~~34~~ 33**

## COMPENSATORY DAMAGES—OVERCHARGE

~~The Plaintiff States claiming damages contend that fans paid excessively high prices for primary tickets for live events at major concert venues because Defendants were charging ticketing fees that were inflated due to Defendants' antitrust violations; that is, higher prices than would have prevailed in a competitive market.~~

Each Plaintiff State claiming damages contends that its residents paid higher fees added to the face value of primary tickets to concerts that took place at so-called "major concert venues," because Ticketmaster allegedly charged those venues more money for primary ticketing services than Ticketmaster would have but for Ticketmaster's alleged anticompetitive conduct. To be clear, no Plaintiff State contends that the face value of any ticket was too high as a result of this alleged conduct. The Plaintiff States solely contend that venues increased the fees they add to the ticket price as a direct result of Ticketmaster supposedly charging those venues more for primary ticketing services than they would have paid but for the alleged anticompetitive conduct.

~~If you find that the Plaintiffs have proven that Defendants violated the antitrust laws I previously described, and that the Plaintiff States claiming damages have satisfied the other elements for damages in my previous instructions, then the Plaintiff States claiming damages are entitled to recover, on behalf of fans, as damages, for those overcharges. That amount is the difference between what fans paid for primary tickets during the damages period and the price you find that fans would have paid in a competitive market.~~

If you find that any Plaintiff State has proven that Ticketmaster violated the antitrust laws I previously described, and that as a direct result venues increased the ticketing fees paid by fans, then for each Plaintiff State that satisfies the other elements for damages in my previous instructions, you must determine the per-ticket overcharge amount paid by residents of that State for primary concert

153

tickets for events at so-called "major concert venues." The per-ticket overcharge amount is the difference between what residents of the Plaintiff State paid for fees added to the face value of tickets sold in the primary market during the damages period, and the amount of ticket fees you find those residents of that State would have paid but for Ticketmaster's alleged anticompetitive conduct. You are not being asked to determine, and may not speculate as to, the total number of tickets or ticket purchasers affected by any overcharge.

You are being asked to determine the average per ticket overcharge amount for primary tickets purchased by fans for events at major concert venues in each of the Plaintiff States claiming damages. You are not being asked to determine the total number of tickets or fans affected by those overcharges.

**Plaintiffs' Authority**: Jury Instructions at 15-16, *Morelock Enterprises, Inc. v. Weyerhaeuser Co.*, 3:04-cv-00583-PA (D. Ore. Apr. 25, 2008).

**Plaintiffs' Position:** Plaintiffs have proposed a short nonargumentative instruction regarding the nature of overcharge damages. Defendants' proposed instruction complicates this instruction in a way that mischaracterizes Plaintiffs' claims and may otherwise be confusing for the jury.

First, for the same reasons described with respect to prior instructions, Defendants' alternative names for Plaintiffs' proposed markets risk confusing the jury.

Second, Defendants again mischaracterize Plaintiffs' claims (as relevant to this instruction) as only against Ticketmaster, rather than both Defendants.

Third, Defendants do not accurately describe the Plaintiff States' economic evidence about the basis of the overcharge to fans. While it is correct that the Plaintiff States' expert will testify that Defendants' increased ticketing fees are the cause of any injuries to fans, Defendants' instruction suggests that the only mechanism by which fans are injured is through a simple pass-through model in which venues are charged increased fees by Ticketmaster and those venues subsequently increase their fees to fans. As the Plaintiff States' expert will testify, because Ticketmaster sells tickets directly to fans, and the various components of a ticket depend on one another, Defendants' characterization of causation here is not accurate. And regardless, given that causality may be a subject of dispute between experts at trial, attempting to characterize it in detail in a jury instruction is not appropriate.

**Defendants' Authority**: Jury Instructions at 15-16, *Morelock Enterprises, Inc. v. Weyerhaeuser Co.*, 3:04-cv-00583-PA (D. Ore. Apr. 25, 2008); 15 U.S.C. § 15c(a)(1) ("The court shall exclude from the amount of monetary relief awarded in [a parent patriae] action any amount of monetary relief. . . which is properly allocable to. . . any business entity.").

154

**Defendants' Argument:**  Defendants object to Plaintiffs' characterization of the alleged overcharge, which seeks to prejudice the jury by obfuscating the nature of the alleged overcharge and how it allegedly results.  Defendants' edits seek to make clear that the alleged overcharge at issue (1) relates to *fees* added to the face value of tickets, not the face value of tickets themselves; and (2) results from *venues* increasing those fees, not Ticketmaster.  Defendants' remaining edits align this instruction with the preceding damages instructions and were undertaken for the same reasons.

**Post-Instruction No. ~~35~~ 34**

### BASIS FOR CALCULATING ~~DAMAGES~~OVERCHARGE

You are permitted to make just and reasonable estimates in determining the amount of the ~~average~~ per-ticket overcharge for each Plaintiff State claiming damages that has proven it is entitled to recover damages. You are not required to calculate the amount of the overcharge with mathematical certainty or precision. However, the overcharge must have a reasonable basis in the evidence and must be based on reasonable, non-speculative assumptions and estimates. The overcharge may not be based on guesswork or speculation. Each ~~of the~~ Plaintiff ~~States~~State claiming damages must prove the reasonableness of each of the assumptions upon which the ~~damages calculation~~per-ticket overcharge for its State is based~~. But if you determine that Defendants violated the Sherman Act, Defendants bear the risk of any uncertainty in calculating damages created by their own wrongdoing~~.

If you find that any Plaintiff ~~States~~State claiming damages ~~have~~has provided a reasonable basis for determining ~~damages~~the per-ticket overcharge in its State, then you may find an overcharge amount for that State so long as that amount is a just and reasonable estimate supported by the evidence.

If you find that any Plaintiff ~~States failed to carry their burden of providing a reasonable basis for determining damages, then you may not find that any overcharge occurred.~~

**Plaintiffs' Authority**: Adapted ABA Model Instr. 6.B.3; *See, e.g., Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264–66 (1946) ("The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created."); *Story Parchment Co.,* 282 U.S. at 563 ("[I]t would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts."); *see also New York v. Julius Nasso Concrete Corp.*, 202 F.3d 82, 88 (2d Cir. 2000); *Nat'l Farmers' Org., Inc. v. Associated Milk Producers, Inc.*, 850 F.2d 1286, 1293 (8th Cir. 1988).

**Plaintiffs' Position:** Plaintiffs have proposed an adapted version of the ABA Model Jury Instructions for this instruction. Defendants' proposed instruction unnecessarily repeats the requirement for individual determinations for each State that is already covered in the existing instruction.

**Defendants' Authority**: Adapted ABA Model Instr. 6.B.3.

**Defendants' Argument:**  Defendants' edits to this instruction align it with the preceding damages instructions and were undertaken for the same reasons.

Defendants object to Plaintiffs' statement that "Defendants bear the risk of uncertainty in calculating damages created by their own wrongdoing."  This statement is highly prejudicial and might incline the jury to disregard this Court's instruction that its calculations must be "just and reasonable" under all circumstances.  Indeed, in *Bigelow v. RKO Radio Pictures*, the Supreme Court held that "even where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guesswork." 327 U.S. 251, 264.  Rather, it must "make a just and reasonable estimate of the damage based on relevant data." *Id.*  The Court reasoned that "[a]ny other rule," *i.e.*, a rule requiring "direct and positive proof," "would enable the wrongdoer to profit by his wrongdoing." *Id.*  Plaintiffs' proposal takes that statement out of context and erroneously suggests to the jury that it may do exactly what the Supreme Court has forbidden.  "It is well-settled that the burden is on the plaintiff to establish its entitlement to recovery." *Trs. of Plumbers & Pipefitters Nat. Pension Fund v. Daniel Weintraub & Assocs., Inc.*, 2007 WL 4125453, at *3 (E.D.N.Y. Nov. 16, 2007).  Plaintiffs' attempt to flip the burden is unavailing and should be rejected

~~**Post-Instruction No. 35P**~~

~~**CALCULATION OF MONETARY RECOVERY FOR VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200 ET SEQ.)**~~

~~If you find that Defendants have violated California's Unfair Competition Law, then you must determine the amount of the average per ticket overcharge, if any, that individuals who purchased primary concert tickets for live concert events at major concert venues in California are entitled to recover. This overcharge must have resulted from Defendants imposing ticketing fees that were higher than they would have been but for any business act or practice that you have found violated the Unfair Competition Law.~~

~~The fact that I am giving you instructions concerning the issue of the amount of monetary recovery under California's Unfair Competition Law does not mean that I believe any party should, or should not, prevail in this case. If you reach a verdict for Defendants on California's Unfair Competition Law, you may disregard the monetary recovery instructions that I am about to give.~~

~~The average per ticket overcharge amount is the difference between what fans paid for~~

~~primary concert tickets for live events at major concert venues in California and the price you find that fans would have paid without the business act or practice that violated the Unfair Competition Law.~~

~~In addition, if you found that the unlawful or unfair act or practice that Defendants engaged in emanated from California and harmed consumers who paid for primary concert tickets for live events at major concert venues outside of California, you should separately determine the amount of overcharge for those consumers.~~

~~In calculating the overcharge amount, you must use a reasonable basis of computation. Your calculation of the overcharge amount may be an approximation. Your computation must be supported by evidence. If you find that the State of California has~~State failed to carry its burden of providing a reasonable basis for determining the ~~amount of the~~per-ticket overcharge in its State, then you may not find that any overcharge ~~amount.~~occurred in that State.

**Plaintiffs' Authority**: *People v. Ashford Univ., LLC*, 100 Cal. App. 5th 485, 506-07, 518-21 (2024) (citing *Abbott Laboratories v. Superior Court*, 9 Cal. 5th 642, 651–652 (2020)); *Ashford*, 100 Cal. App. 5th at 518-19 (the trial court properly determined that defendants' conduct emanated from California and had cited "evidence that defendants were headquartered in San Diego, and Ashford's former presidents, admissions counselors, and the majority of admissions employees worked in San Diego" and that, as an example, the UCL "could constitutionally be applied to the claims of nonresident class members" where the defendant was a California corporation with its principal place of business in California and the "brochures at issue were prepared in and distributed from California" (citation omitted); *Fernandez v. CoreLogic Credco*, LLC, 593 F. Supp. 3d 974, 992 (S.D. Cal. 2022) (refusing to dismiss UCL claim and finding it plausible that unlawful conduct emanated from California in lawsuit brought by Maryland resident against a firm that had its principal place of business in California, management level employees in California, and that the policies and procedures at issue in this case were developed, designed, and implemented in California); *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 988 (9th Cir. 2015) ("Restitution under the UCL . . . must be of a measurable amount to restore to the plaintiff what has been acquired by the violation of the statute[], and that measurable amount must be supported by evidence" and "[i]n calculating damages, here restitution, California law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation" and that "the fact that the amount of damage may not be susceptible of exact proof or may be uncertain, contingent or difficult of ascertainment does not bar recovery" (citing *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 698 (2006), *Marsu, B.V. v. Walt Disney Co.*, 185 F.3d 932, 938-39 (9th Cir. 1999) (internal quotation marks omitted)). Jury Instructions at 15-16, *Morelock Enterprises, Inc. v. Weyerhaeuser Co.*, 3:04-cv-

158

00583-PA (D. Ore. Apr. 25, 2008).

**Plaintiffs' Position:** Plaintiffs' request for the jury to be instructed on its request for monetary restitution under California's Unfair Competition law is both legally proper and in the interest of judicial efficiency. As stated in Plaintiffs' Joint Memorandum of Law in Support of Plaintiffs' Motion to Bifurcate Trial, the State of California believes that judicial efficiency is served by its request for monetary restitution being tried to the same jury as the liability claims. *See* ECF No. 528 at 7 n.3. The State of California's request for monetary restitution is based on the same evidence and testimony that will support the damages claims of the other states. Plaintiffs' monetary relief expert, Dr. Rosa Abrantes-Metz, calculates the amount of monetary restitution California seeks in the same manner as those of the damages states and presenting the same testimony in another phase of the trial would be inefficient and unnecessary. Further, the Federal Rules permit a jury to sit in an advisory capacity on equitable claims such as the State of California's monetary relief claim where, as here, judicial efficiency would be best served by a single jury considering the claim with others in the case. Fed. R. Evid. 39(c); 9 Wright & Miller, Federal Practice and Procedure: Civil 3d § 2335; *Starr Int'l Co. v. Am. Int'l Grp., Inc.*, 623 F. Supp. 2d 497, 502 (S.D.N.Y. 2009) ("Courts may empanel an advisory jury in order to maximize efficiency and convenience.").

**Defendants' Argument**: California has sought only equitable relief and civil penalties in this case. ECF No. 257 at 95 (Am. Compl.) (seeking "[i]njunctive, restitution and other equitable relief under the UCL" and "[c]ivil penalties"). Indeed, "[a] UCL action is equitable in nature; damages cannot be recovered." Cruz v. PacifiCare Health Systems, Inc., 30 Cal. 4th 303, 317 (Cal. 2003). Although the UCL provides for monetary recovery in the form of restitution, that too is viewed as an equitable remedy "[i]n the UCL context." Id. This Court has already decided that equitable remedies and civil penalties will be determined at a later phase, after the jury trial on liability and damages. Defendants object to California's attempt to relitigate that ruling and have its equitable remedies tried to the jury

159

**Post-Instruction No. ~~36~~ 35**

### FINAL INSTRUCTIONS

You are about to go into the jury room and begin your deliberations. If during those deliberations you want to see any of the exhibits, you may request that they be brought into the jury room. If you want any of the testimony read back to you, you may also request that. Please remember that it is not always easy to locate what you might want to read or hear, so be as specific as you possibly can in requesting exhibits or portions of the testimony.

Your requests for exhibits or testimony—in fact, any communication with the Court—should be made to me in writing, signed by your foreperson, and given to one of the marshals. In any event, do not tell me or anyone else how the jury stands on any issue until after a unanimous verdict is reached.

*Duty to Deliberate/Unanimous Verdict*

You will now retire to decide the case.  It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement. Each of you must decide the case for yourselves, but you should do so only after a consideration of the case with your fellow jurors, and you should not hesitate to change an opinion when convinced that it is erroneous. Your verdict must be unanimous, but you are not bound to surrender your honest convictions concerning the effect or weight of the evidence for the mere purpose of returning a verdict or solely because of the opinion of other jurors. Discuss and weigh your respective opinions dispassionately, without regard to sympathy, without regard to prejudice or favor for either party, and adopt that conclusion which in your good conscience appears to be in accordance with the truth.

Again, each of you must make your own decision about the proper outcome of this case based on your consideration of the evidence and your discussions with your fellow jurors. No juror should surrender their conscientious beliefs solely for the purpose of returning a unanimous verdict.

160

*Selection of Foreperson*

When you retire, you should elect one member of the jury as your foreperson. That person will preside over the deliberations and speak for you here in open court.

Verdict forms have been prepared for your convenience. You will take these forms to the jury room and, when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date, and sign the form that sets forth the verdict upon which you unanimously agree. You will then return with your verdict to the courtroom. I will read the verdict form to you now.

*Return of Verdict*

After you have reached a verdict, your foreperson will fill in the form that has been given to you, each of you will sign it with the date and advise the marshal outside your door that you are ready to return to the courtroom.

I will stress that each of you should be in agreement with the verdict which is announced in court. Once your verdict is announced by your foreperson in open court and officially recorded, it cannot ordinarily be revoked.

*Juror Oath*

In determining the facts, you are reminded that you took an oath to render judgment impartially and fairly, without prejudice and without fear, solely upon the evidence in the case and the applicable law. I know that you will do this and reach a just and true verdict.

161

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, et al., <br><br> Plaintiffs, <br><br> LIVE NATION ENTERTAINMENT, INC., <br> and TICKETMASTER L.L.C., <br><br> Defendants. | Case No. 1:24-cv-03973-AS |

DEFENDANTS' PROPOSED JURY INSTRUCTIONS

Pursuant to Rule 51(a) of the Federal Rules of Civil Procedure and the Court's Individual Practices in Civil Cases, Paragraph D, Plaintiffs the States of Arizona, California, Colorado, Connecticut, Florida, Illinois, Indiana, Kansas, Louisiana, Maryland, Michigan, Minnesota, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, Oregon, Rhode Island, South Carolina, Tennessee, Texas, Utah, Vermont, Washington, West Virginia, Wisconsin, and Wyoming, the Commonwealths of Massachusetts, Pennsylvania, and Virginia, and the District of Columbia, acting by and through their respective Attorneys General (collectively, "Plaintiff States"), together with Defendants Live Nation Entertainment, Inc., and Ticketmaster L.L.C. (collectively, "Defendants"), respectfully request that the Court provide the following instructions to the jury. For those instructions where the parties could not reach agreement, Plaintiffs and Defendants have separately set forth their proposed instruction together with short arguments, including citations to supporting authority.

1

# Contents

Post-Instruction No. 1 ......................................................................................................6

GENERAL INTRODUCTION ........................................................................................6

Post-Instruction No. 2 ......................................................................................................7

THE PARTIES ...................................................................................................................7

Post-Instruction No. 3 ....................................................................................................13

EVIDENCE IN THE CASE ...........................................................................................13

Post-Instruction No. 4 ....................................................................................................14

WITNESS CREDIBILITY ............................................................................................14

Post-Instruction No. 5 ....................................................................................................16

USE OF DEPOSITIONS AS EVIDENCE ....................................................................16

Post-Instruction No. 6 ....................................................................................................17

EXPERT TESTIMONY ..................................................................................................17

Post-Instruction No. 7 ....................................................................................................18

SUMMARY OF CONTENTIONS .................................................................................18

Post-Instruction No. 8 ....................................................................................................23

BURDEN OF PROOF—PREPONDERANCE OF THE EVIDENCE ....................................23

Post-Instruction No. 9 ....................................................................................................24

MONOPOLIZATION ELEMENTS ..............................................................................24

Post-Instruction No. 10 ..................................................................................................27

MONOPOLIZATION ELEMENT #1: RELEVANT MARKET—GENERAL ....................27

Post-Instruction No. 11 ..................................................................................................30

RELEVANT PRODUCT MARKET—General ............................................................30

Post-Instruction No. 11D ...............................................................................................34

**RELEVANT PRODUCT MARKET—PRIMARY TICKETING MARKETS** ......................34

**Post-Instruction No. 11D2** ...............................................................................................36

**RELEVANT PRODUCT MARKET—AMPHITHEATERS MARKET** ................................36

**Post-Instruction No. 12** ...................................................................................................38

**MONOPOLIZATION ELEMENT #2: MONOPOLY POWER** ...............................................38

**Post-Instruction No. 13** ...................................................................................................40

**EXISTENCE OF MONOPOLY POWER—DIRECT PROOF** ................................................40

**Post-Instruction No. 14** ...................................................................................................44

**EXISTENCE OF MONOPOLY POWER—INDIRECT PROOF** ..........................................44

**Post-Instruction No. 15** ...................................................................................................49

**MONOPOLIZATION ELEMENT #3: WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY POWER THROUGH ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT** ........................................................................................................................................49

**Post-Instruction No. 16** ...................................................................................................55

**ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT—EXCLUSIVE DEALING SHERMAN ACT SECTION 2** .............................................................................................55

**Post-Instruction No. 16D** .................................................................................................58

**THREATS AND RETALIATION** .........................................................................................58

**Post-Instruction No. 16D2** ...............................................................................................62

**VERTICAL INTEGRATION AND SELF-PREFERENCING** ..............................................62

**Post-Instruction No. 16D3** ...............................................................................................65

**MONOPOLIZATION ELEMENT #4: COMPETITIVE HARM** ..........................................65

**Post-Instruction No. 17** ...................................................................................................68

**EXCLUSIVE DEALING AGAINST TICKETMASTER—SHERMAN ACT SECTION 168**

**Post-Instruction No. 18** ...................................................................................................75

**UNLAWFUL TYING AGAINST LIVE NATION** ................................................................75

**Post-Instruction No. 18D** ...............................................................................................81

**UNLAWFUL TYING—IDENTITY OF THE PURCHASER** ...................................................81

**Post-Instruction No. 18D2** ........................................................................................83

**UNLAWFUL TYING—PRESENCE OF TWO PRODUCTS** ...................................................83

**Post-Instruction No. 19** ............................................................................................84

**UNLAWFUL TYING—PROOF OF CONDITIONING AND COERCION**.........................84

**Post-Instruction No. 20** ............................................................................................86

**UNLAWFUL TYING—INVOLVEMENT OF A NOT INSUBSTANTIAL VOLUME OF INTERSTATE COMMERCE WITH RESPECT TO THE TIED PRODUCT AND SUBSTANTIAL FORECLOSURE IN TIED PRODUCT MARKET** ....................................86

**Post-Instruction No. 21** ............................................................................................88

**STATE LAW CLAIMS**...................................................................................................88

**Post-Instruction No. 22** ............................................................................................89

**CONGRUENT STATE CLAIMS** .....................................................................................89

**Post-Instruction No. 23** ............................................................................................95

**CALIFORNIA UNFAIR COMPETITION LAW  (Cal. Bus. & Prof. Code § 17200 *et seq.*)**...........................................................................................................................95

**Post-Instruction No. 24**............................................................................................100

**FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT (Fla. Stat. § 501.204)**100

**Post-Instruction No. 25**............................................................................................104

**ILLINOIS ANTITRUST ACT (740 ILCS 10/1 *et seq.*)** ............................................104

**Post-Instruction No. 25D**.........................................................................................106

**INDIANA ANTITRUST ACT (IND. CODE §§ 24-1-2-1 AND 24-1-2-2)**.............................106

**Post-Instruction No. 26**............................................................................................108

**KANSAS RESTRAINT OF TRADE ACT (Kan. Stat. Ann. § 50-101 *et seq.*)** .....................108

**Post-Instruction No. 27**............................................................................................110

**DONNELLY ACT (New York General Business Law §§ 340 *et seq.*)** ..................................110

**Post-Instruction No. 28**............................................................................................112

**SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT  (S.C. Code Ann. § 39-5-10 et seq.)** ...................................................................................................................................112

**Post-Instruction No. 29**...................................................................................................115

**TENNESSEE TRADE PRACTICES ACT  (TENN. CODE ANN. §§ 47-25-101 AND 102)**115

**Post-Instruction No. 30**...................................................................................................117

**STATES DAMAGES CLAIMS**.........................................................................................117

**Post-Instruction No. 31**...................................................................................................121

**INJURY AND CAUSATION**............................................................................................121

**Post-Instruction No. 31D**................................................................................................124

**STATUTE OF LIMITATIONS**.........................................................................................124

**Post-Instruction No. 32**...................................................................................................127

**DAMAGES INSTRUCTIONS—GENERAL**....................................................................127

**Post-Instruction No. 33**...................................................................................................129

**COMPENSATORY DAMAGES—OVERCHARGE**.........................................................129

**Post-Instruction No. 34**...................................................................................................131

**BASIS FOR CALCULATING OVERCHARGE** ..............................................................131

**Post-Instruction No. 35**...................................................................................................133

**FINAL INSTRUCTIONS**..................................................................................................133
*Duty to Deliberate/Unanimous Verdict* .............................................................................133
*Selection of Foreperson* .....................................................................................................134
*Return of Verdict* ................................................................................................................134
*Juror Oath*...........................................................................................................................134

**Post-Instruction No. 1**

## GENERAL INTRODUCTION

Now that you have heard the evidence and the argument, it is my duty to instruct you about the applicable law. It is your duty to follow the law as I state it. You must apply the law to the facts as you find them from the evidence in the case. Do not single out one instruction as stating the law, but consider the instructions as a whole. Do not be concerned about the wisdom of any rule of law stated by me. You must follow and apply the law.

Nothing I say in these instructions indicates I have any opinion about the facts of the case. You, not I, have the duty to determine the facts.

You must perform your duties as jurors without bias or prejudice as to any party. The law does not permit you to be controlled by sympathy, prejudice, or public opinion. The parties expect that you will carefully and impartially consider all the evidence, follow the law as it is now being given to you, and reach a just unanimous verdict, regardless of the consequences.

**Authority**: *Nike, Inc. v. Lululemon USA Inc.*, Final Jury Instructions at 3, 1:23-cv-00771-AS (S.D.N.Y.).

**Post-Instruction No. 2**

## THE PARTIES

As I instructed you earlier, the Plaintiffs are the [33] individual States and the District of Columbia. The Defendants in this case are Live Nation Entertainment, Inc. and Ticketmaster L.L.C.

There are multiple Plaintiffs and Defendants in this case, and different Plaintiffs are asserting different claims against different Defendants. You must decide each claim by each Plaintiff against each Defendant separately. Each Plaintiff must meet its own burden of proof for each of its claims and each Defendant is entitled to have the claims alleged against it determined based on its own conduct. In particular, each Plaintiff State must prove every element of its own claims.

Unless otherwise stated, these instructions apply to all parties.

**Plaintiffs' Authority**: Adapted 4 Modern F. Jury Instructions-Civil P 79.02, 79-5; *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 777 (1984) ("[a]ny anticompetitive activities of corporations and their wholly owned subsidiaries meriting antitrust remedies may be policed adequately [because] the enterprise is fully subject to Section 2 of the Sherman Act"); *id.* at 771-72 (explaining that "the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise . . . [because a] parent and its wholly owned subsidiary have a complete unity of interest . . . [and] in reality a parent and a wholly owned subsidiary *always* have a unity of purpose or a common design. They share a common purpose whether or not the parent keeps a tight rein over the subsidiary") (citation omitted and emphasis in original); *id.* at 772 ("Antitrust liability should not depend on whether a corporate subunit is organized as an unincorporated division or a wholly owned subsidiary," and a company's decisions "to choose one structure over the other are not relevant to whether the enterprise's conduct seriously threatens competition.") *Caribe BMW, Inc. v. Bayerische Motoren Werke Aktiengesellschaft*, 19 F.3d 745, 749-50 (1st Cir. 1994) (Breyer, C.J.) (applying *Copperweld* in the Robinson Patman context, and explaining that the *Copperweld* "Court saw an identity of economic interest between parent and wholly owned subsidiary that, considered in terms of the economically oriented antitrust laws, warrants regarding them as one"); *Arandell Corp. v. Centerpoint Energy Services, Inc.*, 900 F.3d 623, 630 (9th Cir. 2018) ('[w]here there is substantial common ownership, ... individual firms function as an economic unit and are generally treated as a single entity.'") (holding subsidiary could be liable for anticompetitive conduct of parent by "selling gas at rigged prices and distributing the inflated profits to its parent"); *Lenox MacLaren Surgical Corporation v. Medtronic, Inc.*, 847 F.3d 1221, 1236 (10th Cir. 2017) ("Rather, in a single-enterprise situation, it is the affiliated corporations' collective conduct—i.e., the conduct of the *enterprise* they jointly compose—that matters; it is the *enterprise* which must be shown to satisfy the elements of a monopolization or attempted monopolization claim.") (collecting cases where courts "held that a parent can be liable for subsidiary-level anticompetitive activity" "when the parent controls, dictates or encourages the subsidiary's anticompetitive conduct" (cleaned up)); *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1070 (D. Colo. 2004) ("When the parent controls, directs, or encourages the subsidiary's anticompetitive conduct, the parent engages in

7

sufficient independent conduct to be held directly liable as a single enterprise with the subsidiary under the Sherman Act.").

**Plaintiffs' Position:** Defendants' proposed instruction that each Plaintiff must meet its burden of proof for each of its claims, as drafted, is likely to be confusing to the jury and, in any event, is unsupported by Defendants' cited authorities. With respect to the federal antitrust claims, the Plaintiff States have asserted the same claims and intend to jointly present evidence in support of those claims at trial and California's claims rely on the same common nucleus of facts. There is no legal requirement for each of the Plaintiffs to independently present evidence to the jury multiple times. The cases cited by Defendants are inapposite. In *Phillips v. Potter,* "each Plaintiff br[ought] separate factual allegations supporting the same claim – [a] sexually hostile environment." 2008 WL 11492752, at *30 (N.D. Ohio Mar. 31, 2008). But here, for the federal claims, all Plaintiffs base their claims on the exact same factual allegations.

Of course, to the extent a Plaintiff State has also brought a separate state law claim or sought damages, it will be responsible for ensuring the evidence at trial supports those claims, but each such Plaintiff State believes that the evidence overlaps significantly with evidence supporting the federal antitrust claims. Defendants' proposed instruction is overly broad and would seem to require that each State independently put forward the necessary evidence, even though such evidence overlaps substantially both with the federal claims and across state law and state damages claims. Defendants' cherry-picked quotation from *Phillips* fairs no better. *Phillips* merely stands for the proposition that one plaintiff's "testimony about events that occurred in 2001 are not admissible or relevant to [other plaintiffs'] claims of harassment beginning in 2004." *Id.* at *31. There is no parallel to the joint claims brought by the State Plaintiffs here.

The *Radmanovich* case involved a class certification decision where the court highlighted as a key issue "that each plaintiff would need to come forth with proof of how the pattern or practice of discrimination impacted her." *Radmanovich v. Combined Ins. Co. of Am.*, 216 F.R.D. 424, 436 (N.D. Ill. 2003). The court noted a finding of a commonly alleged "pattern or practice" alone would be insufficient to establish liability on any individual's claim. *See id.* at 439. But no such showing of individualized impact is required for any of the federal antitrust claims alleged here, except to the extent certain Plaintiff States seek damages or to independently prove liability under their laws, for which they each intend to offer sufficient evidence at trial within the time allotted by the Court. Indeed, in *Orchestrate,* cited by Defendants, the court did not compartmentalize evidence between Plaintiffs but rather allowed Plaintiffs to argue "that evidence of damages to one may possibly be used as evidence of damages to the other where damages overlap." *Orchestrate HR, Inc. v. Trombetta*, 2017 WL 273669, at *8 (N.D. Tex. Jan. 20, 2017) (denying in part defendants' motion in limine). And *Louisiana Crawfish Producers Ass'n-W. v. Amerada Hess Corp.*, 2015 WL 10571063, at *11 (W.D. La. Nov. 23, 2015), merely confirmed that when an individual plaintiff pursues monetary recovery for damages it experienced, it must prove the amount of damages incurred. No such requirement applies to the Plaintiff States when seeking to enforce the federal antitrust laws, outside of specific damages claims.

Further, Defendants' proposed instruction that the jury must consider each Defendant separately and in isolation misstates the law. Under the antitrust laws, a parent and its wholly owned subsidiary are viewed as a single entity with a complete unity of interest. In *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984), the Supreme Court overturned "a long-settled

8

rule" permitting Section 1 Sherman Act antitrust liability for "intra-enterprise" coordinated conduct between a parent and its wholly owned subsidiary. *Id*. at 777, 784. In doing so, however, the Court held that "[a]ny anticompetitive activities of [such enterprises] meriting antitrust remedies may be policed adequately without resort to an intra-enterprise conspiracy doctrine" as "the enterprise is fully subject to § 2 of the Sherman Act." 467 U.S. at 776-77. The *Copperweld* Court reasoned that "the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise . . . [because a] parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one . . . [and] in reality a parent and a wholly owned subsidiary *always* have a unity of purpose or a common design. They share a common purpose whether or not the parent keeps a tight rein over the subsidiary" (emphasis added). *Id.* at 771-72. Significant to the dispute here, the Court also barred the consideration of multi-factor tests to determine whether corporate entities could be considered a "single entity" "[a]s applied to a wholly owned subsidiary" because such a test is "inadequate to preserve the Sherman Act's distinction between unilateral and concerted conduct." *Id.* at 772 n. 18 (noting that "[a]t least when a subsidiary is wholly owned, however, these factors are not sufficient to describe a separate economic entity for purposes of the Sherman Act" because "[t]hey cannot overcome the basic fact that the ultimate interests of the subsidiary and the parent are identical, so the parent and the subsidiary *must* be viewed as a single economic unit") (emphasis added).

Courts have been near uniform in applying this rule in antitrust cases. *See, e.g., Fraser v. Major League Soccer, LLC*, 284 F.3d 47, 58 (1st Cir. 2002) (Boudin, J.) (explaining that it is settled law under *Copperweld* that a "parent and its wholly owned subsidiary . . . share[ ] a 'complete unity of interests'") (quoting *Copperweld*, 467 U.S. at 771); *Caribe BMW, Inc. v. Bayerische Motoren Werke Aktiengesellschaft*, 19 F.3d 745, 749-50 (1st Cir. 1994) (Breyer, C.J.) (explaining that the *Copperweld* "[c]ourt saw an identity of economic interest between a parent and wholly owned subsidiary that, considered in terms of the economically oriented antitrust laws, warrants regarding them as one [because] [a]ny claimed instance of truly 'independent,' owner-hostile, subsidiary decisionmaking would meet with the skeptical question, 'But, if the subsidiary acts contrary to its parent's economic interest, why does the parent not replace the subsidiary's management?' Given the strength of that joint economic interest, we do not see how a case-specific judicial examination of 'actual' parental control would help achieve any significant antitrust objective"); *United States v. Waste Mgmt., Inc.*, 743 F.2d 976, 978-79 (2d Cir. 1984) (post-*Copperweld*, attributing without discussion subsidiaries' activities and market shares to parent corporation for purposes of Clayton Act merger analysis).

Defendants' reliance on a smattering of non-antitrust cases and some out-of-circuit, inapposite antitrust cases do not support a rejection of *Copperweld* here. *See, e.g.*, *United States v. Bestfoods*, 524 U.S. 51, 61-62 (1998) (discussing "general principle[s] of corporate law" in the context of CERCLA); *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir. 1993) (considering a franchisee's efforts to collect an arbitral breach-of-contract award against a franchisor's parent company); *In re Outpatient Medical Center Employee Antitrust Litig.*, 630 F. Supp. 3d 968, 991 (N.D. Ill. 2022) (considering liability of a parent company that purchased defendant company, which was already engaging in Section 1 conspiracy with co-defendants); *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 857 (10th Cir. 1999) (declining to consider a non-insurance company "as an insurance company on the same horizontal level as [co-defendant insurance companies] merely because [non-insurance] company happens to be the wholly owned subsidiary of [a parent company]

9

which owns other subsidiaries which are insurance companies"). Other cases cited by Defendants undercut their position here. *See, e.g.*, *Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 633 (9th Cir. 2018) (finding parent and subsidiary should be treated as a single entity for purposes of Sherman Act claim and chastising defendants for trying to "have the *Copperweld* doctrine both ways [by] insist[ing] both (1) that two affiliates are incapable of conspiring with each other for purposes of Section 1 of the Sherman Act because they 'always' share a 'unity of purpose,' and (2) that one affiliate may escape liability for its own conduct . . . by disavowing the anticompetitive intent of the other, even where the two acted together" because "*Copperweld* 'foreclose[d]' a result that would allow sophisticated companies to evade Section 2 liability by spreading anticompetitive schemes over multiple affiliates").

Finally, even assuming arguendo that Defendants' cited authorities were applicable to the facts and circumstances here—they are not—Plaintiffs have presented evidence at trial that Live Nation is "involved" in the alleged conduct of its wholly owned subsidiary, such that they should be considered a single entity even under a more restrictive test. Notably, Defendants request a separate instruction premised on their "vertical integration," claiming that their existence as a single entity provides a defense to liability, while insisting through this instruction that they be treated as entirely separate entities as a matter of law. This charge should be denied as legally and factually baseless and likely to confuse the jury.

**Defendants' Authority**: *North Am. Soccer League, LLC v. U.S. Soccer Federation, Inc.*, Final Jury Instructions at 7, No. 1:17-cv-5495, ECF No. 531 (E.D.N.Y. Jan. 31, 2025); *Phillips v. Potter*, No. 1:05 CV 1852, 2008 WL 11492752, at *31 (N.D. Ohio Mar. 31, 2008) ("It is well understood that each Plaintiff must prove her own individual claims."); *Radmanovich v. Combined Ins. Co. of Am.*, 216 F.R.D. 424, 439 (N.D. Ill. 2003) ("Each plaintiff will be responsible for establishing the elements of her own claims."); *Orchestrate HR, Inc. v. Trombetta*, No. 3:13-CV-2110-KS, 2017 WL 273669, at *8 (N.D. Tex. Jan. 20, 2017) ("It is elementary that each plaintiff must prove its own damages."); *Louisiana Crawfish Producers Ass'n-W. v. Amerada Hess Corp.*, No. CV 6:10-0348, 2015 WL 10571063, at *11 (W.D. La. Nov. 23, 2015) ("Each plaintiff must necessarily prove his or her case."); *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries."; collecting cases); *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir. 1993); *In re Outpatient Medical Center Employee Antitrust Litig.*, 630 F. Supp. 3d 968, 991 (N.D. Ill. 2022) ("Courts have declined to extend *Copperweld* to allow § 1 liability for both a parent and its subsidiary 'even where there is no evidence that both were involved in the challenged conduct.'" (quoting *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 857 (10th Cir. 1999))); *id.* ("[C]ourts continue to find a parent liable only when it was directly involved in the anticompetitive conduct." (citing *Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 633 (9th Cir. 2018))); *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 857 (10th Cir. 1999) ("Plaintiffs wish to extend *Copperweld* to hold that a subsidiary and its parent, or a subsidiary and a sister subsidiary, can be considered one entity for all § 1 purposes, and either one can be liable for conspiring to restrain trade, even where there is no evidence that both were involved in the challenged conduct. We reject this extension."); *In re Pa. Title Ins. Antitrust Litig.*, 648 F. Supp. 2d 663, 688-89 (E.D. Pa. 2009) ("[W]hen a 'parent controls, directs, or encourages the subsidiary's anticompetitive conduct, the parent engages in sufficient independent conduct to be held directly liable as a single enterprise with the subsidiary under the Sherman Act.'"; dismissing claims against corporate parents); *McCray v. Fidelity Nat'l Title Ins. Co.*, 636 F. Supp. 2d

10

322, 334 (D. Del. 2009) (dismissing "the claims against the corporate parent defendants" for failure to allege "facts sufficient to infer... direct involvement"), *aff'd*, 682 F.3d 229 (3d Cir. 2012); *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1237 (10th Cir. 2017) ("[A]lthough we agree that Lenox was entitled to pursue its § 2 claims against Defendants as a single enterprise, and to prove those claims based on the actions of the enterprise as a whole, Lenox was still required to come forward with evidence that each defendant independently participated in the enterprise's scheme, to justify holding that defendant liable as part of the enterprise."); *Climax Molybdenum Co. v. Molychem, L.L.C.*, 414 F. Supp. 2d 1007, 1012 (D. Colo. 2005) ("When the parent controls, dictates or encourages the subsidiary's anticompetitive conduct, the parent engages in sufficient independent conduct to be held directly liable as a single enterprise with the subsidiary under the Sherman Act.").

**Defendants' Argument**:  Defendants object to Plaintiffs' treatment of Live Nation and Ticketmaster "as a single entity" here and throughout these instructions.  Under "well-settled principles of corporate law, . . . parent corporations and their subsidiaries a[re] legally distinct entities." *Balintulo v. Ford Motor Co.*, 796 F.3d 160, 168 (2d Cir. 2015).  And "a parent corporation . . . is not liable for the acts of its subsidiaries," or vice versa.  *United States v. Bestfoods*, 524 U.S. 51, 61 (1998).  A parent corporation may be held liable for the acts of its subsidiaries only under certain narrow circumstances, such as "under a veil-piercing, alter ego, or respondeat superior theory." *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1237 (10th Cir. 2017); *see Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir. 1993).  Plaintiffs have not alleged those theories here, it is far too late to do so now, and doing so would be futile in any event.  Plaintiffs must prove their claims against each Defendant separately.

Contrary to Plaintiffs' contention, *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984), does not justify collapsing legally separate and distinct parent and subsidiary entities in all antitrust cases.  *Copperweld* considered the "intra-enterprise conspiracy doctrine" and held only that a parent company "and its wholly owned subsidiary [] are incapable of conspiring with each other for purposes of § 1 of the Sherman Act."  467 U.S. at 758, 777.  Plaintiffs have not alleged any intra-enterprise conspiracy between Live Nation and Ticketmaster.  Nor have they cited any on-point authority suggesting that *Copperweld* displaces the traditional rule of corporate separateness absent such an allegation.  *Caribe BMW, Inc. v. Bayerische Motoren Werke Aktiengesellschaft* discussed *Copperweld* in the disparate context of the Robinson-Patman Act to determine whether a parent company and subsidiary selling the *exact same product* may be considered a "single seller."  19 F.3d 745, 748-49 (1st Cir. 1994).  That is not the situation here.  And *Arandell Corp. v. Centerpoint Energy Services, Inc.* involved a situation where the plaintiffs sought to hold a parent and a subsidiary liable for a price-fixing scheme that was perpetrated by the parent and in which the subsidiary participated by selling natural gas at prices rigged by the parent.  900 F.3d 623, 625 (9th Cir. 2018).  The Ninth Circuit reasoned that the subsidiary could be held liable for the parent's actions because the subsidiary engaged in "coordinated activity in furtherance of the anticompetitive scheme of its parent." *Id.* at 632.  But that case says nothing about whether a parent that is not even engaged in the same business as the subsidiary may be held liable for the subsidiary's actions.

Importantly, courts have expressly declined to follow the approach advocated by Plaintiffs here.  "Courts have declined to extend *Copperweld* to allow § 1 liability for both a parent and its subsidiary '[] where there is no evidence that both were involved in the challenged conduct.'" *In re Outpatient Medical Center Employee Antitrust Litig.*, 630 F. Supp. 3d 968, 991 (N.D. Ill. 2022) (quoting *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 857 (10th Cir. 1999)).  And "courts continue to find a parent liable only when it was directly involved in the anticompetitive conduct," and thus is being held liable for

11

its own conduct, not that of its subsidiary. *Id.* (citing *Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 633 (9th Cir. 2018)); *see also In re Pa. Title Ins. Antitrust Litig.*, 648 F. Supp. 2d 663, 688-89 (E.D. Pa. 2009) (dismissing claims against corporate parents); *McCray v. Fidelity Nat'l Title Ins. Co.*, 636 F. Supp. 2d 322, 334 (D. Del. 2009) (dismissing "claims against the corporate parent defendants" for failure to allege "facts sufficient to infer . . . direct involvement"), *aff'd*, 682 F.3d 229 (3d Cir. 2012).

As this Court likewise recognized in pre-trial proceedings, to hold entities within the same corporate family liable for the same conduct, "there must be evidence of the involvement of the two parts of the corporate family in the scheme." 2/27/26 Hearing Tr. at 154:7-9; *see Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1237 (10th Cir. 2017) ("[A]lthough we agree that Lenox was entitled to pursue its § 2 claims against Defendants as a single enterprise, and to prove those claims based on the actions of the enterprise as a whole, Lenox was still required to come forward with evidence that each defendant independently participated in the enterprise's scheme, to justify holding that defendant liable as part of the enterprise."). Defendants object to Plaintiffs instructions that merely lump Defendants together without making clear that to hold Live Nation liable for Ticketmaster's conduct, Live Nation must have independently and directly participated in that conduct. In particular, Live Nation must have "control[led], dictate[d] or encourage[d]" Ticketmaster's conduct such that it engaged in sufficient independent conduct to be held directly liable itself. *Climax Molybdenum Co. v. Molychem, L.L.C.*, 414 F. Supp. 2d 1007, 1012 (D. Colo. 2005); *In re Pa. Title Ins. Antitrust Litig.*, 648 F. Supp. 2d 663, 688-89 (E.D. Pa. 2009). Plaintiffs' instructions completely omit that requirement and thus err in stating the law. Moreover, Plaintiffs err in lumping Defendants together for purposes of the amphitheater-related claims. There is no allegation, nor could there be as a matter of law, that Ticketmaster "controls, dictates or encourages" Live Nation's conduct with respect to those venues.

Additionally, it is well-established that each plaintiff in a case must "prove her own individual claims." *Phillips v. Potter*, No. 1:05 CV 1852, 2008 WL 11492752, at *31 (N.D. Ohio Mar. 31, 2008). And each plaintiff must prove how the conduct at issue "impacted her." *Radmanovich v. Combined Ins. Co. of Am.*, 216 F.R.D. 424, 436 (N.D. Ill. 2003). In particular, Plaintiff States have brought several individual claims and damages claims, which each State must prove for itself. Plaintiffs entirely and opportunistically omit this point throughout their proposed instructions. Defendants' edits to this instruction seek to make clear to the jury at the outset that it must assess whether each Plaintiff has proven its case against each Defendant separately.

12

**Post-Instruction No. 3**

## EVIDENCE IN THE CASE

Unless you are otherwise instructed, the evidence in the case consists of the sworn testimony of the witnesses regardless of who may have called the witness, all exhibits received in evidence regardless of who may have produced them, and all facts and events that may have been admitted, stipulated to, or taken judicial notice of.

Statements and arguments by the lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statement, closing arguments, and at other times is intended to help you understand the evidence, but it is not evidence. However, as I explained at the beginning of this trial, the lawyers on both sides have agreed on certain facts known as stipulations, and you must treat those facts as proven.

Any question to which I have sustained an objection and evidence that I have ordered stricken must be entirely disregarded.

**Authority**: *Nike, Inc. v. Lululemon USA Inc.*, Final Jury Instructions at 5-6, 1:23-cv-00771-AS (S.D.N.Y.).

13

**Post-Instruction No. 4**

## WITNESS CREDIBILITY

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

1.      the opportunity and ability of the witness to see or hear or know the things testified to;

2.      the witness's memory;

3.      the witness's manner while testifying;

4.      the witness's interest in the outcome of the case, if any;

5.      the witness's bias or prejudice, if any;

6.      whether other evidence contradicted the witness's testimony;

7.      the reasonableness of the witness's testimony in light of all the evidence; and

8.      any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened.  People often forget things or make mistakes in what they remember.  Also, two people may see the same event but remember it differently.  You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said.  On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

14

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify.  What is important is how believable the witnesses were, and how much weight you think their testimony deserves.

**Authority**: Adapted 9th Circuit Manual of Model Civil Jury Instruction 1.14 (2025 ed.).

15

**Post-Instruction No. 5**

## USE OF DEPOSITIONS AS EVIDENCE

During the trial, certain testimony has been presented by way of deposition. The deposition consisted of sworn, recorded answers to questions asked of the witness in advance of the trial by the attorneys. The testimony of a witness who, for some reason, is not present to testify from the witness stand may be presented under oath on a videotape. Such testimony is entitled to the same consideration and is to be judged as to credibility, weighed, and otherwise considered by you in the same way as if the witness had been present and testified from the witness stand.

**Authority**: Adapted Fed. Jury Prac. & Instr. § 105:02 (6th ed.).

16

**Post-Instruction No. 6**

### EXPERT TESTIMONY

You have heard testimony from a number of witnesses who were designated by the respective parties as "experts." These designated witnesses are allowed to express opinions on matters about which they may have special knowledge and training. This testimony is presented to you on the theory that someone who is experienced in a particular field may be able to assist you in understanding the evidence and in reaching your independent decision on the facts.

In weighing this type of testimony, you may consider the witness's qualifications, opinions, reasons for testifying, as well as all the other considerations that ordinarily apply when you are deciding whether to believe a witness's testimony.

The expert witness's testimony was based on particular facts, as the witness obtained knowledge of them and testified to them before you, or as the attorneys who questioned the designated witness asked them to assume. You may reject such a witness's opinion if you find the facts in the case to be different from those that formed the basis for the opinion.

You may give "expert" testimony whatever weight, if any, you find it deserves in light of all of the evidence in the case and the witness's interest in the proceeding, including any compensation for work the expert may have received. You should not, however, accept the testimony merely because it is given by a designated "expert," nor should you substitute it for your own reason, judgment, and common sense. The determination of the facts in this case rests solely with you.

**Authority**: *United States of America, et al. ex rel. Uri Bassan v. Omnicare, Inc.,* Joint Proposed Jury Instructions at 13, 1:15-cv-04179-CM-VF, ECF No. 747 (S.D.N.Y. Apr. 23, 2025)

17

**Post-Instruction No. 7**

**SUMMARY OF CONTENTIONS**

As I did at the start of the case, I will give you a summary of each side's positions in this case. I will then provide you with detailed instructions on what Plaintiffs must prove to win on each of their claims.

*Section 2: Monopolization*

The first issue you will be asked to decide is whether Plaintiffs have proved by a preponderance of the evidence that any Defendant violated Section 2 of the Sherman Act by unlawfully monopolizing any of the three alleged markets. As a reminder, Plaintiffs allege that Ticketmaster (but not Live Nation) monopolized the two alleged ticketing markets:

1.      Primary concert ticketing services to what Plaintiffs call "major concert venues" (primary concert ticketing).

2.      Primary ticketing services to what Plaintiffs call "major concert venues" (primary ticketing).

And Plaintiffs allege that Live Nation (but not Ticketmaster) monopolized the alleged amphitheater market:

3.      Use of what Plaintiffs call "large amphitheaters" by artists (amphitheaters).

There are certain requirements that Plaintiffs must prove to show that either Defendant illegally monopolized a market, which I will explain in more detail in a few minutes. In general, however, to prove monopolization for each separate market as to each Defendant, Plaintiffs must show by a preponderance of the evidence that the alleged market is a valid antitrust market (i.e., one that is properly drawn), that the relevant Defendant (Live Nation or Ticketmaster) possessed monopoly power in that market, that the relevant Defendant willfully acquired or maintained monopoly power in that market by engaging in anticompetitive acts, and that the relevant Defendant's anticompetitive

18

acts harmed competition and caused anticompetitive effects in that market. You must assess monopolization for each market separately and for each Defendant separately. It is up to you to decide whether Plaintiffs have proven Defendants are liable for monopolization as to all markets, no markets, or only as to some markets, and as to both Defendants, only one Defendant, or neither Defendant.

*Section 1: Exclusive Dealing and Tying*

In addition to alleging that each Defendant monopolized certain markets, Plaintiffs also allege that Ticketmaster (but not Live Nation) violated Section 1 of the Sherman Act through unlawful exclusive dealing, and they allege that Live Nation (but not Ticketmaster) violated Section 1 of the Sherman Act through tying. You will need to consider the exclusive dealing and tying claims under Section 1 separate from and in addition to the monopolization claims.

First, Plaintiffs allege that Ticketmaster engaged in unlawful exclusive dealing by entering into certain primary ticketing contracts with venues. There are different elements Plaintiffs must prove for you to find Ticketmaster liable for unlawful exclusive dealing. In general, to prove unlawful exclusive dealing Plaintiffs must prove by a preponderance of the evidence that Ticketmaster possesses substantial market power in a relevant market and entered into an exclusive contract with a venue that, when judged on its own and not together with other contracts, substantially foreclosed competition in that relevant market.

Second, Plaintiffs allege that Live Nation (but not Ticketmaster) engaged in an unlawful tying arrangement related to certain amphitheaters that Live Nation owns or controls. In general, for this claim, Plaintiffs must prove by a preponderance of the evidence that Live Nation forced artists who wanted to use these amphitheaters to also use Live Nation's promotion services when artists would have preferred to use a different concert promoter.

If and only if you decide that at least some of the Plaintiff States claiming damages proved every element of at least one of the primary ticketing monopolization claims or the Section 1 exclusive

19

dealing claim against at least one Defendant, then the final issue you will be asked to decide is whether those (and only those) Plaintiff States are entitled to damages. You should not assume that any of the Plaintiff States are entitled to any damages merely because I am instructing you on the issue of damages.

I remind you, as I did at the outset, that although the Plaintiff States are suing on behalf of the residents of their States who have purchased tickets from Ticketmaster to live events, you should not assume that any of those residents will receive any portion of any money the Plaintiff States may ultimately receive in this case. And neither you nor any member of your family will receive any portion of any funds that the States may receive.

**Plaintiffs' Authority**: Am. Compl. (ECF No. 257); Answer (ECF No. 498); *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) ("The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."); *United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 609, 611-612 (S.D.N.Y. 2025); *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984).

**Plaintiffs' Position**: Plaintiffs have proposed a neutral statement of the case that outlines the basic facts of the litigation, succinctly summarizes Plaintiffs' claims as set forth in the Amended Complaint, and provides a straightforward preview of Defendants' defenses as well as a high-level overview of the applicable law. Defendants' proposed instruction misstates Plaintiffs' allegations, misstates the applicable legal standards, and advocates for Defendants' anticipated defenses.

In the first substantive paragraph ("Section 2 Monopolization") Defendants incorrectly state the allegations Plaintiffs made in the Amended Complaint, which states that Live Nation, in conjunction with its wholly owned subsidiary, Ticketmaster, monopolized the two primary ticketing markets. Amended Compl. at 85. Defendants also incorrectly assert that Live Nation and Ticketmaster must be treated as separate entities for liability purposes, notwithstanding a long line of cases to the contrary, as explained above at Post Instruction No. 2.

As in earlier instructions, Defendants' proposed exclusive dealing instruction misstates the law by requiring the jury to consider each contract individually and in isolation, as explained below at Post-Instruction No. 18; *see also* ECF No. 1037 at 41–42 ("To endorse Live Nation's argument for all Section 1 claims would be a coup for antitrust defendants. Section 1 exclusive dealing claims would become virtually impossible to bring, as the anticompetitive effect of any individual contract would be minimal except for in the most extreme cases."). And as to tying, Defendants' proposed instruction again artificially inflates Plaintiffs' burden by contending Plaintiffs must prove artists "*would* have preferred to use a different concert promoter" rather than simply that they "might" have preferred to do so. *See Jefferson Parish*, 466 US. at 12.

20

The final two paragraphs regarding damages may potentially confuse the jury by suggesting that Plaintiffs are required to prove each element of every claim to recover on any of them, which is not accurate. And given that the Court will be providing detailed damages instructions later, no further reference is necessary here and will instead be duplicative and waste time.

**Defendants' Authority:** ABA Model Instr. 3.A.1, 2.D.5; *Dickson v. Microsoft Corporation*, 309 F.3d 193, 203-05 (4th Cir. 2002) (declining to consider licensing agreements between Microsoft and various OEMs in the aggregate and analyzing each agreement "individually" instead); *Howard Hess Dental Laboratories v. Dentsply International*, 602 F.3d 239, 255-56 (3d Cir. 2010) (requiring plaintiffs to show that "every single agreement" between a manufacturer and its dealers had anticompetitive effect); *Gibson v. Cendyn Group*, 148 F.4th 1069, 1087 (9th Cir. 2025) (finding that "a grouping of individual agreements could not be 'aggregated' for the purposes of determining whether together they acted as an unreasonable restraint of trade," and requiring that the agreements "have a 'discrete effect' on competition"); *Panini America v. Fanatics*, 2025 WL 753954, at *9 (S.D.N.Y. Mar. 10, 2025) (refusing to "consider the effects of [] six exclusive deals together" and considering the effect of each separately instead); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984) ("[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms."); ECF No. 257 (Am. Compl.); ECF No. 777 at 41 (Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment); *Washington v. Chimei Innolux Corp.*, 659 F.3d 842, 848 (9th Cir. 2011) ("[A] statutory *parens patriae* action may well result in a settlement that does not include restitution to victims of the fraud, but only results in penalties paid to the public treasury."); *Broselow v. Fisher*, 319 F.3d 605, 608 (3d Cir. 2003) (individuals have no right to funds collected through *parens patriae* claims because such funds are not collected "under an assignment" from those individuals); *New York by Vacco v. Reebok Int'l*, 96 F.3d 44, 49 (2d Cir. 1996) (individuals are not entitled to distributions from the settlement of a *parens patriae* suit); N.Y. Exec. § 63(12) ("monies recovered or obtained under this subdivision" are subject to N.Y. State Fin. § 4(11), which requires that the funds "be deposited in the state treasury" and not disbursed "except pursuant to an appropriation").

**Defendants' Argument**: Defendants' edits to this instruction align it with the proposed instructions on the law below.

Additionally, Defendants seek to make clear, for the reasons explained above, that each Defendant's liability for each claim must be assessed separately. *See* Defendants' Argument on Post-Instruction No. 2 (The Parties); *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries."). Defendants also seek to make clear that not all States are seeking damages, and the jury may consider damages only if the States seeking damages prove liability on certain claims. Finally, Defendants' proposal reiterates this Court's instruction provided at the start of trial that the jury should not assume any State residents will receive any portion of the States' damages, if any, and that the jury members will not receive any portion of those damages. Voir Dire Tr. at 16:12-19.

Defendants object to Plaintiffs' use of the terms "major concert venues" and "large amphitheaters" here and throughout these instructions to the extent those terms are used without making clear that

21

Plaintiffs have attached those terms to sets of venues Plaintiffs curated for this litigation. Without such clarification, those terms are prejudicial and misleading because they give the jury the misimpression that as a factual matter, there is industry recognition and acceptance of distinct categories of venues called "major concert venues" and "large amphitheaters," when that is an issue disputed between the parties and for the jury to decide.

**Post-Instruction No. 8**

## BURDEN OF PROOF—PREPONDERANCE OF THE EVIDENCE

As I instructed you earlier, in this case, Plaintiffs must prove every essential element of each of their claims against each Defendant by a preponderance of the evidence. If Plaintiffs should fail to establish any essential element of one of their claims by a preponderance of the evidence against any Defendant, you should find for each such Defendant as to that claim.

"To prove by a preponderance of the evidence" means to prove something is more likely than not. In determining whether any fact in issue has been proved by a preponderance of the evidence, unless otherwise instructed, you may consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

**Plaintiffs' Authority**: *Nike, Inc. v. Lululemon USA Inc.*, Final Jury Instructions at 6, 1:23-cv-00771-AS (S.D.N.Y.); Adapted 9th Cir. Manual of Model Civ. Jury Instr. 1.6 (2025 ed.); Fed. Jury Prac. & Instr. § 104:01 (6th ed.); *Ostrowski v. Atl. Mut. Ins. Cos.*, 968 F.2d 171, 187 (2d Cir. 1992) ("[T]he court should instruct the jury that it is to conclude that a fact has been proven by a preponderance of the evidence if it 'finds that the scales tip, however slightly, in favor of the party with the burden of proof' as to that fact.").

**Plaintiffs' Position**: Plaintiffs have proposed a simplified instruction based on the cited authorities that briefly explains the preponderance standard. Defendants' proposed instruction fails to include language that even "slightly" tipping the scales is sufficient (despite that language appearing in the source Defendants cite, and the Court using similar language in its preliminary instructions to the jury). *See* 3.2.2026 Tr. at 5:18–6:6. Defendants' proposal is also confusing to the extent it can be read to suggest that Plaintiffs must prevail on every element of every claim in order to win on any one of them.

**Defendants' Authority:** Fed. Jury Prac. & Instr. § 104:01.

**Defendants' Argument**: Defendants' proposal tracks verbatim the model federal jury instruction on preponderance of the evidence. Defendants object to Plaintiffs' watered down burden of proof instruction. Plaintiffs' "tip the scale, even if slightly" language does not appear in the model federal jury instruction or in the model instructions for any court of appeals. *See* Notes, Fed. Jury Prac. & Instr. § 104:01.

23

**Post-Instruction No. 9**

## MONOPOLIZATION ELEMENTS

Plaintiffs allege that Ticketmaster (but not Live Nation) unlawfully monopolized the following markets:

(1)    primary concert ticketing services to what Plaintiffs call "major concert venues"; and

(2)    primary ticketing services to what Plaintiffs call "major concert venues."

Plaintiffs allege that Live Nation (but not Ticketmaster) unlawfully monopolized the following market:

(3)    the use of what Plaintiffs call "large amphitheaters" by artists.

Plaintiffs have brought three monopolization claims in total, one for each of these alleged markets. The alleged monopolization of each of these three alleged markets is a distinct claim that you are to consider separately for the relevant Defendant, either Ticketmaster or Live Nation. To prevail on a monopolization claim, Plaintiffs must prove the following elements by a preponderance of the evidence as to each separate alleged market for each Defendant:

(1)    the alleged market is a valid antitrust market;

(2)    the relevant Defendant possessed monopoly power in that market;

(3)    the relevant Defendant willfully acquired or maintained monopoly power in that market by engaging in anticompetitive conduct, instead of having superior products, business skill, or prior history; and

(4)    the relevant Defendant's anticompetitive conduct harmed competition in that market and caused anticompetitive effects in that market.

If you find that Plaintiffs have failed to prove any of these elements for a particular claim for a particular alleged market for the relevant Defendant, then you must find for the relevant Defendant and against Plaintiffs on that particular claim only. If you find that Plaintiffs have proven each of these

24

elements by a preponderance of the evidence for a particular claim for a particular alleged market for the relevant Defendant, then you must find for Plaintiffs and against the relevant Defendant on that particular claim only.

I will now provide you with further instructions on these elements.

**Plaintiffs' Authority**: *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) ("The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."); *see E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 441 (4th Cir. 2014); Adapted ABA Model Instr. 3.A.1; Am. Compl. (ECF No. 257) ¶¶ 224-32, 249-64.

**Plaintiffs' Position:** Plaintiffs' proposal hews closely to the ABA Model Instruction, adapted to fit the circumstances of this case. Specifically, Plaintiffs identify the three remaining markets here. Plaintiffs propose a minor modification that captures the fact that Plaintiffs have alleged monopolization in three separate markets, instructing the jury that "[t]he alleged monopolization of any one of these three markets is a distinct claim that you are to consider separately."

Defendants' proposal incorrectly renames and mischaracterizes the three markets as alleged in Plaintiffs' complaint which would likely confuse the jury and prejudice Plaintiffs, as Plaintiffs are entitled to have the jury be instructed to assess Plaintiffs' actual claims as they are presented at trial. Defendants again incorrectly assert that Defendants should be treated as separate entities for liability, which Plaintiffs address in Post-Instruction No. 2.

**Defendants' Authority:** ECF No. 257 (Am. Compl.); Adapted ABA Model Instr. 3.A.1; Adapted *North Am. Soccer League, LLC v. U.S. Soccer Federation, Inc.*, Final Jury Instructions at 48, No. 1:17-cv-5495, ECF No. 531 (E.D.N.Y. Jan. 31, 2025); *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (To violate Section 2, "a monopolist's act must have an 'anticompetitive effect.' That is, it must harm the competitive *process* and thereby harm consumers."); *In re Google Digital Advertising Antitrust Litig.*, 627 F. Supp. 3d 346, 380 (S.D.N.Y. 2022) (conduct "must have an anticompetitive effect in order to form the basis of a monopolization claim"); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005) ("[T]he exclusionary conduct must have an anti-competitive effect."); *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) (an element of a Section 2 violation is "the willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident").

**Defendants' Argument**: Defendants object to Plaintiffs' two-element structure. The ABA model jury instruction on the elements of a Section 2 monopolization claim contains five elements. *See* ABA Model Instr. 3.A.1. In line with that instruction, jury instructions given to juries in numerous cases contain four to five elements. *See, e.g.*, *North Am. Soccer League, LLC v. U.S. Soccer Federation, Inc.*, Final Jury Instructions at 48, No. 1:17-cv-5495, ECF No. 531 (E.D.N.Y. Jan. 31, 2025). Parties frequently do not dispute, and thus exclude, as here, the requirement that "defendant's conduct occurred in or affected interstate or foreign commerce." ABA Model Instr. 3.A.1. Defendants propose a similar four-element structure here.

25

There is a reason why juries are not instructed using Plaintiffs' two-element structure—it is confusing and might lead the jury to miss important parts of the analysis, such as market definition and anticompetitive effects. Defining the relevant market is the threshold step in analyzing the antitrust claims in this case. *Ohio v. American Express Co.*, 585 U.S. 529, 542 (2018); *Berkey Photo v. Eastman Kodak*, 603 F.2d 263, 268-69 (2d Cir. 1979) ("It is, of course, a basic principle in the law of monopolization that the first step in a court's analysis must be a definition of the relevant markets."). And market definition is hotly disputed in this case. By burying market definition within the element on monopoly power, Plaintiffs improperly seek to obfuscate that element before the jury. Plaintiffs also err in entirely omitting any element on harm even though it is well-established that a Section 2 violation requires proof of competitive harm and anticompetitive effects. *See, e.g.*, *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (To violate Section 2, "a monopolist's act must have an 'anticompetitive effect.' That is, it must harm the competitive *process* and thereby harm consumers."); *In re Google Digital Advertising Antitrust Litig.*, 627 F. Supp. 3d 346, 380 (S.D.N.Y. 2022) (conduct "must have an anticompetitive effect in order to form the basis of a monopolization claim"). Indeed, Plaintiffs did not dispute this element during summary judgment briefing, *see* ECF No. 777 at 26-36 (Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment), yet they erroneously omit it here and throughout these instructions.

**Post-Instruction No. 10**

## MONOPOLIZATION ELEMENT #1: RELEVANT MARKET—GENERAL

The first step in assessing each of Plaintiffs' separate monopolization claims against each Defendant is determining whether Plaintiffs have proven the alleged relevant market for that claim by a preponderance of the evidence. Defining the relevant market is essential because you are required to make a judgment about whether the relevant Defendant (Live Nation or Ticketmaster) has monopoly power and caused anticompetitive effects in a properly defined economic market. To make this judgment, you must be able to determine what, if any, economic forces restrain the relevant Defendant's freedom to set prices for the products or services they provide, control output for those products or services, or degrade the quality of those products or services.

The most likely and most important restraining force will be actual and potential competition from other firms and their products or services. This includes all firms and products or services that act or likely could act as restraints on the relevant Defendant's power to set prices as it pleases because customers could switch to these competing firms if the relevant Defendant sets its own prices too high. All the firms and products or services that exert such restraining force are within what is called the relevant market.

**Plaintiffs' Authority**: Adapted ABA Model Instr. 3.A.3; *Cf FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460 (1986) ("the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition"); *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 339 (2d Cir. 2024) ("Two products are reasonably interchangeable where there is sufficient cross-elasticity of demand—that is, where consumers would respond to a slight increase in the price of one product by switching to another product." (citation and quotation omitted)); *Brown Shoe v. United States*, 370 U.S. 294, 325, 336 (1962) (a relevant product market should "correspond to the commercial realities of the industry," and within the boundaries of a product market "well defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes"); *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956) (a "market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use, and qualities considered"); *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 611, 612 n.31 (1953) ("The 'market,' as most concepts in law or economics, cannot be measured by metes and bounds" and "[f]or every product, substitutes exist. But a relevant market cannot meaningfully encompass that infinite range. The circle must be drawn narrowly to exclude any

27

other product to which, within reasonable variations in price, only a limited number of buyers will turn”); *Balaklaw v. Lovell*, 14 F.3d 793, 799 (2d Cir. 1994).

**Plaintiffs' Position:** Plaintiffs' proposed instruction is derived from ABA Model Instruction and adds two additional explanatory paragraphs at the beginning of the instruction. Plaintiffs added additional explanatory language so the jury would better understand the purpose and objective of defining a relevant market in antitrust cases. In *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 339 (2d Cir. 2024), the Second Circuit reiterated that a relevant market can be determined by looking at the reasonable interchangeability of use or the cross-elasticity of demand between the product at issue and potential close substitutes for it.

In addition, Plaintiffs added language so the jury would understand that narrower relevant markets may exist within broader relevant markets. In *Brown Shoe v. United States*, the Supreme Court held that the outer bounds of a product market are determined by "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." 370 U.S. 294, 325 (1962). However, within broad markets, "well defined submarkets may exist which in themselves, constitute product markets for antitrust purposes." *Id*.; *see also Grinnell*, 384 U.S. at 570 ("In § 2 cases under the Sherman Act, as in § 7 cases under the Clayton Act there may be submarkets that are separate economic entities."); *P&L Develop., LLC v. Gerber Prods. Co*., 715 F. Supp. 3d 435, 459 (E.D.N.Y. 2024) ("[a] product market can be limited to a particular category of buyers," with a relevant market of "sales of store-brand infant formula to [] retailers" rather than to all "end-user consumers"); *Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242, 249, 249-52 n.8 (1959) (affirming liability for Sherman Act §§1 and 2 violations based upon the relevant market of "promotion of championship boxing contests," as distinct from "all professional boxing events," even though any boxing event "includes one ring, two boxers and one referee fighting under the same rules before . . . spectators," relying "[b]y analogy" on a case involving "the Clayton Act's 'line of commerce.'") (citing *United States v. E.I. Du Pont De Nemours & Co.*, 353 U.S. 586, 593-97 (1957)).

Plaintiffs object to Defendants' proposed instruction that a relevant market "includes all firms and products or services that act or likely could act as restraints on the relevant Defendant's power to set prices as they please because customers could switch to these competing firms if the relevant Defendant set its own prices too high." This overstates the relevant standard in two ways. First, even a monopolist's power to set prices is always restrained to some degree – as is cautioned by the "*Cellophane* fallacy." *See, e.g.*, *United States v. Eastman Kodak Co.*, 853 F. Supp. 1454, 1469 (W.D.N.Y. 1994) (explaining that "every monopolist faces an elastic demand at its profit-maximizing output and price" because "at a high enough price, even poor substitutes look good to the consumer") (cleaned up).  For similar reasons, contrary to Defendants proposed language, a relevant market does not consist of "all" firms or products that exert *any* restraining force — the restraining force must be sufficient to prevent the monopolist from imposing a price increase. *See Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 339 (2d Cir. 2024) ("Two products are reasonably interchangeable where there is '*sufficient* cross-elasticity of demand'—that is, 'where consumers *would* respond to a slight increase in the price of one product by switching to another product.'" (emphasis added)). Second, the relevant question is not whether customers "could" conceivably switch to products outside the relevant market—as suggested by Defendants' proposal—but whether customers in fact "would" switch in sufficient numbers to constrain a price increase or worsening of terms. *Id.*

28

**Defendants' Authority:** Adapted ABA Model Instr. 3.A.3; *Berkey Photo v. Eastman Kodak*, 603 F.2d 263, 268-69 (2d Cir. 1979) ("It is, of course, a basic principle in the law of monopolization that the first step in a court's analysis must be a definition of the relevant markets."); *City of New York v. Grp. Health*, 649 F.3d 151, 155 (2d Cir. 2011) (To state an antitrust claim, "a plaintiff must allege a plausible relevant market in which competition will be impaired."); *United States v. Eastman Kodak Co.*, 63 F.3d 95, 104 (2d Cir. 1995) ("Without a definition of the relevant market, there is no way to measure a company's ability to act as a monopolist."); *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018) (before assessing "direct evidence" of "anticompetitive effects," we must "first define the relevant market").

**Defendants' Objection**:  Defendants object to Plaintiffs' discussion of "submarkets."  That concept does not appear in the ABA model instruction on general market definition, is irrelevant here, and is likely to confuse and mislead the jury.  *See FTC v. Meta Platforms, Inc.*, 2025 WL 3458822, at *28 (D.D.C. Dec. 2, 2025) (the concept of "submarkets" can be "misleading" because "[t]he only relevant concept is the product market").  Moreover, Plaintiffs' alleged ticketing markets survived summary judgment on the theory that they are targeted customer markets, which are distinct from the concept of "submarkets."  That concept thus does not need to be raised for the first time in this case in the Court's instructions to the jury.  Defendants' proposed instruction tracks the ABA model jury instruction and is sufficient to give the jury an introduction to market definition.

29

**Post-Instruction No. 11**

## RELEVANT PRODUCT MARKET—GENERAL

A relevant market must consist of all products or services that are reasonably interchangeable in the eyes of customers of those products or services. In other words, the relevant market includes the products or services that a customer believes are reasonably interchangeable or reasonable substitutes for each other. This is a practical test taking into account actual behavior of buyers and marketing efforts of sellers. It looks to the practical realities of substitution, not theoretical substitution. A market does not need to include all conceivable substitutes, but only those that a buyer would view as reasonably interchangeable. Accordingly, your analysis should focus on whether or not the products or services are economic substitutes, not simply whether they appear to be functionally similar. For instance, women's shoes may not be reasonably interchangeable with men's shoes. Even if both are functionally similar, consumers may not typically substitute one for the other.

The parties disagree about the relevant markets in this case. Plaintiffs allege that the three markets I just described to you are relevant markets, while Defendants deny that those three markets are relevant markets. Your task is to determine whether the evidence supports the three markets alleged by Plaintiffs.

**Plaintiffs' Authority**: ABA Model Instr. 3.A.4; *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 335 (S.D.N.Y. 2001), *modified*, 183 F. Supp. 2d 613 (S.D.N.Y. 2001), *and aff'd*, 344 F.3d 229 (2d Cir. 2003), *and enforced*, No. 98 CIV. 7076 (BSJ), 2007 WL 1741885 (S.D.N.Y. June 15, 2007) ("A relevant product market is composed of products that have reasonable interchangeability, in the eyes of consumers, with what the defendant sells." (quotation marks and citation omitted)); *Brown Shoe v. United States*, 370 U.S. 294, 325, 336 (1962) (relevant product market should "correspond to the commercial realities of the industry" and within the boundaries of a product market "well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes"); *United States v. U.S. Sugar Corp.*, 73 F.4th 197, 204-07 (3d Cir. 2023) (affirming district court's application of *Brown Shoe* practical indicia); *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956) ("[A] market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use, and qualities considered."); *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 611, 612 n.31 (1953) ("The 'market,' as most concepts in law or economics, cannot be measured by metes and bounds" and "[f]or every product, substitutes exist. But a relevant market cannot meaningfully encompass that infinite range. The circle must be drawn

30

narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn."); *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966) ("In § 2 cases under the Sherman Act, as in § 7 cases under the Clayton Act, there may be submarkets that are separate economic entities"); *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 202 (D.D.C. 2018) (recognizing that some "fuzziness is inherent in bounding any market"); *Phila. Nat'l Bank*, 374 U.S. 321, 360 n.37 (1963) ("[F]uzziness would seem inherent in any attempt to delineate the relevant geographical market."); *see also United States v. Eastman Kodak Co.*, 63 F.3d 95, 103, 105 (2d Cir. 1995); *F.T.C. v. Swedish Match*, 131 F. Supp. 2d 151, 160 (D.D.C. 2000); *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 339 (2d Cir. 2024); *Teradata Corp. v. SAP SE,* 124 F.4th 555, 565-66, 569-70 (9th Cir. 2024); *Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242, 249-50, 252 n.8 (1959); *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 228 (2d Cir. 1999) ("It is important to remember that a market is any grouping of sales whose sellers, if unified by a hypothetical cartel or merger, could profitably raise prices significantly above the competitive level. If the sales of other producers substantially constrain the price-increasing ability of the hypothetical cartel, these others are part of the market." (cleaned up)); *United States v. Continental Can Co.*, 378 U.S. 441, 457 (1964) (holding that "nothing [] preclude[d]" the Court from defining a relevant market that "was not pressed upon the District Court" by either party, so long as it was supported by the evidence); *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 978 n.9 (9th Cir. 2023) (rejecting defendant's "radical argument that, where parties offer dueling market definitions, the case immediately ends if the [factfinder] finds the record supports the defendant's proposed market (or a third in-between market . . .) rather than the plaintiff's market"); *United States v. Energy Solutions, Inc.*, 265 F. Supp. 3d 415, 437 (D. Del. 2017) (defining broader relevant markets than the government asserted, because "[t]he court's decision to not further sub-divide the markets does not end the analysis").

**Plaintiffs' Position**: Plaintiffs' proposed instruction is based on the ABA Model Instruction with certain adjustments to clarify how reasonable interchangeability of products is properly assessed, how economic substitution is evaluated (based on examples drawn from caselaw), and how the outer boundaries of product markets are properly defined.

In particular, Plaintiffs have proposed additional language to instruct the jury that the focus is on economic substitution rather than merely functional similarities in products. *See Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 340 (2d Cir. 2024) ("Rather, the applicable analysis is whether or not the products are *economic* substitutes, not whether they appear to be functionally similar. This analysis turns on economic differences, such as a lack of cross-elasticity of demand or reasonable interchangeability among products.") (holding that identical medication in vials and pre-filled syringes could be in separate product markets). Additionally, Plaintiffs' proposed instructions explain to jurors that the outer boundaries of a relevant market may be "fuzzy" and need not be defined by precise metes and bounds or mathematical precision. *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 202 (D.D.C. 2018) (recognizing that some "fuzziness is inherent in bounding any market") (citation omitted); *cf. United States v. Phila. Nat'l Bank*, 374 U.S. 321, 360 n.37 (1963) ("[F]uzziness would seem inherent in any attempt to delineate the relevant geographical market."); *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 611 (1953) ("The 'market,' as most concepts in law or economics, cannot be measured by metes and bounds"); *id.* at 613 n.31 ("For every product, substitutes exist. But a relevant market cannot meaningfully encompass that infinite range. The circle must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn").

Additionally, Plaintiffs' proposed instruction introduces the concept that multiple valid relevant markets may exist for functionally similar products, which may not be intuitive to jurors. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 326 (1962) ("Applying these considerations to the present case, we conclude that the record supports the District Court's finding that the relevant lines of commerce are men's, women's, and children's shoes."); *United States v. Apple, Inc.*, 2025 WL 1829127, at \*7 (D.N.J. June 30, 2025) (recognizing product markets for both smartphones and "performance smartphones" and collecting cases); *United States v. Am. Airlines Grp. Inc.*, 675 F. Supp. 3d 65, 118 (D. Mass. 2023) (declining to decide between alternative markets because "there may be multiple relevant markets or sub-markets, any of which might appropriately be examined to assess the competitive effects of a restraint"), *aff'd*, 121 F.4th 209 (1st Cir. 2024); *U.S. Airways, Inc. v. Sabre Holdings Corp.*, No. 11-cv-2725, 2022 WL 874945, at \*7-10 (S.D.N.Y. Mar. 24, 2022) (finding that the defendant could have monopoly power in both narrower "Sabre-only product market" and broader market for "GDS services").

**Defendants' Authority**: ABA Model Instr. 3.A.4; *United States v. United States Sugar Corp.*, 2022 WL 4544025, at \*25 (D. Del. Sept. 28, 2022), aff'd, 73 F.4th 197 (3d Cir. 2023) ("In reality, what the Government is asking the Court to do is figure out which market allows the Government to prevail and then to use that market. The Court declines to do so."); *United States v. Sabre Corp.*, 452 F. Supp. 3d 97, 142 n.20 (D. Del. 2020) ("[T]o the extent DOJ is now inviting the Court to 'unilaterally change the defective market allegations if necessary to save its case,' it would be wrong for the Court to do so under the circumstances here, which include that both parties (and the Court) have already devoted enormous resources to the case the government chose to bring."); *Continental Trend Resources, Inc. v. OXY USA Inc.*, 44 F.3d 1465, 1481 n.19 (10th Cir. 1995) (rejecting "later attempt[] to redefine the relevant market" because "plaintiffs are saddled with their Complaint filed in this Court"), *vacated on other grounds*, 517 U.S. 1216 (1996); *Pastore v. Bell Telephone Co.*, 24 F.3d 508, 512-13 (3d Cir. 1994) ("hold[ing] plaintiffs to their own contention" regarding market definition).

**Defendants' Argument**:  Defendants object to Plaintiffs' statement that the jury may find "broader or narrow[er]" markets than those alleged by Plaintiffs.  To start, none of this appears in the ABA model instruction on relevant product markets.  Next, Plaintiffs have not cited a single case in which *a jury* was told it could find any markets it pleased, regardless of the markets alleged by the plaintiff and notwithstanding that all of the parties' evidence regarding monopoly power, anticompetitive conduct, anticompetitive effects, etc. was premised on the alleged markets.  Indeed, *this Court* did not even find markets beyond those alleged by Plaintiffs.  After determining that Plaintiffs' concert booking, promotions, and fan-facing ticketing markets were not properly defined, this Court dismissed all claims based on those markets rather than find different markets or give Plaintiffs the opportunity to take their case to the jury in the hopes that the jury would find different markets.  ECF No. 1037; *see also* 1/23/26 Tr. at 77:10-78:1 (noting that Plaintiffs "are not relying on a market that includes stadiums," so "if the MCV market is not properly defined, then the [claims] that would rely on that definition would be out").

Like this Court, courts have repeatedly declined plaintiffs' invitation to define markets beyond those alleged.  *See, e.g.*, *United States v. United States Sugar Corp.*, 2022 WL 4544025, at \*25 (D. Del. Sept. 28, 2022), *aff'd*, 73 F.4th 197 (3d Cir. 2023) ("In reality, what the Government is asking the Court to do is figure out which market allows the Government to prevail and then to use that market. The Court declines to do so."); *United States v. Sabre Corp.*, 452 F. Supp. 3d 97, 142 n.20 (D. Del. 2020) ("[T]o the extent DOJ is now inviting the Court to 'unilaterally change the defective market

allegations if necessary to save its case,' it would be wrong for the Court to do so under the circumstances here, which include that both parties (and the Court) have already devoted enormous resources to the case the government chose to bring."); *Continental Trend Resources, Inc. v. OXY USA Inc.*, 44 F.3d 1465, 1481 n.19 (10th Cir. 1995) (rejecting "later attempt[] to redefine the relevant market" because "plaintiffs are saddled with their Complaint filed in this Court"), *vacated on other grounds*, 517 U.S. 1216 (1996); *Pastore v. Bell Telephone Co.*, 24 F.3d 508, 512-13 (3d Cir. 1994) ("hold[ing] plaintiffs to their own contention" regarding market definition).

Plaintiffs' cases are not to the contrary. In *United States v. Continental Can Co.*, the Supreme Court determined that "combined glass and metal container industries" was a line of commerce in addition to the two found by the district court because it was "coextensive with the two industries, which were held to be lines of commerce," and "composed largely, if not entirely, of the more particularized end-use lines urged in the District Court by the Government." 378 U.S. 441, 457 (1964). In other words, the Court held the government to its allegations, determining that the two lines urged by the government, in addition to the sum of those lines, were relevant lines of commerce. Likewise in *United States v. Energy Solutions, Inc.*, the court rejected the government's four product markets that divided higher-activity from lower-activity waste and operational from decommissioning waste, determining that one of those distinctions was unnecessary—not that an entirely different market unrelated to the ones alleged was relevant. 265 F. Supp. 3d 415, 436-37 (D. Del. 2017). Finally, in *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 978 n.9 (9th Cir. 2023), the Ninth Circuit cited *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1437 (9th Cir. 1995), without any further reasoning for the proposition Plaintiffs' quote, but in *Rebel*, the plaintiff had alleged another market "[i]n the alternative"—something Plaintiffs have not done here, *see* 1/23/26 Tr. at 77:10-78:1.

In short, Plaintiffs "are saddled" with the markets they alleged, *Continental Trend*, 44 F.3d at 1481 n.19, and no authority permits the Court or the jury to rewrite Plaintiffs' allegations on their behalf and decide an entirely different case than the one the "parties (and the Court) have already devoted enormous resources to," *Sabre*, 452 F. Supp. 3d at 142 n.20.

Additionally, Defendants object to Plaintiffs' relevant product market instruction because it fails to instruct the jury that the ticketing markets in this case are targeted customer markets, and to provide any guidance on analyzing such markets. Defendants propose relevant product market instructions that account for the targeted customer markets as well as traditional product market at issue here. Moreover, Defendants' proposed instructions explain the parties' disputes as to each alleged market and what the jury must find as to each alleged market to enable the jury to understand the unique and complex market definition analysis it must perform here.

Finally, Defendants propose omitting "product" in several places. The parties do not dispute market geography for any of the markets that remain in this case. Given that, there is no need to discuss the concept of "product" markets to distinguish them from "geographic" markets, and doing so may confuse the jury.

33

**Post-Instruction No. 11D**

## RELEVANT PRODUCT MARKET—PRIMARY TICKETING MARKETS

For the alleged primary ticketing services and primary concert ticketing services markets, Plaintiffs have limited the scope of both markets to 257 venues that they call "major concert venues." According to Plaintiffs, these venues are amphitheaters and arenas with a capacity of 8,000 or more that hosted 10 or more concerts in at least one year from 2017 to 2024. Defendants dispute that it is appropriate to limit these markets just to that subset of venues; Defendants contend that Plaintiffs' definition is too narrow because primary ticketing companies compete for many more customers, and therefore, that the relevant market should include other venues.

Plaintiffs alleged primary ticketing markets are what are known as "targeted customer markets" because they are focused on a subset of all customers of a particular product or service. In order for Plaintiffs to prove that each of these two markets should be limited solely to the 257 venues they call "major concert venues," Plaintiffs must prove that the 257 venues are in a unique position relative to other venues at which concerts take place in that Ticketmaster has and has exercised the power to impose on those venues worse prices or terms of service (for example, by charging higher prices for primary ticketing services) than are charged to other venues.

If you find that Plaintiffs have proven either of the alleged ticketing markets as relevant markets, then you should continue to evaluate the remainder of Plaintiffs' claims solely related to that alleged market. If you find that Plaintiffs have failed to prove either of these alleged markets, then you do not need to consider any other elements for claims related to that alleged market. Instead, you should find for Defendants and against Plaintiffs on all claims for which you found Plaintiffs failed to prove a relevant market.

**Plaintiffs' Position (11D):** Plaintiffs object to Defendants' proposed instruction on targeted customer markets. The same legal standards for relevant product markets apply to all of Plaintiffs' alleged relevant markets, and therefore a single instruction addressing the *Brown Shoe* factors and the

34

hypothetical monopolist test should apply to all, as proposed by Plaintiffs. *See* Post-Instruction No. 11.

**Defendants' Authority:** *FTC v. Whole Foods Mkt.*, 548 F.3d 1028, 1037-39 (D.C. Cir. 2008); *FTC v. Sysco*, 113 F. Supp. 3d 1, 37-39 (D.D.C. 2015); Merger Guidelines 44-45 (Dec. 18, 2023); *FTC v. Meta Platforms*, 2025 WL 3458822, at *35 (D.D.C. Dec. 2, 2025) ("So if there were a separate market for users who cared about friend content, then that market's borders must be shown by significant differences in price."); *United States v. Eastman Kodak Co.*, 63 F.3d 95, 104 (2d Cir. 1995) ("Having chosen to rebut Kodak's proposed market definition by relying on its theory of price discrimination, it was incumbent upon the government to produce probative evidence of systematic price discrimination, which it failed to do. In the absence of such proof, the district court properly rejected the government's theory."); *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018) (market definition must rest on "actual market realities"); *PepsiCo v. Coca-Cola*, 114 F. Supp. 2d 243, 249 (S.D.N.Y. 2000), *aff'd*, 315 F.3d 101 (2d Cir. 2002) (market definition requires "sufficient evidence from which a factfinder could conclude that the customer base should be viewed so narrowly").

**Defendants' Argument**: Defendants' position is that Plaintiffs' alleged ticketing markets—and any claims premised on those markets—should not be presented to the jury at all. As Defendants have explained, "if a plaintiff alleging actual monopoly seeks to define a market by reference to a subset of buyers of a given product, 'then that market's borders must be shown by significant differences in price' paid by those buyers compared with others outside the target set." ECF No. 797 at 3 (quoting *FTC v. Meta Platforms*, 2025 WL 3458822, at *35 (D.D.C. Dec. 2, 2025)). In other words, Plaintiffs must prove their targeted customer markets with evidence of actual price discrimination. And the *Brown Shoe* factors are irrelevant to this analysis. ECF No. 1059 at 5-6. Plaintiffs have conceded that they have no evidence of actual price discrimination. ECF No. 1000 at 65:13-66:3. Accordingly, their targeted customer ticketing markets should have been held invalid at summary judgment, all claims premised on those markets should have been dismissed before trial, and this issue should not be going to the jury at all. Defendants propose this instruction only because Plaintiffs' targeted customer ticketing markets erroneously continue to be part of this case.

To the extent that Plaintiffs' alleged ticketing markets and claims related to those markets are presented to the jury, Defendants maintain that the jury must be instructed that it is required to find evidence of actual price discrimination. Indeed, during summary judgment proceedings, Plaintiffs distinguished *Meta* only on the basis that it was decided "after a full trial," effectively conceding that the *Meta* standard was the correct one to apply at trial. ECF No. 1000 at 65:13-66:3. The jury cannot find in favor of Plaintiffs' alleged ticketing markets without the evidence that is required to prove targeted customer markets—*i.e.*, evidence of actual price discrimination.

35

**Post-Instruction No. 11D2**

### RELEVANT PRODUCT MARKET—AMPHITHEATERS MARKET

Plaintiffs define their alleged amphitheater market to include only 87 amphitheaters, which Plaintiffs call "large amphitheaters." According to Plaintiffs, these are amphitheaters with capacity of 8,000 or more that hosted 10 or more concerts in at least one year from 2017 to 2024. Defendants contend this alleged market is not properly defined because it excludes other venues that are reasonable substitutes for "large amphitheaters," and it includes certain amphitheaters that do not qualify as "large amphitheaters." To prove this market, Plaintiffs must prove that artists in general do not view other types of venues, such as smaller amphitheaters or arenas, as reasonable substitutes for the class of large amphitheaters Plaintiffs selected.

To determine whether products are reasonably interchangeable or reasonable substitutes for each other, you may consider:

- whether artists substitute between large amphitheaters and other venues;

- consumers' views on whether the products are interchangeable;

- the relationship between the price of one product and sales of another;

- the presence or absence of specialized vendors;

- the perceptions of either industry or the public as to whether the products are in separate markets; and

- the views of Defendants regarding who their competitors are.

If you find that Plaintiffs have proven that the alleged amphitheaters market is properly drawn, then you should continue to evaluate the remainder of Plaintiffs' claims solely related to that market. If you find that Plaintiffs have failed to prove that the alleged amphitheaters market is properly drawn, then you do not need to consider any other elements for claims related to this

36

alleged market. Instead, you should find for Defendants and against Plaintiffs on all claims for which

you found Plaintiffs failed to prove a relevant market.

**Plaintiffs' Position (11D2):** Plaintiffs object to a separate instruction limited to Plaintiffs' alleged markets for the use of large amphitheaters and primary ticketing for fans at major concert venues. The same legal framework, and therefore the same instructions, should apply to all of Plaintiffs' alleged markets. *See* Post-Instruction No. 11.

**Defendants' Authority:**  Adapted ABA Model Instr. 3.A.4; *Geneva Pharm. Tech. v. Barr Labs.*, 386 F.3d 485, 496 (2d Cir. 2004) ("The relevant market is defined as all products 'reasonably interchangeable by consumers for the same purposes,' because the ability of consumers to switch to a substitute restrains a firm's ability to raise prices above the competitive level."); *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 394-400 (1956); *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) ("Products will be considered to be reasonably interchangeable if consumers treat them as 'acceptable substitutes.'").

**Defendants' Argument**:  Defendants' proposed relevant product market instruction on Plaintiffs' alleged amphitheaters market, which involves traditional product market considerations, tracks the ABA model instruction on relevant product markets.  *See* ABA Model Instr. 3.A.4.

37

**Post-Instruction No. 12**

## MONOPOLIZATION ELEMENT #2: MONOPOLY POWER

If you find that Plaintiffs have proven any alleged relevant market by a preponderance of the evidence, then you should separately determine whether the relevant Defendant (Live Nation or Ticketmaster) has monopoly power in that market. To prove a monopolization claim, Plaintiffs must prove that the relevant Defendant has monopoly power in a relevant antitrust market. Monopoly power is the power to control prices, restrict output, or exclude competition in a relevant antitrust market. More precisely, a firm has monopoly power if it can profitably raise prices substantially above the competitive level for a significant period of time. However, possession of monopoly power, in and of itself, is not unlawful. As I will explain later, Plaintiffs must also prove that the relevant Defendant engaged in anticompetitive conduct that caused anticompetitive effects in the relevant market.

Plaintiffs can prove monopoly power "directly," through direct evidence, or "indirectly," through indirect evidence. Either type of evidence may be sufficient to prove monopoly power. I will now provide further instructions about how you may determine whether Plaintiffs have met their burden of proving monopoly power in a relevant market.

**Plaintiffs' Authority**: Adapted ABA Model Instr. 3.A.2; *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 97-98 (2d Cir. 1998) ("Monopoly power … is the power to control prices or exclude competition") (quotation marks and citation omitted); *American Tobacco Co. v. United States*, 328 U.S. 781, 809 (1946) (defining monopoly power as the power to "exclude actual or potential competition from the field"); *see also Otter Tail Power Co. v. United States*, 410 U.S. 366, 378 (1973).

**Plaintiffs' Position:** Plaintiffs' proposal largely tracks the ABA Model Instruction but with certain edits for clarity and accuracy. It also clarifies that either direct or indirect evidence may be sufficient for the jury to find monopoly power.

Defendants proposed instruction first inserts two separate instructions (11D and 11D1) for the MCV-based and amphitheater-based markets. Defendants' preamble paragraphs are slanted in Live Nation's favor and are unnecessary and improper, because the jury will hear the parties positions in closing arguments and will have already been instructed on the separate markets in the court's summary of the allegations in Post-Instruction No. 7, making further instructions here unnecessary. In the first portion of their instruction (11D), Defendants also wrongfully suggest that Plaintiffs must prove worse prices or terms of service in order to prove their claims, because the MCV market is a targeted

38

customer market. As this Court has already held, the standard tools used to determine whether reasonably interchangeability or cross-elasticity of demand is sufficient to define a relevant antitrust market—the *Brown Shoe* analysis or an HMT—apply equally to these markets. *See* ECF No. 1037 at 19–20. In the third portion of their instruction (11D2), Defendants continue to seek to instruct the jury to treat Defendants separately, as discussed above in Post Instruction No. 2. Plaintiffs have also deleted the additional sentence proposed by Defendants defining monopoly power as the ability to "profitably raise prices substantially" because it confusingly highlights only one of the manifestations of monopoly power set forth in the preceding sentence: "the power to control prices, restrict output, or exclude competition." Plaintiffs also object to Defendants' additional sentences related to anticompetitive conduct, as later instructions separately instruct the jury on that distinct element of Plaintiffs' monopolization claims. Including discussion of anticompetitive conduct within the monopoly power instruction will only confuse the jury.

**Defendants' Authority:** ABA Model Instr. 3.A.2.

**Defendants' Argument**: Defendants' edits to this instruction track the ABA model instruction on monopoly power. Defendants object to Plaintiffs' modifications to that model instruction in ways that transparently lessen Plaintiffs' burden. For instance, Plaintiffs delete language making clear that "monopoly power, in and of itself, is not unlawful," and that "a firm has monopoly power if it can profitably raise prices substantially above the competitive level for a significant period of time." ABA Model Instr. 3.A.2.

**Post-Instruction No. 13**

### EXISTENCE OF MONOPOLY POWER—DIRECT PROOF

Plaintiffs can provide direct proof of monopoly power in a relevant market via direct evidence through any one of these alternative ways.

*Raising or Maintaining Prices Above Competitive Levels*

One way Plaintiffs may prove that the relevant Defendant (Live Nation or Ticketmaster) has monopoly power in a relevant market is to show that the relevant Defendant can profitably raise or maintain prices in the relevant market above a competitive level. Plaintiffs must prove that the relevant Defendant has the power to do so by itself—that is, without the assistance of, and despite competition from, any existing or potential competitors.

- In Plaintiffs' alleged primary ticketing services markets, the prices in question are what the ticketers, such as Ticketmaster, receive by way of compensation under the terms of their contracts with "major concert venues," which is the fees they retain net of any payments the ticketer is required to make to the venue under the terms of the contract.

- In Plaintiffs' alleged amphitheaters market, the prices in question are the prices that Plaintiffs claim artists pay to rent the amphitheaters.

Plaintiffs must also prove that the relevant Defendant (Live Nation or Ticketmaster) has the power to maintain prices above a competitive level for a significant period of time. If the relevant Defendant attempted to maintain prices above competitive levels, but would lose so much business to other competitors that the price increase would become unprofitable and would have to be withdrawn, then that Defendant does not have monopoly power.

The ability to earn high profit margins or a high rate of return does not necessarily mean that any Defendant has monopoly power. Other factors may enable a company without monopoly power

40

to sell at higher prices or earn higher profit margins than its competitors, such as superior products or services, low costs, or superior advertising or marketing.

However, an ability to sell at higher prices or earn higher profit margins than other companies for similar goods or services over a long period of time may be evidence of monopoly power. By contrast, evidence that a defendant would lose a substantial amount of sales if it raised prices substantially, or that a defendant's profit margins were low compared to its competitors, or that a defendant's margins go up and down or are steadily decreasing, tends to suggest that the defendant does not have monopoly power.

*Reducing Quality Or Output Below Competitive Levels*

Another way Plaintiffs may prove that the relevant Defendant (Live Nation or Ticketmaster) has monopoly power is by showing that the Defendant has the ability to reduce the quality of its product without losing meaningful sales.  This is similar to the point I just described regarding price. If the relevant Defendant attempted to reduce quality below competitive levels, but would lose so much business to other competitors that the reduction would become unprofitable and would have to be withdrawn, then that Defendant does not have monopoly power.

Another way of showing monopoly power is through evidence that a firm has the ability to affect marketwide prices by reducing its own output.  Output for these purposes refers to the amount of its products or services that a firm chooses to produce.

*Power to Exclude Competition*

Alternatively, Plaintiffs may prove that the relevant Defendant (Live Nation or Ticketmaster) has monopoly power by proving that the relevant Defendant has the ability to exclude competition. Excluding competition means more than competing to keep one's business.  It means that a firm does not need to compete hard because it has been able to prevent other firms from competing effectively.

41

If new competitors can enter the relevant market or existing competitors can compete for new opportunities as they arise, then that Defendant does not have monopoly power.

**Plaintiffs' Authority**: Adapted ABA Model Instr. 3.A.8; *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 783 n.2 (6th Cir. 2002) ("the material consideration in determining whether a monopoly exists is not that prices are raised and that competition is excluded, but that power exists to raise prices or to exclude competition when it is desired to do so.") (quotation marks and citation omitted); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 274 (2d Cir.1979) ("[T]he fact that the power has not been used to extract improper benefits provides no succor to the monopolist."); *Cf. In re Google Digital Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 375 (S.D.N.Y. 2022) ("Harm to competition may be inferred through facts such as 'reduced output, increased prices and decreased quality' in the relevant market." (citation omitted)); *See United States v. Google LLC*, 747 F. Supp. 3d 1, 118 (D.D.C. 2024) ("Just as the power to raise price when it is desired to do so is proof of monopoly power, so too is the ability to degrade product quality without concern of losing consumers . . . ." (cleaned up)); *Cf. MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 182 (2d Cir. 2016) ("[A] plaintiff may offer direct evidence of harm to competition by proving higher prices, reduced output, or lower quality in the market as a whole.").

**Plaintiffs' Position:** Plaintiffs propose an expanded and clarified version of the ABA Model Instruction on direct proof of monopoly power. In particular, Plaintiffs have proposed additional language to clarify that the ability to charge prices above competitive levels is sufficient, even if a monopolist chooses not to exercise such power. *See Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 274 (2d Cir.1979) ("[T]he fact that the power has not been used to extract improper benefits provides no succor to the monopolist."); *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 783 n.2 (6th Cir. 2002) ("[T]he material consideration in determining whether a monopoly exists is not that prices are raised and that competition is excluded, but that power exists to raise prices or to exclude competition when it is desired to do so.") Plaintiffs propose an additional short section on reducing or maintaining quality below competitive levels because both sides have put on evidence of product quality. It is well-recognized that a reduction in quality below competitive levels is the functional equivalent of a price increase to customers. *Cf. In re Google Digital Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 375 (S.D.N.Y. 2022) ("Harm to competition may be inferred through facts such as 'reduced output, increased prices and decreased quality' in the relevant market."). Defendants' version of this paragraph removes the requirement that new competitors would need to be able to enter the market in order to make the reduction in quality unprofitable, ignoring the potential presence of barriers to entry. Plaintiffs also object to Defendants' alterations to the "power to exclude competition" section it inserts language on the level of competition that is unnecessary and may confuse the jury.

**Defendants' Authority**: Adapted ABA Model Instr. 3.A.8; *United States v. Google LLC*, 747 F. Supp. 3d 1, 118 (D.D.C. 2024) ("Just as the power to raise price when it is desired to do so is proof of monopoly power, so too is the ability to degrade product quality without concern of losing consumers . . . ." (cleaned up)); *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 182 (2d Cir. 2016) ("[A] plaintiff may offer direct evidence of harm to competition by proving higher prices, reduced output, or lower quality in the market as a whole.").

**Defendants' Argument**: Defendants object to Plaintiffs' modifications to the ABA model jury instruction on direct proof of monopoly power in ways that transparently lessen Plaintiffs' burden.

42

43

For instance, Plaintiffs omit the two paragraphs proposed by Defendants on the ability to earn high profit margins, which are necessary to inform the jury that high profit margins alone do not entail monopoly power.  *See* ABA Model Instr. 3.A.8.

**Post-Instruction No. 14**

### EXISTENCE OF MONOPOLY POWER—INDIRECT PROOF

Now I will instruct you on how Plaintiffs can provide indirect proof of monopoly power in a relevant market via indirect evidence.

Indirect evidence is evidence regarding the structure of the relevant market. If this evidence establishes that the relevant Defendant (Live Nation or Ticketmaster) has the power to control price, restrict output, or exclude competition in the relevant market, then you may conclude that the Defendant has monopoly power in that market. By contrast, if the relevant Defendant does not have the power to control price, restrict output, or exclude competition in the relevant market, then you may conclude that the Defendant lacks monopoly power. I will now explain the structural factors you may consider in more detail.

*Market Share*

One factor that you should consider is the relevant Defendant's share of the relevant market. While market share is not the equivalent of monopoly power, it is relevant to your determination of whether Plaintiffs have proven monopoly power. The relevant Defendant (Live Nation or Ticketmaster) must have a significant share of the market in order to possess monopoly power.

An inference of monopoly power usually requires a market share above 60%. A market share below 50% is rarely sufficient to support a conclusion that any Defendant has monopoly power. In evaluating whether the relevant Defendant's market share supports a finding of monopoly power, you should also consider other aspects of the relevant market, including market share trends, the existence of barriers to entry, the entry and exit by other companies, and the number and size of competitors. Along with the relevant Defendant's market share, these factors should inform you as to whether the relevant Defendant has monopoly power.

*Market Share Trends*

The trend in the relevant Defendant's market share is something you may consider. An increasing market share may strengthen an inference that a company has monopoly power, particularly where that company has a high market share, while a decreasing share might show that a company does not have monopoly power.

*Barriers to Entry*

You may also consider whether there are barriers to entry or expansion in or into the relevant market. Barriers to entry or expansion make it difficult for new competitors to enter the relevant market in a meaningful and timely way, or for existing competitors to sell more of a product that they already sell in the relevant market. Barriers to entry or expansion in the alleged ticketing markets might include whether there is a large financial investment required to develop new ticketing technologies; whether existing ticketing companies do not have the capacity to sell primary ticketing services to more of the venues Plaintiffs call "major concert venues"; whether there are specialized marketing practices to what Plaintiffs call "major concert venues"; and the reputation of the companies already participating in the market (or the brand recognition of their products).

Evidence of low or no entry barriers in the alleged ticketing markets may be evidence that the relevant Defendant does not have monopoly power, regardless of the Defendant's market share, because new competitors could enter easily, or existing competitors could expand, if the Defendant attempted to raise prices or reduce quality for a substantial period of time. For example, you may consider evidence that other existing ticketing companies have the capacity and ability to sell primary ticketing services to some of what Plaintiffs call "major concert venues" if Ticketmaster tried to increase ticketing prices to venues as evidence that neither Defendant has monopoly power in the alleged ticketing markets, despite their alleged market shares. By contrast, evidence of high barriers to entry along with high market share may support an inference that Defendants have monopoly power.

45

*Entry and Exit by Other Companies*

The history of entry and exit in the relevant market may be helpful to consider. Entry of new competitors or expansion of existing competitors may be evidence that a defendant lacks monopoly power. On the other hand, departures from the market, or the failure of firms to enter the market, particularly if prices and profit margins are relatively high, may support an inference that a defendant has monopoly power in that market.

*Number and Size of Competitors*

You may consider whether Live Nation's competitors in the alleged amphitheater market, or Ticketmaster's competitors in the alleged ticketing markets, are capable of effectively competing. In other words, you should consider whether the financial strength, market shares, and number of competitors act as a check on each Defendant's ability to price its services. If Ticketmaster's competitors in the alleged ticketing markets are strong or have meaningful or increasing market shares, this may be evidence that Ticketmaster lacks monopoly power in those markets. On the other hand, if you determine that Ticketmaster's competitors are weak or have small or declining market shares, this may support an inference that Ticketmaster has monopoly power. Similarly, if Live Nation's competitors in the alleged amphitheater market are strong or have meaningful or increasing market shares, this may be evidence that Live Nation lacks monopoly power in that market. On the other hand, if Live Nation's competitors are weak or have small or declining market shares, this may support an inference that Live Nation has monopoly power.

You may find that a Defendant has monopoly power based on direct evidence, indirect evidence, or both. If you find that a Defendant has monopoly power in a relevant market, then you must consider the remaining elements of Plaintiffs' monopolization claim as to that market and that Defendant only. If you find that a Defendant does not have monopoly power in a relevant market, then

46

you must find for that Defendant and against Plaintiffs on the monopolization claim as to that particular relevant market.

**Plaintiffs' Authority**: ABA Model Instr. 3.A.7; *New York v. Actavis, PLC*, No. 14 CIV. 7473, 2014 WL 7015198, at \*37 (S.D.N.Y. Dec. 11, 2014), *aff'd sub nom. New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638 (2d Cir. 2015) ("depending on other market factors, courts in the Second Circuit have permitted findings of market power with shares less than 50%," such as "finding [a] market share less than 30% would not foreclose the possibility of proving monopoly power"); *Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.*, 651 F.2d 122, 129 (2d Cir.1981) ("[T]he higher a market share, the stronger is the inference of monopoly power."); *In re Google Digital Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 364 (S.D.N.Y. 2022) ("In this Circuit, there is no bright-line rule.").

**Plaintiffs' Position:** Plaintiffs' proposed instruction moves the first paragraph of the model instruction to the direct proof section for clarity, since that section appears first in the proposed instructions. Plaintiffs' proposal then lists the types of evidence the jury may consider as indirect evidence, adds additional clarifications to each section, and clarifies the language. In the market share section, Plaintiffs provide market share percentages to aid the jury in comparing market shares presented in this case to those that have been found to be sufficient indirect evidence of monopoly power. In *Tops Markets Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 98 (2d Cir. 1998), the Second Circuit noted that while "market share is not the functional equivalent of monopoly power, it nevertheless is highly relevant to the determination of monopoly power." The Second Circuit has also clarified that while a market share below 50% may rarely be evidence of monopoly power, a share between 50% and 70% can show monopoly power, and share above 70% is usually strong evidence of monopoly power, "when the evidence presents a fair jury issue of monopoly power, the jury should not be told that it must find monopoly power lacking below a specified share or existing above a specified share." *Id*. *See Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.*, 651 F.2d 122, 129 (2d Cir. 1981). In addition, Plaintiffs added additional details to the barriers to entry section to aid in the jury's understanding of the concept. Defendants' alterations to the introduction add repetitive language regarding structural factors. Their edits to the market share section wrongly insert a new market share threshold of 60% for a finding of monopoly, apparently based on *PepsiCo, Inc. v. Coca-Cola*, 315 F.3d 101 (2d Cir. 2002). But that instruction would be legal error: *PepsiCo* does not apply here, where the jury has heard evidence of Defendants' ability to exclude competition. Defendants' proposed instruction on finding monopoly power based on a market share below 50% is inconsistent with Second Circuit case law. Defendants' edits to the barriers-to-entry section insert inappropriate argument, and its edits to the entry and exit by other companies section inappropriately focus on "relatively high" profit margins. And Defendants' edits inappropriately lower the threshold for showing effective competition in the market.

**Defendants' Authority**: ABA Model Instr. 3.A.7; *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 109 (2d Cir. 2002) ("Absent additional evidence, such as an ability to control prices or exclude competition, a 64 percent market share is insufficient to infer monopoly power.").

**Defendants' Argument**:  Defendants object to Plaintiffs' modifications to the ABA model jury instruction on indirect proof of monopoly power in ways that transparently lessen Plaintiffs' burden. For instance, Plaintiffs omit language making clear that regardless whether they use direct or indirect

evidence, the evidence must "establish[] that defendant has the power to control prices and exclude competition," and that a market share below 50% is "not sufficient to support a conclusion that defendant has monopoly power." ABA Model Instr. 3.A.7. Defendants also object to Plaintiffs' additions to the market share inquiry. These additions are misleading as they fail to mention that even where a defendant's market share is above 70%, there must still be other evidence of monopoly power. *See United States v. Microsoft*, 253 F.3d 34, 54 (D.C. Cir. 2001) ("agree[ing]" that "even a predominant market share [of 95%] does not by itself indicate monopoly power"). They are also misleading because they suggest that other indirect evidence is relevant only where market share is low. Finally, Defendants object to Plaintiffs' lengthy recitation of various aspects of their case as "barriers to entry." Such recitation of Plaintiffs' allegations as part of the Court's instructions on the law improperly seeks to give the jury the misimpression that the Court agrees with Plaintiffs' allegations. Defendants' edits to this instruction align it with the ABA model jury instruction. And Defendants' addition that a market share above 60% is usually required is consistent with Second Circuit precedent. *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 109 (2d Cir. 2002) ("Absent additional evidence, such as an ability to control prices or exclude competition, a 64 percent market share is insufficient to infer monopoly power.").

48

**Post-Instruction No. 15**

## MONOPOLIZATION ELEMENT #3: WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY POWER THROUGH ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT

If you find that Plaintiffs have met their burden of proving (a) a relevant market, and (b) that a Defendant possessed monopoly power in that relevant market, then you must turn to the third element of Plaintiffs' monopolization claim regarding that particular market and that particular Defendant. Plaintiffs must prove by a preponderance of the evidence that the Defendant willfully acquired or maintained monopoly power in that relevant market through anticompetitive or exclusionary conduct or acts.

Anticompetitive or exclusionary acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market. Harm to competition is different from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition. Harm to competition can include evidence of increased prices, decreased production levels, and reduced quality, though not all increases in prices, decreases in production levels or reductions in quality harm competition.

The mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws. Similarly, the acquisition or maintenance of monopoly power by supplying better products or services, possessing superior business skills, or because of prior history or luck, is not unlawful. A monopolist may compete aggressively without violating the antitrust laws, and a monopolist may charge monopoly prices without violating the antitrust laws. A monopolist's conduct only becomes unlawful if the monopolist either obtained or maintained its monopoly power through anticompetitive acts.

The difference between anticompetitive conduct and conduct that has a legitimate business purpose can be difficult to determine. This is because all companies have a desire to increase their

49

profits and increase their market share. These goals are an essential part of a competitive marketplace, and the antitrust laws do not make these goals—or the achievement of these goals—unlawful, as long as a company does not use anticompetitive means to achieve these goals.

In determining whether a particular Defendant's conduct was anticompetitive or exclusionary, or whether it was legitimate business conduct, you should determine whether the conduct is consistent with competition on the merits, whether the conduct provides benefits to consumers, and whether the conduct would make business sense apart from any effect it has on excluding competition or harming competitors.

The acts or practices that result in the acquisition or maintenance of monopoly power must represent something more than the conduct of business that is part of the normal competitive process or commercial success. They must represent conduct that has made it very difficult or impossible for competitors to compete and that was taken for no legitimate business reason. You may not find that a company willfully acquired or maintained monopoly power through anticompetitive means if it has acquired or maintained that power through the exercise of superior foresight and skill, such as providing quality products or services.

If you find that Plaintiffs have proven by a preponderance of the evidence that a particular Defendant engaged in anticompetitive or exclusionary conduct in a relevant market, then you may consider nonpretexual, procompetitive justifications for that conduct offered by that Defendant. If you find that Defendant has offered such justifications, then you must determine whether Plaintiffs have proven by a preponderance of the evidence that the anticompetitive or exclusionary conduct at issue was not reasonably necessary to achieve the procompetitive benefits claimed by that Defendant. If you find that the conduct was reasonably necessary to achieve the procompetitive benefits, then you must balance those benefits against the competitive harm resulting from that conduct. Conduct is anticompetitive and exclusionary only if its competitive harm outweighs its competitive benefits.

If you find that any Defendant willfully acquired or maintained monopoly power through anticompetitive or exclusionary conduct in a relevant market, then you must consider the remaining element of Plaintiffs' monopolization claim as to that market and that Defendant. If you find that a Defendant did not willfully acquire or maintain monopoly power through anticompetitive or exclusionary conduct in a relevant market, then you must find for that Defendant and against Plaintiffs on the monopolization claim as to that market.

**Plaintiffs' Authority**: ABA Model Instr. 3.A.9; *US Airways, Inc., for Am. Airlines, Inc. as Successor & Real Party in Int. v. Sabre Holdings Corp.*, Final Jury Instructions, 1:11cv2725, ECF No. 1207-8 at *18 (S.D.N.Y. May 19, 2022); *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 355 (4th Cir. 2024); *United States v. Microsoft Corp.*, 253 F.3d 34, 79 (D.C. Cir. 2001); *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99 (1962); *Otter Tail Power Co. v. United States*, 410 U.S. 366, 377 (1973); *United States v. Griffith*, 334 U.S. 100, 107 (1948); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985); *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 452-53 (7th Cir. 2020); *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 229 (S.D.N.Y. 2019) ("A monopolist's conduct violates Section 2 if it '(1) tends to impair the opportunities of rivals, [and] also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way.'"); *Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d 180, 222 (S.D.N.Y. 2014) ("Specifically, § 2 proscribes the use of monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor." (cleaned up) (quoting *Eastman Kodak*, 504 U.S. at 482-83))).

**Plaintiffs' Position:** Plaintiffs' proposed instruction begins with the ABA model and adds to it additional explanation of what constitutes anticompetitive or exclusionary conduct based on Section 2 case law. In particular, Plaintiffs' proposal includes an additional sentence instructing the jury that it may consider whether the "conduct causes harm to competition by limiting the opportunities of competitors, and either does not further competition on the merits or does so in an unnecessarily restrictive way," drawing from language in *Aspen Skiing* and other cited cases. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985) ("The question whether Ski Co.'s conduct may properly be characterized as exclusionary cannot be answered by simply considering its effect on Highlands. In addition, it is relevant to consider its impact on consumers and whether it has impaired competition in an unnecessarily restrictive way. If a firm has been 'attempting to exclude rivals on some basis other than efficiency,' it is fair to characterize its behavior as predatory."); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 229 (S.D.N.Y. 2019) ("A monopolist's conduct violates Section 2 if it '(1) tends to impair the opportunities of rivals, [and] also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way.'").

Additionally, Plaintiffs proposed the subsequent sentence to explain to jurors some of the particular forms of conduct that the Supreme Court has previously held to be anticompetitive: "foreclosing potential competitors from obtaining access to a key input, using monopoly power to destroy threatened competition, or using a strategic position to acquire exclusive privileges in an area where it otherwise has competitors can all constitute exclusionary conduct." *See Otter Tail Power Co. v.*

51

*United States*, 410 U.S. 366, 377 (1973); *United States v. Griffith,* 334 U.S. 100, 107 (1948)); *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 353 (4th Cir. 2024); *Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d 180, 222 (S.D.N.Y. 2014) ("Specifically, § 2 proscribes the use of monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor." (cleaned up) (quoting *Eastman Kodak*, 504 U.S. at 482-83))*.*

Plaintiffs' proposed instruction also provides guidance to jurors on how to evaluate the connection between the anticompetitive conduct alleged by Plaintiffs and the maintenance of any monopoly power by Defendants to avoid jurors incorrectly applying a "but-for" causation standard. Specifically, relying upon *United States v. Microsoft Corp.*, Plaintiffs propose jurors be told that "Plaintiffs may meet their burden by proving, by a preponderance of the evidence, that the exclusionary conduct was reasonably capable of contributing significantly to Defendants' continued monopoly power in any relevant market." 253 F.3d 34, 79 (2001).

Given the wide range of interrelated anticompetitive conduct alleged by Plaintiffs, much of which applies to multiple claims, Plaintiffs also believe it is important that the jury be instructed to consider the evidence as a whole, including its interrelated nature, consistent with the Supreme Court's guidance in *Continental Ore* and the Fourth Circuit's recent opinion in *Duke Energy*. *See Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("In cases such as this, plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole; and in a case like the one before us, the duty of the jury was to look at the whole picture and not merely at the individual figures in it." (cleaned up)); *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 355 (4th Cir. 2024), cert. denied sub nom.; *Duke Energy Carolinas v. NTE Carolinas II, LLC*, 2026 WL 79821 (U.S. Jan. 12, 2026) ("Just as the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole, so too must a firm's exclusionary efforts be considered in their totality." (citation and quotation omitted)).

Defendants' proposed instruction, by contrast, misstates the law by narrowly defining anticompetitive conduct, failing to provide the jury with examples of such conduct, and imposing additional hurdles for Plaintiffs to clear that are unsupported by the case law. For example, Defendants' proposed language can be incorrectly interpreted to be exhaustive: "[h]arm to competition can include evidence of increased prices, decreased production levels, and reduced quality." However, courts have made clear that "harm to the competitive process" is itself sufficient harm to competition to render conduct anticompetitive. *See Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 453 (7th Cir. 2020) ("The fact that the categories of conduct here are conceptually related and may overlap should not cause confusion if we stay focused on the underlying inquiry: the conduct 'must harm the competitive process and thereby harm consumers.'"); *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998) (plaintiffs "must allege and prove harm, not just to a single competitor, but to the competitive process, i.e., to competition itself"). Defendants' proposed instruction appears to require near complete foreclosure of competition by conduct to be anticompetitive ("conduct that has made it very difficult or impossible for competitors to compete"), but Defendants identify no authority for such a high bar. As explained above, the correct test set forth in *Microsoft* requires Plaintiffs to show the conduct merely "was reasonably capable of contributing significantly to Defendants' continued monopoly power in any relevant market." *United States v. Microsoft Corp.*, 253 F.3d 34, 79 (2001).

52

Defendants' proposal incorrectly instructs the jury that anticompetitive conduct "must represent something more than the conduct of business that is part of the normal competitive process or commercial success." But "a monopolist is not free to take certain actions that a company in a competitive (or even oligopolistic) market may take, because there is no market constraint on a monopolist's behavior." *LePage's Inc. v. 3M*, 324 F.3d 141, 151-52 (3d Cir. 2003); *United States v. Google LLC*, 803 F. Supp. 3d 18, 142 (D.D.C. 2025) ("[C]onduct that is otherwise lawful when committed by a non-monopolist can be deemed anticompetitive when performed by a dominant firm.").

Defendants' proposal also vaguely and confusingly injects the concept of a "legitimate business purpose" and implies without further explanation that any conduct undertaken for a "business purpose" such as increased profits or market share is necessarily not anticompetitive. But that is not the law. As the Seventh Circuit explained in *Viamedia*, "a short-term profit sacrifice is neither necessary nor sufficient for conduct to be exclusionary." *Viamedia*, 951 F.3d at 462; *see also Delaware & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) ("The fact that profit maximization is a goal of the make or buy policy provides support for an argument that the policy is a legitimate practice, but does not shield the policy from judicial scrutiny. A monopolist cannot escape liability for conduct that is otherwise actionable simply because that conduct also provides short-term profits."); *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 431 (2d Cir. 1945) ("[The monopolist] insists that it never excluded competitors; but we can think of no more effective exclusion than progressively to embrace each new opportunity as it opened, and to face every newcomer with new capacity already geared into a great organization, having the advantage of experience, trade connections and the elite of personnel. Only in case we interpret 'exclusion' as limited to maneuvers not honestly industrial, but actuated solely by a desire to prevent competition, can such a course, indefatigably pursued, be deemed not 'exclusionary.' So to limit it would in our judgment emasculate the Act; would permit just such consolidations as it was designed to prevent."); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1075-76 (10th Cir. 2013) ("[S]urely a monopolist can find ways to harm competition while still making money.").

To avoid confusion, any discussion of business purposes should be included in the subsequent instruction on procompetitive justifications. That instruction also properly clarifies that it is Defendants' burden to come forward with non-pretextual procompetitive justifications for the alleged conduct, rather than any generic "business purpose." *See Kodak*, 504 U.S. at 483, 485 (defendants' proffered business reasons must be "valid," "sufficient," "legitimate," and "competitive"); *Aspen Skiing*, 472 U.S. at 608-10; *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1212-14, 1218–20 (9th Cir. 1997). Defendants further misstate the law by suggesting that jurors "may not find that a company willfully acquired or maintained monopoly power through anticompetitive means if it has acquired or maintained that power through the exercise of superior foresight and skill, such as providing quality products or services." But this misstates the holding of *Grinnell* by creating a false dichotomy. *Grinnell* held that the maintenance of a monopoly "as a consequence of a superior product, business acumen, or historic accident" did not itself violate the Sherman Act, but the Court did not hold that a company with a superior product or business acumen that *also* engaged in anticompetitive conduct cannot be found liable under Section 2. Defendants' proposed instruction incorrectly suggests this to be the case.

**Defendants' Authority:** Adapted ABA Model Instr. 3.A.9, 1.C.3, 1.C.4.

53

**Defendants' Argument**:  *First*, Defendants object to Plaintiffs' elimination of "willful acquisition," which is included in the ABA model jury instruction on anticompetitive conduct as well as in the caselaw.  ABA Model Instr. 3.A.9; *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).

*Second*, Defendants object to Plaintiffs' modifications to the model instruction in ways that transparently lessen Plaintiffs' burden.  For instance, Plaintiffs omit language regarding examples of harm to competition, a monopolist's ability to compete aggressively and charge monopoly prices without violating the law, and the difference between anticompetitive conduct and legitimate business conduct.

*Third*, Defendants object to Plaintiffs' insertion of language that they must prove only that "the exclusionary conduct was reasonably capable of contributing significantly to Defendants' continued monopoly power."  That is not the law for any Plaintiff.  Indeed, no Plaintiff even argued as much during summary judgment briefing.  ECF No. 724 at 23 (Memorandum of Law in Support of Defendants' Motion for Summary Judgment); ECF No. 777 at 26-36 (Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment).  Even if that standard might potentially apply "when a regulator is seeking only injunctive relief," *United States v. Google LLC*, 747 F. Supp. 3d 1, 152-53 (D.D.C. 2024), it has no place here where Plaintiff States are seeking monetary relief as well.

Defendants' proposal aligns this instruction with the ABA model jury instruction.  It also combines subsequent instructions regarding procompetitive justifications and balancing competitive effects to reduce the length of the jury instructions and indicate to the jury that the latter analyses are all part of the anticompetitive conduct analysis.

54

**Post-Instruction No. 16**

### ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT—EXCLUSIVE DEALING SHERMAN ACT SECTION 2

I will now provide some additional detail on one particular type of anticompetitive or exclusionary conduct Plaintiffs have alleged in this case. Plaintiffs have alleged that Ticketmaster entered into long-term, exclusive primary ticketing contracts with what Plaintiffs call "major concert venues" that generally require the venue to use Ticketmaster as the exclusive primary ticketer for all events or for all concerts. Such contracts are called "exclusive dealing" contracts because they require buyers, here certain venues, to buy a product or service exclusively (or almost exclusively) from one seller, here Ticketmaster, for a period of time. Exclusive dealing contracts are presumptively procompetitive and lawful, but they can be anticompetitive in certain circumstances as I will explain to you now.

Exclusive contracts can be anticompetitive where a seller uses its monopoly power to force a customer to enter into an exclusive contract when the customer would have preferred to enter into a non-exclusive contract so that the customer could buy from multiple different sellers. However, where a customer wants an exclusive contract and only wants to buy from a single seller, it is not ordinarily anticompetitive for a seller to agree to sell on an exclusive basis, even if that seller has monopoly power. Customers are permitted to freely choose the terms on which they want to buy goods or services. To be anticompetitive, the seller has to use its monopoly power to coerce a customer into an exclusive contract that the customer did not want at all or would have preferred to be non-exclusive.

Here Plaintiffs allege that Ticketmaster coerced certain venues into signing exclusive primary ticketing contracts when those venues would have preferred non-exclusive ticketing contracts. You may find Ticketmaster's contracting practices to be anticompetitive or exclusionary only if you find that Ticketmaster coerced venues into accepting exclusive primary ticketing contracts. If you find that the venues wanted exclusive primary ticketing contracts and freely chose to enter into exclusive

55

contracts, then it is not anticompetitive or exclusionary for Ticketmaster to enter into exclusive ticketing contracts with those venues.

**Plaintiffs' Authority**: Adapted ABA Model Instr. 2.D.5, 1.C.2., 2.E.8; *United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 609, 611-612, (S.D.N.Y. 2025).

**Plaintiffs' Position**: Plaintiffs have proposed an instruction that closely tracks the three relevant ABA Model Instructions for exclusive dealing, combining two of them for purposes of streamlining. Plaintiffs' only substantive alterations consist of (i) clarifying that exclusive deals may be "nearly exclusive," consistent with other parts of the model instruction and case law, and (ii) providing the jury with guidance on sufficient foreclosure rates and other relevant factors for assessing competitive effects, based on *United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 609, 611-612, (S.D.N.Y. 2025) (citing *ZF Meritor*, 696 F.3d at 271-72).

Defendants' proposal is not based on an established model and misstates the law. First, it incorrectly suggests to jurors that the particular exclusive contracts at issue *here* are "presumptively procompetitive and lawful" based on caselaw describing certain exclusive contracts more generally across the economy. Whether the particular exclusive contracts at issue here are anticompetitive/procompetitive or lawful/unlawful depends on the particular facts and circumstances, as analyzed using the *ZF Meritor* factors that appear nowhere in Defendants' proposed instruction. Additionally, Defendants' proposed instruction misstates the law on coercion and is likely to confuse the jury. Defendants' proposal suggests the jury must find that customers "would have preferred to enter into a non-exclusive contract," but the relevant question, as with tying, is whether, but for Defendants' conduct, customers *might* have preferred a different arrangement such as a non-exclusive contract. *See supra* Plaintiffs' Position at Post-Instruction No. 7; *see also United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 611 (S.D.N.Y. 2025) (identifying "evidence that the dominant firm engaged in coercive behavior" as only one of seven factors courts consider in assessing foreclosure). Additionally, Defendants' broad assertion that "it is not anticompetitive for a seller to agree to sell on an exclusive basis, even if that seller has monopoly power," finds no support in the cases cited, as the key question under Section 2 is whether Defendants' exclusive contracts foreclosed competition, here in furtherance of maintaining their ticketing monopolies.

**Defendants' Authority:** *In re Mylan N.V. Sec. Litig.*, 666 F. Supp. 3d 266, 291 (S.D.N.Y. 2023) ("With respect to exclusive dealing agreements, the Supreme Court has long held that such agreements, whether challenged under Section 1 or Section 2, are presumptively procompetitive and lawful."); *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 245 (2d Cir. 1997) ("[E]xclusive distributorship arrangements are presumptively legal."); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 284 (3d Cir. 2012) ("Exclusive dealing will generally only be unlawful where the market is highly concentrated, the defendant possesses significant market power, and there is some element of coercion present."); *Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*, 962 F.3d 1015, 1031 n.11 (8th Cir. 2020) (same); *Interface Grp., Inc. v. Massachusetts Port Auth.*, 816 F.2d 9, 11 (1st Cir. 1987) ("When there is no plausible connection between exclusive dealing and antitrust harm, courts have not hesitated to hold that dealing lawful."); *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 77-78 (3d Cir. 2010) ("coercion is a fundamental consideration" where customers have "freely entered into exclusive contracts with the respective suppliers"); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 189-90 (3d Cir. 2005); *In re EpiPen Mktg., Sales Pracs.*

56

*& Antitrust Litig.*, 44 F.4th 959, 996 (10th Cir. 2022) ("We can [] generally presume exclusive deals are procompetitive. But this assumption is thrown out the window when record evidence suggests coercion by the monopolist.").

**Defendants' Argument**:  Exclusive contracting is the core conduct that Plaintiffs challenge in their Section 1 claim and most of their Section 2 claims.  Given its central role in this case, the jury should be instructed on the law of exclusive contracts.  This instruction explains that exclusive contracts themselves are not unlawful, and they do not constitute anticompetitive or exclusionary conduct unless the seller coercively imposed them on customers.  As multiple courts have recognized, this element of coercion is required with respect to exclusive contracts.  *See, e.g.*, *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 284 (3d Cir. 2012); *Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*, 962 F.3d 1015, 1031 n.11 (8th Cir. 2020); *In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 996 (10th Cir. 2022).  Without an instruction of this nature, the jury may erroneously believe that the mere fact of entering into exclusive contracts is anticompetitive.  Defendants object to Plaintiffs' proposal, which might suggest that exclusive contracts are always anticompetitive if, for instance, they have a certain duration—a position long rejected by the Supreme Court.  *See In re Mylan N.V. Sec. Litig.*, 666 F. Supp. 3d 266, 291 (S.D.N.Y. 2023) ("With respect to exclusive dealing agreements, the Supreme Court has long held that such agreements, whether challenged under Section 1 or Section 2, are presumptively procompetitive and lawful.").

**Post-Instruction No. 16D**

## THREATS AND RETALIATION

Plaintiffs have also alleged that Ticketmaster engaged in anticompetitive or exclusionary conduct by threatening venues with the loss of Live Nation content if they did not choose Ticketmaster for ticketing, and/or by retaliating against venues who did not choose Ticketmaster by withholding Live Nation content. These allegations of threats and/or retaliation cannot qualify as anticompetitive or exclusionary conduct unless you find that Live Nation has market power in a market for promoting all concerts to all artists at all venues. The same instructions regarding market definition and monopoly power that I provided to you earlier apply here. You must find the aforementioned market for concerts and that Live Nation has market power in that market before considering whether any allegations regarding threats and/or retaliation constitute anticompetitive or exclusionary conduct.

If you consider this alleged conduct, you must take care to distinguish between, on the one hand, affirmative acts of threatening venues or retaliating against venues and, on the other hand, concerns that a venue might have about how the choice of a ticketing provider might affect its ability to compete with other venues for concerts.  Only affirmative acts of threatening venues or retaliating against venues can support this part of Plaintiffs' case.  Likewise, that a venue might perceive an advantage in obtaining Live Nation promoted concerts because Ticketmaster is an affiliated company is not, in itself, proof of threats or retaliation.  There is no challenge in this case to the merger of Live Nation and Ticketmaster, so the corporate affiliation alone is not probative of threats or retaliation.

If you find that Ticketmaster threatened one or more venues with the loss of Live Nation content if they did not choose Ticketmaster for ticketing, and/or retaliated against one or more venues who did not choose Ticketmaster by withholding Live Nation content, you must consider whether that behavior was sufficiently widespread that it amounted to meaningful foreclosure of competition in the

58

relevant ticketing market.  You may consider both qualitative and quantitative evidence of foreclosure; for example:

- the number of threats or instances of retaliation Plaintiffs have proven

- the number of major concert venues, ticketing contracts and concert routing decisions in the same period of time;

- whether threats were made privately or disseminated broadly;

- whether Ticketmaster's rivals were able to develop counterstrategies for addressing the effects of threats or retaliation;

- whether Live Nation has monopoly power in concert promotion.

**Plaintiffs' Position (16D)**: Plaintiffs object to Defendants' proposed additional instruction as misleading, inaccurate, and unnecessary.  The Court's decision denying Defendants' motion for reconsideration forecloses Defendants' proposed requirement that the jury also must find "that Live Nation has market power in a market for promoting all concerts to all artists at all venues." In that decision, the Court rejected the identical argument Defendants raise here, holding that "Live Nation tries to add a market-definition requirement where there otherwise isn't one." Dkt. 1094 at 5. Rather, as the Court correctly explained, Plaintiffs' "theory is that Live Nation entrenches its monopoly power in a *single* market using threats and coercion," and while "[t]hose threats and coercion may be based on a product in another market," there is no requirement that Plaintiffs "must define that market too." *Id.* at 6.

The Court's decision denying Defendants' motion for reconsideration forecloses Defendants' proposed requirement that the jury also must find "that Live Nation has market power in a market for promoting all concerts to all artists at all venues." In that decision, the Court rejected the identical argument Defendants raise here, holding that "Live Nation tries to add a market-definition requirement where there otherwise isn't one." Dkt. 1094 at 5. Rather, as the Court correctly explained, Plaintiffs' "theory is that Live Nation entrenches its monopoly power in a single market using threats and coercion," and while "[t]hose threats and coercion may be based on a product in another market," there is no requirement that Plaintiffs "must define that market too." Id. at 6.

**Defendants' Authority**:  *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 230 (2d Cir. 1999) ("Whatever the continued scope of monopoly leveraging claims as independent causes of action," such a theory at a minimum requires "monopoly power in one market" that the defendant uses "to foreclose competition, to gain a competitive advantage, or to destroy a competitor in another distinct market."); *Kaufman v. Time Warner*, 836 F.3d 137, 143 (2d. Cir. 2016) ("[M]arket power in the tying product—is essential to a would-be monopolist's coercion via tie-in. Without the leverage of market power, a seller's inefficient tie-in will fail because a rational consumer will buy the tying product from the seller's competitor. . . . Hence, without market power, there is little risk of anticompetitive harm from the seller's tie-in."); *LePage's Inc. v. 3M*, 324 F.3d 141, 155-56 (3d Cir.

59

2003) (bundling theory requires "exploitation of the seller's monopoly power"); *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (requiring harm to "competitive *process*"); *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 183 (2d Cir. 2016) (requiring plaintiffs to offer grounds to "believe that the defendant's behavior will harm competition market-wide"); *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 96 (2d Cir. 1998) ("Before a factfinder may consider the harms and benefits of the challenged behavior, a plaintiff initially must show that the challenged action had an *actual* adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice."); *Giordano v. Saks Inc.*, 654 F. Supp. 3d 174, 208 (E.D.N.Y. 2023), *aff'd sub nom. Giordano v. Saks & Co. LLC*, No. 23-600-CV, 2025 WL 799270 (2d Cir. Mar. 13, 2025) (while "[p]laintiffs and those similarly situated suffered a certain amount of restricted job mobility as a result of the non-hire agreements, this does not lead to the conclusion that the no-hire agreements created an adverse effect on competition market-wide").

**Defendants' Argument**:  Defendants' position is that Plaintiffs' threats/retaliation evidence should have never been presented to the jury, and the jury should not be permitted to consider Plaintiffs' threats/retaliation theory.  *See* ECF No. 1049.  At summary judgment, this Court determined that Plaintiffs' alleged concert promotion market was invalid, thus preventing Plaintiffs from proving that Live Nation wields market power in that market.  *See* ECF No. 1037 at 12.  Without such proof, there is no lawful basis for a jury to find that it violates the antitrust laws for Defendants to "condition" the provision of Live Nation concerts to venues on the venues' choice of Ticketmaster as their primary ticketer.  While it is still unclear precisely which doctrinal rubric Plaintiffs' "conditioning" claims fall under, the closest fit seems to be a "monopoly leveraging" theory.  But there can be no leveraging of a monopoly (here, in concert promotions) to gain unfair advantage in an adjacent market (here, ticketing) without the existence of a monopoly (in concert promotions) in the first place.  *See AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 230 (2d Cir. 1999) ("[w]hatever the continued scope of monopoly leveraging claims as independent causes of action," such a theory at a minimum requires "monopoly power in one market" that the defendant uses "to foreclose competition, to gain a competitive advantage, or to destroy a competitor in another distinct market").  Nor can this constitute an actionable tie, which would not be unlawful absent market power in the tying product market.  *See Kaufman v. Time Warner*, 836 F.3d 137, 143 (2d. Cir. 2016) ("[M]arket power in the tying product— is essential to a would-be monopolist's coercion via tie-in.  Without the leverage of market power, a seller's inefficient tie-in will fail because a rational consumer will buy the tying product from the seller's competitor. . . . Hence, without market power, there is little risk of anticompetitive harm from the seller's tie-in.").  And a bundling theory fares no better, because that too requires a showing of "exploitation of the seller's monopoly power."  *LePage's Inc. v. 3M*, 324 F.3d 141, 155-56 (3d Cir. 2003).  In short, Plaintiffs must prove market power in a concert promotion market for their "conditioning" theory to succeed, and they cannot do so because their alleged concert promotion market has failed.

To the extent that the jury is allowed to consider Plaintiffs' threats/retaliation theory at all (and it should not be), it must be instructed that a showing of market power in concerts is required before it may do so.  Given that Plaintiffs' alleged concert promotion market involving artists at "major concert venues" has failed, Defendants propose a concert promotion market involving all artists at all venues.  But to be clear, Defendants' frontline position is that Plaintiffs cannot be allowed to even attempt to prove this market or any other concert promotion market given that their only alleged market was deemed invalid, and this theory should not go to the jury at all.

60

Plaintiffs' "conditioning" theory separately fails if Plaintiffs cannot show market-wide harm resulting from the alleged threats/retaliation.  Plaintiffs must prove that the alleged threats/retaliation "harm the competitive process and thereby harm consumers." *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001).  Isolated instances of supposed misconduct cannot, as a matter of law, harm the competitive process; Plaintiffs must offer grounds to "believe that the defendant's behavior will harm competition market-wide." *See MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 183 (2d Cir. 2016) (citation and quotation marks omitted).

61

**Post-Instruction No. 16D2**

## VERTICAL INTEGRATION AND SELF-PREFERENCING

You have heard evidence in this case that Live Nation is vertically integrated, meaning that it participates in multiple related businesses such as concert promotion, ticketing and venues. It is not unlawful for a company to combine multiple businesses that are related to one another or are part of the same supply chain. Plaintiffs do not have a claim in this case in which they contend that vertical integration is in itself unlawful.

If a business is vertically integrated and produces the products or services it needs internally, it will sometimes use its own products or services rather than purchasing those products or services from another company. For instance, a manufacturer might distribute its own products rather than hire another company to handle the distribution. It is not unlawful for a business to prefer to use its own goods or services rather than those of a third party. Evidence that Live Nation prefers to favor its own businesses that promote concerts, own and operate venues, and provide ticketing services does not by itself establish unlawful conduct. Nor is it unlawful for Live Nation promoters to prefer to use Ticketmaster's ticketing services instead of third-party ticketing services.

As you consider whether Plaintiffs have proven that Ticketmaster coerced certain venues into signing exclusive primary ticketing contracts, you should consider both that it is not unlawful for a business to prefer to use its own goods or services rather than those of a third party and that it is not unlawful for a company to be "vertically integrated."

**Plaintiffs' Position (16D2)**: Plaintiffs object to Defendants' proposed additional instruction as misleading, inaccurate, and unnecessary. Ultimately, vertical integration is a potential procompetitive justification, and Plaintiffs have separately proposed a thorough instruction on procompetitive benefits. As such, any discussion of vertical integration (if warranted at all) belongs within the broader procompetitive benefits instruction. *See United States v. Microsoft Corp.*, 253 F.3d 34, 89 (D.C. Cir. 2001) ("[W]e do not find that Microsoft's integration is welfare-enhancing or that it should be absolved of tying liability."); *United States v. Google LLC*, 778 F. Supp. 3d 797, 868 (E.D. Va. 2025) (considering and rejecting vertical integration as a procompetitive justification). In addition, the instruction is confusing because even the Supreme Court acknowledged "vertical integration" "is an

62

indefinite term without explicit meaning." United States v. Columbia Steel Co., 334 U.S. 495, 525 (1948).

Separately, the cases cited by Defendants do not stand for the sweeping assertions that vertical integration is per se lawful and any conduct ostensibly related to it is immune from antitrust scrutiny. Port Dock was a decision limited almost entirely to antitrust standing, which is not at issue here (and for the United States is not applicable). To the extent that case discussed vertical integration, it was limited to a producer in one market's "vertical expansion into another level of the same product market," i.e. the distribution level. *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 124, 126 (2d Cir. 2007) (recognizing that in other cases involving different facts, such vertical expansion could be actionable); *see also Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 465 (7th Cir. 2020) (noting that Port Dock acknowledged this). That does not resemble the facts here, where the alleged markets are distinct but related and do not involve multiple production levels (e.g., supplier and distributor) within a single supply chain. *See Port Dock*, 507 F.3d at 127 (explaining that Eastman Kodak was distinct, for example, because it "involved a claim of leveraging monopoly power over one product market into a distinct product market, . . . rather than vertical integration in one product market.").

Likewise, while the court in Jack Walters recognized that vertical integration alone is not an inherently unlawful category of conduct—and Plaintiffs do not allege as such in this case—nevertheless, "[o]f course if [a company] set about to [vertically integrate] in an unlawful fashion it would not be immune from liability just because it had an unexceptionable end in view. But that is only because, as we have noted, a conspiracy to attain a lawful end by unlawful means is actionable." *Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 710-11 (7th Cir. 1984) (also acknowledging "monopolistic firms might integrate vertically in order to deny supplies or outlets to competitors, or to make it more costly for new firms to enter the market (because they would have to enter at more than one level of production or distribution)").

Similarly, *Columbia Steel* did not hold that vertically integrated companies are somehow immune from antitrust laws, but rather "the fact that [companies] were integrated did not insulate them from the [Sherman] act." *Columbia Steel Co.*, 334 U.S. at 522. Columbia Steel also discussed Paramount Pictures and the factors "considered to be significant in determining the legality of vertical integration" hence the "without more" caveat included within the very quote Defendants use. *Id.* at 524-525. Likewise, the AT&T court held, "vertical integration may be unlawful under the Sherman Act if it creates monopoly power and is accompanied by an intent to exclude competition. Moreover, when activity among vertically-related affiliates restrains trade it violates the antitrust laws." *United States v. Am. Tel. & Tel. Co.*, 524 F. Supp. 1336, 1373 (D.D.C. 1981) (emphasis added). As in AT&T, the "government here did not attempt to prove that vertical integration itself amounts to anticompetitive conduct," and therefore the proposed instruction is irrelevant and confusing to the jury. *Id.*

Defendants' citation to *Dreamstime* stands for the opposite of what Defendants advance here. There, the Ninth Circuit held plaintiffs' allegations "that Google 'self-preferenced' Google Images in its search results . . . could be taken to show harm to Dreamstime in the online search market for images.*"* *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1141-42 (9th Cir. 2022) (emphasis added). However, the court affirmed dismissal of the claim there because the plaintiff disavowed any reliance on the theory of harm in the market. *Id.*

63

**Defendants' Authority:** *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 123-25 (2d Cir. 2007); *Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 710-11 (7th Cir. 1984) ("[V]ertical integration is not an unlawful or even a suspect category under the antitrust laws."); *United States v. Columbia Steel Co.*, 334 U.S. 495, 525 (1948) ("It seems clear to us that vertical integration, as such without more, cannot be held violative of the Sherman Act."); *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1141-42 (9th Cir. 2022) (claim that defendant "self-preferenced," among other things, did not "plausibly state a claim for anticompetitive conduct"); *United States v. Am. Tel. & Tel. Co.*, 524 F. Supp. 1336, 1373 (D.D.C. 1981) ("Clearly, vertical integration is not prohibited per se. . . and even an alleged monopolist has the right to compete vigorously."); *Reazin v. Blue Cross and Blue Shield of Kansas, Inc.*, 899 F.2d 951, 976 (10th Cir. 1990) (jury instruction that actions "were 'in and of themselves…not illegal or violative of the antitrust laws'" had "correctly reminded the jury that 'vertical integration . . . in and of itself is not violative of any law, including antitrust laws.'"); *Becker v. Egypt News Co., Inc.*, 713 F.2d 363, 366 (8th Cir. 1983) ("Since vertical integration by monopolists can have procompetitive effects, a refusal to deal to accomplish this integration, 'as such without more, cannot be held violative of the Sherman Act.'" (quoting *United States v. Columbia Steel Co.*, 334 U.S. 495, 525 (1948))); *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 689 (4th Cir. 2016) ("vertical integration has generally been permitted despite its apparent similarity to tying" and "[a] single firm incorporating separate but closely related processes can often be far more efficient than various independent entities"); *Auburn News Co., Inc. v. Providence Journal Co.*, 659 F.2d 273, 278 (1st Cir. 1981) ("[V]ertical integration can result in economic advantage to society" and "be a good faith effort to do business in more efficient ways."); *Theatre Party Associates, Inc. v. Shubert Organization, Inc.*, 695 F. Supp. 150, 155 (S.D.N.Y. 1988) ("[A] manufacturer or seller is free to control the distribution of its own product, [and] can unilaterally terminate or replace independent distributors and vertically integrate without violating the antitrust laws. Vertical integration without more, even by a monopolist, does not offend [the Sherman Act]." (citation omitted)); *United States v. Google LLC*, 803 F. Supp. 3d 18, 158 (D.D.C. 2025) ("The court will not hobble Google's competitiveness by prohibiting self-preferencing of its own . . . technologies . . . ."); *Belfiore v. New York Times Co.*, 826 F.2d 177, 181 (2d Cir. 1987) (Because "vertical integration even by a monopolist publisher 'does not, without more, offend Section 2' … [s]ummary judgment was proper on the monopolization claim." (citation omitted)); *Viacom Int'l Inc. v. Time Inc.*, 785 F. Supp. 371, 379 (S.D.N.Y. 1992) ("It is of course axiomatic that the antitrust laws do not operate to prevent a vertically integrated firm from reaping the rewards of its efficiency or to punish a company that profits from its expertise and innovativeness."); *S.W.B. New England, Inc. v. R.A.B. Food Grp., LLC.*, No. 06CIV. 15357GEL, 2008 WL 540091, at *5 (S.D.N.Y. Feb. 27, 2008) ("The fact that a defendant has a large market share 'does not change [the] analysis' that 'vertical integration does not violate antitrust laws.'" (citation omitted)).

**Defendants' Argument**: This instruction clarifies that the mere fact of Live Nation owning multiple businesses is not unlawful. *Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 710-11 (7th Cir. 1984) ("[V]ertical integration is not an unlawful or even a suspect category under the antitrust laws."). It also clarifies that those businesses' preference to deal with other Live Nation-owned businesses is likewise not unlawful. *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1141-42 (9th Cir. 2022) (claim that defendant "self-preferenced," among other things, did not "plausibly state a claim for anticompetitive conduct"). This instruction is necessary because Plaintiffs have repeatedly suggested that Live Nation's ownership of multiple businesses, *i.e.*, the so-called "fly-wheel," and Live Nation promoters' preference to use Live Nation-owned venues or venues that use Ticketmaster is inherently anticompetitive. Without this instruction, Plaintiffs' arguments may mislead the jury as to the law.

64

**Post-Instruction No. 16D3**

## MONOPOLIZATION ELEMENT #4: COMPETITIVE HARM

The final monopolization element Plaintiffs must prove by a preponderance of the evidence is that the relevant Defendant's (Live Nation's or Ticketmaster's) alleged anticompetitive or exclusionary acts harmed competition and caused anticompetitive effects in the relevant market. Although it may be relevant to the inquiry, harm that occurs to individual competitors is not enough, by itself, to demonstrate harm to competition generally. That is, harm to a single competitor or group of competitors does not necessarily mean that there has been harm to competition.

A harmful effect on competition, or competitive harm, refers to (a) a reduction in competition, that then (b) results in harm to the relevant customers. It means that customers lost lower prices, increased output, or higher product quality. If the challenged conduct did not result in customers paying higher prices, receiving lower quality products or services, or experiencing decreased output, then there has been no competitive harm.

Here, the relevant customers in the alleged ticketing markets are what Plaintiffs call "major concert venues." So you have to decide whether Plaintiffs proved that any anticompetitive conduct you may find actually harmed those "major concert venues," such as by causing them to pay higher prices for primary ticketing services or receiving lower quality ticketing services.

The relevant customers in the alleged market for amphitheaters are artists. So you have to decide whether Plaintiffs proved that any anticompetitive conduct you may find relevant to Plaintiffs' amphitheater market actually harmed artists by, for example, requiring them to pay higher prices to rent amphitheaters, having lower quality amphitheaters to play concerts in, or having fewer amphitheaters to play.

If you find that Plaintiffs have proven by a preponderance of the evidence that any anticompetitive or exclusionary acts by a Defendant in an alleged market actually harmed competition

65

in that market, then you must find for Plaintiffs and against that Defendant on the monopolization claim as to that market. If, however, you find that Plaintiffs did not prove by a preponderance of the evidence that anticompetitive or exclusionary acts by a Defendant in an alleged market actually harmed competition in that market, then you must find for that Defendant and against Plaintiffs on the monopolization claim as to that market. I remind you that you must consider and decide each claim against each Defendant in each alleged market separately.

This concludes the instructions on Plaintiffs' monopolization claims.

**Plaintiffs' Position (16D3):** Plaintiffs object to Defendants proposed instruction on a "fourth" element of monopolization. As discussed above, this additional element is not among the "two elements" identified by the Supreme Court in *Grinnell. United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). It appears to be in part duplicative of earlier instructions on anticompetitive conduct, which definitionally is conduct capable of having an anticompetitive effect, and in part an additional element Defendants have created from whole-cloth. As with earlier proposed instructions, Defendants' proposal here that Plaintiffs must show conduct "harmed competition and caused anticompetitive effects in the relevant market" ignores case law that harm to the competitive process is itself an anticompetitive effect. *See Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 453 (7th Cir. 2020) ("The fact that the categories of conduct here are conceptually related and may overlap should not cause confusion if we stay focused on the underlying inquiry: the conduct 'must harm the competitive *process* and thereby harm consumers.'" (emphasis in original)); *Nynex Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998) (plaintiffs "must allege and prove harm, not just to a single competitor, but to the competitive process, i.e., to competition itself"). Additionally, Defendants' proposed instructions distinguishing between harm to individual competitors and harm to the competition is duplicative of earlier instructions.

For the reasons addressed in Plaintiffs' opposition to Defendants' motion for summary judgment, Defendants' proposed instruction requiring Plaintiffs to prove actual effects in the form of "customers paying higher prices, receiving lower quality products or services, decreased output or the loss of some other competitive benefit," is incorrect. Plaintiffs' proposed instructions correctly state Plaintiffs' burden to establish liability here, which is to show harm to competition. Evidence of price or quality effects can help establish liability under Section 2, and Plaintiffs will present evidence of such effects at trial, including in connection with State Plaintiffs' damages claims.

**Defendants' Authority:** Adapted ABA Instr. 1.C.2; *MacDermid Printing Sols. v. Cortron*, 833 F.3d 172, 183 (2d Cir. 2016) ("[I]n no precedential opinion in this Circuit has a plaintiff successfully proved an adverse effect on competition without offering evidence of changed prices, output, or quality."); *Hasbrouck v. Texaco, Inc.*, 842 F.2d 1034, 1040 (9th Cir. 1987), *aff'd*, 496 U.S. 543 (1990) ("The purpose of drawing a distinction between harm to competition and harm to competitors is to point out that not all acts that harm competitors harm competition."); *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (To violate Section 2, "a monopolist's act must have an 'anticompetitive effect.' That is, it must harm the competitive *process* and thereby harm consumers."); *In re Google*

66

*Digital Advertising Antitrust Litig.*, 627 F. Supp. 3d 346, 380 (S.D.N.Y. 2022) (conduct "must have an anticompetitive effect in order to form the basis of a monopolization claim"); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005) ("[T]he exclusionary conduct must have an anti-competitive effect.").

**Defendants' Argument**:  As noted above, proof of competitive harm and anticompetitive effects is required in a Section 2 claim, and Defendants object to Plaintiffs' complete exclusion of this element from the monopolization analysis.  *See* Defendants' Argument on Post-Instruction No. 9 (Monopolization Elements).  The Second Circuit has explained that this showing requires "evidence of changed prices, output, or quality." *MacDermid Printing Sols. v. Cortron*, 833 F.3d 172, 183 (2d Cir. 2016).  Defendants' proposed instruction aligns with this requirement and the ABA model jury instruction on competitive harm.  *See* ABA Instr. 1.C.2.

**Post-Instruction No. 17**

**EXCLUSIVE DEALING AGAINST TICKETMASTER—SHERMAN ACT SECTION 1**

Plaintiffs separately claim that Ticketmaster has engaged in unlawful exclusive dealing in violation of Section 1 of the Sherman Act by entering into long-term, exclusive primary ticketing contracts with what Plaintiffs call "major concert venues" that generally require the venue to use Ticketmaster as the exclusive primary ticketer for all events or for all concerts. This claim is only against Ticketmaster, not Live Nation. I have already instructed you on how to evaluate exclusive dealing conduct under Plaintiffs' Section 2 monopolization claims. I will now instruct you on how to evaluate exclusive dealing conduct under Plaintiffs' separate Section 1 exclusive dealing claim.

To establish that an exclusive dealing arrangement violates Section 1 of the Sherman Act, Plaintiffs must establish each of the following elements by a preponderance of the evidence for each agreement separately:

(1)    There is an agreement between one of the venues that Plaintiffs refer to as "major concert venues" and Ticketmaster that substantially forecloses the venue from buying primary ticketing services from competing primary ticketing companies.

(2)    There is a relevant market limited to what Plaintiffs call "major concert venues" for (a) primary ticketing services, and/or (b) primary concert ticketing services. If you did not find that Plaintiffs proved either of these markets, there is nothing else for you to consider on this claim for any such markets. You must find for Ticketmaster and against Plaintiffs on the Section 1 Exclusive Dealing claim for all such markets. If you found that Plaintiffs proved either of these alleged ticketing markets, then you should go on to consider whether Plaintiffs proved the other elements of this claim for that market.

(3)    Ticketmaster has substantial market power in at least one of the alleged ticketing markets. Market power has been defined as an ability to profitably raise prices for a

68

sustained period of time above those prices that would be charged in a competitive market. A firm that possesses market power generally can charge higher prices for the same goods or services than a firm in the same market that does not possess market power. The ability to charge higher prices for better products or services, however, is not market power. An important factor in determining whether Ticketmaster possesses market power in the alleged ticketing markets is Ticketmaster's market share, that is, its percentage of the products or services sold in the relevant market by all competitors. Other factors that you may consider in determining whether Ticketmaster has market power include the existence of barriers to entry or expansion by potential competitors. I previously instructed you on barriers to entry or expansion in connection with the Section 2 claims, and those same instructions apply here.

(4)    Ticketmaster used its alleged market power in the alleged market to coerce the venue into an exclusive contract that the venue did not want at all or would have preferred to be non-exclusive. Coercion here means the same thing as I instructed you with respect to the Section 2 claim earlier.

(5)    The agreement substantially foreclosed competition in the alleged market.

(6)    The alleged foreclosure of competition caused anticompetitive effects in the alleged market. Anticompetitive effects has the same meaning as I instructed you on the Section 2 claim above.

In determining whether Ticketmaster coerced any venue to enter into an exclusive contract and whether any individual contract substantially foreclosed competition on the merits, it is important to consider whether the venue wanted an exclusive contract and whether other ticketing competitors had the opportunity to compete for the contract, even if they ultimately did not do so. An opportunity to compete does not require proof of a public bidding process or a specific invitation from the venue to bid. A competitor is considered to have had an opportunity to compete for a contract if it is aware of

69

what is going on in the marketplace generally and is generally aware of how to compete for contracts with the venue.

In determining whether any exclusive contract with a venue substantially foreclosed competition, it is also relevant to consider the percentage of the market foreclosed by the contract and the length of the foreclosure. Where an exclusive dealing contract forecloses less than 20 percent of the market, this indicates that the harm from the foreclosure of competition is not substantial because there are alternatives available. Similarly, the shorter the duration of the contract, the less likely it is to harm competition. The longer the contract's duration, the more likely that the harm to competition will be greater, unless it is clear that there was vigorous competition on the merits to win the longer contract or the buyer as a practical matter can terminate the agreement on short notice without cause and without significant penalty.

Plaintiffs must prove these elements for each challenged agreement. To prove that each challenged agreement caused anticompetitive effects, Plaintiffs must prove that the agreement, judged on its own and not aggregated together with other challenged agreements, caused substantial harm to competition.

If you find that Plaintiffs have failed to prove any one of these elements for any agreement they challenge, then you must find for Ticketmaster and against Plaintiffs on Plaintiffs' Section 1 exclusive dealing claim. If you find that Plaintiffs have proven all of these elements for each of the agreements they challenge, then you must find for Plaintiffs and against Ticketmaster on Plaintiffs' Section 1 exclusive dealing claim.

**Plaintiffs' Authority**: Adapted ABA Model Instr. 1.C.2, 2.D.5; *United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 609, 611-12, (S.D.N.Y. 2025) (setting forth exclusive dealing framework under Section 1 of the Sherman Act); *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 342 (S.D.N.Y. 2001) (ruling that MasterCard had "market power in the general purpose card network services market" where Mastercard had a "26%" market share), *modified*, 183 F. Supp. 2d 613 (S.D.N.Y. 2001), and *aff'd*, 344 F.3d 229 (2d Cir. 2003); *United States v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001) (Section 1 generally requires a roughly "40% standard drawn from the caselaw," while a Section 2

70

violation may "foreclose less than the roughly 40% or 50% share usually required in order to establish a [Section] 1 violation"); Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1821c ("[Foreclosure] [p]ercentages higher than 50 percent are routinely condemned when the practice is complete exclusion by a contract of fairly long duration.").

**Plaintiffs' Position:** As with the exclusive dealing instruction under Section 2, Plaintiffs' proposed instruction hews closely to the cited ABA Model Instructions and the language from *United States v. Visa*. 788 F. Supp. 3d 585, 609 (S.D.N.Y. 2025). Further, the Court has already rejected the premise that each agreement must be evaluated separately. ECF No. 1037 at 41–42.

**Defendants' Authority:** Adapted ABA Model Instr. 1.C.2, 2.D.5, 2.D.6, *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 116 (S.D.N.Y. 2015) ("In order to adequately plead foreclosure in a relevant market, a plaintiff first must properly define the relevant market."); *id.* at 117 ("It also is well established that exclusive agreements do not harm competition when there is competition to obtain the exclusive contract."); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 284 (3d Cir. 2012) ("Exclusive dealing will generally only be unlawful where the market is highly concentrated, the defendant possesses significant market power, and there is some element of coercion present."); *Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*, 962 F.3d 1015, 1031 n.11 (8th Cir. 2020) (same); *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 77-78 (3d Cir. 2010) ("coercion is a fundamental consideration" where customers have "freely entered into exclusive contracts with the respective suppliers"); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 189-90 (3d Cir. 2005); *In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 996 (10th Cir. 2022) ("We can [] generally presume exclusive deals are procompetitive. But this assumption is thrown out the window when record evidence suggests coercion by the monopolist."); *CoStar Grp., Inc. v. Comm. Real Estate Exch., Inc.*, 150 F.4th 1056, 1067 (9th Cir. 2025) ("[A] § 1 exclusive dealing claim requires a substantial foreclosure of competition."); *New York v. Meta Platforms, Inc.*, 66 F.4th 288, (D.C. Cir. 2023) (requiring "substantial market foreclosure"); *United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 609 (S.D.N.Y. 2025) ("[A]n exclusive dealing arrangement must 'foreclose competition in such a substantial share of the relevant market so as to adversely affect competition.'"); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720 (MKB), 2024 WL 1014159, at *26 (E.D.N.Y. Mar. 8, 2024) ("Moreover, it is settled law that, under the rule of reason, a plaintiff bears the burden of showing 'an actual adverse effect' on competition through increased prices, decreased output, or that the challenged conduct 'otherwise stifled competition.'"); *Dickson v. Microsoft Corporation*, 309 F.3d 193, 203-05 (4th Cir. 2002) (declining to consider licensing agreements between Microsoft and various OEMs in the aggregate and analyzing each agreement "individually" instead); *Howard Hess Dental Laboratories v. Dentsply International*, 602 F.3d 239, 255-56 (3d Cir. 2010) (requiring plaintiffs to show that "every single agreement" between a manufacturer and its dealers had anticompetitive effect); *Gibson v. Cendyn Group*, 148 F.4th 1069, 1087 (9th Cir. 2025) (finding that "a grouping of individual agreements could not be 'aggregated' for the purposes of determining whether together they acted as an unreasonable restraint of trade," and requiring that the agreements "have a 'discrete effect' on competition"); *Panini America v. Fanatics*, 2025 WL 753954, at *9 (S.D.N.Y. Mar. 10, 2025) (refusing to "consider the effects of [] six exclusive deals together" and considering the effect of each separately instead); *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 83-84 (3d Cir. 2010) (plaintiff was not denied the ability to compete merely because it did not receive an invitation to bid where it was "well aware of what [was] going on in the marketplace" and knew how to compete for exclusive contracts); *Paddock Publ'ns v. Chi. Tribune*, 103 F.3d 42, 45 (7th Cir. 1996) ("Competition-for-the-contract is a form of competition that antitrust laws protect rather than proscribe, and it is common."); *Ticketmaster v. Tickets.com*, 2003 WL

71

21397701 (C.D. Cal. Mar. 7, 2003), *aff'd*, 127 F. App'x 346 (9th Cir. 2005); *City of New York v. Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011) ("To state a claim under. . . §§ 1 or 2 of the Sherman Act. . . a plaintiff must allege a plausible relevant market in which competition will be impaired.").

**Defendants' Argument**:  Defendants' edits to this instruction primarily accomplish four things.

*First*, they clarify that this claim is asserted only against Ticketmaster, not Live Nation.  ECF No. 257 at 87-88 (Am. Compl.).  Indeed, only Ticketmaster is a party to its primary ticketing contracts with venues, and Plaintiffs have not alleged any veil-piercing or like theory that would permit this claim against Live Nation.  *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir. 1993) ("a contract under the corporate name of [either a parent corporation or its subsidiary] is not treated as that of both").

*Second*, Defendants' proposal makes clear that Plaintiffs must prove their Section 1 exclusive dealing claim for each challenged primary ticketing contract separately.  As Defendants explained in their summary judgment briefing, exclusive dealing challenges under Section 1 cannot aggregate contracts, unlike under Section 2.  ECF No. 724 at 32 (Memorandum of Law in Support of Defendants' Motion for Summary Judgment); *Dickson v. Microsoft Corporation*, 309 F.3d 193, 203-05 (4th Cir. 2002) (declining to consider licensing agreements between Microsoft and various OEMs in the aggregate and analyzing each agreement "individually" instead); *Howard Hess Dental Laboratories v. Dentsply International*, 602 F.3d 239, 255-56 (3d Cir. 2010) (requiring plaintiffs to show that "every single agreement" between a manufacturer and its dealers had anticompetitive effect); *Gibson v. Cendyn Group*, 148 F.4th 1069, 1087 (9th Cir. 2025) (finding that "a grouping of individual agreements could not be 'aggregated' for the purposes of determining whether together they acted as an unreasonable restraint of trade," and requiring that the agreements "have a 'discrete effect' on competition"); *Panini America v. Fanatics*, 2025 WL 753954, at *9 (S.D.N.Y. Mar. 10, 2025) (refusing to "consider the effects of [] six exclusive deals together" and considering the effect of each separately instead).

This Court rejected this argument at summary judgment on the basis that the cited cases are all conspiracy cases in which a plaintiff sued the hub and the spokes.  ECF No. 1037 at 41-42.  But that is not true of two of the four cases.  Defendants thus respectfully request reconsideration.  *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995) (reconsideration warranted where party can point to matters "that might reasonably be expected to alter the conclusion reached by the court").  In *Panini*, the plaintiff sued only the hub and no spokes, and the plaintiff did not allege any conspiracy claims.  In other words, the *Panini* plaintiff alleged the same type of straightforward Section 1 exclusive dealing contract theory that Plaintiffs allege here.  There is thus no factual basis to distinguish Judge Swain's ruling in *Panini* from this Court's summary judgment ruling—which created a direct split of authority between district courts in this district without citing a single case supporting its reading of Section 1.  Every court to have directly considered and addressed the question of aggregation of contracts under Section 1 has held that, in the absence of proof that all the participants were part of a single conspiracy through a hub-and-spoke theory, aggregation of the contracts is improper.  No court has held, as this Court did, that a defendant's liability under Section 1 turns on who else the plaintiffs chose to sue.  It cannot be the law that a defendant is subject to a different legal standard under Section 1 only if plaintiffs choose not to sue the counterparties to the agreements.

This Court's reading of *Gibson* was also erroneous.  In *Gibson*, the plaintiffs alleged two different Section 1 theories in their complaint—one based on a hub-and-spoke theory, and a separate one based on the aggregation of individual exclusive agreements.  On appeal, plaintiffs abandoned the hub-and-

72

spoke claim (as the Ninth Circuit expressly recognized, *see* 148 F.4th at 1079), so the only claim the Ninth Circuit addressed was whether it was appropriate to aggregate individual exclusive contracts with a common licensor under Section 1.  The Ninth Circuit held unequivocally that is improper, as every other court to have addressed the question has held.  This Court's ruling on summary judgment directly contradicts the Ninth Circuit's ruling, and these other cases.

This Court also cited *Standard Oil Co. v. United States*, 337 U.S. 293, 295 (1949), in support of its ruling.  ECF No. 1037 at 42.  But *Standard Oil* addressed Section 3 of the Clayton Act, not Section 1 of the Sherman Act, and the Supreme Court expressly disclaimed consideration of whether its decision would be the same under Section 1 of the Sherman Act.  *See* 337 U.S. at 314.  *Standard Oil* thus presents no impediment to the conclusion many courts have reached—that Section 1 does not permit aggregation of contracts in the absence of proof that all the alleged participants acted together in a single conspiracy.  Plaintiffs here, of course, have never alleged (and could never prove) that Ticketmaster acted together with all its venue clients in a single conspiracy.  Because the Court's ruling on summary judgment was based on a mistaken reading of 3 of the 5 cases it cited, we respectfully request that the Court reconsider and reverse that ruling and hold that aggregation of contracts is not permitted in the circumstances of this case.  Whether this legal holding may present a "coup for antitrust defendants" is not an appropriate basis to disregard settled law.  ECF No. 1037 at 42.  In any event, it does not.  The legal basis for a claim that a series of individual exclusive contracts harms competition is Section 2, not Section 1.  Interpreting Section 1 as this Court did actually creates a coup for antitrust plaintiffs, allowing them to try to make out a claim under Section 1 that they cannot prove under Section 2.  There is no basis in Section 1 law for such a maneuver.

*Third*, Defendants' edits to the market power element align it with the ABA model jury instruction on market power.  *See* ABA Model Instr. 1.C.2.  Defendants object to Plaintiffs' comparison of market power to monopoly power.  This comparison, and in particular Plaintiffs' provision of a market share percentage at which market power may be found, is prejudicial as it may cause the jury to ignore the market power analysis and find the market power element satisfied based only on Ticketmaster's market share.

*Fourth*, Defendants have added elements on market definition, coercion, substantial foreclosure, and anticompetitive effects because it is well-established that each of those inquiries must be satisfied in a Section 1 exclusive dealing claim.  *City of New York v. Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011) ("To state a claim under . . . §§ 1 or 2 of the Sherman Act . . . a plaintiff must allege a plausible relevant market in which competition will be impaired."); *supra* Post-Instruction No. 16 (Anticompetitive or Exclusionary Conduct – Exclusive Dealing – Sherman Act Section 2); *United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 609 (S.D.N.Y. 2025) ("[A]n exclusive dealing arrangement must 'foreclose competition in such a substantial share of the relevant market so as to adversely affect competition.'").  Defendants' explanation of the substantial foreclosure element tracks the relevant ABA model jury instruction.  *See* ABA Model Instr. 2.D.6.  As does Defendants' explanation that the jury should consider whether venues wanted to enter into exclusive primary ticketing contracts, and whether Ticketmaster's competitors has an opportunity to compete for those contracts.  *Id.*; *see Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 117 (S.D.N.Y. 2015) ("It also is well established that exclusive agreements do not harm competition when there is competition to obtain the exclusive contract."); *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 83-84 (3d Cir. 2010) (plaintiff was not denied the ability to compete merely because it did not receive an invitation to bid

73

where it was "well aware of what [was] going on in the marketplace" and knew how to compete for exclusive contracts).

**Post-Instruction No. 18**

### UNLAWFUL TYING AGAINST LIVE NATION

Plaintiffs also claim that Live Nation engaged in an unlawful tying arrangement in violation of Section 1 of the Sherman Act. This claim is against Live Nation, and not Ticketmaster. Again, this is separate and apart from Plaintiffs' claims of monopolization and unlawful exclusive dealing and is subject to different rules, which I will explain now.

A tying arrangement is one in which the seller will sell one product or service (referred to as the tying product) only on the condition that buyers also purchase a different product or service (referred to as the tied product) from the seller, or that buyers at least agree not to purchase the tied product or service from any other seller. In this case, Plaintiffs claim that the tying product is the use of what they call "large amphitheaters" by artists, and the tied product is promotion services to all touring artists. Plaintiffs claim that Live Nation requires all touring artists to use Live Nation's promotion services if those artists want to perform at so-called "large amphitheaters" owned, operated, or controlled by Live Nation.

In assessing Plaintiffs' tying claim, you should know that, as a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing. This means that businesses have no general duty to deal with their competitors. Live Nation has no obligation to rent its amphitheaters to rival promoters. And it is not unlawful for Live Nation to refuse to do so.

If you find that Live Nation's rival promoters want to rent Live Nation's amphitheaters so that they can win promotion business from artists instead of Live Nation, and that Live Nation's lawful refusal to rent to its rival promoters is what causes artists to choose Live Nation as their promoter, then you must find for Live Nation and against Plaintiffs on the Section 1 tying claim.

75

To prevail on their tying claim, Plaintiffs must prove each of the following elements by a preponderance of the evidence:

1.      Artists themselves, and not Live Nation's concert promoter competitors, directly rent amphitheaters from Live Nation;

2.      The use (i.e., rental) of so-called "large amphitheaters" by artists (the tying product) and promotion services to all touring artists (the tied product) are separate and distinct products. If you previously found that Plaintiffs failed to prove that artists' use of so-called "large amphitheaters" is a relevant market, then you should not go on to consider any other element of this claim. Instead, you should find for Live Nation and against Plaintiffs on the Section 1 tying claim. Only if you found that Plaintiffs proved that alleged market should you go on to consider whether Plaintiffs proved the other elements of this claim. Additionally, you must find that promotion services to all touring artists is a relevant market. The same market definition instructions I provided to you in connection with Plaintiffs' monopolization claims apply here. If you find that promotion services to all touring artists is not a relevant market, then you should not go on to consider any other element of this claim. Instead, you should find for Live Nation and against Plaintiffs on the Section 1 tying claim. Only if you find that Plaintiffs proved that promotion services to all touring artists is a relevant market should you go on to consider whether Plaintiffs proved the other elements of this claim.

3.      Live Nation conditioned artists' use of so-called "large amphitheaters" on artists also purchasing Live Nation's promotion services.

4.      Live Nation has sufficient market power with respect to the use of what Plaintiffs call "large amphitheaters" by artists to enable Live Nation to restrain competition as to promotion services to all touring artists. I have previously instructed you on the meaning of market power

76

in connection with the exclusive dealing claim. The same rules apply in determining the existence of market power here.

5.    The alleged tying arrangement has unreasonably restrained trade in that it had a substantial adverse effect in the market for promotion services to all touring artists, for example by raising the price of promotion services paid by those artists, or by lowering the quality or amount of those services. I have previously instructed you on competitive harm and anticompetitive effects in connection with Plaintiffs' monopolization claims. The same rules apply in determining substantial adverse effect here.

6.    The alleged tying arrangement affected a not insubstantial volume of interstate commerce in promotion services to artists.

If you find that Plaintiffs have proved all six of these elements, then you must find for Plaintiffs and against Live Nation on Plaintiffs' tying claim. If you find that Plaintiffs have failed to prove any one of these elements, then you must find for Live Nation and against Plaintiffs on Plaintiffs' tying claim.

I will now provide additional detail on these elements.

**Plaintiffs' Authority**: Adapted ABA Model Instr. 2.E.1 and 2.E.3; ECF 1094 at 3-5; SJ Op., EC 1037 at 32-33; *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12-13, 26, 29 (1984) (if a defendant with market power over a tying product has forced or coerced customers into purchasing a separate, tied product, and a not insubstantial amount of commerce is affected for the tied product, then a Plaintiff has successfully "invok[ed] the per se rule against tying and thereby avoid[s] analysis of actual market conditions" because such a tie is inherently anticompetitive; if defendant has insufficient power in the tying market, however, the plaintiff, "[i]n order to prevail in the absence of per se liability," must make "an inquiry into the actual effect . . . on competition"); *Fortner Enter., Inc. v. United States Steel Corp.*, 394 U.S. 495, 500-01 (1969) ("the per se doctrine['s] . . . requirement that a 'not insubstantial' amount of commerce be involved makes no reference to the scope of any particular market or to the share of that market foreclosed by the tie"; and the "inability to satisfy [the per se] standards" are not "fatal to a plaintiff's case" as "[a] plaintiff can still prevail on the merits whenever he can prove, on the basis of a more thorough examination of the purposes and effects of the standards involved"—i.e., through a rule of reason analysis—"that the general standards of the Sherman Act have been violated"); *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 463 (1992); *N. Pacific R. Co. v. United States*, 356 U.S. 1, 7 (1958); *Hill v. A-T-O, Inc.*, 535 F.2d 1349, 1353 (2d Cir. 1976); *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 133 n. 5 (2d Cir.

77

2001), *overruled on other grounds In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006); *accord United States v. IBM Corp.*, 163 F.3d 737, 741 (2d Cir. 1998); *Park Irmat Drug Corp. v. Optumrx, Inc.*, 152 F. Supp. 3d 127, 139 (S.D.N.Y. 2016); Areeda & Hovenkamp, Antitrust Law ¶ 1702 ; ; ; ("[a]rrangements not unlawful [per se] might be unlawful under the rule of reason . . . even in the absence of any 'tying' product over which the supplier has power, or of the 'separate products' that per se tying law requires"); *In re Wireless Services Antitrust Lit.*, 385 F. Supp. 2d 403, 414-15 ("where a tying arrangement may be condemned as illegal per se, plaintiffs need not allege, let alone prove, an element relevant to a rule-of-reason inquiry: i.e., anticompetitive effects in the tied market", and "the plaintiff is also relieved of the burden of rebutting any justifications the defendant may offer for the tie"; if, however, "the showing of market power is insufficient to find a per se violation of antitrust law, courts apply a rule of reason analysis at the fact-finding stage through a burden shifting scheme," pursuant to which a plaintiff may demonstrate "an actual adverse effect on competition" through "examining factors like reduced output, increased prices and decreased quality" or "significant barriers to entry into a particular market") (cleaned up).

**Plaintiffs' Position**: Plaintiffs combined ABA Model Instructions 2.E.1 (Unlawful Tying Arrangement) and 2.E.3 (Elements – Per Se Unlawful Tying) for brevity and clarity. Plaintiffs' proposal conforms closely to the ABA Model for both instructions. In paragraph one, Plaintiffs add the sentence with the language "separate and apart" to make it clear to the jurors that they are now considering a new claim. In paragraph two, Plaintiffs provide an illustrative example for the jurors, by specifying the type of conduct being alleged. In paragraph three, Plaintiffs list all five elements that are required to prove a tying claim in the Second Circuit: "first, a tying and a tied product; second, evidence of actual coercion by the seller that forced the buyer to accept the tied product; third, sufficient economic power in the tying product market to coerce purchaser acceptance of the tied product; fourth, anticompetitive effects in the tied market; and fifth, the involvement of a 'not insubstantial' amount of commerce in the 'tied' market." *Gonzalez v. St. Margaret's House Hous. Dev. Fund Corp.*, 880 F.2d 1514, 1516-17 (2d Cir. 1989); *accord E & L Consulting, Ltd. v. Doman Indus.*, 472 F.3d 23, 31 (2d Cir. 2006).

Defendants also attempt to insert an improper requirement of a separate relevant market for "promotion services to all touring artists" into their proposed instruction for Plaintiffs' unlawful tying claim. But as with Defendants' proposed Post-Instruction No. 16D, the Court already rejected the argument that Plaintiffs must define a separate market for the "tied" product market in denying Defendants' motion for reconsideration. ECF No. 1094 at 2-5 (concluding that "no Second Circuit or Supreme Court case says that a plaintiff must provide a formal market definition for the tied product," and finding the "nonbinding caselaw" cited by Defendants "unpersuasive"). Plaintiffs are only required to "identify some separate product from the tying market and then establish that there are anticompetitive effects in the market for that tied product," *id.* at 5, as set forth in Plaintiffs' proposed instruction.

**Defendants' Authority**: Adapted ABA Model Instr. 2.E.1, 2.E.3; *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 71 (2d Cir. 1996) (noting "the 'fundamental principle of antitrust law that an illegal tying arrangement requires that at least two products and/or services be purchased by the same individual'"); *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 447 (2009) ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."); *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) ("[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or

78

manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'"); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 604-05 (1985) (jury instructed that "refusal to deal … 'does not violate Section 2 if valid business reasons exist for that refusal'"); *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 929 (4th Cir. 1990) ("In general, a seller has the right to choose with whom it wishes to deal."); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1066 (10th Cir. 2013) (Gorsuch, J.) ("[T]he antitrust laws rarely impose on firms—even dominant firms—a duty to deal with their rivals."); *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 305 (D.C. Cir. 2023) ("To consider Facebook's policy as a violation of § 2 would be to suppose that a dominant firm must lend its facilities to its potential competitors. That theory of antitrust law runs into problems under the Supreme Court's *Trinko* opinion.").

**Defendants' Argument**:  Defendants' position is that this claim should not be going to the jury at all. In the Second Circuit, a tied product market is required to prove a tying claim, regardless whether the claim is a per se or rule of reason tying claim.  *See* ECF No. 1048; ECF No. 1051; ECF No. 1059 at 8-13; *Coniglio v. Highwood Servs., Inc.*, 495 F.2d 1286, 1292-93 (2d Cir. 1974) (affirming summary judgment of per se tying claim when there was no proper definition of tied product market, or evidence of anticompetitive effects in it); *Gonzalez v. St. Margaret's House Hous. Dev. Fund Corp.*, 880 F.2d 1514, 1516-19 (2d Cir. 1989) (listing "anticompetitive effects in the tied market" as an element of per se tying claim); *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 31-32 (2d Cir. 2006) (affirming dismissal of tying claim for failure to define tied product market because "an antitrust defendant charged with illegal tying is entitled to some specificity as to . . . the anticompetitive effects in a specified [tied] market, and the effect on the business of the plaintiff.").  At summary judgment, this Court deemed invalid the only tied product market alleged by Plaintiffs in this case.  ECF No. 1037 at 12.  Plaintiffs' tying claim thus failed as a matter of law and should have ended before trial.

To the extent that this claim is going to the jury at all, Defendants object to Plaintiffs' assertion that they have an unqualified right to instruct the jury that their tying claim is per se.  In *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, the Supreme Court made clear that only "*certain* tying arrangements" pose such "an unacceptable risk of stifling competition" that they are unreasonable "per se."  466 U.S. 2, 9 (1984) (emphasis added); *see Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 36 (2006) (*Jefferson Parish* "reject[ed] the application of a per se rule that all tying arrangements constitute antitrust violations").  The per se rule now applies only when the practice at issue lacks procompetitive or efficiency justifications.  *See, e.g.*, *United States v. Microsoft Corp.*, 253 F.3d 34, 94-95 (D.C. Cir. 2001) (en banc) (reversing application of per se tying rule where en banc court could not "comfortably say" that the alleged tie had "so little redeeming value and that there would be so very little loss to society from its ban" that its invocation was justified).  Whether per se analysis applies is a question of law for the court, *not* (as Plaintiffs seem to think) every plaintiff's option.  *See id.* at 89-95; *Arizona v. Maricopa Cty. Med. Socy.*, 457 U.S. 332, 351 (1982) (characterizing the per se rule as a "rule of law"); *Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 922 F.3d 713, 727 (6th Cir. 2019) ("Whether challenged conduct belongs in the per se category is a question of law.").  And "it is only after considerable experience with certain business relationships that courts classify [tying arrangements] as per se violations." *Microsoft*, 253 F.3d at 90 (quoting *Broad. Music, Inc. v. Columbia Broad. Sys., Inc*., 441 U.S. 1, 9 (1979)).

In short, Plaintiffs cannot take this claim to the jury as a per se tying claim unless the Court determines that the claim qualifies for per se analysis as a matter of law—which it does not.  Plaintiffs' alleged tie is not one of those limited "types of [] arrangements [that] are deemed unreasonable as a matter of law." *Jefferson Parish*, 466 U.S. at 9.  This is not a textbook tying case where a seller is saying to a

79

buyer, "if you want X, you have to take Y." Instead, the alleged tie arises in the context of a vertically integrated concert promoter and venue operator that has a policy of refusing to deal with its rivals. Properly understood, this is not a tie at all—but a lawful refusal to deal. Even if the Court disagrees, it is not the type of tie that courts have enough familiarity with to deem it per se unlawful. At best for Plaintiffs, this would be a tie implemented through an intermediary, roughly equivalent to the one the Seventh Circuit allowed to proceed in *Viamedia*. But even that was not a *per se* case—and there is no basis for the Court here to classify a rarely-if-ever-seen form of "tie" and put it in the legal bucket reserved for commercial arrangements that courts can confidently say, by virtue of experience, almost never have procompetitive justifications. In other words, there is no basis in the law to treat Defendants' policy as something presumptively *unlawful*. And Plaintiffs have identified "no close parallel in prior antitrust cases" to support per se condemnation. *Microsoft Corp.*, 253 F.3d at 84. To the contrary, relieving Plaintiffs of the obligation to show any harm to competition would pose a real "risk[] of error [or] of deterring welfare-enhancing innovation." *Id.* at 89-90. Should this Court allow Plaintiffs' tying claim to proceed as a per se claim, its decision would be in serious tension with *Jefferson Parish*, *Illinois Tool*, and *Microsoft*.

Accordingly, to the extent Plaintiffs can take this claim to the jury at all (and they cannot), it must proceed as a rule of reason claim, and the jury must be instructed that Plaintiffs must prove a tied product market and anticompetitive effects in that market. Given that the Court has deemed invalid Plaintiffs' alleged tied product market involving promotion services to artists at "major concert venues," that should end the claim altogether. But assuming the Court disagrees, the only alternative option (which Defendants press here not as a frontline argument, but only in the event that the Court rejects their frontline position and does believe the claim should go forward) is to put it to Plaintiffs to prove a tied product market involving promotion services to all artists at all venues. Defendants have thus proposed that tied product market throughout their tying instructions. But to be clear, Defendants' position is that Plaintiffs cannot be allowed to even attempt to prove that or any other tied product market after their only alleged market was deemed invalid, and this claim should not be going to the jury at all.

Additionally, Defendants' proposal includes an instruction on refusal to deal, as well as an element requiring the jury to determine whether artists or promoters are renters of amphitheaters. "[A]n illegal tying arrangement requires that at least two products and/or services be purchased by *the same individual*." *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 71 (2d Cir. 1996) (emphasis added). If promoters are the purchasers, as Defendants contend, then there is no illegal tying arrangement involving artists. Moreover, if promoters are the purchasers, then it is not unlawful for Live Nation to refuse to deal with those competitors. *See Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 447 (2009) ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."); *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) ("[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'"). As this Court recognized at summary judgment, the issue of who is the purchaser is disputed between the parties and must be resolved by the jury. ECF No. 1037 at 31-32. The jury thus must be instructed to resolve that issue, as well as on the important refusal to deal principle that accompanies that issue.

**Post-Instruction No. 18D**

### UNLAWFUL TYING—IDENTITY OF THE PURCHASER

An illegal tying arrangement requires that at least two products and/or services be purchased by one buyer. Therefore, the first thing you must decide is who is the customer that actually purchases the alleged tying product here, which is rental of amphitheaters. By that I mean you need to decide who is the economic actor that seeks to rent the amphitheater, assumes the contractual obligation to pay for the use of the amphitheater, and bears the economic risks from the rental agreement. Plaintiffs contend that artists are the customers that rent amphitheaters. Live Nation contends that promoters, not artists, are the customers that rent amphitheaters.

If you decide that promoters, not artists, are the customers that rent amphitheaters, you should find for Live Nation and against Plaintiffs on this claim. If, however, you find that artists are the customers that rent amphitheaters from Live Nation, you should go on to consider whether Plaintiffs have proven the other elements of this claim.

**Plaintiffs' Position (18D):** Defendants proposed instruction would impose a heightened standard for Plaintiffs to prove tying claims that finds no support in the case law. As described in the previous instruction, Plaintiffs are required to meet five elements in the Second Circuit. *See* Post-Instruction No. 18. Further, other courts have rejected the requirement that a consumer must "directly" acquire the tying product from the seller, including the Seventh Circuit in *Viamedia, Inc. v. Comcast Corp.*, which recognized "fundamentally, a tying claim does not fail as a matter of law simply because it was implemented by refusing to deal with an intermediary." 951 F.3d 429, 472 (7th Cir. 2020). There, Comcast provided two services: (1) it maintained an advertising "interconnect" platform, (2) and it provided "ad rep services" to cable television providers (MVPDs). Viamedia was a competing provider of ad rep services, and some of the ads to be aired on their customers MVPDs' channels (but sold through Viamedia) had to be placed through the Comcast-controlled Interconnect. Viamedia alleged that Comcast required MVPDs to hire Comcast as their ad rep if they wanted access to the Comcast-controlled "Interconnect." *Id.* at 436, 466. The Seventh Circuit rejected the argument that the "refusal to deal" doctrine allowed Comcast to prohibit MVPDs from connecting to the Interconnect through Viamedia (*i.e.*, tying), stating: "The fact that the arrangements were structured so that ownership of the slot avails [ads] passed from MVPDs to Viamedia does not affect this analysis. In applying the antitrust laws, we care more about economic substance than about form." *Id.* at 470. The United States Supreme Court also agreed in *Jefferson Parish*, 466 U.S. at 22-23, 28 n.4, that patients are consumers for the use of hospital operating rooms and anesthesiology services even if they do not choose or directly pay the anesthesiologist. The same is true in this case. The fact that artists use promoters as intermediaries to purchase the use of amphitheaters does not change the analysis of the economic substance of these transactions. *Viamedia*, 951 F.3d at 470.

81

**Defendants' Authority:** *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 71 (2d Cir. 1996) (noting "the 'fundamental principle of antitrust law that an illegal tying arrangement requires that at least two products and/or services be purchased by the same individual'").

**Defendants' Argument**:  As explained, resolution of who rents amphitheaters from Live Nation is essential to the tying analysis. *See* Defendants' Argument on Post-Instruction No. 18 (Unlawful Tying Against Live Nation).  "[A]n illegal tying arrangement requires that at least two products and/or services be purchased by *the same individual*." *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 71 (2d Cir. 1996) (emphasis added).  If promoters are the purchasers, then there is no illegal tying arrangement involving artists, as Plaintiffs' contend.  And if promoters are the purchasers, then it is not unlawful for Live Nation to refuse to deal with those competitors. *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 447 (2009) ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."); *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) ("[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'").

82

**Post-Instruction No. 18D2**

### UNLAWFUL TYING—PRESENCE OF TWO PRODUCTS

To determine whether use of so-called "large amphitheaters" by artists and promotion services to artists are separate and distinct products, you should consider whether there would be demand for each of them if they were offered separately. If enough artists would want to purchase the use of so-called "large amphitheaters" and promotion services separately to induce venues and promoters generally to provide each service separately, then each service is a separate service. On the other hand, if there is very little demand for artists to buy one of the services by itself, that is, without the other service, then the use of the so-called "large amphitheaters" by artists and promotion services to all touring artists are not two separate products for the purposes of the tying claim, even if they are sometimes sold separately.

Services may be separate services even if one of them is useless without the other. The relevant issue is whether there is sufficient demand from customers to induce sellers to provide them separately, even if the customer needs to obtain both products from one or more suppliers.

**Defendants' Authority**: Adapted ABA Model Instr. 2.E.5.

**Defendants' Argument**:  Defendants' proposal tracks the ABA model instruction.  *See* ABA Model Instr. 2.E.5.

83

**Post-Instruction No. 19**

### UNLAWFUL TYING—PROOF OF CONDITIONING AND COERCION

You may find that an illegal tying arrangement exists between the use of so-called "large amphitheaters" by artists and promotion services to touring artists only if you find that Live Nation conditioned the rental of its so-called "large amphitheaters" on an artist's agreement to buy Live Nation's promotion services when the artists would have preferred to buy promotion services elsewhere.

To find that an illegal tying arrangement exists, you must also find that Live Nation effectively coerced artists into buying Live Nation's promotion services in order to rent the so-called "large amphitheaters" controlled by Live Nation. To prove coercion, Plaintiffs must prove by a preponderance of the evidence that Live Nation exploited its control over the use of so-called "large amphitheaters" controlled by Live Nation to force artists into the purchase of promotion services, which the artists either did not want at all, or would have preferred to purchase from a different promoter on different terms, and that any appearance of choice was illusory.

There is no coercion if artists would have purchased promotion services from Live Nation anyway, regardless of any alleged tie.

You may not find that Live Nation coerced artists merely because of its policy of refusing to rent its amphitheaters to rival promoters.

**Plaintiffs' Authority**: Adapted ABA Model Instr. 2.E.7; *Hill v. A-T-O, Inc.*, 535 F.2d 1349, 1355 (2d Cir. 1976); *Park v. Thomson Corp.*, 2007 WL 119461, at *4 (S.D.N.Y. Jan. 11, 2007).

**Plaintiffs' Position:** Plaintiffs' proposal conforms largely to the ABA Model Instruction, adding clarifying language to provide examples of the type of conduct Plaintiffs would need to prove to meet their burden. In the final paragraph, Plaintiffs add two sentences on the standard in the Second Circuit, recognized in *Hill v. A-T-O, Inc.*, 535 F.2d 1349, 1355 (2d Cir. 1976), that Plaintiffs can prove coercion by showing evidence of an unremitting policy of a tie, if accompanied by sufficient market power in the tying product (use of large amphitheaters) to appreciably restrain competition for the tied product (artist promotion services). Plaintiffs also object to Defendants' renaming of Plaintiffs' proposed relevant markets in a manner that is confusing, prejudicial, and misleading to the jury.

**Defendants' Authority**: Adapted ABA Model Instr. 2.E.7; *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984) ("[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms."); *Virgin Atl. Airways Ltd. v. Brit. Airways PLC*, 257 F.3d 256, 270 (2d Cir. 2001) ("An invalid tying arrangement conditions the purchase of one product to the purchase of a second product that the buyer either does not want or would have preferred to purchase elsewhere."); *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996) ("To prove a tying claim, a plaintiff must have "evidence of actual coercion by the seller that forced the buyer to accept the tied product."); *Unijax, Inc. v. Champion Int'l, Inc.*, 683 F.2d 678, 686 (2d Cir. 1982); *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 447 (2009) ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."); *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) ("[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'"); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 604-05 (1985) (jury instructed that "refusal to deal … 'does not violate Section 2 if valid business reasons exist for that refusal'"); *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 929 (4th Cir. 1990) ("In general, a seller has the right to choose with whom it wishes to deal."); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1066 (10th Cir. 2013) (Gorsuch, J.) ("[T]he antitrust laws rarely impose on firms—even dominant firms—a duty to deal with their rivals."); *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 305 (D.C. Cir. 2023) ("To consider Facebook's policy as a violation of § 2 would be to suppose that a dominant firm must lend its facilities to its potential competitors. That theory of antitrust law runs into problems under the Supreme Court's *Trinko* opinion.").

**Defendants' Argument**:  Defendants object to Plaintiffs' additions to this instruction that do not appear in the ABA model jury instruction on proof of conditioning.  In particular, Defendants object to Plaintiffs' statement that "coercion can be shown even if the artist thinks that the promoter did a good job or charged a fair price."  And Defendants object to Plaintiffs' language regarding "[a]n unremitting policy of a tie."  Defendants' edits align this instruction with the ABA model jury instruction and make clear that a tying arrangement is illegal only if the buyer was forced into purchasing "a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms."  *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984). Lastly, Defendants' proposal reiterates that mere refusal-to-deal with competitors is not unlawful.  *See* Defendants' Argument on Post-Instruction No. 18 (Unlawful Tying Against Live Nation).

85

**Post-Instruction No. 20**

## UNLAWFUL TYING—INVOLVEMENT OF A NOT INSUBSTANTIAL VOLUME OF INTERSTATE COMMERCE WITH RESPECT TO THE TIED PRODUCT AND SUBSTANTIAL FORECLOSURE IN TIED PRODUCT MARKET

The next element is whether the alleged tying arrangement involved a not insubstantial amount of interstate commerce in promotion services and resulted in substantial foreclosure of competition in the market for concert promotion services to touring artists.

For commerce to be considered interstate, it must have a nexus to commerce that affects or touches more than one state.

In determining whether the tying arrangement involved a not insubstantial amount of interstate commerce, you should consider the total dollar amount of Live Nation's sales of promotion services to all touring artists in interstate commerce achieved by the tying arrangement in absolute terms.

With respect to substantial foreclosure of competition, there is no substantial foreclosure if only a small percentage of sales of promotion services to all touring artists was affected by the tying arrangement.

**Plaintiffs' Authority**: Adapted ABA Model Instr. 2.E.9; *Summit Health. Ltd. v. Pinhas*, 500 U.S. 322, 328 (1991) (affirming appellate court's description of interstate commerce requirement as requiring no more than a nexus to commerce that affects more than one state, even if "any actual impact on interstate commerce would be 'indirect' and 'fortuitous'"); *Fortner Enterprises, Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 501-02 (1969) ("requirement that a 'not insubstantial' amount of commerce be involved makes no reference to the scope of any particular market or to the share of that market foreclosed by the tie"; rather, "normally the controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely de minimis, is foreclosed to competitors by the tie"); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 16 (1984); *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992); *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 6-7 (1958) (requiring only that "a 'not insubstantial' amount interstate commerce is affected").

**Plaintiffs' Position:** Plaintiffs' proposed instruction generally follows the ABA Model with an additional sentence explaining what constitutes interstate commerce, drawing from the cited cases. Plaintiffs' have also revised the model language to more closely mirror the "not insubstantial" phrasing used by the Supreme Court in *Fortner Enterprises* and *Northern Pacific Railway Co*. Plaintiffs object to Defendants renaming of Plaintiffs' proposed markets as confusing, prejudicial, and misleading to the jury. Plaintiffs also object to Defendants' addition of the phrase "achieved by," which is vague and likely confusing. The relevant question is the amount of commerce "involved" in or "affected" by the

86

alleged tying arrangement. *See Fortner Enterprises, Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 501-02 (1969) ("requirement that a 'not insubstantial' amount of commerce be involved makes no reference to the scope of any particular market or to the share of that market foreclosed by the tie"; rather, "normally the controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely de minimis, is foreclosed to competitors by the tie"); *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 6 (1958) (tying agreements are unreasonable "whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount interstate commerce is affected").

**Defendants' Authority**: Adapted ABA Model Instr. 2.E.9; *Summit Health. Ltd. v. Pinhas*, 500 U.S. 322, 328 (1991) (affirming appellate court's description of interstate commerce requirement as requiring no more than a nexus to commerce that affects more than one state, even if "any actual impact on interstate commerce would be 'indirect' and 'fortuitous'"); *Fortner Enterprises, Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 501-02 (1969) ("requirement that a 'not insubstantial' amount of commerce be involved makes no reference to the scope of any particular market or to the share of that market foreclosed by the tie"; rather, "normally the controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely de minimis, is foreclosed to competitors by the tie"); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 16 (1984); *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992); *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 6-7 (1958) (requiring only that "a 'not insubstantial' amount interstate commerce is affected").

**Defendants' Argument**:  Defendants' edits align this instruction with the relevant ABA model jury instruction.  *See* ABA Model Instr. 2.E.9.  They also instruct the jury on substantial foreclosure, on which the parties have not provided a separate instruction, making clear that inquiry is distinct from the insubstantial volume of interstate commerce inquiry and requires a higher showing in the tied product market.

87

**Post-Instruction No. 21**

## STATE LAW CLAIMS

In addition to the claims that the Plaintiff States have brought under the Sherman Act, some Plaintiff States have brought claims under their own state laws. I will proceed to instruct you on those state law claims now.

**Authority**: ECF No. 257 (Am. Compl.).

**Post-Instruction No. 22**

## CONGRUENT STATE CLAIMS

Certain Plaintiffs are alleging violations of their state laws that are congruent with Section 1 or 2 of the Sherman Act. That means these state laws have the same elements as Section 1 or 2 of the Sherman Act. If you find that a Plaintiff State has proven every element of a Sherman Act Section 1 or 2 claim for a particular Defendant, and that the particular Defendant's conduct harmed competition in that Plaintiff State, then for the state statutes listed below, you must find that the Plaintiff State has also proven the elements of its State statute as to that particular Defendant. If you find that a Plaintiff State has not proven every element of any Sherman Act claim for a particular Defendant, or that the particular Defendant's conduct did not harm competition in that Plaintiff State, then for the state statutes listed below, you must find for that Defendant and against that Plaintiff State.

- the Colorado Antitrust Act of 2023, Colo. Rev. Stat. 6-4-101, *et seq.*;

- the Connecticut Antitrust Act, Conn. Gen. Stat. § 35-24 *et seq.*;

- the District of Columbia Antitrust Act, D.C. Code § 28-4501 *et seq.*;

- the Florida Antitrust Act, Fla. Stat. § 542.15 *et seq.*;

- the Louisiana Unfair Trade Practices Act, LSA-R.S. 51:1401 *et seq.*;

- the Maryland Antitrust Act, MD Commercial Law Code Ann. § 11-201 *et seq.*;

- the Michigan Antitrust Reform Act, MCL 445.771 *et seq.*;

- the Minnesota Antitrust Law of 1971, Minn. Stat. §§ 325D.49–325D.66;

- the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. § 598A.010 *et seq.*;

- the New Hampshire Revised Statutes Annotated § 356 *et seq.*;

- the New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-1 and 57-1-2;

- the North Carolina Unfair or Deceptive Trade Practices Act, N.C.G.S. § 75-1 *et seq.*;

- the Valentine Act, Ohio Rev. Code Chapter 1331;

- the Rhode Island Antitrust Law, R.I. Gen. L. §§ 6-36-4 and 6-36-5;

- the Texas Business and Commerce Code § 15.01 *et seq.*;

- the Utah Antitrust Act, Utah Code §76-16-510;

- the Virginia Antitrust Act, Va. Code § 59.1-9.1 *et seq.*;

- the Washington Consumer Protection Act, Wash. Rev. Code §§ 19.86.030 and 19.86.040; and

- the West Virginia Antitrust Act, W. Va. Code § 47-18-1 *et seq.*

**Plaintiffs' Authority**: *In re Elec. Books Antitrust Litig.,* No 11 MD 2293 DLC, 12 Civ. 3394 (DLC) (S.D.N.Y 2011); *People ex rel. Woodward v. Colo. Springs Bd. of Realtors*, 692 P.2d 1055, 1061 (Colo. 1984); *Shea v. First Fed. Sav. & Loan Ass'n*, 439 A.2d 997, 1006-07 (Connecticut General Statutes sections 35-26 and 25-27 are substantively the same as Sections 1 and 2 of the Sherman Act); *District of Columbia v. Amazon.com, Inc.*, 320 A.3d 1073, 1079 (D.C. 2024) ("The two provisions of the D.C. Antitrust Act at issue here, D.C. Code § 28-4502 and § 28-4503, mirror sections 1 and 2 of the federal Sherman Antitrust Act, 15 U.S.C. § 1 and 15 U.S.C. § 2. In language that is opportune given the dearth of antitrust decisions in this court, the D.C. statute itself—in a provision labeled "Uniformity"—explicitly gives us the green light to rely upon federal courts' interpretations of the Sherman Act when interpreting the D.C. Antitrust Act."); Fla. Stat. §§ 542.16, 542.32 (In interpreting Florida Antitrust Act, "great weight [should] be given to the interpretations of the federal courts relating to comparable federal antitrust statutes); *Bi-Rite Oil Co. v. Ind. Farm Bureau Coop. Ass'n*, 720 F. Supp. 1363, 1378 (S.D. Ind. 1989), *aff'd*, 908 F.2d 200 (7th Cir. 1990) ("Indiana antitrust law . . . was substantially patterned after the federal Sherman Antitrust Act and references to decisional law under the Sherman Act may be made in construing Indiana antitrust provisions . . . ."); *Goldfinch Lab'y, P.C. v. Iowa Pathology Assocs., P.C.,* No. 4:24-CV-00168-RGE-HCA, 2024 WL 5205936, at *7 (S.D. Iowa Dec. 13, 2024); *Louisiana Power & Light Co. v. United Gas Pipe Line Co.,* 493 So. 2d 1149 (La. 1986), *superseded in part by statute,* La R.S. 51:122(B); *Neugebauer v. A. S. Abell Co.*, 474 F. Supp. 1053, 1071 (D. Md. 1979)(state law claims for exclusive dealing, tying, monopolization and others treated like federal claims under Sherman Act because Maryland Antitrust Act, Md. Code Ann., Comm. Law, Sec. 11-204(a)-(b) "were 'carefully and purposefully patterned after their counterparts in the federal law,'") (*citing* General Revisor's Note to the Maryland Antitrust Act); *Little Caesar Enterprises, Inc. v. Smith*, 895 F. Supp. 884, 898 (E.D. Mich. 1995) ("Michigan antitrust law is identical to federal law and follows the federal precedents."); *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 626 (Minn. 2007) (citing *Minn. Twins P'ship v. State*, 592 N.W.2d 847, 851 (Minn.1999)) ("Minnesota antitrust law is generally interpreted consistently with federal antitrust law."); *Walker v. U-Haul Co. of Miss.*, 734 F.2d 1068, 1070 n.5 (5th Cir.), on reh'g, 747 F.2d 1011 (5th Cir. 1984) ("courts treat federal and Mississippi state antitrust claims as "analytically identical"); *Salem Grain Company, Inc. v. Consolidated Grain and Barge Co.*, 900 N.W.2d 909, 922 (Neb. 2017) ("The NCPA is Nebraska's version of the Sherman Act, but it also encompasses portions of other federal antitrust law, including the FTCA…Further, the act was intended to be an antitrust measure to protect Nebraska consumers from monopolies and price-fixing conspiracies."); *Furniture Royal, Inc. v. Schnadig Int'l Corp.*, No. 2:18-CV-318, 2018 WL 6574779, at *4 (D. Nev. Dec. 13, 2018) (analysis under Nevada

90

Unfair Trade Practices Act "is the same as the Sherman Act"); *Kenneth E. Curran, Inc. v. Auclair Transp.,* 128 N.H. 743, 748-49 (1986); *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F2d 589, 593 (1st. Cir. 1993); *See Shire US, Inc. v. Allergan, Inc.*, 375 F. Supp. 3d 538, 546 (D.N.J. 2019) (the New Jersey Antitrust Act shall be construed in harmony with ruling judicial interpretations of comparable federal antitrust statutes) (quoting *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 402 n.11 (3d Cir. 2016)); *see also State v. Lawn King,* 417 A.2d 1025, 1032 (N.J. 1980) (finding that consonance between the federal and state enactments is required); *Romero v. Philip Morris, Inc.*, 2010-NMSC-035, ¶ 18, 148 N.M. 713, 242 P.3d 280 ("It is therefore the duty of the courts to ensure that New Mexico antitrust law does not deviate from federal interpretations of antitrust law."); *Rose v. Vulcan Materials*, 282 N.C. 643, 655 (1973); *C.K. & J.K., Inc. v. Fairview Shopping Ctr. Corp.*, 63 Ohio St. 2d 201, 204 (1980); *Johnson v. Microsoft Corp.*, 106 Ohio St. 3d 278, 284 (2005); *Northwest Medical Laboratories, Inc. v. Blue Cross and Blue Shield of Oregon, Inc.,* 775 P.2d 863, 868 (Or. App. 1989), *aff'd*, 310 Or. 72 (1990) (Oregon Antitrust Law should be interpreted consistently with federal antitrust law); R.R. Gen. Laws § 6-36-2(b) ("[t]his chapter shall be construed in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable, except where provisions of this chapter are expressly contrary to applicable federal provisions as construed"); Tex. Bus. & Comm. Code § 15.04 ("The purpose of this Act is to maintain and promote economic competition in trade and commerce occurring wholly or partly within the State of Texas and to provide the benefits of that competition to consumers in the state [and] shall be construed in harmony with federal judicial interpretations of comparable federal antitrust statutes to the extent consistent with this purpose."); Utah Code. § 76-16-502(2) ("The Legislature intends that the courts, in construing this part, will be guided by interpretations given by the federal courts to comparable federal antitrust statutes and by other state courts to comparable state antitrust statutes"); *Boeing Co. v. Sierracin Corp.,* 108 Wn.2d 38, 54, 738 P.2d 665, 677 (1987) (citing RCW 19.86.920); W.Va. Code § 47-18-16 (West Virginia Antitrust laws "shall be construed liberally and in harmony with ruling judicial interpretations of comparable federal antitrust statutes."); *Kessel v Mon. County Gen. Hosp. Co.*, 648 S.E.2d 366, 374 (W.Va. 2007); *Olstad v. Microsoft Corp.*, 2005 WI 121, ¶ 42 ("The pivotal language in the first two sections [of the Wisconsin antitrust act and Sherman Act] is nearly identical. This has led courts and commentators to refer to that first incarnation of Wisconsin's antitrust act as the 'Little Sherman Act.'"); *Pulp Wood Co. v. Green Bay Paper & Fiber Co.*, 157 Wis. 604, 625, 147 N.W. 1058 (1914) (Wisconsin antitrust law is a "copy of the federal statute" that "should receive the same interpretation that [is] placed on the federal act, from which it was taken".).

**Plaintiffs' Position:** The parties largely agree on the instructions regarding state laws that are congruent with the Plaintiffs' federal law claims, but several aspects of Defendants' proposed instructions are inaccurate.

First, as discussed above, for purposes of the claims at issue, Defendants should be considered together for purposes of liability. *See* Preliminary Instruction No. 1.

Second, Plaintiffs have alleged national markets for all claims at issue that may require proof of a relevant market, and Plaintiffs will collectively present evidence to prove that Defendants' conduct harmed competition nationwide. Defendants' proposal may suggest that each Plaintiff is independently required to put on a separate case, which is not correct. To avoid juror confusion while ensuring an evaluation of State impact, the jury should be instructed to determine whether Defendants' conduct "harmed competition nationwide, including in each Plaintiff State."

91

Third, Defendants have removed four states from the instruction without an adequate basis. For three states—Arizona, New Jersey, and Wisconsin—Defendants' objection appears to rest on a belief that these States are not empowered to bring *parens patriae* actions. Defendants' objection is misplaced for two reasons. As an initial matter, even if these states did not have *parens patriae* standing to bring damages claims, that does not preclude those states from seeking a jury to determine liability, given their claims for civil penalties. But more importantly, Defendants are incorrect; each state does in fact have standing to bring *parens patriae* claims. *See* A.R.S. § 21-102(F) (State of Arizona has the right to a jury in a civil action seeking, among other relief, civil penalties); *United States v. Apple, Inc.,* No. 24-CV-04055, 2025 WL 1829127, at *16–17 (D.N.J. June 30, 2025) (New Jersey has standing to bring *parens patriae* actions)*; In re Generic Pharmaceuticals Pricing Antitrust Litigation,* 605 F.Supp.3d 672, 679-80 (E.D. Pa 2022) (Iowa and New Jersey have standing to bring *parens patriae* actions); Wis. Stat. § 165.25(1m) (Wisconsin DOJ shall prosecute "any cause or matter … in which the state or the people of this state may be interested"); *State v. City of Oak Creek*, 232 Wis. 2d 612, 628 (2000) (Wisconsin Attorney General may bring a specific action where authorized by law).

Finally, for Indiana, Defendants' proposed instructions are superfluous for this phase of the trial and are likely to lead to juror confusion. Indiana is pursuing federal claims along with its state claims under the Indiana Antitrust Act, and its claim for damages under 15 U.S.C. § 15c are subject to the federal statute of limitations. To the extent Indiana's other claims for relief (*e.g.*, injunctive relief and penalties) are impacted an amendment to the Indiana Antitrust Act, those issues can be resolved during the second phase of the trial. Presenting the jury with additional dates is likely to cause unnecessary confusion and will not bear on the issues before them (liability and damages).

**Defendants' Authority**: *People ex rel. Woodward v. Colo. Springs Bd. of Realtors*, 692 P.2d 1055, 1061 (Colo. 1984); *Shea v. First Fed. Sav. & Loan Ass'n*, 439 A.2d 997, 1006–07 (Connecticut General Statutes sections 35-26 and 25-27 are substantively the same as Sections 1 and 2 of the Sherman Act); *District of Columbia v. Amazon.com, Inc.*, 320 A.3d 1073, 1079 (D.C. 2024) ("The two provisions of the D.C. Antitrust Act at issue here, D.C. Code § 28-4502 and § 28-4503, mirror sections 1 and 2 of the federal Sherman Antitrust Act, 15 U.S.C. § 1 and 15 U.S.C. § 2. In language that is opportune given the dearth of antitrust decisions in this court, the D.C. statute itself—in a provision labeled "Uniformity"—explicitly gives us the green light to rely upon federal courts' interpretations of the Sherman Act when interpreting the D.C. Antitrust Act."); Fla. Stat. §§ 542.16, 542.32 (In interpreting Florida Antitrust Act, "great weight [should] be given to the interpretations of the federal courts relating to comparable federal antitrust statutes); *Louisiana Power & Light Co. v. United Gas Pipe Line Co.*, 493 So. 2d 1149 (La. 1986), *superseded in part by statute*, La R.S. 51:122(B); *Neugebauer v. A. S. Abell Co.*, 474 F. Supp. 1053, 1071 (D. Md. 1979) (state law claims for exclusive dealing, tying, monopolization and others treated like federal claims under Sherman Act because Maryland Antitrust Act, Md. Code Ann., Comm. Law, Sec. 11-204(a)-(b) "were 'carefully and purposefully patterned after their counterparts in the federal law,'") (*citing* General Revisor's Note to the Maryland Antitrust Act); *Little Caesar Enterprises, Inc. v. Smith*, 895 F. Supp. 884, 898 (E.D. Mich. 1995) ("Michigan antitrust law is identical to federal law and follows the federal precedents."); *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 626 (Minn. 2007) (citing *Minn. Twins P'ship v. State*, 592 N.W.2d 847, 851 (Minn.1999)) ("Minnesota antitrust law is generally interpreted consistently with federal antitrust law."); *Walker v. U-Haul Co. of Miss.*, 734 F.2d 1068, 1070 n.5 (5th Cir.), on reh'g, 747 F.2d 1011 (5th Cir. 1984) ("Courts treat federal and Mississippi state antitrust claims as 'analytically identical'"); *Salem Grain Company, Inc. v. Consolidated Grain and Barge Co.*, 900 N.W.2d 909, 922 (Neb. 2017) ("The NCPA is Nebraska's version of the Sherman Act, but it also

92

encompasses portions of other federal antitrust law, including the FTCA…Further, the act was intended to be an antitrust measure to protect Nebraska consumers from monopolies and price-fixing conspiracies."); *Furniture Royal, Inc. v. Schnadig Int'l Corp.*, No. 2:18-CV-318, 2018 WL 6574779, at *4 (D. Nev. Dec. 13, 2018) (analysis under Nevada Unfair Trade Practices Act "is the same as the Sherman Act"); *Kenneth E. Curran, Inc. v. Auclair Transp.,* 128 N.H. 743, 748-49 (1986); *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F2d 589, 593 (1st. Cir. 1993); *Romero v. Philip Morris, Inc.*, 2010-NMSC-035, ¶ 18, 148 N.M. 713, 242 P.3d 280 ("It is therefore the duty of the courts to ensure that New Mexico antitrust law does not deviate from federal interpretations of antitrust law."); *Rose v. Vulcan Materials*, 282 N.C. 643, 655 (1973); *C.K. & J.K., Inc. v. Fairview Shopping Ctr. Corp.*, 63 Ohio St. 2d 201, 204 (1980); *Johnson v. Microsoft Corp.*, 106 Ohio St. 3d 278, 284 (2005); R.R. Gen. Laws § 6-36-2(b) ("[t]his chapter shall be construed in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable, except where provisions of this chapter are expressly contrary to applicable federal provisions as construed."); Tex. Bus. & Comm. Code § 15.04 ("The purpose of this Act is to maintain and promote economic competition in trade and commerce occurring wholly or partly within the State of Texas and to provide the benefits of that competition to consumers in the state [and] shall be construed in harmony with federal judicial interpretations of comparable federal antitrust statutes to the extent consistent with this purpose."); Utah Code. § 76-16-502(2) ("The Legislature intends that the courts, in construing this part, will be guided by interpretations given by the federal courts to comparable federal antitrust statutes and by other state courts to comparable state antitrust statutes"); *Boeing Co. v. Sierracin Corp.,* 108 Wn.2d 38, 54, 738 P.2d 665, 677 (1987) (citing RCW 19.86.920); W.Va. Code § 47-18-16 (West Virginia Antitrust laws "shall be construed liberally and in harmony with ruling judicial interpretations of comparable federal antitrust statutes."); *New York, by James v. Niagara-Wheatfield Cent. Sch. Dist.*, 119 F.4th 270, 279 (2d Cir. 2024), *cert. denied sub nom. Niagara-Wheatfield Cent. Sch. Dist. v. New York*, 146 S. Ct. 324 (2025); *California v. Infineon Techs. AG*, 531 F. Supp. 2d 1124 (N.D. Cal. 2007) ("[N]othing in Arizona's antitrust statute grants the Attorney General *parens patriae* authority."); Iowa Code §§ 553.1 *et seq.* (no provision for *parens patriae* actions); N.J. Stat. Ann. §§ 56:9-1 *et seq.* (no provision for *parens patriae* actions); Vt. Stat. Ann. tit. 9 §§ 2451 *et seq.* (no provision for *parens patriae* actions); Wis. Stat. Ann. §§ 133.01 *et seq.* (no provision for *parens patriae* actions); *State v. City of Oak Creek*, 232 Wis. 2d 612, 627 (2000) ("The attorney general is devoid of the inherent power to initiate and prosecute litigation intended to protect or promote the interests of the state or its citizens and cannot act for the state as *parens patriae*."); *California v. Infineon Techs. AG*, 531 F. Supp. 2d 1124 (N.D. Cal. 2007) ("[T]here is no express grant of *parens patriae* authority to sue for damages on behalf of consumers in Wisconsin's antitrust statute."); Utah Code § 76-16-510.

**Defendants' Argument:** Defendants object to Plaintiffs' inclusion of Arizona, Indiana, New Jersey, and Wisconsin in this instruction.

Arizona, New Jersey, and Wisconsin lack parens patriae authority to bring their state-law claims. *See California v. Infineon Techs. AG*, 531 F. Supp. 2d 1124, 1165 (N.D. Cal. 2007) ("[N]othing in Arizona's antitrust statute grants the Attorney General *parens patriae* authority."); N.J. Stat. Ann. §§ 56:9-1 *et seq.* (no provision for *parens patriae* actions); Wis. Stat. Ann. §§ 133.01 *et seq.* (no provision for *parens patriae* actions); *State v. City of Oak Creek*, 232 Wis. 2d 612, 627 (2000) ("The attorney general is devoid of the inherent power to initiate and prosecute litigation intended to protect or promote the interests of the state or its citizens and cannot act for the state as *parens patriae*."); *California v. Infineon Techs. AG*, 531 F. Supp. 2d 1124 (N.D. Cal. 2007) ("[T]here is no express grant of *parens patriae* authority to sue for damages on behalf of consumers in Wisconsin's antitrust statute."). Plaintiffs have provided no authority to the contrary.

93

As for Indiana, the antitrust statute of Indiana did not authorize parens patriae actions until July 1, 2023. Ind. Code § 24-1-2-5.1 (granting parens patriae authority as of July 1, 2023). And the statutory amendment authorizing such actions does not apply retroactively. *Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-CV-02056 (MPS), 2025 WL 1207566, at *7 (D. Conn. Apr. 25, 2025) ("Indiana conceded that this amendment is not retroactive."). Accordingly, Defendants have provided a separate instruction for Indiana, making clear that it can only recover for each Defendant's conduct that harmed Indiana residents and competition in Indiana occurring after the date on which Indiana authorized parens patriae actions.

94

**Post-Instruction No. 23**

## CALIFORNIA UNFAIR COMPETITION LAW
### (CAL. BUS. & PROF. CODE § 17200 *ET SEQ.*)

The State of California alleges that each Defendant has violated California's Unfair Competition Law, which prohibits unfair competition through unlawful or unfair business acts or practices.

For the State of California to prevail on its claim under the Unfair Competition Law, you must find that the State of California has proven each of the following elements by a preponderance of the evidence as to each Defendant:

1.  The Defendant engaged in a business act or practice;

2.  The act or practice occurred within California, emanated from California, or harmed California residents; and

3.  The act or practice is either unlawful or unfair.

To determine whether acts or practices emanate from California, you may consider the location of the firm's headquarters, executives, or other employees involved in the conduct; where the relevant materials were created; where the relevant policies at issue were developed or executed; and where the firm conducts business. It is sufficient for the State of California to prove by a preponderance of the evidence that several of these factors show that the acts or practices at issue emanated from California, but any single factor alone, without more, is insufficient to show that the acts or practices at issue emanated from California.

*Unlawful*

To establish a violation of the unlawful prong of the California Unfair Competition Law, the State of California must prove by a preponderance of the evidence that each Defendant has violated another law, and that the act or practice that violated that other law occurred within California or emanated from California or harmed California residents. Therefore, if you find for Plaintiffs on

95

another claim and that the associated act or practice occurred within California or emanated from California or harmed California residents, you must find that the Defendant who committed that act or practice violated the unlawful prong of California's Unfair Competition Law.

*Unfair*

To establish a violation of the unfair prong of the California Unfair Competition Law, the State of California must prove by a preponderance of evidence that each Defendant has:

1.  engaged in conduct that threatens an incipient violation of the antitrust laws or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition; or

2.  engaged in a business act or practice for which the harm to consumers outweighs the utility of the conduct.

These tests are not mutually exclusive and you may find that Plaintiffs have proven a violation of (1) or (2) or both (1) and (2).

A business act or practice may be unfair even if not prohibited by some other law such as the Sherman Act.

In order to find a violation of the unfair prong of the Unfair Competition Law, you must also find that the act or practice that satisfies either test of that prong occurred within California or emanated from California or harmed California residents.

**Plaintiffs' Authority**: *People v. Ashford Univ., LLC*, 100 Cal. App. 5th 485, 506-07, 519 (2024) (citing *Abbott Laboratories v. Superior Court*, 9 Cal. 5th 642, 651-652 (2020); *Fernandez v. CoreLogic Credco*, LLC, 593 F. Supp. 3d 974, 992 (S.D. Cal. 2022); *Ehret v. Uber Techs., Inc.*, 68 F. Supp. 3d 1121, 1131-32 (N.D. Cal. 2014) (finding that a plaintiff had plausibly alleged a "sufficient nexus" and that allegedly unlawful misrepresentations "emanated from California" where the plaintiff alleged misrepresentations were developed in California, contained on a website and application maintained in California, and that billing went through servers located in California); *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 598-99 (S.D. Cal. 2008); *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1000 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 681 (2024) ("As the UCL's three-prong structure makes clear, a business practice may be 'unfair,' and therefore illegal under the UCL, 'even if not specifically proscribed by some other law.'" (*citing Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999))); *Id.* ("First, to support 'any finding of unfairness

96

to *competitors*,' a court uses the 'tethering' test, which asks whether the defendant's conduct 'threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.'" (quoting *Cel-Tech*, 20 Cal. 4th at 186-87); *Id.* ("Second, to support a finding of unfairness to consumers, a court uses the balancing test, which 'weigh[s] the utility of the defendant's conduct against the gravity of the harm to the alleged victim.'" (quoting *Progressive W. Ins. Co. v. Super. Ct.*, 135 Cal. App. 4th 263, 285 (2005) (citation omitted))); *Id.* at 1002 (rejecting the defendant's argument that the UCL "mandates trial courts to define a relevant market and then conduct the balancing test within that market (similar to the Rule of Reason)" because the defendant did "not cite to any California authority for this proposition" and that "such a rule runs contrary to California courts' repeated instruction that '[n]o inflexible rule can be laid down as to what conduct will constitute unfair competition.'" (quoting *Pohl v. Anderson*, 13 Cal. App. 2d 241, 242 (1936))); *In re Google Play Store Antitrust Litig.*, 147 F.4th 917, 933 n.3 (9th Cir. 2025) ("The UCL forbids not only 'unlawful' but 'unfair' conduct, thus allowing for liability even when there is a failure to prove an antitrust claim, as we held in *Epic Games, Inc. v. Apple Inc* . . . [t]he UCL claim survives independent of any antitrust liability").

**Plaintiffs' Position:** Plaintiffs have proposed an instruction that correctly describes the only two elements of California's Unfair Competition Law ("UCL") at issue here: (1) Defendants engaged in a business act or practice and (2) the act or practice is either unlawful or unfair. Cal. Bus. & Prof. Code § 17200 *et seq.*; *see Epic Games v. Apple*, 67 F.4th 946, 1000 (9th Cir. 2023) ("*Epic*"). The UCL is a strict liability statute. *See Hewlett v. Squaw Valley Ski Corp.*, 54 Cal. App. 4th 499, 520 (Cal. Ct. App. 1997) ("The [UCL] statute imposes strict liability. It is not necessary to show that the defendant intended to injure anyone.").

Plaintiffs' proposed instruction lists examples of the factors from caselaw that can be considered when evaluating whether conduct emanated from California for the purposes of out-of-state liability. *See People v. Ashford Univ., LLC,* 100 Cal. App. 5th 485, 518 (2024). Defendants' proposed instruction is unsupported by the cases they cite. In those cases, one factor was not enough to show that conduct emanated from California, but they do not stand for the proposition that one factor is always insufficient. *Sullivan v. Oracle,* which was specifically limited to the "circumstances of [that] case" as stipulated by the parties, declined to apply the UCL to nonresidents when the stipulated facts "identif[ed] only a single instance of relevant conduct occurring in California" that was not "unlawful in the abstract." 51 Cal. 4th 1191, 1208 (2011). The court in *Aghaji v. Bank of America* noted that the plaintiffs failed to even "disclose what information they have that leads them to believe that the alleged violations occurred in . . . California facilities" and failed to allege a violation "in California as to any Plaintiff." 247 Cal. App. 4th 1110, 1119-20 (2016). *Norwest Mortgage v. Superior Court* is also distinguishable because in that case the harm to "nonresident members of the nationwide class" was "caused by conduct occurring outside of California's borders by actors headquartered and operating outside of California." 72 Cal. App. 4th 214, 228 (1999).

In addition, Plaintiffs' proposed instruction correctly states that the UCL applies where "individuals in California" were harmed. Defendant's proposed instruction, which requires harm to "California residents[,]" is inappropriate because the UCL applies to both residents and "nonresidents of California." *Ashford*, 100 Cal. App. 5th at 519, 524 (2024).

97

Finally, as many of the earlier jury instructions refer to relevant antitrust markets and other antitrust concepts, it is appropriate and necessary to instruct the jury that the UCL does not require any market definition or showing of antitrust injury. *Epic*, 67 F.4th at 1001-02 (rejecting defendant's argument that "the UCL mandates trial courts to define a relevant market and then conduct the balancing test within that market (similar to the Rule of Reason)" because defendant "does not cite any California authority for this proposition" and "such a rule runs contrary to California courts' repeated instruction that '[n]o inflexible rule can be laid down as to what conduct will constitute unfair competition'" (citation omitted)).

**Defendants' Authority**: *People v. Ashford Univ., LLC*, 100 Cal. App. 5th 485, 506-07, 519-20 (2024) (the trial court properly determined that defendants' conduct emanated from California and had cited "evidence that defendants were headquartered in San Diego, and Ashford's former presidents, admissions counselors, and the majority of admissions employees worked in San Diego"); *Fernandez v. CoreLogic Credco*, LLC, 593 F. Supp. 3d 974, 992 (S.D. Cal. 2022) (refusing to dismiss UCL claim and finding it plausible that unlawful conduct emanated from California in lawsuit brought by Maryland resident against a firm that had its principal place of business in California, management level employees in California, and that the policies and procedures at issue in this case were developed, designed, and implemented in California); *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1000 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 681 (2024) ("As the UCL's three-prong structure makes clear, a business practice may be 'unfair,' and therefore illegal under the UCL, 'even if not specifically proscribed by some other law.'" (*citing Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999))); *Id.* ("First, to support 'any finding of unfairness to *competitors*,' a court uses the 'tethering' test, which asks whether the defendant's conduct 'threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.'" (quoting *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 186-87 (1999))); *Id.* ("Second, to support a finding of unfairness to consumers, a court uses the balancing test, which 'weigh[s] the utility of the defendant's conduct against the gravity of the harm to the alleged victim.'" (*quoting Progressive W. Ins. Co. v. Super. Ct.*, 135 Cal. App. 4th 263, 285 (2005) (citation omitted))); *Aghaji v. Bank of America, N.A.*, 247 Cal. App. 4th 1110, 1119 (Cal. Ct. App. 2016) ("[P]laintiffs who are not California residents must also allege facts to show that the alleged violations occurred within California, because California's unfair competition law does not apply extraterritorially."); *id.* at 1119-20 (finding insufficient that defendant had "processing facilities and personnel in California" and that is "where the misapplied payments were received or that is from where the improper charges or improper crediting of payments occurred"); *Norwest Mortgage, Inc. v. Superior Court*, 72 Cal. App. 4th 214, 222 (Cal. App. 1999) ("non-California residents for whom [defendant's] conduct. . . occurred in states other than California (Category III members)" could "not assert UCL claims"); *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1209 (Cal. 2011) ("that [defendant's] decision. . . was made in California does not, standing alone, justify applying the UCL to the nonresident plaintiffs' FLSA claims for overtime worked in other states.").

**Defendants' Argument:** *First*, in order to simplify this instruction, Defendants propose a three-element structure rather than a two-element structure. As Defendants understand it, California does not dispute that in addition to proving that each Defendant engaged in a business act or practice that was either unlawful or unfair, the State must prove a territorial nexus between that act or practice and California. Listing the territorial nexus requirement with the other two requirements makes this instruction easier to understand for the jury and ensures that Defendants will not be prejudiced in the event that the jury overlooks the territorial nexus requirement because it is not listed as an element.

98

*Second*, Defendants object to California's language suggesting that "individuals in California [] harmed by the act or practice," without more, are covered by the Unfair Competition Law (UCL). The caselaw distinguishes between California residents and non-residents, not between individuals within and outside California. *See Aghaji v. Bank of America, N.A.*, 247 Cal. App. 4th 1110, 1119 (Cal. Ct. App. 2016) ("[P]laintiffs who are not California residents must also allege facts to show that the alleged violations occurred within California, because California's unfair competition law does not apply extraterritorially."); *Norwest Mortgage, Inc. v. Superior Court*, 72 Cal. App. 4th 214, 222 (Cal. App. 1999) ("non-California residents for whom [defendant's] conduct . . . occurred in states other than California" could "not assert UCL claims"); *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1209 (Cal. 2011) ("that [defendant's] decision . . . was made in California does not, standing alone, justify applying the UCL to the nonresident plaintiffs' FLSA claims for overtime worked in other states"). California's proposed instruction is misleading and prejudicial to Defendants because it suggests that the UCL covers anyone who happened to be injured in California at some point, even if that person is a resident of a different State.

Importantly, if that interpretation of the UCL were right (it is not), then it is possible that Plaintiff States might obtain double recoveries in this lawsuit. In other words, California could recover for a Texas resident who was injured in California at some point, and Texas could also recover for that Texas resident. That prospect severely prejudices Defendants and violates the basic damages principle that "only a single recovery is allowed" for one injury. *Conway v. Icahn & Co., Inc.*, 16 F.3d 504, 511 (2d Cir. 1994).

*Third*, Defendants object to California's recitation of things it need not prove (intent to injure, market definition, antitrust injury). Defendants' proposed instruction—like all other instructions in this document—straightforwardly lists what Plaintiffs must prove to prevail. Reciting elements that must not be proven adds unnecessary length and risks confusing the jury.

99

**Post-Instruction No. 24**

**FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT (FLA. STAT. § 501.204)**

The State of Florida alleges that Defendants' anticompetitive conduct violated the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), which broadly prohibits persons from engaging in unfair methods of competition in the conduct of any trade or commerce based in or directed toward the State of Florida.

To establish a violation of the FDUTPA based on anticompetitive conduct, Florida must prove by a preponderance of the evidence that each Defendant engaged in an unfair method of competition.

*Unfair Methods of Competition*

A method of competition is "unfair" if the conduct goes beyond competition on the merits. Competition on the merits may include, for example, superior products or services, superior business skills, or truthful marketing and advertising practices. Conduct goes beyond competition on the merits if it is coercive, exploitative, collusive, abusive, deceptive, predatory, or exclusionary and tends to foreclose competition. To be "unfair," the act or practice must cause or be likely to cause substantial injury to consumers which is not reasonably avoidable and not outweighed by countervailing benefits to consumers or to competition.

Violations of antitrust laws also constitute "unfair methods of competition" under the FDUTPA. Therefore, if you find that the State of Florida proves by a preponderance of the evidence that each Defendant violated the Sherman Act through conduct based in or directed toward the State of Florida, you may find that such conduct by such Defendant also violated the FDUTPA.

**Plaintiffs' Authority**: Fla. Stat. § 501.204 (in construing prohibited conduct under FDUTPA, "due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. s. 45(a)(1)"); Fla. Stat. § 501.203(3)(b)-(c) (violations of FDUTPA may be based on, inter alia, "[t]he standards of unfairness and deception set forth and interpreted by the Federal Trade Commission or the federal courts" or "[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices"); Federal Trade Commission, Comm'n File No. P221202, Policy Statement Regarding the Scope of Unfair Methods

100

of Competition Under Section 5 of the Federal Trade Commission Act (Nov. 10, 2022) at 8-9; *See United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) (distinguishing unlawful acquisition or maintenance of monopoly power from consequences of "a superior product, business acumen, or historic accident"); *see F.T.C. v. Sperry & Hutchinson*, 405 U.S. 233, 243-44 (1972) (construing Section 5 to reach conduct shown to exploit consumers); *Atlantic Refining Co. v. F.T.C.*, 381 U.S. 357, 369 (1965) (finding an unfair method of competition where the defendant "utilize[ed] … economic power in one market to curtail competition in another," which was "bolstered by actual threats and coercive practices"); *F.T.C. v. Texaco*, 393 U.S. 223, 228-29 (1968) (finding an unfair method of competition where the defendant used its "dominant economic power … in a manner which tended to foreclose competition"); *E.I. du Pont de Nemours v. F.T.C.*, 729 F.2d 128, 140 (2d Cir. 1984) (finding that unfair methods of competition includes practices that are "collusive, coercive, predatory, restrictive, or deceitful" as well as "exclusionary"); *Mack v. Bristol-Myers Squibb Co.*, 673 So. 2d 100, 104 (Fla. 1st DCA 1996) ("[T]he acts proscribed by subsection 501.204(1) include antitrust violations."); *Morris Commc'ns Corp. v. PGA Tour, Inc.,* 235 F. Supp. 2d 1269, 1286 (M.D. Fla. 2002), *aff'd,* 364 F.3d 1288 (11th Cir. 2004) ("FDUTPA is to be construed consistently with antitrust law."); *see also F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 454 (1986) ("unfairness" under the FTCA encompasses "practices that violate the Sherman Act and the other antitrust laws . . . but also practices that the [FTC] determines are against public policy for other reasons"); *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 609 (1953) (tying arrangement that violates § 1 of the Sherman Act "transgresses s 5 of the [FTCA], since minimally that section registers violations of the Clayton and Sherman Acts"); *Crawford v. Am. Title Ins. Co.*, 518 F.2d 217, 218-19 (5th Cir. 1975) ("[I]t has been uniformly held that 'a violation of the Sherman Act is an 'unfair method of competition' under the [FTCA].'") (citations omitted).

**Defendants' Authority**: Fla. Stat. § 501.204 (in construing prohibited conduct under FDUTPA, "due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. 45(a)(1)"); Fla. Stat. § 501.203(3)(b)-(c) (violations of FDUTPA may be based on, inter alia, "[t]he standards of unfairness and deception set forth and interpreted by the Federal Trade Commission or the federal courts" or "[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices"); Federal Trade Commission, Comm'n File No. P221202, Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act (Nov. 10, 2022) at 8-9; *See U.S. v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) (distinguishing unlawful acquisition or maintenance of monopoly power from consequences of "a superior product, business acumen, or historic accident"); *see Sperry & Hutchinson*, 405 U.S. at 905 (construing Section 5 to reach conduct shown to exploit consumers); *Atlantic Refining Co. v. Fed. Trade Comm'n*, 381 U.S. 357, 369 (1965) (finding an unfair method of competition where the defendant "utilize[ed] … economic power in one market to curtail competition in another," which was "bolstered by actual threats and coercive practices"); *Fed. Trade Comm'n v. Texaco*, 393 U.S. 223, 228-29 (1968) (finding an unfair method of competition where the defendant used its "dominant economic power … in a manner which tended to foreclose competition"); *E.I. du Pont de Nemours v. Fed. Trade Comm'n (Ethyl)*, 729 F.2d 128, 140 (finding that unfair methods of competition includes practices that are "collusive, coercive, predatory, restrictive, or deceitful" as well as "exclusionary"); *Mack v. Bristol-Myers Squibb Co.*, 673 So. 2d 100, 104 (Fla. 1st DCA 1996) ("[T]he acts proscribed by subsection 501.204(1) include antitrust violations."); *Morris Commc'ns Corp. v. PGA Tour, Inc.,* 235 F. Supp. 2d 1269, 1286 (M.D. Fla. 2002), *aff'd,* 364 F.3d 1288 (11th Cir. 2004) ("FDUTPA is to be construed consistently with antitrust law."); *see also F.T.C. v. Indiana*

101

*Fedn. of Dentists*, 476 U.S. 447, 454 (1986) ("unfairness" under the FTCA encompasses "practices that violate the Sherman Act and the other antitrust laws... but also practices that the [FTC] determines are against public policy for other reasons"); *Times-Picayune Pub. Co. v. U.S.*, 345 U.S. 594, 609 (1953) (tying arrangement that violates § 1 of the Sherman Act "transgresses s 5 of the [FTCA], since minimally that section registers violations of the Clayton and Sherman Acts"); *Crawford v. Am. Title Ins. Co.*, 518 F.2d 217, 218-19 (5th Cir. 1975) ("[I]t has been uniformly held that 'a violation of the Sherman Act is an 'unfair method of competition' under the [FTCA].'") (citations omitted); *Team Servs., Inc. v. Securitas Elec. Sec., Inc.*, No. 1:21-CV-21026-KMM, 2021 WL 9350987, at *5 (S.D. Fla. Aug. 9, 2021), *aff'd*, No. 22-12840, 2023 WL 6890660 (11th Cir. Oct. 19, 2023) ("FDUTPA applies only to action that occurred within the state of Florida."); *Millennium Comm'ns & Fulfillment, Inc. v. Office of Attorney General, Dep't of Legal Affairs*, 761 So. 2d 1256, 1262 (Fla. Ct. App. 2000) ("As we read FDUTPA, it seeks to prohibit unfair, deceptive and/or unconscionable practices which have transpired within the territorial boundaries of this state without limitation."); *Zarfati v. Artsana USA, Inc.*, No. 1:24-cv-21372-KMM, 2025 WL 373081, at *12 (S.D. Fla. Jan. 15, 2025) (plaintiffs stated a FDUTPA claim by alleging that "deceptive acts and unfair practices were at a minimum aimed at consumers in Florida"); Federal Trade Commission Act Amendments of 1994, codified as amended at 15 U.S.C. § 45(n) (1994) (codifying FTC Policy Statement on Unfairness (Dec. 17, 1980)), *appended to Int'l Harvester Co.*, 104 F.T.C. 949, 1070 (1984) ("The Commission shall have no authority under this section or section 57a of this title to declare unlawful an act or practice on the grounds that such act or practice is unfair unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition."); *Porsche Cars North America, Inc. v. Diamond*, 140 So. 3d 1090, 1097-98 (Fla. Ct. App. 2014) ("Following the clear and unambiguous directive of sections 501.203(3)(b), 501.204(2), and 501.202(3), Florida Statutes, we hold 1980 Policy Statement's definition of unfair trade practice should be used when interpreting FDUTPA.").

**Defendants' Argument:** Defendants' proposed instruction requires that any unfair method of competition have been based in or directed toward Florida. This requirement is well-established in Florida law: FDUTPA seeks to prohibit unfair practices that "transpire[] within the territorial boundaries" of Florida. *Millennium Comm'ns & Fulfillment, Inc. v. Office of Attorney General, Dep't of Legal Affairs*, 761 So. 2d 1256, 1262 (Fla. Ct. App. 2000); *see also Team Servs., Inc. v. Securitas Elec. Sec., Inc.*, No. 1:21-CV-21026-KMM, 2021 WL 9350987, at *5 (S.D. Fla. Aug. 9, 2021), *aff'd*, No. 22-12840, 2023 WL 6890660 (11th Cir. Oct. 19, 2023) ("FDUTPA applies only to action that occurred within the state of Florida."). Courts have interpreted FDUTPA to encompass acts occurring within Florida as well as acts "aimed at consumers" in the State. *Zarfati v. Artsana USA, Inc.*, No. 1:24-cv-21372-KMM, 2025 WL 373081, at *12 (S.D. Fla. Jan. 15, 2025). A territorial nexus requirement must be included to reflect the proper scope of FDUTPA.

Defendants' proposed instruction also includes the requirement that an unfair act or practice must cause or be likely to cause a substantial injury. FDUTPA embraces the Federal Trade Commission's (FTC) interpretations of Section 5(a)(1) of the Federal Trade Commission Act (FTCA). Fla. Stat. § 501.204(2); *Porsche Cars North America, Inc. v. Diamond*, 140 So. 3d 1090, 1097-98 (Fla. Ct. App. 2014) ("Following the clear and unambiguous directive of sections 501.203(3)(b), 501.204(2), and 501.202(3), Florida Statutes, we hold 1980 Policy Statement's definition of unfair trade practice should be used when interpreting FDUTPA."). The FTC's 1980 Policy Statements restrict authority under the FTCA to only those unfair acts that are "likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing

102

benefits to consumers or to competition." Federal Trade Commission Act Amendments of 1994, codified as amended at 15 U.S.C. § 45(n) (1994) (codifying FTC Policy Statement on Unfairness (Dec. 17, 1980)), *appended to Int'l Harvester Co.*, 104 F.T.C. 949, 1070 (1984). That restriction of authority must be reflected here as well.

Defendants object to language in the second paragraph indicating that an unfair method of competition or an antitrust violation can violate FDUTPA. This language is redundant as the next two paragraphs sufficiently explain those two ways of violating FDUTPA. Repetition of this point adds unnecessary length and risks confusing the jury and prejudicing Defendants. Moreover, Plaintiffs' allegations in this case have rested on antitrust violations, and Plaintiffs have not provided any theories or facts—let alone Florida-specific theories or facts—to support non-antitrust consumer protection violations.

**Post-Instruction No. 25**

## ILLINOIS ANTITRUST ACT (740 ILCS 10/1 *ET SEQ.*)

The State of Illinois has brought claims under the Illinois Antitrust Act. The elements of proof for claims under this statute are the same as under Section 1 of the Sherman Act. If you find for Plaintiffs and against one or more Defendants on Plaintiffs' claims under Section 1 of the Sherman Act for unlawful exclusive dealing and unlawful tying, and Illinois proves by a preponderance of the evidence that one or more Defendants' conduct harmed competition in Illinois, then you must find for the State of Illinois and against the relevant Defendant on those same claims under the Illinois Antitrust Act. If you find for one or more Defendants on Plaintiffs' claims under Section 1 of the Sherman Act for unlawful exclusive dealing and unlawful tying, you must find for the relevant Defendant under those same claims under the Illinois Antitrust Act.

For claims under the Illinois Antitrust Act involving monopolization, the elements of proof are the same as under Section 2 of the Sherman Act, except the State of Illinois must also prove that Defendants acted with the purpose of excluding competition or controlling, fixing, or maintaining prices in the relevant market. If you find for Plaintiffs and against one or more Defendants under Plaintiffs' claims under Section 2 of the Sherman Act, and Illinois proves by a preponderance of evidence that one or more Defendants acted with the purpose of excluding competition or controlling, fixing, or maintaining prices in the relevant market, and that one or more Defendants' conduct harmed competition in Illinois, then you must also find for the State of Illinois on those same claims under the Illinois Antitrust Act and against the relevant Defendant. If you find for one or more Defendants on Plaintiffs' claims under Section 2 of the Sherman Act, or that the State of Illinois fails to prove that one or more Defendants acted with the purpose of excluding competition or controlling, fixing, or maintaining prices in the relevant market, then you must find for the relevant Defendants for that claim under the Illinois Antitrust Act.

104

**Plaintiffs' Authority:** 740 ILCS 10/3(2); 740 ILCS 10/3(3); 740 ILCS 10/11; *Gilbert's Ethan Allen Gallery v. Ethan Allen, Inc.*, 251 Ill. App. 3d 17, 24 (1993), *aff'd*, 162 Ill. 2d 99 (1994).

**Plaintiffs' Position:** The parties disputes regarding the Illinois's claims under the Illinois Antitrust Act ("IAA") in part mirror those discussed above. First, for the reasons stated regarding Post-Instruction No. 25, Defendants' actions should be evaluated collectively. Second, as discussed above, Plaintiffs will collectively present evidence to prove that Defendants' conduct harmed competition nationwide. Defendants' proposal may suggest that Illinois is independently required to put on a separate case, which is not correct. To avoid juror confusion while ensuring an evaluation of State impact, the jury should be instructed to determine whether the evidence presented by Plaintiffs is sufficient to show that Defendants' conduct harmed competition in Illinois.

The parties agree that Illinois' claims under the IAA and Section 1 of the Sherman Act are congruent because the wording of the IAA is identical or similar to that of the Sherman Act. 740 ILCS 10/11; *Int'l Star Registry v. RGIFT Ltd.*, 2024 WL 3594644, *3 (N.D. Ill. July 31, 2024). With respect to Illinois's claims under Sections 3(2) and 3(3) of the IAA, those claims are largely congruent with Section 2 of the Sherman Act. Where additional proof elements are required, Illinois has added appropriate language in its proposed jury instructions consistent with Illinois' claims and the wording of Sections 3(2) and 3(3) of the IAA. *See* 740 ILCS 10/3(2); 740 ILCS 10/3(3); *Gilbert's Ethan Allen Gallery v. Ethan Allen, Inc.*, 251 Ill. App. 3d 17, 24 (1993), *aff'd*, 162 Ill. 2d 99 (1994). Plaintiffs revisions inappropriately delete instructions on Section 3(2) of the Illinois Antitrust Act. Conduct that violates Section 2 of the Sherman Act may violate both Sections 3(2) and 3(3) of the Illinois Antitrust Act, and instructing the jury on both is appropriate. *See Force Partners, LLC v. KSA Lighting & Controls, Inc.,* 2022 WL 580808, at *18 (N.D. Ill. February 25, 2022).

**Defendants' Authority:** *Gilbert's Ethan Allen Gallery v. Ethan Allen, Inc.*, 251 Ill. App. 3d 17, 24 (1993), *aff'd*, 162 Ill. 2d 99 (1994) ("[T]he Illinois Act requires more proof than section 2 of the Sherman Act for a court to find that a defendant violated section 3(3) of the Illinois Act, in that not only must the plaintiff prove that defendant established, maintained, used, or attempted to acquire monopoly power over any substantial part of trade or commerce but, in addition, plaintiff must prove that defendant did so for the purpose of excluding competition or controlling, fixing, or maintaining prices in that trade or market.").

**Defendants' Argument:**  For monopolization claims under the Illinois Antitrust Act, "not only must the plaintiff prove that defendant established, maintained, used, or attempted to acquire monopoly power over any substantial part of trade or commerce but, in addition, plaintiff must prove that defendant did so for the purpose of excluding competition or controlling, fixing, or maintaining prices in that trade or market." *Gilbert's Ethan Allen Gallery v. Ethan Allen, Inc.*, 251 Ill. App. 3d 17, 24 (1993), *aff'd*, 162 Ill. 2d 99 (1994).  Defendants' proposed instruction has added this additional element for monopolization claims under the Illinois Antitrust Act.  Defendants see no need to discuss the alleged markets separately in this instruction.

105

**Post-Instruction No. 25D**

**INDIANA ANTITRUST ACT (IND. CODE §§ 24-1-2-1 AND 24-1-2-2)**

The State of Indiana has brought claims under the Indiana Antitrust Act. The State of Indiana is authorized to bring claims under this Act only for conduct that occurred after July 1, 2023. So conduct that occurred before July 1, 2023 cannot form a basis for liability under this statute. If the State of Indiana fails to provide evidence of conduct that occurred and harmed competition in Indiana after July 1, 2023, you must find for Defendants on this claim.

For conduct that occurred after July 1, 2023, if you find that the State of Indiana has proven every element of a Sherman Act Section 1 or Section 2 claim against a particular Defendant, and that the particular Defendant's conduct harmed competition in Indiana, then you may find that the State of Indiana has also proven the elements of the Indiana Antitrust Act as to that particular Defendant.

**Plaintiffs' Authority**: Ind. Code § 24-1-2-5.1 (2008), 2008 Ind. Legis. Serv. P.L. 125-2008 (H.E.A. 1179) (WEST) (stating that the attorney general may bring an action on behalf of the State for injuries or damages sustained directly or indirectly as a result of a violation of Indiana's Antitrust Act); *Bd. Of Commissioner's of Howard Cty. v. Kokomo City Plan Comm.,* 330 N.E. 2d 92, 101 (Ind. 1975) (recognizing "a state may act as *parens patriae* on behalf of its citizens"); Ind. Code § 4-6-3-2 ("attorney general shall have charge of and direct the prosecution of all civil actions that are brought in the name of the state of Indiana…"); "It shall be the duty of the attorney general . . . to institute appropriate proceedings to prevent and restrain violations of the provisions of this chapter or any other statute or the common law relating to the subject matter of this chapter and to prosecute any person or persons guilty of having violated any of the penal provisions thereof . . . The attorney general may file such proceedings upon the attorney general's own relation or that of any private person in any circuit or superior court of the state, without applying to such court for leave, when the attorney general shall deem it the attorney general's duty so to do." Indiana Code § 24-1-2-5; see also Ind. Code § 24-1-1-2 ("It is hereby made the duty of the attorney general of the state to enforce this section by due process of law."); *Bi-Rite Oil Co. v. Ind. Farm Bureau Coop. Ass'n*, 720 F. Supp. 1363, 1378 (S.D. Ind. 1989), *aff'd*, 908 F.2d 200 (7th Cir. 1990) ("Indiana antitrust law . . . was substantially patterned after the federal Sherman Antitrust Act and references to decisional law under the Sherman Act may be made in construing Indiana antitrust provisions . . . .").

**Plaintiffs' Position**: Indiana's state law claims are not time limited as Defendants contend. The amendments in 2023 had the effect of adding specific penalties, and clarifying authority that already resided with the Indiana Attorney General. The Indiana Supreme Court has held that the state has *parens patriae* authority to act on behalf of its citizens, and Indiana's Antitrust Act provided the Attorney General with authority to bring claims for injuries or damages sustained directly or indirectly prior to the amendments in 2023. Defendants' proposed instruction erroneously appears to limit any

106

liability for antitrust violations that Indiana is duly authorized to enforce. Indiana should be included in Post-Instruction 22 and Post-Instruction 25D should not be issued.

**Defendants' Authority:** Ind. Code § 24-1-2-5.1 (granting parens patriae authority as of July 1, 2023); *State ex rel. Steers v. Crim. Ct. of Lake Cnty.*, 232 Ind. 443, 447 (1953) ("the Attorney General of Indiana has no common law powers, and that his rights, powers and duties are statutory"); *Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-CV-02056 (MPS), 2025 WL 1207566, at *7 (D. Conn. Apr. 25, 2025) ("Indiana conceded that this amendment is not retroactive.").

**Defendants' Argument:**  The Indiana Antitrust Act did not authorize parens patriae actions until July 1, 2023.  Ind. Code § 24-1-2-5.1 (granting parens patriae authority as of July 1, 2023).  And the statutory amendment authorizing such actions does not apply retroactively.  *Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-CV-02056 (MPS), 2025 WL 1207566, at *7 (D. Conn. Apr. 25, 2025) ("Indiana conceded that this amendment is not retroactive.").  Accordingly, Defendants' proposed instruction makes clear that Indiana's recovery under the Indiana Antitrust Act is limited to each Defendant's conduct occurring after July 1, 2023 that harmed Indiana residents and competition in Indiana.

107

**Post-Instruction No. 26**

### KANSAS RESTRAINT OF TRADE ACT (KAN. STAT. ANN. § 50-101 *ET SEQ.*)

The State of Kansas has brought claims under the Kansas Restraint of Trade Act. The elements of proof for monopolization claims under this statute are the same as under Section 2 of the Sherman Act, except the State of Kansas must also prove the existence of concerted or joint action with another party. If you find for Plaintiffs and against one or more Defendants on Plaintiffs' monopolization claims under Section 2 of the Sherman Act, and Kansas proves by a preponderance of the evidence that one or more Defendants acted jointly or in concert with another party, and that one or more Defendants' conduct harmed competition in Kansas, then you must also find for the State of Kansas on those same claims under the Kansas Restraint of Trade Act and against the relevant Defendants. If you find for one or more Defendants on Plaintiffs' claims under Section 2 of the Sherman Act, or that the State of Kansas failed to prove that one or more Defendants acted jointly or in concert with another party, then you must find for the relevant Defendants under those claims under the Kansas Restraint of Trade Act.

**Plaintiffs' Authority:** Kan. Stat. Ann. §§ 50-102, 112, 163(b).

**Plaintiffs' Position:** Defendants appear to take the position that Kansas is not able to pursue state law claims analogous to Section 1 of the Sherman Act, based on a prior dismissal of its state law claims in the *In re Elec. Books Antitrust Litigation*. As discussed above (*see* Post-Instruction No. 25), the voluntary dismissal of a claim in prior litigation has no bearing on Kansas's ability to bring those claims here. And under Kansas's harmonization statute, the Kansas Restraint of Trade Act and Section 1 of the Sherman Act are congruent. *See* Kan. Stat. Ann. § 50-163(b).

**Defendants' Authority:** Memorandum Endorsing Plaintiff States' Motion to Voluntarily Dismiss Certain State Law Claims, *In re Elec. Books Antitrust Litig.*, No. 1:11-md-02293-DLC (S.D.N.Y, May 29, 2013), ECF No. 352 (voluntarily dismissing claim under Kansas Restraint of Trade Act); *In re Elec. Books Antitrust Litig.*, No. 11 MD 2293 DLC, 2014 WL 2535112, at *2 (S.D.N.Y. June 5, 2014) ("The States moved on May 28 to voluntarily dismiss all state law claims not congruent with Section 1 of the Sherman Act. The Court granted that motion on May 29."); *In re Effexor Antitrust Litig.*, 357 F. Supp. 3d 363, 394 (D.N.J. 2018) ("[T]he case law as well as the plain language of the Kansas. . . antitrust statute[] require concerted action between two parties. As such, allegations relating to [plaintiff]'s unilateral conduct fails to state a claim under the[] statute[].").

108

**Defendants' Argument:**   Defendants have not been able to locate cases interpreting the Kansas Restraint of Trade Act consistently with the Sherman Act, or any statutory provision harmonizing the two statutes.  In at least one case, Kansas voluntarily dismissed its claims under the Kansas Restraint of Trade Act "as not congruent with Section 1 of the Sherman Act." *In re Elec. Books Antitrust Litig.*, No. 11 MD 2293 DLC, 2014 WL 2535112, at *2 (S.D.N.Y. June 5, 2014); Memorandum Endorsing Plaintiff States' Motion to Voluntarily Dismiss Certain State Law Claims, *In re Elec. Books Antitrust Litig.*, No. 1:11-md-02293-DLC (S.D.N.Y, May 29, 2013), ECF No. 352 (voluntarily dismissing claims under Kansas Restraint of Trade Act).  Defendants' proposed instruction thus interprets the Kansas Restraint of Trade Act as consistent with only Section 2 of the Sherman Act.  Plaintiffs have provided no authority to the contrary.  Moreover, the Kansas Restraint of Trade Act requires concerted action for monopolization claims, unlike Section 2 of the Sherman Act.  *In re Effexor Antitrust Litig.*, 357 F. Supp. 3d 363, 394 (D.N.J. 2018) ("[T]he case law as well as the plain language of the Kansas . . . antitrust statute[] require concerted action between two parties. As such, allegations relating to [plaintiff]'s unilateral conduct fails to state a claim under the[] statute[].").  Defendants' proposed instruction includes this requirement.

**Post-Instruction No. 27**

### DONNELLY ACT (NEW YORK GENERAL BUSINESS LAW §§ 340 *ET SEQ.*)

The State of New York has brought claims under the Donnelly Act, New York General Business Law §§ 340 *et seq.* New York's claims under the Donnelly Act are based on the same conduct as its claims under the Sherman Act.

For claims under the Donnelly Act involving the restraint of competition by contracts, agreements, arrangements, or combinations, the elements of proof are the same as under Section 1 of the Sherman Act. If you find for Plaintiffs and against one or more Defendants on Plaintiffs' claims under Section 1 of the Sherman Act regarding unlawful exclusive dealing or unlawful tying, and New York proves by a preponderance of the evidence that one or more Defendants engaged in unlawful conduct that harmed competition in New York, then you must also find for the State of New York and against the relevant Defendant on those same claims under the Donnelly Act. If you find for one or more Defendants under Plaintiffs' claims under Section 1 of the Sherman Act for unlawful exclusive dealing or unlawful tying, you must find for the relevant Defendant under those same claims under the Donnelly Act.

For claims under the Donnelly Act involving monopolization, the elements of proof are the same as under Section 2 of the Sherman Act, except the State of New York must also prove that the establishment or maintenance of the monopoly involved a contract, agreement, arrangement, or combination. If you find for Plaintiffs and against one or more Defendants under Plaintiffs' monopolization claims under Section 2 of the Sherman Act, and New York proves by a preponderance of the evidence that those monopolies were established or maintained through one or more contracts, agreements, arrangements, or combinations, and that one or more Defendants engaged in unlawful conduct that harmed competition in New York, then you must also find for the State of New York and against the relevant Defendant on those same claims under the Donnelly Act. If you find for one or

110

more Defendants on Plaintiffs' claims under Section 2 of the Sherman Act, or the State of New York

fails to prove the existence of a contract, agreement, arrangement, or combination in connection with

that claim, then you must find for the relevant Defendant under those claims under the Donnelly Act.

**Plaintiffs' Authority**: *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 68-69 (2d Cir. 2019); *New York v. Actavis, PLC*, No. 14 Civ. 7473, 2014 WL 7015198, at *43 (S.D.N.Y. Dec. 11, 2014); *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 370 (S.D.N.Y. 2012); *Saxe, Bacon & Bolan, P.C. v. Martindale-Hubbell, Inc.*, 710 F.2d 87, 90 (2d Cir. 1983) (citations omitted).

**Defendants' Authority**: *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 68–69 (2d Cir. 2019); *New York v. Actavis, PLC*, No. 14 Civ. 7473, 2014 WL 7015198, at *43 (S.D.N.Y. Dec. 11, 2014); *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 370 (S.D.N.Y. 2012); *Saxe, Bacon & Bolan, P.C. v. Martindale-Hubbell, Inc.*, 710 F.2d 87, 90 (2d Cir. 1983) (citations omitted).

**Defendants' Argument:**  Defendants' edits to this instruction make clear that New York must prove each Defendant's liability separately, as explained above.  *See* Defendants' Argument on Post-Instruction No. 2 (The Parties).

111

**Post-Instruction No. 28**

## SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT
### (S.C. CODE ANN. § 39-5-10 ET SEQ.)

The state of South Carolina alleges that each Defendant's conduct violates the South Carolina Unfair Trade Practices Act (S.C. Code Ann. § 39-5-10 *et seq.*), SCUTPA provides that "[u]nfair methods of competition and unfair [] acts or practices in the conduct of any trade or commerce are… unlawful."

For the State of South Carolina to prevail on this claim, you must find for each Defendant separately that:

1. The Defendant engaged in an act or practice in trade or commerce.

2. The act or practice is unfair.

3. The act or practice has an impact on the public interest.

The words "trade" and "commerce" include the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity or thing of value wherever situated, and any trade or commerce directly or indirectly affecting the people of South Carolina.

The act or practice alleged must be unfair. An act or practice is "unfair" when it is offensive to public policy or when it is immoral, unethical, or oppressive. Whether an act or practice is unfair within the meaning of the Act depends upon the surrounding facts and the impact of the transaction on the marketplace.

Unfair acts or practices in the conduct of trade or commerce have an impact upon the public interest if the acts or practices have the potential for repetition. While not the only means for showing potential repetition, potential for repetition may be shown by:

1. showing the same kind of actions occurred in the past, thus making it likely they will continue to occur absent deterrence; or

112

2.    showing the company's procedures create a potential for repetition of the unfair acts.

**Plaintiffs' Authority**: Roger L. Couch, *South Carolina Requests to Charge – Civil*, 2011; Ralph King Anderson, Jr., *South Carolina Requests to Charge - Civil*, 2009, §§ 34-1; 34-2, 34-3; *Chucks Feed & Seed Co. v. Ralston Purina Co.*, 810 F.2d 1289, 1292 (4th Cir. 1987); *Clarkson v. Orkin Exterminating Co.*, 761 F.2d 189, 191 (4th Cir. 1985) (the Act may be violated if there is a claim or representation that had the capacity or effect or tendency to deceive; plaintiff need not show intentional deception under South Carolina UTPA, but a plaintiff cannot prevail without showing at least a potential of deception); *Cheshire v. Coca-Cola Bottling Affiliated Inc.*, 758 F. Supp. 1098, 1101 (D.S.C. 1990); *State ex rel. Wilson v. Ortho-McNeil-Janssen Pharms.*, Inc., 414 S.C. 33, 777 S.E.2d 176 (2015); *Singleton v. Stokes Motor, Inc.*, 358 S.C. 369, 595 S.E.2d 461 (2004); *Crary v. Djebelli*, 329 S.C. 385, 496 S.E.2d 21 (1998); *York v. Conway Ford, Inc.*, 325 S.C. 170, 173, 480 S.E.2d 726, 728 (1997)(alleged acts or practices have the potential for repetition where defendant remains in the same business and faced with opportunities to repeat the conduct); *Taylor v. Medenica*, 324 S.C. 200, 479 S.E.2d 35 (1996); *Daisy Outdoor Advertising Co. v. Abbott*, 322 S.C. 489, 493-94, 473 S.E.2d 47, 49-50 (1996)(evidence of a potential for repetition, generally speaking, establishes the required public impact); *Adams v. G.J. Creel and Sons, Inc.*, 320 S.C. 274, 465 S.E.2d 84 (1995); *Foggie v. CSX Transp., Inc.*, 313 S.C. 98, 431 S.E.2d 587 (1993); *Camp v. Springs Mortgage Corp.*, 310 S.C. 514, 426 S.E.2d 304 (1993); *Haley Nursery Co. v. Forrest*, 298 S.C. 520, 381 S.E.2d 906 (1989); *Inman v. Ken Hyatt Chrysler Plymouth, Inc.*, 294 S.C. 240, 363 S.E.2d 691 (1988); *Wright v. Craft*, 372 S.C. 1, 640 S.E.2d 486 (Ct. App. 2006); *Wogan v. Kunze*, 366 S.C. 583, 606, 623 S.E.2d 107, 120 (Ct. App. 2005); *Robertson v. First Union Nat'l Bank*, 350 S.C. 339, 565 S.E.2d 309 (Ct. App. 2002); *DeBondt v. Carlton Motorcars, Inc.*, 342 S.C. 254, 536 S.E.2d 399 (Ct. App. 2000); *Prestwick Golf Club, Inc. v. Prestwick Limited Partnership*, 331 S.C. 385, 503 S.E.2d 184 (Ct. App. 1998); *Perry v. Green*, 313 S.C. 250, 437 S.E.2d 150 (Ct. App. 1993); *Baker v. Chavis*, 306 S.C. 203, 410 S.E.2d 600 (Ct. App. 1991); *Dowd v. Imperial Chrysler-Plymouth, Inc.*, 298 S.C. 439, 381 S.E.2d 212 (Ct. App. 1989); *Potomac Leasing Co. v. Bone*, 294 S.C. 494, 366 S.E.2d 26 (Ct. App. 1988); *Barnes v. Jones Chevrolet Co.*, 292 S.C. 607, 358 S.E.2d 156 (Ct. App. 1987); *Key Co. v. Fameco Distrib., Inc.*, 292 S.C. 524, 357 S.E.2d 476 (Ct. App. 1987); *Noack Enters., Inc. v. Country Corner Interiors*, 290 S.C. 475, 351 S.E.2d 347 (Ct. App. 1986); *State ex-rel. Medlock v. Nest Egg Soc'y Today, Inc.*, 290 S.C. 124, 128-29, 348 S.E.2d 381, 384 (Ct. App. 1986); *State ex- rel. McLeod v. Brown*, 278 S.C. 281, 283-84, 294 S.E.2d 781, 782-83 (Ct. App. 1982); S.C. Code Ann. § 39-5-10(b) (1985); S.C. Code Ann. § 39-5- 20(a) (1985); S.C. Code Ann. § 39-5- 50(a) (1985); S.C. Code Ann. § 39-5- 110(a) (1985); S.C. Code Ann. § 39-5-140 (1985); Federal Trade Commission, Comm'n File No. P221202, *Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission A*ct (Nov. 10, 2022).

**Plaintiffs' Position:** Defendants' proposed jury instructions for the South Carolina Unfair Trade Practices Act strike certain language defining the meaning of "trade and commerce" under the Unfair Trade Practices Act. Defendants provide no authority for their removal of this language, and it should be maintained.

**Defendants' Authority**: Roger L. Couch, *South Carolina Requests to Charge – Civil*, 2011; Ralph King Anderson, Jr., *South Carolina Requests to Charge – Civil*, 2009, §§ 34-1, 34-2, 34-3; ECF No. 257 ¶ 464 (Am. Compl.) ("Defendants' acts or practices alleged herein constitute "unfair methods of competition" under S.C. Code § 39-5-20.).

113

**Defendants' Argument:**  *First*, Defendants object to South Carolina's statement that "'trade and commerce' may also mean other activities" not enumerated in the statute.  The statutory definition sufficiently makes clear what "trade and commerce" means under SCUTPA.  South Carolina's statement that it could also mean other things is confusing and inaccurate.

*Second*, Defendants object to inclusion of "deceptive" as no deceptive conduct has been alleged here.

*Third*, Defendants object to South Carolina's recitation of things it need not prove (actual impact and market definition).  Defendants' proposed instruction—like all other instructions in this document—straightforwardly lists what the State must prove to prevail.  Reciting elements that must not be proven adds unnecessary length and risks confusing the jury.  Moreover, South Carolina's statement that it need not prove actual impact directly contradicts element three of the statute—"impact on the public interest."  South Carolina's internally inconsistent proposed instruction is likely to confuse the jury and prejudice Defendants.  And in any event, South Carolina has brought this action in parens patriae and thus must show that a "substantial segment of the state's population was injured."  *New York, by James v. Niagara-Wheatfield Cent. Sch. Dist.*, 119 F.4th 270, 280 (2d Cir. 2024), *cert. denied sub nom. Niagara-Wheatfield Cent. Sch. Dist. v. New York*, 146 S. Ct. 324 (2025).

**Post-Instruction No. 29**

## TENNESSEE TRADE PRACTICES ACT
## (TENN. CODE ANN. §§ 47-25-101 AND 102)

The State of Tennessee has brought claims under the Tennessee Trade Practices Act. The State of Tennessee is authorized to bring claims under this Act only for conduct that occurred after April 23, 2024. So conduct that occurred before April 23, 2024 cannot form a basis for liability under this statute. If the State of Tennessee fails to provide evidence of conduct that occurred and harmed competition in Tennessee after April 23, 2024, you must find for Defendants on this claim.

For conduct that occurred after April 23, 2024, if you find that the State of Tennessee has proven every element of a Sherman Act Section 1 or Section 2 claim against a particular Defendant, and that the particular Defendant's conduct harmed competition in Tennessee, then you may find that the State of Tennessee has also proven the elements of the Tennessee Trade Practices Act as to that claim and that particular Defendant.

**Plaintiffs' Authority**: Tenn. Code Ann. § 47-25-106.

**Plaintiffs' Position:** For the reasons stated above in connection with Preliminary Instruction No. 1, Defendants' liability should be assessed collectively.

**Defendants' Authority:** Tenn. Code Ann. § 47-25-106 (granting parens patriae authority as of April 23, 2024); *California v. Infineon Techs. AG*, 531 F. Supp. 2d 1124, 1170-71 (N.D. Cal. 2007) (recognizing that Tennessee previously lacked *parens patriae* authority); *State ex rel. Leech v. Levi Strauss & Co.*, No. 79-722-III, 1980 WL 4696, at *5 (Tenn. Ch. Sept. 25, 1980) (rejecting common-law parens patriae authority because such authority "must result from acts of the Legislature where the underlying public policy issues can be resolved and where essential procedural safeguards can be established"); *Connecticut v. Sandoz, Inc.*, No. 3:20-CV-00802(MPS), ECF No. 645 at 5-6 (D. Conn. Apr. 25, 2025) ("Tennessee's constitution prohibits retrospective laws, Tenn. Const. Art. 1, § 20. As such, statutes are presumed to operate prospectively absent clear indication from the legislature that the law is intended to apply retrospectively.. . . Here, the legislature did not clearly provide that the amendment to the TTPA be retroactive; therefore, the amendment is presumed to operate prospectively.").

**Defendants' Argument:** The Tennessee Trade Practices Act did not authorize parens patriae actions until April 23, 2024. Tenn. Code Ann. § 47-25-106 (granting parens patriae authority as of April 23, 2024). And the statutory amendment authorizing such actions does not apply retroactively. *Connecticut v. Sandoz, Inc.*, No. 3:20-CV-00802(MPS), ECF No. 645 at 5-6 (D. Conn. Apr. 25, 2025) ("Tennessee's constitution prohibits retrospective laws, Tenn. Const. Art. 1, § 20. . . . Here, the

115

legislature did not clearly provide that the amendment to the TTPA be retroactive; therefore, the amendment is presumed to operate prospectively."). Accordingly, Defendants' proposed instruction makes clear that Tennessee's recovery under the Tennessee Trade Practices Act is limited to each Defendant's conduct occurring after April 23, 2024 that harmed Tennessee residents and competition in Tennessee.

**Post-Instruction No. 30**

### STATES DAMAGES CLAIMS

[Twenty-one] of the Plaintiff States—specifically, Arizona, Colorado, Connecticut, Florida, Illinois, Indiana, Michigan, Minnesota, Nevada, New Hampshire, New Jersey, New York, North Carolina, Pennsylvania, Rhode Island, South Carolina, Utah, Washington, West Virginia, Wisconsin, and the District of Columbia—are seeking damages from Ticketmaster on behalf of fans who purchased primary concert tickets for events at what Plaintiffs call "major concert venues." I may refer to these [21] States as "Plaintiff States claiming damages." The Plaintiff States claiming damages allege that residents of their States were overcharged on purchases of primary concert tickets for events at so-called "major concert venues."

If you find that any Plaintiff State claiming damages proved that Ticketmaster monopolized the market for primary concert ticketing services to so-called "major concerts venues" in violation of Section 2 of the Sherman Act or those States' laws, or proved that Ticketmaster engaged in unlawful exclusive dealing in violation of Section 1 of the Sherman Act or those States' laws, then you must decide if, as a result of any such violation, residents of that Plaintiff State were overcharged for primary concert tickets for events at so-called "major concert venues." If any Plaintiff State claiming damages fails to prove that as a result of Ticketmaster's conduct, residents of its particular State were overcharged for primary concert tickets, then that State is not entitled to any damages, and you need not do any further analysis for that State.

If any Plaintiff State claiming damages proves that residents of its State were overcharged as a result of the violations I just described, then you must determine whether that Plaintiff State has proved by a preponderance of the evidence the amount that residents of that particular Plaintiff State were overcharged on a per-ticket basis for their purchases of primary concert tickets for events at so-called "major concert venues." You are not being asked to determine the total number of tickets or

117

ticket purchasers affected.  You are only being asked to determine the per-ticket overcharge in each Plaintiff State claiming damages.

I remind you that you should not assume that any resident of any Plaintiff State claiming damages will receive any portion of any money the Plaintiff States might ultimately recover in this case.  And neither you nor any member of your family will receive any portion of any funds that the States may ultimately receive.

I will now provide further instructions on what each Plaintiff State claiming damages must prove before you may calculate any per-ticket overcharge for that State, and how you must calculate any such overcharge.

**Plaintiffs' Authority**: Adapted Final Jury Instructions at 54, *Innovative Health LLC v. Biosense Webster, Inc.*, Case No. 8:19-cv-1984 JVS (C.D. Cal. May 16, 2025); ABA Model Jury Instructions in Civil Antitrust Cases B-304.

**Plaintiffs' Position:** Plaintiffs have adapted nonargumentative damages instructions based on the ABA Model Jury Instructions and those used in *Innovative Health LLC v. Biosense Webster, Inc.* Defendants' proposed modifications misstate the relevant claims at issue or otherwise pose a risk of confusing the jury.

First, for the same reasons described with respect to prior instructions, Defendants' alternative names for Plaintiffs' proposed markets risk confusing the jury.

Second, Defendants again mischaracterize Plaintiffs' claims (as relevant to this instruction) as only against Ticketmaster, rather than both Defendants.

Third, the parties have agreed that issues of the total number of tickets sold to Plaintiff State residents, and any total damages, will be deferred to the remedies phase of the trial. 3.4.2026 Trial Tr. at 457:19–25. Instead, the jury will only be required to find a nationwide overcharge. *See id.* Defendants' proposed language focusing on State residents may mislead the jury to believe they are required to find elements of proof that have been deferred by mutual agreement to a later phase of trial. Plaintiffs' proposed instructions address all the necessary elements to establish injury and the fact of damage, as well as the existence of an overcharge, which is all that is required under the parties' agreement.

Fourth, as described above, Defendants' language stating that the jury should not "assume that any resident of any Plaintiff state will receive any portion of any money the Plaintiff States might ultimately recover" is unnecessary and potentially misleading. Any recovery under 15 U.S.C. § 15c likely will be returned to fans. As 15 U.S.C. Sections 15c and 15e explicitly contemplate, any funds recovered by the States "shall … be distributed in such manner as the district court in its discretion may authorize" and that any "distribution procedure adopted afford each person a reasonable

118

opportunity to secure his appropriate portion of the net monetary relief." *Id.* § 15e. While, subject to the approval of the Court, some or all of the funds recovered *may* "be deemed a civil penalty by the court and deposited with the State as general revenues," there is no basis to instruct the jury to assume that will happen, or that the States will not try to distribute damages awards to residents. A reminder to the jury that neither they nor their families will personally recover funds is sufficient.

**Defendants' Authority:** ECF No. 777 at 41 (Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment); *Washington v. Chimei Innolux Corp.*, 659 F.3d 842, 848 (9th Cir. 2011) ("[A] statutory *parens patriae* action may well result in a settlement that does not include restitution to victims of the fraud, but only results in penalties paid to the public treasury."); *Broselow v. Fisher*, 319 F.3d 605, 608 (3d Cir. 2003) (individuals have no right to funds collected through *parens patriae* claims because such funds are not collected "under an assignment" from those individuals); *New York by Vacco v. Reebok Int'l*, 96 F.3d 44, 49 (2d Cir. 1996) (individuals are not entitled to distributions from the settlement of a *parens patriae* suit); N.Y. Exec. § 63(12) ("monies recovered or obtained under this subdivision" are subject to N.Y. State Fin. § 4(11), which requires that the funds "be deposited in the state treasury" and not disbursed "except pursuant to an appropriation"); *New York, by James v. Niagara-Wheatfield Cent. Sch. Dist.*, 119 F.4th 270, 279 (2d Cir. 2024), *cert. denied sub nom. Niagara-Wheatfield Cent. Sch. Dist. v. New York*, 146 S. Ct. 324 (2025) ("A state suing *in parens patriae* must establish '(1) [an] injury to a sufficiently substantial segment of the state's population; (2) a quasi-sovereign interest; and (3) an inability for individual plaintiffs to obtain complete relief.'"); *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir. 1993) ("a contract under the corporate name of [either a parent corporation or its subsidiary] is not treated as that of both"); ECF No. 483 at 4 n.1 (Opinion and Order); *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 161 (2d Cir. 2016) ("to suffer antitrust injury, the putative plaintiff must be a participant in the very market that is directly restrained"); *Orchestrate HR, Inc. v. Trombetta*, No. 3:13-CV-2110-KS, 2017 WL 273669, at *8 (N.D. Tex. Jan. 20, 2017) ("It is elementary that each plaintiff must prove its own damages."); *U.S. Football League v. Nat'l Football League*, No. 84 CIVIL 7484PKL, 1986 WL 10620, at *34 (S.D.N.Y. July 31, 1986) ("I instruct you that each one of the plaintiffs must show the fact of its injury and the amount of its damage. Should you find that one of the plaintiffs was injured in fact and was damaged in its business or property, that does not necessarily mean that any other plaintiff was either injured or damaged."); *City of New York v. Beretta U.S.A. Corp.*, 315 F. Supp. 2d 256, 265 (E.D.N.Y. 2004) ("The doctrine of parens patriae grants standing to a state to sue on behalf of its citizens."); 15 U.S.C. § 15c(a)(1) (parens patriae authority is "on behalf of natural persons residing in such State").

**Defendants' Argument:** Defendants' position is that the question of damages should not be presented to the jury at all. At summary judgment, this Court deemed invalid the only market in which the "fans" on behalf of whom Plaintiff States are claiming damages even remotely participate. Accordingly, Plaintiff States could never, and certainly cannot now, prove antitrust injury, and without such injury, they cannot obtain damages. *See* Post-Instruction No. 31 (Injury and Causation). "[T]o suffer antitrust injury, the putative plaintiff must be a participant in the very market that is directly restrained." *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 161 (2d Cir. 2016). The fans that Plaintiff States seek to represent do not meet this requirement, nor are the fans' alleged injuries "inextricably intertwined" with alleged injuries in other purported markets. *In re DDAVP Direct Purchaser Antitrust Litigation* and *Blue Shield of Virginia v. McCready*—are distinguishable. In *DDAVP*, the defendants' exclusionary conduct focused directly on the *same product* (a drug) that the plaintiffs purchased. 585 F.3d 677, 683, 688 (2d Cir. 2009). And in *McCready*, the plaintiff alleged that she was a "consumer of *psychotherapeutic services* and that she had been injured by the defendants'

119

conspiracy to restrain competition in the market *for such services*." *Associated Gen. Contractors of California v. California State Council of Carpenters*, 459 U.S. 519, 538 (1983) (describing *McCready*, 457 U.S. 465, 484 (1982)) (emphasis added). In such circumstances, "the consumers' injury is 'clearly foreseeable,' 'inextricably intertwined' with the anticompetitive conduct, and 'flows from that which makes [the] defendants' acts unlawful.'" ECF No. 483 at 6 (Opinion and Order Denying Defendants' Motion to Dismiss) (citations omitted). But that is not this case: fans purchase a different product, in a different market, than the product in the venue-facing market where the alleged conduct occurs and, as a result, the alleged conduct and any alleged injury to fans are not "inextricably intertwined."

Defendants propose the damages-related instructions here only if the question of damages is presented to the jury. But to be clear, Defendants' frontline position is that it should not be presented to the jury at all.

As for Defendants' edits to this instruction, they clarify that each Plaintiff State claiming damages can only seek damages (1) on an individual, not collective, basis; and (2) from Ticketmaster, not Live Nation, who is not a party to the ticketing contracts that allegedly harm "fans." *Orchestrate HR, Inc. v. Trombetta*, No. 3:13-CV-2110-KS, 2017 WL 273669, at *8 (N.D. Tex. Jan. 20, 2017) ("It is elementary that each plaintiff must prove its own damages."); *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir. 1993) ("a contract under the corporate name of [either a parent corporation or its subsidiary] is not treated as that of both"). Defendants object to Plaintiffs' assertion that all Plaintiff States claiming damages can do so on the basis of an "average" overcharge—each Plaintiff "must show the fact of its injury and the amount of its damage." *U.S. Football League v. Nat'l Football League*, No. 84 CIVIL 7484PKL, 1986 WL 10620, at *34 (S.D.N.Y. July 31, 1986).

Defendants' edits also make clear that a Plaintiff State claiming damages may recover only if it has proven (1) injury to residents of its State who purchased primary concert tickets to events at "major concert venues," and (2) that Ticketmaster's alleged unlawful conduct caused the alleged injury. *See* Post-Instruction No. 31 (Injury and Causation).

120

**Post-Instruction No. 31**

### INJURY AND CAUSATION

Each Plaintiff State claiming damages is entitled to recover damages only if it can establish these three elements of injury and causation:

1. Residents in its State who purchased primary concert tickets to attend events at what Plaintiffs refer to as "major concert venues" were in fact injured as a result of Ticketmaster's alleged violations of the antitrust laws;

2. Those injuries would not have occurred but for Ticketmaster's alleged antitrust violation; and

3. Those injuries are of the type that the antitrust laws were intended to prevent.

The first element is sometimes referred to as "injury in fact" or "fact of damage." For each of the Plaintiff States claiming damages to establish that it is entitled to damages, it must prove that residents of its State who purchased primary concert tickets to attend events at any of the so-called "major concert venues" were injured as a result of Ticketmaster's alleged monopolization of the market for primary concert tickets at so-called "major concert venues" in violation of Section 2 of the Sherman Act, or for exclusive dealing in violation of Section 1 of the Sherman Act. It is important to understand that injury and amount of damage are different concepts and that you cannot consider the amount of any overcharge alleged by any particular State unless and until you have concluded that fans in that State were in fact injured.

Each Plaintiff State claiming damages must also offer evidence that establishes by a preponderance of the evidence that injuries to residents in that State would not have occurred but for Ticketmaster's alleged unlawful conduct. This means that each Plaintiff State claiming damages must have proven that some overcharge was imposed on residents in its State because of Ticketmaster's

121

alleged antitrust violation, and that such overcharge would not have been imposed but for the alleged antitrust violation.

Finally, each of the Plaintiff States claiming damages must establish that the alleged injuries to residents of its State are the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If the alleged injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then the alleged injuries are antitrust injuries. On the other hand, if the alleged injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit artists, venues, or consumers, then the alleged injuries are not antitrust injuries and none of the Plaintiff States claiming damages can recover damages for those injuries under the antitrust laws.

In summary, if each of the Plaintiff States claiming damages can establish that residents of its State who purchased primary concert tickets to events at so-called "major concert venues" were in fact injured by Ticketmaster's conduct, that such injuries would not have occurred but for Ticketmaster's conduct, and that such injuries were the type that the antitrust laws were intended to prevent, then each such Plaintiff State is entitled to recover for the overcharge paid by such residents in each such Plaintiff State.

**Plaintiffs' Authority**: Adapted Final Jury Instructions at 52-53, *Innovative Health LLC v. Biosense Webster, Inc.*, Case No. 8:19-cv-1984 JVS (C.D. Cal. May 16, 2025); ABA Model Jury Instructions in Civil Antitrust Cases A-300, A-303; ABA Model Instr. 6.A.1; *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 479-84 (1982); *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009); *United States of Am. v. Live Nation Entm't, Inc.*, No. 1:24-cv-03973-AS (S.D.N.Y. Mar. 13, 2025) at 4-7; ECF No. 1037 at 42-43.

**Plaintiffs' Position:** Plaintiffs have adapted nonargumentative damages instructions based on the ABA Model Jury Instructions and those used in *Innovative Health LLC v. Biosense Webster, Inc.* Defendants' proposed modifications are unnecessary of misleading.

First, for the same reasons described with respect to prior instructions, Defendants' alternative names for Plaintiffs' proposed markets risk confusing the jury.

122

Second, Defendants again mischaracterize Plaintiffs' claims (as relevant to this instruction) as only against Ticketmaster, rather than both Defendants.

Third, Defendants' instructions misleadingly imply that their conduct must be the sole cause of any injury to fans, rather than a material cause of those injuries.

**Defendants' Authority**: ABA Model Instr. 6.A.1; *U.S. Football League v. Nat'l Football League*, No. 84 CIVIL 7484PKL, 1986 WL 10620, at *34 (S.D.N.Y. July 31, 1986) ("I instruct you that each one of the plaintiffs must show the fact of its injury and the amount of its damage. Should you find that one of the plaintiffs was injured in fact and was damaged in its business or property, that does not necessarily mean that any other plaintiff was either injured or damaged."); *City of New York v. Beretta U.S.A. Corp.*, 315 F. Supp. 2d 256, 265 (E.D.N.Y. 2004) ("The doctrine of parens patriae grants standing to a state to sue on behalf of its citizens."); 15 U.S.C. § 15c(a)(1) (parens patriae authority is "on behalf of natural persons residing in such State"); *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 41 (2d Cir. 1986) ("Consequently, an essential element in plaintiffs' claim is that the injuries alleged would not have occurred *but for* Kodak's antitrust violation.").

**Defendants' Argument:**  Defendants' edits to this instruction align it with the previous instruction and were undertaken for the same reasons.  Additionally, Defendants' edits make clear that Ticketmaster's alleged antitrust violation must have been a but-for cause of the fans' alleged injuries. *See Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 41 (2d Cir. 1986) ("Consequently, an essential element in plaintiffs' claim is that the injuries alleged would not have occurred *but for* Kodak's antitrust violation.").

**Post-Instruction No. 31D**

## STATUTE OF LIMITATIONS

A statute of limitations establishes a time limit for bringing a lawsuit. In doing so, the law seeks to eliminate stale claims, to promote justice by preventing surprises, and to provide security and stability to human affairs. Statutes of limitations ensure that a plaintiff does not wait, sleep on their rights, and allow damages to accumulate before bringing suit.

The statute of limitations for the claims in this case does not permit recovery for any injury to residents in any State suffered prior to May 23, 2020. This means that any alleged anticompetitive conduct that occurred prior to May 23, 2020, and any injury resulting from that conduct, is time-barred. You can only find that each Plaintiff has proved the required elements of injury and causation if they have proven both that (i) the injury occurred on or after May 23, 2020 and (ii) that injury was caused by anticompetitive conduct that occurred on or after May 23, 2020. You may not base any finding of injury or your overcharge calculation for damages on any anticompetitive conduct that occurred prior to May 23, 2020, regardless of whether you believe the conduct was unlawful and regardless of whether the harm or damages from that conduct continued after May 23, 2020.

While you may not consider injury or harm resulting from conduct that occurred before May 23, 2020, Plaintiffs have introduced evidence about conduct occurring before May 23, 2020 solely as background or context for the acts that took place on or after May 23, 2020. It is important that you consider this evidence only as background for the alleged conduct or injury that took place *after* May 23, 2020. Otherwise, this evidence has expired and cannot support Plaintiffs' claims.

**Plaintiffs' Position (31D):** The Plaintiff States do not dispute that their damages claims in this action are subject to a four-year statute of limitations. But pursuant to the parties' agreement to defer determination of damages (beyond a jury finding on the overcharge), the impact of any statute of limitations on damages can be resolved by the Court. No jury determination on this issue is needed.

**Defendants' Authority**: *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 69 (2d Cir. 2019); 15 U.S.C. § 15b ("Any action to enforce any cause of action under [the Sherman Act] shall be forever barred unless commenced within four years after the cause of action accrued."); *Zenith Radio Corp.*

124

*v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971) (a plaintiff may recover only those damages which he has suffered within the limitations period); *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) ("[T]he commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period."); *CSX Transp., Inc. v. Norfolk S. Ry. Co.*, 114 F.4th 280, 286 (2024) ("Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business."); *id.* at 289 ("[M]ere silence or inaction from a defendant—even though the allegedly unlawful conspiracy to exclude a plaintiff remains in effect—isn't enough to restart the limitations period. Instead, an affirmative act—like a promise to act in the future—is required."); *id.* ("an overt act … must be a new and independent act that is not merely a reaffirmation of a previous act" (quoting *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 600 (6th Cir. 2014)); *id.* at 292 ("[I]n … antitrust cases, [a] plaintiff cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period."); *Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265, 271 (8th Cir. 2004) ("Only where the monopolist actively reinitiates the anti-competitive policy and enjoys benefits from that action can the continuing violation theory apply."); *Z Techs.*, 753 F.3d at 599-600 (concluding that the law "clearly indicate[s] that price increases following a merger or acquisition are not overt acts" and explaining that the Court "ha[s] not discovered a case, let alone a Sixth Circuit authority, nor has [the plaintiff] identified one, in which the continuing violations doctrine has been applied to price increases following a merger or acquisition."); *Chalmers v. Nat'l Collegiate Athletic Ass'n*, No. 24 CIV. 5008 (PAE), 2025 WL 1225168, at *8 (S.D.N.Y. Apr. 28, 2025), *aff'd,* No. 25-1307-CV, 2025 WL 3628416 (2d Cir. Dec. 15, 2025) ("The continuing violation doctrine, however, is heavily disfavored in the Second Circuit and courts have been loath to apply it absent a showing of compelling circumstances.. . . [The doctrine] would also permit plaintiffs who know of the defendant's pattern of activity simply to wait, 'sleeping on their rights,' as the pattern continues and treble damages accumulate.") (internal quotation marks and citations omitted); *SEC v. Kelly*, 663 F.Supp.2d 276, 288 (S.D.N.Y. 2009) (continuous accrual applies "only to 'continual unlawful acts, not continual ill effects from a single violation'"); *Madison Square Garden, L.P. v. Nat'l Hockey League*, No. 7 Civ. 8455, 2008 WL 4547518, at *10 (S.D.N.Y. Oct. 10, 2008) ("continued. . . enforcement of pre-existing policies" does not constitute new overt act); *US Airways*, 938 F.3d at 68 ("performance of a contract [i]s a manifestation of the 'overt act,' the decision to enter the contract, rather than an independent overt act of its own"); *In re Libor-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 NRB, 2015 WL 4634541, at *125 (S.D.N.Y. Aug. 4, 2015) (continuing violation doctrine does not apply where "only the injurious effects continued into the limitations period"); *Klehr*, 521 U.S. at 190 ("Nor can the presence of the new act help them recover for the injuries caused by pre-1989 acts."); *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 457 (2009) (rejecting attempt to "alchemize [different claims] into a new form of antitrust liability"); *Am. President Lines, LLC v. Matson, Inc.*, 775 F. Supp. 3d 379, 402 (D.D.C. 2025), dismissed, No. 25-7051, 2025 WL 1649080 (D.C. Cir. June 6, 2025) (finding it "unworkable" to consider a "course of conduct" theory "beyond conspiracies"); *Limestone Dev. Corp. v. Vill. Of Lemont, Ill.*, 520 F.3d 797, 801 (7th Cir. 2008) (the continuing violation doctrine applies when conduct does not amount to an actionable claim "until a series of wrongful acts blossoms into an injury on which suit can be brought"); *CTS Corp. v. Waldburger*, 573 U.S. 1, 7 (2014) ("[A] statute of limitations creates 'a time limit for suing in a civil case, based on the date when the claim accrued.'"); Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application § 320a (2025) ("Limitation serves the same functions in antitrust as elsewhere in the law: to put old liabilities to rest, to relieve courts and parties from 'stale' claims where the best evidence may no longer be available, and to create incentives for those who believe themselves wronged to investigate and bring

125

their claims promptly, particularly when they are known or can be determined."); *Rotella v. Wood*, 528 U.S. 549, 555 (2000) (noting "the basic policies of all limitations provisions: repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities"); *Gabelli v. SEC*, 568 U.S. 442, 448-49 (2013) ("Statutes of limitations are intended to 'promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.' They provide 'security and stability to human affairs.' We have deemed them 'vital to the welfare of society,' and concluded that 'even wrongdoers are entitled to assume that their sins may be forgotten.'"); *Seets v. Anne Arundel County*, 40 F. App'x 744, 750-51 (4th Cir. 2002) (instructing jury on statute of limitations).

**Defendants' Argument**:   Plaintiffs erroneously omit any instruction on the statute of limitations despite previously conceding it applied. This instruction is necessary both to notify the jury what a statute of limitations is and explain that the applicable statutes of limitations materially limit the manner in which Plaintiffs can try to establish Defendants' liability and collect damages.  ECF No. 1019 at 12-15 (Memorandum of Law in Support of Defendants' Motions in Limine); ECF No. 704 at 14-18 (Memorandum of Law in Support of Defendants' Motion to Exclude Dr. Rosa M. Abrantes-Metz); ECF No. 1079 at 5 (Order on Motions in Limine).

The law is clear that Plaintiffs are legally precluded from recovering for any injury suffered prior to May 23, 2020.  *See* 15 U.S.C. § 15b; *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971) (a plaintiff may recover only those damages which he has suffered within the limitations period); *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 69 (2d Cir. 2019); *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) ("[T]he commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period."). While the Court has allowed Plaintiffs to introduce evidence of time-barred conduct as background, Plaintiffs may rely on such conduct only to contextualize the non-time-barred conduct.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002); *Fitzgerald v. Henderson*, 251 F.3d 345, 365 (2d Cir. 2001) (evidence of conduct pre-dating the statute of limitations must be "relevant to events during the period"); ECF No. 1079 at 5 (Order on Motions in Limine).  Plaintiffs may not attempt to bootstrap their damages claims to "injuries caused by other predicate acts that took place outside the limitations period." *Klehr*, 521 U.S. at 190.

Moreover, although the Court, not the jury, would determine whether any Plaintiff is entitled to any penalty, statutes of limitations also apply to Plaintiffs' penalties claims, some of which are even less than four years. *See, e.g.*, S.C. Code § 39-5-150 ("No action may be brought under this article more than three years after discovery of the unlawful conduct which is the subject of the suit.").  Plaintiffs' equitable claims are also subject to the doctrine of laches.  *See New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 40 (D.D.C. 2021) ("the doctrine of laches [] applies to parens patriae suits"); *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 301 (D.C. Cir. 2023) (applying laches).  So the evidence Plaintiffs can rely on to try to prove liability for those claims also must post-date May 23, 2020.

**Post-Instruction No. 32**

## DAMAGES INSTRUCTIONS—GENERAL

If you find that any Plaintiff State claiming damages proved that Ticketmaster monopolized the alleged market for primary concert ticketing in violation of Section 2 of the Sherman Act, or that Ticketmaster engaged in unlawful exclusive dealing in violation of Section 1 of the Sherman Act, and you also find that the Plaintiff State proved that any such violation caused injury to residents of its State who purchased primary concert tickets to events at so-called "major concert venues" within the statute of limitations, then you must determine the amount of the overcharge, if any, paid by those residents in that Plaintiff State. The fact that I am giving you instructions concerning the issue of damages does not mean that I believe any Plaintiff should, or should not, prevail in this case. If you reach a verdict for Ticketmaster on Plaintiffs' claims for monopolization of the alleged market for primary concert tickets at so-called "major concert venues" in violation of Section 2 of the Sherman Act and laws of the Plaintiff States claiming damages, or for exclusive dealing in violation of Section 1 of the Sherman Act and the laws of the Plaintiffs States claiming damages, you should not consider the issue of damages, and you may disregard the damages instruction that I am about to give.

The law provides that each Plaintiff State claiming damages can recover based on the amount of per-ticket overcharge imposed on primary concert tickets purchased by residents of that State for events at one or more of the venues Plaintiffs call "major concert venues," only if you find that the overcharge was caused by the conduct that you have found to be unlawful.

Antitrust damages are only compensatory, meaning their purpose is to put injured persons, if any, as near as possible in the position in which they would have been had the alleged antitrust violation not occurred. The law does not permit you to award any additional overcharge amount to punish a wrongdoer—what we sometimes refer to as punitive damages—or to deter particular conduct in the future. Furthermore, you are not permitted to award to any of the Plaintiff States an amount for

127

attorneys' fees or the costs of maintaining this lawsuit. Again, you are only being asked to determine the per-ticket overcharge paid by ticket purchasers in each Plaintiff State that proves the violations I described and meets the injury and causation requirements I described.

**Plaintiffs' Authority**: Final Jury Instructions at 54, *Innovative Health LLC v. Biosense Webster, Inc.*, Case No. 8:19-cv-1984 JVS (C.D. Cal. May 16, 2025); ABA Model Instr. 6.B.1.

**Plaintiffs' Position:** Plaintiffs have adapted nonargumentative damages instructions based on the ABA Model Jury Instructions and those used in *Innovative Health LLC v. Biosense Webster, Inc.* Defendants' proposed modifications misstate the relevant claims at issue or otherwise pose a risk of confusing the jury. First, for the same reasons described with respect to prior instructions, Defendants' alternative names for Plaintiffs' proposed markets risk confusing the jury. Second, Defendants again mischaracterize Plaintiffs' claims (as relevant to this instruction) as only against Ticketmaster, rather than both Defendants. Third, Defendants unnecessarily repeat the specific claims at issue, which the jury will have previously been instructed on in Post Instruction No. 31.

**Defendants' Authority**: Final Jury Instructions at 54, *Innovative Health LLC v. Biosense Webster, Inc.*, Case No. 8:19-cv-1984 JVS (C.D. Cal. May 16, 2025); ABA Model Instr. 6.B.1; 15 U.S.C. § 15c(a)(1) ("The court shall exclude from the amount of monetary relief awarded in [a parent patriae] action any amount of monetary relief. . . which is properly allocable to. . . any business entity.").

**Defendants' Argument:** Defendants' edits to this instruction align it with the previous damages-related instructions and were undertaken for the same reasons. Additionally, they seek to make clear that the jury must have found specific antitrust violations, injury, and causation to proceed to the per-ticket overcharge issue.

**Post-Instruction No. 33**

## COMPENSATORY DAMAGES—OVERCHARGE

Each Plaintiff State claiming damages contends that its residents paid higher fees added to the face value of primary tickets to concerts that took place at so-called "major concert venues," because Ticketmaster allegedly charged those venues more money for primary ticketing services than Ticketmaster would have but for Ticketmaster's alleged anticompetitive conduct. To be clear, no Plaintiff State contends that the face value of any ticket was too high as a result of this alleged conduct. The Plaintiff States solely contend that venues increased the fees they add to the ticket price as a direct result of Ticketmaster supposedly charging those venues more for primary ticketing services than they would have paid but for the alleged anticompetitive conduct.

If you find that any Plaintiff State has proven that Ticketmaster violated the antitrust laws I previously described, and that as a direct result venues increased the ticketing fees paid by fans, then for each Plaintiff State that satisfies the other elements for damages in my previous instructions, you must determine the per-ticket overcharge amount paid by residents of that State for primary concert tickets for events at so-called "major concert venues." The per-ticket overcharge amount is the difference between what residents of the Plaintiff State paid for fees added to the face value of tickets sold in the primary market during the damages period, and the amount of ticket fees you find those residents of that State would have paid but for Ticketmaster's alleged anticompetitive conduct. You are not being asked to determine, and may not speculate as to, the total number of tickets or ticket purchasers affected by any overcharge.

**Plaintiffs' Authority**: Jury Instructions at 15-16, *Morelock Enterprises, Inc. v. Weyerhaeuser Co.*, 3:04-cv-00583-PA (D. Ore. Apr. 25, 2008).

**Plaintiffs' Position:** Plaintiffs have proposed a short nonargumentative instruction regarding the nature of overcharge damages. Defendants' proposed instruction complicates this instruction in a way that mischaracterizes Plaintiffs' claims and may otherwise be confusing for the jury.

129

First, for the same reasons described with respect to prior instructions, Defendants' alternative names for Plaintiffs' proposed markets risk confusing the jury.

Second, Defendants again mischaracterize Plaintiffs' claims (as relevant to this instruction) as only against Ticketmaster, rather than both Defendants.

Third, Defendants do not accurately describe the Plaintiff States' economic evidence about the basis of the overcharge to fans. While it is correct that the Plaintiff States' expert will testify that Defendants' increased ticketing fees are the cause of any injuries to fans, Defendants' instruction suggests that the only mechanism by which fans are injured is through a simple pass-through model in which venues are charged increased fees by Ticketmaster and those venues subsequently increase their fees to fans. As the Plaintiff States' expert will testify, because Ticketmaster sells tickets directly to fans, and the various components of a ticket depend on one another, Defendants' characterization of causation here is not accurate. And regardless, given that causality may be a subject of dispute between experts at trial, attempting to characterize it in detail in a jury instruction is not appropriate.

**Defendants' Authority**: Jury Instructions at 15-16, *Morelock Enterprises, Inc. v. Weyerhaeuser Co.*, 3:04-cv-00583-PA (D. Ore. Apr. 25, 2008); 15 U.S.C. § 15c(a)(1) ("The court shall exclude from the amount of monetary relief awarded in [a parent patriae] action any amount of monetary relief. . . which is properly allocable to. . . any business entity.").

**Defendants' Argument:** Defendants object to Plaintiffs' characterization of the alleged overcharge, which seeks to prejudice the jury by obfuscating the nature of the alleged overcharge and how it allegedly results. Defendants' edits seek to make clear that the alleged overcharge at issue (1) relates to *fees* added to the face value of tickets, not the face value of tickets themselves; and (2) results from *venues* increasing those fees, not Ticketmaster. Defendants' remaining edits align this instruction with the preceding damages instructions and were undertaken for the same reasons.

130

**Post-Instruction No. 34**

### BASIS FOR CALCULATING OVERCHARGE

You are permitted to make just and reasonable estimates in determining the amount of the per-ticket overcharge for each Plaintiff State claiming damages that has proven it is entitled to recover damages. You are not required to calculate the amount of the overcharge with mathematical certainty or precision. However, the overcharge must have a reasonable basis in the evidence and must be based on reasonable, non-speculative assumptions and estimates. The overcharge may not be based on guesswork or speculation. Each Plaintiff State claiming damages must prove the reasonableness of each of the assumptions upon which the per-ticket overcharge for its State is based.

If you find that any Plaintiff State claiming damages has provided a reasonable basis for determining the per-ticket overcharge in its State, then you may find an overcharge amount for that State so long as that amount is a just and reasonable estimate supported by the evidence.

If you find that any Plaintiff State failed to carry its burden of providing a reasonable basis for determining the per-ticket overcharge in its State, then you may not find that any overcharge occurred in that State.

**Plaintiffs' Authority**: Adapted ABA Model Instr. 6.B.3; *See, e.g., Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264–66 (1946) ("The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created."); *Story Parchment Co.,* 282 U.S. at 563 ("[I]t would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts."); *see also New York v. Julius Nasso Concrete Corp.*, 202 F.3d 82, 88 (2d Cir. 2000); *Nat'l Farmers' Org., Inc. v. Associated Milk Producers, Inc.*, 850 F.2d 1286, 1293 (8th Cir. 1988).

**Plaintiffs' Position:** Plaintiffs have proposed an adapted version of the ABA Model Jury Instructions for this instruction. Defendants' proposed instruction unnecessarily repeats the requirement for individual determinations for each State that is already covered in the existing instruction.

**Defendants' Authority**: Adapted ABA Model Instr. 6.B.3.

**Defendants' Argument:**  Defendants' edits to this instruction align it with the preceding damages instructions and were undertaken for the same reasons.

131

Defendants object to Plaintiffs' statement that "Defendants bear the risk of uncertainty in calculating damages created by their own wrongdoing." This statement is highly prejudicial and might incline the jury to disregard this Court's instruction that its calculations must be "just and reasonable" under all circumstances. Indeed, in *Bigelow v. RKO Radio Pictures*, the Supreme Court held that "even where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guesswork." 327 U.S. 251, 264. Rather, it must "make a just and reasonable estimate of the damage based on relevant data." *Id.* The Court reasoned that "[a]ny other rule," *i.e.*, a rule requiring "direct and positive proof," "would enable the wrongdoer to profit by his wrongdoing." *Id.* Plaintiffs' proposal takes that statement out of context and erroneously suggests to the jury that it may do exactly what the Supreme Court has forbidden. "It is well-settled that the burden is on the plaintiff to establish its entitlement to recovery." *Trs. of Plumbers & Pipefitters Nat. Pension Fund v. Daniel Weintraub & Assocs., Inc.*, 2007 WL 4125453, at *3 (E.D.N.Y. Nov. 16, 2007). Plaintiffs' attempt to flip the burden is unavailing and should be rejected.

**Post-Instruction No. 35**

### FINAL INSTRUCTIONS

You are about to go into the jury room and begin your deliberations. If during those deliberations you want to see any of the exhibits, you may request that they be brought into the jury room. If you want any of the testimony read back to you, you may also request that. Please remember that it is not always easy to locate what you might want to read or hear, so be as specific as you possibly can in requesting exhibits or portions of the testimony.

Your requests for exhibits or testimony—in fact, any communication with the Court—should be made to me in writing, signed by your foreperson, and given to one of the marshals. In any event, do not tell me or anyone else how the jury stands on any issue until after a unanimous verdict is reached.

*Duty to Deliberate/Unanimous Verdict*

You will now retire to decide the case. It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement. Each of you must decide the case for yourselves, but you should do so only after a consideration of the case with your fellow jurors, and you should not hesitate to change an opinion when convinced that it is erroneous. Your verdict must be unanimous, but you are not bound to surrender your honest convictions concerning the effect or weight of the evidence for the mere purpose of returning a verdict or solely because of the opinion of other jurors. Discuss and weigh your respective opinions dispassionately, without regard to sympathy, without regard to prejudice or favor for either party, and adopt that conclusion which in your good conscience appears to be in accordance with the truth.

Again, each of you must make your own decision about the proper outcome of this case based on your consideration of the evidence and your discussions with your fellow jurors. No juror should surrender their conscientious beliefs solely for the purpose of returning a unanimous verdict.

*Selection of Foreperson*

When you retire, you should elect one member of the jury as your foreperson. That person will preside over the deliberations and speak for you here in open court.

Verdict forms have been prepared for your convenience. You will take these forms to the jury room and, when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date, and sign the form that sets forth the verdict upon which you unanimously agree. You will then return with your verdict to the courtroom. I will read the verdict form to you now.

*Return of Verdict*

After you have reached a verdict, your foreperson will fill in the form that has been given to you, each of you will sign it with the date and advise the marshal outside your door that you are ready to return to the courtroom.

I will stress that each of you should be in agreement with the verdict which is announced in court. Once your verdict is announced by your foreperson in open court and officially recorded, it cannot ordinarily be revoked.

*Juror Oath*

In determining the facts, you are reminded that you took an oath to render judgment impartially and fairly, without prejudice and without fear, solely upon the evidence in the case and the applicable law. I know that you will do this and reach a just and true verdict.

134

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA et al.,

      *Plaintiffs*,

      v.                            Civil No. 1:24–cv–3973-AS

LIVE NATION ENTERTAINMENT, INC.,
and TICKETMASTER L.L.C.,

      *Defendants*.

**<u>DEFENDANTS' PROPOSED VERDICT FORM</u>**

**VERDICT FORM**

**Part I: Section 2 Monopolization Claim Against Ticketmaster For Alleged Market Of Primary Ticketing Services To The Venues Plaintiffs Refer To As "Major Concert Venues"**

1.      Have Plaintiffs proven, by a preponderance of the evidence, that primary ticketing services to the venues Plaintiffs refer to as "major concert venues" is a properly-defined antitrust market?
Yes _____          No _____
*If you answered "Yes," proceed to Question 2.*
*If you answered "No," proceed to Question 5.*

2.      Have Plaintiffs proven, by a preponderance of the evidence, that Ticketmaster has monopoly power in that alleged market?
Yes _____          No _____
*If you answered "Yes," proceed to Question 3.*
*If you answered "No," proceed to Question 5.*

3.      Have Plaintiffs proven, by a preponderance of the evidence, that Ticketmaster willfully acquired or maintained monopoly power in that alleged market by engaging in anticompetitive conduct, as opposed to having superior products or business skills?
Yes _____          No _____
*If you answered "Yes," proceed to Question 4.*
*If you answered "No," proceed to Question 5.*

4.      Have Plaintiffs proven, by a preponderance of the evidence, that Ticketmaster's alleged anticompetitive conduct harmed competition and caused anticompetitive effects in that alleged market?
Yes _____          No _____
*Proceed to Question 5.*

**Part II: Section 2 Monopolization Claim Against Ticketmaster For Alleged Market Of Primary *Concert* Ticketing Services To The Venues Plaintiffs Refer To As "Major Concert Venues"**

5.      Have Plaintiffs proven, by a preponderance of the evidence, that primary *concert* ticketing services to the venues Plaintiffs refer to as "major concert venues" is a properly-defined antitrust market?
Yes _____          No _____
*If you answered "Yes," proceed to Question 6.*
*If you answered "No," proceed to Question 9.*

6.      Have Plaintiffs proven, by a preponderance of the evidence, that Ticketmaster has monopoly power in that alleged market?
Yes _____          No _____

1

*If you answered "Yes," proceed to Question 7.*
*If you answered "No," proceed to Question 9.*

7.    Have Plaintiffs proven, by a preponderance of the evidence, that Ticketmaster willfully acquired or maintained monopoly power in that alleged market by engaging in anticompetitive conduct, as opposed to having superior products or business skills?
Yes _____        No _____
*If you answered "Yes," proceed to Question 8.*
*If you answered "No," proceed to Question 9.*

8.    Have Plaintiffs proven, by a preponderance of the evidence, that Ticketmaster's alleged anticompetitive conduct harmed competition and caused anticompetitive effects in that alleged market?
Yes _____        No _____
*Proceed to Question 9.*

**Part III: Section 2 Monopolization Claim Against Live Nation For Alleged Market Of Use Of Venues Plaintiffs Refer To As "Large Amphitheaters" By Artists**

9.    Have Plaintiffs proven, by a preponderance of the evidence, that use of venues Plaintiffs refer to as "large amphitheaters" by artists is a properly-defined antitrust market?
Yes _____        No _____
*If you answered "Yes," proceed to Question 10.*
*If you answered "No," proceed to Question 13.*

10.    Have Plaintiffs proven, by a preponderance of the evidence, that Live Nation has monopoly power in that alleged market?
Yes _____        No _____
*If you answered "Yes," proceed to Question 11.*
*If you answered "No," proceed to Question 13.*

11.    Have Plaintiffs proven, by a preponderance of the evidence, that Live Nation willfully acquired or maintained monopoly power in that alleged market by engaging in anticompetitive conduct as opposed to having superior products or business skills?
Yes _____        No _____
*If you answered "Yes," proceed to Question 12.*
*If you answered "No," proceed to Question 13.*

12.    Have Plaintiffs proven, by a preponderance of the evidence, that Live Nation's alleged anticompetitive conduct harmed competition and caused anticompetitive effects in that alleged market?
Yes _____        No _____
*Proceed to Question 13.*

2

**Part IV: Section 1 Exclusive Dealing Claim Against Ticketmaster**

*If you answered "Yes" to Questions 1 and/or 5, proceed to Question 13.*
*If you answered "No" to Questions 1 and 5, proceed to Question 20.*

13.     Have Plaintiffs proven, by a preponderance of the evidence, that there are one or more contracts between one of the venues Plaintiffs refer to as "major concert venues" and Ticketmaster that substantially foreclose venues from buying primary ticketing services from competing primary ticketing companies?
Yes _____                    No_____
*If you answered "Yes," proceed to Question 14.*
*If you answered "No," proceed to Question 20.*

14.     Have Plaintiffs proven, by a preponderance of the evidence, that Ticketmaster has substantial market power in any of these alleged markets?
(a) primary ticketing services            Yes \_\_\_\_\_            No \_\_\_\_\_
(b) primary concert ticketing services     Yes \_\_\_\_\_            No \_\_\_\_\_
*If you answered "Yes," as to any of the two alleged markets, proceed to Question 15.*
*If you answered "No" to both alleged markets, proceed to Question 20.*

15.     Have Plaintiffs proven, by a preponderance of the evidence, that Ticketmaster used its alleged substantial market power to coerce one or more venues into an exclusive contract when the venue wanted a non-exclusive contract?
Yes _____                    No_____
*If you answered "Yes," proceed to Question 16.*
*If you answered "No," proceed to Question 20.*

16.     If you answered "Yes" to Question 15 above, identify each contract you found that Plaintiffs proved, by a preponderance of the evidence, a venue did not sign voluntarily, but only because of alleged coercion by Ticketmaster:

_____
*Proceed to Question 17.*

17.     For any contract you found in response to Question 16, have Plaintiffs proven, by a preponderance of the evidence, that the individual exclusive contract, judged on its own, substantially foreclosed competition in at least one of the two alleged ticketing markets?
Yes _____                    No_____
*If you answered "Yes," proceed to Question 18.*
*If you answered "No," proceed to Question 20.*

18.     If you answered "Yes" to Question 17 above, identify each contract you found that, when judged on its own, substantially foreclosed competition in at least one of the two alleged ticketing markets:

_____

3

*Proceed to Question 19.*

19.     For each separate exclusive contract you identified in Question 18 above, have Plaintiffs proven, by a preponderance of the evidence, that foreclosure of competition from that one exclusive contract, judged on its own, caused anticompetitive effects in at least one of the two alleged ticketing markets?
Yes _____          No_____
*Proceed to Question 20.*

## Part V: Section 1 Tying Claim Against Live Nation

20.     Have Plaintiffs proven, by a preponderance of the evidence, that artists are the customers who rent amphitheaters, and not promoters?
Yes _____          No_____
*If you answered "Yes," proceed to Question 21.*
*If you answered "No," proceed to Question 26.*

21.     Have Plaintiffs proven, by a preponderance of the evidence, that the use by artists of the venues Plaintiffs refer to as "large amphitheaters," and promotion services to all touring artists, are separate and distinct products in properly-defined antitrust markets?
Yes _____          No_____
*If you answered "Yes," proceed to Question 22.*
*If you answered "No," proceed to Question 26.*

22.     Have Plaintiffs proven, by a preponderance of the evidence, that Live Nation conditioned artists' use of the venues Plaintiffs refer to as "large amphitheaters" on artists also purchasing Live Nation's promotion services?
Yes _____          No_____
*If you answered "Yes," proceed to Question 23.*
*If you answered "No," proceed to Question 26.*

23.     Have Plaintiffs proven, by a preponderance of the evidence, that Live Nation has sufficient market power with respect to the use by artists of the venues Plaintiffs refer to as "large amphitheaters" to enable Live Nation to restrain competition as to promotion services to all touring artists?
Yes _____          No_____
*If you answered "Yes," proceed to Question 24.*
*If you answered "No," proceed to Question 26.*

24.     Have Plaintiffs proven, by a preponderance of the evidence, that the alleged tying arrangement caused anticompetitive effects in the market for promotion services to all touring artists?
Yes _____          No_____
*If you answered "Yes," proceed to Question 25.*
*If you answered "No," proceed to Question 26.*

25.    Have Plaintiffs proven, by a preponderance of the evidence, that the alleged tying arrangement involved a not insubstantial volume of interstate commerce in promotion services to all touring artists?

Yes _____                No_____

***Proceed to Question 26.***

## Part VI: Congruent State Law Claims

26.    Has each of the following Plaintiff States proven, by a preponderance of the evidence, that Ticketmaster engaged in unlawful conduct that harmed competition in its State?

| State | Yes | No |
|---|---|---|
| Colorado | | |
| Connecticut | | |
| District of Columbia | | |
| Florida | | |
| Louisiana | | |
| Maryland | | |
| Michigan | | |
| Minnesota | | |
| Nevada | | |
| New Hamshire | | |
| New Mexico | | |
| North Carolina | | |
| Ohio | | |
| Rhode Island | | |
| Texas | | |
| Utah | | |
| Virginia | | |
| Washington | | |
| West Virginia | | |

***Proceed to Question 27.***

27.    Has each of the following Plaintiff States proven, by a preponderance of the evidence, that Live Nation engaged in unlawful conduct that harmed competition in its State?

| State | Yes | No |
|---|---|---|
| Colorado | | |
| Connecticut | | |
| District of Columbia | | |
| Florida | | |
| Louisiana | | |
| Maryland | | |
| Michigan | | |

| | | |
|---|---|---|
| Minnesota | | |
| Nevada | | |
| New Hamshire | | |
| New Mexico | | |
| North Carolina | | |
| Ohio | | |
| Rhode Island | | |
| Texas | | |
| Utah | | |
| Virginia | | |
| Washington | | |
| West Virginia | | |

*Proceed to Question 28.*

**Part VII: Damages**

*If you answered "Yes" to <u>all</u> Questions in Part I, Part II, or Part IV, proceed to Question 28.  If not, proceed to Question 31.*

28.    Has each of the following Plaintiff States proven, by a preponderance of the evidence, that its specific State residents were harmed by paying higher ticket fees as a result of Ticketmaster's anticompetitive conduct?

| State | Yes | No |
|---|---|---|
| Arizona | | |
| Colorado | | |
| Connecticut | | |
| District of Columbia | | |
| Florida | | |
| Illinois | | |
| Indiana | | |
| Michigan | | |
| Minnesota | | |
| Nevada | | |
| New Hamshire | | |
| New Jersey | | |
| New York | | |
| North Carolina | | |
| Pennsylvania | | |
| Rhode Island | | |
| South Carolina | | |
| Utah | | |
| Washington | | |
| West Virginia | | |

6

| | | |
|---|---|---|
| Wisconsin | | |

***If you answered "Yes" for any Plaintiff State, proceed to Question 29 only for such State(s).***
***If you answered "No" for all Plaintiff States, proceed to Question 31.***

29.    Has each of the following Plaintiff States proven, by a preponderance of the evidence, that the alleged higher ticket fees its specific State residents paid were caused by Ticketmaster's alleged anticompetitive conduct that occurred after May 23, 2020 as opposed to alleged anticompetitive conduct that occurred before May 23, 2020?

| State | Yes | No |
|---|---|---|
| Arizona | | |
| Colorado | | |
| Connecticut | | |
| District of Columbia | | |
| Florida | | |
| Illinois | | |
| Indiana | | |
| Michigan | | |
| Minnesota | | |
| Nevada | | |
| New Hamshire | | |
| New Jersey | | |
| New York | | |
| North Carolina | | |
| Pennsylvania | | |
| Rhode Island | | |
| South Carolina | | |
| Utah | | |
| Washington | | |
| West Virginia | | |
| Wisconsin | | |

***If you answered "Yes" for any Plaintiff State, proceed to Question 30 only for such State(s).***
***If you answered "No" for all Plaintiff States, proceed to Question 31.***

7

30.    Please state the amount (if any) that each Plaintiff State proved, by a preponderance of the evidence, that residents in its specific State were overcharged per ticket for primary concert tickets to events at the venues Plaintiffs call "major concert venues" because of Ticketmaster's alleged anticompetitive conduct that occurred after May 23, 2020.  You may not calculate any overcharge based on any alleged anticompetitive conduct that occurred before May 23, 2020.

| State | |
|---|---|
| Arizona | $ |
| Colorado | $ |
| Connecticut | $ |
| District of Columbia | $ |
| Indiana | $ |
| Michigan | $ |
| Minnesota | $ |
| Nevada | $ |
| New Hamshire | $ |
| New Jersey | $ |
| North Carolina | $ |
| Pennsylvania | $ |
| Rhode Island | $ |
| Utah | $ |
| Washington | $ |
| West Virginia | $ |
| Wisconsin | $ |

*Proceed to Question 31.*

## Part VIII: Other State Law Claims And Damages

## California Unfair Competition Law – Unlawful Prong

31.    Has California proven, by a preponderance of the evidence, that Ticketmaster engaged in unlawful conduct that harmed competition in its State?
Yes _____            No_____
*If you answered "Yes," proceed to Question 32.*
*If you answered "No," proceed to Question 33.*

32.    Has California proven, by a preponderance of the evidence, that Ticketmaster engaged in an unlawful business act or practice that occurred within California, emanated from California, or harmed California residents in violation of the California Unfair Competition Law?
Yes _____            No_____
*Proceed to Question 33.*

33.    Has California proven, by a preponderance of the evidence, that Live Nation engaged in unlawful conduct that harmed competition in its State?
Yes _____            No_____

8

*If you answered "Yes," proceed to Question 34.*
*If you answered "No," proceed to Question 35.*

34.    Has California proven, by a preponderance of the evidence, that Live Nation engaged in an unlawful business act or practice that occurred within California, emanated from California, or harmed California residents in violation of the California Unfair Competition Law ?
Yes _____          No_____
*Proceed to Question 35.*

## California Unfair Competition Law – Unfair Prong

*Answer Question 35 only if you answered "Yes," to Question 31.  If you answered "No" to Question 31, proceed to Question 36.*

35.    Has California proven, by a preponderance of the evidence, that Ticketmaster engaged in an unfair business act or practice that occurred within California, emanated from California, or harmed California residents in violation of the California Unfair Competition Law?
Yes _____          No_____
*Proceed to Question 36.*

*Answer Question 36 only if you answered "Yes," to Question 33.  If you answered "No" to Question 33, proceed to Question 37.*

36.    Has California proven, by a preponderance of the evidence, that Live Nation engaged in an unfair business act or practice that occurred within California, emanated from California, or harmed California residents in violation of the California Unfair Competition Law?
Yes _____          No_____
*Proceed to Question 37.*

## Florida Trade Practices Act

37.    Has Florida proven, by a preponderance of the evidence, that Ticketmaster engaged in unlawful conduct that harmed competition in its State?
Yes _____          No_____
*If you answered "Yes," proceed to Question 38.*
*If you answered "No," proceed to Question 39.*

38.    Has Florida proven, by a preponderance of the evidence, that Ticketmaster engaged in an unfair method of competition in violation of the Florida Deceptive and Unfair Trade Practices Act?
Yes _____          No_____
*Proceed to Question 39.*

39.    Has Florida proven, by a preponderance of the evidence, that Live Nation engaged in unlawful conduct that harmed competition in its State?
Yes _____          No_____

9

*If you answered "Yes," proceed to Question 40.*
*If you answered "No," proceed to Question 41.*

40.    Has Florida proven, by a preponderance of the evidence, that Live Nation engaged in an unfair method of competition in violation of the Florida Deceptive and Unfair Trade Practices Act?
Yes _____         No_____
*Proceed to Question 41.*

*If you answered "Yes" to <u>all</u> Questions in Part I, Part II, or Part IV, answer Question 41.  If not, proceed to Question 44.*

41.    Has Florida proven, by a preponderance of the evidence, that its specific State residents were harmed by paying higher ticket fees as a result of Ticketmaster's anticompetitive conduct?
Yes _____         No_____
*If you answered "Yes," proceed to Question 42.*
*If you answered "No," proceed to Question 44.*

42.    Has Florida proven, by a preponderance of the evidence, that the alleged higher ticket fees its specific State residents paid were caused by Ticketmaster's alleged anticompetitive conduct that occurred after May 23, 2020 as opposed to alleged anticompetitive conduct that occurred before May 23, 2020?
Yes _____         No_____
*If you answered "Yes," proceed to Question 43.*
*If you answered "No," proceed to Question 44.*

43.    Please state the amount (if any) that Florida proved, by a preponderance of the evidence, that residents in its specific State were overcharged per ticket for primary concert tickets to events at the venues Plaintiffs call "major concert venues" because of Ticketmaster's alleged anticompetitive conduct that occurred after May 23, 2020.  You may not calculate any overcharge based on any alleged anticompetitive conduct that occurred before May 23, 2020.
$_____
*Proceed to Question 44.*

**<u>Illinois Antitrust Act</u>**

44.    Has Illinois proven, by a preponderance of the evidence, that Ticketmaster engaged in unlawful conduct that harmed competition in its State?
Yes _____         No_____
*If you answered "Yes," proceed to Question 45.*
*If you answered "No," proceed to Question 46.*

45.    Has Illinois proven, by a preponderance of the evidence, that Ticketmaster engaged in unlawful conduct in violation of the Illinois Antitrust Act?
Yes _____         No_____
*Proceed to Question 46.*

10

46.     Has Illinois proven, by a preponderance of the evidence, that Live Nation engaged in unlawful conduct that harmed competition in its State?
Yes _____                No_____
*If you answered "Yes," proceed to Question 47.*
*If you answered "No," proceed to Question 48.*

47.     Has Illinois proven, by a preponderance of the evidence, that Live Nation engaged in unlawful conduct in violation of the Illinois Antitrust Act?
Yes _____                No_____
*Proceed to Question 48.*

*If you answered "Yes" to <u>all</u> Questions in Part I, Part II, or Part IV, answer Question 48.  If not, proceed to Question 51.*

48.     Has Illinois proven, by a preponderance of the evidence, that its specific State residents were harmed by paying higher ticket fees as a result of Ticketmaster's anticompetitive conduct?
Yes _____                No_____
*If you answered "Yes," proceed to Question 49.*
*If you answered "No," proceed to Question 51.*

49.     Has Illinois proven, by a preponderance of the evidence, that the alleged higher ticket fees its specific State residents paid were caused by Ticketmaster's alleged anticompetitive conduct that occurred after May 23, 2020 as opposed to alleged anticompetitive conduct that occurred before May 23, 2020
Yes _____                No_____
*If you answered "Yes," proceed to Question 50.*
*If you answered "No," proceed to Question 51.*

50.     Please state the amount (if any) that Illinois proved, by a preponderance of the evidence, that residents in its specific State were overcharged per ticket for primary concert tickets to events at the venues Plaintiffs call "major concert venues" because of Ticketmaster's alleged anticompetitive conduct that occurred after May 23, 2020.  You may not calculate any overcharge based on any alleged anticompetitive conduct that occurred before May 23, 2020.
$_____
*Proceed to Question 51.*

**Indiana Antitrust Act**

51.     Has Indiana proven, by a preponderance of the evidence, that Ticketmaster engaged in unlawful conduct after July 1, 2023 that harmed competition in its State?
Yes _____                No_____
*If you answered "Yes," proceed to Question 52.*
*If you answered "No," proceed to Question 53.*

11

52.     Has Indiana proven, by a preponderance of the evidence, that Ticketmaster engaged in unlawful conduct after July 1, 2023 in violation of the Indiana Antitrust Act?
Yes _____          No_____
***Proceed to Question 53.***

53.     Has Indiana proven, by a preponderance of the evidence, that Live Nation engaged in unlawful conduct after July 1, 2023 that harmed competition in its State?
Yes _____          No_____
***If you answered "Yes," proceed to Question 54.***
***If you answered "No," proceed to Question 55.***

54.     Has Indiana proven, by a preponderance of the evidence, that Live Nation engaged in unlawful conduct after July 1, 2023 in violation of the Indiana Antitrust Act?
Yes _____          No_____
***Proceed to Question 55.***

## Kansas Restraint Of Trade Act

55.     Has Kansas proven, by a preponderance of the evidence, that Ticketmaster engaged in unlawful conduct that harmed competition in its State?
Yes _____          No_____
***If you answered "Yes," proceed to Question 56.***
***If you answered "No," proceed to Question 57.***

56.     Has Kansas proven, by a preponderance of the evidence, that Ticketmaster engaged in unlawful conduct in violation of the Kansas Restraint Of Trade Act?
Yes _____          No_____
***Proceed to Question 57.***

57.     Has Kansas proven, by a preponderance of the evidence, that Live Nation engaged in unlawful conduct that harmed competition in its State?
Yes _____          No_____
***If you answered "Yes," proceed to Question 58.***
***If you answered "No," proceed to Question 59.***

58.     Has Kansas proven, by a preponderance of the evidence, that Live Nation engaged in unlawful conduct in violation of the Kansas Restraint Of Trade Act?
Yes _____          No_____
***Proceed to Question 59.***

**New York – Donnelly Act**

59.      Has New York proven, by a preponderance of the evidence, that Ticketmaster engaged in unlawful conduct that harmed competition in its State?

Yes _____            No_____

*If you answered "Yes," proceed to Question 60.*
*If you answered "No," proceed to Question 61.*

60.      Has New York proven, by a preponderance of the evidence, that Ticketmaster maintained monopoly power through anticompetitive conduct involving the use of contracts, agreements, arrangements, or combinations, in violation of New York's Donnelly Act?

Yes _____            No_____

*Proceed to Question 61.*

61.      Has New York proven, by a preponderance of the evidence, that Live Nation engaged in unlawful conduct that harmed competition in its State?

Yes _____            No_____

*If you answered "Yes," proceed to Question 62.*
*If you answered "No," proceed to Question 63.*

62.      Has New York proven, by a preponderance of the evidence, that Live Nation maintained monopoly power through anticompetitive conduct involving the use of contracts, agreements, arrangements, or combinations, in violation of New York's Donnelly Act?

Yes _____            No_____

*Proceed to Question 63.*

*If you answered "Yes" to <u>all</u> Questions in Part I, Part II, or Part IV, answer Question 63.  If not, proceed to Question 66.*

63.      Has New York proven, by a preponderance of the evidence, that its specific State residents were harmed by paying higher ticket fees as a result of Ticketmaster's anticompetitive conduct?

Yes _____            No_____

*If you answered "Yes," proceed to Question 64.*
*If you answered "No," proceed to Question 66.*

64.      Has New York proven, by a preponderance of the evidence, that the alleged higher ticket fees its specific State residents paid were caused by Ticketmaster's alleged anticompetitive conduct that occurred after May 23, 2020 as opposed to alleged anticompetitive conduct that occurred before May 23, 2020

Yes _____            No_____

*If you answered "Yes," proceed to Question 65.*
*If you answered "No," proceed to Question 66.*

65.      Please state the amount (if any) that New York proved, by a preponderance of the evidence, that residents in its specific State were overcharged per ticket for primary concert

13

tickets to events at the venues Plaintiffs call "major concert venues" because of Ticketmaster's alleged anticompetitive conduct that occurred after May 23, 2020.  You may not calculate any overcharge based on any alleged anticompetitive conduct that occurred before May 23, 2020.
$_____

***Proceed to Question 66.***

## South Carolina Unfair Trade Practices Act

66.     Has South Carolina proven, by a preponderance of the evidence, that Ticketmaster engaged in unlawful conduct that harmed competition in its State?
Yes _____                No_____
***If you answered "Yes," proceed to Question 67.***
***If you answered "No," proceed to Question 68.***

67.     Has South Carolina proven, by a preponderance of the evidence, that Ticketmaster engaged in an unfair method of competition in violation of the South Carolina Unfair Trade Practices Act?
Yes _____                No_____
***Proceed to Question 68.***

68.     Has South Carolina proven, by a preponderance of the evidence, that Live Nation engaged in unlawful conduct that harmed competition in its State?
Yes _____                No_____
***If you answered "Yes," proceed to Question 69.***
***If you answered "No," proceed to Question 70.***

69.     Has South Carolina proven, by a preponderance of the evidence, that Live Nation engaged in an unfair method of competition in violation of the South Carolina Trade Practices Act?
Yes _____                No_____
***Proceed to Question 70.***

***If you answered "Yes" to <u>all</u> Questions in Part I, Part II, or Part IV, answer Question 70.  If not, proceed to Question 73.***

70.     Has South Carolina proven, by a preponderance of the evidence, that its specific State residents were harmed by paying higher ticket fees as a result of Ticketmaster's anticompetitive conduct?
Yes _____                No_____
***If you answered "Yes," proceed to Question 71.***
***If you answered "No," proceed to Question 73.***

71.     Has South Carolina proven, by a preponderance of the evidence, that the alleged higher ticket fees its specific State residents paid were caused by Ticketmaster's alleged anticompetitive conduct that occurred after May 23, 2020 as opposed to alleged anticompetitive conduct that occurred before May 23, 2020

14

Yes _____          No_____
*If you answered "Yes," proceed to Question 72.*
*If you answered "No," proceed to Question 73.*

72.    Please state the amount (if any) that South Carolina proved, by a preponderance of the evidence, that residents in its specific State were overcharged per ticket for primary concert tickets to events at the venues Plaintiffs call "major concert venues" because of Ticketmaster's alleged anticompetitive conduct that occurred after May 23, 2020.  You may not calculate any overcharge based on any alleged anticompetitive conduct that occurred before May 23, 2020.
$_____
*Proceed to Question 73.*

**Tennessee Trade Practices Act**

73.    Has Tennessee proven, by a preponderance of the evidence, that Ticketmaster engaged in unlawful conduct after April 23, 2024 that harmed competition in its State?
Yes _____          No_____
*If you answered "Yes," proceed to Question 74.*
*If you answered "No," proceed to Question 75.*

74.    Has Tennessee proven, by a preponderance of the evidence, that Ticketmaster engaged in unlawful conduct after April 23, 2024 in violation of the Tennessee Trade Practices Act?
Yes _____          No_____
*Proceed to Question 75.*

75.    Has Tennessee proven, by a preponderance of the evidence, that Live Nation engaged in unlawful conduct after April 23, 2024 that harmed competition in its State?
Yes _____          No_____
*If you answered "Yes," proceed to Question 76.*
*If you answered "No," your form is complete.*

76.    Has Tennessee proven, by a preponderance of the evidence, that Live Nation engaged in unlawful conduct after April 23, 2024 in violation of the Tennessee Trade Practices Act?
Yes _____          No_____


Your deliberations are now complete. Sign this verdict form and notify the clerk that your deliberations are complete.

DATED:_____

FOREPERSON SIGNATURE:_____

15

**Plaintiffs' Position**: Plaintiffs and Defendants are both proposing a general verdict form pursuant to Fed. R. Civ. P. 49(b). Plaintiffs have proposed a straightforward verdict form, based on the cited authorities, in an effort to present claims in clear terms jurors will understand. Defendants' proposed verdict form is extremely long, repetitive, and complicated, likely leading to confusion by the jury. Defendants' proposed verdict form also purposefully renames allegations made by Plaintiffs, misstates the elements of claims, and mischaracterizes others. In addition, Plaintiffs propose that the jury finds a single per-ticket overcharge amount for all damages states. This is consistent with this Court's guidance at the pre-trial conference, in which Your Honor suggested that the question the jury be asked is "what are the per ticket damages, if any, that you found." 2/27/2026 Hr'g Tr. 167:2-3. Defendants, by contrast, seek to require the jury to find a separate per-ticket overcharge for each of the damages states. This is not only burdensome, but is also likely to confuse the jurors because it does not conform to the evidence presented in this case—Plaintiffs only present a single, nationwide overcharge calculation.

**Defendants' Authority:**  *Tevra Brands LLC v. Bayer Healthcare LLC*, No. 5:19-cv-4312, ECF No. 485 (N.D. Cal. Aug. 1, 2024); *Pacific Surf Designs, Inc. v. WhiteWater West Industries, Ltd.*, No. 3:20-cv-1464, ECF No. 313 (S.D. Cal. Aug. 28, 2023).

**Defendants' Argument**:  Defendants object to Plaintiffs' proposed verdict form, which fails to enumerate each claim's elements that Plaintiffs must satisfy.  It is commonplace in antitrust cases, to enumerate claims' elements.  *See, e.g.*, *Tevra Brands LLC v. Bayer Healthcare LLC*, No. 5:19-cv-4312, ECF No. 485 (N.D. Cal. Aug. 1, 2024); *Pacific Surf Designs, Inc. v. WhiteWater West Industries, Ltd.*, No. 3:20-cv-1464, ECF No. 313 (S.D. Cal. Aug. 28, 2023); *Deutscher Tennis Bund v. ATP Tour Inc.*, No. 1:07-cv-178, ECF No. 195 (D. Del. Aug. 5, 2008).  And courts have long recognized that doing so facilitates "review, uniformity, and possibly postverdict judgments as a matter of law," *Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 39 n.8 (1997), as well as "the process of appellate review," *United States v. Poehlman*, 217 F.3d 692, 698 n.7 (9th Cir. 2000); *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 285 (2d Cir. 1998) ("We are somewhat hampered in our review of the district court's decision because of the generality of the instructions given to the jury and the lack of specificity in the verdict it returned.").  Plaintiffs' form elides the numerous complex inquiries jurors must make in this case on each claim, and that obfuscation is compounded by their proposed jury instructions, which do not even set out market definition and anticompetitive effects as elements of monopolization. Together with their jury instructions, Plaintiffs' verdict form creates a situation where jurors might miss the market definition and anticompetitive effects inquiries entirely, thus severely prejudicing Defendants.

Defendants also object to Plaintiffs' proposed verdict form because it does not require the jury to separately determine Live Nation's and Ticketmaster's liability.  As Defendants explained in their jury instruction argument on this issue, a parent corporation and its subsidiary are legally distinct entities and cannot be held liable for the acts of each other absent narrow circumstances neither present nor alleged here.  *See* Defendants' Proposed Jury Instructions, Defendants' Argument on Post-Instruction No. 2 (The Parties); *United States v. Bestfoods*, 524 U.S. 51, 61 (1998); *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir. 1993).

16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA, et al.,

Plaintiffs,

v.

LIVE NATION ENTERTAINMENT, INC.,
and TICKETMASTER L.L.C.,

Defendants.

Case No. 1:24-cv-03973-AS

**PLAINTIFFS' PROPOSED VERDICT FORM**

## VERDICT FORM

*When answering the following questions and filling out this Verdict Form, please follow the directions provided throughout.*

### PART I.  Monopolization Claims in Plaintiffs' Proposed Relevant Markets (Sherman Act Section 2)[1]

Have Plaintiffs proven, by a preponderance of the evidence, that Defendants have maintained monopoly power through anticompetitive conduct in the following proposed relevant markets? (Answer for each of the 3 proposed relevant markets.)

|  | YES | NO |
|---|---|---|
| 1. Primary Concert Ticketing: (*Primary Concert Ticketing Services to major concert venues*) |  |  |
| 2. Primary Ticketing: (*Primary Ticketing Services to major concert venues*) |  |  |
| 3. Amphitheaters: (*Use of Large Amphitheaters by Artists*) |  |  |

*Please proceed to **PART II (Exclusive Dealing Claim),** regardless of how you answered the questions in Part I.*

---

[1] *US Airways, Inc. v. Sabre Holdings Corp.*, Verdict Form, 1:11-cv-02725-LGS; ECF No. 1208 (S.D.N.Y. May 19, 2022).

2

## PART II. Exclusive Dealing Claim

1. Have Plaintiffs proven, by a preponderance of the evidence, that Defendants' long-term exclusive primary ticketing contracts with major concert venues substantially foreclosed competition in a relevant market for primary concert ticketing services to major concert venues?

Yes _____            No_____

***If you answered "Yes," to Question 1 under Section II proceed to Question 2. If you answered "No," proceed instead to Section III (Tying).***

2. Have Plaintiffs proven, by a preponderance of the evidence, that Defendants' exclusive primary ticketing contracts with venues are an unreasonable restraint of trade that has adverse effects on competition?

Yes _____            No_____

*Please proceed to **PART III. (Tying Claim),** regardless of how you answered the questions in Part II.*

## PART III. Tying Claim (Sherman Act Section 1)[2]

Have Plaintiffs proven, by a preponderance of the evidence, that Defendants unlawfully tied their artist promotion services to the use of large amphitheaters by artists?

Yes _____            No_____

*Please proceed to **PART IV. (State Law Claims),** regardless of how you answered the questions in Part III.*

---

[2] *Epic Games, Inc. v. Google LLC et al.*, Verdict Form, 3:20cv5671, ECF No. 606 (N.D. Cal. Dec. 11, 2023).

3

**PART IV. State Law Claims**

1.  Have Plaintiffs proven, by a preponderance of the evidence, that Defendants engaged in unlawful conduct that harmed competition nationwide, including in these Plaintiff States?

| STATE | YES | NO |
|---|---|---|
| Arizona | | |
| Colorado | | |
| Connecticut | | |
| District of Columbia | | |
| Florida | | |
| Illinois | | |
| Indiana | | |
| Kansas | | |
| Louisiana | | |
| Maryland | | |
| Michigan | | |
| Minnesota | | |
| Nevada | | |
| New Hampshire | | |
| New Jersey | | |
| New Mexico | | |
| New York | | |

4

| STATE | YES | NO |
|---|---|---|
| North Carolina | | |
| Ohio | | |
| Rhode Island | | |
| South Carolina | | |
| Texas | | |
| Utah | | |
| Vermont | | |
| Virginia | | |
| Washington | | |
| West Virginia | | |
| Wisconsin | | |

*California Unfair Competition Law – Unlawful Prong*

2. Have Plaintiffs proven, by a preponderance of the evidence, that Defendants engaged in an illegal business act or practice that occurred within California and harmed individuals in California or that emanated from California and harmed individuals in California in violation of the California Unfair Competition Law?

   Yes _____          No_____

3. Have Plaintiffs proven, by a preponderance of the evidence, that Defendants engaged in an illegal business act or practice that emanated from California and harmed individuals outside of California in violation of the California Unfair Competition Law?

   Yes _____          No_____

5

*California Unfair Competition Law – Unfair Prong*

4. Have Plaintiffs proven, by a preponderance of the evidence, that Defendants have engaged in a business act or practice within California that harmed individuals in California or that emanated from California and harmed individuals in California and that same act or practice is unfair in violation of the California Unfair Competition Law?

   Yes _____          No_____

5. Have Plaintiffs proven, by a preponderance of the evidence, that Defendants have engaged in a business act or practice that emanates from California and harmed individuals outside of California and that same act or practice is unfair in violation of the California Unfair Competition Law?

   Yes _____          No_____

*Florida Trade Practices Act*

   ***If you answered "Yes" for Florida for Question 1 in this Section (State Law Claims) answer Question 6. Otherwise, proceed to Question 7.***

6. Have Plaintiffs proven, by a preponderance of the evidence, that Defendants have engaged in an unfair method of competition in violation of the Florida Deceptive and Unfair Trade Practices Act?

   Yes _____          No_____

*Illinois Antitrust Act*

   ***If you answered "Yes" to Question 1 OR Question 2 in Section I (Monopolization Claims), AND answered "Yes" for Illinois for Question 1 in this Section (State Law Claims) answer Question 7. Otherwise, proceed to Question 8.***

7. Have Plaintiffs proven, by a preponderance of the evidence, that Defendants have established, maintained, used or attempted to acquire monopoly power over primary concert ticketing for the purpose of excluding competition or controlling, fixing, or maintaining prices for: primary concert ticketing services to major concert venues or primary ticketing services to major concert venues in violation of the Illinois Antirust Act?

Yes _____                No_____

***If you answered "Yes" to Question 3 in Section I (Monopolization Claims), AND answered "Yes" for Illinois for Question 1 in this Section (State Law Claims) answer Question 8. Otherwise, proceed to Question 9.***

8.  Have Plaintiffs proven, by a preponderance of the evidence, that Defendants have: unreasonably restrained trade or commerce through anticompetitive conduct involving the use of a contract, combination or conspiracy involving the use of large amphitheaters by artists; or established, maintained, used or attempted to acquire monopoly power over the use of large amphitheaters by artists for the purpose of excluding competition or controlling, fixing, or maintaining prices for the use of large amphitheaters, in violation of the Illinois Antirust Act?

Yes _____                No_____

*Kansas Restraint of Trade Act*

***If you answered "Yes" to Question 1, Question 2, OR Question 3 in Section I (Monopolization Claims), AND answered "Yes" for Kansas for Question 1 in this Section (State Law Claims) answer Question 9. Otherwise, proceed to Question 10.***

9.  Have Plaintiffs proven, by a preponderance of the evidence, that Defendants have maintained monopoly power through anticompetitive conduct jointly or in concert with another party, in violation of the Kansas Restraint of Trade Act?

Yes _____                No_____

*New York – Donnelly Act*

***If you answered "Yes" to Question 1, Question 2 OR Question 3 in Section I (Monopolization Claims), AND answered "Yes" for New York for Question 1 in this Section (State Law Claims) answer Question 10. Otherwise, proceed to Question 11.***

10. Have Plaintiffs proven, by a preponderance of the evidence, that Defendants have maintained monopoly power through anticompetitive conduct

involving the use of contracts, agreements, arrangements, or combinations, in violation of New York's Donnelly Act?

Yes _____             No_____

*South Carolina Unfair Trade Practices Act*

> ***If you answered "Yes" for South Carolina for Question 1 in this Section (State Law Claims) answer Question 11. Otherwise, proceed to Question 12.***

11. Have Plaintiffs proven, by a preponderance of the evidence, that Defendants have engaged in an unfair method of competition in violation of the South Carolina Unfair Trade Practices Act?

Yes _____             No_____

*Tennessee Trade Practices Act*

12. Have Plaintiffs proven, by a preponderance of the evidence, that Defendants engaged in unlawful conduct after April 23, 2024 that harmed competition in Tennessee?

Yes _____             No_____

> ***If you answered "Yes" for Question 12 in this Section (State Law Claims) answer Question 13. Otherwise, proceed to Question 14.***

13. Have Plaintiffs proven, by a preponderance of the evidence, that Defendants have engaged in unlawful conduct after April 23, 2024 in violation of the Tennessee Trade Practices Act?

Yes _____             No_____

*Vermont Consumer Protection Act*

> ***If you answered "Yes" for Vermont for Question 1 in this Section (State Law Claims) answer Question 14. Otherwise, proceed to Question 15.***

14. Have Plaintiffs proven, by a preponderance of the evidence, that Defendants have engaged in an unfair or deceptive method of competition in violation of the Vermont Consumer Protection Act?

8

Yes _____                    No_____

*Damages for Ticketing*

**If you answered "Yes" to Question 1 OR Question 2 in Section I (Monopolization Claims), OR Question 2 in Section II (Exclusive Dealing Claim), proceed to Question 15.**
**Otherwise, proceed to "California Unfair Competition Law – Monetary Recovery."**

15. Have the Plaintiff States claiming monetary damages proven, by a preponderance of the evidence, that their residents overpaid for primary concert tickets as a result of Defendants' anticompetitive conduct?

Yes _____                    No_____

Please state the average per-ticket overcharge that resident purchasers of primary concert tickets paid as a result of Defendants' anticompetitive conduct.

$_____

*California Unfair Competition Law – Monetary Recovery*

16. If you answered "Yes" to Questions 2 or 4 in this Section ("State Law Claims"), please state whether the average per-ticket overcharge, if any, you found in response to Question 16 of this Section applies to purchases made by individuals in California of primary concert tickets for live concert events at major concert venues in California.

Yes _____                    No_____

17. If you answered "Yes" to Questions 3 or 5 in this Section ("State Law Claims"), please state whether the average per-ticket overcharge, if any, you found in response to Question 16 of this Section applies to purchases made

9

by individuals outside of California of primary concert tickets for live concert events at major concert venues that took place outside of California.

Yes _____          No_____

Your deliberations are now complete. Sign this verdict form and notify the clerk that your deliberations are complete.

DATED:_____

FOREPERSON SIGNATURE:_____

**Plaintiffs' Position**: Plaintiffs and Defendants are both proposing a general verdict form pursuant to Fed. R. Civ. P. 49(b). Plaintiffs have proposed a straightforward verdict form, based on the cited authorities, in an effort to present claims in clear terms jurors will understand. Defendants' proposed verdict form is extremely long, repetitive, and complicated, likely leading to confusion by the jury. Defendants' proposed verdict form also purposefully renames allegations made by Plaintiffs, misstates the elements of claims, and mischaracterizes others. In addition, Plaintiffs propose that the jury finds a single per-ticket overcharge amount for all damages states. This is consistent with this Court's guidance at the pre-trial conference, in which Your Honor suggested that the question the jury be asked is "what are the per ticket damages, if any, that you found." 2/27/2026 Hr'g Tr. 167:2-3. Defendants, by contrast, seek to require the jury to find a separate per-ticket overcharge for each of the damages states. This is not only burdensome, but is also likely to confuse the jurors because it does not conform to the evidence presented in this case—Plaintiffs only present a single, nationwide overcharge calculation.

**Defendants' Authority:** *Tevra Brands LLC v. Bayer Healthcare LLC*, No. 5:19-cv-4312, ECF No. 485 (N.D. Cal. Aug. 1, 2024); *Pacific Surf Designs, Inc. v. WhiteWater West Industries, Ltd.*, No. 3:20-cv-1464, ECF No. 313 (S.D. Cal. Aug. 28, 2023).

**Defendants' Argument**:  Defendants object to Plaintiffs' proposed verdict form, which fails to enumerate each claim's elements that Plaintiffs must satisfy.  It is commonplace in antitrust cases, to enumerate claims' elements.  *See, e.g.*, *Tevra Brands LLC v. Bayer Healthcare LLC*, No. 5:19-cv-4312, ECF No. 485 (N.D. Cal. Aug. 1, 2024); *Pacific Surf Designs, Inc. v. WhiteWater West Industries, Ltd.*, No. 3:20-cv-1464, ECF No. 313 (S.D. Cal. Aug. 28, 2023); *Deutscher Tennis Bund v. ATP Tour Inc.*, No. 1:07-cv-178, ECF No. 195 (D. Del. Aug. 5, 2008).  And courts have long recognized that doing so facilitates "review, uniformity, and possibly postverdict judgments as a matter of law," *Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 39 n.8 (1997), as well as "the process of appellate review," *United States v. Poehlman*, 217 F.3d 692, 698 n.7 (9th Cir. 2000); *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 285 (2d Cir. 1998) ("We are somewhat hampered in our review of the district court's decision because of the generality of the instructions given to the jury and the lack of specificity in the verdict it returned.").  Plaintiffs' form elides the numerous complex inquiries jurors must make in

10

this case on each claim, and that obfuscation is compounded by their proposed jury instructions, which do not even set out market definition and anticompetitive effects as elements of monopolization.  Together with their jury instructions, Plaintiffs' verdict form creates a situation where jurors might miss the market definition and anticompetitive effects inquiries entirely, thus severely prejudicing Defendants.

Defendants also object to Plaintiffs' proposed verdict form because it does not require the jury to separately determine Live Nation's and Ticketmaster's liability.  As Defendants explained in their jury instruction argument on this issue, a parent corporation and its subsidiary are legally distinct entities and cannot be held liable for the acts of each other absent narrow circumstances neither present nor alleged here.  *See* Defendants' Proposed Jury Instructions, Defendants' Argument on Post-Instruction No. 2 (The Parties); *United States v. Bestfoods*, 524 U.S. 51, 61 (1998); *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir. 1993).

11