# EXHIBIT 18

| | |
|---|---|
| **From:** | Gushman, Robin (Bay Area) |
| **Sent:** | Sunday, April 5, 2026 9:05 PM |
| **To:** | Subramanian NYSD Chambers; LiveNationTeam@winston.com; livenationtrialstates@ag.ny.gov; #C-M US V LIVE NATION LITIGATION - FULL - LW TEAM; ln_lit_csm@cravath.com |
| **Subject:** | RE: United States v. Live Nation 24cv3973 Proposed Jury Instructions and Verdict Form |
| **Attachments:** | 2026.04.05 Combined Edits to Court Proposed Jury Instructions.docx; 2026.04.05 Combined Edits to Court Proposed Verdict Form.docx; 2026.04.05 Pls Edits to Court Proposed Jury Instructions.docx; 2026.04.05 Defs Edits to Court Proposed Jury Instructions.docx; 2026.04.05 Pls Edits to Court Proposed Verdict Form.docx; 2026.04.05 Defs Edits to Court Proposed Verdict Form.docx |

Dear Judge Subramanian:

Pursuant to the Court's instructions, attached please find (1) a document showing the parties' edits to the proposed jury instructions in different color redlines and (2) a document showing the parties' edits to the proposed verdict form in different color redlines.  Because the redlines are overlapping in certain places, we also attach for clarity (3) a document showing Plaintiffs' edits to the proposed jury instructions, (4) a document showing Defendants' edits to the proposed jury instructions, (5) a document showing Plaintiffs' edits to the proposed verdict form, and (6) a document showing Defendants' edits to the proposed verdict form.

Please note that the redlines may show up in different colors on different computers.  Plaintiffs' edits appear (by hovering over the edits) as "Jonathan Hatch," while Defendants' edits appear as "Defendants."

Finally, as noted in footnote 1 of the combined documents, where the redline shows that one side proposes to delete language, the other side does not agree to delete that language unless explicitly stated.  Likewise, where the redline shows that one side proposes to add language, the other side does not agree to add that language unless explicitly stated.

Respectfully submitted,

**Robin L. Gushman**

**LATHAM & WATKINS** LLP
505 Montgomery Street | Suite 2000 | San Francisco, CA 94111-6538
D: +1.415.646.7830

---

**From:** Subramanian NYSD Chambers <SubramanianNYSDChambers@nysd.uscourts.gov>
**Sent:** Friday, April 3, 2026 6:54 PM
**To:** LiveNationTeam@winston.com; livenationtrialstates@ag.ny.gov; #C-M US V LIVE NATION LITIGATION - FULL - LW TEAM <usvlivenationlitigationfull.lwteam@lw.com>; ln_lit_csm@cravath.com
**Cc:** Subramanian NYSD Chambers <SubramanianNYSDChambers@nysd.uscourts.gov>
**Subject:** United States v. Live Nation 24cv3973 Proposed Jury Instructions and Verdict Form

Dear Counsel:

Please see attached the Court's proposed jury instructions and verdict form. The Court has considered the parties' proposals and their objections in preparing these proposals.

The parties should make their edits to these documents, and then reconcile them with each other, **so that the Court receives back one document for the jury instructions and one for the verdict form**

**reflecting both sides' edits**. The parties' edits should be reflected in different color redlines, and footnotes can be added to reflect the party's legal justification or authorities for their edits.

The parties should focus on those edits that they believe are significant, and they should try to work together to resolve any edits that are insignificant.

Of course, the parties will have the opportunity to raise any and all objections to the instructions at the charge conference.

**Chambers of The Honorable Arun Subramanian**
United States District Court
Southern District of New York
500 Pearl Street, Courtroom 15A
New York, NY 10007

`UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, et al.,<br><br>Plaintiffs,<br><br>LIVE NATION ENTERTAINMENT, INC.,<br>and TICKETMASTER L.L.C.,<br><br>Defendants. | Case No. 1:24-cv-03973-AS |

PROPOSED JURY INSTRUCTIONS[1] [2]

Pursuant to Rule 51(a) of the Federal Rules of Civil Procedure and the Court's Individual Practices in Civil Cases, Paragraph D, Plaintiffs the States of Arizona, California, Colorado, Connecticut, Florida, Illinois, Indiana, Kansas, Louisiana, Maryland, Michigan, Minnesota, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, Oregon, Rhode Island, South Carolina, Tennessee, Texas, Utah, Vermont, Washington, West Virginia, Wisconsin, and Wyoming, the Commonwealths of Massachusetts, Pennsylvania, and Virginia, and the District of Columbia, acting by and through their respective Attorneys General (collectively, "Plaintiff States"), together with Defendants Live Nation Entertainment, Inc., and Ticketmaster L.L.C. (collectively,

---

[1] In this document, where the redline shows that one side proposes to delete language, the other side does not agree to delete that language unless explicitly stated.  Likewise, where the redline shows that one side proposes to add language, the other side does not agree to add that language unless explicitly stated.

[2] **Defendants' Argument:**  In addition to the arguments provided in this document, Defendants incorporate by reference the arguments and authorities provided in their prior submissions of proposed jury instructions, as well as the arguments made in their pending motions for judgment as a matter of law, for sanctions, and to strike the testimony of Dr. Abrantes-Metz.  *See* ECF No. 1031-10; Defendants' Proposed Jury Instructions submitted Mar. 23, 2026; ECF No. 1348; ECF No. 1362; ECF No. 1378; Trial Tr. 3968:11-20 (noting that "objections are preserved").

"Defendants"), respectfully request that the Court provide the following instructions to the jury. For those instructions where the parties could not reach agreement, Plaintiffs and Defendants have separately set forth their proposed instruction together with short arguments, including citations to supporting authority.

## Contents

Post-Instruction No. 1 .................................................................................................87

GENERAL INTRODUCTION ......................................................................................87

Post-Instruction No.2 ..................................................................................................98

USE OF NOTES .............................................................................................................98

Post-Instruction No.3 ................................................................................................109

JUROR USE OF ELECTRONIC COMMUNICATION TECHNOLOGIES ....................109

Post-Instruction No. 4 ................................................................................................1110

THE PARTIES ..............................................................................................................1110

Post-Instruction No.5 ................................................................................................1211

ALL PERSONS EQUAL BEFORE THE LAW—ORGANIZATIONS............................1211

Post-Instruction No. 6 ................................................................................................1312

EVIDENCE IN THE CASE ..........................................................................................1312

Post-Instruction No. 7 ................................................................................................1413

ELECTION OF FOREPERSON OR PRESIDING JUROR; DUTY TO DELIBERATE;
COMMUNICATIONS WITH COURT; CAUTIONARY; UNANIMOUS VERDICT;
VERDICT FORM ..........................................................................................................1413

Post-Instruction No. 8 ................................................................................................1615

WITNESS CREDIBILITY ............................................................................................1615

Post-Instruction No. 9 ................................................................................................1817

USE OF DEPOSITIONS AS EVIDENCE ....................................................................1817

Post-Instruction No. 10 ..............................................................................................1918

EXPERT TESTIMONY ................................................................................................1918

Post-Instruction No. 11 ..............................................................................................2019

BURDEN OF PROOF—PREPONDERANCE OF THE EVIDENCE............................2019

**Post-Instruction No.12**............................................................................................**21**~~20~~

**DIRECT AND CIRCUMSTANTIAL EVIDENCE**.................................................**21**~~20~~

**Post-Instruction No.13**............................................................................................**23**~~22~~

**INFERENCES**...........................................................................................................**23**~~22~~

**Post-Instruction No. 14**...........................................................................................**24**~~23~~

**SUMMARY OF CONTENTIONS**...........................................................................**24**~~23~~

**Post-Instruction No. 15**...........................................................................................**27**~~26~~

**MONOPOLIZATION ELEMENTS**.........................................................................**27**~~26~~

**Post-Instruction No. 16**...........................................................................................**29**~~28~~

**MONOPOLIZATION ELEMENT #1: RELEVANT MARKET—GENERAL**................**29**~~28~~

**Post-Instruction No. 17**...........................................................................................**30**~~29~~

**RELEVANT PRODUCT MARKET—General**..........................................................**30**~~29~~

**Post-Instruction No. 18**...........................................................................................**37**~~31~~

**MONOPOLIZATION ELEMENT #2: MONOPOLY POWER**......................................**37**~~31~~

**Post-Instruction No. 19**...........................................................................................**38**~~32~~

**EXISTENCE OF MONOPOLY POWER—DIRECT PROOF**......................................**38**~~32~~

**Post-Instruction No. 20**...........................................................................................**41**~~35~~

**EXISTENCE OF MONOPOLY POWER—INDIRECT PROOF**...................................**41**~~35~~

**Post-Instruction No. 21**...........................................................................................**45**~~39~~

**MONOPOLIZATION ELEMENT #3: WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY POWER THROUGH ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT** ...........................................................................................................**45**~~39~~

**Post-Instruction No. 22**...........................................................................................**50**~~41~~

**ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT—EXCLUSIVE DEALING SHERMAN ACT SECTION 2**.................................................................................**50**~~41~~

**Post-Instruction No. 23**...........................................................................................**52**~~42~~

**THREATS AND RETALIATION** ...........................................................................**52**~~42~~

**Post-Instruction No. 24**................................................................................**56**~~44~~

**EXCLUSIVE DEALING AGAINST TICKETMASTER—SHERMAN ACT SECTION 1 56**~~44~~

**Post Instruction 25**.....................................................................................**58**~~46~~

**LIVE NATION'S LIABILITY FOR TICKETMASTER'S ALLEGED CONDUCT**.......**58**~~46~~

**Post-Instruction No. 26**................................................................................**59**~~47~~

**UNLAWFUL TYING AGAINST LIVE NATION** .................................................**59**~~47~~

**Post-Instruction No. 27**................................................................................**63**~~49~~

**UNLAWFUL TYING—IDENTITY OF THE PURCHASER** ..............................**63**~~49~~

**Post-Instruction No. 28**................................................................................**64**~~50~~

**UNLAWFUL TYING—PRESENCE OF TWO PRODUCTS** ............................**64**~~50~~

**Post-Instruction No. 29**................................................................................**65**~~51~~

**UNLAWFUL TYING—PROOF OF CONDITIONING** .....................................**65**~~51~~

**Post-Instruction No. 30**................................................................................**66**~~52~~

**UNLAWFUL TYING—PROOF OF COERCION**..............................................**66**~~52~~

**Post-Instruction No. 31**................................................................................**67**~~53~~

**UNLAWFUL TYING—MARKET POWER IN THE TYING MARKET**.......................**67**~~53~~

**Post-Instruction No. 32**................................................................................**68**~~54~~

**UNLAWFUL TYING—ANTICOMPETITIVE EFFECTS FOR THE TIED PRODUCT 68**~~54~~

**Post-Instruction No. 33**................................................................................**69**~~55~~

**UNLAWFUL TYING—NOT INSUBSTANTIAL AMOUNT OF INTERSTATE COMMERCE**................................................................................**69**~~55~~

**Post-Instruction No. 34**................................................................................**70**~~56~~

**STATE LAW CLAIMS**....................................................................................**70**~~56~~

**Post-Instruction No. 35**................................................................................**71**~~57~~

**CONGRUENT STATE CLAIMS** ..................................................................**71**~~57~~

**Post-Instruction No. 36**................................................................................**73**~~59~~

**CALIFORNIA UNFAIR COMPETITION LAW  (Cal. Bus. & Prof. Code § 17200 *et seq.*)**..........................................................................................................................**73**59

**Post-Instruction No. 37**..........................................................................................................**75**61

**FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT (Fla. Stat. § 501.204)**7561

**Post-Instruction No. 38**..........................................................................................................**76**62

**ILLINOIS ANTITRUST ACT (740 ILCS 10/1 et seq.)**...........................................................**76**62

**Post-Instruction No. 39**..........................................................................................................**78**64

**INDIANA ANTITRUST ACT (IND. CODE §§ 24-1-2-1 AND 24-1-2-2)**.............................**78**64

**Post-Instruction No. 40**..........................................................................................................**79**65

**KANSAS RESTRAINT OF TRADE ACT (Kan. Stat. Ann. § 50-101 et seq.)**....................**79**65

**Post-Instruction No. 41**..........................................................................................................**81**67

**DONNELLY ACT (New York General Business Law §§ 340 et seq.)**................................**81**67

**Post-Instruction No. 42**..........................................................................................................**83**69

**SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT  (S.C. Code Ann. § 39-5-10 et seq.)**..........................................................................................................................................**83**69

**Post-Instruction No. 43**..........................................................................................................**85**71

**TENNESSEE TRADE PRACTICES ACT  (TENN. CODE ANN. §§ 47-25-101 AND 102)**8571

**Post-Instruction No. 44**..........................................................................................................**87**72

**STATES DAMAGES CLAIMS**..................................................................................................**87**72

**Post-Instruction No. 45**..........................................................................................................**89**74

**INJURY AND CAUSATION**......................................................................................................**89**74

**Post-Instruction No. 46**..........................................................................................................**92**76

**STATUTE OF LIMITATIONS**....................................................................................................**92**76

**Post-Instruction No. 47**..........................................................................................................**94**77

**DAMAGES INSTRUCTIONS—GENERAL**...............................................................................**94**77

**Post-Instruction No. 48**..........................................................................................................**96**79

**COMPENSATORY DAMAGES—OVERCHARGE**......................................................................**96**79

**Post-Instruction No. 49**................................................................................................**97**~~80~~

**BASIS FOR CALCULATING OVERCHARGE** ...............................................................**97**~~80~~

**Post-Instruction No. 50**................................................................................................**98**~~81~~

**FINAL INSTRUCTIONS**................................................................................................**100**~~81~~

**Post-Instruction No. 1**

## GENERAL INTRODUCTION

Now that you have heard the evidence and the argument, it is my duty to instruct you about the applicable law. It is your duty to follow the law as I state it. You must apply the law to the facts as you find them from the evidence in the case. Do not single out one instruction as stating the law, but consider the instructions as a whole. Do not be concerned about the wisdom of any rule of law stated by me. You must follow and apply the law.

Nothing I say in these instructions indicates I have any opinion about the facts of the case. You, not I, have the duty to determine the facts.

You must perform your duties as jurors without bias or prejudice as to any party. The law does not permit you to be controlled by sympathy, prejudice, or public opinion. The parties expect that you will carefully and impartially consider all the evidence, follow the law as it is now being given to you, and reach a just unanimous verdict, regardless of the consequences.

**Post-Instruction No. 2**

## USE OF NOTES

You may use the notes taken by you during the trial.  The notes, however, should not be substituted for your memory.  Remember, notes are not evidence.  If your memory should differ from your notes, then you should rely on your memory and not on your notes. Please remember that you can always ask for any portion of the transcript, or exhibit, to be provided to you during deliberations.

**Post-Instruction No. 3**

### JUROR USE OF ELECTRONIC COMMUNICATION TECHNOLOGIES

Throughout your deliberations, you may discuss with each other the evidence and the law that has been presented in this case, but you must not communicate with anyone else by any means about the case. You also cannot learn from outside sources about the case, the matters in the case, the legal issues in the case, or individuals or other entities involved in the case. This means you may not use any electronic device or media (such as a phone, computer, or tablet), the internet, any text or instant messaging service, or any social media apps (such as X (formerly known as Twitter), Facebook, Instagram, LinkedIn, YouTube, WhatsApp, and Snapchat) to research or communicate about what you've seen and heard in this courtroom.

These restrictions continue during deliberations because it is essential, under our Constitution, that you decide this case based solely on the evidence and law presented in this courtroom. Information you find on the internet or through social media may be incomplete, misleading, or inaccurate. As I noted in my instructions at the start of the trial, even using your smartphones, tablets, and computers—and the news and social media apps on those devices—may inadvertently expose you to certain notices, such as pop-ups or advertisements, that could influence your consideration of the matters you've heard about in this courtroom.

You are permitted to discuss the case with only your fellow jurors during deliberations because they have seen and heard the same evidence and instructions on the law that you have, and it is important that you decide this case solely on the evidence presented during the trial, without undue influence by anything or anyone outside of the courtroom. For this reason, I expect you to inform me at the earliest opportunity, should you learn about or share any information about this case outside of this courtroom or the jury room, or learn that another juror has done so.

**Post-Instruction No. 4**

## THE PARTIES

As I instructed you earlier, the Plaintiffs are the [33] individual States and the District of Columbia. The Defendants in this case are Live Nation Entertainment, Inc. and Ticketmaster L.L.C.

Unless otherwise stated, these instructions apply to all parties.

**Post-Instruction No. 5**

## ALL PERSONS EQUAL BEFORE THE LAW—ORGANIZATIONS

A corporation is entitled to the same fair trial as a private individual or governmental entity like a state.  All persons, governmental entities, and corporations, stand equal before the law, and are to be treated as equals.

**Post-Instruction No. 6**

## EVIDENCE IN THE CASE

Unless you are otherwise instructed, the evidence in the case consists of the sworn testimony of the witnesses regardless of who may have called the witness, all exhibits received in evidence regardless of who may have produced them, and all facts and events that may have been admitted, stipulated to, or taken judicial notice of.

Statements and arguments by the lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statement, closing arguments, and at other times is intended to help you understand the evidence, but it is not evidence. However, as I explained at the beginning of this trial, the lawyers on both sides have agreed on certain facts known as stipulations, and you must treat those facts as proven.

Any question to which I have sustained an objection and evidence that I have ordered stricken must be entirely disregarded.

**Post-Instruction No. 7**

### ELECTION OF FOREPERSON OR PRESIDING JUROR; DUTY TO DELIBERATE; COMMUNICATIONS WITH COURT; CAUTIONARY; UNANIMOUS VERDICT; VERDICT FORM

You must follow these rules while deliberating and returning your verdict:

First, when you go to the jury room, you must select a foreperson.  The foreperson will preside over your discussions and speak for you here in court.

Second, it is your duty, as jurors, to discuss this case with one another in the jury and try to reach agreement.

Each of you must make your own conscientious decision, but only after you have considered all the evidence, discussed it fully with the other jurors, and listened to the views of the other jurors.

Do not be afraid to change your opinions if the discussion persuades you that you should.  But do not make a decision simply because other jurors think it is right, or simply to reach a verdict.  Remember at all times that you are judges of the facts.  Your sole interest is to seek the truth from the evidence in the case.

Third, if you need to communicate with me during your deliberations, send me a note signed by one or more of you.  Give the note to the Marshal and I will answer you as soon as I can, either in writing or here in court.  While you are deliberating, do not tell anyone—including me—how many jurors are voting for any side.

Fourth, your verdict must be based solely on the evidence and on the law I have given to you in these instructions.  The verdict must be unanimous.  Nothing I have said or done is intended to suggest what your verdict should be—that is entirely for you to decide.

Finally, the verdict form is simply the written notice of the decision that you reach in this case.  You will take this form to the jury room, and when each of you has agreed on the verdict, your

foreperson will fill in the form, sign and date it, and advise the Marshal that you are ready to return to

the courtroom.

**Post-Instruction No. 8**

### WITNESS CREDIBILITY

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

1.      the opportunity and ability of the witness to see or hear or know the things testified to;

2.      the witness's memory;

3.      the witness's manner while testifying;

4.      the witness's interest in the outcome of the case, if any;

5.      the witness's bias or prejudice, if any;

6.      whether other evidence contradicted the witness's testimony;

7.      the reasonableness of the witness's testimony in light of all the evidence; and

8.      any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently. You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said. On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify. What is important is how believable the witnesses were, and how much weight you think their testimony deserves.

**Post-Instruction No. 9**

## USE OF DEPOSITIONS AS EVIDENCE

During the trial, certain testimony has been presented by way of deposition. The deposition consisted of sworn, recorded answers to questions asked of the witness in advance of the trial by the attorneys. The testimony of a witness who, for some reason, is not present to testify from the witness stand may be presented under oath on a videotape. Such testimony is entitled to the same consideration and is to be judged as to credibility, weighed, and otherwise considered by you in the same way as if the witness had been present and testified from the witness stand.

**Post-Instruction No. 10**

### EXPERT TESTIMONY

You have heard testimony from a number of witnesses who were designated by the respective parties as "experts." These designated witnesses are allowed to express opinions on matters about which they may have special knowledge and training. This testimony is presented to you on the theory that someone who is experienced in a particular field may be able to assist you in understanding the evidence and in reaching your independent decision on the facts.

In weighing this type of testimony, you may consider the witness's qualifications, opinions, reasons for testifying, as well as all the other considerations that ordinarily apply when you are deciding whether to believe a witness's testimony.

The expert witness's testimony was based on particular facts, as the witness obtained knowledge of them and testified to them before you, or as the attorneys who questioned the designated witness asked them to assume. You may reject such a witness's opinion if you find the facts in the case to be different from those that formed the basis for the opinion.

You may give "expert" testimony whatever weight, if any, you find it deserves in light of all of the evidence in the case and the witness's interest in the proceeding, including any compensation for work the expert may have received. You should not, however, accept the testimony merely because it is given by a designated "expert," nor should you substitute it for your own reason, judgment, and common sense. The determination of the facts in this case rests solely with you.

**Post-Instruction No. 11**

### BURDEN OF PROOF—PREPONDERANCE OF THE EVIDENCE

As I instructed you earlier, in this case, Plaintiffs must prove every essential element of each of their claims against each Defendant by a preponderance of the evidence. If Plaintiffs should fail to establish any essential element of one of their claims by a preponderance of the evidence against any Defendant, you should find for each such Defendant as to that claim.

"To prove by a preponderance of the evidence" means to prove something is more likely than not. In determining whether any fact in issue has been proved by a preponderance of the evidence, unless otherwise instructed, you may consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

**Post-Instruction No. 12**

### DIRECT AND CIRCUMSTANTIAL EVIDENCE

Generally speaking, there are two types of evidence presented during a trial—direct evidence and circumstantial evidence.  Direct evidence is testimony by a witness about something he knows by virtue of his own senses—something he has seen, felt, touched, or heard.  For example, if a witness testified that when he left his house this morning, it was raining, that would be direct evidence about the weather.

The second type of evidence is circumstantial evidence. Circumstantial evidence is evidence that tends to prove a disputed fact indirectly by proof of other facts. There is a simple example of circumstantial evidence that is often used in this courthouse, and in fact which I related when this trial started.

Assume that when you came into the courthouse this morning that the sun was shining and it was a nice day outdoors.  Assume that the courtroom shades were drawn and you could not look outside.  Assume further that as you were sitting here, someone walked in with an umbrella that was dripping wet and then, a few moments later, somebody else walked in with a raincoat that was also dripping wet. Now, because you could not look outside the courtroom and you could not see whether it was raining, you would have no direct evidence of that fact.  But, on the combination of facts that I have asked you to assume, it would be reasonable and logical for you to conclude that it was raining.

That is all there is to circumstantial evidence.  You infer on the basis of your reason, experience, and common sense from one established fact the existence or the nonexistence of some other fact.

The law generally makes no distinction between the weight or value to be given to either direct or circumstantial evidence. A greater degree of certainty is not required of circumstantial evidence.

You are required to find the facts in accordance with the preponderance of all the evidence in the case, both direct and circumstantial.

**Post-Instruction No. 13**

## INFERENCES

You are to consider only the evidence in the case. However, you are not limited to the statements of the witnesses. You may draw from the facts you find have been proved such reasonable inferences as seem justified in light of your experience.

"Inferences" are deductions or conclusions that reason and common sense lead you to draw from facts established by the evidence in the case.

There are times when different inferences may be drawn from the evidence. The plaintiff states ask you to draw one set of inferences. Defendants Live Nation and Ticketmaster ask you to draw another. It is for you, and for you alone, to decide what inferences you will draw.

**Post-Instruction No. 14**

### SUMMARY OF CONTENTIONS

As I did at the start of the case, I will give you a summary of each side's positions in this case. I will then provide you with detailed instructions on what Plaintiffs must prove to win on each of their claims.

*Section 2: Monopolization*

The first issue you will be asked to decide is whether Plaintiffs have proved by a preponderance of the evidence that any Defendant violated Section 2 of the Sherman Act by unlawfully monopolizing any of the three alleged markets. As a reminder, Plaintiffs allege that Ticketmaster monopolized the two alleged ticketing markets:

1.     Primary concert ticketing services to what Plaintiffs call "major concert venues" (primary concert ticketing).

2.     Primary ticketing services to what Plaintiffs call "major concert venues" (primary ticketing).

Plaintiffs allege that Live Nation is liable for Ticketmaster's monopolization in the two alleged ticketing markets because it controlled, dictated or encouraged that conduct.

Plaintiffs also allege that Live Nation (but not Ticketmaster) monopolized the alleged amphitheater market:

3.     Use of what Plaintiffs call "large amphitheaters" by artists.

There are certain requirements that Plaintiffs must prove to show that either Defendant illegally monopolized a market, which I will explain in more detail in a few minutes. In general, however, to prove monopolization for each separate market, Plaintiffs must show by a preponderance of the evidence that the alleged market is a valid antitrust market, that the relevant Defendant (Live Nation

or Ticketmaster) possessed monopoly power in that market and, that the relevant Defendant willfully acquired or maintained monopoly power in that market by engaging in anticompetitive acts., and that the relevant Defendant's anticompetitive acts harmed competition and caused anticompetitive effects to customers in that market. In Plaintiffs' alleged ticketing markets, the customers are venues, and in Plaintiffs' alleged amphitheater market, the customers are artists.[3] You must assess monopolization for each market separately. It is up to you to decide whether Plaintiffs have proven Defendants are liable for monopolization as to all markets, no markets, or only as to some markets.

*Section 1: Exclusive Dealing and Tying*

In addition to alleging that each Defendant monopolized certain markets, Plaintiffs also allege that Ticketmaster violated Section 1 of the Sherman Act through unlawful exclusive dealing. You will need to consider the exclusive dealing claims under Section 1 separate from and in addition to the monopolization claims.

First, Plaintiffs allege that Ticketmaster engaged in unlawful exclusive dealing by entering into certain primary ticketing contracts with venues. There are different elements Plaintiffs must prove for you to find Ticketmaster liable for unlawful exclusive dealing. In general, to prove unlawful exclusive dealing Plaintiffs must prove by a preponderance of the evidence that Ticketmaster possesses substantial market power in a relevant market and entered into exclusive contracts with venues that substantially foreclosed competition in that relevant market. Plaintiffs also allege that Live Nation is liable for Ticketmaster's exclusive dealing because it controlled, dictated or encouraged that conduct.

---

[3] **Defendants' Argument**:  As explained below, Plaintiffs must prove anticompetitive effects to prevail on their monopolization claims. *See infra* n.22.  Defendants object to the exclusion of language regarding this requirement.

~~Second, Plaintiffs allege that Live Nation (but not Ticketmaster) violated Section 1 of the Sherman Act~~ [4] by engaging in an unlawful tying arrangement related to certain amphitheaters that Live Nation owns or controls. In general, for this claim, Plaintiffs must prove by a preponderance of the evidence that Live Nation unlawfully required artists who wanted to use these amphitheaters to also use Live Nation's promotion services.

If and only if you decide that at least some of the Plaintiff States claiming damages proved every element of at least one of the primary ticketing monopolization claims ~~or the Section 1 exclusive dealing claim against at least one Defendant~~against Ticketmaster[5], then the final issue you will be asked to decide is whether those (and only those) Plaintiff States are entitled to damages. You should not assume that any of the Plaintiff States are entitled to any damages merely because I am instructing you on the issue of damages.

I remind you, as I did at the outset, that although the Plaintiff States are suing on behalf of the residents of their States who have purchased tickets from Ticketmaster to live events, you should not assume that any of those residents will receive any portion of any money the Plaintiff States may ultimately receive in this case. And neither you nor any member of your family will receive any portion of any funds that the States may receive.

---

[4] **Plaintiffs' Argument:** The Plaintiff States are withdrawing their claims for exclusive dealing under Section 1 of the Sherman Act. In addition to the edits to this instruction, the Plaintiff States have made conforming edits to subsequent instructions to account for the withdrawal of this claim.

**Defendants' Argument:** Defendants agree with Plaintiffs' edits to the "Section 1" portion of this instruction.

[5] **Plaintiffs' Argument:** While Live Nation's conduct is relevant to the claims for monopolization, including exclusive dealing under Section 2 of the Sherman Act, the damages calculated by Dr. Abrantes-Metz require the existence of contracts between Ticketmaster and the major concert venues. Ticketmaster is therefore the relevant Defendant for this inquiry (per the Court's decision to treat the two Defendants separately).

**Post-Instruction No. 15**

## MONOPOLIZATION ELEMENTS

Plaintiffs allege that Ticketmaster unlawfully monopolized the following markets:

(1)    primary concert ticketing services to ~~what Plaintiffs call~~ "major concert venues"; ", which are amphitheaters or arenas with a capacity of 8,000 or more that hosted 10 or more concerts in at least one year from 2017 to 2024[6]; and

(2)    primary ticketing services to ~~what Plaintiffs call~~those "major concert venues."

Plaintiffs allege that Live Nation unlawfully monopolized the following market:

(3)    the use of ~~what Plaintiffs call~~ "large amphitheaters" by artists, which are amphitheaters with a capacity of 8,000 or more that hosted 10 or more concerts in at least one year from 2017 to 2024.

Plaintiffs have brought three monopolization claims in total, one for each of these alleged markets. The alleged monopolization of each of these three alleged markets is a distinct claim that you are to consider separately for the relevant Defendant, either Ticketmaster or Live Nation. To prevail on a monopolization claim, Plaintiffs must prove the following elements by a preponderance of the evidence as to each separate alleged market for each Defendant:

(1)    the alleged market is a valid antitrust market;

(2)    the relevant Defendant possessed monopoly power in that market; and

---

[6] **Plaintiffs' Argument:** Plaintiff propose inserting the definition of "major concert venues" and "large amphitheaters" in this instruction, to remind the jury of how Plaintiffs have designed the relevant markets. Further, with respect to "large amphitheaters," that term is used by both parties, though the specific definitions are in dispute.

(3)    the relevant Defendant willfully acquired or maintained monopoly power in that market by engaging in anticompetitive conduct, instead of solely through~~having~~ superior products, business skill, or ~~prior history .~~; and historical accident.[7]

(4)    the relevant Defendant's anticompetitive conduct harmed competition in that market and caused anticompetitive effects to customers (that is, venues or artists) in that market.[8]

Further, to hold Live Nation liable for Ticketmaster's monopolization in any market, plaintiffs must prove by a preponderance of the evidence that Live Nation controlled, dictated or encouraged that conduct.

If you find that Plaintiffs have failed to prove any of these elements for a particular claim, then you must find for the relevant Defendant and against Plaintiffs on that particular claim only. If you find that Plaintiffs have proven each of these elements by a preponderance of the evidence for a particular claim for a particular alleged market for the relevant Defendant, then you must find for Plaintiffs and against the relevant Defendant on that particular claim.

I will now provide you with further instructions on these elements.

---

[7] **Plaintiffs' Argument:** As drafted, the instruction implies that a Defendant that may possess some superior products or skill may never be liable for anticompetitive conduct. But to the extent Defendants have acquired or maintained their monopolies through anticompetitive conduct, the fact that they may have some superior products or skills (or attained their position through historical accident) does not insulate them from liability. *See United States v*. Microsoft Corp., 253 F.3d 34, 79 (D.C. Cir. 2001) ("Plaintiffs may meet their burden by proving, by a preponderance of the evidence, that the exclusionary conduct was reasonably capable of contributing significantly to Defendants' continued monopoly power in any relevant market."); *United States v. Google LLC*, 747 F. Supp. 3d 1, 79 (D.D.C. 2024) (Google's innovations, skilled workforce, and sound business decisions did not defeat liability where it also "used illegal restraints to maintain its monopoly."). Plaintiffs have also changed "prior history," which is vague and could imply prior anticompetitive conduct was sanctioned, to "historic accident," which more closely parallels the language in *United States v. Grinnell Corp.*, 384 U.S. 563 (1966). *Id.* at 570–71.

[8] **Defendants' Argument**:  As explained below, Plaintiffs must prove anticompetitive effects to prevail on their monopolization claims. *See infra* n.22.  Defendants object to the exclusion of language regarding this requirement.

**Post-Instruction No. 16**

## MONOPOLIZATION ELEMENT #1: RELEVANT MARKET—GENERAL

The first step in assessing each of Plaintiffs' separate monopolization claims against each Defendant is determining whether Plaintiffs have proven the alleged relevant market for that claim by a preponderance of the evidence. Defining the relevant market is essential because you are required to make a judgment about whether the relevant Defendant (Live Nation or Ticketmaster) has monopoly power in a properly defined economic market. To make this judgment, you must be able to determine what, if any, economic forces restrain the relevant Defendant's freedom to set prices for the products or services they provide, control output for those products or services, or degrade the quality of those products or services.

The most likely and most important restraining force will be actual and potential competition from other firms and their products or services. This includes the firms and products or services that act or likely would act as restraints on the relevant Defendant's power to set prices above competitive levels because customers would switch to these competing firms if the relevant Defendant sets its own prices too high. The firms and products or services that exert such restraining force are within what is called the relevant market.

**Post-Instruction No. 17**

## RELEVANT PRODUCT MARKET—GENERAL

A relevant market must consist of all products or services that are reasonably interchangeable in the eyes of customers of those products or services. In other words, the relevant market includes the products or services that a customer believes are reasonably interchangeable or reasonable substitutes for each other. This is a practical test taking into account actual behavior of buyers and marketing efforts of sellers. It looks to the practical realities of substitution, not theoretical substitution. A market does not need to include all conceivable substitutes, but only those that a buyer would view as reasonably interchangeable. Accordingly, your analysis should focus on whether or not the products or services are economic substitutes, not simply whether they appear to be functionally similar. For instance, women's shoes may not be reasonably interchangeable with men's shoes. Even if both are functionally similar, consumers may not typically substitute one for the other.[9]

To determine whether products are reasonably interchangeable or reasonable substitutes for each other, you may consider:

- whether artists substitute between large amphitheaters and other venues;

- consumers' views on whether the products are interchangeable;

---

[9] **Defendants' Argument**:  Defendants object to market definition instructions that do not make clear that Plaintiffs' alleged primary ticketing markets are targeted customer markets.  As Defendants have explained, standard substitution analysis has no utility with respect to those markets, especially here, where there is no substitution question—all agree on the product and competitors, and the only question for the jury to resolve is whether Plaintiffs have proven that "major concert venues" are targeted customers.  *See* ECF No. 689 at 16-21; ECF No. 797 at 2-6; ECF No. 976 at 1-5; ECF No. 1059 at 3-8; ECF No. 1031-10 at 73-75; Defendants' Proposed Jury Instructions submitted Mar. 23, 2026 at 38-40.  Indeed, speaking in terms of "product" makes no sense for the primary ticketing markets, because the jury does not need to decide whether those markets include all relevant products—it needs to decide whether they include all relevant customers.  Defendants propose separate instructions on the alleged targeted customer markets and the alleged amphitheater market. Defendants incorporate by reference their arguments and authorities for these separate instructions provided in their prior submissions of proposed jury instructions.  ECF No. 1031-10; Defendants' Proposed Jury Instructions submitted Mar. 23, 2026.

- the relationship between the price of one product and sales of another;

- the presence or absence of specialized vendors;

- the perceptions of either industry or the public as to whether the products are in separate markets; and

- the views of Defendants regarding who their competitors are.

The three markets at issue are as follows: *First*, the market for primary ticketing services to what plaintiffs call "major concert venues." *Second*, the market for primary concert ticketing services to those major concert venues. The market for primary ticketing services includes all events, including sporting events, at major concert venues, while the market for primary concert ticketing services includes only concerts or comedy shows.[10] Plaintiffs define "major concert venues as amphitheaters and arenas with a capacity of 8,000 or more that hosted 10 or more concerts in at least one year from 2017 to 2024. *Third*, the market for artists to use what plaintiffs call "large amphitheaters." Plaintiffs define large amphitheaters as those amphitheaters with a capacity of 8,000 or more that hosted 10 or more concerts in at least one year from 2017 to 2024.  The parties disagree about the relevant markets in this case. Plaintiffs allege that the three markets I just described to you are relevant markets, while Defendants deny that those three markets are relevant markets. Your task is to determine whether the evidence supports the three markets alleged by Plaintiffs.

---

[10] **Plaintiffs' Argument:** Plaintiffs propose inserting this sentence to avoid juror confusion between the first two markets.

**Post-Instruction No. 17D**

**RELEVANT PRODUCT MARKET—PRIMARY TICKETING MARKETS**

For the alleged primary ticketing services and primary concert ticketing services markets, Plaintiffs have limited the scope of both markets to 257 venues that they call "major concert venues." Defendants dispute that it is appropriate to limit these markets just to that subset of venues; Defendants contend that Plaintiffs' definition is too narrow because primary ticketing companies compete for many more customers, and therefore, that the relevant market should include other venues.

Plaintiffs' alleged primary ticketing markets are what are known as "targeted customer markets" because they are focused on a subset of all customers of a particular product or service. In order for Plaintiffs to prove that each of these two markets should be limited solely to the 257 venues they call "major concert venues," Plaintiffs must prove that the 257 venues are in a unique position relative to other venues at which concerts take place in that Ticketmaster has and has exercised the power to impose on those venues worse prices or terms of service (for example, by charging higher prices for primary ticketing services) than are charged to other venues. To determine whether these 257 venues are in a unique position relative to other venues, you may also consider these factors: (i) whether persons in the primary ticketing industry or the public recognize these venues as unique, (ii) whether these venues have peculiar characteristics and uses, (iii) whether these venues have distinct customers, (iv) whether these venues pay distinct prices or are uniquely sensitive to price changes, and (v) whether specialized vendors cater to these venues.[11]

---

[11] **Defendants' Argument**:  Defendants have added this sentence to their previously proposed targeted customer market instruction to incorporate the *Brown Shoe* factors.  But to be clear, Defendants do not view the *Brown Shoe* factors as serving any analytical purpose here.  These factors "use qualitative evidence as a proxy for substitutability." *FTC v. Meta Platforms, Inc.*, 811 F. Supp. 3d 67, 97 (D.D.C. 2025).  As explained above, there is no substitutability question here.  *See supra* n.9.  Defendants object to instructing the jury that *Brown Shoe* or any substitutability analysis may be used to analyze Plaintiffs' alleged primary ticketing markets, but understanding that the Court views the *Brown Shoe* factors as applicable here, Defendants propose the addition of this sentence.

If you find that Plaintiffs have proven either of the alleged ticketing markets as relevant markets, then you should continue to evaluate the remainder of Plaintiffs' claims solely related to that alleged market. If you find that Plaintiffs have failed to prove either of these alleged markets, then you do not need to consider any other elements for claims related to that alleged market. Instead, you should find for Defendants and against Plaintiffs on all claims for which you found Plaintiffs failed to prove a relevant market.

**Post-Instruction No. 17D2**

### RELEVANT PRODUCT MARKET—AMPHITHEATERS MARKET

As for Plaintiffs' alleged amphitheater market, Defendants contend this alleged market is not properly defined because it excludes other venues that are reasonable substitutes for "large amphitheaters," and it includes certain amphitheaters that do not qualify as "large amphitheaters." To prove this market, Plaintiffs must prove that artists in general do not view other types of venues, such as smaller amphitheaters or arenas, as reasonable substitutes for the class of large amphitheaters Plaintiffs selected.

To determine whether products are reasonably interchangeable or reasonable substitutes for each other, you may consider:

- whether artists substitute between large amphitheaters and other venues;

- consumers' views on whether the products are interchangeable;

- the relationship between the price of one product and sales of another;

- the presence or absence of specialized vendors;

- the perceptions of either industry or the public as to whether the products are in separate markets; and

- the views of Defendants regarding who their competitors are.

If you find that Plaintiffs have proven that the alleged amphitheaters market is properly drawn, then you should continue to evaluate the remainder of Plaintiffs' claims solely related to that market. If you find that Plaintiffs have failed to prove that the alleged amphitheaters market is properly drawn, then you do not need to consider any other elements for claims related to this alleged market. Instead, you should find for Defendants and against Plaintiffs on all claims for which you found Plaintiffs failed to prove a relevant market.

**Post-Instruction No. 17D3**

### RELEVANT GEOGRAPHIC MARKET

For the "large amphitheaters" market, the parties also dispute the geography of the market. The relevant geographic market is the area in which defendants face competition from other firms that compete in the relevant product market and to which customers can reasonably turn for purchases. When analyzing the relevant geographic market, you should consider whether changes in prices or product offerings in one geographic area have substantial effects on prices or sales in another geographic area, which would tend to show that both areas are in the same relevant geographic market. The geographic market may be as large as global or nationwide, or as small as a single town or neighborhood.

Plaintiffs have the burden of proving a relevant geographic market by a preponderance of the evidence. Plaintiffs contend that the relevant geographic market for the alleged amphitheaters market is the entire United States. By contrast, Live Nation asserts that the relevant geographic market is narrower.

In determining whether Plaintiffs have met their burden and demonstrated that the entire United States is the relevant geographic market for the alleged amphitheaters market, you may consider several factors, including:

- the geographic area in which the 87 "large amphitheaters" are located and where customers of those amphitheaters are located;
- the geographic area to which customers turn for supply of "large amphitheaters";
- the geographic area to which customers have turned or have seriously considered turning;
- the transportation cost differences between areas; and
- the geographic areas that suppliers view as potential sources of competition.

If you find that Plaintiffs proved that the alleged amphitheaters market is as broad as the entire United Sates, then you should continue to evaluate the remainder of Plaintiffs' monopolization claim against Live Nation as to this market. But if you find that Plaintiffs have failed to prove that this alleged market is as broad as the United States, then you must find in Live Nation's favor on all claims related to this market.[12]

---

[12] **Defendants' Argument**:  In light of how the evidence has come in at trial, Defendants dispute the geography of Plaintiffs' alleged amphitheaters market.  Defendants' proposed instruction tracks the ABA model instruction.  See ABA Model Instr. 3.A.6.

**Post-Instruction No. 18**

### MONOPOLIZATION ELEMENT #2: MONOPOLY POWER

If you find that Plaintiffs have proven any alleged relevant market by a preponderance of the evidence, then you should separately determine whether the relevant Defendant (Live Nation or Ticketmaster) has monopoly power in that market. To prove a monopolization claim, Plaintiffs must prove that the relevant Defendant has monopoly power in a relevant antitrust market. Monopoly power is the power to control prices, restrict output, or exclude competition in a relevant antitrust market. ~~More precisely, a firm has monopoly power if it can profitably raise prices substantially above the competitive level for a significant period of time.~~ [13] However, possession of monopoly power, in and of itself, is not unlawful.[14]

Plaintiffs can prove monopoly power "directly," through direct evidence, or "indirectly," through indirect evidence. Either type of evidence may be sufficient to prove monopoly power. I will now provide further instructions about how you may determine whether Plaintiffs have met their burden of proving monopoly power in a relevant market.

---

[13] **Plaintiffs' Argument:** Plaintiffs propose deleting this sentence. While the prior sentence appropriately references prices, output, and the exclusion of competition, this sentence as drafted suggests that price evidence is the sole consideration.

[14] **Defendants' Authority:** ABA Model Instr. 3.A.2. Plaintiffs do not object to the insertion of this sentence.

**Post-Instruction No. 19**

### EXISTENCE OF MONOPOLY POWER—DIRECT PROOF

Plaintiffs can provide direct proof of monopoly power in a relevant market via direct evidence through any one of these alternative ways.

*Raising or Maintaining Prices Above Competitive Levels*

One way Plaintiffs may prove that the relevant Defendant (Live Nation or Ticketmaster) has monopoly power in a relevant market is to show that the relevant Defendant can profitably raise or maintain prices in the relevant market above a competitive level. Plaintiffs must prove that the relevant Defendant has the power to do so by itself—that is, without the assistance of, and despite competition from, any existing or potential competitors.

- In Plaintiffs' alleged primary ticketing services markets, the prices in question are what the ticketers, such as Ticketmaster, receive by way of compensation under the terms of their contracts with "major concert venues."

- In Plaintiffs' alleged amphitheaters market, the prices in question are the prices that Plaintiffs claim artists pay to rent the amphitheaters.[15]

To prove monopoly power in this way, Plaintiffs must also prove that the relevant Defendant (Live Nation or Ticketmaster) has the power to maintain prices above a competitive level for a significant period of time. If the relevant Defendant attempted to maintain prices above competitive levels, but would lose so much business to other competitors that the price increase would become unprofitable and would have to be withdrawn, then that Defendant does not have monopoly power.

---

[15] **Defendants' Argument**: This addition is necessary because the parties dispute whether artists or promoters rent amphitheaters. Indeed, the jury is later asked to make a determination about that issue. So this bullet point should not misleadingly suggest that artists are the individuals who rent amphitheaters.

Plaintiffs do not object to the insertion of "Plaintiffs claim."

The ability to earn high profit margins or a high rate of return does not necessarily mean that any Defendant has monopoly power. Other factors may enable a company without monopoly power to sell at higher prices or earn higher profit margins than its competitors, such as superior products or services, low costs, or superior advertising or marketing.

However, an ability to sell at higher prices or earn higher profit margins than other companies for similar goods or services over a long period of time may be evidence of monopoly power. By contrast, evidence that a defendant would lose a substantial amount of sales if it raised prices substantially, or that a defendant's profit margins were low compared to its competitors, or that a defendant's margins go up and down or are steadily decreasing, tends to suggest that the defendant does not have monopoly power.

*Reducing Quality Or Output Below Competitive Levels*

Another way Plaintiffs may prove that the relevant Defendant (Live Nation or Ticketmaster) has monopoly power is by showing that the Defendant has the ability to reduce the quality of its product without losing meaningful sales.  This is similar to the point I just described regarding price. If the relevant Defendant had the ability to reduce quality below competitive levels without losing so much business to other competitors that the reduction would become unprofitable and would have to be withdrawn, then that Defendant does not have monopoly power.

Another way of showing monopoly power is through evidence that a firm has the ability to affect marketwide prices by reducing its own output.  Output for these purposes refers to the amount of its products or services that a firm chooses to produce.

*Power to Exclude Competition*

Alternatively, Plaintiffs may prove that Defendants have monopoly power by proving that Defendants have the ability to exclude or block competition. If you find that Defendants had the power to inhibit growth or expansion by existing competitors in a market or to prevent new competition from

entering that market, then Defendants have monopoly power. This power to exclude may be shown by evidence of Defendants blocking competitors' ability to compete or of Defendants reducing or restricting the share of the market held by competitors.[16]

Excluding competition means more than competing to keep one's business. It means that a firm does not need to compete hard because it has been able to prevent other firms from competing effectively. If new competitors can enter the relevant market or existing competitors can compete for new opportunities as they arise, then that Defendant does not have monopoly power.

---

[16] **Defendants' Argument**: Defendants object to these two sentences. Plaintiffs have provided no authority that "inhibiting expansion" or "reducing or restricting the share of the market held by competitors"—which could result from lawful competition on the merits—is evidence of monopoly power.

**Post-Instruction No. 20**

## EXISTENCE OF MONOPOLY POWER—INDIRECT PROOF

Now I will instruct you on how Plaintiffs can provide indirect proof of monopoly power in a relevant market via indirect evidence.

Indirect evidence is evidence regarding the structure of the relevant market. If this evidence establishes that the relevant Defendant (Live Nation or Ticketmaster) has the power to control price, restrict output, or exclude competition in the relevant market, then you may conclude that the Defendant has monopoly power in that market. By contrast, if the relevant Defendant does not have the power to control price, restrict output, or exclude competition in the relevant market, then you may conclude that the Defendant lacks monopoly power. I will now explain the structural factors you may consider in more detail.

*Market Share*

One factor that you should consider is the relevant Defendant's share of the relevant market. While market share is not the equivalent of monopoly power, it is relevant to your determination of whether Plaintiffs have proven monopoly power. The relevant Defendant (Live Nation or Ticketmaster) must have a significant share of the market in order to possess monopoly power.

A market share of over 70 percent is usually strong evidence of monopoly power. A market share below 50% is rarely evidence of monopoly power, and a share between 50% and 70% can occasionally show monopoly power. Nonetheless, such evidence does not conclusively establish monopoly power. In evaluating whether the relevant Defendant's market share supports a finding of monopoly power, you should also consider other aspects of the relevant market, including market share trends, the existence of barriers to entry, the entry and exit by other companies, and the number and size of competitors. Along with the relevant Defendant's market share, these factors should inform you as to whether the relevant Defendant has monopoly power.

*Market Share Trends*

The trend in the relevant Defendant's market share is something you may consider. An increasing market share may strengthen an inference that a company has monopoly power, particularly where that company has a high market share, while a decreasing share might show that a company does not have monopoly power.

*Barriers to Entry*

You may also consider whether there are barriers to entry or expansion in or into the relevant market. Barriers to entry or expansion make it difficult for new competitors to enter the relevant market in a meaningful and timely way, or for existing competitors to sell more of a product that they already sell in the relevant market. Barriers to entry or expansion in the alleged ticketing markets might include, but are not limited to,  whether there is a large financial investment required to develop new ticketing technologies; whether existing ticketing companies do not have the capacity to sell primary ticketing services to more of the venues Plaintiffs call "major concert venues"; whether there are specialized marketing practices to what Plaintiffs call "major concert venues"; business risks in switching ticketers; and the reputation of the companies already participating in the market (or the brand recognition of their products).[17]

Evidence of low or no entry barriers in the alleged ticketing markets may be evidence that the relevant Defendant does not have monopoly power, regardless of the Defendant's market share, because new competitors could enter easily, or existing competitors could expand, if the Defendant attempted to raise prices or reduce quality for a substantial period of time. For example, you may consider evidence that other existing ticketing companies have the capacity and ability to sell primary

---

[17] **Defendants' Argument**:  Plaintiffs have provided no authority that ordinary business risks faced by buyers constitute barriers to entry for sellers.

Plaintiffs do not object to the deletion of "business risks in switching ticketers."

ticketing services to some of what Plaintiffs call "major concert venues" if Ticketmaster tried to increase ticketing prices to venues as evidence that neither Defendant has monopoly power in the alleged ticketing markets, despite their alleged market shares. By contrast, evidence of high barriers to entry along with high market share may support an inference that Defendants have monopoly power.

*Entry and Exit by Other Companies*

The history of entry and exit in the relevant market may be helpful to consider. Entry of new competitors or expansion of existing competitors may be evidence that a defendant lacks monopoly power. On the other hand, departures from the market, or the failure of firms to enter the market, particularly if prices and profit margins are relatively high, may support an inference that a defendant has monopoly power in that market.

*Number and Size of Competitors*

You may consider whether Live Nation's competitors in the alleged amphitheater market, or Ticketmaster's competitors in the alleged ticketing markets, are capable of effectively competing. In other words, you should consider whether the financial strength, market shares, and number of competitors act as a check on each Defendant's ability to increase the price or lower the quality of its services. If Ticketmaster's competitors in the alleged ticketing markets are strong or have meaningful or increasing market shares, this may be evidence that Ticketmaster lacks monopoly power in those markets. On the other hand, if you determine that Ticketmaster's competitors are weak or have small or declining market shares, this may support an inference that Ticketmaster has monopoly power. Similarly, if Live Nation's competitors in the alleged amphitheater market are strong or have meaningful or increasing market shares, this may be evidence that Live Nation lacks monopoly power in that market. On the other hand, if Live Nation's competitors are weak or have small or declining market shares, this may support an inference that Live Nation has monopoly power.

You may find that a Defendant has monopoly power based on direct evidence, indirect evidence, or both. If you find that a Defendant has monopoly power in a relevant market, then you must consider the remaining elements of Plaintiffs' monopolization claim as to that market. If you find that a Defendant does not have monopoly power in a relevant market, then you must find for that Defendant and against Plaintiffs on the monopolization claim as to that particular relevant market.

**Post-Instruction No. 21**

### MONOPOLIZATION ELEMENT #3: WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY POWER THROUGH ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT

If you find that Plaintiffs have met their burden of proving (a) a relevant market, and (b) that a Defendant possessed monopoly power in that relevant market, then you must turn to the third element of Plaintiffs' monopolization claim regarding that particular market and that particular Defendant. Plaintiffs must prove by a preponderance of the evidence that the Defendant willfully acquired or maintained monopoly power in that relevant market through anticompetitive or exclusionary conduct or acts.

Anticompetitive or exclusionary acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market. Acts are not anticompetitive or exclusionary unless they have anticompetitive effect. That is, the acts must harm the competitive process and thereby harm the customers of the products or services in the relevant markets.[18] In Plaintiffs' alleged primary ticketing markets, the customers are the 257 venues Plaintiffs call "major concert venues." In Plaintiffs' alleged amphitheaters market, the customers according to Plaintiffs are artists. Harm to competition is different from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition. Harm to competition ~~can include, among other~~

---

[18] **Defendants' Authority**: *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001). As explained below, Plaintiffs must prove anticompetitive effects to prevail on their monopolization claims. *See infra* n.22. Defendants object to the exclusion of language regarding this requirement. Moreover, including language on anticompetitive effects in this instruction is necessary because later Section 1 instructions on tying refer back to earlier instructions regarding anticompetitive effects.

things, means evidence of increased prices, decreased production levels, and reduced quality, though not all increases in prices, decreases in production levels or reductions in quality harm competition.[19]

The mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws. Similarly, the acquisition or maintenance of monopoly power by supplying better products or services, possessing superior business skills, or because of prior history or luck, is not unlawful. A monopolist may compete aggressively without violating the antitrust laws, and a monopolist may charge monopoly prices without violating the antitrust laws. Similarly, the mere fact that a business prefers to use its own goods or services, or is "vertically integrated," is not anticompetitive by itself. Instead, a monopolist's conduct only becomes unlawful if the monopolist either obtained or maintained its monopoly power through anticompetitive acts, that is, acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market.

In determining whether a particular Defendant's conduct was anticompetitive or exclusionary, or whether it was legitimate business conduct, you should determine whether the conduct is inconsistent consistent with competition on the merits, whether the conduct provides benefits to consumers, and whether the conduct would make business sense apart from any effect it has on excluding competition or harming competitors.[20] does not provide benefits to consumers. Further, you should weigh the evidence as a whole and consider all of the alleged exclusionary conduct, including the interrelated effects of the different conduct in aggregate, not in isolation, to reach your

---

[19] **Defendants' Authority**: *MacDermid Printing Sols. v. Cortron*, 833 F.3d 172, 183 (2d Cir. 2016) ("[I]n no precedential opinion in this Circuit has a plaintiff successfully proved an adverse effect on competition without offering evidence of changed prices, output, or quality.").

[20] **Defendants' Authority**: ABA Model Instr. 3.A.9. Defendants object to this paragraph if it omits these proposed edits as it fundamentally alters the balance of the language in the ABA model instruction.

determination as to whether that Defendant's conduct was reasonably capable of contributing significantly to maintaining their monopoly.[21]

If you find that Plaintiffs have proven by a preponderance of the evidence that a particular Defendant engaged in anticompetitive or exclusionary conduct in a relevant market that had anticompetitive effect, then you may consider ~~nonpretexual,~~ procompetitive justifications for that conduct offered by that Defendant. Procompetitive justification are nonpretextual claims that the conduct was indeed a form of competition on the merits because it involved, for example, greater efficiency or enhanced consumer appeal. If you find that Defendant has offered such justifications, then you must determine whether Plaintiffs have proven by a preponderance of the evidence that the anticompetitive harm of the anticompetitive or exclusionary conduct at issue ~~was not reasonably necessary to achieve the~~ outweighs its procompetitive benefits ~~claimed by that Defendant. If you find~~

---

[21] **Plaintiffs' Argument:** Plaintiffs believe this sentence is necessary to instruct the jury it may consider all of the evidence of anticompetitive conduct together, as courts in this circuit have repeatedly held. *See City of Groton v. Conn. Light & Power Co.*, 662 F.2d 921, 928–35 (2d Cir. 1981) (recognizing that courts must assess the combined or "synergistic effect" of a defendant's conduct, not merely its individual acts viewed in isolation); New York ex rel. Schneiderman v. Actavis PLC, 787 F.3d 638, 652–54 (2d Cir. 2015) (confirming that monopolization liability depends on the overall competitive effect of combined conduct that coerces consumers and impedes competition, rather than on isolated acts); *Reiss v. Audible, Inc.,* 2025 WL 1654643, at *6 (S.D.N.Y. June 11, 2025) (collecting cases); *United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 604 (S.D.N.Y. 2025) (collecting cases); *see also Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 353–55 (4th Cir. 2024); ("Just as the 'character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole,' … , so too must a firm's exclusionary efforts be considered in their totality."); *In re EpiPen Mktg., Sales Practices & Antitrust Litig.*, 44 F.4th 959, 980–82 (10th Cir. 2022) (holding that courts may evaluate alleged exclusionary acts separately for analytical clarity, but must ultimately consider the evidence in its totality to determine whether exclusionary conduct exists); *Viamedia, Inc. v. Comcast Corp.,* 951 F.3d 429, 450, 469 (7th Cir. 2020) (emphasizing that Section 2 analysis requires consideration of the evidence in its totality, including the combined effects of challenged conduct); *In re Lipitor Antitrust Litig.,* 855 F.3d 126, 147 (3d Cir. 2017) (explaining that the monopolization inquiry turns on the combined anticompetitive effect of exclusionary practices); *Conwood Co. v. U.S. Tobacco Co.,* 290 F.3d 768, 783–84 (6th Cir. 2002) (recognizing that Section 2 liability may arise from a defendant's overall course of conduct, evaluated as a whole rather than parsed into isolated acts); *City of Anaheim v. S. Cal. Edison Co.,* 955 F.2d 1373, 1376 (9th Cir. 1992) (warning against focusing on individual acts of a monopolist while refusing to consider their overall combined effect).

that the conduct was reasonably necessary to achieve the procompetitive benefits, then you must balance those benefits against the competitive harm resulting from that conduct. Conduct is anticompetitive and exclusionary only if its competitive harm outweighs its competitive benefits. In making this determination, your focus should be on the effect of the conduct, not on the intent behind it.[22]

---

[22] **Defendants' Argument**: Defendants maintain that anticompetitive effects is a separate element of Section 2 monopolization claims, as the D.C. Circuit's analysis in *United States v. Microsoft Corp.* makes clear. 253 F.3d 34, 58-59 (D.C. Cir. 2001). The Second Circuit endorsed the *Microsoft* framework in *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 652 (2d Cir. 2015). Moreover, the Second Circuit draws no material distinction between the requirement to show anticompetitive effects in the context of a Section 2 claim and requirement to do so in the context of a Section 1 claim. *See id*. Accordingly, to prevail on a monopolization claim, a plaintiff must prove not only anticompetitive conduct, but also that such conduct "has the requisite anticompetitive effect." *Microsoft*, 253 F.3d at 58-59. To show that effect, the plaintiff must show that the conduct "harm[ed] the competitive *process* and thereby harm[ed] consumers." *Id*. at 58; *Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 486 (S.D.N.Y. 2016). And in the Second Circuit, that showing has always required "evidence of changed prices, output, or quality." *MacDermid Printing Sols. v. Cortron*, 833 F.3d 172, 183 (2d Cir. 2016). Recent Supreme Court cases from the rule of reason context are to the same effect. *See Ohio v. American Express Co.*, 585 U.S. 529, 549 (2018) (Plaintiffs cannot establish direct anticompetitive effects "absent some evidence that tends to prove that output was restricted or prices were above a competitive level"); *NCAA v. Alston*, 594 U.S. 69, 88 (2021) (characterizing *AmEx*'s holding as requiring plaintiffs to show an "actual effect on competition," meaning a restraint's "capacity to reduce output and increase price"). There is no Second Circuit case upholding a finding of anticompetitive effects based solely on intangibles such as "choice," nor "harm to the competitive process" that does *not* cause tangible consumer harm. *See In re EpiPen*, 44 F.4th 959, 985 (10th Cir. 2022) ("Under the consumer welfare standard, [courts] still seek to 'protect the process of competition,' but [they] do it 'with the interests of *consumers*, not competitors, in mind.'" (emphasis added)).

Defendants believe that the jury instructions should include a separate instruction on anticompetitive effects, as Defendants proposed in their prior submissions of proposed jury instructions. ECF No. 1031-10 at 105-07; Defendants' Proposed Jury Instructions submitted Mar. 23, 2026 at 81-83. Defendants propose edits to the burden-shifting language in this instruction as an alternative, in the event that the Court determines that a separate instruction on anticompetitive effects should not be provided. The proposed burden-shifting language tracks the language in *United States v. Microsoft Corp.*, 253 F.3d 34, 58-59 (D.C. Cir. 2001). Moreover, including this language here is necessary because later Section 1 instructions on tying refer back to earlier instructions regarding anticompetitive effects. But to be clear, Defendants do not view this language as an adequate alternative to providing a separate instruction on anticompetitive effects, and Defendants object to the exclusion of such an instruction. Recognizing that the Court disagrees, however, Defendants are not reinserting the proposed separate instruction in this document.

If you find that any Defendant willfully acquired or maintained monopoly power through anticompetitive or exclusionary conduct in a relevant market, then you must find for Plaintiffs on that claim. If you find that a Defendant did not willfully acquire or maintain monopoly power through anticompetitive or exclusionary conduct in a relevant market, then you must find for that Defendant and against Plaintiffs on the monopolization claim as to that market.

**Post-Instruction No. 22**

## ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT—EXCLUSIVE DEALING
## SHERMAN ACT SECTION 2

I will now provide some additional detail on one particular type of anticompetitive or exclusionary conduct Plaintiffs have alleged in this case. Plaintiffs have alleged that Ticketmaster entered into long-term, exclusive primary ticketing contracts with what Plaintiffs call "major concert venues" that generally require the venue to use Ticketmaster as the exclusive primary ticketer for all events or for all concerts. Such contracts are called "exclusive dealing" contracts because they require buyers, here certain venues, to buy a product or service exclusively (or almost exclusively) from one seller, here Ticketmaster, for a period of time.

Exclusive dealing is not in itself anticompetitive.[23] Exclusive dealing contracts ~~can~~will generally only be ~~anticompetitive in certain circumstances. There is no set formula for evaluating whether~~unlawful where the market is highly concentrated, the defendant possesses significant market power, and there is some element of coercion present.[24]

To establish that Ticketmaster's exclusive dealing is anticompetitive, ~~but it generally requires a showing of~~Plaintiffs must prove: (i) significant market power by the Defendant, here Ticketmaster; (ii) substantial foreclosure of the market, that is, whether the exclusive dealing barred a substantial number of competitors or severely restricted the market's ambit; (iii) contracts of sufficient duration to prevent meaningful competition by rivals; and (iv) ~~whether likely or actual~~ anticompetitive effects ~~are outweighed by procompetitive effects.~~in the relevant market. You may also consider (v) ~~evidence~~

---

[23] **Defendants' Argument:** Defendants added this language to align with the Court's proposed Post-Instruction No. 24, which stated: "As I previously stated, exclusive dealing is not in itself anticompetitive."

[24] **Defendants' Authority:** *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 284 (3d Cir. 2012).

~~of~~whether exclusive contracts result from coercive behavior, i.e., because Ticketmaster coerced the venue into an exclusive contract that the venue did not want at all or would have preferred to be non-exclusive, or because venues preferred exclusive contracting for their own reasons; (vi) the ability of customers to terminate the agreements; and (vii) the use of exclusive dealing by competitors of the defendant.[25]

---

[25] **Defendants' Argument:** Certain of Defendants' edits align the language of this instruction with the language of the Court's proposed Post-Instruction No. 24 (Exclusive Dealing Against Ticketmaster – Sherman Act Section 1), to reduce juror confusion. Additionally, the instruction that there is "no set formula" for evaluating whether exclusive dealing is anticompetitive might give the false impression to the jury that these factors are not required. Finally, Defendants have added explanation regarding the coercion element to make clear that there is no coercion if venues preferred exclusive contracts. *See In re EpiPen*, 44 F.4th 959, 991-1000 (10th Cir. 2022); *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 78 (3d Cir. 2010); *Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*, 962 F.3d 1015, 1031 n.11 (8th Cir. 2020). To be clear, it is Defendants' position that, in the circumstances of this case, where there is no evidence whatsoever that any venue was coerced into an exclusive contract when it did not want exclusivity, coercion is a required element to find that the type of exclusive dealing at issue constitutes exclusionary or anticompetitive conduct. *See Race Tires*, 614 F.3d at 78 ("[C]oercion is a fundamental consideration in the *present* circumstances, namely, where various sports sanctioning bodies have freely adopted their own equipment rules and then freely entered into exclusive contracts with the respective suppliers."). Accordingly, the last paragraph of this instruction should read: "To establish that Ticketmaster's exclusive dealing is anticompetitive, Plaintiffs must prove: (i) significant market power by the Defendant, here Ticketmaster; (ii) substantial foreclosure of the market, that is, whether the exclusive dealing barred a substantial number of competitors or severely restricted the market's ambit; (iii) contracts of sufficient duration to prevent meaningful competition by rivals; (iv) anticompetitive effects in the relevant market; and (v) that the contracts were coerced, i.e., that Ticketmaster coerced the venue into an exclusive contract that the venue did not want at all or would have preferred to be non-exclusive. You may also consider (vi) the ability of customers to terminate the agreements and (vii) the use of exclusive dealing by competitors of the defendant." Recognizing that the Court disagrees, however, Defendants are not belaboring the point by inserting this proposed language in this document.

**Post-Instruction No. 23**

## ~~ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT—THREATS AND RETALIATION~~[26]

~~Plaintiffs have also alleged that Ticketmaster engaged in anticompetitive or exclusionary conduct by threatening venues with the loss of Live Nation content if they did not choose Ticketmaster for ticketing, and/or by retaliating against venues who did not choose Ticketmaster by withholding Live Nation content.~~

~~If you consider this alleged conduct, you must take care to distinguish between, on the one hand, affirmative acts of threatening venues or retaliating against venues and, on the other hand, independent concerns that a venue might have about how the choice of a ticketing provider might affect its ability to compete with other venues for concerts. Only affirmative acts of threatening venues or retaliating against venues can support this part of Plaintiffs' case. Likewise, that a venue might perceive an advantage in obtaining Live Nation promoted concerts because Ticketmaster is an affiliated company is not, in itself, proof of threats or retaliation.~~

---

[26] **Defendants' Argument**:  Defendants object to exclusion of language requiring the jury to find that Live Nation has market power in a market for promoting all concerts to all artists at all venues. Defendants maintain that such language proposed in Defendants prior jury instruction submission should be included here.  Defendants' Proposed Jury Instructions submitted Mar. 23, 2026.  As Defendants have explained, without proof of Live Nation's market power in concerts (which Plaintiffs cannot show), there is no lawful basis for a jury to find that it violates the antitrust laws for Defendants to "condition" the provision of Live Nation concerts to venues on the venues' choice of Ticketmaster as their primary ticketer.  ECF No. 1049; ECF No. 1362; Defendants' Proposed Jury Instructions submitted Mar. 23, 2026; *see* Herbert Hovenkamp, Antitrust and Self-Preferencing, *Antitrust*, Vol. 38, No. 1, Fall 2023 5, 7 ("To generalize, while current United States antitrust law has many prohibitions on self-preferencing, they apply only when the firm in question has market power in the dominant good and competitive harm results from the refusal to give equal treatment.").  Without such proof, Plaintiffs' threats/retaliation/conditioning theory merely attacks self-preferencing by a vertically-integrated company—which is not unlawful.  Recognizing that the Court disagrees, however, Defendants are not reinserting the proposed market definition language in this document.

I will remind you, as I did previously, that you heard testimony about what Live Nation or Ticketmaster's competitors heard about certain venues' concerns about content. Unless the witness who supposedly heard those statements directly from the venue testified live at trial, you may not consider whether those statements were in fact made or not, or whether the concerns were true or not. And as to those statements heard by witnesses who testified live at trial, you may only consider the fact of those statements to show the information available to the competitor and its effect on the competitor's understanding or actions. The statements were not admitted for their truth as to whether the concerns were true or not, and you may not consider whether they were true or not.[27]

If you find that Ticketmaster threatened one or more venues with the loss of Live Nation content if they did not choose Ticketmaster for ticketing, and/or retaliated against one or more venues who did not choose Ticketmaster by withholding Live Nation content, you must consider whether that behavior was sufficiently widespread that it amounted to meaningful foreclosure of competition in the relevant ticketing market. You may consider both qualitative and quantitative evidence of foreclosure; for example:

- the number of threats or instances of retaliation Plaintiffs have proven

- the number of major concert venues, ticketing contracts and concert routing decisions in the same period of time;

- whether threats were made privately or disseminated broadly; and

- whether Ticketmaster's rivals were able to develop counterstrategies for addressing the effects of threats or retaliation.[28]

---

[27] **Defendants' Argument:** This instruction reinforces the Court's hearsay limiting instruction provided to the jury during trial. *See, e.g.*, Trial Tr. at 2610:21-2611:8.

[28] **Plaintiffs' Argument:** Plaintiffs submit that this instruction is unnecessary and improperly treats the evidence of threats and retaliation as a separate claim under its own legal framework rather than one type of evidence supporting Plaintiffs' claims under Section 2. As such, this evidence should be

**Post-Instruction No. 23D**

**ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT—CONTROLLING AMPHITHEATERS**

As part of their amphitheater monopolization claim, Plaintiffs have alleged that Live Nation unlawfully acquired "control" of a number of amphitheaters either because it owns them, leases them, or has exclusive booking agreements with them.  Live Nation's ownership of, control over, or acquisition of amphitheaters does not, in itself, count as anticompetitive conduct.  Plaintiffs' claim is about things Live Nation did to increase its share of large amphitheaters since 2015.

To find in favor of Plaintiffs on their amphitheater monopolization claim, you must find that Live Nation's acquired monopoly power in the alleged market for large amphitheaters through acquisitions and exclusive booking arrangements and that these acquisitions and exclusive booking arrangements had an actual anticompetitive effect—that is, it harmed the competitive process and thereby harmed artists, who are the alleged consumers in Plaintiffs' amphitheater market.  You may not find anticompetitive effects simply because Live Nation's share of large amphitheaters increased. That requires independent evidence of higher prices, lower output, reduced quality or the like.[29]

---

considered in conjunction with other types of anticompetitive conduct, as Plaintiffs have noted above in connection with Instruction No. 21. *See also United States v. Google LLC*, No. 1:23-CV-108 (LMB/JFA), 2025 WL 1132012, at *46 (E.D. Va. Apr. 17, 2025) ("As the Fourth Circuit made clear in *Duke Energy*, courts must avoid unduly divvying up a 'complex or atypical exclusionary campaign' into 'manufactured subcategories' and justify the actions using 'specific conduct tests.'). Indeed, a court must, when "faced with allegations of a complex or atypical exclusionary campaign," such as we have here, "aggregate" two or more practices which, while lawful individually, are all "part of the same scheme to perpetuate dominance or drive the plaintiff from the market." *Id.* at 354-55 ("This is because 'the means of illicit exclusion, like the means of legitimate competition, are myriad.'"). As the Court previously noted, "coercion and threats are relevant to the theory of exclusive dealing in the market between venues and primary ticketers." ECF No. 1098 at 6; *see also* ECF No. 1037 at 35 (describing coercion as relevant to certain factors of the exclusive dealing analysis under *ZF Meritor LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012). Plaintiffs are not required to demonstrate market-wide impact based solely on threats or retaliation, nor are they attempting to plead a monopoly leveraging claim. *See* ECF No. 1098 at 6 (rejecting analogy to monopoly leveraging).

[29] **Defendants' Argument:**  This additional instruction is necessary to clarify the alleged anticompetitive conduct relevant to Plaintiffs' amphitheater monopolization claim.  It is consistent

with the Court's summary judgment ruling, which recognized that "Live Nation acquisitions of other promoters [do not] count as anticompetitive conduct by itself" because "a Section 2 claim requires not mere growth by acquisition, but the willful maintenance or acquisition of monopoly power as distinguished from growth or development as a consequence of superior product, business acumen, or historic accident." ECF No. 1037 at 33 (citation and quotation marks omitted) (also recognizing that, while the "Supreme Court has previously analyzed whether acquisitions can be relevant to a theory of *attempted monopolization* under Section 2 of the Sherman Act . . . the government hasn't provided any authority (nor can the Court identify one) that extends this analysis to the existence of anticompetitive effects"). The requirement to prove anticompetitive effects is based on *Microsoft*, 253 F.3d at 58, as well as the other authorities Defendants have cited for the broad proposition that proof of anticompetitive effects is always required in a Section 2 actual monopolization case.

**Post-Instruction No. 24**

~~EXCLUSIVE DEALING AGAINST TICKETMASTER—SHERMAN ACT SECTION 1~~

~~Plaintiffs separately claim that Ticketmaster has engaged in unlawful exclusive dealing in violation of Section 1 of the Sherman Act by entering into long-term, exclusive primary ticketing contracts with what Plaintiffs call "major concert venues" that generally require the venue to use Ticketmaster as the exclusive primary ticketer for all concerts. I have already instructed you on how to evaluate exclusive dealing conduct under Plaintiffs' Section 2 monopolization claims. I will now instruct you on how to evaluate exclusive dealing conduct under Plaintiffs' separate Section 1 exclusive dealing claim.~~

~~To establish that an exclusive dealing arrangement violates Section 1 of the Sherman Act, Plaintiffs must establish each of the following elements by a preponderance of the evidence:~~

~~*First*, that there is a relevant market limited to what Plaintiffs call "major concert venues" for primary concert ticketing services. If you did not find that Plaintiffs proved this markets, there is nothing else for you to consider on this claim for any such markets. You must find for Ticketmaster and against Plaintiffs on the Section 1 Exclusive Dealing claim for all such markets. If you found that Plaintiffs proved either of these alleged ticketing markets, then you should go on to consider whether Plaintiffs proved the other elements of this claim for that market.~~

~~*Second*, that Ticketmaster engaged in anticompetitive exclusive dealing with those major concert venues. As I previously stated, exclusive dealing is not in itself anticompetitive. In determining whether Ticketmaster's exclusive dealing was anticompetitive, Plaintiffs must prove (i) significant market power by Ticketmaster; (ii) substantial foreclosure of the market, that is, whether the exclusive dealing barred a substantial number of competitors or severely restricted the market's ambit; (iii) contracts of sufficient duration to prevent meaningful competition by rivals; and (iv) whether likely or actual anticompetitive effects are outweighed by procompetitive effects. You may also consider (v)~~

evidence of coercive behavior; (vi) the ability of customers to terminate the agreements; and (vii) the use of exclusive dealing by competitors of the defendant. If you find that Plaintiffs have failed to prove any one of these elements, then you must find for Ticketmaster and against Plaintiffs on Plaintiffs' Section 1 exclusive dealing claim. If you find that Plaintiffs have proven all of these elements, then you must find for Plaintiffs and against Ticketmaster on Plaintiffs' Section 1 exclusive dealing claim. [30]

---

[30] **Plaintiffs' Argument:** As noted above, the Plaintiff States are withdrawing their claims for exclusive dealing under Section 1 of the Sherman Act.

**Defendants' Argument:**   Defendants agree to delete this instruction given that Plaintiffs are withdrawing their claim for exclusive dealing under Section 1 of the Sherman Act.

**Post Instruction No. 25**

## LIVE NATION'S LIABILITY FOR TICKETMASTER'S ALLEGED CONDUCT

If you find that Plaintiffs have proven by a preponderance of the evidence each element of their claim that Ticketmaster has (1) monopolized the primary ticketing market for what Plaintiffs define as "major concert venues," or (2) monopolized the primary concert ticketing market for major concert venues, or (3) has violated Section 1 through exclusive dealing,[31] then you should find for Plaintiffs and against Ticketmaster on that claim. As to each claim that you find for Plaintiffs and against Ticketmaster, you should then also decide whether Live Nation should also be held liable for Ticketmaster's conduct. If you find by a preponderance of the evidence that Live Nation controlled, dictated or encouraged Ticketmaster's unlawful conduct, then you should find Live Nation liable on that claim. If you do not find that Plaintiffs have proven, by a preponderance of the evidence that Live Nation controlled, dictated or encouraged Ticketmaster's unlawful conduct, then Live Nation is not liable on that claim.

---

[31] **Defendants' Argument:** Defendants agree to delete this language given that Plaintiffs are withdrawing their claim for exclusive dealing under Section 1 of the Sherman Act.

**Post-Instruction No. 26**

### UNLAWFUL TYING AGAINST LIVE NATION

Plaintiffs also claim that Live Nation engaged in an unlawful tying arrangement in violation of Section 1 of the Sherman Act. This claim is against Live Nation, and not Ticketmaster. ~~Again, this~~This is a separate ~~and apart~~ ~~from Plaintiffs' claims of monopolization and unlawful exclusive dealing and~~claim that is subject to different rules, which I will explain now.[32] [33]

A tying arrangement is one in which the seller will sell one product or service (referred to as the tying product) only on the condition that buyers also purchase a different product or service (referred to as the tied product) from the seller, or that buyers at least agree not to purchase the tied product or service from any other seller. In this case, Plaintiffs claim that the tying product is the use of what they call "large amphitheaters" by artists, and the tied product is promotion services to all touring artists. Plaintiffs claim that Live Nation requires all touring artists to use Live Nation's promotion services if those artists want to perform at so-called "large amphitheaters" owned, operated, or controlled by Live Nation.

In assessing Plaintiffs' tying claim, you should know that, as a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing. This means that businesses have no general duty to deal with their competitors. Live Nation has no obligation to rent its amphitheaters to rival promoters. And it is not unlawful for Live Nation to refuse to do so.

---

[32] **Plaintiffs' Argument:** Plaintiffs proposed changing this sentence, as the tying claim is related to, though not dependent on, Plaintiffs claims of monopolization of large amphitheaters.

[33] **Defendants' Argument:** Defendants disagree with Plaintiffs' characterization of their tying claim, but agree to the language Plaintiffs propose.

If you find that Live Nation's rival promoters want to rent Live Nation's amphitheaters so that they can win promotion business from artists instead of Live Nation, and that Live Nation's lawful refusal to rent to its rival promoters is what causes artists to choose Live Nation as their promoter, then you must find for Live Nation and against Plaintiffs on the Section 1 tying claim.[34]

To prevail on their tying claim, Plaintiffs must prove each of the following elements by a preponderance of the evidence:

1.    Artists themselves, and not Live Nation's concert promoter competitors, are the customers who rent amphitheaters from Live Nation;

2.    The use (i.e., rental) of so-called "large amphitheaters"," which are those amphitheaters with a capacity of 8,000 or more that hosted 10 or more concerts in at least one year from 2017 to 2024,[35] by artists (the tying product) and promotion services to all touring artists (the tied product) are separate and distinct products. If you previously foundfind that Plaintiffs failed to

---

[34] **Defendants' Argument**:  Defendants are entitled to have the jury instructed on the difference between tying and a unilateral refusal to deal.  It is well established that refusing to deal with competitors is lawful and does not constitute unlawful tying.  *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009) ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."); *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) ("[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'"); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 604-05 (1985) (jury instructed that "refusal to deal … 'does not violate Section 2 if valid business reasons exist for that refusal'"); *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 929 (4th Cir. 1990) ("In general, a seller has the right to choose with whom it wishes to deal."); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1066 (10th Cir. 2013) (Gorsuch, J.) ("[T]he antitrust laws rarely impose on firms—even dominant firms—a duty to deal with their rivals."); *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 305 (D.C. Cir. 2023) ("To consider Facebook's policy as a violation of § 2 would be to suppose that a dominant firm must lend its facilities to its potential competitors. That theory of antitrust law runs into problems under the Supreme Court's *Trinko* opinion.").  In the absence of instructions distinguishing unlawful tying from a lawful refusal to deal, the jury is likely to interpret evidence about Live Nation's unilateral policy as evidence of tying.

[35] **Plaintiffs' Argument:** Plaintiffs propose this edit (and conforming edits below) as the jury may interpret the term "so-called" as pejorative and suggest that the Court does not credit Plaintiffs' proposed market definition.

prove that artists' use of so-called "large amphitheaters" is a relevant market, then you should not go on to consider any other element of this claim. Instead, you should find for Live Nation and against Plaintiffs on the Section 1 tying claim. Only if you ~~found~~ find that Plaintiffs proved that alleged market should you go on to consider whether Plaintiffs proved the other elements of this claim.

3.    Live Nation enforced a policy that conditioned artists' use of ~~so-called~~ "large amphitheaters" on artists also purchasing Live Nation's promotion services.

~~4.    Live Nation uses coercion to force artists to purchase Live Nation's promotion services.~~ [36]

~~5.~~4.    Live Nation has sufficient market power with respect to the use of what Plaintiffs call "large amphitheaters" by artists to enable Live Nation to coerce artists to purchase Live Nation's promotion services.

~~6.    The alleged tying arrangement has had anticompetitive effects as to promotion services available to~~ all touring ~~artists, for example by raising the price of promotion services paid by those artists, or by lowering the quality or amount of those services. I have previously instructed you on competitive harm and anticompetitive effects in connection with Plaintiffs' monopolization claims. The same rules apply in determining whether this element has been satisfied.~~ [37]

---

[36] **Plaintiffs' Argument:** The evidence at trial is sufficient to support a jury finding that Live Nation enforced a policy of conditioning access to large amphitheaters for artists playing live music concerts or comedy shows on use of Live Nation's promotion services, rendering proof of coercion to individual artists unnecessary—an enforced policy of conditioning is the coercion. *See Park v. Thomson Corp.*, 2007 WL 119461, at *4 (S.D.N.Y. Jan. 11, 2007) ("When a policy of conditioned sales is demonstrated, proof of coercion on an individual basis is unnecessary.") (citing *Hill v. A-T-O, Inc.*, 535 F.2d 1349, 1355 (2d Cir. 1976)); *see also* ECF No. 1037 at 32.

[37] **Defendants' Argument**:  Defendants object to exclusion of language requiring Plaintiffs to prove a tied product market.  As Defendants have explained, a tying claim cannot proceed without a properly defined tied product market.  ECF No. 1048; ECF No. 1051; ECF No. 1059 at 8-13; ECF No. 1362 at

7.5.    The alleged tying arrangement affected a not insubstantial volume of interstate commerce in promotion services to artists.

If you find that Plaintiffs have proved these elements by a preponderance of the evidence, then you must find for Plaintiffs and against Live Nation on Plaintiffs' tying claim. If you find that Plaintiffs have failed to prove any one of these elements, then you must find for Live Nation and against Plaintiffs on Plaintiffs' tying claim.

I will now provide additional detail on these elements.

---

6-7; Defendants' Proposed Jury Instructions submitted Mar. 23, 2026 at 76.  Moreover, anticompetitive effects cannot be determined without a properly defied market in which competition is to be measured.  *Ohio v. American Express Co.*, 585 U.S. 529, 543 (2018) ("Without a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition."). Instructing the jury to find anticompetitive effects, without asking it to find a market in which competition might have been affected, makes no sense.  Defendants maintain that the jury must be instructed to find a tied product market, as Defendants proposed in their prior submissions of proposed jury instructions.  ECF No. 1031-10 at 114-15; Defendants Proposed Jury Instructions submitted Mar. 23, 2026 at 76.  Given the Court's disagreement on this point, however, Defendants are not reinserting the tied product market requirement here.

Separately, the jury must be told to find anticompetitive effects as to promotion services available to a specified group of artists.  Given that Plaintiffs' promotion services to artists at "major concert venues" market did not make it past summary judgment, Defendants propose that this instruction refer to "all touring artists."

**Plaintiffs' Argument:** Plaintiffs have brought a *per se* tying claim. This element is therefore unnecessary. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 15 (1984) (establishing the per se framework for unlawful tying arrangements, under which coercive tying practices supported by sufficient market power may be condemned as illegal without engaging in rule-of-reason balancing of market effects or procompetitive justifications); *In re Visa Check/MasterMoney Antitrust Litig.*, 192 F.R.D. 68, 80–81 (E.D.N.Y. 2000), *aff'd* 280 F.3d 124 (2d Cir. 2001) (identifying the elements of a per se tying claim and expressly distinguishing that framework from a rule-of-reason theory, which requires proof of anticompetitive effects and consideration of asserted procompetitive justifications); *Park v. Thomson Corp.*, 2007 WL 119461, at *3–4 (S.D.N.Y. Jan. 11, 2007) (applying *Jefferson Parish* and recognizing that, where a tying arrangement qualifies for per se treatment, plaintiffs need not prove actual anticompetitive effects or address procompetitive justifications); *In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d 403, 413–17 (S.D.N.Y. 2005) (recognizing that tying arrangements may be subject to per se condemnation where coercive forcing presents a substantial potential for anticompetitive impact, and distinguishing such per se claims from rule-of-reason tying claims that require proof of market effects and allow procompetitive justifications).

**Post-Instruction No. 27**

### UNLAWFUL TYING— ELEMENT #1: IDENTITY OF THE PURCHASER

An illegal tying arrangement requires that at least two products and/or services be purchased by one buyer. Therefore, the first thing you must decide is who is the customer that actually purchases the alleged tying product here, which is rental of amphitheaters. Plaintiffs contend that artists are the customers that rent amphitheaters. Live Nation contends that promoters, not artists, are the customers that rent amphitheaters. In making this determination, you may consider, among other relevant facts, who the decisionmaker is that seeks to rent the amphitheater, who assumes the contractual obligation to pay for the use of the amphitheater, and who bears the economic risk from the rental agreement, and who benefits from the rental agreement with the amphitheater..[38]

If you decide that promoters, not artists, are the customers that rent amphitheaters, you should find for Live Nation and against Plaintiffs on this claim. If, however, you find that artists are the customers that rent amphitheaters from Live Nation, you should go on to consider whether Plaintiffs have proven the other elements of this claim.

---

[38] The parties propose deleting this sentence as several of the factors are vague and may be confusing for the jury.

**Post-Instruction No. 28**

## UNLAWFUL TYING— ELEMENT #2: PRESENCE OF TWO PRODUCTS

To determine whether use of so-called "large amphitheaters" by artists and promotion services to artists are separate and distinct products, you should consider whether there would be demand for each of them if they were offered separately. If enough artists would want to purchase the use of so-called "large amphitheaters" and promotion services separately to induce venues and promoters generally to provide each service separately, then each service is a separate service. On the other hand, if there is very little demand for artists to buy one of the services by itself, that is, without the other service, then the use of the so-called "large amphitheaters"," meaning amphitheaters with a capacity of 8,000 or more that hosted 10 or more concerts in at least one year from 2017 to 2024, by artists and promotion services to all touring artists are not two separate products for the purposes of the tying claim, even if they are sometimes sold separately.

Services may be separate services even if one of them is useless without the other. The relevant issue is whether there is sufficient demand from customers to induce sellers to provide them separately, even if the customer needs to obtain both products from one or more suppliers.

**Post-Instruction No. 29**

## UNLAWFUL TYING— ELEMENT #3: PROOF OF CONDITIONING

You may find that an illegal tying arrangement exists between the use of what Plaintiffs define as so-called "large amphitheaters" by artists and promotion services to touring artists only if you find that Live Nation enforced a policy that conditioned the rental of its so-called "large amphitheaters" on an artist's agreement to buy Live Nation's promotion services when the artists would have preferred to buy promotion services elsewhere.

**Post-Instruction No. 30**

<del>UNLAWFUL TYING —</del> **ELEMENT #4:** <del>PROOF OF COERCION</del>

<del>To find that an illegal tying arrangement exists, you must also find that Live Nation coerced artists into buying Live Nation's promotion services. To prove coercion, Plaintiffs must prove by a preponderance of the evidence that Live Nation exploited its control over the use of so-called "large amphitheaters" controlled by Live Nation to force artists into the purchase of promotion services, which the artists either did not want at all, or would have preferred to purchase from a different promoter on different terms, and that any appearance of choice was illusory.</del>

<del>There is no coercion if artists would have purchased promotion services from Live Nation anyway, regardless of any alleged tie.[39]</del>

---

[39] **Plaintiffs' Argument:** For the reasons stated above, this instruction is unnecessary.

**Post-Instruction No. 31**

**UNLAWFUL TYING— ELEMENT #5: MARKET POWER IN THE TYING MARKET**

To find that an illegal tying arrangement exists, you must also find that Live Nation has sufficient market power in the market for the use of what plaintiffs ~~call~~define as ~~—~~"large amphitheaters~~"~~," by artists such that Live Nation can coerce artists into using its promoters. Market power is the ability of a single seller to raise ~~price~~prices, ~~and~~ restrict output~~.~~, or exclude competition. You may assess market power by considering the same things I instructed you on for assessing monopoly power earlier.  For example, market share is a proxy for market power but you should also consider other aspects of the relevant market, including market share trends, the existence of barriers to entry, the entry and exit by other companies, and the number and size of competitors.

**Post-Instruction No. 32**

Post-Instruction No. 32

UNLAWFUL TYING — **ELEMENT #6:** ANTICOMPETITIVE EFFECTS FOR THE TIED PRODUCT

The next element is whether the alleged tying arrangement has had anticompetitive effects as to promotion services available to all touring artists, for example by raising the price of promotion services paid by those artists, or by lowering the quality or amount of those services. I have previously instructed you on competitive harm and anticompetitive effects in connection with Plaintiffs' monopolization claims. The same rules apply in determining whether this element has been satisfied.[40]

---

[40] **Plaintiffs' Argument:** As discussed above, this instruction is unnecessary.

**Post-Instruction No. 33**

### UNLAWFUL TYING— ELEMENT #7: NOT INSUBSTANTIAL AMOUNT OF INTERSTATE COMMERCE

The last element is whether the alleged tying arrangement involved a not insubstantial amount of interstate commerce in promotion services.

For commerce to be considered interstate, it must have a nexus to commerce that affects or touches more than one state. In determining whether the tying arrangement involved a not insubstantial amount of interstate commerce, you should consider the total dollar amount of Live Nation's sales of promotion services to all touring artists in interstate commerce achieved by the tying arrangement in absolute terms.

**Post-Instruction No. 34**

## STATE LAW CLAIMS

In addition to the claims that the Plaintiff States have brought under the Sherman Act, some Plaintiff States have brought claims under their own state laws. I will proceed to instruct you on those state law claims now.

**Post-Instruction No. 35**

## CONGRUENT STATE CLAIMS

Certain Plaintiffs are alleging violations of their state laws that are congruent with Section 1 or 2 of the Sherman Act. That means these state laws have the same elements as Section 1 or 2 of the Sherman Act. If you find that a Plaintiff State has proven every element of a Sherman Act Section 1 or 2 claim for a particular Defendant, and that the proven conduct harmed competition in that Plaintiff State, then for the state statutes listed below, you must find that the Plaintiff State has also proven the elements of its State statute as to that particular Defendant. If you find that a Plaintiff State has not proven every element of any Sherman Act claim for a particular Defendant, or that the conduct did not harm competition in that Plaintiff State, then for the state statutes listed below, you must find for that Defendant and against that Plaintiff State.

- The Arizona Uniform State Antitrust Act, A.R.S. § 44-1401 *et seq*;

- the Colorado Antitrust Act of 2023, Colo. Rev. Stat. 6-4-101, *et seq.*;

- the Connecticut Antitrust Act, Conn. Gen. Stat. § 35-24 *et seq.*;

- the District of Columbia Antitrust Act, D.C. Code § 28-4501 *et seq.*;

- the Florida Antitrust Act, Fla. Stat. § 542.15 *et seq.*;

- ~~the Indiana Antitrust Act, Ind. Code Sections 24-1-2-1 and 24-1-2-2;~~ [41]the Louisiana Unfair Trade Practices Act, LSA-R.S. 51:1401 *et seq.*;

- the Maryland Antitrust Act, MD Commercial Law Code Ann. § 11-201 *et seq.*;

- the Michigan Antitrust Reform Act, MCL 445.771 *et seq.*;

- the Minnesota Antitrust Law of 1971, Minn. Stat. §§ 325D.49–325D.66;

- the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. § 598A.010 *et seq.*;

---

[41] The parties agree that this language can be deleted, since there is a separate instruction on Indiana below.

- the New Hampshire Revised Statutes Annotated § 356 *et seq.*;

- the New Jersey Antitrust Act, N.J.S.A. § 56:9-1 *et seq.*;

- the New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-1 and 57-1-2;

- the North Carolina Unfair or Deceptive Trade Practices Act, N.C.G.S. § 75-1 *et seq.*;

- the Valentine Act, Ohio Rev. Code Chapter 1331;

- the Rhode Island Antitrust Law, R.I. Gen. L. §§ 6-36-4 and 6-36-5;

- the Texas Business and Commerce Code § 15.01 *et seq.*;

- the Utah Antitrust Act, Utah Code §76-16-510;

- the Virginia Antitrust Act, Va. Code § 59.1-9.1 *et seq.*;

- the Washington Consumer Protection Act, Wash. Rev. Code §§ 19.86.030 and 19.86.040;

- the West Virginia Antitrust Act, W. Va. Code § 47-18-1 *et seq.*; and

- Wisconsin Statutes Chapter 133.

**Post-Instruction No. 36**

### CALIFORNIA UNFAIR COMPETITION LAW
### (CAL. BUS. & PROF. CODE § 17200 *ET SEQ.*)

The State of California alleges that each Defendant has violated California's Unfair Competition Law, which prohibits unfair competition through unlawful or unfair business acts or practices.

For the State of California to prevail on its claim under the Unfair Competition Law, you must find that the State of California has proven each of the following elements by a preponderance of the evidence as to each Defendant:

1.    The Defendant engaged in a business act or practice;

2.    The act or practice occurred within California, emanated from California, or harmed California residents; and

3.    The act or practice is either unlawful or unfair.

To determine whether acts or practices emanate from California, you may consider the location of the firm's headquarters, executives, or other employees involved in the conduct; where the relevant materials were created; where the relevant policies at issue were developed or executed; and where the firm conducts business.

*Unlawful*

To establish a violation of the unlawful prong of the California Unfair Competition Law, the State of California must prove by a preponderance of the evidence that each Defendant has violated another law, and that the act or practice that violated that other law occurred within California or emanated from California or harmed California residents. Therefore, if you find for Plaintiffs on another claim and that the associated act or practice occurred within California or emanated from

California or harmed California residents, you must find that the Defendant who committed that act or practice violated the unlawful prong of California's Unfair Competition Law.

*Unfair*

To establish a violation of the unfair prong of the California Unfair Competition Law, the State of California must prove by a preponderance of evidence that each Defendant has:

1. engaged in conduct that threatens a violation of the antitrust laws or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition; or

2. engaged in a business act or practice for which the harm to consumers outweighs the utility of the conduct.

These tests are not mutually exclusive and you may find that Plaintiffs have proven a violation of (1) or (2) or both (1) and (2). It is not necessary to show that the defendant intended to injure anyone.[42]

A business act or practice may be unfair even if not prohibited by some other law such as the Sherman Act. That is to say, the elements of the monopolization, including market definition,[43] exclusive dealing, and tying claims that I previously described to you do not apply to this claim. Instead, you should follow these instructions when deciding whether California has proven its UCL claim by a preponderance of the evidence.

---

[42] **Plaintiffs' Authority:** *Hewlett v. Squaw Valley Ski Corp*., 54 Cal. App. 4th 499, 520 (Cal. Ct. App. 1997).

[43] **Plaintiffs' Argument:** Defendants have devoted a significant portion of their case to criticizing Plaintiff's alleged antitrust markets, and several of the Jury Instructions refer to market definition. To avoid confusion, it is appropriate and necessary to instruct the jury that the UCL does not depend on proving any market definition. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1000, 1001-02 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 681 (2024) (rejecting defendant's argument that "the UCL mandates trial courts to define a relevant market" because "such a rule runs contrary to California courts' repeated instruction that '[n]o inflexible rule can be laid down as to what conduct will constitute unfair competition'").

**Post-Instruction No. 37**

**FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT (FLA. STAT. § 501.204)**

The State of Florida alleges that Defendants' anticompetitive conduct violated the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), which broadly prohibits persons from engaging in unfair methods of competition in the conduct of any trade or commerce based in or directed toward the State of Florida.

To establish a violation of the FDUTPA based on anticompetitive conduct, Florida must prove by a preponderance of the evidence that each Defendant engaged in an unfair method of competition.

*Unfair Methods of Competition*

A method of competition is "unfair" if the conduct goes beyond competition on the merits. Competition on the merits may include, for example, superior products or services, superior business skills, or truthful marketing and advertising practices. Conduct goes beyond competition on the merits if it is coercive, exploitative, collusive, abusive, deceptive, predatory, or exclusionary and tends to foreclose competition. To be "unfair," the act or practice must cause or be likely to cause substantial injury to consumers which is not reasonably avoidable and not outweighed by countervailing benefits to consumers or to competition.

Violations of antitrust laws also constitute "unfair methods of competition" under the FDUTPA. Therefore, if you find that the State of Florida proves by a preponderance of the evidence that each Defendant violated the Sherman Act through conduct based in or directed toward the State of Florida, you may find that such conduct by such Defendant also violated the FDUTPA. However, it is not necessary to find such a violation if the Defendant's conduct was otherwise unfair.

**Post-Instruction No. 38**

## ILLINOIS ANTITRUST ACT (740 ILCS 10/1 ET SEQ.)

The State of Illinois has brought claims under the Illinois Antitrust Act Illinois's claims under the Illinois Antitrust Act are based on the same conduct as its claims under the Sherman Act. However, they have some additional requirements. *Section 1*: The elements of proof for claims under this statute are the same as under Section 1 of the Sherman Act. If you find for Plaintiffs and against ~~one or more Defendants~~Live Nation on Plaintiffs' claim~~s~~ under Section 1 of the Sherman Act for ~~unlawful exclusive dealing and~~ unlawful tying, and Illinois proves by a preponderance of the evidence that the conduct harmed competition in Illinois, then you must find for the State of Illinois and against ~~the relevant Defendant~~Live Nation on those same claims under the Illinois Antitrust Act. If you find for ~~one or more Defendants~~Live Nation on Plaintiffs' claim~~s~~ under Section 1 of the Sherman Act for ~~unlawful exclusive dealing and~~ unlawful tying, you must find for ~~the relevant Defendant~~Live Nation under ~~those same claims~~that same claim under the Illinois Antitrust Act.

*Section 2*: For claims under the Illinois Antitrust Act involving monopolization, the elements of proof are the same as under Section 2 of the Sherman Act, except the State of Illinois must also prove that Defendants acted with the purpose of excluding competition or controlling, fixing, or maintaining prices in the relevant market. If you find for Plaintiffs and against one or more Defendants under Plaintiffs' claims under Section 2 of the Sherman Act, and Illinois proves by a preponderance of evidence that one or more Defendants acted with the purpose of excluding competition or controlling, fixing, or maintaining prices in the relevant market, and that the conduct harmed competition in Illinois, then you must also find for the State of Illinois on those same claims under the Illinois Antitrust Act and against the relevant Defendant. If you find for one or more Defendants on Plaintiffs' claims under Section 2 of the Sherman Act, or that the State of Illinois fails to prove that

one or more Defendants acted with the purpose of excluding competition or controlling, fixing, or maintaining prices in the relevant market, then you must find for the relevant Defendants for that claim under the Illinois Antitrust Act.

**Post-Instruction No. 39**

**INDIANA ANTITRUST ACT (IND. CODE §§ 24-1-2-1 AND 24-1-2-2)**

The State of Indiana has brought claims under the Indiana Antitrust Act. The State of Indiana is authorized to bring claims under this Act only for conduct that occurred after July 1, 2023. So conduct that occurred before July 1, 2023 cannot form a basis for liability under this statute. If the State of Indiana fails to provide evidence of conduct that occurred and harmed competition in Indiana after July 1, 2023, you must find for Defendants on this claim.

For conduct that occurred after July 1, 2023, if you find that the State of Indiana has proven every element of a Sherman Act Section 1 or Section 2 claim against a particular Defendant, and that the particular Defendant's conduct harmed competition in Indiana, then you may find that the State of Indiana has also proven the elements of the Indiana Antitrust Act as to that particular Defendant.

**Post-Instruction No. 40**

**KANSAS RESTRAINT OF TRADE ACT (KAN. STAT. ANN. § 50-101 ET SEQ.)**

The State of Kansas has brought claims under the Kansas Restraint of Trade Act, Kan. Stat. Ann. § 50-101 *et seq.* Kansas's claims under the Kansas Restraint of Trade Act are based on the same conduct as its claims under the Sherman Act.

For claims under the Kansas involving the restraint of competition by contracts, agreements, arrangements, or combinations, the elements of proof are the same as under Section 1 of the Sherman Act. If you find for Plaintiffs and against ~~the relevant Defendant~~Live Nation on Plaintiffs' claim~~s~~ under Section 1 of the Sherman Act regarding ~~unlawful exclusive dealing or~~ unlawful tying, and Kansas proves by a preponderance of the evidence that the conduct harmed competition in Kansas, then you must also find for the State of Kansas and against ~~the relevant Defendant~~Live Nation on those same claims under the Kansas Restraint of Trade Act. If you find for ~~the relevant Defendant~~Live Nation under Plaintiffs' claim~~s~~ under Section 1 of the Sherman Act for ~~unlawful exclusive dealing or~~ unlawful tying, you must find for ~~that Defendant~~Live Nation under ~~those same claims~~that same claim under the Kansas Restraint of Trade Act.

The elements of proof for monopolization claims under this statute are the same as under Section 2 of the Sherman Act, except the State of Kansas must also prove the existence of concerted or joint action with another party. If you find for Plaintiffs and against one or more Defendants on Plaintiffs' monopolization claims under Section 2 of the Sherman Act, and Kansas proves by a preponderance of the evidence that one or more Defendants acted jointly or in concert with another party, and that one or more Defendants' conduct harmed competition in Kansas, then you must also find for the State of Kansas on those same claims under the Kansas Restraint of Trade Act and against the relevant Defendants. If you find for one or more Defendants on Plaintiffs' claims under

Section 2 of the Sherman Act, or that the State of Kansas failed to prove that one or more

Defendants acted jointly or in concert with another party, then you must find for the relevant

Defendants under those claims under the Kansas Restraint of Trade Act.

**Post-Instruction No. 41**

**DONNELLY ACT (NEW YORK GENERAL BUSINESS LAW §§ 340 ET SEQ.)**

The State of New York has brought claims under the Donnelly Act, New York General Business Law §§ 340 *et seq.* New York's claims under the Donnelly Act are based on the same conduct as its claims under the Sherman Act.

For claims under the Donnelly Act involving the restraint of competition by contracts, agreements, arrangements, or combinations, the elements of proof are the same as under Section 1 of the Sherman Act. If you find for Plaintiffs and against ~~one or more Defendants~~Live Nation on Plaintiffs' claim~~s~~ under Section 1 of the Sherman Act regarding ~~unlawful exclusive dealing or~~ unlawful tying, and New York proves by a preponderance of the evidence that the conduct harmed competition in New York, then you must also find for the State of New York and against ~~the relevant Defendant~~Live Nation on those same claims under the Donnelly Act. If you find for ~~one or more Defendants~~ Live Nation under Plaintiffs' claim~~s~~ under Section 1 of the Sherman Act for unlawful exclusive dealing or unlawful tying, you must find for ~~the relevant Defendant~~Live Nation under ~~those~~ that same claim~~s~~ under the Donnelly Act.

For claims under the Donnelly Act involving monopolization, the elements of proof are the same as under Section 2 of the Sherman Act, except the State of New York must also prove that the establishment or maintenance of the monopoly involved a contract, agreement, arrangement, or combination. If you find for Plaintiffs and against one or more Defendants under Plaintiffs' monopolization claims under Section 2 of the Sherman Act, and New York proves by a preponderance of the evidence that those monopolies were established or maintained through one or more contracts, agreements, arrangements, or combinations, and that the conduct harmed competition in New York, then you must also find for the State of New York and against the relevant Defendant on those same

claims under the Donnelly Act. If you find for one or more Defendants on Plaintiffs' claims under

Section 2 of the Sherman Act, or the State of New York fails to prove the existence of a contract,

agreement, arrangement, or combination in connection with that claim, then you must find for the

relevant Defendant under those claims under the Donnelly Act.

**Post-Instruction No. 42**

### SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT
### (S.C. CODE ANN. § 39-5-10 ET SEQ.)

The state of South Carolina alleges that each Defendant's conduct violates the South Carolina Unfair Trade Practices Act (S.C. Code Ann. § 39-5-10 *et seq.*), SCUTPA provides that "[u]nfair methods of competition and unfair [] acts or practices in the conduct of any trade or commerce are… unlawful."

For the State of South Carolina to prevail on this claim, you must find for each Defendant separately that:

1.      The Defendant engaged in an act or practice in trade or commerce.

2.      The act or practice is unfair.

3.      The act or practice has an impact on the public interest.

The words "trade" and "commerce" include the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity or thing of value wherever situated, and any trade or commerce directly or indirectly affecting the people of South Carolina.

The act or practice alleged must be unfair. An act or practice is "unfair" when it is offensive to public policy or when it is immoral, unethical, or oppressive. Whether an act or practice is unfair within the meaning of the Act depends upon the surrounding facts and the impact of the transaction on the marketplace.

Unfair acts or practices in the conduct of trade or commerce have an impact upon the public interest if the acts or practices have the potential for repetition. While not the only means for showing potential repetition, potential for repetition may be shown by:

1.      showing the same kind of actions occurred in the past, thus making it likely they will continue to occur absent deterrence; or

2.    showing the company's procedures create a potential for repetition of the unfair acts.

**Post-Instruction No. 43**

### TENNESSEE TRADE PRACTICES ACT
### (TENN. CODE ANN. §§ 47-25-101 AND 102)

The State of Tennessee has brought claims under the Tennessee Trade Practices Act. The State of Tennessee is authorized to bring claims under this Act only for conduct that occurred after April 23, 2024. So conduct that occurred before April 23, 2024 cannot form a basis for liability under this statute. If the State of Tennessee fails to provide evidence of conduct that occurred and harmed competition in Tennessee after April 23, 2024, you must find for Defendants on this claim.

For conduct that occurred after April 23, 2024, if you find that the State of Tennessee has proven every element of a Sherman Act Section 1 or Section 2 claim against a particular Defendant, and that the conduct harmed competition in Tennessee, then you may find that the State of Tennessee has also proven the elements of the Tennessee Trade Practices Act as to that claim and that particular Defendant.

**Post-Instruction No.  42P**

## VERMONT CONSUMER PROTECTION ACT
### (9 V.S.A. § 2451 ET SEQ.)

The State of Vermont alleges that Defendants' conduct violates the Vermont Consumer Protection Act (9 V.S.A § 2451 *et seq.*)

For the State of Vermont to prevail on this claim, you must find that:

    1.     Defendants engaged in an act or practice in commerce; and

    2.     The act or practice is unfair.

An act or practice occurs "in commerce" when it takes place in the consumer marketplace in the context of a defendant's business, rather than in a private transaction; and (2) it has a potential harmful effect on consumers, constituting a breach of duty owed to consumers.

The act or practice alleged must be unfair. An act or practice is "unfair" when it (1) offends public policy even if it hasn't been previously considered unlawful; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers. Acts or practices are considered against public policy if they are in the realm of what is considered unfair as established by statutes, common law, or another established concept of unfairness.

When the State of Vermont brings a claim under the Vermont Consumer Protection Act, there is no requirement for the State to prove intent by the defendant to have acted unfairly.[44]

---

[44] **Plaintiffs' Argument:** Defendants' only basis for striking Vermont's instruction was that Vermont purportedly lacked the authority to bring *parens patriae* claims. As Plaintiffs have previously argued, there is no basis for striking Vermont's ability to purse claims under the Vermont Consumer Protection Act outside of a *parens patriae* capacity. In any event, Vermont may proceed with *parens patriae* claims under the Act. *See State v. Clearview AI, Inc.,* No. 226-3-20 CNCV, Order on Mot. To Dismiss (Vt.Super. Sept. 20, 2020) (finding the State's action against Clearview AI to confer standing on the State as *parens patriae*); *State of Vt. v. Densmore Brick Co.,* No. 78-297, 1980 WL 1846 (D. Vt. Apr. 10, 1980) (acknowledging the State's action as *parens patriae* for all Vermont residents who purchased woodburning stoves from defendant's Vermont retailers).

~~Post-Instruction No.~~ **44**

## STATES DAMAGES CLAIMS

[Twenty-one] of the Plaintiff States—specifically, Arizona, Colorado, Connecticut, Florida, Illinois, Indiana, Michigan, Minnesota, Nevada, New Hampshire, New Jersey, New York, North Carolina, Pennsylvania, Rhode Island, South Carolina, Utah, Washington, West Virginia, Wisconsin, and the District of Columbia—are seeking damages from Ticketmaster on behalf of fans who purchased primary concert tickets for events at what Plaintiffs call "major concert venues." I may refer to these [21] States as "Plaintiff States claiming damages." The Plaintiff States claiming damages allege that residents of their States were overcharged on purchases of primary concert tickets for events at ~~so-called~~what Plaintiffs call "major concert venues."

If you find that any Plaintiff State claiming damages proved that Ticketmaster monopolized the market for primary concert ticketing services to "major concerts venues" in violation of Section 2 of the Sherman Act or those States' laws~~, or proved that Ticketmaster engaged in unlawful exclusive dealing in violation of Section 1 of the Sherman Act or those States' laws,~~ then you must decide if, as a result of any such violation, residents of that Plaintiff State were overcharged for primary concert tickets for events at what Plaintiffs call ~~so-called~~ "major concert venues." If any Plaintiff State claiming damages fails to prove that as a result of Ticketmaster's conduct, residents of its particular State were overcharged for primary concert tickets, then that State is not entitled to any damages, and you need not do any further analysis for that State.

If any Plaintiff State claiming damages proves that residents of its State were overcharged as a result of the violations I just described, then you must determine whether that Plaintiff State has proved by a preponderance of the evidence the amount that residents of that particular Plaintiff State were overcharged on a per-ticket basis for their purchases of primary concert tickets for events at so-

called "major concert venues." You are not being asked to determine the total number of tickets or ticket purchasers affected. You are only being asked to determine the per-ticket overcharge in each Plaintiff State claiming damages.

I remind you that you should not assume that any resident of any Plaintiff State claiming damages will receive any portion of any money the Plaintiff States might ultimately recover in this case. And neither you nor any member of your family will receive any portion of any funds that the States may ultimately receive.

I will now provide further instructions on what each Plaintiff State claiming damages must prove before you may calculate any per-ticket overcharge for that State, and how you must calculate any such overcharge.

**Post-Instruction No. 45**

## INJURY AND CAUSATION

Each Plaintiff State claiming damages is entitled to recover damages only if it can establish these three elements of injury and causation:

1.     Residents in its State who purchased primary concert tickets to attend events at what Plaintiffs refer to as "major concert venues" were in fact injured as a result of Ticketmaster's alleged violations of the antitrust laws;

2.     Those injuries would not have occurred but for Ticketmaster's alleged antitrust violation; and

3.     Those injuries are of the type that the antitrust laws were intended to prevent.

The first element is sometimes referred to as "injury in fact" or "fact of damage." For each of the Plaintiff States claiming damages to establish that it is entitled to damages, it must prove that residents of its State who purchased primary concert tickets to attend events at any of what Plaintiffs call~~the so-called~~  "major concert venues" were injured as a result of Ticketmaster's alleged monopolization of the market for primary concert tickets at ~~so-called~~what Plaintiffs call "major concert venues" in violation of Section 2 of the Sherman Act~~, or for exclusive dealing in violation of Section 1 of the Sherman Act~~. It is important to understand that injury and amount of damage are different concepts and that you cannot consider the amount of any overcharge alleged by any particular State unless and until you have concluded that fans in that State were in fact injured.

Each Plaintiff State claiming damages must also offer evidence that establishes by a preponderance of the evidence that injuries to residents in that State ~~would not have occurred but~~

~~for~~were materially caused by Ticketmaster's alleged unlawful conduct[45]. This means that each Plaintiff State claiming damages must have proven that some overcharge was imposed on residents in its State because of Ticketmaster's alleged antitrust violation, and that such overcharge would not have been imposed but for the alleged antitrust violation.

Finally, each of the Plaintiff States claiming damages must establish that the alleged injuries to residents of its State are the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If the alleged injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then the alleged injuries are antitrust injuries. On the other hand, if the alleged injuries were caused by heightened competition or, the competitive process itself, ~~or by acts that would benefit~~

---

[45] **Plaintiffs' Argument:** Plaintiffs submit that an instruction stating that Plaintiffs must prove only that injuries to residents are a material cause (rather than a but-for cause) is the proper formulation. This is the standard from the ABA Model instructions. *See* ABA Model Jury Instructions in Civil Antitrust Cases A-300. This standard is supported by case law, which hold that Plaintiffs do not have to disaggregate damages caused by unlawful versus lawful actions in this action. *Dial Corp. v. News Corp.*, 165 F. Supp. 3d 25, 38 (S.D.N.Y. 2016) ("But calculating damages in antitrust cases is not an exact science. . . . And if a jury were to find [defendant's] actions taken as a whole to be a violation of Section Two of the Sherman Act, disaggregating the monopolist's lawful actions from its unlawful actions for the purpose of calculating damages may be unnecessary, if not impossible."). Rather, the jury, upon finding unlawful monopolization, is entitled to award damages based on a "just and reasonable inference." *Bigelow v. RKO Pictures, Inc.*, 327 U.S. 251, 264 (1946) ("'[T]he jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly."); *Wilder Enters., Inc. v. Allied Artists Pictures Corp.*, 632 F.2d 1135, 1142 (4th Cir. 1980). Other courts have found disaggregation is unnecessary as the defendant's conduct needs only to be a material cause. *Ingevity Corp. v. BASF Corp.*, 2024 WL 579667, at *7 (D. Del. Feb. 13, 2024) (holding disaggregation was unnecessary, as reflected by jury instruction that Plaintiff was "entitled to recover damages for an injury to its business or property if it can establish . . . that the alleged illegal conduct was a material cause of BASF's injury"); *see also LePage's Inc. v. 3M*, 324 F.3d 141, 166 (3d Cir. 2003) ("Similarly, 3M's actions, taken as a whole, were found to violate § 2, thus making the disaggregation that 3M speaks of to be unnecessary, if not impossible."); *In re Pork Antitrust Litig.*, 2024 WL 2060386, at *10-11 (D. Minn. May 8, 2024) ("*Comcast* does not impose a requirement to 'disaggregate lawful and unlawful conduct.'"); *Ingevity Corp. v. BASF Corp.*, 2024 WL 579667, at *7 (D. Del. Feb. 13, 2024) (holding disaggregation was unnecessary, as reflected by jury instruction that Plaintiff was "entitled to recover damages for an injury to its business or property if it can establish . . . that the alleged illegal conduct was a material cause of BASF's injury").

~~artists, venues, or consumers~~[46]~~,~~ then the alleged injuries are not antitrust injuries and none of the Plaintiff States claiming damages can recover damages for those injuries under the antitrust laws.

In summary, if each of the Plaintiff States claiming damages can establish that residents of its State who purchased primary concert tickets to events at ~~so-called~~what Plaintiffs call "major concert venues" were in fact injured by Ticketmaster's conduct, that such injuries would not have occurred but for Ticketmaster's conduct, and that such injuries were the type that the antitrust laws were intended to prevent, then each such Plaintiff State is entitled to recover for the overcharge paid by such residents in each such Plaintiff State.

---

[46] **Plaintiffs' Argument:** As drafted, this instruction is vague and could allow the jury to consider benefits to artists, venues, or consumers in isolation without regard to the overall impact to the competition in the market for primary concert ticketing services to venues, including benefits of a type that do not promote competition. Only benefits that improve the competitive process may be properly considered. *See United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (relevant question is "whether the challenged conduct harms the competitive process and thereby harms consumers, not whether it produces efficiencies or innovations in isolation."); *see also Nat'l Soc'y of Professional Engineers v. United States*, 435 U.S. 679, 692, 695 (1978) ("The purpose of the [antitrust] analysis is to form a judgment about the competitive significance of the restraint; it is not to decide whether a policy favoring competition is in the public interest").

**Post-Instruction No. 46**

## STATUTE OF LIMITATIONS

A statute of limitations establishes a time limit for bringing a lawsuit. In doing so, the law seeks to eliminate stale claims, to promote justice by preventing surprises, and to provide security and stability to human affairs. Statutes of limitations ensure that a plaintiff does not wait, sleep on their rights, and allow damages to accumulate before bringing suit.

The statute of limitations for the claims in this case does not permit recovery for any injury to residents in any State suffered prior to May 23, 2020. ~~This means that any alleged anticompetitive conduct that occurred prior to May 23, 2020, and any injury resulting from that conduct, is time-barred.~~ You can only find that each Plaintiff has proved the required elements of injury and causation if they have proven ~~both~~ that ~~(i)~~ the injury occurred on or after May 23, 2020[47] ~~and (ii) that injury was caused~~

---

[47] **Plaintiffs' Argument:** The instruction misstates the law on the statute of limitations in a monopolization case. Here, Plaintiff States are seeking damages for supracompetitive pricing to fans who—unlike an excluded rival—are not injured until "the monopolist actually exercises its illicit power to extract an excessive price. *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 295 (2d Cir. 1979). The Second Circuit's decision in *Berkey Photo* is instructive, explaining that "a purchaser is suing a monopolist for overcharges paid within the previous four years may satisfy the conduct prerequisite to recovery by pointing to anticompetitive actions taken before the limitations period." *Id.* at 296; *see also CSX Transp., Inc. v. Norfolk S. Ry. Co.*, 114 F.4th 280, 290-91 (4th Cir. 2024) ("[U]nlike an excluded rival who is injured as soon as the exclusion begins, a customer is not injured until a sale occurs, and it suffers a new and accumulating injury each time a subsequent supracompetitive price is paid."); *Mayor & City Council of Balt. v. Actelion Pharms. Ltd.*, 995 F.3d 123, 131–32 (4th Cir. 2021). Plaintiffs only seek damages for injuries suffered during the limitations period, but pre-limitations conduct continuing into the limitations period is actionable. *Toledo Mack Sales & Serv. v. Mack Trucks, Inc.*, 530 F.3d 204, 217 (3d Cir. 2008); *Sidibe v. Sutter Health*, 103 F.4th 675, 698 (9th Cir. 2024).

Anticompetitive conduct prior to May 23, 2020 is not mere "background or context," it is material evidence of Ticketmaster's maintenance of its monopoly that resulted in injury during the limitations period. *Dial Corp. v. News Corp.*, 165 F. Supp. 3d 25, 37 (S.D.N.Y. 2016) ("[A] monopoly which is 'maintained' during the damages period would need to be created before the damages period, and anticompetitive conduct before the limitations period may be material to a showing that [p]laintiffs were injured during the damages period."); "When the monopolist creates its monopoly by a series of repeated or reasserted acts designed to maintain its monopoly, the statute of limitation is restarted provided that the subsequent acts fall within the definition of 'independent' predicate acts." Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶320c.

by anticompetitive conduct that occurred on or after May 23, 2020. ~~You may not base any finding of injury or your overcharge calculation for damages on any anticompetitive conduct that occurred prior to May 23, 2020, regardless of whether you believe the conduct was unlawful and regardless of whether the harm or damages from that conduct continued after May 23, 2020.~~

~~While you may not consider injury or harm resulting from conduct that occurred before May 23, 2020, Plaintiffs have introduced evidence about conduct occurring before May 23, 2020 solely as background or context for the acts that took place on or after May 23, 2020. It is important that you consider this evidence only as background for the alleged conduct or injury that took place *after* May 23, 2020. Otherwise, this evidence has expired and cannot support Plaintiffs' claims.~~

---

Further, this instruction suggests that Ticketmaster's exclusionary efforts should be "dismember[ed ] and view[ed in] separate parts," which contradicts case law that a firm's exclusionary efforts must be considered in their totality. *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 353–55 (4th Cir. 2024); *United States v. Google LLC*, No. 1:23-CV-108 (LMB/JFA), 2025 WL 1132012, at *46 (E.D. Va. Apr. 17, 2025) ("As the Fourth Circuit made clear in *Duke Energy*, courts must avoid unduly divvying up a 'complex or atypical exclusionary campaign' into 'manufactured subcategories' and justify the actions using 'specific conduct tests.'").

**Post-Instruction No. 47**

### DAMAGES INSTRUCTIONS—GENERAL

If you find that any Plaintiff State claiming damages proved that Ticketmaster monopolized the alleged market for primary concert ticketing in violation of Section 2 of the Sherman Act, ~~or that Ticketmaster engaged in unlawful exclusive dealing in violation of Section 1 of the Sherman Act,~~ and you also find that the Plaintiff State proved that any such violation caused injury to residents of its State who purchased primary concert tickets to events at ~~so-called~~what Plaintiffs call "major concert venues" within the statute of limitations, then you must determine the amount of the overcharge, if any, paid by those residents in that Plaintiff State. The fact that I am giving you instructions concerning the issue of damages does not mean that I believe any Plaintiff should, or should not, prevail in this case. If you ~~reach a verdict for Ticketmaster on~~ find against Plaintiffs on their² claims for monopolization of the alleged market for primary concert tickets at ~~so-called~~what Plaintiffs call "major concert venues" in violation of Section 2 of the Sherman Act and laws of the Plaintiff States claiming damages, ~~or for exclusive dealing in violation of Section 1 of the Sherman Act and the laws of the Plaintiffs States claiming damages~~, you should not consider the issue of damages, and you may disregard the damages instruction that I am about to give.

The law provides that each Plaintiff State claiming damages can recover based on the amount of per-ticket overcharge imposed on primary concert tickets purchased by residents of that State for events at one or more of the venues Plaintiffs call "major concert venues," only if you find that the overcharge was caused by the conduct that you have found to be unlawful.

Antitrust damages are only compensatory, meaning their purpose is to put injured persons, if any, as near as possible in the position in which they would have been had the alleged antitrust violation not occurred. The law does not permit you to award any additional overcharge amount to punish a wrongdoer—what we sometimes refer to as punitive damages—or to deter particular conduct in the

future. Furthermore, you are not permitted to award to any of the Plaintiff States an amount for attorneys' fees or the costs of maintaining this lawsuit. Again, you are only being asked to determine the per-ticket overcharge paid by ticket purchasers in each Plaintiff State that proves the violations I described and meets the injury and causation requirements I described.

**Post-Instruction No. 48**

### COMPENSATORY DAMAGES—OVERCHARGE

Each Plaintiff State claiming damages contends that its residents paid higher fees added to the face value of primary tickets to concerts that took place at so-called "major concert venues," because Ticketmaster allegedly charged those venues more money for primary ticketing services than Ticketmaster would have but for Ticketmaster's alleged anticompetitive conduct.

If you find that any Plaintiff State has proven that Ticketmaster violated the antitrust laws I previously described, and that ~~as a direct result venues increased the ticketing fees paid by fans,~~as a result fans paid higher ticketing fees,[48] then for each Plaintiff State that satisfies the other elements for damages in my previous instructions, you must determine the per-ticket overcharge amount paid by residents of that State for primary concert tickets for events at so-called "major concert venues." The per-ticket overcharge amount is the difference between what residents of the Plaintiff State paid for fees added to the face value of tickets sold in the primary market during the damages period, and the amount of ticket fees you find those residents of that State would have paid but for Ticketmaster's alleged anticompetitive conduct. You are not being asked to determine, and may not speculate as to, the total number of tickets or ticket purchasers affected by any overcharge.

---

[48] **Plaintiffs' Argument:** As drafted, this clause suggests that the jury must find evidence of specific ticket fee increases by venues to award damages, as opposed to ticketing fees being higher than that would be absent the alleged anticompetitive conduct, which is the relevant inquiry for purposes of determining an overcharge. The clause as drafted also assumes that venues have full control over all ticketing fees, which is an issue in dispute in this trial. Also, as noted above in connection with Instruction No. 45, what is required is that Ticketmaster's conduct be a material cause of the injuries and resulting damages, not that it be a "direct" result.

96

**Post-Instruction No. 49**

## BASIS FOR CALCULATING OVERCHARGE

You are permitted to make just and reasonable estimates in determining the amount of the per-ticket overcharge for each Plaintiff State claiming damages that has proven it is entitled to recover damages. You are not required to calculate the amount of the overcharge with mathematical certainty or precision. However, the overcharge must have a reasonable basis in the evidence and must be based on reasonable, non-speculative assumptions and estimates. The overcharge may not be based on guesswork or speculation. Each Plaintiff State claiming damages must prove the reasonableness of each of the assumptions upon which the per-ticket overcharge for its State is based.

If you find that any Plaintiff State claiming damages has provided a reasonable basis for determining the per-ticket overcharge in its State, then you may find an overcharge amount for that State so long as that amount is a just and reasonable estimate supported by the evidence.

If you find that any Plaintiff State failed to carry its burden of providing a reasonable basis for determining the per-ticket overcharge in its State, then you may not find that any overcharge occurred in that State.

97

**Post-Instruction No. 49P**

**CALCULATION OF MONETARY RECOVERY FOR VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
(CAL. BUS. & PROF. CODE § 17200 ET SEQ.)**

If you find that Defendants have violated California's Unfair Competition Law, then you must determine the amount of the average per ticket overcharge, if any, that individuals who purchased primary concert tickets for live concert events at major concert venues in California are entitled to recover. This overcharge must have resulted from Defendants imposing ticketing fees that were higher than they would have been but for any business act or practice that you have found violated the Unfair Competition Law.

The fact that I am giving you instructions concerning the issue of the amount of monetary recovery under California's Unfair Competition Law does not mean that I believe any party should, or should not, prevail in this case. If you reach a verdict for Defendants on California's Unfair Competition Law, you may disregard the monetary recovery instructions that I am about to give.

The average per ticket overcharge amount is the difference between what fans paid for primary concert tickets for live events at major concert venues in California and the price you find that fans would have paid without the business act or practice that violated the Unfair Competition Law.

In addition, if you found that the unlawful or unfair act or practice that Defendants engaged in emanated from California and harmed consumers who paid for primary concert tickets for live events at major concert venues outside of California, you should separately determine the amount of overcharge for those consumers.

In calculating the overcharge amount, you must use a reasonable basis of computation. Your calculation of the overcharge amount may be an approximation. Your computation must be supported

by evidence. If you find that the State of California has failed to carry its burden of providing a reasonable basis for determining the amount of the overcharge, then you may not find any overcharge amount.[49]

---

[49] **Plaintiffs' Argument:** As stated in Plaintiffs' Joint Memorandum of Law in Support of Plaintiffs' Motion to Bifurcate Trial, the State of California believes that judicial efficiency is served by its request for monetary restitution being tried to the same jury as the liability claims. *See* ECF No. 528 at 7 n.3. The State of California's request for monetary restitution is based on the same evidence and testimony that will support the damages claims of the other states. Presenting the same testimony in another phase of the trial would be inefficient and unnecessary. Further, the Federal Rules permit a jury to sit in an advisory capacity on equitable claims such as the State of California's monetary relief claim where, as here, judicial efficiency would be best served by a single jury considering the claim with others in the case. *Starr Int'l Co. v. Am. Int'l Grp., Inc.*, 623 F. Supp. 2d 497, 502 (S.D.N.Y. 2009) ("Courts may empanel an advisory jury in order to maximize efficiency and convenience."). *Gragg v. City; of Omaha*, 20 F.3d 357, 358 (8th Cir. 1994) ("Having concluded the [state-law] claim was not triable of right to a jury, the district court properly exercised its initiative under Federal Rule of Civil Procedure 39(c) to try the claim with an advisory jury.").

~~Post-Instruction No.~~ **50**

## FINAL INSTRUCTIONS

You are about to go into the jury room and begin your deliberations. If during those deliberations you want to see any of the exhibits, you may request that they be brought into the jury room. If you want any of the testimony read back to you, you may also request that. Please remember that it is not always easy to locate what you might want to read or hear, so be as specific as you possibly can in requesting exhibits or portions of the testimony.

Your requests for exhibits or testimony—in fact, any communication with the Court—should be made to me in writing, signed by your foreperson, and given to one of the marshals. In any event, do not tell me or anyone else how the jury stands on any issue until after a unanimous verdict is reached.

*Duty to Deliberate/Unanimous Verdict*

You will now retire to decide the case. It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement. Each of you must decide the case for yourselves, but you should do so only after a consideration of the case with your fellow jurors, and you should not hesitate to change an opinion when convinced that it is erroneous. Your verdict must be unanimous, but you are not bound to surrender your honest convictions concerning the effect or weight of the evidence for the mere purpose of returning a verdict or solely because of the opinion of other jurors. Discuss and weigh your respective opinions dispassionately, without regard to sympathy, without regard to prejudice or favor for either party, and adopt that conclusion which in your good conscience appears to be in accordance with the truth.

100

Again, each of you must make your own decision about the proper outcome of this case based on your consideration of the evidence and your discussions with your fellow jurors. No juror should surrender their conscientious beliefs solely for the purpose of returning a unanimous verdict.

*Selection of Foreperson*

When you retire, you should elect one member of the jury as your foreperson. That person will preside over the deliberations and speak for you here in open court.

Verdict forms have been prepared for your convenience. You will take these forms to the jury room and, when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date, and sign the form that sets forth the verdict upon which you unanimously agree. You will then return with your verdict to the courtroom. I will read the verdict form to you now.

*Return of Verdict*

After you have reached a verdict, your foreperson will fill in the form that has been given to you, each of you will sign it with the date and advise the marshal outside your door that you are ready to return to the courtroom.

I will stress that each of you should be in agreement with the verdict which is announced in court. Once your verdict is announced by your foreperson in open court and officially recorded, it cannot ordinarily be revoked.

*Juror Oath*

In determining the facts, you are reminded that you took an oath to render judgment impartially and fairly, without prejudice and without fear, solely upon the evidence in the case and the applicable law. I know that you will do this and reach a just and true verdict.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA et al.,

      *Plaintiffs*,

      v.                     Civil No. 1:24–cv–3973-AS

LIVE NATION ENTERTAINMENT, INC.,
and TICKETMASTER L.L.C.,

      *Defendants*.

**<u>PROPOSED VERDICT FORM</u>**

**VERDICT FORM**[1]

**Part I: Section 2 Monopolization Claim Against Ticketmaster For Alleged Market Of Primary Ticketing Services To The Venues Plaintiffs Refer To As "Major Concert Venues"**

1.      Have Plaintiffs proven, by a preponderance of the evidence, that primary ticketing services to the venues Plaintiffs refer to as "major concert venues" is a properly-defined antitrust market?
Yes_____          No_____
*If you answered "Yes," proceed to Question 2.*
*If you answered "No," proceed to Question 5.*

~~1.~~2.      Have Plaintiffs proven, by a preponderance of the evidence, that Ticketmaster willfully acquired or maintained monopoly power in the market for primary ticketing services to what Plaintiffs refer to as "major concert venues" by engaging in anticompetitive conduct?
Yes_____          No_____
*If you answered "Yes," proceed to Question 2~~3~~.*
*If you answered "No," proceed to Question 3~~5~~.*

3.      Have Plaintiffs proven, by a preponderance of the evidence, that ~~Live Nation controlled, dictated, or encouraged~~ Ticketmaster's alleged anticompetitive conduct caused anticompetitive effects in ~~this~~the market~~?~~ for primary ticketing services to what Plaintiffs refer to as "major concert venues"?
Yes_____          No_____
~~*Proceed*~~*If you answered "Yes," proceed to Question 4.*
*If you answered "No," proceed to Question 5.*

~~2.~~4.      Have Plaintiffs proven, by a preponderance of the evidence, that Live Nation controlled, dictated, or encouraged Ticketmaster's anticompetitive conduct in this market?
Yes_____          No_____
*Proceed to Question 5~~3~~.*

**Part II: Section 2 Monopolization Claim Against Ticketmaster For Alleged Market Of Primary *Concert* Ticketing Services To The Venues Plaintiffs Refer To As "Major Concert Venues"**

5.      Have Plaintiffs proven, by a preponderance of the evidence, that primary *concert* ticketing services to the venues Plaintiffs refer to as "major concert venues" is a properly-defined antitrust market?
Yes_____          No_____

---

[1] In this document, where the redline shows that one side proposes to delete language, the other side does not agree to delete that language unless explicitly stated.  Likewise, where the redline shows that one side proposes to add language, the other side does not agree to add that language unless explicitly stated.

1

*If you answered "Yes," proceed to Question 6.*
*If you answered "No," proceed to Question 9.*

3.6.    Have Plaintiffs proven, by a preponderance of the evidence, that Ticketmaster willfully acquired or maintained monopoly power in the market for primary *concert*[2] [3] ticketing services to what Plaintiffs refer to as "major concert venues" by engaging in anticompetitive conduct?
Yes _____        No _____
**If you answered "Yes," proceed to Question 74.**
**If you answered "No," proceed to Question 95.**

7.        Have Plaintiffs proven, by a preponderance of the evidence, that Ticketmaster's alleged anticompetitive conduct caused anticompetitive effects in the market for primary *concert* ticketing services to what Plaintiffs refer to as "major concert venues"?
Yes _____        No _____
*If you answered "Yes," proceed to Question 8.*
*If you answered "No," proceed to Question 9.*

4.8.    Have Plaintiffs proven, by a preponderance of the evidence, that Live Nation controlled, dictated, or encouraged Ticketmaster's anticompetitive conduct in this market?
Yes _____        No _____
**Proceed to Question 95.**

**Part III: Section 2 Monopolization Claim Against Live Nation For Alleged Market Of Use Of Venues Plaintiffs Refer To As "Large Amphitheaters" By Artists**

9.        Have Plaintiffs proven, by a preponderance of the evidence, that use of the venues Plaintiffs refer to as "large amphitheaters" is a properly-defined antitrust market?
Yes _____        No _____
*If you answered "Yes," proceed to Question 10.*
*If you answered "No," proceed to Question 12.*

5.10.    Have Plaintiffs proven, by a preponderance of the evidence, that Live Nation willfully acquired or maintained monopoly power in the market for the use of venues Plaintiffs refer to as "large amphitheaters" by engaging in anticompetitive conduct?
Yes _____        No _____
*If you answered "Yes," proceed to Question 11.*
*If you answered "No," proceed to Question 12.*

11.        Have Plaintiffs proven, by a preponderance of the evidence, that Live Nation's alleged anticompetitive conduct caused anticompetitive effects in the market for the use of venues Plaintiffs refer to as "large amphitheaters"?

---

[2] **Plaintiffs' Argument:** Plaintiffs recommend italicizing "concert" (as with the Part title) for purposes of clarity.

[3] **Defendants' Argument:** Defendants do not object to italicizing "concert".

2

Yes _____ No _____
*Proceed to Question 6<ins>12.</ins>*

~~**Part IV: Section 1 Exclusive Dealing Claim Against Ticketmaster**~~[4][5]

~~6.     Have Plaintiffs proven, by a preponderance of the evidence, that the contracts between the venues Plaintiffs refer to as "major concert venues" and Ticketmaster substantially foreclosed competition in a relevant market for primary concert ticketing services to those major concert venues?~~

~~*If you answered "Yes," proceed to Question 7.*~~
~~*If you answered "No," proceed to Question 8.*~~

~~7.     Have Plaintiffs proven, by a preponderance of the evidence, that those contracts are an unreasonable restraint of trade that has caused anticompetitive effects in the market for primary concert ticketing services to major concert venues?~~

~~Yes _____ No _____~~
~~*Proceed to Question 8.*~~

**Part ~~V~~IV: Section 1 Tying Claim Against Live Nation**

*If you answered "Yes" to Question 9, proceed to Question 12.*
*If you answered "No" to Question 9, proceed to Question 14.*

12.     Have Plaintiffs proven, by a preponderance of the evidence, that artists are the customers who rent amphitheaters, and not promoters?
Yes _____ No _____
*If you answered "Yes," proceed to Question 13.*
*If you answered "No," proceed to Question 14.*

~~8.~~13.   Have Plaintiffs proven, by a preponderance of the evidence, that there is a relevant market for the use of venues Plaintiffs refer to as "large amphitheaters," and that Live Nation unlawfully tied artist promotion services to the artists' use of those "large amphitheaters"?
Yes _____          No_____
*Proceed to Question ~~9~~14.*
~~7~~9.

_____

[4] **Plaintiffs' Argument:** Plaintiffs agree with withdraw their claim based on exclusive dealing under Section 1 of the Sherman Act.

[5] **Defendants' Argument:**  Defendants agree to delete these questions given that Plaintiffs have withdrawn their Section 1 exclusive dealing claim.

3

**Part VI: ~~Congruent State Law Claims~~State Impact**

~~9.~~14.   Has each of the following Plaintiff States proven, by a preponderance of the evidence, that Live Nation, Ticketmaster or both, engaged in unlawful conduct that harmed competition in its State?[6]

| State | Live Nation (check if YES) | No | Ticketmaster (check if YES) | No |
|---|---|---|---|---|
| Arizona | | | | |
| California[7] | | | | |
| Colorado | | | | |
| Connecticut | | | | |
| District of Columbia | | | | |
| Florida | | | | |
| Illinois | | | | |
| Indiana | | | | |
| Kansas | | | | |
| Louisiana | | | | |
| Massachusetts | | | | |
| Maryland | | | | |
| Michigan | | | | |
| Minnesota | | | | |
| Nevada | | | | |

[6] **Plaintiffs' Argument:** Plaintiff have revised the chart associated with this question because we believe the jury should make a finding regarding harm to competition for each state bringing a claim. Prior versions of the proposed form made these findings as part of separate questions and Plaintiffs believe dealing with all States in the context of one question will reduce the risk of jury confusion.

[7] **Plaintiffs' Argument:** As stated in Plaintiffs' Joint Memorandum of Law in Support of Plaintiffs' Motion to Bifurcate Trial, the State of California believes that judicial efficiency is served by its request for monetary restitution being tried to the same jury as the liability claims. *See* ECF No. 528 at 7 n.3.  The State of California's request for monetary restitution is based on the same evidence and testimony that will support the damages claims of the other states. Presenting the same testimony in another phase of the trial would be inefficient and unnecessary.  Further, the Federal Rules permit a jury to sit in an advisory capacity on equitable claims such as the State of California's monetary relief claim where, as here, judicial efficiency would be best served by a single jury considering the claim with others in the case. *See* Fed. R. Evid. 39(c); *Starr Int'l Co. v. Am. Int'l Grp., Inc.*, 623 F. Supp. 2d 497, 502 (S.D.N.Y. 2009) ("Courts may empanel an advisory jury in order to maximize efficiency and convenience."); *Lavalle-Cervantes v. Int'l Hosp. Assocs.*, 261 F. Supp. 3d 197, 200 (D.P.R. 2016); *see also Gragg v. City; of Omaha*, 20 F.3d 357, 358 (8th Cir. 1994) ("Having concluded the [state-law] claim was not triable of right to a jury, the district court properly exercised its initiative under Federal Rule of Civil Procedure 39(c) to try the claim with an advisory jury.)

4

| New Hampshire | | | | |
|---|---|---|---|---|
| New Jersey | | | | |
| New Mexico | | | | |
| New York | | | | |
| North Carolina | | | | |
| Ohio | | | | |
| Oregon | | | | |
| Pennsylvania | | | | |
| Rhode Island | | | | |
| South Carolina | | | | |
| Tennessee | | | | |
| Texas | | | | |
| Utah | | | | |
| Vermont | | | | |
| Virginia | | | | |
| Washington | | | | |
| West Virginia | | | | |
| Wisconsin | | | | |
| Wyoming | | | | |

*Proceed to Question ~~10~~15~~810~~.*

**Part VI~~I~~: Damages**

*If you answered "Yes" to ~~all Questions in Part I, Question 3 in~~ Part II, ~~or Part IV, proceedIv~~and answered "Yes" with respect to Question ~~10~~15.Ticketmaster for any State in Question 7 in Part V, proceed to Question 8~~10~~.  If not, proceed to Question ~~11~~16.9~~11~~.[8]*

---

[8] **Plaintiffs' Argument:** The Plaintiff States propose revising this preliminary paragraph to make clear the jury may only award damages related to Plaintiffs' claims for monopolization of primary concert ticketing services, and only for States where the jury has found harm to competition. For the reasons in Plaintiffs' comments to the jury instructions, Ticketmaster is the relevant Defendant for this inquiry, and the ability to award damages does not turn on a finding of liability by Live Nation for this claim.

10.15.  Please state the amount (if any) that each Plaintiff State proved, by a preponderance of the evidence, that residents in its specific State were overcharged per ticket for primary concert tickets to events at the venues Plaintiffs call "major concert venues" because of Ticketmaster's alleged anticompetitive conduct that occurred after May 23, 2020.  You may not calculate any overcharge based on any alleged anticompetitive conduct that occurred before May 23, 2020.[9]

| State | |
|---|---|
| Arizona | $ |
| California | $ |
| Colorado | $ |
| Connecticut | $ |
| District of Columbia | $ |
| Florida | $ |
| Illinois | $ |
| Indiana | $ |
| Kansas[10] | $ |
| Louisiana | $ |
| Maryland | $ |
| Michigan | $ |
| Minnesota | $ |
| Nevada | $ |
| New Hampshire | $ |
| New Jersey | $ |
| New Mexico | $ |
| New York | $ |
| North Carolina | $ |
| OhioPennsylvania | $ |
| Rhode Island | $ |
| South Carolina | $ |
| Texas | $ |
| Utah | $ |
| Vermont | $ |
| Virginia | $ |
| Washington | $ |
| West Virginia | $ |
| Wisconsin | $ |

*Proceed to Question 116911.*

---

[9] **Plaintiffs' Argument:** Plaintiffs propose cutting these clauses. The jury will receive a specific instruction on the statute of limitations, and the current formulation is not consistent with Plaintiffs' proposed edits to the jury instructions.

[10] **Plaintiffs' Argument:** The Plaintiff States have revised this table to accurately reflect the States seeking damages (or, in the case of California, other monetary relief).

**Part VIII: Other State Law Claims And Damages**

**California Unfair Competition Law**

11.16.  Has California proven, by a preponderance of the evidence, that Ticketmaster engaged in an unlawful or unfair business act or practice that occurred within California, emanated from California, or harmed California residents in violation of the California Unfair Competition Law?
Yes _____          No_____
*Proceed to Question 1217102.*

12.17.  Has California proven, by a preponderance of the evidence, that Live Nation engaged in an unlawful or unfair business act or practice that occurred within California, emanated from California, or harmed California residents in violation of the California Unfair Competition Law?
Yes _____          No_____
*Proceed to Question 1318113.*

**Florida Trade Practices Act**

13.18.  Has Florida proven, by a preponderance of the evidence, that Ticketmaster engaged in an unfair method of competition in violation of the Florida Deceptive and Unfair Trade Practices Act?
Yes _____          No_____
*Proceed to Question 1419124.*

14.19.  Has Florida proven, by a preponderance of the evidence, that Live Nation engaged in an unfair method of competition in violation of the Florida Deceptive and Unfair Trade Practices Act?
Yes _____          No_____
*Proceed to Question 1520135.*

**Illinois Antitrust Act**

15.20.  Has Illinois proven, by a preponderance of the evidence, that Ticketmaster engaged in unlawful conduct in violation of the Illinois Antitrust Act?
Yes _____          No_____
*Proceed to Question 16214.*

16.21.  Has Illinois proven, by a preponderance of the evidence, that Live Nation engaged in unlawful conduct in violation of the Illinois Antitrust Act?
Yes _____          No_____
*Proceed to Question 17225.*

**Indiana Antitrust Act**

17.22.  Has Indiana proven, by a preponderance of the evidence, that Ticketmaster engaged in unlawful conduct after July 1, 2023 in violation of the Indiana Antitrust Act?
Yes _____                No_____
*Proceed to Question 1823168.*

18.23.  Has Indiana proven, by a preponderance of the evidence, that Live Nation engaged in unlawful conduct after July 1, 2023 in violation of the Indiana Antitrust Act?
Yes _____                No_____
*Proceed to Question 1924179.*

**Kansas Restraint Of Trade Act**

19.24.  Has Kansas proven, by a preponderance of the evidence, that Ticketmaster engaged in unlawful conduct in violation of the Kansas Restraint Of Trade Act?
Yes _____                No_____
*Proceed to Question 20251820.*

20.25.  Has Kansas proven, by a preponderance of the evidence, that Live Nation engaged in unlawful conduct in violation of the Kansas Restraint Of Trade Act?
Yes _____                No_____
*Proceed to Question 21261921.*

**New York – Donnelly Act**

21.26.  Has New York proven, by a preponderance of the evidence, that Ticketmaster maintained monopoly power through anticompetitive conduct involving the use of contracts, agreements, arrangements, or combinations, in violation of New York's Donnelly Act?
Yes _____                No_____
*Proceed to Question 2227202.*

22.27.  Has New York proven, by a preponderance of the evidence, that Live Nation maintained monopoly power through anticompetitive conduct involving the use of contracts, agreements, arrangements, or combinations, in violation of New York's Donnelly Act?
Yes _____                No_____
*Proceed to Question 2328213.*

**South Carolina Unfair Trade Practices Act**

23.28.  Has South Carolina proven, by a preponderance of the evidence, that Ticketmaster engaged in an unfair method of competition in violation of the South Carolina Unfair Trade Practices Act?
Yes _____                No_____
*Proceed to Question 2429224.*

8

24.29.  Has South Carolina proven, by a preponderance of the evidence, that Live Nation engaged in an unfair method of competition in violation of the South Carolina Trade Practices Act?
Yes _____          No_____
***Proceed to Question 2530253.***

**Tennessee Trade Practices Act**

25.30.  Has Tennessee proven, by a preponderance of the evidence, that Ticketmaster engaged in unlawful conduct after April 23, 2024 in violation of the Tennessee Trade Practices Act?
Yes _____          No_____
***Proceed to Question 2631246.***

26.31.  Has Tennessee proven, by a preponderance of the evidence, that Live Nation engaged in unlawful conduct after April 23, 2024 in violation of the Tennessee Trade Practices Act?
Yes _____          No_____
***Proceed to Question 25.***

**Vermont Consumer Protection Act[11]**

32.      Has Vermont proven, by a preponderance of the evidence, that Ticketmaster engaged in an unfair method of competition in violation of the Vermont Consumer Protection Act?
Yes_____          No_____
***Proceed to Question 26.***

33.      Has Vermont proven, by a preponderance of the evidence, that Live Nation engaged in an unfair method of competition in violation of the Vermont Consumer Protection Act?
Yes_____          No_____

Your deliberations are now complete. Sign this verdict form and notify the clerk that your deliberations are complete.[12]

---

[11] **Plaintiffs' Argument:** For the reasons stated in Plaintiffs' proposed edits to the jury instructions, Plaintiffs submit the questions specific to Vermont should be incorporated here.

[12] **Defendants' Argument**:  Defendants object to a verdict form that does not enumerate each claim's elements that Plaintiffs must satisfy.  It is commonplace in antitrust cases, to enumerate claims' elements.  *See, e.g.*, *Tevra Brands LLC v. Bayer Healthcare LLC*, No. 5:19-cv-4312, ECF No. 485 (N.D. Cal. Aug. 1, 2024); *Pacific Surf Designs, Inc. v. WhiteWater West Industries, Ltd.*, No. 3:20-cv-1464, ECF No. 313 (S.D. Cal. Aug. 28, 2023); *Deutscher Tennis Bund v. ATP Tour Inc.*, No. 1:07-cv-178, ECF No. 195 (D. Del. Aug. 5, 2008).  And courts have long recognized that doing so facilitates "review, uniformity, and possibly postverdict judgments as a matter of law," *Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 39 n.8 (1997), as well as "the process of appellate review," *United States v. Poehlman*, 217 F.3d 692, 698 n.7 (9th Cir. 2000); *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 285 (2d Cir. 1998) ("We are somewhat hampered in our review of the district court's decision because of the generality of the

9

DATED:_____

FOREPERSON SIGNATURE:_____

---

instructions given to the jury and the lack of specificity in the verdict it returned.").  At minimum, the jury should be asked to state its findings on market definition and anticompetitive effects for the monopolization claims, and the identity of the purchaser for the tying claim.  These issues are hotly disputed between the parties, and jury findings on them will facilitate postverdict motions and appellate review.

`UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA, et al.,

Plaintiffs,

LIVE NATION ENTERTAINMENT, INC.,
and TICKETMASTER L.L.C.,

Defendants.

---

Case No. 1:24-cv-03973-AS

## PROPOSED JURY INSTRUCTIONS[1]

Pursuant to Rule 51(a) of the Federal Rules of Civil Procedure and the Court's Individual

Practices in Civil Cases, Paragraph D, Plaintiffs the States of Arizona, California, Colorado,

Connecticut, Florida, Illinois, Indiana, Kansas, Louisiana, Maryland, Michigan, Minnesota, Nevada,

New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, Oregon, Rhode Island,

South Carolina, Tennessee, Texas, Utah, Vermont, Washington, West Virginia, Wisconsin, and

Wyoming, the Commonwealths of Massachusetts, Pennsylvania, and Virginia, and the District of

Columbia, acting by and through their respective Attorneys General (collectively, "Plaintiff States"),

together with Defendants Live Nation Entertainment, Inc., and Ticketmaster L.L.C. (collectively,

"Defendants"), respectfully request that the Court provide the following instructions to the jury. For

those instructions where the parties could not reach agreement, Plaintiffs and Defendants have

---

[1] **Defendants' Argument:**  In addition to the arguments provided in this document, Defendants incorporate by reference the arguments and authorities provided in their prior submissions of proposed jury instructions, as well as the arguments made in their pending motions for judgment as a matter of law, for sanctions, and to strike the testimony of Dr. Abrantes-Metz.  *See* ECF No. 1031-10; Defendants' Proposed Jury Instructions submitted Mar. 23, 2026; ECF No. 1348; ECF No. 1362; ECF No. 1378; Trial Tr. 3968:11-20 (noting that "objections are preserved").

separately set forth their proposed instruction together with short arguments, including citations to supporting authority.

**Contents**

**Post-Instruction No. 1** ..................................................................................................**8**

**GENERAL INTRODUCTION** .........................................................................................**8**

**Post-Instruction No.2** ...................................................................................................**10**

**USE OF NOTES** ..............................................................................................................**10**

**Post-Instruction No.3** ...................................................................................................**11**

**JUROR USE OF ELECTRONIC COMMUNICATION TECHNOLOGIES** .....................**11**

**Post-Instruction No. 4** ..................................................................................................**12**

**THE PARTIES** ................................................................................................................**12**

**Post-Instruction No.5** ...................................................................................................**13**

**ALL PERSONS EQUAL BEFORE THE LAW—ORGANIZATIONS** ...............................**13**

**Post-Instruction No. 6** ..................................................................................................**14**

**EVIDENCE IN THE CASE** .............................................................................................**14**

**Post-Instruction No. 7** ..................................................................................................**15**

**ELECTION OF FOREPERSON OR PRESIDING JUROR; DUTY TO DELIBERATE; COMMUNICATIONS WITH COURT; CAUTIONARY; UNANIMOUS VERDICT; VERDICT FORM** .............................................................................................................**15**

**Post-Instruction No. 8** ..................................................................................................**17**

**WITNESS CREDIBILITY** ..............................................................................................**17**

**Post-Instruction No. 9** ..................................................................................................**19**

**USE OF DEPOSITIONS AS EVIDENCE** ......................................................................**19**

**Post-Instruction No. 10** ................................................................................................**20**

**EXPERT TESTIMONY** ...................................................................................................**20**

**Post-Instruction No. 11** ................................................................................................**21**

**BURDEN OF PROOF—PREPONDERANCE OF THE EVIDENCE** ...............................**21**

**Post-Instruction No.12** .................................................................................................**22**

**DIRECT AND CIRCUMSTANTIAL EVIDENCE** ............................................................**22**

**Post-Instruction No.13**..............................................................................................**24**

**INFERENCES**..............................................................................................................**24**

**Post-Instruction No. 14**............................................................................................**25**

**SUMMARY OF CONTENTIONS**...........................................................................**25**

**Post-Instruction No. 15**............................................................................................**28**

**MONOPOLIZATION ELEMENTS**.........................................................................**28**

**Post-Instruction No. 16**............................................................................................**30**

**MONOPOLIZATION ELEMENT #1: RELEVANT MARKET—GENERAL**....................**30**

**Post-Instruction No. 17**............................................................................................**31**

**RELEVANT PRODUCT MARKET—General**.........................................................**31**

**Post-Instruction No. 18**............................................................................................**38**

**MONOPOLIZATION ELEMENT #2: MONOPOLY POWER**.............................................**38**

**Post-Instruction No. 19**............................................................................................**39**

**EXISTENCE OF MONOPOLY POWER—DIRECT PROOF**.................................**39**

**Post-Instruction No. 20**............................................................................................**42**

**EXISTENCE OF MONOPOLY POWER—INDIRECT PROOF**...........................**42**

**Post-Instruction No. 21**............................................................................................**46**

**MONOPOLIZATION ELEMENT #3: WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY POWER THROUGH ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT** ....................................................................................................................**46**

**Post-Instruction No. 22**............................................................................................**50**

**ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT—EXCLUSIVE DEALING SHERMAN ACT SECTION 2**......................................................................................**50**

**Post-Instruction No. 23**............................................................................................**52**

**THREATS AND RETALIATION** .............................................................................**52**

**Post-Instruction No. 24**............................................................................................**55**

**EXCLUSIVE DEALING AGAINST TICKETMASTER—SHERMAN ACT SECTION 155**

**Post Instruction 25** ......................................................................................................57

**LIVE NATION'S LIABILITY FOR TICKETMASTER'S ALLEGED CONDUCT**...........57

**Post-Instruction No. 26** ................................................................................................58

**UNLAWFUL TYING AGAINST LIVE NATION** ........................................................58

**Post-Instruction No. 27** ................................................................................................62

**UNLAWFUL TYING—IDENTITY OF THE PURCHASER** ..................................62

**Post-Instruction No. 28** ................................................................................................63

**UNLAWFUL TYING—PRESENCE OF TWO PRODUCTS** ..................................63

**Post-Instruction No. 29** ................................................................................................64

**UNLAWFUL TYING—PROOF OF CONDITIONING** ..........................................64

**Post-Instruction No. 30** ................................................................................................65

**UNLAWFUL TYING—PROOF OF COERCION**....................................................65

**Post-Instruction No. 31** ................................................................................................66

**UNLAWFUL TYING—MARKET POWER IN THE TYING MARKET** ...........................66

**Post-Instruction No. 32** ................................................................................................67

**UNLAWFUL TYING—ANTICOMPETITIVE EFFECTS FOR THE TIED PRODUCT**..67

**Post-Instruction No. 33** ................................................................................................68

**UNLAWFUL TYING—NOT INSUBSTANTIAL AMOUNT OF INTERSTATE
COMMERCE**....................................................................................................................68

**Post-Instruction No. 34** ................................................................................................69

**STATE LAW CLAIMS**....................................................................................................69

**Post-Instruction No. 35** ................................................................................................70

**CONGRUENT STATE CLAIMS** ...................................................................................70

**Post-Instruction No. 36** ................................................................................................72

**CALIFORNIA UNFAIR COMPETITION LAW  (Cal. Bus. & Prof. Code § 17200 *et
seq.*)**....................................................................................................................................72

**Post-Instruction No. 37**................................................................................................74

**FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT (Fla. Stat. § 501.204)** 74

**Post-Instruction No. 38** .................................................................................................. 75

**ILLINOIS ANTITRUST ACT (740 ILCS 10/1 et seq.)** .................................................. 75

**Post-Instruction No. 39** .................................................................................................. 77

**INDIANA ANTITRUST ACT (IND. CODE §§ 24-1-2-1 AND 24-1-2-2)** ............................ 77

**Post-Instruction No. 40** .................................................................................................. 78

**KANSAS RESTRAINT OF TRADE ACT (Kan. Stat. Ann. § 50-101 et seq.)** ..................... 78

**Post-Instruction No. 41** .................................................................................................. 80

**DONNELLY ACT (New York General Business Law §§ 340 et seq.)** ................................... 80

**Post-Instruction No. 42** .................................................................................................. 82

**SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT  (S.C. Code Ann. § 39-5-10 et seq.)** .................................................................................................................................... 82

**Post-Instruction No. 43** .................................................................................................. 84

**TENNESSEE TRADE PRACTICES ACT  (TENN. CODE ANN. §§ 47-25-101 AND 102)** 84

**Post-Instruction No. 44** .................................................................................................. 85

**STATES DAMAGES CLAIMS** ......................................................................................... 85

**Post-Instruction No. 45** .................................................................................................. 87

**INJURY AND CAUSATION** ............................................................................................. 87

**Post-Instruction No. 46** .................................................................................................. 89

**STATUTE OF LIMITATIONS** ......................................................................................... 89

**Post-Instruction No. 47** .................................................................................................. 90

**DAMAGES INSTRUCTIONS—GENERAL** ...................................................................... 90

**Post-Instruction No. 48** .................................................................................................. 92

**COMPENSATORY DAMAGES—OVERCHARGE** ............................................................ 92

**Post-Instruction No. 49** .................................................................................................. 93

**BASIS FOR CALCULATING OVERCHARGE** ................................................................. 93

**Post-Instruction No. 50**..................................................................................................**94**

**FINAL INSTRUCTIONS**.............................................................................................**94**

**Post-Instruction No. 1**

### GENERAL INTRODUCTION

Now that you have heard the evidence and the argument, it is my duty to instruct you about the applicable law. It is your duty to follow the law as I state it. You must apply the law to the facts as you find them from the evidence in the case. Do not single out one instruction as stating the law, but consider the instructions as a whole. Do not be concerned about the wisdom of any rule of law stated by me. You must follow and apply the law.

Nothing I say in these instructions indicates I have any opinion about the facts of the case. You, not I, have the duty to determine the facts.

You must perform your duties as jurors without bias or prejudice as to any party. The law does not permit you to be controlled by sympathy, prejudice, or public opinion. The parties expect that you will carefully and impartially consider all the evidence, follow the law as it is now being given to you, and reach a just unanimous verdict, regardless of the consequences.

**Post-Instruction No. 2**

## USE OF NOTES

You may use the notes taken by you during the trial.  The notes, however, should not be substituted for your memory.  Remember, notes are not evidence.  If your memory should differ from your notes, then you should rely on your memory and not on your notes. Please remember that you can always ask for any portion of the transcript, or exhibit, to be provided to you during deliberations.

**Post-Instruction No. 3**

### JUROR USE OF ELECTRONIC COMMUNICATION TECHNOLOGIES

Throughout your deliberations, you may discuss with each other the evidence and the law that has been presented in this case, but you must not communicate with anyone else by any means about the case.  You also cannot learn from outside sources about the case, the matters in the case, the legal issues in the case, or individuals or other entities involved in the case.  This means you may not use any electronic device or media (such as a phone, computer, or tablet), the internet, any text or instant messaging service, or any social media apps (such as X (formerly known as Twitter), Facebook, Instagram, LinkedIn, YouTube, WhatsApp, and Snapchat) to research or communicate about what you've seen and heard in this courtroom.

These restrictions continue during deliberations because it is essential, under our Constitution, that you decide this case based solely on the evidence and law presented in this courtroom.  Information you find on the internet or through social media may be incomplete, misleading, or inaccurate.  As I noted in my instructions at the start of the trial, even using your smartphones, tablets, and computers—and the news and social media apps on those devices—may inadvertently expose you to certain notices, such as pop-ups or advertisements, that could influence your consideration of the matters you've heard about in this courtroom.

You are permitted to discuss the case with only your fellow jurors during deliberations because they have seen and heard the same evidence and instructions on the law that you have, and it is important that you decide this case solely on the evidence presented during the trial, without undue influence by anything or anyone outside of the courtroom.  For this reason, I expect you to inform me at the earliest opportunity, should you learn about or share any information about this case outside of this courtroom or the jury room, or learn that another juror has done so.

**Post-Instruction No. 4**

## THE PARTIES

As I instructed you earlier, the Plaintiffs are the [33] individual States and the District of Columbia. The Defendants in this case are Live Nation Entertainment, Inc. and Ticketmaster L.L.C.

Unless otherwise stated, these instructions apply to all parties.

**Post-Instruction No. 5**

## ALL PERSONS EQUAL BEFORE THE LAW—ORGANIZATIONS

A corporation is entitled to the same fair trial as a private individual or governmental entity like a state.  All persons, governmental entities, and corporations, stand equal before the law, and are to be treated as equals.

**Post-Instruction No. 6**

## EVIDENCE IN THE CASE

Unless you are otherwise instructed, the evidence in the case consists of the sworn testimony of the witnesses regardless of who may have called the witness, all exhibits received in evidence regardless of who may have produced them, and all facts and events that may have been admitted, stipulated to, or taken judicial notice of.

Statements and arguments by the lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statement, closing arguments, and at other times is intended to help you understand the evidence, but it is not evidence. However, as I explained at the beginning of this trial, the lawyers on both sides have agreed on certain facts known as stipulations, and you must treat those facts as proven.

Any question to which I have sustained an objection and evidence that I have ordered stricken must be entirely disregarded.

**Post-Instruction No. 7**

**ELECTION OF FOREPERSON OR PRESIDING JUROR; DUTY TO DELIBERATE; COMMUNICATIONS WITH COURT; CAUTIONARY; UNANIMOUS VERDICT; VERDICT FORM**

You must follow these rules while deliberating and returning your verdict:

First, when you go to the jury room, you must select a foreperson. The foreperson will preside over your discussions and speak for you here in court.

Second, it is your duty, as jurors, to discuss this case with one another in the jury and try to reach agreement.

Each of you must make your own conscientious decision, but only after you have considered all the evidence, discussed it fully with the other jurors, and listened to the views of the other jurors.

Do not be afraid to change your opinions if the discussion persuades you that you should. But do not make a decision simply because other jurors think it is right, or simply to reach a verdict. Remember at all times that you are judges of the facts. Your sole interest is to seek the truth from the evidence in the case.

Third, if you need to communicate with me during your deliberations, send me a note signed by one or more of you. Give the note to the Marshal and I will answer you as soon as I can, either in writing or here in court. While you are deliberating, do not tell anyone—including me—how many jurors are voting for any side.

Fourth, your verdict must be based solely on the evidence and on the law I have given to you in these instructions. The verdict must be unanimous. Nothing I have said or done is intended to suggest what your verdict should be—that is entirely for you to decide.

Finally, the verdict form is simply the written notice of the decision that you reach in this case. You will take this form to the jury room, and when each of you has agreed on the verdict, your

foreperson will fill in the form, sign and date it, and advise the Marshal that you are ready to return to

the courtroom.

**Post-Instruction No. 8**

## WITNESS CREDIBILITY

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

1.     the opportunity and ability of the witness to see or hear or know the things testified to;

2.     the witness's memory;

3.     the witness's manner while testifying;

4.     the witness's interest in the outcome of the case, if any;

5.     the witness's bias or prejudice, if any;

6.     whether other evidence contradicted the witness's testimony;

7.     the reasonableness of the witness's testimony in light of all the evidence; and

8.     any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened.  People often forget things or make mistakes in what they remember.  Also, two people may see the same event but remember it differently.  You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said.  On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify. What is important is how believable the witnesses were, and how much weight you think their testimony deserves.

**Post-Instruction No. 9**

### USE OF DEPOSITIONS AS EVIDENCE

During the trial, certain testimony has been presented by way of deposition. The deposition consisted of sworn, recorded answers to questions asked of the witness in advance of the trial by the attorneys. The testimony of a witness who, for some reason, is not present to testify from the witness stand may be presented under oath on a videotape. Such testimony is entitled to the same consideration and is to be judged as to credibility, weighed, and otherwise considered by you in the same way as if the witness had been present and testified from the witness stand.

**Post-Instruction No. 10**

## EXPERT TESTIMONY

You have heard testimony from a number of witnesses who were designated by the respective parties as "experts." These designated witnesses are allowed to express opinions on matters about which they may have special knowledge and training. This testimony is presented to you on the theory that someone who is experienced in a particular field may be able to assist you in understanding the evidence and in reaching your independent decision on the facts.

In weighing this type of testimony, you may consider the witness's qualifications, opinions, reasons for testifying, as well as all the other considerations that ordinarily apply when you are deciding whether to believe a witness's testimony.

The expert witness's testimony was based on particular facts, as the witness obtained knowledge of them and testified to them before you, or as the attorneys who questioned the designated witness asked them to assume. You may reject such a witness's opinion if you find the facts in the case to be different from those that formed the basis for the opinion.

You may give "expert" testimony whatever weight, if any, you find it deserves in light of all of the evidence in the case and the witness's interest in the proceeding, including any compensation for work the expert may have received. You should not, however, accept the testimony merely because it is given by a designated "expert," nor should you substitute it for your own reason, judgment, and common sense. The determination of the facts in this case rests solely with you.

**Post-Instruction No. 11**

### BURDEN OF PROOF—PREPONDERANCE OF THE EVIDENCE

As I instructed you earlier, in this case, Plaintiffs must prove every essential element of each of their claims against each Defendant by a preponderance of the evidence. If Plaintiffs should fail to establish any essential element of one of their claims by a preponderance of the evidence against any Defendant, you should find for each such Defendant as to that claim.

"To prove by a preponderance of the evidence" means to prove something is more likely than not. In determining whether any fact in issue has been proved by a preponderance of the evidence, unless otherwise instructed, you may consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

**Post-Instruction No. 12**

### DIRECT AND CIRCUMSTANTIAL EVIDENCE

Generally speaking, there are two types of evidence presented during a trial—direct evidence and circumstantial evidence.  Direct evidence is testimony by a witness about something he knows by virtue of his own senses—something he has seen, felt, touched, or heard.  For example, if a witness testified that when he left his house this morning, it was raining, that would be direct evidence about the weather.

The second type of evidence is circumstantial evidence. Circumstantial evidence is evidence that tends to prove a disputed fact indirectly by proof of other facts. There is a simple example of circumstantial evidence that is often used in this courthouse, and in fact which I related when this trial started.

Assume that when you came into the courthouse this morning that the sun was shining and it was a nice day outdoors.  Assume that the courtroom shades were drawn and you could not look outside.  Assume further that as you were sitting here, someone walked in with an umbrella that was dripping wet and then, a few moments later, somebody else walked in with a raincoat that was also dripping wet. Now, because you could not look outside the courtroom and you could not see whether it was raining, you would have no direct evidence of that fact.  But, on the combination of facts that I have asked you to assume, it would be reasonable and logical for you to conclude that it was raining.

That is all there is to circumstantial evidence.  You infer on the basis of your reason, experience, and common sense from one established fact the existence or the nonexistence of some other fact.

The law generally makes no distinction between the weight or value to be given to either direct or circumstantial evidence. A greater degree of certainty is not required of circumstantial evidence.

You are required to find the facts in accordance with the preponderance of all the evidence in the case,

both direct and circumstantial.

**Post-Instruction No. 13**

## INFERENCES

You are to consider only the evidence in the case. However, you are not limited to the statements of the witnesses. You may draw from the facts you find have been proved such reasonable inferences as seem justified in light of your experience.

"Inferences" are deductions or conclusions that reason and common sense lead you to draw from facts established by the evidence in the case.

There are times when different inferences may be drawn from the evidence. The plaintiff states ask you to draw one set of inferences. Defendants Live Nation and Ticketmaster ask you to draw another.  It is for you, and for you alone, to decide what inferences you will draw.

**Post-Instruction No. 14**

## SUMMARY OF CONTENTIONS

As I did at the start of the case, I will give you a summary of each side's positions in this case. I will then provide you with detailed instructions on what Plaintiffs must prove to win on each of their claims.

*Section 2: Monopolization*

The first issue you will be asked to decide is whether Plaintiffs have proved by a preponderance of the evidence that any Defendant violated Section 2 of the Sherman Act by unlawfully monopolizing any of the three alleged markets. As a reminder, Plaintiffs allege that Ticketmaster monopolized the two alleged ticketing markets:

1.    Primary concert ticketing services to what Plaintiffs call "major concert venues" (primary concert ticketing).

2.    Primary ticketing services to what Plaintiffs call "major concert venues" (primary ticketing).

Plaintiffs allege that Live Nation is liable for Ticketmaster's monopolization in the two alleged ticketing markets because it controlled, dictated or encouraged that conduct.

Plaintiffs also allege that Live Nation (but not Ticketmaster) monopolized the alleged amphitheater market:

3.   Use of what Plaintiffs call "large amphitheaters" by artists.

There are certain requirements that Plaintiffs must prove to show that either Defendant illegally monopolized a market, which I will explain in more detail in a few minutes. In general, however, to prove monopolization for each separate market, Plaintiffs must show by a preponderance of the evidence that the alleged market is a valid antitrust market, that the relevant Defendant (Live Nation or Ticketmaster) possessed monopoly power in that market ~~and,~~ that the relevant Defendant willfully

acquired or maintained monopoly power in that market by engaging in anticompetitive acts., and that the relevant Defendant's anticompetitive acts harmed competition and caused anticompetitive effects to customers in that market. In Plaintiffs' alleged ticketing markets, the customers are venues, and in Plaintiffs' alleged amphitheater market, the customers are artists.[2] You must assess monopolization for each market separately. It is up to you to decide whether Plaintiffs have proven Defendants are liable for monopolization as to all markets, no markets, or only as to some markets.

Section 1: Exclusive Dealing and Tying

In addition to alleging that each Defendant monopolized certain markets, Plaintiffs also allege that Ticketmaster violated Section 1 of the Sherman Act through unlawful exclusive dealing. You will need to consider the exclusive dealing claims under Section 1 separate from and in addition to the monopolization claims.

First, Plaintiffs allege that Ticketmaster engaged in unlawful exclusive dealing by entering into certain primary ticketing contracts with venues. There are different elements Plaintiffs must prove for you to find Ticketmaster liable for unlawful exclusive dealing. In general, to prove unlawful exclusive dealing Plaintiffs must prove by a preponderance of the evidence that Ticketmaster possesses substantial market power in a relevant market and entered into exclusive contracts with venues that substantially foreclosed competition in that relevant market. Plaintiffs also allege that Live Nation is liable for Ticketmaster's exclusive dealing because it controlled, dictated or encouraged that conduct.

Second, Plaintiffs allege that Live Nation (but not Ticketmaster) violated Section 1 of the Sherman Act by engaging in an unlawful tying arrangement related to certain amphitheaters that Live Nation owns or controls. In general, for this claim, Plaintiffs must prove by a preponderance of the

_____

[2] **Defendants' Argument**:  As explained below, Plaintiffs must prove anticompetitive effects to prevail on their monopolization claims. *See infra* n.14.  Defendants object to the exclusion of language regarding this requirement.

evidence that Live Nation unlawfully required artists who wanted to use these amphitheaters to also use Live Nation's promotion services.

If and only if you decide that at least some of the Plaintiff States claiming damages proved every element of at least one of the primary ticketing monopolization claims ~~or the Section 1 exclusive dealing claim against at least one Defendant~~against Ticketmaster, then the final issue you will be asked to decide is whether those (and only those) Plaintiff States are entitled to damages. You should not assume that any of the Plaintiff States are entitled to any damages merely because I am instructing you on the issue of damages.

I remind you, as I did at the outset, that although the Plaintiff States are suing on behalf of the residents of their States who have purchased tickets from Ticketmaster to live events, you should not assume that any of those residents will receive any portion of any money the Plaintiff States may ultimately receive in this case. And neither you nor any member of your family will receive any portion of any funds that the States may receive.

**Post-Instruction No. 15**

## MONOPOLIZATION ELEMENTS

Plaintiffs allege that Ticketmaster unlawfully monopolized the following markets:

(1)    primary concert ticketing services to what Plaintiffs call "major concert venues"; and

(2)    primary ticketing services to what Plaintiffs call "major concert venues."

Plaintiffs allege that Live Nation unlawfully monopolized the following market:

(3)    the use of what Plaintiffs call "large amphitheaters" by artists.

Plaintiffs have brought three monopolization claims in total, one for each of these alleged markets. The alleged monopolization of each of these three alleged markets is a distinct claim that you are to consider separately for the relevant Defendant, either Ticketmaster or Live Nation. To prevail on a monopolization claim, Plaintiffs must prove the following elements by a preponderance of the evidence as to each separate alleged market for each Defendant:

(1)    the alleged market is a valid antitrust market;

(2)    the relevant Defendant possessed monopoly power in that market; ~~and~~

(3)    the relevant Defendant willfully acquired or maintained monopoly power in that market by engaging in anticompetitive conduct, instead of having superior products, business skill, or prior history ~~.~~; and

(4)    the relevant Defendant's anticompetitive conduct harmed competition in that market and caused anticompetitive effects to customers (that is, venues or artists) in that market.[3]

---

[3] **Defendants' Argument**:  As explained below, Plaintiffs must prove anticompetitive effects to prevail on their monopolization claims. *See infra* n.14.  Defendants object to the exclusion of language regarding this requirement.

Further, to hold Live Nation liable for Ticketmaster's monopolization in any market, plaintiffs must prove by a preponderance of the evidence that Live Nation controlled, dictated or encouraged that conduct.

If you find that Plaintiffs have failed to prove any of these elements for a particular claim, then you must find for the relevant Defendant and against Plaintiffs on that particular claim only. If you find that Plaintiffs have proven each of these elements by a preponderance of the evidence for a particular claim for a particular alleged market for the relevant Defendant, then you must find for Plaintiffs and against the relevant Defendant on that particular claim.

I will now provide you with further instructions on these elements.

**Post-Instruction No. 16**

## MONOPOLIZATION ELEMENT #1: RELEVANT MARKET—GENERAL

The first step in assessing each of Plaintiffs' separate monopolization claims against each Defendant is determining whether Plaintiffs have proven the alleged relevant market for that claim by a preponderance of the evidence. Defining the relevant market is essential because you are required to make a judgment about whether the relevant Defendant (Live Nation or Ticketmaster) has monopoly power in a properly defined economic market. To make this judgment, you must be able to determine what, if any, economic forces restrain the relevant Defendant's freedom to set prices for the products or services they provide, control output for those products or services, or degrade the quality of those products or services.

The most likely and most important restraining force will be actual and potential competition from other firms and their products or services. This includes the firms and products or services that act or likely would act as restraints on the relevant Defendant's power to set prices above competitive levels because customers would switch to these competing firms if the relevant Defendant sets its own prices too high. The firms and products or services that exert such restraining force are within what is called the relevant market.

**Post-Instruction No. 17**

## RELEVANT PRODUCT MARKET—GENERAL

A relevant market must consist of all products or services that are reasonably interchangeable in the eyes of customers of those products or services. In other words, the relevant market includes the products or services that a customer believes are reasonably interchangeable or reasonable substitutes for each other. This is a practical test taking into account actual behavior of buyers and marketing efforts of sellers. It looks to the practical realities of substitution, not theoretical substitution. A market does not need to include all conceivable substitutes, but only those that a buyer would view as reasonably interchangeable. Accordingly, your analysis should focus on whether or not the products or services are economic substitutes, not simply whether they appear to be functionally similar. For instance, women's shoes may not be reasonably interchangeable with men's shoes. Even if both are functionally similar, consumers may not typically substitute one for the other.

[4]To determine whether products are reasonably interchangeable or reasonable substitutes for each other, you may consider:

- whether artists substitute between large amphitheaters and other venues;

- consumers' views on whether the products are interchangeable;

---

[4] **Defendants' Argument**: Defendants object to market definition instructions that do not make clear that Plaintiffs' alleged primary ticketing markets are targeted customer markets. As Defendants have explained, standard substitution analysis has no utility with respect to those markets, especially here, where there is no substitution question—all agree on the product and competitors, and the only question for the jury to resolve is whether Plaintiffs have proven that "major concert venues" are targeted customers. *See* ECF No. 689 at 16-21; ECF No. 797 at 2-6; ECF No. 976 at 1-5; ECF No. 1059 at 3-8; ECF No. 1031-10 at 73-75; Defendants' Proposed Jury Instructions submitted Mar. 23, 2026 at 38-40. Indeed, speaking in terms of "product" makes no sense for the primary ticketing markets, because the jury does not need to decide whether those markets include all relevant products—it needs to decide whether they include all relevant customers. Defendants propose separate instructions on the alleged targeted customer markets and the alleged amphitheater market. Defendants incorporate by reference their arguments and authorities for these separate instructions provided in their prior submissions of proposed jury instructions. ECF No. 1031-10; Defendants' Proposed Jury Instructions submitted Mar. 23, 2026.

- the relationship between the price of one product and sales of another;

- the presence or absence of specialized vendors;

- the perceptions of either industry or the public as to whether the products are in separate markets; and

- the views of Defendants regarding who their competitors are.

The three markets at issue are as follows: *First*, the market for primary ticketing services to what plaintiffs call "major concert venues." *Second*, the market for primary concert ticketing services to those major concert venues. Plaintiffs define "major concert venues as amphitheaters and arenas with a capacity of 8,000 or more that hosted 10 or more concerts in at least one year from 2017 to 2024. *Third*, the market for artists to use what plaintiffs call "large amphitheaters." Plaintiffs define large amphitheaters as those amphitheaters with a capacity of 8,000 or more that hosted 10 or more concerts in at least one year from 2017 to 2024.  The parties disagree about the relevant markets in this case. Plaintiffs allege that the three markets I just described to you are relevant markets, while Defendants deny that those three markets are relevant markets. Your task is to determine whether the evidence supports the three markets alleged by Plaintiffs.

**Post-Instruction No. 17D**

**RELEVANT PRODUCT MARKET—PRIMARY TICKETING MARKETS**

For the alleged primary ticketing services and primary concert ticketing services markets, Plaintiffs have limited the scope of both markets to 257 venues that they call "major concert venues." Defendants dispute that it is appropriate to limit these markets just to that subset of venues; Defendants contend that Plaintiffs' definition is too narrow because primary ticketing companies compete for many more customers, and therefore, that the relevant market should include other venues.

Plaintiffs' alleged primary ticketing markets are what are known as "targeted customer markets" because they are focused on a subset of all customers of a particular product or service. In order for Plaintiffs to prove that each of these two markets should be limited solely to the 257 venues they call "major concert venues," Plaintiffs must prove that the 257 venues are in a unique position relative to other venues at which concerts take place in that Ticketmaster has and has exercised the power to impose on those venues worse prices or terms of service (for example, by charging higher prices for primary ticketing services) than are charged to other venues.  To determine whether these 257 venues are in a unique position relative to other venues, you may also consider these factors: (i) whether persons in the primary ticketing industry or the public recognize these venues as unique, (ii) whether these venues have peculiar characteristics and uses, (iii) whether these venues have distinct customers, (iv) whether these venues pay distinct prices or are uniquely sensitive to price changes, and (v) whether specialized vendors cater to these venues.[5]

---

[5] **Defendants' Argument**:  Defendants have added this sentence to their previously proposed targeted customer market instruction to incorporate the *Brown Shoe* factors.  But to be clear, Defendants do not view the *Brown Shoe* factors as serving any analytical purpose here.  These factors "use qualitative evidence as a proxy for substitutability." *FTC v. Meta Platforms, Inc.*, 811 F. Supp. 3d 67, 97 (D.D.C. 2025).  As explained above, there is no substitutability question here.  *See supra* n.4.  Defendants object to instructing the jury that *Brown Shoe* or any substitutability analysis may be used to analyze Plaintiffs' alleged primary ticketing markets, but understanding that the Court views the *Brown Shoe* factors as applicable here, Defendants propose the addition of this sentence.

If you find that Plaintiffs have proven either of the alleged ticketing markets as relevant markets, then you should continue to evaluate the remainder of Plaintiffs' claims solely related to that alleged market. If you find that Plaintiffs have failed to prove either of these alleged markets, then you do not need to consider any other elements for claims related to that alleged market. Instead, you should find for Defendants and against Plaintiffs on all claims for which you found Plaintiffs failed to prove a relevant market.

**Post-Instruction No. 17D2**

## RELEVANT PRODUCT MARKET—AMPHITHEATERS MARKET

As for Plaintiffs' alleged amphitheater market, Defendants contend this alleged market is not properly defined because it excludes other venues that are reasonable substitutes for "large amphitheaters," and it includes certain amphitheaters that do not qualify as "large amphitheaters." To prove this market, Plaintiffs must prove that artists in general do not view other types of venues, such as smaller amphitheaters or arenas, as reasonable substitutes for the class of large amphitheaters Plaintiffs selected.

To determine whether products are reasonably interchangeable or reasonable substitutes for each other, you may consider:

- whether artists substitute between large amphitheaters and other venues;

- consumers' views on whether the products are interchangeable;

- the relationship between the price of one product and sales of another;

- the presence or absence of specialized vendors;

- the perceptions of either industry or the public as to whether the products are in separate markets; and

- the views of Defendants regarding who their competitors are.

If you find that Plaintiffs have proven that the alleged amphitheaters market is properly drawn, then you should continue to evaluate the remainder of Plaintiffs' claims solely related to that market. If you find that Plaintiffs have failed to prove that the alleged amphitheaters market is properly drawn, then you do not need to consider any other elements for claims related to this alleged market. Instead, you should find for Defendants and against Plaintiffs on all claims for which you found Plaintiffs failed to prove a relevant market.

**Post-Instruction No. 17D3**

## RELEVANT GEOGRAPHIC MARKET

For the "large amphitheaters" market, the parties also dispute the geography of the market. The relevant geographic market is the area in which defendants face competition from other firms that compete in the relevant product market and to which customers can reasonably turn for purchases. When analyzing the relevant geographic market, you should consider whether changes in prices or product offerings in one geographic area have substantial effects on prices or sales in another geographic area, which would tend to show that both areas are in the same relevant geographic market. The geographic market may be as large as global or nationwide, or as small as a single town or neighborhood.

Plaintiffs have the burden of proving a relevant geographic market by a preponderance of the evidence. Plaintiffs contend that the relevant geographic market for the alleged amphitheaters market is the entire United States. By contrast, Live Nation asserts that the relevant geographic market is narrower.

In determining whether Plaintiffs have met their burden and demonstrated that the entire United States is the relevant geographic market for the alleged amphitheaters market, you may consider several factors, including:

- the geographic area in which the 87 "large amphitheaters" are located and where customers of those amphitheaters are located;

- the geographic area to which customers turn for supply of "large amphitheaters";

- the geographic area to which customers have turned or have seriously considered turning;

- the transportation cost differences between areas; and

- the geographic areas that suppliers view as potential sources of competition.

If you find that Plaintiffs proved that the alleged amphitheaters market is as broad as the entire United Sates, then you should continue to evaluate the remainder of Plaintiffs' monopolization claim against Live Nation as to this market. But if you find that Plaintiffs have failed to prove that this alleged market is as broad as the United States, then you must find in Live Nation's favor on all claims related to this market.[6]

---

[6] **Defendants' Argument**:  In light of how the evidence has come in at trial, Defendants dispute the geography of Plaintiffs' alleged amphitheaters market.  Defendants' proposed instruction tracks the ABA model instruction.  See ABA Model Instr. 3.A.6.

**Post-Instruction No. 18**

### MONOPOLIZATION ELEMENT #2: MONOPOLY POWER

If you find that Plaintiffs have proven any alleged relevant market by a preponderance of the evidence, then you should separately determine whether the relevant Defendant (Live Nation or Ticketmaster) has monopoly power in that market. To prove a monopolization claim, Plaintiffs must prove that the relevant Defendant has monopoly power in a relevant antitrust market. Monopoly power is the power to control prices, restrict output, or exclude competition in a relevant antitrust market. More precisely, a firm has monopoly power if it can profitably raise prices substantially above the competitive level for a significant period of time. However, possession of monopoly power, in and of itself, is not unlawful.[7]

Plaintiffs can prove monopoly power "directly," through direct evidence, or "indirectly," through indirect evidence. Either type of evidence may be sufficient to prove monopoly power. I will now provide further instructions about how you may determine whether Plaintiffs have met their burden of proving monopoly power in a relevant market.

---

[7] **Defendants' Authority**:  ABA Model Instr. 3.A.2.

**Post-Instruction No. 19**

### EXISTENCE OF MONOPOLY POWER—DIRECT PROOF

Plaintiffs can provide direct proof of monopoly power in a relevant market via direct evidence through any one of these alternative ways.

*Raising or Maintaining Prices Above Competitive Levels*

One way Plaintiffs may prove that the relevant Defendant (Live Nation or Ticketmaster) has monopoly power in a relevant market is to show that the relevant Defendant can profitably raise or maintain prices in the relevant market above a competitive level. Plaintiffs must prove that the relevant Defendant has the power to do so by itself—that is, without the assistance of, and despite competition from, any existing or potential competitors.

- In Plaintiffs' alleged primary ticketing services markets, the prices in question are what the ticketers, such as Ticketmaster, receive by way of compensation under the terms of their contracts with "major concert venues."

- In Plaintiffs' alleged amphitheaters market, the prices in question are the prices that Plaintiffs claim artists pay to rent the amphitheaters.[8]

To prove monopoly power in this way, Plaintiffs must also prove that the relevant Defendant (Live Nation or Ticketmaster) has the power to maintain prices above a competitive level for a significant period of time. If the relevant Defendant attempted to maintain prices above competitive levels, but would lose so much business to other competitors that the price increase would become unprofitable and would have to be withdrawn, then that Defendant does not have monopoly power.

---

[8] **Defendants' Argument**:  This addition is necessary because the parties dispute whether artists or promoters rent amphitheaters.  Indeed, the jury is later asked to make a determination about that issue. So this bullet point should not misleadingly suggest that artists are the individuals who rent amphitheaters.

The ability to earn high profit margins or a high rate of return does not necessarily mean that any Defendant has monopoly power. Other factors may enable a company without monopoly power to sell at higher prices or earn higher profit margins than its competitors, such as superior products or services, low costs, or superior advertising or marketing.

However, an ability to sell at higher prices or earn higher profit margins than other companies for similar goods or services over a long period of time may be evidence of monopoly power. By contrast, evidence that a defendant would lose a substantial amount of sales if it raised prices substantially, or that a defendant's profit margins were low compared to its competitors, or that a defendant's margins go up and down or are steadily decreasing, tends to suggest that the defendant does not have monopoly power.

*Reducing Quality Or Output Below Competitive Levels*

Another way Plaintiffs may prove that the relevant Defendant (Live Nation or Ticketmaster) has monopoly power is by showing that the Defendant has the ability to reduce the quality of its product without losing meaningful sales.  This is similar to the point I just described regarding price. If the relevant Defendant had the ability to reduce quality below competitive levels without losing so much business to other competitors that the reduction would become unprofitable and would have to be withdrawn, then that Defendant does not have monopoly power.

Another way of showing monopoly power is through evidence that a firm has the ability to affect marketwide prices by reducing its own output.  Output for these purposes refers to the amount of its products or services that a firm chooses to produce.

*Power to Exclude Competition*

Alternatively, Plaintiffs may prove that Defendants have monopoly power by proving that Defendants have the ability to exclude or block competition. ~~If you find that Defendants had the power to inhibit growth or expansion by existing competitors in a market or to prevent new competition from~~

entering that market, then Defendants have monopoly power. This power to exclude may be shown by evidence of Defendants blocking competitors' ability to compete or of Defendants reducing or restricting the share of the market held by competitors.[9]

Excluding competition means more than competing to keep one's business. It means that a firm does not need to compete hard because it has been able to prevent other firms from competing effectively. If new competitors can enter the relevant market or existing competitors can compete for new opportunities as they arise, then that Defendant does not have monopoly power.

---

[9] **Defendants' Argument**: Defendants object to these two sentences. Plaintiffs have provided no authority that "inhibiting expansion" or "reducing or restricting the share of the market held by competitors"—which could result from lawful competition on the merits—is evidence of monopoly power.

**Post-Instruction No. 20**

### EXISTENCE OF MONOPOLY POWER—INDIRECT PROOF

Now I will instruct you on how Plaintiffs can provide indirect proof of monopoly power in a relevant market via indirect evidence.

Indirect evidence is evidence regarding the structure of the relevant market. If this evidence establishes that the relevant Defendant (Live Nation or Ticketmaster) has the power to control price, restrict output, or exclude competition in the relevant market, then you may conclude that the Defendant has monopoly power in that market. By contrast, if the relevant Defendant does not have the power to control price, restrict output, or exclude competition in the relevant market, then you may conclude that the Defendant lacks monopoly power. I will now explain the structural factors you may consider in more detail.

*Market Share*

One factor that you should consider is the relevant Defendant's share of the relevant market. While market share is not the equivalent of monopoly power, it is relevant to your determination of whether Plaintiffs have proven monopoly power. The relevant Defendant (Live Nation or Ticketmaster) must have a significant share of the market in order to possess monopoly power.

A market share of over 70 percent is usually strong evidence of monopoly power. A market share below 50% is rarely evidence of monopoly power, and a share between 50% and 70% can occasionally show monopoly power. Nonetheless, such evidence does not conclusively establish monopoly power. In evaluating whether the relevant Defendant's market share supports a finding of monopoly power, you should also consider other aspects of the relevant market, including market share trends, the existence of barriers to entry, the entry and exit by other companies, and the number and size of competitors. Along with the relevant Defendant's market share, these factors should inform you as to whether the relevant Defendant has monopoly power.

*Market Share Trends*

The trend in the relevant Defendant's market share is something you may consider. An increasing market share may strengthen an inference that a company has monopoly power, particularly where that company has a high market share, while a decreasing share might show that a company does not have monopoly power.

*Barriers to Entry*

You may also consider whether there are barriers to entry or expansion in or into the relevant market. Barriers to entry or expansion make it difficult for new competitors to enter the relevant market in a meaningful and timely way, or for existing competitors to sell more of a product that they already sell in the relevant market. Barriers to entry or expansion in the alleged ticketing markets might include, but are not limited to,  whether there is a large financial investment required to develop new ticketing technologies; whether existing ticketing companies do not have the capacity to sell primary ticketing services to more of the venues Plaintiffs call "major concert venues"; whether there are specialized marketing practices to what Plaintiffs call "major concert venues"; ~~business risks in switching ticketers;~~ and the reputation of the companies already participating in the market (or the brand recognition of their products).[10]

Evidence of low or no entry barriers in the alleged ticketing markets may be evidence that the relevant Defendant does not have monopoly power, regardless of the Defendant's market share, because new competitors could enter easily, or existing competitors could expand, if the Defendant attempted to raise prices or reduce quality for a substantial period of time. For example, you may consider evidence that other existing ticketing companies have the capacity and ability to sell primary ticketing services to some of what Plaintiffs call "major concert venues" if Ticketmaster tried to

---

[10] **Defendants' Argument**:  Plaintiffs have provided no authority that ordinary business risks faced by buyers constitute barriers to entry for sellers.

increase ticketing prices to venues as evidence that neither Defendant has monopoly power in the alleged ticketing markets, despite their alleged market shares. By contrast, evidence of high barriers to entry along with high market share may support an inference that Defendants have monopoly power.

*Entry and Exit by Other Companies*

The history of entry and exit in the relevant market may be helpful to consider. Entry of new competitors or expansion of existing competitors may be evidence that a defendant lacks monopoly power. On the other hand, departures from the market, or the failure of firms to enter the market, particularly if prices and profit margins are relatively high, may support an inference that a defendant has monopoly power in that market.

*Number and Size of Competitors*

You may consider whether Live Nation's competitors in the alleged amphitheater market, or Ticketmaster's competitors in the alleged ticketing markets, are capable of effectively competing. In other words, you should consider whether the financial strength, market shares, and number of competitors act as a check on each Defendant's ability to increase the price or lower the quality of its services. If Ticketmaster's competitors in the alleged ticketing markets are strong or have meaningful or increasing market shares, this may be evidence that Ticketmaster lacks monopoly power in those markets. On the other hand, if you determine that Ticketmaster's competitors are weak or have small or declining market shares, this may support an inference that Ticketmaster has monopoly power. Similarly, if Live Nation's competitors in the alleged amphitheater market are strong or have meaningful or increasing market shares, this may be evidence that Live Nation lacks monopoly power in that market. On the other hand, if Live Nation's competitors are weak or have small or declining market shares, this may support an inference that Live Nation has monopoly power.

You may find that a Defendant has monopoly power based on direct evidence, indirect evidence, or both. If you find that a Defendant has monopoly power in a relevant market, then you

must consider the remaining elements of Plaintiffs' monopolization claim as to that market. If you find that a Defendant does not have monopoly power in a relevant market, then you must find for that Defendant and against Plaintiffs on the monopolization claim as to that particular relevant market.

**Post-Instruction No. 21**

### MONOPOLIZATION ELEMENT #3: WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY POWER THROUGH ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT

If you find that Plaintiffs have met their burden of proving (a) a relevant market, and (b) that a Defendant possessed monopoly power in that relevant market, then you must turn to the third element of Plaintiffs' monopolization claim regarding that particular market and that particular Defendant. Plaintiffs must prove by a preponderance of the evidence that the Defendant willfully acquired or maintained monopoly power in that relevant market through anticompetitive or exclusionary conduct or acts.

Anticompetitive or exclusionary acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market. Acts are not anticompetitive or exclusionary unless they have anticompetitive effect. That is, the acts must harm the competitive process and thereby harm the customers of the products or services in the relevant markets.[11] In Plaintiffs' alleged primary ticketing markets, the customers are the 257 venues Plaintiffs call "major concert venues." In Plaintiffs' alleged amphitheaters market, the customers according to Plaintiffs are artists. Harm to competition is different from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition. Harm to competition ~~can include, among other~~

---

[11] **Defendants' Authority**: *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001). As explained below, Plaintiffs must prove anticompetitive effects to prevail on their monopolization claims. *See infra* n.14. Defendants object to the exclusion of language regarding this requirement. Moreover, including language on anticompetitive effects in this instruction is necessary because later Section 1 instructions on exclusive dealing and tying refer back to earlier instructions regarding anticompetitive effects.

~~things,~~means evidence of increased prices, decreased production levels, and reduced quality, though not all increases in prices, decreases in production levels or reductions in quality harm competition.[12]

The mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws. Similarly, the acquisition or maintenance of monopoly power by supplying better products or services, possessing superior business skills, or because of prior history or luck, is not unlawful. A monopolist may compete aggressively without violating the antitrust laws, and a monopolist may charge monopoly prices without violating the antitrust laws. Similarly, the mere fact that a business prefers to use its own goods or services, or is "vertically integrated," is not anticompetitive by itself. Instead, a monopolist's conduct only becomes unlawful if the monopolist either obtained or maintained its monopoly power through anticompetitive acts, that is, acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market.

In determining whether a particular Defendant's conduct was anticompetitive or exclusionary, or whether it was legitimate business conduct, you should determine whether the conduct is ~~inconsistent~~consistent with competition on the merits, whether the conduct provides benefits to consumers, and whether the conduct ~~does not provide benefits to consumers.~~

would make business sense apart from any effect it has on excluding competition or harming competitors.[13]If you find that Plaintiffs have proven by a preponderance of the evidence that a particular Defendant engaged in anticompetitive or exclusionary conduct in a relevant market that had anticompetitive effect, then you may consider ~~nonpretexual,~~ procompetitive justifications for that

---

[12] **Defendants' Authority**: *MacDermid Printing Sols. v. Cortron*, 833 F.3d 172, 183 (2d Cir. 2016) ("[I]n no precedential opinion in this Circuit has a plaintiff successfully proved an adverse effect on competition without offering evidence of changed prices, output, or quality.").

[13] **Defendants' Authority**: ABA Model Instr. 3.A.9. Defendants object to this paragraph if it omits these proposed edits as it fundamentally alters the balance of the language in the ABA model instruction.

conduct offered by that Defendant. Procompetitive justification are nonpretextual claims that the conduct was indeed a form of competition on the merits because it involved, for example, greater efficiency or enhanced consumer appeal. If you find that Defendant has offered such justifications, then you must determine whether Plaintiffs have proven by a preponderance of the evidence that the anticompetitive harm of the anticompetitive or exclusionary conduct at issue was not reasonably necessary to achieve the outweighs its procompetitive benefits claimed by that Defendant. If you find that the conduct was reasonably necessary to achieve the procompetitive benefits, then you must balance those benefits against the competitive harm resulting from that conduct. Conduct is anticompetitive and exclusionary only if its competitive harm outweighs its competitive benefits. In making this determination, your focus should be on the effect of the conduct, not on the intent behind it.[14]

---

[14] **Defendants' Argument**:  Defendants maintain that anticompetitive effects is a separate element of Section 2 monopolization claims, as the D.C. Circuit's analysis in *United States v. Microsoft Corp.* makes clear.  253 F.3d 34, 58-59 (D.C. Cir. 2001).  The Second Circuit endorsed the *Microsoft* framework in *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 652 (2d Cir. 2015). Moreover, the Second Circuit draws no material distinction between the requirement to show anticompetitive effects in the context of a Section 2 claim and requirement to do so in the context of a Section 1 claim.  *See id*.  Accordingly, to prevail on a monopolization claim, a plaintiff must prove not only anticompetitive conduct, but also that such conduct "has the requisite anticompetitive effect." *Microsoft*, 253 F.3d at 58-59.  To show that effect, the plaintiff must show that the conduct "harm[ed] the competitive *process* and thereby harm[ed] consumers." *Id.* at 58; *Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 486 (S.D.N.Y. 2016).  And in the Second Circuit, that showing has always required "evidence of changed prices, output, or quality." *MacDermid Printing Sols. v. Cortron*, 833 F.3d 172, 183 (2d Cir. 2016).  Recent Supreme Court cases from the rule of reason context are to the same effect. *See Ohio v. American Express Co.*, 585 U.S. 529, 549 (2018) (Plaintiffs cannot establish direct anticompetitive effects "absent some evidence that tends to prove that output was restricted or prices were above a competitive level"); *NCAA v. Alston*, 594 U.S. 69, 88 (2021) (characterizing *AmEx*'s holding as requiring plaintiffs to show an "actual effect on competition," meaning a restraint's "capacity to reduce output and increase price").  There is no Second Circuit case upholding a finding of anticompetitive effects based solely on intangibles such as "choice," nor "harm to the competitive process" that does *not* cause tangible consumer harm. *See In re EpiPen*, 44 F.4th 959, 985 (10th Cir. 2022) ("Under the consumer welfare standard, [courts] still seek to 'protect the process of competition,' but [they] do it 'with the interests of *consumers*, not competitors, in mind.'" (emphasis added)).

If you find that any Defendant willfully acquired or maintained monopoly power through anticompetitive or exclusionary conduct in a relevant market, then you must find for Plaintiffs on that claim. If you find that a Defendant did not willfully acquire or maintain monopoly power through anticompetitive or exclusionary conduct in a relevant market, then you must find for that Defendant and against Plaintiffs on the monopolization claim as to that market.

---

Defendants believe that the jury instructions should include a separate instruction on anticompetitive effects, as Defendants proposed in their prior submissions of proposed jury instructions. ECF No. 1031-10 at 105-07; Defendants' Proposed Jury Instructions submitted Mar. 23, 2026 at 81-83. Defendants propose edits to the burden-shifting language in this instruction as an alternative, in the event that the Court determines that a separate instruction on anticompetitive effects should not be provided. The proposed burden-shifting language tracks the language in *United States v. Microsoft Corp.*, 253 F.3d 34, 58-59 (D.C. Cir. 2001). Moreover, including this language here is necessary because later Section 1 instructions on exclusive dealing and tying refer back to earlier instructions regarding anticompetitive effects. But to be clear, Defendants do not view this language as an adequate alternative to providing a separate instruction on anticompetitive effects, and Defendants object to the exclusion of such an instruction. Recognizing that the Court disagrees, however, Defendants are not reinserting the proposed separate instruction in this document.

**Post-Instruction No. 22**

### ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT—EXCLUSIVE DEALING
### SHERMAN ACT SECTION 2

I will now provide some additional detail on one particular type of anticompetitive or exclusionary conduct Plaintiffs have alleged in this case. Plaintiffs have alleged that Ticketmaster entered into long-term, exclusive primary ticketing contracts with what Plaintiffs call "major concert venues" that generally require the venue to use Ticketmaster as the exclusive primary ticketer for all events or for all concerts. Such contracts are called "exclusive dealing" contracts because they require buyers, here certain venues, to buy a product or service exclusively (or almost exclusively) from one seller, here Ticketmaster, for a period of time.

Exclusive dealing is not in itself anticompetitive.[15] Exclusive dealing contracts ~~can~~will generally only be ~~anticompetitive in certain circumstances. There is no set formula for evaluating whether~~unlawful where the market is highly concentrated, the defendant possesses significant market power, and there is some element of coercion present.[16]

To establish that Ticketmaster's exclusive dealing is anticompetitive, ~~but it generally requires a showing of~~Plaintiffs must prove: (i) significant market power by the Defendant, here Ticketmaster; (ii) substantial foreclosure of the market, that is, whether the exclusive dealing barred a substantial number of competitors or severely restricted the market's ambit; (iii)- contracts of sufficient duration to prevent meaningful competition by rivals; and (iv) ~~whether likely or actual~~ anticompetitive effects ~~are outweighed by procompetitive effects.~~in the relevant market. You may also consider (v) ~~evidence of~~whether exclusive contracts result from coercive behavior, i.e., because Ticketmaster coerced the

---

[15] **Defendants' Argument:**  Defendants added this language to reduce confusion, given that the Court's proposed Post-Instruction No. 24 states: "As I previously stated, exclusive dealing is not in itself anticompetitive."

[16] **Defendants' Authority:**  *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 284 (3d Cir. 2012).

venue into an exclusive contract that the venue did not want at all or would have preferred to be non-exclusive, or because venues preferred exclusive contracting for their own reasons; (vi) the ability of customers to terminate the agreements; and (vii) the use of exclusive dealing by competitors of the defendant.[17]

---

[17] **Defendants' Argument:** Certain of Defendants' edits align the language of this instruction with the language of the Court's proposed Post-Instruction No. 24 (Exclusive Dealing Against Ticketmaster – Sherman Act Section 1), to reduce juror confusion. Additionally, the instruction that there is "no set formula" for evaluating whether exclusive dealing is anticompetitive might give the false impression to the jury that these factors are not required. Finally, Defendants have added explanation regarding the coercion element to make clear that there is no coercion if venues preferred exclusive contracts. *See In re EpiPen*, 44 F.4th 959, 991-1000 (10th Cir. 2022); *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 78 (3d Cir. 2010); *Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*, 962 F.3d 1015, 1031 n.11 (8th Cir. 2020). To be clear, it is Defendants' position that, in the circumstances of this case, where there is no evidence whatsoever that any venue was coerced into an exclusive contract when it did not want exclusivity, coercion is a required element to find that the type of exclusive dealing at issue constitutes exclusionary or anticompetitive conduct. *See Race Tires*, 614 F.3d at 78 ("[C]oercion is a fundamental consideration in the *present* circumstances, namely, where various sports sanctioning bodies have freely adopted their own equipment rules and then freely entered into exclusive contracts with the respective suppliers."). Accordingly, the last paragraph of this instruction should read: "To establish that Ticketmaster's exclusive dealing is anticompetitive, Plaintiffs must prove: (i) significant market power by the Defendant, here Ticketmaster; (ii) substantial foreclosure of the market, that is, whether the exclusive dealing barred a substantial number of competitors or severely restricted the market's ambit; (iii) contracts of sufficient duration to prevent meaningful competition by rivals; (iv) anticompetitive effects in the relevant market; and (v) that the contracts were coerced, i.e., that Ticketmaster coerced the venue into an exclusive contract that the venue did not want at all or would have preferred to be non-exclusive. You may also consider (vi) the ability of customers to terminate the agreements and (vii) the use of exclusive dealing by competitors of the defendant." Recognizing that the Court disagrees, however, Defendants are not belaboring the point by inserting this proposed language in this document.

**Post-Instruction No. 23**

## ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT—THREATS AND RETALIATION[18]

Plaintiffs have also alleged that Ticketmaster engaged in anticompetitive or exclusionary conduct by threatening venues with the loss of Live Nation content if they did not choose Ticketmaster for ticketing, and/or by retaliating against venues who did not choose Ticketmaster by withholding Live Nation content.

If you consider this alleged conduct, you must take care to distinguish between, on the one hand, affirmative acts of threatening venues or retaliating against venues and, on the other hand, independent concerns that a venue might have about how the choice of a ticketing provider might affect its ability to compete with other venues for concerts. Only affirmative acts of threatening venues or retaliating against venues can support this part of Plaintiffs' case. Likewise, that a venue might perceive an advantage in obtaining Live Nation promoted concerts because Ticketmaster is an affiliated company is not, in itself, proof of threats or retaliation.

I will remind you, as I did previously, that you heard testimony about what Live Nation or Ticketmaster's competitors heard about certain venues' concerns about content. Unless the witness

---

[18] **Defendants' Argument**: Defendants object to exclusion of language requiring the jury to find that Live Nation has market power in a market for promoting all concerts to all artists at all venues. Defendants maintain that such language proposed in Defendants prior jury instruction submission should be included here. Defendants' Proposed Jury Instructions submitted Mar. 23, 2026. As Defendants have explained, without proof of Live Nation's market power in concerts (which Plaintiffs cannot show), there is no lawful basis for a jury to find that it violates the antitrust laws for Defendants to "condition" the provision of Live Nation concerts to venues on the venues' choice of Ticketmaster as their primary ticketer. ECF No. 1049; ECF No. 1362; Defendants' Proposed Jury Instructions submitted Mar. 23, 2026; *see* Herbert Hovenkamp, Antitrust and Self-Preferencing, *Antitrust*, Vol. 38, No. 1, Fall 2023 5, 7 ("To generalize, while current United States antitrust law has many prohibitions on self-preferencing, they apply only when the firm in question has market power in the dominant good and competitive harm results from the refusal to give equal treatment."). Without such proof, Plaintiffs' threats/retaliation/conditioning theory merely attacks self-preferencing by a vertically-integrated company—which is not unlawful. Recognizing that the Court disagrees, however, Defendants are not reinserting the proposed market definition language in this document.

who supposedly heard those statements directly from the venue testified live at trial, you may not consider whether those statements were in fact made or not, or whether the concerns were true or not. And as to those statements heard by witnesses who testified live at trial, you may only consider the fact of those statements to show the information available to the competitor and its effect on the competitor's understanding or actions. The statements were not admitted for their truth as to whether the concerns were true or not, and you may not consider whether they were true or not.[19]

If you find that Ticketmaster threatened one or more venues with the loss of Live Nation content if they did not choose Ticketmaster for ticketing, and/or retaliated against one or more venues who did not choose Ticketmaster by withholding Live Nation content, you must consider whether that behavior was sufficiently widespread that it amounted to meaningful foreclosure of competition in the relevant ticketing market. You may consider both qualitative and quantitative evidence of foreclosure; for example:

- the number of threats or instances of retaliation Plaintiffs have proven

- the number of major concert venues, ticketing contracts and concert routing decisions in the same period of time;

- whether threats were made privately or disseminated broadly; and

- whether Ticketmaster's rivals were able to develop counterstrategies for addressing the effects of threats or retaliation.

---

[19] **Defendants' Argument:** This instruction reinforces the Court's hearsay limiting instruction provided to the jury during trial. *See, e.g.*, Trial Tr. at 2610:21-2611:8.

**Post-Instruction No. 23D**

## ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT—CONTROLLING AMPHITHEATERS

As part of their amphitheater monopolization claim, Plaintiffs have alleged that Live Nation unlawfully acquired "control" of a number of amphitheaters either because it owns them, leases them, or has exclusive booking agreements with them.  Live Nation's ownership of, control over, or acquisition of amphitheaters does not, in itself, count as anticompetitive conduct.  Plaintiffs' claim is about things Live Nation did to increase its share of large amphitheaters since 2015.

To find in favor of Plaintiffs on their amphitheater monopolization claim, you must find that Live Nation's acquired monopoly power in the alleged market for large amphitheaters through acquisitions and exclusive booking arrangements and that these acquisitions and exclusive booking arrangements had an actual anticompetitive effect—that is, it harmed the competitive process and thereby harmed artists, who are the alleged consumers in Plaintiffs' amphitheater market.  You may not find anticompetitive effects simply because Live Nation's share of large amphitheaters increased. That requires independent evidence of higher prices, lower output, reduced quality or the like.[20]

---

[20] **Defendants' Argument:**  This additional instruction is necessary to clarify the alleged anticompetitive conduct relevant to Plaintiffs' amphitheater monopolization claim.  It is consistent with the Court's summary judgment ruling, which recognized that "Live Nation acquisitions of other promoters [do not] count as anticompetitive conduct by itself" because "a Section 2 claim requires not mere growth by acquisition, but the willful maintenance or acquisition of monopoly power as distinguished from growth or development as a consequence of superior product, business acumen, or historic accident."  ECF No. 1037 at 33 (citation and quotation marks omitted) (also recognizing that, while the "Supreme Court has previously analyzed whether acquisitions can be relevant to a theory of *attempted monopolization* under Section 2 of the Sherman Act . . . the government hasn't provided any authority (nor can the Court identify one) that extends this analysis to the existence of anticompetitive effects").  The requirement to prove anticompetitive effects is based on *Microsoft*, 253 F.3d at 58, as well as the other authorities Defendants have cited for the broad proposition that proof of anticompetitive effects is always required in a Section 2 actual monopolization case.

**Post-Instruction No. 24**

EXCLUSIVE DEALING AGAINST TICKETMASTER—SHERMAN ACT SECTION 1

Plaintiffs separately claim that Ticketmaster has engaged in unlawful exclusive dealing in violation of Section 1 of the Sherman Act by entering into long-term, exclusive primary ticketing contracts with what Plaintiffs call "major concert venues" that generally require the venue to use Ticketmaster as the exclusive primary ticketer for all concerts. I have already instructed you on how to evaluate exclusive dealing conduct under Plaintiffs' Section 2 monopolization claims. I will now instruct you on how to evaluate exclusive dealing conduct under Plaintiffs' separate Section 1 exclusive dealing claim.

To establish that an exclusive dealing arrangement violates Section 1 of the Sherman Act, Plaintiffs must establish each of the following elements by a preponderance of the evidence:

*First*, that there is a relevant market limited to what Plaintiffs call "major concert venues" for primary concert ticketing services. If you did not find that Plaintiffs proved this markets, there is nothing else for you to consider on this claim for any such markets. You must find for Ticketmaster and against Plaintiffs on the Section 1 Exclusive Dealing claim for all such markets. If you found that Plaintiffs proved either of these alleged ticketing markets, then you should go on to consider whether Plaintiffs proved the other elements of this claim for that market.

*Second*, that Ticketmaster engaged in anticompetitive exclusive dealing with those major concert venues. As I previously stated, exclusive dealing is not in itself anticompetitive. In determining whether Ticketmaster's exclusive dealing was anticompetitive, Plaintiffs must prove (i) significant market power by Ticketmaster; (ii) substantial foreclosure of the market, that is, whether the exclusive dealing barred a substantial number of competitors or severely restricted the market's ambit; (iii) contracts of sufficient duration to prevent meaningful competition by rivals; and (iv) whether likely or actual anticompetitive effects are outweighed by procompetitive effects. You may also consider (v)

evidence of coercive behavior; (vi) the ability of customers to terminate the agreements; and (vii) the use of exclusive dealing by competitors of the defendant. If you find that Plaintiffs have failed to prove any one of these elements, then you must find for Ticketmaster and against Plaintiffs on Plaintiffs' Section 1 exclusive dealing claim. If you find that Plaintiffs have proven all of these elements, then you must find for Plaintiffs and against Ticketmaster on Plaintiffs' Section 1 exclusive dealing claim.[21]

---

[21] **Defendants' Argument:** Defendants agree to delete this instruction given that Plaintiffs are withdrawing their claim for exclusive dealing under Section 1 of the Sherman Act.

**Post Instruction No. 25**

## LIVE NATION'S LIABILITY FOR TICKETMASTER'S ALLEGED CONDUCT

If you find that Plaintiffs have proven by a preponderance of the evidence each element of their claim that Ticketmaster has (1) monopolized the primary ticketing market for what Plaintiffs define as "major concert venues," or (2) monopolized the primary concert ticketing market for major concert venues, or (3) has violated Section 1 through exclusive dealing,[22] then you should find for Plaintiffs and against Ticketmaster on that claim. As to each claim that you find for Plaintiffs and against Ticketmaster, you should then also decide whether Live Nation should also be held liable for Ticketmaster's conduct. If you find by a preponderance of the evidence that Live Nation controlled, dictated or encouraged Ticketmaster's unlawful conduct, then you should find Live Nation liable on that claim. If you do not find that Plaintiffs have proven, by a preponderance of the evidence that Live Nation controlled, dictated or encouraged Ticketmaster's unlawful conduct, then Live Nation is not liable on that claim.

---

[22] **Defendants' Argument:** Defendants agree to delete this language given that Plaintiffs are withdrawing their claim for exclusive dealing under Section 1 of the Sherman Act.

**Post-Instruction No. 26**

## UNLAWFUL TYING AGAINST LIVE NATION

Plaintiffs also claim that Live Nation engaged in an unlawful tying arrangement in violation of Section 1 of the Sherman Act. This claim is against Live Nation, and not Ticketmaster. ~~Again, this~~This is a separate ~~and apart from Plaintiffs' claims of monopolization and unlawful exclusive dealing and claim that~~ is subject to different rules, which I will explain now.[23]

A tying arrangement is one in which the seller will sell one product or service (referred to as the tying product) only on the condition that buyers also purchase a different product or service (referred to as the tied product) from the seller, or that buyers at least agree not to purchase the tied product or service from any other seller. In this case, Plaintiffs claim that the tying product is the use of what they call "large amphitheaters" by artists, and the tied product is promotion services to all touring artists. Plaintiffs claim that Live Nation requires all touring artists to use Live Nation's promotion services if those artists want to perform at so-called "large amphitheaters" owned, operated, or controlled by Live Nation.

In assessing Plaintiffs' tying claim, you should know that, as a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing. This means that businesses have no general duty to deal with their competitors. Live Nation has no obligation to rent its amphitheaters to rival promoters. And it is not unlawful for Live Nation to refuse to do so.

If you find that Live Nation's rival promoters want to rent Live Nation's amphitheaters so that they can win promotion business from artists instead of Live Nation, and that Live Nation's lawful

---

[23] **Defendants' Argument:**  Defendants disagree with Plaintiffs' characterization of their tying claim, but agree to the language Plaintiffs propose.

refusal to rent to its rival promoters is what causes artists to choose Live Nation as their promoter, then you must find for Live Nation and against Plaintiffs on the Section 1 tying claim.[24]

To prevail on their tying claim, Plaintiffs must prove each of the following elements by a preponderance of the evidence:

1. Artists themselves, and not Live Nation's concert promoter competitors, are the customers who rent amphitheaters from Live Nation;

2. The use (i.e., rental) of so-called "large amphitheaters" by artists (the tying product) and promotion services to all touring artists (the tied product) are separate and distinct products. If you previously found that Plaintiffs failed to prove that artists' use of so-called "large amphitheaters" is a relevant market, then you should not go on to consider any other element of this claim. Instead, you should find for Live Nation and against Plaintiffs on the Section 1 tying claim. Only if you found that Plaintiffs proved that alleged market should you go on to consider whether Plaintiffs proved the other elements of this claim.

---

[24] **Defendants' Argument**:  Defendants are entitled to have the jury instructed on the difference between tying and a unilateral refusal to deal.  It is well established that refusing to deal with competitors is lawful and does not constitute unlawful tying. *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009) ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."); *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) ("[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'"); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 604-05 (1985) (jury instructed that "refusal to deal … 'does not violate Section 2 if valid business reasons exist for that refusal'"); *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 929 (4th Cir. 1990) ("In general, a seller has the right to choose with whom it wishes to deal."); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1066 (10th Cir. 2013) (Gorsuch, J.) ("[T]he antitrust laws rarely impose on firms—even dominant firms—a duty to deal with their rivals."); *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 305 (D.C. Cir. 2023) ("To consider Facebook's policy as a violation of § 2 would be to suppose that a dominant firm must lend its facilities to its potential competitors. That theory of antitrust law runs into problems under the Supreme Court's *Trinko* opinion.").  In the absence of instructions distinguishing unlawful tying from a lawful refusal to deal, the jury is likely to interpret evidence about Live Nation's unilateral policy as evidence of tying.

3. Live Nation conditioned artists' use of so-called "large amphitheaters" on artists also purchasing Live Nation's promotion services.

4. Live Nation uses coercion to force artists to purchase Live Nation's promotion services.

5. Live Nation has sufficient market power with respect to the use of what Plaintiffs call "large amphitheaters" by artists to enable Live Nation to coerce artists to purchase Live Nation's promotion services.

6. The alleged tying arrangement has had anticompetitive effects as to promotion services available to all touring artists, for example by raising the price of promotion services paid by those artists, or by lowering the quality or amount of those services. I have previously instructed you on competitive harm and anticompetitive effects in connection with Plaintiffs' monopolization claims. The same rules apply in determining whether this element has been satisfied.[25]

7. The alleged tying arrangement affected a not insubstantial volume of interstate commerce in promotion services to artists.

---

[25] **Defendants' Argument**: Defendants object to exclusion of language requiring Plaintiffs to prove a tied product market. As Defendants have explained, a tying claim cannot proceed without a properly defined tied product market. ECF No. 1048; ECF No. 1051; ECF No. 1059 at 8-13; ECF No. 1362 at 6-7; Defendants' Proposed Jury Instructions submitted Mar. 23, 2026 at 76. Moreover, anticompetitive effects cannot be determined without a properly defied market in which competition is to be measured. *Ohio v. American Express Co.*, 585 U.S. 529, 543 (2018) ("Without a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition."). Instructing the jury to find anticompetitive effects, without asking it to find a market in which competition might have been affected, makes no sense. Defendants maintain that the jury must be instructed to find a tied product market, as Defendants proposed in their prior submissions of proposed jury instructions. ECF No. 1031-10 at 114-15; Defendants Proposed Jury Instructions submitted Mar. 23, 2026 at 76. Given the Court's disagreement on this point, however, Defendants are not reinserting the tied product market requirement here.

Separately, the jury must be told to find anticompetitive effects as to promotion services available to a specified group of artists. Given that Plaintiffs' promotion services to artists at "major concert venues" market did not make it past summary judgment, Defendants propose that this instruction refer to "all touring artists."

If you find that Plaintiffs have proved these elements by a preponderance of the evidence, then you must find for Plaintiffs and against Live Nation on Plaintiffs' tying claim. If you find that Plaintiffs have failed to prove any one of these elements, then you must find for Live Nation and against Plaintiffs on Plaintiffs' tying claim.

I will now provide additional detail on these elements.

**Post-Instruction No. 27**

<strong>UNLAWFUL TYING— ELEMENT #1: IDENTITY OF THE PURCHASER</strong>

An illegal tying arrangement requires that at least two products and/or services be purchased by one buyer. Therefore, the first thing you must decide is who is the customer that actually purchases the alleged tying product here, which is rental of amphitheaters. Plaintiffs contend that artists are the customers that rent amphitheaters. Live Nation contends that promoters, not artists, are the customers that rent amphitheaters. ~~In making this determination, you may consider, among other relevant facts, who the decisionmaker is that seeks to rent the amphitheater, who assumes the contractual obligation to pay for the use of the amphitheater, who bears the economic risk from the rental agreement, and who benefits from the rental agreement with the amphitheater.~~.[26]

If you decide that promoters, not artists, are the customers that rent amphitheaters, you should find for Live Nation and against Plaintiffs on this claim. If, however, you find that artists are the customers that rent amphitheaters from Live Nation, you should go on to consider whether Plaintiffs have proven the other elements of this claim.

---

[26] **Defendants' Argument**:  The parties propose deleting this sentence as several of the factors are vague and may be confusing for the jury.

**Post-Instruction No. 28**

### UNLAWFUL TYING— ELEMENT #2: PRESENCE OF TWO PRODUCTS

To determine whether use of so-called "large amphitheaters" by artists and promotion services to artists are separate and distinct products, you should consider whether there would be demand for each of them if they were offered separately. If enough artists would want to purchase the use of so-called "large amphitheaters" and promotion services separately to induce venues and promoters generally to provide each service separately, then each service is a separate service. On the other hand, if there is very little demand for artists to buy one of the services by itself, that is, without the other service, then the use of the so-called "large amphitheaters" by artists and promotion services to all touring artists are not two separate products for the purposes of the tying claim, even if they are sometimes sold separately.

Services may be separate services even if one of them is useless without the other. The relevant issue is whether there is sufficient demand from customers to induce sellers to provide them separately, even if the customer needs to obtain both products from one or more suppliers.

**Post-Instruction No. 29**

### UNLAWFUL TYING— ELEMENT #3: PROOF OF CONDITIONING

You may find that an illegal tying arrangement exists between the use of so-called "large amphitheaters" by artists and promotion services to touring artists only if you find that Live Nation conditioned the rental of its so-called "large amphitheaters" on an artist's agreement to buy Live Nation's promotion services when the artists would have preferred to buy promotion services elsewhere.

**Post-Instruction No. 30**

### UNLAWFUL TYING— ELEMENT #4: PROOF OF COERCION

To find that an illegal tying arrangement exists, you must also find that Live Nation coerced artists into buying Live Nation's promotion services. To prove coercion, Plaintiffs must prove by a preponderance of the evidence that Live Nation exploited its control over the use of so-called "large amphitheaters" controlled by Live Nation to force artists into the purchase of promotion services, which the artists either did not want at all, or would have preferred to purchase from a different promoter on different terms, and that any appearance of choice was illusory.

There is no coercion if artists would have purchased promotion services from Live Nation anyway, regardless of any alleged tie.

**Post-Instruction No. 31**

**UNLAWFUL TYING— ELEMENT #5: MARKET POWER IN THE TYING MARKET**

To find that an illegal tying arrangement exists, you must also find that Live Nation has sufficient market power in the market for the use of what plaintiffs call "large amphitheaters" by artists such that Live Nation can coerce artists into using its promoters. Market power is the ability of a single seller to raise price and restrict output. You may assess market power by considering the same things I instructed you on for assessing monopoly power earlier. For example, market share is a proxy for market power but you should also consider other aspects of the relevant market, including market share trends, the existence of barriers to entry, the entry and exit by other companies, and the number and size of competitors.

**Post-Instruction No. 32**

~~Post-Instruction No. 32~~

## UNLAWFUL TYING— ELEMENT #6: ANTICOMPETITIVE EFFECTS FOR THE TIED PRODUCT

The next element is whether the alleged tying arrangement has had anticompetitive effects as to promotion services available to all touring artists, for example by raising the price of promotion services paid by those artists, or by lowering the quality or amount of those services. I have previously instructed you on competitive harm and anticompetitive effects in connection with Plaintiffs' monopolization claims.  The same rules apply in determining whether this element has been satisfied.

**Post-Instruction No. 33**

Post-Instruction No. 33

### UNLAWFUL TYING— ELEMENT #7: NOT INSUBSTANTIAL AMOUNT OF INTERSTATE COMMERCE

The last element is whether the alleged tying arrangement involved a not insubstantial amount of interstate commerce in promotion services.

For commerce to be considered interstate, it must have a nexus to commerce that affects or touches more than one state. In determining whether the tying arrangement involved a not insubstantial amount of interstate commerce, you should consider the total dollar amount of Live Nation's sales of promotion services to all touring artists in interstate commerce achieved by the tying arrangement in absolute terms.

**Post-Instruction No. 34**

### STATE LAW CLAIMS

In addition to the claims that the Plaintiff States have brought under the Sherman Act, some Plaintiff States have brought claims under their own state laws. I will proceed to instruct you on those state law claims now.

**Post-Instruction No. 35**

## CONGRUENT STATE CLAIMS

Certain Plaintiffs are alleging violations of their state laws that are congruent with Section 1 or 2 of the Sherman Act. That means these state laws have the same elements as Section 1 or 2 of the Sherman Act. If you find that a Plaintiff State has proven every element of a Sherman Act Section 1 or 2 claim for a particular Defendant, and that the proven conduct harmed competition in that Plaintiff State, then for the state statutes listed below, you must find that the Plaintiff State has also proven the elements of its State statute as to that particular Defendant. If you find that a Plaintiff State has not proven every element of any Sherman Act claim for a particular Defendant, or that the conduct did not harm competition in that Plaintiff State, then for the state statutes listed below, you must find for that Defendant and against that Plaintiff State.

- The Arizona Uniform State Antitrust Act, A.R.S. § 44-1401 *et seq*;

- the Colorado Antitrust Act of 2023, Colo. Rev. Stat. 6-4-101, *et seq.*;

- the Connecticut Antitrust Act, Conn. Gen. Stat. § 35-24 *et seq.*;

- the District of Columbia Antitrust Act, D.C. Code § 28-4501 *et seq.*;

- the Florida Antitrust Act, Fla. Stat. § 542.15 *et seq.*;

- ~~the Indiana Antitrust Act, Ind. Code Sections 24-1-2-1 and 24-1-2-2;~~ the Louisiana Unfair Trade Practices Act, LSA-R.S. 51:1401 *et seq.*;[27]

- the Maryland Antitrust Act, MD Commercial Law Code Ann. § 11-201 *et seq.*;

- the Michigan Antitrust Reform Act, MCL 445.771 *et seq.*;

- the Minnesota Antitrust Law of 1971, Minn. Stat. §§ 325D.49–325D.66;

---

[27] **Defendants' Argument**: The proposed instructions include Indiana twice, both here and in a separate instruction later. For the reasons Defendants have explained, Indiana should not be included in this instruction on congruent state claims. ECF No. 1031-10 at 136, 150; Defendants' Proposed Jury Instructions submitted Mar. 23, 2026 at 94, 107.

- the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. § 598A.010 *et seq.*;

- the New Hampshire Revised Statutes Annotated § 356 *et seq.*;

- the New Jersey Antitrust Act, N.J.S.A. § 56:9-1 *et seq.*;

- the New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-1 and 57-1-2;

- the North Carolina Unfair or Deceptive Trade Practices Act, N.C.G.S. § 75-1 *et seq.*;

- the Valentine Act, Ohio Rev. Code Chapter 1331;

- the Rhode Island Antitrust Law, R.I. Gen. L. §§ 6-36-4 and 6-36-5;

- the Texas Business and Commerce Code § 15.01 *et seq.*;

- the Utah Antitrust Act, Utah Code §76-16-510;

- the Virginia Antitrust Act, Va. Code § 59.1-9.1 *et seq.*;

- the Washington Consumer Protection Act, Wash. Rev. Code §§ 19.86.030 and 19.86.040;

- the West Virginia Antitrust Act, W. Va. Code § 47-18-1 *et seq.*; and

- Wisconsin Statutes Chapter 133.

**Post-Instruction No. 36**

## CALIFORNIA UNFAIR COMPETITION LAW
### (CAL. BUS. & PROF. CODE § 17200 *ET SEQ.*)

The State of California alleges that each Defendant has violated California's Unfair Competition Law, which prohibits unfair competition through unlawful or unfair business acts or practices.

For the State of California to prevail on its claim under the Unfair Competition Law, you must find that the State of California has proven each of the following elements by a preponderance of the evidence as to each Defendant:

1. The Defendant engaged in a business act or practice;

2. The act or practice occurred within California, emanated from California, or harmed California residents; and

3. The act or practice is either unlawful or unfair.

To determine whether acts or practices emanate from California, you may consider the location of the firm's headquarters, executives, or other employees involved in the conduct; where the relevant materials were created; where the relevant policies at issue were developed or executed; and where the firm conducts business.

*Unlawful*

To establish a violation of the unlawful prong of the California Unfair Competition Law, the State of California must prove by a preponderance of the evidence that each Defendant has violated another law, and that the act or practice that violated that other law occurred within California or emanated from California or harmed California residents. Therefore, if you find for Plaintiffs on another claim and that the associated act or practice occurred within California or emanated from California or harmed California residents, you must find that the Defendant who committed that act or practice violated the unlawful prong of California's Unfair Competition Law.

*Unfair*

To establish a violation of the unfair prong of the California Unfair Competition Law, the State of California must prove by a preponderance of evidence that each Defendant has:

1.  engaged in conduct that threatens a  violation of the antitrust laws or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition; or

2.  engaged in a business act or practice for which the harm to consumers outweighs the utility of the conduct.

These tests are not mutually exclusive and you may find that Plaintiffs have proven a violation of (1) or (2) or both (1) and (2).

A business act or practice may be unfair even if not prohibited by some other law such as the Sherman Act. That is to say, the elements of the monopolization, exclusive dealing, and tying claims that I previously described to you do not apply to this claim. Instead, you should follow these instructions when deciding whether California has proven its UCL claim by a preponderance of the evidence.

**Post-Instruction No. 37**

**FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT (FLA. STAT. § 501.204)**

The State of Florida alleges that Defendants' anticompetitive conduct violated the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), which broadly prohibits persons from engaging in unfair methods of competition in the conduct of any trade or commerce based in or directed toward the State of Florida.

To establish a violation of the FDUTPA based on anticompetitive conduct, Florida must prove by a preponderance of the evidence that each Defendant engaged in an unfair method of competition.

*Unfair Methods of Competition*

A method of competition is "unfair" if the conduct goes beyond competition on the merits. Competition on the merits may include, for example, superior products or services, superior business skills, or truthful marketing and advertising practices. Conduct goes beyond competition on the merits if it is coercive, exploitative, collusive, abusive, deceptive, predatory, or exclusionary and tends to foreclose competition. To be "unfair," the act or practice must cause or be likely to cause substantial injury to consumers which is not reasonably avoidable and not outweighed by countervailing benefits to consumers or to competition.

Violations of antitrust laws also constitute "unfair methods of competition" under the FDUTPA. Therefore, if you find that the State of Florida proves by a preponderance of the evidence that each Defendant violated the Sherman Act through conduct based in or directed toward the State of Florida, you may find that such conduct by such Defendant also violated the FDUTPA. However, it is not necessary to find such a violation if the Defendant's conduct was otherwise unfair.

**Post-Instruction No. 38**

### ILLINOIS ANTITRUST ACT (740 ILCS 10/1 ET SEQ.)

The State of Illinois has brought claims under the Illinois Antitrust Act Illinois's claims under the Illinois Antitrust Act are based on the same conduct as its claims under the Sherman Act. However, they have some additional requirements. *Section 1*: The elements of proof for claims under this statute are the same as under Section 1 of the Sherman Act. If you find for Plaintiffs and against one or more Defendants on Plaintiffs' claims under Section 1 of the Sherman Act for unlawful exclusive dealing and unlawful tying, and Illinois proves by a preponderance of the evidence that the conduct harmed competition in Illinois, then you must find for the State of Illinois and against the relevant Defendant on those same claims under the Illinois Antitrust Act. If you find for one or more Defendants on Plaintiffs' claims under Section 1 of the Sherman Act for unlawful exclusive dealing and unlawful tying, you must find for the relevant Defendant under those same claims under the Illinois Antitrust Act.

*Section 2*: For claims under the Illinois Antitrust Act involving monopolization, the elements of proof are the same as under Section 2 of the Sherman Act, except the State of Illinois must also prove that Defendants acted with the purpose of excluding competition or controlling, fixing, or maintaining prices in the relevant market. If you find for Plaintiffs and against one or more Defendants under Plaintiffs' claims under Section 2 of the Sherman Act, and Illinois proves by a preponderance of evidence that one or more Defendants acted with the purpose of excluding competition or controlling, fixing, or maintaining prices in the relevant market, and that the conduct harmed competition in Illinois, then you must also find for the State of Illinois on those same claims under the Illinois Antitrust Act and against the relevant Defendant. If you find for one or more Defendants on Plaintiffs' claims under Section 2 of the Sherman Act, or that the State of Illinois fails to prove that one or more Defendants acted with the purpose of excluding competition or controlling, fixing, or

maintaining prices in the relevant market, then you must find for the relevant Defendants for that claim under the Illinois Antitrust Act.

**Post-Instruction No. 39**

### INDIANA ANTITRUST ACT (IND. CODE §§ 24-1-2-1 AND 24-1-2-2)

The State of Indiana has brought claims under the Indiana Antitrust Act. The State of Indiana is authorized to bring claims under this Act only for conduct that occurred after July 1, 2023. So conduct that occurred before July 1, 2023 cannot form a basis for liability under this statute. If the State of Indiana fails to provide evidence of conduct that occurred and harmed competition in Indiana after July 1, 2023, you must find for Defendants on this claim.

For conduct that occurred after July 1, 2023, if you find that the State of Indiana has proven every element of a Sherman Act Section 1 or Section 2 claim against a particular Defendant, and that the particular Defendant's conduct harmed competition in Indiana, then you may find that the State of Indiana has also proven the elements of the Indiana Antitrust Act as to that particular Defendant.

**Post-Instruction No. 40**

## KANSAS RESTRAINT OF TRADE ACT (KAN. STAT. ANN. § 50-101 ET SEQ.)

The State of Kansas has brought claims under the Kansas Restraint of Trade Act, Kan. Stat. Ann. § 50-101 *et seq.* Kansas's claims under the Kansas Restraint of Trade Act are based on the same conduct as its claims under the Sherman Act.

For claims under the Kansas involving the restraint of competition by contracts, agreements, arrangements, or combinations, the elements of proof are the same as under Section 1 of the Sherman Act. If you find for Plaintiffs and against the relevant Defendant on Plaintiffs' claims under Section 1 of the Sherman Act regarding unlawful exclusive dealing or unlawful tying, and Kansas proves by a preponderance of the evidence that the conduct harmed competition in Kansas, then you must also find for the State of Kansas and against the relevant Defendant on those same claims under the Kansas Restraint of Trade Act. If you find for the relevant Defendant under Plaintiffs' claims under Section 1 of the Sherman Act for unlawful exclusive dealing or unlawful tying, you must find for that Defendant under those same claims under the Kansas Restraint of Trade Act.

The elements of proof for monopolization claims under this statute are the same as under Section 2 of the Sherman Act, except the State of Kansas must also prove the existence of concerted or joint action with another party. If you find for Plaintiffs and against one or more Defendants on Plaintiffs' monopolization claims under Section 2 of the Sherman Act, and Kansas proves by a preponderance of the evidence that one or more Defendants acted jointly or in concert with another party, and that one or more Defendants' conduct harmed competition in Kansas, then you must also find for the State of Kansas on those same claims under the Kansas Restraint of Trade Act and against the relevant Defendants. If you find for one or more Defendants on Plaintiffs' claims under

Section 2 of the Sherman Act, or that the State of Kansas failed to prove that one or more

Defendants acted jointly or in concert with another party, then you must find for the relevant

Defendants under those claims under the Kansas Restraint of Trade Act.

**Post-Instruction No. 41**

## DONNELLY ACT (NEW YORK GENERAL BUSINESS LAW §§ 340 ET SEQ.)

The State of New York has brought claims under the Donnelly Act, New York General Business Law §§ 340 *et seq.* New York's claims under the Donnelly Act are based on the same conduct as its claims under the Sherman Act.

For claims under the Donnelly Act involving the restraint of competition by contracts, agreements, arrangements, or combinations, the elements of proof are the same as under Section 1 of the Sherman Act. If you find for Plaintiffs and against one or more Defendants on Plaintiffs' claims under Section 1 of the Sherman Act regarding unlawful exclusive dealing or unlawful tying, and New York proves by a preponderance of the evidence that the conduct harmed competition in New York, then you must also find for the State of New York and against the relevant Defendant on those same claims under the Donnelly Act. If you find for one or more Defendants under Plaintiffs' claims under Section 1 of the Sherman Act for unlawful exclusive dealing or unlawful tying, you must find for the relevant Defendant under those same claims under the Donnelly Act.

For claims under the Donnelly Act involving monopolization, the elements of proof are the same as under Section 2 of the Sherman Act, except the State of New York must also prove that the establishment or maintenance of the monopoly involved a contract, agreement, arrangement, or combination. If you find for Plaintiffs and against one or more Defendants under Plaintiffs' monopolization claims under Section 2 of the Sherman Act, and New York proves by a preponderance of the evidence that those monopolies were established or maintained through one or more contracts, agreements, arrangements, or combinations, and that the conduct harmed competition in New York, then you must also find for the State of New York and against the relevant Defendant on those same claims under the Donnelly Act. If you find for one or more Defendants on Plaintiffs' claims under Section 2 of the Sherman Act, or the State of New York fails to prove the existence of a contract,

agreement, arrangement, or combination in connection with that claim, then you must find for the

relevant Defendant under those claims under the Donnelly Act.

**Post-Instruction No. 42**

**SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT
(S.C. CODE ANN. § 39-5-10 ET SEQ.)**

The state of South Carolina alleges that each Defendant's conduct violates the South Carolina Unfair Trade Practices Act (S.C. Code Ann. § 39-5-10 *et seq.*), SCUTPA provides that "[u]nfair methods of competition and unfair [] acts or practices in the conduct of any trade or commerce are… unlawful."

For the State of South Carolina to prevail on this claim, you must find for each Defendant separately that:

1.      The Defendant engaged in an act or practice in trade or commerce.

2.      The act or practice is unfair.

3.      The act or practice has an impact on the public interest.

The words "trade" and "commerce" include the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity or thing of value wherever situated, and any trade or commerce directly or indirectly affecting the people of South Carolina.

The act or practice alleged must be unfair. An act or practice is "unfair" when it is offensive to public policy or when it is immoral, unethical, or oppressive. Whether an act or practice is unfair within the meaning of the Act depends upon the surrounding facts and the impact of the transaction on the marketplace.

Unfair acts or practices in the conduct of trade or commerce have an impact upon the public interest if the acts or practices have the potential for repetition. While not the only means for showing potential repetition, potential for repetition may be shown by:

1.      showing the same kind of actions occurred in the past, thus making it likely they will continue to occur absent deterrence; or

2.      showing the company's procedures create a potential for repetition of the unfair acts.

**Post-Instruction No. 43**

## TENNESSEE TRADE PRACTICES ACT
### (TENN. CODE ANN. §§ 47-25-101 AND 102)

The State of Tennessee has brought claims under the Tennessee Trade Practices Act. The State of Tennessee is authorized to bring claims under this Act only for conduct that occurred after April 23, 2024. So conduct that occurred before April 23, 2024 cannot form a basis for liability under this statute. If the State of Tennessee fails to provide evidence of conduct that occurred and harmed competition in Tennessee after April 23, 2024, you must find for Defendants on this claim.

For conduct that occurred after April 23, 2024, if you find that the State of Tennessee has proven every element of a Sherman Act Section 1 or Section 2 claim against a particular Defendant, and that the conduct harmed competition in Tennessee, then you may find that the State of Tennessee has also proven the elements of the Tennessee Trade Practices Act as to that claim and that particular Defendant.

**Post-Instruction No. 44**

**STATES DAMAGES CLAIMS**

[Twenty-one] of the Plaintiff States—specifically, Arizona, Colorado, Connecticut, Florida, Illinois, Indiana, Michigan, Minnesota, Nevada, New Hampshire, New Jersey, New York, North Carolina, Pennsylvania, Rhode Island, South Carolina, Utah, Washington, West Virginia, Wisconsin, and the District of Columbia—are seeking damages from Ticketmaster on behalf of fans who purchased primary concert tickets for events at what Plaintiffs call "major concert venues." I may refer to these [21] States as "Plaintiff States claiming damages." The Plaintiff States claiming damages allege that residents of their States were overcharged on purchases of primary concert tickets for events at so-called "major concert venues."

If you find that any Plaintiff State claiming damages proved that Ticketmaster monopolized the market for primary concert ticketing services to "major concerts venues" in violation of Section 2 of the Sherman Act or those States' laws, or proved that Ticketmaster engaged in unlawful exclusive dealing in violation of Section 1 of the Sherman Act or those States' laws, then you must decide if, as a result of any such violation, residents of that Plaintiff State were overcharged for primary concert tickets for events at so-called "major concert venues." If any Plaintiff State claiming damages fails to prove that as a result of Ticketmaster's conduct, residents of its particular State were overcharged for primary concert tickets, then that State is not entitled to any damages, and you need not do any further analysis for that State.

If any Plaintiff State claiming damages proves that residents of its State were overcharged as a result of the violations I just described, then you must determine whether that Plaintiff State has proved by a preponderance of the evidence the amount that residents of that particular Plaintiff State were overcharged on a per-ticket basis for their purchases of primary concert tickets for events at so-called "major concert venues." You are not being asked to determine the total number of tickets or

ticket purchasers affected.  You are only being asked to determine the per-ticket overcharge in each Plaintiff State claiming damages.

I remind you that you should not assume that any resident of any Plaintiff State claiming damages will receive any portion of any money the Plaintiff States might ultimately recover in this case.  And neither you nor any member of your family will receive any portion of any funds that the States may ultimately receive.

I will now provide further instructions on what each Plaintiff State claiming damages must prove before you may calculate any per-ticket overcharge for that State, and how you must calculate any such overcharge.

**Post-Instruction No. 45**

<strong>INJURY AND CAUSATION</strong>

Each Plaintiff State claiming damages is entitled to recover damages only if it can establish these three elements of injury and causation:

1. Residents in its State who purchased primary concert tickets to attend events at what Plaintiffs refer to as "major concert venues" were in fact injured as a result of Ticketmaster's alleged violations of the antitrust laws;

2. Those injuries would not have occurred but for Ticketmaster's alleged antitrust violation; and

3. Those injuries are of the type that the antitrust laws were intended to prevent.

The first element is sometimes referred to as "injury in fact" or "fact of damage." For each of the Plaintiff States claiming damages to establish that it is entitled to damages, it must prove that residents of its State who purchased primary concert tickets to attend events at any of the so-called "major concert venues" were injured as a result of Ticketmaster's alleged monopolization of the market for primary concert tickets at so-called "major concert venues" in violation of Section 2 of the Sherman Act, or for exclusive dealing in violation of Section 1 of the Sherman Act. It is important to understand that injury and amount of damage are different concepts and that you cannot consider the amount of any overcharge alleged by any particular State unless and until you have concluded that fans in that State were in fact injured.

Each Plaintiff State claiming damages must also offer evidence that establishes by a preponderance of the evidence that injuries to residents in that State would not have occurred but for Ticketmaster's alleged unlawful conduct. This means that each Plaintiff State claiming damages must have proven that some overcharge was imposed on residents in its State because of Ticketmaster's

alleged antitrust violation, and that such overcharge would not have been imposed but for the alleged antitrust violation.

Finally, each of the Plaintiff States claiming damages must establish that the alleged injuries to residents of its State are the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If the alleged injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then the alleged injuries are antitrust injuries. On the other hand, if the alleged injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit artists, venues, or consumers, then the alleged injuries are not antitrust injuries and none of the Plaintiff States claiming damages can recover damages for those injuries under the antitrust laws.

In summary, if each of the Plaintiff States claiming damages can establish that residents of its State who purchased primary concert tickets to events at so-called "major concert venues" were in fact injured by Ticketmaster's conduct, that such injuries would not have occurred but for Ticketmaster's conduct, and that such injuries were the type that the antitrust laws were intended to prevent, then each such Plaintiff State is entitled to recover for the overcharge paid by such residents in each such Plaintiff State.

**Post-Instruction No. 46**

### STATUTE OF LIMITATIONS

A statute of limitations establishes a time limit for bringing a lawsuit. In doing so, the law seeks to eliminate stale claims, to promote justice by preventing surprises, and to provide security and stability to human affairs. Statutes of limitations ensure that a plaintiff does not wait, sleep on their rights, and allow damages to accumulate before bringing suit.

The statute of limitations for the claims in this case does not permit recovery for any injury to residents in any State suffered prior to May 23, 2020. This means that any alleged anticompetitive conduct that occurred prior to May 23, 2020, and any injury resulting from that conduct, is time-barred. You can only find that each Plaintiff has proved the required elements of injury and causation if they have proven both that (i) the injury occurred on or after May 23, 2020 and (ii) that injury was caused by anticompetitive conduct that occurred on or after May 23, 2020. You may not base any finding of injury or your overcharge calculation for damages on any anticompetitive conduct that occurred prior to May 23, 2020, regardless of whether you believe the conduct was unlawful and regardless of whether the harm or damages from that conduct continued after May 23, 2020.

While you may not consider injury or harm resulting from conduct that occurred before May 23, 2020, Plaintiffs have introduced evidence about conduct occurring before May 23, 2020 solely as background or context for the acts that took place on or after May 23, 2020. It is important that you consider this evidence only as background for the alleged conduct or injury that took place *after* May 23, 2020. Otherwise, this evidence has expired and cannot support Plaintiffs' claims.

**Post-Instruction No. 47**

### DAMAGES INSTRUCTIONS—GENERAL

If you find that any Plaintiff State claiming damages proved that Ticketmaster monopolized the alleged market for primary concert ticketing in violation of Section 2 of the Sherman Act, or that Ticketmaster engaged in unlawful exclusive dealing in violation of Section 1 of the Sherman Act, and you also find that the Plaintiff State proved that any such violation caused injury to residents of its State who purchased primary concert tickets to events at so-called "major concert venues" within the statute of limitations, then you must determine the amount of the overcharge, if any, paid by those residents in that Plaintiff State. The fact that I am giving you instructions concerning the issue of damages does not mean that I believe any Plaintiff should, or should not, prevail in this case. If you reach a verdict for Ticketmaster on Plaintiffs' claims for monopolization of the alleged market for primary concert tickets at so-called "major concert venues" in violation of Section 2 of the Sherman Act and laws of the Plaintiff States claiming damages, or for exclusive dealing in violation of Section 1 of the Sherman Act and the laws of the Plaintiffs States claiming damages, you should not consider the issue of damages, and you may disregard the damages instruction that I am about to give.

The law provides that each Plaintiff State claiming damages can recover based on the amount of per-ticket overcharge imposed on primary concert tickets purchased by residents of that State for events at one or more of the venues Plaintiffs call "major concert venues," only if you find that the overcharge was caused by the conduct that you have found to be unlawful.

Antitrust damages are only compensatory, meaning their purpose is to put injured persons, if any, as near as possible in the position in which they would have been had the alleged antitrust violation not occurred. The law does not permit you to award any additional overcharge amount to punish a wrongdoer—what we sometimes refer to as punitive damages—or to deter particular conduct in the future. Furthermore, you are not permitted to award to any of the Plaintiff States an amount for

attorneys' fees or the costs of maintaining this lawsuit. Again, you are only being asked to determine the per-ticket overcharge paid by ticket purchasers in each Plaintiff State that proves the violations I described and meets the injury and causation requirements I described.

**Post-Instruction No. 48**

## COMPENSATORY DAMAGES—OVERCHARGE

Each Plaintiff State claiming damages contends that its residents paid higher fees added to the face value of primary tickets to concerts that took place at so-called "major concert venues," because Ticketmaster allegedly charged those venues more money for primary ticketing services than Ticketmaster would have but for Ticketmaster's alleged anticompetitive conduct.

If you find that any Plaintiff State has proven that Ticketmaster violated the antitrust laws I previously described, and that as a direct result venues increased the ticketing fees paid by fans, then for each Plaintiff State that satisfies the other elements for damages in my previous instructions, you must determine the per-ticket overcharge amount paid by residents of that State for primary concert tickets for events at so-called "major concert venues." The per-ticket overcharge amount is the difference between what residents of the Plaintiff State paid for fees added to the face value of tickets sold in the primary market during the damages period, and the amount of ticket fees you find those residents of that State would have paid but for Ticketmaster's alleged anticompetitive conduct. You are not being asked to determine, and may not speculate as to, the total number of tickets or ticket purchasers affected by any overcharge.

**Post-Instruction No. 49**

## BASIS FOR CALCULATING OVERCHARGE

You are permitted to make just and reasonable estimates in determining the amount of the per-ticket overcharge for each Plaintiff State claiming damages that has proven it is entitled to recover damages. You are not required to calculate the amount of the overcharge with mathematical certainty or precision. However, the overcharge must have a reasonable basis in the evidence and must be based on reasonable, non-speculative assumptions and estimates. The overcharge may not be based on guesswork or speculation. Each Plaintiff State claiming damages must prove the reasonableness of each of the assumptions upon which the per-ticket overcharge for its State is based.

If you find that any Plaintiff State claiming damages has provided a reasonable basis for determining the per-ticket overcharge in its State, then you may find an overcharge amount for that State so long as that amount is a just and reasonable estimate supported by the evidence.

If you find that any Plaintiff State failed to carry its burden of providing a reasonable basis for determining the per-ticket overcharge in its State, then you may not find that any overcharge occurred in that State.

**Post-Instruction No. 50**

## FINAL INSTRUCTIONS

You are about to go into the jury room and begin your deliberations. If during those deliberations you want to see any of the exhibits, you may request that they be brought into the jury room. If you want any of the testimony read back to you, you may also request that. Please remember that it is not always easy to locate what you might want to read or hear, so be as specific as you possibly can in requesting exhibits or portions of the testimony.

Your requests for exhibits or testimony—in fact, any communication with the Court—should be made to me in writing, signed by your foreperson, and given to one of the marshals. In any event, do not tell me or anyone else how the jury stands on any issue until after a unanimous verdict is reached.

*Duty to Deliberate/Unanimous Verdict*

You will now retire to decide the case. It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement. Each of you must decide the case for yourselves, but you should do so only after a consideration of the case with your fellow jurors, and you should not hesitate to change an opinion when convinced that it is erroneous. Your verdict must be unanimous, but you are not bound to surrender your honest convictions concerning the effect or weight of the evidence for the mere purpose of returning a verdict or solely because of the opinion of other jurors. Discuss and weigh your respective opinions dispassionately, without regard to sympathy, without regard to prejudice or favor for either party, and adopt that conclusion which in your good conscience appears to be in accordance with the truth.

Again, each of you must make your own decision about the proper outcome of this case based on your consideration of the evidence and your discussions with your fellow jurors. No juror should surrender their conscientious beliefs solely for the purpose of returning a unanimous verdict.

94

*Selection of Foreperson*

When you retire, you should elect one member of the jury as your foreperson. That person will preside over the deliberations and speak for you here in open court.

Verdict forms have been prepared for your convenience. You will take these forms to the jury room and, when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date, and sign the form that sets forth the verdict upon which you unanimously agree. You will then return with your verdict to the courtroom. I will read the verdict form to you now.

*Return of Verdict*

After you have reached a verdict, your foreperson will fill in the form that has been given to you, each of you will sign it with the date and advise the marshal outside your door that you are ready to return to the courtroom.

I will stress that each of you should be in agreement with the verdict which is announced in court. Once your verdict is announced by your foreperson in open court and officially recorded, it cannot ordinarily be revoked.

*Juror Oath*

In determining the facts, you are reminded that you took an oath to render judgment impartially and fairly, without prejudice and without fear, solely upon the evidence in the case and the applicable law. I know that you will do this and reach a just and true verdict.

95

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA et al.,

      *Plaintiffs*,

        v.                      Civil No. 1:24–cv–3973-AS

LIVE NATION ENTERTAINMENT, INC.,
and TICKETMASTER L.L.C.,

      *Defendants*.

**<u>PROPOSED VERDICT FORM</u>**

## VERDICT FORM

**Part I: Section 2 Monopolization Claim Against Ticketmaster For Alleged Market Of Primary Ticketing Services To The Venues Plaintiffs Refer To As "Major Concert Venues"**

1.    Have Plaintiffs proven, by a preponderance of the evidence, that primary ticketing services to the venues Plaintiffs refer to as "major concert venues" is a properly-defined antitrust market?
Yes_____    No_____
*If you answered "Yes," proceed to Question 2.*
*If you answered "No," proceed to Question 5.*

~~1.~~2.    Have Plaintiffs proven, by a preponderance of the evidence, that Ticketmaster willfully acquired or maintained monopoly power in the market for primary ticketing services to what Plaintiffs refer to as "major concert venues" by engaging in anticompetitive conduct?
Yes_____    No_____
*If you answered "Yes," proceed to Question ~~2~~3.*
*If you answered "No," proceed to Question ~~3~~5.*

~~2.~~3.    Have Plaintiffs proven, by a preponderance of the evidence, that ~~Live Nation controlled, dictated, or encouraged~~ Ticketmaster's alleged anticompetitive conduct caused anticompetitive effects in ~~this~~the market~~?~~ for primary ticketing services to what Plaintiffs refer to as "major concert venues"?
Yes_____    No_____
~~Proceed~~*If you answered "Yes," proceed* to Question 4.
*If you answered "No," proceed to Question 5.*

4.    Have Plaintiffs proven, by a preponderance of the evidence, that Live Nation controlled, dictated, or encouraged Ticketmaster's anticompetitive conduct in this market?
Yes_____    No_____
*Proceed to Question 5.*

~~3.~~

**Part II: Section 2 Monopolization Claim Against Ticketmaster For Alleged Market Of Primary *Concert* Ticketing Services To The Venues Plaintiffs Refer To As "Major Concert Venues"**

5.    Have Plaintiffs proven, by a preponderance of the evidence, that primary *concert*[1] ticketing services to the venues Plaintiffs refer to as "major concert venues" is a properly-defined antitrust market?
Yes_____    No_____
*If you answered "Yes," proceed to Question 6.*
*If you answered "No," proceed to Question 9.*

---

[1] **Defendants' Argument:**  Defendants do not object to italicizing "concert".

1

~~3.~~6.      Have Plaintiffs proven, by a preponderance of the evidence, that Ticketmaster willfully acquired or maintained monopoly power in the market for primary *concert* ticketing services to what Plaintiffs refer to as "major concert venues" by engaging in anticompetitive conduct?
Yes \_\_\_\_\_          No \_\_\_\_\_
***If you answered "Yes," proceed to Question 7.***
***If you answered "No," proceed to Question 9.***

7.      Have Plaintiffs proven, by a preponderance of the evidence, that Ticketmaster's alleged anticompetitive conduct caused anticompetitive effects in the market for primary *concert* ticketing services to what Plaintiffs refer to as "major concert venues"?
Yes \_\_\_\_\_          No \_\_\_\_\_
***If you answered "Yes," proceed to Question 8.***
***If you answered "No," proceed to Question 9.***

8.      Have Plaintiffs proven, by a preponderance of the evidence, that Live Nation controlled, dictated, or encouraged Ticketmaster's anticompetitive conduct in this market?
Yes \_\_\_\_\_          No \_\_\_\_\_
***Proceed to Question 9.***
~~4.~~
~~*If you answered "No," proceed to Question 5.*~~

~~4.1.     Have Plaintiffs proven, by a preponderance of the evidence, that Live Nation controlled, dictated, or encouraged Ticketmaster's anticompetitive conduct in this market?~~
~~Yes \_\_\_\_\_          No \_\_\_\_\_~~
~~*Proceed to Question 5.*~~


**Part III: Section 2 Monopolization Claim Against Live Nation For Alleged Market Of Use Of Venues Plaintiffs Refer To As "Large Amphitheaters" By Artists**

9.      Have Plaintiffs proven, by a preponderance of the evidence, that use of the venues Plaintiffs refer to as "large amphitheaters" is a properly-defined antitrust market?
Yes \_\_\_\_\_          No \_\_\_\_\_
***If you answered "Yes," proceed to Question 10.***
***If you answered "No," proceed to Question 12.***

~~5.~~10.   Have Plaintiffs proven, by a preponderance of the evidence, that Live Nation willfully acquired or maintained monopoly power in the market for the use of venues Plaintiffs refer to as "large amphitheaters" by engaging in anticompetitive conduct?
Yes \_\_\_\_\_          No \_\_\_\_\_
***If you answered "Yes," proceed to Question 11.***
***If you answered "No," proceed to Question 12.***

2

11.     Have Plaintiffs proven, by a preponderance of the evidence, that Live Nation's alleged anticompetitive conduct caused anticompetitive effects in the market for the use of venues Plaintiffs refer to as "large amphitheaters"?

Yes_____ No_____

***Proceed to Question 6~~6~~12.***

~~**Part IV: Section 1 Exclusive Dealing Claim Against Ticketmaster**[2]~~

~~6.     Have Plaintiffs proven, by a preponderance of the evidence, that the contracts between the venues Plaintiffs refer to as "major concert venues" and Ticketmaster substantially foreclosed competition in a relevant market for primary concert ticketing services to those major concert venues?~~

~~*If you answered "Yes," proceed to Question 7.*~~
~~*If you answered "No," proceed to Question 8.*~~

~~7.     Have Plaintiffs proven, by a preponderance of the evidence, that those contracts are an unreasonable restraint of trade that has caused anticompetitive effects in the market for primary concert ticketing services to major concert venues?~~
~~Yes_____ No_____~~
~~*Proceed to Question 8.*~~

**Part I~~I~~V: Section 1 Tying Claim Against Live Nation**

*If you answered "Yes" to Question 9, proceed to Question 12.*
*If you answered "No" to Question 9, proceed to Question 14.*

12.     Have Plaintiffs proven, by a preponderance of the evidence, that artists are the customers who rent amphitheaters, and not promoters?
Yes_____ No_____
*If you answered "Yes," proceed to Question 13.*
*If you answered "No," proceed to Question 14.*

~~8.~~13.   Have Plaintiffs proven, by a preponderance of the evidence, that there is a relevant market for the use of venues Plaintiffs refer to as "large amphitheaters," and that Live Nation unlawfully tied artist promotion services to the artists' use of those "large amphitheaters"?
Yes_____ No_____
***Proceed to Question 9~~9~~14.***

**Part VI: Congruent State Law Claims**

---

[2] **Defendants' Argument:**  Defendants agree to delete these questions given that Plaintiffs have withdrawn their Section 1 exclusive dealing claim.

9.14.   Has each of the following Plaintiff States proven, by a preponderance of the evidence, that Live Nation, Ticketmaster or both, engaged in unlawful conduct that harmed competition in its State?

| State | Live Nation (check if YES) | No | Ticketmaster (check if YES) | No |
|---|---|---|---|---|
| Arizona | | | | |
| Colorado | | | | |
| Connecticut | | | | |
| District of Columbia | | | | |
| Florida | | | | |
| Illinois | | | | |
| Indiana | | | | |
| Kansas | | | | |
| Louisiana | | | | |
| Maryland | | | | |
| Michigan | | | | |
| Minnesota | | | | |
| Nevada | | | | |
| New Hampshire | | | | |
| New Jersey | | | | |
| New Mexico | | | | |
| New York | | | | |
| North Carolina | | | | |
| Ohio | | | | |
| Rhode Island | | | | |
| Texas | | | | |
| Utah | | | | |
| Vermont | | | | |
| Virginia | | | | |
| Washington | | | | |
| West Virginia | | | | |
| Wisconsin | | | | |

*Proceed to Question 1015.*

4

**Part VII: Damages**

*If you answered "Yes" to __all__ Questions in Part I, Part II, or Part IV, proceed to Question 10̶15. If not, proceed to Question 11̶16.*

10̶.15.  Please state the amount (if any) that each Plaintiff State proved, by a preponderance of the evidence, that residents in its specific State were overcharged per ticket for primary concert tickets to events at the venues Plaintiffs call "major concert venues" because of Ticketmaster's alleged anticompetitive conduct that occurred after May 23, 2020.  You may not calculate any overcharge based on any alleged anticompetitive conduct that occurred before May 23, 2020.

| State | |
|---|---|
| Arizona | $ |
| Colorado | $ |
| Connecticut | $ |
| District of Columbia | $ |
| Florida | $ |
| Illinois | $ |
| Indiana | $ |
| Kansas | $ |
| Louisiana | $ |
| Maryland | $ |
| Michigan | $ |
| Minnesota | $ |
| Nevada | $ |
| New Hampshire | $ |
| New Jersey | $ |
| New Mexico | $ |
| New York | $ |
| North Carolina | $ |
| Ohio | $ |
| Rhode Island | $ |
| Texas | $ |
| Utah | $ |
| Vermont | $ |
| Virginia | $ |
| Washington | $ |
| West Virginia | $ |
| Wisconsin | $ |

*Proceed to Question 11̶16.*

**Part VIII: Other State Law Claims A̶n̶d̶ ̶D̶a̶m̶a̶g̶e̶s̶**

5

**California Unfair Competition Law**

11.16.  Has California proven, by a preponderance of the evidence, that Ticketmaster engaged in an unlawful or unfair business act or practice that occurred within California, emanated from California, or harmed California residents in violation of the California Unfair Competition Law?

Yes _____          No_____

*Proceed to Question 1217.*

12.17.  Has California proven, by a preponderance of the evidence, that Live Nation engaged in an unlawful or unfair business act or practice that occurred within California, emanated from California, or harmed California residents in violation of the California Unfair Competition Law?

Yes _____          No_____

*Proceed to Question 1318.*

**Florida Trade Practices Act**

13.18.  Has Florida proven, by a preponderance of the evidence, that Ticketmaster engaged in an unfair method of competition in violation of the Florida Deceptive and Unfair Trade Practices Act?

Yes _____          No_____

*Proceed to Question 1419.*

14.19.  Has Florida proven, by a preponderance of the evidence, that Live Nation engaged in an unfair method of competition in violation of the Florida Deceptive and Unfair Trade Practices Act?

Yes _____          No_____

*Proceed to Question 1520.*

**Illinois Antitrust Act**

15.20.  Has Illinois proven, by a preponderance of the evidence, that Ticketmaster engaged in unlawful conduct in violation of the Illinois Antitrust Act?

Yes _____          No_____

*Proceed to Question 1621.*

16.21.  Has Illinois proven, by a preponderance of the evidence, that Live Nation engaged in unlawful conduct in violation of the Illinois Antitrust Act?

Yes _____          No_____

*Proceed to Question 1722.*

**Indiana Antitrust Act**

17.22.  Has Indiana proven, by a preponderance of the evidence, that Ticketmaster engaged in unlawful conduct after July 1, 2023 in violation of the Indiana Antitrust Act?

6

Yes _____            No_____
***Proceed to Question 1823.***

18.23.  Has Indiana proven, by a preponderance of the evidence, that Live Nation engaged in unlawful conduct after July 1, 2023 in violation of the Indiana Antitrust Act?
Yes _____            No_____
***Proceed to Question 1924.***

## Kansas Restraint Of Trade Act

19.24.  Has Kansas proven, by a preponderance of the evidence, that Ticketmaster engaged in unlawful conduct in violation of the Kansas Restraint Of Trade Act?
Yes _____            No_____
***Proceed to Question 2025.***

20.25.  Has Kansas proven, by a preponderance of the evidence, that Live Nation engaged in unlawful conduct in violation of the Kansas Restraint Of Trade Act?
Yes _____            No_____
***Proceed to Question 2126.***

## New York – Donnelly Act

21.26.  Has New York proven, by a preponderance of the evidence, that Ticketmaster maintained monopoly power through anticompetitive conduct involving the use of contracts, agreements, arrangements, or combinations, in violation of New York's Donnelly Act?
Yes _____            No_____
***Proceed to Question 2227.***

22.27.  Has New York proven, by a preponderance of the evidence, that Live Nation maintained monopoly power through anticompetitive conduct involving the use of contracts, agreements, arrangements, or combinations, in violation of New York's Donnelly Act?
Yes _____            No_____
***Proceed to Question 2328.***

## South Carolina Unfair Trade Practices Act

23.28.  Has South Carolina proven, by a preponderance of the evidence, that Ticketmaster engaged in an unfair method of competition in violation of the South Carolina Unfair Trade Practices Act?
Yes _____            No_____
***Proceed to Question 2429.***

24.29.  Has South Carolina proven, by a preponderance of the evidence, that Live Nation engaged in an unfair method of competition in violation of the South Carolina Trade Practices Act?
Yes _____            No_____

7

*Proceed to Question ~~25~~30.*

**Tennessee Trade Practices Act**

~~25.~~30.  Has Tennessee proven, by a preponderance of the evidence, that Ticketmaster engaged in unlawful conduct after April 23, 2024 in violation of the Tennessee Trade Practices Act?
Yes _____          No_____
*Proceed to Question ~~26~~31.*

~~26.~~31.  Has Tennessee proven, by a preponderance of the evidence, that Live Nation engaged in unlawful conduct after April 23, 2024 in violation of the Tennessee Trade Practices Act?
Yes _____          No_____


Your deliberations are now complete. Sign this verdict form and notify the clerk that your deliberations are complete. [3]


DATED:_____


FOREPERSON SIGNATURE:_____

---

[3] **Defendants' Argument**:  Defendants object to a verdict form that does not enumerate each claim's elements that Plaintiffs must satisfy.  It is commonplace in antitrust cases, to enumerate claims' elements.  *See, e.g., Tevra Brands LLC v. Bayer Healthcare LLC*, No. 5:19-cv-4312, ECF No. 485 (N.D. Cal. Aug. 1, 2024); *Pacific Surf Designs, Inc. v. WhiteWater West Industries, Ltd.*, No. 3:20-cv-1464, ECF No. 313 (S.D. Cal. Aug. 28, 2023); *Deutscher Tennis Bund v. ATP Tour Inc.*, No. 1:07-cv-178, ECF No. 195 (D. Del. Aug. 5, 2008).  And courts have long recognized that doing so facilitates "review, uniformity, and possibly postverdict judgments as a matter of law," *Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 39 n.8 (1997), as well as "the process of appellate review," *United States v. Poehlman*, 217 F.3d 692, 698 n.7 (9th Cir. 2000); *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 285 (2d Cir. 1998) ("We are somewhat hampered in our review of the district court's decision because of the generality of the instructions given to the jury and the lack of specificity in the verdict it returned.").  At minimum, the jury should be asked to state its findings on market definition and anticompetitive effects for the monopolization claims, and the identity of the purchaser for the tying claim.  These issues are hotly disputed between the parties, and jury findings on them will facilitate postverdict motions and appellate review.

8

`UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, et al.,<br><br>Plaintiffs,<br><br>LIVE NATION ENTERTAINMENT, INC.,<br>and TICKETMASTER L.L.C.,<br><br>Defendants. | Case No. 1:24-cv-03973-AS |

PROPOSED JURY INSTRUCTIONS

Pursuant to Rule 51(a) of the Federal Rules of Civil Procedure and the Court's Individual Practices in Civil Cases, Paragraph D, Plaintiffs the States of Arizona, California, Colorado, Connecticut, Florida, Illinois, Indiana, Kansas, Louisiana, Maryland, Michigan, Minnesota, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, Oregon, Rhode Island, South Carolina, Tennessee, Texas, Utah, Vermont, Washington, West Virginia, Wisconsin, and Wyoming, the Commonwealths of Massachusetts, Pennsylvania, and Virginia, and the District of Columbia, acting by and through their respective Attorneys General (collectively, "Plaintiff States"), together with Defendants Live Nation Entertainment, Inc., and Ticketmaster L.L.C. (collectively, "Defendants"), respectfully request that the Court provide the following instructions to the jury. For those instructions where the parties could not reach agreement, Plaintiffs and Defendants have separately set forth their proposed instruction together with short arguments, including citations to supporting authority.

## Contents

**Post-Instruction No. 1** ...................................................................................................**88**7

**GENERAL INTRODUCTION** ......................................................................................**88**7

**Post-Instruction No.2** .....................................................................................................**99**8

**USE OF NOTES** ..............................................................................................................**99**8

**Post-Instruction No.3** ...................................................................................................**1010**9

**JUROR USE OF ELECTRONIC COMMUNICATION TECHNOLOGIES** .................**1010**9

**Post-Instruction No. 4** .................................................................................................**1111**10

**THE PARTIES** ..............................................................................................................**1111**10

**Post-Instruction No.5** ..................................................................................................**1212**11

**ALL PERSONS EQUAL BEFORE THE LAW—ORGANIZATIONS** .........................**1212**11

**Post-Instruction No. 6** .................................................................................................**1313**12

**EVIDENCE IN THE CASE** ..........................................................................................**1313**12

**Post-Instruction No. 7** .................................................................................................**1414**13

**ELECTION OF FOREPERSON OR PRESIDING JUROR; DUTY TO DELIBERATE; COMMUNICATIONS WITH COURT; CAUTIONARY; UNANIMOUS VERDICT; VERDICT FORM** ...........................................................................................................**1414**13

**Post-Instruction No. 8** .................................................................................................**1616**15

**WITNESS CREDIBILITY** ...........................................................................................**1616**15

**Post-Instruction No. 9** .................................................................................................**1818**17

**USE OF DEPOSITIONS AS EVIDENCE** ...................................................................**1818**17

**Post-Instruction No. 10** ...............................................................................................**1919**18

**EXPERT TESTIMONY** ................................................................................................**1919**18

**Post-Instruction No. 11** ...............................................................................................**2020**19

**BURDEN OF PROOF—PREPONDERANCE OF THE EVIDENCE** ..........................**2020**19

**Post-Instruction No.12** ................................................................................................**2121**20

**DIRECT AND CIRCUMSTANTIAL EVIDENCE** ......................................................**2121**20

**Post-Instruction No.13** ............................................................................................**2323**22

**INFERENCES** ................................................................................................................**2323**22

**Post-Instruction No. 14** ..........................................................................................**2424**23

**SUMMARY OF CONTENTIONS** ...............................................................................**2424**23

**Post-Instruction No. 15** ..........................................................................................**2727**26

**MONOPOLIZATION ELEMENTS** ...........................................................................**2727**26

**Post-Instruction No. 16** ..........................................................................................**2929**28

**MONOPOLIZATION ELEMENT #1: RELEVANT MARKET—GENERAL** ............**2929**28

**Post-Instruction No. 17** ..........................................................................................**3030**29

**RELEVANT PRODUCT MARKET—General** ...........................................................**3030**29

**Post-Instruction No. 18** ..........................................................................................**3232**31

**MONOPOLIZATION ELEMENT #2: MONOPOLY POWER** ....................................**3232**31

**Post-Instruction No. 19** ..........................................................................................**3333**32

**EXISTENCE OF MONOPOLY POWER—DIRECT PROOF** ....................................**3333**32

**Post-Instruction No. 20** ..........................................................................................**3636**35

**EXISTENCE OF MONOPOLY POWER—INDIRECT PROOF** .................................**3636**35

**Post-Instruction No. 21** ..........................................................................................**4040**39

**MONOPOLIZATION ELEMENT #3: WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY POWER THROUGH ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT** ...................................................................................................................**4040**39

**Post-Instruction No. 22** ..........................................................................................**4343**41

**ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT—EXCLUSIVE DEALING SHERMAN ACT SECTION 2** .....................................................................................**4343**41

**Post-Instruction No. 23** ..........................................................................................**4444**42

**THREATS AND RETALIATION** ...............................................................................**4444**42

**Post-Instruction No. 24** ..........................................................................................**4646**44

**EXCLUSIVE DEALING AGAINST TICKETMASTER—SHERMAN ACT SECTION 1** ...................................................................................................................464644

**Post Instruction 25** ...................................................................................484846

**LIVE NATION'S LIABILITY FOR TICKETMASTER'S ALLEGED CONDUCT**...484846

**Post-Instruction No. 26**............................................................................494947

**UNLAWFUL TYING AGAINST LIVE NATION** .............................................494947

**Post-Instruction No. 27**............................................................................525249

**UNLAWFUL TYING—IDENTITY OF THE PURCHASER** .......................................525249

**Post-Instruction No. 28**............................................................................535350

**UNLAWFUL TYING—PRESENCE OF TWO PRODUCTS** ........................................535350

**Post-Instruction No. 29**............................................................................545451

**UNLAWFUL TYING—PROOF OF CONDITIONING** ..............................................545451

**Post-Instruction No. 30**............................................................................555552

**UNLAWFUL TYING—PROOF OF COERCION**....................................................555552

**Post-Instruction No. 31**............................................................................565653

**UNLAWFUL TYING—MARKET POWER IN THE TYING MARKET** ....................565653

**Post-Instruction No. 32**............................................................................575754

**UNLAWFUL TYING—ANTICOMPETITIVE EFFECTS FOR THE TIED PRODUCT**575754

**Post-Instruction No. 33**............................................................................585855

**UNLAWFUL TYING—NOT INSUBSTANTIAL AMOUNT OF INTERSTATE COMMERCE**........................................................................................585855

**Post-Instruction No. 34**............................................................................595956

**STATE LAW CLAIMS**................................................................................595956

**Post-Instruction No. 35**............................................................................606057

**CONGRUENT STATE CLAIMS** ....................................................................606057

**Post-Instruction No. 36**............................................................................626259

**CALIFORNIA UNFAIR COMPETITION LAW** **(Cal. Bus. & Prof. Code § 17200** *et seq.*)..................................................................................................................6262~59~

**Post-Instruction No. 37**..............................................................................6464~61~

**FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT (Fla. Stat. § 501.204)** ..............................................................................................................6464~61~

**Post-Instruction No. 38**..............................................................................6565~62~

**ILLINOIS ANTITRUST ACT (740 ILCS 10/1 et seq.)**....................................6565~62~

**Post-Instruction No. 39**..............................................................................6767~64~

**INDIANA ANTITRUST ACT (IND. CODE §§ 24-1-2-1 AND 24-1-2-2)**.........6767~64~

**Post-Instruction No. 40**..............................................................................6868~65~

**KANSAS RESTRAINT OF TRADE ACT (Kan. Stat. Ann. § 50-101 et seq.)**...............6868~65~

**Post-Instruction No. 41**..............................................................................7070~67~

**DONNELLY ACT (New York General Business Law §§ 340 et seq.)**............7070~67~

**Post-Instruction No. 42**..............................................................................7272~69~

**SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT** **(S.C. Code Ann. § 39-5-10 et seq.)** ..............................................................................................................7272~69~

**Post-Instruction No. 43**..............................................................................7474~71~

**TENNESSEE TRADE PRACTICES ACT** **(TENN. CODE ANN. §§ 47-25-101 AND 102)** ..............................................................................................................7474~71~

**Post-Instruction No. 44**..............................................................................7676~72~

**STATES DAMAGES CLAIMS**........................................................................7676~72~

**Post-Instruction No. 45**..............................................................................7878~74~

**INJURY AND CAUSATION**..........................................................................7878~74~

**Post-Instruction No. 46**..............................................................................8181~76~

**STATUTE OF LIMITATIONS**.......................................................................8181~76~

**Post-Instruction No. 47**..............................................................................8383~77~

**DAMAGES INSTRUCTIONS—GENERAL**....................................................8383~77~

**Post-Instruction No. 48**...........................................................................................**858**~~5~~79

**COMPENSATORY DAMAGES—OVERCHARGE**.......................................................**858**~~5~~79

**Post-Instruction No. 49**...........................................................................................**868**~~6~~80

**BASIS FOR CALCULATING OVERCHARGE** ..........................................................**868**~~6~~80

**Post-Instruction No. 50**...........................................................................................**878**~~7~~81

**FINAL INSTRUCTIONS**...........................................................................................**898**~~9~~81

**Post-Instruction No. 1**

## GENERAL INTRODUCTION

Now that you have heard the evidence and the argument, it is my duty to instruct you about the applicable law. It is your duty to follow the law as I state it. You must apply the law to the facts as you find them from the evidence in the case. Do not single out one instruction as stating the law, but consider the instructions as a whole. Do not be concerned about the wisdom of any rule of law stated by me. You must follow and apply the law.

Nothing I say in these instructions indicates I have any opinion about the facts of the case. You, not I, have the duty to determine the facts.

You must perform your duties as jurors without bias or prejudice as to any party. The law does not permit you to be controlled by sympathy, prejudice, or public opinion. The parties expect that you will carefully and impartially consider all the evidence, follow the law as it is now being given to you, and reach a just unanimous verdict, regardless of the consequences.

**Post-Instruction No. 2**

### USE OF NOTES

You may use the notes taken by you during the trial.  The notes, however, should not be substituted for your memory.  Remember, notes are not evidence.  If your memory should differ from your notes, then you should rely on your memory and not on your notes. Please remember that you can always ask for any portion of the transcript, or exhibit, to be provided to you during deliberations.

**Post-Instruction No. 3**

### JUROR USE OF ELECTRONIC COMMUNICATION TECHNOLOGIES

Throughout your deliberations, you may discuss with each other the evidence and the law that has been presented in this case, but you must not communicate with anyone else by any means about the case. You also cannot learn from outside sources about the case, the matters in the case, the legal issues in the case, or individuals or other entities involved in the case. This means you may not use any electronic device or media (such as a phone, computer, or tablet), the internet, any text or instant messaging service, or any social media apps (such as X (formerly known as Twitter), Facebook, Instagram, LinkedIn, YouTube, WhatsApp, and Snapchat) to research or communicate about what you've seen and heard in this courtroom.

These restrictions continue during deliberations because it is essential, under our Constitution, that you decide this case based solely on the evidence and law presented in this courtroom. Information you find on the internet or through social media may be incomplete, misleading, or inaccurate. As I noted in my instructions at the start of the trial, even using your smartphones, tablets, and computers—and the news and social media apps on those devices—may inadvertently expose you to certain notices, such as pop-ups or advertisements, that could influence your consideration of the matters you've heard about in this courtroom.

You are permitted to discuss the case with only your fellow jurors during deliberations because they have seen and heard the same evidence and instructions on the law that you have, and it is important that you decide this case solely on the evidence presented during the trial, without undue influence by anything or anyone outside of the courtroom. For this reason, I expect you to inform me at the earliest opportunity, should you learn about or share any information about this case outside of this courtroom or the jury room, or learn that another juror has done so.

**Post-Instruction No. 4**

## THE PARTIES

As I instructed you earlier, the Plaintiffs are the [33] individual States and the District of Columbia. The Defendants in this case are Live Nation Entertainment, Inc. and Ticketmaster L.L.C.

Unless otherwise stated, these instructions apply to all parties.

**Post-Instruction No. 5**

### ALL PERSONS EQUAL BEFORE THE LAW—ORGANIZATIONS

A corporation is entitled to the same fair trial as a private individual or governmental entity like a state.  All persons, governmental entities, and corporations, stand equal before the law, and are to be treated as equals.

**Post-Instruction No. 6**

## EVIDENCE IN THE CASE

Unless you are otherwise instructed, the evidence in the case consists of the sworn testimony of the witnesses regardless of who may have called the witness, all exhibits received in evidence regardless of who may have produced them, and all facts and events that may have been admitted, stipulated to, or taken judicial notice of.

Statements and arguments by the lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statement, closing arguments, and at other times is intended to help you understand the evidence, but it is not evidence. However, as I explained at the beginning of this trial, the lawyers on both sides have agreed on certain facts known as stipulations, and you must treat those facts as proven.

Any question to which I have sustained an objection and evidence that I have ordered stricken must be entirely disregarded.

**Post-Instruction No. 7**

**ELECTION OF FOREPERSON OR PRESIDING JUROR; DUTY TO DELIBERATE; COMMUNICATIONS WITH COURT; CAUTIONARY; UNANIMOUS VERDICT; VERDICT FORM**

You must follow these rules while deliberating and returning your verdict:

First, when you go to the jury room, you must select a foreperson. The foreperson will preside over your discussions and speak for you here in court.

Second, it is your duty, as jurors, to discuss this case with one another in the jury and try to reach agreement.

Each of you must make your own conscientious decision, but only after you have considered all the evidence, discussed it fully with the other jurors, and listened to the views of the other jurors.

Do not be afraid to change your opinions if the discussion persuades you that you should. But do not make a decision simply because other jurors think it is right, or simply to reach a verdict. Remember at all times that you are judges of the facts. Your sole interest is to seek the truth from the evidence in the case.

Third, if you need to communicate with me during your deliberations, send me a note signed by one or more of you. Give the note to the Marshal and I will answer you as soon as I can, either in writing or here in court. While you are deliberating, do not tell anyone—including me—how many jurors are voting for any side.

Fourth, your verdict must be based solely on the evidence and on the law I have given to you in these instructions. The verdict must be unanimous. Nothing I have said or done is intended to suggest what your verdict should be—that is entirely for you to decide.

Finally, the verdict form is simply the written notice of the decision that you reach in this case. You will take this form to the jury room, and when each of you has agreed on the verdict, your

foreperson will fill in the form, sign and date it, and advise the Marshal that you are ready to return to the courtroom.

**Post-Instruction No. 8**

## WITNESS CREDIBILITY

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

1.      the opportunity and ability of the witness to see or hear or know the things testified to;

2.      the witness's memory;

3.      the witness's manner while testifying;

4.      the witness's interest in the outcome of the case, if any;

5.      the witness's bias or prejudice, if any;

6.      whether other evidence contradicted the witness's testimony;

7.      the reasonableness of the witness's testimony in light of all the evidence; and

8.      any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened.  People often forget things or make mistakes in what they remember.  Also, two people may see the same event but remember it differently.  You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said.  On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify.  What is important is how believable the witnesses were, and how much weight you think their testimony deserves.

**Post-Instruction No. 9**

## USE OF DEPOSITIONS AS EVIDENCE

During the trial, certain testimony has been presented by way of deposition. The deposition consisted of sworn, recorded answers to questions asked of the witness in advance of the trial by the attorneys. The testimony of a witness who, for some reason, is not present to testify from the witness stand may be presented under oath on a videotape. Such testimony is entitled to the same consideration and is to be judged as to credibility, weighed, and otherwise considered by you in the same way as if the witness had been present and testified from the witness stand.

**Post-Instruction No. 10**

## EXPERT TESTIMONY

You have heard testimony from a number of witnesses who were designated by the respective parties as "experts." These designated witnesses are allowed to express opinions on matters about which they may have special knowledge and training. This testimony is presented to you on the theory that someone who is experienced in a particular field may be able to assist you in understanding the evidence and in reaching your independent decision on the facts.

In weighing this type of testimony, you may consider the witness's qualifications, opinions, reasons for testifying, as well as all the other considerations that ordinarily apply when you are deciding whether to believe a witness's testimony.

The expert witness's testimony was based on particular facts, as the witness obtained knowledge of them and testified to them before you, or as the attorneys who questioned the designated witness asked them to assume. You may reject such a witness's opinion if you find the facts in the case to be different from those that formed the basis for the opinion.

You may give "expert" testimony whatever weight, if any, you find it deserves in light of all of the evidence in the case and the witness's interest in the proceeding, including any compensation for work the expert may have received. You should not, however, accept the testimony merely because it is given by a designated "expert," nor should you substitute it for your own reason, judgment, and common sense. The determination of the facts in this case rests solely with you.

**Post-Instruction No. 11**

### BURDEN OF PROOF—PREPONDERANCE OF THE EVIDENCE

As I instructed you earlier, in this case, Plaintiffs must prove every essential element of each of their claims against each Defendant by a preponderance of the evidence. If Plaintiffs should fail to establish any essential element of one of their claims by a preponderance of the evidence against any Defendant, you should find for each such Defendant as to that claim.

"To prove by a preponderance of the evidence" means to prove something is more likely than not. In determining whether any fact in issue has been proved by a preponderance of the evidence, unless otherwise instructed, you may consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

**Post-Instruction No. 12**

## DIRECT AND CIRCUMSTANTIAL EVIDENCE

Generally speaking, there are two types of evidence presented during a trial—direct evidence and circumstantial evidence.  Direct evidence is testimony by a witness about something he knows by virtue of his own senses—something he has seen, felt, touched, or heard.  For example, if a witness testified that when he left his house this morning, it was raining, that would be direct evidence about the weather.

The second type of evidence is circumstantial evidence. Circumstantial evidence is evidence that tends to prove a disputed fact indirectly by proof of other facts. There is a simple example of circumstantial evidence that is often used in this courthouse, and in fact which I related when this trial started.

Assume that when you came into the courthouse this morning that the sun was shining and it was a nice day outdoors.  Assume that the courtroom shades were drawn and you could not look outside.  Assume further that as you were sitting here, someone walked in with an umbrella that was dripping wet and then, a few moments later, somebody else walked in with a raincoat that was also dripping wet. Now, because you could not look outside the courtroom and you could not see whether it was raining, you would have no direct evidence of that fact.  But, on the combination of facts that I have asked you to assume, it would be reasonable and logical for you to conclude that it was raining.

That is all there is to circumstantial evidence.  You infer on the basis of your reason, experience, and common sense from one established fact the existence or the nonexistence of some other fact.

The law generally makes no distinction between the weight or value to be given to either direct or circumstantial evidence. A greater degree of certainty is not required of circumstantial evidence.

You are required to find the facts in accordance with the preponderance of all the evidence in the case, both direct and circumstantial.

**Post-Instruction No. 13**

## INFERENCES

You are to consider only the evidence in the case. However, you are not limited to the statements of the witnesses. You may draw from the facts you find have been proved such reasonable inferences as seem justified in light of your experience.

"Inferences" are deductions or conclusions that reason and common sense lead you to draw from facts established by the evidence in the case.

There are times when different inferences may be drawn from the evidence. The plaintiff states ask you to draw one set of inferences. Defendants Live Nation and Ticketmaster ask you to draw another.  It is for you, and for you alone, to decide what inferences you will draw.

**Post-Instruction No. 14**

## SUMMARY OF CONTENTIONS

As I did at the start of the case, I will give you a summary of each side's positions in this case. I will then provide you with detailed instructions on what Plaintiffs must prove to win on each of their claims.

*Section 2: Monopolization*

The first issue you will be asked to decide is whether Plaintiffs have proved by a preponderance of the evidence that any Defendant violated Section 2 of the Sherman Act by unlawfully monopolizing any of the three alleged markets. As a reminder, Plaintiffs allege that Ticketmaster monopolized the two alleged ticketing markets:

1. Primary concert ticketing services to what Plaintiffs call "major concert venues" (primary concert ticketing).

2. Primary ticketing services to what Plaintiffs call "major concert venues" (primary ticketing).

Plaintiffs allege that Live Nation is liable for Ticketmaster's monopolization in the two alleged ticketing markets because it controlled, dictated or encouraged that conduct.

Plaintiffs also allege that Live Nation (but not Ticketmaster) monopolized the alleged amphitheater market:

3. Use of what Plaintiffs call "large amphitheaters" by artists.

There are certain requirements that Plaintiffs must prove to show that either Defendant illegally monopolized a market, which I will explain in more detail in a few minutes. In general, however, to prove monopolization for each separate market, Plaintiffs must show by a preponderance of the evidence that the alleged market is a valid antitrust market, that the relevant Defendant (Live Nation or Ticketmaster) possessed monopoly power in that market and that the relevant Defendant willfully

acquired or maintained monopoly power in that market by engaging in anticompetitive acts. You must assess monopolization for each market separately. It is up to you to decide whether Plaintiffs have proven Defendants are liable for monopolization as to all markets, no markets, or only as to some markets.

Section 1: ~~Exclusive Dealing and~~ Tying

In addition to alleging that each Defendant monopolized certain markets, Plaintiffs also allege that Ticketmaster violated Section 1 of the Sherman Act ~~through unlawful exclusive dealing. You will need to consider the exclusive dealing claims under Section 1 separate from and in addition to the monopolization claims.~~

~~First, Plaintiffs allege that Ticketmaster engaged in unlawful exclusive dealing by entering into certain primary ticketing contracts with venues. There are different elements Plaintiffs must prove for you to find Ticketmaster liable for unlawful exclusive dealing. In general, to prove unlawful exclusive dealing Plaintiffs must prove by a preponderance of the evidence that Ticketmaster possesses substantial market power in a relevant market and entered into exclusive contracts with venues that substantially foreclosed competition in that relevant market. Plaintiffs also allege that Live Nation is liable for Ticketmaster's exclusive dealing because it controlled, dictated or encouraged that conduct.~~

~~Second, Plaintiffs allege that Live Nation (but not Ticketmaster) violated Section 1 of the Sherman Act~~ [1] by engaging in an unlawful tying arrangement related to certain amphitheaters that Live Nation owns or controls. In general, for this claim, Plaintiffs must prove by a preponderance of the evidence that Live Nation unlawfully required artists who wanted to use these amphitheaters to also use Live Nation's promotion services.

---

[1] **Plaintiffs' Argument:** The Plaintiff States are withdrawing their claims for exclusive dealing under Section 1 of the Sherman Act. In addition to the edits to this instruction, the Plaintiff States have made conforming edits to subsequent instructions to account for the withdrawal of this claim.

If and only if you decide that at least some of the Plaintiff States claiming damages proved every element of at least one of the primary ticketing monopolization claims ~~or the Section 1 exclusive dealing claim against at least one Defendant~~against Ticketmaster[2], then the final issue you will be asked to decide is whether those (and only those) Plaintiff States are entitled to damages. You should not assume that any of the Plaintiff States are entitled to any damages merely because I am instructing you on the issue of damages.

I remind you, as I did at the outset, that although the Plaintiff States are suing on behalf of the residents of their States who have purchased tickets from Ticketmaster to live events, you should not assume that any of those residents will receive any portion of any money the Plaintiff States may ultimately receive in this case. And neither you nor any member of your family will receive any portion of any funds that the States may receive.

---

[2] **Plaintiffs' Argument:** While Live Nation's conduct is relevant to the claims for monopolization, including exclusive dealing under Section 2 of the Sherman Act, the damages calculated by Dr. Abrantes-Metz require the existence of contracts between Ticketmaster and the major concert venues. Ticketmaster is therefore the relevant Defendant for this inquiry (per the Court's decision to treat the two Defendants separately).

**Post-Instruction No. 15**

## MONOPOLIZATION ELEMENTS

Plaintiffs allege that Ticketmaster unlawfully monopolized the following markets:

(1)     primary concert ticketing services to ~~what Plaintiffs call~~ "major concert venues", which are amphitheaters or arenas with a capacity of 8,000 or more that hosted 10 or more concerts in at least one year from 2017 to 2024[3]; and

(2)     primary ticketing services to ~~what Plaintiffs call~~those "major concert venues."

Plaintiffs allege that Live Nation unlawfully monopolized the following market:

(3)     the use of ~~what Plaintiffs call~~ "large amphitheaters" by artists, which are amphitheaters with a capacity of 8,000 or more that hosted 10 or more concerts in at least one year from 2017 to 2024.

Plaintiffs have brought three monopolization claims in total, one for each of these alleged markets. The alleged monopolization of each of these three alleged markets is a distinct claim that you are to consider separately for the relevant Defendant, either Ticketmaster or Live Nation. To prevail on a monopolization claim, Plaintiffs must prove the following elements by a preponderance of the evidence as to each separate alleged market for each Defendant:

(1)     the alleged market is a valid antitrust market;

(2)     the relevant Defendant possessed monopoly power in that market; and

---

[3] **Plaintiffs' Argument:** Plaintiff propose inserting the definition of "major concert venues" and "large amphitheaters" in this instruction, to remind the jury of how Plaintiffs have designed the relevant markets. Further, with respect to "large amphitheaters," that term is used by both parties, though the specific definitions are in dispute.

(3)      the relevant Defendant willfully acquired or maintained monopoly power in that market by engaging in anticompetitive conduct, instead of solely through~~having~~ superior products, business skill, or ~~prior history~~historical accident.[4]

Further, to hold Live Nation liable for Ticketmaster's monopolization in any market, plaintiffs must prove by a preponderance of the evidence that Live Nation controlled, dictated or encouraged that conduct.

If you find that Plaintiffs have failed to prove any of these elements for a particular claim, then you must find for the relevant Defendant and against Plaintiffs on that particular claim only. If you find that Plaintiffs have proven each of these elements by a preponderance of the evidence for a particular claim for a particular alleged market for the relevant Defendant, then you must find for Plaintiffs and against the relevant Defendant on that particular claim.

I will now provide you with further instructions on these elements.

---

[4] **Plaintiffs' Argument:** As drafted, the instruction implies that a Defendant that may possess some superior products or skill may never be liable for anticompetitive conduct. But to the extent Defendants have acquired or maintained their monopolies through anticompetitive conduct, the fact that they may have some superior products or skills (or attained their position through historical accident) does not insulate them from liability. *See United States v.* Microsoft Corp., 253 F.3d 34, 79 (D.C. Cir. 2001) ("Plaintiffs may meet their burden by proving, by a preponderance of the evidence, that the exclusionary conduct was reasonably capable of contributing significantly to Defendants' continued monopoly power in any relevant market."); *United States v. Google LLC*, 747 F. Supp. 3d 1, 79 (D.D.C. 2024) (Google's innovations, skilled workforce, and sound business decisions did not defeat liability where it also "used illegal restraints to maintain its monopoly."). Plaintiffs have also changed "prior history," which is vague and could imply prior anticompetitive conduct was sanctioned, to "historic accident," which more closely parallels the language in *United States v. Grinnell Corp.*, 384 U.S. 563 (1966). *Id.* at 570–71.

**Post-Instruction No. 16**

## MONOPOLIZATION ELEMENT #1: RELEVANT MARKET—GENERAL

The first step in assessing each of Plaintiffs' separate monopolization claims against each Defendant is determining whether Plaintiffs have proven the alleged relevant market for that claim by a preponderance of the evidence. Defining the relevant market is essential because you are required to make a judgment about whether the relevant Defendant (Live Nation or Ticketmaster) has monopoly power in a properly defined economic market. To make this judgment, you must be able to determine what, if any, economic forces restrain the relevant Defendant's freedom to set prices for the products or services they provide, control output for those products or services, or degrade the quality of those products or services.

The most likely and most important restraining force will be actual and potential competition from other firms and their products or services. This includes the firms and products or services that act or likely would act as restraints on the relevant Defendant's power to set prices above competitive levels because customers would switch to these competing firms if the relevant Defendant sets its own prices too high. The firms and products or services that exert such restraining force are within what is called the relevant market.

**Post-Instruction No. 17**

### RELEVANT PRODUCT MARKET—GENERAL

A relevant market must consist of all products or services that are reasonably interchangeable in the eyes of customers of those products or services. In other words, the relevant market includes the products or services that a customer believes are reasonably interchangeable or reasonable substitutes for each other. This is a practical test taking into account actual behavior of buyers and marketing efforts of sellers. It looks to the practical realities of substitution, not theoretical substitution. A market does not need to include all conceivable substitutes, but only those that a buyer would view as reasonably interchangeable. Accordingly, your analysis should focus on whether or not the products or services are economic substitutes, not simply whether they appear to be functionally similar. For instance, women's shoes may not be reasonably interchangeable with men's shoes. Even if both are functionally similar, consumers may not typically substitute one for the other.

To determine whether products are reasonably interchangeable or reasonable substitutes for each other, you may consider:

- whether artists substitute between large amphitheaters and other venues;

- consumers' views on whether the products are interchangeable;

- the relationship between the price of one product and sales of another;

- the presence or absence of specialized vendors;

- the perceptions of either industry or the public as to whether the products are in separate markets; and

- the views of Defendants regarding who their competitors are.

The three markets at issue are as follows: *First*, the market for primary ticketing services to what plaintiffs call "major concert venues." *Second*, the market for primary concert ticketing services to those major concert venues. The market for primary ticketing services includes all events, including

sporting events, at major concert venues, while the market for primary concert ticketing services includes only concerts or comedy shows.[5] Plaintiffs define "major concert venues as amphitheaters and arenas with a capacity of 8,000 or more that hosted 10 or more concerts in at least one year from 2017 to 2024. *Third*, the market for artists to use what plaintiffs call "large amphitheaters." Plaintiffs define large amphitheaters as those amphitheaters with a capacity of 8,000 or more that hosted 10 or more concerts in at least one year from 2017 to 2024.  The parties disagree about the relevant markets in this case. Plaintiffs allege that the three markets I just described to you are relevant markets, while Defendants deny that those three markets are relevant markets. Your task is to determine whether the evidence supports the three markets alleged by Plaintiffs.

---

[5] **Plaintiffs' Argument:** Plaintiffs propose inserting this sentence to avoid juror confusion between the first two markets.

**Post-Instruction No. 18**

### MONOPOLIZATION ELEMENT #2: MONOPOLY POWER

If you find that Plaintiffs have proven any alleged relevant market by a preponderance of the evidence, then you should separately determine whether the relevant Defendant (Live Nation or Ticketmaster) has monopoly power in that market. To prove a monopolization claim, Plaintiffs must prove that the relevant Defendant has monopoly power in a relevant antitrust market. Monopoly power is the power to control prices, restrict output, or exclude competition in a relevant antitrust market. ~~More precisely, a firm has monopoly power if it can profitably raise prices substantially above the competitive level for a significant period of time.~~ [6]

Plaintiffs can prove monopoly power "directly," through direct evidence, or "indirectly," through indirect evidence. Either type of evidence may be sufficient to prove monopoly power. I will now provide further instructions about how you may determine whether Plaintiffs have met their burden of proving monopoly power in a relevant market.

---

[6] **Plaintiffs' Argument:** Plaintiffs propose deleting this sentence. While the prior sentence appropriately references prices, output, and the exclusion of competition, this sentence as drafted suggests that price evidence is the sole consideration.

**Post-Instruction No. 19**

## EXISTENCE OF MONOPOLY POWER—DIRECT PROOF

Plaintiffs can provide direct proof of monopoly power in a relevant market via direct evidence through any one of these alternative ways.

*Raising or Maintaining Prices Above Competitive Levels*

One way Plaintiffs may prove that the relevant Defendant (Live Nation or Ticketmaster) has monopoly power in a relevant market is to show that the relevant Defendant can profitably raise or maintain prices in the relevant market above a competitive level. Plaintiffs must prove that the relevant Defendant has the power to do so by itself—that is, without the assistance of, and despite competition from, any existing or potential competitors.

- In Plaintiffs' alleged primary ticketing services markets, the prices in question are what the ticketers, such as Ticketmaster, receive by way of compensation under the terms of their contracts with "major concert venues."

- In Plaintiffs' alleged amphitheaters market, the prices in question are the prices that artists pay to rent the amphitheaters.

To prove monopoly power in this way, Plaintiffs must also prove that the relevant Defendant (Live Nation or Ticketmaster) has the power to maintain prices above a competitive level for a significant period of time. If the relevant Defendant attempted to maintain prices above competitive levels, but would lose so much business to other competitors that the price increase would become unprofitable and would have to be withdrawn, then that Defendant does not have monopoly power.

The ability to earn high profit margins or a high rate of return does not necessarily mean that any Defendant has monopoly power. Other factors may enable a company without monopoly power to sell at higher prices or earn higher profit margins than its competitors, such as superior products or services, low costs, or superior advertising or marketing.

However, an ability to sell at higher prices or earn higher profit margins than other companies for similar goods or services over a long period of time may be evidence of monopoly power. By contrast, evidence that a defendant would lose a substantial amount of sales if it raised prices substantially, or that a defendant's profit margins were low compared to its competitors, or that a defendant's margins go up and down or are steadily decreasing, tends to suggest that the defendant does not have monopoly power.

*Reducing Quality Or Output Below Competitive Levels*

Another way Plaintiffs may prove that the relevant Defendant (Live Nation or Ticketmaster) has monopoly power is by showing that the Defendant has the ability to reduce the quality of its product without losing meaningful sales. This is similar to the point I just described regarding price. If the relevant Defendant had the ability to reduce quality below competitive levels without losing so much business to other competitors that the reduction would become unprofitable and would have to be withdrawn, then that Defendant does not have monopoly power.

Another way of showing monopoly power is through evidence that a firm has the ability to affect marketwide prices by reducing its own output. Output for these purposes refers to the amount of its products or services that a firm chooses to produce.

*Power to Exclude Competition*

Alternatively, Plaintiffs may prove that Defendants have monopoly power by proving that Defendants have the ability to exclude or block competition. If you find that Defendants had the power to inhibit growth or expansion by existing competitors in a market or to prevent new competition from entering that market, then Defendants have monopoly power. This power to exclude may be shown by evidence of Defendants blocking competitors' ability to compete or of Defendants reducing or restricting the share of the market held by competitors.

Excluding competition means more than competing to keep one's business. It means that a firm does not need to compete hard because it has been able to prevent other firms from competing effectively. If new competitors can enter the relevant market or existing competitors can compete for new opportunities as they arise, then that Defendant does not have monopoly power.

**Post-Instruction No. 20**

### EXISTENCE OF MONOPOLY POWER—INDIRECT PROOF

Now I will instruct you on how Plaintiffs can provide indirect proof of monopoly power in a relevant market via indirect evidence.

Indirect evidence is evidence regarding the structure of the relevant market. If this evidence establishes that the relevant Defendant (Live Nation or Ticketmaster) has the power to control price, restrict output, or exclude competition in the relevant market, then you may conclude that the Defendant has monopoly power in that market. By contrast, if the relevant Defendant does not have the power to control price, restrict output, or exclude competition in the relevant market, then you may conclude that the Defendant lacks monopoly power. I will now explain the structural factors you may consider in more detail.

*Market Share*

One factor that you should consider is the relevant Defendant's share of the relevant market. While market share is not the equivalent of monopoly power, it is relevant to your determination of whether Plaintiffs have proven monopoly power. The relevant Defendant (Live Nation or Ticketmaster) must have a significant share of the market in order to possess monopoly power.

A market share of over 70 percent is usually strong evidence of monopoly power. A market share below 50% is rarely evidence of monopoly power, and a share between 50% and 70% can occasionally show monopoly power. Nonetheless, such evidence does not conclusively establish monopoly power. In evaluating whether the relevant Defendant's market share supports a finding of monopoly power, you should also consider other aspects of the relevant market, including market share trends, the existence of barriers to entry, the entry and exit by other companies, and the number and size of competitors. Along with the relevant Defendant's market share, these factors should inform you as to whether the relevant Defendant has monopoly power.

*Market Share Trends*

The trend in the relevant Defendant's market share is something you may consider. An increasing market share may strengthen an inference that a company has monopoly power, particularly where that company has a high market share, while a decreasing share might show that a company does not have monopoly power.

*Barriers to Entry*

You may also consider whether there are barriers to entry or expansion in or into the relevant market. Barriers to entry or expansion make it difficult for new competitors to enter the relevant market in a meaningful and timely way, or for existing competitors to sell more of a product that they already sell in the relevant market. Barriers to entry or expansion in the alleged ticketing markets might include, but are not limited to,  whether there is a large financial investment required to develop new ticketing technologies; whether existing ticketing companies do not have the capacity to sell primary ticketing services to more of the venues Plaintiffs call "major concert venues"; whether there are specialized marketing practices to what Plaintiffs call "major concert venues"; business risks in switching ticketers; and the reputation of the companies already participating in the market (or the brand recognition of their products).

Evidence of low or no entry barriers in the alleged ticketing markets may be evidence that the relevant Defendant does not have monopoly power, regardless of the Defendant's market share, because new competitors could enter easily, or existing competitors could expand, if the Defendant attempted to raise prices or reduce quality for a substantial period of time. For example, you may consider evidence that other existing ticketing companies have the capacity and ability to sell primary ticketing services to some of what Plaintiffs call "major concert venues" if Ticketmaster tried to increase ticketing prices to venues as evidence that neither Defendant has monopoly power in the

alleged ticketing markets, despite their alleged market shares. By contrast, evidence of high barriers to entry along with high market share may support an inference that Defendants have monopoly power.

*Entry and Exit by Other Companies*

The history of entry and exit in the relevant market may be helpful to consider. Entry of new competitors or expansion of existing competitors may be evidence that a defendant lacks monopoly power. On the other hand, departures from the market, or the failure of firms to enter the market, particularly if prices and profit margins are relatively high, may support an inference that a defendant has monopoly power in that market.

*Number and Size of Competitors*

You may consider whether Live Nation's competitors in the alleged amphitheater market, or Ticketmaster's competitors in the alleged ticketing markets, are capable of effectively competing. In other words, you should consider whether the financial strength, market shares, and number of competitors act as a check on each Defendant's ability to increase the price or lower the quality of its services. If Ticketmaster's competitors in the alleged ticketing markets are strong or have meaningful or increasing market shares, this may be evidence that Ticketmaster lacks monopoly power in those markets. On the other hand, if you determine that Ticketmaster's competitors are weak or have small or declining market shares, this may support an inference that Ticketmaster has monopoly power. Similarly, if Live Nation's competitors in the alleged amphitheater market are strong or have meaningful or increasing market shares, this may be evidence that Live Nation lacks monopoly power in that market. On the other hand, if Live Nation's competitors are weak or have small or declining market shares, this may support an inference that Live Nation has monopoly power.

You may find that a Defendant has monopoly power based on direct evidence, indirect evidence, or both. If you find that a Defendant has monopoly power in a relevant market, then you must consider the remaining elements of Plaintiffs' monopolization claim as to that market. If you

find that a Defendant does not have monopoly power in a relevant market, then you must find for that

Defendant and against Plaintiffs on the monopolization claim as to that particular relevant market.

**Post-Instruction No. 21**

## MONOPOLIZATION ELEMENT #3: WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY POWER THROUGH ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT

If you find that Plaintiffs have met their burden of proving (a) a relevant market, and (b) that a Defendant possessed monopoly power in that relevant market, then you must turn to the third element of Plaintiffs' monopolization claim regarding that particular market and that particular Defendant. Plaintiffs must prove by a preponderance of the evidence that the Defendant willfully acquired or maintained monopoly power in that relevant market through anticompetitive or exclusionary conduct or acts.

Anticompetitive or exclusionary acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market. Harm to competition is different from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition. Harm to competition can include, among other things, evidence of increased prices, decreased production levels, and reduced quality, though not all increases in prices, decreases in production levels or reductions in quality harm competition.

The mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws. Similarly, the acquisition or maintenance of monopoly power by supplying better products or services, possessing superior business skills, or because of prior history or luck, is not unlawful. A monopolist may compete aggressively without violating the antitrust laws, and a monopolist may charge monopoly prices without violating the antitrust laws. Similarly, the mere fact that a business prefers to use its own goods or services, or is "vertically integrated," is not anticompetitive by itself. Instead, a monopolist's conduct only becomes unlawful if the monopolist either obtained or maintained its monopoly power through anticompetitive acts, that is, acts, other than competition on

the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market.

In determining whether a particular Defendant's conduct was anticompetitive or exclusionary, you should determine whether the conduct is inconsistent with competition on the merits and whether the conduct does not provide benefits to consumers. Further, you should weigh the evidence as a whole and consider all of the alleged exclusionary conduct, including the interrelated effects of the different conduct in aggregate, not in isolation, to reach your determination as to whether that Defendant's conduct was reasonably capable of contributing significantly to maintaining their monopoly.[7]

If you find that Plaintiffs have proven by a preponderance of the evidence that a particular Defendant engaged in anticompetitive or exclusionary conduct in a relevant market, then you may consider nonpretexual, procompetitive justifications for that conduct offered by that Defendant. If you

---

[7] **Plaintiffs' Argument:** Plaintiffs believe this sentence is necessary to instruct the jury it may consider all of the evidence of anticompetitive conduct together, as courts in this circuit have repeatedly held. *See City of Groton v. Conn. Light & Power Co.*, 662 F.2d 921, 928–35 (2d Cir. 1981) (recognizing that courts must assess the combined or "synergistic effect" of a defendant's conduct, not merely its individual acts viewed in isolation); New York ex rel. Schneiderman v. Actavis PLC, 787 F.3d 638, 652–54 (2d Cir. 2015) (confirming that monopolization liability depends on the overall competitive effect of combined conduct that coerces consumers and impedes competition, rather than on isolated acts); *Reiss v. Audible, Inc.*, 2025 WL 1654643, at *6 (S.D.N.Y. June 11, 2025) (collecting cases); *United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 604 (S.D.N.Y. 2025) (collecting cases); *see also Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 353–55 (4th Cir. 2024); ("Just as the 'character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole,' … , so too must a firm's exclusionary efforts be considered in their totality."); *In re EpiPen Mktg., Sales Practices & Antitrust Litig.*, 44 F.4th 959, 980–82 (10th Cir. 2022) (holding that courts may evaluate alleged exclusionary acts separately for analytical clarity, but must ultimately consider the evidence in its totality to determine whether exclusionary conduct exists); *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 450, 469 (7th Cir. 2020) (emphasizing that Section 2 analysis requires consideration of the evidence in its totality, including the combined effects of challenged conduct); *In re Lipitor Antitrust Litig.*, 855 F.3d 126, 147 (3d Cir. 2017) (explaining that the monopolization inquiry turns on the combined anticompetitive effect of exclusionary practices); *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 783–84 (6th Cir. 2002) (recognizing that Section 2 liability may arise from a defendant's overall course of conduct, evaluated as a whole rather than parsed into isolated acts); *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992) (warning against focusing on individual acts of a monopolist while refusing to consider their overall combined effect).

find that Defendant has offered such justifications, then you must determine whether Plaintiffs have proven by a preponderance of the evidence that the anticompetitive or exclusionary conduct at issue was not reasonably necessary to achieve the procompetitive benefits claimed by that Defendant. If you find that the conduct was reasonably necessary to achieve the procompetitive benefits, then you must balance those benefits against the competitive harm resulting from that conduct. Conduct is anticompetitive and exclusionary only if its competitive harm outweighs its competitive benefits.

If you find that any Defendant willfully acquired or maintained monopoly power through anticompetitive or exclusionary conduct in a relevant market, then you must find for Plaintiffs on that claim. If you find that a Defendant did not willfully acquire or maintain monopoly power through anticompetitive or exclusionary conduct in a relevant market, then you must find for that Defendant and against Plaintiffs on the monopolization claim as to that market.

**Post-Instruction No. 22**

### ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT—EXCLUSIVE DEALING SHERMAN ACT SECTION 2

I will now provide some additional detail on one particular type of anticompetitive or exclusionary conduct Plaintiffs have alleged in this case. Plaintiffs have alleged that Ticketmaster entered into long-term, exclusive primary ticketing contracts with what Plaintiffs call "major concert venues" that generally require the venue to use Ticketmaster as the exclusive primary ticketer for all events or for all concerts. Such contracts are called "exclusive dealing" contracts because they require buyers, here certain venues, to buy a product or service exclusively (or almost exclusively) from one seller, here Ticketmaster, for a period of time.

Exclusive dealing contracts can be anticompetitive in certain circumstances. There is no set formula for evaluating whether exclusive dealing is anticompetitive, but it generally requires a showing of (i) significant market power by the Defendant, here Ticketmaster; (ii) substantial foreclosure of the market, that is, whether the exclusive dealing barred a substantial number of competitors or severely restricted the market's ambit; (iii) contracts of sufficient duration to prevent meaningful competition by rivals; and (iv) whether likely or actual anticompetitive effects are outweighed by procompetitive effects. You may also consider (v) evidence of coercive behavior; (vi) the ability of customers to terminate the agreements; and (vii) the use of exclusive dealing by competitors of the defendant.

**Post-Instruction No. 23**

<span style="text-decoration: line-through">THREATS AND RETALIATION</span>

<span style="text-decoration: line-through">Plaintiffs have also alleged that Ticketmaster engaged in anticompetitive or exclusionary conduct by threatening venues with the loss of Live Nation content if they did not choose Ticketmaster for ticketing, and/or by retaliating against venues who did not choose Ticketmaster by withholding Live Nation content.</span>

<span style="text-decoration: line-through">If you consider this alleged conduct, you must take care to distinguish between, on the one hand, affirmative acts of threatening venues or retaliating against venues and, on the other hand, independent concerns that a venue might have about how the choice of a ticketing provider might affect its ability to compete with other venues for concerts. Only affirmative acts of threatening venues or retaliating against venues can support this part of Plaintiffs' case. Likewise, that a venue might perceive an advantage in obtaining Live Nation promoted concerts because Ticketmaster is an affiliated company is not, in itself, proof of threats or retaliation.</span>

<span style="text-decoration: line-through">If you find that Ticketmaster threatened one or more venues with the loss of Live Nation content if they did not choose Ticketmaster for ticketing, and/or retaliated against one or more venues who did not choose Ticketmaster by withholding Live Nation content, you must consider whether that behavior was sufficiently widespread that it amounted to meaningful foreclosure of competition in the relevant ticketing market. You may consider both qualitative and quantitative evidence of foreclosure; for example:</span>

- <span style="text-decoration: line-through">the number of threats or instances of retaliation Plaintiffs have proven</span>
- <span style="text-decoration: line-through">the number of major concert venues, ticketing contracts and concert routing decisions in the same period of time;</span>
- <span style="text-decoration: line-through">whether threats were made privately or disseminated broadly; and</span>

- ~~whether Ticketmaster's rivals were able to develop counterstrategies for addressing the effects of threats or retaliation.~~[8]

---

[8] **Plaintiffs' Argument:** Plaintiffs submit that this instruction is unnecessary and improperly treats the evidence of threats and retaliation as a separate claim under its own legal framework rather than one type of evidence supporting Plaintiffs' claims under Section 2. As such, this evidence should be considered in conjunction with other types of anticompetitive conduct, as Plaintiffs have noted above in connection with Instruction No. 21. *See also United States v. Google LLC*, No. 1:23-CV-108 (LMB/JFA), 2025 WL 1132012, at *46 (E.D. Va. Apr. 17, 2025) ("As the Fourth Circuit made clear in *Duke Energy*, courts must avoid unduly divvying up a 'complex or atypical exclusionary campaign' into 'manufactured subcategories' and justify the actions using 'specific conduct tests.'"). Indeed, a court must, when "faced with allegations of a complex or atypical exclusionary campaign," such as we have here, "aggregate" two or more practices which, while lawful individually, are all "part of the same scheme to perpetuate dominance or drive the plaintiff from the market." *Id.* at 354-55 ("This is because 'the means of illicit exclusion, like the means of legitimate competition, are myriad.'"). As the Court previously noted, "coercion and threats are relevant to the theory of exclusive dealing in the market between venues and primary ticketers." ECF No. 1098 at 6; *see also* ECF No. 1037 at 35 (describing coercion as relevant to certain factors of the exclusive dealing analysis under *ZF Meritor LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012). Plaintiffs are not required to demonstrate market-wide impact based solely on threats or retaliation, nor are they attempting to plead a monopoly leveraging claim. *See* ECF No. 1098 at 6 (rejecting analogy to monopoly leveraging).

**Post-Instruction No. 24**

### EXCLUSIVE DEALING AGAINST TICKETMASTER—SHERMAN ACT SECTION 1

Plaintiffs separately claim that Ticketmaster has engaged in unlawful exclusive dealing in violation of Section 1 of the Sherman Act by entering into long-term, exclusive primary ticketing contracts with what Plaintiffs call "major concert venues" that generally require the venue to use Ticketmaster as the exclusive primary ticketer for all concerts. I have already instructed you on how to evaluate exclusive dealing conduct under Plaintiffs' Section 2 monopolization claims. I will now instruct you on how to evaluate exclusive dealing conduct under Plaintiffs' separate Section 1 exclusive dealing claim.

To establish that an exclusive dealing arrangement violates Section 1 of the Sherman Act, Plaintiffs must establish each of the following elements by a preponderance of the evidence:

*First*, that there is a relevant market limited to what Plaintiffs call "major concert venues" for primary concert ticketing services. If you did not find that Plaintiffs proved this markets, there is nothing else for you to consider on this claim for any such markets. You must find for Ticketmaster and against Plaintiffs on the Section 1 Exclusive Dealing claim for all such markets. If you found that Plaintiffs proved either of these alleged ticketing markets, then you should go on to consider whether Plaintiffs proved the other elements of this claim for that market.

*Second*, that Ticketmaster engaged in anticompetitive exclusive dealing with those major concert venues. As I previously stated, exclusive dealing is not in itself anticompetitive. In determining whether Ticketmaster's exclusive dealing was anticompetitive, Plaintiffs must prove (i) significant market power by Ticketmaster; (ii) substantial foreclosure of the market, that is, whether the exclusive dealing barred a substantial number of competitors or severely restricted the market's ambit; (iii) contracts of sufficient duration to prevent meaningful competition by rivals; and (iv) whether likely or actual anticompetitive effects are outweighed by procompetitive effects. You may also consider (v)

evidence of coercive behavior; (vi) the ability of customers to terminate the agreements; and (vii) the use of exclusive dealing by competitors of the defendant. If you find that Plaintiffs have failed to prove any one of these elements, then you must find for Ticketmaster and against Plaintiffs on Plaintiffs' Section 1 exclusive dealing claim. If you find that Plaintiffs have proven all of these elements, then you must find for Plaintiffs and against Ticketmaster on Plaintiffs' Section 1 exclusive dealing claim. [9]

---

[9] **Plaintiffs' Argument:** As noted above, the Plaintiff States are withdrawing their claims for exclusive dealing under Section 1 of the Sherman Act.

**Post Instruction No. 25**

### LIVE NATION'S LIABILITY FOR TICKETMASTER'S ALLEGED CONDUCT

If you find that Plaintiffs have proven by a preponderance of the evidence each element of their claim that Ticketmaster has (1) monopolized the primary ticketing market for what Plaintiffs define as "major concert venues," or (2) monopolized the primary concert ticketing market for major concert venues, or (3) has violated Section 1 through exclusive dealing, then you should find for Plaintiffs and against Ticketmaster on that claim. As to each claim that you find for Plaintiffs and against Ticketmaster, you should then also decide whether Live Nation should also be held liable for Ticketmaster's conduct. If you find by a preponderance of the evidence that Live Nation controlled, dictated or encouraged Ticketmaster's unlawful conduct, then you should find Live Nation liable on that claim. If you do not find that Plaintiffs have proven, by a preponderance of the evidence that Live Nation controlled, dictated or encouraged Ticketmaster's unlawful conduct, then Live Nation is not liable on that claim.

**Post-Instruction No. 26**

### UNLAWFUL TYING AGAINST LIVE NATION

Plaintiffs also claim that Live Nation engaged in an unlawful tying arrangement in violation of Section 1 of the Sherman Act. This claim is against Live Nation, and not Ticketmaster. ~~Again, this~~This is a separate ~~and apart from Plaintiffs' claims of monopolization and unlawful exclusive dealing and~~claim that is subject to different rules, which I will explain now.[10]

A tying arrangement is one in which the seller will sell one product or service (referred to as the tying product) only on the condition that buyers also purchase a different product or service (referred to as the tied product) from the seller, or that buyers at least agree not to purchase the tied product or service from any other seller. In this case, Plaintiffs claim that the tying product is the use of what they call "large amphitheaters" by artists, and the tied product is promotion services to all touring artists. Plaintiffs claim that Live Nation requires all touring artists to use Live Nation's promotion services if those artists want to perform at so-called "large amphitheaters" owned, operated, or controlled by Live Nation.

To prevail on their tying claim, Plaintiffs must prove each of the following elements by a preponderance of the evidence:

1.  Artists themselves, and not Live Nation's concert promoter competitors, are the customers who rent amphitheaters from Live Nation;

2.  The use (i.e., rental) of ~~so-called~~ "large amphitheaters," which are those amphitheaters with a capacity of 8,000 or more that hosted 10 or more concerts in at least one year from 2017

---

[10] **Plaintiffs' Argument:** Plaintiffs proposed changing this sentence, as the tying claim is related to, though not dependent on, Plaintiffs claims of monopolization of large amphitheaters.

to 2024,[11] by artists (the tying product) and promotion services to all touring artists (the tied product) are separate and distinct products. If you ~~previously found~~find that Plaintiffs fail~~ed~~ to prove that artists' use of so-called "large amphitheaters" is a relevant market, then you should not go on to consider any other element of this claim. Instead, you should find for Live Nation and against Plaintiffs on the Section 1 tying claim. Only if you ~~found~~ find that Plaintiffs proved that alleged market should you go on to consider whether Plaintiffs proved the other elements of this claim.

3.    Live Nation enforced a policy that conditioned artists' use of ~~so-called~~ "large amphitheaters" on artists also purchasing Live Nation's promotion services.

~~4.    Live Nation uses coercion to force artists to purchase Live Nation's promotion services.~~[12]

~~5.~~4.    Live Nation has sufficient market power with respect to the use of what Plaintiffs call "large amphitheaters" by artists to enable Live Nation to coerce artists to purchase Live Nation's promotion services.

~~6.    The alleged tying arrangement has had anticompetitive effects as to promotion services available to artists, for example by raising the price of promotion services paid by those artists, or by lowering the quality or amount of those services. I have previously instructed you on~~

---

[11] **Plaintiffs' Argument:** Plaintiffs propose this edit (and conforming edits below) as the jury may interpret the term "so-called" as pejorative and suggest that the Court does not credit Plaintiffs' proposed market definition.

[12] **Plaintiffs' Argument:** The evidence at trial is sufficient to support a jury finding that Live Nation enforced a policy of conditioning access to large amphitheaters for artists playing live music concerts or comedy shows on use of Live Nation's promotion services, rendering proof of coercion to individual artists unnecessary—an enforced policy of conditioning is the coercion. *See Park v. Thomson Corp.*, 2007 WL 119461, at *4 (S.D.N.Y. Jan. 11, 2007) ("When a policy of conditioned sales is demonstrated, proof of coercion on an individual basis is unnecessary.") (citing *Hill v. A-T-O, Inc.*, 535 F.2d 1349, 1355 (2d Cir. 1976)); *see also* ECF No. 1037 at 32.

~~competitive harm and anticompetitive effects in connection with Plaintiffs' monopolization claims. The same rules apply in determining whether this element has been satisfied.~~ [13]

~~7.~~5.    The alleged tying arrangement affected a not insubstantial volume of interstate commerce in promotion services to artists.

If you find that Plaintiffs have proved these elements by a preponderance of the evidence, then you must find for Plaintiffs and against Live Nation on Plaintiffs' tying claim. If you find that Plaintiffs have failed to prove any one of these elements, then you must find for Live Nation and against Plaintiffs on Plaintiffs' tying claim.

I will now provide additional detail on these elements.

---

[13] **Plaintiffs' Argument:** Plaintiffs have brought a *per se* tying claim. This element is therefore unnecessary. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 15 (1984) (establishing the per se framework for unlawful tying arrangements, under which coercive tying practices supported by sufficient market power may be condemned as illegal without engaging in rule-of-reason balancing of market effects or procompetitive justifications); *In re Visa Check/MasterMoney Antitrust Litig.*, 192 F.R.D. 68, 80–81 (E.D.N.Y. 2000), *aff'd* 280 F.3d 124 (2d Cir. 2001) (identifying the elements of a per se tying claim and expressly distinguishing that framework from a rule-of-reason theory, which requires proof of anticompetitive effects and consideration of asserted procompetitive justifications); *Park v. Thomson Corp.*, 2007 WL 119461, at *3–4 (S.D.N.Y. Jan. 11, 2007) (applying *Jefferson Parish* and recognizing that, where a tying arrangement qualifies for per se treatment, plaintiffs need not prove actual anticompetitive effects or address procompetitive justifications); *In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d 403, 413–17 (S.D.N.Y. 2005) (recognizing that tying arrangements may be subject to per se condemnation where coercive forcing presents a substantial potential for anticompetitive impact, and distinguishing such per se claims from rule-of-reason tying claims that require proof of market effects and allow procompetitive justifications).

**Post-Instruction No. 27**

### UNLAWFUL TYING—IDENTITY OF THE PURCHASER

An illegal tying arrangement requires that at least two products and/or services be purchased by one buyer. Therefore, the first thing you must decide is who is the customer that actually purchases the alleged tying product here, which is rental of amphitheaters.  Plaintiffs contend that artists are the customers that rent amphitheaters. Live Nation contends that promoters, not artists, are the customers that rent amphitheaters. In making this determination, you may consider, among other relevant facts, who the decisionmaker is that seeks to rent the amphitheater, who assumes the contractual obligation to pay for the use of the amphitheater, ~~who bears the economic risk from the rental agreement,~~ and who benefits from the rental agreement with the amphitheater.[14]

If you decide that promoters, not artists, are the customers that rent amphitheaters, you should find for Live Nation and against Plaintiffs on this claim. If, however, you find that artists are the customers that rent amphitheaters from Live Nation, you should go on to consider whether Plaintiffs have proven the other elements of this claim.

---

[14] The parties propose deleting this sentence as several of the factors are vague and may be confusing for the jury.

**Post-Instruction No. 28**

**UNLAWFUL TYING—PRESENCE OF TWO PRODUCTS**

To determine whether use of so-called "large amphitheaters" by artists and promotion services to artists are separate and distinct products, you should consider whether there would be demand for each of them if they were offered separately. If enough artists would want to purchase the use of so-called "large amphitheaters" and promotion services separately to induce venues and promoters generally to provide each service separately, then each service is a separate service. On the other hand, if there is very little demand for artists to buy one of the services by itself, that is, without the other service, then the use of the ~~so-called~~ "large amphitheaters," meaning amphitheaters with a capacity of 8,000 or more that hosted 10 or more concerts in at least one year from 2017 to 2024, by artists and promotion services to all touring artists are not two separate products for the purposes of the tying claim, even if they are sometimes sold separately.

Services may be separate services even if one of them is useless without the other. The relevant issue is whether there is sufficient demand from customers to induce sellers to provide them separately, even if the customer needs to obtain both products from one or more suppliers.

**Post-Instruction No. 29**

### UNLAWFUL TYING—PROOF OF CONDITIONING

You may find that an illegal tying arrangement exists between the use of what Plaintiffs define as ~~so-called~~ "large amphitheaters" by artists and promotion services to touring artists only if you find that Live Nation enforced a policy that conditioned the rental of its ~~so-called~~ "large amphitheaters" on an artist's agreement to buy Live Nation's promotion services when the artists would have preferred to buy promotion services elsewhere.

**Post-Instruction No. 30**

### UNLAWFUL TYING—PROOF OF COERCION

To find that an illegal tying arrangement exists, you must also find that Live Nation coerced artists into buying Live Nation's promotion services. To prove coercion, Plaintiffs must prove by a preponderance of the evidence that Live Nation exploited its control over the use of so-called "large amphitheaters" controlled by Live Nation to force artists into the purchase of promotion services, which the artists either did not want at all, or would have preferred to purchase from a different promoter on different terms, and that any appearance of choice was illusory.

There is no coercion if artists would have purchased promotion services from Live Nation anyway, regardless of any alleged tie.[15]

---

[15] **Plaintiffs' Argument:** For the reasons stated above, this instruction is unnecessary.

**Post-Instruction No. 31**

## UNLAWFUL TYING—MARKET POWER IN THE TYING MARKET

To find that an illegal tying arrangement exists, you must also find that Live Nation has sufficient market power in the market for the use of what plaintiffs ~~call~~define as "large amphitheaters," by artists such that Live Nation can coerce artists into using its promoters. Market power is the ability of a single seller to raise prices, ~~and~~ restrict output, or exclude competition. You may assess market power by considering the same things I instructed you on for assessing monopoly power earlier.  For example, market share is a proxy for market power but you should also consider other aspects of the relevant market, including market share trends, the existence of barriers to entry, the entry and exit by other companies, and the number and size of competitors.

**Post-Instruction No. 32**

UNLAWFUL TYING—ANTICOMPETITIVE EFFECTS FOR THE TIED PRODUCT

The next element is whether the alleged tying arrangement has had anticompetitive effects as to promotion services available to artists, for example by raising the price of promotion services paid by those artists, or by lowering the quality or amount of those services. I have previously instructed you on competitive harm and anticompetitive effects in connection with Plaintiffs' monopolization claims. The same rules apply in determining whether this element has been satisfied.[16]

---

[16] **Plaintiffs' Argument:** As discussed above, this instruction is unnecessary.

**Post-Instruction No. 33**

### UNLAWFUL TYING—NOT INSUBSTANTIAL AMOUNT OF INTERSTATE COMMERCE

The last element is whether the alleged tying arrangement involved a not insubstantial amount of interstate commerce in promotion services.

For commerce to be considered interstate, it must have a nexus to commerce that affects or touches more than one state. In determining whether the tying arrangement involved a not insubstantial amount of interstate commerce, you should consider the total dollar amount of Live Nation's sales of promotion services to all touring artists in interstate commerce achieved by the tying arrangement in absolute terms.

**Post-Instruction No. 34**

## STATE LAW CLAIMS

In addition to the claims that the Plaintiff States have brought under the Sherman Act, some Plaintiff States have brought claims under their own state laws. I will proceed to instruct you on those state law claims now.

**Post-Instruction No. 35**

## CONGRUENT STATE CLAIMS

Certain Plaintiffs are alleging violations of their state laws that are congruent with Section 1 or 2 of the Sherman Act. That means these state laws have the same elements as Section 1 or 2 of the Sherman Act. If you find that a Plaintiff State has proven every element of a Sherman Act Section 1 or 2 claim for a particular Defendant, and that the proven conduct harmed competition in that Plaintiff State, then for the state statutes listed below, you must find that the Plaintiff State has also proven the elements of its State statute as to that particular Defendant. If you find that a Plaintiff State has not proven every element of any Sherman Act claim for a particular Defendant, or that the conduct did not harm competition in that Plaintiff State, then for the state statutes listed below, you must find for that Defendant and against that Plaintiff State.

- The Arizona Uniform State Antitrust Act, A.R.S. § 44-1401 *et seq*;

- the Colorado Antitrust Act of 2023, Colo. Rev. Stat. 6-4-101, *et seq.*;

- the Connecticut Antitrust Act, Conn. Gen. Stat. § 35-24 *et seq.*;

- the District of Columbia Antitrust Act, D.C. Code § 28-4501 *et seq.*;

- the Florida Antitrust Act, Fla. Stat. § 542.15 *et seq.*;

- ~~the Indiana Antitrust Act, Ind. Code Sections 24-1-2-1 and 24-1-2-2;~~ [17]the Louisiana Unfair Trade Practices Act, LSA-R.S. 51:1401 *et seq.*;

- the Maryland Antitrust Act, MD Commercial Law Code Ann. § 11-201 *et seq.*;

- the Michigan Antitrust Reform Act, MCL 445.771 *et seq.*;

- the Minnesota Antitrust Law of 1971, Minn. Stat. §§ 325D.49–325D.66;

- the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. § 598A.010 *et seq.*;

---

[17] Indiana has provided with a separate instruction below.

- the New Hampshire Revised Statutes Annotated § 356 *et seq.*;

- the New Jersey Antitrust Act, N.J.S.A. § 56:9-1 *et seq.*;

- the New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-1 and 57-1-2;

- the North Carolina Unfair or Deceptive Trade Practices Act, N.C.G.S. § 75-1 *et seq.*;

- the Valentine Act, Ohio Rev. Code Chapter 1331;

- the Rhode Island Antitrust Law, R.I. Gen. L. §§ 6-36-4 and 6-36-5;

- the Texas Business and Commerce Code § 15.01 *et seq.*;

- the Utah Antitrust Act, Utah Code §76-16-510;

- the Virginia Antitrust Act, Va. Code § 59.1-9.1 *et seq.*;

- the Washington Consumer Protection Act, Wash. Rev. Code §§ 19.86.030 and 19.86.040;

- the West Virginia Antitrust Act, W. Va. Code § 47-18-1 *et seq.*; and

- Wisconsin Statutes Chapter 133.

**Post-Instruction No. 36**

## CALIFORNIA UNFAIR COMPETITION LAW
### (CAL. BUS. & PROF. CODE § 17200 *ET SEQ.*)

The State of California alleges that each Defendant has violated California's Unfair Competition Law, which prohibits unfair competition through unlawful or unfair business acts or practices.

For the State of California to prevail on its claim under the Unfair Competition Law, you must find that the State of California has proven each of the following elements by a preponderance of the evidence as to each Defendant:

1. The Defendant engaged in a business act or practice;

2. The act or practice occurred within California, emanated from California, or harmed California residents; and

3. The act or practice is either unlawful or unfair.

To determine whether acts or practices emanate from California, you may consider the location of the firm's headquarters, executives, or other employees involved in the conduct; where the relevant materials were created; where the relevant policies at issue were developed or executed; and where the firm conducts business.

*Unlawful*

To establish a violation of the unlawful prong of the California Unfair Competition Law, the State of California must prove by a preponderance of the evidence that each Defendant has violated another law, and that the act or practice that violated that other law occurred within California or emanated from California or harmed California residents. Therefore, if you find for Plaintiffs on another claim and that the associated act or practice occurred within California or emanated from California or harmed California residents, you must find that the Defendant who committed that act or practice violated the unlawful prong of California's Unfair Competition Law.

*Unfair*

To establish a violation of the unfair prong of the California Unfair Competition Law, the State of California must prove by a preponderance of evidence that each Defendant has:

1. engaged in conduct that threatens a violation of the antitrust laws or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition; or

2. engaged in a business act or practice for which the harm to consumers outweighs the utility of the conduct.

These tests are not mutually exclusive and you may find that Plaintiffs have proven a violation of (1) or (2) or both (1) and (2). It is not necessary to show that the defendant intended to injure anyone.[18]

A business act or practice may be unfair even if not prohibited by some other law such as the Sherman Act. That is to say, the elements of the monopolization, including market definition,[19] exclusive dealing, and tying claims that I previously described to you do not apply to this claim. Instead, you should follow these instructions when deciding whether California has proven its UCL claim by a preponderance of the evidence.

---

[18] **Plaintiffs' Authority:** *Hewlett v. Squaw Valley Ski Corp.*, 54 Cal. App. 4th 499, 520 (Cal. Ct. App. 1997).

[19] **Plaintiffs' Argument:** Defendants have devoted a significant portion of their case to criticizing Plaintiff's alleged antitrust markets, and several of the Jury Instructions refer to market definition. To avoid confusion, it is appropriate and necessary to instruct the jury that the UCL does not depend on proving any market definition. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1000, 1001-02 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 681 (2024) (rejecting defendant's argument that "the UCL mandates trial courts to define a relevant market" because "such a rule runs contrary to California courts' repeated instruction that '[n]o inflexible rule can be laid down as to what conduct will constitute unfair competition'").

**Post-Instruction No. 37**

**FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT (FLA. STAT. § 501.204)**

The State of Florida alleges that Defendants' anticompetitive conduct violated the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), which broadly prohibits persons from engaging in unfair methods of competition in the conduct of any trade or commerce based in or directed toward the State of Florida.

To establish a violation of the FDUTPA based on anticompetitive conduct, Florida must prove by a preponderance of the evidence that each Defendant engaged in an unfair method of competition.

*Unfair Methods of Competition*

A method of competition is "unfair" if the conduct goes beyond competition on the merits. Competition on the merits may include, for example, superior products or services, superior business skills, or truthful marketing and advertising practices. Conduct goes beyond competition on the merits if it is coercive, exploitative, collusive, abusive, deceptive, predatory, or exclusionary and tends to foreclose competition. To be "unfair," the act or practice must cause or be likely to cause substantial injury to consumers which is not reasonably avoidable and not outweighed by countervailing benefits to consumers or to competition.

Violations of antitrust laws also constitute "unfair methods of competition" under the FDUTPA. Therefore, if you find that the State of Florida proves by a preponderance of the evidence that each Defendant violated the Sherman Act through conduct based in or directed toward the State of Florida, you may find that such conduct by such Defendant also violated the FDUTPA. However, it is not necessary to find such a violation if the Defendant's conduct was otherwise unfair.

**Post-Instruction No. 38**

### ILLINOIS ANTITRUST ACT (740 ILCS 10/1 ET SEQ.)

The State of Illinois has brought claims under the Illinois Antitrust Act Illinois's claims under the Illinois Antitrust Act are based on the same conduct as its claims under the Sherman Act. However, they have some additional requirements. *Section 1*: The elements of proof for claims under this statute are the same as under Section 1 of the Sherman Act. If you find for Plaintiffs and against ~~one or more Defendants~~Live Nation on Plaintiffs' claim~~s~~ under Section 1 of the Sherman Act for ~~unlawful exclusive dealing and~~ unlawful tying, and Illinois proves by a preponderance of the evidence that the conduct harmed competition in Illinois, then you must find for the State of Illinois and against ~~the relevant Defendant~~Live Nation on those same claims under the Illinois Antitrust Act. If you find for ~~one or more Defendants~~Live Nation on Plaintiffs' claim~~s~~ under Section 1 of the Sherman Act for ~~unlawful exclusive dealing and~~ unlawful tying, you must find for ~~the relevant Defendant~~Live Nation under ~~those same claims~~that same claim under the Illinois Antitrust Act.

*Section 2*: For claims under the Illinois Antitrust Act involving monopolization, the elements of proof are the same as under Section 2 of the Sherman Act, except the State of Illinois must also prove that Defendants acted with the purpose of excluding competition or controlling, fixing, or maintaining prices in the relevant market. If you find for Plaintiffs and against one or more Defendants under Plaintiffs' claims under Section 2 of the Sherman Act, and Illinois proves by a preponderance of evidence that one or more Defendants acted with the purpose of excluding competition or controlling, fixing, or maintaining prices in the relevant market, and that the conduct harmed competition in Illinois, then you must also find for the State of Illinois on those same claims under the Illinois Antitrust Act and against the relevant Defendant. If you find for one or more Defendants on Plaintiffs' claims under Section 2 of the Sherman Act, or that the State of Illinois fails to prove that one or more Defendants acted with the purpose of excluding competition or controlling, fixing, or

maintaining prices in the relevant market, then you must find for the relevant Defendants for that claim under the Illinois Antitrust Act.

**Post-Instruction No. 39**

**INDIANA ANTITRUST ACT (IND. CODE §§ 24-1-2-1 AND 24-1-2-2)**

The State of Indiana has brought claims under the Indiana Antitrust Act. The State of Indiana is authorized to bring claims under this Act only for conduct that occurred after July 1, 2023. So conduct that occurred before July 1, 2023 cannot form a basis for liability under this statute. If the State of Indiana fails to provide evidence of conduct that occurred and harmed competition in Indiana after July 1, 2023, you must find for Defendants on this claim.

For conduct that occurred after July 1, 2023, if you find that the State of Indiana has proven every element of a Sherman Act Section 1 or Section 2 claim against a particular Defendant, and that the particular Defendant's conduct harmed competition in Indiana, then you may find that the State of Indiana has also proven the elements of the Indiana Antitrust Act as to that particular Defendant.

**Post-Instruction No. 40**

**KANSAS RESTRAINT OF TRADE ACT (KAN. STAT. ANN. § 50-101 ET SEQ.)**

The State of Kansas has brought claims under the Kansas Restraint of Trade Act, Kan. Stat. Ann. § 50-101 *et seq.* Kansas's claims under the Kansas Restraint of Trade Act are based on the same conduct as its claims under the Sherman Act.

For claims under the Kansas involving the restraint of competition by contracts, agreements, arrangements, or combinations, the elements of proof are the same as under Section 1 of the Sherman Act. If you find for Plaintiffs and against ~~the relevant Defendant~~Live Nation on Plaintiffs' claim~~s~~ under Section 1 of the Sherman Act regarding ~~unlawful exclusive dealing or~~ unlawful tying, and Kansas proves by a preponderance of the evidence that the conduct harmed competition in Kansas, then you must also find for the State of Kansas and against ~~the relevant Defendant~~Live Nation on those same claims under the Kansas Restraint of Trade Act. If you find for ~~the relevant Defendant~~Live Nation under Plaintiffs' claim~~s~~ under Section 1 of the Sherman Act for ~~unlawful exclusive dealing or~~ unlawful tying, you must find for ~~that Defendant~~Live Nation under ~~those same claims~~that same claim under the Kansas Restraint of Trade Act.

~~.~~ The elements of proof for monopolization claims under this statute are the same as under Section 2 of the Sherman Act, except the State of Kansas must also prove the existence of concerted or joint action with another party. If you find for Plaintiffs and against one or more Defendants on Plaintiffs' monopolization claims under Section 2 of the Sherman Act, and Kansas proves by a preponderance of the evidence that one or more Defendants acted jointly or in concert with another party, and that one or more Defendants' conduct harmed competition in Kansas, then you must also find for the State of Kansas on those same claims under the Kansas Restraint of Trade Act and

against the relevant Defendants. If you find for one or more Defendants on Plaintiffs' claims under Section 2 of the Sherman Act, or that the State of Kansas failed to prove that one or more Defendants acted jointly or in concert with another party, then you must find for the relevant Defendants under those claims under the Kansas Restraint of Trade Act.

**Post-Instruction No. 41**

## DONNELLY ACT (NEW YORK GENERAL BUSINESS LAW §§ 340 ET SEQ.)

The State of New York has brought claims under the Donnelly Act, New York General Business Law §§ 340 *et seq.* New York's claims under the Donnelly Act are based on the same conduct as its claims under the Sherman Act.

For claims under the Donnelly Act involving the restraint of competition by contracts, agreements, arrangements, or combinations, the elements of proof are the same as under Section 1 of the Sherman Act. If you find for Plaintiffs and against ~~one or more Defendants~~Live Nation on Plaintiffs' claim~~s~~ under Section 1 of the Sherman Act regarding ~~unlawful exclusive dealing or~~ unlawful tying, and New York proves by a preponderance of the evidence that the conduct harmed competition in New York, then you must also find for the State of New York and against ~~the relevant Defendant~~Live Nation on those same claims under the Donnelly Act. If you find for ~~one or more Defendants~~ Live Nation under Plaintiffs' claim~~s~~ under Section 1 of the Sherman Act for unlawful exclusive dealing or unlawful tying, you must find for ~~the relevant Defendant~~Live Nation under ~~those~~ that same claim~~s~~ under the Donnelly Act.

For claims under the Donnelly Act involving monopolization, the elements of proof are the same as under Section 2 of the Sherman Act, except the State of New York must also prove that the establishment or maintenance of the monopoly involved a contract, agreement, arrangement, or combination. If you find for Plaintiffs and against one or more Defendants under Plaintiffs' monopolization claims under Section 2 of the Sherman Act, and New York proves by a preponderance of the evidence that those monopolies were established or maintained through one or more contracts, agreements, arrangements, or combinations, and that the conduct harmed competition in New York, then you must also find for the State of New York and against the relevant Defendant on those same claims under the Donnelly Act. If you find for one or more Defendants on Plaintiffs' claims under

Section 2 of the Sherman Act, or the State of New York fails to prove the existence of a contract, agreement, arrangement, or combination in connection with that claim, then you must find for the relevant Defendant under those claims under the Donnelly Act.

**Post-Instruction No. 42**

### SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT
### (S.C. CODE ANN. § 39-5-10 ET SEQ.)

The state of South Carolina alleges that each Defendant's conduct violates the South Carolina Unfair Trade Practices Act (S.C. Code Ann. § 39-5-10 *et seq.*), SCUTPA provides that "[u]nfair methods of competition and unfair [] acts or practices in the conduct of any trade or commerce are… unlawful."

For the State of South Carolina to prevail on this claim, you must find for each Defendant separately that:

1. The Defendant engaged in an act or practice in trade or commerce.

2. The act or practice is unfair.

3. The act or practice has an impact on the public interest.

The words "trade" and "commerce" include the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity or thing of value wherever situated, and any trade or commerce directly or indirectly affecting the people of South Carolina.

The act or practice alleged must be unfair. An act or practice is "unfair" when it is offensive to public policy or when it is immoral, unethical, or oppressive. Whether an act or practice is unfair within the meaning of the Act depends upon the surrounding facts and the impact of the transaction on the marketplace.

Unfair acts or practices in the conduct of trade or commerce have an impact upon the public interest if the acts or practices have the potential for repetition. While not the only means for showing potential repetition, potential for repetition may be shown by:

1. showing the same kind of actions occurred in the past, thus making it likely they will continue to occur absent deterrence; or

2.     showing the company's procedures create a potential for repetition of the unfair acts.

**Post-Instruction No. 43**

## TENNESSEE TRADE PRACTICES ACT
## (TENN. CODE ANN. §§ 47-25-101 AND 102)

The State of Tennessee has brought claims under the Tennessee Trade Practices Act. The State of Tennessee is authorized to bring claims under this Act only for conduct that occurred after April 23, 2024. So conduct that occurred before April 23, 2024 cannot form a basis for liability under this statute. If the State of Tennessee fails to provide evidence of conduct that occurred and harmed competition in Tennessee after April 23, 2024, you must find for Defendants on this claim.

For conduct that occurred after April 23, 2024, if you find that the State of Tennessee has proven every element of a Sherman Act Section 1 or Section 2 claim against a particular Defendant, and that the conduct harmed competition in Tennessee, then you may find that the State of Tennessee has also proven the elements of the Tennessee Trade Practices Act as to that claim and that particular Defendant.

**Post-Instruction No.  42P**

### VERMONT CONSUMER PROTECTION ACT
### (9 V.S.A. § 2451 ET SEQ.)

The State of Vermont alleges that Defendants' conduct violates the Vermont Consumer Protection Act (9 V.S.A § 2451 *et seq.*)

For the State of Vermont to prevail on this claim, you must find that:

      1.    Defendants engaged in an act or practice in commerce; and

      2.    The act or practice is unfair.

An act or practice occurs "in commerce" when it takes place in the consumer marketplace in the context of a defendant's business, rather than in a private transaction; and (2) it has a potential harmful effect on consumers, constituting a breach of duty owed to consumers.

The act or practice alleged must be unfair. An act or practice is "unfair" when it (1) offends public policy even if it hasn't been previously considered unlawful; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers. Acts or practices are considered against public policy if they are in the realm of what is considered unfair as established by statutes, common law, or another established concept of unfairness.

When the State of Vermont brings a claim under the Vermont Consumer Protection Act, there is no requirement for the State to prove intent by the defendant to have acted unfairly.[20]

---

[20] **Plaintiffs' Argument:** Defendants' only basis for striking Vermont's instruction was that Vermont purportedly lacked the authority to bring *parens patriae* claims. As Plaintiffs have previously argued, there is no basis for striking Vermont's ability to purse claims under the Vermont Consumer Protection Act outside of a *parens patriae* capacity. In any event, Vermont may proceed with *parens patriae* claims under the Act. *See State v. Clearview AI, Inc.,* No. 226-3-20 CNCV, Order on Mot. To Dismiss (Vt.Super. Sept. 20, 2020) (finding the State's action against Clearview AI to confer standing on the State as *parens patriae*); *State of Vt. v. Densmore Brick Co.,* No. 78-297, 1980 WL 1846 (D. Vt. Apr. 10, 1980) (acknowledging the State's action as *parens patriae* for all Vermont residents who purchased woodburning stoves from defendant's Vermont retailers).

**Post-Instruction No. 44**

### STATES DAMAGES CLAIMS

[Twenty-one] of the Plaintiff States—specifically, Arizona, Colorado, Connecticut, Florida, Illinois, Indiana, Michigan, Minnesota, Nevada, New Hampshire, New Jersey, New York, North Carolina, Pennsylvania, Rhode Island, South Carolina, Utah, Washington, West Virginia, Wisconsin, and the District of Columbia—are seeking damages from Ticketmaster on behalf of fans who purchased primary concert tickets for events at what Plaintiffs call "major concert venues." I may refer to these [21] States as "Plaintiff States claiming damages." The Plaintiff States claiming damages allege that residents of their States were overcharged on purchases of primary concert tickets for events at so-calledwhat Plaintiffs call "major concert venues."

If you find that any Plaintiff State claiming damages proved that Ticketmaster monopolized the market for primary concert ticketing services to "major concerts venues" in violation of Section 2 of the Sherman Act or those States' laws, or proved that Ticketmaster engaged in unlawful exclusive dealing in violation of Section 1 of the Sherman Act or those States' laws, then you must decide if, as a result of any such violation, residents of that Plaintiff State were overcharged for primary concert tickets for events at what Plaintiffs call so-called "major concert venues." If any Plaintiff State claiming damages fails to prove that as a result of Ticketmaster's conduct, residents of its particular State were overcharged for primary concert tickets, then that State is not entitled to any damages, and you need not do any further analysis for that State.

If any Plaintiff State claiming damages proves that residents of its State were overcharged as a result of the violations I just described, then you must determine whether that Plaintiff State has proved by a preponderance of the evidence the amount that residents of that particular Plaintiff State were overcharged on a per-ticket basis for their purchases of primary concert tickets for events at so-

called "major concert venues." You are not being asked to determine the total number of tickets or ticket purchasers affected. You are only being asked to determine the per-ticket overcharge in each Plaintiff State claiming damages.

I remind you that you should not assume that any resident of any Plaintiff State claiming damages will receive any portion of any money the Plaintiff States might ultimately recover in this case. And neither you nor any member of your family will receive any portion of any funds that the States may ultimately receive.

I will now provide further instructions on what each Plaintiff State claiming damages must prove before you may calculate any per-ticket overcharge for that State, and how you must calculate any such overcharge.

**Post-Instruction No. 45**

### INJURY AND CAUSATION

Each Plaintiff State claiming damages is entitled to recover damages only if it can establish these three elements of injury and causation:

1.     Residents in its State who purchased primary concert tickets to attend events at what Plaintiffs refer to as "major concert venues" were in fact injured as a result of Ticketmaster's alleged violations of the antitrust laws;

2.     Those injuries would not have occurred but for Ticketmaster's alleged antitrust violation; and

3.     Those injuries are of the type that the antitrust laws were intended to prevent.

The first element is sometimes referred to as "injury in fact" or "fact of damage." For each of the Plaintiff States claiming damages to establish that it is entitled to damages, it must prove that residents of its State who purchased primary concert tickets to attend events at any of what Plaintiffs call~~the so-called~~ "major concert venues" were injured as a result of Ticketmaster's alleged monopolization of the market for primary concert tickets at ~~so-called~~what Plaintiffs call "major concert venues" in violation of Section 2 of the Sherman Act~~, or for exclusive dealing in violation of Section 1 of the Sherman Act~~. It is important to understand that injury and amount of damage are different concepts and that you cannot consider the amount of any overcharge alleged by any particular State unless and until you have concluded that fans in that State were in fact injured.

Each Plaintiff State claiming damages must also offer evidence that establishes by a preponderance of the evidence that injuries to residents in that State ~~would not have occurred but for~~were materially caused by Ticketmaster's alleged unlawful conduct[21]. This means that each

---

[21] **Plaintiffs' Argument:** Plaintiffs submit that an instruction stating that Plaintiffs must prove only that injuries to residents are a material cause (rather than a but-for cause) is the proper formulation.

Plaintiff State claiming damages must have proven that some overcharge was imposed on residents in its State because of Ticketmaster's alleged antitrust violation, and that such overcharge would not have been imposed but for the alleged antitrust violation.

Finally, each of the Plaintiff States claiming damages must establish that the alleged injuries to residents of its State are the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If the alleged injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then the alleged injuries are antitrust injuries. On the other hand, if the alleged injuries were caused by heightened competition or, the competitive process itself, or by acts that would benefit

---

This is the standard from the ABA Model instructions. *See* ABA Model Jury Instructions in Civil Antitrust Cases A-300. This standard is supported by case law, which hold that Plaintiffs do not have to disaggregate damages caused by unlawful versus lawful actions in this action. *Dial Corp. v. News Corp.*, 165 F. Supp. 3d 25, 38 (S.D.N.Y. 2016) ("But calculating damages in antitrust cases is not an exact science. . . . And if a jury were to find [defendant's] actions taken as a whole to be a violation of Section Two of the Sherman Act, disaggregating the monopolist's lawful actions from its unlawful actions for the purpose of calculating damages may be unnecessary, if not impossible.). Rather, the jury, upon finding unlawful monopolization, is entitled to award damages based on a "just and reasonable inference." *Bigelow v. RKO Pictures, Inc.*, 327 U.S. 251, 264 (1946) ("'[T]he jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly."); *Wilder Enters., Inc. v. Allied Artists Pictures Corp.*, 632 F.2d 1135, 1142 (4th Cir. 1980). Other courts have found disaggregation is unnecessary as the defendant's conduct needs only to be a material cause. *Ingevity Corp. v. BASF Corp.*, 2024 WL 579667, at *7 (D. Del. Feb. 13, 2024) (holding disaggregation was unnecessary, as reflected by jury instruction that Plaintiff was "entitled to recover damages for an injury to its business or property if it can establish . . . that the alleged illegal conduct was a material cause of BASF's injury"); *see also LePage's Inc. v. 3M*, 324 F.3d 141, 166 (3d Cir. 2003) ("Similarly, 3M's actions, taken as a whole, were found to violate § 2, thus making the disaggregation that 3M speaks of to be unnecessary, if not impossible."); *In re Pork Antitrust Litig.*, 2024 WL 2060386, at *10-11 (D. Minn. May 8, 2024) ("*Comcast* does not impose a requirement to 'disaggregate lawful and unlawful conduct.'"); *Ingevity Corp. v. BASF Corp.*, 2024 WL 579667, at *7 (D. Del. Feb. 13, 2024) (holding disaggregation was unnecessary, as reflected by jury instruction that Plaintiff was "entitled to recover damages for an injury to its business or property if it can establish . . . that the alleged illegal conduct was a material cause of BASF's injury").

artists, venues, or consumers[22], then the alleged injuries are not antitrust injuries and none of the Plaintiff States claiming damages can recover damages for those injuries under the antitrust laws.

In summary, if each of the Plaintiff States claiming damages can establish that residents of its State who purchased primary concert tickets to events at so-calledwhat Plaintiffs call "major concert venues" were in fact injured by Ticketmaster's conduct, that such injuries would not have occurred but for Ticketmaster's conduct, and that such injuries were the type that the antitrust laws were intended to prevent, then each such Plaintiff State is entitled to recover for the overcharge paid by such residents in each such Plaintiff State.

---

[22] **Plaintiffs' Argument:** As drafted, this instruction is vague and could allow the jury to consider benefits to artists, venues, or consumers in isolation without regard to the overall impact to the competition in the market for primary concert ticketing services to venues, including benefits of a type that do not promote competition. Only benefits that improve the competitive process may be properly considered. *See United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (relevant question is "whether the challenged conduct harms the competitive process and thereby harms consumers, not whether it produces efficiencies or innovations in isolation."); *see also Nat'l Soc'y of Professional Engineers v. United States*, 435 U.S. 679, 692, 695 (1978) ("The purpose of the [antitrust] analysis is to form a judgment about the competitive significance of the restraint; it is not to decide whether a policy favoring competition is in the public interest").

**Post-Instruction No. 46**

## STATUTE OF LIMITATIONS

A statute of limitations establishes a time limit for bringing a lawsuit. In doing so, the law seeks to eliminate stale claims, to promote justice by preventing surprises, and to provide security and stability to human affairs. Statutes of limitations ensure that a plaintiff does not wait, sleep on their rights, and allow damages to accumulate before bringing suit.

The statute of limitations for the claims in this case does not permit recovery for any injury to residents in any State suffered prior to May 23, 2020. ~~This means that any alleged anticompetitive conduct that occurred prior to May 23, 2020, and any injury resulting from that conduct, is time-barred.~~ You can only find that each Plaintiff has proved the required elements of injury and causation if they have proven ~~both~~ that ~~(i)~~ the injury occurred on or after May 23, 2020[23] ~~and (ii) that injury was caused~~

---

[23] **Plaintiffs' Argument:** The instruction misstates the law on the statute of limitations in a monopolization case. Here, Plaintiff States are seeking damages for supracompetitive pricing to fans who—unlike an excluded rival—are not injured until "the monopolist actually exercises its illicit power to extract an excessive price. *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 295 (2d Cir. 1979). The Second Circuit's decision in *Berkey Photo* is instructive, explaining that "a purchaser is suing a monopolist for overcharges paid within the previous four years may satisfy the conduct prerequisite to recovery by pointing to anticompetitive actions taken before the limitations period." *Id.* at 296; *see also CSX Transp., Inc. v. Norfolk S. Ry. Co.*, 114 F.4th 280, 290-91 (4th Cir. 2024) ("[U]nlike an excluded rival who is injured as soon as the exclusion begins, a customer is not injured until a sale occurs, and it suffers a new and accumulating injury each time a subsequent supracompetitive price is paid."); *Mayor & City Council of Balt. v. Actelion Pharms. Ltd.*, 995 F.3d 123, 131–32 (4th Cir. 2021).  Plaintiffs only seek damages for injuries suffered during the limitations period, but pre-limitations conduct continuing into the limitations period is actionable. *Toledo Mack Sales & Serv. v. Mack Trucks, Inc.*, 530 F.3d 204, 217 (3d Cir. 2008); *Sidibe v. Sutter Health*, 103 F.4th 675, 698 (9th Cir. 2024).

Anticompetitive conduct prior to May 23, 2020 is not mere "background or context," it is material evidence of Ticketmaster's maintenance of its monopoly that resulted in injury during the limitations period.  *Dial Corp. v. News Corp.*, 165 F. Supp. 3d 25, 37 (S.D.N.Y. 2016) ("[A] monopoly which is 'maintained' during the damages period would need to be created before the damages period, and anticompetitive conduct before the limitations period may be material to a showing that [p]laintiffs were injured during the damages period."); "When the monopolist creates its monopoly by a series of repeated or reasserted acts designed to maintain its monopoly, the statute of limitation is restarted provided that the subsequent acts fall within the definition of 'independent' predicate acts." Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶320c.

by anticompetitive conduct that occurred on or after May 23, 2020. You may not base any finding of injury or your overcharge calculation for damages on any anticompetitive conduct that occurred prior to May 23, 2020, regardless of whether you believe the conduct was unlawful and regardless of whether the harm or damages from that conduct continued after May 23, 2020.

While you may not consider injury or harm resulting from conduct that occurred before May 23, 2020, Plaintiffs have introduced evidence about conduct occurring before May 23, 2020 solely as background or context for the acts that took place on or after May 23, 2020. It is important that you consider this evidence only as background for the alleged conduct or injury that took place *after* May 23, 2020. Otherwise, this evidence has expired and cannot support Plaintiffs' claims.

---

Further, this instruction suggests that Ticketmaster's exclusionary efforts should be "dismember[ed ] and view[ed in] separate parts," which contradicts case law that a firm's exclusionary efforts must be considered in their totality. *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 353–55 (4th Cir. 2024); *United States v. Google LLC*, No. 1:23-CV-108 (LMB/JFA), 2025 WL 1132012, at *46 (E.D. Va. Apr. 17, 2025) ("As the Fourth Circuit made clear in *Duke Energy*, courts must avoid unduly divvying up a 'complex or atypical exclusionary campaign' into 'manufactured subcategories' and justify the actions using 'specific conduct tests.'").

**Post-Instruction No. 47**

### DAMAGES INSTRUCTIONS—GENERAL

If you find that any Plaintiff State claiming damages proved that Ticketmaster monopolized the alleged market for primary concert ticketing in violation of Section 2 of the Sherman Act, ~~or that Ticketmaster engaged in unlawful exclusive dealing in violation of Section 1 of the Sherman Act,~~ and you also find that the Plaintiff State proved that any such violation caused injury to residents of its State who purchased primary concert tickets to events at ~~so-called~~what Plaintiffs call "major concert venues" within the statute of limitations, then you must determine the amount of the overcharge, if any, paid by those residents in that Plaintiff State. The fact that I am giving you instructions concerning the issue of damages does not mean that I believe any Plaintiff should, or should not, prevail in this case. If you ~~reach a verdict for Ticketmaster on~~find against Plaintiffs on their[2] claims for monopolization of the alleged market for primary concert tickets at ~~so-called~~what Plaintiffs call "major concert venues" in violation of Section 2 of the Sherman Act and laws of the Plaintiff States claiming damages, ~~or for exclusive dealing in violation of Section 1 of the Sherman Act and the laws of the Plaintiffs States claiming damages~~, you should not consider the issue of damages, and you may disregard the damages instruction that I am about to give.

The law provides that each Plaintiff State claiming damages can recover based on the amount of per-ticket overcharge imposed on primary concert tickets purchased by residents of that State for events at one or more of the venues Plaintiffs call "major concert venues," only if you find that the overcharge was caused by the conduct that you have found to be unlawful.

Antitrust damages are only compensatory, meaning their purpose is to put injured persons, if any, as near as possible in the position in which they would have been had the alleged antitrust violation not occurred. The law does not permit you to award any additional overcharge amount to punish a wrongdoer—what we sometimes refer to as punitive damages—or to deter particular conduct in the

future. Furthermore, you are not permitted to award to any of the Plaintiff States an amount for attorneys' fees or the costs of maintaining this lawsuit. Again, you are only being asked to determine the per-ticket overcharge paid by ticket purchasers in each Plaintiff State that proves the violations I described and meets the injury and causation requirements I described.

**Post-Instruction No. 48**

### COMPENSATORY DAMAGES—OVERCHARGE

Each Plaintiff State claiming damages contends that its residents paid higher fees added to the face value of primary tickets to concerts that took place at so-called "major concert venues," because Ticketmaster allegedly charged those venues more money for primary ticketing services than Ticketmaster would have but for Ticketmaster's alleged anticompetitive conduct.

If you find that any Plaintiff State has proven that Ticketmaster violated the antitrust laws I previously described, and that ~~as a direct result venues increased the ticketing fees paid by fans~~as a result fans paid higher ticketing fees,[24] then for each Plaintiff State that satisfies the other elements for damages in my previous instructions, you must determine the per-ticket overcharge amount paid by residents of that State for primary concert tickets for events at so-called "major concert venues." The per-ticket overcharge amount is the difference between what residents of the Plaintiff State paid for fees added to the face value of tickets sold in the primary market during the damages period, and the amount of ticket fees you find those residents of that State would have paid but for Ticketmaster's alleged anticompetitive conduct. You are not being asked to determine, and may not speculate as to, the total number of tickets or ticket purchasers affected by any overcharge.

---

[24] **Plaintiffs' Argument:** As drafted, this clause suggests that the jury must find evidence of specific ticket fee increases by venues to award damages, as opposed to ticketing fees being higher than that would be absent the alleged anticompetitive conduct, which is the relevant inquiry for purposes of determining an overcharge. The clause as drafted also assumes that venues have full control over all ticketing fees, which is an issue in dispute in this trial. Also, as noted above in connection with Instruction No. 45, what is required is that Ticketmaster's conduct be a material cause of the injuries and resulting damages, not that it be a "direct" result.

85

**Post-Instruction No. 49**

## BASIS FOR CALCULATING OVERCHARGE

You are permitted to make just and reasonable estimates in determining the amount of the per-ticket overcharge for each Plaintiff State claiming damages that has proven it is entitled to recover damages. You are not required to calculate the amount of the overcharge with mathematical certainty or precision. However, the overcharge must have a reasonable basis in the evidence and must be based on reasonable, non-speculative assumptions and estimates. The overcharge may not be based on guesswork or speculation. Each Plaintiff State claiming damages must prove the reasonableness of each of the assumptions upon which the per-ticket overcharge for its State is based.

If you find that any Plaintiff State claiming damages has provided a reasonable basis for determining the per-ticket overcharge in its State, then you may find an overcharge amount for that State so long as that amount is a just and reasonable estimate supported by the evidence.

If you find that any Plaintiff State failed to carry its burden of providing a reasonable basis for determining the per-ticket overcharge in its State, then you may not find that any overcharge occurred in that State.

**Post-Instruction No. 49P**

**CALCULATION OF MONETARY RECOVERY FOR VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
(CAL. BUS. & PROF. CODE § 17200 ET SEQ.)**

If you find that Defendants have violated California's Unfair Competition Law, then you must determine the amount of the average per ticket overcharge, if any, that individuals who purchased primary concert tickets for live concert events at major concert venues in California are entitled to recover. This overcharge must have resulted from Defendants imposing ticketing fees that were higher than they would have been but for any business act or practice that you have found violated the Unfair Competition Law.

The fact that I am giving you instructions concerning the issue of the amount of monetary recovery under California's Unfair Competition Law does not mean that I believe any party should, or should not, prevail in this case. If you reach a verdict for Defendants on California's Unfair Competition Law, you may disregard the monetary recovery instructions that I am about to give.

The average per ticket overcharge amount is the difference between what fans paid for primary concert tickets for live events at major concert venues in California and the price you find that fans would have paid without the business act or practice that violated the Unfair Competition Law.

In addition, if you found that the unlawful or unfair act or practice that Defendants engaged in emanated from California and harmed consumers who paid for primary concert tickets for live events at major concert venues outside of California, you should separately determine the amount of overcharge for those consumers.

In calculating the overcharge amount, you must use a reasonable basis of computation. Your calculation of the overcharge amount may be an approximation. Your computation must be supported by evidence. If you find that the State of California has failed to carry its burden of providing a

87

reasonable basis for determining the amount of the overcharge, then you may not find any overcharge amount.[25]

---

[25] **Plaintiffs' Argument:** As stated in Plaintiffs' Joint Memorandum of Law in Support of Plaintiffs' Motion to Bifurcate Trial, the State of California believes that judicial efficiency is served by its request for monetary restitution being tried to the same jury as the liability claims. *See* ECF No. 528 at 7 n.3. The State of California's request for monetary restitution is based on the same evidence and testimony that will support the damages claims of the other states. Presenting the same testimony in another phase of the trial would be inefficient and unnecessary. Further, the Federal Rules permit a jury to sit in an advisory capacity on equitable claims such as the State of California's monetary relief claim where, as here, judicial efficiency would be best served by a single jury considering the claim with others in the case. *Starr Int'l Co. v. Am. Int'l Grp., Inc.*, 623 F. Supp. 2d 497, 502 (S.D.N.Y. 2009) ("Courts may empanel an advisory jury in order to maximize efficiency and convenience."). *Gragg v. City; of Omaha*, 20 F.3d 357, 358 (8th Cir. 1994) ("Having concluded the [state-law] claim was not triable of right to a jury, the district court properly exercised its initiative under Federal Rule of Civil Procedure 39(c) to try the claim with an advisory jury.").

**Post-Instruction No. 50**

### FINAL INSTRUCTIONS

You are about to go into the jury room and begin your deliberations. If during those deliberations you want to see any of the exhibits, you may request that they be brought into the jury room. If you want any of the testimony read back to you, you may also request that. Please remember that it is not always easy to locate what you might want to read or hear, so be as specific as you possibly can in requesting exhibits or portions of the testimony.

Your requests for exhibits or testimony—in fact, any communication with the Court—should be made to me in writing, signed by your foreperson, and given to one of the marshals. In any event, do not tell me or anyone else how the jury stands on any issue until after a unanimous verdict is reached.

*Duty to Deliberate/Unanimous Verdict*

You will now retire to decide the case. It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement. Each of you must decide the case for yourselves, but you should do so only after a consideration of the case with your fellow jurors, and you should not hesitate to change an opinion when convinced that it is erroneous. Your verdict must be unanimous, but you are not bound to surrender your honest convictions concerning the effect or weight of the evidence for the mere purpose of returning a verdict or solely because of the opinion of other jurors. Discuss and weigh your respective opinions dispassionately, without regard to sympathy, without regard to prejudice or favor for either party, and adopt that conclusion which in your good conscience appears to be in accordance with the truth.

Again, each of you must make your own decision about the proper outcome of this case based on your consideration of the evidence and your discussions with your fellow jurors. No juror should surrender their conscientious beliefs solely for the purpose of returning a unanimous verdict.

89

*Selection of Foreperson*

When you retire, you should elect one member of the jury as your foreperson. That person will preside over the deliberations and speak for you here in open court.

Verdict forms have been prepared for your convenience. You will take these forms to the jury room and, when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date, and sign the form that sets forth the verdict upon which you unanimously agree. You will then return with your verdict to the courtroom. I will read the verdict form to you now.

*Return of Verdict*

After you have reached a verdict, your foreperson will fill in the form that has been given to you, each of you will sign it with the date and advise the marshal outside your door that you are ready to return to the courtroom.

I will stress that each of you should be in agreement with the verdict which is announced in court. Once your verdict is announced by your foreperson in open court and officially recorded, it cannot ordinarily be revoked.

*Juror Oath*

In determining the facts, you are reminded that you took an oath to render judgment impartially and fairly, without prejudice and without fear, solely upon the evidence in the case and the applicable law. I know that you will do this and reach a just and true verdict.

90

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA et al.,

      *Plaintiffs*,

      v.                         Civil No. 1:24–cv–3973-AS

LIVE NATION ENTERTAINMENT, INC.,
and TICKETMASTER L.L.C.,

      *Defendants*.

**<u>PROPOSED VERDICT FORM</u>**

**VERDICT FORM**

**Part I: Section 2 Monopolization Claim Against Ticketmaster For Alleged Market Of Primary Ticketing Services To The Venues Plaintiffs Refer To As "Major Concert Venues"**

1.      Have Plaintiffs proven, by a preponderance of the evidence, that Ticketmaster willfully acquired or maintained monopoly power in the market for primary ticketing services to what Plaintiffs refer to as "major concert venues" by engaging in anticompetitive conduct?
Yes _____          No _____
*If you answered "Yes," proceed to Question 2.*
*If you answered "No," proceed to Question 3.*

2.      Have Plaintiffs proven, by a preponderance of the evidence, that Live Nation controlled, dictated, or encouraged Ticketmaster's anticompetitive conduct in this market?
Yes _____          No _____
*Proceed to Question 3.*

**Part II: Section 2 Monopolization Claim Against Ticketmaster For Alleged Market Of Primary *Concert* Ticketing Services To The Venues Plaintiffs Refer To As "Major Concert Venues"**

3.      Have Plaintiffs proven, by a preponderance of the evidence, that Ticketmaster willfully acquired or maintained monopoly power in the market for primary *concert*[1] ticketing services to what Plaintiffs refer to as "major concert venues" by engaging in anticompetitive conduct?
Yes _____          No _____
*If you answered "Yes," proceed to Question 4.*
*If you answered "No," proceed to Question 5.*

4.      Have Plaintiffs proven, by a preponderance of the evidence, that Live Nation controlled, dictated, or encouraged Ticketmaster's anticompetitive conduct in this market?
Yes _____          No _____
*Proceed to Question 5.*

**Part III: Section 2 Monopolization Claim Against Live Nation For Alleged Market Of Use Of Venues Plaintiffs Refer To As "Large Amphitheaters" By Artists**

5.      Have Plaintiffs proven, by a preponderance of the evidence, that Live Nation willfully acquired or maintained monopoly power in the market for the use of venues Plaintiffs refer to as "large amphitheaters" by engaging in anticompetitive conduct?
Yes _____          No _____
*Proceed to Question 6.*

---

[1] Plaintiffs recommend italicizing "concert" (as with the Part title) for purposes of clarity.

1

**Part IV: Section 1 Exclusive Dealing Claim Against Ticketmaster[2]**

6.        Have Plaintiffs proven, by a preponderance of the evidence, that the contracts between the venues Plaintiffs refer to as "major concert venues" and Ticketmaster substantially foreclosed competition in a relevant market for primary concert ticketing services to those major concert venues?

*If you answered "Yes," proceed to Question 7.*
*If you answered "No," proceed to Question 8.*

7.        Have Plaintiffs proven, by a preponderance of the evidence, that those contracts are an unreasonable restraint of trade that has caused anticompetitive effects in the market for primary concert ticketing services to major concert venues?
Yes _____    No_____
*Proceed to Question 8.*

**Part IV: Section 1 Tying Claim Against Live Nation**

8.6.    Have Plaintiffs proven, by a preponderance of the evidence, that there is a relevant market for the use of venues Plaintiffs refer to as "large amphitheaters," and that Live Nation unlawfully tied artist promotion services to the artists' use of those "large amphitheaters"?
Yes _____            No_____
*Proceed to Question 79.*

**Part VI: Congruent State Law ClaimsState Impact**

9.7.    Has each of the following Plaintiff States proven, by a preponderance of the evidence, that Live Nation, Ticketmaster or both, engaged in unlawful conduct that harmed competition in its State?[3]

| State | Live Nation (check if YES) | No | Ticketmaster (check if YES) | No |
|---|---|---|---|---|
| Arizona | | | | |
| California[4] | | | | |

---

[2] Plaintiffs agree with withdraw their claim based on exclusive dealing under Section 1 of the Sherman Act.
[3] Plaintiff have revised the chart associated with this question because we believe the jury should make a finding regarding harm to competition for each state bringing a claim. Prior versions of the proposed form made these findings as part of separate questions and Plaintiffs believe dealing with all States in the context of one question will reduce the risk of jury confusion.
[4] As stated in Plaintiffs' Joint Memorandum of Law in Support of Plaintiffs' Motion to Bifurcate Trial, the State of California believes that judicial efficiency is served by its request for monetary restitution being tried to the same jury as the liability claims. *See* ECF No. 528 at 7 n.3.  The

2

| | | | | |
|---|---|---|---|---|
| Colorado | | | | |
| Connecticut | | | | |
| District of Columbia | | | | |
| Florida | | | | |
| Illinois | | | | |
| Indiana | | | | |
| Kansas | | | | |
| Louisiana | | | | |
| Massachusetts | | | | |
| Maryland | | | | |
| Michigan | | | | |
| Minnesota | | | | |
| Nevada | | | | |
| New Hampshire | | | | |
| New Jersey | | | | |
| New Mexico | | | | |
| New York | | | | |
| North Carolina | | | | |
| Ohio | | | | |
| Oregon | | | | |
| Pennsylvania | | | | |
| Rhode Island | | | | |
| South Carolina | | | | |
| Tennessee | | | | |
| Texas | | | | |
| Utah | | | | |
| Vermont | | | | |
| Virginia | | | | |
| Washington | | | | |
| West Virginia | | | | |
| Wisconsin | | | | |
| Wyoming | | | | |

State of California's request for monetary restitution is based on the same evidence and testimony that will support the damages claims of the other states. Presenting the same testimony in another phase of the trial would be inefficient and unnecessary. Further, the Federal Rules permit a jury to sit in an advisory capacity on equitable claims such as the State of California's monetary relief claim where, as here, judicial efficiency would be best served by a single jury considering the claim with others in the case. *See* Fed. R. Evid. 39(c); *Starr Int'l Co. v. Am. Int'l Grp., Inc.*, 623 F. Supp. 2d 497, 502 (S.D.N.Y. 2009) ("Courts may empanel an advisory jury in order to maximize efficiency and convenience."); *Lavalle-Cervantes v. Int'l Hosp. Assocs.*, 261 F. Supp. 3d 197, 200 (D.P.R. 2016); *see also Gragg v. City; of Omaha*, 20 F.3d 357, 358 (8th Cir. 1994) ("Having concluded the [state-law] claim was not triable of right to a jury, the district court properly exercised its initiative under Federal Rule of Civil Procedure 39(c) to try the claim with an advisory jury.)

*Proceed to Question 8~~10~~.*

**Part VI~~I~~: Damages**

*If you answered "Yes" to ~~all Questions in Part I,~~ Question 3 in Part II, ~~or Part Iv~~and answered "Yes" with respect to Ticketmaster for any State in Question 7 in Part V, proceed to Question 8~~10~~. If not, proceed to Question 9~~11~~.[5]*

~~10.~~8.    Please state the amount (if any) that each Plaintiff State proved, by a preponderance of the evidence, that residents in its specific State were overcharged per ticket for primary concert tickets to events at the venues Plaintiffs call "major concert venues" because of Ticketmaster's alleged anticompetitive conduct ~~that occurred after May 23, 2020. You may not calculate any overcharge based on any alleged anticompetitive conduct that occurred before May 23, 2020.~~[6]

| State | |
|---|---|
| Arizona | $ |
| California | $ |
| Colorado | $ |
| Connecticut | $ |
| District of Columbia | $ |
| Florida | $ |
| Illinois | $ |
| Indiana | $ |
| ~~Kansas[7]~~ | ~~$~~ |
| ~~Louisiana~~ | ~~$~~ |
| ~~Maryland~~ | ~~$~~ |
| Michigan | $ |
| Minnesota | $ |
| Nevada | $ |
| New Hampshire | $ |
| New Jersey | $ |
| ~~New Mexico~~ | ~~$~~ |

---

[5] The Plaintiff States propose revising this preliminary paragraph to make clear the jury may only award damages related to Plaintiffs' claims for monopolization of primary concert ticketing services, and only for States where the jury has found harm to competition. For the reasons in Plaintiffs' comments to the jury instructions, Ticketmaster is the relevant Defendant for this inquiry, and the ability to award damages does not turn on a finding of liability by Live Nation for this claim.

[6] Plaintiffs propose cutting these clauses. The jury will receive a specific instruction on the statute of limitations, and the current formulation is not consistent with Plaintiffs' proposed edits to the jury instructions.

[7] The Plaintiff States have revised this table to accurately reflect the States seeking damages (or, in the case of California, other monetary relief).

| | |
|---|---|
| New York | $ |
| North Carolina | $ |
| ~~Ohio~~Pennsylvania | $ |
| Rhode Island | $ |
| South Carolina | $ |
| ~~Texas~~ | $ |
| Utah | $ |
| ~~Vermont~~ | $ |
| ~~Virginia~~ | $ |
| Washington | $ |
| West Virginia | $ |
| Wisconsin | $ |

*Proceed to Question 9~~11~~.*

**Part VII~~I~~: Other State Law Claims ~~And Damages~~**

**California Unfair Competition Law**

~~11.~~9.    Has California proven, by a preponderance of the evidence, that Ticketmaster engaged in an unlawful or unfair business act or practice that occurred within California, emanated from California, or harmed California residents in violation of the California Unfair Competition Law?
Yes _____            No_____
*Proceed to Question 10~~2~~.*

~~12.~~10.  Has California proven, by a preponderance of the evidence, that Live Nation engaged in an unlawful or unfair business act or practice that occurred within California, emanated from California, or harmed California residents in violation of the California Unfair Competition Law?
Yes _____            No_____
*Proceed to Question 11~~3~~.*

**Florida Trade Practices Act**

~~13.~~11.  Has Florida proven, by a preponderance of the evidence, that Ticketmaster engaged in an unfair method of competition in violation of the Florida Deceptive and Unfair Trade Practices Act?
Yes _____            No_____
*Proceed to Question 12~~4~~.*

~~14.~~12.  Has Florida proven, by a preponderance of the evidence, that Live Nation engaged in an unfair method of competition in violation of the Florida Deceptive and Unfair Trade Practices Act?
Yes _____            No_____
*Proceed to Question 13~~5~~.*

5

**Illinois Antitrust Act**

~~15.~~13.  Has Illinois proven, by a preponderance of the evidence, that Ticketmaster engaged in unlawful conduct in violation of the Illinois Antitrust Act?
Yes _____          No_____
*Proceed to Question 16~~4~~.*

~~16.~~14.  Has Illinois proven, by a preponderance of the evidence, that Live Nation engaged in unlawful conduct in violation of the Illinois Antitrust Act?
Yes _____          No_____
*Proceed to Question 17~~5~~.*

**Indiana Antitrust Act**

~~17.~~15.  Has Indiana proven, by a preponderance of the evidence, that Ticketmaster engaged in unlawful conduct after July 1, 2023 in violation of the Indiana Antitrust Act?
Yes _____          No_____
*Proceed to Question 16~~8~~.*

~~18.~~16.  Has Indiana proven, by a preponderance of the evidence, that Live Nation engaged in unlawful conduct after July 1, 2023 in violation of the Indiana Antitrust Act?
Yes _____          No_____
*Proceed to Question 17~~9~~.*

**Kansas Restraint Of Trade Act**

~~19.~~17.  Has Kansas proven, by a preponderance of the evidence, that Ticketmaster engaged in unlawful conduct in violation of the Kansas Restraint Of Trade Act?
Yes _____          No_____
*Proceed to Question 18~~20~~.*

~~20.~~18.  Has Kansas proven, by a preponderance of the evidence, that Live Nation engaged in unlawful conduct in violation of the Kansas Restraint Of Trade Act?
Yes _____          No_____
*Proceed to Question 19~~21~~.*

**New York – Donnelly Act**

~~21.~~19.  Has New York proven, by a preponderance of the evidence, that Ticketmaster maintained monopoly power through anticompetitive conduct involving the use of contracts, agreements, arrangements, or combinations, in violation of New York's Donnelly Act?
Yes _____          No_____
*Proceed to Question 20~~2~~.*

22.20.  Has New York proven, by a preponderance of the evidence, that Live Nation maintained monopoly power through anticompetitive conduct involving the use of contracts, agreements, arrangements, or combinations, in violation of New York's Donnelly Act?
Yes _____          No_____
***Proceed to Question 213.***

**South Carolina Unfair Trade Practices Act**

23.21.  Has South Carolina proven, by a preponderance of the evidence, that Ticketmaster engaged in an unfair method of competition in violation of the South Carolina Unfair Trade Practices Act?
Yes _____          No_____
***Proceed to Question 224.***

24.22.  Has South Carolina proven, by a preponderance of the evidence, that Live Nation engaged in an unfair method of competition in violation of the South Carolina Trade Practices Act?
Yes _____          No_____
***Proceed to Question 253.***

**Tennessee Trade Practices Act**

25.23.  Has Tennessee proven, by a preponderance of the evidence, that Ticketmaster engaged in unlawful conduct after April 23, 2024 in violation of the Tennessee Trade Practices Act?
Yes _____          No_____
***Proceed to Question 246.***

26.24.  Has Tennessee proven, by a preponderance of the evidence, that Live Nation engaged in unlawful conduct after April 23, 2024 in violation of the Tennessee Trade Practices Act?
Yes _____          No_____
***Proceed to Question 25.***

**Vermont Consumer Protection Act[8]**

25.     Has Vermont proven, by a preponderance of the evidence, that Ticketmaster engaged in an unfair method of competition in violation of the Vermont Consumer Protection Act?
Yes _____          No_____
***Proceed to Question 26.***

26.     Has Vermont proven, by a preponderance of the evidence, that Live Nation engaged in an unfair method of competition in violation of the Vermont Consumer Protection Act?
Yes _____          No_____

---

[8] For the reasons stated in Plaintiffs' proposed edits to the jury instructions, Plaintiffs submit the questions specific to Vermont should be incorporated here.

Your deliberations are now complete. Sign this verdict form and notify the clerk that your deliberations are complete.

DATED:_____

FOREPERSON SIGNATURE:_____