# EXHIBIT 19

---

| **From:** | Subramanian NYSD Chambers <SubramanianNYSDChambers@nysd.uscourts.gov> |
|---|---|
| **Sent:** | Wednesday, April 8, 2026 2:10 AM |
| **To:** | #C-M US V LIVE NATION LITIGATION - FULL - LW TEAM; ln_lit_csm@cravath.com; livenationtrialstates@ag.ny.gov; LiveNationTeam@winston.com |
| **Cc:** | Subramanian NYSD Chambers |
| **Subject:** | United States v. Live Nation 24cv3973 Jury Instructions and Verdict Form |
| **Attachments:** | Proposed Jury Instructions [circulation].docx; US v. LN - Proposed Verdict Form [circulation].docx |

Counsel:

Please find attached the Court's revised jury instructions and verdict form ahead of the charging conference.

**Chambers of The Honorable Arun Subramanian**
United States District Court
Southern District of New York
500 Pearl Street, Courtroom 15A
New York, NY 10007

`UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, et al.,<br><br>Plaintiffs,<br><br>LIVE NATION ENTERTAINMENT, INC.,<br>and TICKETMASTER L.L.C.,<br><br>Defendants. | Case No. 1:24-cv-03973-AS |

PROPOSED JURY INSTRUCTIONS

**Contents**

**Post-Instruction No. 1** ..................................................................................................**7**

**GENERAL INTRODUCTION** .......................................................................................**7**

**Post-Instruction No. 2** ..................................................................................................**8**

**USE OF NOTES** ...............................................................................................................**8**

**Post-Instruction No. 3** ..................................................................................................**9**

**JUROR USE OF ELECTRONIC COMMUNICATION TECHNOLOGIES** ........................**9**

**Post-Instruction No. 4** ................................................................................................**10**

**THE PARTIES** ................................................................................................................**10**

**Post-Instruction No. 5** ................................................................................................**11**

**ALL PERSONS EQUAL BEFORE THE LAW—ORGANIZATIONS** .................................**11**

**Post-Instruction No. 6** ................................................................................................**12**

**EVIDENCE IN THE CASE** ...........................................................................................**12**

**Post-Instruction No. 7** ................................................................................................**13**

**ELECTION OF FOREPERSON OR PRESIDING JUROR; DUTY TO DELIBERATE; COMMUNICATIONS WITH COURT; CAUTIONARY; UNANIMOUS VERDICT; VERDICT FORM** ...........................................................................................................**13**

**Post-Instruction No. 8** ................................................................................................**15**

**WITNESS CREDIBILITY** .............................................................................................**15**

**Post-Instruction No. 9** ................................................................................................**17**

**USE OF DEPOSITIONS AS EVIDENCE** .....................................................................**17**

**Post-Instruction No. 10** ..............................................................................................**18**

**EXPERT TESTIMONY** ..................................................................................................**18**

**Post-Instruction No. 11** ..............................................................................................**19**

**BURDEN OF PROOF—PREPONDERANCE OF THE EVIDENCE** .................................**19**

**Post-Instruction No. 12**..................................................................................................**20**

**DIRECT AND CIRCUMSTANTIAL EVIDENCE**.................................................**20**

**Post-Instruction No. 13**..................................................................................................**22**

**LIMITING INSTRUCTIONS**..........................................................................................**22**

**Post-Instruction No. 14**..................................................................................................**23**

**INFERENCES**....................................................................................................................**23**

**Post-Instruction No. 15**..................................................................................................**24**

**SUMMARY OF CONTENTIONS**....................................................................................**24**

**Post-Instruction No. 16**..................................................................................................**27**

**MONOPOLIZATION ELEMENTS**.................................................................................**27**

**Post-Instruction No. 17**..................................................................................................**29**

**MONOPOLIZATION ELEMENT #1: RELEVANT MARKET—GENERAL**.................**29**

**Post-Instruction No. 18**..................................................................................................**30**

**RELEVANT PRODUCT MARKET—GENERAL**.............................................................**30**

**Post-Instruction No. 19**..................................................................................................**31**

**RELEVANT PRODUCT MARKET—PRIMARY TICKETING MARKETS**.....................**31**

**Post-Instruction No. 20**..................................................................................................**33**

**RELEVANT PRODUCT MARKET—AMPHITHEATERS MARKET**..............................**33**

**Post-Instruction No. 21**..................................................................................................**34**

**RELEVANT GEOGRAPHIC MARKET**...........................................................................**34**

**Post-Instruction No. 22**..................................................................................................**36**

**MONOPOLIZATION ELEMENT #2: MONOPOLY POWER**..........................................**36**

**Post-Instruction No. 23**..................................................................................................**37**

**EXISTENCE OF MONOPOLY POWER—DIRECT PROOF**...........................................**37**

**Post-Instruction No. 24**..................................................................................................**39**

**EXISTENCE OF MONOPOLY POWER—INDIRECT PROOF**.......................................**39**

**Post-Instruction No. 25**......................................................................................................**43**

**MONOPOLIZATION ELEMENTS #3-#4: WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY POWER THROUGH ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT, AND ANTICOMPETITIVE EFFECT**................................................................**43**

**Post-Instruction No. 26**......................................................................................................**46**

**ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT—EXCLUSIVE DEALING SHERMAN ACT SECTION 2**....................................................................................**46**

**Post Instruction No. 27**......................................................................................................**47**

**LIVE NATION'S LIABILITY FOR TICKETMASTER'S ALLEGED CONDUCT**...........**47**

**Post-Instruction No. 28**......................................................................................................**48**

**UNLAWFUL TYING AGAINST LIVE NATION**..................................................................**48**

**Post-Instruction No. 29**......................................................................................................**50**

**UNLAWFUL TYING— ELEMENT #1: IDENTITY OF THE PURCHASER**....................**50**

**Post-Instruction No. 30**......................................................................................................**51**

**UNLAWFUL TYING— ELEMENT #2: PRESENCE OF TWO PRODUCTS**....................**51**

**Post-Instruction No. 31**......................................................................................................**52**

**UNLAWFUL TYING— ELEMENT #3: PROOF OF CONDITIONING**............................**52**

**Post-Instruction No. 32**......................................................................................................**53**

**UNLAWFUL TYING— ELEMENT #4: MARKET POWER IN THE TYING MARKET**..**53**

**Post-Instruction No. 33**......................................................................................................**54**

**UNLAWFUL TYING—ELEMENT #5: COERCION**............................................................**54**

**Post-Instruction No. 34**......................................................................................................**55**

**UNLAWFUL TYING—ELEMENT #6: ANTICOMPETITIVE EFFECTS FOR THE TIED PRODUCT**....................................................................................................................**55**

**Post-Instruction No. 35**......................................................................................................**56**

**UNLAWFUL TYING— ELEMENT #7: NOT INSUBSTANTIAL AMOUNT OF INTERSTATE COMMERCE**..................................................................................................**56**

**Post-Instruction No. 36**......................................................................................................**57**

**STATE LAW CLAIMS**.................................................................................................................**57**

**Post-Instruction No. 37**............................................................................................................**58**

**CONGRUENT STATE CLAIMS** ...............................................................................................**58**

**Post-Instruction No. 38**............................................................................................................**60**

**CALIFORNIA UNFAIR COMPETITION LAW   (Cal. Bus. & Prof. Code § 17200 *et seq.*)**....................................................................................................................................**60**

**Post-Instruction No. 39**............................................................................................................**62**

**FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT (Fla. Stat. § 501.204)62**

**Post-Instruction No. 40**............................................................................................................**63**

**ILLINOIS ANTITRUST ACT (740 ILCS 10/1 et seq.)**............................................................**63**

**Post-Instruction No. 41**............................................................................................................**65**

**INDIANA ANTITRUST ACT (IND. CODE §§ 24-1-2-1 AND 24-1-2-2)** .................................**65**

**Post-Instruction No. 42**............................................................................................................**66**

**KANSAS RESTRAINT OF TRADE ACT (Kan. Stat. Ann. § 50-101 et seq.)**........................**66**

**Post-Instruction No. 43**............................................................................................................**68**

**DONNELLY ACT (New York General Business Law §§ 340 et seq.)**......................................**68**

**Post-Instruction No. 44**............................................................................................................**70**

**SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT  (S.C. Code Ann. § 39-5-10 et seq.)**
.................................................................................................................................................**70**

**Post-Instruction No. 45**............................................................................................................**72**

**TENNESSEE TRADE PRACTICES ACT  (TENN. CODE ANN. §§ 47-25-101 AND 102)** **72**

**Post-Instruction No.  46**...........................................................................................................**73**

**Vermont Consumer Protection Act   (9 V.S.A. § 2451 et seq.)** ................................................**73**

**Post-Instruction No. 47**............................................................................................................**74**

**STATE DAMAGES CLAIMS**.....................................................................................................**74**

**Post-Instruction No. 48**............................................................................................................**76**

**INJURY AND CAUSATION**.......................................................................................................**76**

**Post-Instruction No. 49**..................................................................................................**78**

**STATUTE OF LIMITATIONS**.........................................................................................**78**

**Post-Instruction No. 50**..................................................................................................**79**

**DAMAGES INSTRUCTIONS—GENERAL**.......................................................................**79**

**Post-Instruction No. 51**..................................................................................................**81**

**COMPENSATORY DAMAGES—OVERCHARGE**............................................................**81**

**Post-Instruction No. 52**..................................................................................................**82**

**BASIS FOR CALCULATING OVERCHARGE** ................................................................**82**

**Post-Instruction No. 53**..................................................................................................**83**

**CALCULATION OF MONETARY RECOVERY FOR VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW  (CAL. BUS. & PROF. CODE § 17200 ET SEQ.)**............**83**

**Post-Instruction No. 54**..................................................................................................**85**

**FINAL INSTRUCTIONS**..................................................................................................**85**

**Post-Instruction No. 1**

### GENERAL INTRODUCTION

Now that you have heard the evidence and the argument, it is my duty to instruct you about the applicable law. It is your duty to follow the law as I state it. You must apply the law to the facts as you find them from the evidence in the case. Do not single out one instruction as stating the law, but consider the instructions as a whole. Do not be concerned about the wisdom of any rule of law stated by me. You must follow and apply the law.

Nothing I say in these instructions indicates I have any opinion about the facts of the case. You, not I, have the duty to determine the facts.

You must perform your duties as jurors without bias or prejudice as to any party. The law does not permit you to be controlled by sympathy, prejudice, or public opinion. The parties expect that you will carefully and impartially consider all the evidence, follow the law as it is now being given to you, and reach a just unanimous verdict, regardless of the consequences.

**Post-Instruction No. 2**

## USE OF NOTES

You may use the notes taken by you during the trial. The notes, however, should not be substituted for your memory.  Remember, notes are not evidence.  If your memory should differ from your notes, then you should rely on your memory and not on your notes. Please remember that you can always ask for any portion of the transcript to be provided to you during deliberations. You will have all of the exhibits admitted as evidence in this trial available to you in the jury room.

**Post-Instruction No. 3**

**JUROR USE OF ELECTRONIC COMMUNICATION TECHNOLOGIES**

Throughout your deliberations, you may discuss with each other the evidence and the law that has been presented in this case, but you must not communicate with anyone else by any means about the case. You also cannot learn from outside sources about the case, the matters in the case, the legal issues in the case, or individuals or other entities involved in the case. This means you may not use any electronic device or media (such as a phone, computer, or tablet), the internet, any text or instant messaging service, or any social media apps (such as X (formerly known as Twitter), Facebook, Instagram, LinkedIn, YouTube, WhatsApp, and Snapchat) to research or communicate about what you've seen and heard in this courtroom.

These restrictions continue during deliberations because it is essential, under our Constitution, that you decide this case based solely on the evidence and law presented in this courtroom. Information you find on the internet or through social media may be incomplete, misleading, or inaccurate. As I noted in my instructions at the start of the trial, even using your smartphones, tablets, and computers—and the news and social media apps on those devices—may inadvertently expose you to certain notices, such as pop-ups or advertisements, that could influence your consideration of the matters you've heard about in this courtroom.

You are permitted to discuss the case with only your fellow jurors during deliberations because they have seen and heard the same evidence and instructions on the law that you have, and it is important that you decide this case solely on the evidence presented during the trial, without undue influence by anything or anyone outside of the courtroom. For this reason, I expect you to inform me at the earliest opportunity, should you learn about or share any information about this case outside of this courtroom or the jury room, or learn that another juror has done so.

**Post-Instruction No. 4**

## THE PARTIES

As I instructed you earlier, the Plaintiffs are the [33] individual States and the District of Columbia. The Defendants in this case are Live Nation Entertainment, Inc. and Ticketmaster L.L.C.

