**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA, *et al.,*

     *Plaintiffs*,

     *v.*

LIVE NATION ENTERTAINMENT, INC.,
and TICKETMASTER L.L.C.,

     *Defendants*.

Case No. 1:24-cv-03973-AS

**NON-PARTY JUSTIN W. BERNICK'S MEMORANDUM OF LAW**
**IN RESPONSE TO ORDER TO SHOW CAUSE**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................3

ARGUMENT .........................................................................................................................7

I.      MR. BERNICK HAS NOT RECEIVED ADEQUATE NOTICE OF THE
        LEGAL AUTHORITY ON WHICH THE COURT MIGHT BASE SANCTIONS...........7

II.     THE COURT'S POWER TO IMPOSE INHERENT AUTHORITY SANCTIONS
        IS LIMITED AND REQUIRES AN OPPORTUNITY TO BE HEARD...........................8

III.    MR. BERNICK DID NOT ACT IN BAD FAITH. ..........................................................10

IV.     MR. BERNICK'S ACTIONS HAD MORE THAN A COLORABLE BASIS. ...............14

        A.      Mere Breach of Contract Does Not Establish That Conduct Lacks a
                Colorable Basis. ..................................................................................................15

        B.      Disclosing Documents Protected By Confidentiality Provisions is Not
                Only Colorable, but Legally Required in the Second Circuit. ..............................16

        C.      Disclosure Did Not Violate the Separation Agreement. .......................................21

        D.      The Court Does Not Have Jurisdiction To Resolve A Contractual Dispute
                Between Mr. Mueller and AEG. ...........................................................................22

V.      NEITHER DEFENDANTS NOR MR. MUELLER SUFFERED ANY
        COMPENSABLE HARM CAUSED BY MR. BERNICK'S ACTIONS. ........................23

CONCLUSION.....................................................................................................................26

CERTIFICATE OF COMPLIANCE......................................................................................27

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Integrated Sports Media & Ent. PPV, LLC v. Livecast 365,*
  LLC, No. 2:22-CV-00980-DSF-JC, 2023 WL 12218660
  (C.D. Cal. June 9, 2023) ...............................................................................................17

*In re 60 E. 80th St. Equities, Inc.*,
  218 F.3d 109 (2d Cir. 2000)........................................................................................1, 7

*Amerisource Corp. v. Rx USA Int'l Inc.*,
  No. 02-CV-2514 (JMA), 2010 WL 2730748 (E.D.N.Y. July 6, 2010) ...................................10

*Applied Equip Corp. v. Litton Saudi Arabia Ltd.*,
  869 P.2d 454 (Cal. 1994) ..............................................................................................16

*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991)........................................................................................8, 9, 15, 16

*Cont'l Cas. Co. v. Marshall Granger & Co., LLP*,
  No. 11-CV-3979 (CS), 2017 WL 1901969 (S.D.N.Y. May 9, 2017)......................................11

*In re ContiFinancial Corp.*,
  336 F. App'x 29 (2d Cir. 2009) .....................................................................................23

*In re Dual–Deck Video Cassette Recorder Antitrust Litigation*,
  10 F.3d 693 (9th Cir. 1993) ..........................................................................................19

*Gaia House Mezz LLC v. State Street Bank and Trust Co.*,
  720 F.3d 84 (2d Cir. 2013)............................................................................................16

*Goodyear Tire & Rubber Co v. Haeger*,
  581 U.S. 101 (2017)......................................................................................3, 23, 24, 25

*Heckman et al. v. Live Nation Ent., Inc. et al.*,
  22-cv-00047-GW-KES (C.D. Cal. Apr. 11, 2025) ...............................................................20

*Jones v. Combs*,
  759 F. Supp. 3d 534 (S.D.N.Y. 2024)..............................................................................11

*Joseph P. Carroll Ltd. v. Baker*,
  No. 09 CIV. 3174 (SHS), 2012 WL 1232957 (S.D.N.Y. Apr. 12, 2012)................................19

*Klipsch Grp., Inc. v. ePRO E-Com. Ltd.*,
  880 F.3d 620 (2d Cir. 2018)..........................................................................................19

*Liebowitz v. Bandshell Artist Mgmt.*,
  6 F.4th 267 (2d Cir. 2021) ...................................................................................14

*Malmberg v. United States*,
  No. 506-CV-1042 (FJS) (GHL), 2010 WL 1186573 (N.D.N.Y. Mar. 24, 2010)....................19

*Milltex Indus. Corp. v. Jacquard Lace Co.*,
  55 F.3d 34 (2d Cir. 1995)..............................................................................9, 10

*Muhammad v. Walmart Stores East, L.P.*,
  732 F.3d 104 (2d Cir. 2013)...............................................................................11

*New York Credit & Fin. Mgmt. Grp. v. Parson Ctr. Pharmacy, Inc.*, 432 F. App'x
  25 (2d Cir. 2011)...........................................................................................10

*Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*,
  369 F.3d 645 (2d Cir. 2004)..................................................................................8

*In re Parikh*,
  508 B.R. 572 (Bankr. E.D.N.Y. 2014)........................................................................10

*In re Plumeri*,
  434 B.R. 315 (S.D.N.Y. 2010)..................................................................................9

*Queen Villas Homeowners Ass'n v. TCB Prop. Mgmt.*,
  149 Cal. App. 4th 1 (Cal. Ct. App. 2007) ..................................................................22

*Rates Tech. Inc. v. Broadvox Holding Co., LLC*,
  56 F. Supp. 3d 515 (S.D.N.Y. 2014)..........................................................................14

*Revson v. Cinque & Cinque, P.C.*,
  221 F.3d 71 (2d Cir. 2000)..........................................................................10, 14, 16

*Rossbach v. Montefiore Med. Ctr.*,
  81 F.4th 124 (2d Cir. 2023) .................................................................................14

*Royal Park Investments SA/NV v. Deutsche Bank Nat. Trust Co.*,
  192 F. Supp. 3d 400 (S.D.N.Y. 2016).........................................................................19

*Sakon v. Andreo*,
  119 F.3d 109 (2d Cir. 1997)..................................................................................10

*Schlaifer Nance & Co. v. Est. of Warhol*,
  194 F.3d 323 (2d Cir. 1999)..........................................................................2, 9, 10, 14

*Seawolf Tankers Inc. v. Laurel Shipping LLC*,
  No. 120-CV-05198 (JHR)(SDA), 2024 WL 240591 (S.D.N.Y. Jan. 23, 2024)......................16

*Sierra Club v. United States Army Corps of Eng'rs*,
    776 F.2d 383 (2d Cir. 1985)................................................................................10

*Sparks v. Seltzer*,
    No. 05-CV-1061 (NG)(KAM), 2006 WL 2358157 (E.D.N.Y. Aug. 14, 2006) .....................17

*Ted Lapidus, S.A. v. Vann*,
    112 F.3d 91 (2d Cir. 1997)..................................................................................7

*United States v. Abel*,
    469 U.S. 45 (1984)...........................................................................................20

*United States v. Seltzer*,
    227 F.3d 36 (2d Cir. 2000)..................................................................................9

*Virginia Properties, LLC v. T-Mobile Northeast LLC*,
    865 F.3d 110 (2d Cir. 2017)................................................................................11

*Wilson v. Citigroup, N.A.*,
    702 F.3d 720 (2d Cir. 2012)................................................................................15

