**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>          *Plaintiffs,*<br><br>     v.<br><br>LIVE NATION ENTERTAINMENT, INC.,<br>and TICKETMASTER L.L.C.,<br><br>          *Defendants.* | Case No. 1:24-cv-03973-AS |

**NON-PARTY ANSCHUTZ ENTERTAINMENT GROUP, INC.'S RESPONSE TO**
**<u>ORDER TO SHOW CAUSE RE SANCTIONS</u>**

**Contents**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 2

    A.   The Separation Agreement and Mr. Mueller's Obligations to AEG. ...................................... 2

    B.   Mr. Mueller's Employment at Live Nation and Role as a Defense Witness. ........................... 3

    C.   AEG Provides the Separation Agreement and Employment Records to Plaintiffs for the Purpose of Impeachment. ................................................................................. 4

    D.   The Sanctions Motion, the Court's Ruling, and the OSC. ..................................... 5

APPLICABLE STANDARD .................................................................................. 6

I.    The Threshold for Sanctioning Non-Party Corporate Entities is High. ............................... 6

    A.   The Court's Inherent Authority to Sanction Is Narrow, Exceptional, and Governed by Demanding Requirements. ............................................................................ 7

    B.   The Court's Inherent Authority to Sanction Corporate Non-Parties is Subject to Even More Demanding Requirements. ...................................................................... 8

ARGUMENT .................................................................................................... 9

I.    AEG Cannot Be Sanctioned for an Alleged but Unproven Breach of the Separation Agreement or Violation of Mr. Mueller's Privacy Rights. ........................................ 9

II.   AEG Acted Legally, Ethically, and Appropriately in Providing the Separation Agreement and Employment Records to Plaintiffs in Confidence and Solely for Impeachment Purposes. ............................................................................... 13

    A.   AEG Was Entitled to Disclose the Separation Agreement to Enforce It. ........................ 13

    B.   Mr. Mueller Did Not Negotiate the Separation Agreement or Request Confidentiality. ....... 15

    C.   AEG Owns the Employment Records That It Provided to Plaintiffs, Not Mr. Mueller. ........ 17

    D.   California Privacy Law Unequivocally Authorizes the Disclosure of the Employment Records. ............................................................................................... 18

        1.   The CPRA Expressly Authorizes AEG's Disclosure of Its Employment Records. ...... 18

        2.   The California Constitutional Right to Privacy Does Not Apply Because Mr. Mueller Had No Reasonable Expectation of Privacy. ............................................. 20

III.  Supplying Impeachment Evidence to Plaintiffs Is Not Sanctionable Conduct. .................. 22

    A.   AEG Acted Appropriately in Providing Impeachment Evidence to Plaintiffs. ................... 22

    B.   There Is No Clear or Convincing Evidence of Bad Faith By AEG. ............................. 24

IV.  AEG Has Not Received Adequate Notice or a Proper Opportunity to be Heard. ............... 26

CONCLUSION .................................................................................................. 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 60 E. 80th St. Equities, Inc.*,
218 F.3d 109 (2d Cir. 2000) ......................................................................................... 8, 26

*Chambers v. NASCO, Inc.*,
501 U.S. 32 (1991) ................................................................................................ 7, 8, 9, 26

*Goodyear Tire & Rubber Co. v. Haeger*,
581 U.S. 101 (2017) .................................................................................................. 10, 11, 12

*Hill v. Nat'l Collegiate Athletic Ass'n*,
7 Cal. 4th 1 (1994) ...................................................................................................... 18, 20, 22

*Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*,
991 F.3d 361 (2d Cir. 2021) ........................................................................................... 12

*Levin v. Tiber Holding Corp.*,
277 F.3d 243 (2d Cir. 2002) ........................................................................................... 8

*Milltex Indus. Corp. v. Jacquard Lace Co.*,
55 F.3d 34 (2d Cir. 1995) ................................................................................................ 8

*Pillsbury, Madison, & Sutro v. Schectman*,
55 Cal. App. 4th 1279 (1997) ........................................................................................ 17

*Rossbach v. Montefiore Med. Ctr.*,
81 F.4th 124 (2d Cir. 2023) .................................................................................. 7, 8, 24, 25

*Schlaifer Nance & Co. v. Est. of Warhol*,
194 F.3d 323 (2d Cir. 1999) .................................................................................... *passim*

*Ted Lapidus, S.A. v. Vann*,
112 F.3d 91 (2d Cir. 1997) ......................................................................................... 8, 26

*Wolters Kluwer Fin. Servs., Inc. v. Scivantage*,
564 F.3d 110 (2d Cir. 2009) ...................................................................................... 7, 8, 24

*Yukos Cap. S.A.R.L. v. Feldman*,
977 F.3d 216 (2d Cir. 2020) ....................................................................................... 8, 25

**Statutes**

Cal. Civ. Code §§ 56 *et seq.* ........................................................................................... 18

Cal. Code Civ. Proc. § 1001 ............................................................................................ 16

Cal. Civ. Code §§ 1785.1 *et seq.* (Consumer Credit Reporting Agencies Act) ........................................ 18

Cal. Civ. Code §§ 1798.100, 1798.145(a) ...................................................................... 18, 19, 20

Cal. Gov. Code §§ 12964.5, 12964.5(b) ................................................................................ 16

Cal. Labor Code §§ 1198.5(b)(1), 2860 ................................................................................ 17

California Fair Employment and Housing Act ........................................................................ 16

California Privacy Rights Act ................................................................................ 18, 19, 20

Medical Information Act ................................................................................................ 18

**Other Authorities**

Cal. Const. Art. I, § 1 ................................................................................................ 18, 20

## INTRODUCTION

Anschutz Entertainment Group, Inc. ("AEG") believes firmly that it acted appropriately and lawfully in this matter. While AEG proceeded in good faith, AEG understands the Court has had to devote significant time and attention to the dispute over Mr. Mueller's testimony and employment documents in the midst of a hotly contested trial, and AEG regrets the unfortunate distraction imposed on the Court by the dispute and associated motion practice.

AEG's expression of regret is not an admission of wrongdoing. To the contrary, AEG should not be punished because the Defendants' assertions of misconduct that ultimately led to the Order to Show Cause ("OSC") are based on a false premise: that AEG violated California law by providing the Separation Agreement and Mr. Mueller's employment records to Plaintiffs. The premise is false because AEG had the unequivocal right to provide those materials to Plaintiffs.

