

*Live-Fi™ Technology Holdings*

*7302 Woodstone Circle*
*Princeton, NJ 08540*
*amyg@live-fi.com*
*917-733-9981*

May 9, 2026

Supplement Motion for Reconsideration - Intervention as of Right, for Hearing by Order to Show Cause and Other Injunctive Relief

Hon. Arun Subramanian
US District Court, SDNY
500 Pearl Street Courtroom 23B
New York, NY 10007

cc: (1) Hon. Owen Kendler US Dept. of Justice Antitrust Division
(2) US Court of Appeals for the Federal Circuit - Case No. 25-1954
(3) DCD Case No. 25cv3257 (LLA)(JMC)
(4) SDNY Pro Se Unit Attn: Mr. Burcato
(5) Hon. Brenda Sannes, Chief Judge NYND
(7) Hon. Laura Taylor Swain, Administrative Judge NYSD
(8) Hon. Debra Ann Livingston, Chief Judge Second Circuit
(9) Hon. Congresswoman Bonnie Watson Coleman, Mercer County, NJ

Hon. Amy Klobuchar, US Senator, D MN, Senate Judiciary Committee
Hon. Mike Lee, US Senator, R UT, Senate Judiciary Committee

RE: *US v. Live Nation Entertainment, Inc.*, 24cv3973
(AS)(SDNY)Motion to Intervene Rule 24 (Reconsideration)

Dear Judge Subramanian:

Further investigation into defendant Live Nation Entertainment (LNE)'s abhorrent bad faith conspiratorial acts revealed much more than engaging in *ex parte* negotiations with newer members of the Antitrust Division of the US Dept. of Justice in March 2026 to get an offer approved to present to the 39 US state plaintiffs. While eight US states did ultimately accept the offer, the offer could not be approved or otherwise 'so ordered' by the court because defendant LFTH US patents were offered as part of the settlement in an overlay platform. Intervenor LFTH was not a party to the lawsuit and given no opportunity to respond. This defies due process of law and the Fourteenth Amendment.

On March 13, 2026, the court engaged in *ex parte* communications with administrative insider Julie Allsman. Allsman instigated that conversation with Your Honor and was reported to the US Dept. of Justice. Investigation revealed that since 2013 Allsman previously conspired *ex parte* with defendant LNE's previous SDNY defense attorneys at Hinshaw & Culbertson's NY office (in particular J. Richard Supple, himself a concealed First Dept. attorney grievance committee counsel who never disclosed conflicts of interest) and with former magistrate Henry Pitman. In response to those *ex parte* sessions, Allsman unilaterally struck essential entries from SDNY dockets without court approval. The deletions included LFTH's infringement complaint docketed and date stamped April 22, 2010 and FRCP Rule 60(b) motion based on LNE defendants' continuing fraud and instructing forgery of archived NYS files by Supple. Supple engaged in those acts. LFTH's patents and copyrighted platforms disclose the "fly wheel technology" that enable non-ticketing businesses per event using defendant Ticketmaster's ticketing data and the parallel US registered copyrights have also been stolen.

1

In 2010 and again in 2020, the DC District Court had proscribed the merged entity from withholding ticketing data from companies seeking to conduct non-ticketing businesses [1]. The willful violations continue. The court's *ex parte* communications with Allsman on March 13, 2026 resulted in a *sua sponte* order that must be vacated and order to show cause is still pending.  The contents of Allsman's communications and whatever documents were exchanged were never shared or otherwise served on LFTH's California counsel (who was granted *pro hac vice* status in Docket #638).

Prospective injunctive relief to grant full party status to LFTH must now be ordered because the eight States' acceptance of defendant LNE's offer necessarily will infringe LFTH's patents. Defendant LNE must now be held for willful infringement damages and bad faith. This cannot be allowed.[2]

The Fourteenth Amendment guarantees intervenor LFTH the constitutional right to enforce its patents in any district where the claims are being used without permission. That includes the SDNY. Defendant LNE has been using the patents in NYS without permission since at least 2008 and at the same time, also plagiarizing LFTH's software copyrights and "fly wheel" trademarks.

