# EXHIBIT 1

**PLAINTIFF STATES' INITIAL REMEDIES PROPOSAL**

Binding Supreme Court precedent states "in a § 2 case, upon appropriate findings of violation, it is the duty of the [district] court to prescribe relief which will terminate the illegal monopoly, deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future." *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250 (1968) (The district court is "charged with [the] inescapable responsibility to achieve this objective"). Stated differently, "[a]ntitrust relief should unfetter a market from anticompetitive conduct and 'pry open to competition a market that has been closed by defendants' illegal restraints.'" *Ford Motor Co. v. United States,* 405 U.S. 562, 577-78 (1972) (citing *Int'l Salt Co. v. United States,* 332 U.S. 392, 401 (1947)).

Consistent with these principles, the Plaintiff States are evaluating a range of remedies to achieve the objectives that the Supreme Court has held as necessary to remedy a defendant's Section 2 violations. In response to the Court's directive for a high-level framework, Plaintiffs identify the following categories of remedies that they intend to pursue based on the current record. The Plaintiff States reserve all rights to pursue different, additional, or alternative remedies as discovery proceeds and expert analysis develops.

**Markets for Primary Ticketing at Major Concert Venues[1]**

1. **Divestiture of Ticketmaster:** An order requiring Live Nation to divest Ticketmaster, such that it is capable of restoring competition for primary ticketing contracts with Major Concert Venues. Plaintiffs are evaluating the scope of assets, contracts, personnel, and systems that would be necessary for a standalone Ticketmaster to effectively compete in the market for primary ticketing services to Major Concert Venues.

2. **Limitations on Live Nation's Re-entry into the Primary Ticketing Market:** Limitations on Live Nation acquiring any ownership interest in the market for primary ticketing for Major Concert Venues, and on the manner in which Live Nation may re-enter the primary ticketing market, for a specified time period.

3. **Prohibition on Content Conditioning:** Prohibitions on Live Nation and Ticketmaster conditioning a venue's access to Live Nation content in any way based on a venue's choice of ticketing platform(s), including retaliating in any way, or threatening to retaliate, against venues for the venue's choice of ticketing platform(s), for a specified time period.

4. **Limitations on Ticketmaster's Enforcement or Extension of Existing Contracts:** Prohibition on Ticketmaster's enforcement of contractual provisions, such as exclusivity, against Major Concert Venues. Such relief may provide other primary ticketers an opportunity to compete for some or all of the ticketing services for such venues.

---

[1] "Major Concert Venues," as used in this submission, is defined in the same way that it was defined at trial.

5. **Limitations on Future Exclusive Ticketing Agreements:** Limitations or prohibitions on Defendants' future long-term, exclusive primary ticketing contracts with Major Concert Venues. Such relief may include forward-looking limits on the use, extent, and duration of exclusive ticketing agreements.

**Market for Large Amphitheaters[2]**

6. **Divestiture of Live Nation-Owned Large Amphitheaters:** An order requiring Live Nation to divest a sufficient number of Live Nation-owned Large Amphitheaters, together with the cancellation of a sufficient number of leases or exclusive booking arrangements, to terminate (i) a national monopoly on Large Amphitheaters, and (ii) local monopolies on Large Amphitheaters.

7. **Limitations on Amphitheater Market Acquisitions:** Limitations or prohibitions on Live Nation acquiring Large Amphitheaters for a specified time period.

8. **Modification or Early Termination of Agreements Granting Live Nation Control over Large Amphitheater Concert Booking:** A remedy requiring Live Nation to modify or rescind agreements with Large Amphitheaters that delegate control over booking concerts to Live Nation, and prohibitions or limitations on Live Nation entering exclusive booking or promotion arrangements with Large Amphitheaters for a specified time period.

