# DDX-24

# Part 2 of 2



# No Retaliation

# Good Reasons for Fewer Shows at Barclays







- UBS just opened

*Trial Tr. 342:16-17 (Abbamondi)*

- SeatGeek was underperforming

*DX-0625, DX-0633, DX-0645, DX-0671, DX-0678*

- Promoters had concerns about SeatGeek

*DX-0625, DX-0633*

- Artists decide where they play

*Trial Tr. 4239:7-9 (Capshaw); 2004:19-24 (Lewis)*

- Numerous witnesses admitted they did not know why artists decided not to play at Barclays

*Trial Tr. 372:8-13 (Abbamondi); 2250:5-7 (Hill); 3564:14-3565:7 (Jacoby)*

- The only show identified as withheld was Billie Eilish

*Trial Tr. 375:2-17 (Abbamondi)*

DDX-24.83

# Plaintiffs' Billie Eilish Accusations Fall Flat





**Q.** Do you know where Ms. Eilish played on that tour [during the time period Barclays has been on Ticketmaster]?

**A. Yes.**

**Q.** Where?

**A. UBS Arena.**

**Q.** So you didn't get Ms. Eilish's show while you were on SeatGeek, UBS did. Is that your testimony?

**A. Yes.**

**Q.** And then when you were on Ticketmaster, did you get Ms. Eilish's show?

**A. No.**

*Trial Tr. 3572:5-14 (Jacoby)*

DDX-24.84

# SeatGeek Issues Were Real





## Jack Groetzinger
*Co-Founder / CEO, SeatGeek*



## Laurie Jacoby
*Chief Entertainment Officer, BSE Global*



Q. What was -- having received those considerations, what was your reaction? What did you understand based on that? Or what happened next?

A. **It was very clear that Laurie was creating issues that didn't exist because she wanted to leave SeatGeek so she could get Ticketmaster shows back.**

*Trial Tr. 890:9-14 (Groetzinger)*

Q. If the jury heard testimony that you were creating issues that didn't exist . . . because you wanted to leave SeatGeek so that you could get Live Nation content back, is that your understanding? Do you agree with that?

A. **I do not agree with that.**

Q. And why not?

A. **Because it didn't happen that way. That's not -- you know, I wasn't looking to create anything. I was looking to solve problems.**

*Trial Tr. 3529:13-22 (Jacoby)*

## FALSE ACCUSATIONS

## REALITY



DDX-24.85

# SeatGeek Issues Were SeatGeek's Fault





## John Abbamondi
*(former) CEO,*
*BSE Global*



**Q.** Did Barclays experience any on-sale issues with SeatGeek during your time [as] CEO?

**A.** **We certainly experienced issues. In my view, they were, by and large, the fault of our staff, frankly, and the lack of training on the new system.**

*Trial Tr. 288:14-18 (Abbamondi)*





## Laurie Jacoby
*Chief Entertainment Officer,*
*BSE Global*



**Q.** If the issues with the on-sales that were occurring were described as, by and large, the fault of the Barclays staff and the lack of training on the new system, would you agree with that?

**A.** **I don't agree with that.**

**Q.** Why not?

**A.** **There were systems beyond the control of the staff at Barclays Center.**

*Trial Tr. 3519:19-3520:1 (Jacoby)*



DDX-24.86

# No Evidence of Retaliation



## Prof. Carlton and Dr. Hill Agree



**Jack Groetzinger**
*SeatGeek*

SeatGeek told potential venue clients it was <span style="color:red">**"confident that no data exists to validate the belief of lost shows occurring."**</span>

*Trial Tr. 855:1-12 (Groetzinger)*



**Dennis Carlton**
*Professor of Economics*

**Q.** If Ticketmaster had harmed competition by threatening to withhold content, what would you expect to see with respect to the statistical relationship between Ticketmaster's margins and take rates and the share of a venue's revenue that is attributable to Live Nation content?

**A. Well, they would be positively related. The more you rely on Live Nation, the higher the price, it should be statistically sufficient. That would be true of both margins and it would be true of take rates. That's precisely the statistical investigation I undertake and find that there is no evidence of that.**

*Trial Tr. 4018: 11-21 (Carlton)*



**Dr. Nicholas Hill**
*Plaintiffs' Expert*

**"No statistically significant relationship between margins or take rate and a venue's reliance on Live Nation-promoted content."**

*Trial Tr. 2283:25-2284:3 (Hill)*

DDX-24.87

# <u>15 Years</u> of Ticketing Negotiations

**Live Nation Promotes Shows in Non-Ticketmaster Venues**



# Live Nation Promotes Many Shows Without Ticketmaster

# Live Nation Promotes Non-Ticketmaster Shows





**Michael Rapino**
*Live Nation*

**Q.** Any sense of how many shows a year Live Nation promotes at venues that don't use Ticketmaster?

**A. How many shows?**

**Q.** Yes.

**A. In America, I think -- that doesn't use Ticketmaster?**

**Q.** Yes, that doesn't use Ticketmaster, it's a non-Ticketmaster venue.

**A. Oh, thousands, thousands.**

*Trial Tr. 1920:22-1921:4 (Rapino)*



**Bob Roux**
*Live Nation*

**Q.** Does Live Nation promote shows at venues that do not use Ticketmaster?

**A. I do it all the time.**

*Trial Tr. 1337:6-8 (Roux)*



**Omar Al-joulani**
*Live Nation*

**Q.** So how often do you promote shows at venues that use someone other than Ticketmaster?

**A. On any given tour, there's always going to be venues that are not Ticketmaster.**

**Q.** ...How often do you promote a tour where the only ticketer on that tour is Ticketmaster?

**A. It would be rare.**

*Trial Tr. 2961:1-8 (Al-joulani)*

DDX-24.90

# Self-Interested Allegations of Threats





**Jack Groetzinger**
*CEO of SeatGeek*

**Admits that he:**

- **Pushed** the government to bring this case
- Expressed delight that his complaints to the government were having an adverse impact on a Ticketmaster employee **and his family**
- Fed negative stories about Ticketmaster to the press
- Sees this lawsuit as a **potential benefit to SG's business**
- Has a **personal financial interest** in this case

- **Hired lobbyists and counsel** connected to DOJ and **met** with DOJ

**… despite:**

- Having **never heard, seen, or observed any threats**
- Undertaking analyses showing that Live Nation does not divert concerts from non-Ticketmaster venues
- Failing to tell the government that Ryan Smith of the Utah Jazz told him **there was no threat made to him**

*Trial Tr. 790:12-20, 793:16-20, 793:25-794:2, 795:21-23, 796:11-15, 797:8-10, 798:7-15, 798:22-799:2, 801:7-9, 853:15-22; 854:5-9, 868:19-24 (Groetzinger)*

# Make-Good Allegation



## Only **5** make-good clauses

### Of those, **2** at "MCVs"

#### Of *those*, only **1** paid





**Appendix C**

**Make-Good and Performance Incentive**

In the event of a Substantial Decrease (as defined below) with respect to Events-related revenue from Live Nation shows at the Arena ("Live Nation Events Related Revenue") in any given contract year during the Term, SeatGeek shall remit to Client an amount that shall be calculated as follows (the "Make-Good"):

Ex. No
PX0276
1:24-cv-03973

"Through my negotiation with SeatGeek, we expressed **the concern that we had with concerts and their ability to perform** . . . . So we told them that if concert revenue decreased, we wanted to have a downside protection from them."

