**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>     *Plaintiffs,*<br><br>     v.<br><br>LIVE NATION ENTERTAINMENT, INC.,<br>and TICKETMASTER L.L.C.,<br><br>     *Defendants.* | Case No. 1:24-cv-03973-AS |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW**
**PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 50(B)**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

LEGAL STANDARD..............................................................................................................2

ARGUMENT ...........................................................................................................................2

I.    DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW
ON ALL AMPHITHEATER CLAIMS....................................................................2

    A.    Plaintiffs Failed To Prove That Live Nation Unlawfully Acquired
Monopoly Power in Large Amphitheaters...................................................2

    B.    Plaintiffs Failed To Prove Their Alleged "Large Amphitheater" Market ...............6

    C.    Plaintiffs Failed To Prove Tying..................................................................10

        1.    Plaintiffs Failed To Prove Anticompetitive Effects In Any Tied
Product Market......................................................................................10

        2.    Plaintiffs Failed To Prove Coercion ...........................................................12

        3.    The Tying Claim Is A Non-Cognizable Refusal-To-Deal Claim ..............12

        4.    The Tying Claim Is Time-Barred .................................................................13

II.    DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW
ON ALL TICKETING CLAIMS.............................................................................14

    A.    Plaintiffs Failed To Prove Their Alleged Primary Ticketing Markets ..................14

        1.    No Evidence Justifies The "Major Concert Venues" Market....................14

        2.    There Is No Basis For A Separate Primary *Concert* Ticketing
Market ....................................................................................................18

    B.    Plaintiffs Failed To Prove Anticompetitive Effects..............................................19

    C.    Plaintiffs Failed To Prove Exclusionary Conduct .................................................22

    D.    Plaintiffs Failed To Prove Monopoly Power ........................................................28

III.    DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW
ON ALL STATE-LAW CLAIMS............................................................................28

IV.    DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW
ON DAMAGES.......................................................................................................28

CONCLUSION.......................................................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Bayou Bottling v. Dr. Pepper*,
  725 F.2d 300 (5th Cir. 1984) ...................................................................................24

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
  603 F.2d 263 (2d Cir. 1979)...............................................................................14, 26

*Bookhouse of Stuyvesant Plaza v. Amazon.com*,
  985 F. Supp. 2d 612 (S.D.N.Y. 2013)......................................................................11

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962)........................................................................................8, 17

*Cinema Vill. Cinemart v. Regal Ent. Grp.*,
  2016 WL 5719790 (S.D.N.Y. Sept. 29, 2016).........................................................11

*City of Groton v. Connecticut Light & Power Co.*,
  662 F.2d 921 (2d Cir. 1981)....................................................................................23

*Corsearch, Inc. v. Thomson & Thomson*,
  792 F. Supp. 305 (S.D.N.Y. 1992)............................................................................5

*FTC v. Facebook, Inc.*,
  560 F. Supp. 3d 1 (D.D.C. 2021)............................................................................25

*FTC v. Facebook, Inc.*,
  581 F. Supp. 3d 34 (D.D.C. 2022) ...........................................................................5

*FTC v. Meta Platforms, Inc.*,
  811 F. Supp. 3d 67 (D.D.C. 2025).............................................................2, 15, 28

*FTC v. Qualcomm, Inc.*,
  969 F.3d 974 (9th Cir. 2020) ..............................................................................1, 6

*FTC v. Tapestry*,
  755 F. Supp. 3d 386 (S.D.N.Y. 2024)...................................................................8, 17

*FTC v. Whole Foods Mkt., Inc.*,
  548 F.3d 1028 (D.C. Cir. 2008)........................................................................8, 15, 16

*Health Alliance Network, Inc. v. Continental Cas. Co.*,
  245 F.R.D. 121 (S.D.N.Y. 2007) ...............................................................................2

*Hill v. A-T-O, Inc.*,
535 F.2d 1349 (2d Cir. 1976)................................................................................................12

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
44 F.4th 959 (10th Cir. 2022) ..............................................................................................27

*In re: Zinc Antitrust Litig.*,
2016 WL 3167192 (S.D.N.Y. June 6, 2016) ...........................................................................6

*It's My Party, Inc. v. Live Nation, Inc.*,
811 F.3d 676 (4th Cir. 2016) ....................................................................................7, 10, 24

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
466 U.S. 2 (1984)............................................................................................................12, 24

*K.M.B. Warehouse Dist. v. Walker Mfg.*,
61 F.3d 123 (2d Cir. 1995)....................................................................................................20

*Klehr v. A.O. Smith Corp.*,
521 U.S. 179 (1997)................................................................................................................4

*MacDermid Printing Sols. v. Cortron Corp.*,
833 F.3d 172 (2d Cir. 2016)......................................................................................2, 11, 20

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
2026 WL 1397077 (2d Cir. May 19, 2026) ..............................................................10, 18, 20

*Nat'l Collegiate Athletic Ass'n v. Alston*,
594 U.S. 69 (2021)................................................................................................................20

*New York ex rel. Schneiderman v. Actavis PLC*,
787 F.3d 638 (2015)........................................................................................................19, 20

*New York v. Facebook, Inc.*,
549 F. Supp. 3d 6 (D.D.C. 2021) ......................................................................................4, 14

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018)........................................................................................................19, 20

*Pac. Bell Tel. Co. v. linkLine Commc'ns*,
555 U.S. 438 (2009)..............................................................................................................13

*PepsiCo v. Coca-Cola*,
315 F.3d 101 (2d Cir. 2002)................................................................................................7, 9

*Race Tires Am. v. Hoosier Racing Tire*,
614 F.3d 57 (3d Cir. 2010)....................................................................................................27

*Reeves v. Sanderson Plumbing Prods., Inc.*,
   530 U.S. 133 (2000)............................................................................................................2

*Shak v. JPMorgan Chase & Co.*,
   156 F. Supp. 3d 462 (S.D.N.Y. 2016)................................................................................20

*Sullivan v. Nat'l Football League*,
   34 F.3d 1091 (1st Cir. 1994)...............................................................................................6

*United States v. Colgate & Co.*,
   250 U.S. 300 (1919)...........................................................................................................13

*United States v. Eastman Kodak Co.*,
   63 F.3d 95 (2d Cir. 1995) ..................................................................................................15

*United States v. Google LLC*,
   687 F. Supp. 3d 48 (D.D.C. 2023).....................................................................................24

*United States v. Google LLC*,
   778 F. Supp. 3d 797 (E.D. Va. 2025) ................................................................................22

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001).................................................................................19, 20, 25

*United States v. Oracle Corp.*,
   331 F. Supp. 2d 1098 (N.D. Cal. 2004) .............................................................................17

*United States v. U.S. Sugar Corp.*,
   2022 WL 4544025 (D. Del. Sept. 28, 2022), *aff'd*, 73 F.4th 197 (3d Cir. 2023) ....................18

*Valassis Commc'ns v. News Corp.*,
   2019 WL 802093 (S.D.N.Y. Feb. 21, 2019).......................................................................23

*Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004)...........................................................................................................13

*Virgin Atl. Airways Ltd. v. British Airways PLC*,
   257 F.3d 256 (2d Cir. 2001).........................................................................................20, 25

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
   401 U.S. 321 (1971).............................................................................................................4

**RULES**

Fed. R. Civ. P.
   50(b)...............................................................................................................................1, 2, 10

**OTHER AUTHORITIES**

Herbert Hovenkamp, Antitrust and Self-Preferencing, *Antitrust*, Vol. 38, No. 1,
     Fall 2023 .......................................................................................................................24, 25

Live Nation Entertainment, Inc. and Ticketmaster L.L.C. ("Defendants") respectfully request judgment as a matter of law under Federal Rule of Civil Procedure 50(b).

