**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA, *et al.*,

        *Plaintiffs,*

        v.

LIVE NATION ENTERTAINMENT, INC.,
and TICKETMASTER L.L.C.,

        *Defendants.*

Case No. 1:24-cv-03973-AS

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION FOR A NEW TRIAL**
**PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 59**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

LEGAL STANDARD.............................................................................................................2

ARGUMENT ..........................................................................................................................2

I.      THE VERDICT IS AGAINST THE CLEAR WEIGHT OF THE EVIDENCE.................2

II.     HIGHLY PREJUDICIAL EVIDENTIARY ERRORS REQUIRE A NEW TRIAL ..........4

      A.      The Admission Of Evidence On Ancillary, Non-Ticketing Products Was
            Erroneous And Prejudicial.........................................................................................5

      B.      The Admission Of Evidence That Predated The Limitations Period Was
            Erroneous And Prejudicial.........................................................................................7

      C.      The Admission Of Hearsay Evidence On Supposed Threats Or Retaliation
            Was Erroneous And Prejudicial...............................................................................11

      D.      The Admission Of Evidence On Primary Ticketing In Europe Was
            Erroneous And Prejudicial.......................................................................................13

      E.      The Admission Of Dr. Abrantes-Metz's Testimony Was Erroneous And
            Prejudicial ................................................................................................................15

III.    ERRORS IN JURY INSTRUCTIONS REQUIRE A NEW TRIAL.................................16

      A.      The Instruction On Anticompetitive Effects Was Erroneous And Warrants
            A New Trial On All Monopolization Claims ...........................................................17

      B.      The Coercion Instruction Was Erroneous And Warrants A New Trial On
             The Tying Claim .......................................................................................................19

      C.      The Court's Refusal To Provide Instructions On Two Forms Of Alleged
            Exclusionary Conduct Was Erroneous And Warrants A New Trial On All
            Monopolization Claims.............................................................................................21

      D.      The Exclusive Dealing Instruction Was Erroneous And Warrants A New
            Trial On The Primary Ticketing Claims ..................................................................25

      E.      The Market Definition Instructions Were Erroneous And Warrant A New
            Trial On The Primary Ticketing And Tying Claims..................................................27

CONCLUSION.....................................................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Amato v. City of Saratoga Springs,*
170 F.3d 311 (2d Cir. 1999)................................................................................8, 10

*AngioDynamics v. C.R. Bard,*
2022 WL 4333555 (N.D.N.Y. Sept. 19, 2022)........................................................11

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
472 U.S. 585 (1985)................................................................................................18

*Audet v. Fraser,*
605 F. Supp. 3d 372 (D. Conn. 2022).......................................................................4

*Caruolo v. John Crane, Inc.,*
226 F.3d 46 (2d Cir. 2000)....................................................................................2, 4

*City of Anaheim v. S. California Edison Co.,*
955 F.2d 1373 (9th Cir. 1992) ...........................................................................24, 25

*City of Groton v. Connecticut Light & Power Co.,*
662 F.2d 921 (2d Cir. 1981)....................................................................................23

*Cweklinsky v. Mobil Chem. Co.,*
364 F.3d 68 (2d Cir. 2004)......................................................................................18

*Dixon v. Aragona,*
1992 WL 107360 (N.D.N.Y. May 8, 1992)...............................................................2

*Farrior v. Waterford Bd. of Educ.,*
277 F.3d 633 (2d Cir. 2002)...................................................................................2, 4

*Fitzgerald v. Henderson,*
251 F.3d 345 (2d Cir. 2001)......................................................................................8

*Freeland v. AT&T Corp.,*
238 F.R.D. 130 (S.D.N.Y. 2006) .......................................................................19, 21

*Girden v. Sandals Int'l,*
262 F.3d 195 (2d Cir. 2001).....................................................................................20

*Haskell v. Kaman Corp.,*
743 F.2d 113 (2d Cir. 1984)....................................................................................16

*Heerwagen v. Clear Channel Commc'ns*,
    435 F.3d 219 (2d Cir. 2006)..................................................................................14

*Hill v. A-T-O, Inc.*
    535 F.2d 1349 (2d Cir. 1976)....................................................................19, 20, 21

*In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*,
    44 F.4th 959 (10th Cir. 2022) ..............................................................................25

*Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*,
    962 F.3d 1015 (8th Cir. 2020) ..............................................................................25

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984)........................................................................................19, 20, 21

*Knox v. John Varvatos Enters. Inc.*,
    512 F. Supp. 3d 470 (S.D.N.Y. 2021).....................................................................4

*LNC Investments, Inc. v. First Fidelity Bank*,
    126 F. Supp. 2d 778 (S.D.N.Y. 2001)...................................................................13

*MacDermid Printing Sols. v. Cortron Corp.*,
    833 F.3d 172 (2d Cir. 2016)..................................................................................17

*Malek v. Fed. Ins. Co.*,
    994 F.2d 49 (2d Cir. 1993)....................................................................................16

*Manley v. AmBase Corp.*,
    337 F.3d 237 (2d Cir. 2003)....................................................................................4

*N. Am. Soccer League LLC v. U.S. Soccer Fed'n, Inc.*,
    2024 WL 2959967 (E.D.N.Y. June 12, 2024) ........................................................5

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
    2026 WL 1397077 (2d Cir. May 19, 2026) ..........................................................27

*Nat'l Collegiate Athletic Ass'n v. Alston*,
    594 U.S. 69 (2021)................................................................................................18

*New York v. Facebook, Inc.*,
    549 F. Supp. 3d 6 (D.D.C. 2021) ............................................................................8

*New York v. Meta Platforms, Inc.*,
    66 F.4th 288 (D.C. Cir. 2023)..................................................................................8

*Newton v. City of New York*,
    171 F. Supp. 3d 156 (S.D.N.Y. 2016)......................................................................2

iii

*Nimely v. City of New York*,
   414 F.3d 381 (2d Cir. 2005)................................................................................2, 4

*Ohio v. Am. Express Co.*,
   585 U.S. 529 (2018).............................................................................................17

*Pacific Bell Telephone Co. v. linkLine Commc'ns, Inc.*,
   555 U.S. 438 (2009).............................................................................................24

*Park v. Thomson Corp.*,
   2007 WL 119461 (S.D.N.Y. Jan. 11, 2007) ........................................................21

*Race Tires America, Inc. v. Hoosier Racing Tire Corp.*,
   614 F.3d 57 (3d Cir. 2010)...................................................................................25

*Raedle v. Credit Agricole Indosuez*,
   670 F.3d 411 (2d Cir. 2012)...................................................................................3

*Trans Sport, Inc. v. Starter Sportswear, Inc.*,
   964 F.2d 186 (2d Cir. 1992).................................................................................19

*Tse v. UBS Fin. Servs., Inc.*,
   568 F. Supp. 2d 274 (S.D.N.Y. 2008)....................................................................4

*United States v. Belfiore*,
   2024 WL 2075128 (2d Cir. May 9, 2024) ...........................................................16

*United States v. Masotto*,
   73 F.3d 1233 (2d Cir. 1996).................................................................................16

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001)...............................................................................18

*United States v. Polouizzi*,
   564 F.3d 142 (2d Cir. 2009).................................................................................19

*Valassis Commc'ns, Inc. v. News Corp.*,
   2019 WL 802093 (S.D.N.Y. Feb. 21, 2019).........................................................23

*Zenith Radio Corp. v. Hazeltine Res., Inc.*,
   401 U.S. 321 (1971)...............................................................................................8

*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012)...........................................................................26, 27

**STATUTES**

15 U.S.C. § 15b.................................................................................................................7

iv

Cal. Bus. & Prof. Code § 17206 ........................................................................................8

**RULES**

Fed. R. Civ. P.
    50(b).................................................................................................................................1
    59(a)(1)(A).......................................................................................................................2

Fed. R. Evid.
    401.............................................................................................................................5, 8
    402................................................................................................................................8
    403.............................................................................................................................6, 8
    801(c) ..........................................................................................................................11

**OTHER AUTHORITIES**

Gigi Liman, *Resounding Verdict! Jury Finds the Live Nation-Ticketmaster
    Monopoly Illegal on All Claims*, Big Tech on Trial (Apr. 15, 2026) ...................................7, 15

W. Perry Brandt, *Tying Arrangements and the Individual Coercion Doctrine*, 30
    Vand. L. Rev. 755 (1977) .......................................................................................20

If the Court does not enter judgment as a matter of law in favor of Live Nation Entertainment, Inc. and Ticketmaster L.L.C. ("Defendants") on all claims, Defendants respectfully request a new trial on the remaining claims under Federal Rule of Civil Procedure 59.

