**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>                  *Plaintiffs*,<br><br>        v.<br><br>LIVE NATION ENTERTAINMENT, INC.<br>and TICKETMASTER L.L.C.,<br><br>                  *Defendants*. | Case No. 1:24-cv-3973-AS |

**PROPOSED FINAL JUDGMENT**

WHEREAS, Plaintiff, United States of America, along with the Attorneys General of Arkansas, Iowa, Mississippi, Nebraska, Oklahoma, and South Dakota (collectively, the "Settling States"), filed their Amended Complaint on August 30, 2024 ("Amended Complaint");

AND WHEREAS, the United States, the Settling States, and Defendants, Live Nation Entertainment, Inc. and Ticketmaster L.L.C., consent to entry of this Final Judgment;

AND WHEREAS, Defendants agree to undertake the obligations and obey the prohibitions described in this Final Judgment to remedy the loss of competition alleged in the Amended Complaint;

AND WHEREAS, Defendants represent that the relief required by this Final Judgment can and will be made and that Defendants will not later raise a claim of hardship or difficulty as grounds for asking the Court to modify any provision of this Final Judgment;

NOW THEREFORE, it is ORDERED, ADJUDGED, AND DECREED:

1

## I.    Jurisdiction

The Court has jurisdiction over the subject matter of, and each of the parties to, this action. The Amended Complaint states a claim upon which relief may be granted against Defendants under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1-2) and the state laws identified in the Amended Complaint that correspond to claims brought by the Settling States.

## II.    Definitions

As used in this Final Judgment:

A.    "Live Nation" means Defendant Live Nation Entertainment Inc., a Delaware corporation with its headquarters in Beverly Hills, California, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, in each instance if controlled by Live Nation Entertainment, Inc., and their directors, officers, managers, agents, and employees, except for those entities listed on Schedule A attached hereto, so long as Defendants lack operational and management control over those entities and do not exercise their influence over, or otherwise use, those entities to engage in conduct prohibited by this Final Judgment.

B.    "Ticketmaster" means Defendant Ticketmaster L.L.C., a Virginia limited liability company with its headquarters in Beverly Hills, CA, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, in each instance if controlled by Ticketmaster L.L.C., and their directors, officers, managers, agents, and employees.

C.    "Amphitheater" means an outdoor Venue that typically has a lawn with general admission seating, and is (1) a Major Concert Venue that is identified as an "amphitheater" on Schedule B attached hereto (but solely for so long as such Venue remains a "Major Concert

2

Venue" as defined herein), or (2) a Venue not listed on Schedule B but that is or becomes a Major Concert Venue as defined in Section II.N.

D.      "API" means an application programming interface.

E.      "Artist" means any creator or performer of live entertainment content, including concert, comedy, theatrical, or family entertainment content.

F.      "Client Ticketing Data" means the following data relating to a ticketing client's events: on-sale dates for a client's events, the number of tickets sold, location or type of tickets sold, ticket prices (including all fees charged and the amount of such fees), sales proceeds, marketing and promotions results, ticket purchaser/ticket holder information, and inventory status of any particular ticket. "Client Ticketing Data" does not include data that: (1) is collected through other means (e.g., website visitor tracking, user group surveys, public sources); or (2) is made public by someone other than Defendants and Defendants' agents.

G.      "Condition" or "Conditioning" means to explicitly or practically require buyers to purchase or use one product or service if they want to purchase or use a second product or service. In addition to explicit Conditioning, Conditioning can also occur if, due to the seller's pricing, policies, or other conduct, it is unreasonably difficult, costly, or economically infeasible to purchase the desired product or service alone.

H.      "Content Steering" means, with respect to concert promotion or booking, any decision, conduct, or action that requires, encourages, prohibits, or discourages an Artist to perform at a particular Venue based on the identity of a Primary Ticketing Services provider of such Venue or the revenue that Defendants receive by virtue of being a Primary Ticketing Services provider of such Venue. For clarity, "Content Steering" does not include (1) truthful and non-misleading discussions with an Artist about the capabilities of the Primary Ticketing

3

Services provider(s) of such Venue and how that might affect the Artist's interests, or (2) decisions made in the ordinary course of business based on commercial considerations other than the identity of the Primary Ticketing Services provider(s) or the revenue Defendants receive by virtue of being the Primary Ticketing Services provider, including scheduling, demand, production requirements, or other non-prohibited economic factors.

I.      "Eligible Primary Ticketing Services Provider" means a Person that either (1) is engaged in the sale of primary tickets for Live Entertainment Events at Venues in the United States through a Primary Marketplace as an established ongoing business (independent of any primary tickets received as part of Ticketmaster's non-exclusivity under this Final Judgment), or (2) has demonstrated or can demonstrate the ability to fully provide Primary Ticketing Services for Major Concert Venues in the United States by offering both a Primary Marketplace and a Primary Ticketing Back-End. Any Person that qualifies under Clause (1) of this definition and also operates a secondary ticket sales business can remain qualified under Clause (1) only if it (a) maintains and reasonably enforces a policy prohibiting speculative ticket sales (including but not limited to the listing, offering for sale, or sale of tickets that the seller does not own, control, or have been contractually allocated at the time of listing, and including a firmly enforced prohibition on the sale of any tickets prior to a material pre-sale or on-sale); (b) follows bona fide artist, team, or other content owner requests to limit resale to face value (or other pricing restrictions), geofence sales, or otherwise adhere to content owner requests for secondary ticket sales on designated events; (c) requires ticket sellers to disclose their identities to the marketplace operator; and (d) prohibits ticket listings without specific section, row and seat quantity, or other indicia that the tickets are genuine. Any disputes as to whether a Primary

4

Ticketing Services provider qualifies as an Eligible Primary Ticketing Services Provider will be resolved by the process set forth in Section IV.E.

J.    "Exempted Employee" means any employee of Defendants who is not a Firewall Employee, including: (1) any senior corporate officer, director, or manager with responsibilities that include oversight of Defendants' provision of Primary Ticketing Services; and (2) any employee whose primary responsibilities solely include accounting, human resources, legal, information systems, and/or finance.

K.    "Firewall Employee" means any employee of Defendants whose principal job responsibility involves the operation or day-to-day management of Defendants' Venues, concert promotions, or Artist management services.

L.    "Including" means including, but not limited to.

M.    "Live Entertainment Event" means an event (other than a multi-day multi-Artist festival or similar event) where an Artist performs in a Venue and for which tickets are sold to the public. References herein to the "provision of" or "providing" Live Entertainment Events means to supply one or more Live Entertainment Events and/or the services reasonably necessary to plan, promote, market, and settle one or more Live Entertainment Events, such as concert promotion services, but specifically excludes the provision of Primary Ticketing Services, Venue management services, and/or tour stage/set design and construction services.

N.    "Major Concert Venue" means (1) each of the Venues set forth on Schedule B attached hereto, and (2) any other Amphitheater or arena located in the United States that has a Live Entertainment Event sellable capacity of 8,000 or more and (a) hosted ten or more Live Entertainment Events in any calendar year from 2024 through the term of this Final Judgment or (b) is new and forecasts hosting ten or more Live Entertainment Events in an upcoming calendar

year. Any Venue added to this definition pursuant to subclause (2) of this Section will be deemed a "Major Concert Venue" solely on a prospective basis in connection with new contracts entered into after the end of the immediately preceding calendar year. Notwithstanding the foregoing or anything to the contrary in this Final Judgment, if a particular Venue undergoes a structural or systemic operational change that reduces its Live Entertainment Event sellable capacity to fewer than 8,000 people or no longer regularly operates as an Amphitheater or arena that hosts Live Entertainment Events on a consistent basis, then such Venue will not be considered a "Major Concert Venue" for purposes of the next calendar year.

O.    "Management" means all directors and officers of Defendants, or any other employee with management or supervisory responsibilities for Defendants' business or operations related to negotiating the provision of Primary Ticketing Services or the provision of Live Entertainment Events.

P.    "Nondiscriminatory Calendar Procedures" means the procedures that govern requesting, holding, and challenging dates for Live Entertainment Events on the Venue's booking calendar that apply generally to Promoters on a nondiscriminatory basis (i.e., without regard to whether any given Promoter is owned or operated by, or otherwise affiliated with, Defendants) and include, at minimum, the following principles: (1) equal application to all Promoters, including Live Nation and third-party Promoters; (2) assignment of hold positions based on the order in which complete booking requests are received; (3) a challenge process by which any date holder may require priority-position holders to either confirm their booking with a binding commitment or release the date; and (4) standardized confirmation requirements, including execution of a license agreement, receipt of the required deposit, and written confirmation.

6

Q.    "Oak View Group" means Oak View Group LLC, a Delaware limited liability company with its headquarters in Denver, Colorado, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

R.    "Person" or "Persons" means any natural person, corporate entity, partnership, association, joint venture, or trust, including corporations and associations existing under or authorized by the laws of the United States, the laws of any State, or the laws of any foreign country.

S.    "Preferred Booking Agreement" means an agreement or understanding between a Venue and Live Nation that grants Live Nation any Preferred Booking Rights. "Preferred Booking Agreement" does not include: (1) agreements or understandings between a Venue and Live Nation that engage Live Nation to book such Venue and to administer, but not control, such Venue's booking calendar so long as the agreement does not include any Preferred Booking Rights; (2) operating leases, subleases, or similar agreements between a Venue and Live Nation that grant Live Nation the right to operate the Venue; or (3) agreements between Live Nation and a third-party Promoter pursuant to which the third-party Promoter sublicenses or otherwise grants to Live Nation the right to book and/or promote only a portion of the Live Entertainment Events at the Venue, so long as Live Nation promotes less than 50% of the total number of Live Entertainment Events that are held at the applicable Venue in a calendar year.

T.    "Preferred Booking Rights" means rights that grant: (1) preferred access to certain dates for booking and/or promotion of Live Entertainment Events at the Venue not otherwise generally available to Promoters, other than in accordance with Nondiscriminatory Calendar Procedures; (2) the exclusive right to book and/or promote all, or a specified number of, Live

Entertainment Events at the Venue; (3) co-promotion rights that require third party Promoters to co-promote Live Entertainment Events at the Venue with Live Nation; (4) booking rights of first refusal for dates at the Venue; (5) most-favored nation booking or promotion rights at the Venue; and (6) rebates to Live Nation for shows promoted by third parties. For clarity, "Preferred Booking Rights" do not include incentives by a Venue to encourage the achievement of financial thresholds or show volume from a Promoter or to re-coup prepayments or other guaranteed financial commitments made by the Promoter to the Venue.

