**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | |
| *Plaintiffs,* | |
| v. | Case No. 1:24-cv-03973-(AS) |
| LIVE NATION ENTERTAINMENT, INC., and TICKETMASTER LLC, | |
| *Defendants* | |

**MOTION FOR LEAVE TO FILE BRIEF OF ECONOMISTS AS *AMICI CURIAE* IN OPPOSITION TO DEFENDANTS' RULE 50(b) MOTION FOR JUDGEMENT AS A MATTER OF LAW ON DAMAGES**

The proposed *amici* respectfully request leave to file the proposed *amicus curiae* brief, attached as Exhibit A, in opposition to the defendants' Rule 50(b) Motion for Judgement as a Matter of Law on Damages (Dkt. No. 1403 §VI, April 8, 2026). The proposed *amici* are economists who can opine on foundational concepts that will be helpful to this Court's disposition of the motion.  Specifically, the proposed *amici* explain the economic concepts behind Dr. Abramets-Metz's damages calculations; namely the foundational principle that fixed costs are not used to set the marginal price, and the implications of miscalculating the passthrough.

In response to our request for consent to this motion for leave to file, Live Nation responded that "Live Nation takes no position on this motion, but if the Court is inclined to grant, Live Nation requests an opportunity to file a responsive brief of equal length." A proposed order is attached as Exhibit B.

## I.      STANDARD FOR MOTION FOR LEAVE TO APPEAR AS *AMICI CURIAE*

"District courts have broad discretion to permit or deny the appearance of *amici curiae* in a given case." *Kearns v. Cuomo*, 2019 U.S. Dist. LEXIS 175384, *13 (S.D.N.Y. Oct. 19, 2019) (quoting *United States v. Ahmed*, 788 F. Supp. 196, 198 n.1 (S.D.N.Y. 1992), *aff'd*, 980 F.2d 161 (2d Cir. 1992)).  Because the Federal Rules of Civil Procedure do not include rules governing amicus briefs, courts look to the Federal Rules of Appellate Procedure, which provide that "a court may grant leave to appear as an *amicus* if the information offered is 'timely and useful.'" *Lehman XS Trust, Series 2006-GP2 v. Greenpoint Mortg. Funding, Inc.*, 2014 U.S. Dist. LEXIS 11179, *6, 2014 WL 265784 (S.D.N.Y. Jan. 23 2014) (citing Fed. R. App. P. 29(a)).

Amicus briefs are welcomed by courts when the [proposed] "amicus has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide." *Auto. Club of N.Y., Inc. v. Port* Auth, 11 Civ. 6746, 2011 U.S. Dist. LEXIS 135391) (S.D.N.Y. Nov. 22, 2011) (quoting *Citizens Against Casino Gambling in Erie County v. Kempthorne,* 471 F.Supp.2d 295, 311 (W.D.N.Y. 2007)); *see also Ryan v. Commodity Futures Trading Comm'n,* 125 F.3d 1062, 1063 (7th Cir. 1997)).  Courts routinely grant non-parties leave to file amicus briefs if the proposed *amici* can, based on their expertise and experience, offer "aid to the court" and "insights not available from the parties." *Auto Club of N.Y.*, 2011 U.S. Dist. (S.D.N.Y. Nov. 22, 2011) (granting leave to file an amicus brief by elected officials); *see also Kearns v. Cuomo*, No. 1:19-CV-00902, 2019 U.S. Dist. LEXIS 175384, at *4 (W.D.N.Y. Oct. 9, 2019).

A motion for leave to file an amicus brief is considered timely if it does not cause "prolonged delay in the litigation." *Andersen v. Leavitt*, No. 03-cv-6115, 2007 U.S. Dist. LEXIS 59108, at *7 (E.D.N.Y. Aug. 13, 2007).

## I.   IDENTITY, INTERESTS, AND RELEVANCE OF PROPOSED *AMICI CURIAE*

The proposed *amici* are renowned economists who are interested in ensuring that the disposition of antitrust litigation is based on accurate economic principles.  The accurate calculation of damages is crucial to the enforcement of antitrust law.  The proposed *amici* have not only written extensively about these foundational economic issues but also, through their research, scholarship, and government service, have a unique understanding of negative consequences that will result if incorrect passthrough methodology is used to calculate damages.

