**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et. al.*,<br><br>      *Plaintiffs*,<br><br>      v.<br><br>LIVE NATION ENTERTAINMENT, INC., and TICKETMASTER L.L.C.,<br><br>      *Defendants*. | Case No. 1:24-cv-03973-AS |

**MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 50(b)**

**TABLE OF CONTENTS**

Page

INTRODUCTION ........................................................................................................... 1

LEGAL STANDARD....................................................................................................... 2

ARGUMENT ................................................................................................................... 2

I.    DEFENDANTS ARE NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW
      ON PLAINTIFFS' AMPHITHEATER CLAIMS ............................................... 2

      A.    The Evidence Established a Market for Large Amphitheaters. ............................ 2

      B.    The Evidence Established Monopoly Power in the Large Amphitheaters Market. 4

      C.    The Evidence Established Anticompetitive Effects in the Large Amphitheater
            Market. ...................................................................................................... 7

      D.    The Jury's Verdict on Tying Was Supported by the Record. ................................ 8

            1.    The Evidence Established Anticompetitive Effects in the Tied Market..... 8

            2.    The Evidence Established Coercion Through an Unremitting Policy. ...... 10

            3.    This Court Already Rejected Defendants' Refusal-to-Deal Argument. ... 11

            4.    Plaintiffs' Tying Claim Is Timely.............................................................. 11

II.   DEFENDANTS ARE NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW
      ON PLAINTIFFS' TICKETING MARKET CLAIMS ..................................... 12

      A.    Both Primary Ticketing Markets Were Supported by the Record........................ 12

            1.    The Evidence Established that Both Primary Ticketing Markets Are
                  Properly Limited to "MCVs."................................................................... 12

            2.    The Evidence Established a Separate Primary Concert Ticketing Market.
                  ................................................................................................................... 13

      B.    The Evidence Established Monopoly Power in the Primary Ticketing Markets.. 14

      C.    The Evidence Established that Defendants Engaged in Exclusionary Conduct to
            Maintain a Monopoly in the Primary Ticketing Markets. ................................... 15

      D.    The Evidence Established Anticompetitive Effects in the Primary Ticketing
            Markets. ...................................................................................................... 20

III.  DEFENDANTS ARE NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW
      ON THE STATE-LAW CLAIMS. ..................................................................... 23

IV.   DEFENDANTS ARE NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW
      ON DAMAGES ................................................................................................. 23

      A.    Defendants' Upfront-Payment Challenge Sounds in Rule 702, Not Rule 50....... 25

      B.    Dr. Abrantes-Metz's Treatment of Upfront Payments When Implementing Her
            Methodology Satisfies Rule 702. ..................................................................... 26

1.      Dr. Abrantes-Metz's Regression and Treatment of Upfront Payments Reliably Measured the Relevant Ticket-Level Charge for Purposes of Her Tax-Incidence Analysis. ........................................................................... 26

2.      Even if Defendants' Criticism Is Viewed as an Omitted-Variable Challenge, That Dispute Also Goes to Weight, Not Admissibility. ......... 29

C.     Figure 29 Independently Corroborates the Reliability of the Abrantes-Metz Methodology. ...................................................................................................... 31

CONCLUSION ............................................................................................................................ 32

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AIG Glob. Sec. Lending Corp. v. Banc of Am. Sec., LLC*,
  386 F. App'x 5 (2d Cir. 2010) ....................................................................................24

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002)...................................................................................24, 25

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985)...................................................................................................6, 19

*Bayou Bottling, Inc. v. Dr. Pepper Co.*,
  725 F.2d 300 (5th Cir. 1984) ..........................................................................................19

*Bazemore v. Friday*,
  478 U.S. 385 (1986)..................................................................................................26, 29

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
  603 F.2d 263 (2d Cir. 1979)...............................................................................5, 11, 15

*Bookhouse of Stuyvesant Plaza v. Amazon.com*,
  985 F. Supp. 2d 612 (S.D.N.Y. 2013).........................................................................10

*Boucher v. U.S. Suzuki Motor Corp.*,
  73 F.3d 18 (2d Cir. 1996) ............................................................................................25

*Cash v. Cnty. of Erie*,
  654 F.3d 324 (2d Cir. 2011)............................................................................................2

*Cinema Vill. Cinemart v. Regal Ent. Grp.*,
  2016 WL 5719790 (S.D.N.Y. Sept. 29, 2016)............................................................10

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
  370 U.S. 690 (1962)..................................................................................................5, 15

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992).......................................................................................................11

*FTC v. Hackensack Meridian Health, Inc.*,
  30 F.4th 160 (3d Cir. 2022) ..........................................................................................12

*FTC v. Meta Platforms, Inc.*,
  811 F. Supp. 3d 67 (D.D.C. 2025) ..................................................................................4

*FTC v. Tapestry, Inc.*,
    755 F. Supp. 3d 386 (S.D.N.Y. 2024).................................................................................3, 4

*Gulf Coast Bank & Tr. Co. v. Great Lakes Ins. SE*,
    2025 WL 1134454 (M.D. La. Apr. 16, 2025)........................................................................26

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
    392 U.S. 481 (1968)..............................................................................................................11

*Hill v. A-T-O, Inc.*,
    535 F.2d 1349 (2d Cir. 1976)................................................................................................10

*Int'l Boxing Club of N.Y., Inc. v. United States*,
    358 U.S. 242 (1959)..............................................................................................................14

*It's My Party, Inc. v. Live Nation, Inc.*,
    811 F.3d 676 (4th Cir. 2016) ..................................................................................................4

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
    383 F. Supp. 3d 187 (S.D.N.Y. 2019)...................................................................................19

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997)................................................................................................................6

*Kurtz v. Costco Wholesale Corp.*,
    818 F. App'x 57 (2d Cir. 2020) .............................................................................................30

*Lavin-McEleney v. Marist Coll.*,
    239 F.3d 476 (2d Cir. 2001)..................................................................................................25

*Le v. Zuffa, LLC*,
    216 F. Supp. 3d 1154 (D. Nev. 2016)...................................................................................14

*MacDermid Printing Sols. v. Cortron*,
    833 F.3d 172 (2d Cir. 2016)..................................................................................................20

*McWane, Inc. v. FTC*,
    783 F.3d 814 (11th Cir. 2015) ..............................................................................................21

*Meloff v. N.Y. Life Ins. Co.*,
    240 F.3d 138 (2d Cir. 2001)..............................................................................................2, 17

*New York v. Facebook, Inc.*,
    549 F. Supp. 3d 6 (D.D.C. 2021) ......................................................................................6, 11

*North American Soccer League, LLC v. U.S. Soccer Federation, Inc.*,
    2026 WL 1397077 (2d Cir. May 19, 2026) .............................................................................8

*Novell, Inc. v. Microsoft Corp.*,
  731 F.3d 1064 (10th Cir. 2013) ......................................................................19

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*,
  2022 WL 15053250 (E.D.N.Y. Oct. 26, 2022) ..............................................28

*Reed Construction Data Inc. v. McGraw-Hill Cos.*,
  49 F. Supp. 3d 385 (S.D.N.Y. 2014) ..............................................................30

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133 (2000) .....................................................................................2, 3

*In re Remicade Antitrust Litig.*,
  345 F. Supp. 3d 566 (E.D. Pa. 2018) .............................................................23

*Restivo v. Hessemann*,
  846 F.3d 547 (2d Cir. 2017) .....................................................................26, 31

*Samuels v. Air Transp. Local 504*,
  992 F.2d 12 (2d Cir. 1993) .............................................................................23

*New York ex rel. Schneiderman v. Actavis PLC*,
  787 F.3d 638 (2d Cir. 2015) ...........................................................................15

*United States v. Am. Exp. Co.*,
  2014 WL 2879811 (E.D.N.Y. June 24, 2014) ...............................................25

*United States v. Bertelsmann SE & Co. KGaA*,
  646 F. Supp. 3d 1 (D.D.C. 2022) ................................................................4, 12

*United States v. Google LLC*,
  747 F. Supp. 3d 1 (D.D.C. 2024) .......................................................15, 16, 19

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) .....................................................................20, 21

*United States v. Oracle Corp.*,
  331 F. Supp. 2d 1098 (N.D. Cal. 2004) .........................................................12

*United States v. Space Hunters, Inc.*,
  429 F.3d 416 (2d Cir. 2005) ..........................................................................1, 2

*Viamedia, Inc. v. Comcast Corp.*,
  951 F.3d 429 (7th Cir. 2020) ........................................................................9, 11

*In re Visa Check/MasterMoney Antitrust Litig.*,
  280 F.3d 124 (2d Cir. 2001) ..............................................................................9

*In re Wireless Tel. Servs. Antitrust Litig.*,
   385 F. Supp. 2d 403 (S.D.N.Y. 2005)..................................................................................19

*Yentsch v. Texaco, Inc.*,
   630 F.2d 46 (2d Cir. 1980)................................................................................................9

*Zellner v. Summerlin*,
   494 F.3d 344 (2d Cir. 2007)........................................................................................2, 18

*Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*,
   571 F.3d 206 (2d Cir. 2009)...........................................................................................25

*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012)...........................................................................................16

**Other Authorities**

Dennis W. Carlton & Jeffrey M. Perloff, *Modern Industrial Organization* ch. 10
   (4th ed. 2005) .................................................................................................................27

Fed. R. Civ. P. 50 ...................................................................................................... *passim*

Fed. R. Evid. 702 ...................................................................................................... *passim*

Patrick Rey & Jean Tirole, *The Logic of Vertical Restraints*, 76 Am. Econ. Rev.
   921, 921-25 (1986)..........................................................................................................28

**INTRODUCTION**

Over a multiweek trial, a diligent jury heard testimony from dozens of witnesses, reviewed hundreds of exhibits, and deliberated four days before finding Defendants liable on every claim. Defendants now ask this Court to second-guess the jury's verdict, but Rule 50 does not permit a court to substitute its judgment for the jury's. *See United States v. Space Hunters, Inc.*, 429 F.3d 416, 429 (2d Cir. 2005).

Ample evidence supported the jury's verdict. In the Large Amphitheater market, Live Nation obtained and maintained control over the only Large Amphitheaters in 40 critical markets nationwide; held onto money-losing amphitheaters to exclude competitors; used its monopoly power to leave its amphitheaters dark on most summer weekends; threatened to withhold concerts from venues seeking to compete with Live Nation; and had a policy that refused to allow talent access without using Live Nation's promotion services.

