**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, <br><br>     *Plaintiffs,* <br><br>       v. <br><br> LIVE NATION ENTERTAINMENT, INC., and TICKETMASTER L.L.C., <br><br>     *Defendants.* | Case No. 1:24-cv-03973-(AS) <br><br><br> **ORAL ARGUMENT REQUESTED** |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR A NEW TRIAL PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 59**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

LEGAL STANDARD ......................................................................................................... 2

ARGUMENT ...................................................................................................................... 2

I.      Defendants' Weight-of-the-Evidence Argument Is a Repackaging of Their Meritless Rule 50(b) Motion .............................................................................. 2

II.    Defendants Fail to Identify Any Evidentiary Errors by the Court that Warrant a New Trial ...................................................................................... 4

        A.    Evidence concerning the fees charged by Defendants for ancillary products at large amphitheaters was properly admitted. ............................ 5

        B.    Relevant evidence predating the damages period was properly admitted. ................................................................................................ 9

        C.    Evidence of concerns about retaliation expressed by venues was properly admitted for non-hearsay purposes, with appropriate limiting instructions. .................................................................. 13

        D.    Evidence regarding primary ticketing practices in Europe was properly admitted to rebut procompetitive justifications for Defendants' conduct. .................................................................... 15

        E.    Dr. Abrantes-Metz's admissible testimony does not provide a basis for a new trial. .................................................................... 18

III.   Defendants' Challenge to the Court's Carefully Considered Jury Instructions Also Provides No Basis for a New Trial .......................................... 19

        A.    The Court's Jury Instruction No. 24 accurately defined the anticompetitive effects required to prove exclusionary conduct. ............. 19

        B.    The Court properly instructed the jury on proving coercion to show unlawful tying. ................................................................................. 21

        C.    The Court properly instructed the jury regarding Defendants' anticompetitive conduct. .......................................................... 23

        D.    The exclusive dealing instructions properly instructed the jury that coercion was a factor that could be considered. ..................................... 25

        E.    The Court properly instructed the jury that it could consider the *Brown Shoe* factors in evaluating targeted customer markets. ................ 27

F.  There is no basis for Defendants' renewed complaint that the Jury Instructions did not require Plaintiffs to prove a relevant market for the tied product. ...................................................................................... 27

CONCLUSION.................................................................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABKCO Music v. Sagan*,
  50 F.4th 309 (2d Cir. 2022) ................................................................................................2

*AngioDynamics v. C.R. Bard*,
  2022 WL 4333555 (N.D.N.Y. Sept. 19, 2022) .......................................................................13

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985) ..............................................................................................................20

*Audet v. Fraser*,
  605 F. Supp. 3d 372 (D. Conn. 2022) ...................................................................................3

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
  603 F.2d 263 (2d Cir. 1979) .............................................................................................6, 12

*Britt v. Garcia*,
  457 F.3d 264 (2d Cir. 2006) .................................................................................................13

*Campbell v. Metro. Prop. & Cas. Ins. Co.*,
  239 F.3d 179 (2d Cir. 2001) .................................................................................................18

*Carroll v. Trump*,
  124 F.4th 140 (2d Cir. 2024) ..............................................................................................5, 9

*City of Groton v. Conn. Light & Power Co.*,
  662 F.2d 921 (2d Cir. 1981) .................................................................................................23

*Cooper v. Parsky*,
  140 F.3d 433 (2d Cir. 1998) .................................................................................................10

*Dial Corp. v. News Corp.*,
  165 F. Supp. 3d 25 (S.D.N.Y. 2016) .....................................................................................12

*Discover Fin. Servs. v. Visa U.S.A. Inc.*,
  2008 WL 4560707 (S.D.N.Y. Oct. 9, 2008) ..........................................................................13

*DLC Mgmt. Corp. v. Town of Hyde Park*,
  163 F.3d 124 (2d Cir. 1998) ..............................................................................................3, 18

*In re Epipen Marketing, Sales Practices, & Antitrust Litig.*,
  44 F.4th 959 (10th Cir. 2022) ..............................................................................................26

*Farrior v. Waterford Bd. of Educ.*,
  277 F.3d 633 (2d Cir. 2002).................................................................................3

*Fitzgerald v. Henderson*,
  251 F.3d 345 (2d Cir. 2001).................................................................................9

*FTC v. Ind. Fed'n of Dentists*,
  476 U.S. 447 (1986) ...........................................................................................17

*FTC v. Staples, Inc.*,
  970 F. Supp. 1066 (D.D.C. 1997)......................................................................17

*Gordon v. Lewistown Hosp.*,
  272 F. Supp. 2d 393 (M.D. Pa. 2003), *aff'd,* 423 F.3d 184 (3d Cir. 2005)...............................3

*Heerwagen v. Clear Channel Commc'ns*,
  435 F.3d 219 (2d Cir. 2006)...............................................................................16

*Hill v. A-T-O, Inc.*,
  535 F.2d 1349 (2d Cir. 1976)........................................................................21, 22

*ING Glob. v. UPS Oasis Supply Corp.*,
  757 F.3d 92 (2d Cir. 2014).............................................................................2, 3

*Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*,
  962 F.3d 1015 (8th Cir. 2020) ...........................................................................26

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
  466 U.S. 2 (1984)................................................................................................21

*In re Joint E. & S. Dist. Asbestos Litig.*,
  52 F.3d 1124 (2d Cir. 1995)...............................................................................18

*Kansas City Star Co. v. United States*,
  240 F.2d 643 (8th Cir. 1957) .......................................................................10, 12

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
  383 F. Supp. 3d 187 (S.D.N.Y. 2019)................................................................20

*Knox v. John Varvatos Enters., Inc.*,
  512 F. Supp. 3d 490 (S.D.N.Y. 2021)..................................................................3

*LNC Invs., Inc. v. First Fidelity Bank*,
  126 F. Supp. 2d 778 (S.D.N.Y. 2001)................................................................14

*MacDermid Printing Sols. LLC v. Cortron Corp.*,
  833 F.3d 172 (2d Cir. 2016).........................................................................19, 20

*Manley v. AmBase Corp.*,
  337 F.3d 237 (2d Cir. 2003).................................................................................................3, 18

*Marvel Characters, Inc. v. Kirby*,
  726 F.3d 119 (2d Cir. 2013).....................................................................................................11

*Metromedia Co. v. Fugazy*,
  983 F.2d 350 (2d Cir. 1992).......................................................................................................3

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
  2025 WL 1311115 (E.D.N.Y. May 6, 2025) ............................................................................27

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
  2026 WL 1397077 (2d Cir. May 19, 2026) ..............................................................................27

*Newton v. City of New York.*,
  171 F. Supp. 3d 156 (S.D.N.Y. 2016)....................................................................................2, 4

*Nimely v. City of New York*,
  414 F.3d 381 (2d Cir. 2005).......................................................................................................4

*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018)..................................................................................................................20

*Park v. Thomson Corp.*,
  2007 WL 119461 (S.D.N.Y. Jan. 11, 2007) ............................................................................21

*Park W. Radiology v. CareCore Nat'l LLC*,
  675 F. Supp. 2d 314 (S.D.N.Y. 2009)................................................................................15, 22

*Phillips v. Bowen*,
  278 F. 3d 103 (2d Cir. 2002).....................................................................................................18

*Race Tires Am., Inc. v. Hoosier Racing Tires Corp.*,
  614 F.3d 57 (3d Cir. 2010)........................................................................................................26

*Raedle v. Credit Agricole Indosuez*,
  670 F.3d 411 (2d Cir. 2012) (Mot. 3) ........................................................................................3

*New York ex rel. Schneiderman v. Actavis PLC*,
  787 F.3d 638 (2d Cir. 2015)......................................................................................................23

*SCS Commc'ns, Inc. v. Herrick Co.*,
  360 F.3d 329 (2d Cir. 2004)......................................................................................................12

*Sidibe v. Sutter Health*,
  103 F.4th 675 (9th Cir. 2024) ...................................................................................................10

*Sir Speedy, Inc. v. L & P Graphics, Inc.*,
  957 F.2d 1033 (2d Cir. 1992)...................................................................................9

*Slack v. County. of Suffolk*,
  50 F. Supp. 3d 254 (E.D.N.Y. 2014) ......................................................................2

*Stampf v. Long Island R.R. Co.*,
  761 F.3d 192 (2d Cir. 2014).....................................................................................2

*Strobl v. N.Y. Mercantile Exch.*,
  582 F. Supp. 770 (S.D.N.Y. 1984)...........................................................................3

*Tesser v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*,
  370 F.3d 314 (2d Cir. 2004).....................................................................................2

*Tops Markets, Inc. v. Quality Markets, Inc.*,
  142 F.3d 90 (2d Cir. 1998) .....................................................................................20

*United States v. Awadallah*,
  436 F.3d 125 (2d Cir. 2006).....................................................................................8

*United States v. Dukagjini*,
  326 F.3d 45 (2d Cir. 2003)......................................................................................11

*United States v. E.I. du Pont de Nemours & Co.*,
  353 U.S. 586 (1957)............................................................................................6, 11

*United States v. Google LLC*,
  747 F. Supp. 3d 1 (D.D.C. 2024) .........................................................................6, 7

*United States v. Grinnell Corp.*,
  384 U.S. 563 (1966)..................................................................................................6

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001)..................................................................................20

*United States v. Pforzheimer*,
  826 F.2d 200 (2d Cir. 1987)...................................................................................13

