**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,
*et al.*,

> *Plaintiffs*,

> v.

LIVE NATION ENTERTAINMENT, INC.
and TICKETMASTER L.L.C.,

> *Defendants*.

Case No. 1:24-cv-3973-AS

**COMPETITIVE IMPACT STATEMENT**

In accordance with the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)–(h) (the

"APPA" or "Tunney Act"), the United States of America[1] files this Competitive Impact

Statement related to its proposed Final Judgment filed in this civil antitrust proceeding.

**I.    NATURE AND PURPOSE OF THE PROCEEDING**

On May 23, 2024, the United States and several States (collectively "Plaintiffs") filed a

civil antitrust complaint against Defendants Live Nation Entertainment, Inc. and Ticketmaster

L.L.C. Plaintiffs subsequently filed an amended complaint (the "Complaint") on August 30,

2024. The Complaint alleges Defendants violated Sections 1 and 2 of the Sherman Act, 15

U.S.C. §§ 1–2, as well as several State laws by engaging in anticompetitive conduct in certain

---

[1] This Competitive Impact Statement addresses only the effects of the proposed Final Judgment on the claims
brought by the United States. It does not address any effects of the proposed Final Judgement on the claims pursued
by the Settling States or the State-Specific Provisions contained in Section XIX of the proposed Final Judgment.

1

ticketing, promotions, and amphitheater markets.

On March 5, 2026, Defendants and the United States executed a term sheet (ECF No. 1171-1) memorializing the material terms of a settlement of the pending litigation. Subsequently, the States of Arkansas, Iowa, Mississippi, Nebraska, Oklahoma, and South Dakota (the "Settling States") joined the settlement with additional terms applicable only to the Settling States. The United States and the Settling States have now filed a proposed Final Judgment and Stipulation and Order ("Stipulation and Order") to which Defendants have agreed and that is designed to remedy the loss of competition alleged in the Complaint.

Under the proposed Final Judgment, which is explained more fully below, Defendants are required to: (1) develop technology to allow Major Concert Venues[2] utilizing Ticketmaster's back-end software to sell and distribute primary tickets through third-party marketplaces; (2) loosen exclusivity provisions in their existing primary ticketing contracts and abide by new restrictions on exclusive contracting for future ticketing contracts; (3) allow promoters and artists to use alternative sellers of tickets ("ticketers") at Defendants' amphitheaters; (4) cap ticket service fees at Defendants' amphitheaters; (5) divest control over certain amphitheaters; (6) allow artists who choose to work with other promoters to perform at Defendants' amphitheaters; (7) waive exclusive and preferred booking rights at Major Concert Venues; (8) refrain from engaging in conditioning, retaliation, or content-steering that impairs competition; (9) maintain firewalls that limit disclosure of information between Ticketmaster and Live Nation; (10) terminate their ticketing agreement with the Oak View Group ("OVG") and refrain from entering into similar agreements in the future; (11) share certain data with artists; and (12) notify the United States of certain future acquisitions. Additionally, the proposed Final

---

[2] "Major Concert Venues" generally refers to arenas and amphitheaters with a seating capacity of 8,000 or more. *See* Proposed Final Judgment, ECF No. 1523-2, Paragraph II(N).

Judgment provides for the appointment of a monitor to oversee Defendants' compliance, and it imposes substantial penalties and other consequences should Defendants violate these or other provisions of the Final Judgment in the future. The decree will last for eight years, unless the Court grants an extension.

Under the terms of the Stipulation and Order, Defendants must comply with the proposed Final Judgment, including all timeframes specified in its provisions, pending entry by the Court or until the time for all appeals of any Court ruling declining entry of the proposed Final Judgment has expired. On June 15, 2026, the Court entered the Stipulation and Order.

The United States and Defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment will terminate this action with respect to the United States, except that the Court will retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof.

