**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>　　　　　*Plaintiffs*,<br><br>　　　v.<br><br>LIVE NATION ENTERTAINMENT, INC.,<br>and TICKETMASTER L.L.C.,<br><br>　　　　　*Defendants.* | Case No. 1:24-cv-03973-AS |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW**
<u>**PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 50(B)**</u>

**TABLE OF CONTENTS**

INTRODUCTION ...........................................................................................................................1

ARGUMENT ................................................................................................................................2

I.     PLAINTIFFS' AMPHITHEATER CLAIMS FAIL ..........................................................2

     A.    No Proof Of Live Nation Willfully Acquiring Or Maintaining Monopoly Power In Large Amphitheaters .................................................................................2

     B.    No Proof Of Amphitheater Market ...........................................................................5

     C.    No Proof Of Tying ....................................................................................................6

II.    PLAINTIFFS' TICKETING CLAIMS FAIL ...................................................................7

     A.    No Proof Of Primary Ticketing Markets ..................................................................7

     B.    No Proof Of Anticompetitive Effects .......................................................................8

     C.    No Proof Of Exclusionary Conduct ........................................................................10

III.   PLAINTIFFS' STATE-LAW CLAIMS FAIL .................................................................11

IV.   PLAINTIFFS' SOLE BASIS FOR DAMAGES FAILS ..................................................12

CONCLUSION............................................................................................................................13

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*1-800 Contacts, Inc. v. FTC*,
    1 F.4th 102 (2d Cir. 2021) ...................................................................................................9

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962) ............................................................................................................5

*FTC v. Whole Foods Mkt., Inc.*,
    548 F.3d 1028 (D.C. Cir. 2008) ..................................................................................1, 5, 7

*Hill v. A-T-O, Inc.*,
    535 F.2d 1349 (2d Cir. 1976).............................................................................................7

*In re Mylan N.V. Securities Litig.*,
    2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) .................................................................11

*In re Urethane Antitrust Litig.*,
    663 F. Supp. 2d 1067 (D. Kan. 2009)...............................................................................11

*In re Vivendi Univ., S.A. Sec. Litig.*,
    765 F. Supp. 2d 512 (S.D.N.Y. 2011)................................................................................2

*It's My Party, Inc. v. Live Nation, Inc.*,
    811 F.3d 676 (4th Cir. 2016) ..........................................................................................5, 6

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984)................................................................................................................7

*MacDermid Printing Sols. LLC v. Cortron Corp.*,
    833 F.3d 172 (2d Cir. 2016)............................................................................................1, 2

*New York v. Facebook, Inc.*,
    549 F. Supp. 3d 6 (D.D.C. 2021) .......................................................................................4

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018)........................................................................................................4, 9

*PepsiCo, Inc. v. Coca-Cola Co.*,
    315 F.3d 101 (2d Cir. 2002)...............................................................................................5

*Race Tires Am. v. Hoosier Racing Tire*,
    614 F.3d 57 (3d Cir. 2010)...............................................................................................11

*Reed Construction Data v. McGraw-Hill Cos.*,
49 F. Supp. 3d 385 (S.D.N.Y. 2014)........................................................................13

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133 (2000)........................................................................................2

*United States v. Google LLC*,
747 F. Supp. 3d 1 (D.D.C. 2024)..........................................................................8

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001)............................................................................4, 8

*United States v. Oracle Corp.*,
331 F. Supp. 2d 1098 (N.D. Cal. 2004)..................................................................8

*Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*,
546 U.S. 164 (2006)........................................................................................2

## OTHER AUTHORITIES

Thomas A. Lambert, *The Essence of an Antitrust Violation*, 76 UC Law SF L.J.
1155 (2025).................................................................................................1

**INTRODUCTION**

Plaintiffs' opposition is the culmination of their trial strategy: secure the first-ever jury trial in a government monopolization action, prevail at trial with made-for-juries emotional arguments, and then defend the verdict with standard-of-review arguments. It is remarkable how little Plaintiffs say about the technical requirements of the Sherman Act. And especially how little they say about the elements that go to the heart of what makes conduct anticompetitive under the law: weakening competitive constraints so that a firm with significant market power can *extract additional surplus from customers*. Thomas A. Lambert, *The Essence of an Antitrust Violation*, 76 UC Law SF L.J. 1155, 1172 (2025) ("surplus-extractive power is the ultimate culprit behind monopoly's adverse effects"). That is why courts define markets around what a profit-maximizing monopolist would do—which is to extract as much surplus from customers as it can. It is why antitrust developed the theory of targeted customer markets—because sometimes additional surplus can be extracted from vulnerable customers. *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1039 (D.C. Cir. 2008). And it is why courts require proof that the challenged conduct resulted in "changed prices, output, or quality," *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 183 (2d Cir. 2016)—those are the ways monopolists extract additional surplus.

