**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> LIVE NATION ENTERTAINMENT, INC., and TICKETMASTER L.L.C., <br><br> *Defendants*. | Case No. 1:24-cv-03973-AS |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION FOR A NEW TRIAL**
<u>**PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 59**</u>

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

ARGUMENT........................................................................................................................1

I.      THE VERDICT IS AGAINST THE WEIGHT OF THE EVIDENCE...............................1

II.     EVIDENTIARY ERRORS PREJUDICED THE VERDICT..............................................3

III.    INSTRUCTIONAL ERRORS PREJUDICED THE VERDICT.........................................8

CONCLUSION....................................................................................................................11

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*American Bearing Co., Inc. v. Litton Indus.*,
729 F.2d 943 (3d Cir. 1984)....................................................................................................2, 3

*Carroll v. Trump*,
124 F.4th 140 (2d Cir. 2024) .......................................................................................................3

*DLC Mgmt. Corp. v. Town of Hyde Park*,
163 F.3d 124 (2d Cir. 1998)........................................................................................................2

*Farrior v. Waterford Bd. of Educ.*,
277 F.3d 633 (2d Cir. 2002).........................................................................................................1

*Fitzgerald v. Henderson*,
251 F.3d 345 (2d Cir. 2001).........................................................................................................6

*FTC v. Qualcomm Inc.*,
969 F.3d 974 (9th Cir. 2020) .......................................................................................................5

*Graphic Products Distributors, Inc. v. ITEK Corp.*,
717 F.2d 1560 (11th Cir. 1983) ...................................................................................................9

*In re Mylan N.V. Sec. Litig.*,
666 F. Supp. 3d 266 (S.D.N.Y. 2023).........................................................................................10

*ING Global v. United Parcel Serv. Oasis Supply Corp.*,
757 F.3d 92 (2d Cir. 2014).......................................................................................................2, 8

*MacDermid Printing Solutions LLC v. Cortron Corp.*,
833 F.3d 172 (2d Cir. 2016).........................................................................................................9

*Manley v. AmBase Corp.*,
337 F.3d 237 (2d Cir. 2003).........................................................................................................3

*Nimely v. City of New York*,
414 F.3d 381 (2d Cir. 2005).....................................................................................................3, 4

*Raedle v. Credit Agricole Indosuez*,
670 F.3d 411 (2d Cir. 2012).....................................................................................................1, 2

*Song v. Ives Labs., Inc.*,
957 F.2d 1041 (2d Cir. 1992).......................................................................................................2

*Tops Markets, Inc. v. Quality Markets, Inc.*,
　142 F.3d 90 (2d Cir. 1998)..........................................................................................9

*United States v. Garnes*,
　102 F.4th 628 (2d Cir. 2024) ......................................................................................5

*US Airways, Inc. v. Sabre Holdings Corp.*,
　938 F.3d 43 (2d Cir. 2019)..........................................................................................7

**INTRODUCTION**

If the Court does not grant judgment as a matter of law, it should grant a new trial. In arguing otherwise, Plaintiffs conflate the Rule 50(b) and Rule 59 standards. Contrary to Plaintiffs' assertions, the Court's ability to reweigh the evidence is precisely what distinguishes a Rule 59 new trial motion from a Rule 50 motion. Plaintiffs also downplay the sheer quantity and impact of out-of-market price evidence, stale acquisitions and threats, and hearsay "concerns." And they never confront the prejudice standard that governs evidentiary errors. If the challenged evidence was improperly admitted (and it was), there can be little question it swayed the jury. The out-of-market price evidence masked the total lack of anticompetitive effects in the relevant markets, while the stale and hearsay evidence propped up the single "threat" during the relevant time period. That was Plaintiffs' narrative before the jury, and they are still relying on that evidence today. Compounding those errors, the jury instructions allowed the jury to assess anticompetitive effects under the wrong standard and did not give the jury guidance on how to assess the supposed threats that were the centerpiece of Plaintiffs' case. Absent these errors, there is little reason to think the verdict would have been the same. This Court should grant a new trial.

**ARGUMENT**

**I.    THE VERDICT IS AGAINST THE WEIGHT OF THE EVIDENCE**

Plaintiffs do not dispute that the Rule 59 new trial standard is less burdensome than the Rule 50 standard, or that a court "may grant a new trial ... if the verdict is against the weight of the evidence." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417 (2d Cir. 2012). Yet Plaintiffs argue the Court cannot order a new trial even if it "would weigh the evidence differently than the jury." NT-Opp.3. That confuses, and ultimately collapses, the distinct standards.

