

200 Park Avenue
New York, NY 10166-4193
+1 (212) 294-6700

**JEFFREY L. KESSLER**
Partner
(212) 294-4698
Jeffrey.Kessler@winstontaylor.com

August 4, 2026

**VIA ECF**

The Honorable Arun Subramanian
United States District Court
Southern District of New York
500 Pearl Street, Courtroom 15A
New York, NY 10007

**Re:** *United States et al. v. Live Nation Entertainment, Inc. et al., 1:24-cv-03973-AS*

Dear Judge Subramanian:

Pursuant to the Court's invitation during the July 31, 2026 hearing, Plaintiffs respectfully make this supplemental submission in response to certain questions raised by the Court (ECF No. 1576) and discussed at the July 31, 2026 hearing on Defendants' Rule 50 and Rule 59 motions.

I.    **Question 1 to Plaintiffs: On any of the issues raised by defendants' motions, is there any material additional evidence that you wish to direct the Court's attention to, other than what is cited in your briefs?**

Plaintiffs respectfully submit Exhibit A as additional evidence relevant to Plaintiffs' Oppositions to Defendants' Rule 50 and Rule 59 motions that were not contained in their prior briefing.

II.    **Question 11 to Plaintiffs: What is your best trial evidence that MCVs' ticketing needs are so distinct that an antitrust market for ticketing should be defined around them, and only them? Even if they are similar in size and dependent on concerts, why does that make a difference in terms of the kind of *ticketing* services they receive?**

Although, as discussed below, ticketing services for MCVs are distinct from those for other venue types, Plaintiffs do not need to prove whether the ticketing services for MCVs were different from those for other venues in order to establish an MCV-facing antitrust market. That is because the primary ticketing markets are defined around the *customer*, not the product.[1] Numerous cases have found it

---

[1] *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) (distinct customers as a practical indicia to evaluate relevant product market); 2023 Antitrust Merger Guidelines 4.3.D.1 ("If the merged

appropriate to define a market based on a subset of customers without considering whether the product itself was offered beyond that distinct customer set. *See, e.g.*, *Spirit Airlines, Inc. v. Nw. Airlines, Inc.*, 431 F.3d 917, 933–935 (6th Cir. 2005) (holding that a jury "could find that leisure or price-sensitive passengers represent a separate and distinct market" compared to business travelers without analyzing the functional differences between classes of seats); *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 47, 51–56 (D.D.C. 2018) (holding that "the supply of marine water treatment products [] and services to Global Fleet customers," i.e., "vessels above 1,000 gross tons in size that have traded at two ports that are at least 2,000 nautical miles apart in the preceding 12 months" constituted a relevant submarket in part because "Global Fleets" was "a distinct customer group within the market for [such] products"); *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 127 (D.D.C. 2016) (holding that the "alleged market of consumable office supplies . . . sold and distributed . . . to large B-to-B customers . . . is a relevant market for antitrust purposes"); *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 179, 195–202 (D.D.C.) (noting that "[c]ase law provides for the distinction of product markets by customer" and holding that the relevant market was "the sale of commercial health insurance to national account customers" with more than 5,000 employees, because "national account customers are a distinct subset of the health insurance market, with needs that differentiate them from employers on the smaller end of the large group spectrum"), *aff'd*, 855 F.3d 345 (D.C. Cir. 2017); *see also Saint Francis Hosp. & Med. Ctr., Inc. v. Hartford Healthcare Corp.*, 655 F. Supp. 3d 52, 84 (D. Conn. 2023) ("[W]here there is an inelastic difference in price between sales of a single product to a particular group of customers and sales of that same product to other customers, the relevant product market may be properly limited to a sub-group of buyers.") (internal quotation omitted); *Fed. Trade Comm'n v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 166–72 (3d Cir. 2022) (finding market definition appropriate for only certain segment of the hospital's patient services for commercial insurers and their members without any finding of price discrimination).

The evidence of MCVs here is the same type as that in *Wilhelmsen*. First, in *Wilhelmsen*, the market was defined by a size-and-activity threshold applied to customers[2]—the same structure as Dr. Hill's 8,000-capacity and ten-concert criteria for MCVs. Second, the products sold to Global Fleet customers in *Wilhelmsen* were not technologically different; the court did not require proof that the chemicals sold to a Global Fleet vessel differed from those sold to another vessel. *Wilhelmsen*, 341 F. Supp. 3d at 52–56. What mattered was that the customer group was distinct, had distinct requirements, and could be targeted. *Id.* Here, the evidence at trial demonstrated both that MCV customers were especially sensitive to the price of concert ticketing services because of their dependence on concerts for profitability, and that the services they required were distinct from those required at stadiums, which presented a different economic model for ticketing services. This was more than sufficient for the jury to find that MCVs make up a targeted customer group.

For example, Dr. Hill determined that arenas and amphitheaters are dependent on concert revenue for profitability, as compared to stadiums, which host very few if any concerts during the year—a point supported by Defendants' expert's testimony and non-expert testimony as well. Hill, Trial

[1] firm could profitably target a subset of customers for changes in prices or other terms, the Agencies may identify relevant markets defined around those targeted customers.").

[2] In *Wilhelmsen*, "Global Fleets" were defined as "fleets of 10 or more globally trading vessels—vessels above 1,000 gross tons in size that have traded at two ports that are at least 2,000 nautical miles apart in the preceding 12 months." 341 F. Supp. 3d at 51.

Tr. 2089:1–2090:22; Carlton, Trial Tr. 4090:16–4091:22; Perez, Trial Tr. 2432:23–2433:8; Groetzinger, Trial Tr. 924:25–925:4 ("arenas could be four [concerts] in a week" while stadiums "maybe have ten a year"). This made MCVs particularly vulnerable to the threats and conditioning that would allow Ticketmaster to exercise its market power against these concert-dependent venues. *See, e.g.*, Groetzinger, Trial Tr. 751:9–752:19 (SeatGeek targeted MLS stadiums because of the lack of concerts and all the other venues SeatGeek talked to that had concerts "expressed extreme levels of concern around the concert issue . . . that if they moved to SeatGeek, they would lose concerts."). In fact, the evidence of actual threats, conditioning, and retaliation to major concert venues presented to the jury in this case was itself evidence that these customers are a distinct group with distinct ticketing needs that make them vulnerable to abuse by Defendants.[3]

Further, the trial evidence showed that the product service offerings for MCVs and stadiums differed because stadiums were dependent on sports for their profitability, while MCVs are primarily dependent on concert ticketing, and there were different ticketing services and challenges posed by each type of ticketing. *See* Perez, Trial Tr. 2318:22–2319:11. Because of these different ticketing service needs, Ticketmaster maintained different backend inventory systems depending on the type of ticketing—Archtics for sports ticketing, and Host for concert ticketing. Granger, Trial Tr. 2648:6–13; Khoury, Trial Tr. 1618:24–1619:6.

The trial evidence also showed that MCVs, in contrast to stadiums, have an acute need for ticketing systems able to handle high volumes all at once because concerts have a set date and time for an on-sale, where the ticketing system will "get just crushed with traffic," whereas sports tickets typically have drawn-out sales and many season tickets. Luter, Dep. Tr. 79:15–81:3; *see* Kelly, Trial Tr. 1590:1–9 (fan describing a timed release and "60,000 people in front of you in the queue"); Jacoby, Trial Tr. 3513:25–3514:4 (testifying that queues not moving during on-sales is an issue because "[i]f it's taking a long time, they, at some point, may opt out" and not purchase a ticket. Focusing on concerts alone, on-sale issues are more significant for MCVs, due to MCVs' lower overall capacity to balance with consumer demand compared to stadiums. Perez, Trial Tr. 2433:9–19. The concert on-sale is also a key opportunity for bots and bad actors to abuse the system. Marcus, Trial Tr. 2908:9–15; PX1261 at -702 (noting that "[d]emand surges during highly clustered onsale windows" and that "[a]rbitrage opportunities incentivize bots / bad actors"). This risk requires that concert ticket services to MCVs include systems that can address this heightened threat from bots. Perez, Trial Tr. 2321:1–4 ("I would say that that's probably the constant in our business, particularly at the larger venue sector, is that you've got be [sic] really good at defending against the bots."); PX1261 at -702 (internal Live Nation presentation stating that "[i]nfrastructure must handle highly volatile traffic during tight onsale windows

---

[3] During the hearing, the Court questioned whether any threshold was needed given that arenas hold many concerts. 7.31.2026 Hearing Tr. 81:25–82:19. Dr. Hill testified that he reviewed ordinary-course documents that refer to "ten-plus" concerts as being an appropriate cutoff and others that used a different threshold. Hill, Trial Tr. 2087:12–13. However, because he was focused on "competition related to the live entertainment industry, in particular concerts," he concluded it was appropriate to use the ten-concert threshold. *Id.* 2087:8-16. Thresholds are an analytical tool used by economists and courts to define a market and do not need to be exact to be relied upon. *See United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1, 27, 29 (D.D.C. 2022). Dr. Hill tested for different thresholds (five and 15 concerts) as a robustness check on his market definition and found that Ticketmaster's market share did not materially change when these different thresholds were used. Hill, Trial Tr. 2097:17-2098:2.



with the ability to transact at scale and high-speeds; Platforms must constantly evolve to combat bots and bad actors"); PX0800 at -524 (internal Ticketmaster presentation listing "Bots are acquiring tickets illegally at the expense of fans" as fan pain point); DX0790 at -210.

Stadiums' and MCVs' needs and business models are so different that, as the evidence at trial showed, Ticketmaster maintained distinct departments for sports and concert ticketing. Marcus, Trial Tr. 2838:16–19. Moreover, the evidence also showed that stadiums and arenas are separate business segments because their economics and needs for specialized ticketing services differ. Luter, Dep. Tr. 13:14–15:19; *see* ECF No. 1528 at 12–14.[4] This was additional evidence the jury could have reasonably relied upon to support the two relevant ticketing markets that it found.

In addition, the jury was able to consider trial evidence on what an MCV would find to be a reasonable substitute for primary concert ticketing services should Ticketmaster raise its prices. That evidence showed that JUMP, Paciolan, and other ticketers outside the MCV market were able to effectively compete to provide ticketing services for stadiums but could not do so for concert-dominated MCVs.[5] This evidence also supported the jury's finding that stadiums are outside of the relevant MCV ticketing markets.