Unless otherwise stated, these instructions apply to all parties.

**Post-Instruction No. 5**

### ALL PERSONS EQUAL BEFORE THE LAW—ORGANIZATIONS

A corporation is entitled to the same fair trial as a private individual or governmental entity like a state. All persons, governmental entities, and corporations, stand equal before the law, and are to be treated as equals.

**Post-Instruction No. 6**

## EVIDENCE IN THE CASE

Unless you are otherwise instructed, the evidence in the case consists of the sworn testimony of the witnesses regardless of who may have called the witness, all exhibits received in evidence regardless of who may have produced them, and all facts and events that may have been admitted, stipulated to, or taken judicial notice of.

Statements and arguments by the lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statement, closing arguments, and at other times is intended to help you understand the evidence, but it is not evidence. However, as I explained at the beginning of this trial, the lawyers on both sides have agreed on certain facts known as stipulations, and you must treat those facts as proven.

Any question to which I have sustained an objection, and any evidence that I have ordered stricken must be entirely disregarded.

**Post-Instruction No. 7**

**ELECTION OF FOREPERSON OR PRESIDING JUROR; DUTY TO DELIBERATE; COMMUNICATIONS WITH COURT; CAUTIONARY; UNANIMOUS VERDICT; VERDICT FORM**

You must follow these rules while deliberating and returning your verdict:

<u>First</u>, when you go to the jury room, you must select a foreperson. The foreperson will preside over your discussions and speak for you here in court.

<u>Second</u>, it is your duty, as jurors, to discuss this case with one another in the jury and try to reach agreement.

Each of you must make your own conscientious decision, but only after you have considered all the evidence, discussed it fully with the other jurors, and listened to the views of the other jurors.

Do not be afraid to change your opinions if the discussion persuades you that you should. But do not make a decision simply because other jurors think it is right, or simply to reach a verdict. Remember at all times that you are judges of the facts. Your sole interest is to seek the truth from the evidence in the case.

<u>Third</u>, if you need to communicate with me during your deliberations, send me a note signed by one or more of you. Give the note to the Marshal and I will answer you as soon as I can, either in writing or here in court. While you are deliberating, do not tell anyone—including me—how many jurors are voting for any side.

<u>Fourth</u>, your verdict must be based solely on the evidence and on the law I have given to you in these instructions. The verdict must be unanimous. Nothing I have said or done is intended to suggest what your verdict should be—that is entirely for you to decide.

Finally, the verdict form is simply the written notice of the decision that you reach in this case. You will take this form to the jury room, and when each of you has agreed on the verdict, your

foreperson will fill in the form, sign and date it, and advise the Marshal that you are ready to return to

the courtroom.

**Post-Instruction No. 8**

**WITNESS CREDIBILITY**

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

1.    the opportunity and ability of the witness to see or hear or know the things testified to;

2.    the witness's memory;

3.    the witness's manner while testifying;

4.    the witness's interest in the outcome of the case, if any;

5.    the witness's bias or prejudice, if any;

6.    whether other evidence contradicted the witness's testimony;

7.    the reasonableness of the witness's testimony in light of all the evidence; and

8.    any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened.  People often forget things or make mistakes in what they remember.  Also, two people may see the same event but remember it differently.  You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said.  On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify. What is important is how believable the witnesses were, and how much weight you think their testimony deserves.

**Post-Instruction No. 9**

### USE OF DEPOSITIONS AS EVIDENCE

During the trial, certain testimony has been presented by way of deposition. The deposition consisted of sworn, recorded answers to questions asked of the witness in advance of the trial by the attorneys. The testimony of a witness who, for some reason, is not present to testify from the witness stand may be presented under oath on a videotape. Such testimony is entitled to the same consideration and is to be judged as to credibility, weighed, and otherwise considered by you in the same way as if the witness had been present and testified from the witness stand.

**Post-Instruction No. 10**

### EXPERT TESTIMONY

You have heard testimony from a number of witnesses who were designated by the respective parties as "experts." These designated witnesses are allowed to express opinions on matters about which they may have special knowledge and training. This testimony is presented to you on the theory that someone who is experienced in a particular field may be able to assist you in understanding the evidence and in reaching your independent decision on the facts.

In weighing this type of testimony, you may consider the witness's qualifications, opinions, reasons for testifying, as well as all the other considerations that ordinarily apply when you are deciding whether to believe a witness's testimony.

The expert witness's testimony was based on particular facts, as the witness obtained knowledge of them and testified to them before you, or as the attorneys who questioned the designated witness asked them to assume. You may reject such a witness's opinion if you find the facts in the case to be different from those that formed the basis for the opinion.

You may give "expert" testimony whatever weight, if any, you find it deserves in light of all of the evidence in the case and the witness's interest in the proceeding, including any compensation for work the expert may have received. You should not, however, accept the testimony merely because it is given by a designated "expert," nor should you substitute it for your own reason, judgment, and common sense. The determination of the facts in this case rests solely with you.

**Post-Instruction No. 11**

## BURDEN OF PROOF—PREPONDERANCE OF THE EVIDENCE

As I instructed you earlier, in this case, Plaintiffs must prove every essential element of each of their claims against each Defendant by a preponderance of the evidence. If Plaintiffs should fail to establish any essential element of one of their claims by a preponderance of the evidence against any Defendant, you should find for each such Defendant as to that claim.

"To prove by a preponderance of the evidence" means to prove something is more likely than not. In determining whether any fact in issue has been proved by a preponderance of the evidence, unless otherwise instructed, you may consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

**Post-Instruction No. 12**

### DIRECT AND CIRCUMSTANTIAL EVIDENCE

Generally speaking, there are two types of evidence presented during a trial—direct evidence and circumstantial evidence.  Direct evidence is testimony by a witness about something he knows by virtue of his own senses—something he has seen, felt, touched, or heard.  For example, if a witness testified that when he left his house this morning, it was raining, that would be direct evidence about the weather.

The second type of evidence is circumstantial evidence. Circumstantial evidence is evidence that tends to prove a disputed fact indirectly by proof of other facts. There is a simple example of circumstantial evidence that is often used in this courthouse, and in fact which I related when this trial started.

Assume that when you came into the courthouse this morning that the sun was shining and it was a nice day outdoors.  Assume that the courtroom shades were drawn and you could not look outside.  Assume further that as you were sitting here, someone walked in with an umbrella that was dripping wet and then, a few moments later, somebody else walked in with a raincoat that was also dripping wet. Now, because you could not look outside the courtroom and you could not see whether it was raining, you would have no direct evidence of that fact.  But, on the combination of facts that I have asked you to assume, it would be reasonable and logical for you to conclude that it was raining.

That is all there is to circumstantial evidence.  You infer on the basis of your reason, experience, and common sense from one established fact the existence or the nonexistence of some other fact.

The law generally makes no distinction between the weight or value to be given to either direct or circumstantial evidence. A greater degree of certainty is not required of circumstantial evidence.

You are required to find the facts in accordance with the preponderance of all the evidence in the case, both direct and circumstantial.

**Post-Instruction No. 13**

### LIMITING INSTRUCTIONS

At times during this trial I have instructed you that evidence that you saw or heard should be considered only for a limited purpose. You are reminded that you are permitted to consider this evidence only for the purpose that I instructed you on, and not for any other purpose.

Specifically, both sides in this case have made reference to certain statements from third parties who did not testify in this case, that were made or conveyed to a witness who did testify in this case. In certain of those instances, I have instructed you that the statements from the third parties should not be considered for their truth. What that means is that you may consider the fact that the statements were made, and any effect that they may have had on the witness. But you may not consider those statements for their truth—that is, whether the facts conveyed by the statements were true or not.

[The parties may meet and confer and propose balanced examples to provide to the jury if they can reach agreement.]

**Post-Instruction No. 14**

**INFERENCES**

You are to consider only the evidence in the case. However, you are not limited to the statements of the witnesses. You may draw from the facts you find have been proved such reasonable inferences as seem justified in light of your experience.

"Inferences" are deductions or conclusions that reason and common sense lead you to draw from facts established by the evidence in the case.

There are times when different inferences may be drawn from the evidence. The plaintiff states ask you to draw one set of inferences. Defendants Live Nation and Ticketmaster ask you to draw another. It is for you, and for you alone, to decide what inferences you will draw.

**Post-Instruction No. 15**

### SUMMARY OF CONTENTIONS

As I did at the start of the case, I will give you a summary of each side's positions in this case. I will then provide you with detailed instructions on what Plaintiffs must prove to win on each of their claims.

*Section 2: Monopolization*

The first issue you will be asked to decide is whether Plaintiffs have proved by a preponderance of the evidence that any Defendant violated Section 2 of the Sherman Act by unlawfully monopolizing any of the three alleged markets. As a reminder, Plaintiffs allege that Ticketmaster monopolized the two alleged ticketing markets:

1.    Primary ticketing services to what Plaintiffs call "major concert venues" (primary ticketing).

2.    Primary *concert* ticketing services to what Plaintiffs call "major concert venues" (primary concert ticketing).

Plaintiffs allege that Live Nation is liable for Ticketmaster's monopolization in the two alleged ticketing markets because it controlled, dictated or encouraged that conduct.

Plaintiffs also allege that Live Nation (but not Ticketmaster) monopolized the alleged amphitheater market:

3.    The third market is for the use of what Plaintiffs call "large amphitheaters" by artists.

There are certain requirements that Plaintiffs must prove to show that either Defendant illegally monopolized a market, which I will explain in more detail in a few minutes. In general, however, to prove monopolization for each separate market, Plaintiffs must show by a preponderance of the evidence that the alleged market is a valid antitrust market, that the relevant Defendant (Live Nation

or Ticketmaster) possessed monopoly power in that market and that the relevant Defendant willfully acquired or maintained monopoly power in that market by engaging in anticompetitive or exclusionary conduct, as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. The relevant Defendant's conduct must also have had an anticompetitive effect, that is, it must have harmed the competitive process and thereby harmed consumers. In contrast, harm to one or more competitors alone will not suffice.

In Plaintiffs' alleged ticketing markets, the consumers are venues, and in Plaintiffs' alleged amphitheater market, the consumers are artists. You must assess monopolization for each market separately. It is up to you to decide whether Plaintiffs have proven that a relevant Defendant is liable for monopolization as to all markets they are alleged to have monopolized, no markets, or only as to some markets.

*Section 1: Tying*

In addition to alleging that each Defendant monopolized certain markets, Plaintiffs also allege that Live Nation violated Section 1 of the Sherman Act by engaging in an unlawful tying arrangement related to certain amphitheaters that Live Nation owns or controls. In general, for this claim, Plaintiffs must prove by a preponderance of the evidence that Live Nation unlawfully required artists who wanted to use these amphitheaters to also use Live Nation's promotion services.

*Section 2: Damages*

If, and only if, you decide that at least some of the Plaintiff States claiming damages proved every element of at least one of the Section 2 ticketing claims against Ticketmaster, then you will be asked to decide whether those (and only those) Plaintiff States are entitled to damages. You should not assume that any of the Plaintiff States are entitled to any damages merely because I am instructing you on the issue of damages.

**Commented [A1]:** Here and elsewhere, the Court has adopted language describing the required showing of an anticompetitive effect from *United States v. Microsoft*, 253 F.3d 34, 58 (D.C. Cir. 2001), which the Court understands to be the clearest articulation of this requirement, and as defendants point out has been endorsed by the Second Circuit. *New York ex. rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 652 (2d Cir. 2015).

It does not adopt suggested language from *MacDermid* that would require a showing of changed price/output/quality because it does not read *MacDermid* to have changed the law of anticompetitive conduct in the Second Circuit, which continues to allow plaintiffs to show anticompetitive effects "in either of two ways," meaning either by "direct evidence of harm to competition by proving higher prices, reduced output, or lower quality in the market as a whole," or "indirectly by establishing that the alleged conspirators had sufficient market power to cause an adverse effect, plus some other ground for believing that the challenged behavior has harmed competition." *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 182 (2d Cir. 2016). Indeed, the Second Circuit revisited MacDermid in N*orth American Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 42 (2d Cir. 2018), clarifying that "[p]laintiffs seeking to show adverse effect indirectly must demonstrate both the defendant's market power and 'other grounds' for believing the challenged restraint harms competition. These other grounds might include price increases, reduced output or market quality, significantly heightened barriers to entry, or reduced consumer choice." *Id.*

And, contrary to any suggestion that the older Second Circuit cases that endorsed the indirect approach are no longer good law after the 2016 *MacDermid* decision, the Supreme Court in 2018 relied on exactly those cases to stand for the proposition of indirect proof of anticompetitive conduct. See *Ohio v. American Express*, 585 U.S. 529, 542 (2018) (("Indirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition.") (citing *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 97 (2d Cir. 1998))).