*Wolters Kluwer Fin. Servs., Inc. v. Scivantage*,
    564 F.3d 110 (2d Cir. 2009)................................................................................14

*Yukos Cap. S.A.R.L. v. Feldman*,
    977 F.3d 216 (2d Cir. 2020)................................................................................9

*Zhang v. Zhang*,
    No. 19-683, 2022 WL 2057793 (2d Cir. June 8, 2022).............................................23

**Statutes**

28 U.S.C. § 1927..................................................................................................8

**Other Authorities**

Fed. R. Civ. P. 11................................................................................................8

## INTRODUCTION

The Court has ordered Justin Bernick, counsel for Anschutz Entertainment Group, Inc. ("AEG"), to show cause why he should not be sanctioned for facilitating AEG's production of documents to Plaintiffs regarding the departure of Rick Mueller from the company for impeachment purposes. Neither AEG nor Mr. Bernick are parties to this litigation. Nor has any party sought sanctions against AEG or Mr. Bernick. Nevertheless, the Court has expressed concern that Mr. Bernick's cover email to Plaintiffs' counsel enclosing the documents suggested that his purpose in doing so was to dissuade Mr. Mueller from testifying and that sharing the documents violated Mr. Mueller's separation agreement with AEG. The Court has asked why Mr. Bernick and AEG should not have to pay Mr. Mueller's and Defendants' attorney's fees associated with a dispute in this case between Plaintiffs and Defendants regarding Plaintiffs' questioning of Mr. Mueller and the use of those documents. Mr. Bernick recognizes that the circumstances of providing those documents to Plaintiffs has left the Court with questions and regrets that it has occupied the Court's time and attention during already demanding proceedings. As detailed below, however, sanctions are unwarranted for at least four reasons.

*First*, Mr. Bernick has not received adequate notice of the authority under which the Court is considering sanctioning him. Under longstanding Second Circuit precedent, Mr. Bernick is entitled to notice of (1) the conduct the Court thinks is sanctionable, (2) the sanction the Court is considering, and (3) the legal authority the Court believes authorizes the contemplated sanction. *In re 60 E. 80th St. Equities, Inc.*, 218 F.3d 109, 117 (2d Cir. 2000). The order to show cause does not provide the requisite notice of the legal framework that governs the contemplated sanction.

*Second*, the Court's concern that Mr. Bernick shared the documents to dissuade Mr. Mueller from testifying is not supported by a fair interpretation of the evidence. Mr. Bernick and AEG have submitted declarations confirming that the purpose of turning over the documents was to provide Plaintiffs with material requested to impeach Mr. Mueller if he misrepresented or downplayed the circumstances of his departure from AEG, not to dissuade Mr. Mueller from testifying. Those declarations are confirmed by the surrounding circumstances. If Mr. Bernick's purpose was to try to convince Mr. Mueller not to testify, he would have wanted Mr. Mueller to know that Plaintiffs had the documents and were ready to use them. But Mr. Bernick only produced the documents to Plaintiffs. Plaintiffs assured Mr. Bernick that they would treat the documents as confidential. They did so. Sanctions imposed under a court's inherent authority powers, like the Court appears to be contemplating, may only be imposed upon a finding of bad faith *by clear and convincing evidence*. *Schlaifer Nance & Co. v. Est. of Warhol*, 194 F.3d 323, 336 (2d Cir. 1999). Mr. Bernick's cover email is not clear and convincing evidence of bad faith conduct, especially in the face of overwhelming evidence to the contrary.

*Third*, the Court on this record cannot conclude that Mr. Bernick acted without a colorable basis. *Id.* The colorability of Mr. Bernick's actions does not turn on whether Mr. Mueller's separation agreement allowed disclosure. The Court lacks jurisdiction to resolve that question, and, in any event, the adjudication of private contracts between two non-parties is not the province of inherent authority sanctions, which allows the Court to ensure the integrity of its own proceedings. More fundamentally, it is black letter-law in the Second Circuit that confidentiality provisions cannot insulate documents from production in litigation. That AEG chose to voluntarily cooperate with Plaintiffs rather than demand a formal trial subpoena for the documents does not make Mr. Bernick's conduct sanctionable. Moreover, the separation

2

agreement allows for "standard" or "legally required" disclosures, without insisting upon a subpoena or giving Mr. Mueller any right to notice or to object to production. Although the Court may disagree with AEG's and Mr. Bernick's interpretation of the contract, that does not form the basis for sanctions.

*Finally*, neither AEG nor Mr. Bernick has harmed Mr. Mueller or Defendants in a way that would warrant monetary sanctions. Neither Mr. Mueller nor Defendants have contended that they expended additional attorneys' fees because documents were turned over. Nor can they. As the Supreme Court has explained, the only compensatory sanctions allowed under a Court's inherent authority are those that redress injuries with a but-for connection to the misconduct. *Goodyear Tire & Rubber Co v. Haeger*, 581 U.S. 101, 108 (2017). Here, *Plaintiffs'* decisions triggered the motion practice about the questioning of Mr. Mueller about his departure from AEG and the potential use of the documents AEG produced. That is why Defendants sought sanctions against Plaintiffs, not Mr. Bernick. The Court already denied Defendants' request to sanction Plaintiffs. Therefore, there is no basis to sanction Mr. Bernick, who was not the but-for cause of Plaintiffs' decisions about how to question Mr. Mueller.

The order to show cause should be discharged.

## BACKGROUND

AEG has, over many years, repeatedly responded to government information requests about Defendants' anticompetitive conduct. Before Plaintiffs filed this case, AEG produced hundreds of thousands of documents and gigabytes of data to the Antitrust Division and State Attorneys General in response to Civil Investigative Demands. Dkt. 1388-1 ¶ 1. AEG employees answered questions in multiple calls and meetings from the Department of Justice's Antitrust Division and State Attorneys General regarding the ticketing and promotions businesses, as well

3

as the effect of Live Nation's and Ticketmaster's conduct on AEG's ability to compete. *Id*. AEG

also submitted written advocacy that is part of the discovery record in this case, including a

September 19, 2023, white paper explaining Live Nation's unlawful conduct. *Id*.; DX-0899.

After Plaintiffs filed this case, AEG produced over 200,000 additional documents and more data

in response to subpoenas from both Plaintiffs and Defendants. Dkt. 1388-1 ¶ 2. These myriad

productions included many thousands of pages of documents covered by confidentiality and non-

disclosure provisions.

Mr. Mueller left AEG and began working at Live Nation before the close of fact

discovery. *Id.* ¶ 3. Although Defendants never sought documents related to Mr. Mueller, they did

seek his testimony. *Id.* ¶ 4. Collier Kelley, a Trial Attorney at the Antitrust Division, deposed

Mr. Mueller on July 23, 2025. *Id.* ¶¶ 3-4. Before that deposition, Mr. Kelley asked AEG's

counsel about the circumstances of Mr. Mueller's departure from AEG. *Id*. Mr. Kelley informed

Mr. Bernick that he did not question Mr. Mueller regarding those circumstances at the deposition

because of Mr. Mueller's favorable testimony regarding documents discussing quality problems

with Ticketmaster. *Id.* After discovery closed, AEG cooperated with Plaintiff's counsel in

preparing AEG's witnesses, but none of those meetings concerned or discussed Mr. Mueller. *Id.*

¶ 5.