When examined under the illumination of AEG's legal entitlement to share the materials, the alleged misconduct that triggered the OSC falls away, leaving only the question of whether AEG's provision of documents to the government when it asked for help could somehow constitute a bad faith attempt to deter Mr. Mueller's trial testimony. There is no evidence in Defendants' motion, the record, or anywhere else to support that contention, especially not clear and convincing evidence required for sanctions. Instead, the only logical inference from the record is that AEG made no effort to block Mr. Mueller's testimony.

Plaintiffs' decision to break their agreement with Defendants over Mr. Mueller's testimony triggered this entire incident and should be seen for what it is: an attempt to re-trade when a better opportunity arose. And Defendants' claims of wrongdoing should be seen for what they are: overzealous advocacy that seized on a hastily worded email in an attempt to inflict a fatal blow on a litigation adversary. The Court recognized both of these realities in declining to sanction Plaintiffs. AEG respectfully requests the same treatment.

1

## BACKGROUND

**A.    The Separation Agreement and Mr. Mueller's Obligations to AEG.**

Mr. Mueller worked at AEG's subsidiary, AEG Presents LLC, for thirteen years. Ex. A, Declaration of J. Belloli at ¶ 2 ("Belloli Decl."). AEG decided to ███████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████ *Id*. at ¶¶ 3-11.

AEG offered Mr. Mueller ████████████████████████████ ████████████████████████████████. Ex. B, Declaration of S. Trell at ¶ 5 ("Trell Decl."). ████ ████ he entered into a separation agreement and release (the "Separation Agreement") with the company. Ex. C. The Separation Agreement contained a confidentiality provision that restricted disclosure of its terms, but authorized disclosures made, among other purposes, "to the extent necessary to enforce the Agreement." *Id*. at § 7(a). ███████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

---

█ With great reluctance, AEG includes the details of ████████████████████████ ██████████████████████ in its response to the OSC because the details provide the necessary context for the Court to evaluate the propriety of AEG's conduct. AEG has redacted sensitive ██████████████████████ information from its submission and respectfully requests that the redacted portions of this brief and its exhibits be afforded the same confidential treatment previously given to these materials so that the materials are not disclosed publicly.

2



*Id*. at § 7(b) (emphasis added). Mr. Mueller signed the agreement on May 8, 2024. *Id*. at 8.

The Separation Agreement's confidentiality provision contains carveouts for legally required corporate reporting or disclosure, fiduciary duty obligations, disclosures to attorneys, accountants, auditors, tax preparers, and financial advisors as reasonably necessary for their services, and any other disclosures required by law. *Id*. at § 7(a). And the Separation Agreement also includes a carveout permitting disclosure of the agreement and its terms to the extent disclosure is necessary to enforce the agreement:

> The parties agree that the contents of this Agreement, including the amount of the Consideration, and the matters discussed in negotiating the terms of this Agreement are confidential, and neither party shall reveal, discuss, publish, or in any way communicate to any person or entity any of the terms of this Agreement, the amount of the Consideration, or the matters discussed in negotiating the terms of this Agreement, ***except that the Company and/or the Releasees may disclose this Agreement and its terms*** as necessary to fulfill standard or legally required corporate reporting or disclosure requirements, to fulfill fiduciary duty obligations, to their respective attorneys, accountants, auditors, tax preparers, and financial advisors as reasonably necessary for the performance of their services, ***to the extent necessary to enforce the Agreement*** or to request or receive legal advice regarding the Agreement, or as otherwise required by law.

*Id*. (emphasis added).

**B.    Mr. Mueller's Employment at Live Nation and Role as a Defense Witness.**

Months after his departure from AEG, in September 2024, Mr. Mueller began working at Live Nation. Trell Decl. at ¶ 10.

In this matter, Defendants served Mr. Mueller with a trial subpoena, planning to call him to testify about his experience with AEG's AXS ticketing system and how it compared to Ticketmaster. Dkt. No. 1375-3 at 1. As a current Live Nation employee offering testimony as a

3

defense witness against his former employer, Mr. Mueller's potential bias was a legitimate and significant subject for cross-examination—as was his character for truthfulness.

### C.    AEG Provides the Separation Agreement and Employment Records to Plaintiffs for the Purpose of Impeachment.

Throughout the long history of this litigation, AEG has cooperated extensively with the Antitrust Division and State Attorneys General, producing over 500,000 documents and participating in numerous calls and interviews. Declaration of J. Bernick at ¶¶ 1–2, Dkt. No. 1388-1 ("Bernick Decl."). That cooperation continued during trial.

On the evening of March 23, 2026, Adam Gitlin, Chief of the Antitrust and Nonprofit Enforcement Section for the District of Columbia Attorney General, contacted AEG's outside counsel, Justin Bernick, to ask about the circumstances of Mr. Mueller's departure from AEG. *Id.* at ¶ 6. Mr. Gitlin explained that Plaintiffs anticipated cross-examining Mr. Mueller to explore the reasons behind his departure as evidence bearing on his credibility as a defense witness. *Id*. Mr. Bernick briefly explained the circumstances of the departure and indicated he would follow up with additional materials. *Id.* The following day, after again speaking with Mr. Gitlin at the courthouse and receiving renewed assurances that the materials would be held in strict confidence and used solely for impeachment if necessary, AEG provided certain documents regarding Mr. Mueller's departure to Plaintiffs' counsel. *Id.* at ¶¶ 7–8. AEG's counsel emailed the documents to Mr. Gitlin and asked him for his thoughts on how he intended to use the information, requested "an opportunity to be heard" before any public disclosure, and cautioned that public disclosure risked Mr. Mueller seeking to avoid testifying. Dkt. No. 1375-1 at 5; Bernick Decl. at ¶ 8. That same evening, Plaintiffs' counsel confirmed to Mr. Bernick that the documents would be used only if necessary to impeach Mr. Mueller's untruthful or incomplete testimony concerning the

4

circumstances of his departure, and the material would otherwise be kept confidential and not made public. Bernick Decl. at ¶¶ 9, 16.

AEG's decision to provide the materials was rooted in a specific purpose: ensure that Mr. Mueller—a defense witness for AEG's primary competitor in a major federal antitrust trial—could be impeached if he testified untruthfully or downplayed his departure from AEG. *Id.*; Ex. D, Declaration of T. Fikre at ¶ 8 ("Fikre Decl."). Given the ██████████████████ ████████████████████████ AEG had strong reason to believe Mr. Mueller might not testify truthfully ████████████████████████ Belloli Decl. at ¶¶ 5–9; Trell Decl. at ¶ 4. Providing the materials to Plaintiffs for impeachment—to be deployed if, and only if, Mr. Mueller misrepresented his departure while testifying under oath—was the minimum necessary exercise of AEG's ████████████████████ ██████ Bernick Decl. at ¶¶ 9, 16; Ex. C at § 7(a). At no point did AEG communicate with Mr. Mueller about the materials, suggest to Defendants that the materials existed, or take any step to directly or indirectly influence whether Mr. Mueller would testify. Bernick Decl. at ¶¶ 15, 17; Fikre Decl. at ¶¶ 5-7.