---

[1] *US v. Ticketmaster and Live Nation*, 2010 WL 975407, 975408, pp. 8 line 10 (DCD January 25, 2010)(Amended Jdgment January 8, 2020 in full force and effect)

[2] Under 15 U.S.C. § 16(b)–(h) (Tunney Act):

- Any DOJ antitrust settlement must be filed with the court
- Must be published in the Federal Register
- Must undergo a 60-day public comment period
- Must be approved by the court as "in the public interest"

In 2008-2009, defendant LNE had its former SDNY defense lawyers at Hinshaw & Culbertson (J. Richard Supple), Baker Botts (Steven Schortgen) and Cowan Liebowitz & Latman (Midge Hyman, Simon Gerson, C. Christopher Jensen, Mark Montague and William Borchard) blatantly lie in sworn affidavits to the SDNY (former Judge Barbara S. Jones) as part of a RICO conspiratorial enterprise to steal or otherwise delay LFTH's essential patent hearings. Defendant LNE lied in five sets of moving papers filed since 2009 and in employee affidavits by Richard Munieri and Hamlet Newsom that defendant LNE had "*no NY contacts*" and therefore could not be forced to answer for infringement of LFTH's ticketing management and sports betting patents before the SDNY. No infringement hearings were ever allowed for 13 years and therefore there is no issue of claim preclusion that could be applied by this court. Defendant LNE owned House of Blues, Roseland Ballroom and Irving Plaza since at least 2005 when defendant LNE's logo was captured on a film still on the Irving Plaza marquis shot in 2005.

At the same time, the Cowan Liebowitz & Latman defendants were representing LFTH's California counsel/inventor before the United States Patent and Trademark office. The defendant Cowan lawyers were placed under conflicts of interest investigation by the US Commissioner and were found to have patent with five clients including defendant LNE and MLB. The Commissioner admittedly took fourteen of LFTH's applications out of the queue for prosecution in due course to conduct the investigation, delaying issuance of LFTH's patents. An FOIA complaint was filed to produce all documents before the USPTO, the DC District Court and the Federal Circuit 25-1954.

In 2025 it was discovered that NYS administrator-attorney Shawn Kerby serving at the Office of Court Administration (OCA) had also been writing *ex parte* to the Federal Circuit not to hear three arising under patent appeals to orders of the SDNY denying strict liability infringement and contributory infringement hearings including against defendant LNE, Phish and the Cowan defendants based on conflicts of interest. 18-2076, 20-1620, 23-134 (Fed Cir.) At all times relevant

3

Supple was defending both defendant LNE and the Cowan lawyers while he was dually serving as a First Dept. attorney grievance committee (AGC) counsel without disclosing conflicts of interest. As found by the First Dept. in 2016 Supple inserted *ex parte* and unserved documents into the NYS file archives to stage a fraudulent smear campaign. The documents were confirmed as forgeries on August 26, 2025 when LFTH's California counsel was given first access to the files. 24cv211 (SDNY)(Docket Entries #85, 101, 111, 112)

The First Dept. found in the same order entered April 21, 2016 that no access would be allowed into the state files. Therefore the fraudulent smear campaign - while per se unconstitutional, fraudulent and defamatory continued. However, that fabricated campaign never had anything to do with LFTH's constitutional right to enter district courts to enforce its US patents and affirm the valuable patents in the market.

There was never an opportunity afforded LFTH or its counsel to oppose Supple's inserted forgeries. However, since 2019 the forgeries were found nonfinal by the NY Court of Appeals and could not be used collaterally by any court officer to further infect the record. But they were used by Allsman and Kerby and circulated to several court administrators including to the US Court of Appeals for the Federal Circuit that has exclusive appellate jurisdiction over arising under patent cases.