9. **Limitations Relating to the Tying of Amphitheater Access to Promotion Services:** Limitations or prohibitions on practices that tie or condition an artist's access to Live Nation-Controlled venues on that artist's use of Live Nation's promotion services. Live Nation would be required to make its owned and operated Large Amphitheaters available for booking to non-Live Nation promoters under the same general terms and conditions as are provided to Live Nation. Live Nation may also be subject to limitations on its ability to exclusively promote tours, such as a requirement that the right to provide promotion services be opened to competitive bidding for some number of stops on each tour, for a specified time period.

**Enforcement, Monitoring, and Anti-Circumvention**

10. Provisions to ensure compliance with the decree, including appropriate oversight over any divestiture processes, monitoring of compliance with the terms of behavioral remedies, and systems to detect efforts by Defendants to evade or circumvent the Court's decree. This would include the appointment of a new independent monitor with appropriately broad investigatory tools and broad and real-time access to Defendants' business records, communications, executives, policies, and negotiations with venues and artists.

---

[2] "Large Amphitheaters," as used in this submission, is defined in the same way that it was defined at trial.

**Monetary Relief**

11. **Damages:** Money damages for overcharges on ticketing fees paid by residents of the Plaintiff States alleging damages who purchased a ticket to a concert at a Major Concert Venue during the limitations period.

12. **Civil Penalties:** Civil penalties sufficient to serve the intended purposes of each state's civil penalties statute, including, where appropriate, to punish the violations found and deter future violations.

13. **Disgorgement:** Disgorgement of ill-gotten profits derived from ticketing fees charged at Live Nation owned venues, and venues Live Nation operates or controls, during the period of unlawful monopoly maintenance.

14. **Restitution:** Restitution, including restitutionary disgorgement, for overcharges on ticketing fees paid by residents of the Plaintiff States alleging restitution who purchased a ticket to a concert at a Major Concert Venue during the limitations period.

<u>**PLAINTIFF STATES' INITIAL DISCOVERY PROPOSAL**</u>

Plaintiffs anticipate that discovery will be necessary to support the development of effective remedies tailored to the market for primary ticketing at Major Concert Venues and the market for Large Amphitheaters. Plaintiffs provide below a preliminary description of the initial discovery they anticipate seeking. Plaintiffs reserve their right to seek additional or alternative discovery as appropriate.

**1.    Discovery Related to Markets for Primary Ticketing**

    a.    <u>Updated Market Data for Primary Ticketing at Major Concert Venues.</u> Updated transaction-level ticketing data and related information that will allow Plaintiffs' experts to evaluate the present state of competition in primary ticketing and assess the likely effects of potential remedies in this market, as well as to calculate per-state damages based on the overcharge found by the jury related to primary concert tickets sold at Major Concert Venues. This will update key datasets, extending the record beyond 2024, such as updated transaction-level ticketing data and updated information regarding venues previously identified as Live Nation "owned and operated" or otherwise central to the jury's findings.

    b.    <u>Information Related to Structural Relief.</u>  Plaintiffs will seek discovery that bears on the operational and financial feasibility of separating Ticketmaster from Live Nation and operating Ticketmaster as a separate business or businesses. This includes:

        i.    Updated organizational charts, reporting structures, and personnel breakdowns for Live Nation and Ticketmaster, focused specifically on their ticketing, promotion, and amphitheater business lines;

        ii.    Existing internal Live Nation analyses or third-party (e.g., investment banker, consultant) assessments addressing the viability of different parts, or the whole, of Ticketmaster being divested to any buyer(s) or operating independently;

        iii.    Live Nation and third-party (e.g., investment banker, consultant) materials analyzing potential acquirers of part or all of Ticketmaster, or any spin-off strategy;

        iv.    Discovery from third parties regarding any plans, proposals, or analysis regarding the possibility of owning or operating venues, and from third-party venues on any plans, proposals, or analysis of providing ticketing or promotions services;

        v.    Discovery regarding the technical separation of Ticketmaster's systems from Live Nation's promotion and venue operations, and separation of ticketing systems for different types of events or venues.