\* \* \*

**Q.** Has your Live Nation team that you deal with ever implicitly or expressly threatened to steer concerts away from you based on your choice of a primary ticketer?

**A.  No. No.**

**Q.** Has your Live Nation team ever retaliated against the Panthers for choosing SeatGeek over Ticketmaster?

**A. Not that I'm aware of.**



**Matthew Caldwell**
*CEO of Florida Panthers*

# Make-Good Allegation



## What SeatGeek calls "retaliation insurance" actually reflects venues' concerns about SeatGeek



### Jack Groetzinger
*Co-Founder / CEO, SeatGeek*

"And it seems crazy to me, because what we're doing is basically insuring against something a competitor can do to financially harm us . . . . So we offered **retaliation insurance**."

*Trial Tr. 764:12-20 (Groetzinger)*



### Matthew Caldwell
*CEO of Florida Panthers*



**Q.** If I were to characterize . . . the make-good clause . . . as reflecting a concern by the Panthers that its Live Nation partners such as Brittany, would punitively route concerts to other venues as retaliation for choosing SeatGeek, would that be an incorrect interpretation?

**A. I would not characterize it as the way you said it . . . . [W]hether it was because they didn't market to enough people or whether it was because of some, you know, issues they had that, you know, bad perception of artists or whatever it is, it could be for a variety of reasons.**

*Caldwell Dep. Tr. 146:1-21, 147:17-148:16*

# Competing Ticketing Providers Have Performance Issues





(10/30/23)

**SeatGeek – Challenges**

1.) Marketing
   a. In ability to sell tickets for middle of the road shows
   b. Challenge in quantifying marketing from SG for promoters
   c. Deal score working against primary ticketing goals (bad deal markers are not a good idea)
   d. SG Website & App not available in Spanish
   e. SG database 400k in south Florida / Panthers 540k

2.) Ticketing
   a. Scaling tool is still not completed, inefficient
   b. Prime product still not fully operational with SG pricing
   c. Not able to reprice tickets in bulk, inefficient
   d. Fees lump together instead of breaking out tax, fac fee, cc fee and SG fee
   e. Vet Tix
   f. Fee set up – too much room for error & SG missed it to

3.) Reporting
   a. Summary reports do not break out lift, VIP...etc
   b. Summary reports do not break out comps + paid = total tickets
   c. Amplify still does not break out lift

Marketing plan over all
Marketing plan by show
5 tactical steps:
   Engage Gupta Group Agency (Cavs & Kracken)
   SEO/SEM
   Digital Geo Fencing
   Billboards
   Other
   Fee review
Historical sales comparison (by show, by promoter)



(12/20/23)

SeatGeek – Challe

1.) Marketing
   a. In ability to sell tickets for middle of the road shows
   b. Challenge in quantifying marketing from SG for promoters
   c. Deal score working against primary ticketing goals (bad deal markers are not a good idea)(Teal score in development)
   d. SG Website & App not available in Spanish
   e. SG database 400k in south Florida / Panthers 540k
   f. Bi weekly marketing calls with SG marketing staff (first one happened 12/21)
2.) Ticketing
   a. Scaling tool can now calculate revenue, onto phase three
   b. Prime product works but does not automatically handle pricing yet
   c. Need open API for Groupon
   d. Need open API for Vet Tix on internal/off manifest tickets
   e. Can't reprice tickets already transferred (can reprice tickers not transferred)
3.) Reporting (Danny to provide more detail next week)
   a. Summary reports do not break out lift, VIP...etc
   b. Summary reports do not break out comps + paid = total tickets
   c. Amplify still does not break out lift
4.) 5 tactical steps:
   a. Engage Gupta Group Agency
   b. SEO/SEM & Digital Geo Fencing
   c. SeatGeek marketing investment
   d. Produce localized Panthers/SG commercial: https://www.youtube.com/watch?v=oXttWBGpl4k
   e. Fee review: 27% is highest in the industry
5.) Historical sales comparison: LN=3% above average Other Promoters=11% above average
6.) Ticket sales comparison = 30% below average
7.) Past on sale issues
   a. Drake CashApp pre sale
   b. Trilogy on sale time incorrect on SG website

# SeatGeek Created Problems—With *All* Promoters





**Laurie Jacoby**
*BSE Global*

**Q.** So, just trying to take you back to the July 2022 time period, or the summer of 2022, how were you feeling about SeatGeek as a partner at that time?

**A. I had concerns.**

Q. Can you elaborate on that at all?

**A. Yes. I had concern[s] about just the way some of our on-sales were operating. I had concerns about the marketing of the shows. I had concerns about settlement. I had a lot of concerns.**

*Trial Tr. 3521:15-23 (Jacoby)*

\* \* \*

**Q.** In terms of what you were going through, to use your words, can you just describe, from your perspective, like what were you trying to communicate here? What were you going through?

**A. Yeah, it was a frustrating experience, and I was afraid that we were going to lose our ability to book events and, you know, our ability to stay competitive.**

Q. With respect to your answer just now, in terms of losing your ability to book events, was that specific to Live Nation or was that across all events?

**A. It was across all events.**

*Trial Tr. 3523:8-17 (Jacoby)*

DDX-24.95

# Failure of Proof



| Ticketing | Amphitheaters |
|---|---|
| Made Up Markets | Made Up Markets |
| No Monopoly Power | No Monopoly Power |
| Competitive Conduct | Competitive Conduct |
| **No Harm to Competition** | No Harm to Competition |
| No Damages | No Damages Claimed |

# The Law – Harm to Competition





"Harm to one or more competitors will not suffice; Plaintiffs must demonstrate that the monopolist's conduct harmed competition, not just a competitor."

"Harm to competition includes evidence of increased prices, decreased production levels, and reduced quality, though not all increases in prices, decreases in production levels or reductions in quality harm competition."

Post-Instruction No. 24

# Key Questions



## Key Questions

- Did output **_decrease_**?
- Did prices **_increase_**?
- Did quality **_decrease_**?

## Monopolies Tend to:



**_Reduce_** output    **_Increase_** prices    **_Reduce_** quality

# Failure of Proof



## Dr. Hill Did Not Study or Express an Opinion on Most of the Key Indicators

| Output | Price | Quality |
|---|---|---|

**Output**

Q. Now, you don't discuss anywhere in your reports, and didn't present here, the effect of the alleged anticompetitive behavior on output at MCVs, correct?

A. **Are we talking about ticketing?**

Q. Yes, sir.

A. **That's fair.**

*Trial Tr. 2274:10-15 (Hill)*

**Price**

Q. …it's also true, is it not, that you don't offer, and have not offered, any evidence of MCVs, as you define them, being charged monopoly prices, correct?

A. **Correct.**

*Trial Tr. 2183:24-2184:3 (Hill)*

\* \* \*

Q. Well, in your opening report, you don't compare Ticketmaster's take rate at venues in your proposed markets to take rates at any other venues, correct?

A. **Correct.**

*Trial Tr. 2210:22-25 (Hill)*

**Quality**

Q. …Let's talk a little bit about quality in ticketing. You saw evidence, sir, that Ticketmaster in the view -- in the eyes of many, many customers provide superior ticketing products and services, correct?