## INTRODUCTION

This Court gave Plaintiffs the benefit of the doubt at summary judgment that the evidence at trial might support Plaintiffs' novel and bespoke "large amphitheater" and "major concert venue" markets; that Plaintiffs would be able to prove anticompetitive effects in those markets; and that Plaintiffs would deliver on the promised "mountain" of evidence showing a "years-long campaign of threats and retaliation." But after 25 days of trial and testimony from 50 witnesses, the evidence never materialized. Plaintiffs used the jury trial to smear Defendants with cherrypicked documents, ancillary issues, and emotional charges. But they failed to present meaningful evidence on core legal elements of their claims.

It is now abundantly clear there is no relevant evidence of any increase in price, decrease in output, or diminution in quality in any market. No venue testified to being overcharged or underserved; neither did any artist. No venue lodged any complaint about exclusive contracting, which is unsurprising because Ticketmaster's share of the economics from those deals has been declining. And the record shows artists benefit from Live Nation's ownership of amphitheaters because they can extract more money from promoters when they play promoter-owned venues.

Plaintiffs' response to that lack of evidence was to change the subject. They told the jury about harms to fans. *E.g.*, Trial-Tr.4601:9-4603:17 (telling jury that higher fees paid by fans are "price effects, anticompetitive effects"). But evidence of anticompetitive effects must exist "'in the market where competition is [allegedly] being restrained.'" *FTC v. Qualcomm, Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) (alteration in original). Fans do not book amphitheaters or buy primary ticketing services. Plaintiffs' fixation on ticketing fees and other alleged harms to fans was and is legally irrelevant.

1

That flaw pervades every aspect of Plaintiffs' case. No precedential decision in this Circuit has ever upheld a finding of anticompetitive effects in these circumstances. And this failure of proof is fatal to market definition and market power too. There is no direct evidence of monopoly power, not even an argument. Instead, Plaintiffs infer power with made-for-litigation markets that—by ignoring most of the primary ticketing opportunities in the United States and hundreds of venues that compete with "large amphitheaters"—generate large market shares. The jury accepted this, but Plaintiffs' gerrymandering is too obvious for these markets to stand.

This Court has given Plaintiffs every chance. But the trial evidence cannot sustain the jury's verdict. The Court should enter judgment as a matter of law.

## LEGAL STANDARD

"The standard for judgment as a matter of law under Rule 50 mirrors the standard for summary judgment under Rule 56." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Judgment under Rule 50(b) "should be granted" when the evidence does not provide enough "for a reasonable jury to find for a party on an issue." *Health Alliance Network, Inc. v. Continental Cas. Co.*, 245 F.R.D. 121, 125 (S.D.N.Y. 2007); *see, e.g.*, *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 192 (2d Cir. 2016) (reversing denial of Rule 50(b) motion).

## ARGUMENT

I.    **DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON ALL AMPHITHEATER CLAIMS**

A.    **Plaintiffs Failed To Prove That Live Nation Unlawfully Acquired Monopoly Power in Large Amphitheaters**

The most extreme example of Plaintiffs' failure of proof concerns the Fourth Claim for Relief, which asserts that Live Nation acquired monopoly power over "large amphitheaters" by a series of "acquisitions or … control agreements" between 2015 and 2024. Trial-Tr.2135:5-2136:3 (Hill). That is a claim comparable in scope and complexity to *FTC v. Meta Platforms, Inc.*, 811

2

F. Supp. 3d 67 (D.D.C. 2025), the FTC case alleging that Meta's acquisitions of Instagram and WhatsApp violated Section 2 of the Sherman Act. Judge Boasberg presided over a six-week trial to consider nothing but those acquisitions.

Dr. Hill's discussion of this claim at trial amounted to only two points: (1) an assertion that Live Nation increased its market share of large amphitheaters from 2015-2024 via "acquisitions or entering into new control agreements," and (2) a conclusion that "if a large firm acquires a significant number of rivals, it increases its share in a concentrated market, then that's usually presumed to be likely to reduce competition." Trial-Tr.2135:5-2136:3 (Hill). That record pales in comparison to *Meta* and falls far short of what is needed to prove Plaintiffs' claim.

***Plaintiffs failed to prove foundational facts*:** To start, Plaintiffs did not even prove the acquisitions and "control agreements" underlying this claim. The relevant transactions were not identified, and there are no lease, operation, ownership, or exclusive booking agreements between Live Nation and any amphitheater in the trial record. That dearth of evidence is particularly glaring when it comes to booking agreements, since on cross Dr. Hill admitted that "[m]ost of the control [acquired since 2015] was through exclusive booking," and "an exclusive booker [] doesn't control the venue." Trial-Tr.2269:3-10 (Hill). If there is something about these agreements that ceded control, Plaintiffs did not prove it. Indeed, Dr. Hill admitted he had not analyzed the specifics of any booking agreement. Trial-Tr.2269:19-25 (Hill).[1]

Live Nation acquired only four amphitheaters by ownership or lease since 2015. Dr. Hill admitted he did not "evaluate any of them individually." Trial-Tr.2271:2-4 (Hill). And fact-

---

[1] Dr. Hill was also unaware that Live Nation has since lost several of these booking agreements. Trial-Tr.2265:15-2266:11 (Hill). Some of the amphitheaters Dr. Hill relied on for his market share calculation are today booked by third-party promoters. *See* Trial-Tr.1405:15-1406:6 (Roux); Trial-Tr.4258:25-4259:7 (Capshaw).

witness testimony focused only on one: the Ameris Bank Amphitheatre that Live Nation acquired operating rights to in 2016.  Trial-Tr.1481:9-24 (Campana).  There is hardly anything in the record about the remaining three—Utah First Credit Union Amphitheater, Hayden Homes Amphitheater, and Bank NH Pavilion.  The only testimony is about *benefits* from these acquisitions, *e.g.*, Trial-Tr.1508:10-1509:17 (Campana re: Ameris); M-Smith-Dep.13:19-33:22 (re: Hayden Homes); nothing that would support a finding of anticompetitive effects.

*Most of the "acquisitions" are time-barred*:  Plaintiffs also relied extensively on pre-May 23, 2020 evidence.  Trial-Tr.2135:5-14 (documenting market share growth from 2015-2024); Trial-Tr.2268:18-22 (relying on Live Nation's conduct since 2015); PX348 (2016 information); Trial-Tr.1241:11-20 (Live Nation owned or exclusively booked 42 of the top 50 amphitheaters before the end of 2018).  According to Dr. Hill, Live Nation achieved monopoly market share in 2018—and has not grown it since.  PDX5.69.

None of this pre-May 2020 evidence can support liability.  "Generally, a [federal antitrust] cause of action accrues and the statute begins to run when a defendant commits an [injurious] act." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971).  "[T]he commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997). These principles impose a "starting presumption" that an antitrust plaintiff "must file its lawsuit within four years from 'the accrual of the claim.'" *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 35 (D.D.C. 2021).  That rule is "particularly appropriate for challenges to acquisitions" because plaintiffs often seek divestiture of illegally-obtained assets or businesses, and "[s]uch a remedy, if ordered well after" the problematic conduct, "will usually prejudice the defendant by inflicting substantial hardship." *Id.*

4

If the alleged monopoly was acquired through acquisitions by 2018, the challenge to those deals should have been brought by 2022.  And it is inconceivable that the more recent acquisitions—two booking deals (one of which Live Nation has since lost) and two leases (Hayden Homes and Cascades)—could sustain the claim alone.  That case was never presented.

***No evidence of actual or likely adverse effects***:    Since this is a Section 2 acquisition-of-monopoly claim, there is no presumption that any deal harms competition.  As the Court correctly instructed the jury, "a company's control over or acquisition of amphitheaters does not, without more, count as anticompetitive conduct."  ECF-No.1411-24, Jury Instruction ("JI") 24; *see Corsearch, Inc. v. Thomson & Thomson*, 792 F. Supp. 305, 325-26 (S.D.N.Y. 1992) (acquisition by monopolist not unlawful where "there is no evidence that the acquisition was undertaken in order to acquire or maintain a monopoly position and prevent competition").  Plaintiffs were thus required to prove "not mere growth by acquisition, but the willful maintenance or acquisition of monopoly power," including the threshold element of anticompetitive effects.  ECF-No.1037, p.33; *see FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34, 57 (D.D.C. 2022).