## INTRODUCTION

For all the reasons set forth in Defendants' Rule 50(b) motion, there is not substantial evidence to support the jury verdict and Defendants are entitled to judgment as a matter of law. But even if the evidence were substantial, the Court can and should grant a new trial.

First, the jury's verdict is contrary to the clear weight of the evidence on all claims. This standard is different than summary judgment and judgment as a matter of law: the Court must independently weigh the evidence and assess credibility. The Court sat through the 25 days of trial and heard the testimony of 50 witnesses. The evidence that came in—and, just as important, the evidence that did *not* come in—shows the jury's verdict cannot stand.

Second, evidentiary errors prejudiced the outcome of the case. The trial record is replete with stale, irrelevant, and prejudicial evidence designed not to inform, but to inflame and distract. Lacking evidence of harm to venues and artists, Plaintiffs changed the subject to fans. Hours of trial time were spent on prices for lawn chairs and parking. Phrases like "robbing them blind baby" and "velvet hammer" were Plaintiffs' mantras. Lacking evidence of any recent threats or acquisitions, Plaintiffs relied on decades-old conduct. And lacking evidence of any increase in U.S. ticket prices, Plaintiffs told the jury about ticket prices and ticketing practices in Europe. None of this evidence should have come in, and its devastating impact became more apparent as the trial progressed. Without it, there is little chance the jury would have returned the same verdict.

Third, while the jury instructions got a lot right, they also got a few critical things wrong. The absence of any evidence that prices increased, output decreased, or quality diminished—in any market—should have been game over. But the jury was told it could find anticompetitive

1

effects based on "constrained consumer choice" or, essentially, anticompetitive "conduct" alone. On tying, there was no evidence of actual coercion: no testimony that any artist was forced to purchase Live Nation's promotion services but didn't otherwise want them. But the jury was told that was no problem because a mere "policy of tying products together" can itself prove coercion. And the jury was not told that a venue's mere concerns did not count as Defendants' conduct—let alone unlawful conduct that could be considered as part of the collective whole. So even though the evidence of actual threats or retaliation was near nil, the jury was allowed to fill that evidentiary void. These and other instructions got the law wrong and led the jury astray.

In the end, the jury verdict is legally indefensible. At the very least, a new trial is needed.

## LEGAL STANDARD

The Court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). A new trial is appropriate when "the verdict is against the clear weight of the evidence," or "substantial errors occurred in the admission or rejection of evidence or the giving or refusal of instructions to the jury." *Newton v. City of New York*, 171 F. Supp. 3d 156, 164 (S.D.N.Y. 2016); *see, e.g.*, *Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 634-35 (2d Cir. 2002) (affirming new trial grant because verdict was "against the weight of the evidence"); *Nimely v. City of New York*, 414 F.3d 381, 392-400 (2d Cir. 2005) (granting a new trial because erroneously admitted evidence prejudiced the outcome).

## ARGUMENT

## I.    THE VERDICT IS AGAINST THE CLEAR WEIGHT OF THE EVIDENCE

"The standard for granting a new trial is less burdensome than the standard for entering judgment as a matter of law." *Dixon v. Aragona*, 1992 WL 107360, *4 (N.D.N.Y. May 8, 1992). Unlike a motion for judgment as a matter of law, the Court may grant a new trial "even if there is substantial evidence to support the verdict." *Caruolo v. John Crane, Inc.*, 226 F.3d 46, 54 (2d Cir.

2

2000).  In assessing whether a new trial is warranted, the Court should "weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner."  *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012).

For all the reasons set forth in Defendants' motion for judgment as a matter of law, there is not substantial evidence to support the jury verdict.  Defs.' Mem. of Law in Support of Defs.' Renewed Mot. for Judgment as a Matter of Law (filed concurrently) ("JMOL-Motion").  But, at the very least, the Court should grant a new trial because the verdict is against the clear weight of the evidence.

That is true for both amphitheater claims: monopolization and tying.  On monopolization, the evidence is deficient at every turn—from the absence of predicate acquisitions or control agreements during the relevant time period, to the absence of anticompetitive effects, and beyond. *Id.* at 2-6.  As for tying, Plaintiffs are missing key elements: there is no evidence of anticompetitive effects in any tied product market for promotion services, of any artist who was coerced into purchasing Live Nation's promotion services the artist did not want in order to rent a Live Nation amphitheater, or of artists being the real purchasers of access to Live Nation amphitheaters in the first place.  *Id.* at 10-14.  And for both, the evidence came nowhere close to establishing a "large amphitheater" market to begin with: substitution of other venues proved to be the norm.  *Id.* at 6-10.

The jury's verdict on Plaintiffs' primary ticketing claims likewise fails under a clear-weight-of-the-evidence standard.  Limiting Plaintiffs' primary ticketing markets to "major concert venues" had no evidentiary support at trial; there is no evidence "major concert venues" have experienced higher prices, less output, or worse quality; evidence of the exclusionary conduct

3

alleged simply did not materialize at trial; and evidence of monopoly power is limited to market shares, which can only be credited if the markets are properly defined to begin with. *Id.* at 14-28.

The jury's per-ticket overcharge finding is against the clear weight of the evidence, too. The only evidence supporting this overcharge is Dr. Abrantes-Metz's testimony, which is entitled to no weight. *Id.* at 28-29; ECF-Nos.704, 790, 1192, 1348, 1385.

The paucity of evidence supporting the jury verdict across the board makes clear "the jury has reached a seriously erroneous result," and "the verdict is a miscarriage of justice." *Caruolo*, 226 F.3d at 54. A new trial is warranted. *See, e.g.*, *Farrior*, 277 F.3d at 634-35 (affirming "grant of a new trial on the ground that the verdict was against the weight of the evidence"); *Manley v. AmBase Corp.*, 337 F.3d 237, 244 (2d Cir. 2003) (same); *Knox v. John Varvatos Enters. Inc.*, 512 F. Supp. 3d 470, 491 (S.D.N.Y. 2021) (finding verdict was against the weight of the evidence and granting a new trial on damages); *Audet v. Fraser*, 605 F. Supp. 3d 372, 394 (D. Conn. 2022) (granting new trial on one of four claims because "any finding by the jury … was against the weight of the evidence").

## II.    HIGHLY PREJUDICIAL EVIDENTIARY ERRORS REQUIRE A NEW TRIAL

District courts grant new trials based on erroneous evidentiary rulings if the rulings were "clearly prejudicial to the outcome of the trial." *Nimely*, 414 F.3d at 399; *see Tse v. UBS Fin. Servs., Inc.*, 568 F. Supp. 2d 274, 305-08 (S.D.N.Y. 2008) (admission of prejudicial exhibit justified new trial). Several evidentiary rulings justify granting a new trial, including erroneously admitting: (1) evidence of prices paid by fans for ancillary, non-ticketing products; (2) evidence about Defendants' conduct that predated the limitations periods; (3) hearsay statements regarding supposed threats and retaliation; (4) evidence about primary ticketing practices outside the United States; and (5) Dr. Abrantes-Metz's overcharge analysis. Individually and cumulatively, these rulings were prejudicial and seriously impacted the outcome of the trial.