U.    "Primary Marketplace" means a technology or distribution platform for making the initial distribution of tickets. For clarity, "Primary Marketplace" does not include technology or distribution platforms that lack the ability to fulfill the responsibilities of a merchant of record, as described in Section IV.A.

V.    "Primary Ticketing Back-End" means the collection of software, technology, and/or platform services provided to, and used by or on behalf of, Major Concert Venues for the following functions related to the ticketing of Live Entertainment Events: (1) event and inventory configuration; (2) manifest, seat map, inventory, holds, and exclusive allocation controls; (3) barcode/token generation; (4) secure rendering support; (5) ticket-validity and entry-control validation; (6) entry scan validation; (7) maintenance of operational/audit logs necessary to support allocation, token issuance, and scanning; and (8) providing data feeds, APIs, and reporting related to event details, inventory status, entry scans, and other relevant and applicable data points.

W.    Primary Ticketing Services means the provision of a Primary Ticketing Back-End, or a Primary Marketplace, or both.

X.      "Promoter" means a Person (other than an Artist and its managers and/or agents) that generally bears the potential financial risk and gain of presenting Live Entertainment Events and assists with the planning and production of Live Entertainment Events, such as by working with Artists (and the Artist's managers and/or agents) to construct a tour, negotiate with and select Venue(s) at which to perform, determine ticket prices and distribution strategy, advertise or publicize the show or tour to the public, and/or organize staffing or logistics for the Artist's team.

Y.      "Relevant Employees" means Defendants' employees with responsibility for Primary Ticketing Services or Live Entertainment Events.

Z.      "Retaliate" or "Retaliating" means refusing to provide Live Entertainment Events to a Venue, or providing Live Entertainment Events to a Venue on less favorable terms, because the Venue has contracted or is contemplating contracting with a company other than Defendants for Primary Ticketing Services. "Retaliate" does not mean: (1) truthful and non-misleading discussions with an Artist about the capabilities of the Primary Ticketing Services provider(s) of such Venue and how that might affect the Artist's interests, (2) actions taken at the independent direction of an Artist or an Artist's managers or agents, or (3) other decisions made in the ordinary course of business based on commercial considerations other than the identity of the Primary Ticketing Services provider(s) or the revenue Defendants receive by virtue of being the Primary Ticketing Services provider, including scheduling, demand, production requirements, or other non-prohibited economic factors.

AA.     "Ticket Service Fees" means all service charges retained (in whole or part) by the Primary Ticketing Services provider, shipping and handling fees, and order processing fees. "Ticket Service Fees" do not include Venue or facility fees, credit card fees and other payment processing fees, and fees charged in connection with any optional add-ons (e.g., insurance,

payment installment plan fees, merchandise, and any other service or product not required for the purchase of a primary ticket).

BB.    "Ticketmaster Back-End" means the full suite of Ticketmaster software, technology, and/or platform services used by or on behalf of Venues for functions related to the ticketing of Live Entertainment Events such as: (1) event and inventory configuration; (2) manifest, seat map, inventory, holds, and exclusive allocation controls; (3) third-party Primary Ticketing Services provider authorization and credentialing; (4) APIs, feeds, queues, or other mechanisms for third-party Primary Ticketing Services providers to retrieve allocated inventory; (5) validation of third-party ticketing service provider sale requests; (6) barcode/token generation; (7) secure rendering support; (8) ticket-validity and entry-control validation; (9) entry scan validation; (10) maintenance of operational/audit logs necessary to support allocation, token issuance, and scanning; and (11) providing data feeds, APIs, and reporting related to event details, inventory status, entry scans, and other relevant and applicable data points. For clarity, Ticketmaster Marketplace is distinct from and not included in Ticketmaster Back-End, and together, Ticketmaster Marketplace and Ticketmaster Back-End make up Ticketmaster's Primary Ticketing Services business.

CC.    "Ticketmaster Marketplace" means all products, services, features, and capabilities of Ticketmaster that are not part of Ticketmaster Back-End, including Ticketmaster's technology and distribution platform used to market and sell primary tickets to Live Entertainment Events to consumers.

DD.    "Venue" means any building or physical space located in the United States that hosts Live Entertainment Events and any owner, operator, or manager of that building or physical space.

### III.    Applicability

This Final Judgment applies to Live Nation and Ticketmaster, as defined above, and all other Persons in active concert or participation with any Defendant who receive actual notice of this Final Judgment.

### IV.    Ticketing

A.    Ticketmaster must develop and provide an open distribution and ticket authentication system that enables any Major Concert Venue using Ticketmaster Back-End to distribute primary tickets using any Eligible Primary Ticketing Services Provider(s) chosen by such Major Concert Venue. Such open distribution and ticket authentication system must have Ticketmaster remain responsible for the various functions that constitute the Ticketmaster Back-End. Such system must permit Eligible Primary Ticketing Services Providers to be sufficiently integrated into the Ticketmaster Back-End so that, once a Major Concert Venue has allocated tickets to an Eligible Primary Ticketing Services Provider, such Eligible Primary Ticketing Services Provider is able to utilize its own technologies to assume the customary responsibilities of a merchant of record, both before and after a Major Concert Venue has allocated tickets to it. The customary responsibilities of a merchant of record to be assumed by such Eligible Primary Ticketing Services Provider include the following:

1.    storing and supporting discovery for event listings and providing details thereof;

2.    ingesting event and allocated inventory data;

3.    configuring the event and allocated seats in such Eligible Primary Ticketing Services Provider's own systems and/or ingesting such

11

information from another Primary Ticketing Services provider for the Venue;

4.     listing allocated tickets in Primary Marketplace(s), managing checkout flows and payment processing, maintaining related order records and customer accounts or sessions, and processing refunds, cancellations, exchanges, chargebacks, and taxes;

5.     sales reporting and settlement;

6.     requesting, receiving, and rendering barcodes/tokens issued by Ticketmaster Back-End;

7.     supporting refunds, cancellations, exchanges, transfer/resale features, and fan support; and

8.     collecting and (as appropriate) remitting ticket sales proceeds to the Promoter and/or Venue concerned.

B.     The open distribution and ticket authentication system required by Section IV.A must:

1.     facilitate the automated transfer of tickets/ticket barcodes for all primary tickets sold using third-party Primary Marketplaces and may not, in connection with any transfer and/or re-sale of tickets purchased through third-party Primary Marketplaces, require ticket purchasers to pay any additional fees or otherwise take materially burdensome or unnecessary additional actions, such as use of a Ticketmaster website, app, or account (provided that Ticketmaster may require Eligible Primary Ticketing Services Providers to pay fees in connection with such transfer and/or re-

sale intended to cover the costs of Ticketmaster Back-End, as verified by the monitor);

2.  be fully operational, implemented, and made available as a standalone product to Major Concert Venues within 275 days of entry of this Final Judgment (the "Ticketing Transition Deadline"); and

3.  be maintained by Ticketmaster such that it addresses any reasonable deficiencies identified by Defendants, Major Concert Venues, third-party Primary Marketplaces, the monitor, or the United States as necessary to accomplish the purposes of this Final Judgment.

C.      Ticketmaster must timely publish and update any documentation or other information necessary for Major Concert Venues or Eligible Primary Ticketing Services Providers to utilize the system described in Section IV.A.

D.      Ticketmaster must not use any contractual, pricing, technological, or other means to restrict Major Concert Venues' choice of Eligible Primary Ticketing Services Providers. Ticketmaster must allow Major Concert Venues to choose to use (1) solely Ticketmaster Back-End (and not any other product or service offered by Defendants, including Ticketmaster Marketplace) or (2) multiple Primary Ticketing Back-End systems.

E.      Ticketmaster is not required to integrate with any third-party marketplace that is not an Eligible Primary Ticketing Services Provider. Should Ticketmaster believe that a Major Concert Venue has asked it to integrate with a third-party marketplace that is not an Eligible Primary Ticketing Services Provider, it must immediately inform the monitor, who will promptly determine whether the third-party marketplace is an Eligible Primary Ticketing Services Provider. The monitor's determination as to whether the third-party marketplace is or is not an

13

Eligible Primary Ticketing Services Provider will be conclusive, subject to an application by the United States to the Court for a determination that the third-party marketplace is an Eligible Primary Ticketing Services Provider.

F.    Ticketmaster must not use any Client Ticketing Data collected via Ticketmaster Back-End from the transfer of tickets on third-party Primary Marketplaces for any purpose, other than in connection with the performance of services by Ticketmaster Back-End.

G.    For all Primary Ticketing Services contracts between Ticketmaster and a Major Concert Venue in effect as of the date of the entry of this Final Judgment, any and all contract terms that renew the contract or extend its term automatically are hereby waived and unenforceable. Ticketmaster must provide written notice of this provision to every Major Concert Venue to which it applies, in a form to be approved by the United States in its sole discretion, within 30 calendar days of entry of this Final Judgment. The United States may, in its sole discretion, grant Defendants additional time.

H.    No later than the Ticketing Transition Deadline, Ticketmaster must waive any exclusive Primary Marketplace ticketing requirements of any contract then in effect between a Major Concert Venue and Ticketmaster to allow the Major Concert Venue to use the Primary Marketplace of any other Eligible Primary Ticketing Services Provider for one Live Entertainment Event per year during each year remaining in its contract with Ticketmaster. The Major Concert Venue has the sole discretion to choose the events. Ticketmaster may not seek payment from any Major Concert Venue in connection with the Major Concert Venue's exercise of this provision. Ticketmaster must provide notice of this provision to every Major Concert Venue to which it is applicable in a form to be approved by the United States in its sole discretion.

I.     For any contract between Ticketmaster and any Major Concert Venue that, as of the entry of this Final Judgment, has at least four years remaining on its term (excluding any renewal or automatic extension terms that are waived in accordance with Section IV.G), Ticketmaster must, no later than the Ticketing Transition Deadline and on each one-year anniversary of the entry of the Final Judgment (until such point that fewer than four years remain on any such contract), provide that Venue the option to sell or distribute up to 20% of fee-bearing primary ticket inventory for Live Entertainment Events otherwise sellable by Ticketmaster through Eligible Primary Ticketing Services Providers for the remainder of the contract term, notwithstanding any exclusivity commitments made to Ticketmaster, provided that:

1.     Ticketmaster may require the Venue to agree to a pro rata adjustment to any economic arrangements under such contract or related contract that were associated with exclusivity of Primary Ticketing Services. In the event of irreconcilable disagreements between Ticketmaster and a Venue as to whether particular economic arrangements were associated with exclusivity of Primary Ticketing Services, such dispute will be submitted to the monitor for resolution, and the monitor's resolution will be binding on Defendants. For the avoidance of doubt, such adjustments may be implemented through reductions or offsets to ongoing or future payments or consideration under the contract.