- **Steven Berry** is the Sterling Professor of Economics at Yale University and the inaugural Faculty Director of the Tobin Center at Yale University.

- **Nancy L. Rose** is the Charles P. Kindleberger Professor of Applied Economics and former department head in the Massachusetts Institute of Technology Department of Economics, and a Visiting Scholar in the Mossavar-Rahmani Center for Business and Government, Harvard Kennedy School. Professor Rose is a former Deputy Assistant Attorney General for Economic Analysis (Chief Economist) at the Antitrust Division of the U.S. Department of Justice. She served as the director of the National Bureau of Economic Research program in Industrial Organization from 1991-2014.

- **Fiona Scott Morton** is the Theodore Nierenberg Professor of Economics at the Yale University School of Management. Professor Scott Morton is a former Deputy Assistant Attorney General for Economic Analysis (Chief Economist) at the Antitrust Division of

the U.S. Department of Justice and founder and director of the Thurman Arnold Project at Yale University.

The brief of the proposed *amici* explains the bedrock economic principle upon which Dr. Abrantes-Metz's damages calculation is based: Profit-maximizing prices are determined on the margin and not by fixed costs.  Lump-sum payments between firms do not belong in the per-unit price comparison that determines overcharge.  As they explain, getting this wrong would have dire consequences for antitrust enforcement.

The brief is timely, in that it comes before the motions from the parties are set to be considered on this very issue, and will no doubt be "useful" to the Court (*see Auto Club of N.Y.*, 2011 U.S. Dist. (S.D.N.Y. Nov. 22, 2011), because it explains the foundational economic principles at issue in the calculation of damages.

## I.      CONCLUSION

For the foregoing reasons, proposed *amici* respectfully seek this Court's leave to appear as *amici curiae* and further respectfully ask that the proposed brief be deemed filed.

Respectfully submitted,

By:

_____

Christopher Sprigman
Attorney of Record for [Proposed]
Economist *Amici*

**E-FILING ATTESTATION**

I, Christopher Sprigman, am the ECF User whose ID and password are being used to file this document. I hereby attest that each of the signatories identified above has concurred in this filing.

Dated: June 18, 2026

By:

_____

Christopher Sprigman
Attorney of Record for [Proposed]
Economist *Amici*

# EXHIBT A
# BRIEF

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.,* | |
| *Plaintiffs,* | |
| v. | Case No. 1:24-cv-03973-(AS) |
| LIVE NATION ENTERTAINMENT, INC., and TICKETMASTER LLC, | |
| *Defendants* | |

**BRIEF OF ECONOMISTS AS *AMICI CURIAE* IN OPPOSITION TO DEFENDANTS'
RULE 50(b) MOTION FOR JUDGEMENT AS A MATTER OF LAW ON DAMAGES**

**INTRODUCTION & STATEMENT OF INTEREST**

*Amici* are renowned economists with an interest in ensuring that antitrust law is based on sound economic theory. *Amici* have spent their careers in academia and government service advocating for the fair and accurate disposition of antitrust cases to benefit consumers and competition. Whether for plaintiffs, defendants, or as neutral court-appointed experts, collectively *amici* have served as testifying economists in many antitrust disputes. None is being paid for his or her opinion in this case or has any financial interest in the outcome of this litigation. They offer their opinion to assist this Court's understanding of the bedrock, uncontroversial economic principle fundamental to the calculation of damages in this case: a fixed payment between

1

contracting firms should *not* be netted against a per-unit marginal price for purposes of measuring overcharge to consumers.

### ARGUMENT

It is a foundational principle of economics that a profit-maximizing firm sets per-unit prices on the margin.[1] A firm calculates the price that will maximize profits independent of fixed costs. Therefore, a change in fixed costs does not change the profit-maximizing per-unit price.[2] A lump-sum payment between two contracting firms, whether labeled an "upfront payment," a "signing bonus," a "sponsorship payment," or a "fixed royalty," is a fixed cost to the payer and a fixed receipt to the payee and bears no economic relationship to the marginal price. Such payments can be important because they affect the profitability of both sides, and therefore whether each wishes to be in the relationship at all, but such lump sum transfers do not enter the calculation of the price a customer pays.