Plaintiffs' evidence also unmistakably established Defendants' monopolization of primary ticketing markets. Ticketmaster locked up 83%–87% of major concert venues through long-term exclusive contracts and incentivized employees to pursue early renewals and long-term extensions, while Live Nation threatened and withheld content from venues that dared to choose a different ticketer. Mr. Rapino boasted of "an incredible moat around the castle." Trial Tr. 1803:13–18. SeatGeek, the jury heard, had to offer "retaliation insurance" to venues at least 15 times. Groetzinger, Trial Tr. 764:20–765:1. Defendants greedily pursued a "boil the frog" strategy to impose double-dipping ticketing fees on platinum pricing products. Marcus, Trial Tr. 2893:17–19. And Ticketmaster's aging technology was so bad it was held together with "duct tape." Rapino, Trial Tr. 1862:11–15.

Dr. Hill's analysis reinforced this evidence of monopoly power and anticompetitive conduct and effects, and he defined the relevant markets, rooting those definitions in record evidence. Rule 50(b) does not empower Defendants to ignore this mountain of evidence while relying on scattered molehills of contradictory testimony. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000); *Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007).

Finally, there is no basis for this Court to revisit its prior *Daubert* rulings and exclude Dr. Abrantes-Metz's testimony under Rules 50(b) or 702. The jury credited this testimony after vigorous cross-examination and countervailing expert testimony.

## LEGAL STANDARD

Judgment as a matter of law is an extraordinary remedy that "should be granted cautiously and sparingly." *Meloff v. N.Y. Life Ins. Co.*, 240 F.3d 138, 145 (2d Cir. 2001). The court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151. The movant's "burden is 'particularly heavy' where, as here, 'the jury has deliberated in the case and actually returned its verdict' in favor of the non-movant." *Cash v. Cnty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011).

## ARGUMENT

I.    **DEFENDANTS ARE NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFFS' AMPHITHEATER CLAIMS**

A.    **The Evidence Established a Market for Large Amphitheaters.**

Defendants' argument that Plaintiffs failed to prove a Large Amphitheaters market is one of many improper requests to reweigh the evidence. *See Space Hunters*, 429 F.3d at 429. It is of no significance that Dr. Hill's HMT analysis was excluded—through Dr. Hill and a multitude of

fact witnesses and documents, Plaintiffs presented ample *Brown Shoe* evidence to support the jury's market finding.

*First*, Defendants are wrong that "[s]ubstitution among amphitheaters and other venue types is undisputed." Mot. 8. Multiple witnesses testified that many artists prefer amphitheaters. Roux, Trial Tr. 1272:6–9 (agreeing that "many non-superstar artists predetermine that they're going to play amphitheaters"); Hurwitz, Trial Tr. 668:6–669:7; Marciano, Trial Tr. 949:5–19, 952:19–25; Capshaw, Trial Tr. 4276:6–25. And many artists construct national tours predominantly at amphitheaters. Geiger, Trial Tr. 495:18–25; Roux, Trial Tr. 1377:21–23; Marciano, Trial Tr. 949:5–19; *see also* Hill, Trial Tr. 2128:3–10 (amphitheaters have peculiar characteristics), 2129:2–10 (61% of artists who had done amphitheater tours repeated them). Dr. Yurukoglu may have disagreed with these fact witnesses and with Dr. Hill, but the jury gets to decide which witnesses to credit. *Reeves*, 530 U.S. at 151; *see also FTC v. Tapestry, Inc.*, 755 F. Supp. 3d 386, 415–17 (S.D.N.Y. 2024) (distinct market not disproved by consumer cross-shopping). The evidence also showed inelastic demand: Live Nation's executives stated that when artists have determined to play amphitheaters, Live Nation does not need to negotiate or offer higher guarantees. PX0422 at -676; PX0893 at -866; *see also* PX0811 at -452; Weeden, Trial Tr. 3674:15–25.

*Second*, with respect to industry recognition, Dr. Hill opined that the 8,000-capacity and 10-concert cutoffs were a reasonable proxy commonly reflected in industry documents. Hill, Trial Tr. 2085:21–2086:25. Live Nation itself recognized the distinction. PX0867 at -697 ("The standard cutoff for us between Boutique/Large Amp . . . is 8000 cap[acity]."); PX0326 at -543 (2018 Board slide defining "[l]arge amphitheater[s] . . . as having capacity of 8,000 or greater"); Lewis, Trial Tr. 1987:14–22; Weeden, Trial Tr. 3578:2–8; Al-Joulani, Trial Tr. 3001:16–22;

Hansen, Trial Tr. 3440:6–3443:18. Defendants likewise used the Large Amphitheaters designation in financial assessments. *See, e.g.*, PX0787 (profits increasing at higher rate for "Large Amp"); Roux, Trial Tr. 1309:13–16 (profits at Large Amphitheaters nearly tripled between 2019 and 2024). And Defendants singled out amphitheaters in determining pricing strategy with artists. PX0422 at -676; PX0893 at -866.[1]

*Third*, amphitheaters are purpose-built for concerts with distinct characteristics uniquely tailored to musical performances. Lovett, Dep. Tr. 33:7–9 ("[A]mphitheaters are built with concerts in mind, acoustically but also experientially"); Hurwitz, Trial Tr. 665:3–16 (amphitheaters "are a unique animal"); PX1013 at 6 ("Amphitheaters are generally outdoor venues" and "designed specifically for concert events").

*Finally*, Defendants' reliance on *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676 (4th Cir. 2016), is as meritless now as at summary judgment. ECF No. 1037 at 13; *see also* ECF No. 1079 at 3. That case involved a local market, and unlike here, the plaintiff's expert opinion was excluded for failing to consider cross-elasticity of demand. *It's My Party*, 811 F.3d at 683.

### B. The Evidence Established Monopoly Power in the Large Amphitheaters Market.

Dr. Hill testified that Live Nation increased *and maintained* its substantial market share of the Large Amphitheater market during the limitations period through acquisitions of ownership or control, offsetting new entrants and reducing competition. Hill, Trial Tr. 2134:24–

---

[1] That certain witnesses testified about different capacity boundaries for a Large Amphitheaters market does not provide a basis for challenging the jury's relevant market finding. *See United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1, 33 (D.D.C. 2022) ("The Supreme Court has wisely recognized there is 'some artificiality' in any boundaries, but that 'such fuzziness' is inherent in bounding any market."); *Tapestry*, 755 F. Supp. 3d at 415 (markets need not be defined with precision) (citing cases).

2137:3.[2] While Defendants criticize Dr. Hill for not analyzing the specific mechanisms of Live Nation's "control" over Large Amphitheaters, fact witnesses testified that Live Nation controlled booking through management agreements even without ownership. *See* Roux, Trial Tr. 1235:4–21 (exclusive booking rights to the Hollywood Bowl); Campana, Trial Tr. 1473:23–1475:3 (exclusive booking rights to Riverbend Music Center); Weeden, Trial Tr. 3590:22–3591:4 (extended lease for Glen Helen Amphitheater). Mr. Weeden confirmed that control over bookings gave Live Nation control over artist access. Trial Tr. 3609:2–4. Mr. Roux admitted Live Nation had the power to control access to the country's most important Large Amphitheaters; Messrs. Marciano and Hurwitz agreed.[3]

The jury heard testimony that Live Nation used the "Velvet Hammer" of content withholding to maintain its Large Amphitheater monopoly. Roux threatened to withhold concert content if Red Mountain continued competing instead of giving Live Nation control. PX0451 at -497 ("Either we are together or we are competitors."); Roux, Trial Tr. 1248:22–1249:8; PX0415 at -183 ("Can't get complacent and let small guys encroach from the edges."). Although that incident occurred in 2018, the jury could consider it in concluding that Live Nation's conduct during the limitations period was similarly exclusionary. *See Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 295–96 (2d Cir. 1979); *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 709–10 (1962).

---

[2] Defendants' analogy to *FTC v. Meta Platforms, Inc.*, 811 F. Supp. 3d 67 (D.D.C. 2025) falls short. *Meta* was based on at most a 60% market share. *Id.* at 122. Here, Plaintiffs presented ample evidence of a substantially higher share maintained through anticompetitive conduct.

[3] Roux admitted that in 2018, for 42 of the 50 top amphitheaters, "we either own them or we book them exclusively or we're operating them." Roux, Trial Tr. 1241:11–14. When asked whether Live Nation owns or operates 23 of the top 25 amphitheaters, Roux conceded, "directionally that's probably right." *Id.* 1229:3–7; *see also id.* 1405:11–14 (Live Nation is the only amphitheater option for artists in 40 different markets); Marciano, Trial Tr. 948:23–949:4; Hurwitz, Trial Tr. 665:17–19.

The evidence likewise refutes Defendants' statute-of-limitations argument. Dr. Hill testified that if Live Nation had not acquired additional amphitheaters during the limitations period, its market share would have decreased. Hill, Trial Tr. 2135:5–2136:20. It was undisputed that Live Nation maintained its policy of adding amphitheaters and augmented its amphitheater monopoly power via ownership or control during the limitations period. Rapino, Trial Tr. 1897:11–14 ("We're always looking to bolt on, for sure."); Roux, Trial Tr. 1243:7–10 (control of Ford Idaho Center in 2023), 1271:6–11 (control of McKinney amphitheater in 2025); Hill, Trial Tr. 2134:24–2137:3 (summarizing Live Nation's amphitheater acquisitions and control agreements through 2024); Capshaw, Trial Tr. 4235:6–17. Indeed, in 2023, Live Nation repeatedly threatened to route around Irvine's proposed amphitheater if the city chose an open booking model instead of giving Live Nation control. Chi, Trial. Tr. 546:5–552:6; PX0202.[4]

Live Nation did not merely acquire or gain control over competitors. Mot. 4–5. The jury also heard testimony that Live Nation hoarded unprofitable amphitheaters to exclude competitors. *See* Rule 59 Opp'n 20–21 (citing, *e.g.*, *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985)). For instance, Live Nation extended its lease on the Montage in 2022 despite "poor performance and low show count" to "not give up a venue which competitor could snap up." Roux, Trial Tr. 1260:11–1263:6. Weeden likewise testified that Live Nation kept money-losing amphitheaters to exclude competitors. Weeden, Trial Tr. 3651:13–17, 3645:19–3649:24 (Live Nation renewed leases of four amphitheaters despite operating at a financial loss;

---

[4] Defendants' cases do not support a different result. *Klehr v. A.O. Smith Corp.* recognizes that "'each overt act that is part of the violation and that injures the plaintiff . . . starts the statutory period running again.'" 521 U.S. 179, 189 (1997). And *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 42–43 (D.D.C. 2021) rejects the sufficiency of "'inertial consequences'" of past acquisitions, but Plaintiffs here presented evidence of ongoing monopoly maintenance. Hill, Trial Tr. 2134:24–2137:3.