*United States v. Rowland*,
  826 F.3d 100 (2d Cir. 2016)...................................................................................13

*United States v. Snype*,
  441 F.3d 119 (2d Cir. 2006)...................................................................................13

*United States v. Visa, Inc.*,
  788 F. Supp. 3d 585 (S.D.N.Y. 2025).....................................................................23

*Walker v. Raja*,
  2023 WL 6390162 (E.D.N.Y. Sept. 30, 2023) ..........................................................4

*Yates v. Evatt*,
  500 U.S. 391 (1991).................................................................................................2

*Zenith Radio Corp. v. Hazeltine Rsch, Inc.*,
  401 U.S. 321 (1971)...............................................................................................12

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012)..............................................................................25, 26

**Statutes**

15 U.S.C. § 2.................................................................................................20, 23, 26

**Other Authorities**

Fed. R. Civ. P. 50 ................................................................................ *passim*

Fed. R.Civ. P. 59 ..............................................................................................1, 2, 3

Fed. R. Civ. P. 61 ....................................................................................................2

Fed. R. Evid. 403 ................................................................................................8, 9

Fed. R. Evid. 801(c)(2) .........................................................................................12

Fed. R. Evid. 803(3)..............................................................................................12

## INTRODUCTION

Nothing about this case comes close to meeting the exceptional circumstances that would warrant a new trial under Rule 59(a). After a full and fair trial with five weeks of testimony and hundreds of exhibits, the jury deliberated for four days, diligently following the instructions of the Court, asking to review additional testimony and, on multiple occasions, seeking the Court's guidance. Defendants present no valid basis for disturbing the jury's careful verdict.

First, Defendants' argument that the verdict is against the weight of the evidence is merely a repackaging of their Rule 50(b) motion and fails for the same reasons discussed in Plaintiffs' opposition to that motion—it improperly asks the Court to substitute its own view of the evidence for the jury's.

Second, Defendants repeat various evidentiary objections they presented at trial, each of which the Court overruled after careful consideration. All of this evidence was properly admitted for the jury's consideration and certainly was not an abuse of discretion by the Court. Moreover, because Defendants do not challenge the other substantial evidence that supports the verdict, Defendants cannot show that the admission of the evidence they do challenge would cause any material prejudice warranting a new trial.

Third, Defendants' challenge to the Court's jury instructions is not grounds for a new trial. Those instructions were the product of multiple rounds of negotiation and argument, further argument at the charging conference, and careful consideration by the Court. Defendants have not identified any legal error—let alone clear legal error—that would warrant a new trial.

Because Defendants have not identified any of the exceptional circumstances that Rule 59(a) demands before ordering the extraordinary relief of a new trial, their Rule 59 motion must be denied.

## LEGAL STANDARD

Verdicts should not be disturbed absent an "egregious case," *ING Glob. v. UPS Oasis Supply Corp.*, 757 F.3d 92, 99 (2d Cir. 2014), and new trial motions "ordinarily should be denied unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *ABKCO Music, Inc. v. Sagan*, 50 F.4th 309, 324 (2d Cir. 2022); *see Slack v. County. of Suffolk*, 50 F. Supp. 3d 254, 263 (E.D.N.Y. 2014) (new trial under Rule 59 reserved for "exceptional circumstances").

Rule 59 permits setting aside verdicts only for "substantial errors . . . in the admission or rejection of evidence or the giving or refusal" of jury instructions. *Newton v. City of New York*, 171 F. Supp. 3d 156, 164 (S.D.N.Y. 2016); *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 202 (2d Cir. 2014). However, evidentiary error is harmless if the proof was "unimportant in relation to everything else the jury considered." *Yates v. Evatt*, 500 U.S. 391, 403 (1991); *cf. Tesser v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 370 F.3d 314, 319 (2d Cir. 2004); Fed. R. Civ. P. 61.

## ARGUMENT

**I.      Defendants' Weight-of-the-Evidence Argument Is a Repackaging of Their Meritless Rule 50(b) Motion**

Defendants' first argument for ordering a new trial is an express repackaging of their Rule 50(b) motion, which they incorporate by reference. Mot. 3. But there was far more than a "paucity of evidence" to support the jury's carefully reasoned verdict.

As discussed in detail in Plaintiffs' concurrently filed Rule 50(b) Opposition, Plaintiffs introduced more than sufficient evidence to support the verdict on all of their claims. Defendants' arguments to the contrary are based on their refusal to acknowledge unfavorable evidence— including from their own witnesses—and their mischaracterization of controlling law. Both Defendants' Rule 50(b) motion and their motion for a new trial based on the claim that the

2

verdict is not supported by the weight of the evidence should be denied. *See* Rule 50(b) Opp'n 2–11 (amphitheater claims), 12–22 (primary ticketing claims), 23–32 (per-ticket overcharge).

Defendants are arguing that the Court should second-guess the jury, draw its own inferences, and order a new trial if the Court believes it would weigh the evidence differently than the jury. But this is not the law. A jury's verdict based heavily on the credibility of testifying witnesses is "particularly ill-suited to after-the-fact second guessing," *ING Glob.*, 757 F.3d at 99; *see also Metromedia Co. v. Fugazy*, 983 F.2d 350, 363 (2d Cir. 1992) (credibility determinations are entitled to great deference). Defendants' own cited law confirms this. Under Rule 59, courts must proceed with "caution and great restraint" and "a judge 'should rarely disturb a jury's evaluation of a witness's credibility.'" *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012) (quoting *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998)) (Mot. 3); *see also ING Glob.*, 757 F.3d at 99. A number of critical issues in this case—including threats and retaliation by Defendants, and the market definition for Large Amphitheaters—depended on credibility determinations by the jury (*see* Rule 50(b) Opp'n 3, 5–6, 17–18), and there is no valid basis to disturb them here.

A court should never substitute its own judgment for the jury's, and Defendants' attempt to reargue the evidence presented is not a proper basis to order a new trial under Rule 59. *See Raedle*, 670 F.3d at 419–20 (reversing grant of new trial where district court improperly made its own credibility determinations); *ING Glob.*, 757 F.3d at 99 (affirming denial of new trial where verdict was sufficiently supported by the record); *Strobl v. N.Y. Mercantile Exch.*, 582 F. Supp.

770, 777–78 (S.D.N.Y. 1984) (court may not "usurp the jury['s] function" by substituting its own view of the evidence).[1]

## II.    Defendants Fail to Identify Any Evidentiary Errors by the Court that Warrant a New Trial

"[E]videntiary rulings by the trial court rarely rise to the level of requiring a new trial." *Walker v. Raja*, 2023 WL 6390162, at \*3 (E.D.N.Y. Sept. 30, 2023). To obtain a new trial based on a court's improper admission of evidence, "the challenged evidentiary rulings must have been "a clear abuse of discretion and . . . so clearly prejudicial to the outcome of the trial that [the court is] convinced [that] . . . a seriously erroneous result or . . . miscarriage of justice" occurred. *Newton*, 171 F. Supp. 3d at 164 (quoting *Nimely v. City of New York*, 414 F.3d 381, 399 (2d Cir. 2005)). Defendants do not come close to meeting this high burden.

Plaintiffs proved that Live Nation has monopoly power in large amphitheaters and that anticompetitive effects result from its acquisition and maintenance of that power. *See* Rule 50(b) Opp'n 4–8. The record supporting that and Plaintiffs' other claims included voluminous evidence of anticompetitive acts within the limitations period. *Id.* 5–6, 15–20. Where Plaintiffs offered evidence of threats to withhold content, they came in the form of ordinary-course documents and direct witness testimony. *Id.* 5–6, 17–19. The jury heard testimony from industry participants about their desire for more competitive primary ticketing and the anticompetitive impact of long-

---

[1] Defendants' cited cases are distinguishable. *See Manley v. AmBase Corp.*, 337 F.3d 237 (2d Cir. 2003) (affirming order for new trial where it was undisputed that contractual evidence used to support indemnification claim at trial indemnified different party); *Knox v. John Varvatos Enters., Inc.*, 512 F. Supp. 3d 490 (S.D.N.Y. 2021) (new trial for damages where jury award was twice what the evidence supported and if true would mean defendant possibly violated other laws); *Audet v. Fraser*, 605 F. Supp. 3d 372 (new trial following defense verdict where plaintiffs' evidence "overwhelming[ly]" met legal elements under governing law). And, in *Farrior v. Waterford Board of Education*, the Second Circuit reaffirmed that "a decision is against the weight of the evidence, for purposes of a Rule 59 motion, if and only if the verdict is seriously erroneous or a miscarriage of justice." 277 F.3d 633, 635 (2d Cir. 2002).

term exclusive agreements. *Id.* 15–17, 20–22. And Dr. Abrantes-Metz applied well-established methodologies to estimate damages to fans due to Defendants' ticketing misconduct. *Id.* 23–32.

Against that strong evidentiary record, Defendants challenge the Court's admission of five narrow categories of evidence to claim that their admission prejudiced the verdict: (A) evidence on the charging of ancillary fees at amphitheaters that was relevant to assessing Defendants' possession and exercise of monopoly power in the large amphitheater market, as well as how artists would view the quality of the amphitheater experience of their fans; (B) pre-limitations period evidence that was relevant to the jury's understanding and assessment of in-limitations period conduct by Defendants; (C) out-of-court statements admitted to establish the effect on the listener; (D) evidence regarding the lower ticketing fees charged in EU markets without ticketing exclusives to rebut Defendants' arguments about the procompetitive effects of long-term ticketing exclusives; and (E) expert damages testimony estimating average, per-ticket overcharges to fans. In each case, the Court has already carefully considered Defendants' evidentiary objections and found them to be wanting. And even if the Court were to conclude that one or more of these categories of evidence should have been excluded—for the reasons below, it should not—there would still be sufficient evidence to support the jury's verdict such that no new trial would be warranted. *Carroll v. Trump*, 124 F.4th 140, 157–58, 178 (2d Cir. 2024) (no new trial where the record as a whole supported the verdict).