## II.    DESCRIPTION OF EVENTS GIVING RISE TO THE ALLEGED VIOLATIONS

### A.    The Defendants and their Anticompetitive Conduct

Defendants are the "largest live entertainment company in the world," the "largest producer of live music concerts in the world," and "the world's leading live entertainment ticketing sales and marketing company."[3] Live Nation Entertainment was formed in 2010 as a result of the merger between Live Nation and Ticketmaster. At that time, to resolve competitive concerns the United States alleged would result from the merger, Live Nation entered into the 2010 Final Judgment[4] with the United States in which Live Nation agreed not to condition live entertainment content on a venue's use of Ticketmaster or retaliate against a venue that chose or

---

[3] Am. Compl. ¶ 16.
[4] *United States, et. al v. Ticketmaster Ent.*, ECF No. 15, No. 10-cv-00139 (D.D.C. July 30, 2010).

3

considered a primary ticketing provider other than Ticketmaster, among other relief. In the years following the 2010 Final Judgment, Live Nation engaged in conduct that, in the United States' view, violated the 2010 Final Judgment. More specifically, the United States alleged that Live Nation had repeatedly conditioned and threatened to condition its provision of live entertainment content on a venue's using Ticketmaster's primary ticketing service. As a result, in 2020, Live Nation and the United States agreed to modify and extend the 2010 Final Judgment into what became the 2020 Amended Final Judgment.[5]

As alleged in the Complaint, Defendants have maintained monopolies and/or restrained competition in certain markets for primary ticketing, promotion services for artists, promotion and booking services for venues, and the use of large amphitheaters through a wide range of anticompetitive acts. For example, Defendants entered into exclusive primary ticketing contracts with Major Concert Venues, threatened and/or retaliated against venues that chose to or considered working with competing ticketers, entered into exclusive and preferred booking agreements with venues, acquired venues and promoters, entered into an anticompetitive agreement with OVG related to ticketing, and tied artists' access to Defendants' amphitheaters to the use of Defendants' promotion services.

### B.    Industry Background

The performance of a concert requires multiple steps and multiple actors. First, the artist decides—often in consultation with the artist's representatives and potential promoters—where and when they want to perform. This decision is largely focused on the desired geographical areas and the type of venue (*e.g.*, amphitheaters, arenas, etc.). Next, typically through an agent, the artist solicits offers from promoters who bid to promote a concert or tour. Promoting a

---

[5] *United States, et. al v. Ticketmaster Ent.*, ECF No. 29, No. 10-cv-00139 (D.D.C. Jan. 28, 2020).

concert generally involves taking on the financial risk of the show by guaranteeing an artist a set amount of money, marketing the show, negotiating with venues on behalf of the artist, and other logistical tasks.

Some promoters enter into exclusive booking agreements with venues whereby if the artist wants to perform at a specific venue, then that artist must use the venue's exclusive promoter. Under an exclusive booking agreement, artists cannot benefit from competition that might otherwise occur between promoters who are competing to book concerts at that specific venue. Additionally, some promoters enter into preferred booking agreements with venues that provide the promoter with preferential rights to book dates or promote shows at a venue. Live Nation has numerous exclusive and preferred booking arrangements with Major Concert Venues, including large amphitheaters. Live Nation also owns and operates a significant number of large amphitheaters in the United States and serves as the exclusive booker of those venues. As such, Live Nation is typically the only promoter that promotes concerts in its owned and operated amphitheaters and in venues it does not own and operate but with which it has exclusive or preferred booking arrangements. Live Nation has acquired and leased amphitheaters across the country, sometimes even when Live Nation projected that it would incur a financial loss as a result of these decisions.

After the artist has chosen the venue and promoter, the next step is selling tickets to consumers. Ticketers include primary ticketers and secondary ticketers. Primary ticketers typically make their sales to consumers under a contract with a venue. Under an exclusive primary ticketing arrangement, the venue typically chooses the primary ticketing company. Under non-exclusive primary ticketing arrangements, promoters and artists may choose the primary ticketing company in conjunction with the venue.

The event ticketing services that primary ticketers provide include two major types of services: (1) "back-end" services and (2) distribution ("marketplace") services. First, the primary ticketing back-end is a collection of software, technology, and/or platform services used by venues to manage the inventory of tickets, generate barcodes, control and manage the entry of ticket holders into the venue, report data related to the event, and perform other similar functions related to managing the event. Second, the primary ticketing marketplace is a technology or distribution platform for making the initial distribution of tickets to the consumers who purchase them from the primary ticketers. After the initial sale of a ticket from a primary ticketer to a consumer (including fans, brokers, and other stakeholders), the purchaser typically can sell their tickets through secondary ticketing platforms. Artists and promoters generally do not receive revenue from secondary ticketing sales.