Plaintiffs obviously would have developed and offered this evidence if they could have. Dr. Hill was not shy about advancing aggressive arguments, and his two reports totaled over 800 pages. That there has not even been a claim in this case, let alone evidence, that anything Defendants did permitted them to raise prices or lower quality to artists and venues is something that cannot be ignored. Particularly when we know why the evidence is missing: Artists *make more* at the allegedly monopolized amphitheaters, and Ticketmaster's prices to "major concert venues" are *no higher than to others* and *have been falling*.

1

With that record, it is no surprise that Plaintiffs' opposition largely talks past Defendants' arguments. They can say there is sufficient evidence only by arguing there is precious little they had to prove, and nothing more for this Court to do but rubberstamp the jury verdict. They are wrong on the law, on the record, and on this Court's Rule 50(b) role.

## ARGUMENT

Plaintiffs claim the Rule 50(b) standard is "'particularly heavy'" because "'the jury has deliberated in the case and actually returned its verdict.'" JMOL-Opp.2 (citation omitted). But the Rule 50 standard "mirrors the standard for summary judgment." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 135 (2000). And both the Supreme Court and the Second Circuit have repeatedly invoked Rule 50(b) to set aside jury verdicts where the evidence was insufficient. *E.g.*, *Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 178 (2006) (reversing denial of judgment as matter of law notwithstanding jury verdict because evidence did "not show the injury to competition targeted by the Robinson-Patman Act"); *MacDermid Printing Sols. LLC*, 833 F.3d at 192 (reversing denial of judgment as a matter of law following antitrust jury verdict). Plaintiffs' refrain that Defendants are asking the Court to "reweigh the evidence," JMOL-Opp.2, 12, is similarly misplaced. Rule 50(b) requires the Court to "review the record as a whole," *Reeves*, 530 U.S. at 151, "look at the trial evidence," and "assess whether that evidence [is] sufficient to support the verdict," *In re Vivendi Univ., S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 546 (S.D.N.Y. 2011).

## I.    PLAINTIFFS' AMPHITHEATER CLAIMS FAIL

### A.    No Proof Of Live Nation Willfully Acquiring Or Maintaining Monopoly Power In Large Amphitheaters

Plaintiffs present a fundamentally new version of their Fourth Claim for Relief. It is not what they pleaded about "acquiring nascent threats and neutralizing rivals," ECF-No.257, pp.49-

50, nor what Dr. Hill advanced at trial concerning a handful of acquisitions and a dozen or so booking agreements between 2015 and 2024, Trial-Tr.2135:5-2136:3 (Hill). The new argument is that "Live Nation obtained and maintained control over the only Large Amphitheaters in 40 critical markets." JMOL-Opp.1. Perhaps it has, but (a) that's not the claim in this case, (b) most of those acquisitions were decades ago and clearly time-barred, and (c) Plaintiffs have done nothing to prove that having a portfolio of amphitheaters is anticompetitive.

Plaintiffs hardly do anything to defend the claim they actually advanced. Plaintiffs have no answer for their failure to prove the specific acquisitions or control agreements they now say formed the backbone of Live Nation's unlawful acquisition of monopoly power. *See* JMOL-Mot.3-4. They do little to rehabilitate Dr. Hill's testimony that "[m]ost of the control" Live Nation acquired was "through exclusive booking" and that "booker[s]" do not "control the venue." Trial-Tr.2269:3-10 (Hill); *see* JMOL-Mot.3. And Plaintiffs' entire response to their failure to put on any meaningful *analysis* of the relevant acquisitions is a footnote attempting to distinguish *Meta* by asserting that they "presented ample evidence of a substantially higher share" than the one in *Meta*. JMOL-Opp.5.n2. Even if true, Plaintiffs need more than market share to prove monopolization. As the Court instructed the jury, "a company's control over or acquisition of amphitheaters does not, without more, count as anticompetitive conduct." JI24.