A court may grant a new trial motion when "the verdict is against the weight of the evidence," meaning that it is "seriously erroneous" or a "miscarriage of justice." *Farrior v.*

*Waterford Bd. of Educ.*, 277 F.3d 633, 635 (2d Cir. 2002) (citation omitted). "Unlike on a Rule 50 motion, ... on a Rule 59 motion the court 'may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner.'" *ING Global v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 99 (2d Cir. 2014) (quoting *Raedle*, 670 F.3d at 418); *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998); *Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1047 (2d Cir. 1992). And "[u]nlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict." *DLC Mgmt.*, 163 F.3d at 134. That is, "a trial judge *is* free to weigh the evidence himself." *Id.* (emphasis added). Which is why courts have rejected the argument that a "district court may only grant a new trial … when the moving party would be entitled to judgment notwithstanding the verdict." *American Bearing Co., Inc. v. Litton Indus.*, 729 F.2d 943, 948 n.11 (3d Cir. 1984).

Plaintiffs claim that "[a] number of critical issues in this case—including threats and retaliation by Defendants, and the market definition for Large Amphitheaters—depended on credibility determinations" and emphasize that "'a judge "should rarely disturb a jury's evaluation of a witness's credibility."'" NT-Opp.3 (citations omitted). But the Second Circuit has affirmed a decision granting a new trial because "the district court was in a unique position to assess the credibility of the witnesses and to determine the weight which should be accorded their testimony." *Song*, 957 F.2d at 1047. This Court can do the same.

More fundamentally, Defendants' weight-of-the-evidence argument rests largely on the paucity of evidence, not witness credibility. NT-Mot.3-4. For example, the Court can credit all of the witness testimony about the Barclays incident and still conclude the verdict is not supported by the weight of the evidence—because there is nothing else. The issues and evidence are the same as those set forth in the Rule 50(b) motion; it is the standard that is different. So even if the

2

Court believes there is sufficient evidence to support the verdict for Rule 50(b) purposes, it should order a new trial under Rule 59's "less stringent standard" because the weight of the evidence does not support the same. *Manley v. AmBase Corp.*, 337 F.3d 237, 246 (2d Cir. 2003); *see, e.g.*, *American Bearing*, 729 F.2d at 949 (affirming new trial grant because defendant "could not have had market power in the market established by [the] evidence, and a verdict predicated on the market [the plaintiff] sought to prove would be against the weight of the evidence").

## II.    EVIDENTIARY ERRORS PREJUDICED THE VERDICT

Plaintiffs' arguments regarding evidentiary errors likewise misstate the Rule 59 standard. The question is not whether "there would still be sufficient evidence to support the jury's verdict." NT-Opp.5.  The question is whether the erroneously admitted evidence "substantially influence[d] the jury" and caused its "judgment [to] be swayed in a material fashion." *Carroll v. Trump*, 124 F.4th 140, 157-58 (2d Cir. 2024)[1] (internal citations omitted); *see Nimely v. City of New York*, 414 F.3d 381, 399-400 (2d Cir. 2005) (granting new trial where erroneous admission of expert testimony raised "distinct possibility that … jury would not have reached the verdict that it did"). Plaintiffs do not argue that the evidence (if erroneously admitted) was not prejudicial under *that* standard.  They either make their inapposite harmless error argument, *e.g.*, NT-Opp.5, 9 (as to challenged categories of evidence and as to fans' prices for ancillaries), or avoid discussing prejudice altogether, *id.* at 12-13, 15, 17-18 (as to introduction of stale evidence, hearsay regarding venues' "concerns," fans' fees in Europe, and Dr. Abrantes-Metz's overcharge analysis).

---

[1] Plaintiffs repeatedly misstate *Carroll*'s holding.  The court did not deny a "new trial where the record as a whole supported the verdict."  NT-Opp.5, 9.  The court first found no evidentiary errors, and then noted that, assuming there *had* been error, it was "not persuaded that any claimed error or combination of errors … affected Mr. Trump's substantial rights," *i.e.*, "swayed" the jury's judgment "in a material fashion."  *Carroll*, 124 F.4th at 178 (citation omitted).