Based on all this trial evidence, there is no basis to disturb the jury's careful verdict, which explicitly found that the Plaintiff States had proven both of the relevant MCV ticketing markets identified by Dr. Hill.

**III.**     <u>**Plaintiffs' Response to Question No. 9 to Defendants:**</u> **What is your response to the argument made in the economists' amicus brief pertaining to Dr. Abrantes-Metz? Why aren't they correct that the upfront payments here would be classified as fixed costs, even if based on predictions about future ticket sales, and would not affect the marginal price venues charge fans, in the way a per-ticket payment might?**

Dr. Abrantes-Metz's opinion reflects a reliable application of well-established economic principles and methods to the facts of the case, as required by Rule 702(d). Her decision not to deduct "upfront" payments—fixed amounts paid by ticketers to venues, which are never adjusted as each ticket

---

[1]

[4] Industry recognition is a "significant" factor, because courts assume that "economic actors usually have accurate perceptions of economic realities." *Todd v. Exxon Corp.*, 275 F.3d 191, 205 (2d Cir. 2001).

[5] Khoury, Trial Tr. 1613:20–1614:19 (testifying that JUMP has attempted to move into concert ticketing outside of sports ticketing for stadiums, but has not been able to do so because, among other things, the "feedback [JUMP] get[s] from team owners [is] that they're typically concerned about giving us the entertainment side and losing on some of the concerts that they have to run in their business."); *id.* 1649:12–15 (noting that venues do not allow JUMP to take over concerts because team owners "typically are concerned of losing concert revenue by moving off of their current solutions."); Hill, Trial Tr. 2122:18–2124:3 (testifying that sports stadium ticketers like Paciolan "haven't been able to use their success in other areas as a primary ticketer to enter into or expand in the market for primary concert tickets at major concert venues."); Groetzinger, Trial Tr. 788:5–11 (Barclays asked to retain SeatGeek for sports but Ticketmaster for concerts).

**WINSTON TAYLOR.**

is sold—when determining the fees Ticketmaster would have charged to venues in the but for world in which damages are estimated, is supported by economics, logic, and the evidence in the record.  The amicus brief of the economists established that bedrock economic principles support the decision of Dr. Abrantes-Metz to not deduct fixed payments in estimating a ticket fee price that would be determined solely by its marginal costs. *See* ECF No. 1527, Brief of Economists as *Amici Curiae* ("Economists' Amicus").

At the hearing, Defendants argued that Dr. Abrantes-Metz's decision not to deduct upfront payments renders her opinions inadmissible for failure to fit the facts of the case, citing the decisions in *Klein v. Meta Platforms, Inc.*, 766 F. Supp. 3d 956 (N.D. Cal. 2025) and *In re NFL "Sunday Ticket" Antitrust Litig.*, No. ML-02668, 2024 WL 3628118 (C.D. Cal. Aug. 1, 2024). 7.31.2026 Hearing Tr. at 94:4–20. According to Defendants, because both the upfront payments and the amount of the ticketing fees paid by the venues to Ticketmaster are set at the time of entry into the contract, the latter must invariably be tied to the former such that ticketers would have considered the upfront payments they paid as a marginal cost of obtaining higher ticket fees.  This argument fails for multiple reasons.

*First*, the reason that Dr. Abrantes-Metz properly determined that it would not be proper to deduct fixed upfront payments in her analysis of the marginal, per-ticket price charged by Ticketmaster (and AXS) is because, under fundamental economic principles, firms will set their marginal revenue equal to marginal cost. This means that ticketers would not deduct any fixed costs when determining their profit-maximizing price for ticketing fees. Upfront payments are a fixed cost because they constitute "a lump sum payment at the beginning, at the contract, that the venues receive, typically for other services, such as sponsorship agreements," regardless of the total number of concerts booked or tickets sold by a venue. *Id.* at 2579:8–14. Because the amount of the upfront payment associated with a contract does not vary with output (i.e., ticket sales) it would not be a marginal cost that the ticketers would consider in setting their ticket fees. Abrantes-Metz, Trial Tr. at 2579:15–2580:7; *id.* at 2581:2–11; *id.* at 2584:22–24.[6] The methodological soundness of this approach is explained by the economist-*amici curiae*, who confirm that it is a bedrock principle that fixed costs do not factor into how parties set a profit-maximizing price. Indeed, the *amici* point out that the principle underlying Dr. Abrantes-Metz's marginal pricing methodology is "one of the most well-understood principles in economics and business" so that deducting fixed payments from the calculations of the ticketing fees "would fly in the face of foundational economic principles." Economists' Amicus at 3, 7. The fact that a fixed payment

---

[6] And even if the parties disagree about whether those payments have been taken into account properly, that dispute only goes to weight, not admissibility. *See In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d 352, 394 (D.R.I. 2019) (denying *Daubert* where plaintiffs' expert supposedly "fail[ed] to offset his damages calculation by [defendant's] so-called price concessions"). The "categorical rule" (7.31.2026 Hearing Tr. at 99–100) is not that certain payments should never be considered in determining marginal cost, but rather, that such payments should be considered for this purpose only when they vary with the amount purchased, such that they would be expected to affect a firm's profit-maximizing decisions.  That is not the case here.  *See* J. Johnson, Trial Tr. 3940:7–3941:14 (confirming that upfront payments remain the same regardless of how many tickets are sold).



and a marginal payment may be part of the same contract does not affect their treatment for purposes of a marginal pricing analysis. *Id.* at 6–7.

*Second*, Defendants' contention—that upfront payments function as a marginal offset to the per-ticket revenue ticketers receive—is inconsistent with the trial record. There is no testimony or other evidence in the record establishing a link between a specific upfront payment and the per-ticket fees set in a contract between Ticketmaster and a venue. No venue witness testified that he or she agreed to higher ticketing fees to offset any upfront payments the venue received for items like sponsorship, hardware, marketing, or exclusivity, or that any of these discrete terms moved in sync or were tied together in any meaningful way during the negotiations. While there was evidence that the amount of the upfront payments, and any economic benefits received in return, could affect Ticketmaster's assessment of the overall *profitability* of a venue deal (J. Johnson, Trial Tr. 3939:20–23), Dr. Abrantes-Metz's analysis did not rest on (or even seek to address) the profitability of particular contracts with the venues. Abrantes-Metz, Trial Tr. 2579:15–2580:7.

In short, there is no trial evidence of a negotiated offset between upfront payments and ticketing fees that the opinions of Dr. Abrantes-Metz do not "fit." To the contrary, it is Defendants who speculate about non-existent offsets that appear nowhere in the trial record. Defendants' "fit" argument fails because they have not pointed to any facts in the record that would cause this Court to find that the opinion of Dr. Abrantes-Metz does not reflect a "reliable application" of her well-accepted methodology "to the facts of the case." Fed. R. Evid. 702(d). Defendants' "fit" argument fails because they have not pointed to any facts in the record showing that upfront payments were adjusted based upon the amount of ticketing fees charged or based on each subsequent ticket sale or the total number of tickets sold. That is the sort of evidence they would have to have introduced for this Court to find that venues and Ticketmaster treated upfront payments as marginal costs in setting ticket fees in their agreements. They did not do so.[7]

*Third*, Defendants' argument about fixed upfront payments being an offset to higher ticket fees also does not "fit" this case because there was evidence in the record that upfront payments were often made for valuable consideration. *See* Abrantes-Metz, Trial Tr. 2579:7–14 (upfront payments not typically "just a cash-in for nothing in return."). Defendants' own witnesses conceded, consistent with other witness testimony, that upfront payments were generally received in exchange for something else of value unrelated to the price of individual tickets, such as sponsorship or marketing rights. Budish, Trial Tr. 3249:8–3253:10, 3252:4–13; J. Johnson, Trial Tr. 3813–14; Abbamondi, Trial Tr. 229:11–24 (fixed sponsorship payments were in exchange for advertising rights such as signage or naming a gate); W. Johnson, Dep. Tr. 59:22–60:18 (fixed payments included those for "marketing opportunities, enhancements for the guest experience . . . [and] enhancement for the artist experience backstage"); Abrantes-Metz, Trial Tr. 2579:7–14; *see also* ECF No. 1385 at 5 (Defendants conceding that "sometimes [upfront payments] reflect other consideration"). Documentary evidence also supported this point, including Defendants' DAT documents, which showed that Ticketmaster paid fixed, upfront payments for, among other things, sponsorship rights, marketing, and hardware allowances. *See, e.g.*, DX404 at -

---

[7] Defendants could also have sought the upfront-payment data from AXS and tested whether deducting them from both AXS and Ticketmaster ticketing fees would change the damages estimate in a material way, though again, those payments would not change the marginal pricing decisions of either company. They did not do that either.

363, -366; DX553 at -662, -665 (used with Dr. Abrantes-Metz on cross-examination). This evidence is yet another reason why Defendants' speculation about upfront payments being an offset should be rejected under Rule 702 as a basis for exclusion. The jury could reasonably rely upon this evidence to credit the damages analysis of Dr. Abrantes-Metz.

The decisions in *Klein v. Meta Platforms, Inc* and *In re Sunday Ticket* are not to the contrary. *Klein* involved an expert applying a non-mainstream economic theory that was highly questionable— whether social media companies would pay for user data—that was supported only by a few articles that included the "speculations of their authors." 766 F. Supp. 3d at 962, 964. The expert's opinion in *Klein* also was unmoored from the record, which contained no evidence that the defendant had ever paid its users any price, including a "negative price." *Id.* at 963–64. That doesn't apply here; the only issue is whether fixed payments should be included in marginal price analysis. In *Sunday Ticket*, the experts assumed (i) that all out-of-market NFL games would be distributed for free based on a comparison to college football (despite the fact that not all out-of-market college football games were aired for free) and (ii) a competing direct-to-consumer product would have existed, despite a lack of evidence that a viable competitor to create the product existed and the lack of any analysis of that product's characteristics. *Sunday Ticket*, 2024 WL 3628118, at *6–8. Here, by contrast, Dr. Abrantes-Metz did not overlook upfront payments or fail to address them. She considered them and concluded they should not be deducted because they were not a marginal cost that would be considered in determining ticketing fees—an opinion that is supported by a "foundational" economic principle. Economists' Amicus at 2.