I remind you, as I did at the outset, that although the Plaintiff States are suing on behalf of the residents of their States who have purchased tickets from Ticketmaster to live events, you should not assume that any of those residents will receive any portion of any money the Plaintiff States may ultimately receive in this case. And neither you nor any member of your family will receive any portion of any funds that the States may receive.

**Post-Instruction No. 16**

### MONOPOLIZATION ELEMENTS

Plaintiffs allege that Ticketmaster unlawfully monopolized the following markets:

(1)    primary ticketing services to "major concert venues," which Plaintiffs define as amphitheaters or arenas with a capacity of 8,000 or more that hosted 10 or more concerts in at least one year from 2017 to 2024; and

(2)    primary concert ticketing services to those "major concert venues."

Plaintiffs allege that Live Nation unlawfully monopolized the following market:

(3)    the use of "large amphitheaters" by artists, which Plaintiffs define as amphitheaters with a capacity of 8,000 or more that hosted 10 or more concerts in at least one year from 2017 to 2024.

Plaintiffs have brought three monopolization claims in total, one for each of these alleged markets. The alleged monopolization of each of these three alleged markets is a distinct claim that you are to consider separately for the relevant Defendant, either Ticketmaster or Live Nation. To prevail on a monopolization claim, Plaintiffs must prove the following elements by a preponderance of the evidence as to each separate alleged market for each Defendant:

(1)    the alleged market is a valid antitrust market;

(2)    the relevant Defendant possessed monopoly power in that market;

(3)    the relevant Defendant willfully acquired or maintained monopoly power in that market by engaging in anticompetitive or exclusionary conduct, instead of through superior products, business skill, or historical accident;

(4)    and the relevant Defendant's conduct had an anticompetitive effect in that market.

Further, to hold Live Nation liable for Ticketmaster's monopolization in any market, plaintiffs must prove by a preponderance of the evidence that Live Nation controlled, dictated or encouraged that conduct.

If you find that Plaintiffs have failed to prove any of these elements for a claim, then you must find for the relevant Defendant and against Plaintiffs on that claim only. If you find that Plaintiffs have proven each of these elements by a preponderance of the evidence for a claim, then you must find for Plaintiffs and against the relevant Defendant on that claim.

I will now provide you with further instructions on these elements.

**Post-Instruction No. 17**

**MONOPOLIZATION ELEMENT #1: RELEVANT MARKET—GENERAL**

The first step in assessing each of Plaintiffs' separate monopolization claims against each Defendant is determining whether Plaintiffs have proven the alleged relevant market for that claim by a preponderance of the evidence. Defining the relevant market is essential because you are required to make a judgment about whether the relevant Defendant (Live Nation or Ticketmaster) has monopoly power in a properly defined economic market. To make this judgment, you must be able to determine what, if any, economic forces restrain the relevant Defendant's freedom to set prices for the products or services they provide, control output for those products or services, or degrade the quality of those products or services.

The most likely and most important restraining force will be actual and potential competition from other firms and their products or services. This includes the firms and products or services that act or likely would act as restraints on the relevant Defendant's power to set prices above competitive levels because customers would switch to these competing firms if the relevant Defendant sets its own prices too high. The firms and products or services that exert such restraining force are within what is called the relevant market.

**Post-Instruction No. 18**

### RELEVANT PRODUCT MARKET—GENERAL

A relevant market must consist of all products or services that are reasonably interchangeable in the eyes of customers of those products or services. In other words, the relevant market includes the products or services that a customer believes are reasonably interchangeable or reasonable substitutes for each other. This is a practical test taking into account actual behavior of buyers and marketing efforts of sellers. It looks to the practical realities of substitution, not theoretical substitution. A market does not need to include all conceivable substitutes, but only those that a buyer would view as reasonably interchangeable. Accordingly, your analysis should focus on whether or not the products or services are economic substitutes, not simply whether they appear to be functionally similar. For instance, women's shoes may not be reasonably interchangeable with men's shoes. Even if both are functionally similar, consumers may not typically substitute one for the other.

The three markets at issue are as follows: *First*, the market for primary ticketing services to what plaintiffs call "major concert venues." *Second*, the market for primary *concert* ticketing services to those major concert venues. The market for primary ticketing services includes all events, including sporting events, at major concert venues, while the market for primary *concert* ticketing services includes only concerts or comedy shows. Plaintiffs define "major concert venues" as amphitheaters and arenas with a capacity of 8,000 or more that hosted 10 or more concerts in at least one year from 2017 to 2024. *Third*, the market for artists to use what plaintiffs call "large amphitheaters." Plaintiffs define large amphitheaters as those amphitheaters with a capacity of 8,000 or more that hosted 10 or more concerts in at least one year from 2017 to 2024.  The parties disagree about the relevant markets in this case. Plaintiffs allege that the three markets I just described to you are relevant markets, while Defendants deny that those three markets are relevant markets. Your task is to determine whether the evidence supports the three markets alleged by Plaintiffs.

**Post-Instruction No. 19**

### RELEVANT PRODUCT MARKET—PRIMARY TICKETING MARKETS

For the alleged primary ticketing services and primary concert ticketing services markets, Plaintiffs have limited the scope of both markets to 257 venues that they call "major concert venues." Defendants dispute that it is appropriate to limit these markets just to that subset of venues. Defendants contend that Plaintiffs' definition is too narrow because primary ticketing companies compete for many more customers, and therefore, that the relevant market should include other venues.

Plaintiffs' alleged primary ticketing markets are what are known as "targeted customer markets" because they are focused on a subset of all customers of a particular product or service. In order for Plaintiffs to prove that each of these two markets should be limited solely to the 257 venues they call "major concert venues," Plaintiffs must prove that the 257 venues are in a unique position relative to other venues at which concerts take place. That is the case if Ticketmaster is able to identify these venues and to impose on them worse prices or terms of service (for example, by charging higher prices for primary ticketing services) than are charged to other venues. To determine whether these 257 venues are in a unique position relative to other venues, you may consider these factors: (i) whether persons in the primary ticketing industry or the public recognize these venues as unique, (ii) whether these venues have peculiar characteristics and uses, (iii) whether these venues have distinct customers, (iv) whether these venues pay distinct prices or are uniquely sensitive to price changes, (v) whether specialized vendors cater to these venues, and (vi) whether Ticketmaster has *actually* exercised the power to impose on these venues worse prices or terms of service than are charged to other venues.

If you find that Plaintiffs have proven either of the alleged ticketing markets as relevant markets, then you should continue to evaluate the remainder of Plaintiffs' claims related to that alleged market. If you find that Plaintiffs have failed to prove either of these alleged markets, then you do not

**Commented [A2]:** The Court agrees that plaintiffs' theory—from complaint through summary judgment—has been one of targeted customer markets, and that the issue should be presented to the jury as such. The Court also made changes consistent with its summary judgment opinion to reflect that a targeted customer market requires the *ability* of a seller to engage in price discrimination, but left the presence of actually raised prices as a factor to be considered (again consistent with the Court's opinion on summary judgment).

need to consider any other elements for claims related to that alleged market. Instead, you should find for Defendants and against Plaintiffs on all claims for which you found Plaintiffs failed to prove a relevant market.

**Post-Instruction No. 20**

### RELEVANT PRODUCT MARKET—AMPHITHEATERS MARKET

As for Plaintiffs' alleged amphitheater market, Defendants contend this market is not properly defined because it excludes other venues that are reasonable substitutes for the "large amphitheaters" that Plaintiffs have defined, and that it includes certain amphitheaters that do not qualify as "large amphitheaters." To prove this market, Plaintiffs must prove that artists do not view other types of venues, such as smaller amphitheaters or arenas, as reasonable substitutes for the venues within the alleged market of "large amphitheaters."

To determine whether products are reasonably interchangeable or reasonable substitutes for each other, you may consider:

- whether artists substitute between large amphitheaters and other venues;

- consumers' views on whether the products are interchangeable;

- the relationship between the price of one product and sales of another;

- the presence or absence of specialized vendors;

- the perceptions of either industry or the public as to whether the products are in separate markets; and

- the views of Defendants regarding who their competitors are.

If you find that Plaintiffs have proven that the alleged amphitheaters market is properly drawn, then you should continue to evaluate the remainder of Plaintiffs' claims related to that market. If you find that Plaintiffs have failed to prove that the alleged amphitheaters market is properly drawn, then you do not need to consider any other elements for claims related to this alleged market. Instead, you should find for Live Nation and against Plaintiffs on all claims for which you found Plaintiffs failed to prove this market.

**Post-Instruction No. 21**

### RELEVANT GEOGRAPHIC MARKET

For the "large amphitheaters" market, the parties also dispute the geography of the market. The relevant geographic market is the area in which Live Nation faces competition from other firms that compete in the relevant product market and to which customers can reasonably turn for purchases. When analyzing the relevant geographic market, you should consider whether changes in prices or product offerings in one geographic area have substantial effects on prices or sales in another geographic area, which would tend to show that both areas are in the same relevant geographic market. The geographic market may be as large as global or nationwide, or as small as a single town or neighborhood.

Plaintiffs have the burden of proving a relevant geographic market by a preponderance of the evidence. Plaintiffs contend that the relevant geographic market for the alleged amphitheaters market is the entire United States. By contrast, Live Nation asserts that the relevant geographic market is narrower.

In determining whether Plaintiffs have met their burden and demonstrated that the entire United States is the relevant geographic market for the alleged amphitheaters market, you may consider several factors, including:

- the geographic area in which the 87 "large amphitheaters" are located and where customers of those amphitheaters are located;

- the geographic area to which customers turn for supply of "large amphitheaters";

- the geographic area to which customers have turned or have seriously considered turning;

- the transportation cost differences between areas; and

- the geographic areas that suppliers view as potential sources of competition.

If you find that Plaintiffs proved that the alleged amphitheaters market is as broad as the entire United States, then you should continue to evaluate the remainder of Plaintiffs' monopolization claim against Live Nation as to this market. But if you find that Plaintiffs have failed to prove that this alleged market is as broad as the United States, then you must find in Live Nation's favor on all claims related to this market.

**Post-Instruction No. 22**

**MONOPOLIZATION ELEMENT #2: MONOPOLY POWER**

If you find that Plaintiffs have proven any alleged relevant market by a preponderance of the evidence, then you should separately determine whether the relevant Defendant (Live Nation or Ticketmaster) has monopoly power in that market. To prove a monopolization claim, Plaintiffs must prove that the relevant Defendant has monopoly power in a relevant antitrust market. Monopoly power is the power to control prices, restrict output, or exclude competition in a relevant antitrust market. However, possession of monopoly power, in and of itself, is not unlawful.

Plaintiffs can prove monopoly power "directly," through direct evidence, or "indirectly," through indirect evidence. Either type of evidence may be sufficient to prove monopoly power. I will now provide further instructions about how you may determine whether Plaintiffs have met their burden of proving monopoly power in a relevant market.

**Post-Instruction No. 23**

## EXISTENCE OF MONOPOLY POWER—DIRECT PROOF

Plaintiffs can provide direct proof of monopoly power in a relevant market via direct evidence through any one of these alternative ways.

*Raising or Maintaining Prices Above Competitive Levels*

One way Plaintiffs may prove that the relevant Defendant (Live Nation or Ticketmaster) has monopoly power in a relevant market is to show that the relevant Defendant can profitably raise or maintain prices in the relevant market above a competitive level. Plaintiffs must prove that the relevant Defendant has the power to do so without the assistance of, and despite competition from, any existing or potential competitors.

- In Plaintiffs' alleged primary ticketing services markets, the prices in question are what the ticketers, such as Ticketmaster, receive by way of compensation under the terms of their contracts with "major concert venues."

- In Plaintiffs' alleged amphitheaters market, the prices in question are the prices that Plaintiffs claim artists pay to rent the amphitheaters.

To prove monopoly power in this way, Plaintiffs must also prove that the relevant Defendant (Live Nation or Ticketmaster) has the power to maintain prices above a competitive level for a significant period of time. If the relevant Defendant attempted to maintain prices above competitive levels, but would lose so much business to other competitors that the price increase would become unprofitable and would have to be withdrawn, then that Defendant does not have monopoly power.

The ability to earn high profit margins or a high rate of return does not necessarily mean that any Defendant has monopoly power. Other factors may enable a company without monopoly power to sell at higher prices or earn higher profit margins than its competitors, such as superior products or services, low costs, or superior advertising or marketing.