On March 23, 2026, Adam Gitlin, the District of Columbia's counsel, emailed Mr.

Bernick seeking a phone call about Mr. Mueller. *Id.* ¶ 6. He asked about the circumstances of

Mr. Mueller's departure from AEG, which Mr. Bernick briefly explained. *Id*. Mr. Gitlin said that

Plaintiffs expected a favorable cross-examination of Mr. Mueller regarding Ticketmaster's

quality, consistent with Mr. Mueller's deposition testimony. *Id*. Mr. Gitlin also asked Mr.

Bernick to provide additional information about Mr. Mueller's departure because it could be

important to the jury's evaluation of Mr. Mueller's credibility. *Id.* The following day, Mr. Gitlin again spoke with Mr. Bernick at the courthouse. *Id.* ¶ 7. Mr. Bernick said that the circumstances of Mr. Mueller's departure were sufficiently sensitive that public disclosure of the information could potentially result in Mr. Mueller trying to avoid testifying. Mr. Bernick therefore insisted that any information provided be treated as confidential. *Id.* Mr. Gitlin reiterated that Plaintiffs had no intention of publicly disclosing the information and wanted to move forward with their planned cross-examination. *Id.*

Later that afternoon, AEG provided certain documents to Mr. Gitlin regarding Mr. Mueller's departure, *id.* ¶ 8, along with a cover note that said, in relevant part:

> Attached are the materials Plaintiffs requested regarding Rick Mueller. Below is some context:
>
> [REDACTED]
>
> Please let us know your thoughts on how to use this, particularly if you believe there is any possibility of these documents (or the name of the subordinate) becoming public—we would want an opportunity to be heard on that issue. We think there is a good chance he would try to avoid testifying if he knew this would come up. We also think he is likely to admit the circumstances of his departure, even if he downplays them. Happy to chat if helpful . . ..

Dkt. No. 1375-1. Defendants have focused on the fourth sentence as suggesting that AEG and Mr. Bernick were trying to dissuade Mr. Mueller from testifying, that was not the case. Mr. Bernick (1) asked Mr. Gitlin how he intended to use the documents; (2) re-emphasized that the documents should remain confidential; and (3) cautioned Mr. Gitlin that failure to treat the documents as confidential risked Mr. Mueller seeking to avoid testifying. Mr. Gitlin—like Mr. Kelley before him—had twice emphasized the benefits to Plaintiffs in cross-examining Mr. Mueller. Dkt. 1388-1 ¶ 8. Indeed, in addition to Mr. Mueller's testimony, numerous documents exist in the record in which Mr. Mueller complains about Ticketmaster's quality. Dkt. 1388 at 5.

5

The email cautioned Mr. Gitlin that public disclosure of the information risked Mr. Mueller potentially trying to avoid testifying—precisely what Plaintiffs did not want.

Mr. Gitlin and Mr. Bernick spoke again that evening. *Id.* ¶ 9. In response to the questions in the email, Mr. Gitlin explained that, at most, he would use one document—a document AEG created and not even arguably subject to any confidentiality obligation—for impeachment, but only if Mr. Mueller misrepresented the circumstances of his departure. *Id*. Mr. Gitlin added that the documents AEG produced on March 23 would be kept confidential and not made public. *Id*.

Defendants' counsel apparently met with Mr. Mueller ahead of his planned testimony on March 26, and claimed that Mr. Mueller "seemed concerned about questions that might come up regarding his departure from AEG." Dkt. 1378 at 5. Mr. Bernick had not communicated with Mr. Mueller or his counsel. Dkt 1388-1 at ¶ 15. Mr. Bernick also could not have used the prospect of questioning Mr. Mueller about his departure from AEG to dissuade him from testifying, *Id*. ¶ 14, because Mr. Mueller was independently aware that he could be questioned on that topic and still committed to testifying. Moreover, the documents were produced with the assurance of confidentiality and *never* disclosed publicly, which is consistent with Mr. Bernick's request to Plaintiffs to maintain the confidentiality of the documents. Dkt. No. 1375-1.

A dispute apparently arose between Plaintiffs and Defendants regarding the scope of permissible questioning of Mr. Mueller about his departure from AEG. The Court held a conference to resolve the dispute the evening of March 26 which AEG was not invited to attend. Likewise, AEG did not receive the *in camera* letters the parties exchanged thereafter. Dkt. 1375-2, Dkt. 1375-3. The Court held a further hearing the morning of March 27 that Mr. Bernick was unable to attend. At the hearing, the Court concluded that Plaintiffs could not use the documents provided by AEG to impeach Mr. Mueller and limited Plaintiffs' potential inquiry on the subject

to a particular question that counsel for Plaintiffs and Defendants apparently had agreed upon in advance. Mr. Mueller testified later that day and was not asked about the documents.

Non-party Inner City Press, an online publication, subsequently moved for disclosure of the *in camera* letters the Court received on March 26. Dkt. 1336. Defendants and Mr. Mueller objected to the disclosure and AEG responded. Dkt. 1353, Dkt. 1356, Dkt. 1358. The Court held a hearing on April 1 and asked Mr. Bernick why he should not be sanctioned, even though no party had sought sanctions against AEG or Mr. Bernick. On April 2, Defendants filed a motion for sanctions against Plaintiffs—not AEG or Mr. Bernick—seeking the admission of certain evidence and jury instructions that would advantage Defendants in the litigation. Dkt. 1377, Dkt. 1378. The Court denied Defendants' motion for sanctions against Plaintiffs, but *sua sponte* ordered AEG and Mr. Bernick to show cause why the Court should not order them to pay legal fees that Defendants or Mr. Mueller incurred "regarding AEG's disclosure of the materials." Dkt. 1401.

## ARGUMENT

### I.    MR. BERNICK HAS NOT RECEIVED ADEQUATE NOTICE OF THE LEGAL AUTHORITY ON WHICH THE COURT MIGHT BASE SANCTIONS.

"Due process requires that courts provide notice and an opportunity to be heard before imposing *any* kind of sanctions." *Ted Lapidus, S.A. v. Vann*, 112 F.3d 91, 96 (2d Cir. 1997) (brackets omitted). An attorney facing sanctions, at a minimum, "must receive specific notice of the conduct alleged to be sanctionable and the standard by which that conduct will be assessed, and an opportunity to be heard on that matter, and must be forewarned of the authority under which sanctions are being considered, and given a chance to defend himself against specific charges." *In re 60 E. 80th St. Equities, Inc.*, 218 F.3d 109, 117 (2d Cir. 2000) (internal quotations omitted); *see also Ted Lapidus, S.A.*, 112 F.3d at 96 (vacating *sua sponte* sanctions

7

because the attorney was given insufficient notice of the specific sanctioning authority under consideration).

The Court's order to show cause here does not meet these standards. The order states that "for the reasons stated on the record on April 8, 2026," Mr. Bernick is ordered to show cause "why the court should not order, as a monetary sanction against [him], any and all legal fees incurred by defendants or Rick Mueller regarding AEG's disclosure of the materials." Dkt. 1401 at 1. In the incorporated-by-reference transcript, the Court stated that it viewed as potentially sanctionable the "email disclosure of Mr. Mueller's personnel file to the plaintiffs."[1] Apr. 8, 2026 Trial Tr. 4471:2-5. But the Court did not state on the record the sanctioning authority it was considering, leaving Mr. Bernick with no way to know what statutory or other framework he should analyze when explaining why he should not be sanctioned. Below, we assume that the potential basis for the sanction is the Court's inherent authority.[2] But the Court should discharge the order to show cause because it does not meet the Second Circuit's minimum due-process standards.