### D.    The Sanctions Motion, the Court's Ruling, and the OSC

How Defendants came to learn of the Separation Agreement during their own witness preparation with Mr. Mueller on March 25 has not been the subject of any discovery or unredacted submissions to the Court. What is known from the record is that Defendants' counsel met with Mr. Mueller to prepare him for his scheduled trial testimony when, during that preparation session, the ████████████████████ surrounding Mr. Mueller's termination from AEG became apparent to them. Dkt. No. 1375-3 at 2. Notably, if Defendants' counsel had possessed any information suggesting that Mr. Mueller had been improperly contacted or influenced concerning his pending testimony or the existence of his Separation Agreement, they would have brought that information

to the Court's attention. They did not, because no such contact occurred. Bernick Decl. at ¶ 15; Fikre Decl. at ¶¶ 5-7.

On April 2, Defendants filed a motion for sanctions against Plaintiffs. Dkt. No. 1378. AEG filed a response on April 6. Dkt. No. 1388. On April 8, the Court denied the sanctions motion with respect to Plaintiffs, finding no wrongdoing by them in their receipt or intended use of the materials. Dkt. No. 1401. As to AEG and its counsel, the Court expressed concern about the disclosure, stating that it "reflects a complete disregard for AEG's legal obligations" and that the transmittal email "arguably bespeaks some malicious intent," and issued the OSC directing AEG and Mr. Bernick to respond within ten days as to why they should not be required to pay "any and all legal fees incurred by defendants or Rick Mueller regarding AEG's disclosure of the materials." Dkt. No. 1401; Trial Tr. at 4471–72. AEG submits this response to demonstrate that the disclosure was affirmatively authorized by the Agreement's own terms and California law and was made in good faith, and that even if the Court is not convinced that AEG's disclosure was permitted under the Separation Agreement, the record falls far short of the clear and convincing showing of subjective bad faith required for inherent authority sanctions under controlling Second Circuit law.

## APPLICABLE STANDARD

### I.    The Threshold for Sanctioning Non-Party Corporate Entities is High.

AEG is involved in this case through witness testimony, third party discovery, and voluntary cooperation with Plaintiffs' investigations and prosecution of the case. But at the end of the day, AEG is not a party to this proceeding and AEG has not violated any order of this Court. Given AEG's non-party and non-attorney status, the law rightfully imposes demanding procedural and substantive requirements that must be satisfied before sanctions are imposed on AEG.

A.     **The Court's Inherent Authority to Sanction Is Narrow, Exceptional, and Governed by Demanding Requirements.**

District courts wield inherent sanction authority to "manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quoting *Link* v. *Wabash R. Co.*, 370 U.S. 626, 630–631 (1962)). Because inherent sanction powers are potent, the Supreme Court directs that they "must be exercised with restraint and discretion." *Id.* at 44. The Second Circuit gives this directive concreteness through a line of decisions that impose strict prerequisites on the imposition of sanctions under a court's inherent authority.

Specifically, a court may impose inherent authority sanctions only upon an explicit finding of bad faith. *Rossbach v. Montefiore Med. Ctr.*, 81 F.4th 124, 143 (2d Cir. 2023) (quoting *United States v. Seltzer*, 227 F.3d 36, 41–42 (2d Cir. 2000)); *Wolters Kluwer Fin. Servs., Inc. v. Scivantage*, 564 F.3d 110, 114 (2d Cir. 2009) ("Imposition of sanctions under a court's inherent powers requires a specific finding that an attorney acted in bad faith."). Bad faith means acting "vexatiously, wantonly, or for oppressive reasons." *Chambers*, 501 U.S. at 45–46.

To satisfy this standard, a court must conclude that (1) the challenged conduct was entirely without color and (2) the conduct was motivated by improper purposes such as harassment or delay. *Schlaifer Nance & Co. v. Est. of Warhol*, 194 F.3d 323, 336 (2d Cir. 1999); *Wolters Kluwer*, 564 F.3d at 114. The requirement is conjunctive; lack of color and improper purpose must both exist. *Id.*

Conduct is *entirely* without color only when it lacks *any* legal or factual basis. *Wolters Kluwer*, 564 F.3d at 114. If an action has some legal or factual support, considered in light of the reasonable beliefs of the actor whose conduct is at issue, it has color. *Id.* Because of this, mere negligence or even recklessness is not sufficient for sanctions. *Rossbach*, 81 F.4th at 143.

7

Bad faith must also be established by clear and convincing evidence. *Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d 216, 235 (2d Cir. 2020). Clear and convincing means "reasonable certainty," not mere possibility or even a preponderance of the evidence. *See Levin v. Tiber Holding Corp.*, 277 F.3d 243, 250 (2d Cir. 2002).

A finding of bad faith "must be supported by a high degree of specificity in the factual findings." *Wolters Kluwer*, 564 F.3d at 114 (citing *Schlaifer Nance*, 194 F.3d at 337). The Second Circuit has repeatedly reversed district court sanctions orders that fail to make sufficiently particularized bad faith findings. *See Milltex Indus. Corp. v. Jacquard Lace Co.*, 55 F.3d 34, 38–41 (2d Cir. 1995) (reversing sanctions for absence of specific findings supporting bad faith); *Wolters Kluwer*, 564 F.3d at 114–15 (reversing sanctions against firm where record lacked specific evidence of intentional bad faith); *Rossbach*, 81 F.4th at 141 (vacating sanctions against counsel where district court failed to make the required explicit finding of bad faith).

### B. The Court's Inherent Authority to Sanction Corporate Non-Parties is Subject to Even More Demanding Requirements.

The inherent authority doctrine developed principally in the context of managing parties and their counsel within litigation. *See Chambers*, 501 U.S. at 43–46. When a court extends its inherent authority to reach a non-party, the constitutional and prudential concerns multiply.

In particular, due process requires not only that the non-party receive notice of the potential sanction but also notice of the specific source of authority from which the sanction may issue. *Ted Lapidus, S.A. v. Vann*, 112 F.3d 91, 96 (2d Cir. 1997) (due process requires notice of "the sanctioning authority being considered"); *In re 60 E. 80th St. Equities, Inc.*, 218 F.3d 109, 117 (2d Cir. 2000) (the party subject to sanctions must know "the source of authority for the sanctions being considered").