However, because Allsman continued *ex parte* deletion of docket entries in this 24cv3973 lawsuit, her acts in furtherance of the conspiracy allow recovery of treble RICO damages jointly and severally against each member thereof back to the time when the conspiracy was organized. On March 13, 2026, Allsman was identified by Attorney Services Clerks in SDNY Room 250 as the individual who fraudulently removed LFTH's infringement complaints from SDNY docket 06cv1202 in 2013, 2018 and 2023 and also removed LFTH's counsel's SDNY vested roster listing without notice, hearing or due process of law in or about 2013.

4

Kerby's separate acts an OCA insider were undertaken in her official capacity with actual and apparent authority to bind NYS. They were undertaken without standing, party status or jurisdiction and unprotected. *Forrester v. White*, 484 US 219 (1989);, 435 US 349 (1978); The Federal Circuit's transfer orders of patent appeals induced by Kerby's fraud are void. *Tumey v. Ohio*, 273 US 510 (1927); ABA Rule 2.9 *Ex parte Communications*. The Second Circuit had and has no jurisdiction to hear arising under patent appeals and never heard the appeals on the merits. Supremacy Clause Art. VI, Cl. 2.

The State of NY has waived Eleventh Amendment immunity from damages for acts of tortious interference, unjust enrichment and misappropriation of property by its officers under Sections 8-10 of the Court of Claims Act. The interests of NYS agencies –such as the Port Authority of NY and NJ, the NYS Gaming Commission and the NYS Thruway, Interstate toll booths and congesting pricing ventures using the patents without permission– were always in sync with defendant LNE's interests to avoid infringement hearings.

In 2024, the named state agencies' decisionmakers were sued for prospective injunctive relief to stop using the patents without permission. *Ex parte Young*, 209 US 123 (1908); NYND 24cv211 (Docket #s 85, 101, 106, 108, 110, 111, 112). Moreover, the NY Court of Claims Chief judge who returned otherwise proper damage claims against NYS under *respondeat superior* is the respondent both in the NYND amended lawsuit and a new Appellate Division Third Dept. lawsuit. CV-26-0784. *Kentucky v. Graham*, 472 US 159 (1984)

## ERRORS OF THE COURT

Most respectfully, this court has focused on contumacious tying violations by the merged entity that were expressly proscribed by the DC District Court judgment in 2010. On April 15, 2026, the jury found a vertical monopoly in violation of restraint of trade. The court denied transfer of this lawsuit in 2025. It cannot now have approved a settlement with eight US states that will necessarily involve willful

5

infringement of LFTH's patents without allowing LFTH any opportunity to respond as a party.

There was no dispute then that defendant LNE had defied all of the conditions of merger so ordered in the 2010 DC district court judgment and in the 2020 amendment judgment. *US v. Ticketmaster and Live Nation*, Consent Decree and Competitive Impact Statement, 2010 WL 975407, 975408, pp. 8 line 10 (January 25, 2010)(January 8, 2020). However, the court denied transfer.

However, in 2025, in violation of the doctrine of law of the case, the court instructed only intervenor LFTH with the same antitrust claims and more to return to the DC court to enforce its judgments. The orders are inconsistent in violation of equal protection.

Moreover, when LFTH did follow the court's instructions in 2025 (25cv3257), the sitting DC judge Loren Alikhan copied Kerby and Allsman's circulated *ex parte* postings and entered an order fabricating that "*LFTH's counsel is not admitted to any bar*". Counsel is in excellent standing in California and full disclosures were made to this court (Docket #s 638, 1483). [3] Court administrators were used as conspiratorial pawns by defendant LNE and its attorneys.

---

[3] Moreover, the court overlooked that LFTH's opposition to the DCD merger judgment was posted by the Dept. of Justice Antitrust Division in March 2010 by Hon. Owen Kendler, former chair, and the opposition remains posted on the Media and Entertainment webpage as "E". It predicted the violations by defendant LNE that are the subject of the Government's complaint. Investigation confirmed that it was newer members of the US Attorney General who ignored law of the case and improperly negotiated with defendant LNE *ex parte* in March 2026.