vi.     Discovery regarding the technical interoperability of Ticketmaster's systems with third-party ticketing systems;

vii.    Discovery regarding the extent of technical integration between ticketing systems and Live Nation systems, including any internal assessments of the potential disruption or transitional needs associated with structural separation;

viii.   Discovery from third parties regarding the operation of vertically integrated and non-vertically integrated ticketing; and

ix.     Discovery from third parties regarding barriers to entry.

c.     <u>Updated Information from Defendants and Third Parties.</u> Discovery concerning Defendants' contract negotiations with Major Concert Venues for primary ticketing services and the types of incentives and disincentives offered in those negotiations.

d.     <u>Information Regarding Ticketmaster's Development of Open or Interoperable Ticketing Systems.</u> Discovery regarding Ticketmaster's work—if any—to develop open, interoperable, or API-based ticketing capabilities (including those contemplated in the Defendants' settlement with the Department of Justice).

## 2.     Discovery Related to Market for Large Amphitheaters

a.     <u>Updated Market Data for Large Amphitheaters.</u> Updated information relevant to Live Nation's control over Large Amphitheaters, including refreshed data concerning owned and operated amphitheaters, amphitheater booking arrangements, and any changes in Live Nation's amphitheater footprint since the close of the liability record.

b.     <u>Information Relating to Structural Relief.</u> In relation to the potential divestiture of Live Nation-owned Large Amphitheaters, or modification or rescission of agreements with leased and/or exclusively booked Large Amphitheaters, Plaintiffs will seek discovery on the operational and financial feasibility of the relevant Large Amphitheaters under a different owner or as a standalone business (or businesses).

c.     <u>Information Regarding Ticketmaster's Efforts to End Exclusive Booking Arrangements at Certain Large Amphitheaters.</u> Discovery regarding Ticketmaster's work—if any—to end exclusive booking arrangements at certain Large Amphitheaters (as contemplated in its terms of settlement with the Department of Justice).

## 3.     Prior or Alternative Remedies Proposals

a.     <u>Discovery Regarding the Relief Afforded by the DOJ Settlement.</u> Plaintiffs anticipate that Live Nation will argue that the relief afforded by the DOJ settlement is sufficient.  Discovery thus is necessary to determine whether elements of the

proposed settlement will be effective. For example, discovery on the 80/20 exclusivity restrictions in contracts, including how it would impact up-front payments and how meaningfully other ticketers could and would compete for the 20%; how the proposed API would operate in practice and impact competition; whether the amphitheater "divestiture" is sufficient; and some of the other key terms of the settlement.

b.   <u>Information Concerning Any and All Other Remedies Analyzed by Defendants.</u> Discovery concerning the viability and effectiveness of any alternative remedies that Defendants may put forward over the course of this litigation, and any other remedies that were analyzed but not put forward.

**4.    Monetary Relief**

a.   <u>Updated Transaction Data.</u> As noted above, Plaintiffs will seek updated transaction data to identify the number of residents in each State seeking damages who purchased tickets for live music or comedy events at Major Concert Venues.

b.   <u>Updated Financial Information.</u> Plaintiffs will seek updated financial information, including revenue and profit data, necessary for the determination of the appropriate penalties to be assessed and any applicable disgorgement.

c.   <u>Information to Inform Penalties Issues.</u> Plaintiffs will seek further information on Defendants' exclusive contracts, ticketing practices, tying, and control of Large Amphitheaters to inform the outstanding fact questions relating to the quantum of civil penalties, which will be considered during the remedies phase of litigation by stipulation of the parties.[3]

d.   <u>Discovery Relevant to Disgorgement.</u> Plaintiffs anticipate seeking limited financial and ticketing-fee data for Major Concert Venues that Live Nation owns, operates, or controls, to evaluate profits earned during the period of unlawful monopoly maintenance and to inform any disgorgement remedy.

---

[3] *See* Joint Pretrial Order p. 27 fn. 3; Ex. 2 (Stipulation Regarding Civil Penalties and the Testimony of Dr. Mathis Wagner).