A. **I haven't analyzed that, but there are customers. Mr. Nagle talked about Ticketmaster's quality, and he said he really liked it.**

*Trial Tr. 2278:11-18 (Hill)*

DDX-24.99

# More Concerts, More Artists, More Tickets Sold





**Eric Budish**
*Professor of Economics*
*University of Chicago*

**Q.** [D]id you analyze whether the number of concerts at the venues at issue in this case increased during the time period you study from 2017 to 2024?

**A. Yes, I did.**

**Q.** And what did you find?

**A. Over the time period of the case, the number of concerts went up, the number of artists performing concerts went up, the number of tickets sold went up. There's a lot of lines going up.**

*Trial Tr. 3188:17-25 (Budish)*

DDX-24.100

# Output Has Increased





**Dr. Nicholas Hill**
*Plaintiffs' Expert*

**Q.** And there's been, we can agree, an increase in the number of primary concert tickets sold over the last ten years, right?

**A. That's fair.**

*Trial Tr. 2273:18-20 (Hill)*

**\*   \*   \***

**Q**. And since 2017, output in your ticketing markets has expanded along a number of metrics, correct?

**A. Correct.**

*Trial Tr. 2274:16-18 (Hill)*

DDX-24.101

# Ticketmaster Sells More Tickets





**Eric Budish**
*Professor of Economics
University of Chicago*

**Q.** Did you study how Ticketmaster compared to other ticketers on the core job of just selling tickets?

**A. Yes, I did.**

**Q.** And what did you conclude?

**A. So I did several different studies of this. So one study I did was comparing Ticketmaster specifically to AXS [] on their ability to sell tickets. And I found that for the same show ... Ticketmaster would sell 9 to 14 percent more tickets than would AXS[] So that means if you had a concert where AXS would sell, say, 10,000 tickets ... if Ticketmaster were the ticketer, they would sell an additional 900 to 1400-ish extra tickets. There's a lot more tickets, a lot more fans in the building enjoying the show, it's a lot more money for everybody.**

*Trial Tr. 3171:23-3172:12 (Budish)*

DDX-24.102

# Quality Is Up





**Dave Brown**
*American Airlines Center*

"[Ticketmaster is] always trying to **advance the technologies**, **protect the ticket buyer**, you know, **broaden accessibility to tickets to the right people**, **eliminate fraud**, if I didn't say that already, expedite guest access into the building through the ticketing redemption validation process, **adding value to tickets so that tickets serve multiple functions beyond admission**..."

*Brown Dep. Tr. 46:10-20*



**Robert Henson**
*SevenVenues*

"In my professional opinion, my team's professional opinion, **Ticketmaster for us over the years has proven to be the most reliable ticketing platform to do the volume of business that we have done**..."

*Henson Dep Tr. 34:11-16*



**Jim Van Stone**
*Monumental Sports & Entertainment*

"I think by far [Ticketmaster is] **the best-in-class ticketing technology** company that's out **there**, run by lead executives that listen to their customers and **find solutions if you are facing any challenges on anything**. And... their **tech stack kit has grown each year and gotten better and better**. So I think **they're the best out there**, and, you know, I think **we're proud to call them a partner**."

*Trial Tr. 3286:13-21 (Van Stone)*

# Quality Is Up



"...gives us the ability to dynamic price, is very key for us."

"...fraud protection package...tremendous, and our fraud has really dropped down to zero."

"...extremely positive."

"...ticketing fraud has dropped down to near zero."

"...state of the art mobile app that...

"...overall user experience from both our in-house sales reps, representatives to our external customer has been very good."

"...extremely innovative."

"...able to handle large on-sales without the system crashing..."

"...user experience under Ticketmaster has become seamless... overall tech experience from the fan engagement has been seamless."

"...a big step forward for us."

"...very large marketing database that gives us the ability to..."

"...there's constant upgrades."

# No Evidence of Harm to Competition





**Dennis Carlton**
*Professor of Economics*
*Emeritus*
*University of Chicago*

**Q.** What's your overall assessment of any assertion by plaintiffs' experts that Live Nation and Ticketmaster have harmed competition in Dr. Hill's ticketing markets?

**A. It's false. There's no evidence if you look at the underlying data to support that claim.**

*Trial Tr. 4006:6-10 (Carlton)*

DDX-24.105

# No Evidence of Harm to Competition



- **If Ticketmaster were engaged in anticompetitive harm, Ticketmaster's margins and take rates should be higher inside Dr. Hill's market than outside.**

- **There is no empirical evidence that Ticketmaster's margins and take rates are higher inside Dr. Hill's market than outside.**

*Trial Tr. 4008:1-22, 4011:20-4013:14 (Carlton)*



**Ticketmaster's Average Concert Gross Margin**
*2017 – 2023, excluding 2020*

69.5% — Outside
66.3% — Inside



**Ticketmaster's Average Take Rate**
*2017 – 2023, excluding 2020*

6.4% — Outside
5.3% — Inside

*Trial Tr. 4010:4-16, 4011:6-19 (Carlton); DDX-22*

DDX-24.106

# Dr. Hill Confirmed Prof. Carlton's Findings





**Dr. Nicholas Hill**
*Plaintiffs' Expert*

**Q.** Let me put it this way: You didn't present any evidence that the supposedly vulnerable 257 venues at issue in your markets paid more for ticketing services than for other venues, correct?

**A. That those venues paid more than other venues?  Correct.**

**Q.** Correct, you didn't do that analysis, correct?

**A. Well, I did it in response to Dr. Carlton, but it didn't show that they were paying more.**

**Q.** Right, exactly.  It didn't show they were paying more, correct?

**A. Correct.**

*Trial Tr. 2182:5-15 (Hill)*

\* \* \*

**Q**. And you also didn't find that Ticketmaster's margins and take rates were higher in a statistically significant way inside your alleged MCV market than outside that market, correct, Dr. Hill?

**A. That's correct.**

*Trial Tr. 2183:19-23 (Hill)*

DDX-24.107

# Failure of Proof



| Ticketing | Amphitheaters |
|-----------|---------------|
| Made Up Markets | Made Up Markets |
| No Monopoly Power | No Monopoly Power |
| Competitive Conduct | Competitive Conduct |
| No Harm to Competition | No Harm to Competition |
| **No Damages** | No Damages Claimed |

# The Law – No Violation, No Damages





"The fact that I am giving you instructions concerning the issue of damages does not mean that I believe any Plaintiff should, or should not, prevail in this case."

"If you find against Plaintiffs on their claims for monopolization of the alleged market for primary concert tickets at what Plaintiffs call 'major concert venues' in violation of Section 2 of the Sherman Act and laws of the Plaintiff States claiming damages, you should not consider the issue of damages, and you may disregard the damages instruction that I am about to give."

Post-Instruction No. 49

DDX-24.109

# Abrantes-Metz's Damages Theory



- The foundation of Plaintiffs' damages study is that "Ticketmaster's retained fees are larger than AXS's."

  *Trial Tr. 2449:22-2450:11 (Abrantes-Metz)*

- Retained Fees are offered as a proxy for the price of a primary ticketing services contract.