Yet on the sparse record developed, the jury had no option but to presume that acquisitions *themselves* constitute anticompetitive effects.  Nothing else was proven.  The closest Plaintiffs came to presenting evidence of anticompetitive effects had nothing to do with these acquisitions or effects on artists, the relevant consumers.  It was anecdotal messages suggesting that Live Nation had increased prices to *fans* for things like parking, VIP tickets, or lawn chairs.[2]  That is not evidence of anticompetitive effects in the "particular market" where Plaintiffs have attempted

---

[2] This evidence should have been excluded as irrelevant and prejudicial.  *See* Defs.' Mem. of Law in Support of Defs.' Mot. for New Trial (filed concurrently) ("NT-Motion") 5-7.  It also has no connection to the amphitheaters Live Nation acquired control over in 2015-2024.  Live Nation has operated the MidFlorida Credit Union Amphitheatre that was the subject of Ben Baker's testimony and Slack messages since its inception.  Trial-Tr.1546:6-8 (Baker); PX720 at 1.

to prove "monopoly power." *In re: Zinc Antitrust Litig.*, 2016 WL 3167192, \*13 (S.D.N.Y. June 6, 2016); *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) ("[C]ourts must focus on anticompetitive effects 'in the market where competition is [allegedly] being restrained.'" (alteration in original)); *Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1113 (1st Cir. 1994) (key inquiry is "beneficial impact on competition in the market itself"). For the same reason, alleged effects on promoters are irrelevant. That Plaintiffs had to resort to out-of-market effects confirms they have no evidence of harm to artists, which is dispositive.

*No competitive effects theory or analysis*: The jury was not even offered a cogent explanation for why these acquisitions would be expected to harm competition. Contrast this showing with the FTC's in *Meta*. While the FTC lost that case on monopoly power, it at least presented extensive and sophisticated evidence about the competitive effects of the acquisitions. *See* FTC Post-Trial Mem., 2025 WL 2886554. The FTC explained, for instance, that Meta's "acquisition" of "nascent threats" (like Instagram and WhatsApp) paved the company's path to monopolization. *Id.*, §IV. That was based on "[o]verwhelming evidence show[ing] that Instagram was a serious threat to Meta" because "it was [] rapidly growing" in a competitive market "at the time of the acquisition." *Id.* Evidence included Meta's own assessment of its competitors, along with testimony by Meta's CEO. *See id.* Evidence also established that WhatsApp posed a serious threat that "went to the heart of Meta's business." *Id.* Plaintiffs' case here looked nothing like that. They treated this claim as if Dr. Hill's brief discussion of it was all they needed. They are wrong. This extreme failure of proof requires judgment for Defendants.

### B.    Plaintiffs Failed To Prove Their Alleged "Large Amphitheater" Market

Plaintiffs' amphitheater monopolization and tying claims turn on whether "large amphitheaters"—amphitheaters of 8,000+ capacity that hosted 10+ concerts in at least one year

from 2017-2024—are a distinct market.  At summary judgment, Defendants argued that *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676 (4th Cir. 2016), defeated this market.  There, the Fourth Circuit held that the "proposed market" of large amphitheaters—which "closely resembles" Plaintiffs' proposed market—"was drawn too narrowly [by] excluding 'clubs, arenas, stadiums, and other venues'" that are ready substitutes for large amphitheaters.  ECF-No.1037, p.13; *see PepsiCo v. Coca-Cola*, 315 F.3d 101, 105 (2d Cir. 2002) (relevant market must include all products consumers view as "acceptable substitutes").  This Court rejected that argument, reasoning that, "this time around, the government has better evidence."  ECF-No.1037, p.13.  The Court surmised that evidence at trial could show that large amphitheaters have "industry recognition," "[u]nique production facilities," and other "economic realities" that "might distinguish" them.  *Id.*, pp.13-14.  It was possible, the Court thought, that "artists [might] not want to switch to an arena" such that they have "highly inelastic demand for amphitheaters *specifically*."  *Id.*, p.14.

The evidence at trial did not come close to supporting Plaintiffs' theory.  For starters, the Court excluded as unreliable Dr. Hill's version of the flagship economic test for market definition, an HMT analysis.  ECF-No.1037, p.15.  Nor was there other evidence that "artists have highly inelastic demand for amphitheaters *specifically*."  *Id.*, p.14.  That includes the small group of artists who we heard want to do national large amphitheater tours.  Trial.Tr.495:18-23 (Geiger).  Plaintiffs did *nothing* to show that this preference manifests in a willingness to pay more for amphitheaters, which is what "highly inelastic demand" means.[3]

---

[3] As Plaintiffs increasingly relied on this notion of artists who want to play national large amphitheater tours, the large amphitheaters market became, in substance, another targeted customer market.  It was therefore incumbent on Plaintiffs to prove that Live Nation was able to exploit this group with discriminatory pricing.  *See infra* at 14-16.

7

Substitution among amphitheaters and other venue types is undisputed.  All the testimony from artist and venue representatives made clear artists—the alleged consumers—routinely substitute arenas and other venues for "large amphitheaters."  Trial-Tr.523:11-14 (Geiger); Trial-Tr.688:12-23 (Hurwitz); Trial-Tr.2988:21-2989:10 (Al-joulani); Trial-Tr.2007:8-11 (Lewis); Trial-Tr.1379:14-17 (Roux); Trial-Tr.4241:8-12, 4247:11-22 (Capshaw).  That includes the *only* artist who testified: his band played at both amphitheaters and other types of venues on the same tour.  Lovett-Dep.64:07-64:25.  Dr. Yurukoglu also showed without contradiction that artists who play "large amphitheaters" play 81% of their concerts in the same year in other venue types.  Trial-Tr.4287:9-24, 4306:14-4309:6 (Yurukoglu).

Plaintiffs selectively use *Brown Shoe* factors to argue the absence of reasonable interchangeability, but the evidence they offered is much weaker than what they promised.

Start with industry recognition.  There is no doubt that for various purposes industry participants categorize venues; that amphitheaters are one category; and that there is a distinction between large and boutique amphitheaters.  Plaintiffs seem to think this is enough to justify their large amphitheaters market.  But the *Brown Shoe* factor is "industry or public recognition of the [market] *as a separate economic entity.*"  *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) (emphasis added).  It does not support narrow markets every time a term is commonly used, but rather when the proposed market aligns with how market participants regularly describe the market boundaries in which they operate.  *E.g.*, *FTC v. Tapestry*, 755 F. Supp. 3d 386, 430-35 (S.D.N.Y. 2024) ("reams of ordinary-course documents" showed "terms like 'accessible luxury' are used frequently and consistently"); *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1045 (D.C. Cir. 2008) (Tatel, C.J., concurring) ("dozens of record studies about the grocery store industry … distinguish between 'traditional' or 'conventional' grocery stores on the one hand and 'natural

8

food' or 'organic' stores on the other"). There can be no industry recognition where the category is not so used. *See PepsiCo*, 315 F.3d at 107.

There is no evidence that amphitheaters with 8,000+ capacity (let alone those that hosted 10+ concerts in at least one year from 2017-2024) correspond to some commonly accepted, commercially significant market construct. Witnesses could not even agree on what "large" means. Some witnesses said large amphitheaters are "14,000 and bigger," Trial-Tr.1383:17-24 (Roux); others thought anywhere from "10,000 to 25,000" qualifies, Trial-Tr.483:21-484:2 (Geiger); and some drew the line at "12,000 and above," Trial-Tr.3010:21-3011:6 (Al-joulani); Trial-Tr.947:5-10 (Marciano viewing amphitheaters as "between a 12,000- and 18,000-seat outdoor venue"). But no one—including Dr. Hill—testified that the large/boutique distinction has the kind of economic significance that mattered in cases like *Tapestry* and *Whole Foods.*

The evidence also undermines Plaintiffs' theory that "large amphitheaters" are unique because they are outdoors. Festivals, fairgrounds, boutique amphitheaters, and most stadiums are also outdoors. Trial-Tr.1378:12-22 (Roux). In all events, the issue is substitutability, not simply distinct qualities. "Large amphitheaters" regularly compete with smaller amphitheaters, arenas, and other venues for concerts and can host similar productions. Trial-Tr.521-22 (Geiger); Trial-Tr.2986 (Al-joulani); Trial-Tr.687 (Hurwitz). And with arenas in particular, "large amphitheaters" are similarly sized and offer reserved seat tickets at a similar price point. Trial-Tr.521 (Geiger); Trial-Tr.2089 (Hill); Lovett-Dep.33:12-15. The trial evidence thus fails to support the "government's argument," credited at summary judgment, that because "an amphitheater show is outdoors, not indoors," that somehow "drive[s] artists' decisions." ECF-No.1037, p.14.