4

### A.    The Admission Of Evidence On Ancillary, Non-Ticketing Products Was Erroneous And Prejudicial

To prove their claims at trial, Plaintiffs were required to show harm to venues (the customers in the primary ticketing markets) and artists (the customers in the amphitheater market, according to Plaintiffs). *See* ECF-No.1037, pp.26-30 (dismissing the only fan-facing market). The only harm to *fans* the jury was asked to determine was whether they were overcharged for primary ticketing fees as a result of upstream supracompetitive pricing of Ticketmaster's primary ticketing contracts with venues. ECF-No.1417, p.6. The Court nevertheless allowed Plaintiffs to admit informal Slack messages between two Live Nation employees making passing references to *ancillary, non-ticketing* products and services sold to concertgoers at two Live Nation amphitheaters—such as VIP club access, premier parking, and lawn chair rentals. Trial-Tr.1060:22-1063:24 (ruling). The Court reasoned that this evidence on "[t]he fan experience at Live Nation's amphitheaters is relevant to whether an artist would want to play there or not[.]" *Id.* at 1061:20-21. Defendants disagree as a matter of logic. But regardless, Plaintiffs never connected the dots: there is no evidence about whether or how the fan experience with ancillaries like parking and lawn chairs impacts artists' decisionmaking. If anything, the evidence is that artists directly or indirectly share in ancillary revenues, which cuts the other way. Trial-Tr.668:6-669:1, 695:22-696:23 (Hurwitz); Trial-Tr.4244:1-4245:12 (Capshaw). Plaintiffs used a fabricated rationale to justify using this irrelevant evidence to inflame the jury—and that is exactly what it did.

This evidence (PX719, PX720, and related testimony) was irrelevant to begin with and should have been excluded. ECF-No.1146. Evidence is relevant and admissible only if it has "any tendency to make a fact more or less probable," and "the fact is one of consequence in determining the action." Fed. R. Evid. 401. Evidence unrelated to any of the surviving markets is not relevant. *See, e.g.*, *N. Am. Soccer League LLC v. U.S. Soccer Fed'n, Inc.*, 2024 WL 2959967, *16 (E.D.N.Y.

5

June 12, 2024) (excluding evidence as irrelevant to showing anticompetitive effects in plaintiff's proposed relevant markets). Neither amphitheater claim concerns the effects of acquisitions or tying on ancillary products or services sold to concertgoers. Even in his hundreds of pages of expert disclosures, Dr. Hill never claimed that—and he certainly did not testify to any such theory. These ancillaries are optional add-ons. Trial-Tr.1536:4-8 (Baker); Trial-Tr.3597:3-5 (Weeden); Trial-Tr.1787:8-10 (Rapino). And they do not reveal anything about Live Nation's alleged national-level power over amphitheaters. On the contrary, prices of ancillaries like parking are decided locally and, as Mr. Marciano acknowledged, venues that no one claims are monopolies commonly charge high prices for premium parking and experiences. Trial-Tr.1217:10-1219:7 (Marciano).

This evidence also should have been excluded as prejudicial. ECF-No.1146. The dangers of unfair prejudice and jury confusion substantially outweighed any remote relevance. Fed. R. Evid. 403. The evidence concerned informal, off-the-cuff banter between two personal friends, not any Live Nation policy or decisionmaking of consequence to Plaintiffs' claims. Plaintiffs' obvious purpose in admitting it was not to prove any fact material to their claims, but to portray Defendants in a negative light by capitalizing on one particular Slack message: "robbing them blind baby." PX719. Plaintiffs made this purpose clear in their opening statement, telling the jury that "You will see how [Live Nation and Ticketmaster] talk about their fans and how they talk about the customers. Robbing them blind, baby." Trial-Tr.99:23-100:1. From that moment on, it was pellucidly clear Plaintiffs intended to use the evidence to provoke an emotional response.

Plaintiffs' counsel repeatedly returned to the "robbing them blind baby" excerpt with witness after witness. Trial-Tr.1549:15-1550:1 (Baker); Trial-Tr.1805:18-1806:17 (Rapino); Trial-Tr.4370:20-23 (Yurukoglu). And in closing, Plaintiffs' counsel reminded the jury that the

presentation of this evidence "was one of the most dramatic moments in the case." Trial-Tr.4575:10-12. He urged the jury to find—*based on the language used in these exhibits*—that Live Nation is a monopolist. Trial-Tr.4575:10-21 ("What type of company uses this language? The answer, I think you are going to find, is a monopolist who views itself to be above the law.").

The ultimate effect of all this was that Plaintiffs succeeded in shifting the focus of the trial. Evidence of prices paid by fans for items ancillary to concert tickets was irrelevant, yet Plaintiffs' extended discussion inflamed the jury against Defendants and confused the jury into crediting this evidence as proof of anticompetitive effects. *See* Trial-Tr.4575:10-4576:18 (mentioning anticompetitive effects in closing argument directly after reminding the jury of this evidence); ECF-No.1387, pp.7-9 (citing only evidence of prices to fans as evidence of anticompetitive effects in primary ticketing markets); Gigi Liman, *Resounding Verdict! Jury Finds the Live Nation-Ticketmaster Monopoly Illegal on All Claims*, Big Tech on Trial (Apr. 15, 2026) ("Several pieces of evidence proved key for the plaintiffs' case. 'There were a couple emails—the tone, the language they used,' that stood out, the foreperson said. When I asked about the lawn chairs and the now-infamous 'robbing them blind' quote, she said those 'stuck in the head of everybody as evidence.'"). There is no pricing, output, or quality evidence regarding venues or artists—the customers in Plaintiffs' alleged markets—that would have permitted the jury to find anticompetitive effects. *See* JMOL-Motion.5-6, 10-11, 19-22.

The erroneous admission of this irrelevant evidence significantly prejudiced the verdict.

## B.    The Admission Of Evidence That Predated The Limitations Period Was Erroneous And Prejudicial

There is no dispute Plaintiffs' damages claims are subject to a four-year statute of limitations. 15 U.S.C. § 15b; ECF-No.1411-24, Jury Instruction ("JI") 48. And although the Court will determine whether any Plaintiff is entitled to civil penalties or equitable remedies, state

7

statutes of limitations and laches apply to those claims, too. *See, e.g.*, Cal. Bus. & Prof. Code § 17206 (four-year statute of limitations); *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 34-40 (D.D.C. 2021) (applying laches to equitable claims); *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 295-301 (D.C. Cir. 2023) (same). So there was little reason to present evidence predating May 23, 2020. Yet Plaintiffs introduced extensive evidence of conduct that occurred before that date. That evidence should have been excluded as irrelevant and prejudicial, and its admission prejudiced the outcome.