2.     Any 20% allocation under this provision must be: (a) 20% of each section or tier, as determined by the Major Concert Venue equitably and in good faith; (b) 20% of Live Entertainment Events each year, with the events selected by the Major Concert Venue equitably and in good faith; or (c) a

15

combination of (a) and (b) totaling up to 20% of fee-bearing primary ticket inventory for Live Entertainment Events otherwise sellable by Ticketmaster at the applicable Major Concert Venue in that year.

3. Ticketmaster must provide notice of this provision to every Major Concert Venue to which it applies in a form to be approved by the United States in its sole discretion.

J. Upon entry of this Final Judgment, for any Live Entertainment Event at any Amphitheater that Live Nation owns, operates, or controls: (1) the Venue must allow any Promoter or Artist contracting after such date to present a Live Entertainment Event in such Venue to sell and distribute up to 50% of the fee-bearing primary ticket inventory for each section or tier in the Venue through the Primary Marketplace of any Eligible Primary Ticketing Services Provider that the Promoter or Artist chooses, without Ticketmaster charging any Ticket Service Fees on such tickets when sold through third-party Eligible Primary Ticketing Services Providers; and (2) on tickets it sells, Ticketmaster must not charge Ticket Service Fees that exceed 15% of the ticket face value. Ticketmaster may require third-party ticketing services providers to pay fees in connection with the distribution of tickets under this Section intended to cover the costs of Ticketmaster Back-End, as verified by the monitor.

K. Upon entry of this Final Judgment, Ticketmaster must not negotiate nor enter into any Primary Ticketing Services contracts with a Major Concert Venue inconsistent with the following requirements:

1. If Ticketmaster negotiates a Primary Ticketing Services contract with a Major Concert Venue, Ticketmaster must offer such Major Concert Venue the option to choose a fully or partially non-exclusive contract under

which all or a portion of the primary tickets (at the Major Concert Venue's election) are not exclusive to Ticketmaster. Such non-exclusive contracts may not use pricing schemes, pricing tiers, or other provisions that have the practical effect of Primary Ticketing Services exclusivity.

2. If Ticketmaster seeks to offer a fully exclusive contract, such contract may not have a term longer than four years. Any partial-exclusive contract with at least 20% of tickets not exclusive to Ticketmaster is not subject to the four-year maximum term applicable to fully exclusive agreements if (a) the Major Concert Venue, in writing, requests a longer term and/or (b) a competitor submits an offer for a longer term.

3. Ticketmaster will provide notice and a copy of this Final Judgment, in a form to be proposed by Defendants and approved by the United States in its sole discretion, to every Major Concert Venue with whom Ticketmaster discusses or negotiates the provision of any Primary Ticketing Services at the beginning of any such negotiation. The notice will include an explanation of the requirements of Section IV of this Final Judgment, a statement encouraging the Major Concert Venue to contact the Department of Justice and the monitor if they are or become aware of any potential violations of this Final Judgment, and a statement waiving any contractual limitation on what the Major Concert Venue may disclose to the monitor or a government agency as well as any obligation to provide notice to Defendants about any such contacts.

L.	Primary Ticketing Services contracts entered into during the term of this Final Judgment between Ticketmaster and a Major Concert Venue (including any renewals or extensions of existing contracts) must not: (a) contain any auto-renewal provisions; or (b) condition any terms on a Venue forgoing a Request for Proposals ("RFP") process or other competitive bidding process for Primary Ticketing Services.

## V.	Venue and Promotions

A.	Within 30 days of entry of this Final Judgment, unless the United States, in its sole discretion, grants Defendants additional time, Defendants must provide notice to the Venues listed in Table 1 (the "Divestiture Venues"), in a form approved by the United States in its sole discretion, that Defendants are required to, at the Divestiture Venues' election, do one of the following with respect to any and all contracts that relate to the provision of booking or promotion services and/or control or ownership interests at the Divestiture Venues: (1) terminate such contracts or (2) modify such existing contracts to bring them into compliance with all aspects of Section V.B.1 below on terms agreeable to Defendants and the Divestiture Venue. For avoidance of doubt, nothing herein prevents Defendants from terminating such contracts based on any doctrines excusing or discharging contractual obligations available at law or in equity.

| Table 1: Divestiture Venues | | |
|---|---|---|
| Wharf Amphitheater | Orange Beach | AL |
| Walmart AMP | Rogers | AR |
| Ford Idaho Center | Nampa | ID |
| Maine Savings Amphitheater | Bangor | ME |
| Pine Knob Music Theatre | Clarkston | MI |
| Brandon Amphitheater | Brandon | MS |
| Bethel Woods Center for the Arts | Bethel | NY |
| Empower FCU Amphitheater at Lakeview | Syracuse | NY |
| Riverbend Music Center | Cincinnati | OH |
| Germania Insurance Amphitheater | Austin | TX |
| Cynthia Woods Mitchell Pavilion | Woodlands | TX |
| BMO Pavilion | Milwaukee | WI |
| American Family Insurance Amphitheater | Milwaukee | WI |

B.    Following termination or modification of all applicable rights under any and all contracts pursuant to Section V.A:

1.    Defendants must not enter into any Preferred Booking Agreement with the Divestiture Venues, or otherwise acquire or exercise any form of ownership or control over the Divestiture Venues in any way (including control, but excluding administration without control, of the Divestiture Venues' booking calendar). For the avoidance of doubt, Defendants may not engage in Content Steering with respect to the Divestiture Venues.

19

2.      The owner or operator of any Divestiture Venue will be free to conduct a new ticketing RFP. Any Primary Ticketing Services contract offered by Defendants must conform to the requirements set forth in Section IV.K.

C.      Within 30 days of entry of this Final Judgment, at any Amphitheater owned, operated, or controlled by Defendants: (1) Defendants must abide by the Nondiscriminatory Calendar Procedures; (2) Defendants must not refuse an Artist access to such Amphitheater because the Artist has engaged a Promoter other than Defendants; and (3) Defendants must offer rental terms to Artists using a third-party Promoter for such Amphitheater that are, when taken as a whole and accounting for Venue-driven economic considerations (such as day of week, time of year, number of shows, popularity of the Artist, expected onsite revenue from concessions and VIP hospitality, historical performance of the Artist in similar Venues, etc.), at least as favorable as those offered to Artists that use Defendants as their Promoter for such Amphitheater to the extent Defendants control setting such terms at the Amphitheater.

D.      Upon entry of this Final Judgment, Defendants must not enter into any Preferred Booking Agreement with a Major Concert Venue.

E.      Within 30 days of entry of this Final Judgment, unless the United States, in its sole discretion, grants Defendants additional time, Defendants must provide notice, approved by the United States in its sole discretion, to all Major Concert Venues for which Defendants have a Preferred Booking Agreement that Defendants are required to, at the Venue's election, (1) terminate such Preferred Booking Agreement or (2) modify such Preferred Booking Agreement in a manner that renders the agreement no longer a Preferred Booking Agreement on terms agreeable to Defendants and the Venue.

F.      Defendants' Nondiscriminatory Calendar Procedures must be implemented by Live Nation in good faith and set forth in Live Nation's official, published, generally applicable booking calendar management policies, and may be updated by Live Nation provided such updates are consistent with the foregoing principles and other requirements of this Final Judgment and provided to the monitor.

## VI.    Anti-Conditioning, Anti-Retaliation, Anti-Content Steering, and other Provisions Designed to Promote Competition

A.      Defendants must not:

1.      Retaliate, in any way, against a Venue because it is known to Defendants that the Venue has contracted or is contemplating contracting with a company other than Defendants for Primary Ticketing Services;

2.      Condition or threaten to Condition (including via intermediaries) the provision of Live Entertainment Events to a Venue based on that Venue refraining from contracting with a company other than Defendants for Primary Ticketing Services;

3.      Condition or threaten to Condition the provision of Primary Ticketing Services to a Venue based on that Venue refraining from contracting with a company other than Defendants for the provision of Live Entertainment Events; or

4.      Engage in Content Steering with respect to Venues.

B.      For the avoidance of doubt, the prohibitions set forth in Section VI.A apply to the provision of one or more Live Entertainment Events at Venues. Defendants have waived any argument that the prohibitions set forth in Section VI.A only apply to all Live Entertainment

Events at Venues. For clarity, Plaintiffs need not identify particular Live Entertainment Events that have been withheld in order to prevail on a claim of Retaliation.

C.    Prior to opening or obtaining control over any Amphitheater, Defendants must report that fact to the monitor and state whether Defendants believe the Amphitheater is a Major Concert Venue.

D.    Defendants must not (1) engage in any conduct materially the same as conduct prohibited by another Section of this Final Judgment or designed to evade any obligation imposed by this Final Judgment; or (2) engage in any conduct that evades or frustrates the purposes of this Final Judgment.

## VII.    Firewalls

A.    Defendants must implement and maintain effective procedures to prevent any Client Ticketing Data from being shared with, disclosed to, or accessible by any Firewall Employee, except as expressly permitted by this Section VII.

B.    Defendants may disclose to a Firewall Employee only the Client Ticketing Data that concerns a specific event for which the Firewall Employee is involved in promotion or management of the Artist who will perform or did perform at the event, and only if Defendants do so on the same terms as generally provided to other Promoters or Artist managers not affiliated with Defendants. Defendants may disclose to an Exempted Employee only the Client Ticketing Data required for the Exempted Employee to perform his or her job function(s), provided, however, that such Exempted Employee may not use Client Ticketing Data to perform any job function(s) that primarily involve(s) the day-to-day operation or management of Defendants' businesses related to Venues, concert promotions, or Artist management services. Defendants may disclose Client Ticketing Data to any Defendant employee where so required by

law, government regulation, legal process, or court order, so long as such disclosure is limited to fulfillment of that purpose.

C.      Defendants must, within 30 calendar days of the entry of the Stipulation and Order, submit to the United States a compliance plan setting forth in detail the procedures Defendants propose to implement to effect compliance with this Section VII. The United States will inform Defendants within 15 business days of receipt whether, in its sole discretion, the United States approves or rejects Defendants' compliance plan. Within 15 business days of receiving a notice of rejection, Defendants must submit a revised compliance plan. The United States may request that the Court determine whether Defendants' proposed compliance plan fulfills the requirements of this Section VII.

D.      At minimum, an effective compliance plan must include, for all Firewall Employees: (1) initial written notice followed by quarterly written reminders; (2) training within 30 days of the date the compliance plan is approved, followed by training on a yearly basis; and (3) provision of written acknowledgment of the obligations of this Section VII within 30 days of the date the compliance plan is approved, followed by acknowledgment on a yearly basis. The form of all written notifications must be approved by the United States in its sole discretion.