Here, netting a lump sum payment (the upfront payments to a venue) against a per-unit price (the price charged per-ticket) would incorrectly conflate two different economic concepts: the most profitable unit price given demand and marginal costs, and the overall profitability of a firm during the timeframe of the fixed payment. The former is the marginal price, which includes the per-ticket overcharge that is the basis for damages in this case. Though the profitability of the firm is affected by the fixed payment as well as the marginal price and number of units sold, the fixed payment is not factored into determining the marginal price. It is a mistake to subtract the fixed payment from the calculation of damages that is based on higher ticket fees.

---

[1] *See, e.g.*, N. Gregory Mankiw, *Principles of Microeconomics* 284 (6th ed. 2012).
[2] *See, e.g.*, Hal H. Varian, *Intermediate Microeconomics: A Modern Approach* 380 (Jack Repcheck, ed., 8th ed. 2010); Andreu Mas-Colell et al., *Microeconomic Theory* 141 (1995).

### A. Profit-Maximizing Prices are Determined on the Margin, not by Fixed Costs.

A firm choosing the per-unit price that maximizes profit equates marginal revenue with marginal cost.[3] Marginal cost is the incremental cost of producing the next unit for sale; marginal revenue is the incremental revenue from selling an additional unit.[4]  If incremental revenue is above incremental cost at the current price, the firm can increase profits by reducing the price to sell additional units.  If incremental revenue is below incremental cost, the firm can increase profits by raising price and selling fewer units.[5]  When the incremental cost is just equal to the incremental revenue, profits are at a maximum; the firm cannot raise profits by changing price to sell one more or one less unit.  This is one of the most well-understood principles in economics and business.[6] There is no role for fixed costs in this calculation.  Fixed costs are invariant to the sale of another unit, and therefore do not affect this optimal price calculation.[7] This result is general and fundamental; it holds whether the firm is a monopolist, an oligopolist, or facing strong competition, and has been known in the industrial organization literature for decades.[8]

To see this principle in a simple setting, consider a park with a concession stand that sells soft drinks. Assume each drink sold by the park incurs $1 in marginal costs and demand is strong enough (because consumers do not want to leave the park when they are thirsty) that the concession stand makes maximum profit by charging $5 for each drink. In this simple setting, the concession

---

[3] *See, e.g.*, George J. Stigler, *The Theory of Price* 4 (1949).
[4] *See, e.g.*, Paul Krugman & Robin Wells, *Microeconomics* 230; 334 (2nd ed. 2009).
[5] *See, e.g.*, Mankiw, *Principles of Microeconomics* at 284.
[6] *See, e.g.*, Douglas G. Brooks, *Cost-Oriented Pricing: A Realistic Solution to a Complicated Problem*, 39 J. of Marketing 72, 72 (1975).
[7] *See, e.g.*, Varian, *Intermediate Microeconomics: A Modern Approach* at 380.
[8] *See, e.g.*, Jean Tirole, *The Theory of Industrial Organization* (1988); John B. Kirkwood, *Market Power and Antitrust Enforcement* 98 Boston U. L. Rev. 1169, 1176 (2018); William J. Baumol, John C. Panzar & Robert D. Willig, *Contestable Markets and the Theory of Industry Structure* (Harcourt, 1982); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* 974 ("[F]ixed costs are not formally taken into account in the computation of price.").

stand will earn total revenues of $5 times the number of drinks sold and profits of $4 times the number of drinks sold. Now assume that the park contracts for a soft drink maker to run the stand and set prices. The first year the park charges the soft drink maker nothing. In the second year, the park charges a fixed sum for the concession. Will the price of a drink change between the two years? No. This is because there is no price that earns more profit; $5 is the optimal price. The fixed sum paid in the second year may be based on any number of factors, including how many drinks the parties predict will be sold and what price. But the reasoning behind the amount of the fixed payment does not change the fact that it does not affect the marginal price.[9] Regardless of the size of the lump sum the soft drink maker pays the park for access (or the park pays the drink maker for its participation), the optimal price of a drink stays the same.