Weeden would not even suggest getting out of those leases to senior executives); PX0850. The jury also heard that, this year, Live Nation required as a condition of sale that an existing amphitheater be demolished—and that a restrictive covenant be placed on the deed—to eliminate competition for a Live Nation amphitheater opening 20 miles away. Weeden, Trial Tr. 3655:9–3657:13. This evidence was sufficient for the jury to find that Live Nation maintained monopoly power during the limitations period through exclusionary acts.

**C.      The Evidence Established Anticompetitive Effects in the Large Amphitheater Market.**

Defendants' argument about anticompetitive effects rests on a mistaken premise—Plaintiffs did not need to show higher prices, reduced output, or lower quality. As the jury was properly instructed, "[h]arm to competition . . . may also include substantially constrained consumer choice in the market." JI24. Evidence of constrained choices by artists—the consumers in the artist-facing Large Amphitheater market—was sufficient. Multiple witnesses testified that many artists wanted to construct a Large Amphitheater national tour and were deprived of their choice of promoters. Rapino, Trial Tr. 1854:7–14, 1852:14–1853:4; Marciano, Trial Tr. 952:2–953:6; Roux, Trial Tr. 1405:11–14; Lewis, Trial Tr. 1989:24–1990:2; Capshaw, Trial Tr. 4243:22–25.

While loss of choice is enough, the jury also heard evidence that Live Nation's monopoly had adverse price and quality effects, depriving artists of competition that would result in higher pay and better terms. Live Nation internally modeled that competing Large Amphitheater entry in Dallas would require increasing artist splits from 94% to 97%. PX0858; Roux, Trial Tr. 1264:19–1271:16. And for artists set on playing amphitheaters, Live Nation did not need to negotiate or offer higher guarantees because there were no competitive alternatives. PX0422 at -676; PX0893 at -866. Defendants argue artists were economically better off at Large

Amphitheaters, but the jury received evidence that artists made only 18% more playing at Large Amphitheaters, while Live Nation made ***358% more***. PX0811; Weeden, Trial Tr. 3674:15–25; *see also* Rule 59 Opp'n 8.

Reduced output (e.g., dark days) at Live Nation amphitheaters also showed anticompetitive effects. Roux, Trial Tr. 1294:18–1297:17 (confirming that Live Nation's top amphitheaters "sit empty" on "nearly 50 percent of their summer Saturdays"); Weeden, Trial Tr. 3609:10–3614:18 (67% of Fridays and 64% of Saturdays between Memorial Day and Labor Day were dark). Live Nation knew that if it permitted other promoters to bring talent, there would be fewer dark days—just like at the Greek Theater, an independent amphitheater open to all promoters. PX1129 at -324; Weeden, Trial Tr. 3630:14–3634:11; Rapino, Trial Tr. 1857:16–25. Live Nation's exclusivity policy prevented "a more diverse range of shows" and "greater financial benefits for the owner of the venue." Chi, Trial Tr. 542:2–543:23.[5]

### D.    The Jury's Verdict on Tying Was Supported by the Record.

#### 1.    The Evidence Established Anticompetitive Effects in the Tied Market.

Defendants' argument that Plaintiffs were required to define a relevant tied product market has already been rejected by the Court, *see* ECF No. 1094 at 2–5, and Defendants offer no new basis for reconsideration.[6] As the Court previously held, Plaintiffs only had to present

---

[5] The evidence of competitive harm to excluded promoters and fans also supported the verdict. JI24; Johnson, Trial Tr. 3828:3–9, 3943:3–3944:18 (Ticketmaster charged higher fees to fans at Live Nation venues than at other venues).

[6] Defendants cite *North American Soccer League, LLC v. U.S. Soccer Federation, Inc.*, 2026 WL 1397077, at *2 (2d Cir. May 19, 2026) for the proposition that "relevant-market analysis is 'essential for assessing the potential harm to competition from the defendants' alleged misconduct.'" Mot. 10. But that case did not involve a tying claim, and this Court has already held that anticompetitive effects for tying claims "means something different here from elsewhere in antitrust law." ECF No. 1094 at 4.

evidence of "some nontrivial impact on competition" with respect to the tied product. ECF No. 1094 at 4 (citing *Yentsch v. Texaco, Inc.*, 630 F.2d 46, 58 (2d Cir. 1980)).[7]

*First*, Live Nation's tying policy eliminated artists' competitive choice of a promoter. Hill, Trial Tr. 2133:4–7 ("It would be difficult to do a truly nationwide tour of large amphitheaters without dealing with Live Nation."); Marciano, Trial Tr. 948:23–949:4 ("[I]f an artist wants to play an amphitheater, they have to deal with Live Nation"); Yurukoglu, Trial Tr. 4369:3–23 (similar). Competing promoters were completely blocked from entry. Hurwitz, Trial Tr. 669:2–674:23 (Live Nation is effectively the only company capable of promoting amphitheater tours); Geiger, Trial Tr. 502:6–13 (AEG-promoted artists could not "get into the facilities"); Capshaw, Trial Tr. 4277:10–21; PX0754 ("[n]eed the message to be, you can only play amps with us"). But given the option, artists can and do choose other promoters. PX1129; Weeden, Trial Tr. 3634:4–11 (agreeing that "when artists don't have to use Live Nation at a venue, like [at] The Greek," they choose non-Live Nation promoters). This evidence alone is sufficient to support the tying verdict. *See Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 475–76 (7th Cir. 2020).

*Second*, Plaintiffs showed harm to competition in reduced output—the dark days on which amphitheaters had no programming, i.e., fewer promoted shows. *See supra* 8. Internally, Live Nation executives attributed dark days to its tying policy and pointed to the Greek Theater as an open venue with greater output. *See supra* 8.[8]

---

[7] Plaintiffs maintain that proof of anticompetitive effects was not required because this is a *per se* claim. *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 133 n.5 (2d Cir. 2001) (Sotomayor, J.). But Plaintiffs presented substantial evidence of anticompetitive impacts from Live Nation's tying policy.

[8] Of the two cases Defendants cite for the proposition that "harm to 'competitors . . . is not a market harm under the Sherman Act,'" neither is a tying case. Mot. 11 (citing *Cinema Vill.*

### 2.    The Evidence Established Coercion Through an Unremitting Policy.

Defendants argue that "the record contains no evidence that any artist was forced into purchasing Live Nation's promotion services." Mot. 12. But trial was replete with evidence that Live Nation consistently barred any artist performing at its amphitheaters from using any promoter other than Live Nation. Rapino, Trial Tr. 1852:14–1853:4 (Q: "[I]f an artist wants to play at a venue you own . . . they have to use you as the promoter, correct?" A: "[Y]eah, we don't let rival promoters, competitors, in our venues."); Weeden, Trial Tr. 3605:17–20; Al-Joulani, Trial Tr. 2987:12–19. Other promoters confirmed that this policy blocked them from promoting artists on amphitheater tours (*see supra* 9), and Weeden agreed that "when artists don't have to use Live Nation at a venue, like [at] The Greek," they choose non-Live Nation promoters. Weeden, Trial Tr. 3630:14–3634:11.

Further, Live Nation admitted that it conditions use of its amphitheaters on use of its promotion services. Roux, Trial Tr. 1400:14–24 (Live Nation's "business practice" not to allow competitor promoters). The jury was free to rely on this evidence to find artists were coerced into using Live Nation promoters.  *See Hill v. A-T-O, Inc.*, 535 F.2d 1349, 1355 (2d Cir. 1976*)* ("An unremitting policy of tie-in, if accompanied by sufficient market power in the tying product to appreciably restrain competition in the market for the tied product constitutes the requisite coercion . . . ."). Plaintiffs proved Defendants' coercive tying policy with evidence from numerous witnesses, including Defendants' own executives. *Supra* 8–9; Rule 59 Opp'n 21–22.

---

*Cinemart v. Regal Ent. Grp.*, 2016 WL 5719790, at *4-5 (S.D.N.Y. Sept. 29, 2016); *Bookhouse of Stuyvesant Plaza v. Amazon.com*, 985 F. Supp. 2d 612, 620 (S.D.N.Y. 2013)).

### 3.   This Court Already Rejected Defendants' Refusal-to-Deal Argument.

Defendants' attempt to characterize their tying policy as a lawful "refusal to deal" (Mot. 12) has already been rejected. ECF No. 483 at 3. A "tying claim does not fail as a matter of law simply because it was implemented by refusing to deal with an intermediary." *Viamedia*, 951 F.3d at 472; *see also Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 463 n.8 (1992).

Defendants are also wrong that Plaintiffs did not present evidence that artists are the real customers purchasing two *separate* products. The evidence was uniform—including from Live Nation's own executives—that artists choose the venues where they play. Lewis, Trial Tr. 2004:22–24 ("The artist decides."); Roux, Trial Tr. 1336:4–7; Capshaw, Trial Tr. 4238:25–4239:9. Under antitrust law, economic substance governs. ECF No. 1037 at 31–33.

### 4.   Plaintiffs' Tying Claim Is Timely.

Defendants' statute-of-limitations argument is meritless. Live Nation's tying policy undisputedly continued through the limitations period. Roux, Trial Tr. 1298:6–8 (confirming that "[i]f an artist wants to play a Live Nation amphitheater, they need to sign up for Live Nation promotion"); Rapino, Trial Tr. 1853:1–2 ("[W]e don't let rival promoters, competitors, in our venues."). Live Nation's tying policy is therefore not barred by the statute of limitations. *See Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 n.15 (1968). Neither case cited by Defendants supports a different result. *Berkey* held that a plaintiff harmed during the limitations period "may satisfy the conduct prerequisite to recovery by pointing to anticompetitive actions taken before the limitations period." 603 F.2d at 296. And *Facebook*, 549 F. Supp. 3d 6 (D.D.C. 2021), dealt with laches related to prior, completed acquisitions, not a continuing anticompetitive policy.