**A.    Evidence concerning the fees charged by Defendants for ancillary products at large amphitheaters was properly admitted.**

Defendants object to the admission of evidence demonstrating how Live Nation used its monopoly power over large amphitheaters to raise prices to fans for ancillary products and services. Mot. 5–7. Admitting this evidence was not an abuse of discretion—it was relevant to issues before the jury and was not unduly prejudicial.

As the Court explained, "[t]he fan experience at Live Nation's amphitheaters is relevant to whether an artist would want to play there or not, and artists may prefer not to play at a venue if fans will be overcharged for services like parking or lawn seats." Trial Tr. 1060:22–1063:24. Indeed, *Defendants* put the experience of fans at its venues front and center in their opening argument, stating that Live Nation made amphitheaters "better so fans have a choice of going someplace where they can actually enjoy the concert." Trial Tr. 143:16–18; *United States v. Google LLC*, 747 F. Supp. 3d 1, 118 (D.D.C. 2024) ("Just as the power to raise price when it is desired to do so is proof of monopoly power . . . so too is the ability to degrade product quality without concern of losing consumers.") (cleaned up); *Gordon v. Lewistown Hosp.,* 272 F. Supp. 2d 393, 420 n.22 (M.D. Pa. 2003), *aff'd,* 423 F.3d 184 (3d Cir. 2005) (similar). Its witnesses elaborated on these themes. The jury heard testimony that "fan satisfaction" was "one of the big reasons [artists] want to play" at amphitheaters. Hurwitz, Trial Tr. 661:15–17; *see also id.* 657:20–22; Geiger, Trial Tr. 499:14–20. Defendants' executives and expert testified that artists price tickets lower to "return on tour" and maintain a "musical relationship with their fans," keeping prices lower out of "fairness and altruism towards fans" and to avoid appearing "piggish." Marcus, Trial Tr. 2900:1–2901:4; Budish, Trial Tr. 3159:20–3160:12; Roux, Trial Tr. 1334:1–1335:1; *see also* Weeden, Trial Tr. 3582:6–20. Live Nation's overcharging fans for ancillary services was directly relevant to these issues.

The evidence was also relevant to proving that Live Nation had monopoly power in the large amphitheater market, because the ability to raise prices without competitive consequences is a hallmark of monopoly power. *See, e.g.*, *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 272 (2d Cir. 1979) (monopoly power is "'the power to control prices or exclude competition'") (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391

6

(1956)).[2] The evidence regarding Live Nation's pricing for ancillary services at large amphitheaters showed that Live Nation *was able to* raise these prices to high levels without losing fans, artists or market share. PX0720 (internal communications showing significant increases in ancillary pricing without reduction in demand); Rule 50(b) Opp'n 4–7.

The evidence on how Live Nation profitably overcharged fans for ancillary services with impunity was relevant to showing how this exercise of monopoly power hurt both artists and fans. The fact that the relevant market was artist-facing did not make this evidence of overcharging fans irrelevant, as it demonstrated reduced quality of the fan experience, which adversely impacted artists as well, who had no other large amphitheater options. Roux, Trial Tr. 1405:9–14 (40 markets where Live Nation is only option for large amphitheaters); Rapino, Trial Tr. 1855:3–9 (artists need Live Nation to do national amphitheater tour); Hill, Trial Tr. 2133:4–7 (same).[3]

This evidence was also relevant to rebutting Defendants' claim that they used their monopoly control over amphitheaters to benefit artists by providing them with a greater share of ticket revenues than they obtained at other types of venues. *See, e.g.*, Lewis, Trial Tr. 2009:7–11 (Live Nation offers "more attractive financial offers" "[b]ecause we have the ancillary revenue that we can use to essentially lower the expenses"); Yurukoglu, Trial Tr. 4351:6–11 (testifying that artists receive a higher share of ticket revenue—+18 percentage points—on tours with more amphitheater stops).[4] In reality, the high fees that Defendants charged on food and beverage,

---

[2] *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966); *Google LLC*, 747 F. Supp. 3d at 118.

[3] The evidence that fans paid these fees also demonstrates antitrust injury to fans on each claim. ECF 1037 at 42–43.

[4] *See also* Roux, Trial Tr. 1327:23–1329:15 ("We can definitely . . . generally pay what [artists] asked for" given the "ancillary income."); Capshaw, Trial Tr. 4244:12–4245:12 (artists "better

parking, and other ancillary services were not shared with artists in any meaningful sense; take-home revenue by artists from amphitheaters increased only 18%, while Live Nation's amphitheater revenue increased over 350% during the same period. PX0811; PX0602. Tossing artists a few crumbs off the table doesn't disprove that Live Nation used its monopoly power to feast on the fees paid by consumers, and the jury was entitled to evaluate Defendants' claims to the contrary in this context.

Finally, evidence about the prices charged and revenues earned from ancillary products at amphitheaters was put at issue by Defendants' claims, made in opening argument, that Live Nation could not have monopoly power because of its low margins. *See* Defs' Opening, Trial Tr. 149:8–13, 128:7–11 ("Live Nation's average operating margin during the period reflected here, so 2015 and 2024, is 1.8 percent" and "far below what you would expect of a monopolist"). In response, Plaintiffs were required to demonstrate how Live Nation used its "flywheel" strategy and control of content to generate higher margins in other parts of its business, including from the high prices it charged for ancillary services at amphitheaters. *See, e.g.*, Rapino, Trial Tr. 1910:16–24 (flywheel means Defendants could subsidize amphitheater losses and "make some return" through food and beverage and other ancillaries);[5] 1783:13–1784:19 (flywheel "drives the growth of the higher margin businesses in sponsorship, ticketing, and some of your venue revenues"); Hansen, Trial Tr. 3431:2–18 (flywheel deck showing onsite (including ancillary) at 55% margin); *see also* PX0475; PX0511; PX0977. In sum, Defendants' own arguments opened multiple doors, any one of which would be sufficient to make this evidence relevant.

---

off" playing at amphitheaters); Rapino, Trial Tr. 1921:2–18 (artists "make more money in amphitheaters than they would if it was just run by a simple P&L.").

[5] Using ancillary revenue to recoup losses in its amphitheater business is all the more relevant considering Live Nation's practice of maintaining control of low-performing amphitheaters to keep competitors out of the market. Rule 50(b) Opp'n 6–7.

Nor did the Court abuse its discretion in admitting this evidence over claims that its contemptuous language towards fans was prejudicial. Mot. 5, 6–7. Rule 403 requires relevant evidence to be admitted unless the evidence is found to be *unfairly* prejudicial and that prejudice *substantially* outweighs probative value. "[S]o long as the district court has conscientiously balanced the proffered evidence's probative value with the risk for prejudice, its conclusion will be disturbed only if it is arbitrary or irrational." *United States v. Awadallah*, 436 F.3d 125, 131 (2d Cir. 2006). Here, any prejudice to Defendants from the language used by their employees was not *unfairly* prejudicial under Rule 403 because the language was directly probative of one of the issues the jury was called upon to resolve: whether Live Nation had the monopoly power to raise prices for ancillary services to fans who attended concerts at large amphitheaters without a reduction in output.[6] The Court did not abuse its discretion in admitting this evidence; the harsh language was relevant to demonstrating that Live Nation knew it could raise prices without adverse consequences.

Finally, Defendants make no showing that this evidence could have so "significantly prejudice[d]" the verdict as to warrant a new trial, even if it was improperly admitted (and it was properly admitted). As shown in Plaintiffs' opposition to the Rule 50(b) motion, there was ample other evidence in the record to support every part of the jury's verdict regarding the large amphitheater claims. Rule 50(b) Opp'n 2–11; *Carroll*, 124 F.4th at 178 (challenged evidence did not substantially impact verdict where record as a whole supported verdict).

**B.        Relevant evidence predating the damages period was properly admitted.**

---

[6] Defendants' complaint about the admission of evidence of higher prices rings particularly hollow given their mistaken contention, repeatedly rejected by the Court, that Plaintiffs must show higher prices (or reduced output) to prevail. *See, e.g.*, ECF 1037 at 36.

9

Defendants argue that it was error for the Court to admit evidence of their conduct before May 23, 2020, because this conduct was outside the limitations period. Mot. 8. But this argument ignores the fact that while a statute of limitations acts to limit the period over which a plaintiff can seek damages; "it is not an evidentiary rule" and does not bar evidence where it is "relevant to events during the [actionable] period." *Fitzgerald v. Henderson*, 251 F.3d 345, 365 (2d Cir. 2001); ECF 1079 at 5. It is common for courts to admit evidence of conduct in an antitrust case that predates the limitations period if the evidence is relevant to the jury's assessment of conduct by defendants during the limitations period. *Sir Speedy, Inc. v. L & P Graphics, Inc.*, 957 F.2d 1033, 1038 (2d Cir. 1992); *see Cooper v. Parsky*, 140 F.3d 433, 441 (2d Cir. 1998) (evidence may be admissible to shed light on the motives for in-period conduct); *Kansas City Star Co. v. United States*, 240 F.2d 643, 651 (8th Cir. 1957) (evidence of a course of conduct "over a period of years" leading up to the limitations period is admissible to show design, pattern, and intent). Indeed, excluding evidence of conduct by Defendants prior to the limitations period could itself be reversible error if probative of intent, market power, or anticompetitive effects. *Sidibe v. Sutter Health*, 103 F.4th 675, 703–06 (9th Cir. 2024) (reversing district court after four-week jury trial for excluding evidence of anticompetitive conduct before limitations period because it was "highly relevant" to claims).