### C.     The Competitive Effects of the Conduct

Defendants' conduct had anticompetitive effects in the markets alleged in the Complaint. Defendants' anticompetitive acts distorted the competitive process, impeded competitors, deterred entry, reduced customer choice, increased prices, and reduced output.

For example, Defendants' exclusive ticketing agreements limited venues', artists', and fans' options with respect to primary ticketers and enabled Defendants to impose supra-competitive ticketing fees, borne by fans. Similarly, Defendants' threats to venues and their conditioning of live entertainment content on a venue's use of Ticketmaster impeded the ability of existing ticketing companies to compete and deterred or impeded entry by new or nascent rivals. Defendants also entered into a secret agreement with OVG that rewarded OVG for converting its venue clients' ticketing contracts to Ticketmaster, which subverted the competitive bidding process for those ticketing contracts.

With respect to artists, Defendants' policy of restricting artists' access to large amphitheaters unless those artists also used Defendants' promotions services distorted and reduced competition for promotion services and limited the shows performed at Defendants' venues. Similarly, Defendants used exclusive or preferred booking agreements with Major Concert Venues to impede competition by other promoters, to the detriment of artists, venues, and fans.

## III.    EXPLANATION OF THE PROPOSED FINAL JUDGMENT

The relief required by the proposed Final Judgment will remedy the harm to competition alleged in the Complaint.

### A.    Ticketing Provisions

Section IV of the proposed Final Judgment requires Defendants to develop, within 275 days, a new open distribution and ticket authentication technology to allow Major Concert Venues that use Ticketmaster's back-end system to sell and distribute primary tickets through eligible third-party primary ticketing marketplaces of the venue's choosing. Additionally, this section requires Defendants to modify certain existing ticketing agreements with venues to provide greater flexibility for venues to partner with third-party ticketing service providers, and it prohibits Defendants from engaging in certain exclusive ticketing practices in the future.

More specifically, Paragraphs IV(A–D) of the proposed Final Judgment obligate Ticketmaster to develop and launch an open distribution and ticket authentication system that provides venues with a means to sell primary tickets through any eligible primary ticketing marketplace[6] of the venue's choosing, without disadvantaging or encumbering any third-party

---

[6] An "Eligible Primary Ticketing Services Provider" is defined in Paragraph II(I) of the proposed Final Judgment. In general, a primary marketplace is eligible to receive a ticketing allocation under the new open distribution system if it (1) is engaged in the sale of primary tickets to live entertainment events in the United States through a primary marketplace as an established ongoing business or (2) can demonstrate the ability to fully provide primary ticketing

marketplace. Specifically, Ticketmaster may not use any contractual, pricing, technological, or other means to restrict a Major Concert Venue's choice of primary ticketing service providers. Additionally, Ticketmaster must also facilitate the transfer and resale of tickets, regardless of the primary marketplace through which the ticket was initially purchased, without requiring the ticket purchaser to take any additional steps on the Ticketmaster website or pay any additional fees to Ticketmaster. Ticketmaster is limited to collecting from the third-party marketplace a transfer fee that covers Ticketmaster's cost of providing the back-end services necessary to facilitate the ticket transfer. These amounts will be verified by the monitor.

Ticketmaster also is required to address any reasonable deficiencies in this new system that are identified by venues, third-party marketplaces, the United States,[7] or the monitor. Once this new technology is launched, Ticketmaster must offer Ticketmaster's back-end software as a standalone product and allow venues to use it with any eligible primary ticketing marketplace(s) or other back-end systems of the venue's choosing, subject to the eligibility criteria noted above. These provisions collectively are designed to allow new and existing primary ticketing marketplaces to compete more effectively to sell and distribute primary tickets, regardless of whether a venue currently uses Ticketmaster or in the future chooses to use Ticketmaster's back-end system.