Plaintiffs brush off the fundamental requirement to prove anticompetitive effects. They assert that they "did not need to show higher prices, reduced output, or lower quality." JMOL-Opp.7. But even the most generous reading of *MacDermid* would require more than "[e]vidence of constrained choices by artists." JMOL-Opp.7. Here in particular, something needs to counter the evidence Plaintiffs acknowledge: "that artists made ... 18% *more* playing at [Live

3

Nation] Large Amphitheaters." JMOL-Opp.8 (emphasis added).[1] *See, e.g.*, *United States v. Microsoft Corp.,* 253 F.3d 34, 59 (D.C. Cir. 2001) ("[P]laintiff must demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit."). Even if artists "were deprived of their choice of promoters," JMOL-Opp.7, there is no evidence that meant artists paid more—or received lower quality services—in the alleged large amphitheaters market.

Nor are "dark days" enough to show "[r]educed output." JMOL-Opp.8. The "dark days" argument has always been thin, but at trial it reduced to a claim that Live Nation's amphitheaters across the nation have, on average, more dark days than the Greek Theater—one of the most famous and popular amphitheaters in the world. That anecdotal comparison does not prove Live Nation *reduced* its own output, let alone show a reduction in marketwide output. *See Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018) (requiring "anticompetitive effects" on a marketwide basis).

Finally, Plaintiffs have no response about their reliance on pre-May 2020 conduct, despite the "starting presumption" that antitrust plaintiffs must file "challenges to acquisitions" "within four years from 'the accrual of the claim.'" *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 35 (D.D.C. 2021) (citation omitted). There is no disputing that Dr. Hill built his argument around acquisitions and booking agreements "from 2015 ... to 2024." Trial-Tr.2135:5-11 (Hill). No analysis was offered of just the acquisitions and booking agreements within the limitations period.

The Fourth Claim for Relief was never developed as a serious, standalone claim. The empty record reflects that, and the jury verdict on that claim cannot stand.

---

[1] Plaintiffs' claim that "Live Nation made 358% more," JMOL-Opp.8 (emphasis omitted), is specious. That statistic is from a comparison of arenas and amphitheaters. PX811. Artists make most of the profits in both types of venues, but promoters have very low margins in arenas. Trial-Tr.1327:17-20 (Roux); Trial-Tr.3348:14-20 (Hansen). So mathematically, Live Nation's higher profits at amphitheaters appear to be a far higher percentage increase. The document's point is that regarding "Artist and LN earnings ... we *all* win in the Amps." PX811 (emphasis added).

### B.    No Proof Of Amphitheater Market

This Court gave Plaintiffs the opportunity to show that "artists have highly inelastic demand for amphitheaters *specifically*." ECF-No.1037, p.14. That is the test because, to be a relevant market, "large amphitheaters" must be a "separate economic entity"—*i.e.*, economically distinct from stadiums, arenas, and amphitheaters with fewer seats or concerts. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). Plaintiffs must show there is a "discrete class of customers that ha[ve] such a strong preference for [large amphitheaters] that it would not consider substitutes if other factors (especially price) changed." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 107 (2d Cir. 2002). This is the point that was dispositive in *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676 (4th Cir. 2016). While of course there are some artists who prefer to play large amphitheaters, "a particular artist's preference for amphitheaters or arenas does not reveal what the artist would do if the cost of performing in an amphitheater began to rise." *Id.* at 683.

Plaintiffs' opposition does not confront—and the trial evidence does not satisfy—that standard. Since Dr. Hill's HMT was excluded as unreliable, ECF-No.1037, p.15, Plaintiffs rely solely on a handful of documents they claim "showed inelastic demand" because "when artists have determined to play amphitheaters, Live Nation does not need to negotiate or offer higher guarantees." JMOL-Opp.3. But not one document says Live Nation can raise the cost of performing at amphitheaters without the risk that artists will turn to other kinds of venues. And Plaintiffs admit "that artists made ... 18% *more* playing at [Live Nation] Large Amphitheaters" than at arenas. JMOL-Opp.8 (emphasis added). Even under a *Brown Shoe* analysis, "the economic criteria are primary." *Whole Foods*, 548 F.3d at 1039. Plaintiffs offer nothing on them.

Instead, Plaintiffs lean into amphitheaters' "distinct characteristics." JMOL-Opp.4. But the test is *substitutability*, and despite Plaintiffs' insistence otherwise, the evidence on that was undisputed: artists regularly substitute large amphitheaters for other venues. JMOL-Mot.8.