3

Individually and cumulatively, this evidence clearly swayed the jury. NT-Mot.7, 10, 13, 14-16. Because there was no evidence of higher prices to venues or artists, without the evidence on fees to fans, the jury likely would not have found the "price effects, anticompetitive effects" Plaintiffs urged it to find based on that evidence. Trial-Tr.4603:6-17 (pointing to lower ticket fees paid by fans in Europe as "evidence of price effects"). Without the evidence on Defendants' stale conduct and venues' "concerns," Plaintiffs' primary theories of exclusionary conduct in their ticketing markets would have been wholly unsupported. And without Dr. Abrantes-Metz's testimony, there would have been no overcharge finding. Had these errors been avoided, there is more than a "distinct possibility" the "jury would not have reached the verdict it did." *Nimely*, 414 F.3d at 400.

That puts all the focus on whether the five categories of evidence Defendants identified were erroneously admitted. NT-Mot.4-16. They were.

***Out-of-market price evidence*:** The two categories of out-of-market price evidence—evidence about fees to fans (including in Europe) rather than prices to venues or artists—should have been excluded and Plaintiffs' arguments to the contrary do not withstand scrutiny.

The prices fans paid at two amphitheaters for parking and lawn chairs were not relevant. NT-Mot.5-6. What Plaintiffs are citing now about how artists care generally about "fan satisfaction," NT-Opp.6 (citation omitted), cannot be the connection to artist welfare that the Court had in mind when it allowed this evidence. Plaintiffs cannot identify any testimony or other evidence that "artists … prefer not to play at a venue if fans will be overcharged for services like parking or lawn seats." Trial-Tr.1061:22-23. The connection was never established.

Plaintiffs also contend these prices demonstrate Live Nation's "monopoly power in the large amphitheater market." NT-Opp.6. But these are not prices to *artists*—the customers in the

4

relevant market. *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) (anticompetitive effects must exist "'in the market where competition is [allegedly] being restrained'" (citation omitted) (alteration in original)); JMOL-Mot.5-6. Plaintiffs quibble with Defendants' point that artists were actually better off at amphitheaters, NT-Opp.7-8, but that is beside the point.[2] This evidence has no relation to whether there was a decrease in *artists'* welfare. Plaintiffs' continued reliance on out-of-market effects only shows why this evidence should not have been admitted in the first place.[3]

The evidence was also *far* more prejudicial than probative. NT-Mot.6-7. Plaintiffs' response is to argue the evidence was probative. NT-Opp.9. But Rule 403 is a balancing test that comes into play only when the evidence has some probative value. *United States v. Garnes*, 102 F.4th 628, 635 (2d Cir. 2024) ("Rule 403 concerns the admissibility of *relevant* evidence."). And when it comes to the prejudice side of the balance, Plaintiffs completely duck the inquiry because they have no answer. Of course this evidence was prejudicial; the impact could hardly be more stark: Plaintiffs repeatedly invoked "robbing them blind baby" and urged the jury to focus on that language as evidence that Live Nation is a monopolist. NT-Mot.6-7.

---

[2] As explained, Plaintiffs' use of PX811 to minimize the increase in artist earnings at Live Nation amphitheaters is sophistry. JMOL-Reply.4 n.1. That document compares artists' and Live Nation's earnings at arenas versus amphitheaters, and the reason Live Nation's percentage increase appears large is because promoters have much lower margins at arenas. *Id.* And, of course, Live Nation has additional revenue streams at its amphitheaters that make the percentage increase higher. Trial-Tr.3458:8-22 (Hansen). What Plaintiffs cannot dispute is that artists are making substantially more at venues that are supposedly monopolized. If there is any way to reconcile that with allegations of monopoly, neither Dr. Hill nor any other witness provided it.

[3] Plaintiffs contend they had to introduce evidence on prices charged for ancillaries to rebut "Defendants' claims … that Live Nation could not have monopoly power because of its low margins." NT-Opp.8. That makes no sense: if a business makes excessive profits on ancillaries yet still has low margins, that is further evidence that it *does not* have monopoly power.