At bottom, the trial record reflects what often happens in complex litigation: "experts come to different conclusions based on contested sets of facts" whereby the answer is not to preclude one expert but to permit the jury to "decide which side's expert[] to credit." Fed. R. Evid. 702 advisory committee's note to 2023 amendment; *Bazemore v. Friday*, 478 U.S. 385, 400 (1986); *Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017). The issue of upfront payments was front and center during Defendants' cross-examination of Dr. Abrantes-Metz and their expert's response to her testimony. The jury was entitled to credit Dr. Abrantes-Metz's testimony that upfront payments did not impact how venues set their ticketing fees at the margin, and reject, based on the evidence presented, Defendants' arguments and expert testimony to the contrary. Because Defendants haven't shown that Dr. Abrantes-Metz committed any methodological error by applying a foundational economic principle—much less that any claimed error would materially affect her damages calculations—or that her opinions do not "fit" the evidence in the trial record, her testimony is admissible under Rule 702(d). There is thus no basis to disturb the jury's damages verdict.

IV.    <u>**Question No. 1 to Both Parties:**</u> **Is there any dispute that if a claim is time-barred based on the four-year limitations period, then laches would apply to bar any claim for equitable relief?**

For the reasons discussed in the Plaintiff States' briefs and at the July 31, 2026 hearing, all of the Plaintiff States' damages claims and penalty claims are timely. But even if the Court were to conclude that any of these claims were time barred, laches would not bar the Plaintiff States' claims for equitable relief.

*First*, Defendants have not presented any argument to show that the defense of laches would apply at all to any of the Plaintiff States' claims under their own *state laws*, where each state is the

sovereign, just as laches does not apply to the federal government where federal claims are asserted. At a minimum, this issue would require a state-by-state analysis and full briefing. *See State v. LG Elecs., Inc.*, 375 P.3d 636, 642–44 (Wash. 2016) (statute of limitations not applicable against State of Washington in antitrust enforcement action); *Capruso v. Village of Kings Point*, 23 N.Y.3d 631, 641–42 (2014) ("It is settled that the equitable doctrine of laches may not be interposed as a defense against the State when acting in a governmental capacity to enforce a public right or protect a public interest.") (internal quotation omitted); *New York v. United Parcel Serv., Inc.*, 160 F. Supp. 3d 629, 645–48 (S.D.N.Y. 2016), *reconsideration granted on other grounds*, No. 15-cv-1136 (S.D.N.Y. June 21, 2016) (laches and other equitable defenses not applicable to state or local government pursing enforcement action). The only case cited by Defendants, *New York v. Meta Platforms, Inc.*, is limited by its terms to equitable antitrust claims under federal law, specifically 15 U.S.C. § 26, where the court found that, as a matter of "statutory interpretation," laches could lie against states. 66 F.4th 288, 299 (D.C. Cir. 2023).

*Second*, even as to the Plaintiff States' federal law claims, *Meta* does not support a defense of laches. *Meta*, an out-of-circuit authority, is not binding, and other cases, including one in this district, have declined to apply laches to states bringing federal antitrust claims, at least without a full inquiry on the specific circumstances of the case. *See In re Google Digital Advertising Antitrust Litig.*, 627 F. Supp. 3d 346, 406 (S.D.N.Y. 2022) (declining to apply laches on motion to dismiss); *Massachusetts ex rel. Belliotti v. Russel Stover Candies, Inc.*, 541 F. Supp. 143, 145 (D. Mass. 1982) (laches does not lie against state enforcing antitrust laws).

And *Meta* was clear that a defendant is still required to show the traditional elements of laches— (1) undue delay and (2) material prejudice. 66 F.4th at 295; *see also King. v. Innovation Books*, 976 F.2d 824, 832 (2d Cir. 1992); *Advanced Cardiovascular Systems, Inc. v. Scimed Life Systems, Inc.*, 988 F.2d 1157, 1163 (Fed. Cir. 1993) ("[U]nlike a statutory period of limitation on suit, the presumption of laches is rebuttable. The presumption serves to place upon the [plaintiff] the burden of coming forward with evidence that the delay is reasonable and excusable."). And even if both factors are established, a court retains discretion to deny the defense. *See Pecorino v. Vutec Corp.*, 6 F. Supp. 3d 217, 221 (E.D.N.Y. 2013) ("[T]he establishment of the factors of undue delay and prejudice, whether by actual proof or by the presumption, does not *mandate* recognition of a laches defense in every case. Laches remains an equitable judgment of the trial court in light of all the circumstances.") (internal quotations omitted) (emphasis in original).

As to the first element, there is no basis to find the Plaintiff States unduly delayed pursuing their rights. In *Meta*, the court acknowledged that the statute of limitations was only a "guideline" for assessing undue delay, and the fact that legal claims might be untimely under the applicable statute of limitations was not dispositive. *Id.* at 300; *see also Vasquez v. Indiana Univ. Health, Inc.*, 40 F.4th 582, 588 (7th Cir. 2022) (asserting that "we treat the laches defense at issue here as rising or falling with the statute of limitations defense, though it need not in every case."); *Argus Inc. v. Eastman Kodak Co.*, 552 F. Supp. 589, 599–600 (S.D.N.Y. 1982) (denying summary judgment with respect to claims for equitable relief despite plaintiffs' undue delay because defendants failed to establish prejudice); P. Areeda & H. Hovenkamp, Antitrust Law*: An Analysis of Antitrust Principles and Their Application*, ¶ 320g (4th ed. 2023) ("Extending the period during which a plaintiff may seek an injunction beyond the four-year statute of limitation is occasionally justified."). Here, Defendants were subject to a pending consent order that had a monitor charged with overseeing compliance with the order's terms. When further anticompetitive conduct was reported, an amended consent order was pursued. And before that amended consent order expired, the Plaintiff States sued. The Plaintiff States, as government enforcers, acted reasonably in waiting to see if the consent orders would be an effective remedy before pursuing further action. *See* Areeda & Hovenkamp, ¶ 320g ("Delay is also justifiable, especially on the government's



part, when it serves antitrust policy. For example, there may be good reason not to sue unlawful monopolies until they prove resistant to self-correcting natural market forces."); *Dale v. Deutsche Telecom AG*, 2023 WL 7220054, at \*16 (N.D. Ill. Nov. 2, 2023) (plaintiffs entitled to wait until two years following merger to mount challenge in order to evaluate Defendant's compliance with pre-merger commitments).

As to the second element, Defendants have not put any facts into the record establishing material prejudice or argued how they have been specifically harmed by purportedly delayed enforcement. Even if Defendants could establish that laches applies here and that the Plaintiff States had unduly delayed— and for the reasons above, it is unlikely they can—Defendants would still be required to make this showing. *See Holmberg v. Armbrecht,* 327 U.S. 392, 396 (1946) ("[L]aches is not, like limitation, a mere matter of time; but principally a question of the inequity of permitting the claim to be enforced.") (internal quotations omitted). As the parties previously agreed, the proper forum for this would be a subsequent remedies proceeding, in which both parties would have an opportunity to address these issues. Trial Tr. 4543:8–4551:13.[8] Nothing in the record provides a basis for the Court to apply laches to the issues put before the jury at this time.

V.      **Question No. 2 to Both Parties: Focusing on the Large Amphitheater market, what is your best example of a case where a similar set of facts, either in terms of quality or thrust, either was or wasn't sufficient to give rise to a viable antitrust market?**

A discrete group of customers with a strong preference is exactly what supports a distinct relevant market where the preference is strong enough that the group would not switch based on a price increase. This principle is set forth in Defendants' own authority: *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 107 (2d Cir. 2002), asks whether there is a "discrete class of customers that ha[ve] such a strong preference for [the product] that it would not consider substitutes if other factors (especially price) changed." The jury found that standard satisfied here and found a Large Amphitheaters market. The evidence reasonably supports that verdict.

As noted at the hearing, there are several cases where courts have sustained market definitions based on distinct demand of a material group of customers with strong preferences.  *See* 7.31.2026 Hearing Tr. at 78:19–79:18; *see also Le v. Zuffa, LLC*, 216 F. Supp. 3d 1154, 1159–60 (D. Nev. 2016) ("[L]ive Elite Professional MMA bouts" market, because the industry itself distinguished elite from non-elite and such "distinctions . . . will vary from sport to sport"); *FTC v. Meta Platforms Inc.*, 654 F. Supp. 3d 892, 912, 917 (N.D. Cal. 2023) ("[Virtual Reality] dedicated fitness apps" market, because consumers seeking that experience did not treat general VR entertainment as a reasonable substitute); *Bertelsmann*, 646 F. Supp. 3d at 11–15, 33–35. And Defendants' prior counterexample, *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676 (4th Cir. 2016), has already been twice considered by this Court and found not to be a bar to Plaintiffs' Large Amphitheater market claim. *See* ECF No. 1528 at 4; ECF No. 1037 at 13; ECF No. 1079 at 3. Significantly, in that case, there were no ordinary-course documents in which the defendant itself recognized the distinct market at the boundaries the plaintiff proposed.  *See generally It's My Party*, 811 F.3d 676. Here, Plaintiffs presented such evidence.

---

[8] The Plaintiff States also understand Defendants may intend to argue that individual States' statutes of limitation may impact the amount of penalties available under certain State laws. The parties likewise agreed to reserve those issues until the remedies phase. *See id.*



For example, the jury reviewed evidence that Live Nation knew it could increase prices to artists who wanted to appear at Large Amphitheaters because they had nowhere else to go.[9] Multiple witnesses identified the substantial number of artists who want to do Large Amphitheater tours because of their preferences and those of their audiences. *See, e.g.*, Geiger, Trial Tr. 495:18–496:12; Marciano, Trial Tr. 949:5–15; Hill, Trial Tr. 2129:24–2130:5; Weeden, Trial Tr. 3587:20–22 (admitting "there's certain artists that want to play amphitheaters, you know, the Dave Matthews of the world, the Jack Johnson's of the world, it's a better vibe outside."). Defendants' own artist-manager witness, Coran Capshaw, on direct examination *rejected* the suggestion that the artists who prefer amphitheater-only tours was a "relatively rare occurrence," instead testifying: "There's artists that play amphitheaters and do, you know, just really almost all their shows in them because I think, again, fans enjoy the—my opinion— fans enjoy the outdoor experience and amphitheaters give us an opportunity to have lower prices on the lawns and that seating. And, you know, amphitheaters, I think, enhance ticket sales." Capshaw Tr. 4242:9–14; *see also id* 4275:16–4276:25 (explaining how some artists cultivate an amphitheater experience).