However, an ability to sell at higher prices or earn higher profit margins than other companies for similar goods or services over a long period of time may be evidence of monopoly power. By contrast, evidence that a defendant would lose a substantial amount of sales if it raised prices substantially, or that a defendant's profit margins were low compared to its competitors, or that a defendant's margins go up and down or are steadily decreasing, tends to suggest that the defendant does not have monopoly power.

*Reducing Quality Or Output Below Competitive Levels*

Another way Plaintiffs may prove that the relevant Defendant (Live Nation or Ticketmaster) has monopoly power is by showing that the Defendant has the ability to reduce the quality of its product without losing meaningful sales. This is similar to the point I just described regarding price. If the relevant Defendant had the ability to reduce quality below competitive levels without losing so much business to other competitors that the reduction would become unprofitable and would have to be withdrawn, then that Defendant does not have monopoly power.

Another way of showing monopoly power is through evidence that a firm has the ability to affect marketwide prices by reducing its own output. Output for these purposes refers to the amount of its products or services that a firm chooses to produce.

*Power to Exclude Competition*

Alternatively, Plaintiffs may prove that the relevant Defendant has monopoly power by proving that the Defendant has the ability to exclude or block competition.

Excluding competition means more than competing to keep one's business. It means that a firm does not need to compete hard because it has been able to prevent other firms from competing effectively. If new competitors can enter the relevant market or existing competitors can compete for new opportunities as they arise, then that Defendant does not have monopoly power.

**Post-Instruction No. 24**

### EXISTENCE OF MONOPOLY POWER—INDIRECT PROOF

Now I will instruct you on how Plaintiffs can provide indirect proof of monopoly power in a relevant market via indirect evidence.

Indirect evidence is evidence regarding the structure of the relevant market. If this evidence establishes that the relevant Defendant (Live Nation or Ticketmaster) has the power to control price, restrict output, or exclude competition in the relevant market, then you may conclude that the Defendant has monopoly power in that market. By contrast, if the relevant Defendant does not have the power to control price, restrict output, or exclude competition in the relevant market, then you may conclude that the Defendant lacks monopoly power. I will now explain the structural factors you may consider in more detail.

*Market Share*

One factor that you should consider is the relevant Defendant's share of the relevant market. While market share is not the equivalent of monopoly power, it is relevant to your determination of whether Plaintiffs have proven monopoly power. The relevant Defendant (Live Nation or Ticketmaster) must have a significant share of the market in order to possess monopoly power.

A market share of over 70 percent is usually strong evidence of monopoly power. A market share below 50 percent is rarely evidence of monopoly power, and a share between 50 percent and 70 percent can occasionally show monopoly power. Nonetheless, such evidence does not conclusively establish monopoly power. In evaluating whether the relevant Defendant's market share supports a finding of monopoly power, you should also consider other aspects of the relevant market, including market share trends, the existence of barriers to entry, the entry and exit by other companies, and the number and size of competitors. Along with the relevant Defendant's market share, these factors should inform you as to whether the relevant Defendant has monopoly power.

*Market Share Trends*

The trend in the relevant Defendant's market share is something you may consider. An increasing market share may strengthen an inference that a company has monopoly power, particularly where that company has a high market share, while a decreasing share might show that a company does not have monopoly power.

*Barriers to Entry*

You may also consider whether there are barriers to entry or expansion in or into the relevant market. Barriers to entry or expansion make it difficult for new competitors to enter the relevant market in a meaningful and timely way, or for existing competitors to sell more of a product that they already sell in the relevant market. Barriers to entry or expansion in the alleged ticketing markets might include, but are not limited to, whether there is a large financial investment required to develop new ticketing technologies; whether existing ticketing companies do not have the capacity to sell primary ticketing services to more of the venues Plaintiffs call "major concert venues"; whether there are specialized marketing practices to what Plaintiffs call "major concert venues"; and the reputation of the companies already participating in the market (or the brand recognition of their products).

Evidence of low or no entry barriers in the alleged ticketing markets may be evidence that the relevant Defendant does not have monopoly power, regardless of the Defendant's market share, because new competitors could enter easily, or existing competitors could expand, if the Defendant attempted to raise prices or reduce quality for a substantial period of time. For example, you may consider evidence that other existing ticketing companies have the capacity and ability to sell primary ticketing services to some of what Plaintiffs call "major concert venues" if Ticketmaster tried to increase ticketing prices to venues as evidence that neither Defendant has monopoly power in the alleged ticketing markets, despite their alleged market shares. By contrast, evidence of high barriers

to entry along with high market share may support an inference that the relevant defendant has monopoly power.

*Entry and Exit by Other Companies*

The history of entry and exit in the relevant market may be helpful to consider. Entry of new competitors or expansion of existing competitors may be evidence that a defendant lacks monopoly power. On the other hand, departures from the market, or the failure of firms to enter the market, particularly if prices and profit margins are relatively high, may support an inference that a defendant has monopoly power in that market.

*Number and Size of Competitors*

You may consider whether Live Nation's competitors in the alleged amphitheater market, or Ticketmaster's competitors in the alleged ticketing markets, are capable of effectively competing. In other words, you should consider whether the financial strength, market shares, and number of competitors act as a check on each Defendant's ability to increase the price or lower the quality of its services. If Ticketmaster's competitors in the alleged ticketing markets are strong or have meaningful or increasing market shares, this may be evidence that Ticketmaster lacks monopoly power in those markets. On the other hand, if you determine that Ticketmaster's competitors are weak or have small or declining market shares, this may support an inference that Ticketmaster has monopoly power. Similarly, if Live Nation's competitors in the alleged amphitheater market are strong or have meaningful or increasing market shares, this may be evidence that Live Nation lacks monopoly power in that market. On the other hand, if Live Nation's competitors are weak or have small or declining market shares, this may support an inference that Live Nation has monopoly power.

You may find that a Defendant has monopoly power based on direct evidence, indirect evidence, or both. If you find that a Defendant has monopoly power in a relevant market, then you must consider the remaining elements of Plaintiffs' monopolization claim as to that market. If you

find that a Defendant does not have monopoly power in a relevant market, then you must find for that Defendant and against Plaintiffs on the monopolization claim as to that relevant market.

**Post-Instruction No. 25**

**MONOPOLIZATION ELEMENTS #3-#4: WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY POWER THROUGH ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT, AND ANTICOMPETITIVE EFFECT**

If you find that Plaintiffs have met their burden of proving (a) a relevant market, and (b) that a Defendant possessed monopoly power in that relevant market, then you must turn to the third and fourth elements of Plaintiffs' monopolization claim regarding that particular market and that particular Defendant. Plaintiffs must prove by a preponderance of the evidence that (c) the Defendant willfully acquired or maintained monopoly power in that relevant market through anticompetitive or exclusionary conduct, and (d) that that conduct had a substantial anticompetitive effect in the relevant market.

Anticompetitive or exclusionary conduct means acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market. Acts are not anticompetitive or exclusionary unless they have anticompetitive effect. That is, the acts must harm the competitive process and thereby harm the customers of the products or services in the relevant market at issue. In Plaintiffs' alleged primary ticketing markets, the customers are the 257 venues Plaintiffs call "major concert venues." In Plaintiffs' alleged amphitheaters market, the customers according to Plaintiffs are artists. Harm to one or more competitors will not suffice; Plaintiffs must demonstrate that the monopolist's conduct harmed competition, not just a competitor.

Harm to competition includes evidence of increased prices, decreased production levels, and reduced quality, though not all increases in prices, decreases in production levels or reductions in quality harm competition. It may also include substantially constrained consumer choice in the market. Or it may include conduct that has significantly restricted competitors' ability to enter the

> **Commented [A3]:** As previously noted, the Court has adopted language here from *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 182 (2d Cir. 2016) and , *North American Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 42 (2d Cir. 2018), but doesn't go further to read into *MacDermid's* dicta an additional, narrower, requirement of showing the types of effects that defendants argue are required. However, the Court agrees with defendants' argument in their 50(a) motion that reduced customer choice is not an automatic harm to competition, Dkt. 1389 at 18, and agrees that *MacDermid* doesn't endorse that proposition. That's why the adopted language clarifies that not just any impact on consumer choice will do, drawing the "substantial" language from cases like *Ohio v. American Express*, 585 U.S. 529, 541 (2018), and *NCAA v. Alston*, 594 U.S. 69, 96 (2021).

relevant market and compete—in other words, whether the challenged behavior created significantly higher barriers to entry. You should weigh the evidence as a whole and consider all of the alleged exclusionary conduct, including the interrelated effects of the different conduct in aggregate to reach your determination.

The mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws. Similarly, the acquisition or maintenance of monopoly power by supplying better products or services, possessing superior business skills, or because of prior history or luck, is not unlawful. A monopolist may compete aggressively without violating the antitrust laws, and a monopolist may charge monopoly prices without violating the antitrust laws. Similarly, the mere fact that a business prefers to use its own goods or services, or is "vertically integrated," is not anticompetitive by itself. Instead, a monopolist's conduct only becomes unlawful if the monopolist either obtained or maintained its monopoly power through anticompetitive or exclusionary conduct, that is, acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market, and which had an anticompetitive effect in the relevant market.

In determining whether a particular Defendant's conduct was anticompetitive or exclusionary and had a substantial anticompetitive effect in the relevant market, or whether it was legitimate business conduct, you should determine whether the conduct is consistent with competition on the merits, whether the conduct provides benefits to consumers, and whether the conduct would make business sense apart from any effect it has on excluding competition or harming competitors.

If you find that Plaintiffs have proven by a preponderance of the evidence that a particular Defendant engaged in anticompetitive or exclusionary conduct in a relevant market that had substantial anticompetitive effect, then you may consider procompetitive justifications for that conduct offered by that Defendant. Procompetitive justifications are nonpretextual claims that the conduct was indeed

**Commented [A4]:** The Court has included this instruction, reflecting the guidance in Areeda & Hovenkamp Paragraph 310c7 ("In one sense the aggregation problem that arises when assessing exclusionary practices is similar to the problem of proving agreement. The fact finder should be permitted to consider the entire sum of unlawful exclusionary practices and their impact. Certainly for purposes of measuring damages such aggregation would be in order. One can imagine a case in which a half dozen independently unlawful acts each had an impact insufficient to warrant antitrust relief, but the impact of the aggregation was substantial.").

a form of competition on the merits because it involved, for example, greater efficiency or enhanced consumer appeal. If you find that Defendant has offered such justifications, then you must determine whether Plaintiffs have proven by a preponderance of the evidence that the anticompetitive harm of the anticompetitive or exclusionary conduct at issue outweighs its procompetitive benefits. Conduct is anticompetitive or exclusionary only if its competitive harm outweighs its competitive benefits. In making this determination, your focus should be on the effect of the conduct, not on the intent behind it.

If you find that any Defendant willfully acquired or maintained monopoly power through anticompetitive or exclusionary conduct in a relevant market, and that this conduct had substantial anticompetitive effects in that market, then you must find for Plaintiffs on that claim. If you find that a Defendant did not willfully acquire or maintain monopoly power through anticompetitive or exclusionary conduct in a relevant market, or that this conduct did not have a substantial anticompetitive effect in the market, then you must find for that Defendant and against Plaintiffs on the monopolization claim as to that market.

**Post-Instruction No. 26**

**ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT—EXCLUSIVE DEALING
SHERMAN ACT SECTION 2**

I will now provide some additional detail on one particular type of anticompetitive conduct Plaintiffs have alleged in this case. Plaintiffs have alleged that Ticketmaster entered into long-term, exclusive primary ticketing contracts with what Plaintiffs call "major concert venues" that generally require the venue to use Ticketmaster as the exclusive primary ticketer for all events or for all concerts. Such contracts are called "exclusive dealing" contracts because they require buyers, here certain venues, to buy a product or service exclusively (or almost exclusively) from one seller, here Ticketmaster, for a period of time.

Exclusive dealing is not in itself anticompetitive. Exclusive dealing contracts will generally only be unlawful where the market is highly concentrated, the defendant possesses significant market power, and there is some element of coercion present.

To establish that Ticketmaster's exclusive dealing is anticompetitive, Plaintiffs must prove: (i) significant market power by the Defendant, here Ticketmaster; (ii) substantial foreclosure of the market, that is, whether the exclusive dealing barred a substantial number of competitors or severely restricted the market's ambit; (iii) contracts of sufficient duration to prevent meaningful competition by rivals; and (iv) anticompetitive effects in the relevant market in light of any procompetitive effects. You may also consider (v) whether exclusive contracts result from coercive behavior, i.e., because Ticketmaster coerced the venue into an exclusive contract that the venue did not want at all or would have preferred to be non-exclusive, or because venues preferred exclusive contracting for their own reasons; (vi) the ability of customers to terminate the agreements; and (vii) the use of exclusive dealing by competitors of the defendant.