## II. THE COURT'S POWER TO IMPOSE INHERENT AUTHORITY SANCTIONS IS LIMITED AND REQUIRES AN OPPORTUNITY TO BE HEARD.

The Court's inherent powers allow the court "to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43

---

[1] The Court referred to the disclosure as "Mr. Mueller's personnel file." Apr. 8. Tr. 4471:3. However, as AEG has explained, the documents shared were not Mr. Mueller's personnel file. Dkt. 1358 at 2.

[2] No other sanctioning authority would be potentially applicable here. *See, e.g.*, Fed. R. Civ. P. 11(c)(4) (sanction paid to other party can only follow a motion, not imposed by the Court *sua sponte*); 28 U.S.C. § 1927 (sanctions can be imposed against an attorney only if he unreasonably and vexatiously multiplies proceedings); *Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004) (sanctions for civil contempt can be imposed only if an attorney violates a court order).

(1991). "Because of their very potency, inherent powers must be exercised with restraint and discretion." *Id.* at 44. The Court may impose inherent authority sanctions against an attorney only if the lawyer engaged in conduct that was both without a colorable basis and motivated by bad faith. *See Schlaifer Nance & Co. v. Est. of Warhol*, 194 F.3d 323, 336 (2d Cir. 1999); *see also Milltex Indus. Corp. v. Jacquard Lace Co.*, 55 F.3d 34, 38 (2d Cir. 1995) (sanctions under inherent authority "are not appropriate unless the challenged actions are (1) 'entirely without color' and (2) motivated by 'improper purposes,' such as harassment or delay.") (quoting *Olivieri v. Thompson*, 803 F.2d 1265, 1272 (2d Cir. 1986)); *accord Chambers*, 501 U.S. at 44-46 (1996).[3]

Both "entirely without color" and "bad faith" are demanding standards. For an attorney's action to meet the former, it must lack "*any* legal or factual or basis." *Schlaifer Nance & Co.*, 194 F.3d at 337 (quoting *Sierra Club v. United States Army Corps of Eng'rs*, 776 F.2d 383, 390 (2d Cir. 1985)). A position can therefore be wrong, yet colorable, "when it has some legal and factual support, considered in light of the reasonable beliefs of the individual making the claim." *Id.* (quoting *Nemeroff v. Abelson*, 620 F.2d 339, 348 (2d Cir. 1980) (per curiam)). For the action to meet the latter, the conduct must be "motivated by improper purposes such as harassment or delay," *Schlaifer Nance & Co.*, 194 F.3d at 336, have been undertaken "vexatiously, wantonly, or for oppressive reasons," *Chambers*, 501 U.S. at 45-46.

A belief or suspicion that an attorney acted in bad faith is not enough. Inherent authority sanctions require "clear and convincing evidence of bad faith," *Yukos Cap. S.A.R.L. v. Feldman*,

---

[3] There is a narrow exception to the bad faith requirement when conduct "involves [an] attorney's violation of a court order or other misconduct *that is not undertaken for the client's benefit.*" *United States v. Seltzer*, 227 F.3d 36, 42 (2d Cir. 2000) (emphasis added); *see also In re Plumeri,* 434 B.R. 315, 329 (S.D.N.Y. 2010). Mr. Bernick here acted as AEG's counsel in producing the documents, so a bad-faith finding is required.

977 F.3d 216, 235 (2d Cir. 2020), which must be supported by "a high degree of specificity." *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 71, 78 (2d Cir. 2000) (cleaned up).[4]  And the standard "is conjunctive," so "neither meritlessness alone nor improper purpose alone will suffice." *Sierra Club v. U.S. Army Corps of Engr's*, 776 F.2d 383, 390 (2d Cir. 1985).

Finally, before a court may sanction a non-party lawyer, due process requires that counsel have an opportunity to be heard. *Schlaifer Nance & Co.*, 194 F.3d at 335. "Sanctions carry much more than a pecuniary impact: Reputations are at stake and licenses to practice are in danger. Thus, irrespective of the state of the factual record, a district court will often exercise its discretion to provide someone facing this jeopardy the opportunity to speak to the very court that is about to pronounce judgment." *Id.* The Court should discharge the order to show cause following this briefing. But if the Court is going to move forward, due process requires the Court to hold oral argument to give Mr. Bernick an opportunity to be heard. *See Sakon v. Andreo*, 119 F.3d 109, 114 (2d Cir. 1997) ("Like other sanctions, attorney's fees certainly should not be assessed lightly or without fair notice and an opportunity for a hearing on the record.").

## III.    MR. BERNICK DID NOT ACT IN BAD FAITH.

Sanctions based on a court's inherent authority require clear and convincing evidence of bad faith. Courts regularly refuse to sanction attorneys when there is insufficient evidence of bad faith. *See, e.g.*, *Milltex Industries Corp. v. Jacquard Lace Co.* 55 F.3d 34, 35 (2d Cir. 1995)

---

[4] Indeed, where the party facing sanctions is a non-party, courts in this Circuit have observed that the required showing may be even higher. *See Amerisource Corp. v. Rx USA Int'l Inc.*, No. 02-CV-2514 (JMA), 2010 WL 2730748, at *5 (E.D.N.Y. July 6, 2010), *aff'd sub nom.*, *New York Credit & Fin. Mgmt. Grp. v. Parson Ctr. Pharmacy, Inc.*, 432 F. App'x 25 (2d Cir. 2011) (observing that nonparty "ordinarily would not be subject to sanctions absent violation of a specific court order"); *In re Parikh*, 508 B.R. 572, 601 (Bankr. E.D.N.Y. 2014) (concluding that a non-party may only be sanctioned pursuant to the court's inherent power if the non-party: (1) violates a specific court order, or (2) acts in bad faith, has a substantial interest in the litigation, and plays a substantial role in the litigation).

(reversing sanctions for failure to disclose a related action and violation of temporary restraining order); *see also Virginia Properties, LLC v. T-Mobile Northeast LLC*, 865 F.3d 110, 113-123 (2d Cir. 2017) (reversing sanctions for lack of bad faith); *Muhammad v. Walmart Stores East, L.P.,* 732 F.3d 104, 109 (2d Cir. 2013) (same); *Cont'l Cas. Co. v. Marshall Granger & Co., LLP*, No. 11-CV-3979 (CS), 2017 WL 1901969, at \*11 (S.D.N.Y. May 9, 2017) (finding no bad faith despite conduct "entirely unbecoming of members of our profession,"); *Jones v. Combs*, 759 F. Supp. 3d 534, 542 (S.D.N.Y. 2024) (finding no bad faith based on misreading of a contract and misstatements of law).

The record is devoid of any evidence of bad faith. The Court stated that Mr. Bernick's email to Plaintiffs transmitting AEG's documents regarding the circumstances of Mr. Mueller's separation "arguably bespeaks some malicious intent."  Apr. 8, 2026 Trial Tr. 4471:2-5. To the extent that the Court was referencing Defendants' allegation that Mr. Bernick disclosed the documents to prevent Mr. Mueller's testimony, Dkt. No. 1378 at 11, the facts are contrary.