8

Corporate entity status also matters. Unlike an attorney, a corporation is not subject to a court's supervisory authority over officers of the court, has no professional obligations running to a court, is not governed by a court's rules of practice, is not subject to rules of professional conduct, and does not appear before a court in a representative capacity. The authority a court may possess to sanction attorneys therefore cannot and should not be extended to a corporate entity that is neither an attorney nor a party to a proceeding. Instead, such sanction authority must arise, if at all, only from a court's inherent power to sanction conduct that abuses the judicial process. *See Chambers*, 501 U.S. at 43–46.

A party facing sanctions also must have a full and fair opportunity to be heard. The Second Circuit recognizes that before imposing sanctions on a non-party, due process specifically requires that the party be given the opportunity to be heard by the very court that is about to pronounce judgment. *See Schlaifer Nance*, 194 F.3d at 335. "Sanctions carry much more than a pecuniary impact: Reputations are at stake and licenses to practice are in danger." *Id.*

## ARGUMENT

### I.    AEG Cannot Be Sanctioned for an Alleged but Unproven Breach of the Separation Agreement or Violation of Mr. Mueller's Privacy Rights.

As the Court recognizes, the dispute between Mr. Mueller and AEG over a purported breach of the Separation Agreement and violation of Mr. Mueller's privacy rights is for another day and court or arbitrator. *See* Trial Tr. 4472:2-4. In such a proceeding, Mr. Mueller and AEG would be able to litigate their respective claims and defenses in their chosen forum applying California law, and with the benefit of full discovery and legal process. The Separation Agreement ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9



*See* Separation Agreement, § 13, p. 7.

Because the threshold question—whether AEG's disclosure constituted a breach of the Separation Agreement or a violation of California privacy law—remains unresolved, and because the parties have contractually committed to resolve that threshold question in California courts or arbitration, the unproven breach of the Separation Agreement and privacy violations cannot serve as the predicate for sanctions in this proceeding. *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108 (2017) (a court, when using its inherent sanctioning authority, must establish a causal link between the litigant's misbehavior and legal fees paid by the opposing party). An alleged but not-yet-established violation of California law simply cannot constitute litigation misconduct, and therefore, the causal link to sanctions is broken.

Moreover, because AEG did not in fact breach the Separation Agreement or Mr. Mueller's privacy rights when it provided documents to Plaintiffs, Mr. Mueller has not suffered any harm sufficient to support inherent sanctions. "[A] sanction counts as compensatory only if it is 'calibrate[d] to [the] damages caused by' the bad-faith acts on which it is based." *Id.* (*quoting Mine Workers v. Bagwell*, 512 U.S. 821, 834 (1994)). Or put another way, unless and until AEG is found or adjudicated to have breached its obligations, there is no established harm that can be remedied,

and it is premature to impose sanctions. *Id.* (fee award may go no further than to redress the wronged party for losses sustained).

The Court has already fashioned a remedy by "leveling the playing field" to ensure that Mr. Mueller can adequately litigate his claims in California, should he choose to do so. The Court has ordered the Bernick email and its enclosures be disclosed to Mr. Mueller and Live Nation, thereby providing Mr. Mueller with the evidence of purported wrongdoing. Whether Mr. Mueller can successfully use that evidence to establish harm is for another court and another day. But Mr. Mueller has not yet established any such harm, and sanctions cannot rest on the assumption that he will do so.

The causal link to sanctions for Defendants is even more tenuous for three reasons. First, counsel for Defendants elected not to seek sanctions against AEG or Mr. Bernick in this proceeding, rendering an award of sanctions in their favor punitive rather than compensatory. While Defendants have repeatedly thrown serious but unsupported accusations at AEG and Mr. Bernick, the sanctions motion targets only Plaintiffs, as made plain by Defendants' reply memorandum: "But this motion seeks to hold *Plaintiffs* responsible….". Dkt. No. 1390, Reply Memorandum at 1 (emphasis in original).

Second, and setting aside the predicate causation problem, *Goodyear* requires a but-for causal connection between the specific sanctionable conduct and each dollar of fees sought. *Goodyear*, 581 U.S. at 108 ("[T]he court can shift only those attorney's fees incurred *because of* the misconduct at issue."). This requirement has independent bite: the OSC contemplates fees "incurred by defendants or Rick Mueller regarding AEG's disclosure of the materials." Dkt. No. 1401. But AEG cannot be said to be the but-for cause of Defendants' fees for several reasons. For one thing, the dispute that led to Defendants' initial filings, the initial court hearings and orders,

11

and Defendants' initial fees originated not from AEG's disclosures, but from Plaintiffs' decision to back out of an agreement with Defendants over the cross-examination of Mr. Mueller. Bernick Decl. ¶¶ 12, 13. For another, Defendants incurred additional fees not attributable to AEG when they opposed Inner City Press's motion to unseal the redacted letters that Defendants and Plaintiffs had lodged over their disputed agreement. *Id*. at ¶ 14.

Moreover, Defendants' own litigation tactics—filing a broad sanctions motion seeking sweeping, punitive jury instructions that went well beyond harm to Mr. Mueller, pursuing days of additional briefing, and pursuing extensive satellite litigation that could have been avoided entirely had Defendants limited their request to narrowly tailored and remedial relief—are self-inflicted wounds that break the causal chain between AEG's disclosure and the fees Defendants actually incurred. As the Court recognized, Defendants overreached by seeking mismatched dispositive evidentiary sanctions and adverse jury instructions that have nothing to do with an invasion of Mr. Mueller's privacy rights or the appropriate remedy for a breach of contract, and everything to do with aggressive litigation tactics. Sanctions may not include fees that would have been incurred regardless of AEG's conduct or that were caused by Defendants' own litigation strategy. *Goodyear*, 581 U.S. at 109–10; *see also Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*, 991 F.3d 361, 369 (2d Cir. 2021) (the "severity of the sanction must match the seriousness of the misconduct").

Finally, counsel for Defendants do not represent Mr. Mueller in this proceeding, and therefore any fees incurred by Defendants are not causally tied to the purported breach of Mr. Mueller's rights under California law. And as is the case with Mr. Mueller's claims, Defendants' asserted harm in this case cannot be premised on a to-be-resolved dispute over whether AEG breached California law.[2]

---

[2] If the Court reaches the question of remedy, AEG respectfully requests an evidentiary hearing on causation and fee amounts before any award issues. *Schlaifer Nance*, 194 F.3d at 335

Nevertheless, because Defendants' accusations of witness tampering are based exclusively on the false premise that AEG violated California law, AEG explains below why that premise does not hold water.