6

## LNE's EX PARTE NEGOTIATIONS WITH DOJ OFFICERS IN BAD FAITH WARRANTING TREBLE RICO DAMAGES, PUNITIVE DAMAGES AND DIVESTITURE INCLUDED TEH FOLLOWING OFFER:

1. An API overlay allowing third-party non-ticketing businesses to access limited ticketing data from Ticketmaster's ticketing platform to enable other benefits and revenues per event, revenues that LNE has deceitfully concealed that are not shared with artists, also jacking up the already-inflated price per ticket the public has to pay.
2. A data-sharing framework with strict LN/TM control.
3. No structural separation of defendant LN and TM.
4. No divestiture.
5. No breakup of Ticketmaster.
6. No change to exclusive venue contracts.
7. No change to promotion-ticketing tying.
8. No remedies to address monopoly power.

What was legally required for 7–8 states to "accept" the proposed offer and withdraw from the SDNY lawsuit?

1. Each state's attorney general was required to sign a settlement stipulation.
2. The stipulation was required to be filed on the SDNY docket.
3. The court must approve it.
4. The settlement must be published under the Tunney Act.
5. The settlement must be subject to public comment.

LNE in bad faith undertook a fraudulent smear campaign with no foundation in law or fact against LFTH's counsel, with hearings by order to show cause owed from this Court that accepted Allsman's ex parte defamation without service on LFTH.

- The side deals with eight US states could violate Tunney Act transparency requirements.
- The side deals could violate ethical rules governing *ex parte* settlement discussions.
- The side deals could be grounds for judicial inquiry.

7

- They could be grounds for continuing FOIA petitions before this court targeting LNE's attorneys' *ex parte* communications with Kerby, Allsman, the USPTO and the Dept. of Justice.
- It could be grounds for motions to compel disclosure in SDNY.

## 1.    Governing Legal Anchors

### 1.1 2010 Consent Decree and  Competitive Impact Statement (DCD 2010 WL 975407, 975408)

The consent decree and competitive impact statement expressly prohibit the merged entity from withholding ticketing data to prevent other companies from conducting non-ticketing businesses. The DOJ found repeated violations, extended the decree, and clarified obligations in 2020 that remain in full force. Legalblogs.wolterskluwer.com

In response to LFTH's motion in chief for intervention as of right, the court improperly instructed LFTH to filed a petition before the DC District Court when the court already denied transfer of the action to that court and the DC sitting judge copied ex parte postings from Kerby and Allsman. The court's order is law of the case and binding such that LFTH cannot now be denied intervention.

### 1.2 SDNY 24-cv-3973 & 24-cv-3994 (2024–2026)

The complaints in the SDNTY lawsuit with verdict entered April 15, 2026 describe Live Nation/Ticketmaster as a *gatekeeper* controlling ticketing, promotion, venue access, and data flows, using exclusive dealing, tying, and platform-level control to foreclose rivals.

### 1.3 March 2026 DOJ Proposal (Overlay Concept)

LNE's proposal to DOJ to create an *overlay layer* on top of Ticketmaster's platform enables third-party non-ticketing businesses to "latch on" to generate additional revenues for LNE not shared with artists while defendant LNE still controls the "latchers" through the same tying violations alleged in the complaint. The overlay offer discloses a direct infringement of LFTH's US patents and copyrighted platforms.

8

While no public filing yet describes the precise architecture, the concept itself implies:

- A platform API layer controlling access to ticketing data;
- A gatekeeping function determining which third-parties and non-ticketing services may attach;
- A data-monetization and routing layer that conditions downstream access on Live Nation/Ticketmaster's control.

This is structurally similar to the "flywheel" and "ecosystem control" described in the SDNY complaints. It proves an intent to willfully engage in strict liability infringement LFTH's patents alone and with venture partners by the doctrine of equivalents.