  *Trial Tr. 2512:19-23 (Abrantes-Metz)*

- Ticketmaster's price is excessive because it is higher than AXS's, which is supposedly of equal quality.

  *Trial Tr. 2463:24-2464:9 (Abrantes-Metz)*



**Overcharge Estimation in Three Steps**

**1** — **I show that Ticketmaster's retained fees are larger than AXS's**
- This is true even after controlling for legitimate differences between the events they both ticket

**2** — **I estimate what percentage of Ticketmaster's excess retained fees is paid by the venues, and what percentage is paid by the fans, as reflected in higher fees**
- I also show that **total fees charged by Ticketmaster are higher than total fees charged by AXS**, consistent with higher retained fees for Ticketmaster leading to higher fees charged to consumers

**3** — **I show that face values set by artists/promoters do not change due to this change in excess retained fees (or a change in fees)**

Abrantes-Metz Opening Report (Aug. 15, 2025), ¶¶ 171-176, 125-126, and 209, and Figures 27, 29, 31-32
Abrantes-Metz Rebuttal Report (Oct. 9, 2025), Attachment 1: Figures 27, 29, 31-32
PDX006.36

# No Reasonable Basis



"If you find that **any Plaintiff State failed to carry its burden of providing a reasonable basis for determining the per-ticket overcharge in its State**, then you may not find that any overcharge occurred in that State."

**Post-Instruction No. 51**

- **Fans are not the customer in any of plaintiffs' alleged markets**

  *Trial Tr. 2085:1-20 (Hill)*

- **Dr. Abrantes-Metz ignores upfront payments**

  *Trial Tr. 2571:22-24 (Abrantes-Metz)*

- **AXS and Ticketmaster were not of comparable quality throughout the studied damages period**

  *E.g., Trial Tr. 1117:15-1118:1, 1154:11-18, 1156:19-21, 1168:18-1169:1 (Marciano)*
  *Trial Tr. 2366:13-19, 2377:7-11 (Perez)*
  *Trial Tr. 3050:8-3052:7, 3075:7-9 (Mueller)*
  *DX-0267; DX-0268; DX-0270*

- **The alleged overcharge is $2.30, but venues, promoters, and artists make $12 to $18 more when they use Ticketmaster**

  *Trial Tr. 3264:23-3265:7 (Budish)*

DDX-24.111

# Dr. Abrantes-Metz Ignores Upfront Payments



| Dr. Abrantes-Metz's Approach | The Industry's Approach |
|---|---|



**Dr. Abrantes-Metz**
*Plaintiffs' Expert*

**Q.** Now, you didn't deduct upfront payments when you were calculating retained amounts in this case, did you?

**A. That's correct.**

*Trial Tr. 2571:22-24 (Abrantes-Metz)*

The price ticketers charge have **two main financial aspects**—the **fee split and upfront payments**

*Trial Tr. 1177:14-19 (Marciano); Trial Tr. 2921:15-24 (Marcus); Trial Tr. 3820:14-25 (J. Johnson); Trial Tr. 2275:11-19 (Hill)*

Venues and ticketers negotiate upfront payments and fee splits **at the same time**

*Trial Tr. 2573:8-16 (Abrantes-Metz); Trial Tr. 1195:8-11 (Marciano)*

Ticketers, including Ticketmaster, **view upfront payments as affecting the per-ticket value** they receive for their ticketing services

*Trial Tr. 3356:5-20 (Hansen); Trial Tr. 1195:12-15 (Marciano); Trial Tr. 2577:21-2578:11 (Abrantes-Metz)*

If upfront payments were reduced, **venues may increase the overall ticketing fees fans pay**

*Marion Dep. Tr. 74:17-75:14; Johnson Dep. Tr. 61:5-62:3*

DDX-24.112

# Price = Money Received Less Money Paid





**Jenny Johnson**
*Ticketmaster*

**EARLY RENEWAL: HONDA CENTER / ANAHEIM DUCKS (NHL)**

## TM's GM by source

| TM GM (Annual) | 22 / 23 Actual | TM Proposal |
|---|---|---|
| Primary Tickets | 422k | 345k |
| Platinum & VIP Tickets | 33k | 24k |
| Resale Tickets | 74k | 74k |
| Total Tickets (primary + resale) | 529k Total | 442k Total |
| Primary – Team | $0.3M | $0.2M |
| | $3.45 / ticket | $3.60 / ticket |
| Resale – Team | $0.2M | $0.2M |
| | $5.20 / ticket | $5.30 / ticket |
| Primary – Concerts & Other | $3.0M | $2.0M |
| | $8.90 / ticket | $7.05 / ticket |
| VIP & Platinum | $0.6M | $0.6M |
| | $19.60 / ticket | $26.75 / ticket |
| Resale – Concerts & Other | $0.5M | $0.4M |
| | $16.45 / ticket | $15.75 / ticket |
| Sponsorship (Advertising) | ($0.6M) | ($1.6M) |
| | -$1.20 / ticket | -$3.55 / ticket |
| Signing Bonus | ($0M) | ($0.4M) |
| | - | -$0.85 / ticket |
| Product Credit / Hardware Allowance / Other | ($0.2M) | ($0.1M) |
| | -$0.40 / ticket | -$0.40 / ticket |
| **Total TM GM (Annual)** | **$3.8M** | **$1.5M** |
| | $7.27 per ticket | $3.29 per ticket |

*t*

- ***Every time*** Ticketmaster approves a  ticketing deal for a large venue, it converts the fixed payments to the venues into a per-ticket value that is deducted from what Ticketmaster receives by way of it's share of fees.

*Trial Tr. 3815:4-22, 3820:14-25, 3860:12-3861:21, 3845:8-3848:13, 3860:23-3861:17 (J. Johnson)*

- In her construction of Ticketmaster's price, Dr. Abrantes-Metz ***only counts the money Ticketmaster receives***, not the net of what it pays and receives.

*Trial Tr. 2571:22-24 (Abrantes-Metz)*

- ***It is not a study of price at all.***

*PX0764*

DDX-24.113

# Dr. Abrantes-Metz's Core Assumption of Comparable Quality Is Counter to the Evidence

LIVE NATION

*ticketmaster*

## Dr. Abrantes-Metz's Approach



**Dr. Abrantes-Metz**
*Plaintiffs' Expert*

**Q.** And you're offering an opinion about the **quality of ticketing services of Ticketmaster and AXS throughout the entire period** from 2017 through 2024, right?

**A. Yes.** The opinion of being reasonably comparable to each other for the purpose I just said.

*Trial Tr. 2531:11-15 (Abrantes-Metz)*

## The Evidence

Dr. Abrantes-Metz concedes that **differences in quality can generally lead to differences in price**

*Trial Tr. 2533:17–2534:23 (Abrantes-Metz)*

Dr. Abrantes-Metz concedes that, if AXS and Ticketmaster ***were not*** reasonably comparable for ***any portion*** of the period she studied, she did not provide a methodology by which the jury could assess damages only for the period in which they ***were*** comparable

*Trial Tr. 2566:12–2567:15 (Abrantes-Metz)*

AXS and Ticketmaster were **not** "of comparable quality" in the pre-pandemic era

*E.g., Trial Tr. 1117:15-1118:1, 1154:11-18, 1168:18-1169:1 (Marciano);*
*Trial Tr. 2366:13-19, 2377:7-11 (Perez);*
*Trial Tr. 3050:8-3052:7, 3075:3-9 (Mueller);*
*DX-0267; DX-0268; DX-0270*

# No Damages





**Eric Budish**
*Professor of Economics*

**Q.** What is the direct economic benefit per ticket from using Ticketmaster instead of AXS?

**A. So selling 9 to 14 percent more tickets is [] like the equivalent of generating an extra 12 to 18 dollars per ticket to the parties involved in putting on the show** — so the artist, the promoter, the venue, et cetera.