After trial, Plaintiffs' evidence looks no different than the evidence in *It's My Party.* Plaintiffs similarly failed to identify any "evidence demonstrating that artists are so likely to stick

to amphitheaters in the event of a price increase that amphitheaters comprise their own market." 811 F.3d at 683. The evidence likewise shows that "[a]rtists who prefer amphitheaters may nonetheless turn to a lower-priced substitute, which, after all, allows the show to go on." *Id.* Plaintiffs too have "not carried [their] burden of showing that amphitheaters are the only place certain artists are willing to perform, irrespective of the monetary or logistical advantages of other concert locations." *Id.* And no evidence shows "what the artist[s] would do if the cost of performing in an amphitheater began to rise." *Id.* The jury could not reasonably conclude that "large amphitheaters" are a properly defined relevant market under the governing legal standards.

### C.      Plaintiffs Failed To Prove Tying

#### 1.      Plaintiffs Failed To Prove Anticompetitive Effects In Any Tied Product Market

This Court correctly rejected Plaintiffs' bid for a per se tying claim and required the jury to find anticompetitive effects. JI27; JI33. As Live Nation argued, that necessarily requires Plaintiffs to define a relevant tied product market. ECF-Nos.1048, 1051; *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 2026 WL 1397077, *2 (2d Cir. May 19, 2026) ("relevant-market analysis is 'essential for assessing the potential harm to competition from the defendants' alleged misconduct'"). Because the Court set aside the only tied product market alleged—the market for promotion services to artists at "major concert venues," ECF-No.1037, p.12—Plaintiffs' tying claim should have been dismissed. That is reason alone to grant Rule 50(b) relief.

If the Court adheres to its prior decision that "formal market definition for the tied market" is not required, ECF-No.1094, pp.2-5, there still remains a failure-of-proof problem: Plaintiffs failed to prove anticompetitive effects in some broader promotion services market. There is no evidence of any harm to artists (the consumers) vis-à-vis promotion services.

10

Plaintiffs did not even try to adduce evidence of anticompetitive effects in any promotion services market because of their incorrect view they were not required to do so. Accordingly, there is zero evidence that, as a result of the alleged tie, artists are subject to pricier, fewer, or worse promotion services. *MacDermid*, 833 F.3d at 183 (anticompetitive effects requires "evidence of changed prices, output, or quality"); *see infra* at 19-20. The closest Plaintiffs come to making any argument about artists and promotion services is their contention that "artists' competitive choice[] with respect to their promoter" is reduced. ECF-No.1387, p.27. But there is no evidence of fewer promoter options generally. AEG and its affiliated Messina Touring Group are thriving—and in all events, harm to "competitors rather than consumers or competition as a whole … is not a market harm under the Sherman Act." *Cinema Vill. Cinemart v. Regal Ent. Grp.*, 2016 WL 5719790, \*4-5 (S.D.N.Y. Sept. 29, 2016); *see Bookhouse of Stuyvesant Plaza v. Amazon.com*, 985 F. Supp. 2d 612, 620 (S.D.N.Y. 2013). There is certainly no evidence that any artist has found promoter options lacking at arenas or stadiums, the heart of the concert industry. At most, Plaintiffs argue that artist choice could be reduced at Live Nation amphitheaters because of Live Nation's policy of not allowing rival promoters to promote at its venues. That could be a *cause* of harm, but Plaintiffs failed to prove the *effect*.

Plaintiffs also point to "dark days." ECF-No.1387, p.28. But dark days say nothing about competition in any promotion services market. And in any event, there is no evidence dark days at Live Nation amphitheaters *increased* as a result of Live Nation's conduct.

The record shows Live Nation's closed-amphitheaters policy has affected competition, at best, only marginally. No matter how low the bar for proving adverse effects in the tied market, Plaintiffs did not clear it.

## 2.  Plaintiffs Failed To Prove Coercion

Plaintiffs' tying claim also fails because the record contains no evidence that any artist was forced into purchasing Live Nation's promotion services the artist "either did not want at all, or might have preferred to purchase elsewhere on different terms." JI32; *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984).  How is it that after all the discovery in this case, Plaintiffs could not find even one artist to testify that he or she accepted Live Nation as promoter unwillingly or on bad terms?  The only artist whose testimony was presented at trial unequivocally stated he was not "coerced in any way to use Live Nation."  Lovett-Dep.110:25-111:04.

Plaintiffs say it does not matter because of the "unremitting policy" that artists who play at Live Nation's amphitheaters may be required to use Live Nation as their promoter at those amphitheaters.  ECF-No.1387, p.24.  But the "unremitting policy" theory from *Hill v. A-T-O, Inc.*, 535 F.2d 1349, 1355 (2d Cir. 1976), does not hold up after *Jefferson Parish*, which makes clear that coercion is the "essential characteristic of an invalid tying arrangement" and requires a showing that the buyer was forced into purchasing a product he "either did not want at all, or might have preferred to purchase elsewhere on different terms,"  466 U.S. at 12; *see* NT-Motion.19-21.  Courts that have continued to apply *Hill* after *Jefferson Parish* have cabined *Hill* to its facts, and there is no factual basis to apply *Hill* here.  NT-Motion.19-21.  The lack of evidence that artists were forced to do anything they did not want to do, including using Live Nation as promoter, means there is no coercion as a matter of law.

## 3.  The Tying Claim Is A Non-Cognizable Refusal-To-Deal Claim

The evidence at trial lays bare what Defendants have repeatedly argued:  Plaintiffs' "tying" claim is really a refusal-to-deal claim in disguise.  ECF-No.273, pp.12-17; ECF-No.689, pp.33-36.  Plaintiffs are challenging Live Nation's lawful policy of refusing to deal with its promoter competitors at its amphitheaters.  That is not a cognizable antitrust claim under well-established

12

Supreme Court law. *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919); *Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004); *Pac. Bell Tel. Co. v. linkLine Commc'ns*, 555 U.S. 438, 449 (2009).

This Court allowed Plaintiffs' tying claim to proceed past summary judgment on the theory that evidence at trial might prove that artists—not promoters—"are the real customers, who purchase two *separate* products (promotion services and placement at a venue)." ECF-No.1037, p.31. The jury was so instructed. JI28. But there is no evidence that an artist, agent, or manager ever sought to rent a venue directly. The evidence shows *promoters* rent venues. Trial-Tr.2988:2-16 (Al-joulani); Trial-Tr.1340:7-9, 1340:23-25 (Roux); Trial-Tr.2257:9-19 (Hill). Nor is there evidence from which a reasonable jury could conclude that when promoters rent venues, they do so as the legal agents of artists. Indeed, the evidence shows artists bear no risk from promoters' deals with venues and are not party to the deals. Trial-Tr.2976:10-18 (Al-joulani); Trial-Tr.700:12-20 (Hurwitz); DX865. So no evidence supports the jury's finding that artists are the purchasers of amphitheaters.

### 4.    The Tying Claim Is Time-Barred

Plaintiffs' theory of tying has progressively emphasized Live Nation's "unremitting policy" of excluding rival promoters from its amphitheaters. ECF-No.771, pp.37-41; ECF-No.1387, p.24. As just discussed, that "unremitting policy" now provides Plaintiffs' only evidence of coercion. But there is no dispute that Live Nation's closed-amphitheaters policy has been in place since before May 23, 2020 and has remained fundamentally unchanged. Trial-Tr.1387:16-1388:4 (Roux); Trial-Tr.3453:2-3 (Hansen) ("Historically we have not rented venues to our competitors.").