As Defendants explained in multiple filings, evidence of "any alleged threats to, or retaliation against, any venues before May 23, 2020," and evidence about the "acquisitions of, or joint ventures with, any promoters, ticketers, or venues before May 23, 2020" is irrelevant, and allowing Plaintiffs to introduce that evidence as "background" risked confusion and prejudice. ECF-No.1019, pp.12-15; *see* ECF-No.1035; Fed. R. Evid. 401, 402, 403; *Zenith Radio Corp. v. Hazeltine Res., Inc.*, 401 U.S. 321, 338-39 (1971) (conduct occurring outside limitations period cannot be the basis for damages). This Court disagreed for two reasons: (1) because "no statute of limitation applies to the federal government's claims," and (2) "'evidence that predates the commencement of the limitations period but that is relevant to events during the period'" could "potentially be relevant" to the States' claims. ECF-No.1079, p.5 (quoting *Fitzgerald v. Henderson*, 251 F.3d 345, 365 (2d Cir. 2001)). To address the first point, Defendants proposed bifurcation. *See* ECF-No.1035; *Amato v. City of Saratoga Springs*, 170 F.3d 311, 316 (2d Cir. 1999) (affirming bifurcation "where one party will be prejudiced by evidence presented against another party," including because evidence was "either inadmissible … or prejudicial to" other party). The Court denied that request. ECF-No.1094, pp.7-8.

So, over Defendants' many objections, *see, e.g.*, Trial-Tr.1570:21-1571:19 (noting Defendants' objections to stale evidence); ECF-No.1478-7 (objecting to three stale exhibits), evidence of pre-May 23, 2020 conduct was admitted and pervaded at trial. This evidence covered (among other things):

- The 2011 contract negotiations between Ticketmaster and Barclays. PX335; Trial-Tr.1668:6-1674:7 (Evans).

- A 2015 ticketing partner analysis document from Monumental Sports and Entertainment. PX231.

- The 2017 contract negotiations between Ticketmaster and the SAP Center, and between Ticketmaster and the HEB Center. Trial-Tr.1674:9-1686:25 (Evans); PX389; PX392; PX408; PX412; PX444.

- The 2018 acquisition of Red Mountain and other communications about Red Mountain, some dating back to 2016. PX413; PX414; PX415; Trial-Tr.1243:25-1258:16 (Roux).[1]

- The 2019 contract negotiations between Ticketmaster and the Xcel Center, as well as SeatGeek and the Xcel Center. Trial-Tr.392:23-409:21 (Helgerson); PX227; PX230.

- AXS's strategy in primary ticketing competitions at various venues in 2019. Trial-Tr.2326:5-2327:15 (Perez).

- Communications between Live Nation and various venues regarding a 2019 Jonas Brothers Tour. PX458; PX476; Trial-Tr.1440:3-1448:2 (Campana).

- Internal communications from January 2020 regarding a potential Radio Disney event at Five Point Amphitheater. PX648; Trial-Tr.1288:5-1293:15 (Roux).

- Various internal Live Nation analyses and strategy documents. PX422; PX429; PX348; PX893.

---

[1] The admission of this evidence allowed Plaintiffs to capitalize on the term "Velvet Hammer." PX451. Following its admission, Plaintiffs' counsel used this phrase some 22 times before the jury. Trial-Tr.1249:9-22 (Roux); Trial-Tr.1410:14-17 (Roux); Trial-Tr.1464:2-1465:10 (Campana); Trial-Tr.1934:2-1937:6 (Rapino); Trial-Tr.4574:24-4575:4, 4615:11-24 (closing argument). The repeated invocation of this term and imagery served a now-familiar purpose: to paint Defendants in a negative light and evoke an emotional response from the jury.

Dr. Hill's testimony on the alleged "condition[ing]" relied on some of the evidence listed above. PDX5.35. His testimony on Live Nation's control over "large amphitheaters" was likewise premised on conduct dating back to 2015. PDX5.68. And Dr. Abrantes-Metz's analysis relied on data from as early as 2017. PDX6; Trial-Tr.2448:13-25 (Abrantes-Metz).

None of this evidence should have come in. And the Court's two reasons for not excluding the evidence broke down further during trial. First, the United States settled after the first week of trial, so the federal government's claims quickly dropped out of the case. Second, the remaining States never fulfilled their promise to show why evidence predating May 2020 was relevant to events during the limitations period. In fact, after admitting pre-limitations-period evidence based on "its previous ruling," the Court had to inquire "where are the documents from the 2020s or where is the connection to the current period? What is that connection?" Trial-Tr.1571:6-19. There was no connection.

The quantum and impact of this stale evidence—without any federal claim or link to the relevant time period—was significant and prejudiced the outcome of the case. Almost all of the alleged threats and retaliation underlying Plaintiffs' primary ticketing claims predate May 2020: HEB Center in 2017 and Xcel Center in 2019. *See* Trial-Tr.107:19-110:13. Without that evidence, the *only* alleged threat in the trial record relates to Barclays. *Id.* Similarly, virtually all of the agreements and acquisitions underlying Plaintiffs' amphitheater monopolization claim, as well as the refusal-to-deal policy underlying Plaintiffs' tying claim, predate May 2020. JMOL-Motion.4-5, 13-14. The only amphitheater agreements and acquisitions within the limitations period are two booking deals (one of which Live Nation has since lost) and two leases (Hayden Homes Amphitheater and Cascades Amphitheater). *Id.* at 5. Without the extensive pre-limitations-period evidence, the jury would have had little (if any) basis to return a verdict for Plaintiffs.

**C.    The Admission Of Hearsay Evidence On Supposed Threats Or Retaliation Was Erroneous And Prejudicial**

Faced with razor thin evidence of actual threats and retaliation against venues, Plaintiffs relied on self-serving testimony from Defendants' *competitors* to establish the venues' purported concerns.  That testimony was both rank hearsay and unduly prejudicial, and it should have been excluded before trial.  ECF-No.1019, pp.1-5.  The Court's decision to allow such testimony proved prejudicial.

Competitors' testimony on venues' "concerns" pervaded at trial.  *See, e.g.*, Trial-Tr.752:7-10 (Groetzinger) ("Nearly every venue we talked to that had concerts … expressed extreme levels of concern around the concert issue, the idea that if they moved to SeatGeek, they would lose concerts."); *id.* at 754:4-6 ("[A]s we had begun to talk to arenas, they expressed extreme levels of concern around losing concerts."); Trial-Tr.1614:16-19 (Khoury) ("There's feedback we get from team owners that they're typically concerned about giving us the entertainment side and losing on some of the concerts that they have to run in their business.").  This included Dr. Hill's testimony on "win-loss data" from AXS and SeatGeek, stating that the majority of these companies' losses were due to "concert withholding concerns."  Trial-Tr.2118:7-23.

All of this testimony was textbook hearsay—out-of-court statements offered "to prove the truth of the matter asserted."  Fed. R. Evid. 801(c).  Dr. Hill's win-loss data reading was multiple layers of it, as the Court later determined.  Trial-Tr.4473:4-4477:15.  And at minimum, the testimony was unduly prejudicial:  Its purpose was to mislead the jury into thinking there were widespread threats or examples of retaliation when, in fact, Plaintiffs could identify at most a few examples over the course of a decade.  *See supra* at 10; *AngioDynamics v. C.R. Bard*, 2022 WL 4333555, *4 (N.D.N.Y. Sept. 19, 2022) (court should consider the possibility of "self-serving testimony" and the "risk of insincerity in a potential customer's statement why products were not

11

being ordered"). Plaintiffs did not even bother to establish that the venues' "concerns" were based on threats or retaliation, as opposed to worries that concert promoters would be less attracted to SeatGeek or AXS, Trial-Tr.3060:2-3061:20 (Mueller), or some other reason.

The Court denied Defendants' motion *in limine* seeking to exclude hearsay testimony on supposed threats or retaliation before trial on the theory that the motion was "premature" because the testimony "would potentially be admissible" under hearsay exceptions or would not be offered "for the truth of the matter." ECF-No.1079, p.3. Even if true, that wouldn't have mitigated the prejudice. And from the very start of trial, it was readily apparent Plaintiffs were offering the evidence without the cover of any hearsay exception and for the truth of the matter.