E.      Defendants must maintain complete records of all written notices, training, employee acknowledgments, and all other efforts made to comply with this Section VII until one year after the expiration of this decree or any enforcement efforts or litigation brought by the United States or any Settling States that implicates this firewall, whichever is later.

**VIII.    Termination of Agreement with Oak View Group**

A.    Within 30 calendar days after the Court's entry of the Stipulation and Order, Defendants must terminate the Ticketing Services Incentive Agreement with Oak View Group dated July 1, 2022 ("Oak View Agreement").

B.    Within 60 calendar days of entry of this Final Judgment, for any Venue managed by Oak View Group that entered into a contract with Defendants on or after July 1, 2022 (excluding, for clarity, Venues that are owned in whole or part by Oak View Group), Defendants must: (1) disclose the existence and nature of the Oak View Agreement and all payments made to Oak View Group associated with the Oak View Agreement, including the $20 million payment of July 2022; and (2) at the option of the Venue, allow the Venue to conduct a new RFP process for any contract between the Venue and Defendants, including for Primary Ticketing Services, without penalty. Defendants must provide notice to Venues of the disclosure required by VIII.B.1 and the option to conduct a new RFP process under VIII.B.2 in a form approved by the United States in its sole discretion.

C.    To the extent Defendants are required under Section VIII.A to terminate rights to upfront payments or other financial considerations, nothing herein prevents Defendants from asserting any contract law or other claims or remedies to seek a pro rata adjustment to any ongoing or future payments or consideration to reflect the reduced scope of such rights or obligations.

D.    Defendants must not enter into any agreement with a Major Concert Venue's agent (including a third-party facility manager or other agent with authority, influence, or involvement regarding decisions to enter into Primary Ticketing Services contracts) that compensates or rewards the agent for converting any of the Major Concert Venue's existing

24

Primary Ticketing Services contracts into a new Primary Ticketing Services contract with Ticketmaster.

## IX.    Artist Transparency

A.    Upon entry of this Final Judgment, at an Artist's request, Defendants must provide the Artist with all data and information in Defendants' possession, custody, or control about purchasers of tickets for Live Entertainment Events performed by that Artist sold by Ticketmaster (e.g., ticket purchasers, number of tickets sold, location or type of tickets sold, ticket prices, sales proceeds) for such Artist's sole interests, subject to any restrictions, prohibitions, obligations, or other requirements arising under privacy laws applicable to Defendants and any commitments to purchasers of tickets with respect to the use of their data (collectively, "Privacy Obligations"). Defendants must not modify their privacy policies and/or practices in a manner that circumvents or frustrates their obligation described in this Section IX.A. Defendants may provide this information subject to standard privacy protection and a non-disclosure agreement, subject to approval by the United States in its sole discretion. Such non-disclosure agreement will not restrict the Artist's use of this data more than necessary, in the United States' sole discretion, to comply with Defendant's Privacy Obligations and reasonably protect any competitively sensitive information belonging to Defendants, which includes not directly sharing such information with Defendants' competitors or transferring the rights to the information, including to data aggregators.

B.    Defendants must provide notice to all Artists for which it maintains data or information covered by Section IX.A, that the information and data described in Section IX.A is available to them upon request, subject to the limitations in Section IX.A. Such notice must be in

a form acceptable to the United States in its sole discretion and must be transmitted to the Artist's manager, counsel, or representative (including of the estate of any deceased Artist).

### X.    Affidavits

A.    Within 30 calendar days of entry of this Final Judgment and every 60 calendar days thereafter until (1) the ticketing distribution enablement required by Section IV of this Final Judgment has been made available to Venues, and (2) the divestiture of the Divestiture Venues required by Section V of this Final Judgment is complete, Defendants must deliver to the United States an affidavit, signed by Live Nation's Chief Financial Officer and Executive Vice President for Corporate and Regulatory Affairs, that describes in reasonable detail all actions that Defendants have taken and all steps that Defendants have implemented to comply with Sections IV and V of this Final Judgment. The United States, in its sole discretion, may approve different signatories for the affidavits.

B.    If a Defendant makes any changes to actions and steps described in affidavits provided pursuant to Section X.A, the Defendant must, within 15 calendar days after any change is implemented, deliver to the United States an affidavit describing those changes.

C.    Defendants must keep all records of any efforts made to comply with Section IV until one year after the ticketing distribution enablement required by Section IV has been made available to Venues. Defendants must keep all records of any efforts made to comply with Section V until one year after the Venue divestitures required by Section V of this Final Judgment have been completed.

### XI.    Appointment of Monitor

A.    Upon application of the United States, which Defendants may not oppose, the Court will appoint a monitor selected by the United States in its sole discretion, after consultation

with the Settling States, and approved by the Court. The United States will select the same Person appointed by the Court as monitor pursuant to the Amended Final Judgment in *United States v. Ticketmaster Entertainment Inc. and Live Nation Entertainment Inc.*, No. 10-cv-139 (D.D.C.), unless that Person is unavailable or unable to accomplish the monitor's duties. If that Person is or becomes unavailable or unable to accomplish the monitor's duties, the United States will select and recommend a different monitor in its sole discretion, after consultation with the Settling States, for the Court's approval. Once approved, the court-appointed monitor should be considered by the United States and Defendants to be an arm and representative of the Court.

B.      The monitor will have the power and authority to monitor Defendants' compliance with the terms of this Final Judgment and the Stipulation and Order entered by the Court and will have other powers as the Court deems appropriate. The monitor will have no responsibility or obligation for the operation of Defendants' businesses. No attorney-client relationship will be formed between Defendants and the monitor.

C.      The monitor will have the authority to take such steps as, in the judgment of the monitor and the United States, may be necessary to accomplish the monitor's responsibilities. The monitor may seek information from Defendants' personnel, including in-house counsel, compliance personnel, and internal auditors. The monitor may require Defendants to produce documents, to submit signed affidavits, and to make employees available to sit for interviews. The monitor may require that such interviews be conducted under oath in the format of a deposition with a court reporter. Defendants must establish a policy, annually communicated to all employees, that employees may disclose any information to the monitor without reprisal for such disclosure. Defendants must not punish or take any adverse action against any employee or third party for disclosing information to the monitor.

D.      Defendants may not object to actions taken by the monitor in fulfillment of the monitor's responsibilities under any Order of the Court on any ground other than malfeasance by the monitor. Disagreements between the monitor and Defendants related to the scope of the monitor's responsibilities do not constitute malfeasance. Objections by Defendants must be conveyed in writing to the United States and the monitor within 20 calendar days of the monitor's action that gives rise to Defendants' objection, or the objection is waived.

E.      The monitor will serve at the cost and expense of Defendants pursuant to a written agreement, on terms and conditions, including confidentiality requirements and conflict of interest certifications, approved by the United States in its sole discretion. If the monitor and Defendants are unable to reach such a written agreement within 14 calendar days of the Court's appointment of the monitor, or if the United States, in its sole discretion, declines to approve the proposed written agreement, the United States, in its sole discretion, may take appropriate action, including making a recommendation to the Court, which may set the terms and conditions for the monitor's work, including compensation, costs, and expenses.

F.      The monitor may hire, at the cost and expense of Defendants, any agents and consultants, including investment bankers, attorneys, technical experts, and accountants, that are reasonably necessary in the monitor's judgment to assist with the monitor's duties. These agents or consultants will be directed by and solely accountable to the monitor and will serve on terms and conditions, including confidentiality requirements and conflict-of-interest certifications, approved by the United States in its sole discretion. Within three business days of hiring any agents or consultants, the monitor must provide written notice of the hiring and the rate of compensation to Defendants and the United States.

G.      The compensation of the monitor and agents or consultants retained by the monitor must be on reasonable and customary terms commensurate with the individuals' experience and responsibilities.

H.      The monitor must account for all costs and expenses incurred.

I.      Defendants' failure to promptly pay the monitor's accounted-for costs and expenses, including for agents and consultants, will constitute a violation of this Final Judgment and may result in sanctions. If Defendants make a timely objection in writing to the United States to any part of the monitor's accounted-for costs and expenses, Defendants must establish an escrow account into which Defendants must pay the disputed costs and expenses until the dispute is resolved.

J.      Defendants must use best efforts to cooperate fully with the monitor and to assist the monitor in monitoring Defendants' compliance with their obligations under this Final Judgment and the Stipulation and Order. Subject to reasonable protection for trade secrets, other confidential research, development, or commercial information (e.g., through use of a non-disclosure or confidentiality agreement), or any applicable privileges (e.g., privilege log), Defendants must provide the monitor and agents or consultants retained by the monitor with full and complete access to all personnel (current and former), agents, consultants, books, records, and facilities.

K.      Any disputes between Defendants and the monitor with respect to reasonable protection for trade secrets, other confidential research, development, or commercial information, or any applicable privileges will be decided by the United States in its sole discretion. Defendants may not take any action to interfere with or to impede accomplishment of the monitor's responsibilities.

L.      The monitor must investigate and report on Defendants' compliance with every provision of this Final Judgment and the Stipulation and Order, including by taking all actions necessary to monitor Defendants' compliance with the remedies set forth in Sections IV, V, and VI. The monitor must provide reports to the United States and Settling States, on a quarterly basis and as requested, setting forth Defendants' efforts to comply with their obligations under this Final Judgment and under the Stipulation and Order. In any proceeding in which the United States or a Settling State is a party, Defendants waive any argument that statements by the monitor are a public record or are statements of the United States or of any Settling State.

M.      Within 30 calendar days after appointment of the monitor by the Court, and on a yearly basis thereafter, the monitor must provide to the United States and Defendants a proposed written work plan. Defendants may provide comments on the proposed written work plan to the United States and the monitor within 14 calendar days after receipt, after which the monitor must produce a final work plan to the United States and Defendants, for approval by the United States in its sole discretion. Any disputes between Defendants and the monitor with respect to any written work plan will be decided by the United States in its sole discretion. The United States retains the right, in its sole discretion, to move the Court to require changes or additions to a work plan at any time.

N.      The monitor may communicate *ex parte* with the Court when, in the monitor's judgment, such communication is reasonably necessary to the monitor's duties under this Final Judgment, including if Defendants fail to pay the monitor's costs and expenses in a timely manner or otherwise violate this Final Judgment.

O.      The monitor will serve until this Final Judgment expires.

P.      If the United States determines that the monitor is not acting diligently or in a reasonably cost-effective manner, or if the monitor resigns or becomes unable to accomplish the monitor's duties, the United States may recommend that the Court appoint a substitute.