Marginal cost changes in the form of ticketing fees are passed on to the consumer without respect to any upfront fixed payments. Imagine the park adds a $1 fee to the $1 marginal cost of a drink, making a total of $2 in marginal costs for the soft drink company. The company must set a retail price for drinks, keeping in mind demand and its marginal costs (fee + drink cost). Now the price of a soda will rise above $5 because the per-drink fee has increased the marginal cost. If, based on the park's new fee, the new optimal price is $5.50, then we say that the fee of $1 was passed through to end consumers by 50% (50 cents). Again, the profit of selling drinks at $5.50 will be the margin ($5.50 minus the $2 cost) multiplied by the number of drinks sold. Despite the increased marginal price, many consumers will still purchase drinks in the park even though the fee has added to the marginal price. This effect is known as "passthrough" and is one manner by

---

[9] *See, e.g.*, Francine Lafontaine & Kathryn L. Shaw, *The Dynamics of Franchise Contracting: Evidence from Panel Data*, 107 J. of Political Economy 1041, 1044 (1999); *see also*, Varian, *Intermediate Microeconomics: A Modern Approach* at 380.

which end-consumers can be hurt by supracompetitive pricing earlier in the supply chain.[10] Passthrough almost always occurs when marginal costs change; then when prices change, consumers are impacted. As before, this marginal price change will occur regardless of the size of any upfront fixed payment.

Whether or not there are many sellers of drinks who each compete for the concession or one monopoly seller of drinks, the parties (the park owner and the drink maker) want to maximize the pie they are going to share. To maximize profits from the sale of drinks, there is one price they will charge given the economics above: $5 per drink. And, if there is a per-drink fee imposed, those costs will be passed on (at least in part) to the consumer. These retail prices are derived from the conditions of demand and marginal cost, not from any fixed payment paid to the park by the drink maker. The amount of any fixed cost payment made to the park by more than one competing drink-seller, or one monopolist drink-seller, is only relevant when calculating a drink-maker's overall profit and whether they wish to be part of the transaction in the first place.[11] The fixed fee (whether paid by the park or the drink-maker) is relevant to the decision as to whether the drink maker will sell drinks in the park; it is not relevant to the price the consumer will pay for the drink once that decision has been made.

This concept—that fixed costs do not factor into how parties set a profit-maximizing marginal price—is well-settled and uncontroversial.

**B. Upfront Payments are Fixed Costs That Should Not Be Deducted from Damages Calculations Based on Inflated Marginal Prices.**

---

[10] *See, e.g.*, E. Glen Weyl & Michal Fabinger, *Pass-Through as an Economic Tool: Principles of Incidence under Imperfect Competition,* 121 J. of Political Economy 528, 533 (2013).
[11] *See, e.g.*, Mankiw, *Principles of Microeconomics* at 285-286.

As with the park example above, after a contract with an artist is signed, the venue determines what fees to charge ticket-buyers. These prices are determined based on the willingness to pay by consumers and the venue's marginal costs of supplying the service to those consumers. In general, if demand increases, so will the most profitable per ticket price; if fees increase the marginal cost of supplying consumers, the profitable per ticket price will also increase. Fixed costs, such as a payment from a ticketing service that is independent of ticket sales, are irrelevant to passthrough.

Contracts with a per-unit price for each transaction and a lump-sum payment whose magnitude does not vary with transaction volume are common. They are a basic type of contract (known as a "two-part tariff") and have been studied in the industrial organization literature for decades.[12] The standard treatment recognizes the two components as separate pricing instruments: the per-unit price affects decisions at the margin such as price and output, while the lump-sum payment redistributes surplus between the contracting parties, perhaps to induce participation.[13]

This logic is invariant to the specific name used to describe the lump-sum payment: an "upfront payment," a "signing bonus," a "sponsorship fee," or a "fixed royalty." What matters is the economic structure: a payment determined at the time of contracting that does not vary with subsequent transaction volume.[14] Such a payment is a fixed cost to the payer and a fixed receipt to the payee; the party setting per-unit prices will not rationally adjust them in response to a change in fixed payments.

---

[12] *See, e.g.,* Walter Y. Oi, *A Disneyland Dilemma: Two-Part Tariffs for a Mickey Mouse Monopoly*, 85 Q.J. Econ. 77 (1971); Richard Schmalensee, *Monopolistic Two-Part Pricing Arrangements*, 12 Bell J. Econ. 445 (1981); Robert S. Pindyck & Daniel L. Rubinfeld, *Microeconomics* 414 (8th ed., 2013).