## II.    DEFENDANTS ARE NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFFS' TICKETING MARKET CLAIMS

### A.    Both Primary Ticketing Markets Were Supported by the Record.

Plaintiffs presented ample evidence proving both primary ticketing markets. The Court need not (and should not) reweigh the evidence.

#### 1.    The Evidence Established that Both Primary Ticketing Markets Are Properly Limited to "MCVs."

Defendants' argument that Plaintiffs had to show "price discrimination" to support a market limited to Major Concert Venues ("MCVs") has already been rejected. ECF 1037 at 18–19. Courts regularly define markets around product characteristics important for a customer segment without any finding of price discrimination. *See Bertelsmann*, 646 F. Supp. 3d at 27–29; *FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 169 (3d Cir. 2022).

Moreover, Defendants either ignore or mischaracterize the extensive trial evidence of "sensitivity to price" and "[i]ndustry recognition." Mot. 16. For example, Dr. Hill testified that MCVs were highly dependent on concerts for profitability, making them especially sensitive to Ticketmaster's market power to raise prices. Hill, Trial Tr. 2089:22–2090:19.

The jury also heard evidence that MCVs are recognized as distinct; industry documents distinguish stadiums from arenas and amphitheaters and use capacity cutoffs like the 8,000-capacity cutoff Dr. Hill found reasonable. Hill, Trial Tr. 2085:21–2086:25*;* PX0867 at -697; PX1013 at 9; PX0326 at -543; Roux, Trial Tr. 1320:11–18. Unlike in *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1158–62 (N.D. Cal. 2004), Plaintiffs here did not put the "full weight" of proving their product markets on their expert alone; they bolstered their expert's market-definition opinions with industry testimony and documents.

Finally, the jury heard evidence that MCVs have different ticketing needs than stadiums. Because stadiums earn most of their revenues from team sports, they require different ticketing

services. Perez, Trial Tr. 2318:22–2319:11, 2432:23–2433:19; Groetzinger, Trial Tr. 822:4–14; *see also* Luter, Dep. Tr. 13:14–15:19 (Ticketmaster has separate business units for stadiums and arenas due to different ticketing needs). Dr. Hill and others testified that stadiums have only a few concerts each year and are much less dependent on concerts than MCVs. Hill, Trial Tr. 2089:1–18, 2090:1–2092:3. *See also* Marciano, Trial Tr. 947:23–24 (difference between an MCV and a stadium is based on "the amount of activity"); 948:15–17 (agreeing that stadiums "host fewer concerts than arenas and amphitheaters"); Perez, Trial Tr. 2433:1–8 ("Stadiums are primarily sports venues" hosting "just a handful of concerts a year"); Roux, Trial Tr. 1276:1–22 (non-superstar artists pre-determine to play amphitheaters, while superstar artists like Taylor Swift and Beyoncé can sell out stadiums); Groetzinger, Trial Tr. 924:25–925:4 ("arenas could be four [concerts] in a week" while stadiums "maybe have ten a year"). Ticketers specializing in large sporting events have not been able to enter the MCV market. Hill, Trial Tr. 2122:18–2124:8.

### 2.    The Evidence Established a Separate Primary Concert Ticketing Market.

Plaintiffs' market for Primary Concert Ticketing at MCVs is not "made up." Live Nation's own documents recognize concert ticketing as a separate market. PX0508 at -879; Marcus, Trial Tr. 2841:10–2842:3 (Ticketmaster document calculating its concert ticketing market share at 82%); 2838:11–24 (concert ticketing treated as distinct business). Dr. Hill provided extensive expert testimony in support. Hill, Trial Tr. 2089:22–2090:19, 2122:18–2124:3. Mr. Groetzinger testified that Barclays wanted to retain SeatGeek for sports but Ticketmaster for concerts. Trial Tr. 788:5–11. JUMP attempted to move beyond sports into concert ticketing but could not do so. Khoury, Trial Tr. 1613:20–1614:19; *see also* Hill, Trial Tr. 2122:18–2124:3 (Paciolan unable to break into primary ticketing market for MCVs). Courts

routinely find narrow markets defined by specific industry characteristics. *See Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242, 249–52 (1959); *Le v. Zuffa, LLC*, 216 F. Supp. 3d 1154, 1159–60 (D. Nev. 2016).

**B.    The Evidence Established Monopoly Power in the Primary Ticketing Markets.**

As the Court instructed, the jury could find monopoly power from indirect evidence— large market shares, persistent over time, protected by barriers to entry. JI23. Dr. Hill testified that Ticketmaster's share of the relevant ticketing markets varied between 83% and 87% from 2017 to 2024. Hill, Trial Tr. 2101:9–12. Ticketmaster documents calculated its share at 82% for concert ticketing. PX0508 at -879; Marcus, Trial Tr. 2841:10–2842:3. AXS's CEO testified that Ticketmaster is "over ten times" the size of its biggest competitor. Marciano, Trial Tr. 1101:17–22.

Dr. Hill testified about the durability of these market shares and the barriers protecting them. Hill, Trial Tr. 2105:16–2106:21. Industry witnesses confirmed: SeatGeek spent "hundreds of millions of dollars on R&D over the last ten years on primary ticketing" (Groetzinger, Trial Tr. 750:2–7); AXS testified that competing "requires a lot of patience and a lot of capital" (Perez, Trial Tr. 2323:23–2325:5). These barriers were exacerbated by long-term exclusive contracts— "72 percent of major concert venues" locked up for an average of 5.6 years. Hill, Trial Tr. 2285:24–2286:8 (noting that small ticketers do not lock up a market the same way a "firm with a very large portion of the market" can with long-term exclusive contracts); Marciano, Trial Tr. 1101:23–1102:3.

The jury was entitled to use this evidence to find monopoly power in the ticketing markets. This finding was bolstered by an internal document stating that Ticketmaster "alone can move the market." PX0406. The jury was also free to draw an inference from evidence that

-14-

senior executives sought to quash communications admitting market power. PX0715 ("Please do not send emails that state you want to 'crush' a Competitor. Not the language we want to be seeing in emails when reviewed by the DOJ or anyone for that matter.").

Finally, although direct evidence of price effects was not required, there was evidence that Ticketmaster used its monopoly power to raise prices (*see infra* 21–22) and consistently maintained ticketing profit margins exceeding 35%. Rapino, Trial Tr. 1778:7–1779:8 (AOI margin between 36%–38% from 2022 to 2024).

### C. The Evidence Established that Defendants Engaged in Exclusionary Conduct to Maintain a Monopoly in the Primary Ticketing Markets.

The evidence demonstrated that Defendants maintained their monopoly in the Primary Ticketing markets through a pattern of exclusionary conduct, including long-term exclusive ticketing agreements, aggressive renewals and extensions, threats to withhold and actual withholding of concerts, and the anticompetitive OVG agreement. The jury was properly instructed to consider this conduct holistically. JI24; *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 652–54 (2d Cir. 2015) (confirming that monopolization depends on the overall competitive effect of combined conduct that coerces consumers and impedes competition, rather than isolated acts); *see Cont'l Ore Co.*, 370 U.S. at 699 ("[T]he duty of the jury was to look at the whole picture."). The "key question" is whether Defendants' conduct "reasonably appear[s] capable of significantly contributing to maintaining [Ticketmaster's] monopoly power." *United States v. Google LLC*, 747 F. Supp. 3d 1, 153 (D.D.C. 2024); *see Berkey Photo*, 603 F.2d at 274 (monopoly power need not have been used to extract a monopoly price).

***Exclusive Dealing***: Ample evidence showed Defendants' policy of entering long-term exclusive ticketing agreements with a substantial portion of the market. This evidence alone was

sufficient to support the jury's verdict finding exclusionary conduct to maintain Ticketmaster's monopoly in the ticketing markets. *See Google*, 747 F. Supp. 3d at 152–153 (exclusive dealing unlawful "when used by a dominant firm to maintain its monopoly"); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012).

It is uncontested that Ticketmaster entered long-term exclusive agreements averaging five years or more with hundreds of venues. Yovich, Trial Tr. 2733:17–2734:5; Rapino, Trial Tr. 1844:2–17. Ticketmaster had such agreements with at least one MCV in every Plaintiff state except Vermont. PX1293; Trial Tr. 3272:10–3273:15. The jury could infer this was part of what Rapino described as the "incredible moat around the castle." Rapino, Trial Tr. 1803:13–18.

The evidence further showed that Ticketmaster aggressively policed its exclusive deals against any attempt to sell primary concert tickets outside its platform. Marcus, Trial Tr. 2853:17–20, 2854:6–2859:7 ("Ticketmaster has a long history of defending its exclusive rights, which Mr. Rapino and the Live Nation management team fully supports"), 2860:9–2864:8 (aggressive enforcement against Kanye West).

Dr. Hill testified that Ticketmaster's long-term exclusive agreements raised barriers to entry and expansion. Hill, Trial Tr. 2105:16–2106:21. Competing ticketers confirmed this testimony: SeatGeek's CEO testified that "a substantial majority of venues could not" switch even if SeatGeek had a product "20 times better," because they are "locked into a very long-term exclusive deal." Groetzinger, Trial Tr. 762:10–17; Marciano, Trial Tr. 1101:25–1102:3 (AXS's biggest challenge is the "ticketing agreements that Ticketmaster has with the venues" because AXS cannot "find ways to build a client base."); Van Stone, Trial Tr. 3290:21–3291:22, 3292:14–3293:11 (Ticketmaster contract prohibited venue from working with primary ticketer offering less friction or better fan service/pricing); Abbamondi, Trial Tr. 231:23–233:11 (Barclays found

SeatGeek's proposal attractive because it allowed nonexclusive distribution not permitted with Ticketmaster).

The evidence established that Defendants compounded these effects by aggressively pursuing early renewals to avoid RFPs and deprive competitors of chances to bid. PX0835 ("Continue to aggressively pursue early renewal opportunities to avoid RFP processes."); Johnson, Trial Tr. 3791:18–25, 3899:24–3900:2 (bonuses incentivizing early renewals), 3923:24–3924:12 (bonuses incentivizing longer-term renewals).

***Threats, retaliation, conditioning***: The trial record contained evidence that Defendants threatened to and actually withheld concerts from venues that did not choose Ticketmaster. Defendants argue that there should have been more of this evidence, but it was up to the jury to determine if the evidence presented was sufficient. *Meloff*, 240 F.3d at 145.

Dr. Hill testified that NBA and NHL arenas received 14 Live Nation concerts while using a rival ticketer versus 27 when using Ticketmaster—and lost shows when switching away from Ticketmaster (17 to 11). Hill, Trial Tr. 2115:15–2116:20.

The jury also heard specific examples from fact witnesses. After Barclays chose SeatGeek over Ticketmaster, Rapino made a "veiled threat" and Live Nation carried it out, resulting in "a dramatic decline in Live Nation shows" with "[s]ignificant[]" financial impact on Barclays, which made "essentially all of [its] profits from concerts." Abbamondi, Trial Tr. 260:24–261:5, 265:6–21, 267:20–23. Dr. Hill studied the data after Barclays switched back to Ticketmaster and confirmed a pattern of conduct in which the number of Live Nation concerts received by Barclays went up and down depending on its fealty to Ticketmaster, while the supply of concerts to other New York venues negated any claim that the reduction was due to UBS Arena's opening. Hill, Trial Tr. 2113:4–2114:25. Similarly, when Xcel Energy Center considered

-17-

switching from Ticketmaster, Live Nation made "credible threat[s]" of withholding concerts that would be "almost catastrophic." Helgerson, Trial Tr. 397:17–398:9, 404:20–405:2. Xcel Center then signed with Ticketmaster even though SeatGeek offered $1 million more per year. *Id.* 406:7–407:7; PX1293. AEG's venues likewise "started losing Live Nation shows" after switching from Ticketmaster. Marciano, Trial Tr. 1122:5–13. The jury's decision to credit this testimony is not subject to reevaluation. *Zellner*, 494 F.3d at 371.

Conduct toward one venue can also affect the decisions of other venues, as managers often speak with counterparts when evaluating ticketing options. Groetzinger, Trial Tr. 757:25–759:1; *see also* Abbamondi, Trial Tr. 289:13–291:13 (spoke with other venue owners about Barclays's experience switching ticketers); Chi, Trial Tr. 540:11–21 (City of Irvine spoke with other amphitheaters when considering ticketing options).

SeatGeek was so concerned about Defendants' content withholding that it offered "retaliation insurance" to venues on at least 15 separate occasions. Groetzinger, Trial Tr. 763:14–765:1. The insurance was triggered twice (Dallas Cowboys and Florida Panthers). *Id.* 768:9–20, 775:4–24; *see also* Perez, Trial Tr. 2327:22–2328:8 (venue required AXS to include "million dollar content acquisition fund" to guarantee against losing Live Nation concerts).

Live Nation executives responsible for concerts understood their job included obtaining venues' selection of Ticketmaster. Campana, Trial Tr. 1450:1–23 (job was "not just to put the tours in the buildings, but to get the venues to [contract with] Ticketmaster"); PX0368 (Campana: "We have always looked at our job as needing to deliver both buildings for ticketing"); Campana, Trial Tr. 1440:7–23 (Mr. Wavra of Live Nation told venues "they had to drop AXS . . . and use Ticketmaster, in order to get the Jonas Brothers tour"); Evans, Trial Tr.

1693:10–1697:10 (Live Nation withheld content from HEB Center after venue selected different ticketer).

Defendants argue that concert withholding is mere "self-preferencing." But the jury was free to reject that characterization. *See In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 229 (S.D.N.Y. 2019) ("A monopolist's conduct violates Section 2 if it '(1) tends to impair the opportunities of rivals, [and] also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way.'"); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072–73 (10th Cir. 2013) (distinguishing refusal to deal from unlawful efforts to "limit the abilities of third parties to deal with rivals"); *Aspen Skiing Co.*, 472 U.S. at 601–04 (refusal to provide rival ticketing access to ski mountains that were necessary to compete violated Section 2).[9]

Defendants further argue that conditioning access to concerts can only be exclusionary if Live Nation has market power in concerts. That is wrong. The question is whether the conduct has "the effect of preventing or excluding competition . . . within the relevant market." JI24. In any event, the jury heard evidence that Live Nation controls 75%–80% of concert content in the United States. PX0852; Evans, Trial Tr. 1663:12–1664:15. Rapino described Live Nation as "larger than every other promoter in the world combined" with "incredible market power." Rapino, Trial Tr. 1798:25–1799:14; Roux, Trial Tr. 1285:13–1286:6 (49% U.S. promoter share, three times the closest competitor); *In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d 403, 418 (S.D.N.Y. 2005) (market share over 30% is the "presumptive line for inferring market power"). And Dr. Hill testified that venues could not reasonably replace Live Nation concerts

---

[9] Defendants' reliance on *Google* and *Bayou Bottling, Inc. v. Dr. Pepper Co.*, 725 F.2d 300 (5th Cir. 1984), is misplaced. Both courts found no evidence of harm to competition. Here, Live Nation used content-withholding threats to foreclose Ticketmaster's competition.

with non-Live Nation concerts or other types of shows, confirming that Live Nation's conditioning excluded competition. Trial Tr. 2120:12–2123:8.

*OVG Agreement*: Lastly, the jury could reasonably conclude that Ticketmaster's 2022 agreement with OVG to steer client venues to Ticketmaster's monopoly, which OVG did not disclose to its clients, was additional exclusionary conduct. *See United States v. Microsoft Corp.*, 253 F.3d 34, 76 (D.C. Cir. 2001) (misleading developers into supporting Microsoft's monopoly through product design while representing it would abide by its "public commitment" to neutrality was anticompetitive). OVG's CEO testified that Ticketmaster agreed to pay OVG $70 million over 10 years, plus a $20 million "signing bonus," to "advocate" for Ticketmaster at over 200 venues—while keeping this paid advocacy secret in violation of OVG's fiduciary duty. Granger, Trial Tr. 2662:25–2666:8. Under the 2022 deal, OVG steered venues into exclusive Ticketmaster deals without competitive bidding. *Id.* 2632:10–2635:15; PX0781 at -703–04 (venue "agreed to disregard" its RFP requirement after "[v]enue leadership [*e.g.*, OVG] lobbied the city"); Yovich, Trial Tr. 2738:19–2741:12.

AXS's CEO testified that "[h]istorically, [AXS] has not been invited" to compete for OVG-managed venues. Perez, Trial Tr. 2331:4–6. When Hartford learned about the no-bid process, it reopened bidding—and AXS won by offering better terms. Perez, Trial Tr. 2331:25–2332:7; Granger, Trial Tr. 2638:3–19.

> **D.    The Evidence Established Anticompetitive Effects in the Primary Ticketing Markets.**

Defendants argue the anticompetitive-effects verdict should be overturned for lack of price or output evidence. But the jury was properly instructed that "[h]arm to competition . . . may . . . include substantially constrained consumer choice in the market." J24; *see MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 182, 186 (2d Cir. 2016) ("reduced consumer

choice" suffices); ECF No. 1037 at 36 ("[N]o part of this analysis requires the plaintiff to show *actual* 'changed prices, output, or quality'") (emphasis in original). Moreover, contrary to Defendants' assertions, the jury heard evidence of anticompetitive price and quality effects.

*Choice*: Plaintiffs put forth significant evidence that Defendants substantially restrained venue choice by maintaining their monopoly through exclusionary conduct. *See supra* 15–20. The trial evidence showed this deprivation of choice was exacerbated by high barriers to entry. *See supra* 14–16. Defendants dismiss barrier evidence as relevant only to monopoly power, but barriers erected by exclusionary conduct are probative of anticompetitive effects because they show the conduct is "capable of making a significant contribution to . . . maintaining monopoly power." *Microsoft*, 253 F.3d at 79. Evidence that Ticketmaster's long-term exclusive contracts, concert withholding, and the OVG deal substantially impaired rivals' ability to expand their ticketing business supports the jury's verdict. *See McWane, Inc. v. FTC*, 783 F.3d 814, 840 (11th Cir. 2015) (anticompetitive effects where rivals' "growth was meaningfully (and deliberately) slowed").

*Price*: Plaintiffs presented evidence that Ticketmaster used its monopoly power to charge high ticketing fees. Rapino, Trial Tr. 1408:13–15 (on a $70 ticket, fees can average $20 or more); Hill, Trial Tr. 2124:14–2125:14 (fees went up by $4.33 at MCVs that switched to Ticketmaster and decreased by $3.82 when switching away); Mueller, Trial Tr. 3115:23–3117:11 (admitting he told Irvine City Council that Defendants would charge "exorbitant fees"); *see also* Abrantes-Metz, Trial Tr. 2452:8–17 (68%–75% of overcharge paid by fans, rest by venues). Defendants' executives admitted that Ticketmaster's double-dipping fees on Platinum pricing were "hard to defend," with Roux stating: "How much money do we need to make!?!?" PX1106; Marcus, Trial Tr. 2893:8–23 ("boil the frog" strategy regarding Platinum fees).

Trial evidence showed lower ticketing fees in the UK and France, where long-term exclusive agreements are not used and ticketing is typically split among multiple companies. Perez, Trial Tr. 2338:2–7 ("In the U.S., [ticket fees] can run around 25 percent . . . . In the UK, the market is really 12.5 percent. And in France, it's 10 percent.").

*Quality*: The jury also heard extensive evidence of reduced quality. Rapino, Trial Tr. 1862:11–15 (describing Ticketmaster's core technology as being held together with "duct tape"); Yovich, Trial Tr. 2710:10–2711:16 (90% of Ticketmaster's internal tech executives were dissatisfied with technological delivery against its strategic plan); DX-0790 at -210 (Ticketmaster has "fallen behind in the arms race" to prevent tech abuse); PX0231 at -160 (Ticketmaster "slow to move and innovate"); Yovich, Trial Tr. 2694:17–2695:3 (Ticketmaster's technology still based on system first developed in 1977); PX0576 at-479 (onsale issue "affects [Ticketmaster clients'] most important fans, and [Ticketmaster is] unable to execute a very simple task"); PX0018 ("TM sucks"); Mueller, Trial Tr. 3089:22–3091:12 (Ticketmaster's failure to prevent purchases by bots and brokers that violate ticket-purchase terms of service); Marcus, Trial Tr. 2881:24–2882:23 (admitting concern that "Ticketmaster is not investing enough in data science"); Khoury, Trial Tr. 1616:24–1618:20 (limitations of Ticketmaster's "core ticketing engine" compared to JUMP's modern system); Hansen, Trial Tr. 3378:7–3381:5; 3384:7–3387:22; PX0783 at -334–43 (fan "pain points" include fact that "[c]onfusing and error-filled sales are frustrating fans and degrading [Ticketmaster's] brand"); PX0878 at -866; PX0800 at -536–39; DX-0790 at -210 (Ticketmaster's abuse team "lack[s] the tools and skillset to identify and manage sophisticated bots"); Yovich, Trial Tr. 2727:2–2728:24 (testifying about same); Budish, Trial Tr. 3217:22-3218:14; 3221:13–20 (same); Kelly, Trial Tr. 1589:25–1590:23 (describing difficulties with purchasing Ticketmaster tickets).

## III.  DEFENDANTS ARE NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THE STATE-LAW CLAIMS.

For the reasons set forth above, Defendants' arguments on the Sherman Act claims are without merit. Consequently, the jury's verdict on state statutes congruent with the Sherman Act cannot be overturned.

The evidence also supports the jury's finding of competitive impact in each Plaintiff state. The jury heard that Live Nation maintained nationwide policies with respect to long-term exclusive ticketing agreements and prohibiting non-Live Nation promoters at its venues, including Large Amphitheaters, with no exceptions for any state. *See supra* 14–16, 9–11. Defendants admitted that Ticketmaster had exclusive deals with, and Live Nation promoted a show in, at least one MCV in each Plaintiff state except Vermont. PX1293; Trial Tr. 3272:10–3273:15. Moreover, combined ticketing data showed competitive impact on prices for fans in every state. DX-4054; Trial Tr. 3272:10–3273:15; *see In re Remicade Antitrust Litig.*, 345 F. Supp. 3d 566, 585–87 (E.D. Pa. 2018) (rejecting that plaintiffs must plead conduct occurring wholly within the state to show impact within a state).

## IV.  DEFENDANTS ARE NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON DAMAGES

Defendants' motion on damages should be denied. Defendants have identified no basis—under Rule 702 or Rule 50(b)—for disturbing the jury's unanimous damages verdict.

As a threshold matter, to the extent Defendants attempt to incorporate by reference all pre-trial challenges to the admissibility of Dr. Abrantes-Metz's opinions (Mot. 28–29), Defendants fail to identify which arguments, if any, support judgment as a matter of law *based on the evidence presented at trial*. That is plainly insufficient under Rule 50, which requires the movant to specifically identify the particular legal and factual basis for each claim they contend is legally insufficient. *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 17 (2d Cir. 1993) (reversing grant of

Rule 50 motion where specificity requirement was not satisfied; the motion must identify why "a reasonable jury could only reach one conclusion."); *AIG Glob. Sec. Lending Corp. v. Banc of Am. Sec., LLC*, 386 F. App'x 5, 6 (2d Cir. 2010) ("[T]he specificity requirement is obligatory.").[10]

The only remaining issue is the admissibility of Dr. Abrantes-Metz's opinion that fixed lump-sum "upfront payments" should not be netted against marginal per-ticket charges when measuring price effects on consumers.[11] That narrow issue concerns admissibility under Rule of Evidence 702, not sufficiency under Rule 50.

Nothing in the trial record compels the Court to change its original conclusion that Defendants' challenges to her treatment of upfront payments "do not undermine the admissibility of Abrantes-Metz's model, although they may go to the weight assigned to it by the jury." ECF No. 1094 at 13. And because the jury credited Dr. Abrantes-Metz's testimony despite vigorous cross-examination and countervailing expert testimony on the upfront-payments issue, Defendants are not entitled to judgment as a matter of law on damages.

---

[10] Plaintiffs relied on the Court's prior admissibility rulings pertaining to Dr. Abrantes-Metz's testimony in presenting their damages case at trial. Even if the Court deems proper Defendants' attempt to shoehorn 102 pages of prior briefing from 5 filings, including pre-trial filings, into their Rule 50(b) motion, those previously-rejected arguments to exclude the opinions of Dr. Abrantes-Metz fail for the reasons set forth in Plaintiffs' corresponding briefs (ECF Nos. 743, 1229, 1382) and the Court's prior orders (ECF Nos. 1094, 1278, Trial Tr. 4477:18–4478:21). Indeed, Rule 50(b) is not a vehicle for relitigating expert-admissibility challenges the Court has already considered and rejected. *See Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267–68 (2d Cir. 2002) ("Once the district court has deemed the evidence sufficiently reliable so as to be admissible, it is 'bound to consider the evidence in the light most favorable to plaintiff' when deciding motions for . . . judgment as a matter of law.").

[11] Defendants' March 30, 2026 motion to strike raised three objections: (1) exclusion of upfront payments from the retained-amount analysis; (2) alleged perjury concerning the meaning of "retained amount"; and (3) reliability of AXS as a benchmark. ECF No. 1348 at 12–18. On April 8, 2026, the Court denied grounds (2) and (3) on the merits. Trial Tr. 4477:16–4478:21. The Court reserved its decision only on the upfront-payment issue. *Id.* at 4478:22–4482:4.

**A.      Defendants' Upfront-Payment Challenge Sounds in Rule 702, Not Rule 50.**

A court cannot grant a motion under Rule 50(b) unless a "reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(b).  If the Court properly admitted Dr. Abrantes-Metz's testimony, there is no question that it was a sufficient basis for the jury to reach its damages verdict—and Defendants do not argue otherwise. Mot. 28.

Defendants argue instead that the testimony should not have been admitted in the first place because Dr. Abrantes-Metz's decision not to net upfront payments against retained amounts was purportedly methodologically unreliable. *Id.* That is a Rule 702 determination. *See Amorgianos*, 303 F.3d at 264. The Court recognized this distinction, explaining that the question implicated its Rule 702 gatekeeping obligations. Trial Tr. 4478:22–4479:13. The legal issue is whether Dr. Abrantes-Metz had a reliable basis under Rule 702 for treating retained amounts— the marginal per-ticket price—as the relevant upstream charge for her tax-incidence analysis. She did.

Under Rule 702, courts exclude expert testimony only "if it is speculative or conjectural or based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison.'" *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009) (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)). Regression analyses have long been held to be the type of established technique that is admissible under Rule 702. *Lavin-McEleney v. Marist Coll.*, 239 F.3d 476, 482 (2d Cir. 2001) ("It is undisputed that multiple regression analysis . . . is a scientifically valid statistical technique"); *United States v. Am. Exp. Co.*, 2014 WL 2879811, at *4 (E.D.N.Y. June 24, 2014) ("Plaintiffs do not, and indeed cannot, contend that multiple regression analysis is not itself a well-established and reliable econometric methodology

-25-

frequently relied upon by federal courts under Rule 702."). Neither is it an "apples and oranges comparison"—Dr. Abrantes-Metz excluded upfront payments from the benchmark and Ticketmaster to ensure an "apples-to-apples" comparison. Trial Tr. 2485:12–24, 2585:17–2586:9.

Defendants and their experts take issue only with Dr. Abrantes-Metz's *application* of the methodology—her decision not to deduct upfront payments. But that dispute was for the jury to resolve. *See Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (Brennan, J., concurring in part and joined by all members of the Court); *Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017); *Gulf Coast Bank & Tr. Co. v. Great Lakes Ins. SE*, 2025 WL 1134454, at *4–5 (M.D. La. Apr. 16, 2025) ("The most appropriate place to challenge the assumptions made by an expert is at trial on cross-examination and with countervailing expert testimony."); Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("'[S]ufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.").

### B.    Dr. Abrantes-Metz's Treatment of Upfront Payments When Implementing Her Methodology Satisfies Rule 702.

#### 1.    Dr. Abrantes-Metz's Regression and Treatment of Upfront Payments Reliably Measured the Relevant Ticket-Level Charge for Purposes of Her Tax-Incidence Analysis.

The Court identified the core issue at the April 8 hearing: whether Dr. Abrantes-Metz's retained-amount methodology could reliably serve as the foundation for her tax-incidence model if upfront payments were excluded. Trial Tr. 4479:25–4480:21. Her damages model proceeds in two steps: first, identifying an overcharge imposed by Ticketmaster on venues ("Step One"); second, determining how that overcharge is allocated between venues and consumers ("Step Two"). *Id.* 4479:25–4480:6. The Court questioned whether Step One can reliably identify an

overcharge if upfront payments are excluded from the retained-amount calculation. *Id.* 4480:11–16. The question is thus whether she had a reliable economic basis for treating retained amounts—the marginal per-ticket price—rather than net profitability as the relevant upstream charge. She did.

As Dr. Abrantes-Metz explained, Step One was not designed to measure net profitability of Ticketmaster's venue contracts. It was designed to measure the *per-ticket* price Ticketmaster charges venues, whose elevation generates an overcharge and whose incidence is allocated between venues and consumers. Step One focuses on the charge that varies with each ticket sold, rather than on fixed contractual transfers, which are independent of ticket sales.

Dr. Abrantes-Metz testified that the retained amount represented "the dollar *marginal price per ticket* that Ticketmaster keeps," and confirmed this had "always been [her] definition." *Id.* 4180:15–18 (emphasis added). Her rebuttal report was equally explicit: the retained amount "is essentially the per-ticket *price* charged by Ticketmaster. It is not, nor was it intended to be, the *net per-ticket profit* retained by Ticketmaster. To arrive at that, one would of course deduct all manner of expenses—not just upfront payments . . . but also employee salaries, rent, and all other operating expenses." Rebuttal Report ¶ 108 (emphasis in original). She further testified that upfront payments are "not part of the price at all," Trial Tr. 2584:22–24, and that "[t]he fan does not get a discount if they're going to an event for a venue for which there were no upfront payments," *id.* 2581:11–13.

This approach is supported by well-established economics literature. Where a contract combines a fixed upfront payment with a per-transaction charge, the fixed payment allocates surplus between the contracting parties, while the per-unit charge drives transaction-level pricing and determines pass-through to end buyers. *See* Dennis W. Carlton & Jeffrey M. Perloff, *Modern*

-27-

*Industrial Organization* ch. 10, at 314–16 (4th ed. 2005); Patrick Rey & Jean Tirole, *The Logic of Vertical Restraints*, 76 Am. Econ. Rev. 921, 921–25 (1986) (in vertical contracts, the per-unit wholesale price—not any fixed fee—drives downstream pricing because the fixed fee does not enter the downstream firm's per-unit cost calculus). Because an overcharge-allocation analysis asks how a price increase on individual transactions is divided between seller and buyer, the per-unit charge is the correct input. The upfront payment remains the same whether a venue sells ten thousand tickets or one hundred thousand—it has no impact on the individual transaction price. Johnson, Trial Tr. 3940:7–3941:14. The retained amount, by contrast, is earned one ticket at a time.

Defendants' proposed adjustment would distort the analysis. Amortizing a fixed upfront payment across future ticket sales would make the per-ticket "overcharge" depend on the total number of tickets sold over the contract's lifetime—a quantity unknown when consumer prices are set. Abrantes-Metz, Trial Tr. 4191:2–21. A variable that cannot be known at the time of the relevant pricing decision cannot determine the price venues charge to fans. As Dr. Abrantes-Metz testified: "No one knows because that calculation is not possible." Trial Tr. 2609:1. Further, Defendants' approach would mean that if a venue sold more tickets than expected, the same upfront payment would be split among that higher number of tickets, leading to lower per-ticket deductions and higher overcharges. That can't be right.

Fundamentally, Defendants' disagreement over whether upfront payments should be deducted goes to weight, not admissibility. *See In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.*, 2022 WL 15053250, at *27, *31 (E.D.N.Y. Oct. 26, 2022) (disagreements over assumptions, inputs, or methodology raise questions for the jury, not for exclusion); *see also* ECF No. 1382 at 20 n.6 (collecting cases). Dr. Abrantes-Metz does not

-28-

disagree that upfront payments may affect profitability. Trial Tr. 4190:24–4191:2. But her analysis addressed the marginal per-ticket price and how the resulting overcharge is allocated between venues and consumers. Selecting the economically appropriate input for that calculation is a methodological choice that Defendants vigorously contested before the jury. Under Rule 702, however, a methodology is not rendered unreliable because an adversary prefers a different framework.

The reliability of Dr. Abrantes-Metz's methodology is further confirmed by results: higher retained amounts were associated with higher consumer fees—exactly the relationship economic theory predicts. Opening Report ¶ 178 & Fig. 28 (ECF No. 722-1). If retained amounts were not capturing the relevant ticket-level charge, there would be no reason to expect this observed causal relationship.

For the foregoing reasons, the retained-amount methodology employed by Dr. Abrantes-Metz is reliable. Rule 702 does not require an expert to employ the only acceptable methodology, or even the best one. It requires only a reliable methodology based on accepted principles and a reasoned basis for the choices made. Even if the Court were to conclude that a different methodology was preferable, exclusion is not warranted under Rule 702. The question was for the factfinder, and after intensive cross-examination on this specific issue, the jury resolved it in Plaintiffs' favor.

### 2. Even if Defendants' Criticism Is Viewed as an Omitted-Variable Challenge, That Dispute Also Goes to Weight, Not Admissibility.

Defendants have at times cast their objection as an omitted-variable claim, arguing Dr. Abrantes-Metz wrongfully excluded upfront payments. But "[n]ormally, failure to include variables will affect the analysis' probativeness, not its admissibility." *Bazemore*, 478 U.S. at 400. The Second Circuit has consistently applied that principle, holding that regressions

excluding "potentially important" variables may not be excluded on that basis alone. *See Reed Construction Data Inc. v. McGraw-Hill Cos.*, 49 F. Supp. 3d 385, 401 (S.D.N.Y. 2014); *Kurtz v. Costco Wholesale Corp.*, 818 F. App'x 57, 62 (2d Cir. 2020).

Dr. Abrantes-Metz did not overlook upfront payments; she expressly considered them and concluded they should not be incorporated because they are fixed transfers that, under established economic theory, would not affect ticket-level charges paid by consumers. As Dr. Abrantes-Metz explained: "Fans are not a party to the upfront payments. Fans do not receive upfront payments, nor do they make them. When I break down the ticket price paid by fans, no portion of it is allocated to 'upfront payments.'" ECF No. 1382-1 ¶ 41 (Apr. 3, 2026 Decl.); *see also* Rebuttal Rep. ¶ 109 (ECF No. 722-2). Her exclusion of upfront payments flowed directly from her conclusion that, under established economic principles, upfront payments are not part of the ticket-level charge whose incidence is borne by consumers. This was independently confirmed by Dr. Budish's concession that upfront payments, in many cases, are provided "in exchange for rights" of economic value to Ticketmaster—such as sponsorship, naming rights, and exclusivity—rather than as an offset to per-ticket pricing. Trial Tr. 3249:8–3253:10. The jury heard similar testimony from Ms. Johnson that Ticketmaster's fixed payments to venues typically involve some exchange of asset to Ticketmaster, like promotional signage, status as official ticketer, or any number of things, as well as advances that can sometimes require repayment. Trial Tr. 3881:6–3882:20, 3888:20–23, 3921:11–16; *see also* DX-0404 at -366.

Nor does this case fall within the narrow exception in *Reed Construction*, where an expert omitted a clearly outcome-determinative variable without justification. There, the expert conceded the omitted variable had a "significant and negative" effect. 49 F. Supp. 3d at 403–04. Here, there is no showing that upfront payments are outcome-determinative for any step of Dr.

-30-

Abrantes-Metz's analysis, and she offered a well-reasoned justification for her approach. Defendants cannot show that her treatment of upfront payments is so unsupported by economic theory as to warrant exclusion. *See Restivo*, 846 F.3d at 577 (assumptions go to weight unless "so unrealistic and contradictory as to suggest bad faith").

      **C.**       **Figure 29 Independently Corroborates the Reliability of the Abrantes-Metz Methodology.**

Plaintiffs agree with the Court's observation that Figure 29 was not presented to the jury and does not bear on sufficiency under Rule 50(b). Trial Tr. 4479:6–9. But Defendants' remaining challenge rests on Rule 702, and both parties agree the Court may consider materials not presented to the jury for that purpose. *Id.* 4479:6–13. In denying Defendants' pretrial *Daubert* motion, the Court relied significantly on Figure 29. *Id.* 4479:4–6. It remains relevant to the Rule 702 inquiry.

Figure 29 provides independent confirmation that consumers paid higher fees at Ticketmaster-ticketed events, using a comparison methodology that does not rely on the challenged retained amounts. *Id.* 4182:18–4183:22. This supports admissibility.

Defendants argue that Dr. Abrantes-Metz used a "gross retained amount" when she should have used a measure net of upfront payments. However, this argument does not (and cannot) extend to fees paid by fans. "Fan-paid fees net of upfront payments" is not an economically meaningful concept: upfront payments are not paid by fans and cannot be deducted from what fans pay.

Dr. Abrantes-Metz's assignment was to measure the elevation in prices paid by fans as a result of Ticketmaster's monopolization. Opening Rep. ¶ 21. She used the two-step process described above. Figure 29 obviates the need to look at both steps (along with the challenged retained amount) and asks the damages question directly: were total fees paid by fans higher for

-31-

Ticketmaster-ticketed events than for comparable AXS-ticketed events? That is why Figure 29 serves as an independent cross-check: it does not depend on the challenged allocation of fees between venues and ticketers contained in the retained amount. The per-ticket fee premium identified by Figure 29 is directionally and statistically consistent with Dr. Abrantes-Metz's $1.56 to $1.72 damages estimate. Opening Rep. ¶ 182.

* * *

For all these reasons, there is no basis under Rule 702 to disturb the jury's damages verdict. The jury had this expert dispute squarely presented through extensive cross-examination and Defendants' own experts and resolved it in Plaintiffs' favor. There is no basis under Rule 50(b) for overturning the jury's unanimous decision.

## CONCLUSION

The Court should deny Defendants' motion for judgment as a matter of law and leave standing the jury's carefully considered verdict.

*[Signatures on following page]*

-32-

Dated June 18, 2026

Respectfully Submitted,

/s/ *Jeffrey L. Kessler*

Jeffrey L. Kessler
Eva W. Cole
Johanna Rae Hudgens
**WINSTON TAYLOR LLP**
200 Park Avenue
New York, NY 10166
Tel: (212) 294-6700
Fax: (212) 294-4700
jeffrey.kessler@winstontaylor.com
Eva.cole@winstontaylor.com
Johanna.hudgens@winstontaylor.com

Jeanifer E. Parsigian (*pro hac vice*)
**WINSTON TAYLOR LLP**
101 California Street, 21st Floor
San Francisco, CA 94111
Tel: (415) 591-1000
Fax: (415) 591-1400
jeanifer.parsigian@winstontaylor.com

/s/ *Jonathan H. Hatch*
Jonathan H. Hatch
Assistant Attorney General
**Office of the New York State Attorney General**
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8598
Email: jonathan.hatch@ag.ny.gov

*Counsel for Plaintiff State of New York*

*/s/ Robert A. Bernheim*
Robert A. Bernheim (admitted *pro hac vice*)
Office of the Arizona Attorney General
Consumer Protection & Advocacy Section
2005 N. Central Avenue
Phoenix, AZ 85004
Telephone: (602) 542-3725
Fax: (602) 542-4377
Email: Robert.Bernheim@azag.gov
*Attorney for Plaintiff State of Arizona*

*/s/ Brent Nakamura*
Brent Nakamura (admitted *pro hac vice)*
Supervising Deputy Attorney General
Office of the Attorney General
California Department of Justice
300 South Spring Street
Los Angeles, CA 90013
Telephone: (213) 269-6000
Email: Brent.Nakamura@doj.ca.gov
*Attorney for Plaintiff State of California*

*/s/ Conor J. May*
Conor J. May (admitted *pro hac vice*)
Assistant Attorney General
Antitrust Unit
Colorado Department of Law
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email: Conor.May@coag.gov
*Attorney for Plaintiff State of Colorado*

*/s/ Rose Levine*
Rose Levine (admitted *pro hac vice*)
Nicole Demers (admitted *pro hac vice*)
Assistant Attorney General
Office of the Attorney General of
Connecticut
165 Capitol Avenue
Hartford, CT 06106
Telephone: 860-808-5030
Email: rose.levine@ct.gov
         nicole.demers@ct.gov
*Attorney for Plaintiff State of Connecticut*

*/s/ Adam Gitlin*
Adam Gitlin (admitted *pro hac vice*)
Chief, Antitrust and Nonprofit Enforcement
Section
Office of the Attorney General for the
District of Columbia
400 6ᵗʰ Street NW, 10ᵗʰ Floor
Washington, DC 20001
Email: Adam.Gitlin@dc.gov
*Attorney for Plaintiff District of Columbia*

*/s/ Lizabeth A. Brady*
Lizabeth A. Brady
Director, Antitrust Division
Florida Office of the Attorney General
PL-01 The Capitol
Tallahassee, FL 32399-1050
Telephone: 850-414-3300
Email: Liz.Brady@myfloridalegal.com
*Attorney for Plaintiff State of Florida*

*/s/ Richard S. Schultz*
Richard S. Schultz (admitted *pro hac vice*)
Assistant Attorney General
Office of the Illinois Attorney General
Antitrust Bureau
115 S. LaSalle Street, Floor 23
Chicago, Illinois 60603
Telephone: (872) 272-0996
Email: Richard.Schultz@ilag.gov
*Attorney for Plaintiff State of Illinois*

*/s/ Jesse Moore*
Jesse Moore (admitted *pro hac vice*)
Deputy Attorney General
Office of the Indiana Attorney General
302 W. Washington St., Fifth Floor
Indianapolis, IN 46204
Telephone: 317-232-4956
Email: Jesse.Moore@atg.in.gov
*Attorney for Plaintiff State of Indiana*

*/s/ Christopher Teters*
Christopher Teters (admitted *pro hac vice*)
Assistant Attorney General
Public Protection Division

-34-

Office of Kansas Attorney General
120 S.W. 10th Avenue, 2nd Floor
Topeka, KS 66612-1597
Telephone: (785) 296-3751
Email: chris.teters@ag.ks.gov
*Attorney for Plaintiff State of Kansas*

/s/ *Mario Guadamud*
Mario Guadamud (admitted *pro hac vice*)
Louisiana Office of Attorney General
1885 North Third Street
Baton Rouge, LA 70802
Telephone: (225) 326-6400
Fax: (225) 326-6498
Email: GuadamudM@ag.louisiana.gov
*Attorney for Plaintiff State of Louisiana*

/s/ *Schonette J. Walker*
Schonette J. Walker (admitted *pro hac vice*)
Assistant Attorney General
Chief, Antitrust Division
200 St. Paul Place, 19th floor
Baltimore, Maryland 21202
Telephone: (410) 576-6470
Email: swalker@oag.state.md.us
*Attorney for Plaintiff State of Maryland*

/s/ *Katherine W. Krems*
Katherine W. Krems (admitted *pro hac vice*)
Assistant Attorney General, Antitrust Division
Office of the Massachusetts Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (617) 963-2189
Email: Katherine.Krems@mass.gov
*Attorney for Plaintiff Commonwealth of Massachusetts*

/s/ *LeAnn D. Scott*
LeAnn D. Scott (admitted *pro hac vice*)
Assistant Attorney General
Corporate Oversight Division

Michigan Department of Attorney General
P.O. Box 30736
Lansing, MI 48909
Telephone: (517) 335-7632
Email: ScottL21@michigan.gov
*Attorney for Plaintiff State of Michigan*

/s/ *Zach Biesanz*
Zach Biesanz
Senior Enforcement Counsel
Antitrust Division
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
Saint Paul, MN 55101
Telephone: (651) 757-1257
Email: zach.biesanz@ag.state.mn.us
*Attorney for Plaintiff State of Minnesota*

/s/ *Lucas J. Tucker*
Lucas J. Tucker (admitted *pro hac vice*)
Senior Deputy Attorney General
Office of the Nevada Attorney General
Bureau of Consumer Protection
100 N. Carson St.
Carson City, NV 89701
Email: ltucker@ag.nv.gov
*Attorney for Plaintiff State of Nevada*

/s/ *Zachary Frish*
Zachary A. Frish (admitted *pro hac vice*)
Assistant Attorney General
Consumer Protection & Antitrust Bureau
New Hampshire Attorney General's Office
Department of Justice
1 Granite Place South
Concord, NH 03301
Telephone: (603) 271-2150
Email: zachary.a.frish@doj.nh.gov
*Attorney for Plaintiff State of New Hampshire*

/s/ *Andrew F. Esoldi*
Andrew F. Esoldi
Deputy Attorney General
Division of Law

Antitrust Litigation and Competition
Enforcement
124 Halsey Street, 5th Floor
Newark, NJ 07101
Telephone: (609) 696-5465
Email: Andrew.Esoldi@law.njoag.gov
*Attorney for Plaintiff State of New Jersey*

*/s/ Evan Crocker*
Evan Crocker (admitted *pro hac vice*)
Assistant Attorney General, Division
Director
Consumer Affairs Division
New Mexico Department of Justice
201 3rd St NW, Suite 300
Albuquerque, NM 87102
Telephone: (505) 494-8973
Email: ecrocker@nmdoj.gov
*Attorney for Plaintiff State of New Mexico*

*/s/ Francisco Benzoni*
Francisco Benzoni (admitted *pro hac vice*)
Special Deputy Attorney General
Brian Rabinovitz (admitted *pro hac vice*)
Special Deputy Attorney General
North Carolina Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
Telephone: (919) 716-6000
Facsimile: (919) 716-6050
Email: fbenzoni@ncdoj.gov
Email: brabinovitz@ncdoj.gov
*Attorneys for Plaintiff State of North
Carolina*

*/s/ Sarah Mader*
Sarah Mader (admitted *pro hac vice)*
Assistant Attorney General
Antitrust Section
Office of the Ohio Attorney General
30 E. Broad St., 26th Floor
Columbus, OH 43215
Telephone: (614) 466-4328
Email: Sarah.Mader@OhioAGO.gov
*Attorney for Plaintiff State of Ohio*

*/s/ Gina Ko*
Gina Ko (admitted *pro hac vice*)
Assistant Attorney General
Economic Justice Section
Oregon Department of Justice
100 SW Market St.,
Portland, Oregon 97201
Telephone: (971) 673-1880
Fax: (503) 378-5017
Email: Gina.Ko@doj.oregon.gov
*Attorney for Plaintiff State of Oregon*

*/s/ Joseph S. Betsko*
Joseph S. Betsko (admitted *pro hac vice*)
Assistant Chief Deputy Attorney General
Antitrust Section
Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
Telephone: (717) 787-4530
Email: jbetsko@attorneygeneral.gov
*Attorney for Plaintiff Commonwealth of
Pennsylvania*

*/s/ Paul T.J. Meosky*
Paul T.J. Meosky (admitted *pro hac vice*)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400, ext. 2064
Fax: (401) 222-2995
Email: pmeosky@riag.ri.gov
*Attorney for Plaintiff State of Rhode Island*

*/s/ Jared Q. Libet*
Jared Q. Libet (admitted pro hac vice)
Assistant Deputy Attorney General
Office of the Attorney General of South
Carolina
P.O. Box 11549
Columbia, South Carolina 29211
Telephone: (803) 734-5251
Email: jlibet@scag.gov
*Attorney for Plaintiff State of South
Carolina*

/s/ Hamilton Millwee
Hamilton Millwee (admitted *pro hac vice*)
Assistant Attorney General
Office of the Attorney General and
Reporter
P.O. Box 20207
Nashville, TN 38202
Telephone: (615) 291-5922
Email: Hamilton.Millwee@ag.tn.gov
*Attorney for Plaintiff State of Tennessee*

/s/ Diamante Smith
Diamante Smith (admitted *pro hac vice*)
Assistant Attorney General, Antitrust
Division
Office of the Attorney General of Texas
P.O. Box 12548
Austin, TX 78711-2548
Telephone: (512) 936-1162
*Attorney for Plaintiff State of Texas*

/s/ Marie W.L. Martin
Marie W.L. Martin (admitted *pro hac vice*)
Deputy Division Director,
Antitrust & Data Privacy Division
Utah Office of Attorney General
160 East 300 South, 5th Floor
P.O. Box 140830
Salt Lake City, UT 84114-0830
Telephone: 801-366-0375
Email: mwmartin@agutah.gov
*Attorney for Plaintiff State of Utah*

/s/ Sarah L. J. Aceves
Sarah L. J. Aceves (admitted *pro hac vice*)
Assistant Attorney General
Consumer Protection and Antitrust Unit
Vermont Attorney General's Office
109 State Street
Montpelier, VT 05609
Telephone: (802) 828-3170
Email: sarah.aceves@vermont.gov
*Attorney for Plaintiff State of Vermont*

/s/ David C. Smith
David C. Smith (admitted *pro hac vice*)
Assistant Attorney General
Office of the Attorney General of Virginia
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 692-0588
Facsimile: (804) 786-0122
Email: dsmith@oag.state.va.us
*Attorney for Plaintiff Commonwealth of
Virginia*

/s/ Ashley A. Locke
Ashley A. Locke (admitted *pro hac vice*)
Assistant Attorney General
Antitrust Division
Washington Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
Telephone: (206) 389-2420
Email: Ashley.Locke@atg.wa.gov
*Attorney for Plaintiff State of Washington*

/s/ Douglas L. Davis
Douglas L. Davis (admitted *pro hac vice*)
Senior Assistant Attorney General
Consumer Protection and Antitrust Section
West Virginia Office of Attorney General
P.O Box 1789
Charleston, WV 25326
Telephone: (304) 558-8986
Fax: (304) 558-0184
Email: douglas.l.davis@wvago.gov
*Attorney for Plaintiff State of West Virginia*

/s/ Caitlin M. Madden
Caitlin M. Madden (admitted *pro hac vice*)
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
Telephone: (608) 267-1311
Email: caitlin.madden@wisdoj.gov
*Attorney for Plaintiff State of Wisconsin*

/s/ William T. Young
William T. Young
Assistant Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
Telephone: (307) 777-7847
Email: william.young@wyo.gov
*Attorney for Plaintiff State of Wyoming*

-38-

**CERTIFICATE OF COMPLIANCE**

I, Jeffrey L. Kessler, an attorney duly admitted to practice before this Court, hereby certify pursuant to Local Rule 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rules"), Rule 8(C) of Judge Arun Subramanian's Individual Practices in Civil Cases ("Individual Rules"), that the foregoing Memorandum of Law was prepared using Microsoft Word, and contains 9,724 words. In making this calculation, I have relied on the word and page counts of the word-processing program used to prepare the document.

Dated:   June 18, 2026
         New York, NY

                              */s/ Jeffrey L. Kessler*
                              Jeffrey L. Kessler