Here, the pre-limitations period evidence admitted by the Court was relevant to (1) explaining or contextualizing anticompetitive conduct by Defendants within the limitations period; (2) showing Defendants' willfulness in maintaining their monopoly power; and (3) explaining how Defendants used their continuing exclusionary behavior to inflict anticompetitive harm during the limitations period. For example:

- *The 2011 Barclays–Ticketmaster negotiation (PX0335)* was essential to understand the conduct by Defendants against Barclays within the limitations

10

period and relevant to showing why Barclays feared retaliation and the anticompetitive intent behind Defendants' reduction of concerts to Barclays after it switched to SeatGeek. Abbamondi, Trial Tr. 238:16–20; 265:6–21; 276:24–277:6; Jacoby, Trial Tr. 3481:1–12.

- *The 2015 Monumental Sports analysis (PX0231)* showed how venues evaluated ticketing quality and competition—dynamics that persisted through the limitations period.

- *The 2017 SAP and HEB Center negotiations (PX0389, PX0392, PX0408, PX0412, PX0444)* illustrated Defendants' conditioning conduct. The resulting contracts remained in force during the limitations period (*see* PX1293), and the conduct that produced them continued to deter venue switching.

- *The 2018 Red Mountain acquisition (PX0413, PX0414, PX0415)* reflects Defendants' strategy of acquiring rivals to strengthen their amphitheater monopoly and how its effects persisted into the limitations period.[7]

- *The 2019 Xcel Center negotiations (PX0227, PX0230)* showed Defendants conditioning content on Ticketmaster use. The contract extended into the limitations period (*see* PX1293; Helgerson, Trial Tr. 388:22–389:16; 398:5–9), and the fear of losing concerts continued to influence venue behavior.

- *AXS's 2019 ticketing strategy (Perez, Trial Tr. 2324:18–2325:18)* was relevant to understanding the barriers to entry and expansion that blocked rivals during the limitations period.

- *The 2019 Jonas Brothers Tour communications (PX0458, PX0476)* illustrated content routing based on ticketing relationships—conduct central to the conditioning claim that continued during the limitations period.

- *The January 2020 Radio Disney email (PX0648)*, written just months before the damages period, showed the ongoing policy of Live Nation to condition artist access to its venues on using Live Nation promoters—a policy that continued throughout the limitations period.

- *Internal Live Nation strategy documents (PX0422, PX0429, PX0348, PX0893)* revealed long-term objectives—expanding the amphitheater network, leveraging concerts for exclusive ticketing, growing ancillary revenue through high prices

---

[7] Defendants argue PX0451's "velvet hammer" reference merely painted them negatively. Mot. 9 n.1. To the contrary, it showed how Live Nation withheld content to bully companies into complying with its objectives—a practice that continued into the limitations period.

11

without output reduction—of strategies Defendants executed during the limitations period.[8]

The Court admitted this evidence because it was relevant to a pattern of conduct, intent to monopolize, and injury during the limitations period even though it took place prior to the limitations period. *See E.I. du Pont de Nemours & Co.*, 353 U.S. at 597 (acquisition may take years "to ripen into a prohibited effect"); *Kansas City Star Co.*, 240 F.2d at 651. A plaintiff may recover for injuries within the limitations period while relying on earlier anticompetitive acts to establish continuing anticompetitive acts. *Berkey Photo, Inc.*, 603 F.2d at 295–96; *Dial Corp. v. News Corp.*, 165 F. Supp. 3d 25, 37 (S.D.N.Y. 2016) ("[A] monopoly which is 'maintained' during the damages period would need to be created before the damages period, and anticompetitive conduct before the limitations period may be material to a showing that [p]laintiffs were injured during the damages period.").[9]

Significantly, the Court was careful in determining what pre-limitations period evidence to admit and what pre-limitations evidence to exclude. *See, e.g.*, Trial Tr. 3409:25–3410:7 (excluding PX0917), 1741:10–11 (excluding 2016 Red Mountain incident except an excerpt for impeachment), 3977:4–12 (excluding PX1507). This measured decision-making was not an abuse of discretion. Indeed, the Court instructed the jury that it "may consider conduct that occurred prior to [May 23, 2020]," but that damages must be "based on a finding . . . that

---

[8] Defendants also point to the use of pre-damages period evidence relied upon by Plaintiffs' experts (Mot. 10), but evidence does not need to be admissible for experts to rely upon it. *United States v. Dukagjini*, 326 F.3d 45 (2d Cir. 2003); *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013). Defendants raised no objections to Dr. Hill's expert testimony on this ground. Trial Tr. 2108:17–2109:15, 2115:17–2117:2, 2126:3–2127:1. And Defendants crossed Dr. Abrantes-Metz on this issue, leaving disputes about relevance and weight to the jury. Trial Tr. 2534:25–2536:7, 2537:1–2539:3.

[9] Defendants' reliance on *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338–39 (1971), is misplaced. *Zenith* holds conduct outside the limitations period cannot be the *basis for damages within the limitations* period, not that it is inadmissible as evidence.

Ticketmaster unlawfully monopolized the primary concert ticketing market on or after May 23, 2020." Trial Tr. 4798:2–10. Juries are presumed to follow instructions,[10] and this instruction prevented the jury from using the pre-limitations period evidence for an improper purpose.

### C.    Evidence of concerns about retaliation expressed by venues was properly admitted for non-hearsay purposes, with appropriate limiting instructions.

As the Court has explained, evidence of non-party statements offered to show the speaker's state of mind under Rule 803(3), or the effect on the listener under Rule 801(c)(2), is admissible for these non-hearsay purposes. ECF No. 1079. The challenged evidence of statements from venues raising the fear of retaliation was properly held to be admissible for its effect on the listener, not its truth. *See* Groetzinger, Trial Tr. 865:4–7 (testimony about venue "threats" "would not come in for the truth of the matter asserted"), 754:7–755:3 (Court providing limiting instruction to consider testimony only for its "effect on the witness").[11] The Court applied this rule evenly and often allowed Defendants to admit out-of-court statements with similar limiting instructions. *See, e.g.*, Jacoby, Trial Tr. 3509:2–7 (Court: "we're just seeing the flip side of that"), 4226:3–5 (Court: "[b]oth sides" used "the 801 exception to the hearsay rules").[12] And when Mr. Khoury testified about "feedback . . . from team owners," the Court properly overruled Defendants' hearsay objection, (Trial Tr. 1614:16–19), but *sua sponte* offered a limiting instruction. Trial Tr. 1649:20–25.[13]

---

[10] *See, e.g.*, *SCS Commc'ns, Inc. v. Herrick Co.*, 360 F.3d 329, 338 (2d Cir. 2004).

[11] Mr. Groetzinger's retaliation testimony was substantiated by evidence of SeatGeek repeatedly offering "retaliation" insurance to its venue customers. *See* Rule 50(b) Opp'n 18–19; PX0230; PX0227. This is "independent, non-hearsay evidence" not present in *AngioDynamics v. C.R. Bard*, 2022 WL 4333555, at *4–5 (N.D.N.Y. Sept. 19, 2022). Mot. 11–12.

[12] Defendants attempt to rely on the Court's statement that "both sides" "abused" the hearsay exceptions, but having put on similar evidence, Defendants cannot now argue unfair prejudice.

[13] There is "a strong presumption that juries follow limiting instructions." *United States v. Snype*, 441 F.3d 119, 129 (2d Cir. 2006); *Britt v. Garcia*, 457 F.3d 264 (2d Cir. 2006) ("It is a

Defendants include Dr. Hill's "win-loss data" testimony in their challenge (Mot. at 11), but the Court ruled Defendants had waived their hearsay objection to this testimony. Trial Tr. 4476:5–6 ("So the Court will not strike any portion of Dr. Hill's testimony, as that relief has been forfeited and waived."). Nonetheless, at Defendants' request, the Court gave the jury a limiting instruction on their use of this testimony (using language to which Defendants agreed) and ruled that Plaintiffs should not reference it in closing. *Id.* 4477:6–15. This even-handed treatment was not an abuse of discretion or grounds for a new trial.

Defendants' claim that they could not "rebut" the "threats-and-retaliation evidence" because of the Court's evidentiary rulings (Mot. at 13) is wrong. Ms. Jacoby was permitted to testify about events that Defendants claimed were evidence that Ticketmaster did not win business through threats. *See, e.g.*, Jacoby, Trial Tr. 3514:9–12, 3514:13–16, 3514:23–3515:1, 3518:3–5, 3518:8–12, 3521:1–3522:3, 3504:1–3504:6 (Barclays lost non-Live Nation content too). Defendants, moreover, could have sought, and in some instances did seek, testimony that particular witnesses had never been threatened. Van Stone, Trial Tr. 3282:5–15, 3325:23–25; Groetzinger, Trial Tr. 853:10–18, 869:3–17. What the Court did not permit—either from Ms. Jacoby or from Plaintiff witnesses—was testimony about out-of-court statements offered to prove the truth of their assertions. *See* Jacoby, Trial Tr. 3493:9–15; Abbamondi, Trial Tr. 241:1–6; 241:8–13.[14]

---

fundamental proposition that a jury is presumed to follow the instructions of the trial judge.") (quoting *United States v. Pforzheimer*, 826 F.2d 200, 205 (2d Cir.1987)); *United States v. Rowland*, 826 F.3d 100, 115 (2d Cir. 2016); *Discover Fin. Servs. v. Visa U.S.A. Inc.*, 2008 WL 4560707, at *1 (S.D.N.Y. Oct. 9, 2008); *contra* Mot. 12.

[14] *LNC Investments, Inc. v. First Fidelity Bank*, 126 F. Supp. 2d 778 (S.D.N.Y. 2001) is inapposite. That case excluded evidence of limited relevance and *denied* a new trial because the movant failed to show any resulting prejudice, emphasizing the verdict "turned on the voluminous evidence introduced by both sides." *Id.* at 787–89, 797.

Defendants' argument that the jury would not have credited Plaintiffs' "threats-and-retaliation theory" without this evidence is pure speculation and belied by the trial record. There was extensive independent evidence of concert withholding upon which the jury could rely.[15]

### D.    Evidence regarding primary ticketing practices in Europe was properly admitted to rebut procompetitive justifications for Defendants' conduct.

As the Court explained, evidence of ticketing practices and fees in nonexclusive European markets (the UK and France) was relevant to rebut Defendants' argument that exclusive arrangements are procompetitive and desired by venues. ECF 1079 at 6. Defendants also opened the door to this issue in their opening, telling the jury that "exclusive relationships . . . [are] not anticompetitive. It is exactly the opposite." Trial Tr. 161:10–12. Defendants returned to this evidence at trial and during summation, making it a cornerstone of their argument regarding the ticketing markets. *See* Carlton, Trial Tr. 4024:1–4025:1; Defs' Closing, Trial Tr. 4671:1–11.

It was thus relevant for Plaintiffs to introduce evidence about ticketing practices in the UK and France, where venues generally used more than one ticketer for the same concerts. *See* Perez, Trial Tr. 2336:18–2338:7 (describing non-exclusive ticketing in UK and France, and testifying that U.S. fees "can run around 25 percent of the face value of the ticket. In the UK, the market is really 12.5 percent. And in France, it's 10 percent."); Marciano, Trial Tr. 1107:5–1108:25 (same); Yovich, Trial Tr. 2802:11–2803:15 (same). Evidence need not come from within a relevant market to make it admissible; it need only make a consequential fact more or less

---

[15] *See, e.g.*, Abbamondi, Trial Tr. 260:24–265:21 (Live Nation's "veiled threat" followed by "dramatic decline" in shows); Chi, Trial Tr. 546:5–14 (Live Nation stated only viable model for Irvine venue required their content and control); Groetzinger, Trial Tr. 763:14–764:22 (SeatGeek "retaliation insurance"); Perez, Trial Tr. 2327:22–2328:8 (venue required "content acquisition fund").

probable. *See Park W. Radiology v. CareCore Nat'l LLC*, 675 F. Supp. 2d 314 (S.D.N.Y. 2009). Here, whether exclusive contracts were pro- or anticompetitive was a consequential dispute for the jury to resolve.

Nor did non-U.S. evidence "plug the hole" where no other evidence existed. Plaintiffs presented evidence that quality improvements like digital tickets, anti-fraud technology, and dynamic pricing were not unique to exclusive ticketing arrangements (Khoury, Trial Tr. 1612:7–25, 1621:11–24, 1647:14–17); that non-exclusive ticketing technology exists and is used in the NFL, and by Jump and AXS (Khoury, Trial Tr. 1636:15–23; Marciano, Trial Tr. 956:22–957:2; Perez, Trial Tr. 2335:8–11); and that Ticketmaster quality suffered from a lack of competitive pressure (Khoury, Trial Tr. 1648:7–17; PX0800). Evidence that in non-exclusive ticketing markets in France and the UK, venues use multiple ticketers, entry is easier, and ticketing fees are "generally lower" was consistent with other evidence presented at trial. *See, e.g.*, Rapino, Trial Tr. 1846:19–1847:19; Perez, Trial Tr. 2336:18–2340:16; Marciano, Trial Tr. 937:14–938:8; Yovich, Trial Tr. 2802:13–2803:15 (UK fees lower than US); PX0180. The Court properly held that because Defendants argued exclusivity is "procompetitive and desired," Plaintiffs were "entitled to show" that other markets function without it. The Court applied that ruling consistently, signaling at the outset that this evidence would be permitted and overruling Defendants' objection when raised. *See* Trial Tr. 68:1–21, 1107:5–16. The fact that other jurisdictions may use exclusive contracts (Mot. 14) is beside the point; the evidence introduced by Plaintiffs casts doubts on Defendants' claims that exclusive contracts were essential and procompetitive.

No "preliminary question" of market comparability was required. Mot. 14.[16] The issue of whether to credit evidence about ticketing in the UK and France was for the jury to decide, and Defendants had the opportunity to challenge the comparability of these markets to the United States. *See, e.g.*, Marciano, Trial Tr. 1186:5–1190:17; Yovich, Trial Tr. 2793:2–2795:15; Defs' Closing, Trial Tr. 4669:4–21.

There is also no merit to Defendants' argument that the European evidence was irrelevant because it concerned "fees to fans rather than compensation to venues." Mot. 14–15. The jury was presented with evidence that Ticketmaster charged above-market ticketing fees to venues, which *also* caused overcharge damages to fans; both venues and fans were impacted by the same practices. Rule 50(b) Opp'n 21–22. Evidence about such fees in the UK and France, which operate without the influence of Ticketmaster's monopoly power and exclusive dealing agreements, was relevant to the jury's consideration of whether Ticketmaster's long-term exclusive dealing was a cause of supracompetitive ticketing charges in the United States. Higher prices caused by anticompetitive acts are themselves evidence of market power. *See FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460–62 (1986); *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1075–76 (D.D.C. 1997). At most, Defendants' objection goes to weight, not admissibility, and the Court admitted the evidence for a proper rebuttal purpose. *See* ECF No. 1079 at 6; *see also* ECF No. 1042 at 25.

Defendants' claim that "nothing else" showed anticompetitive effects in the United States is wrong. Mot. 15. The record included substantial evidence about the anticompetitive effects of

---

[16] Defendants cite *Heerwagen v. Clear Channel Communications*, 435 F.3d 219 (2d Cir. 2006), for a noncontroversial definition of a geographic market. But the fact that the UK and France are outside the geographic market stipulated to at trial does not mean that the competitive dynamics there cannot be relevant to issues before the jury.

Defendants' monopolization of ticketing markets in the United States, including the loss of choice by venues, a reduction in product quality, and price effects. *See* Rule 50(b) Opp'n 20–22.

### E.    Dr. Abrantes-Metz's admissible testimony does not provide a basis for a new trial.

For the reasons set forth in Plaintiffs' Rule 50(b) Opposition, the damages testimony of Dr. Abrantes Metz is admissible. Rule 50(b) Opp'n 23–32. Any further disputes about its persuasiveness were for the jury to decide. It cannot be the basis for a new trial on damages, even if the Court were to disagree with the jury's assessment of competing expert evidence. *See, e.g.*, *In re Joint E. & S. Dist. Asbestos Litig.*, 52 F.3d 1124, 1132–34 (2d Cir. 1995); *Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 185–86 (2d Cir. 2001).[17]

***

Because each challenged category of evidence was properly admitted, Defendants cannot show the cumulative effect of claimed errors affected their substantial rights. Mot. 15. Courts "measure prejudice by assessing error in light of the record as a whole." *Phillips v. Bowen*, 278 F. 3d 103, 111 (2d Cir. 2002). Here, there were no errors by the Court in admitting the challenged evidence and no basis to find the type of substantial injustice and prejudice that would warrant a new trial.

---

[17] Defendants' citation to a news article purporting to quote one juror does not demonstrate any error regarding improper reliance on Abrantes-Metz for liability issues warranting a new trial. Mot. 15 n.2; *Manley*, 337 F.3d at 252 ("prejudice cannot be based on subjective reports of the actual jurors"). The jury heard substantial evidence from Dr. Hill and from non-expert witnesses showing evidence of monopoly power and anticompetitive effects on which to base their verdict. *See* Rule 50(b) Opp'n 4–9, 14–22.

III.    **Defendants' Challenge to the Court's Carefully Considered Jury Instructions Also Provides No Basis for a New Trial**

Defendants challenge six aspects of the Court's jury instructions, none of which require a new trial. To the contrary, the jury instructions were the product of multiple rounds of briefing, extensive argument at the charging conference, and careful consideration by the Court. All of Defendants' arguments about the instructions have already been thoroughly considered and rejected by the Court. Defendants present no basis for the Court to reconsider its ruling on these instructions now.

Further, Defendants do not—and cannot—show that any challenged jury instruction resulted in "seriously erroneous result[s]" or a "miscarriage of justice." *DLC Mgmt.*, 163 F.3d at 133 (internal marks omitted). Defendants' arguments are merely disagreements with the Court's phrasing or with how the jury was permitted to evaluate the evidence. Each challenged instruction accurately reflected governing law or, at minimum, did not misstate it, and none could have affected the verdict in light of the strong evidence of liability presented at trial.

A.    **The Court's Jury Instruction No. 24 accurately defined the anticompetitive effects required to prove exclusionary conduct.**

Defendants argue that Jury Instruction No. 24 "incorrectly relieved Plaintiffs of their burden to prove changed price, output, or quality." Mot. 17; ECF No. 1411-24 at 41–43. They then argue this purported error requires a new trial because Plaintiffs did not present the required evidence of a price effect, output effect, or a reduction in quality. Mot. 17–18. Defendants are wrong.

As an initial matter, Defendants' claims of a "dearth of evidence on price, output, or quality" (Mot. 18) ignore the substantial evidence in the trial record on these points. *See* Rule 50(b) Opp'n 7–8, 20–22. This evidence alone defeats the premise of Defendants' objection.

19

Further, the Court properly instructed the jury that "constrained consumer choice" was an anticompetitive effect that could support a finding of exclusionary conduct. Trial Tr. 4769:11–22. The decision in *MacDermid Printing Solutions LLC v. Cortron Corp.*, 833 F.3d 172 (2d Cir. 2016)—one of Defendants' primary authorities—specifically noted "actions that reduce consumer choice" fall among those that may be "inherently anticompetitive." *Id.* at 183.

Jury Instruction 24 was also consistent with the holding in *MacDermid* that "a plaintiff may demonstrate an adverse effect indirectly by establishing that [Defendants] had sufficient 'market power' to cause an adverse effect, 'plus some other ground for believing that the challenge behavior' has harmed competition" as an *alternative* to direct evidence of higher prices, reduced output, or lower quality. *Id.* at 182 (quoting *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 97 (2d Cir. 1998). Here, the jury found that the applicable Defendant had monopoly power in each relevant market.[18] In such a case, *MacDermid* recognizes that direct evidence of an adverse effect on price, output, or quality is not required.[19] *MacDermid*, 833 F.3d at 182.

Similarly, the reference in Jury Instruction No. 24 to examining whether the challenged exclusionary conduct "has significantly restricted competitors' ability to enter the relevant market and compete" is consistent with the Supreme Court's decision in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, cited by Defendants, which held that "it is relevant to consider [the challenged conduct's] impact on consumers and whether it has impaired competition in an

---

[18] Verdict Form, ECF No. 1417, Questions 2, 6, 10. Defendants do not challenge the Court's instructions regarding monopoly power.

[19] *Ohio v. American Express Co.*, 585 U.S. 529 (2018) is distinguishable. There, plaintiffs "stake[d] their entire case" on proving increased merchant fees and failed. *Id.* at 547–52. That plaintiffs there chose to focus on certain anticompetitive effects, and failed to prove them, does not mean those are the only ways to prove harm to competition.

unnecessarily restrictive way. If a firm has been 'attempting to exclude rivals on some basis other than efficiency,' it is fair to characterize its behavior as predatory." 472 U.S. 585, 605 (1985); *see also In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 229 (S.D.N.Y. 2019) ("A monopolist's conduct violates Section 2 if it (1) tends to impair the opportunities of rivals, [and] also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way.") (internal quotations omitted). If a monopolist's conduct deters entry, that harms the competitive process itself, not just competitors. *See United States v. Microsoft Corp.*, 253 F.3d 34, 79 (D.C. Cir. 2001) (requiring only that exclusionary conduct be "reasonably capable of contributing significantly" to a defendant's "continued monopoly power").

### B.    The Court properly instructed the jury on proving coercion to show unlawful tying.

Defendants argue that the Court erred in instructing the jury that "a policy of tying products together, together with market power in the market for the tying product, may suffice to show coercion." JI32;[20] Mot. 19. Defendants acknowledge that *Hill v. A-T-O, Inc.*, 535 F.2d 1349, 1355 (2d Cir. 1976), held that an "unremitting policy of tie-in . . . constitutes the requisite coercion," but argue that *Hill* was overruled by implication by *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2 (1984). Mot. 19. The Court has previously rejected this argument, and it should do so again.

Defendants cite *Jefferson Parish* for the proposition that coercion requires the buyer to purchase something it did not want or would have preferred to purchase elsewhere. Mot. 20. But these uncontroversial principles set forth by the Supreme Court do not address the relevant

---

[20] ECF No. 1411-24 at 52.

question here, specifically regarding what types of behavior *constitute* coercion. In *Hill*, the Second Circuit held that an unremitting policy mandating a tie was coercive when accompanied by sufficient market power in the tying product; this would meet the standard in *Jefferson Parish*. *Hill*, 535 F.2d at 1355. Nothing in *Jefferson Parish* overturns *Hill*, and *Hill's* holding has been reaffirmed after *Jefferson Parish*. *See, e.g.*, *Park v. Thomson Corp.*, 2007 WL 119461, at *4 (S.D.N.Y. Jan. 11, 2007) ("When a policy of conditioned sales is demonstrated, proof of coercion on an individual basis is unnecessary.") (citing *Hill*). *Jefferson Parish* in fact confirms that ties imposed by entities with market power (like Live Nation) can violate the antitrust laws. 466 U.S. at 13–14 ("[W]e have condemned tying arrangements when the seller has some special ability— usually called 'market power'—to force a purchaser to do something that he would not do in a competitive market.").

Defendants attempt to evade *Hill* and *Park* by arguing that there was no evidence of a policy of conditioned sales admitted to by Defendants, only a "policy of refusing to deal with rivals." Mot. 21. But the evidence on the challenged tying policy was clear. Defendants' witnesses uniformly testified that Live Nation had a consistent policy that did not allow artists to gain access to Live Nation-owned or -operated amphitheaters unless they used Live Nation promoters for the concerts at these venues. *See* Rule 50(b) Opp'n 9–10. The jury found that artists, not promoters, were the actual customers for large amphitheaters (*see* Verdict at Question 12), a finding supported by Defendants' own witnesses, who testified artists made the decision about where to play. *See* Rule 50(b) Opp'n 11; Defs' Opening, Trial Tr. 161:21–162:17 ("it is . . . the artists who decide where they are going to play"). This evidence was more than sufficient for the jury to find the required coercion through Live Nation's tying policy.

22

C.    **The Court properly instructed the jury regarding Defendants' anticompetitive conduct.**

Defendants concede the Court properly instructed the jury about anticompetitive conduct in general (Mot. 21), and about anticompetitive conduct with regard to exclusive dealing specifically (*id.* 21–22), but argue the Court should have provided separate instructions about (i) threats, conditioning, and retaliation in the ticketing markets, and (ii) Live Nation's conduct regarding large amphitheaters. *Id.* 22. Defendants were not entitled to any further instructions on these issues.

i.    ***The Court properly instructed the jury to consider threats, conditioning, and retaliation in the context of the exclusive-dealing claim, and also covered such behavior with its general instruction on exclusionary conduct.***

Courts have repeatedly cautioned against viewing each type of anticompetitive conduct in a Section 2 monopolization case in isolation. *See City of Groton v. Conn. Light & Power Co.*, 662 F.2d 921, 928–35 (2d Cir. 1981) (courts must assess the combined or "synergistic effect" of a defendant's conduct); *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 652–54 (2d Cir. 2015) (monopolization liability depends on the overall competitive effect of combined conduct); *United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 604 (S.D.N.Y. 2025) (collecting cases). Defendants argue lawful conduct may not form part of this calculus, but they do not seriously argue that threatening to withhold live entertainment from venues to secure long-term, exclusive contracts is lawful, procompetitive behavior. There was evidence of such overt threats at trial (Rule 50(b) Opp'n 5–6, 17–19), and thus no risk the jury considered purely lawful behavior.

Here, the Court instructed the jury that it could consider any threats, conditioning, or retaliation as forms of coercion as part of its exclusive dealing analysis. Mot. 22. This made sense; it is undisputed that the purpose of Defendants' threats was to secure and maintain exclusive ticketing contracts with venues. *See* Rapino, Trial Tr. 1844:10–17; Yovich, Trial Tr.

23

2733:17–20; Marcus, Trial Tr. 2853:17–20; PX0735 at -096; PX0782 at -360; PX1078; Rule 50(b) Opp'n 17–19.

In addition, threats, withholding, and retaliation were also covered by the general instruction that the Court provided defining exclusionary or anticompetitive conduct. *See* JI24 ("Exclusionary conduct means acts other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market."). There was no legal requirement or need that the Court provide another instruction directed solely at threats, withholding, and retaliation.

> ii. **The Court's instructions on anticompetitive effects properly covered the conduct of Live Nation related to its monopolization of large amphitheaters.**

The jury received comprehensive instruction on anticompetitive effects—covering increased prices, reduced output or quality, constrained consumer choice, and restrictions on competitive entry—spanning two and a half pages. *See* JI24. That instruction specifically stated that "a company's control over or acquisition of amphitheaters does not, without more, count as anticompetitive conduct." *Id.* Defendants nonetheless challenge the instruction's purported focus on "conduct" versus "effects." Mot. 24.

This argument elevates form over substance. The challenged sentence appeared within a general instruction on anticompetitive effects, and there is no reason to believe the jury ignored that context when evaluating the claim related to monopolization of large amphitheaters. *See* JI24 ("[A] monopolist's conduct only becomes unlawful if the monopolist either obtained or maintained its monopoly power through exclusionary conduct . . . which had a substantial anticompetitive effect in the relevant market."). Defendants' request for the Court to repeat the forms of anticompetitive effects for the large amphitheater market—"higher prices, lower output, reduced quality, or *the like*"—was superfluous. Mot. 24 (emphasis added). That language was

24

already in the general instructions, *see* JI24, and Defendants' own formulation concedes that anticompetitive effects extend beyond price, output, and quality effects. The Court did not err in rejecting Defendants' request for additional instructions on this point.

### D.    The exclusive dealing instructions properly instructed the jury that coercion was a factor that could be considered.

Defendants don't dispute that the Court instructed the jury that coercion was an element it could consider in deciding whether Ticketmaster's exclusive dealing practices constituted exclusionary conduct. Mot. 25. They further admit that multiple cases state that evidence of coercion can be *relevant* to assessing the anticompetitive effects of exclusive dealing but is not a *required* element. *Id.* Defendants nonetheless seek a new trial because they were not granted a bespoke instruction for this case that coercion *is* a required element, due to the supposed "one-sided" evidence about venue preferences for exclusive ticketing contracts. *Id.*

There is no case law supporting Defendants' request—for good reason. If the jury found that Ticketmaster's exclusive dealing policies maintained its monopoly and excluded entry, it is irrelevant whether a particular venue was in favor of an exclusive ticketing arrangement. The exclusionary effect in maintaining the monopoly would be the same, and, as the Court has repeatedly reminded Defendants, antitrust prizes substance over form.

Further, the evidence was not what Defendants claim. Even of the venue witnesses who testified in favor of some type of exclusive arrangement, not a single one testified that they wanted a five-year exclusive agreement, rather than a shorter exclusive deal, or that they wanted Live Nation to use Oak View Group ("OVG") to promote exclusive contract renewals without competitive bidding and without revealing that it was being paid tens of millions of dollars by Live Nation. The evidence further showed that there were AEG venues that preferred multiple ticketers, and that in the UK and France, where Ticketmaster is not a monopolist, nonexclusive

25

ticketing is common. Marciano, Trial Tr. 937:9–938:3, 955:20–957:2, 1107:12–1108:4; Perez, Trial Tr. 2336:13–2338:1. And although Defendants claim that Mr. Abbamondi testified he preferred "exclusive contracting" (Mot. 23), Mr. Abbamondi actually testified that Barclays found SeatGeek's proposal attractive because it allowed nonexclusive distribution. Trial Tr. 231:23–233:11. There is no basis for Defendants' request that a special coercion instruction be constructed because of the unique facts of this case, and no basis to argue that the absence of such a special instruction requires a new trial.

Defendants cite *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012) for the proposition that unlawful exclusive dealing requires "some element of coercion," (Mot. 26), but omit the next sentence: "if the defendant occupies a dominant position in the market, its exclusive dealing arrangements *invariably have the power to exclude rivals*." 696 F.3d at 284 (emphasis added).[21] That is the proper standard in a Section 2 case. Plaintiffs agreed at the charging conference to include Defendants' cited language from *ZF Meritor* if this sentence was also included. Trial Tr. 4509:8–4510:3. Defendants rejected that proposal. *Id.* 4511:9–20.

Defendants' remaining authorities confirm that coercion is not a required element. *Inline Packaging, LLC v. Graphic Packaging International, LLC*, 962 F.3d 1015 (8th Cir. 2020), cites the same *ZF Meritor* passage, including that dominant-position exclusive arrangements inherently exclude rivals. *Id.* at 1031 n.11. *Race Tires America, Inc. v. Hoosier Racing Tires Corp.*, 614 F.3d 57 (3d Cir. 2010), pre-*ZF Meritor*, declined to hold "coercion is an essential element of every successful antitrust claim" and denied summary judgment on that basis. *Id.* at 78. And *In re EpiPen Marketing, Sales Practices, & Antitrust Litigation*, 44 F.4th 959 (10th Cir.

---

[21] *ZF Meritor* further held that a monopolist "may use its power to break the competitive mechanism and deprive consumers of the ability to make a meaningful choice." *Id.* at 285.

2022), flatly states coercion is "unnecessary to establish a successful exclusive dealing case." *Id.* at 996.

> **E.  The Court properly instructed the jury that it could consider the *Brown Shoe* factors in evaluating targeted customer markets.**

Defendants argue the Court erred by permitting the jury to consider *Brown Shoe* factors, rather than price discrimination, for defining targeted customer markets. Mot. 27. But Defendants' argument that price discrimination is required to define such a market is wrong. *See* Rule 50(b) Opp'n 12–13. As this Court correctly held, such a requirement would condition a market's existence "on a monopolist's *use* of its monopoly power" and preclude proof through indirect evidence. ECF No. 1037 at 19 (emphasis in original). There is no basis for the Court to revisit this ruling.

> **F.  There is no basis for Defendants' renewed complaint that the Jury Instructions did not require Plaintiffs to prove a relevant market for the tied product.**

Defendants once again challenge the tying instructions for failing to require proof of a relevant tied product market. Mot. 27. But, as the Court has already ruled, there is no such requirement. Tying claims require an "anticompetitive effect" related to the tied product, not a formal market definition for the tied product. *See* ECF No. 1094 at 2–5. The only new authority Defendants cite, *North American Soccer League, LLC v. United States Soccer Federation, Inc.*, 2026 WL 1397077 (2d Cir. May 19, 2026), is unpublished and did not involve a tying claim, much less the requirements regarding any tied market.[22]

---

[22] *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 2025 WL 1311115, at *2 (E.D.N.Y. May 6, 2025).

## CONCLUSION

For the reasons set forth above and in Plaintiffs' Rule 50(b) Opposition, the Court should deny Defendants' motion for a new trial.

*[Signatures on following page]*

Dated June 18, 2026                                    Respectfully Submitted,

                                                      /s/ *Jeffrey L. Kessler*

                                                      Jeffrey L. Kessler
                                                      Eva W. Cole
                                                      Johanna Rae Hudgens
                                                      **WINSTON TAYLOR LLP**
                                                      200 Park Avenue
                                                      New York, NY 10166
                                                      Tel: (212) 294-6700
                                                      Fax: (212) 294-4700
                                                      jeffrey.kessler@winstontaylor.com
                                                      Eva.cole@winstontaylor.com
                                                      Johanna.hudgens@winstontaylor.com

                                                      Jeanifer E. Parsigian (*pro hac vice*)
                                                      **WINSTON TAYLOR LLP**
                                                      101 California Street, 21st Floor
                                                      San Francisco, CA 94111
                                                      Tel: (415) 591-1000
                                                      Fax: (415) 591-1400
                                                      jeanifer.parsigian@winstontaylor.com

                                                      /s/ *Jonathan H. Hatch*
                                                      Jonathan H. Hatch
                                                      Assistant Attorney General
                                                      **Office of the New York State Attorney General**
                                                      28 Liberty Street
                                                      New York, NY 10005
                                                      Telephone: (212) 416-8598
                                                      Email: jonathan.hatch@ag.ny.gov

                                                      *Counsel for Plaintiff State of New York*

29

/s/ Robert A. Bernheim
Robert A. Bernheim (admitted *pro hac vice*)
Office of the Arizona Attorney General
Consumer Protection & Advocacy Section
2005 N. Central Avenue
Phoenix, AZ 85004
Telephone: (602) 542-3725
Fax: (602) 542-4377
Email: Robert.Bernheim@azag.gov
*Attorney for Plaintiff State of Arizona*

/s/ Brent Nakamura
Brent Nakamura (admitted *pro hac vice)*
Supervising Deputy Attorney General
Office of the Attorney General
California Department of Justice
300 South Spring Street
Los Angeles, CA 90013
Telephone: (213) 269-6000
Email: Brent.Nakamura@doj.ca.gov
*Attorney for Plaintiff State of California*

/s/ Conor J. May
Conor J. May (admitted *pro hac vice*)
Assistant Attorney General
Antitrust Unit
Colorado Department of Law
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email: Conor.May@coag.gov
*Attorney for Plaintiff State of Colorado*

/s/ Rose Levine
Rose Levine (admitted *pro hac vice*)
Nicole Demers (admitted *pro hac vice*)
Assistant Attorney General
Office of the Attorney General of
Connecticut
165 Capitol Avenue
Hartford, CT 06106
Telephone: 860-808-5030
Email: rose.levine@ct.gov
        nicole.demers@ct.gov
*Attorney for Plaintiff State of Connecticut*

/s/ Adam Gitlin
Adam Gitlin (admitted *pro hac vice*)
Chief, Antitrust and Nonprofit Enforcement Section
Office of the Attorney General for the
District of Columbia
400 6th Street NW, 10th Floor
Washington, DC 20001
Email: Adam.Gitlin@dc.gov
*Attorney for Plaintiff District of Columbia*

/s/ Lizabeth A. Brady
Lizabeth A. Brady
Director, Antitrust Division
Florida Office of the Attorney General
PL-01 The Capitol
Tallahassee, FL 32399-1050
Telephone: 850-414-3300
Email: Liz.Brady@myfloridalegal.com
*Attorney for Plaintiff State of Florida*

/s/ Richard S. Schultz
Richard S. Schultz (admitted *pro hac vice*)
Assistant Attorney General
Office of the Illinois Attorney General
Antitrust Bureau
115 S. LaSalle Street, Floor 23
Chicago, Illinois 60603
Telephone: (872) 272-0996
Email: Richard.Schultz@ilag.gov
*Attorney for Plaintiff State of Illinois*

/s/ Jesse Moore
Jesse Moore (admitted *pro hac vice*)
Deputy Attorney General
Office of the Indiana Attorney General
302 W. Washington St., Fifth Floor
Indianapolis, IN 46204
Telephone: 317-232-4956
Email: Jesse.Moore@atg.in.gov
*Attorney for Plaintiff State of Indiana*

/s/ Christopher Teters
Christopher Teters (admitted *pro hac vice*)
Assistant Attorney General
Public Protection Division

30

Office of Kansas Attorney General
120 S.W. 10th Avenue, 2nd Floor
Topeka, KS 66612-1597
Telephone: (785) 296-3751
Email: chris.teters@ag.ks.gov
*Attorney for Plaintiff State of Kansas*

/s/ *Mario Guadamud*
Mario Guadamud (admitted *pro hac vice*)
Louisiana Office of Attorney General
1885 North Third Street
Baton Rouge, LA 70802
Telephone: (225) 326-6400
Fax: (225) 326-6498
Email: GuadamudM@ag.louisiana.gov
*Attorney for Plaintiff State of Louisiana*

/s/ *Schonette J. Walker*
Schonette J. Walker (admitted *pro hac vice*)
Assistant Attorney General
Chief, Antitrust Division
200 St. Paul Place, 19th floor
Baltimore, Maryland 21202
Telephone: (410) 576-6470
Email: swalker@oag.state.md.us
*Attorney for Plaintiff State of Maryland*

/s/ *Katherine W. Krems*
Katherine W. Krems (admitted *pro hac vice*)
Assistant Attorney General, Antitrust Division
Office of the Massachusetts Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (617) 963-2189
Email: Katherine.Krems@mass.gov
*Attorney for Plaintiff Commonwealth of Massachusetts*

/s/ *LeAnn D. Scott*
LeAnn D. Scott (admitted *pro hac vice*)
Assistant Attorney General
Corporate Oversight Division

Michigan Department of Attorney General
P.O. Box 30736
Lansing, MI 48909
Telephone: (517) 335-7632
Email: ScottL21@michigan.gov
*Attorney for Plaintiff State of Michigan*

/s/ *Zach Biesanz*
Zach Biesanz
Senior Enforcement Counsel
Antitrust Division
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
Saint Paul, MN 55101
Telephone: (651) 757-1257
Email: zach.biesanz@ag.state.mn.us
*Attorney for Plaintiff State of Minnesota*

/s/ *Lucas J. Tucker*
Lucas J. Tucker (admitted *pro hac vice*)
Senior Deputy Attorney General
Office of the Nevada Attorney General
Bureau of Consumer Protection
100 N. Carson St.
Carson City, NV 89701
Email: ltucker@ag.nv.gov
*Attorney for Plaintiff State of Nevada*

/s/ *Zachary Frish*
Zachary A. Frish (admitted *pro hac vice*)
Assistant Attorney General
Consumer Protection & Antitrust Bureau
New Hampshire Attorney General's Office
Department of Justice
1 Granite Place South
Concord, NH 03301
Telephone: (603) 271-2150
Email: zachary.a.frish@doj.nh.gov
*Attorney for Plaintiff State of New Hampshire*

/s/ *Andrew F. Esoldi*
Andrew F. Esoldi
Deputy Attorney General
Division of Law

31

Antitrust Litigation and Competition Enforcement
124 Halsey Street, 5th Floor
Newark, NJ 07101
Telephone: (609) 696-5465
Email: Andrew.Esoldi@law.njoag.gov
*Attorney for Plaintiff State of New Jersey*

*/s/ Evan Crocker*
Evan Crocker (admitted *pro hac vice*)
Assistant Attorney General, Division Director
Consumer Affairs Division
New Mexico Department of Justice
201 3rd St NW, Suite 300
Albuquerque, NM 87102
Telephone: (505) 494-8973
Email: ecrocker@nmdoj.gov
*Attorney for Plaintiff State of New Mexico*

*/s/ Francisco Benzoni*
Francisco Benzoni (admitted *pro hac vice*)
Special Deputy Attorney General
Brian Rabinovitz (admitted *pro hac vice*)
Special Deputy Attorney General
North Carolina Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
Telephone: (919) 716-6000
Facsimile: (919) 716-6050
Email: fbenzoni@ncdoj.gov
Email: brabinovitz@ncdoj.gov
*Attorneys for Plaintiff State of North Carolina*

*/s/ Sarah Mader*
Sarah Mader (admitted *pro hac vice)*
Assistant Attorney General
Antitrust Section
Office of the Ohio Attorney General
30 E. Broad St., 26th Floor
Columbus, OH 43215
Telephone: (614) 466-4328
Email: Sarah.Mader@OhioAGO.gov
*Attorney for Plaintiff State of Ohio*

*/s/ Gina Ko*
Gina Ko (admitted *pro hac vice*)
Assistant Attorney General
Economic Justice Section
Oregon Department of Justice
100 SW Market St.,
Portland, Oregon 97201
Telephone: (971) 673-1880
Fax: (503) 378-5017
Email: Gina.Ko@doj.oregon.gov
*Attorney for Plaintiff State of Oregon*

*/s/ Joseph S. Betsko*
Joseph S. Betsko (admitted *pro hac vice*)
Assistant Chief Deputy Attorney General
Antitrust Section
Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
Telephone: (717) 787-4530
Email: jbetsko@attorneygeneral.gov
*Attorney for Plaintiff Commonwealth of Pennsylvania*

*/s/ Paul T.J. Meosky*
Paul T.J. Meosky (admitted *pro hac vice*)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400, ext. 2064
Fax: (401) 222-2995
Email: pmeosky@riag.ri.gov
*Attorney for Plaintiff State of Rhode Island*

*/s/ Jared Q. Libet*
Jared Q. Libet (admitted *pro hac vice*)
Assistant Deputy Attorney General
Office of the Attorney General of South Carolina
P.O. Box 11549
Columbia, South Carolina 29211
Telephone: (803) 734-5251
Email: jlibet@scag.gov
*Attorney for Plaintiff State of South Carolina*

32

/s/ Hamilton Millwee
Hamilton Millwee (admitted *pro hac vice*)
Assistant Attorney General
Office of the Attorney General and
Reporter
P.O. Box 20207
Nashville, TN 38202
Telephone: (615) 291-5922
Email: Hamilton.Millwee@ag.tn.gov
*Attorney for Plaintiff State of Tennessee*


/s/ Diamante Smith
Diamante Smith (admitted *pro hac vice*)
Assistant Attorney General, Antitrust
Division
Office of the Attorney General of Texas
P.O. Box 12548
Austin, TX 78711-2548
Telephone: (512) 936-1162
*Attorney for Plaintiff State of Texas*


/s/ Marie W.L. Martin
Marie W.L. Martin (admitted *pro hac vice*)
Deputy Division Director,
Antitrust & Data Privacy Division
Utah Office of Attorney General
160 East 300 South, 5th Floor
P.O. Box 140830
Salt Lake City, UT 84114-0830
Telephone: 801-366-0375
Email: mwmartin@agutah.gov
*Attorney for Plaintiff State of Utah*


/s/ Sarah L. J. Aceves
Sarah L. J. Aceves (admitted *pro hac vice*)
Assistant Attorney General
Consumer Protection and Antitrust Unit
Vermont Attorney General's Office
109 State Street
Montpelier, VT 05609
Telephone: (802) 828-3170
Email: sarah.aceves@vermont.gov
*Attorney for Plaintiff State of Vermont*


/s/ David C. Smith
David C. Smith (admitted *pro hac vice*)
Assistant Attorney General
Office of the Attorney General of Virginia
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 692-0588
Facsimile: (804) 786-0122
Email: dsmith@oag.state.va.us
*Attorney for Plaintiff Commonwealth of
Virginia*


/s/ Ashley A. Locke
Ashley A. Locke (admitted *pro hac vice*)
Assistant Attorney General
Antitrust Division
Washington Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
Telephone: (206) 389-2420
Email: Ashley.Locke@atg.wa.gov
*Attorney for Plaintiff State of Washington*


/s/ Douglas L. Davis
Douglas L. Davis (admitted *pro hac vice*)
Senior Assistant Attorney General
Consumer Protection and Antitrust Section
West Virginia Office of Attorney General
P.O Box 1789
Charleston, WV 25326
Telephone: (304) 558-8986
Fax: (304) 558-0184
Email: douglas.l.davis@wvago.gov
*Attorney for Plaintiff State of West Virginia*


/s/ Caitlin M. Madden
Caitlin M. Madden (admitted *pro hac vice*)
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
Telephone: (608) 267-1311
Email: caitlin.madden@wisdoj.gov
*Attorney for Plaintiff State of Wisconsin*

*/s/ William T. Young*
William T. Young
Assistant Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
Telephone: (307) 777-7847
Email: william.young@wyo.gov
*Attorney for Plaintiff State of Wyoming*

## CERTIFICATE OF COMPLIANCE WITH LOCAL CIVIL RULE 7.1(c)

I hereby certify that the foregoing Memorandum of Law in Support of Plaintiffs' Opposition to Defendants' Motion For A New Trial Pursuant to Federal Rule of Civil Procedure 59 complies with the wordcount limitation in Local Civil Rule 7.1(c). According to the word processing software used to prepare this document, the memorandum contains 8,749 words, excluding the parts of the documents exempted by Local Civil Rule 7.1(c).

Dated: June 18, 2026

*/s/ Jeffrey L. Kessler*

Jeffrey L. Kessler