Section IV also requires Defendants to modify certain existing Ticketmaster contracts and to follow new restrictions in future contracts. First, Defendants must waive any auto-renewal

---

services for Major Concert Venues by offering both a primary ticketing marketplace and a primary ticketing back-end technology. A ticketer that also operates a secondary ticketing marketplace remains qualified under (1) so long as it has reasonable policies and practices in place to limit speculative ticketing (i.e. offering for sale tickets that the seller does not own, control, or have a contractual right to at the time of listing) and other ticketing practices that harm consumers and/or violate the directions of artists and venues. Any disputes as to whether a primary marketplace is eligible to receive a ticketing allocation will be resolved by the monitor, subject to a potential appeal by the United States to the Court.

[7] Any interested person is invited to raise any identified deficiencies with the United States.

provisions and may not induce or penalize Major Concert Venues to forgo a Request for Proposal ("RFP") when a ticketing contract is nearing expiration. Defendants also must waive exclusivity provisions in existing ticketing contracts with Major Concert Venues to allow those venues the opportunity to use, without penalty, alternative primary ticketing marketplaces for at least one event during each year remaining on their Ticketmaster contract. Additionally, Defendants must provide certain Major Concert Venues the option to sell or distribute up to 20% of primary tickets via eligible third-party primary marketplaces in exchange for a pro-rata adjustment to any amounts previously paid by Defendants to obtain primary ticketing exclusivity under the venue's existing primary ticketing contract. In future contract negotiations with Major Concert Venues, Defendants must offer fully and partially non-exclusive contracts under which all or a portion of the primary tickets (at the Major Concert Venue's election) are not exclusive to Ticketmaster. Ticketmaster may not use any pricing schemes, pricing tiers, or other contract provisions that have the practical effect of exclusivity for primary ticketing services. Finally, any fully exclusive primary ticketing agreements with Major Concert Venues are capped at four years. Partially-exclusive primary ticketing contracts may be longer than four years, but only if the venue specifically requests, in writing, a longer term or a competing ticketer submits an offer to that venue for a longer term. These provisions are designed to facilitate entry of new primary ticketing service providers and increase competition among existing ticketing service providers.

The relief secured by Section IV will further improve competition by changing the structure of the primary ticketing markets at issue in the case. By separating the "back-end" and "marketplace" functions of primary ticketing, competitors will face lower barriers to entry. Competition among marketplaces can happen more dynamically because Major Concert Venues can use multiple marketplaces and can shift their usage more frequently than they change

9

primary ticketing back-ends. Marketplaces can compete for ticketing sales without needing to compete to provide back-end services. Additionally, by empowering venues to use multiple ticketing marketplaces in a single concert season and/or for individual shows, Defendants' promotions business will have less incentive and ability to steer content away from venues that use rival ticketers.

This section of the proposed Final Judgment has additional ticketing provisions designed specifically to foster ticketing competition at amphitheaters and ameliorate the harm to consumers stemming from Defendants' monopolies. Specifically, this section requires Defendants to allow any promoter or artist performing a show at a large amphitheater[8] owned, operated, or controlled by Defendants to sell and distribute up to 50% of their tickets through an eligible third-party primary marketplace. Additionally, Defendants may not charge service fees in excess of 15% for any tickets sold via Ticketmaster for events at those amphitheaters.

### B.    Venue and Promotions Provisions

Section V of the proposed Final Judgment requires Defendants to terminate or modify certain venue and promotions contracts with thirteen Divestiture Venues, which are large amphitheaters over which Defendants currently exercise control. Under the terms of the proposed Final Judgment, Defendants may no longer exert control over these venues and must allow the venues to conduct a new RFP process for ticketing services if they wish to do so. Moreover, Defendants may not engage in any form of content steering with respect to Divestiture Venues. At both these venues and other Major Concert Venues, Defendants may no longer enter into, and must either terminate or modify, any exclusive or preferred booking agreements. Additionally, Defendants must allow artists to rent large amphitheaters owned or controlled by

---

[8] These provisions extend to large amphitheaters that qualify as a Major Concert Venue.

Defendants regardless of which promoter artists select; Defendants must rent these venues on the same terms as other artists promoted by Defendants, accounting for the nature of the particular show. This section is designed to foster increased competition among promoters by allowing artists to partner with their promoter of choice without fear of being locked out of Major Concert Venues controlled by Live Nation where fans wish to see them perform.

### C.   Anti-Conditioning, Anti-Retaliation, and Anti-Steering

Section VI of the proposed Final Judgment contains prohibitions against Defendants engaging in any form of conditioning, steering, or retaliation based on a venue's choice of or consideration of primary ticketer. This section specifically forbids Defendants from retaliating "in any way" against a venue because Defendants know or believe that venue is considering contracting with another primary ticketer. It also prohibits Defendants from steering artists to venues based on the identity of the primary ticketer or based on the ticketing revenues Defendants receive from events at a venue, while allowing Defendants to share truthful and non-misleading information about the capabilities of ticketers engaged by the venue. These provisions are designed to expand, clarify, and strengthen similar provisions contained in the 2020 Amended Final Judgment. Additionally, Paragraph VI(D) of the proposed Final Judgment bars Defendants from engaging in conduct that is materially the same as conduct prohibited by the proposed Final Judgment, conduct designed to evade any obligation imposed by the proposed Final Judgment, and conduct that evades or frustrates the purposes of the proposed Final Judgment.

These provisions are intended to foster increased competition for primary ticketing by prohibiting Defendants from using their monopoly power in artist promotion and venue booking markets to distort the competitive process or inhibit customer choice.

11

### D.    Firewalls

Section VII of the proposed Final Judgment requires Defendants to maintain firewalls between their ticketing and promotions businesses, similar to those Defendants were required to implement pursuant to the 2020 Amended Final Judgment.

### E.    Oak View Group Agreement

Section VIII of the proposed Final Judgment requires Defendants to terminate their 2022 ticketing agreement with Oak View Group ("OVG"), under which Defendants paid OVG millions of dollars to "advocate" to flip venues managed by OVG to use Ticketmaster rather than their existing primary ticketer. This section also requires Ticketmaster to allow affected venues to conduct a new ticketing RFP after being made aware of the terms of Defendants' agreement with OVG. Defendants are prohibited from entering into similar agreements with venue managers in the future.

### F.    Artist Transparency

Section IX of the proposed Final Judgment requires Defendants to provide artists with ticketing data and information for those artists' shows, both retrospectively and on an ongoing basis. This provision is designed to allow artists to use that data to build their fan base and promote future shows, regardless of which promoters or ticketers they partner with going forward.

### G.    Reporting Obligations for Future Acquisitions

Section XIV of the proposed Final Judgment requires Defendants to notify the United States in advance of acquiring, directly or indirectly, in a transaction that would not otherwise be reportable under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, 15 U.S.C. § 18a (the "HSR Act"), any assets of or any 20% or greater interest in any entity related to ticketing, promotions services, or Major Concert Venues in the United States. Pursuant to the

12

proposed Final Judgment, Defendants must notify the United States of such acquisitions as it would for a required HSR Act filing, as specified in the Appendix to Part 803 of Title 16 of the Code of Federal Regulations. The proposed Final Judgment further provides for waiting periods and opportunities for the United States to obtain additional information, analogous to the corresponding provisions of the HSR Act, before such acquisitions can be consummated. Requiring notification before Defendants' acquisition of an entity involved in ticketing, promotions services, or venues will permit the United States to assess the competitive effects of that acquisition before it is consummated and, if necessary, seek to enjoin the transaction.

### H.    Monitor

Section XI of the proposed Final Judgment provides that the United States may appoint a monitor who will have the power and authority to investigate and report on Defendants' compliance with the terms of the Final Judgment and the Stipulation and Order. These powers include the ability to require Defendants to produce documents, to submit signed affidavits, and to make employees available to sit for interviews, including interviews conducted under oath. The monitor will not have any responsibility or obligation for the operation of Defendants' businesses. The monitor will serve at Defendants' expense, on such terms and conditions as the United States approves, and Defendants must assist the monitor in fulfilling his or her obligations. The monitor will provide periodic reports to the United States and will serve until the Final Judgement expires.

### I.    Compliance and Inspection

The proposed Final Judgment also contains provisions designed to promote compliance with and make enforcement of the Final Judgment as effective as possible.

Paragraph XVIII(A) allows the United States to re-open the case in the future if it believes that Defendants have violated the Final Judgment. If this occurs, the United States may

seek additional relief by showing by a preponderance of the evidence that the Final Judgment did not redress the violations alleged in the Complaint and restore competition.

Paragraph XVIII(B) provides that the United States retains and reserves all rights to enforce the Final Judgment, including the right to seek an order of contempt from the Court. Under the terms of this section, Defendants have agreed that in any civil contempt action, any motion to show cause, or any similar action brought by the United States regarding an alleged violation of the Final Judgment, the United States may establish the violation and the appropriateness of any remedy by a preponderance of the evidence and that Defendants have waived any argument that a different standard of proof should apply. This provision aligns the standard for compliance with the Final Judgment with the standard of proof that applies to the underlying offenses that the Final Judgment addresses.

Paragraph XVIII(C) provides additional clarification regarding the interpretation of the provisions of the proposed Final Judgment. The proposed Final Judgment is intended to remedy the loss of competition the United States alleges in the Complaint occurred due to Defendants' conduct. Defendants agree that they will abide by the proposed Final Judgment and that they may be held in contempt of the Court for failing to comply with any provision of the proposed Final Judgment that is stated specifically and in reasonable detail, as interpreted in light of this procompetitive purpose.

Paragraph XVIII(D) provides that if the Court finds in an enforcement proceeding that a Defendant has violated the Final Judgment, the United States may apply to the Court for an extension of the Final Judgment, together with such other relief as may be appropriate. In addition, to compensate American taxpayers for any costs associated with investigating and enforcing violations of the Final Judgment, Paragraph XVIII(D) provides that, in any successful

14

effort by the United States to enforce the Final Judgment against a Defendant, whether litigated or resolved before litigation, the Defendant must reimburse the United States for attorneys' fees, experts' fees, and other costs incurred in connection with that effort to enforce this Final Judgment, including the investigation of the potential violation.

Paragraph XVIII(E) requires Defendants to pay to the United States a penalty of $5,000,000 for each violation of the Final Judgment involving a Major Concert Venue. Acts directed toward different venues, acts occurring in different contracting cycles, and conduct concerning different artists each count as a separate violation of the Final Judgment.

Paragraph XVIII(F) states that the United States may file an action against a Defendant for violating the Final Judgment for up to four years after the Final Judgment has expired or been terminated. This provision is meant to address circumstances such as when evidence that a violation of the Final Judgment occurred during the term of the Final Judgment is discovered after the Final Judgment has expired or been terminated or when there is not sufficient time for the United States to complete an investigation of an alleged violation prior to expiration or termination of the Final Judgment. This provision, therefore, makes clear that, for four years after the Final Judgment has expired or been terminated, the United States may still challenge a violation that occurred during the term of the Final Judgment.

Finally, Section XX of the proposed Final Judgment provides that the Final Judgment will expire eight years from the date of its entry, except that certain provisions concerning conditioning and firewalls will expire earlier upon a sale or divestiture of Ticketmaster.

## IV.    REMEDIES AVAILABLE TO POTENTIAL PRIVATE PLAINTIFFS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable

attorneys' fees. Entry of the proposed Final Judgment as to the United States does not impair the bringing of any private antitrust damage action.

## V.    PROCEDURES AVAILABLE FOR MODIFICATION OF THE PROPOSED FINAL JUDGMENT

The United States, Settling States, and Defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least 60 days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within 60 days of the date of publication of this Competitive Impact Statement in the Federal Register, or within 60 days of the first date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later. All comments received during this period will be considered by the U.S. Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time before the Court's entry of the Final Judgment. The comments and the response of the United States will be filed with the Court. In addition, the comments and the United States' response will be published in the *Federal Register* unless the Court agrees that the United States instead may publish them on the U.S. Department of Justice, Antitrust Division's internet website.

Written comments should be submitted in English to:

> David Teslicko
> Acting Chief, Financial Services, Fintech, and Banking Section
> Antitrust Division
> United States Department of Justice
> 450 Fifth St. NW, Suite 4000
> Washington, DC 20530
> LiveNationPublicComment@usdoj.gov

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.[9]

## VI.    ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

As an alternative to the proposed Final Judgment, the United States considered completing the liability trial on the merits against Defendants. The United States could have continued the litigation and, upon a finding of liability, sought injunctive relief through additional remedy proceedings. This proposed Final Judgment provides relief designed to improve competition in markets, such as the artist promotion and venue booking markets, for which the Court previously granted Defendants' motion for summary judgment, over the United States' objections. *See* ECF No. 1037. It also brings benefits to competition sooner than would be expected after a full trial and appeals. Based on the totality of circumstances, including the time, expense, uncertainty, and risks associated with completing trial on the merits and completing any possible appeals, and the benefits to competition secured in the proposed Final

---

[9] *See* Proposed Final Judgment, ECF No. 1523-2, Section XVII.

Judgment, the United States chose not to complete the full trial on the merits and ensuing remedies proceeding and potential appeals.

## VII.    STANDARD OF REVIEW UNDER THE APPA FOR THE PROPOSED FINAL JUDGMENT

Under the APPA, proposed Final Judgments, or "consent decrees," in antitrust cases brought by the United States are subject to a 60-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1); *see also United States v. Int'l Bus. Mach. Corp.*, 163 F.3d 737, 740 (2d Cir. 1998). In making that determination, the Court, in accordance with the statute as amended in 2004, is required to consider:

> (A)    the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and
>
> (B)    the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B); *see generally United States v. Keyspan*, 763 F. Supp. 2d 633, 637–38 (S.D.N.Y. 2011) (discussing Tunney Act standards). In considering these statutory factors, the Court's inquiry is necessarily a limited one as the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *accord United States v. Alex. Brown & Sons, Inc.*, 963 F. Supp. 235, 238 (S.D.N.Y. 1997), *aff'd sub nom. United States v. Bleznak*, 153 F.3d 16 (2d Cir. 1998) (citing *Microsoft*, 56 F.3d at 1460); *Keyspan*, 763 F. Supp. 2d at 637 (same).

As the United States Court of Appeals for the District of Columbia Circuit has held, under the APPA a court considers, among other things, the relationship between the remedy secured and the specific allegations in the government's Complaint, whether the proposed Final Judgment is sufficiently clear, whether its enforcement mechanisms are sufficient, and whether it may positively harm third parties. *See Microsoft*, 56 F.3d at 1458–62. With respect to the adequacy of the relief secured by the decree, "'[t]he Court's function is not to determine whether the proposed [d]ecree results in the balance of rights and liabilities that is the one that will *best* serve society, but only to ensure that the resulting settlement is 'within the *reaches* of the public interest.'" *United States v. Morgan Stanley*, 881 F. Supp. 2d 563, 567 (S.D.N.Y. 2012) (quoting *Alex. Brown & Sons*, 963 F. Supp. at 238) (internal quotation marks omitted) (emphasis in original). In making this determination, "'[t]he [c]ourt is not permitted to reject the proposed remedies merely because the [c]ourt believes other remedies are preferable. [Rather], the relevant inquiry is whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlement are reasonable.'" *Morgan Stanley*, 881 F. Supp. 2d at 567 (citing *United States v. Abitibi-Consolidated Inc.*, 584 F. Supp. 2d 162, 165 (D.D.C. 2008)); *see also United States v. Apple, Inc.*, 889 F. Supp. 2d 623, 631 (S.D.N.Y. 2012); *Alex. Brown & Sons*, 963 F. Supp. at 238.[10] The United States' predictions about the efficacy of the remedy are to be afforded deference by the Court. *Apple*, 889 F. Supp. 2d at 631; *Microsoft*, 56 F.3d at 1461 (noting the need for courts to be "deferential to the government's predictions as to the effect of the proposed remedies"); *United States v. ArcherDaniels-Midland Co.*, 272 F. Supp.

---

[10] *See also United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981) ("The balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General."); *see generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

2d 1, 6 (D.D.C. 2003) (noting that the court should grant due respect to the United States'

prediction as to the effect of proposed remedies, its perception of the market structure, and its

views of the nature of the case); *United States v. Iron Mountain, Inc.*, 217 F. Supp. 3d 146, 152–

53 (D.D.C. 2016) ("In evaluating objections to settlement agreements under the Tunney Act, a

court must be mindful that [t]he government need not prove that the settlements will perfectly

remedy the alleged antitrust harms[;] it need only provide a factual basis for concluding that the

settlements are reasonably adequate remedies for the alleged harms.") (internal quotations

omitted).

"[A] proposed decree must be approved even if it falls short of the remedy the court

would impose on its own, as long as it falls within the range of acceptability or is 'within the

reaches of public interest.'" *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C.

1982); *Apple*, 889 F. Supp. 2d at 637 n.10; *see also United States v. U.S. Airways Grp., Inc.*, 38

F. Supp. 3d 69, 74 (D.D.C. 2014) (noting that room must be made for the government to grant

concessions in the negotiation process for settlements) (citing *Microsoft*, 56 F.3d at 1461);

*Morgan Stanley*, 881 F. Supp. 2d at 568 (approving the consent decree even though the court

may have imposed a greater remedy). To meet this standard, "it is necessary only that the

submissions provide an ample 'factual foundation for the government's decisions such that its

conclusions regarding the proposed settlement are reasonable.'" *Apple*, 889 F. Supp. 2d at 639

(citing *Keyspan*, 763 F. Supp. 2d at 637–38).

Moreover, the Court's role under the APPA is limited to reviewing the remedy in

relationship to the violations that the United States has alleged in its Complaint, and does not

authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against

that case." *Microsoft*, 56 F.3d at 1459; *see also Morgan Stanley*, 881 F. Supp. 2d at 567 ("A

court must limit its review to the issues in the complaint and give 'due respect to the [Government's] perception of . . . its case.'") (citing *Microsoft*, 56 F.3d at 1461); *United States v. InBev*, 2009 U.S. Dist. LEXIS 84787, at *20 (D.D.C. Aug. 11, 2009) ("[T]he 'public interest' is not to be measured by comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged"). Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Microsoft*, 56 F.3d at 1459–60.

In its 2004 amendments to the APPA, Congress made clear its intent to preserve the practical benefits of using judgments proposed by the United States in antitrust enforcement, Pub. L. 108-237 § 221, and added the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2); *see also Apple*, 889 F. Supp. 2d at 633 (declining to hold evidentiary hearing and finding "[a] hearing would serve only to delay the proceedings unnecessarily."); *U.S. Airways*, 38 F. Supp. 3d at 76 (stating that "[a] court is not required to hold an evidentiary hearing or to permit intervenors as part of its review under the Tunney Act"). This language explicitly wrote into the statute what Congress intended when it first enacted the Tunney Act in 1974. As Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Sen. John V. Tunney). Rather, the procedure for the public interest determination is left to the discretion of the court, with the recognition that the

court's "scope of review remains sharply proscribed by precedent and the nature of Tunney Act proceedings." *SBC Commc'ns*, 489 F. Supp. 2d at 11; *see also Apple*, 889 F. Supp. 2d at 632 ("[P]rosecutorial functions vested solely in the executive branch could be undermined by the improper use of the APPA as an antitrust oversight provision or anti-takeover statute." (quoting *United States v. BNS Inc.*, 858 F.2d 456, 466 (9th Cir. 1988)). A court can make its public interest determination based on the detailed allegations in the Complaint, competitive impact statement, and response to public comments alone. *Apple*, 889 F. Supp. 2d at 633; *U.S. Airways*, 38 F. Supp. 3d at 76.

## VIII.    DETERMINATIVE DOCUMENTS

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.


Dated: June 29, 2026

Respectfully submitted,

FOR PLAINTIFF
UNITED STATES OF AMERICA:


/s/ Andrew L. Kline
Andrew L. Kline
David M. Teslicko
United States Department of Justice
Antitrust Division
450 Fifth St. NW, Suite 4000
Washington, DC 20530
Telephone:  (202) 549-6655
Email: Andrew.Kline@usdoj.gov