5

Plaintiffs do not dispute Dr. Yurukoglu's evidence that artists who played "large amphitheaters" also played other types of venues for 81% of their other shows in the same year. *Id.*

There is no basis to reach the opposite conclusion in this case than the district court and Fourth Circuit reached in *It's My Party*. The "better evidence" promised at summary judgment never materialized. ECF-No.1037, p.13. The expert testimony is certainly no better; Dr. Hill did nothing to address cross-elasticity of demand other than the HMT that was excluded. And the different geographic markets make no difference. The dispositive point is Plaintiffs have not carried their burden to show "that amphitheaters are the only place certain artists are willing to perform, irrespective of the monetary or logistical advantages of other concert locations." *It's My Party,* 811 F.3d at 683.

### C.    No Proof Of Tying

The tying claim has many flaws; Defendants focus this reply on two key points.

First, even if "formal market definition for the tied market" is not required, ECF-No.1094, pp.2-5, Plaintiffs still had to prove anticompetitive effects in some broader promotions services market. JMOL-Mot.10-11. Quoting this Court, Plaintiffs claim they "only had to present evidence of 'some nontrivial impact on competition' with respect to the tied product." JMOL-Opp.8-9. But that was in the context of Plaintiffs' *per se* tying claim—which did not go to the jury. JI27; JI33. For the tying claim that *did* go to the jury, Plaintiffs had to prove "the alleged tying arrangement has had anticompetitive effects as to promotion services available to artists who want to use promotion services." JI33. And, the Court added, "[t]he same rules apply" for assessing "anticompetitive effects" with respect to tying as with "Plaintiffs' monopolization claims." *Id.*

The only impact Plaintiffs identify is that Live Nation's "policy eliminated artists' competitive choice of a promoter." JMOL-Opp.9. But there is zero evidence of any artist who wanted to choose a different promoter but did not. That should be dispositive. Plaintiffs cannot

prove the *effect* of the alleged tie *in the promotions market* simply by repeating that there is a tie. The effect of the tie is an independent requirement necessitating different proof.

Second, on coercion, Plaintiffs' only argument is to restate that "Live Nation consistently barred any artist performing at its amphitheaters from using any promoter other than Live Nation." JMOL-Opp.10. But Plaintiffs had to show this forced the customer to buy something it "either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984). There is no such evidence. Plaintiffs' invocation of *Hill v. A-T-O, Inc.*, 535 F.2d 1349 (2d Cir. 1976), JMOL-Opp.10, doesn't work factually or legally. Unlike *Hill*, there is no clear conditional sale, and reading *Hill* as Plaintiffs do would mean that a policy of refusing to deal with rivals proves illegal tying. JMOL-Mot.12; NT-Mot.19-21. *Jefferson Parish* makes clear that is not the law.

## II.    PLAINTIFFS' TICKETING CLAIMS FAIL

### A.    No Proof Of Primary Ticketing Markets

Plaintiffs continue to ground their 257 "major concert venues" targeted customer market exclusively on the theory that these customers are "highly dependent on concerts" and "especially sensitive to Ticketmaster's market power to raise prices." JMOL-Opp.12. But they have no evidence that "major concert venues" have faced higher prices or worse terms. The evidence is that they have not. JMOL-Mot.15-16.

Defendants believe that is dispositive but, at the very least, it is a compelling reason to think Plaintiffs' "targeted" customers are not really targeted at all. And *Brown Shoe* factors cannot save this. Plaintiffs discuss only two in any detail—neither one of which are the "economic criteria" that are "primary." *Whole Foods*, 548 F.3d at 1039. The evidence Plaintiffs cite may show that "major concert venues" are "recognized as distinct" *venues*, but it does not show they "have different ticketing needs" or are viewed as a distinct *ticketing market*. JMOL-Opp.12-13.

Plaintiffs cite nothing suggesting that the industry recognizes their curated set of 257 venues (or anything like it) as such a market. *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1102-03, 1158-62 (N.D. Cal. 2004).[2] Nor do Plaintiffs dispute that primary ticketing companies cater to all sorts of venue types with the same core ticketing system. JMOL-Mot.17-18. The limited "evidence" Plaintiffs cite is about venue characteristics—not evidence these customers make up a distinct *ticketing* market.

As for Plaintiffs' primary *concert* ticketing services market, there is no evidence that any primary ticketing company offers "concert ticketing services" as a distinct product. That definition is purely a device to inflate market shares.

### B.    No Proof Of Anticompetitive Effects

Plaintiffs largely double down on their "constrained consumer choice" theory to prove anticompetitive effects. JMOL-Opp.20-21. Constrained choice is not enough. JMOL-Mot.19-20; *supra* at 3-4, 7. Plaintiffs otherwise justify their perfunctory effects case by claiming they were only required to show that exclusionary conduct was "capable of making a significant contribution to ... maintaining monopoly power." JMOL-Opp.21 (quoting *Microsoft*, 253 F.3d at 79). That is clearly incorrect. *Microsoft* applied that standard to "actions seeking injunctive relief." 253 F.3d at 79; *see United States v. Google LLC*, 747 F. Supp. 3d 1, 152-53 (D.D.C. 2024). Where, as here, a plaintiff brings an actual monopolization claim seeking damages for past conduct, it must prove actual harm to competition. JMOL-Mot.19-20; ECF-No.1389, p.18. Plaintiffs do not show that.

---

[2] Plaintiffs' effort to distinguish *Oracle* fails. The government in *Oracle* called over 15 non-party witnesses. *Id.* at 1125. The court's comment that the "full weight" of the market definition fell on the government's expert was because the lay testimony was unpersuasive. *Id.* at 1158.

Plaintiffs' fallback assertion that the jury could have found price and quality effects fares no better. JMOL-Opp.21-22. On price, Plaintiffs cite evidence of *fees to fans*. This out-of-market evidence does not count. JMOL-Mot.5-6 (citing cases). What Plaintiffs need—but do not have— is evidence that "major concert venues" (not fans) in the United States (not Europe) have suffered higher prices resulting from anticompetitive conduct. *Id.*[3]

As for quality, Plaintiffs string cite anecdotal attacks on Ticketmaster's quality, JMOL-Opp.22, but they cite no complaints *from venues* about quality and nothing showing that Ticketmaster "reduced quality in the relevant market," *1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 118 (2d Cir. 2021), on a marketwide basis, *AmEx*, 585 U.S. at 542; *supra* at 3-4.

Ultimately, Plaintiffs are again asking the Court to permit an inference of anticompetitive effects from the underlying conduct, effectively eliminating adverse effects as a separate element. Look at what they say about exclusive primary ticketing contracts—that it reduced venues' choice of ticketers. That is true of *all* exclusive dealing: A buyer party to an exclusive contract cannot deal with other sellers during the contract's term. But that has anticompetitive effects only if it excludes or raises the costs of rivals such that the monopolist is able to raise prices or reduce quality to customers. Plaintiffs ignore that part of the analysis. And in all events, there is no meaningful reduction in choice if venues *choose* to enter into the exclusive contract. Here, there is only evidence of venues voluntarily choosing exclusive contracts. *See infra* at 11.

The record in this case shows (a) the total lack of evidence of higher prices to venues, (b) undisputed evidence of falling prices, (c) no reduced output, and (d) no complaints from venues about reduced quality. There is no evidence of anticompetitive effects on any metric.

---

[3] Plaintiffs' repeated citing of Dr. Abrantes-Metz for effects on venues does not work. JMOL-Mot.21; JMOL-Opp.21. As the Court has noted repeatedly, she did not opine on liability. *E.g.*, Trial-Tr.4481:21-4482:1; 4483:22-4484:5.

## C.    No Proof Of Exclusionary Conduct

Plaintiffs fail to address Second Circuit caselaw requiring that—prior to any holistic analysis of the effects of unlawful conduct—there must be a determination whether the conduct is unlawful.  JMOL-Mot.21-22; NT-Mot.23-24.  Perfectly lawful conduct cannot be part of the holistic analysis.  *Id.*

***Threats, retaliation, conditioning***:  The evidence of threats or retaliation could not be thinner.  All Plaintiffs point to is the Barclays and Xcel Center incidents, JMOL-Opp.17-18—both of which Defendants already addressed, JMOL-Mot.23.

Plaintiffs contend venues "often speak with counterparts when evaluating ticketing options."  JMOL-Opp.18.  Then Plaintiffs should have developed evidence about what was said.  The cited testimony is about SeatGeek's ability to recruit venue clients through positive word-of-mouth; discussions between Barclays and venue owners about SeatGeek; and discussions the City of Irvine had about the effects of venue operating models.  *See id*.  That is all irrelevant.

Plaintiffs lean on "concert withholding" evidence to fill the evidentiary gap.  JMOL-Opp.19.  But it is not unlawful for Live Nation to route more concerts to Ticketmaster venues than to non-Ticketmaster venues, JMOL-Mot.23-24, and Plaintiffs do not argue otherwise.  Simply saying "the jury was free to reject" the "characterization" of this conduct as "self-preferencing" is no answer.  JMOL-Opp.19.  Self-preferencing is just a term.  What matters is that it is nearly always lawful for firms to favor affiliates over rivals.  JMOL-Mot.23-24.

Plaintiffs say they are not required to show market power in the market for concerts, JMOL-Opp.19, but they do not say why.  And Defendants have already explained why such proof is required.  JMOL-Mot.24-26.  It is not enough that "the jury heard evidence" about Live Nation's control over concerts.  JMOL-Opp.19.  The legal requirement is market power in a properly

10

defined market.  JMOL-Mot.24-26.  Plaintiffs made no effort to prove any concerts-related market or market power in it.

*Exclusive dealing*:  Plaintiffs' exclusive dealing theory boils down to the assertion that any time a company enters into "long-term exclusive [] agreements with a substantial portion of the market," it engages in unlawful behavior.  JMOL-Opp.15-16.  They seem to suggest that exclusive agreements are unlawful simply because they are advantageous for incumbents.  JMOL-Opp.16-17.  That is not the law.  "[A]s a general rule, exclusive-dealing agreements are 'presumptively legal.'"  *In re Mylan N.V. Securities Litig.*, 2018 WL 1595985, *14 (S.D.N.Y. Mar. 28, 2018) (citation omitted).  Where, as here, customers prefer exclusive contracting, there is no basis for denying them the product they want even if it inclines them toward repurchasing from an incumbent firm.  *Race Tires Am. v. Hoosier Racing Tire*, 614 F.3d 57, 78 (3d Cir. 2010); NT-Mot.25-27.  At the very least, Plaintiffs had to prove that the anticompetitive effects of the exclusive contracts outweighed their procompetitive benefits.  JI24-25.  They make no such argument—which would fail anyway since there is no evidence that exclusive contracting has allowed Ticketmaster to charge supracompetitive prices.  JMOL-Mot.26-27.

## III.    PLAINTIFFS' STATE-LAW CLAIMS FAIL

Plaintiffs' state-law claims congruent with the Sherman Act rise and fall with the federal claims, and fall here for the reasons discussed.  The jury's finding of competitive impact in each Plaintiff State also cannot be sustained.  As Plaintiffs' opposition makes clear, they did not try to prove *any* state-specific harm at trial.  JMOL-Opp.23.  The mere presence of a "major concert venue" in various states, without evidence of competitive harm at that venue, does not establish in-state competitive harm.  *E.g.*, *In re Urethane Antitrust Litig.*, 663 F. Supp. 2d 1067, 1083-84 (D. Kan. 2009) ("[A] plaintiff alleging a violation of Wisconsin's antitrust statutes must show 'that

11

the conduct complained of has impacts in Wisconsin, and not merely nationwide impacts.'"
(citation omitted)).

## IV.    PLAINTIFFS' SOLE BASIS FOR DAMAGES FAILS

Plaintiffs again argue that Dr. Abrantes-Metz's "retained amount" measures the "marginal per-ticket price," and that "fixed" upfront payments are irrelevant to transaction-level pricing. JMOL-Opp.27.  But Dr. Abrantes-Metz first analyzes how much *ticketers charge venues*, and every witness with firsthand knowledge—venues,[4] ticketing competitors,[5] Ticketmaster employees[6]—testified that ticketing services are not sold ticket-by-ticket, but rather under multi-year contracts amassing hundreds of thousands, or millions, of expected ticket sales, and under which upfront payments are an integral component of the price venues pay for ticketing services. The marginal unit of production is the contract, not one ticket; the fixed payments are negotiated simultaneously with fee splits; and when ticketers calculate what they are likely to earn per-ticket they invariably net fixed payments from fee income.

Abstract economic arguments about when fixed payments "should" count cannot substitute for an undisputed factual record.  Nor can Plaintiffs defend Dr. Abrantes-Metz's work by theorizing that some upfront payments, though not all, may have purchased rights of independent value.  That argument concedes the problem.  And Figure 29 does not rescue the analysis.[7]  Figure

---

[4] Glickman-Dep.-Tr.53:20-54:5; Briggs-Dep-Tr.25:15-26:4; Marion-Dep.-Tr.72:6-75:2.

[5] Trial-Tr.1177:14-19, 1195:8-15 (Marciano).

[6] Trial-Tr.2921:15-24 (Marcus); Trial-Tr.3820:14-25 (J. Johnson).

[7] Plaintiffs say Defendants cannot rely on prior filings, but Plaintiffs' cited cases are inapposite because they had ample notice that the admissibility of Dr. Abrantes-Metz's testimony would be fairly considered as part of the post-trial motions.  *See* ECF-No.1473.  In any event, Plaintiffs themselves invoke Figure 29, which they concede was not presented at trial.  JMOL-Opp.31-32. Plaintiffs' cases don't stand for this proposition but, in any event, Defendants' Motion to Strike is still pending and relies on failures of Dr. Abrantes-Metz's trial testimony.

29 is not—and cannot be—a robustness check because it does not test the econometric concern at issue: the two-way flow of money in ticketing contracts. ECF-No.1385, p.9. Figure 29 studies an entirely different level of the market (downstream fan fees). Dr. Abrantes-Metz's approach is exactly what *Reed Construction Data v. McGraw-Hill Cos.*, 49 F. Supp. 3d 385, 407 (S.D.N.Y. 2014) forbids: omitting an outcome-determinative variable without justification and without any sensitivity analysis to show the omission is immaterial. ECF-No.1385, p.9.

The AXS comparability problem is likewise fatal. The overcharge figure rests on a uniform seven-year average that assumes comparability throughout 2017-2024. But AXS avowed it was not of comparable quality to Ticketmaster until, at earliest, late 2021. *E.g.*, DX267 at -331; Trial-Tr.1117:15-1118:1, 1154:6-18, 1157:5-1158:24, 1166:25-1168:3, 1168:18-1169:1 (Marciano). And Dr. Abrantes-Metz conceded she has no methodology by which the jury could adjust damages for any period of non-comparability. Trial-Tr.2567:7-15. And of course they didn't.

Because the lone evidentiary basis for damages is unreliable, inadmissible, and insufficient, judgment as a matter of law is warranted.

## CONCLUSION

The Court should enter judgment as a matter of law for Defendants.

*[Signatures on following page]*

13

Dated: July 2, 2026

Respectfully submitted,

| LATHAM & WATKINS LLP | CRAVATH, SWAINE & MOORE LLP |
|---|---|

Andrew M. Gass (admitted *pro hac vice*)
Alfred C. Pfeiffer (admitted *pro hac vice*)
   *Co-Lead Trial Counsel*
David R. Marriott
   *Co-Lead Trial Counsel*
Timothy L. O'Mara (admitted *pro hac vice*)
Jennifer L. Giordano
Kelly S. Fayne (admitted *pro hac vice*)
Lindsey S. Champlin (admitted *pro hac vice*)
Robin L. Gushman (admitted *pro hac vice*)

Lauren A. Moskowitz
Jesse M. Weiss
Nicole M. Peles

Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 474-1000

505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600

lmoskowitz@cravath.com

jweiss@cravath.com

1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

npeles@cravath.com

*Attorneys for Defendants Live Nation
Entertainment, Inc. and Ticketmaster L.L.C.*

555 11th Street, NW, Suite 1000
Washington, D.C. 20004
(202) 637-2200

Al.Pfeiffer@lw.com
David.Marriott@lw.com
Tim.O'Mara@lw.com
Jennifer.Giordano@lw.com
Andrew.Gass@lw.com
Kelly.Fayne@lw.com
Lindsey.Champlin@lw.com
Robin.Gushman@lw.com

*Attorneys for Defendants Live Nation
Entertainment, Inc. and Ticketmaster L.L.C.*

14

**CERTIFICATE OF COMPLIANCE**

I, Andrew M. Gass, an attorney duly admitted to practice before this Court, hereby certify pursuant to Local Rule 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rules"), Rule 8(C) of Judge Arun Subramanian's Individual Practices in Civil Cases ("Individual Rules"), and ECF 1473, that the foregoing Memorandum of Law was prepared using Microsoft Word, and contains 3,950 words.  In making this calculation, I have relied on the word and page counts of the word-processing program used to prepare the document.

Dated:    July 2, 2026
          San Francisco, California

_____

Andrew M. Gass