5

As for the evidence about ticketing practices and prices in Europe, Plaintiffs continue to insist the evidence was relevant to "rebut Defendants' argument that exclusive arrangements are procompetitive and desired by venues." NT-Opp.15. But Plaintiffs concede that a key purpose of this evidence was to show that "ticketing fees"—and specifically those paid by fans—are lower outside the United States. *Id.* at 16-17. This was a critical part of Mr. Marciano's testimony and Plaintiffs returned to the point repeatedly. Trial-Tr.1108:19-25 (Marciano); 4603:6-17 (closing).

Plaintiffs' suggestion that these categories of out-of-market price evidence were "narrow," NT-Opp.5, is disingenuous. They repeatedly returned to this evidence, including in closing. NT-Mot.6-7, 14-15. And Plaintiffs are still relying on it to prove anticompetitive effects post-trial. JMOL-Opp.22 (citing ticketing prices in Europe). That is because there was no evidence artists or venues suffered higher prices, lower output, or worse quality as a result of Defendants' conduct. JMOL-Mot.5-6, 19-22. Plaintiffs' emphasis on prices paid by fans (and in Europe) filled the gap and, contrary to law, encouraged the jury to view those prices as evidence of anticompetitive effects. NT-Mot.14-15. The out-of-market price evidence should not have been admitted.

***Pre-limitations-period and hearsay evidence*:** The two categories of stale and hearsay evidence should have been excluded and Plaintiffs' contrary arguments fail to show otherwise.

Plaintiffs argue that Defendants' stale conduct was relevant to events that occurred during the limitations period. NT-Opp.10 (citing *Fitzgerald v. Henderson*, 251 F.3d 345, 365 (2d Cir. 2001)).[4] But the vast majority of the lengthy bullet-point list of stale evidence was "too remote[ly]" connected to anything during the limitations period to be relevant. *Fitzgerald*, 251

---

[4] *Fitzgerald* is an employment discrimination case about "specific and related instances of discrimination" that the employer "has permitted … to continue unremedied for so long that its inaction may reasonably be viewed as tantamount to a policy or practice of tolerating such discrimination." 251 F.3d at 362. To the extent it is relevant at all, it stands in sharp contrast to the record in this case, where the evidence of threats and retaliation is anything but continuous.

F.3d at 365.  Plaintiffs still make little effort to connect this evidence to events that happened during the limitations period.  Every argument is a thin reed, at best.  Plaintiffs assert, for instance, that a 2015 analysis "showed how venues evaluated ticketing quality and competition," but they fail to connect that analysis to any venue's decisionmaking during the limitations period.  NT-Opp.11.  Plaintiffs contend that a 2018 acquisition demonstrated "Defendants' strategy of acquiring rivals," but they have no evidence that a "velvet hammer" strategy was implemented during the limitations period.  *Id.*[5]  And Plaintiffs claim the 2017 SAP Center and HEB Center negotiations, 2019 Xcel Center negotiation, and 2019 Jonas Brothers Tour communications were all "central" to their threats, retaliation, and "conditioning" claim, *id.*, but they could point to only a single incident of such conduct during the limitations period—hardly a "pattern" of anything, *id.* at 11-12.[6]  In the end, the long list of stale evidence just demonstrates how pervasive that evidence was at trial; without it, Plaintiffs had precious little to support their primary theories of exclusionary conduct.  NT-Mot.10.[7]

Even with the stale evidence, Plaintiffs could only muster three or four examples of alleged threats and retaliation over the course of a decade.  JMOL-Mot.23.  This in a case where dozens

---

[5] The "velvet hammer" is the poster child for Plaintiffs' trial tactic of using inflammatory language in a handful of documents to make up for their lack of objective evidence of anticompetitive conduct.  It was an off-hand comment made eight years ago about an acquisition that Coran Capshaw testified was a great deal for the sellers, himself included.  Trial-Tr.4258:2-24.  And Plaintiffs did *nothing* to establish that Live Nation ever withheld content from the venue, nor that the acquisition (years later) had anticompetitive effects.

[6] Plaintiffs contend that stale contract negotiations are relevant because the "contract[s] extended into the limitations period."  NT-Opp.11.  Again, their rationale for admitting the evidence has little to do with how they used it.  Regardless, injury must be based on a defendant's "overt act" that occurred during the limitations period, not the mere "manifestation of the prior overt act."  *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 68-69 (2d Cir. 2019) (citation omitted).

[7] Plaintiffs seek refuge in the Court's exclusion of a handful of pre-limitations-period evidence, NT-Opp.12-13, but that does not speak to the relevance of the stale evidence that was admitted.

of venues were deposed and dozens more produced documents. Plaintiffs filled that void with hearsay evidence from Defendants' competitors that venues had "concerns," based on what they heard from other venues, that they would lose concerts if they switched away from Ticketmaster. NT-Mot.11; *see, e.g.*, Trial-Tr.752:4-754:6 (Groetzinger). Plaintiffs continue to insist this evidence was admissible because it showed "state of mind" or "effect on the listener." NT-Opp.13. But as the Court noted, those exceptions were "abused" at trial. Trial-Tr.4226:2-11. And while it said that of both sides, the reason Defendants had to introduce hearsay evidence was to counter Plaintiffs' hearsay evidence that should not have been admitted. NT-Mot.12-13.

Without the stale evidence and hearsay testimony, the threats-and-retaliation theory central to their ticketing claims would have rested exclusively on the single, 2021 Barclays incident. And their amphitheater monopolization claim would have rested exclusively on two booking deals and two leases. NT-Mot.10. This evidence should not have been admitted.

*Dr. Abrantes-Metz's overcharge analysis*: Plaintiffs' arguments regarding Dr. Abrantes-Metz's testimony are addressed in Defendants' Rule 50(b) reply. Moreover, under Rule 59, the Court is entitled to make its own evaluation of Dr. Abrantes-Metz's credibility. *ING Global*, 757 F.3d at 99. It is not limited to addressing sufficiency. Dr. Abrantes-Metz was not credible. Her ever-changing explanations about what she did, what Plaintiffs instructed her to do, and how her "retained amount" has any bearing on actual pricing to venues are reason enough to find she lacks credibility. Her insistence that AXS was of equal quality to Ticketmaster—which the jury must have fully accepted—is indefensible on this record. The Court can and should grant a new trial on this ground alone.

## III.    INSTRUCTIONAL ERRORS PREJUDICED THE VERDICT

As Defendants explained, the jury instructions misstated the law on market definition, anticompetitive effects, coercion, and exclusive dealing, NT-Mot.17-21, 25-27, and incorrectly

omitted instructions on two forms of alleged exclusionary conduct, *id.* at 21-25. But recognizing that this Court previously rejected these arguments, and that some are addressed in Defendants' Rule 50(b) reply, JMOL-Reply.7, Defendants focus on highlighting how two key instructional errors exacerbated the prejudicial effects discussed above.

First, the Court's anticompetitive effects instruction incorrectly placed constrained consumer choice and restriction of competitors' ability to compete on the same footing as price, output, and quality evidence. JI24. This gave Plaintiffs additional avenues to show anticompetitive effects where they otherwise would have had none given the total dearth of relevant price, output, and quality evidence. *See supra* at 6. Put differently, the Court's instruction allowed Plaintiffs to do exactly what the Second Circuit explained has never been done before: "[I]n no precedential opinion in this Circuit has a plaintiff successfully proved an adverse effect on competition without offering evidence of changed prices, output, or quality." *MacDermid Printing Solutions LLC v. Cortron Corp.*, 833 F.3d 172, 183 (2d Cir. 2016).

Plaintiffs argue that when a defendant has market power, "some [] ground for believing that the challenge[d] behavior has harmed competition" is sufficient to show anticompetitive effects. NT-Opp.20 (citation omitted). But as the Second Circuit noted in *Tops Markets, Inc. v. Quality Markets, Inc.*, "such grounds" are things like when the defendant's challenged conduct is "inherent[ly] anticompetitive," or the market structure is such that the competition impeded by that conduct is "a critical source of competitive pressure on price." 142 F.3d 90, 97 (2d Cir. 1998) (citation omitted); *see Graphic Products Distributors, Inc. v. ITEK Corp.*, 717 F.2d 1560, 1573 (11th Cir. 1983). Plaintiffs did not try to show the latter, and the former does not work either. As this Court recognized, conduct such as acquisitions and exclusive dealing is not, without more, unlawful. ECF-No.1037, pp.33-35 (citation omitted). Exclusive dealing is presumptively

*procompetitive*. *In re Mylan N.V. Sec. Litig.*, 666 F. Supp. 3d 266, 291 (S.D.N.Y. 2023). There was thus no basis for JI24 to discuss anything besides price, output, and quality—metrics on which the jury would not have been able to find anticompetitive effects.

Second, Plaintiffs offer no meaningful defense of the Court's decision not to give the jury a specific instruction on threats, retaliation, and conditioning. Their main argument is that this conduct was obviously unlawful so there was no risk of prejudice. NT-Opp.23. Perhaps the jury thought so too—which is why a specific instruction was required. And since Plaintiffs tried to make up for the absence of threats with extensive evidence on venues' "concerns," it was especially important to instruct the jury that "concerns" cannot be part of the exclusionary conduct analysis—it is not even conduct. NT-Mot.22. Plaintiffs' threats-and-retaliation theory was front and center throughout the presentation of their case. They spent nearly all of the first week of their case-in-chief on it. Trial-Tr.208-453 (Abbamondi, Helgerson); 533-652 (Chi); 741-928 (Groetzinger). Had the jury been instructed that only a small part of that evidence could constitute exclusionary conduct, it is doubtful it would have reached the same verdict.

Plaintiffs alternatively assert that "the Court instructed the jury that it could consider any threats, conditioning, or retaliation as forms of coercion as part of its exclusive dealing analysis." NT-Opp.23. Not so. The Court's exclusive dealing instruction made no mention of this conduct. JI25. And doing so would have been wrong anyway. Plaintiffs presented threats and retaliation as a *separate* form of exclusionary conduct to the jury. NT-Mot.22-23; PDX5.29. And there is no evidence that the few supposed threats in the record were made to secure exclusivity specifically. Every venue witness that testified wanted an exclusive contract, even Plaintiffs' star witness on threats—John Abbamondi of Barclays. Trial-Tr.302:8-25, 324:4-327:20. Plaintiffs'

10

own evidence belies their revisionist history seeking to intertwine threats and retaliation and exclusive dealing. The jury should have been instructed on the former just as it was on the latter.

## CONCLUSION

If the Court does not enter judgment as a matter of law for Defendants, it should grant a new trial.

*[Signatures on following page]*

11

Dated: July 2, 2026

Respectfully submitted,

LATHAM & WATKINS LLP                      CRAVATH, SWAINE & MOORE LLP


_____                   _____
Andrew M. Gass (admitted *pro hac vice*)  Lauren A. Moskowitz
Alfred C. Pfeiffer (admitted *pro hac vice*)  Jesse M. Weiss
    *Co-Lead Trial Counsel*                Nicole M. Peles
David R. Marriott
    *Co-Lead Trial Counsel*               Two Manhattan West
Timothy L. O'Mara (admitted *pro hac vice*)  375 Ninth Avenue
Jennifer L. Giordano                      New York, NY 10001
Kelly S. Fayne (admitted *pro hac vice*)  (212) 474-1000
Lindsey S. Champlin (admitted *pro hac vice*)
Robin L. Gushman (admitted *pro hac vice*)  lmoskowitz@cravath.com


505 Montgomery Street, Suite 2000         jweiss@cravath.com
San Francisco, CA 94111
(415) 391-0600                            npeles@cravath.com


1271 Avenue of the Americas               *Attorneys for Defendants Live Nation*
New York, NY 10020                        *Entertainment, Inc. and Ticketmaster L.L.C.*
(212) 906-1200


555 11th Street, NW, Suite 1000
Washington, D.C. 20004
(202) 637-2200


Al.Pfeiffer@lw.com
David.Marriott@lw.com
Tim.O'Mara@lw.com
Jennifer.Giordano@lw.com
Andrew.Gass@lw.com
Kelly.Fayne@lw.com
Lindsey.Champlin@lw.com
Robin.Gushman@lw.com


*Attorneys for Defendants Live Nation*
*Entertainment, Inc. and Ticketmaster L.L.C.*


12

## CERTIFICATE OF COMPLIANCE

I, Andrew M. Gass, an attorney duly admitted to practice before this Court, hereby certify pursuant to Local Rule 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rules"), Rule 8(C) of Judge Arun Subramanian's Individual Practices in Civil Cases ("Individual Rules"), that the foregoing Memorandum of Law was prepared using Microsoft Word, and contains 3,444 words. In making this calculation, I have relied on the word and page counts of the word-processing program used to prepare the document.

Dated:    July 2, 2026
          San Francisco, California

_____

Andrew M. Gass