This testimony was more than sufficient for the jury to reasonably find that there existed a sufficiently large cohort of artists who preferred appearing at Large Amphitheaters, and thus were susceptible to price increases by a hypothetical monopolist, regardless of cross-shopping by artists who may play other concerts at other venues. *See FTC v. Tapestry, Inc.*, 755 F. Supp. 3d 386, 415–16, 454–56 (S.D.N.Y. 2024).

Defendants claim their best case on whether Plaintiffs had met their burden in establishing a Large Amphitheater market is *United States v. Sungard Data Sys.* (*see* 7.31.2026 Hearing Tr. at 15:12– 16), which challenged a merger between providers of "shared hotsite disaster recovery services for mainframe and midrange computers"—essentially the technological precursor to internet cloud-based backup. 172 F. Supp. 2d 172, 174 (D.D.C. 2001). Defendants' *Sungard* theory—that the evidence at trial about artists who prefer amphitheaters was not representative of a group "substantial enough" to define a relevant market, *id.* at 192; 07.31.2026 Hearing Tr. 14:7–15:16—appears nowhere in their briefing. Nor

---

[9] *See* PX0806 at -773 (Lovett: "As an artist I know I'd want to play this amphitheater for 8% less walkout all day long"); PX0422 at -676 (Roux: "Many of the Non-Superstar Artists have pre-determined to play Amps when we get the call, and these are the acts or tours, where we may have some room for tighter negotiations and deals."); PX0777 at -566 (Colin Lewis: "These guarantees are historically what we paid in the past and there's no reason to pay [artists Snoop Dogg and Wiz Khalifa] more because they don't have options to play other amps."); PX0893 at -866 (Roux: "Don't push Guarantees to get 'True Amp Tours' confirmed. When we know they are likely playing Amphitheaters we are going to get those in most cases, so don't need to press above deals we've already submitted."); Lovett, Dep. Tr. 92:13–93:13 (testifying about PX0806); Roux, Trial Tr. 1275:1–16 (testifying about PX0422); Lewis, Trial Tr. 1999:14–2000:16 (testifying about PX0777); Roux, Trial Tr. 1272:6–1281:4 (testifying about PX0893); Hill, Trial Tr. 2128:21–2129:20 (61% of artists who previously did an amphitheater tour and toured again during amphitheater season did another amphitheater tour as their next tour); 07.31.2026 Hearing Tr. 7:3–11:12, 12:18–13:2.

did they make the argument or cite *Sungard* in their Rule 50(a) papers, or raise the argument before trial.[10]

But even if the Court does not consider this argument waived, the decision in *Sungard* is no bar to Plaintiffs' Large Amphitheater market claims. In *Sungard*, the court did not find the customers for whom the United States submitted declarations regarding their switching behavior to be "representative of the entire client base for the product." *Id.* at 190–92. The court acknowledged some of these customers would not substitute in response to a SSNIP, but found the government had "failed, however, to show whether this captive group is substantial enough that a hypothetical monopolist would find it profitable to impose such an increase in price." *Id.* at 191–92. That is not the case here, where the evidence shows exactly that—there were artists who were sufficiently captive to Large Amphitheaters that Live Nation believed it could raise their prices or reduce their guarantees without competitive consequences. *Supra* 10 n.9.

Further, Dr. Hill quantified the pattern that demonstrated the strong preference of a large group of artists to appear in national Large Amphitheater tours. For those artists who had done a national Large Amphitheater tour, Dr. Hill found that 61% of them did another Large Amphitheater tour the next season. Hill, Trial Tr. 2128:21–2129:20. And Defendants' own expert on this issue conceded the preference of these artists. Yurukoglu, Trial Tr. 4305:18–22 ("There are some artists, we've heard, it's indisputable, at least a few artists, who like amphitheaters. . . . There's artists who really prefer amphitheaters."). It was up to the jury to determine whether this evidence was sufficient to support Plaintiffs' Large Amphitheater market claims. *See* ECF No. 1037 at 15.[11]

Respectfully submitted,

*/s/ Jeffrey L. Kessler*
Jeffrey L. Kessler

cc:    All Counsel of Record

*[Counsel Signature Blocks to Follow]*

---

[10] The same applies to *United States v. Engelhard Corp.*, 126 F.3d 1302 (11th Cir.1997), which Defendants mentioned even more briefly at the July 31, 2026 Hearing, and on which *Sungard* heavily relied. 7.31.2026 Hearing Tr. at 15:14–16.

[11] Aside from artists' preferences, there is sufficient evidence in the record to support Dr. Hill's capacity and concert thresholds. *See, e.g.*, ECF No. 1528 at 3–4; Weeden, Trial Tr. 3601:2–7 (confirming that Live Nation maintains separate lines of business for large amphitheaters and boutique amphitheaters and that large amphitheaters have "the highest AOI of any venue type"); *id.* 3647:6–14 (agreeing that anything below ten concerts is a low show count); PX0867 at -697 (internal Live Nation email stating that "[t]he standard cutoff for us between Boutique/Large Amp . . . is 8000 cap[acity]"); Roux, Trial Tr. 1309:13–16 (Large Amphitheater profits nearly tripled between 2019 and 2024).

**WINSTON TAYLOR.**

**WINSTON TAYLOR LLP**

Jeffrey L. Kessler
Eva W. Cole
Johanna Rae Hudgens
200 Park Avenue
New York, NY 10166
Tel: (212) 294-6700
Fax: (212) 294-4700
jeffrey.kessler@winstontaylor.com
eva.cole@winstontaylor.com
johanna.hudgens@winstontaylor.com

Jeanifer E. Parsigian (*pro hac vice*)
**WINSTON TAYLOR LLP**
101 California Street, 21st Floor
San Francisco, CA 94111
Tel: (415) 591-1000
Fax: (415) 591-1400
jen.parsigian@winstontaylor.com

*/s/ Jonathan H. Hatch*
Jonathan H. Hatch
Assistant Attorney General
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8598
Email: jonathan.hatch@ag.ny.gov

*Counsel for Plaintiff State of New York*

*/s/ Robert A. Bernheim*
Robert A. Bernheim (admitted *pro hac vice*)
Office of the Arizona Attorney General Consumer
Protection & Advocacy Section
2005 N. Central Avenue
Phoenix, AZ 85004
Telephone: (602) 542-3725
Fax: (602) 542-4377
Email: Robert.Bernheim@azag.gov
*Attorney for Plaintiff State of Arizona*

*/s/ Brent Nakamura*
Brent Nakamura (admitted *pro hac vice*)

Supervising Deputy Attorney General
Office of the Attorney General
California Department of Justice
300 South Spring Street
Los Angeles, CA 90013
Telephone: (213) 269-6000
Email: Brent.Nakamura@doj.ca.gov
*Attorney for Plaintiff State of California*

*/s/ Conor J. May*
Conor J. May (admitted *pro hac vice*)
Assistant Attorney General
Antitrust Unit
Colorado Department of Law
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email: Conor.May@coag.gov
*Attorney for Plaintiff State of Colorado*

*/s/ Nicole Demers*
Nicole Demers (admitted *pro hac vice*)
Assistant Attorney General
Office of the Attorney General of Connecticut
165 Capitol Avenue
Hartford, CT 06106
Telephone: 860-808-5030
Email: Nicole.Demers@ct.gov
*Attorney for Plaintiff State of Connecticut*

*/s/ Adam Gitlin*
Adam Gitlin (admitted *pro hac vice*)
Chief, Antitrust and Nonprofit Enforcement Section
Office of the Attorney General for the District of Columbia
400 6th Street NW, 10th Floor
Washington, DC 20001
Email: Adam.Gitlin@dc.gov
*Attorney for Plaintiff District of Columbia*

*/s/ Lizabeth A. Brady*
Lizabeth A. Brady
Director, Antitrust Division
Florida Office of the Attorney General
PL-01 The Capitol
Tallahassee, FL 32399-1050

Telephone: 850-414-3300
Email: Liz.Brady@myfloridalegal.com
*Attorney for Plaintiff State of Florida*

/s/ *Richard S. Schultz*
Richard S. Schultz (admitted *pro hac vice*)
Assistant Attorney General
Office of the Illinois Attorney General
Antitrust Bureau
115 S. LaSalle Street, Floor 23
Chicago, Illinois 60603
Telephone: (872) 272-0996
Email: Richard.Schultz@ilag.gov
*Attorney for Plaintiff State of Illinois*

/s/ *Jennifer Linsey*
Jennifer Linsey (admitted *pro hac vice*)
Deputy Attorney General
Office of the Indiana Attorney General
302 W. Washington St., Fifth Floor
Indianapolis, IN 46204
Telephone: 463-261-7401
Email: Jennifer Linsey@atg.in.gov
*Attorney for Plaintiff State of Indiana*

/s/ *Christopher Teters*
Christopher Teters (admitted *pro hac vice*)
Assistant Attorney General
Public Protection Division
Office of Kansas Attorney General
120 S.W. 10th Avenue, 2nd Floor
Topeka, KS 66612-1597
Telephone: (785) 296-3751
Email: chris.teters@ag.ks.gov
*Attorney for Plaintiff State of Kansas*

/s/ *Mario Guadamud*
Mario Guadamud (admitted *pro hac vice*)
Louisiana Office of Attorney General
1885 North Third Street
Baton Rouge, LA 70802
Telephone: (225) 326-6400
Fax: (225) 326-6498
Email: GuadamudM@ag.louisiana.gov
*Attorney for Plaintiff State of Louisiana*

/s/ Schonette J. Walker
Schonette J. Walker (admitted *pro hac vice*)
Assistant Attorney General
Chief, Antitrust Division
200 St. Paul Place, 19th floor
Baltimore, Maryland 21202
Telephone: (410) 576-6470
Email: swalker@oag.state.md.us
*Attorney for Plaintiff State of Maryland*

/s/ Katherine W. Krems
Katherine W. Krems (admitted *pro hac vice*)
Assistant Attorney General, Antitrust Division
Office of the Massachusetts Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (617) 963-2189
Email: Katherine.Krems@mass.gov
*Attorney for Plaintiff Commonwealth of Massachusetts*

/s/ LeAnn D. Scott
LeAnn D. Scott (admitted *pro hac vice*)
Assistant Attorney General
Corporate Oversight Division
Michigan Department of Attorney General
P.O. Box 30736
Lansing, MI 48909
Telephone: (517) 335-7632
Email: ScottL21@michigan.gov
*Attorney for Plaintiff State of Michigan*

/s/ Zach Biesanz
Zach Biesanz
Senior Enforcement Counsel Antitrust Division
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
Saint Paul, MN 55101
Telephone: (651) 757-1257
Email: zach.biesanz@ag.state.mn.us
*Attorney for Plaintiff State of Minnesota*

/s/ Lucas J. Tucker
Lucas J. Tucker (admitted *pro hac vice*)
Senior Deputy Attorney General
Office of the Nevada Attorney General
Bureau of Consumer Protection

100 N. Carson St.
Carson City, NV 89701
Email: ltucker@ag.nv.gov
*Attorney for Plaintiff State of Nevada*

/s/ *Zachary Frish*
Zachary A. Frish (admitted *pro hac vice*)
Assistant Attorney General
Consumer Protection & Antitrust Bureau
New Hampshire Attorney General's Office
Department of Justice
1 Granite Place South
Concord, NH 03301
Telephone: (603) 271-2150
Email: zachary.a.frish@doj.nh.gov
*Attorney for Plaintiff State of New Hampshire*

/s/ *Andrew F. Esoldi*
Andrew F. Esoldi
Deputy Attorney General
Division of Law
Antitrust Litigation and Competition Enforcement
124 Halsey Street, 5th Floor
Newark, NJ 07101
Telephone: (609) 696-5465
Email: Andrew.Esoldi@law.njoag.gov
*Attorney for Plaintiff State of New Jersey*

/s/ *Evan Crocker*
Evan Crocker (admitted *pro hac vice*)
Assistant Attorney General, Division Director
Consumer Affairs Division
New Mexico Department of Justice
201 3rd St NW, Suite 300
Albuquerque, NM 87102
Telephone: (505) 494-8973
Email: ecrocker@nmdoj.gov
*Attorney for Plaintiff State of New Mexico*

/s/ *Francisco Benzoni*
Francisco Benzoni (admitted *pro hac vice*)
Special Deputy Attorney General
Brian Rabinovitz (admitted *pro hac vice*)
Special Deputy Attorney General
North Carolina Department of Justice
Post Office Box 629

**WINSTON
TAYLOR.**

Raleigh, North Carolina 27602
Telephone: (919) 716-6000
Facsimile: (919) 716-6050
Email: fbenzoni@ncdoj.gov
Email: brabinovitz@ncdoj.gov
*Attorneys for Plaintiff State of North Carolina*

*/s/ Sarah Mader*
Sarah Mader (admitted *pro hac vice)*
Assistant Attorney General
Antitrust Section
Office of the Ohio Attorney General
30 E. Broad St., 26th Floor
Columbus, OH 43215
Telephone: (614) 466-4328
Email: Sarah.Mader@OhioAGO.gov
*Attorney for Plaintiff State of Ohio*

*/s/ Gina Ko*
Gina Ko (admitted *pro hac vice*)
Assistant Attorney General
Economic Justice Section
Oregon Department of Justice
100 SW Market St.,
Portland, Oregon 97201
Telephone: (971) 673-1880
Fax: (503) 378-5017
Email: Gina.Ko@doj.oregon.gov
*Attorney for Plaintiff State of Oregon*

*/s/ Joseph S. Betsko*
Joseph S. Betsko (admitted *pro hac vice*)
Assistant Chief Deputy Attorney General
Antitrust Section
Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
Telephone: (717) 787-4530
Email: jbetsko@attorneygeneral.gov
*Attorney for Plaintiff Commonwealth of Pennsylvania*

*/s/ Paul T.J. Meosky*
Paul T.J. Meosky (admitted *pro hac vice*)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903

Telephone: (401) 274-4400, ext. 2064
Fax: (401) 222-2995
Email: pmeosky@riag.ri.gov
*Attorney for Plaintiff State of Rhode Island*

/s/ *Jared Q. Libet*
Jared Q. Libet (admitted *pro hac vice*)
Assistant Deputy Attorney General
Office of the Attorney General of South Carolina
P.O. Box 11549
Columbia, South Carolina 29211
Telephone: (803) 734-5251
Email: jlibet@scag.gov
*Attorney for Plaintiff State of South Carolina*

/s/ *Hamilton Millwee*
Hamilton Millwee (admitted *pro hac vice*)
Assistant Attorney General
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 38202
Telephone: (615) 291-5922
Email: Hamilton.Millwee@ag.tn.gov
*Attorney for Plaintiff State of Tennessee*

/s/ *Diamante Smith*
Diamante Smith (admitted *pro hac vice*)
Assistant Attorney General, Antitrust Division
Office of the Attorney General of Texas
P.O. Box 12548
Austin, TX 78711-2548
Telephone: (512) 936-1162
diamante.smith@oag.texas.gov
*Attorney for Plaintiff State of Texas*

/s/ *Marie W.L. Martin*
Marie W.L. Martin (admitted *pro hac vice*)
Deputy Division Director,
Antitrust & Data Privacy Division
Utah Office of Attorney General
160 East 300 South, 5th Floor
P.O. Box 140830
Salt Lake City, UT 84114-0830
Telephone: 801-366-0375
Email: mwmartin@agutah.gov
*Attorney for Plaintiff State of Utah*

*/s/ Sarah L. J. Aceves*
Sarah L. J. Aceves (admitted *pro hac vice*)
Assistant Attorney General
Consumer Protection and Antitrust Unit
Vermont Attorney General's Office
109 State Street
Montpelier, VT 05609
Telephone: (802) 828-3170
Email: sarah.aceves@vermont.gov
*Attorney for Plaintiff State of Vermont*

*/s/ David C. Smith*
David C. Smith (admitted *pro hac vice*)
Assistant Attorney General
Office of the Attorney General of Virginia
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 692-0588
Facsimile: (804) 786-0122
Email: dsmith@oag.state.va.us
*Attorney for Plaintiff Commonwealth of Virginia*

*/s/ Ashley A. Locke*
Ashley A. Locke (admitted *pro hac vice*)
Assistant Attorney General
Antitrust Division
Washington Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
Telephone: (206) 389-2420
Email: Ashley.Locke@atg.wa.gov
*Attorney for Plaintiff State of Washington*

*/s/ Douglas L. Davis*
Douglas L. Davis (admitted *pro hac vice*)
Senior Assistant Attorney General
Consumer Protection and Antitrust Section
West Virginia Office of Attorney General
P.O Box 1789
Charleston, WV 25326
Telephone: (304) 558-8986
Fax: (304) 558-0184
Email: douglas.l.davis@wvago.gov
*Attorney for Plaintiff State of West Virginia*

**WINSTON TAYLOR.**

*/s/ Caitlin M. Madden*
Caitlin M. Madden (admitted *pro hac vice*)
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
Telephone: (608) 267-1311
Email: caitlin.madden@wisdoj.gov
*Attorney for Plaintiff State of Wisconsin*

*/s/ William T. Young*
William T. Young
Assistant Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
Telephone: (307) 777-7847
Email: william.young@wyo,gov
*Attorney for the Plaintiff State of Wyoming*

**WINSTON TAYLOR.**

**EXHIBIT A**

**Question 1 to Plaintiffs:** On any of the issues raised by defendants' motions, is there any material additional evidence that you wish to direct the Court's attention to, other than what is cited in your briefs?

*Plaintiffs' Supplemental Evidence Chart*

| Evidence Cite | Description/Quote | Point it Pertains to in Defendants' Brief (Rule 59 or Rule 50) | Plaintiffs' Argument |
|---|---|---|---|
| **Geiger, Trial Tr. 503:12–21** | "Q. You mentioned earlier that you had artist clients who did a tour promoted by Live Nation. Did your artist clients ever seek permission from Live Nation to play a show outside of their tour deal utilizing a different promoter? A. Yes. Q. And in your experience, was Live Nation willing to allow your artist clients to play a particular venue promoted by someone else? A. Many years ago the exceptions were much easier than more recently. There's less exceptions made recently." | Responds to Defendants' argument that Plaintiffs offered no evidence of coercion or of any artist forced to purchase Live Nation promotion services. Defs.' Rule 50 at 12, Defs.' Rule 50 Reply at 7, Defs.' Rule 59 at 21. | This testimony demonstrates that artists and their agents do want to use other promoters but are increasingly unable to do so, directly contradicting Defendants' claim that no artist was "coerced" or preferred other options. |
| **Roux, Trial Tr. 1388:14–1389:17** | Testifying that Live Nation admitted a rival promoter to gain business from Kenny Chesney, whom Live Nation "bought . . . from Louis [Messina], effectively, for a few years" ahead of a Messina-promoted stadium date and that Live Nation lost a bid to promote Shawn Mendes due to its exclusivity policy. | Responds to Defendants' arguments that Plaintiffs offered no evidence of coercion and that Live Nation's closed-amphitheater policy does not establish tying. Defs.' Rule 50 at 12–13, Rule 59 at 21, Rule 50 Reply at 6. | Roux's own testimony provides examples of artists who declined Live Nation's exclusivity requirements, from which the jury could have reasonably inferred that non-superstar artists would have been forced to accept Live Nation's promoter services. |
| **Lewis, Trial Tr. 2010:7–23** | Live Nation's large-amphitheater line-of-business leader testifying that Live | Responds to Defendants' argument that Plaintiffs' tying claim fails because | This testimony, from Live Nation's own executive, confirms |

| Evidence Cite | Description/Quote | Point it Pertains to in Defendants' Brief (Rule 59 or Rule 50) | Plaintiffs' Argument |
|---|---|---|---|
| | Nation admits outside promoters into its amphitheaters only where it does not "perceive the other company to be as competitive or competing for the same artist," and that as to direct competitors like AEG, "[w]e don't go into their venues, they don't go into ours". | the record contains no evidence that any artist was forced to purchase Live Nation promotion services, and that Plaintiffs rely only on Live Nation's policy of excluding rival promoters from its venues. Defs.' Rule 50 at 11–12. | the policy exists and that it is applied specifically against competitive promoters, proving coercion through an unremitting policy. |
| **Al-joulani, Trial Tr. 2987:5–11** | Testifying that rival promoters are admitted only "on a case-by-case basis," that any exceptions are limited to local, faith-based, or "ethnic promoters," and that "we don't, as a matter of course . . . on a regular basis, let third-party competitors in." | Responds to Defendants' characterization of Plaintiffs' tying theory as a non-cognizable refusal-to-deal claim based on Live Nation's assertedly lawful policy of refusing to deal with promoter competitors at its amphitheaters. Defs.' Rule 50 at 12–13. | Al-joulani's own admission confirms the policy is unremitting, with only marginal exceptions for non-competitive promoters, the very "unremitting policy" that satisfies the coercion element. |
| **Al-joulani, Trial Tr. 2988:21– 2989:10** | Testifying that various artists use multiple promoters on tours, even when those tours include Live Nation venues. | Responds to Defendants' argument that Plaintiffs' tying claim fails because the record contains no evidence that any artist was forced to purchase Live Nation promotion services, and that Plaintiffs rely only on Live Nation's policy of excluding rival promoters from its venues. Defs.' Rule 50 at 11–12. | This testimony demonstrates that artists, when given a choice, chose promoters other than Live Nation. |
| **Lovett, Dep. Tr. 73:16–23** | Testifying that Mumford & Sons used promoters other than Live Nation on recent shows. | Responds to Defendants' argument that Plaintiffs' tying claim fails because the record contains no evidence that any artist was forced to purchase Live Nation promotion | This artist testimony demonstrates that artists, when given a choice, chose promoters other than Live Nation. |

**WINSTON TAYLOR.**

| Evidence Cite | Description/Quote | Point it Pertains to in Defendants' Brief (Rule 59 or Rule 50) | Plaintiffs' Argument |
|---|---|---|---|
| | | services, and that Plaintiffs rely only on Live Nation's policy of excluding rival promoters from its venues. Defs.' Rule 50 at 11–12. | |
| **Smith, Dep. Tr. 35:4–21** | Testifying that the "vast majority of concerts held at Hayden Homes are promoted by Live Nation," but that "[t]here have been some exceptions," including select co-promotions (Anderson .Paak, Sturgill Simpson, Bonnie Rait) and that Chris Stapleton's tour was promoted by AEG. | Responds to Defendants' arguments that Plaintiffs offered no evidence of coercion and that Live Nation's closed-amphitheater policy is merely a lawful refusal to deal with rival promoters. Defs.' Rule 50 at 12–13. | Exceptions to Live Nation's policy, even if very limited, are evidence that the artists who sought and/or obtained those exceptions wanted to use other promoters. |
| **PX0679 at -951, -963, -965** | March 2024 Live Nation internal deck stating that "[h]istorically only Live Nation promoters are permitted to book shows at Venue Nation amphitheaters" and noting limited exceptions to policy ("92% of large amp shows were subject to baseline agreement in 2023"). | Responds to Defendants' limitations argument that Live Nation's closed-amphitheater policy has been in place since before May 23, 2020 and remained fundamentally unchanged. Defs.' Rule 50 at 13–14. | This 2024 internal document is a direct admission of the exclusionary policy, squarely within the limitations period, confirming that "only Live Nation promoters are permitted to book shows" at its amphitheaters. |
| **Roux, Trial Tr. 1272:6–1277:4 (testifying about PX0422)** | "Non-Superstar" artists were already committed to amphitheaters, giving LN room to seek "tighter negotiations and deals" to improve its own profitability. | Responds to Defendants' arguments that Plaintiffs failed to show inelastic demand for amphitheaters or anticompetitive effects on artists, including evidence that artists paid more because of Live Nation's conduct. Defs.' Rule 50 at 5–10; Defs.' Rule 50 Reply at 3–6. | This admission, from Live Nation's own executive, directly proves inelastic demand: when artists are "likely playing amphitheaters," Live Nation knows it does not need to offer competitive deals because artists lack alternatives. |

**WINSTON TAYLOR.**

| Evidence Cite | Description/Quote | Point it Pertains to in Defendants' Brief (Rule 59 or Rule 50) | Plaintiffs' Argument |
|---|---|---|---|
| **Roux, Trial Tr. 1280:6–1281:4 (testifying about PX0893)** | Agreeing that it is a "totally accurate statement" that "When [Live Nation] know[s] [artists] are likely playing amphitheaters, we are going to get those in most cases, so we don't need to press above deals we've already submitted." | Responds to Defendants' arguments that Plaintiffs failed to show inelastic demand for amphitheaters or anticompetitive effects on artists, including any evidence that artists paid more because of Live Nation's conduct. Defs.' Rule 50 at 5–10; Defs.' Rule 50 Reply at 3–6. | This admission, from Live Nation's own executive, directly proves inelastic demand: when artists are "likely playing amphitheaters," Live Nation knows it does not need to offer competitive deals because artists lack alternatives. |
| **Campana, Trial Tr. 1487:1, 1489:2–10** | 1487:1 ("arts organizations are world famous for overpaying artists")<br><br>1489:2–10 (". . . when you have to compete with someone else for talent to promote in a market, that competition could cause you to increase how much you pay the artist, correct?<br>A. Basic premise of competition, yes, sir.<br>Q. And if you don't have such competition, you might be able<br>to just decide to pay whatever you think is fair, correct? That's just how it works?<br>A. Well, the artist may not decide to come to that market.") | Responds to Defendants' arguments that Plaintiffs failed to show inelastic demand for amphitheaters or anticompetitive effects on artists, including any evidence that artists paid more because of Live Nation's conduct. Defs.' Rule 50 at 5–10; Defs.' Rule 50 Reply at 3–6. | In conjunction with testimony that in 40+ markets, artists can only play Live Nation amphitheaters, Campana's testimony shows that Live Nation could leverage its market control to dictate prices to artists with minimal competitive pressure. |
| **Lewis, Trial Tr. 1999:14–2000:16 (testifying** | Acknowledging statement that "there's no reason to pay them more because they don't have options to play other amps" | Responds to Defendants' arguments that Plaintiffs failed to show inelastic demand for amphitheaters or anticompetitive effects | Lewis's own words, "no reason to pay them more because they don't have options to play other |

**WINSTON TAYLOR.**

| Evidence Cite | Description/Quote | Point it Pertains to in Defendants' Brief (Rule 59 or Rule 50) | Plaintiffs' Argument |
|---|---|---|---|
| **about PX0777)** | when referring to Snoop Dogg and Wiz Khalifa. | on artists, including any evidence that artists paid more because of Live Nation's conduct. Defs.' Rule 50 at 5–10; Defs.' Rule 50 Reply at 3–6. | amps," are direct evidence of monopoly power and inelastic demand in the amphitheater market. |
| **PX0777 at -566** | November 2021 Live Nation email chain regarding 2022 Snoop Dogg and Wiz Khalifa guarantees, in which Colin Lewis directed his team that "[t]hese guarantees are historically what we paid in the past" and "there's no reason to pay them more because they don't have options to play other amps." | Responds to Defendants' arguments that Plaintiffs failed to show inelastic demand for amphitheaters or anticompetitive effects on artists, including any evidence that artists paid more because of Live Nation's conduct. Defs.' Rule 50 at 5–10; Defs.' Rule 50 Reply at 3–6. | This contemporaneous business document contains an admission that Live Nation knowingly exploited its amphitheater monopoly to suppress artist compensation. |
| **Hill, Trial Tr. 2128:21–2129:20** | Testifying that 61% of artists who had previously done an amphitheater tour did another amphitheater tour, for their next tour, that took place during amphitheater season. | Responds to Defendants' arguments that Plaintiffs failed to show inelastic demand for amphitheaters or anticompetitive effects on artists, including any evidence that artists paid more because of Live Nation's conduct. Defs.' Rule 50 at 5–10; Defs.' Rule 50 Reply at 3–6. | This expert testimony quantifies the inelastic demand for amphitheaters among artists who consistently play in them. |
| **Weeden, Trial Tr. 3587:20–22** | Admitting "there's certain artists that want to play amphitheaters, you know, the Dave Matthews of the world, the Jack Johnson's of the world, it's a better vibe outside." | Responds to Defendants' argument that Plaintiffs failed to prove a substantial group of artists with inelastic demand for amphitheaters. Defs.' Rule 50 at 6–10; Defs.' Rule 50 Reply at 3–6. | Defendants' own executive acknowledged a group of artists with strong amphitheater preferences, directly contradicting Defendants' claim that Plaintiffs failed to prove inelastic demand. |

**WINSTON TAYLOR.**

| Evidence Cite | Description/Quote | Point it Pertains to in Defendants' Brief (Rule 59 or Rule 50) | Plaintiffs' Argument |
|---|---|---|---|
| **Capshaw, Trial Tr. 4242:9–14** | "There's artists that play amphitheaters and do, you know, just really almost all their shows in them because I think, again, fans enjoy the— my opinion—fans enjoy the outdoor experience and amphitheaters give us an opportunity to have lower prices on the lawns and that seating. And, you know, amphitheaters, I think, enhance ticket sales." | Responds to Defendants' argument that Plaintiffs failed to prove a substantial group of artists with inelastic demand for amphitheaters. Defs.' Rule 50 at 6–10; Defs.' Rule 50 Reply at 3–6. | Defendants' own artist-manager witness confirmed that artists play "almost all their shows" in amphitheaters because of the distinct fan experience and pricing advantages, demonstrating a strong, persistent preference sufficient to define a market. |
| **Yurukoglu, Trial Tr. 4305:18–22** | "There are some artists, we've heard, it's indisputable, at least a few artists, who like amphitheaters. . . . There's artists who really prefer amphitheaters." | Responds to Defendants' argument that Plaintiffs failed to prove a substantial group of artists with inelastic demand for amphitheaters. Defs.' Rule 50 at 6–10; Defs.' Rule 50 Reply at 3–6. | Defendants' own expert conceded that artist preference for amphitheaters is "indisputable," effectively conceding the predicate for Plaintiffs' market definition claim. |
| **Hill, Trial Tr. 2129:24–2130:5** | Testimony identifying artists who want to do Large Amphitheater tours. | Responds to Defendants' argument that Plaintiffs failed to prove a substantial group of artists with inelastic demand for amphitheaters. Defs.' Rule 50 at 6–10; Defs.' Rule 50 Reply at 3–6. | Dr. Hill quantified a substantial cohort of artists with amphitheater preferences, providing the economic foundation for the targeted-customer market that the jury credited. |
| **Weeden, Trial Tr. 3674:15–3676:22 (testifying about PX1243)** | Increasing house nut and padding, i.e., costs to artists, was a growth lever. | Responds to Defendants' arguments that Plaintiffs failed to show inelastic demand for amphitheaters or anticompetitive effects on artists, including any evidence that artists paid more because of Live Nation's conduct. Defs.' | Weeden's testimony shows that Live Nation specifically identified increasing costs to artists as a "growth lever," direct evidence of the ability to exploit monopoly |



| Evidence Cite | Description/Quote | Point it Pertains to in Defendants' Brief (Rule 59 or Rule 50) | Plaintiffs' Argument |
|---|---|---|---|
| | | Rule 50 at 5–10; Defs.' Rule 50 Reply at 3–6. | power to the detriment of artists. |
| PX1243 | Increasing house nut and padding, i.e., costs to artists, was growth lever. | Responds to Defendants' arguments that Plaintiffs failed to show inelastic demand for amphitheaters or anticompetitive effects on artists, including any evidence that artists paid more because of Live Nation's conduct. Defs.' Rule 50 at 5–10; Defs.' Rule 50 Reply at 3–6. | This document directly demonstrates anticompetitive effects on artists, the relevant consumers, through increased costs imposed by Live Nation. |
| Lovett, Depo. Tr. 92:13–94:7 | Lovett Testimony that an artist would still want to play the Orion Amphitheater over an arena even if they made 8% less because an arena show is "inherently different." | Responds to Defendants' arguments that Plaintiffs failed to show inelastic demand for amphitheaters or anticompetitive effects on artists, including any evidence that artists would pay more because of Live Nation's conduct. Defs.' Rule 50 at 5–10; Defs.' Rule 50 Reply at 3–6. | Lovett, the only artist to testify, stated he would accept 8% less to play an amphitheater, proving the inelastic demand the Court anticipated at summary judgment and directly refuting Defendants' substitutability argument. |
| PX0806 | Artist would still want to play the Orion Amphitheater over an arena even if they made 8% less. | Responds to Defendants' arguments that Plaintiffs failed to show inelastic demand for amphitheaters or anticompetitive effects on artists, including any evidence that artists would pay more because of Live Nation's conduct. Defs.' Rule 50 at 5–10; Defs.' Rule 50 Reply at 3–6. | This document corroborates Lovett's testimony and demonstrates inelastic demand for amphitheaters. |
| PX0825 | Reflecting that Live Nation amphitheaters were dark on 67% of Fridays and 64% of Saturdays. | Responds to Defendants' arguments that evidence of dark days does not show reduced output and | The high percentage of dark weekend days demonstrates reduced output in the |

| Evidence Cite | Description/Quote | Point it Pertains to in Defendants' Brief (Rule 59 or Rule 50) | Plaintiffs' Argument |
|---|---|---|---|
| | | says nothing about competition in any promotion services market. Defs.' Rule 50 at 11; Defs.' Rule 50 Reply at 4. | amphitheater market: Live Nation's monopoly power allows it to leave venues underutilized rather than admit rival promoters. |
| **Roux, Trial Tr. 1229:8–21** | Q. "OK. And, Mr. Roux, one of the strategies that Live Nation has pursued to expand its amphitheater business is to try to either acquire or to obtain the exclusive rights at amphitheaters that it doesn't control at that time, correct? A. I mean, if you look at the last, you know, four or five years, when we have an opportunity to invest in a business that fits in well with what we have, we'll do that. Q. You'll go out and acquire an amphitheater if it's available and it fits your business, correct? A. If it makes sense, yes." | Responds to Defendants' argument that Plaintiffs failed to prove Live Nation unlawfully acquired monopoly power in large amphitheaters, including because Live Nation acquired only four amphitheaters by ownership or lease since 2015 and older acquisitions are time-barred. Defs.' Rule 50 at 3–4; Defs.' Rule 50 Reply at 2–3. | Roux's testimony confirms Live Nation's ongoing strategy to acquire and expand its amphitheater portfolio, directly rebutting Defendants' claim that acquisitions are time-barred or inconsequential. |
| **Campana, Trial Tr. 1484:7–25 (testifying about PX0417).** | "Then the next one is: Stop the threat of AEG from acquiring the venue and entering the Atlanta market, where they currently have no venue presence. Do you see that? A. I do see that. Q. So another justification here was to prevent a competitor from entering this market, right? That's what it says. A. Yes, if we win the RFP, it would be keeping all of the | Responds to Defendants' arguments that Plaintiffs failed to prove unlawful amphitheater acquisitions by showing a larger strategy among Live Nation executives of acquisitions for exclusionary purposes only. Defs.' Rule 50 at 3–5; Defs.' Rule 50 Reply at 2–3. | Campana's testimony demonstrates a long-time strategic approach to acquisitions that included preventing competition from establishing itself in Live Nation's markets. |



| Evidence Cite | Description/Quote | Point it Pertains to in Defendants' Brief (Rule 59 or Rule 50) | Plaintiffs' Argument |
|---|---|---|---|
| | other suiters [sic] out of that building. | | |
| **PX0417 at "Strategic Justification" tab** | Acquisition scenario modeling which included "Stop the threat of AEG from acquiring the venue and entering the Atlanta market, where they currently have no venue presence" as a "Strategic Justification for pursuing the deal" | Responds to Defendants' arguments that Plaintiffs failed to prove unlawful amphitheater acquisitions by showing a larger strategy among Live Nation executives of acquisitions for exclusionary purposes only. Defs.' Rule 50 at 3–5; Defs.' Rule 50 Reply at 2–3. | This document demonstrates Live Nation's long-time strategic approach to acquisitions that included preventing competition from establishing itself in Live Nation's markets |
| **PX0885** | November 2022 email from Jordan Zachary stating: "decision was made to not give up [Montage amphitheater] which competitor could snap up. So extend lease." | Responds to Defendants' arguments that Plaintiffs failed to prove unlawful amphitheater acquisitions and that any relevant acquisition conduct is time-barred. Defs.' Rule 50 at 3–5; Defs.' Rule 50 Reply at 2–3. | This 2022 internal email demonstrates Live Nation's continued strategy of maintaining monopoly power by refusing to relinquish amphitheaters specifically to prevent competitors from acquiring them, willful maintenance of monopoly power within the limitations period. |
| **Groetzinger, Trial Tr. 751:9–752:15** | Groetzinger testifying that SeatGeek targeted Major League Soccer stadiums because "[t]hey have either no concerts or very few concerts" and that all the other venues SeatGeek talked to that had concerts "expressed extreme levels of concern around the concert issue … that if they moved to SeatGeek, they would lose concerts" and | Responds to Defendants' challenge to Plaintiffs' vulnerability theory for targeted-customer markets. Defs.' Rule 50 at 15–16. | Groetzinger's testimony directly demonstrates that concert dependency creates the vulnerability underlying the targeted customer market. |



| Evidence Cite | Description/Quote | Point it Pertains to in Defendants' Brief (Rule 59 or Rule 50) | Plaintiffs' Argument |
|---|---|---|---|
| | "would get fewer concerts from Live Nation." | | |
| **Khoury, Trial Tr. 1649:12–15** | Khoury testifying that team owners do not allow JUMP to take over concerts because they "typically are concerned of losing concert revenue by moving off of their current solutions." | Responds to Defendants' challenge to Plaintiffs' vulnerability theory for targeted-customer markets. Defs.' Rule 50 at 15–16. | Khoury's testimony from a competing ticketing company confirms the mechanism of Ticketmaster's market power: venues that depend on concerts are locked in because they cannot risk losing concert revenue by switching ticketing providers. |
| **Granger, Trial Tr. 2648:6–13** | Ticketmaster maintained different backend inventory systems depending on the type of ticketing—Archtics for sports ticketing, and Host for concert ticketing. | Responds to Defendants' argument that MCVs do not have ticketing needs sufficiently distinct from other venues to support a separate market. Defs.' Rule 50 at 17–18. | Ticketmaster's own internal systems confirm that concert ticketing and sports ticketing are functionally distinct business lines requiring different infrastructure, corroborating the jury's finding of a separate MCV ticketing market. |
| **Khoury, Trial Tr. 1618:24–1619:6** | Khoury testifying about sports-specific capabilities of Archtics. | Responds to Defendants' argument that MCVs do not have ticketing needs sufficiently distinct from other venues to support a separate market. Defs.' Rule 50 at 17–18. | A competitor ticketer's executive demonstrates the distinct service requirements for concert ticketing versus sports ticketing, reinforcing the separate market finding. |
| **Luter, Dep. Tr. 79:15–81:3** | Luter testifying MCVs have an acute need for ticketing systems able to handle high | Responds to Defendants' argument that MCVs do not have ticketing needs | An industry witness confirms the fundamental |



| Evidence Cite | Description/Quote | Point it Pertains to in Defendants' Brief (Rule 59 or Rule 50) | Plaintiffs' Argument |
|---|---|---|---|
| | volumes all at once because concerts have a set date and time for an on-sale, where the ticketing system will "get just crushed with traffic," whereas sports tickets typically have drawn-out sales and many season tickets. | sufficiently distinct from other venues to support a separate market. Defs.' Rule 50 at 17–18. | technological distinction between concert and sports ticketing: concerts require massive simultaneous-capacity infrastructure, while sports sales are distributed over time. This structural difference supports the jury's finding that MCVs constitute a distinct market. |
| **Jacoby, Trial Tr. 3513:14– 3514:4** | Jacoby testifying that queues not moving during on-sales is an issue because "[i]f it's taking a long time, they, at some point, may opt out" and not purchase a ticket. | Responds to Defendants' argument that MCVs do not have ticketing needs sufficiently distinct from other venues to support a separate market. Defs.' Rule 50 at 17–18. | Defendants' own witness acknowledged that concert on-sale performance is critical because delays cause lost sales, further demonstrating the distinct, high-capacity ticketing needs of MCVs. |
| **Marcus, Trial Tr. 2908:9–15** | Marcus testifying that a concert on-sale is a key opportunity for bots and bad actors to abuse the system. | Responds to Defendants' argument that MCVs do not have ticketing needs sufficiently distinct from other venues to support a separate market. Defs.' Rule 50 at 17–18. | Ticketmaster's own executive confirms that concert on-sales create unique security challenges from bots and bad actors, a challenge specific to the high-volume, time-compressed nature of MCV ticketing. |
| **Perez, Trial Tr. 2321:1–4** | "I would say that that's probably the constant in our business, particularly at the larger venue sector, is that you've got to be really good at defending against the bots." | Responds to Defendants' argument that MCVs do not have ticketing needs sufficiently distinct from other venues to support a | AXS's CEO confirms that bot defense is a defining requirement "particularly at the larger venue sector," demonstrating the |

**WINSTON TAYLOR.**

| Evidence Cite | Description/Quote | Point it Pertains to in Defendants' Brief (Rule 59 or Rule 50) | Plaintiffs' Argument |
|---|---|---|---|
| | | separate market. Defs.' Rule 50 at 17–18. | specialized ticketing needs that distinguish MCVs from other venues. |
| **PX1261 at -702** | Noting that "[d]emand surges during highly clustered onsale windows" and that "[a]rbitrage opportunities incentivize bots / bad actors" are unique ticketing industry dynamics and technical requirements that "[i]nfrastructure must handle highly volatile traffic during tight onsale windows with the ability to transact at scale and high-speeds; Platforms must constantly evolve to combat bots and bad actors." | Responds to Defendants' argument that MCVs do not have ticketing needs sufficiently distinct from other venues to support a separate market. Defs.' Rule 50 at 17–18. | This internal Live Nation document demonstrates the unique issues on-sales pose and the technical requirements they demand, demonstrating the specialized ticketing needs that distinguish MCVs from other venues. |
| **Marcus, Trial Tr. 2838:16–19** | Ticketmaster maintained distinct departments for sports and concert ticketing and clients in each had "different needs." | Responds to Defendants' argument that MCVs do not have ticketing needs sufficiently distinct from other venues to support a separate market. Defs.' Rule 50 at 17–18. | Ticketmaster's own executive acknowledged that its internal organizational structure maintained separate departments for sports and concert ticketing and admitted that the clients for each – i.e., venues – had different needs, further demonstrating the specialized ticketing needs that distinguish MCVs from other venues. |
| **Hill, Trial Tr. 2087:8–16** | Dr. Hill testifying that he reviewed documents that refer to "ten-plus" concerts as being an appropriate cutoff and others that used a different threshold and concluded it was | Responds to Defendants' argument that the ten-concert threshold for MCVs is arbitrary and unsupported. Defs.' Rule 50 at 9, 14. | Dr. Hill's threshold was supported by documentary evidence. |

**WINSTON TAYLOR.**

| Evidence Cite | Description/Quote | Point it Pertains to in Defendants' Brief (Rule 59 or Rule 50) | Plaintiffs' Argument |
|---|---|---|---|
| | appropriate to use the ten-concert threshold because he was focused on competition related to the "live entertainment industry, in particular concerts." | | |
| **Hill, Trial Tr. 2097:17–2098:2** | Dr. Hill testifying that he tested different thresholds (five and 15 concerts) as a robustness check on his market definition and found that Ticketmaster's market share did not materially change when these different thresholds were used. | Responds to Defendants' argument that the ten-concert threshold for MCVs is arbitrary. Defs.' Rule 50 at 9, 14. | The robustness check confirms that Ticketmaster's monopoly share is not an artifact of the particular threshold chosen; the higher share persists whether five, ten, or fifteen concerts is used. |
| **Weeden, Trial Tr. 3601:2–7** | Weeden testifying that Live Nation maintains separate lines of business for large amphitheaters and boutique amphitheaters and that large amphitheaters have "the highest AOI of any venue type." | Responds to Defendants' argument that the capacity and concert thresholds are arbitrary. Defs.' Rule 50 at 9, 14. | Defendants' own executive confirms that Live Nation itself distinguishes between "large" and "boutique" amphitheaters, as separate business segments with distinct economics, directly validating the capacity-based market definition. |
| **Abrantes-Metz, Trial Tr. 2579:7–14** | Abrantes-Metz testifying that upfront payments "are a lump sum payment at the beginning, at the contract, that the venues receive, typically for other services, such as sponsorship agreements. So they're not typically 'just a cash-in for nothing in return.'" | Responds to Defendants' argument that Dr. Abrantes-Metz improperly failed to deduct upfront payments from her damages estimate. Defs.' Rule 50 at 28–29; Defs' Rule 50 Reply at 12–13. | Dr. Abrantes-Metz directly addressed and considered upfront payments and concluded they were typically made in exchange for other services – not as offsets to per-ticket pricing – supporting her decision not to deduct them from |

| Evidence Cite | Description/Quote | Point it Pertains to in Defendants' Brief (Rule 59 or Rule 50) | Plaintiffs' Argument |
|---|---|---|---|
| | | | marginal cost estimates. |
| **Abrantes-Metz, Trial Tr. 2579:15–2580:7** | Testifying that because she was estimating ticket fee pricing in the but-for world and not "profitability," she should not deduct upfront payments because fixed upfront payments do not impact pricing. | Responds to Defendants' argument that Dr. Abrantes-Metz improperly failed to deduct upfront payments from her damages estimate. Defs.' Rule 50 at 28–29; Defs' Rule 50 Reply at 12–13. | Dr. Abrantes-Metz applied a foundational economic principle – price equals marginal cost in competitive markets – to conclude that fixed upfront payments are irrelevant to estimating marginal per-ticket pricing, the precise methodology validated by the economist amici. |
| **J. Johnson, Trial Tr. 3813:13–17** | Testifying that upfront payments were generally something that venues received in exchange for something else of value. | Responds to Defendants' argument that Dr. Abrantes-Metz improperly failed to deduct upfront payments from her damages estimate. Defs.' Rule 50 at 28–29; Defs' Rule 50 Reply at 12–13. | Defendants' own witness confirmed that upfront payments were made in exchange for value (sponsorship, marketing rights, etc.), not as a substitute for or offset to per-ticket charges, corroborating Dr. Abrantes-Metz's treatment. |
| **Abbamondi, Trial Tr. 229:10–230:2** | Fixed sponsorship payments were in exchange for advertising rights such as signage or naming a gate. | Responds to Defendants' argument that Dr. Abrantes-Metz improperly failed to deduct upfront payments from her damages estimate. Defs.' Rule 50 at 28–29; Defs' Rule 50 Reply at 12–13. | A venue witness confirmed that upfront payments were made in exchange for value (e.g., advertising rights), not as a substitute for or offset to per-ticket charges, corroborating Dr. Abrantes-Metz's treatment. |



| Evidence Cite | Description/Quote | Point it Pertains to in Defendants' Brief (Rule 59 or Rule 50) | Plaintiffs' Argument |
|---|---|---|---|
| **W. Johnson, Dep. Tr. 59:21–60:18** | Testifying that upfront payments included those for marketing opportunities, enhancements for the guest experience, and enhancement for the artist experience backstage. | Responds to Defendants' argument that Dr. Abrantes-Metz improperly failed to deduct upfront payments from her damages estimate. Defs.' Rule 50 at 28–29; Defs' Rule 50 Reply at 12–13. | A Ticketmaster witness confirmed that upfront payments covered marketing, guest enhancements, and artist backstage improvements – not ticket-fee offsets – further demonstrating these are separate consideration items unrelated to marginal pricing. |
| **Perez, Trial Tr. 2433:9–19** | "Q.  Are there differences in the on-sale demands between stadiums on the one hand and arenas and amphitheaters on the other hand with respect to concerts?  A.  The arenas and amphitheaters tend to be a little bit more intense. . . . when you go to the stadium and there's 60,000 seats, there's plenty of seats for everyone, so it can be slightly less acute in terms of that demand." | Responds to Defendants' argument that MCVs do not have ticketing needs sufficiently distinct from other venues to support a separate market. Defs.' Rule 50 at 17–18. | AXS's CEO confirms that MCVs have more intense on-sale demands than stadiums due to their lower capacity. |
| **Kelly, Trial Tr. 1590:1–9** | "So the tickets will all come out at 10:00 a.m. or noon on a day.  So when I find out about it, I often just put an alert in my phone to let me know that I have to go on the website at that time . . . and then when you get in and the tickets go on sale, you end up in a queue, an electronic queue.  So often you'll see that there will be 60,000 people in front of you in the queue.. | Responds to Defendants' argument that MCVs do not have ticketing needs sufficiently distinct from other venues to support a separate market. Defs.' Rule 50 at 17–18. | A fan witness confirms that it is particularly important for MCVs' ticketing providers to be able to effectively handle "on-sales" – dates where tickets are released and generate massive demand in a short time frame.  This is often how concert tickets are released. |

| Evidence Cite | Description/Quote | Point it Pertains to in Defendants' Brief (Rule 59 or Rule 50) | Plaintiffs' Argument |
| --- | --- | --- | --- |
| **Yovich, Trial Tr. 2770:18–22** | "Well, we had huge numbers in these queues [for Taylor Swift tickets], millions of people that had turned up that day to join those queues" | Responds to Defendants' argument that MCVs do not have ticketing needs sufficiently distinct from other venues to support a separate market. Defs.' Rule 50 at 17–18. | A Ticketmaster witness confirms that it is particularly important for MCVs' ticketing providers to be able to effectively handle "on-sales" – dates where tickets are released and generate massive demand in a short time frame. This is often how concert tickets are released. |
| PX0592; Roux, Trial Tr. 1242:19–23; Roux, Trial Tr. 1243:7–13; Roux, Trial Tr. 1271:6–11; Roux, Trial Tr. 1386:3–10; Hill, Trial Tr. 2267:5–23; Campana, Trial Tr. 1457:22–1458:15; Weeden, Trial Tr. 3637:1–8; Weeden, Trial Tr. 3645:19–25; Roux, Trial Tr. 1260:11–1263:6; Weeden, Trial Tr. 3591:23–3592:18; Weeden, Trial Tr. 3648:20–3649:14; Hill, Trial Tr. | Evidence regarding Live Nation's acquisition of control over amphitheaters. | Responds to Defendants' argument that Plaintiffs failed to prove that Live Nation unlawfully acquired monopoly power in the Large Amphitheaters market. Defs' Rule 50 at 2–6. | The jury could infer, based on this evidence, Live Nation's anticompetitive maintenance of its monopoly. |

**WINSTON
TAYLOR.**

| Evidence Cite | Description/Quote | Point it Pertains to in Defendants' Brief (Rule 59 or Rule 50) | Plaintiffs' Argument |
|---|---|---|---|
| 2135:3–2136:20 | | | |