**Post Instruction No. 27**

### LIVE NATION'S LIABILITY FOR TICKETMASTER'S ALLEGED CONDUCT

If you find that Plaintiffs have proven by a preponderance of the evidence each element of their claim that Ticketmaster has (1) monopolized the primary ticketing market for what Plaintiffs define as "major concert venues" or (2) monopolized the primary concert ticketing market for major concert venues, then you should find for Plaintiffs and against Ticketmaster on that claim.

As to each claim that you find for Plaintiffs and against Ticketmaster, you should then also decide whether Live Nation should also be held liable for Ticketmaster's conduct. If you find by a preponderance of the evidence that Live Nation controlled, dictated or encouraged Ticketmaster's unlawful conduct, then you should find Live Nation liable on that claim. If you do not find that Plaintiffs have proven, by a preponderance of the evidence, that Live Nation controlled, dictated or encouraged Ticketmaster's unlawful conduct, then Live Nation is not liable on that claim.

**Post-Instruction No. 28**

**UNLAWFUL TYING AGAINST LIVE NATION**

Plaintiffs also claim that Live Nation engaged in an unlawful tying arrangement in violation of Section 1 of the Sherman Act. This claim is against Live Nation, and not Ticketmaster. This is a separate claim that is subject to different rules, which I will explain now.

A tying arrangement is one in which the seller will sell one product or service (referred to as the tying product) only on the condition that buyers also purchase a different product or service (referred to as the tied product) from the seller, or that buyers at least agree not to purchase the tied product or service from any other seller. In this case, Plaintiffs claim that the tying product is the use of what they call "large amphitheaters" by artists, and the tied product is promotion services to touring artists. Plaintiffs claim that Live Nation requires touring artists to use Live Nation's promotion services if those artists want to perform at so-called "large amphitheaters" owned, operated, or controlled by Live Nation.

In assessing Plaintiffs' tying claim, you should know that, as a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing. This means that businesses have no general duty to deal with their competitors. Live Nation has no obligation to rent its amphitheaters to rival promoters. And it is not unlawful for Live Nation to refuse to do so.

To prevail on their tying claim, Plaintiffs must prove each of the following elements by a preponderance of the evidence:

1.     Artists themselves, and not Live Nation's concert promoter competitors, are the customers who rent amphitheaters from Live Nation;

**Commented [A5]:** The Court has used the elements of tying as articulated in cases like *Kaufman v. Time Warner*, 836 F.3d 137 (2d Cir. 2016), but has adapted the coercion prong to clarify that coercion may be satisfied by a combination of market power and a policy, reflecting the Second Circuit's articulation that "the seller must have sufficient market power in the market for the tying product to coerce the purchase of the tied product." *Id.* at 141; *see also Hill v. A-T-O, Inc.*, 535 F.2d 1349, 1355 (2d Cir. 1976) ("An unremitting policy of tie-in, if accompanied by sufficient market power in the tying product to appreciably restrain competition in the market for the tied product constitutes the requisite coercion."). The Court notes that the Second Circuit has not distinguished between per se and rule of reason theories in its caselaw on tying, either in more recent cases like *Kaufman*, or in the older cases discussed in the Court's ruling on Live Nation's motion for reconsideration Dkt. 1094 at 2–5.

2.     The use (i.e., rental) of "large amphitheaters", which Plaintiffs define as those amphitheaters with a capacity of 8,000 or more that hosted 10 or more concerts in at least one year from 2017 to 2024, by artists (the tying product) and promotion services to touring artists (the tied product) are separate and distinct products.

3.     Live Nation enforced a policy that conditioned artists' use of "large amphitheaters" on artists also purchasing Live Nation's promotion services.

4.     Live Nation has sufficient market power with respect to the use of what Plaintiffs call "large amphitheaters" by artists to enable Live Nation to coerce artists to purchase Live Nation's promotion services.

5.     Live Nation uses coercion to force artists to purchase Live Nation's promotion services.

6.     The tie has anticompetitive effects in the tied market, which is the market for promotion services in which the artists are customers.

7.     The alleged tying arrangement affected a not insubstantial volume of interstate commerce in promotion services to artists.

If you find that Plaintiffs have proved these elements by a preponderance of the evidence, then you must find for Plaintiffs and against Live Nation on Plaintiffs' tying claim. If you find that Plaintiffs have failed to prove any one of these elements, then you must find for Live Nation and against Plaintiffs on Plaintiffs' tying claim.

I will now provide additional detail on these elements.

**Post-Instruction No. 29**

**UNLAWFUL TYING— ELEMENT #1: IDENTITY OF THE PURCHASER**

An illegal tying arrangement requires that at least two products and/or services be purchased by one buyer. Therefore, the first thing you must decide is who is the customer that actually purchases the alleged tying product here, which is rental of amphitheaters.  Plaintiffs contend that artists are the customers that rent amphitheaters. Live Nation contends that promoters, not artists, are the customers that rent amphitheaters.

If you decide that promoters, not artists, are the customers that rent amphitheaters, you should find for Live Nation and against Plaintiffs on this claim. If, however, you find that artists are the customers that rent amphitheaters from Live Nation, you should go on to consider whether Plaintiffs have proven the other elements of this claim.

**Post-Instruction No. 30**

**UNLAWFUL TYING— ELEMENT #2: PRESENCE OF TWO PRODUCTS**

To determine whether use of so-called "large amphitheaters" by artists and promotion services to artists are separate and distinct products, you should consider whether there would be demand for each of them if they were offered separately. If enough artists would want to purchase the use of so-called "large amphitheaters" and promotion services separately to induce venues and promoters generally to provide each service separately, then each service is a separate service. On the other hand, if there is very little demand for artists to buy one of the services by itself, that is, without the other service, then the use of the "large amphitheaters"," meaning amphitheaters with a capacity of 8,000 or more that hosted 10 or more concerts in at least one year from 2017 to 2024, by artists and promotion services to touring artists are not two separate products for the purposes of the tying claim, even if they are sometimes sold separately.

Services may be separate services even if one of them is useless without the other. The relevant issue is whether there is sufficient demand from customers to induce sellers to provide them separately, even if the customer needs to obtain both products from one or more suppliers.

Note that if you find that Plaintiffs fail to prove that artists' use of "large amphitheaters" is a relevant market, then you should not go on to consider any other element of this claim. Instead, you should find for Live Nation and against Plaintiffs on the Section 1 tying claim. Only if you find that Plaintiffs proved that alleged market, and that the use of large amphitheaters and promotion services are separate products, should you go on to consider whether Plaintiffs proved the other elements of this claim.

**Post-Instruction No. 31**

**UNLAWFUL TYING— ELEMENT #3: PROOF OF CONDITIONING**

You may find that an illegal tying arrangement exists between the use of what Plaintiffs define as "large amphitheaters" by artists and promotion services to touring artists only if you find that Live Nation enforced a policy that conditioned the rental of its "large amphitheaters" on an artist's agreement to buy Live Nation's promotion services when the artists would have preferred to buy promotion services elsewhere.

**Post-Instruction No. 32**

**UNLAWFUL TYING— ELEMENT #4: MARKET POWER IN THE TYING MARKET**

To find that an illegal tying arrangement exists, you must also find that Live Nation has sufficient market power in the market for the use of what plaintiffs define as "large amphitheaters," by artists such that Live Nation can coerce artists into using its promoters. Market power is the ability of a single seller to raise prices, restrict output, or exclude competition. You may assess market power by considering the same things I instructed you on for assessing monopoly power earlier.  For example, market share is a proxy for market power but you should also consider other aspects of the relevant market, including market share trends, the existence of barriers to entry, the entry and exit by other companies, and the number and size of competitors.

**Post-Instruction No. 33**

### UNLAWFUL TYING—ELEMENT #5: COERCION

To find that an illegal tying arrangement exists, you must also find that Live Nation coerced artists into buying Live Nation's promotion services. To prove coercion, Plaintiffs must prove by a preponderance of the evidence that Live Nation exploited its control over the use of what Plaintiffs call "large amphitheaters" controlled by Live nation to force artists into the purchase of promotion services, which the artists either did not want at all or would have preferred to purchase from a different promoter on different terms, and that any appearance of choice is illusory. An unremitting policy of tying the products together, together with market power in the market for the tying product, is sufficient to show coercion.

**Post-Instruction No. 34**

### UNLAWFUL TYING—ELEMENT #6: ANTICOMPETITIVE EFFECTS FOR THE TIED PRODUCT

The next element is whether the alleged tying arrangement has had anticompetitive effects as to promotion services available to artists who want to use promotion services, for example by raising the price of promotion services paid by those artists, or by lowering the quality or amount of those services. I have previously instructed you on competitive harm and anticompetitive effects in connection with Plaintiffs' monopolization claims. The same rules apply in determining whether this element has been satisfied.

**Post-Instruction No. 35**

### UNLAWFUL TYING— ELEMENT #7: NOT INSUBSTANTIAL AMOUNT OF INTERSTATE COMMERCE

The last element is whether the alleged tying arrangement involved a not insubstantial amount of interstate commerce in promotion services.

For commerce to be considered interstate, it must have a nexus to commerce that affects or touches more than one state. In determining whether the tying arrangement involved a not insubstantial amount of interstate commerce, you should consider the total dollar amount of Live Nation's sales of promotion services to all touring artists in interstate commerce achieved by the tying arrangement in absolute terms.

**Post-Instruction No. 36**

## STATE LAW CLAIMS

In addition to the claims that the Plaintiff States have brought under the Sherman Act, some Plaintiff States have brought claims under their own state laws. I will proceed to instruct you on those state law claims now.

**Post-Instruction No. 37**

### CONGRUENT STATE CLAIMS

Certain Plaintiffs are alleging violations of their state laws that are congruent with Section 1 or 2 of the Sherman Act. That means these state laws have the same elements as Section 1 or 2 of the Sherman Act. If you find that a Plaintiff State has proven every element of a Sherman Act Section 1 or 2 claim for a particular Defendant, and that the proven conduct harmed competition in that Plaintiff State, then for the state statutes listed below, you must find that the Plaintiff State has also proven the elements of its State statute as to that particular Defendant. If you find that a Plaintiff State has not proven every element of any Sherman Act claim for a particular Defendant, or that the conduct did not harm competition in that Plaintiff State, then for the state statutes listed below, you must find for that Defendant and against that Plaintiff State.

- The Arizona Uniform State Antitrust Act, A.R.S. § 44-1401 *et seq*;

- the Colorado Antitrust Act of 2023, Colo. Rev. Stat. 6-4-101, *et seq.*;

- the Connecticut Antitrust Act, Conn. Gen. Stat. § 35-24 *et seq.*;

- the District of Columbia Antitrust Act, D.C. Code § 28-4501 *et seq.*;

- the Florida Antitrust Act, Fla. Stat. § 542.15 *et seq.*;

- the Louisiana Unfair Trade Practices Act, LSA-R.S. 51:1401 *et seq.*;

- the Maryland Antitrust Act, MD Commercial Law Code Ann. § 11-201 *et seq.*;

- the Michigan Antitrust Reform Act, MCL 445.771 *et seq.*;

- the Minnesota Antitrust Law of 1971, Minn. Stat. §§ 325D.49–325D.66;

- the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. § 598A.010 *et seq.*;

- the New Hampshire Revised Statutes Annotated § 356 *et seq.*;

- the New Jersey Antitrust Act, N.J.S.A. § 56:9-1 *et seq.*;

- the New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-1 and 57-1-2;

- the North Carolina Unfair or Deceptive Trade Practices Act, N.C.G.S. § 75-1 *et seq.*;

- the Valentine Act, Ohio Rev. Code Chapter 1331;

- the Rhode Island Antitrust Law, R.I. Gen. L. §§ 6-36-4 and 6-36-5;

- the Texas Business and Commerce Code § 15.01 *et seq.*;

- the Utah Antitrust Act, Utah Code §76-16-510;

- the Virginia Antitrust Act, Va. Code § 59.1-9.1 *et seq.*;

- the Washington Consumer Protection Act, Wash. Rev. Code §§ 19.86.030 and 19.86.040;

- the West Virginia Antitrust Act, W. Va. Code § 47-18-1 *et seq.*; and

- Wisconsin Statutes Chapter 133.

**Post-Instruction No. 38**

### CALIFORNIA UNFAIR COMPETITION LAW
### (CAL. BUS. & PROF. CODE § 17200 *ET SEQ.*)

The State of California alleges that each Defendant has violated California's Unfair Competition Law, which prohibits unfair competition through unlawful or unfair business acts or practices.

For the State of California to prevail on its claim under the Unfair Competition Law, you must find that the State of California has proven each of the following elements by a preponderance of the evidence as to each Defendant:

1. The Defendant engaged in a business act or practice;

2. The act or practice occurred within California, emanated from California, or harmed California residents; and

3. The act or practice is either unlawful or unfair.

To determine whether acts or practices emanate from California, you may consider the location of the firm's headquarters, executives, or other employees involved in the conduct; where the relevant materials were created; where the relevant policies at issue were developed or executed; and where the firm conducts business.

*Unlawful*

To establish a violation of the unlawful prong of the California Unfair Competition Law, the State of California must prove by a preponderance of the evidence that each Defendant has violated another law, and that the act or practice that violated that other law occurred within California or emanated from California or harmed California residents. Therefore, if you find for Plaintiffs on another claim and that the associated act or practice occurred within California or emanated from

California or harmed California residents, you must find that the Defendant who committed that act or practice violated the unlawful prong of California's Unfair Competition Law.

*Unfair*

To establish a violation of the unfair prong of the California Unfair Competition Law, the State of California must prove by a preponderance of evidence that each Defendant has:

1. engaged in conduct that threatens a violation of the antitrust laws or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition; or

2. engaged in a business act or practice for which the harm to consumers outweighs the utility of the conduct.

These tests are not mutually exclusive and you may find that Plaintiffs have proven a violation of (1) or (2) or both (1) and (2). It is not necessary to show that the defendant intended to injure anyone.

A business act or practice may be unfair even if not prohibited by some other law such as the Sherman Act. That is to say, the elements of the monopolization, exclusive dealing, and tying claims that I previously described to you do not apply to this claim. Instead, you should follow these instructions when deciding whether California has proven its UCL claim by a preponderance of the evidence.

**Post-Instruction No. 39**

**FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT (FLA. STAT. § 501.204)**

The State of Florida alleges that Defendants' anticompetitive conduct violated the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), which broadly prohibits persons from engaging in unfair methods of competition in the conduct of any trade or commerce based in or directed toward the State of Florida.

To establish a violation of the FDUTPA based on anticompetitive conduct, Florida must prove by a preponderance of the evidence that each Defendant engaged in an unfair method of competition.

*Unfair Methods of Competition*

A method of competition is "unfair" if the conduct goes beyond competition on the merits. Competition on the merits may include, for example, superior products or services, superior business skills, or truthful marketing and advertising practices. Conduct goes beyond competition on the merits if it is coercive, exploitative, collusive, abusive, deceptive, predatory, or exclusionary and tends to foreclose competition. To be "unfair," the act or practice must cause or be likely to cause substantial injury to consumers which is not reasonably avoidable and not outweighed by countervailing benefits to consumers or to competition.

Violations of antitrust laws also constitute "unfair methods of competition" under the FDUTPA. Therefore, if you find that the State of Florida proves by a preponderance of the evidence that each Defendant violated the Sherman Act through conduct based in or directed toward the State of Florida, you may find that such conduct by such Defendant also violated the FDUTPA. However, it is not necessary to find such a violation if the Defendant's conduct was otherwise unfair.

**Post-Instruction No. 40**

**ILLINOIS ANTITRUST ACT (740 ILCS 10/1 ET SEQ.)**

The State of Illinois has brought claims under the Illinois Antitrust Act Illinois's claims under the Illinois Antitrust Act are based on the same conduct as its claims under the Sherman Act. However, they have some additional requirements. *Section 1*: The elements of proof for claims under this statute are the same as under Section 1 of the Sherman Act. If you find for Plaintiffs and against Live Nation on Plaintiffs' claim under Section 1 of the Sherman Act for unlawful tying, and Illinois proves by a preponderance of the evidence that the conduct harmed competition in Illinois, then you must find for the State of Illinois and against Live Nation on those same claims under the Illinois Antitrust Act. If you find for Live Nation on Plaintiffs' claim under Section 1 of the Sherman Act for unlawful tying, you must find for Live Nation under that same claim under the Illinois Antitrust Act.

*Section 2*: For claims under the Illinois Antitrust Act involving monopolization, the elements of proof are the same as under Section 2 of the Sherman Act, except the State of Illinois must also prove that Defendants acted with the purpose of excluding competition or controlling, fixing, or maintaining prices in the relevant market. If you find for Plaintiffs and against one or more Defendants under Plaintiffs' claims under Section 2 of the Sherman Act, and Illinois proves by a preponderance of evidence that one or more Defendants acted with the purpose of excluding competition or controlling, fixing, or maintaining prices in the relevant market, and that the conduct harmed competition in Illinois, then you must also find for the State of Illinois on those same claims under the Illinois Antitrust Act and against the relevant Defendant. If you find for one or more Defendants on Plaintiffs' claims under Section 2 of the Sherman Act, or that the State of Illinois fails to prove that one or more Defendants acted with the purpose of excluding competition or controlling, fixing, or

maintaining prices in the relevant market, then you must find for the relevant Defendants for that claim under the Illinois Antitrust Act.

**Post-Instruction No. 41**

**INDIANA ANTITRUST ACT (IND. CODE §§ 24-1-2-1 AND 24-1-2-2)**

The State of Indiana has brought claims under the Indiana Antitrust Act. The State of Indiana is authorized to bring claims under this Act only for conduct that occurred after July 1, 2023. So conduct that occurred before July 1, 2023 cannot form a basis for liability under this statute. If the State of Indiana fails to provide evidence of conduct that occurred and harmed competition in Indiana after July 1, 2023, you must find for Defendants on this claim.

For conduct that occurred after July 1, 2023, if you find that the State of Indiana has proven every element of a Sherman Act Section 1 or Section 2 claim against a particular Defendant, and that the particular Defendant's conduct harmed competition in Indiana, then you may find that the State of Indiana has also proven the elements of the Indiana Antitrust Act as to that particular Defendant.

**Post-Instruction No. 42**

**KANSAS RESTRAINT OF TRADE ACT (KAN. STAT. ANN. § 50-101 ET SEQ.)**

The State of Kansas has brought claims under the Kansas Restraint of Trade Act, Kan. Stat. Ann. § 50-101 *et seq.* Kansas's claims under the Kansas Restraint of Trade Act are based on the same conduct as its claims under the Sherman Act.

For claims under the Kansas involving the restraint of competition by contracts, agreements, arrangements, or combinations, the elements of proof are the same as under Section 1 of the Sherman Act. If you find for Plaintiffs and against Live Nation on Plaintiffs' claim under Section 1 of the Sherman Act regarding unlawful tying, and Kansas proves by a preponderance of the evidence that the conduct harmed competition in Kansas, then you must also find for the State of Kansas and against Live Nation on those same claims under the Kansas Restraint of Trade Act.

If you find for Live Nation under Plaintiffs' claim under Section 1 of the Sherman Act for unlawful tying, you must find for Live Nation under that same claim under the Kansas Restraint of Trade Act. The elements of proof for monopolization claims under this statute are the same as under Section 2 of the Sherman Act, except the State of Kansas must also prove the existence of concerted or joint action with another party. If you find for Plaintiffs and against one or more Defendants on Plaintiffs' monopolization claims under Section 2 of the Sherman Act, and Kansas proves by a preponderance of the evidence that one or more Defendants acted jointly or in concert with another party, and that one or more Defendants' conduct harmed competition in Kansas, then you must also find for the State of Kansas on those same claims under the Kansas Restraint of Trade Act and against the relevant Defendants. If you find for one or more Defendants on Plaintiffs' claims under Section 2 of the Sherman Act, or that the State of Kansas failed to prove that one or more Defendants acted

jointly or in concert with another party, then you must find for the relevant Defendants under those

claims under the Kansas Restraint of Trade Act.

**Post-Instruction No. 43**

**DONNELLY ACT (NEW YORK GENERAL BUSINESS LAW §§ 340 ET SEQ.)**

The State of New York has brought claims under the Donnelly Act, New York General Business Law §§ 340 *et seq.* New York's claims under the Donnelly Act are based on the same conduct as its claims under the Sherman Act.

For claims under the Donnelly Act involving the restraint of competition by contracts, agreements, arrangements, or combinations, the elements of proof are the same as under Section 1 of the Sherman Act. If you find for Plaintiffs and against Live Nation on Plaintiffs' claim under Section 1 of the Sherman Act regarding unlawful tying, and New York proves by a preponderance of the evidence that the conduct harmed competition in New York, then you must also find for the State of New York and against Live Nation on those same claims under the Donnelly Act. If you find for Live Nation under Plaintiffs' claim under Section 1 of the Sherman Act for unlawful exclusive dealing or unlawful tying, you must find for Live Nation under that same claim under the Donnelly Act.

For claims under the Donnelly Act involving monopolization, the elements of proof are the same as under Section 2 of the Sherman Act, except the State of New York must also prove that the establishment or maintenance of the monopoly involved a contract, agreement, arrangement, or combination. If you find for Plaintiffs and against one or more Defendants under Plaintiffs' monopolization claims under Section 2 of the Sherman Act, and New York proves by a preponderance of the evidence that those monopolies were established or maintained through one or more contracts, agreements, arrangements, or combinations, and that the conduct harmed competition in New York, then you must also find for the State of New York and against the relevant Defendant on those same claims under the Donnelly Act. If you find for one or more Defendants on Plaintiffs' claims under Section 2 of the Sherman Act, or the State of New York fails to prove the existence of a contract,

agreement, arrangement, or combination in connection with that claim, then you must find for the relevant Defendant under those claims under the Donnelly Act.

**Post-Instruction No. 44**

### SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT
### (S.C. CODE ANN. § 39-5-10 ET SEQ.)

The state of South Carolina alleges that each Defendant's conduct violates the South Carolina Unfair Trade Practices Act (S.C. Code Ann. § 39-5-10 *et seq.*), SCUTPA provides that "[u]nfair methods of competition and unfair [] acts or practices in the conduct of any trade or commerce are… unlawful."

For the State of South Carolina to prevail on this claim, you must find for each Defendant separately that:

1. The Defendant engaged in an act or practice in trade or commerce.

2. The act or practice is unfair.

3. The act or practice has an impact on the public interest.

The words "trade" and "commerce" include the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity or thing of value wherever situated, and any trade or commerce directly or indirectly affecting the people of South Carolina.

The act or practice alleged must be unfair. An act or practice is "unfair" when it is offensive to public policy or when it is immoral, unethical, or oppressive. Whether an act or practice is unfair within the meaning of the Act depends upon the surrounding facts and the impact of the transaction on the marketplace.

Unfair acts or practices in the conduct of trade or commerce have an impact upon the public interest if the acts or practices have the potential for repetition. While not the only means for showing potential repetition, potential for repetition may be shown by:

1. showing the same kind of actions occurred in the past, thus making it likely they will continue to occur absent deterrence; or

2.    showing the company's procedures create a potential for repetition of the unfair acts.

**Post-Instruction No. 45**

**TENNESSEE TRADE PRACTICES ACT**
**(TENN. CODE ANN. §§ 47-25-101 AND 102)**

The State of Tennessee has brought claims under the Tennessee Trade Practices Act. The State of Tennessee is authorized to bring claims under this Act only for conduct that occurred after April 23, 2024. So conduct that occurred before April 23, 2024 cannot form a basis for liability under this statute. If the State of Tennessee fails to provide evidence of conduct that occurred and harmed competition in Tennessee after April 23, 2024, you must find for Defendants on this claim.

For conduct that occurred after April 23, 2024, if you find that the State of Tennessee has proven every element of a Sherman Act Section 1 or Section 2 claim against a particular Defendant, and that the conduct harmed competition in Tennessee, then you may find that the State of Tennessee has also proven the elements of the Tennessee Trade Practices Act as to that claim and that particular Defendant.

**Post-Instruction No.  46**

**VERMONT CONSUMER PROTECTION ACT**
**(9 V.S.A. § 2451 ET SEQ.)**

The State of Vermont alleges that Defendants' conduct violates the Vermont Consumer Protection Act (9 V.S.A § 2451 *et seq.*).

For the State of Vermont to prevail on this claim, you must find that:

1.    Defendants engaged in an act or practice in commerce; and

2.    The act or practice is unfair.

An act or practice occurs "in commerce" when it takes place in the consumer marketplace in the context of a defendant's business, rather than in a private transaction; and (2) it has a potential harmful effect on consumers, constituting a breach of duty owed to consumers.

The act or practice alleged must be unfair. An act or practice is "unfair" when it (1) offends public policy even if it hasn't been previously considered unlawful; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers. Acts or practices are considered against public policy if they are in the realm of what is considered unfair as established by statutes, common law, or another established concept of unfairness.

When the State of Vermont brings a claim under the Vermont Consumer Protection Act, there is no requirement for the State to prove intent by the defendant to have acted unfairly.

**Post-Instruction No. 47**

### STATE DAMAGES CLAIMS

[Twenty-one] of the Plaintiff States—specifically, Arizona, Colorado, Connecticut, Florida, Illinois, Indiana, Michigan, Minnesota, Nevada, New Hampshire, New Jersey, New York, North Carolina, Pennsylvania, Rhode Island, South Carolina, Utah, Washington, West Virginia, Wisconsin, and the District of Columbia—are seeking damages from Ticketmaster on behalf of fans who purchased primary concert tickets for events at what Plaintiffs call "major concert venues." I may refer to these [21] States as "Plaintiff States claiming damages." The Plaintiff States claiming damages allege that residents of their States were overcharged on purchases of primary concert tickets for events at what Plaintiffs call "major concert venues."

If you find that any Plaintiff State claiming damages proved that Ticketmaster monopolized the market for primary concert ticketing services to "major concerts venues" in violation of Section 2 of the Sherman Act or those States' laws then you must decide if, as a result of any such violation, residents of that Plaintiff State were overcharged for primary concert tickets for events at what Plaintiffs call "major concert venues." If any Plaintiff State claiming damages fails to prove that as a result of Ticketmaster's conduct, residents of its particular State were overcharged for primary concert tickets, then that State is not entitled to any damages, and you need not do any further analysis for that State.

If any Plaintiff State claiming damages proves that residents of its State were overcharged as a result of the violations I just described, then you must determine whether that Plaintiff State has proved by a preponderance of the evidence the amount that residents of that particular Plaintiff State were overcharged on a per-ticket basis for their purchases of primary concert tickets for events at so-called "major concert venues." You are not being asked to determine the total number of tickets or

ticket purchasers affected.  You are only being asked to determine the per-ticket overcharge in each Plaintiff State claiming damages.

I remind you that you should not assume that any resident of any Plaintiff State claiming damages will receive any portion of any money the Plaintiff States might ultimately recover in this case.  And neither you nor any member of your family will receive any portion of any funds that the States may ultimately receive.

I will now provide further instructions on what each Plaintiff State claiming damages must prove before you may calculate any per-ticket overcharge for that State, and how you must calculate any such overcharge.

**Post-Instruction No. 48**

### INJURY AND CAUSATION

Each Plaintiff State claiming damages is entitled to recover damages only if it can establish these three elements of injury and causation:

1.   Residents in its State who purchased primary concert tickets to attend events at what Plaintiffs refer to as "major concert venues" were in fact injured as a result of Ticketmaster's alleged violations of the antitrust laws;

2.   Those injuries would not have occurred but for Ticketmaster's alleged antitrust violation; and

3.   Those injuries are of the type that the antitrust laws were intended to prevent.

The first element is sometimes referred to as "injury in fact" or "fact of damage." For each of the Plaintiff States claiming damages to establish that it is entitled to damages, it must prove that residents of its State who purchased primary concert tickets to attend events at any of what Plaintiffs call "major concert venues" were injured as a result of Ticketmaster's alleged monopolization of the market for primary concert tickets at what Plaintiffs call "major concert venues" in violation of Section 2 of the Sherman Act. It is important to understand that injury and amount of damage are different concepts and that you cannot consider the amount of any overcharge alleged by any particular State unless and until you have concluded that fans in that State were in fact injured.

Each Plaintiff State claiming damages must also offer evidence that establishes by a preponderance of the evidence that injuries to residents in that State were materially caused by Ticketmaster's alleged unlawful conduct. This means that each Plaintiff State claiming damages must have proven that some overcharge was imposed on residents in its State because of Ticketmaster's

alleged antitrust violation, and that such overcharge would not have been imposed but for the alleged antitrust violation.

Finally, each of the Plaintiff States claiming damages must establish that the alleged injuries to residents of its State are the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If the alleged injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then the alleged injuries are antitrust injuries. On the other hand, if the alleged injuries were caused by heightened competition or the competitive process itself, then the alleged injuries are not antitrust injuries and none of the Plaintiff States claiming damages can recover damages for those injuries under the antitrust laws.

In summary, if each of the Plaintiff States claiming damages can establish that residents of its State who purchased primary concert tickets to events at what Plaintiffs call "major concert venues" were in fact injured by Ticketmaster's conduct, that such injuries would not have occurred but for Ticketmaster's conduct, and that such injuries were the type that the antitrust laws were intended to prevent, then each such Plaintiff State is entitled to recover for the overcharge paid by such residents in each such Plaintiff State.

**Post-Instruction No. 49**

### STATUTE OF LIMITATIONS

A statute of limitations establishes a time limit for bringing a lawsuit. In doing so, the law seeks to eliminate stale claims, to promote justice by preventing surprises, and to provide security and stability to human affairs. Statutes of limitations ensure that a plaintiff does not wait, sleep on their rights, and allow damages to accumulate before bringing suit.

The statute of limitations for the claims in this case does not permit recovery for any injury to residents in any State suffered prior to May 23, 2020. That means that you may consider conduct that occurred prior to that date, but that any damages that you award in this case must be based on a finding, by a preponderance of the evidence, that Ticketmaster unlawfully monopolized the primary ticketing, or primary concert ticketing, market on or after May 23, 2020, even if that violation began earlier, and that this conduct that inflicted an injury to the plaintiff after May 23, 2020.

You can only find that each Plaintiff has proved the required elements of injury and causation if they have proven that the injury occurred on or after May 23, 2020.

**Commented [A6]:** The Court adopted this language, following *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 295 (2d Cir. 1979), which allowed for conduct before the limitations period to be considered as long as it extended into the period and the injury occurred during the limitation period. *See also* Areeda & Hovenkamp Paragraph 310c4.

**Post-Instruction No. 50**

### DAMAGES INSTRUCTIONS—GENERAL

If you find that any Plaintiff State claiming damages proved that Ticketmaster monopolized the alleged market for primary concert ticketing in violation of Section 2 of the Sherman Act and you also find that the Plaintiff State proved that any such violation caused injury to residents of its State who purchased primary concert tickets to events at what Plaintiffs call "major concert venues" within the statute of limitations, then you must determine the amount of the overcharge, if any, paid by those residents in that Plaintiff State. The fact that I am giving you instructions concerning the issue of damages does not mean that I believe any Plaintiff should, or should not, prevail in this case. If you find against Plaintiffs on their claims for monopolization of the alleged market for primary concert tickets at what Plaintiffs call "major concert venues" in violation of Section 2 of the Sherman Act and laws of the Plaintiff States claiming damages, , you should not consider the issue of damages, and you may disregard the damages instruction that I am about to give.

The law provides that each Plaintiff State claiming damages can recover based on the amount of per-ticket overcharge imposed on primary concert tickets purchased by residents of that State for events at one or more of the venues Plaintiffs call "major concert venues," only if you find that the overcharge was caused by the conduct that you have found to be unlawful.

Antitrust damages are only compensatory, meaning their purpose is to put injured persons, if any, as near as possible in the position in which they would have been had the alleged antitrust violation not occurred. The law does not permit you to award any additional overcharge amount to punish a wrongdoer—what we sometimes refer to as punitive damages—or to deter particular conduct in the future. Furthermore, you are not permitted to award to any of the Plaintiff States an amount for attorneys' fees or the costs of maintaining this lawsuit. Again, you are only being asked to determine the per-ticket overcharge paid by ticket purchasers in each Plaintiff State that proves the violations I

described and meets the injury and causation requirements I described.

**Post-Instruction No. 51**

## COMPENSATORY DAMAGES—OVERCHARGE

Each Plaintiff State claiming damages contends that its residents paid higher fees added to the face value of primary tickets to concerts that took place at so-called "major concert venues," because Ticketmaster allegedly charged those venues more money for primary ticketing services than Ticketmaster would have but for Ticketmaster's alleged anticompetitive conduct.

If you find that any Plaintiff State has proven that Ticketmaster violated the antitrust laws I previously described, and that ,as a result fans paid higher ticketing fees, then for each Plaintiff State that satisfies the other elements for damages in my previous instructions, you must determine the per-ticket overcharge amount paid by residents of that State for primary concert tickets for events at so-called "major concert venues." The per-ticket overcharge amount is the difference between what residents of the Plaintiff State paid for fees added to the face value of tickets sold in the primary market during the damages period, and the amount of ticket fees you find those residents of that State would have paid but for Ticketmaster's alleged anticompetitive conduct. You are not being asked to determine, and may not speculate as to, the total number of tickets or ticket purchasers affected by any overcharge.

81

**Post-Instruction No. 52**

### BASIS FOR CALCULATING OVERCHARGE

You are permitted to make just and reasonable estimates in determining the amount of the per-ticket overcharge for each Plaintiff State claiming damages that has proven it is entitled to recover damages. You are not required to calculate the amount of the overcharge with mathematical certainty or precision. However, the overcharge must have a reasonable basis in the evidence and must be based on reasonable, non-speculative assumptions and estimates. The overcharge may not be based on guesswork or speculation. Each Plaintiff State claiming damages must prove the reasonableness of each of the assumptions upon which the per-ticket overcharge for its State is based.

If you find that any Plaintiff State claiming damages has provided a reasonable basis for determining the per-ticket overcharge in its State, then you may find an overcharge amount for that State so long as that amount is a just and reasonable estimate supported by the evidence.

If you find that any Plaintiff State failed to carry its burden of providing a reasonable basis for determining the per-ticket overcharge in its State, then you may not find that any overcharge occurred in that State.

82

**Post-Instruction No. 53**

**CALCULATION OF MONETARY RECOVERY FOR VIOLATION OF THE CALIFORNIA
UNFAIR COMPETITION LAW
(CAL. BUS. & PROF. CODE § 17200 ET SEQ.)**

If you find that Defendants have violated California's Unfair Competition Law, then you

must determine the amount of the average per ticket overcharge, if any, that individuals who

purchased primary concert tickets for live concert events at major concert venues in California are

entitled to recover. This overcharge must have resulted from Defendants imposing ticketing fees that

were higher than they would have been but for any business act or practice that you have found

violated the Unfair Competition Law.

The fact that I am giving you instructions concerning the issue of the amount of monetary

recovery under California's Unfair Competition Law does not mean that I believe any party should,

or should not, prevail in this case. If you reach a verdict for Defendants on California's Unfair

Competition Law, you may disregard the monetary recovery instructions that I am about to give.

The average per ticket overcharge amount is the difference between what fans paid for

primary concert tickets for live events at major concert venues in California and the price you find

that fans would have paid without the business act or practice that violated the Unfair Competition

Law.

In addition, if you found that the unlawful or unfair act or practice that Defendants engaged

in emanated from California and harmed consumers who paid for primary concert tickets for live

events at major concert venues outside of California, you should separately determine the amount of

overcharge for those consumers.

In calculating the overcharge amount, you must use a reasonable basis of computation. Your

calculation of the overcharge amount may be an approximation. Your computation must be supported

> **Commented [A7]:** Plaintiffs premised their objection to this instruction on a request for the Court to revisit its prior ruling on the motion to bifurcate on the grounds of judicial efficiency. The Court finds that it would be in the interest of judicial efficiency to allow the jury to give an advisory verdict in this capacity. The Court doesn't understand plaintiffs to be raising an argument that a state civil penalty statute is subject to the Seventh Amendment right to a jury trial.

83

by evidence. If you find that the State of California has failed to carry its burden of providing a reasonable basis for determining the amount of the overcharge, then you may not find any overcharge amount.

**Post-Instruction No. 54**

## FINAL INSTRUCTIONS

You are about to go into the jury room and begin your deliberations. If during those deliberations you want to see any of the exhibits, you may request that they be brought into the jury room. If you want any of the testimony read back to you, you may also request that. Please remember that it is not always easy to locate what you might want to read or hear, so be as specific as you possibly can in requesting exhibits or portions of the testimony.

Your requests for exhibits or testimony—in fact, any communication with the Court—should be made to me in writing, signed by your foreperson, and given to one of the marshals. In any event, do not tell me or anyone else how the jury stands on any issue until after a unanimous verdict is reached.

*Duty to Deliberate/Unanimous Verdict*

You will now retire to decide the case. It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement. Each of you must decide the case for yourselves, but you should do so only after a consideration of the case with your fellow jurors, and you should not hesitate to change an opinion when convinced that it is erroneous. Your verdict must be unanimous, but you are not bound to surrender your honest convictions concerning the effect or weight of the evidence for the mere purpose of returning a verdict or solely because of the opinion of other jurors. Discuss and weigh your respective opinions dispassionately, without regard to sympathy, without regard to prejudice or favor for either party, and adopt that conclusion which in your good conscience appears to be in accordance with the truth.

85

Again, each of you must make your own decision about the proper outcome of this case based on your consideration of the evidence and your discussions with your fellow jurors. No juror should surrender their conscientious beliefs solely for the purpose of returning a unanimous verdict.

*Selection of Foreperson*

When you retire, you should elect one member of the jury as your foreperson. That person will preside over the deliberations and speak for you here in open court.

Verdict forms have been prepared for your convenience. You will take these forms to the jury room and, when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date, and sign the form that sets forth the verdict upon which you unanimously agree. You will then return with your verdict to the courtroom. I will read the verdict form to you now.

*Return of Verdict*

After you have reached a verdict, your foreperson will fill in the form that has been given to you, each of you will sign it with the date and advise the marshal outside your door that you are ready to return to the courtroom.

I will stress that each of you should be in agreement with the verdict which is announced in court. Once your verdict is announced by your foreperson in open court and officially recorded, it cannot ordinarily be revoked.

*Juror Oath*

In determining the facts, you are reminded that you took an oath to render judgment impartially and fairly, without prejudice and without fear, solely upon the evidence in the case and the applicable law. I know that you will do this and reach a just and true verdict.

86

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA et al.,

      *Plaintiffs*,

      v.
                            Civil No. 1:24–cv–3973-AS

LIVE NATION ENTERTAINMENT, INC.,
and TICKETMASTER L.L.C.,

      *Defendants*.

## PROPOSED VERDICT FORM

**VERDICT FORM**

**Part I: Section 2 Monopolization Claim Against Ticketmaster—Market Of Primary Ticketing Services To "Major Concert Venues"**

1.      Have Plaintiffs proven, by a preponderance of the evidence, that primary ticketing services to "major concert venues," as defined by Plaintiffs, is a properly-defined antitrust market?

Yes _____          No _____

*If you answered "Yes," proceed to Question 2. If you answered "No," proceed to Question 5.*

2.      Have Plaintiffs proven, by a preponderance of the evidence, that Ticketmaster willfully acquired or maintained monopoly power in the market for primary ticketing services to those major concert venues through anticompetitive or exclusionary conduct?

Yes _____          No _____

*If you answered "Yes," proceed to Question 3. If you answered "No," proceed to Question 5.*

3.      Have Plaintiffs proven, by a preponderance of the evidence, that Ticketmaster's alleged conduct caused anticompetitive effects in the market for primary ticketing services to those major concert venues?

Yes _____          No _____

*If you answered "Yes," proceed to Question 4. If you answered "No," proceed to Question 5.*

4.      Have Plaintiffs proven, by a preponderance of the evidence, that Live Nation controlled, dictated, or encouraged Ticketmaster's anticompetitive conduct in this market?

Yes _____          No _____

*Proceed to Question 5.*

1

**Part II: Section 2 Monopolization Claim Against Ticketmaster—Market Of Primary *Concert* Ticketing Services To "Major Concert Venues"**

5.    Have Plaintiffs proven, by a preponderance of the evidence, that primary *concert* ticketing services to "major concert venues," as defined by Plaintiffs, is a properly-defined antitrust market?

Yes _____          No _____

*If you answered "Yes," proceed to Question 6.  If you answered "No," proceed to Question 9.*

6.    Have Plaintiffs proven, by a preponderance of the evidence, that Ticketmaster willfully acquired or maintained monopoly power in the market for primary *concert* ticketing services to major concert venues through anticompetitive or exclusionary conduct?

Yes _____          No _____

*If you answered "Yes," proceed to Question 7. If you answered "No," proceed to Question 9.*

7.    Have Plaintiffs proven, by a preponderance of the evidence, that Ticketmaster's conduct caused anticompetitive effects in the market for primary *concert* ticketing services to major concert venues?

Yes _____          No _____

*If you answered "Yes," proceed to Question 8. If you answered "No," proceed to Question 9.*

8.    Have Plaintiffs proven, by a preponderance of the evidence, that Live Nation controlled, dictated, or encouraged Ticketmaster's anticompetitive conduct in this market?

Yes _____          No _____

*Proceed to Question 9.*

2

**Part III: Section 2 Monopolization Claim Against Live Nation—Market Of Use Of "Large Amphitheaters" By Artists**

9.      Have Plaintiffs proven, by a preponderance of the evidence, that use of "large amphitheaters," as defined by Plaintiffs, is a properly-defined antitrust market?

Yes _____            No _____

*If you answered "Yes," proceed to Question 10. If you answered "No," proceed to Question 12.*

10.     Have Plaintiffs proven, by a preponderance of the evidence, that Live Nation willfully acquired or maintained monopoly power in the market for large amphitheaters through anticompetitive or exclusionary conduct?

Yes _____            No _____

*If you answered "Yes," proceed to Question 11. If you answered "No," proceed to Question 12.*

11.     Have Plaintiffs proven, by a preponderance of the evidence, that Live Nation's conduct caused anticompetitive effects in the market for large amphitheaters?
Yes _____            No _____

*Proceed to Question 12.*

3

**Part IV: Section 1 Tying Claim Against Live Nation**

*If you answered "Yes" to Question 9, proceed to Question 12.  If you answered "No" to Question 9, proceed to Question 14.*

12.     Have Plaintiffs proven, by a preponderance of the evidence, that artists are the customers who rent amphitheaters, and not promoters?

Yes _____          No_____

*If you answered "Yes," proceed to Question 13.  If you answered "No," proceed to Question 14.*

13.     Have Plaintiffs proven, by a preponderance of the evidence, that Live Nation unlawfully tied artist promotion services to the artists' use of those "large amphitheaters"?

Yes _____          No_____

*Proceed to Question 14.*

4

**Part V: State Impact**

14.     Has each of the following Plaintiff States proven, by a preponderance of the evidence, that Live Nation, Ticketmaster or both, engaged in unlawful conduct that harmed competition in its State?

| State | Live Nation (check if YES) | No | Ticketmaster (check if YES) | No |
|---|---|---|---|---|
| Arizona | | | | |
| California | | | | |
| Colorado | | | | |
| Connecticut | | | | |
| District of Columbia | | | | |
| Florida | | | | |
| Illinois | | | | |
| Indiana | | | | |
| Kansas | | | | |
| Louisiana | | | | |
| Massachusetts | | | | |
| Maryland | | | | |
| Michigan | | | | |
| Minnesota | | | | |
| Nevada | | | | |
| New Hampshire | | | | |
| New Jersey | | | | |
| New Mexico | | | | |
| New York | | | | |
| North Carolina | | | | |
| Ohio | | | | |
| Oregon | | | | |
| Pennsylvania | | | | |
| Rhode Island | | | | |
| South Carolina | | | | |
| Tennessee | | | | |
| Texas | | | | |
| Utah | | | | |
| Vermont | | | | |
| Virginia | | | | |
| Washington | | | | |
| West Virginia | | | | |
| Wisconsin | | | | |
| Wyoming | | | | |

5

*Proceed to Question 15.*
**Part VI: Damages**

*If you answered "Yes" to Question 3 in Part II, **then** for any State in Question 14 that you answered "Yes" for Ticketmaster, proceed to Question 15. Otherwise, leave Question 15 blank and proceed to Question 16.*

15.     Please state the amount (if any) that each Plaintiff State proved, by a preponderance of the evidence, that residents in its specific State were overcharged per ticket for primary concert tickets to events at the venues Plaintiffs call "major concert venues" because of Ticketmaster's alleged anticompetitive conduct.

| State | |
|---|---|
| Arizona | $ |
| California | $ |
| Colorado | $ |
| Connecticut | $ |
| District of Columbia | $ |
| Florida | $ |
| Illinois | $ |
| Indiana | $ |
| Michigan | $ |
| Minnesota | $ |
| Nevada | $ |
| New Hampshire | $ |
| New Jersey | $ |
| New York | $ |
| North Carolina | $ |
| Pennsylvania | $ |
| Rhode Island | $ |
| South Carolina | $ |
| Utah | $ |
| Washington | $ |
| West Virginia | $ |
| Wisconsin | $ |

*Proceed to Question 16.*

6

**Part VII: Other State Law Claims**

**California Unfair Competition Law**

16.    Has California proven, by a preponderance of the evidence, that Ticketmaster engaged in an unlawful or unfair business act or practice that occurred within California, emanated from California, or harmed California residents in violation of the California Unfair Competition Law?

Yes _____        No_____

*Proceed to Question 17.*

17.    Has California proven, by a preponderance of the evidence, that Live Nation engaged in an unlawful or unfair business act or practice that occurred within California, emanated from California, or harmed California residents in violation of the California Unfair Competition Law?

Yes _____        No_____

*Proceed to Question 18.*

**Florida Trade Practices Act**

18.    Has Florida proven, by a preponderance of the evidence, that Ticketmaster engaged in an unfair method of competition in violation of the Florida Deceptive and Unfair Trade Practices Act?

Yes _____        No_____

*Proceed to Question 19.*

19.    Has Florida proven, by a preponderance of the evidence, that Live Nation engaged in an unfair method of competition in violation of the Florida Deceptive and Unfair Trade Practices Act?

Yes _____        No_____

*Proceed to Question 20.*

**Illinois Antitrust Act**

20.    Has Illinois proven, by a preponderance of the evidence, that Ticketmaster engaged in unlawful conduct in violation of the Illinois Antitrust Act?

Yes _____        No_____

*Proceed to Question 21.*

7

21.    Has Illinois proven, by a preponderance of the evidence, that Live Nation engaged in unlawful conduct in violation of the Illinois Antitrust Act?

Yes _____            No_____

*Proceed to Question 22.*

**<u>Indiana Antitrust Act</u>**

22.    Has Indiana proven, by a preponderance of the evidence, that Ticketmaster engaged in unlawful conduct after July 1, 2023 in violation of the Indiana Antitrust Act?

Yes _____            No_____

*Proceed to Question 23.*

23.    Has Indiana proven, by a preponderance of the evidence, that Live Nation engaged in unlawful conduct after July 1, 2023 in violation of the Indiana Antitrust Act?

Yes _____            No_____

*Proceed to Question 24.*

**<u>Kansas Restraint Of Trade Act</u>**

24.    Has Kansas proven, by a preponderance of the evidence, that Ticketmaster engaged in unlawful conduct in violation of the Kansas Restraint Of Trade Act?

Yes _____            No_____

*Proceed to Question 25.*

25.    Has Kansas proven, by a preponderance of the evidence, that Live Nation engaged in unlawful conduct in violation of the Kansas Restraint Of Trade Act?

Yes _____            No_____

*Proceed to Question 26.*

8

**New York – Donnelly Act**

26.     Has New York proven, by a preponderance of the evidence, that Ticketmaster maintained monopoly power through anticompetitive conduct involving the use of contracts, agreements, arrangements, or combinations, in violation of New York's Donnelly Act?

Yes _____          No_____

*Proceed to Question 27.*

27.     Has New York proven, by a preponderance of the evidence, that Live Nation maintained monopoly power through anticompetitive conduct involving the use of contracts, agreements, arrangements, or combinations, in violation of New York's Donnelly Act?

Yes _____          No_____

*Proceed to Question 28.*

**South Carolina Unfair Trade Practices Act**

28.     Has South Carolina proven, by a preponderance of the evidence, that Ticketmaster engaged in an unfair method of competition in violation of the South Carolina Unfair Trade Practices Act?

Yes _____          No_____

*Proceed to Question 29.*

29.     Has South Carolina proven, by a preponderance of the evidence, that Live Nation engaged in an unfair method of competition in violation of the South Carolina Trade Practices Act?

Yes _____          No_____

*Proceed to Question 30.*

**Tennessee Trade Practices Act**

30.     Has Tennessee proven, by a preponderance of the evidence, that Ticketmaster engaged in unlawful conduct after April 23, 2024 in violation of the Tennessee Trade Practices Act?

Yes _____          No_____

*Proceed to Question 31.*

9

31.     Has Tennessee proven, by a preponderance of the evidence, that Live Nation engaged in unlawful conduct after April 23, 2024 in violation of the Tennessee Trade Practices Act?

Yes _____                    No_____

***Proceed to Question 32.***

**<u>Vermont Consumer Protection Act</u>**

32.     Has Vermont proven, by a preponderance of the evidence, that Ticketmaster engaged in an unfair method of competition in violation of the Vermont Consumer Protection Act?

Yes _____                    No_____

***Proceed to Question 33.***

33.     Has Vermont proven, by a preponderance of the evidence, that Live Nation engaged in an unfair method of competition in violation of the Vermont Consumer Protection Act?

Yes _____                    No_____

Your deliberations are now complete. Sign this verdict form and notify the clerk that your deliberations are complete.

DATED:_____

FOREPERSON SIGNATURE:_____