As Mr. Bernick explained in his declaration, he received a request on March 23, 2026, from Adam Gitlin, the District of Columbia's counsel, for information regarding Mr. Mueller's departure. 1388-1 ¶ 6. The next day, Mr. Bernick spoke with Mr. Gitlin again, expressing concern that the information was sensitive and that public disclosure could potentially result in Mr. Mueller trying to avoid testifying. *Id.* ¶ 7. Mr. Bernick therefore requested that any information be kept confidential and received assurances from Mr. Gitlin that the information would not be disclosed publicly. *Id.* Later that day, Mr. Bernick forwarded certain documents to Mr. Gitlin regarding Mr. Mueller's separation from AEG. *Id.* ¶ 8. In the email forwarding the documents, Mr. Bernick asked how Plaintiffs intended to use the documents and emphasized that AEG would want an opportunity to object if there was "any possibility" of the documents

11

becoming public. *Id.* Mr. Bernick again cautioned that public disclosure risked Mr. Mueller trying to avoid testifying, which Mr. Bernick knew was not Plaintiffs' desire. Plaintiffs had previously elicited favorable testimony from Mr. Mueller during his deposition and, according to Mr. Gitlin, intended to do so again at trial. *Id.* ¶¶ 4, 6, 8. Mr. Gitlin again confirmed that the documents would be kept confidential. *Id.* at ¶ 9. Mr. Bernick never discussed the documents with Mr. Mueller, Live Nation, or its counsel, and does not know of anyone trying to dissuade Mr. Mueller from testifying. *Id.* ¶¶ 15-17. Instead, both Mr. Bernick's and AEG's intent in disclosing the documents to Plaintiffs was to facilitate Plaintiffs' cross-examination and impeachment of Mr. Mueller. *Id.*

Mr. Bernick's understanding is shared by Ted Fikre, Vice Chairman and Chief Legal and Development Officer for AEG, who submitted a sworn declaration in this matter confirming that AEG did not produce the documents to dissuade Mr. Mueller from testifying in this matter. T. Fikre Decl. at ¶ 5. Plaintiffs similarly confirmed that they had no knowledge of any effort to use the materials to dissuade Mr. Mueller from testifying. See Pl. Opp. Dkt. 1386 At 5. Put simply, there is no evidence that anyone understood Mr. Bernick or AEG to be sending the materials to dissuade Mr. Mueller from testifying.

Moreover, Defendants' theory that Mr. Bernick turned over the documents to prevent Mr. Mueller from testifying is inconsistent with his actions. If the goal was to prevent Mr. Mueller from testifying, Mr. Bernick would have wanted Defendants and Mr. Mueller to know that Mr. Bernick had turned over AEG's documents to Plaintiffs. But *no one* told Defendants or Mr. Mueller that AEG had given the documents to Plaintiffs, which only reinforces the unrefuted declarations. Plaintiffs were given the documents only to impeach Mr. Mueller if he provided untruthful testimony. It was *Defendants'* counsel who raised the issue of Mr. Mueller's

12

separation from AEG with Plaintiffs after speaking with Mr. Mueller in advance of his testimony. Dkt. 1378 at 5. Even after defense counsel raised the issue of Mr. Mueller's separation from AEG with Plaintiffs, Plaintiffs apparently refused to disclose the full set of materials until they were ordered to do so by the Court. Dkt. 1379 ¶¶ 2, 7.

Mr. Bernick's statement in his March 24 email that "[w]e think there is a good chance [Mr. Mueller] would try to avoid testifying if he knew this would come up" cannot be interpreted as an intent to prevent Mr. Mueller from testifying because Mr. Bernick's actions undermined any such intent. Moreover, Mr. Bernick produced the documents subject to Plaintiffs' express assurance that they would *not* be disclosed, explaining in the email that if there was "*any possibility* of these documents (or the name of the subordinate) becoming public—[AEG] would want an opportunity to be heard on that issue." Dkt. 1375-1 (emphasis added). That agreement and desire to be heard affirmatively on the issue of confidentiality refute any suggestion that Mr. Bernick sought to use the threat of public disclosure of the documents to dissuade Mr. Mueller from testifying. Mr. Bernick also stated that AEG believed Mr. Mueller would admit to the circumstances of his departure—again, a statement inconsistent with trying to use that same information to discourage Mr. Mueller from testifying. *Id.*

The truth is far simpler. Mr. Bernick provided Plaintiffs with the requested impeachment material on behalf of his client in furtherance of AEG's ongoing efforts to cooperate. 1388-1 ¶¶ 1,2, 8. Mr. Bernick's, AEG's, and Plaintiffs' actions surrounding the documents refute any uncharitable interpretation of the e-mail in question.

Even if the e-mail "arguably" reflected a desire that Mr. Mueller not testify, Apr. 8, 2026 Trial Tr. 4471:2-5, sanctions would still be inappropriate. Bad faith must be shown by *clear and convincing* evidence. The two declarations submitted in response to the Court's order to show

13

cause as well as the facts and circumstances surrounding the disclosure to Plaintiffs all outweigh Defendants' interpretation of Mr. Bernick's email. That is a far cry from clear and convincing evidence required to find bad faith. S*ee Revson*, 221 F.3d at 78 (requiring clear and convincing evidence found with a "high degree of specificity" to impose sanctions); *Rossbach v. Montefiore Med. Ctr.*, 81 F.4th 124, 144 (2d Cir. 2023) (reversing sanctions that did not include "an explicit finding of bad faith"); *Rates Tech. Inc. v. Broadvox Holding Co., LLC*, 56 F. Supp. 3d 515, 529 (S.D.N.Y. 2014) (finding no bad faith where "more than one equally plausible scenario exists"); *cf. Liebowitz v. Bandshell Artist Mgmt.*, 6 F.4th 267, 286 n.22 (2d Cir. 2021) (noting that district court properly did not find bad faith in one instance of misconduct because such a finding was only supported by a preponderance of the evidence).

To be clear, Mr. Bernick acknowledges that he should have been more careful in the wording of his email. It was not an exhaustive recitation of his or AEG's position and the recipient, Mr. Gitlin, had the additional context of his conversations with Mr. Bernick about how the documents would be used and AEG's desire for confidentiality. However, as Mr. Bernick has stated *repeatedly* and under oath, it was never his or AEG's intention to dissuade Mr. Mueller from testifying.

## IV.    MR. BERNICK'S ACTIONS HAD MORE THAN A COLORABLE BASIS.

For the Court to issue sanctions based on its inherent authority it must find both bad faith and that the conduct lacked "*any* legal or factual or basis." *Schlaifer Nance & Co.*, 194 F.3d at 337; *see also Wolters Kluwer Fin. Servs., Inc. v. Scivantage*, 564 F.3d 110, 114 (2d Cir. 2009) ("Conduct is entirely without color when it lacks any legal or factual basis; it is colorable when it has some legal and factual support, considered in light of the reasonable beliefs of the attorney whose conduct is at issue."). Here, the Court observed that sanctions may be warranted because the disclosure of AEG's documents regarding Mr. Mueller's departure to Plaintiffs "was in plain

14

violation of, at the very least, the agreement between AEG and Mr. Mueller." Apr. 8, 2026 Trial Tr. 4471:6-9. However, sanctions will only be appropriate, if the decision to disclose AEG's documents regarding Mr. Mueller's departure had no colorable basis.

Mr. Bernick's transmission of documents regarding Mr. Mueller's departure from AEG to Plaintiffs in response to their request clearly had a colorable basis.[5] *First*, even if there was a disclosure of the separation agreement, that is not determinative of whether Mr. Bernick's or AEG's conduct lacked a colorable basis. *Second*, Mr. Bernick correctly understood that Second Circuit law permitted the disclosure of the materials in a pending litigation notwithstanding the confidentiality provision, and the decision to cooperate with Plaintiffs rather than demand a trial subpoena is not sanctionable. *Third*, the separation agreement provides a colorable argument that disclosure to the State Attorneys General was permissible on a voluntary basis. *Fourth*, the issue of whether disclosure violated the separation agreement between Mr. Mueller and AEG is an issue that is beyond the Court's jurisdiction and therefore cannot form the basis of a sanctions inquiry.

Sanctions, therefore, may not issue. *See Wilson v. Citigroup, N.A.,* 702 F.3d 720, 723-724 (2d Cir. 2012) (reversing district court where actions were colorable).

A.    **Mere Breach of Contract Does Not Establish That Conduct Lacks a Colorable Basis.**

Inherent authority sanctions allow the Court to remedy "conduct which abuses the judicial process." *Chambers*, 501 U.S. at 44-45. Even if the Court believes that AEG should not have disclosed documents concerning Mr. Mueller, that is not an "abuse[ ] of the judicial

_____

[5] In addition to the points below, AEG has advanced additional reasons why there was a colorable basis to disclose the separation materials, including that doing so did not violate California law. Mr. Bernick joins in AEG's arguments which also support discharging the show cause order without the imposition of sanctions.

15

process." *Id.* As the California Supreme Court has explained, the law simply "does not distinguish between good and bad motives for breaching a contract." *Applied Equip Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454, 461 (Cal. 1994). When a contracting party breaches— regardless of its motive—"the contracting party has done nothing more socially opprobrious than to fall short in meeting a contractual commitment." *Id.* at 461; *see also Gaia House Mezz LLC v. State Street Bank and Trust Co.*, 720 F.3d 84, 94 n.5 (2d Cir. 2013). There is no authority for the proposition that conduct automatically lacks any basis in law or fact when it breaches a contract. Indeed, as the Court recognized, "whatever happens in any subsequent proceeding regarding Mr. Mueller and AEG is going to be up to them." Apr. 8, 2026 Trial Tr. 4472:2-4. But even if AEG disclosed documents in violation of the terms of the separation agreement, that disclosure cannot form a basis for inherent authority sanctions.

### B. Disclosing Documents Protected By Confidentiality Provisions is Not Only Colorable, but Legally Required in the Second Circuit.

If the Court were to delve into the permissibility of the disclosure, Mr. Bernick's position that documents subject to confidentiality provisions or non-disclosure agreements may nonetheless be disclosed in litigation is not only colorable but also consistent with well-established law in this Circuit. For example, in *Doe v. Benjamin Zaremski M.D., P.C.*, the court *required* production of documents despite a nondisclosure agreement precluding disclosure of "the terms or conditions of this Agreement . . . including but not limited to the negotiations which culminated in this Agreement"—similar language to that in the separation agreement at issue here. No. 21 CIV. 3187 (ER), 2022 WL 2966041, at *3 (S.D.N.Y. July 27, 2022). *Doe* also noted the plethora of courts holding that confidentiality agreements do not preclude discovery in federal litigation. *Id*. at *10 (collecting cases); *see also Seawolf Tankers Inc. v. Laurel Shipping LLC*, No. 120-CV-05198 (JHR)(SDA), 2024 WL 240591, at *2 (S.D.N.Y. Jan. 23, 2024) ("In

16

order to maintain the confidentiality of information that is subject to a confidentiality or nondisclosure agreement, a protective order can be used."); *Sparks v. Seltzer*, No. 05-CV-1061 (NG)(KAM), 2006 WL 2358157, at *4–*5 (E.D.N.Y. Aug. 14, 2006) ("[W]hen balanced against the need for discovery spark in litigation, confidentiality agreements cannot preclude otherwise permissible discovery.").

This rule exists for a good reason: allowing confidentiality provisions to bar disclosure in judicial proceedings "would clearly impede the truth-seeking function of discovery in federal litigation as all individuals and corporations could use confidentiality agreements to avoid discovery.*" Integrated Sports Media & Ent. PPV, LLC v. Livecast 365*, LLC, No. 2:22-CV-00980-DSF-JC, 2023 WL 12218660, at *11 (C.D. Cal. June 9, 2023) (quoting *In re Subpoena Duces Tecum Served on Bell Commc'ns Rsch., Inc.*, 1997 WL 10919, at *3 (S.D.N.Y. Jan. 13, 1997) (internal quotation marks and citations omitted), *modified*, 1997 WL 16747 (S.D.N.Y., Jan. 17, 1997).

During this litigation and the preceding investigations, AEG has produced *thousands* of pages of highly sensitive documents with confidentiality provisions, including promotions agreements with artists and ticketing agreements with venues, because those provisions do not immunize documents or information from discovery.[6] The production of documents related to

---

[6] *See* DX-1394 (AEG-CID-0000807833 at -807845, specifying that Confidential Information, including the Agreement and the terms and conditions thereof,  shall not be disclosed except as required by applicable law or subpoena or similar order; AEG-CID-0000750445 at –750458, specifying that Confidential Information, including the Agreement and the terms and conditions thereof, shall not be disclosed except as required by applicable law or subpoena or similar order; AEG-LIT-000697906 at -697913, specifying that Confidential Information, including the produced Agreement, shall not be disclosed except as specified in the Agreement, including "in the event that either party receives a request to disclose all or any part of the Confidential Information under the terms of a subpoena, document request, notice of deposition or other legal proceeding" and even then only upon notification and opportunity to obtain a protective order); *see also* AEG-LIT-000060792 at -60806 ("The terms of this Agreement . . . shall be kept

Mr. Mueller's departure in response to a legitimate request from the State Attorneys General falls squarely within this rubric. Again, context matters. Mr. Gitlin—a senior attorney representing a large group of State Attorneys General—made a time-sensitive and narrow request just days before Mr. Mueller's anticipated testimony for information regarding his departure from AEG. Dkt. 1388-1 ¶¶ 6–8. AEG did not approach Mr. Gitlin to volunteer the documents but rather provided them voluntarily in response to a request from Mr. Gitlin. It was in AEG's interest to cooperate with the government and Mr. Bernick understood that he was furthering AEG's interest in responding to a legitimate request for information by State Attorneys General amid a major antirust enforcement action.

Before providing the documents, Mr. Bernick obtained Mr. Gitlin's agreement that the documents would be afforded confidential treatment, and there was no reason for AEG or Mr. Bernick to believe that the Amended Protective Order would not apply to the documents. The Amended Protective Order does not require a formal subpoena to confer confidentiality protections but rather protects "information of *any kind* provided in discovery in this action." Dkt. 347 (emphasis added). Indeed, documents AEG produced to Plaintiffs without a subpoena have been confidential under the Amended Protective Order until their use at trial. *See* DX-0899, DX-1411; *see also* Dkt. 1078 at 3, adopted at Dkt. 1086 at 2 ("documents designated Confidential or Highly Confidential under the Amended Protected Order retain those designations unless and until they are introduced at trial, even if no redactions have been proposed").

---

confidential except to the extent necessary to enforce the terms hereof or as required to comply with the law (such as for example, pursuant to a court order . . . )"; AEG-LIT-000072943 at -72962 ("The terms of this Agreement . . . shall be kept confidential except to the extent necessary to enforce the terms hereof, or as required to comply with the law . . . "). Mr. Bernick would be happy to provide these documents for the Court to review *in camera* if helpful.

Of course, Mr. Gitlin could have made his request through a trial subpoena. *See Malmberg v. United States*, No. 506-CV-1042 (FJS) (GHL), 2010 WL 1186573, at *3 (N.D.N.Y. Mar. 24, 2010) (recognizing trial subpoena where issuing party "intends to use the documents it has requested in these subpoenas for cross-examination and impeachment only"); *Joseph P. Carroll Ltd. v. Baker*, No. 09 CIV. 3174 (SHS), 2012 WL 1232957, at *2–*3 (S.D.N.Y. Apr. 12, 2012) (permitting the use of a trial subpoena after the discovery deadline for purpose of cross-examination and impeachment). But a subpoena was not strictly necessary. The result here also would have been the same whether the documents were produced in response to a separate subpoena or voluntarily in response to a request from Plaintiffs' counsel. That Mr. Gitlin did not issue a formal trial subpoena, and that Mr. Bernick did not bates stamp the material—both of which would have delayed the production of relevant impeachment material on the eve of witness testimony—does not transform the routine sharing of documents subject to a confidentiality provision into sanctionable misconduct. Indeed, we have found no case suggesting that imposing inherent authority sanctions turns on such a formalistic distinction.[7] If third parties risked sanctions whenever they voluntarily complied with a governmental request for confidential information—and that would be the impact of a sanctions order here—the chilling effect on government investigations and enforcement actions would be significant. *Accord Klipsch Grp., Inc. v. ePRO E-Com. Ltd.*, 880 F.3d 620, 631 (2d Cir. 2018) (reiterating the importance of voluntary participation in discovery).

---

[7] Courts routinely recognize that an overly formalistic approach to the application of protective orders can lead to absurd results. *See Royal Park Investments SA/NV v. Deutsche Bank Nat. Trust Co.*, 192 F. Supp. 3d 400, 404 (S.D.N.Y. 2016) ("[A] protective order should be interpreted to comply with common sense … to [avoid] absurd results . . . .") (cleaned up); *In re Dual–Deck Video Cassette Recorder Antitrust Litigation*, 10 F.3d 693, 695 (9th Cir. 1993) ("For the protective order to comply with common sense, a reasonable reading must connect its prohibitions to its purpose—protection against disclosure of commercial secrets.").

19

Moreover, it was a colorable position for AEG and Mr. Bernick to cooperate with legitimate requests for information from the State Attorneys General to ensure truthful and accurate trial testimony. *See United States v. Abel*, 469 U.S. 45, 52 (1984) ("the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony."). AEG has been responding to government requests for information regarding Defendants' anticompetitive conduct since before Live Nation and Ticketmaster merged in 2010. Dkt. 1388 at 3-4. As the Court knows, AEG has serious concerns about Live Nation's anticompetitive conduct and has endeavored throughout the long history of related government investigations and now litigation to cooperate with requests for information, both formal and informal. Dkt. 1388 at 1. Some examples in recent years include:

- Making AEG employees available for voluntary interviews during government agencies' pre-Complaint investigation into Live Nation's anticompetitive conduct;

- Cooperating with the Department of Justice in producing over 300,000 internal and highly sensitive documents—the scope of which exceeded the four corners of the already "exploratory" Civil Investigative Demand due to AEG's cooperative posture. *See* Dkt. 453 at 3; *see also* Dkt. No. 321, Notice of Mot. and Mot. to Intervene and to Amend the Protective Order, *Heckman et al. v. Live Nation Ent., Inc. et al.*, 22-cv-00047-GW-KES (C.D. Cal. Apr. 11, 2025) (explaining that "the scope of non-party responses to CIDs may be broader than in a private action, as a non-party is more likely to be in a cooperative posture");

- Providing declarations to the government, including as recently as October 8, 2025 following the close of fact discovery in this matter;

- Executing a voluntary waiver to allow State Attorneys General to access the materials provided in response to the Civil Investigative Demand absent subpoena, so long as those State Attorneys General provided adequate confidentiality assurances; and

- Providing advocacy submissions and presentations to both Department of Justice and State Attorneys General detailing Live Nation's unlawful conduct, including analyses of ticket fees in the United States and Europe.

In each of these examples, neither AEG nor its counsel demanded a subpoena specifically tailored to the information sought before it cooperated in providing information, much of which was confidential. And in none of these cases has any court or third party accused AEG or its counsel of engaging in sanctionable conduct based on the disclosures.

Further, after the discovery period closed and Plaintiffs requested information in the leadup to and during trial, AEG—through Mr. Bernick—did not refuse to answer Plaintiffs' numerous questions or respond to requests for information because no subpoena had issued. As Live Nation's primary competitor, AEG recognizes that it possesses information uniquely important to the government's investigation into and prosecution of claims against Live Nation. Providing information when requested is part and parcel of AEG's longstanding pattern of facilitating the investigation and prosecution of unlawful conduct.

### C.        Disclosure Did Not Violate the Separation Agreement.

Mr. Bernick also had a colorable basis for his understanding that the separation agreement did not forbid the disclosure of the documents regarding Mr. Mueller's departure. Mr. Bernick joins AEG's analysis in its brief. AEG Br. at 18-22. We write separately only to underscore that the separation agreement explicitly contemplates disclosure "as necessary to fulfill standard or legally required corporate reporting or disclosure requirements . . . or as otherwise required by law." Separation Agreement ¶ 7(a).

Here, AEG disclosed the documents in response to a time sensitive request from a senior attorney in a State Attorney General's office amid a major civil enforcement trial, with assurances that confidentiality would be maintained. These assurances were consistent with AEG's practice throughout this case and antitrust enforcers' investigations into Live Nation's unlawful conduct. Mr. Mueller's separation agreement does not require AEG to demand a subpoena to produce the documents to a law enforcement agency, and it does not give Mr.

21

Mueller the right to be notified of a request for the separation agreement or a right to intervene or object before disclosure is made. Both Mr. Bernick and AEG – a highly sophisticated business that is represented by other lawyers in addition to Mr. Bernick – made a reasoned decision based on their view of the law and the separation agreement.

Against this backdrop, a conclusion that sharing the documents with Plaintiffs was a "standard" disclosure permitted by the separation agreement is colorable. In fact, the separation agreement permits both "standard" disclosures and "legally required" disclosures, which must be read to permit two different categories of permitted information sharing. *See*, *e.g.*, *Queen Villas Homeowners Ass'n v. TCB Prop. Mgmt.*, 149 Cal. App. 4th 1, 9 (Cal. Ct. App. 2007) ("When two words are used in a contract, the rule of construction is that the words have different meaning."). Regardless, the question before the Court is not whether it is "plain" that the agreement prohibits disclosure. *See* Apr. 8. Tr. 4471:6-9. Instead, the question is whether the interpretation of the agreement to permit disclosure was *colorable*. The answer is yes.

Finally, for the reasons discussed in AEG's brief, only the separation agreement itself is arguably subject to the confidentiality provision because the other documents produced to Plaintiffs are not encompassed within the "matters discussed in negotiating the terms" of the agreement. *See* AEG Br. at 16. Therefore, AEG and Mr. Bernick clearly had a colorable basis to disclose the documents that actually discuss the reasons for Mr. Mueller's departure.

>    **D.    The Court Does Not Have Jurisdiction To Resolve A Contractual Dispute Between Mr. Mueller and AEG.**

The Court also lacks jurisdiction to resolve AEG's or Mr. Mueller's obligations under the agreement. Mr. Mueller has not asked the Court for relief connected with any disclosure of the contract, nor could he. The separation agreement specifies that "the parties hereby irrevocably submit to the exclusive jurisdiction of any federal court or state court of the State of California,

22

County of Los Angeles for the resolution of any such dispute." Separation Agreement ¶ 13. Defendants are not third-party beneficiaries of the agreement and therefore cannot raise the issue. There is therefore no case or controversy before the Court regarding any disclosure of the Separation Agreement, and the Court cannot resolve the question. *See, e.g., In re ContiFinancial Corp.*, 336 F. App'x 29, 30 (2d Cir. 2009) (concluding that court lacked jurisdiction because "Article III, Section 2 of the United States Constitution limits federal courts to deciding only cases or controversies").

## V.  NEITHER DEFENDANTS NOR MR. MUELLER SUFFERED ANY COMPENSABLE HARM CAUSED BY MR. BERNICK'S ACTIONS.

Finally, sanctions are inappropriate because neither Defendants nor Mr. Mueller have suffered any compensable harm. "[A] sanction, when imposed pursuant to civil procedures, must be compensatory rather than punitive in nature." *Goodyear Tire & Rubber Co v. Haeger*, 581 U.S. 101, 108 (2017). That is, a fee award "may go no further than to redress the wronged party for losses sustained; it may not impose an additional amount as punishment for the sanctioned party's misbehavior." *Id.* A sanction "counts as compensatory" only if it is "calibrated to the damages caused by the bad-faith acts on which it is based," covering "the legal bills that the litigation abuse occasioned." *Id.*; *see also Zhang v. Zhang*, No. 19-683, 2022 WL 2057793, at *2 (2d Cir. June 8, 2022) (reiterating that sanctions pursuant to a court's inherent powers must be compensatory and not punitive).

Compensatory inherent-authority sanctions must be limited to "only those attorney's fees incurred because of the misconduct at issue." *Goodyear Tire*, 581 U.S. at 109. The inquiry thus "is appropriately framed as a but-for test: The complaining party . . . may recover 'only the portion of his fees that he would not have paid but for' the misconduct." *Id.* (quoting *Fox v. Vice*, 563

23

U.S. 826, 836 (2011)). If the "cost would have been incurred in the absence of the" misconduct, "then the court . . . must leave it alone." *Id.* (cleaned up).

There is no evidence of any compensatory harm here. The only sanction the Court is considering is "legal fees incurred by defendants or Rick Mueller regarding AEG's disclosure of the materials." Dkt. 1401. But despite multiple opportunities to do so, neither Mr. Mueller nor Live Nation claimed that the disclosure to Plaintiffs caused them any financial harm, and neither sought payment of their fees. Indeed, Defendants have already submitted two briefs in support of their earlier request for sanctions. Dkts. 1377 & 1390. Not only did Defendants deliberately decline to seek sanctions against AEG and Mr. Bernick, but the only remedy that Defendants sought was a broad array of jury instructions—all of which the Court denied.

That is not surprising. Mr. Bernick's disclosure of the documents was not the source of the dispute that resulted in legal work and related fees. In the days leading up to Mr. Mueller's testimony, Defendants approached Plaintiffs about the scope of Plaintiffs' intended questioning of Mr. Mueller concerning his departure from AEG. Dkts. 1375-2, Dkt. 1375-3. At that time, Defendants were not aware that AEG produced documents to Plaintiffs regarding Mr. Mueller's departure from the company. *Id*. The parties purportedly reached an agreement resolving Defendants' concerns. However, by Defendants' account, Plaintiffs disavowed the putative agreement and a dispute arose over whether Plaintiffs should be limited in their questioning of Mr. Mueller about his departure from AEG. *Id; see also* Dkt. 1379-1; Dkt. 1379-2. On the evening before Mr. Mueller's anticipated testimony, Mr. Bernick understands that the parties conferred with the Court and submitted letters. Neither AEG nor Mr. Bernick attended the conference and only subsequently saw the letters in redacted form. *Id*.

24

Only after a dispute arose about this agreement did the parties seek Court intervention and submitted related briefing. Dkt. 1379 ¶¶ 5-6. That dispute is a standard evidentiary matter that arises during trials and is independent of AEG's document production. Ultimately, the Court held Plaintiffs to the disputed agreement, *see* Mar. 27, 2026 Trial Tr. 3041:3-6, and Mr. Mueller testified. None of the documents disclosed by AEG to Plaintiffs were used during Mr. Mueller's testimony.

Inner City Press subsequently requested the public disclosure of the letters regarding the questioning of Mr. Mueller and the Court ordered a hearing, during which Defendants first raised the prospect of "potential remedies." Apr. 1, 2026 Hearing Tr. 3704:2-3. Defendants then moved for sanctions against *Plaintiffs*—not against AEG or Mr. Bernick—seeking the admission of certain evidence and jury instructions that would benefit Defendants in the litigation. Dkt. 1378.

There is no basis for Mr. Bernick to compensate Defendants and Mr. Mueller for legal fees flowing from *Plaintiffs'* position regarding the questioning of Mr. Mueller and how they might use the documents. Similarly, there is no basis for Mr. Bernick to pay Defendants' or Mr. Mueller's legal fees related to Defendants' efforts to hold *Plaintiffs* to an agreement that did not involve Mr. Bernick about the scope of Mr. Mueller's cross-examination at trial. The Court has already determined that Plaintiffs' efforts to try to question Mr. Mueller and to use the documents were not sanctionable. It follows that *Mr. Bernick* cannot be sanctioned and forced to pay for Defendants' or Mr. Mueller's legal fees incurred disputing *Plaintiffs'* attempted questioning of Mr. Mueller and use of the documents.

In line with the Supreme Court's holding in *Goodyear*, it is Plaintiffs' conduct, not Mr. Bernick's, that is the cause of any fees that Mr. Mueller and Defendants incurred. *Goodyear Tire*, 581 U.S. at 109.

25

**CONCLUSION**

For the foregoing reasons, the order to show cause should be discharged and the Court should decline to impose sanctions against Mr. Bernick.

Dated: New York, New York
April 18, 2026

FRANKFURT KURNIT KLEIN + SELZ, PC

By: _____
Tyler Maulsby
Rachel Banks (*pro hac vice forthcoming*)

28 Liberty Street, 35th Floor
New York, New York 10005
Telephone: (212) 980-0120
tmaulsby@fkks.com
rbanks@fkks.com

*Attorneys for Justin W. Bernick*

26

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(c) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York:

The foregoing NON-PARTY JUSTIN W. BERNICK'S MEMORANDUM OF LAW IN RESPONSE TO ORDER TO SHOW CAUSE was prepared on a computer using the Microsoft Word program.

Relying on that program's word-count function, the number of words in the foregoing document, excluding caption, any index, table of contents, table of authorities, signature blocks, and this certificate is 8,316.

Dated:  New York, New York
       April 18, 2026

_____
Tyler Maulsby