## II.    AEG Acted Legally, Ethically, and Appropriately in Providing the Separation Agreement and Employment Records to Plaintiffs in Confidence and Solely for Impeachment Purposes.

### A.    AEG Was Entitled to Disclose the Separation Agreement to Enforce It.

Section 7(a) of the Separation Agreement authorizes the disclosure of the Separation Agreement and its terms "to the extent necessary to enforce the Agreement." Ex. C at § 7(a).

████████████████████████████████████████████████████████

████████████████████████████████████ These two unambiguous provisions authorize AEG to disclose the Separation Agreement as necessary to ensure that Mr. Mueller testified truthfully at trial, and that is exactly what happened.

Specifically, AEG provided the Separation Agreement to Plaintiffs for impeachment purposes because the Company was justifiably concerned that Mr. Mueller would not honor his promise to provide truthful or complete trial testimony when questioned about his departure from AEG. This concern was based on experience, not speculation. AEG ████████████ ████████████ Trell Decl. ¶ 4. After the company learned that Mr. Mueller may have been ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████. Belloli Decl. ¶¶ 5–7.

Each time, Mr. Mueller ████████████████████████. Belloli Decl. ¶¶ 5–9. On April 1, 2024, ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████ Belloli Decl. ¶ 5. Two weeks later, on April 16, 2024, Mr. Belloli ████

█████████████████████████████████████████████████████████████████████

██████████ Belloli Decl. ¶¶ 6–7. ███████████████████████████████████

██████████████████████████ Belloli Decl. ¶ 7.

Mr. Mueller's repeated denials were false. The company ███████████████████

████████████████████████████████████████████████████████████ Belloli

Decl. at ¶ 8. The company therefore ████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████ Trell Decl.

¶ 4. Thus, AEG was rightfully concerned that Mr. Mueller would once again not be honest about ████████████████████████████ during his trial testimony in this case, and AEG provided Plaintiffs with evidence that could be used to impeach Mr. Mueller's credibility if that concern came to pass.

AEG nevertheless took steps to ensure that the Separation Agreement *would only* be disclosed as necessary to enforce its terms. AEG provided the Separation Agreement and the other employment records to Plaintiffs in confidence, with the express understanding that the materials would be used to impeach Mr. Mueller's credibility if, and only if, he lied on the stand ██████████ ███████████████████████████████████████ Bernick Decl. ¶ 11. AEG also secured a commitment from Plaintiffs that the materials would be used only to impeach Mr. Mueller if he offered untruthful testimony concerning the materials during cross-examination, and the documents would not be released publicly or introduced as trial exhibits. Bernick Decl. ¶ 9. AEG further sought—

14

and obtained—reassurance from Plaintiffs' counsel that the company would be given the opportunity to be heard before the documents ████████████████████ were made public. Bernick Decl. ¶ 8; March 24, 2026 Email from J. Bernick to A. Gitlin (Dkt. No. 1375-1 at 5); Bernick Decl. ¶ 9. If Mr. Mueller testified truthfully, none of the materials would be used at trial or otherwise.

Because the Separation Agreement would only be used, if at all, to impeach Mr. Mueller if he lied or downplayed the circumstances of his departure, because the Separation Agreement ██████████████████████████ and because the Separation Agreement permitted disclosure as necessary to enforce its terms, AEG was within its right to share the Separation Agreement with Plaintiffs. Fikre Decl. at ¶ 9; Ex. C (Separation Agreement, §§ 7(a) and 7(b), p. 4-5). And for the reasons explained in Section III below, even if the Court is not convinced that AEG's disclosure was permitted under the Separation Agreement, that interpretation alone does not mean AEG should be sanctioned if AEG had a colorable explanation for its conduct and the conduct was not motivated by an improper purpose, both of which are true.

## B.    Mr. Mueller Did Not Negotiate the Separation Agreement or Request Confidentiality.

It is also important to understand the genesis of the confidentiality provision in the Separation Agreement. The company ███████████████████████████████████████████████████████████████ the Separation Agreement and ██████████████████████████ Trell Decl. at ¶¶ 4–5. Mr. Mueller signed the Separation Agreement ██████████████████████ ████████████ Trell Decl. ¶ 7; Ex. C (Separation Agreement at 8 (signature block, dated May 8, 2024)). He did not request a modification of any of its provisions. Trell Decl. at ¶ 7. He did not try to negotiate its terms. *Id*.

15

Mr. Mueller also did not request or seek confidentiality regarding the Separation Agreement or his departure. *Id*. Instead, the confidentiality provision in the Separation Agreement is standard language that is typically used in the company's template agreement for California-based employees. Trell Decl. at ¶ 6. This language is intended to comply with California law restrictions on the use of confidentiality and non-disparagement provisions in separation agreements. *See* CAL. GOV. CODE § 12964.5; CAL. CODE CIV. PROC. § 1001. For example, the California Fair Employment and Housing Act makes it unlawful for an employer to include in any agreement related to an employee's separation from employment any provision that prohibits the disclosure of information about unlawful acts in the workplace. Cal. Gov. Code § 12964.5(b).

These facts are important for several reasons. First, while the Separation Agreement prohibits the disclosure of "the matters discussed in negotiating *the terms* of this Agreement" (emphasis added), there were no negotiations over the terms of the Separation Agreement, and therefore there are no "matters discussed" in negotiating those terms. Separation Agreement at § 7(a); Trell Decl. at ¶¶ 6-7. The agreement was presented to Mr. Mueller, and he signed it without attempting to negotiate its terms. Trell Decl. at ¶¶ 5, 7. Thus, it is not correct to say that the other employment records are swept up by the prohibition on disclosure of "matters discussed in the negotiating the terms of this Agreement." Separation Agreement at § 7(a).

Second, even if the other employment records could be characterized as "matters discussed" in negotiating the terms of the Separation Agreement, that confidentiality provision remains subject to the disclosure exception for the enforcement of the agreement's terms.

Third, this is not a situation where Mr. Mueller sought out or negotiated specific confidentiality protections. While Defendants make much of the purported violation of Mr. Mueller's privacy rights in an attempt to further their litigation goals, the reality is that Mr.

16

Mueller's privacy would never have been impacted but for the dispute between Plaintiffs and Defendants over Mr. Mueller's trial testimony and Defendants' initial efforts to prevent Plaintiffs from impeaching Mr. Mueller the night before he was scheduled to testify.

Consequently, AEG was lawfully entitled to provide the Separation Agreement to Plaintiffs in order to enforce its terms. And as discussed below, AEG was equally entitled to provide its employment records and ███████████████ materials to Plaintiff.

### C.    AEG Owns the Employment Records That It Provided to Plaintiffs, Not Mr. Mueller.

During the discussion of Defendants' sanctions requests on April 1 and April 8, defense counsel and Mr. Mueller's personal counsel argued to the Court that Mr. Mueller has a "sacrosanct" privacy interest in "his" personnel records. This argument fails when scrutinized under applicable law.

Contrary to Defendants' assertions, AEG is the owner of the personnel records and ███████████████ materials it prepares and maintains with respect to its employees. *See* Cal. Labor Code § 2860 ("Everything which an employee acquires by virtue of his employment, except the compensation which is due to him from his employer, belongs to the employer, whether acquired lawfully or unlawfully, or during or after the expiration of the term of his employment."). Therefore, employees have no ownership rights or property interests in their personnel records. *Pillsbury, Madison, & Sutro v. Schectman*, 55 Cal. App. 4th 1279 (1997) (employer is the owner of confidential personnel documents taken by former employees without employer's consent). And while employees have the right to inspect and copy their personnel records under Labor Code section 1198.5, employees must pay the actual costs of reproduction if they want copies of the records, a cost they obviously would not need to pay if they owned the records. *See* Cal. Labor Code § 1198.5(b)(1).

Thus, Mr. Mueller had no ownership or property interest in the ████████████ documents and employment records that AEG provided to Plaintiffs in confidence, and for the reasons discussed below, AEG was perfectly entitled to disclose its own records under California law if it chose to do so.

### D.    California Privacy Law Unequivocally Authorizes the Disclosure of the Employment Records.

Privacy interests in California are protected both by statute and the state constitution. CAL. CONST. ART. I, § 1; CAL. CIV. CODE §§ 1798.100 *et seq.*; *see also Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 15–27 (1994) (discussing both constitutional and statutory sources of California privacy rights). The primary California privacy statute is the California Consumer Privacy Act, as amended by the California Privacy Rights Act ("CPRA"). And Article I, Section 1 of the California Constitution provides a general constitutional right to privacy to California citizens.

While these statutory and constitutional privacy rights apply in certain contexts, California law does not impose a blanket notice or consent requirement before an employer may disclose its personnel records to third parties. Instead, restrictions are statute and context specific (e.g., consumer records produced in response to state court civil subpoenas, medical records, or consumer credit reports). *See, e.g.*, CAL. CIV. CODE §§ 56 *et seq.* (Confidentiality of Medical Information Act); CAL. CIV. CODE §§ 1785.1 *et seq.* (Consumer Credit Reporting Agencies Act). However, none of those restrictions apply to AEG's provision of employment records to Plaintiffs.

### 1.    The CPRA Expressly Authorizes AEG's Disclosure of Its Employment Records.

The CPRA itself expressly authorizes the release of personnel records to government agencies. Specifically, California Civil Code section 1798.145(a) provides that CPRA's privacy restrictions and obligations "shall not restrict a business's ability to:

18

(A) Comply with a civil, criminal, or regulatory *inquiry*, investigation, subpoena, or summons by federal, state, or local authorities [. . .]

(C) *Cooperate with* law enforcement agencies concerning conduct or activity that the business reasonably and in good faith believes may violate federal, state, or local law [. . .] and

(E) *Exercise* or defend legal claims."

Cal. Civ. Code § 1798.145(a) (emphasis added).

Several key points are illuminated by the CPRA exceptions. First, no subpoena is required. Subsection (A) broadly covers compliance with an "inquiry" or "investigation," and not just compulsory discovery procedures. Compliance with "subpoena" and "summons" are listed separately.

Second, the statute authorizes an employer to respond to "inquiries" from "federal, state, or local authorities," including the D.C. and California Attorneys General. This is precisely what AEG did.

Third, voluntary cooperation with law enforcement agencies is affirmatively contemplated. Subsection (C) expressly protects good faith cooperation with law enforcement agencies concerning conduct or activity that the employer reasonably and in good faith believes may violate federal or state law, such as the antitrust violations committed by Defendants.

Fourth, there is no notice or consent requirement. Nothing in CPRA conditions disclosures under Section 1798.145(a) on employee notice or consent.

Fifth, and more generally, the CPRA authorizes the processing and disclosure of personnel records for purposes compatible with the context of their collection. Cal. Civ. Code § 1798.100(c) states, "A business' collection, use, retention, and sharing of a consumer's personal information shall be reasonably necessary and proportionate to achieve the purposes for which the personal information was collected or processed, or for another disclosed purpose that is compatible with the context in which the personal information was collected" (emphasis added). Disclosures for

19

legal compliance and government investigations are paradigmatic examples of compatible secondary processing. *See*, *e.g.*, Civ. Code § 1798.145(a)'s enumerated exceptions.

Consequently, multiple provisions of the CPRA, the primary privacy statute in California, expressly authorize AEG to: (1) produce its employment records in response to an inquiry from the 36 state Attorneys General who are prosecuting this lawsuit, (2) cooperate with the AGs efforts to remediate conduct or activity that AEG believes violate federal or state antitrust laws; and (3) do so without Mr. Mueller's notice or consent.

### 2.    The California Constitutional Right to Privacy Does Not Apply Because Mr. Mueller Had No Reasonable Expectation of Privacy.

Mr. Mueller's purported privacy interests in his personnel records fare no better under the California Constitution. Article I, Section 1 of the California Constitution guarantees a right to privacy. However, the California Supreme Court has made clear that this right is not absolute and does not create a categorical or *per se* rule against all intrusions. Rather, whether a person has a "reasonable expectation of privacy" depends on context and circumstance and must be evaluated on a case-by-case basis. *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 35–37 (1994).

In *Hill*, the California Supreme Court articulated the governing framework for state constitutional privacy claims. The Court held that to prevail on an invasion of privacy claim, a plaintiff must establish: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy under the circumstances; and (3) a serious invasion of that interest. *Id.* at 39-40. Failure to establish any one of these elements defeats a constitutional privacy claim. *Id.* at 40.

Critically, the *Hill* court emphasized that even "when a legally cognizable privacy interest is present, other factors may affect a person's reasonable expectation of privacy. For example, advance notice of an impending action may serve to 'limit [an] intrusion upon personal dignity and security' that would otherwise be regarded as serious." *Id*. at 36.

20

Here, Mr. Mueller was put on clear notice that AEG might disclose his personnel records to third parties, thereby destroying any expectation of privacy he might have otherwise held. Belloli Decl. ¶ 12, Ex. C at § 7(a). During Mr. Mueller's employment, AEG informed its employees via a Privacy Notice published to the Company's employee intranet site that the Company could disclose his ███████████████████████████████████ in connection with legal, regulatory, or accountability-related matters. *Id*. Specifically, AEG's HR Privacy Notice, revised December 15, 2022, and effective December 29, 2022 (the "HR Privacy Notice," attached hereto as Ex. E), explicitly discloses that employee Personal Data ████████████████████ ████████████████ may be used and disclosed for legal and regulatory compliance, external accountability, and litigation-related purposes. *Id*.

The HR Privacy Notice's definition of Personal Data expressly includes ████████████ ████████████████████████████ records, records relating to ████████████████ and compliance and governance materials. The categories of employment records that AEG provided to the Plaintiffs concerning Mueller's departure—including ████████████████████████ ████████████████ documentation—fall squarely within these enumerated categories.

In defining AEG's permitted "Business Purposes," (for which all Personal Data may be used and disclosed), the HR Privacy Notice expressly includes: "Legal and regulatory compliance, including without limitation, all uses and disclosures of Personal Data that are required by law or for compliance with legally mandated policies and procedures," and "other processing in connection with the establishment and defense of legal claims." *Id*.

The HR Privacy Notice also states that records relating to █████████████████████ ████████████████ may be used for, among other things, "demonstrating compliance and accountability externally," and "as needed for litigation and defense of claims." *Id*.

These provisions are not conditioned on employee consent and place employees on notice that ███████████████ records may be disclosed and relied upon in legal proceedings and regulatory contexts, and without compulsory process. Belloli Decl. at ¶ 12.

In light of these disclosures, Mr. Mueller (a senior executive) could not reasonably expect that company records concerning ████████████████████████████ records would remain categorically insulated from disclosure in litigation or regulatory contexts, and AEG was permitted to disclose the records to Plaintiffs. *See Hill*, 7 Cal. 4th at 37-40. And while AEG was under no compulsion to do so, the company still took steps to ensure the records would not be publicly disclosed, as discussed above.

### III. Supplying Impeachment Evidence to Plaintiffs Is Not Sanctionable Conduct.

For transparent reasons, in their motion for sanctions that led to the Court's OSC, Defendants focused on the intent of Mr. Bernick's cover email enclosing the documents that AEG provided to Plaintiffs. Mr. Bernick will address the intent behind his statements in the cover email, none of which are attributed to AEG.

To be clear, AEG is accused only of having provided documents in violation of California law. *See* Dkt. 1401. There has been no allegation that AEG engaged in any other form of misconduct or witness tampering. *See id.*; Dkt. No. 1378 at 1; Dkt. No. 1390 at 1. Nevertheless, AEG addresses its reasoning for providing the Separation Agreement and employment records to demonstrate that it did so for proper purposes.

### A. AEG Acted Appropriately in Providing Impeachment Evidence to Plaintiffs.

AEG did not act rashly or in disregard of its obligations in sharing the materials with Plaintiffs. To the contrary, AEG's conduct reflects care, not rashness. AEG provided the materials only in response to a direct request from a senior state enforcement official, only in confidence, only with assurances that the materials would be used solely for impeachment if Mr. Mueller

22

testified untruthfully, and only with assurances that AEG would be heard before any public disclosure. Bernick Decl. at ¶¶ 6–9; Fikre Decl. at ¶¶ 5, 8.

After concluding it could provide Plaintiffs with impeachment evidence outside of formal discovery, AEG did so for two reasons: (1) to allow Mr. Mueller to be impeached if he misrepresented the circumstances regarding his employment and (2) to continue AEG's long history of being responsive to and cooperative with the government's request for assistance in a lawsuit that matters a great deal to AEG. Bernick Decl. at ¶¶ 1–2, 8–9; Fikre Decl. at ¶ 8.

As to the first reason, the Court noted there is nothing inherently improper about AEG, a competitor of Defendant Live Nation with an interest in the outcome of the litigation, providing Plaintiffs with information helpful to Plaintiffs' case in response to a hallway conversation. Trial Tr. 3706:18–3707:6. And despite Defendants' wild accusations to the contrary, AEG had no legal prohibition on providing the materials and information to Plaintiffs for the reasons outlined in Sections II.A, II.C, and II.D above.

Instead, AEG firmly believed then, and AEG firmly believes now, that it "did the right thing" by providing the impeachment evidence. Fikre Decl. at ¶ 9. Mr. Mueller was an important witness in the case. His ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ gave AEG pause as to his credibility on the stand. Mr. Mueller ▇▇▇▇▇▇▇ to testify truthfully, and AEG wanted to ensure it could effectively ▇▇▇▇▇▇▇▇ by arming Plaintiffs to impeach his credibility if he ▇▇▇▇▇▇▇ Trell Decl. at ¶ 5; Ex. C (Separation Agreement § 7(b)); Bernick Decl. at ¶¶ 8, 9; Fikre Decl. at ¶¶ 8, 9. None of this is bad faith or malicious conduct. And there is no evidence in the record of AEG acting with malicious intent.

As to the second reason, it is reasonable—not bad faith—for AEG to voluntarily produce information in response to a request for assistance from the government after a long history of such

cooperation. Moreover, AEG believed it was permitted to disclose the information in the manner it did (correctly so), and so there was no reason to demand a subpoena when a consortium of 36 state agencies approached the company and asked for help. Fikre Decl. at ¶ 8.

### B.        There Is No Clear or Convincing Evidence of Bad Faith By AEG.

A court may not impose inherent authority sanctions without explicitly finding bad faith. *Rossbach*, 81 F.4th at 143; *Wolters Kluwer*, 564 F.3d at 114. And a bad faith finding requires both that (1) the challenged conduct was entirely without color and (2) the conduct was motivated by improper purposes such as harassment or delay. *Schlaifer Nance*, 194 F.3d at 336; *Wolters Kluwer*, 564 F.3d at 114. Conduct is without color only when it lacks any legal or factual basis, and it is colorable when it has some legal and factual support, considered in light of the reasonable beliefs of the attorney whose conduct is at issue. *Wolters Kluwer*, 564 F.3d at 114.

Here, while the parties may dispute whether AEG breached the Separation Agreement's confidentiality provision by providing it to Plaintiffs, it is abundantly clear that AEG has more than a "colorable" legal and factual basis for providing the document to Plaintiff. As explained in Sections II(A) and (B) above, not only does AEG have a legal basis for disclosing the agreement, but it actually was permitted to do so as a matter of law. Thus, providing the Separation Agreement to Plaintiffs cannot be considered improper conduct without color on which sanctions are based.

This is equally true with respect to the provision of the employment records that were provided with the Separation Agreement. For the reasons detailed in Sections II(C) above, AEG both owned those records and was permitted to disclose them under California statutory and constitutional law without Mr. Mueller's knowledge or consent. Thus, the act of providing those materials also cannot serve as improper conduct that is sanctionable.

Even if the Court were to conclude that AEG recklessly disclosed the materials, or even if the Court is not convinced that AEG's disclosure was permitted under the Separation Agreement,

AEG still cannot be sanctioned for its conduct unless the Court also finds that AEG had no colorable basis for providing the materials, *Rossbach*, 81 F.4th at 143, and that AEG's acts were motivated by an improper purpose. *Schlaifer Nance*, 194 F.3d at 336. The record must contain clear and convincing evidence of both a lack of a colorable explanation for and improper motivation for the conduct. *Yukos*, 977 F.3d at 235.

There is no such evidence. There is no evidence that AEG attempted to contact Mr. Mueller or dissuade him from testifying, and AEG did not do so. Bernick Decl. at ¶¶ 15, 17; Fikre Decl. at ¶¶ 5-7. There is no evidence that AEG pressured Mr. Mueller or threatened to make the circumstances of his departure public if he testified, and AEG did not do so. Bernick Decl. at ¶¶ 8, 9, 17; Fikre Decl. at ¶¶ 5-7. There is no evidence that AEG informed Defendants of the materials or documents in an effort to convey a message to Mr. Mueller, and AEG did not do so. Bernick Decl. at ¶ 17; Fikre Decl. at ¶ 6. And these evidentiary holes remain unfilled even if the Court concludes that AEG should not have provided the materials to Plaintiffs.

Instead, the available evidence shows the opposite—that AEG extracted a promise from Plaintiffs to keep the materials confidential and not use them unless and until Mr. Mueller testified untruthfully, and even then, to use them solely to impeach his untruthful testimony, without releasing the materials publicly or using them as trial exhibits. Bernick Decl. at ¶¶ 8, 9. This is the opposite of witness tampering.

AEG also did not know when it provided the documents that the Plaintiffs' counsel had reached a side agreement with defense counsel regarding Mr. Mueller's questioning on his termination (Bernick Decl. at ¶ 13), and so AEG cannot be accused of somehow interfering with that agreement.

25

AEG disclosed impeachment evidence to Plaintiffs because it wanted the jury and Court to have more evidence, not less. AEG acted with a clean conscience and in good faith, not bad faith.

## IV.   AEG Has Not Received Adequate Notice or a Proper Opportunity to be Heard.

Due process mandates that a non-party receive notice of both the potential sanction and the specific source of authority from which the sanction may issue. *Ted Lapidus*, 112 F.3d at 96 (2d Cir. 1997) (due process requires notice of "the sanctioning authority being considered"); *In re 60 E. 80th St. Equities, Inc.*, 218 F.3d at 117 ("the party subject to sanctions must know the source of authority for the sanctions being considered").

Here, the Court's OSC identifies the conduct at issue—"AEG's disclosure of the materials"—but does not specify the legal authority under which sanctions are being considered. The OSC should be discharged for this reason alone. *See Ted Lapidus*, 112 F.3d at 96.

AEG also is not subject to the more rigorous conduct requirements imposed on attorneys. While an attorney may be sanctioned under the Court's supervisory authority over officers of the court or for violations of the rules of professional conduct, AEG does not owe those same duties, and sanctions can arise, if at all, only from a court's inherent power to sanction abuse of the judicial process. *See Chambers*, 501 U.S. at 43–46. Here again, the OSC does not advise AEG that it is subject to such sanctions.

Sanctions also should not issue before AEG has a full and fair opportunity to be heard. *See Schlaifer Nance*, 194 F.3d at 335. "Sanctions carry much more than a pecuniary impact: Reputations are at stake and licenses to practice are in danger." *Id.* Therefore, unless the Court discharges the OSC on the papers—which is the proper result here—AEG respectfully requests oral argument before sanctions issue. *Id.*

26

## CONCLUSION

When all is said and done, AEG's innocence is easily demonstrated by what it did and what it didn't do. AEG *did* ensure the materials it provided would only be used *after* Mr. Mueller testified at trial and even then only if Mr. Mueller's testimony was deemed untruthful by Plaintiffs and therefore subject to impeachment. AEG *did not* disclose the materials to Mr. Mueller or Defendants *before* he took the stand. If the goal was to stop Mr. Mueller from testifying, the inverse would be true.

AEG lawfully provided the materials to the government after the government requested help. Neither California law nor the Separation Agreement prohibit AEG from doing so, and AEG made sure the materials remained protected from public disclosure. This is not a close call – AEG proceeded in good faith and sanctions should not issue.

Dated: New York, New York
      April 18, 2026

BAKER & MCKENZIE LLP

 /s/  *Jacob M. Kaplan*
Jacob M. Kaplan
452 Fifth Avenue
New York, NY 10018
Tel. +1 212 626-4100
Fax: +1 212 310 1600
jacob.kaplan@bakermckenzie.com

Robin Samuel (*pro hac vice application pending*)
10250 Constellation Blvd., Ste. 1850
Los Angeles, CA 90067
Tel. +1 310 201-4728
Fax. +1 310 201-4721

Michael D. Lehrman (*admission to SDNY approved, swearing-in ceremony pending*)
300 E. Randolph St., Ste. 5000
Chicago, IL 60601
Tel. +1 312 861-8000
Fax. +1 312 861-2899

*Attorneys for Non-Party*
*Anschutz Entertainment Group, Inc.*

27

**<u>Certificate of Compliance</u>**

I, Jacob M. Kaplan, an attorney duly admitted to practice before this Court, hereby certify pursuant to Local Rule 7.1(c) of the United States District Court for the Southern and Eastern Districts of New York and Rule 8(c) of Judge Arun Subramanian's Individual Practices in Civil Cases that the foregoing Response to Order to Show Cause was prepared using Microsoft Word and contains 8,561 words. In making this calculation, I have relied on Microsoft Word's word count.

Dated: April 18, 2026

_____/s/_ _Jacob M. Kaplan_____
Jacob M. Kaplan

28