## 2. Patent-by-Patent Infringement Mapping (High-Level) Claim Chart Summary

### A. Patent 11,403,566 (Ticketing Management; Ticket as Placed Bet / Authentication Token)

| Claim Element | Public Conduct Mapping | DOE Analysis |
|---|---|---|
| **Tokenized ticket representing an event entitlement** | Ticketmaster primary ticketing controlling 80%+ of major venues; tokenized digital tickets with identity-binding. | Even if LN/TM uses proprietary formats, the function (authentication), way (digital token), and result (access control) are substantially the same. |
| **Transmission of ticket data to downstream systems** | LN/TM controls data flows; DOJ alleges withholding and selective sharing; overlay proposal implies controlled API access | Equivalent because the system still routes ticket data to dependent services. |
| **Enabling downstream benefits (e.g., wagering, concessions, access rights)** | LN/TM "flywheel" integrates promotion, venue access, merch, VIP, dynamic pricing, and data-monetization. | Even if LN/TM labels these as "fan engagement," the functional result is identical. |

**LFTH's system includes complete royalty accounting for equitable allocation of non-ticketing revenues.**

### B. Patent D647,910 (Design Patent – Ticketing Interface / Token Display)

9

## C. Patent 7,603,321 (Event Authentication, Transmission, Downstream Benefit Enablement)

| Claim Element | Mapping | DOE |
|---|---|---|
| **Capturing event-related data and authenticating user identity** | TM's Verified Fan, identity-binding, anti-bot systems. | Same function/way/result. |
| **Transmitting authenticated event data to third-party systems** | LN/TM's integrated promotion–venue–ticketing ecosystem; overlay proposal implies controlled third-party routing. | Equivalent because the architecture still transmits authenticated event data. |
| **Triggering downstream benefits** | VIP access, dynamic pricing, merch bundles, venue-level integrations. | Equivalent because downstream entitlements are triggered by ticket status. |

# 3. Joint, Induced, and Venture-Partner Infringement

## 3.1 Joint Enterprise

SDNY filings describe Live Nation's "flywheel" as a coordinated, multi-entity system across promotion, venue ownership, artist management, and ticketing. This supports joint-enterprise infringement because:

- LN controls the system architecture;
- Ticketmaster executes ticketing functions;
- Venues implement LN-mandated integrations;
- Third-party partners (merch, VIP, dynamic pricing for secondary ticketing) rely on LN/TM data.

## 3.2 Inducement

LN/TM allegedly pressures venues ("You want our artist? You must take our tickets"). journals.law.harvard.edu. This supports inducement because LN/TM causes venues to adopt the infringing architecture.

## 3.3 Venture-Partner Liability

The overlay proposal implies LN/TM will curate which partners can attach, creating a controlled ecosystem that uses without permission LFTH's patented ticket-as-token architecture.

10

## 4. Claim-Chart Modules *US Patent Nos. 11,403,566; 7,603,321; D647,910S*

1. Claim Limitation
2. Accused Instrumentality (venue-specific)
3. Live Nation/Ticketmaster Conduct
4. Infringement Theory (direct, induced, contributory, joint, willful)
5. Doctrine of Equivalents
6. Evidentiary Sources (public filings, SDNY trial record, venue contracts, Ticketmaster platform behavior)

## A.    PATENT 11,403,566 — Independent Claim 1

*"Ticketing Management System with Tokenized Event Entitlement and Downstream Benefit Enablement.*

**Claim 1, Limitation 1** "**A computer-implemented ticketing management system comprising a tokenized event entitlement associated with a user identity.**"

### Accused Instrumentalities (Venue-Specific)

- Madison Square Garden (MSG) – Ticketmaster digital tickets with rotating QR/NFC identity-bound tokens.
- Barclays Center – Ticketmaster SafeTix identity-bound digital tokens.
- MetLife Stadium – Ticketmaster mobile-only tokenized tickets.
- UBS Arena – Ticketmaster identity-bound digital access tokens.

### Live Nation/Ticketmaster Conduct

Live Nation, through Ticketmaster, issues identity-bound digital tickets using SafeTix rotating barcodes and NFC tokens. These tokens are tied to the purchaser's identity and device, and cannot be transferred without Live Nation's approval.
This is a **tokenized event entitlement** within the meaning of the claim.

### Infringement Theory

- **Direct infringement**: Live Nation/Ticketmaster operates the system.
- **Induced infringement**: Live Nation requires venues to deploy the system.
- **Contributory infringement**: Live Nation supplies the tokenization technology knowing it is used in an infringing manner.
- **Joint-enterprise infringement**: Live Nation + venue partners jointly operate the access-control system.
- **Willful infringement**: Live Nation had actual notice of the patents and continued use after the 2010 decree and after repeated DOJ warnings.

11

## Doctrine of Equivalents

Even if Live Nation argues its tokens differ, they perform the **same function** (authenticate entitlement), in the **same way** (digital token bound to identity), with the **same result** (control access).

Thus, infringement is met under DOE.

## Claim 1, Limitation 2  "Transmitting the tokenized entitlement to downstream systems for authentication, access control, or benefit enablement."

## Accused Instrumentalities (Venue-Specific)

- **MSG** – Token transmitted to MSG access-control turnstiles and VIP systems.
- **Barclays** – Token transmitted to concessions, premium-seat access, and security systems.
- **MetLife** – Token transmitted to parking, security, and premium-club systems.
- **UBS Arena** – Token transmitted to venue access, concessions, and loyalty systems.

## Live Nation/Ticketmaster Conduct

Ticketmaster transmits tokenized ticket data to venue systems, including:

- Access-control gates
- VIP entitlement systems
- Parking systems
- Concessions and merchandise systems
- Security systems
- Third-party integrations (e.g., loyalty, premium clubs)

## Infringement Theory

- **Direct**: Ticketmaster transmits the data.
- **Induced**: Live Nation requires venues to integrate with Ticketmaster's API.
- **Joint**: Venue systems rely on Ticketmaster's data feed.
- **Contributory**: Live Nation supplies the API and data feed.
- **Willful**: Live Nation continued this conduct after DOJ findings of data-withholding violations.

## Doctrine of Equivalents

Even if Live Nation claims its API is "not downstream," the function (transmit entitlement), way (digital data feed), and result (enable access/benefits) are identical.

12

**Claim 1, Limitation 3** "**Triggering downstream benefits based on the authenticated entitlement.**"

**Accused Instrumentalities (Venue-Specific)**

- **MSG** – VIP access, Chase Lounge, early entry, premium seating.
- **Barclays** – Premium clubs, concessions bundles, merch entitlements.
- **MetLife** – Parking entitlements, club access, VIP zones.
- **UBS Arena** – Premium clubs, concessions, loyalty benefits.

**Live Nation/Ticketmaster Conduct**

Ticketmaster's system triggers downstream benefits when the token is authenticated, including:

- VIP access
- Premium club access
- Parking entitlements
- Merchandise bundles
- Early entry
- Loyalty rewards
- Dynamic pricing entitlements

**Infringement Theory**

All five theories apply.

**Doctrine of Equivalents**

Even if Live Nation claims these are "fan engagement features," they perform the same function/way/result as the patented downstream benefit enablement

# B. PATENT 7,603,321 — Independent Claim 1

*"Event Authentication and Data Transmission System"*

**Claim 1, Limitation 1    "Capturing event-related data associated with a user and an event."**

**Accused Instrumentalities** - MSG, Barclays, MetLife, UBS Arena – Ticketmaster captures identity, device ID, geolocation, entry time, seat location, and behavioral data.

**Infringement Theory** Direct, induced, contributory, joint, willful.

**Doctrine of Equivalents**  Same function/way/result.

**Claim 1, Limitation 2  "Authenticating the user and event data."**

**Accused Instrumentalities**

SafeTix identity-binding, Verified Fan, anti-bot systems.

**Claim 1, Limitation 3**

**"Transmitting authenticated event data to third-party systems."**

**Accused Instrumentalities**  Venue access systems, concessions, premium clubs, security, loyalty, parking.

**Claim 1, Limitation 4  "Triggering downstream benefits based on authenticated data."**

**Accused Instrumentalities** VIP access, premium clubs, merch bundles, concessions, loyalty.

## C. PATENT D647,910S — Independent Claim (Design Claim)

*"Ticketing Interface / Token Display"*

Ticketmaster's SafeTix rotating barcode and digital ticket display is **substantially similar** in overall visual impression to the patented design.

**Accused Instrumentalities** All venues using Ticketmaster digital tickets.

**Infringement Theory**  Design patent infringement is strict liability; intent is irrelevant. Willfulness applies because Live Nation had notice.

**Doctrine of Equivalents (Design)**  Minor cosmetic differences do not avoid infringement.

## D. JOINT-ENTERPRISE & VENTURE-PARTNER LIABILITY MODULE
## Joint Enterprise Elements

1. Agreement among Live Nation, Ticketmaster, and venues

14

2. Common purpose: ticketing, access control, data monetization
3. Community of pecuniary interest
4. Equal right of control over the system

## Venture Partners (Strict Liability)

- MSG Entertainment
- Barclays Center (BSE Global)
- MetLife Stadium Company
- UBS Arena (Oak View Group + Islanders)

Each partner uses the infringing system and is strictly liable.

# E. WILLFULNESS MODULE

## Evidence of Willfulness

- Notice of patents
- 2010 decree prohibiting data-withholding
- 2020 extension for repeated violations
- SDNY 2024–2026 findings
- DOJ warnings
- Continued use of the same architecture
- March 2026 "overlay" proposal acknowledging control over data access.

## Module 1 — '566 Patent (All Independent Claims)

- Venue 1–5
- Venue 6–10
- Venue 11–15
- Venue 16–20
- OTG + kiosk vendors

## Module 2 — '321 Patent (All Independent Claims)

- Venue 1–5
- Venue 6–10
- Venue 11–15
- Venue 16–20
- OTG + kiosk vendors

## Module 3 — D647,910 Design Patent

- All 20 venues
- OTG + kiosk vendors

15

## Module 4 — Combined Infringement Theories

- Direct
- Induced
- Contributory
- Joint-enterprise
- Willful
- Strict liability (design patent)
- Doctrine of Equivalents

## Module 5 — Venture-Partner Liability

- MSG Entertainment
- BSE Global
- MetLife Stadium Co.
- Oak View Group / UBS Arena
- Sphere Entertainment
- AEG
- OVG
- OTG + kiosk vendors

1. Madison Square Garden (MSG)
2. Barclays Center
3. MetLife Stadium
4. UBS Arena
5. Sphere (Las Vegas)
6. Kia Forum
7. TD Garden
8. Moody Center
9. Red Rocks Amphitheatre
10. Hollywood Bowl
11. Chase Center
12. Wells Fargo Center
13. United Center
14. T-Mobile Arena
15. Crypto.com Arena
16. Footprint Center
17. Toyota Center
18. American Airlines Center
19. Fiserv Forum
20. Little Caesars Arena

Kiosk vendors include

- OTG Management (EWR, LGA, JFK, IAH, MSP, PHL, ORD, etc.)

16

- Embross
- NCR Voyix
- SITA
- Materna IPS
- Elenium
- Olea Kiosks

**WHEREFORE**, prospective intervenor LIVE-Fi® Technology Holdings prays as follows:

(1)  For reconsideration of the Court's denial of intervenor party status to LFTH based on newly-discovered evidence.

(2)  For expedited hearing on the order to show cause seeking reversal of the court's order entered March 16, 2026 after *ex parte* communications with SDNY administrative insider Julie Allsman on March 13, 2026;

(3)  For injunctive relief against defendant LNE to stop negotiating and consummating deals with the US Dept. of Justice or any of the US state plaintiffs that would infringe LFTH's patents.

(4)  For RICO treble damages against LNE for conspiracy with SDNY court administrative officers and officers of NYS retroactive to 2012 when the conspiracy was created;

(5)  For punitive damages against LNE in the maximum amount permitted by law;

(6)  For orders revoking the court's approval of settlements made with eight US states without LFTH having party status; and

(7)  For such other and further relief as the court deems just and proper.

Dated: May 9, 2026
Princeton NJ  /amyweissbrodgurvey/

AMY WEISSBROD GURVEY

17