*Trial Tr. 3264:23-3265:3 (Budish)*



**Dennis Carlton**
*Professor of Economics*

"If you look at what Dr. Abrantes-Metz has done, she has completely ignored the fact that Ticketmaster is better than AXS on a variety of -- in a variety of ways. **And once you use the data to correct for that, which she could have done but didn't, but once she used the data to correct for, that you find out there are no damages when you use her method**."

*Trial Tr. 4045:24-4046:12 (Carlton)*

# Failure of Proof



## Ticketing

- Made Up Markets
- No Monopoly Power
- Competitive Conduct
- No Harm to Competition
- No Damages

## Amphitheaters

- Made Up Markets
- No Monopoly Power
- Competitive Conduct
- No Harm to Competition
- No Damages Claimed

DDX-24.116

# Jury Instruction





"In general, however, to prove monopolization for each separate market, **Plaintiffs must show** by a preponderance of the evidence that the alleged market **is a valid antitrust market**…"

Post-Instruction No. 15

DDX-24.117

# Failure of Proof



| Ticketing | Amphitheaters |
|---|---|
| Made Up Markets | Made Up Markets |
| No Monopoly Power | No Monopoly Power |
| Competitive Conduct | Competitive Conduct |
| No Harm to Competition | No Harm to Competition |
| No Damages | No Damages Claimed |

DDX-24.118

# What Is a Market?





















DDX-24.119

# Why Market Definition Matters



**If Live Nation were a monopolist, Plaintiffs would be saying this:**



**Live Nation monopolizes large venues**

**But instead, they are saying this:**



**Live Nation monopolizes ~~large venues~~ amphitheaters with a capacity of over 8,000 that hosted 10+ concerts in at least one year from 2017–2024, which we'll call "Major Concert Amphitheaters"**

DDX-24.120

# Made Up Market



## No Document Defines the Market Like Plaintiffs Do



**Dr. Nicholas Hill**
*Plaintiffs' Expert*

**Q.** And, similarly, you haven't seen, in the millions of pages of paper you've had access to, a single document that defines the amphitheater market to consist of the 87 venues that you include, correct?

**A. That's fair.**

*Trial Tr. 2168:8-12 (Hill)*

DDX-24.121

# Gerrymandered Boundaries



- Includes only **87** amphitheaters

- Excludes:
  - **263** amphitheaters
  - **447** arenas
  - **247** stadiums
  - Many other venues

*Trial Tr. 4298:23-4306:9 (Yurukoglu)*

# Artists Switch Between Plaintiffs' "MCAs" and Other Venues





**Marc Geiger**
*Gate 52*

**Q.** And many of those very same artists also played arenas and festivals in a stadium, and then they go back to an amphitheater in the course of their touring?

**A. Yes.**

*Trial Tr. 523:11-14 (Geiger)*

**Chris Stapleton:** *All American Road Show Tour (2024)*

▲ Among the "87"

● Not among the "87"

DDX-24.123

# Chris Stapleton's All-American Road Show Tour (2024)



# Artists Switch Between "Large Amps" and Other Venues



## Where do artists who play in "Large Amps" actually play?

---

## Mostly in other Amps, Arenas, Stadiums, Theaters, and more.



"Large Amps" 19%

Other Amps, Arenas, Stadiums, and More 81%

*September 2022 – August 2023*

*Trial Tr. 4306:14-4307:11 (Yurukoglu)*

# Artists Switch Between "Large Amps" and Festivals



## Amphitheaters

## Arenas

### Tailgate N' Tall Boys



### Hoofbeat Country Fest

### CMA Music Festival



### Country Thunder Wisconsin

### Rock the Country



### WE Fest

*Trial Tr. 4310:15-4311:5 (Yurukoglu)*

**DDX-24.126**

# Dr. Hill
# Did Not Present
# Any Hypothetical Monopolist Test

# No Measure of Substitution





**Ali Yurukoglu**
*Professor of Economics*
*Stanford University*

"[Dr. Hill] **did not establish such a market because he did not *test* for substitution**. Furthermore, when you test for substitution, **the data speak loudly and clearly against the proposition that these 87 amphitheaters** … are the only relevant competition for each other."

*Trial Tr. 4354:4-9 (Yurukoglu)*

DDX-24.128

# Having It Both Ways



**Dr. Hill's Amphitheater Market Assumes That Amphitheaters and Arenas Are Not Substitutes.**

**Whereas His Ticketing Markets Assume They Are.**

# Failure of Proof



| Ticketing | Amphitheaters |
|-----------|---------------|
| Made Up Markets | Made Up Markets |
| No Monopoly Power | **No Monopoly Power** |
| Competitive Conduct | Competitive Conduct |
| No Harm to Competition | No Harm to Competition |
| No Damages | No Damages Claimed |

# Jury Instruction





"To prove a monopolization claim, Plaintiffs must prove that the relevant Defendant has monopoly power in a relevant antitrust market. Monopoly power is the **power to control prices, restrict output, or exclude competition** in a relevant antitrust market."

"If you find that a Defendant does not have monopoly power in a relevant market, then **you must find for that Defendant** and against Plaintiffs on the monopolization claim as to that relevant market."

Post-Instruction Nos. 21, 23

DDX-24.131

# No Power to Control Price





**Dr. Nicholas Hill**
*Plaintiffs' Expert*

**Q.** You didn't study and you don't show that amps charge artists excessive prices to perform in amphitheaters, correct?

**A. That's fair.**

**Q.** And you don't show or present evidence that amps charge artists higher prices than arenas do, correct?

**A. I don't study that, that's correct.**

*Trial Tr. 2190:6-11 (Hill)*

DDX-24.132

# No Overcharge to Artists



**For Live Nation-Promoted Artists Who Perform a Greater Share of Shows in "Large Amps"**

| Artist Share of Face Value (%) |  |
|---|---|

*Controlling for artist and year.*
*\* Statistically significant at the 99% confidence level.*

*Trial Tr. 4350:22-4351:11 (Yurukoglu)*



**Coran Capshaw**
*Red Light Management*

**Q.** So let me get this straight.  Your artists are often better off financially playing Live Nation's amphitheaters than other venues?

**A. Yes.**

*Trial Tr. 4245:9-12 (Capshaw)*

# Artist Earnings Have Gone Up





Inflation-adjusted U.S. Promoter Payments to Artists

*Trial Tr. 4351:23-4352:8 (Yurukoglu)*

# Live Nation Artist Guarantees Have Gone Up



Chart: Live Nation Artist Guarantees

- 1: $1.08 B
- 2: $1.38 B
- 3: $1.48 B
- 4: $1.90 B
- 5: $2.29 B
- 6: $2.67 B

**146%** Increase in Live Nation Guarantees to Artists

*Trial Tr. 4352:12-4353:2 (Yurukoglu)*

# No Monopoly Profits



## Dr. Hill Offers No Evidence Live Nation Earns Monopoly Profits

| Live Nation's Operating Margin for Concerts | |
| --- | --- |
| 2022 | *(1.1%)* |
| 2023 | *(0.4%)* |
| 2024 | *(2.0%)* |

| Live Nation's Operating Margin Overall | |
| --- | --- |
| 2022 | *4.3%* |
| 2023 | *4.8%* |
| 2024 | *3.6%* |

*PX1013, Trial Tr. 2201:5-8 (Hill)*

DDX-24.136

# No Power to Restrict Output





**Dr. Nicholas Hill**
*Plaintiffs' Expert*

**Q.** And the number of artists that are playing at major concert amphitheaters, that increased as well, correct?

**A. I would assume that's true, but I don't believe I studied that.**

*Trial Tr. 2281:3-6 (Hill)*

DDX-24.137

# No Power to Exclude Competitors





# The Law – Share Insufficient





"...market share is not the equivalent of monopoly power..."

"In evaluating whether the relevant Defendant's market share supports a finding of monopoly power, you should also consider other aspects of the relevant market, including market share trends, the existence of barriers to entry, the entry and exit by other companies, and the number and size of competitors."

**Post-Instruction No. 23**

**DDX-24.139**

# Misplaced Reliance on Share





**Dr. Nicholas Hill**
*Plaintiffs' Expert*

- A market share calculation is only as good as the market definition

  *Trial Tr. 2194:2-7 (Hill)*

- High market shares **don't necessarily indicate** significant market power that can harm customers

  *Trial Tr. 2194:12-15 (Hill)*

- A firm can obtain a high market share **without engaging in anticompetitive conduct**

  *Trial Tr. 2194:16-18 (Hill)*

DDX-24.140



# Misplaced Reliance on Share



"A market share **below 50 percent** is rarely evidence of monopoly power…"

**Post-Instruction No. 23**

| Category | Value |
|---|---|
| "Large Amps" & "Large Arenas" | 21% |
| All Amps & Arenas | 22% |
| All Amps, Arenas, & Stadiums | 18% |
| All Amps, Arenas, & Theaters | 24% |
| All Amps, Arenas, Stadiums & Theaters | 20% |

*Trial Tr. 4319:22-4320:19 (Yurukoglu); 2167:2-4 (Hill)*

# Failure of Proof



## Ticketing

- Made Up Markets
- No Monopoly Power
- Competitive Conduct
- No Harm to Competition
- No Damages

## Amphitheaters

- Made Up Markets
- No Monopoly Power
- **Competitive Conduct**
- No Harm to Competition
- No Damages Claimed

DDX-24.142

# Failure of Proof



## Amphitheaters

Made Up Markets

No Monopoly Power

**Competitive Conduct**

| **1** | **No Tying** |
|---|---|

| **2** | **Amp Acquisitions** |
|---|---|

No Harm to Competition

No Damages Claimed



# No Tying

# Live Nation's Amphitheaters



We are, proudly, **the premier developer and operator of outdoor amphitheaters** in the United States



















*DDX-13.6*

**DDX-24.145**

# Jury Instruction





**To prevail on their tying claim, Plaintiffs must prove each of the following elements by a preponderance of the evidence:**

1. Artists themselves, and not Live Nation's concert promoter competitors, are the customers who rent amphitheaters from Live Nation;

2. The use (i.e., rental) of "large amphitheaters" . . . by artists (the tying product) and promotion services to touring artists (the tied product) are separate and distinct products.

3. Live Nation enforced a policy that conditioned artists' use of "large amphitheaters" on artists also purchasing Live Nation's promotion services.

4. Live Nation has sufficient market power with respect to the use of what Plaintiffs call "large amphitheaters" by artists to enable Live Nation to coerce artists to purchase Live Nation's promotion services.

5. Live Nation uses coercion to force artists to purchase Live Nation's promotion services.

6. The tie has anticompetitive effects in the tied market, which is the market for promotion services in which the artists are customers.

7. The alleged tying arrangement affected a not insubstantial volume of interstate commerce in promotion services to artists.

**Post-Instruction No. 27**

DDX-24.146

# Promoters, Not Artists, Rent Amphitheaters



"If you decide that **promoters, not artists, are the customers that rent amphitheaters**, you should find for Live Nation and against Plaintiffs on this claim."

**Post-Instruction No. 28**



- **Not a single artist** said they were the customer

- **No manager** said they were the customer

- **No venues** said the artist was the customer

- Plaintiffs **did not offer a single contract** between venue and artist

- Promoters sign agreement **with venues** *Trial Tr. 1340:7-9 (Roux)*

- **No artist** came to Live Nation and said they tried to pay rent for a venue *Trial Tr. 2988:2-6 (Al-joulani); Trial Tr. 2010:24-2011:3 (Lewis)*

DDX-24.147

# No Evidence of Demand For Separate Services



"If enough artists would want to purchase the use of so-called 'large amphitheaters' and promotion services separately to induce venues and promoters generally to provide each service separately, then each service is a separate service."

Post-Instruction No. 29

# Not a **single** artist has said that they want to purchase the use of large amphitheaters and promotion services separately.

DDX-24.148

# No Evidence of Conditioning



"You may find that an illegal tying arrangement exists . . . **only if** you find that Live Nation enforced a policy that conditioned the rental of its 'large amphitheaters' on an artist's agreement to buy Live Nation's promotion services **when the artists would have preferred to buy promotion services elsewhere**."

**Post-Instruction No. 30**



**Omar Al-joulani**
*Live Nation*

**Q.** Have you ever used access to a Live Nation owned or operated venue as a way to force an artist to choose Live Nation as their promoter?

**A. I've never asked -- I've never forced an artist to do anything or tried to force them to.**

*Trial Tr. 2985:1-5 (Al-joulani)*



**Bob Roux**
*Live Nation*

**Q.** If an artist is playing a mix of Live Nation amphitheaters and the non-Live Nation venues on its tours, does the artist have to use Live Nation as its promoter for the whole tour?

**A. They do not.**

*Trial Tr. 1399:15-18 (Roux)*

**Q.** Mr. Roux, to what extent, if at all, are artists free to use Live Nation as their concert promoter for venues you own and operate and free to use whatever other promoter they want to use for other venues on the same tour?

**A. Always.**

*Trial Tr. 1401:12-17 (Roux)*

**DDX-24.149**

# No Evidence of Conditioning



"You may find that an illegal tying arrangement exists . . . **only if** you find that Live Nation enforced a policy that conditioned the rental of its 'large amphitheaters' on an artist's agreement to buy Live Nation's promotion services **when the artists would have preferred to buy promotion services elsewhere**."

Post-Instruction No. 30



**Omar Al-joulani**
*Live Nation*

**Q.** Have you ever used access to a Live Nation owned or operated venue as a way to force an artist to choose Live Nation as their promoter?

**A. I've never asked -- I've never forced an artist to do anything or tried to force them to.**

*Trial Tr. 2985:1-5 (Al-joulani)*



**Bob Roux**
*Live Nation*

**Q.** If an artist is playing a mix of Live Nation amphitheaters and the non-Live Nation venues on its tours, does the artist have to use Live Nation as its promoter for the whole tour?

**A. They do not.**

*Trial Tr. 1399:15-18 (Roux)*

**Q.** Mr. Roux, to what extent, if at all, are artists free to use Live Nation as their promoter but then free to use whatever other promoter they want to use for the venues you don't own and operate?

**A. Always.**

*Trial Tr. 1401:12-17 (Roux)*

**No artist said that Live Nation conditioned the rental of any of its large amphitheaters on the artist buying Live Nation's promotion service.**

DDX-24.150

# No Evidence of Coercion



"To find that an illegal tying arrangement exists, you must also find that Live Nation coerced artists into buying Live Nation's promotion services. To prove coercion, **Plaintiffs must prove** by a preponderance of the evidence that Live Nation exploited its control over the use of what Plaintiffs call 'large amphitheaters' controlled by Live Nation to force artists into the purchase of promotion services, **which the artists either did not want at all, or would have preferred to purchase from a different promoter on different terms**, and that any appearance of choice was illusory."

**Post-Instruction No. 32**

- **No artist said that they were coerced**

- **No artist said that they were required to purchase promotion services that they did not want**

- **The only artist who testified confirmed that Live Nation did not coerce their band into using Live Nation venues** *Lovett Dep. Tr. 110:25-111:4*

- **No evidence that Live Nation customers are unhappy**

# No Evidence of Coercion



## No Evidence That Live Nation Customers Are Unhappy



**Bob Roux**
*Live Nation*

**Q.** Mr. Roux, has any artist ever told you, in your 20-year career with Live Nation, that they felt forced to use Live Nation as their concert promoter when they would have preferred to use a different promoter?

**A. They have not.**

*Trial Tr. 1395:3-7 (Roux)*



**Omar Al-joulani**
*Live Nation*

**Q.** So in those circumstances where they reject one of your recommendations, how often does Live Nation as a promoter then force them to play at the place they say they don't want to play?

**A. We've never forced an artist to play anywhere they didn't want to play.**

**Q.** Why not?

**A. It's not good business.**

*Trial Tr. 2968:17-24 (Al-joulani)*



**Colin Lewis**
*Live Nation*

**Q.** Now, how often has Live Nation ever forced an artist to play in a Live Nation amphitheater?

**A. We've never done that. We don't force artists to do anything.**

*Trial Tr. 2009:21-24 (Lewis)*

# Live Nation Is "Generous" to Artists





**Coran Capshaw**
*Red Light Management*

**Q.** And have the terms that Live Nation has offered your artist been fair and reasonable for those amp shows in your experience?

**A. Yes, fair and reasonable and actually pretty friendly.**

**Q.** Well, I was going to follow-up on that. Would you say that the terms that Live Nation offers to play at their amps are better or worse than those offered by other amphitheater owners to play their amps?

**A. They've been very friendly and I probably could use the word generous in the deals that we're able to make for our artists.**

*Trial Tr. 4244:1-11 (Capshaw)*

DDX-24.153

# No Evidence of Coercion





**Adel Nur**
*Drake's Manager*

**Q.** You also mentioned that you have a unique relationship with Live Nation; is that right?

**A. I do.**

**Q.** What makes it unique?

**A. They've been very good to me in good times; they've been very good to me in bad times . . . They take a lot of direction from me and from my client on what our goals are, what we want to accomplish. . . it's a really great working relationship.**

*Nur Dep. Tr. 56:6-24*

\* \* \*

**Q.** In the U.S., you work exclusively with Live Nation?

**A. Primarily, not exclusively. I can walk anytime I want to. I can use anyone else if I want to. . . But over the years, they've treated me well, so it's always worked out that we've work together.**

*Nur Dep. Tr. 57:12-21*

# No Evidence of Coercion





**Coran Capshaw**
*Red Light Management*

**Q.** When you negotiate with a Live Nation owned-and-operated amphitheater, do they have you over a barrel?

**A. I don't think they have us over a barrel.  I feel the opposite.  They need shows.  We have the artists.**

**Q.** What would you do if you didn't like the terms that they were offering?

**A. I'd go somewhere else.**

**Q.** What if there's not another large amphitheater in the market?

**A. Well, we might take the show indoors, you know, if we didn't like the terms.  Sometimes you have to put your foot down with promoters.**

\* \* \*

**Q.** So when you choose to put an artist at a Live Nation amphitheater and to use Live Nation as a concert promoter at the same time, do you feel coerced in that choice of concert promoter?

**A. I don't feel coerced in working with any promoter.**

*Trial Tr. 4247:7-4248:2 (Capshaw)*



# Refusing to Deal with a Competitor Is NOT the Same Thing as Tying



# Amphitheater Acquisitions

# Failure of Proof



**Made Up Markets**

**No Monopoly Power**

**Competitive Conduct**

| 1 | No Tying |
|---|----------|
| 2 | Amp Acquisitions |

**No Harm to Competition**

**No Damages Claimed**

# Modest Growth



## Plaintiffs claim Live Nation harmed competition by getting "control" of 15 amps from 2015 – 2024

*Trial Tr. 2134:19-2137:3, 2265:15-2266:11, 2268:18-2269:6 (Hill)*

### In fact, Live Nation:

- Operates only 1 of the amps
- Purchased only 2 of the amps
- Leases only 2 of the amps
- Merely books the others

# Only One Witness from the 15 Amphitheaters "Acquired" Since 2015





**Marney Smith**
*Hayden Homes Amphitheater*



**Q.** And do you recall why ultimately you selected Live Nation over those other two?

**A. Yes. Their response was the best and offered to partner with us in a way that felt like it was best for River Bend Limited Partnership. They were offering to invest in the property and increase the number of shows that we had, while allowing us to maintain control of the day-to-day operations.**

**Q.** And since then, have you been happy with Live Nation as a partner with the venue?

**A. Yes.**

**Q.** How would you grade their performance over the years ago?

**A. What's my scale?**

**Q.** F to A.

**A. A.**

*Smith Dep. Tr. 16:19-17:4, 17:23-18:5*

DDX-24.160

# No Evidence of Harm



## As to the amps in question, Plaintiffs offered no evidence that:

- Anyone else wanted to "acquire"
- Anyone objected to the acquisition at the time
- The amps are now worse off
- Prices are higher than before
- Artists are dissatisfied with the changes
- Anyone has complained



# Live Nation's Investments in Amphitheaters



## Invested over $450 million in amphitheaters from 2022–2025

| Across Live Nation Amphitheaters | |
|---|---|
| Fan Experience | $174.9M |
| Maintenance | $40.2M |
| Security & Safety | $30.5M |
| Artist Experience | $16M |
| Sustainability | $2.9M |
| Accessibility | $2.2M |

### New Venues & Renovations ($189M)












# Failure of Proof



| Ticketing | Amphitheaters |
|---|---|
| Made Up Markets | Made Up Markets |
| No Monopoly Power | No Monopoly Power |
| Competitive Conduct | Competitive Conduct |
| No Harm to Competition | **No Harm to Competition** |
| No Damages | No Damages Claimed |

DDX-24.163

# The Law – Harm to Competition





"Harm to one or more competitors will not suffice; **Plaintiffs must demonstrate that the monopolist's conduct harmed competition, not just a competitor**."

"Harm to competition includes evidence of **increased prices, decreased production levels, and reduced quality**, though not all increases in prices, decreases in production levels or reductions in quality harm competition."

Post-Instruction No. 24

DDX-24.164

# Key Questions



## Key Questions

- Did output **_decrease_**?
- Did prices **_increase_**?
- Did quality **_decrease_**?

## Monopolies Tend to:



**_Reduce_** output          **_Increase_** prices          **_Reduce_** quality

*Trial Tr. 2272:24-2273:4 (Hill)*

# Failure of Proof



## Dr. Hill did not study or express an opinion on most of the key indicators

| Output | Price | Quality |
|---|---|---|
| **Q.** And the number of artists that are playing at major concert amphitheaters, that increased as well, correct?<br><br>**A. I would assume that's true, but I don't believe I studied that.** | **Q.** You didn't study and you don't show that amps charge artists excessive prices to perform in amphitheaters, correct?<br><br>**A. That's fair.**<br><br>**Q.** And you don't show or present evidence that amps charge artists higher prices than arenas do, correct?<br><br>**A. I don't study that, that's correct.** | **Q.** But you didn't, as part of your work, you didn't actually undertake an investigation as to the extent and the nature of improvements by Live Nation in amphitheaters, right?<br><br>**A. Correct.** |
| *Trial Tr. 2281:3-6 (Hill)* | *Trial Tr. 2190:6-11 (Hill)* | *Trial Tr. 2267:9-12 (Hill)* |

# More Concerts Than Ever



**4,368** (2017)
**4,781** (2018)
**5,169** (2019)
**6,075** (2022)
**5,962** (2023)
**6,728** (2024)

*Note: COVID-19 data omitted. Dotted line is expected trend of 2020-2021 had COVID-19 not occurred.*

# Output Has Increased





**Dr. Nicholas Hill**
*Plaintiffs' Expert*

**Q.** So number of concerts at amphitheaters is up, correct?

**A. Major concert amphitheaters, yes.**

**Q.** And the number of artists that are playing at major concert amphitheaters, that increased as well, correct?

**A. I would assume that's true, but I don't believe I studied that.**

*Trial Tr. 2280:25-2281:6 (Hill)*

# Live Nation's "Large Amps" Have Fewer "Dark Days"





**Ali Yurukoglu**
*Professor of Economics*
*Stanford University*

**A.** **So, on average, Live Nation large amphitheaters have six percentage points fewer dark days; that is, they are being utilized more on average than non-Live Nation amphitheaters.**

**Q.** Now, could this result simply be because Live Nation has better, more attractive venues?

**A.** **That was a potential alternative explanation, so I went and investigated that as well. So the next thing I did was a regression analysis, where I control for the venue. So the information we're using is what happens to the number of dark days at a venue when it moves from being a non-Live Nation venue to a Live Nation venue.**

**Q.** What did you find?

**A.** **In that case, you get a similar result. You get – this time it's eight instead of six, but eight percentage points fewer dark days, okay, for these transitions from non-Live Nation venue to Live Nation venue. In other words, there's more utilization of the Live Nation amphitheaters.**

*Trial Tr. 4347:16-4348:8 (Yurukoglu)*

DDX-24.169

# Prices Are Down





**Dr. Nicholas Hill**
*Plaintiffs' Expert*

Q. Can we agree, Dr. Hill, that artists have been paid more money for performing concerts over time?

**A. I think that's fair.**

*Trial Tr. 2281:19-21 (Hill)*

\* \* \*

Q. And artists' take rate at amphitheaters in particular is up. You understand that, right?

**A. I don't recall that. That may be true, but I don't think I looked at that.**

*Trial Tr. 2282:1-4 (Hill)*

\* \* \*

Q. You haven't measured the effect of the alleged conduct in this case on the fees fans paid over time, correct?

**A. Correct.**

*Trial Tr. 2277:17-19 (Hill)*

DDX-24.170

# Quality Has Improved





**Ben Weeden**
*Venue Nation*

**Q.** Has Live Nation made investments in its amphitheaters during that period of time, '22 to now?

**A. Yes. Over the past, approximately, four years, we've invested close to half a billion dollars, I think $450 million to be exact.**

*Trial Tr. 3580:11-15 (Weeden)*

- **Fan Experience** (e.g., better F&B offerings, enhanced audio/visual, premium seatings)

- **Accessibility** (e.g., mobility-friendly seating, sensory inclusion initiatives)

- **Sustainability** (e.g., switching out plastic for aluminum)

- **Security & Safety** (most updated scanners, security cameras)

- **Artist Experience** (dressing rooms, green rooms)

*Trial Tr. 3580:16-3581:22 (Weeden)*

# Live Nation Amps Are Great – Investment & Improvements





**Oliver Chi**
*FivePoint Amphitheatre*

**Q.** And every year that FivePoint Amphitheatre was running, **Live Nation made operational improvements** to that venue, right?

**A.** Yes.

**Q.** For example, **Live Nation worked with the city to make some improvements to address some noise concerns**; you recall that?

**A.** I do.

*Trial Tr. 567:24-568:4 (Chi)*



**Marney Smith**
*Hayden Homes Amphitheater*

**Q.** Has the Hayden Homes Amphitheater invested in any projects over the last few years to improve its facilities?

**A.** Yes.

**Q.** And are there any significant projects that come to mind?

**A.** We were able to add **accessible pathways** throughout the venue. **Prior to our partnership with Live Nation, we had not remodeled the venue**....

*Smith Dep. Tr. 32:21-33:12*



**John Marchant**
*Shoreline Amphitheater*

**Q.** Are you aware of whether Live Nation has made capital improvements to the Shoreline Amphitheater?

**A.** **They have... That includes an improved sound system, audiovisuals**, the monitors throughout the venue to provide messaging. They have installed **additional security cameras**, and they have made **improvements to the box office** in the main entrance to **improve the appearance**.

*Marchant Dep. Tr. 55:11-24*

DDX-24.172

# Quality Is Up





**Marc Geiger**
*Gate 52*

**Q.** Live Nation provides high-quality services for artists in your experience, doesn't it?

**A. Yes.**

**Q.** And over the years, Live Nation has executed tens and tens of thousands of shows very well, hasn't it?

**A. Yes.**

**Q.** And that's good for both artists and concert-going fans, isn't it?

**A. Yes.**

*Trial Tr. 519:21-520:4 (Geiger)*

# Plenty of Choices





**690 Arenas**



**378 Amps**



**788 Stadiums**



**453 Clubs**



**870 Theaters**



**16,848 Others**

*Trial Tr. 2151:1-19 (Hill)*

# Failure of Proof



| Ticketing | Amphitheaters |
|---|---|
| Made Up Markets | Made Up Markets |
| No Monopoly Power | No Monopoly Power |
| Competitive Conduct | Competitive Conduct |
| No Harm to Competition | No Harm to Competition |
| No Damages | No Damages Claimed |

DDX-24.175

# Summary



| Ticketing | Amphitheaters |
|---|---|
| Made Up Markets | Made Up Markets |
| No Monopoly Power | No Monopoly Power |
| Competitive Conduct | Competitive Conduct |
| No Harm to Competition | No Harm to Competition |
| No Damages | No Damages Claimed |

DDX-24.176