The application of laches and state limitations periods here is straightforward. Any tying claim accrued "at the time the anticompetitive conduct occur[ed]," *i.e.*, at the time Live Nation

13

adopted its policy. *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 295-297 (2d Cir. 1979). To hold Live Nation liable, Plaintiffs were required to bring their claim within four years after the policy was adopted and the tying claim accrued. *Facebook*, 549 F. Supp. 3d at 34-38. Since Live Nation's policy long predates May 23, 2020, Plaintiffs' challenge comes too late.

## II.    DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON ALL TICKETING CLAIMS

### A.    Plaintiffs Failed To Prove Their Alleged Primary Ticketing Markets

Plaintiffs' ticketing claims fail at the threshold step of market definition. Plaintiffs tried to prove two primary ticketing markets: (1) primary ticketing services to "major concert venues," and (2) primary *concert* ticketing services to "major concert venues." Plaintiffs limited both markets to "major concert venues"—arenas and amphitheaters of 8,000+ capacity that hosted 10+ concerts in at least one year from 2017-2024. But there is no dispute that many more venues purchase primary ticketing services from the likes of Ticketmaster, SeatGeek, and AXS. Plaintiffs' "major concert venues" construct removes hundreds of theaters, arenas, amphitheaters, and stadiums from the denominator. Their "primary *concert* ticketing services" construct goes further and removes sports tickets from the denominator. Trial-Tr.2196:2-2197:5 (Hill). All in an effort to dramatically affect Ticketmaster's market share. Together, Plaintiffs' gerrymandered markets increase Ticketmaster's share from something below 50% to the claimed 86%. Trial-Tr.2166:23-2167:8 (Hill). No evidence supports either market.

#### 1.    No Evidence Justifies The "Major Concert Venues" Market

Plaintiffs' primary ticketing markets are "targeted customer markets." JI19. Plaintiffs' entire theory for limiting the markets to only 257 customers is that "major concert venues" are uniquely "vulnerable consumers" because of their dependence on concerts. Trial-Tr.2083:12-15 (Hill); Trial-Tr.751:9-752:15 (Groetzinger); Trial-Tr.1613:20-1614:19 (Khoury). Defendants

continue to believe that in an actual monopolization case, where a plaintiff's market is based on supposedly vulnerable customers, proof of actual price discrimination is required. *Meta*, 811 F. Supp. 3d at 117; *United States v. Eastman Kodak Co.*, 63 F.3d 95, 107 (2d Cir. 1995).

No doctrine or caselaw permits market shares to be calculated based on sales to particular customers because of some notion of vulnerability that cannot be (in a prospective case) or has not been (in a retrospective case) exploited. That is probably because, if such a doctrine existed, the license to gerrymander would be unlimited. Every plaintiff could define markets around a smaller group of customers to create a large market share and justify it based on "vulnerability." Dr. Hill admitted "that the supposedly vulnerable 257 venues" in Plaintiffs' alleged primary ticketing markets "didn't" pay more for primary ticketing services than other venues, Trial-Tr.2182:5-15 (Hill); nor did they get worse terms, Trial-Tr.2177:19-2179:6 (Hill). Under Defendants' reading of *Meta* and *Kodak*, that is dispositive.

JI19 indicates the Court views evidence of actual price discrimination as relevant but not required. *See also* ECF-No.1037, pp.16-20. Even under that legal test, that there is *no* evidence of actual price discrimination matters. If "major concert venues" are so vulnerable and impervious to price increases as to constitute a distinct market, one would expect to see evidence that Ticketmaster exploited that through discrimination. *See Whole Foods*, 548 F.3d at 1039 ("the FTC documented exactly the kind of price discrimination that enables a firm to profit from core customers for whom it is the sole supplier"). Where there is no evidence of price discrimination and considerable evidence that prices to "major concert venues" are *declining*, *e.g.*, Trial-

15

Tr.3865:5-3867:1 (Johnson), that at least begs the question: just how vulnerable could that customer base be?[4]

The Court allowed Plaintiffs' primary ticketing markets to proceed to trial on the promise that Plaintiffs might be able to prove these markets using an HMT analysis and evidence relating to the *Brown Shoe* factors.  ECF-No.1037, pp.24-26.  At trial, Plaintiffs did not offer any HMT or other econometric analysis, so the *Brown Shoe* factors must carry the load.  But the "*Brown Shoe*" evidence Plaintiffs pressed at summary judgment—"[i]ndustry recognition," "[d]istinct prices and sensitivity to price," and "[s]pecialized vendors"—did not materialize at trial to show that "major concert venues" "have distinct ticketing needs, that this leads to specialized products, and that the industry recognizes this."  *Id*.

We start with "distinct prices or sensitivity to price," since among the *Brown Shoe* factors "the economic criteria are primary."  *Whole Foods*, 548 F.3d at 1039.  But there is little to say because Plaintiffs did not even try to prove this.  Dr. Hill *did not testify about this* and systematically avoided everything touching on the core issue of whether "major concert venues" have less elastic demand and a higher willingness to pay for primary ticketing services than others. The record evidence, substantially undisputed, is "major concert venues" do not pay distinct prices.

Plaintiffs invoke "industry recognition"—but not of their *ticketing* market.  Plaintiffs did not identify "a single document, anywhere in the millions of pages" reviewed by their expert, in which anyone views the primary ticketing market as limited to these 257 venues or any similar grouping of venues.  Trial-Tr.2168:3-7 (Hill).

---

[4] Even Plaintiffs' arguments about vulnerability were inconsistent.  In crossing Dr. Carlton, they suggested that the reason he did not find higher take rates or margins to "major concert venues" is because other venues are also vulnerable.  But if all venues are vulnerable, there is no basis for the "major concert venue" market.  Trial-Tr.4055:25-4056:15.

This is where the sleight-of-hand comes into play: Plaintiffs claim there are venues recognized in the industry for hosting a lot of concerts, *i.e.*, major concert venues. But that is not evidence that the industry recognizes those venues as a distinct *ticketing* market—the "separate economic entity" *Brown Shoe* cares about. 370 U.S. at 325. There is no evidence that anyone, let alone the industry generally, views *the sale of ticketing services* to major concert venues (however defined) as "a separate economic entity." There are not "reams of ordinary-course documents" describing ticketing that way, as there were in *Tapestry*. 755 F. Supp. 3d at 430-35. Rather, we have the kind of made-for-litigation market that was rejected in *United States v. Oracle Corp.*, where the government attempted to limit the relevant market to "high function" enterprise software sold to "Large Complex Enterprises." 331 F. Supp. 2d 1098, 1103, 1158-62 (N.D. Cal. 2004). The market definition was rejected because (among other reasons) "'[h]igh function software,' as defined by plaintiffs, ha[d] no recognized meaning in the industry," *id.* at 1102, and "Large Complex Enterprises" likewise had "no widely accepted meaning in the industry," *id*. at 1103.[5]

All that is left is whether "major concert venues" are served by "specialized vendors" because they have "materially different ticketing needs." ECF-No.1037, p.25. There is no evidence of that either. Representatives from primary ticketing companies indicated they do not compete only for Plaintiffs' 257 venues; the same primary ticketing companies that compete to

---

[5] Plaintiffs did not even prove that the industry recognizes their definition of "major concert venues"—especially the exclusion of stadiums. Numerous industry participants indicated they did not understand Plaintiffs' grouping of venues to align with "normal industry usage," and they would not "group them that way." Trial-Tr.530:16-25 (Geiger). In AEG's view, "the most representative type of major concert venues are *stadiums*, arenas, and amphitheaters." Trial-Tr.1146:16-24 (Marciano) (emphasis added). The CEO of AXS testified that "any venue north of about 5,000 seats where major concert tours play" is a "major concert venue." Trial-Tr.2397:5-2398:4 (Perez). That definition would include stadiums and venues with 5,000-8,000 seats. And a Paciolan representative testified that any "venue capable of hosting a major concert," which would include stadiums, is a "major concert venue." Lewis-Dep.43:15-44:20.

ticket those venues also compete to ticket other venues—clubs, theaters, amphitheaters, arenas, and stadiums.    Trial-Tr.2920:14-24 (Marcus); Trial-Tr.2398:18-2399:16 (Perez); Trial-Tr.1179:19-1181:11 (Marciano); Trial-Tr.804:19-807:17 (Groetzinger); Lewis-Dep.41:21-42:11. In his direct testimony, Dr. Hill said nothing about the characteristics of the product primary ticketing companies sell to "major concert venues" (even though that was one of the four market definition considerations he listed on PDX5.8).    Then on cross, he admitted the core ticketing system offered to all amphitheaters, arenas, and stadiums is the same across all primary ticketing companies.  Trial-Tr.2175:8-11 (Hill).  Plaintiffs' other ticketing company witnesses confirmed the same.    Trial-Tr.2318:22-2319:6 (Perez); Trial-Tr.821:22-822:17 (Groetzinger); Lewis-Dep.79:19-21.

No rational jury could have found for Plaintiffs, and no claims premised on the "major concert venue" markets can stand.  *See Soccer*, 2026 WL 1397077, *3 (failure to prove markets is "dispositive"); *United States v. U.S. Sugar Corp.*, 2022 WL 4544025, *25 (D. Del. Sept. 28, 2022), *aff'd*, 73 F.4th 197 (3d Cir. 2023).

### 2.    There Is No Basis For A Separate Primary *Concert* Ticketing Market

Plaintiffs' separation of primary ticketing services and primary *concert* ticketing services is another arbitrary limit to unjustifiably inflate Ticketmaster's market share.

Primary concert ticketing services is a made-up product.  Plaintiffs introduced zero evidence of any primary ticketing contract or request for proposal that was only for concert tickets. *See* Trial-Tr.2177:1-24, 2187:12-20 (Hill).    Rather, representatives from primary ticketing companies uniformly testified they ticket all types of events—sports games, concerts, family shows, and others—at the venues with which they contract.  Trial-Tr.2920:25-2921:11 (Marcus); Trial-Tr.2323:23-2325:5 (Perez); Trial-Tr.924:8-925:23 (Groetzinger); *see* Trial-Tr.2186:15-2187:15 (Hill).  Venue representatives likewise testified they contract with primary ticketers for

18

all types of events.  Trial-Tr.390:7-12 (Helgerson); Glickman-Dep.50:12-16.  And the contracts for primary ticketing services in the record cover both concerts and sports.  DX186.0001; DX295.0004.

Plaintiffs cite one page of one Ticketmaster presentation, which breaks down Ticketmaster's market shares into "verticals," one of which is "Concerts."  PX508 at -880.  All that shows is Ticketmaster finds it useful to separate data about the tickets it distributes into these verticals.  So what?  Surely no one would contend the other verticals identified, *e.g.*, "NBA" or "NFL," are their own *antitrust product markets*.  Nothing about this slide indicates that trade in primary ticketing services follows these distinctions, and it does not.  The concert tickets captured in this slide were undoubtedly sold for shows at the same NBA, NHL, etc. venues that make up the other parts of the slide.  This is exactly the kind of evidence that can influence a jury but cannot sustain a verdict.

The "area of effective competition" among primary ticketing companies encompasses all the tickets that venues put up for bid, and market share calculations omitting such tickets are highly misleading.  *Ohio v. Am. Express Co*., 585 U.S. 529, 543 (2018).

## B.    Plaintiffs Failed To Prove Anticompetitive Effects

Plaintiffs' primary ticketing monopolization claims also fail because Plaintiffs adduced no evidence of market-wide, "anticompetitive effect[s]" in their primary ticketing markets.  *United States v. Microsoft Corp.*, 253 F.3d 34, 58-59 (D.C. Cir. 2001).  The failure of proof on this critical element is stark:  Plaintiffs' case is about allegedly anticompetitive conduct that did nothing to increase price, reduce output, or lower quality in the relevant markets.  And there is nothing else.

Plaintiffs were required to prove anticompetitive effects as a distinct element of all their Section 2 claims.  In *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 652 (2015), the Second Circuit endorsed the D.C. Circuit's "*Microsoft* framework" under which a plaintiff

19

bears an initial burden to show anticompetitive effects.  *See Microsoft*, 253 F.3d at 58; *Soccer*, 2026 WL 1397077, \*3; *Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 486 (S.D.N.Y. 2016).  *Actavis* also made clear there is no material distinction between what is required to prove anticompetitive effects in the Section 2 context as compared to Section 1.  787 F.3d at 652.

In this Circuit, no plaintiff has satisfied this element without "evidence of changed prices, output, or quality."  *MacDermid*, 833 F.3d at 183.  Recent Supreme Court cases from the rule-of-reason context are to the same effect.  *See AmEx*, 585 U.S. at 549 ("This Court will 'not infer competitive injury from price and output data absent some evidence that tends to prove that output was restricted or prices were above a competitive level.'"); *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 88 (2021) (rule of reason is "aimed at assessing the challenged restraint's 'actual effect on competition'—especially its capacity to reduce output and increase price").  Defendants continue to believe the jury should not have been instructed that "[h]arm to competition … may also include substantially constrained consumer choice in the market."  JI24; *see* NT-Motion.17-18.  While *MacDermid* acknowledges that, in the abstract, "reduced consumer choice *can* constitute harm to competition," 833 F.3d at 186 (emphasis added), it does not hold that every instance of such a reduction *is* harm to competition, *id.* at 183; *see K.M.B. Warehouse Dist. v. Walker Mfg.*, 61 F.3d 123, 128 (2d Cir. 1995); *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 264-65 (2d Cir. 2001).  On the contrary, *MacDermid* expresses what can only be described as profound skepticism that a reduced choice theory could sustain a finding of adverse effects, standing alone.  833 F.3d at 183-84.

This record—including Plaintiffs' "reduced choice" arguments—provides no basis to find anticompetitive effects in the alleged primary ticketing markets.

**Price:**  The evidence does not permit any reasonable jury to find that "major concert venues" faced higher prices as a result of any allegedly anticompetitive conduct.  Dr. Hill did not conduct his own pricing analysis and squarely admitted he is not claiming that "major concert venues" paid monopoly prices.  Trial-Tr.2183:25-2184:3 (Hill).  His work responding to Dr. Carlton led him to analyze whether "major concert venues" pay higher prices for primary ticketing services as compared to other venues, and he found they "didn't."  Trial-Tr.2182:5-15 (Hill).  And in fact, the evidence shows Ticketmaster's share of ticketing contract revenues has been decreasing.  Trial-Tr.2209:21-2210:9 (Hill).

Instead of establishing a change in price to "major concert venues," Plaintiffs recite anecdotal evidence about "high fees" paid by *fans*.  ECF-No.1387, pp.7-8.  Even if that were right, harms to *fans* are irrelevant in a market for services to *venues*.  *See supra* at 5-6.  Nor does Plaintiffs' evidence demonstrate that these fees are high because of Ticketmaster's alleged conduct or in comparison to a relevant point of reference.

Plaintiffs' reference to Dr. Abrantes-Metz's "overcharge testimony," ECF-No.1387, p.8, cannot fill this evidentiary gap.  For starters, Dr. Abrantes-Metz's analysis should not be available for *any* purpose.  *See infra* at 28-29.  More fundamentally, Dr. Abrantes-Metz admitted she was "not offering any opinion about liability," and her analysis assumed, rather than proved, that any difference in price between Ticketmaster and AXS was a result of the alleged conduct and not the widely-acknowledged differences in quality.  Trial-Tr.2495:6-14 (Abrantes-Metz).

**Output:**  Plaintiffs do not dispute they have no evidence of reduced output, whether by Ticketmaster or in the primary ticketing industry generally.  ECF-No.1387, p.9.  Dr. Hill admitted he did not study output.  Trial-Tr.2274:10-15 (Hill).  He did, however, acknowledge that the

21

number of tickets sold at "major concert venues" have "increased significantly" since 2017. Trial-Tr.2275:2-7 (Hill). Output increased.

***Quality***: Plaintiffs also failed to prove that Ticketmaster reduced quality to "major concert venues." Despite numerous anecdotal attacks on Ticketmaster's quality, Plaintiffs made no effort to establish, on any quality metric, that Ticketmaster provided *less* quality to any customer. Nor, more importantly, did Plaintiffs offer evidence that Ticketmaster held onto its market share despite reducing quality, as in *United States v. Google LLC*, 778 F. Supp. 3d 797, 864 (E.D. Va. 2025).

***Consumer choice/barriers to entry***: Although this Court allowed the jury to make an anticompetitive effects finding based solely on "constrained consumer choice" or "barriers to entry," JI24, that does not help Plaintiffs. They do not claim to show the former and merely point to their monopoly power evidence on the latter. ECF-No.1387, pp.7-10, 12. That evidence hardly proves monopoly power. *See infra* at 28. More to the point, it incorrectly collapses the monopoly power and anticompetitive effects inquiries this Court's instructions recognized as distinct. Whether a defendant has "the power to control prices, restrict output, or exclude competition in a relevant antitrust market" sufficient to show monopoly power, JI21, says nothing about whether the defendant used that power to engage in conduct that harmed competition.

### C.    Plaintiffs Failed To Prove Exclusionary Conduct

Plaintiffs tried to prove that Ticketmaster engaged in three types of exclusionary conduct to maintain its monopoly over primary ticketing services, but failed to adduce sufficient evidence for any of the three.

As an initial matter, in their April 6 letter, Plaintiffs argued—for the first time—for an amorphous, "all of the evidence, considered together in its totality," standard under which they claim their allegations of "threats and retaliation" must be considered "in combination with all the other challenged conduct." ECF-No.1387, pp.13-14. That is not Second Circuit law. The Second

Circuit has instructed courts to "analyze the various issues individually" and "reject[ed] the notion that if there is a fraction of validity to each of the basic claims and the sum of the fractions is one or more, the plaintiffs have proved a violation of section 1 or section 2 of the Sherman Act." *City of Groton v. Connecticut Light & Power Co.*, 662 F.2d 921, 928-29 (2d Cir. 1981); *see Valassis Commc'ns v. News Corp.*, 2019 WL 802093, *10 (S.D.N.Y. Feb. 21, 2019). Each type of exclusionary conduct fails on its own, and the evidence is no stronger together.

**Threats, retaliation, conditioning:** Plaintiffs' first theory is about threats, retaliation, and "conditioning." At summary judgment, Plaintiffs promised abundant "[e]vidence of Defendants' years-long campaign of threats and retaliation." ECF-No.771, p.33. And at trial, they began with testimony regarding alleged content leveraging. *E.g.*, Trial-Tr.245:12-262:8 (Abbamondi). But Plaintiffs overpromised and underdelivered on the "mountain of evidence" that was supposed to prove this. ECF-No.1387, p.14. There was barely a molehill. As for recent evidence, there was just the 2021 Barclays episode. The other three "threats" Plaintiffs invoked—relating to the Xcel Energy Center (2019), the HEB Center (2017), and a Jonas Brothers tour (2019)—all occurred outside the limitations period. *See* ECF-No.1387, pp.14-15. Even so, four incidents in nine years, the most recent in 2021, is not a campaign of anything.

Given this dearth of evidence, Plaintiffs shifted their case toward claiming that Defendants engaged in a form of "conditional dealing" because they sent fewer Live-Nation-promoted shows to venues that switched away from Ticketmaster. That is the thrust of Dr. Hill's testimony related to PDX5.35-41. Dr. Hill purports to show a decreased show count for venues that switched away from Ticketmaster for six venues. Even if true, that does not show actionable anticompetitive

23

conduct.[6]  There is no principle of U.S. antitrust law that requires Live Nation to route the same number of concerts to non-Ticketmaster venues as it routes to Ticketmaster venues.  At most, Dr. Hill's evidence suggests Live Nation engaged in a modest amount of "self-preferencing," which is not unlawful.  *See United States v. Google LLC,* 687 F. Supp. 3d 48, 78-83 (D.D.C. 2023) (granting summary judgment on claim that Google favored its own specialized websites over those of rivals); *Bayou Bottling v. Dr. Pepper*, 725 F.2d 300, 304 (5th Cir. 1984) (rejecting claims based on Coke bottler refusing to allow Pepsi products in vending machines it serviced: "Without anything more, these practices are not barred by the antitrust laws."); Herbert Hovenkamp, Antitrust and Self-Preferencing, *Antitrust*, Vol. 38, No. 1, Fall 2023, at 5.

Plaintiffs' only response is that "concert withholding is not 'self-preferencing,'" ECF-No.1387, p.15, but that just begs the question: what is this "conditioning" claim, exactly?

There is, of course, a "conditioning" offense called tying.  But a tying arrangement would require some kind of overt, coercive condition: something like, to get Live-Nation-promoted concerts, you must use Ticketmaster.  *See, e.g.*, *It's My Party*, 811 F.3d at 684-87 (Live Nation did not tie its venues to its promotion services where artists were merely encouraged, not required, to use the venues); *Jefferson Parish*, 466 U.S. at 12 ("[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product.").  There is no claim Live Nation or Ticketmaster links concerts

---

[6] Nothing suggests that any differences in show count are the result of anticompetitive behavior by Defendants as opposed to, for example, promoters being less attracted to SeatGeek or AXS venues, Trial-Tr.3060:2-3061:20 (Mueller), or innocuous, unrelated reasons like demographic shifts, Trial-Tr.2970:7-24 (Al-joulani).  Dr. Hill admitted his show-count analysis did not assess the reasons behind any observed switching.  Trial-Tr.2248:8-2249:2 (Hill).  Nor is there evidence upon which the jury could have found Live Nation has the power over routing this theory implies.

to ticketing in that way.  Trial-Tr.1920:22-1921:7 (Rapino noting thousands of Live Nation shows in non-Ticketmaster buildings).  So concert withholding is not tying.

There are also cases concerning conditional discounts, *e.g.*, better pricing in exchange for some measure of "loyalty."  *E.g.*, *Virgin Atlantic*, 257 F.3d at 265.  But there is no claim Live Nation or Ticketmaster offers loyalty discounts or even offers to reward loyalty with more concerts.  There are cases where conditional dealing is viewed as a form of exclusive dealing.  *E.g.*, *FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 28 (D.D.C. 2021).  But that is not Plaintiffs' theory here.  Nor could it be given the modest "penalty" venues pay even under Dr. Hill's analysis.  *See Microsoft*, 253 F.3d at 70 (exclusive contracts must usually foreclose at least 40-50% of the market).

The one thing Plaintiffs cannot deny is that every known "conditioning" claim requires a showing of market power in the market for the product used for leverage—here, concerts.  *See* Hovenkamp, Antitrust and Self-Preferencing at 7 ("To generalize, while current United States antitrust law has many prohibitions on self-preferencing, they apply only when the firm in question has market power in the dominant good and competitive harm results from the refusal to give equal treatment.  Mere harm to a competing seller is insufficient.").  There has been no showing that Live Nation has market power in a well-defined market that any self-preferencing theory requires.

Plaintiffs have suggested the jury could have found that Live Nation has market power in "concerts."  ECF-No.1387, p.16.  Not at all.  To the extent they mean "concert promotion services to artists," the Court already rejected that market at summary judgment.  ECF-No.1037, p.12.  And to the extent Plaintiffs invoke the "market for concert booking services and promotion services to venues" alleged in their complaint, that fails too.  After the Court's summary judgment ruling, Plaintiffs argued that this "concert booking" market was the "locus of Live Nation's threats to

25

divert shows from venues unless they use Ticketmaster's ticketing services," and that there was a "genuine issue of fact both on the market's existence and Live Nation's monopoly power therein." ECF-No.1057, p.4. But Plaintiffs presented no evidence whatsoever about that supposed "concert booking" market at trial, let alone evidence that Defendants have market power in it. Dr. Hill said *nothing* about it when he testified.

Plaintiffs' case at trial is no more than an observation that, for reasons their expert did not study, a handful of Ticketmaster venues got a few more shows than non-Ticketmaster venues. Dr. Hill did not even claim this disadvantaged AXS, which had its own concerts to offer venues. And while the evidence may show this was an issue for SeatGeek, it could not have allowed the jury to conclude that it foreclosed competition: SeatGeek dealt with the issue through make-good promises. PX285 at -860. The antitrust laws do not require Defendants to refrain from enjoying the advantages of vertical integration. *See Berkey Photo*, 603 F.2d at 276.

***Exclusive dealing*:** Plaintiffs also failed to prove exclusionary conduct in the form of exclusive dealing. First, it is undisputed venues prefer exclusive contracts, including long-term exclusive contracts. Trial-Tr.1172:21-24 (Marciano); Glickman-Dep.50:17-51:3, 131:23-132:19; Brown-Dep.57:13-16, 57:21-58:12; Trial-Tr.302:21-25, 324:9-11, 327:4-6, 327:4-6 (Abbamondi); Trial-Tr.705:5-11 (Hurwitz); Marion-Dep.71:16-72:5; Henson-Dep.50:13-25, 51:23-52:10; Nagle-Dep.33:14-34:6; Lewis-Dep.55:3-56:1; Paul-Dep.49:6-50:4; Johnson-Dep.54:21-56:5; M-Smith-Dep.72:10-73:6; Trial-Tr.2227:22-25 (Hill); Trial-Tr.3277:10-3278:10 (Van Stone). Not a single venue complained about exclusive contracting or voiced support for Plaintiffs' efforts to find it unlawful. There is also no evidence that any venue was forced into an exclusive contract when it preferred a non-exclusive contract. Under these circumstances, Plaintiffs were required to

26

prove coercion, and there is none. *See* NT-Motion.25-26; *Race Tires Am. v. Hoosier Racing Tire*, 614 F.3d 57, 78 (3d Cir. 2010).

Second, there is undisputed evidence venues prefer exclusive contracting for procompetitive reasons, *e.g.*, the efficiency of using a single ticketer and the bargaining power to obtain the highest value for their ticketing rights. Trial-Tr.324:9-11, 327:4-6 (Abbamondi); Marion-Dep.71:16-72:5; Henson-Dep.51:23-52:10; Brown-Dep.57:21-58:12; Nagle-Dep.33:14-34:6; Lewis-Dep.55:3-56:1; Paul-Dep.49:6-50:4. There was thus no basis for a reasonable jury to find the practice persists solely or mainly for its alleged benefits in preserving Ticketmaster's market position. As such, Plaintiffs had to but failed to prove that anticompetitive effects outweigh benefits. *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 986 (10th Cir. 2022).

Third, there is no evidence from which the jury could reasonably conclude that exclusive contracting resulted in Ticketmaster charging venues supracompetitive prices. The evidence is sharply to the contrary: exclusive contracting makes venues better off, resulting in Ticketmaster's share of ticketing contract revenues decreasing. Trial-Tr.3863:22-3867:7 (Johnson).

***OVG agreement***: Plaintiffs failed to prove that the ticketing agreement between Oak View Group ("OVG") and Ticketmaster constitutes exclusionary conduct. The testimony about this agreement was limited and proved only that a venue management company was paid to advocate for Ticketmaster but was not required even to recommend Ticketmaster when there was a better offer. Trial-Tr.2619:10-15, 2646:7-10 (Granger). Indeed, after the OVG contract, OVG venues entered ticketing contracts with other ticketers. Trial-Tr.2646:11-18 (Granger). No antitrust theory makes the OVG agreement—without more—unlawful.

27

### D.    Plaintiffs Failed To Prove Monopoly Power

Plaintiffs do not claim to have any direct evidence that Ticketmaster controlled prices or excluded competition.    ECF-No.1387, pp.5-6.    Nor could they.    The evidence shows Ticketmaster's take rates are lower within Plaintiffs' alleged "major concert venues" markets, Tr.2211:7-2212:13 (Hill), its share of ticketing contract revenues have been decreasing, Tr.2209:21-2210:9 (Hill), and numerous competitors have entered the primary ticketing industry and won business from Ticketmaster over the last 15 years, Trial-Tr.744:12-745:3 (Groetzinger); Trial-Tr.2317:20-23 (Perez); Trial-Tr.1612:21-24 (Khoury); Tr.2198:10-2199:12 (Hill).

Plaintiffs rest on Ticketmaster's market share.    That should only put more pressure on the need for properly defined relevant markets—not markets arbitrarily narrowed to inflate that very share.    But declining prices, no evidence of higher prices to "major concert venues," and successful entry by the likes of AXS and SeatGeek are still a part of the record, and are fundamentally inconsistent with an inference of monopoly power.  *See Meta*, 811 F. Supp. 3d at 122-23.

## III.    DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON ALL STATE-LAW CLAIMS

The jury had no basis to find for Plaintiffs on their claims brought under state statutes that are congruent with the Sherman Act or share any of the elements discussed above (*e.g.*, market definition) for reasons explained.    Additionally, the jury had no basis to find harm to competition in any particular state, because Plaintiffs adduced no evidence of state-specific harm.

## IV.    DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON DAMAGES

Defendants are entitled to judgment as a matter of law on damages because the evidence does not support the jury's per-ticket overcharge finding.    The *only* basis for this finding was Dr. Abrantes-Metz's testimony, which was riddled with errors and is insufficient for reasons Defendants have outlined at great length in numerous submissions.  ECF-Nos.704, 790, 1192,

28

1348, 1385.   Plaintiffs presented no other evidence on the alleged overcharge.   Defendants incorporate their prior submissions regarding Dr. Abrantes-Metz's testimony by reference and will respond to any points Plaintiffs raise on this matter in Defendants' reply brief.  ECF-No.1473.

## CONCLUSION

The Court should enter judgment as a matter of law for Defendants.


*[Signatures on following page]*

29

Dated: May 21, 2026

Respectfully submitted,

LATHAM & WATKINS LLP

_____

Andrew M. Gass (admitted *pro hac vice*)
Alfred C. Pfeiffer (admitted *pro hac vice*)
    *Co-Lead Trial Counsel*
David R. Marriott
    *Co-Lead Trial Counsel*
Timothy L. O'Mara (admitted *pro hac vice*)
Jennifer L. Giordano
Kelly S. Fayne (admitted *pro hac vice*)
Lindsey S. Champlin (admitted *pro hac vice*)
Robin L. Gushman (admitted *pro hac vice*)

505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600

1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

555 11th Street, NW, Suite 1000
Washington, D.C. 20004
(202) 637-2200

Al.Pfeiffer@lw.com
David.Marriott@lw.com
Tim.O'Mara@lw.com
Jennifer.Giordano@lw.com
Andrew.Gass@lw.com
Kelly.Fayne@lw.com
Lindsey.Champlin@lw.com
Robin.Gushman@lw.com

*Attorneys for Defendants Live Nation*
*Entertainment, Inc. and Ticketmaster L.L.C.*

CRAVATH, SWAINE & MOORE LLP

_____

Lauren A. Moskowitz
Jesse M. Weiss
Nicole M. Peles

Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 474-1000

lmoskowitz@cravath.com
jweiss@cravath.com
npeles@cravath.com

*Attorneys for Defendants Live Nation*
*Entertainment, Inc. and Ticketmaster L.L.C.*

## CERTIFICATE OF COMPLIANCE

I, Andrew M. Gass, an attorney duly admitted to practice before this Court, hereby certify pursuant to Local Rule 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rules"), Rule 8(C) of Judge Arun Subramanian's Individual Practices in Civil Cases ("Individual Rules"), that the foregoing Memorandum of Law was prepared using Microsoft Word, and contains 8,630 words.  In making this calculation, I have relied on the word and page counts of the word-processing program used to prepare the document.

Dated:  May 21, 2026
        San Francisco, California

_____
Andrew M. Gass