As Defendants' many objections explained, *see, e.g.*, Trial-Tr.752:11-12 (Groetzinger); Trial-Tr. 1611:8-9, 1614:14-15, 1649:10-11 (Khoury), Plaintiffs were not offering the hearsay evidence for any permissible purpose. Indeed, as the Court later noted, there had been rampant "abuse[]" of "the 801 exception to the hearsay rules." Trial-Tr.4226:2-11. Numerous statements came in under the guise that "[t]hey were just being put in because of the effect on the listener," but it later became "100 percent clear that the party is trying to get the statements in for the truth of the matter asserted." *Id*. Although the Court sometimes provided limiting instructions, including for the win-loss data, that was only after Plaintiffs "were able to emphasize to the jury the actual statements, understanding that the jury will have potentially some difficulty separating out the hearsay limitations of the statement." Trial-Tr.4226:12-17.

The Court stated that both sides abused the 801 exception. But looking back at the trial record, many of the occasions when Defendants might be accused of that were because they were rebutting evidence that should not have been allowed in the first place. *See* ECF-No.1478-15 (explaining that Defendants sought to introduce certain exhibits to rebut Plaintiffs' narrative that

12

decreased show counts at non-Ticketmaster venues were due to retaliation); Trial-Tr.3494:2-14 (Defendants' counsel explaining that a "central issue[] for [Defendants] to establish" was why artists and promoters were not going to non-Ticketmaster venues).  And when Defendants sought to rebut this threats-and-retaliation evidence, the Court sustained Plaintiffs' hearsay objections. *See* Trial-Tr.4226:18-4227:7; DX465, DX473, DX476 (Jacoby); Trial-Tr.3493:9-15, 3504:8-13, 3502:11-22, 3506:15-22, 3507:20-3508:2, 3515:24-3516:4 (Jacoby); *LNC Investments, Inc. v. First Fidelity Bank*, 126 F. Supp. 2d 778, 787 (S.D.N.Y. 2001) ("[A] court's failure to admit highly probative evidence that is likely to have a profound impact on the outcome of the trial may also be grounds for a new trial.").

Perhaps the Court did not anticipate the volume and prejudicial effect of this testimony. But in retrospect, the hearsay evidence that was admitted prejudiced the outcome of the case.  With precious little evidence of actual threats or retaliation, and without witnesses from venues who would support the threats and retaliation narrative, the hearsay evidence—which did not show any actual threats—was the only thing that could have filled the void.  Without it, the jury would not have credited the threats-and-retaliation theory and likely would not have found in favor of Plaintiffs on their primary ticketing claims.

### D. The Admission Of Evidence On Primary Ticketing In Europe Was Erroneous And Prejudicial

The Court erred in not excluding evidence about foreign primary ticketing practices.  ECF-No.1019, pp.27-28.  Although that evidence had no relevance to Plaintiffs' primary ticketing claims, the extensive evidence on European primary ticketing models and fees impacted the outcome of the case.

Plaintiffs' primary ticketing markets were limited to the United States—meaning that "major concert venues" (the customers in these markets) do not view primary ticketing options

outside the United States as reasonable substitutes for those inside the United States. *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 228 (2d Cir. 2006) ("[T]he geographic market encompasses the geographic area to which consumers can practically turn for alternative sources of the product and in which the antitrust defendants face competition."). As such, there was at the very least a preliminary question that needed to be addressed: are the competitive conditions in European ticketing markets similar enough to the United States to permit comparison?

In denying Defendants' motion *in limine*, the Court concluded that, because Defendants intended to argue that "exclusive arrangements are procompetitive and desired by the venues," "plaintiffs are entitled to show that venues in other jurisdictions benefit from nonexclusive arrangements." ECF-No.1079, p.6. Defendants disagree, but even if that rationale is valid, Plaintiffs did not use this evidence to "show that venues in other jurisdictions benefit from nonexclusive arrangements." *Id*. On the contrary, the evidence shows that exclusive ticketing contracts are prevalent in other jurisdictions as well. Trial-Tr.1186:6-8 (Marciano); Trial-Tr.2792:9-2795:15 (Yovich); Trial-Tr.1951:18-1952:18 (Rapino). In the end, Plaintiffs never seriously disputed that venues prefer exclusivity. Instead, Plaintiffs focused on how European *ticketing fees—fees paid by fans—*compare to those in the United States. Trial-Tr.937-38, 1105-09, 1185-89 (Marciano); Trial-Tr.2337-41 (Perez); Trial-Tr.2792-96 (Yovich); Trial-Tr.2927-29 (Marcus).

The foreign ticketing evidence prejudiced the outcome as to the primary ticketing claims. Plaintiffs had no evidence of higher prices in their alleged primary ticketing markets, JMOL-Motion.19-22, so they tried to plug that hole in their case by arguing that the jury could credit evidence that "ticketing fees in the United States are higher than in Europe," ECF-No.1387, pp.8-9. Plaintiffs' counsel even told the jury in closing to credit the evidence on European prices as

14

evidence of "price effects, anticompetitive effects" in the alleged primary ticketing markets. Trial-Tr.4600:11-4603:17. This evidence never should have been allowed. It is about fees to fans rather than compensation to venues; it has nothing to do with the limited rationale the Court gave for allowing the evidence; and Plaintiffs never established that conditions in Europe permit an apples-to-apples comparison to the United States. Because there wasn't anything else showing higher prices or any other anticompetitive effects in the United States, this evidence must have affected the jury's finding of anticompetitive effects in the alleged primary ticketing markets.

### E.    The Admission Of Dr. Abrantes-Metz's Testimony Was Erroneous And Prejudicial

As Defendants have detailed at length in multiple filings, the testimony of Dr. Abrantes-Metz should never have been presented to the jury. ECF-Nos.704, 790, 1192, 1348, 1385. Not only did this testimony prejudice Defendants by permitting the jury to find a per-ticket overcharge—for which Plaintiffs adduced no other evidence—it infected numerous other aspects of the trial as well. Plaintiffs go so far as to argue the jury could have viewed Dr. Abrantes-Metz's testimony as evidence of monopoly power and anticompetitive effects in the alleged primary ticketing markets, even though Dr. Abrantes-Metz did not purport to render an opinion on those subjects and took Dr. Hill's liability analysis as a given. *See* ECF-No.1387, pp.8, 10, 20. Erroneous admission of this testimony, which the jury undoubtedly credited,[2] prejudiced Defendants as to the jury's overcharge finding and as to liability on the primary ticketing claims.

\*    \*    \*

---

[2] *See* Gigi Liman, *Resounding Verdict! Jury Finds the Live Nation-Ticketmaster Monopoly Illegal on All Claims*, Big Tech on Trial (Apr. 15, 2026) ("When asked which expert resonated the most, the foreperson, who declined to be identified, said, 'They were all very good,' before adding, 'I think Dr. Abrantes-Metz was very good in her expertise and how she demonstrated economically the impact on the consumers.'").

15

Each of these evidentiary errors is serious enough to call for a new trial, standing alone. Their "cumulative effect" demands one. *Haskell v. Kaman Corp.*, 743 F.2d 113, 122 (2d Cir. 1984). Because the cumulative effect of errors may be greater than that of each individual error, courts view "the effect of multiple errors in a single trial" as "cast[ing] such doubt on the fairness of the proceedings that a new trial is warranted." *United States v. Belfiore*, 2024 WL 2075128, *5 (2d Cir. May 9, 2024) (citation omitted); *Malek v. Fed. Ins. Co.*, 994 F.2d 49, 55 (2d Cir. 1993) ("[W]e cannot say that the cumulative effect [of the erroneous evidentiary rulings] is harmless."). The multiple errors here rendered the trial fundamentally unfair: Plaintiffs devoted hours of trial time to parking and lawn chairs; to decade-old acquisitions, contracts, and other conduct; to pervasive hearsay evidence implying supposed threats; to ticketing practices and prices in Europe; and to a fatally flawed "expert" opinion. Once this erroneously admitted evidence is removed from the trial record, there is little left. Even if the jury still could have returned the verdict it did, there is every reason to think it would not. The Court should grant a new trial.

## III.    ERRORS IN JURY INSTRUCTIONS REQUIRE A NEW TRIAL

A jury instruction that "misleads the jury as to the correct legal standard or does not adequately inform the jury on the law … requires a new trial unless the error is harmless." *United States v. Masotto*, 73 F.3d 1233, 1238 (2d Cir. 1996). Several jury instructions satisfy that standard: the instruction on what constitutes anticompetitive effects, which does not comply with prevailing Supreme Court and Second Circuit caselaw and conflates cause and effect (JI24); the coercion instruction for the tying claim, which misleadingly suggests "[a] policy" may suffice to show coercion (JI32); and the exclusive dealing instruction, which failed to instruct the jury on the correct legal standard applicable here (JI25). The instructions also failed to inform the jury how to evaluate two forms of alleged anticompetitive conduct altogether. And the instructions erred as to market definition by letting the jury evaluate Plaintiffs' primary ticketing markets under the

16

*Brown Shoe* factors, and find anticompetitive effects in a tied market without first determining whether such a market exists. The errors were far from harmless and require a new trial.

We understand and acknowledge that the Court thought long and hard about the instructions it gave and, therefore, is not likely to change its mind now. To further preserve these issues for appeal, we endeavor to explain our concerns clearly and in light of the verdict.

### A.    The Instruction On Anticompetitive Effects Was Erroneous And Warrants A New Trial On All Monopolization Claims

The Court provided a single, consolidated instruction on exclusionary conduct and anticompetitive effects. The anticompetitive effects portion of the instruction was erroneous and incorrectly relieved Plaintiffs of their burden to prove changed price, output, or quality.

The Court's instruction stated: "[h]arm to competition includes evidence of increased prices, decreased production levels, and reduced quality," and "may also include substantially constrained consumer choice" or "conduct that has significantly restricted competitors' ability to enter the relevant market and compete." JI24. That instruction is incorrect because the Second Circuit has made clear that while factors such as "constrained consumer choice" can contribute to a finding of adverse effects, a plaintiff must produce "evidence of changed prices, output, or quality." *MacDermid Printing Sols. v. Cortron Corp.*, 833 F.3d 172, 183 (2d Cir. 2016). "[I]n no precedential opinion in [the Second] Circuit has a plaintiff successfully proved an adverse effect on competition without offering" such evidence. *Id.*; *see also id.* at 184 ("[P]roving an adverse effect on competition without showing increased price, reduced output, or reduced quality in the market has remained possible in theory but elusive in practice.") Recent Supreme Court cases from the rule of reason context are to the same effect. *See Ohio v. Am. Express Co.*, 585 U.S. 529, 549 (2018) ("This Court will 'not infer competitive injury from price and output data absent some evidence that tends to prove that output was restricted or prices were above a competitive level.'");

17

*Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 88 (2021) (rule of reason is "aimed at assessing the challenged restraint's 'actual effect on competition'—especially its capacity to reduce output and increase price").

The instruction is also incorrect because it states anticompetitive effects may be found where conduct "has significantly restricted competitors' ability to enter the relevant market and compete." JI24. That conflates cause and effect and, worse, suggests that effects on competitors are sufficient to prove adverse effects to competition. That is wrong. As the Supreme Court stated in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, "[t]he question whether [the defendant's] conduct may properly be characterized as exclusionary cannot be answered by simply considering its effect on [the plaintiff]," but must consider its effect on "competition." 472 U.S. 585, 605 (1985); *see also United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (anticompetitive act must "harm the competitive *process* and thereby harm consumers … harm to one or more *competitors* will not suffice").

These errors were not harmless. The Court's instruction alleviated Plaintiffs' burden to show changed price, output, or quality by creating a false equivalence with factors that have never been sufficient alone (like less choice) or are at best predicates to showing consumer harm (harm to rivals). It gave the jury grounds to excuse Plaintiffs' failure to show *anything* with respect to price or output—the most important factors under *AmEx* and *Alston*. And given the dearth of evidence on price, output, or quality, the jury must have found anticompetitive effects based on those incorrect factors. *See* JMOL-Motion. 5-6, 10-11, 19-22. The prejudice is therefore clear. The verdict cannot stand and a new trial should be granted. *See Cweklinsky v. Mobil Chem. Co.*, 364 F.3d 68, 77 (2d Cir. 2004) ("Because we are unable to determine with certainty that the district

18

court's erroneous instruction did not affect the jury's verdict, we cannot deem that error harmless.").

### B.    The Coercion Instruction Was Erroneous And Warrants A New Trial On The Tying Claim

The "essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984). That has been the governing standard for coercion in tying cases since the Supreme Court articulated it over four decades ago. Yet in addition to instructing the jury on this standard, JI32, the Court instructed the jury that "[a] policy of tying products together … may suffice to show coercion," *id.* That was wrong and the error was not harmless: it eliminated Plaintiffs' burden to show that artists had been coerced into purchasing Live Nation's promotion services.

The Second Circuit has "consistently made clear, 'unless the buyer can prove that it was the unwilling purchaser of the allegedly tied products, actual coercion has not been established and a tying agreement cannot be found to exist.'" *Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186, 192 (2d Cir. 1992) (Marshall, J.). In other words, the *Jefferson Parish* standard must be satisfied. *See Freeland v. AT&T Corp.*, 238 F.R.D. 130, 154 (S.D.N.Y. 2006). Before *Jefferson Parish*, the Second Circuit had stated in *Hill v. A-T-O, Inc.* that "[a]n unremitting policy of tie-in … constitutes the requisite coercion." 535 F.2d 1349, 1355 (2d Cir. 1976). This Court's coercion instruction included language about "[a] policy" based on this case. *See* Trial-Tr.4533:23-4534:14. That additional language was erroneous under both *Jefferson Parish* and *Hill*.

First, to the extent *Hill* is read to allow a finding of coercion in all tying cases based on nothing more than an "unremitting policy," it is no longer good law after *Jefferson Parish*. *See*

19

*United States v. Polouizzi*, 564 F.3d 142, 160 (2d Cir. 2009) (courts in the Second Circuit are not required to follow circuit precedent if "its rationale is overruled, implicitly or expressly, by the Supreme Court or this court"). In *Jefferson Parish*, the Supreme Court unequivocally stated—without exception—that coercion is "the essential characteristic of an invalid tying arrangement." 466 U.S. at 12. And it defined coercion as proof that the buyer was forced to purchase something it did not want or would have preferred to purchase elsewhere. *Id.*

Second, *Hill* does not apply to this case at all and, as such, the instruction should have omitted this language entirely. *See Girden v. Sandals Int'l*, 262 F.3d 195, 203 (2d Cir. 2001) (jury instructions must "give the jury a clear and concise statement of the law *applicable to the facts of the case*" (emphasis added)). *Hill* concerned an admitted tying arrangement in the form of a policy that, to join a valuable buying service, one needed to buy a vacuum cleaner from the defendant. *Id.* at 1351-52. There was no other way to become a member of the buying service. *Id.* The foundation of the opinion was "an admitted tie between two clearly separate products." *Id.* at 1354. With that established, the Second Circuit turned to whether there was evidence of coercion: "[H]ere defendants admit to a policy of never offering the FBP buying plan membership separately from the sale of the Compact cleaner. An unremitting policy of tie-in, if accompanied by sufficient market power in the tying product to appreciably restrain competition in the market for the tied product constitutes the requisite coercion … ." *Id.* at 1355. The holding (or more precisely, one of two alternative holdings on coercion) is that when tying is undisputed and general—*i.e.*, an "unremitting policy"—it can be evidence of coercion. That was especially important because *Hill* was a class action, and most courts would deny class certification in tying cases based on the need to prove coercion individually. *See* W. Perry Brandt, *Tying Arrangements and the Individual Coercion Doctrine*, 30 Vand. L. Rev. 755, 774 (1977) (discussing *Hill* as example of "more

20

modern view" which "appears to presume the requisite coercion on a class-wide basis from evidence of a concerted policy to impose tying arrangements").

After *Jefferson Parish*, some courts in this district have continued to apply *Hill* but, in doing so, have cabined *Hill* to its facts. As Judge Cote explained, *Hill* permits coercion to be satisfied through "generalized proof" in only two circumstances: (1) "when the policy of conditioned sales is admitted to by the defendant," and (2) "when a contractual provision applicable to all members of the class requires the tie." *Freeland*, 238 F.R.D. at 154-55; *see also Park v. Thomson Corp.*, 2007 WL 119461, *4 (S.D.N.Y. Jan. 11, 2007) (finding *Hill* inapplicable and requiring proof of actual coercion). Neither of those circumstances is present here. This is not a class action case. Nor is there a policy of conditioned sales *admitted to* by Live Nation. The only policy discussed at trial is Live Nation's policy of refusing to deal with rivals. That policy is not a tying arrangement, and it is far from the sort of admitted tying arrangement at issue in *Hill*. The Court thus erred in including any language regarding "[a] policy" based on *Hill*.

This error was affirmatively harmful. Plaintiffs failed to provide evidence of any artist who was actually coerced into purchasing Live Nation's promotion services that the artist "either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish*, 466 U.S. at 12; *see* JMOL-Motion.12. The jury nevertheless found coercion, likely based on Live Nation's refusal-to-deal policy—the only policy discussed at trial.

### C. The Court's Refusal To Provide Instructions On Two Forms Of Alleged Exclusionary Conduct Was Erroneous And Warrants A New Trial On All Monopolization Claims

The Court's general instruction on anticompetitive conduct told the jury it "should weigh the evidence as a whole and consider all of the alleged exclusionary conduct, including the interrelated effects of the different conduct in aggregate to reach [its] determination." JI24. For Plaintiffs' exclusive dealing theory, the Court further instructed the jury on how it should evaluate

21

the lawfulness of that conduct.  JI25.  But when it came to Plaintiffs' (1) threats, retaliation, and conditioning theory, and (2) acquisition of large amphitheaters monopoly claim, the Court failed to provide any additional guidance on how to evaluate lawful versus unlawful conduct.  That was error.

*Threats, Retaliation, and Conditioning*:   In their proposed instructions, Defendants provided an instruction for "threats and retaliation" that explained to the jury that "affirmative acts of threatening venues or retaliating against venues" are distinct from "concerns that a venue might have about how the choice of a ticketing provider might affect its ability to compete with other venues for concerts."  *See* ECF-No.1411-15, p.345, Proposed Instruction 16D.  Venues' content concerns had featured extensively at trial, *see, e.g.*, *supra* at 11-13; Trial-Tr.752-53 (Groetzinger); Trial-Tr.2329-30 (Perez), and the goal of this instruction was to make clear that while affirmative threats or retaliation might constitute unlawful conduct, a venue's mere concern does not (indeed, it is not conduct at all).

The Court initially indicated that it would deliver Defendants' proposed instruction.  *See* ECF-No.1411-17, Court's Proposed Instruction 23; Trial-Tr.4524.  It then reversed course because it believed the jury would consider the evidence on threats, retaliation, and conditioning as part of exclusive dealing's "coercion" inquiry.   Trial-Tr.4532; JI25.   But threats, retaliation, and conditioning had always been a distinct theory of anticompetitive conduct in Plaintiffs' case.  From the beginning, Plaintiffs made clear that this conduct, in addition to exclusive dealing, was the basis for their primary ticketing claims.  ECF-No.257, pp.86-87.  And at trial, Plaintiffs presented their case to the jury in the same manner—discussing threats, retaliation, and conditioning as well as exclusive dealing, and doing so separately from each other.  Dr. Hill's presentation, for instance,

22

listed "exclusive contracts" and "condition[ing]" as two separate forms of "[a]lleged [c]onduct." PDX5.29.

It is true Plaintiffs tried to suggest that Ticketmaster won a few contracts because of threats or conditioning, but there was no evidence that *exclusivity*—as opposed to nonexclusive contracting—came about because of any threats or conditioning. Even Plaintiffs' star witness on threats, Mr. Abbamondi, testified that he preferred exclusive contracting. Trial-Tr.323:20-327:6.

Furthermore, the problem is not just that the threats, retaliation, and conditioning theory was distinct, it is that the legal standards governing it are entirely different from anything the jury was told. This is addressed at length in Defendants' motion for judgment as a matter of law, and we will not repeat those arguments here. JMOL-Motion.23-26. But whether one views this theory as a self-preferencing claim, a form of tying, or something else, the jury instructions that would result from that choice were not given to this jury. Nothing was given to the jury defining a threat or retaliation, and the only mention of conditioning was in reference to the tying claim.

This error was anything but harmless. On the contrary, the Court told the jury to "weigh the evidence as a whole and consider all of the alleged exclusionary conduct." JI24. So the jury had to consider threats, retaliation, and conditioning, without knowing what was lawful or unlawful—or really what qualified as conduct in the first place. Following the Court's instructions, the jury likely considered all of the evidence on venues' purported concerns along with the other asserted exclusionary conduct.

That's an issue because the Second Circuit has made clear lawful conduct cannot be part of the calculus. *See City of Groton v. Connecticut Light & Power Co.*, 662 F.2d 921, 928-29 (2d Cir. 1981) ("reject[ing] the notion that if there is a fraction of validity to each of the basic claims and the sum of the fractions is one or more, the plaintiffs have proved a violation of section 1 or

section 2 of the Sherman Act"); *see also Valassis Commc'ns, Inc. v. News Corp.*, 2019 WL 802093, *9 (S.D.N.Y. Feb. 21, 2019) ("[I]t is unlikely that multiple independently lawful acts can come together to create an unlawful monopoly 'broth' from which antitrust injury can arise.").  So has the Supreme Court and other courts.  *See Pacific Bell Telephone Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 457 (2009) ("Two wrong claims do not make one that is right."); *City of Anaheim v. S. California Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992) ("[I]f all we are shown is a number of perfectly legal acts, it becomes much more difficult to find overall wrongdoing.").  Not instructing the jury on the lawful/unlawful line on Plaintiffs' threats, retaliation, and conditioning theory, while telling the jury to weigh everything together, led to a verdict contrary to law.

  ***Amphitheater Monopolization Claim***:  Defendants also proposed an instruction for the alleged exclusionary conduct relevant to Plaintiffs' amphitheater monopolization claim: "controlling amphitheaters."   *See* ECF-No.1411-18, p.57, Proposed Instruction 23D.   This instruction would have explained to the jury that "Live Nation's ownership of, control over, or acquisition of amphitheaters does not, in itself, count as anticompetitive conduct." *Id.*  Plaintiffs instead had to show that the acquisitions and exclusive booking arrangements "had an actual anticompetitive effect" in the form of "higher prices, lower output, reduced quality or the like"; a showing that "Live Nation's share of large amphitheaters increased" alone is not sufficient. *Id.*

  In lieu of providing this separate instruction, the Court added a sentence to its general instruction on anticompetitive conduct that "a company's control over or acquisition of amphitheaters does not, without more, count as anticompetitive conduct."  JI24.  That sentence alone was insufficient because it failed to say anything about *effects*.

  This omission was harmful too.  Besides showing that Live Nation's "control" over amphitheaters increased from 2015 to 2024, Plaintiffs adduced no evidence on their amphitheater

monopolization claim.  JMOL-Motion.2-6.  The jury thus had no basis to find for Plaintiffs on that claim unless it erroneously believed that a showing of increased market share, without anything else, is sufficient.  The Court's decision not to provide Defendants' proposed instruction allowed the jury to believe exactly that.

> **D.      The Exclusive Dealing Instruction Was Erroneous And Warrants A New Trial On The Primary Ticketing Claims**

While the Court did provide an instruction on the circumstances under which exclusive dealing contracts might be considered unlawful, the instruction did not require that "Plaintiffs must prove" coercion to establish that Ticketmaster's exclusive dealing is anticompetitive.  JI25. Instead, it listed four other factors that "Plaintiffs must prove," and then told the jury it "may also consider [] whether exclusive contracts result from coercive behavior."  *Id.*  That is not a correct statement of the law, and it was not harmless.

We fully understand and appreciate the Court's point that in the exclusive dealing caselaw one can find statements suggesting that proof of coercion is relevant but not required.  That is typical of antitrust caselaw *writ large*—there are complicated facts and numerous multi-factor tests, so there tends to be some authority on both sides of everything.  But this case is unique, in that the evidence is completely one-sided on the question of whether consumers (venues) prefer exclusive contracting.  They do.  JMOL-Motion.26-27.  And they do for efficiency reasons and because it increases their bargaining power over ticketing companies.  *Id.*  The question, then, is: what is the right jury instruction for such a case?

Multiple courts have recognized that "[e]xclusive dealing will generally only be unlawful where … there is some element of coercion present."  *Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*, 962 F.3d 1015, 1031 n.11 (8th Cir. 2020); *see also In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 999 (10th Cir. 2022) (concluding that "absence of coercion [is] a

factor in the exclusive dealing analysis"). In *Race Tires America, Inc. v. Hoosier Racing Tire Corp.*, the Third Circuit held that "coercion [was] a fundamental consideration in the *present* circumstances, namely, where various sports sanctioning bodies have freely adopted their own equipment rules and then freely entered into exclusive contracts with the respective suppliers." 614 F.3d 57, 78 (3d Cir. 2010). In other words, where it appears that the parties to the exclusive contracts freely decided they wanted such contracts and then freely entered into them, there must be evidence of coercion on the part of the defendant to hold the exclusive dealing unlawful. The same reasoning applies here. Given the quantum of evidence at trial that venues prefer exclusive contracts and freely entered into them for valid, efficiency-driven reasons, the jury should have been instructed that, unless it disagreed and somehow found coercion, the exclusive contracting at issue was lawful.

The Court declined to instruct the jury that it must find evidence of coercion based on *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012), but that case is not to the contrary. In the portion of that decision analyzing the exclusive dealing at issue, the court states that "[e]xclusive dealing will generally only be unlawful where the market is highly concentrated, the defendant possesses significant market power, *and there is some element of coercion present*." *Id.* at 284 (emphasis added). Only after determining that "there was evidence that Eaton leveraged its position as a supplier of necessary products to coerce the OEMs into entering into the LTAs" did the court conclude that "this case involves precisely the combination of factors … in which exclusive dealing would pose a threat to competition." *Id.* at 285.

As the Court knows, the jury specifically inquired which factors Plaintiffs needed to prove to establish that Ticketmaster's exclusive primary ticketing contracts were unlawful. ECF-No.1456. Had coercion been listed as a requirement instead of merely a consideration, the jury

26

may well have reached a different result given the overwhelming evidence that venues prefer exclusive contracts.  JMOL-Motion.26-27.

> **E.**     **The Market Definition Instructions Were Erroneous And Warrant A New Trial On The Primary Ticketing And Tying Claims**

The Court's instructions related to market definition were erroneous and harmful in two ways.

First, the Court's instruction on the primary ticketing markets informed the jury that these are "targeted customer markets."  JI19.  But the Court permitted the jury to determine whether these venues are "unique" under the *Brown Shoe* factors.  *Id.*  Defendants continue to believe that in an actual monopolization case—and where a plaintiff's market definition is based on supposedly vulnerable customers—proof of actual price discrimination is required to prove targeted customer markets.  JMOL-Motion.14-16.   The jury should have been instructed that, absent such proof, it could not find the targeted customer markets alleged.  *Id.*  And the failure to so instruct the jury was harmful because it allowed the jury to the find Plaintiffs' primary ticketing markets without any evidence of price discrimination.

Second, the Court's tying instruction correctly required Plaintiffs to prove "anticompetitive effects in the tied market," but failed to instruct the jury that, as a prerequisite, Plaintiffs must prove a relevant tied market.  JI27.  Defendants had proposed such language, ECF-No.1411-15, p.363, Proposed Instruction 18, and maintain that it should have been included, JMOL-Motion.10-11.  As the Second Circuit recently confirmed, "relevant-market analysis is 'essential for assessing the potential harm to competition from the defendants' alleged misconduct.'"  *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 2026 WL 1397077, *2 (2d Cir. May 19, 2026).  The Court's instruction was harmful because it permitted the jury to find anticompetitive effects in the tied market without any market analysis.

27

**CONCLUSION**

If the Court does not grant Defendants' motion for judgment as a matter of law, it should grant Defendants a new trial.

*[Signatures on following page]*

Dated: May 21, 2026

Respectfully submitted,

LATHAM & WATKINS LLP

Andrew M. Gass (admitted *pro hac vice*)
Alfred C. Pfeiffer (admitted *pro hac vice*)
   *Co-Lead Trial Counsel*
David R. Marriott
   *Co-Lead Trial Counsel*
Timothy L. O'Mara (admitted *pro hac vice*)
Jennifer L. Giordano
Kelly S. Fayne (admitted *pro hac vice*)
Lindsey S. Champlin (admitted *pro hac vice*)
Robin L. Gushman (admitted *pro hac vice*)

505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600

1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

555 11th Street, NW, Suite 1000
Washington, D.C. 20004
(202) 637-2200

Al.Pfeiffer@lw.com
David.Marriott@lw.com
Tim.O'Mara@lw.com
Jennifer.Giordano@lw.com
Andrew.Gass@lw.com
Kelly.Fayne@lw.com
Lindsey.Champlin@lw.com
Robin.Gushman@lw.com

*Attorneys for Defendants Live Nation Entertainment, Inc. and Ticketmaster L.L.C.*

CRAVATH, SWAINE & MOORE LLP

Lauren A. Moskowitz
Jesse M. Weiss
Nicole M. Peles

Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 474-1000

lmoskowitz@cravath.com
jweiss@cravath.com
npeles@cravath.com

*Attorneys for Defendants Live Nation Entertainment, Inc. and Ticketmaster L.L.C.*

29

**CERTIFICATE OF COMPLIANCE**

I, Andrew M. Gass, an attorney duly admitted to practice before this Court, hereby certify pursuant to Local Rule 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rules"), Rule 8(C) of Judge Arun Subramanian's Individual Practices in Civil Cases ("Individual Rules"), that the foregoing Memorandum of Law was prepared using Microsoft Word, and contains 8,635 words.  In making this calculation, I have relied on the word and page counts of the word-processing program used to prepare the document.

Dated:   May 21, 2026
         San Francisco, California

_____
Andrew M. Gass