## XII.    Compliance Obligations

A.      <u>Antitrust Compliance Officer</u>. Defendants must appoint an Antitrust Compliance Officer, who must be an internal employee or officer of Defendants, subject to the following responsibilities and obligations:

1.      Defendants must appoint an Antitrust Compliance Officer within 21 days of entry of this Final Judgment and must identify to the United States the Antitrust Compliance Officer's name, business address, telephone number, and email address. Within 45 days of a vacancy in the Antitrust Compliance Officer position, Defendants must appoint a replacement and must identify to the United States the replacement Antitrust Compliance Officer's name, business address, telephone number, and email address. In all events, Defendants' appointment of any Antitrust Compliance Officer is subject to the approval of the United States in its sole discretion.

2.      The Antitrust Compliance Officer must be an active member in good standing of the bar in any U.S. jurisdiction and must have at least five years' experience in legal practice, including experience with antitrust, regulatory, or compliance matters.

3.      The Antitrust Compliance Officer must, directly or through the employees or counsel working under the Antitrust Compliance Officer's authority and direction: (a) within 21 days after the Antitrust Compliance Officer's

31

appointment, furnish to all of Defendants' Management and Relevant Employees a copy of this Final Judgment; (b) within 30 days after the Antitrust Compliance Officer's appointment, in a manner to be devised by Defendants and approved by the United States, provide Defendants' Management and Relevant Employees reasonable notice of the meaning and requirements of this Final Judgment.

4.    Twice during the first year, then annually thereafter, the Antitrust Compliance Officer must brief Defendants' Management and Relevant Employees on the meaning and requirements of this Final Judgment, with written materials for each briefing to be approved by the United States in its sole discretion.

5.    The Antitrust Compliance Officer must brief any person who becomes part of Management or a Relevant Employee within 60 days of such transition.

6.    The Antitrust Compliance Officer must obtain from each Person designated as Management or a Relevant Employee, within 30 days of that Person's receipt of this Final Judgment, a certification that the Person (a) has read and understands and agrees to abide by the terms of this Final Judgment; (b) is not aware of any violation of this Final Judgment that has not been reported to Defendants; and (c) understands that failure to comply with this Final Judgment may result in an enforcement action for civil or criminal contempt of court.

7.    The Antitrust Compliance Officer must communicate annually to Defendants' Management and Relevant Employees that they may disclose

to the Antitrust Compliance Officer or monitor, without reprisal or adverse consequence for such disclosure, information concerning any violation or potential violation of this Final Judgment or the U.S. antitrust laws by Defendants.

B.     <u>Reporting and Investigation Requirements</u>. Upon Management or the Antitrust Compliance Officer learning of any violation or potential violation of any provision of this Final Judgment, Defendants must:

1.     promptly notify the monitor and take appropriate action to investigate, and in the event of a violation, terminate or modify the activity so as to comply with this Final Judgment;

2.     within seven days, notify the United States of the violation or potential violation;

3.     maintain all documents related to any violation or potential violation of this Final Judgment for a period of five years or the duration of this Final Judgment, whichever is longer;

4.     maintain, and furnish to Plaintiffs upon request, a log of (a) all such documents for which Defendants claim protection under the attorney-client privilege or the attorney work product doctrine, and (b) all potential and actual violations, even if no documentary evidence regarding the violations exist;

5.     within thirty days, provide to the United States and the monitor a statement describing the violation or potential violation, which must include a description of any communications constituting the violation or

33

potential violation, including the date and place of the communication, the Persons involved, and the subject matter of the communication, as well as a description of the steps taken to mitigate or remediate any violation or potential violation.

C.    Defendants must establish a whistleblower protection policy, which must provide that any employee may disclose, without reprisal or adverse consequence for such disclosure, to the Antitrust Compliance Officer or the monitor information concerning any violation or potential violation by the Defendants of this Final Judgment or the U.S. antitrust laws.

D.    Defendants' CEO must certify in writing to the United States and the Settling States, 180 days after entry of this Final Judgment and thereafter annually on the anniversary date of the entry of this Final Judgment, that Defendants have complied with all provisions of this Final Judgment or that any violations or potential violations known to Management or the Antitrust Compliance Officer have been disclosed to the monitor and the United States.

E.    Defendants must maintain and produce to the United States upon request: (1) a list identifying all employees having received the compliance training required under Sections XII.A.4 and XII.A.5 of this Final Judgment and the dates on which the employees received the training; and (2) copies of all materials distributed as part of the annual antitrust compliance training required under Sections XII.A.4 and XII.A.5 of this Final Judgment. For all materials requested to be produced pursuant to this Section for which Defendants claim protection under the attorney-client privilege or the attorney work product doctrine, Defendants must furnish to the United States a privilege log.

**XIII.    Compliance Inspection**

A.    For the purposes of determining or securing compliance with this Final Judgment or related orders such as the Stipulation and Order, or for purposes of determining whether this Final Judgment should be modified or vacated, upon the written request of an authorized representative of the Assistant Attorney General for the Antitrust Division and reasonable notice to Defendants, Defendants must permit, from time to time and subject to legally recognized privileges, authorized representatives, including agents retained by the United States:

1.    to have access during Defendants' business hours to inspect and copy, or at the option of the United States, to require Defendants to provide electronic copies (without redactions or limitations of any kind except for attorney-client privilege or attorney work product) of, all books, ledgers, accounts, records, data, and documents, wherever located, in the possession, custody, or control of Defendants relating to any matters contained in this Final Judgment; and

2.    to interview, either informally or on the record, Defendants' officers, employees, or agents, wherever located, who may have their individual counsel present, relating to any matters contained in this Final Judgment. The interviews must be subject to the reasonable convenience of the interviewee and without restraint or interference by Defendants.

B.    Upon the written request of an authorized representative of the Assistant Attorney General for the Antitrust Division, Defendants must submit written reports or respond to written interrogatories, under oath if requested, relating to any matters contained in this Final Judgment.

35

C.    Each Settling State will have the same abilities provided by Sections XIII.A and XIII.B to investigate violations or potential violations involving a Venue or Live Entertainment Event located within 125 miles of that Settling State.

**XIV.    Notification**

A.    Starting 60 days after entry of the Stipulation and Order, unless a transaction is otherwise subject to the reporting and waiting period requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, 15 U.S.C. § 18a (the "HSR Act"), Defendants may not, without first providing at least 30 calendar days advance notification to the United States and each of the Settling States (an "Acquisition Notice"), directly or indirectly acquire all (or substantially all) of the assets located in the United States of, or any 20% or greater interest in, any Person engaged in providing ticketing services in the United States, any Promoter operating in the United States, and/or any Major Concert Venue located in the United States. Notwithstanding the foregoing, Defendants will not be required to provide to the United States or the Settling States any Acquisition Notice for: (1) acquisitions of additional interests in Persons in which Defendants already own a controlling interest; (2) acquisitions of real estate and ground and/or operating leases in connection with new Venue development projects; (3) the performance of purchase obligations that are included in existing contracts as of the entry of this Final Judgment; or (4) acquisitions of assets or interests in Persons located outside the United States that generated less than $15 million in annual revenue in the United States in each of the last two years.

B.    Defendants must provide the notification required by this Section XIV in the same format as, and in accordance with the instructions relating to, the Notification and Report Form set forth in the Appendix to Part 803 of Title 16 of the Code of Federal Regulations, as amended,

36

except Defendants will not be required to provide the information requested in the Additional Information section.

C.    Notification must include, beyond the information required by the instructions, the names of the principal representatives who negotiated the transaction on behalf of each party, and all management or strategic plans discussing the proposed transaction. If, within the 30 calendar days following notification, representatives of the United States make a written request for additional information, Defendants may not consummate the proposed transaction until 20 calendar days after submitting all requested information.

D.    Early termination of the waiting periods set forth in this Section may be requested and, where appropriate, granted in the same manner as is applicable under the requirements and provisions of the HSR Act and rules promulgated thereunder. This Section must be broadly construed, and any ambiguity or uncertainty relating to whether to file a notice under this Section must be resolved in favor of providing notice.

E.    For any merger, acquisition, or other transaction that is subject to the HSR Act and is of a Person that engaged in providing ticketing services in the United States, is a Promoter in the United States, and/or owns, operates, or controls a Major Concert Venue in the United States, Defendants must provide a copy of the HSR notification to the United States and to each of the Settling States at the same time Defendants make their required notification under the HSR Act.

F.    For purposes of this Final Judgment, any notice or other communication required to be provided to Plaintiffs will be sent to the Person at the address and emails set forth below (or such other addresses as a Plaintiff may specify in writing to Defendants):

United States
David Teslicko
Financial Services, Fintech, and Banking Section
U.S. Department of Justice, Antitrust Division
450 Fifth Street, NW, Suite 4000
Washington, D.C. 20530
David.Teslicko@usdoj.gov

Arkansas
Amanda Wentz
Senior Assistant Attorney General
Consumer Protection Division
Office of the Arkansas Attorney General
Bob R. Brooks Jr. Justice Building
101 West Capitol Avenue
Little Rock, Arkansas 72201
amanda.wentz@arkansasag.gov
consumer@arkansasag.gov

Iowa
Noah Goerlitz
Assistant Attorney General
Office of the Iowa Attorney General
1305 E. Walnut St.
Des Moines, IA 50319
noah.goerlitz@ag.iowa.gov

Mississippi
Crystal Utley Secoy
Director & Assistant Attorney General
Consumer Protection Division
Mississippi Attorney General's Office
Post Office Box 220
Jackson, Mississippi 39205
crystal.utley@ago.ms.gov

Lee Morris
Special Assistant Attorney General
Consumer Protection Division
Mississippi Attorney General's Office
Post Office Box 220
Jackson, Mississippi 39205
Lee.Morris@ago.ms.gov

Nebraska
Justin C. McCully
Assistant Attorney General
Consumer Protection Bureau
Office of the Nebraska Attorney General
1445 K St. Rm. 2115
Lincoln, Nebraska 68508
Justin.mccully@nebraska.gov

Oklahoma
Cameron Capps OBA No. 32742
Deputy Attorney General
Consumer Protection
Office of the Oklahoma Attorney General
313 N.E. 21st Street
Oklahoma City, Oklahoma 73105
Telephone: (405) 522-0858
Fax: (405) 522-0085
Cameron.Capps@oag.ok.gov

South Dakota
Jacob R. Dempsey
Assistant Attorney General
South Dakota Office of Attorney General
1302 East SD Highway 1889, Suite 1
Pierre SD, 57501
605-773-4425 (Direct Line)
Jacob.Dempsey@state.sd.us

## XV.    No Reacquisition

During the term of this Final Judgment, Defendants may not acquire or reacquire any part of, any interest in, or any form of control over any Divestiture Venue (including any control over event booking at any Divestiture Venue) without prior written authorization of the United States; provided, however, that this Section XV will not prohibit Defendants from booking or administering the calendar for Live Entertainment Events at such Divestiture Venues so long as control over event booking at such Divestiture Venue is not held by Defendants.

39

## XVI.    Public Disclosure

A.    No information or documents obtained pursuant to any provision in this Final Judgment, including reports the monitor provides to the United States or any Settling States pursuant to Section XI.L and any notifications or other information provided pursuant to Section XIV, may be divulged by the United States or by any Settling State to any person other than an authorized representative of the executive branch of the United States or an authorized representative of the Settling States, except in the course of legal proceedings to which the United States or a Settling State is a party, including grand-jury proceedings, for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

B.    In the event that the monitor receives a subpoena, court order, or other court process seeking or requiring production of information or documents obtained pursuant to any provision in this Final Judgment, including reports the monitor provides to the United States or any Settling States pursuant to Section XI.L or any notifications or other information provided pursuant to Section XIV, the monitor must notify the United States, Settling States, and Defendants immediately and prior to any disclosure, so that any of the parties may address such potential disclosure and, if necessary, pursue alternative legal remedies, including if deemed appropriate by Defendants, intervention in the relevant proceedings.

C.    In the event of a request by a third party, pursuant to the Freedom of Information Act, 5 U.S.C. § 552, or similar state disclosure laws for disclosure of information obtained pursuant to any provision of this Final Judgment, the United States will act in accordance with that statute and the Department of Justice regulations at 28 C.F.R. part 16, including the provision on confidential commercial information at 28 C.F.R. § 16.7, and the Settling States will act in accordance with their applicable disclosure laws. Defendants submitting information to the

40

Antitrust Division should designate the confidential commercial information portions of all applicable documents and information under 28 C.F.R. § 16.7. Designations of confidentiality expire 10 years after submission, "unless the submitter requests and provides justification for a longer designation period." *See* 28 C.F.R. § 16.7(b).

D.     If at the time that Defendants furnish information or documents to the United States and Settling States pursuant to any provision of this Final Judgment, Defendants represent and identify in writing information or documents for which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and Defendants mark each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure," the United States and the Settling States must give Defendants 10 calendar days' notice before divulging the material in any legal proceeding (other than a grand jury proceeding).

## XVII.     Retention of Jurisdiction

The Court retains jurisdiction to enable any party to this Final Judgment to apply to the Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## XVIII.     Enforcement of Final Judgment

A.     If at any time during the term of this Final Judgment, the United States or any Settling State determines in its sole discretion that Defendants have violated this Final Judgment, then the United States may re-open this proceeding to seek additional relief. Such additional relief may be ordered by this Court upon a finding by a preponderance of the evidence that this

41

Final Judgment did not redress the violations alleged in the Amended Complaint and restore competition.

B.    The United States and each Settling State retains and reserves all rights to enforce the provisions of this Final Judgment, including the right to seek an order of contempt from the Court. In a civil contempt action, a motion to show cause, or a similar action brought by the United States or any Settling State relating to an alleged violation of this Final Judgment, the United States or any Settling State may establish a violation of this Final Judgment and the appropriateness of a remedy therefor by a preponderance of the evidence, and Defendants waive any argument that a different standard of proof should apply.

C.    This Final Judgment should be interpreted to give full effect to the procompetitive purposes of the antitrust laws and to restore the competition the Amended Complaint alleges was harmed by the challenged conduct. Defendants may be held in contempt of, and the Court may enforce, any provision of this Final Judgment that, as interpreted by the Court in light of these procompetitive principles and applying ordinary tools of interpretation, is stated specifically and in reasonable detail, whether or not it is clear and unambiguous on its face. In any such interpretation, the terms of this Final Judgment should not be construed against either party as the drafter.

D.    In an enforcement proceeding in which the Court finds that Defendants have violated this Final Judgment, the United States, together with any Settling States, may apply to the Court for an extension of this Final Judgment, together with other relief that may be appropriate. In connection with a successful effort by the United States or any Settling State to enforce this Final Judgment against a Defendant, whether litigated or resolved before litigation, that Defendant must reimburse the United States, and any Settling State that brought or joined

said enforcement proceeding, for the fees and expenses of its attorneys, as well as all other costs including experts' fees, incurred in connection with that effort to enforce this Final Judgment, including in connection with the investigation of the potential violation.

E.      For violations involving Major Concert Venues, Defendants will pay a penalty of $5,000,000 per violation of this Final Judgment, payable to the United States of America. For the avoidance of doubt, for conduct in violation of Section VI, multiple threats to Condition content directed to the same Venue during the same contracting cycle would amount to a single violation, but any of the following will amount to independent violations: acts directed toward different Venues; acts occurring in different contracting cycles; conduct concerning different Artists.

F.      For a period of four years following the expiration of this Final Judgment, if the United States has evidence that Defendants violated this Final Judgment before it expired, the United States may file an action against Defendants in this Court requesting that the Court order: (1) Defendants to comply with the terms of this Final Judgment for an additional term of at least four years following the filing of the enforcement action; (2) all appropriate contempt remedies; (3) additional relief needed to ensure the Defendants comply with the terms of this Final Judgment; and (4) fees or expenses as called for by this Section XVIII.

## XIX.    State-Specific Provisions

A.      Defendants must pay to the Settling States the corresponding amounts set forth in the table below ("Settlement Payments"). These payments are to resolve claims for monetary relief and/or civil penalties alleged in the Amended Complaint by certain states, including but not limited to claims brought by states in their *parens patriae* capacities on behalf of natural persons in their respective states. Notice and claims administration costs, taxes, any award of attorneys' fees and expenses to such states, or other payments authorized by the Court directly related to

consumer redress in such states, must also be paid by the Defendants and will not thereby reduce any Settling State's Settlement Payment. More specifically, Defendants agree to make the following payments to the following Settling States:

| State | Amount |
|---|---|
| Arkansas | $3,548,637.22 |
| Iowa | $3,000,000.00 |
| Mississippi | $2,780,037.76 |
| Nebraska | $3,588,759.96 |
| Oklahoma | $4,967,661.87 |
| South Dakota | $677,920.00 |

B.    In consideration of the monetary provisions and commitments contained in Section XIX.A, to the extent allowable by law and as of the date this Final Judgment is entered by the Court, the Settling States agree to fully, finally, and forever release Defendants from all claims that were expressly stated in the Amended Complaint.

C.    The Settlement Payment may be used for any one or more of the following purposes, by the Settling States as they, in their sole discretion, see fit:

1.    For payment of attorneys' fees and expenses, including, without limitation, reimbursement of grants received;

2.    For the enforcement of antitrust or consumer protection law;

3.    For deposit into a state antitrust or consumer protection account (e.g., revolving account, trust account), for use in accordance with the state laws governing that account;

4.    For deposit into a fund exclusively dedicated to assisting state attorneys general enforce the antitrust and consumer protection laws by defraying the costs of (a) experts, economists, and consultants in multistate antitrust investigations and litigation, (b) training or continuing education in antitrust for attorneys in state attorney general offices, or (c) information management systems used in multistate antitrust investigations and litigation; or

5.    For any other purpose as the Attorney General of each Settling State deems appropriate and consistent with or required by, the various states' laws.

## XX.    Expiration of Final Judgment

Unless the Court grants an extension, this Final Judgment will expire on the date that is eight years from the date of its entry. Notwithstanding the foregoing or anything to the contrary in this Final Judgment, upon the closing of a sale or divestiture by Live Nation Entertainment, Inc. of the Ticketmaster business or substantially all of the assets thereof, Sections VI.A, VI.B, and VII will be deemed to have expired, while all other provisions will continue in full force and effect.

## XXI.    Reservation of Rights

This Final Judgment terminates only the claims by the United States and the Settling States expressly stated in the Amended Complaint against Defendants and does not affect other charges or claims the United States or Settling States have filed or may file. The United States and the Settling States retain all rights to investigate and prosecute, under all applicable laws, any federal, state, or local claims against Defendants, whether civil or criminal, other than the

claims expressly stated in the Amended Complaint. The claims of State Plaintiffs that are not Settling States are unaffected by this Final Judgment.

## XXII.    Public Interest Determination

The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including by making available to the public copies of this Final Judgment and the Competitive Impact Statement, public comments thereon, and any response to comments by the United States. Based upon the record before the Court, which includes the Competitive Impact Statement and, if applicable, any comments and response to comments filed with the Court, entry of this Final Judgment is in the public interest.


Date: _____

[Court approval subject to procedures of Antitrust Procedures and Penalties Act, 15 U.S.C. § 16]


_____

Hon. Arun Subramanian
United States District Judge

## <u>Schedule A</u>

<u>Excluded Entities</u>

1.  Roc Nation LLC, and all of its subsidiaries.

2.  VEEPS Inc., and all of its subsidiaries.

### Schedule B

Initial List of Major Concert Venues

| Venue name | City | State | Venue type |
|---|---|---|---|
| ALPINE VALLEY MUSIC THEATRE | EAST TROY | WI | AMPHITHEATER |
| AMERICAN FAMILY INSURANCE AMPHITHEATER | MILWAUKEE | WI | AMPHITHEATER |
| AMERIS BANK AMPHITHEATRE | ALPHARETTA | GA | AMPHITHEATER |
| ARTPARK OUTDOOR AMPHITHEATER | LEWISTON | NY | AMPHITHEATER |
| ATRIUM HEALTH AMPHITHEATER | MACON | GA | AMPHITHEATER |
| AZURA AMPHITHEATER | BONNER SPRINGS | KS | AMPHITHEATER |
| BACK WATERS STAGE | DUBUQUE | IA | AMPHITHEATER |
| BANKNH PAVILION | GILFORD | NH | AMPHITHEATER |
| BANKPLUS AMPHITHEATER AT SNOWDEN GROVE | SOUTHAVEN | MS | AMPHITHEATER |
| BETHEL WOODS CENTER FOR THE ARTS | BETHEL | NY | AMPHITHEATER |
| BLACK OAK MOUNTAIN AMPHITHEATER | LAMPE | MO | AMPHITHEATER |
| BLOSSOM MUSIC CENTER | CUYAHOGA FALLS | OH | AMPHITHEATER |
| BMO PAVILION | MILWAUKEE | WI | AMPHITHEATER |
| BRANDON AMPHITHEATER | BRANDON | MS | AMPHITHEATER |
| CASCADES AMPHITHEATER | RIDGEFIELD | WA | AMPHITHEATER |
| CCNB AMPHITHEATRE AT HERITAGE PARK | SIMPSONVILLE | SC | AMPHITHEATER |
| COASTAL CREDIT UNION MUSIC PARK | RALEIGH | NC | AMPHITHEATER |
| CONCRETE STREET AMPHITHEATER | CORPUS CHRISTI | TX | AMPHITHEATER |
| CONSTELLATION BRANDS MARVIN SANDS PERFORMING ARTS CENTER (CMAC) | CANANDAIGUA | NY | AMPHITHEATER |
| CREDIT ONE STADIUM | CHARLESTON | SC | AMPHITHEATER |
| CREDIT UNION 1 AMPHITHEATRE | TINLEY PARK | IL | AMPHITHEATER |
| CYNTHIA WOODS MITCHELL PAVILION | THE WOODLANDS | TX | AMPHITHEATER |
| DARIEN LAKE AMPHITHEATER | DARIEN CENTER | NY | AMPHITHEATER |
| DOS EQUIS PAVILION | DALLAS | TX | AMPHITHEATER |
| EMPOWER FCU AMPHITHEATER AT LAKEVIEW | SYRACUSE | NY | AMPHITHEATER |
| FIDDLER'S GREEN AMPHITHEATRE | GREENWOOD VILLAGE | CO | AMPHITHEATER |
| FIVEPOINT AMPHITHEATRE | IRVINE | CA | AMPHITHEATER |
| FORD AMPHITHEATER | COLORADO SPRINGS | CO | AMPHITHEATER |
| FORD IDAHO CENTER AMPHITHEATER | NAMPA | ID | AMPHITHEATER |
| FOREST HILLS STADIUM | NEW YORK | NY | AMPHITHEATER |
| FPL SOLAR AMPHITHEATER AT BAYFRONT PARK | MIAMI | FL | AMPHITHEATER |
| FREEDOM MORTGAGE PAVILION | CAMDEN | NJ | AMPHITHEATER |

48

| | | | |
|---|---|---|---|
| FROST AMPHITHEATER | STANFORD | CA | AMPHITHEATER |
| GERMANIA INSURANCE AMPHITHEATER | AUSTIN | TX | AMPHITHEATER |
| GLEN HELEN AMPHITHEATER | SAN BERNARDINO | CA | AMPHITHEATER |
| GORGE AMPHITHEATRE | QUINCY | WA | AMPHITHEATER |
| HAYDEN HOMES AMPHITHEATER | BEND | OR | AMPHITHEATER |
| HERSHEYPARK STADIUM | HERSHEY | PA | AMPHITHEATER |
| HOLLYWOOD BOWL | LOS ANGELES | CA | AMPHITHEATER |
| HOLLYWOOD CASINO AMPHITHEATRE | MARYLAND HEIGHTS | MO | AMPHITHEATER |
| HUNTINGTON BANK PAVILION AT NORTHERLY ISLAND | CHICAGO | IL | AMPHITHEATER |
| ISLETA AMPHITHEATER | ALBUQUERQUE | NM | AMPHITHEATER |
| ITHINK FINANCIAL AMPHITHEATRE | WEST PALM BEACH | FL | AMPHITHEATER |
| JIFFY LUBE LIVE | BRISTOW | VA | AMPHITHEATER |
| LAKE TAHOE OUTDOOR ARENA | STATELINE | NV | AMPHITHEATER |
| LAKEWOOD AMPHITHEATER | ATLANTA | GA | AMPHITHEATER |
| LAURIDSEN AMPHITHEATER | DES MOINES | IA | AMPHITHEATER |
| MAINE SAVINGS AMPHITHEATER | BANGOR | ME | AMPHITHEATER |
| MAINE SAVINGS PAVILION AT ROCK ROW | WESTBROOK | ME | AMPHITHEATER |
| MERCEDES-BENZ AMPHITHEATER | TUSCALOOSA | AL | AMPHITHEATER |
| MERRIWEATHER POST PAVILION | COLUMBIA | MD | AMPHITHEATER |
| MIDFLORIDA CREDIT UNION AMPHITHEATRE | TAMPA | FL | AMPHITHEATER |
| NORTH ISLAND CREDIT UNION AMPHITHEATRE | CHULA VISTA | CA | AMPHITHEATER |
| NORTHWELL AT JONES BEACH THEATER | WANTAGH | NY | AMPHITHEATER |
| OAK MOUNTAIN AMPHITHEATRE | PELHAM | AL | AMPHITHEATER |
| OZARKS AMPHITHEATER | CAMDENTON | MO | AMPHITHEATER |
| PACIFIC AMPHITHEATRE | COSTA MESA | CA | AMPHITHEATER |
| PINE KNOB MUSIC THEATRE | CLARKSTON | MI | AMPHITHEATER |
| PNC BANK ARTS CENTER | HOLMDEL | NJ | AMPHITHEATER |
| PNC MUSIC PAVILION | CHARLOTTE | NC | AMPHITHEATER |
| RED ROCKS AMPHITHEATRE | MORRISON | CO | AMPHITHEATER |
| RIVERBEND MUSIC CENTER | CINCINNATI | OH | AMPHITHEATER |
| RUOFF MUSIC CENTER | NOBLESVILLE | IN | AMPHITHEATER |
| SARATOGA PERFORMING ARTS CENTER | SARATOGA SPRINGS | NY | AMPHITHEATER |
| SHORELINE AMPHITHEATRE | MOUNTAIN VIEW | CA | AMPHITHEATER |
| TALKING STICK RESORT AMPHITHEATRE | PHOENIX | AZ | AMPHITHEATER |
| TD PAVILION AT THE MANN | PHILADELPHIA | PA | AMPHITHEATER |
| THE BAYCARE SOUND | CLEARWATER | FL | AMPHITHEATER |
| THE MILL TERRE HAUTE | TERRE HAUTE | IN | AMPHITHEATER |
| THE ORION AMPHITHEATER | HUNTSVILLE | AL | AMPHITHEATER |
| THE PAVILION AT MONTAGE MOUNTAIN | SCRANTON | PA | AMPHITHEATER |

| | | | |
|---|---|---|---|
| THE PAVILION AT STAR LAKE | BURGETTSTOWN | PA | AMPHITHEATER |
| THE PAVILION AT TOYOTA MUSIC FACTORY | IRVING | TX | AMPHITHEATER |
| THE RADY SHELL AT JACOBS PARK | SAN DIEGO | CA | AMPHITHEATER |
| THE SOUND AMPHITHEATER | GAUTIER | MS | AMPHITHEATER |
| THE WALMART AMP | ROGERS | AR | AMPHITHEATER |
| THE WHARF AMPHITHEATER | ORANGE BEACH | AL | AMPHITHEATER |
| THE XFINITY CENTER | MANSFIELD | MA | AMPHITHEATER |
| TOM MOFFATT WAIKIKI SHELL | HONOLULU | HI | AMPHITHEATER |
| TOYOTA AMPHITHEATRE | WHEATLAND | CA | AMPHITHEATER |
| TOYOTA PAVILION AT CONCORD | CONCORD | CA | AMPHITHEATER |
| UTAH FIRST CREDIT UNION AMPHITHEATRE | WEST VALLEY CITY | UT | AMPHITHEATER |
| VETERANS UNITED HOME LOANS AMPHITHEATER | VIRGINIA BEACH | VA | AMPHITHEATER |
| WESTVILLE MUSIC BOWL | NEW HAVEN | CT | AMPHITHEATER |
| WHITE RIVER AMPHITHEATRE | AUBURN | WA | AMPHITHEATER |
| WILLIAM RANDOLPH HEARST GREEK THEATRE | BERKELEY | CA | AMPHITHEATER |
| XFINITY THEATRE | HARTFORD | CT | AMPHITHEATER |
| ACRISURE ARENA | THOUSAND PALMS | CA | ARENA |
| ADDITION FINANCIAL ARENA | ORLANDO | FL | ARENA |
| ALERUS CENTER | GRAND FORKS | ND | ARENA |
| ALLEN COUNTY WAR MEMORIAL COLISEUM | FORT WAYNE | IN | ARENA |
| ALLIANT ENERGY POWERHOUSE | CEDAR RAPIDS | IA | ARENA |
| ALLSTATE ARENA | ROSEMONT | IL | ARENA |
| AMALIE ARENA | TAMPA | FL | ARENA |
| AMERANT BANK ARENA | SUNRISE | FL | ARENA |
| AMERICAN AIRLINES CENTER | DALLAS | TX | ARENA |
| AMERICAN BANK CENTER | CORPUS CHRISTI | TX | ARENA |
| AMICA MUTUAL PAVILION | PROVIDENCE | RI | ARENA |
| ANGEL OF THE WINDS ARENA | EVERETT | WA | ARENA |
| BALL ARENA | DENVER | CO | ARENA |
| BARCLAYS CENTER | NEW YORK | NY | ARENA |
| BERT OGDEN ARENA | EDINBURG | TX | ARENA |
| BILL GRAHAM CIVIC AUDITORIUM | SAN FRANCISCO | CA | ARENA |
| BLUE CROSS ARENA | ROCHESTER | NY | ARENA |
| BMO HARRIS BRADLEY CENTER | MILWAUKEE | WI | ARENA |
| BOJANGLES COLISEUM | CHARLOTTE | NC | ARENA |
| BOK CENTER | TULSA | OK | ARENA |
| BON SECOURS WELLNESS ARENA | GREENVILLE | SC | ARENA |
| BRIDGESTONE ARENA | NASHVILLE | TN | ARENA |

| | | | |
|---|---|---|---|
| BROADMOOR WORLD ARENA | COLORADO SPRINGS | CO | ARENA |
| BROOKSHIRE GROCERY ARENA | BOSSIER CITY | LA | ARENA |
| BRYCE JORDAN CENTER | STATE COLLEGE | PA | ARENA |
| CADENCE BANK ARENA | TUPELO | MS | ARENA |
| CAJUNDOME | LAFAYETTE | LA | ARENA |
| CAPITAL ONE ARENA | WASHINGTON | DC | ARENA |
| CFG BANK ARENA | BALTIMORE | MD | ARENA |
| CHAIFETZ ARENA | ST LOUIS | MO | ARENA |
| CHARLESTON COLISEUM & CONVENTION CENTER | CHARLESTON | WV | ARENA |
| CHARTWAY ARENA | NORFOLK | VA | ARENA |
| CHASE CENTER | SAN FRANCISCO | CA | ARENA |
| CHI HEALTH CENTER OMAHA | OMAHA | NE | ARENA |
| CLIMATE PLEDGE ARENA | SEATTLE | WA | ARENA |
| COLISEO DE PUERTO RICO JOSÉ MIGUEL AGRELOT | SAN JUAN | PR | ARENA |
| COLONIAL LIFE ARENA | COLUMBIA | SC | ARENA |
| COLUMBUS CIVIC CENTER | COLUMBUS | GA | ARENA |
| CREDIT UNION 1 ARENA | CHICAGO | IL | ARENA |
| CROSS INSURANCE ARENA | PORTLAND | ME | ARENA |
| CROSS INSURANCE CENTER | BANGOR | ME | ARENA |
| CRYPTO.COM ARENA | LOS ANGELES | CA | ARENA |
| DCU CENTER | WORCESTER | MA | ARENA |
| DELTA CENTER | SALT LAKE CITY | UT | ARENA |
| DENNY SANFORD PREMIER CENTER | SIOUX FALLS | SD | ARENA |
| DESERT DIAMOND ARENA | GLENDALE | AZ | ARENA |
| DICKIES ARENA | FORT WORTH | TX | ARENA |
| DIGNITY HEALTH ARENA | BAKERSFIELD | CA | ARENA |
| DON HASKINS CENTER | EL PASO | TX | ARENA |
| DONALD L. TUCKER CIVIC CENTER | TALLAHASSEE | FL | ARENA |
| EAGLEBANK ARENA | FAIRFAX | VA | ARENA |
| ENMARKET ARENA | SAVANNAH | GA | ARENA |
| ENTERPRISE CENTER | ST LOUIS | MO | ARENA |
| EXTRAMILE ARENA | BOISE | ID | ARENA |
| FAMILY ARENA | ST CHARLES | MO | ARENA |
| FEDEXFORUM | MEMPHIS | TN | ARENA |
| FIRST HORIZON COLISEUM | GREENSBORO | NC | ARENA |
| FIRST INTERSTATE ARENA | BILLINGS | MT | ARENA |
| FISERV FORUM | MILWAUKEE | WI | ARENA |
| FORD CENTER | EVANSVILLE | IN | ARENA |
| FORD IDAHO CENTER ARENA | NAMPA | ID | ARENA |
| FRANK ERWIN CENTER | AUSTIN | TX | ARENA |
| FREEMAN COLISEUM | SAN ANTONIO | TX | ARENA |

| | | | |
|---|---|---|---|
| FROST BANK CENTER | SAN ANTONIO | TX | ARENA |
| GAINBRIDGE FIELDHOUSE | INDIANAPOLIS | IN | ARENA |
| GAS SOUTH ARENA | DULUTH | GA | ARENA |
| GIANT CENTER | HERSHEY | PA | ARENA |
| GOLDEN 1 CENTER | SACRAMENTO | CA | ARENA |
| GREAT SOUTHERN BANK ARENA | SPRINGFIELD | MO | ARENA |
| H-E-B CENTER AT CEDAR PARK | CEDAR PARK | TX | ARENA |
| HAMPTON COLISEUM | HAMPTON | VA | ARENA |
| HERITAGE BANK CENTER | CINCINNATI | OH | ARENA |
| HERTZ ARENA | ESTERO | FL | ARENA |
| HONDA CENTER | ANAHEIM | CA | ARENA |
| HUNTINGTON CENTER | TOLEDO | OH | ARENA |
| INTRUST BANK ARENA | WICHITA | KS | ARENA |
| INTUIT DOME | INGLEWOOD | CA | ARENA |
| JIM WHELAN BOARDWALK HALL | ATLANTIC CITY | NJ | ARENA |
| JOE LOUIS ARENA | DETROIT | MI | ARENA |
| JOHN PAUL JONES ARENA | CHARLOTTESVILLE | VA | ARENA |
| KASEYA CENTER | MIAMI | FL | ARENA |
| KEYBANK CENTER | BUFFALO | NY | ARENA |
| KFC YUM! CENTER | LOUISVILLE | KY | ARENA |
| KIA CENTER | ORLANDO | FL | ARENA |
| LA CROSSE CENTER | LA CROSSE | WI | ARENA |
| LANDERS CENTER | SOUTHAVEN | MS | ARENA |
| LEGACY ARENA | BIRMINGHAM | AL | ARENA |
| LENOVO CENTER | RALEIGH | NC | ARENA |
| LITTLE CAESARS ARENA | DETROIT | MI | ARENA |
| MABEE CENTER | TULSA | OK | ARENA |
| MADISON SQUARE GARDEN | NEW YORK | NY | ARENA |
| MASSMUTUAL CENTER | SPRINGFIELD | MA | ARENA |
| MAVERIK CENTER | WEST VALLEY CITY | UT | ARENA |
| MGM GRAND GARDEN ARENA | LAS VEGAS | NV | ARENA |
| MICHELOB ULTRA ARENA | LAS VEGAS | NV | ARENA |
| MISSISSIPPI COAST COLISEUM | BILOXI | MS | ARENA |
| MISSISSIPPI COLISEUM | JACKSON | MS | ARENA |
| MODA CENTER | PORTLAND | OR | ARENA |
| MOHEGAN ARENA AT CASEY PLAZA | WILKES BARRE | PA | ARENA |
| MOHEGAN SUN ARENA | UNCASVILLE | CT | ARENA |
| MOODY CENTER | AUSTIN | TX | ARENA |
| MVP ARENA | ALBANY | NY | ARENA |
| NASHVILLE MUNICIPAL AUDITORIUM | NASHVILLE | TN | ARENA |
| NASSAU VETERANS MEMORIAL COLISEUM | UNIONDALE | NY | ARENA |
| NATIONWIDE ARENA | COLUMBUS | OH | ARENA |

| | | | |
|---|---|---|---|
| NEAL S BLAISDELL ARENA | HONOLULU | HI | ARENA |
| NORTH CHARLESTON COLISEUM | NORTH CHARLESTON | SC | ARENA |
| NRG ARENA | HOUSTON | TX | ARENA |
| NUTTER CENTER | DAYTON | OH | ARENA |
| OAKLAND ARENA | OAKLAND | CA | ARENA |
| ORLEANS ARENA | LAS VEGAS | NV | ARENA |
| PAYCOM CENTER | OKLAHOMA CITY | OK | ARENA |
| PECHANGA ARENA | SAN DIEGO | CA | ARENA |
| PENSACOLA BAY CENTER | PENSACOLA | FL | ARENA |
| PEORIA CIVIC CENTER ARENA | PEORIA | IL | ARENA |
| PETERSEN EVENTS CENTER | PITTSBURGH | PA | ARENA |
| PHX ARENA | PHOENIX | AZ | ARENA |
| PINNACLE BANK ARENA | LINCOLN | NE | ARENA |
| PPG PAINTS ARENA | PITTSBURGH | PA | ARENA |
| PPL CENTER | ALLENTOWN | PA | ARENA |
| PROPST ARENA | HUNTSVILLE | AL | ARENA |
| PRUDENTIAL CENTER | NEWARK | NJ | ARENA |
| RAISING CANE'S RIVER CENTER ARENA | BATON ROUGE | LA | ARENA |
| RESCH CENTER | GREEN BAY | WI | ARENA |
| RICHMOND COLISEUM | RICHMOND | VA | ARENA |
| ROCKET ARENA | CLEVELAND | OH | ARENA |
| RUPP ARENA | LEXINGTON | KY | ARENA |
| SAMES AUTO ARENA | LAREDO | TX | ARENA |
| SAP CENTER AT SAN JOSE | SAN JOSE | CA | ARENA |
| SAVE MART CENTER | FRESNO | CA | ARENA |
| SCHOTTENSTEIN CENTER | COLUMBUS | OH | ARENA |
| SIMMONS BANK ARENA | NORTH LITTLE ROCK | AR | ARENA |
| SMOOTHIE KING CENTER | NEW ORLEANS | LA | ARENA |
| SNHU ARENA | MANCHESTER | NH | ARENA |
| SPECTRUM CENTER | CHARLOTTE | NC | ARENA |
| SPHERE | LAS VEGAS | NV | ARENA |
| SPOKANE ARENA | SPOKANE | WA | ARENA |
| STATE FARM ARENA | ATLANTA | GA | ARENA |
| STATE FARM CENTER | CHAMPAIGN | IL | ARENA |
| T-MOBILE ARENA | LAS VEGAS | NV | ARENA |
| T-MOBILE CENTER | KANSAS CITY | MO | ARENA |
| TACOMA DOME | TACOMA | WA | ARENA |
| TARGET CENTER | MINNEAPOLIS | MN | ARENA |
| TD GARDEN | BOSTON | MA | ARENA |
| THE ARMORY | MINNEAPOLIS | MN | ARENA |
| THE FORD WYOMING CENTER | CASPER | WY | ARENA |
| THE KIA FORUM | INGLEWOOD | CA | ARENA |

| | | | |
|---|---|---|---|
| THE LIACOURAS CENTER | PHILADELPHIA | PA | ARENA |
| THE PALACE OF AUBURN HILLS | AUBURN HILLS | MI | ARENA |
| THE SANTANDER ARENA | READING | PA | ARENA |
| THOMPSON-BOLING ARENA AT FOOD CITY CENTER | KNOXVILLE | TN | ARENA |
| TOYOTA ARENA | ONTARIO | CA | ARENA |
| TOYOTA CENTER | HOUSTON | TX | ARENA |
| UBS ARENA | ELMONT | NY | ARENA |
| UNITED CENTER | CHICAGO | IL | ARENA |
| UNITED SUPERMARKETS ARENA | LUBBOCK | TX | ARENA |
| UNO LAKEFRONT ARENA | NEW ORLEANS | LA | ARENA |
| VAN ANDEL ARENA | GRAND RAPIDS | MI | ARENA |
| VETERANS MEMORIAL COLISEUM | PORTLAND | OR | ARENA |
| VETERANS MEMORIAL COLISEUM | MADISON | WI | ARENA |
| VIBRANT ARENA AT THE MARK | MOLINE | IL | ARENA |
| VIEJAS ARENA | SAN DIEGO | CA | ARENA |
| VYSTAR VETERANS MEMORIAL ARENA | JACKSONVILLE | FL | ARENA |
| WELLS FARGO ARENA | DES MOINES | IA | ARENA |
| WELLS FARGO CENTER | PHILADELPHIA | PA | ARENA |
| WINTRUST ARENA | CHICAGO | IL | ARENA |
| WOLSTEIN CENTER | CLEVELAND | OH | ARENA |
| XCEL ENERGY CENTER | ST PAUL | MN | ARENA |
| XL CENTER | HARTFORD | CT | ARENA |
| YUENGLING CENTER | TAMPA | FL | ARENA |