[13] *See, e.g.*, Robert S. Pindyck & Daniel L. Rubinfeld, *Microeconomics* 414 (8th ed., 2013); *see also* Oi, *A Disneyland Dilemma*, 85 Q.J. Econ. 77.

[14] *See, e.g.*, R. Preston McAfee & John McMillan, *Bidding for Contracts: A Principle-Agent Analysis*, 17 Rand J. of Economics 326, 328 (1986).

This conclusion is also invariant to the timing of the decision to sign the contract and the arrival of the payments. Both the fixed and marginal costs could have been set before any payments are made and these principles would hold. The fixed payment could be made at the start of the contract term and marginal payments later, and these principles would hold. The critical attribute of the fixed payment is that its size does not change with the sale of an additional ticket.

That is why to deduct the fixed payment from the calculation of damages based on the supracompetitive prices charged to consumers on a per-ticket basis would fly in the face of foundational economic principles. The upfront payment had no effect on the parties' determination of the marginal prices; therefore, it should not be netted against that overcharge. Just as the $5 (or $5.50) per-drink price is set without regard to any upfront payment a drink-seller may have made to the park, upfront payments to venues are irrelevant to the marginal per-ticket prices.

## C. Incorrectly Calculating Damages Based on a Faulty Understanding of Passthrough Harms Competition and Consumers.

Antitrust damages must be calculated according to accurate bedrock economic principles. There is a consensus among economists that lump sum payments do not affect marginal prices. Casting aside this principle would do grave harm to antitrust enforcement. Incorrectly calculating damages by deducting fixed costs from the calculation of the marginal price would incentivize anticompetitive behavior and make it more difficult to show that defendants with market power were engaged in supercompetitive pricing. When passthrough is calculated accurately, consumers can be compensated for harm they have suffered. If fixed costs are incorrectly included in the passthrough calculation, damages awards will be inaccurate. This will lead to uncompensated harm to consumers. Because clarity and accuracy are critical to a government trying to protect competition and consumers, a mistake in the economics will not be neutral in its impact but will significantly weaken antitrust enforcement.

**CONCLUSION**

When an economist calculates overcharge passthrough, he or she is calculating the difference between the monopoly price paid by consumers and the competitive price they otherwise would have paid. The lump sum that a ticketer may pay the venue in order to obtain the contract accrues to the *venue*, not to consumers. It would make no sense to calculate consumer harm from ticketing fees and then subtract from that a (purported) venue benefit; that shortchanges the consumers. Not only does the lump sum fail to compensate consumers directly (because it is paid to the venue), it also does not compensate them indirectly by lowering the price of tickets. The reason is that any lump sum paid to the venue does not change its calculation of the profit-maximizing ticket price charged to consumers.

The proposition that profit-maximizing prices are determined on the margin and not by fixed costs is among the most settled in the economic literature. Upfront payments between firms are fixed costs for pricing purposes. They do not belong in the per-unit price comparison that determines whether consumers have been overcharged.

Respectfully submitted,

_____

Christopher Sprigman
Attorney of Record for Economist *Amici*

# EXHIBIT B
# PROPOSED ORDER

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.,* | |
| *Plaintiffs,* | |
| v. | Case No. 1:24-cv-03973-(AS) |
| LIVE NATION ENTERTAINMENT, INC., and TICKETMASTER LLC, | |
| *Defendants* | |

**[PROPOSED] ORDER GRANTING MOTION FOR LEAVE TO FILE BRIEF OF ECONOMISTS AS *AMICI CURIAE* IN OPPOSITION TO DEFENDANTS' RULE 50(b) MOTION FOR JUDGEMENT AS A MATTER OF LAW ON DAMAGES**

Before the Court is a motion for leave to appear and file the brief of Economists as *amici curiae* in Opposition to the Defendants' Rule 50(b) Motion for Judgement as a Matter of Law on Damages. Having considered the motion for leave and the accompanying proposed brief, the Court hereby GRANTS the motion, finding that the motion and proposed brief satisfy the relevant provisions of Fed. R. App. P 29, and because *amici* economists can offer perspectives that could be helpful to the Court. The Court further directs that the proposed brief of economists (Exhibit A) be deemed filed.

**IT IS SO ORDERED**.

_____

**THE HONORABLE**
**ARUN SUBRAMANIAN**

DATED: